1  NICOLA T. HANNA
   United States Attorney
2  BRANDON D. FOX
   Assistant United States Attorney
3  Chief, Criminal Division
   JULIAN L. ANDRÉ (Cal. Bar No. 251120)
4  Assistant United States Attorney
   Major Frauds Section
5       1100 United States Courthouse
        312 North Spring Street
6       Los Angeles, California 90012
        Telephone: (213) 894-6683
7       Facsimile: (213) 894-6269
        Email:    Julian.L.Andre@usdoj.gov
8
   BRETT A. SAGEL (Cal. Bar No. 243918)
9  Assistant United States Attorney
        Ronald Reagan Federal Building
10      411 West Fourth Street, Suite 8000
        Santa Ana, California 92701
11      Telephone:  (714) 338-3598
        Facsimile:  (714) 338-3708
12      Email:    Brett.Sagel@usdoj.gov
13 Attorneys for Plaintiff
   UNITED STATES OF AMERICA
14
                  UNITED STATES DISTRICT COURT
15
              FOR THE CENTRAL DISTRICT OF CALIFORNIA
16
                      SOUTHERN DIVISION
17
   UNITED STATES OF AMERICA,          SA CR No. 19-061-JVS
18
             Plaintiff,               DOCUMENT
19
                  v.                  **[IN CAMERA]**
20
   MICHAEL JOHN AVENATTI,             **[UNDER SEAL]**
21
             Defendant.
22

**UNDER SEAL**

NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
JULIAN L. ANDRÉ (Cal. Bar No. 251120)
Assistant United States Attorney
Major Frauds Section
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-6683
    Facsimile: (213) 894-6269
    Email:    Julian.L.Andre@usdoj.gov

BRETT A. SAGEL (Cal. Bar No. 243918)
Assistant United States Attorney
    Ronald Reagan Federal Building
    411 West Fourth Street, Suite 8000
    Santa Ana, California 92701
    Telephone:  (714) 338-3598
    Facsimile:  (714) 338-3708
    Email:    Brett.Sagel@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>         v.<br><br>MICHAEL JOHN AVENATTI,<br><br>      Defendant. | SA CR No. 19-061-JVS<br><br>DECLARATION OF REMOUN KARLOUS IN SUPPORT OF THE GOVERNMENT'S MOTION FOR AN ARREST WARRANT, ORDER REVOKING PRETRIAL RELEASE, AND ORDER OF DETENTION<br><br>**[IN CAMERA]**<br><br>**[UNDER SEAL]** |

1
<u>**DECLARATION OF REMOUN KARLOUS**</u>

2
I, REMOUN KARLOUS, hereby declare and state as follows:

3
**I.   Introduction**

4
1.   I am a Special Agent ("SA") with the Internal Revenue

5
Service-Criminal Investigation ("IRS-CI") in the Los Angeles Field

6
Office and have been so employed since April 1995.  As an IRS-CI SA,

7
I have investigated numerous cases involving criminal violations of

8
Title 18, Title 21, Title 26, and Title 31 of the United States Code,

9
which have resulted in seizure, search, and arrest warrants.  In

10
particular, I have investigated cases involving money laundering,

11
international money laundering, securities fraud, tax evasion

12
(domestic and international cases), and subscribing to false tax

13
returns.  I am one of the IRS-CI SAs assigned to the investigation

14
and prosecution of defendant MICHAEL JOHN AVENATTI ("defendant") in

15
<u>United States v. Avenatti</u>, SA CR No. 19-061-JVS.

16
2.   This declaration is made in support of the government's

17
Motion for: (a) a warrant for the arrest of defendant; (b) an order

18
revoking defendant's order of pretrial release; and (c) an order

19
detaining defendant pending further proceedings, in the above-

20
referenced case.  I have personal knowledge of the facts stated

21
herein and, if called as a witness, could and would testify

22
competently thereto.

23
3.   The facts set forth in this declaration are based upon my

24
personal observations, my training and experience, and information

25
obtained from various law enforcement personnel and witnesses.  This

26
declaration is intended to show that there is sufficient probable

27
cause for the requested warrant to arrest defendant for violating his

28
pre-trial release order and does not purport to set forth all of my

1   knowledge of the investigation into this matter.  Unless specifically

2   indicated otherwise, all conversations and statements described in

3   this affidavit are related in substance and in part only.

4   **II.  Prior Affidavits Submitted in Connection with the Investigation of Defendant Michael John Avenatti**

5        4.   On February 22, 2019, in case number 8:19-MJ-103, I

6   submitted an affidavit in support of an application for a warrant to

7   search seven digital devices, which had been produced by former GBUS

8   employees, in the custody of IRS-CI in Laguna Niguel, California (the

9   "February 2019 affidavit").  The Honorable Douglas F. McCormick,

10  United States Magistrate Judge, issued the warrant that same day.

11  The February 2019 affidavit is attached hereto as Exhibit 1 and

12  incorporated herein by reference.

13       5.   On March 24, 2019, in case numbers 8:19-MJ-242, 8:19-MJ-

14  243, and 8:19-MJ-244, I submitted an affidavit in support of

15  applications for warrants to search AVENATTI's residence in Los

16  Angeles and two other locations (the "March 2019 affidavit").  The

17  Honorable Douglas F. McCormick, United States Magistrate Judge,

18  issued the warrants that same day.  The March 2019 affidavit,

19  excluding any supporting exhibits, is attached hereto as Exhibit 2

20  and incorporated by reference.

21       6.   On May 24, 2019, in case number 8:19-MJ-419, I submitted an

22  affidavit in support of an application for a warrant to search ten

23  digital devices in the Custody of the Internal Revenue Service –

24  Criminal Investigation (the "May 2019 affidavit").  The Honorable

25  Douglas F. McCormick, United States Magistrate Judge, issued the

26  warrant that same day.  The May 2019 affidavit, excluding any

27

28

2

supporting exhibits, is attached hereto as Exhibit 3 and incorporated herein by reference.

**III. Defendant's Debts**

    **A.    $15 Million Debts to Jason Frank Law Group**

    7.    Attached hereto as Exhibit 4 is a true and correct copy of the settlement agreement between Eagan Avenatti LLP ("EA LLP"), defendant, Jason Frank Law Group ("JFL"), and others, which was executed in or about January 2018 in connection with _In re Eagan Avenatti, LLP_, No. 8:17-bk-11961-CB.

    8.    Attached hereto as Exhibit 5 is a true and correct copy of a final judgment issued against EA LLP and in favor of JFL in the amount of $10,000,000 on May 22, 2018, in _In re Eagan Avenatti, LLP_, No. 8:17-bk-11961-CB.

    9.    Attached hereto as Exhibit 6 is a true and correct copy of a judgment entered against defendant in favor of JFL in the amount of approximately $5,054,288 on November 10, 2018, in _Jason Frank Law, PLC v. Michael J. Avenatti_, Los Angeles Superior Court, Case No. BC706555.

    10.    Attached hereto as Exhibit 7 is a true and correct copy of excerpts from the transcript of defendant's July 25, 2018, judgment debtor examination in _In re Eagan Avenatti, LLP_, No. 8:17-bk-11961-CB, which was obtained from counsel for JFL.

    11.    Attached hereto as Exhibit 8 is a true and correct copy of excerpts from the transcript of defendant's March 15, 2019, judgment debtor examination in _Jason Frank Law, PLC v. Michael J. Avenatti_, Los Angeles Superior Court, Case No. BC706555, which was obtained from counsel for JFL.

12.   Attached hereto as Exhibit 9 is a true and correct copy of excerpts from the transcript of defendant's March 22, 2019, judgment debtor examination in In re Eagan Avenatti, LLP, No. 8:18-CV-1644-VAP (KES), which was obtained from counsel for JFL.

13.   Attached hereto as Exhibit 10 is a true and correct copy of a July 18, 2019, email to defendant and others attaching a subpoena JFL issued to J.P. Morgan Chase, which was obtained from counsel for the court-appointed receiver for EA LLP.

14.   Attached hereto as Exhibit 11 is a true and correct copy of a July 19, 2019, email to defendant and others attaching a subpoena JFL issued to the Intercontinental Hotel, which was obtained from counsel for the court-appointed receiver for EA LLP.

15.   Attached hereto as Exhibit 12 is a true and correct copy of a July 19, 2019, email defendant sent to counsel for JFL and others in response to the subpoena JFL issued to the Intercontinental Hotel, which was obtained from counsel for the court-appointed receiver for EA LLP.

16.   Attached hereto as Exhibit 13 is a true and correct copy of defendant's August 28, 2019, declaration in opposition to a motion for a turnover (excluding attachments) filed by defendant in Jason Frank Law, PLC v. Michael J. Avenatti, Los Angeles Superior Court, Case No. BC706555, which was obtained from counsel for JFL.

17.   Attached hereto as Exhibit 14 is a true and correct copy of excerpts from the transcript of defendant's October 18, 2019, judgment debtor examination in Jason Frank Law, PLC v. Michael J. Avenatti, Los Angeles Superior Court, Case No. BC706555, which was obtained from counsel for JFL.

**B.   $2.2 Million Debt to William J. Parrish**

18.   Attached hereto as Exhibit 15 is a true and correct copy of a judgment entered against defendant in favor of William J. Parrish in the amount of approximately $2,194,302 in <u>Parrish v. Avenatti</u>, Santa Barbara Superior Court Case No. 18CV04106, which was obtained from counsel for Mr. Parrish.

19.   Attached hereto as Exhibit 16 is a true and correct copy of the docket report from <u>Parrish v. Avenatti</u>, Santa Barbara Superior Court Case No. 18CV04106.

20.   Attached hereto as Exhibit 17 is a true and correct copy of the August 26, 2019, proof of service for a notice of judgment debtor examination of defendant filed in <u>Parrish v. Avenatti</u>, Santa Barbara Superior Court Case No. 18CV04106, which was obtained from counsel for Mr. Parrish.

21.   Attached hereto as Exhibit 18 is a true and correct copy of a notice of failure to appear for order examination filed on September 16, 2019, in <u>Parrish v. Avenatti</u>, Santa Barbara Superior Court Case No. 18CV04106, which was obtained from counsel for Mr. Parrish.

22.   Attached hereto as Exhibit 19 is a true and correct copy of a minute order dated October 8, 2019, filed in <u>Parrish v. Avenatti</u>, Santa Barbara Superior Court Case No. 18CV04106, which was obtained from counsel for Mr. Parrish.

23.   Attached hereto as Exhibit 20 is a true and correct copy of a warrant of attachment filed on October 21, 2019, in <u>Parrish v. Avenatti</u>, Santa Barbara Superior Court Case No. 18CV04106, which was obtained from counsel for Mr. Parrish.

24.   Attached hereto as Exhibit 21 is a true and correct copy of an <u>ex parte</u> application defendant filed on October 21, 2019, in <u>Parrish v. Avenatti</u>, Santa Barbara Superior Court Case No. 18CV04106, which was obtained from counsel for Mr. Parrish.

25.   Attached hereto as Exhibit 22 is a true and correct copy of a recall of warrant of attachment filed on October 23, 2019, in <u>Parrish v. Avenatti</u>, Santa Barbara Superior Court Case No. 18CV04106, which was obtained from counsel for Mr. Parrish.

26.   Attached hereto as Exhibit 23 is a true and correct copy of excerpts from the October 29, 2019, judgment debtor examination of defendant in <u>Parrish v. Avenatti</u>, Santa Barbara Superior Court Case No. 18CV04106, which was obtained from counsel for Mr. Parrish.

**C.    $2.5 Million in Child and Spousal Support Debt**

27.   Attached hereto as Exhibit 24 is a true and correct copy of the Stipulation and Order Thereon For Temporary Custody and Support filed on April 23, 2018, in <u>Michael Avenatti v. Lisa Storie-Avenatti</u>, Orange County Superior Court, Case No. 17D009930, obtained from the Orange County Superior Court.

28.   Attached hereto as Exhibit 25 is a true and correct copy of the Findings and Order After Hearing filed on October 22, 2018, in <u>Michael Avenatti v. Lisa Storie-Avenatti</u>, Orange County Superior Court, Case No. 17D009930, obtained from the Orange County Superior Court.

29.   Attached hereto as Exhibit 26 is a true and correct copy of the Stipulation and Order Thereon filed on December 4, 2018, in <u>Michael Avenatti v. Lisa Storie-Avenatti</u>, Orange County Superior Court, Case No. 17D009930, obtained from the Orange County Superior Court.

30.   Attached hereto as Exhibit 27 is a true and correct copy of the Turnover Order (CCP §699.040) filed on January 25, 2019, in <u>Michael Avenatti v. Lisa Storie-Avenatti</u>, Orange County Superior Court, Case No. 17D009930, obtained from the Orange County Superior Court.

31.   Attached hereto as Exhibit 28 is a true and correct copy of the Order denying Respondent's request of temporary emergency order filed on February 14, 2019, in <u>Michael Avenatti v. Lisa Storie-Avenatti</u>, Orange County Superior Court, Case No. 17D009930, obtained from the Orange County Superior Court.

32.   Attached hereto as Exhibit 29 is a true and correct copy of the Order To Deliver Specific Property filed on April 4, 2019, in <u>Michael Avenatti v. Lisa Storie-Avenatti</u>, Orange County Superior Court, Case No. 17D009930, obtained from the Orange County Superior Court.

33.   Attached hereto as Exhibit 30 is a true and correct copy of the Order To Show Cause And Affidavit For Contempt filed on June 5, 2019, in <u>Michael Avenatti v. Lisa Storie-Avenatti</u>, Orange County Superior Court, Case No. 17D009930, obtained from the Orange County Superior Court.

34.   Attached hereto as Exhibit 31 is a true and correct copy of the Minute Order filed on December 13, 2019, in <u>Michael Avenatti v. Lisa Storie-Avenatti</u>, Orange County Superior Court, Case No. 17D009930, obtained from the Orange County Superior Court.

35.   Attached hereto as Exhibit 32 is a true and correct copy of the Ruling On Submitted Matter filed on October 28, 2019, in <u>Michael Avenatti v. Lisa Storie-Avenatti</u>, Orange County Superior Court, Case No. 17D009930, obtained from the Orange County Superior Court.

36.   Attached hereto as Exhibit 33 is a true and correct copy of the Certificate Of Sale Of Personal Property dated August 20, 2019, in <u>Michael Avenatti v. Lisa Storie-Avenatti</u>, Orange County Superior Court, Case No. 17D009930, which defendant submitted as an exhibit to defendant's August 28, 2019, declaration in opposition to a motion for a turnover filed by JFL in <u>Jason Frank Law, PLC v. Michael J. Avenatti</u>, Los Angeles Superior Court, Case No. BC706555.

**D.    $1.5 Million Debt to Washington Department of Revenue**

37.   Attached hereto as Exhibit 34 is a true and correct copy of a Warrant for Unpaid Taxes the Washington Department of Revenue filed on January 17, 2019, in Thurston County Superior Court for the State of Washington, obtained from the Washington Department of Revenue.

38.   Attached hereto as Exhibit 35 is a true and correct copy of Levy Raw Data obtained from J.P. Morgan Chase Bank ("Chase") relating to defendant's Chase Bank account.  Based on my review of this document and the tax warrant attached hereto as Exhibit 34, I know that this document reflects a levy issued to Chase by the Washington Department of Revenue on or about June 14, 2019.

39.   Attached hereto as Exhibit 36 is a true and correct copy of the Notice and Order to Withhold and Deliver the Washington Department of Revenue served on U.S. Bank on or about August 26, 2019, obtained from U.S. Bank.

40.   Based on my training and experience and information I have obtained throughout this investigation, I know that when a levy is issued to a bank the available funds in the account at the time the levy is received are withheld from the account holder and then paid over to the party that issued the levy within 10 to 14 days.  The fact that a levy was issued and funds have been withheld is visible

8

on the account holder's bank statements at the time the levy is issued.

**IV.   Defendant's Receipt of $1,000,000 Settlement Payment in May 2019**

41.   Attached hereto as Exhibit 37 are true and correct (redacted) copies of records IRS-CI obtained from a hotel group relating to a $3,000,000 settlement involving an individual named E.S. who was represented by Avenatti & Associates, APC ("A&A")

42.   Attached hereto as Exhibit 38 is a true and correct (redacted) copy of a $1,000,000 check from the hotel group's insurer, Chubb Insurance Group ("Chubb"), to defendant dated April 30, 2019, obtained from Chubb.

43.   Based on my review of Exhibits 37 and 38, I have learned the following:

a.   In early March 2019, A&A began representing E.S. in connection with potential civil litigation against the hotel group.

b.   On or about April 17, 2019, defendant negotiated a $3,000,000 settlement with the hotel group on behalf of E.S.

c.   The settlement agreement required that $2,000,000 be paid directly to E.S. and $1,000,000 be paid directly to defendant personally.

d.   On or about April 30, 2019, the hotel group's insurer, Chubb, issued a $1,000,000 check to defendant personally.

44.   The name of A&A's client, E.S., and the name of the hotel group have been redacted from Exhibits 37 and 38 to protect these third-parties' privacy rights.

9

## V.   Bank Account Records

45.   Attached hereto as Exhibit 39 are true and correct (redacted) copies of records IRS-CI obtained from Chase relating to defendant's personal checking account x0911 at Chase.

46.   Attached hereto as Exhibit 40 are true and correct (redacted) copies of records IRS-CI obtained from U.S. Bank, relating to Christine A. Carlin's Easy Checking account x7252 at U.S. Bank and defendant's Platinum Select Money Market Savings account x8595 at U.S. Bank.

47.   Attached hereto as Exhibit 41 are true and correct (redacted) copies of additional records IRS-CI obtained from U.S. Bank, relating to Christine A. Carlin's Easy Checking account x7252 at U.S. Bank and defendant's Platinum Select Money Market Savings account x8595 at U.S. Bank.

48.   Attached hereto as Exhibit 42 is a spreadsheet I prepared summarizing the financial transactions relating to defendant's Platinum Select Money Market Savings account x8595 at U.S. Bank. This spreadsheet is based upon the various records U.S. Bank produced to IRS-CI.

49.   Based on my training and experience, I know that individuals that purchase cashier's checks in their own name and hold on to the cashier's checks, typically do so to evade creditors and law enforcement, specifically to prevent the seizure of the funds.

50.   On or about January 10, 2019, I spoke with Mark Witzal, who is a law enforcement liaison with U.S. Bank.  Mr. Witzal informed me that in order for an individual to purchase or deposit a cashier's check at a U.S. Bank branch in California, it would be necessary for U.S. Bank to electronically transmit data relating to the transaction

from the individual bank teller's computer terminal to U.S. Bank's computer servers, which are maintained in Kansas.  Accordingly, any purchase or deposit of a cashier's check at a U.S. Bank branch in California would necessarily result in an electronic interstate wire communication.

**VI.  The Purchase of the 2014 Mercedes Benz S550**

51.  Attached hereto as Exhibit 43 are true and correct (redacted) copies of records IRS-CI obtained from Mercedes Benz of Arcadia relating to the purchase of a 2014 Mercedes Benz S550 ("S550").

52.  On or about January 8, 2020, I participated in an interview with J.O., a salesman at Mercedes Benz of Arcadia.  In summary, J.O., provided me with the following information:

a.  On May 6, 2019, defendant spoke with J.O. regarding the S550 that the dealership had for sale, and J.O. sent photographs of the car to defendant.  Defendant stated that he would come into the dealership to look at the car and defendant did so later that day.  Defendant filled out the paperwork to purchase the vehicle. After defendant told J.O. that he would be registering the S550 out-of-state, J.O. told defendant that the dealership would need to transport the car to the state where the car is registered. Defendant told J.O. that defendant's business manager would wire the money into the dealership to purchase the car.

b.  On May 8, 2019, the money to purchase the car had not arrived so J.O. called defendant.  Defendant told J.O. that defendant was no longer interested in buying the car, but defendant knew someone that was interested in buying the S550.  Defendant returned to the dealership on May 9, 2019 with Carlin and another individual;

11

defendant told J.O. that Carlin was defendant's ex-wife.  Because
Carlin wanted to purchase the S550 with a cashier's check, J.O. told
her the dealership's policy required J.O. to accompany Carlin to the
bank to purchase the cashier's check.  J.O. followed Carlin and
defendant to the Arcadia Foothill Branch of US Bank and was present
inside the bank when Carlin purchased the cashier's check to buy the
S550.

53.  On December 17, 2019, January 1, 2020, and January 7, 2020,
I observed the silver 2014 Mercedes Benz S550 at the residence of
J.C., an individual that I know from this investigation to be
defendant's personal driver.  On December 17, 2019, I observed J.C.
driving the silver 2014 Mercedes Benz S550 from his residence without
anyone else in the vehicle.

54.  Attached hereto as Exhibit 44 is a true and correct copy of
the Declaration of Andrew D. Stolper that JFL filed on or about
December 12, 2019, in connection with a motion for a turnover order
in Jason Frank Law, PLC v. Michael J. Avenatti, Los Angeles Superior
Court, Case No. BC706555, obtained from counsel for JFL.

**VII. Exclusive Resorts Membership**

55.  Attached hereto as Exhibit 45 are true and correct copies
of records IRS-CI obtained from Exclusive Resorts.

I declare under penalty of perjury under the laws of the United
States that the foregoing is true and correct to the best of my
knowledge and that this declaration has been executed on January 14,
2019, in Laguna Niguel, California.

REMOUN KARLOUS
Special Agent, Internal Revenue
Service - Criminal Investigation

12

# EXHIBIT 1

# AFFIDAVIT

## TABLE OF CONTENTS

I.    INTRODUCTION.........................................1

II.   PURPOSE OF AFFIDAVIT.................................1

III.  SUMMARY OF PROBABLE CAUSE...........................3

IV.   STATEMENT OF PROBABLE CAUSE........................12

      A.   Federal Tax Obligations........................12

           1.   Federal Payroll Tax Obligations...........12

           2.   Federal Income Tax Obligations for
                Corporations, Partnerships, and Limited
                Liability Companies.......................14

           3.   Federal Income Tax Obligations for
                Individuals...............................14

      B.   Background Information.........................15

      C.   Tax Offenses Relating to Global Baristas US LLC
           (GBUS) and Global Baristas LLC (GB LLC)........18

           1.   Tax Information Regarding GBUS and GB LLC..18

           2.   The IRS Payroll Tax Collection Case.......21

           3.   GBUS Employee Interviews..................38

           4.   Information Regarding TSYS Merchant
                Solutions.................................81

           5.   Information Regarding The Boeing Company...86

           6.   Preliminary Review of GBUS and GB LLC Bank
                Account Information.......................93

           7.   GBUS Bankruptcy Proceedings...............95

      D.   Tax Offenses Relating to Eagan Avenatti LLP (EA
           LLP) and Avenatti & Associates, APC (A&A).......97

           1.   The IRS Payroll Tax Collection Case.......97

           2.   EA LLP Bankruptcy Proceedings............101

           3.   Information Obtained from Paychex Regarding
                EA LLP's Payroll Taxes...................104

4.     Other Tax Information Regarding EA LLP and A&A...................................105

5.     Preliminary Review of EA LLP's and A&A's Bank Account Information..................107

E.    Tax Offenses Relating to AVENATTI's Personal Income Tax Obligations.......................108

1.     Information Regarding AVENATTI's Personal Income Tax Obligation.....................109

2.     Preliminary Review of AVENATTI's Bank Records..................................111

3.     Information Regarding the Sale of AVENATTI's Residence in Laguna Beach and Purchase of AVENATTI's Residence in Newport Beach.....115

a.    The Laguna Beach Residence..........115

b.    The Newport Beach Residence.........119

4.     Information from AVENATTI's Divorce Proceedings..............................120

5.     AVENATTI's Statements Regarding His Net Worth....................................122

F.    Fraud Offenses Relating to The Peoples Bank....123

1.     $850,000 Loan to GB LLC in January 2014...124

2.     $2,750,000 Loan to EA LLP in March 2014...126

3.     $500,000 Loan to EA LLP in December 2014..128

G.    Fraud Offenses Relating to the $1.6 Million G.B. Settlement..................................135

V.    ADDITIONAL INFORMATION REGARDING THE SUBJECT DEVICES..........................................142

A.    Collection of the Subject Devices.............142

B.    The SUBJECT DEVICES Are Unlikely to Contain Attorney-Client Privileged Communications or Records........................................147

VI.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES.........150

VII.  REQUEST FOR SEALING................................156

VIII.     CONCLUSION...................................158

Case 8:19-cr-00061-JVS   Document 78   Filed 01/14/20   Page 18 of 544   Page ID #:1088
Case 8:19-mj-00061-DUTY   *SEALED*   Document 1-1   *SEALED*   Filed 02/12/19   Page 18 of
184   Page ID #:257

## AFFIDAVIT

I, Remoun Karlous, being duly sworn, declare and state as follows:

### I.  INTRODUCTION

1.    I am a Special Agent ("SA") with the Internal Revenue Service-Criminal Investigation ("IRS-CI") in the Los Angeles Field Office and have been so employed since April 1995.  As an IRS-CI SA, I have investigated numerous cases involving criminal violations of Title 18, Title 21, Title 26, and Title 31 of the United States Code, which have resulted in seizure, search, and arrest warrants.  In particular, I have investigated cases involving money laundering, international money laundering, securities fraud, tax evasion (domestic and international cases), and subscribing to false tax returns.

### II.  PURPOSE OF AFFIDAVIT

2.    This affidavit is made in support of an application for a warrant to search the forensic images of the following digital devices, which are currently held in the custody of IRS-CI in Laguna Niguel, California:

       a.    Dell XPS 128 GB Samsung SSD, bearing serial number S1D2NSAG5000777, provided to IRS-CI by M.E.[1] on or about October 22, 2018 ("SUBJECT DEVICE 1");

---

[1]  Although the government has requested that this affidavit, as well as the search warrant and application, be filed under seal, I have referred to victims and witnesses by their initials throughout the affidavit to protect their privacy in the event the affidavit is later unsealed by the Court.

b.   Dell Precision, Model M4800, bearing service tag number 252M262, provided to IRC-CI by S.F. on or about October 21, 2018 ("SUBJECT DEVICE 2");

c.   Seagate External Hard Drive, model number SRD00F1, bearing serial number NA44HLQH, provided to IRS-CI by M.G. on or about October 22, 2018 ("SUBJECT DEVICE 3");

d.   Samsung flash drive provided to IRS-CI by V.S. on or about October 31, 2018 ("SUBJECT DEVICE 4");

e.   Seagate Hard Drive, bearing serial number 5VJC1GXV, provided to IRS-CI by A.G. on or about November 13, 2018 ("SUBJECT DEVICE 5");

f.   Veeam 2GB flash drive provided to IRS-CI by A.G. on or about November 13, 2018 ("SUBJECT DEVICE 6"); and

g.   Seagate Hard Drive, bearing serial number 5VJC1GXV, provided to IRS-CI by A.G. on or about November 20, 2018 ("SUBJECT DEVICE 7")[2] (collectively, the "SUBJECT DEVICES").

3.   The requested search warrant seeks authorization to seize any data on the SUBJECT DEVICES that constitutes evidence, contraband, instrumentalities, and/or fruits of violations of: 26 U.S.C. § 7201 (attempt to evade or defeat tax); 26 U.S.C. § 7202 (willful failure to collect or pay over tax); 26 U.S.C. § 7203 (willful failure to pay tax or file return); 26 U.S.C. § 7212 (interference with administration of internal revenue laws); 18 U.S.C. § 152 (concealment of assets in bankruptcy); 18

---

[2] As discussed in paragraphs 81-82 below, A.G. used the same hard drive to produce to IRS-CI two different sets of data. IRS-CI created two separate forensic images of the hard drive, each of which is identified herein as a separate SUBJECT DEVICE, namely SUBJECT DEVICE 5 and SUBJECT DEVICE 7.

U.S.C. § 157 (bankruptcy fraud); 18 18 U.S.C. § 371
(conspiracy); 18 U.S.C. § 1001 (false statements); 18 U.S.C.
§ 1014 (false statement to a bank or other federally insured
institution); 18 U.S.C. § 1028A (aggravated identity theft); 18
U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1344 (bank fraud); and
18 U.S.C. § 1957 (money laundering) (the "Subject Offenses"),
and any SUBJECT DEVICE which is itself or which contains
evidence, contraband, fruits, or instrumentalities of the
Subject Offenses, and forensic copies thereof.

　　　　4.　　The SUBJECT DEVICES are identified in Attachment A to
the search warrant application.  The list of items to be seized
is set forth in Attachment B to the search warrant application.
Attachments A and B are incorporated herein by reference.

　　　　5.　　The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested warrant and does
not purport to set forth all of my knowledge of or investigation
into this matter.  Unless specifically indicated otherwise, all
conversations and statements described in this affidavit are
related in substance and in part only.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

　　　　6.　　Michael J. Avenatti ("AVENATTI") was and is an
attorney licensed to practice law in the State of California.
AVENATTI practiced law through Avenatti & Associates, APC
("A&A") and Eagan Avenatti LLP ("EA LLP") in Newport Beach,

California.  AVENATTI was the sole owner of A&A, which owned 75 percent of EA LLP.

7.  AVENATTI was also the principal owner and Chief Executive Officer ("CEO") of Global Baristas US LLC ("GBUS"), which operated Tully's Coffee ("Tully's") stores in Washington and California.  In 2013, AVENATTI's company, Global Baristas LLC ("GB LLC"), acquired TC Global Inc., which previously operated Tully's, out of bankruptcy for approximately $9.2 million.  AVENATTI's company, A&A, owned 100 percent of Doppio Inc., which in turn owned 80 percent of GB LLC.  GB LLC wholly owned GBUS, which handled the day-to-day business operations of Tully's.

8.  As set forth herein, there is probable cause to believe that between at least 2011 and the present AVENATTI committed federal offenses, including the following: (a) tax offenses relating to GBUS's payroll tax obligations and AVENATTI's efforts to obstruct an IRS collection action; (b) tax offenses relating to the tax obligations of EA LLP and A&A, including the payroll tax obligations of EA LLP; (c) tax offenses relating to AVENATTI's personal tax obligations; (d) fraud-related offenses relating to loans AVENATTI and his companies obtained from The Peoples Bank in Mississippi; and (e) wire fraud, money laundering, and bankruptcy fraud offenses relating to an approximately $1.6 million settlement payment AVENATTI and EA LLP received in January 2018, but failed to transfer to EA LLP's client or disclose in federal bankruptcy proceedings involving AVENATTI and EA LLP.

9.   First, between the fourth quarter of 2015 and the fourth quarter of 2017, inclusive, GBUS failed to file employment tax returns and pay approximately $3,121,460 in federal payroll taxes, including approximately $2,390,048 in trust fund taxes, which had been withheld from GBUS employees' paychecks.  Multiple former GBUS employees have said that AVENATTI was responsible for all of GBUS's significant financial and business decisions, including the decision not to pay the payroll and trust fund taxes that GBUS owed to the IRS.  Indeed, AVENATTI was well aware of GBUS's outstanding tax obligations, yet repeatedly refused to authorize the required tax payments to the IRS.

10.   Although GBUS failed to pay to the IRS its payroll taxes between the fourth quarter of 2015 and the fourth quarter of 2017, AVENATTI caused substantial amounts of money to be transferred from GBUS's or GB LLC's bank accounts during this same time period.  For example, a preliminary analysis of GBUS's and GB LLC's bank account records shows that between 2015 and 2017 AVENATTI caused a net of approximately $1.7 million to be transferred from GBUS's or GB LLC's bank accounts to bank accounts associated with A&A or EA LLP.  This money could have and should have been used to pay GBUS payroll tax obligations.

11.   Additionally, after the IRS initiated a collection action relating to GBUS's outstanding payroll tax obligations in September 2016, issued an approximately $5,000,000 tax lien against GBUS in July 2017, and levied multiple GBUS bank accounts, AVENATTI directed repeated attempts to evade

5

collection of those payroll taxes and obstruct the IRS
collection action.  Among other things, AVENATTI took the
following steps to evade the collection of payroll taxes due to
the IRS and obstruct the IRS collection action:

      a.    In October 2016, when first contacted by an IRS
Revenue Officer ("RO 1") regarding GBUS's unpaid payroll taxes,
AVENATTI falsely stated that a third-party payroll company was
responsible for filing GBUS's payroll tax returns and making
GBUS's federal tax deposits.  AVENATTI, however, knew that
GBUS's third-party payroll company, Ceridian HCM Inc.
("Ceridian"), had discontinued the tax services it had
previously provided to GBUS and was, therefore, no longer
responsible for filing GBUS's payroll tax returns and making the
necessary federal tax deposits.  AVENATTI was well aware that
GBUS was not paying its payroll taxes.  GBUS employees
repeatedly asked him to authorize the payment of GBUS's payroll
taxes to the IRS, yet he refused to do so.

      b.    In September 2017, after IRS RO 1 advised GBUS of
the possibility of criminal proceedings and levied multiple GBUS
bank accounts, including a GBUS account at KeyBank, AVENATTI
directed GBUS employees to stop depositing cash receipts from
the Tully's stores into the account at KeyBank.  Instead, in
order to avoid the levies, AVENATTI directed GBUS employees to
deposit all cash receipts from Tully's stores into a little-used
bank account at Bank of America associated with his car racing
entity, GB Autosport, LLC ("GB Auto").  Between September 2017

and December 2017, approximately $859,784 in cash was deposited
into the GB Auto account at AVENATTI's direction.

      c.    In late-September and early-October 2017, in
order to avoid IRS levies issued to the sponsoring bank for
GBUS's merchant credit card processing accounts ("merchant
accounts"), AVENATTI directed GBUS's credit card processing
company, TSYS Merchant Solutions ("TSYS"), to change the company
name and Employer Identification Number ("EIN") associated with
the merchant accounts from GBUS to GB LLC.  AVENATTI also
directed TSYS to have all credit card receipts paid to a new
bank account under the name of GB LLC, which AVENATTI had opened
that same day in Orange County, California, instead of the bank
accounts associated with GBUS, which were already subject to the
IRS levies.

      d.    In November 2016, approximately one month after
the IRS RO first contacted AVENATTI, AVENATTI changed the name
of the party to a contract with The Boeing Company ("Boeing")
from GBUS to "GB Hospitality LLC," a company which does not
appear to have ever been registered with any government agency
or operated.  Later, in September 2017, after the IRS had issued
levies to Boeing and a number of banks with which GBUS had
accounts, Boeing cancelled the contract because GBUS had failed
to make the required commission payments.  In connection with
the cancellation of the contract, Boeing agreed to purchase two
existing Tully's "kiosks" at Boeing facilities and other Tully's
equipment in exchange for a total of $155,010 and the
forgiveness of GBUS's debt to Boeing.  Although all of the

Tully's locations were operated by GBUS, AVENATTI told an attorney at Boeing to use the name GB LLC on the two bills of sale for the kiosks and equipment, and instructed Boeing to wire the $155,010 payment to an attorney trust account associated with EA LLP rather than any of the bank accounts associated with GBUS. Had the Boeing contract and subsequent bills of sale been under the name GBUS, Boeing would not have made the $155,010 payment due to the existing GBUS tax lien. After receiving the $155,010 payment from Boeing, AVENATTI transferred the $155,010 to an A&A bank account, from which he then transferred $15,000 to his personal checking account, paid approximately $13,073 for rent at his residential apartment in Los Angeles, California, and paid approximately $8,459 to Neiman Marcus. Indeed, out of the $155,010 Boeing transferred to the EA LLP trust account, it appears that only approximately half ever ended up in GBUS's bank accounts.

12. Second, AVENATTI's other companies, EA LLP and A&A, have repeatedly failed to meet their tax obligations despite generating substantial revenues. Between 2015 and 2017, EA LLP failed to file payroll tax returns and pay approximately $2.4 million in payroll taxes, including approximately $1,279,001 in trust fund taxes that had been withheld from EA LLP employees' paychecks. Just as he did in connection with GBUS, AVENATTI lied to the IRS when initially contacted regarding EA LLP's failure to pay its payroll taxes, and falsely claimed that a third-party payroll company, Paychex, was responsible for making the required tax payments even though the payroll company had

Case 8:19-cr-00061-JVS  *SEALED*  Document 78  Filed 01/14/20  Page 26 of 544  Page ID #:1096
Case 8:19-cr-00061-JVS  *SEALED*  Document 46-1  Filed 02/22/19  Page 9 of
184   Page ID #:265

notified AVENATTI in January 2015 that it was discontinuing various payroll tax services.  Additionally, EA LLP has not filed partnership tax returns (IRS Form 1065) for the 2013, 2014, 2015, 2016, and 2017 tax years, even though EA LLP appears to have received approximately $137,890,016 of deposits into its bank accounts during these tax years.  Indeed, AVENATTI's personal website claims that AVENATTI has recovered over one billion dollars in verdicts and settlements for his clients.  Similarly, A&A has not filed corporate tax returns (IRS Form 1120S) for the 2011, 2012, 2013, 2014, 2015, 2016, or 2017 tax years, even though A&A appears to have received approximately $37,961,633 of deposits into its bank accounts during these tax years, including net payments of approximately $23,820,816 from EA LLP.

13.  Third, AVENATTI filed federal personal income tax returns for the 2009 and 2010 tax years indicating that he owed the IRS a total of approximately $850,438, plus interest and penalties.  AVENATTI, however, did not pay the IRS the amounts he owed for those tax years.  AVENATTI then failed to file personal tax returns for the 2011 through 2017 tax years.  During these tax years, AVENATTI generated substantial income and lived lavishly, yet largely failed to pay any federal income tax.  A preliminary analysis of AVENATTI's personal bank accounts reflects that AVENATTI received net payments of approximately $8,464,064 from A&A and EA LLP between 2011 to 2017.  AVENATTI also repeatedly used money that had been transferred from GBUS, GB LLC, and EA LLP to A&A to pay for

personal expenses. Further, AVENATTI received proceeds of approximately $5.4 million when he sold his home in Laguna Beach, California in 2015. Finally, in connection with recent divorce proceedings, AVENATTI's wife said that AVENATTI told her that he earned $3.7 million dollars in 2016. His wife also said that their family's monthly expenses were over $200,000 per month. Financial and escrow company records show that from approximately September 2015 to September 2016, AVENATTI and his wife rented a home in Newport Beach for $100,000 per month, after making a $1,000,000 deposit.

14. <u>Fourth</u>, between approximately January 2014 and December 2014, AVENATTI obtained three separate loans from The Peoples Bank, a federally insured bank in Mississippi: (1) a $850,500 loan to GB LLC in January 2014; (2) a $2,750,000 loan to EA LLP in March 2014; and (3) a $500,000 loan to EA LLP in December 2014. In connection with these loans, AVENATTI provided The Peoples Bank with false federal personal income tax returns for the 2011, 2012, and 2013 tax years. In these purported tax returns, AVENATTI claimed that he earned $4,562,881 in adjusted gross income in 2011, $5,423,099 in adjusted gross income in 2012, and $4,082,803 in adjusted gross income in 2013. He also claimed that he had paid to the IRS $1,600,000 in estimated tax payments in 2012, and $1,250,000 in estimated tax payments in 2013. However, AVENATTI never filed personal income tax returns for the 2011, 2012, and 2013 tax years, and did not make any estimated tax payments during the 2012 and 2013 tax years. In fact, as noted above, at the time,

10

AVENATTI still owed the IRS approximately $850,438 in unpaid personal income taxes, plus interest and penalties, from the 2009 and 2010 tax years. Additionally, in March 2014, AVENATTI provided The Peoples Bank with a 2012 federal tax return for EA LLP which claimed total income of $11,426,021 and ordinary business income of $5,819,456. However, the 2012 federal tax return EA LLP actually filed with the IRS in October 2014 claimed total income of only $6,212,605 and an ordinary business loss of $2,128,849.

15. <u>Fifth</u>, between January 2018 and November 2018, AVENATTI defrauded one of EA LLP's client, G.B., out of the client's portion of an approximately $1.6 million settlement payment. Specifically, in January 2018, AVENATTI arranged for the $1.6 million settlement payment to be transferred to one of his attorney trust accounts. Rather than transfer his client's portion of the settlement proceeds to his client, AVENATTI used the entire $1.6 million for his own purposes, including to pay for expenses relating to GBUS. He then lied to his client and claimed that the settlement payment was not due until March 2018. When the fake March 2018 deadline passed, AVENATTI led his client to believe that the $1.6 million payment had never been received. Additionally, AVENATTI failed to disclose in federal bankruptcy proceedings involving AVENATTI and EA LLP that he had received the $1.6 million settlement payment, despite being aware that he was required to do so.

16. Judy Regnier ("REGNIER") has been described by AVENATTI as his office manager, chief paralegal, and bookkeeper.

Case 8:19-cr-00061-JVS  *SEALED*  Document 78  Filed 01/14/20  Page 29 of 544  Page ID #:1099
Case 8:19-cr-00061-JVS  *SEALED*  Document 4-1  Filed 02/22/19  Page 29 of
184  Page ID #:268

She appears to have worked for EA LLP in an administrative
capacity since at least 2010.  At various times, REGNIER was a
signatory on bank accounts associated with GBUS, GB LLC, GB
Auto, EA LLP, and A&A.  REGNIER was personally involved in many
of the events described herein, including directing or executing
the transfer of funds between various entities associated with
AVENATTI, directing the actions of GBUS employees, and
transmitting signed contracts and agreements on behalf of GBUS,
GB LLC, EA LLP, or A&A to other parties.

IV.  <u>STATEMENT OF PROBABLE CAUSE</u>

**A.  Federal Tax Obligations**

     *1.  Federal Payroll Tax Obligations*

17.  Based on my training and experience, as well as
discussions with other IRS-CI SAs and IRS revenue agents, I have
learned the following regarding federal payroll taxes:

     a.  The Internal Revenue Code imposes four types of
tax with respect to wages paid to employees:  (1) income tax;
(2) Social Security tax; (3) Medicare tax; and (4) federal
unemployment tax (collectively, "payroll taxes").

     b.  Income tax is imposed upon employees based upon
the amount of wages they receive.

     c.  Social Security tax and Medicare tax are imposed
by the Federal Insurance Contributions Act, and are collectively
referred to as "FICA" taxes.  FICA taxes are imposed separately
on employees and on employers.

d.    Federal unemployment tax is imposed under the
Federal Unemployment Tax Act ("FUTA").  FUTA taxes are imposed
solely on employers.

e.    Employers are required to withhold employee FICA
taxes and income taxes from the wages paid to their employees,
and to pay over the withheld amounts to the United States.  The
employers duty to pay over income taxes required to be collected
exists even if the taxes are not actually withheld from the
employees' wages.  The employee FICA taxes and income taxes that
employers are required to withhold and pay over to the United
States are commonly referred to as "trust fund taxes" because of
the provision in the Internal Revenue Code requiring that such
taxes "shall be held to be a special fund in trust for the
United States."

f.    Employers are required to file an Employer's
Quarterly Federal Tax Return ("IRS Form 941") quarterly.  On IRS
Form 941, the employer is required to report the income tax,
Social Security tax, and Medicare tax withheld from employees'
paychecks.  The employer is also required to report and pay the
employer's portion of Social Security and Medicare tax for its
employees.

g.    Employers are required to file an Annual Federal
Unemployment (FUTA) Tax Return ("IRS Form 940") yearly.  In
connection with the IRS Form 940, the employer is required to
report its FUTA tax liability for each quarter.

Case 8:19-cr-00061-JVS   Document 78   Filed 01/14/20   Page 31 of 544   Page ID #:1101
Case 8:19-cr-00061-JVS * SEALED * Document 4-1 * SEALED * Filed 02/22/19   Page 31 of
184   Page ID #:270

### 2. Federal Income Tax Obligations for Corporations, Partnerships, and Limited Liability Companies

18.  Based on my training and experience, as well as
discussions with other IRS-CI SAs and IRS revenue agents, I have
learned the following regarding federal income tax obligations
for corporations, partnerships, and limited liability companies,
such as GBUS, GB LLC, EA LLP, and A&A:

   a.   Under 26 U.S.C. § 6012(a)(1)(A), corporations and
partnerships are required to file tax returns yearly,
irrespective of their income.  Similarly, the general rule is
that every partnership shall file a return for each taxable
year.  Single-member LLCs are treated as disregarded entities
for tax purposes unless they affirmatively elect to be treated
as corporations.

### 3. Federal Income Tax Obligations for Individuals

19.  Based on my training and experience, as well as
discussions with other IRS-CI SAs and IRS revenue agents, I have
learned the following regarding federal income tax obligations
for individuals:

   a.   Under 26 U.S.C. § 6012, "every individual having
for the taxable year gross income which equals or exceeds the
exemption amount" is required to file a federal tax return.  The
receipt of a specified amount of gross income generally
determines whether an income tax return must be filed.  The
threshold gross income amount for a married person filing

separately for the 2011 to 2017 tax years ranged from $3,700 to $4,050.[3]

b. Gross income is defined as all income from whatever source derived, including, but not limited to, the following items: (1) compensation for services, including fees, commissions, fringe benefits, and similar items; (2) gross income derived from business; (3) gains derived from dealings in property; and (4) distributive shares of partnership gross income.

**B.  Background Information**

20. Based on publicly available information and other information obtained during the course of this investigation, I have learned the following information regarding AVENATTI and his various companies:

a. AVENATTI is a plaintiff's attorney in Southern California. At all relevant times, AVENATTI lived and worked in Orange County and Los Angeles County, within the Central District of California.

b. In 2006, AVENATTI incorporated A&A, a California subchapter S corporation. In 2007, AVENATTI formed the law firm Eagan O'Malley & Avenatti LLP. In approximately December 2010, O'Malley left the partnership and the firm changed its name to Eagan Avenatti LLP. As recently as January 2019, AVENATTI was still practicing law under the name Eagan Avenatti LLP. According to AVENATTI's website, www.avenatti.com, he has

---

[3] Although AVENATTI was married to L.S. during the 2011 to 2017 tax years, based on my review of IRS tax records I know that L.S. filed separate tax returns during each of these years.

Case 8:19-cr-00061-JVS * Document 78 Filed 01/14/20 Page 33 of 544 Page ID #:1103
Case 8:19-cr-00061-JVS * SEALED * Document 7 Filed 04/14/20 Page 33 of 544 Page ID #:193 of
184   Page ID #:272

obtained over "$1 billion in verdicts and settlements as lead
counsel" in cases throughout the country.  AVENATTI has become a
well-known public figure due to his representation of the
plaintiff in <u>Stephanie Clifford v. Donald J. Trump</u>, No. 2:18-CV-
2217-SJO-FFM (C.D. Cal.), a lawsuit against the President of the
United States,[4] and frequent appearances on cable news shows.

     c.   EA LLP's office was located in Newport Beach,
California until at least in or around November 2018.

     d.   AVENATTI has been since at least July 2013 the
principal owner and CEO of GBUS, which operated Tully's stores
in Washington and California.[5]  GBUS's corporate offices were
located in Seattle, Washington.  In 2013, AVENATTI's company, GB
LLC, acquired TC Global Inc., which previously operated Tully's,
at a bankruptcy auction for approximately $9.2 million.

     e.   During civil depositions taken in October 2016
and July 2017 in connection with <u>Bellevue Square LLC v. Global</u>
<u>Baristas US, LLC et al</u>, Case No. 15-2-27043-5-SEA (the "<u>Bellevue</u>
<u>Square</u> Litigation"), which was pending in the Superior Court of

---

[4] I understand that the <u>Clifford</u> lawsuit was filed on March
6, 2018, well-after the EA LLP IRS collection case began in
September 2015 and the GBUS IRS collection case began in
September 2016.  Indeed, IRS RO 1 first discussed a fraud
referral to IRS-CI in connection with the GBUS collection case
with his manager in September 2017, approximately six months
before the <u>Clifford</u> lawsuit was filed.

[5] In or around October 2018, AVENATTI made press statements
indicating that he was no longer the owner of GB LLC or GBUS and
had recently sold the company for close to $28 million.  To
date, the government has been unable to locate any information
confirming that AVENATTI sold GB LLC or GBUS.  To the contrary,
based on the information available to the government, it appears
these statements were false.

the State of Washington for King County, AVENATTI admitted the
following:

   i.   A&A owns Doppio;

   ii.  Doppio owns at least 80% of GB LLC; and

   iii. GB LLC wholly owns GBUS, which handled "most
of the day-to-day activities" of Tully's.

   f.   Since approximately March 2017, EA LLP has been
involved in bankruptcy proceedings; first in the Middle District
of Florida and then transferred in April 2017 to the Central
District of California, In re Eagan Avenatti, LLP, No. 8:17-BK-
11961-CB (C.D. Cal.) (the "EA Bankruptcy"). (See infra
§ IV.D.2.)  In connection with the EA Bankruptcy, AVENATTI
admitted the following:

   i.   AVENATTI owns 100 percent of A&A.

   ii.  A&A owns 75 percent of EA LLP, and Michael
Eagan owns the remaining 25 percent of EA LLP.

   g.   In documents publicly filed with the Washington
Secretary of State, AVENATTI is listed as the sole officer and
director of Doppio, the sole governor and president of GB LLC,
and the sole manager of GBUS.

   h.   AVENATTI was also a competitive racecar driver
from at least 2007 to 2015.  The website www.driverdb.com
indicates that AVENATTI competed in 34 races during that time
period.  AVENATTI is also the sole governor of GB Auto, a
Washington Limited Liability Company that was formed in 2013
shortly after AVENATTI's company GB LLC purchased TC Global
Inc., the operator of Tully's.

i.    In connection with the EA Bankruptcy, AVENATTI
described REGNIER as his office manager, chief paralegal, and
bookkeeper.

**C.    Tax Offenses Relating to Global Baristas US LLC (GBUS)
and Global Baristas LLC (GB LLC)**

21.    As discussed below, there is probable cause to believe
that AVENATTI committed a variety of tax offenses in connection
with his ownership and control of GBUS.  Specifically, the
investigation to date has revealed that AVENATTI intentionally
failed to pay over to the IRS approximately $3,121,460 in
payroll taxes, including approximately $2,390,048 in trust fund
taxes that had been withheld from GBUS employees' paychecks.
AVENATTI also took a number of steps to obstruct the IRS
collection action and evade the collection of GBUS's payroll
taxes by, among other things, lying to IRS RO 1, changing GBUS's
merchant accounts to avoid IRS tax levies, instructing employees
to deposit over $800,000 in cash from Tully's Coffee shops into
a bank account associated with a separate entity to avoid IRS
levies, and changing the company name on contracts involving
GBUS and Boeing.

**1.    *Tax Information Regarding GBUS and GB LLC***

22.    Based on my review of IRS tax records and discussions
with IRS revenue officers and IRS revenue agents, I have learned
the following regarding GBUS's payment of federal payroll taxes,
including trust fund taxes (i.e., employee withholdings):

a.    Between July 2013 and September 18, 2015, GBUS
paid its federal tax deposits, including trust fund tax

payments, to the IRS on a bi-weekly basis.  During this time period, GBUS also filed its IRS Forms 941 each quarter.

      b.   After the third quarter of 2015, GBUS stopped filing its IRS Forms 941 and paying its federal tax deposits to the IRS.

      c.   On March 27, 2017, in connection with the IRS collection case, the IRS prepared substitute quarterly payroll tax returns for the fourth quarter of 2015 through the third quarter of 2016.

      d.   On October 18, 2017, in connection with the IRS collection case, GBUS filed IRS Forms 941 for the fourth quarter of 2015 through the second quarter of 2017, and an IRS Form 940 for 2016.

      e.   As detailed in the below chart, GBUS has failed to pay over approximately $3,121,460 in federal payroll taxes, including approximately $2,390,048 in trust fund taxes:[6]

| Period | Payroll Tax Assessed | Trust Fund Tax Assessed | Payments | Payroll Tax Owed | Trust Fund Tax Owed |
|---|---|---|---|---|---|
| 2015, Q4 | $466,215 | $292,724 | $173,489 | $292,725 | $292,724 |
| 2016, Q1 | $556,290 | $382,100 | $0 | $556,290 | $382,100 |
| 2016, Q2 | $437,336 | $297,791 | $0 | $437,336 | $297,791 |
| 2016, Q3 | $487,296 | $333,969 | $88,170 | $399,126 | $333,969 |
| 2016, Q4 | $405,440 | $277,681 | $0 | $405,410 | $277,681 |
| 2017, Q1 | $455,289 | $309,702 | $0 | $455,289 | $309,702 |

     [6]  The tax figures included throughout this affidavit are approximate figures based on my preliminary review of IRS tax records, information provided to me by IRS revenue officers, and/or discussions with an IRS revenue agent.  IRS-CI is still in the process of completing its tax calculations.

| Period | Payroll Tax Assessed | Trust Fund Tax Assessed | Payments | Payroll Tax Owed | Trust Fund Tax Owed |
|--------|---------------------|------------------------|----------|-----------------|--------------------|
| 2017, Q2 | $502,969 | $345,094 | $0 | $502,969 | $345,094 |
| 2017, Q3 | $421,648 | $291,222 | $263,678 | $157,969 | $150,989 |
| 2017, Q4 | Unknown | Unknown | $85,684 | −$85,684 | Unknown |
| 2018, Q1 | Unknown | Unknown | $0 | Unknown | Unknown |
| TOTALS | $3,732,483 | $2,530,281 | $611,023 | $3,121,460 | $2,390,048 |

f.  Although the IRS received approximately $611,023 in payroll tax payments during the IRS collection case, such payments only account for a small portion (approximately 16 percent) of the total amount of payroll taxes GBUS owed to the IRS.  Moreover, approximately $261,661 of the payroll tax payments the IRS received was attributable to money received from financial institutions in response to the IRS levies, and approximately $349,362 is attributable to payments GBUS or EA LLP made to the IRS during the IRS collection case.[7]

g.  GBUS, GB LLC, and Doppio did not file federal corporate or partnership income tax returns for the 2013, 2014, 2015, 2016, or 2017 tax years.  In fact, GBUS, GB LLC, and Doppio have never filed federal corporate or partnership income tax returns.

---

[7] Bank records show that on or about October 31, 2017, EA LLP sent the IRS two wire transfers totaling approximately $263,660 as partial payment for GBUS's outstanding payroll tax liability.

Case 8:19-cr-00061-JVS  Document 78  Filed 01/14/20  Page 38 of 544  Page ID #:1108
Case 8:19-cr-00061-JVS *SEALED*  Document 73  Filed 01/14/20  Page 38 of 544  Page ID #:277
184  Page ID #:277

## 2.    The IRS Payroll Tax Collection Case

23.    In or about September 2016, the IRS initiated a
collection action against GBUS due to its failure to file IRS
Forms 941 and pay its payroll taxes.  I have reviewed the
collection case file, including the ICS History.[8]  I also
participated in an interview with IRS RO 1 on September 26,
2018.  Based on my review of the collection case file and the
interview with RO 1, I have learned, among other things, the
following information:

a.    On September 24, 2016, the IRS opened a
collection case against GBUS based on a federal tax deposit
alert ("FTDA").  A FTDA is generated when a company that was
paying quarterly payroll taxes to the IRS stops making such
payments.

b.    On September 26, 2016, the collection case was
assigned to RO 1.  RO 1 ran an initial compliance check on GBUS
and determined that GBUS had already missed filing several
quarters of payroll tax returns.

c.    On October 7, 2016, RO 1 made a field visit to
GBUS's corporate offices in Seattle, Washington.  RO 1 met with
GBUS's Human Resources Director, M.E., and GBUS's Controller,
V.S.  RO 1 told M.E. and V.S. that the purpose of his visit was
to verify federal tax deposits, and that a FTDA had been

---

[8]  Based on my training and experience, I know that the ICS
History is a chronology of events that occurred during the
collection case.  During his interview, RO 1 explained that not
all of the information he receives is included in the ICS
History.  The ICS History is not meant to document every
statement, but is instead just a log of events.

generated based on the possibility that the company had fallen
behind in its federal tax deposit payments. Neither M.E. nor
V.S. appeared surprised by RO 1's visit. M.E. and V.S. both
told RO 1 that AVENATTI was the corporate officer responsible
for all of GBUS's business affairs. RO 1 attempted to obtain
payroll information from M.E. and V.S., but they did not want to
give RO 1 any additional information until RO 1 had spoken with
AVENATTI. M.E. and V.S. gave RO 1 AVENATTI's contact
information.

       d.    Later on October 7, 2016, RO 1 called AVENATTI
and left a voicemail asking AVENATTI to call him back
immediately. When AVENATTI called RO 1, RO 1 stated the purpose
of his visit to GBUS's corporate headquarters was to verify
GBUS's federal tax deposits. RO 1 also confirmed that AVENATTI
was the corporate officer for GBUS. AVENATTI appeared shocked
and did not appear to understand how payroll taxes worked.
AVENATTI said that he was not personally involved in the
company's finances, and that his payroll staff and a third-party
payroll company handled the company's payroll responsibilities
and payroll taxes. AVENATTI did not tell RO 1 the name of the
third-party payroll company, but said that he would provide the
information to RO 1 later. RO 1 told AVENATTI that since
September 2015 GBUS had not filed any payroll tax returns or
made any federal tax deposit payments. AVENATTI said he was
very confused about this as well, and that he would talk to his
accountant to see if the business had changed payroll companies
in late-2015. AVENATTI asked to speak to his accountant and

said he would call RO 1 back by October 13, 2016. RO 1 also told AVENATTI that GBUS owed a balance of $7,758 for the 2015 third-quarter federal tax deposits, and was delinquent for the fourth quarter of 2015 and the first and second quarters of 2016.

       e.   On October 14, 2016, AVENATTI called RO 1 and said that he had talked to his accountant, M.H. (a certified public accountant in Los Angeles, California), who would be handling the collection case as the Power of Attorney ("POA") for GBUS because AVENATTI did not have time.

       f.   On October 20, 2016, RO 1 spoke with M.H. M.H. did not have any information regarding GBUS's payroll taxes at the time. M.H. said she had just been hired, and would need to obtain information regarding the business from AVENATTI. RO 1 told M.H. that by November 14, 2016, GBUS needed to pay the remaining balance of $7,758 for the third-quarter of 2015, and file the delinquent quarterly payroll returns for the fourth-quarter of 2015 and the first three quarters of 2016. RO 1 also requested that GBUS provide 12 months of bank statements, a 2016 profit and loss statement, and a fully completed IRS Form 433B (collection information statement for business). RO 1 further told M.H. that he would need to set up an appointment for an IRS Form 4180 trust fund interview, the purpose of which is the determination of which corporate officers are responsible for making the federal tax deposits. RO 1 explained to M.H. the consequences that would result if GBUS did not meet these deadlines, including the possibility of levies, summonses, and

seizures.  At no point during the call, did M.H. suggest that
AVENATTI was not the responsible party for GBUS's payroll tax
liabilities.

        g.    On November 18, 2016, M.H. called RO 1 to request
an extension of the November 14, 2016, deadline to pay the
$7,758 remaining balance, file the delinquent returns, and
provide the requested financial information and IRS Form 433B.
M.H. told RO 1 that AVENATTI, GBUS's managing member, had been
out of the country for work and M.H. had not been able to have a
meaningful discussion with him regarding the status of the
business or its taxes.  M.H. said that AVENATTI was coming home
for the holidays and that she planned to meet with him
"intensely" to discuss the issues with the business.  RO 1
agreed to extend the deadline to December 19, 2016, and again
explained to M.H. the consequences that would result if GBUS did
not meet this deadline.

        h.    As of the December 19, 2016, deadline, RO 1 had
not heard back from GBUS, M.H., or AVENATTI.  The IRS had not
received from GBUS any additional payments, the delinquent
returns, or the requested financial information.  As a result,
RO 1 mailed to GBUS and M.H. via certified U.S. Mail completed
substitute returns prepared by the IRS ("IRS Form 6020B"); IRS
Publication 5, which detailed appeal rights; blank IRS Form 940
and IRS Form 941 returns; and IRS Letter 1085, detailing the
proposed assessment and advising GBUS that the IRS had prepared
tax returns on the company's behalf and providing GBUS with 30
days to contest the assessment or file its own returns.  Based

Case 8:19-cr-00061-JVS *SEALED* Document 78 Filed 01/14/20 Page 42 of 544 Page ID #:1112
Case 8:19-cr-00061-JVS *SEALED* Document 4-1 Filed 02/22/19 Page 42 of
184   Page ID #:281

on the IRS Form 6020B substitute returns, GBUS owed the IRS a
balance of approximately $4.8 million in unpaid payroll taxes.

i.   On or about December 22, 2016, GBUS paid the
$7,758 balance due for the 2015 third quarter federal tax
deposits.

j.   On or about February 9, 2017, RO 1 filed IRS Form
6020B substitute returns with the IRS for the fourth quarter of
2015, and the first three quarters of 2016.

k.   As of March 13, 2017, GBUS still had not filed
its delinquent returns or provided any of the requested
financial information.  RO 1 attempted to contact M.H., but was
unable to reach her.  RO 1 left M.H. a message informing her
that liens would be filed for all balances due from the IRS Form
6020B assessments.  RO 1 also mailed out an IRS Form 9297 to
GBUS and M.H., which stated that GBUS had until April 10, 2017,
to file the delinquent returns and to provide the requested
financial information and IRS Form 433B.  GBUS did not comply
with the April 10, 2017, deadline.

l.   Because RO 1 had not heard back from GBUS or M.H.
as of June 22, 2017, RO 1 began the process of filing notices of
liens against GBUS for all amounts due to the IRS.  On June 26,
2017, the IRS filed a federal tax lien against GBUS for
approximately $4,998,227 with King County in Washington.

m.   On August 16, 2017, at RO 1's request, IRS levies[9] were issued to a number of financial institutions and companies associated with GBUS, including: (1) Bank of America ("BofA"); (2) California Bank & Trust ("CB&T"); (3) JP Morgan Chase Bank NA ("Chase"); (4) HomeStreet Bank ("HomeStreet"); (5) KeyBank; (6) Heartland Payment Systems ("Heartland"); (7) First National Bank of Omaha ("FNB Omaha"); and (8) Boeing.  The levy notices indicated that GBUS owed the IRS a total of approximately $5,210,769.  The levy notices were simultaneously mailed to GBUS's corporate offices.  As noted in paragraph 29.q below, funds provided to the IRS by the recipient financial institutions as a result of the levies were routinely noted on the monthly financial statements provided to GBUS and AVENATTI by the financial institutions.  RO 1 continued to issue additional levy notices to financial institutions and companies associated with GBUS throughout January 2018.  Because IRS levies only apply to funds in the accounts at the time the levy is issued, RO 1 issued levies on a nearly daily basis at various points in time.  In total, RO 1 issued approximately 125 levy notices.

n.   On or about August 21, 2017, RO 1 began the process of bypassing GBUS's representative, M.H.  Before

---

[9]   Based on my training and experience, I know that an IRS levy is used to collect money that a taxpayer owes to the IRS. The levy requires the recipient to turn over to the United States Treasury the taxpayer's property and rights to property, such as money, credits, and bank deposits, that the recipient of the levy has or is already obligated to pay to the taxpayer. Banks, savings and loans, and credit unions are obligated to hold any funds subject to the levy for 21 days before sending payment to the United States Treasury.

Case 8:19-cr-00061-JVS Document 78 Filed 01/14/20 Page 44 of 544 Page ID #:1114
Case 8:19-mj-00061-DUTY *SEALED* Document 4 Filed 02/22/19 Page 44 of
184 Page ID #:283

bypassing a taxpayer's representative, RO 1 was first required
to issue a warning to M.H. RO 1 called M.H. and left her a
message stating that three separate attempts had been made to
obtain information from her regarding GBUS, but that no
information had been provided, and his calls had not been
returned. RO D.L also said that he would be bypassing M.H. if
she made no further contact. RO 1 did not receive a response.

o. On September 1, 2017, RO 1 visited GBUS's
corporate headquarters. RO 1 spoke to a GBUS employee, S.F.,
who confirmed that AVENATTI was the sole person responsible for
GBUS's finances and served as both the CEO and Chief Financial
Officer ("CFO"). S.F. also confirmed that the various notices
the IRS sent to GBUS had been received by GBUS, and that the
notices were being scanned and then emailed to AVENATTI. S.F.
said that AVENATTI was a practicing attorney in California.
When asked for AVENATTI's email address, S.F. said she could not
give that out. S.F. did not appear surprised that RO 1 was
visiting GBUS. S.F. said she was aware of the IRS levies. RO 1
also provided S.F. with a copy of IRS Letter 903, which stated
that the Department of Justice was considering initiating a
civil suit or criminal prosecution due to GBUS's failure to make
its required trust fund payments to the IRS. RO 1 also read the
letter to S.F., who confirmed that she understood the letter.
As noted in paragraph 32.f below, during a subsequent interview,
S.F. confirmed that she told AVENATTI about RO 1's visit and
provided him with a copy of the IRS 903 Letter.

Case 8:19-cr-00061-JVS *SEALED* Document 78 Filed 01/14/20 Page 45 of 544 Page ID #:1145
Case 8:19-cr-00061-JVS *SEALED* Document 73 Filed 01/14/20 Page 45 of 544 Page ID #:284
184 Page ID #:284

p.   On September 1, 2017, upon returning to his office, RO 1 consulted with his general manager about a possible fraud referral to IRS-CI due to GBUS's non-compliance. RO 1's justification for the potential fraud referral was that GBUS had not provided any documents; RO 1 had been attempting to collect the taxes owed for one year and had only received one payment of approximately $7,000; the POA, M.H., had been dismissed; and Tully's stores were still operating.

q.   On September 5, 2017, Dennis Brager ("Brager"), an attorney from the Brager Tax Law Group, contacted RO 1. Brager said we would serve as the new POA for GBUS.  Brager told RO 1 that the payroll tax issues were all due to a financial error and that GBUS had gone through staffing changes in the financial or accounting department that had caused the payroll tax issue.  Brager also told RO 1 that AVENATTI knew nothing about the IRS issues until the delivery of the 903 Letter "last Friday" (i.e., September 1, 2017).  RO 1 explained to Brager that the case was a year old, he had been unable to get any information from the prior POA, M.H., and that liens and levies had already been issued.  Brager told RO 1 that the left hand did not know what the right hand was doing, that AVENATTI was busy, and that employees were not doing their jobs.  RO 1 told Brager that the balance due to the IRS was currently at $5,274,460.  Brager told RO 1 that GBUS would file original returns and correct all balances due.

r.   On September 6, 2017, S.F. contacted RO 1 and said she wanted to provide information to him confidentially due

to fear of reprisal from AVENATTI if he learned she had spoken to the IRS. RO 1 asked S.F. why she changed her mind and wanted to talk to him. S.F. said that after hearing RO 1 read the 903 Letter she became uncomfortable with AVENATTI's response to the situation and the scramble she had had to go through to pay vendors because of the filed levies.

s. On September 15 and September 25, 2017, RO 1 called Brager's office, but was unable to reach him. During the call on September 25, RO 1 told the receptionist that he would be faxing Brager a number of forms, and also mailing the forms to Brager via certified mail. Among other things, RO 1 sent Brager a Form 9297, summary of contact letter, requesting full payment of the approximately $5.3 million balance due, and setting a deadline of October 16, 2017, for GBUS to file original returns to correct the Form 6020B substitute returns. The Form 9297 letter also advised GBUS that the IRS would seize corporate assets from a number of Tully's locations if GBUS were unable to pay the balance due.

t. On September 26, 2017, RO 1 conducted a IRS Form 4180 trust fund interview with A.H., a former GBUS employee. A.H. confirmed that she had been a payroll clerk and bookkeeper at GBUS. A.H. told RO 1 that AVENATTI was in charge of GBUS and made all of the financial decisions for the company.

u. On September 26, 2017, RO 1 also attempted to conduct an IRS Form 4180 trust fund interview with T.M., GBUS's former CFO and Chief Operating Officer ("COO"), at his home. RO 1 eventually spoke with T.M. via telephone. T.M. said he needed

to speak with counsel before speaking to RO 1.  Subsequently, on
or about November 3, 2017, RO 1 received a letter from T.M.'s
attorney attaching the completed Form 4180, a signed declaration
from T.M., and a copy of T.M.'s September 24, 2015, resignation
email to AVENATTI.  In the Form 4180, T.M. stated that AVENATTI
was the sole corporate officer for GBUS and was responsible for
GBUS's financial decisions.  The letter from T.M.'s attorney
also argued that T.M. was not personally liable for any of
GBUS's tax liabilities.

       v.   On October 3, 2017, RO 1 spoke with Brager.
Brager expressed shock that levies had been issued.  RO 1 told
Brager that the levies were issued because no federal tax
deposits had been received from GBUS and that GBUS was an
"egregious pyramider."[10]  RO 1 told Brager that RO 1 would agree
not to issue additional levies against GBUS until October 16,
2017, so that GBUS could take steps to make immediate federal
tax deposits.  Brager asked RO 1 for a "levy release," which RO
1 declined to provide because GBUS had not been in compliance
and had failed to provide any financial information.  When
Brager said that GBUS would not be able to make any federal tax
deposits due to the levies in place, RO 1 told Brager that GBUS
had not made any federal tax deposits since the fourth-quarter
of 2015, that the levies did not start until August 2017, and
that GBUS therefore had almost two years of payroll taxes
stashed away.  When asked what happened to the payroll taxes

---

      [10] RO 1 explained during his September 2018 interview that a
"pyramider" is a business that is accumulating payroll taxes
every quarter without making the required payments to the IRS.

that had been withheld from the employees from October 2015 to July 2017, Brager told RO 1 that he did not know and that he needed to talk to AVENATTI.

w.   On October 13, 2017, Brager contacted RO 1 and told him that GBUS had made a federal tax deposit payment for its payroll taxes.  Brager also said that GBUS had filed its original payroll tax return.

x.   On October 18, 2017, RO 1 received four payroll tax returns from GBUS for processing and four payroll tax returns for 6020B reconsideration.  As of October 18, 2017, however, the IRS still had not received any federal tax deposits from GBUS.  RO 1 left a message for Brager informing him that there had "still been no FTDS!"  In the message, RO 1 told Brager that the payment of the federal tax deposits needed to be immediate and retroactive since the last federal tax deposit payment had been made on November 2, 2015.

y.   On October 20, 2017, having still not received federal tax deposit payments from GBUS, RO 1 again began issuing daily levies to the financial institutions associated with GBUS, including KeyBank, CB&T, and FNB Omaha.  RO 1 also noted in the ICS History that the case was being considered for a fraud referral to IRS-CI.

z.   On October 26, 2017, the IRS received a $23,763 payment from GBUS.

aa.   In late October 2017, RO 1 noticed that the levies issued were not producing the expected amount of seized

funds.  This raised a red flag for RO 1 regarding GBUS's financial arrangements.

bb.  On November 2, 2017, Brager called RO 1 and faxed over two copies of federal tax deposits made by GBUS.  Brager requested that the IRS enter into an installment agreement with GBUS.  RO 1, however, told Brager that GBUS did not qualify for an installment agreement because GBUS had never provided the IRS with any financial information.  RO 1 told Brager that he believed the request for an installment agreement was merely a stall tactic and attempt to delay collection.[11]  During the call, Brager repeatedly told RO 1 that AVENATTI had relied on the payroll service provider to make payments but the provider had failed to make the deposits.  RO 1 responded that GBUS should have had the money at issue readily available since the federal tax deposits were never made.  Brager said he didn't know the financial information for GBUS, but would get together with AVENATTI and provide RO 1 with all the financial information within 10 days.  RO 1 told Brager that enforcement (i.e., additional levies) would continue during that time period.

cc.  On November 6, 2017, the IRS received a Form 941 payroll return for GBUS for the third-quarter of 2017.  The payroll return was signed by M.E.

dd.  On November 14, 2017, RO 1 spoke with a FNB Omaha employee.  RO 1 wanted to know why there had been no funds from the latest levies issued to FNB Omaha.  The FNB Omaha employee

---

[11]  RO 1's general manager reviewed the installment agreement request and agreed with RO 1's assessment that it was merely a delay tactic.

told RO 1 that GBUS had changed merchant accounts and was no longer using FNB Omaha as the sponsoring bank.  The employee said that GBUS might still be using TSYS as its credit card processor, but a different sponsoring bank.  RO 1 considered the change in merchant accounts to be a red flag.

ee.  On November 14, 2017, a GBUS employee told RO 1 that: (1) the merchant account IDs had been changed in all of the Tully's stores on October 5, 2017; (2) FNB Omaha had requested the GBUS accounts be closed due to risk; (3) the account into which cash from the Tully's stores was deposited had been changed from a KeyBank account to a subsidiary account under the name of GB Auto; (4) cash was being deposited into a BofA account ending in 7412 ("GB Auto BofA Account 7412"); and (5) cash was retrieved from the coffee shops twice a week on Monday and Thursday mornings.  At this point, RO 1 believed that GBUS was actively placing assets out of the reach of the government.

ff.  On November 17, 2017, M.G. called RO 1 to say that M.G. wanted to cooperate and remain anonymous due to fear of reprisal.  M.G. was the Director of Retail Operations for GBUS.[12]  M.G. said she was responsible for daily cash deposits and setting up merchant credit card processing services for all of the Tully's stores.  M.G. told RO 1 that GBUS's corporate headquarters and one of the Tully's retail locations had been closed due to non-payment of the lease.  M.G. said that she had

---

[12] Based on interviews of M.G. and S.F. conducted in September 2018, I know that M.G. and S.F. are sisters.

been instructed by V.S., GBUS's controller, to make numerous
changes to the cash deposits and the merchant accounts, which
made her feel uneasy and suspicious as to whether fraud was
occurring.  M.G. said she had all the financial information and
correspondence from AVENATTI regarding changes to the merchant
accounts.  RO 1 told her that he would be summonsing her into
the office to provide the documents.  He also asked M.G. to let
him know if AVENATTI changed the bank accounts or merchant
accounts again.

gg.  Later, on November 17, 2017, two GBUS employees,
M.G. and V.S. were served with IRS summonses requiring them to
appear before RO 1 and produce relevant GBUS business records.

hh.  On November 28, 2017, M.E. appeared for an
interview in response to the collection summons RO 1 issued.
During the interview, M.E. filled out a Form 4180.  M.E. said
that since April 2016 she prepared, reviewed, signed, and
authorized the transmission of payroll tax returns.  M.E.,
however, confirmed that AVENATTI was the owner and operator of
GBUS, and that all financial obligations, if paid, were paid at
the direction of AVENATTI.

ii.  On November 29, 2017, M.G. appeared for an
interview in response to the collection summons RO 1 issued.
M.G. provided RO 1 with bank account information for GBUS, GB
LLC, and GB Auto.  M.G. confirmed that GBUS had changed both its
credit card processing and cash deposit accounts.  M.G. said
that cash from the Tully's stores were previously being
deposited into a KeyBank account, but was now being deposited

34

into an account for GB Auto.  M.G. said that the entity name for the merchant accounts had been changed from GBUS to GB LLC. M.G. said that REGNIER, from EA LLP, had set up the new bank account for GB LLC.  M.G. also provided RO 1 with emails regarding the company's business, including emails regarding the merchant account changes.[13]

     jj.  On November 30, 2017, V.S. appeared for an interview in response to the collection summons RO 1 issued. V.S. told RO 1 that no payments for GBUS were made unless authorized by AVENATTI.  V.S. repeatedly said that AVENATTI refers to himself as the owner, CEO, and sole member of GBUS and that any and all decisions go through him.  V.S. said that funds were frequently transferred between GBUS and EA LLP, and that unreasonable legal fees were being paid to EA LLP.  V.S. also said that GBUS sponsored the International Motor Sports Association ("IMSA"), and spent approximately $200,000 in license fees and other investments relating to AVENATTI's racing team.  V.S. said that T.M., GBUS's former COO/CFO, and B.H., GBUS's former Director of Operations were both aware of the financial irregularities at GBUS.  V.S. also provided RO 1 with email correspondence involving AVENATTI, as well emails regarding the changes to the TSYS merchant accounts.[14]

     kk.  On December 5, 2017, M.G. told RO 1 that AVENATTI had instructed all of the Tully's stores to hold their cash

---

    [13] IRS-CI's collection and review of these emails is discussed further in footnote 15 below.

    [14]  IRS-CI's collection and review of the emails V.S. provided is discussed further in footnote 15 below.

deposits until further notice.  M.G. said AVENATTI was also very curious about what documents were submitted to the IRS in response to the summons and wanted a full account of the documents submitted.

ll.  On or about December 7, 2017, Brager sent a letter to RO 1's general manager complaining about the summonses issued to GBUS employees.  Among other things, Brager's letter claimed that the IRS had provided inadequate notice of the summonses to GBUS.  Brager further claimed that RO 1 may have obtained privileged information from the employees because AVENATTI is both the managing member of GBUS and its general counsel.[15]

mm.  On December 11, 2017, RO 1 contacted A.R.G., a lawyer for Boeing, regarding the sale of the Tully's kiosks while IRS liens were pending.  On December 12, 2017, A.R.G. emailed RO 1 a copy of the Global Baristas contract, and an email exchange with AVENATTI.  A.G. stated that the contract was

---

[15]  In April 2018, following the fraud referral to IRS-CI, RO 1 provided me with PDFs of six documents he had received in response to the summonses.  In May 2018, RO 1 also provided me with a disk containing additional documents he had received in response to the summonses.  I briefly reviewed the six PDFs, but did not review any of the materials on the disk.  Later in May 2018, while reviewing RO 1's case file, I learned of Brager's privilege claim.  I then provided the materials I received from RO 1 to an attorney with the Department of Justice's Tax Division so that a privilege review could be conducted.  I understand that a Privilege Review Team AUSA ("PRTAUSA") subsequently conducted a review of the materials in August 2018.  The PRTAUSA redacted two portions of one email on the basis that GBUS might be able to claim that the redacted portions were protected by the attorney-client privilege, but concluded that none of the other documents RO 1 had provided were protected or potentially protected by the attorney-client privilege.  The redacted email and the remaining documents were then released to IRS-CI and the prosecution team for us to review.

actually with GB Hospitality, LLC.  In the email, A.G. said that
AVENATTI "verbally had asked me to use the entity Global
Baristas, LLC on the Bill of Sale as he said it was the entity
that held title to the equipment."

   nn.  On December 14, 2017, RO 1 spoke with M.G. and
S.F.  They told him AVENATTI had instructed the Tully's stores
to hold the cash deposits because he was in the process of
setting up new accounts to take cash deposits.  They also told
RO 1 that GBUS was in the process of finalizing a new merchant
credit card account with Chase Bank under the name of GB LLC.

   oo.  On December 14, 2017, RO 1 issued a summons for
AVENATTI to appear for a 4180 trust fund interview.  On January
11, 2018, Brager advised RO 1 that AVENATTI would not appear
because AVENATTI had not been properly served with the summons.

   pp.  As of January 2018, RO 1 was still issuing levies
to known bank accounts associated with GBUS, as well as to bank
accounts associated with GB LLC and GB Auto.  These levies
typically resulted in the recovery of only $50 to $100.

   qq.  On February 2, 2018, Brager sent RO 1 a protest
of the proposed trust fund recovery penalty assessments against
AVENATTI and GBUS.  Among other things, Brager claimed that
AVENATTI "did not act willfully since he was not involved in the
preparation, or calculation of the payroll taxes" and "did not
have knowledge of the fact that the taxes were unpaid until
after the taxes had accrued."  Brager therefore argued that
AVENATTI was not a "responsible person" for GBUS and "cannot be

held personally liable for the trust fund taxes owed by Global
Baristas, US LLC."

       rr.  On March 12, 2018, RO 1 made field visits to a
number of Tully's locations, each of which had signs posted on
the door stating that the store was temporarily closed.  RO 1
then contacted a GBUS employee, who told him that the closures
were in fact permanent.

       ss.  On March 19, 2018, the IRS Fraud Technical
Advisor's Manager approved a fraud referral to IRS-CI.

### 3.   *GBUS Employee Interviews*

   24.  As part of its investigation, IRS-CI has interviewed
numerous former GBUS employees.  At the outset of each
interview, Assistant United States Attorneys ("AUSAs") working
on this investigation requested that the employee not provide
the government with any information that might be covered by the
attorney-client privilege.  The AUSAs explained that any legal
discussions the employee may have had with lawyers acting on
behalf of GBUS or any other company the employee worked for
could potentially be covered by the attorney-client privileged,
and that the company would hold the privilege -- meaning that
only the company could decide to disclose privileged
communications to the government.  The AUSAs further explained
that the government understood that GBUS's owner and CEO,
AVENATTI, was also a lawyer and may have acted both in a
business capacity and a legal capacity on behalf of GBUS.  The
AUSAs asked the employees to inform the interviewers if at any
point the questions might require the employees to disclose

38

legal discussions they had with AVENATTI, and to not disclose any legal discussions they may have had with AVENATTI in his capacity as a lawyer for GBUS.  Each of the employees said they understood and agreed not to provide any information that they believed could be potentially privileged.

25.  On November 13, 2018, I participated in an interview of T.M., GBUS's former Chief Operating Officer ("COO") and Chief Financial Officer ("CFO").  T.M. was accompanied by his personal attorney.  T.M. provided the following information:

a.  T.M. met AVENATTI in approximately 2011 through T.M.'s work for Cascade Capital Group ("Cascade").  In 2012, T.M., AVENATTI, and others were attending a bankruptcy hearing in connection with the Meridian Mortgage Funds ("Meridian") bankruptcy case.  Prior to the Meridian hearing, there was a hearing regarding the auction to purchase TC Global, Tully's parent company, out of bankruptcy.  During that hearing, AVENATTI expressed an interest in purchasing TC Global out of bankruptcy.  AVENATTI then hired Cascade to do due diligence on TC Global and Tully's.  In January 2013, AVENATTI, through GB LLC, put in a successful bid of $9.15 million to purchase TC Global at a bankruptcy auction.  The purchase closed in June 2013.

b.  T.M. worked as a consultant for GBUS beginning in July 2013.  In October or November 2013, T.M. took a full-time position as GBUS's COO and CFO.  T.M worked for GBUS until September 24, 2015, when he resigned.  Between approximately January 2015 and September 2015, T.M. worked for GBUS only half-

time.  T.M.'s base salary was $250,000, with incentives of up to $150,000 annually.  T.M. was also supposed to receive "phantom equity" in GBUS, under which T.M. would receive six percent of the sale proceeds of GBUS equity in excess of $9,150,000.

  c. AVENATTI's title at GBUS was CEO and he was on GBUS's payroll as its CEO.  T.M. considered AVENATTI to be the owner and CEO.  T.M said he "treated this as if I was working for the owner."  AVENATTI's role was to identify strategy and make decisions for GBUS.  T.M. said that AVENATTI was the ultimate decision maker for GBUS and that every important decision was approved by AVENATTI.  For example, AVENATTI made all of the hiring decisions for GBUS, and interviewed and vetted the candidates.

  d. T.M. said that AVENATTI's default position at GBUS was not as a lawyer.  When asked whether AVENATTI ever acted as a lawyer for GBUS, T.M. said he did not know and that this was a gray area.  T.M., however, said that he did not see any invoices from EA LLP and was not aware of GBUS ever hiring EA LLP to do legal work for GBUS.  T.M. considered his conversations with AVENATTI to be about business matters, not legal matters.

  e. T.M. said that for the entire time he worked for GBUS, Foster Pepper PLLC was GBUS's operational counsel.  T.M. saw invoices from Foster Pepper to GBUS, which were then routed to AVENATTI.

  f. T.M. said that GBUS used a third-party payroll company, but was not sure of the company's name.  The prior

payroll company had not been allowing direct deposit of wages
for employees because of cash flow issues. When GBUS switched
to a new payroll company, GBUS set up direct deposit for its
employees.[16] As cash flow got tighter at GBUS, direct deposit
was rolled back. T.M. discussed rolling back direct deposit and
reverting to paper checks with AVENATTI.

   g.  T.M. explained that after direct deposit was
stopped in 2015, the payroll company would generate payroll
checks on GBUS's stock checks. When GBUS had direct deposit,
the payroll company would pull the funds for payroll and payroll
taxes out of GBUS's payroll account on the Friday before the
Monday payday. The money for payroll would therefore be gone
immediately. Cancelling direct deposit gave GBUS "float time"
until the employees' checks cleared the following week, meaning
that the payroll funds would still be in GBUS's bank account and
GBUS had more time to make funds available to pay the employees
and its payroll taxes.

   h.  T.M. resigned his position at GBUS in large part
due to payroll tax issues at GBUS and because he was concerned
about his personal liability. Payroll was very tight and GBUS
could not always meet its payroll obligations. On three or four
occasions, T.M. loaned GBUS money so that it could cover the
gaps in its payroll obligations. T.M. estimated that he loaned

---

[16] Based on interviews with other GBUS witnesses, I learned
that GBUS used Ceridian for its payroll services at all times.
While T.M. appears to have been mistaken about GBUS's use of a
prior payroll company, T.M.'s statements regarding direct
deposit are consistent with statements made by other former GBUS
employees.

GBUS $10,000 to $40,000 to meet its payroll obligations. This money was paid back prior to T.M.'s resignation.

   i.   On September 24, 2015, T.M. had a phone conversation with AVENATTI regarding the outflow of funds for that week.  T.M. told AVENATTI that GBUS needed funds to pay its payroll taxes the next day.  AVENATTI told T.M. not to count on that.[17]  Based on AVENATTI's response, T.M. told AVENATTI that it would be his last day.  He then emailed AVENATTI a resignation letter later that same day.

   j.   T.M. said that AVENATTI was aware that GBUS needed to pay its payroll taxes.  T.M. specifically discussed GBUS's obligation to pay its payroll taxes with AVENATTI on more than one occasion.[18]

   k.   M.D. was the head of Human Resources and Payroll for GBUS.  GBUS's IRS Forms 940 and IRS Forms 941 were normally filed by M.D.  T.M. would be notified when they were filed.

   l.   T.M. was asked whether AVENATTI ever withdrew money from GBUS.  T.M. said that money was flowing out of GBUS as early as August 2013.  AVENATTI was a signer on GBUS's bank accounts, and there were frequent transfers from GBUS to EA LLP

---

[17]  As detailed in paragraph 22.b above, IRS records show that GBUS stopped making federal tax deposit payments to the IRS after the third quarter of 2015.

[18]  During the discussion of GBUS's payroll tax obligations, T.M. began to mention a discussion he and AVENATTI had with a labor lawyer from Foster Pepper in early 2015.  The AUSAs immediately instructed T.M. not to provide any information regarding the substance of his conversations with Foster Pepper. T.M. followed that instruction and did not provide any information regarding the substance of his discussions with GBUS's lawyers.

and from EA LLP to GBUS.  T.M. said that none of the transfers
to EA LLP were for legal services EA LLP provided to GBUS.
AVENATTI would not tell T.M. in advance that he would be taking
money out of GBUS's bank accounts -- the money would just be
gone.  M.B., GBUS's controller at the time, would tell T.M. when
AVENATTI had taken money out of the GBUS bank accounts.  When
T.M. asked AVENATTI if he was going to stop taking money in and
out of GBUS's bank accounts, AVENATTI responded that he did not
foresee that happening.  AVENATTI did not tell T.M. what the
funds AVENATTI was taking out of GBUS's bank accounts were being
used for.  GBUS's accounting team tracked the money AVENATTI
transferred into and out of GBUS.

> m.   T.M. initially had authority to sign company
checks, which were cut whenever vendor invoices were due.  By
approximately March 2015, however, this had changed.[19]  T.M.
would provide AVENATTI with a list of vendors' invoices.
Sometimes T.M. would make the decision to pay vendors on his
own, and other times AVENATTI would approve the payments to
vendors.

> n.   T.M. said that the daily operations of the
Tully's stores went through GBUS.  All cash receipts came from
GBUS and everything happened under GBUS.  T.M. did not recall
any cash receipts coming from GB LLC.

---

[19] Based on my review of GBUS bank account records, I know
that in February 2015 GBUS opened two new accounts at CB&T.
AVENATTI and REGNIER were the only signatories on these bank
accounts.

Case 8:19-cr-00061-JVS   Document 78   Filed 01/14/20   Page 61 of 544   Page ID #:1181
Case 8:19-cr-00061-JVS * SEALED *   Document 4-1 SEALED   Filed 02/22/19   Page 61 of
184   Page ID #:300

o.   T.M. said that the majority of GBUS's profits
came from the Tully's stores at Boeing facilities.  The
commission payments to Boeing were delayed more than once
because of working capital restrictions.  T.M. had never heard
of a company called "GB Hospitality," which was the name
AVENATTI used on the Boeing contract in November 2016 (see
¶ 39.d).

p.   T.M. is familiar with The Peoples Bank in
Mississippi because of litigation that Cascade and AVENATTI
worked on involving Mississippi Power.  T.M., however, was not
aware of AVENATTI obtaining a loan from The Peoples Bank.  T.M.
did not recall seeing any loan documents, and there was no debit
or credit item for a loan from The Peoples Bank in GBUS's
financial statements.

q.   T.M. was also asked about GB Auto.  T.M. said GB
Auto was AVENATTI's racing team in IMSA.  Money that was sent
from GBUS to GB Auto would have been tracked by the accounting
team.  AVENATTI also signed GBUS up as a coffee sponsor for
IMSA.  AVENATTI used the Tully's logo on his race car and an
employee would serve Tully's coffee at IMSA events.  T.M. said
that the IMSA expenses did not help with GBUS's operations.

r.   T.M. did not know whether corporate tax returns
for GBUS had been completed or filed.  T.M. had arranged for
GBUS to hire a tax accountant in Tampa, Florida, to prepare
GBUS's tax returns.  AVENATTI participated in meetings with the
accountants by phone.  The accountants provided GBUS with a list
of documents that were needed to prepare the tax returns,

44

including a number of documents that would have been in AVENATTI's control. T.M. did not know if AVENATTI ever provided the required documents to the accountants.

s.    AVENATTI had a GBUS email address, but T.M. always emailed AVENATTI at his EA LLP email address.

t.    T.M. said that REGNIER was responsible for all of AVENATTI's administrative needs. REGNIER would have been copied on all emails to AVENATTI regarding GBUS's cash needs. T.M. understood that REGNIER had been with AVENATTI for a very long time.

u.    T.M. was asked about a settlement agreement he entered into with AVENATTI and GBUS in 2018 relating to money GBUS still owed T.M. as part of his employment agreement. As part of the settlement, on or about October 2, 2018, T.M. received a $35,000 check from A&A's CB&T bank account, which bounced. T.M. guessed that the check was signed by REGNIER.

v.    Prior to the interview with T.M., I learned that on or about October 31, 2018, T.M. filed a civil lawsuit against AVENATTI in the Superior Court of the State of Washington for King County for wrongful wage withholding; breach of contract; dishonored check; and fraud and misrepresentation. The civil complaint alleges that AVENATTI failed to pay T.M. money he was owed under his employment agreement with GBUS. In addition to the incentive payments mentioned in paragraph 25.b above, the complaint notes that AVENATTI had recently been quoted in a October 24, 2018, Seattle Times article as saying that he sold "Global Baristas . . . for $28 million a long time ago." T.M.

claimed that under the terms of his employment agreement, he would have been entitled to six percent of the sale proceeds above $9.15 million.

     w.   T.M. said he had never discussed selling GBUS with AVENATTI and does not know if AVENATTI ever sold GBUS.

    26.  On October 24, 2018, I participated in an interview of M.B., GBUS's former Controller. M.B. provided the following information:

     a.   In October 2013, M.B. began working at GBUS as its Controller. M.B. had been recruited by T.M., and interviewed for the position with T.M. and AVENATTI. She reported to T.M. M.B. worked full-time at GBUS until December 2015, and part-time at GBUS in January 2016.

     b.   M.B. managed GBUS's accounting department. M.B.'s role at GBUS included assessing and running the accounting systems, overseeing the financials, and looking at the day-to-day accounting figures.

     c.   AVENATTI was the owner and CEO of GBUS. M.B. did not know AVENATTI to be the General Counsel of GBUS.

     d.   AVENATTI would authorize payments for GBUS. M.B. would email T.M. and AVENATTI to ask what bills to pay. M.B. would usually get a response of approval from T.M., and sometimes from AVENATTI.

     e.   GBUS used Ceridian for its payroll services. Ceridian was initially responsible for paying the payroll taxes and preparing and filing the payroll tax returns. M.B. believed this was set up by T.M. or AVENATTI.

f.   In the second or third quarter of 2015, AVENATTI directed Ceridian to stop paying GBUS's payroll tax withholdings and told Ceridian that GBUS would pay the payroll taxes itself. This gave GBUS float time for the payroll payments.   M.B. explained that AVENATTI was the only signatory on GBUS's payroll account and that no one other than AVENATTI was empowered to pay the payroll tax withholdings.   After this change, M.D. (GBUS's Human Resources and Payroll Director) was responsible for filing the payroll tax returns, and AVENATTI was responsible for paying the payroll tax withholdings.   M.B. said the decision to change the payment process for GBUS's payroll tax withholdings with Ceridian was made by AVENATTI, and went from AVENATTI to T.M., and then from T.M. to M.D.   M.B. believes that AVENATTI would have signed the forms authorizing the change with Ceridian.

g.   For the third-quarter of 2015, Ceridian paid the net salary to GBUS employees, Ceridian prepared the IRS Form 941 payroll tax return, and GBUS was responsible for paying the payroll tax withholdings to the IRS.   AVENATTI, however, would not approve the payment of the payroll tax withholdings.   M.B. said that AVENATTI directed M.D. not to pay GBUS's payroll taxes for the third-quarter of 2015.   M.D. was mortified by this directive and told M.B. about it.

h.   M.B. documented AVENATTI's instruction not to pay GBUS's payroll taxes and sent AVENATTI an email explaining the ramifications of not paying the payroll taxes.   AVENATTI did not respond to her email.   When M.B. asked AVENATTI over the phone whether he had received her email, he responded that it was

47

"mine to deal with."  M.B. did not believe she saved a copy of this email, and was unable to locate a copy of it in her personal emails following her interview.

   i. M.B. remembered seeing emails from M.D. to AVENATTI requesting that AVENATTI approve the payment of the payroll tax payments.  M.B. also sent similar requests to AVENATTI.

   j. M.B. said that V.S. and B.C. from the accounting department knew that GBUS's payroll taxes were not being paid because they had access to GBUS's financials.  M.E. from the human resources department also knew that the payroll taxes were not being paid.  In fact, M.B. speculated that everyone in GBUS's corporate office knew about the payroll tax issues because the corporate office was small, and the employees were close on a professional level.

   k. M.B. said the payroll tax issue was the "nail in the coffin" as to her decision to leave GBUS.  She left GBUS a few months later in December 2015, and actually took a pay cut to leave GBUS.  She said that AVENATTI's "moral compass didn't point north."

   l. M.B. thought GBUS spent approximately $750,000 in connection with its IMSA sponsorship.  GBUS was hemorrhaging money at the time and M.B. did not think the IMSA sponsorship was the best use of funds.  Without the IMSA expenses GBUS would have been cash neutral and in a better financial position.  M.B. considered the IMSA sponsorship to be a "vanity" decision by AVENATTI.

m.   M.B. said that AVENATTI would frequently transfer
money in and out of GBUS's bank accounts.  This happened for
months.  M.B. would login into GBUS's bank accounts and see
wires to and from EA LLP or A&A.  M.B. would reconcile the bank
accounts every day and tracked the funds deposited or withdrawn
by AVENATTI.  M.B. said the amount AVENATTI deposited was likely
more than the amount he withdrew, but that if you included the
money AVENATTI spent on IMSA he would likely have owed GBUS
money.  M.B. said that AVENATTI's deposits and withdrawals from
GBUS's bank account had an impact on GBUS's operations.  GBUS
was operating with a cash loss and some of the money AVENATTI
withdrew could have been used to pay vendors.

n.   AVENATTI would wonder why GBUS was short on cash.
In response, M.B. would prepare cash reports and give them to
AVENATTI.

o.   M.B. said that AVENATTI's law firm was not an
investor in GBUS.  There were no invoices between the law firm
and GBUS, and no formal loan documents between GBUS and
AVENATTI's law firm.

p.   M.B. would send emails to AVENATTI at his EA LLP
email address.  M.B. would typically communicate with AVENATTI
via email or by phone.  M.B. only saw AVENATTI a few times a
year.

q.   REGNIER was the right hand person for AVENATTI at
his law firm.  M.B. dealt with REGNIER a few times when M.B.
needed AVENATTI to get something done for GBUS.  REGNIER would
get AVENATTI to take action at M.B.'s request.

49

27.  On October 24, 2018, I participated in an interview
with M.D., GBUS's former human resources and payroll director.
M.D. provided the following information:

a.  M.D. started working at Tully's in 2000 in the
payroll department.  He worked for Tully's when it was sold to
TC Global in 2008, and stayed on after AVENATTI bought TC Global
out of bankruptcy.  His job duties at GBUS included overseeing
payroll, human resources, and facilities.  M.D. resigned from
GBUS in November 2015.  M.D., however, worked part-time at GBUS
until April 2016 to help with payroll.

b.  GBUS used Ceridian to handle its payroll the
entire time that M.D. worked for GBUS.  Payroll was on Mondays,
so the funds would need to be available in GBUS's payroll
account on the prior Thursday or Friday.  In 2013 and 2014,
Ceridian was a full service payroll processor for GBUS.
Ceridian's services during this time included direct deposit
drawn on Ceridian's bank account, withholding, tax filings, and
W-2s, among other things.  These were the services provided for
the first year-and-a-half, at which point T.M. instructed M.D.
to stop the direct deposit service.  Thereafter, payroll was no
longer paid from Ceridian's bank account, but instead from
GBUS's payroll bank account.  The checks were still cut by
Ceridian, but the money was drawn on GBUS's payroll bank
account.

c.  M.D. said another change occurred in the summer
of 2015, when the wires to pay the payroll taxes were not
approved.  Ceridian requested the payroll tax money and the

payment did not get approved by GBUS.  M.D. recalled telling
M.B. that he had been notified by Ceridian about the non-payment
of the payroll taxes by GBUS.  M.D. did not know if the payroll
tax payments were ever made to Ceridian.

>    d.   M.D. said that a couple of times the payroll
payments to Ceridian were late.  After a while, Ceridian told
M.D. that it was no longer going to make payroll payments due to
GBUS failing to pay Ceridian on time.  Ceridian was also no
longer filing GBUS's payroll tax returns.  M.D. told M.B. about
this, who then told T.M. and AVENATTI.

>    e.   M.D. said that bi-weekly payments to the IRS
stopped once the Ceridian services and payments were
discontinued.  He believed that AVENATTI, not T.M., made the
ultimate decision to terminate Ceridian's services.

>    f.   In the third quarter of 2015, GBUS's payroll tax
payments were not made because AVENATTI did not approve the
payments.  M.B. told M.D. that AVENATTI did not approve the tax
payments.

>    g.   M.D. said he started looking for a new job
because of the lack of payroll tax payments.  He thought it was
"unethical" that payroll tax payments were not being made even
though GBUS was withholding taxes from GBUS employees.  He was
concerned someone would blame him so he started looking for a
new job.  He described GBUS's failure to pay its payroll taxes
as the final straw in his decision to leave GBUS because he
believed GBUS had the fiduciary responsibility to pay the IRS.
M.D. ultimately took a pay cut to leave GBUS for another job.

      h.   M.D. did not know if the payroll tax payments for the third or fourth quarter of 2015 were ever paid by GBUS. M.D., however, said that the payroll tax payment requests would have been sent to GBUS's accounting team. M.D. would send check requests for the state and federal tax payments to V.S.

      i.   M.D. shared his concerns regarding the payroll tax issues with M.B., because T.M. had already left GBUS at the time.

      j.   M.D. understood that M.B. was speaking to AVENATTI about the payroll taxes that needed to be paid. M.B. told him about her discussions and communications with AVENATTI regarding the payroll tax issues.

      k.   M.D. believed that he, M.B., and M.E., who worked for him in the human resources and payroll department, were the only employees that knew GBUS was not paying its payroll taxes.

      l.   M.D. believed that AVENATTI and T.M. were signatories on the GBUS bank accounts. M.D. said that no checks could be cut without AVENATTI's approval.

      m.   M.D. considered AVENATTI to be the owner, President, and CEO of GBUS. This is how AVENATTI presented himself. M.D. did not consider AVENATTI to be GBUS's General Counsel, and never heard AVENATTI refer to himself as GBUS's General Counsel. M.D. was not aware of GBUS ever hiring EA LLP to perform any legal services for GBUS.

      n.   M.D. had limited interactions with AVENATTI during his time at GBUS. M.D. had seen AVENATTI only four or five times. He did not recall having any significant

conversations with AVENATTI or any one-on-one phone calls with him. M.D. typically interacted with T.M. and M.B.

     o.   M.D. emailed AVENATTI approximately 10 times at his EA LLP email address. AVENATTI had a GBUS email address, but did not use it.

     p.   M.D. was scared of AVENATTI when he worked at GBUS because he did not want to be personally sued. M.D. respected AVENATTI at first, but over time he no longer trusted AVENATTI and became concerned that AVENATTI would sue him for anything. M.D. also expressed concern that AVENATTI might attempt to retaliate against him if he learned that M.D. was cooperating with the government's investigation.

    28.  On October 22, 2018, I participated in an interview of B.H., GBUS's former Director of Operations. B.H. provided the following information:

     a.   From early 2014 to early 2016, B.H. worked at GBUS as its Director of Operations. T.M. recruited B.H. for the position because they had previously worked together at Cascade. B.H. met with T.M. and AVENATTI before accepting the position.

     b.   As Director of Operations, B.H. was responsible for overseeing the district managers, dealing with store-related issues, and dealing with IMSA-related issues. The individual store managers reported to the district managers, and the district managers reported to B.H. B.H. said 90 percent of their focus was on reaching the stores' revenue goals.

c.    B.H. knew AVENATTI as the owner and head of GBUS.
AVENATTI's role at GBUS was to make major decisions, such as
decisions regarding finances and lease agreements.

d.    B.H. was aware that AVENATTI was a lawyer.
B.H.'s legal experience with AVENATTI related to a dispute
between GBUS and Green Mountain.  B.H. said that if there was a
legal issue, AVENATTI handled it.  B.H. had no knowledge of
AVENATTI's law firm doing any work for GBUS.

e.    B.H. said payroll time was stressful at GBUS
because cash was always tight.  B.H. heard rumors around the
office that GBUS was not paying payroll taxes.  B.H. thought he
heard these rumors from T.M., M.B., and M.D. when he discussed
the need to pay bonuses to GBUS's district managers.  B.H. said
he did not have first-hand knowledge of GBUS not paying taxes,
but stated that not paying taxes went into the "barrel of bad,"
and believed that AVENATTI would have been aware of such issues.

f.    The Tully's stores at Boeing facilities were a
very important part of business for GBUS.  AVENATTI was aware of
this.  B.H. dealt with the paperwork for the GBUS stores at
Boeing.  B.H. had never heard of the name GB Hospitality, which
was the name AVENATTI used on the Boeing contract in November
2016 (see ¶ 39.d).  The only name B.H. was aware of was GBUS.

g.    B.H. spoke with AVENATTI about once or twice a
month, and saw AVENATTI once a month at most.  Most of B.H.'s
conversations with AVENATTI related to the IMSA sponsorship.
B.H. said he never understood why AVENATTI wanted to have GBUS
at IMSA when GBUS already had enough problems.  B.H. felt that

GBUS was losing money on the IMSA sponsorship, and said that AVENATTI could have been using the money he spent on IMSA on coffee supply.

      h.  B.H. said he left GBUS because AVENATTI did not follow through on the future plans for GBUS.  AVENATTI did not reinvest into the company and the stores were failing.  B.H. said there was a "steady bleeding" of GBUS and AVENATTI placed "band aids" on it.  The big reason B.H. decided to work for GBUS was AVENATTI's promise of growing the business, but this never happened.  B.H. assumed T.M. left for similar reasons.

      i.  GBUS stored its corporate records on a server hosted by Amazon Web Services ("AWS").

      j.  B.H. would call REGNIER to schedule things with AVENATTI.

    29.  On October 22, 2018, I participated in an interview with V.S.  V.S. provided the following information:

      a.  V.S. started working at Tully's Coffee Inc. in 2003 or 2004.  He worked for Tully's Coffee Inc., TC Global, and then eventually GBUS.  He resigned from GBUS on September 18, 2018.  V.S. stopped working for GBUS because his paycheck bounced.

      b.  V.S. became the Assistant Controller when GBUS bought out TC Global.  V.S. then became the Controller when M.B. left GBUS in 2015 or 2016.

      c.  V.S. knew AVENATTI to be the owner and operator of GBUS.  AVENATTI was the CEO, and T.M. was the CFO.

d.    When he was Assistant Controller, V.S. reported to M.B.  For financial decisions, M.B. reported to T.M., who in turn reported to AVENATTI.  AVENATTI was T.M.'s boss.

e.    V.S. said that AVENATTI was not physically present at GBUS's corporate office, but was actively involved in operating the company.  T.M. would relay messages to AVENATTI regarding the day-to-day operations of the company.

f.    After T.M. left GBUS, AVENATTI communicated with M.B. and B.H. regarding GBUS's day-to-day operations.  Once M.B. left, V.S. reported directly to AVENATTI, who was effectively the head of the financial department.  V.S. communicated with AVENATTI by email 90 percent of the time and by phone 10 percent of the time.  AVENATTI used his EA LLP email address, rather than his GBUS email address.

g.    When T.M. left GBUS, he received bonus and severance pay from GBUS.  AVENATTI authorized those payments, and REGNIER handled the wire transfers.  V.S. saw the wires on the bank account records, but did not have wiring authority for GBUS's bank accounts.

h.    V.S. would email AVENATTI cash reports daily. V.S. said that the accounts payable department wanted bills to be paid weekly, but there was never enough money to pay all of the bills.

i.    AVENATTI moved money in and out of GBUS bank accounts on a regular basis.  This happened from the beginning of GBUS's operations.  V.S. had access to GBUS's bank account

56

records.  V.S. saw the movement of funds when he would do the bank account reconciliations for GBUS.

     j.  V.S. said he reported to AVENATTI because AVENATTI was the CEO and owner of GBUS.  V.S.'s primary discussions with AVENATTI were about what bills to pay and what was in the bank account.  V.S. said he often could not tell how much money was in the bank accounts because money moved in and out frequently.

     k.  V.S. said he asked AVENATTI for supporting documents for some bank account activities once or twice. AVENATTI's response was that he was the CEO and owner, and that he makes the final decisions.

     l.  V.S. described the accounts payable process. V.S. said that the invoices were entered into the accounting system.  A list of invoices that were due soon was sent to AVENATTI.  AVENATTI would then decide which invoices were to be paid and which invoices were to have their payments held off. AVENATTI would tell S.F. to cut a check for the invoice payments he approved.  For the invoices AVENATTI did not approve, V.S. would wait another week and then bring the invoices up to AVENATTI again.  If payment of the outstanding invoices became more imperative, V.S. would bring the issue to AVENATTI's attention more quickly.  V.S. said he knew what invoices needed to be paid, but still needed AVENATTI's approval to pay the invoices.

     m.  Ceridian handled the payroll for GBUS.  Ceridian was also responsible for paying the payroll tax withholdings on

behalf of GBUS.  In approximately 2015 or 2016, however, GBUS
had Ceridian stop paying the payroll tax withholdings.  V.S. did
not know why this change occurred.

       n.   V.S. said that GBUS did not pay the payroll tax
withholdings.  Ceridian would calculate the payroll
withholdings, and M.E. would book the accounting entry in
Microsoft Dynamics Nav, GBUS's accounting software.  M.E. would
email AVENATTI, with a copy to V.S., the amount needed to pay
the payroll tax withholdings.  AVENATTI would respond by saying
that he would take care of it.  V.S. said that AVENATTI knew
that the payroll tax withholdings were not being paid to the IRS
before RO 1 first showed up to GBUS's corporate office in
October 2016.  V.S. said AVENATTI made the decision not to pay
the payroll tax withholdings and no one else at GBUS could have
made that decision.

       o.   V.S. said that the State of Washington also
contacted GBUS and AVENATTI regarding GBUS's failure to pay
state tax withholdings.

       p.   IRS notices and levies were received at GBUS's
corporate office, and then emailed to AVENATTI.  V.S. said that
AVENATTI did not respond to the IRS notices or the levies.
Initially, the IRS notices and levies GBUS received were sent to
AVENATTI only, but later the IRS notices and levies were sent to
AVENATTI and REGNIER.

       q.   V.S. said that AVENATTI knew what was levied
because the bank made notations of what money was levied on the

Case 8:19-cr-00061-JVS * SEALED * Document 78 Filed 01/14/20 Page 76 of 544 Page ID #:1146
Case 8:19-cr-00061-JVS Document 73 Filed 11/14/SEALED Page 76 of 544 Page ID #:1146 of
184   Page ID #:315

bank account statements.[20]  V.S. also emailed AVENATTI daily cash reports that included the levy notations.

      r.  After GBUS's bank account at KeyBank was levied, AVENATTI told M.G. to hold cash deposits at the stores.  The cash deposits were collected, brought to the office to be counted, and then deposited to a different bank account with a different account name.  M.G. would forward a copy of the deposit slips to AVENATTI.  This made V.S. feel uncomfortable because he thought it was being done to avoid the levies.  V.S. discussed this with M.G., who eventually stopped collecting and depositing cash for GBUS.

      s.  V.S. had never heard of GB Hospitality except seeing it on the November 2016 contract with Boeing.  V.S. had been given a copy of the contract.  There were not separate books and records for GB Hospitality, and V.S. did not think GB Hospitality was registered.  The revenue from the Boeing stores was transferred into a GBUS account, and not to a GB Hospitality account.

      t.  GBUS had to make quarterly commission payments to Boeing.  V.S. said that some of the commission payments were late.  M.G. told V.S. that AVENATTI justified the late payment by saying that the wire transfer had been lost, but V.S. did not see a wire out of the GBUS accounts' payable account that corresponded to when AVENATTI had said the wire to Boeing had been lost.

---

[20] I have reviewed bank records for GBUS's bank accounts at CB&T and KeyBank, and confirmed that the monthly account statements referenced the IRS levies.

u.   V.S. was aware that there were different company names for Global Baristas on contracts, but V.S. did not want to question AVENATTI about the different company names.  One of the reasons V.S. thought there were different company names listed for Global Baristas on contracts was to avoid liens and levies.

v.   In September or early-October 2017, GBUS changed its merchant IDs for its merchant accounts with TSYS.  The change was made at AVENATTI's direction.  AVENATTI wanted to make the change fast, and dealt directly with a representative from TSYS ("TSYS Rep. 1") to make the change.

w.   V.S. reviewed an October 2, 2017, email from TSYS Rep. 1 to V.S. in which TSYS Rep. 1 wrote the following:

> Michael Avenatti called me on Friday.  The accounts should be under Global Baristas LLC, not Global Baristas "US" LLC.  We have to make changes as the IRS with [sic] withholding funds.  Michael has asked that I rush this as much as possible.

After reviewing this email, V.S. said that AVENATTI had instructed V.S. to give him TSYS Rep. 1's contact number.  V.S. also said that AVENATTI knew the purpose of the change was to avoid the IRS liens and levies.  V.S. said that changing the merchant IDs was a big deal because every store had to be changed.  The new merchant IDs was also associated with a different bank account.

x.   V.S. said that TSYS later dropped GBUS as a client, at which point GBUS changed its merchant accounts from TSYS to Chase.  V.S. reviewed the Chase merchant account application, which listed Doppio Inc. as the parent company of GB LLC.  V.S. did not know the purpose of Doppio, did not

60

Case 8:19-cr-00061-JVS *SEALED* Document 78 Filed 01/14/20 Page 78 of 544 Page ID #:1148
Case 8:19-cr-00061-JVS *SEALED* Document 73 Filed 11/14/19 Page 78 of 542 Page ID #:318 of
184   Page ID #:317

believe Doppio owned GBUS, and said that GBUS had never done any
work for Doppio.

     y.   V.S. knew that AVENATTI was a lawyer and owned EA
LLP. V.S. never saw AVENATTI as the General Counsel of GBUS.
He only heard from reports in the media that AVENATTI was the
General Counsel for GBUS.[21]

     z.   AVENATTI's salary at GBUS was approximately
$250,000 a year, and it was the highest salary at GBUS.
AVENATTI was paid this salary as the CEO of GBUS. AVENATTI was
not paid as a lawyer. The money that AVENATTI was transferring
in and out of GBUS's bank account was not compensation to
AVENATTI or his law firm. Some money went to EA LLP, but GBUS
never received an invoice from EA LLP. V.S. believed that there
was more outflow than inflow of cash from EA LLP into GBUS's
bank account.

     aa.  V.S. remembered a $100,000 wire being sent to EA
LLP in March 2017. V.S. said that REGNIER sent the wire from
GBUS's bank account to EA LLP. Based on my review of EA LLP's
bank account records, I know that AVENATTI used the proceeds of
this $100,000 wire transfer to pay EA LLP's lawyers in
connection with the EA LLP bankruptcy.

     bb.  V.S said that the last Tully's stores closed in
March 2018. After that, there was no work to be done. V.S. was
waiting to find out what the next plan of action would be for

---

    [21]  After the <u>Clifford</u> lawsuit was filed, a number of press
articles regarding AVENATTI and GBUS appeared. In some of these
articles, AVENATTI or a GBUS spokesperson were quoted as saying
that AVENATTI no longer owned GBUS and was only acting as its
General Counsel.

Case 8:19-cr-00061-JVS *SEALED* Document 78 Filed 01/14/20 Page 79 of 544 Page ID #:1149
Case 8:19-cr-00061-JVS *SEALED* Document 73 Filed 01/14/20 Page 79 of 544 Page ID #:318
184 Page ID #:318

GBUS, but never heard from GBUS.  M.E. emailed AVENATTI to ask
him to lay off the remaining GBUS employees after the last
Tully's stores closed, but never heard back from AVENATTI.  As a
result, M.E. kept the remaining employees on payroll.  GBUS's
payroll continued to be funded until September 2018, at which
point V.S. and the remaining employees' checks bounced.

cc.  GBUS's accounting records were stored in the
cloud.  In April or May 2017, V.S. asked A.G. to back up GBUS's
accounting data from the cloud because 2nd Watch (the company
that managed GBUS's cloud-based server from AWS) was
discontinuing GBUS's services.

30.  On September 25, 2018, I participated in an interview
with M.E., GBUS's former Human Resources Director.  M.E.
provided the following information:

a.  M.E. started working for Tully's (i.e., TC
Global) in 2009 as a temporary employee.  M.E. became the human
resources coordinator in 2010 and the payroll coordinator at the
end of 2013.  M.E. was promoted to Human Resources Director in
April 2016 after M.D. left GBUS.  M.E. resigned from GBUS in
September 2018 after her payroll paycheck bounced.

b.  AVENATTI was the owner and manager of GBUS.  At
one point, AVENATTI said he was the Chairman and CEO.  AVENATTI
received payroll paychecks in his capacity as the CEO of GBUS.
AVENATTI made $250,000 per year as the CEO and Chairman of GBUS.

c.  AVENATTI was the final decision maker for GBUS.
M.E. would copy REGNIER on emails to AVENATTI to make sure that

62

Case 8:19-cr-00061-JVS  *SEALED*  Document 73  Filed 01/14/20  Page 80 of 544  Page ID #:1150
Case 8:19-cr-00061-JVS  Document 78  Filed 02/12/20  Page 80 of
184  Page ID #:319

AVENATTI saw the emails.  M.E. emailed payroll figures to
AVENATTI every other week.

       d.   M.E. said that S.F. and V.S. would send AVENATTI
emails regarding accounts payable, and AVENATTI would tell them
what they could or could not pay.

       e.   M.E. never heard AVENATTI refer to himself as the
General Counsel of GBUS.  M.E. never dealt with AVENATTI as the
company's lawyer.  M.E. said that GBUS was AVENATTI's company
and that AVENATTI happened to be a lawyer.  M.E. read in the
newspaper that AVENATTI said he was the General Counsel of GBUS,
but not the owner.  When M.E. read that statement, she laughed
in disbelief.  No one at GBUS knew or was aware of AVENATTI
being GBUS's General Counsel.

       f.   M.E. once dealt with AVENATTI on a tricky
personnel issue.  M.E., however, said that if AVENATTI had not
been a lawyer she would have still brought the issue to him in
his capacity as CEO.  M.E. also believed that AVENATTI may have
given legal advice regarding employee issues, employee policies,
and the employee guidebook for GBUS.  M.E. was not aware of
AVENATTI handling any other legal issues for GBUS.

       g.   M.E. knew that GBUS had not been paying its
payroll taxes to the IRS.  M.E. said that AVENATTI did not pay
the payroll withholdings, but still withheld taxes from the
employees' payroll checks.

       h.   M.D. told M.E. that Ceridian stopped paying the
payroll withholdings because GBUS did not have the funds to pay
the withholdings.  M.E. thought that M.D. was preparing the

federal payroll tax returns, but not filing them. M.E. said that M.D. believed that payroll tax returns could not be filed without paying the tax liabilities.

i.   M.E. found out later that GBUS's federal payroll tax returns for the third-quarter of 2015 and subsequent quarters had not been filed with the IRS. AVENATTI asked M.E. to sign and file the IRS Forms 940 and IRS Forms 941 for 2015 and 2016. M.E. did not feel comfortable doing so and thought there might be negative implications for her, but signed the returns because she did not think she was responsible for them. M.E. sent AVENATTI the returns at the same time as she filed them with the IRS. There were no payments made with the returns. M.E. informed the accounting team, V.S. and S.F., of the amounts of payroll taxes owed.

j.   M.E. learned from M.D. and V.S. that M.B. sent AVENATTI an email explaining to him the consequences of GBUS not paying its payroll taxes.

k.   M.E. spoke with REGNIER twice on the phone in 2017 when she filed GBUS's IRS Forms 940 and IRS Forms 941s with the IRS. M.E. said that REGNIER knew how to file the forms online, but REGNIER wanted to mail the forms instead. AVENATTI instructed M.E. to sign the forms.

l.   M.E. was interviewed by RO 1 in November 2017. M.E. spoke to AVENATTI a few days later, and told AVENATTI everything that she had told RO 1. When M.E. told AVENATTI that she had told RO 1 that AVENATTI instructed her not to file the tax returns, AVENATTI was shocked. M.E. then reminded AVENATTI

that he had sent her an email telling her not to file the tax returns.

m.    M.G. told M.E. that the merchant accounts had changed, but M.G. did not understand why the change had been made.

n.    V.S. told M.E. that AVENATTI had instructed him to change the bank account for GBUS.

o.    M.E. took part in collecting cash deposits from the Tully's stores.  M.E. would help M.G. count the cash that had been collected.  Store managers were told to hold all the cash from the stores, and then the GBUS's district managers were supposed to collect the cash.  This occurred in late 2017 or early 2018 when the Tully's stores were being closed down.  M.G. told M.E. that the directive to hold the cash deposits came from AVENATTI.  M.E. also said that the IRS liens were common knowledge throughout GBUS when the stores were holding the cash deposits.

p.    When the last Tully's stores closed in approximately March 2018, M.E. emailed AVENATTI to ask him what the next step was.  AVENATTI did not respond.  M.E. did not understand why employees were still being paid until September 2018 or why GBUS was still operating after the stores closed. M.E. wasn't doing much for GBUS during this time period other than processing unemployment claims and payroll.  M.E. was on "autopilot" and was just processing the payroll every week. This continued until September 2018, when her last paycheck from

Case 8:19-cr-00061-JVS *SEALED* Document 78 Filed 01/14/20 Page 83 of 544 Page ID #:1153
Case 8:19-cr-00061-JVS Document 73 Filed 01/14/20 Page 83 of 544 Page ID #:322
184   Page ID #:322

GBUS bounced.  M.E. did not know how AVENATTI was paying for
payroll after the stores closed.

    31.  On September 26, 2018, I participated in an interview
of M.G., GBUS's former Director of Retail Operations.  M.G.
provided the following information:

        a.  M.G. started working at Tully's as a barista in
2004 and became a store manager in 2005.  In approximately 2012,
M.G. became a District Manager and was responsible for the
Tully's stores at Boeing facilities.  In March 2016, M.G. became
the Director of Retail Operations.  M.G. resigned her position
at GBUS in April 2018, after the last of the Tully's stores
closed.  M.G.'s sister, S.F., also worked for GBUS.

        b.  AVENATTI was the owner, CEO, and Chairman of
GBUS.  As the Director of Retail Operations, M.G. reported to
AVENATTI.

        c.  M.G. never heard AVENATTI referred to as the
General Counsel for GBUS, and did not consider AVENATTI to be
GBUS's General Counsel.  M.G.'s interactions with AVENATTI
involved standard business decisions, and were not legal
discussions.  M.G. was also unaware of AVENATTI's law firm being
hired to represent GBUS.  M.G. said that she asked AVENATTI for
legal advice regarding eviction notices, legal documents, and
the firing of a store manager on one occasion.  She discussed
these issues with AVENATTI because he was the owner of the
company, not because she considered him to be GBUS's General
Counsel.

d.   GBUS was the operating company for the Tully's stores, and GB LLC was GBUS's parent company.

e.   Ceridian handled the payroll for GBUS.  M.E. told M.G. that Ceridian also handled the payment of payroll taxes until there was not enough money in GBUS's accounts to make the tax payments.  At that point, GBUS was responsible for paying its payroll taxes itself.

f.   M.G. had heard that GBUS was not paying its payroll taxes.  M.G. believes that B.H. told her that GBUS's payroll taxes were not being paid.  M.G. also saw an email from M.B. that warned AVENATTI about the consequences of not paying taxes.  M.G. believes that B.H. was copied on this email and that she saw it because she had access to B.H.'s emails after he left GBUS in 2016.

g.   In connection with discussions to renew a lease for GBUS's training facility in 2016, M.G. forwarded an email to AVENATTI about an IRS lien relating to unpaid taxes.  M.G. told AVENATTI that these things needed to be addressed to move forward.  AVENATTI asked her how she learned about the lien, told her that it had nothing to do with GBUS's revenues, and said it was not her concern.

h.   M.G. spoke with M.E. and V.S. about AVENATTI not paying the payroll taxes and withholdings.  M.G. felt that AVENATTI's actions were questionable, and that she needed to make sure she would not be held personally responsible.  M.G. was worried that it would be her word against AVENATTI's word, so she backed up her work files on her personal laptop in case

67

she needed them for proof down the road.  As noted in paragraph
79 below, I understand that these records are contained on
SUBJECT DEVICE 3.

      i.   Around September 2017, either AVENATTI or REGNIER
told M.G. that the Tully's stores could no longer make deposits
into GBUS's KeyBank account because there was a lien on the
account and the money would be gone.  M.G. was instructed to
tell the Tully's stores to hold all of their cash deposits.
AVENATTI later instructed M.G. to deposit the cash from Tully's
stores into GB Auto's account at BofA.  M.G. said that AVENATTI
texted her GB Auto's bank account information and instructed her
to text him a picture of the deposit slip whenever she made a
cash deposit.

      j.   On or about September 7, 2017, M.G. sent AVENATTI
a text message with a picture of the deposit slip for the first
deposit she made to the GB Auto account.  M.G. continued to send
AVENATTI a picture of the deposit slip whenever she made a cash
deposit into the GB Auto account.  M.G. would give the physical
copy of the deposit slip to V.S.  M.G. said that the last
deposit was made in December 2017, at which point she told
AVENATTI that she was not going to make any more cash deposits
into the GB Auto account.  After this, the Tully's stores began
depositing cash into a KeyBank account again.

      k.   M.G. was shown a spreadsheet detailing
approximately 27 cash deposits made into GB Auto BofA Account
7412 between September 2017 and December 2017, totaling

Case 8:19-cr-00061-JVS *SEALED* Document 78 Filed 01/14/20 Page 86 of 544 Page ID #:1156
Case 8:19-cr-00061-JVS *SEALED* Document 73 Filed 11/14/19 Page 86 of 342 Page ID #:325
184 Page ID #:325

approximately $882,884. M.G. confirmed that these were the cash deposits she made at AVENATTI's direction.

l.   M.G. said that she was aware of the IRS liens and GBUS's non-payment of payroll taxes and withholdings when she made the first cash deposit into GB Auto BofA Account 7412.

m.   M.G. was asked about the change in the merchant accounts for the Tully's stores. M.G. said that GBUS's merchant accounts were initially with TSYS. When TSYS eventually terminated its agreement with GBUS, GBUS switched its merchant accounts to Chase. M.G. understood that the change in the merchant IDs for the TSYS merchant account was made at AVENATTI's direction. M.G. said nobody at GBUS other than AVENATTI could make that type of decision. V.S. told M.G. that the change in the merchant IDs for the TSYS account was done because of the liens on the account.

n.   M.G. was responsible for overseeing the Tully's stores at Boeing facilities. The Boeing stores were GBUS's most profitable stores.

o.   M.G. was shown a redlined draft of the November 2016 contract with Boeing in which the name of the contracting party had been changed from GBUS to GB Hospitality. M.G. said that AVENATTI handled the Boeing contract. When M.G. asked AVENATTI about this change, he told her not to worry about it. M.G. and V.S. looked to see if GB Hospitality was a Global Baristas subsidiary, but couldn't find a record of it anywhere. The Boeing contract was only time M.G. ever saw the name GB Hospitality.

p.   The Boeing contact was cancelled in September
2017.  M.G. understood that the contract was cancelled because
GBUS had not paid Boeing the commissions GBUS owed.  In
connection with the cancellation of the contract, GBUS agreed to
sell certain equipment to Boeing as payment for the unpaid
commissions GBUS owed Boeing.  Separately, GBUS agreed to sell
two coffee kiosks to Boeing.  M.G. was shown redline drafts of
the two bills of sale for these transactions, in which the name
GB Hospitality had been replaced with GB LLC.  M.G. did not know
who made that change.  M.G. had received copies of the two bills
of sale from Boeing and shared them with V.S.

q.   GBUS was evicted from its corporate headquarters
in Seattle, Washington, in November 2017.  All of GBUS's
business records stayed at the corporate office when GBUS was
evicted.  AVENATTI said he would deal with getting the business
records back.[22]

r.   M.G. told AVENATTI about the summons she received
from RO 1 in November 2017 and sent him a copy of the summons.
AVENATTI called M.G. and asked her if she went to the hearing to
which she had been summonsed, what documents she brought to the
hearing, and what was said in the hearing.  When M.G. told
AVENATTI she brought documents regarding the change in GBUS's
bank accounts, AVENATTI was livid.  AVENATTI told her that she

---

[22]  Based on my discussions with representatives from Unico,
which served as the property manager for GBUS's corporate
offices, I learned that GBUS's property, including any remaining
business records, were abandoned and either sold at auction or
destroyed.

should not have given the records to RO 1, and should have instead sent them to AVENATTI.

   s. As of January 2018, it was getting more difficult to get answers from AVENATTI.  M.G. began copying REGNIER on emails because AVENATTI was passing GBUS matters on to REGNIER.

   t. M.G. was aware that in March 2018 AVENATTI made statements to the press indicating that he was not the owner of GBUS.  M.G.'s understanding was that AVENATTI had always been GBUS's owner and believed these statements to be false.  On March 8, 2018, M.G. sent AVENATTI a text message confronting him.  M.G. asked AVENATTI if he was not the owner of GBUS, then who should she go to for GBUS business decisions.  AVENATTI responded that everything still went through him and that M.G. should discuss all matters with him.

   u. Sometime after the Tully's stores closed in March 2018, AVENATTI called M.G. and yelled at her because a store manager had released confidential information to the press.  AVENATTI told M.G., "I will fucking destroy him."  AVENATTI also said that if he was willing to sue the President then he was willing to sue an employee.  After that conversation, M.G. felt that AVENATTI was no longer responsive to GBUS employees.

   v. During her interview, M.G. consented to have the IRS retrieve text messages between her and five specific contacts that were stored on her personal cell phone, including all text messages between her and AVENATTI.  IRS SA John Medunic captured images of the text messages, returned the phone to M.G., and then mailed a copy of the images to the Privilege

71

Case 8:19-cr-00061-JVS * Document 78 Filed 01/14/20 Page 89 of 544 Page ID #:1159
Case 8:19-mj-00061-DUTY * SEALED * Document 1-4 *SEALED* Filed 02/22/19 Page 89 of
184   Page ID #:328

Review Team AUSA assigned to this investigation.  I understand
that a privilege review of the text messages is ongoing.

32.   On or about September 25, 2018, I participated in an
interview of S.F., GBUS's former Accounts Manager.  S.F.
provided the following information:

a.   S.F started working for Tully's in 2008, but
eventually resigned due to health reasons.  In December 2013,
S.F. returned to work for GBUS as an assistant store manager.
In October 2015, S.F. became the office manager at GBUS's
corporate headquarters.  In September 2016, she was promoted to
Accounts Manager and Franchise License Business Manager.  S.F.
resigned in September 2018, after her last paycheck bounced.
S.F.'s sister, M.G., also worked at GBUS.

b.   S.F.'s role as Accounts Manager was to enter
vendor invoices into GBUS's accounts payable system.  Most
invoices for GBUS went through S.F.  S.F. had little involvement
with account receivables.

c.   S.F. understood that AVENATTI was the CEO and
owner of GBUS.  AVENATTI operated GBUS from EA LLP's office in
Newport Beach, California.  S.F. used AVENATTI's EA LLP email
address to communicate with him.  S.F. only met AVENATTI once
and did not speak to him frequently.

d.   S.F. never saw AVENATTI act as the General
Counsel for GBUS.  S.F. also did not prepare any payments to
AVENATTI's law firm.  The first time S.F. heard AVENATTI
referred to as General Counsel was in connection with statements
AVENATTI made to the press in 2018.

      e.   M.G. told S.F. that GBUS was not paying its payroll taxes.  S.F. recalled seeing a detailed email to AVENATTI explaining the consequences of GBUS not paying its payroll taxes.

      f.   S.F. recalled RO 1 visiting GBUS's corporate offices in the fall of 2017.  RO 1 gave S.F. a letter during his visit.  S.F. remembered that the letter referenced a possible criminal prosecution.  S.F. said that she either scanned the letter and emailed it to AVENATTI or typed out its contents in an email to AVENATTI.  S.F. spoke to AVENATTI later that day.  AVENATTI seemed rattled and concerned.  AVENATTI asked what RO 1 wanted, what RO 1 had asked, what S.F. told RO 1, and whether RO 1 came with other people.  At the end of the conversation, AVENATTI thanked her for letting him know about the visit, and asked her to keep the situation between the two of them.

      g.   S.F. was aware of the IRS levies on the GBUS bank accounts because she had access to GBUS bank account information.  S.F. said that the State of Washington had also placed levies on GBUS's bank accounts at one point.

      h.   REGNIER worked at EA LLP, and was AVENATTI's paralegal and assistant.  S.F. said the best way to get a hold of AVENATTI was through REGNIER.

      i.   When GBUS received IRS notices, S.F. scanned and emailed the notices to AVENATTI and REGNIER.

      j.   S.F. was aware that AVENATTI told M.G. to collect the cash deposits from the Tully's stores and deposit the cash into a bank account held in the name of GB Auto.

k.   S.F. was aware that GBUS had changed its merchant accounts with TSYS.  The company associated with the TSYS merchant accounts was changed from GBUS to GB LLC.  S.F. assumed this was done to avoid liens.  Later, GBUS switched its merchant accounts from TSYS to Chase.

l.   S.F. heard from V.S. that AVENATTI was withdrawing money from GBUS's bank account.

m.   In November 2017, GBUS was evicted from its corporate offices in Seattle, Washington.  The locks were changed and GBUS did not have an opportunity to move out of the office.

n.   GBUS used Microsoft Dynamics NAV for its accounting software.  The information was stored in an AWS cloud-based server through a company called 2nd Watch.  In approximately May 2018, GBUS lost access to its cloud-based server.

33.  On November 14, 2018, I participated in an interview of B.C., who previously worked in GBUS's accounting department. B.C. provided the following information:

a.   B.C. started working for TC Global/Tully's in 2011 or 2012 as a contractor setting up its point-of-sales ("POS") system.  After GBUS took over Tully's stores, T.M. asked B.C. to come back and help with other projects.  B.C. worked part-time (20 to 25 hours a week) for GBUS until September 2018 when her final paycheck bounced.  B.C. primarily worked remotely from her home.

Case 8:19-cr-00061-JVS *SEALED* Document 78 Filed 01/14/20 Page 92 of 544 Page ID #:1162
Case 8:19-cr-00061-JVS *SEALED* Document 4-1 Filed 02/22/19 Page 97 of
184  Page ID #:331

b.   B.C.'s primary role at GBUS was to pull reports for month end sales and book them into the correct accounting entries.  B.C. pulled credit-card-sales data, tax-sales data, and reports from the POS system, then inputted this data into the general ledger.  At the end of the month, she reconciled cash to sales figures.  B.C. reported to M.B. until M.B. resigned.  After M.B. resigned, she reported to V.S.

c.   AVENATTI was GBUS's CEO.  AVENATTI appointed T.M. as the CFO and COO.  M.B. was GBUS's Controller.  B.C. understood from M.B. that AVENATTI was very involved in the financial aspects of GBUS, and approved payments and contracts for GBUS.

d.   B.C. did not consider AVENATTI to be GBUS's lawyer.

e.   B.C. had seen AVENATTI before, but had never been introduced to him.  She never had a direct conversation with him.  Although she had been copied on emails to or from AVENATTI, she never had direct email communications with AVENATTI.

f.   GBUS changed the location of its bank accounts from HomeStreet to CB&T.  Cash deposits were made at KeyBank while GBUS was banking with CB&T.  B.C. did not have direct access to bank reports from CB&T, and would instead receive the reports from M.B. or V.S.  B.C. had access to the KeyBank account, and would pull reports from the KeyBank account to do the cash reconciliation.

g.   GBUS used Ceridian for payroll services.
Ceridian used to handle the payroll taxes for GBUS, but later
GBUS handled the payroll taxes on its own.

h.   B.C. knew that GBUS was not paying its payroll
taxes.  B.C. knew there were levies on all of the GBUS bank
accounts because she reconciled the bank accounts.  V.S. told
B.C. what the levies were for, but did not go into great detail.
V.S. told B.C. that GBUS owed the IRS millions of dollars, that
AVENATTI was aware of this, and that AVENATTI had decided not to
pay the IRS.

i.   B.C. said that anything and everything was sent
to AVENATTI.  AVENATTI made all of the decisions for GBUS and no
other employees had authority to make decisions.  AVENATTI
approved all account payable checks, and all GBUS checks had
AVENATTI's signature.

j.   In 2015, GBUS switched its merchant accounts from
Heartland to TSYS.  TSYS Rep. 1 was GBUS's sales representative
at TSYS.

k.   B.C. was asked about an email TSYS Rep. 1 sent
her on October 2, 2017 in which TSYS Rep. 1 said:

> Michael Avenatti called me on Friday.  The accounts
> should be under Global Baristas LLC, not Global
> Baristas "US" LLC.  We have to make changes as the IRS
> with [sic] withholding funds.

B.C. explained that if the merchant IDs were changed, then the
credit card terminals at each Tully's store would need to be
reprogrammed.  B.C. did not understand why AVENATTI would want
to make this change.  TSYS Rep. 1 told B.C. that AVENATTI had

76

claimed that the merchant IDs were supposed to be under GB LLC's name and EIN, rather than GBUS's name and EIN.  AVENATTI had called TSYS Rep. 1 and authorized the name change.  B.C. believed this change was made to alter the banking deposits and avoid the IRS levies, which were occurring at the same time.

l.   TSYS Rep. 1 provided B.C. with the paperwork to fill out for the changes to the merchant accounts.  B.C. partially filed out the paperwork and then sent it to REGNIER. B.C. was not comfortable filing out the paperwork because the change was clearly being made to avoid the levies.  She believed that she expressed this concern to V.S. and TSYS Rep. 1 over the phone.

m.   In November 2017, TSYS Rep. 1 called B.C. and told her that TSYS was dropping GBUS as a client.  TSYS Rep. 1 initially offered to help B.C. identify another credit card processing company, but was later advised not to communicate with her further.  B.C. believes that TSYS dropped GBUS as a client because of the merchant account changes to avoid the IRS levies.

n.   B.C. learned from emails between AVENATTI and M.G. that the Tully's stores had been instructed to hold cash for deposit, and then email the cash deposit amounts.  B.C. was on the email chain because she had to enter the cash deposits in the general ledger.  The cash deposits were made into a BofA account instead of the KeyBank account and then transferred to a CB&T account.

o.   B.C. believed the cash deposits were timed. AVENATTI instructed when to make the cash deposit, when to transfer the funds, and when to sweep the account.  B.C. said that these actions were designed to avoid the levies.

p.   AVENATTI took money from the KeyBank account randomly.  M.B. instructed B.C. on how to record the money AVENATTI was transferring in and out of GBUS's bank account in GBUS's accounting records.

q.   GBUS used Microsoft Dynamics NAV for its accounting records.  The accounting data was stored and backed up on an AWS cloud-based server.  Eventually, GBUS's AWS cloud account was shut down because of non-payment.

34.  On November 13, 2018, I participated in an interview with A.H., who previously worked in GBUS's accounting department.  A.H. provided the following information:

a.   A.H. worked in the accounting department at GBUS from approximately April 2014 to October 2016.  A.H. did basic accounting work involving accounts payable and accounts receivable.

b.   A.H. reported to M.B. and worked with V.S. on a daily basis.  After M.B. left GBUS, A.H. reported to V.S.  A.H. participated in weekly conference calls with AVENATTI, M.G., and V.S.

c.   A.H. was aware from discussions she had or overheard in the office that GBUS was not paying its payroll taxes.  M.B. told her she was leaving GBUS because AVENATTI was not paying GBUS's payroll taxes.

     d.  A.H. recalled telling AVENATTI that GBUS had received another IRS letter. GBUS employees would ask AVENATTI to get on a payment plan with the IRS, but AVENATTI would say no. AVENATTI would say that he was negotiating with the IRS and taking care of it.

     e.  A.H. dealt with vendors who were waiting for payments. GBUS was frequently late paying its vendors. A.H. said that AVENATTI was well aware of what was owed to vendors, as well as what was owed to the IRS.

     f.  A.H. recalls telling AVENATTI that A.H. could not pay vendors because AVENATTI had pulled money out of the GBUS bank account. AVENATTI responded by saying it was his money. AVENATTI always made it clear that he was the boss and it was his company. GBUS could not pay bills without AVENATTI's approval, and he approved all vendor payments.

     g.  A.H. said that AVENATTI never wanted anything in writing. AVENATTI would not respond by email, but would instead either call or email back saying "call me."

    35.  On October 25, 2018, I participated in an interview with A.G., GBUS's former Information Technology ("IT") Manager. A.G. provided the following information:

     a.  A.G. started working for Tully's (TC Global) before GBUS took over operations. A.G. was a System Engineer and then took over as IT Manager. He stopped working for GBUS when his last paycheck bounced in September 2018.

b.   A.G. understood AVENATTI to be the owner and CEO of GBUS.  A.G. never heard of AVENATTI being GBUS's General Counsel and never had any legal discussions with him.

c.   A.G. said that AVENATTI approved the expenses at GBUS.

d.   A.G. heard that GBUS changed its bank accounts to avoid IRS levies.  A.G. also heard that GBUS owed a lot of taxes and was getting IRS notices.

e.   A.G. knew that M.G. picked up cash deposit bags from the Tully's stores and counted the cash at the corporate office.  M.G. eventually told AVENATTI that she did not want to do that anymore.

f.   In April or May 2018, AVENATTI told A.G. that, if A.G. was ever approached by the IRS, A.G. should contact AVENATTI first.

g.   AVENATTI had a GBUS email address, but instead used his law firm email account for GBUS business.

h.   GBUS's corporate computer system was setup on a hybrid environment through a managed cloud service called 2nd Watch.[23]  2nd Watch managed GBUS's desktop operating system and server.  GBUS's desktop operating system used a cloud computing service called Microsoft Azure that included programs like Microsoft Office Online 365.  GBUS used a cloud-based server

---

[23] Based on documents received from 2nd Watch and a preliminary review of GBUS bank records, it appears that GBUS paid 2nd Watch on a monthly basis throughout the life of the contract.  The contract with 2nd Watch was, however, entered into by "Tully's Coffee."

Case 8:19-cr-00061-JVS Document 78 Filed 01/14/20 Page 98 of 544 Page ID #:1168
Case 8:18-mj-00099-DUTY Document Document 01/14/20 Page 98 of 544 Filed 04/27/19 Page 108 of
184 Page ID #:337

called Amazon Elastic Compute Cloud (Amazon EC2) that stored its
data in the AWS cloud.

       i.    A.G. showed the interviewers an email he sent to
AVENATTI on April 5, 2018.  In the email, A.G. told AVENATTI
that 2nd Watch had turned off GBUS's server access to AWS and
that GBUS was without functioning email.  A.G. had begged
AVENATTI to keep paying 2nd Watch for the cloud services.
AVENATTI initially paid for the services, but he later stopped.

       j.    J.S., an IT contractor, made a backup of GBUS's
data and emails from the AWS cloud-based server before 2nd Watch
turned off access to the servers.  Based on my discussions with
A.G., I understand that this data is contained on SUBJECT DEVICE
5, SUBJECT DEVICE 6, and SUBJECT DEVICE 7.  (See supra ¶¶ 81-
82.)

### 4.   Information Regarding TSYS Merchant Solutions

36.  IRS-CI's investigation has revealed that AVENATTI
attempted to evade the collection of payroll taxes and obstruct
the IRS collection case by directing TSYS to change the business
name, EIN, and bank account information for GBUS's merchant
accounts.

37.  On November 6, 2018, I participated in an interview
with TSYS Rep. 1.  Based on my review of documents obtained from
TSYS and the interview with TSYS Rep. 1, I have learned, among
other things, the following information:

       a.    On or about June 29, 2015, GBUS entered into a
Merchant Transaction Processing Agreement with TSYS.  The
merchant name on the agreement was GBUS, and the agreement was

signed by M.B.  The sponsoring bank under the TSYS agreement was FNB Omaha.[24]

b.    On or about July 10, 2015, AVENATTI signed an ACH Agreement with TSYS and provided a blank check for GBUS's CB&T operating account ending in 2240 ("GBUS CB&T Account 2240"). GBUS CB&T Account 2240 began receiving deposits from TSYS via FNB Omaha in or around July 2015.

c.    On or about August 16, 2017, the IRS issued a levy for GBUS's merchant accounts with FNB Omaha.  FNB Omaha began withholding funds from GBUS's account by no later than September 25, 2017.

d.    On Friday, September 29, 2017, AVENATTI called TSYS Rep. 1.  This was the first time TSYS Rep. 1 had ever spoken to AVENATTI, as he primarily dealt with M.B. or B.C. TSYS Rep. 1 believes he spoke with AVENATTI multiple times that day.  During these calls, AVENATTI told TSYS Rep. 1 that TSYS was holding GBUS's money, and that he did not know what was going on.  TSYS Rep. 1 told AVENATTI that there were no normal holds on the GBUS account.  After AVENATTI mentioned the IRS, TSYS Rep. 1 suggested that it could be the result of an IRS "1099 hold."  B.V. explained that a "1099 hold" related to a new IRS reporting requirement and occurred when there were issues

---

[24]  TSYS Rep. 1 explained that the sponsoring bank must be a registered financial institution and is responsible to Visa and Master Card.  TSYS processed the credit card transaction data. The funds would be paid to FNB Omaha, and then transferred from FNB Omaha to the GBUS's bank account, after the fees were paid to TSYS.

with the company's name or EIN.[25]  AVENATTI told TSYS Rep. 1 that
TSYS had made a mistake and placed the accounts under the wrong
company name.  AVENATTI said that the merchant accounts should
have been under GB LLC, not GBUS.  AVENATTI told TSYS Rep. 1
that TSYS needed to get this changed.  AVENATTI never disclosed
to TSYS Rep. 1 that there was an IRS tax lien on GBUS, that the
IRS had issued levies on GBUS's bank accounts, or that GBUS had
outstanding payroll tax obligations.  Rather, AVENATTI suggested
to TSYS Rep. 1 that he had no idea why TSYS was holding its
funds.

     e.    TSYS Rep. 1 and AVENATTI also exchanged multiple
emails on September 29, 2017.  TSYS Rep. 1 asked AVENATTI to
confirm the "correct tax ID" and provide him with "the exact
legal name as filed with the IRS."  AVENATTI responded by
providing TSYS Rep. 1 with GB LLC's name and federal tax ID
number (EIN).  TSYS Rep. 1 then emailed AVENATTI a list of items
that would be "needed to perform the change of ownership."  TSYS
Rep. 1 said that the "change in ownership will create new
merchant accounts under the correct business info."  At
AVENATTI's direction, V.S. also emailed TSYS Rep. 1 a
spreadsheet detailing the GBUS funds that were being held by
TSYS and FNB Omaha.

     f.    On October 2, 2017, TSYS Rep. 1 emailed B.C. and
V.S. to obtain information he needed to change the merchant
accounts, which would be a complicated process.  When B.C. asked

---

[25]  A call-log received from TSYS shows that on September
29, 2017, TSYS Rep. 1 called TSYS's client services department
to check if there was a 1099 hold on GBUS's account.

TSYS Rep. 1 what he had been asked to do, TSYS Rep. 1 responded as follows:

> Michael Avenatti called me on Friday.  The accounts should be under Global Baristas LLC, not Global Baristas "US" LLC.  We have to make changes as the IRS with [sic] withholding funds.  Michael has asked that I rush this as much as possible.

g.    On October 2, 2017, TSYS Rep. 1 emailed AVENATTI and V.S. to request the banking information for each Tully's store, as well as bank letters for each account.  AVENATTI responded that the "accounts will likely change."  In a subsequent email that day, AVENATTI told TSYS Rep. 1 that "[w]e want to do it the same way we have done it in the past.  The account number and ownership merely changes."

h.    Later on October 2, 2017, TSYS Rep. 1 emailed AVENATTI and told him there "appears to be a bank levy directed by [sic] our Sponsor Bank - First National Bank of Omaha."  TSYS Rep. 1 explained to AVENATTI that TSYS does not "get any details on the levy" and provided AVENATTI with the contact information for FNB Omaha.  TSYS Rep. 1 also asked AVENATTI to "[l]et me know what you find out and if there are any possible implications when we set up the new accounts with the correct TAX IDs."  During his interview, TSYS Rep. 1 said that he believes that he learned of the levy on October 2, 2017.  TSYS Rep. 1, however, noted that he did not have any or all of the information from FNB Omaha, and AVENATTI was telling TSYS that TSYS had made a mistake when it set up the merchant accounts.

i.    On October 3, 2017, TSYS Rep. 1 emailed AVENATTI and V.S. and asked them to send him the bank letters and the

signed agreement.  TSYS Rep. 1 also asked AVENATTI again to "let
me know if you found out anything yesterday with First National
Bank of Omaha and any possible implications or things needed on
my end."  This was the second time TSYS Rep. 1 had asked
AVENATTI that question.  AVENATTI never responded to his
question or provided TSYS Rep. 1 with any information regarding
the IRS levies or his discussions with FNB Omaha.

      j.   Later on October 3, 2017, REGNIER emailed TSYS
Rep. 1 the new Merchant Transaction Processing Agreement, which
was signed by AVENATTI on behalf of GB LLC in his capacity as
CEO.  REGNIER also emailed TSYS Rep. 1 a bank letter identifying
a GB LLC account at CB&T ending in 3730 ("GB LLC CB&T Account
3730").  Based on my review of CB&T bank records, I know that GB
LLC CB&T Account 3730 was a new bank account that AVENATTI and
REGNIER opened in Orange County, California, earlier that same
day.  AVENATTI and V.S. were copied on all of the emails REGNIER
sent TSYS Rep. 1.

      k.   The change in merchant accounts was completed on
or about October 7, 2017.

      l.   On November 7, 2017, TSYS informed AVENATTI and
GBUS that it was closing GBUS's and GB LLC's merchant accounts.
TSYS Rep. 1 understood that TSYS decided to close the merchant
accounts because GBUS had huge tax liens and levies with the
IRS.

      m.   TSYS Rep. 1 does not believe that TSYS made a
mistake or used the incorrect name when it opened the GBUS
merchant accounts in June 2015, as AVENATTI had claimed.  TSYS

Rep. 1 said that when the GBUS merchant accounts were first opened there were discussions as to whether the correct legal name should be GBUS or GB LLC.

      n.    TSYS Rep. 1 said that had AVENATTI disclosed the existence of the IRS liens and levies to him he would have raised the issue with TSYS's legal department and risk management team.  TSYS Rep. 1 felt that information regarding the IRS tax liens and levies would have been highly valuable information to TSYS.  Indeed, TSYS ultimately cancelled the GBUS contract because of the IRS tax liens and levies.

### *5.   Information Regarding The Boeing Company*

    38.  The investigation has also revealed that AVENATTI attempted to evade the collection of payroll taxes and obstruct the IRS collection case by changing the company name on contracts with Boeing.  As noted above, GBUS operated a number of Tully's stores at Boeing facilities in Washington.  These stores were the most profitable part of GBUS's business.

    39.  On October 23, 2018, I participated in interviews with three Boeing employees, P.K., C.M, and A.R.G.  P.K. and C.M. were both Procurement Agents at Boeing, and A.R.G. was a Senior Counsel in Boeing's legal department.  Based on these interviews and my review of documents produced by Boeing, I learned, among other thing the following information:

      a.    On September 2, 2016, AVENATTI submitted a contract renewal proposal to Boeing.  AVENATTI signed the proposal as the "CEO/Chairman of Global Baristas US, LLC (dba Tully's Coffee)."

      b.   On October 28, 2016, P.K. emailed AVENATTI the proposed Shared Services contract between Boeing and GBUS.

      c.   On November 15, 2016, AVENATTI emailed P.K. a revised Shared Services contract in which he changed the contracting party's name from "Global Baristas US LLC" to "GB Hospitality LLC."  In the email, AVENATTI told P.K. that the name change was "occasioned by us having formed an additional wholly owned subsidiary that serves as the contracting party for all our relationships where we are proving onsite coffee service within corporate environments."

      d.   On November 16, 2016, AVENATTI signed the Shared Services contract with Boeing on behalf of "GB Hospitality LLC." The Shared Services contract required GB Hospitality to make $110,000 quarterly commission payments to Boeing in 2017.  The contract identified AVENATTI's title as "Chairman/CEO."  P.K. said that when he was responsible for the GBUS/GB Hospitality/Tully's account he viewed AVENATTI as the CEO of the contracting party, not as an attorney.

      e.   Between May 24, 2017, and August 15, 2017, P.K. and A.R.G. sent AVENATTI multiple emails and letters regarding GB Hospitality's failure to make the required commission payments for the first and second quarters of 2017.  C.M. and A.R.G. both said that AVENATTI repeatedly failed to respond to Boeing's emails and letters.  C.M. said that she knew AVENATTI was a lawyer, but was communicating with him because he was the owner of GBUS rather than because he was GBUS's lawyer.

Case 8:19-cr-00061-JVS *SEALED* Document 78 Filed 01/14/20 Page 105 of 544 Page ID #:1175
Case 8:19-cr-00061-JVS Document 73 Filed 01/14/20 Page 105 of 544 Page ID #:1175
184   Page ID #:344

      f.   On August 16, 2017, Boeing received an IRS Notice of Levy relating to GBUS. On or about September 19, 2017, Boeing returned the Notice of Levy to the IRS and indicated that it did not owe GBUS any money. As a result, the levy was closed. A.R.G. was aware of the levy at the time and may have been responsible for filling out and returning the levy form to the IRS.

      g.   On September 5, 2017, Boeing sent AVENATTI via email and FedEx a letter notifying him that Boeing was cancelling its contract with GB Hospitality due to the company's failure to make the required commission payments. A.R.G. said that Boeing sent the cancellation notice to AVENATTI because he was the owner of GB Hospitality/GBUS.

      h.   On September 6, 2017, AVENATTI responded to the cancellation letter. Among other things, AVENATTI claimed that he had never received the prior notice of default from Boeing, even though that notice had been delivered to EA LLP's offices via FedEx.

      i.   On September 7, 2017, A.R.G. spoke to AVENATTI regarding the cancellation of the contract and transition discussions. A.R.G. said that all transition calls had to go through AVENATTI. A.R.G. believed that she was communicating with AVENATTI both as the person operating GBUS and as the lawyer for GBUS. A.R.G. always believed that AVENATTI was the

decision maker for GBUS.  At one point, however, AVENATTI told Boeing that he had to run a decision by the Board of Directors.[26]

      j.  On or about September 18, 2017, A.R.G., C.M. and others met with AVENATTI regarding Boeing's transition from GBUS.  During this meeting, Boeing and AVENATTI discussed the sale of GBUS equipment to Boeing.  A.R.G. said that AVENATTI asked to be the point of contact for the sale of GBUS equipment.

      k.  On September 20, 2017, REGNIER emailed AVENATTI a list of GBUS equipment at the Boeing stores.  AVENATTI then forwarded this email to C.M., with a copy to M.G. from GBUS.  A.R.G. said that it made sense for Boeing to buy the equipment from GBUS because it still wanted to supply coffee to its employees.

      l.  On September 22, 2017, AVENATTI emailed C.M. and said:  "We have discussed it internally and we propose that we assign the equipment to Boeing in exchange for any commissions due and owing to Boeing."

      m.  On September 26, 2017, A.R.G. emailed AVENATTI a bill of sale relating to the GBUS equipment at the Boeing stores.  A.R.G. drafted the bill of sale.  She identified GB Hospitality as the seller on the bill of sale because that was the entity name on the contract with Boeing.  Under the terms of the proposed sale, Boeing would pay GB Hospitality $10 and forgive all remaining debt in exchange for the equipment.

---

[26]  This statement appears to have been false.  Multiple former GBUS employees have said that GBUS did not have a Board of Directors.

n.     On September 27, 2017, A.R.G. and AVENATTI
discussed Boeing purchasing two coffee kiosks[27] from GBUS for
$155,000.  C.M. said that the kiosk discussions occurred at the
end of the transition talks.

o.     On September 28, 2017, AVENATTI emailed A.R.G.
and agreed to sell the kiosks for $155,000.  AVENATTI asked
A.R.G. to send him a revised bill of sale.  He also indicated
that he would "need payment no later than next Friday" (i.e.,
October 6, 2017).  Later that day, A.R.G. emailed AVENATTI two
separate bills of sale -- one for the purchase of the equipment
and one for the purchase of the kiosks.  Both Bills of Sale
identified GB Hospitality as the seller.

p.     On September 29, 2017, A.R.G. emailed AVENATTI
revised drafts of the two Bills of Sale in which the name of the
seller was changed from GB Hospitality to "Global Baristas,
LLC."  A.R.G. said that AVENATTI asked her to change the seller
name because GB LLC was the owner of the equipment, not GB
Hospitality.  In her email, A.R.G. also wrote the following:

> As part of my due diligence, I ran a quick UCC search
> on Global Baristas, LLC.  I see one secured credit
> [sic] for office furniture that doesn't look relevant
> for our purposes. There is another secured creditor
> for equipment, Farnam Street Financial?  Can you
> confirm that is also not covering any of this
> equipment?

In an email response just a few minutes later, AVENATTI said
"You are correct – neither covers any of the equipment."

---

[27]  I understand that the coffee kiosks were separate stand-
alone structures that were owned by GBUS, but located at
Boeing's facilities.

q.    Later on September 29, 2017, AVENATTI emailed A.R.G. and C.M. the executed copies of the two bills of sale. AVENATTI signed the bills of sale on behalf GB LLC and identified his title as "Chairman."

r.    On October 2, 2017, AVENATTI emailed wiring instructions to A.R.G. and C.M.  Specifically, AVENATTI instructed Boeing to wire the sale proceeds to an EA LLP attorney trust account at CB&T ending in 8671 ("EA CB&T Trust Account 8671").  AVENATTI also asked when the wire would be sent.  C.M. said that AVENATTI seemed anxious to receive the wire payment from Boeing.

s.    On October 5, 2017, AVENATTI emailed A.R.G. and C.M. a letter on GB LLC letterhead containing the same wiring instructions.  REGNIER was copied on the email.  According to A.R.G., Boeing had asked AVENATTI to provide Boeing the wiring instructions on GB LLC letterhead.  Prior to receiving this letter, neither A.R.G. nor C.M. had ever seen any other documents on GB LLC letterhead.

t.    A.R.G. indicated that she was concerned that the change of the entity name on the bill of sale may have violated the tax lien or levies, but that Boeing checked and neither "GB Hospitality, LLC" nor "Global Baristas, LLC" were identified on the lien and levies.  Boeing determined that it was not in violation of the lien because the lien related to GBUS and the seller identified on the two bills of sale was a different legal entity.  A.R.G. said that the only other entity name she had seen on the contracts with Boeing prior to the two bills of sale

Case 8:19-cr-00061-JVS   Document 78   Filed 01/14/20   Page 109 of 544   Page ID #:1179
Case 8:19-cr-00061-JVS   Document 73   Filed 04/22/19   Page 109 of
184   Page ID #:348

was GB Hospitality.  Boeing would not have paid the $155,010 if GBUS's name had been on the two bills of sale or the 2016 contract.

40.  Based on a preliminary review[28] of bank records relating to GBUS, GB LLC, EA LLP, A&A, and AVENATTI, I have learned the following regarding the $155,010 payment from Boeing for the kiosks and equipment:

a.  On October 5, 2017, Boeing transferred $155,010 via wire to EA CB&T Trust Account 8671.

b.  On October 5, 2017, EA LLP transferred $155,010 from EA CB&T Trust Account 8671 to A&A's CB&T account ending in 0661 ("A&A CB&T Account 0661").  AVENATTI then made the following payments from A&A CB&T Account 0661, among others:

i.  $15,000 wire transfer to AVENATTI and his wife's personal checking account at BofA ending in 5546 ("Avenatti BofA Account 5446");

ii.  $8,459 payment to Neiman Marcus in Newport Beach, California on October 10, 2017; and

iii. $13,073 payment for rent for AVENATTI's residential apartment in Los Angeles, California on October 10, 2017.

c.  Out of the $155,010 that Boeing wired to EA CB&T Trust Account 8671 and which was subsequently transferred to A&A

---

[28]  IRS-CI's review of the bank account records referenced throughout this affidavit is ongoing.  The approximate amounts referenced herein are based on a preliminary analysis of those bank records and my discussions with an IRS-CI revenue agent. These amounts may change as IRS-CI completes its analysis and discovers additional bank account information.

CB&T Account 0661, it appears that only approximately half was ever transferred to bank accounts associated with GBUS.

> **6.  Preliminary Review of GBUS and GB LLC Bank Account Information**

41.  In connection with this investigation, IRS-CI has obtained bank records relating to a number of accounts associated with GBUS and GB LLC.  Based on a preliminary review of these bank account records, it appears that AVENATTI caused approximately $1.7 million to be transferred from GBUS or GB LLC to other entities AVENATTI controlled during the same time period in which GBUS failed to pay to the IRS approximately $3,121,460 in payroll taxes.

42.  Based on a preliminary review of the GBUS and GB LLC bank records, I have learned, among other things, the following:

a.    In February and March 2015, GBUS opened three new bank accounts with CB&T in Orange County, California, including a payroll account and an operating account (GBUS CB&T Account 2240).  AVENATTI and REGNIER were the only two signatories on the GBUS CB&T accounts.

b.    As noted above, on October 3, 2017, GB LLC opened GB LLC CB&T Account 3730 in Orange County, California.  (See supra ¶ 37.j.)  AVENATTI and REGNIER were the only two signatories on this GB LLC account.

43.  Based on a preliminary review of the GBUS's CB&T bank accounts, I have learned, among other things, the following regarding the transfer of funds from GBUS or GB LLC to bank accounts associated with A&A or EA LLP:

a.    Between 2015 and 2017, there were a substantial
number of wire transfers or payments between GBUS's or GB LLC's
bank accounts on one hand, and EA LLP's or A&A's bank accounts
on the other hand.

b.    As detailed in the below chart, between 2015 and
2017, there was a net total of approximately $1,701,800 in
payments from GBUS's or GB LLC's bank accounts to A&A's or EA
LLP's bank accounts.

| Transfers (Net) | 2015 | 2016 | 2017 | TOTALS |
|---|---|---|---|---|
| GBUS & GB LLC to A&A | -$576,500 | $440,500 | $1,360,250 | $1,224,250 |
| GBUS & GB LLC to EA LLP | -$127,436 | $517,400 | $87,586 | $477,550 |
| TOTALS | -$703,936 | $957,900 | $1,447,836 | $1,701,800 |

c.    There was a net transfer of approximately
$703,936 from A&A and EA LLP into GBUS's or GB LLC's bank
accounts in 2015.  However, there was a net transfer of
approximately $2,406,006 out of GBUS's and GB LLC's bank
accounts to A&A and EA LLP during 2016 and 2017, while the IRS
collection case was ongoing and payroll taxes were due.

44.  As set forth further below in Section IV.D.4, it
appears that portions of the approximately $1.7 million that was
transferred from GBUS's and GB LLC's bank accounts to A&A or EA
LLP were subsequently transferred to AVENATTI's personal bank
accounts or used to pay for AVENATTI's personal expenses.

45.  It also appears that AVENATTI directly used GBUS funds
to pay for personal expenses.  For example, on or about March
30, 2016, a total of $200,000 was paid to the G.P. Family Trust

from GBUS CB&T Account 2240.  These payments were for two months of rent for AVENATTI's residence in Newport Beach, California. (See infra § IV.E.3.b.)

### 7. *GBUS Bankruptcy Proceedings*

46.  GBUS is currently the debtor in Chapter 7 bankruptcy proceedings pending in the United States Bankruptcy Court for the Western District of Washington, in In re: Global Baristas US LLC, No. 18-14095-TWD (the "GBUS Bankruptcy").  Based on my review of documents filed in the GBUS Bankruptcy, I have learned, among other things, the following:

a.  On October 24, 2018, a Chapter 7 involuntary bankruptcy petition was filed against GBUS.  GBUS did not appear or oppose the involuntary petition.

b.  On November 30, 2018, an Order for Relief was entered by default.  On or about that same date, Nancy L. James was appointed as the Chapter 7 bankruptcy trustee for GBUS (the "GBUS Trustee").

c.  On or about November 30, 2018, GBUS was also directed to file financial statements and other documents with the bankruptcy court.  To date, GBUS has not filed any such documents.

d.  On January 25, 2019, the GBUS Trustee filed a motion for an order directing three law firms, Osborn Machler PLLC; Eisenhower Carlson PLLC ("Eisenhower"); Talmadge/ Fitzpatrick/Tribe, PPLC, to turn over all files and records relating to the law firms' representation of GBUS.  Among other things, the GBUS Trustee noted that because the GBUS Trustee now

Case 8:19-cr-00061-JVS   Document 78   Filed 01/14/20   Page 113 of 544   Page ID #:1183
Case 8:19-mj-00095-DUTY   *SEALED*   Document 3 (Court only)   Filed 04/22/19   Page 113 of
184   Page ID #:352

manages GBUS, the GBUS Trustee now holds the attorney-client
privilege.

        e.    On January 31, 2019, the GBUS Trustee held the
creditors meeting required under 11 U.S.C. § 341.  No one
appeared on behalf of GBUS at the meeting.

        f.    On February 8, 2019, Eisenhower, which
represented GBUS in the <u>Bellevue Square</u> Litigation, filed an
opposition to the GBUS Trustee's motion for turnover.
Eisenhower argued, among other things, that AVENATTI may believe
that Eisenhower represented him in his personal capacity and
that the motion should be denied until AVENATTI was provided
notice and an opportunity to respond.  Eisenhower stated:

> During the course of the litigation, Bellevue Square
> LLC asserted liability against Michael Avenatti
> personally.  While [Eisenhower] was not formally
> retained by Mr. Avenatti, [Eisenhower] is concerned
> that Mr. Avenatti may assert attorney-client privilege
> as to his personal communications with [Eisenhower].

        g.    On February 15, 2018, the Bankruptcy Court held a
hearing on the GBUS Trustee's motion.  I understand that during
the hearing the Bankruptcy Court held that the GBUS Trustee
holds the attorney-client privilege as to communications between
GBUS and its lawyers, that the law firms were required to turn
over their files to the GBUS Trustee, and ordered the parties to
submit an agreed upon order for the Court to sign by February
22, 2018.

    47.  Although AVENATTI is not personally named in the GBUS
Bankruptcy and has not appeared in it, he is aware of the
proceedings.  On February 13, 2019, AVENATTI sent an email to an

Case 8:19-cr-00061-JVS *SEALED* Document 78 Filed 01/14/20 Page 114 of 544 Page ID #:1184
Case 8:19-cr-00061-JVS Document 73 Filed 04/22/19 Page 113 of
184 Page ID #:353

attorney representing IMSA in a separate civil action, the GBUS

Trustee, and the GBUS Trustee's counsel, which stated:

> It has come to my attention that you are purporting to
> proceed with a hearing tomorrow in a Florida
> collection matter in which Global Baristas US, LLC, me
> [sic] and others are defendants.  Separate [sic] apart
> from the fact that service has never been properly
> effectuated, your attempt to proceed with this matter
> is entirely inappropriate as there has long been a
> bankruptcy stay in place as a result of the attached
> bankruptcy filing (the Trustee and counsel are copied
> above).  Indeed, your continued pursuit of this matter
> over the last several months may subject your client
> to liability for violating the bankruptcy stay, which
> your client is well aware of.

**D.    Tax Offenses Relating to Eagan Avenatti LLP (EA LLP)
and Avenatti & Associates, APC (A&A)**

48.  As discussed below, there is probable cause to believe

that AVENATTI has caused his other companies, EA LLP and A&A, to

evade their federal tax obligations.  Between 2015 and 2017, EA

LLP failed to pay to the IRS approximately $2.4 million in

payroll taxes, including approximately $1,279,001 in trust fund

taxes that had been withheld from EA LLP employees' paychecks.

EA LLP and A&A have also repeatedly failed to file federal

income tax returns or pay federal income taxes, despite

generating substantial income.  Indeed, despite previously

filing tax returns, EA LLP has not filed federal tax returns for

the 2013 through 2017 tax years, and A&A has not filed federal

tax returns for the 2011 through 2017 tax years.

### 1.    The IRS Payroll Tax Collection Case

49.  In September 2015, the IRS initiated a collection case

against EA LLP due to its failure to file its payroll tax

returns and pay payroll taxes.  Based on my review of IRS tax

information, including the ICS History, I have learned, among other things, the following information regarding EA LLP's payroll tax obligations:

a. Between 2011 and the first quarter of 2014, EA LLP paid its federal tax deposits, including trust fund tax payments, to the IRS on a regular basis. During this time period, EA LLP also filed its IRS Forms 941 each quarter and IRS Forms 940 each year.[29] On the various EA LLP IRS Forms 940 and IRS Forms 941 filed with the IRS between 2011 and 2014 that I have reviewed, AVENATTI signed the forms under penalty of perjury as the Managing Partner of EA LLP.

b. On or about April 30, 2015, EA LLP filed its IRS Form 941 for the first quarter of 2015. The IRS Form 941 indicated that EA LLP was required to pay to the IRS approximately $194,545 in payroll taxes, including approximately $152,562 in trust fund payments. EA LLP, however, did not make the required payroll tax payments to the IRS.

c. On September 26, 2015, the IRS opened a collection case against EA LLP based on a FTDA.

d. On September 28, 2015, the collection case was assigned to an IRS revenue officer ("RO 2").

e. On October 8, 2015, RO 2 made a field visit to EA LLP's office in Newport Beach, California. RO 2 spoke with AVENATTI and told him that the field call was being made because

---

[29] During this time period, Paychex was responsible for filing EA LLP's IRS Forms 941 and paying to the IRS EA LLP's federal tax deposits. (See infra ¶ 52.) These services were discontinued at the end of 2014. (See id.)

98

Case 8:19-cr-00061-JVS   Document 78   Filed 01/14/20   Page 116 of 544   Page ID #:1186
Case 8:19-cr-00061-JVS   Document 73   Filed 04/22/19   Page 116 of
184   Page ID #:355

EA LLP had not made its federal tax deposits.  RO 2 asked
AVENATTI if REGNIER could attend the meeting because she was the
POA on file with IRS for EA LLP and was in the office at that
time, but AVENATTI said no.  RO 2 told AVENATTI that EA LLP last
filed a payroll tax return for the first quarter of 2015, but
that it had not paid to the IRS the $194,545 in payroll taxes
that were due.  RO 2 also told AVENATTI that EA LLP had not
filed its payroll tax return or paid its federal tax deposits
for the second quarter of 2015, and that the payroll tax return
and federal tax deposits for the third quarter of 2015 were due
that same day.  RO 2 explained that unless there was a reduction
in EA LLP's payroll since the first quarter of 2015, EA LLP
would likely owe the IRS over $200,000 in payroll taxes for each
of these additional quarters as well.  AVENATTI told RO 2 that
he was not aware that the federal tax deposits were not being
paid.  When asked who prepared the payroll tax returns and made
the federal tax deposits, AVENATTI said that Paychex was
responsible for the payroll taxes.[30]  AVENATTI also said that he
was not sure what was going on with the taxes.  RO 2 set a
deadline of October 23, 2015, for EA LLP to make the outstanding
payroll tax payments.  RO 2 also set deadlines for EA LLP to
file its missing IRS Forms 940 and provide certain financial
documentation, including bank statements and a balance sheet.
Finally, RO 2 instructed AVENATTI to file any other unfiled tax

---

[30]  AVENATTI made a nearly identical statement to RO 1 when
he was contacted about GBUS failure to pay its payroll taxes one
year later on October 7, 2016.  (See supra ¶ 23.d.)

Case 8:19-cr-00061-JVS  *SEALED*  Document 78  Filed 01/14/20  Page 117 of 544  Page ID #:1187
Case 8:19-cr-00061-JVS  Document 73  Filed 04/22/19  Page 117 of
184  Page ID #:356

returns, including his unfiled personal income tax returns for
the 2011 to 2014 tax years.

       f.    On October 14, 2015, M.H. contacted RO 2 and
advised her that she was the POA for EA LLP.  RO 2 advised M.H.
of the deadline she had set for EA LLP to make the outstanding
payroll tax payments, file its IRS Forms 941, and produce
financial documents.

       g.    On October 23, 2015, EA LLP filed its IRS Forms
941 for the second and third quarters of 2015.  Both IRS Forms
941 were signed by AVENATTI.  Although EA LLP filed these two
IRS Forms 941 for the second and third quarters of 2015, EA LLP
did not make the required outstanding payroll tax payments nor
did it produce the required financial information RO S.M
requested.

       h.    On March 14, 2017, RO 2 filed IRS Form 6020B
substitute returns for the fourth quarter of 2015 and the first,
second, third, and fourth quarters of 2016.

       i.    As discussed below in Section IV.D.2, in March
2017, an involuntary Chapter 11 bankruptcy petition was filed
against EA LLP.  Due to the automatic stay issued in the EA
Bankruptcy, RO 2's efforts to collect the outstanding payroll
taxes largely ceased.

       j.    In connection with the EA Bankruptcy, EA LLP and
the IRS reached a settlement regarding EA LLP's unpaid payroll
taxes in which EA LLP agreed to pay to the IRS approximately
$2,389,005, including trust fund taxes of $1,288,277, non-trust

Case 8:19-cr-00061-JVS  Document 78  Filed 01/14/20  Page 118 of 544  Page ID #:1188
Case 8:19-cr-00061-JVS  Document 73  Filed 04/22/19  Page 118 of
184  Page ID #:357

fund taxes of $311,673, penalties of $635,631, and interest of
$153,424.

k.    On or about September 28, 2017, the IRS received
EA LLP's IRS Forms 941 for the fourth quarter of 2015 through
the fourth quarter of 2016.  The IRS Forms 941 appear to have
been signed by AVENATTI.

### 2.    *EA LLP Bankruptcy Proceedings*

50.  Based on my review of documents filed in connection
with the EA Bankruptcy, I have learned, among other things, the
following information:

a.    On or about March 1, 2017, an involuntary
petition was filed against EA LLP in the Middle District of
Florida.

b.    On or about March 10, 2017, EA LLP filed its
answer to the involuntary petition and consented to the order
for relief.

c.    In April 2017, the EA Bankruptcy was transferred
to the Central District of California.

d.    In connection with the EA Bankruptcy, the United
States claimed that it was a secured creditor of EA LLP due to
the filing of federal tax liens.  The United States also filed a
number of claims against the bankruptcy estate.

e.    On or about October 10, 2017, the United States
filed its Fifth Amended Proof of Claim in the amount of
approximately $2,357,202, which consisted of a secured claim in
the amount of $677,410, a priority tax claim of $1,259,355, and
a general unsecured claim of $420,436.

       f.    On January 30, 2018, EA LLP, AVENATTI, and the United States entered into a stipulation regarding the payment of taxes, in which the parties described the terms of the settlement reached between EA LLP, AVENATTI, and the United States.  In the stipulation, the parties agreed that the total amount EA LLP owed to the IRS as of February 28, 2018, would be approximately $2,389,005, consisting of trust fund taxes of $1,288,277, non-trust fund taxes of $311,673, penalties of $635,631, and interest of $153,424.  Under the terms of the settlement, EA LLP was required to make an initial payment to the United States Treasury of $1,508,422, which consisted of all of the $1,288,277 in trust fund taxes due to the IRS, and 20% of the non-trust fund taxes, penalties, and interest in the amount of $220,146 within 10 days of the settlement being approved and bankruptcy being dismissed.  EA LLP was required to pay the remaining balance of $880,583, plus accrued interest, within 120 days of the dismissal order.  Specifically, EA LLP was required to pay $440,291, plus accrued interest of $11,709.07, on the 60th day following the dismissal order, and an additional $440,291 on the 120th day following the dismissal order.

       g.    On March 15, 2018, the Bankruptcy Court issued an order approving the settlement between EA LLP, AVENATTI, and the United States, and dismissed the EA Bankruptcy.

       h.    On March 26, 2018, the IRS received the initial settlement payment of $1,508,422 from a trust account for SulmeyerKupetz, which was the law firm representing A&A and

AVENATTI in the EA Bankruptcy.[31]  EA LLP and AVENATTI, however,
failed to make the remaining payments to the IRS as scheduled.

      i.   On July 3, 2018, the United States filed a motion
to enforce the settlement agreement between EA LLP, AVENATTI,
and the United States.  Among other things, the United States
noted that EA LLP had failed to make the required payment of
approximately $440,291, plus $11,709 by May 14, 2018, as
required under the settlement agreement.

      j.   On August 20, 2018, EA LLP, AVENATTI, and the
United States entered into a stipulation to resolve the United
States July 2018 motion to enforce the settlement agreement.
Under the stipulation, EA LLP agreed to make monthly payments to
the United States in the amount of $75,000.

---

[31]  Based on information I received from the Newport Beach
Police Department and a preliminary review of the relevant bank
account records, it appears that this payment was derived from
money that AVENATTI had received in trust for two clients, M.P.
and L.T.  AVENATTI represented M.P. and L.T. in connection with
the divestment and separation from M.P.'s business.  Under the
engagement agreement, AVENATTI was entitled to 7.5 percent of
the approximately $35.6 million transaction amount (or
approximately $2.67 million).  In September 2017, the first
portion of the transaction amount was wired to a City National
Bank attorney trust account ending in 4704 ("Avenatti CNB Trust
Account 4704").  After AVENATTI deducted his entire 7.5 percent
fee, he then transferred the remaining proceeds to M.P.  On
March 14, 2018, the balance of the transaction amount
(approximately $8,146,288) was transferred to CNB Trust Account
4704.  But AVENATTI did not remit this entire sum to M.P. as he
was required to do.  Rather, on March 15, 2018, AVENATTI
transferred $3,000,000 to an EA LLP CB&T attorney trust account
ending in 4613 ("EA CB&T Trust Account 4613").  AVENATTI then
transferred $2,828,423 from EA CB&T Trust Account 4613 to the
SulmeyerKupetz trust account later that same day.  The following
day, AVENATTI's attorney from SulmeyerKupetz filed a declaration
in the EA Bankruptcy indicating that he had received the
approximately $2.8 million payment so that it could be
distributed to creditors, including the IRS.

k.   On or about August 20, 2018, EA LLP paid the
United States Department of Treasury approximately $75,000 via a
check from one of EA LLP's CB&T bank accounts.  I understand
that no further payments have been received since August 2018
and that EA LLP and AVENATTI still owe the United States
approximately $765,015, plus accrued interest and penalties.

51.  As part of the EA Bankruptcy, EA LLP was required to
close pre-petition bank accounts and open new "debtor in
possession" bank accounts.  EA LLP and AVENATTI were also
required to file with the Bankruptcy Court a monthly operating
report ("MOR") detailing all funds received and disbursed by EA
LLP.

### 3.   Information Obtained from Paychex Regarding EA LLP's Payroll Taxes

52.  As noted above in paragraph 49.e, when AVENATTI was
first contacted by RO 2, AVENATTI claimed that Paychex was
responsible for preparing the payroll tax returns and paying to
the IRS EA LLP's federal tax deposits.  These claims appear to
have been false.  Based on documents produced by Paychex, I have
learned, among other things, the following information:

a.   On or about May 31, 2014, AVENATTI signed a
Paychex Proprietor Services Agreement as the Managing Partner of
EA LLP.

b.   On or about January 5, 2015, Paychex mailed two
letters to EA LLP and AVENATTI confirming "that your Paychex
Taxpay® service has been discontinued at your request, effective
December 28, 2014."  The letters further advised AVENATTI and EA

LLP that "[y]ou will be responsible for making timely tax deposits and filing tax return beginning on December 28, 2014."[32]

### 4.  Other Tax Information Regarding EA LLP and A&A

53.  Based on my review of IRS tax information, I have learned, among other things, the following information regarding EA LLP's filing of federal partnership income tax returns:

a.  On or about August 13, 2010, Eagan O'Malley & Avenatti LLP, which later became EA LLP, filed its 2009 partnership income federal tax return (IRS Form 1065).  The return stated that in the 2009 tax year Eagan O'Malley Avenatti LLP had gross receipts of $12,547,675 and ordinary business income of $5,025,947.  The return listed G.M. in Encino, California, as the paid preparer, and O'Malley as the designated Tax Matters Partner ("TMP") before the IRS.

b.  On or about April 15, 2011, Eagan O'Malley & Avenatti LLP, filed its 2010 partnership income federal tax return (IRS Form 1065).  The return stated that in the 2010 tax year Eagan O'Malley & Avenatti LLP had gross receipts of $7,287,551 and ordinary business income of $1,691,667.  The return listed M.H. as the paid preparer, and A&A as the designated TMP before the IRS.

---

[32] At the June 12, 2017, Section 341 hearing as part of the EA Bankruptcy, AVENATTI testified under penalty of perjury that Paychex was EA LLP's payroll service since "the inception of the firm . . . may have been as long as 10 [years]."  In response to a question regarding EA LLP making deposits for federal and state payroll taxes, AVENATTI testified: "Well, they're made now directly by the firm, but at some point they were being made by Paychex, or at least were to be made by Paychex."  When asked when EA LLP switched from sending money to Paychex to pay the payroll taxes to paying the tax deposits directly, AVENATTI testified "sometime in 2016."

      c.    On or about March 17, 2014, EA LLP filed its 2011 partnership income federal tax return (IRS Form 1065).  The return stated that in the 2011 tax year EA LLP had gross receipts of $13,819,836 and ordinary business income of $5,850,102.  The return indicated that it was "Self Prepared" and appears to have been signed by AVENATTI on March 12, 2014.  The return listed A&A as the designated TMP before the IRS, and AVENATTI as the TMP representative.

      d.    On or about October 8, 2014, EA LLP filed its 2012 partnership income federal tax return (IRS Form 1065).  The return stated that in 2012 EA LLP had gross receipts of $6,212,605 and an ordinary business loss of 2,128,849.  The return appears to have been signed by AVENATTI on October 1, 2014.  The return listed M.H. as the paid preparer, and A&A as the designated TMP before the IRS.

      e.    EA LLP never filed a partnership income federal tax return (IRS Form 1065) for the 2013, 2014, 2015, 2016, or 2017 tax years.

    54.  Based on my review of IRS tax information, I have learned, among other things, the following information regarding A&A:

      a.    A&A's 2009 IRS Form 1120S Corporate Tax Return stated that A&A had total income of $3,391,224 and ordinary business income of $1,578,558 for the 2009 tax year.  The return listed AVENATTI as the President of A&A and M.H.'s firm as the return preparer (the return does not state M.H.'s name, simply the firm at which she worked).

    b.   A&A's 2010 IRS Form 1120S Corporate Tax Return stated that A&A had total income of $1,421,028 and ordinary business income of $821,634 for the 2010 tax year.  AVENATTI appears to have signed the return on September 15, 2011, as the President of A&A.  The return listed M.H. as the return preparer.

    c.   A&A did not file federal corporate tax returns for the 2011, 2012, 2013, 2014, 2015, 2016, or 2017 tax years. The last federal income tax return that A&A filed was the return for the 2010 tax year.

### *5.*   *Preliminary Review of EA LLP's and A&A's Bank Account Information*

55.  A preliminary review of the bank records for accounts associated with EA LLP, A&A, and AVENATTI demonstrates that: (a) EA LLP generated significant income between 2013 and 2017 and would likely have been required to file federal income tax returns for the 2013 to 2017 tax years; (b) A&A generated significant income between 2011 and 2017 and would likely have been required to file income tax returns during the 2011 to 2017 tax years; and (c) EA LLP and AVENATTI had sufficient funds to make the required payroll tax payments due to the IRS in 2015 and 2016.  Specifically, based on a preliminary review of bank account records associated with EA LLP, A&A, AVENATTI, I have learned, among other things, the following information:

a.    Between 2013 and 2017, EA LLP received approximately $137,890,016 of deposits[33] into its bank accounts.

b.    Between 2011 and 2017, A&A received approximately $37,961,633 of deposits into its bank accounts, including net payments of approximately $23,820,816 from EA LLP.

c.    Between 2015 and 2017, EA LLP transferred approximately $13,360,560 to A&A's bank accounts, and A&A transferred approximately $4,424,740 to EA LLP's bank accounts. Thus, between 2015 and 2017, A&A received a net total of approximately $8,935,820 from EA LLP.

d.    Between 2015 and 2017, approximately $3,697,500 was transferred from A&A's bank accounts to AVENATTI's personal bank account, and approximately $190,000 was transferred from EA LLP's bank accounts to AVENATTI's personal bank account. Moreover, as discussed further in paragraph 58.c below, AVENATTI repeatedly used A&A funds to pay for personal expenses between 2015 and 2017.

**E.    Tax Offenses Relating to AVENATTI's Personal Income Tax Obligations**

56.   As discussed below, there is probable cause to believe that AVENATTI committed various tax offenses in connection with his personal income tax obligations.  AVENATTI failed to file personal federal income tax returns for the 2011 through 2017 tax years.  During these tax years, AVENATTI generated substantial income and lived lavishly, yet largely failed to pay

---

[33]    I understand that the $137,890,016 of deposits likely includes some transfers between different EA LLP bank accounts. Therefore, EA LLP's total receipts during this time period could be substantially lower.

any federal income tax.  AVENATTI also appears to have evaded

the assessment and collection of federal income taxes during

these tax years by using the entities he controlled, such as

GBUS, EA LLP, and A&A, to hide and conceal his personal income.

            **1.    Information Regarding AVENATTI's Personal Income
Tax Obligation**

       57.  Based on my review of IRS tax information, I have

learned, among other things, the following regarding AVENATTI's

personal income tax obligations:

       a.  On or about October 15, 2010, AVENATTI filed his

individual income tax return for the 2009 tax year.  The 2009

return indicated that AVENATTI had total income of $1,939,942,

and a total tax due to the IRS in the amount of $570,816.

According to the return, AVENATTI received $300,000 in W-2 wage

income from A&A in 2009, but only had $1,186 withheld in federal

taxes.  AVENATTI, therefore, owed the IRS approximately $569,630

for the 2009 tax year.  AVENATTI, however, did not pay the

remaining tax due for the 2009 tax year until November 2015,

when he sold his residence in Laguna Beach, California, upon

which there was an IRS tax lien.

       b.  On or about October 11, 2011, AVENATTI filed his

individual income tax return for the 2010 tax year.  The 2010

return indicated that AVENATTI had total income of $1,154,800,

and a total tax due to the IRS of $275,947.  According to the

return, AVENATTI had $77 of taxes withheld during 2010.

AVENATTI, therefore, owed the IRS approximately $281,786 for

2010 tax year.  AVENATTI, however, did not pay the remaining

taxes due to the IRS for the 2010 tax year until November 2015, when he sold his residence in Laguna Beach, California, upon which there was an IRS tax lien.

c.    AVENATTI never filed a 2011 individual tax return.  In April 2012, however, AVENATTI or his tax preparer filed an extension request for his 2011 individual tax return in which $0 in tax liability was reported.[34]

d.    AVENATTI never filed a 2012 individual tax return.  In April 2013, however, AVENATTI or his tax preparer filed an extension request for the 2012 individual tax return in which $0 in tax liability was reported.

e.    AVENATTI never filed a 2013 individual tax return.  In April 2014, however, AVENATTI or his tax preparer filed an extension request for the 2013 individual tax return in which $0 in tax liability was reported.

f.    AVENATTI never filed a 2014 individual tax return.  In April 2015, however, AVENATTI or his tax preparer filed an extension request for the 2014 individual tax return in which $0 in tax liability was reported.

g.    On September 2, 2015, the IRS filed a federal tax lien for approximately $903,987 due to AVENATTI's non-payment of taxes due for the 2009 and 2010 tax years.

_____

[34] Based on my review of IRS tax information, I believe that AVENATTI's extension requests for the 2011 to 2015 tax years were submitted to the IRS by M.H.  Because we have not interviewed M.H. at this time, it is unclear whether AVENATTI knew the extension requests were being filed or knew what information was being provided on the extension requests.

h.      On or about October 23, 2015, AVENATTI's POA, M.H., contacted the IRS and advised it that AVENATTI would file his personal federal income tax returns for the 2012, 2013, and 2014 tax years by November 7, 2015.  However, no such returns were ever filed.

i.      On October 30, 2015, the IRS sent AVENATTI a demand letter indicating that he had an outstanding debt of $1,042,878 for the 2009 and 2010 tax years.  A copy of the demand letter was also sent to AVENATTI's POA, M.H.

j.      On November 2, 2015, as a result of the September 2015 federal tax lien, a copy of which was provided to the escrow company handling the sale of AVENATTI's Laguna Beach, California, residence, the IRS received a payment of $1,042,878 for the unpaid 2009 and 2010 taxes from the escrow company after the completion of the sale of AVENATTI's home.

k.      AVENATTI never filed a 2015 individual tax return.  In April 2016, however, AVENATTI or his tax preparer filed an extension request for the 2015 individual tax return in which $0 in tax liability was reported.

l.      AVENATTI never filed an individual tax return for the 2016 or 2017 tax years.  To date, AVENATTI has not filed requests for extensions for the 2016 or 2017 tax years.

### 2.      Preliminary Review of AVENATTI's Bank Records

58.    A preliminary review of AVENATTI's bank account records demonstrates that AVENATTI generated substantial personal income between 2011 and 2017.  Specifically, based on a preliminary review of bank records associated with bank accounts

for AVENATTI, GBUS, EA LLP, and A&A, I have learned, among other things, the following:

      a.    Between 2011 and 2017, it appears that AVENATTI received net payments of approximately $8,464,064 from EA LLP's and A&A's bank accounts.[35]  This amount excludes any amounts that may have been transferred to AVENATTI's personal bank accounts from EA LLP's and A&A's attorney trust accounts.

      b.    Between 2014 and 2017, AVENATTI's personal bank accounts appear to have received a total of approximately $556,134 in direct payments from GBUS.

      c.    Between 2011 and 2017, approximately $37,961,633 was deposited into A&A's bank accounts, including approximately $28,541,055 from EA LLP.  After deducting the approximately $4,720,240 that A&A paid to EA LLP, A&A appears to have received net payments of approximately $23,820,815 from EA LLP during this time period.

      d.    AVENATTI appears to have used money that was deposited into A&A's bank accounts for a variety of personal expenses and to conceal his personal income.  For example, based on a preliminary review of A&A CB&T Account 0661, the investigation has identified the following payments that appear personal in nature and would therefore constitute additional evidence of AVENATTI's unreported personal income and tax evasion:

---

[35] During this same time period, there were total deposits into AVENATTI's personal bank accounts of approximately $18,025,134.

Case 8:19-cr-00061-JVS   Document 78   Filed 01/14/20   Page 130 of 544   Page ID #:1200
Case 8:19-cr-00061-DOC   Document 13   Filed 04/22/19   Page 129 of
184   Page ID #:369

       i.    Between 2011 and 2018, A&A paid AVENATTI's ex-wife, C.C, approximately $979,590.  The investigation has not yet identified any other payments from AVENATTI to C.C, which supports the inference that these payments constituted either child support or alimony, or both.

       ii.   Between 2011 and 2017, a total of $237,985 in cash was withdrawn from A&A CB&T Account 0661 via check or ATM Withdrawal.

       iii. Between 2011 and 2017, A&A paid a total of approximately $216,720 to Neiman Marcus.

       iv.   Between March and June 2011, A&A paid approximately $10,500 to Jewelers On Time, a luxury watch store in Newport Beach, California.

       v.    Between 2013 and 2015, A&A paid a total of approximately $462,499 to Chase Home Finance in connection with the mortgage on AVENATTI's residence in Laguna Beach, California.[36]

       vi.   In June 2014, A&A paid $58,000 to Jewelers On Time.[37]

       vii. Between 2014 and 2015, A&A paid a total of approximately $1,220,201 to Gallo Builders, Inc., a custom home builder in Newport Beach, California.

---

   [36]  Based on records Chase submitted to the IRS, I know that between approximately November 2011 and November 2015 AVENATTI paid to Chase a total of approximately $698,909 in mortgage interest payments for his Laguna Beach home.

   [37]  GB Auto also paid Jewelers On Time approximately $48,500 on November 27, 2015.

viii.     Between February and March 2015, A&A
paid a total of approximately $82,236 to Porsche.

ix.  In May 2016, A&A paid approximately $195,000
to Circle Porsche in Long Beach, California.

x.  Between April 2016 and July 2016, A&A paid a
total of approximately $500,000 to the G.P. Family Trust.  Based
on my review of other records, I understand that these were rent
payments made pursuant to the lease on AVENATTI's residence in
Newport Beach, California.[38]

xi.  In September 2016, A&A paid approximately
$176,500 to Exclusive Resorts, which is described on its website
as the "World's Elite Private Vacation Club."

xii. Between January 2016 and November 2016, A&A
paid approximately $65,855 to Halaby Restoration, a custom home
painting contractor located in Lake Forest, California.

xiii.     Between February 2016 and September
2016, A&A paid a total approximately $138,611 to Vincent
Builders Inc., a custom home builder in Fountain Valley,
California.[39]  A photo of AVENATTI's former residence in Newport
Beach is shown on Vincent Builder's website under "Projects."

_____

[38]  Approximately $200,000 was also paid to the G.P. Family
Trust from GBUS CB&T Account 2240 in March 2016.

[39]  Between December 2015 and April 2016, approximately
$187,611 in additional payments were made to Vincent Builders
from an EA LLP CB&T bank account ending in 2851 ("EA CB&T
Account 2851"), an EA LLP attorney trust account ending in 8541
("EA CB&T Trust Account 8541"), GB Auto BofA Account 7412, and
one of AVENATTI's personal bank accounts.

xiv. Between February 2017 and December 2017, A&A
paid a total of approximately $39,762 to Ferrari Financial
Lease.

xv.  Between March 2017 and December 2017, A&A
paid a total of approximately $123,825 to Ten Thousand in Los
Angeles, California, as rent for AVENATTI's residential
apartment.

### 3.  *Information Regarding the Sale of AVENATTI's Residence in Laguna Beach and Purchase of AVENATTI's Residence in Newport Beach*

59.  As set forth below, the investigation has revealed
that in November 2015 AVENATTI and L.S., AVENATTI's second wife,
sold their home on McKnight Drive in Laguna Beach, California
(the "Laguna Beach Residence"), for approximately $12.65
million, resulting in proceeds of approximately $5.4 million.
It appears that the net proceeds of the sale were transferred to
various entities AVENATTI controlled in an effort to conceal the
proceeds of the sale.  Substantial portions of the sale proceeds
were also used for AVENATTI's personal purposes, including to
finance the purchase of a $15.75 million home on Via Lido Nord
in Newport Beach, California (the "Newport Beach Residence").

a.  <u>The Laguna Beach Residence</u>

60.  Based on my review of mortgage records obtained from
Chase, I have learned that AVENATTI and L.S. purchased the
Laguna Beach Residence for approximately $7.2 million in October
2011.  AVENATTI and L.S. made a down-payment of approximately
$2.2 million, and received a loan from Chase for approximately
$5 million.

61.   Based on my review of records obtained from the escrow company that worked on the sale of the Laguna Beach Residence ("Escrow Company 1") and discussions with Escrow Company 1's manager, J.M., I have learned, among other things, the following information regarding the sale of AVENATTI's Laguna Beach Residence in November 2015:

a.   On or about October 22, 2015, AVENATTI and L.S. entered into a contract to sell the Laguna Beach Residence for approximately $12,625,000 in cash.  Among other things, the contract required that escrow close on or before November 2, 2015, and that the buyer make a $350,000 non-refundable deposit that would be released to AVENATTI and L.S. on October 26, 2015.

b.   On October 23, 2015, AVENATTI emailed his real estate broker, R.S., and instructed him to have Escrow Company 1 wire the $350,000 deposit funds to GBUS's KeyBank account ending in 6193 ("GBUS KeyBank 6193").  This email was then forwarded to J.M., who confirmed the wiring instructions by phone with AVENATTI on October 26, 2015.

c.   On or about October 23, 2015, AVENATTI and L.S. also signed a form directing Escrow Company 1 to send the sale proceeds via wire to GBUS KeyBank 6193.

d.   On or about October 26, 2015, Escrow Company 1 wired $350,000 to GBUS KeyBank Account 6193.

e.   Escrow Company 1's files included a copy of a demand letter the IRS sent to M.H. on October 30, 2015.  The demand letter indicated that AVENATTI's outstanding tax debt included on the notice of federal tax lien for the 2009 and 2010

116

Case 8:19-cr-00061-JVS   Document 78   Filed 01/14/20   Page 134 of 544   Page ID #:1204
Case 8:19-cr-00061-JVS   Document 73   Filed 04/22/19   Page 135 of
184   Page ID #:373

tax years was approximately $1,042,879.  J.M. did not recall
having specific discussions with AVENATTI regarding the tax
lien, but said that his standard practice in such situations was
to discuss the issue with his client or, if his client was not
challenging the lien, to instruct the client to get a demand
letter or payoff amount.

   f. On or about October 30, 2015, AVENATTI and L.S.
electronically signed a seller's estimated closing statement,
which indicated, among other things, that $1,042,879 would be
disbursed to the IRS in connection with the IRS demand.

   g. On November 2, 2015, Escrow Company 1 wired the
remaining sale proceeds of approximately $4,553,889 to GBUS
KeyBank 6193.

   h. On or about November 3, 2015, Escrow Company 1
sent AVENATTI and L.S. a letter via their real estate broker
confirming that escrow had closed on November 2, 2015.  The
letter confirmed the remaining proceeds of the sale in the
amount of $4,553,889 had been wired on November 2, 2015.  The
letter also enclosed a copy of the final settlement and closing
costs statement, as well as a copy of an IRS Form 1099-S
(Proceeds From Real Estate Transactions), which indicated that
the gross proceeds of the sale of the Laguna Beach property were
$12,625,000.

   i. When asked whether Escrow Company 1 submitted the
IRS Form 1099-S to the IRS, J.M. said that Escrow Company 1's
standard practice was to file each IRS Form 1099-S with the IRS
through First American Title.  During a subsequent conversation,

Case 8:19-cr-00061-JVS   Document 78   Filed 01/14/20   Page 135 of 544   Page ID #:1205
Case 8:19-cr-00061-JVS *SEALED*   Document 16-2   Filed 04/22/19   Page 135 of
184   Page ID #:374

however, J.M. confirmed that the IRS Form 1099-S for the sale of AVENATTI's Laguna Beach Residence was never submitted to the IRS due to an error by Escrow Company 1.[40]

62.   Based on a preliminary analysis of bank records associated with AVENATTI, GBUS, EA LLP, and other entities, it appears that AVENATTI diverted the profits he obtained from the sale of Laguna Beach Residence to a number of different entities that he controlled and to his personal bank accounts. Specifically, I have learned, among other things, the following regarding the proceeds from the sale of the Laguna Beach Residence:

      a.   On or about November 2, 2015, approximately $4,553,889 was transferred from Escrow Company 1 to GBUS KeyBank Account 6193.

      b.   On or about November 2, 2015, approximately $4,620,000 was transferred from GBUS KeyBank Account 6193 to GBUS CB&T Account 2240.

      c.   On or about November 2, 2015, approximately $4,600,000 was transferred from GBUS CB&T Account 2240 to an IOLTA attorney trust account associated with The X-Law Group in Los Angeles, California.

      d.   On or about November 3, 2015, the X-Law Group wired approximately $3,600,000 to GB Auto BofA Account 7412.   As set forth in paragraphs 63.b and 63.c below, it appears that the

---

      [40]   Based on my training and experience, I know that AVENATTI would still have been required to report the proceeds from the sale of the Laguna Beach Residence on his 2015 personal income tax return regardless of whether Escrow Company 1 filed the IRS Form 1099-S with the IRS.

remaining $1,000,000 that had been transferred to The X-Law Group was used to pay $1,000,000 in deposits for AVENATTI's purchase of the Newport Beach Residence.

      e.    Between on or about November 3 and November 4, 2015, $2,700,000 was paid from GB Auto Account 7412 to EA CB&T Account 2851.

      f.    On or about November 4, 2015, approximately $300,000 was transferred from EA CB&T Account 2851 to A&A CB&T Account 0661.

      g.    On or about November 4, 2015, approximately $300,000 was transferred from A&A CB&T Account 0661 to AVENATTI's personal bank account.

      b.    <u>The Newport Beach Residence</u>

63.  Based on my review of records obtained from Escrow Company 1 and discussions with J.M., I have learned, among other things, the following regarding AVENATTI's Newport Beach Residence:

      a.    On or about September 23, 2015, AVENATTI and L.S. entered into an agreement to purchase the Newport Beach Residence from the G.P. Family Trust for approximately $15,750,000.  The purchase agreement required AVENATTI and L.S. to pay an initial $200,000 deposit within three days, an additional non-refundable deposit of $800,000 by November 15, 2015, and monthly rent of $100,000 from December 1, 2015, until August 1, 2016, or the close of escrow.

b.   On September 28, 2015, AVENATTI paid a $200,000 deposit to Escrow Company 1 via a cashier's check from The X-Law Group.

c.   On or about November 6, 2015, AVENATTI paid an additional $800,000 deposit to Escrow Company 1 via two wire transfers from The X-Law Group's IOLTA attorney trust account in the amounts of $450,000 and $350,000.

d.   In August 2016, approximately two days before escrow on the Newport Beach Residence was supposed to close, a lawsuit was filed in the Superior Court of California for Orange County by a Swiss company named Maseco, S.A., in which Maseco claimed that it was entitled to possession and title of the Newport Beach Residence.   As a result, the close of escrow was delayed significantly due to litigation.

e.   Ultimately, AVENATTI and L.S. never completed their purchase of the Newport Beach Residence.

64.   As noted above, in 2016, AVENATTI paid to the G.P. Family Trust a total of $500,000 from A&A CB&T Account 0661 (see supra ¶ 58.d.x) and a total of $200,000 from GBUS CB&T Account 2240 (see supra ¶ 45).

### 4.   *Information from AVENATTI's Divorce Proceedings*

65.   On or about January 2, 2018, L.S. filed a declaration in connection with the divorce proceedings regarding her marriage to AVENATTI.   In the declaration, L.S. said, among other things, the following:

a.   AVENATTI and L.S. were married in May 2011 and separated in October 2017.

Case 8:19-cr-00061-JVS   Document 78   Filed 01/14/20   Page 138 of 544   Page ID #:1208
Case 8:19-cr-00061-JVS   *SEALED*   Document 73   Filed 04/22/19   Page 138 of
184   Page ID #:377

b.   Until November 2017, AVENATTI and L.S. "enjoyed a lavish marital lifestyle due to [AVENATTI's] multi-million dollar annual income."

c.   In November 2016, AVENATTI told L.S. he had earned $3.7 million in 2016.

d.   L.S. suspected that AVENATTI's actual earnings are "substantially higher" than $3.7 million based on his self-published verdicts, their family's monthly expenses, and the fact that AVENATTI failed to share with her his tax returns or bank account records.

e.   In 2016, L.S. spent approximately $215,643 per month on expenses for her and her son.

f.   AVENATTI and L.S. made an approximately $5.4 million profit when they sold the Laguna Beach Residence in 2015.

g.   AVENATTI's and L.S.'s home in Newport Beach was worth approximately $19 million and they were leasing the home for a monthly rent of $100,000.  L.S. said that they spent "hundreds of thousands of dollars to fully remodel the Newport Beach residence."

h.   AVENATTI and L.S. employed two nannies and various housekeepers at a cost of approximately $15,000 per month.

i.   AVENATTI made quarterly payments to L.S. in the amount of $60,000 to $80,000 that AVENATTI and L.S. agreed could be added to her personal savings.

       j.    AVENATTI and L.S. spent approximately $30,000 per month on travel, entertainment, and gifts.

       k.    L.S. spent approximately $20,000 per month on clothing.

       l.    L.S.'s monthly American Express bill typically ranged from $60,000 to $70,000 and was always paid in full.

       m.    AVENATTI and L.S. owned two different private jets -- one through A&A and one through an entity called Passport 420. L.S. believed each private jet was worth approximately $4.5 million.

       n.    AVENATTI and L.S. had an investment in Exclusive Resorts. (See supra ¶ 58.d.xi.) L.S. indicated that the total yearly cost for the investment in, and use of, Exclusive Resorts was approximately $158,000.

       o.    In 2017, AVENATTI and L.S. bought an antique Ferrari at Ferrari Southbay.

       p.    AVENATTI drives a 2016 Ferrari GT Spider, leased in L.S.'s name, valued at $410,000.

       q.    AVENATTI has an extensive watch collection, including three or four Patek Phillippe watches AVENATTI told L.S. were worth $60,000 to $70,000 each.

### 5. *AVENATTI's Statements Regarding His Net Worth*

66. Based on my review of documents collected in connection with this investigation, I have learned that AVENATTI previously provided various banks with the following information regarding his net worth:

   a. On or about May 19, 2013, AVENATTI provided HomeStreet with a "Personal Balance Sheet." The Personal Balance Sheet indicated that he had: (1) total assets of $40,039,000; (2) liabilities of $5,463,000; and (3) a net worth of $34,576,000.

   b. On or about March 11, 2014, AVENATTI provided The Peoples Bank with a "Personal Balance Sheet." The Personal Balance Sheet indicated that AVENATTI had (1) total assets of $69,583,000; (2) total liabilities of $5,495,000; and (3) a net worth of $64,088,000. At the bottom of the Personal Balance Sheet there is a handwritten note signed by AVENATTI which states: "The above is true and correct to the best of my knowledge as of March 11, 2014."

   c. On or about November 1, 2014, AVENATTI provided The Peoples Bank with an updated "Personal Balance Sheet." The updated Personal Balance Sheet stated that AVENATTI had: (1) total assets of $75,698,000; (2) total liabilities of $5,456,000; and (3) a net worth of $70,242,000.

  67. Despite claiming that he had a net worth in 2013 and 2014 ranging from $34 million to $70 million, AVENATTI did not file any personal income tax returns during these tax years.

  **F. Fraud Offenses Relating to The Peoples Bank**

  68. As discussed below, there is probable cause to believe that between approximately January 2014 and April 2016 AVENATTI engaged in a scheme to defraud The Peoples Bank in Mississippi by submitting false documents, including false tax returns and

balance sheets, in connection with three separate loans AVENATTI and his companies sought and obtained.

69. Based on my review of publicly available information, I know that The Peoples Bank, which is located in Biloxi, Mississippi, has been federally insured by the Federal Insurance Deposit Commission ("FDIC") since approximately 1934.

70. Based on my review of records obtained from The Peoples Bank, I have learned, among other things, that AVENATTI obtained three separate loans from The Peoples Bank during 2014: (1) a loan to GB LLC for $850,500 on January 16, 2014 to mature on April 15, 2014; (2) a loan to EA LLP for $2,750,000 on March 14, 2014 to mature on June 15, 2014; and (3) a loan to EA LLP for $500,000 on December 12, 2014 to mature on December 12, 2015.[41]  I have also reviewed IRS tax records and other bank account records that are relevant to these loans.

### 1.  *$850,000 Loan to GB LLC in January 2014*

71. In or about January 2014, AVENATTI sought a three-month loan from The Peoples Bank for GB LLC in the amount of $850,500 for the specific purpose of "working capital."  I have learned, among other things, the following regarding this loan:

a.  AVENATTI personally guaranteed the loan, as did Doppio, and AVENATTI signed the loan documents as Manager of GB LLC.  AVENATTI told C.S. -- the President and CEO of The Peoples

---

[41]  Based on the interview with T.M. and the records obtained from The Peoples Bank, I have learned that M.C., an individual with whom AVENATTI had a business and litigation relationship in Seattle, Washington, introduced AVENATTI to C.S., the president and CEO of The Peoples Bank.

Case 8:19-cr-00061-JVS  *  Document 78  Filed 01/14/20  Page 142 of 544  Page ID #:1212
Case 8:19-cr-00061-DOC   Document 1   Filed 04/22/19   Page 142 of
184   Page ID #:381

Bank -- that AVENATTI "own[ed] 90% of [GB] LLC through Doppio, Inc., which [he] wholly own[ed]."

   b. The Peoples Bank provided a list of information they would need from AVENATTI before the bank could approve the loan.  AVENATTI provided numerous documents to The Peoples Bank, including financial statements for GB LLC that listed over $41 million in assets for the company (including over $22 million in "International rights") and nearly $38 million in member's equity.  AVENATTI also provided GB LLC's Operating Agreement dated December 12, 2012, the stock certificates for GB LLC and Doppio, and an irrevocable stock transfer signing over the stock certificates as collateral for the loan.

   c. The Peoples Bank also told AVENATTI that, prior to authorizing the loan, the bank needed a "Taxpayer Statement and copy of most recent filed tax return."  The Peoples Bank had a copy in its files of AVENATTI's 2011 U.S. Individual Income Tax Return (Form 1040).  The AVENATTI 2011 Form 1040 that was provided to the bank listed AVENATTI's total income and adjusted gross income as $4,562,881, and indicated that he owed the IRS $1,506,707 in taxes for the 2011 tax year.  The 2011 Form 1040 listed M.H. as the preparer.  Based on a review of IRS records, however, I know that AVENATTI did not file any IRS Form 1040 for the 2011 tax year nor did he pay any taxes to the IRS for the 2011 tax year.

   d. The Peoples Bank approved the loan and wired the loan proceeds to GB LLC's HomeStreet account, pursuant to AVENATTI's wire instructions.  A third party, J.R.C., then

accepted assignment of the loan and became the "grantor" on the loan requiring AVENATTI to repay the loan to J.R.C.

### 2.   $2,750,000 Loan to EA LLP in March 2014

72.   In early March 2014, AVENATTI sought and obtained a three-month loan from The Peoples Bank for EA LLP in the amount of $2.75 million.  I have learned, among other things, the following information regarding this loan:

a.   AVENATTI told The Peoples Bank that the $2.75 million loan to EA LLP would be used to repay J.R.C. for the earlier $850,000 loan (plus interest), and for "working capital."

b.   When seeking the loan, AVENATTI said that his firm was due approximately $19 million shortly from the settlement of the Scott v. SCI litigation, and that EA LLP and AVENATTI would sign a commercial pledge agreement requiring the escrow company in charge of the settlement proceeds to pay off the loan from The Peoples Bank first upon disbursement of the settlement funds.  AVENATTI submitted a commercial loan application, which he signed both individually and on behalf of EA LLP.  In the loan application, AVENATTI claimed that, as of March 10, 2014, EA LLP had assets and a net worth of approximately $21 million, and had income and revenues of approximately $15.7 million.  AVENATTI also submitted Balance Sheets and Profit and Loss Statements for EA LLP through March 10, 2014, which stated, among other information, that the firm earned over $40 million in total income from January 2011 through March 10, 2014.

       c.    Additionally, AVENATTI emailed The Peoples Bank what purported to be EA LLP's 2012 U.S. Partnership Return, Form 1065 ("Peoples Bank 2012 Form 1065"). The Peoples Bank 2012 Form 1065, which stated that it was "Firm Prepared," declared that in 2012 EA LLP had gross receipts and total income of slightly over $11.4 million, and ordinary business income (calculated after subtracting expenses and deductions from the total income) of approximately $5.8 million. The Peoples Bank 2012 Form 1065 also attached a Schedule K-1, which showed the distribution of income or loss to the partners. The Schedule K-1 attached to the Peoples Bank 2012 1065 showed that AVENATTI, through A&A, received $4,364,592 in income from EA LLP in 2012.

       d.    I have reviewed the 2012 U.S. Partnership Return, Form 1065, that EA LLP actually filed with the IRS ("IRS 2012 Form 1065") on October 8, 2014, and compared it to the Peoples Bank 2012 Form 1065 AVENATTI submitted in March 2014. AVENATTI signed the IRS 2012 Form 1065 under penalty of perjury as the member manager. The IRS 2012 Form 1065 was prepared by M.H. (the CPA in Los Angeles, California, who served as the POA for GBUS). The IRS 2012 Form 1065 listed gross receipts and total income of approximately $6.2 million, and an ordinary business loss of approximately $2.13 million. The Schedule K-1 attached to the IRS 2012 Form 1065 listed an ordinary loss of approximately $1.6 million to A&A. Thus, the 2012 Form 1065 AVENATTI provided to The Peoples Bank claimed over $5.2 million more of gross receipts and nearly $8 million in additional ordinary business income (the difference between the business

Case 8:19-cr-00061-JVS   Document 78   Filed 01/14/20   Page 145 of 544   Page ID #:1215
Case 8:19-cr-00061-JVS   Document 73   Filed 04/22/19   Page 235 of
184   Page ID #:384

income on the Peoples Bank 2012 Form 1065 and the business loss
on the IRS 2012 Form 1065) than was reported on the actual Form
1065 that was filed with the IRS.

     e.   On or about March 14, 2014, the loan in the
amount of $2.75 million was approved with a maturity date of
June 15, 2014.  In support of the loan, AVENATTI signed
commercial pledge agreements on behalf of EA LLP, GB LLC, and
Doppio, and a personal commercial guaranty.  AVENATTI also
signed a loan disbursement request, which instructed The Peoples
Bank to repay J.R.C. the approximately $884,165.63 that was owed
from the January 2014 $850,000 loan (plus interest), and to wire
the remaining $1,824,584 to an EA LLP bank account at CB&T.

     f.   On or about May 23, 2014, after the <u>Scott v. SCI</u>
settlement was finalized, the escrow company wired approximately
$2,787,430 to The Peoples Bank to pay off the outstanding
balance of the March 2014 loan.

### *3.   $500,000 Loan to EA LLP in December 2014*

   73.  In December 2014, AVENATTI obtained a $500,000 loan
from The Peoples Bank to EA LLP.  I have learned, among other
things, the following information regarding this loan:

     a.   On November 10, 2014, AVENATTI emailed C.S. at
The Peoples Bank to follow up on a prior discussion in which
AVENATTI sought a $2.5 million line of credit from the bank for
EA LLP to provide working capital for the needs of the law firm.
AVENATTI offered certain guarantees and protections to the bank,
including pledging an interest in an ongoing litigation to the

bank and a full security agreement to secure the loan, and to provide any further financial information the bank needed.

b.   Two days later, on November 12, 2014, AVENATTI sent an additional email to C.S. attaching a spreadsheet that included EA LLP's "expected and estimated contingency fees in 2015." The spreadsheet indicated that the firm expected to receive approximately $165 million in gross recoveries from contingency cases, and the net costs and attorneys' fees due to EA LLP from these contingency cases would be approximately $47.6 million. AVENATTI further explained that the attached expected earnings of the firm "obviously does not reflect our projected gross hourly revenue from non-contingency cases in 2015."

c.   On November 15, 2014, the bank told AVENATTI that for the bank to consider and move forward on the credit facility, AVENATTI would need to provide: an updated personal balance sheet; personal income tax returns for 2012 and 2013; interim internal financials of EA LLP through September or October 2014; and an audited financial statement for GB LLC and its subsidiaries.

d.   Later on November 15, 2014, AVENATTI emailed back his personal balance sheet as of November 1, 2014, and stated that he would get the bank the other requested documents later. AVENATTI noted, however, that GB LLC and its subsidiaries did not have audited financials on an annual basis, but that there had been no material change to the audited GB LLC balance sheet from sixteen months earlier, which AVENATTI had previously provided to the bank. On the personal balance sheet, AVENATTI

listed over $75 million in total personal assets and a net worth of over $70 million.  (See supra ¶ 66.c.)

    e.    On November 16, 2014, AVENATTI emailed The Peoples Bank the updated financials for EA LLP, including a Profit and Loss Statement, and a Balance Sheet for January 2014 through September 2014.  The Profit and Loss Statement listed EA LLP's total income for the year up through September 2014 as approximately $23.4 million and its net income as approximately $18.2 million.  The EA LLP Balance Sheet for the same time period claimed total current assets of over $31 million and net income of over $27 million (which is $9 million more than listed on the Profit and Loss statement for the same period).  In addition, the EA LLP Balance Sheet that AVENATTI provided the bank indicated that EA LLP had approximately $712,729 in its operating account with CB&T ("EA LLP CB&T Account 8461"), as of September 30, 2014.  Based on a review of the CB&T bank records, however, I know that EA LLP CB&T Account 8461 had a balance of approximately $27,710 as of September 30, 2014.

    f.    On November 22, 2014, C.S. at The Peoples Bank emailed AVENATTI stating that the bank still needed financial information on GB LLC (even if not audited) and AVENATTI's personal tax returns for 2012 and 2013.  Soon thereafter, AVENATTI replied that he "had asked that the remaining info be forwarded to you [C.S.] and will follow-up in short order."

    g.    On November 25, 2014, AVENATTI emailed C.S. and attached a Profit and Loss Statement and Balance Sheet for GB LLC as of November 2, 2014, which listed the company's total

Case 8:19-cr-00061-JVS  Document 78  Filed 01/14/20  Page 148 of 544  Page ID #:1218
Case 8:19-cr-00061-JVS  Document 73  Filed 04/22/19  Page 148 of
184  Page ID #:387

assets as approximately $41.3 million and total equity of
approximately $35.4 million.

> h.   On or about December 1, 2014, AVENATTI provided
The Peoples Bank with what were purported to be his 2012 and
2013 U.S. Individual Income Tax Returns (IRS Forms 1040).[42]

> i.   The 2012 IRS Form 1040 that AVENATTI provided to
the Peoples Bank, included the following information: AVENATTI's
filing status was "single;"[43] AVENATTI's total income and
adjusted gross income were $5,423,099; the total tax due was
$1,790,744; AVENATTI had made $1,600,000 in estimated tax
payments in 2012 and still owed $190,744 in taxes; and the
return was prepared by M.H.  According to IRS records, however,
AVENATTI did not file a 2012 Form 1040, and did not make any tax
payments toward his 2012 individual tax liability.

> j.   Both the "draft" and subsequent version of the
2013 Form 1040 that AVENATTI provided to The Peoples Bank
included the following information: AVENATTI's filing status was
"single;" AVENATTI's total income and adjusted gross income were
$4,082,803; AVENATTI had paid $1,353,511 to the IRS in 2013
($1,250,000 in estimated tax payments and $103,511 in

---

[42] The Peoples Bank deemed the 2013 IRS Form 1040 they
received from AVENATTI via email on December 1, 2014, as a draft
because they received a slightly different and updated 2013 IRS
Form 1040 soon thereafter.  The Peoples Bank also received 2011
and 2012 IRS Forms 1040 for AVENATTI.  However, neither the 2011
Form 1040, 2012 Form 1040, nor the updated 2013 Form 1040 were
attached to an email, so the bank is not certain if they
received the documents via United States Postal Service or
another method.

[43] AVENATTI married L.S. in 2011, however, the 2012 Form
1040 listed AVENATTI as single rather than married filing
jointly or separately.

withholdings from W-2s or 1099s); and the return was prepared by
M.H.  The "draft" 2013 Form 1040 stated AVENATTI owed $1,305,482
in taxes for calendar year 2013, and based on his tax payments
during the year, he wanted $48,029 applied to his 2014 estimated
tax.  The subsequent 2013 Form 1040 provided to The Peoples Bank
claimed AVENATTI owed $1,459,000 in taxes for calendar year
2013, and that based on his tax payments during the year, he
owed $105,489 to the IRS.  According to IRS records, however,
AVENATTI did not file a 2013 Form 1040, did not make any
estimated tax payments toward his 2013 individual tax liability,
and did not have any tax withholdings in 2013.

     k.   Although AVENATTI initially requested a $2.5
million line of credit for EA LLP, after receiving the required
documentation from AVENATTI, The Peoples Bank issued EA LLP a
$500,000 loan on December 12, 2014, which was set to mature on
December 12, 2015.  The loan was guaranteed by AVENATTI
individually and by AVENATTI on behalf of EA LLP, GB LLC, and
Doppio.  AVENATTI also signed a Commercial Pledge Agreement in
which EA LLP agreed to the "Assignment of the first $500,000
plus interest of settlement proceeds in the Meridian related
cases, said attorney's fees to be $10.5 million plus out of
pocket costs for class counsel [EA] LLP."  M.C., who was the
individual that initially put AVENATTI in touch with C.S. at The
Peoples Bank, was serving as the Meridian Liquidating Trustee on
the litigation.  As part of the loan documents, on December 12,
2014, AVENATTI also signed a disbursement request and

authorization, which stated that the "specific purpose of this
loan is: Case Costs and Working Capital."

l.   On December 12, 2014, The Peoples Bank wired the
loan proceeds, $494,500, to EA CB&T Account 8461.  The same day,
$350,000 was wired to a bank account for a lawyer who worked for
EA LLP, and $105,000 was transferred to A&A CB&T Account 0661.

m.   On February 24, 2015, M.C. informed C.S. at The
Peoples Bank that the Meridian case settled and AVENATTI would
be receiving approximately $2.5 million as part of the
settlement.  M.C. wanted to know if he had signed an assignment
of proceeds to The Peoples Bank so he could determine where to
send AVENATTI's money.  C.S. told M.C. that EA LLP was obligated
to pay off the loan, and said the bank could give AVENATTI the
pay-off amount if he called.

n.   On June 6, 2015, C.S. sent M.C. an email
(forwarding the February 24, 2015 emails) after realizing that
neither EA LLP nor AVENATTI had paid off the $500,000 loan to
The Peoples Bank in February 2015 after the Meridian settlement.
M.C. then forwarded the email to AVENATTI (copying C.S.) asking
AVENATTI what his status or plan for the loan was.  The bank's
records do not show AVENATTI replied to the email.

o.   On November 14, 2015, The Peoples Bank emailed
AVENATTI regarding the $500,000 loan to EA LLP, which would be
maturing on December 12, 2015.  The Peoples Bank wanted to get
an update because the bank's files showed it was supposed to be
paid off months earlier with the proceeds of the Meridian
settlement.  Approximately 30 minutes later, C.S. emailed

AVENATTI thanking him for the quick response to the prior email (presumably, AVENATTI responded by phone), and C.S. told AVENATTI that he would need to pay off his current loan before The Peoples Bank could establish a line of credit for EA LLP as AVENATTI sought.   C.S. also provided a list of documentation that AVENATTI would need to provide before the bank could authorize a line of credit.

      p.   On December 23, 2015, C.S. responded to the above emails and informed AVENATTI that the loan matured on December 12, 2015, and wanted to make sure the loan was paid off by the end of the year.

      q.   From February through April 2016, C.S. and others from The Peoples Bank reached out to AVENATTI on numerous dates to get an update on the past-due loan and find out when AVENATTI was going to pay off the loan.   On a couple of occasions, AVENATTI said that a wire to pay off the loan would be coming by a certain date, but the money was never transferred to the bank.

      r.   In April 2016, C.S. informed AVENATTI that the bank would send the loan to its collections department on April 20, 2016, if the loan was not paid off by then, which would result in additional costs and fees to AVENATTI.   On April 20, 2016, AVENATTI emailed the bank attaching documentation establishing that he would soon receive proceeds from a case and would instruct that the first part of the settlement proceeds be used to pay The Peoples Bank.

      s.   On April 22, 2016, the $500,000 EA LLP loan was finally paid off.

### G. Fraud Offenses Relating to the $1.6 Million G.B. Settlement

74.  As discussed below, there is probable cause to believe that AVENATTI: (a) defrauded EA LLP's client, G.B., out of his portion of an approximately $1.6 million settlement payment; (b) used the settlement proceeds for AVENATTI's own purposes; and (c) failed to disclose in the EA Bankruptcy that he had received the $1.6 million settlement payment, despite being aware that he was required to do so.

75.  On or about January 14, 2019, G.B. filed an arbitration claim alleging that AVENATTI received $1.6 million in settlement proceeds from a prior arbitration proceeding against a Colorado-based company ("Company 1") and failed to turn over G.B.'s portion of the settlement proceeds to G.B. G.B. also reported the alleged fraud to the Federal Bureau of Investigation and Newport Beach Police Department.  I have reviewed various records relating to G.B.'s claim, including, but not limited to, documents provided to the government by G.B.'s present counsel and by D.S., Company 1's counsel in the arbitration, and bank records from City National Bank.[44]  Based on my review of these documents and records, I have learned, among other things, the following:

    a.   In approximately July 2014, G.B. retained EA LLP to represent him in various litigation matters, including an intellectual property dispute against Company 1.  The fee

---

[44] I have learned that G.B. pleaded guilty to a felony theft count and received a term of probation.  As such, I have relied primarily on the documentary evidence I have reviewed as it relates to possible fraud committed against G.B.

Case 8:19-cr-00061-JVS   Document 78   Filed 01/14/20   Page 153 of 544   Page ID #:1223
Case 8:19-cr-00061-JVS   Document 73   Filed 04/14/20   Page 153 of 544   Page ID #:392
184   Page ID #:392

agreement entered into by G.B. and AVENATTI on behalf of EA LLP,
included a 40 percent contingency agreement based on the amount
of the recovery.  After AVENATTI and EA LLP initially filed a
civil complaint in federal court on behalf of G.B. against
Company 1, the parties agreed to handle the case through private
arbitration in Colorado.

      b.   On December 22, 2017, D.S. sent AVENATTI a draft
settlement agreement to resolve the arbitration, which required
Company 1 to pay G.B. $1.9 million, with $1.6 million due on
January 10, 2018, and $100,000 due on January 10 of the three
subsequent years.

      c.   On December 26, 2017, AVENATTI sent an email to
D.S. with a Microsoft Word document entitled, "MJA Revised
Draft," which still had the same payment amounts and dates.
AVENATTI also stated in the email that he would provide wire
instructions immediately prior to the execution of the
agreement.

      d.   On December 27, 2017, AVENATTI sent another
Microsoft Word document titled "Further Revised," to D.S., which
was a revised version of the settlement agreement, with red-
lines of the revisions AVENATTI made to the document.  This
revised settlement agreement also set the payment due dates as
January 10, 2018 through 2021.  The primary change AVENATTI made
to this draft of the settlement agreement was to remove the
requirement that the settlement payment be sent via wire
transfer to a specific account identified in the agreement and
instead required that the settlement payment be sent via wire

transfer to an account that AVENATTI would identify to D.S. via email by January 3, 2018.

      e.   On December 28, 2017, D.S. emailed AVENATTI a copy of the fully executed settlement agreement with both parties' signatures, as well as a stipulation to dismiss the matter from arbitration.  The settlement agreement again listed the payment dates as January 10, 2018 through 2021.

      f.   The copy of the settlement agreement that was provided to G.B., however, listed the payment dates for the $1.9 million settlement as $1.6 million on March 10, 2018, and $100,000 on March 10 of each of the next three years.

      g.   On January 2, 2018, AVENATTI emailed D.S. with instructions to wire the settlement money to a City National Bank attorney trust account ending in 5566 ("CNB Trust Account 5566").[45]  AVENATTI also wanted to confirm "that we are on track."  D.S. responded that they were "on track."

      h.   On January 5, 2018, Company 1 wired the $1.6 million settlement into CNB Trust Account 5566 as directed by AVENATTI.  City National Bank records confirm that the $1.6 million wire transfer was received in CNB Trust Account 5566.  Prior to the $1.6 million wire transfer, CNB Trust Account 5566 had a balance of $0.

      i.   None of the $1.6 million in settlement funds that were deposited into CNB Trust Account 5566 were ever paid to G.B.  Rather, between January 5, 2018, and March 14, 2018,

---

[45]  City National Bank records show that AVENATTI opened CNB Trust Account 5566 on December 28, 2017, the same date the settlement agreement was finalized and executed.

Case 8:19-cr-00061-JVS   Document 78   Filed 01/14/20   Page 155 of 544   Page ID #:1225
Case 8:19-cr-00061-JVS   Document 73   Filed 01/14/20   Page 155 of 544   Page ID #:394
184   Page ID #:394

AVENATTI caused approximately $1,599,058 to be paid out of CNB Trust Account 5566 for his own personal purposes, including the following payments:

    i. approximately $617,000 to a Florida-based attorney AVENATTI worked with on an unrelated contingency case;

    ii. a total of approximately $350,000 paid to EA LLP bank accounts;

    iii. a total of approximately $200,000 to GBUS and vendors of GBUS;

    iv. a total of approximately $112,000 to a bank account in the name of "Michael Avenatti, Esq.";

    v. approximately $46,000 to The X-Law Group; and

    vi. approximately $27,000 to Dennis Brager, the lawyer who was representing GBUS in the IRS payroll collection case.

    j. G.B. sent numerous text messages and emails to AVENATTI between January 2018 and November 2018.  These text messages are consistent with G.B.'s claims that he believed the first settlement payment was due on March 10, 2018; did not know that Company 1 had made the $1.6 million settlement payment; and did not know that AVENATTI had received the settlement payment in January 2018.

    k. As set forth below, beginning on March 10, 2018, the date that G.B. believed the settlement proceeds from Company 1 would be arriving, G.B. repeatedly asked AVENATTI if he had received the settlement proceeds, whether AVENATTI had heard

Case 8:19-cr-00061-JVS  Document 78  Filed 01/14/20  Page 156 of 544  Page ID #:1226
Case 8:19-cr-00061-JVS-DFM  Document 75  Filed 04/22/19  Page 139 of
184  Page ID #:395

anything from Company 1 regarding when the money would arrive,
and what, if anything, G.B. and AVENATTI could do to get the
money G.B. was owed.  It appears that AVENATTI did not respond
to most of the messages from G.B. to AVENATTI relating to the
settlement payment from Company 1.  G.B. also made clear to
AVENATTI that he had would be having financial difficulties
without the settlement proceeds and that it was imperative for
G.B. to get the money.

   i.   On or about March 10, 2018, G.B. sent a text
message to AVENATTI stating "I was just thinking is this a big
day from our friends at [Company 1]?"

   ii.  On March 12, G.B. sent AVENATTI a text
message in which he said "[h]ere is my account information for
the wire."

   iii. On March 13, 2018, G.B. sent AVENATTI a text
message saying, among other things, "any word on that wire from
[Company 1]?"

   iv.  On March 14, 2018, G.B. sent AVENATTI a text
message saying that he needed the settlement money and would be
in trouble without the cash because he had made investments over
the last four months in reliance on the settlement money coming
in.  The next day, March 15, 2018, AVENATTI replied, "Let's chat
today – I'm sure it will be resolved."

   v.   Over the next couple weeks, G.B. sent
several additional text messages to AVENATTI explaining how
concerned G.B. was and expressing his need for the settlement
money.  On March 23, 2018, AVENATTI texted G.B. back and told

Case 8:19-cr-00061-JVS *Document 78 Filed 01/14/20 Page 157 of 544 Page ID #:1227
Case 8:19-cr-00061-DVS *Sealed* Document 73 Document 73 Filed 54/22/19 Page 157 of
184 Page ID #:396

him "don't worry.  Let's chat tmrw.  We will figure this out.
Michael."

       vi.  Through the rest of March to May 2018, G.B.
repeatedly asked AVENATTI about the money, whether AVENATTI had
heard from Company 1 about when the money was going to be sent,
and what actions G.B. and AVENATTI could take to cause Company 1
to pay the agreed-upon settlement.  AVENATTI never told G.B. the
money had already come in.  AVENATTI, however, agreed via text
message to provide G.B. "advances" of money to assist him with
expenses.  Based on records provided by G.B.'s attorney, it
appears that AVENATTI "advanced" G.B. approximately $130,000
between April 2018 and November 2018.

       vii. Throughout October 2018 and up until
approximately November 16, 2018, G.B. sent numerous text
messages and emails to AVENATTI again describing G.B.'s dire
financial situation and asking numerous questions about what
actions they could take going forward to get G.B. his money.
AVENATTI did not respond to most of the messages, but on a few
occasions, AVENATTI replied, saying he was working on a solution
and they could set a time to talk.  AVENATTI never responded in
writing to G.B.'s specific questions regarding the Company 1
settlement.

       l.  On or about November 16, 2018, after retaining
new counsel to attempt to collect his settlement proceeds, G.B.,
through his counsel, learned that the actual settlement
agreement had provided for the initial $1.6 million dollars to
be paid on January 10, 2018, as opposed to March 10, 2018, as

Case 8:19-cr-00061-JVS *SEALED* Document 78 Filed 01/14/20 Page 158 of 544 Page ID #:1228
Case 8:19-cr-00061-JVS Document 73 Filed 04/22/19 Page 143 of
184   Page ID #:397

G.B. had been led to believe, and that Company 1 had in fact
made the $1.6 million settlement payment on January 5, 2018.

        m.    On November 17, 2018, G.B.'s new counsel sent a
letter to AVENATTI via email, which stated that G.B. had been
led to believe that Company 1 had not made the initial $1.6
million payment required under the settlement agreement and
sought confirmation of this fact.  The letter also requested a
true and correct copy of the Settlement Agreement and any fee
agreements AVENATTI and EA LLP had with G.B.  Finally, the
letter requested that if the settlement money had actually
already been paid, to provide an immediate accounting concerning
the funds.

        n.    At approximately 10:12 p.m. on November 17, 2018,
AVENATTI sent two text messages to G.B. stating "Pls call me"
and "What is this all about? Pls call me ASAP."[46]  AVENATTI also
called G.B.'s phone twice that night and left a voicemail at
approximately 10:14 p.m., which included, in part, AVENATTI
stating, "Give me a call when you get a chance.  I mean as soon
as possible if you get this please it's urgent.  Thank you."  At
approximately 10:26 p.m., AVENATTI sent G.B. an email saying, "I
just tried you on your cell.  Please call me when you receive
this.  Thanks, Michael."  To date, AVENATTI never responded to
or provided documents as requested in the letter G.B.'s counsel
sent AVENATTI on November 17, 2018.

---

        [46] Although AVENATTI was on notice that G.B. was represented
by new counsel and had been contacted by said counsel rather
than by G.B., AVENATTI contacted G.B. directly and made no known
effort to communicate with G.B.'s new counsel.

76.  As noted in paragraph 51 above, in connection with the EA Bankruptcy, EA LLP and AVENATTI were required to file with the Bankruptcy Court a MOR each month.  AVENATTI, however, never disclosed the $1.6 million settlement payment from the G.B. case nor the existence of CNB Trust Account 5566 to the Bankruptcy Court, as he was required to do.[47]  Rather, on February 15, 2018, AVENATTI signed and filed EA LLP's January 2018 MOR under penalty of perjury, which falsely stated that EA LLP had total receipts of approximately $232,221 during January 2018, based solely on deposits into the EA LLP's DIP CB&T bank account. Additionally, approximately $141,113 out of the $232,221 reported on the MOR was made up of two cashier's checks written from CNB Trust Account 5566, which came from the settlement proceeds.  By using cashier's checks for these payments from CNB Trust Account 5566, AVENATTI hid the existence of this bank account from the Bankruptcy Court and EA LLP's creditors. Finally, based on the records it is clear that G.B. was represented by EA LLP in his case against Company 1; thus, I understand that any payment AVENATTI received from the G.B. case would be property of the bankruptcy estate.

### V.  ADDITIONAL INFORMATION REGARDING THE SUBJECT DEVICES

#### A.  Collection of the Subject Devices

77.  SUBEJECT DEVICE 1:  On October 5, 2018, M.E. was served with a subpoena demanding that she produce certain

---

[47]  It appears that AVENATTI also failed to disclose in the EA Bankruptcy the payments he received in connection with his representation of M.P. and L.T. and the CNB bank account into which such payments were deposited. (See supra page 103 n. 31.)

Case 8:19-cr-00061-JVS   Document 78   Filed 01/14/20   Page 160 of 544   Page ID #:1280
Case 8:19-cr-00061-JVS   Document 73   Filed 04/22/19   Page 160 of
184   Page ID #:399

records relating to GBUS and GB LLC, including any digital
devices used to conduct business on behalf of GBUS, GB LLC, and
other related entities.  On October 22, 2018, M.E. met with me
and IRS-CI SA John Weeks[48] to produce responsive records.  M.E.
consented to have IRS-CI copy and secure evidence from her
laptop computer.  SA John Weeks took possession of the laptop,
created an image of the laptop's hard drive (SUBJECT DEVICE 1),
and returned the laptop to M.E.  M.E. also produced a number of
hard copy GBUS emails responsive to the subpoena.  The hard copy
emails were sealed in an envelope, marked as potentially
tainted, and sent to a PRTAUSA in Los Angeles.[49]  Neither the
contents of SUBJECT DEVICE 1 nor the hard copy records produced
by M.E. have been reviewed by me or any other member of the
prosecution team.  Based on my discussions with M.E., however, I
understand that SUBJECT DEVICE 1 contains copies of her GBUS
emails and other GBUS records.

78.  SUBJECT DEVICE 2:  On October 5, 2018, S.F. was served
with a subpoena demanding that she produce certain records
relating to GBUS and GB LLC, including any digital devices used
to conduct business on behalf of GBUS, GB LLC, and other related
entities.  On October 21, 2018, SA James Kim and I met with S.F.
to obtain records responsive to the subpoena.  S.F. produced to

---

[48]  SA Weeks is an IRS Computer Investigative Specialist
("CIS").  SA Weeks is not part of the investigative team.
Rather, SA Weeks involvement in this investigation has been
limited to the forensic collection of digital evidence.

[49]  Because the hard copy documents were produced by M.E. in
response to specific requests in the subpoena, the government is
not seeking a warrant to search these documents.

Case 8:19-cr-00061-JVS *SEALED* Document 78 Filed 01/14/20 Page 161 of 544 Page ID #:1231
Case 8:19-cr-00061-JVS Document 73 Filed 01/14/20 Page 161 of 544 Page ID of
184  Page ID #:400

us two boxes of documents, which she indicated consisted of GBUS
mail and invoices.  S.F. also consented to have IRS agents copy
and secure evidence from her laptop computer, and allowed us to
take temporary custody of the computer.  SA Weeks subsequently
created a forensic image of S.F.'s laptop (SUBJECT DEVICE 2),
which we returned to her on October 25, 2018.  The contents of
SUBJECT DEVICE 2 have not been reviewed by me or any other
member of the prosecution team.  Based on my discussions with
S.F., however, I understand that SUBJECT DEVICE 2 contains
copies of her GBUS emails and other GBUS records.  The hard copy
documents were mailed to IRS-CI's office in Laguna Niguel and
reviewed by an IRS-CI privilege review SA.  The privilege review
SA confirmed, after consulting with a PRTAUSA, that the hard
copy documents did not contain potentially privileged
information, and then released them to me to review.

　　　79.  SUBJECT DEVICE 3:  On October 5, 2018, M.G. was
served with a subpoena demanding that she produce certain
records relating to GBUS and GB LLC, including any external hard
drives that she used to store business records relating to GBUS,
GB LLC, and other entities.  On October 22, 2018, M.G. met with
me and SA Weeks to produce responsive records.  M.G. consented
to have IRS-CI copy and secure evidence from her external hard
drive.  SA Weeks took possession of the hard drive, created a
forensic image of the hard drive (SUBJECT DEVICE 3), and
returned the hard drive to M.G.  M.G. also consented to have
IRS-CI secure all text messages between her and RO 1, which SA
Weeks retrieved from her cell phone.  Neither the contents of

SUBJECT DEVICE 3 nor the text messages have been reviewed by me
or any other member of the prosecution team.  Based on my
discussions with M.G., however, I understand that SUBJECT DEVICE
3 contains copies of M.G.'s GBUS emails and other GBUS records.

80.  SUBJECT DEVICE 4:  On October 22, 2018, V.S. was
served with a subpoena demanding that he produce certain records
relating to GBUS and GB LLC, including any digital devices used
to conduct business on behalf of GBUS, GB LLC, and other related
entities.  In response to the subpoena, on October 29, 2018, I
received SUBJECT DEVICE 4 and certain hard copy records from
V.S.  SUBJECT DEVICE 4 was sent to IRS-CI SA John Weeks to
download and secure the evidence.  The hard copy documents were
sealed and then provided to an IRS-CI privilege review SA.  The
privilege review SA confirmed, after consulting with a PRTAUSA,
that the hard copy documents did not contain potentially
privileged information, and then released the documents to me to
review.  The contents of SUBJECT DEVICE 4 have been not reviewed
by me or any other member of the prosecution team.  Based on my
discussions with V.S., however, I understand that SUBJECT DEVICE
4 contains copies of V.S.'s GBUS emails and other GBUS records.

81.  SUBJECT DEVICE 5 and SUBJECT DEVICE 6:  On October 25,
2018, A.G. was served with a subpoena demanding that he produce
certain records relating to GBUS and GB LLC, including any
digital devices used to conduct business on behalf of GBUS, GB
LLC, and other related entities.  On November 13, 2018, A.G. met
with me and an IRS CIS, and provided us with a Seagate external
hard drive and Veeam 2GB flash drive.  A.G. consented to have

Case 8:19-cr-00061-JVS *Document 78* Filed 01/14/20 Page 163 of 544 Page ID #:1233
Case 8:19-cr-00061-JVS Document 73 Filed 01/14/20 Page 163 of 544 Page ID #:402
184 Page ID #:402

IRS-CI copy and secure the evidence from these devices.  An IRS
CIS took possession of the devices, created forensic images of
the hard drive (SUBJECT DEVICE 5) and the flash drive (SUBJECT
DEVICE 6), and then returned the devices to A.G. the next day.
Based on my discussions with A.G., I understand that SUBJECT
DEVICE 5 and SUBJECT DEVICE 6 contain GBUS business records,
including GBUS business records that an IT consultant, J.S.,
downloaded from the AWS cloud server before AWS and 2nd Watch
discontinued GBUS's services for non-payment of its fees.  The
contents of SUBJECT DEVICE 5 and SUBJECT DEVICE 6 have not been
reviewed by me or any other member of the prosecution team.

     82.  SUBJECT DEVICE 7:  On November 20, 2018, SA Weeks
received from A.G. a Seagate external hard drive[50] containing
additional records responsive to the October 25, 2018, subpoena.
SA Weeks then created a forensic image of the hard drive
(described herein as SUBJECT DEVICE 7).  I then mailed the
device back to A.G. on December 3, 2018.  Based on my
discussions with A.G. and SA Weeks, I understand that SUBJECT
DEVICE 7 contains approximately 1.5 million emails that J.S.
downloaded from the AWS cloud server before GBUS's services were
discontinued.  SA Weeks further advised me that SUBJECT DEVICE 7
contains a number of GBUS email mailboxes, including email
mailboxes associated with the following former GBUS employees:
A.G.; B.H.; M.D.; M.E.; M.G.; S.F.; T.M.; and V.S.  Notably,

_____

     [50]  I understand that A.G. used the same Seagate external
hard drive he provided to IRS-CI on November 13, 2018, to
produce this additional data to IRS-CI.

SUBJECT DEVICE 7 does not appear to contain any email mailboxes associated with AVENATTI.[51]  Although SA Weeks provided me with a list of the email mailboxes stored on SUBJECT DEVICE 7, the specific contents of SUBJECT DEVICE 7 have not been reviewed by me or any other member of the prosecution team.

### B. The SUBJECT DEVICES Are Unlikely to Contain Attorney-Client Privileged Communications or Records

83.  Although AVENATTI is a licensed attorney and has previously claimed in connection with the IRS collection case that he served as GBUS's General Counsel, it is highly unlikely that the SUBJECT DEVICES will contain information protected by the attorney-client privilege for the following reasons:

a.  First, on February 19, 2019, the GBUS Trustee (see supra Section IV.C.7) executed a written waiver of the attorney-client privilege as to any communications between GBUS's officer, directors, employees, and agents, and any lawyer acting on GBUS's behalf, including any communications with AVENATTI.[52]  The Trustee has also consented to a search of the

---

[51]  As noted in Section IV.C.3 above, multiple former GBUS employees indicated that although AVENATTI had a GBUS email account, he did not use it to conduct business on behalf of GBUS, and used his EA LLP email account instead.

[52]  The written waiver is limited to attorney-client communications prior to the filing of the involuntary bankruptcy petition on October 24, 2018, and does not cover communications between the GBUS Trustee and any lawyers acting on behalf of the GBUS Trustee.  Based on when the SUBJECT DEVICES were collected and my discussions with the former GBUS employees regarding the general contents of the SUBJECT DEVICES, I do not believe the SUBJECT DEVICES include any communications that occurred or records that were created after October 24, 2018, or any communications involving the GBUS Trustee.

SUBJECT DEVICES.  A copy of the Trustee's written waiver of the attorney-client privilege is attached hereto as Exhibit 1.

      b.  Second, the former GBUS employees who have been interviewed during the investigation have all indicated that AVENATTI primarily, if not exclusively, served in a business capacity, and did little to no legal work for GBUS.  Indeed, all of the former GBUS employees considered AVENATTI to be the CEO and Chairman of GBUS, as opposed to its General Counsel.  It is therefore highly unlikely that any of the former GBUS employees' emails contained on the SUBJECT DEVICES would constitute attorney-client privileged communications.  But, to the extent AVENATTI was acting as GBUS's lawyer, any of the individual GBUS employees' communications with AVENATTI are covered by the Trustee's written waiver of the attorney-client privilege referenced in paragraph 83.a above and attached hereto as Exhibit 1.

     84.  Third, I understand AVENATTI could potentially assert that he had an individual attorney-client relationship with certain lawyers that also represented GBUS, such as the Eisenhower law firm, which represented GBUS in the Bellevue Square Litigation, or The Brager Tax Law Group.  I have no reason to believe, however, that communications between AVENATTI and any lawyers representing him in an individual capacity are contained on the SUBJECT DEVICES.  Based on the evidence collected to date and witness interviews, I understand that AVENATTI exclusively used his EA LLP email account to conduct business on behalf of GBUS.  Further, to the best of my

Case 8:19-cr-00061-JVS   Document 78   Filed 01/14/20   Page 166 of 544   Page ID #:236
Case 8:19-cr-00061-JVS   Document 73   Filed 01/14/20   Page 166 of 544   Page ID #:405
184   Page ID #:405

knowledge, the SUBJECT DEVICES do not contain a backup of
AVENATTI's GBUS email account, which in any case GBUS employees
said AVENATTI never used.[53]

85.  For the foregoing reasons, I believe that the SUBJECT
DEVICES will contain limited, if any, attorney-client
communications and that any such attorney-client communications
on the SUBJECT DEVICES are subject to the written waiver of the
attorney-client privilege executed by the Trustee for GBUS.
Accordingly, a privilege review search protocol that encompasses
all of AVENATTI's communications with GBUS employees is
unnecessary and would significantly delay this investigation.
Nevertheless, as set forth in Attachment B to the search warrant
application, a privilege review team will conduct a limited
search of the devices for communications with the following five
law firms with which AVENATTI may claim that he had an
individual attorney-client relationship: (a) Foster Pepper PLLC;
(b) Osborn Machler PLLC; (c) Eisenhower Carlson PLLC; (d)
Talmadge/Fitzpatrick/Tribe, PPLC; and (e) The Brager Tax Law
Group.  The search team will also be advised of the possibility
that AVENATTI could claim that he had an individual attorney-
client relationship with other law firms or lawyers.  To the
extent the search team discovers any individual communications
between AVENATTI and lawyers from the five identified law firms

---

[53] To the extent any of the SUBJECT DEVICES do in fact
contain a backup of AVENATTI's GBUS email accounts, paragraph 8
of Attachment B to the search warrant application requires that
any such email accounts be immediately segregated and not
searched or reviewed absent further authorization from the
Court.

or any other law firms, the search team will immediately cease
its review of those communications and provide them to the
PRTAUSA for further review and, if necessary, relief from the
Court.

### VI.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

86.   As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS); and
security devices.

87.   Based on my knowledge, training, and experience, as
well as information related to me by agents and others involved
in the forensic examination of digital devices, I know that it
is not always possible to search digital devices for digital
data in a single day or even over several weeks for a number of
reasons, including the following:

a.      Searching digital devices can be a highly
technical process that requires specific expertise and
specialized equipment.   There are so many types of digital
devices and software programs in use today that it takes time to
conduct a thorough search.   In addition, it may be necessary to
consult with specially trained personnel who have specific
expertise in the type of digital device, operating system, and
software application being searched.

b.      Digital data is particularly vulnerable to
inadvertent or intentional modification or destruction.
Searching digital devices can require the use of precise,
scientific procedures that are designed to maintain the
integrity of digital data and to recover "hidden," erased,
compressed, encrypted, or password-protected data.   As a result,
a controlled environment, such as a law enforcement laboratory
or similar facility, is essential to conducting a complete and
accurate analysis of data stored on digital devices.

c.      Based on my discussions with IRS-CI SA John
Weeks, I understand the SUBJECT DEVICES may contain a
substantial of data.   A single megabyte of storage space is the
equivalent of 500 double-spaced pages of text.   A single
gigabyte of storage space, or 1,000 megabytes, is the equivalent
of 500,000 double-spaced pages of text.

d.      Electronic files or remnants of such files can be
recovered months or even years after they have been downloaded

Case 8:19-cr-00061-JVS *SEALED* Document 78 Filed 01/14/20 Page 169 of 544 Page ID #:1239
Case 8:19-cr-00061-JVS *SEALED* Document 75 Filed 01/14/20 Page 169 of 544 Page ID #:408
184   Page ID #:408

onto a hard drive, deleted, or viewed via the Internet.[54]
Electronic files saved to a hard drive can be stored for years
with little or no cost.  Even when such files have been deleted,
they can be recovered months or years later using readily-
available forensics tools.  Normally, when a person deletes a
file on a computer, the data contained in the file does not
actually disappear; rather, that data remains on the hard drive
until it is overwritten by new data.  Therefore, deleted files,
or remnants of deleted files, may reside in free space or slack
space, i.e., space on a hard drive that is not allocated to an
active file or that is unused after a file has been allocated to
a set block of storage space, for long periods of time before
they are overwritten.  In addition, a computer's operating
system may also keep a record of deleted data in a swap or
recovery file.  Similarly, files that have been viewed on the
Internet are often automatically downloaded into a temporary
directory or cache.  The browser typically maintains a fixed
amount of hard drive space devoted to these files, and the files
are only overwritten as they are replaced with more recently
downloaded or viewed content.  Thus, the ability to retrieve
residue of an electronic file from a hard drive depends less on
when the file was downloaded or viewed than on a particular
user's operating system, storage capacity, and computer habits.
Recovery of residue of electronic files from a hard drive

---

[54] These statements do not generally apply to data stored in
volatile memory such as random-access memory, or "RAM," which
data is, generally speaking, deleted once a device is turned
off.

requires specialized tools and a controlled laboratory
environment.  Recovery also can require substantial time.

e.    Although some of the records called for by this
warrant might be found in the form of user-generated documents
(such as word processing, picture, and movie files), digital
devices can contain other forms of electronic evidence as well.
In particular, records of how a digital device has been used,
what it has been used for, who has used it, and who has been
responsible for creating or maintaining records, documents,
programs, applications and materials contained on the digital
devices are, as described further in the attachments, called for
by this warrant.  Those records will not always be found in
digital data that is neatly segregable from the hard drive image
as a whole.  Digital data on the hard drive not currently
associated with any file can provide evidence of a file that was
once on the hard drive but has since been deleted or edited, or
of a deleted portion of a file (such as a paragraph that has
been deleted from a word processing file).  Virtual memory
paging systems can leave digital data on the hard drive that
show what tasks and processes on the computer were recently
used.  Web browsers, e-mail programs, and chat programs often
store configuration data on the hard drive that can reveal
information such as online nicknames and passwords.  Operating
systems can record additional data, such as the attachment of
peripherals, the attachment of USB flash storage devices, and
the times the computer was in use.  Computer file systems can
record data about the dates files were created and the sequence

153

in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

        f.    Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

        g.    Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Digital device users can also attempt to conceal data by

154

using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.  In addition, decryption of devices and data stored thereon is a constantly evolving field, and law enforcement agencies continuously develop or acquire new methods of decryption, even for devices or data that cannot currently be decrypted.

      h.   The search of the SUBJECT DEVICES will likely take a considerable amount of time for multiple reasons.  First, as noted above, the SUBJECT DEVICES contain a substantial amount of data.  For example, I understand that SUBJECT DEVICE 7 alone contains approximately 1.5 million emails.  Second, the search of the SUBJECT DEVICES will require the use of a Privilege Review Team and the search protocols set forth in Attachment B to the search warrant application.

Case 8:19-cr-00061-JVS  Document 78  Filed 01/14/20  Page 173 of 544  Page ID #:1243
Case 8:19-mj-00061-DUTY  *SEALED*  Document 3  Filed 03/22/19  Page 173 of
184  Page ID #:412

88.  Other than what has been described herein, to my
knowledge, the United States has not attempted to obtain this
data by other means.

## VII. <u>REQUEST FOR SEALING</u>

89.  I request that the search warrant, the search warrant
application, and this affidavit be kept under seal to maintain
the integrity of this investigation until further order of the
Court, or until the government determines that these materials
are subject to its discovery obligations in connection with
criminal proceedings, at which time they may be produced to
defense counsel.  I make this request for several reasons.

a.  <u>First</u>, this criminal investigation is ongoing and
is neither public nor known to AVENATTI and other subjects of
the investigation.  Disclosure of the search warrant,
application, and this affidavit could cause AVENATTI and others
to accelerate any existing or evolving plans to, and give them
an opportunity to, destroy or tamper with evidence, tamper with
or intimidate witnesses, change patterns of behavior, or notify
confederates.

b.  <u>Second</u>, based on evidence collected to date and
described herein, there is probable cause to believe that
AVENATTI took a number of affirmative actions to obstruct the
IRS civil collection action relating to GBUS's unpaid payroll
taxes by, among other things, lying to RO 1, changing contracts,
merchant accounts, and bank account information to avoid liens
and levies imposed by the IRS, and instructing employees to
deposit over $800,000 in cash from Tully's stores, which were

owned and operated by GBUS, into a bank account associated with
a separate entity to avoid liens and levies by the IRS.  If
AVENATTI were to learn of the instant investigation he might
engage in similarly obstructive conduct.

      c.    <u>Third</u>, a number of former GBUS employees have
expressed concerns that AVENATTI might attempt to retaliate
against them if he learned they were cooperating with the
government's investigation.

      d.    <u>Fourth</u>, there is a possibility that some evidence
relating to GBUS's operations may have already been lost when
GBUS was evicted from its corporate offices and AVENATTI refused
to pay the bill for GBUS's cloud-based server.  Although IRS-CI
has been able to obtain some GBUS records, including the data
stored on the SUBJECT DEVICES, from other sources, AVENATTI's
apparent willingness to allow GBUS records to be lost or
destroyed raises a concern that, were AVENATTI to learn of the
instant investigation, he might not hesitate to destroy any
remaining GBUS records and other relevant evidence.

      e.    <u>Fifth</u>, the government is still attempting to
locate additional documentary evidence that is relevant to the
investigation, including emails and electronic records that may
be stored by AVENATTI, EA LLP, A&A, or other related entities.
As noted herein, AVENATTI appears to have worked primarily out
of EA LLP's office and used solely his EA LLP email address to
conduct business.  The government is still attempting to
identify the internet service provider AVENATTI used for EA
LLP's email accounts and/or the location of his email server.

Additionally, EA LLP was recently evicted from its offices in
Newport Beach, California, and investigators have yet to
determine where EA LLP's records are being currently stored.  If
alerted to the government's investigation, it is therefore
possible that AVENATTI would attempt to destroy such records and
that the government would have no other means to obtain this
evidence.

## VIII.    CONCLUSION

90.  For the reasons described above, I respectfully submit
there is probable cause to believe that evidence, fruits, and
instrumentalities of the Subject Offenses, as described with
particularity in Attachment B, will be found on the SUBJECT
DEVICES, as described with particularity in Attachment A.


                                    /s/
                            _____
                            Remoun Karlous, Special Agent
                            Internal Revenue Service –
                            Criminal Investigation



Subscribed to and sworn before me
this 22nd day of February, 2019.


**DOUGLAS F. McCORMICK**
_____
HONORABLE DOUGLAS F. McCORMICK
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT 2

## AFFIDAVIT

I, Remoun Karlous, being duly sworn, declare and state as follows:

### I.  INTRODUCTION

1.   I am a Special Agent ("SA") with the Internal Revenue Service-Criminal Investigation ("IRS-CI") in the Los Angeles Field Office and have been so employed since April 1995.  As an IRS-CI SA, I have investigated numerous cases involving criminal violations of Title 18, Title 21, Title 26, and Title 31 of the United States Code, which have resulted in seizure, search, and arrest warrants.  In particular, I have investigated cases involving money laundering, international money laundering, securities fraud, tax evasion (domestic and international cases), and subscribing to false tax returns.

### II. PURPOSE OF AFFIDAVIT

2.   This affidavit is submitted in support of the following:

a.   An application for a warrant to search the residence of Michael J. Avenatti ("AVENATTI") located at 10000 Santa Monica Boulevard, Unit 2205, Los Angeles, California 90067 ("SUBJECT PREMISES 1"), as further described in Attachment A-1, for the list of items to be seized as set forth in Attachment B-1.

b.   An application for a warrant to search the residence of Judy K. Regnier ("REGNIER") located at 4491 Rainbow Lane, Yorba Linda, California 92886 ("SUBJECT PREMISES 2"), as

further described in Attachment A-2 for the list of items to be
seized as set forth in Attachment B-2.

     c.  An application for a warrant to search the
business premises of The X-Law Group ("X-Law Group") located at
1910 West Sunset Boulevard, Suite 450, Los Angeles, California
90026 ("SUBJECT PREMISE 3" and, collectively with SUBJECT
PREMISES 1 and SUBJECT PREMISES 2, the "SUBJECT PREMISES"), as
further described in Attachment A-3 for the list of items to be
seized as set forth in Attachment B-3.

    3.  The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested warrants and does
not purport to set forth all of my knowledge of or investigation
into this matter.  Unless specifically indicated otherwise, all
conversations and statements described in this affidavit are
related in substance and in part only.

### III. PROPERTY TO BE SEARCHED

    4.  The property to be searched are the SUBJECT PREMISES,
including any individuals, containers, or digital devices found
therein, as described in Attachments A-1, A-2, and A-3.
Attachments A-1, A-2, and A-3 are incorporated herein by
reference.

### IV. ITEMS TO BE SEIZED

    5.  The requested search warrants seek authorization to
seize from the SUBJECT PREMISES any evidence, fruits, or

instrumentalities of violations of 26 U.S.C. § 7201 (attempt to
evade or defeat tax); 26 U.S.C. § 7202 (willful failure to
collect or pay over tax); 26 U.S.C. § 7203 (willful failure to
pay tax or file return); 26 U.S.C. § 7212 (interference with
administration of internal revenue laws); 18 U.S.C. § 152
(concealment of assets in bankruptcy); 18 U.S.C. § 157
(bankruptcy fraud); 18 U.S.C. § 371 (conspiracy); 18 U.S.C.
§ 1001 (false statements); 18 U.S.C. § 1014 (false statement to
a bank or other federally insured institution); 18 U.S.C.
§ 1028A (aggravated identity theft); 18 U.S.C. § 1343 (wire
fraud); 18 U.S.C. § 1344 (bank fraud); and 18 U.S.C. § 1957
(money laundering) (collectively, the "Subject Offenses").  The
list of items to be seized is set forth in Attachments B-1, B-2,
and B-3.  Attachments B-1, B-2, and B-3 are incorporated by
reference herein.

## V.  **SUMMARY OF PROBABLE CAUSE**

6.   AVENATTI was and is an attorney licensed to practice
law in the State of California.  AVENATTI practiced law through
Avenatti & Associates, APC ("A&A") and Eagan Avenatti LLP ("EA
LLP") in Newport Beach and Los Angeles, California.  AVENATTI
was the sole owner of A&A, which owned 75 percent of EA LLP.

7.   AVENATTI was also the principal owner and Chief
Executive Officer ("CEO") of Global Baristas US LLC ("GBUS"),
which operated Tully's Coffee ("Tully's") stores in Washington
and California.  In 2013, AVENATTI's company, Global Baristas
LLC ("GB LLC"), acquired TC Global Inc., which previously
operated Tully's, out of bankruptcy for approximately $9.2

million.  AVENATTI's company, A&A, owned 100 percent of Doppio
Inc., which in turn owned 80 percent of GB LLC.  GB LLC wholly
owned GBUS, which handled the day-to-day business operations of
Tully's.

        8.    There is probable cause to believe that AVENATTI and
others engaged in the following criminal conduct:  (a) tax
offenses relating to GBUS's failure to pay to the IRS payroll
taxes, including federal income taxes, Social Security taxes,
and Medicare taxes (collectively, "trust fund taxes") that GBUS
withheld from its employees' paychecks, and AVENATTI's
subsequent efforts to obstruct a related IRS collection action;
(b) tax offenses relating to the tax obligations of EA LLP and
A&A, including EA LLP's failure to pay to the IRS its payroll
taxes, and EA LLP's and A&A's failure to file federal corporate
or partnership tax returns and pay federal income taxes; (c) tax
offenses relating to AVENATTI's failure to file federal
individual income tax returns and pay federal income taxes
between 2011 and 2017; (d) fraud-related offenses relating to
loans AVENATTI and his companies obtained from The Peoples Bank
in Mississippi; (e) fraud and money laundering offenses relating
to a total of approximately $5 million that AVENATTI embezzled
from his legal clients (G.B., M.P., and L.T.) in 2018; and
(f) bankruptcy fraud offenses relating to AVENATTI's and EA
LLP's efforts to conceal assets and bank accounts during federal
bankruptcy proceedings involving AVENATTI and EA LLP.

        9.    On March 22, 2019, in case number SA 19-241M, I
submitted an affidavit in support of an arrest warrant and

criminal complaint charging AVENATTI with one count of bank
fraud, in violation of 18 U.S.C. § 1344(1), and one count of
wire fraud, in violation of 18 U.S.C. § 1343.  The Honorable
Douglas F. McCormick, United States Magistrate Judge, authorized
the arrest warrant that same day.  IRS-CI anticipates executing
the arrest warrant concurrently with the proposed search
warrants.

     10.  There is probable cause to believe that evidence of
the SUBJECT OFFENSES will be found at the SUBJECT PREMISES for
the following reasons:

          a.   First, SUBJECT PREMISES 1 is AVENATTI's personal
residence.  Based on my training and experience and evidence
obtained during the course of this investigation, I know that
SUBJECT PREMISES 1 is likely to contain AVENATTI's personal and
business records, as well as digital devices that are likely to
contain such records.

          b.   Second, SUBJECT PREMISES 2 is REGNIER's personal
residence.  Based on my training and experience and
investigation to date, as well as REGNIER's substantial
involvement in the alleged criminal conduct, I believe SUBJECT
PREMISES 2 is also likely to contain relevant business records
and/or digital devices containing such records.  For example, I
understand that EA LLP's and A&A's mail is currently being
forwarded to a mailbox at a Postal Annex store less than a mile
from SUBJECT PREMISES 2 and since EA LLP was evicted from their
offices in Newport Beach, California, between November 2018 and

January 2019, I believe REGNIER has primarily been working from her home.

c.   Third, SUBJECT PREMISES 3 is the business premises of The X-Law Group ("X-Law Group").  AVENATTI has been leasing SUBJECT PREMISES 3 and used it as additional office space for EA LLP since the summer of 2016.  Additionally, X-Law Group was directly involved in a number of significant financial transactions with GBUS, GB LLC, GB Autosport LLC ("GB Auto"), EA LLP, and A&A.  Moreover, in 2018, Filippo Marchino ("MARCHINO"), the Founding Partner of X-Law Group, was directly involved in discussions with AVENATTI's clients, M.P. and L.T., regarding the approximately $4 million that AVENATTI embezzled from M.P. and L.T. in March 2018.

## VI. STATEMENT OF PROBABLE CAUSE

### A.   February 2019 Warrant to Search GBUS Digital Devices

11.   On February 22, 2019, in case number 8:19-MJ-103, I submitted an affidavit in support of an application for a warrant to search seven digital devices in the custody of IRS-CI in Laguna Niguel, California (the "February 2019 affidavit"), which had been produced by former GBUS employees.  The Honorable Douglas F. McCormick, United States Magistrate Judge, authorized the warrant that same day (the "February 2019 search warrant"). The application for a search warrant in case number 8:19-MJ-103, as well as my February 2019 affidavit in support thereof, are attached hereto as Exhibit 1 and incorporated herein by

reference.[1]  In summary, my February 2019 affidavit stated the
following:

      a.    AVENATTI was and is an attorney licensed to
practice law in the State of California.  AVENATTI practiced law
through A&A and EA LLP in Newport Beach, California.  AVENATTI
was the sole owner of A&A, which owned 75 percent of EA LLP.

      b.    AVENATTI was also the principal owner and Chief
Executive Officer ("CEO") of GBUS, which operated Tully's stores
in Washington and California.  In 2013, AVENATTI's company, GB
LLC, acquired TC Global Inc., which previously operated Tully's,
out of bankruptcy for approximately $9.2 million.  AVENATTI's
company, A&A, owned 100 percent of Doppio Inc., which in turn
owned 80 percent of GB LLC.  GB LLC wholly owned GBUS, which
handled the day-to-day business operations of Tully's.

      c.    There is probable cause to believe that between
at least 2011 and the present AVENATTI committed federal
offenses, including the following: (a) tax offenses relating to
GBUS's payroll tax obligations and AVENATTI's efforts to
obstruct an IRS collection action; (b) tax offenses relating to
the tax obligations of EA LLP and A&A, including the payroll tax
obligations of EA LLP; (c) tax offenses relating to AVENATTI's
personal tax obligations; (d) fraud-related offenses relating to

---

    [1]  The search warrant and application in case number 8:19-
MJ-103 were filed under seal and remain under seal to protect
the integrity of the government's ongoing investigation.
Because the search warrants sought in connection with this
application are likely to be executed concurrently with
AVENATTI's arrest warrant, the government will likely be moving
to unseal this application and the February 2019 search warrant
after AVENATTI's arrest.

loans AVENATTI and his companies obtained from The Peoples Bank
in Mississippi; and (e) wire fraud, money laundering, and
bankruptcy fraud offenses relating to an approximately $1.6
million settlement payment AVENATTI and EA LLP received in
January 2018, but failed to transfer to EA LLP's client or
disclose in federal bankruptcy proceedings involving AVENATTI
and EA LLP.

      d.   <u>First</u>, between the fourth quarter of 2015 and the
fourth quarter of 2017, inclusive, GBUS failed to file
employment tax returns and pay approximately $3,121,460 in
federal payroll taxes, including approximately $2,390,048 in
trust fund taxes, which had been withheld from GBUS employees'
paychecks.  Multiple former GBUS employees have said that
AVENATTI was responsible for all of GBUS's significant financial
and business decisions, including the decision not to pay the
payroll and trust fund taxes that GBUS owed to the IRS.  Indeed,
AVENATTI was well aware of GBUS's outstanding tax obligations,
yet repeatedly refused to authorize the required tax payments to
the IRS.

      e.   Although GBUS failed to pay to the IRS its
payroll taxes between the fourth quarter of 2015 and the fourth
quarter of 2017, AVENATTI caused substantial amounts of money to
be transferred from GBUS's or GB LLC's bank accounts during this
same time period.  For example, a preliminary analysis of GBUS's
and GB LLC's bank account records shows that between 2015 and
2017 AVENATTI caused a net of approximately $1.7 million to be
transferred from GBUS's or GB LLC's bank accounts to bank

Case 8:19-cr-00061-JVS  Document 78  Filed 01/14/20  Page 185 of 544  Page ID #:1255
Case 8:19-mj-00061-DUTY  *SEALED*  Document 1-1  *SEALED*  Filed 03/28/19  Page 34 of
100   Page ID #:349

accounts associated with A&A or EA LLP.[2]  This money could have
and should have been used to pay GBUS payroll tax obligations.

     f.   Additionally, after the IRS initiated a
collection action relating to GBUS's outstanding payroll tax
obligations in September 2016, issued an approximately
$5,000,000 tax lien against GBUS in July 2017, and levied
multiple GBUS bank accounts, AVENATTI directed repeated attempts
to evade collection of those payroll taxes and obstruct the IRS
collection action.  Among other things, AVENATTI took the
following steps to evade the collection of payroll taxes due to
the IRS and obstruct the IRS collection action:

     i.   In October 2016, when first contacted by an
IRS Revenue Officer ("RO 1") regarding GBUS's unpaid payroll
taxes, AVENATTI falsely stated that a third-party payroll
company was responsible for filing GBUS's payroll tax returns
and making GBUS's federal tax deposits.  AVENATTI, however, knew
that GBUS's third-party payroll company, Ceridian HCM Inc., had
discontinued the tax services it had previously provided to GBUS
and was, therefore, no longer responsible for filing GBUS's
payroll tax returns and making the necessary federal tax
deposits.  AVENATTI was well aware that GBUS was not paying its
payroll taxes.  GBUS employees repeatedly asked him to authorize

---

     [2]  A further analysis of GBUS's and GB LLC's bank account
records shows that between September 2015 and December 2017,
AVENATTI caused a net of approximately $2,527,318 to be
transferred from GBUS's and GB LLC's bank accounts to bank
accounts associated with A&A and EA LLP.  Moreover, in September
2015 and October 2015 alone, when GBUS first stopped paying its
payroll taxes to the IRS, AVENATTI caused a net of approximately
$501,582 to be transferred to EA LLP's and A&A's bank accounts.

the payment of GBUS's payroll taxes to the IRS, yet he refused to do so.

ii.   In September 2017, after IRS RO 1 advised GBUS of the possibility of criminal proceedings and levied multiple GBUS bank accounts, including a GBUS account at KeyBank, AVENATTI directed GBUS employees to stop depositing cash receipts from the Tully's stores into the account at KeyBank.  Instead, in order to avoid the levies, AVENATTI directed GBUS employees to deposit all cash receipts from Tully's stores into a little-used bank account at Bank of America associated with his car racing entity, GB Auto.  Between September 2017 and December 2017, GBUS employees deposited approximately $859,784 in cash into the GB Auto account at AVENATTI's direction.

iii. In late-September and early-October 2017, in order to avoid IRS levies issued to the sponsoring bank for GBUS's merchant credit card processing accounts ("merchant accounts"), AVENATTI directed GBUS's credit card processing company, TSYS Merchant Solutions ("TSYS"), to change the company name and Employer Identification Number ("EIN") associated with the merchant accounts from GBUS to GB LLC.  AVENATTI also directed TSYS to have all credit card receipts paid to a new bank account under the name of GB LLC, which AVENATTI and REGNIER had opened that same day in Orange County, California, instead of the bank accounts associated with GBUS, which were already subject to the IRS levies.

iv.   In November 2016, approximately one month
after RO 1 first contacted AVENATTI, AVENATTI changed the name
of the party to a contract with The Boeing Company ("Boeing")
from GBUS to "GB Hospitality LLC," a company which does not
appear to have ever been registered with any government agency
or operated.  Later, in September 2017, after the IRS had issued
levies to Boeing and a number of banks with which GBUS had
accounts, Boeing cancelled the contract because GBUS had failed
to make the required commission payments.  In connection with
the cancellation of the contract, Boeing agreed to purchase two
existing Tully's "kiosks" at Boeing facilities and other Tully's
equipment in exchange for a total of $155,010 and the
forgiveness of GBUS's debt to Boeing.  Although all of the
Tully's locations were operated by GBUS, AVENATTI told an
attorney at Boeing to use the name GB LLC on the two bills of
sale for the kiosks and equipment, and instructed Boeing to wire
the $155,010 payment to an attorney trust account associated
with EA LLP rather than any of the bank accounts associated with
GBUS.  Had the Boeing contract and subsequent bills of sale been
under the name GBUS, Boeing would not have made the $155,010
payment due to the existing GBUS tax lien.  After receiving the
$155,010 payment from Boeing, AVENATTI transferred the $155,010
to an A&A bank account, from which he then transferred $15,000
to his personal checking account, paid approximately $13,073 for
rent at his residential apartment in Los Angeles, California
(SUBJECT PREMISES 1), and paid approximately $8,459 to Neiman
Marcus.  Indeed, out of the $155,010 Boeing transferred to the

11

EA LLP trust account, it appears that only approximately half ever ended up in GBUS's bank accounts.

g.  Second, AVENATTI's other companies, EA LLP and A&A, have repeatedly failed to meet their tax obligations despite generating substantial revenues.  Between 2015 and 2017, EA LLP failed to file payroll tax returns and pay approximately $2.4 million in payroll taxes, including approximately $1,279,001 in trust fund taxes that had been withheld from EA LLP employees' paychecks.  Just as he did in connection with GBUS, AVENATTI lied to the IRS when initially contacted regarding EA LLP's failure to pay its payroll taxes, and falsely claimed that a third-party payroll company, Paychex, was responsible for making the required tax payments even though the payroll company had notified AVENATTI in January 2015 that it was discontinuing various payroll tax services.  Additionally, EA LLP has not filed partnership tax returns (IRS Form 1065) for the 2013, 2014, 2015, 2016, and 2017 tax years, even though EA LLP appears to have received approximately $137,890,016 of deposits into its bank accounts during these tax years.  Indeed, AVENATTI's personal website claims that AVENATTI has recovered over one billion dollars in verdicts and settlements for his clients.  Similarly, A&A has not filed corporate tax returns (IRS Form 1120S) for the 2011, 2012, 2013, 2014, 2015, 2016, or 2017 tax years, even though A&A appears to have received approximately $37,961,633 of deposits into its bank accounts during these tax years, including net payments of approximately $23,820,816 from EA LLP.

    h.    Third, AVENATTI filed federal personal income tax

returns for the 2009 and 2010 tax years indicating that he owed

the IRS a total of approximately $850,438, plus interest and

penalties.  AVENATTI, however, did not pay the IRS the amounts

he owed for those tax years.[3]  AVENATTI then failed to file

personal tax returns for the 2011 through 2017 tax years.

During these tax years, AVENATTI generated substantial income

and lived lavishly, yet largely failed to pay any federal income

tax.  A preliminary analysis of AVENATTI's personal bank

accounts reflects that AVENATTI received net payments of

approximately $8,464,064 from A&A and EA LLP between 2011 to

2017.  AVENATTI also repeatedly used money that had been

transferred from GBUS, GB LLC, and EA LLP to A&A to pay for

personal expenses.  Further, AVENATTI received proceeds of

approximately $5.4 million when he sold his home in Laguna

Beach, California in 2015.  Finally, in connection with recent

divorce proceedings, AVENATTI's wife said that AVENATTI told her

that he earned $3.7 million dollars in 2016.  His wife also said

that their family's monthly expenses were over $200,000 per

month.  Financial and escrow company records show that from

approximately September 2015 to September 2016, AVENATTI and his

wife rented a home in Newport Beach for $100,000 per month,

after making a $1,000,000 deposit.

---

[3] The tax due and owing to the IRS for the 2009 and 2010 tax
years was not paid until November 2015, when AVENATTI sold his
residence in Laguna Beach, California, upon which there was an
IRS tax lien.

       i.    <u>Fourth</u>, between approximately January 2014 and December 2014, AVENATTI obtained three separate loans from The Peoples Bank, a federally insured bank in Mississippi: (1) a $850,500 loan to GB LLC in January 2014; (2) a $2,750,000 loan to EA LLP in March 2014; and (3) a $500,000 loan to EA LLP in December 2014.  In connection with these loans, AVENATTI provided The Peoples Bank with false federal personal income tax returns for the 2011, 2012, and 2013 tax years.  In these purported tax returns, AVENATTI claimed that he earned $4,562,881 in adjusted gross income in 2011, $5,423,099 in adjusted gross income in 2012, and $4,082,803 in adjusted gross income in 2013.  He also claimed that he had paid to the IRS $1,600,000 in estimated tax payments in 2012, and $1,250,000 in estimated tax payments in 2013.  However, AVENATTI never filed personal income tax returns for the 2011, 2012, and 2013 tax years, and did not make any estimated tax payments during the 2012 and 2013 tax years.  In fact, as noted above, at the time, AVENATTI still owed the IRS approximately $850,438 in unpaid personal income taxes, plus interest and penalties, from the 2009 and 2010 tax years.  Additionally, in March 2014, AVENATTI provided The Peoples Bank with a 2012 federal tax return for EA LLP which claimed total income of $11,426,021 and ordinary business income of $5,819,456.  However, the 2012 federal tax return EA LLP actually filed with the IRS in October 2014 claimed total income of only $6,212,605 and an ordinary business loss of $2,128,849.

j.    Fifth, between January 2018 and November 2018,
AVENATTI defrauded one of EA LLP's client, G.B., out of the
client's portion of an approximately $1.6 million settlement
payment.  Specifically, in January 2018, AVENATTI arranged for
the $1.6 million settlement payment to be transferred to one of
his attorney trust accounts.  Rather than transfer his client's
portion of the settlement proceeds to his client, AVENATTI used
the entire $1.6 million for his own purposes, including to pay
for expenses relating to GBUS.  He then lied to his client and
claimed that the settlement payment was not due until March
2018.  When the fake March 2018 deadline passed, AVENATTI led
his client to believe that the $1.6 million payment had never
been received.  Additionally, AVENATTI failed to disclose in
federal bankruptcy proceedings involving AVENATTI and EA LLP
that he had received the $1.6 million settlement payment,
despite being aware that he was required to do so.

k.    AVENATTI has described REGNIER as his office
manager, chief paralegal, and bookkeeper.  She appears to have
worked for EA LLP (or its predecessor firm Eagan O'Malley &
Avenatti LLP) in an administrative capacity since at least 2008.[4]
At various times, REGNIER was a signatory on bank accounts
associated with GBUS, GB LLC, GB Auto, EA LLP, and A&A.  REGNIER
was personally involved in many of the events at issue in the
government's investigation, including directing or executing the

_____

[4]  Although my February 2019 affidavit said that REGNIER
worked for EA LLP since at least 2010, I have since reviewed
publicly available information indicating that she worked at
Eagan O'Malley & Avenatti since at least 2008.

15

transfer of funds between various entities associated with
AVENATTI, directing the actions of GBUS employees, and
transmitting signed contracts and agreements on behalf of GBUS,
GB LLC, EA LLP, or A&A to other parties.

**B.    Additional Evidence Regarding the GBUS Tax Offenses**

12.  As noted in my February 2019 affidavit, between the
fourth quarter of 2015 and the fourth quarter of 2017, GBUS
failed to pay to the IRS approximately $3,121,460 in federal
payroll taxes, including approximately $2,390,048 in trust fund
taxes.  AVENATTI also repeatedly attempted to obstruct the IRS
collection action arising from GBUS's failure to pay its payroll
taxes.  Since I submitted my February 2019 affidavit, the
investigation has uncovered additional evidence regarding this
conduct.

13.  In my February 2019 affidavit, I noted that GBUS's
former controller, M.B., told IRS-CI that she sent AVENATTI an
email explaining the ramifications of GBUS not paying its
payroll taxes to the IRS.  (Ex. 1, ¶ 26.h.)  Based on my review
of evidence obtained from the February 2019 search warrant, I
have learned that on November 5, 2015, M.B. sent AVENATTI an
email[5] titled "Information only – Q4 2015 941 Payroll Tax."  The
email stated, in full, the following:

Michael,

Per you instruction, 941 payroll tax and unemployment
tax payments (federal withholding, Medicare and social

[5]  This email was sent to mavenatti@eaganavenatti.com.
Based on the evidence collected during IRS-CI's investigation, I
know that AVENATTI almost exclusively used his EA LLP email
address mavenatti@eaganavenatti.com to conduct business on
behalf of GBUS and his other companies.

security) are not to be paid on an as-we-go basis but
will be paid in total at the 1/31/16 filing due
date.  Two implications result from this strategy:

1. Estimated total tax payment due at 1/31/16 will be
   about $575,000 - $600,000, exclusive of penalties
   and interest.

     a. 6 payrolls each with an $83,000 941 tax
        obligation for a total of $500,000
     b. Federal unemployment of about $8,200
     c. State (CA and WA) unemployment of about $28,000
     d. Washington L&I (workers comp) of about $50,000

2. Global Baristas is a semiweekly filer for 941 tax
   per the Internal Revenue Service.  Per Publication
   15 for semiweekly filers, if the pay day falls on a
   Saturday, Sunday, Monday and/or Tuesday, (Monday as
   the case of GB) then taxes are required to be
   deposited by the following Friday.  Again per
   Publication 15 "you are required to deposit 100% of
   your tax liability on or before the due
   date".  Deposit penalties are as follows:

     a. 2% - Deposit made 1-5 days late
     b. 5% - Deposit made 6-15 days late
     c. 10% - Deposit made 16 or more days late.  Also
        applies to amounts paid within 10 days of the date
        of the first notice the IRS sent asking for the tax
        due
     d. 15% - Amounts still unpaid more than 10 days after
        the date of the first notice the IRS sent asking for
        the tax due or the day on which you received notice
        and demand for immediate payment, whichever is
        earlier.

   I have attached Publication 15 for your
   reference.  Unemployment will also carry penalties and
   interest.

   Again, this is for your information, thus I am not
   looking for a response or direction.  I wanted to
   ensure that you were aware of the implications.

A copy of the "Employer's Tax Guide," IRS Publication 15 for

2015 was attached to the email.  M.B. forwarded a copy of this

email to M.E., GBUS's former Director of Human Resources, on or about December 18, 2015.

14.  As noted in my February 2019 affidavit, M.E. told IRS-CI that AVENATTI had instructed her not to file GBUS's quarterly payroll tax returns ("IRS Forms 941"). (Ex. 1, ¶ 30.l.)  The following hard-copy documents M.E. produced to IRS-CI corroborate M.E.'s statements:

a.  On July 29, 2016, M.E. sent AVENATTI and V.S. an email titled "Q2 Tax Filing Review."  The email included a spreadsheet detailing amounts owed to various tax agencies, including a total of approximately $1,466,554 in federal payroll taxes due to the IRS for the fourth quarter of 2015, and the first and second quarters of 2016, as well as Federal Unemployment Tax Act ("FUTA") taxes due to the IRS for the 2015 tax year.  The email also attached a letter that GBUS had received "from the IRS referring to the FUTA Unemployment Tax from 2015."[6]  M.E. sent this email to AVENATTI over two months before AVENATTI told IRS RO 1 on October 7, 2016, that he was unaware that GBUS had failed to pay its payroll taxes, and blamed the error on GBUS's third-party payroll company. (See Ex. 1, ¶ 23(d).)

b.  On October 27, 2016, M.E. sent AVENATTI and V.S. an email titled "Q3 Tax Filing Review."  The email included an updated spreadsheet detailing GBUS's outstanding tax liabilities, including a total of approximately $1,953,850 in

_____

[6] The attachment to this email was not included in the hard-copy documents that M.E. produced to IRS-CI.

federal payroll taxes due to the IRS for the fourth quarter of
2015 and the first through third quarters of 2016, as well as
FUTA taxes due to the IRS for the 2015 tax year.  M.E. appears
to have attached to the email drafts of GBUS's IRS Form 941 for
the third quarter of 2016.  AVENATTI responded later that same
day, "Thanks [M.E.]  Please do not file anything yet.  I am
having our outside CPA look at the attached and other tax
issues."

        c.   On January 30, 2017, M.E. sent AVENATTI and V.S.
an email titled "Q4 Tax filing Review."  The email included an
updated spreadsheet detailing GBUS's outstanding tax
liabilities, including a total of approximately $2,836,269 in
federal payroll taxes due to the IRS for the fourth quarter of
2015, the first through fourth quarters of 2016, and the first
quarter of 2017, as well as FUTA Unemployment taxes payments due
to the IRS for the 2015 and 2016 tax years.  AVENATTI responded
moments later:  "We are handling.  Thanks."

    15.  As noted in my February 2019 affidavit, GBUS's former
Director of Retail Operations, M.G., told IRS-CI that in
September 2017 AVENATTI had directed M.G. to deposit cash from
the Tully's stores at a Bank of America account associated with
GB Auto ("GB Auto BofA Account 7412").  (Ex. 1, ¶¶ 31.i-31.k.)
Based on my review of evidence obtained from the February 2019
search warrant, I have learned the following additional
information demonstrating that AVENATTI and REGNIER were already
aware of the IRS levy notices when AVENATTI directed the Tully's

stores to deposit all cash into GB Auto BofA Account 7412.   For
example:

      a.   On or about August 25, 2017, V.S. emailed a
KeyBank representative and said:   "There is a hold(s) on the
account #4**93 for Global Baristas Us, LLC; can you send me a
copy of what order/lien this may be for, thanks."   In response,
the KeyBank representative told V.S. that KeyBank had two levies
on the GBUS account, including one levy from the IRS.   On August
28, 2017, another KeyBank representative sent a further response
to V.S. advising V.S. that KeyBank was "required to sweep the
available funds from the account and send them to the parties in
the order" and that KeyBank "will probably be served randomly
until the judgments are satisfied."   V.S. then forwarded this
email string to AVENATTI, who responded moments later stating
"Please send me the email you sent him before his response."

    16.   As noted in my February 2019 affidavit, M.G. also said
that she would send AVENATTI text messages attaching pictures of
the deposit slips after each cash deposit.   (Ex. 1, ¶¶ 31.i-
31.k.)   Text messages M.G. produced to IRS-CI confirm that
AVENATTI instructed M.G. to make these cash deposits and that
M.G. sent him pictures of the deposit slips after most of the
cash deposits.   For example:

      a.   On September 7, 2017, AVENATTI sent a text
message to M.G. with the account information for GB Auto BofA
Account 7412.   Later that day, M.G. sent AVENATTI a text message
stating:   "On my way to the bank.   If they ask is the business
address and phone number for GB Autosport the Western Avenue

address [i.e., GBUS's address]?" AVENATTI responded via text
message, "Yes." M.G. then sent AVENATTI a text message
attaching a deposit slip indicating that approximately $81,524
had been deposited into GB Auto BofA Account 7412. AVENATTI
responded, "Thanks."

      b.    On September 18, 2017, M.G. sent a text message
to AVENATTI asking: "Are stores able to deposit at Key Bank
[sic] yet?" Moments later, AVENATTI responded via text message
stating: "Not yet but hopefully in next two days. Can you
collect deposits tmrw and deposit pls?"

      c.    On September 28, 2017, AVENATTI sent a text
message to M.G. and V.S. asking: "When are we depositing
again?" V.S. responded "Friday afternoon." Moments later,
AVENATTI sent another text message asking: "When was the last
deposit and what did it include?" After V.S. responded,
AVENATTI sent another text message stating: "It is important
that these deposits be made regularly. Thanks."

      d.    Between September 7, 2017, and December 1, 2017,
M.G. sent AVENATTI or AVENATTI and V.S. text messages with
pictures of deposit slips reflecting deposits into GB Auto BofA
Account 7412 on 24 separate occasions. On multiple occasions,
AVENATTI responded to these text messages by stating, "Thanks."
Based on my review of bank account information, I know that the
information on the deposit slips directly corresponds to
deposits that were actually made into GB Auto BofA Account 7412.

    17.   In my February 2019 affidavit, I indicated that on or
about September 29, 2017, AVENATTI instructed a TSYS

Case 8:19-cr-00061-JVS   Document 78   Filed 01/14/20   Page 198 of 544   Page ID #:1268
Case 8:19-mj-00241-DUTY   SEALED   Document 1-1   Filed 03/24/19   Page 24 of
100   Page ID #:362

representative (TSYS Rep. 1") to change the name and EIN associated with GBUS's merchant accounts from "Global Baristas US LLC" to "Global Baristas, LLC." (Ex. 1 ¶ 37.d.)  During this conversation, AVENATTI suggested that he did not know why TSYS was holding GBUS's funds.  Based on my review of evidence obtained from the search warrant authorized in February 2019, I have learned the following additional information demonstrating that AVENATTI and REGNIER were already aware of the IRS levy notices at that time:

     a.  On September 12, 2017, REGNIER sent an email to V.S. titled "CBT Levy."  In this email, REGNIER listed the amounts of various levies on the CB&T accounts since June 1, 2017, and asked V.S. to provide information regarding levies on KeyBank and BofA.  In response, V.S. said, among other things, that "IRS also hit tsys account 8-25-17, still confirming."

     b.  On or about September 28, 2017, V.S. sent an email to AVENATTI titled "IRS Levies 9/20 and 9/25 and 9/27." The email included, among other things, the following information:  "9.25.17 tsys − $22,135.19 IRS levy."

     c.  On or about September 29, 2017, at approximately 10:57 a.m., V.S. sent an email to AVENATTI titled "Levies," in which he stated that "IRS took as [sic] additional $23,73.02 from tsys yesterday."  Based on the timing of other emails between AVENATTI and TSYS Rep. 1 on September 29, 2017, it appears that AVENATTI received this email from V.S. before he first called TSYS Rep. 1 on September 29, 2017.

C.   **Additional Evidence Relating to AVENATTI's Scheme to
     Defraud His Legal Client, G.B.**

18.   As set forth in my February 2019 affidavit, AVENATTI
engaged in a scheme to defraud his client, G.B., out of G.B.'s
portion of an approximately $1.6 million settlement payment
AVENATTI and EA LLP that received in January 2018 in connection
with an arbitration proceeding against a Colorado-based company
("Company 1").   (See Ex. 1, § IV.G.)   Specifically, in January
2018, AVENATTI arranged for the $1.6 million settlement payment
to be transferred to a City National Bank attorney trust account[7]
ending in 5566 ("CNB Trust Account 5566").   (See id.)   AVENATTI
then used the entire $1.6 million for his own purposes,
including to pay for expenses relating to GBUS.[8]   (See id.)
AVENATTI then lied to his client and claimed that the settlement
payment was not due until March 2018.   (See id.)   When the March
2018 deadline passed, AVENATTI led his client to believe that
the $1.6 million payment had never been received.   (See id.)

19.   On March 15, 2019, I participated in an interview of
G.B.   The information G.B. provided during the interview was
consistent with the information G.B. and his counsel had

_____

[7]   I understand that the State Bar of California has
specific rules that apply to the proper use of attorney trust
accounts.   For example, I understand that Rule 1.15 of the State
Bar of California states that "[f]unds belonging to the lawyer
or the law firm shall not be deposited or otherwise commingled
with funds held in a trust account."

[8]   AVENATTI and REGNIER were the only two signatories for
CNB Trust Account 5566.   Moreover, based on a further review of
the bank records for CNB Trust Account 5566, I have learned that
REGNIER authorized at least eight of the payments from CNB Trust
Account 5566.

Case 8:19-cr-00061-JVS   Document 78   Filed 01/14/20   Page 200 of 544   Page ID #:1270
Case 8:19-mj-00061-DUTY   *SEALED*   Document 1-1   Filed 03/22/19   Page 24 of
100   Page ID #:364

previously provided to IRS-CI and the Newport Beach Police
Department ("NBPD"). During the interview, G.B.[9] also provided
the following additional information:

      a.   On or about December 28, 2017, G.B. met with
AVENATTI at EA LLP's offices in Newport Beach, California, to go
over the proposed settlement agreement with Company 1. During
this meeting, AVENATTI provided G.B. with a copy of the $1.9
million settlement agreement to review. The settlement
agreement AVENATTI provided to G.B. listed the payment dates as
$1.6 million on March 10, 2018, and $100,000 on March 10 of each
of the next three years. As noted in my February 2019
affidavit, this information was false and the actual settlement
agreement required Company 1 to pay G.B. $1.6 million on January
10, 2018, and $100,000 on January 10 of each of the three
subsequent years. (Ex. 1, ¶ 75.e.)

      b.   Based on my review of documents produced by
G.B.'s counsel, I know that on or about June 29, 2018, G.B. sent
an email to REGNIER asking her to forward to G.B. the signed
settlement agreement with Company 1. During his interview, G.B.
said that sometime after he sent this email REGNIER brought him
a physical copy of the fully-executed settlement agreement while
G.B. was at EA LLP's offices. REGNIER handed AVENATTI the
settlement agreement. AVENATTI flipped through the settlement

---

[9] G.B. previously pleaded guilty to a felony theft count in
approximately September 2018 and was sentenced to probation.
(See Ex. 1, ¶ 75 n.44.) During his interview, G.B. said that
AVENATTI had encouraged him to plead guilty and that AVENATTI
continued working with G.B. and one of G.B.'s companies after
G.B.'s guilty plea.

agreement and then handed it to G.B.  This copy of the
settlement agreement also falsely stated that the settlement
payments were due on March 10 of 2018 through 2021, as opposed
to January 10 of 2018 through 2021.

        c.   As noted in my February 2019 affidavit, between
April 2018 and November 2018, AVENATTI "advanced" G.B.
approximately $130,000 to help G.B. meet certain financial
obligations while he waited for his portion of the $1.6 million
settlement payment from Company 1.  During his interview, G.B.
said that in approximately October 2018, AVENATTI told G.B. that
AVENATTI would be able to loan G.B. another $100,000 sometime
during the first two weeks of January 2019.  Notably, under the
terms of the true settlement agreement, Company 1 was scheduled
to make an additional $100,000 settlement payment to AVENATTI's
trust account on January 10, 2019.  Thus, it appears that
AVENATTI was offering to loan G.B.'s own money to G.B.

       20.  During the interview on March 15, 2019, G.B's current
counsel also confirmed that AVENATTI still has not turned over
G.B.'s client file to his current attorneys despite repeated
requests that he do so.

**D.    Additional Evidence Relating to AVENATTI's Scheme to
Defraud His Legal Clients, M.P. and L.T.**

       21.  As set forth in my February 2019 affidavit, it appears
that in or around March 2018 AVENATTI embezzled approximately $4
million from his client's M.P. and L.T.  (Ex. 1, ¶ 50.h n.31.)
Based on a further review of information I received from NBPD,
including recorded interviews of M.P. and L.T. and documents

25

M.P. and L.T. provided to Newport Beach Police Department
("NBPD") and IRS-CI, I have learned the following information
regarding AVENATTI's scheme to defraud M.P. and L.T.:

      a.   In or around August 2017, M.P. and her business
manager, L.T., hired AVENATTI to assist them in separating from
one of the companies that M.P. owned ("MP Company 1").

      b.   On or about August 15, 2017, M.P. and L.T.
entered into an "Attorney-Client Fee Contract (Contingency)"
with AVENATTI and EA LLP.[10]  Under the terms of the agreement,
AVENATTI would receive 7.5 percent of the "recovery" or
transaction amount.  In other words, AVENATTI would receive 7.5
percent of the total amount M.P. would receive when she sold her
shares in MP Company 1 back to MP Company 1.  To the extent the
transaction resulted in multiple payments to M.P., AVENATTI was
to receive his entire 7.5 percent fee from the initial lump-sum
payment.  The agreement also authorized AVENATTI to retain
MARCHINO, the founding partner of X-Law Group, to serve as
outside or local counsel in connection with the representation.

      c.   On or about September 17, 2017, MP Company 1
entered into a "Common Stock Repurchase Agreement" with M.P.  In
sum, under the terms of the Common Stock Repurchase Agreement,
MP Company 1 agreed to repurchase 361,565 shares of MP Company 1
from M.P. for approximately $27,478,940, and to subsequently
repurchase from M.P. an additional 107,188 shares of MP Company
1 for approximately $8,146,288.  Thus, M.P. was to receive a

---

     [10] The Attorney-Client Fee Contract identifies "Michael
Avenatti, Esq." as the attorney, but is signed by AVENATTI on
behalf of EA LLP.

total of approximately $35,625,228 under the terms of the Common Stock Repurchase Agreement.  AVENATTI's fee of 7.5 percent would amount to approximately $2,671,892 out of the $35,625,228.

　　　　d.　On or about September 18, 2017, MP Company 1 wired approximately $27,414,668 to AVENATTI's trust account at City National Bank ending in 4705 ("Avenatti CNB Trust Account 4705").[11]  After receiving the $27,414,668 wire on September 18, 2017, AVENATTI caused approximately $2,787,650 (which constituted AVENATTI's attorney fees for the entire $35,625,228 transaction amount) to be transferred to a separate bank account at City National Bank under the name "Michael Avenatti, Esq." ("Avenatti CNB Account 3504").[12]  Between September 21, 2017, and October 3, 2017, AVENATTI then caused the remaining $24,747,466 MP Company 1 had transferred to Avenatti CNB Trust Account 4705 to be transferred to M.P.'s personal bank account and the bank account for another company M.P. controlled ("MP Company 2").

　　　　e.　On or about March 8, 2018, MP Company 1's Chief Financial Officer ("CFO") contacted M.P. and told her that MP Company 1 was prepared to repurchase the remaining 107,188 shares of MP Company 1 and would be making the final payment of approximately $8,146,288.  The CFO asked M.P. to confirm that the funds should again be wired to Avenatti CNB Trust Account 4705.  M.P. then forwarded this email to L.T.  M.P. and/or L.T. then spoke with AVENATTI.  AVENATTI agreed that MP Company 1

---

　　[11] AVENATTI and REGNIER were the only two signatories on Avenatti CNB Trust Account 4705.

　　[12]　AVENATTI and REGNIER were the only two signatories on Avenatti CNB Account 3504.

Case 8:19-cr-00061-JVS  Document 78  Filed 01/14/20  Page 204 of 544  Page ID #:1274
Case 8:19-mj-00061-DUTY  SEALED  Document 1  Filed 03/24/19  Page 30 of
100   Page ID #:368

could wire the final payment to Avenatti CNB Trust Account 4705 and that he would then wire the money to M.P. and L.T.

      f.   On or about March 13, 2018, M.P. emailed MP Company 1's CFO and confirmed that the wire information for Avenatti CNB Trust Account 4705 was correct.

      g.   On or about March 14, 2018, MP Company 1 wired approximately $8,146,288 to Avenatti CNB Trust Account 4705 to be held in trust for M.P.

      h.   AVENATTI did not immediately transfer the $8,146,288 funds to M.P. as he had promised to do and as he was required to do under the Attorney-Client Fee Contract.  Rather, based on my review of bank account records, I know that AVENATTI used substantial portions of the $8,146,288 for his own personal purposes.  For instance:

      i.   On March 15, 2018, AVENATTI caused approximately $3,000,000 to be transferred to an EA LLP CB&T attorney trust account ending in 4613 ("EA CB&T Trust Account 4613").[13]  AVENATTI then caused approximately $2,828,423 to be transferred from EA CB&T Trust Account 4613 to an attorney trust account for SulmeyerKupetz, which was the law firm representing A&A and AVENATTI in the 2017 EA LLP bankruptcy proceedings, In re: Eagan Avenatti, LLP, No. 8:17-BK-11961-CB (C.D. Cal.) (the "2017 EA Bankruptcy"), later that same day.  As noted in my February 2019 affidavit, on March 26, 2018, these funds were then used to repay creditors in the 2017 EA Bankruptcy,

---

[13] AVENATTI and REGNIER were the only two signatories on EA CB&T Trust Account 4613.

including an approximately $1,508,442 payment to the IRS.  (Ex. 1, ¶ 50.h.)

   ii. Between March 20, 2018, and May 1, 2018, AVENATTI caused a total of approximately $786,138 of M.P.'s funds to be transferred to EA CB&T Trust Account 4613 and a total of approximately $260,000 to be paid to an EA LLP CB&T debtor in possession account ending in 0313 ("EA CB&T DIP Account 0313.  Once M.P.'s funds had been transferred to EA CB&T Trust Account 4613, AVENATTI used M.P.'s funds for a variety of other improper and unauthorized purposes, including: (a) transferring a total of over $300,000 to bank accounts associated with GBUS and GB LLC; (b) transferring a total of over $275,000 to bank accounts associated with A&A; and (c) transferring a total of approximately $12,000 to his girlfriend at the time, M.M.

   i. After AVENATTI received the $8,146,288 payment from MP Company 1 on March 14, 2018, L.T. and M.P. repeatedly asked AVENATTI when M.P. could expect to receive the funds. AVENATTI would often not respond to the L.T.'s calls or text messages.  When AVENATTI did respond, he falsely represented to M.P. and L.T. that he would transfer the money to them at a later time and failed to disclose that he had already spent a substantial portion of M.P.'s funds for his own personal purposes.  For instance:

   i. On or about March 23, 2018, L.T. sent AVENATTI a text message stating: "Hi Michael, checking in on the

wire.  Let me know when we should expect it to come our way.
Thanks!"

     ii.  On or about April 5, 2018, L.T. sent
AVENATTI a text message stating "Good morning Michael!  Just
wanted to follow-up on the wire and plane[14] availability.
Thanks!"  AVENATTI responded that same day stating "In NYC –
back tmrw and then we should be able to clear wire."

     iii. On or about April 23, 2018, L.T. sent
AVENATTI a text message stating: "Good morning Michael.  Please
confirm after the wire is sent today.  Thanks."  Later that day,
L.T. sent another text message later that day stating:  "Can
your office provide Fed Ref number for [M.P.'s] wire?  It is
neither posted nor pending status on our end."  AVENATTI then
responded "I will have [REGNIER] get it."

     iv.  On or about April 24, 2018, L.T. sent
AVENATTI a text message stating:  "Just following up on the Fed
Ref #.  We haven't been able to track down [M.P.'s] wire yet."
AVENATTI responded that "I've asked [REGNIER] to get you what u
need."

     v.   On or about April 24, 2018, M.P. met
AVENATTI for lunch.  M.P. asked AVENATTI if everything was okay
with the money.  AVENATTI responded that everything was okay and
that he just needed to go to the bank once he got back to
Newport Beach and sign the paperwork.

---

[14]  As set forth in my February 2019 affidavit, AVENATTI had
at least one private jet at this time.  (Ex. 1, ¶ 65.m.)

       vi.  On or about April 25, 2018, L.T. sent an email to REGNIER and AVENATTI stating:  "Hi Judy [REGNIER], Can you please provide me with the Fed Ref # for [M.P.'s] wire from Monday?"  AVENATTI responded less than an hour later "Pls handle."

       vii. On or about April 26, 2018, L.T. sent another email to AVENATTI and REGNIER stating:

> We've been in contact with the bank all week and they have not been able to track the wire. Please provide the Fed Ref # with immediacy.  This is becoming very urgent.  There is $8M of [M.P.'s] money in the ether somewhere, and we have been given the runaround for over 6 weeks.  I'm becoming extremely concerned. Please advise asap.

       viii.   On or about April 30, 2018, AVENATTI sent a text message to L.T. stating "I am dealing with getting a summons issued from the SDNY and will call you shortly.  Sorry for delay."  That same day, AVENATTI sent an email to REGNIER and L.T. stating:

> Judy [REGNIER] -- I know you are trying to dig out from last week, but please get with [L.T.] and figure out what the issue is on the CNB wire. This needs to be a priority. If I need to do something or find a branch on the East coast let me know but I want this resolved. Thanks.

       ix.  On or about May 1, 2018, L.T. responded to AVENATTI's April 30, 2018, email stating:

> Hi Judy [REGNIER], The wire hasn't come through, and we can only trace it via the Fed Ref #. Please provide ASAP so we can see where it got held up.  This is very urgent.  Thank you.

REGNIER responded "I asked the bank to put a trace on it.  As soon as I get the results I will let you know ASAP."

j.   Between March 14, 2018, and May 4, 2018, L.T. also repeatedly attempted to obtain information from AVENATTI's associate, MARCHINO, regarding the $8,146,288 payment from MP Company 1.  For instance:

i.   On or about March 14, 2018, MARCHINO sent a text message to L.T. stating: "Hi — let me know when the wires have been sent by [MP Company 1].  That way we can turn around quickly."  L.T. responded that the wire had just been sent and that he would provide MARCHINO the wire information.

ii.   On or about March 20, 2018, L.T. sent a text message to MARCHINO to ask if AVENATTI received the wire. MARCHINO responded:  "Hi. No idea.  Need to ask Michael [AVENATTI].  He's knee deep in the stormy."

iii.   On or about April 22, 2019, L.T. sent a text message to MARCHINO stating:  "Please call me back."  MARCHINO then asked if it was urgent.  L.T. responded:  "Same conversation as last time, so yes I'm concerned and losing patience."

iv.   On or about May 3, 2018, L.T. sent a text message to MARCHINO stating:  "Please call me back ASAP." MARCHINO responded:  "I put a call in.  Will have news shortly. Hang tight until tomorrow and I'll get this sorted for you." MARCHINO then sent L.T. another text message stating:  "I've got you.  Don't worry."

k.   On or about May 4, 2018, AVENATTI caused two wire transfers in the amounts of $4,000,000 and $146,288 to be sent from Avenatti CNB Trust Account 4705 to one of M.P.'s companies

("MP Company 3"). This amounted to just over half of the $8,146,288 that was supposed to have been transferred to M.P on or about March 14, 2018. Yet, after making these two wire transfers, there was only $23 remaining in Avenatti CNB Trust Account 4705.

   1. After M.P. received the two wire transfers totaling approximately $4,146,288 on or about May 4, 2018, L.T. repeatedly contacted AVENATTI and MARCHINO in an attempt to find out what happened to the other $4,000,000 of M.P.'s money. L.T. was largely unable to get a hold of AVENATTI. MARCHINO, however, repeatedly suggested that the third wire of $4,000,000 had already been sent. For instance:

     i. On or about May 4, 2018, MARCHINO sent a text message to L.T. asking "Did the other 4 arrive?" L.T. responded that he would have to check on Monday.

     ii. On or about May 7, 2018, MARCHINO sent L.T. a text message asking if there were any updates. L.T. responded: "No sign of it. Do you have the Fed Ref # for tracking?" L.T. received no further response that day.

     iii. On or about May 9, 2018, MARCHINO sent a text message to L.T. stating: "I just got text from bank. We should have fed number shortly."

     iv. On or about May 10, 2018, MARCHINO sent a text message to L.T. and provided him with an IMAD wire transfer reference number that purportedly corresponded to the final $4,000,000 payment.

       v.    On or about May 11, 2018, AVENATTI emailed MARCHINO a wire transfer confirmation document detailing the $4,000,000 wire transfer from Avenatti CNB Trust Account 4705 that M.P. had already received on May 4, 2018.  MARCHINO then forwarded this email to L.T.  That same day MARCHINO and L.T. exchanged numerous text messages regarding the missing $4,000,000 payment.  In these text messages, L.T. told MARCHINO that he needed the reference numbers for all three purported wire transfers.  MARCHINO indicated that he had texted AVENATTI about this but had not heard back.

       vi.   On or about May 24, 2018, L.T. sent a text message to AVENATTI asking him to "Please call me when you have a chance."  AVENATTI does not appear to have responded to this text message.

       vii. On or about June 4, 2018, L.T. sent a text message to AVENATTI stating:  "Hi Michael, I really need to talk to you.  Please call me back so we can figure things out." AVENATTI does not appear to have responded to this text message.

       m.    On or about August 6, 2018, current counsel for M.P. and L.T. sent a letter to AVENATTI advising him that they now represented M.P. and L.T. and demanded that AVENATTI immediately disburse to M.P. the remaining $4,000,000 that was owed to M.P.  AVENATTI did not respond.  AVENATTI still has not paid over to M.P. the remaining $4,000,000 he received from MP Company 1 on her behalf.  Nor has AVENATTI turned over M.P. and L.T.'s client file to their current attorneys as they have repeatedly asked him to do.

22.   Additionally, as set forth in my February 2019 affidavit, in connection with the EA Bankruptcy, EA LLP and AVENATTI were required to close pre-petition bank accounts and open new "debtor in possession" bank accounts.  (Ex. 1, ¶ 51.) EA LLP and AVENATTI were also required to file with the Bankruptcy Court a monthly operating report ("MOR") detailing all funds received and disbursed by EA LLP.  (Id.)  AVENATTI, however, failed to disclose the existence of Avenatti CNB Trust Account 4705 or the funds he received from the Phan and Tran representation to the Bankruptcy Court or his creditors.

**E.    Criminal Complaint and Arrest Warrant**

23.   On March 22, 2019, in case number SA 19-241M, I submitted an affidavit in support of an arrest warrant and criminal complaint charging AVENATTI with one count of bank fraud, in violation of 18 U.S.C. § 1344(1), and one count of wire fraud, in violation of 18 U.S.C. § 1343.  The Honorable Douglas F. McCormick, United States Magistrate Judge, authorized the arrest warrant that same day.  A true and correct copy of the arrest warrant and criminal complaint are attached hereto as Exhibit 2 and incorporated by reference herein.[15]

**F.    Probable Cause to Search AVENATTI's Residence (SUBJECT PREMISES 1)**

24.   Based on the evidence collected during the course of this investigation, there is probable cause to believe that

---

[15]  A copy of the application for the February 2019 search warrant, including my February 2019 affidavit, were also incorporated by reference and attached to the criminal complaint in case number SA 19-241M.  Accordingly, I have not included a duplicate copy of the February 2019 search warrant application, as part of Exhibit 2 to this affidavit.

evidence of the SUBJECT OFFENSES will be found at SUBJECT
PREMISES 1.  For example:

     a.    On or about November 14, 2018, AVENATTI was
arrested by the Los Angeles Police Department ("LAPD") on
suspicion of domestic violence.[16]  Based on my review of the LAPD
police report, I have learned that as of November 14, 2018,
AVENATTI resided in Unit 2205 at the Ten Thousand luxury
condominium complex ("Ten Thousand") located at 10000 Santa
Monica Boulevard in Los Angeles, California (i.e., SUBJECT
PREMISES 1.)

     b.    Based on my review of bank records, I know that
A&A has been paying monthly rent to Ten Thousand since at least
March 2017.  Specifically, between March 2017 and August 2018,
approximately $227,736 (between $12,800 and $16,320 per month)
was paid to Ten Thousand from A&A CB&T Account 0661.
Additionally, on or about November 30, 2018, approximately
$69,119 was paid via cashier's check to Ten Thousand from an
account at City National Bank under the name "Avenatti LLP"
("Avenatti LLP CNB Account 1844").  Avenatti LLP CNB Account
1844 had been opened that very same day and the cashier's check
had been obtained by REGNIER.

     c.    On March 7, 2019, in case number 8:19-MJ-151, the
Honorable Douglas F. McCormick authorized a warrant for
historical cell-site and prospective cell-site and GPS
information relating to cellular telephones used by AVENATTI and

---

[16]  AVENATTI was never formally charged with any crime in
connection with this arrest.

REGNIER.  Although I served the cell-site warrant on Verizon on March 7, 2019, I did not start receiving returns on the warrant until March 18, 2019.  Based on IRS-CI's review of this data, I have learned the following:

   i. On or about March 21, 2019, AVENATTI returned to the Los Angeles area after travelling to another state.  AVENATTI was in the vicinity of SUBJECT PREMISES 1 that night.[17]

   ii. On or about March 22, 2019, AVENATTI was in the vicinity of SUBJECT PREMISES 1 in the early morning hours as well during the night.

   iii. On or about March 23, 2019, AVENATTI was in the vicinity of SUBJECT PREMISES 1 early in the morning.

   d. Based on my discussions with a United States Postal Inspector ("USPI"), I know that as recently as March 6, 2019, AVENATTI was receiving mail at 10000 Santa Monica Boulevard, Unit 2205 in Los Angeles, California (i.e., SUBJECT PREMISES 1.)

   e. As noted in section VII below, based on my training and experience, I know that people who engage in fraud schemes and commit tax offenses frequently maintain hard copy and electronic records at their residences.  Additionally, I know that lawyers often use portable laptop computers and cellular telephones to conduct business remotely from their

---

  [17] The cell-site and GPS information IRS-CI obtained was only accurate to within approximately 900 meters of AVENATTI's cell phone.

residences and/or while traveling.  Thus, lawyers typically keep such digital devices on their person or at their residences.

     f.  Here, I have reviewed numerous text messages sent by AVENATTI to GBUS employees.  I have also reviewed a number of emails AVENATTI appears to have sent after normal business hours, further suggesting that he uses his laptop and cellular telephone to conduct business.

     g.  On or about March 15, 2019, I participated in an interview with G.B.  During the interview, G.B. said that he frequently saw AVENATTI using a laptop computer.

     h.  I have also reviewed a profile of AVENATTI published by the New York Times Magazine on or about July 10, 2018.  This article explicitly noted that AVENATTI was using a laptop computer and an iPhone while he was being interviewed at a hotel in New York in May 2018.  See "The Fast and Furious Michael Avenatti," New York Times Magazine, July 10, 2018, available at https://www.nytimes.com/2018/07/10/magazine/michael-avenatti-stormy-daniels-donald-trump-media.html.

## G.  Probable Cause to Search REGNIER's Residence (SUBJECT PREMISES 2)

    25.  As noted in my February 2019 affidavit, AVENATTI has previously described REGNIER as his office manager, chief paralegal, and bookkeeper.  (Ex. 1, ¶ 20.i.)  REGNIER was personally involved in many of the events described in my February 2019 affidavit and herein, including directing or executing the transfer of funds between various entities

associated with AVENATTI, directing the actions of GBUS employees, receiving and executing directives from AVENATTI, and transmitting signed contracts and agreements on behalf of AVENATTI, GBUS, GB LLC, EA LLP, or A&A to other parties.

26.  Based on my review of publicly available information and law enforcement databases, I know that REGNIER resides at 4491 Rainbow Lane, Yorba Linda, California (i.e., SUBJECT PREMISES 2.)

27.  Based on the evidence collected during the course of this investigation, there is probable cause to believe that evidence of the SUBJECT OFFENSES will be found at REGNIER's residence (i.e., SUBJECT PREMISES 2).  For example:

a.  Based on my discussions with a USPI, I understand that since approximately December 6, 2018, EA LLP's United States mail has been forwarded from EA LLP's prior offices in Newport Beach to Private Mailbox number 404 ("PMB 404") at 18032 Lemon Drive, Suite C.[18]  18032 Lemon Drive, Suite C is the address of a Postal Annex store located less than one mile from REGNIER's residence (SUBJECT PREMISES 2).  The USPI also provided me with a copy of the "Application for Delivery of Mail Through Agent" for PMB 404 dated on or about December 3, 2018. The application is signed by REGNIER on behalf of EA LLP, and indicates the PMB 404 will be used to receive mail for REGNIER, "Avenatti LLP," EA LLP, and A&A.  The application also lists

---

[18]  I also understand that EA LLP's United States mail was being forwarded to X-Law Group's office in Los Angeles (i.e., SUBJECT PREMISES 3) for a short period of time after EA LLP was evicted from its offices in Newport Beach, California.

Case 8:19-cr-00061-JVS   Document 78   Filed 01/14/20   Page 216 of 544   Page ID #:1286
Case 8:19-mj-00461-DUTY   *SEALED*   Document 1-1   Filed 03/24/19   Page 46 of
100   Page ID #:380

AVENATTI as the corporation's officer.  Due to the proximity of
PMB 404 to REGNIER's residence, I believe there is a strong
likelihood that REGNIER is collecting or storing EA LLP and A&A
mail, as well as other relevant records at her residence.

     b.  Based on my review of text messages produced by
M.G. and S.F., I know that REGNIER communicated with GBUS
employees using a cellular telephone.

     c.  Based on my review of toll records for AVENATTI's
and REGNIER's cell phones, I have learned the following:

     i.  Between January 1, 2019 and March 6, 2019,[19]
there were over 100 calls between AVENATTI's cell phone number
and REGNIER's cell phone number.  Often times, there would be
multiple calls between AVENATTI's cell phone and REGNIER's cell
phone each day.

     ii.  This information strongly suggests that
REGNIER still works for AVENATTI and that REGNIER and AVENATTI
do not work at the same location since EA LLP was evicted from
its law offices in Newport Beach, California, between November
2018 and January 2019.

     d.  On or about March 15, 2019, I participated in an
interview with G.B.  During the interview, G.B. said that in
December 2018 EA LLP's receptionist, H.W., told him via an
instant message that all of EA LLP's staff members were working
from home because EA LLP had been evicted from its offices.

---

    [19]  The toll records for AVENATTI's and REGNIER's cell
phones that IRS-CI obtained from Verizon Wireless do not go past
March 6, 2019.

     e.   Based on IRS-CI's review of the data obtained from the prospective cell-site and GPS information relating to a cellular telephone used by REGNIER, I have learned that from March 18, 2019 until March 22, 2019, REGNIER was in the vicinity of SUBJECT PREMISES 2 and PMB 404 during daytime and/or business hours, likely demonstrating that REGNIER has been working from home since EA LLP was evicted from its offices.

     f.   On March 22, 2019, IRS-CI SA James Kim attended a judgment debtor examination of AVENATTI in the In re: Eagan Avenatti, LLP, No. 8:18-CV-10644-VAP-KES, matter in Courtroom 8A of the United States Courthouse in Los Angeles.  I learned from SA Kim that AVENATTI testified under oath that he believed EA LLP's QuickBooks records were likely with REGNIER.

     g.   On June 12, 2017, in connection with the 2017 EA Bankruptcy, AVENATTI testified under oath during a creditors meeting required under 11 U.S.C. § 341 ("341 meeting").  During this proceeding, AVENATTI testified that REGNIER was his "in-house bookkeeper" and she used "QuickBooks and Excel" for financial reporting.

     h.   Based on my training and experience, and investigation to date, I believe that REGNIER is working from home at SUBJECT PREMISES 2 and likely will maintain financial records of EA LLP and related entities at her home, as well as digital devices at SUBJECT PREMISES 2, all of which will likely contain evidence of the SUBJECT OFFENSES.

     i.   Additionally, as noted above and in section VII below, based on my training and experience I know that people

engaged in fraud schemes frequently maintain hard copy and electronic business records at their residences.  I also know that lawyers and those who work for law firms often use portable laptop computers and cellular telephones to conduct business and typically keep such digital devices on their person or at their residence.

**H.   Probable Cause to Search the Business Premises of X-Law Group (SUBJECT PREMISES 3)**

28.   Based on my review of publicly available information, including X-Law Group's website (www.thexlawgroup.com), I know X-Law Group is a law firm operating in Los Angeles, California. MARCHINO is X-Law Group's founding partner.  X-Law Group's business premises are located at 1910 Sunset Boulevard, Suite 450, in Los Angeles, California (i.e., SUBJECT PREMISES 3).

29.   There are at least three reasons to believe that evidence of the SUBJECT OFFENSES will be found at the business premises of X-Law Group (SUBJECT PREMISES 3):  (1) Since at least the summer of 2016, AVENATTI and EA LLP have been using X-Law Group's offices to conduct business; (2) X-Law Group has been involved in significant and suspicious financial transaction involving GBUS, GB LLC, EA LLP, A&A, and AVENATTI; and (3) X-Law Group's founding partner, MARCHINO, was directly involved in the representation of M.P. and L.T., and subsequent communications regarding the $4 million AVENATTI embezzled from M.P. in March 2018.

### 1. AVENATTI's and EA LLP's Use of SUBJECT PREMISES 3 to Conduct Business

30.   IRS-CI's investigation has revealed the following facts establishing that AVENATTI has been using SUBJECT PREMISES 3 to conduct business and practice law since at least August 2016, and that SUBJECT PREMISES 3 is EA LLP's and A&A's current business premises:

a.   During AVENATTI's June 12, 2017, 341 meeting, AVENATTI said the following:

i.   In the summer of 2016, EA LLP entered into a written agreement with X-Law Group.  Under the terms of this agreement, X-Law Group would contribute various cases and assets to EA LLP; EA LLP would get a percentage of the fees from those cases; and X-Law Group would get a percentage of fees from pending cases held by EA LLP.

ii.   Some of the attorneys from X-Law Group also worked for EA LLP.

b.   On July 14, 2017, AVENATTI testified under oath during the continued 341 meeting in connection with the 2017 EA Bankruptcy.  During this proceeding, AVENATTI said the following:

i.   Since the summer of 2016, there was an agreement in place between EA LLP and X-Law Group relating to various EA LLP cases and X-Law Group's right to fees from those cases.

ii.  As part of this agreement, AVENATTI agreed

that EA LLP would pay a portion of the salaries for certain X-

Law Group attorneys.

iii. AVENATTI and/or EA LLP agreed to pay the

rent for X-Law Group's office in Los Angeles

iv.  AVENATTI has known MARCHINO for

approximately five years, and considers him a friend.

v.  MARCHINO and other X-Law Group lawyers were

previously employed by EA LLP.

c.  Based on a preliminary review of bank records, I

know the following:

i.  Between approximately September 2016 and

July 2018, A&A and EA LLP paid to the International Church of

the Foursquare a total of approximately $110,352.  Public

records reflect that the International Church of the Foursquare

owns SUBJECT PREMISES 3.

ii.  Between approximately March 2017 and June

2017, EA LLP paid MARCHINO a total of approximately $34,892.

d.  W-2 information EA LLP submitted to the IRS

reflects that MARCHINO received approximately $83,333 in gross

wages from EA LLP in 2016, and approximately $91,666 in gross

wages from EA LLP in 2017.

e.  On or about January 24, 2018, AVENATTI filed a

Substitution of Attorney form in the Superior Court of

California, San Diego County in Carthey v. Pirch et al., No. 37-

201823387.  The Substitution of Attorney form listed A&A's

mailing address as 1910 West Sunset Boulevard, Suite 450 in Los

Angeles, California (i.e., SUBJECT PREMISES 3).

      f.    On or about January 30, 2018, AVENATTI filed a

declaration in the 2017 EA Bankruptcy. AVENATTI stated under

the penalty of perjury that EA LLP "maintains an office in Los

Angeles under an arrangement with The X-Law Group, P.C. ("X-Law

Group") where X-Law Group is the primary tenant."

      g.    On March 7, 2019, AVENATTI filed a Voluntary

Petition for Non-Individuals Filing for Bankruptcy on behalf of

EA LLP in In re The Trial Group, LLP a/k/a Eagan Avenatti, LLP,

No. 8:19-BK-10822 (C.D. Cal.) (the "2019 EA Bankruptcy").[20]  The

bankruptcy petition identifies the debtor's address as 1910

Sunset Boulevard, Suite 450 in Los Angeles, California (i.e.,

SUBJECT PREMISES 3).

      h.    On March 7, 2019, AVENATTI filed a Notice of

Bankruptcy Filing on behalf of EA LLP in In re: Eagan Avenatti,

LLP, No. 8:18-CV-10644-VAP-KES (C.D. Cal.).  The attorney

caption on the Notice of Bankruptcy Filing identifies AVENATTI's

address as "1910 Sunset Boulevard, Suite 450," in Los Angeles,

California (i.e., SUBJECT PREMISES 3).

---

    [20]  The 2019 EA Bankruptcy petition identifies the debtor as
The Trial Group, LLP, but indicates that it was previously known
as EA LLP.  This petition appears to have been filed for the
specific purpose of avoiding a judgment debtor exam of AVENATTI
that had been scheduled for March 8, 2019, in In re: Eagan
Avenatti, LLP, No. 8:18-CV-10644-VAP-KES (C.D. Cal.).  AVENATTI
did not have authorization to file such a petition because in
February 2019 a receiver had been appointed to oversee EA LLP's
business affairs and had the "sole authority regarding whether
to file a petition for bankruptcy."  On March 13, 2019, the
Bankruptcy Court dismissed the 2019 EA Bankruptcy on those
grounds.

2.   X-Law Group's Involvement in Suspicious Financial
Transactions

31.   As detailed in my February 2019 affidavit (Ex. 1),
IRS-CI's investigation to date has revealed the following facts
establishing that AVENATTI has used X-Law Group to conduct a
number of suspicious financial transactions:

a.   On or about November 2, 2015, AVENATTI caused
approximately $4,600,000 of the proceeds of the sale of his
residence in Laguna Beach, California, to be transferred from
GBUS CB&T Account 2240 to X-Law Group.  (See Ex. 1, ¶ 62.)

b.   On or about November 3, 2015, X-Law Group then
transferred approximately $3,600,000 to GB Auto BofA Account
7412.  (See id.)

c.   It appears that the remaining $1,000,000 that had
been transferred to X-Law Group was used to pay $1,000,000 in
deposits for AVENATTI's purchase of a residence in Newport
Beach, California.  (See id.)  For example:

i.   On September 28, 2015, AVENATTI paid a
$200,000 deposit to the escrow company handling the purchase of
the Newport Beach residence ("Escrow Company 1") via a cashier's
check purchased by X-Law Group.  (See Ex. 1, ¶ 63.)

ii.   On or about November 6, 2015, AVENATTI paid
an additional $800,000 deposit to Escrow Company 1 via two wire
transfers from X-Law Group's IOLTA attorney trust account in the
amounts of $450,000 and $350,000.  (See id.)

3.   X-Law Group's Involvement in the Scheme to
Defraud M.P. and L.T.

32.   As noted in section VI.D above, X-Law Group's founding
partner, MARCHINO was directly involved in discussions with L.T.
regarding the approximately $4 million AVENATTI embezzled from
M.P. in March 2018.  MARCHINO introduced M.P.'s business
manager, L.T., to AVENATTI.  Moreover, between March 2018 and
May 2018, MARCHINO sent L.T. well over 50 text messages
regarding the money that MP Company 1 transferred to Avenatti
CNB Trust Account 4705 to be held in trust for M.P.'s benefit.
In a number of these text messages, MARCHINO referenced
communications or attempted communications with AVENATTI.
Accordingly, there is probably to believe that X-Law Group's and
MARCHINO's files and digital devices will contain additional
evidence regarding AVENATTI's scheme to defraud M.P.

## VII. TRAINING AND EXPERIENCE REGARDING TAX OFFENSES AND FRAUD SCHEMES

33.   In addition to the foregoing facts, based on my
training, experience, and conversations with other law
enforcement agents who have investigated tax offenses and
complex fraud schemes, I have learned the following:

a.   Individuals who carry out complex fraud schemes
or commit tax offenses often use computers, cellular telephones,
and mobile "smart phones" to conduct their fraudulent
activities.  For example, such individuals often use computers,
cellular telephones, and mobile smart phones to conduct online
banking, the records of which may be stored on digital devices
rather than paper records, and to exchange communications,

including email and text messages. Here, as noted above, I know that AVENATTI, REGNIER, and others, such as MARCHINO from X-Law Group, frequently conducted business via email and text message.

b.   Individuals who carry out complex fraud schemes or commit tax offenses often use USB storage devices (commonly referred to as thumb-drives or memory sticks) and external hard drives to store financial records, including banking records and statements, other financial account records, checks, balances, transactions, records of purchases, records reflecting the transfer of assets, and records which are maintained, stored, and utilized to conduct online banking activities.

c.   Businesses, including law firms, often maintain servers that host email accounts for their employees, and that emails may be stored exclusively on those servers. In other instances, emails may be stored in the "cloud" or directly on employees' computers. For example, in this case, I know that important information was exchanged over email, including communications between AVENATTI or REGNIER and GBUS employees or business partners.

d.   Individuals who engage in fraud schemes or commit tax offenses often keep records of their fraudulent activities, including financial records, fraudulent documents, and electronic communications, on computers, USB drives, external hard drives, servers, or other digital devices for years after the fraudulent scheme has been completed.

e.   Businesses, including law firms, commonly maintain paper records like bank statements, wire records,

48

receipts, expense reports, ledgers, balance sheets, income statements, investment agreements, and other financial documents commonly used in fraudulent schemes on their premises.

   f.  Lawyers and individuals who work for law firms often use portable laptop computers, mobile smart phones, or other digital devices to work remotely, including from their residences or while traveling. For example, in this case, I have reviewed records demonstrating that AVENATTI sent emails, text messages, or other communications late at night or while traveling.

### VIII.  **POTENTIAL PRIVILEGE ISSUES**

  34. As noted herein, AVENATTI is a licensed attorney, REGNIER worked or works as a paralegal for AVENATTI and for EA LLP, and X-Law Group is an active law-firm. I also understand that at various times AVENATTI, EA LLP, and/or A&A may have had attorney-client relationships with other attorneys, including the following law firms: (a) Foster Pepper PLLC; (b) Osborn Machler PLLC; (c) Eisenhower Carlson PLLC; (d) Talmadge/Fitzpatrick/Tribe, PPLC; (e) The Brager Tax Law Group; (f) SulmeyerKupetz; (g) Baker & Hostetler LLP; (h) Shulman Hodges & Bastian LLP; (i) Legal & Tax Consulting Group; (j) Pachulski Stang Ziehl & Jones LLP; (k) Foley & Lardner LLP; (l) Raines Feldman, LLP; and (m) Pansky Markle Attorneys at Law.

  35. While the proposed search warrant primarily seeks financial records and non-privileged information there is a significant likelihood that the SUBJECT PREMISES will contain

documents and records that are covered by the attorney-client privilege or attorney-work-product doctrine. Accordingly, Attachments B-1, B-2, and B-3 to the proposed search warrants contains specific procedures designed to avoid unnecessary disclosures of any privileged attorney-client communications or attorney-work-product.

36. The privileged information sought by the proposed search warrant is limited to three former clients or potentials clients of AVENATTI, EA LLP, and A&A: (a) GBUS; (b) G.B.; and (c) M.P. and L.T. Each of these clients, however, have already executed, or indicated through counsel that they will execute, written waivers of the attorney-client-privilege.

a. <u>First</u>, as noted in my February 2019 affidavit, on February 19, 2019, the Chapter 7 bankruptcy trustee for GBUS (the "GBUS Trustee") executed a written waiver of the attorney-client privilege as to any communications between GBUS's officer, directors, employees, and agents, and any lawyer acting on GBUS's behalf, including any communications with AVENATTI. (Ex. 1, ¶ 83.a.) A copy of the GBUS Trustee's written waiver of the attorney-client privilege was attached as Exhibit 1 to my February 2019 affidavit.

b. <u>Second</u>, on March 18, 2019, G.B. executed a written waiver of the attorney-client privilege and attorney-work-product protections as to any legal advice G.B. sought or received from EA LLP, AVENATTI, and any other current or former EA LLP officers, directors, employees, or agents. G.B. also consented to the government's search of any of EA LLP's or

AVENATTI's files relating to EA LLP's and AVENATTI's
representation of G.B.  A copy of the G.B.'s written waiver of
the attorney-client privilege is attached hereto as Exhibit 3.

      c.  Third, counsel for M.P. and L.T. informed the
government that M.P. and L.T. are both willing to execute
written waivers of the attorney-client privilege and attorney-
work-product protections as to legal advice M.P. and L.T. sought
or received from EA LLP, AVENATTI, MARCHINO, and/or any other
current or former officers, directors, employees, or agents of
EA LLP.  M.P. and L.T. are also willing to consent to the
government's search of the files of EA LLP, AVENATTI, and
MARCHINO relating to the representation of M.P. and L.T.  M.P.
and L.T. are expected to execute the written waivers of the
attorney-client privilege within the next seven days.

   37.  I am aware that AVENATTI represented the plaintiff in
Stephanie Clifford v. Donald J. Trump, No. 2:18-CV-2217-SJO-FFM
(C.D. Cal.), a lawsuit against the President of the United
States.  I am also aware that AVENATTI represented Julie
Swetnick, an individual who accused United States Supreme Court
Justice Brett Kavanaugh of sexual assault in connection with
Justice Kavanaugh's confirmation hearing in or around September
2018.  Given the likelihood that the SUBJECT PREMISES may
contain privileged information regarding these representations,
which are irrelevant to this investigation, Attachments B-1, B-
2, and B-3 to the proposed search warrants specifically
requires, in addition to the procedures to avoid unnecessary
disclosure of attorney-client privileged materials and attorney-

work-product, that any materials relating to AVENATTI's representation of Ms. Clifford or Ms. Swetnick that are identified by the Privilege Review Team, other than financial and accounting records identified in paragraphs 1.d, 1.f, 1.g, and 1.r of Attachments B-1, B-2, and B-3, be segregated and not further reviewed.[21]

38.   Attachments B-1, B-2, and B-3 to the proposed search warrants also set forth a procedure to allow AVENATTI and others to seek the appointment of a special master within seven days of the execution of the proposed search warrants.  Although the government does not believe that the appointment of a special master would be necessary in this investigation, the government has included this provision to ensure that any such request is handled in a timely manner and does not unnecessarily delay IRS-CI's ongoing criminal investigation.

## IX.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES[22]

39.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

---

[21]   Other than non-privileged financial or accounting records that may reference these representations, the only documents or records relating to these representations that may fall within the scope of the items to be seized would likely be engagement letters and/or client billing records.  Nevertheless, due the political nature of these representations and because such records are irrelevant to this investigation, the privilege review protocols set forth in Attachments B-1, B-2, and B-3 to the proposed warrants calls for any such records to be segregated and not further reviewed once identified.

[22]   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as

know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

    a.   Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

    b.   Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the

_____

paging devices, mobile telephones, and smart phones; digital
cameras; gaming consoles; peripheral input/output devices, such
as keyboards, printers, scanners, monitors, and drives; related
communications devices, such as modems, routers, cables, and
connections; storage media; and security devices.

form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

      c.    The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

      d.    Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

    40.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it is not always possible to search devices for data
during a search of the premises for a number of reasons,
including the following:

      a.    Digital data are particularly vulnerable to
inadvertent or intentional modification or destruction.  Thus,
often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above.  Also, there are now so

Case 8:19-mj-00061-DUTY   *SEALED*   Document 1   Filed 03/21/19   Page 55 of 100   Page ID #:395

many types of digital devices and programs that it is difficult
to bring to a search site all of the specialized manuals,
equipment, and personnel that may be required.

   b.   Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of
data this equates to, one gigabyte can store close to 19,000
average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

   41.  The search warrant requests authorization to use the
biometric unlock features of a device, based on the following,
which I know from my training, experience, and review of
publicly available materials:

   a.   Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device.  To
unlock a device enabled with a fingerprint unlock function, a
user places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second.  To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

   b.   In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when
a device has been restarted or inactive, has not been unlocked
for a certain period of time (often 48 hours or less), or after

a certain number of unsuccessful unlock attempts. Thus, the
opportunity to use a biometric unlock function even on an
enabled device may exist for only a short time. I do not know
the passcodes of the devices likely to be found in the search.

c. Thus, the warrant I am applying for would permit
law enforcement personnel to, with respect to any device that
appears to have a biometric sensor and falls within the scope of
the warrant: (1) depress AVENATTI's, REGNIER's, and MARCHINO's
thumbs and/or fingers on the device(s); and (2) hold the
device(s) in front of AVENATTI's, REGNIER's, and MARCHINO's
faces with their eyes open to activate the facial-, iris-,
and/or retina-recognition feature.

## X.   REQUEST FOR SEALING

42. I request that the search warrant, the search warrant
application, and this affidavit be kept under seal to maintain
the integrity of this investigation until further order of the
Court, or until the government determines that these materials
are subject to its discovery obligations in connection with
criminal proceedings, at which time they may be produced to
defense counsel. I make this request for several reasons.

a. First, this criminal investigation is ongoing and
is neither public nor known to AVENATTI and other subjects of
the investigation. Disclosure of the search warrant,
application, and this affidavit could cause AVENATTI and others
to accelerate any existing or evolving plans to, and give them
an opportunity to, destroy or tamper with evidence, tamper with

or intimidate witnesses, change patterns of behavior, or notify confederates.

      b.   Second, based on evidence collected to date and described herein, there is probable cause to believe that AVENATTI took a number of affirmative actions to obstruct the IRS civil collection action relating to GBUS's unpaid payroll taxes by, among other things, lying to RO 1, changing contracts, merchant accounts, and bank account information to avoid liens and levies imposed by the IRS, and instructing employees to deposit over $800,000 in cash from Tully's stores, which were owned and operated by GBUS, into a bank account associated with a separate entity to avoid liens and levies by the IRS.  If AVENATTI were to learn of the instant investigation he might engage in similarly obstructive conduct.

      c.   Third, a number of former GBUS employees have expressed concerns that AVENATTI might attempt to retaliate against them if he learned they were cooperating with the government's investigation.

      d.   Fourth, there is a possibility that some evidence relating to GBUS's operations may have already been lost when GBUS was evicted from its corporate offices and AVENATTI refused to pay the bill for GBUS's cloud-based server.  Although IRS-CI has been able to obtain some GBUS records, including the data stored on the SUBJECT DEVICES, from other sources, AVENATTI's apparent willingness to allow GBUS records to be lost or destroyed raises a concern that, were AVENATTI to learn of the

instant investigation, he might not hesitate to destroy any
remaining GBUS records and other relevant evidence.

      e.   Fifth, the government is still attempting to
locate additional documentary evidence that is relevant to the
investigation, including emails and electronic records that may
be stored by AVENATTI, EA LLP, A&A, or other related entities.
If alerted to the government's investigation prior to the
execution of the proposed search warrants, it is therefore
possible that AVENATTI would attempt to destroy such records and
that the government would have no other means to obtain this
evidence.

    43.  Other than what has been described herein, to my
knowledge, the United States has not attempted to obtain this
data by other means.

    ///

    ///

    ///

## XI. CONCLUSION

44.  ·For all the reasons described above, there is probable cause to believe that the items listed in Attachments B-1 through B-3, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found at the SUBJECT PREMISES, as described in Attachments A-1 through A-3.

_____
Remoun Karlous, Special Agent
Internal Revenue Service –
Criminal Investigation

Subscribed to and sworn before me
this ____ day of March, 2019.

_____
HONORABLE DOUGLAS F. MCCORMICK
UNITED STATES MAGISTRATE JUDGE

**DOUGLAS F. McCORMICK**

# EXHIBIT 3

Case 8:19-cr-00061-JVS   Document 78   Filed 01/14/20   Page 237 of 544   Page ID #:1307
Case 8:19-mj-00061-DUTY   *SEALED*   Document 1-1   Filed 03/24/19   Page 24 of
330   Page ID #:530

## **AFFIDAVIT**

I, Remoun Karlous, being duly sworn, declare and state as
follows:

### **I.    INTRODUCTION**

1.    I am a Special Agent ("SA") with the Internal Revenue
Service-Criminal Investigation ("IRS-CI") in the Los Angeles
Field Office and have been so employed since April 1995.  As an
IRS-CI SA, I have investigated numerous cases involving criminal
violations of Title 18, Title 21, Title 26, and Title 31 of the
United States Code, which have resulted in seizure, search, and
arrest warrants.  In particular, I have investigated cases
involving money laundering, international money laundering,
securities fraud, tax evasion (domestic and international
cases), and subscribing to false tax returns.

### **II.   PURPOSE OF AFFIDAVIT**

2.    This affidavit is made in support of an application
for a warrant to search the following digital devices or
forensic images thereof, which are currently held in the custody
of IRS-CI in Los Angeles and Santa Ana, California:[1]

a.    Dell PowerEdge R410, bearing serial number
52RKCK1, obtained by IRS-CI from MixinIT via consent from the
court-appointed receiver for Eagan Avenatti LLP ("EA LLP") on or
about April 4, 2019 ("SUBJECT DEVICE 1");

---

[1] SUBJECT DEVICES 1 through 6 are currently held in the
custody of IRS-CI in Los Angeles, California.  SUBJECT DEVICES 7
through 10 are currently held in the custody of IRS-CI in Santa
Ana, California.

b.   Dell PowerEdge R710, bearing serial number 2GMPCK1, obtained by IRS-CI from MixinIT via consent from the court-appointed receiver for EA LLP on or about April 4, 2019 ("SUBJECT DEVICE 2");

c.   HP ProLiant DL380 G7, bearing serial number A1979827, obtained by IRS-CI from MixinIT via consent from the court-appointed receiver for EA LLP on or about April 4, 2019 ("SUBJECT DEVICE 3");

d.   HP ProLiant DL380 G7, bearing serial number A1979828, obtained by IRS-CI from MixinIT via consent from the court-appointed receiver for EA LLP on or about April 4, 2019 ("SUBJECT DEVICE 4");

e.   HP ProLiant DL380 G7, bearing serial number A1884814, obtained by IRS-CI from MixinIT via consent from the court-appointed receiver for EA LLP on or about April 4, 2019 ("SUBJECT DEVICE 5");

f.   HP ProLiant DL160 G6, bearing serial number MXQ9520ABM, obtained by IRS-CI from MixinIT via consent from the court-appointed receiver for EA LLP on or about April 4, 2019 ("SUBJECT DEVICE 6");

g.   A black USB drive marked "27989," which was seized by law enforcement agents from AVENATTI on March 25, 2019, upon his arrest.  IRS-CI obtained the forensic image of the digital device from the United States Attorney's Office for the Southern District of New York ("SDNY USAO") on or about May 22, 2019  ("SUBJECT DEVICE 7");

      h.   A blue and silver USB drive marked "RAEN," which was seized by law enforcement agents from AVENATTI on March 25, 2019, upon his arrest. IRS-CI obtained the forensic image of the digital device from the SDNY USAO on or about May 22, 2019 ("SUBJECT DEVICE 8");

      i.   A silver and purple USB drive marked "8025328," which was seized by law enforcement agents from AVENATTI on March 25, 2019, upon his arrest. IRS-CI obtained the forensic image of the digital device from the SDNY USAO on or about May 22, 2019 ("SUBJECT DEVICE 9"); and

      j.   A compact disc containing scanned copies of miscellaneous documents that were seized by law enforcement agents from AVENATTI's briefcase on March 25, 2019, upon his arrest. The SDNY USAO scanned the documents and placed them on the disc and provided the disc to IRS-CI on or about May 17, 2019 ("SUBJECT DEVICE 10") (collectively, the "SUBJECT DEVICES").

     3.   The requested search warrant seeks authorization to seize any data on the SUBJECT DEVICES that constitutes evidence, contraband, instrumentalities, and/or fruits of violations of: 26 U.S.C. § 7201 (attempt to evade or defeat tax); 26 U.S.C. § 7202 (willful failure to collect or pay over tax); 26 U.S.C. § 7203 (willful failure to pay tax or file return); 26 U.S.C. § 7212 (interference with administration of internal revenue laws); 18 U.S.C. § 152 (concealment of assets and false oaths and declarations in bankruptcy); 18 U.S.C. § 157 (bankruptcy fraud); 18 U.S.C. § 1028A (aggravated identity theft); 18 U.S.C.

§ 1343 (wire fraud); 18 U.S.C. § 1344 (bank fraud); and 18 U.S.C. § 1957 (money laundering) (the "Subject Offenses"), and any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

4.      The SUBJECT DEVICES are identified in Attachment A to the search warrant application.  The list of items to be seized is set forth in Attachment B to the search warrant application. Attachments A and B are incorporated herein by reference.

5.      The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

6.      AVENATTI was and is an attorney licensed to practice law in the State of California.  AVENATTI practiced law through Avenatti & Associates, APC ("A&A") and EA LLP in Newport Beach and Los Angeles, California.  AVENATTI was the sole owner of A&A, which owned at least 75 percent of EA LLP.

7.      AVENATTI was also the principal owner and Chief Executive Officer ("CEO") of Global Baristas US LLC ("GBUS"), which operated Tully's Coffee ("Tully's") stores in Washington

4

and California.  In 2013, AVENATTI's company, Global Baristas
LLC ("GB LLC"), acquired TC Global Inc., which previously
operated Tully's, out of bankruptcy for approximately $9.15
million.  AVENATTI's company, A&A, owned 100 percent of Doppio
Inc., which in turn owned 80 percent of GB LLC.  GB LLC wholly
owned GBUS, which handled the day-to-day business operations of
Tully's.

     8.   As set forth herein and in the affidavits that I
submitted in February 2019 (attached hereto as Exhibit 1) and
March 2019 (attached hereto as Exhibit 3) in support of prior
search warrant applications, there is probable cause to believe
that between approximately 2011 and March 2019 AVENATTI engaged
in the following criminal conduct: (a) wire fraud and money
laundering offenses relating to millions of dollars AVENATTI
embezzled from his legal clients; (b) tax offenses relating to
GBUS's payroll tax obligations and AVENATTI's efforts to
obstruct an IRS collection action; (c) tax offenses relating to
the tax obligations of EA LLP and A&A, including the payroll tax
obligations of EA LLP; (d) tax offenses relating to AVENATTI's
personal tax obligations; (e) bank fraud and aggravated identity
theft offenses relating to loans AVENATTI and his companies
obtained from The Peoples Bank in Mississippi; and
(f) bankruptcy fraud offenses relating to false statements
AVENATTI made in federal bankruptcy proceedings involving
AVENATTI and EA LLP.

     9.   <u>First</u>, between as early as January 2015 and continuing
through at least March 2019, AVENATTI executed a scheme to

defraud and embezzle money from clients to whom AVENATTI had
agreed to provide legal services.  AVENATTI's scheme to defraud
his victim-clients generally operated in the following manner:
(a) AVENATTI would negotiate a settlement on behalf of a victim-
client that would require the payment of funds to the victim-
client; (b) AVENATTI would cause the settlement proceeds to be
deposited in or transferred to attorney trust accounts AVENATTI
controlled; (c) AVENATTI would misrepresent, conceal, and
falsely describe to the victim-client the true terms of the
settlement and/or make false statements regarding the
disposition of the settlement proceeds; (d) AVENATTI would
embezzle and misappropriate settlement proceeds to which he was
not entitled; and (e) AVENATTI would lull the victim-client to
prevent the victim-client from discovering the embezzlement and
misappropriation by, among other things, falsely denying the
settlement proceeds had been paid, sending funds to the victim-
client under the false pretense that such funds were "advances"
on the purportedly yet-to-be received settlement proceeds, and
falsely claiming that payment of the settlement proceeds to the
victim-client had been delayed for legitimate reasons and would
occur at a later time.

10.  Specifically, there is probable cause to believe that
AVENATTI defrauded and embezzled funds from the following
victim-clients:

      a.   <u>Client 1</u>:  Beginning as early as in or about 2012, AVENATTI and EA LLP represented Client 1[2] in connection with a lawsuit against the County of Los Angeles and others. Between in or about January 2015 and the present, AVENATTI defrauded Client 1 out of Client 1's portion of an approximately $4,000,000 settlement payment from the County of Los Angeles.

      b.   <u>Client 2</u>:  Beginning as early as in or about December 2016, AVENATTI and EA LLP represented Client 2 in connection with potential litigation against an individual with whom Client 2 had a personal relationship ("Individual 1"). Between in or about December 2016 and the present, AVENATTI defrauded Client 2 out of Client 2's portion of an approximately $2,750,000 settlement payment from Individual 1.

      c.   <u>Client 3</u>:  Beginning as early as in or about July 2014, AVENATTI and EA LLP represented Client 3[3] in connection with an intellectual property dispute against a Colorado-based company ("Company 1").  Between in or about December 2017 and

---

    [2]  As noted herein, on April 10, 2019, a federal grand jury returned a 36-count indictment against AVENATTI in <u>United States v. Avenatti</u>, SA CR No. 19-061-JVS (the "Indictment," Exhibit 4, attached).  The Indictment refers to the victim-clients by number (<u>e.g.</u>, "Client 1") rather than by the victim-clients' initials or other identifiers.  In the interest of protecting the client-victims' right to privacy should this affidavit later be unsealed, as well as to maintain consistency with the Indictment, the government is referring to the individuals in this affidavit in the same manner as the Indictment.  The privilege review team and other agents executing the search will be provided with the names of the relevant client-victims before conducting a search of the SUBJECT DEVICES.

    [3]  In the affidavits I submitted in support of the February 2019 and March 2019 search warrant applications, Client 3 is referred to as G.B.

the present, AVENATTI defrauded Client 3 out of Client 3's portion of an approximately $1,600,000 settlement payment from Company 1.

        d.   <u>Client 4 and Client 5</u>:  Beginning as early as in or about August 2017, AVENATTI and/or EA LLP represented Client 4 and Client 5[4] in connection with their separation and divestment from one of the companies in which Client 4 and Client 5 owned shares ("Company 2").  (<u>See</u> Ex. 1, ¶ 50.h. n.31; Ex. 3, § VI.)  Between in or about March 2018 and the present, AVENATTI defrauded Client 4 out of $4,000,000 of Client 4's funds.

        e.   <u>Super Bowl Clients</u>:  Beginning as early as in or about 2012, AVENATTI and EA LLP represented approximately 200 individuals (the "Super Bowl Clients") in connection with litigation against the National Football League ("NFL") relating to the 2011 Super Bowl (the "Super Bowl Litigation").  The evidence IRS-CI has collected to date demonstrates that AVENATTI embezzled substantial portions of the settlement proceeds from the Super Bowl Litigation intended for clients, which AVENATTI received in or about May 2017.

    11.  <u>Second</u>, between the fourth quarter of 2015 and the third quarter of 2017, inclusive, GBUS failed to timely file employment tax returns (IRS Forms 941) and pay approximately $3,207,144 in federal payroll taxes, including approximately $2,390,048 in trust fund taxes, which had been withheld from

---

    [4] In the affidavits I submitted in support of the February 2019 and March 2019 search warrant applications, Client 4 is referred to as M.P. and Client 5 is referred to as L.T.

GBUS employees' paychecks. AVENATTI was responsible for all of GBUS's significant financial and business decisions, including the decision not to pay the payroll and trust fund taxes that GBUS owed to the IRS. Indeed, AVENATTI was well aware of GBUS's outstanding tax obligations, yet repeatedly refused to authorize the required tax payments to the IRS.

12. Additionally, after the IRS initiated a collection action relating to GBUS's outstanding payroll tax obligations in September 2016, issued an approximately $5,000,000 tax lien against GBUS in July 2017, and levied multiple GBUS bank accounts, AVENATTI directed repeated attempts to evade collection of those payroll taxes and obstruct the IRS collection action. Among other things, AVENATTI: (a) made false statements to an IRS Revenue Officer regarding GBUS's payroll taxes and AVENATTI's involvement in GBUS's finances; (b) directed GBUS employees to deposit the cash receipts from Tully's stores into a bank account associated with a different entity AVENATTI controlled; (c) changed the company name, Employer Identification Number ("EIN"), and bank account information associated with GBUS's merchant credit card processing accounts; (d) changed the company name on various contracts with The Boeing Company; and (e) caused significant amounts of GBUS's funds, which could and should have been used to pay GBUS's payroll taxes, to be transferred to other entities AVENATTI controlled, including EA LLP and A&A.

13. Third, AVENATTI filed federal personal income tax returns for the 2009 and 2010 tax years indicating that he owed

the IRS a total of approximately $850,438, plus interest and penalties.  AVENATTI, however, did not pay the IRS the amounts he owed for those tax years.[5]  AVENATTI then failed to file personal tax returns for the 2011 through 2017 tax years.  During these tax years, AVENATTI generated substantial income and lived lavishly, yet largely failed to pay any federal income tax.

14.  Fourth, AVENATTI's other companies, EA LLP and A&A, repeatedly failed to meet their tax obligations despite generating substantial revenues.  Between 2015 and 2017, EA LLP failed to file payroll tax returns and pay approximately $2.4 million in payroll taxes, including approximately $1,279,001 in trust fund taxes that had been withheld from EA LLP employees' paychecks.  Additionally, EA LLP did not file partnership tax returns (IRS Form 1065) for the 2013, 2014, 2015, 2016, and 2017 tax years.  Similarly, A&A did not file corporate tax returns (IRS Form 1120S) for the 2011, 2012, 2013, 2014, 2015, 2016, or 2017 tax years.

15.  Fifth, between approximately January 2014 and December 2014, AVENATTI obtained three separate loans from The Peoples Bank, a federally insured bank in Mississippi: (1) a $850,500 loan to GB LLC in January 2014; (2) a $2,750,000 loan to EA LLP in March 2014; and (3) a $500,000 loan to EA LLP in December 2014.  In connection with these loans, AVENATTI provided The

---

[5] The tax due and owing to the IRS for the 2009 and 2010 tax years was not paid until November 2015, when AVENATTI sold his residence in Laguna Beach, California, upon which there was an IRS tax lien.

Peoples Bank with false federal individual income tax returns
for the 2011, 2012, and 2013 tax years.  AVENATTI, however,
never filed individual income tax returns for the 2011, 2012,
and 2013 tax years, and did not make any estimated tax payments
during the 2012 and 2013 tax years, as claimed on the returns
submitted to The Peoples Bank.  In addition, in March 2014,
AVENATTI provided The Peoples Bank with a 2012 federal tax
return for EA LLP which differed materially from the federal tax
return EA LLP actually filed with the IRS in October 2014.

     16.  <u>Sixth</u>, in March 2017, AVENATTI, as the managing member
of EA LLP, consented to EA LLP being placed in Chapter 11
bankruptcy (the "2017 EA Bankruptcy").  Among other things, the
Chapter 11 bankruptcy guidelines and requirements: (a) required
AVENATTI to close all pre-petition bank accounts controlled by
EA LLP, immediately open debtor-in-possession ("DIP") bank
accounts, and deposit all business revenues into the DIP
operating account; and (b) required AVENATTI to file monthly
operating reports ("MOR") for EA LLP and report all of EA LLP's
financial information for the reporting period.  From
approximately March 2017 through March 2018, AVENATTI failed to
report, among other information, all revenues of EA LLP and
payments and distributions AVENATTI, as an insider, received
from EA LLP funds.  Additionally, between March 2017 and March
2018, AVENATTI defrauded the bankruptcy court, the Office of the
United States Trustee, and the creditors of EA LLP, by
concealing bank accounts controlled by EA LLP, the true revenues
generated by EA LLP, and the sources of revenue to EA LLP.

17.  On March 25, 2019, federal agents arrested AVENATTI in
New York pursuant to a criminal complaint and arrest warrant
issued in this district in case number 8:19-MJ-241, as well as
pursuant to a separate criminal complaint and arrest warrant
issued in the Southern District of New York in case number
19MAG2927.  Simultaneously with AVENATTI's arrest, IRS-CI
executed search warrants issued in this district in case numbers
8:19-MJ-243, 8:19-MJ-244, and 8:19-MJ-247 at three locations
associated with AVENATTI and EA LLP.  Upon AVENATTI's arrest,
federal agents in New York seized several digital devices,
forensic copies of which have been provided to IRS-CI (i.e.,
SUBJECT DEVICES 7 through 9), and miscellaneous documents found
in AVENATTI's briefcase, scanned copies of which have been
provided to IRS-CI (i.e., SUBJECT DEVICE 10).[6]  There is probable
cause to believe that the digital devices and miscellaneous
document found on AVENATTI at the time of his arrest (i.e.,
SUBJECT DEVICES 7 through 10) will contain evidence of the
Subject Offenses, including business records, financial
documents, and emails.

18.  Following AVENATTI's arrest and the execution of the
March 2019 search warrants, IRS-CI learned that in or about
November 2018 AVENATTI caused computer servers belonging to EA

---

[6] Federal agents in New York also seized a black Apple
iPhone X, a silver Apple MacBook Pro, and a black and grey Apple
iPad from AVENATTI upon his arrest.  Currently, the agents in
New York are still attempting to gain access to the contents of
these three digital devices.  If they are able to access these
additional devices, we anticipate receiving forensic images of
them and seeking a warrant to search the contents of these
devices as well.

LLP (i.e., SUBJECT DEVICES 1 through 6) to be moved to a data
center in Orange County, California, operated by MixinIT.  On
April 3, 2019, the court-appointed receiver for EA LLP consented
to IRS-CI taking physical custody of the EA LLP servers so that
IRS-CI could create forensic images of the EA LLP servers.
There is probable cause to believe that the EA LLP servers
(i.e., SUBJECT DEVICES 1 through 6) will contain additional
evidence of the Subject Offenses, including business records,
financial documents, and emails.

## IV.   STATEMENT OF PROBABLE CAUSE

### A.   February 2019 Warrant to Search GBUS Digital Devices

19.  On February 22, 2019, in case number 8:19-MJ-103, I
submitted an affidavit in support of an application for a
warrant to search seven digital devices, which had been produced
by former GBUS employees, in the custody of IRS-CI in Laguna
Niguel, California (the "February 2019 affidavit").  The
Honorable Douglas F. McCormick, United States Magistrate Judge,
issued the warrant that same day (the "February 2019 search
warrant").  The application for a search warrant in case number
8:19-MJ-103, as well as my February 2019 affidavit in support
thereof, are attached hereto as Exhibit 1 and incorporated
herein by reference.

### B.   March 2019 Criminal Complaint

20.  On March 22, 2019, in case number 8:19-MJ-241, I
submitted an affidavit in support of a criminal complaint and
arrest warrant against AVENATTI (the "complaint affidavit").
The criminal complaint charged AVENATTI with one count of bank

Case 8:19-cr-00061-JVS   Document 78   Filed 01/14/20   Page 250 of 544   Page ID #:1320
Case 8:19-mj-00241-DUTY   SEALED   Document 1-1   Filed 04/24/19   Page 320 of
330   Page ID #:543

fraud, in violation of 18 U.S.C. § 1344(1), relating to
AVENATTI's fraudulent scheme to obtain a $500,000 loan from The
Peoples Bank on or about December 12, 2014, and one count of
wire fraud, in violation of 18 U.S.C. § 1343, relating to
AVENATTI's fraudulent scheme to embezzle clients' funds,
specifically the $1.6 million settlement on behalf of Client 3.
The Honorable Douglas F. McCormick, United States Magistrate
Judge, issued the arrest warrant that same day.  The criminal
complaint in case number 8:19-MJ-241, as well as my complaint
affidavit in support thereof, are attached hereto as Exhibit 2
and incorporated herein by reference.[7]

## C.   March 2019 Warrants to Search Locations Associated with AVENATTI and EA LLP

21.  On March 24, 2019, in case numbers 8:19-MJ-242, 8:19-
MJ-243, and 8:19-MJ-244, I submitted an affidavit in support of
applications for warrants to search AVENATTI's residence in Los
Angeles and two other locations (the "March 2019 affidavit").
The Honorable Douglas F. McCormick, United States Magistrate
Judge, issued the warrants that same day (the "March 2019 search
warrant").  The March 2019 affidavit in support for the search
warrants in case numbers 8:19-MJ-242,[8] 8:19-MJ-243, and 8:19-MJ-

_____

[7] A copy of the application for the February 2019 search
warrant, including my February 2019 affidavit, were also
incorporated by reference and attached to the criminal complaint
in case number 8:19-MJ-241.  Accordingly, I have not included a
duplicate copy of the February 2019 search warrant application,
as part of Exhibit 2 to this affidavit.

[8] On March 25, 2019, to execute the warrant issued in case
number 8:19-MJ-242, IRS-CI agents went to 10000 Santa Monica
Boulevard, Unit 2205 in Los Angeles, California, the location
identified as the premise to be search in case number 8:19-MJ-

Case 8:19-cr-00061-JVS   Document 78   Filed 01/14/20   Page 251 of 544   Page ID #:1321
Case 8:19-mj-00061-DUTY   *SEALED*   Document 1-1   Filed 03/24/19   Page 32 of
330   Page ID #:544

244, is attached hereto as Exhibit 3 and incorporated herein by
reference.[9]

22.   The items to be seized set forth in Attachment B to
this search warrant application are largely identical to the
items to be seized set forth in Attachments B-1 through B-3 of
the March 2019 search warrants.   The items to be seized in
Attachment B to this search warrant application principally
differ from items to be seized set forth in Attachments B-1
through B-3 of the March 2019 warrants in that Attachment B to
this search warrant application includes items pertaining to
Client 1, Client 2, the private jet AVENATTI purchased using
Client 2's settlement funds, the Super Bowl Clients, and a
separate entity controlled by AVENATTI called "Augustus LLP."
(See Attachment B ¶¶ 1.a, 1.t, 1.u, 1.v, 1.y, 1.ff.)

23.   The privilege review protocols set forth in Attachment
B to this search warrant application are also largely identical
to the privilege review protocols set forth in Attachments B-1
through B-3 of the March 2019 search warrants.   The principal

---

242, and learned that AVENATTI moved from Unit 2205 to Unit
2107.   As a result, IRS-CI SA Leia R. Bellis presented a new
application for search warrant with an affidavit that she swore
out for Unit 2107, to Judge McCormick on March 25, 2019, in case
number 8:19-MJ-247.   As the facts and circumstances related to
the change in apartment numbers were the only different facts
presented in that affidavit and warrant, I have not attached
that warrant as an exhibit.

[9] A copy of the application for the February 2019 search
warrant, including my February 2019 affidavit, and the criminal
complaint, were also incorporated by reference and attached to
the March 2019 search warrant applications and the affidavits
attached thereto in case numbers 8:19-MJ-242, 8:19-MJ-243, and
8:19-MJ-244.   Accordingly, I have not included a duplicate copy
of the February 2019 search warrant application or the criminal
complaint, as part of Exhibit 3 to this affidavit.

difference is that the privilege review protocol set forth in
Attachment B to this search warrant application does not address
the search of physical locations and non-digital evidence
because the instant search warrant application only covers the
search of digital devices that are already in IRS-CI's custody.

**D.**  **Additional Evidence Regarding AVENATTI's Scheme to Defraud His Legal Clients**

24.   As noted above, evidence establishing probable cause
to believe AVENATTI committed all of the Subject Offenses is set
forth in my February 2019 (Ex. 1) and March 2019 affidavit
(Ex. 3).   This evidence includes evidence that AVENATTI
embezzled funds from at least two sets of his legal clients,
namely, Client 3 (Ex. 1, § IV.G; Ex. 3, § VI.C), and Clients 4
and 5 (Ex. 3, § VI.D).   In this section of the instant
affidavit, I set forth additional evidence that IRS-CI has
discovered since the execution of the March 2019 search warrants
regarding the embezzlement offenses.   This additional evidence
shows that AVENATTI embezzled from additional victim-clients
beyond those discussed in the February 2019 and March 2019
affidavits.

**1.**   *Evidence Regarding AVENATTI's Embezzlement of Client 1's Settlement Funds*

25.   There is probable cause to believe that in or about
January 2015 AVENATTI embezzled Client 1's portion of a
$4,000,000 settlement payment from the County of Los Angeles.
As set forth in greater detail below, the evidence collected to
date demonstrates that AVENATTI: (a) negotiated a $4,000,000
settlement with the County of Los Angeles on behalf of Client 1;

(b) made false representations to Client 1 regarding the terms of the settlement agreement; (c) embezzled Client 1's portion of the $4,000,000 settlement payment; (d) provided Client 1 with periodic payments of $1,000 to $1,900, which AVENATTI falsely described as "advances" on the yet-to-be-received $4,000,000 settlement payment, in order to lull Client 1 and prevent Client 1 from discovering that AVENATTI embezzled Client 1's portion of the $4,000,000 settlement payment.

        a.   <u>The $4,000,000 Settlement Agreement with the County of Los Angeles</u>

26. Based on my review of publicly available court documents and records obtained from Hurrell Cantrall LLP, which represented the County of Los Angeles in litigation involving Client 1, I have learned the following:

        a.   In or about October 2012, EA LLP and AVENATTI filed a lawsuit against the County of Los Angeles and others on behalf of Client 1 (the "L.A. County Lawsuit").

        b.   In or about June 2013, the L.A. County Lawsuit was removed to the United States District Court for the Central District of California.

        c.   The L.A. County Lawsuit alleged that the County of Los Angeles violated Client 1's constitutional rights, causing Client 1 to suffer severe emotional distress and severe physical injuries, including paraplegia.

        d.   On or about November 7, 2014, the parties appeared in federal court for a status conference in connection

Case 8:19-cr-00061-JVS  Document 78  Filed 01/14/20  Page 254 of 544  Page ID #:1324
Case 8:19-mj-00061-DUTY  *SEALED*  Document 1-1  Filed 03/22/19  Page 44 of
330  Page ID #:547

with the L.A. County Lawsuit.  During the status conference,

AVENATTI stated the following:

> Your Honor, for the last week or two, we've been in
> active settlement discussions involving a retired
> judge, Louis Meisinger. The good news is is [sic] that
> the parties have reached a tentative settlement
> relating to all material terms with the exception of
> one material term, which is providing some angst and
> for which Mr. Hurrell and I decided yesterday that
> perhaps the Court, based on Your Honor's experience,
> could assist us with resolving.
>
> And that one material term is mainly when the settlement
> dollars are to be paid to [Client 1], who, as the Court
> knows, is a paraplegic and is in need of the funds.

AVENATTI further stated:  "[Client 1] would like the moneys paid

within 60 days, namely today or Monday so that he can utilize

the money for his living expenses and other needs."

        e.    On or about December 11, 2014, the parties filed

a status report regarding the settlement of the L.A. County

Lawsuit, which settlement required approval from the Los Angeles

County Board of Supervisors.  In the status report, the parties

stated they expected the settlement to be approved by the Board

of Supervisors and funded by March 6, 2015.

        f.    On or about January 6, 2015, AVENATTI sent an

email to counsel for the County of Los Angeles regarding the

settlement agreement.  AVENATTI stated:  "Can you please provide

an update on the schedule?  We are trying to get [Client 1]

taken care of."

        g.    On or about January 13, 2015, the Board of

Supervisors approved the settlement agreement for the L.A.

County Lawsuit.

h.    On or about January 21, 2015, AVENATTI emailed counsel for the County of Los Angeles the signature page for the settlement agreement with the County of Los Angeles.

i.    On or about January 22, 2015, counsel for the County of Los Angeles sent AVENATTI via email and U.S. mail the fully executed settlement agreement.  The settlement agreement stated:

> In exchange for a complete resolution of the [L.A. County] Lawsuit, Defendants, by and through the County of Los Angeles, shall pay to Plaintiff **Four Million Dollas ($4,000,000)** (the "Settlement Funds"), subject to approval by the Los Angeles County Board of Supervisors.  The parties acknowledge that the Court in this matter has issued an order outlining a time table to present this settlement for approval by the Los Angeles County Board of Supervisors, and thereafter issuance of a settlement draft.  It is understood by the parties that if the time table is not complied with, this settlement agreement may be revoked by either party.
>
> The Parties expressly agree that the Lawsuit shall not be dismissed until five (5) business days following receipt by Eagan Avenatti of the Settlement Funds as provided above.

(Emphasis in original.)  The executed settlement agreement was signed by a representative for the County of Los Angeles, counsel for the County of Los Angeles, and AVENATTI, and purportedly signed by Client 1.[10]  The settlement agreement did not contain any confidentiality provisions.  Additionally, the settlement agreement was not dependent on the creation of any sort of trust for Client 1.

---

[10]  When IRS-CI interviewed Client 1, he indicated that the signature on the settlement agreement looked funny to him, but that it could possibly have been his signature.

      j.   On or about January 22, 2015, AVENATTI sent an email to counsel for the County of Los Angeles instructing the County to make the check for the settlement payable to "Eagan Avenatti, LLP Client Trust Account."

      k.   On or about January 29, 2015, the Count of Los Angeles sent to AVENATTI and EA LLP via messenger: (1) a letter enclosing the "settlement check" of $4,000,000; (2) check number TS 0021400949, dated January 26, 2015, to "Eagan Avenatti, LLP Attorney Client Trust Account" in the amount of $4,000,000; and (3) a stipulation to dismiss the L.A. County Lawsuit and corresponding proposed order.

      l.   On or about February 10, 2015, the parties filed a stipulation to dismiss the L.A. County Lawsuit with prejudice. The order dismissing the L.A. County Lawsuit was entered later that same date.

      b.   <u>Bank Account Records Relating to the $4,000,000 Settlement and Client 1</u>

   27.   Based on my review of bank records, I have learned the following regarding the disposition of the $4,000,000 settlement payment from the County of Los Angeles:

      a.   On or about January 29, 2015, the $4,000,000 settlement check (check number TS 0021400949) from the County of Los Angeles to EA LLP's attorney client trust account was deposited into EA LLP's California Bank & Trust ("CB&T") attorney trust account ending in 8541 ("EA Trust Account 8541"). Prior to the $4,000,000 deposit, EA Trust Account 8541 had an account balance of $0.00.

b.     Between on or about January 30, 2015, and on or about March 30, 2015, a total of approximately $3,125,898 was transferred from EA Trust Account 8541 to a EA LLP's CB&T operating account ending in 2851 ("EA Account 2851").

c.     Between on or about January 30, 2015, and on or about March 30, 2015, approximately $1,721,000, the vast majority of which derived from the $4,000,000 settlement payment, was transferred from EA Account 2851 to A&A's CB&T account ending in 0661 ("A&A Account 0661").[11]  Substantial portions of the funds transferred to A&A Account 0661 were then used for AVENATTI's own purposes.[12]  For example, during this time period, AVENATTI made the following payments from A&A Account 0661 for his personal purposes:

i.     Between on or about January 30, 2015, and on or about February 27, 2015, A&A paid approximately $505,000 to GBUS.

ii.    Between on or about January 30, 2015, and on or about March 27, 2015, A&A paid a total of approximately

---

[11]   Prior to the transfer of approximately $3,125,898 from EA Trust Account 8541 to EA Account 2851, EA Account 2851 had an account balance of approximately $25,318.  Between January 30, 2015, and March 30, 2015, approximately $84,161 was transferred to EA Account 2851 from other sources, and approximately $50,000 that had originally been transferred from EA Account 2851 to A&A Account 0661 was transferred back to EA Account 2851.

[12]   Prior to the transfer of approximately $450,000 from EA Account 2851 to A&A Account 0661 on or about January 30, 2015, A&A Account had an account balance of approximately $17,491. Between January 30, 2015, and March 30, 2015, the only deposits into A&A Account 0661 came from EA Account 2851.

$315,000 to GB Autosport LLC, which managed AVENATTI's car racing team.

       iii. Between on or about February 20, 2015, and on or about March 30, 2015, A&A paid approximately $220,000 to AVENATTI's personal Bank of America account.

       iv.  Between on or about January 30, 2015, and on or about February 6, 2015, A&A paid a total of approximately $200,000 to Gallo Builders, Inc., a custom home builder in Newport Beach, California.[13]

       v.  Between on or about February 3, 2015, and on or about March 18, 2015, A&A paid a total of approximately $82,236 to Porsche, including an approximately $79,800 payment on March 18, 2015.

       vi.  Between on or about January 30, 2015, and on or about March 9, 2015, A&A paid a total of approximately $36,500 to AVENATTI's ex-wife, C.C.

       vii. On or about February 3, 2015, A&A paid approximately $80,372 to Chase Home Finance in connection with the mortgage on AVENATTI's residence in Laguna Beach, California.[14]

---

[13] During a Judgment Debtor examination on March 15, 2019, AVENATTI testified under oath and admitted that the payments from the A&A Account 0661 to Gallo Builders were personal expenses of AVENATTI at his personal residence and not business expenses of A&A.

[14]  Bank records reflect that on or about January 29, 2015, a prior payment to Chase Home Finance of approximately $80,372 was returned to A&A Account 0661 due to insufficient funds in A&A Account 0661.

      d.   By no later than July 6, 2015, the entire $4,000,000 settlement payment from the County of Los Angeles for Client 1 had been drained from EA Trust Account 8541.[15]

      e.   IRS-CI has yet to identify any direct payments from EA Trust Account 8541 to Client 1 of money that was traceable to the $4,000,000 settlement payment EA LLP received from the County of Los Angeles to hold in trust on Client 1's behalf.

    28.   Rather than transfer Client 1's portion of the $4,000,000 settlement to Client 1, AVENATTI made relatively-small periodic payments to Client 1, which AVENATTI described as advances on the purportedly yet-to-be-received settlement payment. (See infra ¶ 30.i.)  Specifically, based on IRS-CI's review of records for bank accounts AVENATTI controlled, I understand that between in or about July 2015 and in or about December 2018, AVENATTI caused EA LLP or A&A to make at least 69 payments, each ranging from approximately $1,000 to $1,900 and totaling approximately $122,200, to Client 1.  The $122,200 total, however, does not currently include any purported "advance" payments AVENATTI made to Client 1 between December 2018 and March 2019, as IRS-CI is still in the process of analyzing bank records for that time period.

    29.   AVENATTI also appears to have paid for Client 1's rent at various assisted living facilities.  Specifically, based on

---

[15] On March 31, 2015, approximately $3,034,514 was deposited into EA Trust Account 8541 from another source.  This intervening deposit makes it more difficult for IRS-CI to trace the disposition of the remaining portions of the $4,000,000 settlement payment.

IRS-CI's review of bank records, I understand that between in or
about February 2015 and in or about December 2018, AVENATTI
caused a total of at least approximately $72,000 to be paid from
bank accounts AVENATTI controlled to assisted living facilities
where Client 1 resided.[16]  This total, however, does not
currently include any rent payments AVENATTI made on Client 1's
behalf between December 2018 and March 2019, as IRS-CI is still
in the process of analyzing bank records for that time period.

        c.    <u>Information Client 1 Provided to IRS-CI</u>

     30.  On or about March 31, 2019, IRS-CI SA Gerry Carmona
and IRS-CI SA James Kim participated in an interview of Client
1.  Client 1 was accompanied by his personal attorney.  Based on
my review of a memorandum summarizing the interview with Client
1 and discussions with SA Carmona and SA Kim, I understand that
Client 1 provided, in substance and in part, the following
information:

        a.    EA LLP and AVENATTI represented Client 1 in
connection with a lawsuit against the County of Los Angeles.
Client 1's parents and sister helped Client 1 select EA LLP and
AVENATTI to represent Client 1.

        b.    Client 1 did not recall signing an engagement
letter or contract with AVENATTI or EA LLP, but assumed a
contract was signed.

---

    [16]  I understand that EA LLP also paid for Client 1's rent
at assisted living and/or rehabilitation facilities prior to the
execution of the settlement agreement with the County of Los
Angeles in January 2015. Although additional financial analysis
is necessary, IRS-CI currently believes that the total amount EA
LLP paid prior to the execution of the January 2015 settlement
agreement was between approximately $350,000 and $400,000.

Case 8:19-cr-00061-JVS   Document 78   Filed 01/14/20   Page 261 of 544   Page ID #:1331
Case 8:19-mj-00061-DUTY   SEALED   Document 1-1   Filed 03/22/19   Page 481 of
330   Page ID #:554

      c.   Client 1 reviewed the signature page of the
January 21, 2015, settlement agreement with the County of Los
Angeles.  Client 1 thought his signature looked "funny" to him,
but said that he may have signed the document.  Client 1 said
that he was never presented with the full settlement agreement
and never saw the $4,000,000 settlement amount.

      d.   AVENATTI told Client 1 that a settlement had been
reached with the County of Los Angeles.  AVENATTI may have told
Client 1 the amount Client 1 would receive after fees and
expenses, but Client 1 did not recall ever being told the
settlement was for $4,000,000.

      e.   AVENATTI told Client 1 that under the terms of
the settlement agreement, he would receive approximately $46,000
per quarter for 10 years.  AVENATTI told Client 1 that the
County of Los Angeles does not pay settlements in a lump-sum and
would only pay the settlement in quarterly payments over a
certain period of time.  AVENATTI also told Client 1 that the
settlement proceeds could not be paid until the County of Los
Angeles approved a Special Needs Trust[17] for Client 1.

      f.   Prior to the interview with IRS-CI, Client 1 had
never seen the $4,000,000 settlement payment from the County of
Los Angeles.  AVENATTI never told Client 1 that EA LLP had
received a $4,000,000 settlement payment from the County of Los
Angeles in January 2015.

---

[17] A "Special Needs Trust" is a specialized trust that
allows for a person living with disabilities to maintain his or
her eligibility for public assistance benefits.  (*See* *infra*
¶ 32.)

     g.    Client 1 never authorized AVENATTI to use any of
the settlement funds intended for Client 1 for AVENATTI's
personal or business purposes.  AVENATTI never told Client 1
that Client 1's portion of the settlement funds would be used
for AVENATTI's own personal or business purposes.

     h.    Had Client 1 known that EA LLP received the
$4,000,000 settlement payment, Client 1 would have wanted a
lump-sum payment and would have put the money into a Special
Needs Trust.  Client 1 had been advised by various people to
create a Special Needs Trust so he would not lose his
Supplemental Security Income ("SSI") or Medi-Cal benefits.
AVENATTI told Client 1 that AVENATTI would create a Special
Needs Trust for Client 1 and that he had created Special Needs
Trusts for other clients in the past.

     i.    Client 1 was shown a spreadsheet detailing
approximately 69 payments, each ranging from $1,000 to $1,9000,
to Client 1 from EA LLP or A&A between July 2015 and December
2018.  During this time period, Client 1 was told that the
settlement had not been finalized, but that AVENATTI would
"advance" Client 1 money against the settlement amount.  Client
1 said that he last received a payment from AVENATTI on or about
March 18, 2019, while Client 1 was visiting family.

     j.    Client 1 also said that AVENATTI paid Client 1's
rent at various assisted living facilities.  Client 1 said that
recently Client 1's rent had not been paid for a period of
approximately six months, resulting in late fees.

k.   In approximately 2017, Client 1 told AVENATTI he wanted to buy a house.  AVENATTI told Client 1 buying a house would be a good investment and agreed to help Client 1. AVENATTI found a real estate broker ("Broker 1") to represent Client 1.  AVENATTI, however, wanted Client 1 to deal with AVENATTI instead of dealing with Broker 1 directly.

l.   Client 1 eventually went into escrow on a property in the Canoga Park area.  While in escrow, AVENATTI told Client 1 that there was a problem and the County of Los Angeles still needed to approve Client 1's Special Needs Trust. AVENATTI told Client 1 he had a meeting with the County of Los Angeles to resolve the issue, but the story from AVENATTI went on and on and the house eventually fell out of escrow.

m.   Client 1 is no longer receiving SSI benefits. Client 1 said that, sometime in the three months prior to the interview with IRS-CI, Client 1 received a letter from SSI indicating that Client 1's SSI benefits would be stopped.[18] AVENATTI told Client 1 that this was a mistake and that AVENATTI would take care of it.

n.   In or about February or March 2019 (approximately one month before the interview with IRS-CI), AVENATTI told Client 1 that the County of Los Angeles was still not making the settlement payments because the Special Needs Trust still had not been approved.

---

[18]   Client 1's counsel subsequently provided IRS-CI with the documents Client 1 received from the Social Security Administration ("SSA").  (See infra ¶ 31.e.i.)

Case 8:19-cr-00061-JVS   Document 78   Filed 01/14/20   Page 264 of 544   Page ID #:1334
Case 8:19-mj-00061-DUTY   *SEALED*   Document 1-1   Filed 03/24/19   Page 264 of
330   Page ID #:557

o.   On Friday, March 22, 2019, AVENATTI called
Client 1 and told Client 1 that AVENATTI was in Client 1's
neighborhood and wanted to stop by Client 1's residence.
AVENATTI told Client 1 that the Special Needs Trust had been
approved and asked Client 1 what kind of payment plan Client 1
wanted.

p.   The next day, Saturday, March 23, 2019, AVENATTI
returned to Client 1's residence with a document for Client 1 to
sign.  AVENATTI told Client 1 that the Special Needs Trust was
done and that once Client 1 signed the document he would start
receiving the settlement payments.  Client 1 did not read the
document.  Rather, AVENATTI pointed out the highlights of the
document to Client 1 and then had Client 1 sign the document.
AVENATTI had the document open to the specific page for Client 1
to sign.  AVENATTI did not have Client 1 date the document and
Client 1 did not recall there being a line for the date on the
signature page.  Client 1 did not receive a copy of the document
from AVENATTI.  AVENATTI instead told Client 1 that J.R.,
AVENATTI's office manager, would send Client 1 a copy of the
document at a later time.  AVENATTI also told Client 1 not to
discuss the matter with anyone or Client 1 would lose the money.

q.   During the March 23, 2019, meeting there was also
discussions regarding Client 1's portion of the settlement.
Based on these discussions, Client 1 understood that he was to
receive approximately $1.9 million.  AVENATTI told Client 1 that
AVENATTI's share had already been deducted or factored into the
$1.9 million settlement amount.

      r.   On Sunday, March 24, 2019, AVENATTI returned to Client 1's residence again.  During this meeting, AVENATTI wanted Client 1 to initial the document that Client 1 had signed on March 23, 2019.  AVENATTI told Client 1 that J.R. would be mad at AVENATTI if AVENATTI did not get Client 1's initials on the document.

      s.   Client 1 also recalled signing a second document during the meetings on March 23 and March 24, 2019, which document stated that AVENATTI had done a diligent job representing Client 1.  AVENATTI told Client 1 that AVENATTI wanted to put the document on AVENATTI's website to show what a great job AVENATTI had done on Client 1's case.[19]  Client 1 also recalled AVENATTI asking Client 1 about Client 1's medication.

      t.   Client 1 trusted AVENATTI with everything. AVENATTI was involved in any big decisions involving Client 1.

      u.   Client 1 was asked whether any of Client 1's mental health issues affected his memory.  Client 1 said that his mental health issues have no impact on his memory, he has never had memory issues, and he does not take any medication for memory issues.

      v.   SA Carmona and SA Kim both indicated that Client 1 appeared to be in full possession of his faculties throughout the interview and that Client 1 appeared to them to be intelligent and articulate.

---

[19]  On April 11, 2019, shortly after the Indictment was publicly disclosed, AVENATTI posted what appeared to be a copy of this document on Twitter.com in support of his claim that he is innocent of the charges.  I understand that AVENATTI has since deleted this message from his Twitter account.

Case 8:19-cr-00061-JVS Document 78 Filed 01/14/20 Page 266 of 544 Page ID #:1336
Case 8:19-mj-00061-DUTY SEALED Document 44-29 Filed 03/24/19 Page 30 of
330 Page ID #:559

31.  Client 1 allowed IRS-CI to take photographs of text
messages between Client 1 and AVENATTI and/or J.R., which were
dated between April 2017 and March 2019.  Client 1 also provided
a copy of a text message with a family friend, B.P.  Client 1's
text messages, including the following, appear to be consistent
with Client 1's statements to IRS-CI regarding the purported
"advance" payments Client 1 received from AVENATTI and
Client  1's attempt to purchase a house in 2017:

    a.  Between in or about May 2017 and in or about June
2017, Client 1 sent AVENATTI and J.R. multiple text messages
regarding Client 1's attempted purchase of a house.  For
example, on or about May 24, 2017, Client 1 sent AVENATTI a text
message asking if there was "[a]ny word from the seller on our
latest offer?"  AVENATTI responded the next day and provided
Client 1 with the details of the seller's counter offer and
AVENATTI's planned response.

    b.  On or about August 14, 2017, Client 1 sent a text
message to B.P. stating: "House didn't close move is off for
tomorrow."  The next day, on or about August 15, 2017, B.P.
asked Client 1: "Any problem with close other than a delay?"
Client 1 responded:  "Waiting for the county to approve the
special needs trust."

    c.  Between 2017 and March 2019, Client 1 sent
AVENATTI and/or J.R. numerous text messages asking AVENATTI
and/or J.R. to deposit funds into Client 1's bank account.
Client 1 often had to make repeated requests for funds before
AVENATTI or J.R. made a deposit into Client 1's bank account.

For example, on or about October 6, 2018, Client 1 sent AVENATTI two text messages stating:

> Just FYI I asked for a deposit last Friday to take place this past thurs. two days ago.  That is a weeks notice.  [J.R.] didn't do it till yesterday so the deposit is not available.  I now have no money over the weekend.  I literally have no money for food. This is really hard on me Michael, I don't know what to do.

> And it's a holiday weekend so the funds are not available at the earliest till Tuesday.  That is if I can convince them to take off the hold.

      d.    Between September 2017 and March 2019, Client 1 sent a number of text messages to AVENATTI and/or J.R. in which Client 1 indicated that his rent at his assisted living facility was late and requested that AVENATTI and/or J.R. send payment to his landlord.  For example, on or about February 15, 2019, Client 1 sent AVENATTI and J.R. a text message stating that Client 1's landlord "just gave me a notice saying I have three days to pay the rent or else I have to move out."

      e.    Between in or about October 2018 and in or about March 2019, Client 1 sent multiple text messages to AVENATTI and/or J.R. regarding Client 1's SSI benefits, including the following:

          i.    On or about November 10, 2018, Client 1 appears to have sent J.R. photographs of a letter Client 1 received from SSA regarding Client 1's SSI benefits.[20]  Client 1

---

[20]  Although the photographs associated with this text message were no longer available on Client 1's phone when Client 1 met with IRS-CI, based on the date of the letter from SSA, the date of the text message to J.R., and Client 1's subsequent text messages to AVENATTI and/or J.R. regarding the SSA issue, I believe that photographs of the SSA letter were likely attached to this particular text message.

subsequently provided, through his counsel, a copy of this
letter to IRS-CI.  The letter from SSA stated that SSA needed
additional information in order to further evaluate Client 1's
eligibility for SSI benefits, including information regarding:
(1) Client 1's rental agreement; (2) the "settlement award
letter" from the County of Los Angeles; (3) disbursements from
the settlement since October 2016; (4) verification that the
"trust has or has not been established"; and (5) a letter from
Client 1's attorney about "monthly loan amounts" since October
2016.

    ii. On or about November 26, 2018, Client 1 sent
a text message to AVENATTI stating:  "I sent that letter [from]
SSI that is requesting docs from you to [J.R.] a week and a half
ago.  I included a doc you don't have which u will need to send
along with the rest, my rental agreement with [Client 1's
landlord].  I think it needs to be sent this week."  AVENATTI
responded that same day, "We will handle."

    iii. On or about January 21, 2019, Client 1 sent
a text message to AVENATTI and J.R. stating:  "I received a
letter from SSI on Saturday.  They have stopped my SSI as of
February because they did not receive the requested documents.
I will text the letter to [J.R.] as soon as I get up in my
chair."  AVENATTI responded that same day:  "This is in error.
We will fix it forthwith.  Don't worry."

    f. On or about March 22, 2019, at approximately 7:00
p.m., after meeting with AVENATTI, Client 1 sent AVENATTI a text

message telling him that he would be available to meet with
AVENATTI again from 1:00 p.m. to 5:30 p.m. on March 23, 2019.

            d.    <u>Information Regarding the Purported Special Needs
Trust for Client 1</u>

     32.   As noted above, between in or about January 2015 and
in or about March 2019, AVENATTI falsely represented to Client 1
that the County of Los Angeles could not make the settlement
payment until a Special Needs Trust for Client 1 had been
approved. (<u>See</u> <u>supra</u> ¶¶ 30.e., 30.n.) Based on my review of
publicly available information and discussions with a
representative from the California Department of Health Care
Services ("CA DHCS"), I have learned the following regarding
Special Needs Trusts:

          a.   A Special Needs Trust is a specialized trust that
allows for a person living with disabilities to maintain his or
her eligibility for public assistance benefits despite having
assets that would make the person ineligible for those benefits.

          b.   According to CA DHCS's website, there are two
different types of Special Needs Trusts: (1) a first party
Special Needs Trust; and (2) a third party Special Needs Trust.
First party Special Needs Trusts are "funded with assets that
belong to the trust beneficiary or to which the beneficiary was
legally entitled (<u>e.g.</u>, assets from an award or settlement,
etc.). Third party Special Needs Trusts are funded with "assets
belonging to a person other than the trust beneficiary, and to
which the beneficiary never had possession or legal interest."

33

It appears that any Special Needs Trust for Client 1 would have needed to be a first party Special Needs Trust.

c.   First party Special Needs Trusts typically require notice and payback to the State of California upon the death of a beneficiary or earlier termination of the trust. Based on my discussions with a CA DHCS representative, I understand that such notice would typically need to be provided to CA DHCS and to Medi-Cal through the Los Angeles County Department of Public Social Services ("LA DPSS").

33.   IRS-CI's investigation to date has not discovered any evidence suggesting that AVENATTI made a legitimate effort to establish a Special Needs Trust for Client 1, let alone that AVENATTI submitted to the County of Los Angeles for approval a Special Needs Trust for Client 1.

a.   <u>First</u>, on or about April 5, 2019, after a thorough search of Cal DHCS's records, CA DHCS's Special Needs Trust Unit advised IRS-CI that it does not possess any documents or records relating to an actual or proposed Special Needs Trust for Client 1.

b.   <u>Second</u>, on or about April 9, 2019, after searching LA DPSS's case records from June 2015 to the present, LA DPSS advised IRS-CI that it was unable to locate any Special Needs Trust records relating to Client 1.  LA DPSS also conducted a search for conservatorship/authorized representative documents and found no such records for Client 1.

e.   Information Regarding Client 1's SSI Benefits

34.   As noted above, AVENATTI told Client 1 that AVENATTI
would respond on Client 1's behalf to a request that Client 1
provide SSA information that SSA requested to evaluate
Client 1's continued eligibility for SSI benefits, including
information regarding the settlement agreement with the County
of Los Angeles, the purported Special Needs Trust, and the
monthly payments from AVENATTI.  (See supra ¶ 31.e.)  Based on
discussions with Special Agents with SSA's Office of Inspector
General, I have learned the following:

a.   On or about April 13, 2016, AVENATTI and EA LLP
submitted a letter to SSA on behalf of Client 1.  In this
letter, AVENATTI stated:

> From February 2014 to the present, this law firm has
> been advancing [Client 1] approximately $1,250 a
> month.  As of this time, the court has not entered an
> "award letter" to Client 1.

AVENATTI's statements to SSA appear to be consistent with the
false statements that AVENATTI made to Client 1.

b.   On or about April 8, 2019, SSA advised IRS-CI
that it had searched its files and was unable to locate any
other letters from AVENATTI relating to Client 1.  SSA was also
unable to locate any records of calls to SSA from AVENATTI or EA
LLP.

f.   Information Regarding AVENATTI's Meetings with
Client 1 on March 22, 23, and 24, 2019

35.   The evidence IRS-CI has collected to date demonstrates
that, after AVENATTI was accused of stealing Client 1's money
during a public judgment debtor examination on March 22, 2019,

35

AVENATTI met with Client 1 in an attempt to lull Client 1 and
prevent Client 1 from discovering that AVENATTI had embezzled
Client 1's portion of the $4,000,000 settlement payment.

        a.    <u>First</u>, on or about March 22, 2019, AVENATTI
testified under oath during a judgment debtor examination in <u>In
re: Eagan Avenatti, LLP</u>, No. 8:18-CV-10644-VAP-KES (C.D. Cal.),
in Courtroom 8A of the United States Courthouse in Los Angeles.
Based on my review of a transcript of those proceedings, I
learned that AVENATTI was questioned regarding Client 1.  For
example, AVENATTI was directly asked whether he stole Client 1's
money and responded, "Absolutely not."

        b.    <u>Second</u>, as noted above, Client 1 told IRS-CI that
AVENATTI met with Client 1 at Client 1's residence on March 22,
2019, and that AVENATTI then returned to Client's residence on
March 23 and March 24, 2019, to have Client 1 sign two
documents.

        c.    <u>Third</u>, cell-site and GPS information[21] for
AVENATTI's cellular telephone confirmed that AVENATTI visited
Client 1's residence on March 22, March 23, and March 24, 2019.
Specifically, based on IRS-CI's review of the cell-site and GPS
information, I have learned the following:

        i.    On March 22, 2019, at approximately 6:30
p.m., AVENATTI's cellular telephone was in the vicinity of
Client 1's residence.

---

[21] On March 7, 2019, in case number 8:19-MJ-151, the
Honorable Douglas F. McCormick issued a warrant for historical
cell-site and prospective cell-site and GPS information relating
to the cellular telephone used by AVENATTI.

ii.  On March 23, 2019, at approximately 1:30
p.m., AVENATTI's cellular telephone was in the vicinity of
Client 1's residence.

iii. On March 24, 2019, at approximately 2:30
p.m., AVENATTI's cellular telephone was in the vicinity of
Client 1's residence.

### 2. *Evidence Regarding AVENATTI's Embezzlement of Client 2's Settlement Funds*

36.  There is probable cause to believe that in or about
January 2017, AVENATTI embezzled Client 2's portion of a
$2,750,000 settlement payment from Individual 1.  As set forth
in greater detail below, the evidence collected to date
demonstrates that AVENATTI: (a) negotiated a $3,000,000
settlement with Individual 1 on behalf of Client 2; (b) made
numerous false representations to Client 2 regarding the terms
of the settlement agreement; (c) embezzled Client 2's portion of
the initial $2,750,000 settlement payment from Individual 1 and
used the funds to purchase a private jet; (d) provided Client 2
with monthly payments of approximately $16,000, which AVENATTI
falsely described as monthly settlement payments from
Individual 1, in order to lull Client 2 and prevent Client 2
from discovering that AVENATTI embezzled Client 2's portion of
the initial $2,750,000 settlement payment.

### a. Client 2's $3,000,000 Settlement Agreement with Individual 1

37.  Based on my review of documents IRS-CI obtained
through the investigation, I have learned the following:

37

a.   Between in or about December 2016 and in or about January 2017, EA LLP and AVENATTI represented Client 2 in connection with potential legal claims against Individual 1.

b.   On or about January 7, 2017, during a confidential mediation proceeding in Los Angeles, California, AVENATTI negotiated a settlement agreement between Client 2 and Individual 1.  Under the terms of the settlement agreement, Individual 1 was required to make an initial payment to Client 2 of approximately $2,750,000 by on or about January 28, 2017, and an additional payment to Client 2 of approximately $250,000 on or about November 1, 2020, if certain additional specified conditions were met, for a total of approximately $3,000,000.

c.   Between on or about January 16, 2017, and on or about January 25, 2017, AVENATTI sent Individual 1's lawyer multiple emails regarding the status of the initial $2,750,000 settlement payment.  AVENATTI also left Individual 1's lawyers a number of voicemails regarding the status of the settlement payment and expressing concern that the initial $2,750,000 settlement payment had yet to be received.

d.   On or about January 25, 2017, Individual 1 wired approximately $2,750,000 to EA LLP's CB&T attorney trust account ending in 8671 ("EA Trust Account 8671").

b.   <u>Bank Account Records Relating to the $2,750,000 Settlement Payment and Client 2</u>

38.  Based on IRS-CI's review of bank account records, I have learned the following information regarding the disposition of the initial $2,750,000 settlement payment from Individual 1:

Case 8:19-cr-00061-JVS   Document 78   Filed 01/14/20   Page 275 of 544   Page ID #:1345
Case 8:19-mj-00061-DUTY   *SEALED*   Document 1-1   Filed 03/22/19   Page 275 of
330   Page ID #:568

a.   As of on or about January 1, 2017, the account
balance in EA Trust Account 8671 was approximately $0.23.

b.   On or about January 25, 2017, EA Trust Account
8671 received an approximately $2,750,000 wire transfer from
Individual 1.

c.   On or about January 26, 2017, AVENATTI caused
approximately $2,500,000 to be transferred from EA Trust Account
8671 to a Chase Bank attorney trust account for The X-Law Group
ending in 7608 ("X-Law Account 7608").   That same day, at the
direction of AVENATTI, The X-Law Group wired approximately
$2,500,000 from X-Law Account 7608 to Honda Aircraft Company
LLC.   I understand that these funds were applied to the purchase
of a private Honda jet.

d.   On or about January 26, 2017, AVENATTI also
caused the remaining $250,000 of the $2,750,000 settlement
payment to be transferred from EA Trust Account 8671 to EA
Account 2851 and then from EA Account 2851 to A&A Account 0661.

e.   Between on or about March 15, 2017, and on or
about June 18, 2018, defendant AVENATTI caused approximately 11
payments totaling approximately $194,000 to be deposited into
Client 2's bank account.   These payments were made from a
variety of bank accounts controlled by AVENATTI, including A&A
Account 0661, EA LLP's CB&T attorney trust account ending in
4613 ("EA Trust Account 4613"), EA LLP's CB&T attorney trust
account ending in 3714 ("EA Trust Account 3714"), and a City
National Bank account in the name of "Michal Avenatti Esq."
ending in 3504 ("Avenatti Account 3504").   As noted below,

AVENATTI falsely represented to Client 2 that these 11 payments constituted monthly settlement payments from Individual 1.  (See infra ¶ 39.f.)

        c.   Information Provided by Client 2

39.  On or about April 2, 2019, I participated in an interview with Client 2.  I also participated in a follow-up interview with Client 2 on or about April 8, 2019.  During these interviews, Client 2 provided, in substance and in part, the following information:

        a.   In or about December 2016, Client 2 retained EA LLP and AVENATTI to represent her in connection with potential claims against Individual 1.  Under the terms of the attorney-client fee contract Client 2 signed, a copy of which was provided to IRS-CI, EA LLP was entitled to 33 percent of any recovery obtained prior to the filing of a lawsuit or arbitration claim, and 40 percent of any recovery obtained after the filing of a lawsuit or arbitration proceeding.

        b.   In or about January 2017, Client 2 and AVENATTI attended a mediation with Individual 1 in Los Angeles, California.  At the conclusion of the mediation, AVENATTI told Client 2 that they had reached a settlement with Individual 1.

        c.   Client 2 told IRS-CI she believed that the total settlement amount was $3,600,000.  AVENATTI did not provide Client 2 with an opportunity to read the settlement agreement before Client 2 signed the agreement.  AVENATTI also did not give Client 2 a copy of the settlement agreement.

d.    AVENATTI falsely represented to Client 2 that,
under the terms of the settlement agreement, Individual 1 would
make an initial lump-sum payment, the entirety of which would be
used to pay EA LLP's attorney fees (_i.e._, 33 percent of the
total settlement amount) and costs, and then make approximately
96 monthly payments of approximately $20,000 over the course of
the next eight years by which the remaining settlement funds
would be paid to Client 2.  Client 2, however, understood that
the first 12 monthly payments from Individual 1 would be
approximately $16,000 per month because approximately $4,000 per
month would be deducted to pay for Client 2's rent.[22]

e.    AVENATTI never disclosed to Client 2 that in
January 2015 Individual 1 had wired an initial payment of
$2,750,000 to EA Trust Account 8671.  AVENATTI never disclosed
to Client 2 that AVENATTI used Client 2's portion of the
$2,750,000 settlement payment for his own purposes, including to
purchase a private jet.

f.    Client 2 confirmed that between March 2017 and
June 2018 she received approximately 11 monthly payments
totaling approximately $194,000.  AVENATTI falsely represented
to Client 2 that these monthly payments were coming from
Individual 1 in accordance with the terms of the settlement
agreement.

g.    After Client 2 stopped receiving the purported
monthly settlement payments in or about July 2018, AVENATTI

---

[22] On or about January 24, 2017, AVENATTI also caused a
cashier's check to be purchased from EA Account 2851 for
$51,935, which represented one year's rent for Client 2.

41

represented to Client 2 that Individual 1 was not complying with the settlement agreement. Between July 2018 and March 2019, AVENATTI repeatedly told Client 2 that AVENATTI would work on obtaining the missing monthly settlement payments from Individual 1. Among other things, AVENATTI and Client 2 discussed the possibility of publicly attempting to garnish Individual 1's wages if Individual 1 did not make the monthly payments.

       h. On or about March 24, 2019, AVENATTI met with Client 2 in Los Angeles, California. During this meeting, AVENATTI told Client 2 that Client 2 would soon be receiving a payment from Individual 1 to make up for the purportedly missing monthly settlement payments from Individual 1 for July 2018 through March 2019.

     40. Client 2 also produced documents to IRS-CI, including text message and email communications between Client 2 and AVENATTI. The documents Client 2 produced to IRS-CI appear to be consistent with Client 2's statements to IRS-CI. For example:

       a. On or about July 31, 2018, Client 2 sent AVENATTI a text message stating: "[S]orry to catch up so late but I have not received my deposit. Is there anything we can do about the time, it's become a pattern of them not sending it unless you reach out." AVENATTI responded: "Still? Let me see as this is not right. I'm on it."

       b. On or about September 25, 2018, Client 2 sent AVENATTI a text message stating: "I wanted to follow up on the

deposits and let you know I haven't received anything from them." AVENATTI responded: "???? I will find out what the hell is going on."

        c.    On or about February 24, 2019, Client 2 sent AVENATTI an email regarding a number of topics, including the settlement with Individual 1. The email stated, in part:

> Maybe we can settle the agreement for a lump sum rather than the monthly. From my understanding the original lump sum from the agreement was 33% which covered legal fees the additional to be paid to me stretched over 8 years (2 of which have passed). They are currently 8 months behind on payments totaling $160,000 with the rest of this year and the additional 5 years we are looking at 1.4 Million for a total $1,560,000. Maybe we can find a median to settle for a lump sum payout.

The email also referenced "filing publicly" against Individual 1.

        ***3.    Evidence Regarding AVENATTI's Embezzlement of Settlement Funds from the Super Bowl Litigation and Concealment of the Receipt of Funds from the Super Bowl Litigation During the 2017 EA Bankruptcy***

        41.    There is probable cause to believe that in or about May 2018 AVENATTI embezzled a portion of a $1.55 million settlement received on behalf of the Super Bowl Clients, who were represented by EA LLP in the Super Bowl Litigation. As set forth in greater detail below, the evidence collected to date demonstrates that: (a) on or about May 11, 2018, AVENATTI and EA LLP negotiated a $1,550,000 settlement with the defendants in the Super Bowl Litigation on behalf of the Super Bowl Clients (approximately 200 individual plaintiffs), the litigation that resulted in this settlement was initiated in the Northern District of Texas on or about March 7, 2013; (b) on or about May

15, 2017, AVENATTI requested that approximately $408,724 of the settlement proceeds be transferred to EA Account 2851 and approximately $952,995 be transferred to an attorney client trust account at City National Bank ("CNB"); (c) between July 2017 and October 2018, AVENATTI caused payments totaling approximately $145,222 to be made to approximately 31 of the Super Bowl Clients; (d) AVENATTI used the remainder of the approximately $1.31 million dollars AVENATTI and his law firm received from the settlement of the Super Bowl Litigation for AVENATTI's own personal and business purposes. There is also probable cause to believe that AVENATTI concealed the receipt of settlement proceeds and attorneys' fees from the Super Bowl Litigation during the 2017 EA Bankruptcy.

42. On March 25, 2019, I participated in an interview with J.R., EA LLP's office manager. In response to a question as to whether she was aware of AVENATTI taking money from client funds, J.R. said that the plaintiffs in the Super Bowl Litigation had not all been paid out. When asked how she knew, J.R. stated because some of the Super Bowl Clients called her asking for their portion of the settlement money. When the Super Bowl Clients called, J.R. referred them to AVENATTI. J.R. stated that she knew the settlement funds had come into the firm approximately two years earlier, however, AVENATTI did not authorize her to pay the Super Bowl Clients, even though there had been money available to pay them.

43.  Based on my review of records obtained from EA LLP's co-counsel in the Super Bowl Litigation, C.A., I have learned the following:

a.  On or about May 11, 2018, AVENATTI and EA LLP negotiated a $1,550,000 settlement with the defendants in the Super Bowl Litigation on behalf of the Super Bowl Clients (approximately 200 individual plaintiffs).

b.  On or about May 15, 2017, AVENATTI sent C.A. an email requesting that C.A. transfer approximately $408,725 of the settlement proceeds to EA Account 2851 and transfer approximately $952,995 of the settlement proceeds to an attorney client trust account at CNB ending in 3512 ("Avenatti Trust Account 3512").

44.  Based on IRS-CI's review of bank account records and other records obtained during the investigation, I have learned that between July 2017 and October 2018, AVENATTI caused payments totaling approximately $145,222 to be made to approximately 31 of the approximately 200 Super Bowl Clients.

45.  Based on IRS-CI's review of bank account records, I have learned the following regarding AVENATTI's use of the settlement proceeds from the Super Bowl Litigation, which were transferred from C.A.'s law firm to EA Account 2851 and Avenatti Trust Account 3512:

a.  After C.A.'s law firm wired approximately $408,725 into EA Account 2851 on or about May 17, 2017, AVENATTI used nearly all of the money to pay expenses of EA LLP,

including salary to EA LLP employees, rent, and payments to the
IRS, among others.

        b.    Avenatti Trust Account 3512 was opened on or
about May 17, 2017.  C.A.'s law firm wired approximately
$952,995 of the settlement proceeds to Avenatti Trust Account
3512 that same day.  AVENATTI then caused the following
financial transactions:

        i.    Between May 17 and May 23, 2017, AVENATTI
caused the purchase of three cashier's checks from Avenatti
Trust Account 3512 totaling $640,000, which cashier's checks
were then deposited into Avenatti Account 3504.  Avenatti
Account 3504 was also opened on or about May 17, 2017.

        ii.    Between May 17 and May 23, 2017, AVENATTI
caused three wires transfers totaling $640,000 to be made from
Avenatti Account 3504 to A&A Account 0661.  Substantial portions
of the funds transferred to A&A Account 0661 were then used for
AVENATTI's own purposes, including a $40,000 wire transfer to
C.C., AVENATTI's ex-wife; a $60,000 wire transfer to a bank
account in the name of AVENATTI and L.S.A. (AVENATTI's wife at
the time); and a $150,000 wire transfer to a GBUS bank account.

        iii.    Between June 6 and June 23, 2017, AVENATTI
caused the purchase of three cashier's checks from Avenatti
Trust Account 3512 totaling $300,000, which cashier's checks
were then deposited into Avenatti Account 3504.  During this
same time period, AVENATTI caused three wire transfers totaling
approximately $310,000 to be made from Avenatti Account 3504 to
A&A Account 0061.

46.   I have also participated in telephonic interviews of two of the Super Bowl Clients in the Super Bowl Litigation, who provided in substance and in part the following information:

a.   On March 27, 2019, I participated in an interview of D.W.  D.W. retained EA LLP to represent him against the NFL in D.W.'s attempt to obtain a refund for the tickets he purchased and other expenses related to his experience attending the 2011 Super Bowl in Dallas.  D.W. provided EA LLP with all of his receipts regarding his expenses, which totaled $7,045.  D.W. stated that J.R. was his contact at EA LLP, and after D.W. learned that there was a settlement with the NFL, D.W. called at least fifteen to twenty times in an attempt to find out what money he would be receiving.  He did not recall the exact date, but a few months prior to the telephonic interview with IRS-CI, D.W. stated that AVENATTI had contacted D.W. and told D.W. that he would get his money back.  To date, D.W. had not received any settlement money.

b.   On April 17, 2019, I participated in an interview of D.B.  D.B. retained EA LLP to represent him against the NFL in D.B.'s attempt to obtain a refund for the tickets and other expenses related to his experience attending the 2011 Super Bowl in Dallas.  D.B. had correspondence with at least two people at EA LLP, but had no contact with AVENATTI.  D.B. recalled receiving information from J.R. that a settlement had been reached with the NFL for about 200 victims, and that D.B. fell within one of the three types of victims that would be receiving settlement funds, but that D.B. needed to wait a few weeks for

47

all of the settlement funds to be worked out. D.B. called and
emailed EA LLP numerous times about his settlement money, but he
never got responses. D.B. stated that his claim against the NFL
was for $5,269, but he still has yet to receive a dime in
settlement money.

47. I have reviewed the Confidential Settlement Agreement
and Release in the Super Bowl Litigation, which was a settlement
on behalf of the approximately 200 plaintiffs listed in Exhibit
A of the settlement agreement (_i.e._, the Super Bowl Clients").
The agreement provided, among other things, that "The NFL shall
pay to the plaintiffs an aggregate total sum of $1,550,000.00
("Settlement Consideration") on or before May 18, 2017."
AVENATTI signed the settlement agreement on behalf of the Super
Bowl Clients on or about May 11, 2017. Both D.W. and D.B. are
listed in Exhibit A of the settlement agreement as plaintiffs
entitled to the benefit of the settlement consideration.[23]

48. Based on my review of documents from the 2017 EA
Bankruptcy, _In re: Eagan Avenatti LLP_, No. 8:17-bk-11961-CB, and
other evidence IRS-CI has collected during this investigation, I
have learned the following:

a. AVENATTI failed to disclose on the MOR for EA LLP
for the period May 1, 2017, through May 30, 2017 (the "May 2017
MOR") the funds AVENATTI received from the Super Bowl

---

[23] The privilege review team and other agents executing the
search will be provided with the names of the Super Bowl Clients
from the Super Bowl Litigation before conducting a search of the
SUBJECT DEVICES for non-privileged material.

Litigation.  AVENATTI signed the May 2017 MOR on behalf of EA LLP under the penalty of perjury.

      b.    AVENATTI failed to disclose to the Bankruptcy Court and the U.S. Trustee the existence of Avenatti Trust Account 3512 and Avenatti Account 3504, both of which appear to have been used to conceal the receipt of the settlement funds from the Super Bowl Litigation.

      c.    On or about June 12, 2017, defendant testified under oath at the Section 341(a) debtor's examination in the 2017 EA Bankruptcy and stated "no" when asked whether the debtor, EA LLP, had received any counsel fees from the Super Bowl Litigation.  In truth and in fact, as discussed above in paragraphs 43 to 44, AVENATTI knew that AVENATTI and EA LLP had received fees from the Super Bowl Litigation, namely, two wire transfers totaling approximately $1,361,000, including attorneys' fees, on or about May 17, 2017.

**E.**    **Evidence Relating to Augustus LLP**

49.    Based on my review of the evidence IRS-CI has collected during this investigation to date, I have learned the following regarding Augustus LLP:

      a.    On March 25, 2019, during the interview with J.R., the office manager for EA LLP, J.R. stated that "Augustus LLP" is the name of a new company and/or law firm AVENATTI was starting.

      b.    I have reviewed Union Bank records that show that on or about February 13, 2019, AVENATTI caused business bank accounts at Union Bank to be opened under Augustus LLP.  The

application to open the accounts listed AVENATTI's home address
at 10000 Santa Monica Blvd, Unit 2107, Los Angeles, California,
as the mailing address for Augustus LLP.  On the forms submitted
to Union Bank regarding the accounts, AVENATTI was listed as the
owner/partner of the business and had signature authority over
the accounts, as did J.R., who was listed as the office manager.
The Augustus LLP bank records at Union Bank further reveal:

       i.   On or about March 19, 2019, at least twelve
cashier's checks were purchased from Union Bank from the
Augustus LLP accounts, including several made payable to
individuals who were previously employed by EA LLP, as well as a
$22,400 cashier's check made payable to SM10000 Property LLC,
the property management company of AVENATTI's personal
residence, for February and March rent.

       ii.  On or about March 21, 2019, AVENATTI caused
a wire transfer in the amount of $1,398 to be paid to an
assisted living facility for Client 1's rent;

       iii. On or about March 22, 2019, AVENATTI caused
a wire transfer in the amount of $6,000 to be paid to Client 2;

       iv.  AVENATTI also caused checks and cashier's
checks to be written from the Augustus LLP bank account at Union
Bank to attorneys that have represented AVENATTI in various
legal matters.

       c.   I know from my review of IRS records based on
information submitted to the IRS regarding Augustus LLP, that
AVENATTI was listed as the general partner of Augustus LLP and
AVENATTI's personal residence was listed as the business's

Case 8:19-cr-00061-JVS  Document 78  Filed 01/14/20  Page 287 of 544  Page ID #:1357
Case 8:19-mj-00061-DUTY  *SEALED*  Document 1-1  *SEALED*  Filed 04/24/19  Page 51 of
330  Page ID #:580

address.  In addition, the records indicate that Augustus LLP
was established in December 2018 and is required to file Form
1065 partnership returns on an annual basis.

       d.    Based on my training and experience and the
investigation to date, I believe that Augustus LLP is the latest
in the line of companies that AVENATTI has used and is using to
pay for both personal and business expenses and possibly launder
the proceeds of his prior wire fraud scheme.

**F.   Probable Cause to Search the SUBJECT DEVICES**

       ***1.    SUBJECT DEVICES 1 through 6 Obtained from MixinIT***

       50.   During the interview with IRS-CI on March 25, 2019,
J.R., the office manager for EA LLP, stated, among other things,
that EA LLP had previously maintained its computer servers at EA
LLP's offices at 520 Newport Center Drive, in Newport Beach,
California.  J.R. further said that, when EA LLP received notice
that it would be evicted from its offices in or around October
or November 2018, AVENATTI caused the EA LLP servers to be moved
to MixinIT, a company in Orange County that stored and managed
computer servers.

       51.   On March 28, 2019, MixinIT provided records in
response to a subpoena showing that EA LLP had contracted with
MixinIT to store EA LLP's servers starting on November 19, 2018.

       52.   On April 3, 2019, the court-appointed receiver[24] for EA
LLP authorized agents from IRS-CI to take possession of the EA

---

    [24] EA LLP is currently a Judgment Debtor in a litigation
with a former partner of EA LLP that arose from the 2017 EA LLP
Bankruptcy.  On February 12, 2019, the former partner filed a

LLP servers from MixinIT, house the servers at IRS-CI's forensic lab, and create a forensic image of the servers.

53. On April 4, 2019, based on the consent of the court-appointed receiver, IRS-CI SA Nshan Tashchyan and SA John Weeks obtained SUBJECT DEVICES 1 through 6, which comprised the EA LLP servers, from MixinIT. After bringing SUBJECT DEVICES 1 through 6 to IRS-CI's forensic lab in Laguna Niguel, California, IRS-CI began making a forensic image of SUBJECT DEVICES 1 through 6. The forensic image of SUBJECT DEVICES 1 through 6 was completed on April 19, 2019.

54. Based on the evidence collected during the course of this investigation, there is probable cause to believe that evidence of the Subject Offenses will be found on SUBJECT DEVICES 1 through 6, which comprise the EA LLP servers. For example:

a. During March 25, 2019, interview with IRS-CI, J.R. stated that she can work on EA LLP matters remotely using a desktop connection, which allows her to use her EA LLP email as well as to access QuickBooks and excel spreadsheets. J.R. stated that the EA LLP emails were backed up on the EA LLP

---

motion in the litigation seeking the appointment of a receiver for EA LLP and accusing AVENATTI of bankruptcy fraud. On February 13, 2019, AVENATTI acting on behalf of EA LLP, stipulated to the appointment of Brian Weiss as the EA LLP Receiver and consented to the jurisdiction of the Honorable Karen E. Scott, United States Magistrate Judge, to enter an order appointing the EA LLP Receiver. Judge Scott entered the order appointing the EA LLP Receiver later that same day. The order stated, among other things, that the EA LLP Receiver shall have the power to take possession of and manage the business of EA LLP. The order further required that EA LLP and AVENATTI immediately turn over all EA LLP property to the EA LLP Receiver and provide access to all EA LLP computer systems.

servers stored at MixinIT.  J.R. stated when she logged into the servers remotely, she had access to emails and could download EA LLP documents like a virtual desktop.  J.R. stated in or around December 2018, around the time EA LLP was evicted from its offices, EA LLP obtained a service, Voice Nation, to answer the phone calls and the service sent the voicemails for AVENATTI to MA@augustusLLP.com and other voicemails to JR@augustusLLP.com.

b.     During the course of this investigation, I have reviewed evidence relating to the Subject Offenses including emails sent to and from AVENATTI and J.R. in which AVENATTI and J.R. used their EA LLP email addresses.  Many of the emails that I have reviewed that were sent to and from AVENATTI and J.R. also contained attachments that related to the Subject Offenses.

c.     I have reviewed under oath testimony that AVENATTI provided during the EA LLP Bankruptcy proceedings, as well as during judgment debtor examinations relating to litigation with his former partner.  In response to various questions about where AVENATTI kept financial documents and contracts, among other items, AVENATTI testified that they would have been kept at his offices.  During a judgment debtor examination on March 15, 2019, AVENATTI testified that he sometimes connects to a server when working on his computer.

55.  In addition to the foregoing facts, based my training and experience and discussions with other law enforcement agents who have investigated tax offenses and complex fraud schemes, as described more fully in my March 2019 affidavit (see Ex. 3,

§ VII),[25] I believe SUBJECT DEVICES 1 through 6, namely, the EA
LLP servers, will contain evidence of the Subject Offenses,
including, among other items, emails and attachments that
AVENATTI and J.R. sent and received from their EA LLP email
addresses, financial documents and records, and other personal
and business records.

### 2. SUBJECT DEVICES 7 Through 10 Obtained During AVENATTI's Arrest

56. On March 25, 2019, federal agents arrested AVENATTI in
New York and found several digital devices among his personal
belongings, including the original digital devices from which
SUBJECT DEVICES 7 through 9 were forensically imaged.  In
addition, federal agents seized miscellaneous documents from
AVENATTI's briefcase upon his arrest, and these documents were
scanned and saved on SUBJECT DEVICE 10.  On or about May 17,
2019, and May 22, 2019, the SDNY USAO provided to IRS-CI SUBJECT
DEVICE 10, and SUBJECT DEVICES 7 through 9, respectively, which
are currently held in the custody of IRS-CI in Santa Ana,
California.

57. Based on the evidence set forth herein and in my prior
affidavits, and my training and experience and discussions with
other law enforcement agents who have investigated tax offenses
and complex fraud schemes, which is described more fully in my
March 2019 affidavit (see Ex. 3, § VII), I believe SUBJECT
DEVICES 7 through 10 will likely contain other evidence of the

---

[25] The March 2019 affidavit included a section detailing my
training, experience, and knowledge of tax offenses and fraud
schemes (see Ex. 3, § VII), which is incorporated by reference
herein.

Subject Offenses, including, among other items, emails and
attachments that AVENATTI and J.R. sent and received from their
EA LLP email addresses, financial documents and records, and
other personal and business records.

58.   Additionally, SUBJECT DEVICES 7 through 9, are the
forensic images of three USB drives that were found on
AVENATTI's person upon arrest, while AVENATTI was in New York on
March 25, 2019.   SUBJECT DEVICE 10 contains miscellaneous
documents AVENATTI had on his person at the time of his arrest.
As stated above, AVENATTI met with Client 1 and Client 2 on
March 22, 23, and 24, 2019 (see supra ¶¶ 35, 39.h), prior to
travelling to New York on the evening of March 24, 2019.   I
therefore believe documents, correspondence, and records
relating to AVENATTI's meetings with these two clients in the
days immediately prior to his arrest, as well as documents
relating to AVENATTI's and EA LLP's representation of Client 1
and Client 2, are likely to be found on SUBJECT DEVICES 7
through 10.

G.   **The April 10, 2019, Indictment**

59.   On April 10, 2019, a grand jury in the Central
District of California returned a thirty-six count indictment
against AVENATTI, which included the following charges: (a) ten
counts of wire fraud, in violation of 18 U.S.C. § 1343,
involving AVENATTI's embezzlement of his clients' funds;
(b) eight counts of willful failure to collect and pay over
withheld taxes, in violation of 26 U.S.C. § 7202, relating to
AVENATTI's and GBUS's failure to pay over to the IRS payroll

55

Case 8:19-cr-00061-JVS Document 78 Filed 01/14/20 Page 292 of 544 Page ID #:1362
Case 8:19-mj-00061-DUTY SEALED Document 44-2 ARISE Filed 03/28/19 Page 302 of
330 Page ID #:585

taxes that had been withheld from GBUS employee' paychecks;
(c) one count of endeavoring to obstruct the administration of
the Internal Revenue Code, in violation of 26 U.S.C. § 7212(a),
relating to AVENATTI's attempt to obstruct and impede the IRS's
attempts to collect the payroll taxes GBUS owed to the IRS;
(d) ten counts of willful failure to file tax returns, in
violation of 26 U.S.C. § 7203, relating to AVENATTI's failure to
file individual tax returns for 2014 through 2017, failure to
file partnership tax returns for EA LLP for 2015 through 2017,
and failure to file corporate tax returns for A&A for 2015
through 2017; (e) two counts of bank fraud, in violation of 18
U.S.C. § 1344(1), relating to two loans AVENATTI obtained from
The People's Bank in 2014; (f) one count of aggravated identity
theft, in violation of 18 U.S.C. § 1028A(a)(1), relating to the
use of another person's means of identification in furtherance
of the bank fraud offense; (g) three counts of false declaration
in a bankruptcy, in violation of 18 U.S.C. § 152(3), relating to
AVENATTI's failure to disclose all of EA LLP's receipts on EA
LLP's monthly operating reports; and (h) one count of false oath
in a bankruptcy proceeding, in violation of 18 U.S.C. § 152(2),
related to AVENATTI's false testimony at a Section 341(a)
hearing during EA LLP's bankruptcy.  A copy of the indictment in
United States v. Michael John Avenatti, SA CR 19-61-JVS, is
attached hereto as Exhibit 4 and incorporated herein by
reference.

## V.    POTENTIAL PRIVILEGE ISSUES

60.  As noted in my March 2019 affidavit, and above,
AVENATTI is a licensed attorney and EA LLP and A&A are  law
firms.  (See Ex. 3, § VII.)  I also understand that at various
times AVENATTI, EA LLP, and/or A&A may have had attorney-client
relationships with other attorneys, including the following law
firms: (a) Foster Pepper PLLC; (b) Osborn Machler PLLC;
(c) Eisenhower Carlson PLLC; (d) Talmadge/Fitzpatrick/Tribe,
PPLC; (e) The Brager Tax Law Group; (f) SulmeyerKupetz;
(g) Baker & Hostetler LLP; (h) Shulman Hodges & Bastian LLP;
(i) Legal & Tax Consulting Group; (j) Pachulski Stang Ziehl &
Jones LLP; (k) Foley & Lardner LLP; (l) Raines Feldman, LLP; and
(m) Pansky Markle Attorneys at Law.  (See id.)

61.  Although the proposed search warrant primarily seeks
financial records and non-privileged information, there is a
significant likelihood that the SUBJECT DEVICES will contain
documents and records that are covered by the attorney-client
privilege or attorney-work-product doctrine.  Accordingly,
Attachment B to the proposed search warrant contains specific
procedures designed to avoid unnecessary disclosures of any
privileged attorney-client communications or attorney-work-
product.

62.  The privileged information sought by the proposed
search warrant is limited to the following former clients or
potential clients of AVENATTI, EA LLP, and A&A:  (a) GBUS;
(b) Client 1; (c) Client 2; (d) Client 3; and (e) Client 4 and
Client 5.  Each of these former clients or potential clients,

however, has already executed a written waiver of the attorney-client-privilege.

     a.  <u>First</u>, as noted in my February 2019 affidavit, on February 19, 2019, the Chapter 7 bankruptcy trustee for GBUS (the "GBUS Trustee") executed a written waiver of the attorney-client privilege as to any communications between GBUS's officer, directors, employees, and agents, and any lawyer acting on GBUS's behalf, including any communications with AVENATTI. (Ex. 1, ¶ 83.a.)  A copy of the GBUS Trustee's written waiver of the attorney-client privilege was attached as Exhibit 1 to my February 2019 affidavit.

     b.  <u>Second</u>, on April 4, 2019, Client 1 executed a written waiver of the attorney-client privilege and attorney-work-product protections as to legal advice Client 1 sought or received from EA LLP, AVENATTI, and any other current or former EA LLP officers, directors, employees, or agents.  Client 1 also consented to the government's search of any of EA LLP's or AVENATTI's files relating to EA LLP's and AVENATTI's representation of Client 1.  A redacted copy of Client 1's written waiver of the attorney-client privilege is attached hereto as Exhibit 5.

     c.  <u>Third</u>, on April 8, 2019, Client 2 executed a written waiver of the attorney-client privilege and attorney-work-product protections as to legal advice Client 2 sought or received from EA LLP, AVENATTI, F.M. (an attorney with the X-Law Group), and any other current or former EA LLP officers, directors, employees, or agents.  Client 2 also consented to the

58

government's search of any of EA LLP's or AVENATTI's files relating to EA LLP's and AVENATTI's representation of Client 2. A redacted copy of Client 2's written waiver of the attorney-client privilege is attached hereto as Exhibit 6.

d.   Fourth, on March 18, 2019, Client 3 executed a written waiver of the attorney-client privilege and attorney-work-product protections as to any legal advice Client 3 sought or received from EA LLP, AVENATTI, and any other current or former EA LLP officers, directors, employees, or agents.  Client 3 also consented to the government's search of any of EA LLP's and AVENATTI's files relating to EA LLP's and AVENATTI's representation of Client 3.  A redacted copy of Client 3's written waiver of the attorney-client privilege is attached hereto as Exhibit 7.

e.   Fifth, on April 4, 2019, Client 4 and Client 5 executed written waivers of the attorney-client privilege and attorney-work-product protections as to legal advice Client 4 and Client 5 sought or received from EA LLP, AVENATTI, F.M., and/or any other current or former officers, directors, employees, or agents of EA LLP.  Client 4 and Client 5 also consented to the government's search of the files of EA LLP, AVENATTI, and F.M. relating to the representation of Client 4 and Client 5.  A redacted copy of Client 4's and Client 5's written waivers of the attorney-client privilege are attached hereto as Exhibit 8.

63.  I am aware that AVENATTI represented the plaintiff in Stephanie Clifford v. Donald J. Trump, No. 2:18-CV-2217-SJO-FFM

59

(C.D. Cal.), a lawsuit against the President of the United States.[26]  I am also aware that AVENATTI represented Julie Swetnick, an individual who accused United States Supreme Court Justice Brett Kavanaugh of sexual assault in connection with Justice Kavanaugh's confirmation hearing in or around September 2018.  Attachment B to the proposed search warrant specifically requires, in addition to the procedures to avoid unnecessary disclosure of attorney-client privileged materials and attorney-work-product, that any materials relating to AVENATTI's representation of Ms. Clifford or Ms. Swetnick that are identified by the Privilege Review Team, other than financial and accounting records identified in paragraphs 1.d, 1.f, 1.g, and 1.r of Attachment B, be segregated and not further reviewed absent subsequent authorization from this Court.[27]

64.  Attachment B to the proposed search warrant also sets forth a procedure to allow EA LLP, AVENATTI, and/or others to seek the appointment of a special master within seven days of

---

[26]  On May 22, 2019, AVENATTI was indicted in the Southern District of New York for wire fraud and aggravated identity theft, in connection with a scheme to defraud Ms. Clifford out of approximately $148,000.  Although we are not seeking to seize information relating to AVENATTI's representation of Ms. Clifford at this time, such information could be relevant to this investigation at a later date or to the SDNY USAO's investigation.

[27]  Other than non-privileged financial or accounting records that may reference these representations, the only documents or records relating to these representations that may fall within the scope of the items to be seized would likely be engagement letters and/or client billing records.  Nevertheless, due the nature of these representations and the parties at issue therein, the privilege review protocols set forth in Attachment B to the proposed warrant calls for any such records to be segregated and not further reviewed once identified.

the execution of the proposed search warrants.[28]  Although the government does not believe that the appointment of a special master would be necessary in this investigation, the government has included this provision to ensure that any such request is handled in a timely manner and does not unnecessarily delay IRS-CI's ongoing criminal investigation.

## VI.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES

65.  The March 2019 affidavit also included a section detailing my training experience on digital devices (see Ex. 3, § IX), which is incorporated by reference herein.

66.  The search of the SUBJECT DEVICES will likely take a considerable amount of time for multiple reasons.  First, I understand that the SUBJECT DEVICES contain approximately 10-15 terabytes of data.  Second, the search of the SUBJECT DEVICES will require the use of a Privilege Review Team and the search protocols set forth in Attachment B to the search warrant application.

67.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. REQUEST FOR SEALING

68.  I request that the search warrant, the search warrant application, and this affidavit be kept under seal to maintain the integrity of this ongoing investigation until further order

---

[28] An identical provision was included in Attachments B-1 through B-3 of the March 2019 warrants.  To date, no request for the appointment of a special master has been made following the execution of the March 2019 warrants on March 25, 2019.

of the Court, or until the government determines that these
materials are subject to its discovery obligations in connection
with criminal proceedings, at which time they may be produced to
defense counsel.

      a.   <u>First</u>, this criminal investigation is ongoing and
not all aspects of the investigation are public or known to
AVENATTI and other potential subjects of the investigation.
Although the government anticipates producing the search
warrant, the search warrant application, and this affidavit to
defense counsel for AVENATTI shortly after the execution of the
search warrants, public disclosure of these materials could
cause other subjects of the government's ongoing investigation
to accelerate any existing or evolving plans to, and give them
an opportunity to, destroy or tamper with evidence, tamper with
or intimidate witnesses, change patterns of behavior, or notify
confederates.

      b.   <u>Second</u>, IRS-CI is still in the process of
interviewing additional witnesses and subjects as part of its
ongoing investigation.  This affidavit and the March 2019
Affidavit, which remains sealed and is attached as an exhibit
hereto, contain information regarding additional areas of
investigation and certain facts regarding the pending charges
against AVENATTI that are not publicly known at this time.
Public disclosure of such information provide witnesses and
other subjects of the investigation an opportunity to coordinate
their statements prior to being interviewed by IRS-CI.

       c.   <u>Third</u>, this Affidavit and the sealed March 2019 Affidavit contain detailed information regarding AVENATTI's victim-clients and cooperating government witnesses.  Although the identities of some of AVENATTI's victim-clients and some of the government's witnesses have now been reported in the press, the government is concerned that premature public disclosure of this affidavit will unnecessarily impact the victim-clients and witnesses right to privacy.  This is particularly true given the high-profile nature of the prosecution against AVENATTI.

**VIII.**       <u>CONCLUSION</u>

    69.  For the reasons described above, I respectfully submit there is probable cause to believe that evidence, fruits, and instrumentalities of the Subject Offenses, as described with particularity in Attachment B, will be found on the SUBJECT DEVICES, as described with particularity in Attachment A.

 

                                   /s/
                                   Remoun Karlous, Special Agent
                                   Internal Revenue Service –
                                   Criminal Investigation

 

Subscribed to and sworn before me
this <u>24</u>th day of May, 2019.

## DOUGLAS F. McCORMICK

HONORABLE DOUGLAS F. McCORMICK
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT 4

## SETTLEMENT AGREEMENT AND RELEASES

This Settlement Agreement and Releases ("Agreement") is entered into this 12th day of December 2017 by and between Jason Frank Law, PLC, a professional law corporation organized in California ("JFL"), Jason Frank ("FRANK"), an individual, Scott Sims ("SIMS"), an individual, Andrew Stolper ("STOLPER"), an individual, and Frank Sims & Stolper LLP, a limited liability partnership organized in California ("FSS") (collectively, the "JFL Parties"), on the one hand, and Eagan Avenatti LLP ("EA"), a limited liability partnership organized in California, Avenatti & Associates, APC ("A&A"), a professional corporation organized in California, Michael Avenatti ("AVENATTI"), an individual, and Michael Eagan, an individual ("EAGAN") (collectively, the "EA Parties"), on the other hand. The JFL Parties and EA Parties are collectively referred to as the "Parties."

WHEREAS, JFL and FRANK entered into an Independent Contractor Agreement with EA effective November 1, 2013 (the "JFL Agreement") and prior to that time FRANK had been an employee of EA;

WHEREAS, SIMS entered into an Employment Agreement with EA dated March 1, 2014 (the "SIMS Employment Agreement");

WHEREAS, on or about February 28, 2016, JFL filed a Demand for Arbitration with JAMS against EA asserting claims for damages and other remedies for breach of contract, which demand was later amended to include claims for fraud, unjust enrichment, declaratory relief and punitive damages (the "JFL Arbitration");

WHEREAS, on or about May 20, 2016, JFL, FRANK, SIMS and STOLPER ceased practicing law at EA and formed a new law firm, FSS;

WHEREAS, the clients in the matters listed on Exhibit "A" (attached hereto) (collectively, the "Matters") terminated EA as their counsel in the Matters and retained FSS as their counsel in certain of the Matters;

WHEREAS, EA asserted attorneys' liens in the Matters and/or claimed it had the right to recover its reasonable attorneys' fees and costs for the work performed at EA on the Matters;

WHEREAS, on or about July 22, 2016, EA filed a Demand for Arbitration with JAMS against EA's former client, Kimberly Birbrower, seeking to recover fees and costs in the Birbrower v. Quorn Foods, Inc. matter, which is one of the Matters (the "EA/Birbrower Arbitration");

WHEREAS, on or about August 9, 2016, SIMS filed a Demand for Arbitration with JAMS against EA seeking certain sums owed under the SIMS Employment Agreement, including claims for breach of contract, fraud, accounting and constructive trust (the "SIMS Arbitration");

WHEREAS, on or about September 23, 2016, EA filed counterclaims against SIMS in the SIMS Arbitration asserting claims for breach of contract, fraud, violation of the California Uniform Trade Secret Act, breach of fiduciary duty, breach of duty of loyalty, conversion, accounting, and constructive trust;

WHEREAS, on or about September 12, 2016, EA filed counterclaims against JFL in the JFL Arbitration asserting claims for breach of contract, fraud, breach of fiduciary duty, breach of duty of loyalty, conversion, accounting, constructive trust and tortious interference;

WHEREAS, on or about December 15, 2016, EA filed a complaint in California Superior Court, County of Orange, Case No. 30-2016-00892564-CU-BC-CJC against its former client, William Scott Callaway, seeking to recover fees and costs in the Callaway v. Mercedes Benz USA, Inc. et al. matter, which is one of the Matters (the "EA/Callaway Lawsuit");

WHEREAS, on or about December 21, 2016, EA filed a complaint in California Superior Court, County of Orange, Case No. 30-2016-00893847-CU-MC-CJC against Paul Root and Madison Street Partners, Inc. asserting claims for aiding and abetting breach of duty of loyalty and aiding and abetting fraud (the "EA/Root Lawsuit");

WHEREAS, on or about February 8, 2017, EA's former clients, Authentic Entertainment Properties, LLC and Authentic Entertainment Properties Development, LLC (collectively "AEP") filed a Demand for Arbitration with JAMS against EA seeking declaratory relief and damages relating to EA's former representation of AEP in the AEP v. Royal Center Associates, LLC et al. matter, which is one of the Matters (the "AEP/EA Arbitration");

WHEREAS, on or about February 28, 2017, EA filed a motion to adjudicate its attorney lien against AEP in the District Court for Clark County Nevada, in the AEP v. Royal Center Associates, LLC et al. matter, which such motion was denied and is currently being appealed by EA;

WHEREAS, on or about March 1, 2017, an Involuntary Bankruptcy Petition against EA, seeking that EA be a debtor in a Chapter 11 case was filed in the Middle District of Florida, Case No. 6:17-bk-01329-KSJ (the "Bankruptcy Case");

WHEREAS, on or about March 10, 2017, EA consented to entry of Order for Relief in the Bankruptcy Case;

WHEREAS, on or about May 16, 2017, the Bankruptcy Case was transferred to the Central District of California, Santa Ana Division, before the Honorable Catherine E. Bauer (the "Bankruptcy Court"), and assigned a new case number 8:17-bk-1191-CB;

WHEREAS, on or about June 19, 2017, JFL filed a Proof of Claim in the Bankruptcy Case in the amount of not less than $18,615,886, which included (a) $12,396,633 in unpaid compensation under the JFL Agreement; (b) $1,868,221 in prejudgment, prepetition interest; (c) $500,000 in pre-petition attorneys' fees and costs; and (d) fraud damages and punitive damages in an unliquidated amount but likely in excess of $4,000,000;

137774123.8                                    2

WHEREAS, on or about June 19, 2017, FRANK, SIMS, STOLPER and FSS also filed Proofs of Claim in the Bankruptcy Case;

WHEREAS, on or about July 12, 2017, JFL filed a motion for relief from stay to proceed with the JFL Arbitration [Bankruptcy Case Docket Nos. 155, *et al.*] ("JFL RFS Motion"), the Debtor and certain other parties filed oppositions to the JFL RFS Motion, JFL filed a reply to those oppositions, a hearing on the JFL RFS Motion commenced on August 9, 2017 and was continued by direction of the Bankruptcy Court until September 20, 2017 and repeated times thereafter through and including December 13, 2017;

WHEREAS, AVENATTI is the managing member and majority equity holder of EA and solely owns and controls A&A;

WHEREAS, JFL, FRANK and SIMS have asserted that AVENATTI is personally liable to them for all or substantially all claims they have against EA and that A&A may be liable to them, all of which Avenatti and A&A dispute;

WHEREAS, it is in the personal, professional and business interests of AVENATTI and the professional and business interests of EA and A&A that the disputes among the JFL Parties and EA Parties be resolved promptly and each has concluded that he/it will received meaningful value if this Agreement is executed, approved and fully satisfied; and

WHEREAS, the Parties desire to resolve any and all disputes between them on the terms set forth herein (the "Settlement");

NOW THEREFORE, for and in consideration of the mutual covenants contained herein and for other good and valuable consideration, the sufficiency of which is hereby acknowledged, the Parties agree as follows:

## 1.    **Dismissal of Bankruptcy Case.**

1.1.    Subject to Paragraph 1.5 below, the effectiveness of the terms and obligations of this Agreement are contingent upon (a) EA filing a motion ("Settlement and Dismissal Motion") with the Bankruptcy Court seeking entry of one or more orders (the "Orders") approving the Settlement and authorizing and directing the Debtor to fully comply with all terms of this Agreement pursuant to Fed. R. Bankr. Pro. 9019 ("Settlement Order"), and dismissing the Bankruptcy Case, pursuant to Bankruptcy Code Section 1112(b) ("Dismissal Order"), on terms acceptable to JFL and EA, on or before January 3, 2018,with a hearing on the Settlement and Dismissal Motion to be held on January 24, 2018; (b) entry of the Orders on or before January 31, 2018; (c) the Bankruptcy Case being dismissed within sixteen (16) calendar days after entry of the Dismissal Order; (d) execution of the Guaranty Agreement (as defined below), on or before December 12, 2017; and (e) if a stay of the Settlement Order or Dismissal Order has been entered pursuant to Rule 8007 of the Federal Rules of Bankruptcy Procedure ("Rule 8007"), a

Termination Notice, as defined in Paragraph 1.5 below, having not been provided by JFL or EA. The proposed Order(s) are attached as Exhibit B.

1.2.    The JFL Parties will not oppose any of the relief sought in the proposed Orders, nor will they encourage others to do so, all subject to the timely satisfaction of the deadlines set forth herein (collectively "Deadlines").

1.3.    In the event the Orders are not entered by the Deadlines for their entry, or the Guaranty Agreement is not executed by the pertinent Deadline for its execution, the Parties shall be returned to the *status quo ante* prior to their execution of this Agreement, and the Agreement shall be deemed null and void, and neither this Agreement, its execution nor any statements contained therein may be used in any subsequent proceedings in any court or arbitration.

1.4.    The hearing on the JFL RFS Motion shall be continued until January 24, 2018.

1.5.    If a stay of the Settlement Order or Dismissal Order is entered pursuant to Rule 8007 (a "Stay Order") or if the terms of this Agreement are materially modified by the Court, then JFL or EA may elect to withdraw from and terminate this Agreement, in which case this Agreement and all Orders entered thereon will be rescinded and all Parties will be restored to the *status quo ante* prior to the execution of this Agreement, and the Agreement shall be deemed null and void, and neither this Agreement, its execution nor any statements contained therein may be used in any subsequent proceedings in any court or arbitration. If JFL or EA elects to exercise this right to terminate this Agreement, it shall provide notice of this election to the other parties to this Agreement, in writing, within five (5) business days after the Stay Order is entered (the "Termination Notice"). Upon such election, the Parties will cooperate in taking any action necessary to request that the appropriate court vacate the Settlement Order, the Dismissal Order and Stay Order, and will not object to or oppose such actions.

1.6.    If a Stay Order is issued and neither JFL or EA elect to terminate the Agreement in accordance with Paragraph 1.5, then the time for performing all obligations under this Agreement will commence upon the later of: (a) sixteen (16) calendar days after the Stay Order is no longer in effect provided that the Settlement Order and Dismissal Order have been affirmed; or (b) the time when the obligation would have otherwise been required to be performed under the terms of this Agreement.

## 2.    Resolution of EA's Asserted Liens and Right to Attorneys' Fees and Costs in the Matters.

2.1.    Within sixteen (16) calendar days of entry of the Dismissal Order, and provided no stay of the Settlement Order or Dismissal Order having been issued pursuant to Rule 8007, EA will withdraw all purported liens asserted in the Matters and will forever waive and forego, with prejudice and finality, any present or future claims for attorneys' fees, costs, expenses, damages, or any other compensation or remedies arising out of or relating to the Matters.

2.2.    Upon the sixteenth (16th) day following the entry of the Settlement Order, and provided no stay of the Settlement Order or Dismissal Order having been issued pursuant to Rule 8007, the EA Parties will be deemed to have released and forever waived and foregone, with prejudice and finality, any present or future claims for damages, legal fees and costs, or other remedies against (a) the JFL Parties, (b) the current, prior or future parties in the Matters; (c) the current, prior or future co-counsel of EA or FSS in the Matters, or (d) any other party or their counsel for claims arising out of or relating to the Matters, as more fully set forth in Section 5 of this Agreement.

2.3.    In exchange for the consideration provided under the terms of this Agreement, JFL has agreed to reduce its claim in the Bankruptcy Case, as set forth in paragraph 3.1, below, and SIMS, FRANK, STOLPER and FSS have agreed to waive, forego and withdraw each of their claims in the Bankruptcy Case, subject to and except for the terms of the Releases provided in Paragraph 5 below and compliance with the terms and conditions of this Agreement.

2.4.    In addition, the JFL Parties have agreed that EA will receive 50% of any and all legal fees which would otherwise be paid to FSS or FRANK in the future in connection with FSS's contingency agreement with AEP in the AEP v. Royal Center Associates, LLC et al. matter. This arrangement will be documented in a separate written agreement between EA, AEP and FSS (the "AEP Fee Sharing Agreement"), the execution of which shall be required for this Agreement to take effect. A copy of the AEP Fee Sharing Agreement is attached as Exhibit C.

3.      **Settlement Payments to JFL.**

3.1.    Upon entry of the Settlement Order, JFL will have an allowed claim against EA in the amount of TEN MILLION DOLLARS ($10,000,000.00), which claim ("JFL Allowed Claim") of JFL and liability of EA will survive dismissal of the Bankruptcy Case, and will not be subject to any further defenses, offsets, counterclaims, oppositions, answers, objections, contests, disputes or other challenges by any EA Party or any other party, provided, however, if (a) the Dismissal Order is not entered, (b) a Stay Order is entered and a Termination Notice is timely sent, or (c) the Settlement Order is overturned, vacated or remanded on appeal, then the JFL Allowed Claim will be null and void and the proof of claim it filed in the Bankruptcy Case and all the claims, rights, and damages asserted therein and in the JFL Arbitration will remain pending. Nothing in this Paragraph 3.1 is intended to limit the rights of any Parties to enforce the terms of this Agreement.[1]

---

[1] For the avoidance of any doubt, the Parties arrived at the JFL Allowed Claim amount of TEN MILLION DOLLARS ($10,000,000.00) after deducting the credit for fees on the Matters as described in Paragraph 2.3 above and additionally JFL, thereafter, further agreed to reduce its claim to TEN MILLION DOLLARS ($10,000,000.00) as part of this Settlement. In other words, the Allowed Claim of TEN MILLION DOLLARS ($10,000,000.00) will not be further reduced by any credit for fees, costs, expenses, damages or any other compensation allegedly owed on the Matters.

3.2.    EA will pay JFL the sum of FOUR MILLION EIGHT HUNDRED AND FIFTY
THOUSAND DOLLARS ($4,850,000.00) pursuant to the following schedule:

      3.2.1.  Within sixty (60) calendar days after the entry of the Dismissal Order, and
provided no stay of the Settlement Order or Dismissal Order having been
issued pursuant to Rule 8007 and remains in effect, EA will wire JFL the
sum of TWO MILLION DOLLARS ($2,000,000.00), in immediately
available funds, pursuant to written wire instructions to be provided by
JFL.

      3.2.2.  Within one-hundred and twenty (120) calendar days after the entry of the
Dismissal Order, and provided no stay of the Settlement Order or
Dismissal Order having been issued pursuant to Rule 8007 and remains in
effect, EA will wire JFL the sum of TWO MILLION EIGHT HUNDRED
AND FIFTY THOUSAND DOLLARS ($2,850,000.00), in immediately
available funds, pursuant to written wire instructions to be provided by
JFL.

      3.2.3.  The payments to be made in accordance with Paragraphs 3.2.1 and 3.2.2
are collectively referred to as the "Settlement Payments."

3.3.    In consideration of the terms of this Agreement, including, without limitation, the
Releases set forth herein and the nature and pendency of the disputes between JFL and
the EA Parties, AVENATTI agrees to personally guarantee, in his individual capacity,
the FOUR MILLION EIGHT HUNDRED FIFTY THOUSAND DOLLARS
($4,850,000.00) of Settlement Payments. The complete terms of this guaranty shall be
set forth in a separate agreement ("Guaranty Agreement") between JFL and AVENATTI.
A copy of the Guaranty Agreement is attached as Exhibit D.

3.4.    As will be set forth in the Guaranty Agreement, it is the intention of JFL and
AVENATTI that AVENATTI's payment obligations under the Guaranty Agreement
shall be non-dischargeable, under 11 U.S.C. Section 523(b) in the event AVENATTI
becomes a debtor in a bankruptcy case while the Settlement Payments remain outstanding
and thereafter to the extent any party in (1) AVENATTI's bankruptcy case or (2) a
subsequent bankruptcy case or similar proceeding in which EA is the debtor or has a
similar role seeks to recover all or any portion of the Settlement Payments.

3.5.    If the Settlement Payments are paid by EA to JFL within the timeframes and in
the manner required by this Agreement, then effective 367 calendar days after the final
Settlement Payment is received by JFL, JFL will waive and forego its right to collect any
part of the remaining FIVE MILLION ONE HUNDRED AND FIFTY THOUSAND
DOLLARS ($5,150,000.00) of its allowed claim.

3.6.    Remedy Upon Payment Default.  If the Settlement Payments are not made within
three (3) business days of the applicable Settlement Payment date due, then all of the EA
Parties agree that they will not oppose the entry by the Bankruptcy Court of a final, non-

appealable judgment against EA in favor of JFL in the amount of TEN MILLION DOLLARS minus any amounts previously paid to JFL pursuant to this Agreement (the "Final Judgment"), and will not oppose the reopening of the Bankruptcy Case for the limited and sole purpose only of entering this Final Judgment. JFL and the EA Parties expressly consent to the exclusive jurisdiction of the Bankruptcy Court to enter this Final Judgment against EA. By seeking or obtaining any of the relief described in this paragraph, JFL will not in any way waive or otherwise prejudice or impact its right to enforce the personal guarantee and Guaranty Agreement set forth in Paragraphs 3.3 and 3.4 of the Agreement.

4.     **Dismissal of Lawsuits and Arbitrations.**

4.1.     Within sixteen (16) calendar days of entry of the Dismissal Order, and provided no stay of the Settlement Order or Dismissal Order having been issued pursuant to Rule 8007, the commencing party in each of the following actions shall dismiss the actions and all claims therein with prejudice: (a) the JFL Arbitration and EA's counterclaims therein; and (b) the SIMS Arbitration and EA's counterclaims therein. With respect to the other litigation, EA will not pursue the EA/Birbrower Arbitration, the EA/Callaway Lawsuit, the EA/Root Lawsuit or any claims against AEP. AEP has dismissed, without prejudice, the AEP/EA Arbitration.

5.     **Releases**.

5.1.     **Release of EA Parties by JFL Parties**.     Effective upon the latest of (a) entry of Settlement Order, (b) entry of the Dismissal Order, and (c) dismissal of the Bankruptcy Case, and provided no stay of the Settlement Order or Dismissal Order having been issued pursuant to Rule 8007, and in consideration of the terms of this Agreement and other good and valuable consideration, JFL, FRANK, SIMS, STOLPER and FSS on their own behalf and on behalf of each and all of their respective legal predecessors, successors, assignees, attorneys, agents, partners, owners, employees, heirs, parents, children, spouses, and related organizations hereby irrevocably and unconditionally release, and fully and forever discharge, absolve, and covenant not to sue the EA Parties, and each of them, and every one of their respective partners, officers, directors, owners, agents, employees, companies, parents, subsidiaries, divisions, affiliates, attorneys, trustees, legatee, personal representative, administrators, insurers, fiduciaries, executors, representatives, predecessors, successors, assigns, related parties, heirs, parents, children and spouses from and for any and all claims, causes of action, liabilities, damages, legal or administrative relief, of any basis or source, whether known or unknown, that were, have been or could have been asserted now, in the past, or in the future, including, but not limited to, any and all claims raised in the JFL Arbitration, the Sims Arbitration or the Bankruptcy Case and/or any and all claims arising out of or relating to the JFL Agreement, the Sims Agreement and JFL's, Frank's, Sims' or Stolper's employment at or other rendition of services at EA.     However, and notwithstanding any other terms in this Agreement, this release <u>does</u> <u>not</u> include or in any way release or waive claims held by any of the JFL Parties for indemnification, contribution and insurance coverage for any claims brought against them related to their employment at, or rendition of services at,

EA, including without limitation indemnification for tax liability that they may have now or in the future against EA. Further, notwithstanding the foregoing or any other terms of this Agreement, the releases set forth in this paragraph shall not operate to release the EA Parties from any of their payment and other covenants, obligations and duties under this Agreement or the Guaranty Agreement, nor will they in any way waive, limit or foreclose any of the JFL Parties from seeking and obtaining any appropriate remedies for any violation of the terms of this Agreement or the Guaranty Agreement.

5.2.    **Release of JFL Parties by the EA Parties.** Effective upon the latest of (a) entry of the Settlement Order, (b) entry of the Dismissal Order, and (c) dismissal of the Bankruptcy Case, and provided no stay of the Settlement Order or Dismissal Order having been issued pursuant to Rule 8007, and in consideration of the terms of this Agreement and other good and valuable consideration, EA, EAGAN, A&A and AVENATTI on their own behalf and on behalf of each and all of their respective legal predecessors, successors, assignees, attorneys, agents, partners, employees, heirs, parents, children, spouses, creditors, owners, executors, trustees and related parties hereby irrevocably and unconditionally release, and fully and forever discharge, absolve, and covenant not to sue the JFL Parties, and each of them, and every one of their respective partners, officers, directors, owners, agents, employees, companies, subsidiaries, divisions, affiliates, attorneys, trustees, legatee or personal representative, administrators, insurers, fiduciaries, executors, representatives, predecessors, successors, assigns, related organizations, heirs, parents, children and spouses from and for any and all claims, causes of action, liabilities, damages, legal or administrative relief, of any basis or source, whether known or unknown, that were, have been or could have been asserted now, in the past, or in the future.  This release includes, but is not limited to any and all claims or counterclaims raised in the JFL Arbitration, the SIMS Arbitration or the Bankruptcy Case and/or any and all claims arising out of or relating to the JFL Agreement, the SIMS Agreement or the Parties employment at EA or other rendition of services at EA, or any and all claims for tortious interference, unfair competition, misappropriation, trade secret, conversion, fraud, breach of fiduciary duty, breach of duty or other such claims against the JFL Parties.  Notwithstanding the foregoing, theses releases shall not operate to release the JFL Parties from any of their covenants, obligations and duties under this Agreement or the Guaranty Agreement, nor will they in any way waive, limit or foreclose any of the EA Parties from seeking and obtaining any appropriate remedies or relief for any violation of the terms of this Agreement or the Guaranty Agreement.

5.3.    **Release of Counsel in the Matters by the EA Parties.**  Effective upon the latest of (a) entry of Settlement Order, (b) entry of the Dismissal Order, and (c) dismissal of the Bankruptcy Case, and provided no stay of the Settlement Order or Dismissal Order having been issued pursuant to Rule 8007, and in consideration of the terms of this Agreement and other good and valuable consideration, each of EA, EAGAN, A&A and AVENATTI on their own behalf and on behalf of each and all of their respective legal predecessors, successors, assignees, attorneys, agents, partners, employees, heirs, parents, children, spouses, creditors and related organizations hereby irrevocably and unconditionally release, and fully and forever discharge, absolve, and covenant not to sue the current, past or future co-counsel, in-house counsel, local counsel or subsequent

counsel for current, past or future clients of FSS in the Matters for any claims for attorneys' fees, costs, expenses, damages, or any other compensation or remedies arising out of or related to the matters listed on Exhibit "A," whether known or unknown, that were, have been or could have been asserted now, in the past, or in the future. The persons and entities covered by this release include, but are not limited to: (a) Franklin D. Azar & Associates, P.C., Franklin D. Azar, Esq. Keith R. Scranton, Esq. and Jonathan Parrott, Esq.; (b) Law Offices of Steven R. Young and Steven R. Young, Esq.; (c) Girardi Keese, LLP and James O'Callahan, Esq.; (d) McNicholas & McNicholas, LLP, Patrick McNicholas, Esq., Matthew McNicholas, Esq., Philip Shakhnis Esq., and Michael J. Kent, Esq.; (e) Yuhl Carr LLP, Eric Yuhl, Esq. and Colin Yuhl Esq.; (f) Snell & Wilmer LLP and Steve T. Graham; (g) Lewis Roca Rothgerber Christie LLP and Dan R. Waite, Esq.; (h) Bridgford Gleason & Artinian, Richard K. Bridgford, Esq. and Michael H. Artinian, Esq.; (i) Orrick, Herrington & Sutcliffe LLP and Jörg Ritter, Esq.; (j) Osborn Machler and Simeon J. Osborn, Esq.; (k) Smyth & Mason PLLC and Jeffrey Smyth Esq. and (l) FSS, FRANK, SIMS and STOLPER as well as their respective legal predecessors, successors, assignees, attorneys, agents, partners, employees and related organizations.

5.4.    **Release of the Clients in the Matters by the EA Parties.** Effective upon the latest of (a) entry of Settlement Order, (b) entry of the Dismissal Order, and (c) dismissal of the Bankruptcy Case, and provided no stay of the Settlement Order or Dismissal Order having been issued pursuant to Rule 8007, each of EA, EAGAN, A&A and AVENATTI on their own behalf and on behalf of each and all of their respective legal predecessors, successors, assignees, attorneys, agents, partners, employees, heirs, parents, children, spouses, creditors and related organizations hereby irrevocably and unconditionally release, and fully and forever discharge, absolve, and covenant not to sue the clients and class members in the Matters for any claims for attorneys' fees, costs, expenses, damages, or any other compensation or remedies arising out of or related to the Matters whether known or unknown, that were, have been or could have been asserted now, in the past, or in the future. The persons and entities covered by this release include, but are not limited to: (a) Kimberly Birbrower; (b) William (Scott) and Elizabeth Callaway; (c) Authentic Entertainment Properties, LLP, Authentic Entertainment Properties Development, LLP, RCC Company, LLC, Robert Coffman, Robert O'Neil and Steve Graham; (d) Hannes Kuhn; (e) Gary and Louise Weaver; (f) Jeffrey Wall; (g) the Estate of Jonathan A. Spound, Corey Spound, Michael Spound, and Amy Spound; (h) Skylar Ward; (i) Jamie Deehan; (j) Rasheed, Robinson and Jiminez; (k) Shayna Broadstone and Kristine Billon; (l) Benjamin Lagunas, Dianna Mendoza and Susan Jung; and (m) Al Chaffee, Yuping Chen, Jeanne Demund, Laird Devick, Todd Hager, Ash Hanlon, Peter Heathcote, Nathaniel Heathcote, Mike Scheffler, Matthew Wahlman and Michael Wilson, as well as their respective legal predecessors, successors, assignees, attorneys, agents, partners, employees, related organizations, heirs, parents, siblings and children.

6.    **Waiver of Civil Code § 1542**. Each of the Parties has read and understood the following language contained in Section 1542 of the California Civil Code:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS
> WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT

TO EXIST IN HIS OR HER FAVOR AT THE TIME OF
EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM
OF HER MUST HAVE MATERIALLY AFFECTED HIS OR
HER SETTLEMENT WITH THE DEBTOR.

To the extent that Section 1542 is applicable, each of the Parties hereto expressly waives
all rights, if any, that they may have under this statute.

7.    **No Admission of Liability**.    This Agreement is made in settlement of claims and
allegations which are denied, disputed, and contested.   Neither this Agreement nor
anything contained in this Agreement shall be construed as an admission of any fact,
issue, liability, or responsibility by any Party hereto to any other Party hereto, all of
which are expressly denied.

8.    **Assignment**.  Each of the Parties represents and warrants that he, she, or it has not
assigned or transferred to any person not a Party to this Agreement any part or portion of
any matter released under this Agreement, and each Party agrees to defend, indemnify,
and hold harmless the other Parties against any claim (including the payment of
attorneys' fees and costs actually incurred whether or not litigation or other proceedings
are commenced) based on or in connection with, or arising out of any such assignment or
transfer made, purported, or claimed. Each of the Parties represents and warrants that he,
she, or it will not assign or transfer to any person not a Party to this Agreement any part
or portion of any obligations or liabilities created under this Agreement, except that JFL
may assign its rights to receive the Settlement Payments to any party, in its sole
discretion, and no Party may assign any of its other rights or obligations.   Each Party
agrees to defend, indemnify, and hold harmless the other Parties against any claim
(including the payment of attorneys' fees and costs actually incurred whether or not
litigation or other proceedings are commenced) based on or in connection with, or arising
out of any such assignment or transfer made, purported, or claimed in violation of this
paragraph.

9.    **Indemnification of Claims Brought by Green Street Advisors, LLC**.   The EA Parties,
and each of them, hereby agree they will fully indemnify the JFL Parties and the Estate of
Jonathan A. Spound and its Administrators, Corey and Michael Spound, for any and all
claims brought by Green Street Advisors, LLC ("Green Street") against them individually
or collectively for amounts owed under the Service Engagement Agreement entered into
between EA and Green Street in the matter Spound v. SSV Properties *et al.*, dated March
31, 2016, and modified by an Addendum with the same date (the "Green Street
Engagement"), including but not limited to providing a defense and paying for all
reasonable attorneys' fees, costs and expenses incurred defending against such claims.

10.   **Mutual Non-Defamation**.  Each of the Parties agree that they will not make any
defamatory statements about each other to any third party, whether orally or in writing.

11.    **Changes to FSS Website.** At the request of EA, FSS has made changes to its website with respect to matters that were previously resolved at EA, and those changes will remain in effect as long as such matters are included on the website.

12.    **EA Cooperation on Fee Applications.** EA will cooperate with FSS to promptly compile and provide FSS with all time sheets, emails and other records documenting the time spent at EA on the disputed Matters so that FSS may submit such time in support of any necessary fee applications or other motion practice.

13.    **EA Agreement to Automatically Forward Emails.** EA shall arrange to have all emails sent to the EA email addresses for FRANK, SIMS, STOLPER or Maritza Nowowiejski automatically forwarded to FRANK, SIMS, STOLPER and Maritza Nowowiejski at FSS for a period expiring no earlier than December 31, 2018, and thereafter disable the email addresses.

14.    **EA Agreement to Delete FRANK's Personal Folder.** EA agrees that FRANK will be provided with access to his personal folder on EA's computer system, and upon request, will permanently delete any such items from EA's system.

15.    **Destruction of Documents and Use in Future Legal Proceedings.** Within sixteen (16) calendar days of entry of the Dismissal Order, and provided no stay of the Settlement Order or Dismissal Order having been issued pursuant to Rule 8007, the Parties and each of their respective attorneys, consultants, experts, agents, and representatives and any other person or entity under the direction or control of any of them, and any other person or entity that they caused information to be disseminated to will destroy the original and all copies of the following materials and documents, whether in hard copy or electronic form:

- All discovery, documents, materials, and electronic files received from any Party that were marked confidential.

The Parties shall also jointly request JAMS and its arbitrators to destroy its entire file relating to the JFL arbitration, with the exception of billing information, within 10 days or other reasonable time period proposed by JAMS and agreed to by the Parties, and carry out all reasonable steps to ensure compliance.

Further, to the extent consistent with their professional, ethical and legal obligations, the Parties further agree they will not use the following documents in any subsequent legal proceeding, litigation or arbitration, unless the litigation is between the Parties:

- All discovery responses provided by any Party during the JFL Arbitration;
- All orders entered by any arbitrator during the JFL Arbitration relating to discovery or sanctions;
- All pleadings relating to any motion for sanctions and/or terminating sanctions submitted in connection with the JFL arbitration, including but not limited to all exhibits filed in connection with any such pleading.

16. **Payment, Dismissal and Release Obligations Are Not Excused by Alleged Breaches of this Agreement.** The payment, dismissal and release obligations set forth in this Agreement and the Guaranty Agreement will not be delayed or excused by any alleged breach or violation of Section 7 through 27 of this Agreement. However, any such breaches may be remedied pursuant to the dispute resolution procedures set forth in Paragraph 21 of this Agreement.

17. **Representations and Warranties.** The Parties hereto represent and warrant that each has read and understood and has received independent legal advice with respect to the advisability of making this Agreement, and/or has had the opportunity to obtain such legal advice and has knowingly entered into this Agreement without taking advantage of the opportunity to obtain such advice. Each Party has made such investigation of the facts pertaining to this Agreement and of all other matters pertaining hereto as they deem necessary. The Parties hereto represent and warrant that each signatory hereto has the full right and authority to enter into this Agreement and bind the Party on whose behalf he, she, or it has executed this Agreement.

18. **Further Assurances.** Each Party hereto agrees to cooperate fully and to execute any and all supplementary documents and to take all additional actions that may be necessary or appropriate to give full force and effect to the basic terms and intent of this Agreement and which are not inconsistent with its terms and intent.

19. **Headings.** The various headings in this Agreement are inserted for convenience only, and shall not be deemed a part of or in any manner affect this Agreement or any provision hereof.

20. **Governing Law**. This Agreement shall be governed and construed in accordance with the substantive laws of the State of California and the United States Bankruptcy Code. Respective counsel for each Party hereto has participated in the drafting of, read, and approved the language of this Agreement. The language of this Agreement shall be construed as a whole according to its fair meaning, and not strictly for or against any of the Parties hereto.

21. **Dispute Resolution Procedure.** Any disputes regarding this Agreement, with the exception of the procedures set forth in Paragraph 3.6 above pertaining to failures to make the Settlement Payments in accordance with the terms of this Agreement, shall be first submitted to the Honorable Louis Meisinger to resolve in mediation, and the cost of the mediation shall be equally borne by the JFL Parties, on the one hand, and the EA Parties, on the other hand. If the Parties are unable to resolve the dispute, then 10 days after the mediation, they will submit the claim to binding arbitration before Benchmark Resolution Group, Inc. (the organization recently formed by Judge Meisinger) in Los Angeles, California to be resolved employing their rules and procedures for arbitration.

22. **Waiver/Severability.** The Parties agree that no waiver by any Party of any particular provision or right under this Agreement shall be deemed to be a waiver of any other

provision or right herein. The Parties further agree that each provision or term of this Agreement is intended to be severable from the others so that if any particular provision or term hereof is or determined to be illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the legality or validity of the remaining provisions and terms hereof.

23.     **Attorneys' Fees**. The Parties agree that should any relief be brought by any Party to enforce any provision or right under this Agreement, the prevailing party shall be entitled to recover, in addition to any other relief, reasonable attorneys' fees and costs incurred therein.

24.     **Entire Agreement.** This Agreement constitutes the sole and entire agreement and understanding between the Parties concerning the subject matter hereof and supersedes all prior agreements and understandings between the Parties on those subjects hereto with the exception of (a) the AEP Fee Sharing Agreement and the Guaranty Agreement and (b) the Separation Agreement entered into between EA and STOLPER dated May 23, 2016 (the "STOLPER Separation Agreement"). If there is an inconsistency between this Agreement and the STOLPER Separation Agreement, this Agreement will control. Each of the Parties hereto acknowledge to each of the other Parties that no other Party or any agent or attorney of any Party has made any promise, representation or warranty whatsoever, express or implied, written or oral, not contained herein concerning the subject matter hereof to induce him, her, or it to execute this Agreement, and each of the Parties hereto acknowledges that he, she, or it has not executed this Agreement in reliance on any promise, representation or warranty not expressly contained herein. No person has any authority to make any representation or promise on behalf of any Party that is not set forth herein. This Agreement may be modified only with a written instrument duly executed by each of the Parties hereto.

25.     **Binding Agreement.** This Agreement shall bind and shall inure to the benefit of successors and assigns of each Party. With respect to the individual Parties, this Agreement shall also bind and inure to the benefit of his or her heirs, assigns, executors, legatees, administrators and personal representatives. With respect to the entity Parties, this Agreement shall also bind and inure to the benefit of any parent, affiliate, predecessor-in-interest, successor-in-interest, transferee, endorsee, or assign.

26.     **Notice Provision**. Any and all notices required by this Agreement shall be mailed and emailed in writing to the following:

    26.1.   **To the JFL Parties**. To Jason Frank, Scott Sims, & Andrew Stolper, Frank Sims & Stolper LLP, 19800 McArthur Blvd., Suite 855, Irvine, California 92612, jfrank@lawfss.com; ssims@lawfss.com; astolper@lawfss.com

    26.2.   **To the EA Parties**. To Michael Avenatti & Michael Eagan, Eagan Avenatti, LLP, 520 Newport Center Drive, Ste. 1400, Newport Beach, CA 92660, mavenatti@eaganavenatti.com.

137774123.8                                    13

27.   **Execution/Counterparts.**  This Agreement may be executed in counterparts, and a facsimile or PDF signature shall have the same force and effect as an original signature penned in ink. When each of the Parties hereto has signed and delivered at least one such counterpart to all other Parties or their counsel, each counterpart shall be deemed an original, and when taken together with other signed counterparts, shall constitute one fully executed agreement which shall be binding upon and effective as to all Parties.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the day and year indicated below.

December 2, 2017                        EAGAN AVENATTI LLP

                                        _____
                                        Michael J. Avenatti
                                        Its Managing Partner

December 2, 2017                        AVENATTI & ASSOCIATES, APC

                                        _____
                                        Michael J. Avenatti
                                        Its President

December 2, 2017                        MICHAEL J. AVENATTI

                                        _____
                                        Michael J. Avenatti
                                        In his individual capacity

December 2 2017                         MICHAEL Q. EAGAN

                                        _____
                                        Michael Q. Eagan
                                        In his individual capacity

December 2, 2017                        JASON FRANK LAW, PLC

                                        _____
                                        Jason M. Frank
                                        Its President

137774123.8                             14

December 2, 2017

FRANK SIMS & STOLPER, LLP

_____
Jason M. Frank
Partner

December 12, 2017

JASON M. FRANK

_____
Jason M. Frank
In his individual capacity

December 12, 2017

SCOTT H. SIMS

_____
Scott H. Sims
In his individual capacity

December 2, 2017

ANDREW D. STOLPER

_____
Andrew D. Stolper
In his individual capacity

APPROVED AS TO FORM:

January 30, 2018
~~December ___, 2017~~

PACHULSKI STANG ZIEHL & JONES LLP

_____
~~Richard M. Pachulski~~  Robert M. Saunders
Counsel to Eagan Avenatti LLP

137774123.8                                          15

December 22, 2017

PERKINS COIE LLP

Sara L. Chenetz
Counsel to the JFL Parties

December ___, 2017

SULMEYER KUPETZ LLP

Marc Haroupian
Counsel to Michael Avenatti and Avenatti &
Associates APC

December __, 2017                    PERKINS COIE LLP


                                    _____
                                    Sara L. Chenetz
                                    Counsel to the JFL Parties

December __, 2017                    SULMEYER KUPETZ LXP   APC

                                    _____
                                    Marc Haroupian
                                    Counsel to Michael Avenatti and Avenatti &
                                    Associates APC

                                    MARK HOROUPIAN

# Exhibit A to Settlement Agreement

| Case Name |
|---|
| 1. **Birbrower v. Quorn Foods, Inc.**<br><br>• Nationwide class action for false advertising |
| 2. **Callaway v. Mercedes Benz USA, Inc.**<br><br>• California class action concerning defective seat heaters |
| 3. **Authentic Entertainment Properties v. Royal Center et al.**<br><br>• Breach of Joint Venture Agreement |
| 4. **Weaver v. Southern California Edison, et al.**<br><br>• Personal injury action<br>• Plaintiff is Jason Frank's cousin |
| 5. **Shine v. Williams Sonoma, Inc.**<br><br>• California employment class action challenging on-call shift policy |
| 6. **Ward v. Tilly's**<br><br>• California employment class action challenging on-call shift policy |
| 7. **Deehan v. Gap, Inc.**<br><br>• California employment class action challenging on-call shift policy |
| 8. **Rasheed v. Gap, Inc.**<br><br>• California employment class action challenging on-call shift policy |
| 9. **Broadstone v. Pacific Sunwear**<br><br>• California employment class action challenging on-call shift policy |
| 10. **Broadstone/Billon v. Bath & Body**<br><br>• California employment class action challenging on-call shift policy |
| 11. **Robinson v. BCBG**<br><br>• California employment class action challenging on-call shift policy |
| 12. **Lagunas v. Ambercrombie**<br><br>• California employment class action challenging on-call shift policy |
| 13. **Jiminez (Dylan)**<br><br>• Unaware of any case by this name |

| |
|---|
| **14. RFF v. Spound** |
| |
| •   Hourly breach of contract case representing Defendant |
| •   Incorrectly listed on EA's schedule as a plaintiff case |
| **15. Hannes Kuhn** |
| |
| **16. Chaffe v. Keller Rohrback** |
| |
| •   Attorney malpractice action |
| **17. Eldard (Wall) v. Hewlett Packard** |
| |
| •   California employment class action for waiting time penalties |

# EXHIBIT 5

1  Sara L. Chenetz, SBN 206936
   SChenetz@perkinscoie.com
2  Amir Gamliel, SBN 268121
   AGamliel@perkinscoie.com
3  Perkins Coie LLP
   1888 Century Park East, Suite 1700
4  Los Angeles, CA 90067-1721
   Tel: 310-788-9900
5  Fax: 310-788-3399

6  Attorneys for Jason Frank Law, PLC

**FILED & ENTERED**

**MAY 22 2018**

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY mccall    DEPUTY CLERK

7

8                    UNITED STATES BANKRUPTCY COURT

9            CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION

10

11  In re                              Case No. 8:17-bk-11961-CB

12  EAGAN AVENATTI, LLP,               Chapter 11

13                    Debtor.          **FINAL JUDGMENT AGAINST EAGAN
                                       AVENATTI, LLP AND IN FAVOR OF**
14                                     **JASON FRANK LAW, PLC, IN THE
                                       AMOUNT OF TEN MILLION DOLLARS**
15                                     **AND NO CENTS**

16

17

18          This Court, having entered its Order Granting Motion for Entry of Judgment Against Eagan

19  Avenatti, LLP, and in Favor of Jason Frank Law, PLC in the Amount of Ten Million Dollars and No

20  Cents, on May 22, 2018 as Docket #444,

21          //

22          //

23          //

24

25

26

27

28

                                        -1-

IT IS ORDERED:

(1)     Judgment is issued and entered in the amount of TEN MILLION DOLLARS AND NO

         CENTS in favor of Jason Frank Law, PLC, and against Eagan Avenatti, LLP.

(2)     This Judgment is final and not appealable pursuant to Section 3.6 of the Settlement

         Agreement.

(3)     In accordance with Section 23 of the Settlement Agreement, Jason Frank Law, PLC

         shall be entitled to recover reasonable attorneys' fees and costs incurred in collecting

         any and all sums due from Eagan Avenatti, LLP pursuant to the entered judgment.


                                              ###


Date: May 22, 2018

                                              Catherine Bauer
                                              United States Bankruptcy Judge

# EXHIBIT 6

◻ ORIGINAL

FILED
Superior Court of California
County of Los Angeles

NOV 20 2018

Sherri R. Carter, Executive Officer/Clerk
By _____ Deputy
Daisy G. Vallin

Received

OCT 3 1 2018

Default Section

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES – CENTRAL DISTRICT

| | |
|---|---|
| JASON FRANK LAW PLC, a professional law corporation,<br><br>    Plaintiff,<br><br>    vs.<br><br>MICHAEL J. AVENATTI, an individual<br><br>    Defendant. | Case No. BC706555<br>The Hon. Dennis J. Landin, Dept. 51<br><br>[~~PROPOSED~~] JUDGMENT<br><br>Trial Date:  None Set<br><br>Costs affixed to Judgment<br>4·22·19 |

1142399.1

[~~Proposed~~] Judgment

1    The Motion for Summary Judgment / Adjudication filed by Plaintiff Jason Frank Law, PLC

2   ("JFL") against Defendant Michael Avenatti ("Avenatti") having been granted on October 22, 2018,

3   it is hereby ORDERED and ADJUDGED as follows:

4        1.      JUDGMENT is hereby entered in favor of JFL and against Avenatti in the amount

5   of  $ ~~5,0~~ 5,054,287.75 consisting of a principal amount of $4,850,000 plus

6   prejudgment interest of $ 204,287.75 ($165,753.42 as of October 22, 2018 plus $1,328.77

7   for each day thereafter until judgment is entered).

8        2.      JFL shall have and recover from Avenatti costs in the amount of $ 1,426.10

9   and attorneys' fees in the amount of $ 60,270.38, the amounts to be determined as

10  provided in California Rules of Court, rules 3.1700 and 3.1702, and inserted herein by the Clerk.

11

12

13  DATED:        NOV 2 0 2018

14                                              HON. DENNIS J. LANDIN,
                                                Judge of the Superior Court

15  Respectfully submitted,

16  Eric M. George, SBN 166403
    egeorge@bgrfirm.com
17  BROWNE GEORGE ROSS LLP
    2121 Avenue of the Stars, Suite 2800
18  Los Angeles, California 90067
    Attorneys for Jason Frank Law, PLC
19

20

21

22

23

24

25

26

27

28

1142399.1                          -2-

1                         **PROOF OF SERVICE**

2   STATE OF CALIFORNIA, COUNTY OF ORANGE

3         I am employed in the County of Orange, State of California.  I am over the age of 18 and not a party to the within action; my business address is 19800 MacArthur Boulevard, Suite 855, Irvine,

4   California 92612

5         On October 23, 2018, I served the foregoing documents described as:

6                         **[PROPOSED] JUDGMENT**

7   on the following person(s) in the manner indicated:

8                         **Michael J. Avenatti**
                 **520 Newport Center Drive, Suite 1400**

9                      **Newport Beach, CA 92660**

10 ☐     (BY MAIL)   I am familiar with the practice of Frank Sims & Stolper LLP for collection and processing of correspondence for mailing with the United States Postal Service.  Correspondence so

11   collected and processed is deposited with the United States Postal Service that same day in the ordinary course of business.  On this date, a copy of said document was placed in a sealed envelope,

12   with postage fully prepaid, addressed as set forth herein, and such envelope was placed for collection and mailing at Frank Sims & Stolper LLP, Irvine, California, following ordinary business practices.

13

14 ☐     (BY OVERNIGHT MAIL)  I am familiar with the practice of Frank Sims & Stolper LLP for collection and processing of correspondence for delivery by overnight courier.  Correspondence so

15   collected and processed is deposited in a box or other facility regularly maintained by Federal Express that same day in the ordinary course of business.  On this date, a copy of said document was placed in

16   a sealed envelope designated by Federal Express with delivery fees paid or provided for, addressed as set forth herein, and such envelope was placed for delivery by Federal Express at Frank Sims &

17   Stolper LLP, Irvine, California, following ordinary business practices.

18 ☐     (BY FACSIMILE TRANSMISSION)  On this date, at the time indicated on the transmittal sheet, attached hereto, I transmitted from a facsimile transmission machine, which telephone number is

19   (949) 201-2405, the document described above and an unsigned copy of this declaration to the person, and at the facsimile transmission telephone numbers, set forth herein.   The above-described

20   transmission was reported as complete and without error by a properly issued transmission report issued by the facsimile transmission machine upon which the said transmission was made immediately

21   following the transmission.

22 ☐     (BY ELECTRONIC MAIL)  On this date, I caused a copy of said document to be transmitted via electronic mail to the e-mail addresses listed on the attached service list.

23 ☐     (BY ELECTRONIC SERVICE)   On this date, I caused a copy of said document to be transmitted via electronic mail pursuant to Cal. Rules of Court, Rule 2.251(b), to the e-mail addresses

24   listed above.

25 ☒     **(BY MESSENGER SERVICE)**  I served the documents by placing them in an envelope or package addressed to the person at the addresses listed and providing them to a professional messenger

26   service for service. *[Declaration of Messenger attached/filed separately.]*

27

28

1       I declare under penalty of perjury under the laws of the State of California that the foregoing is

2 true and correct, and that this declaration was executed on October 23, 2018, at Irvine, California.

3

4 Maritza Nowowiejski

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 7

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA


IN RE:

      EAGAN AVENATTI, LLP,         CASE NUMBER
                                  8:17-bk-11961-CB

         Debtor,


_____



EXAMINATION OF MICHAEL AVENATTI

July 25, 2018

11:00 a.m.


411 West Fourth Street

Courtroom 5D Conference Room

Santa Ana, California


REPORTED BY:

Lynette Milakovich

CSR No. 5098

```
 1    APPEARANCES:

 2    For Debtor Eagan Avenatti, LLP:
          RAINES FELDMAN, LLP
 3        BY:  JOHN S. CHA
                   and
 4             HAMID R. RAFATJOO
               Attorney at Law
 5        1800 Avenue of the Stars
          12th Floor
 6        Los Angeles, CA  90067
          (310)440-4100
 7        Jcha@raineslaw.com

 8    For the Judgment Creditor Jason Frank Law:
          WEINTRAUB & SELTH
 9        BY:  JAMES R. SELTH
               Attorney at Law
10        11766 Wilshire Boulevard
          Suite 1170
11        Los Angeles, CA  90025
          (310)207-1494
12        Jim@wsrlaw.net
               and
13        PERKINS COIE
          BY:  SARA L. CHENETZ
14             Attorney at Law
          1888 Century Park East
15        Suite 1700
          Los Angeles, CA  90067-1721
16        (310)788-3218
          Schenetz@perkinscoie.com
17
      For the U.S. Department of Justice:
18        UNITED STATES ATTORNEY'S OFFICE
          BY:  NAJAH J. SHARIFF
19             Assistant United States Attorney
          300 North Los Angeles Street
20        Suite 7211
          Los Angeles, CA  90012
21        (213)894-2534
          Najah.shariff@usdoj.gov
22    Also Present:
          JASON M. FRANK
23        Judgment Creditor

24

25
```

July 25, 2018

```
 1                 INDEX TO EXAMINATION

 2

 3        WITNESS:  MICHAEL AVENATTI

 4    EXAMINATION                                PAGE

 5    By Mr. Selth                                5

 6

 7

 8             WITNESS INSTRUCTED/REFUSED TO ANSWER

 9                    Page 13    Line  9

10                    Page 30    Line 11

11                    Page 62    Line 16

12                    Page 67    Line  9

13                    Page 67    Line 22

14                    Page 74    Line 19

15                    Page 87    Line 5

16                    Page 90    Line 13

17                    Page 92    Line 23

18

19

20

21

22

23

24

25
```

July 25, 2018

1              INDEX TO EXHIBITS

2                MICHAEL AVENATTI

3           IN RE:  EAGAN AVENATTI, LLP

4             Wednesday, July 25, 2018

5          Lynette Milakovich, CSR No. 5098

6

        MARKED      DESCRIPTION                    PAGE
7
        Exhibit 1   Order to Appear for Examination    5
8                   of Judgment Debtor

9       Exhibit 2   Notice of Subpoena Commanding      5
                    the Production of Documents
10
        Exhibit 3   Declaration of Michael J. Avenatti 13
11                  In Response to Order Issued on
                    November 30, 2016
12
        Exhibit 4   Official Form 410 - Proof of Claim 18
13
        Exhibit 5   Declaration of Michael J. Avenatti 76
14                  in Support of Opposition to Jason Frank
                    Law, PLC's Amended Motion for Entry of
15                  Assignment and Restraining Order

16      Exhibit 6   Verified Amended Complaint for Breach 72
                    Of Guaranty Agreement
17
        Exhibit 7   Order Granting In Part and Denying in 85
18                  Part Amended Motion for Assignment and
                    Restraining Order
19
        Exhibit 8   List of Cases - Exhibit A - J Amended 85
20                  Motion

21      Exhibit 9   Submission of Amended Schedules      36

22

23

24

25

July 25, 2018

```
 1                    SANTA ANA, CALIFORNIA

 2              WEDNESDAY, JULY 25, 2018; 11:00 A.M.

 3

 4                    MICHAEL AVENATTI,

 5               having been first duly sworn,

 6                  testified as follows:

 7

 8                      EXAMINATION

 9  BY MR. SELTH:

10      Q   Mr. Avenatti, I am attaching a copy of the

11  Order to Appear for Judgment Debtor Examination that has

12  been issued, why you are here today.

13           I am attaching as Exhibit 2 the copy of

14  Notice of Subpoena that was filed with the court which

15  attaches the subpoena to appear.

16      (Exhibit Numbers 1 and 2 were marked for

17      identification.)

18      Q   (BY MR. SELTH:)  Have you received copies of

19  these documents, Mr. Avenatti?

20      A   Just give me one second.

21           I believe so, yes.

22      Q   Have you brought any documents today in

23  compliance with the subpoena?

24      A   I provided documents to my counsel.  I don't

25
```

```
 1   judgment is bogus.

 2             Q    Have you filed an appeal of the judgment?

 3             A    Do you want to argue with me, or do you want

 4   to ask me questions?

 5             Q    It's a yes or no question.

 6                  Have you filed an appeal?

 7             MR. CHA:  When you are referring to "you," you are

 8   referring to EA, not Mr. Avenatti?

 9             MR. SELTH:  Yes.  I know it's easy to make that

10   mistake.  When I mean him personally, I will say, "You

11   personally."

12             MR. CHA:  Correct.

13             MR. SELTH:  If I say, "You," I am not meaning you

14   personally.

15             MR. CHA:  Very good.  Thank you.

16             Q    (BY MR. SELTH:)  Has EA filed tax returns

17   for 2017?

18             A    No.

19             Q    Has EA filed tax returns for 2016?

20             A    I believe so.

21             Q    Who would know for certain?

22             A    I don't understand the question.

23             Q    You said you believe so?

24             A    That's my answer.  I believe so.

25             Q    You don't know to a certainty?
```

July 25, 2018

```
 1          A    That's the best answer I can give.

 2          Q    Thank you.

 3               How about 2015?  Have you filed tax

 4   returns for 2015?

 5          A    Same answer.

 6          Q    Which is?

 7          A    I believe so.

 8          Q    What about 2014?

 9          A    Same answer.

10          Q    What about 2013?

11          A    Same answer.

12          Q    Would those returns -- when were those returns

13   filed?

14          A    I don't know.

15          Q    Who would know that?

16          A    I would have to look at the returns.  I don't

17   recall exactly when they were filed.

18          Q    Do you have those returns?

19          A    Do I have them with me today?  No.

20          Q    Are you in possession of them at your office?

21          A    I believe we have them, yes.

22          Q    Do you recall that one of the issues in the

23   arbitration with Jason Frank Law was the production of

24   EA tax returns?

25          A    Are you here to ask me about the arbitration,
```

```
 1    or are you here to ask me about the --

 2              Q    Just a yes or no question, Mr. Avenatti.

 3                   Do you recall if the issue of the returns

 4    is one of the issues?

 5              MR. CHA:  I'm sorry.  I'm going to object.  That's

 6    beyond the scope of his judgment debtor examination.

 7    Let's move on.

 8              THE WITNESS:  I believe -- go ahead.

 9              MR. CHA:  Let's move on.

10              MR. SELTH:  You are instructing him not to answer.

11                   Please mark it any time there's an

12    instruction not to answer so we can go back into the court

13    and get authorization on that.

14              (Exhibit Number 3 was marked for identification.)

15              Q    (BY MR. SELTH:)  I am going to show you

16    Exhibit 3 which is a copy of a declaration that you

17    provided in the arbitration case.  Ask you to take a look

18    at that.  And tell me if, after you've read it, if this is

19    a declaration you signed.

20              MR. CHA:  Jim, what is the date on that, please?

21              MR. SELTH:  The date is December 1, 2016.

22              MR. CHA:  Thank you.

23              THE WITNESS:  The question is:  Is that my

24    signature?  Yes.

25              Q    (BY MR. SELTH:)  And in this declaration did
```

July 25, 2018

1    you state that you were unable at that time to locate the

2    2013 tax returns for EA?

3          MR. CHA:  Hang on a second.  This is not a

4    deposition, as you know.

5          MR. SELTH:  No.  It's a judgment debtor

6    examination.

7          MR. CHA:  So we are not going into credibility

8    issues, recollection issues.

9          MR. SELTH:  Talking about tax returns.

10         MR. CHA:  You want to find out what assets are

11   available to satisfy --

12         MR. SELTH:  Mr. Cha, I am allowed a broad scope of

13   questioning, and tax returns are at the heart of the

14   finances of a judgment debtor.

15         MR. CHA:  Right, but you are asking about a

16   declaration, and you are trying to impeach this witness

17   apparently.

18         MR. SELTH:  I am trying to find information about

19   what tax returns and when and where they were filed.

20         MR. CHA:  He already testified to 2013, '14, '15,

21   '16, '17.

22         MR. SELTH:  I'm following up on those questions.

23         MR. CHA:  He's giving you his best testimony.

24         MR. SELTH:  I am following up on those questions.

25         MR. CHA:  What you are doing is putting a

Michael Avenatti
July 25, 2018

1    declaration in front of him that's almost two years old

2    and saying is this true and is it true what you said at

3    the time.  Apparently it was true at the time he signed

4    it.

5              MR. SELTH:  I am asking him --

6              Q   (BY MR. SELTH:)  Mr. Avenatti, in this

7    declaration did you say you were unable to locate the

8    tax returns for 2013 through 2015?

9              MR. CHA:  The document speaks for itself, Jim.

10   It says what it says.

11             THE WITNESS:  I don't know.  I haven't read it.

12             MR. SELTH:  Take your time.  Read it.

13             THE WITNESS:  (Witness reading.)

14                  Okay.  I've read the declaration.  What is

15   the question?

16             Q   (BY MR. SELTH:)  Is that declaration true and

17   correct?

18             A   To the best of my knowledge, yes.

19             Q   And in that declaration you stated that EA's

20   accountant, Marjorie Hendricks, could not find those tax

21   returns as well; is that correct?

22             MR. CHA:  Again, the document speaks for itself.

23   It says what it says.

24             THE WITNESS:  Yeah, I don't think that's what the

25   declaration says in Paragraph 3.  I stand by the

```
1    declaration.

2            Q    (BY MR. SELTH:)  Ms. Hendricks was not in

3    possession of the returns?

4            A    Yeah.  That's not what you asked me.

5            Q    Is she in possession of the returns now?

6            A    I don't know.

7            Q    Attached to it is a copy of a Form 4506 that

8    appears to be signed by you.  Did you submit this 4506 to

9    the IRS to obtain copies of the returns?

10           A    I believe so.  It was almost two years --

11   yeah, almost two years ago.  I think so.

12           Q    So tax returns have been filed for all those

13   three years?

14           A    Sir, I've answered your questions.  I am going

15   to stand by my prior answers.

16           Q    You believe returns were filed for '13, '14,

17   and '15?

18           A    Whatever the transcript is is what my answer

19   is.

20           Q    Did EA file tax returns for 2016?

21           MR. CHA:  That's already been asked and answered.

22           THE WITNESS:  I am going to stand by my prior

23   answer.

24           Q    (BY MR. SELTH:)  What was that?

25           MR. CHA:  He said he believes it was.
```

July 25, 2018

```
 1              THE WITNESS:  Whatever the transcript --

 2         Q   (BY MR. SELTH:)  When were those filed?

 3         A   Can you please not talk over me.

 4         Q   You talk over me.  Let's keep it calm.

 5              When were the 2016 returns filed?

 6         A   I think you asked me that, but maybe you

 7    didn't.  I don't know.

 8         Q   Who would know?  If you don't know, who would

 9    know?

10         A   Well, I imagine if we had the return, that

11    would indicate when it was filed.

12         Q   Let's ask this.  Did you apply for an

13    extension to file the 2016 return?

14         A   I think we did, but I'm not certain about

15    that.

16         Q   So you believe it would have been filed later

17    in 2017?  More recently within the last twelve months?

18              MR. CHA:  It calls for speculation.  He's giving

19    you the best answer possible.

20              MR. SELTH:  He is the only person who would know.

21              MR. CHA:  I understand that, but he's given you

22    the answer.

23              THE WITNESS:  I don't remember when the '16 return

24    was filed, sir.

25         Q   (BY MR. SELTH:)  Okay.  But the bankruptcy
```

1   case was filed in March 2017, correct?

2          A    The first bankruptcy case in Florida?  I don't

3   know.  I think it was -- maybe it was in early March.

4   I don't remember.

5          Q    You think so?

6          A    I think it was early March.

7          Q    Had the 2013, '14, and '15 tax returns been

8   filed at the time of the bankruptcy case?

9          A    I don't remember.

10         Q    You don't remember if the 2013 returns had

11  been filed by March 2017?

12         A    I think you just asked me that.

13         Q    So you are not sure if they were filed timely

14  or were late?

15         A    Sir, I don't remember what returns had been

16  filed as of the date of bankruptcy.

17         Q    And the only way you would know is to look at

18  the returns themselves?

19         A    Well, I'm sure that's not the only way that

20  I could figure that out, but as I sit here right now,

21  that would probably be the best way.

22         Q    What would be another way you could figure it

23  out --

24         A    I don't know.  I can't speculate.

25         Q    -- as to how you would find out when they were

1    filed?

2              (Exhibit Number 4 was marked for identification.)

3         Q    (BY MR. SELTH:)  Let me show you Exhibit 4.

4    And this is a Proof of Claim that was filed by the IRS in

5    October of 2017.  I will represent the IRS filed Proof of

6    Claim and several amendments to Proof of Claim.  This was

7    the last Proof of Claim filed in the bankruptcy case, and

8    it was amended and filed on October 10th as Claim 1-6.

9         MR. CHA:  October 10, 2017?

10        MR. SELTH:  Yes, sir.

11        MR. CHA:  Okay.

12        Q    (BY MR. SELTH:)  Mr. Avenatti, on the last

13   page of this Proof of Claim, the IRS states that tax

14   returns for '14, '15, and '16 have not been filed.

15   Do you see that?

16        A    I've never seen this document before, so if

17   you're asking me -- I mean I see the words on the page

18   here, on the last page.  I can't --

19        Q    Do you have any reason to believe it's not

20   true?

21        MR. CHA:  Based upon the answers --

22        THE WITNESS:  Please stop interrupting me.

23        MR. CHA:  Based on the upon the answers he's

24   given, the record speaks for itself.

25        Q    (BY MR. SELTH:)  Do you have any reason to

July 25, 2018

1    believe that this Proof of Claim is not correct?

2           A   I don't know.  I've never seen the document

3    before.

4           Q   Did you look at any of the Proofs of Claim

5    filed in the bankruptcy case?

6           A   A few.

7           Q   Any of the IRS claims?

8           A   I think I did early on.

9           Q   You cut a settlement with the IRS as part of

10   the dismissal of the bankruptcy case --

11          A   Yes.

12          Q   -- in which you agreed to pay certain payroll

13   taxes?

14          A   Certain taxes, yes.

15          Q   But you don't recall seeing this Proof of

16   Claim at the time you were negotiating that settlement

17   with the IRS?

18          A   I'm sure my lawyers took a good look at it.

19          Q   Did EA provide K-1's to you for the years 2013

20   through 2016?

21          A   I believe they did.

22          Q   Did you file personal tax returns reflecting

23   that income?

24          A   I'm not going to answer that question.

25          MR. CHA:  Objection to that.  He's not a judgment

 1    repayments, expense reimbursements, salary, profit

 2    sharing, distribution?  What form of distribution?

 3         A    Basically all of those with the exception of

 4    salary.  But I may have received salary in '13, but

 5    I just don't remember.

 6         Q    In the bankruptcy schedules there was a list

 7    of loan repayments to you in the twelve months prior to

 8    the bankruptcy filing.  Is there still a loan owed from

 9    EA to you?

10         A    I believe there is, but I'm not certain about

11    that.

12         Q    Do you know the balance?

13         A    I don't.

14         Q    When was the last time EA repaid a loan

15    payment to you?

16         A    I think it was before the bankruptcy.  I think

17    it was listed on one of the schedules.

18         Q    What company is handling the payroll for EA?

19         A    I don't know.  I don't know the name of the

20    company.  We have a payroll company, but I don't know the

21    name of it.

22         Q    Who would know that?  Judy?

23         A    Yeah.  I'm sure we can get you the name of it.

24         Q    Is it the same payroll company that was

25    handling it during the bankruptcy?

```
 1              A    I think it is.

 2              Q    Is it Paychecks?

 3              A    Sir, I don't know the name.  I don't get a

 4    check from the company, so I don't know the name of it.

 5              Q    Does your payroll company handle your payroll

 6    tax withholdings?

 7              A    I believe they do.

 8              Q    For a while that was not the case; is that

 9    correct?

10              A    I don't understand the question.

11              Q    Prior to the bankruptcy being filed, didn't

12    you testify -- excuse me.

13                   In the meeting of creditors that

14    Mr. Hauler conducted I believe in June of 2017, you were

15    asked about who was handling the payroll tax withholding

16    payments for EA.  Do you recall that?

17              A    I recall being asked questions on that topic.

18    I do not recall what my answers were at the time.

19              Q    Do you recall testifying at the meeting of

20    creditors that EA had taken the payroll tax withholding

21    back in-house, so to speak, instead of Paychecks handling

22    it?

23              A    I don't recall testifying to that.  That does

24    not -- by that answer I do not mean to suggest that that

25    was not my testimony.  I just don't remember.
```

July 25, 2018

```
1              Q    How did EA fall delinquent in payroll taxes

2       prior to bankruptcy filing?

3              A    What does this to have to do --

4              MR. CHA:  I was going to say.

5              MR. SELTH:  It's about EA.

6              MR. CHA:  Your client --

7              THE WITNESS:  You are just trying to embarrass me.

8              MR. SELTH:  I couldn't care less about that.

9              MR. CHA:  Your client is trying to collect a

10      judgment.  No issues there.  But the question you just

11      asked is so far afield from the purpose for which we are

12      here.

13             MR. SELTH:  No.

14             MR. CHA:  It makes it seem patently obvious that

15      you are asking, one, irrelevant questions, and, two, you

16      are not pursuing the goal for which you are here.

17             MR. SELTH:  It's my job of how I get to that goal,

18      Mr. Cha.

19             MR. CHA:  You are asking for something that

20      happened in 2013.  You are asking him to testify to

21      recollections of testimony previously given.

22             MR. SELTH:  Right.  He's going to do his best.

23             MR. CHA:  I've got transcripts.  I've got the

24      transcripts.  You've got the transcripts.  You know what

25      his prior testimonies were in two different settings.
```

July 25, 2018

1      Q   (BY MR. SELTH:)  My question is:  How did the

2   EA come to fall behind on its payroll tax?

3      A   I don't remember.

4      Q   Really?

5          Did you pay 2,000,000 dollars to the

6   IRS as part of the dismissal of the bankruptcy case?

7      A   You want to ask me questions or argue with me?

8      MR. CHA:  That's argumentative.

9      Q   (BY MR. SELTH:)  Why did you pay 2,000,000

10  dollars if you didn't owe it?

11     MR. CHA:  Jim, that's argumentative.  I am going

12  to instruct him not to answer.  You can mark that one,

13  too.

14     Q   (BY MR. SELTH:)  The question is:  How did

15  EA fall behind on the payroll tax?  You don't remember?

16     A   I don't recall.

17     Q   You are saying that with a straight face.

18     MR. CHA:  Wait a second, Jim.

19     MR. SELTH:  Mr. Cha.

20     MR. CHA:  Jim.

21     MR. SELTH:  It's one thing for him to say he

22  doesn't recall his precise payment in 2013.

23     MR. CHA:  May I finish?

24     MR. SELTH:  Yes.

25     MR. CHA:  I will give you as much latitude as

EXHIBIT 8

```
1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

2               COUNTY OF LOS ANGELES - CENTRAL DISTRICT

3      DEPT 44    JUDGE:  EDWARD B. MORETON, JR.

4         JASON FRANK LAW PLC,          )
          Professional law corporation, )
5                                        )
                            Plaintiff   )
6                                        )
              Vs.                        ) Case No: BC706555
7                                        )
          MICHAEL J. AVENATTI,           )
8         An individual,                 )
                                         )
9                            Defendant.  )
          _____)
10

11

12

13                  JUDGMENT DEBTOR EXAMINATION,

14      taken on behalf of the Applicant, at the Stanley Mosk

15      Courthouse, 111 North Hill Street, Los Angeles,

16      California, 90012, in Department 44, commencing at 11:57

17      a.m., Friday, March 15, 2019, before Winifred

18      McCray-Moody, C.S.R. No. 12747, (Morning Session), and

19      Ann Bonnette, C.S.R. No. 6108, (Afternoon Session).

20

21

22

23

24

25
```

JUDGMENT DEBTOR EXAMINATION, MARCH 15, 2019

```
 1      APPEARANCES:

 2      For the Applicant:

 3      LAW OFFICES OF FRANK SIMS & STOLPER, LLP

 4      BY:  ANDREW D. STOPLER, ESQ.

 5      19800 MacArthur Boulevard

 6      Suite 855

 7      Irvine, CA 92612

 8      (949) 201-2400

 9      astolper@lawfss.com

10

11      For the Defendant:

12      LAW OFFICES OF SHULMAN HODGES & BASTIAN, LLP

13      BY:  RONALD S. HODGES, ESQ.

14      100 Spectrum Center Drive

15      Suite 600

16      Irvine, CA 92618

17      (949) 340-3400

18      rhodges@shbllp.com

19

20

21

22

23

24

25
```

JUDGMENT DEBTOR EXAMINATION, MARCH 15, 2019

```
 1                        I N D E X

 2     WITNESS:            EXAMINATION       PAGE

 3     MICHAEL J. AVENATTI   BY MR. STOLPER    4, 6, 7, 9, 10

 4                                            13, 14, 15, 16

 5                                            26, 28, 29, 31

 6                                            35, 38, 44, 45

 7                                            46, 47, 48, 49

 8                                            50, 57, 58, 59

 9                                            60, 62, 64, 67,

10                                            68

11

12

13                        E X H I B I T S

14                          None.

15

16

17               INSTRUCTIONS NOT TO ANSWER

18               PAGE                 LINE

19               6                    9
                 9                    4
20               10                   11
                 15                   8
21               16                   4
                 18                   1
22               19                   8
                 22                   25
23               46                   22
                 47                   1
24

25
```

JUDGMENT DEBTOR EXAMINATION, MARCH 15, 2019

```
 1                LOS ANGELES, CALIFORNIA, FRIDAY, MARCH 15, 2019

 2                              11:19 A.M.

 3                              EXAMINATION

 4      BY MR. STOLPER:

 5      Q.      MR. AVANATTI, DO YOU UNDERSTAND YOU'RE UNDER

 6      OATH?

 7      A.      I'M SORRY, SIR?

 8      Q.      DO YOU UNDERSTAND YOU'RE UNDER OATH?

 9      A.      YES.

10      Q.      CAN YOU PLEASE STATE YOUR FULL NAME, PLEASE?

11      A.      MICHAEL JOHN AVANATTI.

12      Q.      WHAT IS YOUR CURRENT RESIDENTIAL ADDRESS?

13      A.      10000 SANTA MONICA BOULEVARD, NUMBER 2107, L.A.,

14      90067.

15      Q.      DO YOU OWN, OR DO YOU RENT?

16      A.      I RENT.

17      Q.      WHAT IS THE NAME THAT THE LEASE IS HELD IN?

18      A.      I THINK IT'S MY NAME, INDIVIDUAL.

19      Q.      WHAT'S THE TERM OF YOUR LEASE?

20      A.      I DON'T REMEMBER.

21      Q.      HOW LONG HAVE YOU LIVED THERE?

22      A.      AT THAT ADDRESS, ABOUT -- I THINK THREE MONTHS.

23      Q.      HOW LONG IN THAT BUILDING?

24      A.      I'VE HAD A UNIT IN THAT BUILDING SINCE MARCH OF

25      2017.
```

JUDGMENT DEBTOR EXAMINATION, MARCH 15, 2019

```
 1                       AFTERNOON SESSION

 2                          1:10 P.M.

 3              (THEREUPON, REPORTER WINIFRED MCCRAY-MOODY

 4              WAS REPLACED BY REPORTER ANN BONNETTE.)

 5                     EXAMINATION (RESUMED)

 6   BY MR. STOLPER:

 7       Q    MR. AVENATTI, WE'RE BACK ON THE RECORD.

 8            YOU UNDERSTAND YOU ARE STILL UNDER OATH?

 9       A    YES, SIR.

10       Q    ARE YOU A CITIZEN OF ANY COUNTRY OTHER THAN THE

11   UNITED STATES?

12       A    ITALY.

13       Q    HOW LONG HAVE YOU BEEN AN ITALIAN CITIZEN?

14       A    I DON'T REMEMBER.

15       Q    WHEN DID YOU APPLY FOR THE ITALIAN PASSPORT?

16       A    I DON'T REMEMBER.

17       Q    WHEN YOU WERE A CHILD?

18       A    NO.  I WASN'T A CHILD.

19       Q    WERE YOU AN ADULT WHEN YOU APPLIED FOR THE

20   ITALIAN PASSPORT?

21       A    YES.

22       Q    WAS IT IN THE LAST FIVE YEARS?

23       A    I DON'T REMEMBER.

24       Q    ISN'T IT TRUE YOU HAD A DOCUMENT NOTARIZED IN

25   2015 AS PART OF YOUR APPLICATION FOR ITALIAN CITIZENSHIP?
```

1    PERFORMED?

2         A    SOME LEGAL WORK, SOME POLITICAL WORK, SOME OTHER

3    WORK.

4         Q    HOW LONG HAS MS. SCOTT WORKED FOR YOU DIRECTLY

5    OR INDIRECTLY?

6         A    I DON'T KNOW.  EIGHTEEN MONTHS, MAYBE.

7         Q    WHAT IS MS. SCOTT'S ROLE IN DESERT HARVEST, IF

8    ANY?

9         A    NONE.

10        Q    TO YOUR KNOWLEDGE, DOES MS. SCOTT HAVE ANY

11   DIRECT OR INDIRECT INTEREST IN DESERT HARVEST?

12        A    SHE HAS NONE.

13        Q    AS I UNDERSTAND IT, YOUR WORK FOR DESERT HARVEST

14   WAS THAT OF AN ATTORNEY?  IS THAT YOUR TESTIMONY?

15        A    ATTORNEY AND ADVISOR.

16        Q    ATTORNEY AND ADVISOR.

17             BEYOND BEING AN ATTORNEY AND ADVISOR, DID YOU

18   RECEIVE ANY EQUITY INTEREST IN DESERT HARVEST, IN ANY WAY,

19   SHAPE, OR FORM?

20        A    NO.

21        Q    WHAT IS AUGUSTUS LLP?

22        A    IT'S A LIMITED LIABILITY PARTNER.

23        Q    WHO OWNS AUGUSTUS LLP?

24        A    I'M NOT AT LIBERTY TO DISCLOSE THAT.  IT'S NOT

25   ME.

1      Q    DO YOU HAVE ANY DIRECT OR INDIRECT INTEREST IN

2    AUGUSTUS, LLP.

3      A    NO.

4      Q    WHY ARE YOU NOT AT LIBERTY TO DISCLOSE WHO OWNS

5    IT?

6      A    BECAUSE IT WAS ESTABLISHED FOR A CLIENT.

7      Q    WHEN WAS IT ESTABLISHED?

8      A    I DON'T REMEMBER.

9      Q    WAS IT ESTABLISHED BY YOU INDIVIDUALLY OR BY ONE

10    OF YOUR LAW FIRMS FOR A CLIENT?

11      A    I DON'T REMEMBER.

12      Q    TO YOUR KNOWLEDGE, DOES AUGUSTUS LLP HAVE ANY

13    ASSETS?

14          MR. HODGES:  OBJECT TO THE EXTENT THAT CALLS FOR

15    ATTORNEY-CLIENT PRIVILEGE.

16          YOU CAN ANSWER THAT "YES" OR "NO" AS TO WHETHER

17    YOU KNOW.

18          THE WITNESS:  I DON'T KNOW HOW I WOULD ANSWER

19    THAT WITHOUT RELYING ON THE INFORMATION FROM MY CLIENT.

20    BY MR. STOLPER:

21      Q    WHETHER OR NOT AUGUSTUS HAS ASSETS IS

22    ATTORNEY-CLIENT PRIVILEGE?

23          MR. HODGES:  OF COURSE.

24          THE WITNESS:  SURE.

25

1    BY MR. STOLPER:

2        Q    I'M NOT ASKING FOR COMMUNICATION.  I AM ASKING

3    FOR WHETHER OR NOT YOU KNOW OF THE FACTS?

4            MR. HODGES:  IT DEPENDS ON WHERE THE PREDICATE

5    FACT COMES FROM.  IF IT IS SOMETHING TOLD BY THE CLIENT,

6    IT IS PRIVILEGED.

7    BY MR. STOLPER:

8        Q    OUTSIDE OF ATTORNEY-CLIENT COMMUNICATION, DO YOU

9    HAVE ANY BASIS TO KNOW WHETHER OR NOT AUGUSTUS, LLC OR LLP

10   HAS ANY ASSETS?

11       A    NO.

12       Q    WHERE -- THE ENTITY AUGUSTUS LLP, IN WHAT

13   JURISDICTION WAS IT FORMED?

14       A    I DON'T REMEMBER.

15       Q    ARE THERE ANY OTHER ENTITIES THAT YOU FORMED FOR

16   CLIENTS OVER THE YEARS?

17       A    THERE'RE ALL KINDS OF ENTITIES I HAVE FORMED.

18       Q    THAT'S SOMETHING THAT YOU ORDINARILY DO IN YOUR

19   PRACTICE?

20       A    WELL, FROM TIME TO TIME.  YES.

21       Q    WHAT IS 2193 -- 21923 PARTHENIA LLC?

22       A    I DON'T REMEMBER.

23       Q    HAVE YOU EVER HEARD OF IT BEFORE?

24       A    I HAVE, BUT I DON'T REMEMBER WHY IT WAS FORMED.

25       Q    IS IT SOMETHING THAT YOU CONTROL?

# EXHIBIT 9

1              UNITED STATES BANKRUPTCY COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                   SANTA ANA DIVISION

4

5    IN RE:                    )
                               )
6                              )
     EAGAN AVENATTI, LLP,      )   No. 8:17-bk-11961-CB
7                              )
              Debtor.          )
8                              )
     _____)
9

10

11

12

13        DEBTOR EXAMINATION OF MICHAEL AVENATTI

14                  PAGES 1 - 245

15    (PAGES 133 THROUGH 155 AND PAGES 174 THROUGH 190

16    WERE MARKED CONFIDENTIAL AND BOUND SEPARATELY)

17             TUESDAY, MARCH 22, 2019

18             LOS ANGELES,  CALIFORNIA

19

20

21

22

23

24
               Reported by Serena Wong
25           CSR #10250, RPR, CCRR #200

1              UNITED STATES BANKRUPTCY COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                  SANTA ANA DIVISION

4

5   IN RE:                    )
                              )
6                             )
    EAGAN AVENATTI, LLP,      )   No. 8:17-bk-11961-CB
7                             )
            Debtor.           )
8                             )
    _____ )
9

10

11

12

13

14

15          THE DEPOSITION OF MICHAEL AVENATTI,

16   taken at 345 350 W. 1st Street, Los Angeles,

17   California, on Friday, March 22,  2019, before

18   Serena Wong, CSR #10250, RPR, CCRR #200, Certified

19   Shorthand Reporter, in and for the State of

20   California.

21

22

23

24

25

```
 1    APPEARANCES:

 2
      For the Debtor:
 3
            SHULMAN, HODGES & BASTIAN
 4          BY:  RONALD S. HODGES, ESQ.
            100 Spectrum Center Drive
 5          Suite 600
            Los Angeles, California  92618
 6          949.340.3400
            rhodges@shbllp.com
 7
      Fo the Claimant:
 8
            FRANK, SIMS, STOLPER
 9          BY:  ANDREW D. STOLPER, ESQ.
                 JASON FRANK, ESQ.
10          19800 MacArthur Parkway
            Suite 855
11          Irvine, California  92612
            949.201.2400
12          astolper@lawfss.com

13    For the Receiver:

14          LANDAU, GOTTFRIED & BERGER, LLP
            BY:  JOHN P. REITMAN, ESQ.
15          1801 Century Park East
            Suite 700
16          Los Angeles, California 90067
            310.557.0056
17          jreitman@lgbfirm.com

18

19

20

21

22

23

24

25
```

```
 1                    FRIDAY, MARCH 22, 219

 2                 LOS ANGELES, CALIFORNIA

 3

 4                  MICHAEL M. AVENATTI,

 5   was called as a witness, and having been first duly

 6   sworn, was examined and testified as follows:

 7

 8                       EXAMINATION

 9   BY MR. STOLPER:

10       Q    Good morning, Mr. Avenatti.  You understand

11   you're under oath?

12       A    Yes, sir.

13       Q    Mr. Avenatti, I first want to ask you some

14   questions about your productions in response to JFL's

15   notice.  On November 28, 2018, you were ordered by

16   Judge Scott to produce documents in response to the

17   notice; is that correct?

18       A    I don't know if it's correct or not as to

19   date.

20       Q    I'm going to go ahead and put up what I've

21   marked as Exhibit 70.  Sorry.  76.  Let's try this.

22   There you go.

23            (Exhibit 76 was marked.)

24       Q    BY MR. STOLPER:  Do you recognize that

25   document?
```

```
 1                THE WITNESS:  I don't.
 2        Q    BY MR. STOLPER:  Mr. Avenatti, have you
 3   produced Eagan Avenatti's federal and state tax returns
 4   from 2013 to the present?
 5        A    I don't remember.  We may have.
 6        Q    Do you recall what steps you took to gather
 7   those tax returns and produce them to JFL Law, if, in
 8   fact, that happened?
 9                MR. HODGES:  Foundation; argumentative.
10                THE WITNESS:  I don't.
11        Q    BY MR. STOLPER:  Would you have done that
12   yourself or would you have instructed an employee to do
13   that?
14        A    Sir, I don't.
15        Q    Who has the tax returns or copies of the tax
16   returns from EA from 2013 to the present, other than
17   the IRS?
18        A    I think they're in the files of the firm in
19   storage.
20        Q    Mr. Avenatti, have you produced all of Eagan
21   Avenatti's agreements with Avenatti & Associates to
22   Jason Frank Law in response to Judge Scott's order?
23        A    Sir, I don't recall without looking at the
24   entirety of the production, as well as the productions
25   that were made prior to the order, because we were not
```

```
 1    under an obligation to reproduce to you something that
 2    was argumentative.
 3         Q    So your testimony is that -- I'm sorry.
 4              My question was simple.  Did you produce to
 5    Jason Frank Law the agreements between Eagan Avenatti
 6    and Avenatti & Associates?
 7              MR. HODGES:  Foundation as to the existence
 8    of any such documents.
 9              You can answer.
10              THE WITNESS:  Sir, I just answered the
11    question.  I do not recall.  There's been a lot of
12    documents that have been produced over the years to
13    Mr. Frank and his counsel.  We were not under an
14    obligation to reproduce documents that had previously
15    been produced.
16         Q    BY MR. STOLPER:  When you say you weren't
17    under an obligation to produce documents that were
18    previously produced, where do you get that from?  Why
19    do you believe that to be true?
20         A    It's generally true.  It's generally true in
21    the law.
22         Q    Mr. Avenatti, did Eagan Avenatti file tax
23    returns each year -- federal tax returns from each year
24    from 2013 until the Receiver took over as the manager
25    of Eagan Avenatti?
```

1           A    The '18 has not been filed yet.  But to the
2     best of my knowledge, yes.
3           Q    And did Eagan Avenatti file state tax returns
4     for each of those years, with the exception of 2018?
5           A    I believe that's true.
6           Q    Are you the person who signed those tax
7     returns?
8           A    I don't remember.
9           Q    Is there somebody else at Eagan Avenatti who
10    was authorized to sign tax returns prior to the
11    Receiver taking over?
12          A    I don't know.  When you say "authorized" --
13          Q    Were you the managing partner at Eagan
14    Avenatti until the Receiver took over Eagan Avenatti?
15          A    I don't know how to answer that question.
16    Generally, yes.
17          Q    Were there times where you were not the
18    managing partner from 2013 to the time the Receiver
19    took over?
20          A    No.
21          Q    So during that entire time period, you were
22    the sole managing partner at Eagan Avenatti; correct?
23          A    I think that's true.
24          Q    You're not sure, though?
25               MR. HODGES:  Argumentative.

# EXHIBIT 10

| From: | Maritza Nowowiejski |
|---|---|
| To: | m@thefight.us; Jim Bastian; mlowe@shbllp.com; Ron Hodges; Ryan O"Dea; John Reitman; Jack Reitman; Brian Weiss |
| Cc: | Scott Sims; Andrew Stolper; Jason Frank |
| Subject: | In Re Eagan Avenatti - Notice of Subpoena |
| Date: | Thursday, July 18, 2019 7:07:11 PM |
| Attachments: | image003.png |
| | image001.png |
| | image002.png |
| | 2019.07.18 Notice of Subpoena - Chase.pdf |

Please see attached.

FSS logo 7

**MARITZA NOWOWIEJSKI** | PARALEGAL/OFFICE MANAGER

- 949.201.2400
- 949.201.2405

Newport Gateway | 19800 MacArthur Blvd. Suite 855 | Irvine, CA 92612

1   Daniel J. Weintraub, State Bar No. 132111
    James R. Selth, State Bar No. 123420
2   Nina Z. Javan, State Bar No. 271392
    WEINTRAUB & SELTH, APC
3   11766 Wilshire Boulevard, Suite 1170
    Los Angeles, California 90025
4   Telephone: (310) 207-1494
    Facsimile: (310) 442-0660
5   jim@wsrlaw.net

6   Andrew D. Stolper, State Bar No. 205462
    Scott H. Sims, State Bar No. 234148
7   FRANK SIMS & STOLPER LLP
    19800 MacArthur Boulevard, Suite 855
8   Irvine, California 92612
    Telephone: (949) 201-2400
9   Facsimile: (949) 201-2401
    astolper@lawfss.com
10  ssims@lawfss.com

11  Attorneys for Judgment Creditor
    JASON FRANK LAW, PLC
12

13              UNITED STATES DISTRICT COURT

14              CENTRAL DISTRICT OF CALIFORNIA

15

16  In re                              Case No.  8:18-cv-01644-VAP-KES

17  EAGAN AVENATTI, LLP,

18          Debtor.                    **NOTICE OF SUBPOENA TO
                                        PRODUCE DOCUMENTS,
19                                      INFORMATION OR OBJECTS
                                        IN A CIVIL ACTION**
20

21

22

23

24

25

26

27

28

1   **TO ALL PARTIES HEREIN AND TO THEIR ATTORNEYS OF**
2   **RECORD:**

3       **PLEASE TAKE NOTICE** that pursuant to Rule 45 of the Federal Rule of Civil
4   Procedure, the attached subpoenas will be served on the following deponents:

5       1. Exhibit 1 – JP Morgan Chase

6

7   Dated: July 18 , 2019                 **FRANK SIMS & STOLPER LLP**

8

9                       By:    */s/ Scott H. Sims*
                                 Andrew D. Stolper
10                                   Scott H. Sims
                                 Attorneys for Jason Frank Law PLC

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NOTICE OF SUBPOENAS TO PRODUCE DOCUMENTS,**
**INFORMATION OR OBJECTS IN A CIVIL ACTION**

Exhibit 1

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Central District of California

| | | |
|---|---|---|
| In Re Eagan Avenatti, LLP | ) | |
| _____ | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.  8:18-cv-01644-VAP-KES |
| | ) | |
| _____ | ) | |
| *Defendant* | ) | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:                                          JP Morgan Chase
_____

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

SEE ATTACHMENT

| Place: Frank Sims & Stolper LLP | Date and Time: |
|---|---|
| 19800 MacArthur Blvd., Suite 855 Irvine, CA 92612 | 08/09/2019 10:00 am |

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    07/18/2019

                    *CLERK OF COURT*
                                                            OR
    _____                    /s/ Scott H. Sims
    *Signature of Clerk or Deputy Clerk*            _____
                                                    *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
Jason Frank Law, PLC                                                    , who issues or requests this subpoena, are:
Scott H. Sims, Frank Sims & Stolper LLP, 19800 MacArthur Blvd., #855, Irvine, CA 92612, (949) 201-2400

## Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   8:18-cv-01644-VAP-KES

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❑  I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❑  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____           _____
                                            *Server's signature*

                                 _____
                                            *Printed name and title*

                                 _____
                                            *Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
   **(i)** is a party or a party's officer; or
   **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
   **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
   **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
   **(i)** fails to allow a reasonable time to comply;
   **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
   **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
   **(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
   **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

   **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
   **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
   **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
   **(i)** expressly make the claim; and
   **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

In Re Avenatti, LLP                    Case No. 8:18-cv-01644-VAP-KESx

**ATTACHMENT**

**Subpoena to JP Morgan Chase**

The documents described below are to be produced pursuant to this Subpoena.

The term "YOU" or "YOUR" refers to JP Morgan Chase and its related entities ("Chase").  **PLEASE NOTE: this Subpoena calls for the production of bank records for Client Trust Accounts (IOLTA Accounts).**

**<u>DOCUMENTS</u>**

1. All documents and/or bank records showing the source of funds used to purchase Cashier's Check 9601703091 purchased on May 8, 2019 (a true and correct copy of which is attached hereto as Exhibit "A"), including but not limited to:
   a. All Bank statements from that account;
   b. Copies of all paid checks from that account, if not included on bank statements;
   c. Copies of all deposited checks from that account;
   d. All documents pertaining to wire transfers sent or received from that account, including but not limited to:
      i. Fed Wire, CHIPS, SWIFT, or other money transfer of message documents;
      ii. Documents (checks, debit memos, cash in tickets, wires in, etc.,) reflecting the source of all funds wire out;
      iii. Documents (bank checks, credit memos, cash out tickets, wires outs, etc.,) reflecting the ultimate disposition within the bank of all funds wired in;
      iv. Notes, memoranda or other writings pertaining to the sending or receipt of wire transfers.
   e. Electronic transfers and any related information necessary to identify the recipient of the electronic transfer and sender of the electronic

transfer from that account, including but not limited to the bank and bank account number of the recipient and sender;

f.  Copies of any counter checks issued from that account;

g.  Copies of any cashier checks issued from that account;

h.  Copies of requests for wire transfers, electronic transfers, counter checks and/or cashier checks from that account;

i.  Signature cards for all accounts, including any revised or superseded signature cards from that account.

2.  **MICHAEL AVENATTI -** All bank records for all accounts maintained at YOUR bank in which **MICHAEL AVENATTI** (Social Security No. ▆▆▆▆▆▆) is a signator from January 1, 2013 to the date of this subpoena is served, including but not limited to:

a.  All Bank statements;

b.  Copies of all paid checks, if not included on bank statements;

c.  Copies of all deposited checks;

d.  All documents pertaining to wire transfers sent or received, including but not limited to:

   i.  Fed Wire, CHIPS, SWIFT, or other money transfer of message documents;

   ii.  Documents (checks, debit memos, cash in tickets, wires in, etc.,) reflecting the source of all funds wire out;

   iii.  Documents (bank checks, credit memos, cash out tickets, wires outs, etc.,) reflecting the ultimate disposition within the bank of all funds wired in;

   iv.  Notes, memoranda or other writings pertaining to the sending or receipt of wire transfers.

e.  Electronic transfers and any related information necessary to identify the recipient of the electronic transfer and sender of the electronic transfer, including but not limited to the bank and bank account number of the recipient and sender;

f.  Copies of any counter checks issued;

g.  Copies of any cashier checks issued;

h.  Copies of requests for wire transfers, electronic transfers, counter checks and/or cashier checks;

      i.  Signature cards for all accounts, including any revised or superseded signature cards.

3. **AUGUSTUS, LLP -** All bank records for all accounts maintained at YOUR bank in which Augustus, LLP (LLP File No. 202019002002) is a signator from January 1, 2013 to the date of this subpoena is served, including but not limited to:

   a. All Bank statements;

   b. Copies of all paid checks, if not included on bank statements;

   c. Copies of all deposited checks;

   d. All documents pertaining to wire transfers sent or received, including but not limited to:

      i. Fed Wire, CHIPS, SWIFT, or other money transfer of message documents;

      ii. Documents (checks, debit memos, cash in tickets, wires in, etc.,) reflecting the source of all funds wire out;

      iii. Documents (bank checks, credit memos, cash out tickets, wires outs, etc.,) reflecting the ultimate disposition within the bank of all funds wired in;

      iv. Notes, memoranda or other writings pertaining to the sending or receipt of wire transfers.

   e. Electronic transfers and any related information necessary to identify the recipient of the electronic transfer and sender of the electronic transfer, including but not limited to the bank and bank account number of the recipient and sender;

   f. Copies of any counter checks issued;

   g. Copies of any cashier checks issued;

   h. Copies of requests for wire transfers, electronic transfers, counter checks and/or cashier checks;

   i. Signature cards for all accounts, including any revised or superseded signature cards.

4. **EAGAN AVENATTI, LLP -** All bank records for all accounts maintained at YOUR bank by **EAGAN AVENATTI, LLP** from January 1, 2013 to the date this subpoena is served, including but not limited to:

a. All Bank statements;

b. Copies of all paid checks, if not included on bank statements;

c. Copies of all deposited checks;

d. All documents pertaining to wire transfers sent or received, including but not limited to:

    i. Fed Wire, CHIPS, SWIFT, or other money transfer of message documents;

    ii. Documents (checks, debit memos, cash in tickets, wires in, etc.,) reflecting the source of all funds wire out;

    iii. Documents (bank checks, credit memos, cash out tickets, wires outs, etc.,) reflecting the ultimate disposition within the bank of all funds wired in;

    iv. Notes, memoranda or other writings pertaining to the sending or receipt of wire transfers.

e. Electronic transfers and any related information necessary to identify the recipient of the electronic transfer and sender of the electronic transfer, including but not limited to the bank and bank account number of the recipient and sender;

f. Copies of any counter checks issued;

g. Copies of any cashier checks issued;

h. Copies of requests for wire transfers, electronic transfers, counter checks and/or cashier checks; and

i. Signature cards for all accounts, including any revised or superseded signature cards.

5. **AVENATTI & ASSOCIATES, APC -** All bank records for all accounts maintained at YOUR bank by **AVENATTI & ASSOCIATES, APC** from January 1, 2013 to the date this subpoena, including but not limited to:

a. All Bank statements;

b. Copies of all paid checks, if not included on bank statements;

c. Copies of all deposited checks;

d. All documents pertaining to wire transfers sent or received, including but not limited to:

    i. Fed Wire, CHIPS, SWIFT, or other money transfer of message documents;

    ii.  Documents (checks, debit memos, cash in tickets, wires in, etc.,) reflecting the source of all funds wire out;

    iii.  Documents (bank checks, credit memos, cash out tickets, wires outs, etc.,) reflecting the ultimate disposition within the bank of all funds wired in;

    iv.  Notes, memoranda or other writings pertaining to the sending or receipt of wire transfers.

  e.  Electronic transfers and any related information necessary to identify the recipient of the electronic transfer and sender of the electronic transfer, including but not limited to the bank and bank account number of the recipient and sender;

  f.  Copies of any counter checks issued;

  g.  Copies of any cashier checks issued;

  h.  Copies of requests for wire transfers, electronic transfers, counter checks and/or cashier checks; and

  i.  Signature cards for all accounts, including any revised or superseded signature cards.

6.  **GLOBAL BARISTAS USA, LLC -** All bank records for all accounts maintained at YOUR bank by **GLOBAL BARISTAS USA, LLC** from January 1, 2013 to the date this subpoena is served, including but not limited to:

  a.  All Bank statements;

  b.  Copies of all paid checks, if not included on bank statements;

  c.  Copies of all deposited checks;

  d.  All documents pertaining to wire transfers sent or received, including but not limited to:

    i.  Fed Wire, CHIPS, SWIFT, or other money transfer of message documents;

    ii.  Documents (checks, debit memos, cash in tickets, wires in, etc.,) reflecting the source of all funds wire out;

    iii.  Documents (bank checks, credit memos, cash out tickets, wires outs, etc.,) reflecting the ultimate disposition within the bank of all funds wired in;

    iv.  Notes, memoranda or other writings pertaining to the sending or receipt of wire transfers.

e. Electronic transfers and any related information necessary to identify the recipient of the electronic transfer and sender of the electronic transfer, including but not limited to the bank and bank account number of the recipient and sender;

f. Copies of any counter checks issued;

g. Copies of any cashier checks issued;

h. Copies of requests for wire transfers, electronic transfers, counter checks and/or cashier checks; and

i. Signature cards for all accounts, including any revised or superseded signature cards.

7. **GLOBAL BARISTAS, LLC -** All bank records for all accounts maintained at YOUR bank by **GLOBAL BARISTAS, LLC** from January 1, 2013 to the date this subpoena is served, including but not limited to:

a. All Bank statements;

b. Copies of all paid checks, if not included on bank statements;

c. Copies of all deposited checks;

d. All documents pertaining to wire transfers sent or received, including but not limited to:

   i. Fed Wire, CHIPS, SWIFT, or other money transfer of message documents;

   ii. Documents (checks, debit memos, cash in tickets, wires in, etc.,) reflecting the source of all funds wire out;

   iii. Documents (bank checks, credit memos, cash out tickets, wires outs, etc.,) reflecting the ultimate disposition within the bank of all funds wired in;

   iv. Notes, memoranda or other writings pertaining to the sending or receipt of wire transfers.

e. Electronic transfers and any related information necessary to identify the recipient of the electronic transfer and sender of the electronic transfer, including but not limited to the bank and bank account number of the recipient and sender;

f. Copies of any counter checks issued;

g. Copies of any cashier checks issued;

     h. Copies of requests for wire transfers, electronic transfers, counter checks and/or cashier checks; and

     i. Signature cards for all accounts, including any revised or superseded signature cards.

8. **PASSPORT 420 LLC -** All bank records for all accounts maintained at YOUR bank by **PASSPORT 420, LLC** from January 1, 2013 to the date this subpoena is served, including but not limited to:

     a. All Bank statements;

     b. Copies of all paid checks, if not included on bank statements;

     c. Copies of all deposited checks;

     d. All documents pertaining to wire transfers sent or received, including but not limited to:

          i. Fed Wire, CHIPS, SWIFT, or other money transfer of message documents;

          ii. Documents (checks, debit memos, cash in tickets, wires in, etc.,) reflecting the source of all funds wire out;

          iii. Documents (bank checks, credit memos, cash out tickets, wires outs, etc.,) reflecting the ultimate disposition within the bank of all funds wired in;

          iv. Notes, memoranda or other writings pertaining to the sending or receipt of wire transfers.

     e. Electronic transfers and any related information necessary to identify the recipient of the electronic transfer and sender of the electronic transfer, including but not limited to the bank and bank account number of the recipient and sender;

     f. Copies of any counter checks issued;

     g. Copies of any cashier checks issued;

     h. Copies of requests for wire transfers, electronic transfers, counter checks and/or cashier checks; and

     i. Signature cards for all accounts, including any revised or superseded signature cards.

9. **GB AUTOSPORT LLC -** All bank records for all accounts maintained at YOUR bank by **GB AUTOSPORT LLC** from January 1, 2013 to the date this subpoena is served, including but not limited to:
   a. All Bank statements;
   b. Copies of all paid checks, if not included on bank statements;
   c. Copies of all deposited checks;
   d. All documents pertaining to wire transfers sent or received, including but not limited to:
      i. Fed Wire, CHIPS, SWIFT, or other money transfer of message documents;
      ii. Documents (checks, debit memos, cash in tickets, wires in, etc.,) reflecting the source of all funds wire out;
      iii. Documents (bank checks, credit memos, cash out tickets, wires outs, etc.,) reflecting the ultimate disposition within the bank of all funds wired in;
      iv. Notes, memoranda or other writings pertaining to the sending or receipt of wire transfers.
   e. Electronic transfers and any related information necessary to identify the recipient of the electronic transfer and sender of the electronic transfer, including but not limited to the bank and bank account number of the recipient and sender;
   f. Copies of any counter checks issued;
   g. Copies of any cashier checks issued;
   h. Copies of requests for wire transfers, electronic transfers, counter checks and/or cashier checks; and
   i. Signature cards for all accounts, including any revised or superseded signature cards.

10. **DOPPIO, INC. -** All bank records for all accounts maintained at YOUR bank by **DOPPIO, INC.** from January 1, 2013 to the date this subpoena is served, including but not limited to:
   a. All Bank statements;
   b. Copies of all paid checks, if not included on bank statements;
   c. Copies of all deposited checks;

    d. All documents pertaining to wire transfers sent or received, including but not limited to:
- i. Fed Wire, CHIPS, SWIFT, or other money transfer of message documents;
- ii. Documents (checks, debit memos, cash in tickets, wires in, etc.,) reflecting the source of all funds wire out;
- iii. Documents (bank checks, credit memos, cash out tickets, wires outs, etc.,) reflecting the ultimate disposition within the bank of all funds wired in;
- iv. Notes, memoranda or other writings pertaining to the sending or receipt of wire transfers.

    e. Electronic transfers and any related information necessary to identify the recipient of the electronic transfer and sender of the electronic transfer, including but not limited to the bank and bank account number of the recipient and sender;

    f. Copies of any counter checks issued;

    g. Copies of any cashier checks issued;

    h. Copies of requests for wire transfers, electronic transfers, counter checks and/or cashier checks;

    i. Signature cards for all accounts, including any revised or superseded signature cards.

11. **MICHAEL AVENATTI -** All bank records for all accounts maintained at YOUR bank by **MICHAEL AVENATTI** from January 1, 2013 to the date this subpoena is served, including but not limited to:

    a. All Bank statements;

    b. Copies of all paid checks, if not included on bank statements;

    c. Copies of all deposited checks;

    d. All documents pertaining to wire transfers sent or received, including but not limited to:
- i. Fed Wire, CHIPS, SWIFT, or other money transfer of message documents;
- ii. Documents (checks, debit memos, cash in tickets, wires in, etc.,) reflecting the source of all funds wire out;

      iii. Documents (bank checks, credit memos, cash out tickets, wires outs, etc.,) reflecting the ultimate disposition within the bank of all funds wired in;

      iv. Notes, memoranda or other writings pertaining to the sending or receipt of wire transfers.

e. Electronic transfers and any related information necessary to identify the recipient of the electronic transfer and sender of the electronic transfer, including but not limited to the bank and bank account number of the recipient and sender;

f. Copies of any counter checks issued;

g. Copies of any cashier checks issued;

h. Copies of requests for wire transfers, electronic transfers, counter checks and/or cashier checks;

i. Signature cards for all accounts, including any revised or superseded signature cards.

12. **MICHAEL AVENATTI ESQ. -** All bank records for all accounts maintained at YOUR bank by **MICHAEL AVENATTI ESQ.** from January 1, 2013 to the date this subpoena is served, including but not limited to:

a. All Bank statements;

b. Copies of all paid checks, if not included on bank statements;

c. Copies of all deposited checks;

d. All documents pertaining to wire transfers sent or received, including but not limited to:

      i. Fed Wire, CHIPS, SWIFT, or other money transfer of message documents;

      ii. Documents (checks, debit memos, cash in tickets, wires in, etc.,) reflecting the source of all funds wire out;

      iii. Documents (bank checks, credit memos, cash out tickets, wires outs, etc.,) reflecting the ultimate disposition within the bank of all funds wired in;

      iv. Notes, memoranda or other writings pertaining to the sending or receipt of wire transfers.

e. Electronic transfers and any related information necessary to identify the recipient of the electronic transfer and sender of the electronic

transfer, including but not limited to the bank and bank account number of the recipient and sender;

f.  Copies of any counter checks issued;

g.  Copies of any cashier checks issued;

h.  Copies of requests for wire transfers, electronic transfers, counter checks and/or cashier checks;

i.  Signature cards for all accounts, including any revised or superseded signature cards.

# Exhibit A



1    **PROOF OF SERVICE**

2    STATE OF CALIFORNIA, COUNTY OF ORANGE

3          I am employed in the County of Orange, State of California.  I am over the age of
4    18 and not a party to the within action; my business address is 19800 MacArthur
     Boulevard, Suite 855, Irvine, California 92612

5          On July 18, 2019, I served the foregoing documents described as**:**

6    **NOTICE OF SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION OR**
     **OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL**
7    **ACTION**

8    on the following person(s) in the manner indicated:

9          **SEE ATTACHED SERVICE LIST**

10   ☐   (BY MAIL) I am familiar with the practice of Frank Sims & Stolper LLP for
     collection and processing of correspondence for mailing with the United States Postal
11   Service.  Correspondence so collected and processed is deposited with the United States
     Postal Service that same day in the ordinary course of business.  On this date, a copy of
12   said document was placed in a sealed envelope, with postage fully prepaid, addressed as
     set forth herein, and such envelope was placed for collection and mailing at Frank Sims
13   & Stolper LLP, Irvine, California, following ordinary business practices.

14   ☐   (BY OVERNIGHT MAIL)  I am familiar with the practice of Frank Sims &
     Stolper LLP for collection and processing of correspondence for delivery by overnight
15   courier.  Correspondence so collected and processed is deposited in a box or other
     facility regularly maintained by Federal Express that same day in the ordinary course of
16   business.  On this date, a copy of said document was placed in a sealed envelope
     designated by Federal Express with delivery fees paid or provided for, addressed as set
17   forth herein, and such envelope was placed for delivery by Federal Express at Frank
     Sims & Stolper LLP, Irvine, California, following ordinary business practices.

18
     ☐   (BY FACSIMILE TRANSMISSION)  On this date, at the time indicated on the
19   transmittal sheet, attached hereto, I transmitted from a facsimile transmission machine,
     which telephone number is (949) 201-2405, the document described above and an
20   unsigned copy of this declaration to the person, and at the facsimile transmission
     telephone numbers, set forth herein.  The above-described transmission was reported as
21   complete and without error by a properly issued transmission report issued by the
     facsimile transmission machine upon which the said transmission was made
22   immediately following the transmission.

23   ☒   **(BY ELECTRONIC MAIL)**  On this date, I caused a copy of said document to
     be transmitted via electronic mail to the e-mail addresses listed on the attached service
24   list.

25   ☐   (BY ELECTRONIC SERVICE)  On this date, I caused a copy of said document
     to be transmitted via electronic mail pursuant to Cal. Rules of Court, Rule 2.251(b), to
26   the e-mail addresses listed above.

27   ☐   (BY MESSENGER SERVICE)  I served the documents by placing them in an
     envelope or package addressed to the person at the addresses listed and providing them
28   to a professional messenger service for service.  *[Declaration of Messenger attached*
     *separately.]*

1

        I declare under penalty of perjury under the laws of the United States of American and the State of California that the foregoing is true and correct, and that this declaration was executed on July 18, 2019, at Irvine, California.

2

3                                                      _/s/ Maritza Nowowiejski_
                                                      Maritza Nowowiejski
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## SERVICE LIST

| | |
|---|---|
| Michael J. Avenatti<br>10000 Santa Monica Blvd., 21st Floor<br>Los Angeles, CA 90067<br>E-Mail:      m@thefight.us | *Attorneys for Eagan Avenatti, LLP and Michael J. Avenatti* |
| James C. Bastian, Jr.<br>Melissa Davis Lowe<br>SHULMAN HODGES & BASTIAN LLP<br>100 Spectrum Center Drive, Suite 600<br>Irvine, CA 92618<br>E-Mails:      JBastian@shbllp.com<br>                  MLowe@shbllp.com<br>                  RHodges@shbllp.com<br>                  ROdea@shbllp.com | *Attorneys for Michael J. Avenatti* |
| John P. Reitman<br>Jack A. Reitman<br>LANDAU GOTTFRIED & BERGER<br>1801 Century Park East, Suite 700<br>Los Angeles, CA 90067<br>E-Mails:      jreitman@lgbfirm.com<br>                  jareitman@lgbfirm.com | *Attorneys for Brian Weiss, Receiver* |
| Brian Weiss<br>Force 10 Partners<br>20341 SW Birch Street, Suite 220<br>Newport Beach, CA 92660<br>E-Mail:      bweiss@force10partners.com | *Receiver* |

# EXHIBIT 11

| From: | Maritza Nowowiejski |
|---|---|
| To: | m@thefight.us; Jim Bastian; mlowe@shbllp.com; Ron Hodges; Ryan O"Dea; John Reitman; Jack Reitman; Brian Weiss |
| Cc: | Andrew Stolper; Scott Sims; Jason Frank |
| Subject: | In Re Eagan Avenatti - Notice of Subpoena |
| Date: | Friday, July 19, 2019 3:12:03 PM |
| Attachments: | image003.png |
| | image001.png |
| | image002.png |
| | 2019.07.19 Notice of Subpoena - InterContinental.pdf |

Please see attached.

| FSS logo 7 | **MARITZA NOWOWIEJSKI** \| PARALEGAL/OFFICE MANAGER |
|---|---|
| | • 949.201.2400 |
| | • 949.201.2405 |
| | Newport Gateway \| 19800 MacArthur Blvd. Suite 855 \| Irvine, CA 92612 |

1  Andrew D. Stolper, State Bar No. 205462
   Scott H. Sims, State Bar No. 234148
2  FRANK SIMS & STOLPER LLP
   19800 MacArthur Boulevard, Suite 855
3  Irvine, California 92612
   Telephone: (949) 201-2400
4  Facsimile: (949) 201-2401
   astolper@lawfss.com
5  ssims@lawfss.com

6  Attorneys for Judgment Creditor
   JASON FRANK LAW, PLC

7

8

9

10              UNITED STATES DISTRICT COURT

11             CENTRAL DISTRICT OF CALIFORNIA

12

13

14  In re                          | Case No.  8:18-cv-01644-VAP-KES

15  EAGAN AVENATTI, LLP,

16          Debtor.               | **NOTICE OF SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION**

17

18

19

20

21

22

23

24

25

26

27

28

                                   1

1   **TO ALL PARTIES HEREIN AND TO THEIR ATTORNEYS OF**
2   **RECORD:**

3      **PLEASE TAKE NOTICE** that pursuant to Rule 45 of the Federal Rule of Civil
4   Procedure, the attached subpoena will be served on the following deponent:

5      1.  Exhibit A – InterContinental Los Angeles Century City

6

7   Dated:  July 19, 2019                    **FRANK SIMS & STOLPER LLP**

8

9                                   By:    */s/ Andrew D. Stolper*
                                           Andrew D. Stolper
10                                          Scott H. Sims
                                           Attorneys for Jason Frank Law PLC

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the
Central District of California

| | |
|---|---|
| In Re Eagan Avenatti, LLP | ) |
| _____ | ) |
| **Plaintiff** | ) |
| v. | ) Civil Action No.  8:18-cv-01644-VAP-KES |
| | ) |
| _____ | ) |
| **Defendant** | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:            InterContinental Los Angeles Century City
_____
(Name of person to whom this subpoena is directed)

☑ **Production: YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

SEE ATTACHMENT

| Place: Frank Sims & Stolper LLP | Date and Time: |
|---|---|
| 19800 MacArthur Blvd., Suite 855 Irvine, CA 92612 | 08/09/2019 10:00 am |

❒ **Inspection of Premises: YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

        The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   07/19/2019

                        **CLERK OF COURT**
                                                            OR
                                                                    /s/ Andrew D. Stolper
_____        _____
     Signature of Clerk or Deputy Clerk                Attorney's signature

The name, address, e-mail address, and telephone number of the attorney representing (name of party) _____
Jason Frank Law, PLC _____ , who issues or requests this subpoena, are:

Andrew D. Stolper, Frank Sims & Stolper LLP, 19800 MacArthur Blvd., #855, Irvine, CA 92612, (949) 201-2400

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   8:18-cv-01644-VAP-KES

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for (name of individual and title, if any) _____

on (date) _____ .

❏  I served the subpoena by delivering a copy to the named person as follows: _____

_____  on (date) _____ ; or

❏  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
Server's signature

_____
Printed name and title

_____
Server's address

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1) For a Trial, Hearing, or Deposition.** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2) For Other Discovery.** A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1) Avoiding Undue Burden or Expense; Sanctions.** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2) Command to Produce Materials or Permit Inspection.**
   **(A) Appearance Not Required.** A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B) Objections.** A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3) Quashing or Modifying a Subpoena.**
   **(A) When Required.** On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
   **(B) When Permitted.** To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C) Specifying Conditions as an Alternative.** In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1) Producing Documents or Electronically Stored Information.** These procedures apply to producing documents or electronically stored information:
   **(A) Documents.** A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B) Form for Producing Electronically Stored Information Not Specified.** If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C) Electronically Stored Information Produced in Only One Form.** The person responding need not produce the same electronically stored information in more than one form.
   **(D) Inaccessible Electronically Stored Information.** The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2) Claiming Privilege or Protection.**
   **(A) Information Withheld.** A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B) Information Produced.** If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

In Re Avenatti, LLP                                    Case No. 8:18-cv-01644-VAP-KESx

**ATTACHMENT**

**Subpoena to InterContinental Los Angeles Century City**


The documents described below are to be produced pursuant to this Subpoena.


The term "YOU" or "YOUR" refers to InterContinental Los Angeles Century City and its related entities ("InterContinental").

## <u>DOCUMENTS</u>

1.     Contract for the rental of a conference room used by Michael J. Avenatti for a press conference that took place on July 18, 2019.
       https://www.youtube.com/watch?v=ZZctjg6DXw4&feature=youtu.be

2.     Documents evidencing payment in connection with the rental of a conference room used by Michael J. Avenatti on July 18, 2019.

3.     Any communications relating to payment for a conference room used by Michael J. Avenatti on July 18, 2019.

1

## **PROOF OF SERVICE**

2

STATE OF CALIFORNIA, COUNTY OF ORANGE

3

I am employed in the County of Orange, State of California.  I am over the age of 18 and not a party to the within action; my business address is 19800 MacArthur Boulevard, Suite 855, Irvine, California 92612

4

5

On July 19, 2019, I served the foregoing documents described as**:**

6

**NOTICE OF SUBPOENAS TO PRODUCE DOCUMENTS, INFORMATION OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION**

7

8

on the following person(s) in the manner indicated:

9

### **SEE ATTACHED SERVICE LIST**

10

☐      (BY MAIL) I am familiar with the practice of Frank Sims & Stolper LLP for collection and processing of correspondence for mailing with the United States Postal Service.  Correspondence so collected and processed is deposited with the United States Postal Service that same day in the ordinary course of business.  On this date, a copy of said document was placed in a sealed envelope, with postage fully prepaid, addressed as set forth herein, and such envelope was placed for collection and mailing at Frank Sims & Stolper LLP, Irvine, California, following ordinary business practices.

11

12

13

14

☐      (BY OVERNIGHT MAIL)  I am familiar with the practice of Frank Sims & Stolper LLP for collection and processing of correspondence for delivery by overnight courier.  Correspondence so collected and processed is deposited in a box or other facility regularly maintained by Federal Express that same day in the ordinary course of business.  On this date, a copy of said document was placed in a sealed envelope designated by Federal Express with delivery fees paid or provided for, addressed as set forth herein, and such envelope was placed for delivery by Federal Express at Frank Sims & Stolper LLP, Irvine, California, following ordinary business practices.

15

16

17

18

☐      (BY FACSIMILE TRANSMISSION)  On this date, at the time indicated on the transmittal sheet, attached hereto, I transmitted from a facsimile transmission machine, which telephone number is (949) 201-2405, the document described above and an unsigned copy of this declaration to the person, and at the facsimile transmission telephone numbers, set forth herein.  The above-described transmission was reported as complete and without error by a properly issued transmission report issued by the facsimile transmission machine upon which the said transmission was made immediately following the transmission.

19

20

21

22

☒      **(BY ELECTRONIC MAIL)**  On this date, I caused a copy of said document to be transmitted via electronic mail to the e-mail addresses listed on the attached service list.

23

24

☐      (BY ELECTRONIC SERVICE)  On this date, I caused a copy of said document to be transmitted via electronic mail pursuant to Cal. Rules of Court, Rule 2.251(b), to the e-mail addresses listed above.

25

26

☐      (BY MESSENGER SERVICE)  I served the documents by placing them in an envelope or package addressed to the person at the addresses listed and providing them to a professional messenger service for service.  *[Declaration of Messenger attached separately.]*

27

28

1       I declare under penalty of perjury under the laws of the United States of American and the State of California that the foregoing is true and correct, and that this

2 declaration was executed on July 19, 2019, at Irvine, California.

3                               /s/ Maritza Nowowiejski

4                               Maritza Nowowiejski

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **SERVICE LIST**

2

| Michael J. Avenatti<br>10000 Santa Monica Blvd., 21ˢᵗ Floor<br>Los Angeles, CA 90067<br>E-Mail:     m@thefight.us | *Attorneys for Eagan Avenatti, LLP and Michael J. Avenatti* |
|---|---|
| James C. Bastian, Jr.<br>Melissa Davis Lowe<br>SHULMAN HODGES & BASTIAN LLP<br>100 Spectrum Center Drive, Suite 600<br>Irvine, CA 92618<br>E-Mails:     JBastian@shbllp.com<br>MLowe@shbllp.com<br>RHodges@shbllp.com<br>ROdea@shbllp.com | *Attorneys for Michael J. Avenatti* |
| John P. Reitman<br>Jack A. Reitman<br>LANDAU GOTTFRIED & BERGER<br>1801 Century Park East, Suite 700<br>Los Angeles, CA 90067<br>E-Mails:     jreitman@lgbfirm.com<br>jareitman@lgbfirm.com | *Attorneys for Brian Weiss, Receiver* |
| Brian Weiss<br>Force 10 Partners<br>20341 SW Birch Street, Suite 220<br>Newport Beach, CA 92660<br>E-Mail:     bweiss@force10partners.com | *Receiver* |

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PROOF OF SERVICE

# EXHIBIT 12

| From: | Michael Avenatti |
|---|---|
| To: | Maritza Nowowiejski |
| Cc: | Andrew Stolper; Brian Weiss; Jason Frank; Jim Bastian; John Reitman; Ron Hodges; Ryan O"Dea; Scott Sims; Jack Reitman; mlowe@shbllp.com |
| Subject: | Re: In Re Eagan Avenatti - Notice of Subpoena |
| Date: | Friday, July 19, 2019 3:35:01 PM |
| Attachments: | image003.png |

I see desperation has set in.  I paid cash.  Nice try.

Looking forward to your defense in the various matters where we are co-defendants.  Perhaps you should have thought through all of this before you took a number of the actions that you did over the last 12 months.  Next time, instead of playing tic tac toe, try chess.

On Fri, Jul 19, 2019 at 3:11 PM Maritza Nowowiejski <mnowowiejski@lawfss.com> wrote:

Please see attached.


FSS logo 7

**MARITZA NOWOWIEJSKI | PARALEGAL/OFFICE MANAGER**

- 949.201.2400

- 949.201.2405

Newport Gateway | 19800 MacArthur Blvd. Suite 855 | Irvine, CA 92612

--
Michael J. Avenatti

# EXHIBIT 13

Electronically FILED by Superior Court of California, County of Los Angeles on 08/28/2019 06:48 PM Sherri R. Carter, Executive Officer/Clerk of Court, by S. Bolden, Deputy Clerk



A π EXHIBIT 1
Deponent M Avenatti
Date 10-18-19 Rptr. CR
WWW.DEPOBOOKPRODUCTS.COM

1   Thomas D. Warren (SBN 160921)
    twarren@piercebainbridge.com
2   Daniel Dubin (SBN 313235)
    ddubin@piercebainbridge.com
3   Pierce Bainbridge Beck Price & Hecht LLP
4   355 South Grand Avenue, 44th Floor
    Los Angeles, CA 90071
5   Tel: (213) 262-9333

6   Attorney for Defendant
7   Michael Avenatti

8

9

10              SUPERIOR COURT OF THE STATE OF CALIFORNIA

11              COUNTY OF LOS ANGELES – CENTRAL DISTRICT

12

13  JASON FRANK LAW PLC, a professional    |  Case No.: BC706555
    law corporation,
14                                          |  **DECLARATION OF**
15              Plaintiff,                   |  **MICHAEL J. AVENATTI**
                                            |  **IN SUPPORT OF HIS**
16      vs.                                 |  **OPPOSITION**
                                            |  **TO PLAINTIFF'S MOTION**
17  MICHAEL J. AVENATTI, an individual,    |  **FOR A TURNOVER ORDER**
                                            |  **PURSUANT TO CCP**
18              Defendant.                   |  **SECTION 699.040**
19
                                            |  Date:  Aug. 29, 2019
20                                          |  Time:  8:30 AM
                                            |  Dept.: 44
21                                          |  Judge: Hon. Edward B.
22                                          |         Moreton, Jr.
23
24
25
26
27
28  ───────────────────────────────────────────
            Declaration of Michael J. Avenatti

1    I, Michael J. Avenatti, declare as follows:

2    1.    I am a party to the present action. I make this declaration in
3    support of my opposition to to Plaintiff's motion for a turnover order pursuant
4    to CCP Section 699.040. I know all of the following to be true of my own
5    knowledge, and, if called and sworn as a witness, I would competently testify
6    thereto.

7    2.    Apart from the Plaintiff in this action, I have several creditors,
8    many of whom have judgments against me. Many of these judgments also
9    predate Plaintiff's by years. I am also presently a defendant in at least five
10   other civil matters whereby parties are attempting to collect monies they
11   claim are due them.

12   3.    On July 23, 2007, the Los Angeles Superior Court entered a
13   Spousal and Child Support Judgment against me relating to obligations owed
14   to my first wife and two minor daughters. The judgment requires me to pay
15   me former wife, Mrs. Christine Avenatti-Carlin, among other things, child
16   support for my two minor daughters, private school tuition, medical expenses,
17   and expenses associated with extracurricular activities. Attached as **Exhibit**
18   **A** is a true and correct copy of the July 23, 2007 Judgment.

19   4.    I presently have significant arrears and am behind in my
20   obligations to Ms. Avenatti-Carlin as provided under the Spousal and Child
21   Support Judgment in an amount far exceeding $500,000.

22   5.    August 20, 2019, Ms. Lisa Storie, my second wife (after Mrs.
23   Avenatti-Carlin), brought a foreclosure auction for certain artwork to
24   partially satisfy her own judgment against me, claiming over $2.5 million in
25   past due child support obligations.  At the Sheriff's auction, which Mr. Frank
26   attended, I paid $18,000 for the items, which will in turn be paid by the

27

28   _____
                    **Declaration of Michael J. Avenatti**

1  Sheriff's Department to Ms. Storie. The bidding was "open" with no

2  restrictions and approximately 10 bidders participated. Mr. Frank could

3  have bid on the items but he did not.

4      6.    Almost immediately after the auction, on August 20, Mrs.

5  Avenatti-Carlin made a demand that I turn over the artwork to her in

6  exchange for a $20,000 credit against the owed obligations under the Spousal

7  and Child Support Judgment. That same day, I did so.

8      7.    Attached as **Exhibit B** is a true and correct copy of the

9  agreement Mrs. Carlin-Avenatti and I signed whereby Mrs. Carlin-Avenatti

10  acknowledged receipt and sole possession of the artwork in exchange for a

11  $20,000 credit against the obligations owing under her judgment.

12      I declare under penalty of perjury under the laws of the State of

13  California that the foregoing is true and correct.

14      Executed this 28th day of August, 2019, at Los Angeles, CA.

15

16                          Michael J. Avenatti

17

18

19

20

21

22

23

24

25

26

27

28  _____
                **Declaration of Michael J. Avenatti**

# EXHIBIT 14

1                 SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                      FOR THE COUNTY OF LOS ANGELES

3

4    JASON FRANK LAW PLC,            )
     PROFESSIONAL LAW CORPORATION )
5                    PLAINTIFF,      )
                                     )
6              VS.                   )   CASE NO. BC706555
                                     )
7    MICHAEL J. AVENATTI,            )
     AN INDIVIDUAL                   )
8                    DEFENDANT.      )
     _____)

9

10        JUDGMENT DEBTOR EXAM OF MICHAEL J. AVENATTI

11                  FRIDAY, OCTOBER 18, 2019

12                        9:40 A.M.

13             LOS ANGELES SUPERIOR COURT

14               111 NORTH HILL STREET

15             CAFETERIA CONFERENCE ROOM

16            LOS ANGELES, CALIFORNIA 90012

17

18

19

20

21

22   JOB NO. 3599719

23   REPORTED BY:

24   CHERI BULLOCK
     CSR NO. 4714

25   PAGES 1 - 85

                                          Page 1

```
 1    APPEARANCES:

 2

 3   FOR THE PLAINTIFF:

 4            FRANK SIMS STOLPER
              BY: ANDREW STOLPER, ESQ.

 5            19800 MACARTHUR BOULEVARD
              SUITE 855

 6            IRVINE, CALIFORNIA 92612
              (949)201-2400

 7

 8   FOR THE DEFENDANT:

 9            PIERCE BAINBRIDGE, LLP
              BY: THOMAS WARREN, ESQ.

10                DANIEL DUBIN, ESQ.
              355 S. GRAND AVENUE, 44TH FLOOR

11            LOS ANGELES, CALIFORNIA 90071
              (216)789-9121

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                        Page 2
```

```
 1                         I N D E X

 2

 3    WITNESS: MICHAEL J. AVENATTI                    PAGE

 4    EXAMINATION BY

 5    MR. STOLPER .....................................4

 6

 7

 8                         EXHIBITS

 9    EXHIBIT          DESCRIPTION                     PAGE

10    EXHIBIT 1    DECLARATION OF MICHAEL AVENATTI ....... 6

11    EXHIBIT 2    PHOTOGRAPHS DATED AUGUST 20, 2019...... 15

12    EXHIBIT 3    ONLINE VEHICLE RECORD ................. 58

13

      EXHIBIT 4    3-15-19 TRANSCRIPT, PAGE 96

14                 RE: AUGUSTUS, LLP.......................71

15    EXHIBIT 5    SECRETARY OF STATE LLP FILING..........77

16

17

18

19

20

21

22

23

24

25

                                              Page  3
```

```
 1                    LOS ANGELES, CALIFORNIA;

 2                  FRIDAY, OCTOBER 18, 2019

 3

 4                    MICHAEL J. AVENATTI,

 5          having been first duly sworn was examined and

 6                    testified as follows:

 7

 8                         EXAMINATION

 9   BY MR. STOLPER:

10       Q    Mr. Avenatti, we are on the record in the

11   continued judgment debtor's exam.  You understand you are

12   under oath?

13       A    Yes, sir.

14       Q    Mr. Avenatti, before we get started, I noticed you

15   paid cash for snacks this morning; is that correct?

16       A    Yes.

17       Q    Do you have that cash in your wallet still?

18       A    No, I don't have my wallet.

19       Q    Do you have that cash on your person still?

20       A    Nope.

21       Q    What did you do with it?

22       A    I gave it to Mr. Dubin to pay his parking.

23       Q    How much was it?

24       A    The change?

25       Q    No, the cash.  How much cash did you give
```

1          Q     Was that under oath?

2          A     I believe it was.

3          Q     Okay.  Did you in that judgment debtor exam

4     provide truthful testimony throughout?

5          A     I'm going to plead the fifth.

6          Q     You are going to decline to answer on the grounds

7     that it may incriminate you whether or not your previous

8     testimony was truthful?

9          A     I've stated my answer.

10         Q     I just want to understand the scope of it.

11         MR. WARREN:  He has answered your question.

12         Q     BY MR. STOLPER:  Okay.  In your prior judgment

13    debtor exam in this court, would you let us -- would you

14    please tell me if the testimony you gave was truthful.

15         A     I believe it was.

16         Q     Okay.  And that prior judgment debtor exam in this

17    court was likewise under oath; is that correct?

18         A     I believe it was.

19         Q     Now let's turn back to Exhibit 1 to this judgment

20    debtor exam, some questions for you on it.

21               It says, "Apart from the plaintiffs --"   I'm

22    reading paragraph two.  "Apart from the plaintiffs in this

23    action, I have several creditors, many of whom have

24    judgments against me."

25               Who are those creditors who have judgments against

1    you?

2        A    My first wife, my second wife, Mr. Frank, who's

3    the plaintiff in this action; Mr. William Parrish, various

4    taxing authorities, and I'm sure that there are others that

5    I am -- that I can't recall.

6        Q    Okay.  So you identified Mr. Frank, which is the

7    Plaintiff; Mr. Parrish; taxing authorities, as well as your

8    two ex-wives; is that correct?

9        A    Correct.  And I am sure there are others, but I

10   just can't recall them.

11       Q    Okay.  And it says many of these judgments also

12   predate the plaintiffs by years.

13            Which of the judgments predate the plaintiffs by

14   years?

15       A    A number of the taxing authorities, I think.

16   Certainly my first ex-wife's judgment, and there may be

17   others that I just can't recall.

18       Q    Does Mr. Parrish's judgment predate Mr. Frank's

19   judgment by years?

20       A    I don't believe so.

21       Q    What's Mr. Parrish's judgment for?

22       MR. WARREN:  Objection, relevance.

23       THE WITNESS:  He has a judgment against me for money.

24       Q    BY MR. STOLPER:  Okay.  But how did he obtain that

25   judgment?

                                                    Page 9

# EXHIBIT 15

JUD-100

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, state bar number, and address):*<br>Lawrence J. Conlan (SBN 221350)<br>Cappello & Noël LLP<br>831 State Street, Santa Barbara<br>TELEPHONE NO.: (805) 564-2444    FAX NO. *(Optional)*: (805) 965-5950<br>E-MAIL ADDRESS *(Optional)*: lconlan@cappellonoel.com<br>ATTORNEY FOR *(Name)*: PLAINIFF, William Parrish | FOR COURT USE ONLY |
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF Santa Barbara<br>STREET ADDRESS: 1100 Anacapa Street<br>MAILING ADDRESS: P.O. Box 21107<br>CITY AND ZIP CODE: Santa Barbara, 93121-1107<br>BRANCH NAME: Santa Barbara - Anacapa | **ELECTRONICALLY FILED**<br>Superior Court of California<br>County of Santa Barbara<br>Darrel E. Parker, Executive Officer<br>10/26/2018 10:51 AM<br>By: Sarah Sisto, Deputy |

PLAINTIFF: WILLIAM PARRISH

DEFENDANT: MICHAEL J. AVENATTI

| JUDGMENT | | CASE NUMBER: |
|---|---|---|
| ☑ By Clerk   ☒ By Default   ☐ After Court Trial<br>☐ By Court   ☒ On Stipulation   ☐ Defendant Did Not Appear at Trial | | 18CV04106 |

**JUDGMENT**

1. ☑ **BY DEFAULT**
   a. Defendant was properly served with a copy of the summons and complaint.
   b. Defendant failed to answer the complaint or appear and defend the action within the time allowed by law.
   c. Defendant's default was entered by the clerk upon plaintiff's application.
   d. ☑ **Clerk's Judgment** (Code Civ. Proc., § 585(a)). Defendant was sued only on a contract or judgment of a court of this state for the recovery of money.
   e. ☐ **Court Judgment** (Code Civ. Proc., § 585(b)). The court considered
      (1) ☐ plaintiff's testimony and other evidence.
      (2) ☐ plaintiff's written declaration (Code Civ. Proc., § 585(d)).

2. ☐ **ON STIPULATION**
   a. Plaintiff and defendant agreed (stipulated) that a judgment be entered in this case. The court approved the stipulated judgment and
   b. ☐ the signed written stipulation was filed in the case.
   c. ☐ the stipulation was stated in open court ☐ the stipulation was stated on the record.

3. ☐ **AFTER COURT TRIAL.** The jury was waived. The court considered the evidence.
   a. The case was tried on *(date and time):*
      before *(name of judicial officer):*
   b. Appearances by:
      ☐ Plaintiff *(name each):*                    ☐ Plaintiff's attorney *(name each):*
         (1)                                             (1)
         (2)                                             (2)
      ☐ Continued on Attachment 3b.

      ☐ Defendant *(name each):*                    ☐ Defendant 's attorney *(name each):*
         (1)                                             (1)
         (2)                                             (2)
      ☐ Continued on Attachment 3b.

   c. ☐ Defendant did not appear at trial. Defendant was properly served with notice of trial.

   d. ☐ A statement of decision (Code Civ. Proc., § 632) ☐ was not ☐ was requested.

Page 1 of 2

| PLAINTIFF: WILLIAM PARRISH | CASE NUMBER: |
|---|---|
| DEFENDANT: MICHAEL J. AVENATTI | 18CV04106 |

**JUDGMENT IS ENTERED AS FOLLOWS BY:**  ☐ THE COURT   ☑ THE CLERK

4. ☐ **Stipulated Judgment.** Judgment is entered according to the stipulation of the parties.

5. **Parties.** Judgment is
   a. ☑ for plaintiff (name each):
      William Parrish
      and against defendant (names):
      Michael J. Avenatti

      ☐ Continued on Attachment 5a.

   b. ☐ for defendant (name each):

   c. ☐ for cross-complainant (name each):

      and against cross-defendant (name each):

      ☐ Continued on Attachment 5c.

   d. ☐ for cross-defendant (name each):

6. **Amount.**
   a. ☑ Defendant named in item 5a above must pay plaintiff on the complaint:

| | | | |
|---|---|---|---|
| (1) | ☑ | Damages | $ 1,500,000.00 |
| (2) | ☑ | Prejudgment interest at the annual rate of 8 % | $ 674,136.99 |
| (3) | ☑ | Attorney fees | $ 19,050.00 |
| (4) | ☑ | Costs | $ 1,114.88 |
| (5) | ☐ | Other (specify): | $ |
| (6) | | **TOTAL** | $ 2,194,301.87 |

   c. ☐ Cross-defendant named in item 5c above must pay cross-complainant on the cross-complaint:

| | | | |
|---|---|---|---|
| (1) | ☐ | Damages | $ |
| (2) | ☐ | Prejudgment interest at the annual rate of % | $ |
| (3) | ☐ | Attorney fees | $ |
| (4) | ☐ | Costs | $ |
| (5) | ☐ | Other (specify): | $ |
| (6) | | **TOTAL** | $ |

   b. ☐ Plaintiff to receive nothing from defendant named in item 5b.
      ☐ Defendant named in item 5b to recover costs $
      ☐ and attorney fees $

   d. ☐ Cross-complainant to receive nothing from cross-defendant named in item 5d.
      ☐ Cross-defendant named in item 5d to recover costs $
      ☐ and attorney fees $

7. ☑ Other (specify):
   Judgment supported by Declaration of Plaintiff William Parrish in support of application for entry of default judgment, filed on 10/25/2018.

Date: _____ ☐ _____
                                    JUDICIAL OFFICER

Date: **10/26/2018**   ☒ Clerk, by _____/s/ Sarah Sisto_____, Deputy

---

**CLERK'S CERTIFICATE** (Optional)

(SEAL)

I certify that this is a true copy of the original judgment on file in the court.

Date:

Clerk, by _____, Deputy

Page 2 of 2

JUD-100 [New January 1, 2002]                    **JUDGMENT**

# EXHIBIT 16

## Case Information

18CV04106 | William Parrish vs Michael J. Avenatti

| | | |
|---|---|---|
| Case Number | Court | Judicial Officer |
| 18CV04106 | Santa Barbara - Anacapa | Anderle, Thomas P |
| File Date | Case Type | Case Status |
| 08/20/2018 | Unlimited Other Contract (37) | Judgment |

## Party

Plaintiff
Parrish, William

Active Attorneys ▾

Lead Attorney
Cappello, A Barry
Retained

Defendant
Avenatti, Michael J.

## Disposition Events

10/26/2018 Judgment ▾

Judicial Officer
Anderle, Thomas P

Judgment Type
Before Trial: Default Judgment Clerk

Judgment - Monetary Award

Awarded To:

Parrish, William

Awarded Against:

Avenatti, Michael J.

Amount

Damages: $1,500,000.00

Pre-Judgment Interest: $674,136.99

Attorney Fees: $19,050.00

Costs: $1,114.88

Total: $2194301.87

## Events and Hearings

| |
|---|
| 08/20/2018 New Filed Case |
| 08/20/2018 Complaint, Filed |
| 08/20/2018 Summons Issued, Filed |
| 08/20/2018 Notice of Case Assignment/Case Management Conf, Filed |
| 08/20/2018 Civil Case Cover Sheet Addendum (Local Form), Filed |
| 08/20/2018 Civil Case Cover Sheet, Filed |
| 09/14/2018 Proof of Service - Summons & Complaint, Filed |

09/14/2018 Proof of Service 30 Day Summons and Complaint ▾

10/11/2018 Request for Entry of Default, Filed

10/25/2018 Request for Clerk's Judgment, Filed

10/25/2018 Declaration - Default/Uncontested Judgment, Filed

10/26/2018 Default Judgment by Clerk, Filed

11/15/2018 Memorandum of Costs/Credits/Interest, Filed

11/30/2018 Notice of Entry of Judgment, Filed

12/18/2018 Case Management Conference ▾

Judicial Officer
Anderle, Thomas P

Hearing Time
8:30 AM

Cancel Reason
Vacated

12/27/2018 Notice of Appeal, Filed ▾

Judicial
Officer
Anderle,
Thomas P

12/28/2018 Clerk's Certificate of Mailing, Filed

01/11/2019 Notice of Default on Appeal, Filed

01/17/2019 Appellant's Notice Designating Record on Appeal, Filed

01/17/2019 Clerk's Certificate of Mailing, Filed

08/07/2019 Application & Order to Appear for Exam, Filed

08/13/2019 Remittitur, Filed

08/13/2019 Order Dismissing Appeal, Filed

08/13/2019 Notice of Filing Remittitur - Dismissed, Filed

08/30/2019 Proof of Service, Filed

09/10/2019 Debtor's Examination ▾

Judicial Officer
Anderle, Thomas P

Hearing Time
9:30 AM

Result
Held

---

09/10/2019 Minute Order, Filed

---

09/16/2019 Clerk's Certificate of Mailing, Filed

---

09/16/2019 Failure to Appear: Order of Examination (Local Form), Filed

---

10/08/2019 Debtor's Examination ▾

Judicial Officer
Anderle, Thomas P

Hearing Time
9:30 AM

Result
Held

---

10/08/2019 Minute Order, Filed

---

10/10/2019 Clerk's Certificate of Mailing, Filed

---

10/21/2019 Warrant of Attachment, Issued

---

10/21/2019 Ex Parte Application, Filed

---

10/23/2019 Declaration, Filed

---

10/24/2019 Ex Parte Order, Filed ▾

Judicial
Officer
Anderle,
Thomas P

---

10/24/2019 Recall of Warrant, Issued

---

10/24/2019 Notice of Ruling, Filed

---

10/29/2019 Debtor's Examination ▾

Judicial Officer
Anderle, Thomas P

Hearing Time
9:30 AM

Result
Held

11/14/2019 Mail Returned Undeliverable

# EXHIBIT 17

| LAWRENCE J. CONLAN<br>CAPPELLO & NOEL, LLP<br>831 STATE STREET   SANTA BARBARA, CA 93101<br>Attorney For: PLAINTIFF<br><br>TELEPHONE NO.: (805) 564-2444          FAX NO. *(Optional)*:<br>E-MAIL ADDRESS *(Optional)*: | SBN: 221350 | *FOR COURT USE ONLY*<br><br>ELECTRONICALLY FILED<br>Superior Court of California<br>County of Santa Barbara<br>Darrel E. Parker, Executive Officer<br>8/30/2019 12:55 PM<br>By: Elizabeth Spann, Deputy |
|---|---|---|

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA BARBARA<br>STREET ADDRESS: 1100 ANACAPA STREET<br>MAILING ADDRESS:<br>CITY AND ZIP CODE: SANTA BARBARA, CA 93101<br>BRANCH NAME: SANTA BARBARA - ANACAPA DIVISION | |
|---|---|

| Plaintiff: WILLIAM PARRISH<br>Defendant: MICHAEL AVENATTI | |
|---|---|
| | CASE NUMBER:<br>18CV04106 |

| **PROOF OF SERVICE** | HEARING DATE:<br>09/10/2019 | DAY: | TIME:<br>09:30 am | DEPT.: | Ref No. or File No.:<br>18008.001 |
|---|---|---|---|---|---|

AT THE TIME OF SERVICE I WAS AT LEAST 18 YEARS OF AGE AND NOT A PARTY TO THIS ACTION
I SERVED COPIES OF THE FOLLOWING DOCUMENTS:

**DEPOSITION SUBPOENA FOR PERSONAL APPEARANCE AND PRODUCTION OF DOCUMENTS AND THINGS;
APPLICATION AND ORDER FOR APPEARANCE AND EXAMINATION, ENFORCEMENT OF JUDGMENT, JUDGMENT
DEBTOR**

PARTY SERVED:     **MICHAEL AVENATTI**

DATE & TIME OF DELIVERY:     **08/26/2019
07:50 pm**

ADDRESS, CITY, AND STATE:     **411 WEST 4TH STREET, 10TH FLOOR, COURTROOM 10C
SANTA ANA, CA 92701**

MANNER OF SERVICE:
Personal Service - By personally delivering copies.

Fee for Service:
County: **ORANGE**
Registration No.: **1530**
**Nationwide Legal, LLC (12-234648)
1609 James M. Wood Blvd., 2nd Fl
Los Angeles, CA 90015
(213) 249-9999
Ref: 18008.001**

I declare under penalty of perjury under the laws of The
State of California that the foregoing information
contained in the return of service and statement of
service fees is true and correct and that this declaration
was executed on **August 26, 2019**.

Signature: _____
**FRANK HARRIGAN**

**PROOF OF SERVICE**

982(a)(23)                                                                                    Order#: 1217704/General

# EXHIBIT 18

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA BARBARA | | | FOR COURT USE ONLY |
|---|---|---|---|
| ☒ Santa Barbara–Anacapa<br>1100 Anacapa Street<br>Santa Barbara, CA 93101 | ☐ Santa Maria–Cook<br>312-C East Cook Street<br>Santa Maria, CA 93454 | ☐ Lompoc Division<br>115 Civic Center Plaza<br>Lompoc, CA 93436 | FILED<br>SUPERIOR COURT of CALIFORNIA<br>COUNTY of SANTA BARBARA<br><br>SEP 16 2019<br><br>Darrel E. Parker, Executive Officer<br>BY _____<br>Veronica Robles, Deputy Clerk |
| PLAINTIFF: William Parrish<br><br>DEFENDANT: Michael Avenatti | | | |
| **FAILURE TO APPEAR FOR ORDER OF EXAMINATION** | | | CASE NUMBER:<br>18CV04106 |

NOTICE TO:

A **warrant** for your **arrest** was demanded by the judgment creditor in the above action because of your failure to appear in this Court on  9/10/2019  for examination as ordered by the Court. Our records indicate that the order requiring your appearance at the examination was served on you on 08/26/2019  [date].

To allow you a further opportunity to comply with this order, examination is continued to:
 10/8/2019  [date] at 9:30 a.m.  [time] in Dept. 3

You are ordered to appear for this continued examination hearing at the court address identified above at that date and time.

If you fail to appear at this continued hearing at the date, place, and time set forth above, the court will issue a **warrant** for your **arrest**. Willful disobedience of a court order may be punished as contempt by fine or imprisonment (Code Civ. Proc., § 1218), by civil sanctions or assessments (Code Civ. Proc., §§ 1992, 1993.2), or otherwise as provided by law.

Dated: 9/16/19

Judge of the Superior Court
THOMAS P. ANDERLE

Copy for Judgment Creditor:

| Barry Cappello | [name] |
|---|---|
| 831 State Street | [address] |
| Santa Barbara, CA 93101 | [telephone number] |

**FAILURE TO APPEAR FOR ORDER OF EXAMINATION**

## SUPERIOR COURT OF CALIFORNIA
## COUNTY OF SANTA BARBARA

| | | | |
|---|---|---|---|
| Dated and Entered: | 09/10/2019 | Time: | 9:30 AM |
| Judicial Officer: | Thomas P Anderle | | |
| Deputy Clerk: | Veronica Robles | Dept: | SB Dept 3 |
| Deputy Sheriff: | Eddie Cazarez | | |
| Court Reporter: | Shelley Cockrell | Case No: | 18CV04106 |

## William Parrish vs Michael J. Avenatti

Parties Present:

Cappello, A Barry            Attorney for Plaintiff

**NATURE OF PROCEEDINGS:** Debtor's Examination

The matter was continued to allow the Defendant another opportunity to appear at the Debtor's exam. Failure to appear at the continued hearing date, the Court will issue an arrest warrant.

The Court's decision on Plaintiff's counsel request for attorney fees for Defendant's failure to appear will be differed until the next hearing date.

The clerk shall give notice.

*Future Scheduled Hearings:*
October 08, 2019 9:30 AM Debtor's Examination
Anderle, Thomas P
Robles, Veronica
SB Dept 3

DARREL E. PARKER, EXECUTIVE OFFICER            Minutes Prepared by:

_____ , Deputy
                    Veronica Robles

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA BARBARA | FOR COURT USE ONLY |
|---|---|
| STREET ADDRESS: 1100 Anacapa Street<br>CITY AND ZIP CODE: Santa Barbara CA 93101<br>BRANCH NAME: Anacapa | **FILED**<br>SUPERIOR COURT of CALIFORNIA<br>COUNTY of SANTA BARBARA |
| CAPTION:<br>**William Parrish vs Michael J. Avenatti** | **09/16/2019**<br>Darrel E. Parker, Executive Officer<br>BY Robles, Veronica<br><s>Deputy Clerk</s> |
| **CLERK'S CERTIFICATE OF MAILING** | CASE NUMBER:<br>**18CV04106** |

I certify that I am not a party to this cause and that a true copy of the **Failure to Appear for Order of Examination & Minute Order filed 9/10/19** was mailed first class, postage prepaid, in a sealed envelope addressed as shown, and that the mailing of such and execution of this certificate occurred at (*place*) Santa Barbara, California, on (*date*): 09/16/2019

Darrel E. Parker, Executive Officer

Dated: 09/16/2019    By _____ Veronica Robles _____ , Deputy

Michael J Avenatti
520 NEWPORT CENTER DRIVE, SUITE 1400
NEWPORT BEACH, CA 92660

A Barry Cappello
Cappello & Noel LLP
831 State St
Santa Barbara    CA 93101

# EXHIBIT 19

## SUPERIOR COURT OF CALIFORNIA
## COUNTY OF SANTA BARBARA

| | | |
|---|---|---|
| Dated and Entered: | 10/08/2019 | Time:  9:30 AM |
| Judicial Officer: | Thomas P Anderle | |
| Deputy Clerk: | Veronica Robles | Dept:   SB Dept 3 |
| Deputy Sheriff: | Eddie Cazarez | |
| Court Reporter: | Michelle Sabado | Case No: 18CV04106 |

## William Parrish vs Michael J. Avenatti

Parties Present:
Larry Conlan                           Attorney for Plaintiff

**NATURE OF PROCEEDINGS***: Debtor's Examination*

Debtor's exam

Attorney for Plaintiff A. Barry Cappello; Larry Conlan appeared at the 10/819 hearing

**Ruling: The debtor, Michael J. Avenatti, failed to appear at the 10/8/19 hearing date, the Court issued an arrest warrant [bench citation – no "cite release - $5,000 bail]. The Court's decision on Plaintiff's counsel request for attorney fees for Defendant's failure to appear will be addressed at the future hearing when the debtor does appear.**

**The Court Clerk will give notice; but the issuance of a bench warrant has serious consequences for the debtor and plaintiff's counsel will also give the debtor notice of the fact that the Court has issued a no cite release bench warrant calling for the arrest of the debtor, as a courtesy to the debtor.**

Background

The case was last on calendar on 9/10/19 and the matter was continued to allow the Defendant another opportunity to appear at the Debtor's examination.

DARREL E. PARKER, EXECUTIVE OFFICER                  Minutes Prepared by:

_____ , Deputy
                          Veronica Robles

# EXHIBIT 20

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA BARBARA | FOR COURT USE ONLY |
|---|---|
| STREET ADDRESS: 1100 Anacapa  Street<br>MAILING ADDRESS:  P.O. Box 21107<br>CITY AND ZIP CODE: Santa Barbara, CA 93121-1107<br>BRANCH NAME: Anacapa Division | |

PLAINTIFF:   William Parrish

DEFENDANT:  Michael J. Avenatti

| **WARRANT OF ATTACHMENT** | CASE NUMBER:<br>18CV04106 |
|---|---|

## THE PEOPLE OF THE STATE OF CALIFORNIA to any Peace Officer in this State:

A(n)  <u>Application and Order for Apperances and Examination</u>                  was served
(State nature of process – subpoena, order to show cause, etc.)
upon  <u>Michael J. Avenatti</u>                   requiring said person to appear before this court on
(Name of person served)
<u>October 8, 2019</u>                <u>9:30</u>      a.m.  , and said person failed to obey such order.
(Date)                              (Time)

You are therefore ordered forthwith to arrest the above named person pursuant to   <u>CCP 708.170</u>
and bring said person before a judge of this court to show cause why said person should not be punished for contempt for
disobeying the mandate of this court; and make your return on any   <u>Tuesday</u>
at <u>9:30</u>    a.m. Dept.   <u>3</u>    .

## OFFICERS ARE DIRECTED TO IMMEDIATELY NOTIFY THIS COURT WHEN A HEARING DATE IS SET.

Arrest under this warrant may be made only:

☐ between the hours of      a.m. and       p.m.

☒ THIS WARRANT MAY BE SERVED DAY OR NIGHT (Penal Code Section 840(4))

Bail fixed in the amount of   $ 5000.00       (including   $          penalty assessment if applicable).

☐ Cite release authorized

(SEAL)

_____
Judge of the Superior Court

THOMAS P. ANDERLE

DARREL E. PARKER, Executive Officer

Dated:  <u>10-21-19</u>            By_____ , Deputy
Veronica Robles

### IDENTIFYING INFORMATION

1.   Known by any other name(s):  _____

2.   Last known residence address:  <u>1000 Santa Monica, 21st Floor, Los Angeles,  CA 90067</u>

3.   Last known business address:  _____

4.   DOB: <u>2/16/1971</u>        Height: <u>6'0</u>      Weight: <u>175</u>      Hair: <u>Bro</u>      Eyes: <u>Bro</u>

5.   Sex: <u>M</u>     Race: <u>White</u>        CDL #: _____     CII #: _____     FBI #: _____

6.   Other:  _____

SC-2900 [Rev. July 1, 2013]           **WARRANT OF ATTACHMENT**           CCP 1993, 1994, 1209, 1212-1216

# EXHIBIT 21

1   Pierce Bainbridge Beck Price & Hecht LLP
    Thomas D. Warren (SBN 160921)
    twarren@piercebainbridge.com
2   Daniel Dubin (SBN 313235)
    ddubin@piercebainbridge.com
3   355 South Grand Avenue, 44th Floor
    Los Angeles, CA 90071
4   (213) 262-9333

5

6

7
                SUPERIOR COURT OF THE STATE OF CALIFORNIA
8
                         COUNTY OF SANTA BARBARA
9

10

11  WILLIAM PARRISH,                        Case No.: 18-cv-04106
                                            Assigned to Hon. Thomas P. Anderle,
12              Plaintiff,                   Dept. 3
          v.
13                                          **Defendant Michael J. Avenatti's** *Ex*
    MICHAEL J. AVENATTI,                    *Parte* **Application to Schedule**
14                                          **Debtor's Examination and**
                Defendant                   **Discharge the Court's October 8,**
15                                          **2019 Minute Order;**

16
                                            **Memorandum of Points and**
17                                          **Authorities;**

18
                                            **Declaration of Daniel Dubin;**
19                                          **[Proposed] Order**

20                                          Hearing Date: October 24, 2019
21                                          Hearing Time: 8:15 a.m.

22

23

24

25

26

27

28
    _____
         *Ex Parte* Application to Schedule Debtor's Examination and Discharge the
                      Court's October 8, 2019 Minute Order

1  **Ex Parte Application**

2  TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

3  PLEASE TAKE NOTICE that, on October 24, 2019, at 8:15 AM, in

4  Department 3 of the above-captioned Court, 1100 Anacapa Street, Santa

5  Barbara, CA 93101, Defendant Michael Avenatti will and hereby does apply *ex*

6  *parte* for an order scheduling the debtor's examination and discharging the

7  Court's October 8, 2019 Minute Order. This application is brought pursuant to

8  California Rules of Court 3.1200 *et seq* on an *ex parte* basis because Mr.

9  Avenatti seeks to schedule the debtor's examination as soon as possible.

10  The debtor's examination of Mr. Avenatti is currently not scheduled. The

11  debtor's examination was previously calendared for September 10, 2019 and

12  then again for October 8, 2019. However, Mr. Avenatti did not receive the

13  notice of the October 8 Court-ordered debtor's examination, and he did not

14  discover the existence of the Order until he read a blog entry on the internet

15  after having been directed there by one of his supporters. Mr. Avenatti and his

16  counsel then immediately sought to rectify the issue by:  (1) contacting the

17  court (the secretary of Department 3 who was out and then Department 4) and

18  (2) contacting opposing counsel via letter. The missed hearing date was

19  entirely unintentional. Mr. Avenatti has had numerous required court

20  appearances in his criminal matters and other creditor/debtor matters over the

21  last 18 months (including at least four other debtor's examinations hearings).

22  He has never missed any of these required appearances. In any event, had Mr.

23  Avenatti known about the October 8 debtor's examination, he would have

24  sought to reschedule it because he was required to be personally present for a

25  court hearing in the Southern District of New York relating to one of his three

26  federal criminal matters.

27

28

1    To resolve this dispute expeditiously, Mr. Avenatti now requests that the

2    Court put the debtor's examination back on calendar and discharge the Court's

3    October 8 Minute Order, which issued a bench warrant. He is prepared to sit

4    for the exam immediately with the exception of Friday morning.

5        On October 21, 2019, at approximately 1:44 PM, Mr. Avenatti's counsel

6    advised Plaintiff's counsel of this *ex parte* application via email.  Declaration of

7    Daniel Dubin ¶ 3.  The notice given included the date, time, and manner of the

8    application, and the name of the party informed, the relief sought, any

9    response, and whether opposition is expected. *Id.*

10

11   Dated: October 21, 2019                  Respectfully submitted,

12                                            **Pierce Bainbridge Beck Price &**
                                              **Hecht LLP**

13

14

15                                           By: _____

16                                           Thomas D. Warren
                                             Attorneys for Respondent

17

18

19

20

21

22

23

24

25

26

27

28

___

*Ex Parte* Application to Schedule Debtor's Examination and Discharge the
Court's October 8, 2019 Minute Order

1      **Memorandum of Points and Authorities**

2      Mr. Avenatti brings this *ex parte* application to correct his unintentional

3      nonappearances at the previously set debtor's examinations. Mr. Avenatti

4      learned from a blog post sent by one of his followers that this Court issued a

5      bench warrant following his failure to appear for a debtor's examination on

6      October 8, 2019. However, Mr. Avenatti was not aware that the Court ordered

7      a debtor's examination to take place on October 8, 2019. According to the

8      Certificate of Mailing, the Court mailed the notice of the debtor's examination

9      to the former address of Mr. Avenatti's law firm, Eagan Avenatti. The office

10     however was vacated in early 2019. It is Mr. Avenatti's understanding that

11     mail sent to Eagan Avenatti should be directed to Eagan Avenatti's Receiver

12     appointed in January/February 2019. The Receiver did not forward the notices

13     to Mr. Avenatti.

14     Mr. Avenatti has had numerous required court appearances in his

15     criminal matters and other creditor/debtor matters over the last 18 months

16     (including at least four other debtor's examinations hearings) and has never

17     missed a required appearance. In fact, Mr. Avenatti appeared for a debtor's

18     examination on Friday, October 18, 2019 in the *Jason Frank Law, APC v.*

19     *Michael Avenatti*, LASC No. BC706555. If Mr. Avenatti had known of the date

20     of the debtor's examination, Mr. Avenatti would have sought to postpone the

21     exam because on that same day, he was required to be personally present for

22     a court hearing in the Southern District of New York.

23     After learning about the Court's October 8, 2019 Minute Order, Mr.

24     Avenatti and his counsel then immediately sought to rectify the issue. On

25     October 18, 2019, Mr. Avenatti's counsel sent a letter to opposing counsel,

26     requesting a new date for the debtor's examination. Opposing counsel did not

27     respond to the letter. Mr. Avenatti's counsel also contacted the Court, who

28

---

*Ex Parte* Application to Schedule Debtor's Examination and Discharge the
Court's October 8, 2019 Minute Order

1 advised that he bring this *ex parte* application to schedule the debtor's

2 examination.

3      Mr. Avenatti respectfully requests that the Court put the debtor's

4 examination back on calendar and discharge the Court's October 8 Minute

5 Order, which issued a bench warrant. He is prepared to sit for the exam

6 immediately with the exception of Friday morning.

7 **I.  CONCLUSION**

8      For the foregoing reasons, this *ex parte* application should be granted. The

9 Court should put the debtor's examination back on calendar and the Court

10 should discharge the October 8, 2019 Minute Order.

11

12 Dated: October 21, 2019          Respectfully submitted,

13                                   **Pierce Bainbridge Beck Price &**

                                  **Hecht LLP**

14

15

16                             By: _____

17                             Thomas D. Warren

                            Attorneys for Respondent

18

19

20

21

22

23

24

25

26

27

28

---

## DECLARATION OF DANIEL DUBIN

I, Daniel Dubin, declare as follows:

1.    I am over the age of 18 years old.

2.    I make this declaration in support of Defendant Michael Avenatti's *ex parte* application to schedule the debtor's examination and discharge the Court's October 8, 2019 Minute Order.

3.    On October 21, 2019, at approximately 1:44 PM, I advised Plaintiff's counsel of this *ex parte* application via email. The notice given, including the date, time, manner, and name of the party informed, the relief sought, any response, and whether opposition is expected and that, within the applicable time under rule 3.1203, the applicant informed the opposing party where and when the application would be made.  Attached as **Exhibit A** is a true and correct copy if the email giving opposing counsel notice of the *ex parte* application.

4.    Attached as **Exhibit B** is a true and correct copy of the October 18, 2019 letter that my office sent Plaintiff's counsel.


Executed on October 21, 2019, in Los Angeles, California.

        I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

_____
Daniel Dubin

---

# EXHIBIT A

| From: | Daniel Dubin |
|---|---|
| To: | abc@cappellonoel.com; lconlan@cappellonoel.com |
| Cc: | Tom Warren |
| Subject: | RE: William Parrish v. Michael J. Avenatti - 18-cv-04106 |
| Date: | Monday, October 21, 2019 1:43:00 PM |
| Attachments: | image001.png |

Counsel,

We spoke to the Court, and we were unable to reserve a hearing date for tomorrow. However, we were able to reserve a hearing date for Mr. Avenatti's *ex parte* application to take place this Thursday.

Please take notice that on **Thursday, October 24, 2019**, at **8:15 AM**, or so soon thereafter as the matter may be heard in Department 3 of the Anacapa Division of the Santa Barbara Superior Courthouse, located at 1100 Anacapa Street, Santa Barbara, CA 91321, Defendant Michael Avenatti will apply *ex parte* for an order putting his debtor's examination back on calendar as soon as possible and discharging the Court's October 8, 2019 Minute Order, including the bench warrant. Please let me know if you will oppose the application. If you will not oppose, we request that you reach out to us so that we can request a mutually agreeable date for the debtor's examination. Thank you.


Best,
Daniel

**Daniel Dubin,** Associate
Pierce Bainbridge Beck Price & Hecht LLP

355 S. Grand Avenue, 44th Floor
Los Angeles, CA 90071
O: (213) 519-5847 C: (818) 331-9797

Boston | Cleveland | **Los Angeles** | New York | Washington, D.C.


PIERCE BAINBRIDGE

This message, including attachments, is confidential and may contain information protected by the attorney-client privilege or work product doctrine. If you are not the addressee, any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this email in error, please destroy it and notify me immediately.

**From:** Daniel Dubin <ddubin@piercebainbridge.com>
**Sent:** Sunday, October 20, 2019 10:42 PM
**To:** abc@cappellonoel.com; lconlan@cappellonoel.com
**Cc:** Tom Warren <twarren@piercebainbridge.com>
**Subject:** William Parrish v. Michael J. Avenatti - 18-cv-04106

Counsel,

Please take notice that on Tuesday, October 22, 2019, at 8:30 AM, or so soon thereafter as the matter may be heard in Department 3 of the Anacapa Division of the Santa Barbara Superior Courthouse, located at 1100 Anacapa Street, Santa Barbara, CA 91321, Defendant Michael Avenatti will apply *ex parte* for an order putting his debtor's examination back on calendar as soon as possible and discharging the Court's October 8, 2019 Minute Order. Please let me know if you will oppose the application. Thank you.

Best,
Daniel

**Daniel Dubin,** Associate
Pierce Bainbridge Beck Price & Hecht LLP

355 S. Grand Avenue, 44th Floor
Los Angeles, CA 90071
O: (213) 519-5847 C: (818) 331-9797

Boston  |  Cleveland  |  **Los Angeles**  |  New York  |  Washington, D.C.

PIERCE BAINBRIDGE

This message, including attachments, is confidential and may contain information protected by the attorney-client privilege or work product doctrine. If you are not the addressee, any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this email in error, please destroy it and notify me immediately.

# EXHIBIT B

**PIERCE BAINBRIDGE**

Thomas D. Warren
Partner
30195 Chagrin Blvd., Suite 210 N
Pepper Pike, OH 44124
(216) 370-7866
twarren@piercebainbridge.com

**VIA E-MAIL AND FACSIMILE**

October 18, 2019

A. Barry Cappello
Lawrence J. Conlan
Cappello & Noel LLP
831 State Street
Santa Barbara, CA 93101-3227
Tel: (805) 564-2444
Fax: (805) 965-5950
abc@cappellonoel.com
lconlan@cappellonoel.com

     *Re*:   *William Parrish v. Michael J. Avenatti*, Case No. 18-cv-04106

Dear Mr. Cappello:

Please be advised that we are representing Michael Avenatti in the above-referenced matter going-forward.

There appears to have been an issue relating to service of the notice of a debtor's exam of our client, as well as subsequent orders relating thereto. For the avoidance of doubt, please be assured that our client is prepared to sit for the exam forthwith on a mutually agreeable date. We kindly ask that you provide us such a date so that we can prepare a stipulation for submission to the Court.

In addition, please ensure that all future correspondence and documents are served on undersigned counsel.

Thank you for your prompt attention to this matter. Please do not hesitate to contact me with any questions or concerns.

Best regards,

Thomas D. Warren

# PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am over the age of 18 and not a party to this action.  I am employed in the county where the service occurred; my business address is 355 S. Grand Ave., 44th Floor, Los Angeles, CA 90071.

On October 21, 2019, I caused to be served the following documents described as:

**Defendant Michael J. Avenatti's *Ex Parte* Application to Schedule Debtor's Examination and Discharge the Court's October 8, 2019 Minute Order; Memorandum of Points and Authorities; Declaration of Daniel Dubin; [Proposed] Order**

on the interested parties in this action as stated below:

**CAPPELLO & NOEL LLP**
A. Barry Cappello
Lawrence J. Conlan
831 State Street
Santa Barbara, CA 93101-3227
Tel.: (805) 564-2444
Fax: (805) 965-5950
abc@cappellonoel.com
lconlan@cappellonoel.com

*Attorneys for Plaintiff William Parish*

[x] **ELECTRONIC SERVICE:** By selecting for electronic service as provided for by One Legal Online Services, contemporaneous with the filing.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on  October 21, 2019, at Los Angeles, California.

_____
Grace Chang

---

*Ex Parte* Application to Schedule Debtor's Examination and Discharge the
Court's October 8, 2019 Minute Order

EXHIBIT 22

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA BARBARA | FOR COURT USE ONLY |
|---|---|

☒ Anacapa Division
1100 Anacapa St., 2nd Floor
Santa Barbara, CA 93121

☐ Cook Division
312 E. Cook St.
Santa Maria, CA 93454

☐ Lompoc Division
115 Civic Center Plz
Lompoc, CA 93436

PETITIONER: **William Parrish**

RESPONDENT: **Michael Avenatti**

| **RECALL OF WARRANT OF ATTACHMENT** | CASE NUMBER:<br>18CV04106 |
|---|---|

**To: Warrant Section**
**Sheriff's Office**
**4436 Calle Real**
**Santa Barbara, CA 93110**

**To: Attn: Sheriff's Department**
**Hollywood Branch**
**5925 Hollywood Blvd., #111**
**Hollywood, CA 90028**

Warrant of Attachment Number ___18CV04106___ issued on ___10/21/2019___ commanding

the arrest of ___Michael Avenatti___ is hereby ordered recalled on ___10/23/2019___ by

___Judge Thomas P. Anderle___.

Clerk of the Superior Court
Dated: ___10/23/2019___

By ___Veronica Robles___
Deputy Clerk

========================================================

Return from the Sheriff to the Superior Court with the following action:

_____ No record of receiving warrant.

_____ Warrant is attached and recall has been made.

Santa Barbara County Sheriff
Warrant Section

By_____

Telephone #:_____

Mandatory Form
SC-2920 [Rev. July 20, 2007]

**RECALL OF WARRANT OF ATTACHMENT**

# EXHIBIT 23

```
 1            SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2                 FOR THE COUNTY OF SANTA BARBARA
 3
      WILLIAM PARRISH,                )
 4                                    )
                    PLAINTIFF,        )
 5                                    ) CASE NO.
            VS.                       ) 18CV04106
 6                                    )
      MICHAEL J. AVENATTI,            )
 7                                    )
                    DEFENDANT.        )
 8    _____)
 9
10
11
12
13              JUDGMENT DEBTOR EXAMINATION
14               OF MICHAEL J. AVENATTI
                 TUESDAY, OCTOBER 29, 2019
15
16
17
18
19
20
21
22
23    JOB NO.:  3610771
24    REPORTED BY TARA SANDFORD, CSR NO. 3374, RPR
25    PAGES 1 - 63
```

Page 1

```
 1          JUDGMENT DEBTOR EXAMINATION OF MICHAEL J. AVENATTI,

 2    TAKEN ON BEHALF OF PLAINTIFF, AT 9:34 A.M., ON TUESDAY,

 3    OCTOBER 29, 2019, AT SANTA BARBARA COURTHOUSE,

 4    DEPARTMENT 3, 1100 ANACAPA STREET, SANTA BARBARA,

 5    CALIFORNIA, BEFORE TARA SANDFORD, CSR NO. 3374, RPR.

 6

 7    APPEARANCES OF COUNSEL:

 8    FOR PLAINTIFF/JUDGMENT CREDITOR:

 9              CAPPELLO & NOEL
                BY:  LAWRENCE CONLAN, ESQ.
10              831 STATE STREET
                SANTA BARBARA, CALIFORNIA 93101
11              805.564.2444
                LCONLAN@CAPPELLONOEL.COM
12

13    FOR DEFENDANT/JUDGMENT DEBTOR:

14              PIERCE BAINBRIDGE BECK PRICE & HECHT
                BY:  DANIEL DUBIN, ESQ.
15              BY:  THOMAS D. WARREN, ESQ.
                355 SOUTH GRAND AVENUE, 4TH FLOOR
16              LOS ANGELES, CALIFORNIA 90071
                213.262.9333
17              DDUBIN@PIERCEBAINBRIDGE.COM
18

19

20

21

22

23

24

25
```

Page 2

```
 1                       I N D E X

 2   WITNESS               EXAMINATION BY              PAGE

 3   MICHAEL J. AVENATTI   MR. CONLAN                     4

 4

 5

 6

 7                      E X H I B I T S

 8                         (NONE)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1        SANTA BARBARA, CALIFORNIA; TUESDAY, OCTOBER 29, 2019

 2                           9:34 A.M.

 3

 4                      MICHAEL J. AVENATTI,

 5        having been first duly sworn by the reporter, was

 6                 examined and testified as follows:

 7

 8                          EXAMINATION

 9   BY MR. CONLAN:

10       Q.   Mr. Avenatti, I am Larry Conlan, and I

11   represent William Parrish.

12       A.   Nice to meet you.

13       Q.   Me, too.

14            You were served with a notice to appear for a

15   judgment debtor's exam some time ago.  You missed the

16   first debtor's exam.  Do you know why?

17            MR. WARREN:  Objection to form.

18            THE WITNESS:  Do I know why I missed the exam?

19       Q.   BY MR. CONLAN:  Why did you not appear?

20       A.   I am going to take the Fifth Amendment relating

21   to that question.

22       Q.   You were served with a subsequent notice to

23   appear for a judgment debtor's exam issued by the Court

24   for the last noticed hearing.  Why did you not appear?

25       A.   I am going to again plead the Fifth.  I am here
```

```
 1              MR. WARREN:  I understand.  But asking him
 2     questions that you already know at this point are
 3     questions he is not going to answer because he's
 4     asserting his privilege against self-incrimination is,
 5     in fact, a waste of time.
 6          Q.   BY MR. CONLAN:  Mr. Avenatti, when is the last
 7     time you had an open brokerage account in your name?
 8          A.   The same answer.
 9          Q.   What is the answer?
10          A.   I am going to not answer the question on the
11     advice of my counsel and assert the Fifth Amendment.
12          Q.   Are you aware of any individuals or entities
13     holding title to real property on your behalf?
14          A.   Not that I can think of.
15          Q.   When is the last time you owned real property?
16          A.   I am going to assert my Fifth Amendment right
17     against self-incrimination on the advice of my counsel.
18          Q.   Other than Avenatti & Associates, do you have
19     an interest in any other business entity?
20          A.   Same answer.
21          Q.   When is the last time you held any securities
22     in your name?
23          A.   Same answer.
24          Q.   Does Avenatti & Associates hold any securities?
25          A.   Same answer.
```

Page 50

# EXHIBIT 24

8

| | |
|---|---|
| 1 | Tonya E. Prescott, Esq. — CSB# 123530<br>Valerie E. Prescott, Esq. — CSB# 170134 |
| 2 | |
| 3 | *Prescott & Prescott Inc.*<br>*Certified Family Law Specialists*<br>*The State Bar of California Board of Legal Specialization* |
| 4 | 400 West First Street<br>Tustin, California 92780-3003 |
| 5 | |
| 6 | Tel: (714) 730-5200 Fax: (714) 730-5225 |

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
LAMOREAUX JUSTICE CENTER

APR 2 3 2018

DAVID H. YAMASAKI, Clerk of the Court

BY: L. DUDEVOIR DEPUTY

7 │ Attorneys for Respondent, Lisa Storie-Avenatti

8 │ SUPERIOR COURT, STATE OF CALIFORNIA

9 │ COUNTY OF ORANGE, LAMOREAUX JUSTICE CENTER

10 │ FAMILY LAW DIVISION

| | | |
|---|---|---|
| 11 | Michael Avenatti, | CASE NO.:  17 D 009930 |
| 12 | Petitioner, | STIPULATION AND ORDER THEREON FOR TEMPORARY CUSTODY AND SUPPORT |
| 13 | vs. | |
| 14 | Lisa Storie-Avenatti, | Assigned for all purposes to:<br>Judge Carol L. Henson<br>Department L71 |
| 15 | Respondent. | |
| 16 | | Hearing on Requests for Orders:<br>Date:  Monday, 4/23/2018<br>Time:  8:45 a.m. |

17

18 │ ***IT IS HEREBY STIPULATED***, by and between Petitioner, Michael Avenatti, individually, and

19 │ through his attorney of record Lonnie K. Seide of Minyard Morris, and Respondent Lisa Storie-Avenatti,

20 │ individually and through her attorney of record, Valerie E. Prescott, of Prescott & Prescott, Inc. as

21 │ follows:

22 │ ***Child Custody and Parenting Time***

23 │ ***Joint Legal Custody***

24 │ 1.    Subject to further order of any Court of competent jurisdiction, Petitioner/Father and

25 │ Respondent/Mother shall have joint legal custody and control of their minor child, Agostino W.

26 │ Avenatti, born August 24, 2014.

27 │ ***Physical Custody***

28 │ 2.    Respondent/Mother shall have primary physical custody of the minor child.

3. Petitioner/Father shall have secondary physical custody of the minor child during the following times:

   a. The first and third weekend of each month as determined by the calendar date on Friday, from Friday at 6:00 p.m. to Sunday at 6:00 p.m.

   b. Every Wednesday from 5:00 p.m. to 7:00 p.m.

   c. Petitioner/Father shall confirm that he will exercise his custodial time with his son no later than the Monday prior to his Wednesday and Friday/weekend custodial time.

   d. One-half (½) of holidays, as well as additional custodial time during the summer (to be determined later if the parties cannot come to an additional mutual agreement).

4. Each party shall keep the other advised at all time of his/her current residence address, telephone numbers (home and work), and the location of any place where the child will be spending any extended period of time (three days or more).

*Custody Jurisdiction*

5. California shall have jurisdiction, and shall be the only convenient forum, to make any initial or modification orders providing for the custody, including parenting time rights of the child of the parties, for as long as either party continues to be a resident of California and to assert his or her custody or parenting time rights with respect to the child.  Neither party shall commence any action seeking such orders, as distinguished from registering a Judgment for the sole purpose of enforcing it, in any out-of-state forum when either party continues to be a residence of California, to assert his or her custody or parenting time rights with respect to the child who is the subject of the action.  Should either party commence such an action in violation of this provision, the Court, in the parties' dissolution action, shall award the other party all costs reasonably incurred as a result, including, but not limited to, transportation costs, attorney fees, and other litigation costs, regardless of whether he or she is the prevailing party in the out-of-state action.  The Court, in the parties' dissolution action, shall reserve jurisdiction to award such costs.

6. Pursuant to Family Code section 3048, the Court finds that:

   a. This Court has jurisdiction over the minor child under the Uniform Child Custody Jurisdiction and Enforcement Act (part 3 of the California Family Code, commencing with

section 3400).

b.    The responding party was given notice and an opportunity to be heard as provided by the laws of the State of California.

c.    Child custody and visitation rights of each party are as set forth in this order.

d.    The minor child's country of habitual residence is the United States of America and his home state is California (as more specifically addressed herein above).

**Any violation of the custody/visitation order may subject the party in violation to civil or criminal penalties, or both.**

*Decision Making*

7.    Each party shall:

a.    have the right and responsibility to make decisions relating to the child's health, education, welfare and religion;

b.    continue to have a full and active role in providing a sound moral, social, economic, and educational environment for the child;

c.    consult the other on all substantial questions relating to the child's religious upbringing, educational plans, significant changes in social environment, and non-emergency health care;

d.    work cooperatively with the other to amicably resolve any disputes;

e.    immediately inform the other regarding 1) any significant changes in the child's health; ii)significant information relative to he child's educational progress, iii) details of the child's medical treatment; iv) the existence of any educational, emotional, or medical problems of the child; and v) all other significant events in the child's life.

*Activities*

8.    Each party shall carefully avoid the scheduling or arranging of activities for the child that are likely to conflict with any periods of custody allocated to the other party.

*Derogatory Remarks*

9.    Neither party shall use or make any disparaging or derogatory remarks about the other, or to the other, in the presence of the child of the marriage.   Both parties are prohibited from permitting

1  the child of the marriage to be in a place where any person (regardless of whether said person

2  may be a relative, friend or significant other) is making disparaging or derogatory remarks about

3  the other.

4  ### Notification Regarding Trips

5  10.  If either party takes the child on a trip away from home for longer than two days, that traveling

6  party shall provide the other party, before leaving, with the address and telephone number of the

7  place where the child will be and shall report any later changes of plans. If a trip of two days or

8  less is to be extended, there shall also be notification to the other party as to the relevant details.

9  ### Move Restrained

10  11.  Each party is enjoined and restrained from removing or attempting to remove a child of the

11  marriage from Orange or Los Angeles Counties, without the prior written consent of the other

12  party or an order of a court of competent jurisdiction, except for vacation purposes not exceeding

13  ten (10) days.

14  ### Surname

15  12.  The parties' minor child shall bear the father's surname on all school records and any other legal

16  documents, and shall not assume the mother's maiden name or the mother's future married name.

17  ### Child Support

18  13.  Petitioner/Father shall pay to Respondent/Mother, as and for the support and maintenance of the

19  minor child ,the sum of $7,000 per month, payable one half on the first day of each month and

20  one-half on the fifteenth day of each month. commencing March 1, 2018 and continuing until the

21  child for whom support is payable dies, marries, is emancipated. until further order of the Court,

22  or, as to an unmarried child who has attained the age of 18 years old, is a full-time high school

23  student, and who is not self-supporting until the child completes the 12th grade or attains the age

24  of 19 years old, which ever occurs first.

25  14.  As and for further child support, Petitioner/Father shall pay to Respondent/Mother the sum of

26  $2,000 per month, payable on the first day of each month, and each month thereafter,

27  commencing March 1, 2018 as and for his contributive share of the minor child's child care and

28  pre-school costs.

15. It is the intention of the parties that these child support orders are temporary and shall be reviewed and modified, if appropriate, within the next 6 months. It is anticipated that within 6 months each party's accountant will have had sufficient time and opportunity to prepare any necessary controllable cash flow reports for purposes of determining a more permanent support order.

16. In the event that there is a contract between a party receiving support and a private child support collector, the party ordered to pay support must pay the fee charged by the private child support collector. This fee must not exceed thirty-three and one-third percent (33 1/3 %) of the total amount of past due support nor may it exceed fifty percent (50%) of any fee charged by the private child support collector and the party receiving support, jointly. (Family Code Section 5616.)

### Health Insurance for Child

17. Pursuant to Family Code Sections 3751(a)(2) and (b), Petitioner/Father shall maintain health insurance coverage for the supported child, if available at no cost or at a reasonable cost. Such health insurance shall be considered reasonable in cost if the cost to Petitioner does not exceed five percent (5%) of his gross income.

### Medical Expenses Not Otherwise Covered by Health Insurance

18. As and for additional child support, pursuant to Family Code Sections 4062 and 4063, each party shall pay one-half of all reasonable uninsured health care costs. When either parent accrues or pays costs pursuant to this paragraph, that parent shall provide an itemized statement of the costs to the other parent within a reasonable time, but not more than thirty (30) days after accruing the costs. These costs shall then be paid as follows:

    a.    If a parent has already paid all of these costs, that parent shall provide proof of payment and a request for reimbursement of his or her court-ordered share to the other parent.

    b.    If a parent has paid his or her court-ordered share of the costs only, that parent shall provide proof of payment to the other parent, request the other parent to pay the remainder of the costs directly to the provider, and provide the reimbursing parent with any necessary information about how to make the payment to the provider.

4/18/18

STIPULATION AND ORDER THEREON
PETITIONER: MICHAEL AVENATTI
RESPONDENT: LISA STORIE-AVENATTI    PAGE 5    OCSC CASE NO.: 17 D 009930

c.  The other parent shall make the reimbursement or pay the remaining costs within a reasonable time, not to exceed thirty (30) days from notification of the amount due.

d.  If the reimbursing parent disputes a request for payment, that parent shall pay the requested amount and thereafter may seek judicial relief under Family Code Sections 290 and 4063.  If the reimbursing parent fails to pay the other parent as required by Family Code Section 4063(b), the other parent may seek judicial relief under Family Code Section 4063.

All of the rights and responsibilities described in the *Notice of Rights and Responsibilities* (FL-192, copy attached hereto) are incorporated by reference to this Stipulation and Order.

## Consent for Medical Care

19.  Except in cases of emergency, the custodial party shall consult the other party and obtain said party's written consent, which shall not be unreasonably withheld, before committing the child to any course of treatment or care for which medical expenses payable by the other arty may reasonably be expected to be in excess of $200 during any calendar month or in excess of $1,000 over a period of one (1) year.

## Uniform Child Support Guideline

20.  Pursuant to Family Code Section 4065, the parties acknowledge that they are fully informed of their rights pursuant to the California Statewide Uniform Child Support Guideline and that this stipulated award is being agreed to without coercion or duress.  The parties declare that the agreement is in the best interest of the child involved and his needs will be adequately met by this stipulated amount.  The right to support has not been assigned to the county pursuant to Section 11477 of the Welfare and Institutions Code, and no public assistance application is pending.

## Stay of Wage Assignment

21.  Pursuant to Family Code Section 5230, the obligor shall assign to the obligee that portion of his earnings sufficient to pay the amount of support set forth herein.  Pursuant to Family Code Section 5260, the court may order that issuance of the assignment be stayed on finding of good cause. The parties stipulate, and the Court finds, that good cause exists for a stay of issuance of the wage assignment, in that the terms of this Stipulation provide an alternative arrangement to

1  ensure payment of the support obligation. Thus, the parties stipulate, and it is ordered, that the
2  issuance of the wage assignment is stayed, pending fifteen (15) days of delinquency.

### *Spousal Support*

#### *Amount and Term*

5  22.  As and for spousal support, Petitioner shall pay to Respondent the sum of $28,000 per month,
6  commencing on March 1, 2018, payable one-half on the first day of each month and one-half on
7  the fifteenth day of each and every month and continuing thereafter on the first and fifteenth day
8  of each month until the death of either party, remarriage of Wife, or further order of the Court,
9  whichever occurs first.

10  23.  It is the intention of the parties that this spousal support order is temporary and shall be reviewed
11  and modified, if appropriate, within the next 6 months. It is anticipated that within 6 months each
12  party's accountant will have had sufficient time and opportunity to prepare any necessary
13  controllable cash flow reports for purposes of determining a more permanent support order.

#### *Stay of Wage Assignment*

15  24.  Pursuant to Family Code Section 5230, the obligor shall assign to the obligee that portion of his
16  earnings sufficient to pay the amount of support set forth herein. Pursuant to Family Code
17  Section 5260, the court may order that issuance of the assignment be stayed on finding of good
18  cause. The parties stipulate, and the Court finds, that good cause exists for a stay of issuance of
19  the wage assignment, in that the terms of this Stipulation provide an alternative arrangement to
20  ensure payment of the support obligation. Thus, the parties stipulate, and it is ordered, that the
21  issuance of the wage assignment is stayed, pending fifteen (15) days of delinquency.

#### *Health Insurance for Respondent*

23  25.  Petitioner shall continue to maintain all presenting existing health, dental and vision insurance
24  coverage for Respondent.

#### *Life Insurance Policies*

26  26.  Petitioner shall maintain and keep current all presently existing life insurance policies insuring his
27  life. Petitioner is specifically restrained and enjoined from changing the beneficiary of any life
28  insurance policies insuring his life and shall continue to list Respondent as the sole and irrevocable

4/18/18

STIPULATION AND ORDER THEREON
PETITIONER: MICHAEL AVENATTI
RESPONDENT: LISA STORIE-AVENATTI        PAGE 7        OCSC CASE NO.: 17 D 009930

1    beneficiary thereof until further order of the Court.

2                    *Hearing on Requests for Orders*

3    27.   The existing *Requests for Orders* scheduled for hearing on April 23, 2018 shall be continued to

4          a mutually agreeable date in July of 2018.

5                    *Stipulation Without Prejudice*

6    28.   The orders herein are without prejudice.  In addition, any child support and/or spousal support

7          orders made at the continued hearing on the parties' *Requests for Orders* may be retroactive to

8          the filing of the corresponding *Request for Order*.

9                    *Pending Discovery*

10   29.   The orders made by the Court on March 26, 2018 are modified as follows:

11         a.    The parties shall exchange current *Income and Expense Declarations* at least 30 days

12               prior to any continued hearing date.

13         b.    Each party shall provide to the other party's attorney their 2016 personal and business tax

14               returns no later than 5/15/2018.

15         c.    Each party shall provide to the other party's attorney their 2017 personal and business tax

16               returns no later than 5/15/2018 or, if not filed by 5/15/2018, within 10 days of filing.

17         d.    Petitioner shall provide to Respondent's counsel copies of all personal and

18               corporate/business bank account statements for the period of 1/1/2016 through 3/31/2018

19               by 5/15/2018.

20   30.   Both parties shall cooperate with the accountants involved herein and provide any and all

21         necessary documentation needed to them within 30 days of the accountant's request.

22                    *Property Orders*

23   31.   The parties' furniture and furnishings are presently in storage.

24   32.   The parties' artwork that was in the family residence is also in storage.

25   33.   The parties agree to equally divide the artwork that was in the family residence as a pre-

26         distribution of community property.

27   34.   Each party shall pay one-half of the storage costs, commencing April 1, 2018 and continuing until

28         these items are equitably divided and the storage facility is no longer needed.

4/18/18

STIPULATION AND ORDER THEREON
PETITIONER: MICHAEL AVENATTI
RESPONDENT: LISA STORIE-AVENATTI          PAGE 8          CCSC CASE NO.: 17 D 009930

*Accounting Costs*

35. Petitioner shall pay to Respondent the sum of $10,000 as and for his contributive share of the retainer needed for Respondent to hire an accountant, subject to reallocation or supplementation at the time of the hearing on this matter. Said sum shall be paid, in full, on or before May 1, 2018.

*Attorneys Fees*

36. Petitioner shall pay to Respondent the sum of $10,000 as a contributive share of her attorney fees and costs. This sum is subject to reallocation or supplementation at the time of the hearing on this matter. Said sum shall be paid in full on or before June 1, 2018.

*Representation by Counsel and Knowledge of Agreement*

37. Petitioner acknowledges that he has retained Attorney Lonnie K. Seide of Minyard Morris to advise him in connection with this *Stipulation and Order Thereon* and with the negotiation and preparation of same. Petitioner has been advised regarding his rights, duties and obligations, and as to the legal effects of this *Stipulation and Order Thereon*.

38. Respondent acknowledges that she has retained Attorney Valerie E. Prescott of Prescott & Prescott Inc. to advise her in connection with this *Stipulation and Order Thereon* and with the negotiation and preparation of same. Respondent has been advised regarding her rights, duties and obligations, and as to the legal effects of this *Stipulation and Order Thereon*.

39. Each of the parties acknowledge that he or she has read this *Stipulation and Order Thereon* and each of its provisions in full and acknowledge it is voluntarily entered into.

///
///
///
///
///
///
///
///

**Other**

40      This *Stipulation and Order Thereon* may be signed in separate counterparts. A facsimile or other electronic signature shall be treated as an original by the Court for purposes of filing this document.

*It Is So Stipulated:*

Dated.   ___ ___

Michael Avenatti, Petitioner

Dated: 4/18/2018

Lisa Storie-Avenatti, Respondent

*Approved as to Form and Content:*

Dated ___ ___

Lonnie K. Seide, Esq.; Minyard Morris
Counsel for Petitioner, Michael Avenatti

Dated. 4/18/2018

Valerie F. Prescott, Esq., Prescott & Prescott Inc
Counsel for Respondent, Lisa Storie-Avenatti

*IT IS SO ORDERED:*

Dated   ___ ___ ___

See next page

Honorable Judge Carol I. Henson
Judge of the Superior Court of California
County of Orange, Lamoreaux Justice Center (L 71)

*(vertical text, left margin)* Prescott & Prescott, Inc.

4-18-18

STIPULATION AND ORDER THEREON

PETITIONER: MICHAEL AVENATTI
RESPONDENT: LISA STORIE-AVENATTI

PAGE 10

OCSC CASE NO.: 17 D 009930



**Other**

40.    This *Stipulation and Order Thereon* may be signed in separate counterparts. A facsimile or other electronic signature shall be treated as an original by the Court for purposes of filing this document.

*It Is So Stipulated.*

Dated: 4/20/2018

Michael Avenatti, Petitioner

Dated: 4/18/2018

Lisa Storie-Avenatti, Respondent

*Approved as to Form and Content:*

Dated: 4/20/18

Lonnie K. Seide, Esq.; Munyard Mifrd
Counsel for Petitioner, Michael Avenatti

Dated: 4/18/2018

Valerie E. Prescott, Esq.; Prescott & Prescott Inc
Counsel for Respondent, Lisa Storie-Avenatti

*IT IS SO ORDERED:*

Dated: APR 2 3 2018

Honorable Jude Carol L. Henson
Judge of the Superior Court of California
County of Orange, Lamoreaux Justice Center (L71)

CAROL L. HENSON

STIPULATION AND ORDER THEREON

4/18/18    PETITIONER: MICHAEL AVENATTI
RESPONDENT: LISA STORIE-AVENATTI        PAGE 10        OCSC CASE NO.: 17 D 008930

## NOTICE OF RIGHTS AND RESPONSIBILITIES

FL-192

### Health-Care Costs and Reimbursement Procedures

## IF YOU HAVE A CHILD SUPPORT ORDER THAT INCLUDES A PROVISION FOR THE REIMBURSEMENT OF A PORTION OF THE CHILD'S OR CHILDREN'S HEALTH-CARE COSTS AND THOSE COSTS ARE NOT PAID BY INSURANCE, THE LAW SAYS:

**1. Notice.** You must give the other parent an itemized statement of the charges that have been billed for any health-care costs not paid by insurance. You must give this statement to the other parent within a reasonable time, but no more than 30 days after those costs were given to you.

**2. Proof of full payment.** If you have already paid all of the uninsured costs, you must (1) give the other parent proof that you paid them and (2) ask for reimbursement for the other parent's court-ordered share of those costs.

**3. Proof of partial payment.** If you have paid only your share of the uninsured costs, you must (1) give the other parent proof that you paid your share, (2) ask that the other parent pay his or her share of the costs directly to the health-care provider, and (3) give the other parent the information necessary for that parent to be able to pay the bill.

**4. Payment by notified parent.** If you receive notice from a parent that an uninsured health-care cost has been incurred, you must pay your share of that cost within the time the court orders; or if the court has not specified a period of time, you must make payment (1) within 30 days from the time you were given notice of the amount due, (2) according to any payment schedule set by the health-care provider, (3) according to a schedule agreed to in writing by you and the other parent, or (4) according to a schedule adopted by the court.

**5. Disputed charges.** If you dispute a charge, you may file a motion in court to resolve the dispute, but only if you pay that charge before filing your motion. If you claim that the other party has failed to reimburse you for a payment, or the other party has failed to make a payment to the provider after proper notice has been given, you may file a motion in court to resolve the dispute. The court will presume that if uninsured costs have been paid, those costs were reasonable. The court may award attorney fees and costs against a party who has been unreasonable.

**6. Court-ordered insurance coverage.** If a parent provides health-care insurance as ordered by the court, that insurance must be used at all times to the extent that it is available for health-care costs.

**a. Burden to prove.** The party claiming that the coverage is inadequate to meet the child's needs has the burden of proving that to the court.

**b. Cost of additional coverage.** If a parent purchases health-care insurance in addition to that ordered by the court, that parent must pay all the costs of the additional coverage. In addition, if a parent uses alternative coverage that costs more than the coverage provided by court order, that parent must pay the difference.

**7. Preferred health providers.** If the court-ordered coverage designates a preferred health-care provider, that provider must be used at all times consistent with the terms of the health insurance policy. When any party uses a health-care provider other than the preferred provider, any health-care costs that would have been paid by the preferred health provider if that provider had been used must be the sole responsibility of the party incurring those costs..

Form Approved for Optional Use
Judicial Council of California
FL-192 (Rev. January 1, 2018)

Martin Dean's
ESSENTIAL FORMS™

**NOTICE OF RIGHTS AND RESPONSIBILITIES**
**Health-Care Costs and Reimbursement Procedures**

Family Code, §§ 4062, 4063
www.courts.ca.gov

## INFORMATION SHEET ON CHANGING A CHILD SUPPORT ORDER

FL-192

**General Information**

The court has just made a child support order in your case. This order will remain the same unless a party to the action requests that the support be changed (modified). An order for child support can be modified only by filing a motion to change child support and serving each party involved in your case. If both parents and the local child support agency (if it is involved) agree on a new child support amount, you can complete, have all parties sign, and file with the court a *Stipulation to Establish or Modify Child Support and Order* (form FL-350) or *Stipulation and Order (Governmental)* (form FL-625).

**When a Child Support Order May Be Modified**

The court takes several things into account when ordering the payment of child support. First, the number of children is considered. Next, the net incomes of both parents are determined, along with the percentage of time each parent has physical custody of the children. The court considers both parties' tax filing status and may consider hardships, such as a child of another relationship. An existing order for child support may be modified when the net income of one of the parents changes significantly, the parenting schedule changes significantly, or a new child is born.

**Examples**

- You have been ordered to pay $500 per month in child support. You lose your job. You continue to owe $500 per month, plus 10 percent interest on any unpaid support, unless you file a motion to modify your child support to a lower amount and the court orders a reduction.
- You are currently receiving $300 per month in child support from the other parent, whose net income has just increased substantially. You will continue to receive $300 per month unless you file a motion to modify your child support to a higher amount and the court orders an increase.
- You are paying child support based upon having physical custody of your children 30 percent of the time. After several months it turns out that you actually have physical custody of the children 50 percent of the time. You may file a motion to modify child support to a lower amount.

**How to Change a Child Support Order**

To change a child support order, you must file papers with the court. *Remember:* You must follow the order you have now.

**What forms do I need?**

If you are asking to change a child support order open with the local child support agency, you must fill out one of these forms:

- FL-680, *Notice of Motion (Governmental)* or FL-683 *Order to Show Cause (Governmental)* **and**
- FL-684, *Request for Order and Supporting Declaration (Governmental)*

If you are asking to change a child support order that is **not** open with the local child support agency, you must fill out one of these forms:

- FL-300, *Request for Order* **or**
- FL-390, *Notice of Motion and Motion for Simplified Modification of Order for Child, Spousal, or Family Support*

You must also fill out one of these forms:

- FL-150, *Income and Expense Declaration* or FL-155, *Financial Statement (Simplified)*

**What if I am not sure which forms to fill out?**

Talk to the family law facilitator at your court.

**After you fill out the forms,** file them with the court clerk and ask for a hearing date. Write the hearing date on the form.

The clerk will ask you to pay a filing fee. If you cannot afford the fee, fill out these forms, too:

- Form FW-001, *Request to Waive Court Fees*
- Form FW-003, *Order on Court Fee Waiver (Superior Court)*

**You must serve the other parent.** If the local child support agency is involved, serve it too.

This means someone 18 or over - **not you** - must serve the other parent copies of your filed court forms at least **16 court days** before the hearing. Add 5 calendar days if you serve by mail within California (see Code of Civil Procedure section 1005 for other situations). **Court days** are weekdays when the court is open for business (Monday through Friday except court holidays). **Calendar days** include all days of the month, including weekends and holidays. To find court holidays, go to *www.courts.ca.gov/holidays.htm.*

The server must also serve blank copies of these forms:

- FL-320, *Responsive Declaration to Request for Order and* FL-150, *Income and Expense Declaration,* **or**
- FL-155, *Financial Statement (Simplified)*

Then the server fills out and signs a *Proof of Service* (form FL-330 or FL-335). Take this form to the clerk and file it.

**Go to your hearing and ask the judge to change the support.** Bring your tax returns from the last two years and your last two months' pay stubs. The judge will look at your information, listen to both parents, and make an order. After the hearing, fill out:

- FL-340, *Findings and Order After Hearing* **and**
- FL-342, *Child Support Information and Order Attachment*

**Need help?**

Contact the family law facilitator in your county or call your county's bar association and ask for an experienced family lawyer.

---

FL-192 [Rev. January 1, 2015]

**NOTICE OF RIGHTS AND RESPONSIBILITIES**
**Health-Care Costs and Reimbursement Procedures**

Page 2 of 2

Martin Dean's
ESSENTIAL FORMS™

# EXHIBIT 25

FL-340

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*:<br>Valerie E. Prescott, Esq. (SBN 170134)<br>Prescott & Prescott Inc.<br>400 West First Street<br>Tustin, CA 92780-3803<br>TELEPHONE NO.:(714) 730-5200   FAX NO. *(Optional)*:(714) 730-5225<br>E-MAIL ADDRESS *(Optional)*: Valerie@familylaw.com<br>ATTORNEY FOR *(Name)*: Lisa Storie-Avenatti | FOR COURT USE ONLY<br><br>**FILED**<br>SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF ORANGE<br>LAMOREAUX JUSTICE CENTER<br><br>OCT 22 2018<br><br>DAVID H. YAMASAKI, Clerk of the Court<br><br>BY: R. ESCOBEDO ,DEPUTY |
|---|---|
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF Orange<br>STREET ADDRESS: 341 The City Drive<br>MAILING ADDRESS: Post Office Box 14170<br>CITY AND ZIP CODE: Orange, CA 92613-1570<br>BRANCH NAME: Family Law Branch | |
| PETITIONER/PLAINTIFF: Michael Avenatti<br><br>RESPONDENT/DEFENDANT: Lisa Storie-Avenatti<br><br>OTHER PARTY: | |

| FINDINGS AND ORDER AFTER HEARING | CASE NUMBER:<br>17 D 009930 |
|---|---|

1. This proceeding was heard
   on *(date)*: Mon. 7/16/2018         at *(time)*: 8:45 a.m.         In Dept.: L71         Room:
   by Judge *(name)*: Carol L. Henson          ☐ Temporary Judge
   On the order to show cause, notice of motion or request for order filed *(date)*: 1/3/2018 & 1/9/2018  by *(name)*: Lisa Storie-Avenatti & Michael Avenatti respectively
   a. ☐ Petitioner/plaintiff present                          ☐ Attorney present *(name)*:
   b. ☒ Respondent/defendant present                 ☒ Attorney present *(name)*: Valerie E. Prescott, Esq.
   c. ☐ Other party present                                       ☐ Attorney present *(name)*:

**THE COURT ORDERS**

2. Custody and visitation/parenting time:    As attached   ☐ on form FL-341   ☒ Other   ☐ Not applicable

3. Child support:    As attached   ☐ on form FL-342   ☒ Other   ☐ Not applicable

4. Spousal or family support:    As attached   ☐ on form FL-343   ☒ Other   ☐ Not applicable

5. Property orders:    As attached   ☐ on form FL-344   ☐ Other   ☐ Not applicable

6. Attorney's fees:    As attached   ☐ on form FL-346   ☒ Other   ☐ Not applicable

7. Other orders:    ☒ As attached   ☐ Not applicable

8. All other issues are reserved until further order of court.

9. ☐ This matter is continued for further hearing on *(date)*: N/A      at *(time)*: N/A      In Dept.: N/A
   on the following issues:

Date:                                                    ▶ Please see Court's approval on page 8 of Attachment.
                                                                              JUDICIAL OFFICER

*Approved as conforming to court order.

▶   Please see Counsel's approval on page 8 of Attachment.
SIGNATURE OF ATTORNEY FOR   ☐ PETITIONER/PLAINTIFF   ☐ RESPONDENT/DEFENDANT   ☐ OTHER PARTY
                                                                                                                        Page 1 of 1

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>FL-340 [Rev. January 1, 2012] | **FINDINGS AND ORDER AFTER HEARING**<br>(Family Law—Custody and Support—Uniform Parentage) | www.courts.ca.gov |
|---|---|---|

CEB Essential<br>ceb.com Forms

AUG 17 2018

**ATTACHMENT TO FORM FL-340 (FINDINGS AND ORDER AFTER HEARING)**

1
2  *This matter came on for hearing on Monday, 7/16/2018 at 8:45 a.m. before Judge Carol L.*
3  *Henson in Department L71 of this Court. Respondent was present as was counsel for Respondent,*
4  *Valerie E. Prescott, Esq. of Prescott & Prescott Inc. Petitioner was not present nor was there an*
5  *appearance made on his behalf.*
6  *The Court made the following findings and orders:*
7  1.  The Court did receive and read the letter from the Petitioner, Michael Avenatti, dated July 16,
8      2018 addressed to Respondent's counsel, and delivered to Department L71 on July 16, 2018
9      prior to this hearing taking place.
10 2.  The *Request for Order* filed by Petitioner on 1/8/2018 regarding child custody and visitation is
11     ordered off calendar as Petitioner failed to appear at the hearing on this date (7/16/2018).
12 3.  The Court proceeded on the *Request for Order* filed by Respondent on 1/3/2018.
13 4.  The Court orders that the following provisions contained in the *Stipulation and Order* filed on
14     4/23/2018, previously stipulated as "agreed upon with out prejudice to either party", are now the
15     this Court's temporary orders in this matter:
16     a.  Custody and Parenting time provisions (items 1-12).
17                    *Child Custody and Parenting Time*
18                         *Joint Legal Custody*
19         1.  Subject to further order of any Court of competent jurisdiction, Petitioner/Father
20             and Respondent/Mother shall have joint legal custody and control of their minor
21             child, Agostino W. Avenatti, born August 24, 2014.
22                         *Physical Custody*
23         2.  Respondent/Mother shall have primary physical custody of the minor child.
24         3.  Petitioner/Father shall have secondary physical custody of the minor child during
25             the following times:
26             a.  The first and third weekend of each month as determined by the calendar
27                 date on Friday, from Friday at 6:00 p.m. to Sunday at 6:00 p.m.
28             b.  Every Wednesday from 5:00 p.m. to 7:00 p.m.

ATTACHMENT TO FORM FL-340 (FINDINGS AND ORDER AFTER HEARING)
7/19/18 PETITIONER: MICHAEL AVENATTI
RESPONDENT: LISA STORIE-AVENATTI          PAGE 1          OCSC CASE NO.: 17 D 009930

   c.     Petitioner/Father shall confirm that he will exercise his custodial time with his son no later than the Monday prior to his Wednesday and Friday/weekend custodial time.

   d.     One-half (½) of holidays, as well as additional custodial time during the summer (to be determined later if the parties cannot come to an additional mutual agreement).

4.    Each party shall keep the other advised at all time of his/her current residence address, telephone numbers (home and work), and the location of any place where the child will be spending any extended period of time (three days or more).

### Custody Jurisdiction

5.    California shall have jurisdiction, and shall be the only convenient forum, to make any initial or modification orders providing for the custody, including parenting time rights of the child of the parties, for as long as either party continues to be a resident of California and to assert his or her custody or parenting time rights with respect to the child. Neither party shall commence any action seeking such orders, as distinguished from registering a Judgment for the sole purpose of enforcing it, in any out-of-state forum when either party continues to be a residence of California, to assert his or her custody or parenting time rights with respect to the child who is the subject of the action.  Should either party commence such an action in violation of this provision, the Court, in the parties' dissolution action, shall award the other party all costs reasonably incurred as a result, including, but not limited to, transportation costs, attorney fees, and other litigation costs, regardless of whether he or she is the prevailing party in the out-of-state action. The Court, in the parties' dissolution action, shall reserve jurisdiction to award such costs.

6.    Pursuant to Family Code section 3048, the Court finds that:

   a.     This Court has jurisdiction over the minor child under the Uniform Child

ATTACHMENT TO FORM FL-340 (FINDINGS AND ORDER AFTER HEARING)
7/19/18   PETITIONER: MICHAEL AVENATTI
RESPONDENT: LISA STORIE-AVENATTI      PAGE 2      OCSC CASE NO.: 17 D 009930

1    Custody Jurisdiction and Enforcement Act (part 3 of the California
2    Family Code, commencing with section 3400).
3    b.   The responding party was given notice and an opportunity to be heard as
4         provided by the laws of the State of California.
5    c.   Child custody and visitation rights of each party are as set forth in this
6         order.
7    d.   The minor child's country of habitual residence is the United States of
8         America and his home state is California (as more specifically addressed
9         herein above).
10   Any violation of the custody/visitation order may subject the party in violation
11   to civil or criminal penalties, or both.
12                              *Decision Making*
13   7.   Each party shall:
14   a.   have the right and responsibility to make decisions relating to the child's
15        health, education, welfare and religion;
16   b.   continue to have a full and active role in providing a sound moral, social,
17        economic, and educational environment for the child;
18   c.   consult the other on all substantial questions relating to the child's
19        religious upbringing, educational plans, significant changes in social
20        environment, and non-emergency health care;
21   d.   work cooperatively with the other to amicably resolve any disputes;
22   e.   immediately inform the other regarding 1) any significant changes in the
23        child's health; ii)significant information relative to he child's educational
24        progress, iii) details of the child's medical treatment; iv) the existence of
25        any educational, emotional, or medical problems of the child; and v) all
26        other significant events in the child's life.
27                                  *Activities*
28   8.   Each party shall carefully avoid the scheduling or arranging of activities for the

ATTACHMENT TO FORM FL-340 (FINDINGS AND ORDER AFTER HEARING)
7/19/18  PETITIONER: MICHAEL AVENATTI
RESPONDENT: LISA STORIE-AVENATTI          PAGE 3          OC8C CASE NO.: 17 D 009930

1    child that are likely to conflict with any periods of custody allocated to the other

2    party.

3                       *Derogatory Remarks*

4   9.   Neither party shall use or make any disparaging or derogatory remarks about the

5    other, or to the other, in the presence of the child of the marriage.  Both parties

6    are prohibited from permitting the child of the marriage to be in a place where

7    any person (regardless of whether said person may be a relative, friend or

8    significant other) is making disparaging or derogatory remarks about the other.

9    Notification Regarding Trips

10  10.  If either party takes the child on a trip away from home for longer than two days,

11    that traveling party shall provide the other party, before leaving, with the address

12    and telephone number of the place where the child will be and shall report any

13    later changes of plans.  If a trip of two days or less is to be extended, there shall

14    also be notification to the other party as to the relevant details.

15                      *Move Restrained*

16  11.  Each party is enjoined and restrained from removing or attempting to remove a

17    child of the marriage from Orange or Los Angeles Counties, without the prior

18    written consent of the other party or an order of a court of competent

19    jurisdiction, except for vacation purposes not exceeding ten (10) days.

20    Surname

21  12.  The parties' minor child shall bear the father's surname on all school records and

22    any other legal documents, and shall not assume the mother's maiden name or the

23    mother's future married name.

24  b.   Health Insurance for the minor child (item 17).

25                 *Health Insurance for Child*

26  17.  Pursuant to Family Code Sections 3751(a)(2) and (b), Petitioner/Father shall

27    maintain health insurance coverage for the supported child, if available at no cost

28    or at a reasonable cost.  Such health insurance shall be considered reasonable in

cost if the cost to Petitioner does not exceed five percent (5%) of his gross income.

c.   Medical Expenses not Otherwise Covered by Health Insurance (provision 18)

*Medical Expenses Not Otherwise Covered by Health Insurance*

18.   As and for additional child support, pursuant to Family Code Sections 4062 and 4063, each party shall pay one-half of all reasonable uninsured health care costs. When either parent accrues or pays costs pursuant to this paragraph, that parent shall provide an itemized statement of the costs to the other parent within a reasonable time, but not more than thirty (30) days after accruing the costs. These costs shall then be paid as follows:

a.   If a parent has already paid all of these costs, that parent shall provide proof of payment and a request for reimbursement of his or her court-ordered share to the other parent.

b.   If a parent has paid his or her court-ordered share of the costs only, that parent shall provide proof of payment to the other parent, request the other parent to pay the remainder of the costs directly to the provider, and provide the reimbursing parent with any necessary information about how to make the payment to the provider.

c.   The other parent shall make the reimbursement or pay the remaining costs within a reasonable time, not to exceed thirty (30) days from notification of the amount due.

d.   If the reimbursing parent disputes a request for payment, that parent shall pay the requested amount and thereafter may seek judicial relief under Family Code Sections 290 and 4063. If the reimbursing parent fails to pay the other parent as required by Family Code Section 4063(b), the other parent may seek judicial relief under Family Code Section 4063.

All of the rights and responsibilities described in the *Notice of Rights and Responsibilities* (FL-192, copy attached hereto) are incorporated herein by this

1    reference.

2    d.    Provision 19.

3                          *Consent for Medical Care*

4         19.    Except in cases of emergency, the custodial party shall consult the other party and

5    obtain said party's written consent, which shall not be unreasonably withheld, before

6    committing the child to any course of treatment or care for which medical expenses

7    payable by the other arty may reasonably be expected to be in excess of $200 during any

8    calendar month or in excess of $1,000 over a period of one (1) year.

9    e.    Provision 25, and 26.

10                         *Health Insurance for Respondent*

11        25.    Petitioner shall continue to maintain all presenting existing health, dental and

12    vision insurance coverage for Respondent.

13                Life Insurance Policies

14        26.    Petitioner shall maintain and keep current all presently existing life insurance

15    policies insuring his life.  Petitioner is specifically restrained and enjoined from

16    changing the beneficiary of any life insurance policies insuring his life and shall

17    continue to list Respondent as the sole and irrevocable beneficiary thereof until

18    further order of the Court.

19    5.    The Court swore in the Respondent and testimony was taken from her concerning her *Income*

20    *and Expense Declaration* filed on 6/18/2018.

21                          <u>*Child Support*</u>

22    6.    The Court orders Petitioner to pay to Respondent as and for child support, commencing

23    retroactively to 1/1/2018, the sum of $31,897 per month, plus one-half of child care of $12,000

24    per month, for a total of $37,897 per month payable one-half on the first and one-half on the

25    fifteenth days of each month.

26    7.    The findings for the pendente lite child support ordered herein above are as set forth on the

27    Xspouse calculation report adopted by and filed by the Court this date (7/16/2018), a copy of

28    which is attached hereto as **Exhibit A** and incorporated herein as if fully set forth herein.

8.    Pursuant to Family Code section 3901, the child support order contained herein shall continue as to Agostino W. Avenatti born 8/26/2014 until further order of the Court or until such a time as Agostino does any of the following:  marries; dies; is emancipated; attains the age of 18, 19 if still attending high school full time and not self supporting, whichever occurs first.

9.    Pursuant to Family Code section 5230, Petitioner/Father's employer is ordered to assign to Respondent/Mother, that portion of Petitioner/Father's earnings due or to be due in the future as will be sufficient to pay the amount of support ordered above.

10.    Pursuant to Family Code Section 5616, in the event that there is a contract between a party receiving support and a private child support collector, the party ordered to pay support must pay the fee charged by the private child support collector.  This fee must not exceed 33⅓ percent of the total amount of past due support nor may it exceed 50 percent of any fee charged by the private child support collector.  The money judgment created by this provision is in favor of the private child support collector and the party receiving support, jointly.

### *Child Support Arrears Created by this Order*

11.    The Court reserves jurisdiction to order a monthly payment toward the child support arrearage created by the retroactive child support order set forth herein above after credit has been given for the support payments made by Petitioner from 1/1/2018 to date.

### *Spousal Support*

12.    The Court orders Petitioner to pay to Respondent as and for spousal support, commencing retroactively to 1/1/2018, the sum of $124,398 per month payable one-half on the first and one-half on the fifteenth days of each month until death of either party, further order of the Court or remarriage of Respondent, whichever occurs first.

13.    The findings for the pendente lite spousal support ordered herein above are as set forth on the Xspouse calculation report adopted by and filed by the Court this date (7/16/2018), a copy of which is attached hereto as **Exhibit A** and incorporated herein as if fully set forth herein.

### *Spousal Support Arrears Created by this Order*

14.    The Court reserves jurisdiction to order a monthly payment toward the spousal support arrearage created by the retroactive spousal support order set forth herein above after credit has been given

1   for the support payments made by Petitioner from 1/1/2018 to date.

2   *Attorney Fees and Costs*

3   15.   The Court orders Petitioner to pay to Respondent, as and for further support, $185,000 as a

4         further contribution toward her attorney fees and costs already incurred herein. Said sum is

5         payable forthwith to the Respondent directly. Said sum is ordered in addition to the $10,000 in

6         attorney fees set forth in the *Stipulation and Order* filed on 4/23/2018.

7   16.   The Court orders Petitioner to pay to Respondent, as and for further support, an additional

8         $30,000 for accounting fees and costs. Said sum is payable to Respondent forthwith.

9   17.   The Court orders Petitioner to advance and pay to Respondent's counsel, as and for further

10        support, the sum of $50,000 to be placed in Respondent's counsel's trust account in order to pay

11        for anticipated further expert fees, future accounting fees, etc. Said sum is due and payable

12        forthwith.

13  18.   The Court finds that the above ordered amounts are reasonable and that they are a necessary

14        function of support for the Respondent.

15  *Prior Existing Orders*

16  19.   All prior existing orders not specifically modified herein remain in full force and effect.

17  *Preparation of Formal Order*

18  20.   Counsel for Respondent shall prepare the formal order.

19  *Approved as to Form and Content*:

20  Dated: _____

21                                       Petitioner, Michael Avenatti, Self-Represented

22  Dated: 8-17-2018

23                                       Valerie E. Prescott, Esq.; Prescott & Prescott Inc.
                                         Counsel for Respondent, Lisa Storie-Avenatti

24  *IT IS SO ORDERED*:

25

26  Dated: 10/22/18

27                                       Honorable Carol L. Henson
                                         Judge of the Superior Court of California

28                                       County of Orange, Lamoreaux Justice Center
                                         Family Law Division, Department L71

                                         **Reviewed pursuant to CRC 3.1312**

# EXHIBIT



7/16/2018

MainScreen.html

## 2018     Xspouse 2018-1-CA     Monthly Figures

| Fixed Shares | Father | Mother |
|---|---|---|
| Number of children | 0 | 1 |
| Percent time with NCP | 10.00% | 0.00% |
| Filing status | SINGLE | HH/MLA |
| Number of exemptions | 1 | 2 |
| Wages and salary | 0 | 0 |
| Self employed income | 0 | 0 |
| Other taxable income | 0 | 0 |
| TANF CS received | 0 | 0 |
| Other nontaxable income | 281830 | 0 |
| New spouse income | 0 | 0 |
| Adjustments to income | 0 | 0 |
| SS paid prev marriage | 0 | 0 |
| CS paid prev marriage | 0 | 0 |
| Health insurance | 0 | 0 |
| Other medical expenses | 0 | 0 |
| Property tax expenses | 0 | 0 |
| Ded interest expense | 0 | 0 |
| Contribution deduction | 0 | 0 |
| Misc tax deductions | 0 | 0 |
| Qualified business income deduction | 0 | 0 |
| Required union dues | 0 | 0 |
| Mandatory retirement | 0 | 0 |
| Hardship deduction | 0 | 0 |
| Other GDL deductions | 0 | 0 |
| Child care expenses | 0 | 0 |

**Monthly Figures 2018**

**GUIDELINE**

Nets (adjusted)

| | |
|---|---|
| Father | 281830 |
| Mother | -58405 |
| Total | 205425 |

Support

| | |
|---|---|
| Addons | 0 |
| Guidein CS | 31697 |
| S.Clara SS | 124398 |
| Total | 156296 |

Proposed
Tactic 8(f)

| | |
|---|---|
| Nondeductible | 0 |
| Deductible | 127319 |
| Total | 127319 |
| Saving | -1469 |
| Releases | 1 |

**Cash Flow**

| | Guideline | Proposed |
|---|---|---|
| Combined net spendable | 205426 | 203957 |
| Percent change | 0% | -1% |
| **Father** | | |
| Payment cost/benefit | -156296 | -127319 |
| Net spendable income | 105534 | 134511 |
| Change from guideline | 0 | 28977 |
| % of combined spendable | 51% | 66% |
| % of saving over guideline | 0% | -1973% |
| Total taxes | 0 | 0 |
| Dep. exemption value | 0 | 0 |
| # withholding allowances | 0 | 0 |
| Net wage paycheck | 0 | 0 |
| **Mother** | | |
| Payment cost/benefit | 89891 | 69445 |
| Net spendable income | 89891 | 69445 |
| Change from guideline | 0 | -30446 |
| % of combined spendable | 49% | 34% |
| % of saving over guideline | 0% | 2073% |
| Total taxes | 59404 | 57873 |
| Dep. exemption value | 0 | 0 |
| # withholding allowances | -16 | -7 |
| Net wage paycheck | 0 | 0 |

Father pays Guideline CS, Guideline SS, Proposed SS

FC 4055 checking: ON
Per Child Information

| | Timeshare | ccs(F) | ccs(M) | Addons Payer | Basic CS Payor | Pres CS Payor |
|---|---|---|---|---|---|---|
| All children | 10 - 90 | 0 | 0 | 0 Father | 31,897 Father | 31,897 Father |
| | 10 - 90 | 0 | 0 | 0 Father | 31,897 Father | 31,897 Father |

Prescott & Prescott Inc.
Attorneys at Law
EXHIBIT A
ATTACHMENT TO FORM FL-340 (FINDINGS AND ORDER AFTER HEARING)

PETITIONER: MICHAEL AVENATTI
RESPONDENT: LISA STORIE-AVENATTI

OCSC CASE NO.: 17 D 009930

FL-192

## NOTICE OF RIGHTS AND RESPONSIBILITIES

### Health-Care Costs and Reimbursement Procedures

**IF YOU HAVE A CHILD SUPPORT ORDER THAT INCLUDES A PROVISION FOR THE REIMBURSEMENT OF A PORTION OF THE CHILD'S OR CHILDREN'S HEALTH-CARE COSTS AND THOSE COSTS ARE NOT PAID BY INSURANCE, THE LAW SAYS:**

**1. Notice.** You must give the other parent an itemized statement of the charges that have been billed for any health-care costs not paid by insurance. You must give this statement to the other parent within a reasonable time, but no more than 30 days after those costs were given to you.

**2. Proof of full payment.** If you have already paid all of the uninsured costs, you must (1) give the other parent proof that you paid them and (2) ask for reimbursement for the other parent's court-ordered share of those costs.

**3. Proof of partial payment.** If you have paid only your share of the uninsured costs, you must (1) give the other parent proof that you paid your share, (2) ask that the other parent pay his or her share of the costs directly to the health-care provider, and (3) give the other parent the information necessary for that parent to be able to pay the bill.

**4. Payment by notified parent.** If you receive notice from a parent that an uninsured health-care cost has been incurred, you must pay your share of that cost within the time the court orders; or if the court has not specified a period of time, you must make payment (1) within 30 days from the time you were given notice of the amount due, (2) according to any payment schedule set by the health-care provider, (3) according to a schedule agreed to in writing by you and the other parent, or (4) according to a schedule adopted by the court.

**5. Disputed charges.** If you dispute a charge, you may file a motion in court to resolve the dispute, but only if you pay that charge before filing your motion. If you claim that the other party has failed to reimburse you for a payment, or the other party has failed to make a payment to the provider after proper notice has been given, you may file a motion in court to resolve the dispute. The court will presume that if uninsured costs have been paid, those costs were reasonable. The court may award attorney fees and costs against a party who has been unreasonable.

**6. Court-ordered insurance coverage.** If a parent provides health-care insurance as ordered by the court, that insurance must be used at all times to the extent that it is available for health-care costs.

**a. Burden to prove.** The party claiming that the coverage is inadequate to meet the child's needs has the burden of proving that to the court.

**b. Cost of additional coverage.** If a parent purchases health-care insurance in addition to that ordered by the court, that parent must pay all the costs of the additional coverage. In addition, if a parent uses alternative coverage that costs more than the coverage provided by court order, that parent must pay the difference.

**7. Preferred health providers.** If the court-ordered coverage designates a preferred health-care provider, that provider must be used at all times consistent with the terms of the health insurance policy. When any party uses a health-care provider other than the preferred provider, any health-care costs that would have been paid by the preferred health provider if that provider had been used must be the sole responsibility of the party incurring those costs.

Page 1 of 2

Form Approved for Optional Use
Judicial Council of California
FL-192 [Rev. January 1, 2013]

Martin Dean's
ESSENTIAL FORMS™

**NOTICE OF RIGHTS AND RESPONSIBILITIES**
Health-Care Costs and Reimbursement Procedures

Family Code, §§ 4063, 4063
www.courts.ca.gov

## INFORMATION SHEET ON CHANGING A CHILD SUPPORT ORDER

**FL-192**

**General Information**

The court has just made a child support order in your case. This order will remain the same unless a party to the action requests that the support be changed (modified). An order for child support can be modified only by filing a motion to change child support and serving each party involved in your case. If both parents and the local child support agency (if it is involved) agree on a new child support amount, you can complete, have all parties sign, and file with the court a *Stipulation to Establish or Modify Child Support and Order* (form FL-350) or *Stipulation and Order (Governmental)* (form FL-625).

**When a Child Support Order May Be Modified**

The court takes several things into account when ordering the payment of child support. First, the number of children is considered. Next, the net incomes of both parents are determined, along with the percentage of time each parent has physical custody of the children. The court considers both parties' tax filing status and may consider hardships, such as a child of another relationship. An existing order for child support may be modified when the net income of one of the parents changes significantly, the parenting schedule changes significantly, or a new child is born.

**Examples**

- You have been ordered to pay $500 per month in child support. You lose your job. You will continue to owe $500 per month, plus 10 percent interest on any unpaid support, unless you file a motion to modify your child support to a lower amount and the court orders a reduction.
- You are currently receiving $300 per month in child support from the other parent, whose net income has just increased substantially. You will continue to receive $300 per month unless you file a motion to modify your child support to a higher amount and the court orders an increase.
- You are paying child support based upon having physical custody of your children 30 percent of the time. After several months it turns out that you actually have physical custody of the children 50 percent of the time. You may file a motion to modify child support to a lower amount.

**How to Change a Child Support Order**

To change a child support order, you must file papers with the court. *Remember:* You must follow the order you have now.

**What forms do I need?**

If you are asking to change a child support order open with the local child support agency, you must fill out one of these forms:

- FL-680, *Notice of Motion (Governmental)* or FL-683 *Order to Show Cause (Governmental)* and
- FL-684, *Request for Order and Supporting Declaration (Governmental)*

If you are asking to change a child support order that is not open with the local child support agency, you must fill out one of these forms:

- FL-300, *Request for Order* or
- FL-390, *Notice of Motion and Motion for Simplified Modification of Order for Child, Spousal, or Family Support*

You must also fill out one of these forms:

- FL-150, *Income and Expense Declaration* or FL-155, *Financial Statement (Simplified)*

**What if I am not sure which forms to fill out?**

Talk to the family law facilitator at your court.

After you fill out the forms, file them with the court clerk and ask for a hearing date. Write the hearing date on the form.

The clerk will ask you to pay a filing fee. If you cannot afford the fee, fill out these forms, too:

- Form FW-001, *Request to Waive Court Fees*
- Form FW-003, *Order on Court Fee Waiver (Superior Court)*

You must serve the other parent. If the local child support agency is involved, serve it too.

This means someone 18 or over - not you - must serve the other parent copies of your filed court forms at least 16 court days before the hearing. Add 5 calendar days if you serve by mail within California (see Code of Civil Procedure section 1005 for other situations). Court days are weekdays when the court is open for business (Monday through Friday except court holidays). Calendar days include all days of the month, including weekends and holidays. To find court holidays, go to *www.courts.ca.gov/holidays.htm.*

The server must also serve blank copies of these forms:

- FL-320, *Responsive Declaration to Request for Order* and FL-150, *Income and Expense Declaration*, or
- FL-155, *Financial Statement (Simplified)*

Then the server fills out and signs a *Proof of Service* (form FL-330 or FL-335). Take this form to the clerk and file it.

Go to your hearing and ask the judge to change the support. Bring your tax returns from the last two years and your last two months' pay stubs. The judge will look at your information, listen to both parents, and make an order. After the hearing, fill out:

- FL-340, *Findings and Order After Hearing* and
- FL-342, *Child Support Information and Order Attachment*

**Need help?**

Contact the family law facilitator in your county or call your county's bar association and ask for an experienced family lawyer.

**Martin Dean's
ESSENTIAL FORMS™**

**NOTICE OF RIGHTS AND RESPONSIBILITIES
Health-Care Costs and Reimbursement Procedures**

**PROOF OF SERVICE**
State of California, County of Orange

1

2

3  I am employed in the county of Orange, State of California. I am over the age of 18 and not a party to the within action; my business address is

4  400 West First Street, Tustin, California, 92780.

5  On July 19, 2018, I served the foregoing document described below on the interested parties

6  in this action in the manner set forth below:

7  Recipient(s) name, address, fax number, email address (as pertinent):

8

9  **Michael Avenatti, Esq**
**Eagan Avenatti, LLP**

10  **520 Newport Center Drive, Ste 1400**
**Newport Beach CA 92660-7020**

11  **Email: mavenatti@eaganavenatti.com**

12  Document Title:

13  **FINDINGS AND ORDER AFTER HEARING**

14  ( X ) U. S. Regular Mail
I placed a true copy of the above named document

15  enclosed in a sealed envelope with postage thereon fully prepaid in the United States mail at Tustin,

16  California, addressed as above. (C.C.P. § 1013(a))

17  I am readily familiar with this office's practice for collection and processing of correspondence for

18  mailing with the United States Postal Service. Service made pursuant hereto is presumed invalid

19  if the postal cancellation date or postage meter date on the envelope is more than one day after the date

20  of deposit for mailing contained herein.

21  ( ) U. S. Express Mail
I placed a true copy of the above named document

22  enclosed in a sealed express mail envelope with express mail postage thereon fully prepaid in the

23  United States mail at Orange, California, addressed as above. (C.C.P. § 1013(c))

24

25  ( ) U.P.S. Next Day Air
I placed a true copy of the above named document enclosed in a sealed U.P.S. Next Day Air envelope

26  fully prepaid in a box or other facility regularly maintained by the express service carrier addressed

27  as above. (C.C.P. § 1013(c))

28  ( ) Facsimile Service

I caused such document to be transmitted to a machine maintained by the person on whom it is served at the address indicated above. (C.C.P. § 1013(e))

(X) Electronic Service – Based on a court order or an agreement of the parties to accept service by electronic transmission, I caused the documents to be sent to the person(s) at th electronic notification address(es) listed herein. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

( ) Delivery Service
I placed a true copy of the above named document enclosed in a sealed envelope and caused such envelope to be delivered to the person named therein at the offices of the addresses named above.

( ) Personal Service
I handed a true copy of the above named document to the person named herein on the below mentioned date at:

**Superior Court of California**
**County of Orange**
**Lamoreaux Justice Center**
**341 The City Drive, Dept. L71**
**Orange, CA 92868**

( X ) State: I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

( ) Federal: I declare that I am employed in the office of a member of the bar of this court at whose direction service was made.

Executed on July 19, 2018, at Tustin, California.

*Julie Warrick*



PROOF OF SERVICE

# EXHIBIT 26

Tonya E. Prescott, Esq. — CSB# 123530
Valerie E. Prescott, Esq. — CSB# 170134

*Prescott & Prescott Inc.*
*Certified Family Law Specialists*
*The State Bar of California Board of Legal Specialization*
400 West First Street
Tustin, California 92780-3003

Tel: (714) 730-5200 Fax: (714) 730-5225

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
LAMOREAUX JUSTICE CENTER

DEC 0 4 2018

DAVID H. YAMASAKI, Clerk of the Court

BY: L. DUDEVOIR   DEPUTY

Attorneys for Respondent, Lisa Storie-Avenatti

# SUPERIOR COURT, STATE OF CALIFORNIA

## COUNTY OF ORANGE, LAMOREAUX JUSTICE CENTER

## FAMILY LAW DIVISION

| Michael Avenatti, | CASE NO.:   **17 D 009930** |
|---|---|
| Petitioner, | **STIPULATION AND ORDER THEREON** |
| vs. | Assigned for all purposes to:<br>**Judge Carol L. Henson**<br>**Department L71** |
| Lisa Storie-Avenatti, | |
| Respondent. | |

*IT IS HEREBY STIPULATED*, by and between Petitioner, Michael Avenatti, and Respondent Lisa Storie- Avenatti, individually and through her attorney of record, Valerie E. Prescott, of Prescott & Prescott, Inc. as follows:

1.  Petitioner, Michael Avenatti, acknowledges service and receipt of the following documents/orders:

    a.  *Notice of Ruling - Motions (2) To Compel Further Discovery Responses (Demand for Production of Documents, Set One date 12/29/2017; Form Interrogatories - Family Law Set One served 12/29/2017);*

    b.  *Findings and Order After Hearing* filed on October 22, 2018;

    c.  *Application and Order to Appear for Examination,* set for 12/7/2018 at 8:45 a.m. in L71, a copy of which is attached hereto, as Exhibit A.

2.  Both parties agree not to file any motions in the pending dissolution matter, case #17D009930,

---

12/1/18

STIPULATION AND ORDER THEREON

PETITIONER: MICHAEL AVENATTI
RESPONDENT: LISA STORIE-AVENATTI

PAGE 1

OCSC CASE NO.: 17 D 009930

1   for 60 days from the date that this agreement was initially reached on 12/13/2018, i.e. not until
2   1/13/2019, provided that Petitioner, Michael Avenatti, makes a child support payment to
3   Respondent, Lisa Storie-Avenatti of at least $40,000 on 12/3/2018 and $40,000 on 1/2/2019.
4   If either payment is not made timely, and in full, Respondent, Lisa Storie-Avenatti, shall not be
5   restrained from filing nor proceeding with any motion within the family law dissolution case
6   #17D009930.

7  3.   It is stipulated that counsel for Respondent shall appear and continue the hearing presently set
8   for 12/7/2018.  Petitioner, Michael Avenattti, waives his personal appearance for the 12/7/2018
9   Judgment Debtor hearing.  Petitioner, Michael Avenatti, stipulates and agrees to accept service
10   of the new hearing date via email sent to his email address of mavenatti@eaganavenatti.com.
11   Petitioner, Michael Avenatti, further stipulates that service by email of the new hearing date is
12   valid personal service upon him and that the Court's personal jurisdiction over him will continue
13   to the new hearing date.

14  4.   Petitioner, Michael Avenatti, hereby stipulates to turn over the assets listed on Exhibit B as
15   partial satisfaction of the support due and owing from Petitioner to Respondent pursuant to the
16   *Findings and Order After Hearing* filed on 10/22/2018 (" hereinafter "SUPPORT ORDER").
17   The assets listed on Exhibit B shall be liquidated and sold. The Parties agree that Petitioner's
18   stipulation herein does not waive any of Petitioner's statutory legal or procedural objections to
19   the SUPPORT ORDER and Petitioner expressly reserves the right to challenge the support order.

20  5.   The parties hereby stipulate that the assets listed on Exhibit B attached hereto and incorporated
21   herein  shall be characterized as community property, assigned to Petitioner, Michael Avenatti
22   as his sole and separate property, and subject to equalization to Respondent, Lisa Storie-
23   Avenatti.

24  6.   With respect to each asset listed on Exhibit B, and turned over to Respondent pursuant to this
25   agreement, the  Court hereby reserves for future determination the issue of characterization and
26   allocation of any post separation lien or encumbrance incurred by the Petitioner where an asset
27   on Exhibit B was used for collateral.

28  7.   The Parties agree that with respect to each asset listed on Exhibit B and turned over to

Respondent:

    a.    Respondent shall have exclusive possession custody and control of said asset pending sale;

    b.    The issue of which party is responsible for revolving payments on any outstanding liens or encumbrances pending sale is reserved for future determination;

    c.    Petitioner shall maintain all insurance polices covering said assets pending sale;

    d.    Respondent is hereby authorized to sell each asset forthwith without any further authorization from Petitioner;

    e.    Respondent shall satisfy any asset specific lien or encumbrance from the gross proceeds of sale and shall retain the net proceeds of sale as the partial payment toward the SUPPORT ORDER.

    f.    Respondent shall provide an accounting to Petitioner of all assets sold.

8.    The Parties agree that payments made from the sale of the assets turned over to Respondent shall be applied first to Petitioner's child support obligation, then to Petitioner's spousal support obligation and then toward any other amounts ordered in the nature of support under the SUPPORT ORDER.

9.    Northwestern Mutual Life Insurance Policy #18441100.   Petitioner, Michael Avenatti shall provide documentary proof that the payments on said policy are current.  Petitioner, Michael Avenatti shall maintain and pay all payments as they become due on said policy. Petitioner, Michael Avenatti shall provide documentary evidence that Respondent, Lisa Storie-Avenatti is still the beneficiary of said policy on or before 12/10/2018 or within 5 business days of a demand post 12/10/2018 by Respondent, Lisa Storie-Avenatti thereafter.

10.    Petitioner, Michael Avenatti agrees that on or before 12/20/2018, he shall produce all banking records for the period 1/1/2016 through 11/30/2018 for Eagan Avenatti, LLP, Michael Avenatti, and Avenatti & Associates to Respondent's Counsel. If documents are not received on or before 12/20/2018, Respondent, Lisa Storie-Avenatti shall not be restrained from filing any motions within the family law dissolution case after 12/20/2018. Respondent, Lisa Storie-Avenatti agrees that on or before 12/20/2018, she shall produce all banking records for the period 1/01/2016

1   through 11/30/2018 for Lisa Storie-Avenatti and Ikaria to Petitioner. If documents are not

2   received on or before 12/20/2018, Petitioner Michael Avenatti shall not be restrained from filing

3   any motions within the family law dissolution case after 12/20/2018. The purpose of this

4   exchange is to facilitate a voluntary settlement conference with a private retired judicial officer.

5   11.   Each party shall cooperate fully with the other, shall execute any document reasonably requested

6   by the other or by a buyer, and to furnish information needed in order to effectuate the transfer

7   and sale of the assets addressed herein.

8   12.   Within 3 business days of the request, each party shall execute the documents required in order

9   to transfer title and/or facilitate the sale of the items set forth herein. If either party fails or

10   refuses to execute the tendered documents within the time stated herein above, upon ex parte

11   declaration,  the Court shall upon ex parte application to the Court, appoint the Clerk of Court

12   of the Superior Court of California as Elisor pursuant to Code of Civil Procedure Section 128.4

13   to execute such documents in the place and stead of the party who has failed or refused to do so.

14   13.   The court's jurisdiction to award the sale or turn over of further assets is reserved until the time

15   of the continued further Judgment debtor hearing.

16   14.   The court's jurisdiction is reserved over the above assets until they have been sold.

17   15.   Each of the parties acknowledge that he or she has read this *Stipulation and Order Thereon* and

18   each of its provisions in full and hereby acknowledges that they have entered into this agreement

19   freely and voluntarily.

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28

STIPULATION AND ORDER THEREON.

12/1/18

PETITIONER: MICHAEL AVENATTI
RESPONDENT: LISA STORIE-AVENATTI                      PAGE 4                      OCSC CASE NO.: 17 D 009930

16.     This *Stipulation and Order Thereon* may be signed in separate counterparts. A facsimile or other electronic signature shall be treated as an original by the Court for purposes of filing this document.

*It is So Stipulated:*

Dated: _11-30-2018_                        *Please refer the attached signature*

Michael Avenatti, Respondent

Dated: _11-30-2018_                        *Please refer the attached signature*

Lisa Storie-Avenatti, Respondent

*Approved as to Form and Content:*

Dated: _11-30-2018_

Valérie E. Prescott, Esq., Prescott & Prescott Inc.
Counsel for Respondent, Lisa Storie-Avenatti

*IT IS SO ORDERED:*

Dated: _12/4/18_

Honorable Judge Carol L. Henson
Judge of the Superior Court of California
County of Orange, Lamoreaux Justice Center (L71)

---

STIPULATION AND ORDER THEREON

16. This *Stipulation and Order Thereon* may be signed in separate counterparts. A facsimile or other electronic signature shall be treated as an original by the Court for purposes of filing this document.

*It is So Stipulated:*

Dated: **11-30-18**

_____
Michael Avenatti, Respondent

Dated: _____

_____
Lisa Storie-Avenatti, Respondent

*Approved as to Form and Content:*

Dated: _____

_____
Valerie E. Prescott, Esq.; Prescott & Prescott Inc.
Counsel for Respondent, Lisa Storie-Avenatti

*IT IS SO ORDERED:*

Dated: _____ *see first sig page*

_____
Honorable Judge Carol L. Henson
Judge of the Superior Court of California
County of Orange, Lamoreaux Justice Center (L71)

STIPULATION AND ORDER THEREON

11/30/18

PETITIONER: MICHAEL AVENATTI
RESPONDENT: LISA STORIE-AVENATTI  PAGE 5  OCSC CASE NO.: 17 D 009930

6.      This *Stipulation and Order Thereon* may be signed in separate counterparts. A facsimile or other electronic signature shall be treated as an original by the Court for purposes of filing this document.

It is So Stipulated.

Dated:   11-30-18

Dated:   12-1-2018

                              Michael Avenatti, Respondent

                              Lisa Storie-Avenatti, Respondent

                              *Approved as to Form and Content:*

Dated:

                              Valerie E. Prescott, Esq., Prescott & Prescott, Inc.
                              Counsel for Respondent, Lisa Storie-Avenatti

*IT IS SO ORDERED.*

Dated:

                              Honorable Judge Carol T. Henson
                              Judge of the Superior Court of California
                              County of Orange, Lamoreaux Justice Center (L71)

1                  **EXHIBIT A**

AT-138/EJ-125

| ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NO.: | FOR COURT USE ONLY |
|---|---|---|
| NAME: Matthew S. DeArmey 199294 | | ELECTRONICALLY FILED |
| FIRM NAME: THE LAW OFFICE OF MILO F. DE ARMEY | | Superior Court of California |
| STREET ADDRESS: 950 WEST 17TH STREET, SUITE A | | County of Orange |
| CITY: SANTA ANA  STATE: CA  ZIP CODE: 92706 | | Lamoreaux Justice Center |
| TELEPHONE NO.: (714) 558-7744  FAX NO.: (714) 558-0925 | | 11/6/2018 4:19 PM |
| E-MAIL ADDRESS: matt@dearmeylaw.com | | David H. Yamasaki, Clerk of the Court |
| ATTORNEY FOR (name): Lisa Storie-Avenatti | | By: D. Hanzich, Deputy |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Orange
STREET ADDRESS: 341 The City Drive
MAILING ADDRESS: P.O. Box 14170
CITY AND ZIP CODE: Orange, CA 92868-3205
BRANCH NAME: Lamoreaux Justice Center

PLAINTIFF Michael Avenatti
DEFENDANT Lisa Storie-Avenatti

| APPLICATION AND ORDER FOR APPEARANCE AND EXAMINATION | CASE NUMBER: |
|---|---|
| [X] ENFORCEMENT OF JUDGMENT  ☐ ATTACHMENT (Third Person) | 17D009930 |
| [X] Judgment Debtor  ☐ Third Person | |

ORDER TO APPEAR FOR EXAMINATION

1. TO (name):  MICHAEL JOHN AVENATTI
2. YOU ARE ORDERED TO APPEAR personally before this court, or before a referee appointed by the court, to
   a. [X] furnish information to aid in enforcement of a money judgment against you.
   b. [X] answer concerning property of the judgment debtor in your possession or control or concerning a debt you owe the judgment debtor.
   c. [X] answer concerning property of the defendant in your possession or control or concerning a debt you owe the defendant that is subject to attachment.

| Date: 12/7/2018 | Time: 8:45 AM | Dept. or Div.: L71 | Rm.: |
|---|---|---|---|
| Address of court [X] is shown above ☐ is: | | | |

3. This order may be served by a sheriff, marshal, registered process server, or the following specially appointed person (name):
   MATTHEW S. DE ARMEY, ESQ

Date: 11/6/2018 4:19 PM

This order must be served not less than 10 days before the date set for the examination.

Judge Lon F. Hurwitz

**IMPORTANT NOTICES ON REVERSE**

APPLICATION FOR ORDER TO APPEAR FOR EXAMINATION

4. [X] Original judgment creditor ☐ Assignee of record ☐ Plaintiff who has a right to attach order
   applies for an order requiring (name):
   to appear and furnish information to aid in enforcement of the money judgment or to answer concerning property or debt.
5. The person to be examined is
   a. [X] the judgment debtor.
   b. ☐ a third person (1) who has possession or control of property belonging to the judgment debtor or the defendant or (2) who owes the judgment debtor or the defendant more than $250. An affidavit supporting this application under Code of Civil Procedure section 491.110 or 708.120 is attached.
6. The person to be examined resides or has a place of business in this county or within 150 miles of the place of examination.
7. ☐ This court is not the court in which the money judgment is entered or (attachment only) the court that issued the writ of attachment. An affidavit supporting an application under Code of Civil Procedure section 491.150 or 708.160 is attached.
8. ☐ The judgment debtor has been examined within the past 120 days. An affidavit showing good cause for another examination is attached.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 11/6/2018

MATTHEW S. DE ARMEY, ESQ.
_____
(TYPE OR PRINT NAME)

JUDGE LON F. HURWITZ
_____
(SIGNATURE OF DECLARANT)

(Continued on reverse)

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
AT-138/EJ-125 [Rev. January 1, 2017]

CEB Essential Forms
ceb.com

APPLICATION AND ORDER FOR
APPEARANCE AND EXAMINATION
(Attachment-Enforcement of Judgment)

Code of Civil Procedure
§§ 491.110, 708.110, 708.120, 708.170
www.courts.ca.gov

Storie-Avenatti, Lisa

AT-138/EJ-126

## Information for Judgment Creditor Regarding Service

If you want to be able to ask the court to enforce the order on the judgment debtor or any third party, you must have a copy of the order personally served on the judgment debtor by a sheriff, marshal, registered process server, or the person appointed in item 3 of the order at least 10 calendar days before the date of the hearing, and have a proof of service filed with the court.

## IMPORTANT NOTICES ABOUT THE ORDER

### APPEARANCE OF JUDGMENT DEBTOR (ENFORCEMENT OF JUDGMENT)

NOTICE TO JUDGMENT DEBTOR If you fail to appear at the time and place specified in this order, you may be subject to arrest and punishment for contempt of court, and the court may make an order requiring you to pay the reasonable attorney fees incurred by the judgment creditor in this proceeding.

### APPEARANCE OF A THIRD PERSON (ENFORCEMENT OF JUDGMENT)

(1) NOTICE TO PERSON SERVED If you fail to appear at the time and place specified in this order, you may be subject to arrest and punishment for contempt of court, and the court may make an order requiring you to pay the reasonable attorney fees incurred by the judgment creditor in this proceeding.

(2) NOTICE TO JUDGMENT DEBTOR The person in whose favor the judgment was entered in this action claims that the person to be examined under this order has possession or control of property that is yours or owes you a debt. This property or debt is as follows *(describe the property or debt):*

If you claim that all or any portion of this property or debt is exempt from enforcement of the money judgment, you must file your exemption claim in writing with the court and have a copy personally served on the judgment creditor not later than three days before the date set for the examination. You must appear at the time and place set for the examination to establish your claim of exemption or your exemption may be waived.

### APPEARANCE OF A THIRD PERSON (ATTACHMENT)

NOTICE TO PERSON SERVED If you fail to appear at the time and place specified in this order, you may be subject to arrest and punishment for contempt of court, and the court may make an order requiring you to pay the reasonable attorney fees incurred by the plaintiff in this proceeding.

### APPEARANCE OF A CORPORATION, PARTNERSHIP, ASSOCIATION, TRUST, OR OTHER ORGANIZATION

It is your duty to designate one or more of the following to appear and be examined: officers, directors, managing agents, or other persons who are familiar with your property and debts.

 Request for Accommodations. Assistive listening systems, computer-assisted real-time captioning, or sign language interpreter services are available if you ask at least 5 days before your hearing. Contact the clerk's office for *Request for Accommodation* (form MC-410). (Civil Code, § 54.8.)

AT-138/EJ-126 [Rev. January 1, 2017]

CEB | Essential ceb.com | forms

APPLICATION AND ORDER FOR APPEARANCE AND EXAMINATION (Attachment-Enforcement of Judgment)          Storie-Avenatti, Lisa

Page 2 of 2

# EXHIBIT B

1. 2017 Ferrari 488 GT Spider in the name of the Respondent. Petitioner, Michael Avenatti specifically represents that there are no liens or encumbrances on this vehicle, other than the monthly lease payment.

2. The following watches;
   a. Patek 5712,
   b. Patek 5726,
   c. Patek 5960,
   d. Rolex 116500 and
   e. Hublot.

3. The following Artwork:
   i. "Pergusa III" 1983
   ii. Craig Kauffman "No. 17" 1989
   iii. Frank Gehry Sculpture
   iv. Heath Gwyn Martin "Rough and Tumble"
   v. Michael Mulhern "Untitled" (WET)
   vi. David Shapiro
   vii. David Shapiro "Clearing 11"
   viii. Murano Glass and Painted Fish
   ix. Existing "4 Nudes" - H-20" x W-9"
   x. The Ford Garage at Téloche, c. 1959, 20x24 inches
   xi. The Start of the 1956 24 Hours, 20x24 inches
   xii. Jo Bonnier Photo that spans p. 46 and p. 47 of the Porsche Moments Book Jo Bonnier RSK is in the Karussell, 20x24 inches
   xiii. Jesse Alexander "Porsches - Le Mans" circa 1959, Archival Pigment Paint
   xv. Any other artwork presently in storage which was previously in the parties marital residence.

4. The entire legal and equitable member interest of Avenatti & Associates, APC in Passport 420, LLC, which owns as its principal asset a 2016 Honda Jet, Model HA-420 serial number 42000029, FAA Registry number N227WP, in the name of Passport 420 LLC.

   a. Petitioner, as President and sole shareholder of Avenatti &Associates, APC, and in his capacity as Manager of Passport 420 LLC, shall execute forthwith the transfer of the Avenatti & Associates, APC member interest to Respondent and shall provide to Respondent the original member ownership certificates for this limited liability company.

   b. Petitioner, Michael Avenatti, specifically represents and warrants that he is not aware of any liens or encumbrances on the member interest or assets of Passport 420 LLC, including the Honda Jet Plane

   c. Petitioner shall provide all notices required by Paragraph 16 of the Passport 420, LLC Operating Agreement.

# EXHIBIT 27

1  Matthew S. DeArmey, SBN 199294
2  **THE LAW OFFICES OF MILO F. DE ARMEY**
   950 West 17th Street, Suite A
3  Santa Ana, CA 92706
   Telephone: (714) 558-7744
4  Facsimile: (714) 558-0925
   Email: matt@dearmeylaw.com
5
6  Associate Attorneys for Respondent
   Lisa Storie-Avenatti
7
8
9              **THE SUPERIOR COURT OF CALIFORNIA**
10                **FOR THE COUNTY OF ORANGE**
11

12  MICHAEL AVENATTI,                    Case No.: 17D009930
13              Petitioner,
14                                      **TURNOVER ORDER (CCP §699.040)**
15  v.
16  LISA STORIE-AVENATTI
17              Respondent.
18

19
20  **TURNOVER ORDER PURSUANT TO CCP §699.040**
21       On January 17, 2019, a writ of execution issued in this action in the total sum amount
22  including principal, interest and cost of $2,053,332.00 against Petitioner Michael Avenatti the
23  judgment debtor in this action and in favor or Respondent Lisa Storie-Avenatti the judgment
24  creditor in this action.
25       The sources of this debt are the Court orders filed April 23, 2018 and October 22, 2018,
26  
27  which contain orders for child support, spousal support, and attorney's fees and costs which
28  were made in the nature of support.

                                    1
                        TURNOVER ORDER (CCP §699.040)

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
LAMOREAUX JUSTICE CENTER

JAN 25 2019

DAVID H. YAMASAKI, Clerk of the Court

BY: ___ S___ ARAZA ___,DEPUTY

THE LAW OFFICES OF MILO F. DEARMEY
950 WEST 17th STREET, SUITE A
SANTA ANA, CALIFORNIA 92706

Respondent alleges that Petitioner Michael Avenatti, the judgment debtor has an interest in the following assets in the possession or under the control of the judgment debtor that is not exempt from enforcement of the money judgment. These assets are:

1.     100% of the shares in the corporation Avenatti & Associates, A Professional Corporation, California Corporation Number C2874165.

2.     100% of the shares owned by Petitioner in the company Seek Thermal, Inc, a Delaware corporation, registered in the State of California SOS Number 3474177, formerly known as iyrian Systems, Inc.

3.     100% of the funds due and owing to Petitioner from The Fight PAC, FEC Committee ID # C00685966

4.     100% of the shares owned by Petitioner in the company Desert Harvest, LLC, a Delaware LLC, registered in the State of California SOS Number 201032010071.

5.     Patek Phillipe Watch Model Number 5035, 18k White Gold, Movement Number 3.134.531, Case Number 4.208.344.

6.     Patek Phillipe Watch Model Number 5270

7.     Patek Phillip Watch Model Number 5055

8.  All artwork in the name of Petitioner in the possession of Orange County Fine Art Storage.

9.  All artwork in the name Avenatti & Associates, A Professional Corporation in the possession of Orange County Fine Art Storage.

**IT IS HEREBY ORDERED** pursuant to Code of Civil Procedure §699.040 that Petitioner Michael Avenatti, the Judgment Debtor, immediately deliver to the Levying Officer or a registered process server the following assets:

1. 100% of the shares in the corporation Avenatti & Associates, A Professional Corporation, California Corporation Number C2874165.

2. 100% of the shares owned by Petitioner in the company Seek Thermal, Inc, a Delaware corporation, registered in the State of California SOS Number 3474177, formerly known as Tyrian Systems, Inc.

3. 100% of the funds due and owing to Petitioner from The Fight PAC, FEC Committee ID # C00685966

4. 100% of the shares owned by Petitioner in the company Desert Harvest, LLC, a Delaware LLC, registered in the State of California SOS Number 201032010071.

5. Patek Phillipe Watch Model Number 5035, 18k White Gold, Movement Number 3.134.531, Case Number 4.208.344.

6. Patek Phillipe Watch Model Number 5270

7. Patek Phillip Watch Model Number 5055

8. All artwork in the name of Petitioner in the possession of Orange County Fine Art Storage.

9. All artwork in the name Avenatti & Associates, A Professional Corporation in the possession of Orange County Fine Art Storage.

The Levying Officer or Registered Process Server shall not sell, distribute or transfer the assets in any way without a court order.

1   FAILURE TO COMPLY WITH THE ORDER MAY SUBJECT THE JUDGMENT

2   DEBTOR TO ARREST AND PUNISHMENT FOR CONTEMPT OF COURT

3

4   Dated:        JAN 2 5 2019

5                                    Honorable Nathan Vu
                                     JUDGE OF THE SUPERIOR COURT
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4
TURNOVER ORDER (CCP §699.040)

POS-050/EFS-050

| | |
|---|---|
| **ATTORNEY OR PARTY WITHOUT ATTORNEY:**   STATE BAR NO:<br>NAME: Douglas A. Hatherley, Esq. SBN 265230<br>FIRM NAME: STEGMEIER, GELBART, SCHWARTZ & BENAVENTE, LLP<br>STREET ADDRESS: 19762 MacArthur Boulevard, Suite 200<br>CITY: Irvine        STATE: CA ZIP CODE: 92612<br>TELEPHONE NO.: (949) 337-4050    FAX NO.: (949) 337-4059<br>E-MAIL ADDRESS: dhatherley@sgsblaw.com<br>ATTORNEY FOR (name):  Michael Avenatti | *FOR COURT USE ONLY*<br><br>ELECTRONICALLY FILED<br>Superior Court of California<br>County of Orange<br>Lamoreaux Justice Center<br>1/30/2019 8:54 AM<br>David H. Yamasaki, Clerk of the Court<br>By: J. Duncanson, Deputy |

| | |
|---|---|
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE<br>  STREET ADDRESS: 341 The City Drive South<br>  MAILING ADDRESS: P.O. Box 14170<br>  CITY AND ZIP CODE: Orange, California 92868-3205<br>  BRANCH NAME: Lamoreaux Justice Center | |
| PLAINTIFF/PETITIONER:  Michael Avenatti | **CASE NUMBER:**<br>17 D 00-99-30 |
| DEFENDANT/RESPONDENT: Lisa Storie-Avenatti | **JUDICIAL OFFICER:**<br>The Honorable Nathan Vu |
| **PROOF OF ELECTRONIC SERVICE** | **DEPARTMENT:**<br>L-67 |

1.  I am at least 18 years old.

   a.  My residence or business address is *(specify):*
       19762 MacArthur Boulevard, Suite 200
       Irvine,California 926121

   b.  My electronic service address is *(specify):*
       jwesolowski@sgsblaw.com

2.  I electronically served the following documents *(exact titles):*
    (1) Conformed Request for Order filed January 29, 2019; and (2) Blank Responsive Declaration.

   ☐ The documents served are listed in an attachment. *(Form POS-050(D)/EFS-050(D) may be used for this purpose.)*

3.  I electronically served the documents listed in 2 as follows:

   a.  Name of person served:  Valerie E. Prescott, Esq. and Matthew DeArmey, Esq.
       On behalf of *(name or names of parties represented, if person served is an attorney):*
       Respondent, Lisa Storie-Avenatti

   b.  Electronic service address of person served:   valerie@familylaw.com; matt@dearmeylaw.com

   c.  On *(date):*  January 29, 2019

   ☐ The documents listed in item 2 were served electronically on the persons and in the manner described in an attachment.
   *(Form POS-050(P)/EFS-050(P) may be used for this purpose.)*

Date:      January 29, 2019

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

JEAN M. WESOLOWSKI                                    ▶
_____                         _____
(TYPE OR PRINT NAME OF DECLARANT)                        (SIGNATURE  OF DECLARANT)

Form Approved for Optional Use
Judicial Council of California
POS-050/EFS-050 [Rev. February 1, 2017]
**PROOF OF ELECTRONIC SERVICE**
**(Proof of Service/Electronic Filing and Service)**
Cal. Rules of Court, rule 2.251
www.courts.ca.gov

CEB® | Essential
ceb.com | 🔲Forms™

# EXHIBIT 28

*Avenatti and Avenatti*

Case No. 17D009930

Superior Court of the State of California

County of Orange


Respondent's request for temporary emergency order for CCP 708.205 Turnover Order and Appointment of Receiver Pursuant to CCP 708.510 is **denied** until the court hearing on the matter.

There has been no affirmative factual showing based on evidence or competent testimony (made in affidavits or declarations) of irreparable harm, immediate danger, or emergency sufficient to justify *ex parte* relief.

Petitioner is prohibited from transferring, encumbering, hypothecating, concealing, or in any way disposing of the assets that are the subject of Respondent's Request for CCP 708.205 Turnover Order and Appointment of Receiver Pursuant to CCP 708.510, pending the hearing on the matter, without the written consent of the other party or an order of the court.

The hearing on this matter is set for March 22, 2019 at 1:30 pm in Department L-67 of this Court. Moving parties' ex parte papers shall be considered the moving papers. Responsive papers shall be filed on or before Feb. 22, _____, 2019. Reply papers shall be filed on or before March 1 _____, 2019. Electronic service of the papers shall be permitted.

FEB 1 4 2019,

NATHAN VU

# EXHIBIT 29

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
LAMOREAUX JUSTICE CENTER

APR 04 2019

DAVID H. YAMASAKI, Clerk of the Court
BY:___S. GUSTAFSON___,DEPUTY

1  Matthew S. DeArmey, SBN 199294
2  Sandra Shapiro, SBN 299589
   THE LAW OFFICES OF MILO F. DE ARMEY
3  950 West 17th Street, Suite A
   Santa Ana, CA 92706
4  Telephone: (714) 558-7744
   Facsimile: (714) 558-0925
5  Email: matt@dearmeylaw.com
6
   Associate Attorneys for Respondent
7  Lisa Storie-Avenatti
8
9               THE SUPERIOR COURT OF CALIFORNIA
10
                 FOR THE COUNTY OF ORANGE
11

12
13   MICHAEL AVENATTI,                    Case No.: 17D009930
14          Petitioner,
15                                        [PROPOSED] ORDER TO DELIVER
     v.                                   SPECIFIC PROPERTY
16
     LISA STORIE-AVENATTI                 *Assigned for all purposes to The Honorable
17                                        Nathan Vu, Department L-67*
          Respondent.
18

19

20        On April 23, 2018 and October 22, 2018, Respondent Lisa Storie-Avenatti, the judgment

21   creditor in this matter, obtained orders in this court against Petitioner Michael Avenatti, the
                                 approximately
22   judgment debtor for the sum of $2,053,332, including principal, interest accrued as of January

23   9, 2019, and costs incurred as of January 17, 2019. These orders are for child support, spousal

24   support, and attorney's fees and costs made in the nature of support.

25

26

27

28
                                              1
                         [PROPOSED] ORDER TO DELIVER SPECIFIC PROPERTY

Respondent
alleges that from the examination of Michael Avenatti that he, the judgment debtor, has an interest in the following property in his possession, custody, or under his control that is not exempt from enforcement of the money judgment:

1.    100% of the Eagan Avenatti, LLP partnership interest titled in the name of Michael Avenatti.

2.    100% of the shares in the corporation Avenatti & Associates, A Professional Corporation, California Corporation Number C2874165, which has a titled partnership interest in Eagan Avenatti, LLP.

3.    100% of the shares owned by Michael Avenatti in the company Seek Thermal, Inc, a Delaware corporation, registered in the State of California, SOS Number 3474177, formerly known as Tyrian Systems, Inc.

4.    100% of the funds due and owing to Michael Avenatti from The Fight PAC, FEC Committee ID # C00685966

5.    100% of the shares owned by Michael Avenatti in the company Desert Harvest, LLC, a Delaware LLC, registered in the State of California, SOS Number 201032010071.

6.    Patek Phillipe Watch Model Number 5035, 18k White Gold, Movement Number 3.134.531, Case Number 4.208.344.

7.    Patek Phillipe Watch Model Number 5270

8.    Patek Phillip Watch Model Number 5055

9.    All artwork in the name of Michael Avenatti in the possession of Orange County Fine Art Storage.

10.    All artwork in the name Avenatti & Associates, A Professional Corporation in the possession of Orange County Fine Art Storage.

2

~~PROPOSED~~ ORDER TO DELIVER SPECIFIC PROPERTY

1    11.    All artwork in the name Eagan Avenatti, LLP in the possession of Orange

2  County Fine Art Storage.

3    12.    One hundred percent (100%) of the member interest in Passport 420, LLC, that

4  is titled in the name of Avenatti & Associates, A Professional Corporation, California

5  Corporation Number C2874165A,  which owns as its principal asset a 2016 Honda Jet, Model

6  HA-420 serial number 42000029, FAA Registry number N227WP, titled in the name of

7  Passport 420 LLC.

8

9    13.    Ownership of the Northwestern Mutual Life Insurance Policy #18441100.

10    IT IS HEREBY ORDERED that Michael Avenatti immediately deliver to the

11    Levying Officer, the property set forth above, which shall be applied toward the

12  satisfaction of the judgment.

13

14

15

16  Dated:    APR 0 4 2019,

        _Nathan Vu_
        HONORABLE NATHAN VU
        Superior Court Judge

17

18

19

20

21

22

23

24

25

26

27

28

                              3

            PROPOSED ORDER TO DELIVER SPECIFIC PROPERTY

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE<br>LAMOREAUX JUSTICE CENTER - 341 The City Drive, Orange, CA 92868-3205 | FILED<br>SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF ORANGE<br>LAMOREAUX JUSTICE CENTER<br><br>APR 04 2019<br><br>DAVID H. YAMASAKI, Clerk of the Court<br><br>BY: S. GUSTAFSON , DEPUTY |
|---|---|
| PETITIONER: MICHAEL AVENATTI<br><br>RESPONDENT: LISA STORIE-AVENATTI | |
| **RULING ON SUBMITTED MATTER** | CASE NUMBER:<br>17D009930 |

The court having taken this matter under submission on 03/22/2019, now rules in the attached and signed ruling, incorporated herein by reference.

PRESCOTT & PRESCOTT INC
400 W FIRST ST
TUSTIN CA 92780

STEGMEIER GELBART SCHWARTZ & BENAVENTE LLP
19762 MACARTHUR BLVD STE 200
IRVINE CA 92612

MATTHEW DEARMEY

950 W. 17TH STREET, SUITE A

SANTA ANA, CA 92706

## CLERK'S CERTIFICATE OF SERVICE OF MAIL

I certify that I am not a party to this action and that this Clerk's Certificate of Service by Mail was mailed in accordance with Section 1013a of the Code of Civil Procedure. A copy(s) of Ruling on Submitted matter were deposited in the United States mail, in a sealed envelope with postage fully prepaid addressed as shown above. The mailing and this certification occurred at Orange, California, on: 04/04/2019

DAVID H. YAMASAKI, Clerk of the Court

4/4/2019

By: SYLVIA GUSTAFSON, Deputy Clerk

Page 1 of 1

*Avenatti and Storie-Avenatti*

Case No. 17D009930

Superior Court of the State of California

County of Orange

On January 29, 2019, Petitioner Michael Avenatti filed the Motion to Quash the Writ of Execution filed January 17, 2019 and to Recall the Turnover Order filed January 25, 2019 ("Motion to Quash").

On February 14, 2019, Respondent Lisa Storie-Avenatti filed the Motion for Code of Civil Procedure section 708.205 Turnover Order and for Appointment of A Receiver Pursuant to Code of Civil Procedure Section 708.510 ("Motion for Second Turnover Order").

On March 22, 2019, the Court heard argument on both Motions and now rules as follows:

I. Motion to Quash

A writ of execution may be recalled and quashed where the issuance was improperly or inadvertently made. (*Creditors Adjustment Co. v. Newman* (1921) 185 Cal. 509, 511; *Meyer vs. Meyer* (1952) 115 Cal.App.2d 48, 49.) Whether to issue a writ of execution and whether to grant a motion to quash a writ of execution is left to the discretion of the trial court. (See *Parker v. Parker* (1928) 203 Cal. 787, 795, overruled on other grounds in *In re Marriage of Lippel* (1990) 51 Cal.3d 1160, 1168; *In re Marriage of Farner* (1976) 216 Cal.App.3d 1370, 1377; Family Code, § 290.)

Petitioner argues that the writ of execution should be recalled and quashed because it was issued for the wrong amount. Petitioner points to errors in three respects.

1

A. Arrearages Not Determined and Not Yet Due

First, Petitioner argues that the writ of execution includes amounts for arrearages of child support and spousal support that have not been determined and are not yet due. Petitioner points to paragraphs 11 and 14 (on pages 7 and 8) of the Court's Findings and Order After Hearing filed October 22, 2018 ("FOAH"):

11. The Court reserves jurisdiction to order a monthly payment toward the child support arrearage created by the retroactive child support order set forth herein above after credit has been given for the support payments made by Petitioner from 1/1/2018 to date.

. . .

14. The Court reserves jurisdiction to order a monthly payment toward the spousal support arrearage created by the retroactive spousal support order set forth herein above after credit has been given for the support payments made by Petitioner from 1/1/2018 to date.

The "retroactive child support order" and the "retroactive spousal support order" also are contained in the FOAH and read as follows:

6. The Court orders Petitioner to pay to Respondent as and for child support, commencing retroactively to 1/1/2018, the sum of $31,897 per month, plus one-half of child care of $12,000 per month, for a total of $37,897 per month payable one-half on the first and one-half on the fifteenth days of each month.

. . .

12. The Court orders Petitioner to pay to Respondent as and for spousal support, commencing retroactively to 1/1/2018, the sum of $124,398 per month payable one-half on the first and one-half on the fifteenth days of each month until death of either party, further order of the Court or remarriage of Respondent, whichever occurs first.

2

The above provisions indicate that the Court did determine the amount of support due and the date when it was due in the FOAH. For example, child support in the amount of $18,948.50 (half of $37,897) was due on January 1, 2018, and another $18,948.50 was due on January 15, 2018.

Paragraphs 11 and 14 of the FOAH do not indicate that the Court had not determined the amounts due and due dates. Rather, in those provisions, the Court reserved jurisdiction to set a different monthly payment schedule for arrearages that had accumulated because Petitioner had not paid the specified amounts of support when they were due.

There was no error in the writ of execution due to this reason.

B. Interest Not Calculated Correctly

Petitioner next claims that interest was calculated incorrectly because Respondent included interest on arrearages that had not been determined and were not due. For the reasons stated above, the Court rejects Petitioner's argument that the arrearages had not been determined and were not yet due .

Petitioner also argues that Respondent improperly calculated interest for time periods before the FOAH was filed on October 22, 2018. Petitioner is correct. Code of Civil Procedure section 685.020(a) states, "interest commences to accrue on a money judgment on the date of entry of the judgment." (Code Civ. Proc., § 685.020, subd. (a).) Family Code section 155 makes it clear that Section 685.020 applies to support orders. (See Family Code, § 155; see also *In re Marriage of McClellan* (2005) 130 Cal.App.4th 247, 251 [legislature amended Section 155 to prohibit court-created exception to statutory interest laws].) The Court is not aware of and neither party cited to any statutory authority or caselaw that would make Section 685.020(a) inapplicable under these circumstances.

C. Payment Not Properly Credited

Third, Petitioner claims that Respondent unilaterally took $900,000 in community property funds and that half this amount should be credited as a payment of Petitioner's support obligations. This is an issue of property division or breach of fiduciary duty, not of child support or spousal support. Petitioner

3

cites to no statutory authority or caselaw for the proposition that an unadjudicated property division claim can be set off against a support obligation.

There was no error in the writ of execution due to this reason.

### D. Whether to Recall and Quash Writ of Execution

The Court must now determine whether Respondent's mistake in calculating interest results in the writ of execution being "improperly or inadvertently made," such that the Court should exercise its discretion to recall and quash the writ. From the Executioner™ printout attached to the writ of execution, it appears that Respondent calculated interest from September 1, 2018, even though interest did not begin to accrue until October 22, 2018 (the date the FOAH was filed). This resulted in a miscalculation of approximately $350 in excess interest on total child support arrearages of $146,154.73 and approximately $8,800 in excess interest on total spousal support arrearages of $1,606,481.95. Overall, the error is less than one half of one percent of the total amount of the writ of execution, which exceeds $2 million.

Petitioner cites to *Bryant vs. Bryant* (1958) 161 Cal.App.2d 579 in support of his argument. In that case, the court of appeal noted that the trial court would have been correct to recall and quash the writ because the wife had made false allegations that she was entitled to child support when she was not, and had failed to inform the trial court "that defendant did not have physical custody of said children during the period in question; that some were in institutions during this time and not supported by defendant; and that some had reached their majority." (*Id.* at pp. 580-582.) Other cases in which the writ of execution was recalled and quashed involved similar facts. (See *Wilkins vs. Wilkins* (1950) 95 Cal.App.2d 605 [writ of execution obtained by affidavit that did not inform court that wife sought support for periods when children were 19 and married, and for periods when wife had remarried]; *Hale vs. Hale* (1935) 6 Cal.App.2d 661 [writ of execution obtained by affidavit that did not inform court that wife sought support for periods when children were adults and wife had remarried].)

The Court could not find any case which a writ of execution was recalled and quashed for a minor calculation error. The Court takes guidance from *In re Marriage of Farner*, supra, 216 Cal.App.3d 1370. There, the trial court ordered that Respondent was entitled to 43.75 percent of Petitioner's military retirement

4

pay but did not state the amount owed to Respondent. (*Id.* at pp. 1372-1373.) Respondent obtained a writ of execution from the court clerk, but had to rely upon, among other things, a letter from the Air Force that "set[] forth the amount of [Petitioner's] gross monthly retirement pay from May 1979 through April 1987." (*Id.* at p. 1373.)

The trial court denied Petitioner's motion to quash the writ of execution, but the court of appeal reversed on the basis that the Air Force statement was not part of the record and therefore, the court clerk should not have issued the writ of execution. (*Id.* at pp. 1373-1374.) The court of appeal remanded the matter so that "the operative facts" could be presented to the trial court so that the judge (and not the court clerk) could issue the writ. (*Id.* at pp. 1376-1377.)

However, the court of appeal rejected Petitioner's "argument that the court can never order execution in this case because it could not . . . ascertain with certainty the amount allegedly owing to Mrs. Farner." (*Id.* at p. 1378.) Instead, the *Farner* court reiterated that "[t]he trial court has broad power . . . to oversee and enforce its decrees." (*Ibid.*) Finally, the court of appeal pointed out that interest had been incorrectly calculated because Section 685.010 had not been applied properly, but that this issue could be corrected on remand. (*Id.* at pp. 1377-1378.)

Here, the Court finds that it would not be "correct or equitable" to recall and quash the writ of execution. (*Id.* at p. 1377.) The error in this case is not one similar to other cases where Respondent had no substantive right to a money judgment and the writ of execution was based on intentionally false declarations. The mistake in this case was negligible and inadvertent. The Court will use its broad powers and exercise its discretion to order Respondent to amend the writ of execution to include to proper calculation of interest.

**The Motion to Quash is denied. Respondent is ordered to amend the writ of execution based on a proper calculation of interest on the child support and spousal support arrearages, which could not accrue until the order was entered in this case on October 22, 2018.**

Motion for Second Turnover Order

Code of Civil Procedure section 708.205 states that the court "may" order the judgment debtor to turnover property and section 708.510 states the court "may" make an assignment to a receiver, indicating the Court has discretion in this regard. (See *Housing Authority of Oakland v. Superior Court* (1941) 18 Cal.2d 336, 339 [legislature's use of "may" expresses intent to vest discretion in the trial court].)

In opposition to the Motion for Second Turnover Order, Petitioner asserts the same arguments he made in support of the Motion to Quash – that the amount and due date of Petitioner's support arrearages have not been determined. For the reasons stated above, the Court rejects this argument.

Petitioner does not claim that the property that is the subject of the Section 708.205 turnover order is not in Petitioner's possession or under his control, or is exempt. Thus, the Court need not address these issues. (See *Imperial Bank v. Pim Electric, Inc.* (1995) 33 Cal.App.4th 540, 549-555.)

However, the Court may only order that money be turned over to the judgment creditor pursuant to Section 708.205. (*Palacio Del Mar Homeowners Association, Inc. v. McMahon* (2009) 174 Cal.App.4th 1386, 1390-1391). Non-monetary property must be turned over to a levying officer or receiver to be valued and sold. (*Ibid.*) Here, it appears that the property that is the subject of the Section 708.205 turnover order is all or almost all non-monetary. Thus, the Court will order that the items be turned over to a levying officer.

When non-monetary property is turned over to a levying officer, a proper writ of execution is still required, even if the turnover order is made pursuant to Section 708.205. (See *Imperial Bank v. Pim Electric, Inc., supra*, 33 Cal.App.4th at p. 547; Law Revision Committee Comments to Section 708.205 (1982) ["If property is to be sold pursuant to the court's order under subdivision (a), it will be sold either by a levying officer (in which case there must be a valid writ of execution outstanding). . . ."] Thus, while Respondent is correct that Section 708.205, by its terms, does not require a writ of execution, in this case, a writ of execution is still required.

6

Respondent also requests an assignment pursuant to Code of Civil Procedure section 708.510.  That provision states:

> Except as otherwise provided by law, upon application of the judgment creditor on noticed motion, the court may order the judgment debtor to assign to the judgment creditor or to a receiver appointed pursuant to Article 7 (commencing with Section 708.610) all or part of a right to payment due or to become due, whether or not the right is conditioned on future developments, including but not limited to the following types of payments:
>
>> (1) Wages due from the federal government that are not subject to withholding under an earnings withholding order.
>> (2) Rents.
>> (3) Commissions.
>> (4) Royalties.
>> (5) Payments due from a patent or copyright.
>> (6) Insurance policy loan value.

(Code Civ. Proc., § 708.510, subd. (a).)

Specifically, Respondent seeks an assignment of "all intangible property of Michael Avenatti, including all media rights, which include theatrical, television, dramatic state, radio, sound recording, music, publishing, commercial tie-ins, merchandising, advertising, and publicity rights to the life story of Michael Avenatti, his likeness and image."  This request is supported by Petitioner's testimony at the judgment debtor examination "that [Petitioner] has had multiple offers, too many to enumerate, with a variety of different forms of compensation, to license and otherwise acquire the media rights to his life story, his image, and his likeness."

Respondent argues that the Court may order the turnover of intangible property pursuant to Section 708.510.  Respondent is correct, in part.  Section 708.510 may relate to intangible property such as patent or copyrights.  (See Code Civ. Proc., § 708.510, subd. (a)(5).)  However, Section 708.510 only applies to "a right of payment due or to become due."  Thus, Section 708.510 does not allow for the turnover of a patent or copyright, but only the "[p]ayments due

7

from a patent or copyright." (See *Weingarten Realty Investors v. Chiang* (2012) 212 Cal.App.4th 163, 167 [court order cannot assign property but only "right to payment due" pursuant to Code of Civil Procedure section 708.510(a)], superseded by statute on other grounds, *Casiopea Bovet, LLC v. Chiang* (2017) 12 Cal.App.5th 656, 662 fn. 2.)

The use of the word "payment due" means that the right to payment must be in existence, even if the payment may "become due" in the future or the right to payment is "conditioned on future developments". (Code Civ. Proc., § 708.510, subd. (a).) This is supported by Section 708.510(d), which states that "a right to payment may be assigned pursuant to this article only to the extent necessary to satisfy the money judgment." There is no way to impose that condition where the right to payment does not yet exist.  Here, Respondent does not seek the assignment of a right to payment that is in existence.  Respondent claims that Petitioner has received offers that, if accepted, may create a "right to payment." However, Respondent does not assert that any rights to payment currently exist based on Petitioner's intangible property.

In addition, Respondent's request is overbroad and lacks specificity. It encompasses "all intangible property of Michael Avenatti." In addition, it does not specify the payor, the amount of the payment(s), when the payment(s) will be due, whether any conditions have been placed on the right to payment, or the basis of the right to payment. The Court is not aware of any case in which a trial court has ordered an assignment of a right to payment pursuant to Section 708.510 in the absence of a specific and existing right to payment.

The cases cited by Respondent do not support her claim. *Peterson v. Sheriff of the City and County of San Francisco* (1896) 115 Cal. 211; *Finnegan v. Finnegan* (1944) 64 Cal. App. 2d 109; *Zanetti v. Zanetti* (1947) 77 Cal. App. 2d 553; *Hendricks & Lewis PLLC v. Clinton* (2014 9th Cir.) 766 F. 3d 991, involve situations in which the intangible property itself (such as patents or copyrights) was assigned to a receiver. Those cases had nothing to do with assigning a right to payment due or Section 708.510.

To the extent Respondent is requesting that the Court order Petitioner to turnover his intangible property to a receiver, the Court exercises its discretion

8

and declines to do so.  Respondent has not explained how it would be possible to assign, for example, Petitioner's "likeness and image" to a receiver.

Because the Court has determined that there is no existing "right to payment" under Section 708.510(a), there is no need for the Court to conduct the analysis under subdivision (c).

**The Motion for Second Turnover Order is granted in part and denied in part.  The Court grants the Section 708.205 turnover order, subject to the property being turned over to the levying officer and not Respondent, and denies the Section 708.510 assignment order.**

IT IS SO ORDERED.

JUDGE/COMMISSIONER OF THE SUPERIOR COURT

DATE:   APR 0 4 2019          NATHAN VU

The Court clerk will provide a courtesy copy of the Order to Deliver Specific Property, with the Ruling on Submitted matter, but it will not constitute service. Mr. DeArmey will be required to provide proper service.

9

EXHIBIT 30

FL-410

**ATTORNEY OR PARTY WITHOUT ATTORNEY** *(name, State Bar number, and address):*
Lisa Storie-Avenatti
3419 Via Lido, 610
Newport Beach, Ca 92663

TELEPHONE NO.: 9492851906    FAX NO. *(optional):*
E-MAIL ADDRESS *(optional):*
ATTORNEY FOR *(name):* In Pro Per

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF**
STREET ADDRESS: 341 The City Dr. S, Orange Ca 92868
MAILING ADDRESS: 341 The City Dr. S,
CITY AND ZIP CODE: Orange Ca 92868
BRANCH NAME: Lamoreaux Justice Center

PETITIONER/PLAINTIFF: Michael Avenatti
RESPONDENT/DEFENDANT: Lisa Storie-Avenatti
OTHER PARTY/PARENT:

FOR COURT USE ONLY

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
LAMOREAUX JUSTICE CENTER

JUN 05 2019

DAVID H. YAMASAKI, Clerk of the Court

BY: ___J. HARREL___, DEPUTY

| | |
|---|---|
| **ORDER TO SHOW CAUSE AND AFFIDAVIT FOR CONTEMPT** | CASE NUMBER: 17D009930 |

**NOTICE!**
A contempt proceeding is criminal in nature. If the court finds you in contempt, the possible penalties include jail sentence, community service, and fine.

You are entitled to the services of an attorney, who should be consulted promptly in order to assist you. If you cannot afford an attorney, the court may appoint an attorney to represent you.

**¡AVISO!**
Un proceso judicial por desacato es de índole criminal. Si la corte le declara a usted en desacato, las sanciones posibles incluyen penas de prisión y de servicio a la comunidad, y multas.

Usted tiene derecho a los servicios de un abogado, a quien debe consultar sin demora para obtener ayuda. Si no puede pagar a un abogado, la corte podrá nombrar a un abogado para que le represente.

1. TO CITEE *(name of person you allege has violated the orders):* Michael Avenatti
2. YOU ARE ORDERED TO APPEAR IN THIS COURT AS FOLLOWS, TO GIVE ANY LEGAL REASON WHY THIS COURT SHOULD NOT FIND YOU GUILTY OF CONTEMPT, PUNISH YOU FOR WILLFULLY DISOBEYING ITS ORDERS AS SET FORTH IN THE AFFIDAVIT BELOW AND ANY ATTACHED *AFFIDAVIT OF FACTS CONSTITUTING CONTEMPT;* AND REQUIRE YOU TO PAY, FOR THE BENEFIT OF THE MOVING PARTY, THE ATTORNEY FEES AND COSTS OF THIS PROCEEDING.

   a. Date: 08/02/2019    Time: 8:30 Am    Dept.: L67    Rm.:

   b. Address of court: [X] same as noted above   [ ] other *(specify):*

Date: JUN 05 2019   ▶   JUDGE JULIE A. PALAFOX
                                    JUDICIAL OFFICER

**AFFIDAVIT SUPPORTING ORDER TO SHOW CAUSE FOR CONTEMPT**

3. [ ] An *Affidavit of Facts Constituting Contempt* (form FL-411 or FL-412) is attached.
4. Citee has willfully disobeyed certain orders of this court as set forth in this affidavit and any attached affidavits.
5. a. Citee had knowledge of the order in that
   (1) [ ] citee was present in court at the time the order was made.
   (2) [✱] citee was served with a copy of the order.
   (3) [ ] citee signed a stipulation upon which the order was based.
   (4) [✱] other *(specify):*
       Petitioner counsel was present in court at the time the order was made.
       [ ] Continued on Attachment 5a(4).
   b. Citee was able to comply with each order when it was disobeyed.
6. Based on the instances of disobedience described in this affidavit
   a. [ ] I have not previously filed a request with the court that the citee be held in contempt.
   b. [✱] I have previously filed a request with the court that the citee be held in contempt *(specify date filed and results):*
       5/24/2019 for Failure to Pay Support and Costs, Hearing continued to 6/14/2019
       [ ] Continued on Attachment 6b.

Page 1 of 4

Form Adopted for Mandatory Use
Judicial Council of California
FL-410 (Rev. January 1, 2018)

**ORDER TO SHOW CAUSE AND AFFIDAVIT FOR CONTEMPT**

Family Code, § 292;
Code of Civil Procedure, §§ 1211.5, 2015.5
www.courts.ca.gov

FL-410

| PETITIONER/PLAINTIFF: M i c H a E L  A v e n a T T i. | CASE NUMBER: |
| RESPONDENT/DEFENDANT: L i s a  S T o R i o - A v e n a T t i | 17D009930 |
| OTHER PARTY/PARENT: | |

7. ☐ Citee has previously been found in contempt of a court order *(specify case, court, date):*

☐ Continued on Attachment 7.

8. ☒ Each order disobeyed and each instance of disobedience is described as follows:

a. ☐ Orders for child support, spousal support, family support, attorney fees, and court or other litigation costs (see attached *Affidavit of Facts Constituting Contempt* (form FL-411))

b. ☐ Domestic violence restraining orders and child custody and visitation orders (see attached *Affidavit of Facts Constituting Contempt* (form FL-412))

c. ☐ Injunctive or other order *(specify which order was violated, how the order was violated, and when the order was violated):*

☒ Continued on Attachment 8c.

d. ☐ Other material facts, including facts indicating that the violation of the orders was without justification or excuse *(specify):*

☐ Continued on Attachment 8d.

e. ☐ I am requesting that attorney fees and costs be awarded to me for the costs of pursuing this contempt action. (A copy of my *Income and Expense Declaration* (form FL-150) is attached.)

**WARNING: IF YOU PURSUE THIS CONTEMPT ACTION, IT MAY AFFECT THE ABILITY OF THE DISTRICT ATTORNEY TO PROSECUTE THE CITEE CRIMINALLY FOR THE SAME VIOLATIONS.**

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 6/3/2109

Lisa Storie-Avenatti
_____
(TYPE OR PRINT NAME)                                    (SIGNATURE)

FL-410 [Rev January 1, 2016]          **ORDER TO SHOW CAUSE AND AFFIDAVIT FOR CONTEMPT**          Page 2 of 4

Attachment 8.c

Attachement: 8.c. continued

I, Lisa Storie-Avenatti, declare that on 4/23/2018 the Court issued an order "STIPULATION AND ORDER THEREON FOR TEMPORARY CUSTODY AND SUPPORT" Petitioner had knowledge of said order in that counsel for Petitioner was present in Court at the time that the order was made, and Petitioner was served with a copy of the order.  Attached as Exhibit "1". ORDER ON MOTIONS (2) TO COMPEL FURTHER DISCOVERY RESPONSES (DEMAND FOR PRODUCTION OF DOCUMENTS, SET ONE dated 12/29/2017; FORM INTERROGATORIES - FAMILY LAW, SET ONE served 12/29/2017) Attached as Exhibit "2".

Petitioner had the ability to comply with the order and willfully disobeyed the order. A formal demand for Full and Complete Compliance was sent on 6/4/2018.  Attached as Exhibit "3"

The statutory authorization for an order to show cause for contempt in California family law cases is found in Code of Civil Procedure §§ 1218 & 1219 which state in pertinent part that any party subject to a valid court order who, with knowledge of the order and the ability to comply, fails to comply with the terms of the order is subject to a contempt adjudication and statutory contempt penalties.

Petitioner should be found in contempt on the following counts:
1. 2016 personal and business tax returns (which were due by 5/15/2018).
    a. **To date, no tax returns have been received.**
2. 2017 personal and business tax returns (which were due by 5/15/2018).
    a. **To date, no tax returns have been received.**
3. Copies of all personal and corporate/business bank account statements for the period of 1/1/2016 through 3/31/2018 (which were due by 5/15/2018)
    a. **To date, no bank statements have been received.**
4. Provision (29(a)) which provides that petitioner will serve and file a current Income and Expense Declaration at least 30 days prior to any continued hearing date. As such, petitioner must serve and file your current FL-150 with supporting documentation on or before 6/16/2018 in anticipation of the hearing scheduled for 7/16/2018.
    a. **To date, no Preliminary Declaration of Disclosure or Income and Expense Declarations have been received.**

Date 6/3/2019

Respondent, Lisa Storie-Avenatti

Exhibit "1"

# EXHIBIT 31

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE**
LAMOREAUX JUSTICE CENTER - 341 The City Drive, Orange, CA 92868-3205

PETITIONER: MICHAEL AVENATTI

RESPONDENT: LISA STORIE-AVENATTI

| **RULING ON SUBMITTED MATTER** | CASE NUMBER: 17D009930 |
|---|---|

The court having taken this matter under submission on 10/23/2019,now rules as follows:

STATEMENT OF DECISION
on Petitioner's Motion to Set Aside Set Aside
Child and Spousal Support Orders Filed October 22, 2018.

1. Objections to Respondent's Declaration filed May 28, 2019

    a. SUSTAIN as to Objections #1-#3 on the grounds that the is argument and legal conclusion.  The Court will disregard all legal argument contained in Respondent's Declaration and will strike the following text:

        i. Page 1, Paragraph 1: "Avenatti did not utilize the mandated Judicial Council form FL-360 to make his request. Avenatti filed an FL-300 Request for Order which is a generic Judicial Council form that cannot be used to make this request."

        ii. Page 1, Paragraph 2: "Avenatti failed to file his request timely as required by Fam.C. Section 3691."

    b. OVERRULE as to Objections #4-#5.  The statements complained of can be interpreted as statements of fact and the Court will interpret them as such.

2. Failure to Use Form FL-360

    a. The form is mandatory for parties and counsel, but that does not require the Court to dismiss a filing simply because the wrong form is used.  The Court has discretion to accept or refuse filings that do not use mandatory Judicial Council forms. (See *Marriage of Zimmerman* (2010) 183 Cal.App.4th 900, 905 ("The trial court observed that the motion was not filed on the mandatory Cal. Judicial Council form FL-360 (rev. Jan. 1, 2007), but nevertheless allowed the hearing on the motion.")

    b. Here, Petitioner included all the required information in his filing and there has been no showing of prejudice to the Respondent.  The Court will exercise its discretion to accept Petitioner's filing.

3. Timeliness of Opposition/Response to Motion to Set Aside

Page 1 of 5

a. As the Court stated at the hearing on 06/07/19, the Petitioner was within his rights to assert a default and the Court denies any request for Family Code section 271 sanctions based on Petitioner's assertion of default.  However, the Court finds that:

    i. The continuance had been agreed to by Respondent's prior counsel and it was excusable neglect by Respondent that this was not clearly communicated to new counsel;

    ii. There was confusion at the hearing on 05/24/19 since there was also a motion for bifurcation on calendar on 06/07/19; and

    iii. The Court had mistakenly not put the motion to set aside on its online calendar for 06/07/19 and Respondent's new counsel  was justified in believing that the motion to set aside was not on calendar for that date.

b. The Court therefore accepted Respondent's Opposition and allowed Petitioner additional time to prepare an amended reply, if Petitioner wished to do so.

**RULING ON SUBMITTED MATTER**

4. Merits of the Motion to Set Aside

   A. Material Perjury

   To set aside a support order pursuant to Family Code section 3691, the moving party must not only prove that perjury occurred but also that the perjury materially affected those provisions of the Court's support order that are being challenged. (See Family Code, § 3693.) Here, Petitioner seeks to set aside the Court's child support and spousal support order of 07/16/18. That order was based upon an XSpouse printout that was filed the same date. That XSpouse printout showed that the Court imputed to the Petitioner after-tax income of $261,830 per month for 2018.[1]

   In its minute order of 07/16/18, the Court noted that "it is not appropriate to turn a blind eye that none of the requests have been complied with by the petitioner. There are no tax returns, bank statements, no income & expense declarations, no preliminary declaration of disclosure and no financial documents [even though] [t]he petitioner was ordered to produce the documents by 6/22/18." Nor was Petitioner present at the hearing on 07/16/19.

   Without the benefit of information or documents from the Petitioner or testimony from the Petitioner himself, the Court determined Petitioner's income based on historical information regarding the parties' expenses in 2016, when they were married and Petitioner was paying said expenses from his income. The figure of $261,830 came from the Marital Expenses column of the attachment to Respondent's Income and Expense Declaration and not the Current Expenses column or Proposed Needs column.[2]

   However, Petitioner is not alleging that the Marital Expenses column contained perjury, only that the Current Expenses or Proposed Needs columns contained perjury. Thus, the alleged perjury did not materially affect the Court's support order.

   Petitioner also argues that Respondent falsely testified at the 07/16/18 hearing that her expenses had not changed after the date of separation (which occurred no later than October 2017). Even if this is true, the Court did not rely on Respondent's post-separation expenses in calculating Petitioner's 2018 income. Petitioner did not pay Respondent's post-separation expenses and thus, Respondent's post-separation expenses bore no relationship to Petitioner's income and could not have been used to calculate Petitioner's income. Rather, as Petitioner himself states, "The XSpouse printout upon which the October 22, 2018 Order was based showed that the amount of support was based on non-taxable income for the Petitioner of $261,830 per month 2018. That figure came from the Marital Expenses column of the attachment to Respondent's income and Expense Declaration." (Petitioner's Further Reply in Supp. of Req. for Order to Set Aside Child and Spousal Support Orders, at p. 2.)

   B. Timeliness

[1] The Court's child support and spousal support order of 07/16/18 was retroactive to 01/01/18. Therefore, the Court was imputing Petitioner's income for 2018.

[2] Respondent's January 3, 2018 Income and Expense Declaration lists the total Current Expenses as $215,643 and the total Marital Expenses as $261,831. Respondent's April 23, 2018 Income and Expense Declaration lists the total Proposed Needs as $124,060 and the total Marital Expenses as $262,247. Respondent's June 18, 2018 Income and Expense Declaration lists the total Proposed Needs as $215,643 and total Marital Expenses as $261,830

Page 3 of 8

Pursuant to Family Code section 3691(b), any motion to set aside based on perjury must be brought within six months of the moving party discovering the perjury or when the moving party reasonably should have discovered the perjury. (See Family Code, § 3691, subd. (b).) Here, the allegedly perjured information was contained in all three of Respondent's Income and Expense Declarations filed in 2018. The last of these Income and Expense declarations were served on Petitioner on June 18, 2018.

The Marital Expenses figure of $261,830 was contained on the Respondent's Income and Expense Declaration filed shortly before the hearing of 07/16/18 (filed June 18, 2018) and the remaining Income and Expense Declarations had a similar number (filed January 3, 2018, which listed martial expenses of $261, 831 and filed April 23, 2018, which listed marital expenses of $262,247). The figure of $261,830 was used by the Court in its calculation of child support and spousal support, as shown in the XSpouse printout filed by the Court on 07/16/18.

The proposed Findings and Order After Hearing with the XSpouse printout was served on Petitioner on 07/19/18. Petitioner acknowledged receiving these documents in a letter dated 08/06/18. Petitioner even objected to the proposed Findings and Orders After Hearing, showing that he had reviewed the documents. Thus, no later than 08/06/18, Petitioner was aware that Respondent was claiming expenses of $261,830 and that the Court had imputed income to him of $261,830 to calculate support. Petitioner's Motion to Set Aside was filed on 04/04/19, more than six months after 08/06/18, and is therefore not timely under Family Code section 3692.

Petitioner argues that he was not aware that the figure of $261,830 was perjurious until he had the opportunity to review the transcript of the hearing of July 17, 2018. However, Respondent had claimed that $261,830 was the parties' Marital Expenses in her Income and Expenses Declaration. In addition, the Court's XSpouse printout and the proposed Findings and Order After Hearing indicated that the Court had imputed $261,830 as Petitioner's after-tax income. Petitioner should have reasonably discovered the perjury by 08/06/18, at which point he had already reviewed the proposed Findings and Order After Hearing and the XSpouse printout. Petitioner cannot claim that he could not have reasonably discovered Respondent's alleged perjury because he chose, of his own accord, not to be present at the hearing at which Respondent testified and then chose to not obtain the transcript from the hearing.

C. Petitioner's Other Arguments

Petitioner also argues that Respondent failed to inform the Court of dividend and interest income Respondent received, that Respondent failed to correct her counsel when counsel incorrectly represented that nanny expenses were not part of the Marital Expenses and should be added-on to the child support order, Respondent did not inform the Court that Petitioner had existing child support obligations for children from other relationships, and that the Marital Expenses included private pilot expenses that were untrue.

These arguments suffer from the same timeliness issue described above. Respondent's alleged omissions would have been apparent from Respondent's Income and Expense Declarations, the proposed Findings and Order after Hearing, and the XSpouse printout. In addition, these arguments are made for the first time in Petitioner's Reply and Respondent was not given a full opportunity to prepare a response.[3] (See *People v. Tully* (2012) 54

---

[3] The argument relating to private pilot expenses was not raised in the Reply but was asserted for the first time at the hearing on this matter on 10/23/19.

Cal.4th 952, 1075 ["It is axiomatic that arguments made for the first time in a reply brief will not be entertained because of the unfairness to the other party."].) Petitioner's Reply was filed one week before the hearing and at the time, Respondent's counsel had withdrawn from this case and no new counsel had appeared for Respondent. Therefore, the Court exercises its discretion to not consider arguments made for the first time in reply. (See *Grappo v. McMills* (2017) 11 Cal.App.5th 996, 1009 ["court has discretion to accept arguments or evidence made for the first time in reply"].)

Petitioner's remaining arguments are not bases upon which the Court may set aside the prior support order pursuant to Family Code section 3691. (See Family Code, § 3691, subds. (a)-(c).) The jist of these arguments is not that the Court relied upon perjured testimony, but that the support amount was incorrectly calculated or that certain procedural or disclosure requirements were not met.

While this Court does sit as a court of equity, it is also bound by statutory law that sets limits on its power to set aside support orders. (See Family Code, §§ 3691, subd. (b), & 3693.) Furthermore, Family Code section 3692 explicitly prohibits this Court from setting aside a support order because it was inequitable when made or subsequent circumstances caused it to become excessive or inadequate. (See Family Code, § 3692.) The Court does not and need not decide these arguments on the merits, because even if they were true, they would not form a basis upon which the Court could grant the Motion to Set Aside.

**It is so Ordered:**
**Date: 10/28/19**

**Judge Nathan Vu**

MICHAEL AVENATTI
520 NEWPORT CENTER DR STE 1400
NEWPORT BEACH CA 92660

LISA STORIE-AVENATTI
3419 VIA LIDO APT 610
NEWPORT BEACH CA 92663

STEGMEIER GELBART SCHWARTZ & BENAVENTE LLP
19762 MACARTHUR BLVD STE 200
IRVINE CA 92612

### CLERK'S CERTIFICATE OF SERVICE OF MAIL

I certify that I am not a party to this action and that this Clerk's Certificate of Service by Mail was mailed in accordance with Section 1013a of the Code of Civil Procedure. A copy(s) of Ruling on Submitted matter were deposited in the United States mail, in a sealed envelope with postage fully prepaid addressed as shown above. The mailing and this certification occurred at Orange, California, on: 10/30/2019

DAVID H. YAMASAKI, Clerk of the Court

10/30/2019

By: SARAH ARAZA, Deputy Clerk

Page 5 of 5

For Court Use Only     **RULING ON SUBMITTED MATTER**     CA Rule of Court 3.1109

Form # CT037 [New October 16, 2014]

FL-335

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*<br>— Saul Gelbart, Esq. SBN 100772<br>STEGMEIER, GELBART, SCHWARTZ & BENAVENTE, LLP<br>19762 MacArthur Boulevard, Suite 200<br>Irvine, California 92612<br>TELEPHONE NO.: (949) 337-4050    FAX NO. *(Optional):* (949) 337-4059<br>E-MAIL ADDRESS *(Optional):* sgelbart@sgsblaw.com<br>ATTORNEY FOR *(Name):* MICHAEL AVENATTI | FOR COURT USE ONLY<br><br>ELECTRONICALLY FILED<br>Superior Court of California<br>County of Orange<br>Lamoreaux Justice Center<br>10/30/2019 9:56 AM<br>David H. Yamasaki, Clerk of the Court<br>By: D. Yi, Deputy |
|---|---|
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF  ORANGE<br>STREET ADDRESS: 341 The City Drive South<br>MAILING ADDRESS: P.O. Box 14170<br>CITY AND ZIP CODE: Orange, California 92868-3205<br>BRANCH NAME: Lamoreaux Justice Center | |

| PETITIONER/PLAINTIFF: MICHAEL AVENATTI | CASE NUMBER:<br>17 D 00-99-30 |
|---|---|
| RESPONDENT/DEFENDANT: LISA STORIE-AVENATTI | *(If applicable, provide):* |
| OTHER PARENT/PARTY: | HEARING DATE: September 20, 2019 |
| **PROOF OF SERVICE BY MAIL** | HEARING TIME: 8:30 a.m.<br>DEPT.: L-67 |

NOTICE: To serve temporary restraining orders you must use personal service (see form FL-330).

1. I am at least 18 years of age, not a party to this action, and I am a resident of or employed in the county where the mailing took place.

2. My residence or business address is:
   19762 MacArthur Boulevard, Suite 200, Irvine, California 92612

3. I served a copy of the following documents *(specify)* :
   Findings and Order After Hearing filed October 25, 2019

   by enclosing them in an envelope AND
   a. ☐ depositing the sealed envelope with the United States Postal Service with the postage fully prepaid.
   b. ☒ placing the envelope for collection and mailing on the date and at the place shown in item 4 following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in a sealed envelope with postage fully prepaid.

4. The envelope was addressed and mailed as follows:
   a. Name of person served: Lisa Storie-Avenatti
   b. Address:           419 Via Lido, 610
                         Newport Beach, California 92663
   c. Date mailed: October 30, 2019
   d. Place of mailing *(city and state):*  Irvine, California

5. ☐ I served a request to modify a child custody, visitation, or child support judgment or permanent order which included an address verification declaration. *(Declaration Regarding Address Verification—Postjudgment Request to Modify a Child Custody, Visitation, or Child Support Order* (form FL-334) may be used for this purpose.)

6. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: October 30, 2019

LESLIE MORGAN
_____
          *(TYPE OR PRINT NAME)*

▶ _____
          *(SIGNATURE OF PERSON COMPLETING THIS FORM)*

Page 1 of 1

Form Approved for Optional Use<br>Judicial Council of California<br>FL-335 [Rev. January 1, 2012]     Essential<br>ceb.com [F]Forms    **PROOF OF SERVICE BY MAIL**    Code of Civil Procedure, §§ 1013, 1013a<br>www.courts.ca.gov

# EXHIBIT 32

## SUPERIOR COURT OF CALIFORNIA
## FOR THE COUNTY OF ORANGE
## MINUTE ORDER
12/13/2019

**Judge / Commissioner:** NATHAN VU

**Dept.**: L67 at 8:30 AM                          **Clerk:** S. ARAZA

**Bailiff:** N. MEJIAZEA                           **Reporter:** S. GOLDING 5934

**Case Type**: DISSOLUTION WITH CHILD

**Case Number:** 17D009930

**Case Name**: MICHAEL AVENATTI VS  LISA STORIE-AVENATTI

**Appearances:**
LISA STORIE-AVENATTI, RESPONDENT
STEGMEIER GELBART SCHWARTZ & BENAVENTE LLP, ATTORNEY FOR PETITIONER

**Attorney for PET / PLTF**
by Jason M. Schwartz
**Attorney for RESP / DEF**
Special by Arthur J. LaCilento

---

**OSC - CONTEMPT**                                           Filed on
By

9:14 AM In open court, all parties except Petitioner/Citee are present.

Citee's counsel informs Court he is appearing pursuant to Penal Code Section 977.

Court hears from both counsel as to making good faith efforts to resolving matter, Citee's upcoming federal hearing, and support.

Parties stipulate to continuing the Pre-Trial.

Citee's counsel waives time.

**Continuance**
**The Court orders this matter continued to February 28, 2020 at 8:30 AM in Department L67.**

Court informs parties if parties are unable to resolve the matter by the next hearing date Court will move foward and set matter for Trial.

9:17 AM Matter concludes for this date.

# EXHIBIT 33

☒ SUPERIOR
☐ MUNICIPAL

COURT OF CALIFORNIA, COUNTY OF
JUDICIAL DISTRICT

| Michael Avenatti | CERTIFICATE OF SALE OF PERSONAL PROPERTY |
| vs | CASE NUMBER 17D009930 |
| Lisa Storie-Avenatti | |

I, the undersigned, Sheriff of Orange County, State of California, do hereby certify that under and by virtue of an execution issued out of the above court, on a judgment rendered therein on   04/23/18 & 10/22/18   in favor of creditor   Lisa Storie-Avenatti 24040 Camino del Avion, Ste., A-109, Monarch Beach, CA 92629   and against debtor   Michael Avenatti 10000 Santa Monica Blvd., No 2205, Los Angeles, CA 90024   , which execution was attested on   05/10/19   , and by which I was required to make the sum of $2,553,088.88 dollars, with interests and costs, to satisfy said judgment, out of the personal property of said debtor if sufficient personal property could be found, all of which more fully appears from said execution, to which reference is hereby made. I levied on the following described personal property:

1 Small Sculpture, Metal Head and Stand
1 Large Sculpture, Face, Bicycle
1 Artwork of a Batman 1of 3
1 Artwork of a Batman 2 of 3
1 Artwork of a Batman 3 of 3
1 Artwork of an Impressionist Street in Rain
1 Artwork of a Fingerprint of Gold Leaf on Black
1 Artwork of a Fingerprint of Gold Text on Red
1 Artwork of a Blue, White, Red Lines
1 Artwork of an Orange/ Pink Lines
1 Artwork of a Blurry Silver/Blue Lines
1 B&W Photo of Stone Bridge
1 B&W Photo of Eiffel Tower
1 B&W Photo of Race Car

and at   CITY OF LAGUNA HILLS   , on   August 20, 2019   , duly sold all the right, COUNTY OF ORANGE, STATE OF CALIFORNIA title, and interest of the judgment debtor in and to the same at public auction, according to law and after due and legal notice, to   Michael Avenatti, Attorney In Fact   , who made the highest bid therefore at such sale, for the sum of   $18,000.00 dollars, current lawful money of the United States of America, which sum was the whole price paid for such property.

Date:   August 20, 2019

Location:   Santa Ana, CA
F0328-142.3

DON BARNES
SHERIFF-CORONER OF ORANGE COUNTY

By: _____ #0986
Deputy

# EXHIBIT 34

19-2-00386-34
W0BUT        1
Warrant for OverPaid Benefits Unpaid Taxes
4713401



E-FILED
THURSTON COUNTY, WA
SUPERIOR COURT
01/17/2019 8:23:20 AM
Linda Myhre Enlow
Thurston County Clerk



State of Washington
Department of Revenue
Compliance Administration
Olympia, Washington 98504-7473

19-2-00386-34

**BEFORE THE DEPARTMENT OF REVENUE THE STATE OF WASHINGTON**

**WARRANT FOR UNPAID TAXES**

| WARRANT NO. | POSTING PERIOD | DATE OF ISSUE | DISTRICT OFFICE | REGISTRATION NO. |
|---|---|---|---|---|
| 56620 | 03-2018 | Jan-04-2019 | Kent | 604-337-851 |

**TAXPAYER**

MICHAEL J AVENATTI (a Sole Proprietor)
224 VIA LIDO NORD
NEWPORT BEACH CA 92663-4608

**SUMMARY OF LIABILITY:**
**The liability of this warrant includes the period(s):** Monthly period ending Jul 31, 2017, Monthly period ending Aug 31, 2017, Monthly period ending Sep 30, 2017, Monthly period ending Oct 31, 2017, Monthly period ending Nov 30, 2017, Monthly period ending Dec 31, 2017, Monthly period ending Jan 31, 2018, Monthly period ending Feb 28, 2018, Monthly period ending Mar 31, 2018



Page 1 of 2

Original

gbL2001



State of Washington
Department of Revenue
Compliance Administration
Olympia, Washington 98504-7473

| WARRANT NO. | POSTING PERIOD | DATE OF ISSUE | DISTRICT OFFICE | REGISTRATION NO. |
|---|---|---|---|---|
| 56620 | 03-2018 | Jan-04-2019 | Kent | 604-337-851 |

**STATE OF**

      MICHAEL J AVENATTI (a Sole Proprietor)
      224 VIA LIDO NORD
      NEWPORT BEACH CA 92663-4608

**SUMMARY OF LIABILITY:**

**The liability of this warrant includes the period(s):** Monthly period ending Jul 31, 2017, Monthly period ending Aug 31, 2017, Monthly period ending Sep 30, 2017, Monthly period ending Oct 31, 2017, Monthly period ending Nov 30, 2017, Monthly period ending Dec 31, 2017, Monthly period ending Jan 31, 2018, Monthly period ending Feb 28, 2018, Monthly period ending Mar 31, 2018

| | |
|---|---|
| TAX DUE | $995,208.68 |
| DELINQUENT PENALTY | $161,118.67 |
| WARRANT PENALTY (10% of Tax) | $99,520.87 |
| AUDIT INTEREST | $0.00 |
| ADDITIONAL INTEREST | $25,565.69 |
| ADDITIONAL PENALTY | $248,802.16 |
| **TOTAL DUE** | **$1,530,216.07** |

The State of Washington, through the Department of Revenue, to **Jason Ciummo,** or any other agent of the Department of Revenue:
    WHEREAS, the taxpayer is indebted to the State of Washington in the amount of **$1,530,216.07** for taxes, increases and penalties imposed under and by virtue of Chapters 82.04 through 82.32 RCW, for the period(s) shown above, together with interest thereon at the rate allowed by law from and after the date of this warrant; and
    WHEREAS, the amount specified above became due more than fifteen days prior to the date of this warrant, or is hereby declared to be immediately due and payable for the reason that the Director of the Department of Revenue does believe that the tax or penalty specified above will not be paid when due;
    NOW, THEREFORE, in the name of the State of Washington, you are commanded (1) to file a copy of this warrant with the Clerk of the Superior Court of a county in which you may find property of the taxpayer, and (2) to levy upon the personal property of said taxpayer to the total amount specified above, together with interest at the rate allowed by law to the date of said levy, and together with cost of executing this warrant, and make sale thereof according to law, and to levy upon and seize any surety bond or other security conditioned upon payment by the taxpayer of taxes due the State of Washington, and if sufficient personal property and bonds or other security cannot be found, to satisfy said amount due out of the real property of said taxpayer.
    WITNESS, the Department of Revenue of the State of Washington and the Seal of said Department, affixed on **January 04, 2019.**



                                       Eric Overson
                            Assistant Director for Compliance

                                       Original

gbL2001

# EXHIBIT 35

## AFFIDAVIT
### Case No. : R 20 01155

Suzanne L Story, certifies and declares as follows:

1. I am over the age of 18 years and not a party to this action.

2. My business address is 7610 West Washington Street, Indianapolis, Indiana 46231.

3. I am a Doc Review Sr Specialist III and Custodian of Records for JPMorgan Chase Bank, N.A. (hereinafter referred to as the "Bank") in the National Subpoena Processing Department located in Indianapolis, Indiana.

4. Based on my knowledge of the Bank's business records practices and procedures, the enclosed records are a true and correct copy of the original documents kept by the Bank in the ordinary course of business.

5. Based on my knowledge of the Bank's business records practices and procedures, the records were made at or near the time of the occurrence of the matters set forth in the records by, or from, information transmitted by a person with knowledge of those matters.

6. It is the regular practice of the Bank to make such a record of transactions in the ordinary course of business.

I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct.

Dated: 12 20 19

By: Suzanne L Story
Doc Review Sr Specialist III
National Subpoena Processing

Sworn to before me this 20 day of December, 20 19.

Notary Public

DENISE M CLEMONS
Notary Public - Seal
Johnson County - State of Indiana
Commission Number NP0719174
My Commission Expires Mar 13, 2027

Commission Expires
Subp91

SD_SwornDocumentExecution_000208730012
SB1083103-F3

**Table Of Contents :**
**SB1083103-F3**

**Account Number : 00000000000398880911**
    **Checking - Other Records**                                    **1**

NowbrLevy Raw Data recevedby BFM

## Case Id : COAL-14Jun19-2527

| SL | Data Field | Parsed Value |
|---|---|---|
| 1 | Record Type | W |
| 2 | Withold Request Id | 000049134 |
| 3 | Tra Number | 604337851 |
| 4 | Invoice Number | 000 |
| 5 | Invoice Doc Source Number | 19-2-00386-34 |
| 6 | Warrant ID | 000056620 |
| 7 | Account ID | 000000000 |
| 8 | Inquiry Social Security Number1 | 493902479 |
| 9 | Inquiry Social Security Number2 | |
| 10 | Inquiry Social Security Number3 | |
| 11 | Inquiry Social Security Number4 | |
| 12 | Inquiry Le-Fein | |
| 13 | Inquiry Business Name 1 | AVENATTI, MICHAEL J |
| 14 | Inquiry Business Name 2 | AVENATTI, MICHAEL J |
| 15 | Inquiry Business Name 3 | |
| 16 | Inquiry Business Name 4 | |
| 17 | Amount Owed | 0153585545 |
| 18 | Account Type | 04 |
| 19 | Payees Reference Number | 0000000000398880911 |
| 20 | Name 1 Listed On Account Located By FI | MICHAEL J AVENATTI |
| 21 | Name 2 Listed On Account Located By FI | |

**SB1083103-F3**                                                          1

# EXHIBIT 36



STATE OF WASHINGTON
DEPARTMENT OF REVENUE

U.S. Bank

AUG 2 6 2019

Levy Department

U.S. BANK NATIONAL ASSOCIATION
C/O LEVY DEPARTMENT
PO BOX 5220 CN-OH-L2GT
CINCINNATI OH  45201-5220

August 16, 2019
Letter ID: L0010331239

# Notice and Order to Withhold And Deliver
# (Continuing Lien)

The Department of Revenue hereby notifies you that **MICHAEL AVENATTI** has a tax debt of **$1,521,034.33** owed to the State of Washington. A lien exists on all property or rights to property.

**See addendum for detailed warrant information**        **Total Due: $1,521,034.33**

This Order requires that you **immediately** withhold all wages, funds, payables, credit, property or effects of the taxpayer in your possession. It is a continuing levy and shall remain in effect until the Department issues an official release. Additional interest may accrue on the total amount due.

You are required to respond in writing and under oath, within **Twenty (20)** days of receipt of this Order. A response form is enclosed for your use.

Payment(s) must be made payable to the Washington State Department of Revenue and mailed **to the address listed on the response form**. Include **Taxpayer's Registration Number (604-337-851) and Garnish ID 76205** on all payments.

Failure to comply with the requirements of this Order is unlawful and you may be held liable for the full amount due, with costs, if judgment by default is rendered against you by the court. (RCW 82.32.235)

| | |
|---|---|
| **Registration Number: 604-337-851**<br>**Garnish ID: 76205**<br>**Taxpayer:**<br>MICHAEL AVENATTI<br>10000 SANTA MONICA BLVD UNIT 2107<br>LOS ANGELES CA 90067-7021<br><br><br>SSN: 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 | Department of Revenue<br><br>*Jason Ciummo*<br>JASON CIUMMO, Revenue Agent<br>Phone: (425) 656-5153   Fax: (425) 656-5157<br><br>Date of Personal Service:<br><br><br>Date of Certified Mailing:   August 16, 2019<br><br><br>Date of Electronic Service: |

**SEE ADDITIONAL INSTRUCTIONS ON THE REVERSE**

# EXHIBIT 37

# AVENATTI & ASSOCIATES, APC

1910 Sunset Boulevard, Suite 450
Los Angels, CA 90026
949.706.7000

March 14, 2019

**Via E-Mail**

David M. Samuels, Esq.
Lewis Brisbois Bisgaard & Smith LLP
633 W. Fifth Street, Suite 4000
Los Angeles, CA 90071
David.Samuels@lewisbrisbois.com

     Re:    Representation of █████████

Dear Mr. Samuels:

    This letter is to confirm that this office represents ███████████ in connection with the ██████████ that occurred earlier this month at the ██████████████ hotel. Accordingly all future communications and correspondence should be directed to the undersigned counsel. If you have any questions or concerns, please do not hesitate to contact me.

Very truly yours,

Michael J. Avenatti
AVENATTI & ASSOCIATES, APC

MJA:jkr

001