H. Dean Steward, SBN 85317
107 Avenida Miramar, Ste. C
San Clemente, CA 92672
Tel (949) 481-4900
Fax (949) 497-6753

Attorney for Defendant
MICHAEL JOHN AVENATTI

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | SA CR No. 19-061-JVS |
| Plaintiff, | DEFENDANT'S STATUS REPORT |
| v. | Hearing Date:    June 1, 2020 |
| MICHAEL JOHN AVENATTI, | Hearing Time:    9:00 a.m. |
| Defendant. | Location:    Telephonic - Courtroom of the Hon. James V. Selna |

In advance of the status conference set in this matter for June 1, 2020, defendant MICHAEL JOHN AVENATTI ("Mr. Avenatti") by and through his counsel of record, H. Dean Steward, hereby files this Status Report in order to bring to the Court's attention a number of issues impacting the trial and scheduling in this matter.

Dated: May 27, 2020                    Respectfully submitted,

                                       /s/ H. Dean Steward
                                       H. DEAN STEWARD

                                       Attorney for Defendant
                                       MICHAEL JOHN AVENATTI

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................... iii

I.    MR. AVENATTI'S CUSTODY STATUS AND
      TRIAL PREPARATION ............................................................................ 1

      A. April 24, 2020 to the Present ............................................................. 1

      B. January 14 to April 23, 2020 .............................................................. 6

II.   THE GOVERNMENT'S DISCOVERY PRODUCTIONS .................... 13

III.  THE GOVERNMENT'S CONTINUED USE OF A GRAND JURY
      AND THE POSSIBILITY OF A SUPERCEDING INDICTMENT ....... 14

IV.   THE TRIAL DATE AND ASSOCIATED SCHEDULE ....................... 15

      A. Trial during a deadly, highly contagious pandemic would impair
         the defendant's right to effective assistance of counsel ...................... 17

      B. Trial during a deadly pandemic would deprive the defendant of trial
         before a fair cross-section of the community ...................................... 22

      C. Trial during a deadly pandemic would compromise the defendant's
         right to meaningful confrontation ...................................................... 25

      D. Trial during a deadly pandemic would compromise the defendant's
         right to compulsory process, to present evidence, and to testify ......... 27

      E. Trial during a deadly pandemic would compromise the defendant's
         right to be present and to be judged without the effect of a prejudicial
         face covering ..................................................................................... 28

      F. Trial during a deadly pandemic would compromise the defendant's
         right to be tried by an impartial jury and be free of coercive verdicts . 30

G.  Trial during a deadly pandemic would compromise the defendant's
    right to be free of coercive pressure to plead guilty...........................31

H.  Trial during a deadly pandemic would violate the defendant's due
    process right to the exercise of reasonable care toward the health and
    safety of persons confined by state action ...........................................32

CERTIFICATE OF SERVICE.................................................................................34

## <u>TABLE OF AUTHORITIES</u>

<u>CASES:</u>                                                                    <u>Page</u>

*Brady v. United States*,
397 U.S. 742 (1970) ................................................................................ 30, 31

*Burdine v. Johnson*,
262 F.3d 336 (5th Cir. 2001) ...................................................................... 17

*California v. Green*,
399 U.S. 149 (1970) .................................................................................... 25

*Chambers v. Florida*,
309 U.S. 227 (1940) .................................................................................... 31

*Chambers v. Mississippi*,
410 U.S. 284 (1973) .................................................................................... 26

*Coy v. Iowa*,
487 U.S. 1012 (1988) .................................................................................. 25

*Deck v. Missouri*,
544 U.S. 622 (2005) .................................................................................... 28

*DeShaney v. Winnebago County Dep't of Social Services*,
489 U.S. 195 (1989) .................................................................................... 32

*Duren v. Missouri*,
439 U.S. 357 (1976) .................................................................................... 23

*Estelle v. Williams*,
425 U.S. 501 (1976) .................................................................................... 28

*Freeman v. Ferguson*,
911 F.2d 52 (8th Cir.1990) ......................................................................... 32

*Geders v. United States*,
425 U.S. 80 (1976) ...................................................................................... 19

*Gregory v. City of Rogers, Ark*,
974 F.2d 1006 (8th Cir. 1992) ............................................................... 32

*Jones v. Phyfer*,
761 F.2d 642 (11th Cir. 1985) ............................................................... 32

*Jordan v. Massachusetts*,
225 U.S. 167 (1912) .............................................................................. 30

*Kercheval v. United States*,
274 U.S. 220, 223 (1927) ...................................................................... 31

*Kirby v. Illinois*,
406 U.S. 682 (1972) .............................................................................. 17

*Machibroda v. United States*,
368 U.S. 487 (1962) .............................................................................. 31

*Maryland v. Craig*,
497 U.S. 836 (1990) .............................................................................. 25

*Mattox v. United States*
156 U.S. 237 (1896) .............................................................................. 25

*Montejo v. Louisiana*,
556 U.S. 778 (2009). ............................................................................. 17

*Morris v. Slappy*,
461 U.S. 1 (1983) .................................................................................. 22

*Perry v. Leeke*,
488 U.S. 272 (1989) .............................................................................. 17

*Powell v. Alabama*,
287 U.S. 45 (1932) ................................................................................ 18

*Rock v. Arkansas*,
483 U.S. 44 (1987) ................................................................................ 27

*Smith v. Robbins*,
528 U.S. 259 (2000) ................................................................................. 17

*State v. Long*,
499 A.2d 264 (N.J. 1985) ......................................................................... 25

*Tanner v. United States*,
483 U.S. 107 (1987) .................................................................................. 30

*Taylor v. Illinois*,
484 U.S. 400 (1987). ........................................................................... 26, 27

*United States v. Cronic*,
466 U.S. 648 (1984) .................................................................................. 17

*United States v. DeJesus-Castaneda*,
705 F.3d 1117 (9th Cir. 2013) ............................................................ 25, 26

*United States v. El-Mezain*,
664 F.3d 467 (5th Cir. 2011) ................................................................... 26

*United States v. Hemmingson*,
157 F.3d 347 (5th Cir. 1998) ................................................................... 22

*United States v. Kennedy*,
548 F.2d 608 (5th Cir.1977). .................................................................... 22

*United States v. Kimmel*,
777 F.2d 290 (5th Cir. 1985) ................................................................... 30

*United States v. Snarr*,
704 F.3d 368 (5th Cir. 2013). .................................................................. 24

*Waley v. Johnston*,
316 U.S. 101 (1942) .................................................................................. 31

*Walker v. Johnston*,
312 U.S. 275 (1941) .................................................................................. 31

*Washington v. Texas*,
88 U.S. 14 (1967). .................................................................................. 27

*Weatherford v. Bursey*,
429 U.S. 545 (1977) .............................................................................. 19

*Wells v. Walker*,
852 F.2d 368 (8th Cir.1988) ................................................................ 32

## **OTHER AUTHORITIES:**

U.S. Const. Amend. VI ................................................................. passim

## I.   MR. AVENATTI'S CUSTODY STATUS AND TRIAL PREPARATION

### A.   April 24, 2020 to the Present

On April 24, 2020, pursuant to this Court's Order, Mr. Avenatti was released from the New York Metropolitan Correctional Center ("MCC") and placed in home confinement in Venice, California with significant restrictions and conditions.  To date, Mr. Avenatti has met each condition and there have been no issues or violations relating to his bail.  Indeed, in connection with the recent Pre-Sentence Report ("PSR") completed for Mr. Avenatti in the SDNY Nike matter, Ms. Shakira Davis, the Pre-Trial Specialist assigned to monitor Mr. Avenatti during his home confinement reported that Mr. Avenatti has been in full compliance with his release conditions since his release on April 24, 2020.  Further, the PSR noted that Mr. Avenatti is "viewed as a fair candidate for voluntary surrender" should be ordered incarcerated in that matter."[1] [2]

Since Mr. Avenatti's release from MCC on April 24, 2020, the defense's ability to prepare for trial, including motion practice and reciprocal discovery obligations, has been severely impacted by, among other factors, the following:

---

[1]  Mr. Avenatti has filed a post-trial motion seeking acquittal and a new trial in the Nike case (Case No. 1:19-CR-00373-PGG), which is fully briefed but awaiting a ruling by the Hon. Paul G. Gardephe.  On May 19, 2020, Judge Gardephe continued the sentencing hearing date in the Nike matter to August 19, 2020.

[2]  On May 15, 2020, the Hon. Jesse M. Furman continued the trial date in the Stormy Daniels related SDNY criminal case (Case No. 1:19-CR-00374-JMF) to October 13, 2020, although it is widely anticipated that the trial will again be continued due to COVID-19.  In addition, Mr. Avenatti intends to renew his request that the case be transferred to this district, especially in light of the need to conserve judicial and juror resources as a result of the coronavirus.

(1)     As part of his bail conditions, the government insisted on severely limiting Mr. Avenatti's ability to use a computer.  This poses a significant problem as the vast amount of discovery produced by the government in this case has been produced on hard drives or via other electronic means.  Moreover, there is simply no way to access and review certain of the discovery produced (i.e. data and other computer files) by any means other than a computer.  Seeing as Mr. Avenatti has unparalleled knowledge as to a significant amount of the discovery, it is critical that he have the ability to review the discovery in order to prepare for trial.

(2)     As a result of undersigned counsel's age (68), his risk for contracting COVID-19 (he has diabetes), and the required stay-at-home orders, counsel has been unable to spend any significant time with Mr. Avenatti reviewing the discovery in-person and preparing for trial.  Even though Mr. Avenatti and counsel are in regular communication by phone, this does not serve as a meaningful substitution for in-person meetings and review of the extensive discovery in this case (which the government continues to produce with no end in sight).  Counsel and Mr. Avenatti are further restricted from communicating by Zoom or video conference due to Mr. Avenatti's conditions of home confinement.

(3)     Because of COVID-19 and Mr. Avenatti's home confinement conditions, neither defense counsel nor Mr. Avenatti have been permitted to appear in-person at the offices of the IRS in order to further review Mr. Avenatti's e-mails, electronic

documents and those of his law firm.[3]  These emails and electronic documents are critical to Mr. Avenatti's defense because, for instance, email often served as the primary communication method between Mr. Avenatti and the alleged victims in this case, as well as between Mr. Avenatti and others whom he employed/dealt with, who are at the center of the allegations in the indictment.  While the government has provided copies of *some* email and documents to the defense, the government has not produced copies of all of the email and documents bearing on the allegations in the indictment and Mr. Avenatti's defenses.

The Court will recall that Mr. Avenatti previously filed a motion to compel the government to provide a copy of the entirety of the servers of Mr. Avenatti's law firm without regard to case or topic, which was successfully opposed by the government. Alternatively, the government established a terminal/database in the offices of the IRS in Los Angeles in order to permit Mr. Avenatti and his counsel the opportunity to review the email and documents as needed.  Mr. Avenatti and his counsel availed themselves of this opportunity before COVID-19 and began the process of sifting and searching for the relevant documents and information, although this process was less than 20% complete at the time of Mr. Avenatti's January 14, 2020 arrest.

(4)     The records of Mr. Avenatti's law firm Eagan Avenatti, LLP, including critical records detailing costs and expenses on cases involving the alleged victims, as

---

[3] There are well over 2,000,000 emails in the database, which likely comprise over 6,000,000 pages of material.

well as hours spent on the matters, are not in the possession of Mr. Avenatti.  Instead, the records are now in the possession of a bankruptcy trustee for the law firm.

(5)     The government continues to produce vast amounts of data and discovery to the defense, despite the fact that the government has previously and repeatedly represented to the Court and counsel that discovery would be complete long ago.[4]  *In fact, to date, the government has now produced over 1.1 million pages of discovery in this case, **with over 664,000 pages (well over half of the discovery production) having been produced two weeks ago on May 8.**[5]*  This is obviously in addition to the huge amounts of electronic data already produced.  The government has been in possession of the documents and materials in most instances for 14 months and yet is now inundating the defense with documents.  The prejudice to the defense that results cannot be overstated.  Further, this prejudice is compounded by the fact that the government

---

[4] For instance, the government previously represented to the Court and counsel that its privilege review would be completed last year and all documents produced.  And yet all indications are that it continues.

[5] On May 8, the government made this production while stating that "almost all" of the production had been previously produced by the Privilege Review Team to the defense on March 13, 2020.  The defense has not been able confirm this as there is no way to easily cross-reference the productions to determine what exactly has been previously produced and what is duplicative.  Further, the defense was still in the process of reviewing the March production (which alone consists of nearly 1 million pages) when the May production of 664,000 pages was made.  As the Court can appreciate, it can easily take months to review this amount of discovery, not to mention then reviewing and comparing that discovery to later productions.

refuses to affirmatively state either (a) that all discovery has now been produced or (b) to provide a date certain as to when all discovery will have been produced.[6]

(6)      As the Court is aware, Mr. Avenatti's counsel in this matter[7] is a solo practitioner with limited resources and a limited ability to review the over 1,000,000 pages of discovery that has been dumped on the defense by the government, not to mention the huge amount of electronic data consisting of millions of additional pages/images.  The sheer magnitude of the discovery the government has produced, and

_____

[6] The defense respectfully requests that the Court direct the government to promptly (a) provide the Court with a detailed summary of the government's productions to date, including the date of each production and the amount of pages/data associated with each production and b) affirmatively state all discovery has now been produced or, if not, provide an absolute date certain as to when all discovery will be produced.

