# *In The Matter Of:*

### *United States of America*
### *v.*
### *Michael John Avenatti*

---

### *Jay Manheimer VOL I*

### *June 17, 2020*

---



**BEN**HYATT
Certified Deposition Reporters

17835 Ventura Blvd. Suite 310 Encino, CA 91316
P 888.272.0022 F 818.343.7119
www.benhyatt.com

BH CDR Job # **1116107**
number of pages 121

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

_____

UNITED STATES OF AMERICA,                    )

                 Plaintiff,                    )

vs.                                          )SA CR No. 19-061-JVS

MICHAEL JOHN AVENATTI,                        )

                Defendants,                   )

_____

Deposition of JAY MANHEIMER, taken at 411 West

Fourth Street, Santa Ana, California,

commencing at 1:07 p.m., Wednesday, June 17,

2020, before Mary M. O'Brien, CSR No. 11986.

PAGES 1 - 121

Jay Manheimer - 6/17/2020

```
1    APPEARANCES OF COUNSEL:

2

3

4        FOR THE PLAINTIFF:

5            UNITED STATES ATTORNEY'S OFFICE

6            BY:  JULIAN ANDRE, ESQ.

7                 BRETT SAGEL, ESQ.

8            411 West Fourth Street

9            Suite 8000

10           Santa Ana, California  92701

11           (714) 338-3532

12           Julian.L.Andre@usdoj.gov

13           brett.sagel@usdoj.gov

14

15

16       FOR THE DEFENDANT, MICHAEL J. AVENATTI:

17           LAW OFFICES OF H. DEAN STEWARD

18           BY:  H. DEAN STEWARD, ESQ.

19           107 Avenida Miramar

20           Suite C

21           San Clemente, California 92672-6713

22           (949) 481-4900

23           deansteward7777@gmail.com

24

25
```

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

```
 1   APPEARANCES - (Continued)

 2

 3

 4        FOR THE WITNESS, JAY MANHEIMER:

 5            LAW OFFICES OF SHAWN R. PEREZ

 6            BY:  SHAWN R. PEREZ, ESQ.

 7            7121 West Craig Road

 8            Suite 113-38

 9            Las Vegas, Nevada 89129

10            (949) 492-9545

11            shawn711@msn.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

```
 1                     JAY MANHEIMER,

 2  having been first duly sworn, testified as follows:

 3

 4                     EXAMINATION

 5

 6  BY MR. ANDRE:

 7      Q.   Good afternoon.  My name is Julian Andre.  I'm

 8  an Assistant United States Attorney, and this is my

 9  colleague, AUSA Brett Sagel.

10           Please state your full name for the record.

11      A.   Jay Manheimer.

12      Q.   Mr. Manheimer, you're represented by counsel

13  here today, correct?

14      A.   Correct.

15      Q.   Have you had a chance to speak with your

16  counsel prior to today's deposition?

17      A.   Yes.

18      Q.   Do you feel that you have had a sufficient

19  opportunity to consult with your attorney prior to

20  today's deposition?

21      A.   Yes.

22      Q.   If, at any point, you need to take a break to

23  talk to your lawyer or any other reason, please let us

24  know.

25           As a witness, you have the Fifth Amendment
```

1   right to refuse to answer any question asked of you if

2   you honestly and truly believe the answer may tend to

3   incriminate you.  An answer may tend to incriminate you

4   if it can provide or lead to information concerning a

5   crime for which you can be prosecuted.

6           Do you understand you have that right?

7      A.   Yes.

8      Q.   And you understand everything you say here is

9   being recorded?

10     A.   Yes.

11     Q.   So you're testifying here today under oath.

12          Do you understand that you could be prosecuted

13  for perjury or making false statements or obstruction of

14  justice if you fail to testify truthfully here today?

15     A.   Yes.

16     Q.   As I mentioned, this is being recorded by a

17  court reporter and transcribed.  As we discussed with

18  your counsel, we'll give you an opportunity to review

19  that transcript after it's prepared to review it.

20          Since this is being transcribed by a court

21  reporter, you must answer the questions audibly with

22  words rather than gestures nods or other nonverbal

23  communication.

24          Do you understand that?

25     A.   Yes.

```
 1       Q.   It's also important that you wait until I
 2  finish my question before you answer my questions.
 3  Otherwise, it's going to be difficult for the court
 4  reporter to prepare an accurate transcript.
 5            Do you understand that?
 6       A.   Yes.
 7       Q.   Now, Mr. Steward, or your lawyer, Mr. Perez,
 8  may object to certain questions or answers.  These
 9  objections are for the Court to consider at a later time.
10  Unless your lawyer instructs you not to answer the
11  question, you should go ahead and answer the question
12  after the objection.
13            Do you understand?
14       A.   Yes.
15       Q.   Now if, at any point, I ask you a question that
16  you think is unclear or you don't understand, will you
17  please let me know?
18       A.   Yes.
19       Q.   If you answer the question, I will assume you
20  understood it, so if there's something that's unclear,
21  which may very well happen, please do let me know.
22       A.   Okay.
23       Q.   Also, when answering my questions, you
24  shouldn't guess or speculate.  It is entirely appropriate
25  for you to provide an estimate based on your best
```

Jay Manheimer - 6/17/2020

```
1    recollection.

2            Do you understand that?

3        A.   Yes.

4        Q.   Are you feeling mentally and physically capable

5    of proceeding here today?

6        A.   Yes.

7        Q.   Is there anything that would prevent you from

8    testifying honestly and thoroughly here today?

9        A.   No.

10       Q.   You've agreed to serve as the third-party

11   custodian for Defendant Michael John Avenatti; is that

12   correct?

13       A.   Correct.

14       MR. STEWARD:  One other thing, I think Judge Selna

15   would want me to indicate that my client is not here.  We

16   have a waiver on file of his presence, but he is

17   listening via the system that everyone else is listening

18   to.

19            Sorry.  Go ahead.

20       MR. ANDRE:  Mr Steward, thank you.

21            And will you let us know if, for some reason,

22   your client has issues?

23       MR. STEWARD:  I will.

24   BY MR. ANDRE:

25       Q.   You agreed to be the third-party custodian for
```

**Ben Hyatt Certified Deposition Reporters**
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

1    Defendant Michael Avenatti?

2         A.    Correct.

3         Q.    Did anyone offer to compensate you in any way

4    for agreeing to serve as defendant's third-party

5    custodian?

6         A.    No.

7         Q.    Have you received any compensation for agreeing

8    to serve as defendant's third-party custodian?

9         A.    No.

10        Q.    Did you expect to receive any compensation for

11   agreeing to serve as defendant's third-party custodian?

12        A.    No.

13        Q.    Have you received or do you expect to receive

14   any sort of benefit for serving as defendant's

15   third-party custodian?

16        A.    I mean, we've had some supporters send gifts,

17   but nothing...

18        Q.    What kind of supporters?

19        A.    Supporters of Mr. Avenatti.

20        Q.    What type of gifts?

21        A.    Food, supplies.

22        Q.    About how many gifts have you or Mr. Avenatti

23   received?

24        A.    I can't speculate.  I don't know.

25        MR. STEWARD:  I'm going to object as being compound,

**Jay Manheimer - 6/17/2020**

1    you and Mr. Avenatti.

2              You can answer.

3         THE WITNESS:  What am I answering?

4    BY MR. ANDRE:

5         Q.   I'll rephrase.

6              Let me ask this:  Have the gifts been directed

7    to you personally or to Mr. Avenatti?

8         A.   They were sent to my home.

9         Q.   Were they addressed to you or to Mr. Avenatti?

10        A.   I believe to Mr. Avenatti.

11        Q.   How many gifts has Mr. Avenatti received from

12   supporters since he's been in your custody?

13        A.   I don't know.  Some food and supplies.  I don't

14   know how to put a number on it.

15        Q.   What types of supplies?

16        A.   You know, cleaning supplies.  Home stuff.

17        MR. ANDRE:  Now, I'm going to draw your attention to

18   what is Exhibit 1 in the binder in front of you.

19              (Exhibit 1 was marked for

20              identification and is annexed

21              hereto.)

22   BY MR. ANDRE:

23        Q.   Are you familiar with this document?

24        A.   Yes.

25        Q.   And so this is called, it's Form CR-31,

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

1    Affidavit of Third-Party Custodian, correct?

2         A.    I guess.  I don't see the number.

3         Q.    It's an Affidavit of Third-Party Custodian.

4         A.    Yes, I see that.

5         Q.    Is that your signature?

6         A.    Yes.

7         Q.    As of the date this document was signed, it

8    appears to be April 13, 2020, did you understand as the

9    defendant third-party custodian, you had an obligation to

10   supervise the defendant?

11        A.    Yes.

12        Q.    Did you understand the obligation to notify

13   Pre-Trial Services immediately if defendant violated a

14   condition of his release?

15        A.    Yes.

16        Q.    And did you understand that you could be

17   prosecuted for Contempt of Court if you failed to

18   discharge your obligations as defendant's custodian?

19        A.    Yes.

20        MR. ANDRE:  I now would like to draw your attention

21   to Exhibit 2 which is an order setting forth the

22   conditions of defendant's temporary release.

23                  (Exhibit 2 was marked for

24                  identification and is annexed

25                  hereto.)

**Jay Manheimer - 6/17/2020**

1   BY MR. ANDRE:

2        Q.   Have you seen this document before?

3             And please, with anything I show you, please

4   take however much time as you need to look through it.

5        A.   I don't recall seeing this document.

6        MR. ANDRE:  If you could now, let me have you look

7   at Exhibit 3.

8                  (Exhibit 3 was marked for

9                  identification and is annexed

10                 hereto.)

11  BY MR. ANDRE:

12       Q.   Are you familiar with Exhibit 3 at all?

13       A.   I don't recall seeing it.

14       Q.   Do you recall reviewing at any point since you

15  agreed to be the defendant's custodian, a document

16  setting forth the various conditions of his temporary

17  release?

18       A.   Yes.

19       Q.   And so you've had a chance to look through

20  Exhibit 2 and 3.

21            Both of those are those documents, correct?

22       A.   Yes.  I don't recall seeing those specific

23  documents, but...

24       Q.   What document do you recall seeing that lay out

25  his conditions of release?

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

Jay Manheimer - 6/17/2020

```
1        A.   It's more similar to Exhibit 1.  It was a -- I
2   recall one page that I signed.
3        Q.   As you'll see, the actual conditions of the
4   defendant's release are pretty extensive.
5             You agree with that?
6             I have laid out as Exhibit 2 and Exhibit 3.
7   You can focus on Exhibit 2.  It's a seven-page document
8   with 26 conditions, paragraphs.
9        A.   Sorry, what was the question?
10       Q.   So looking at Exhibit 2, there's 26 paragraphs
11  in the seven-page document setting the conditions of his
12  release.
13            Do you see that?
14       A.   Yes, I see.
15       Q.   Were you ever provided a document that laid out
16  all of these conditions?
17       A.   The conditions look familiar.  Whether it was
18  this document, I can't say.
19       Q.   And you've had a chance now to look through
20  Exhibit 2 fairly thoroughly?
21       A.   Yes.
22       Q.   So the conditions themselves, those look
23  familiar to you, but the document itself does not.
24            Is that fair?
25       A.   Correct.
```

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

**Jay Manheimer - 6/17/2020**

1   Q.   Do you recall anyone providing you with a copy

2   of defendant's conditions of release for you to review?

3   A.   Yes, I had signed a document that had

4   conditions of his release.

5   Q.   Who provided you that?

6   A.   Mr. Steward.

7   Q.   Did the defendant ever provide you with a copy

8   of his conditions of release?

9   A.   Not that I recall.

10   Q.   Did you discuss the defendant's conditions of

11   release with Mr. Avenatti?

12   A.   Yeah.

13   Q.   What did you discuss?

14   A.   I don't know if we were specific, but we agreed

15   that the bail conditions were to be followed, and that

16   was the extent of it, I believe.

17   Q.   How many conversations did you have with the

18   defendant regarding his bail conditions?

19   A.   I don't recall.

20   Q.   Do you believe you discussed it once or more

21   than once?

22   A.   Perhaps more than once.

23   Q.   Did you discuss the defendant's bail conditions

24   with Mr. Steward?

25   A.   I don't know if we discussed them, but he sent

1    that document that I signed.

2        Q.   So beyond the document that you signed, do you

3    recall any specific discussions with Mr. Steward in which

4    he explained to you what the various conditions were?

5        A.   Yeah, I believe there were preliminary phone

6    calls before Mr. Avenatti arrived.

7        Q.   What do you remember about those phone calls?

8        A.   I remember before he arrived, it was more about

9    the negotiating whether he would be released or not, what

10   the conditions would be if he were released.

11       Q.   So before we get into the specifics of a couple

12   of conditions here, since Mr. Avenatti was placed into

13   your custody, what did you understand his conditions of

14   release to be?

15       A.   I mean, basically no Internet access.  That was

16   the biggest.  I mean, that seemed to cover most of it.

17       Q.   So do you still have Exhibit 2 in front of you?

18   If you could turn to Page 4, Paragraph 12 please.

19            This provision states, in part, "The defendant

20   shall not possess, use or access any digital devices that

21   offer or allow Internet access."

22            Were you familiar with that specific language

23   of his release condition?

24       A.   Yeah, vaguely.

25       Q.   What did you understand the restrictions on

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Jay Manheimer - 6/17/2020

1  defendant's ability to access the Internet to be?

2      A.   No access.

3      Q.   Now, here it mentioned not being able to

4  possess, use or access any device that could connect to

5  the Internet.

6           Did you have an understanding that he wasn't

7  allowed to use a computer that was capable of connecting

8  to the Internet?

9      A.   I mean, I went along with the no access.

10     Q.   No access to a computer that could connect to

11  the Internet or no Internet access?

12     A.   No access to the Internet.

13     Q.   No access to the Internet?

14          Okay.  So did you believe defendant could use a

15  computer as long as it was not connected to the Internet?

16     A.   Yes, as long as there was no Internet access.

17     Q.   What was the basis for that understanding you

18  just described; that he could use a computer as long as

19  it wasn't connected to the Internet?

20     A.   I mean, the idea of no Internet access was the

21  condition.

22     Q.   Did the defendant ever tell you that he could

23  use a computer as long as it's not actually connected to

24  the Internet?

25     A.   No.

**Ben Hyatt Certified Deposition Reporters**
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

**Jay Manheimer - 6/17/2020**

1     Q.   But that was your understanding?

2     A.   Yeah, as long as there was no Internet access,

3     that was my understanding.

4     Q.   Did you ever have a discussion with Mr. Steward

5     regarding this particular provision?

6     A.   I believe we discussed it preliminarily.  I

7     don't remember the conversation.

8     Q.   Do you recall Mr. Steward telling you as long

9     as the computer wasn't connected to the Internet that he

10    could use the computer?

11    A.   I don't recall that.

12    Q.   Did you ever have a discussion with Pre-Trial

13    Services?

14    A.   I may have.

15    MR. SAGEL:  Do you understand that Pre-Trial

16    Services are the individuals who are supervising Mr.

17    Avenatti?

18    THE WITNESS:  Right.

19    BY MR. ANDRE:

20    Q.   So staying on Paragraph 12, what steps did you

21    personally take to ensure that defendant complied with

22    what you understood this condition to be?

23    A.   I'm sorry.  Can you repeat the question?

24    Q.   I'm going to try to paraphrase it.

25         My understanding, based on what you testified

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

**Jay Manheimer - 6/17/2020**

1    to, is that you interpreted Paragraph 12 to be no

2    Internet access, correct?

3        A.   Correct.

4        Q.   What steps did you take to ensure the defendant

5    could not access the Internet while in your custody?

6        A.   My devices and passwords, he doesn't know

7    about, and everything goes through me.  I print, the

8    e-mails are directed to me, so I print and read

9    e-mails, I take the dictation, I reply to e-mails.  I

10   basically am his paralegal, I guess in a way, so I do all

11   the work.  I do searches for him, I do -- any of the

12   Internet access is through me.

13       Q.   You mentioned you're doing Internet searches

14   for him.

15            What Internet searches are you doing for him?

16       A.   I don't know any.  I can't think of any

17   specific.

18       Q.   What types of things are you searching for?

19       A.   It usually involves his cases, to some degree.

20   Maybe something for Mr. Steward.

21       MR. ANDRE:  So this is on a conference call line so

22   people can listen in, so if anyone is listening in, I

23   request you please mute your phone so that we can

24   continue on.

25   //

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

**Jay Manheimer - 6/17/2020**

```
 1   BY MR. ANDRE:

 2        Q.   So you mentioned Internet research for the

 3   defendant's cases.

 4             Are you using legal databases for him?

 5        A.   Not that I'm aware of.

 6        MR. SAGEL:  What are you searching?  You mentioned

 7   you were doing Internet searches.

 8             Where were you searching?

 9        THE WITNESS:  I'm sorry.  I don't know what "where"

10   means.

11        MR. SAGEL:  What websites are you searching?

12        THE WITNESS:  Oh.  Like I said, I don't know every

13   search.  While I'm searching for him, I have my own life

14   and I'm doing my own things.  I don't know, you know.

15   BY MR. ANDRE:

16        Q.   How often are you conducting Internet searches

17   for the defendant?

18        A.   It's hard to say.  I don't know.  Like I said,

19   I don't know how many I've done for him or when.  All I

20   know is, any time he needs something searched for, I do

21   it.

22        Q.   So he's been -- defendant has been in your

23   custody for about a month and a half to two months,

24   correct?

25        A.   Yes.  April 24th, actually.
```

**Jay Manheimer - 6/17/2020**

1    Q.   Has it been a frequent occurrence where you run
2  Internet searches for him or is it rare?

3    A.   I didn't really keep track.  Sometimes maybe
4  more than others.

5    Q.   Would you describe it as a daily occurrence?
6  Multiple times a day?  Your best estimate.

7    A.   Some days, it could have been multiple times,
8  sometimes none.

9    MR. SAGEL:  And you didn't view Paragraph 12 that
10  disallowed him access to the Internet, preventing him
11  from using you to give him the same access?

12    THE WITNESS:  No, I did not.

13  BY MR. ANDRE:

14    Q.   How many rooms are there in the residence?

15    A.   How many?

16    Q.   Bedrooms.

17    A.   Two.

18    Q.   Is there also a separate living room?

19    A.   Yes.

20    Q.   Any other rooms?

21    A.   Kitchen, bathroom.

22    Q.   How many bathrooms?

23    A.   One.

24    Q.   Where does the defendant physically stay in
25  your residence?

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

1       A.   In the second bedroom.

2       Q.   And is that a private room?

3       A.   Yes.

4       Q.   Do you have access to that room?

5       A.   No.

6       Q.   How often do you go in defendant's room?

7       A.   Rarely.

8       MR. SAGEL:  We're only talking about from April 24th

9    to the present.

10      THE WITNESS:  Yes.  Rarely.

11   BY MR. ANDRE:

12      Q.   Where in your residence does the defendant

13   spend most of his time when he's awake?

14      A.   Between the living room and his bedroom.

15      Q.   To the extent defendant were to do any sort of

16   work, reading, anything, where would he do that while in

17   your residence?

18      A.   I'm sorry?

19      Q.   Where typically would he -- if he were doing

20   any sort of -- without getting specific of what he's

21   doing, if he were doing work or reviewing something for

22   one of his cases, where would he physically be in your

23   residence?

24      A.    It varies.  Sometimes his bedroom, sometimes in

25   the living room, kitchen area.

**Ben Hyatt Certified Deposition Reporters**
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

**Jay Manheimer - 6/17/2020**

```
1          Q.   The reason I'm asking this obviously, so some
2    people may, they like to camp out at a kitchen table, and
3    that's where they're going to do stuff, or they are going
4    to do it at a kitchen table or maybe they do it on the
5    couch or do it in his room.
6               Is there a typical place where if he wanted to
7    do something, he would sit down and do it?
8          A.   Maybe the kitchen counter.
9          Q.   So the first bedroom, that's your bedroom in
10   the residence?
11         A.   I'm sorry?
12         Q.   You have obviously the main bedroom in your
13   residence?
14         A.   Right.
15         Q.   When you're home and awake, where do you spend
16   most of your time?
17         A.   Same.  It's a pretty small place.  Bedroom,
18   living room, outside.
19         Q.   Since April 24, 2020 when defendant came to
20   live with you, has anyone else lived at your residence or
21   stayed at your residence?
22         A.   Yeah.  His girlfriend.
23         Q.   Who would that be?
24         MR. STEWARD:  Objection; relevance.  Why don't you
25   not answer that.
```

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

1        MR. ANDRE:  Mr. Steward, with all do respect, you're

2   not the witness' counsel.

3        MR. STEWARD:  But as we talked about before, this is

4   kind of a hybrid of a deposition.

5        MR. SAGEL:  The relevance is that someone else could

6   bring anything into this department, so it's highly

7   relevant.  If someone else is staying there with

8   Mr. Avenatti, I don't see relevance being the

9   objection.

10        MR. STEWARD:  The objection is the privacy aspect of

11   it, and I would maintain that objection.

12           I agree with you, I don't think I can instruct

13   Mr. Manheimer what to do, but I can make the objections,

14   and I have.

15        MR. SAGEL:  Is your concern saying her name out

16   loud?

17        MR. STEWARD:  That's my concern.

18        MR. SAGEL:  Okay.

19        MR. ANDRE:  Would you feel more comfortable if he

20   wrote it down on a piece of paper?

21        MR. STEWARD:  Is it going to become part of the open

22   record?  If so, then yes.  We would be willing to file

23   that name under seal to the judge.

24        MR. ANDRE:  This is what I propose.  We can have the

25   witness write it down.  We'll agree that the exhibit, we

1   won't publicly file just as we wouldn't with his phone

2   numbers, unless until any objections with respect to

3   privacy is resolved by the Court.

4       MR. STEWARD:  As long as Judge Selna is in the

5   middle of that, I can abide by that.  Thank you.

6       MR. ANDRE:  Would you mind writing Mr. Avenatti's

7   girlfriend's name on a piece of paper in front of you.

8       MR. SAGEL:  It can be phonetic.  We won't hold you

9   to the spelling.

10      MR. ANDRE:  I'm just going to go ahead and mark this

11  as Exhibit 19.

12              (Exhibit 19 was marked for

13          identification and is annexed

14          hereto.)

15  BY MR. ANDRE:

16      Q.   From here on out, I'm going to refer to the

17  individual you identified on the paper as the defendant's

18  girlfriend.

19          Is that fair?

20      A.   Okay.

21      Q.   How often has defendant's girlfriend come to

22  stay with you?

23      A.   Twice.

24      MR. SAGEL:  How long each time?

25      THE WITNESS:  A few days, I think.

1  BY MR. ANDRE:

2     Q.   Do you know whether she had with her any

3  Internet accessible devices?

4     A.   I don't recall.  She had a smart phone, but I

5  don't remember anything else.

6     Q.   Did you see her with a tablet or computer?

7     A.   No.

8     Q.   Did defendant's girlfriend spend time alone

9  with defendant during those two visits?

10    A.   Yes.

11    Q.   So would you know what they were doing while

12 they were alone?

13    MR. STEWARD:  I have to object, but I don't know

14 what the grounds would be.

15    MR. SAGEL:  Whether or not Mr. Avenatti had access

16 to the Internet.

17    THE WITNESS:  I'm sorry.  So what is the question?

18 BY MR. ANDRE:

19    Q.   Let me ask it this way, more direct.  Do you

20 have any way to know whether the defendant accessed the

21 Internet or used an Internet capable device while he was

22 alone with his girlfriend inside your residence?

23    A.   No.

24    Q.   Did you have any conversations with defendant's

25 girlfriend regarding defendants conditions of release

```
1    when she came to stay with you and defendant in your
2    residence?
3         A.   I believe those conditions were known.
4         Q.   What makes you say you believe the conditions
5    were known?
6         A.   We weren't hiding it.  We wanted to keep him
7    free and clear of any violations, so...
8         Q.   Did you have a conversation with his girlfriend
9    in which you told her that Michael can't use the
10   Internet?
11        A.   I don't remember a specific conversation, but
12   I'm pretty sure she was aware of that.
13        Q.   Other than defendant's girlfriend, has anyone
14   else come to stay with you and Mr. Avenatti at your
15   residence since he's been in your custody?
16        A.   Not that I recall.
17        Q.   That would include obviously any guests you may
18   have had.
19        MR. PEREZ:  If you know.
20   BY MR. ANDRE:
21        Q.   So I'm not sure if there was an answer.
22             Do you recall anyone other than defendant's
23   girlfriend staying in your residence since the defendant
24   has been in your custody?
25        MR. STEWARD:  Object to the word "staying".
```

```
 1        MR. ANDRE:  Stay overnight.

