# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CASE NUMBER |
|---|---|
| vs.                PLAINTIFF, | SA-CR-19-61-JVS |
| MICHAEL J. AVENATTI | **AFFIDAVIT OF THIRD-PARTY CUSTODIAN** |
| DEFENDANT/MATERIAL WITNESS, | |

Having been ordered by the Court on _____APRIL 10, 2020_____ to take third-party custody of

___ MICHAEL J. AVENATTI ___ I, _____ JAY. S. MANHEIMER _____

agree to (a) supervise the defendant/material witness, (b) use every effort to assure the defendant's/material witness'

appearance at all court proceedings, and (c) notify Pretrial Services immediately if the defendant/material witness

violates a condition of release or is no longer in the custodian's custody. I understand that if I fail to discharge my

obligations under this agreement I may be held in contempt of court.

**EXHIBIT /**
Manheimer For I.D.
DATE: 6|17 RPTR: MO
BEN HYATT
888.272.0022

_____
Signature of Third-Party Custodian (Person or Organization)

FRIEND
_____
Relationship to Defendant/Material Witness

N/A
_____
Address (only if the above is an organization)

VENICE, CA.
_____
City and State only

312-208-3388
_____
Telephone Number

Date:     **4/13/20**     _____

1

2  CERTIFICATE OF SERVICE

3

4  I, H. Dean Steward, am a citizen of the United States, and am at least 18 years of age.

5  My business address is 107 Avenida Miramar, Ste. C, San Clemente, CA 92672.

6

7        I am not a party to the above entitled action. I have caused, on  4-16-20, service

8  of the defendant's:

9  **CR-31- 3ʳᵈ Party Custodian Form**

10

11  On the following party, using the court's ECF system:

12  **AUSA BRETT SAGEL AND JULIAN ANDRE**

13

14  ————————————————

15  **AND BY E-MAIL ON**

16  **PRE-TRIAL SERVICES OFFICER SHAKIRA DAVIS**

17

18  ————————————————

19  I declare under penalty of perjury that the foregoing is true and correct.

20  Executed on 4-16-20

21

22  s/ H. Dean Steward

23  H. Dean Steward

24

25

26

27

28

- 2 -
- 2 -

**EXHIBIT 1**

1   NICOLA T. HANNA
    United States Attorney
2   BRANDON D. FOX
    Assistant United States Attorney
3   Chief, Criminal Division
    JULIAN L. ANDRÉ (Cal. Bar No. 251120)
4   Assistant United States Attorney
    Major Frauds Section
5       1100 United States Courthouse
        312 North Spring Street
6       Los Angeles, California 90012
        Telephone: (213) 894-6683
7       Facsimile: (213) 894-6269
        Email:    Julian.L.Andre@usdoj.gov
8
    BRETT A. SAGEL (Cal. Bar No. 243918)
9   Assistant United States Attorney
        Ronald Reagan Federal Building
10      411 West Fourth Street, Suite 8000
        Santa Ana, California 92701
11      Telephone:  (714) 338-3598
        Facsimile:  (714) 338-3708
12      Email:    Brett.Sagel@usdoj.gov

13  Attorneys for Plaintiff
    UNITED STATES OF AMERICA
14

15              UNITED STATES DISTRICT COURT

16          FOR THE CENTRAL DISTRICT OF CALIFORNIA

17                  SOUTHERN DIVISION

18  UNITED STATES OF AMERICA,          SA CR No. 19-061-JVS

19          Plaintiff,                 ORDER SETTING FORTH THE CONDITIONS
                                       OF TEMPORARY RELEASE FOR DEFENDANT
20          v.                         MICHAEL JOHN AVENATTI

21  MICHAEL JOHN AVENATTI,

22          Defendant.

23

24       Pursuant to 18 U.S.C. § 3142(i), the Court temporarily releases

25  defendant MICHAEL JOHN AVENATTI for a period of 90 days under the

26  following terms and conditions:

27       1.   Defendant release is conditioned upon the submission and

28  Court approval of a $1,000,000 bond signed by Hubert Bromma, with at

EXHIBIT 2
Mannheimer  For I.D.
DATE: 6|17 RPTR: MO
BEN HYATT
888.272.0022

**EXHIBIT 2**

1  least $500,000 of the bond to be secured by the full deeding of real
2  property or by depositing $500,000 with the Clerk of the Court.

3      2.    As a condition precedent to release, defendant shall submit
4  to a 14-day quarantine at an appropriate Bureau of Prisons ("BOP")
5  facility prior to release.

6      3.    As a condition precedent to release, defendant shall also
7  submit to a health screening by the BOP.

8      4.    Defendant shall not be released until BOP has determined to
9  the best of its abilities that defendant has not contracted COVID-19.
10  If the defendant is found to be exhibiting symptoms consistent with
11  COVID-19 or is confirmed to have COVID-19, the defendant shall not be
12  released to the public because of the danger the defendant poses to
13  the community.

14      5.    Following release, defendant shall submit to screening for
15  COVID-19 as directed by the United States Probation and Pretrial
16  Services Office ("Pretrial Services").  Should the defendant then or
17  thereafter exhibit symptoms consistent with COVID-19, the defendant
18  shall remain in quarantine or isolation as directed by Pretrial
19  Services in a form directed by Pretrial services, including self-
20  isolation or self-quarantine.

21      6.    During the period of pre-trial supervision, defendant shall
22  comply with national, state, and local public-health orders regarding
23  COVID-19, including California's Executive Order N-33-20 (March 19,
24  2020) and, if applicable, the Los Angeles "Safer At Home" Order,
25  Public Order Under City of Los Angeles Emergency Authority (March 19,
26  2020)

27      7.    Defendant shall be subject to supervision as directed by
28  Pretrial Services.

1       8.   Defendant shall be released to the custody of third-party

2   custodian Jay Manheimer.  Prior to defendant's release, third-party

3   custodian Mr. Manheimer must sign, complete, and submit to the Court

4   an Affidavit of Third-Party Custodian (Form CR-31) acknowledging and

5   agreeing to (a) supervise defendant, (b) use every effort to assure

6   defendant's appearance at all court proceedings, and (c) notify

7   Pretrial Services immediately if defendant violates a condition of

8   release or is no longer in the custodian's custody.  The third-party

9   custodian's failure to discharge his obligations may result in the

10  custodian being held in contempt of Court.  The United States

11  Attorney's Office shall review the Affidavit of Third-Party of

12  Custodian before the Affidavit is filed with the Court.

13      9.   Upon defendant's release from the Metropolitan Correctional

14  Center in New York ("MCC New York"), defendant's counsel, H. Dean

15  Steward, or another individual expressly authorized by this Court,

16  shall transport defendant from MCC New York to the residence of the

17  third-party custodian Jay Manheimer in Venice, California.  Defendant

18  and/or defendant's counsel shall provide Pretrial Services with a

19  copy of defendant's travel itinerary at least 24 hours in advance and

20  must immediately notify Pretrial Services upon defendant's arrival at

21  Mr. Manheimer's residence.  Defendant's counsel shall accompany

22  defendant at all times until defendant arrives at Mr. Manheimer's

23  residence and is placed in Mr. Manheimer's custody.

24      10.   Defendant shall be confined to the personal residence of

25  Jay Manheimer, in Venice, California (at the address provided to

26  Pretrial Services), at all times and with no exceptions, other than

27  for emergency medical treatment after notification to Pretrial

28

1   Services.   Advance permission of the Court shall be required for any
2   other travel, including for court appearances.

3       11.   Defendant shall participate in the Location Monitoring
4   Program and abide by all requirements of the program, under the
5   direction of Pretrial Services, which shall include a location
6   monitoring bracelet.   Defendant must pay all of the costs of the
7   Location Monitoring Program based upon his ability to pay as
8   determined by Pretrial Services, and will be financially responsible
9   for any lost or damaged equipment.

10      12.   Defendant shall not possess, use, or access any digital
11  devices that offer or allow internet access.   Defendant may, however,
12  possess and use a non-internet connected telephone, approved by
13  Pretrial Services, to communicate with his attorneys, family,
14  friends, and for other basic living needs during the 90-day term of
15  his temporary release.

16      13.   Although defendant may not possess, use, or access any
17  internet-enabled digital devices, this Order does not preclude
18  defendant's legal counsel from emailing legal documents to
19  defendant's third-party custodian, Jay Manheimer, so that defendant's
20  third-party custodian can print them for defendant to review.
21  Defendant may also access and use an internet-enabled digital device
22  while in the presence of defendant's legal counsel, solely for the
23  purpose of preparing his defense in this case and in the two pending
24  prosecutions in the Southern District of New York ("SDNY"), United
25  States v. Avenatti, No. 1:19-cr-373-PGG (SDNY), and United States v.
26  Avenatti, No. 1:19-cr-374-JMF (SDNY).

27      14.   Within 48 hours of defendant's release, defendant shall
28  disclose to Pretrial Services all bank accounts, credit card

4

1 | accounts, or other financial accounts that defendant controls, either
2 | directly or indirectly, and provide Pretrial Services with a list of
3 | any assets exceeding $5,000 that defendant owns, possess, or
4 | controls, either directly or indirectly.

5 |     15.  Defendant shall not open, either directly or indirectly,
6 | any new bank accounts, credit card accounts, or other financial
7 | accounts without notifying and obtaining the prior approval of
8 | Pretrial Services.

9 |     16.  Defendant shall not engage in any financial transactions
10 | exceeding $500, either directly or indirectly, without notifying and
11 | obtaining the prior approval of Pretrial Services.

12 |     17.  Defendant shall not sell, transfer, or give away any asset
13 | valued at $500 or more, either directly or indirectly, without
14 | notifying and obtaining prior approval of Pretrial Services.

15 |     18.  Defendant shall provide to Pretrial Services every two
16 | weeks a report (or other documentation approved by Pretrial Services)
17 | detailing all of defendant's financial transactions, including any
18 | transactions under $500, during the prior two-week period.

19 |     19.  Defendant shall avoid all contact (except in the presence
20 | of counsel), directly or indirectly, with any person who the
21 | government has identified as victim or potential witness in this
22 | prosecution and investigation, except for Christine Avenatti Carlin.
23 | Defendant, however, shall not engage in any substantive discussions
24 | with Ms. Carlin regarding this prosecution and investigation (except
25 | in the presence of counsel).

26 |     20.  Defendant shall comply with all court orders, including,
27 | but not limited to, any conditions of release in United States v.
28 |

1  *Avenatti*, No. 1:19-cr-373-PGG (SDNY), and *United States v. Avenatti*,
2  No. 1:19-cr-374-JMF (SDNY).

3      21.  Defendant shall surrender all passports and travel
4  documents to Pretrial Services within 24 hours of his release (to the
5  extent he has not already done so), sign a Declaration re Passport
6  and Other Travel Documents (Form CR-37), and shall not apply for a
7  passport or other travel document during the pendency of this case.

8      22.  Defendant shall comply with the General Conditions of
9  Release set forth in the Central District of California Release Order
10  and Bond Form.

11      23.  In order to determine compliance with these conditions of
12  release, defendant agrees to submit to a search of his person
13  and/property by Pretrial Services in conjunction with the U.S.
14  Marshal.  Defendant's third-party custodian Jay Manheimer shall also
15  agree to provide Pretrial Services and the U.S. Marshal with access
16  to his residence in order to conduct such a search if requested to do
17  so.

18      24.  At the expiration of defendant's 90-day temporary release
19  period, defendant shall surrender to the United States Marshals
20  office at 411 W. 4th Street, Second Floor Santa Ana, CA 92701, or the
21  United States Marshals office in the Southern District of New York at
22  500 Pearl Street, Suite 400, New York, NY 10007, as directed by
23  Pretrial Services or the Court.  Defendant's counsel, H. Dean
24  Steward, defendant's third-party custodian, Jay Manheimer, or another
25  party authorized by the Court, shall transport defendant from
26  Mr. Manheimer's residence to United States Marshals office, and shall
27  accompany defendant at all times during transport.

28

1      25.   The Court reserves the right to revoke this Order

2  temporarily releasing defendant prior to the expiration of the 90-day

3  period in light of changed circumstances after notice to the parties.

4      26.   This Order does not withdraw, is not in derogation of, and

5  does not conflict with this Court's prior finding, and the Ninth

6  Circuit's affirmance of this Court's finding, that there is probable

7  cause to believe that defendant committed state and federal crimes

8  while on pretrial release, that defendant is a danger to the

9  community, and that defendant failed to rebut the presumption that no

10  conditions or combination of conditions will assure the safety of the

11  community.  See United States v. Avenatti, C.A. No. 20-50017 (9th

12  Cir. Mar. 6, 2020).

13     IT IS SO ORDERED.

14

15  April 10, 2020

16  DATE                      HONORABLE JAMES V. SELNA

                              UNITED STATES DISTRICT JUDGE

17

18  Presented by:

19     /s/

20  JULIAN L. ANDRÉ

   BRETT A. SAGEL

21  Assistant United States Attorneys

22

23    /s/ via email authorization

   H. DEAN STEWARD

24  Attorney for Defendant

   MICHAEL JOHN AVENATTI

25

26

27

28

7

# UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA

**Case Name:** United States of America v. **Michael John Avenatti**          **Case No.** 8:19-cr-00061-JVS

☑ Defendant     ☐ Material Witness

Violation of Title and Section: **18:1343; 26:7202;18:2(b); 26:7212(a); 26:7203; 18:1344(1),2(b); 18:1028A(a)(1),2(b); 18:152(3),2(b)**

☐ Summons     ☐ Out of District     ☐ **UNDER SEAL**     ■ Modified Date: **April 10, 2020**

*Check only one of the five numbered boxes below (unless one bond is to be replaced by another):*

| | | |
|---|---|---|
| 1. ☐ Personal Recognizance *(Signature Only)* | (c). ☒ Affidavit of Surety With Justification *(Form CR-3)* Signed by: | Release No. Conditional Temporary Release |
| 2. ☐ Unsecured Appearance Bond <br> $ _____ | Hubert Bromma for $500,000 or | Electronically Issued on 4/23/20 <br> *Temporary* |
| 3. ☒ Appearance Bond <br> $ 1,000,000 total amount | ** cash deposit of $500,000 wth the Clerk <br> of the Court | ☐ **Release to Pretrial ONLY** <br> ☐ **Release to Probation ONLY** <br> ☐ Forthwith Release |
| (a). ☒ Cash Deposit *(Amount or %) (Form CR-7)* <br> **See item (c) | ☒ With Full Deeding of Property: | |
| (b). ☒ Affidavit of Surety Without <br> Justification *(Form CR-4)* Signed by: | | |
| Hubert Bromma for $500,000 | | ☐ All Conditions of Bond <br> *(Except Clearing-Warrants Condition)* Must be Met and Posted by: |
| | 4. ☐ Collateral Bond in the Amount of *(Cash or Negotiable Securities)*: <br> $ _____ | ■ Third-Party Custody <br> Affidavit *(Form CR-31)* |
| | 5. ☐ Corporate Surety Bond in the Amount of: <br> $ _____ | ■ Bail Fixed by Court: <br> JVS ____ / lmb <br> *(Judge / Clerk's Initials)* |

## PRECONDITIONS TO RELEASE

☐ The government has requested a Nebbia hearing under 18 U.S.C. § 3142(g)(4).

☐ The Court has ordered a Nebbia hearing under § 3142 (g)(4).

☐ The Nebbia hearing is set for _____ at _____ ☐ a.m. ☐ p.m.

**EXHIBIT** ☑
Manheimer For I.D.
DATE: 6/19 RPTR: MO
BEN HYATT
888.272.0022

## ADDITIONAL CONDITIONS OF RELEASE

In addition to the GENERAL CONDITIONS of RELEASE, the following conditions of release are imposed upon you:

■ Submit to: ■ Pretrial Services Agency (PSA) supervision as directed by PSA; ☐ Probation (USPO) supervision as directed by USPO.
*(The agency indicated above, PSA or USPO, will be referred to below as "Supervising Agency.")*

☐ Surrender all passports and travel documents to Supervising Agency no later than _____ , sign a Declaration

re Passport and Other Travel Documents *(Form CR-37)*, and do not apply for a passport or other travel document during the pendency

of this case.

☐ Travel is restricted to _____ unless prior permission is granted by Supervising

Agency to travel to a specific other location.  Court permission is required for international travel.

☐ Reside as approved by Supervising Agency and do not relocate without prior permission from Supervising Agency.

☐ Maintain or actively seek employment and provide proof to Supervising Agency. ☐ Employment to be approved by Supervising Agency.

☐ Maintain or begin an educational program and provide proof to Supervising Agency.

Defendant's Initials: MJA   Date: 4-26-20

CR-1 (05/19)          CENTRAL DISTRICT OF CALIFORNIA RELEASE ORDER AND BOND FORM          PAGE 1 OF 4

**EXHIBIT 3**

Case Name: United States of America v. Michael John Avenatti _____   Case No. 8:19-cr-00061-JVS _____

☒ Defendant   ☐ Material Witness

☐ Avoid all contact, directly or indirectly (including by any electronic means), with any person who is a known victim or witness in the subject investigation or prosecution, ☐ including but not limited to _____

_____ ; ☐ except _____ .

☐ Avoid all contact, directly or indirectly (including by any electronic means), with any known codefendants except in the presence of counsel. Notwithstanding this provision, you may contact the following codefendants without your counsel present: _____ .

☐ Do not possess any firearms, ammunition, destructive devices, or other dangerous weapons. ☐ In order to determine compliance, you agree to submit to a search of your person and/or property by Supervising Agency in conjunction with the U.S. Marshal.

☐ Do not use or possess any identification, mail matter, access device, or any identification-related material other than in your own legal or true name without prior permission from Supervising Agency. ☐ In order to determine compliance, you agree to submit to a search of your person and/or property by Supervising Agency in conjunction with the U.S. Marshal.

☐ Do not engage in telemarketing.

☐ Do not sell, transfer, or give away any asset valued at $ _____ or more without notifying and obtaining permission from the Court, except _____ .

☐ Do not engage in tax preparation for others.

☐ Do not use alcohol.

☐ Participate in the electronic remote alcohol monitoring program as directed by Supervising Agency and abide by all the rules and requirements of the program. You must pay all or part of the costs for treatment based upon your ability to pay as determined by Supervising Agency.

☐ Do not use or possess illegal drugs or state-authorized marijuana. ☐ In order to determine compliance, you agree to submit to a search of your person and/or property by Supervising Agency in conjunction with the U.S. Marshal.

☐ Do not use for purposes of intoxication any controlled substance analogue as defined by federal law or street, synthetic, or designer psychoactive substance capable of impairing mental or physical functioning more than minimally, except as prescribed by a medical doctor.

☐ Submit to: ☐ drug and/or ☐ alcohol testing. If directed to do so, participate in outpatient treatment approved by Supervising Agency. You must pay all or part of the costs for testing and treatment based upon your ability to pay as determined by Supervising Agency.

☐ Participate in residential ☐ drug and/or ☐ alcohol treatment as directed by Supervising Agency. You must pay all or part of the costs of treatment based upon your ability to pay as determined by Supervising Agency. ☐ **Release to PSA only** ☐ **Release to USPO only**

☐ Submit to a mental health evaluation. If directed to do so, participate in mental health counseling and/or treatment approved by Supervising Agency. You must pay all or part of the costs based upon your ability to pay as determined by Supervising Agency.

☒ Participate in the Location Monitoring Program and abide by all of the requirements of the program, under the direction of Supervising Agency, which ☒ will or ☐ will not include a location monitoring bracelet. You must pay all or part of the costs of the program based upon your ability to pay as determined by Supervising Agency. You must be financially responsible for any lost or damaged equipment.

☐ Location monitoring only - no residential restrictions;

-or-

☐ You are restricted to your residence every day:

☐ from _____ ☐ a.m. ☐ p.m. to _____ ☐ a.m. ☐ p.m.

☐ as directed by Supervising Agency;

-or-

Defendant's Initials: MJD   Date: 4-26-20

**Case Name:** United States of America v. **Michael John Avenatti**          Case No. 8:19-cr-00061-JVS

☐ **Defendant**     ☐ Material Witness

☐ You are restricted to your residence at all times except for medical needs or treatment, attorney visits, court appearances, and

_____ , all of which must be preapproved by Supervising Agency;

☐ **Release to PSA only**     ☐ **Release to USPO only**

☑ You are placed in the third-party custody (*Form CR-31*) of Jay Manheimer. See Order filed 4/10/2020, dkt no. 140.

☐ Clear outstanding ☐ warrants or ☐ DMV and traffic violations and provide proof to Supervising Agency within _____ days
of release from custody.

☑ Do not possess or have access to, in the home, the workplace, or any other location, any device that offers internet access except
as approved by Supervising Agency.  ☐ In order to determine compliance, you agree to submit to a search of your person
and/or property by Supervising Agency in conjunction with the U.S. Marshal.

☐ Do not associate or have verbal, written, telephonic, electronic, or any other communication with any person who is less than
the age of 18 except in the presence of a parent or legal guardian of the minor.

☐ Do not loiter or be found within 100 feet of any schoolyard, park, playground, arcade, or other place primarily used by children
under the age of 18.

☐ Do not be employed by, affiliated with, own, control, or otherwise participate directly or indirectly in the operation of any daycare
facility, school, or other organization dealing with the care, custody, or control of children under the age of 18.

☐ Do not view or possess child pornography or child erotica.  ☐ In order to determine compliance, you agree to submit to a search
of your person and/or property, including computer hardware and software, by Supervising Agency in conjunction with the U.S.
Marshal.

☑ Other conditions:

See attached Orders, filed April 10, 2020, April 13, 2020 and April 23, 2020, document numbers 140, 142 and 151,

respectively, for additional conditions.

_____

_____

_____

## GENERAL CONDITIONS OF RELEASE

I will appear in person in accordance with any and all directions and orders relating to my appearance in the above entitled matter as
may be given or issued by the Court or any judicial officer thereof, in that Court or before any Magistrate Judge thereof, or in any other
United States District Court to which I may be removed or to which the case may be transferred.

I will abide by any judgment entered in this matter by surrendering myself to serve any sentence imposed and will obey any order or
direction in connection with such judgment as the Court may prescribe.

I will immediately inform my counsel of any change in my contact information, including my residence address and telephone number,
so that I may be reached at all times.

I will not commit a federal, state, or local crime during the period of release.

I will not intimidate any witness, juror, or officer of the court or obstruct the criminal investigation in this case. Additionally, I will not
tamper with, harass, or retaliate against any alleged witness, victim, or informant in this case. I understand that if I do so, I may be
subject to further prosecution under the applicable statutes.

I will cooperate in the collection of a DNA sample under 42 U.S.C. § 14135a.

Defendant's Initials: MJA      Date: 4-26-20

Case Name: United States of America v. **Michael John Avenatti**          Case No.  8:19-cr-00061-JVS

■ Defendant      ☐ Material Witness

## ACKNOWLEDGMENT OF DEFENDANT/MATERIAL WITNESS

As a condition of my release on this bond, pursuant to Title 18 of the United States Code, I have read or have had interpreted to me and understand the general conditions of release, the preconditions, and the additional conditions of release and agree to comply with all conditions of release imposed on me and to be bound by the provisions of Local Criminal Rule 46-6.

Furthermore, it is agreed and understood that this is a continuing bond (including any proceeding on appeal or review) which will continue in full force and effect until such time as duly exonerated.

I understand that violation of any of the general and/or additional conditions of release of this bond may result in a revocation of release, an order of detention, and a new prosecution for an additional offense which could result in a term of imprisonment and/or fine.

I further understand that if I fail to obey and perform any of the general and/or additional conditions of release of this bond, this bond may be forfeited to the United States of America. If said **forfeiture is not set aside, judgment may be summarily entered in this Court against me and each surety, jointly and severally, for the bond amount, together with interest and costs. Execution of the judgment may be issued or payment secured as provided by the Federal Rules of Criminal Procedure and other laws of the United States, and any cash or real or personal property or the collateral previously posted in connection with this bond may be forfeited.**

4-26-20                                                                          949-887-4110

Date          Signature of Defendant / Material Witness          Telephone Number

Venice C.A

City and State (DO NOT INCLUDE ZIP CODE)

☐ **Check if interpreter is used:** I have interpreted into the _____ language this entire form and have been told by the defendant that he or she understands all of it.

_____          _____
Interpreter's Signature                                          Date

Approved _____          April 27, 2020
          United States District Judge / Magistrate Judge          Date

If cash deposited: Receipt # _____ for $ _____

(This bond may require surety agreements and affidavits pursuant to Local Criminal Rule 46.)


Defendant's Initials: MJA   Date: 4.26-20

1  NICOLA T. HANNA
   United States Attorney
2  BRANDON D. FOX
   Assistant United States Attorney
3  Chief, Criminal Division
   JULIAN L. ANDRÉ (Cal. Bar No. 251120)
4  Assistant United States Attorney
   Major Frauds Section
5       1100 United States Courthouse
        312 North Spring Street
6       Los Angeles, California 90012
        Telephone: (213) 894-6683
7       Facsimile: (213) 894-6269
        Email:    Julian.L.Andre@usdoj.gov
8
   BRETT A. SAGEL (Cal. Bar No. 243918)
9  Assistant United States Attorney
        Ronald Reagan Federal Building
10      411 West Fourth Street, Suite 8000
        Santa Ana, California 92701
11      Telephone: (714) 338-3598
        Facsimile: (714) 338-3708
12      Email:    Brett.Sagel@usdoj.gov

13 Attorneys for Plaintiff
   UNITED STATES OF AMERICA
14

15              UNITED STATES DISTRICT COURT

16          FOR THE CENTRAL DISTRICT OF CALIFORNIA

17                   SOUTHERN DIVISION

18 UNITED STATES OF AMERICA,          SA CR No. 19-061-JVS

19          Plaintiff,                ORDER SETTING FORTH THE CONDITIONS
                                      OF TEMPORARY RELEASE FOR DEFENDANT
20          v.                        MICHAEL JOHN AVENATTI

21 MICHAEL JOHN AVENATTI,

22          Defendant.

23

24     Pursuant to 18 U.S.C. § 3142(i), the Court temporarily releases

25 defendant MICHAEL JOHN AVENATTI for a period of 90 days under the

26 following terms and conditions:

27     1.   Defendant release is conditioned upon the submission and

28 Court approval of a $1,000,000 bond signed by Hubert Bromma, with at

Defendant's Initials MJA   Date 4-24-20

1    least $500,000 of the bond to be secured by the full deeding of real
2    property or by depositing $500,000 with the Clerk of the Court.

3        2.    As a condition precedent to release, defendant shall submit
4    to a 14-day quarantine at an appropriate Bureau of Prisons ("BOP")
5    facility prior to release.

6        3.    As a condition precedent to release, defendant shall also
7    submit to a health screening by the BOP.

8        4.    Defendant shall not be released until BOP has determined to
9    the best of its abilities that defendant has not contracted COVID-19.
10   If the defendant is found to be exhibiting symptoms consistent with
11   COVID-19 or is confirmed to have COVID-19, the defendant shall not be
12   released to the public because of the danger the defendant poses to
13   the community.

14       5.    Following release, defendant shall submit to screening for
15   COVID-19 as directed by the United States Probation and Pretrial
16   Services Office ("Pretrial Services").  Should the defendant then or
17   thereafter exhibit symptoms consistent with COVID-19, the defendant
18   shall remain in quarantine or isolation as directed by Pretrial
19   Services in a form directed by Pretrial services, including self-
20   isolation or self-quarantine.

21       6.    During the period of pre-trial supervision, defendant shall
22   comply with national, state, and local public-health orders regarding
23   COVID-19, including California's Executive Order N-33-20 (March 19,
24   2020) and, if applicable, the Los Angeles "Safer At Home" Order,
25   Public Order Under City of Los Angeles Emergency Authority (March 19,
26   2020)

27       7.    Defendant shall be subject to supervision as directed by
28   Pretrial Services.

Defendant's Initials ___  Date 4-26-20

1      8.    Defendant shall be released to the custody of third-party
2  custodian Jay Manheimer.  Prior to defendant's release, third-party
3  custodian Mr. Manheimer must sign, complete, and submit to the Court
4  an Affidavit of Third-Party Custodian (Form CR-31) acknowledging and
5  agreeing to (a) supervise defendant, (b) use every effort to assure
6  defendant's appearance at all court proceedings, and (c) notify
7  Pretrial Services immediately if defendant violates a condition of
8  release or is no longer in the custodian's custody.  The third-party
9  custodian's failure to discharge his obligations may result in the
10  custodian being held in contempt of Court.  The United States
11  Attorney's Office shall review the Affidavit of Third-Party of
12  Custodian before the Affidavit is filed with the Court.

13      9.    Upon defendant's release from the Metropolitan Correctional
14  Center in New York ("MCC New York"), defendant's counsel, H. Dean
15  Steward, or another individual expressly authorized by this Court,
16  shall transport defendant from MCC New York to the residence of the
17  third-party custodian Jay Manheimer in Venice, California.  Defendant
18  and/or defendant's counsel shall provide Pretrial Services with a
19  copy of defendant's travel itinerary at least 24 hours in advance and
20  must immediately notify Pretrial Services upon defendant's arrival at
21  Mr. Manheimer's residence.  Defendant's counsel shall accompany
22  defendant at all times until defendant arrives at Mr. Manheimer's
23  residence and is placed in Mr. Manheimer's custody.

24      10.   Defendant shall be confined to the personal residence of
25  Jay Manheimer, in Venice, California (at the address provided to
26  Pretrial Services), at all times and with no exceptions, other than
27  for emergency medical treatment after notification to Pretrial

28

3 Defendant's Initials NTH  Date 4-21-20

1    Services.  Advance permission of the Court shall be required for any
2    other travel, including for court appearances.

3         11.  Defendant shall participate in the Location Monitoring
4    Program and abide by all requirements of the program, under the
5    direction of Pretrial Services, which shall include a location
6    monitoring bracelet.  Defendant must pay all of the costs of the
7    Location Monitoring Program based upon his ability to pay as
8    determined by Pretrial Services, and will be financially responsible
9    for any lost or damaged equipment.

10        12.  Defendant shall not possess, use, or access any digital
11   devices that offer or allow internet access.  Defendant may, however,
12   possess and use a non-internet connected telephone, approved by
13   Pretrial Services, to communicate with his attorneys, family,
14   friends, and for other basic living needs during the 90-day term of
15   his temporary release.

16        13.  Although defendant may not possess, use, or access any
17   internet-enabled digital devices, this Order does not preclude
18   defendant's legal counsel from emailing legal documents to
19   defendant's third-party custodian, Jay Manheimer, so that defendant's
20   third-party custodian can print them for defendant to review.
21   Defendant may also access and use an internet-enabled digital device
22   while in the presence of defendant's legal counsel, solely for the
23   purpose of preparing his defense in this case and in the two pending
24   prosecutions in the Southern District of New York ("SDNY"), United
25   States v. Avenatti, No. 1:19-cr-373-PGG (SDNY), and United States v.
26   Avenatti, No. 1:19-cr-374-JMF (SDNY).

27        14.  Within 48 hours of defendant's release, defendant shall
28   disclose to Pretrial Services all bank accounts, credit card

4    Defendant's Initials MKW    Date 4-21-20

1  accounts, or other financial accounts that defendant controls, either
2  directly or indirectly, and provide Pretrial Services with a list of
3  any assets exceeding $5,000 that defendant owns, possess, or
4  controls, either directly or indirectly.

5      15.   Defendant shall not open, either directly or indirectly,
6  any new bank accounts, credit card accounts, or other financial
7  accounts without notifying and obtaining the prior approval of
8  Pretrial Services.

9      16.   Defendant shall not engage in any financial transactions
10 exceeding $500, either directly or indirectly, without notifying and
11 obtaining the prior approval of Pretrial Services.

12     17.   Defendant shall not sell, transfer, or give away any asset
13 valued at $500 or more, either directly or indirectly, without
14 notifying and obtaining prior approval of Pretrial Services.

15     18.   Defendant shall provide to Pretrial Services every two
16 weeks a report (or other documentation approved by Pretrial Services)
17 detailing all of defendant's financial transactions, including any
18 transactions under $500, during the prior two-week period.

19     19.   Defendant shall avoid all contact (except in the presence
20 of counsel), directly or indirectly, with any person who the
21 government has identified as victim or potential witness in this
22 prosecution and investigation, except for Christine Avenatti Carlin.
23 Defendant, however, shall not engage in any substantive discussions
24 with Ms. Carlin regarding this prosecution and investigation (except
25 in the presence of counsel).

26     20.   Defendant shall comply with all court orders, including,
27 but not limited to, any conditions of release in United States v.

28

5  Defendant's Initials AJA  Date 4-26-19

1  Avenatti, No. 1:19-cr-373-PGG (SDNY), and United States v. Avenatti,
2  No. 1:19-cr-374-JMF (SDNY).

3      21.  Defendant shall surrender all passports and travel
4  documents to Pretrial Services within 24 hours of his release (to the
5  extent he has not already done so), sign a Declaration re Passport
6  and Other Travel Documents (Form CR-37), and shall not apply for a
7  passport or other travel document during the pendency of this case.

8      22.  Defendant shall comply with the General Conditions of
9  Release set forth in the Central District of California Release Order
10  and Bond Form.

11      23.  In order to determine compliance with these conditions of
12  release, defendant agrees to submit to a search of his person
13  and/property by Pretrial Services in conjunction with the U.S.
14  Marshal.  Defendant's third-party custodian Jay Manheimer shall also
15  agree to provide Pretrial Services and the U.S. Marshal with access
16  to his residence in order to conduct such a search if requested to do
17  so.

18      24.  At the expiration of defendant's 90-day temporary release
19  period, defendant shall surrender to the United States Marshals
20  office at 411 W. 4th Street, Second Floor Santa Ana, CA 92701, or the
21  United States Marshals office in the Southern District of New York at
22  500 Pearl Street, Suite 400, New York, NY 10007, as directed by
23  Pretrial Services or the Court.  Defendant's counsel, H. Dean
24  Steward, defendant's third-party custodian, Jay Manheimer, or another
25  party authorized by the Court, shall transport defendant from
26  Mr. Manheimer's residence to United States Marshals office, and shall
27  accompany defendant at all times during transport.

28

Defendant's Initials WJA  Date 4-26-20

1        25.   The Court reserves the right to revoke this Order

2    temporarily releasing defendant prior to the expiration of the 90-day

3    period in light of changed circumstances after notice to the parties.

4        26.   This Order does not withdraw, is not in derogation of, and

5    does not conflict with this Court's prior finding, and the Ninth

6    Circuit's affirmance of this Court's finding, that there is probable

7    cause to believe that defendant committed state and federal crimes

8    while on pretrial release, that defendant is a danger to the

9    community, and that defendant failed to rebut the presumption that no

10   conditions or combination of conditions will assure the safety of the

11   community.  See United States v. Avenatti, C.A. No. 20-50017 (9th

12   Cir. Mar. 6, 2020).

13       IT IS SO ORDERED.

14

15   April 10, 2020

16   DATE                                    HONORABLE JAMES V. SELNA
                                             UNITED STATES DISTRICT JUDGE
17

18   Presented by:

19      /s/

20   JULIAN L. ANDRÉ
     BRETT A. SAGEL
21   Assistant United States Attorneys

22

23      /s/ via email authorization
     H. DEAN STEWARD
24   Attorney for Defendant
     MICHAEL JOHN AVENATTI
25

26

27

28

      7  Defendant's Initials MKA  Date 4-26-20

Case 8:19-cr-00061-JVS   Document 200-3   Filed 07/16/20   Page 21 of 227   Page ID #:3176
Case 8:19-cr-00061-JVS   Document 154   Filed 04/27/20   Page 12 of 15   Page ID #:2508
Case 8:19-cr-00061-JVS   Document 142   Filed 04/13/20   Page 1 of 2   Page ID #:2412

H. Dean Steward  SBN 85317
107 Avenida Miramar, Ste. C
San Clemente, CA 92672
949-481-4900
Fax: (949) 496-6753

Attorney for Defendant
MIACHAEL J. AVENATTI

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES, | Case No.  SACR 19-61-JVS |
|---|---|
| Plaintiff, | ORDER RE ATTORNEY MINDERS FOR DEFENDANT'S TRANSPORTATION- NEW YORK TO VENICE, CALIFORNIA |
| vs. | |
| MICHAEL J. AVENATTI | |
| Defendant. | |

GOOD CAUSE HAVING BEEN SHOWN, it is ordered that upon release from

the Metropolitan Correction Center in New York City, NY, defendant shall be

accompanied by attorney Mariel Colon to one of three local New York City airports,

(JKK, La Guardia or Newark), there to be met by attorney Douglas Hatherley from

California. Mr. Avenatti will then travel with attorney Hatherley from New York to

California LAX airport via a flight that has been disclose to Pre-Trial Services at least

24 hours in advance of that travel.

Upon arrival at LAX, attorney H. Dean Steward will meet the defendant and

attorney Hatherley. Attorney Steward will transport the defendant to the home of Jay

S. Manheimer in Venice, California, and turn over the defendant to Mr. Manheimer.

- 1 - Defendant's Initials MJA   Date 4-26-20

Case 8:19-cr-00061-JVS   Document 200-3   Filed 07/16/20   Page 22 of 227   Page ID #:3177
Case 8:19-cr-00061-JVS   Document 154   Filed 04/27/20   Page 13 of 15   Page ID #:2509
Case 8:19-cr-00061-JVS   Document 142   Filed 04/13/20   Page 2 of 2   Page ID #:2413

1    It is the intension of this Court that the defendant be accompanied by counsel at

2    all times during this trip.

3

4    **By assuming the role of minder each attorney below consents to jurisdiction**

5    **of this Court and shall so acknowledge by endorsing and causing to be filed with**

6    **this Court a copy of this order.**

7

8    So ordered.

9

10   Dated: April  13, 2020

11

12                                    Hon. James V. Selna
                                     U.S. District Judge
13

14

15

16   With respect to my duties as a minder under the above order, I consent to the

17   jurisdiction of the United States District Court for the Central District of California.

18

19   Dated:  April __, 2020        _____

20                                        Mariel Colon

21

22   Dated:  April __, 2020        _____

23                                     Douglas Hatherley

24

25

26

27

28

                                    - 2 -   Defendant's Initials ____ Date 4-26-20

Case 8:19-cr-00061-JVS   Document 200-3   Filed 07/16/20   Page 23 of 227   Page ID #:3178
Case 8:19-cr-00061-JVS   Document 154   Filed 04/27/20   Page 14 of 15   Page ID #:2510
Case 8:19-cr-00061-JVS   Document 151   Filed 04/23/20   Page 1 of 2   Page ID #:2493

1   H. Dean Steward  SBN 85317
  107 Avenida Miramar, Ste. C
2   San Clemente, CA 92672
  949-481-4900
3   Fax: (949) 496-6753

4   Attorney for Defendant
  MIACHAEL J. AVENATTI

5

6

7

8          UNITED STATES DISTRICT COURT

9         CENTRAL DISTRICT OF CALIFORNIA

10   UNITED STATES,            Case No.  SACR 19-61-JVS

11        Plaintiff,

12       vs.                  AMENDED ORDER AND

13   MICHAEL J. AVENATTI     CLARIFICATION RE BAIL PENDING

14       Defendant.          TRIAL

15

16     GOOD CAUSE HAVING BEEN SHOWN, the Court makes the following

17 clarifications on the previously issued order re bond. [docket # 140].

18

19 1. Defendant shall sign the bond and passport forms immediately after release, and

20 counsel shall file within 48 hours after his release.  If he fails to do so, the minder shall

21 immediately deliver him to MCC, and the release order is revoked. Defendant shall

22

23 submit to GPS monitoring by Pretrial Services immediately upon arrival at the

24 Manheimer residence.

25 2. The Court, assuming all other conditions and requirements of the posting of a

26

27 property bond in this district are met, will approve the submitted property bond

28 without the actual file-stamped deed from the County of San Luis Obispo. The Court

                                      - 1 - Defendant's Initials MA  Date 4/26/21

Case 8:19-cr-00061-JVS   Document 200-3   Filed 07/16/20   Page 24 of 227   Page ID #:3179
Case 8:19-cr-00061-JVS   Document 154   Filed 04/27/20   Page 15 of 15   Page ID #:2511
Case 8:19-cr-00061-JVS   Document 151   Filed 04/23/20   Page 2 of 2   Page ID #:2494

1   will rely primarily on the lot book report issued by Pacific Corporate and Title

2

3   Services of Sacramento, California and on file herein. When received, a copy of the

4   file stamped deed shall be submitted to the U.S. Attorneys Office.

5

6

7

8   Dated: April 23, 2020

                              Hon. James V. Selna

9

10

11                            U.S. District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 2 -   Defendant's Initials AKA   Date 4-26-20

1  H. Dean Steward, SBN 85317
   107 Avenida Miramar, Ste. C
2  San Clemente, CA 92672
   Tel (949) 481-4900
3  Fax (949) 497-6753

4  Attorney for Defendant
   MICHAEL JOHN AVENATTI
5

6

7  **UNITED STATES DISTRICT COURT**

8  **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

9  UNITED STATES OF AMERICA,        SA CR No. 19-061-JVS

10        Plaintiff,                DEFENDANT'S STATUS REPORT

11           v.                     Hearing Date:   June 1, 2020
                                    Hearing Time:   9:00 a.m.
12  MICHAEL JOHN AVENATTI,          Location:       Telephonic - Courtroom
                                                    of the Hon. James V.
13        Defendant.                                Selna

14

15

16        In advance of the status conference set in this matter for June 1, 2020, defendant

17  MICHAEL JOHN AVENATTI ("Mr. Avenatti") by and through his counsel of record,

    H. Dean Steward, hereby files this Status Report in order to bring to the Court's attention
18
    a number of issues impacting the trial and scheduling in this matter.
19

20  Dated: May 27, 2020              Respectfully submitted,
21

22                                  /s/ H. Dean Steward

23                                  H. DEAN STEWARD

24                                  Attorney for Defendant
                                    MICHAEL JOHN AVENATTI
25

26                                  **EXHIBIT** 4
                                    Manheimer    For I.D.
27                                  DATE: 6/17 RPTR: M0

28                                  BEN HYATT
                                    888.272.0022

                                    **EXHIBIT 4**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

I.    MR. AVENATTI'S CUSTODY STATUS AND
      TRIAL PREPARATION ........................................................................... 1

      A. April 24, 2020 to the Present ................................................................ 1

      B. January 14 to April 23, 2020 ................................................................ 6

II.   THE GOVERNMENT'S DISCOVERY PRODUCTIONS .................... 13

III.  THE GOVERNMENT'S CONTINUED USE OF A GRAND JURY
      AND THE POSSIBILITY OF A SUPERCEDING INDICTMENT ....... 14

IV.   THE TRIAL DATE AND ASSOCIATED SCHEDULE ........................ 15

      A. Trial during a deadly, highly contagious pandemic would impair
         the defendant's right to effective assistance of counsel ...................... 17

      B. Trial during a deadly pandemic would deprive the defendant of trial
         before a fair cross-section of the community ...................................... 22

      C. Trial during a deadly pandemic would compromise the defendant's
         right to meaningful confrontation ....................................................... 25

      D. Trial during a deadly pandemic would compromise the defendant's
         right to compulsory process, to present evidence, and to testify ......... 27

      E. Trial during a deadly pandemic would compromise the defendant's
         right to be present and to be judged without the effect of a prejudicial
         face covering ....................................................................................... 28

      F. Trial during a deadly pandemic would compromise the defendant's
         right to be tried by an impartial jury and be free of coercive verdicts . 30

G. Trial during a deadly pandemic would compromise the defendant's
right to be free of coercive pressure to plead guilty.............................31

H. Trial during a deadly pandemic would violate the defendant's due
process right to the exercise of reasonable care toward the health and
safety of persons confined by state action ...........................................32

CERTIFICATE OF SERVICE................................................................................34

## TABLE OF AUTHORITIES

**CASES:**                                                                      **Page**

*Brady v. United States,*
397 U.S. 742 (1970) ...................................................................................30, 31

*Burdine v. Johnson,*
262 F.3d 336 (5th Cir. 2001)...............................................................................17

*California v. Green,*
399 U.S. 149 (1970)............................................................................................25

*Chambers v. Florida,*
309 U.S. 227 (1940)............................................................................................31

*Chambers v. Mississippi,*
410 U.S. 284 (1973)............................................................................................26

*Coy v. Iowa,*
487 U.S. 1012 (1988).........................................................................................25

*Deck v. Missouri,*
544 U.S. 622 (2005)............................................................................................28

*DeShaney v. Winnebago County Dep't of Social Services,*
489 U.S. 195 (1989)............................................................................................32

*Duren v. Missouri,*
439 U.S. 357 (1976)............................................................................................23

*Estelle v. Williams,*
425 U.S. 501 (1976)............................................................................................28

*Freeman v. Ferguson,*
911 F.2d 52 (8th Cir.1990)................................................................................32

*Geders v. United States,*
425 U.S. 80 (1976) .............................................................................................19

*Gregory v. City of Rogers, Ark,*
974 F.2d 1006 (8th Cir. 1992) ................................................................. 32

*Jones v. Phyfer,*
761 F.2d 642 (11th Cir. 1985) ................................................................. 32

*Jordan v. Massachusetts,*
225 U.S. 167 (1912) ................................................................................ 30

*Kercheval v. United States,*
274 U.S. 220, 223 (1927) ........................................................................ 31

*Kirby v. Illinois,*
406 U.S. 682 (1972) ................................................................................ 17

*Machibroda v. United States,*
368 U.S. 487 (1962) ................................................................................ 31

*Maryland v. Craig,*
497 U.S. 836 (1990) ................................................................................ 25

*Mattox v. United States*
156 U.S. 237 (1896) ................................................................................ 25

*Montejo v. Louisiana,*
556 U.S. 778 (2009). ............................................................................... 17

*Morris v. Slappy,*
461 U.S. 1 (1983) .................................................................................... 22

*Perry v. Leeke,*
488 U.S. 272 (1989) ................................................................................ 17

*Powell v. Alabama,*
287 U.S. 45 (1932) .................................................................................. 18

*Rock v. Arkansas,*
483 U.S. 44 (1987) .................................................................................. 27

*Smith v. Robbins,*
528 U.S. 259 (2000) ............................................................................................ 17

*State v. Long,*
499 A.2d 264 (N.J. 1985) ..................................................................................... 25

*Tanner v. United States,*
483 U.S. 107 (1987) ............................................................................................. 30

*Taylor v. Illinois,*
484 U.S. 400 (1987). ...................................................................................... 26, 27

*United States v. Cronic,*
466 U.S. 648 (1984) ............................................................................................. 17

*United States v. DeJesus-Castaneda,*
705 F.3d 1117 (9th Cir. 2013) ........................................................................ 25, 26

*United States v. El-Mezain,*
664 F.3d 467 (5th Cir. 2011) ............................................................................... 26

*United States v. Hemmingson,*
157 F.3d 347 (5th Cir. 1998) ............................................................................... 22

*United States v. Kennedy,*
548 F.2d 608 (5th Cir.1977) ................................................................................ 22

*United States v. Kimmel,*
777 F.2d 290 (5th Cir. 1985) ............................................................................... 30

*United States v. Snarr,*
704 F.3d 368 (5th Cir. 2013) ............................................................................... 24

*Waley v. Johnston,*
316 U.S. 101 (1942) ............................................................................................. 31

*Walker v. Johnston,*
312 U.S. 275 (1941) ............................................................................................. 31

*Washington v. Texas,*
88 U.S. 14 (1967). ............................................................................................. 27

*Weatherford v. Bursey,*
429 U.S. 545 (1977) .......................................................................................... 19

*Wells v. Walker,*
852 F.2d 368 (8th Cir.1988)............................................................................... 32

## OTHER AUTHORITIES:

U.S. Const. Amend. VI ............................................................................... passim

## I.   MR. AVENATTI'S CUSTODY STATUS AND TRIAL PREPARATION

### A.   April 24, 2020 to the Present

On April 24, 2020, pursuant to this Court's Order, Mr. Avenatti was released from the New York Metropolitan Correctional Center ("MCC") and placed in home confinement in Venice, California with significant restrictions and conditions.  To date, Mr. Avenatti has met each condition and there have been no issues or violations relating to his bail.  Indeed, in connection with the recent Pre-Sentence Report ("PSR") completed for Mr. Avenatti in the SDNY Nike matter, Ms. Shakira Davis, the Pre-Trial Specialist assigned to monitor Mr. Avenatti during his home confinement reported that Mr. Avenatti has been in full compliance with his release conditions since his release on April 24, 2020.  Further, the PSR noted that Mr. Avenatti is "viewed as a fair candidate for voluntary surrender" should be ordered incarcerated in that matter."[1] [2]

Since Mr. Avenatti's release from MCC on April 24, 2020, the defense's ability to prepare for trial, including motion practice and reciprocal discovery obligations, has been severely impacted by, among other factors, the following:

---

[1]  Mr. Avenatti has filed a post-trial motion seeking acquittal and a new trial in the Nike case (Case No. 1:19-CR-00373-PGG), which is fully briefed but awaiting a ruling by the Hon. Paul G. Gardephe.  On May 19, 2020, Judge Gardephe continued the sentencing hearing date in the Nike matter to August 19, 2020.

[2] On May 15, 2020, the Hon. Jesse M. Furman continued the trial date in the Stormy Daniels related SDNY criminal case (Case No. 1:19-CR-00374-JMF) to October 13, 2020, although it is widely anticipated that the trial will again be continued due to COVID-19.  In addition, Mr. Avenatti intends to renew his request that the case be transferred to this district, especially in light of the need to conserve judicial and juror resources as a result of the coronavirus.

(1)     As part of his bail conditions, the government insisted on severely limiting

Mr. Avenatti's ability to use a computer.  This poses a significant problem as the vast

amount of discovery produced by the government in this case has been produced on hard

drives or via other electronic means.  Moreover, there is simply no way to access and

review certain of the discovery produced (i.e. data and other computer files) by any

means other than a computer.  Seeing as Mr. Avenatti has unparalleled knowledge as to a

significant amount of the discovery, it is critical that he have the ability to review the

discovery in order to prepare for trial.

(2)     As a result of undersigned counsel's age (68), his risk for contracting

COVID-19 (he has diabetes), and the required stay-at-home orders, counsel has been

unable to spend any significant time with Mr. Avenatti reviewing the discovery in-

person and preparing for trial.  Even though Mr. Avenatti and counsel are in regular

communication by phone, this does not serve as a meaningful substitution for in-person

meetings and review of the extensive discovery in this case (which the government

continues to produce with no end in sight).  Counsel and Mr. Avenatti are further

restricted from communicating by Zoom or video conference due to Mr. Avenatti's

conditions of home confinement.

(3)     Because of COVID-19 and Mr. Avenatti's home confinement conditions,

neither defense counsel nor Mr. Avenatti have been permitted to appear in-person at the

offices of the IRS in order to further review Mr. Avenatti's e-mails, electronic

1  documents and those of his law firm.[3]  These emails and electronic documents are

2  critical to Mr. Avenatti's defense because, for instance, email often served as the primary

3

4  communication method between Mr. Avenatti and the alleged victims in this case, as

5  well as between Mr. Avenatti and others whom he employed/dealt with, who are at the

6  center of the allegations in the indictment.  While the government has provided copies of

7

8  *some* email and documents to the defense, the government has not produced copies of all

9  of the email and documents bearing on the allegations in the indictment and Mr.

10  Avenatti's defenses.

11

12  The Court will recall that Mr. Avenatti previously filed a motion to compel the

13  government to provide a copy of the entirety of the servers of Mr. Avenatti's law firm

14  without regard to case or topic, which was successfully opposed by the government.

15

16  Alternatively, the government established a terminal/database in the offices of the IRS in

17  Los Angeles in order to permit Mr. Avenatti and his counsel the opportunity to review

18  the email and documents as needed.  Mr. Avenatti and his counsel availed themselves of

19

20  this opportunity before COVID-19 and began the process of sifting and searching for the

21  relevant documents and information, although this process was less than 20% complete

22  at the time of Mr. Avenatti's January 14, 2020 arrest.

23

24  (4)  The records of Mr. Avenatti's law firm Eagan Avenatti, LLP, including

25  critical records detailing costs and expenses on cases involving the alleged victims, as

26

27  [3] There are well over 2,000,000 emails in the database, which likely comprise over 6,000,000 pages of material.

28

3

well as hours spent on the matters, are not in the possession of Mr. Avenatti.  Instead, the records are now in the possession of a bankruptcy trustee for the law firm.

(5)     The government continues to produce vast amounts of data and discovery to the defense, despite the fact that the government has previously and repeatedly represented to the Court and counsel that discovery would be complete long ago.[4]  *In fact, to date, the government has now produced over 1.1 million pages of discovery in this case,* **with over 664,000 pages (well over half of the discovery production) having been produced two weeks ago on May 8.**[5]  This is obviously in addition to the huge amounts of electronic data already produced.  The government has been in possession of the documents and materials in most instances for 14 months and yet is now inundating the defense with documents.  The prejudice to the defense that results cannot be overstated.  Further, this prejudice is compounded by the fact that the government

---

[4] For instance, the government previously represented to the Court and counsel that its privilege review would be completed last year and all documents produced.  And yet all indications are that it continues.

[5] On May 8, the government made this production while stating that "almost all" of the production had been previously produced by the Privilege Review Team to the defense on March 13, 2020.  The defense has not been able confirm this as there is no way to easily cross-reference the productions to determine what exactly has been previously produced and what is duplicative.  Further, the defense was still in the process of reviewing the March production (which alone consists of nearly 1 million pages) when the May production of 664,000 pages was made.  As the Court can appreciate, it can easily take months to review this amount of discovery, not to mention then reviewing and comparing that discovery to later productions.

1  refuses to affirmatively state either (a) that all discovery has now been produced or (b) to

2  provide a date certain as to when all discovery will have been produced.[6]

4       (6)     As the Court is aware, Mr. Avenatti's counsel in this matter[7] is a solo

5  practitioner with limited resources and a limited ability to review the over 1,000,000

6  pages of discovery that has been dumped on the defense by the government, not to

8  mention the huge amount of electronic data consisting of millions of additional

9  pages/images. The sheer magnitude of the discovery the government has produced, and

---

11      [6] The defense respectfully requests that the Court direct the government to promptly (a) provide
12  the Court with a detailed summary of the government's productions to date, including the date of each
13  production and the amount of pages/data associated with each production and b) affirmatively state all
14  discovery has now been produced or, if not, provide an absolute date certain as to when all discovery
   will be produced.

15      [7] The government has previously gone to great lengths to repeatedly inform the Court that Mr.
16  Avenatti was represented at the Nike trial by "SEVEN (7) attorneys." However, what the government
17  has failed to tell the Court, despite having full knowledge of all of Mr. Avenatti's finances, bank
18  accounts, and payments to his lawyers during the last three years, including in 2019 and 2020, is that:
19  (a) **only TWO (2) of those lawyers were being paid by Mr. Avenatti, with the payments occurring**
20  **entirely in the Spring of 2019**; (b) the "seven" lawyers included a pro bono jury consultant and other
   lawyers in support, who played no role at trial after jury selection; and (c) *unlike here*, Mr. Avenatti had
21  the good fortune of having lawyers, firms and consultants volunteer their services in the Nike case due
22  to (i) the case being venued in New York, (ii) the high-profile nature of the case and the fact that it
23  involved some of the biggest names in college basketball, and (iii) the belief by many in the legal
24  community that Mr. Avenatti had been singled out for prosecution in the Nike case over what was in
25  reality a hard charging settlement negotiation, no different than what occurs hundreds of times by
26  plaintiffs' lawyers every day across the country. Accordingly, any claim by the government that Mr.
27  Avenatti chose to lavishly fund his defense in the Nike case at the expense of his defense in this matter
28  is without merit.

continues to produce, cannot be overstated.  Even were Mr. Avenatti able to employ a team of lawyers/paralegals to review the discovery in the case, the undertaking would require months of time.[8]  The effects of COVID-19 make this process even more inefficient and time consuming.

### B.    January 14 to April 23, 2020

At the last status conference held on April 27, the USAO represented to the Court that Mr. Avenatti had the ability to fully review discovery in this matter and prepare for trial while he was in custody from January through the end of April.  As set forth in detail below, this representation is *patently false*.

On the evening of January 14, 2020, despite knowing full well that Mr. Avenatti was scheduled to depart for New York on a commercial flight five hours later in order to assist with trial preparation and be present for the Nike trial (set for the following Tuesday), the government caused Mr. Avenatti to be arrested in downtown Los Angeles. They chose to arrest Mr. Avenatti not at his residence as is customary, or even at the

---

[8] Mr. Avenatti is presently attempting to make arrangements for additional counsel to represent him in this case with the hope that such counsel can assist in the review of the discovery and preparation for trial.  This process has been significantly hindered by the position previously taken by the government in connection with Mr. Avenatti's bail revocation, namely that every dollar he expends on anything other than paying his estranged wife Lisa Storie or the creditor Jason Frank (who is law partners with, and represented by, Mr. Sagel's close friend Andrew Stolper) is an effort somehow aimed at hindering their efforts at collection and thus amounts to criminal conduct.  As this Court can appreciate, and as the court in the Nike case specifically recognized, this position by the government creates a significant impediment to Mr. Avenatti's ability to retain counsel, fund a defense, pay costs and experts, and properly prepare for trial.

airport.  Instead, the prosecution purposely chose to have Mr. Avenatti arrested while he was attending a high-profile State bar hearing at which the media was present.  As planned, a media circus resulted, with Mr. Avenatti's arrest and ultimate remand being widely reported nationwide, together with repeated mentions of Mr. Sagel by name.  The judge in the Nike matter (the Hon. Paul G. Gardephe) later noted that the timing was especially curious seeing as the alleged conduct used by the government for the basis for the arrest and bail revocation was known by the government for months prior (dating back to July 2018).[9]

At the time of his arrest and repeatedly thereafter as he was being transported to Santa Ana jail from downtown Los Angeles, Mr. Avenatti asked the agents who had arrested him why he was in custody.  They refused to tell him.

Upon being booked in the Santa Ana jail on the night of January 14, Mr. Avenatti was placed in solitary confinement, in a wing of the jail generally reserved for violent inmates with disciplinary problems.[10]  He asked to be able to take a shower but that request was denied.

---

[9] The timing of Mr. Avenatti's arrest caused the Nike trial to be delayed and rescheduled, and further caused considerable inconvenience to the Nike court and its staff.  It also resulted in an obscene waste of taxpayer money in that Mr. Avenatti, accompanied by three U.S. Marshalls, had to be flown on a chartered private jet (likely at a cost of over $60,000) from Orange County airport to New York on the Friday after his arrest.

[10] As the Court is aware, from 1971 until 2019 (48 years), Mr. Avenatti had never been charged with any crime, let alone convicted of any crime, and had no history of violence.

On the morning of January 15, this Court remanded Mr. Avenatti to custody, at which time he was placed back in solitary confinement despite repeatedly asking to be housed in general population. He was again denied a shower.

On January 16, Mr. Avenatti spent the entire day in his cell with no ability to use the phone, take a shower, or have any contact with his attorneys.

Early in the morning of Friday, January 17, Mr. Avenatti was removed from his cell and transported to Orange County airport, where he was flown, together with three U.S. Marshalls, on a private jet to Teterboro, New Jersey outside of New York. At all times, Mr. Avenatti was handcuffed, shackled at the waist and required to wear ankle restraints. He still had not been permitted to shower.

After having been transported to the MCC in Manhattan,[11] Mr. Avenatti arrived at approximately 6:30 p.m. Despite Mr. Avenatti repeatedly asking (and practically begging) that he not be placed in solitary confinement, he was placed in solitary confinement in the notorious "10 South," in a cell previously used to hold international fugitive and drug lord Joaquin "El Chapo" Guzman before, during and after his recent trial in Brooklyn, New York.[12] Unit 10 South houses 6-7 inmates at a time, nearly all of whom are considered threats to the national security of the United States (i.e. high-

---

[11] The substandard conditions at MCC are widely known throughout the Bureau of Prisons and are considered the worst in the nation.

[12] Despite the existence of the Federal Metropolitan Detention Center ("MDC") in Brooklyn where almost all federal pre-trial inmates are held pending trial in Brooklyn, El Chapo was instead held at MCC due to its extreme security measures.

profile terrorists or individuals accused of treason against the United States).[13]  Indeed, the security measures used at 10 South are some of the highest used throughout the Federal Bureau of Prisons, with the unit considered the "Super Max" of pre-trial facilities in the United States.[14]  It has been routinely described as tougher than Guantanamo Bay, with conditions that cause severe psychological trauma.

Despite repeated requests by Mr. Avenatti and his counsel that he be moved from 10 South, Mr. Avenatti was held in solitary confinement in 10 South for nearly five (5) weeks until February 20,[15] at which time he was finally placed in general population in Unit 5 South.  For the first three weeks, a guard was stationed immediately outside the door of his cell 24 hours a day.  During the five weeks he was held in 10 South, he was never permitted to go outside to breath fresh air or see the sky.[16]  He was rarely permitted to view any television, was not allowed to use a radio, and was never

---

[13] Because of the severe restrictions and violation of constitutional rights that result from being placed in 10 South, incarceration in the unit generally requires a directive from the Office of the Attorney General of the United States and judicial approval of "Special Administrative Measures" or "SAMS."  It is presently unknown how Mr. Avenatti was placed in 10 South without this judicial safeguard and what role, if any, the Attorney General had in placing Mr. Avenatti in 10 South.

[14] The Court is urged to read Exhibits A-D as they relate to the specific conditions Mr. Avenatti faced while at MCC, especially because they severely impacted his ability to prepare for trial in this case, as well as his mental fitness.

[15] On February 14, Mr. Avenatti was convicted in the Nike matter.  He was not remanded to custody as a result of that conviction.

[16] Mr. Avenatti was ultimately held at MCC for a total of approximately 100 days; he was allowed to go outside to breath fresh air *once*.

permitted to read a newspaper.  He was not allowed a single social visit.[17]  His every move (including showers and use of the toilet) was recorded on two cameras located inside his cell, with Mr. Avenatti being told that if he tried to cover himself when using the toilet, he would be disciplined.  He could not control the lights within his cell, which were routinely left on without interruption.  And the temperature inside his cell would reach approximately 45 degrees at night.

*Moreover, his attorney visits and access to discovery materials were severely restricted.*  Indeed, Mr. Avenatti was not permitted by MCC to have any discovery or legal paperwork relating to any other case or matter other than the Nike matter.  Further, he was not allowed to have email access; his calls, including attorney calls, were severely restricted; and he was not permitted to use the law library (where discovery materials must be reviewed per MCC policy).

On Wednesday, February 26, Mr. Avenatti was first granted access to the law library at MCC, where inmates are permitted to review discovery.  However, MCC informed Mr. Avenatti that no discovery from this case or the Stormy Daniels related matter was on file for him to review.

The next day (Thursday, February 27) and a mere seven days after he was moved out of 10 South - the entire MCC was placed on locked-down status after it was

---

[17] In fact, Mr. Avenatti was never permitted a single social visit during his approximate 100 days at MCC, even though his family and close friends went to great lengths to attempt to see him, including travelling to New York only to be turned away at MCC.

discovered that a correctional officer at the institution had smuggled a loaded firearm into the facility and provided it to an inmate.  Attorney visits and contact were immediately stopped that day.  All inmates were locked in their cells 24 hours a day so that a search could begin prison wide for the firearm.  "Sort" teams (i.e. SWAT like teams) and other correctional officers from maximum security United States Penitentiaries from across the country were brought to MCC to conduct repeated cell raids, often in the middle of the night.[18]  In the thirteen days that followed, Mr. Avenatti was permitted only two showers – each five minutes in length (one on March 1 and one on March 7); he was locked in rat-infested cells 24 hours a day with no clean laundry;[19] he was cut off entirely from his counsel and family; he had no phone or email access; and he was not given a single hot meal (he was fed frozen peanut butter and jelly sandwiches every night for 13 nights straight).

---

[18] For instance, Mr. Avenatti had his cell searched seven times by officers in full tactical gear, often at 3:00 or 4:00 a.m., across thirteen days.  At one point, Mr. Avenatti, together with other inmates, were required to stand and sit on the floor with their hands on their heads for three consecutive hours and were told if they removed their hands, there would be "hell to pay" and they would get a "shot" (a disciplinary charge) and taken to the SHU.  He was also strip searched repeatedly.  Further, the personal property of Mr. Avenatti, including over ½ of his legal documents, were taken and "lost."  During one strip search at approximately 3:30 in the morning on March 4, a correctional officer said to another that Avenatti "doesn't look as tough now as he thought he did when he was going after Trump on TV."

[19] Mr. Avenatti was ultimately allowed one change of clothes and sheets across approximately five weeks.

11

On March 10, days after the firearm was recovered, MCC finally came off locked down status and Mr. Avenatti was moved to unit 11 South.  He was subsequently finally able to meet with undersigned counsel, who, despite the virus outbreak, flew to New York from Los Angeles for the purposes of discovery and motion review, and trial preparation.  However, those efforts were soon again derailed.

Only 12 days later, on March 22, Mr. Avenatti's unit was again locked down for what was then described as a "staff shortage."  The next day, March 23, MCC informed Mr. Avenatti's unit that it would remain locked down and quarantined as a result of an inmate in the unit testing positive for COVID-19.  All attorney visits were stopped; all law library/discovery access was immediately suspended; no inmate was permitted to leave the unit unless they were being released; and inmates were permitted to leave their cells only approximately three times per week for a total of 5 hours per week to use the phone or email system.  Occasionally, a hot meal (lunch) would be served, but generally all meals were cold or frozen.[20]

On Saturday, April 11, despite the fact that Mr. Avenatti had already been quarantined since March 23 (i.e. for 19 days), MCC moved Mr. Avenatti back to solitary confinement in 10 South and again placed him under severely restrictive conditions.  He was not permitted to leave his cell on a single occasion until his release from MCC to

_____

[20] Mr. Avenatti was again fed frozen peanut butter and jelly sandwiches every night for dinner – this time for 32 consecutive nights.

12

home confinement on April 24.  Nor was he permitted email access, access to a computer, or regular contact with his attorneys or family.

In sum, as detailed above, Mr. Avenatti was in custody approximately 100 days and was in solitary confinement or under locked-down status for over 80 of those days. He was routinely denied access to his discovery, legal papers and counsel through no fault of his own.[21]  *And he was forced to endure abhorrent, brutal conditions almost unheard of even for inmates with long, violent criminal histories.  Accordingly, any claim by the government that Mr. Avenatti was easily able to adequately review discovery in this matter, meet and communicate with his attorneys, and prepare for trial is frankly absurd.*

## II.    THE GOVERNMENT'S DISCOVERY PRODUCTIONS

As discussed previously (*see* I. A. (5), *infra*), the government continues to produce vast amounts of discovery in this case while at the same time refusing to either state that all discovery is now complete or provide a date certain by which all discovery will be complete.  Much of this information has been in the possession of the government for well over a year.  This, coupled with the issues detailed above relating to discovery review, makes it virtually impossible for the defense to adequately prepare motions, participate in reciprocal discovery, mount a global defense strategy, properly prepare witnesses, make decisions as to which witnesses to call and whether Mr. Avenatti will

---

[21] Mr. Avenatti did not have a single disciplinary incident while in custody.

testify, and generally prepare for trial.  To date, the government has produced over 1.1 million pages of discovery, with well over 50% of those pages (over 664,000) only recently having been produced.  This does not take into account the total amount of information provided to the defense from the Privilege Review Team.  And there have been untold productions of electronic discovery comprising enormous amount of data.

As can be expected under these circumstances, counsel has yet to review well over one half of the discovery produced in this case as of the date of this filing.  It goes without saying that Mr. Avenatti should not be required to proceed to trial until his counsel is adequately prepared.

## III.  THE GOVERNMENT'S CONTINUED USE OF A GRAND JURY AND THE POSSIBILITY OF A SUPERCEDING INDICTMENT

The defense understands that the government continues to subpoena documents and witnesses in connection with its investigation of Mr. Avenatti.  Indeed, all indications are that the government over the last 18 months has dug into virtually every aspect of Mr. Avenatti's life and every financial transaction that he or his law firms participated in dating back some seven years, and that this inquiry continues to this day.  If the government intends on bringing a superseding indictment against Mr. Avenatti, it will obviously have a significant impact on the scope of the trial, discovery, and trial preparation.

**IV.   THE TRIAL DATE AND ASSOCIATED SCHEDULE**

The trial in this matter is presently set to begin on August 17, 2020 and is likely to last for approximately six weeks or longer depending on the government's ability to use alleged 404(b) evidence.  For the reasons set forth above, the defense has serious concerns about Mr. Avenatti's right to a fair trial and the defense's ability to meet the current schedule, complete its review of the mountain of discovery in this case, file the extensive motions necessary for Mr. Avenatti's defense, meet with Mr. Avenatti to prepare for trial, and adequately represent Mr. Avenatti at trial.  These concerns are even more heightened in light of the coronavirus and its effects on the defense and counsel.

By the date of the status conference in this matter, there will be over 1,700,000 confirmed cases of COVID-19 in the United States, with over 100,000 deaths.  Los Angeles County and Orange County alone account for over 50,000 cases and 2,200 deaths.  On Friday, May 22, 2020, Dr. Deborah Birx, the White House Coronavirus Response Coordinator,  identified the Los Angeles Metropolitan Area and Orange County as one of three geographic areas of concern for COVID-19 spread in the United States, with the White House asking the CDC to investigate.  As of May 25, 2020, (a) Los Angeles County reported 13,243 new cases in the previous 14 days – almost half of total new cases reported in all of California during that time period and (b) Orange County had seen a 24.3 percent increase in positive COVID-19 hospital patients and a

15

44.4 percent increase in ICU positive COVID-19 patients.[22]  Meanwhile, cases, deaths and hospitalizations are spiking in other states that have moved toward reopening (i.e. North Carolina, Alabama, and Minnesota).  Indeed, many experts, including renowned expert Dr. Anthony Fauci, are predicting a "second wave" for the pandemic, which may result in a more dangerous set of circumstances than the first wave and produce a larger percentage of cases and deaths later this Summer or Fall.  Simply put, there is nothing that presently suggests that the pandemic will be "over" by August or that any degree of true normalcy will be restored by that date.[23]

Critically, a trial in August in the middle of the COVID-19 pandemic would have a significant, negative and dramatic impact on Mr. Avenatti's rights,[24] including (a) his rights to effective assistance of counsel, including pre-trial preparation, trial performance, and midtrial consultation with counsel, (b) to be tried entirely on properly admitted evidence; (c) to be tried by a fair cross-section of the community; (d) to meaningful confrontation; (e) to compulsory process; (f) to an impartial jury that can reasonably be expected to hear the evidence with the appropriate attention, and to be free

---

[22] *See* https://covid19.ca.gov/roadmap-counties/, visited May 25, 2020.

[23] For instance, California State University, the largest four-year public university system in the United States, announced on May 12, 2020 that, with few exceptions, they were suspending in-person classes at its 23 campuses throughout the state, including in Orange County, because a course that might begin in a face-to-face modality would likely have to be switched to a virtual format during the term if a serious second wave of the pandemic occurs, as forecast.

[24] Mr. Avenatti's health issues and heightened risk for serious injury or death as a result of contracting the virus are well documented in the record and are, therefore, not repeated here.

16

of coercive verdicts; (g) to be free of coercive pressure to plead guilty; and (h) to the

exercise of reasonable care for the safety of those endangered by state action.

**A.     Trial during a deadly, highly contagious pandemic would impair the defendant's right to effective of assistance of counsel.**

Defendants enjoy a right to the assistance of counsel at all critical stages of a

criminal proceeding. *See Montejo v. Louisiana*, 556 U.S. 778, 786 (2009).  Both the trial

itself and the post-indictment period before trial constitute critical stages. *See Kirby v.*

*Illinois*, 406 U.S. 682, 688 (1972) (right to counsel attaches "at or after the time

adversary judicial proceedings have been initiated against him").  When defendants

suffer the impairment of counsel by a state-created barrier, they need not show that the

inadequate performance affected the outcome – they need only show that such barriers

affected counsel's performance. *See Smith v. Robbins*, 528 U.S. 259, 287

(2000)("various kinds of state interference with counsel's assistance' can warrant a

presumption of prejudice.")(internal quotations omitted); *Perry v. Leeke*, 488 U.S. 272

(1989)(recognizing that while most claims of ineffectiveness require a showing of

prejudice, "direct governmental interference with the right to counsel is a different

matter.")  And in some circumstances, the effective performance of counsel is so

unlikely as to amount to the functional equivalent of a complete denial of counsel. *See*

*United States v. Cronic*, 466 U.S. 648 (1984); *Burdine v. Johnson*, 262 F.3d 336, 347

(5th Cir. 2001) (en banc).  In these cases, reversal is automatic. *See Cronic*, 466 U.S. at

659

17

Trial under the current circumstances would destroy the defendant's right to counsel in multiple ways and would constitute both the state interference with the duties of counsel and the constructive denial of counsel altogether.

        1.     Trial in August would so compromise counsel's trial performance as to constitute a complete denial of counsel; it would also destroy any meaningful right to mid-trial attorney-client consultation.

Trial in a setting that gravely threatens his or her own physical well-being – as well as that of his or her client and family -- amounts to the constructive denial of counsel. *See Powell v. Alabama*, 287 U.S. 45, 53 (1932)(demand that counsel try a capital case on short notice and under thinly veiled threat of mob violence effectively deprived defendants of counsel). Conducting a jury trial always requires immense and sustained focus. Under the best of circumstances, even a simple criminal trial presents innumerable moving parts that require the full, rapt attention of one or more attorneys. And if an attorney stumbles on any point, such a misstep may rightfully become scrutinized on appellate review, in habeas petitions, and even bar complaints.

Unfortunately, even skilled and experienced trial attorneys would find it impossible to maintain the necessary sustained focus in the current environment. During a deadly pandemic, every step an attorney takes, every pen he or she picks up, every person that wants to converse, and every cough he or she hears, could mean infection with a deadly virus. *This concern is even more heightened as a result of undersigned counsel's age and health condition (68 years old with diabetes), which places him in a high risk category for contracting the virus and suffering serious consequences.* And he

18

will also be seriously concerned about who will be exposed to the virus when he or she leaves court each day.  Preserving Mr. Avenatti's rights, moreover, will require some effort to put on the record at least the most serious occasions of such distractions.

Quite apart from the question of divided attention, trying the case under COVID-19 protocols will undermine counsel's ability to perform other basic functions. Counsel – like the jury, and judge – probably will not understand all of the testimony of masked witnesses and will certainly be unable to evaluate their demeanor. Nor will counsel be able to judge the reactions of jurors or the Court.  Indeed, a crucial part of being an effective trial advocate is the ability to gauge the reaction of jurors to the evidence and witness testimony in real time and adjust your presentation and trial strategy accordingly. If the jurors are forced to wear masks covering a significant portion of their faces, the ability of trial counsel to perform this critical task is eliminated.  Communication with co-counsel, witnesses, and paralegals will likewise be impaired.

Most critically, counsel will have to choose between his or her own safety and consultation with Mr. Avenatti, who faces years in prison. The defendant possesses an unqualified right to consult with his attorney throughout his trial.  *See Geders v. United States*, 425 U.S. 80 (1976).  Indeed, that right prevails over even very weighty concerns of trial administration, such as the witness sequestration rule.  *See Geders*, 425 U.S. at 88-92.

The current setting burdens this right in several ways. The efficacy of attorney-client consultation diminishes at a distance. If the defendant and counsel can hear each

19

other at this distance, they probably cannot speak privacy, as contemplated by the Sixth

Amendment. *See Weatherford v. Bursey*, 429 U.S. 545, 554 n. 4 (1977). And because

such conversations cannot be conducted safely, privately, and effectively, they will

inevitably be conducted less frequently than necessary. Nor, of course, could such

consultations be safely conducted at shorter distances.

Conceivably, the Court could recess the trial each time the defendant and his

counsel wished to confer, to permit a private conversation. This would exact a massive

toll on the trial's efficiency, and likely generate frustration and resentment by jurors

toward the defendant. Further, it would call heightened attention to the defendant's

conferences with his lawyer, and increase the risk that the jury draws factual inferences

of guilt from his behavior at counsel table. The defendant's consultation with his lawyer,

like his conduct at counsel table generally, constitute improper bases for conviction.

> 2.   Trial in August would effectively deprive the defendant of the right to counsel in the period of pretrial preparation.

The Supreme Court has recognized "that the assistance of counsel cannot be

limited to participation in a trial; to deprive a person of counsel during the period prior to

trial may be more damaging than denial of counsel during the trial itself." *See*

*Weatherford v. Bursey*, 429 U.S. 545, 554 n. 4 (1977). Here, an August trial would

compromise several important forms of pre-trial preparation.

First, counsel cannot reasonably make strategic decisions without basic knowledge

about how it will be conducted, including as it relates to voir dire. It is anticipated that

due to Mr. Avenatti's notoriety and the media attention surrounding his arrests and

20

recent conviction, an initial panel of at least 125-150 prospective jurors will be required.[25] But the protocols surrounding jury selection, and the trial itself, have yet to be disclosed or discussed.

Trial attorneys should be expert in the rules and procedures that govern the trial. Without a detailed recitation of the trial protocols, the defense can neither prepare evidence for the trial nor challenge its processes. Cross-examination strategies, for example, may depend on whether a witness will be wearing a mask. Counsel cannot responsibly decide how much evidence to present without knowing how uncomfortable or fearful the jury will be when hearing it. Nor can the defense know how to display its exhibits or demonstrative aids without knowing where and how the jury will sit, or what technology is available. Further, witnesses cannot be prepared without being able to tell them how they will testify: in a mask, over closed circuit TV, at the far side of the room. Most critically, the defendant's own choice to testify may well be affected by the Court's decision about whether he is going to do so in a mask.

There is also the question of how discussions at the bench will occur during the trial. Oftentimes during a trial, the parties need to discuss a matter out of earshot of the jury and those discussions take place huddled at the bench. Will the jury be excused each

---

[25] If social distancing requirements are to be met, this will require a contiguous space of at least 14,125 square feet (125 individuals x 113 square feet per individual (area of a circle with a 6 foot radius), not accounting for Court staff and attorneys.

time a discussion needs to occur with the Court so the parties may remain some distance from each other?

Pretrial consultation has also been significantly affected.  Beyond the inability to review discovery with the defendant as discussed above, counsel cannot converse with the defendant or the defense witnesses live, in face-to-face confrontation, in order to judge demeanor for possible testimony.

Put simply, the assistance of counsel that the defendant would receive in these circumstances would not be what the Constitution demands.  Insistence on proceeding with a lengthy trial under these circumstances would represent an "unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay.'" *Morris v. Slappy*, 461 U.S. 1, 11–12, (1983) (citing *Ungar*, 376 U.S. at 589). It would therefore violate the constitution.

**B.   Trial during a deadly pandemic would deprive the defendant of trial before a fair cross-section of the community.**

The Sixth Amendment and 28 U.S.C. §1861 et seq. (the "Jury Selection Act") guarantee a party a trial before a fair cross-section of the community. In order to show a violation of the statute, a defendant must prove a "substantial failure" to comply with its provisions. A substantial failure is one that destroys the "random nature or objectivity of the selection process." *United States v. Hemmingson*, 157 F.3d 347, 358 (5th Cir. 1998)(internal citations omitted, quoting 28 U.S.C. § 1867(a)), and *United States v. Kennedy*, 548 F.2d 608, 612 (5th Cir.1977).

22

To show a Sixth Amendment violation, the defendant must show that (1) "the group alleged to be excluded [from the jury system] is a 'distinctive' group in the community," (2) "the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community," and (3) "this underrepresentation is due to systematic exclusion of the group in the jury selection process." *Duren v. Missouri*, 439 U.S. 357, 364 (1976).

Jury summonses issued during the pandemic cannot produce a lawful cross-section of the community. Neither the coronavirus nor the economic dislocation it has occasioned have affected the community uniformly. Some portions of the Central District have suffered higher infection rates, and experience greater risks of serious illness or death than have others. Nor is fear of the virus uniform along ethnic or racial lines. Because of significant racial and ethnic differentials in infection rates and access to health insurance, different racial and ethnic groups within our community may feel greater vulnerability to the virus in the event it is contracted.

As to the economic effects, some segments of our community have experienced elevated rates of occupational dislocation, and graver risks to family finances upon losing a job or paycheck. Further, some ethnic and racial groups have higher concentrations of employment in critical industries. Women are also concentrated in these industries. Finally, the age structure of each ethnic and racial grouping in our community varies significantly. Moreover, the virus's disruption of childcare arrangements will certainly affect different ethnic and racial groupings, and their ability

23

and willingness to serve on a jury, differently. These differences will almost certainly manifest themselves in differential response rates to summons.

The magnitude and breadth of social and economic change in the immediate wake of the virus is absolutely vast. Predictions about the precise ways that the virus will skew summons response rates are therefore dangerous and unknown. Certainly, however, the group of people who answer the summons will not resemble a typical, representative jury pool in the Central District.

That suffices to show a violation of the Jury Selection Act and the Constitution. The act of sending summons at the peak of a pandemic "destroys the random nature" of jury selection.  For instance, just as a jury summons issued for service on a major religious holiday observed by a plurality of the community would not produce a "random" selection of its residents, nor would a summons issued during a pandemic that affects large ethnic groups more severely than its white, conservative, Republican residents.

The issuance of a summons for jury duty in August will likely skew the venire by large margins along multiple cognizable cleavages.  Further, the unequal probabilities for jury service among each group will result from systemic, rather than random, factors. The decision to convene a jury trial in this short moment of intense social dislocation represents a "procedure[] in the jury selection process that work(s) to exclude class members."  *United States v. Snarr*, 704 F.3d 368, 385 (5th Cir. 2013).

1    Finally, even if every cognizable group in the District had the same probability of

2    jury selection, COVID-19 notwithstanding, it would still violate the Jury Selection Act

3

4    and Sixth Amendment. *If we can predict nothing else about jury selection in a pandemic,*

5    *one thing is almost certain: the response rate will be abnormally low.* Because an

6    adequate sample size is essential to random selection, this fact alone will "destroy the

7

8    random nature" of the selection process. Further, it will significantly increase the

9    likelihood that the responding population underrepresents someone, and hence increase

10   the likelihood of a homogenous or statistically outlying jury. This is not a fair cross-

11

12   section. *See State v. Long*, 499 A.2d 264, 272 (N.J. 1985) (a system that produces

13   homogenous venires does not produce a fair cross-section, even if each resident has an

14   equal chance of service).

15

16   **C.    Trial during a deadly pandemic would compromise the defendant's right to meaningful confrontation.**

17       The Constitution guarantees the defendant the right to confront witnesses against

18   him. *See* U.S. Const. Amend. VI.  An essential component of that right is:

19

20   [T]he opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may
21   look at him, and judge by his demeanor upon the stand and the manner in which he gives
22   his testimony whether he is worthy of belief.

23   *Mattox v. United States*, 156 U.S. 237, 242 (1896); *accord Maryland v. Craig*, 497 U.S.

24

25   836, 845 (1990); *Coy v. Iowa*, 487 U.S. 1012 (1988); *California v. Green*, 399 U.S. 149

26   (1970).  Compelling witnesses to testify in a face covering would obviously impair the

27

28

25

jury's capacity to judge the witnesses' facial expressions and demeanor when "standing face to face" and "looking at" the witnesses.

In some cases, courts have permitted witnesses to testify in facial covering to protect their safety. *See, e.g., United States v. DeJesus-Castaneda*, 705 F.3d 1117, 1120 (9th Cir. 2013); *see also Craig*, 497 U.S. at 851 (closed circuit testimony); *United States v. El-Mezain*, 664 F.3d 467, 491-494 (5th Cir. 2011)(pseudonymous witness). But in those cases, the witnesses feared retaliation, and no alternative measure could assure their safety. *See DeJesus-Castaneda*, 705 F.3d at 1120; *El-Mezain*, 664 F.3d at 491-494. Thus, facial coverings furthered an important government interest and did not render the testimony unreliable. *See DeJesus-Castaneda*, 705 F.3d at 1120; *see also Craig*, 497 U.S. at 850 (recounting this test). Here, by contrast, nothing more is at stake than a delay in the trial date – unmasked testimony will be perfectly safe after the pandemic. Further, if the witnesses cannot be understood, their testimony – as comprehended by the jury – is not reliable.

Finally, the right of confrontation may be drained of its value even if the witnesses do not testify in coverings. If the jury finds that government witnesses appear nervous or concerned about their answers, this fact may have little probative value in a pandemic. Large numbers of the trial participants will be scared to be in public during a deadly infection, a matter wholly independent of the truth of their testimony. Accordingly, a continuance is necessary to protect the core of the defendant's confrontation right.

26

**D.      Trial during a deadly pandemic would compromise the defendant's right to compulsory process, to present evidence, and to testify.**

The Sixth Amendment promises Mr. Avenatti "compulsory process for obtaining witnesses in his favor." U.S. Const. Amend. VI. "Few rights are more fundamental than that of an accused to present witnesses in his own defense." *Taylor v. Illinois*, 484 U.S. 400, 408 (1987); *accord Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). Moreover, "the right is a fundamental element of due process of law." *Taylor*, 484 U.S. at 409; *accord Washington v. Texas*, 388 U.S. 14, 19 (1967). These rights carry special force when the defendant himself seeks to testify. *See Rock v. Arkansas*, 483 U.S. 44, 49-52 (1987). The defendant's right to testify overcomes even strong public policy concerns about the reliability of evidence, and may defeat even less than absolute prohibitions on giving testimony. *See Rock*, 483 U.S. at 56-62. That right arises from dignitary concerns – the personal nature of the right to be heard "in his own words" -- and not solely on constitutional protections against unreliable verdicts. *Id.* at 52.

Trial during a pandemic would undermine this complex of fundamental rights. Assuming defense investigators can make service of subpoenas, the pandemic creates a serious risk of witness non-compliance. And if defense witnesses do appear, the jury cannot evaluate their credibility, whether positively or negatively, if they testify in facial coverings. Further, causing witnesses to testify in a state of fear significantly prejudices Mr. Avenatti.

If nothing else, the need to testify in facial coverings will seriously abridge the defendant's right to be heard. This is true in a literal sense – early experience with

27

speaking through facial coverings suggests that it is often incomprehensible. But it is also true in another sense -- the jury will not be able to see and evaluate Mr. Avenatti's face if he testifies. Speech is more than expulsion of sound waves; it is a full presentation of the self, especially through facial expression.  Accordingly, a defendant compelled to testify behind a mask is no more heard "in his own words" than one compelled to deliver testimony in writing.

Finally, causing Mr. Avenatti and other witnesses to appear in Court while they are nervous about health issues unrelated to guilt or innocence, or the facts of the case, prejudices the defendant.  Jurors will observe Mr. Avenatti while the trial is proceeding and if he appears nervous they could unfairly interpret that as consciousness of guilt. Likewise, they could interpret the nervousness of a defense witness as a sign of lacking credibility or belief in their own testimony.

### E. Trial during a deadly pandemic would compromise the defendant's right to be present and to be judged without the effect of a prejudicial face covering.

Ultimately, the defendant will either attend the trial in a mask or without one. Neither option is fair to him. Due process requires courts to consider whether the appearance of the defendant will prejudice the jury, and to take care to avoid such prejudice. *See Estelle v. Williams*, 425 U.S. 501 (1976).  Thus, defendants may not be tried in prison garb, *see Williams*, 425 U.S. at 505, nor in shackles barring clear threats to the safety or good order of the proceedings. *See Deck v. Missouri*, 544 U.S. 622 (2005).

28

1

2

3      Our culture very frequently associates masks with villainy. Train bandits,

4   Hannibal Lecter, and Klansman, figures now etched into the contemporary American

5   subconscious, all wear masks. And there may well be a segment of the population that

6   dislikes not merely the mask but the people who wear them.[26] Indeed, there are already

7   signs that wearing a mask is becoming widely politicized, with media reports of "mask

8   shaming" in the United States and conservative supporters of the President labeling

9   individuals who wear masks as "left wing liberals who don't respect individual

10   freedoms."

11

12      Alternatively, Mr. Avenatti's presence without a mask could prejudice the jury

13   against him, inviting inferences that he is selfish and reckless towards the lives of others.

14   Some jurors may agree with New York Governor Andrew Cuomo, a major public figure

15   in the country's COVID-19 response, who said publically that mask refusal "is

16

17   insensitive, it is arrogant, it is self-destructive, it is disrespectful to other people."[27] The

18   Court should wait until a time that it does not have to make this choice.

19

20      [26] See Ryan Lizza and Daniel Lippman, *Wearing a mask is for smug liberals. Refusing to is for*

21   *reckless Republicans* (May 1, 2020)("On the right, where the mask is often seen as the symbol of a

22   purported overreaction to the coronavirus, mask promotion is a target of ridicule, a sign that in a deeply

23   polarized America almost anything can be politicized and turned into a token of tribal affiliation."),

24   *available at https://www.politico.com/news/2020/05/01/masks-politics-coronavirus- 227765, last*

25   *visited May 26, 2020.*

26      [27] George Back, *Andrew Cuomo on 'selfish' New Yorkers not wearing masks: 'I just don't get it'*,

27   Yahoo Entertainment (May 7, 2020), available at *https://sports.yahoo.com/andrew-cuomo-on- selfish-*

28   *new-yorkers-not-wearing-masks-i-just-dont-get-it-074031942.html, last visited May 26, 2020.*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**F.      Trial during a deadly pandemic would compromise the defendant's right to be tried by an impartial jury and to be free of coercive verdicts.**

Trial during a deadly pandemic would compromise the defendant's right to be trial by an impartial jury and to be free of coercive verdicts.  The Supreme Court "has recognized that a defendant has a right to a tribunal both impartial and mentally competent to afford a hearing." *Tanner v. United States*, 483 U.S. 107, 126 (1987); *Jordan v. Massachusetts*, 225 U.S. 167, 176 (1912).  Moreover, the jury should be reasonably attentive.  And it cannot be coerced into rendering a premature verdict.

A trial in August cannot be accomplished consistently with these principles. Jurors will not likely devote their full attention to the testimony and evidence while they worry about their safety and that of loved ones. Nor can they be expected to remain neutral in these circumstances, free of any resentment toward the prosecution for bringing the case, or, more likely, the defendant for insisting on a jury trial. Finally, when the jury returns for deliberations, the Court should not be surprised by a quick verdict to terminate the proceedings. Other than avoiding service through voir dire or simple non-compliance with a summons, which should both be expected as jurors seek to avoid potentially deadly exposure to the virus, the speed of the verdict will be the one way that jurors can control the duration of their viral exposure. In deciding whether a verdict is coerced, "the real question is whether the jury was required to deliberate an unreasonable length of time or for unreasonable intervals or was threatened with the prospect of such unreasonably lengthy deliberations." *United States v. Kimmel*, 777 F.2d 290, 295 (5th

Cir. 1985).  In the midst of a pandemic, nearly any amount of time is "an unreasonable length of time."

### G.     Trial during a deadly pandemic would compromise the defendant's right to be free of coercive pressure to plead guilty.

The choice between trial and a plea of guilty must be made entirely voluntarily, and without any threats or promises of unlawful action.  *See Brady v. United States*, 397 U.S. 742, 748 (1970); *Machibroda v. United States*, 368 U.S. 487, 493 (1962); *Waley v. Johnston*, 316 U.S. 101, 104 (1942); *Walker v. Johnston*, 312 U.S. 275, 286 (1941); *Chambers v. Florida*, 309 U.S. 227 (1940); *Kercheval v. United States*, 274 U.S. 220, 223 (1927).  Scheduling a trial in August would undermine the voluntary character of this choice in two ways.

First, proceeding with a trial in August undermines the value of the jury trial as a means for obtaining exoneration or acquittal upon less than proof beyond a reasonable doubt. Even if the government fails to present proof beyond a reasonable doubt, Mr. Avenatti may be convicted for improper reasons: because defense counsel is too distracted to mount an effective cross-examination, because the jury lacks the accumulated wisdom and experience of a diverse cross-section, because the jury cannot see a witness smirk beneath his mask, because a crucial defense witness ignores a subpoena rather than risk his or her life to the virus, because the jury feels prejudice toward the defendant because he is or is not wearing a mask, because the jury is too distracted to notice the holes in the government's case, because the jury resents Mr.

31

1  Avenatti's insistence on a trial, or because the last hold-out juror surrenders her honest

2  convictions to get out of a hot zone.

3

4      Second, proceeding with a trial in August would force the defendant to choose

5  between his right to trial and his personal safety. The decision to waive trial by jury is

6  not voluntary if the trial could result in death or permanent lung damage to the defendant

7
   or another participant.
8

9      **H.    Trial during a deadly pandemic would violate the defendant's due
           process right to the exercise of reasonable care toward the health and
10           safety of persons confined by state action.**

11     The due process clause "imposes a duty on state actors to protect or care for

12  citizens when the state affirmatively places a particular individual in a position of danger

13
   the individual would not otherwise have faced." *Gregory v. City of Rogers, Ark*, 974
14

15  F.2d 1006, 1010 (8th Cir. 1992) (en banc).  Due process imposes a duty on state actors to

16
   protect or care for citizens in two situations: first, in custodial and other settings in which
17

18  the state has limited the individuals' ability to care for themselves; and second, when the

19  state affirmatively places a particular individual in a position of danger the individual

20
   would not otherwise have faced.  *See Wells v. Walker*, 852 F.2d 368, 370 (8th Cir.1988);
21

22  *see also DeShaney v. Winnebago County Dep't of Social Services*, 489 U.S. 195 (1989);

23  *Freeman v. Ferguson*, 911 F.2d 52, 55 (8th Cir.1990).  The government violates an

24
   individual's right to due process when it (1) "affirmatively place[s] [the] individual in
25

26  danger," or (2) by "acting with 'deliberate indifference to [a] known or obvious

27  danger.'" *Jones v. Phyfer*, 761 F.2d 642 (11th Cir. 1985) (a constitutional right to

28

32

1 │ protection by the state exists when there is a showing that the victim faces a special

2 │ danger distinguishable from that of the public at large).

3 │

4 │      Barring a plea of guilty, Mr. Avenatti is compelled to attend his own trial.  And as

5 │ argued above, the trial, however conducted, and certainly if conducted in a way that

6 │ respects any of Mr. Avenatti's procedural rights, will expose him to a serious risk of

7 │

8 │ contracting the virus. Accordingly, proceeding with a trial in August will deprive him of

9 │ the due process right to physical security in the face of state-created danger.

10 │

11 │

12 │ Dated: May 27, 2020            Respectfully submitted,

13 │

14 │           /s/ H. Dean Steward

15 │           H. DEAN STEWARD

          Attorney for Defendant

16 │           MICHAEL JOHN AVENATTI

17 │

18 │

19 │

20 │

21 │

22 │

23 │

24 │

25 │

26 │

27 │

28 │

**CERTIFICATE OF SERVICE**

I, H. Dean Steward, am a citizen of the United States, and am at least 18 years of age. My business address is 107 Avenida Miramar, Ste. C, San Clemente, CA 92672. I am not a party to the above-entitled action. I have caused, on May 27, 2020, service of the defendant's:

**STATUS REPORT**


on the following party, using the Court's ECF system:

AUSA BRETT SAGEL AND AUSA JULIAN ANDRE

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 27, 2020

/s/ H. Dean Steward

H. Dean Steward

34

# EXHIBIT A

**The New York Times** | https://nyti.ms/2jSC3wa

## Manhattan Jail That Holds El Chapo Is Called Tougher Than Guantánamo Bay

By Joseph Goldstein

Jan. 23, 2017

The Metropolitan Correctional Center, the rust-colored fortress in Lower Manhattan where hundreds of federal inmates are housed, was described as less hospitable than Guantánamo Bay by one inmate who had been incarcerated at both. The highest risk half-dozen inmates — or at least the ones facing the most severe charges — are housed in conditions so isolating that some have blamed them for deteriorating eyesight.

This is where federal agents brought Joaquín Guzmán Loera, the drug lord known as El Chapo, when he was extradited to the United States last week after two escapes from high-security Mexican prisons.

The Metropolitan Correctional Center, which held Ramzi Ahmed Yousef, the mastermind of the 1993 bombing of the World Trade Center, and Bernard L. Madoff, who orchestrated a $20 billion Ponzi scheme, has a reputation for stringent security measures. Even so, several inmates over the years have tried to escape, and a few have succeeded.

The most sensational attempt occurred in 1981, when an inmate was nearly plucked off the rooftop recreational center by confederates in a hijacked helicopter. And in 1990, two inmates disappeared out a second-story window, lowering themselves with an electrical cord from a machine used to buff the floors. One is still on the United States Marshals Service's list of most wanted fugitives.



Joaquín Guzmán Loera, the drug lord known as El Chapo, was brought to the center after he was extradited to the United States from Mexico. U.S. law enforcement, via Associated Press

In 2009, Anthony Boyd, a serial bank robber, was released from the Metropolitan Correctional Center as a result of what appeared to be an administrative error.

Whether there have been other successful escapes or missing prisoners in recent years is unclear. Officials at the Metropolitan Correctional Center did not return a phone call or respond to an email message seeking comment.

The jail, opened in 1975, holds about 795 inmates. It is wedged between the Church of St. Andrew and the United States Court House. From the upper floors of the courthouse, inmates can be seen playing basketball in the rooftop recreation area.

It is unlikely Mr. Guzmán will be permitted to join them. The inmates deemed most dangerous are housed in a half-dozen cells in a small wing known as 10 South, where they are held in solitary confinement and prohibited from calling out to one another. The lights are on 23 or 24 hours a day, according to court records, interviews with lawyers and written accounts. The frosted glass windows offer no view of the outside world. Even the slot on each cell door is kept shut, meaning that inmates see little beyond their solitary cell.

But guards can see inside, by way of a camera directed at the shower stall and another above the toilet or bed, according to a published account by Uzair Paracha, who was held there for two years until 2005, when he was convicted of providing support to Al Qaeda.



A police sharpshooter aimed at one of the roof doors of the center during an escape attempt in 1981.   Larry C. Morris/The New York Times

Mr. Paracha said it was not unusual for inmates to notice their eyesight deteriorating while in 10 South, and to request eyeglasses for an onset of nearsightedness.

Other than prayers, the only human voices were typically the sounds of guards cracking jokes at the inmates' expense, according to Mr. Paracha, whose detailed account of life in the Metropolitan Correctional Center is included in the 2016 book "Hell Is a Very Small Place: Voices from Solitary Confinement."

This litany of severe conditions, known generally as "Special Administrative Measures," requires the approval of the attorney general. In 2011, Amnesty International wrote to Attorney General Eric H. Holder Jr., expressing concern that the conditions amounted to cruel and inhuman treatment.

"The segregated units are horrifying and inhumane," David E. Patton, the executive director of Federal Defenders of New York, wrote by email. "If you wanted to intentionally design a place to drive people mad, you'd be hard pressed to do better."

Mr. Patton, whose office represents Mr. Guzmán and many inmates in the Metropolitan Correctional Center, described the isolation on 10 South as stark, with prisoners' days mostly devoid of human interaction. "The fluorescent lights are always on," he said. "The only sound is the occasional clanking of metal when doors are opened and closed."

The motorcade carrying the Mexican drug kingpin known as El Chapo arrived at the
Metropolitan Correctional Center on Thursday.   Jason Szenes/European Pressphoto Agency

The 10 South unit is reached by a stairway from the ninth floor, a secure area known as the "Special Housing Unit," which has its own stringent security measures. Even so, getting into 10 South, from the unit on the ninth floor, requires passing through two locked metal doors, the first of which is controlled electronically and the second of which requires a key, according to testimony.

In 2000, an inmate suspected of terrorism stabbed a guard in the eye with a sharpened plastic comb on 10 South. That attack, which caused the guard severe brain damage, led to a tightening of security restrictions in the wing and a sense of vigilance that remains.

Within the last three years, guards have reported that one terrorism suspect had left a "drop note" containing coded messages in the recreation room for his co-defendants to find. Defense lawyers, however, said the note reflected just "a hunger and a thirst for human contact."

Whether Mr. Guzmán will end up being held in 10 South or even in the Metropolitan Correctional Center while his case is pending in Brooklyn remains unknown. Most inmates facing federal charges in Brooklyn are held at a larger federal jail in Sunset Park, Brooklyn, but a few are held at the Metropolitan Correctional Center, which is where Mr. Guzmán was returned after his arraignment on Friday.

The Bureau of Prison's online directory of inmates does not indicate his whereabouts. Mr. Patton declined to discuss Mr. Guzmán's location or the case.

# EXHIBIT B

NEWS (/NEWS)

# Prisoners Endure A Nightmare 'Gulag' In Lower Manhattan, Hidden In Plain Sight

BY AVIVA STAHL (/STAFF/AVIVA-STAHL)
JUNE 19, 2018 10:45 A.M. • 21 COMMENTS

   



MADELEINE CRENSHAW / GOTHAMIST

Half a block behind Manhattan's federal courthouse, two blocks from City Hall, three blocks from the Brooklyn Bridge, and less than a mile from the hustle-and-bustle of Wall Street, sits a detention center that has been condemned by a United Nations human rights expert for exposing its inmates to conditions akin to torture.

While reports of the horrendous conditions on Rikers Island helped spur Mayor Bill de Blasio's pledge to shutter (http://gothamist.com/2017/03/31/close_rikers_recommendation.php) the jail's violence-plagued facilities, far less attention has been paid to the environment inside the Metropolitan Correctional Center, the federal jail which mainly holds people who have been charged but not yet convicted of crimes, who in the eyes of the law are still presumed innocent.

Yet those locked up at the MCC are subject to their own indignities and rights violations, say those who have spent time there on both sides of the bars. These include filthy conditions, vermin infestations, substandard medical care, and violence and abuse at the hands of guards. Interviews with a dozen people who have spent time locked up there as recently as 2017, as well as with attorneys who have represented clients at MCC, human rights groups, and others with direct knowledge of the prison, confirm that those incarcerated at MCC often endure a rat-infested, high-rise hell just yards from the federal courts that send them there.



ADVERTISEMENT

"I thought there was nowhere worse than Rikers Island," Melvin Rodriguez, who spent three weeks at MCC, told Gothamist. In October 2016, Rodriguez was arrested in the Bronx on federal charges for selling drugs to a confidential informant, as part of the largest gang raid in New York City history.

Rodriguez said the bug and rodent infestation at MCC was particularly horrifying. "The cells [ are ] very small and at nighttime you hear the mouses, see waterbugs in the shower," he told Gothamist. At least one former MCC prisoner said the mice would find their way into commissary boxes, and gnaw away at their food.

"You asked about the conditions," wrote Ricardo Stewart, another young man indicted as part of the Bronx gang raid. "We saw rats so big it seemed like they could only be in the sewer."

"But they weren't in the streets or the sewers," Stewart added. "They were more like roommates."

In a special jail-within-a-jail called 10 South, alleged terrorists, mobsters and drug kingpins are subject to some of the most brutal conditions of solitary confinement in the nation. This extreme isolation, reserved for those charged with the most heinous crimes, was described as "a punitive measure that is unworthy of the United States as a civilized democracy," according to a former special monitor (https://ccrjustice.org/sites/default/files/assets/files/US%20experts%20submission%20to%20House%20of%20Lords%20extradition%20com on torture and punishment for the United Nations who investigated the case of one prisoner held there for three years.

Hundreds of people indicted in the Southern District of New York, as well as many individuals indicted in the Eastern District, based in Brooklyn's federal court across the river, end up at the jail awaiting trial for federal offenses including drug-related crimes, fraud, bribery, and sex offenses. Defendants facing terrorism charges have spent more than three

years at the facility, attorneys say. But even those facing less high-profile charges generally spend at least one or two years there before their criminal cases are resolved.



(Madeleine Crenshaw / Gothamist)

The MCC is one of two federal pretrial facilities in New York City: Metropolitan Detention Center, located on the waterfront in Sunset Park, Brooklyn, is the other.

They are part of a network of eleven such facilities run by the federal Board of Prisons, with nine spread across the continental U.S. and two others in Honolulu and Guaynabo, Puerto Rico. Many others awaiting trial on federal charges are detained in local jails.

This past February, a British appeals court blocked the extradition of alleged hacker Lauri Love to the United States, where he would have most likely been held at either MCC or the federal jail in Brooklyn, the Metropolitan Detention Center.

The court determined that Love, who has been diagnosed with Asperger Syndrome and depression, would be at high risk of suicide if he were extradited, in part because of the poor mental health care available at the facilities. MDC and MCC share a single psychiatrist and each have only a handful of psychologists on staff, according to court documents, raising questions (https://www.judiciary.gov.uk/wp-content/uploads/2018/02/lauri-love-v-usa.pdf) about whether the two facilities could adequately treat the nearly 500 inmates suffering from significant psychiatric illnesses.

New York attorney Joshua Dratel, who has represented clients at the notorious U.S. facility at Guantanamo, says in some regards, MCC—particularly 10 South — is worse. Dratel said he has represented nearly a dozen people who have served time on 10 South, and countless others in MCC. He describes the prison as "soul-negating." (http://www.latimes.com/nation/la-na-el-chapo-prosecution-20170119-story.html)

"It's physically, mentally, psychologically, emotionally—as unaccommodating to the idea of being human as any place I've been," Dratel told Gothamist.

Because MCC is a federal prison, the accountability mechanisms that have helped bring change to Rikers and, to a lesser degree, to New York's state prisons, cannot be applied. Conditions at MCC may only worsen in the age of Trump and Sessions, who have vowed to step up federal prosecutions (https://www.washingtonpost.com/world/national-security/sessions-issues-sweeping-new-criminal-charging-policy/2017/05/11/4752bd42-3697-11e7-b373-418f6849a004_story.html?utm_term=.871aad63718f%5C) while signaling their disdain (https://www.washingtonpost.com/news/post-nation/wp/2017/07/28/trump-tells-police-not-to-worry-about-injuring-suspects-during-arrests/?utm_term=.d9e7675e5d1a) for the rights of individuals in custody.

Jeanne Theoharis (http://www.brooklyn.cuny.edu/web/academics/faculty/faculty_profile.jsp?faculty=510) is a Distinguished Professor of Political Science at Brooklyn College who has written extensively about conditions at MCC.

"If I described these conditions to you—filthy, freezing, no natural light, isolation so extreme that you're punished for speaking through the walls, absurd rules like prisoners not getting to see the newspapers unless they're 30 days old, secrecy so deep that people are force-fed and lawyers can be punished for describing the conditions their clients are experiencing—you'd be forgiven for thinking that this was Iran or Russia," she said.

"But in fact this gulag exists right here in lower Manhattan."

organized by the                    separate-justice.org)                    Martinez)

When MCC first opened in 1975 as part of the broader renovation of New York's downtown civic center institutions, the move was praised as an important step towards prison reform. "[T]he new Metropolitan Correctional Center at Foley Square will bring to New York City its first piece of advanced – and humane – prison design" hailed The New York Times (https://www.nytimes.com/1975/07/26/archives/new-detention-center-at-foley-sq-is-hailed-as-advance-in-jail.html) in an article published just before the facility's completion.

The cells were designed to be single occupancy, with a total rated capacity for the facility of 474 inmates. But today the prison population at MCC is almost double that number—just shy of 800. Although the vast majority of individuals held at the facility are men, a few dozen women are also detained there.

On residential floors, the north and south wings each contain six groups of eight rooms, arranged in a two-tiers clustered around what the Times story termed "a double-height lounge space" designed to allow prisoners a sense of privacy while ensuring they could be observed from the common space.

But the "lounge" hardly resembles a college dorm suite, and by all accounts the overcrowding at MCC leaves little room for comfort. In the dormitory units on the 11th floor, dozens of men are expected to share one toilet, one sink, and one shower. According to one 2015 pro se lawsuit against the BOP filed by a prisoner named Levit Fernandini, when the toilets broke down men were given bags to defecate in, which were then not removed from the unit. Some men used the shower as a toilet.

In his lawsuit, Fernandini describes the presence of rat and mice droppings throughout the floor, and states that he has "found rats in his bed and seen rats crawling on inmates while they slept." When he was bitten by a rodent in January 2014, "the counselor for the unit was far from surprised, if anything in light of the infestation, the only surprise is that not every inmate is bitten," he wrote. Fernandini maintains that medical staff ignored his requests for treatment for several days, even after the bite became infected.

Medical care at MCC was also condemned by former prisoners and defense attorneys. "Unless it's life or death there's no immediate medical care," prisoner Marlon Roberts wrote Gothamist in a letter. "[I]t can take 2 months to answer your sick call request."

Andrew Laufer, a civil rights attorney who has filed several lawsuits challenging conditions at the BOP's two federal jails in New York City, recalled suing the BOP on behalf of a prisoner at MCC who had had his fingertip chopped off by a cell door. Rather than being placed in an ambulance, alleges Laufer, the man was chained at his ankles and wrists and brought to the hospital by correctional officers, bleeding profusely.

"I think it's a human rights violation," Laufer says of the medical care at MCC. "I think it's an Eighth Amendment violation— deliberate indifference."

There are also claims of extreme brutality by those who are held at the MCC. In September of 2017, Laufer filed a lawsuit alleging that after 35-year-old Roberto Grant was beaten to death at MCC in May 2015, the prison staff tried to cover it up, by telling his Grant's family he'd died of an overdose.

Gothamist reviewed a copy of the autopsy performed on Grant by the New York City Medical Examiner, which stated the father of two had suffered "blunt force injuries of the head, neck, torso, and extremities" and had no detectable traces of drugs in his system.

"You have someone who's beaten to death in MCC, and there are cameras everywhere," Laufer said. "There's not an inch of that facility that is not surveilled. No one cares."

The case is ongoing, and Laufer recently lost a motion to compel the government to release documents and other materials relevant to Grant's death. In court filings, the Department of Justice has denied wrongdoing.

The Bureau of Prisons did not respond to written inquiries about this incident or other allegations laid out in this story. A spokesperson for the BOP also declined to comment.

Several prisoners told Gothamist that they had been physically assaulted by staff. "I ended up catching a new charge in MCC for defending myself," said Fabian Morrison in a letter. "A crazy officer... attacked me and I defended myself, I'm the seventh inmate he put hands on. He is really fucked up in the head from the military."

In the past fifteen years, at least one correctional officer at MCC has been convicted of beating an inmate (http://www.nytimes.com/2005/05/03/nyregion/metro-briefing-new-york-manhattan-guard-admits-beating.html), and at least three guards have been found guilty of sexually assaulting prisoners (https://nypost.com/2016/05/04/ex-correction-officer-sentenced-for-raping-inmate/). In 2016, a former correctional officer at MCC was sentenced to seven years behind bars for raping a woman detained at the facility. "Even in my dreams, I am suffering flashbacks where I'm repeatedly raped," the woman told the court. And this past April, a guard was arrested (https://www.justice.gov/usao-sdny/pr/correctional-officer-arrested-taking-bribes-smuggle-contraband-metropolitan) for taking bribes to smuggle food, alcohol and cellphones into the facility.

When individuals held by the Bureau of Prisons are charged with disciplinary offenses, they wait in what is called the Segregated Housing Unit (SHU) for a Disciplinary Hearing Officer (DHO) to review the allegations. That process can take weeks, sometimes months, explained Sarah Kunstler, a New York City-based civil rights and criminal defense attorney who has extensive experience working with clients locked up at MCC. Prisoners don't get credit for that time towards their eventual punishment, creating a substantial incentive for them to just accept the charge.

Moreover, at the hearing, the DHO is often evaluating the prisoner's word against that of the officer, so challenging the allegations can feel pointless. "There's an impunity that the officers [at MCC] have to enforce discipline without any recourse, which allows a kind of arbitrary scheme," said Kunstler. "There's no test of the allegations, ever."

While the BOP does release broad statistics documenting violent incidents (https://www.bop.gov/about/statistics/statistics_prison_safety.jsp) across the federal prison system, it does not publicly release data on how rates of violence vary in individual facilities. However, a September 2012 Government Accountability Office report (https://www.gao.gov/products/GAO-12-743) on overcrowding in federal prisons noted that "more inmates are sharing cells and other living units, which brings together for longer periods of time inmates with a higher risk of violence and more potential victims."

Sally Butler, another attorney who has represented individuals locked up at MCC, says she encourages her clients do whatever they can to stay out of the crosshairs of correctional officers. "If the officer says jump, you jump," she said.

Butler noted that in state court, it makes no difference if a prisoner is charged with disciplinary infractions pretrial. But those tickets can make a huge difference as to what facility federal prisoners are sent to post-conviction.

The recreation yard at MCC is on the roof, and prisoners told Gothamist they are brought up for a brief period of exercise about once every three days. The rest of the time they're locked up in their units with little to do and no access to fresh air or sunlight.

Meanwhile, for prisoners held on 10 South, recreation is taken in what essentially amounts to a double cell, with a narrow, barred window, which looks out onto the street and lets in just a tiny bit of fresh air. They are never let outside.



In January 2017, after escaping from two Mexican high-security prisons, alleged Mexican drug kingpin "El Chapo," whose legal name is Joaquín Guzmán Loera, was extradited to the US (https://www.nytimes.com/2017/01/19/world/el-chapo-extradited-mexico.html) to face charges as the head of the Sinaloa cartel, and locked up in 10 South.

After months, Guzmán's sanity started to unravel, according to legal motions
(https://www.documentcloud.org/documents/4172978-El-Chapo-Request-for-Mental-Evaluation.html#document/p1) filed by his attorneys over the spring and fall of 2017. Auditory hallucinations, depression, paranoia, the inability to remember people, places and events, the client "repeating himself often and sometimes forgetting what the discussion is about," were the symptoms described by his attorneys in a letter submitted to federal judge Brian Cogan in October 2017. "It is plain to the defense team that something is not right with Mr. Guzman."

But Guzman is just one of the most recent arrivals there. For the last two decades, Muslim men facing terrorism charges have been held on the unit for up to four years before the resolution of their criminal case.

Wali Khan Amin Shah said that he was moved onto 10 South right after it was built, in February 1997. The year prior, he and two codefendants were convicted of conspiring (http://articles.baltimoresun.com/1995-05-28/news/1995148047_1_bojinka-philippines-plot) to simultaneously blow up about a dozen planes over the Pacific. Shah was held in 10 South until September 1998, when he was transferred to a different part of the facility.

"I been around in this world, almost a decade in a war zone...seen my part of torture and bad prisons, I was in jungles and deserts," Shah wrote in an email from a federal prison in Indiana. "But the time I spent in 10 South took a large chunk of my soul, it is a very bleak place by design."

The lights in 10 South are left on 24 hours per day, according to several former residents. There is a window flap in each cell door, which only the guards can open. The cells are about 17 feet by 8 feet
(https://www.nytimes.com/2017/05/04/nyregion/el-chapo-jail-restrictions-joaquin-guzman-loera.html), with two cameras fixed on each cell at every moment. Defense attorneys said there were only about six or seven cells on the unit.

Ali Yasin Ahmed was transferred to MCC in September 2014, and spent about a year there while he faced charges for providing material support to al-Shabaab. "It's another thing if someone is at a black site, or all the way in Gitmo," he told Gothamist, when asked what it was like to experience such austere isolation in downtown Manhattan. "But it is happening [right] next to you, and people don't realize it."

Like everyone else in the unit, while in 10 South Ahmed was placed under additional restrictions called Special Administrative Measures (SAMs). SAMs came into being in 1996, soon after the Oklahoma City bombing, and give the U.S. Attorney General sole discretion to limit a prisoner's communication if a determination is made that there is "substantial risk" the prisoner's contact with others could pose a security threat. (Guzmán is currently under SAMs).

During his time at MCC, Ahmed was only allowed to communicate with his attorneys and immediate family members, including his parents, siblings, wife and son. He was permitted one non-legal phone call each month along with one letter per week. But since the letters were first analyzed and copied by the FBI before being sent out, they often took one to two months to reach his loved ones. Communicating with the media was also strictly prohibited.

Former 10 South residents told us that prisoners are also not allowed to share books. If a guard brings a book out to the tier and one person reads it, the book must then be destroyed. SAMs generally prohibit prisoners from speaking to each other. At least one individual on 10 South lost his meager family phone privileges for months after greeting another detainee with the Arabic words "A-Salaam-Alaikum."

A September 2017 report (https://ccrjustice.org/sites/default/files/attach/2017/09/SAMs%20Report.Final_.pdf) published by Yale Law School's Allard K. Lowenstein's International Human Rights Clinic and the Center for Constitutional Rights raised concerns that Muslims were disproportionately targeted by the measures. "It appears that a major criterion for deciding whom to place under SAMs was not the prisoner's demonstrated capacity to communicate dangerous information, but rather the prisoner's religion."

In a 2011 letter (http://www.amnesty.org/en/documents/AMR51/029/2011/en/) to then-Attorney General Eric Holder, Amnesty International expressed concern that conditions on 10 South "fall short of international standards for humane treatment" and "appear incompatible with the presumption of innocence." The brutal nature of life on the unit, including its extreme conditions of isolation, were also documented in a 2014 Human Rights Watch report (https://www.hrw.org/report/2014/07/21/illusion-justice/human-rights-abuses-us-terrorism-prosecutions) about human rights abuses in US terrorism prosecutions.

During his six-year term as the UN Special Rapporteur for Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, which ended in October 2016, the BOP prevented Juan Méndez from speaking to suspected or convicted terrorists. Méndez was able to investigate the conditions at 10 South by interviewing family members of the incarcerated and contacting the State Department about the allegations. He ultimately determined (http://www.ohchr.org/Documents/HRBodies/HRCouncil/RegularSession/Session22/A.HRC.22.53.Add.4_Advance_version.pdf) that international human rights protections had been violated.

"Prolonged or indefinite solitary confinement—that is, solitary confinement that is prolonged beyond a few days—inflicts mental pain and suffering consistent with the definition of cruel, inhuman or degrading treatment," Méndez told Gothamist. "And as I said, in some cases is consistent with the definition of torture."



(Madeleine Crenshaw / Gothamist)

Public accountability has played a key role in Mayor de Blasio's plan to shutter Rikers Island over the next decade and create borough-based jails for the 10,000 people (https://www.nytimes.com/2017/04/05/nyregion/rikers-island-prison-new-york.html) held there. Even New York's often brutal upstate prisons have come under increased scrutiny (http://www.pulitzer.org/finalists/tom-robbins-marshall-project-and-michael-schwirtz-and-michael-winerip) by the press and grassroots activists in recent years. New York State legislators voted last spring to stop automatically (http://www.correctionalassociation.org/cmp/raise-the-age-home-page) prosecuting 16 and 17 year olds as adults (although Raise the Age has yet to be fully implemented (https://www.nynmedia.com/content/new-york-city-ready-implement-raise-age)), and a bill sharply curtailing the use (http://nycaic.org/legislation/) of solitary confinement has gained considerable ground (https://www.amny.com/opinion/columnists/mark-chiusano/how-a-proposal-dies-an-albany-story-1.17953591).

But when it comes to federal facilities like MCC, the primary responsibility for oversight falls to Congress, which has a long track record of dereliction, according to Amy Fettig, Deputy Director for the ACLU's National Prison Project.

"Congress has so much going on, that for them to oversee the Bureau of Prisons in a systematic and effective manner is almost impossible," Fettig said.

Her words were echoed by Phil Fornaci, the Director of the DC Prisoners' Project of the Washington Lawyers' Committee for Civil Rights and Urban Affairs, an organization which that has sued the BOP. "There's no oversight unless there's a [Congressional] hearing called," he said.

Fornaci says the Department of Justice has investigated prison conditions on the state and local level. When it comes to the BOP, however, not only does the DOJ not provide oversight, but they actually defend the BOP in litigation. Both he and Fettig agreed that there needs to be an agency established external to both Congress and DOJ if the BOP is to be properly monitored.

The Justice Committee within the House of Representatives—and more specifically the Subcommittee on Crime, Terrorism, Homeland Security and Investigations—holds jurisdiction over prison issues.

No members of the subcommittee (https://judiciary.house.gov/wp-content/uploads/2018/04/115th-Crime-Terrorism-Homeland-Security-and-Investigations-Subcommittee-Updated-4-27-18.pdf), which include 7 Democrats and 10 Republicans, responded to repeated requests for comment.

While there has been increasing advocacy for reforms to local jail and prison conditions, federal prisons remain a kind of political orphan, a situation compounded in the Trump era. "Rikers is a good example of the power of people in a democracy to hold their elected officials accountable," said Fettig, "but in the federal context—federal facilities house people from all around the country, and so there's no natural constituency in the state, city, county they're located in" to express concern about what's happening on the inside.

As a result, for people locked up at MCC, there's little hope that conditions will improve anytime soon.

That could be exactly the way jailers and prosecutors want it. Pre-trial detention, which often lasts years, can become not only unsafe, but coercive; as a result, individuals are pressured to provide information to prosecutors or accept plea deals in their desperation to be released, say former prisoners.

"You want to plead guilty and get out of this dump to a prison," said Nicky, the former inmate."The feds have a 98% conviction rate for a reason," Melvin Rodriguez, another former prisoner said. "They mentally break you."

Asked why he thought MCC has received so much less coverage than Rikers, Rodriguez replied, "I think [MCC] went unnoticed because people think just because it's the feds the conditions are better.There are certain things that go on in these places that the government covers so the public would never know."

*Listen to Aviva Stahl discuss MCC with WNYC.*

*Aviva Stahl is a Brooklyn-based journalist who primarily writes about prisons, especially the experiences of terrorism suspects and LGBTQ people behind bars. Follow her @stahlidarity (https://twitter.com/stahlidarity).*
*This story was reported with support from a grant by the CUNY Graduate School of Journalism Urban Reporting Project.*

### Sign Up for Daily NYC COVID-19 Coverage

your@email.com

By submitting your information, you're agreeing to receive communications from New York Public Radio in accordance with our Terms (https://www.wnyc.org/terms/).

#10 SOUTH (/TAGS/10-SOUTH)    #EL CHAPO (/TAGS/EL-CHAPO)

#FEDERAL PRISONS (/TAGS/FEDERAL-PRISONS)    #MCC (/TAGS/MCC)

#METROPOLITAN CORRECTIONAL CENTER (/TAGS/METROPOLITAN-CORRECTIONAL-CENTER)

#PRISONS (/TAGS/PRISONS)    #ORIGINAL (/TAGS/ORIGINAL)

**Do you know the scoop?**   Comment below or Send us a Tip (mailto:tips@gothamist.com)

# EXHIBIT C

## IDEAS

# I Tried to Tell the World About Epstein's Jail. No One Wanted to Listen.

The Metropolitan Correctional Center has become notorious for decades of inhumane treatment.

**AUGUST 16, 2019**

**Jeanne Theoharis**
Distinguished Professor of Political Science at Brooklyn College



JEENAH MOON / REUTERS

"URGENT," the emails were marked. Since Jeffrey Epstein's death at the Metropolitan Correctional Center, at least 20 reporters and shows from a broad cross section of the nation's major news outlets have reached out for context and comment about the federal penitentiary. I spent a decade trying to get media outlets to pay attention to the MCC, in Lower Manhattan, pleading with journalists for hours on the phone, over email, and in person to launch investigations of the jail. Over and over, for years, these media organizations did not follow up.

Suddenly, there was urgency to talk about the conditions at MCC. The jail now provided an intriguingly grimy backdrop to an already sordid story. The question is whether a sustained light will actually be shined on the conditions there, or whether the widespread fascination with MCC just becomes part of the spectacle.

I spent years, alongside lawyers, civil-rights leaders, concerned citizens, and family members of the incarcerated, taking part in vigils outside MCC to call attention to the inhumanity happening within its walls. Over and over, Department of Justice officials did nothing.

I went to court hearings and read court filings where people being held there attested to the inhumane conditions at MCC. Judges repeatedly refused to intervene. <u>Nearly all</u> were persuaded by the government's incessant claims that such conditions were justified by necessity and national security.

When the news broke about Epstein's death, Attorney General William Barr said he was shocked, calling for an investigation into the "serious irregularities" at MCC. Then on Tuesday, attempting to foist the blame on underlings, he reassigned the warden and put two guards on administrative leave.

This is willful shock, a deeply disingenuous surprise. The scandal is not a few rogue employees. The surprise is not that a man in federal custody who had shown suicidal tendencies <u>managed to kill himself</u>, nor, conversely, that a man could be killed behind bars. Barr and his DOJ (like previous DOJ officials) knew MCC was structured on "irregularities." So did U.S. Attorney Geoffrey Berman, and his predecessor, Preet Bharara. So did the judges of the Southern District of New York. The federal prison system is replete with "irregularities."

*[ Ken White: Thirty-two short stories about death in prison ]*

The real scandal is that the horrors of MCC have existed for decades, hidden in plain sight. The journalist Aviva Stahl published a <u>searing exposé</u> last year in *Gothamist* on conditions at MCC that documented the filth, rodents, overflowing sewage, deeply substandard medical care, wrenching isolation, and often indifferent —and at times, cruel—staff. From reports from lawyers and people imprisoned there, to the legal motions they have filed attempting to mitigate the inhumane conditions, to the hundreds of administrative remedies prisoners have filled out to request remediation (the first step prisoners must take to document problems with

their conditions), to the research of scholars and human-rights organizations, the abusive and corrupt conditions at MCC are well documented.

But a broad swath of public officials, from the attorney general on down, have chosen to countenance these conditions—and major news organizations haven't pressed the issue. As attention finally came to the despicable conditions at Rikers, few journalists looked across the river to MCC. Perhaps many labored under the misapprehension that while state and local (and private) jails might be mismanaged, abusive, and decrepit, the federal government runs a largely rights-respecting, clean operation. On top of this, the federal government—and the Bureau of Prisons in particular—makes it supremely difficult to investigate its prisons and jails, constantly throwing up justifications for denying access to the materials researchers want ("too burdensome," " national security," "privacy," "internal agency workings") and shrouding their practices in secrecy .

When news about MCC reaches the public, it typically comes in sensational stories about alleged mega-criminals such as Epstein, Sammy "The Bull" Gravano, or Joaquín "El Chapo" Guzman being held there—the crimes with which they are charged completely obscuring the jail itself. Moreover, while Americans broadly profess to oppose torture and cruelty, there's a tendency to look away from (or even take some glee in) the abusive conditions facing incarcerated people, particularly those who are publicly reviled.

I don't know why the overwhelming majority of journalists I talked with over the years never published serious investigations into MCC. Perhaps racialized assumptions played a role, separating victims of government abuse whose situations seemed urgent and worthy of months of painstaking research from those who are assumed to pose exceptional danger and thus perhaps deserve extreme measures. I was highlighting the inhumane conditions that largely unknown Muslims facing terrorism charges were experiencing at MCC. Now they are calling me about the über-rich, white Jeffrey Epstein.

Or perhaps it was the simple incongruity of the U.S. government running a high-rise dungeon in Manhattan's financial district, which featured conditions more commonly associated with the jails of foreign dictatorships. The descriptions of the dirty, decrepit, vermin-infested, hyper-isolating jail sitting in an elite zip code never seemed to stick.

5/26/2020  Case 8:19-cr-00061-JVS   Document 164 Real Scandal of MCC  Filed 05/27/20 The Atlantic  Page 59 of 72   Page ID #:2598

The public attention to Epstein's suicide could change that—but only if the public resists the seductive scandal of it all and insists on seeing the structural problems that Epstein's time at MCC exposes.

First the basics: MCC is a pretrial federal facility run by the Bureau of Prisons, which is part of the Department of Justice and overseen by Congress, that holds people awaiting trial on charges in the Southern District of New York. This means that the people it holds are presumed innocent, and the law ostensibly prohibits their punishment before conviction. Opened in 1975, MCC today houses about 750 people in a facility built for fewer than 500. The conditions of their confinement vary widely, depending on where they are held, from the general population to the Special Housing Unit on the ninth floor to the fearsome 10 South wing. The SHU is for people the jail deems not safe in general population or who have allegedly broken jail rules; it features much more restrictive conditions, including solitary confinement. Epstein began in the general population, but was reportedly in the SHU on 9 South when he died.

*[ Read: How gangs took over prisons ]*

Lawyers and people held there awaiting trial regularly report appalling conditions. The temperature is not adequately regulated; the facility is often sweltering in the summer and so cold in the winter that prisoners report having trouble thinking and wearing layers of clothes to be able to sleep. A single psychiatrist serves both MCC and the Metropolitan Detention Center, another federal facility located in Brooklyn. People report being "treated" through the slat in their cell door. The facility is run-down, and the plumbing and elevators break often.

The most inhumane section of MCC is 10 South. The majority of the people held there over the past two decades have been Muslims facing terrorism charges; Guzman was held there as well. No outdoor recreation is allowed for 10 South prisoners, and windows are frosted so they are cut off from natural air and light. Besides the filth and vermin (even cell-cleaning supplies are often denied), one chief complaint is the lack of ventilation. On 10 South, prisoners are alone in their cells almost all of the time; they even shower there. Their sole escape is the hour when they are moved to a solitary cage for exercise. Sometimes, that recreation is denied, leaving prisoners to go days without leaving their cells. Cells are electronically

surveilled, so that every action—including using the toilet, showering, and talking
—is monitored.

The defense attorney Robert Boyle has described the conditions at MCC as
producing "a continuing deterioration in his [client's] health," and has noted
reports from other lawyers with clients in similar conditions as "unable to make
rational decisions in relation to the trial they face."

Nearly all of the people held on 10 South are under special administrative measures
(SAMs) imposed by the attorney general, which restrict their communication with
the outside world. On 10 South, you can be punished for yelling through the walls,
for saying "As-Salaam Alaikum" to another prisoner, for making the call to prayer.
While some talk between prisoners through walls or doors is not punished, there is
always the threat of punishment, and sometimes guards exercise their prerogative to
do so. Prisoners report going months without any talking—all before they have
been convicted of any crime.

The SAMs also mean that anyone in contact with the prisoner, a list typically
restricted to a lawyer and the prisoner's immediate family, is forbidden from
communicating anything heard from the detainee. Put another way, lawyers or
family members can be punished for disclosing any specifics of the conditions they
hear the prisoner is facing.

[ *Read: The prison-industrial complex* ]

The British civil-rights lawyer Gareth Peirce, who has spent decades defending Irish
and Muslim prisoners accused of terrorism, visited MCC after clients she was
representing were extradited from the U.K. to the U.S. No stranger to prison
abuses, Peirce was astonished by the conditions at MCC. "Diabolical" was how she
described it.

According to studies, rates of suicide in jail are higher than in prison. And Epstein
had reportedly already made one attempt to take his own life. While MCC is a
special breed of hell, its approach to mental health is indicative of the BOP's broad,
cruel indifference to mental-health care. Faced with a spate of suicides in 2012, for
instance, the BOP director sent every prisoner in federal custody an absurd letter.
"At times you may feel hopeless about your future, and your thought may turn to
suicide," Director Charles E. Samuels wrote. "If you are unable to think of

solutions other than suicide, it is not because solutions do not exist; it is because you are currently unable to see them. Do not lose hope."

International organizations have condemned MCC's conditions. From 2007 to 2012, the European Court for Human Rights stayed the extradition of six U.K. subjects, concerned about inhumane prison conditions at U.S. federal facilities like MCC and the nation's supermax prison in Colorado, before finally capitulating to U.S. pressure in 2012. Amnesty International in 2014 decried the conditions at MCC, as has the former UN Special Rapporteur on Torture Juan Méndez; so, too, did an extensive 2014 report by Human Rights Watch and Columbia Law School's Human Rights Institute.

The question now is whether MCC will merely serve as the dirty backdrop to bizarre conspiracy theories and sordid accountings of Epstein's last hours, allowing the inhumanity to remain hidden in plain sight—or whether Epstein's death is going to finally force us to see what is going on in Lower Manhattan and insist that conditions at MCC finally be addressed.

*We want to hear what you think about this article. Submit a letter to the editor or write to letters@theatlantic.com.*

# EXHIBIT D

**The**
**Intercept_**

# THE GUANTÁNAMO IN NEW YORK YOU'RE NOT ALLOWED TO KNOW ABOUT

Arun Kundnani

February 5 2016, 5:55 a.m.



Photo: Chris Hondros/Getty Images

BEFORE EVERY PHONE CALL that Fatuma Hashi has with her brother Mahdi, FBI agents come on the line to tell her what she is not permitted to talk about. "You're not allowed to speak about political issues. Or whatever's happening in the outside world. Or his case," she told *The Intercept.*

Mahdi Hashi, a young man of Somali origin who grew up in London, had never been to the United States before he was imprisoned in the 10-South wing of the Metropolitan Correctional Center in lower Manhattan in November 2012, when he was 23. For over three years, he has been confined to a small cell 23 hours a day without natural light, with an hour alone in a slightly larger indoor cage. He has had no physical contact with anyone. Apart from occasional visits by his lawyer, his human interaction has been limited to brief, transactional exchanges with guards and a monthly 30-minute phone call with his family.

Yet most of Hashi's time in solitary confinement occurred before he had been deemed guilty by the justice system. Prolonged isolation prior to or in the absence of trial, sensory deprivation, and a lack of independent monitoring are normally associated with the detention center at Guantánamo Bay and CIA black sites overseas. But the MCC's 10-South wing, which houses terrorism suspects, is no different in these respects. A former MCC prisoner and a psychologist specializing in trauma told *The Intercept* that the kind of extreme isolation imposed on defendants there can pressure them to accept a guilty plea, irrespective of actual guilt.

For Hashi, who worked at a community youth organization in London, everything changed when he was approached by MI5, the U.K.'s domestic intelligence agency. He was pressured to become an informant, according to accounts he gave to rights groups and local authorities, but refused, despite being warned that doing so would make his life difficult.

In 2012, while Hashi was visiting Somalia, the British government used special powers to strip him of his citizenship, leaving him stateless. He crossed into neighboring Djibouti to visit the British consulate there, he

claims, and appeal the decision. U.S. prosecutors allege he was traveling to Yemen to join al Qaeda.

Upon entering Djibouti, Hashi was arrested by agents of the secret police and forced to watch other prisoners gagged, blindfolded, and beaten for hours, he alleges in case filings, with the complicity of FBI agents and other unidentified Americans. According to defense attorneys, Hashi was threatened with physical abuse and rape if he did not cooperate.



Madhi Hashi Photo: Facebook

In November 2012, he was transported to New York by the U.S. government to face charges of supporting al Shabaab, the Somali terrorist organization. Prosecutors say he traveled to Somalia to attend a training camp and fight with al Shabaab in Somalia's civil war. They accept that Hashi poses no specific threat to any Americans and that he received "harsh treatment" in Djibouti.

In May 2015, after two-and-a-half years of isolation, Hashi entered a guilty plea of conspiring to provide material support to al Shabaab. Last week, on January 29, he was sentenced to nine years in prison. He will likely be incarcerated at a Supermax facility in Colorado or a high-security "communications management unit" in Illinois or Indiana, all of which mean ongoing solitary confinement.

Government prosecutors were seeking 15 years, but Judge John Gleeson of the Eastern District of New York said the case was "complicated," and accepted, in part, Hashi's position that he joined al Shabaab not to engage in violent attacks but because he thought the group could restore peace to war-torn Somalia. "I believe you believe this organization you

joined was dramatically different than what you thought or hoped it would be," Judge Gleeson said.

For Fatuma Hashi, the U.S. government's approach is hard to understand. "He was in his own country," she said. "It had nothing to do with the United States. Why does this country that has nothing to do with us have a say in his life?"

Fatuma cannot fully share with journalists what she knows about her brother's treatment in the MCC, a gray slab of a building that goes largely unnoticed by the office workers and tourists walking the streets near the Manhattan end of the Brooklyn bridge. Government restrictions — known as "special administrative measures," or SAMs — prevent prisoners, their attorneys, and family members from describing the conditions inside the high-security unit to the wider public, shrouding New York's little Guantánamo in secrecy.

# Psychological damage

In an account to be published in a new book on solitary confinement — titled *Hell Is a Very Small Place* — a Pakistani prisoner, Uzair Paracha, gives one of the most detailed illustrations yet of incarceration at the MCC. He was held in isolation there for two-and-a-half years after he was arrested in 2003 at age 23.

"The windows were huge but the glass was frosted so we had a lot of light but couldn't see a thing," he said. "It was a shade of white during the day, blue in the evening and early morning, black at night, and yellow when it snowed, as the snow reflected the streetlights. This was one way to estimate the time since they didn't allow any watches."

Video cameras constantly monitored the inside of Paracha's cell, including the shower and toilet areas. Lighting was completely controlled

from the outside, so that guards could deliberately leave the lights on at night to make sleeping harder. With their metallic walls, the cells were like ovens in the summer and freezing in the winter.

The medical effects of Paracha's imprisonment at the MCC were severe: a weakening of his eyesight, brought about by having his entire world just a few feet away; a deterioration of physical coordination that made walking on stairs harder; and breathing problems, especially while trying to sleep.

Dr. Kate Porterfield is a clinical psychologist at the Bellevue/New York University Program for Survivors of Torture. She has evaluated prisoners held at various sites in America's war on terror, including at Guantánamo. "With isolation, there's a severing of the orienting data of our lives — the stuff that makes us feel like we are on our feet," she told *The Intercept*. "This can result in paranoia, disorientation, feeling confused about whether your perceptions match reality, and not being sure who to trust."

"That's very dangerous to someone's psyche," she added. "It's not just about feeling depressed because you're in prison. The defendant ought to be oriented enough in the realities of their life and world that they can contribute to their own defense. A sense of paranoia and suspicion hampers the defendant in trying to connect with his or her legal team so that they can discuss and investigate the case."

If a person has experienced torture or coercive interrogation before being put in isolation, they are even more vulnerable, Dr. Porterfield said. "There is then a greater likelihood of psychological damage and even less chance for recovery in any real sense."

Indeed, virtually every academic study has concluded that solitary confinement has serious mental health consequences. These begin after 60

days and resemble the acute reactions suffered by torture and trauma victims.

The average length of time that defendants in federal terrorism prosecutions spend in solitary confinement prior to trial is 22 months, according to a 2014 report by Human Rights Watch and the Columbia Law School Human Rights Institute. Amnesty International has stated that pre-trial solitary confinement at the MCC amounts to "cruel, inhuman, or degrading treatment."

At least one prisoner who has been held at both the MCC and Guantánamo has described the Manhattan jail as harsher. Ahmed Khalfan Ghailani, who was convicted of involvement in the 1998 bombings of two U.S. embassies in East Africa, told his psychiatrist that Guantánamo is "more pleasant" and "more relaxed" than the isolation section at the MCC. At Guantánamo, he said, prisoners were not strip-searched and could associate together for recreational activities.

Joshua Dratel, an attorney who has represented clients at Guantánamo as well as the MCC, has also said the New York jail is worse.

# A tool for prosecutors

The one advantage that prisoners at the MCC are supposed to have over their counterparts in Guantánamo is that they are subject to trial in a criminal court rather than a military tribunal. However, the use of pre-trial solitary confinement has become, in effect if not intent, a tool for prosecutors to skew the judicial process in their favor.

Experts like Dr. Porterfield emphasize how extreme isolation can induce a desire to accept a plea. "We find again and again that isolation in prisons and the experience of maltreatment have a huge impact to the point where people do almost anything to get out of the coercive situa-

5/26/2020   Case 8:19-cr-00061-JVS   Document 64   Filed: 05/27/20   Page 69 of 72   Page ID #:2608

tion," she said. "If there's one thing the last 14 years have shown us, it's that abuse does not lead to good information gathering."

Laura Whitehorn was held for two months in pre-trial isolation at the MCC in 1986 on allegations of passport fraud, part of a larger conspiracy case for which she was later sentenced to 23 years in prison. "The sense of isolation, even after only two months, was so intense," she told *The Intercept*. "I think, at that point, one would be ready to do almost anything to be back in human contact."

"What was particularly horrible was the constant watching and monitoring," Whitehorn recalled. "It was like being played with by the guards, a form of psychological taunting. I felt at any moment I could have any part of my being or body violated with impunity."

Peter Quijano has represented several clients facing federal terrorism charges at the MCC, most of whom have been held in the jail's isolation unit.

"It just seems obvious that if anyone, regardless of the mental state they have going in, is housed and detained in such a manner for any period of time, it has to start having an effect on them," he said. "Anecdotally, we've seen increased deterioration over a period of time, especially in a pre-trial situation. It seems like a punishment and it affects their ability to assist in their defense."

Legal visits at the MCC are hampered by the extreme temperatures in the "claustrophobic" visiting room. "It's hard to stay there for much more than two hours," Quijano said. Attorney and client remain in separate cages during the visits, divided by a mesh grate that makes eye contact impossible.

# Severe restrictions on communication

Mahdi Hashi divides his monthly phone call between his parents and siblings in London and his wife in Somalia. His sister Fatuma described being "overwhelmed with emotions" on these calls after not hearing his voice for so long. "Every day I'm in pain thinking about his situation," she said. Fatuma, who is 24, has not seen Mahdi for six years.

She says the family has sent him books that took eight months to arrive. He never receives the letters and photographs they send. But there are strict limits on what Fatuma can say publicly about his imprisonment due to the SAMs applied in his case, which prevent Mahdi Hashi from any "oral, written, or recorded communications" with another prisoner; restrict his monthly phone calls to immediate family members; and prevent his family from sharing the content of the calls with anyone else.

Nor is Hashi allowed to communicate with journalists in any way, including via his attorney. SAMs, which are issued by the attorney general, are supposed to be specific to individual prisoners who pose "a substantial risk" of communicating messages that "could result in death or serious bodily injury to persons."

One consequence of the SAMs is that protests by prisoners remain hidden from public view. In September 2013, a blogger claimed that Hashi was on hunger strike to protest the conditions of his imprisonment. He was reportedly hospitalized with jaundice and close to liver failure. But the protest could not be verified or discussed in more detail.

"It's a last resort when you have so few resources to defend yourself," said Whitehorn, the former MCC prisoner, on reports of Hashi's hunger strike.

It has not been established whether Hashi was forced to undergo the brutal force-feeding practices used at Guantánamo, although force-feeding was applied in response to the protest of another MCC prisoner. Oussama Kassir, a Swede who went on hunger strike at

5/26/2020   Case 8:19-cr-00061-JVS   Document 64 Filed 05/26/20   Page 95 of 72   Page ID #:2610

the MCC eight years ago, was subjected to "medical feeding," according to his attorney.

The people best placed to shed light on Hashi's hunger strike — his lawyers and his family — were restricted by the SAMs, and prosecutors and prison administrators declined to comment. According to the blogger, the FBI cut off a phone call from Hashi to his father — in which Hashi described the protest — after one minute, but the SAMs mean we cannot know if this actually happened.

Saghir Hussain, Hashi's British lawyer, has spoken with his client about the conditions of his incarceration, but is prevented from sharing such information. Hashi's American lawyer did not respond to multiple requests for comment.

Mahdi Hashi's prosecution provides one model of how the U.S. government deals with Western citizens accused of fighting with jihadi organizations overseas: coercive interrogation outside of U.S. jurisdiction, transportation to the isolation unit of a federal jail in New York, solitary confinement and restricted communication in conditions of secrecy until a guilty plea is made, then a lengthy incarceration at a high-security prison.

From one perspective, this approach seems to respect the rule of law. But look a little closer and it becomes clear that there are possibilities for abuse equivalent to or worse than at Guantánamo.

*Top photo: Razor wire hangs on a railing at the Metropolitan Correctional Center, June 9, 2009, in New York City.*

**WAIT! BEFORE YOU GO** on about your day, ask yourself: How likely is it that the story you just read would have been produced by a different news outlet if The Intercept hadn't done it?

As the pandemic worsens, it's not just the virus itself that threatens human life. The corruption, cronyism, and incompetence of those in power is adding fuel to the fire. The public deserves to know more than just case counts and death tolls, which is why our reporters are digging deep to break stories on corporate profiteering and political jockeying that undermine public health.

The kind of reporting we do is essential to democracy, but it is not easy, cheap, or profitable. The Intercept is an independent nonprofit news outlet. We don't have ads, so we depend on our members — 55,000 and counting — to help us hold the powerful to account. Joining is simple and doesn't need to cost a lot: You can become a sustaining member for as little as $3 or $5 a month. That's all it takes to support the journalism you rely on.

**Become a Member →**

## LATEST STORIES

### Despite the Hype, Gilead's Remdesivir Will Do Nothing to End the Coronavirus Pandemic

Sharon Lerner — 10:05 a.m.

A combination of generic drugs appears to be more effective in fighting the coronavirus than Gilead Sciences' remdesivir.

### Corporate Immunity, Mitch McConnell's Priority for Coronavirus

Case 8:19-cr-00061-JVS   Document 164   Filed 05/27/20   Page 1 of 72   Page ID #:2540



**Document Properties**

Description  Security  Fonts  Initial View  Custom  Advanced

**Description**

File:  CR 164 - Defendant Status Report.pdf

Title:  Final Status Report

Author:  JAY MANHEIMER

Subject:

Keywords:

Created:  5/27/2020 4:45:35 PM

Modified:  5/27/2020 10:18:29 AM

Application:  Word

**Advanced**

PDF Producer:  macOS Version 10.14.6 (Build 18G4032) Quartz PDFContext; modified using iText® 5.5.9 ©2000-2015 iText Group NV

PDF Version:  1.6 (Acrobat 7.x)

Location:  \\usa.doj.gov\cloud\CACLA-Courthouse\Shared\Cases\CR\GBUS\CR_Docket\

File Size:  8.74 MB (9,165,770 Bytes)

Page Size:  8.50 x 11.00 in                    Number of Pages:  72

Tagged PDF:  No                                 Fast Web View:  No

Additional Metadata...

Help                                            OK        Cancel

MICHAEL JOHN AVENATTI ("Mr. Avenatti") by and through his counsel of record,

H. Dean Steward, hereby files this Status Report in order to bring to the Court's attention

**EXHIBIT 5**

EXHIBIT 5
Manheimer For I.D.
DATE: 6/17  RPTR: MD
BEN HYATT
888.272.0022

1  H. Dean Steward, SBN 85317
   107 Avenida Miramar, Ste. C
2  San Clemente, CA 92672
   Tel (949) 481-4900
3  Fax (949) 497-6753

4  Attorney for Defendant
   MICHAEL JOHN AVENATTI
5

6

7              **UNITED STATES DISTRICT COURT**

8         **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

9  UNITED STATES OF AMERICA,          SA CR No. 19-061-JVS

10         Plaintiff,                 DEFENDANT'S SUPPLEMENT TO
                                      STATUS REPORT
11         v.

12  MICHAEL JOHN AVENATTI,            Hearing Date:    June 1, 2020
                                      Hearing Time:    9:00 a.m.
                                      Location:        Telephonic - Courtroom
13         Defendant.                                  of the Hon. James V.
                                                       Selna
14

15

16

17        In advance of the status conference set in this matter for June 1, 2020, defendant

18  MICHAEL JOHN AVENATTI ("Mr. Avenatti") by and through his counsel of record,

19  H. Dean Steward, hereby files this supplement to Defendant's Status Report previously

20  filed on May 27, 2020 [Docket No. 164].

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28

**EXHIBIT** 6
Mannheimer For I.D.
DATE: 6/17 RPTR: MD
BEN HYATT
888.272.0022

**EXHIBIT 6**

1  Exhibits E and F attached hereto specifically relate to an expert report just completed by

2  Dr. Homer Venters, who previously served as the top medical officer for New York

3  City's jail system, relating to the conditions at the Metropolitan Correctional Center

4  ("MCC"), including conditions in units in which Mr. Avenatti was incarcerated (i.e. 10

5  South and 11 South).

6

7  Dated: May 28, 2020                         Respectfully submitted,

8

9                                              /s/ H. Dean Steward

10                                             H. DEAN STEWARD

11                                             Attorney for Defendant
                                               MICHAEL JOHN AVENATTI

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case 8:19-cr-00061-JVS   Document 200-3   Filed 07/16/20   Page 100 of 227   Page ID
#:3255
Case 8:19-cr-00061-JVS   Document 165   Filed 05/28/20   Page 3 of 60   Page ID #:2614

**CERTIFICATE OF SERVICE**

I, H. Dean Steward, am a citizen of the United States, and am at least 18 years of age. My business address is 107 Avenida Miramar, Ste. C, San Clemente, CA 92672.  I am not a party to the above-entitled action.  I have caused, on May 28, 2020, service of the defendant's:

**SUPPLEMENT TO STATUS REPORT**


on the following party, using the Court's ECF system:

AUSA BRETT SAGEL AND AUSA JULIAN ANDRE

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 28, 2020

/s/ H. Dean Steward

H. Dean Steward

Case 8:19-cr-00061-JVS   Document 200-3   Filed 07/16/20   Page 101 of 227   Page ID
Case 8:19-cr-00061-JVS   Document 165   Filed 05/28/20   Page 4 of 60   Page ID #:2615
#:3256

# EXHIBIT E

SECTIONS

SUBSCRIBE
SALE: $1 FOR 3 MONTHS

LOG IN

LATEST CORONAVIRUS UPDATES IN NYC AND AROUND THE WORLD

Central Park 'Karen'
previously sued alleged
romantic interest for stealin...



Body of long-missing Gilgo
Beach victim identified after
20 years as former...



Cuomo authorizes New York
businesses to ban entry
without wearing a mask



EXCLUSIVE: 'I'm not goi
just be quiet': Ex-dog w
of white woman who called..

ADVERTISEMENT

CORONAVIRUS

# Infamous jail where Jeffrey Epstein killed himself overrun by mice, roaches, coronavirus: expert


**By STEPHEN REX BROWN**
NEW YORK DAILY NEWS  |  MAY 27, 2020

  



Metropolitan Correctional Center in downtown Manhattan.(Luiz C. Ribeiro / for New York D/New York Daily News)

The lower Manhattan jail best known for its failure to prevent Jeffrey Epstein from killing himself is infested with vermin and so mismanaged that a coronavirus outbreak was likely exacerbated, a corrections expert writes in a scathing new report.

Dr. Homer Venters, who previously served as the top medical officer for the city's jail system, visited the Metropolitan Correctional Center on May 13 for nearly four hours in connection with a Manhattan federal lawsuit over the jail's handling of the pandemic. Venters wrote in a 35-page report that he found "widespread and systematic failures" to combat COVID-19. The laundry list of screwups at MCC included "signs of severe pest infection, such as roaches caught in traps," the doctor reported.

ADVERTISEMENT

Advertisement



5/28/2020   Case 8:19-cr-00061-JVS  Document 165  Filed 05/28/20  Page 7 of 80  Page ID #:2618



"It was clear that the MCC is widely infested with mice and roaches. Almost all of the housing areas I toured had evidence of numerous living and dead roaches and mice. Particularly concerning is the presence of these vermin in cells utilized for medical isolation of COVID-19 patients," Venters wrote in the report filed late Tuesday.

"While COVID-19 is not known to be spread via these vectors, the presence of mice, rats and roaches throughout the facility indicates a basic disregard for sanitation and infection control that casts doubt on ability or commitment of the MCC to maintain a sanitary facility."

The troubled jail grabbed headlines last year when Epstein — one of the most high-profile inmates in the country — hanged himself in his cell while awaiting trial for sex trafficking. The lockup faced a series of crises prior to the outbreak, including a loaded gun smuggled into an inmate housing area.

Inmate films video, shows living conditions inside Metropolitan Correctional Center.



Attorneys representing MCC inmates are asking a judge to order the federal Bureau of Prisons, which operates the jail, to make an array of improvements to combat the outbreak and to prepare for a possible resurgence of infections.

Advertisement



Case 8:19-cr-00061-JVS   Document 200-3   Filed 07/16/20   Page 105 of 227   Page ID
#:3260
5/28/2020   Case 8:19-cr-00061-JVS   Document 165   Filed 05/28/20   Page 8 of 80   Page ID #:2619



MCC officially reports that five inmates and 46 staff tested positive for coronavirus. But Venters said those figures almost certainly understate the outbreak due to basic failures to screen new inmates for symptoms, pull exposed staff off the job, keep track of who needs treatment, provide protective equipment and reduce overcrowding, among other factors.

The doctor was particularly troubled that some symptomatic inmates were held in isolation in the jail's Special Housing Unit, which is typically used for punishment. Those sick inmates were locked in cells with concrete beds and no sheets, pillows or blankets. Other inmates, however, reported being held in cramped units holding 26 people total despite having coronavirus symptoms.

Inmate Chris Karimbux said he had a temperature of 105 degrees and trouble breathing — but medical staff left him among other inmates and prescribed only Tylenol. His symptoms lasted more than two weeks.

MOST READ

Central Park 'Karen' previously sued alleged romantic interest for stealing $65k, a story he calls 'fabricated'

Body of long-missing Gilgo Beach victim identified after 20 years as former Philadelphia area prostitute

Cuomo authorizes New York businesses to ban entry without wearing a mask

"The other guys in my tier made me hot tea and helped me take hot showers to open up my lungs. I was afraid it was the end," he said in court filings.

Topics: MCC, coronavirus, Metropolitan Correctional Center

 **Stephen Rex Brown**
New York Daily News    

Stephen Rex Brown covers New York courts and criminal justice issues, with a focus on Manhattan Federal Court and Manhattan Supreme Court.

If You Like to Play, this City-Building Game is a Must-Have. No Install.
FORGE OF EMPIRES | SPONSORED

These SUVs Are So Cool It's Hard to Believe They Cost Under $30K! Research Best Crossover SUV 2020
SUV | SPONSORED

# EXHIBIT F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CESAR FERNANDEZ-RODRIGUEZ, ROBER
GALVEZ-CHIMBO, SHARON HATCHER,
JONATHAN MEDINA, and JAMES
WOODSON, individually and on behalf of all
others similarly situated,

                    Petitioners,

          -v.-

MARTI LICON-VITALE, in her official capacity
as Warden of the Metropolitan Correctional
Center,

                    Respondent.

No. 20 Civ. 3315 (ER)

**FACILITY EVALUATION OF
THE METROPOLITAN
CORRECTIONAL CENTER**

---

DR. HOMER S. VENTERS declares pursuant to 28 U.S.C. § 1746:

## I.    Executive Summary

    1.    My inspection of the Metropolitan Correctional Center ("MCC") and review of information from BOP staff as well as detained and recently released people indicates that the MCC's response to the COVID-19 pandemic suffers from widespread and systematic failures to follow CDC guidelines and basic infection control practices.

    2.    The deficiencies in the MCC's response to the COVID-19 pandemic include the following failures: (1) inadequate detection and response to COVID-19 cases among staff and detainees; (2) inadequate infection control measures necessary to slow the spread of COVID-19 through the facility; and (3) inadequate identification and protection of high-risk detainees from serious illness and death. These deficiencies are caused in substantial part by grossly inadequate or absent sick call systems, deficient COVID-19 screening and contact tracing, inadequate access

to soap and cleaning supplies, and deficient isolation and quarantine procedures. Across many measures, the MCC has failed to implement CDC guidelines.

3.      These deficiencies have led to many vulnerable people becoming infected with COVID-19 and receiving ineffective care. These deficiencies have also increased the risk that detained people and staff will suffer serious illness or death from COVID-19.

4.      I believe that these deficiencies can be remedied but they require a commitment to address structural barriers to access, quality, and transparency in the MCC's health services, and meeting the CDC's specific COVID-19 guidelines. Without fundamental improvements to the underlying health care system at the MCC, it is likely that the next wave of COVID-19 will similarly overwhelm the facility's medical system and leave patients with unmet needs, increasing the risk of serious illness or death.

## II.      Background

5.      I am a physician, internist, and epidemiologist with over a decade of experience in providing, improving, and leading health services for incarcerated people. My clinical training includes residency training in internal medicine at Albert Einstein/Montefiore Medical Center (2007) and a fellowship in public health research at the New York University School of Medicine (2009). My experience in correctional health includes two years visiting immigration detention centers as part of my public health fellowship where I conducted analyses of physical and mental health policies and procedures for persons detained by the U.S. Department of Homeland Security and evaluated individual asylum applications for torture survivors. This work included and resulted in collaboration with U.S. Immigration and Customs Enforcement ("ICE") on numerous individual cases of medical release, the formulation of health-related policies, as well as testimony before the U.S. Congress regarding mortality inside ICE detention facilities.

Case 8:19-cr-00061-JVS  Document 200-3  Filed 07/16/20  Page 109 of 227  Page ID
Case 8:19-cr-00061-JVS  Document 165-4  Filed 05/28/20  Page 212 of 660  Page ID #:2623
#:2623

6.    After my fellowship training, I became the Deputy Medical Director of the Correctional Health Services of New York City.  This position included both direct care to persons held in NYC's 12 jails, as well as oversight of medical policies for their care.  This role included oversight of chronic care, sick call, specialty referral, and emergency care.  I subsequently was promoted to the positions of Medical Director, Assistant Commissioner, and Chief Medical Officer.  In the latter two roles, I was responsible for all aspects of health services including physical and mental health, addiction, quality improvement, re-entry, and morbidity and mortality reviews as well as all training and oversight of physicians, nurses, and pharmacy staff.  In these roles, I was also responsible for evaluating and making recommendations on the health implications of numerous security policies and practices including use of force and restraints.  During this time I provided numerous datasets and other forms of cooperation for the U.S. Department of Justice investigation into brutality in the NYC jail system, and worked with my team to support their critical efforts.  Many of the data systems that I implemented in the NYC jails were identified and reported in the U.S. Attorney's Office for the Southern District of New York's substantiation of the health consequences of a pattern and practices of brutality regarding adolescent detainees.[1]

7.    During this time, I managed multiple communicable disease outbreaks including H1N1 in 2009, which impacted almost 1/3 of housing areas inside the adolescent jail, multiple seasonal influenza outbreaks, a recurrent legionella infection, and several other smaller outbreaks.

8.    In March 2017, I left the Correctional Health Services of New York City to become the Director of Programs for Physicians for Human Rights.  In this role, I oversaw all programs of

---

[1] *See* Report on CRIPA Investigation of the New York City Department of Correction Jails on Rikers Island, U.S. Dep't of Justice (Aug. 4, 2014), https://www.justice.gov/sites/default/files/usao-sdny/legacy/2015/03/25/SDNY%20Rikers%20Report.pdf.

Physicians for Human Rights, including training of physicians, judges, and law enforcement staff on forensic evaluation and documentation, analysis of mass graves and mass atrocities, documentation of torture and sexual violence, and analysis of attacks against healthcare workers. I subsequently worked with the nonprofit Community Oriented Correctional Health Services (COCHS) in promoting evidence-based health services for people with justice involvement. I have also worked as an independent correctional health expert since 2017. In my roles as a correctional health physician I have conducted over 50 facility inspections, three of which have been specific for assessing the adequacy of COVID-19 response. My CV is attached hereto as **Appendix A**.

9.       I expect to be compensated for my work on this matter at my usual consulting rate of $500 dollars per hour, plus reimbursement of reasonable expenses. My compensation is not contingent upon the substance of the opinions expressed.

### III.    Methodology

10.      The purpose of this report is to focus on the adequacy of the MCC's response to COVID-19 with focus on infection control and other public health measures currently being implemented to prevent serious illness and death among staff and detained people.

11.      In order to prepare this report, I visited the MCC on May 13, 2020 and physically inspected the facility. I toured and examined the entry and screening area, housing areas, and the health services unit. Housing areas that I inspected included 11S (Dorm), 9S/10S (Special Housing Unit, SHU), 9N, Unit 2 (Women's unit), Unit 3 (at the time used for medical isolation). During this time I spoke with 13 detained people.[2]

---

[2] The people spoken with were: Nicolas Sucich, David Crosby, Robert Russo, Ahmed El Soury, Chris Karimbux, Lenin Guzman-Hidalgo, Eddie Cotto, Brian Capellen, Antonio Smith, Geovanny Fuentes-Ramirez, Tiffany Days, Lavaughn Campbell, and Andres Bello.

Case 8:19-cr-00061-JVS   Document 200-3   Filed 07/16/20   Page 111 of 227   Page ID
Case 8:19Case0:0080-cv-833156-ERemdoc65#3286605/28/20 08/ag#204 6fage 5Page1ID #:2625
#:3286

12.     My interactions with detained people included in most cases asking the following
questions, with follow-up as appropriate:

    a.  Have you been around anyone you thought had COVID-19?

    b.  What has this facility done to prepare for COVID-19?

    c.  Have you been asked any questions about COVID-19 by health staff?

    d.  How have you reported concerns about your health (including COVID-19) in this
facility?

    e.  Who wears masks and gloves in this facility and how do they get this equipment?

    f.  Who cleans inside cells in this facility and how and how often do they get cleaning
supplies?

    g.  Who cleans outside cells in this facility and how and how often do they get cleaning
supplies?

13.     I have conducted this assessment and review of information with the following
questions in mind:

    a.  Do current practices in the MCC adequately detect the number and severity of
COVID-19 cases among staff and detainees and respond in a manner consistent
with CDC guidelines and other established clinical standards of care?

    b.  Do current practices in the MCC adequately slow the spread of COVID-19 through
the facility and between people, both staff and detainees, in a manner consistent
with CDC guidelines and other clinical standards of care?

    c.  Do current practices in the MCC adequately identify and protect high-risk detainees
from serious illness and death from COVID-19?

5

Case 8:19-cr-00061-JVS   Document 200-3   Filed 07/16/20   Page 112 of 227   Page ID
Case 8:19-cr-00061-JVS   Document 165   Filed 05/28/20   Page 215 of 615   Page ID #:2626
#:3267

14.     In addition to my inspection of the facility, I was able to review the following

records and information:

    a.  Declarations from 33 detained or recently released people;[3]

    b.  MCC/BOP policies and procedures relating to COVID-19;

    c.  Sick call requests of detained people;

    d.  Medical records of detained people;[4]

    e.  Photographs taken during the facility inspection;

    f.  The deposition transcripts of the following MCC staff: Acting Clinical Director Dr.
        Robert Beaudouin, dated May 20, 2020;  Associate Warden Charisma Edge, dated
        May 20, 2020; Warden Marti Licon-Vitale, dated May 21, 2020; and Acting
        Warden Robert Hazelwood, dated May 22, 2020; and

    g.  The deposition transcripts of the following MCC inmates: Cesar Fernandez-
        Rodriguez, Rober Galvez-Chimbo, Sharon Hatcher, and James Woodson, each
        dated May 19, 2020, and Nicolas Sucich, dated May 21, 2020;

    h.  A sample of records documenting inmate temperature checks.

---

[3] I have reviewed the declarations of the following people who are detained at, or were
recently released from, the MCC: Vinicius Andrade, Robert Barnes, Armando Beniquez, Randolph
Bourgoin, William Bradley, Terrell Brown, David Crosby, Franklyn Dansowah, Darius Davis,
Tiffany Days, Manolo Dones, Michael Falu, Cesar Fernandez-Rodriguez, Anthony Flynn, Rober
Galvez-Chimbo, Carlos Garcia, Rodney Griffin, Sharon Hatcher, Chris Karimbux, Anthony Luna,
Emil Matute, Ahmad Jamal Naqvi, Michel Richard, Carolyn Richardson, Adrienne Roberts,
Joseph Schiliro, Antonio Smith, Jorge Soto, Nicolas Sucich, Tyler Toro, Wilbert Turner, James
Woodson and Guillermo Zegarra-Martinez.

[4] I have reviewed the medical records of Woodson, Sucich, Naqvi, Medina, Hatcher,
Galvez-Chimbo, Fernandez-Rodriguez, Falu, and Davis.

Case 8:19-cr-00061-JVS   Document 200-3   Filed 07/16/20   Page 113 of 227   Page ID
Case 8:19-cv-00081-JVS-JDE   Document 165   Filed 05/28/20   Page 215 of 60   Page ID #:2627
#:3268

15.     The information I have gathered from the above referenced documents, in
conjunction with the results of my physical site visit, are sufficient for me to come to the
conclusions drawn below with a high degree of confidence.

## IV.     Assessment of the COVID-19 Response in the MCC

### A.     Visual Observations from the Inspection

16.     The inspection of the facility lasted approximately 3.5 hours and consisted of
observation and photography of various housing units, as well as interviews of inmates both cell-
side and in open areas.  All interviews were conducted in the presence of at least one representative
of the Respondent, including in many cases MCC staff.

17.     A significant portion of the inspection took place on 11 South, which, based on
medical records, declarations, and deposition testimony, is the unit where the initial outbreak of
COVID-19 occurred.  11 South consists of an open communal area with a number of different tiers
separated by open metal bars.  Each tier contained a dorm-like room with a number of bunk beds
spaced only a few feet apart across the tier.  It appeared that 20 or more men were in each tier I
was able to observe, and were standing or sitting close together.  At our request, the MCC staff
removed inmates from one tier to enable me to inspect the tier.  Photographs were taken of the set-
up within the tier.  *See* Kala Decl. Exs. 10 and 11.  The tier I observed had approximately 26 bunk
beds spaced a few feet apart and some small tables in the center.  The tier had a single toilet and
sink. *See* Kala Decl. Ex. 12.  In this tier, as in other places I visited during the inspection, I observed
signs of severe pest infection, such as roaches caught in traps.  *See* Kala Decl. Ex. 13.  I spoke to
several inmates on this tier who reported that many in the tier, including Chris Karimbux, Brian
Capellan, and David Crosby, had been symptomatic for COVID-19 but were not removed from
the tier upon reporting symptoms.  This is discussed in more detail below.

7

Case 8:19-cr-00061-JVS Document 200-3 Filed 07/16/20 Page 114 of 227 Page ID
Case 8:19-cr-00061-JVS Document 165 Filed 05/25/20 Page 217 of 610 Page ID #:2628
#:3269

18.     I also observed the Special Housing Unit ("SHU") where, based on medical records, declarations, and deposition testimony, it appears that a number of inmates who had COVID-19 were housed for medical isolation. Photographs were taken of a SHU cell. *See* Kala Decl. Exs 14 and 15. The cells I observed and depicted in the photographs consisted of a concrete "bed," a concrete stool affixed to the ground, and a combined toilet/sink.

19.     Throughout my tour of the facility, I observed computer workstations and phones in common areas for inmate use. In almost every case, no cleaning fluid or applicator was visible near these common spaces. *See* Kala Decl. Exs 16 and 17. In a few other instances, I observed cleaning supply with no applicator, *see* Kala Decl. Ex. 18, or a cloth towel with no cleaning supply, *see* Kala Decl. Ex. 19. This was consistent with reports from inmates, including as discussed below, that disinfectant supplies were lacking. I also observed in some instances signs stating that soap was available upon request. As discussed below, inmates I spoke to and declarations I reviewed reported that such signs had been put up in the days prior to the inspection and that adequate soap was not always in fact available.

20.     During my tour, it was clear that the MCC is widely infested with mice and roaches. Almost all of the housing areas and other common spaces I toured had evidence of numerous living and dead roaches and mice. Particularly concerning is the presence of these vermin in cells utilized for medical isolation of COVID-19 patients, including the cell in the women's unit as well as the men's SHU. This was also an obvious problem in the current isolation unit, as well as 11S, which is designated for high risk patients. Mr. Robert Barnes, a resident of 11 South who is 73 years old and has coronary artery disease, reported that "[t]here is black mold in our unit that has built up over the years. I recently showed it to an employee, but no action has been taken to address it. There are rodents—both rats and mice—and cockroaches in our unit. I see them every day."

8

Case 8:19-cr-00061-JVS Document 200-3 Filed 07/16/20 Page 115 of 227 Page ID
Case 8:19-cr-00061-JVS Document 165 Filed 05/28/20 Page 213 of 310 Page ID #:2629
#:3270

Devlin-Brown Decl. Ex. 7 (Barnes Decl. ¶ 7). While COVID-19 is not known to be spread via these vectors, the presence of mice, rats, and roaches throughout the facility indicates a basic disregard for sanitation and infection control that casts doubt on the ability or commitment of the MCC to maintain a sanitary facility. The CDC identifies over 35 diseases carried by mice and rats,[5] and the presence of these vermin inside the locked cells of medically isolated patients is especially troubling.

## V. Detection of COVID-19 Cases

### 1. Screening

21.     The MCC has failed to adequately detect COVID-19 cases in the facility, and its existing practices for detecting such illness remain deeply inadequate and in many cases non-compliant with CDC guidelines. Most notably, the MCC has ignored the high prevalence of COVID-19 symptoms being experienced and reported by detained people. Therefore, the number of infected detained people has likely been much larger than currently appreciated. There are several reasons for this failure to detect COVID-19 infection, set out below.

22.     The CDC recommends that all new admissions to a detention facility be screened for both signs and symptoms of COVID-19. This process should include asking about common symptoms of COVID-19 such as cough, fever, and shortness of breath. This also includes asking about contact with people who have had COVID-19 and checking temperature. Screening should also occur where there is a risk that the infection is being carried by inmates or staff in the facility.[6]

23.     The MCC acknowledges that COVID-19 screening for all inmates should take place, and claims that such screening became MCC policy in late March. *See* Kala Decl. Ex. 1

---

[5] *Rodents*, CDC, https://www.cdc.gov/rodents/index.html (last reviewed July 9, 2010).

[6] *See* Kala Decl. Ex. 20 (CDC Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, at 10, 26).

9

Case 8:19-cr-00061-JVS  Document 200-3  Filed 07/16/20  Page 116 of 227  Page ID
Case 8:19-cr-00061-JVS  Document 165  Filed 05/28/2005  Page 19 of 51  ID #:2630
#:2630

(Beaudouin Dep. Tr. at 138:5-9).  The screening is meant to involve health staff taking temperatures as well as asking about COVID-19 symptoms.  Dr. Robert Beaudouin testified that screening should include "the usual questions, do you have cough, chest pains, shortness of breath, fever, nausea, vomiting, diarrhea, loss of taste, loss of smell, muscle aches and pains." *Id.* at 146:9-14.  He also stated the records of these encounters were not kept electronically, with the exception of temperature taken in the isolation settings, because the process of recording symptoms would have been too burdensome.  *See id.* at 148:14-23.  He stated that some people would receive this screening on a daily basis when they first arrived into the facility, or if they were in quarantine, and later may have received it less frequently, based generally on whether or not there were any COVID-19 cases at the time.  *See id.* at 146-149.  He also stated that, when the facility had cases of COVID-19, these screenings would be conducted every day.  *See id.* at 149:15-150:5.  For the most part, results of these screenings were not officially documented and were handwritten on roster sheets.  *See id.* at 147-148.

24.     Notwithstanding these statements, it is clear from my conversations with detained people, review of declarations, and review of medical records that very little screening is in fact occurring in the MCC, and that this screening relies almost exclusively on temperature checks.  Among other examples, Mr. Michael Falu reported that "[t]here was a period of time when people were coming around to take everyone's temperatures.  But they've stopped doing that.  I don't believe that anyone has come to take our temperatures in the last two weeks." Devlin-Brown Decl. Ex. 17 (Falu Decl. ¶ 13).  Likewise, Mr. James Woodson testified that his temperature also had not been checked in approximately two weeks.  *See* Devlin-Brown Decl. Ex. 9 (Woodson Dep. Tr. at 33:2-4).  According to Ms. Sharon Hatcher, unless she requests it from the med line, she no longer receives temperature checks.  *See* Devlin-Brown Decl. Ex. 5 (Hatcher Dep. Tr. at 28:1-7).

10

Similarly, Mr. Wilbert Turner reported his temperature has not been checked since early April. *See* Devlin-Brown Decl. Ex. 33 (Turner Decl. ¶ 13).

25.     Further, most of the people I spoke with reported no symptom screening.  That is, they were never asked whether they had cardinal symptoms of COVID-19, including, for example: fatigue, shortness of breath, cough, loss of taste or smell, and other symptoms identified by the CDC.[7]  The same is true of many declarations I reviewed.  For example, Mr. Wilbert Turner reported that, even when the MCC was performing temperature checks, they "never asked us about any other symptoms."  Devlin-Brown Decl. Ex. 33 (Turner Decl. ¶ 13).  Likewise, Mr. Franklyn Dansowah states that, "[w]hen the medical staff started coming around taking temperatures, they did not care if people had other symptoms – cough, chills, diarrhea.  They just left them in bed unless they had a fever."  Devlin-Brown Decl. Ex. 13 (Dansowah Decl. ¶ 9.)  Mr. David Crosby also requested medical care but was told that, unless he had a fever, all they could do was give him Tylenol.  *See* Devlin-Brown Decl. Ex. 12 (Crosby Decl. ¶ 8).  I have also reviewed a sample of records that the MCC provided to Petitioners which document the results of inmate temperature checks.  *See* Kala Decl. Ex. 41.  Other than brief and sporadic notes, this document provides no evidences that inmates are asked any standard set of questions regarding symptoms of COVID-19. The accuracy of the thermometers being utilized is also questionable.  The internal body temperatures of people who are not ill is commonly accepted to fall between 97 and 99 degrees Fahrenheit.[8]  That few, if any, temperatures were recorded above 98.8 degrees suggests some form

---

[7]  *See Symptoms of Coronavirus*, CDC, https://www.cdc.gov/coronavirus/2019-ncov /symptoms-testing/symptoms.html (last reviewed May 13, 2020).

[8]  *See Body Temperature Norms*, MedlinePlus, https://medlineplus.gov/ency/article/ 001982.htm (last updated May 7, 2020).

of systematic flaw in this process, potentially the accuracy of the devices being utilized or the training of those administering the checks.

      26.    The failure to consistently screen individuals for symptoms is a material failing. The CDC makes clear that COVID-19 can present with many signs or symptoms and that screening and surveillance should be focused on asking about symptoms as well as detecting elevated temperature.[9] It is essential that such active screening be part of any response to a viral outbreak. Failure to do so can result in catastrophic consequences to populations exposed to a communicable virus, such as COVID-19.

      27.    Detained people I spoke with, and inmates whose declarations I reviewed, also indicated that even when a person is detected as having a temperature or is able to report COVID-19 symptoms, they often are left in their housing area and not placed into isolation. Mr. Chris Karimbux reported that while on 11S, he developed a fever and other COVID-19 symptoms, and a nurse found his temperature to be 105 degrees. He reported that "[s]he gave me Tylenol and told me to take two tablets every four hours. I went back to my bed. My symptoms lasted over two weeks. My bed is a bunk bed very close to everyone else's bed in my tier. I started having trouble breathing. The other guys in my tier made me hot tea and helped me take hot showers to open up my lungs. I was afraid it was the end. . . . New guys continue to join our unit, as recently as two or three days ago a new person came." Devlin-Brown Decl. Ex. 21 (Karimbux Decl. ¶¶ 6-10). Likewise, three members of Anthony Luna's tier developed high fevers in early April but were "just left in the tier." Devlin-Brown Decl. Ex. 22 (Luna Decl. ¶ 7). After medical staff took Ms. Adrienne Roberts' temperature and determined she had a fever, they left her in her cell until she suggested that she was going to hurt herself. Only then was she isolated. Devlin-Brown Decl.

---

[9] *See* Interim Guidance on COVID-19 in Correctional Facilities, *supra* note 6.

Ex. 27 (Roberts Decl. ¶¶ 13-15).  These reports call into question the MCC's claim that it promptly
isolates symptomatic inmates.[10]

28.     When asked about whether any inmates who reported COVID-19 symptoms were
not placed into isolation, Dr. Beaudouin stated "I am not aware of that."  Kala Decl. Ex. 1
(Beaudouin Dep. Tr. at 158:14).  When asked if a symptomatic patient would ever be left in a
housing area, he stated "[i]f we know of it, we wouldn't do it."  *Id.* at 186:11-16.  However, a
document entitled Quarantine Isolation Flowsheet provided by the MCC, *see* Kala Decl. Ex. 32,
shows that only 33 inmates have been isolated, and does not account for the isolation of numerous
inmates who experienced COVID-19 symptoms (as reported through sick call requests, my
interviews, and declarations).

29.     This lack of screening has translated into inmates contracting COVID-19 and never
receiving testing or care.  For example, Mr. Darius Davis reported "I had symptoms of the
coronavirus in April.  My bunkmate complained of a fever first.  Then I lost my sense of smell and
taste, and I experienced fever and chills.  I wrapped myself in a blanket.  I asked correctional
officers for medical care.  They said they would ask medical to see me, but no one came.  I also
asked to speak with the lieutenant, but he did not come either and the officers did not come back
to check on me."  Devlin-Brown Decl. Ex. 14 (Davis Decl. ¶ 6).  Many others have reported heavily
delayed or nonexistent responses.  For example, Mr. Armando Beniquez also requested to see a
doctor due to his fever, chest pain, cough, lethargy, and loss of taste.  Despite his repeated requests,

---

[10] Dr. Beaudouin testified that any person who was found to have a fever during their
screening would automatically be placed in isolation and examined.  He stated that, "[i]f somebody
has a fever, yes.  Person has a fever, then we are going to put him in isolation.  We are going to
examine him too."  Kala Decl. Ex. 1 (Beaudouin Dep. Tr. at 150:22-151:3).  Warden Licon-Vitale
also stated that any inmate who is determined to have symptoms of COVID-19 is isolated
immediately.  *See* Kala Decl. Ex. 7 (Licon-Vitale Dep. Tr. at 62:9-14).

Case 8:19ase0D0061eJVS331DoEuRnenDt165feRi5d 05/21d2005720/2023 Page 1Page1D #:2634

he never saw a doctor. *See* Devlin-Brown Decl. Ex. 8 (Beniquez Decl. ¶¶ 7-8).  While developing

symptoms himself, Mr. Guillermo Zegarra-Martinez listened to his cellmate "ask for help and

medical attention over and over and over again, with no help given."  Devlin-Brown Decl. Ex. 34

(Zegarra-Martinez Decl. ¶¶ 8-10).  Mr. Michael Falu refused to re-enter his cell until a lieutenant

ensured him that he would receive medical attention.  It still took days until he received a medical

visit, and even when he did, the doctor was unfamiliar with his complaints.  *See* Devlin-Brown

Decl. Ex. 17 (Falu Decl. ¶ 5).  Symptomatic inmates should be promptly tested, and testing of

close contacts of positive cases should follow.  As I indicate in my recommendations below, the

following groups should be immediately prioritized for COVID-19 testing at MCC:

   a.  Any new admissions or inmates returning from outside the facility;

   b.  Any detained person with signs and/or symptoms of COVID-19;

   c.  Any close contacts of COVID-19 cases; and

   d.  Any staff or detained person who is in the high-risk cohort, as defined by CDC
       criteria.

   30.    The failure to detect and respond to COVID-19 at the MCC is also linked to the

failure to undertake the critical step of contact tracing once a staff member or inmate is identified

as possibly having COVID-19.

   31.    With respect to inmates, there is no indication that any contact tracing is undertaken

for those who test positive.  Associate Warden Edge testified that while such tracing was

recommended, she was not aware whether it was actually conducted to identify staff and/or

inmates who had interacted with COVID-19 positive inmates.  *See* Kala Decl. Ex. 2 (Edge Dep.

Tr. 52:5-12).  What is more, while the MCC's number of positive inmates has been suppressed by

a lack of testing, *see* Kala Decl. Ex. 7 (Licon-Vitale Dep. Tr. at 51:12-17), it appears the MCC is

also not even engaging in contact tracing for symptomatic inmates either, *see* Kala Decl. Ex. 6
(Hazelwood Dep. Tr. 41:19-42:9).

      32.    The testimony of Dr. Beaudouin raises concerns that the COVID-19 cases among
staff are not resulting in adequate contact investigations. In his deposition, Dr. Beaudouin reports
that despite being the Acting Clinical Director of the MCC and responsible for contact
investigations in the facility, he was not even notified whenever a staff member tested positive for
COVID-19. When asked about being notified about staff cases, he stated "I wasn't being informed
regularly. At first the AW, I think, was contacting the HSA to do the contact investigation. And
then after the HSA got sick and she was contacting me, but I think she contacted me like three or
four times to do some contact investigation but from the chart there are many more staff that
needed some contact investigation who tested positive." Kala Decl. Ex. 1 (Beaudouin Dep. Tr. at
117:14-25). He also agreed that there is no actual policy or protocol for contact tracing in the
MCC, and later admitted there is a need "to tighten up on the contact investigation." *Id.* at 118-
19, 131:14-17.

      33.    It is also apparent that staff members exposed to COVID-19 positive staff or
inmates are expected to continue working, at least in some cases when symptomatic or positive for
COVID-19, thus amplifying the risk of the infection spreading. *See* Kala Decl. Ex. 1 (Beaudouin
Dep. Tr. at 120-126). Dr. Beaudouin identified multiple instances in which staff continued to work
in the MCC despite having COVID-19 symptoms or a positive test. *See id.* He also noted that an
individual who has been exposed to someone with COVID-19 symptoms should quarantine for 14
days, but acknowledged that this standard has not been met for staff members, who are expected
to continue working even if they have been exposed to another staff member who has tested
positive, unless they themselves develop symptoms. *See id* at 102-3; 134-35.

Case 8:19-cr-00061-JVS   Document 200-3   Filed 07/16/20   Page 122 of 227   Page ID
Case 8:19-cr-00061-JVS   Document 165   Filed 05/29/2005   Page 18 of 51   #:2636
#:2237

## 2.    The Inadequate Sick Call System

34.    In addition to proactively screening inmates, it is crucial that the MCC provide them with a way of reporting illness potentially relating to COVID-19, and that it ensure that such reports are promptly acted upon. However, I have found that the sick call system at the MCC is systematically deficient and serves as a barrier to adequate care and an adequate COVID-19 response.

35.    It is critical for correctional facilities to implement an effective "sick-call" system to ensure that people who are ill or have medical concerns can receive timely and clinically competent assessments and treatment. This system should be operated so that when a person reports a health problem, the request for medical care is recorded and the individual is assessed by a nurse or physician within 24 hours. This best practice is identified by the National Commission of Correctional Health Care as a basic element of ensuring that sick patients do not deteriorate alone in cells or housing areas and die without receiving care. This standard of care relies on a daily review of paper and electronic sick call submissions by the correctional health authority. That review must be documented and then the records of the original sick call requests must be retained, whether in a central location or the personal medical records of the patients.

36.    This basic approach to sick calls becomes even more critical during an outbreak of communicable disease, when the facility must work to quickly identify new symptomatic staff and inmates, both to ensure prompt treatment as well as to track and mitigate the spread of the outbreak throughout the facility. On an operational level, this means that every day, nursing staff should review all sick call requests (as they should always) with a list of symptoms relating to the outbreak. Then any sick call requests with these symptoms should result in a referral for appropriate clinical assessments, and the entry of those symptoms and the inmate's location into a database or spreadsheet used to track the overall spread of disease symptoms in the facility.

16

37.     MCC Acting Clinical Director Dr. Robert Beaudouin has acknowledged in his testimony that anyone who submitted a sick call request with any symptom of COVID-19 should be seen immediately. *See* Kala Decl. Ex. 1 (Beaudouin Dep. Tr. at 228:12-18).  However, his testimony regarding the sick call process provides a clear and concerning account of the multiple deficiencies in the MCC sick call system, and how these deficiencies drive a lack of awareness or care for detained people with COVID-19.

38.     Dr. Beaudouin reports three ways in which sick call requests can be requested: via verbal request, written paper request, and electronic request. *See* Kala Decl. Ex. 1 (Beaudouin Dep. Tr. at 211:11-15).  He reported that there are no guidelines or tracking for the number of, or responses to, verbal requests, or even a record as to whether such requests are made. *See id.* at 213:21-214:2; 217:21-218:10.  For electronic requests, he indicates that either a nurse or the health services administrator (HSA) is designated to review them. *See id.* at 233:2-234:7.  He also reported that paper sick call requests were not retained, but shredded, and that the response was to view them, schedule an encounter and then shred the paper request. *See id.* at 218-220.  As a result, there would be no record of the original request, and if no appointment was scheduled, there would be no record of the patient's request for care or reporting of symptoms. Both Warden Marti Licon-Vitale and Acting Warden Robert Hazelwood stated in their depositions that they were unaware that paper sick call requests were being destroyed. *See* Kala Decl. Ex. 7 (Licon-Vitale Dep. Tr. at 59:7-18); Kala Decl. Ex. 6 (Hazelwood Dep. Tr. at 28:18-22).

39.     Information I have gathered from my tour of the MCC and review of available information indicates that virtually all of these steps of sick call are broken or grossly deficient in the MCC. This has resulted in the current situation wherein many people cannot report their COVID-19 symptoms via sick call, or when they do, there is no appropriate response.

17

Case 8:19-cr-00061-JVS   Document 200-3   Filed 07/16/20   Page 124 of 227   Page ID
#:3270
Case 8:19-cr-00061-JVS-JCG   Document 165   Filed 05/28/20   Page 18 of 51   Page ID #:2638

40.     When I toured the MCC, staff stated that the computer kiosks located in each housing area were both operational and also were utilized to report COVID-19 related health problems and all other medical concerns.  However, Dr. Beaudouin testified that this electronic sick call inbox was not being monitored by anyone while staff members were absent.  *See* Kala Decl. Ex. 1 (Beaudouin Dep. Tr. at 259-262).  As a result, the monitoring "hasn't been done timely."  *Id.* at 259:21-22.  He further stated that, to date, sick call monitoring had not been treated as a priority: "The sick call box was to be monitored by a nurse daily.  If the nurse wasn't there, it's supposed to be the HSA.  But what happened is there are a lot of work to be done.  Sometimes if you don't address it, then it stays and you get busy with other things but it's a problem that right now we have to put it as a priority, the sick call to be addressed first thing in the morning."  *Id.* at 260:22-261:12.

41.     I have reviewed a compilation of sick call requests, *see* Kala Decl. Ex. 36, alongside a BOP Health Services Activity Report, *see* Kala Decl. Ex. 37, reflecting that in many cases *weeks* or even a month or more went by between inmates making a sick call request relating to COVID-19 symptoms and any treatment or care.  For example, in one such electronic request, from April 16, 2020, a patient reported coughs, fever, chest pain, and shortness of breath and was ignored.  This patient was never placed in isolation and an email reply to this patient was sent on May 5 scheduling him or her for sick call.  As of May 15, the patient had not had a single encounter with medical staff since March 1.  Other patients similarly reported shortness of breath, fever, and chest pain and also received no response, or a very delayed response, to their electronic sick call requests.  In fact, of approximately 25 inmates who submitted electronic sick call requests, the medical activities report indicates that only four received any sort of medical care within one day and only five received medical care within one week.  Six of these inmates had to wait over 15 days to even

18

Case 8:19-cr-00061-JVS   Document 200-3   Filed 07/16/20   Page 125 of 227   Page ID
Case 8:19-cr-00061-JVS   Document 165   Filed 05/28/2005/20/20   Page 19 of 51   #:2639
#:3280

be seen by a medical staff member, and, as of May 15, seven of these inmates had not been seen
by a medical staff member at all since making the sick call request.

42.     Numerous inmates have reported that their sick call requests – whether verbal, on
paper, or in electronic form – have gone unanswered. Mr. Michael Falu, who experienced several
days of fever, chills and progressive weakness, reported that he and his cellmate told security staff
for several days of his symptoms and that he needed to be seen. Devlin-Brown Decl. Ex. 17 (Falu
Decl. ¶ 5). He stated "I did not receive any medical attention until several days later, when a
doctor, who was taking temperatures in the unit, came to my cell. I told him about the symptoms
I was having. Nothing in his visit suggested that he had come to see me because he had heard
about my request for medical attention; instead, it appeared that he was just there because he was
taking everyone's temperatures." *Id.* Mr. Falu reported never being tested for COVID-19. Others
have reported the same issues. After many inmates in his tier became ill, Mr. Anthony Luna and
others reported their symptoms to the staff. The staff "did not do anything in response." *See*
Devlin-Brown Decl. Ex. 22 (Luna Decl. ¶ 10). Mr. Darius Davis told correctional officers of his
fever, chills, and loss of smell and taste, and while the officers stated that they would inform
medical staff, no one came for weeks. *See* Devlin-Brown Decl. Ex 14 (Davis Decl. ¶ 6). Likewise,
Mr. Carlos Garcia reported his sweating, headache, and tight chest directly to an MCC doctor, who
simply told him to place a sick call request. Mr. Garcia followed the doctor's instructions but
nevertheless did not receive any medical treatment for approximately one week. *See* Devlin-
Brown Decl. Ex. 19 (Garcia Decl. ¶¶ 10-12).

43.     Dr. Beaudouin also confirms that details from the sick call request or the
appointment scheduling do not become incorporated into the sick call encounter itself. This means
that no record of the original concern is retained by the health system, essentially making it

19

impossible to see whether sick call encounters that do occur adequately address the original complaint. When asked about whether he sees the detail of the appointment or the original sick call request when seeing patients for sick call, Dr. Beaudouin replied "No. I don't see the sick call. So when I'm seeing the inmates, I'm talking to him about the present complaint, the complaint he has not [the] complaint he had before." Kala Decl. Ex. 1 (Beaudouin Dep. Tr. at 274:18-22).

44.     In the outbreaks I have managed, we would create a template for nurses conducting an outbreak sick-call review so that they could pull out any requests that included rash, spider bites, or fever in the case of MRSA outbreak; or, fever, cough, or sore throat during H1N1, for example. This subset of sick-call requests is then used for two purposes. First, on the clinical side, these patients are seen immediately (same day or next morning) for assessment. Second, on the outbreak management side, these symptoms are put into a simple spreadsheet that can track the overall incidence of various symptoms by date and location within a certain facility.

45.     This approach is absolutely essential to tracking the spread of any outbreak and I have utilized it in managing outbreaks of H1N1, Legionella, MRSA, Clostridium Difficile diarrheal illness, seasonal influenza and numerous other instances. I would have expected to have seen such a system implemented at MCC given the severity of the current COVID-19 outbreak.

46.     By failing to conduct adequate screenings as well as failing to monitor and respond to sick call requests, the MCC not only increases the likelihood that individual patients with COVID-19 will develop serious illness, but also increases the likelihood that they will transmit infection to others. Ms. Roberts reported that a woman known to have a fever was placed into her cell, and that she became so anxious to get out of the cell that MCC staff responded with a security team armed with riot gear. She stated, "when medical staff was in my Unit they saw Ms. Piquant still in my cell and said, 'you are not supposed to be in here, you have a fever.' The medical staff

20

Case 8:19-cr-00061-JVS  Document 200-3  Filed 07/16/20  Page 127 of 227  Page ID
Case 8:19-cr-00061-JVS  Document 165  Filed 05/21/20  Page 21 of 61  Page ID #:2641
#:2282

person then took my temperature, saw that I had a fever, closed the door to my cell and ran away.
I was terrified.  I now realized that Ms. Piquant had Coronavirus symptoms and I was locked in a
cell with her.  Panicked, I knew the only way to get taken out of the cell was to act as if I was
going to hurt myself.  So I began hanging a sheet up.  The guards saw this and opened the cell door
screaming and yelling.  One of the guards had some kind of paint gun and put it to my head.  I was
put in isolation after that. . . . I had a fever.  I asked for medicine.  I was told to take the Tylenol I
already had prescribed to me.  Other than taking and keeping records of my temperature and blood
pressure no other medical care was provided."  Devlin-Brown Decl. Ex. 27 (Roberts Decl. ¶¶ 13-
15).

47.     Mr. Garcia reported that on "March 27, my head still hurt and I was covered in
sweat.  I had never had a headache that bad before.  I told a female C.O. named Lupo that I was
too sick to work that day.  When the morning doctor, Joaquin, came to the unit that day, I told him
I was sick.  I told him I was sweating, I had a headache and my chest felt really tight.  I also told
him I wanted a COVID test.  He wouldn't give me a test and he didn't check me for any symptoms
and didn't take my temperature.  The only thing he said was that I should put in a sick call on the
computer.  That same day, March 27, after I spoke with him, I used the computer to put in the sick
call, but I didn't see a doctor.  I was sick all weekend and into the next week.  I was constantly
coughing and I also felt a pain in my chest like someone was sticking me with needles.  I wasn't
sweating the whole time, but some nights I would wake up sweating and sometimes I would sweat
in the day.  I never saw a doctor or a nurse during that time and didn't get any treatment or
medicine.  At that time, we were still locked in our cells just about all day.  My bunky started to
complain about all the coughing.  He kept saying I was going to get him sick."  Devlin-Brown
Decl. Ex. 19 (Garcia Decl. ¶¶ 9-13).

Case 8:19-cr-00061-JVS   Document 200-3   Filed 07/16/20   Page 128 of 227   Page ID
Case 8:19-cr-00061-JVS   Document 165   Filed 05/28/20   Page 22 of 51   Page ID #:2642
#:2642

**B.       Treatment of Inmates in Isolation**

48.     My review indicates that the clinical response to patients who are transferred into
medical isolation is also grossly deficient.  Dr. Beaudouin's testimony reveals that even when
identified as needing isolation for suspected or confirmed COVID-19, patients at the MCC are
unlikely to receive appropriate care.  In his deposition, Dr. Beaudouin testified that the MCC does
not have the capacity to create a COVID-19 infirmary and that consequently, the BOP's own
guidance document for isolation practices is not being followed.  *See* Kala Decl. Ex. 1 (Beaudouin
Dep. Tr. 61:9-19).  When asked about the ability to implement this guideline, Dr. Beaudouin
responded "Yes-we do not have the resources to do it."  *Id.* at 63:13-17.

49.     MCC records and reports from inmates also make clear that the SHU was used to
house COVID-19 cases.   These housing units, which contain concrete beds, are grossly
inappropriate for the treatment of any ill inmates, and particularly those suffering from COVID-
19.  *See* Kala Decl. Exs. 14 and 15 (photographs of empty SHU cell).  The SHU is a unit that is
typically meant as a place to house inmates for disciplinary purposes.  Warden Licon-Vitale stated
in her deposition that "the conditions for the inmates in the SHU are not as favorable as conditions
in an ordinary cell."  Kala Decl. Ex. 7 (Licon-Vitale Dep. Tr. at 64:14-18).  Yet, the Warden was
aware of no steps taken to ameliorate the harsh conditions of the SHU for inmates placed there for
medical isolation.  *See id.* at 65:15-18.

50.     Reports from inmates confirm that treatment in isolation is medically inappropriate.
Mr. Vinicius Andrade was part of the group of men who became ill with COVID-19 symptoms in
late March, but unlike most of them, he was not kept in his housing area but transferred to the
hospital, where he was tested and found positive for COVID-19, and then returned to the SHU.
There, he was locked in a cell with a concrete bed and no sheets, pillow or blanket.  As he described

22

Case 8:19-cv-00061-JVS  Document 165  Filed 05/29/2005/20/20  Page 29 of 51  Page ID #:2643

it, "I lay on the concrete shaking. They had given me a big SHU jumpsuit to wear, so I took that
off and used it as a pillow, but then I was just in my t-shirt and underwear so I was cold. I was not
given any food until the next morning." Devlin-Brown Decl. Ex. 6 (Andrade Decl. ¶ 6). He
reported being in that cell for 15 days without clinical evaluations beyond temperature and blood
pressure checks: "No one ever checked my chest or lungs. I could not smell anything. My muscles
hurt. I got very depressed. The only water I had to drink was from the sink." *Id.* ¶ 8. Mr. Terrell
Brown reports that while he was isolated in the SHU, he and his cellmate were forced to rip up
towels and clothes in order to clean their cell. Mr. Brown also had to cover the SHU's solitary
phone with a sock since the inmates were not provided with anything to clean it between uses.
Devlin-Brown Decl. Ex. 11 (Brown Decl. ¶¶ 21, 23).

     51.     This lack of basic care flies in the face of elemental correctional health practices
and even the BOP's own pandemic influenza plan, which identifies a series of daily assessments
for patients identified as being ill.

     52.     The conditions of the SHU not only increased the likelihood that patients with
serious illness could worsen or die, it also created a strong disincentive for patients with COVID-
19 symptoms to report being ill. Mr. Andrade reported "[w]hen I got back, a lot of guys were sick.
No one wanted to report anything to medical because they did not want to go to the box and go
through what I did. They said they would rather die in their beds because at least other people
would be around them." Devlin-Brown Decl. Ex. 6 (Andrade Decl. ¶ 12). Others have also
expressed the same fear of being locked in the SHU for reporting signs of COVID-19. For
example, after coughing in front of a guard, Mr. Randolph Bourgoin was afraid that he would be
put in the SHU. *See* Devlin-Brown Decl. Ex. 9 (Bourgoin Decl. ¶ 4). Messrs. David Crosby and
James Woodson have each reported that inmates would hide their symptoms for the same reason.

*See* Devlin-Brown Decl. Ex. 12 (Crosby Decl. ¶ 12); Devlin-Brown Decl. Ex. 5 (Woodson Decl. ¶ 15).

53.     It also appears that by utilizing the solitary confinement area as medical isolation, the MCC may have allowed for transmission of COVID-19 from medical isolation patients to those in the SHU for segregation or punishment reasons. Mr. Antonio Smith was housed in the SHU from the end February 2020, and was aware that people with COVID-19 symptoms were being transferred into the unit. He reported that, "[a] few days after the sick inmates were transferred to the SHU, I began feeling sick. I felt very tired and found it difficult to move or even get out of bed. My eyes were swollen and tearing. My nose would not stop running. I had a cough that felt different from any cough I have had before. When I coughed instead of producing mucus, a clear sticky substance would come out. I lost my sense of taste and my appetite. I was sweating a lot. During my illness, I lost approximately 36 pounds." Devlin-Brown Decl. Ex. 29 (Smith Decl. ¶ 8). Despite being ill, and even having pneumonia identified on an x-ray, he was never tested for COVID-19, ever had anyone listen to his lungs, and was even given a cellmate in the SHU. *Id.* at ¶¶ 9-11. At one point Mr. Smith was allowed to work on a cleaning detail and leave the unit when a passing health staffer recognized that he was ill and then initiated a 5 day quarantine. *Id.* ¶ 14.

54.     Other inmates isolated on the 3rd floor of the MCC also reported inadequate medical care. Mr. Garcia, who was also placed into isolation, reported that "[t]he isolation area was on the 3rd floor of MCC. I was locked in a cell alone 24 hours a day. They would come around twice a day, 8am and 3:30pm, to take my temperature. There was no other testing or treatment. I never received a COVID test. The only medicine I received was a Ziploc bag with 12 Tylenols." Devlin-Brown Decl. Ex. 19 (Garcia Decl. ¶ 19). Mr. Richard Michel reported that, even in isolation, "[w]henever anyone was sick and tried to get the attention of staff to report their symptoms or ask

24

to see a doctor, it was often hard to get the attention of a CO. Many inmates who wanted to see a doctor were not taken to see a doctor." Devlin-Brown Decl. Ex. 25 (Michel Decl. ¶ 7).

55.     Finally, post-isolation care for recovering inmates appears practically non-existent. When inmates are removed from isolation they are often returned to open dormitories where they are unable to engage in social distancing. Kala Decl. Ex. 1 (Beaudouin Dep. Tr. at 203-04). What is more, they not provided with any follow-up medical care, nor are their symptoms closely tracked. *Id.* at 168:3-21. Mr. Beniquez's cellmate, for example, still showed symptoms after he was returned from isolation to his regular unit. *See* Devlin-Brown Decl. Ex. 8 (Beniquez Decl. ¶ 10).

**VI.     Assessment of the MCC's Mitigation Practices to Slow the Spread of COVID-19**

56.     As discussed in the preceding paragraphs, the spread of COVID-19 throughout the MCC has been driven by the MCC's failure to properly screen its inmates for symptoms of COVID-19, as well as its failures to appropriately quarantine, isolate, and test inmates. In addition to these issues, the MCC's lack of adequate sanitation and hygiene practices impacted the spread of COVID-19 within the facility.

57.     Based on my physical inspection of the MCC, it is my assessment that several current practices in MCC actually promote a more rapid spread of COVID-19 inside the facility and serve to work against some of the infection control measures already in place.

58.     The CDC has identified basic guidelines for infection control and overall COVID-19 response in detention settings, many of which the MCC appears to have ignored. For example, I would have expected—at minimum—that the MCC had sufficient levels of personal protective equipment ("PPE"), cleaning solution and equipment, an adequate quantity of tests available, that

common, high-touch surfaces such as phones and computers would be cleaned between uses, and that no-touch waste receptacles would be present in the facility common areas and housing areas.

59.     Detainees I spoke with reported a lack of access to basic soap and hand washing supplies.  Mr. Barnes, who is 73 with heart disease, reported, "[w]e do not have enough soap or cleaning products.  We receive a hygiene kit once a month.  It contains a small portion of soap that we each must use for our hands and bodies.  I personally have little or no money coming in for commissary, and I have been forced to borrow a bar of soap when my kit has run out and I have no money.  I have asked for more soap several times but have been told that it is unavailable because it is locked upstairs in the unit counselor's office.  I received the same response when I requested additional toilet paper."  Devlin-Brown Decl. Ex. 7 (Barnes Decl. ¶ 5).

60.     Detainees that I spoke with or whose declarations I reviewed indicated significant gaps in access to cleaning solutions, with some reporting that they receive insufficient cleaning solution for their cell area.  Mr. Dones reported that the "MCC does not give us cleaning materials for our cells.  The only cleaning implements available in my unit are a broom, dustpan, and dirty mop.  The mop is so dirty that it is worse than nothing."  Devlin-Brown Decl. Ex. 16 (Dones Decl. ¶ 7).  Mr. Michael Falu reported that "[n]o one, however, cleans or disinfects our cells, or provides us with the supplies to do so.  We ask for cleaning supplies all the time.  There are three phones and five e-mail terminals shared by everyone in the unit.  No cleaning supplies are provided to clean the phones or the e-mail terminals between use.  When I use the phone, I try to cover it with a sock or toilet paper."  Devlin-Brown Decl. Ex. 17 (Falu Decl. ¶¶ 10-11).  Mr. Tyler Toro reports that he also has not been given cleaning supplies to sanitize phones or computers, and that he cannot use his "two travel sized pieces of soap" for that purpose.  Devlin-Brown Decl. Ex. 32 (Toro Decl. ¶ 27).  Even when the MCC does supply cleaning materials, they often do so in such

Case 8:19-cr-00061-JVS  Document 200-3  Filed 07/16/20  Page 133 of 227  Page ID
Case 8:19-cr-00061-JVS  Document 165  Filed 05/28/20  Page 21 of 51  Page ID #:2647
#:3288

small volumes that they run out quickly. *See* Devlin-Brown Decl. Ex. 7 (Barnes Decl. ¶ 5). The facility also does not provide sufficient rags and clothes. Instead, inmates are forced to "rip their old towels up to make cloths," which are then used for every surface. Devlin-Brown Decl. Ex. 12 (Crosby Decl. ¶ 18).

      61.    The lack of basic infection control extended to failing to initiate any additional cleaning when a person was identified with COVID-19 and transferred to medical isolation or the hospital. The CDC has clear guidance on the extra measures to be taken in these situation, none of which appear to occur at the MCC. For example, when Mr. Andrade returned to his original housing area, he reports that "[t]he inmates in my tier gave me a plastic bag that they had put my blanket and sheet in so they did not spread the infection. But everything else was just the same, and the guys in my tier said no one had come to clean or given them any extra cleaning supplies." Devlin-Brown Decl. Ex. 6 (Andrade Decl. ¶ 11). Likewise, when I talked to Robert Russo, an inmate from 11 South, he reported that when he was returned from medical isolation, no one had sanitized his tier or even replaced his bedding.

      62.    The MCC also appears to have given little effort to implementing any social distancing. Nowhere is this more true than 11 South. Multiple inmates housed there report that the dorms provide "no possibility of social distancing." *See, e.g.,* Devlin-Brown Decl. Ex. 33 (Turner Decl. ¶ 21). Inmates sleep on bunk beds within an arm's reach of each other. Mr. Turner reports that this means he has five inmates sleeping within six feet of him. *Id.* ¶ 4. Inmates in the dorms share a single urinal, toilet, sink, and shower. *See* Devlin-Brown Decl. Ex. 7 (Barnes Decl. ¶ 4). The two tables each have four chairs attached to them, meaning that inmates cannot distance from each other while eating. *Id.* Meals and medication are also doled out from the gate, which

forces the inmates to gather together to collect their items. *See* Devlin-Brown Decl. Ex. 10 (Bradley Decl. ¶ 11).

63.     The use of masks by staff also appears to be poorly implemented. Mr. Andrade reported that "[o]fficers all have masks, but they often leave them around their neck, even when we are out in the unit." Devlin-Brown Decl. Ex. 6 (Andrade Decl. ¶ 13). Mr. Anthony Luna also confirms that "[n]ot all of the staff wear their masks at all times." *See* Devlin-Brown Decl. Ex. 22 (Luna Decl. ¶ 18). Mr. Rodney Griffin has observed a staff member "coughing without covering her mouth or wearing a face mask." Devlin-Brown Decl. Ex. 20 (Griffin Decl. ¶ 16). Tellingly, Warden Licon-Vitale also has acknowledged that she has observed staff around the facility not properly wearing their masks. *See* Kala Decl. Ex. 7 (Licon-Vitale Dep. Tr. at 78:13-21).

64.     The MCC appears to have dedicated considerable resources to preparation for the facility inspection instead of consistent infection control practices as outlined by the CDC. Many of the declarations I reviewed reported a hasty spate of cleaning and other efforts in the days before the inspection of May 13, with little sustained effort before or after. As Mr. Karimbux stated, "[b]efore the inspection by the doctor last week, the officers ordered the orderlies to scrub the unit, and they put up signs about COVID, and they made us all wear our masks. I also saw that a staff person came around and sanitized the unit with a backpack and a hose full of some kind of spray while the inspection was happening. That has never been done on our unit before or since." Devlin-Brown Decl. Ex. 21 (Karimbux Decl. ¶ 12). Mr. Sucich reported that "[t]oday when the inspector came, the CO came through and was spraying the bars of the dormitory with disinfectant. That had never happened before." Devlin-Brown Decl. Ex. 31 (Sucich Decl. ¶ 13).

65.     It also appears that the MCC posted additional signs in anticipation of the inspection. During my tour, Tiffany Days, an inmate in the Women's Unit, told me that posters

28

Case 8:19-cr-00061-JVS   Document 200-3   Filed 07/16/20   Page 135 of 227   Page ID
Case 8:19-cr-00061-JVS   Document 165   Filed 05/28/20   Page 29 of 51   Page ID #:2649
#:3290

had been put up informing the inmates that soap was available upon request. Ms. Days informed me that this was not true. Mr. Woodson also reported that, shortly before the inspection, signs were posted on his unit's "bubble" falsely claiming that "soap, toilet paper, cleaning suppliers [sic], and masks" were available there, which they weren't. Kala Decl. Ex. 9 (Woodson Dep. Tr. at 39:20-25). Similarly, Mr. Jorge Soto reported that "[l]ast week, inspectors visited the jail. The day before they came, the jail put up signs saying if we need anything to clean our cell, ask the officer. This was strange because we couldn't get any materials to clean our cells before." Devlin-Brown Decl. Ex. 30 (Soto Decl. ¶ 8).

## VII.  Assessment of the MCC's Efforts to Identify and Protect Detainees Particularly Vulnerable to the Effects of COVID-19 Due to High-Risk Factors

66.     Based on my physical inspection of the MCC, it is my assessment that current practices do not adequately identify and protect detainees who are particularly vulnerable to the effects of COVID-19 due to their high-risk underlying medical conditions. This is despite the fact that the facility is aware that many such high-risk detainees exist.

67.     According to the CDC, people who are "high-risk" include those who are older; people with diabetes, asthma, coronary artery disease, and hypertension; and people who are immunocompromised, severely obese (body mass index [BMI] of 40 or higher), have chronic kidney disease, and smokers.[11]

68.     Warden Licon-Vitale and Acting Warden Hazelwood each testified that patients with more serious health problems had been intentionally placed into 11 South. *See* Kala Decl. Ex. 7 (Licon-Vitale Dep. Tr. at 69:4-19); Kala Decl. Ex. 6 (Hazelwood Dep. Tr. at 57:7-11).

---

[11] *See People Who Are at Higher Risk for Severe Illness*, CDC, https://www.cdc.gov /coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last reviewed May 14, 2020).

Case 8:19-cr-00061-JVS   Document 200-3   Filed 07/16/20   Page 136 of 227   Page ID
Case 8:19-cv-00061-JVS-DUTY   Document 65-1   Filed 05/28/2005/20/20   Page 30 of 51   #:2650
#:3291

Associate Warden Edge likewise testified that, "we did try to group all of those quote/unquote high risk inmates together in one location [on 11 South] as opposed to throughout the institution," Kala Decl. Ex. 2 (Edge Dep. Tr. at 165:11-20), and Dr. Beaudouin stated that "most" of the people who were high-risk for serious illness or death from COVID-19 were on 11 South, Kala Decl. Ex. 1 (Beaudouin Dep. Tr. at 84:21-24). While cohorting medically vulnerable inmates may be an appropriate measure, the benefits of cohorting are poorly served by quarantining vulnerable persons in close quarters and ignoring basic infection control practices, particularly when inmates and staff that are not regularly tested for COVID-19 are introduced to the unit. The tiers on 11 South were medically inappropriate for such purposes.

69.     During my visit to the MCC, I encountered several patients with risk factors for serious illness or death from COVID-19, including Mr. Miller, Mr. Ruffin, Mr. Cooper, and Mr. Cotroneau, and it was apparent that they had not been identified to receive any additional protection or surveillance for COVID-19 symptoms.

70.     I also spoke with Mr. Nicolas Sucich, housed on 11 South, and reviewed his declaration and a transcript of his deposition. He has several chronic health problems that clearly identify him as high risk based on CDC criteria. He reported that he experienced COVID-19 symptoms within in his housing area: "I lost my taste and smell for several days and I was shivering and convulsing with fever." Devlin-Brown Decl. Ex. 31 (Sucich Decl. ¶ 10). He also reported that "[d]uring those three days that I was extremely sick no doctors came to check on me. I have had a lot of trouble breathing since then." *Id.*

71.     As discussed in Paragraph 17, 11 South is comprised of extremely cramped bunk areas, housing 26 men in a low ceiling, small space that includes one toilet per 26 man pod. This housing area had no PPE cart outside or near the unit entry and was infested with roaches during

30

our visit. No social distancing was possible inside the small bunk areas, where men reported being locked for extended periods of time. I observed phones being used in this unit without any cleaning occurring in between uses. These conditions likely increase the spread of COVID-19 among the high risk patients placed onto this unit.

72. There did not appear to be any regular screening of the high-risk patients held on this unit. Several detained people I spoke with on this unit, including Nicolas Sucich, David Crosby, and Lenin Guzman-Hidalgo, reported intermittent temperature checks, but no screenings that occurred every day and no screenings that included questions about the symptoms of COVID-19.

73. Despite being on a high-risk unit, detainees I spoke with on 11 South reported that their sick call requests submitted to medical were often ignored or took days to weeks for a response, even when reporting symptoms of COVID-19.

74. Detainees on 11 South reported that when they returned from Otisville (after being sent there when the MCC reduced its population over a security incident), several of them became ill with COVID-19 symptoms. Several reported that nurses checked their temperature, found them to have fevers, and left them on the unit. These men report that they had to stay in their small pod areas on 11 South for the duration of their acute COVID-19 illness, watching the other people around them become ill within days.

## VIII. Minimum Expectations of Correctional Best Practices

75. Given the severity of the COVID-19 outbreak, and the clear guidelines outlined by the CDC, I would have expected that MCC implemented the following simple procedures in order to slow the spread of COVID-19:

31

Case 8:19-cr-00061-JVS  Document 200-3  Filed 07/16/20  Page 138 of 227  Page ID
#:8298
Case 8:19-cv-00061-JVS Document 165 Filed 05/29/2005 Page 32 of 51 Page ID #:2652

    a. Screening of all inmates for COVID-19 signs and symptoms on a twice-daily basis if they are in isolation or quarantine and on a twice-weekly basis otherwise. Inmates should also be provided with a daily opportunity to report any symptoms of COVID-19, and records of those reports should be maintained;

    b. Evaluating all inmates who report symptoms of COVID-19 within 24 hours of the inmate's report;

    c. Administering COVID-19 testing of all inmates:

        i. with signs and/or symptoms of COVID-19, unless a clear alternative rationale is documented, even when individual temperatures are within normal limits;

        ii. who have been in close contact with an inmate who is positive for, or has symptoms of, COVID-19;

        iii. who are being newly admitted to the facility or are returning from outside the facility;

        iv. who possess risk factors for serious illness or death from COVID-19, as defined by the CDC; and

        v. who are to be released from quarantine;

    d. COVID-19 testing of staff who possess (i) risk factors for serious illness or death from COVID-19; (ii) any signs and/or symptoms of COVID-19; or (iii) who have been exposed to an individual with COVID-19 signs or symptoms;

    e. Tracing close contacts of staff and inmates who test positive for COVID-19 or have symptoms of COVID-19. Records of each contact tracing investigation should be recorded and preserved;

Case 8:19-cr-00061-JVS   Document 200-3   Filed 07/16/20   Page 139 of 227   Page ID
Case 8:19-cr-00061-JVS   Document 165   Filed 05/21/2005720/20   Page 39 of 51   #:2653
#:8294

f.  Adopting a standardized COVID-19 surveillance tool which includes COVID-19
symptoms and signs, including temperature checks, to be administered twice daily
by medical staff to all incarcerated persons in quarantine and isolation, and to be
administered twice weekly by medical staff to all other inmates;

g.  Isolating any inmate displaying COVID-19 symptoms in housing not typically used
for disciplinary purposes, even when temperature is within normal limits, not later
than 12 hours after a positive test or staff becoming aware of such symptoms;

h.  For all patients who are suspected or confirmed to have COVID-19, performing a
standardized clinical evaluation at least daily by nursing staff in a clinical setting
and not cell-side;

i.  Reviewing on a same-day basis every sick-call paper request and electronic
submission that will (i) trigger immediate (same day or next morning) assessment
for COVID-19 and (ii) provide data that creates a facility wide symptom tracking
dashboard that health care staff will use;

j.  Decreasing the number of people in 11 South by 50% of capacity and in any other
area where high-risk patients are housed to allow for social distancing of 6 feet or
more, including sleeping, meals, medication administration, and other activities;

k.  Immediately addressing the infestation of mice, rats and roaches in the MCC;

l.  Quarantining all close contacts of inmates and staff with COVID-19 in accordance
with CDC guidelines;

m. Ensuring all isolation units follow CDC guidelines for management of COVID-19
including the use of appropriate PPE, cleaning of common surfaces, and exclusion
of individuals not suspected to or confirmed to have COVID-19;

33

    n.  Requiring that all staff wear personal protective equipment, including masks, when interacting with any person or when touching surfaces in cells or common areas; this PPE must include N95 masks if it involves interaction with inmates in medical isolation and any quarantine or other settings when interacting with patients suspected of having COVID-19;

    o.  Providing sufficient disinfecting supplies, free of charge, so incarcerated people can clean high-touch areas or items (including, but not limited to, phones and computers) between each use;

    p.  Ensuring that each incarcerated person receives, free of charge, masks effective at preventing the transmission of COVID-19, adequate personal hygiene supplies for hand washing, disinfectant products effective against COVID-19 for daily cleanings, and access to daily showers and daily access to clean laundry;

    q.  Providing weekly COVID-19 information sessions for detainees and correctional staff by a member of the MCC health team that cover the status of the outbreak and efforts to mitigate the spread of COVID-19, with the opportunity for detainees and staff to ask questions.

76.    I recommend that MCC implements these practices as soon as possible.

77.    I may develop additional recommendations as I review any supplemental materials or testimony in this case.

78.    Based on the above considerations, it is evident that the MCC has failed to implement numerous best-practices derived from the CDC guidelines as well as outbreak best practices. Such practices would increase the health and safety of correctional staff, detainees and the general population.

34

Case 8:19-cr-00061-JVS   Document 165   Filed 05/28/20   Page 36 of 51   Page ID #:2655

79.     I am therefore concerned about the ongoing health and safety of the population at

the MCC, and the likelihood of the continued spread of COVID-19 therein.

80.     I declare under penalty of perjury that the foregoing is true and correct.

Executed:  May 26, 2020
           Port Washington, New York


_____

Dr. Homer S. Venters

Case 8:19-cr-00061-JVS   Document 200-3   Filed 07/16/20   Page 142 of 227   Page ID
Case 8:19-cr-00061-JVS   Document 165   Filed 05/28/2005   Page 3 of 51   #:2656
#:3297

# APPENDIX A

Case 8:19-cr-00061-JVS   Document 200-3   Filed 07/16/20   Page 143 of 227   Page ID
Case 8:19-cr-00061-JVS   Document 165   Filed 05/28/2005720/246   Page 37 of 51 D #:2657
#:3298

# Dr. Homer D. Venters

10 ½ Jefferson St., Port Washington, NY, 11050
hventers@gmail.com, Phone: 646-734-5994

---

**HEALTH ADMINISTRATOR**          **PHYSICIAN**          **EPIDEMIOLOGIST**

## *Professional Profile*

- International leader in provision and improvement of health services to patients with criminal justice involvement.
- Innovator in linking care of the incarcerated to Medicaid, health homes, DSRIPs.
- Successful implementer of nations' first electronic health record, performance dashboards and health information exchange among pre-trial patients.
- Award winning epidemiologist focused on the intersection of health, criminal justice and human rights in the United States and developing nations.
- Human rights leader with experience using forensic science, epidemiology and public health methods to prevent and document human rights abuses.

## *Professional Experience*

**Medical/Forensic Expert**, 3/2016-present
o Review COVID-19 policies and procedures in detention settings.
o Conduct analysis of health services and outcomes in detention settings.
o Conduct site inspections and evaluations in detention settings.
o Produce expert reports, testimony regarding detention settings.

**President**, Community Oriented Correctional Health Services (COCHS), 1/1/2020-4/30/20.
o Lead COCHS efforts to provide technical assistance, policy guidance and research regarding correctional health and justice reform.
o Oversee operations and programmatic development of COCHS
o Serve as primary liaison between COCHS board, funders, staff and partners.

**Senior Health and Justice Fellow**, Community Oriented Correctional Health Services (COCHS), 12/1/18-12/31/2018
o Lead COCHS efforts to expand Medicaid waivers for funding of care for detained persons relating to Substance Use and Hepatitis C.
o Develop and implement COCHS strategy for promoting non-profit models of diversion and correctional health care.

**Director of Programs,** Physicians for Human Rights, 3/16-11/18.
o Lead medical forensic documentation efforts of mass crimes against Rohingya and Yazidi people.
o Initiate vicarious trauma program.
o Expand forensic documentation of mass killings and war crimes.
o Develop and support sexual violence capacity development with physicians, nurses

Case 8:19-ase-00061-JVS-3315-FIRmenDot165-FerRst-05/21/2005/26/2e47 Page 3Page51D #:2658

and judges.
o  Expand documentation of attacks against health staff and facilities in Syria and
   Yemen.

**Chief Medical Officer/Assistant Vice President,** Correctional Health Services, NYC
        Health and Hospitals Corporation 8/15-3/17.
o  Transitioned entire clinical service (1,400 staff) from a for-profit staffing company
   model to a new division within NYC H + H.
o  Developed new models of mental health and substance abuse care that significantly
   lowered morbidity and other adverse events.
o  Connected patients to local health systems, DSRIP and health homes using
   approximately $5 million in external funding (grants available on request).
o  Reduced overall mortality in the nation's second largest jail system.
o  Increased operating budget from $140 million to $160 million.
o  Implemented nation's first patient experience, provider engagement and racial
   disparities programs for correctional health.

**Assistant Commissioner,** Correctional Health Services, New York Department of
        Health and Mental Hygiene, 6/11-8/15.
o  Implemented nation's first electronic medical record and health information exchange
   for 1,400 staff and 75,000 patients in a jail.
o  Developed bilateral agreements and programs with local health homes to identify
   incarcerated patients and coordinate care.
o  Increased operating budget of health service from $115 million to $140 million.
o  Established surveillance systems for injuries, sexual assault and mental health that
   drove new program development and received American Public Health Association
   Paper of the Year 2014.
o  Personally care for and reported on over 100 patients injured during violent
   encounters with jail security staff.

**Medical Director,** Correctional Health Services, New York Department of Health and
        Mental Hygiene, 1/10-6/11.
o  Directed all aspects of medical care for 75,000 patients annually in 12 jails, including
   specialty, dental, primary care and emergency response.
o  Direct all aspects of response to infectious outbreaks of H1N1, Legionella,
   Clostridium Difficile.
o  Developed new protocols to identify and report on injuries and sexual assault among
   patients.

**Deputy Medical Director,** Correctional Health Services, New York Department of
        Health and Mental Hygiene, 11/08-12/09.
o  Developed training program with Montefiore Social internal medicine residency
   program.
o  Directed and delivered health services in 2 jails.

Case 8:19-cr-00061-JVS   Document 200-3   Filed 07/16/20   Page 145 of 227   Page ID
Case 8:19-cr-00061-JVS-033  Document 65  Filed 05/28/2005/28/2005  Page 39 of 51  #:2659
#:3300

**Clinical Attending Physician,** Bellevue/NYU Clinic for Survivors of Torture, 10/07-12/11.

**Clinical Attending Physician,** Montefiore Medical Center Bronx NY, Adult Medicine, 1/08-11/09.

## *Education and Training*

**Fellow, Public Health Research,** New York University 2007-2009. MS 6/2009
Projects: Health care for detained immigrants, Health Status of African immigrants in NYC.
**Resident, Social Internal Medicine**, Montefiore Medical Center/Albert     Einstein University7/2004- 5/2007.
**M.D.,** University of Illinois, Urbana, 12/2003.
**M.S.** Biology, University of Illinois, Urbana, 6/03.
**B.A.** International Relations, Tufts University, Medford, MA, 1989**.**

## *Academic Appointments, Licensure*

Clinical Associate Professor, New York University College of Global Public Health, 5/18-present.

Clinical Instructor, New York University Langone School of Medicine, 2007-2018.

M.D.   New York (2007-present).

## *Media*

TV

i24 Crossroads re Suicide in U.S. Jails 8/13/19.

i24 Crossroads re re *Life and Death in Rikers Island* 6/13/19.

Amanpour & Company, NPR/PBS re *Life and Death in Rikers Island* 4/15/19.

CNN, Christiane Amanpour re Forensic documentation of mass crimes against Rohingya. 7/11/18.

i24 Crossroads with David Shuster re health crisis among refugees in Syria. 7/6/18.

Canadian Broadcasting Corporation TV with Sylvie Fournier (in French) re crowd control weapons. 5/10/18

3

i24 Crossroads with David Shuster re Cholera outbreak in Yemen.  2/15/18.

China TV re WHO guidelines on HIV medication access 9/22/17.

Radio/Podcast

Morning Edition, NPR re Health Risks of Criminal Justice System. 8/9/19.

Fresh Air with Terry Gross, NPR re *Life and Death in Rikers Island*, 3/6/19.

Morning Edition, NPR re *Life and Death in Rikers Island*, 2/22/19.

LeShow with Harry Sherer re forensic documentation of mass crimes in Myanmar, Syria, Iraq. 4/17/18.

Print articles and public testimony

Oped: Four ways to protect our jails and prisons from coronavirus. The Hill 2/29/20.

Oped: It's Time to Eliminate the Drunk Tank. The Hill 1/28/20.

Oped: With Kathy Morse. A Visit with my Incarcerated Mother. The Hill 9/24/19.

Oped: With Five Omar Muallim-Ak. The Truth about Suicide Behind Bars is Knowable. The Hill 8/13/19.

Oped: With Katherine McKenzie. Policymakers, provide adequate health care in prisons and detention centers. CNN Opinion, 7/18/19.

Oped: Getting serious about preventable deaths and injuries behind bars. *The Hill*, 7/5/19.

Testimony: Access to Medication Assisted Treatment in Prisons and Jails,  New York State Assembly Committee on Alcoholism and Drug Abuse, Assembly Committee on Health, and Assembly Committee on Correction**.** NY, NY, 11/14/18.

Oped: Attacks in Syria and Yemen are turning disease into a weapon of war, *STAT News*, 7/7/17.

Testimony: Connecticut Advisory Committee to the U.S. Commission on Civil Rights: Regarding the use of solitary confinement for prisoners. Hartford CT, 2/3/17.

Testimony: Venters HD, New York Advisory Committee to the U.S. Commission on Civil Rights: Regarding the use of solitary confinement for juveniles in New York. July 10, 2014. NY NY.

Testimony: New York State Assembly Committee on Correction with the Committee on

4

Case 8:19-cr-00061-JVS   Document 200-3   Filed 07/16/20   Page 147 of 227   Page ID
Case 8:19-cr-00061-JVS   Document 165-4   Filed 05/27/20   Page 41 of 61   Page ID #:2661
#:8302

Mental Health: Regarding Mental Illness in Correctional Settings. November 13, 2014.
Albany NY.

Testimony: New York State Assembly Committee on Correction with the Committee on
Mental Health: Regarding Mental Illness in Correctional Settings. November 13, 2014.
Albany NY.

Oped: Venters HD and Keller AS, The Health of Immigrant Detainees. Boston Globe,
April 11, 2009.

Testimony: U.S. House of Representatives, House Judiciary Committee's Subcommittee
on Immigration, Citizenship, Refugees, Border Security, and International Law: Hearing
on Problems with Immigration Detainee Medical Care, June 4, 2008.

## *Peer Reviewed Publications*

Parmar PK, Leigh J, **Venters H**, Nelson T. Violence and mortality in the Northern Rakhine State
of Myanmar, 2017: results of a quantitative survey of surviving community leaders in
Bangladesh. Lancet Planet Health. 2019 Mar;3(3):e144-e153.

**Venters H**. Notions from Kavanaugh hearings contradict medical facts. *Lancet.* 10/5/18.

Taylor GP, Castro I, Rebergen C, Rycroft M, Nuwayhid I, Rubenstein L, Tarakji A, Modirzadeh
N, **Venters H**, Jabbour S. Protecting health care in armed conflict: action towards accountability.
*Lancet.* 4/14/18.

Katyal M, Leibowitz R, **Venters H**. IGRA-Based Screening for Latent Tuberculosis Infection in
Persons Newly Incarcerated in New York City Jails. *J Correct Health Care.* 2018 4/18.

Harocopos A, Allen B, Glowa-Kollisch S, **Venters H**, Paone D, Macdonald R. The Rikers Island
Hot Spotters: Exploring the Needs of the Most Frequently Incarcerated.
*J Health Care Poor Underserved.* 4/28/17.

MacDonald R, Akiyama MJ, Kopolow A, Rosner Z, McGahee W, Joseph R, Jaffer M, **Venters
H**. Feasibility of Treating Hepatitis C in a Transient Jail Population.
*Open Forum Infect Dis.* 7/7/18.

Siegler A, Kaba F, MacDonald R, **Venters H**. Head Trauma in Jail and Implications for Chronic
Traumatic Encephalopathy. *J Health Care Poor and Underserved.* In Press (May 2017).

Ford E, Kim S, **Venters H**. Sexual abuse and injury during incarceration reveal the need for re-
entry trauma screening. *Lancet.* 4/8/18.

Alex B, Weiss DB, Kaba F, Rosner Z, Lee D, Lim S, **Venters H,** MacDonald R. Death After Jail
Release. *J Correct Health Care.* 1/17.

5

Akiyama MJ, Kaba F, Rosner Z, Alper H, Kopolow A, Litwin AH, **Venters H**, MacDonald R. Correlates of Hepatitis C Virus Infection in the Targeted Testing Program of the New York City Jail System. *Public Health Rep.* 1/17.

Kalra R, Kollisch SG, MacDonald R, Dickey N, Rosner Z, **Venters H**. Staff Satisfaction, Ethical Concerns, and Burnout in the New York City Jail Health System. *J Correct Health Care.* 2016 Oct;22(4):383-392.

**Venters H.** A Three-Dimensional Action Plan to Raise the Quality of Care of US Correctional Health and Promote Alternatives to Incarceration. *Am J Public Health.* April 2016.104.

Glowa-Kollisch S, Kaba F, Waters A, Leung YJ, Ford E, **Venters H**. From Punishment to Treatment: The "Clinical Alternative to Punitive Segregation" (CAPS) Program in New York City Jails. *Int J Env Res Public Health.* 2016. 13(2),182.

Jaffer M, Ayad J, Tungol JG, MacDonald R, Dickey N, Venters H. Improving Transgender Healthcare in the New York City Correctional System. *LGBT Health.* 2016 1/8/16.

Granski M, Keller A, Venters H. Death Rates among Detained Immigrants in the United States. *Int J Env Res Public Health.* 2015. 11/10/15.

Michelle Martelle, Benjamin Farber, Richard Stazesky, Nathaniel Dickey, Amanda Parsons, **Homer Venters**. Meaningful Use of an Electronic Health Record in the NYC Jail System. *Am J Public Health.* 2015. 8/12/15.

Fatos Kaba, Angela Solimo, Jasmine Graves, Sarah Glowa-Kollisch, Allison Vise, Ross MacDonald, Anthony Waters, Zachary Rosner, Nathaniel Dickey, Sonia Angell, **Homer Venters**. Disparities in Mental Health Referral and Diagnosis in the NYC Jail Mental Health Service. *Am J Public Health.* 2015. 8/12/15.

Ross MacDonald, Fatos Kaba, Zachary Rosner, Alison Vise, Michelle Skerker, David Weiss, Michelle Brittner, Nathaniel Dickey, **Homer Venters**. The Rikers Island Hot Spotters. *Am J Public Health.* 2015. 9/17/15.

Selling Molly Skerker, Nathaniel Dickey, Dana Schonberg, Ross MacDonald, **Homer Venters**. Improving Antenatal Care for Incarcerated Women: fulfilling the promise of the Sustainable Development Goals. *Bulletin of the World Health Organization.*2015.

Jasmine Graves, Jessica Steele, Fatos Kaba, Cassandra Ramdath, Zachary Rosner, Ross MacDonald, Nathanial Dickey, **Homer Venters** Traumatic Brain Injury and Structural Violence among Adolescent males in the NYC Jail System *J Health Care Poor Underserved.* 2015;26(2):345-57.

Glowa-Kollisch S, Graves J, Dickey N, MacDonald R, Rosner Z, Waters A, **Venters H**. Data-Driven Human Rights: Using Dual Loyalty Trainings to Promote the Care of Vulnerable Patients in Jail. *Health and Human Rights.* Online ahead of print, 3/12/15.

Teixeira PA[1], Jordan AO, Zaller N, Shah D, **Venters H**. Health Outcomes for HIV-Infected Persons Released From the New York City Jail System With a Transitional Care-Coordination

6

Case 8:19-cr-00061-JVS   Document 200-3   Filed 07/16/20   Page 149 of 227   Page ID
Case 8:19-cr-00061-JVS 33 Document 165 04-05/29/2005/26/62 Page 49 of 51 #:2663
#:2664

Plan. 2014. *Am J Public Health*. 2014 Dec 18.

Selling D, Lee D, Solimo A, **Venters H.** A Road Not Taken: Substance Abuse Programming in the New York City Jail System. *J Correct Health Care*. 2014 Nov 17.

Glowa-Kollisch S, Lim S, Summers C, Cohen L, Selling D, **Venters H**. Beyond the Bridge: Evaluating a Novel Mental Health Program in the New York City Jail System. *Am J Public Health*. 2014 Sep 11.

Glowa-Kollisch S, Andrade K, Stazesky R, Teixeira P, Kaba F, MacDonald R, Rosner Z, Selling D, Parsons A, **Venters H**. Data-Driven Human Rights: Using the Electronic Health Record to Promote Human Rights in Jail. *Health and Human Rights*. 2014. Vol 16 (1): 157-165.

MacDonald R, Rosner Z, **Venters H**. Case series of exercise-induced rhabdomyolysis in the New York City Jail System. *Am J Emerg Med*. 2014. Vol 32(5): 446-7.

Bechelli M, Caudy M, Gardner T, Huber A, Mancuso D, Samuels P, Shah T, **Venters H.** Case Studies from Three States: Breaking Down Silos Between Health Care and Criminal Justice. *Health Affairs*. 2014. Vol. 3. 33(3):474-81.

Selling D, Solimo A, Lee D, Horne K, Panove E, **Venters H**. Surveillance of suicidal and non-suicidal self-injury in the new York city jail system. *J Correct Health Care*. 2014. Apr:20(2).

Kaba F, Diamond P, Haque A, MacDonald R, **Venters H**. Traumatic Brain Injury Among Newly Admitted Adolescents in the New York City Jail System. *J Adolesc Health*. 2014. Vol 54(5): 615-7.

Monga P, Keller A, **Venters H**. Prevention and Punishment: Barriers to accessing health services for undocumented immigrants in the United States. *LAWS*. 2014. 3(1).

Kaba F, Lewsi A, Glowa-Kollisch S, Hadler J, Lee D, Alper H, Selling D, MacDonald R, Solimo A, Parsons A, **Venters H**. Solitary Confinement and Risk of Self-Harm Among Jail Inmates. *Amer J Public Health*. 2014. Vol 104(3):442-7.

MacDonald R, Parsons A, **Venters H.** The Triple Aims of Correctional Health:    Patient    safety, Population Health and Human Rights. *Journal of Health Care for the Poor and Underserved*. 2013. 24(3).

Parvez FM, Katyal M, Alper H, Leibowitz R, **Venters H.** Female sex workers incarcerated in New York City jails: prevalence of sexually transmitted infections and associated risk behaviors. *Sexually Transmitted Infections*. 89:280-284. 2013.

Brittain J, Axelrod G, **Venters H.** Deaths in New York City Jails: 2001 – 2009. *Am J Public Health*. 2013 103:4.

Jordan AO, Cohen LR, Harriman G, Teixeira PA, Cruzado-Quinones J, **Venters H.** Transitional Care Coordination in New York City Jails: Facilitating Linkages to Care for People with HIV Returning Home from Rikers Island. *AIDS Behav. Nov.* 2012.

7

Case 8:19-cr-00061-JVS  Document 200-3  Filed 07/16/20  Page 150 of 227  Page ID
Case 8:19-cr-00061-JVS  Document 165-5  Filed 05/29/2005720/2653  Page 44 of 51  Page ID #:2664
#:2664

Jaffer M, Kimura C, **Venters H.** Improving medical care for patients with HIV in New York City jails. *J Correct Health Care*. 2012 Jul;18(3):246-50.

Ludwig A, Parsons, A, Cohen, L, **Venters H.** Injury Surveillance in the NYC Jail System, *Am J Public Health* 2012 Jun;102(6).

**Venters** H, Keller, AS. *Psychiatric Services.* (2012) Diversion of Mentally Ill Patients from Court-ordered care to Immigration Detention. Epub. 4/2012.

**Venters** H, Gany, F. *Journal of Immigrant and Minority Health* (2011) Mental Health Concerns Among African Immigrants. 13(4): 795-7.

**Venters** H, Foote M, Keller AS. *Journal of Immigrant and Minority Health.* (2010) Medical Advocacy on Behalf of Detained Immigrants. 13(3): 625-8.

**Venters** H, McNeely J, Keller AS. *Health and Human Rights.* (2010) HIV Screening and Care for Immigration Detainees. 11(2) 91-102.

**Venters** H, Keller AS. *Journal of Health Care for the Poor and Underserved.* (2009) The Immigration Detention Health Plan: An Acute Care Model for a Chronic Care Population. 20:951-957.

**Venters** H, Gany, F. *Journal of Immigrant and Minority Health* (2009) African Immigrant Health. 4/4/09.

**Venters** H, Dasch-Goldberg D, Rasmussen A, Keller AS, *Human Rights Quarterly* (2009) Into the Abyss: Mortality and Morbidity among Detained Immigrant. 31 (2) 474-491.

**Venters** H, *The Lancet* (2008) Who is Jack Bauer? 372 (9653).

**Venters** H, Lainer-Vos J, Razvi A, Crawford J, Shaf'on Venable P, Drucker EM, *Am J Public Health* (2008) Bringing Health Care Advocacy to a Public Defender's Office. 98 (11).

**Venters** H, Razvi AM, Tobia MS, Drucker E. *Harm Reduct J.* (2006) The case of Scott Ortiz: a clash between criminal justice and public health. Harm Reduct J. 3:21

Cloez-Tayarani I, Petit-Bertron AF, **Venters HD**, Cavaillon JM (2003) *Internat. Immunol.* Differential effect of serotonin on cytokine production in lipopolysaccharide-stimulated human peripheral blood mononuclear cells.15,1-8.

Strle K, Zhou JH, Broussard SR, **Venters HD**, Johnson RW, Freund GG, Dantzer R, Kelley KW, (2002) *J. Neuroimmunol.* IL-10 promotes survival of microglia without activating Akt. 122, 9-19.

**Venters HD**, Broussard SR, Zhou JH, Bluthe RM, Freund GG, Johnson RW, Dantzer R, Kelley KW, (2001) *J. Neuroimmunol.* Tumor necrosis factor(alpha) and insulin-like growth factor-I in the brain: is the whole greater than the sum of its parts? 119, 151-65.

**Venters HD**, Dantzer R, Kelley KW, (2000) *Ann. N. Y. Acad. Sci.* Tumor necrosis factor-alpha

induces neuronal death by silencing survival signals generated by the type I insulin-like growth factor receptor. 917, 210-20.

**Venters HD,** Dantzer R, Kelley KW, (2000) *Trends. Neurosci.* A new concept in neurodegeneration: TNFalpha is a silencer of survival signals. 23, 175-80.

**Venters HD,** Tang Q, Liu Q, VanHoy RW, Dantzer R, Kelley KW, (1999) *Proc. Natl. Acad. Sci. USA.* A new mechanism of neurodegeneration: A proinflammatory cytokine inhibits receptor signaling by a survival peptide, 96, 9879-9884.

**Venters HD,** Ala TA, Frey WH 2nd , (1998) Inhibition of antagonist binding to human brain muscarinic receptor by vanadium compounds. *Recept. Signal. Transduct.* 7, 137-142.

**Venters HD,** Tang Q, Liu Q, VanHoy RW, Dantzer R, Kelley KW, (1999) *Proc. Natl. Acad. Sci. USA.* A new mechanism of neurodegeneration: A proinflammatory cytokine inhibits receptor signaling by a survival peptide, 96, 9879-9884.

**Venters HD,** Ala TA, Frey WH 2nd , (1998) Inhibition of antagonist binding to human brain muscarinic receptor by vanadium compounds. *Recept. Signal. Transduct.* 7, 137-142**.**

**Venters HD**, Bonilla LE, Jensen T, Garner HP, Bordayo EZ, Najarian MM, Ala TA, Mason RP, Frey WH 2nd, (1997) Heme from Alzheimer's brain inhibits muscarinic receptor binding via thiyl radical generation. *Brain. Res.* 764, 93-100.

Kjome JR, Swenson KA, Johnson MN, Bordayo EZ, Anderson LE, Klevan LC, Fraticelli AI, Aldrich SL, Fawcett JR, **Venters HD**, Ala TA, Frey WH 2nd (1997) Inhibition of antagonist and agonist binding to the human brain muscarinic receptor by arachidonic acid. *J. Mol. Neurosci.* 10, 209-217.

## *Honors and Presentations (past 10 years)*

**Keynote Address**, Academic Correctional Health Conference, April 2020, Chapel Hill, North Carolina.

**TedMed Presentation**, Correctional Health, Boston MA, March 2020.

**Finalist, Prose Award for Literature**, Social Sciences category for *Life and Death in Rikers Island*, February, 2020.

**Keynote Address,** John Howard Association Annual Benefit, November 2019, Chicago IL.

**Keynote Address,** Kentucky Data Forum, Foundation for a Healthy Kentucky, November 2019, Cincinnati Ohio.

**Oral Presentation,** Dual loyalty and other human rights concerns for physicians in jails an prisons. Association of Correctional Physicians, Annual meeting. 10/16, Las Vegas.

**Oral Presentation,** Clinical Alternatives to Punitive Segregation: Reducing self-harm for

9

Case 8:19-cr-00061-JVS Document 200-3 Filed 07/16/20 Page 152 of 227 Page ID
Case 8:19-cv-00261-JVS-DFM Document 65-8 Filed 05/28/20 Page 49 of 51 #:2666
#:8807

incarcerated patients with mental illness. American Public Health Association Annual Meeting,
November 2015, Chicago IL.

**Oral Presentation,** Analysis of Deaths in ICE Custody over 10 Years . American Public Health
Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Medication Assisted Therapies for Opioid Dependence in the New York City
Jail System. American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Pathologizing Normal Human Behavior: Violence and Solitary Confinement
in an Urban Jail. American Public Health Association Annual Meeting, November 2014, New
Orleans, LA.

**Training,** International Committee of the Red Cross and Red Crescent, Medical Director meeting
10/15, Presentation on Human Rights and dual loyalty in correctional health.

**Paper of the Year,** American Public Health Association. 2014. (Kaba F, Lewis A, Glowa-
Kollisch S, Hadler J, Lee D, Alper H, Selling D, MacDonald R, Solimo A, Parsons A, Venters H.
Solitary Confinement and Risk of Self-Harm Among Jail Inmates. *Amer J Public Health*. 2014.
Vol 104(3):442-7.)

**Oral Presentation,** Pathologizing Normal Human Behavior: Violence and Solitary Confinement
in an Urban Jail. *American Public Health Association* Annual Meeting, New Orleans LA, 2014.

**Oral Presentation,** Human rights at Rikers: Dual loyalty among jail health staff. American
Public Health Association Annual Meeting, New Orleans LA, 2014.

**Poster Presentation**, Mental Health Training for Immigration Judges. American Public Health
Association Annual Meeting, New Orleans LA, 2014.

**Distinguished Service Award;** Managerial Excellence. Division of Health Care Access and
Improvement, NYC DOHMH. 2013.

**Oral Presentation,** Solitary confinement in the ICE detention system. American Public Health
Association Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Self-harm and solitary confinement in the NYC jail system. American Public
Health Association Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Implementing a human rights practice of medicine inside New York City
jails. American Public Health Association Annual Meeting, Boston MA, 2013.

**Poster Presentation,** Human Rights on Rikers: integrating a human rights-based framework for
healthcare into NYC's jail system. *American Public Health Association* Annual Meeting, Boston
MA, 2013.

**Poster Presentation**, Improving correctional health care: health information exchange and the
affordable care act. *American Public Health Association* Annual Meeting, Boston MA, 2013.

10

**Oral Presentation**, Management of Infectious Disease Outbreaks in a Large Jail System. American Public Health Association Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Diversion of Patients from Court Ordered Mental Health Treatment to Immigration Detention. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation**, Initiation of Antiretroviral Therapy for Newly Diagnosed HIV Patients in the NYC Jail System. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Medical Case Management in Jail Mental Health Units. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation**, Injury Surveillance in New York City Jails. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Ensuring Adequate Medical Care for Detained Immigrants. Venters H, Keller A, American Public Health Association Annual Meeting, Denver, CO, 2010.

**Oral Presentation,** HIV Testing in NYC Correctional Facilities. Venters H and Jaffer M, *American Public Health Association,* Annual Meeting, Denver, CO, 2010.

**Oral Presentation,** Medical Concerns for Detained Immigrants. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Oral Presentation,** Growth of Immigration Detention Around the Globe. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Oral Presentation,** Role of Hospital Ethics Boards in the Care of Immigration Detainees. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Oral Presentation,** Health Law and Immigration Detainees. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Bro Bono Advocacy Award,** Advocacy on behalf of detained immigrants. Legal Aid Society of New York, October 2009.

**Oral Presentation,** Deaths of immigrants detained by Immigration and Customs Enforcement. Venters H, Rasmussen A, Keller A, *American Public Health Association* Annual Meeting, San Diego CA, October 2008.

**Poster Presentation,** Death of a detained immigrant with AIDS after withholding of prophylactic Dapsone. Venters H, Rasmussen A, Keller A, *Society of General Internal Medicine* Annual Meeting, Pittsburgh PA, April 2008.

**Poster Presentation,** Tuberculosis screening among immigrants in New York City reveals higher rates of positive tuberculosis tests and less health insurance among African immigrants. *Society of General Internal Medicine* Annual Meeting, Pittsburgh PA, April 2008.

11

Case 8:19-cr-00061-JVS  Document 200-3  Filed 07/16/20  Page 154 of 227  Page ID
Case 8:19-cr-00061-JVS  Document 165-8  Filed 05/23/2005  Page 49 of 51 #:2668
#:2668

**Daniel Leicht Award for Achievement in Social Medicine,** Montefiore Medical Center,
Department of Family and Social Medicine, 2007.

**Poster Presentation**, Case Findings of Recent Arestees. Venters H, Deluca J, Drucker E. *Society
of General Internal Medicine* Annual Meeting, Toronto Canada, April 2007.

**Poster Presentation,** Bringing Primary Care to Legal Aid in the Bronx. Venters H, Deluca J,
Drucker E. *Society of General Internal Medicine* Annual Meeting, Los Angeles CA, April 2006.

**Poster Presentation**, A Missed Opportunity, Diagnosing Multiple Myeloma in the Elderly
Hospital Patient. Venters H, Green E., *Society of General Internal Medicine* Annual Meeting,
New Orleans LA, April 2005.

## *Grants: Program*

San Diego County: Review of jail best practices (COCHS), 1/2020, $90,000.

Ryan White Part A - Prison Release Services (PRS). From HHS/HRSA to Correctional Health Services
(NYC DOHMH), 3/1/16-2/28/17 (Renewed since 2007). Annual budget $ 2.7 million.

Ryan White Part A - Early Intervention Services- Priority Population Testing. From HHS/HRSA to
Correctional Health Services (NYC DOHMH), 3/1/16-2/28/18 (Renewed since 2013). Annual budget
$250,000.

Comprehensive HIV Prevention. From HHS to Correctional Health Services (NYC DOHMH), 1/1/16-
12/31/16. Annual budget $500,000.

HIV/AIDS Initiative for Minority Men. From HHS Office of Minority Health to Correctional Health
Services (NYC DOHMH), 9/30/14-8/31/17. Annual budget $375,000.

SPNS Workforce Initiative, From HRSA SPNS to Correctional Health Services (NYC DOHMH), 8/1/14-
7/31/18. Annual budget $280,000.

SPNS Culturally Appropriate Interventions. From HRSA SPNS to Correctional Health Services (NYC
DOHMH), 9/1/13-8/31/18. Annual budget $290,000.

Residential substance abuse treatment. From New York State Division of Criminal Justice Services to
Correctional Health Services (NYC DOHMH), 1/1/11-12/31/17. Annual budget $175,000.

Community Action for Pre-Natal Care (CAPC). From NY State Department of Health AIDS Institute to
Correctional Health Services (NYC DOHMH), 1/1/05-12/31/10. Annual budget $290,000.

Point of Service Testing. From MAC/AIDS, Elton John and Robin Hood Foundations to Correctional
Health Services (NYC DOHMH), 11/1/09-10/31/12. Annual budget $100,000.

Mental Health Collaboration Grant. From USDOJ to Correctional Health Services (NYC DOHMH), 1/1/11-9/30/13. Annual budget $250,000.

## *Teaching*

**Instructor,** Health in Prisons Course, Bloomberg School of Public Health, Johns Hopkins University, June 2015, June 2014, April 2019.

**Instructor**, Albert Einstein College of Medicine/Montefiore Social Medicine Program Yearly lectures on Data-driven human rights, 2007-present.

## *Other Health & Human Rights Activities*

**DIGNITY Danish Institute Against Torture**, Symposium with Egyptian correctional health staff regarding dual loyalty and data-driven human rights. Cairo Egypt, September 20-23, 2014.

**Doctors of the World,** Physician evaluating survivors of torture, writing affidavits for asylum hearings, with testimony as needed, 7/05-11/18.

**United States Peace Corps**, Guinea Worm Educator, Togo West Africa, June 1990- December 1991.

> -*Primary Project;* Draconculiasis Eradication. Activities included assessing levels of infection in 8 rural villages and giving prevention presentations to mothers in Ewe and French
> -*Secondary Project;* Malaria Prevention.

## *Books*

**Venters H.** *Life and Death in Rikers Island.* Johns Hopkins University Press. 2/19.

## *Chapters in Books*

**Venters H.** Mythbusting Solitary Confinement in Jail. In Solitary Confinement Effects, Practices, and Pathways toward Reform. Oxford University Press, 2020.

MacDonald R. and **Venters H.** Correctional Health and Decarceration. In Decarceration. Ernest Drucker, New Press, 2017.

## *Membership in Professional Organizations*

**American Public Health Association**

13

*Foreign Language Proficiency*

**French**      Proficient
**Ewe**        Conversant

## Prior Testimony and Deposition

Benjamin v. Horn, No. 1:75-cv-03073 (S.D.N.Y.), as expert for defendants, 2015

Rodgers v. Texas, No. 2:16-cv-00216 (N.D. Tx.), as expert for plaintiffs, 10/19/17

Fikes v. Abernathy, No. 17:16-cv-00843 (N.D. Ala.), as expert for plaintiffs, 10/30/17.

Fernandez v. City of New York, No. 1:17-cv-02431 (S.D.N.Y.), as defendant in role as city employee, 4/10/18.

Charleston v. Corizon Health, Inc., No. 2:17-cv-03039 (E.D. Pa.), as expert for plaintiffs, 4/20/18.

Atencio v. Bd. of Cty. Comm'rs. of Santa Fe Cty., No. 1:17-cv-00617 (D.N.M.), as expert for plaintiffs, 7/23/18.

Hammonds v. Dekalb County, Ala., No. 4:16-cv-01558 (N.D. Ala.), as expert for plaintiffs, 11/30/2018.

Mathiason v. Rio Arriba County NM, No. D-117-CV-2007-00054, as expert for plaintiff, 2/7/19.

Hutchinson v. Bates, No. 2:17-cv-00185 (M.D. Ala.), as expert for plaintiff, 3/27/19.

Lewis v. Gautreaux, No. 3:16-cv-00352 (M.D. La.), as expert for plaintiff, 6/24/19.

Belcher v. Lopinto, No. 2:18-cv-07368 (E.D. La.), as expert for plaintiffs, 12/5/2019.

Imperati v. Semple, No. 3:18-cv-01847 (D. Conn.), as expert for plaintiffs, 3/11/20.

USA v. Pratt, No. 2:19-cr-00213 (W.D. Pa.) (Video Hearing 4/28/20).

USA v. Nelson, No. 1:19-cr-00021 (W.D. Pa.) (Video Hearing 5/4/20).

Chunn v. Edge, No. 1:20-cv-01590 (E.D.N.Y.) (Video Hearing 5/12/20, Video Deposition 4/30/20).

Case 8:19-cv-00061-JVS   Document 165   Filed 05/29/2009   Page 51 of 61   Page ID #:2671

## Fee Schedule

Case review, reports, testimony $500/hour.
Site visits and other travel, $2,500 per day (not including travel costs).

15

Case 8:19-cr-00061-JVS   Document 200-3   Filed 07/16/20   Page 158 of 227   Page ID
Case 8:19-cr-00061-JVS   Document 167-3  Filed 05/29/20   Page 1 of 5   Page ID #:2674
#:3313

1   H. Dean Steward, SBN 85317
    107 Avenida Miramar, Ste. C
2   San Clemente, CA 92672
    Tel (949) 481-4900
3   Fax (949) 497-6753

4   Attorney for Defendant
    MICHAEL JOHN AVENATTI
5

6

7                    **UNITED STATES DISTRICT COURT**

8          **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

9   UNITED STATES OF AMERICA,            SA CR No. 19-061-JVS

10         Plaintiff,                    DEFENDANT'S SECOND SUPPLEMENT
                                         TO STATUS REPORT
11         v.
                                         Hearing Date:    June 1, 2020
12  MICHAEL JOHN AVENATTI,               Hearing Time:    9:00 a.m.
                                         Location:        Telephonic - Courtroom
13         Defendant.                                     of the Hon. James V.
                                                          Selna
14

15

16

17          In advance of the status conference set in this matter for June 1, 2020 and in brief

18  response to each of the issues addressed by the Court in its Order Re Status Conference

19  [Docket No. 165], defendant MICHAEL JOHN AVENATTI ("Mr. Avenatti"), by and

20  through his counsel of record, H. Dean Steward, hereby files this Second Supplement to

21  Status Report.

22          1.      A trial in the midst of the pandemic.  The defense appreciates the

23  Court's response to the defense's legitimate concerns relating to proceeding to trial

24  during the current pandemic (as outlined in the Status Report (Docket No. 164)).  In the

25  view of the defense, it is simply not plausible to hold a trial in this matter that adequately

26  protects Mr. Avenatti's rights and the health of the parties, witnesses, Court staff, and the

27  public until 2021.  There are simply far too many unknowns relating to the COVID-19

28  crisis at this juncture to set this complicated, lengthy case for trial, especially as it relates

**EXHIBIT** 8
Mannweiler For I.D.
DATE:6|17 RPTR:M6
BEN HYATT
888.272.0022

**EXHIBIT 8**

to health risk. *Indeed, within the last 24 hours, a study was released that found of*
*COVID-19 patients with diabetes, 10 percent die within seven days of hospital*
*admission, and one in five requires intubation and the use of a ventilator.* As the Court
knows, undersigned counsel is at a heightened risk for contracting the virus due to his
age and the fact that he has diabetes.[1] Accordingly, the defense submits that the proper
course of action is to vacate the trial date and hold a further trial setting conference on
August 31. Mr. Avenatti is prepared to waive time under the Speedy Trial Act as
required.

2. The May production of over 600,000 pages. As discussed on pages 4-5 and 14
of its Status Report, including in footnotes 5 and 6 (Docket No. 164), this production is
also very troubling to the defense, as is the government's unwillingness to commit to a
date certain for the production of all remaining discovery. If counsel was able to do
nothing other than review 2,500 pages of the 664,000 pages a day (more than 300 pages
an hour), it would take 265 days or nearly 9 months (working 8 hours a day) to complete
only the review of this production. This estimate does not take into account the review
of the approximate 1,000,000 pages produced in March, which must be cross-referenced
against the 664,000 page production. Nor does it include the time required to still review
other discovery produced in the case, prepare motions, represent other clients, etc.

3. The Court's suggestion regarding a computer for Mr. Avenatti for discovery
review. The defense believes the Court's suggestion is a good one and asks that the
government work with the defense to accomplish this as quickly as possible. The
defense also requests that a solution be devised relating to Mr. Avenatti and counsel's
ability to review the documents and emails presently located at the IRS's offices in Los
Angeles (*see* Docket No. 164, pp. 2-3).

---

[1] This is one reason why undersigned counsel is not meeting with clients who are
incarcerated, namely that he does not want to risk contracting the virus.

Case 8:19-cr-00061-JVS   Document 200-3   Filed 07/16/20   Page 160 of 227   Page ID
Case 8:19-cr-00061-JVS   Document 164   Filed 05/29/20   Page 3 of 5   Page ID #:2676
#:3345

4. <u>Alleged failure to deploy assets</u>.  The defense will timely brief this issue if requested but maintains that it is not necessary.  Mr. Avenatti has *not* failed to adequately deploy assets nor has any such alleged failure led to a delay in trial or lack of effective preparation for trial.  As discussed in footnote 7 in the Status Report (Docket No. 164), the government's prior claim of Mr. Avenatti "having 7 lawyers in the Nike trial" is simply not accurate.  Moreover, as a result of the choices and inefficient strategy deployed by the government in its effort to prosecute Mr. Avenatti, the defendant was indicted on two coasts by way of three separate indictments, including one in which the alleged net loss amount is less than $150,000 (the case relating to Stormy Daniels).  As a result, Mr. Avenatti has been forced to expend exponentially more money mounting a defense for three separate matters.  At the same time, Mr. Avenatti has been required to retain and pay counsel in connection with a divorce proceeding; numerous civil matters in which he is a defendant; a bankruptcy/receivership of his law firm; and various collection proceedings.  All of this is in addition to paying various of his obligations, including monies paid toward child support, living expenses, and other debts for which he was contractually obligated.  Further, other assets and monies of Mr. Avenatti have been seized by the government and creditors since his indictment in this matter, including by a creditor undoubtedly assisted along the way by the prosecutors in this case (Mr. Jason Frank), thus interfering with his ability to retain and pay counsel.

5. <u>Effective assistance of counsel</u>.  Undersigned counsel remains concerned that in light of COVID-19, his age and health may continue to interfere with the ability of Mr. Avenatti to obtain the constitutionally-required level of effective counsel in this matter.  Counsel suggests that this issue be revisited with the Court in thirty (30) days, after counsel has been able to further assess the situation relating to COVID-19 and confer with Mr. Avenatti, and after Mr. Avenatti is able to determine whether he can add additional counsel to his defense.

Case 8:19-cr-00061-JVS   Document 200-3   Filed 07/16/20   Page 161 of 227   Page ID
Case 8:19-cr-00061-JVS   Document 167   Filed 05/29/20   Page 4 of 5   Page ID #:2677
#:3316

1      6.  The trial date.  The defense obviously agrees with the Court.  As set forth

2 above, the defense requests that the current trial date be vacated and a trial setting

3 conference be scheduled for August 31.  In the alternative, the defense requests a

4 tentative trial date no earlier than February 2021 in light of (a) the pandemic and

5 resulting trial-related issues (*see* Docket No. 164, pp. 15-33) and (b) the issues relating to

6 discovery (*see* Docket No. 164, pp. 1-14).

7

8

9

10 Dated: May 29, 2020               Respectfully submitted,

11

12                              /s/ H. Dean Steward

13                              H. DEAN STEWARD

14                              Attorney for Defendant
                                MICHAEL JOHN AVENATTI

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

Case 8:19-cr-00061-JVS   Document 200-3   Filed 07/16/20   Page 162 of 227   Page ID
Case 8:19-cr-00061-JVS   Document 167-3   Filed 05/29/20   Page 5 of 5   Page ID #:2678
#:3817

1

**CERTIFICATE OF SERVICE**

2

3

I, H. Dean Steward, am a citizen of the United States, and am at least 18 years of

4

age. My business address is 107 Avenida Miramar, Ste. C, San Clemente, CA 92672.  I

5

am not a party to the above-entitled action.  I have caused, on May 29, 2020, service of

6

the defendant's:

7

8

**SECOND SUPPLEMENT TO STATUS REPORT**

9

10

on the following party, using the Court's ECF system:

11

12

AUSA BRETT SAGEL AND AUSA JULIAN ANDRE

13

I declare under penalty of perjury that the foregoing is true and correct.

14

Executed on May 29, 2020

15

16                                          /s/ H. Dean Steward

17                                          H. Dean Steward

18

19

20

21

22

23

24

25

26

27

28

1  H. Dean Steward, SBN 85317
   107 Avenida Miramar, Ste. C
2  San Clemente, CA 92672
   Tel (949) 481-4900
3  Fax (949) 497-6753

4  Attorney for Defendant
   MICHAEL JOHN AVENATTI
5

6
                    UNITED STATES DISTRICT COURT
7
           FOR THE CENTRAL DISTRICT OF CALIFORNIA
8

9  UNITED STATES OF AMERICA,          SA CR No. 19-061-JVS

10           Plaintiff,               DEFENDANT'S STATUS REPORT

11              v.                    Hearing Date:    June 8, 2020
                                      Hearing Time:    9:00 a.m.
12 MICHAEL JOHN AVENATTI,             Location:        Telephonic - Courtroom
                                                       of the Hon. James V.
13           Defendant.                                Selna

14

15
           In advance of the status conference set in this matter for June 8, 2020, defendant
16
   MICHAEL JOHN AVENATTI ("Mr. Avenatti") by and through his counsel of record,
17
   H. Dean Steward, hereby files this Status Report.
18

19
   Dated: June 5, 2020                   Respectfully submitted,
20

21                                       /s/ H. Dean Steward

22                                       H. DEAN STEWARD

23                                       Attorney for Defendant
                                         MICHAEL JOHN AVENATTI
24

25

26                                                        
                                                          EXHIBIT 10
27

28

Case 8:19-cr-00061-JVS   Document 200-3   Filed 07/16/20   Page 164 of 227   Page ID
Case 8:19-cr-00061-JVS   Document 172-3 Filed 06/05/20   Page 2 of 5   Page ID #:2719
#:3319

## TABLE OF CONTENTS

I.      STATUS OF DISCOVERY ........................................................................1

     A. Mr. Avenatti's Computer Access ..........................................................1

     B. Access to the IRS Terminal ..................................................................1

     C. The Government's Additional Discovery.............................................2

II.     AVAILABILITY OF ADDITIONAL COUNSEL....................................2

CERTIFICATE OF SERVICE..................................................................................3

Case 8:19-cr-00061-JVS   Document 200-3   Filed 07/16/20   Page 165 of 227   Page ID
Case 8:19-cr-00061-JVS   Document 177-3   Filed 06/05/20   Page 3 of 5   Page ID #:2720
#:3320

I.      **STATUS OF DISCOVERY**

      A.      **Mr. Avenatti's Computer Access**

As a result of this Court's directives issued on June 1, 2020, the defense has

obtained a pre-owned HP laptop computer for Mr. Avenatti to use so that he may

properly review the discovery in this case.  Mr. Avenatti is expected to receive the laptop

and the discovery in electronic form by defense counsel this weekend or on Monday at

the latest.  Internet access has been disabled by way of a computer program (Net

Disabler) per the defense's agreement with the prosecution.

      B.      **Access to the IRS Terminal**

Since the last Status Conference on June 1, 2020, defense counsel has contacted

Mr. Patrick Fitzgerald of the Privilege Review Team to coordinate access to the IRS

terminal.  As the Court suggested, it is anticipated that counsel will provide search terms

via email to Mr. Fitzgerald to be run against the database as needed in the coming

months, with the resulting documents being produced to the defense as with prior

requests. *The defense expects to be able to significantly limit its requests to targeted*

*documents or specific issues/date ranges after first substantially completing its review of*

*the 87,226 documents produced by the Privilege Review Team on March 13, 2020 and*

*then subsequently provided to the prosecution, although it is presently unclear as to*

*when this will be completed.*[1]  The defense is prioritizing this review over the *additional*

---

[1] A widely accepted rule of thumb is that it takes approximately one hour to review 35-50
documents.

1    39,062 documents that were also produced by the Privilege Review Team to the defense

2    on March 13, 2020 but subsequently withheld from the prosecution.

3

4         **C.    The Government's Additional Discovery**

5         In its recent Response to Status Report (Docket No. 168), the government stated

6    that it has an additional 9,700 documents (with untold number of pages) to produce to

7    the defense.  These documents appear to have been in the possession of the government

8

9    for approximately one year and yet still have not been produced.  The defense has

10   requested that these documents, together with any other unproduced discovery, be

11   provided to the defense as soon as possible.

12

13   **II.    AVAILABILITY OF ADDITIONAL COUNSEL**

14        As previously noted, Mr. Avenatti continues to attempt to make arrangements for

15   additional counsel to assist in the defense of this case with the hope that such counsel

16   can assist in the review of the discovery and preparation for trial.  This process has been

17

18   significantly hindered by the position previously taken by the government in connection

19   with Mr. Avenatti's bail revocation, namely that every dollar he expends on anything

20   other than paying his estranged wife Lisa Storie or the creditor Jason Frank, is an effort

21

22   somehow aimed at hindering their efforts at collection and thus amounts to criminal

23   conduct.  As this Court can appreciate, and as the court in the Nike case specifically

24   recognized, this position by the government creates a significant impediment to Mr.

25

26   Avenatti's ability to retain counsel, fund a defense, pay costs and experts, and properly

27   prepare for trial.  *Mr. Avenatti is further hampered by the fact that for months now, he*

28

2

Case 8:19-cr-00061-JVS   Document 200-3   Filed 07/16/20   Page 167 of 227   Page ID
Case 8:19-cr-00061-JVS   Document 172-3   Filed 06/05/20   Page 5 of 5   Page ID #:2722
#:3322

1    *has had far less than $5,000 in liquid assets*.  Despite these obstacles, Mr. Avenatti

2    continues to work diligently to attempt to obtain additional counsel for this case.

3

4

5    Dated: June 5, 2020                    Respectfully submitted,

6

7                                           /s/ H. Dean Steward

8                                           H. DEAN STEWARD

9                                           Attorney for Defendant
                                            MICHAEL JOHN AVENATTI

10

11                        **CERTIFICATE OF SERVICE**

12        I, H. Dean Steward, am a citizen of the United States, and am at least 18 years of

13

14   age. My business address is 107 Avenida Miramar, Ste. C, San Clemente, CA 92672.  I

15   am not a party to the above-entitled action.  I have caused, on June 5, 2020, service of

16   the defendant's:

17

18                          **STATUS REPORT**

19

20   on the following party, using the Court's ECF system:

21

22   AUSA BRETT SAGEL AND AUSA JULIAN ANDRE

23   I declare under penalty of perjury that the foregoing is true and correct.

24   Executed on June 5, 2020

25

26                                          /s/ H. Dean Steward

27                                          H. Dean Steward

28

                                  3

H. Dean Steward, SBN 85317
107 Avenida Miramar, Ste. C
San Clemente, CA 92672
Tel (949) 481-4900
Fax (949) 497-6753

Attorney for Defendant
MICHAEL JOHN AVENATTI

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | SA CR No. 19-061-JVS |
| Plaintiff, | DEFENDANT'S MEMORANDUM RE ALLOCATION OF ASSETS AND THE IMPACT ON DEFENDANT'S RIGHTS AND THE TRIAL DATE |
| v. | |
| MICHAEL JOHN AVENATTI, | |
| Defendant. | |

Pursuant to the Court's Order on June 1, 2020 (Docket No. 169), defendant

MICHAEL JOHN AVENATTI ("Mr. Avenatti") by and through his counsel of record,

H. Dean Steward, hereby files this Memorandum regarding Mr. Avenatti's allocation of

assets and its alleged impact on Mr. Avenatti's rights, his defense in this case, and the

trial date.

Dated: June 5, 2020                    Respectfully submitted,

                                        /s/ H. Dean Steward
                                        H. DEAN STEWARD
                                        Attorney for Defendant
                                        MICHAEL JOHN AVENATTI

**EXHIBIT** 12

Mannheimer For I.D.
DATE: 6/17 RPTR: MD
BEN **HYATT**
888.272.0022

**EXHIBIT 12**

Case 8:19-cr-00061-JVS   Document 200-3   Filed 07/16/20   Page 169 of 227   Page ID
Case 8:19-cr-00061-JVS   Document 174   Filed 06/05/20   Page 2 of 16   Page ID #:2729
#:3324

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................ii

I.   INTRODUCTION ...................................................................................1

II.  ARGUMENT.............................................................................................

     A. The Trial Date Has Not Been Materially Impacted by the
        Defense's Approach To This Case .......................................................3

     B. The Government's Late Production of Discovery and
        Strategic Choices Are to Blame for This Matter Not
        Proceeding to Trial Earlier...................................................................4

     C. The Government is Estopped From Arguing Mr. Avenatti
        Had Sufficient Assets to Fund His Defense in This Case
        But Chose Not To ..................................................................................9

     D. The Government's Claims Regarding Mr. Avenatti's
        Alleged Asset Allocation Are Not Supported
        By Competent Evidence ......................................................................10

     E. The Government's Violation of Mr. Avenatti's Rights
        While in Custody is Far More Material to Mr. Avenatti's
        Inability to Prepare a Defense and Proceed to Trial............................11

III. CONCLUSION.......................................................................................12

CERTIFICATE OF SERVICE...............................................................................13

Case 8:19-cr-00061-JVS  Document 200-3  Filed 07/16/20  Page 170 of 227  Page ID
Case 8:19-cr-00061-JVS  Document 174  Filed 06/05/20  Page 3 of 16  Page ID #:2730
#:3325

## TABLE OF AUTHORITIES

**CASES:**                                                                                    **Page**

*Olivo v. Lafler,*
2007 WL 1747154 (E.D. Mich. 2007) ................................................................. 11

*Quintero v. Carpenter,*
2014 WL 7139987 (M.D. Tenn. 2014) ................................................................ 11

*Roller v. McKellar,*
711 F. Supp. 272 (D.S.C. 1989) .......................................................................... 11

## OTHER AUTHORITIES:

U.S. Const. Amend. VI ......................................................................................... 11

## I.    INTRODUCTION

On June 1, 2020, this Court directed that counsel brief the issue of Mr. Avenatti's

asset allocation and its impact on Mr. Avenatti's rights, defense in this matter and the

trial date.  For each of the following reasons, the impact of Mr. Avenatti's post-

indictment financial decisions on this case has been negligible at best.

*First*, because of the COVID-19 pandemic, nothing Mr. Avenatti has done or not

done as it relates to his allocation of financial resources has had any material impact on

the trial date.

*Second*, any prejudice to Mr. Avenatti and his counsel's ability to prepare an

adequate defense, prepare for trial and promptly proceed to trial is not "self inflicted" but

rather results directly from (a) the government's strategic and purposeful decision to

simultaneously bring charges against Mr. Avenatti on two coasts in three separate cases,

including one indictment that claims an alleged net loss amount of less than $150,000;[1]

(b) the government's choice to dump huge amounts of discovery on the defense less than

two months before trial, including the production of approximately 1,700,000 pages over

the last 84 days (since March 13, 2020);[2] (c) the government's choice to arrest Mr.

Avenatti in January 2020 and subsequently deny him adequate access to his counsel and

---

[1] The decision by the Department of Justice and the USAO in New York to pursue a separate indictment involving this relatively small loss amount, which is far below the loss threshold amount generally necessary for federal charges, is highly unusual.

[2] As disclosed on page 4, footnote 5 of defendant's Status Report (Docket No. 164), the government claims approximately 664,000 pages are duplicative of pages produced on March 13. However, this is of little consequence, because even accepting the government's position as true, this still amounts to approximately 87,226 documents that require review well prior to trial.

Case 8:19-cr-00061-JVS  Document 200-3  Filed 07/16/20  Page 172 of 227  Page ID
Case 8:19-cr-00061-JVS  Document 174-3   06/05/20  Page 5 of 16  Page ID #:2732
#:3327

the discovery in this case by way of placing him in solitary confinement and/or locked-down status for over 80 days; and (d) the COVID-19 pandemic.  Indeed, even if *some* amount of responsibility could be placed on Mr. Avenatti (it cannot), this amount pales in comparison to the responsibility that lies at the feet of the government.

*Third*, as a result of the government's representations repeatedly made to the Court, and argued to the jury, in the recent Nike case[3] relating to Mr. Avenatti's alleged "enormous indebtedness;" negligible assets; and lack of income, the government is estopped from now arguing the exact opposite in this case, namely that Mr. Avenatti had at all relevant times considerable wealth, assets and income to devote to his defense but simply chose not to.  Indeed, in their successful effort to gain a conviction against Mr. Avenatti in the Nike matter, the government made, over Mr. Avenatti's repeated objections, the alleged poor financial condition and vast indebtedness of Mr. Avenatti a *centerpiece of their case, arguing that Mr. Avenatti had no assets and was desperate, with no other potential income likely or available.*[4]  Accordingly, the government cannot now reverse course and argue to this Court that in reality, Mr. Avenatti had considerable assets, income and wealth.

*Finally*, there is insufficient competent evidence that (a) Mr. Avenatti has had sufficient assets to devote to his defense in this case and yet purposely did not do so; (b) Mr. Avenatti's choice to fund other legal matters in which he was a defendant (i.e. two

---

[3] Case No. 1:19-CR-00373-PGG, Southern District of New York.

[4] It is anticipated that the government will attempt to use the same line of argument in this matter when it proceeds to trial.

other criminal proceedings, a divorce case, other civil litigation in which he is a defendant, a State Bar proceeding, and collection matters in which he is a debtor) and also fund certain living expenses was somehow improper; (c) Mr. Avenatti's asset allocation decisions have had any impact on his defense in this matter, the ability for Mr. Avenatti's counsel to adequately prepare for trial, or the trial date; and (d) any other asset allocation by Mr. Avenatti would have resulted in a material difference in the defense's trial preparation or an earlier trial date.  Further, under existing law, it cannot reasonably be argued later in this case that any "underfunding" of his counsel establishes constitutionally ineffective assistance of counsel.

For each of these reasons, as well as the additional reasons detailed below, any claim that Mr. Avenatti's choices relating to allocation of assets has had any significant or material impact on his rights, defense in this case, or the trial date is without merit.

## II.   ARGUMENT

### A.   The Trial Date Has Not Been Materially Impacted by the Defense's Approach To This Case

On August 26, 2019, this Court set the first real trial date in this complex case[5] as *May 19, 2020* (Docket No. 64).[6]  This date was subsequently continued at the request of the defense to *August 18, 2020* (Docket No. 126 – March 26, 2020) and then to

---

[5] The government designated this 36-count case as "complex" on April 10, 2019.  (*See* Docket No. 18).

[6] Even though various trial dates had been set by the Court prior to this date, it was understood among the parties and the Court that such dates were mere placeholders.  This is why the Court specifically ordered the parties to appear at the August 26, 2019 Status Conference prepared to discuss a real trial date.  (See Docket No. 54).

3

*December 8, 2020* (Docket No. 169 – June 1, 2020).  In reality, however, the impact of the defense's requests on the ultimate trial date has been negligible in light of the COVID-19 pandemic and its dramatic consequences, including governmental restrictions on mobility (i.e. stay at home orders) and the unavailability of jury trials in the Central District.  Indeed, on March 17, 2020, Chief Judge Virginia A. Phillips ordered the suspension of all jury trials effective immediately due to COVID-19.  This suspension was subsequently extended and, as of the date of this filing, jury trials remain suspended indefinitely.[7]  Accordingly, even if the defense had not requested that the original May 19, 2020 trial date be continued for various reasons, it would have been literally impossible for this case to proceed to trial on May 19, 2020 as originally scheduled.  In other words, the parties would most likely be looking at a trial date not much different than the current date of December 8, 2020.  As a result, nothing that Mr. Avenatti has allegedly done or not done by way of allocating resources in this case can be said to have had any material impact on the trial date.

**B.    The Government's Late Production of Discovery and Strategic Choices Are to Blame for This Matter Not Proceeding to Trial Earlier**

On March 13, 2020, *approximately 36 days before the then scheduled May 19, 2020 trial date*, the government's Privilege Review Team first produced 126,288 documents to the defense, which consisted of approximately 1,000,000 pages of discovery.  On May 8, 2020, the prosecution produced 87,226 documents totaling

---

[7] In his Status Report (Docket No. 164, pp. 15-33), Mr. Avenatti raised a numerous legitimate issues relating to proceeding to trial during the pandemic.

4

664,275 pages and noted that these documents were a subset of the documents produced by the privilege review team less than 2 months earlier. (*See* Response to Status Report, Docket No. 168, Exhibit 1). Critically, all of this discovery was in the possession of the government for close to one year before it was produced to the defense. And yet the discovery was inexplicably dumped on the defense very late in the process, at the same time (a) Mr. Avenatti was in solitary confinement and/or under locked-down status at the Metropolitan Correctional Center in New York, unable to meaningfully communicate with his lawyers and review discovery, and (b) the COVID-19 pandemic swept the country and substantially interfered with the defense's ability to prepare for trial.[8]

To compound matters, the government has recently admitted that they still have remaining discovery to produce to the defense totaling at least 9,700 documents (with untold number of pages). (*See* Docket No. 168). As with the prior discovery, these documents appear to have been in the possession and control of the government since the Spring of 2019 and yet still have not been produced to the defense.[9] Of course, all of the documents produced by the government in the last 90 days are in addition to the prior discovery (including vast amounts of electronic data) previously produced to the defense, which the defense continues to review.

---

[8] At the June 1 Status Conference, the Court acknowledged that the COVID-19 pandemic had impacted the defense's ability to prepare for trial in this matter.

[9] Seeing as the trial date was previously May 19, 2020, it is unclear as to why this information was not produced to the defense long ago.

Case 8:19-cr-00061-JVS   Document 200-3   Filed 07/16/20   Page 176 of 227   Page ID
Case 8:19-cr-00061-JVS   Document 174-3 Filed 06/05/20   Page 9 of 16   Page ID #:2736
#:3381

1   The recently produced discovery obviously requires review by the defense well

2   prior to trial and this review alone will take well over 2,000 hours (conservatively) to

3

4   complete.[10] *Even though the government may wish to quibble with this claim and*

5   *attempt to offer excuses as to why this is not true,[11] it is beyond dispute.*

6       To be clear, nothing Mr. Avenatti has done or not done as it relates to his

7

8   allocation of alleged resources[12] has had any effect on the government's failure to timely

9   produce discovery in this case and, in particular, failure to produce approximately

10  100,000 documents until recently.  Regardless of how much money Mr. Avenatti could

11  allocate toward this case, the defense could not review what they did not have nor can

12

13  they now review what they still do not have.

14      Moreover, after initially charging Mr. Avenatti with limited crimes by way of a

15  criminal complaint, the government then made the strategic choice to indict Mr. Avenatti

16

17  by way of a 36-count indictment involving a myriad of unrelated conduct, including

18

19      [10] Generally, a widely accepted rule of thumb is that it takes approximately one hour to review
20  35-50 documents.  Using the midpoint of 42.5 documents per hour, reviewing 96,926 documents (the
    9,700 documents the defense has yet to receive as disclosed by the government in its recent status
21  report *plus* the 87,226 documents the government claims are a subset of the 126,288 documents) *will
    take 2,280 hours or 285 eight-hour days.*  This assumes the defense spends no time reviewing the
22  additional 39,062 documents comprising the balance of the March 13, 2020 privilege production.  If
    these documents are also reviewed, it will require *an additional 919 hours or 114 eight-hour days. The
23  cost associated with this review alone is enormous.*

24      [11] For instance, any claim that the recent discovery produced to the defense "really is not that
    important or material to the case" is without merit.  If the information is important enough to have been
25  produced by the government pursuant to its obligations, then it is obviously important enough to be
26  reviewed by the defense prior to trial.

27      [12] For the last five months, Mr. Avenatti has had less than $5,000 in liquid assets.  If the
    government disputes this fact, the defense respectfully requests that they come forward with actual
28  evidence in support of their position.

6

bank fraud charges stemming from a loan that had been fully repaid years earlier with no loss to the financial institution. They made this decision with full knowledge that the USAO for the Southern District of New York was already pursuing two other cases against Mr. Avenatti, each of which could result in a significant prison sentence. As a result of their charging decision, this case became significantly more complex (*see* Docket No. 18) and thus burdensome on the defense. Indeed, there are natural consequences that flow from the government's strategic decisions and Mr. Avenatti's allocation of assets had no bearing on the government's decision to make this case more complex and complicated, thus requiring significantly more discovery to review and more time to prepare for trial.

In addition, the strategic decision by the Department of Justice to simultaneously charge Mr. Avenatti in three separate cases on two coasts[13] had the obvious and foreseeable effects of (a) making it significantly more difficult and more expensive for Mr. Avenatti to mount a defense;[14] (b) delaying the resolution and trials in two of the three matters; and (c) Mr. Avenatti having fewer assets and financial resources to allocate to the cases that were scheduled for trial after the first case (Nike). In fact, had the government wished to proceed in an efficient manner designed to resolve all of the charges against Mr. Avenatti as quickly as possible and/or get to trial, they could have

---

[13] Case No. 1:19-CR-00373-PGG (SDNY) (the "Nike" case); Case No. 1:19-CR-00374-JMF (SDNY) (the "Stormy Daniels" case); and this case.

[14] Regardless of one's financial position, defending against three separate federal indictments simultaneously is a herculean task.

Case 8:19-cr-00061-JVS  Document 200-3  Filed 07/16/20  Page 178 of 227  Page ID
Case 8:19-cr-00061-JVS  Document 174  Filed 06/05/20  Page 11 of 16  Page ID #:2738
#:8333

1  brought one surgical indictment in one venue.  Instead, they chose to bring three separate

2  cases in two districts, including one with an alleged net loss amount of less than

3

4  $150,000.

5      Separate and apart from the increased burden and legal costs placed on Mr.

6  Avenatti as a result of the government's decision, the government's decision also had the

7

8  foreseeable consequence that Mr. Avenatti would devote significant assets resources to

9  the first case to go to trial and that those resources would then not be available to be

10  deployed toward his defense in the second and third cases.  Not surprisingly, this is

11

12  exactly what transpired - Mr. Avenatti was first required to allocate significant assets and

13  resources toward his defense in the Nike case because it was the first case to proceed to

14  trial and, as the Hon. Paul G. Gardephe noted, involves charges as serious as those in this

15

16  matter.  Further, no legitimate claim can be made that Mr. Avenatti's decisions to expend

17  monies on his defense in the Nike case were somehow unreasonable or that he funded a

18  "lavish" defense in that case and that those monies should have instead been allocated

19

20  towards his defense in this matter (the *third* case scheduled for trial).[15]

21

22      [15] In an effort to paint an inaccurate picture of Mr. Avenatti's asset allocation decisions, the

23  government has previously gone to great lengths to repeatedly claim before this Court that Mr. Avenatti
was represented at the Nike trial by "SEVEN (7) attorneys."  However, what the government has failed

24  to tell the Court, despite having full knowledge of all of Mr. Avenatti's finances, bank accounts, and
payments to his lawyers during the last three years, including in 2019 and 2020, is that: (a) only TWO

25  (2) of those lawyers were being paid by Mr. Avenatti, with the payments occurring entirely in the
Spring of 2019; (b) the "seven" lawyers included a pro bono jury consultant and other lawyers in

26  support, who played no role at trial after jury selection; and (c) *unlike here*, Mr. Avenatti had the good
fortune of having lawyers, firms and consultants volunteer their services in the Nike case due to (i) the

27  case being venued in New York, (ii) the high-profile nature of the case and the fact that it involved

28  some of the biggest names in college basketball, and (iii) the belief by many in the legal community
*(footnote cont'd on next page)*

8

Case 8:19-cr-00061-JVS   Document 200-3   Filed 07/16/20   Page 179 of 227   Page ID
#:3334
Case 8:19-cr-00061-JVS   Document 174   Filed 06/05/20   Page 12 of 16   Page ID #:2739

**C.    The Government is Estopped From Arguing Mr. Avenatti Had
Sufficient Assets to Fund His Defense in This Case But Chose Not To**

In the recent Nike trial, the government repeatedly referenced Mr. Avenatti's

alleged poor financial condition, lack of assets and income, and deep indebtedness in the

Spring of 2019 as evidence that Mr. Avenatti committed extortion and honest services

fraud against Nike and his client.  They offered this evidence and argument before the

jury over the repeated objection of the defense, including a motion in limine.  In fact, this

evidence and argument served as one of the centerpieces of the prosecution, with the

prosecution calling Mr. Avenatti's former Office Manager, Judy Regnier, to establish

Mr. Avenatti's alleged desperate financial condition and lack of assets in the Spring of

2019.[16]  Indeed, the record in the Nike case is replete with references to the

government's claims in that case before the judge and jury that Mr. Avenatti was deeply

in debt, had negligible assets and no way of paying any expenses in the Spring of 2019.

*See*, *e.g.*, Exhibit GX S-4 (government's trial exhibit showing outstanding civil

judgments against Mr. Avenatti that exceeded $11 million) and Nike Docket No. 108

(Case No. 1:19-CR-00373-PGG:  Government's opposition to Mr. Avenatti's motion in

limine regarding his financial condition).[17]  Having prevailed - over the repeated

objections of Mr. Avenatti both before and during trial in the Nike case - and after

that Mr. Avenatti had been singled out for prosecution in the Nike case over what was in reality a hard
charging settlement negotiation, no different than what occurs hundreds of times by plaintiffs' lawyers
every day across the country.

[16] AUSAs Brett Sagel and Julian Andre travelled to New York and were present when Ms.
Regnier testified on behalf of the government in the Nike trial.

[17] If this claim is disputed, the defense is prepared to provide specific references to the trial
transcript to assist the Court if necessary.

9

having successfully claimed that Mr. Avenatti had no tangible assets, the government is estopped from now arguing the exact opposite in this case, namely that Mr. Avenatti had considerable wealth, assets and income to devote to his defense in this case but chose not to.

### D. The Government's Claims Regarding Mr. Avenatti's Alleged Asset Allocation Are Not Supported By Competent Evidence

Any claim by the government that Mr. Avenatti wasted assets and financial resources, or dissipated monies that could have otherwise been allocated towards his defense in this case is without merit. *Further, even if Mr. Avenatti expended monies that should have been spent towards his defense in this case (he did not), the government has failed to show any causal connection between that failure and the scheduling and discovery issues in this case. Nor can they in light of the record (as detailed above).*

To be clear, there is insufficient evidence that (a) Mr. Avenatti has had sufficient assets to devote to his defense in this case and yet purposely has not done so; (b) Mr. Avenatti's choice to fund other legal matters in which he is a defendant (i.e. two other criminal proceedings, a divorce case, other civil litigation in which he is a defendant, a State Bar proceeding, and collection matters in which he is a debtor) and also fund certain living expenses is somehow improper; (c) Mr. Avenatti's asset allocation decisions have had any material impact on his defense in this matter, the ability for Mr. Avenatti's counsel to adequately prepare for trial, or the trial date; and (d) any different asset allocation by Mr. Avenatti would have resulted in a *material* difference in the defense's trial preparation or an earlier trial date.

Case 8:19-cr-00061-JVS   Document 200-3   Filed 07/16/20   Page 181 of 227   Page ID
Case 8:19-cr-00061-JVS   Document 174 Filed 06/05/20   Page 14 of 16   Page ID #:2741
#:8336

Nor could it reasonably be argued later in this case that any "underfunding" of his

counsel establishes constitutionally ineffective assistance of counsel. *See, e.g., Roller v.*

*McKellar*, 711 F. Supp. 272 (D.S.C. 1989) (finding that a generalized complaint that trial

counsel was underfunded will not sustain a charge of ineffectiveness unless it can be

shown that it caused counsel's performance to fall below some objective standard of

reasonableness and actually prejudiced his chances at trial); *Olivo v. Lafler*, 2007 WL

1747154, at *8 (E.D. Mich. 2007); *Quintero v. Carpenter*, 2014 WL 7139987 (M.D.

Tenn. 2014).

**E.**     **The Government's Violation of Mr. Avenatti's Rights While in Custody is Far More Material to Mr. Avenatti's Inability to Prepare a Defense and Proceed to Trial**

In its prior Status Report (Docket No. 164, pp. 6-13),[18] the defense provided a

detailed factual recitation of the government's mistreatment of Mr. Avenatti from

January 14, 2020 through April 24, 2020, including specific instances of the

government's violation of Mr. Avenatti's fundamental constitutional rights, including

those afforded by the Sixth Amendment.  Among other things, the government

repeatedly subjected Mr. Avenatti to treatment and conditions that violated his right to

counsel, his right to review the discovery in this case and prepare for trial, and generally

and substantially interfered with his ability to defend himself against the charges in this

case.  They did so by way of a multitude of actions, including but not limited to placing

---

[18] In the interest of brevity, the defense incorporates by reference the factual recitation on pages 6-13 of the Status Report (together with the exhibits from the Status Report and Supplemental Status Report (Docket No. 165)) rather than repeat it herein verbatim.

Case 8:19-cr-00061-JVS   Document 200-3   Filed 07/16/20   Page 182 of 227   Page ID
Case 8:19-cr-00061-JVS   Document 174   Filed 06/05/20   Page 15 of 16   Page ID #:2742
#:8337

1   Mr. Avenatti in solitary confinement under brutal conditions that have been routinely

2   described as tougher than Guantanamo Bay.

3

4        The government's conduct as detailed in the Status Report is far more material to

5   Mr. Avenatti's ability to prepare a defense and proceed to trial than any perceived or

6   alleged lack of allocation of assets or resources.  As a result, the government should not

7

8   now be heard to complain that Mr. Avenatti is to blame and that any prejudice he

9   suffered is "self-inflicted."

10  **III.   CONCLUSION**

11       For each of the above-detailed reasons, any claim that Mr. Avenatti's choices

12

13  relating to allocation of assets has had any significant impact on his rights, defense in

14  this case, or the trial date is without merit and should be summarily rejected.

15

16

17  Dated: June 5, 2020                      Respectfully submitted,

18                                           /s/ H. Dean Steward

19                                           H. DEAN STEWARD

20                                           Attorney for Defendant
21                                           MICHAEL JOHN AVENATTI

22

23

24

25

26

27

28

                                    12

## CERTIFICATE OF SERVICE

I, H. Dean Steward, am a citizen of the United States, and am at least 18 years of age. My business address is 107 Avenida Miramar, Ste. C, San Clemente, CA 92672. I am not a party to the above-entitled action. I have caused, on June 5, 2020, service of the defendant's:

## MEMORANDUM RE ALLOCATION OF ASSETS AND

## THE IMPACT ON DEFENDANT'S RIGHTS AND THE TRIAL DATE

on the following party, using the Court's ECF system:

AUSA BRETT SAGEL AND AUSA JULIAN ANDRE

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 5, 2020

/s/ H. Dean Steward

H. Dean Steward

13

Case 8:19-cr-00061-JVS   Document 200-3   Filed 07/16/20   Page 184 of 227   Page ID
Case 8:19-cr-00061-JVS   Document 178-3 Filed 06/07/20   Page 1 of 6   Page ID #:2831
#:3889

1 | H. Dean Steward, SBN 85317
107 Avenida Miramar, Ste. C
2 | San Clemente, CA 92672
Tel (949) 481-4900
3 | Fax (949) 497-6753

4 | Attorney for Defendant
MICHAEL JOHN AVENATTI
5

6

7 | **UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**
8

9 | UNITED STATES OF AMERICA,     SA CR No. 19-061-JVS

10 |       Plaintiff,     DEFENDANT'S SUPPLEMENTAL
STATUS REPORT
11 |       v.

12 | MICHAEL JOHN AVENATTI,     Hearing Date:    June 8, 2020
Hearing Time:    9:00 a.m.
13 |       Defendant.     Location:      Telephonic - Courtroom
of the Hon. James V.
14 |      Selna

15

16 |      In advance of the status conference set in this matter for June 8, 2020, defendant

17 | MICHAEL JOHN AVENATTI ("Mr. Avenatti") by and through his counsel of record,

18 | H. Dean Steward, hereby files this Supplemental Status Report to the Status Report filed

19 | by the defense on Friday (Docket No. 172).

20

21 | Dated: June 7, 2020         Respectfully submitted,

22

23 |                  /s/ H. Dean Steward

24 |                  H. DEAN STEWARD

25 |                  Attorney for Defendant
MICHAEL JOHN AVENATTI
26

27

28



**EXHIBIT** 14
Manheimer For I.D.
DATE: 6/7 RPTR: MD
BEN HYATT
888.272.0022

**EXHIBIT 14**

Case 8:19-cr-00061-JVS   Document 200-3   Filed 07/16/20   Page 185 of 227   Page ID
Case 8:19-cr-00061-JVS   Document 178   Filed 06/07/20   Page 2 of 6   Page ID #:2832
#:3340

## TABLE OF CONTENTS

I.  STATUS OF DISCOVERY ......................................................................1

    A. Computer Access ...................................................................................1

    B. The IRS Terminal/Database ..................................................................1

II.  REQUEST TO SUBMIT ADDITIONAL BRIEFING..............................3

CERTIFICATE OF SERVICE...................................................................................4

Case 8:19-cr-00061-JVS   Document 200-3   Filed 07/16/20   Page 186 of 227   Page ID
Case 8:19-cr-00061-JVS   Document 178-3 Filed 06/07/20   Page 3 of 6   Page ID #:2833
#:3841

I. **STATUS OF DISCOVERY**

    A. **Computer Access**

       Mr. Avenatti was provided a computer by counsel on Friday and has spent the weekend reviewing documents first produced by the government in March (while he was in custody at MCC). By the status conference on Monday morning, it is expected that he will have completed his review of approximately 450 of those documents, totaling in excess of 2,000 pages.

    B. **The IRS Terminal/Database**

       The Court correctly ruled at the last Status Conference on June 1 that the defense would be afforded reasonable access to the IRS database, which includes some of the most critical documents for the defense, including (a) emails between Mr. Avenatti and the alleged victim clients; (b) emails between and among Mr. Avenatti and others lawyers/staff at his law firm regarding the matters on which they worked for the alleged victim clients; (c) emails between and among Mr. Avenatti and opposing counsel regarding the matters identified in the indictment, including emails relating to the timing and payment of settlement proceeds; (d) cost and fee information and documentation for the cases handled for alleged victim clients; and (e) other documentation and communications relating to the charges in the Indictment (i.e. emails relating to the bank loans, tax filings, and prior bankruptcy case).

       *Contrary to the government's claims in its recent filings, the critical cost documentation for each of the alleged victim clients (and other clients for that matter) was not generally kept by the firm and organized by client-matter in Quickbooks.*

Rather, Quickbooks was used as the firm's high level accounting software suite (as a basic check register for instance), with other systems used to track and organize client costs and expenses and the time spent on individual client matters.  Much of this crucial information is included on the EA servers and is part of the IRS database.  This is a central issue in the case and goes to the heart of the allegations against Mr. Avenatti.  Mr. Avenatti requires this information for his defense.

As noted in the defense's Status Report (Docket No. 172), the defense expects to utilize targeted searches with the Privilege Review Team to acquire what is needed for trial and it is anticipated that these searches will be able to be significantly limited after the defense first completes its review of the documents produced by the government in March.  The government, however, now seeks to have the Court reverse its ruling of a week ago and hold that the defense is not permitted to access the IRS database in its preparation for trial, despite the fact that the defense has previously enjoyed a professional, cooperative relationship with the Privilege Review Team with no disputes.  Indeed, the defense on at least two occasions has been able to request and obtain certain documents directly relating to many of the alleged victim clients identified in the indictment - these searches were _not_ limited to Client 2 as claimed by the government nor did they amount to a "fishing expedition." *And to be clear, seeing as there is a vast amount of legitimate discovery left to review, the defense has no interest in obtaining thousands of additional irrelevant documents to review before trial for no real reason.*

2

Before the COVID-19 pandemic, this process was relatively seamless.  There is no reason why the defense's access should now be curtailed or otherwise restricted.

## II.     REQUEST TO SUBMIT ADDITIONAL BRIEFING

The parties submitted briefs on Friday relating to Mr. Avenatti's asset allocation and its effect on trial preparation, the trial date and his rights (Docket Nos. 174 and 175). In the government's brief (Docket No. 175), the government made a number of claims relating to the alleged history of Mr. Avenatti's retention of counsel in this matter, his retention of other counsel in other legal matters, and his receipt and expenditure of various monies post-indictment.  The defense respectfully requests the opportunity to submit a responsive brief on Thursday, June 11 of no more than six (6) pages (exclusive of exhibits) to address these claims and bring to the Court's attention a number of inaccuracies.

Dated: June 7, 2020                              Respectfully submitted,

                                                 /s/ H. Dean Steward
                                                 H. DEAN STEWARD
                                                 Attorney for Defendant
                                                 MICHAEL JOHN AVENATTI

3

Case 8:19-cr-00061-JVS   Document 200-3   Filed 07/16/20   Page 189 of 227   Page ID
Case 8:19-cr-00061-JVS   Document 178-3   Filed 06/07/20   Page 6 of 6   Page ID #:2836
#:3844

## CERTIFICATE OF SERVICE

I, H. Dean Steward, am a citizen of the United States, and am at least 18 years of age. My business address is 107 Avenida Miramar, Ste. C, San Clemente, CA 92672.  I am not a party to the above-entitled action.  I have caused, on June 7, 2020, service of the defendant's:

### SUPPLEMENTAL STATUS REPORT

on the following party, using the Court's ECF system:

AUSA BRETT SAGEL AND AUSA JULIAN ANDRE

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 7, 2020

/s/ H. Dean Steward

H. Dean Steward

4

1  NICOLA T. HANNA
   United States Attorney
2  BRANDON D. FOX
   Assistant United States Attorney
3  Chief, Criminal Division
   JULIAN L. ANDRÉ (Cal. Bar No. 251120)
4  Assistant United States Attorney
   Major Frauds Section
5       1100 United States Courthouse
        312 North Spring Street
6       Los Angeles, California 90012
        Telephone: (213) 894-6683
7       Facsimile: (213) 894-6269
        Email:    Julian.L.Andre@usdoj.gov
8
   BRETT A. SAGEL (Cal. Bar No. 243918)
9  Assistant United States Attorney
        Ronald Reagan Federal Building
10      411 West Fourth Street, Suite 8000
        Santa Ana, California 92701
11      Telephone:  (714) 338-3598
        Facsimile:  (714) 338-3708
12      Email:     Brett.Sagel@usdoj.gov

13 Attorneys for Plaintiff
   UNITED STATES OF AMERICA
14

15              UNITED STATES DISTRICT COURT

16          FOR THE CENTRAL DISTRICT OF CALIFORNIA

17                   SOUTHERN DIVISION

18 UNITED STATES OF AMERICA,          SA CR No. 19-061-JVS

19          Plaintiff,                GOVERNMENT'S REQUEST FOR INQUIRY
                                      REGARDING DEFENDANT MICHAEL JOHN
20          v.                        AVENATTI'S POTENTIAL VIOLATIONS OF
                                      HIS CONDITIONS OF TEMPORARY
21 MICHAEL JOHN AVENATTI,             RELEASE; DECLARATION OF JULIAN L.
                                      ANDRÉ
22          Defendant.

23

24

25      Plaintiff United States of America, by and through its counsel

26 of record, the United States Attorney for the Central District of

27 California and Assistant United States Attorneys Julian L. André and

28 Brett A. Sagel, hereby files its request for the Court to conduct an

**EXHIBIT 16**

Case 8:19-cr-00061-JVS  Document 200-3  Filed 07/16/20  Page 191 of 227  Page ID
Case 8:19-cr-00061-JVS  Document 177  Filed 06/07/20  Page 2 of 33  Page ID #:2799
#:3346

1  inquiry regarding potential violations of defendant MICHAEL JOHN

2  AVENATTI's ("defendant") conditions of temporary release.

3       This submission is based upon the attached memorandum of points

4  and authorities, the declaration of Assistant United States Attorney

5  Julian L. André, the files and records in this case, and such further

6  evidence and argument as the Court may permit.

7  Dated: June 7, 2020                Respectfully submitted,

8                                     NICOLA T. HANNA
                                       United States Attorney
9
                                       BRANDON D. FOX
10                                     Assistant United States Attorney
                                       Chief, Criminal Division
11
                                       *Julian André*
12
                                       JULIAN L. ANDRÉ
13                                     BRETT A. SAGEL
                                       Assistant United States Attorney
14
                                       Attorneys for Plaintiff
15                                     UNITED STATES OF AMERICA

16

17

18

19

20

21

22

23

24

25

26

27

28

2

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2    In April 2020, this Court ordered defendant MICHAEL JOHN

3    AVENATTI ("defendant") temporarily released from custody pursuant to

4    18 U.S.C. § 3142(i) due to the current public health crisis relating

5    to COVID-19.  (CR 140; CR 154.)  Defendant was released to the

6    custody of third-party custodian Jay Manheimer. (CR 140 ¶ 12; CR

7    154.)  Among other things, the conditions of defendant's temporary

8    release state that "defendant shall not possess, use, or access any

9    digital devices that offer or allow internet access."  (CR 140 ¶ 12;

10   CR 154.)  On or about April 13, 2020, Mr. Manheimer signed an

11   Affidavit of Third-Party Custodian, Form CR 31, and Mr. Manheimer

12   agreed to, among other things, notify Pretrial Services immediately

13   if defendant violates a condition of release.  (CR 143.)  Based on

14   the government's interview of Mr. Manheimer to approve him as a

15   suitable Third-Party Custodian, Mr. Manheimer is not a lawyer.

16   As set forth below, defendant may have violated the conditions

17   of his temporary release by using his third-party custodian

18   Mr. Manheimer's computer to personally draft the past five documents

19   that defendant has filed in this case.  At a minimum, defendant and

20   his counsel, H. Dean Steward, appear to have intentionally misled

21   this Court when they claimed that defendant was unable to access a

22   computer to review discovery in this case during the past six weeks

23   (CR 164 at 2, ¶ 1; CR 167 at ¶ 3).

24   The government therefore requests that the Court hold a hearing

25   to further inquire as to whether defendant has violated the

26   conditions of his temporary release and provide the parties with an

27   opportunity to address the appropriate remedy, if any, if defendant

28   did in fact commit such violations.

1                  **Defendant's May 27, 2020, Status Report (CR 164)**

2      On May 27, 2020, defendant, through counsel Mr. Steward, filed a

3 72-page Status Report, which included as exhibits four news articles

4 pulled from the internet.  (CR 164.)  The metadata[1] for the Adobe PDF

5 file that was submitted through the Court's CM/ECF system (CR 164)

6 shows that the "Author" of the document was defendant's third-party

7 custodian, "JAY MANHEIMER," and that the document was created using

8 Microsoft Word and a Mac computer:

9    Case 8:19-cr-00061-JVS   Document 164   Filed 05/27/20   Page 1 of 72   Page ID #:2540



24 (See André Decl. Ex. 1.)  Although the Status Report appears to be

25 written and created using Mr. Manheimer's computer, defendant claimed

26

27      [1]  The Court can view the metadata for each document defendant
filed by opening the PDF file on a computer, clicking the "File"
28 button on the top left, and selecting "Properties," and then
selecting "Description."

2

1   in the Status Report that he was unable to review the discovery

2   because he was precluded from using a computer.  (CR 164 at 2, ¶ 1.)

3      **Defendant's May 28, 2020, Supplement to Status Report (CR 165)**

4      On May 28, 2020, defendant filed a Supplement to Status Report.

5   (CR 165.)  Defendant's Supplement attached another news article from

6   the internet and an expert report that had been electronically filed

7   in the Southern District of New York.  (CR 165.)  The metadata for

8   the Adobe PDF file that was submitted through the Court's CM/ECF

9   system (CR 165) shows that the "Author" of the document was

10   defendant's third-party custodian, "JAY MANHEIMER," and that the

11   document was created using Microsoft Word and a Mac computer:



26   (See André Decl. Ex. 2.)

3

1          **Defendant's May 29, 2020, Second Supplement (CR 167)**

2          In response to the Minute Order this Court issued on May 28,

3    2020 (CR 166), defendant filed a Second Supplement to Status Report

4    (CR 167) on May 29, 2020.  The metadata for the Adobe PDF file that

5    was submitted through the Court's CM/ECF system (CR 167) shows that

6    the "Author" of the document was defendant's third-party custodian,

7    "JAY MANHEIMER," and that the document was created using Microsoft

8    Word and a Mac computer:

9          Case 8:19-cr-00061-JVS   Document 167   Filed 05/29/20   Page 1 of 5   Page ID #:2674



27   (André Decl. Ex. 3.)  Despite the Second Supplement to Status Report

28   seemingly being created on Mr. Manheimer's computer, defendant stated

4

1  the he "believes the Court's suggestion [regarding a computer] is a
2  good one and asks that the government work with the defense to
3  accomplish this as quickly as possible."  (CR 167 at 2.)

4  **Defendant's June 5, 2020, Status Report (CR 172)**

5       On June 5, 2020, defendant filed a Status Report in advance of
6  the June 8, 2020, status conference.  (CR 172.)  The Status Report
7  stated, among other things, that defendant was expected to receive a
8  laptop computer to use to review the discovery on Monday, June 8,
9  2020.  (CR 172 at 1.)  The metadata for the Adobe PDF file that was
10 submitted through the Court's CM/ECF system (CR 172) shows that the
11 "Author" of the document was defendant's third-party custodian, "JAY
12 MANHEIMER," and that the document was created using Microsoft Word
13 and a Mac computer:

Case 8:19-cr-00061-JVS  Document 172  Filed 06/05/20  Page 1 of 5  Page ID #:2718

Document Properties                                                          ×

Description  Security  Fonts  Initial View  Custom  Advanced

Description

   File:  CR 172 - 2020.06.05 Defendant Status Report.pdf

   Title:  Status Report June 8

   Author:  JAY MANHEIMER

   Subject:

   Keywords:

   Created:  6/5/2020 6:04:19 PM                          Additional Metadata...
   Modified:  6/5/2020 12:00:48 PM
   Application:  Word

Advanced

   PDF Producer:  macOS Version 10.14.6 (Build 18G4032) Quartz PDFContext; modified using iText® 5.5.9 ©2000-2015 iText Group NV
   PDF Version:  1.4 (Acrobat 5.x)
   Location:  \\usa.doj.gov\cloud\CAC\LA-Courthouse\Shared\Cases\CR\GBUS\CR_Docket\
   File Size:  209.76 KB (214,799 Bytes)
   Page Size:  8.50 x 11.00 in          Number of Pages:  5
   Tagged PDF:  No                       Fast Web View:  No

28 (André Decl. Ex. 4.)

1    **Defendant's June 5, 2020, Memorandum (CR 174)**

2         On June 5, 2020, defendant also filed a Memorandum re Allocation

3    of Assets and the Impact on Defendant's Rights and the Trial Date.

4    (CR 174.)  As with defendant's last four filings, the metadata for

5    the Adobe PDF file that was submitted through the Court's CM/ECF

6    system (CR 174) shows that the "Author" of the document was

7    defendant's third-party custodian, "JAY MANHEIMER," and that the

8    document was created using Microsoft Word and a Mac computer:

9         Case 8:19-cr-00061-JVS   Document 174   Filed 06/05/20   Page 1 of 16   Page ID #:2728



26   (André Decl. Ex. 5.)

6

1 | **Document's Previously Filed by Mr. Steward**

2 |     The government has also reviewed a number of the documents

3 | Mr. Steward filed on defendant's behalf <u>before</u> defendant was

4 | temporarily released from custody in April 2020, including

5 | defendant's March 18, 2020, bail reconsideration request (CR 117),

6 | defendant's March 24, 2020, ex parte application for a continuance

7 | (CR 122), and defendant's April 4, 2020, bail reconsideration request

8 | (CR 136).  The metadata for these three documents (CR 117; CR 122; CR

9 | 136), all have the author as "leenicole" and appear to have been

10 | created using a completely different computer and PDF generator.

11 | (<u>See</u> André Decl. Exs. 6-8.)  For example, below is the metadata for

12 | defendant's April 4, 2020, bail reconsideration request:



1  (André Decl. Ex. 8.)   The metadata for these three documents, which

2  Mr. Steward filed while defendant was in custody, provide further

3  evidence that defendant personally drafted his five most recent

4  pleadings using his third-party custodian Mr. Manheimer's Mac

5  computer.

6      To further confirm that Mr. Steward did not prepare defendant's

7  five most recent filings in this case, and that other documents

8  Mr. Steward have prepared would have "leenicole" identified as the

9  "Author" in the metadata, the government also reviewed the metadata

10 for a Supplement to Rule 29 Motion that Mr. Steward filed with this

11 Court on May 25, 2020, in United States v. Jonathan Brightman, SA CR

12 No. 16-076-JVS, at docket number 1085:

13     Case 8:16-cr-00076-JVS   Document 1085   Filed 05/25/20   Page 1 of 8   Page ID #:12267



8

1 (André Decl. Ex. 9.)  The metadata for the May 25, 2020, Brightman

2 filing also lists "leenicole" as "Author," and appears to have been

3 created using the same computer and PDF generator as the three

4 documents Mr. Steward filed in this case while defendant was in

5 custody.

6 Finally, statements defendant and his counsel made during the

7 June 1, 2020, status conference further demonstrate that defendant

8 has been personally drafting these filings.  As the Court may recall,

9 when the Court expressed concern regarding counsel's lack of candor

10 regarding the discovery issues raised in defendant's May 27, 2020,

11 Status Report, defendant himself responded:

12 THE COURT:     Sir, I expect a greater degree of candor
                          going forward.  That's a material fact that
13                        should have been presented to the Court
                          along with your concerns about the
14                        production.

15 MR. STEWARD:   Understood, Your Honor.

16 DEFENDANT:     It was included on Page 4, Footnote 5,
                          actually.
17
   THE COURT:     Who is that speaking?
18
   MR. STEWARD:   That was my client, Your Honor.
19

20 (6/1/2020 RT 5:14-6:1.)  And when the Court later raised concerns

21 regarding the length and relevancy of much of defendant's 34-page May

22 27, 2020, Status Report, defense counsel stated: "The Court is very

23 familiar with my writing.  I am usually very succinct."  (6/1/2020 RT

24 16:9-17:6.)

25 **Conclusion**

26 In light of the foregoing, the government believes that

27 defendant has likely violated the conditions of his temporary release

28 by using his third-party custodian Jay Manheimer's internet-

9

1   accessible computer to draft his last five filings in this case.   At
2   a minimum, defendant and his counsel have not been candid with this
3   Court.   Accordingly, the government requests that the Court hold a
4   hearing to further inquire as to whether defendant has violated the
5   conditions of his release and, if so, allow the parties an
6   opportunity to address the appropriate remedy for any such
7   violations.   Although the government believes that the evidence
8   contained herein is sufficient to establish that defendant violated
9   the conditions of his temporary release, at a minimum, the government
10  believes that the Court should direct Pretrial Services to search Mr.
11  Manheimer's residence, including his computer, and provide the
12  government with an opportunity to question Mr. Manheimer under oath
13  regarding his involvement in the creation of these pleadings and/or
14  defendant's access to Mr. Manheimer's computer and the internet.

15       Additionally, the government notes that defendant's use of
16  Mr. Manheimer's computer to personally draft the last five pleadings
17  in this case directly contradicts defendant's prior representations
18  to this Court regarding his ability to use a computer.   Such
19  misrepresentations are directly relevant to the other issues
20  currently before this Court, including defendant's representation
21  issues and defendant's claims regarding the discovery in this matter.

22       The government will be prepared to address defendant's potential
23  violations of his conditions of temporary release further during the
24  June 8, 2020, status conference.

25

26

27

28

10

1

## DECLARATION OF JULIAN L. ANDRÉ

2      I, Julian L. André, declare as follows:

3      1.   I am an Assistant United States Attorney ("AUSA") in the

4    United States Attorney's Office for the Central District of

5    California (the "USAO").  I am one of the AUSAs assigned to represent

6    the government in <u>United States v. Michael John Avenatti</u>, SA CR 19-

7    61-JVS.  I submit this declaration in support of the government's

8    request for the Court to conduct an inquiry regarding potential

9    violations of defendant MICHAEL JOHN AVENATTI's ("defendant")

10   conditions of temporary release.

11     2.   On June 7, 2020, I reviewed the metadata for a number of

12   Adobe PDF documents that were filed on defendant's behalf in this

13   matter through the Court's CM/ECF system.  To view the metadata for

14   each filing referenced herein, I took the following steps:

15          a.   Using Adobe Acrobat Pro, I opened each PDF file, which

16   I had previously downloaded from the CM/ECF system and saved onto my

17   computer.

18          b.   I clicked the "File" button on the top left of the

19   Adobe Acrobat program.

20          c.   I selected "Properties" in the "File" drop-down

21   window.

22          d.   I selected the "Description" tab on the "Document

23   Properties" screen.

24          e.   I then took a screenshot of the metadata for each PDF

25   file.

26     3.   Attached hereto as Exhibit 1 is a true and correct copy of

27   a screenshot of the metadata for defendant's May 27, 2020, Status

28

Case 8:19-cr-00061-JVS   Document 200-3   Filed 07/16/20   Page 203 of 227   Page ID
Case 8:19-cr-00061-JVS   Document 177   Filed 06/07/20   Page 14 of 33   Page ID #:2811
#:8358

1  Report, which was filed in this matter at docket number 164 using the
2  Court's CM/ECF system (CR 164).

3      4.    Attached hereto as Exhibit 2 is a true and correct copy of
4  a screenshot of the metadata for defendant's May 28, 2020, Supplement
5  to Status Report, which was filed in this matter at docket number 165
6  using the Court's CM/ECF system (CR 165).

7      5.    Attached hereto as Exhibit 3 is a true and correct copy of
8  a screenshot of the metadata for defendant's May 29, 2020, Second
9  Supplement Status Report, which was filed in this matter at docket
10  number 167 using the Court's CM/ECF system (CR 167).

11      6.    Attached hereto as Exhibit 4 is a true and correct copy of
12  a screenshot of the metadata for defendant's June 5, 2020, Status
13  Report, which was filed in this matter at docket number 172 using the
14  Court's CM/ECF system (CR 172).

15      7.    Attached hereto as Exhibit 5 is a true and correct copy of
16  a screenshot of the metadata for defendant's June 5, 2020, Memorandum
17  re Assets and the Impact on Defendant's Rights and the Trial Date,
18  which was filed in this matter at docket number 174 using the Court's
19  CM/ECF system (CR 174).

20      8.    Attached hereto as Exhibit 6 is a true and correct copy of
21  a screenshot of the metadata for defendant's March 18, 2020, Bail
22  Reconsideration Request, which was filed in this matter at docket
23  number 117 using the Court's CM/ECF system (CR 117).

24      9.    Attached hereto as Exhibit 7 is a true and correct copy of
25  a screenshot of the metadata for defendant's March 24, 2020, Ex Parte
26  Application for a Continuance, which was filed in this matter at
27  docket number 122 using the Court's CM/ECF system (CR 122).

28

1       10.   Attached hereto as Exhibit 8 is a true and correct copy of

2   a screenshot of the metadata for defendant's April 4, 2020, Bail

3   Reconsideration Request, which was filed in this matter at docket

4   number 136 using the Court's CM/ECF system (CR 136).

5       11.   Attached hereto as Exhibit 9 is a true and correct copy of

6   the metadata for the Supplement to Rule 29 Motion defendant's

7   counsel, H. Dean Steward, filed on May 25, 2020, in United States v.

8   Jonathan Brightman, SA CR No. 16-076-JVS, at docket number 1085 using

9   the Court's CM/ECF system.

10      I declare under penalty of perjury under the laws of the United

11  States of America that the foregoing is true and correct and that

12  this declaration is executed at Los Angeles, California, on June 7,

13  2020.

14

15                              JULIAN L. ANDRÉ

16

17

18

19

20

21

22

23

24

25

26

27

28

                              3

# EXHIBIT 1



**Document Properties**   ×

Description   Security   Fonts   Initial View   Custom   Advanced

**Description**

File:   CR 164 - Defendant Status Report.pdf

Title:   Final Status Report

Author:   JAY MANHEIMER

Subject:

Keywords:

Created:   5/27/2020 4:45:35 PM

Modified:   5/27/2020 10:18:29 AM

Application:   Word

**Advanced**

PDF Producer:   macOS Version 10.14.6 (Build 18G4032) Quartz PDFContext; modified using iText® 5.5.9 ©2000-2015 iText Group NV

PDF Version:   1.6 (Acrobat 7.x)

Location:   \\usa.doj.gov\xcloud\CAC\LA-Courthouse\Shared\Cases\CR\GBUS\CR_Docket\

File Size:   8.74 MB (9,165,770 Bytes)

Page Size:   8.50 x 11.00 in          Number of Pages:   72

Tagged PDF:   No          Fast Web View:   No

Additional Metadata...

Help          OK          Cancel

MICHAEL JOHN AVENATTI ("Mr. Avenatti") by and through his counsel of record,

H. Dean Steward, hereby files this Status Report in order to bring to the Court's attention

Case 8:19-cr-00061-JVS   Document 200-3   Filed 07/16/20   Page 207 of 227   Page ID
Case 8:19-cr-00061-JVS   Document 177   Filed 06/07/20   Page 18 of 33   Page ID #:2815
#:3862

# EXHIBIT 2

Case 8:19-cr-00061-JVS  Document 177  Filed 06/07/20  Page 19 of 33  Page ID #:2616



In advance of the status conference set in this matter for June 1, 2020, defendant

MICHAEL JOHN AVENATTI ("Mr. Avenatti") by and through his counsel of record,

H. Dean Steward, hereby files this supplement to Defendant's Status Report previously

filed on May 27, 2020 [Docket No. 164].

# EXHIBIT 3



In advance of the status conference set in this matter for June 1, 2020 and in brief

Case 8:19-cr-00061-JVS   Document 200-3   Filed 07/16/20   Page 211 of 227   Page ID
Case 8:19-cr-00061-JVS   Document 177-3 Filed 06/07/20   Page 22 of 33   Page ID #:2819
#:3366

# EXHIBIT 4

Document Properties                                                                                ×

Description  Security  Fonts  Initial View  Custom  Advanced

Description

File:  CR 172 - 2020.06.05 Defendant Status Report.pdf

Title:  Status Report June 8

Author:  JAY MANHEIMER

Subject:

Keywords:

Created:  6/5/2020 6:04:19 PM                                              Additional Metadata...

Modified:  6/5/2020 12:00:48 PM

Application:  Word

Advanced

PDF Producer:  macOS Version 10.14.6 (Build 18G4032) Quartz PDFContext; modified using iText® 5.5.9 ©2000-2015 iText Group NV

PDF Version:  1.4 (Acrobat 5.x)

Location:  \\usa.doj.gov\cloud\CAC\LA-Courthouse\Shared\Cases\CR\GBUS\CR_Docket\

File Size:  209.76 KB (214,799 Bytes)

Page Size:  8.50 x 11.00 in                          Number of Pages:  5

Tagged PDF:  No                                      Fast Web View:  No

Help                                                      OK          Cancel

Dated: June 5, 2020                     Respectfully submitted,

                                        /s/ H. Dean Steward

Case 8:19-cr-00061-JVS   Document 200-3   Filed 07/16/20   Page 213 of 227   Page ID
Case 8:19-cr-00061-JVS   Document 177-3  Filed 06/07/20   Page 24 of 33   Page ID #:2821
#:3368

# EXHIBIT 5



H. Dean Steward, hereby files this Memorandum regarding Mr. Avenatti's allocation of assets and its alleged impact on Mr. Avenatti's rights, his defense in this case, and the trial date.

# EXHIBIT 6



Document Properties

Description | Security | Fonts | Initial View | Custom | Advanced

**Description**

File: CR 117 - Avenatti Bail Reconsideration Motion.pdf

Title: Pleading Wizard

Author: leenicole

Subject:

Keywords:

Created: 3/18/2020 2:39:24 PM

Modified: 3/19/2020 12:19:44 AM

Application: Acrobat PDFMaker 11 for Word

**Advanced**

PDF Producer: Adobe PDF Library 11.0; modified using iText® 5.5.9 ©2000-2015 iText Group NV (AGPL-version)

PDF Version: 1.5 (Acrobat 6.x)

Location: \\usa.doj.gov\cloud\CACLA-Courthouse\Shared\Cases\CR\GBUS\CR_Docket\

File Size: 154.34 KB (158,042 Bytes)

Page Size: 8.50 x 11.00 in

Tagged PDF: Yes

Number of Pages: 18

Fast Web View: No

Additional Metadata...

Help

OK    Cancel

# EXHIBIT 7



**Document Properties**

Description | Security | Fonts | Initial View | Custom | Advanced

**Description**

File: CR 122 - Ex Parte App for Continuance.pdf

Title: Pleading Wizard

Author: leenicole

Subject:

Keywords:

Created: 3/24/2020 1:40:00 PM

Modified: 3/24/2020 3:53:07 PM

Application: Acrobat PDFMaker 11 for Word

Additional Metadata...

**Advanced**

PDF Producer: Adobe PDF Library 11.0; modified using iText® 5.5.9 ©2000-2015 iText Group NV (AGPL-version)

PDF Version: 1.5 (Acrobat 6.x)

Location: \\usa.doj.gov\cloud\CACLA-Courthouse\Shared\Cases\CR\GBUS\CR_Docket\

File Size: 47.63 KB (48,776 Bytes)

Page Size: 8.50 x 11.00 in          Number of Pages: 7

Tagged PDF: Yes          Fast Web View: Yes

Help          OK          Cancel

Case 8:19-cr-00061-JVS   Document 200-3   Filed 07/16/20   Page 219 of 227   Page ID
Case 8:19-cr-00061-JVS   Document 177   Filed 06/07/20   Page 30 of 33   Page ID #:2827
#:3374

# EXHIBIT 8



Case 8:19-cr-00061-JVS   Document 200-3   Filed 07/16/20   Page 221 of 227   Page ID
Case 8:19-cr-00061-JVS   Document 177   Filed 06/07/20   Page 32 of 33   Page ID #:2829
#:3376

# EXHIBIT 9

**Document Properties**    ✕

Description   Security   Fonts    Initial View   Custom   Advanced

Description

File:   031133134787.pdf

Title:   Pleading Wizard

Author:   leenicole

Subject:

Keywords:

Created:   5/25/2020 4:17:49 PM            Additional Metadata...

Modified:   6/7/2020 1:24:54 PM

Application:   Acrobat PDFMaker 11 for Word

Advanced

PDF Producer:   Adobe PDF Library 11.0; modified using iText® 5.5.9 ©2000-2015 iText Group NV (AGPL-version)

PDF Version:   1.5 (Acrobat 6.x)

Location:   C:\Users\JAndre1\Desktop\

File Size:   67.41 KB (69,029 Bytes)

Page Size:   8.50 x 11.00 in          Number of Pages:   8

Tagged PDF:   Yes              Fast Web View:   No

Help                          OK        Cancel

19   supplements his previously foiled Rule 29 motion and alternatively, motion for new

20

21   trial.

22   Dated: May 25, 2020               /s./ H. Dean Steward

23                          H. Dean Steward

                            Counsel for Defendant

24                          Jonathan Brightman

25

26

Case 8:19-cr-00061-JVS  Document 200-3  Filed 07/16/20  Page 223 of 227  Page ID
#:3378
Case 8:19-cr-00061-JVS  Document 177  Filed 06/07/20  Page 1 of 5  Page ID #:2837

1   H. Dean Steward, SBN 85317
    107 Avenida Miramar, Ste. C
2   San Clemente, CA 92672
    Tel (949) 481-4900
3   Fax (949) 497-6753

4   Attorney for Defendant
    MICHAEL JOHN AVENATTI
5

6
                    **UNITED STATES DISTRICT COURT**
7
            **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
8

9   UNITED STATES OF AMERICA,          SA CR No. 19-061-JVS

10              Plaintiff,             DEFENDANT'S PRELIMINARY
                                       RESPONSE TO GOVERNMENT'S
11              v.                     REQUEST RE BAIL CONDITIONS
                                       (DOCKET NO. 177)
12  MICHAEL JOHN AVENATTI,

13              Defendant.             Hearing Date:    June 8, 2020
                                       Hearing Time:    9:00 a.m.
14                                     Location:        Telephonic - Courtroom
                                                        of the Hon. James V.
15                                                      Selna

16

17
        Defendant MICHAEL JOHN AVENATTI ("Mr. Avenatti") by and through his
18
    counsel of record, H. Dean Steward, hereby files this Preliminary Response to
19
    Government's Request for Inquiry Regarding Defendant Michael John Avenatti's
20
    Potential Violations of His Condition of Temporary Release (Docket No. 177).
21

22
    Dated: June 7, 2020                    Respectfully submitted,
23

24                                         /s/ H. Dean Steward

25                                         H. DEAN STEWARD

26                                         Attorney for Defendant
                                           MICHAEL JOHN AVENATTI
27

28



**EXHIBIT 17**

## I. MR. AVENATTI HAS NOT VIOLATED ANY CONDITIONS OF HIS RELEASE

Contrary to the government's allegations, Mr. Avenatti has not violated any of his conditions of release. First, Mr. Avenatti has not accessed the internet using any computer or electronic device since his release. Nor is there any evidence that he has. In fact, the government has not presented any evidence that Mr. Avenatti has accessed the internet in its filing (Docket No. 177) nor can they.[1]

Instead, the government claims that because certain filings with this court have metadata in the pdfs showing that the final documents were printed to pdf files (this is how a pdf is created, by printing it as a pdf when the print window appears) using Acrobat DC, a computer program registered to Mr. Manheimer, this somehow demonstrates that Mr. Avenatti has violated his bail conditions. This is not accurate. As the bail conditions allow, Mr. Avenatti is able to review documents with his counsel via email between Mr. Manheimer and counsel. Mr. Manheimer is then able to print those documents for Mr. Avenatti's review. Mr. Avenatti is also able to communicate with his counsel regarding changes and edits to the documents, including via email between Mr. Manheimer and his counsel, and phone calls. There is also nothing prohibiting Mr.

---

[1] As the Court well knows, the conditions relating to Mr. Avenatti not accessing the internet related entirely to addressing a concern raised by the prosecution that Mr. Avenatti would access the internet to transfer assets or move monies between financial accounts. It had nothing to do with prohibiting Mr. Avenatti from defending himself or working on legal filings. Regardless, he has not accessed the internet for any purpose. And he has fully complied with all other conditions of his release, including all financial reporting and prohibition on financial transactions.

Case 8:19-cr-00061-JVS   Document 200-3   Filed 07/16/20   Page 225 of 227   Page ID
Case 8:19-cr-00061-JVS   Document 174-3   Filed 06/07/20   Page 3 of 5   Page ID #:2839
#:3880

Manheimer from printing to pdf the final agreed-upon filings for undersigned counsel's convenience and then emailing that final document for filing by undersigned counsel. This enables counsel to file the final documents directly from home, as opposed to having to go to his office and prepare the final pdfs for filing manually by physically printing the documents and compiling them. Because of the COVID-19 pandemic, this has been necessary as counsel is at high risk due to his age and health condition, and has avoided travelling into the office as much as possible.

There is also nothing prohibiting Mr. Avenatti from working on his case nor is there anything prohibiting him or other lawyers from Mr. Avenatti's other cases assisting with various filings in this case. Indeed, due to the pandemic and the workload of undersigned counsel, as well as the complicated nature of this case and Mr. Avenatti's familiarity with the facts of this case, it would be expected that Mr. Avenatti would assist on the case. Because he is a lawyer, it is also expected that he would have definitive views on the filings made on his behalf in this case and would want to review and comment on those filings before they are finalized. To be clear, the defense does not dispute that Mr. Avenatti has been helping defend himself in this case and will continue to do so.

Finally, counsel has not misled this court regarding Mr. Avenatti's access to a computer to review discovery. Until Friday, Mr. Avenatti did not have the ability to review the discovery via computer. He now has a designated computer for this purpose and indeed spent a good part of the weekend reviewing the discovery as would be

2

1    expected.

2 **II. CONCLUSION**

3

4      For each of these reasons, there is no basis to conclude that Mr. Avenatti has

5 violated his bail conditions.

6

7

8 Dated: June 7, 2020                Respectfully submitted,

9                            /s/ H. Dean Steward

10                            H. DEAN STEWARD

11                            Attorney for Defendant

12                            MICHAEL JOHN AVENATTI

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

Case 8:19-cr-00061-JVS  Document 200-3  Filed 07/16/20  Page 227 of 227  Page ID
Case 8:19-cr-00061-JVS  Document 177-3  Filed 06/07/20  Page 5 of 5  Page ID #:2841
#:3882

1   **CERTIFICATE OF SERVICE**

2
3       I, H. Dean Steward, am a citizen of the United States, and am at least 18 years of

4   age. My business address is 107 Avenida Miramar, Ste. C, San Clemente, CA 92672.  I

5   am not a party to the above-entitled action.  I have caused, on June 7, 2020, service of

6   the defendant's:
7

8   **DEFENDANT'S PRELIMINARY RESPONSE TO GOVERNMENT'S REQUEST**

9   **RE BAIL CONDITIONS (DOCKET NO. 177)**

10

11
12  on the following party, using the Court's ECF system:

13  AUSA BRETT SAGEL AND AUSA JULIAN ANDRE

14  I declare under penalty of perjury that the foregoing is true and correct.
15

16  Executed on June 7, 2020

17                          /s/ H. Dean Steward

18                          H. Dean Steward

19

20

21

22

23

24

25

26

27

28

4