H. Dean Steward, SBN 85317
107 Avenida Miramar, Ste. C
San Clemente, CA 92672
Tel (949) 481-4900
Fax (949) 497-6753

Attorney for Defendant
MICHAEL JOHN AVENATTI

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL JOHN AVENATTI,<br><br>Defendant. | SA CR No. 19-061-JVS<br><br>DEFENDANT'S SUPPLEMENTAL FILING AND RESPONSE TO THE GOVERNMENT'S RESPONSE TO DEFENDANT'S EX PARTE APPLICATION FOR CJA APPOINTMENT |

Defendant MICHAEL JOHN AVENATTI ("Mr. Avenatti") by and through his counsel of record, H. Dean Steward, hereby files this Supplemental Filing and Response to the Government's Response to Defendant's Ex Parte Application for CJA Appointment.

Dated: July 24, 2020                     Respectfully submitted,


                                         /s/ H. Dean Steward
                                         H. DEAN STEWARD

                                         Attorney for Defendant
                                         MICHAEL JOHN AVENATTI

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... ii

I.   INTRODUCTION ........................................................................................ 1

II.  ARGUMENT ................................................................................................ 2

    A. Mr. Avenatti's Liquid Assets ................................................................... 2

    B. The Government Continues to Take Inconsistent Positions
       Relating to Mr. Avenatti's Finances in Violation of His
       Due Process Rights .................................................................................. 4

    C. Mr. Avenatti is Permitted to Work on His Defense ................................. 7

    D. The Defense Has Been Diligent .............................................................. 7

    E. The Government Fails to Acknowledge Relevant Authority ............... 10

III. CONCLUSION ........................................................................................... 12

CERTIFICATE OF SERVICE ............................................................................... 13

# TABLE OF AUTHORITIES

**CASES:**                   **Page**

*Calderon v. Thompson,*
523 U.S. 538 (1998) ............................................................................................... 7

*Drake v. Kemp,*
762 F.2d 1449 (11th Cir. 1985) ............................................................................. 7

*Faretta v. California,*
422 U.S. 806 (1975) ............................................................................................... 7

*Gannett Co. v. DePasquale,*
443 U.S. 368 (1979) ............................................................................................... 7

*McCoy v. Louisiana,*
138 S.Ct. 1500 (2018) ............................................................................................ 7

*Oscanyon v. Arms Co.,*
103 U.S. 261 (1893) ............................................................................................... 6

*Osler v. Smith,*
223 Cal. App. 3d 33 (1990) ................................................................................... 9

*Smith v. Groose,*
205 F.3d 1045 (8th Cir. 2000) ............................................................................... 7

*Snyder v. Sec. of Health and Human Svcs.,*
117 F.3d 545 (Fed. Cir. 1997) ............................................................................... 1

*Thompson v. Calderon,*
120 F.3d 1045 (9th Cir. 1997) ............................................................................... 6

*United States v. Flores,*
679 F.2d 173 (9th Cir. 1982) ................................................................................. 6

*United States v. Read,*
918 F.3d 712 (9th Cir. 2019) ................................................................................. 7

**OTHER AUTHORITIES:**

U.S. Const. Amend. VI ...................................................................................... 7

Ninth Circuit CJA Guidelines ..................................................................... 11,12

Ninth Circuit CJA Plan ............................................................................... 10, 11

## I. INTRODUCTION

After acknowledging in its Response to Defendant's *Ex Parte* Application for CJA Appointment that the government is "not privy to any of the information or bases upon which the defendant relies," admitting that "the government has no ability to address the merits of defendant's request," and stating "the government takes no position as to whether the Court should grant defendant's request," [Docket No. 208, p. 1.], the prosecution nonetheless proceeds, *yet again*, to malign the Defendant and his counsel unnecessarily.[1] In doing so, and in accordance with their consistent practice in this case, the government purposely misstates numerous facts and engages in revisionist history, all as part of their never-ending effort to further soil the defendant and impugn the integrity of undersigned counsel. *This type of conduct and the personal attacks by the prosecution must end. They have no place in this criminal case or any other.* The Federal Circuit's decision in *Snyder v. Sec. of Health and Human Svcs.*, 117 F.3d 545, 549 (Fed. Cir. 1997) is instructive in this regard:

> The government's brief . . . proceeds to accuse the appellant of using "flimsy excuses" and "spurious charges"; making "complaints more akin to meaningless quibbling than reasoned and compelling grounds"; arguing "a ruse"; offering a "feeble and shopworn excuse" and making an argument that is "either naïve or absurd" . . . Such pejorative language has no place in any brief filed by the United States (or any other party) in this or any other court. . . . For shame, that our government writes such a brief, instead of meeting the high standards of advocacy its citizens and courts deserve.

