NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
JULIAN L. ANDRÉ (Cal. Bar No. 251120)
Assistant United States Attorney
Major Frauds Section
       1100 United States Courthouse
       312 North Spring Street
       Los Angeles, California 90012
       Telephone: (213) 894-6683
       Facsimile: (213) 894-6269
       Email:    Julian.L.Andre@usdoj.gov

BRETT A. SAGEL (Cal. Bar No. 243918)
Assistant United States Attorney
       Ronald Reagan Federal Building
       411 West Fourth Street, Suite 8000
       Santa Ana, California 92701
       Telephone:  (714) 338-3598
       Facsimile:  (714) 338-3708
       Email:    Brett.Sagel@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>               v.<br><br>MICHAEL JOHN AVENATTI,<br><br>          Defendant. | SA CR No. 19-061-JVS<br><br>GOVERNMENT'S CONSOLIDATED POSITION REGARDING DEFENDANT'S VIOLATIONS OF HIS CONDITIONS OF TEMPORARY RELEASE AND OPPOSITION TO DEFENDANT'S MOTION TO PRECLUDE REVIEW AND USE OF PRETRIAL SERVICES REPORT; DECLARATION OF JULIAN L. ANDRÉ AND EXHIBITS |

     Plaintiff United States of America, by and through its counsel

of record, the United States Attorney for the Central District of

California and Assistant United States Attorneys Julian L. André and

Brett A. Sagel, hereby files its consolidated position regarding

defendant's violations of his temporary release conditions and

opposition to defendant's motion to preclude review and use of the

1 United States Probation and Pretrial Services Office's digital

2 forensic examination report (CR 207).

3    The government's consolidated position and opposition is based

4 upon the attached memorandum of points and authorities, the

5 supporting declaration of Julian L. André and attached exhibits, the

6 previously lodged transcript of Jay Manheimer's June 17, 2020,

7 examination (CR 200), the files and records in this case, and such

8 further evidence and argument as the Court may permit.

9  Dated: July 28, 2020          Respectfully submitted,

10                               NICOLA T. HANNA
                                 United States Attorney
11
                                 BRANDON D. FOX
12                               Assistant United States Attorney
                                 Chief, Criminal Division
13

14                                    /s/
                                 _____
                                 JULIAN L. ANDRÉ
15                               BRETT A. SAGEL
                                 Assistant United States Attorney
16
                                 Attorneys for Plaintiff
17                               UNITED STATES OF AMERICA

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

DESCRIPTION                                                              PAGE

TABLE OF AUTHORITIES.................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.    INTRODUCTION..................................................1

II.   STATEMENT OF FACTS............................................3

      A.    Defendant's Temporary Release...........................3

      B.    Defendant Claimed He Could Not Prepare for Trial
            Because He Had No Access to a Computer..................4

      C.    The Government Discovered that Defendant Used
            Manheimer's Computer to Draft Pleadings................6

      D.    Defendant's Initial Privilege Objections................8

      E.    Manheimer Testified that Defendant Personally Used
            Manheimer's MacBook Computer...........................10

      F.    Disclosure of the PTS Forensic Examination Report and
            Defendant's Privilege Objection........................13

III.  ARGUMENT.....................................................16

      A.    Defendant Intentionally Violated His Temporary Release
            Conditions by Using Manheimer's Computer...............16

      B.    Defendant Intentionally Misled this Court..............20

      C.    Manheimer Is Not a Suitable Third-Party Custodian......21

      D.    Defendant's Privilege Objections Are Meritless.........23

            1.    Defendant Has Failed to Establish that the
                  Contents of the PTS Report are Privileged........24

            2.    Defendant Is Attempting to Use the Attorney-
                  Client Privilege as a Sword and a Shield.........28

      E.    Potential Remedies for Defendant's Violation of His
            Temporary Release Conditions...........................32

IV.   CONCLUSION...................................................34

i

**TABLE OF AUTHORITIES**

<u>DESCRIPTION</u>                                                                                    <u>PAGE</u>

**FEDERAL CASES**

<u>Apple Inc. v. Samsung Elec. Co.</u>,
       306 F.R.D. 234 (N.D. Cal. 2015)...............................27

<u>Chevron Corp. v. Pennzoil Co.</u>,
       974 F.2d 1156 (9th Cir. 1992).................................28

<u>Couch v. United States</u>,
       409 U.S. 322 (1976)...........................................25

<u>Dolby Labs. Licensing Corp. v. Adobe Inc.</u>,
       402 F. Supp. 3d 855 (N.D. Cal. 2019).........................26

<u>Dole v. Milonas</u>,
       889 F.2d 885 (9th Cir. 1989)..................................27

<u>Eden Isle Marina, Inc. v. United States</u>,
       89  Fed. Cl. 480 (Fed. Cl. 2009)..............................27

<u>Feld v. Fireman's Fund Ins. Co.</u>,
       991 F. Supp. 2d 242 (D.D.C. 2013)............................26

<u>Fisher v. United States</u>,
       425 U.S. 391 (1976)...........................................24

<u>In re Grand Jury Investigation</u>,
       974 F.2d 1068 (9th Cir. 1992).............................24, 27

<u>Matter of Walsh</u>,
       623 F.2d 489 (7th Cir. 1980)..................................25

<u>Meade v. Gen. Motors, LLC</u>,
       250 F. Supp. 3d 1387 (N.D. Ga. 2017).........................26

<u>United States v. Al-Shawaf</u>,
       No. 5:16-CV-01539-ODW (SPX),
       2017 WL 6001273 (C.D. Cal. Nov. 8, 2017)....................26

<u>United States v. Amlani</u>,
       169 F.3d 1189 (9th Cir. 1999).................................28

<u>United States v. Krug</u>,
       868 F.3d 82 (2d Cir. 2017)....................................24

<u>Upjohn Co. v. United States</u>,
       449 U.S. 383 (1981)...........................................25

**FEDERAL STATUTES**

18 U.S.C. § 3142(i)........................................3, 32

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

**I.   INTRODUCTION**

Defendant MICHAEL JOHN AVENATTI ("defendant") has again proven he cannot be trusted.  In April 2020, this Court temporarily released defendant to the custody of his friend Jay Manheimer due to defendant's alleged health concerns relating to the COVID-19 pandemic.  (CR 140.)  Defendant's conditions of temporary release, to which he stipulated, state that defendant "shall not possess, use, or access any digital devices that offer or allow internet access." (CR 140, ¶ 12.)  In direct violation of this condition, defendant used Manheimer's computer to personally draft or edit various pleadings in this case, including a status report in which defendant claimed that he could not prepare for trial in this matter because his release conditions prevented him from using a computer to review discovery or work on motions (CR 164).  In other words, defendant violated his release conditions by using Manheimer's computer to draft a status report in which he acknowledged that his release conditions precluded him from using that very same computer and argued that he therefore could not prepare for trial.

In June 2020, the government alerted this Court to the fact that defendant had likely violated his conditions of release by using Manheimer's computer to draft five recent pleadings in this case, and requested that the Court conduct a further inquiry.  (CR 177.)  The Court agreed, (1) authorizing the government to question Manheimer under oath, and (2) directing the United States Probation and Pretrial Services Office ("PTS") to conduct a forensic examination of any digital devices at Manheimer's residence.  In connection with this inquiry, defendant offered a series of evolving and incredible

explanations as to how Manheimer's computer could have been used to prepare the filings in this case without defendant violating his release conditions.  Manheimer's testimony proved that these prior explanations were false and misleading.

Manheimer testified that defendant had in fact used Manheimer's computer to work on defendant's legal cases.  Although defendant will undoubtedly claim the use of Manheimer's computer was fine because Manheimer had allegedly "turned off" the internet on the computer, such use was undoubtedly a violation of defendant's release conditions.  Manheimer's testimony also directly contradicts defendant's prior representations to this Court, including defense counsel's statement that "Mr. Avenatti has not had access to a device with internet capabilities" (6/8/2020 RT 11:17-22).  Defendant cannot be trusted to comply with his temporary release conditions or be candid with this Court, and Manheimer cannot be trusted to properly supervise defendant while defendant is on temporary release.

Rather than address Manheimer's testimony and defendant's violation of his release conditions, defendant devotes his entire brief to a privilege claim regarding the forensic report prepared by PTS (the "PTS Report").  None of the information disclosed in the PTS Report, such as an email subject line or file name, discloses the content of any confidential attorney-client communication.  It appears the primary purpose of defendant's privilege argument is to prevent this Court and the government from reviewing generic non-privileged information that would further prove that defendant violated his release conditions and intentionally misled this Court.  Having placed his ability to use a computer and prepare for trial directly at issue before this Court, defendant should not be allowed

2

to engage in further gamesmanship and use such privilege claims to prevent the government and the Court from evaluating the accuracy of his representations.

