NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
JULIAN L. ANDRÉ (Cal. Bar No. 251120)
Assistant United States Attorney
Major Frauds Section
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-6683
    Facsimile: (213) 894-6269
    Email:    Julian.L.Andre@usdoj.gov

BRETT A. SAGEL (Cal. Bar No. 243918)
Assistant United States Attorney
    Ronald Reagan Federal Building
    411 West Fourth Street, Suite 8000
    Santa Ana, California 92701
    Telephone:  (714) 338-3598
    Facsimile:  (714) 338-3708
    Email:    Brett.Sagel@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>         v.<br><br>MICHAEL JOHN AVENATTI,<br><br>      Defendant. | No. SA CR 19-061-JVS<br><br>GOVERNMENT'S MOTION TO TERMINATE AND NOT FURTHER EXTEND DEFENDANT MICHAEL JOHN AVENATTI'S TEMPORARY RELEASE; DECLARATION OF BRETT A. SAGEL |

     Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Julian L. André and Brett A. Sagel, hereby files its motion to terminate and not further extend defendant MICHAEL JOHN AVENATTI's temporary release pursuant

to 18 U.S.C. § 3142(i), which is currently set to expire on September 21, 2020.[1]

The government's motion is based upon the attached memorandum of points and authorities, the declaration of Assistant United States Attorney Brett A. Sagel, the previously lodged transcript of Jay Manheimer's June 17, 2020, examination (CR 200), the Pretrial Services Digital Forensic Examination Report, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: September 4, 2020          Respectfully submitted,

                                  NICOLA T. HANNA
                                  United States Attorney

                                  BRANDON D. FOX
                                  Assistant United States Attorney
                                  Chief, Criminal Division


                                  _____/s/_____
                                  JULIAN L. ANDRÉ
                                  BRETT A. SAGEL
                                  Assistant United States Attorneys

                                  Attorneys for Plaintiff
                                  UNITED STATES OF AMERICA

---

[1] The government recognizes that a one or two-week extension of defendant's temporary release may be necessary to allow the Court sufficient time to address the issues raised in the instant motion and/or to ensure that there is sufficient bed space for defendant if he is returned to custody.  The government does not object to such an extension.

**TABLE OF CONTENTS**

DESCRIPTION                                                      PAGE

TABLE OF AUTHORITIES..................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES..................................1

I.    INTRODUCTION....................................................1

II.   STATEMENT OF FACTS.............................................3

      A.    Revocation of Defendant's Bond...........................3

      B.    Defendant's Temporary Release............................3

      C.    Defendant Claimed He Could Not Prepare for Trial
            Because He Had No Access to a Computer...................5

      D.    The Government Discovered that Defendant Used
            Manheimer's Computer to Draft Pleadings..................6

      E.    Pretrial's Search of Manheimer's Apartment..............8

      F.    Manheimer Testified that Defendant Personally Used
            Manheimer's MacBook Computer............................9

      G.    Prior Extension of Defendant's Temporary Release........12

      H.    The PTS Forensic Examination Report.....................12

III.  ARGUMENT......................................................13

      A.    The Court Has Broad Discretion to Terminate or Not
            Further Extend Defendant's Temporary Release............13

      B.    Defendant Intentionally Violated His Temporary Release
            Conditions by Using Manheimer's Computer................14

      C.    Defendant Intentionally Misled this Court...............18

      D.    Manheimer Is Not a Suitable Third-Party Custodian.......20

      E.    The Court Should Terminate or Decline to Extend
            Defendant's Temporary Release...........................22

IV.   CONCLUSION....................................................25

i

**TABLE OF AUTHORITIES**

DESCRIPTION                                                                PAGE

**FEDERAL CASES**

United States v. Dupree,
        833 F. Supp. 2d 241 (E.D.N.Y. 2011)...........................14

**FEDERAL STATUTES**

18 U.S.C. § 3142(i)................................................passim

18 U.S.C. § 3148(b)...................................................14

**MISCELLANEOUS**

BOP, COVID-19 Coronavirus,
        available at https://www.bop.gov/coronavirus/index.jsp
        (last visited Sep. 4, 2020)..................................24

Centers for Disease Control, Coronavirus Disease 2019 (COVID-
        19): People at Increase Risk,
        available at https://www.cdc.gov/coronavirus/2019-
        ncov/need-extra-precautions/index.html.......................24

Centers for Disease Control, Coronavirus Disease 2019 (COVID-
        19): People with Certain Medical Conditions,
        available at https://www.cdc.gov/coronavirus/2019-
        ncov/need-extra-precautions/people-with-medical-
        conditions.html..............................................24

Katie Murar, Recent COVID-19 Cases Down 50%, Orange County
        Business Journal (Sep. 2, 2020),
        available at https://www.ocbj.com/news/2020/sep/02/recent-
        covid-19-cases-down-50/......................................23

Workbook: COVID-19 Cases Dashboard,
        available at https://public.tableau.com/views/COVID-
        19CasesDashboard_15931020425010/Cases?:embed=y&:showVizHome
        =no  ........................................................23

ii

1

<b><u>MEMORANDUM OF POINTS AND AUTHORITIES</u></b>

2

**I.   INTRODUCTION**

3

Defendant MICHAEL JOHN AVENATTI ("defendant") has repeatedly
demonstrated that he cannot be trusted.  In April 2020, this Court
temporarily released defendant to the custody of his long-time friend
Jay Manheimer due to defendant's alleged health concerns relating to
the COVID-19 pandemic.  (CR 128; CR 140.)  Defendant's conditions of
temporary release, to which he stipulated, state that defendant
"shall not possess, use, or access any digital devices that offer or
allow internet access."  (CR 140, ¶ 12.)  In direct violation of this
condition, defendant used Manheimer's computer to personally draft or
edit pleadings in this case, including a status report in which
defendant claimed that he could not prepare for trial in this matter
because his release conditions prevented him from using a computer to
review discovery or work on motions (CR 164).  In other words,
defendant violated his release conditions by using Manheimer's
computer to draft a status report in which defendant acknowledged
that his release conditions precluded him from using that very same
computer.