[7] The government has previously gone to great lengths to repeatedly inform the Court that Mr. Avenatti was represented at the Nike trial by "SEVEN (7) attorneys."  However, what the government has failed to tell the Court, despite having full knowledge of all of Mr. Avenatti's finances, bank accounts, and payments to his lawyers during the last three years, including in 2019 and 2020, is that: (a) **only TWO (2) of those lawyers were being paid by Mr. Avenatti, with the payments occurring entirely in the Spring of 2019**; (b) the "seven" lawyers included a pro bono jury consultant and other lawyers in support, who played no role at trial after jury selection; and (c) *unlike here*, Mr. Avenatti had the good fortune of having lawyers, firms and consultants volunteer their services in the Nike case due to (i) the case being venued in New York, (ii) the high-profile nature of the case and the fact that it involved some of the biggest names in college basketball, and (iii) the belief by many in the legal community that Mr. Avenatti had been singled out for prosecution in the Nike case over what was in reality a hard charging settlement negotiation, no different than what occurs hundreds of times by plaintiffs' lawyers every day across the country.  Accordingly, any claim by the government that Mr. Avenatti chose to lavishly fund his defense in the Nike case at the expense of his defense in this matter is without merit.

continues to produce, cannot be overstated.  Even were Mr. Avenatti able to employ a team of lawyers/paralegals to review the discovery in the case, the undertaking would require months of time.[8]  The effects of COVID-19 make this process even more inefficient and time consuming.

### B.    January 14 to April 23, 2020

At the last status conference held on April 27, the USAO represented to the Court that Mr. Avenatti had the ability to fully review discovery in this matter and prepare for trial while he was in custody from January through the end of April.  As set forth in detail below, this representation is *patently false*.

On the evening of January 14, 2020, despite knowing full well that Mr. Avenatti was scheduled to depart for New York on a commercial flight five hours later in order to assist with trial preparation and be present for the Nike trial (set for the following Tuesday), the government caused Mr. Avenatti to be arrested in downtown Los Angeles. They chose to arrest Mr. Avenatti not at his residence as is customary, or even at the

---

[8] Mr. Avenatti is presently attempting to make arrangements for additional counsel to represent him in this case with the hope that such counsel can assist in the review of the discovery and preparation for trial.  This process has been significantly hindered by the position previously taken by the government in connection with Mr. Avenatti's bail revocation, namely that every dollar he expends on anything other than paying his estranged wife Lisa Storie or the creditor Jason Frank (who is law partners with, and represented by, Mr. Sagel's close friend Andrew Stolper), is an effort somehow aimed at hindering their efforts at collection and thus amounts to criminal conduct.  As this Court can appreciate, and as the court in the Nike case specifically recognized, this position by the government creates a significant impediment to Mr. Avenatti's ability to retain counsel, fund a defense, pay costs and experts, and properly prepare for trial.

airport.  Instead, the prosecution purposely chose to have Mr. Avenatti arrested while he was attending a high-profile State bar hearing at which the media was present.  As planned, a media circus resulted, with Mr. Avenatti's arrest and ultimate remand being widely reported nationwide, together with repeated mentions of Mr. Sagel by name.  The judge in the Nike matter (the Hon. Paul G. Gardephe) later noted that the timing was especially curious seeing as the alleged conduct used by the government for the basis for the arrest and bail revocation was known by the government for months prior (dating back to July 2018).[9]

At the time of his arrest and repeatedly thereafter as he was being transported to Santa Ana jail from downtown Los Angeles, Mr. Avenatti asked the agents who had arrested him why he was in custody.  They refused to tell him.

Upon being booked in the Santa Ana jail on the night of January 14, Mr. Avenatti was placed in solitary confinement, in a wing of the jail generally reserved for violent inmates with disciplinary problems.[10]  He asked to be able to take a shower but that request was denied.

---

[9] The timing of Mr. Avenatti's arrest caused the Nike trial to be delayed and rescheduled, and further caused considerable inconvenience to the Nike court and its staff.  It also resulted in an obscene waste of taxpayer money in that Mr. Avenatti, accompanied by three U.S. Marshalls, had to be flown on a chartered private jet (likely at a cost of over $60,000) from Orange County airport to New York on the Friday after his arrest.

[10] As the Court is aware, from 1971 until 2019 (48 years), Mr. Avenatti had never been charged with any crime, let alone convicted of any crime, and had no history of violence.

On the morning of January 15, this Court remanded Mr. Avenatti to custody, at which time he was placed back in solitary confinement despite repeatedly asking to be housed in general population.  He was again denied a shower.

On January 16, Mr. Avenatti spent the entire day in his cell with no ability to use the phone, take a shower, or have any contact with his attorneys.

Early in the morning of Friday, January 17, Mr. Avenatti was removed from his cell and transported to Orange County airport, where he was flown, together with three U.S. Marshalls, on a private jet to Teterboro, New Jersey outside of New York.  At all times, Mr. Avenatti was handcuffed, shackled at the waist and required to wear ankle restraints.  He still had not been permitted to shower.

After having been transported to the MCC in Manhattan,[11] Mr. Avenatti arrived at approximately 6:30 p.m.  Despite Mr. Avenatti repeatedly asking (and practically begging) that he not be placed in solitary confinement, he was placed in solitary confinement in the notorious "10 South," in a cell previously used to hold international fugitive and drug lord Joaquin "El Chapo" Guzman before, during and after his recent trial in Brooklyn, New York.[12]  Unit 10 South houses 6-7 inmates at a time, nearly all of whom are considered threats to the national security of the United States (i.e. high-

[11] The substandard conditions at MCC are widely known throughout the Bureau of Prisons and are considered the worst in the nation.

[12] Despite the existence of the Federal Metropolitan Detention Center ("MDC") in Brooklyn where almost all federal pre-trial inmates are held pending trial in Brooklyn, El Chapo was instead held at MCC due to its extreme security measures.

profile terrorists or individuals accused of treason against the United States).[13]  Indeed, the security measures used at 10 South are some of the highest used throughout the Federal Bureau of Prisons, with the unit considered the "Super Max" of pre-trial facilities in the United States.[14]  It has been routinely described as tougher than Guantanamo Bay, with conditions that cause severe psychological trauma.

Despite repeated requests by Mr. Avenatti and his counsel that he be moved from 10 South, Mr. Avenatti was held in solitary confinement in 10 South for nearly five (5) weeks until February 20,[15] at which time he was finally placed in general population in Unit 5 South.  For the first three weeks, a guard was stationed immediately outside the door of his cell 24 hours a day.  During the five weeks he was held in 10 South, he was never permitted to go outside to breath fresh air or see the sky.[16]  He was rarely permitted to view any television, was not allowed to use a radio, and was never

---

[13] Because of the severe restrictions and violation of constitutional rights that result from being placed in 10 South, incarceration in the unit generally requires a directive from the Office of the Attorney General of the United States and judicial approval of "Special Administrative Measures" or "SAMS."  It is presently unknown how Mr. Avenatti was placed in 10 South without this judicial safeguard and what role, if any, the Attorney General had in placing Mr. Avenatti in 10 South.

[14] The Court is urged to read Exhibits A-D as they relate to the specific conditions Mr. Avenatti faced while at MCC, especially because they severely impacted his ability to prepare for trial in this case, as well as his mental fitness.

[15] On February 14, Mr. Avenatti was convicted in the Nike matter.  He was not remanded to custody as a result of that conviction.

[16] Mr. Avenatti was ultimately held at MCC for a total of approximately 100 days; he was allowed to go outside to breath fresh air *once*.

permitted to read a newspaper.  He was not allowed a single social visit.[17]  His every

move (including showers and use of the toilet) was recorded on two cameras located

inside his cell, with Mr. Avenatti being told that if he tried to cover himself when using

the toilet, he would be disciplined.  He could not control the lights within his cell, which

were routinely left on without interruption.  And the temperature inside his cell would

reach approximately 45 degrees at night.

    *Moreover, his attorney visits and access to discovery materials were severely*

*restricted.*  Indeed, Mr. Avenatti was not permitted by MCC to have any discovery or

legal paperwork relating to any other case or matter other than the Nike matter.  Further,

he was not allowed to have email access; his calls, including attorney calls, were

severely restricted; and he was not permitted to use the law library (where discovery

materials must be reviewed per MCC policy).

    On Wednesday, February 26, Mr. Avenatti was first granted access to the law

library at MCC, where inmates are permitted to review discovery.  However, MCC

informed Mr. Avenatti that no discovery from this case or the Stormy Daniels related

matter was on file for him to review.

    The next day (Thursday, February 27) and a mere seven days after he was moved

out of 10 South - the entire MCC was placed on locked-down status after it was

---

    [17] In fact, Mr. Avenatti was never permitted a single social visit during his approximate 100
days at MCC, even though his family and close friends went to great lengths to attempt to see him,
including travelling to New York only to be turned away at MCC.

discovered that a correctional officer at the institution had smuggled a loaded firearm into the facility and provided it to an inmate.  Attorney visits and contact were immediately stopped that day.  All inmates were locked in their cells 24 hours a day so that a search could begin prison wide for the firearm.  "Sort" teams (i.e. SWAT like teams) and other correctional officers from maximum security United States Penitentiaries from across the country were brought to MCC to conduct repeated cell raids, often in the middle of the night.[18]  In the thirteen days that followed, Mr. Avenatti was permitted only two showers – each five minutes in length (one on March 1 and one on March 7); he was locked in rat-infested cells 24 hours a day with no clean laundry;[19] he was cut off entirely from his counsel and family; he had no phone or email access; and he was not given a single hot meal (he was fed frozen peanut butter and jelly sandwiches every night for 13 nights straight).

---

[18] For instance, Mr. Avenatti had his cell searched seven times by officers in full tactical gear, often at 3:00 or 4:00 a.m., across thirteen days.  At one point, Mr. Avenatti, together with other inmates, were required to stand and sit on the floor with their hands on their heads for three consecutive hours and were told if they removed their hands, there would be "hell to pay" and they would get a "shot" (a disciplinary charge) and taken to the SHU.  He was also strip searched repeatedly.  Further, the personal property of Mr. Avenatti, including over ½ of his legal documents, were taken and "lost."  During one strip search at approximately 3:30 in the morning on March 4, a correctional officer said to another that Avenatti "doesn't look as tough now as he thought he did when he was going after Trump on TV."

[19] Mr. Avenatti was ultimately allowed one change of clothes and sheets across approximately five weeks.

On March 10, days after the firearm was recovered, MCC finally came off locked down status and Mr. Avenatti was moved to unit 11 South.  He was subsequently finally able to meet with undersigned counsel, who, despite the virus outbreak, flew to New York from Los Angeles for the purposes of discovery and motion review, and trial preparation.  However, those efforts were soon again derailed.

Only 12 days later, on March 22, Mr. Avenatti's unit was again locked down for what was then described as a "staff shortage."  The next day, March 23, MCC informed Mr. Avenatti's unit that it would remain locked down and quarantined as a result of an inmate in the unit testing positive for COVID-19.  All attorney visits were stopped; all law library/discovery access was immediately suspended; no inmate was permitted to leave the unit unless they were being released; and inmates were permitted to leave their cells only approximately three times per week for a total of 5 hours per week to use the phone or email system.  Occasionally, a hot meal (lunch) would be served, but generally all meals were cold or frozen.[20]

On Saturday, April 11, despite the fact that Mr. Avenatti had already been quarantined since March 23 (i.e. for 19 days), MCC moved Mr. Avenatti back to solitary confinement in 10 South and again placed him under severely restrictive conditions.  He was not permitted to leave his cell on a single occasion until his release from MCC to

---

[20] Mr. Avenatti was again fed frozen peanut butter and jelly sandwiches every night for dinner – this time for 32 consecutive nights.

home confinement on April 24.  Nor was he permitted email access, access to a computer, or regular contact with his attorneys or family.

In sum, as detailed above, Mr. Avenatti was in custody approximately 100 days and was in solitary confinement or under locked-down status for over 80 of those days. He was routinely denied access to his discovery, legal papers and counsel through no fault of his own.[21]  *And he was forced to endure abhorrent, brutal conditions almost unheard of even for inmates with long, violent criminal histories.  Accordingly, any claim by the government that Mr. Avenatti was easily able to adequately review discovery in this matter, meet and communicate with his attorneys, and prepare for trial is frankly absurd.*

## II.    THE GOVERNMENT'S DISCOVERY PRODUCTIONS

As discussed previously (*see* I. A. (5), *infra*), the government continues to produce vast amounts of discovery in this case while at the same time refusing to either state that all discovery is now complete or provide a date certain by which all discovery will be complete.  Much of this information has been in the possession of the government for well over a year.  This, coupled with the issues detailed above relating to discovery review, makes it virtually impossible for the defense to adequately prepare motions, participate in reciprocal discovery, mount a global defense strategy, properly prepare witnesses, make decisions as to which witnesses to call and whether Mr. Avenatti will

---

[21] Mr. Avenatti did not have a single disciplinary incident while in custody.

testify, and generally prepare for trial.  To date, the government has produced over 1.1 million pages of discovery, with well over 50% of those pages (over 664,000) only recently having been produced.  This does not take into account the total amount of information provided to the defense from the Privilege Review Team.  And there have been untold productions of electronic discovery comprising enormous amount of data.