 2        THE WITNESS:  I had one friend one night.

 3        MR. SAGEL:  Did Mr. Avenatti have any visitors who

 4   did not stay overnight?

 5        MR. STEWARD:  I have to object, Mr. Sagel, to you

 6   questioning.  I think if we were in a courtroom, Judge

 7   Selna would require that only one person question.

 8   Obviously you can talk to Mr. Julian right there.

 9        MR. SAGEL:  I don't mind doing that.  I'm just

10   trying to short-circuit it.

11        MR. STEWARD:  I appreciate that, but...

12        MR. ANDRE:  Fair.

13   BY MR. ANDRE:

14        Q.   Have you had -- so we were just asking about

15   individuals that may have stayed overnight in your

16   residence.

17             Has the defendant had any other visitors during

18   the time he's been in your custody?

19        A.   A bunch of attorneys.

20        Q.   Other than attorneys, who else?

21        A.   That's all I recall.

22        Q.   Have any of his family members come to visit

23   him?

24        A.   Right.  His daughters have come to visit for

25   dinner.
```

```
1        Q.   How many times, approximately, has his
2   daughters come to see him?
3        A.   A handful.  I don't know.  I don't remember the
4   exact number.
5        Q.   And during those visits, would they be alone
6   with the defendant?
7        A.   Can you clarify?
8        Q.   Were you physically present during all of the
9   defendant's visits with his daughters?
10       A.   Yes.
11       Q.   So he would not have been alone with them while
12  they were visiting?
13       A.   They may go to the bathroom or step out.
14       Q.   So let me ask is another way.  Do you know
15  whether during the times his daughters visited him, they
16  may have provided him with access to the Internet?
17       A.   I'm sorry.  What did you say?
18       Q.   Do you know if his daughters may have provided
19  him with access to the Internet while they were visiting
20  him, in your best estimate?
21       A.   I do not know that.
22       Q.   How often during -- siding the question during
23  the current circumstances.  How often do you leave your
24  residence focusing on the last six, seven weeks since
25  defendant has come to stay in your custody?
```

Page 27

Jay Manheimer - 6/17/2020

```
 1        A.   I mean, not very often.

 2        Q.   What do leave your residence for?

 3        A.   To go for a run, go surf, go to the store.

 4   That's about it.

 5        Q.   Are you currently working?

 6        A.   No.

 7        Q.   Since defendant has been in your custody, have

 8   you been employed in any way?

 9        A.   No.

10        Q.   So then you're not leaving to go to work?

11        A.   Correct.

12        Q.   How often would you say defendant is alone in

13   your residence?

14        A.   Could you be more specific?

15        Q.   When you leave -- you said you left the house

16   to go running, surfing.

17             How often would defendant be left alone in your

18   residence since he's been in your custody, your best

19   estimate?

20        A.   I'm sorry.  You mean total time or when I go

21   surf?

22        Q.   How many days a week do you go running?

23        A.   Maybe twice.

24        Q.   How many days a week do you go surfing?

25        A.   It depends on the waves.  I would go every day,
```

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

Jay Manheimer - 6/17/2020

```
1   but yeah, it's really sporadic.  Maybe once, twice
2   lately.
3        Q.   So that would be about three or four times a
4   week that you would leave defendant alone in your
5   residence to go running or surfing.
6             Is that fair?
7        A.   That's fair.
8        Q.   Do you leave the house to go get groceries or
9   things of that nature?
10       A.   Yes.
11       Q.   How often would you go get groceries?
12       A.   Once a week, once every ten days, something
13   like that.
14       Q.   So other than those, let's say four or five
15  times a week, any other times when defendant would be
16  alone in your residence?
17       A.   Maybe if I go see a friend.  You know, the
18  majority of the time is at home, like everybody else.
19       Q.   Has there been any nights since defendant has
20  been in your custody where you didn't stay in your
21  apartment?
22       A.   Not that I recall.
23       Q.   So what would you consider -- what would you
24  estimate the longest amount of time, continuous time, the
25  defendant has been alone in your residence?
```

**Ben Hyatt Certified Deposition Reporters**
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

**Jay Manheimer - 6/17/2020**

```
 1        A.   Maybe six, seven hours.

 2        Q.   And how often?  Is that a rare occurrence or

 3   frequent occurrence to be alone for six or seven hours in

 4   your residence?

 5        A.   Rare.

 6        Q.   Is defendant paying any rent to stay with

 7   you?

 8        A.   No.

 9        Q.   Is anyone else paying you rent for defendant or

10   on defendant's behalf?

11        A.   No.

12        Q.   Is defendant paying for any other living

13   expenses while staying with you?

14        A.   No.

15        Q.   Is anyone else paying for any of his living

16   expenses while he's staying with you?

17        A.   No.

18        Q.   Who pays for defendant's food?

19        A.   I pay for it.  He's gotten some donations from

20   Mr. Steward.

21        Q.   You said he's gotten donations through

22   Mr. Steward?

23        A.   Yeah.

24        Q.   Can you explain what you mean by that?

25        MR. STEWARD:  Objection to the relevance of this
```

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

1    line of questioning.

2         MR. ANDRE:  There are conditions that relate to

3    finances, Mr. Steward.

4         MR. STEWARD:  Withdraw my objection.

5    BY MR. ANDRE:

6         Q.   Can you explain what you mean by he's received

7    donations through Mr. Steward?

8         A.   I believe some supporters have donated for

9    Mr. Avenatti.

10        Q.   Is this donated money?

11        A.   Yes, through Mr. Steward.

12        Q.   How does the money get to you?

13        A.   Through Mr. Steward.

14        Q.   Do you know how people would know to make

15   donations through Mr. Steward?

16        A.   I don't.

17        Q.   Has defendant told you or explained to you how

18   people are donating money to him through Mr. Steward?

19        A.   I'm sorry.  Can you repeat that.

20        Q.   Has the defendant explained to you how it is

21   that people are donating money to him through his

22   attorney, Mr. Steward?

23        A.   No.

24        Q.   Have you asked?

25        A.   No.  Mr. Steward, it went through him, so...

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

1        Q.   Approximately how much money have you received

2   from Mr. Steward on defendant's behalf?

3        A.   Maybe 500.  I don't recall.

4        Q.   You said maybe 500?  500 total?

5        A.   Yes.

6        Q.   Is that your best estimate sitting here

7   today?

8        A.   Yes.

9        Q.   And is that money transferred to you

10  electronically?

11       A.   Mr. Steward sent the check.

12       Q.   Mr. Steward sends a check.

13            Since defendant has been in your custody, how

14  many computers have you owned or possessed inside your

15  residence?

16       A.   One working computer.

17       Q.   One working computer.

18            Okay.  Let's start with the working computer.

19            What kind of computer is that?

20       A.   A MacBook.

21       Q.   MacBook.

22            Approximately what year MacBook or how old is

23  the computer?

24       A.   I need a new one.  I think I got it in 2014.

25  '15 or '14.

Jay Manheimer - 6/17/2020

```
 1        Q.   Is that the primary computer that you use?

 2        A.   Yes.

 3        Q.   Where do you keep that computer?

 4        A.   In my bedroom.

 5        Q.   In your bedroom.

 6             Is there a lock on your bedroom door?

 7        A.   Yes.

 8        Q.   Do you keep your bedroom door locked

 9   typically?

10        A.   Typically, no.

11        Q.   Does your MacBook connect to the Internet?

12        A.   It does.

13        Q.   How does it connect to the Internet?

14        A.   Through Wi-Fi.

15        Q.   When you turn on your MacBook, does it

16   automatically connect to the Internet each time?

17        A.   Yes.

18        Q.   So the Wi-Fi, it's permanently connected

19   through your residence?

20        A.   Yes.

21        Q.   Is that computer password-protected?

22        A.   Yes.

23        Q.   Does the defendant know the password to that

24   computer?

25        A.   No.
```

Page 33

1      Q.   Would defendant have had physical access to

2  that MacBook computer?

3      A.   Can you clarify?

4      Q.   Could he, if he wanted to, go and grab the

5  MacBook computer?

6      A.   I suppose so, yes.

7      Q.   Have you seen defendant use that MacBook

8  computer for any reason?

9      A.   There was one time, I believe, Mr. Steward

10  directed us for something, and I -- the Internet was not

11  accessible, and I supervised him.  I don't know what he

12  was working on.

13      Q.   So one time, he used the MacBook.  You said the

14  Internet was off.

15           Did you turn off the Internet?

16      A.   Yes.

17      Q.   You said you supervised him.

18           What did you do to supervise him?

19      A.   I was next to him, right behind him.

20      Q.   How long did he use the MacBook for?

21      A.   I don't remember how long.

22      Q.   Do you have a best estimate?

23      A.   I don't know.  An hour or two maybe.

24      Q.   When did this occur, approximately?  How long

25  ago?  Last week?  Last month?

Page 34

```
1        A.   I don't know.  I think it was around the end of
2   May.
3        Q.   Other than that one instance you've just
4   described, has defendant used your MacBook any other time
5   for any other reason?
6        A.   Not that I recall.
7        Q.   What was your understanding as to what
8   defendant was using your MacBook computer for on that
9   specific instance?
10       A.   To me, it related to one of his cases.
11       Q.   You said you supervised him.
12            Do you know what he was doing on the computer?
13       A.   I don't know.  It was some sort of document.
14       Q.   So you recall him working on a document?
15       A.   Yes.
16       Q.   Was he typing?
17       A.   I think so.
18       Q.   And other than that one instance you described,
19   you don't recall him using your MacBook at any other
20   time?
21       A.   I do not.
22       Q.   Has he ever asked you to use your MacBook on
23   any other occasions?
24       A.   Not that I recall.
25       Q.   The MacBook you've described, is that one of
```

Page 35

1    the computers that Pre-Trial Services recently took

2    custody of?

3         A.   Yes.

4         Q.   You said you have one computer that worked.

5              Are there other computers in your residence

6    that don't work?

7         A.   Yes.

8         Q.   How many non-working computers are there?

9         A.   Two.

10        Q.   What kind of computers are those?

11        A.   Mac.

12        Q.   Mac?

13        A.   They're both laptops.

14        Q.   Are they both older than your current

15   MacBook?

16        A.   Yes.

17        Q.   What's the basis for you saying they don't

18   work?

19        A.   They won't turn on.

20        Q.   So they physically won't turn on?

21        A.   Correct.

22        Q.   And where are those two non-functional MacBooks

23   located in your residence?

24        A.   Well, they're not in my residence at the

25   moment.

**Jay Manheimer - 6/17/2020**

1    Q.   When they were in your residence, where were

2    they located?

3    A.   In a pile in my closet.

4    Q.   Would defendant have had access to those two

5    computers?

6    A.   No.  I mean, I didn't know they were even there

7    when we were searched.  I had totally forgotten about

8    them, so he was not aware of them.

9    Q.   Have you gotten your computers back yet?

10   A.   No.

11   Q.   So other than -- I'm just focusing on computers

12   now.

13        Other than the three computers we just

14   discussed, have you seen defendant possess or use any

15   other computer while he's been in your custody?

16   A.   No.

17   Q.   So at some point, I believe on June 5th or

18   June 8th, was he provided with a laptop by defense

19   counsel?

20   A.   I don't know the date, but yes, a PC.

21   Q.   So you've seen him with that computer though?

22   A.   Correct.

23   Q.   So other than the three MacBooks you've

24   described and that computer you've seen from defense

25   counsel, have you seen him with any other computers while

**Ben Hyatt Certified Deposition Reporters**
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

**Jay Manheimer - 6/17/2020**

```
 1   in your residence?

 2        A.   No.

 3        Q.   Do you own or have you possessed any tablets or

 4   iPads?

 5        A.   Yes, iPad.

 6        Q.   And you've had an iPad since defendant has been

 7   in your custody?

 8        A.   Yes.

 9        Q.   Where is that iPad kept in the residence?

10        A.   Normally in my bedroom.

11        Q.   And is the iPad connected to the Internet?

12        A.   Yes.

13        Q.   Is it connected via Wi-Fi or cellular?

14        A.   Wi-Fi.

15        Q.   Is the iPad password-protected?

16        A.   Yes.

17        Q.   Does defendant know the password to your

18   iPad?

19        A.   No.

20        Q.   Have you seen defendant use your iPad for any

21   reason?

22        A.   No.

23        Q.   Has he ever asked you to use your iPad?

24        A.   No.

25        Q.   Do you have any other tablets or old iPads in
```

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

Jay Manheimer - 6/17/2020

```
 1    your residence?

 2         A.    No.

 3         Q.    So it's just the one?

 4         A.    Correct.

 5         Q.    Have you seen defendant either physically

 6    possess any other tablet while he's been in your

 7    custody?

 8         A.    No.

 9         Q.    Do you own any Internet-enabled cell phones or

10    smart phones?

11         A.    Yes.

12         Q.    How many smart phones do you have?

13         A.    One.

14         Q.    And is that the only smart phone you have in

15    your residence?

16         A.    Yes.

17         Q.    Where do you keep your phone?

18         A.    Usually on me or in my bedroom.

19         Q.    Your phone connects to the Internet?

20         A.    Yes.

21         Q.    Is it password-protected?

22         A.    Yes.

23         Q.    Does the defendant know the password to your

24    phone?

25         A.    No.
```

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

1      Q.   Has defendant used your phone for any reason?

2      A.   No.

3      Q.   Have you seen him physically hold your phone?

4      A.   No.

5      Q.   Has he ever asked you to use -- let me

6  rephrase.

7           Has defendant ever asked you to allow him to

8  use your phone?

9      A.   We have done a conference call with perhaps

10 Officer Davis with Pre-Trial Services before he had his

11 own flip phone, but since he had his own flip phone,

12 no.

13     Q.   So other than the circumstances you're

14 describing in terms of talking to his Pre-Trial Services

15 officer, he's never asked to use your phone for any

16 purpose?

17     A.   Correct.

18     Q.   Have you seen defendant physically possess any

19 smart phone at any time since he's been in your custody?

20     A.   No.

21     Q.   You mentioned he has a flip phone now?

22     A.   Correct.

23     Q.   What color is that flip phone?

24     A.   It's like a red, maroon.  Something

25 obnoxious.

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

**Jay Manheimer - 6/17/2020**

1    Q.   Have you seen him use any other phone other

2    than that red flip phone?

3    A.   Not since he received that phone, no.

4    Q.   Do you have a land line in your apartment?

5    A.   No.

6    Q.   Since defendant's been in your custody, are

7    there any other digital devices in your home that are

8    capable of connecting to the Internet?

9    A.   The Smart TV.

10   Q.   So like Apple TV or part of your television?

11   A.   Yeah, an Apple TV.

12   Q.   I assume you guys use that to watch Netflix and

13   things of that nature?

14   A.   Yeah.

15   Q.   Beyond watching TV, do you use the Apple TV for

16   any other purpose?

17   A.   No.

18   Q.   Have you seen defendant try to use the Apple TV

19   for any other purpose?

20   A.   No.

21   Q.   Other than Apple TV or Internet-enabled

22   television, are there any other devices in your home

23   you're aware of that are capable of accessing the

24   Internet?

25   A.   My copier is wireless, or the printer.

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

Jay Manheimer - 6/17/2020

```
 1        Q.   Does the printer connect to your computer?

 2        A.   It's wireless.

 3        Q.   Does it connect to your computer wirelessly?

 4        A.   Yes.

 5        Q.   What kind of printer is it?

 6        A.   Cannon.

 7        Q.   Do you have a scanner?

 8        A.   No.  Well, I have an old printer that had it,

 9   but it's not -- it's in my residence, but I don't use

10   it.

11        Q.   Have you scanned any documents for the

12   defendant?

13        A.   Through my smart phone.

14        Q.   Can you explain how that works?

15        A.   There's an app called Genius Scan, so you do it

16   through the app and you can e-mail or whatever.

17        Q.   So you don't have -- and you have scanned

18   documents for the defendant?

19        A.   Yes.

20        Q.   And you used your cell phone to do that?

21        A.   Yes.

22        Q.   So we've talked a little bit about Internet

23   access.  I have a few more specific questions about that.

24             What is your Internet Service Provider?

25        A.   Spectrum.
```

Page  42

Jay Manheimer - 6/17/2020

```
 1        Q.   And you have a Wi-Fi router in your
 2   apartment?
 3        A.   Yes.
 4        Q.   Is the Wi-Fi password-protected?
 5        A.   Yes.
 6        Q.   Does defendant know the password for your
 7   Wi-Fi?
 8        A.   No.
 9        Q.   Are you able to access any other Wi-Fi networks
10   from your residence?
11        A.   I don't know.
12        Q.   Do you understand what I'm asking?
13        A.   Can you clarify?
14        Q.   I'll give you an example.  Sometimes when, if
15   I'm trying to access the Wi-Fi, even from home, I may see
16   four neighbors' Wi-Fi networks.  If I lived in probably a
17   different area, I may see businesses' Wi-Fi networks.
18             Do you -- from your apartment, are there other
19   Wi-Fi networks that are accessible to you beyond your
20   own?
21        A.   There are other networks.  Whether they're
22   accessible, I don't know.  I believe they're all
23   password-protected, but I don't really know.
24        Q.   So sitting here today, are you aware of any
25   non-password-protected Wi-Fi network that you could
```

```
1    access from your apartment?
2         A.   I don't know.
3         Q.   Can you connect to the Internet in your
4    residence using an Ethernet cord?
5         A.   I suppose so.
6         Q.   Do you have an Ethernet cord in your residence
7    that you know of?
8         A.   Not that I know of.
9         Q.   Since defendant has been in your custody, have
10   you seen him personally access the Internet at any
11   time?
12        A.   No.
13        Q.   Since the defendant has been in your custody,
14   has he told you at any point that he accessed the
15   Internet?
16        A.   No.
17        Q.   Since defendant has been in your custody, has
18   he done anything that would lead you to believe that he
19   did access the Internet?
20        A.   No.
21        Q.   Since defendant has been in your custody, has
22   he said anything that would lead you to believe he was
23   accessing the Internet?
24        A.   No.
25        Q.   So we talked a little bit about this.  You
```

Jay Manheimer - 6/17/2020

```
1    testified that you have used the Internet on defendant's
2    behalf, correct?
3         A.   Correct.
4         Q.   You said you used it to do some searches for
5    his cases?
6         A.   Yes.  Searches for him, yes.
7         Q.   What else can you recall you've used the
8    Internet for on defendant's behalf?
9         A.   E-mail.
10        Q.   When you say that you are sending e-mails for
11   defendant, are you using your personal e-mail address?
12        A.   Yes.
13        Q.   Do you ever use defendant's e-mail address?
14        A.   No.
15        Q.   Have you logged in to defendant's e-mail
16   account for him?
17        A.   Yes.
18        Q.   Approximately how many times?
19        A.   I think only once.
20        Q.   Do you recall his e-mail address that he's
21   currently using?
22        A.   I don't remember.  I don't know if it's
23   something @thefight.com?
24        Q.   M@thefight.US?
25             Does that sound right to you?
```

Page 45

```
 1         A.   I'm sorry?

 2         Q.   Is it @thefight.US?

 3         A.   Possibly.  I don't recall specifically.

 4         Q.   But to your recollection, you've only accessed

 5    his e-mail account once, correct?

 6         A.   Maybe twice, but yeah.

 7         Q.   Do you recall why you accessed defendant's

 8    e-mail account those one or two times?

 9         A.   I believe it was in relation to one of his

10    cases.

11         Q.   Can you think of any other things you've done

12    for defendant with respect -- so we've mentioned

13    researching for his case, legal cases, accessing his

14    e-mail.

15              Are there any other ways in which you've used

16    the Internet for defendant since he's been in your

17    custody that you can think of?

18         A.   Not that I recall.

19         Q.   Have you accessed social media for the

20    defendant, for example?

21         A.   Not that I recall.

22         Q.   How often do you use the Internet for the

23    defendant?

24         A.   Like I said, it's hard to put a number on it.

25    I don't know.
```

Page 46

**Jay Manheimer - 6/17/2020**

1        Q.   On your computer -- or let me back up.

2             When you access the Internet for defendant or

3    use the Internet on his behalf, what device do you

4    typically use to do that?

5        A.   My computer.

6        Q.   Would you use your tablet, as well, for that?

7        A.   Possibly.

8        Q.   What about your cell phone?

9        A.   Possibly.

10       Q.   Do you believe you would have most likely used

11   one device more than the others?

12       A.   Yes, probably my computer.

13       Q.   On any of your devices, do you use any sort of

14   private Internet browsing options?

15       A.   Can you clarify the question?

16       Q.   You have a MacBook, correct?

17       A.   Correct.

18       Q.   Do you know which browser you use on your

19   MacBook?

20       A.   Sometimes Chrome, sometimes Safari.

21       Q.   Are you aware that both Chrome and Safari have

22   an option where you can be in either private browsing

23   mode or incognito mode?  I think they are referred to

24   different ways, where it's allegedly non-tracking what

25   you're looking at?

Page  47

```
1        A.   Right.

2        Q.   You know what I'm talking about?

3        A.   Yes.

4        Q.   Do you use that option?

5        A.   I have.

6        Q.   Have you used that option on behalf of

7   defendant?

8        A.   No.

9        Q.   Since defendant has been in your custody, have

10  you taken any steps to conceal your Internet usage or

11  websites he may be visiting?

12       A.   No.

13       Q.   Since defendant's been in your custody, have

14  you done anything to delete the web history for your

15  computer, tablet or smart phone?

16       A.   Not that I recall.

17       Q.   Since defendant has been in your custody, have

18  you done anything to try to delete your Google search

19  history or Yahoo search history?

20       A.   Not that I recall.

21       Q.   Have you done anything since defendant has been

22  in your custody to try to delete what you've been

23  searching for on the Internet, for yourself or for

24  defendant?

25       A.   Not that I recall.
```

1        MR. SAGEL:  I don't know what you asked your

2    attorney, but if you need to take a break at any point,

3    we can take a five-minute break.

4    BY MR. ANDRE:

5        Q.   So you said, not that you recall.

6             Do you recall -- have you ever deleted your

7    search history on your computer?

8        A.   Prior to April 24th?

9        Q.   Yes.

10       MR. STEWARD:  Objection; relevance.

11            Go ahead and answer.

12       MR. ANDRE:  You can answer.

13       THE WITNESS:  Yes, my personal.  I'm sure I have not

14   regularly.  I don't, really.  It's not necessary.

15   BY MR. ANDRE:

16       Q.   Since defendant has been in your custody

17   though, you don't have any reason to believe you've done

18   anything to try to hide any Internet access that's taken

19   place on any of your devices?

20       A.   No.

21       Q.   So Mr. Manheimer, I know you said right now

22   that you're not working.

23            What do you do for a living?

24       A.   I'm a writer, freelance writer.

25       Q.   What kind of things do you write?

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

1       A.   Ads, advertising.  I also work on my own.  I do

2   my personal writing that's not paid for.

3       Q.   And how long have you been a writer in the

4   advertisement industry?

5       A.   Over 25 years.

6       Q.   Do you have any legal training?

7       A.   No.

8       Q.   Never attended law school?

9       A.   No.  Wish I had now.

10      MR. PEREZ:  No, you don't.

11      MR. ANDRE:  No, you don't.

12      MR. SAGEL:  Some lawyers don't get paid for their

13   work.

14      MR. ANDRE:  I don't think anyone in this room will

15   tell you that you're missing out.  I think that's

16   probably the only thing all four of us will agree on.

17   BY MR. ANDRE:

18      Q.   Have you ever worked in a law firm?

19      A.   No.

20      Q.   Any experience conducting legal research?

21      A.   No.

22      Q.   Do you know how to use the Westlaw legal

23   database?

24      A.   I don't even know what that is.

25      Q.   How about Lexus Nexus; do you know what that

**Ben Hyatt Certified Deposition Reporters**
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

1    is?

2        A.   I've heard of it.

3        Q.   Any experience using Lexus Nexus to conduct

4    legal research?

5        A.   No.

6        Q.   Have you ever done any legal writing?

7        A.   For example?

8        MR. PEREZ:  Just ask him a direct question.

9    BY MR. ANDRE:

10       Q.   Have you ever written legal briefs?

11       A.   No.

12       Q.   So since defendant was released into your

13   custody, have you had any involvement in preparing any

14   legal filings for the defendant?

15       MR. STEWARD:  Objection to the word "prepare".

16       MR. PEREZ:  And I'm going to object on vague.  I

17   mean, prepared, are you talking about like typing

18   something that was written, or are you talking about

19   writing it from memory or writing it from a publication?

20   There's a variety of ways it can be prepared.

21       MR. STEWARD:  Or clerically.

22   BY MR. ANDRE:

23       Q.   That was going to be my next question.

24            Do you understand what I'm asking?

25       A.   No.

**Jay Manheimer - 6/17/2020**

```
 1        MR. PEREZ:  I didn't either, so you might as well

 2   ask him.