---

[1] It is perplexing that the government continues to take steps to interfere with Mr. Avenatti's ability to have able, adequate legal representation and present a defense in this case. In a criminal matter of this magnitude and complexity, the prosecution should be striving to protect the record, especially as it relates to such a fundamental issue as representation.

The prosecution is permitted to dislike Mr. Avenatti and believe he is guilty. The prosecution is likewise permitted to not care for his counsel and disagree with his approach to the defense in this case. But what the prosecutors are not permitted to do is allow their *personal* feelings about Mr. Avenatti and his counsel to consistently permeate and govern their approach and briefing in this case; the positions they take; and their role as prosecutors charged with seeking justice for the United States, as opposed to headlines and retribution for their close friends.[2]

As set forth below, the government's Response is inaccurate in many respects and at the same time fails to disclose to the Court facts and authority highly relevant to the pending Application and the required analysis.[3] [4]

## II. ARGUMENT

### A. Mr. Avenatti's Liquid Assets[5]

The government, without any competent evidence, continues to lead this Court to believe that Mr. Avenatti has vast sums of cash and liquid assets somewhere, but is

---

[2] The government is likewise precluded from (1) assigning prosecutors to this case who have close, personal relationships with non-victim witnesses who have a personal score to settle with Mr. Avenatti and (2) then assisting those friend witnesses with seizing Mr. Avenatti's assets and collecting on their debt, to the detriment of the alleged victims in this case and Mr. Avenatti's ability to retain counsel.

[3] Prior to the filing of the government's Response, the Court made a request to the defense (under seal) for additional information. The defense is in the process of responding to that request and will provide information, and an update, no later than July 27 as previously directed.

[4] In the interest of brevity, the defense will not address every inaccuracy or half-truth contained in the Response.

[5] The term "liquid assets" is traditionally defined as cash, cash equivalents (i.e. checks), monies on deposit, bonds, publicly traded stocks and securities, and precious metals.

2

choosing not to deploy them for use in his criminal defense in this case. Under the government's theory, Mr. Avenatti is hoarding these monies, evidently for "a raining day", an "emergency", or "when things really get bad." This lacks all merit and logic.

Mr. Avenatti was recently incarcerated in solitary confinement under conditions routinely described by human rights groups as worse than Guatanamo Bay. He is presently on home confinement, unable to work and pay for his daily living expenses. He sleeps on an air mattress at a friend's 1,000 square foot apartment. He was convicted in New York in February of multiple felonies and faces two other felony trials in the coming months on two coasts. His law license has been suspended and he will likely never practice law again. His estranged second wife, Lisa Storie-Avenatti, refuses to allow him to see his five-year-old son despite a court order allowing for visitation and despite him and his lawyers repeatedly pleading for visitation. He is routinely mocked and vilified in the press. He is defined with the juvenile moniker the "Creepy Porn Lawyer" on social media and on the highest-rated shows on cable television. He is publicly attacked by the President and his family, even in the middle of a deadly pandemic.[6] He is photographed by garbage tabloids when he walks on the balcony outside the apartment where he lives. His life and liberty hang in the balance. <u>What exactly does the government maintain Mr. Avenatti is waiting for before he deploys these imaginary millions they claim he is hiding?</u>

---

[6] For instance, on March 25, 2020, with the COVID-19 pandemic threatening millions of Americans and after this Court initially denied Mr. Avenatti's motion to be released to home confinement, the President gloated to his 80 million twitter followers: "Gee, that's too bad. Such a fine guy. Presidential aspirations you know!"