Regardless of how the Court resolves defendant's privilege objection, there is no longer any question as to whether defendant violated his conditions of his release -- he did so knowingly and intentionally.  Thus, the ultimate question before this Court is what is the appropriate remedy for defendant's specific violation?  The government is mindful of the Court's prior rulings in this case regarding the impact of COVID-19 as a basis for granting defendant's temporary release.  Defendant, however, should not be allowed to remain on temporary release if he cannot be trusted to comply with his release conditions or be candid with this Court.  At a minimum, if the Court allows defendant to remain on temporary release, the Court should require defendant to identify a new third-party custodian.  Manheimer, if believed, could barely remember events that had taken place within the past three weeks, and proved to be either incapable of or unwilling to properly supervise defendant.

Accordingly, the government respectfully requests that the Court: (1) conduct an in camera review of the PTS Report and authorize the government to review all non-privileged portions; and (2) address defendant's violation of his temporary release conditions at the status conference on August 3, 2020, or at a later date and time convenient to the Court.

## II.   STATEMENT OF FACTS

### A.   Defendant's Temporary Release

In April 2020, this Court ordered defendant temporarily released from custody pursuant to 18 U.S.C. § 3142(i) due to the COVID-19

3

1   pandemic and defendant's alleged health concerns.[1] (CR 140; CR 154.)

2   Defendant was released to the custody of a third-party custodian, Jay

3   Manheimer. (CR 140 ¶ 12; CR 154.)  Among other things, the conditions

4   of defendant's temporary release state that "defendant shall not

5   possess, use, or access any digital devices that offer or allow

6   internet access."[2]  (CR 140 ¶ 12; CR 154.)  As the Court has

7   explained, the "restriction [was] not that he couldn't use the

8   internet, but he was not to have access to devices that would permit

9   him to use the internet."  (6/8/20 RT 10.)  Defendant's release

10  conditions, however, had exceptions designed to allow him to assist

11  with his defense, including, for example, the ability to use a

12  computer while in the presence of his legal counsel. (CR 140, ¶ 13.)

13        **B.    Defendant Claimed He Could Not Prepare for Trial Because He**
                **Had No Access to a Computer**
14

15        On May 27, 2020, defendant filed an unsolicited 33-page status

16  report.  (CR 164.)  Defendant argued, among other things, that his

17  ability to prepare for trial, including motion practice, had been

18  "severely impacted" by a number of factors.  (Id. at 1-2.)  Most

19  notably, defendant argued that he could not prepare for trial because

20

21        [1] The government continues to question defendant's sincerity
    regarding his health concerns as he has had numerous visitors since
22  his temporary release, including his girlfriend who traveled cross-
    country by airplane from Florida to stay with him on at least two
23  separate occasions. (See CR 200-1 at 21:19-23:25.)

24        [2]  This condition was imposed after defendant first proposed
    restrictions on his use of digital devices.  On March 30, 2020,
25  defendant proposed that PTS be allowed to randomly search and monitor
    his electronic devices to ensure that he was not engaged in improper
26  financial transactions.  (CR 129 at 6; CR 129-1 at 1.)  In response
    to this proposal, the Court ruled: "If he is released, we need
27  conditions to ensure that he has not access to any form of
    telecommunications or wire."  (CR 132 at 4.)  The government and
28  defendant then met-and-conferred and jointly proposed the specific
    language included in the defendant's release order.  (CR 140.)

                                    4

his release conditions prevented him from using a computer to review the discovery.  (Id.)  Defendant did not disclose that he had already been using Manheimer's computer to work on this case, including to draft, revise, and/or edit portions of that very same status report.

In response, the Court suggested that the discovery be "loaded on a laptop or desktop, under the supervision of the parties, with disabled communications ability."  (CR 166.)  Defendant immediately filed a second supplemental status report agreeing with the Court's suggestion and asking that "the government work with the defense to accomplish this as quickly as possible."  (CR 167.)

At the June 1, 2020, status conference, the Court again addressed defendant's inability to use a computer to review discovery.  The Court reiterated that defendant should be provided a "disabled laptop with the discovery" and said it "[did not] see why that can't be done and can't be done quickly."  (6/1/2020 RT 6:12-16.)  Both parties agreed.  (Id. at 6:17-7:20.)  The government said it had "no objection to Mr. Steward providing the defendant a disabled computer," but requested that PTS be advised of the computer defendant would be using and "provided an opportunity to confirm that the computer had been disabled."  (Id.)  Although the Court had just minutes earlier told defense counsel that "I expect a greater degree of candor from you going forward" (id. at 5:18-21)[3], neither defendant nor his counsel disclosed that defendant had already been using Manheimer's computer to work on this case (id. at 6:12-7:20.)

---

[3] The Court's comments were related to claims in defendant's status report about the discovery the government produced in this case.  As described in Section III.A., infra, statements made by defendant and his counsel at the June 1, 2020, status hearing, further demonstrate that defendant likely wrote most if not all of the May 27, 2020 status report (CR 164).

Consistent with the Court's directions, on June 5, 2020, the parties jointly lodged a proposed modification of defendant's temporary release conditions to allow him to use an "internet-disabled laptop computer to access the discovery in this case." (CR 173.)  The notice of lodging was personally signed by defendant and his counsel. (CR 173 at 2.)  The Court entered the modification order on June 8, 2020. (CR 180.)

In addition to the filings referenced above, defendant filed a number of other documents during this same two-week time period, including three additional status reports or supplemental status reports on May 28, 2020, June 5, 2020, and June 7, 2020, and a brief regarding defendant's representation issues on June 5, 2020. (CR 165; CR 172; CR 174; CR 178).

**C.   The Government Discovered that Defendant Used Manheimer's Computer to Draft Pleadings**

Despite defendant claiming he could not access a computer to review the discovery, the government soon discovered that defendant had used Manheimer's computer to create the last five pleadings defendant had filed with this Court. (CR 177.)  Specifically, the metadata for defendant's last five pleadings (CR 164; CR 165; CR 167; CR 172; CR 174), including his May 27, 2020, status report (CR 164), indicated that the author of the documents was "JAY MANHEIMER" and that the filed PDFs were created using Microsoft Word and Manheimer's MacBook computer. (CR 177.)

On June 7, 2020, the government alerted the Court to the potential violations and requested that the Court authorize a further inquiry as to the violations. (<u>Id.</u>)  The government requested that the Court: (1) direct Pretrial Services to search Mr. Manheimer's

6

residence, including his digital devices; and (2) allow the government to examine Manheimer under oath "regarding his involvement in the creation of these pleadings and/or defendant's access to Mr. Manheimer's computer and the internet." (Id. at 10.)

Later that evening, defendant filed his opposition to the government's violation inquiry request.[4] (CR 179.) Defendant did not deny using Manheimer's computer, and instead merely stated that he had "not accessed the internet using any computer or electronic devices." (CR 179.) Defendant then offered a convoluted theoretical explanation about how Manheimer could have assisted defense counsel in finalizing those pleadings without defendant actually using a computer and violating his temporary release conditions. (Id.) For example, defendant stated:

> Mr. Avenatti is able to review documents with his counsel via email between Mr. Manheimer and counsel. Mr. Manheimer is then able to print those documents for Mr. Avenatti's review. Mr. Avenatti is able to communicate with his counsel regarding changes and edits to the documents, including via email between Mr. Manheimer and his counsel, and phone calls. There is also nothing prohibiting Mr. Manheimer from printing to pdf the final agreed-upon filings for undersigned counsel's convenience and then emailing that final document for filing.

(CR 179 at 1-2.) Notably, defendant never disclosed that he had personally used Manheimer's computer to work on those pleadings; nor

---

[4] Approximately one hour after the government alleged that defendant violated his conditions of release (CR 177), defendant filed another supplemental status report (CR 178). Just as with defendant's last five pleadings, the metadata shows that this supplemental status report was also created using Manheimer's computer. (CR 178.) Apparently, this document was filed before defendant or his counsel reviewed the government's brief, because defendant's subsequent opposition did not contain any such metadata and was instead printed and then physically scanned (CR 179).

did he claim that it would have been appropriate for him to do so as long as the internet was temporarily turned off.

At a status conference the next day, June 8, 2020, the Court reiterated that the "restriction is not that he couldn't use the internet, but that he was not to have access to devices that would permit him to use the internet." (6/8/2020 RT 10:6-19; CR 180.)  The Court said the allegations warrant further investigation, and agreed with the government's requests that PTS search Manheimer's computer and the government be allowed to examine Manheimer. (6/8/2020 RT 10:6-19.)  Defendant also agreed that this was a "good plan." (Id. at 10:22-23.)  Defense counsel did not disclose that defendant had been using Manheimer's computer to prepare pleadings in this case. Rather, counsel told the Court that he "spoke with Mr. Manheimer last night, and he assured me that Mr. Avenatti has not had access to a device with internet capabilities." (Id. at 11:15-22.)  As set forth further below, this representation was inaccurate.

### D.  Defendant's Initial Privilege Objections

On June 10, 2020, PTS searched Manheimer's residence and took custody of several digital devices so that it could conduct the Court-ordered search of those devices. (CR 185.)  Defendant immediately objected to the search and asked the Court to amend its prior Order to "exclude from review any attorney-client privileged material by Pre-Trial Services/Probation." (Id.)  The government filed a short response, which included an invitation to defendant to provide the Court with evidence demonstrating that defendant and his counsel prepared the filings in the manner defendant claimed to moot any potential issue. (CR 186.)  Defendant filed a reply (CR 187),

1    and the Court set a hearing to discuss defendant's objection (CR

2    188).