In June 2020, the government alerted this Court to the fact that
defendant had likely violated his conditions of release by using
Manheimer's computer to draft five recent pleadings in this case, and
requested that the Court conduct a further inquiry and allow the
government to examine Manheimer under oath.  (CR 177.)  In connection
with this inquiry, defendant offered a series of evolving and
incredible explanations as to how Manheimer's computer could have
been used to prepare the filings in this case without defendant

1    violating his release conditions.   Manheimer's testimony proves that

2    these prior explanations were false and misleading.

3         Manheimer testified that defendant had in fact used Manheimer's

4    computer to work on defendant's legal cases.   Although defendant will

5    likely claim that his use of Manheimer's computer was fine because

6    Manheimer had allegedly "turned off" the internet on the computer

7    (see CR 220), such use was undoubtedly a violation of defendant's

8    release conditions.   Manheimer's testimony also directly contradicts

9    defendant's prior representations to this Court, including defense

10   counsel's statement that "Mr. Avenatti has not had access to a device

11   with internet capabilities" (6/8/2020 RT 11:17-22).   There is no

12   question as to whether defendant violated his conditions of temporary

13   release -- he did so knowingly and intentionally.   Although these

14   violations may appear technical in nature, they are significant in

15   that they further prove that defendant cannot be trusted.

16        When the Court granted defendant a temporary release, it

17   balanced its prior finding that defendant was an "ongoing danger" to

18   the community with the potential risks to defendant associated with

19   the COVID-19 pandemic.   (CR 128.)   The Court, however, also indicated

20   that specific release terms would be necessary to effectuate

21   defendant's temporary release.   (See 3/31/2020 RT 3:18-6:12; CR 128;

22   CR 134.)   Defendant should not be allowed to remain on temporary

23   release if he cannot be trusted to comply with those conditions or be

24   candid with this Court.   And although the government is mindful of

25   the ongoing health concerns regarding COVID-19 and the Court's prior

26   rulings, the government believes the changed circumstances in Orange

27   County regarding COVID-19, as discussed further below, would allow

28   the Court to safely return defendant to custody at this time.

Accordingly, the government respectfully requests that the Court terminate defendant's temporary release and order that defendant be returned to custody as soon as practical.  Alternatively, if the Court is inclined to further extend defendant's temporary release, the government requests that the Court require defendant to identify and obtain a new third-party custodian as Manheimer's testimony proved that he is unable to properly supervise defendant.

## II.  STATEMENT OF FACTS

### A.  Revocation of Defendant's Bond

In January 2020, the Court revoked defendant's bail and ordered him detained pending trial.  (CR 83.)  The Court found probable cause to believe that defendant had committed federal and state crimes while on pretrial release, there was an "ongoing danger" that defendant would violate the conditions of his release and commit further crimes, and that the danger to the community was "real and palpable."  (11/15/2020 RT 36-37.)  The Ninth Circuit affirmed this Court's ruling, holding that both this Court's probable-cause and safety findings were "correct."  (CR 116.)

Between January 2020 and April 2020, defendant was detained at the Metropolitan Correctional Center in New York due to his two pending trials in the Southern District of New York ("SDNY").

### B.  Defendant's Temporary Release

In April 2020, this Court ordered defendant temporarily released from custody pursuant to 18 U.S.C. § 3142(i) due to the COVID-19 pandemic, its effects on the "greater New York City" area, and defendant's alleged health concerns. (CR 128; CR 140; CR 154.)  The Court's finding was limited to defendant's medical history and the specific location and vicinity where he was housed at the time, _i.e._,

3

1    New York City.[1]  (CR 128.)  The Court, however, also stated that it

2    had not lost sight of the Court's prior finding that defendant is "a

3    danger to the community."  (CR 128 at 2.)  The Court then set forth

4    the "minimum terms" that would be necessary to effectuate defendant's

5    temporary release, including the appointment of a third-party

6    custodian to supervise defendant and conditions to ensure that

7    defendant "has no access to any form of telecommunications or wire."

8    (See 3/31/2020 RT 3:18-6:12; CR 128; CR 134.)

9         On April 24, 2020, defendant was released to the custody of a

10   third-party custodian, Jay Manheimer. (CR 140 ¶ 12; CR 154.)  Among

11   other things, the conditions of defendant's temporary release state

12   that "defendant shall not possess, use, or access any digital devices

13   that offer or allow internet access."[2]  (CR 140 ¶ 12; CR 154.)

14   Defendant's release conditions, however, allowed him to "access and

15   use an internet-enabled digital device while in the presence of

16   defendant's legal counsel, solely for the purpose of preparing his

17   defense" in his criminal cases. (CR 140, ¶ 13.)

18

19

20

21        [1]  At the time defendant sought to be temporarily released from
22   custody, New York City was the epicenter of the COVID-19 pandemic in
     the United States.  (See CR 125 at 1.)

23        [2]  Defendant has repeatedly claimed that the government insisted
     on this condition.  (See, e.g., CR 164 at 2.)  This is incorrect.
24   This condition was imposed after defendant first proposed
     restrictions on his use of digital devices.  On March 30, 2020,
25   defendant proposed that PTS be allowed to randomly search and monitor
     his electronic devices to ensure that he was not engaged in improper
26   financial transactions.  (CR 129 at 6; CR 129-1 at 1.)  In response
     to this proposal, the Court ruled: "If he is released, we need
27   conditions to ensure that he has no access to any form of
     telecommunications or wire."  (CR 132 at 4.)  The government and
28   defendant then met-and-conferred and jointly proposed the specific
     language included in the defendant's release order.  (CR 140.)