As can be expected under these circumstances, counsel has yet to review well over one half of the discovery produced in this case as of the date of this filing.  It goes without saying that Mr. Avenatti should not be required to proceed to trial until his counsel is adequately prepared.

## III.   THE GOVERNMENT'S CONTINUED USE OF A GRAND JURY AND THE POSSIBILITY OF A SUPERCEDING INDICTMENT

The defense understands that the government continues to subpoena documents and witnesses in connection with its investigation of Mr. Avenatti.  Indeed, all indications are that the government over the last 18 months has dug into virtually every aspect of Mr. Avenatti's life and every financial transaction that he or his law firms participated in dating back some seven years, and that this inquiry continues to this day. If the government intends on bringing a superseding indictment against Mr. Avenatti, it will obviously have a significant impact on the scope of the trial, discovery, and trial preparation.

## IV.   **THE TRIAL DATE AND ASSOCIATED SCHEDULE**

The trial in this matter is presently set to begin on August 17, 2020 and is likely to last for approximately six weeks or longer depending on the government's ability to use alleged 404(b) evidence.  For the reasons set forth above, the defense has serious concerns about Mr. Avenatti's right to a fair trial and the defense's ability to meet the current schedule, complete its review of the mountain of discovery in this case, file the extensive motions necessary for Mr. Avenatti's defense, meet with Mr. Avenatti to prepare for trial, and adequately represent Mr. Avenatti at trial.  These concerns are even more heightened in light of the coronavirus and its effects on the defense and counsel.

By the date of the status conference in this matter, there will be over 1,700,000 confirmed cases of COVID-19 in the United States, with over 100,000 deaths.  Los Angeles County and Orange County alone account for over 50,000 cases and 2,200 deaths.  On Friday, May 22, 2020, Dr. Deborah Birx, the White House Coronavirus Response Coordinator,  identified the Los Angeles Metropolitan Area and Orange County as one of three geographic areas of concern for COVID-19 spread in the United States, with the White House asking the CDC to investigate.  As of May 25, 2020, (a) Los Angeles County reported 13,243 new cases in the previous 14 days – almost half of total new cases reported in all of California during that time period and (b) Orange County had seen a 24.3 percent increase in positive COVID-19 hospital patients and a

44.4 percent increase in ICU positive COVID-19 patients.[22]  Meanwhile, cases, deaths and hospitalizations are spiking in other states that have moved toward reopening (i.e. North Carolina, Alabama, and Minnesota).  Indeed, many experts, including renowned expert Dr. Anthony Fauci, are predicting a "second wave" for the pandemic, which may result in a more dangerous set of circumstances than the first wave and produce a larger percentage of cases and deaths later this Summer or Fall.  Simply put, there is nothing that presently suggests that the pandemic will be "over" by August or that any degree of true normalcy will be restored by that date.[23]

Critically, a trial in August in the middle of the COVID-19 pandemic would have a significant, negative and dramatic impact on Mr. Avenatti's rights,[24] including (a) his rights to effective assistance of counsel, including pre-trial preparation, trial performance, and midtrial consultation with counsel, (b) to be tried entirely on properly admitted evidence; (c) to be tried by a fair cross-section of the community; (d) to meaningful confrontation; (e) to compulsory process; (f) to an impartial jury that can reasonably be expected to hear the evidence with the appropriate attention, and to be free

[22] *See* https://covid19.ca.gov/roadmap-counties/, visited May 25, 2020.

[23] For instance, California State University, the largest four-year public university system in the United States, announced on May 12, 2020 that, with few exceptions, they were suspending in-person classes at its 23 campuses throughout the state, including in Orange County, because a course that might begin in a face-to-face modality would likely have to be switched to a virtual format during the term if a serious second wave of the pandemic occurs, as forecast.

[24] Mr. Avenatti's health issues and heightened risk for serious injury or death as a result of contracting the virus are well documented in the record and are, therefore, not repeated here.

16

of coercive verdicts; (g) to be free of coercive pressure to plead guilty; and (h) to the exercise of reasonable care for the safety of those endangered by state action.

### A. Trial during a deadly, highly contagious pandemic would impair the defendant's right to effective of assistance of counsel.

Defendants enjoy a right to the assistance of counsel at all critical stages of a criminal proceeding. *See Montejo v. Louisiana*, 556 U.S. 778, 786 (2009). Both the trial itself and the post-indictment period before trial constitute critical stages. *See Kirby v. Illinois*, 406 U.S. 682, 688 (1972) (right to counsel attaches "at or after the time adversary judicial proceedings have been initiated against him"). When defendants suffer the impairment of counsel by a state-created barrier, they need not show that the inadequate performance affected the outcome – they need only show that such barriers affected counsel's performance. *See Smith v. Robbins*, 528 U.S. 259, 287 (2000)("various kinds of state interference with counsel's assistance' can warrant a presumption of prejudice.")(internal quotations omitted); *Perry v. Leeke*, 488 U.S. 272 (1989)(recognizing that while most claims of ineffectiveness require a showing of prejudice, "direct governmental interference with the right to counsel is a different matter.") And in some circumstances, the effective performance of counsel is so unlikely as to amount to the functional equivalent of a complete denial of counsel. *See United States v. Cronic*, 466 U.S. 648 (1984); *Burdine v. Johnson*, 262 F.3d 336, 347 (5th Cir. 2001) (en banc). In these cases, reversal is automatic. *See Cronic*, 466 U.S. at 659

Trial under the current circumstances would destroy the defendant's right to counsel in multiple ways and would constitute both the state interference with the duties of counsel and the constructive denial of counsel altogether.

1. <u>Trial in August would so compromise counsel's trial performance as to constitute a complete denial of counsel; it would also destroy any meaningful right to mid-trial attorney-client consultation.</u>

Trial in a setting that gravely threatens his or her own physical well-being – as well as that of his or her client and family -- amounts to the constructive denial of counsel. *See Powell v. Alabama*, 287 U.S. 45, 53 (1932)(demand that counsel try a capital case on short notice and under thinly veiled threat of mob violence effectively deprived defendants of counsel).  Conducting a jury trial always requires immense and sustained focus. Under the best of circumstances, even a simple criminal trial presents innumerable moving parts that require the full, rapt attention of one or more attorneys. And if an attorney stumbles on any point, such a misstep may rightfully become scrutinized on appellate review, in habeas petitions, and even bar complaints.

Unfortunately, even skilled and experienced trial attorneys would find it impossible to maintain the necessary sustained focus in the current environment. During a deadly pandemic, every step an attorney takes, every pen he or she picks up, every person that wants to converse, and every cough he or she hears, could mean infection with a deadly virus. *<u>This concern is even more heightened as a result of undersigned counsel's age and health condition (68 years old with diabetes), which places him in a high risk category for contracting the virus and suffering serious consequences.</u>*  And he

18

will also be seriously concerned about who will be exposed to the virus when he or she leaves court each day.  Preserving Mr. Avenatti's rights, moreover, will require some effort to put on the record at least the most serious occasions of such distractions.

Quite apart from the question of divided attention, trying the case under COVID-19 protocols will undermine counsel's ability to perform other basic functions. Counsel – like the jury, and judge – probably will not understand all of the testimony of masked witnesses and will certainly be unable to evaluate their demeanor. Nor will counsel be able to judge the reactions of jurors or the Court.  Indeed, a crucial part of being an effective trial advocate is the ability to gauge the reaction of jurors to the evidence and witness testimony in real time and adjust your presentation and trial strategy accordingly. If the jurors are forced to wear masks covering a significant portion of their faces, the ability of trial counsel to perform this critical task is eliminated.  Communication with co-counsel, witnesses, and paralegals will likewise be impaired.

Most critically, counsel will have to choose between his or her own safety and consultation with Mr. Avenatti, who faces years in prison. The defendant possesses an unqualified right to consult with his attorney throughout his trial.  *See Geders v. United States*, 425 U.S. 80 (1976).  Indeed, that right prevails over even very weighty concerns of trial administration, such as the witness sequestration rule.  *See Geders*, 425 U.S. at 88-92.

The current setting burdens this right in several ways. The efficacy of attorney-client consultation diminishes at a distance. If the defendant and counsel can hear each

19

other at this distance, they probably cannot speak privacy, as contemplated by the Sixth Amendment.  *See Weatherford v. Bursey*, 429 U.S. 545, 554 n. 4 (1977).  And because such conversations cannot be conducted safely, privately, and effectively, they will inevitably be conducted less frequently than necessary. Nor, of course, could such consultations be safely conducted at shorter distances.

Conceivably, the Court could recess the trial each time the defendant and his counsel wished to confer, to permit a private conversation. This would exact a massive toll on the trial's efficiency, and likely generate frustration and resentment by jurors toward the defendant. Further, it would call heightened attention to the defendant's conferences with his lawyer, and increase the risk that the jury draws factual inferences of guilt from his behavior at counsel table. The defendant's consultation with his lawyer, like his conduct at counsel table generally, constitute improper bases for conviction.

2.   <u>Trial in August would effectively deprive the defendant of the right to counsel in the period of pretrial preparation.</u>

The Supreme Court has recognized "that the assistance of counsel cannot be limited to participation in a trial; to deprive a person of counsel during the period prior to trial may be more damaging than denial of counsel during the trial itself." *See Weatherford v. Bursey*, 429 U.S. 545, 554 n. 4 (1977).  Here, an August trial would compromise several important forms of pre-trial preparation.

First, counsel cannot reasonably make strategic decisions without basic knowledge about how it will be conducted, including as it relates to voir dire.  It is anticipated that due to Mr. Avenatti's notoriety and the media attention surrounding his arrests and

20

recent conviction, an initial panel of at least 125-150 prospective jurors will be required.[25] But the protocols surrounding jury selection, and the trial itself, have yet to be disclosed or discussed.

Trial attorneys should be expert in the rules and procedures that govern the trial. Without a detailed recitation of the trial protocols, the defense can neither prepare evidence for the trial nor challenge its processes. Cross-examination strategies, for example, may depend on whether a witness will be wearing a mask. Counsel cannot responsibly decide how much evidence to present without knowing how uncomfortable or fearful the jury will be when hearing it. Nor can the defense know how to display its exhibits or demonstrative aids without knowing where and how the jury will sit, or what technology is available. Further, witnesses cannot be prepared without being able to tell them how they will testify: in a mask, over closed circuit TV, at the far side of the room. Most critically, the defendant's own choice to testify may well be affected by the Court's decision about whether he is going to do so in a mask.

There is also the question of how discussions at the bench will occur during the trial. Oftentimes during a trial, the parties need to discuss a matter out of earshot of the jury and those discussions take place huddled at the bench. Will the jury be excused each

---

[25] If social distancing requirements are to be met, this will require a contiguous space of at least 14,125 square feet (125 individuals x 113 square feet per individual (area of a circle with a 6 foot radius), not accounting for Court staff and attorneys.

time a discussion needs to occur with the Court so the parties may remain some distance from each other?

Pretrial consultation has also been significantly affected.  Beyond the inability to review discovery with the defendant as discussed above, counsel cannot converse with the defendant or the defense witnesses live, in face-to-face confrontation, in order to judge demeanor for possible testimony.

Put simply, the assistance of counsel that the defendant would receive in these circumstances would not be what the Constitution demands.  Insistence on proceeding with a lengthy trial under these circumstances would represent an "unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay.'" *Morris v. Slappy*, 461 U.S. 1, 11–12, (1983) (citing *Ungar*, 376 U.S. at 589). It would therefore violate the constitution.

## B. Trial during a deadly pandemic would deprive the defendant of trial before a fair cross-section of the community.

The Sixth Amendment and 28 U.S.C. §1861 et seq. (the "Jury Selection Act") guarantee a party a trial before a fair cross-section of the community. In order to show a violation of the statute, a defendant must prove a "substantial failure" to comply with its provisions. A substantial failure is one that destroys the "random nature or objectivity of the selection process."  *United States v. Hemmingson*, 157 F.3d 347, 358 (5th Cir. 1998)(internal citations omitted, quoting 28 U.S.C. § 1867(a)), and *United States v. Kennedy*, 548 F.2d 608, 612 (5th Cir.1977).

22

To show a Sixth Amendment violation, the defendant must show that (1) "the group alleged to be excluded [from the jury system] is a 'distinctive' group in the community," (2) "the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community," and (3) "this underrepresentation is due to systematic exclusion of the group in the jury selection process." *Duren v. Missouri*, 439 U.S. 357, 364 (1976).