 3   BY MR. ANDRE:

 4        Q.   Have you, in any way, assisted the defendant in

 5   writing, finalizing, preparing any legal brief or legal

 6   document since he's been in your custody?

 7        MR. STEWARD:  Same objection; vague.

 8        MR. PEREZ:  As far as preparing, are you talking

 9   about typing it?

10        MR. ANDRE:  I'm talking about all of it.

11        MR. STEWARD:  And it's compound.

12        MR. PEREZ:  Do you understand that?

13        THE WITNESS:  Oh, any instance?  Yeah.

14   BY MR. ANDRE:

15        Q.   What have you done to assist defendant with any

16   legal document since he's been in your custody?

17        A.   Well, I've sent Dean stuff through my e-mail.

18        Q.   Okay.  Without getting into the substance of

19   your communications with Mr. Steward, what types of

20   things have you sent him?

21        A.   I don't know.  PDFs.

22        Q.   And what kind of PDFs?

23        A.   I don't know.  Case PDF.  I don't know.  I

24   guess related to cases.  I mean, a PDF is a PDF.

25        Q.   So you would send a PDF to Mr. Steward.
```

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

1              What did you think those PDFs were?

2        A.   Related to his cases; Mr. Avenatti's cases.

3        Q.   Did you create any of those PDFs?

4        A.   I may have helped them compile them.

5        Q.   What do you mean by compile?

6        A.   Put together into one PDF.

7        MR. PEREZ:  Are you talking about converting?

8        THE WITNESS:  Yes.

9        MR. PEREZ:  Okay.  Converting to PDF.

10   BY MR. ANDRE:

11       Q.   What else beyond converting the documents to

12   PDF, compiling the documents, would you do before sending

13   them to Mr. Steward?

14       MR. PEREZ:  I'm going to object again on vagueness

15   because, are you talking about -- I mean, when you say

16   "What did you do before," did he scan it?  Did he type

17   it?  Did you write it?  Did you copy it from the library?

18   There's a million different possibilities.  Can you just

19   narrow it down and ask him what you want to know?

20       MR. STEWARD:  We've been going about an hour and a

21   half, and I think we have at least a dozen of exhibits.

22   Can I suggest we take ten?

23       MR. ANDRE:  If you'd like to take a break, that's

24   fine.

25       (A break was taken from 2:29 p.m. to 2:49 p.m.)

Ben Hyatt Certified Deposition Reporters
888.272.0022  818.343.7040  Fax 818.343.7119  www.benhyatt.com

1    BY MR. ANDRE:

2        Q.    Mr. Manheimer, before we took a break, I was

3    asking you, you had mentioned you would send PDFs to Mr.

4    Steward.

5            Do you recall where we were?

6        A.    Yes, I recall that question.

7        Q.    Can you please describe for me what you

8    personally did with that PDF prior to sending it to

9    Mr. Steward?

10       A.    I believe I compiled several PDFs together.  I

11   don't know.  You'll have to excuse me.  My memory isn't

12   great for that time period.  It was around the time of my

13   dad's year anniversary of his death, so my mind was kind

14   of all over the place.

15           Yeah, I mean, that's all I can recollect.  Just

16   put a PDF together to send to Mr. Steward.

17       Q.    So how many -- you mentioned this specific time

18   frame with respect to your father.

19           What time frame are you referring to?

20       A.    Late May.

21       Q.    Late May.

22           How many PDF documents did you compile and then

23   e-mail to Mr. Steward?

24       A.    A couple.  I mean, there's been a lot of

25   correspondence.  Mr. Avenatti's e-mails go through me.  I

Jay Manheimer - 6/17/2020

1    have to be the intermediary.  It's very difficult for me

2    to keep track of everything I've done for him.

3         Q.   I understand.

4              Best estimate, as best as you can, in terms of

5    actual PDF documents you would compile?

6         A.   A couple three, a handful.

7         Q.   Other than compiling the PDF and sending them

8    to Mr. Steward, would you do anything else with that

9    document, generally speaking?

10        A.   Not that I recall.

11        Q.   Where would the original document come from?

12        A.   Probably an e-mail from Mr. Steward.

13        Q.   I just want to make sure I know what the

14   general process was.

15             So you would receive a document via your e-mail

16   from Mr. Steward?

17        A.   Yes.

18        Q.   Would that be a Word document or a PDF?

19        A.   I don't remember.  He sent several.  A

20   variety.

21        Q.   Best of your recollection, what would you do

22   once you received such a document from Mr. Steward?

23        A.    I would notify Mr. Avenatti that something has

24   come from Mr. Steward and wait on how to proceed.

25        Q.   Would you make edits to those documents?

1       A.   Not that I --

2       MR. STEWARD:  I object.  You are kind of getting

3  close to entering the defense function here.  If he is

4  doing things at my direction on Mr. Avenatti's behalf,

5  having to do with this particular case, I suggest that's

6  covered by attorney-client privilege, and I'm going to

7  object on that basis.

8  BY MR. ANDRE:

9       Q.   I'm not asking you -- to be clear, I don't want

10 to know what edits you made, what the substance of

11 anything that was happening.  I just want to know the

12 physical process.

13          Are you actually making edits to the documents

14 before you convert them to PDF and send them to

15 Mr. Steward?

16      MR. STEWARD:  Same objection.  If he is making

17 edits, clearly that's part of the defense function.  If

18 he's not making edits, it's still, if he was sitting in

19 my office working at my direction, I don't think there

20 would be any dissension that that's part of the defense

21 function, and I'm going to object on that basis.

22 BY MR. ANDRE:

23      Q.   Unless your lawyer instructs you otherwise, you

24 can answer the question.

25          Are you physically editing any of the documents

1    that Mr. Steward sends to you prior to converting them to

2    PDF?

3         MR. PEREZ:  I'd say you don't have to answer that

4    either.

5         MR. SAGEL:  The basis for your objection?

6         MR. PEREZ:  Here's the problem.  I can't assert the

7    privilege on behalf of Mr. Avenatti, but Mr. Steward can.

8    Whether I said answer it or not, I think Mr. Avenatti has

9    a valid objection based on attorney-client privilege.  So

10   in an abundance of caution, I would have to waive any

11   non-objection if I did have an objection, to defer to

12   Mr. Steward on that ground.

13        MR. ANDRE:  Mr. Steward, just to be clear, we are

14   trying to stay away from any substantive conversations so

15   we don't have to come back after we raise those to the

16   Court, so if you're instructing your client not to

17   answer, I'm going to move on to the next question.

18        MR. SAGEL:  And we'll ask for your client and you to

19   come back on a future dare.

20        MR. PEREZ:  I get that.

21        MR. ANDRE:  If that's the way we proceed...

22        MR. STEWARD:  Let's do it that way, and then Judge

23   Selna can make the call.

24   BY MR. ANDRE:

25        Q.   Generally speaking with respect to the

Ben Hyatt Certified Deposition Reporters

888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

1   documents you would send to Mr. Steward, convert to PDF

2   and then send to Mr. Steward, have you seen defendant

3   physically edit any of those documents?

4       MR. STEWARD:  Same objection.

5       MR. ANDRE:  Mr. Perez, you're going to instruct your

6   client?

7       MR. PEREZ:  That's a tough one.  I'm not so sure the

8   action of whether he observed him do anything is

9   objectionable from his standpoint, but again, in an

10  abundance of caution in terms of the attorney-client

11  privilege which has been asserted on behalf of

12  Mr. Avenatti, I'm going to have to concur.

13      MR. SAGEL:  Just so we're clear, Mr. Steward, on

14  Document 179 that you supposedly wrote on June 7, 2020,

15  you actually wrote out the ways in which these documents

16  were written and filed.  So that's not attorney-client

17  privilege, but this is?

18      MR. STEWARD:  Mr. Sagel, you're asking me questions.

19  There's two problems with that.  One, you're talking, and

20  two, that you're asking me questions.  I'm not the

21  deponent.

22      MR. SAGEL:  Well, we're trying to save two people's

23  time to come back for an objection that makes no sense.

24      MR. STEWARD:  If we have to come back, we have to

25  come back.  Let the judge make the call.

Ben Hyatt Certified Deposition Reporters

888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

**Jay Manheimer - 6/17/2020**

1        MR. ANDRE:  So Mr. Perez, is it fair to say that you

2   are instructing your client not to answer?

3        MR. PEREZ:  Correct.

4   BY MR. ANDRE:

5        Q.   Mr. Manheimer, you're not going to answer that

6   question on behalf of the instruction of your lawyer?

7        A.   Correct.

8        MR. ANDRE:  So let's short-circuit, for everyone's

9   sake, the back and forth debate that's going on right

10  now.  I'm going to ask you a series of questions.  I have

11  a suspicion that a lot of what I'm going to ask you from

12  here on out is going to involve the same thing, so

13  Mr. Steward, if you have the same objection, please say

14  you have the same objection.  Mr. Perez, if you have the

15  same instruction, please say the same.  And if you could,

16  just clarify you're going to follow your lawyer's

17  instruction.  I'll put them on the record, and we will go

18  to the Court and have this dealt with however we can.

19       MR. STEWARD:  That's fine.

20       MR. PEREZ:  Okay.

21  BY MR. ANDRE:

22       Q.   Generally speaking, any of the documents that

23  you converted to PDF and e-mailed to Mr. Steward, did you

24  personally see defendant write any portions of those

25  documents using your computer or any other digital

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

1    device?

2         MR. STEWARD:  Same objection.

3         MR. PEREZ:  Same.

4         THE WITNESS:  Same.

5    BY MR. ANDRE:

6         Q.   You mentioned these documents were being sent,

7    you mentioned you received documents from Mr. Steward,

8    you mentioned you also e-mailed documents to Mr. Steward.

9              Are these all going through your own e-mail

10   address?

11        A.   Yes.

12        Q.   I'm going to ask you, if you could, to write

13   what e-mail address you were using for those

14   communications on one of those pieces of paper in front

15   of you.  That pen, I don't think works, but this one

16   does.

17        A.   [Witness complying].

18        Q.   Other than the e-mail address you've written on

19   that piece of paper, have you used any other e-mails

20   since defendant has been in your custody?

21        A.   Could you clarify the question.

22        Q.   You just wrote an e-mail address on a piece of

23   paper for us?

24        A.   Correct.

25        MR. ANDRE:  I am going to have that marked as

1    Exhibit 20, and we will not have that be part of the

2    public.

3                    (Exhibit 20 was marked for

4              identification and is annexed

5              hereto.)

6    BY MR. ANDRE:

7         Q.   Other than the e-mail address you just wrote

8    down, since defendant has been in your custody, have you

9    used any other e-mail addresses?

10        A.   Yes.

11        Q.   How many other e-mail addresses have you used

12   since defendant has been in your custody?

13        A.   Is this in relation to Mr. Avenatti?

14        Q.   Separate.

15             Well, let me ask you this:  The e-mail address

16   you wrote down, is that the only e-mail address you would

17   use to communicate on defendant's behalf?

18        A.   Yes.

19        Q.   Are there other e-mail addresses you would

20   personally use yourself?

21        A.   Yes.

22        Q.   And you have used since he's been in your

23   custody?

24        A.   Yes.

25        Q.   If you could, draw a line under that e-mail

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

```
1    address you just wrote, and write down your other e-mail
2    addresses below that, please.
3         A.   [Witness complying].
4         Q.   Would any of the communications that you had on
5    defendant's behalf with Mr. Steward, would any of those
6    have gone through defendant's e-mail address?
7         A.   Not that I'm aware of.
8         Q.   Have you -- without getting into any of the
9    substance of the communications, have you had any -- sent
10   any e-mails or received any e-mails on defendant's behalf
11   from other lawyers beyond -- besides Mr. Steward?
12        A.   I'm sorry, what's the question?
13        Q.   You said you would receive e-mails from
14   Mr. Steward, and you would send e-mails back to
15   Mr. Steward, correct?
16        A.   Correct.
17        Q.   Have you engaged in the same process of sending
18   e-mails on defendant's behalf with other lawyers besides
19   Mr. Steward?
20        A.   Yes.
21        Q.   Again, I don't want to know any of the
22   substance of those communications.
23             Do you recall which other lawyers you've
24   communicated with on the defendant's behalf?
25             MR. PEREZ:  If you know.
```

**Ben Hyatt Certified Deposition Reporters**
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

**Jay Manheimer - 6/17/2020**

```
1         THE WITNESS:  I don't know all of them.  Should I
2    write them down?
3         MR. ANDRE:  Whatever you're most familiar with.
4         MR PEREZ:  You can give names of the lawyers.  If
5    you don't remember them, then you don't remember them.
6         THE WITNESS:  Tom Warren, Ryan O'Dea, Evan Jenness.
7    That's all that come to mind.
8    BY MR. ANDRE:
9         Q.   You don't, sitting here today, remember anyone
10   else's name?
11        A.   I can't right now.
12        MR. ANDRE:  I'm going to start going through these
13   specific documents with you.
14            If you turn to Exhibit 4 in the binder in front
15   of you.  Before you do that, take a second and look
16   through that.  Let me know when you're ready.
17                (Exhibit 4 was marked for
18                identification and is annexed
19                hereto.)
20        MR. PEREZ:  While he's looking, do you have a
21   specific question?
22        THE WITNESS:  Anything specific I'm supposed to look
23   for?
24   BY MR. ANDRE:
25        Q.   My first question is, have you seen this
```

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022  818.343.7040  Fax 818.343.7119  www.benhyatt.com**

Jay Manheimer - 6/17/2020

```
1   particular document before?

2        A.   Possibly.  I can't say for sure.

3        Q.   Do you know if this document or at least the

4   PDF of this document was created using your MacBook

5   computer?

6        A.   Sorry.  What was the question?

7        Q.   Do you know if the PDF for this document was

8   created using your MacBook computer?

9        A.   Possibly.  I can't say 100 percent.

10       MR. ANDRE:  I'm going to have you turn to Exhibit 5

11  briefly.  I'm going to represent to you this is a

12  screenshot of metadata we pulled from this particular

13  document, Exhibit 4.  The author there says Jay

14  Manheimer.

15                 (Exhibit 5 was marked for

16                 identification and is annexed

17                 hereto.)

18  BY MR. ANDRE:

19       Q.   That's your name, correct?

20       A.   Correct.

21       Q.   And it identifies a PDF producer, has a MacOS,

22  version 10.14.6.

23            Do you see that?

24       A.   Yes.

25       Q.   Do you know if that's referring to your MacBook
```

Page 64

1    computer?

2         A.   The 10.14.6.

3         Q.   Yes.

4         A.   I have no idea.  I don't even know what that

5    number means.

6         Q.   But you did use your MacBook to complete

7    previous PDFs for defendant, correct?

8         A.    Correct.

9         Q.   But you don't specifically recall this

10   particular document?

11        A.   I can't say 100 percent, but it looks

12   familiar.

13        Q.   It looks familiar.

14             Do you remember creating this document using

15   the PDF, creating the PDF of this document?

16        A.   No, I don't recall 100 percent.  It's

17   possible.

18        Q.   Do you recall who would have sent you the

19   original draft of this document?

20        A.   I would assume Mr. Steward.

21        MR. STEWARD:  Move to strike, speculation.

22   BY MR. ANDRE:

23        Q.   Is that just speculation or is that based on

24   what your normal practice was with respect to helping?

25        A.   No, I don't recall.

1       Q.   You don't recall.

2            Do you recall personally writing or typing any

3    portion of this particular document?

4       A.   Writing or typing?  No, I don't recall.

5       Q.   Do you recall if defendant or did you see

6    defendant personally type or write any portion of this

7    particular document that's marked as Exhibit 4?

8       A.   Like I said, I'm not really familiar with this

9    document, so I can't be sure.

10      Q.   I'd like to draw your attention to Page 16,

11   Footnote 22 of this particular document, Exhibit 4.

12      A.   Which footnote?

13      Q.   22.  There's a website address.  Page 16 at the

14   bottom.

15      A.   Yes.

16      Q.   It is for a website with the name of

17   Covid19.ca.gov/roadmap-counties.

18           Do you see that?

19      A.   Yes.

20      Q.   Did you search for this particular website on

21   defendant's behalf?

22      A.   I must have.

23      MR. STEWARD:  Move to strike, speculation.

24   BY MR. ANDRE:

25      Q.   You said you must have.

```
 1              What makes you say you must have?

 2      A.   Because Mr. Avenatti does not access the

 3   Internet.

 4      Q.   You were conducting searches for him?

 5      A.   Yes.

 6      Q.   And you believe, based on your general

 7   practice, this is one of the websites you would have

 8   searched for him?

 9      A.   Yes.

10      Q.   Would you have been the one to type this into

11   the document?

12      A.   Perhaps.  I don't recall.

13      Q.   Let's move on to -- are you familiar with leg

14   citation formatting?

15      A.   No.

16      Q.   If you notice here on Footnote 22, the word C

17   is italicized.

18              Do you know why you would have italicized that

19   word?

20      MR. STEWARD:  Objection; misstates the testimony.

21   He said he didn't remember whether he typed that or

22   not.

23   BY MR. ANDRE:

24      Q.   Do you recall Mr. Avenatti instructing you at

25   various points in time how to format various citations so
```

Page 67

```
1    they comply with legal citation format?

2         A.   I don't recall.

3         Q.   Do you recall him telling you to italicize

4    various words, not italicize various words?

5         A.   I don't recall.

6         Q.   Let's move onto, we're going to go to Page 29

7    of Exhibit 4.  The page number is at the bottom.  I will

8    draw your attention to Footnote 26.

9              Do you see that citation?

10        A.   Yes.

11        Q.   Did you search for this politico.com article on

12   the Internet for defendant?

13        A.   I must have.

14        Q.   Do you recall reading this particular article?

15        A.   I do not recall.

16        Q.   And would you have been the one that would have

17   typed this citation into this document?

18        MR. STEWARD:  Objection; calls for speculation.

19        MR. ANDRE:  You can answer.

20        MR. PEREZ:  You can answer.

21        THE WITNESS:  I don't recall.

22   BY MR. ANDRE:

23        Q.   Looking down at Footnote 27, there's a citation

24   to a sports.yahoo.com article by George Back.

25             Do you see that citation?
```

```
 1        A.   Yes.

 2        Q.   Would you have searched for this article on the

 3   Internet for defendant?

 4        A.   Yes.

 5        Q.   Do you remember this particular article?

 6        A.   I do not.

 7        Q.   Do you believe you're the one that typed this

 8   citation into this document?

 9        A.   I don't recall.

10        Q.   Could the defendant have typed this citation

11   into the document?

12        A.   I'm sorry?

13        Q.   Could the defendant have typed this citation

14   into this document?

15        A.   I don't recall.

16        Q.   But it's possible he could have?

17        A.   I don't recall.

18        Q.   So I'm going to now have you turn to Exhibit A.

19   There's four exhibits to this particular -- sorry.  So

20   Exhibit 4 has attached to it four PDF articles, Exhibits

21   A through D.  If you look at the top of the document in

22   blue, it's going to start at Page 42.

23             So Exhibit A appears to be a New York Times

24   article regarding El Chapo.

25             Do you see that?
```

Jay Manheimer - 6/17/2020

1      A.   Yes.

2      Q.   Did defendant search for this article on your

3  computer?

4      A.   No.

5      Q.   Would you have searched for this article on

6  your computer for defendant?

7      MR. STEWARD:  Objection; calls for speculation.

8      MR. PEREZ:  You can answer.

9      THE WITNESS:  I could have, yes.

10  BY MR. ANDRE:

11      Q.   Do you recall searching this article for

12  defendant on your computer?

13      A.   I don't recall.

14      Q.   Do you recall searching any articles on your

15  computer for the defendant and then printing them so they

16  can be attached to a legal filing?

17      A.   I recall searching and printing, but not a

18  specific article.

19      Q.   So when you would print them, would you print

20  them to PDF or would you print them to actual paper

21  copies?

22      A.   Paper, as far as I remember.

23      Q.   When you were looking, for searching for

24  articles on the Internet for defendant to print, were you

25  looking for specific articles or were you doing broad

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

1    searches and then finding various articles?

2        MR. STEWARD:  Objection.  That moves into the area

3    of attorney-client defense function.  Same objection I

4    had before.

5        MR. ANDRE:  Mr. Perez, same instruction?

6        MR. PEREZ:  Same.

7    BY MR. ANDRE:

8        Q.   Mr. Manheimer, I assume you are not going to

9    answer and follow your lawyer's instruction?

10       A.   Correct.

11       Q.   Let me short-circuit this a little bit.

12   There's four exhibits attached to this particular

13   exhibit, A through D.

14           Can you take a minute and look through all four

15   of them.

16           Do you recall searching for any of these

17   articles on your computer for defendant?

18       A.   The subject matter, I recognize about the

19   conditions at MCC.  Whether they were specific articles,

20   I can't attest to.

21       Q.   Do you recall seeing defendant conduct any

22   searches?

23       A.   No.

24       Q.   Did you attach these particular articles to

25   this brief?

1        A.   I must have.

2        Q.   Why do you say that?

3        A.   They were from the Internet.

4        Q.   So based on your general practice assisting

5   defendant with these filings, you would have printed them

6   and attached them to the PDF before sending them to

7   Mr. Steward?

8        A.   Could you repeat that?  I'm sorry.

9        Q.   You said you must have attached these articles,

10  these exhibits to the PDF.

11            Are you saying that because it's your general

12  practice or do you recall generally printing articles

13  from the Internet and attaching them to documents that

14  you then sent to Mr. Steward?

15       A.   Yes, I would have handled the search.

16       Q.   But you don't recall who would have actually

17  typed the citation to these articles into the documents?

18       A.   I don't recall.

19       Q.   Would you have been working with a Word

20  document when you were assisting defendant with these

21  filings?

22       A.   Possibly.

23       Q.   And would defendant have been able to actually

24  write or type edits or portions of these filings using

25  Microsoft Word on your computer?

1       A.   Like I said, I recall an instance where

2   Internet was not enabled, I was supervising and he worked

3   on a document.

4       Q.   And you were supervising?

5       A.   Yes.

6       Q.   Was he working on Microsoft Word?

7       A.   I believe one time.

8       Q.   This one instance, I think you previously said

9   this was towards the end of May.

10          Is that fair?

11      A.   To the best of my knowledge.

12      MR. ANDRE:  Let's move on to another document.  I'll

13  have you move on to Exhibit 6.

14              (Exhibit 6 was marked for

15              identification and is annexed

16              hereto.)

17  BY MR. ANDRE:

18      Q.   And if you could just briefly look through it

19  and see if you recognize the document.  That will be my

20  first question.

21      A.   Am I looking for something in particular?

22      Q.   Just if you recognize it.

23      A.   I don't recognize it.

24      Q.   Do you know if this document was created using

25  your computer?

1       A.   I'm sorry?

2       Q.   Do you know if this document was created using

3   your computer?

4       A.   I don't recall.

5       Q.   There is an article and what I think I call an

6   expert report that attaches as exhibits to this

7   particular filing.

8            Do you recognize either of those particular

9   documents?

10      A.   What page are you referring to?

11      Q.   If you look at the top, so Exhibit 6 is

12   defendant's Supplemental Status Report.  That document

13   itself is three pages, and then starting on the fourth

14   page, if you look at the top, there's an Exhibit E that

15   references Jeffrey Epstein, and then a couple pages

16   later, there's an Exhibit F, which is a Facility

17   Evaluation of Metropolitan Correctional Center.

18           Do you see those two exhibits?

19      A.   Uh-huh.

20      Q.   Are either of those familiar to you?

21      A.   I don't recall.

22      Q.   Do you recall searching for either of these

23   documents or pulling up either of these documents from

24   the Internet on your computer?

25      A.   I don't recall.

**Jay Manheimer - 6/17/2020**

```
1          Q.   And you don't remember whether this is a PDF
2     that would have been created on your computer?
3          A.   Yeah, I don't recall.
4          MR. ANDRE:  Let's turn to Exhibit 8.
5               (Exhibit 8 was marked for
6               identification and is annexed
7               hereto.)
8     BY MR. ANDRE:
9          Q.   And again, if you could just take quick look at
10    it.  It's a shorter document.  Let me know -- my question
11    is whether this looks familiar to you, whether you
12    remember this particular document.
13         A.   I really don't recall.
14         Q.   This doesn't look familiar to you?
15         A.   No.
16         Q.   Do you know if this document was created using
17    your computer?
18         A.   I don't recall.
19         Q.   Do you recall personally typing or writing any
20    portion of this particular document, Exhibit 8?
21         A.   I don't recall.
22         Q.   With respect to Exhibit 8, would you have seen
23    defendant physically type or write or edit any portion of
24    this particular document?
25         A.   I don't recall.
```

1       Q.   Is it possible he could have done that?

2       MR. STEWARD:   Objection; calls for speculation.

3   Anything is possible.

4       MR. PEREZ:   You can answer.

5       THE WITNESS:   What was the question?   I'm sorry.

6   BY MR. ANDRE:

7       Q.   Do you believe it's possible that defendant

8   wrote or typed any portion of Exhibit 8?

9       A.   As long as it didn't need the Internet, it's

10  possible.

11      Q.   So you said as long as he wasn't actually

12  connected to the Internet he could have used your

13  computer to type or write a portion of this document?

14      A.   Correct.

15      Q.   But you don't remember physically if he did?

16      A.   Correct.

17      Q.   Of the documents, the PDFs that you sent to

18  Mr. Steward, were there any instances in which those

19  documents were, the Word documents, underlying Word

20  documents was created from scratch using your computer?

21      A.   Could you clarify?

22      Q.   So do you recall any instances in which your

23  computer was used to basically create a new document for

24  one of defendant's cases that you then later sent to

25  Mr. Steward?

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

```
1          A.   I don't recall.