3

Over the last 21 months, AUSAs Sagel and Andre, the assigned AUSAs in New York, the DOJ, the Los Angeles and New York offices of the FBI, and the Criminal Division of the IRS have all scoured Mr. Avenatti's finances and banking transactions. They claim to have left no stone unturned and to have examined nearly all, if not all, of his financial transactions during the last seven years. *Accordingly, if the government has any evidence that Mr. Avenatti has any meaningful liquid assets (i.e. more than $1,000) remaining, they should disclose that evidence to the Court and the defense. <u>Immediately</u>. And if they are unaware of any such evidence, they have a duty to likewise immediately disclose this fact and stop claiming, without any basis, that Mr. Avenatti has substantial liquid assets.[7] To be clear, the government knows exactly what Mr. Avenatti's liquid assets are and they know he has practically no liquid assets to pay counsel or transfer to anyone.*

### B. The Government Continues to Take Inconsistent Positions Relating to Mr. Avenatti's Finances in Violation of His Due Process Rights

In Mr. Avenatti's recent federal criminal trial in New York, Case No. 1:19-CR-00373-PGG (SDNY) (the "Nike" case), the government repeatedly referenced Mr. Avenatti's alleged poor financial condition, lack of assets and income, and deep indebtedness in the Spring of 2019 as evidence that Mr. Avenatti committed extortion and honest services fraud against Nike and his client. They offered this evidence and argument before the jury over the repeated objection of the defense, including a motion

---

[7] The government has used this fallacy for multiple purposes in this case, including as an alleged basis for the requirement that Mr. Avenatti not be permitted to access the Internet.

4

*in limine*. In fact, this evidence and argument served as one of the centerpieces of the prosecution, with the prosecution calling Mr. Avenatti's former Office Manager, Judy Regnier, to establish Mr. Avenatti's alleged desperate financial condition and lack of assets in the Spring of 2019.[8] The record in the Nike case is replete with references to the government's claims in that case before the judge and jury that Mr. Avenatti was deeply in debt, had negligible assets and no way of paying any expenses in the Spring of 2019. *See, e.g.*, Exhibit GX S-4 (government's trial exhibit showing outstanding civil judgments against Mr. Avenatti that exceeded $11 million) and Nike Docket No. 108 (Case No. 1:19-CR-00373-PGG: Government's opposition to Mr. Avenatti's motion in limine regarding his financial condition).

Indeed, the government made their claim that Mr. Avenatti was broke and deeply in debt a central theme of their closing argument:

> And that is why we are here today. Because Michael Avenatti, facing a mountain of debts, saw a light at the end of the tunnel. He saw a way to walk out from under those debts . . . And so Avenatti took what Gary Franklin told him and he used it. He used it to shake down Nike, to line his own pockets, to try to pay off his debts.
> [Trial Transcript, February 11, 2020, p. 2127:13-22]
>
> . . . .
>
> But you know why he did it here. You know why he made these demands. It starts with the amount of money. The $12 million up front is a lot of money to anyone, but in this case it was really important to Michael Avenatti. He needed that money right away. . . . Why did he need that money? Here's a stipulation. Government Exhibit S4. It says, On October 22, 2018, a civil order was entered in the Superior Court of California,

---

[8] AUSAs Brett Sagel and Julian Andre travelled to New York and were present in the courtroom when Ms. Regnier testified on behalf of the government in the *Nike* trial.

5

> against the defendant, that totaled approximately $2,219,669.60 as of March 1, 2019. And the defendant hadn't paid it. Here's the second one. Another court order. This one for $2,194,301.87. Court order in October 2018, and the defendant had not paid it by March. Third one. This one November 2018, court orders Avenatti to pay $5,054,287.75. Hadn't paid it. Fourth one. Court order, in January 2019, to pay $1,530,216.07. Hadn't paid it. Separate judgments. So what does that add up to? Just under $11 million in mounting debts, all ordered by courts, in the months leading up to this extortion scheme. That's not all. You heard the testimony of Ms. Regnier, the defendant's longtime office manager. You heard that the defendant's law firm was collapsing financially in March 2019, and it actually had been evicted from its offices. . . . [T]his wasn't about Franklin for Avenatti. This was about getting out from under this debt. About a get-rich-quick scheme to clear $11 million in debt.
> [Trial Transcript, February 11, 2020, pp. 2164-66.]

The government's claims in the *Nike* case regarding Mr. Avenatti's financial condition are factual admissions, admissible against them. *See, e.g., Oscanyon v. Arms Co.*, 103 U.S. 261, 263 (1893); *United States v. Flores*, 679 F.2d 173, 177-78 (9th Cir. 1982). Further, having prevailed - over the repeated objections of Mr. Avenatti both before and during trial in the *Nike* case - and after having successfully argued to the jury that Mr. Avenatti was in a desperate financial position with no other way to pay his debts, the government is not permitted to now take an entirely inconsistent position in this case and claim the exact opposite, namely that Mr. Avenatti had and has considerable wealth, assets and income. The prosecution's repeated attempt to do so in this case is a violation of Mr. Avenatti's due process rights and should not be allowed. *See, e.g., Thompson v. Calderon*, 120 F.3d 1045, 1058 (9th Cir. 1997)(en banc), *rev'd on other grounds, Calderon v. Thompson*, 523 U.S. 538 (1998); *Smith v. Groose*, 205 F.3d 1045 (8th Cir. 2000); *Drake v. Kemp*, 762 F.2d 1449, 1479 (11th Cir. 1985)(Clark, J.,

6

concurring)("Such actions reduce criminal trials to mere gamesmanship and rob them of their supposed search for truth.").