3         During the hearing, the Court began by asking defense counsel to

4    explain the "mechanics" of how documents were transmitted to and from

5    defendant. (6/11/2020 RT 4:11-5:10.) Counsel explained that he

6    would send a document to Manheimer, who would print it and deliver it

7    to defendant. (Id.) Defendant would then handwrite edits and give

8    them to Manheimer, who would send the edits back to counsel via a

9    scanned PDF or an email. (Id.) Counsel did not disclose that

10   defendant himself had been using Manheimer's computer at any point

11   during this process. The government again suggested defendant could

12   resolve this entire issue by submitting to the Court in camera the

13   relevant correspondence, including the initial drafts of any pleading

14   that were sent from counsel to defendant, as well as proof that

15   defense counsel had done the legal research in the filings. (Id. at

16   6:25-7:6.) Defendant never did so.

17        As to the substance of defendant's privilege objection,

18   defendant repeatedly indicated that he was willing to rely on PTS to

19   conduct the review and identify any privileged documents. (6/11/2020

20   RT 4:4-10, 9:20-10:7.) Indeed, defense counsel said PTS was "quite

21   good at it" and that he was "fine with them making a determination

22   whether it's an attorney/client communication." (Id. at 10:3-6.)

23   The parties and the Court thus agreed that PTS would conduct the

24   review and would be "entitled to open up any email for the limited

25   purpose of determining whether it's attorney/client communication."

26   (Id. at 10:8-22.) The clear focus of this discussion was on whether

27   the content of certain emails or documents were privileged. At no

28   point did defendant argue that the mere fact that there was a

                                      9

communication was itself privileged, or that the existence of a particular file on Manheimer's computer would be privileged information.

### E.   Manheimer Testified that Defendant Personally Used Manheimer's MacBook Computer

On June 17, 2020, the government conducted Manheimer's under-oath examination.  (CR 200-1.[5])  Although Manheimer struggled to remember specific details of what had occurred during the preceding three weeks, he admitted that defendant had personally used Manheimer's computer to work on defendant's legal cases in late May. Manheimer testified as follows:

> AUSA ANDRÉ:    Have you seen defendant use that MacBook computer for any reason?
>
> MANHEIMER:    There was one time, I believe, Mr. Steward directed us for something, and I – the internet was not accessible, and I supervised him.  I don't know what he was working on.
>
> AUSA ANDRÉ:    So one time, he used the MacBook.  You said the internet was off.  Did you turn off the internet?
>
> MANHEIMER:    Yes.
>
> AUSA ANDRÉ:    You said you supervised him.  What did you do to supervise him?
>
> MANHEIMER:    I was next to him, right behind him.
>
> AUSA ANDRÉ:    How long did he use the MacBook for?
>
> MANHEIMER:    I don't remember how long.
>
> AUSA ANDRÉ:    Do you have a best estimate?
>
> MANHEIMER:    I don't know.  An hour or two maybe.

_____

[5]  On July 16, 2020, the government lodged with the Court the transcript of Manheimer's examination, the errata sheet and penalty of perjury statement signed by Manheimer, and the exhibits from the examination.  (CR 200.)

| | | |
|---|---|---|
| AUSA ANDRÉ: | When did this occur, approximately?  How long ago?  Last week?  Last month? |
| MANHEIMER: | I don't know.  I think it was around the end of May. |
| *** | |
| AUSA ANDRÉ: | What was your understanding as to what defendant was using your MacBook computer for on that specific instance? |
| MANHEIMER: | To me, it related to one of his cases. |
| AUSA ANDRÉ: | You said you supervised him.  Do you know what he was doing on the computer? |
| MANHEIMER: | I don't know.  It was some sort of document. |
| AUSA ANDRÉ: | So you recall him working on a document? |
| MANHEIMER: | Yes. |
| AUSA ANDRÉ: | Was he typing? |
| MANHEIMER: | I think so. |

(CR 200-1 at 34:7-35:17, 72:23-11.)[6]  Although Manheimer said he did not recall defendant using Manheimer's MacBook any additional times (id. at 35:22-24), he later testified that there were potentially two or more instances in which defendant used Manheimer's computer (id. at 79:19-80:12).  Manheimer also confirmed that defendant's counsel was not present during either instance in which defendant had used Manheimer's computer.  (Id. at 114:10-14.)[7]

---

[6] Manheimer also testified that he believed it was fine for defendant to use his computer so long as the internet was turned off. (CR 200-1 at 91:3-16.)  This was because defendant never told Manheimer that this was violation, and Manheimer never asked PTS whether such use was appropriate under defendant's release conditions.  (Id.)  And although Manheimer apparently spoke to defense counsel about such use, he does not recall the specifics of that conversation.  (Id.; CR 200-2 at 5 (changing prior testimony).)

[7] As noted above, defendant was permitted to use a computer in the presence of his counsel.  (CR 140, ¶ 13.)

Defense counsel, however, repeatedly prevented the government from obtaining additional information regarding defendant's use of Manheimer's computer.  Despite previously describing to the Court the purported process by which Manheimer and defendant assisted with the preparation of pleadings (see CR 179; 6/11/2020 RT 4:11-5:10), defense counsel repeatedly objected to Manheimer answering questions regarding that process during the examination (CR 200-1 at 55:25-60:4).  For example, defense counsel objected on privilege grounds to questions regarding whether Manheimer would make edits to the documents before he converted them to PDF and sent them to defense counsel (id. at 56:8-57:4); whether he saw defendant physically edit those documents (id. at 57:25-59:7); and whether Manheimer saw defendant use Manheimer's computer or any other digital device to write any portions of those documents (id. at 59:22-60:4). Manheimer's counsel then instructed Manheimer not to answer those questions.  (Id. 55:25-60:4.)  Manheimer technically answered some of these questions when he submitted his errata sheet one month later, but did not provide any actual information. (CR 200-2 at 4.) Instead, Manheimer merely claimed "I don't recall if Mr. Avenatti edited anything" and "I don't recall if Mr. Avenatti wrote anything." (Id.)

Manheimer also could not recall anything about the specific pleadings that had been generated using Manheimer's computer and subsequently filed with this Court.  Manheimer repeatedly claimed that he did not recognize those documents, did not recall what he done to assist with the documents, and did not recall what defendant had done to prepare the documents.  For example, Manheimer was unable to recall whether he or defendant had assisted in preparing the two

12

documents defendant filed on June 5, 2020 (6/11/2020 RT 81:6-84:2), or the supplemental status report defendant filed on June 7, 2020 (id. at 85:16-87:1), even though all three documents were created using Manheimer's computer less than two weeks earlier (see CR 177).

Manheimer did, however, indicate that he would frequently conduct internet searches for defendant. He also said that he sometimes printed news articles to attach to defendant's pleadings, but again could not provide the government with any specific information regarding the articles he printed.

At the conclusion of the examination the parties agreed that Manheimer would have an opportunity to review the final transcript and make sure there were no mistakes. (CR 200-1 at 115:10-116:7.) On June 29, 2020, the court reporter finalized the transcript and provided electronic copies to the parties (CR 200-1 at 120), and on July 14, 2020, Manheimer's counsel emailed the parties a six-page errata sheet and the signed penalty of perjury statement (CR 200-2). Manheimer altered a significant number of his answers and, in a number of instances, completely changed his testimony. (CR 200-2.)

**F.    Disclosure of the PTS Forensic Examination Report and Defendant's Privilege Objection**

On June 30, 2020, PTS Officer Shakira Davis advised the government that PTS had completed its forensic examination of the devices seized from Manheimer's residence. (André Decl. Ex. 1.) Officer Davis said PTS was not taking any action because it "could not conclusively determine the defendant to be in violation of the

13

1  release conditions."[8]  (Id.)  Officer Davis also said that PTS was

2  waiting for the Court to determine if PTS was authorized to release

3  the findings to all the parties.  (Id.)

4      Later that day, Officer Davis emailed the government and defense

5  counsel a copy of the PTS Report, which the government understood the

6  Court had authorized PTS to release to the parties.  (André Decl. Ex.

7  1, ¶ 3.)  Because Officer Davis's initial email did not include the

8  PTS Report's attachments, she emailed the parties full PTS Report

9  (including the attachments) later that day.  (Id.)  Government

10 counsel conducted a preliminary review of the full PTS Report that

11 evening.  (André Decl. ¶ 4.)  Undersigned counsel does not recall

12 seeing anything in PTS Report or its attachments that appeared to be

13 privileged information.[9]  (Id.)  Rather, the PTS Report, including

14 its attachments, primarily included the type of information that

15 would typically appear in a basic privilege log, such as the date,

16 time, recipients, and subject of certain emails, and the file names

17 of any email attachment.  (Id.)

18     The next day, July 1, 2020, defense counsel advised the

19 government that it objected to the disclosure of the PTS Report and

20 its attachments because they contained privileged information. (André

21 Decl. Ex. 2.)  The government then received a number of additional

22 emails from defense counsel requesting that the government not review

23 the materials further until the issue had been resolved by the Court.