4

### C. Defendant Claimed He Could Not Prepare for Trial Because He Had No Access to a Computer

On May 27, 2020, a month after his release, defendant filed an unsolicited 33-page status report. (CR 164.)  Defendant argued, among other things, that his ability to prepare for trial, including motion practice, had been "severely impacted" by a number of factors.  (<u>Id.</u> at 1-2.)  Most notably, defendant argued that he could not prepare for trial because his release conditions prevented him from using a computer to review the discovery.  (<u>Id.</u>)  Defendant did not disclose that he had already been using Manheimer's computer to work on this case, including to draft or edit portions of that status report.

In response, the Court suggested that the discovery be "loaded on a laptop or desktop, under the supervision of the parties, with disabled communications ability." (CR 166.)  Defendant immediately filed a second supplemental status report agreeing with the Court's suggestion and asking that "the government work with the defense to accomplish this as quickly as possible." (CR 167.)

At the June 1, 2020, status conference, the Court reiterated that defendant should be provided a "disabled laptop with the discovery" and said it "[did not] see why that can't be done and can't be done quickly." (6/1/2020 RT 6:12-16.)  Both parties agreed. (<u>Id.</u> at 6:17-7:20.)  Although the Court had just minutes earlier told defense counsel that "I expect a greater degree of candor from you going forward" (<u>id.</u> at 5:18-21)[3], neither defendant nor his counsel

---

[3] The Court's comments were related to claims in defendant's status report about the discovery the government produced in this case.  As described in Section III.A., <u>infra</u>, statements made by defendant and his counsel at the June 1, 2020, status hearing, further demonstrate that defendant likely wrote most if not all of the May 27, 2020 status report (CR 164).

5

disclosed that defendant had already been using Manheimer's computer to work on this case (id. at 6:12-7:20).

Consistent with the Court's directions, the parties jointly lodged a proposed modification of defendant's temporary release conditions, which defendant signed, to allow him to use an "internet-disabled laptop computer to access the discovery in this case." (CR 173.)  The Court ordered the modification on June 8, 2020.  (CR 180.)

In addition to the filings referenced above, defendant filed a number of other documents during this same two-week time period, including three additional status reports or supplemental status reports on May 28, 2020, June 5, 2020, and June 7, 2020, and a brief regarding defendant's representation issues on June 5, 2020.  (CR 165; CR 172; CR 174; CR 178).

**D.   The Government Discovered that Defendant Used Manheimer's Computer to Draft Pleadings**

Despite defendant claiming he could not access a computer to review the discovery, the government soon discovered that defendant had used Manheimer's computer to create the last five pleadings defendant had filed with this Court.  (CR 177.)  Specifically, the metadata for defendant's last five pleadings (CR 164; CR 165; CR 167; CR 172; CR 174), including his May 27, 2020, status report (CR 164), indicated that the author of the documents was "JAY MANHEIMER" and that the filed PDFs were created using Microsoft Word and Manheimer's MacBook computer.  (CR 177.)

On June 7, 2020, the government alerted the Court to the potential violations and requested that the Court authorize a further inquiry as to the violations.  (Id.)  The government requested that the Court: (1) direct Pretrial Services ("PTS") to search Manheimer's

residence, including his digital devices; and (2) allow the government to examine Manheimer under oath.  (Id. at 10.)

Later that evening, defendant filed his opposition to the government's violation inquiry request.[4]  (CR 179.)  Defendant did not specifically deny using Manheimer's computer, and instead merely stated that he had "not accessed the internet using any computer or electronic devices."  (CR 179.)  Defendant then offered a convoluted theoretical explanation about how Manheimer could have assisted defense counsel in finalizing those pleadings without defendant actually using a computer and violating his temporary release conditions.  (Id.)  For example, defendant stated:

> Mr. Avenatti is able to review documents with his counsel via email between Mr. Manheimer and counsel.  Mr. Manheimer is then able to print those documents for Mr. Avenatti's review.  Mr. Avenatti is able to communicate with his counsel regarding changes and edits to the documents, including via email between Mr. Manheimer and his counsel, and phone calls.  There is also nothing prohibiting Mr. Manheimer from printing to pdf the final agreed-upon filings for undersigned counsel's convenience and then emailing that final document for filing.

(Id. at 1-2.)  Notably, defendant never disclosed that he had personally used Manheimer's computer to work on those pleadings; nor did he claim that it would have been appropriate for him to do so if Manheimer temporarily turned off the internet.

---

[4] Approximately one hour after the government alleged that defendant violated his conditions of release (CR 177), defendant filed another supplemental status report (CR 178).  Just as with defendant's last five pleadings, the metadata shows that this supplemental status report was also created using Manheimer's computer.  (CR 178.)  Apparently, this document was filed before defendant or his counsel reviewed the government's brief, because defendant's subsequent opposition did not contain any such metadata and was instead printed and then physically scanned (CR 179).

At a status conference the next day, June 8, 2020, the Court reiterated that the "restriction is not that he couldn't use the internet, but that he was not to have access to devices that would permit him to use the internet." (6/8/2020 RT 10:6-19; CR 180.)  The Court said the allegations warrant further investigation, and agreed with the government's requests that PTS search Manheimer's computer and the government be allowed to examine Manheimer.  (6/8/2020 RT 10:6-19.)  Defendant also agreed that this was a "good plan." (Id. at 10:22-23.)  Rather than stating that defendant had used Manheimer's computer to prepare pleadings in this case, defense counsel told the Court that he "spoke with Mr. Manheimer last night, and he assured me that Mr. Avenatti has not had access to a device with internet capabilities." (Id. at 11:15-22.)  As set forth further below, this representation was inaccurate.