Jury summonses issued during the pandemic cannot produce a lawful cross-section of the community. Neither the coronavirus nor the economic dislocation it has occasioned have affected the community uniformly. Some portions of the Central District have suffered higher infection rates, and experience greater risks of serious illness or death than have others.  Nor is fear of the virus uniform along ethnic or racial lines.  Because of significant racial and ethnic differentials in infection rates and access to health insurance, different racial and ethnic groups within our community may feel greater vulnerability to the virus in the event it is contracted.

As to the economic effects, some segments of our community have experienced elevated rates of occupational dislocation, and graver risks to family finances upon losing a job or paycheck.  Further, some ethnic and racial groups have higher concentrations of employment in critical industries.  Women are also concentrated in these industries.  Finally, the age structure of each ethnic and racial grouping in our community varies significantly.  Moreover, the virus's disruption of childcare arrangements will certainly affect different ethnic and racial groupings, and their ability

23

and willingness to serve on a jury, differently. These differences will almost certainly manifest themselves in differential response rates to summons.

The magnitude and breadth of social and economic change in the immediate wake of the virus is absolutely vast. Predictions about the precise ways that the virus will skew summons response rates are therefore dangerous and unknown. Certainly, however, the group of people who answer the summons will not resemble a typical, representative jury pool in the Central District.

That suffices to show a violation of the Jury Selection Act and the Constitution. The act of sending summons at the peak of a pandemic "destroys the random nature" of jury selection.  For instance, just as a jury summons issued for service on a major religious holiday observed by a plurality of the community would not produce a "random" selection of its residents, nor would a summons issued during a pandemic that affects large ethnic groups more severely than its white, conservative, Republican residents.

The issuance of a summons for jury duty in August will likely skew the venire by large margins along multiple cognizable cleavages.  Further, the unequal probabilities for jury service among each group will result from systemic, rather than random, factors. The decision to convene a jury trial in this short moment of intense social dislocation represents a "procedure[] in the jury selection process that work(s) to exclude class members." *United States v. Snarr*, 704 F.3d 368, 385 (5th Cir. 2013).

Finally, even if every cognizable group in the District had the same probability of

jury selection, COVID-19 notwithstanding, it would still violate the Jury Selection Act

and Sixth Amendment. *If we can predict nothing else about jury selection in a pandemic,*

*one thing is almost certain: the response rate will be abnormally low*. Because an

adequate sample size is essential to random selection, this fact alone will "destroy the

random nature" of the selection process. Further, it will significantly increase the

likelihood that the responding population underrepresents someone, and hence increase

the likelihood of a homogenous or statistically outlying jury. This is not a fair cross-

section. *See State v. Long*, 499 A.2d 264, 272 (N.J. 1985) (a system that produces

homogenous venires does not produce a fair cross-section, even if each resident has an

equal chance of service).

### C. Trial during a deadly pandemic would compromise the defendant's right to meaningful confrontation.

The Constitution guarantees the defendant the right to confront witnesses against

him.  *See* U.S. Const. Amend. VI.  An essential component of that right is:

[T]he opportunity, not only of testing the recollection and sifting the conscience of the
witness, but of compelling him to stand face to face with the jury in order that they may
look at him, and judge by his demeanor upon the stand and the manner in which he gives
his testimony whether he is worthy of belief.

*Mattox v. United States*, 156 U.S. 237, 242 (1896); *accord Maryland v. Craig*, 497 U.S.

836, 845 (1990); *Coy v. Iowa*, 487 U.S. 1012 (1988); *California v. Green*, 399 U.S. 149

(1970).  Compelling witnesses to testify in a face covering would obviously impair the

jury's capacity to judge the witnesses' facial expressions and demeanor when "standing

face to face" and "looking at" the witnesses.

In some cases, courts have permitted witnesses to testify in facial covering to

protect their safety.  *See, e.g., United States v. DeJesus-Castaneda*, 705 F.3d 1117, 1120

(9th Cir. 2013); *see also Craig*, 497 U.S. at 851 (closed circuit testimony); *United States*

*v. El-Mezain*, 664 F.3d 467, 491-494 (5th Cir. 2011)(pseudonymous witness).  But in

those cases, the witnesses feared retaliation, and no alternative measure could assure

their safety.  *See DeJesus-Castaneda*, 705 F.3d at 1120; *El-Mezain*, 664 F.3d at 491-494.

Thus, facial coverings furthered an important government interest and did not render the

testimony unreliable.  *See DeJesus-Castaneda*, 705 F.3d at 1120; *see also Craig*, 497

U.S. at 850 (recounting this test).  Here, by contrast, nothing more is at stake than a

delay in the trial date – unmasked testimony will be perfectly safe after the pandemic.

Further, if the witnesses cannot be understood, their testimony – as comprehended by the

jury – is not reliable.

Finally, the right of confrontation may be drained of its value even if the witnesses

do not testify in coverings. If the jury finds that government witnesses appear nervous or

concerned about their answers, this fact may have little probative value in a pandemic.

Large numbers of the trial participants will be scared to be in public during a deadly

infection, a matter wholly independent of the truth of their testimony. Accordingly, a

continuance is necessary to protect the core of the defendant's confrontation right.

26

**D. Trial during a deadly pandemic would compromise the defendant's right to compulsory process, to present evidence, and to testify.**

The Sixth Amendment promises Mr. Avenatti "compulsory process for obtaining witnesses in his favor." U.S. Const. Amend. VI. "Few rights are more fundamental than that of an accused to present witnesses in his own defense." *Taylor v. Illinois*, 484 U.S. 400, 408 (1987); *accord Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). Moreover, "the right is a fundamental element of due process of law." *Taylor*, 484 U.S. at 409; *accord Washington v. Texas*, 388 U.S. 14, 19 (1967). These rights carry special force when the defendant himself seeks to testify. *See Rock v. Arkansas*, 483 U.S. 44, 49-52 (1987). The defendant's right to testify overcomes even strong public policy concerns about the reliability of evidence, and may defeat even less than absolute prohibitions on giving testimony. *See Rock*, 483 U.S. at 56-62. That right arises from dignitary concerns – the personal nature of the right to be heard "in his own words" -- and not solely on constitutional protections against unreliable verdicts. *Id.* at 52.

Trial during a pandemic would undermine this complex of fundamental rights. Assuming defense investigators can make service of subpoenas, the pandemic creates a serious risk of witness non-compliance. And if defense witnesses do appear, the jury cannot evaluate their credibility, whether positively or negatively, if they testify in facial coverings. Further, causing witnesses to testify in a state of fear significantly prejudices Mr. Avenatti.

If nothing else, the need to testify in facial coverings will seriously abridge the defendant's right to be heard. This is true in a literal sense – early experience with

27

speaking through facial coverings suggests that it is often incomprehensible. But it is also true in another sense -- the jury will not be able to see and evaluate Mr. Avenatti's face if he testifies. Speech is more than expulsion of sound waves; it is a full presentation of the self, especially through facial expression.  Accordingly, a defendant compelled to testify behind a mask is no more heard "in his own words" than one compelled to deliver testimony in writing.

Finally, causing Mr. Avenatti and other witnesses to appear in Court while they are nervous about health issues unrelated to guilt or innocence, or the facts of the case, prejudices the defendant.  Jurors will observe Mr. Avenatti while the trial is proceeding and if he appears nervous they could unfairly interpret that as consciousness of guilt. Likewise, they could interpret the nervousness of a defense witness as a sign of lacking credibility or belief in their own testimony.

### E.   Trial during a deadly pandemic would compromise the defendant's right to be present and to be judged without the effect of a prejudicial face covering.

Ultimately, the defendant will either attend the trial in a mask or without one. Neither option is fair to him. Due process requires courts to consider whether the appearance of the defendant will prejudice the jury, and to take care to avoid such prejudice.  *See Estelle v. Williams*, 425 U.S. 501 (1976).  Thus, defendants may not be tried in prison garb, *see Williams*, 425 U.S. at 505, nor in shackles barring clear threats to the safety or good order of the proceedings.  *See Deck v. Missouri*, 544 U.S. 622 (2005).

28

Our culture very frequently associates masks with villainy. Train bandits, Hannibal Lecter, and Klansman, figures now etched into the contemporary American subconscious, all wear masks.  And there may well be a segment of the population that dislikes not merely the mask but the people who wear them.[26]  Indeed, there are already signs that wearing a mask is becoming widely politicized, with media reports of "mask shaming" in the United States and conservative supporters of the President labeling individuals who wear masks as "left wing liberals who don't respect individual freedoms."

Alternatively, Mr. Avenatti's presence without a mask could prejudice the jury against him, inviting inferences that he is selfish and reckless towards the lives of others. Some jurors may agree with New York Governor Andrew Cuomo, a major public figure in the country's COVID-19 response, who said publically that mask refusal "is insensitive, it is arrogant, it is self-destructive, it is disrespectful to other people."[27]  The Court should wait until a time that it does not have to make this choice.

---

[26] See Ryan Lizza and Daniel Lippman, *Wearing a mask is for smug liberals. Refusing to is for reckless Republicans* (May 1, 2020)("On the right, where the mask is often seen as the symbol of a purported overreaction to the coronavirus, mask promotion is a target of ridicule, a sign that in a deeply polarized America almost anything can be politicized and turned into a token of tribal affiliation."), *available at https://www.politico.com/news/2020/05/01/masks-politics-coronavirus- 227765, last visited May 26, 2020.*

[27] George Back, *Andrew Cuomo on 'selfish' New Yorkers not wearing masks: 'I just don't get it'*, Yahoo Entertainment (May 7, 2020), available at *https://sports.yahoo.com/andrew-cuomo-on- selfish-new-yorkers-not-wearing-masks-i-just-dont-get-it-074031942.html, last visited May 26, 2020.*

**F.     Trial during a deadly pandemic would compromise the defendant's right to be tried by an impartial jury and to be free of coercive verdicts.**

Trial during a deadly pandemic would compromise the defendant's right to be trial by an impartial jury and to be free of coercive verdicts.  The Supreme Court "has recognized that a defendant has a right to a tribunal both impartial and mentally competent to afford a hearing."  *Tanner v. United States*, 483 U.S. 107, 126 (1987); *Jordan v. Massachusetts*, 225 U.S. 167, 176 (1912).  Moreover, the jury should be reasonably attentive.  And it cannot be coerced into rendering a premature verdict.

A trial in August cannot be accomplished consistently with these principles. Jurors will not likely devote their full attention to the testimony and evidence while they worry about their safety and that of loved ones. Nor can they be expected to remain neutral in these circumstances, free of any resentment toward the prosecution for bringing the case, or, more likely, the defendant for insisting on a jury trial. Finally, when the jury returns for deliberations, the Court should not be surprised by a quick verdict to terminate the proceedings. Other than avoiding service through voir dire or simple non-compliance with a summons, which should both be expected as jurors seek to avoid potentially deadly exposure to the virus, the speed of the verdict will be the one way that jurors can control the duration of their viral exposure. In deciding whether a verdict is coerced, "the real question is whether the jury was required to deliberate an unreasonable length of time or for unreasonable intervals or was threatened with the prospect of such unreasonably lengthy deliberations."  *United States v. Kimmel*, 777 F.2d 290, 295 (5th

Cir. 1985).  In the midst of a pandemic, nearly any amount of time is "an unreasonable

length of time."

### G. Trial during a deadly pandemic would compromise the defendant's right to be free of coercive pressure to plead guilty.

The choice between trial and a plea of guilty must be made entirely voluntarily,

and without any threats or promises of unlawful action.  *See Brady v. United States*, 397

U.S. 742, 748 (1970); *Machibroda v. United States*, 368 U.S. 487, 493 (1962); *Waley v.

Johnston*, 316 U.S. 101, 104 (1942); *Walker v. Johnston*, 312 U.S. 275, 286 (1941);

*Chambers v. Florida*, 309 U.S. 227 (1940); *Kercheval v. United States*, 274 U.S. 220,

223 (1927).  Scheduling a trial in August would undermine the voluntary character of

this choice in two ways.

First, proceeding with a trial in August undermines the value of the jury trial as a

means for obtaining exoneration or acquittal upon less than proof beyond a reasonable

doubt. Even if the government fails to present proof beyond a reasonable doubt, Mr.

Avenatti may be convicted for improper reasons: because defense counsel is too

distracted to mount an effective cross-examination, because the jury lacks the

accumulated wisdom and experience of a diverse cross-section, because the jury cannot

see a witness smirk beneath his mask, because a crucial defense witness ignores a

subpoena rather than risk his or her life to the virus, because the jury feels prejudice

toward the defendant because he is or is not wearing a mask, because the jury is too

distracted to notice the holes in the government's case, because the jury resents Mr.

Avenatti's insistence on a trial, or because the last hold-out juror surrenders her honest convictions to get out of a hot zone.

Second, proceeding with a trial in August would force the defendant to choose between his right to trial and his personal safety. The decision to waive trial by jury is not voluntary if the trial could result in death or permanent lung damage to the defendant or another participant.

### H. Trial during a deadly pandemic would violate the defendant's due process right to the exercise of reasonable care toward the health and safety of persons confined by state action.