2          Q.   Do you understand what I'm asking?

3          A.   Yes, I believe so.

4          Q.   Like it would basically be where you took a

5    blank document or maybe a document that had just the

6    caption, and then would have started it from scratch

7    using your computer.

8          A.   I understand.

9          Q.   You don't recall doing that?

10         A.   No.

11         MR. AVENATTI:  I cannot hear the question or the

12   answer.  I would ask if you have the ability to mute the

13   people that have called in, that you do so.  It is

14   terribly distracting, and I have an entitlement and a

15   right in this case to hear what happens.

16         MR. ANDRE:  I am going to mute, as best I can,

17   everyone on this line.  I am then going to confer with

18   Mr. Avenatti's counsel and try to unmute solely

19   Mr. Avenatti's line, if he would like me to do so.

20         MR. STEWARD:  That's fine.

21         MR. ANDRE:  You're going to have to tell me his cell

22   phone number.

23              At this point, everyone should be muted except

24   for the phone in front of AUSA Andre and the phone in

25   front of the witness and Mr. Steward.
```

**Ben Hyatt Certified Deposition Reporters**
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Jay Manheimer - 6/17/2020

1              Mr. Avenatti, if you can hear me, will you

2     speak.  You should be the only other person that is

3     currently unmuted.  I want to make sure he can hear okay.

4              As best we can tell, everyone other than the

5     phones here and the defendant are muted.  If you are

6     listening on this line, I'd ask again, please make sure

7     you mute your phone.  Mr. Avenatti, if, at any point, you

8     have issues hearing, please -- I have you unmuted.

9     Please either speak up and let us know or text

10    Mr. Steward so we can -- I can try to mute everyone

11    again.

12             Is that okay?

13        MR. AVENATTI:  That's fine.  [Inaudible] not to

14    interrupt the deposition, but I want the record to

15    reflect that I cannot hear [inaudible].  I ask that

16    another system be put in place that allows me to

17    participate in these proceedings in light of the matter

18    of due process.  This is my criminal case, and I have a

19    right to be present.

20        MR. STEWARD:  Mr. Avenatti, you've spoken enough.

21    Please stop.

22        MR. SAGEL:  Just to state for the record, everything

23    he said, I'm assuming you did not get any of it.

24        MR. ANDRE:  The court reporter was not able to hear,

25    how we are set up, what the defendant said.  We will,

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

**Jay Manheimer - 6/17/2020**

1    however, I believe his counsel was able to hear, and

2    Mr. Steward will put on the record the concerns the

3    defendant has raised regarding not being able to

4    adequately participate and adequately hear.

5           Again, if you do have issues hearing going

6    forward, we're doing the best we can.  Let Mr. Steward

7    know.  We'll try the best we can, and we'll deal with

8    this at another time.

9    BY MR. ANDRE:

10       Q.   I'm going to keep moving on, Mr. Mannheim.

11          We were looking at Exhibit 8.  I believe you

12   said you don't recall whether there were circumstances in

13   which you basically created a document from the beginning

14   for defendant to then send to Mr. Steward; is that

15   correct?

16       A.   Correct.

17       Q.   You don't recall defendant doing that either?

18       A.   Correct.

19       Q.   But as long as your computer wasn't connected

20   to the Internet, it's possible he could have used

21   Microsoft Word to write portions of this document,

22   correct?

23       MR. STEWARD:  Objection; calls for speculation.

24   BY MR. ANDRE:

25       Q.   That's what you testified to earlier, correct?

**Jay Manheimer - 6/17/2020**

```
 1        A.   I believe I testified that there was, yes, one
 2   instance, one or two where I supervised him without the
 3   Internet on.
 4        Q.   One or two?
 5        A.   One or two.
 6        Q.   Potentially more than once?
 7        A.   Potentially two.
 8        Q.   You think it's possible it's more than twice?
 9        A.   I don't recall.
10        Q.   During the time you were supervising him while
11   he was using your computer but not connected to the
12   Internet, what do you recall him actually doing,
13   defendant actually doing?
14        MR. STEWARD:  I'm going to object to that as I've
15   objected before as part of the attorney-client privilege
16   and the defense function.  Same objection as before.
17        MR. PEREZ:  Repeat the question.
18        MR. STEWARD:  If you can.
19   BY MR. ANDRE:
20        Q.   While you were supervising the defendant using
21   your computer, what do you recall seeing him physically
22   do?
23        MR. PEREZ:  I concur with Mr. Steward.  He's
24   invoking the privilege.
25        MR. ANDRE:  You're instructing your client not to
```

**Ben Hyatt Certified Deposition Reporters**
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

**Jay Manheimer - 6/17/2020**

1   answer.

2   BY MR. ANDRE:

3       Q.   And I assume your taking your lawyer's advice,

4   correct?

5       A.   Correct.

6       MR. ANDRE:  Let's move on.  Turn to Exhibit 10,

7   please.

8                    (Exhibit 10 was marked for

9               identification and is annexed

10              hereto.)

11  BY MR. ANDRE:

12      Q.   If you could take a look at it.  My first

13  question will be if you recognize this document, if

14  you're familiar with this document?

15      A.   I don't recall.

16      Q.   So this is a status report that was filed on

17  June 5th, 2020 which would be about 12 days ago.

18          Do you see where it says that at the top?

19      A.   Yes.

20      Q.   You don't recall seeing this document before?

21      A.   I do not.

22      Q.   Do you know if this document was created using

23  your computer?

24      A.   I don't recall.

25      Q.   Did you personally type or write any portion of

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

1    this particular document?

2         MR. STEWARD:  Objection.  If he hasn't seen the

3    document or doesn't recall the document, I'm not sure how

4    he can answer that.

5    BY MR. ANDRE:

6         Q.   You can answer.

7         A.   What's the question?

8         Q.   Do you recall typing or writing any portion of

9    this particular document that's been marked as

10   Exhibit 10?

11        A.   I do not recall.

12        Q.   Do you know what the court's ECF system is?  Is

13   that a phrase you're familiar with?

14        A.   No.

15        Q.   Have you ever heard the phrase Pacer?

16        A.   No.

17        Q.   During -- since defendant's been in your

18   custody, have you actually filed any documents with the

19   court on defendant's behalf?

20        A.   Can you clarify?

21        Q.   Sure.

22             His report in this case has an electronic

23   filing system, case filing system where you can submit

24   documents to the court electronically.

25             Have you ever gone onto the court's website to

```
1    file a document with the court on defendant's behalf?

2         A.   Not that I recall.

3         Q.   You think that's something you would remember

4    doing?

5         MR. STEWARD:  Objection; calls for speculation.

6    BY MR. ANDRE:

7         Q.   You can answer.

8         A.   I don't know.  I don't recall, so it's hard for

9    me to say.  If I did it, I don't remember.

10        MR. ANDRE:  Let's turn to Exhibit 12.

11                  (Exhibit 12 was marked for

12            identification and is annexed

13            hereto.)

14   BY MR. ANDRE:

15        Q.   If you could, take a look at this document and

16   let me know if you're familiar with it.

17        A.   I don't recall.

18        Q.   Do you know if this document was created using

19   your computer?

20        A.   I don't know.

21        Q.   Do you remember writing or typing any portion

22   of this document?

23        A.   I don't recall.

24        Q.   Do you remember seeing defendant write or type

25   any portion of this document which has been marked as
```

Page 83

1    Exhibit 12?

2         A.   I do not recall.

3         Q.   Let me turn now to -- are you aware that on

4    Sunday, June 7th, so a little over a week ago, the

5    Government raised concerns with the court that defendant

6    may have violated the conditions of his release?

7         A.   What was the question?

8         Q.   On June 7th, are you aware that on June 7th,

9    Sunday, June 7th, a little over a week ago, the

10   Government raised concerns with the court that the

11   defendant in this case, Michael Avenatti, may have

12   violated the conditions of his release by using your

13   computer to draft legal briefs in this case?

14        A.   I was aware of the issue when it happened.  I

15   don't remember specifically.

16        Q.   How did you find out about the issue

17   happening?

18        A.   Mr. Avenatti told me.

19        Q.   What did he tell you?

20        A.   I don't recall specifically.

21        Q.   Do you recall anything about the conversation

22   you had with the defendant after the Government alleged

23   that he may have violated the conditions of his

24   release?

25        A.   Yes.  It involved that issue.  The Government

1  is claiming that he violated his bail.

2      Q.   What did he tell you specifically we were

3  alleging?

4      A.   I believe that the Government was alleging he

5  used the Internet.

6      Q.   Did you see what the Government had filed?

7      A.   No.

8      Q.   What was your response when the defendant told

9  you we had alleged he was violating the conditions of his

10  release?

11     A.   I was shocked.  I didn't know where it was

12  coming from.

13     Q.   And he never showed you this specific document

14  that we filed that contained the allegations?

15     A.   I don't recall.

16     MR. ANDRE:  Let me back up a second.  If you could

17  look at Exhibit 14.  This is defendant's Supplemental

18  Status Report.  The document was filed on June 7th, 2020

19  in defendant's case.

20              (Exhibit 14 was marked for

21              identification and is annexed

22              hereto.)

23  BY MR. ANDRE:

24     Q.   Can you take a quick look at it.

25              Are you familiar with this document at all?

Page 85

1       A.   I don't recall seeing it.

2       Q.   You don't recognize this?

3       A.   No.

4       Q.   The same day that the Government alleged that

5   defendant violated the conditions of his release, do you

6   remember creating a PDF document that you sent to

7   Mr. Steward to file?

8       A.   I don't recall.  I don't recall.

9       Q.   So you don't recall creating a PDF and

10  e-mailing it to Mr. Steward on the same day that the

11  Government alleged that he violated his conditions of

12  release?

13      A.   If it was e-mailed to Mr. Steward, then I

14  e-mailed it.  I don't recall creating a PDF.

15      Q.   Do you remember writing any portion or typing

16  any portion of this particular document that is marked

17  Exhibit 14?

18      A.   No, I don't recall.

19      Q.   Do you recall this document being created on

20  your computer?

21      A.   I do not recall that.

22      Q.   Do you recall if defendant typed or wrote any

23  portion of this particular document that is marked as

24  Exhibit 14?

25      A.   That, I don't recall.  I believe he had his own

**Jay Manheimer - 6/17/2020**

1    computer at that point, so I don't know.

2        Q.    Since he's had his own computer, has he used

3    that computer to create documents that you then would

4    e-mail to Mr. Steward or other lawyers?

5        A.    To the best of my knowledge.

6        Q.    From just a mechanical aspect, how does that

7    work?  How does a document get from defendant's computer

8    to your computer to be e-mailed out?

9        A.    Thumb drive.

10       Q.    Since defendant's had that computer, how many

11   times have you transferred documents from that computer

12   to your computer to e-mail, approximately?

13       A.    A handful.  I can't approximate.

14       MR. ANDRE:  So if you can turn to Exhibit 16.  I

15   have asked you generally about this.  Exhibit 16 is the

16   Government's request for inquiry regarding potential

17   violations of defendant's release conditions filed on

18   June 7th.

19              (Exhibit 16 was marked for

20              identification and is annexed

21              hereto.)

22   BY MR. ANDRE:

23       Q.    Do you see that?

24       A.    Yes.

25       Q.    I will ask you if you recall seeing what we had

1    filed.  I wanted to give you a chance to actually look

2    through the document that's been marked as Exhibit 16.

3            Do you recall having a chance to look at it and

4    seeing this that night of June 7th?

5        A.   I don't recall.

6        Q.   I'll draw your attention, if you look on Page 2

7    and Page 3, there's a screenshot of metadata.

8            Prior to today, have you ever seen those?

9        A.   I don't believe so.

10       Q.   When defendant told you that the Government was

11   alleging that he violated his conditions, did you ask to

12   see what the Government had filed?

13       A.   I don't believe so.

14       Q.   Did defendant offer to show you what the

15   Government had filed?

16       A.   I don't recall.

17       Q.   So other than -- let me ask you this way.  In

18   order for defendant to have received a copy of this

19   particular document, it would have had to have been

20   e-mailed to you by Mr. Steward, correct?

21       A.   I guess so.

22       Q.   Do you recall printing this document for the

23   defendant so he could see it?

24       A.   It's possible.  I don't remember

25   specifically.

**Jay Manheimer - 6/17/2020**

1      Q.   So you agreed to serve as defendant's
2  custodian, correct?
3      A.   Correct.
4      Q.   You agreed to supervise him?
5      A.   Correct.
6      Q.   And you agreed that there would be potentially
7  significant consequences to you personally if he did not
8  comply with the conditions of his release?
9      A.   Yes.
10     Q.   So when the Government alleged that he violated
11 the conditions of his release, did that concern you?
12     A.   Yes.
13     Q.   But not enough to actually look at what the
14 Government was alleging that he did?
15     A.   I guess not.
16     Q.   The night of June 7, 2020, Sunday night when
17 the Government filed Exhibit 16 and alleged that the
18 defendant had violated the conditions of his release, did
19 you have any conversations with Mr. Steward that
20 evening?
21     A.   I believe that night or the next day,
22 perhaps.
23     Q.   Do you recall ever telling Mr. Steward that
24 defendant has not had access to a device with Internet
25 capabilities?

**Ben Hyatt Certified Deposition Reporters**
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

**Jay Manheimer - 6/17/2020**

1     A.   I don't know if those were the exact words.

2     Q.   What do you recall telling Mr. Steward about

3 the Government's allegations that defendant had violated

4 the conditions of his release?

5     A.   I believe that he didn't have access to an

6 Internet-enabled device.

7     Q.   What do you mean by that?

8     A.   Like I said, I had supervised him on the

9 computer without Internet access.

10    Q.   You felt that was appropriate under his

11 conditions?  As long as the Internet was off and you were

12 supervising, you felt it was appropriate for him to use

13 the computer?

14    MR. ANDRE:  I believe the defendant is having issues

15 hearing.  I'm going to go ahead and mute everyone

16 again.

17    MR. PEREZ:  It's either a yes or no answer.  Ask him

18 again.

19    MR. ANDRE:  I've muted everyone else except for the

20 two phones in this room, as well as the defendant.

21 Hopefully that will make defendant be able to hear

22 better.

23    MR. SAGEL:  You may want to say the witness hasn't

24 answered anything.

25    MR. ANDRE:  Yes.  The witness hadn't answered yet.

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

Jay Manheimer - 6/17/2020

```
1    Let me ask it again.
2    BY MR. ANDRE:
3         Q.   Did you feel it was appropriate under the
4    conditions of the release for defendant to use the
5    computer so long as you were supervising and you had
6    turned off the Internet?
7         A.   Yes.
8         Q.   At any point, did defendant tell you that was a
9    violation of his conditions?
10        A.   No.
11        Q.   Did you ever ask anyone whether, such as
12   Pre-Trial Services, whether that was consistent with his
13   conditions of release?
14        A.   I don't believe so.
15        Q.   Have you talked to Mr. Steward about it?
16        A.   I don't recall.
17        MR. ANDRE:  I will have you look at Exhibit 17.
18   Take a second and take a look at it.
19                  (Exhibit 17 was marked for
20              identification and is annexed
21              hereto.)
22   BY MR. ANDRE:
23        Q.   Let me know if you recognize this document.
24   Let me know whenever you're ready.
25        A.   I don't recall seeing it.
```

**Ben Hyatt Certified Deposition Reporters**
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

**Jay Manheimer - 6/17/2020**

```
 1        Q.   So will you agree this is defendant's response
 2   to the Government's allegation that defendant had
 3   violated the conditions of his release?  Is that a fair
 4   general summary of this document?
 5        A.   I'm sorry.  What did you say?
 6        Q.   Would you agree this document is a response
 7   from the defendant to the Government's allegations that
 8   he had violated the conditions of his release?
 9        A.   With no legal training, yes.
10        Q.   Generally speaking, as best you can.
11        A.   Yeah.
12        Q.   Did you take part at all in drafting a response
13   to the Government's allegation that the defendant had
14   violated the conditions of his release?
15        A.   No.
16        Q.   Did you see defendant write or type any sort of
17   response to the Government's allegations?
18        A.   I don't recall.
19        Q.   So looking again at Exhibit 17, do you remember
20   scanning a document for defendant that night of June 7th
21   after the Government had alleged he violated the
22   conditions of his release?
23        A.   I may have.  I don't recall.
24        Q.   You don't remember one way or the other?
25        A.   Correct.
```

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

1        Q.   We asked you about your e-mail addresses, and

2    you've written those down on that piece of paper which I

3    marked as Exhibit 20.

4            We've also asked you about the fact you have a

5    smart phone.  I believe Exhibit 1, there's a cell phone

6    number identified for you ending in 3388.

7            Do you see that?

8        A.   Yes.

9        Q.   Do you have any other phone numbers or cell

10   phone numbers you use?

11       A.   No.

12       Q.   Do you use social media?

13       A.   Occasionally.

14       Q.   What social media accounts do you have?  Not

15   the actual username, but like Facebook, Twitter, et

16   cetera?

17       A.   Facebook, Twitter and Instagram.

18       Q.   Do you have a Linked In account?

19       A.   Yes.

20       Q.   I'm going to try to do this as efficiently as

21   possible.

22            How often do you use Facebook?

23       A.   Very rarely.

24       Q.   Do you know your Facebook username?

25       A.   Facebook username?

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

1        Q.   Yes.

2        A.   I think it's just my name.

3        MR. STEWARD:  Objection; relevance.

4    BY MR. ANDRE:

5        Q.   I'm going to move on to another question.

6             How often do you use Twitter?

7        MR. STEWARD:  Same objection.

8    BY MR. ANDRE:

9        Q.   You can answer the question.

10       A.   Rarely.

11       Q.   Can you please write down, if you know it --

12   well, do you know your Twitter username?

13       A.   I believe so.

14       Q.   If you do, if you could write it down on that

15   piece of paper?

16       MR. STEWARD:  While he's doing that, I'm going to

17   assert a standing objection to this line of questioning

18   as irrelevant.

19   BY MR. ANDRE:

20       Q.   You said you rarely use Twitter.

21            Is that rarely posting to Twitter or rarely

22   looking at Twitter?

23       A.   Rarely in both cases.

24       Q.   You said you use Linked In.

25            How often do you use Linked In?

Ben Hyatt Certified Deposition Reporters
888.272.0022  818.343.7040  Fax 818.343.7119  www.benhyatt.com

Jay Manheimer - 6/17/2020

```
 1        A.   Rarely.

 2        Q.   I assume that's associated with your own

 3   name?

 4        A.   Yes.

 5        Q.   How often do you use Instagram?

 6        A.   Fairly regularly.

 7        Q.   Do you know your Instagram username?

 8        A.   Yeah.

 9        Q.   If you could please write that down on the same

10   piece of paper that's marked as Exhibit 20.

11             Since defendant has been in your custody, have

12   you seen him access any of his social media accounts?

13        A.   No.

14        Q.   Have you accessed any of defendant's social

15   media accounts on his behalf?

16        A.   Not that I recall.

17        Q.   Do you use any encrypted messaging

18   applications?

19        A.   Can you clarify?

20        Q.   Are you familiar with WhatsApp?

21        A.   I have used it.

22        Q.   So fair to say, WhatsApp is a type of encrypted

23   messaging service?