### C. Mr. Avenatti is Permitted to Work on His Defense

The government repeatedly complains that Mr. Avenatti is working on his defense in this case. This is curious in light of the Sixth Amendment to the United States Constitution and over 200 years of legal jurisprudence, which provides that a criminal defendant is permitted to protect his liberty, defend himself and assist counsel in his criminal defense. *See, e,g., McCoy v. Louisiana*, 138 S.Ct. 1500, 1507-08 (2018)(noting that the Sixth Amendment "speaks of the assistance of counsel of counsel, and an assistant, however expert, is still an assistant" and that "the accused, not a lawyer, is master of his own defense.")(quoting *Faretta v. California*, 422 U.S. 806, 819-20 (1975) and *Gannett Co. v. DePasquale*, 443 U.S. 368, 382 n. 10 (1979); *see also, United States v. Read*, 918 F.3d 712 (9th Cir. 2019). To be clear, Mr. Avenatti is permitted to review documents and discovery, draft documents, work and comment on pleadings, communicate with his counsel, and conduct research in connection with each of his legal matters, this case included. If the government knows of any legal authority that holds otherwise, they should provide it to the Court, as counsel knows of no such authority. Until then, Mr. Avenatti will continue to exercise his Constitutional rights.

### D. The Defense Has Been Diligent

The government purposely misstates the positions taken by the defense in its filing regarding Mr. Avenatti's allocation of assets [Docket No. 174]. That filing describes in

7

detail the late and vast discovery produced by the government this Spring (approximately one million pages), as well as the fact that nothing the defense has done or not done had any real impact on the then existing trial date.[9] Importantly, the defense also addressed Mr. Avenatti's allocation of resources in light of the three criminal matters brought simultaneously against him by the Department of Justice.

Following briefing and at a hearing that followed, the Court remarked that the filings did not require any further action at that time. Accordingly, rather than belabor the issue and further inundate the Court, the defense determined that there was no reason to submit additional briefing addressing the numerous factual inaccuracies submitted by the government regarding Mr. Avenatti's asset allocation. Further, this issue is irrelevant to the pending Application because the analysis required for CJA appointment centers on Mr. Avenatti's **current net resources** (which includes accounting for *debts*), not what monies he has spent in the past in other cases or on other living expenses.

To be clear, however, many of the government's claims regarding Mr. Avenatti's income and expenses during the time period March 2019 and January 2020 are not accurate and/or are only partially true. *By way of example only*, the government has made much of Mr. Avenatti's payments to his first wife of 13 years, Mrs. Christine Avenatti-Carlin, the mother of his two minor daughters. What the government has failed to tell the Court, including at the January 15, 2020 hearing where they successfully

---

[9] The Court previously extended the deadline for the filing of the defense motions due to the large amount of late produced discovery dumped on the defense, which accounts for why motions have yet to be filed.

8

sought his remand, is (1) if the government's claims regarding Mr. Avenatti's alleged income and the allegations in the indictment in this case are accurate (meaning using the government's figures), Mr. Avenatti owed Mrs. Carlin over $5,000,000 in back child and spousal support throughout all of 2019 and January 2020 pursuant to the parties' 2007 divorce judgment and established California law (*See, e.g., Osler v. Smith*, 223 Cal. App. 3d 33 (1990);[10] (2) Mr. Avenatti and Ms. Carlin had written communications long *before* his arrest in this case regarding her claim for arrears; and (3) in 2019, months *prior* to the government claiming before this Court that Mr. Avenatti's payments to Mrs. Carlin were improper and then using it as a basis for his remand, Mrs. Carlin and her counsel provided this information to the prosecutors and also explained that child support fluctuates with income under the express terms of their divorce judgment (the government has a copy) and under California law. This information should have been provided to the Court but inexplicably was not. To compound matters, the government continues to point to Mr. Avenatti's payments to his ex-wife as improper.