24 _____

25     [8] When PTS prepared its report it had not received or reviewed
   the transcript of Manheimer's testimony.  Accordingly, PTS has never

26 had the benefit of comparing its findings to Manheimer's actual
   testimony.  And the government has not sought to further discuss with

27 PTS its report or Manheimer's testimony because it has agreed not to
   access the PTS Report until this privilege issue is resolved.

28     [9] Notably, it appeared that the pleadings at issue were only
   emailed in one direction: from Manheimer to defense counsel.

1  (André Decl. Exs. 3-4.)  Although the government advised defendant

2  that it did not believe the report contained any privileged

3  information, a conclusion that both the Court and PTS had also

4  reached, the government agreed not to conduct any further review of

5  the report or its attachments.  (André Decl. Ex. 3.)  Government

6  counsel has not accessed or reviewed the report since June 30, 2020.

7  (André Decl. ¶ 6.)

8       On July 6, 2020, during a telephonic status conferences, the

9  parties addressed defendant's temporary release, defendant's

10 privilege objections to the PTS Report, and the transcript of

11 Manheimer's testimony.  Defendant requested that his temporary

12 release be extended due to COVID-19. (7/6/2020 RT 5:25-7:19.)  The

13 government opposed defendant's request to extend his temporary

14 release, arguing that the Court should consider the evidence

15 regarding defendant's violation before extending defendant's

16 temporary release.  (Id. at 7:20-9:22.)  The government further noted

17 that it was missing critical information because it was unable to

18 review the PTS Report due to defendant's privilege objection.

19      The Court indicated that it had reviewed the PTS Report and that

20 it believed "there's no more information there than you'd find in a

21 carefully and diligently prepared privilege log." (7/6/2020 RT 10:1-

22 10.)  The Court then told defendant he had seven days after the

23 Manheimer transcript was finalized to submit a brief regarding the

24 relief defendant was requesting, including whether the PTS Report

25 itself is privileged.  (Id.)  The Court also extended defendant's

26 temporary release an additional 60 days, but expressly reserved the

27 right to remand defendant at any time, including in response to

28

1  information in the PTS Report or Manheimer's testimony.  (<u>Id.</u> at
2  10:25-11:8.)

3      On July 21, 2020, defendant moved to preclude the government
4  from reviewing or using the PTS Report or its attachments, arguing
5  that the contents of the PTS Report are protected by the attorney-
6  client privilege and/or attorney-work-product doctrine.  (CR 207.)
7  Defendant, however, did not address Manheimer's testimony,
8  defendant's violation of his release conditions, or the extension of
9  defendant's temporary release.  (CR 207.)

10 **III. ARGUMENT**

11     **A.   Defendant Intentionally Violated His Temporary Release
            Conditions by Using Manheimer's Computer**
12

13     Defendant's conditions of temporary release state that
14 "defendant shall not possess, use, or access any digital devices that
15 offer or allow internet access."  (CR 140 ¶ 12; CR 154.)  The
16 "restriction [was] not that he couldn't use the internet, but he was
17 not to have access to devices that would permit him to use the
18 internet."  (6/8/20 RT 10.)  There is now indisputable evidence that
19 defendant intentionally violated this condition by using Manheimer's
20 MacBook computer.

21     <u>First</u>, Manheimer testified that defendant used Manheimer's
22 MacBook computer on at least two occasions in late May to do work
23 relating to his legal cases.  (CR 200-1 at 34:7-35:17, 72:23-73:11,
24 114:10-14.)  Although Manheimer testified that the internet was
25 turned "off" and he "supervised" defendant at all times, Manheimer
26 could not recall any specific information about what defendant
27 actually did other than that defendant was typing on "some sort of
28 document" (<u>id.</u> at 35:12-17) and might have used Microsoft Word to do

                                16

so (id. at 72:23-73:7).  Whether the internet was on or off is irrelevant since Manheimer's MacBook was undoubtedly a device that "offer[s] or allow[s] internet access." (Id. at 32:13-34:6.) Indeed, Manheimer testified that the computer is permanently connected to the internet through the Wi-Fi. (Id.) Manheimer's testimony that defendant used this computer unequivocally proves that defendant violated his temporary release conditions.

Second, six of defendant's pleadings in this case were created using Manheimer's computer. (CR 177.)[10]  At a minimum, defendant wrote substantial portions of the May 27, 2020, status report (CR 164), given that was the only significant pleading defendant filed in late-May -- the time period in which Manheimer admitted defendant used his computer (CR 200-1 at 32:13-35:17). Moreover, when the Court expressed concern regarding counsel's lack of candor during the June 1, 2020, status conference, it was defendant -- not counsel -- who responded and pointed the Court to specific portions of the May 27, 2020, status report. (6/1/2020 RT 5:14-6:1.)[11]

In light of Manheimer's testimony, however, the Court can properly infer that defendant himself used Manheimer's computer to draft or edit significant portions of all six pleadings. Crucially, Manheimer could not recall doing any specific work on those six pleading, all of which had been filed within two-to-three weeks of his examination. (CR 200-1 at 63:14-65:25, 73:12-76:16, 81:6-84:2,

---

[10] The sixth pleading, defendant's June 7, 2020, supplemental status report (CR 178), was filed after the government's request for a violation inquiry.

[11] When the Court later raised concerns regarding the length and relevancy of much of defendant's 34-page May 27, 2020, Status Report, defense counsel stated: "The Court is very familiar with my writing. I am usually very succinct." (6/1/2020 RT 16:9-17:6.)

1    85:16-87:1.)  Manheimer did not even recognize the pleadings, other

2    than the May 27, 2020, status report which "looked familiar." (Id.)

3    Had Manheimer edited and/or finalized these pleadings as defendant

4    previously claimed one would expect Manheimer to recognize them and

5    remember at least some of the work he did to help prepare them.  And

6    although Manheimer himself could not remember whether he worked on

7    any of the documents that were created using his computer, he

8    acknowledged that it was possible defendant could have used

9    Manheimer's computer to do so "as long it didn't need the internet."

10   (Id. at 76:7-16.)

11        Third, there is no question that defendant understood that he

12   was not allowed to access, possess, or use any computer that was

13   capable of being connected to the internet, including Manheimer's

14   MacBook.  In his May 27, 2020, status report, defendant argued that

15   he could not prepare for trial, including motion practice, because

16   his release conditions prevented him from using a computer to review

17   the discovery.  (CR 164 at 1-2.)  If defendant believed it was

18   appropriate to use Manheimer's computer so long as the internet was

19   turned off, there would have been no reason for defendant to raise

20   the computer access issue in his status report; he would have been

21   able to use Manheimer's computer to review the discovery at any time.

22   And at no point during the discussions with the Court regarding

23   obtaining a computer for defendant to review the discovery did

24   defendant ever indicate he believed it was appropriate to use

25   Manheimer's computer or any other computer so long as the internet

26   was temporarily turned off.

27        Defendant also personally signed the proposed modification of

28   his release conditions allowing him to use an internet-disabled

                                    18

laptop going forward. (CR 173.)  If defendant believed it was appropriate to use Manheimer's computer so long as the internet was off, such a modification would have been entirely unnecessary.

Moreover, if defendant truly believed he was allowed to use Manheimer's computer, defendant would have immediately raised that issue with the Court when the government first accused him of violating his release conditions on June 7, 2020.  Instead, defendant offered a series of convoluted explanations (see CR 179) and falsely claimed that he "has not had access to a device with internet capabilities" (6/8/2020 RT 11:15-22).  Defendant never argued that his conditions allowed him to use Manheimer's computer so long as the internet was temporarily off because defendant knew he was not allowed to do so.

Finally, the government expects that defendant will argue, as he has done in other pleadings (see CR 209), that the government is trying to prevent him from assisting with his defense.  Nothing could be further from the truth.  The government has no objection to defendant assisting with his defense; defendant is entitled to do so and has at all times remained free to do so.  Defendant, however, cannot violate his release conditions or mislead this Court.  Here, he did both.  If defendant felt his release conditions were preventing him from effectively assisting with his defense, he could have raised that issue with the government and/or the Court and sought to modify his conditions.  But rather than asking the government or the Court to modify his release conditions when he was initially released from custody, defendant intentionally violated those conditions in an attempt to argue -- over a month after he was

1  released -- that he was being unfairly prevented from reviewing

2  discovery and therefore could not prepare for trial.

3        **B.   Defendant Intentionally Misled this Court**

4       Manheimer's testimony also confirmed that defendant

5  intentionally misled this Court on numerous occasions.

6       <u>First</u>, defendant's initial claims in his May 27, 2020, status

7  report that he could not prepare for trial or assist with his

8  defense, including working on motions practice, because his release

9  conditions prevented him from using a computer to review the

10 discovery were, at a minimum, wholly misleading.  Defendant himself

11 had used Manheimer's computer to write substantial portions, if not

12 all, of that very same status report.  And despite being admonished

13 by the Court regarding his lack of candor moments earlier, neither

14 defendant nor his counsel disclosed defendant's use of Manheimer's

15 computer during the June 1, 2020, status conference or anytime

16 thereafter.  (<u>See</u> 6/1/2020 RT 5:18-7:20.)