**E.   Pretrial's Search of Manheimer's Apartment**

On June 10, 2020, PTS searched Manheimer's apartment and took custody of several digital devices to conduct the Court-ordered search of those devices.  (CR 185.)  During a subsequent hearing as to the privilege concerns defendant raised regarding PTS's search of the digital devices, the Court asked defense counsel to explain the "mechanics" of how documents were transmitted to and from defendant. (6/11/2020 RT 4:11-5:10.)  Defense counsel explained that he would send a document to Manheimer, who would print it and deliver it to defendant.  (Id.)  Defendant would then handwrite edits and give them to Manheimer, who would send the edits back to counsel via a scanned PDF or an email.  (Id.)  Counsel did not disclose that defendant himself had been using Manheimer's computer at any point during this process.  (Id.)  The government suggested defendant could resolve

8

1  this entire issue by submitting to the Court <u>in camera</u> the relevant

2  correspondence, including the initial drafts of any pleading that

3  were sent from counsel to defendant, as well as proof that defense

4  counsel had done the legal research in the filings.  (<u>Id.</u> at 6:25-

5  7:6.)  Defendant never did so.

6      **F.   Manheimer Testified that Defendant Personally Used
           Manheimer's MacBook Computer**

7

8      On June 17, 2020, the government conducted Manheimer's under-

9  oath examination.  (CR 200-1.)  Although Manheimer struggled to

10 remember specific details of what had occurred during the preceding

11 three weeks, he admitted that defendant had personally used

12 Manheimer's computer to work on defendant's legal cases in late May.

13 Manheimer testified as follows:

14     AUSA ANDRÉ:     Have you seen defendant use that MacBook
                       computer for any reason?
15
       MANHEIMER:      There was one time, I believe, Mr. Steward
16                     directed us for something, and I – the
                       internet was not accessible, and I
17                     supervised him.  I don't know what he was
                       working on.
18
       AUSA ANDRÉ:     So one time, he used the MacBook.  You said
19                     the internet was off.  Did you turn off the
                       internet?
20
       MANHEIMER:      Yes.
21
       AUSA ANDRÉ:     You said you supervised him.  What did you
22                     do to supervise him?

23     MANHEIMER:      I was next to him, right behind him.

24     AUSA ANDRÉ:     How long did he use the MacBook for?

25     MANHEIMER:      I don't remember how long.

26     AUSA ANDRÉ:     Do you have a best estimate?

27     MANHEIMER:      I don't know.  An hour or two maybe.

28

| | |
|---|---|
| AUSA ANDRÉ: | When did this occur, approximately?  How long ago?  Last week?  Last month? |
| MANHEIMER: | I don't know.  I think it was around the end of May. |

***

| | |
|---|---|
| AUSA ANDRÉ: | What was your understanding as to what defendant was using your MacBook computer for on that specific instance? |
| MANHEIMER: | To me, it related to one of his cases. |
| AUSA ANDRÉ: | You said you supervised him.  Do you know what he was doing on the computer? |
| MANHEIMER: | I don't know.  It was some sort of document. |
| AUSA ANDRÉ: | So you recall him working on a document? |
| MANHEIMER: | Yes. |
| AUSA ANDRÉ: | Was he typing? |
| MANHEIMER: | I think so. |

(CR 200-1 at 34:7-35:17, 72:23-11.)[5]  Although Manheimer initially said he did not recall defendant using Manheimer's MacBook any additional times (id. at 35:22-24), he later testified that there were "potentially two" instances in which defendant used Manheimer's computer (id. at 79:19-80:12).  And when asked whether it is possible that defendant used Manheimer's computer "more than twice," Manheimer said "I don't recall."  (Id.)  Manheimer also confirmed that defendant's counsel was not present when defendant had used Manheimer's computer.  (Id. at 114:10-14.)

_____

[5] Manheimer also testified that he believed it was fine for defendant to use his computer so long as the internet was turned off.  (CR 200-1 at 91:3-16.)  This was because defendant never told Manheimer that this was a violation, and Manheimer never asked PTS whether such use was appropriate under defendant's release conditions.  (Id.)  And although Manheimer apparently spoke to defense counsel about such use, he does not recall the specifics of that conversation.  (Id.; CR 200-2 at 5 (changing prior testimony).)

10

Manheimer, however, was unable to provide any further details regarding defendant's use of Manheimer's computer, including whether Manheimer would make edits to the documents before he converted them to PDF and sent them to defense counsel (id. at 56:8-57:4); whether he saw defendant physically edit those documents (id. at 57:25-59:7); and whether Manheimer saw defendant use Manheimer's computer or any other digital device to write any portions of those documents (id. at 59:22-60:4). Even though previously describing to the Court the purported process to create the pleadings, defendant's counsel objected to questions related to the preparation of pleadings by defendant and Manheimer on privilege grounds, and Manheimer therefore did not answer them during the examination. (Id. 55:25-60:4.) When Manheimer submitted his errata sheet one month later he did answer the questions, but did not provide any actual information. (CR 200-2 at 4.) Instead, Manheimer merely claimed "I don't recall if Mr. Avenatti edited anything" and "I don't recall if Mr. Avenatti wrote anything." (Id.)

Manheimer also could not recall anything about the specific pleadings that had been generated using Manheimer's computer and subsequently filed with this Court. Manheimer claimed that he did not recognize those documents, did not recall what he did to assist with the documents, and did not recall what defendant had done to prepare the documents. For example, Manheimer was unable to recall whether he or defendant had assisted in preparing the two documents defendant filed on June 5, 2020 (6/11/2020 RT 81:6-84:2), or the supplemental status report defendant filed on June 7, 2020 (id. at 85:16-87:1), even though all three documents were created using Manheimer's computer less than two weeks earlier (see CR 177).