The due process clause "imposes a duty on state actors to protect or care for citizens when the state affirmatively places a particular individual in a position of danger the individual would not otherwise have faced." *Gregory v. City of Rogers, Ark*, 974 F.2d 1006, 1010 (8th Cir. 1992) (en banc). Due process imposes a duty on state actors to protect or care for citizens in two situations: first, in custodial and other settings in which the state has limited the individuals' ability to care for themselves; and second, when the state affirmatively places a particular individual in a position of danger the individual would not otherwise have faced. *See Wells v. Walker*, 852 F.2d 368, 370 (8th Cir.1988); *see also DeShaney v. Winnebago County Dep't of Social Services*, 489 U.S. 195 (1989); *Freeman v. Ferguson*, 911 F.2d 52, 55 (8th Cir.1990). The government violates an individual's right to due process when it (1) "affirmatively place[s] [the] individual in danger," or (2) by "acting with 'deliberate indifference to [a] known or obvious danger.'" *Jones v. Phyfer*, 761 F.2d 642 (11th Cir. 1985) (a constitutional right to

32

protection by the state exists when there is a showing that the victim faces a special danger distinguishable from that of the public at large).

Barring a plea of guilty, Mr. Avenatti is compelled to attend his own trial. And as argued above, the trial, however conducted, and certainly if conducted in a way that respects any of Mr. Avenatti's procedural rights, will expose him to a serious risk of contracting the virus. Accordingly, proceeding with a trial in August will deprive him of the due process right to physical security in the face of state-created danger.

Dated: May 27, 2020                    Respectfully submitted,

                                       /s/ H. Dean Steward
                                       H. DEAN STEWARD
                                       Attorney for Defendant
                                       MICHAEL JOHN AVENATTI

## CERTIFICATE OF SERVICE

I, H. Dean Steward, am a citizen of the United States, and am at least 18 years of age. My business address is 107 Avenida Miramar, Ste. C, San Clemente, CA 92672.  I am not a party to the above-entitled action.  I have caused, on May 27, 2020, service of the defendant's:

## STATUS REPORT


on the following party, using the Court's ECF system:

AUSA BRETT SAGEL AND AUSA JULIAN ANDRE

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 27, 2020

/s/ H. Dean Steward

H. Dean Steward

**EXHIBIT A**

**The New York Times** | https://nyti.ms/2jSC3wa

## Manhattan Jail That Holds El Chapo Is Called Tougher Than Guantánamo Bay

By Joseph Goldstein

Jan. 23, 2017

The Metropolitan Correctional Center, the rust-colored fortress in Lower Manhattan where hundreds of federal inmates are housed, was described as less hospitable than Guantánamo Bay by one inmate who had been incarcerated at both. The highest risk half-dozen inmates — or at least the ones facing the most severe charges — are housed in conditions so isolating that some have blamed them for deteriorating eyesight.

This is where federal agents brought Joaquín Guzmán Loera, the drug lord known as El Chapo, when he was extradited to the United States last week after two escapes from high-security Mexican prisons.

The Metropolitan Correctional Center, which held Ramzi Ahmed Yousef, the mastermind of the 1993 bombing of the World Trade Center, and Bernard L. Madoff, who orchestrated a $20 billion Ponzi scheme, has a reputation for stringent security measures. Even so, several inmates over the years have tried to escape, and a few have succeeded.

The most sensational attempt occurred in 1981, when an inmate was nearly plucked off the rooftop recreational center by confederates in a hijacked helicopter. And in 1990, two inmates disappeared out a second-story window, lowering themselves with an electrical cord from a machine used to buff the floors. One is still on the United States Marshals Service's list of most wanted fugitives.



Joaquín Guzmán Loera, the drug lord known as El Chapo, was brought to the center after he was extradited to the United States from Mexico.   U.S. law enforcement, via Associated Press

In 2009, Anthony Boyd, a serial bank robber, was released from the Metropolitan Correctional Center as a result of what appeared to be an administrative error.

Whether there have been other successful escapes or missing prisoners in recent years is unclear. Officials at the Metropolitan Correctional Center did not return a phone call or respond to an email message seeking comment.

The jail, opened in 1975, holds about 795 inmates. It is wedged between the Church of St. Andrew and the United States Court House. From the upper floors of the courthouse, inmates can be seen playing basketball in the rooftop recreation area.

It is unlikely Mr. Guzmán will be permitted to join them. The inmates deemed most dangerous are housed in a half-dozen cells in a small wing known as 10 South, where they are held in solitary confinement and prohibited from calling out to one another. The lights are on 23 or 24 hours a day, according to court records, interviews with lawyers and written accounts. The frosted glass windows offer no view of the outside world. Even the slot on each cell door is kept shut, meaning that inmates see little beyond their solitary cell.

But guards can see inside, by way of a camera directed at the shower stall and another above the toilet or bed, according to a published account by Uzair Paracha, who was held there for two years until 2005, when he was convicted of providing support to Al Qaeda.



A police sharpshooter aimed at one of the roof doors of the center during an escape attempt in 1981.  Larry C. Morris/The New York Times

Mr. Paracha said it was not unusual for inmates to notice their eyesight deteriorating while in 10 South, and to request eyeglasses for an onset of nearsightedness.

Other than prayers, the only human voices were typically the sounds of guards cracking jokes at the inmates' expense, according to Mr. Paracha, whose detailed account of life in the Metropolitan Correctional Center is included in the 2016 book "Hell Is a Very Small Place: Voices from Solitary Confinement."

This litany of severe conditions, known generally as "Special Administrative Measures," requires the approval of the attorney general. In 2011, Amnesty International wrote to Attorney General Eric H. Holder Jr., expressing concern that the conditions amounted to cruel and inhuman treatment.

"The segregated units are horrifying and inhumane," David E. Patton, the executive director of Federal Defenders of New York, wrote by email. "If you wanted to intentionally design a place to drive people mad, you'd be hard pressed to do better."

Mr. Patton, whose office represents Mr. Guzmán and many inmates in the Metropolitan Correctional Center, described the isolation on 10 South as stark, with prisoners' days mostly devoid of human interaction. "The fluorescent lights are always on," he said. "The only sound is the occasional clanking of metal when doors are opened and closed."

Case 8:19-cr-00061-JVS Document 164 Filed 05/27/20 Page 45 of 72 Page ID #:2584

The motorcade carrying the Mexican drug kingpin known as El Chapo arrived at the Metropolitan Correctional Center on Thursday.  Jason Szenes/European Pressphoto Agency

The 10 South unit is reached by a stairway from the ninth floor, a secure area known as the "Special Housing Unit," which has its own stringent security measures. Even so, getting into 10 South, from the unit on the ninth floor, requires passing through two locked metal doors, the first of which is controlled electronically and the second of which requires a key, according to testimony.

In 2000, an inmate suspected of terrorism stabbed a guard in the eye with a sharpened plastic comb on 10 South. That attack, which caused the guard severe brain damage, led to a tightening of security restrictions in the wing and a sense of vigilance that remains.

Within the last three years, guards have reported that one terrorism suspect had left a "drop note" containing coded messages in the recreation room for his co-defendants to find. Defense lawyers, however, said the note reflected just "a hunger and a thirst for human contact."

Whether Mr. Guzmán will end up being held in 10 South or even in the Metropolitan Correctional Center while his case is pending in Brooklyn remains unknown. Most inmates facing federal charges in Brooklyn are held at a larger federal jail in Sunset Park, Brooklyn, but a few are held at the Metropolitan Correctional Center, which is where Mr. Guzmán was returned after his arraignment on Friday.

The Bureau of Prison's online directory of inmates does not indicate his whereabouts. Mr. Patton declined to discuss Mr. Guzmán's location or the case.

# EXHIBIT B

Case 8:19-cr-00061-JVS · Document 164 · Filed 05/27/20 · Page 47 of 72 · Page ID #:2586

NEWS (/NEWS)

# Prisoners Endure A Nightmare 'Gulag' In Lower Manhattan, Hidden In Plain Sight

BY AVIVA STAHL [/STAFF/AVIVA-STAHL]

JUNE 19, 2018 10:45 A.M. • 21 COMMENTS

   



➡ MADELEINE CRENSHAW / GOTHAMIST

Half a block behind Manhattan's federal courthouse, two blocks from City Hall, three blocks from the Brooklyn Bridge, and less than a mile from the hustle-and-bustle of Wall Street, sits a detention center that has been condemned by a United Nations human rights expert for exposing its inmates to conditions akin to torture.

While reports of the horrendous conditions on Rikers Island helped spur Mayor Bill de Blasio's pledge to shutter (http://gothamist.com/2017/03/31/close_rikers_recommendation.php) the jail's violence-plagued facilities, far less attention has been paid to the environment inside the Metropolitan Correctional Center, the federal jail which mainly holds people who have been charged but not yet convicted of crimes, who in the eyes of the law are still presumed innocent.

Yet those locked up at the MCC are subject to their own indignities and rights violations, say those who have spent time there on both sides of the bars. These include filthy conditions, vermin infestations, substandard medical care, and violence and abuse at the hands of guards. Interviews with a dozen people who have spent time locked up there as recently as 2017, as well as with attorneys who have represented clients at MCC, human rights groups, and others with direct knowledge of the prison, confirm that those incarcerated at MCC often endure a rat-infested, high-rise hell just yards from the federal courts that send them there.



A D V E R T I S E M E N T

"I thought there was nowhere worse than Rikers Island," Melvin Rodriguez, who spent three weeks at MCC, told Gothamist. In October 2016, Rodriguez was arrested in the Bronx on federal charges for selling drugs to a confidential informant, as part of the largest gang raid in New York City history.

Rodriguez said the bug and rodent infestation at MCC was particularly horrifying. "The cells [are] very small and at nighttime you hear the mouses, see waterbugs in the shower," he told Gothamist. At least one former MCC prisoner said the mice would find their way into commissary boxes, and gnaw away at their food.

"You asked about the conditions," wrote Ricardo Stewart, another young man indicted as part of the Bronx gang raid. "We saw rats so big it seemed like they could only be in the sewer."

"But they wasn't in the streets or the sewers," Stewart added. "They were more like roommates."

In a special jail-within-a-jail called 10 South, alleged terrorists, mobsters and drug kingpins are subject to some of the most brutal conditions of solitary confinement in the nation. This extreme isolation, reserved for those charged with the most heinous crimes, was described as "a punitive measure that is unworthy of the United States as a civilized democracy," according to a former special monitor (https://ccrjustice.org/sites/default/files/assets/files/US%20experts%20submission%20to%20House%20of%20Lords%20extradition%20com on torture and punishment for the United Nations who investigated the case of one prisoner held there for three years.

Hundreds of people indicted in the Southern District of New York, as well as many individuals indicted in the Eastern District, based in Brooklyn's federal court across the river, end up at the jail awaiting trial for federal offenses including drug-related crimes, fraud, bribery, and sex offenses. Defendants facing terrorism charges have spent more than three

years at the facility, attorneys say. But even those facing less high-profile charges generally spend at least one or two years there before their criminal cases are resolved.



➡️ (Madeleine Crenshaw / Gothamist)

The MCC is one of two federal pretrial facilities in New York City; Metropolitan Detention Center, located on the waterfront in Sunset Park, Brooklyn, is the other.

They are part of a network of eleven such facilities run by the federal Board of Prisons, with nine spread across the continental U.S. and two others in Honolulu and Guaynabo, Puerto Rico. Many others awaiting trial on federal charges are detained in local jails.

This past February, a British appeals court blocked the extradition of alleged hacker Lauri Love to the United States, where he would have most likely been held at either MCC or the federal jail in Brooklyn, the Metropolitan Detention Center.

The court determined that Love, who has been diagnosed with Asperger Syndrome and depression, would be at high risk of suicide if he were extradited, in part because of the poor mental health care available at the facilities. MDC and MCC share a single psychiatrist and each have only a handful of psychologists on staff, according to court documents, raising questions (https://www.judiciary.gov.uk/wp-content/uploads/2018/02/lauri-love-v-usa.pdf) about whether the two facilities could adequately treat the nearly 500 inmates suffering from significant psychiatric illnesses.

New York attorney Joshua Dratel, who has represented clients at the notorious U.S. facility at Guantanamo, says in some regards, MCC—particularly 10 South — is worse. Dratel said he has represented nearly a dozen people who have served time on 10 South, and countless others in MCC. He describes the prison as "soul-negating." (http://www.latimes.com/nation/la-na-el-chapo-prosecution-20170119-story.html)

"It's physically, mentally, psychologically, emotionally—as unaccommodating to the idea of being human as any place I've been," Dratel told Gothamist.

Because MCC is a federal prison, the accountability mechanisms that have helped bring change to Rikers and, to a lesser degree, to New York's state prisons, cannot be applied. Conditions at MCC may only worsen in the age of Trump and Sessions, who have vowed to step up federal prosecutions (https://www.washingtonpost.com/world/national-security/sessions-issues-sweeping-new-criminal-charging-policy/2017/05/11/4752bd42-3697-11e7-b373-418f6849a004_story.html?utm_term=.871aad63716f%5C) while issuing their disdain (https://www.washingtonpost.com/news/post-nation/wp/2017/07/28/trump-tells-police-not-to-worry-about-injuring-suspects-during-arrests/?utm_term=.d9e7675e5d1a) for the rights of individuals in custody.