24        A.   I guess so.  I don't know.

25        Q.   Do you use any applications on your phone to
```

Page 95

Jay Manheimer - 6/17/2020

```
 1    communicate with people where the messages are not saved
 2    or automatically deleted after a certain period of time?
 3         A.   Not that I know of.
 4         Q.   So you don't frequently use any encrypted
 5    messaging applications on your phone that you're aware
 6    of?
 7         A.   Can you give me examples?
 8         Q.   WhatsApp or Signal or Telegram?
 9         A.   No.
10         Q.   Have you ever used any sort of encrypted
11    messaging service to communicate with the defendant,
12    something other than text message or e-mail or phone,
13    some sort of encrypted message system, like WhatsApp,
14    Signal or SnapChat, something like that?
15         A.   What time period?
16         Q.   Prior to, let's say the last two years.
17         A.   Last two years?  I don't believe so.
18         Q.   Have you used any encrypted messaging services
19    to communicate on defendant's behalf since he's been in
20    your custody?
21         A.   No.
22         Q.   Have you seen defendant use any sort of
23    encrypted messaging program or software?
24         A.   Not that I recall.
25         MR. ANDRE:  Mr. Perez, just to be clear, the next
```

**Ben Hyatt Certified Deposition Reporters**
888.272.0022  818.343.7040  Fax 818.343.7119  www.benhyatt.com

**Jay Manheimer - 6/17/2020**

1   series of questions, I want to be very careful about your

2   privacy, but I want to be able to rule out certain

3   activities that may be found on your computer.

4   BY MR. ANDRE:

5       Q.   Do you use the Internet to do any online

6   banking or conduct financial transactions?

7       MR. PEREZ:  Yes or no.

8       THE WITNESS:  Yes.

9   BY MR. ANDRE:

10      Q.   Focusing on since defendant has been in your

11  custody, could you write down on that piece of paper, the

12  financial institutions in which you would have conducted

13  any on-line banking?

14      MR. PEREZ:  Well, I'm going to object on relevance

15  grounds.

16      MR. ANDRE:  I understand that.

17      MR. PEREZ:  I don't see the relevance of his

18  Internet banking and what you're alleging in your

19  pleadings concerning Mr. Avenatti's potential violation

20  of his conditions.

21      MR. ANDRE:  I will gladly explain why I'm asking,

22  and then we can leave it if need be.

23          For example, let's say Mr. Perez -- or

24  Mr. Manheimer has an account at Bank of America and an

25  account at Citibank, and those are the only two accounts

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

1    he has.  And then Pre-Trial Services, when looking

2    through the devices for Mr. Manheimer's residence, find a

3    bunch of visits to Wells Fargo.  The fact that

4    Mr. Manheimer doesn't have an account there is relevant.

5    That's why we're asking.  I'm happy to do it in a way

6    that protects your client's privacy as best as possible.

7         MR. PEREZ:  I think you can give the identity of

8    your bank, your on-line bank.

9         MR. ANDRE:  Again, just with everything else, these

10   are not going to be part of the public record.

11              I assume you did not write down your account

12   number.  I do not want it.

13   BY MR. ANDRE:

14        Q.   To the extent you conduct online banking, which

15   devices of yours do you use?

16        A.   All of them.

17        Q.   Have you observed defendant using any digital

18   device to conduct any sort of financial transactions

19   since he's been in your custody?

20        A.   No.

21        Q.   Have you conducted any financial transactions

22   on defendant's behalf since he's been in your custody?

23        A.   No.

24        Q.   Have you accessed his bank accounts online or

25   anything of that nature?

**Ben Hyatt Certified Deposition Reporters**
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

**Jay Manheimer - 6/17/2020**

1          Let me withdraw that.  That's not a very good

2    question.

3          Have you used the Internet to access any bank

4    account or financial account associated with defendant

5    since he's been in your custody?

6    A.    No.

7    Q.    Are you aware of defendant conducting any

8    financial transactions in excess of $500?

9    A.    No.

10   Q.    Do you know where defendant is currently

11   maintaining a bank account?

12   MR. STEWARD:  Objection; assumes facts not in

13   evidence that he has a current bank account.

14   BY MR. ANDRE:

15   Q.    I will back up and ask it this way.  Do you

16   know if defendant currently has a bank account?

17   A.    I do not.

18   Q.    And since you don't know if he has a bank

19   account, I assume you do not know where that bank account

20   is?

21   A.    Correct.

22   Q.    We looked earlier at Exhibit 2 which was the

23   conditions of defendant's release.

24          Have you observed defendant violate any other

25   condition of his release?

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

**Jay Manheimer - 6/17/2020**

1        A.   Can you be more specific?

2        Q.   I'm asking you a broad question.  Have you

3    personally observed defendant violate any condition of

4    his release?

5        A.   No, I have not.

6        Q.   Do you have any reason to believe defendant has

7    violated any other conditions of his release?

8        A.   I do not.

9        Q.   So we talked a little about the night, late

10   afternoon on June 7th, Sunday, when the Government

11   alleged the defendant violated the conditions of his

12   release.

13            Were you aware there was a hearing the next

14   day?

15       A.   I'm sorry?

16       Q.   Are you aware there was a hearing the next day,

17   that Monday, June 8th?

18       A.   Sounds familiar.

19       Q.   Did you listen in on that hearing?

20       A.   No.

21       Q.   Did you talk to defendant after that hearing

22   was over?

23       A.   I don't recall.

24       Q.   How did you learn that the Court in this case,

25   the judge in this case, had ordered that we be allowed to

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

**Jay Manheimer - 6/17/2020**

1  conduct this deposition; that the Government be allowed

2  to conduct this deposition?

3      A.   I believe it was through Mr. Steward, but I

4  don't recall specifically.

5      Q.   Do you recall how you learned the Court had

6  ordered Pre-Trial Services to conduct the search of your

7  computer and other digital devices?

8      A.   I recall Officer Davis calling and telling

9  us.

10      Q.   Before you spoke to Officer Davis, did you know

11  that was going to happen?

12      A.   I don't recall.

13      Q.   Do you remember --

14      A.   Yeah, until she called, I didn't know it was

15  going to happen, not for sure.

16      Q.   When she called and said they are going to come

17  search your computer in your residence, you were

18  surprised by that?

19      A.   Yes.

20      Q.   Defendant hadn't told you the Court had ordered

21  that would take place?

22      A.   I don't recall that.

23      Q.   You don't recall Mr. Steward telling you that

24  would take place?

25      A.   I recall it being a possibility, but until she

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

**Jay Manheimer - 6/17/2020**

1   called, I didn't know it was happening for sure.

2          Q.   Let me just make sure I understand.

3               You knew it was possible, but you didn't know

4   if it was for sure going to happen?

5          A.   Correct.

6          Q.   So when it did happen, you were surprised?

7          A.   When Officer Davis told me, yes.

8          Q.   What, if anything, did you do -- well, let me

9   back up a second.

10              Other than discussions you had with Mr. Perez,

11  which I do not want to know about, what have you done to

12  prepare for your testimony here today?

13         A.   I spoke to Mr. Perez.

14         Q.   Did you discuss your testimony here today with

15  the defendant, Michael Avenatti?

16         A.   No.

17         Q.   Have you talked to him at all about what you

18  were going to say here today?

19         A.   No.

20         Q.   Have you discussed your testimony here today

21  with Mr. Steward?

22         A.   I don't recall that.  Just Mr. Perez.

23         Q.   So you recall speaking to your own lawyer, but

24  you don't recall having any discussions with Mr. Steward

25  about your testimony here today?

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022  818.343.7040  Fax 818.343.7119  www.benhyatt.com**

**Jay Manheimer - 6/17/2020**

1    A.   Correct.

2    Q.   Since June 7th, when the Government alleged the

3 defendant had violated the conditions of his release and

4 today, what discussions have you had with defendant about

5 the Government's allegations?

6    A.   I don't really understand the question.

7    Q.   So it's been -- there's been 12 days, on June

8 7th -- ten days ago, on June 7th, the Government alleged

9 that defendant had violated the conditions of his release

10 by using your computer.  Ten days has since passed.

11        Have you discussed the Government's allegations

12 with defendant in those ten days?

13   A.   I mean, generally, we didn't understand them,

14 but there's nothing really.  We never really -- I mean, I

15 didn't really understand them.  Once they searched my

16 place and took my computers, there wasn't much to talk

17 about.

18   Q.   Have you intentionally avoided discussing them

19 with the defendant?

20   A.   Well, the process really wasn't making me

21 happy, so I didn't really want to --

22   Q.   Have you --

23   A.   -- look into it.

24   Q.   I didn't mean to cut you off.

25        Were you finished with your answer?

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

**Jay Manheimer - 6/17/2020**

1       A.   Yes.

2       Q.   Did you express -- I think you said you weren't

3  particularly happy?

4       A.   Yes.

5       Q.   Did you express the unhappiness to defendant?

6       A.   Yes.

7       MR. AVENATTI:  I didn't hear that question.

8  BY MR. ANDRE:

9       Q.   When you told the defendant you were unhappy,

10  what was his response?

11       A.   He said, I'm sorry you have to go through

12  this.

13       Q.   Anything else?

14       A.   No.  The incident I recall is, once I found out

15  my apartment was going to be searched, I wasn't happy and

16  went in my room and just wanted to be alone.

17       Q.   You said -- if I'm getting the exact words

18  wrong, please correct me.  You said that we didn't

19  understand the allegations.

20            Did you mean to include defendant didn't seem

21  to understand what the Government was alleging?

22       A.   I can't speak for him.  I'm saying I didn't

23  understand where the allegations were coming from.

24       Q.   Do you think defendant understood the

25  allegations and what they were?

Page 104

**Jay Manheimer - 6/17/2020**

1        MR. STEWARD:  Objection; calls for speculation.

2    BY MR. ANDRE:

3        Q.   You can answer.

4        A.   Again, I can't speak for him.

5        Q.   Did defendant ever tell you he was confused and

6    didn't understand what this was about?

7        MR. STEWARD:  Objection; leading.

8        MR. ANDRE:  You can answer.

9        MR. PEREZ:  You can answer.

10       THE WITNESS:  Yes, he was perplexed, as I was.  I

11   don't remember specifically what he said.

12       MR. ANDRE:  Can you give me a few seconds.  We're

13   almost done, and I will turn it over to Mr. Steward.  I

14   just want to confer with Mr. Sagel.

15       (A break was taken from 4:17 p.m. to 4:19 p.m.)

16   BY MR. ANDRE:

17       Q.   I just have a couple follow-up questions.

18            At the beginning, you mentioned the defendant

19   received, I think you called them gifts.

20            Do you recall that?

21       A.   Yes.

22       Q.   And my recollection is that you testified they

23   would have been addressed to the defendant, Michael

24   Mr. Avenatti, as opposed to you personally?

25       A.   I don't recall.  I mean, it's my address, so it

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022  818.343.7040  Fax 818.343.7119  www.benhyatt.com**

**Jay Manheimer - 6/17/2020**

1  has to be addressed to me.

2      Q.   Does Mr. Avenatti receive mail at your address

3  in his own name?

4      A.   I believe the ankle bracelet, the bill for

5  that, was in his name.

6      Q.   Have you seen Mr. Avenatti attempt to remove

7  his ankle bracelet?

8      A.   No.

9      Q.   The gifts that arrived, were you aware in

10  advance that they were arriving?

11      A.   Can you clarify?

12      Q.   Did Mr. Avenatti tell you, There are gifts

13  arriving for me tomorrow?

14      A.   No.

15      Q.   They just appeared, at least from your

16  perspective?

17      A.   I received e-mails from some of his supporters

18  that said they might be sending something.

19      Q.   Would you then provide his supporters with your

20  address so they could send it?

21      A.   Yes.

22      Q.   Would you look in the contents of those boxes

23  when they arrived?

24      MR. STEWARD:  Objection; assumes facts not in

25  evidence that they were boxes.

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022  818.343.7040  Fax 818.343.7119  www.benhyatt.com**

**Jay Manheimer - 6/17/2020**

1    BY MR. ANDRE:

2         Q.   Boxes envelopes, I'll rephrase it.

3              The packages that arrived, would you review the

4    contents of the packages that would arrive?

5         A.   I have, yes.

6         Q.   Did you review the contents of all the packages

7    or just occasionally?

8         A.   No, I would say that I probably saw

9    everything.

10        Q.   And again, what types of items were in these

11   packages?

12        A.   Mainly food.  Someone sent a tartan of some

13   sort or a scarf, cleaning supplies.

14        Q.   Do you know if any packages would have included

15   a phone or tablet or anything that could access the

16   Internet?

17        A.   No.

18        Q.   No, you don't know, or no?

19        A.   I'm sorry, no, they did not.

20        Q.   At any point between June 7th, when the

21   Government alleged defendant violated his conditions

22   under his release, and when Pre-Trial Services came to

23   search your devices, did you see defendant do anything to

24   conceal any sort of Internet usage or anything along

25   those lines?

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022  818.343.7040  Fax 818.343.7119  www.benhyatt.com**

**Jay Manheimer - 6/17/2020**

1      A.   No.

2      Q.   Did you make any efforts between those two

3  days, June 7th, and when Pre-Trial Services came to your

4  residence to conceal defendant's use of the computer or

5  Internet?

6      A.   No.

7      MR. ANDRE:  With that, I have no more questions for

8  you at this time.

9           Mr. Steward, I believe it is your turn.

10                   EXAMINATION

11 BY MR. STEWARD:

12     Q.   Thank you.  Mr. Manheimer, following up on

13 gifts part we were just talking about, were these gifts,

14 when you say food.  Was it cookies?  What sort of things

15 was he getting?

16     A.   Some fish, burgers, that kind of stuff.

17     Q.   Some of these were in the monetary form,

18 right?

19     A.   Yes, some were gift certificates for like food

20 delivery.

21     Q.   You got a check from me, right?

22     A.   Correct.

23     Q.   Approximately $500?

24     A.   Correct.

25     Q.   What was your understanding what that money was

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022  818.343.7040  Fax 818.343.7119  www.benhyatt.com**

**Jay Manheimer - 6/17/2020**

1  for?

2      A.   To help mitigate the expenses for Michael

3  living with me.

4      Q.   It wasn't a payment to you, was it?

5      A.   Sorry?

6      Q.   It wasn't like a payment to you for putting up

7  with him, was it?

8      A.   No, it was directly to bills.

9      Q.   Fair to say costs, right?

10     A.   I'm sorry?

11     Q.   Costs is what it was for?

12     A.   Yes.

13     Q.   Now, do you know that Mr. Avenatti reported

14  these gifts to Pre-Trial Services?

15     A.   I know he sends a financial report every two

16  weeks to Officer Davis.

17     Q.   And do you know that he included these gifts or

18  one way or the other, do you know?

19     A.   I don't know.

20     Q.   And when we're talking about Ms. Davis, she's a

21  Pre-Trial Services officer in Los Angeles, correct?

22     A.   Correct.

23     Q.   And before Mr. Avenatti was dropped off at your

24  apartment by me, you had a conversation with Ms. Davis

25  about the conditions that were going to apply to

**Ben Hyatt Certified Deposition Reporters**
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

**Jay Manheimer - 6/17/2020**

1    Mr. Avenatti's bail, right?

2        A.   Correct.

3        Q.   And she went over point-by-point with you what

4    those conditions were, right?

5        A.   Correct.

6        MR. ANDRE:  Objection; leading.

7        MR. STEWARD:  Well, I get to lead, but anyway.

8    BY MR. STEWARD:

9        Q.   So at the end of that conversation, did she ask

10   you if you were willing to act as a third-party

11   custodian?

12       A.   I don't recall.  I assume.

13       Q.   And what you do recall out of that is going

14   over the conditions, right?

15       A.   Correct.

16       Q.   Now, having this body of information in your

17   mind, are you aware of any instance where Mr. Avenatti

18   had violated any bail condition?

19       A.   No.

20       Q.   And based on your observations of Mr. Avenatti

21   for the last six weeks, has he taken his bail conditions

22   very seriously at all times?

23       A.   Yes.

24       Q.   Has it been your observation that it's

25   important for him to comply fully with these

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022  818.343.7040  Fax 818.343.7119  www.benhyatt.com**

**Jay Manheimer - 6/17/2020**

1    conditions?

2         A.   Yes.

3         Q.   You mentioned that you had -- and just

4    hopefully got back, a cell phone, a tablet and a laptop,

5    right?

6         A.   Yes, and also two dead computers.

7         Q.   Each one of those three devices that I just

8    named, did they have password protection?

9         A.   Yes.

10        Q.   And did Mr. Avenatti have the password for any

11   of those three devices?

12        A.   No.

13        Q.   When you said that the Internet was disabled on

14   the one or two times you recall Mr. Avenatti using the

15   keyboard, how did you disable the Internet?

16        A.   I turned it off.

17        Q.   Now, I think you said Mr. Avenatti has been

18   visited by some attorneys; is that correct?

19        A.   Correct.

20        Q.   And were you aware that at Page 4 of the bail

21   conditions, Line 21, reads as follows:  Defendant may

22   also access and use an Internet-enabled digital device

23   while in the presence of defendant's legal counsel solely

24   for the purpose of preparing his defense in this case and

25   in the two pending cases in the Southern District of New

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

**Jay Manheimer - 6/17/2020**

1    York.

2            Were you aware of that?

3        A.   Yes.

4        Q.   And on e-mail, have you connected with any

5    attorneys, in addition to me, about Mr. Avenatti's

6    cases?

7        A.   Yes.

8        Q.   Any idea how many of them?

9        A.   Six maybe.  Five, six, seven.

10       Q.   At least six?

11       A.   Probably.

12       Q.   And perhaps as many as six have visited

13   Mr. Avenatti at your home, correct?

14       A.   Probably.

15       Q.   Now, in terms of the phone that Mr. Avenatti

16   was to use, do you know if Ms. Davis, from Pre-Trial

17   Services, examined it or otherwise approved it for

18   use?

19       A.   Yes, she approved it.

20       Q.   And also, have you been a conduit between

21   Ms. Davis at Pre-Trial Services and Mr. Avenatti?

22       A.   Can you clarify?

23       Q.   Sure.

24            E-mails back and forth.  For example,

25   Mr. Avenatti needs to report every two weeks his

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

**Jay Manheimer - 6/17/2020**

 1    finances.

 2              How would he do that to Ms. Davis in Los

 3    Angeles?

 4         A.   Yes.  Through e-mail.

 5         Q.   How would that information go from Mr. Avenatti

 6    to Ms. Davis in Los Angeles?

 7         A.    Through my personal e-mail.

 8         Q.   I guess what I'm asking is, how did

 9    Mr. Avenatti, did he hand write it out and hand it to you

10    or dictate it to you?  How is it the information from him

11    gets to Ms. Davis?

12         A.    Taking dictation, sometimes he writes things

13    out.

14         MR. STEWARD:  No further questions.

15                          EXAMINATION

16    BY MR. ANDRE:

17         Q.   I have just a couple follow-ups.

18              So Mr. Steward asked about defendant's

19    attorneys.

20              How many of defendant's attorneys have visited

21    him in your residence?

22         A.   I'd say five, six, seven.

23         Q.   Frequently?  Rarely?  How many times has his

24    lawyers come to visit him at your residence?

25         A.   I really don't know.  I mean, I really don't

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

**Jay Manheimer - 6/17/2020**

1  know.

2       Q.   Now, Mr. Steward asked you about the condition

3  about defendant using a computer with Internet while his

4  defense attorneys were present.

5            Do you recall that questioning?

6       A.   Correct.

7       Q.   Did you see defendant using a computer with

8  Internet access with his attorneys?

9       A.   I don't remember one way or the other.

10       Q.   The two instances you discussed in which you

11  supervised him using your computer with the Internet off,

12  those weren't with his attorneys present, those were just

13  with you and Mr. Avenatti, correct?

14       A.   Correct.

15       Q.   How many times did Mr. Steward visit your

16  residence?

17       A.   I'd say once, I believe.

18       Q.   So one time.

19            Is that the time Mr. Steward dropped the

20  defendant off at your residence or is that one time in

21  addition to it?

22       A.   I believe when he dropped him off.

23       Q.   You mentioned that defendant would dictate

24  things to you to then send via e-mail.

25            Do you recall that?

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

**Jay Manheimer - 6/17/2020**

1     A.   Yes.

2     Q.   Did he dictate anything else for you to type

3  for him other than e-mails?

4     A.   Not that I recall.

5     Q.   So the only thing you remember him dictating

6  for you to type are e-mails?

7     A.   I can't say for sure.

8     MR. ANDRE:  I think that is all of my questions.

9        Mr. Steward, anything else?

10    MR. STEWARD:  No.  Other than, I think Mr. Perez was

11  going to ask if we can put on the record the standard

12  deposition stuff which I don't do civil.  Mr. Perez does

13  more than me.

14    MR. PEREZ:  Which is still limited.

15       One of the thing I wanted to make sure of is

16  that Mr. Manheimer has the ability to review the

17  transcript make and sure there are no mistakes, have him

18  sign it under penalty of perjury, send it back to you, to

19  the court reporter.  I don't know if you do where he has

20  to go view it and sign it there or if it is actually sent

21  to him.  I don't know what your practice is here.

22    MR. SAGEL:  Probably in the current environment, we

23  will e-mail it to you.

24    MR. PEREZ:  If the original is lost, a copy can be

25  used for any and all purposes.

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022  818.343.7040  Fax 818.343.7119  www.benhyatt.com**

**Jay Manheimer - 6/17/2020**

1          THE REPORTER:  Do you want copies?

2          MR. STEWARD:  I definitely want a copy.

3          MR. ANDRE:  Anything else, Mr. Steward, you want to

4     put on the record?

5          MR. STEWARD:  No.

6          MR. ANDRE:  Mr. Perez?

7          MR. PEREZ:  No.

8          MR. ANDRE:  Thank you for your time.  With that, we

9     will go off the record, and I'm going it hang up this

10    conference call line.

11              (Whereupon the proceedings ended at 4:35 p.m.)

12         (Penalty of Perjury on the following page, attached

13         hereto.)

14

15

16

17

18

19

20

21

22

23

24

25

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022  818.343.7040  Fax 818.343.7119  www.benhyatt.com**

Jay Manheimer - 6/17/2020

```
 1                        GOVERNMENT'S EXHIBITS

 2                          JAY MANHEIMER

 3

 4     NUMBER              DESCRIPTION              IDENTIFIED

 5

 6     1     Form CR-31, Affidavit of Third-Party        9
             Custodian
 7
       2     The order setting forth the conditions of  10
 8           defendant's temporary release

 9     3     Another document setting forth the         11
             conditions of defendant's temporary release
10
       19    Mr. Avenatti's girlfriend's name written   23
11           out on a piece of paper
             (NOT FOR PUBLIC VIEWING)
12
       20    E-mail addresses and usernames of          61
13           Mr. Manheimer written on a piece of paper
             (NOT FOR PUBLIC VIEWING)
14
       4     A document titled, "Defendant's Status     63
15           Report" filed on May 27, 2020

16     5     A screenshot of metadata pulled from       64
             Exhibit 4
17
       6     A document titled, "Defendant's            73
18           Supplement to Status Report

19     8     A document titled, "Defendant's Second     75
             Supplement to Status Report
20
       10    A document titled, "Defendant's Status     81
21           Report" filed on June 5, 2020

22     12    A document titled, Defendant's Memorandum  83
             Re Allocation of Assets and the Impact
23           on Defendant's Rights and the Trial Date

24

25
```

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

**Jay Manheimer - 6/17/2020**

```
 1    EXHIBITS - (Continued)

 2

 3

 4    14    A document titled, "Defendant's          85
            Supplemental Status Report filed
 5          June 7, 2020

 6    16    Government's Request for Inquiry          87
            Regarding Defendant Michael John
 7          Avenatti's Potential Violations of
            his Conditions of Temporary Release
 8
      17    A document titled, Defendant's            91
 9          Preliminary Response to Government's
            Request Re Bail Conditions
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

Jay Manheimer - 6/17/2020

```
 1        I declare under penalty of perjury under the laws of
 2   the State of California that the foregoing is true and
 3   correct.
 4            Executed on_____, 2020 at
 5   _____, California
 6
 7                          _____
 8                          SIGNATURE OF THE WITNESS
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

```
 1    STATE OF CALIFORNIA      )
                               )    ss.
 2    COUNTY OF ORANGE         )

 3

 4              I, the undersigned, a Certified Shorthand

 5    Reporter of the State of California, do hereby certify:

 6              That the foregoing proceedings were taken

 7    before me at the time and place herein set forth; that

 8    any witnesses in the foregoing proceedings, prior to

 9    testifying, were placed under oath; that a verbatim

10    record of the proceedings was made by me using machine

11    shorthand which was thereafter transcribed under my

12    direction; further, that the foregoing is a true record

13    of the testimony given.

14              Before completion of the deposition, review of

15    the transcript [X]was [ ]was not requested.  If

16    requested, any changes made by the deponent (and provided

17    to the reporter) during the period allowed are appended

18    hereto.

19              I further certify that I am not interested in

20    the outcome of the action.

21              WITNESS WHEREOF, I have subscribed my name this

22    29th day of June, 2020.