In addition, in its Response, the government artfully uses the time period of May 2019 to November 2019 (seven months) and claims that Mr. Avenatti deposited approximately $1.1 million into his bank accounts during this period. What the government fails to explain to the court is that only approximately $100,000 of the $1.1 million was received in the last six months of this time period (June through November), and only a portion of that was income.

---

[10] In California, child support is never a fixed sum beyond adjustment due to income.

9

Finally, the government takes issue with certain payments made by Mr. Avenatti for his lease and other debts and obligations, describing them as "lavish." Is it the government's position that starting in March 2019, Mr. Avenatti should have simply ignored all of his prior obligations and liabilities, and allowed additional judgments and collection actions to accrue against him regardless of the consequences? Should Mr. Avenatti not have paid his lawyers in other matters, including those in the *Nike* case, which was the first case to go to trial? Once again, it bears repeating that the government chose to indict Mr. Avenatti in three separate cases on two coasts and likewise chose to try the *Nike* case first. There are consequences that flow from this inefficient, strategic decision.

### E. The Government Fails to Acknowledge Relevant Authority

In its Response, the government fails to acknowledge authority highly relevant to the necessary analysis. For instance, Section IV.C.7 of the Ninth Circuit CJA Plan provides:

> A court may find it appropriate to allow the retained attorney to begin billing under the CJA upon appointment. Or, a court may find it appropriate to appoint the retained attorney nunc pro tunc to the start of counsel's representation. *In the latter scenario*, the court may then order that any funds paid to retained counsel be attributed to work already performed and costs incurred (at the applicable CJA hourly rate), as well as new work performed and costs incurred, until the funds are deemed exhausted. Once exhausted, counsel and service providers would begin billing under the CJA. Other equitable arrangements may be appropriate. (emphasis added).

10

Here, counsel is not seeking an appointment *nunc pro tunc* (the "latter scenario"). Accordingly, there is no basis for the government's requests relating to any equitable arrangement for past work performed.

Second, the government does not mention the CJA Guidelines endorsed by the Ninth Circuit that undercut their arguments. For example, section 210.40.30 of the Guide Vol. 7A states the relevant standard that must be followed: "An offender is 'financially unable to obtain counsel'…if the person's net financial resources and income are insufficient to obtain qualified counsel." In other words, the analysis centers on a person's **net** financial resources (inclusive of debts and expenses). The Guide goes to state in that same section that "the cost of providing the person and his dependents with the necessities of life" must also be considered.

Critically, section 210.430.30(b) declares that "*Any* doubts as to a person's eligibility should be resolved *in the person's favor*; erroneous determinations of eligibility may be corrected at a later time." (emphasis added). Further, section 210.40.50 provides that the "initial determination of eligibility should be made without regard to the financial ability of the person's family unless the family indicates willingness and financial ability to retain counsel promptly."

Section 210.40.20(e) states: "Employees of law enforcement agencies or U.S. attorney offices should not …seek to obtain information from a person requesting the appointment of counsel concerning the person's eligibility." Section 210.30.20(g) adds: "The prosecution and other interested entities may present to the court information

11

concerning the person's eligibility, but the judicial inquiry into financial eligibility must *not* be utilized as a forum to discover whether the person has assets subject to forfeiture, or the ability to pay a fine, make restitution, or compensate another person under the Victim/Witness Protection Act or other purposes not related to the appointment of counsel." (emphasis added).

### III. CONCLUSION

For each of the above reasons, the Application should be granted.

Dated: July 24, 2020                     Respectfully submitted,

/s/ H. Dean Steward
H. DEAN STEWARD

Attorney for Defendant
MICHAEL JOHN AVENATTI

# CERTIFICATE OF SERVICE

I, H. Dean Steward, am a citizen of the United States, and am at least 18 years of age. My business address is 107 Avenida Miramar, Ste. C, San Clemente, CA 92672. I am not a party to the above-entitled action. I have caused, on July 24, 2020, service of the defendant's:

DEFENDANT'S FURTHER SUBMISSION AND RESPONSE TO THE GOVERNMENT'S RESPONSE TO DEFENDANT'S EX PARTE APPLICATION FOR CJA APPOINTMENT

on the following party, using the Court's ECF system:

AUSA BRETT SAGEL AND AUSA JULIAN ANDRE

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 24, 2020

/s/ H. Dean Steward
H. Dean Steward

13