17      <u>Second</u>, since the government accused defendant of violating his

18 release conditions, defendant has repeatedly misled this Court

19 regarding his use of Manheimer's computer.  As discussed above,

20 defendant has had multiple opportunities to disclose to the Court

21 that defendant used Manheimer's computer to work on this case, but

22 has failed to do so.  Instead, the defense explicitly denied any such

23 use, falsely stating that defendant "has not had access to a device

24 with internet capabilities." (6/8/2020 at 11:15-22.)  And the

25 convoluted explanations defendant offered regarding the creation of

26 these pleadings -- <u>e.g.</u>, Manheimer simply printed the documents to

27 PDF because defense counsel could not do so at his house (CR 179) --

28 were not supported by Manheimer's testimony during which Manheimer

could either not remember much of anything regarding the creation of the documents or refused to answer the questions based on defendant's privilege objections.  Indeed, after initially telling the Court that the examination of Manheimer was a "good plan" and describing the process by which these pleadings were created, the defense has consistently attempted to prevent the government from evaluating the accuracy of its representations.

Moreover, if defendant believed the process by which defendant used Manheimer's computer to create the pleadings was entirely appropriate, there would have been no reason for defendant to have changed the manner in which he creates and files documents since the government raised the issue on June 7, 2020.  Defendant's actions, however, are quite telling as he now prints and scans the documents before filing, thus concealing the author of the document from the metadata.  (Compare CR 164, CR 278 with CR 179, CR 207, CR 209.)

### C.   Manheimer Is Not a Suitable Third-Party Custodian

Manheimer's testimony also establishes that Manheimer is not suitable to serve as defendant's third-party custodian.  Manheimer agreed to supervise defendant and notify PTS if defendant violated his conditions of his release.  (CR 143.)  Manheimer has shown he is either incapable or unwilling to perform either task.

Manheimer had only a minimal understanding of defendant's release conditions.  During his deposition, Manheimer testified he had never even seen defendant's conditions of release.  (CR 200-1 at 10:20-14:1.)  But, in his errata, Manheimer changed this testimony to indicate that defendant or counsel had provided him a copy of the release conditions, and that he discussed the conditions with Officer Davis after defendant was released into his custody.  (CR 200-2 at 1,

21

5.)  Moreover, when asked during his examination what he understood defendant's release conditions to be, the only thing Manheimer remembered was that defendant could not use the internet.  (CR 200-1 at 14:11-16.)  And although Manheimer believed that defendant could use a computer so long as the computer was not connected to the internet, Manheimer could not point to any specific basis for this incorrect understanding. (Id. at 14:17-16:18.)

Additionally, Manheimer's claim that defendant only used Manheimer's computer twice lacks credibility.  If Manheimer truly believed that defendant could use his computer so long as the internet was temporarily turned off, there would be no reason for defendant to have used Manheimer's computer on only two occasions as Manheimer claimed.  Why would Manheimer need to take dictation from defendant or finalize PDFs for filing, if Manheimer could just turn off the internet and allow defendant to do the work himself?  Furthermore, if Manheimer allowed defendant to use Manheimer's computer on only on two occasions, why were six filings during a two-week period created in the same manner?

Manheimer's claim that he supervised defendant when defendant used Manheimer's computer also raises serious doubts.  When asked how he supervised defendant, Manheimer said he was "next to him, right behind him" for an "hour or two." (CR 200-1 at 34:17-23.)  But despite supervising defendant, Manheimer could barely remember what defendant actually did when he used Manheimer's computer other than possibly typing on a document using Microsoft Word.  (Id.) Defendant's filings between May 27 and June 7, 2020, also include numerous legal citations, but Manheimer provided no explanation of

22

1  who conducted such legal research, and how.  (Id. at 18:2-21; 50:20-

2  51:11; 67:13-68:5.)

3       Moreover, Manheimer consistently struggled to remember what had

4  occurred in the two-to-three weeks leading up to his examination.

5  Manheimer did not recognize any of the pleadings that had been

6  created using his computer, did not remember what specific work he

7  had done on those documents, did not remember what work defendant did

8  using Manheimer's computer, and did not remember what internet

9  searches he ran for defendant.  Indeed, Manheimer testified that he

10 "did not recall" or "did not remember" basic facts dozens of times

11 throughout his examination.  At best, Manheimer's inability to

12 remember specifics details regarding defendant's activities during

13 this two-to-three week time period reflects that he was not actually

14 supervising defendant's activities, as he had promised to do.  At

15 worst, Manheimer is actively attempting to cover for his long-time

16 friend, and thus was not entirely forthcoming during his testimony.

17 Either way, Manheimer demonstrated that the Court cannot trust him to

18 provide any meaningful supervision of defendant going forward.

19      **D.   Defendant's Privilege Objections Are Meritless**

20      Rather than address defendant's violation of his temporary

21 release conditions or Manheimer's testimony, defendant focuses

22 exclusively on his claim that the contents of the PTS Report are

23 privileged.[12]  Defendant's privilege arguments are meritless and an

24 apparent attempt to prevent the government and this Court from

25 reviewing additional evidence regarding defendant's violations and

26

27 ─────────────────

28      [12]  Defendant's decision not to address Manheimer's testimony is
   curious given that the Court allowed defendant to delay submission of
   his brief until one-week after the finalization of the transcript.

                              23

1   lack of candor with this Court, or, at a minimum, to further delay

2   this proceeding.   To the extent the Court believes it is necessary to

3   reach this issue, the government requests that the Court conduct an

4   <u>in camera</u> review of the PTS Report to confirm that it does not

5   contain any privileged information and then order that the government

6   be allowed to review and rely upon the full PTS Report, or any non-

7   privileged information contained therein.[13]

8               1.   <u>Defendant Has Failed to Establish that the Contents of</u>
                     <u>the PTS Report are Privileged</u>

9

10       Defendant bears the burden of proving that the attorney-client

11  privilege or attorney-work-product doctrine applies to the contents

12  of the PTS Report.   <u>In re Grand Jury Investigation</u>, 974 F.2d 1068,

13  1070 (9th Cir. 1992).   Defendant has not met this burden or cited any

14  case law that supports his overly-expansive view of the attorney-

15  client privilege.   Indeed, defendant has failed to conduct any

16  particularized analysis of the information in the PTS Report, instead

17  arguing that any reference to communications with his counsel in the

18  PTS would be privileged.

19       The purpose of the attorney-client privilege is to protect

20  "confidential disclosures made by a client to an attorney to obtain

21  legal advice as well as advice in response to such disclosures."   <u>Id.</u>

22  The attorney-client privilege is strictly construed.   <u>United States</u>

23  <u>v. Krug</u>, 868 F.3d 82 (2d Cir. 2017).   "Since the privilege has the

24  effect of withholding relevant information from the fact-finder, it

25  applies only where necessary to achieve its purpose."   <u>Fisher v.</u>

26

27       [13]  If the Court agrees that defendant has violated his release
    conditions, the government recognizes that there may be no need to
28  further address defendant's privilege claim.   <u>See</u> <u>supra</u> Section
    III.E.

                                    24

1    United States, 425 U.S. 391, 403 (1976).  "The privilege only

2    protects disclosure of confidential communications; it does not

3    protect disclosure of the underlying facts by those who communicated

4    with the attorney."  Upjohn Co. v. United States, 449 U.S. 383, 395

5    (1981).  In fact, only the confidential communications, not the

6    attorney-client relationship as a whole, are protected.  See Matter

7    of Walsh, 623 F.2d 489, 493 (7th Cir. 1980) (holding that what the

8    attorney observed, and the number of times he met with client were

9    not privileged).  The privilege also does not extend to

10   communications made by a client to his attorney with the

11   understanding that it will be disclosed to third parties.  Couch v.

12   United States, 409 U.S. 322, 335-36 (1976).

13        Here, defendant does not claim that the PTS Report or its

14   attachments disclose or contain the actual content of any emails

15   between defendant and his counsel.  Instead, the PTS Report merely

16   includes basic identifying information, such as the file names of

17   documents exchanged between defendant and his counsel or the subject

18   line of certain emails.  (CR 207 at 9.)  Such generic information

19   does not constitute a confidential disclosure of privileged

20   information, and defendant has cited to no case law holding that it

21   does.  This is because lawyers -- and clients -- typically do not use

22   subject lines or file names to communicate privileged information or

23   discuss legal advice.  Rather it is the content of the file or

24   specific email that would be considered a privileged communication.

25   For example, the mere fact that an email or document may have been

26

27

28

                                   25

titled "Status Report" would not disclose the content of any

privileged discussions between defendant and his counsel.[14]

Additionally, as the government and the Court noted during the

July 6, 2020, status conference, email subject lines and file names

are the type of generic information that are typically included in

privilege logs.  Under the Federal Rules of Civil Procedure,

privilege logs must describe the nature of the document or

communication in a manner that will "enable other parties to assess

the applicability of the privilege or protection."  Fed. R. Civ. P.