11

Manheimer did, however, indicate that he would frequently conduct internet searches for defendant, but could not recall the specifics of the searches.  (CR 200-1 at 17:13-20.)  He also said that he sometimes printed news articles to attach to defendant's pleadings, but again could not provide any specific information regarding the articles he printed.  (See id. at 69:18-72:15.)[6]

## G.   Prior Extension of Defendant's Temporary Release

On July 6, 2020, during a telephonic status conferences, defendant requested that his temporary release be extended due to COVID-19. (7/6/2020 RT 5:25-7:19.)  The Court extended defendant's temporary release an additional 60 days, but expressly reserved the right to remand defendant at any time, including if the Court determined based on Manheimer's testimony that defendant had violated his temporary release conditions.  (Id. at 10:25-11:8.)  Defendant's temporary release currently expires on September 21, 2020.

## H.   The PTS Forensic Examination Report

On August 28, 2020, following the resolution of defendant's privilege objections (see CR 239), the Court released to the government a redacted copy of the confidential PTS Digital Forensic Examination Report (the "Report").  PTS determined that Manheimer's MacBook Air computer had been used to "view, create, and/or modify" Microsoft Word and PDF documents, as well to send and receive email

---

[6] At the conclusion of the examination the parties agreed that Manheimer would have an opportunity to review the final transcript and make sure there were no mistakes.  (CR 200-1 at 115:10-116:7.) On June 29, 2020, the court reporter finalized the transcript and provided electronic copies to the parties (CR 200-1 at 120), and on July 14, 2020, Manheimer's counsel emailed the parties a six-page errata sheet and the signed penalty of perjury statement (CR 200-2). Manheimer altered a significant number of his answers and, in a number of instances, completely changed his testimony.  (CR 200-2.)

communications.  (Report at 1.)  PTS, however, could not determine whether "defendant was the individual preparing the documents or if his legal counsel was or was not present during said preparation of any documents/correspondence to the attorney."  (CR 239 at 2.)  PTS thus did "not view the preliminary findings to be in violation of the defendant's conditions of release" and did not recommend that the Court take further action based on the PTS Report.  (CR 239 at 2.)

Notably, PTS's recommendation was based exclusively on the Report, and did not take into account Manheimer's testimony.  Indeed, at the time PTS examined the devices and prepared the Report, the transcript of Manheimer's testimony had not yet been finalized or provided to the parties.  PTS was therefore unaware that Manheimer testified that defendant personally used Manheimer's computer on at least one or two occasions to prepare legal documents, or that defendant's legal counsel was not present when defendant had used Manheimer's computer.  See supra Section II.F at 9-11.

## III. ARGUMENT

### A.   The Court Has Broad Discretion to Terminate or Not Further Extend Defendant's Temporary Release

Defendant was temporarily released from custody for 90-days pursuant to 18 U.S.C. § 3142(i) due to the COVID-19 pandemic, its effects in the "greater New York City" area, and defendant's alleged health concerns.  (CR 128.)  Just as the Court had broad discretion to grant defendant temporary release under § 3142(i), the Court has broad discretion to either terminate or decline to extend defendant's temporary release.  Indeed, the Court expressly reserved the right to revoke defendant's temporary release based on any "changed circumstances" after notice to the parties.  (CR 140 at 7, ¶ 15; see

1  also 7/6/2020 RT 10:25-11:8.)  Accordingly, the ultimate question

2  before this Court is whether defendant's temporary release is

3  appropriate or necessary at this time.

4  Additionally, as the Court has already revoked defendant's bail

5  pursuant to 18 U.S.C. § 3148(b)(1)(A), the government does not

6  believe the § 3148(b) revocation standard applies here.  Rather,

7  since defendant is seeking a further extension of his temporary

8  release under § 3142(i) (see CR 246 at 4), defendant still bears the

9  burden to show that temporary release is "necessary" under that

10 provision.  United States v. Dupree, 833 F. Supp. 2d 241, 246

11 (E.D.N.Y. 2011).  Nevertheless, to the extent the Court is inclined

12 to apply § 3148(b) here, the government would merely be required to

13 prove by "clear and convincing evidence" that defendant violated his

14 temporary release conditions.  18 U.S.C. § 3148(b)(1)(B).  This

15 standard has been met.

16 **B.   Defendant Intentionally Violated His Temporary Release
       Conditions by Using Manheimer's Computer**

18 Defendant's conditions of temporary release state that

19 "defendant shall not possess, use, or access any digital devices that

20 offer or allow internet access."  (CR 140 ¶ 12; CR 154.)  The

21 "restriction [was] not that he couldn't use the internet, but he was

22 not to have access to devices that would permit him to use the

23 internet."  (6/8/20 RT 10.)  There is now clear and convincing

24 evidence that defendant intentionally violated this condition by

25 using Manheimer's MacBook computer.

26 First, Manheimer testified that defendant used Manheimer's

27 MacBook computer on at least one or two (and potentially more than

28 two) occasions to do work relating to his legal cases.  (CR 200-1 at

34:7-35:17, 72:23-73:11, 114:10-14.)   Although Manheimer testified that the internet was turned "off" and he "supervised" defendant at all times, Manheimer could not recall any specific information about what defendant actually did other than that defendant was typing on "some sort of document" (id. at 35:12-17) and might have used Microsoft Word to do so (id. at 72:23-73:7).   Whether the internet was temporarily turned off is irrelevant since Manheimer's MacBook was undoubtedly a device that "offer[s] or allow[s] internet access."[7]   (Id. at 32:13-34:6.)   Indeed, Manheimer testified that the computer was otherwise permanently connected to the internet via Wi-Fi.   (Id.)   Manheimer's testimony that defendant used this computer thus proves that defendant violated his temporary release conditions.