Jeanne Theoharis (http://www.brooklyn.cuny.edu/web/academics/faculty/faculty_profile.jsp?faculty=510) is a Distinguished Professor of Political Science at Brooklyn College who has written extensively about conditions at MCC.

"If I described these conditions to you—filthy, freezing, no natural light, isolation so extreme that you're punished for speaking through the walls, absurd rules like prisoners not getting to see the newspapers unless they're 30 days old, secrecy so deep that people are force-fed and lawyers can be punished for describing the conditions their clients are experiencing—you'd be forgiven for thinking that this was Iran or Russia," she said.

"But in fact this gulag exists right here in lower Manhattan."



Activists outside MCC in 2014 during a vigil organized by the No Separate Justice campaign (http://no-separate-justice.org) (Courtesy Toni Martinez)

When MCC first opened in 1975 as part of the broader renovation of New York's downtown civic center institutions, the move was praised as an important step towards prison reform. "[T]he new Metropolitan Correctional Center at Foley Square will bring to New York City its first piece of advanced - and humane - prison design" hailed The New York Times (https://www.nytimes.com/1975/07/26/archives/new-detention-center-at-foley-sq-is-hailed-as-advance-in-jail.html) in an article published just before the facility's completion.

The cells were designed to be single occupancy, with a total rated capacity for the facility of 474 inmates. But today the prison population at MCC is almost double that number—just shy of 800. Although the vast majority of individuals held at the facility are men, a few dozen women are also detained there.

On residential floors, the north and south wings each contain six groups of eight rooms, arranged in a two-tiers clustered around what the Times story termed "a double-height lounge space" designed to allow prisoners a sense of privacy while ensuring they could be observed from the common space.

But the "lounge" hardly resembles a college dorm suite, and by all accounts the overcrowding at MCC leaves little room for comfort. In the dormitory units on the 11th floor, dozens of men are expected to share one toilet, one sink, and one shower. According to one 2015 pro se lawsuit against the BOP filed by a prisoner named Levit Fernandini, when the toilets broke down men were given bags to defecate in, which were then not removed from the unit. Some men used the shower as a toilet.

In his lawsuit, Fernandini describes the presence of rat and mice droppings throughout the floor, and states that he has "found rats in his bed and seen rats crawling on inmates while they slept." When he was bitten by a rodent in January 2014, "the counselor for the unit was far from surprised, if anything in light of the infestation, the only surprise is that not every inmate is bitten," he wrote. Fernandini maintains that medical staff ignored his requests for treatment for several days, even after the bite became infected.

Medical care at MCC was also condemned by former prisoners and defense attorneys. "Unless it's life or death there's no immediate medical care," prisoner Marlon Roberts wrote Gothamist in a letter. "[I]t can take 2 months to answer your sick call request."

Andrew Laufer, a civil rights attorney who has filed several lawsuits challenging conditions at the BOP's two federal jails in New York City, recalled suing the BOP on behalf of a prisoner at MCC who had had his fingertip chopped off by a cell door. Rather than being placed in an ambulance, alleges Laufer, the man was chained at his ankles and wrists and brought to the hospital by correctional officers, bleeding profusely.

"I think it's a human rights violation," Laufer says of the medical care at MCC. "I think it's an Eighth Amendment violation—deliberate indifference."

There are also claims of extreme brutality by those who are held at the MCC. In September of 2017, Laufer filed a lawsuit alleging that after 35-year-old Roberto Grant was beaten to death at MCC in May 2015, the prison staff tried to cover it up, by telling his Grant's family he'd died of an overdose.

Gothamist reviewed a copy of the autopsy performed on Grant by the New York City Medical Examiner, which stated the father of two had suffered "blunt force injuries of the head, neck, torso, and extremities" and had no detectable traces of drugs in his system.

"You have someone who's beaten to death in MCC, and there are cameras everywhere," Laufer said. "There's not an inch of that facility that is not surveilled. No one cares."

The case is ongoing, and Laufer recently lost a motion to compel the government to release documents and other materials relevant to Grant's death. In court filings, the Department of Justice has denied wrongdoing.

The Bureau of Prisons did not respond to written inquiries about this incident or other allegations laid out in this story. A spokesperson for the BOP also declined to comment.

Several prisoners told Gothamist that they had been physically assaulted by staff. "I ended up catching a new charge in MCC for defending myself," said Fabian Morrison in a letter. "A crazy officer… attacked me and I defended myself, I'm the seventh inmate he put hands on. He is really fucked up in the head from the military."

In the past fifteen years, at least one correctional officer at MCC has been convicted of beating an inmate (http://www.nytimes.com/2005/05/03/nyregion/metro-briefing-new-york-manhattan-guard-admits-beating.html), and at least three guards have been found guilty of sexually assaulting prisoners (https://nypost.com/2016/05/04/ex-correction-officer-sentenced-for-raping-inmate/). In 2016, a former correctional officer at MCC was sentenced to seven years behind bars for raping a woman detained at the facility. "Even in my dreams, I am suffering flashbacks where I'm repeatedly raped," the woman told the court. And this past April, a guard was arrested (https://www.justice.gov/usao-sdny/pr/correctional-officer-arrested-taking-bribes-smuggle-contraband-metropolitan) for taking bribes to smuggle food, alcohol and cellphones into the facility.

When individuals held by the Bureau of Prisons are charged with disciplinary offenses, they wait in what is called the Segregated Housing Unit (SHU) for a Disciplinary Hearing Officer (DHO) to review the allegations. That process can take weeks, sometimes months, explained Sarah Kunstler, a New York City-based civil rights and criminal defense attorney who has extensive experience working with clients locked up at MCC. Prisoners don't get credit for that time towards their eventual punishment, creating a substantial incentive for them to just accept the charge.

Moreover, at the hearing, the DHO is often evaluating the prisoner's word against that of the officer, so challenging the allegations can feel pointless. "There's an impunity that the officers [at MCC] have to enforce discipline without any recourse, which allows a kind of arbitrary scheme," said Kunstler. "There's no test of the allegations, ever."

While the BOP does release broad statistics documenting violent incidents (https://www.bop.gov/about/statistics/statistics_prison_safety.jsp) across the federal prison system, it does not publicly release data on how rates of violence vary in individual facilities. However, a September 2012 Government Accountability Office report (https://www.gao.gov/products/GAO-12-743) on overcrowding in federal prisons noted that "more inmates are sharing cells and other living units, which brings together for longer periods of time inmates with a higher risk of violence and more potential victims."

Sally Butler, another attorney who has represented individuals locked up at MCC, says she encourages her clients do whatever they can to stay out of the crosshairs of correctional officers. "If the officer says jump, you jump," she said.

Butler noted that in state court, it makes no difference if a prisoner is charged with disciplinary infractions pretrial. But those tickets can make a huge difference as to what facility federal prisoners are sent to post-conviction.

The recreation yard at MCC is on the roof, and prisoners told Gothamist they are brought up for a brief period of exercise about once every three days. The rest of the time they're locked up in their units with little to do and no access to fresh air or sunlight.

Meanwhile, for prisoners held on 10 South, recreation is taken in what essentially amounts to a double cell, with a narrow, barred window, which looks out onto the street and lets in just a tiny bit of fresh air. They are never let outside.



(Madeleine Crenshaw / Gothamist)

In January 2017, after escaping from two Mexican high-security prisons, alleged Mexican drug kingpin "El Chapo," whose legal name is Joaquín Guzmán Loera, was extradited to the US (https://www.nytimes.com/2017/01/19/world/el-chapo-extradited-mexico.html) to face charges as the head of the Sinaloa cartel, and locked up in 10 South.

After months, Guzmán's sanity started to unravel, according to legal motions (https://www.documentcloud.org/documents/4172978-El-Chapo-Request-for-Mental-Evaluation.html#document/p1) filed by his attorneys over the spring and fall of 2017. Auditory hallucinations, depression, paranoia, the inability to remember people, places and events, the client "repeating himself often and sometimes forgetting what the discussion is about," were the symptoms described by his attorneys in a letter submitted to federal judge Brian Cogan in October 2017. "It is plain to the defense team that something is not right with Mr. Guzman."

But Guzman is just one of the most recent arrivals there. For the last two decades, Muslim men facing terrorism charges have been held on the unit for up to four years before the resolution of their criminal case.

Wali Khan Amin Shah said that he was moved onto 10 South right after it was built, in February 1997. The year prior, he and two codefendants were convicted of conspiring (http://articles.baltimoresun.com/1995-05-28/news/1995148047_1_bojinka-philippines-plot) to simultaneously blow up about a dozen planes over the Pacific. Shah was held in 10 South until September 1998, when he was transferred to a different part of the facility.

"I been around in this world, almost a decade in a war zone…seen my part of torture and bad prisons, I was in jungles and deserts," Shah wrote in an email from a federal prison in Indiana. "But the time I spent in 10 South took a large chunk of my soul, it is a very bleak place by design."

The lights in 10 South are left on 24 hours per day, according to several former residents. There is a window flap in each cell door, which only the guards can open. The cells are about 17 feet by 8 feet (https://www.nytimes.com/2017/05/04/nyregion/el-chapo-jail-restrictions-joaquin-guzman-loera.html), with two cameras fixed on each cell at every moment. Defense attorneys said there were only about six or seven cells on the unit.

Ali Yasin Ahmed was transferred to MCC in September 2014, and spent about a year there while he faced charges for providing material support to al-Shabaab. "It's another thing if someone is at a black site, or all the way in Gitmo," he told Gothamist, when asked what it was like to experience such austere isolation in downtown Manhattan. "But it is happening [right] next to you, and people don't realize it."

Like everyone else in the unit, while in 10 South Ahmed was placed under additional restrictions called Special Administrative Measures (SAMs). SAMs came into being in 1996, soon after the Oklahoma City bombing, and give the U.S. Attorney General sole discretion to limit a prisoner's communication if a determination is made that there is "substantial risk" the prisoner's contact with others could pose a security threat. (Guzmán is currently under SAMs).

During his time at MCC, Ahmed was only allowed to communicate with his attorneys and immediate family members, including his parents, siblings, wife and son. He was permitted one non-legal phone call each month along with one letter per week. But since the letters were first analyzed and copied by the FBI before being sent out, they often took one to two months to reach his loved ones. Communicating with the media was also strictly prohibited.

Former 10 South residents told us that prisoners are also not allowed to share books. If a guard brings a book out to the tier and one person reads it, the book must then be destroyed. SAMs generally prohibit prisoners from speaking to each other. At least one individual on 10 South lost his meager family phone privileges for months after greeting another detainee with the Arabic words "A-Salaam-Alaikum."

A September 2017 report (https://ccrjustice.org/sites/default/files/attach/2017/09/SAMs%20Report.Final_.pdf) published by Yale Law School's Allard K. Lowenstein's International Human Rights Clinic and the Center for Constitutional Rights raised concerns that Muslims were disproportionately targeted by the measures. "It appears that a major criterion for deciding whom to place under SAMs was not the prisoner's demonstrated capacity to communicate dangerous information, but rather the prisoner's religion."

In a 2011 letter (http://www.amnesty.org/en/documents/AMR51/029/2011/en/) to then-Attorney General Eric Holder, Amnesty International expressed concern that conditions on 10 South "fall short of international standards for humane treatment" and "appear incompatible with the presumption of innocence." The brutal nature of life on the unit, including its extreme conditions of isolation, were also documented in a 2014 Human Rights Watch report (https://www.hrw.org/report/2014/07/21/illusion-justice/human-rights-abuses-us-terrorism-prosecutions) about human rights abuses in US terrorism prosecutions.

During his six-year term as the UN Special Rapporteur for Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, which ended in October 2016, the BOP prevented Juan Méndez from speaking to suspected or convicted terrorists. Méndez was able to investigate the conditions at 10 South by interviewing family members of the incarcerated and contacting the State Department about the allegations. He ultimately determined (http://www.ohchr.org/Documents/HRBodies/HRCouncil/RegularSession/Session22/A.HRC.22.53.Add.4_Advance_version.pdf) that international human rights protections had been violated.

"Prolonged or indefinite solitary confinement—that is, solitary confinement that is prolonged beyond a few days—inflicts mental pain and suffering consistent with the definition of cruel, inhuman or degrading treatment," Méndez told Gothamist. "And as I said, in some cases is consistent with the definition of torture."



(Madeleine Crenshaw / Gothamist)

Public accountability has played a key role in Mayor de Blasio's plan to shutter Rikers Island over the next decade and create borough-based jails for the 10,000 people (https://www.nytimes.com/2017/04/05/nyregion/rikers-island-prison-new-york.html) held there. Even New York's often brutal upstate prisons have come under increased scrutiny (http://www.pulitzer.org/finalists/tom-robbins-marshall-project-and-michael-schwirtz-and-michael-winerip) by the press and grassroots activists in recent years. New York State legislators voted last spring to stop automatically (http://www.correctionalassociation.org/cmp/raise-the-age-home-page) prosecuting 16 and 17 year olds as adults (although Raise the Age has yet to be fully implemented (https://www.nynmedia.com/content/new-york-city-ready-implement-raise-age)), and a bill sharply curtailing the use (http://nycaic.org/legislation/) of solitary confinement has gained considerable ground (https://www.amny.com/opinion/columnists/mark-chiusano/how-a-proposal-dies-an-albany-story-1.17953591).