23

24    _____
                                         MARY M. O'BRIEN
25                                       CSR #11986
```

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Jay Manheimer - 6/17/2020

```
 1   I N D E X

 2

 3

 4   WEDNESDAY, JUNE 17, 2020

 5

 6   WITNESS                              EXAMINATION

 7

 8   JAY MANHEIMER

 9

10          (By Mr. Andre)               4,113

11          (By Mr. Steward)              108

12

13

14              INSTRUCTION NOT TO ANSWER

15                    Page      Line

16                     59         3

17

18

19

20

21

22

23

24

25
```

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022  818.343.7040  Fax 818.343.7119  www.benhyatt.com**

## A

abide 23:5
ability 15:1 77:12
  115:16
able 15:3 43:9
  72:23 78:24 79:1
  79:3 90:21 97:2
abundance 57:10
  58:10
access 14:15,20,21
  15:1,2,4,9,10,11
  15:12,13,16,20
  16:2 17:2,5,12
  19:10,11 20:4
  24:15 27:16,19
  34:1 37:4 42:23
  43:9,15 44:1,10
  44:19 47:2 49:18
  67:2 89:24 90:5,9
  95:12 99:3 107:15
  111:22 114:8
accessed 24:20
  44:14 46:4,7,19
  95:14 98:24
accessible 24:3
  34:11 43:19,22
accessing 41:23
  44:23 46:13
account 45:16 46:5
  46:8 93:18 97:24
  97:25 98:4,11
  99:4,4,11,13,16
  99:19,19
accounts 93:14
  95:12,15 97:25
  98:24
accurate 6:4
act 110:10
action 58:8 120:20
activities 97:3
actual 12:3 55:5
  70:20 93:15
addition 112:5
  114:21
address 45:11,13

45:20 60:10,13,18
  60:22 61:7,15,16
  62:1,6 66:13
  105:25 106:2,20
addressed 9:9
  105:23 106:1
addresses 61:9,11
  61:19 62:2 93:1
  117:12
adequately 79:4,4
Ads 50:1
advance 106:10
advertisement 50:4
advertising 50:1
advice 81:3
Affidavit 10:1,3
  117:6
afternoon 4:7
  100:10
ago 34:25 81:17
  84:4,9 103:8
agree 12:5 22:12,25
  50:16 92:1,6
agreed 7:10,25
  11:15 13:14 89:1
  89:4,6
agreeing 8:4,7,11
ahead 6:11 7:19
  23:10 49:11 90:15
allegation 92:2,13
allegations 85:14
  90:3 92:7,17
  103:5,11 104:19
  104:23,25
alleged 84:22 85:9
  86:4,11 89:10,17
  92:21 100:11
  103:2,8 107:21
allegedly 47:24
alleging 85:3,4
  88:11 89:14 97:18
  104:21
Allocation 117:22
allow 14:21 40:7
allowed 15:7

100:25 101:1
  120:17
allows 78:16
Amendment 4:25
America 1:5 97:24
amount 29:24
Ana 1:17 2:10
Andre 2:6 4:6,7
  7:20,24 9:4,17,22
  10:20 11:1,6,11
  16:19 17:21 18:1
  18:15 19:13 20:11
  22:1,19,24 23:6
  23:10,15 24:1,18
  25:20 26:1,12,13
  31:2,5 49:4,12,15
  50:11,14,17 51:9
  51:22 52:3,10,14
  53:10,23 54:1
  56:8,22 57:13,21
  57:24 58:5 59:11,4
  59:8,21 60:5,25
  61:6 63:3,8,12,24
  64:10,18 65:22
  66:24 67:23 68:19
  68:22 70:10 71:5
  71:7 73:12,17
  75:4,8 76:6 77:16
  77:21,24 78:24
  79:9,24 80:19,25
  81:2,6,11 82:5
  83:6,10,14 85:16
  85:23 87:14,22
  90:14,19,25 91:2
  91:17,22 94:4,8
  94:19 96:25 97:4
  97:9,16,21 98:9
  98:13 99:14 104:8
  105:2,8,12,16
  107:1 108:7 110:6
  113:16 115:8
  116:3,6,8 121:10
Angeles 109:21
  113:3,6
ankle 106:4,7

annexed 9:20 10:24
  11:9 23:13 61:4
  63:18 64:16 73:15
  75:6 81:9 83:12
  85:21 87:20 91:20
anniversary 54:13
answer 5:1,2,3,21
  6:2,10,11,19 9:2
  21:25 25:21 49:11
  49:12 56:24 57:3
  57:8,17 59:2,5
  68:19,20 70:8
  71:9 76:4 77:12
  81:1 82:4,6 83:7
  90:17 94:9 103:25
  105:3,8,9 121:14
answered 90:24,25
answering 6:23 9:3
answers 6:8
anyway 110:7
apartment 29:21
  41:4 43:2,18 44:1
  104:15 109:24
app 42:15,16
APPEARANCES
  2:1 3:1
appeared 106:15
appears 10:8 69:23
appended 120:17
Apple 41:10,11,15
  41:18,21
applications 95:18
  95:25 96:5
apply 109:25
appreciate 26:11
appropriate 6:24
  90:10,12 91:3
approved 112:17
  112:19
approximate 87:13
approximately
  27:1 32:1,22
  34:24 45:18 87:12
  108:23
April 10:8 18:25

20:8 21:19 49:8
area 20:25 43:17
  71:2
arrive 107:4
arrived 14:6,8
  106:9,23 107:3
arriving 106:10,13
article 68:11,14,24
  69:2,5,24 70:2,5
  70:11,18 74:5
articles 69:20 70:14
  70:24,25 71:1,17
  71:19,24 72:9,12
  72:17
asked 5:1 31:24
  35:22 38:23 40:5
  40:7,15 49:1
  87:15 93:1,4
  113:18 114:2
asking 21:1 26:14
  43:12 51:24 54:3
  56:9 58:18,20
  77:2 97:21 98:5
  100:2 113:8
aspect 22:10 87:6
assert 57:6 94:17
asserted 58:11
Assets 117:22
assist 52:15
Assistant 4:8
assisted 52:4
assisting 72:4,20
associated 95:2
  99:4
assume 6:19 41:12
  65:20 71:8 81:3
  95:2 98:11 99:19
  110:12
assumes 99:12
  106:24
assuming 78:23
attach 71:24
attached 69:20
  70:16 71:12 72:6
  72:9 116:12

**attaches** 74:6
**attaching** 72:13
**attempt** 106:6
**attended** 50:8
**attention** 9:17
　10:20 66:10 68:8
　88:6
**attest** 71:20
**attorney** 4:8,19
　31:22 49:2
**ATTORNEY'S** 2:5
**attorney-client**
　56:6 57:9 58:10
　58:16 71:3 80:15
**attorneys** 26:19,20
　111:18 112:5
　113:19,20 114:4,8
　114:12
**audibly** 5:21
**AUSA** 4:9 77:24
**author** 64:13
**automatically**
　33:16 96:2
**Avenatti** 1:8 2:16
　7:11 8:1,19,22 9:1
　9:7,9,10,11 13:11
　14:6,12 16:17
　22:8 24:15 25:14
　26:3 31:9 55:23
　57:7,8 58:12
　61:13 67:2,24
　77:11 78:1,7,13
　78:20 84:11,18
　102:15 104:7
　105:24 106:2,6,12
　109:13,23 110:17
　110:20 111:10,14
　111:17 112:13,15
　112:21,25 113:5,9
　114:13
**Avenatti's** 23:6
　53:2 54:25 56:4
　77:18,19 97:19
　110:1 112:5
　117:10 118:7

**Avenida** 2:19
**avoided** 103:18
**awake** 20:13 21:15
**aware** 18:5 25:12
　37:8 41:23 43:24
　47:21 62:7 84:3,8
　84:14 96:5 99:7
　100:13,16 106:9
　110:17 111:20
　112:2

**B**
**back** 37:9 47:1
　57:15,19 58:23,24
　58:25 59:9 62:14
　68:24 85:16 99:15
　102:9 111:4
　112:24 115:18
**bail** 13:15,18,23
　85:1 110:1,18,21
　111:20 118:9
**bank** 97:24 98:8,8
　98:24 99:3,11,13
　99:16,18,19
**banking** 97:6,13,18
　98:14
**based** 6:25 16:25
　57:9 65:23 67:6
　72:4 110:20
**basically** 14:15
　17:10 76:23 77:4
　79:13
**basis** 15:17 36:17
　56:7,21 57:5
**bathroom** 19:21
　27:13
**bathrooms** 19:22
**bedroom** 20:1,14
　20:24 21:9,9,12
　21:17 33:4,5,6,8
　38:10 39:18
**Bedrooms** 19:16
**beginning** 79:13
　105:18
**behalf** 30:10 32:2

45:2,8 47:3 48:6
　56:4 57:7 58:11
　59:6 61:17 62:5
　62:10,18,24 66:21
　82:19 83:1 95:15
　96:19 98:22
**believe** 5:2 9:10
　13:16,20 14:5
　15:14 16:6 25:3,4
　31:8 34:9 37:17
　43:22 44:18,22
　46:9 47:10 49:17
　54:10 67:6 69:7
　73:7 76:7 77:3
　79:1,11 80:1 85:4
　86:25 88:9,13
　89:21 90:5,14
　91:14 93:5 94:13
　96:17 100:6 101:3
　106:4 108:9
　114:17,22
**benefit** 8:14
**best** 6:25 19:6
　27:20 28:18 32:6
　34:22 55:4,4,21
　73:11 77:16 78:4
　79:6,7 87:5 92:10
　98:6
**better** 90:22
**beyond** 14:2 41:15
　43:19 53:11 62:11
**biggest** 14:16
**bill** 106:4
**bills** 109:8
**binder** 9:18 63:14
**bit** 42:22 44:25
　71:11
**blank** 77:5
**blue** 69:22
**body** 110:16
**bottom** 66:14 68:7
**boxes** 106:22,25
　107:2
**bracelet** 106:4,7
**break** 4:22 49:2,3

53:23,25 54:2
　105:15
**Brett** 2:7 4:9
**brett.sagel@usd...**
　2:13
**brief** 52:5 71:25
**briefly** 64:11 73:18
**briefs** 51:10 84:13
**bring** 22:6
**broad** 70:25 100:2
**browser** 47:18
**browsing** 47:14,22
**bunch** 26:19 98:3
**burgers** 108:16
**businesses'** 43:17

**C**
**C** 2:20 67:16
**California** 1:2,17
　2:10,21 119:2,5
　120:1,5
**call** 17:21 40:9
　57:23 58:25 74:5
　116:10
**called** 9:25 42:15
　77:13 101:14,16
　102:1 105:19
**calling** 101:8
**calls** 14:6,7 68:18
　70:7 76:2 79:23
　83:5 105:1
**camp** 21:2
**Cannon** 42:6
**capabilities** 89:25
**capable** 7:4 15:7
　24:21 41:8,23
**caption** 77:6
**careful** 97:1
**case** 46:13 52:23
　56:5 77:15 78:18
　82:22,23 84:11,13
　85:19 100:24,25
　111:24
**cases** 17:19 18:3
　20:22 35:10 45:5

46:10,13 52:24
　53:2,21 76:24
　94:23 111:25
　112:6
**caution** 57:10
　58:10
**cell** 39:9 42:20 47:8
　77:21 93:5,9
　111:4
**cellular** 38:13
**Center** 74:17
**CENTRAL** 1:2
**certain** 6:8 96:2
　97:2
**certificates** 108:19
**Certified** 120:4
**certify** 120:5,19
**cetera** 93:16
**chance** 4:15 11:19
　12:19 88:1,3
**changes** 120:16
**Chapo** 69:24
**check** 32:11,12
　108:21
**Chrome** 47:20,21
**circumstances**
　27:23 40:13 79:12
**citation** 67:14 68:1
　68:9,17,23,25
　69:8,10,13 72:17
**citations** 67:25
**Citibank** 97:25
**civil** 115:12
**claiming** 85:1
**clarify** 27:7 34:3
　43:13 47:15 59:16
　60:21 76:21 82:20
　95:19 106:11
　112:22
**cleaning** 9:16
　107:13
**clear** 25:7 56:9
　57:13 58:13 96:25
**clearly** 56:17
**Clemente** 2:21

clerically 51:21
client 7:15,22 57:16
  57:18 58:6 59:2
  80:25
client's 98:6
close 56:3
closet 37:3
colleague 4:9
color 40:23
come 23:21 25:14
  26:22,24 27:2,25
  55:11,24 57:15,19
  58:23,24,25 63:7
  101:16 113:24
comfortable 22:19
coming 85:12
  104:23
commencing 1:18
communicate
  61:17 96:1,11,19
communicated
  62:24
communication
  5:23
communications
  52:19 60:14 62:4
  62:9,22
compensate 8:3
compensation 8:7
  8:10
compile 53:4,5
  54:22 55:5
compiled 54:10
compiling 53:12
  55:7
complete 65:6
completion 120:14
complied 16:21
comply 68:1 89:8
  110:25
complying 60:17
  62:3
compound 8:25
  52:11
computer 15:7,10

15:15,18,23 16:9
  16:10 24:6 32:16
  32:17,18,19,23
  33:1,3,21,24 34:2
  34:5,8 35:8,12
  36:4 37:15,21,24
  42:1,3 47:1,5,12
  48:15 49:7 59:25
  64:5,8 65:1 70:3,6
  70:12,15 71:17
  72:25 73:25 74:3
  74:24 75:2,17
  76:13,20,23 77:7
  79:19 80:11,21
  81:23 83:19 84:13
  86:20 87:1,2,3,7,8
  87:10,11,12 90:9
  90:13 91:5 97:3
  101:7,17 103:10
  108:4 114:3,7,11
computers 32:14
  36:1,5,8,10 37:5,9
  37:11,13,25
  103:16 111:6
conceal 48:10
  107:24 108:4
concern 22:15,17
  89:11
concerning 5:4
  97:19
concerns 79:2 84:5
  84:10
concur 58:12 80:23
condition 10:14
  14:23 15:21 16:22
  99:25 100:3
  110:18 114:2
conditions 10:22
  11:16,25 12:3,8
  12:11,16,17,22
  13:2,4,8,10,15,18
  13:23 14:4,10,12
  14:13 24:25 25:3
  25:4 31:2 71:19
  84:6,12,23 85:9

86:5,11 87:17
  88:11 89:8,11,18
  90:4,11 91:4,9,13
  92:3,8,14,22
  97:20 99:23 100:7
  100:11 103:3,9
  107:21 109:25
  110:4,14,21 111:1
  111:21 117:7,9
  118:7,9
conduct 51:3 71:21
  97:6 98:14,18
  101:1,2,6
conducted 97:12
  98:21
conducting 18:16
  50:20 67:4 99:7
conduit 112:20
confer 77:17
  105:14
conference 17:21
  40:9 116:10
confused 105:5
connect 15:4,10
  33:11,13,16 42:1
  42:3 44:3
connected 15:15,19
  15:23 16:9 33:18
  38:11,13 76:12
  79:19 80:11 112:4
connecting 15:7
  41:8
connects 39:19
consequences 89:7
consider 6:9 29:23
consistent 91:12
consult 4:19
contained 85:14
Contempt 10:17
contents 106:22
  107:4,6
continue 17:24
Continued 3:1
  118:1
continuous 29:24

conversation 16:7
  25:8,11 84:21
  109:24 110:9
conversations
  13:17 24:24 57:14
  89:19
convert 56:14 58:1
converted 59:23
converting 53:7,9
  53:11 57:1
cookies 108:14
copier 41:25
copies 70:21 116:1
copy 13:1,7 53:17
  88:18 115:24
  116:2
cord 44:4,6
correct 4:13,14
  7:12,13 8:2 10:1
  11:21 12:25 17:2
  17:3 18:24 28:11
  36:21 37:22 39:4
  40:17,22 45:2,3
  46:5 47:16,17
  59:3,7 60:24
  62:15,16 64:19,20
  65:7,8 71:10
  76:14,16 79:15,16
  79:18,22,25 81:4
  81:5 88:20 89:2,3
  89:5 92:25 99:21
  102:5 103:1
  104:18 108:22,24
  109:21,22 110:2,5
  110:15 111:18,19
  112:13 114:6,13
  114:14 119:3
Correctional 74:17
correspondence
  54:25
costs 109:9,11
couch 21:5
counsel 2:1 4:12,16
  5:18 22:2 37:19
  37:25 77:18 79:1

111:23
counter 21:8
COUNTY 120:2
couple 14:11 54:24
  55:6 74:15 105:17
  113:17
court 1:1 5:17,20
  6:3,9 10:17 23:3
  57:16 59:18 78:24
  82:19,24 83:1
  84:5,10 100:24
  101:5,20 115:19
court's 82:12,25
courtroom 26:6
cover 14:16
covered 56:6
Covid19.ca.gov/r...
  66:17
CR 1:7
CR-31 9:25 117:6
Craig 3:7
create 53:3 76:23
  87:3
created 64:4,8
  73:24 74:2 75:2
  75:16 76:20 79:13
  81:22 83:18 86:19
creating 65:14,15
  86:6,9,14
crime 5:5
criminal 78:18
CSR 1:19 120:25
current 27:23
  36:14 99:13
  115:22
currently 28:5
  45:21 78:3 99:10
  99:16
custodian 7:11,25
  8:5,8,11,15 10:1,3
  10:9,18 11:15
  89:2 110:11 117:6
custody 9:12 14:13
  17:5 18:23 25:15
  25:24 26:18 27:25

28:7,18 29:20
32:13 36:2 37:15
38:7 39:7 40:19
41:6 44:9,13,17
44:21 46:17 48:9
48:13,17,22 49:16
51:13 52:6,16
60:20 61:8,12,23
82:18 95:11 96:20
99:5
**cut** 103:24

**D**

**D** 69:21 71:13
121:1
**dad's** 54:13
**daily** 19:5
**dare** 57:19
**database** 50:23
**databases** 18:4
**date** 10:7 37:20
117:23
**daughters** 26:24
27:2,9,15,18
**Davis** 40:10 101:8
101:10 102:7
109:16,20,24
112:16,21 113:2,6
113:11
**day** 19:6 28:25 86:4
86:10 89:21
100:14,16 120:22
**days** 19:7 23:25
28:22,24 29:12
81:17 103:7,8,10
103:12 108:3
**dead** 111:6
**deal** 79:7
**dealt** 59:18
**Dean** 2:17,18 52:17
**deansteward777...**
2:23
**death** 54:13
**debate** 59:9

**declare** 119:1
**defendant** 2:16
7:11 8:1 10:9,10
10:13 13:7,18
14:19 15:14,22
16:21 17:4 18:17
18:22 19:24 20:12
20:15 21:19 24:9
24:20 25:1,23
26:17 27:6,25
28:7,12,17 29:4
29:15,19,25 30:6
30:9,12 31:17,20
32:13 33:23 34:1
34:7 35:4,8 37:4
37:14 38:6,17,20
39:5,23 40:1,7,18
41:18 42:12,18
43:6 44:9,13,17
44:21 45:11 46:12
46:16,20,23 47:2
48:7,9,17,21,24
49:16 51:12,14
52:4,15 58:2
59:24 60:20 61:8
61:12 65:7 66:5,6
68:12 69:3,10,13
70:2,6,12,15,24
71:17,21 72:5,20
72:23 75:23 76:7
78:5,25 79:3,14
79:17 80:13,20
83:24 84:5,11,22
85:8 86:5,22
88:10,14,18,23
89:18,24 90:3,14
90:20,21 91:4,8
92:2,7,13,16,20
95:11 96:11,22
97:10 98:17 99:4
99:7,10,16,24
100:3,6,11,21
101:20 102:15
103:3,4,9,12,19
104:5,9,20,24

105:5,18,23
107:21,23 111:21
114:3,7,20,23
118:6
**defendant's** 8:4,8
8:11,14 10:18,22
11:15 12:4 13:2
13:10,23 15:1
18:3 20:6 23:17
23:21 24:8,24
25:13,22 27:9
30:10,18 32:2
41:6 45:1,8,13,15
46:7 48:13 61:17
62:5,6,10,18,24
66:21 74:12 76:24
82:17,19 83:1
85:17,19 87:7,10
87:17 89:1 92:1
95:14 96:19 98:22
99:23 108:4
111:23 113:18,20
117:8,9,14,17,19
117:20,22,23
118:4,8
**defendants** 1:9
24:25
**defense** 37:18,24
56:3,17,20 71:3
80:16 111:24
114:4
**defer** 57:11
**definitely** 116:2
**degree** 17:19
**delete** 48:14,18,22
**deleted** 49:6 96:2
**delivery** 108:20
**department** 22:6
**depends** 28:25
**deponent** 58:21
120:16
**deposition** 1:16
4:16,20 22:4
78:14 101:1,2
115:12 120:14

**describe** 19:5 54:7
**described** 15:18
35:4,18,25 37:24
**describing** 40:14
**DESCRIPTION**
117:4
**device** 15:4 24:21
47:3,11 60:1
89:24 90:6 98:18
111:22
**devices** 14:20 17:6
24:3 41:7,22
47:13 49:19 98:2
98:15 101:7
107:23 111:7,11
**dictate** 113:10
114:23 115:2
**dictating** 115:5
**dictation** 17:9
113:12
**different** 43:17
47:24 53:18
**difficult** 6:3 55:1
**digital** 14:20 41:7
59:25 98:17 101:7
111:22
**dinner** 26:25
**direct** 24:19 51:8
**directed** 9:6 17:8
34:10
**direction** 56:4,19
120:12
**directly** 109:8
**disable** 111:15
**disabled** 111:13
**disallowed** 19:10
**discharge** 10:18
**discuss** 13:10,13,23
102:14
**discussed** 5:17
13:20,25 16:6
37:14 102:20
103:11 114:10
**discussing** 103:18
**discussion** 16:4,12

**discussions** 14:3
102:10,24 103:4
**dissension** 56:20
**distracting** 77:14
**District** 1:1,2
111:25
**DIVISION** 1:3
**document** 9:23
10:7 11:2,5,15,24
12:7,11,15,18,23
13:3 14:1,2 35:13
35:14 52:6,16
55:9,11,15,18,22
58:14 64:1,3,4,7
64:13 65:10,14,15
65:19 66:3,7,9,11
67:11 68:17 69:8
69:11,14,21 72:20
73:3,12,19,24
74:2,12 75:10,12
75:16,20,24 76:13
76:23 77:5,5
79:13,21 81:13,14
81:20,22 82:1,3,3
82:9 83:1,15,18
83:22,25 85:13,18
85:25 86:6,16,19
86:23 87:7 88:2
88:19,22 91:23
92:4,6,20 117:9
117:14,17,19,20
117:22 118:4,8
**documents** 11:21
11:23 42:11,18
53:11,12 54:22
55:5,25 56:13,25
58:1,3,15 59:22
59:25 60:6,7,8
63:13 72:13,17
74:9,23,23 76:17
76:19,19,20 82:18
82:24 87:3,11
**doing** 17:13,15
18:7,14 20:19,21
20:21 24:11 26:9

35:12 56:4 70:25
77:9 79:6,17
80:12,13 83:4
94:16
donated 31:8,10
donating 31:18,21
donations 30:19,21
31:7,15
door 33:6,8
dozen 53:21
draft 65:19 84:13
drafting 92:12
draw 9:17 10:20
61:25 66:10 68:8
88:6
drive 87:9
dropped 109:23
114:19,22
due 78:18
duly 4:2

**E**

E 74:14 121:1
e-mail 42:16 45:9
45:11,13,15,20
46:5,8,14 52:17
54:23 55:12,15
60:9,13,18,22
61:7,9,11,15,16
61:19,25 62:1,6
87:4,12 93:1
96:12 112:4 113:4
113:7 114:24
115:23 117:12
e-mailed 59:23
60:8 86:13,14
87:8 88:20
e-mailing 86:10
e-mails 17:8,9,9
45:10 54:25 60:19
62:10,10,13,14,18
106:17 112:24
115:3,6
earlier 79:25 99:22
ECF 82:12

edit 58:3 75:23
editing 56:25
edits 55:25 56:10
56:13,17,18 72:24
efficiently 93:20
efforts 108:2
either 39:5 47:22
52:1 57:4 74:8,20
74:22,23 78:9
79:17 90:17
EI 69:24
electronic 82:22
electronically
32:10 82:24
else's 63:10
employed 28:8
enabled 73:2
encrypted 95:17,22
96:4,10,13,18,23
ended 116:11
engaged 62:17
ensure 16:21 17:4
entering 56:3
entirely 6:24
entitlement 77:14
envelopes 107:2
environment
115:22
Epstein 74:15
ESQ 2:6,7,18 3:6
estimate 6:25 19:6
27:20 28:19 29:24
32:6 34:22 55:4
et 93:15
Ethernet 44:4,6
Evaluation 74:17
Evan 63:6
evening 89:20
everybody 29:18
everyone's 59:8
evidence 99:13
106:25
exact 27:4 90:1
104:17
**EXAMINATION**

4:4 108:10 113:15
121:6
examined 112:17
example 43:14
46:20 51:7 97:23
112:24
examples 96:7
excess 99:8