26(b)(5).  As a result, email subject lines or file names are a

common, if not near-universal, feature of modern privilege logs.  See

United States v. Al-Shawaf, No. 5:16-CV-01539-ODW (SPX), 2017 WL

6001273 (C.D. Cal. Nov. 8, 2017) (noting that the "email subject

lines shown in the privilege log" were insufficient to determine

whether a privilege applied); see also Dolby Labs. Licensing Corp. v.

Adobe Inc., 402 F. Supp. 3d 855, 864–65 (N.D. Cal. 2019) (noting that

the subject lines of emails on a privilege log appeared to reference

non-privileged advice); Meade v. Gen. Motors, LLC, 250 F. Supp. 3d

1387, 1396 (N.D. Ga. 2017) (requiring "titles of email file

attachments" and "subject matter lines" be included in privilege

log); Feld v. Fireman's Fund Ins. Co., 991 F. Supp. 2d 242, 248

(D.D.C. 2013) (noting privilege log contained document titles and

email subject lines).  Even where parties have included file names or

---

[14] Although it is theoretically possible that the subject line of
an email or file names could be detailed enough so as to constitute a
privileged communication, the government does not recall seeing any
such privileged information when it conducted its preliminary review
on June 30, 2020.  The Court would of course be able to order that
any such information be redacted if necessary when it conducts an in
camera review.

email subject lines on a privilege log, courts have nevertheless found such privilege logs to be insufficient.  See, e.g., Friends of Hope Valley v. Frederick Co., 268 F.R.D. 643, 651 (E.D. Cal. 2010) (finding that privilege logs that "just copied the subject line from the e-mail or letter withheld" were insufficient); Eden Isle Marina, Inc. v. United States, 89 Fed. Cl. 480, 498-99 (Fed. Cl. 2009) (finding email subject lines on privilege log insufficient to allow evaluation of privilege claim).  And email subject lines and file names are typically included on privilege logs precisely because they rarely contain any privileged information.

Defendant's claim that file names and email subject lines typically contain privileged information that would be excluded from a privilege log is not supported by the three cases defendant cites. Most notably, defendant suggests that Apple Inc. v. Samsung Elec. Co., 306 F.R.D. 234, 237 (N.D. Cal. 2015), supports the proposition that an email subject line or file name is "information itself privileged or protected." (CR 207 at 13.)  The Apple decision says no such thing -- it doesn't even address that issue.  Defendant is merely citing to the portion of the Apple decision that directly quotes the standard set forth in Federal Rule of Civil Procedure 26. See Apple, 306 F.R.D at 237, n.5.  In fact, the district court in Apple was actually critical of Samsung's privilege log that contained "only generic statements" regarding the content of the withheld documents.  Id. at 240.

Defendant's reliance on Dole v. Milonas, 889 F.2d 885, 888 n.3, 890 (9th Cir. 1989) and In re Grand Jury Investigation, 974 F.2d at 1071, is equally misguided.  Although it is true that neither Dole nor In re Grand Jury Investigation require a privilege log to include

a file name or email subject line, neither decision addressed whether such information would be considered privileged -- likely because these decisions were issued in 1989 and 1992 <u>before</u> emails were commonly used to conduct business.  And the mere fact that a party may not be required to include the email subject line or file name on a privilege log does not establish that such information is necessarily privileged.

Defendant's list of hypothetical questions is also irrelevant. Defendant is attempting to analogize a list of email subject lines or file names in the PTS Report to a fictitious situation in which the government is interrogating the defendant.  They are not the same thing; the government is not interrogating defendant and is not asking these questions.  Defendant's list of hypothetical questions, which is divorced from any particularized analysis of the contents of PTS Report, is not enough for defendant to meet his burden.[15]

2.   <u>Defendant Is Attempting to Use the Attorney-Client Privilege as a Sword and a Shield</u>

The Ninth Circuit has long held that "[t]he privilege which protects attorney-client communications may not be used both as a sword and a shield.  Where a party raises a claim which in fairness requires disclosure of the protected communication, the privilege may be implicitly waived." <u>Chevron Corp. v. Pennzoil Co.</u>, 974 F.2d 1156, 1162 (9th Cir. 1992) (internal references omitted); <u>see also</u> <u>United States v. Amlani</u>, 169 F.3d 1189, 1195 (9th Cir. 1999) ("Simply put,

---

[15]  Defendant's hypothetical questions suggest that neither the Court nor the government could ever inquire as to whether a criminal defendant had consulted with his attorney regarding a specific topic. This is plainly incorrect, particularly in criminal cases where the Court and government must regularly confirm that a defendant has consulted with his attorney and understands his rights.

1   Amlani cannot assert that certain factors caused him to discharge his

2   attorney and then invoke the attorney-client privilege to prevent the

3   government from examining the situation further.").

4       Significantly, here, it was defendant who put his ability to

5   assist with his defense at issue in this case, when he filed his May

6   27, 2020, status report claiming his release conditions prevented him

7   from using a computer to review the discovery.  (CR 164.)  Defendant

8   then continued to persist in such claims for over a week until his

9   conditions were modified to allow him to use a specific internet-

10  disabled laptop.  Defendant therefore cannot turn around and rely on

11  the privilege to prevent the government and the Court from evaluating

12  the accuracy of these prior claims.

13      Moreover, in response to the government's allegation that

14  defendant violated his release conditions, the defense made a number

15  of specific representations to the Court regarding defendant's use of

16  Manheimer's computer, defendant's involvement in preparing the

17  pleadings, and the mechanics of transmitting documents to and from

18  defendant.  For example, on June 11, 2020, counsel advised the Court

19  that he would email documents to Manheimer, Manheimer would print

20  them for defendant, defendant would edit them, and then Manheimer

21  would send the edits back to counsel via a scanned document or email.

22  (6/11/2020 RT 4:11-5:10.)  Similarly, defendant's opposition to the

23  government's request for inquiry, filed on June 7, 2020, also

24  described how defendant and counsel would collaborate on filings,

25  specifically that defendant would "review and comment on those

26  filings before finalized."  (CR 179 at 1-2.)  Defendant had no issue

27  disclosing that information to the Court, but now that PTS has

28  prepared a report that could prove defendant's representations were

29

false or misleading, he objects on the basis of privilege.  Having made specific claims regarding the process by which these documents were created, defendant cannot now use the attorney-client privilege or work-product doctrine as a basis to prevent the government and the Court from evaluating whether these representations were accurate.

If counsel's representations to the Court regarding the "mechanics" of the process (6/11/2020 RT 4:11-5:10) were accurate, counsel presumably would have emailed an initial draft of each pleading to Manheimer for defendant to review, and then received either edits or a final draft back from Manheimer in return.  If defendant instead wrote most of those pleading from scratch using Manheimer's computer, there would be no initial emails with draft documents from counsel to Manheimer on Manheimer's computer.  The PTS Report's list of documents and emails would likely answer this question for the Court, but would not provide either the government or the Court with any privileged information regarding the actual content of the communications.  Moreover, if the defense's representations were accurate, the defense could have resolved this entire issue a month ago by submitting to the Court in camera the relevant correspondence, including the initial drafts of any pleading that were sent from counsel to defendant, as well as proof that defense counsel had done the legal research in the filings, as the government has repeatedly suggested.  (See 6/11/2020 at 6:25-7:6; CR 186 at 4, n.4.)  Defendant's unwillingness to do so is telling.

Defendant's privilege objection has also prevented the government from completing its investigation of potential violations. Crucially, PTS had not reviewed Manheimer's testimony when it completed the PTS Report.  And, in light of defendant's privilege

objection, the government refrained from having any discussions with PTS regarding the PTS Report or Manheimer's testimony.  Such discussions would likely be essential for both PTS and the government to determine whether there were further violations and whether Manheimer's testimony was accurate.  For example, Manheimer testified that he "rarely" used Twitter (CR 200-1 at 94:6-10), which was one of defendant's favorite forms of social media.  Thus, the government should be provided an opportunity to ask PTS whether Manheimer's computer or other devices were regularly used to access Twitter. Similarly, Manheimer testified that he did not recall deleting his internet history since defendant has been in his custody.  (Id. at 48:9-25.)  Thus, the government will also need to discuss with PTS whether the internet history for Manheimer's devices had been deleted recently.  These are just two of many potential examples, as the government repeatedly sought to obtain information during Manheimer's testimony that might assist PTS -- and the Court -- in their review of his devices and evaluation of potential violations.

Finally, the government reiterates that is has no interest in reviewing any of defendant's privileged information.  At no point in time has the government sought privileged information.  And the government has consistently said that it has no interest in the content of any communications between defendant and his counsel.  (CR 186 at 3; 6/11/2020 RT 5:12-7:15.)  The government is merely seeking to evaluate the accuracy of defendant's own claims regarding his inability to use a computer, and the process by which defendant exchanged documents with counsel and prepared pleadings.  As set forth above, this basic information is not privileged, and is

1   directly relevant to the issues before this Court that defendant

2   first raised in his May 27, 2020, status report.