Second, six of defendant's pleadings in this case were created using Manheimer's computer. (CR 177.)   At a minimum, defendant wrote substantial portions of the May 27, 2020, status report (CR 164), given that was the only significant pleading defendant filed in late-May -- the time period in which Manheimer admitted defendant used his computer (CR 200-1 at 32:13-35:17).   Moreover, when the Court expressed concern regarding counsel's lack of candor during the June 1, 2020, status conference, it was defendant -- not counsel -- who responded and pointed the Court to specific portions of the May 27, 2020, status report.   (6/1/2020 RT 5:14-6:1.)[8]

_____

[7] Temporarily turning off a computer's internet access by, for example, disconnecting it from a WiFi network, is not the same thing as disabling a computer's ability to access the internet.   A computer that is merely disconnected from the internet can easily be reconnected to the internet at any time.

[8] When the Court later raised concerns regarding the length and relevancy of much of defendant's 33-page May 27, 2020, Status Report, defense counsel stated: "The Court is very familiar with my writing. I am usually very succinct."   (6/1/2020 RT 16:9-17:6.)

15

In light of Manheimer's testimony, however, the Court can properly infer that defendant himself used Manheimer's computer to draft or edit significant portions of all six pleadings.  Manheimer could not recall doing any specific work on those six pleading, all of which had been filed within two-to-three weeks of his examination. (CR 200-1 at 63:14-65:25, 73:12-76:16, 81:6-84:2, 85:16-87:1.) Manheimer did not even recognize the pleadings, other than the May 27, 2020, status report which "looked familiar." (Id.)  Had Manheimer edited and/or finalized these pleadings as defendant previously claimed one would expect Manheimer to recognize them and remember at least some of the work he did to help prepare them.  And although Manheimer could not remember whether he worked on the documents that were created using his computer, he acknowledged that it was possible defendant could have used Manheimer's computer to do so "as long it didn't need the internet." (Id. at 76:7-16.)

It is also notable that none of the Word documents or PDFs that PTS found saved on Manheimer's MacBook identify defendant's counsel as the author. (Report, Exs. E-F.)  Rather, the majority of the documents created or modified during the relevant time period identify Manheimer as the author. (Id.)  In contrast, there were numerous documents saved on Manheimer's MacBook identifying Scott Srebnick (defendant's counsel in one of the SDNY cases) as author. (Id.)  Defendant's counsel in this case also does not appear to have sent defendant (via Manheimer) many emails with attachments, whereas there are numerous emails from defendant (via Manheimer) to defendant's counsel with attachments during this same time period. (Report, Ex. D.)  This further suggests that defendant personally drafted all six pleadings using Manheimer's computer and did not, as

he previously claimed, merely review or edit the documents that his counsel had prepared on his behalf.

Third, there is no question that defendant understood that he was not allowed to access, possess, or use any computer that was capable of being connected to the internet, including Manheimer's MacBook.  In his May 27, 2020, status report, defendant argued that he could not prepare for trial, including motion practice, because his release conditions prevented him from using a computer to review the discovery.  (CR 164 at 1-2.)  If defendant believed he could use Manheimer's computer so long as the internet was temporarily turned off, there would have been no reason for defendant to raise the computer access issue in his status report; he would have been able to use Manheimer's computer at any time.  And at no point during the discussions with the Court regarding obtaining a computer for defendant to review discovery did defendant ever indicate he believed it was appropriate to use Manheimer's computer or any other computer so long as the internet was temporarily turned off.

Defendant also personally signed the proposed modification of his release conditions allowing him to use an internet-disabled laptop going forward. (CR 173.)  If defendant believed it was appropriate to use Manheimer's computer so long as the internet was off, such a modification would have been entirely unnecessary.

Moreover, if defendant truly believed he was allowed to use Manheimer's computer, defendant would have immediately raised that issue with the Court when the government first accused him of violating his release conditions on June 7, 2020.  Instead, defendant offered a series of convoluted explanations (see CR 179) and falsely claimed that he "has not had access to a device with internet

17

capabilities" (6/8/2020 RT 11:15-22).  Defendant did not argue that his conditions allowed him to use Manheimer's computer so long as the internet was temporarily off because defendant knew he was not allowed to do so.

Finally, the government expects that defendant will argue, as he has done in other pleadings (see CR 209; CR 220), that the government is trying to prevent him from assisting with his defense.  This is baseless.  Defendant is entitled to assist in his defense and has at all times remained free to do so.  Defendant, however, cannot violate his release conditions or mislead this Court.  Here, he did both.  If defendant felt his release conditions were preventing him from effectively assisting with his defense, he could have raised that issue with the government or the Court.  But rather than asking the government or the Court to modify his release conditions when he was released from custody, defendant intentionally violated those conditions in an attempt to argue -- over a month after he was released -- that he was being unfairly prevented from reviewing discovery and therefore could not prepare for trial.

### C.   Defendant Intentionally Misled this Court

Manheimer's testimony also confirmed that defendant intentionally misled this Court on numerous occasions.

First, defendant's initial claims in his May 27, 2020, status report that he could not prepare for trial or assist with his defense because his release conditions prevented him from using a computer were, at a minimum, wholly misleading.  Defendant himself had used Manheimer's computer to write substantial portions, if not all, of that very same status report.  And despite being admonished by the Court regarding his lack of candor moments earlier, neither defendant

nor his counsel disclosed defendant's use of Manheimer's computer during the June 1, 2020, status conference or anytime thereafter. (See 6/1/2020 RT 5:18-7:20.)

Second, since the government accused defendant of violating his release conditions, defendant has repeatedly misled this Court regarding his use of Manheimer's computer.  As discussed above, defendant had multiple opportunities to disclose to the Court that defendant used Manheimer's computer to work on this case, but failed to do so.  Instead, the defense explicitly denied any such use, falsely stating that defendant "has not had access to a device with internet capabilities."  (6/8/2020 at 11:15-22.)  And the convoluted explanations defendant offered regarding the creation of these pleadings -- e.g., Manheimer simply printed the documents to PDF because defense counsel could not do so at his house (CR 179) -- were not supported by Manheimer's testimony during which Manheimer could not remember any specific details regarding the creation of the documents.  Indeed, the first time defendant ever acknowledged the possibility he had used Manheimer's computer was nearly two months later.  (CR 220 at 4.)