But when it comes to federal facilities like MCC, the primary responsibility for oversight falls to Congress, which has a long track record of dereliction, according to Amy Fettig, Deputy Director for the ACLU's National Prison Project.

"Congress has so much going on, that for them to oversee the Bureau of Prisons in a systematic and effective manner is almost impossible," Fettig said.

Her words were echoed by Phil Fornaci, the Director of the DC Prisoners' Project of the Washington Lawyers' Committee for Civil Rights and Urban Affairs, an organization which that has sued the BOP. "There's no oversight unless there's a [Congressional] hearing called," he said.

Fornaci says the Department of Justice has investigated prison conditions on the state and local level. When it comes to the BOP, however, not only does the DOJ not provide oversight, but they actually defend the BOP in litigation. Both he and Fettig agreed that there needs to be an agency established external to both Congress and DOJ if the BOP is to be properly monitored.

The Justice Committee within the House of Representatives—and more specifically the Subcommittee on Crime, Terrorism, Homeland Security and Investigations—holds jurisdiction over prison issues.

No members of the subcommittee (https://judiciary.house.gov/wp-content/uploads/2018/04/115th-Crime-Terrorism-Homeland-Security-and-Investigations-Subcommittee-Updated-4-27-18.pdf), which include 7 Democrats and 10 Republicans, responded to repeated requests for comment.

While there has been increasing advocacy for reforms to local jail and prison conditions, federal prisons remain a kind of political orphan, a situation compounded in the Trump era. "Rikers is a good example of the power of people in a democracy to hold their elected officials accountable," said Fettig, "but in the federal context—federal facilities house people from all around the country, and so there's no natural constituency in the state, city, county they're located in" to express concern about what's happening on the inside.

As a result, for people locked up at MCC, there's little hope that conditions will improve anytime soon.

That could be exactly the way jailers and prosecutors want it. Pre-trial detention, which often lasts years, can become not only unsafe, but coercive; as a result, individuals are pressured to provide information to prosecutors or accept plea deals in their desperation to be released, say former prisoners.

"You want to plead guilty and get out of this dump to a prison," said Nicky, the former inmate."The feds have a 98% conviction rate for a reason," Melvin Rodriguez, another former prisoner said. "They mentally break you."

Asked why he thought MCC has received so much less coverage than Rikers, Rodriguez replied, "I think [MCC] went unnoticed because people think just because it's the feds the conditions are better.There are certain things that go on in these places that the government covers so the public would never know."

*Listen to Aviva Stahl discuss MCC with WNYC.*

*Aviva Stahl is a Brooklyn-based journalist who primarily writes about prisons, especially the experiences of terrorism suspects and LGBTQ people behind bars. Follow her @stahlidarity (https://twitter.com/stahlidarity).*
*This story was reported with support from a grant by the CUNY Graduate School of Journalism Urban Reporting Project.*

## Sign Up for Daily NYC COVID-19 Coverage

```
your@email.com
```

By submitting your information, you're agreeing to receive communications from New York Public Radio in accordance with our Terms (https://www.wnyc.org/terms/).

**#10 SOUTH (/TAGS/10-SOUTH)**     **#EL CHAPO (/TAGS/EL-CHAPO)**

**#FEDERAL PRISONS (/TAGS/FEDERAL-PRISONS)**     **#MCC (/TAGS/MCC)**

**#METROPOLITAN CORRECTIONAL CENTER (/TAGS/METROPOLITAN-CORRECTIONAL-CENTER)**

**#PRISONS (/TAGS/PRISONS)**     **#ORIGINAL (/TAGS/ORIGINAL)**

**Do you know the scoop?**   Comment below or Send us a Tip (mailto:tips@gothamist.com)

**EXHIBIT C**

The Real Scandal of Epstein's Jail - The Atlantic

## IDEAS

# I Tried to Tell the World About Epstein's Jail. No One Wanted to Listen.

The Metropolitan Correctional Center has become notorious for decades of inhumane treatment.

**AUGUST 16, 2019**

**Jeanne Theoharis**
Distinguished Professor of Political Science at Brooklyn
College



JEENAH MOON / REUTERS

"URGENT," the emails were marked. Since Jeffrey Epstein's death at the Metropolitan Correctional Center, at least 20 reporters and shows from a broad cross section of the nation's major news outlets have reached out for context and comment about the federal penitentiary. I spent a decade trying to get media outlets to pay attention to the MCC, in Lower Manhattan, pleading with journalists for hours on the phone, over email, and in person to launch investigations of the jail. Over and over, for years, these media organizations did not follow up.

Suddenly, there was urgency to talk about the conditions at MCC. The jail now provided an intriguingly grimy backdrop to an already sordid story. The question is whether a sustained light will actually be shined on the conditions there, or whether the widespread fascination with MCC just becomes part of the spectacle.

I spent years, alongside lawyers, civil-rights leaders, concerned citizens, and family members of the incarcerated, taking part in vigils outside MCC to call attention to the inhumanity happening within its walls. Over and over, Department of Justice officials did nothing.

I went to court hearings and read court filings where people being held there attested to the inhumane conditions at MCC. Judges repeatedly refused to intervene. Nearly all were persuaded by the government's incessant claims that such conditions were justified by necessity and national security.

When the news broke about Epstein's death, Attorney General William Barr said he was shocked, calling for an investigation into the "serious irregularities" at MCC. Then on Tuesday, attempting to foist the blame on underlings, he reassigned the warden and put two guards on administrative leave.

This is willful shock, a deeply disingenuous surprise. The scandal is not a few rogue employees. The surprise is not that a man in federal custody who had shown suicidal tendencies managed to kill himself, nor, conversely, that a man could be killed behind bars. Barr and his DOJ (like previous DOJ officials) knew MCC was structured on "irregularities." So did U.S. Attorney Geoffrey Berman, and his predecessor, Preet Bharara. So did the judges of the Southern District of New York. The federal prison system is replete with "irregularities."

*[ Ken White: Thirty-two short stories about death in prison ]*

The real scandal is that the horrors of MCC have existed for decades, hidden in plain sight. The journalist Aviva Stahl published a searing exposé last year in *Gothamist* on conditions at MCC that documented the filth, rodents, overflowing sewage, deeply substandard medical care, wrenching isolation, and often indifferent —and at times, cruel—staff. From reports from lawyers and people imprisoned there, to the legal motions they have filed attempting to mitigate the inhumane conditions, to the hundreds of administrative remedies prisoners have filled out to request remediation (the first step prisoners must take to document problems with

their conditions), to the research of scholars and human-rights organizations, the abusive and corrupt conditions at MCC are well documented.

But a broad swath of public officials, from the attorney general on down, have chosen to countenance these conditions—and major news organizations haven't pressed the issue. As attention finally came to the despicable conditions at Rikers, few journalists looked across the river to MCC. Perhaps many labored under the misapprehension that while state and local (and private) jails might be mismanaged, abusive, and decrepit, the federal government runs a largely rights-respecting, clean operation. On top of this, the federal government—and the Bureau of Prisons in particular—makes it supremely difficult to investigate its prisons and jails, constantly throwing up justifications for denying access to the materials researchers want ("too burdensome," " national security," "privacy," "internal agency workings") and shrouding their practices in secrecy .

When news about MCC reaches the public, it typically comes in sensational stories about alleged mega-criminals such as Epstein, Sammy "The Bull" Gravano, or Joaquín "El Chapo" Guzman being held there—the crimes with which they are charged completely obscuring the jail itself. Moreover, while Americans broadly profess to oppose torture and cruelty, there's a tendency to look away from (or even take some glee in) the abusive conditions facing incarcerated people, particularly those who are publicly reviled.

I don't know why the overwhelming majority of journalists I talked with over the years never published serious investigations into MCC. Perhaps racialized assumptions played a role, separating victims of government abuse whose situations seemed urgent and worthy of months of painstaking research from those who are assumed to pose exceptional danger and thus perhaps deserve extreme measures. I was highlighting the inhumane conditions that largely unknown Muslims facing terrorism charges were experiencing at MCC. Now they are calling me about the über-rich, white Jeffrey Epstein.

Or perhaps it was the simple incongruity of the U.S. government running a high-rise dungeon in Manhattan's financial district, which featured conditions more commonly associated with the jails of foreign dictatorships. The descriptions of the dirty, decrepit, vermin-infested, hyper-isolating jail sitting in an elite zip code never seemed to stick.

The public attention to Epstein's suicide could change that—but only if the public resists the seductive scandal of it all and insists on seeing the structural problems that Epstein's time at MCC exposes.

First the basics: MCC is a pretrial federal facility run by the Bureau of Prisons, which is part of the Department of Justice and overseen by Congress, that holds people awaiting trial on charges in the Southern District of New York. This means that the people it holds are presumed innocent, and the law ostensibly prohibits their punishment before conviction. Opened in 1975, MCC today houses about 750 people in a facility built for fewer than 500. The conditions of their confinement vary widely, depending on where they are held, from the general population to the Special Housing Unit on the ninth floor to the fearsome 10 South wing. The SHU is for people the jail deems not safe in general population or who have allegedly broken jail rules; it features much more restrictive conditions, including solitary confinement. Epstein began in the general population, but was reportedly in the SHU on 9 South when he died.

[ *Read: How gangs took over prisons* ]

Lawyers and people held there awaiting trial regularly report appalling conditions. The temperature is not adequately regulated; the facility is often sweltering in the summer and so cold in the winter that prisoners report having trouble thinking and wearing layers of clothes to be able to sleep. A single psychiatrist serves both MCC and the Metropolitan Detention Center, another federal facility located in Brooklyn. People report being "treated" through the slat in their cell door. The facility is run-down, and the plumbing and elevators break often.

The most inhumane section of MCC is 10 South. The majority of the people held there over the past two decades have been Muslims facing terrorism charges; Guzman was held there as well. No outdoor recreation is allowed for 10 South prisoners, and windows are frosted so they are cut off from natural air and light. Besides the filth and vermin (even cell-cleaning supplies are often denied), one chief complaint is the lack of ventilation. On 10 South, prisoners are alone in their cells almost all of the time; they even shower there. Their sole escape is the hour when they are moved to a solitary cage for exercise. Sometimes, that recreation is denied, leaving prisoners to go days without leaving their cells. Cells are electronically

surveilled, so that every action—including using the toilet, showering, and talking —is monitored.

The defense attorney Robert Boyle has described the conditions at MCC as producing "a continuing deterioration in his [client's] health," and has noted reports from other lawyers with clients in similar conditions as "unable to make rational decisions in relation to the trial they face."

Nearly all of the people held on 10 South are under special administrative measures (SAMs) imposed by the attorney general, which restrict their communication with the outside world. On 10 South, you can be punished for yelling through the walls, for saying "As-Salaam Alaikum" to another prisoner, for making the call to prayer. While some talk between prisoners through walls or doors is not punished, there is always the threat of punishment, and sometimes guards exercise their prerogative to do so. Prisoners report going months without any talking—all before they have been convicted of any crime.

The SAMs also mean that anyone in contact with the prisoner, a list typically restricted to a lawyer and the prisoner's immediate family, is forbidden from communicating anything heard from the detainee. Put another way, lawyers or family members can be punished for disclosing any specifics of the conditions they hear the prisoner is facing.

*[ Read: The prison-industrial complex ]*

The British civil-rights lawyer Gareth Peirce, who has spent decades defending Irish and Muslim prisoners accused of terrorism, visited MCC after clients she was representing were extradited from the U.K. to the U.S. No stranger to prison abuses, Peirce was astonished by the conditions at MCC. "Diabolical" was how she described it.

According to studies, rates of suicide in jail are higher than in prison. And Epstein had reportedly already made one attempt to take his own life. While MCC is a special breed of hell, its approach to mental health is indicative of the BOP's broad, cruel indifference to mental-health care. Faced with a spate of suicides in 2012, for instance, the BOP director sent every prisoner in federal custody an absurd letter. "At times you may feel hopeless about your future, and your thought may turn to suicide," Director Charles E. Samuels wrote. "If you are unable to think of

solutions other than suicide, it is not because solutions do not exist; it is because you are currently unable to see them. Do not lose hope."

International organizations have condemned MCC's conditions. From 2007 to 2012, the European Court for Human Rights stayed the extradition of six U.K. subjects, concerned about inhumane prison conditions at U.S. federal facilities like MCC and the nation's supermax prison in Colorado, before finally capitulating to U.S. pressure in 2012. Amnesty International in 2014 decried the conditions at MCC, as has the former UN Special Rapporteur on Torture Juan Méndez; so, too, did an extensive 2014 report by Human Rights Watch and Columbia Law School's Human Rights Institute.