excuse 54:11
Executed 119:4
exhibit 9:18,19
10:21,23 11:7,8
11:12,20 12:1,6,6
12:7,10,20 14:17
22:25 23:11,12
61:1,3 63:14,17
64:10,13,15 66:7
66:11 68:7 69:18
69:20,23 71:13
73:13,14 74:11,14
74:16 75:4,5,20
75:22 76:8 79:11
81:6,8 82:10
83:10,11 84:1
85:17,20 86:17,24
87:14,15,19 88:2
89:17 91:17,19
92:19 93:3,5
95:10 99:22
117:16
exhibits 53:21
69:19,20 71:12
72:10 74:6,18
117:1 118:1
expect 8:10,13
expenses 30:13,16
109:2
experience 50:20
51:3
expert 74:6
explain 30:24 31:6
42:14 97:21
explained 14:4
31:17,20
express 104:2,5

extensive 12:4
extent 13:16 20:15
98:14

**F**

F 74:16
Facebook 93:15,17
93:22,24,25
Facility 74:16
fact 93:4 98:3
facts 99:12 106:24
fail 5:14
failed 10:17
fair 12:24 23:19
26:12 29:6,7 59:1
73:10 92:3 95:22
109:9
fairly 12:20 95:6
false 5:13
familiar 9:23 11:12
12:17,23 14:22
63:3 65:12,13
66:8 67:13 74:20
75:11,14 81:14
82:13 83:16 85:25
95:20 100:18
family 26:22
far 52:8 70:22
Fargo 98:3
father 54:18
feel 4:18 22:19 91:3
feeling 7:4
felt 90:10,12
Fifth 4:25
file 7:16 22:22 23:1
83:1 86:7
filed 58:16 81:16
82:18 85:6,14,18
87:17 88:1,12,15
89:17 117:15,21
118:4
filing 70:16 74:7
82:23,23
filings 51:14 72:5
72:21,24

finalizing 52:5
finances 31:3 113:1
financial 97:6,12
98:18,21 99:4,8
109:15
find 84:16 98:2
finding 71:1
fine 53:24 59:19
77:20 78:13
finish 6:2
finished 103:25
firm 50:18
first 4:2 21:9 63:25
73:20 81:12
fish 108:16
five 29:14 112:9
113:22
five-minute 49:3
flip 40:11,11,21,23
41:2
focus 12:7
focusing 27:24
37:11 97:10
follow 59:16 71:9
follow-up 105:17
follow-ups 113:17
followed 13:15
following 108:12
116:12
follows 4:2 111:21
food 8:21 9:13
30:18 107:12
108:14,19
footnote 66:11,12
67:16 68:8,23
foregoing 119:2
120:6,8,12
forgotten 37:7
form 9:25 108:17
117:6
format 67:25 68:1
formatting 67:14
forth 10:21 11:16
59:9 112:24 117:7
117:9 120:7

forward 79:6
found 97:3 104:14
four 29:3,14 43:16
   50:16 69:19,20
   71:12,14
fourth 1:17 2:8
   74:13
frame 54:18,19
free 25:7
freelance 49:24
frequent 19:1 30:3
frequently 96:4
   113:23
friend 26:2 29:17
front 9:18 14:17
   23:7 60:14 63:14
   77:24,25
full 4:10
fully 110:25
function 56:3,17,21
   71:3 80:16
further 113:14
   120:12,19
future 57:19

G
general 55:14 67:6
   72:4,11 92:4
generally 55:9
   57:25 59:22 72:12
   87:15 92:10
   103:13
Genius 42:15
George 68:24
gestures 5:22
getting 20:20 52:18
   56:2 62:8 104:17
   108:15
gift 108:19
gifts 8:16,20,22 9:6
   9:11 105:19 106:9
   106:12 108:13,13
   109:14,17
girlfriend 21:22
   23:18,21 24:8,22

24:25 25:8,13,23
girlfriend's 23:7
   117:10
give 5:18 19:11
   43:14 63:4 88:1
   96:7 98:7 105:12
given 120:13
gladly 97:21
go 6:11 7:19 20:6
   23:10 27:13 28:3
   28:3,3,10,16,20
   28:22,24,25 29:5
   29:8,11,17 34:4
   49:11 54:25 59:17
   68:6 90:15 104:11
   113:5 115:20
   116:9
goes 17:7
going 6:3 8:25 9:17
   16:24 21:3,3
   22:21 23:10,16
   51:16,23 53:14,20
   56:6,21 57:17
   58:5,12 59:5,9,10
   59:11,12,16 60:9
   60:12,25 63:12,12
   64:10,11 68:6
   69:18,22 71:8
   77:16,17,21 79:5
   79:10 80:14 90:15
   93:20 94:5,16
   97:14 98:10
   101:11,15,16
   102:4,18 104:15
   109:25 110:13
   115:11 116:9
good 4:7 99:1
Google 48:18
gotten 30:19,21
   37:9
Government 84:5
   84:10,22,25 85:4
   85:6 86:4,11
   88:10,12,15 89:10
   89:14,17 92:21

100:10 101:1
103:2,8 104:21
107:21
Government's
   87:16 90:3 92:2,7
   92:13,17 103:5,11
   117:1 118:6,9
grab 34:4
great 54:12
groceries 29:8,11
ground 57:12
grounds 24:14
   97:15
guess 6:24 10:2
   17:10 52:24 88:21
   89:15 95:24 113:8
guests 25:17
guys 41:12

H
H 2:17,18
half 18:23 53:21
hand 113:9,9
handful 27:3 55:6
   87:13
handled 72:15
hang 116:9
happen 6:21
   101:11,15 102:4,6
happened 84:14
happening 56:11
   84:17 102:1
happens 77:15
happy 98:5 103:21
   104:3,15
hard 18:18 46:24
   83:8
hear 77:11,15 78:1
   78:3,15,24 79:1,4
   90:21 104:7
heard 51:2 82:15
hearing 78:8 79:5
   90:15 100:13,16
   100:19,21
help 109:2

helped 53:4
helping 65:24
hereto 9:21 10:25
   11:10 23:14 61:5
   63:19 64:17 73:16
   75:7 81:10 83:13
   85:22 87:21 91:21
   116:13 120:18
hide 49:18
hiding 25:6
highly 22:6
history 48:14,19,19
   49:7
hold 23:8 40:3
home 9:8,16 21:15
   29:18 41:7,22
   43:15 112:13
honestly 5:2 7:8
hopefully 90:21
   111:4
hour 34:23 53:20
hours 30:1,3
house 28:15 29:8
hybrid 22:4

I
idea 15:20 65:4
   112:8
identification 9:20
   10:24 11:9 23:13
   61:4 63:18 64:16
   73:15 75:6 81:9
   83:12 85:21 87:20
   91:20
identified 23:17
   93:6 117:4
identifies 64:21
identity 98:7
immediately 10:13
Impact 117:22
important 6:1
   110:25
inaudible 78:13,15
incident 104:14
include 25:17

104:20
included 107:14
   109:17
incognito 47:23
incriminate 5:3,3
indicate 7:15
individual 23:17
individuals 16:16
   26:15
industry 50:4
information 5:4
   110:16 113:5,10
inquiry 87:16
   118:6
inside 24:22 32:14
Instagram 93:17
   95:5,7
instance 35:3,9,18
   52:13 73:1,8 80:2
   110:17
instances 76:18,22
   114:10
institutions 97:12
instruct 22:12 58:5
instructing 57:16
   59:2 67:24 80:25
instruction 59:6,15
   59:17 71:5,9
   121:14
instructs 6:10
   56:23
intentionally
   103:18
interested 120:19
intermediary 55:1
Internet 14:15,21
   15:1,5,8,11,11,12
   15:13,15,16,19,20
   15:24 16:2,9 17:2
   17:5,12,13,15
   18:2,7,16 19:2,10
   24:3,16,21,21
   25:10 27:16,19
   33:11,13,16 34:10
   34:14,15 38:11

39:19 41:8,24
42:22,24 44:3,10
44:15,19,23 45:1
45:8 46:16,22
47:2,3,14 48:10
48:23 49:18 67:3
68:12 69:3 70:24
72:3,13 73:2
74:24 76:9,12
79:20 80:3,12
85:5 89:24 90:9
90:11 91:6 97:5
97:18 99:3 107:16
107:24 108:5
111:13,15 114:3,8
114:11
**Internet-enabled**
39:9 41:21 90:6
111:22
**interpreted** 17:1
**interrupt** 78:14
**invoking** 80:24
**involve** 59:12
**involved** 84:25
**involvement** 51:13
**involves** 17:19
**iPad** 38:5,6,9,11,15
38:18,20,23
**iPads** 38:4,25
**irrelevant** 94:18
**issue** 84:14,16,25
**issues** 7:22 78:8
79:5 90:14
**italicize** 68:3,4
**italicized** 67:17,18
**items** 107:10

**J**
**J** 2:16
**Jay** 1:16 3:4 4:1,11
64:13 117:2 121:8
**Jeffrey** 74:15
**Jenness** 63:6
**John** 1:8 7:11
118:6

**judge** 7:14 22:23
23:4 26:6 57:22
58:25 100:25
**Julian** 2:6 4:7 26:8
**Julian.L.Andre...**
2:12
**June** 1:18 37:17,18
58:14 81:17 84:4
84:8,8,9 85:18
87:18 88:4 89:16
92:20 100:10,17
103:2,7,8 107:20
108:3 117:21
118:5 120:22
121:4
**justice** 5:14

**K**
**keep** 19:3 25:6 33:3
33:8 39:17 55:2
79:10
**kept** 38:9
**keyboard** 111:15
**kind** 8:18 22:4
32:19 36:10 42:5
49:25 52:22 54:13
56:2 108:16
**kitchen** 19:21
20:25 21:2,4,8
**knew** 102:3
**know** 4:24 6:17,21
7:21 8:24 9:13,14
9:16 13:14,25
17:6,16 18:9,12
18:14,14,18,19,20
24:2,11,13,20
25:19 27:3,14,18
27:21 29:17 31:14
31:14 33:23 34:11
34:23 35:1,12,13
37:6,20 38:17
39:23 43:6,11,22
43:23 44:2,7,8
45:22 46:25 47:18
48:2 49:1,21

50:22,24,25 52:21
52:23,23 53:19
54:11 55:13 56:10
56:11 62:21,25
63:1,16 64:3,7,25
65:4 67:18 73:24
74:2 75:10,16
78:9 79:7 81:22
82:12 83:8,16,18
83:20 85:11 87:1
90:1 91:23,24
93:24 94:11,12
95:7,24 96:3
99:10,16,18,19
101:10,14 102:1,3
102:11 107:14,18
109:13,15,17,18
109:19 112:16
113:25 114:1
115:19,21
**knowledge** 73:11
87:5
**known** 25:3,5

**L**
**laid** 12:6,15
**land** 41:4
**language** 14:22
**laptop** 37:18 111:4
**laptops** 36:13
**Las** 3:9
**late** 54:20,21 100:9
**lately** 29:2
**law** 2:17 3:5 50:8
50:18
**laws** 119:1
**lawyer** 4:23 6:7,10
56:23 59:6 102:23
**lawyer's** 59:16 71:9
81:3
**lawyers** 50:12
62:11,18,23 63:4
87:4 113:24
**lay** 11:24
**lead** 5:4 44:18,22

110:7
**leading** 105:7 110:6
**learn** 100:24
**learned** 101:5
**leave** 27:23 28:2,15
29:4,8 97:22
**leaving** 28:10
**left** 28:15,17
**leg** 67:13
**legal** 18:4 46:13
50:6,20,22 51:4,6
51:10,14 52:5,5
52:16 68:1 70:16
84:13 92:9 111:23
**let's** 29:14 32:18
57:22 59:8 67:13
68:6 73:12 75:4
81:6 83:10 96:16
97:23
**Lexus** 50:25 51:3
**library** 53:17
**life** 18:13
**light** 78:17
**limited** 115:14
**line** 17:21 31:1 41:4
61:25 77:17,19
78:6 94:17 111:21
116:10 121:15
**lines** 107:25
**Linked** 93:18 94:24
94:25
**listen** 17:22 100:19
**listening** 7:17,17
17:22 78:6
**little** 42:22 44:25
71:11 84:4,9
100:9
**live** 21:20
**lived** 21:20 43:16
**living** 19:18 20:14
20:25 21:18 30:12
30:15 49:23 109:3
**located** 36:23 37:2
**lock** 33:6
**locked** 33:8

**logged** 45:15
**long** 15:15,16,18,23
16:2,8 23:4,24
34:20,21,24 50:3
76:9,17 79:19
90:11 91:5
**longest** 29:24
**look** 11:4,6,19
12:17,19,22 63:15
63:22 69:21 71:14
73:18 74:11,14
75:9,14 81:12
83:15 85:17,24
88:1,3,6 89:13
91:17,18 103:23
106:22
**looked** 99:22
**looking** 12:10
47:25 63:20 68:23
70:23,25 73:21
79:11 92:19 94:22
98:1
**looks** 65:11,13
75:11
**Los** 109:21 113:2,6
**lost** 115:24
**lot** 54:24 59:11
**loud** 22:16

**M**
**M** 1:19 120:24
**M@thefight.US**
45:24
**Mac** 36:11,12
**MacBook** 32:20,21
32:22 33:11,15
34:2,5,7,13,20
35:4,8,19,22,25
36:15 47:16,19
64:4,8,25 65:6
**MacBooks** 36:22
37:23
**machine** 120:10
**MacOS** 64:21
**mail** 106:2

main 21:12
maintain 22:11
maintaining 99:11
majority 29:18
making 5:13 56:13
56:16,18 103:20
Manheimer 1:16
3:4 4:1,11,12
22:13 49:21 54:2
59:5 64:14 71:8
97:24 98:4 108:12
115:16 117:2,13
121:8
Manheimer's 98:2
Mannheim 79:10
mark 23:10
marked 9:19 10:23
11:8 23:12 60:25
61:3 63:17 64:15
66:7 73:14 75:5
81:8 82:9 83:11
83:25 85:20 86:16
86:23 87:19 88:2
91:19 93:3 95:10
maroon 40:24
Mary 1:19 120:24
matter 71:18 78:17
MCC 71:19
mean 8:16 14:15,16
15:9,20 28:1,20
30:24 31:6 37:6
51:17 52:24 53:5
53:15 54:15,24
90:7 103:13,14,24
104:20 105:25
113:25
means 18:10 65:5
mechanical 87:6
media 46:19 93:12
93:14 95:12,15
members 26:22
Memorandum
117:22
memory 51:19
54:11

mentally 7:4
mentioned 5:16
15:3 17:13 18:2,6
40:21 46:12 54:3
54:17 60:6,7,8
105:18 111:3
114:23
message 96:12,13
messages 96:1
messaging 95:17,23
96:5,11,18,23
metadata 64:12
88:7 117:16
Metropolitan
74:17
Michael 1:8 2:16
7:11 8:1 25:9
84:11 102:15
105:23 109:2
118:6
Microsoft 72:25
73:6 79:21
middle 23:5
million 53:18
mind 23:6 26:9
54:13 63:7 110:17
minute 71:14
Miramar 2:19
missing 50:15
misstates 67:20
mistakes 115:17
mitigate 109:2
mode 47:23,23
moment 36:25
Monday 100:17
monetary 108:17
money 31:10,12,18
31:21 32:1,9
108:25
month 18:23 34:25
months 18:23
move 57:17 65:21
66:23 67:13 68:6
73:12,13 81:6
94:5

moves 71:2
moving 79:10
multiple 19:6,7
mute 17:23 77:12
77:16 78:7,10
90:15
muted 77:23 78:5
90:19

---

**N**

N 121:1
name 4:7,10 22:15
22:23 23:7 63:10
64:19 66:16 94:2
95:3 106:3,5
117:10 120:21
named 111:8
names 63:4
narrow 53:19
nature 29:9 41:13
98:25
necessary 49:14
need 4:22 11:4
32:24 49:2 76:9
97:22
needs 18:20 112:25
negotiating 14:9
neighbors' 43:16
Netflix 41:12
network 43:25
networks 43:9,16
43:17,19,21
Nevada 3:9
never 40:15 50:8
85:13 103:14
new 32:24 69:23
76:23 111:25
Nexus 50:25 51:3
night 26:2 88:4
89:16,16,21 92:20
100:9
nights 29:19
nods 5:22
non-functional
36:22

non-objection
57:11
non-password-pr...
43:25
non-tracking 47:24
non-working 36:8
nonverbal 5:22
normal 65:24
Normally 38:10
notice 67:16
notify 10:12 55:23
number 9:14 10:2
27:4 46:24 65:5
68:7 77:22 93:6
98:12 117:4
numbers 23:2 93:9
93:10

---

**O**

O'Brien 1:19
120:24
O'Dea 63:6
oath 5:11 120:9
object 6:8 8:25
24:13 25:25 26:5
51:16 53:14 56:2
56:7,21 80:14
97:14
objected 80:15
objection 6:12
21:24 22:9,10,11
30:25 31:4 49:10
51:15 52:7 56:16
57:5,9,11 58:4,23
59:13,14 60:2
67:20 68:18 70:7
71:2,3 76:2 79:23
80:16 82:2 83:5
94:3,7,17 99:12
105:1,7 106:24
110:6
objectionable 58:9
objections 6:9
22:13 23:2
obligation 10:9,12

obligations 10:18
obnoxious 40:25
observation 110:24
observations
110:20
observed 58:8
98:17 99:24 100:3
obstruction 5:13
obviously 21:1,12
25:17 26:8
occasionally 93:13
107:7
occasions 35:23
occur 34:24
occurrence 19:1,5
30:2,3
offer 8:3 14:21
88:14
office 2:5 56:19
officer 40:10,15
101:8,10 102:7
109:16,21
OFFICES 2:17 3:5
Oh 18:12 52:13
okay 6:22 15:14
22:18 23:20 32:18
52:18 53:9 59:20
78:3,12
old 32:22 38:25
42:8
older 36:14
on-line 97:13 98:8
once 13:20,21,22
29:1,12,12 45:19
46:5 55:22 80:6
103:15 104:14
114:17
online 97:5 98:14
98:24
open 22:21
opportunity 4:19
5:18
opposed 105:24
option 47:22 48:4,6
options 47:14

**ORANGE** 120:2
**order** 10:21 88:18
  117:7
**ordered** 100:25
  101:6,20
**original** 55:11
  65:19 115:24
**outcome** 120:20
**outside** 21:18
**overnight** 26:1,4,15
**owned** 32:14

**P**

**p.m** 1:18 53:25,25
  105:15,15 116:11
**Pacer** 82:15
**packages** 107:3,4,6
  107:11,14
**page** 12:2 14:18
  66:10,13 68:6,7
  69:22 74:10,14
  88:6,7 111:20
  116:12 121:15
**pages** 1:24 74:13
  74:15
**paid** 50:2,12
**paper** 22:20 23:7
  23:17 60:14,19,23
  70:20,22 93:2
  94:15 95:10 97:11
  117:11,13
**Paragraph** 14:18
  16:20 17:1 19:9
**paragraphs** 12:8
  12:10
**paralegal** 17:10
**paraphrase** 16:24
**part** 14:19 22:21
  41:10 56:17,20
  61:1 80:15 92:12
  98:10 108:13
**participate** 78:17
  79:4
**particular** 16:5
  56:5 64:1,12

**65:10 66:3,7,11
  66:20 68:14 69:5
  69:19 71:12,24
  73:21 74:7,8
  75:12,20,24 82:1
  82:9 86:16,23
  88:19
particularly** 104:3
**passed** 103:10
**password** 33:23
  38:17 39:23 43:6
  111:8,10
**password-protec...**
  33:21 38:15 39:21
  43:4,23
**passwords** 17:6
**pay** 30:19
**paying** 30:6,9,12,15
**payment** 109:4,6
**pays** 30:18
**PC** 37:20
**PDF** 52:23,24,24
  52:25 53:6,9,12
  54:8,16,22 55:5,7
  55:18 56:14 57:2
  58:1 59:23 64:4,7
  64:21 65:15,15
  69:20 70:20 72:6
  72:10 75:1 86:6,9
  86:14
**PDFs** 52:21,22 53:1
  53:3 54:3,10 65:7
  76:17
**pen** 60:15
**penalty** 115:18
  116:12 119:1
**pending** 111:25
**people** 17:22 21:2
  31:14,18,21 77:13
  96:1
**people's** 58:22
**percent** 64:9 65:11
  65:16
**Perez** 3:5,6 6:7
  25:19 50:10 51:8

**51:16 52:1,8,12
  53:7,9,14 57:3,6
  57:20 58:5,7 59:1
  59:3,14,20 60:3
  62:25 63:4,20
  68:20 70:8 71:5,6
  76:4 80:17,23
  90:17 96:25 97:7
  97:14,17,23 98:7
  102:10,13,22
  105:9 115:10,12
  115:14,24 116:6,7
period** 54:12 96:2
  96:15 120:17
**perjury** 5:13
  115:18 116:12
  119:1
**permanently** 33:18
**perplexed** 105:10
**person** 26:7 78:2
**personal** 45:11
  49:13 50:2 113:7
**personally** 9:7
  16:21 44:10 54:8
  59:24 61:20 66:2
  66:6 75:19 81:25
  89:7 100:3 105:24
**perspective** 106:16
**phone** 14:5,7 17:23
  23:1 24:4 39:14
  39:17,19,24 40:1
  40:3,8,11,11,15
  40:19,21,23 41:1
  41:2,3 42:13,20
  47:8 48:15 77:22
  77:24,24 78:7
  93:5,5,9,10 95:25
  96:5,12 107:15
  111:4 112:15
**phones** 39:9,10,12
  78:5 90:20
**phonetic** 23:8
**phrase** 82:13,15
**physical** 34:1 56:12
**physically** 7:4**

**19:24 20:22 27:8
  36:20 39:5 40:3
  40:18 56:25 58:3
  75:23 76:15 80:21
piece** 22:20 23:7
  60:19,22 93:2
  94:15 95:10 97:11
  117:11,13
**pieces** 60:14
**pile** 37:3
**place** 21:6,17 49:19
  54:14 78:16
  101:21,24 103:16
  120:7
**placed** 14:12 120:9
**Plaintiff** 1:6 2:4
**pleadings** 97:19
**please** 4:10,23 6:17
  6:21 11:3,3 14:18
  17:23 54:7 59:13
  59:15 62:2 78:6,8
  78:9,21 81:7
  94:11 95:9 104:18
**point** 4:22 6:15
  11:14 37:17 44:14
  49:2 77:23 78:7
  87:1 91:8 107:20
**point-by-point**
  110:3
**points** 67:25
**politico.com** 68:11
**portion** 66:3,6
  75:20,23 76:8,13
  81:25 82:8 83:21
  83:25 86:15,16,23
**portions** 59:24
  72:24 79:21
**possess** 14:20 15:4
  37:14 39:6 40:18
**possessed** 32:14
  38:3
**possibilities** 53:18
**possibility** 101:25
**possible** 65:17
  69:16 76:1,3,7,10**

**79:20 80:8 88:24
  93:21 98:6 102:3
Possibly** 46:3 47:7
  47:9 64:2,9 72:22
**posting** 94:21
**potential** 87:16
  97:19 118:7
**potentially** 80:6,7
  89:6
**practice** 65:24 67:7
  72:4,12 115:21
**Pre-Trial** 10:13
  16:12,15 36:1
  40:10,14 91:12
  98:1 101:6 107:22
  108:3 109:14,21
  112:16,21
**preliminarily** 16:6
**preliminary** 14:5
  118:9
**prepare** 6:4 51:15
  102:12
**prepared** 5:19
  51:17,20
**preparing** 51:13
  52:5,8 111:24
**presence** 7:16
  111:23
**present** 20:9 27:8
  78:19 114:4,12
**pretty** 12:4 21:17
  25:12
**prevent** 7:7
**preventing** 19:10
**previous** 65:7
**previously** 73:8
**primary** 33:1
**print** 17:7,8 70:19
  70:19,20,24
**printed** 72:5
**printer** 41:25 42:1
  42:5,8
**printing** 70:15,17
  72:12 88:22
**prior** 4:16,19 49:8**

54:8 57:1 88:8
96:16 120:8
**privacy** 22:10 23:3
97:2 98:6
**private** 20:2 47:14
47:22
**privilege** 56:6 57:7
57:9 58:11,17
80:15,24
**probably** 43:16
47:12 50:16 55:12
107:8 112:11,14
115:22
**problem** 57:6
**problems** 58:19
**proceed** 55:24
57:21
**proceeding** 7:5
**proceedings** 78:17
116:11 120:6,8,10
**process** 55:14
56:12 62:17 78:18
103:20
**producer** 64:21
**program** 96:23
**propose** 22:24
**prosecuted** 5:5,12
10:17
**protection** 111:8
**protects** 98:6
**provide** 5:4 6:25
13:7 106:19
**provided** 12:15
13:5 27:16,18
37:18 120:16