3          **E.    Potential Remedies for Defendant's Violation of His**
              **Temporary Release Conditions**

4

5          In granting defendant temporary release pursuant to 18 U.S.C.

6   § 3142(i), the Court sought to balance its prior finding that

7   defendant was a danger to the community with the potential risks to

8   defendant associated with the COVID-19 pandemic.  (CR 128.)   While

9   doing so, the Court repeatedly set forth the "minimum terms" that

10  would be necessary to effectuate defendant's temporary release,

11  including the appointment of a third-party custodian to supervise

12  defendant and conditions to ensure that defendant "has no access to

13  any form of telecommunications or wire."  (See 3/31/2020 RT 3:18-

14  6:12; CR 128; CR 134.)

15         The government is mindful of the Court's prior rulings regarding

16  COVID-19.  But by intentionally violating his release conditions and

17  misleading this Court, defendant has breached the Court's trust and

18  taken advantage of the extraordinary relief this Court granted

19  defendant.  And although the government fully recognizes that the

20  COVID-19 pandemic continues to present significant risks for everyone

21  in this country, the government continues to believe that defendant's

22  individualized health concerns were overstated.  For example, despite

23  defendant claiming that he was at particularly high risk from COVID-

24  19, Manheimer testified that defendant's girlfriend traveled from

25  Florida to stay with defendant at Manheimer's residence on two

26  separate occasions after defendant was temporarily released from

27  custody.  (CR 200-1 at 21:19-23:25.)   The government therefore

28  believes it would be entirely appropriate for the Court to terminate

defendant's temporary release at this time or to decline to grant
defendant any further extensions of his temporary release.  This
Court should not allow defendant to remain on temporary release if
defendant cannot be trusted to comply with his release conditions or
be candid with this Court.

At a minimum, if the Court allows defendant to remain on
temporary release, the government maintains the Court should require
defendant to identify and obtain a new third-party custodian.
Manheimer's testimony demonstrated that Manheimer is either unable or
unwilling to properly supervise defendant.  If defendant is allowed
to remain on release, it is essential that the Court have confidence
that there is a suitable third-party custodian to supervise defendant
going forward and ensure defendant does not violate any of his other
release conditions.

In light of the foregoing, the government believes the Court
should proceed in one of the two following ways.  The Court can
review on its own the PTS Report and Manheimer's testimony, in
conjunction with the record in this case, to determine whether
defendant violated his conditions of temporary release and/or misled
this Court.  Based on its review of the current record and evidence
before the Court, the Court can exercise its discretion to terminate
defendant's temporary release or permit defendant to remain on
temporary release with any modifications the Court deems appropriate.
Alternatively, if the Court believes additional information is
necessary, the Court could conduct an in camera review of the PTS
Report, release any non-privileged portions of the PTS Report to the
government so that it can discuss the report with PTS, and allow the
government to submit further briefing to the Court regarding

33

defendant's violations of his conditions of temporary release and/or lack of candor with the Court.  The Court, however, need not devote time or resources to address defendant's privilege claims regarding the PTS Report at this time unless it believes additional information would be useful in making a determination as to defendant's violation or the appropriate remedy for such violation.

## IV.   CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court (1) conduct an <u>in camera</u> review of the PTS Report and authorize the government to review all non-privileged portions of the PTS Report; and (2) address defendant's violation of his temporary release conditions at the status conference on August 3, 2020, or at a later hearing date and time convenient with the Court.

1

## DECLARATION OF JULIAN L. ANDRÉ

2      I, Julian L. André, declare as follows:

3      1.    I am an Assistant United States Attorney ("AUSA") in the

4 United States Attorney's Office for the Central District of

5 California (the "USAO").  I, together with AUSA Brett A. Sagel, am

6 assigned to represent the government in the prosecution of defendant

7 MICHAEL JOHN AVENATTI ("defendant") in <u>United States v. Michael John</u>

8 <u>Avenatti</u>, SA CR 19-61-JVS.  I submit this declaration in support of

9 the government's consolidated position regarding defendant's

10 violations of his conditions of temporary release and opposition to

11 defendant's motion to preclude review and use of the United States

12 Probation and Pretrial Services Office's ("PTS") digital forensic

13 examination report (the "PTS Report").

14      2.    On June 30, 2020, PTS Officer Shakira Davis advised the

15 government that PTS had completed its forensic examination of the

16 digital devices seized from the residence of defendant's third-party

17 custodian Jay Manheimer.  Officer Davis said PTS was not taking any

18 action because it "could not conclusively determine the defendant to

19 be in violation of the release conditions."  Officer Davis also said

20 that PTS was waiting for the Court to determine if PTS is authorized

21 to release the findings to all of the parties.  Attached hereto as

22 Exhibit 1 is a true and correct copy of the email I received from PTS

23 Officer Shakira Davis on June 30, 2020.

24      3.    Shortly thereafter, on June 30, 2020, Officer Davis emailed

25 the government and defense counsel a copy of the PTS Report, which

26 the government understood the Court had authorized PTS to release to

27 the parties.  Because Officer Davis's initial email did not include

28 the PTS Report's attachments, she emailed the parties full PTS Report

(including the attachments) later that day.  I have not attached the emails I received from Officer Davis to this declaration because the PTS Report, which the government has agreed not to further review, is also attached to those emails.

4.    AUSA Sagel and I conducted a preliminary review of the full PTS Report on the evening of June 30, 2020.  I do not recall seeing anything in PTS Report or its attachments that appeared to be privileged information.  Rather, I believed the PTS Report, including its attachments, primarily included the type of information one would typically see in a basic privilege log, such as the date, time, recipients, and subject of certain emails, and the file names of any email attachment.  I have spoken with AUSA Sagel who also does not recall seeing any privileged information in the PTS Report.

5.    The next day, July 1, 2020, defense counsel emailed the government and said it objected to the disclosure of the PTS Report and its attachments because they contained privileged information.  I then received two additional emails from defense counsel further explaining the defense's position and requesting that the government not review the materials further until the issue had been resolved by the Court.  Although I advised defense counsel that the government did not believe the report contained any privileged information, the government agreed not to conduct any further review of the report or its attachments at that time.  Attached hereto as Exhibits 2 through 4 are true and correct copies of the email correspondence with defense counsel from July 1, 2020.

6.    AUSA Sagel and I have not accessed or further reviewed the PTS Report since we conducted a preliminary of the PTS Report on June 30, 2020.

2

7.    In light of defendant's pending privilege objection, AUSA Sagel and I have not discussed the PTS Report with Officer Davis or anyone else at PTS since we received the PTS report on June 30, 2020. Additionally, the government has not provided PTS with a copy of the transcript of Manheimer's June 17, 2020, under-oath examination. Thus, to the best of my knowledge, PTS is unaware of the substance of Manheimer's testimony.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and that this declaration is executed at Los Angeles, California, on July 28, 2020.

_____
JULIAN L. ANDRÉ

# EXHIBIT 1

| | |
|---|---|
| **From:** | Shakira Davis |
| **To:** | Andre, Julian L. (USACAC); Sagel, Brett (USACAC) |
| **Subject:** | Re: US v. Avenatti |
| **Date:** | Tuesday, June 30, 2020 1:47:55 PM |

Hello AUSA Andre and AUSA Segal,

Our office has completed the forensic inspection of all the devices that were surrendered. A report was submitted to the Court and approved on June 29, 2020. PSA could not conclusively determine the defendant to be in violation of the release conditions therefore, no action is being taken by our office. We are waiting on direction from the Court to determine if PSA is authorized to release the findings to all the parties in this case. The devices have been returned to the defendant and the 3rd party custodian.

Should the Court approve for PSA to release the findings, we will provide you with a copy.

Thank you for your cooperation.

Get Outlook for iOS

**From:** Shakira Davis
**Sent:** Tuesday, June 9, 2020 10:45:46 AM
**To:** Andre, Julian L. (USACAC) <Julian.L.Andre@usdoj.gov>
**Subject:** RE: US v. Avenatti

Good Morning Mr. Andre,

I am not sure if you received my email from yesterday, but I staffed the matter with my supervisor and I am waiting from the CRD to complete the Order so that our search team can review it. I will contact you once the CRD provides me with this information.

**From:** Andre, Julian L. (USACAC) <Julian.L.Andre@usdoj.gov>
**Sent:** Tuesday, June 9, 2020 10:34 AM
**To:** Shakira Davis <Shakira_Davis@cacp.uscourts.gov>
**Cc:** Sagel, Brett (USACAC) <Brett.Sagel@usdoj.gov>
**Subject:** RE: US v. Avenatti

Officer Davis:

I wanted to follow-up regarding the below.  Please let us know if you have some time to discuss the Court's order re a search of Mr. Manheimer's residence and computer sometime today.  Thank you.

Julian

**Julian L. André**
**Assistant United States Attorney**
**Major Frauds Section**

United States Courthouse, Suite 1100
312 N. Spring St. | Los Angeles, California 90012
T: 213.894.6683 | C: 213.453.9469
julian.l.andre@usdoj.gov

---

**From:** Andre, Julian L. (USACAC)
**Sent:** Monday, June 8, 2020 10:24 AM
**To:** Shakira Davis <Shakira_Davis@cacp.uscourts.gov>
**Cc:** Sagel, Brett (USACAC) <BSagel@usa.doj.gov>
**Subject:** RE: US v. Avenatti

Officer Davis,

Judge Selna briefly addressed the allegations this morning and ordered that pretrial services conduct a search of Mr. Manheimer's residence, including a search of his computer. He requested that we let you know about that particular order. Judge Selna also ordered us to take Mr. Manheimer's testimony under oath about the alleged violations, which we are going to work to arrange for some time next week.