Moreover, if defendant believed the process by which defendant used Manheimer's computer to create the pleadings was entirely appropriate, there would have been no reason for defendant to have changed the manner in which he creates and files documents since the government raised the issue on June 7, 2020.  Defendant's actions, however, are telling as he began printing and scanning the documents before filing, thus concealing the author of the document from the metadata.  (Compare CR 164, CR 178 with CR 179, CR 207, CR 209.)

1        **D.   Manheimer Is Not a Suitable Third-Party Custodian**

2        Manheimer's testimony also establishes that he is not suitable

3   to serve as defendant's third-party custodian.  Manheimer agreed to

4   supervise defendant and notify PTS if defendant violated his

5   conditions of his release.  (CR 143.)  Manheimer has shown he is

6   either incapable or unwilling to perform either task.

7        Manheimer had only a minimal understanding of defendant's

8   release conditions.  During his examination, Manheimer testified he

9   did not recall seeing and did not recognize the Court's April 10,

10  2020, order setting forth defendant's conditions of release (CR 140)

11  or defendant's release form and bond paperwork (CR 154).  (CR 200-1

12  at 10:20-14:1; CR 200-3, Exs 2-3.)[9]  Moreover, when asked during his

13  examination what he understood defendant's release conditions to be,

14  Manheimer only remembered was that defendant could not use the

15  internet.  (CR 200-1 at 14:11-16.)  And although Manheimer believed

16  that defendant could use a computer so long as the computer was not

17  connected to the internet, Manheimer could not point to any specific

18  basis for this incorrect understanding.  (Id. at 14:17-16:18.)

19       Additionally, Manheimer's claim that defendant only used

20  Manheimer's computer once or twice lacks credibility.  If Manheimer

21  truly believed that defendant could use Manheimer's computer so long

22

23  _____

24      [9]  Manheimer did recall seeing a "one page" document he had signed, similar to the Form CR-31 Affidavit of Third-Party Custodian.

25  (CR 200-1 at 11:14-12:18; see CR 200-3, Ex. 1.)  And although Manheimer did not recall seeing the actual documents setting forth

26  defendant's release conditions, he indicated that defense counsel had provided him with some sort of signed document that had defendant's

27  release conditions.  (See CR 200-1 at 12:19-13:6.)  In his errata submitted a month later, Manheimer changed this testimony to indicate

28  that defendant or counsel had provided him a copy of the release conditions, and that he discussed the conditions with Officer Davis after defendant was released into his custody.  (CR 200-2 at 1, 5.)

as the internet was temporarily turned off, there would be no reason for defendant to have used Manheimer's computer on only one or two occasions as Manheimer claimed.  Why would Manheimer need to take dictation from defendant or finalize defendant's PDFs for filing, if Manheimer could just turn off the internet and allow defendant to do the work himself?  Furthermore, if Manheimer allowed defendant to use Manheimer's computer on only one or two occasions, why were six filings during a two-week period created in the same manner?

Manheimer's claim that he supervised defendant when defendant used Manheimer's computer also raises serious doubts.  Although Manheimer claimed to supervise defendant by being "next to him, right behind him" for an "hour or two," Manheimer could barely remember what defendant actually did when he used Manheimer's computer other than possibly typing on a document using Microsoft Word.  (CR 200-1 at 34:17-23.)  Defendant's filings between May 27 and June 7, 2020, also include numerous legal citations, but Manheimer provided no explanation of who conducted such legal research, and how.  (Id. at 18:2-21; 50:20-51:11; 67:13-68:5.)

Moreover, Manheimer consistently struggled to remember what had occurred in the two-to-three weeks leading up to his examination. Manheimer did not recognize any of the pleadings that had been created using his computer, did not remember what specific work he had done on those documents, did not remember what work defendant did using Manheimer's computer, and did not remember what internet searches he purportedly ran for defendant.  Indeed, Manheimer testified that he "did not recall" or "did not remember" basic facts numerous times throughout his examination.  At best, Manheimer's inability to remember specifics details regarding defendant's

21

activities during this two-to-three week time period reflects that Manheimer was not, as he had promised to do, actually supervising defendant's activities.  At worst, Manheimer was not entirely forthcoming during his testimony and is attempting to cover for his long-time friend.  Either way, Manheimer demonstrated that the Court cannot trust him to meaningfully supervise defendant going forward.

**E.    The Court Should Terminate or Decline to Extend Defendant's Temporary Release**

In granting defendant temporary release pursuant to 18 U.S.C. § 3142(i), the Court sought to balance its prior finding that defendant was a danger to the community with the potential risks to defendant associated with the COVID-19 pandemic.  (CR 128.)   While doing so, the Court repeatedly set forth the "minimum terms" that would be necessary to effectuate defendant's temporary release, including the appointment of a third-party custodian to supervise defendant and conditions to ensure that defendant "has no access to any form of telecommunications or wire."  (See 3/31/2020 RT 3:18-6:12; CR 128; CR 134.)  By intentionally violating his release conditions and misleading this Court about his use of Manheimer's computer, defendant breached the Court's trust and took advantage of the extraordinary relief he was granted.  Defendant should not be allowed to remain on temporary release if he cannot be trusted to comply with his release conditions or be candid with the Court.

Additionally, over five months has now passed since the Court first indicated it would be willing to grant defendant temporary release due to COVID-19.  (CR 128.)  When the Court first considered defendant's request in March 2020, defendant was detained in New York City (the epicenter of the COVID-19 pandemic in the United States at

the time) and little was known about COVID-19.  Although the government is mindful of the ongoing health concerns regarding COVID-19 and the Court's prior rulings, the government believes that defendant can be safely returned to custody at this time.