The question now is whether MCC will merely serve as the dirty backdrop to bizarre conspiracy theories and sordid accountings of Epstein's last hours, allowing the inhumanity to remain hidden in plain sight—or whether Epstein's death is going to finally force us to see what is going on in Lower Manhattan and insist that conditions at MCC finally be addressed.

*We want to hear what you think about this article. Submit a letter to the editor or write to letters@theatlantic.com.*

**EXHIBIT D**

# The Intercept_

# THE GUANTÁNAMO IN NEW YORK YOU'RE NOT ALLOWED TO KNOW ABOUT

Arun Kundnani

February 5 2016, 5:55 a.m.



Photo: Chris Hondros/Getty Images

BEFORE EVERY PHONE CALL that Fatuma Hashi has with her brother Mahdi, FBI agents come on the line to tell her what she is not permitted to talk about. "You're not allowed to speak about political issues. Or whatever's happening in the outside world. Or his case," she told *The Intercept*.

Mahdi Hashi, a young man of Somali origin who grew up in London, had never been to the United States before he was imprisoned in the 10-South wing of the Metropolitan Correctional Center in lower Manhattan in November 2012, when he was 23. For over three years, he has been confined to a small cell 23 hours a day without natural light, with an hour alone in a slightly larger indoor cage. He has had no physical contact with anyone. Apart from occasional visits by his lawyer, his human interaction has been limited to brief, transactional exchanges with guards and a monthly 30-minute phone call with his family.

Yet most of Hashi's time in solitary confinement occurred before he had been deemed guilty by the justice system. Prolonged isolation prior to or in the absence of trial, sensory deprivation, and a lack of independent monitoring are normally associated with the detention center at Guantánamo Bay and CIA black sites overseas. But the MCC's 10-South wing, which houses terrorism suspects, is no different in these respects. A former MCC prisoner and a psychologist specializing in trauma told *The Intercept* that the kind of extreme isolation imposed on defendants there can pressure them to accept a guilty plea, irrespective of actual guilt.

For Hashi, who worked at a community youth organization in London, everything changed when he was approached by MI5, the U.K.'s domestic intelligence agency. He was pressured to become an informant, according to accounts he gave to rights groups and local authorities, but refused, despite being warned that doing so would make his life difficult.

In 2012, while Hashi was visiting Somalia, the British government used special powers to strip him of his citizenship, leaving him stateless. He crossed into neighboring Djibouti to visit the British consulate there, he

claims, and appeal the decision. U.S. prosecu-
tors allege he was traveling to Yemen to join
al Qaeda.



Upon entering Djibouti, Hashi was arrested
by agents of the secret police and forced to
watch other prisoners gagged, blindfolded,
and beaten for hours, he alleges in case fil-
ings, with the complicity of FBI agents and
other unidentified Americans. According to
defense attorneys, Hashi was threatened
with physical abuse and rape if he did not
cooperate.

**Madhi Hashi** Photo: Facebook

In November 2012, he was transported to New York by the U.S. govern-
ment to face charges of supporting al Shabaab, the Somali terrorist or-
ganization. Prosecutors say he traveled to Somalia to attend a training
camp and fight with al Shabaab in Somalia's civil war. They accept that
Hashi poses no specific threat to any Americans and that he received
"harsh treatment" in Djibouti.

In May 2015, after two-and-a-half years of isolation, Hashi entered a
guilty plea of conspiring to provide material support to al Shabaab. Last
week, on January 29, he was sentenced to nine years in prison. He will
likely be incarcerated at a Supermax facility in Colorado or a high-secu-
rity "communications management unit" in Illinois or Indiana, all of
which mean ongoing solitary confinement.

Government prosecutors were seeking 15 years, but Judge John Gleeson
of the Eastern District of New York said the case was "complicated," and
accepted, in part, Hashi's position that he joined al Shabaab not to en-
gage in violent attacks but because he thought the group could restore
peace to war-torn Somalia. "I believe you believe this organization you

joined was dramatically different than what you thought or hoped it would be," Judge Gleeson said.

For Fatuma Hashi, the U.S. government's approach is hard to understand. "He was in his own country," she said. "It had nothing to do with the United States. Why does this country that has nothing to do with us have a say in his life?"

Fatuma cannot fully share with journalists what she knows about her brother's treatment in the MCC, a gray slab of a building that goes largely unnoticed by the office workers and tourists walking the streets near the Manhattan end of the Brooklyn bridge. Government restrictions — known as "special administrative measures," or SAMs — prevent prisoners, their attorneys, and family members from describing the conditions inside the high-security unit to the wider public, shrouding New York's little Guantánamo in secrecy.

# Psychological damage

In an account to be published in a new book on solitary confinement — titled *Hell Is a Very Small Place* — a Pakistani prisoner, Uzair Paracha, gives one of the most detailed illustrations yet of incarceration at the MCC. He was held in isolation there for two-and-a-half years after he was arrested in 2003 at age 23.

"The windows were huge but the glass was frosted so we had a lot of light but couldn't see a thing," he said. "It was a shade of white during the day, blue in the evening and early morning, black at night, and yellow when it snowed, as the snow reflected the streetlights. This was one way to estimate the time since they didn't allow any watches."

Video cameras constantly monitored the inside of Paracha's cell, including the shower and toilet areas. Lighting was completely controlled

from the outside, so that guards could deliberately leave the lights on at night to make sleeping harder. With their metallic walls, the cells were like ovens in the summer and freezing in the winter.

The medical effects of Paracha's imprisonment at the MCC were severe: a weakening of his eyesight, brought about by having his entire world just a few feet away; a deterioration of physical coordination that made walking on stairs harder; and breathing problems, especially while trying to sleep.

Dr. Kate Porterfield is a clinical psychologist at the Bellevue/New York University Program for Survivors of Torture. She has evaluated prisoners held at various sites in America's war on terror, including at Guantánamo. "With isolation, there's a severing of the orienting data of our lives — the stuff that makes us feel like we are on our feet," she told *The Intercept*. "This can result in paranoia, disorientation, feeling confused about whether your perceptions match reality, and not being sure who to trust."

"That's very dangerous to someone's psyche," she added. "It's not just about feeling depressed because you're in prison. The defendant ought to be oriented enough in the realities of their life and world that they can contribute to their own defense. A sense of paranoia and suspicion hampers the defendant in trying to connect with his or her legal team so that they can discuss and investigate the case."

If a person has experienced torture or coercive interrogation before being put in isolation, they are even more vulnerable, Dr. Porterfield said. "There is then a greater likelihood of psychological damage and even less chance for recovery in any real sense."

Indeed, virtually every academic study has concluded that solitary confinement has serious mental health consequences. These begin after 60

days and resemble the acute reactions suffered by torture and trauma victims.

The average length of time that defendants in federal terrorism prosecutions spend in solitary confinement prior to trial is 22 months, according to a 2014 report by Human Rights Watch and the Columbia Law School Human Rights Institute. Amnesty International has stated that pre-trial solitary confinement at the MCC amounts to "cruel, inhuman, or degrading treatment."

At least one prisoner who has been held at both the MCC and Guantánamo has described the Manhattan jail as harsher. Ahmed Khalfan Ghailani, who was convicted of involvement in the 1998 bombings of two U.S. embassies in East Africa, told his psychiatrist that Guantánamo is "more pleasant" and "more relaxed" than the isolation section at the MCC. At Guantánamo, he said, prisoners were not strip-searched and could associate together for recreational activities.

Joshua Dratel, an attorney who has represented clients at Guantánamo as well as the MCC, has also said the New York jail is worse.

# A tool for prosecutors

The one advantage that prisoners at the MCC are supposed to have over their counterparts in Guantánamo is that they are subject to trial in a criminal court rather than a military tribunal. However, the use of pre-trial solitary confinement has become, in effect if not intent, a tool for prosecutors to skew the judicial process in their favor.

Experts like Dr. Porterfield emphasize how extreme isolation can induce a desire to accept a plea. "We find again and again that isolation in prisons and the experience of maltreatment have a huge impact to the point where people do almost anything to get out of the coercive situa-

tion," she said. "If there's one thing the last 14 years have shown us, it's that abuse does not lead to good information gathering."

Laura Whitehorn was held for two months in pre-trial isolation at the MCC in 1986 on allegations of passport fraud, part of a larger conspiracy case for which she was later sentenced to 23 years in prison. "The sense of isolation, even after only two months, was so intense," she told *The Intercept*. "I think, at that point, one would be ready to do almost anything to be back in human contact."

"What was particularly horrible was the constant watching and monitoring," Whitehorn recalled. "It was like being played with by the guards, a form of psychological taunting. I felt at any moment I could have any part of my being or body violated with impunity."

Peter Quijano has represented several clients facing federal terrorism charges at the MCC, most of whom have been held in the jail's isolation unit.

"It just seems obvious that if anyone, regardless of the mental state they have going in, is housed and detained in such a manner for any period of time, it has to start having an effect on them," he said. "Anecdotally, we've seen increased deterioration over a period of time, especially in a pre-trial situation. It seems like a punishment and it affects their ability to assist in their defense."

Legal visits at the MCC are hampered by the extreme temperatures in the "claustrophobic" visiting room. "It's hard to stay there for much more than two hours," Quijano said. Attorney and client remain in separate cages during the visits, divided by a mesh grate that makes eye contact impossible.

# Severe restrictions on communication

Mahdi Hashi divides his monthly phone call between his parents and siblings in London and his wife in Somalia. His sister Fatuma described being "overwhelmed with emotions" on these calls after not hearing his voice for so long. "Every day I'm in pain thinking about his situation," she said. Fatuma, who is 24, has not seen Mahdi for six years.

She says the family has sent him books that took eight months to arrive. He never receives the letters and photographs they send. But there are strict limits on what Fatuma can say publicly about his imprisonment due to the SAMs applied in his case, which prevent Mahdi Hashi from any "oral, written, or recorded communications" with another prisoner; restrict his monthly phone calls to immediate family members; and prevent his family from sharing the content of the calls with anyone else.

Nor is Hashi allowed to communicate with journalists in any way, including via his attorney. SAMs, which are issued by the attorney general, are supposed to be specific to individual prisoners who pose "a substantial risk" of communicating messages that "could result in death or serious bodily injury to persons."

One consequence of the SAMs is that protests by prisoners remain hidden from public view. In September 2013, a blogger claimed that Hashi was on hunger strike to protest the conditions of his imprisonment. He was reportedly hospitalized with jaundice and close to liver failure. But the protest could not be verified or discussed in more detail.

"It's a last resort when you have so few resources to defend yourself," said Whitehorn, the former MCC prisoner, on reports of Hashi's hunger strike.

It has not been established whether Hashi was forced to undergo the brutal force-feeding practices used at Guantánamo, although force-feeding was applied in response to the protest of another MCC prisoner. Oussama Kassir, a Swede who went on hunger strike at

the MCC eight years ago, was subjected to "medical feeding," according to his attorney.

The people best placed to shed light on Hashi's hunger strike — his lawyers and his family — were restricted by the SAMs, and prosecutors and prison administrators declined to comment. According to the blogger, the FBI cut off a phone call from Hashi to his father — in which Hashi described the protest — after one minute, but the SAMs mean we cannot know if this actually happened.

Saghir Hussain, Hashi's British lawyer, has spoken with his client about the conditions of his incarceration, but is prevented from sharing such information. Hashi's American lawyer did not respond to multiple requests for comment.

Mahdi Hashi's prosecution provides one model of how the U.S. government deals with Western citizens accused of fighting with jihadi organizations overseas: coercive interrogation outside of U.S. jurisdiction, transportation to the isolation unit of a federal jail in New York, solitary confinement and restricted communication in conditions of secrecy until a guilty plea is made, then a lengthy incarceration at a high-security prison.

From one perspective, this approach seems to respect the rule of law. But look a little closer and it becomes clear that there are possibilities for abuse equivalent to or worse than at Guantánamo.

*Top photo: Razor wire hangs on a railing at the Metropolitan Correctional Center, June 9, 2009, in New York City.*

**WAIT! BEFORE YOU GO** on about your day, ask yourself: How likely is it that the story you just read would have been produced by a different news outlet if The Intercept hadn't done it?

As the pandemic worsens, it's not just the virus itself that threatens human life. The corruption, cronyism, and incompetence of those in power is adding fuel to the fire. The public deserves to know more than just case counts and death tolls, which is why our reporters are digging deep to break stories on corporate profiteering and political jockeying that undermine public health.

The kind of reporting we do is essential to democracy, but it is not easy, cheap, or profitable. The Intercept is an independent nonprofit news outlet. We don't have ads, so we depend on our members — 55,000 and counting — to help us hold the powerful to account. Joining is simple and doesn't need to cost a lot: You can become a sustaining member for as little as $3 or $5 a month. That's all it takes to support the journalism you rely on.

**Become a Member** →

## LATEST STORIES

### Despite the Hype, Gilead's Remdesivir Will Do Nothing to End the Coronavirus Pandemic

Sharon Lerner — 10:05 a.m.

A combination of generic drugs appears to be more effective in fighting the coronavirus than Gilead Sciences' remdesivir.

### Corporate Immunity, Mitch McConnell's Priority for Coronavirus