**Provider** 42:24
**providing** 13:1
**provision** 14:19
16:5
**public** 61:2 98:10
117:11,13
**publication** 51:19
**publicly** 23:1
**pulled** 64:12
117:16

**pulling** 74:23
**purpose** 40:16
41:16,19 111:24
**purposes** 115:25
**put** 9:14 46:24 53:6
54:16 59:17 78:16
79:2 115:11 116:4
**putting** 109:6

**Q**

**question** 5:1 6:2,11
6:11,15,19 12:9
16:23 24:17 26:7
27:22 47:15 51:8
51:23 54:6 56:24
57:17 59:6 60:21
62:12 63:21,25
64:6 73:20 75:10
76:5 77:11 80:17
81:13 82:7 84:7
94:5,9 99:2 100:2
103:6 104:7
**questioning** 26:6
31:1 94:17 114:5
**questions** 5:21 6:2
6:8,23 42:23
58:18,20 59:10
97:1 105:17 108:7
113:14 115:8
**quick** 75:9 85:24

**R**

**R** 3:5,6
**raise** 57:15
**raised** 79:3 84:5,10
**rare** 19:2 30:2,5
**rarely** 20:7,10
93:23 94:10,20,21
94:21,23 95:1
113:23
**read** 17:8
**reading** 20:16
68:14
**reads** 111:21
**ready** 63:16 91:24

**really** 19:3 29:1
43:23 49:14 66:8
75:13 103:6,14,14
103:15,20,21
113:25,25
**reason** 4:23 7:21
21:1 34:8 35:5
38:21 40:1 49:17
100:6
**recall** 11:5,13,14,22
11:24 12:2 13:1,9
13:19 14:3 16:8
16:11 24:4 25:16
25:22 26:21 29:22
32:3 35:6,14,19
35:24 45:7,20
46:3,7,18,21
48:16,20,25 49:5
49:6 54:5,6 55:10
62:23 65:9,16,18
65:25 66:1,2,4,5
67:12,24 68:2,3,5
68:14,15,21 69:9
69:15,17 70:11,13
70:14,17 71:16,21
72:12,16,18 73:1
74:4,21,22,25
75:3,13,18,19,21
75:25 76:22 77:1
77:9 79:12,17
80:9,12,21 81:15
81:20,24 82:3,8
82:11 83:2,8,17
83:23 84:2,20,21
85:15 86:1,8,8,9
86:14,18,19,21,22
86:25 87:25 88:3
88:5,16,22 89:23
90:2 91:16,25
92:18,23 95:16
96:24 100:23
101:4,5,8,12,22
101:23,25 102:22
102:23,24 104:14
105:20,25 110:12

110:13 111:14
114:5,25 115:4
**receive** 8:10,13
55:15 62:13 106:2
**received** 8:7,13,23
9:11 31:6 32:1
41:3 55:22 60:7
62:10 88:18
105:19 106:17
**recognize** 71:18
73:19,22,23 74:8
81:13 86:2 91:23
**recollect** 54:15
**recollection** 7:1
46:4 55:21 105:22
**record** 4:10 22:22
59:17 78:14,22
79:2 98:10 115:11
116:4,9 120:10,12
**recorded** 5:9,16
**red** 40:24 41:2
**refer** 23:16
**references** 74:15
**referred** 47:23
**referring** 54:19
64:25 74:10
**reflect** 78:15
**refuse** 5:1
**regarding** 13:18
16:5 24:25 69:24
79:3 87:16 118:6
**regularly** 49:14
95:6
**relate** 31:2
**related** 35:10 52:24
53:2
**relation** 46:9 61:13
**release** 10:14,22
11:17,25 12:4,12
13:2,4,8,11 14:14
14:23 24:25 84:6
84:12,24 85:10
86:5,12 87:17
89:8,11,18 90:4
91:4,13 92:3,8,14

92:22 99:23,25
100:4,7,12 103:3
103:9 107:22
117:8,9 118:7
**released** 14:9,10
51:12
**relevance** 21:24
22:5,8 30:25
49:10 94:3 97:14
97:17
**relevant** 22:7 98:4
**remember** 14:7,8
16:7 24:5 25:11
27:3 34:21 45:22
55:19 63:5,5,9
65:14 67:21 69:5
70:22 75:1,12
76:15 83:3,9,21
83:24 84:15 86:6
86:15 88:24 92:19
92:24 101:13
105:11 114:9
115:5
**remove** 106:6
**rent** 30:6,9
**repeat** 16:23 31:19
72:8 80:17
**rephrase** 9:5 40:6
107:2
**reply** 17:9
**report** 74:6,12
81:16 82:22 85:18
109:15 112:25
117:15,18,19,21
118:4
**reported** 109:13
**reporter** 5:17,21
6:4 78:24 115:19
116:1 120:5,17
**represent** 64:11
**represented** 4:12
**request** 17:23
87:16 118:6,9
**requested** 120:15
120:16

require 26:7
research 18:2
  50:20 51:4
researching 46:13
residence 19:14,25
  20:12,17,23 21:10
  21:13,20,21 24:22
  25:2,15,23 26:16
  27:24 28:2,13,18
  29:5,16,25 30:4
  32:15 33:19 36:5
  36:23,24 37:1
  38:1,9 39:1,15
  42:9 43:10 44:4,6
  98:2 101:17 108:4
  113:21,24 114:16
  114:20
resolved 23:3
respect 22:1 23:2
  46:12 54:18 57:25
  65:24 75:22
response 85:8 92:1
  92:6,12,17 104:10
  118:9
restrictions 14:25
review 5:18,19 13:2
  107:3,6 115:16
  120:14
reviewing 11:14
  20:21
right 5:1,6 16:18
  21:14 26:8,24
  34:19 45:25 48:1
  49:21 59:9 63:11
  77:15 78:19
  108:18,21 109:9
  110:1,4,14 111:5
Rights 117:23
Road 3:7
room 19:18 20:2,4
  20:6,14,25 21:5
  21:18 50:14 90:20
  104:16
rooms 19:14,20
router 43:1

rule 97:2
run 19:1 28:3
running 28:16,22
  29:5
Ryan 63:6

S

SA 1:7
Safari 47:20,21
Sagel 2:7 4:9 16:15
  18:6,11 19:9 20:8
  22:5,15,18 23:8
  23:24 24:15 26:3
  26:5,9 49:1 50:12
  57:5,18 58:13,18
  58:22 78:22 90:23
  105:14 115:22
sake 59:9
San 2:21
Santa 1:17 2:10
save 58:22
saved 96:1
saw 107:8
saying 22:15 36:17
  72:11 104:22
says 64:13 81:18
scan 42:15 53:16
scanned 42:11,17
scanner 42:7
scanning 92:20
scarf 107:13
school 50:8
scratch 76:20 77:6
screenshot 64:12
  88:7 117:16
seal 22:23
search 18:13 48:18
  48:19 49:7 66:20
  68:11 70:2 72:15
  101:6,17 107:23
searched 18:20
  37:7 67:8 69:2
  70:5 103:15
  104:15
searches 17:11,13

17:15 18:7,16
  19:2 45:4,6 67:4
  71:1,22
searching 17:18
  18:6,8,11,13
  48:23 70:11,14,17
  70:23 71:16 74:22
second 20:1 63:15
  85:16 91:18 102:9
  117:19
seconds 105:12
see 10:2,4 12:3,13
  12:14 22:8 24:6
  27:2 29:17 43:15
  43:17 59:24 64:23
  66:5,18 68:9,25
  69:25 73:19 74:18
  81:18 85:6 87:23
  88:12,23 92:16
  93:7 97:17 107:23
  114:7
seeing 11:5,13,22
  11:24 71:21 80:21
  81:20 83:24 86:1
  87:25 88:4 91:25
seen 11:2 34:7
  37:14,21,24,25
  38:20 39:5 40:3
  40:18 41:1,18
  44:10 58:2 63:25
  75:22 82:2 88:8
  95:12 96:22 106:6
Selna 7:14 23:4
  26:7 57:23
send 8:16 52:25
  54:3,16 56:14
  58:1,2 62:14
  79:14 106:20
  114:24 115:18
sending 45:10
  53:12 54:8 55:7
  62:17 72:6 106:18
sends 32:12 57:1
  109:15
sense 58:23

sent 9:8 13:25
  32:11 52:17,20
  55:19 60:6 62:9
  65:18 72:14 76:17
  76:24 86:6 107:12
  115:20
separate 19:18
  61:14
series 59:10 97:1
seriously 110:22
serve 7:10 8:4,8,11
  89:1
service 42:24 95:23
  96:11
services 10:13
  16:13,16 36:1
  40:10,14 91:12
  96:18 98:1 101:6
  107:22 108:3
  109:14,21 112:17
  112:21
serving 8:14
set 78:25 120:7
setting 10:21 11:16
  12:11 117:7,9
seven 27:24 30:1,3
  112:9 113:22
seven-page 12:7,11
SHAWN 3:5,6
shawn711@msn....
  3:11
shocked 85:11
short-circuit 26:10
  59:8 71:11
shorter 75:10
shorthand 120:4,11
show 11:3 88:14
showed 85:13
siding 27:22
sign 115:18,20
Signal 96:8,14
signature 10:5
  119:8
signed 10:7 12:2
  13:3 14:1,2

significant 89:7
similar 12:1
sit 21:7
sitting 32:6 43:24
  56:18 63:9
six 27:24 30:1,3
  110:21 112:9,9,10
  112:12 113:22
small 21:17
smart 24:4 39:10
  39:12,14 40:19
  41:9 42:13 48:15
  93:5
SnapChat 96:14
social 46:19 93:12
  93:14 95:12,14
software 96:23
solely 77:18 111:23
sorry 7:19 12:9
  16:23 18:9 20:18
  21:11 24:17 27:17
  28:20 31:19 46:1
  62:12 64:6 69:12
  69:19 72:8 74:1
  76:5 92:5 100:15
  104:11 107:19
  109:5,10
sort 8:14 20:15,20
  35:13 47:13 92:16
  96:10,13,22 98:18
  107:13,24 108:14
sound 45:25
Sounds 100:18
Southern 1:3
  111:25
speak 4:15 78:2,9
  104:22 105:4
speaking 55:9
  57:25 59:22 92:10
  102:23
specific 11:22
  13:14 14:3,22
  17:17 20:20 25:11
  28:14 35:9 42:23
  54:17 63:13,21,22

70:18,25 71:19
85:13 100:1
**specifically** 46:3
65:9 84:15,20
85:2 88:25 101:4
105:11
**specifics** 14:11
**Spectrum** 42:25
**speculate** 6:24 8:24
**speculation** 65:21
65:23 66:23 68:18
70:7 76:2 79:23
83:5 105:1
**spelling** 23:9
**spend** 20:13 21:15
24:8
**spoke** 101:10
102:13
**spoken** 78:20
**sporadic** 29:1
**sports.yahoo.com**
68:24
**ss** 120:1
**standard** 115:11
**standing** 94:17
**standpoint** 58:9
**start** 32:18 63:12
69:22
**started** 77:6
**starting** 74:13
**state** 4:10 78:22
119:2 120:1,5
**statements** 5:13
**states** 1:1,5 2:5 4:8
14:19
**status** 74:12 81:16
85:18 117:14,18
117:19,20 118:4
**stay** 19:24 23:22
25:1,14 26:1,4
27:25 29:20 30:6
57:14
**stayed** 21:21 26:15
**staying** 16:20 22:7
25:23,25 30:13,16

**step** 27:13
**steps** 16:20 17:4
48:10
**Steward** 2:17,18
6:7 7:14,20,23
8:25 13:6,24 14:3
16:4,8 17:20
21:24 22:1,3,10
22:17,21 23:4
24:13 25:25 26:5
26:11 30:20,22,25
31:3,4,7,11,13,15
31:18,22,25 32:2
32:11,12 34:9
49:10 51:15,21
52:7,11,19,25
53:13,20 54:4,9
54:16,23 55:8,12
55:16,22,24 56:2
56:15,16 57:1,7
57:12,13,22 58:1
58:2,4,13,18,24
59:13,19,23 60:2
60:7,8 62:5,11,14
62:15,19 65:20,21
66:23 67:20 68:18
70:7 71:2 72:7,14
76:2,18,25 77:20
77:25 78:10,20
79:2,6,14,23
80:14,18,23 82:2
83:5 86:7,10,13
87:4 88:20 89:19
89:23 90:2 91:15
94:3,7,16 99:12
101:3,23 102:21
102:24 105:1,7,13
106:24 108:9,11
110:7,8 113:14,18
114:2,15,19 115:9
115:10 116:2,3,5
121:11
**stop** 78:21
**store** 28:3
**Street** 1:17 2:8

**strike** 65:21 66:23
**stuff** 9:16 21:3
52:17 108:16
115:12
**subject** 71:18
**submit** 82:23
**subscribed** 120:21
**substance** 52:18
56:10 62:9,22
**substantive** 57:14
**sufficient** 4:18
**suggest** 53:22 56:5
**Suite** 2:9,20 3:8
**summary** 92:4
**Sunday** 84:4,9
89:16 100:10
**supervise** 10:10
34:18 89:4
**supervised** 34:11
34:17 35:11 80:2
90:8 114:11
**supervising** 16:16
73:2,4 80:10,20
90:12 91:5
**Supplement** 117:18
117:19
**Supplemental**
74:12 85:17 118:4
**supplies** 8:21 9:13
9:15,16 107:13
**supporters** 8:16,18
8:19 9:12 31:8
106:17,19
**suppose** 34:6 44:5
**supposed** 63:22
**supposedly** 58:14
**sure** 25:12,21 49:13
55:13 58:7 64:2
66:9 78:3,6 82:3
82:21 101:15
102:1,2,4 112:23
115:7,15,17
**surf** 28:3,21
**surfing** 28:16,24
29:5

**surprised** 101:18
102:6
**suspicion** 59:11
**sworn** 4:2
**system** 7:17 78:16
82:12,23,23 96:13

———————

**T**

**table** 21:2,4
**tablet** 24:6 39:6
47:6 48:15 107:15
111:4
**tablets** 38:3,25
**take** 4:22 11:4
16:21 17:4,9 49:2
49:3 53:22,23
63:15 71:14 75:9
81:12 83:15 85:24
91:18,18 92:12
101:21,24
**taken** 1:16 48:10
49:18 53:25
105:15 110:21
120:6
**talk** 4:23 26:8
100:21 103:16
**talked** 22:3 42:22
44:25 91:15 100:9
102:17
**talking** 20:8 40:14
48:2 51:17,18
52:8,10 53:7,15
58:19 108:13
109:20
**tartan** 107:12
**Telegram** 96:8
**television** 41:10,22
**tell** 15:22 50:15
77:21 78:4 84:19
85:2 91:8 105:5
106:12
**telling** 16:8 68:3
89:23 90:2 101:8
101:23
**temporary** 10:22

11:16 117:8,9
118:7
**ten** 29:12 53:22
103:8,10,12
**tend** 5:2,3
**terms** 40:14 55:4
58:10 112:15
**terribly** 77:14
**testified** 4:2 16:25
45:1 79:25 80:1
105:22
**testify** 5:14
**testifying** 5:11 7:8
120:9
**testimony** 67:20
102:12,14,20,25
120:13
**text** 78:9 96:12
**thank** 7:20 23:5
108:12 116:8
**thefight.com** 45:23
**thefight.US** 46:2
**thing** 7:14 50:16
59:12 115:5,15
**things** 17:18 18:14
29:9 41:13 46:11
49:25 52:20 56:4
108:14 113:12
114:24
**think** 6:16 7:14
17:16 22:12 23:25
26:6 32:24 35:1
35:17 45:19 46:11
46:17 47:23 50:14
50:15 53:1,21
56:19 57:8 60:15
73:8 74:5 80:8
83:3 94:2 98:7
104:2,24 105:19
111:17 115:8,10
**third-party** 7:10,25
8:4,8,11,15 10:1,3
10:9 110:10 117:6
**thoroughly** 7:8
12:20

three 29:3 37:13,23
55:6 74:13 111:7
111:11
Thumb 87:9
time 6:9 11:4 18:20
20:13 21:16 23:24
24:8 26:18 28:20
29:18,24,24 33:16
34:9,13 35:4,20
40:19 44:11 54:12
54:12,17,19 58:23
67:25 73:7 79:8
80:10 96:2,15
108:8 114:18,19
114:20 116:8
120:7
times 19:6,7 27:1
27:15 29:3,15,15
45:18 46:8 69:23
87:11 110:22
111:14 113:23
114:15
titled 117:14,17,19
117:20,22 118:4,8
today 4:13 5:11,14
7:5,8 32:7 43:24
63:9 88:8 102:12
102:14,18,20,25
103:4
today's 4:16,20
told 25:9 31:17
44:14 84:18 85:8
88:10 101:20
102:7 104:9
Tom 63:6
tomorrow 106:13
top 69:21 74:11,14
81:18
total 28:20 32:4
totally 37:7
tough 58:7
track 19:3 55:2
training 50:6 92:9
transactions 97:6
98:18,21 99:8

transcribed 5:17
5:20 120:11
transcript 5:19 6:4
115:17 120:15
transferred 32:9
87:11
Trial 117:23
true 119:2 120:12
truly 5:2
truthfully 5:14
try 16:24 41:18
48:18,22 49:18
77:18 78:10 79:7
93:20
trying 26:10 43:15
57:14 58:22
turn 14:18 33:15
34:15 36:19,20
63:14 64:10 69:18
75:4 81:6 83:10
84:3 87:14 105:13
108:9
turned 91:6 111:16
TV 41:9,10,11,15
41:15,18,21
twice 23:23 28:23
29:1 46:6 80:8
Twitter 93:15,17
94:6,12,20,21,22
two 18:23 19:17
24:9 34:23 36:9
36:22 37:4 46:8
58:19,20,22 74:18
80:2,4,5,7 90:20
96:16,17 97:25
108:2 109:15
111:6,14,25
112:25 114:10
type 8:20 53:16
66:6 67:10 72:24
75:23 76:13 81:25
83:24 92:16 95:22
115:2,6
typed 67:21 68:17
69:7,10,13 72:17

76:8 86:22
types 9:15 17:18
52:19 107:10
typical 21:6
typically 20:19
33:9,10 47:4
typing 35:16 51:17
52:9 66:2,4 75:19
82:8 83:21 86:15

**U**

Uh-huh 74:19
unclear 6:16,20
underlying 76:19
undersigned 120:4
understand 5:6,8
5:12,24 6:5,13,16
7:2 10:8,12,16
14:13,25 16:15
43:12 51:24 52:12
55:3 77:2,8 97:16
102:2 103:6,13,15
104:19,21,23
105:6
understanding
15:6,17 16:1,3,25
35:7 108:25
understood 6:20
16:22 104:24
unhappiness 104:5
unhappy 104:9
United 1:1,5 2:5
4:8
unmute 77:18
unmuted 78:3,8
usage 48:10 107:24
use 14:20 15:4,7,14
15:18,23 16:10
25:9 33:1 34:7,20
35:22 37:14 38:20
38:23 40:5,8,15
41:1,12,15,18
42:9 45:13 46:22
47:3,4,6,13,18
48:4 50:22 61:17

61:20 65:6 90:12
91:4 93:10,12,22
94:6,20,24,25
95:5,17,25 96:4
96:22 97:5 98:15
108:4 111:22
112:16,18
username 93:15,24
93:25 94:12 95:7
usernames 117:12
usually 17:19 39:18

**V**

vague 51:16 52:7
vaguely 14:24
vagueness 53:14
valid 57:9
varies 20:24
variety 51:20 55:20
various 11:16 14:4
67:25,25 68:4,4
71:1
Vegas 3:9
verbatim 120:9
version 64:22
view 19:9 115:20
VIEWING 117:11
117:13
violate 99:24 100:3
violated 10:13 84:6
84:12,23 85:1
86:5,11 88:11
89:10,18 90:3
92:3,8,14,21
100:7,11 103:3,9
107:21 110:18
violating 85:9
violation 91:9
97:19
violations 25:7
87:17 118:7
visit 26:22,24
113:24 114:15
visited 27:15
111:18 112:12

113:20
visiting 27:12,19
48:11
visitors 26:3,17
visits 24:9 27:5,9
98:3
vs 1:7

**W**

wait 6:1 55:24
waive 57:10
waiver 7:16
want 7:15 53:19
55:13 56:9,11
62:21 78:3,14
90:23 97:1,2
98:12 102:11
103:21 105:14
116:1,2,3
wanted 21:6 25:6
34:4 88:1 104:16
115:15
Warren 63:6
wasn't 15:6,19 16:9
76:11 79:19
103:16,20 104:15
109:4,6
watch 41:12
watching 41:15
waves 28:25
way 8:3 17:10
24:19,20 27:14
28:8 52:4 57:21
57:22 88:17 92:24
98:5 99:15 109:18
114:9
ways 46:15 47:24
51:20 58:15
we'll 5:18 22:25
57:18 79:7,7
we're 20:8 58:13,22
68:6 79:6 98:5
105:12 109:20
we've 8:16 42:22
46:12 53:20 93:4

web 48:14
website 66:13,16
  66:20 82:25
websites 18:11
  48:11 67:7
Wednesday 1:18
  121:4
week 28:22,24 29:4
  29:12,15 34:25
  84:4,9
weeks 27:24 109:16
  110:21 112:25
Wells 98:3
went 15:9 31:25
  104:16 110:3
weren't 25:6 104:2
  114:12
West 1:16 2:8 3:7
Westlaw 50:22
WhatsApp 95:20
  95:22 96:8,13
WHEREOF
  120:21
Wi-Fi 33:14,18
  38:13,14 43:1,4,7
  43:9,15,16,17,19
  43:25
willing 22:22
  110:10
wireless 41:25 42:2
wirelessly 42:3
Wish 50:9
withdraw 31:4
  99:1
witness 3:4 4:25
  9:3 16:18 18:9,12
  19:12 20:10 22:25
  23:25 24:17 26:2
  49:13 52:13 53:8
  60:4,17 62:3 63:1
  63:6,22 68:21
  70:9 76:5 77:25
  90:23,25 97:8
  105:10 119:8
  120:21 121:6

witness' 22:2
witnesses 120:8
word 25:25 51:15
  55:18 67:16,19
  72:19,25 73:6
  76:19,19 79:21
words 5:22 68:4,4
  90:1 104:17
work 17:11 20:16
  20:21 28:10 36:6
  36:18 50:1,13
  87:7
worked 36:4 50:18
  73:2
working 28:5 32:16
  32:17,18 34:12
  35:14 49:22 56:19
  72:19 73:6
works 42:14 60:15
wouldn't 23:1
write 22:25 49:25
  53:17 59:24 60:12
  62:1 63:2 66:6
  72:24 75:23 76:13
  79:21 81:25 83:24
  92:16 94:11,14
  95:9 97:11 98:11
  113:9
writer 49:24,24
  50:3
writes 113:12
writing 23:6 50:2
  51:6,19,19 52:5
  66:2,4 75:19 82:8
  83:21 86:15
written 51:10,18
  58:16 60:18 93:2
  117:10,13
wrong 104:18
wrote 22:20 58:14
  58:15 60:22 61:7
  61:16 62:1 76:8
  86:22

X
X 121:1
X]was 120:15

Y
Yahoo 48:19
yeah 13:12 14:5,24
  16:2 21:22 29:1
  30:23 41:11,14
  46:6 52:13 54:15
  75:3 92:11 95:8
  101:14
year 32:22 54:13
years 50:5 96:16,17
York 69:23 112:1

Z

0

1
1 1:24 9:18,19 12:1
  93:5 117:6
1:07 1:18
10 81:6,8 82:10
  117:7,20
10.14.6 64:22 65:2
100 64:9 65:11,16
107 2:19
108 121:11
11 117:9
113-38 3:8
11986 1:19 120:25
12 14:18 16:20 17:1
  19:9 81:17 83:10
  83:11 84:1 103:7
  117:22
121 1:24
13 10:8
14 32:25 85:17,20
  86:17,24 118:4
15 32:25
16 66:10,13 87:14
  87:15,19 88:2
  89:17 118:6
17 1:18 91:17,19
  92:19 118:8 121:4

179 58:14
19 23:11,12 117:10
19-061-JVS 1:7

2
2 10:21,23 11:20
  12:6,7,10,20
  14:17 88:6 99:22
  117:7
2:29 53:25
2:49 53:25
20 61:1,3 93:3
  95:10 117:12
2014 32:24
2020 1:19 10:8
  21:19 58:14 81:17
  85:18 89:16
  117:15,21 118:5
  119:4 120:22
  121:4
21 111:21
22 66:11,13 67:16
23 117:10
24 21:19
24th 18:25 20:8
  49:8
25 50:5
26 12:8,10 68:8
27 68:23 117:15
29 68:6
29th 120:22

3
3 11:7,8,12,20 12:6
  88:7 117:9 121:16
338-3532 2:11
3388 93:6

4
4 14:18 63:14,17
  64:13 66:7,11
  68:7 69:20 111:20
  117:14,16
4,113 121:10
4:17 105:15
4:19 105:15

4:35 116:11
411 1:16 2:8
42 69:22
481-4900 2:22
492-9545 3:10

5
5 64:10,15 117:16
  117:21
500 32:3,4,4 99:8
  108:23
59 121:16
5th 37:17 81:17

6
6 73:13,14 74:11
  117:17
61 117:12
63 117:14
64 117:16

7
7 58:14 89:16 118:5
7121 3:7
714 2:11
73 117:17
75 117:19
7th 84:4,8,8,9
  85:18 87:18 88:4
  92:20 100:10
  103:2,8,8 107:20
  108:3

8
8 75:4,5,20,22 76:8
  79:11 117:19
8000 2:9
81 117:20
83 117:22
85 118:4
87 118:6
89129 3:9
8th 37:18 100:17

9
9 117:6

**91** 118:8
**92672-6713** 2:21
**92701** 2:10
**949** 2:22 3:10