Please let me know if you have some time to talk to AUSA Sagel and I about this today.

Thank you.

Julian

---

**From:** Shakira Davis <Shakira_Davis@cacp.uscourts.gov>
**Sent:** Monday, June 8, 2020 9:53 AM
**To:** Andre, Julian L. (USACAC) <JAndre1@usa.doj.gov>
**Subject:** RE: US v. Avenatti

Thank you Mr. Andre. Please let me know how the Court intends to proceed with a potential violation hearing or if this is addressed today.

---

**From:** Andre, Julian L. (USACAC) <Julian.L.Andre@usdoj.gov>
**Sent:** Sunday, June 7, 2020 4:45 PM
**To:** Shakira Davis <Shakira_Davis@cacp.uscourts.gov>
**Cc:** Sagel, Brett (USACAC) <Brett.Sagel@usdoj.gov>
**Subject:** US v. Avenatti

Officer Davis:

We wanted to let you know that we just filed the attached pleading raising concerns that defendant AVENATTI has violated the conditions of his release or, at a minimum, has misled the Court. We

expect it will come up at the telephonic status conference tomorrow morning at 9:00 am.  Please let us know if you have any questions.  Thank you.

Julian

**Julian L. André**
**Assistant United States Attorney**
**Major Frauds Section**
United States Courthouse, Suite 1100
312 N. Spring St. | Los Angeles, California 90012
T: 213.894.6683 | julian.l.andre@usdoj.gov

# EXHIBIT 2

**Andre, Julian L. (USACAC)**

| | |
|---|---|
| **From:** | Dean Steward <deansteward7777@gmail.com> |
| **Sent:** | Wednesday, July 1, 2020 7:00 AM |
| **To:** | Andre, Julian L. (USACAC) |
| **Cc:** | Shakira Davis |
| **Subject:** | Re: Pre-Trial Services computer report |

## I'd object...it's direct defense privileged docs. This is exactly what I was objection to after the PT seizure.

On Tue, Jun 30, 2020 at 5:33 PM Andre, Julian L. (USACAC) <Julian.L.Andre@usdoj.gov> wrote:

Dean:

Based on my conversation with Officer Davis, I do not believe she received the attachments from the examiner either.  I expect she will provide them to both of us once she does receive them.

Julian

**From:** Dean Steward <deansteward7777@gmail.com>
**Sent:** Tuesday, June 30, 2020 5:21 PM
**To:** Andre, Julian L. (USACAC) <JAndre1@usa.doj.gov>
**Subject:** Re: Pre-Trial Services computer report

Thank you sir. I didn't think so, but I needed to be sure.

Dean

On Tue, Jun 30, 2020, 5:12 PM Andre, Julian L. (USACAC) <Julian.L.Andre@usdoj.gov> wrote:

Dean,

We did not receive the attachments referenced in the report either.  I just spoke with Officer Davis (copied) and she is looking into it.

1

Julian


**From:** Dean Steward <deansteward7777@gmail.com>
**Sent:** Tuesday, June 30, 2020 5:07 PM
**To:** Lisa_Bredahl@cacd.uscourts.gov
**Cc:** Sagel, Brett (USACAC) <BSagel@usa.doj.gov>; Andre, Julian L. (USACAC) <JAndre1@usa.doj.gov>
**Subject:** Pre-Trial Services computer report


On the report released to me this afternoon, I note that the government also got a copy. Did they receive a copy of the attachments? I did not, and I assume they did not either. Please confirm.

Thanks,

Dean


--



949-481-4900   www.deansteward.com

# EXHIBIT 3

**Andre, Julian L. (USACAC)**

| | |
|---|---|
| **From:** | Dean Steward <deansteward7777@gmail.com> |
| **Sent:** | Wednesday, July 1, 2020 2:39 PM |
| **To:** | Andre, Julian L. (USACAC) |
| **Subject:** | Re: 39 page report from Pre-Trial |

The attachments were not sent to me until last night. Hence my emails to you today.

On Wed, Jul 1, 2020, 12:07 PM Andre, Julian L. (USACAC) <Julian.L.Andre@usdoj.gov> wrote:

Dean:

Officer Davis's initial email and my subsequent emails to you yesterday indicated that the full report, including the attachments, were going to be disclosed to both parties.  And AUSA Sagel and I have both already conducted a preliminary review of the full report.  If you had concerns, you should have raised them yesterday.  Yet, at no point in your emails yesterday, did you say that you objected to the attachments being provided to us.

Additionally, based on Officer Davis's email this morning, our understanding is that the Court already authorized release of the report, including the attachments.  Contrary to your claims, the full report does not contain any attorney-client privileged information.  Pretrial Services' review of the devices and report also appears to be entirely consistent with the agreement reached during the June 11, 2020, status conference, since the report does not reference the substance of any attorney-client communications.  Thus, we do not believe there is any legitimate basis for you to object to the disclosure of the full report, including attachments, to the government.  Indeed, it appears any such objection would not be based on a valid privilege concern, but instead based on the fact that the information contained in the report appears to directly contradict the representations you and your client made to the Court regarding defendant's improper use of Mr. Manheimer's computer.

Nevertheless, we will agree not to further review the full report with attachments for 24 hours so that you can decide how you wish to proceed.  To the extent you intend to raise this issue with the Court, please do so by 12:00 pm tomorrow, so that the government has sufficient time to respond prior to Monday's status conference.

Thank you.

Julian

**Julian L. André**

1

**Assistant United States Attorney**

**Major Frauds Section**
United States Courthouse, Suite 1100

312 N. Spring St. | Los Angeles, California 90012
T: 213.894.6683 | julian.l.andre@usdoj.gov

**From:** Dean Steward <deansteward7777@gmail.com>
**Sent:** Wednesday, July 1, 2020 9:42 AM
**To:** Sagel, Brett (USACAC) <BSagel@usa.doj.gov>; Andre, Julian L. (USACAC) <JAndre1@usa.doj.gov>
**Subject:** 39 page report from Pre-Trial

Gentlemen-

I was taken aback that Pre-Trial sent you the "Forensic Report" containing defense information, contacts back and forth and other defense preparation material.

I ask that you not review it, and I will decide in the next 48 hours on a course of action.

I regret Pre-Trial's actions- this was exactly what I feared when I brought to the Court's attention the possibility of invading the defense campand attorney-client privilege.

Dean.

--



949-481-4900  www.deansteward.com

# EXHIBIT 4

**Andre, Julian L. (USACAC)**

| | |
|---|---|
| **From:** | Dean Steward <deansteward7777@gmail.com> |
| **Sent:** | Thursday, July 2, 2020 8:55 AM |
| **To:** | Andre, Julian L. (USACAC) |
| **Cc:** | Sagel, Brett (USACAC) |
| **Subject:** | Pre-Trial disclosures |

Julian:

The report and the attachments contain information clearly protected by the attorney-client privilege and work product doctrines. Under no circumstances should this information have been disclosed to your office nor should you have reviewed it once it was received. Within moments, you and AUSA Sagel should have recognized that a listing of emails between an attorney and client, including the subjects of communication, and the disclosure of document titles and other information relating to the defense, are protected. Were the tables turned, would you maintain that the defense would be entitled to a listing of emails between you and AUSA Sagel, including the subjects, and the title and details of various documents you worked on together? We reserve all rights relating to seeking a remedy as a result of your admitted review.

Second, there was never any waiver or failure to act on defendant's part. The defense has been consistent in our position that the attorney-client privilege and work product doctrine apply to all communications between Mr. Avenatti and his lawyers, including all attachments and information relating to emails between Mr. Manheimer and counsel, as well as all metadata. And we have taken the same position relating to documents (i.e. Word documents and pdfs) created in connection with this case and Mr. Avenatti's other legal cases. In fact, we sent an email to pre-trial services immediately after the status conference on June 11, 2020 and no issue or objection was raised in response to this email.

Third, as soon as we became aware that the attachments had been provided to you and AUSA Sagel, we immediately brought the issue to your attention and demanded that you not review the information. At no time did we understand that the attachments had been provided, or were going to be provided by pre-trial, until after they had already been sent.

1

Fourth, there have been no misrepresentations to the court by me or my client and your claim otherwise is baseless.

Finally, we are under no obligation to raise this issue with the Court by the unreasonable deadline you have unilaterally set.  We continue to research the law on the issue and are reviewing our options and appropriate remedies.  However, you, AUSA Sagel and others are under an affirmative obligation not to review, or use, the report and attachments until the issue of the attorney-client privilege and work product doctrine is fully resolved.  The law and ethical requirements are clear in this regard and I again demand that you not conduct any further review or use of the report, or its attachments.


Dean

--




949-481-4900  www.deansteward.com