As the Court noted during the last status conference, the number of COVID-19 cases in Orange County have been declining significantly and the relevant metrics are all trending in the right direction. See Katie Murar, Recent COVID-19 Cases Down 50%, Orange County Business Journal (Sep. 2, 2020), available at https://www.ocbj.com/news/2020/sep/02/recent-covid-19-cases-down-50/. Indeed, as of the filing of this motion, the seven-day rolling average of new cases in Orange County has fallen to 254 cases per day.  See Workbook: COVID-19 Cases Dashboard, available at https://public.tableau.com/views/COVID-19CasesDashboard_15931020425010/Cases?:embed=y&:showVizHome=no (last visited Sep. 4, 2020).  The number of positive cases in Los Angeles County has also declined.  See id.

Equally important, the two locations where defendant would most likely be detained, Santa Ana Jail ("SAJ") and the Metropolitan Detention Center ("MDC") in Los Angeles, have implemented extensive safety protocols and proven to be more than capable of protecting defendant's health and safety.  The United States Marshals' Service ("USMS") has indicated that SAJ currently only has four inmates suffering from COVID-19.  (Sagel Decl. ¶ 2.)  Moreover, the USMS stated that SAJ has never had a significant COVID-19 outbreak and has not had more than three or four inmates test positive for COVID-19 at any one time.  (Id.)  Indeed, for most of the past five months, SAJ has had zero inmates infected with COVID-19.  (Id.)  Similarly, MDC

23

has only one inmate that is currently infected with COVID-19.  BOP, COVID-19 Coronavirus (updated daily at 12pm Pacific), <u>available at</u> https://www.bop.gov/coronavirus/index.jsp (last visited Sep. 4, 2020).  And since March 2020, MDC has only housed a total of seven inmates that were infected with COVID-19.  (<u>Id.</u>)

The government also continues to believe that defendant's individualized health concerns are overstated.  Defendant based his claim for temporary release on a single alleged incident of pneumonia that occurred in September 2019.  (CR 119; CR 125.)  The Centers for Disease Control, however, most recently updated its guidance as to which individuals are at a higher-risk of severe illness from COVID-19 in August 2020.  <u>See</u> Centers for Disease Control, Coronavirus Disease 2019 (COVID-19): People at Increase Risk, <u>available at</u> https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html.  Notably, defendant does not fall within any of the categories of individuals who "are at increased risk of severe illness" or "might be at increased risk for severe illness."  <u>See</u> Centers for Disease Control, Coronavirus Disease 2019 (COVID-19): People with Certain Medical Conditions, <u>available at</u> https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

Defendant's own conduct since being temporarily released also contradicts his claim that he is at particularly high risk from COVID-19.  Manheimer testified that defendant's girlfriend, who lived in Florida, stayed with defendant at Manheimer's residence on two separate occasions after defendant was temporarily released from

custody.[10]   (CR 200-1 at 21:19-23:25.)   If defendant were truly concerned about contracting COVID-19, he likely would not have had his girlfriend stay with him on two occasions after flying cross-country on a plane.

Accordingly, the government believes it would be appropriate for the Court to terminate defendant's temporary release at this time and order defendant returned to custody.   At a minimum, if the Court is inclined to extend defendant's temporary release any further, the Court should require defendant to identify and obtain a new third-party custodian.   Manheimer's vague testimony raises significant concerns and demonstrates that Manheimer is either unable or unwilling to properly supervise defendant.   If defendant is allowed to remain on release, the Court must have confidence that there is a suitable third-party custodian to supervise defendant and ensure defendant does not violate any of his other release conditions -- particularly, given the Court's prior finding that defendant is a danger to the community.

## IV.   CONCLUSION

For the foregoing reasons, the government requests that the Court terminate or decline to extend defendant's temporary release, or, alternatively, require defendant to obtain a new third-party custodian.

---

[10] Although Manheimer did not testify as to where defendant's girlfriend lived, the government is aware that she lived and worked in Florida and flight records show she traveled by plane from Miami during the relevant time.

1

## DECLARATION OF BRETT A. SAGEL

2

I, Brett A. Sagel, declare as follows:

3

1.   I am an Assistant United States Attorney ("AUSA") in the
4 United States Attorney's Office for the Central District of
5 California (the "USAO").  I, together with AUSA Julian L. André, am
6 assigned to represent the government in the prosecution of defendant
7 MICHAEL JOHN AVENATTI ("defendant") in <u>United States v. Michael John</u>
8 <u>Avenatti</u>, SA CR 19-61-JVS.  I submit this declaration in support of
9 the government's motion to terminate and not further extend
10 defendant's temporary release.

11

2.   On or about September 1, 2020, I spoke with Supervisory
12 Deputy United States Marshal Juan Medrano.  Deputy Medrano told me
13 that the Santa Ana Jail ("SAJ") in Orange County currently has four
14 inmates who have been infected with COVID-19.  Deputy Medrano said
15 that between March 2020 when the COVID-19 pandemic began and the
16 present there have been no significant COVID-19 outbreaks at SAJ.
17 The most number of COVID-19 infected inmates SAJ has had at any given
18 time was three to four, and SAJ has had zero infected inmates for
19 much of the time.  Deputy Medrano also told me that SAJ has imposed
20 significant health protocols to address COVID-19, including, but not
21 limited to, detailed health screenings, COVID-19 testing for all new
22 inmates, isolation and quarantine procedures, enhanced cleaning
23 procedures, and other modified operations designed to prevent the
24 spread of COVID-19 in SAJ.

25 ///

26 ///

27 ///

28

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and that this declaration is executed at Santa Ana, California, on September 4, 2020.

_____
BRETT A. SAGEL