

H. Dean Steward, SBN 85317
107 Avenida Miramar, Ste. C
San Clemente, CA 92672
Tel (949) 481-4900
Fax (949) 497-6753

Attorney for Defendant
MICHAEL JOHN AVENATTI

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | SA CR No. 19-061-JVS |
| Plaintiff, | DEFENDANT'S OPPOSITION TO THE GOVERNMENT'S MOTION TO TERMINATE AND NOT FURTHER EXTEND DEFENDANT'S TEMPORARY RELEASE [DOCKET NO. 262] |
| v. | |
| MICHAEL JOHN AVENATTI, | |
| Defendant. | [Declarations of F. Ramzi Asfour, M.D., and H. Dean Steward filed concurrently herewith; Motion to Strike and [Proposed] Order previously filed] |

Defendant MICHAEL JOHN AVENATTI ("Mr. Avenatti") by and through his counsel of record, H. Dean Steward, hereby files this Opposition to the Government's Motion to Terminate and Not Further Extend Defendant Michael John Avenatti's Temporary Release [Docket No. 262].  Defendant's opposition to the motion is based on the attached memorandum of points and authorities; the concurrently filed declarations of F. Ramzi Asfour, M.D. and H. Dean Steward; the previously filed Motion to Strike and Objections To Portions of AUSA Brett Sagel's Declaration Submitted in Support of the Government's Motion to Terminate and Not Further Extend Defendant Michael John Avenatti's Temporary Release [Docket No. 267], together with the Reply [Docket No. 269]; the previously lodged deposition transcript of Mr. Jay Manheimer, together with his Notice of Errata [Docket Nos. 200-1 and 200-2]; the previously filed Declaration of

Lea Black [Docket No. 119-2]; the Pretrial Services Digital Forensic Examination Report; the files, records and transcripts in this case; and such further evidence and argument as the Court may permit at a hearing on this matter.

Dated: September 11, 2020                    Respectfully submitted,


/s/ H. Dean Steward
 H. DEAN STEWARD

Attorney for Defendant
MICHAEL JOHN AVENATTI

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................... iii

I.   INTRODUCTION ................................................................... 1

II.  FACTUAL BACKGROUND ................................................... 6

    A.  The January 2020 Bail Revocation ...................................... 6

    B.  The March/April Release to Home Confinement ................. 7

    C.  The Government's Prior Positions Regarding Computer
        and Internet Access ............................................................. 8

    D.  The Court's Framing of the Issue ......................................... 9

    E.  The Pretrial Services Report .............................................. 10

    F.  Mr. Manheimer's Testimony .............................................. 10

III. ARGUMENT .......................................................................... 14

    A.  Mr. Avenatti's Constitutional Right to Work on His Defense
        Must Be Respected and Afforded Deference ...................... 14

    B.  The Evidence Is Insufficient to Demonstrate Mr. Avenatti
        Violated Any of His Bail Conditions ................................. 15

    C.  If There Was a Violation, It Was Not Purposeful and
        Instead Resulted from a Reasonable Misinterpretation
        of the Bail Conditions ........................................................ 18

    D.  There Were No Misrepresentations Made to the Court
        and the Government's Liberties with the Evidence Should
        Not be Credited ................................................................. 18

i

     E.  Remanding Mr. Avenatti To Custody is Punitive and
         Unnecessary, Especially In light of the Pandemic and
         its Health Risks ..................................................................................... 21

     F.  Mr. Manheimer Should Be Permitted to Remain as
         Mr. Avenatti's Third-Party Custodian ................................................ 25

  IV.   CONCLUSION .................................................................................................. 25

CERTIFICATE OF SERVICE ............................................................................... 26

<u>**TABLE OF AUTHORITIES**</u>

<u>**CASES**</u>:                                                                            <u>**Page**</u>

*Faretta v. California*, 422 U.S. 806 (1975)*,*
422 U.S. 806 (1975) ...........................................................................14

*Gannett Co. v. DePasquale*,
443 U.S. 368 (1979) ...........................................................................14

*McCoy v. Louisiana,*
138 S.Ct. 1500 (2018) ........................................................................14

*U.S. v. Park*,
2020 WL 1970603 (S.D.N.Y. April 24, 2020) ...................................22

*United States v. Read*,
918 F.3d 712 (9th Cir. 2019) .............................................................14

*U.S. v. Rountree*,
2020 WL 2610923 (N.D.N.Y. May 18, 2020)....................................23

*U.S. v. White*,
2020 WL 3960830 (D. Md. July 10, 2020) ........................................23

*U.S. v. Young*,
2020 WL 2514673 (D. Mass. May 15, 2020)................................ 23-24

*U.S. v. Zuckerman*,
2020 WL 1659880 (S.D.N.Y. April 3, 2020) ................................ 21-22

<u>**OTHER AUTHORITIES:**</u>

U.S. Const. Amend. VI ..................................................................4, 14

B. Saloner, Ph D., et al., *Covid-19 Cases and Deaths in Federal &
State Prisons*, J. Am. Med. Assoc. (July 8, 2020) ..............................24

Dictionary.com (www.dictionary.com), accessed September 10, 2020.............16

Macmillan Dictionary (www.macmillandictionary.com),
accessed September 10, 2020 ..............................................................................16

Merriam-Webster Dictionary (www.merriam-webster.com),
accessed September 10, 2020 ........................................................................16, 17

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Remarkably, the government seeks to have Defendant Michael John Avenatti ("Mr. Avenatti") remanded because, according to their most friendly version of the "facts," on one or two occasions, over three months ago, as part of his criminal defense and at the direction of his counsel H. Dean Steward, Mr. Avenatti edited legal filings on a computer that did not permit him access to the Internet and then Mr. Steward filed the pleadings.  Pretrial Services previously recommended to the Court that "no action" be taken against Mr. Avenatti and found that Mr. Avenatti has "maintained compliance with his bond conditions.  Pretrial Services does not believe further action is warranted . . ." The government, however, refuses to move on.

Instead, by way of their motion [Docket No. 262] (the "Motion"), the government demands that Mr. Avenatti be sent back to jail.  They do so not out of concern for the safety of the community or because they claim there is evidence establishing Mr. Avenatti is a flight risk.  Rather, they do so because they want Mr. Avenatti to suffer. At bottom, the prosecution's motion is spiteful and petty, and fails to reflect the exercise of reasoned prosecutorial discretion and self-restraint on power typically exhibited by the U.S. Attorney's Office for the Central District in other cases and required under our criminal justice system.

The motion should be denied for a litany of reasons.  *First*, since his release to home confinement due to COVID-19 nearly five months ago on April 24, 2020, Defendant Michael Avenatti ("Mr. Avenatti") has taken the terms of his release seriously and has been fully compliant with each of his approximate 30 bond conditions.  Among other things, Mr. Avenatti (a) did everything he was required to do prior to being released from MCC, including being placed in solitary confinement and securing the $1 million bond; (b) met all of the requirements relating to his travel to California from New York with no issues; (c) promptly reported to Pretrial Services upon his arrival and

regularly thereafter; (d) has timely made all necessary financial reports and disclosures to Pre Trial Services as required; (e) has avoided all prohibited contact with witnesses; (f) has complied with the orders of his release in his other two criminal matters pending in the Southern District of New York; (g) has executed all documents as required by this Court; (h) has complied with the General Conditions of Release set forth in the Central District of California Release Order and Bond Form; (i) has maintained an exceptional relationship and perfect record with Pretrial Services ("PTS"); (j) has been monitored regularly and consistently by PTS through in-person, unannounced visits, FaceTime calls and emails (through Mr. Jay Manheimer as directed by PTS) and 24-hour electronic monitoring; (k) has remained confined in Mr. Manheimer's 1,000 square foot, two-bedroom, one -bath apartment, where he sleeps on an air mattress; and (l) in almost five months, has never left Mr. Manheimer's property nor asked for the opportunity to leave, even for medical or dental care (which he needs).  In sum, Mr. Avenatti has done everything he was required to do.  Indeed, by all accounts other than that of the prosecutors in this case, Mr. Avenatti's home confinement has been uneventful and drama free.

_Second_, Mr. Avenatti has not engaged in any improper financial transactions, dissipated assets or improperly accessed any financial accounts.  In addition, as this Court [Docket No. 253] and the Southern District of New York (the Hon. Jesse M. Furman presiding) recently ruled [Case No. 1:19-CR-00374-JMF, Docket No. 73], Mr. Avenatti is indigent.  As a result, he does not have significant liquid assets to transfer or move anywhere,[1] even if he desired to.

---

[1] This is the only reason the government has previously provided for the need for the prohibition on Mr. Avenatti having access to the internet.  But, as the government well knows, Mr. Avenatti has no significant money to transfer via the internet or otherwise to anyone.  The defense has requested repeatedly that that if the government has any evidence that Mr. Avenatti has any liquid assets greater than $1,000 to access or transfer, they immediately disclose it to the Court and the defense.  _Their continued silence on this issue demonstrates that the entire reason for the internet prohibition is and has been a fallacy, without any basis._

*Third*, Mr. Avenatti has not violated any of his release conditions relating to internet usage or access to the internet.  The Court recently stated in its Ruling on Pretrial Services Report [Docket No. 239] on August 11, 2020 that "[T]he ultimate question before Court is whether Avenatti violated the terms of his release by using a computer or other device *which permitted him to access the internet*." (emphasis added). Despite this fact, however, the government's motion fails to mention, let alone address, the language of this ruling.  The reason for this is clear – because there is no evidence that Mr. Avenatti ever used a computer or device that permitted him to access the internet.  Despite a thorough search of the residence and a forensic search of multiple devices, PTS did not find any such evidence.  Nor did Mr. Manheimer testify that Mr. Avenatti had ever used a computer or device that permitted him to access the internet.  In fact, despite the government's attempt to twist and misstate Mr. Manheimer's testimony[2] in its Motion to fit their false narrative, his testimony is clear and establishes the exact opposite – that Mr. Avenatti never accessed the internet, never had possession or use of any device that permitted Mr. Avenatti to access the internet, and has had no way to connect to the internet.  Moreover, Mr. Manheimer's testimony is equally clear that Mr. Avenatti has been fully compliant with his bail conditions and taken them seriously, and Mr. Manheimer has routinely and consistently assisted Mr. Avenatti and his attorneys by creating documents and filings (e.g. pdfs), emailing, and searching for articles and things on the internet relating to Mr. Avenatti's cases.

*Fourth*, the government's request for remand is even more unreasonable and punitive considering that by agreement of the government and Order of the Court, Mr. Avenatti has been able to do for over the last three months what the government now

---

[2] The defense encourages the Court to read the entirety of Mr. Manheimer's actual testimony [Docket No. 200-1], together with his corrections (which were permitted pursuant to the Federal Rules of Civil Procedure by agreement of the government and thus also constitute his testimony) [Docket No. 200-2].  Upon doing so, the Court will determine that Mr. Manheimer, a non-lawyer who had never been deposed before, let alone by two federal prosecutors with over 100 people listening in, testified as one might expect and truthfully.

3

claims he improperly did back in May – use a computer that is not able to connect to the internet when Mr. Avenatti uses it, in order to work on his criminal defense (i.e., exercise his Sixth Amendment rights).  That computer is able to access the internet generally but does not have internet access when Mr. Avenatti uses it because he does not have the password necessary to unlock the internet access (i.e., enable the internet).  If this use is not controversial and is approved, it is unclear how Mr. Avenatti's actions, even under the best set of facts for the government, could justify remanding Mr. Avenatti and placing him at heightened risk due to COVID-19.

*Fifth*, unlike other high-profile defendants presently out on bail or released to home confinement due to COVID19 (i.e. Michael Cohen, Steve Bannon and Brian Kolfage), Mr. Avenatti has maintained an extremely low profile.  For instance, he has not appeared on radio or television; he has turned down over 60 requests for interviews and comments from the media since his release, and he has not had others post to his social media accounts on his behalf.

*Sixth*, the general risks related to the COVID-19 pandemic are significantly greater now than in April when Mr. Avenatti was released to home confinement.[3]  This is even more true in jails and prisons.[4]  **Indeed, as of ten days ago (September 1), 90 of the top 100 COVID-19 outbreak clusters in the United States were in prisons and jails.[5]**  Thus, the risk to Mr. Avenatti's health were he to be remanded is also exponentially

---

[3] Since Mr. Avenatti's release, California has set new records for cases, hospitalizations, and deaths.  And by nearly every statistical measure, the COVID-19 pandemic is far worse now than when this Court ordered Mr. Avenatti released on March 27, 2020.  *See*, *e.g.*, Exhibit A attached hereto.

[4] The Declaration of AUSA Sagel submitted with the Motion is unreliable, has no evidentiary value, no foundation, and provides little assistance to the Court.  Among other defects, there is nothing in the Declaration establishing or even suggesting that either AUSA Sagel or the Deputy have any personal, firsthand knowledge as to the conditions at the jails, let alone the degree of knowledge necessary to state concrete facts relating to preventative measures, COVID-19 infection rates and risks to inmates, especially Mr. Avenatti.

[5] *See* https://www.theguardian.com/world/2020/sep/08/coronavirus-prisons-jails-us

4

greater today than when the Court previously ordered him released on March 27.  The question is not whether the risks have decreased since their peak a few weeks ago; *the question is whether the risks are less  now than when Mr. Avenatti was released in April (they are not) and what the risks are likely to be in the weeks and months ahead as California and the nation enters flu season and likely suffers a "second wave" as is universally predicted.*  Moreover, Mr. Avenatti's health conditions continue to place him at a heightened risk.  *See, e.g.*, Declaration of F. Ramzi Asfour, M.D. with attached report at Exhibit B (filed concurrently herewith) (the "Asfour Decl.").[6]

*Seventh*, even if Mr. Avenatti violated the technical letter of one of his bail conditions, he did so at the direction of his defense counsel and with a reasonable misunderstanding of exactly what was prohibited.  He did not purposely violate any of this Court's Orders nor did he act with blatant disregard for either the letter or spirit of the Court's Orders.  At most, his counsel made an honest mistake in believing Mr. Avenatti could work on his legal defense in consultation with undersigned counsel, who had been unable to physically meet with Mr. Avenatti due to counsel's age and heightened risk for contracting the coronavirus.  *See*, *e.g.*, Declaration of H. Dean Steward (the "Steward Decl."), ¶¶ 11-13.  If their understanding was incorrect, both counsel and the defendant sincerely apologize to the Court and PTS, but respectfully submit that the punishment for this misunderstanding should not be the drastic remedy of remanding Mr. Avenatti to custody, especially in light of the pandemic.

For each of these reasons, as well as those detailed below, Mr. Avenatti respectfully requests that the Court deny the Motion and permit him to remain on home confinement for an additional sixty (60) days under the same conditions previously imposed by the Court.

---

[6]  The Court previously directed the parties to refrain from further arguing the health issues relating to Mr. Avenatti and the risk to him were he to remain in custody.  However, in light of the arguments made by the government in its Motion, the defense is filing Dr. Asfour's declaration and report attesting to Mr. Avenatti's current heath conditions and the significant risk to him of serious injury or death were he to be remanded in the current environment.

## II.  FACTUAL BACKGROUND

### A.  The January 2020 Bail Revocation

On the evening of January 14, 2020, despite knowing full well that Mr. Avenatti was scheduled to depart for New York on a commercial flight five hours later in order to assist with trial preparation and be present for the Nike trial (set for the following Tuesday), the government caused Mr. Avenatti to be arrested in downtown Los Angeles. They chose to arrest Mr. Avenatti not at his residence as is customary, or even at the airport.  Instead, the prosecution purposely chose to have Mr. Avenatti arrested while he was attending a high-profile State bar hearing at which the media was present.  As planned, a media circus resulted, with Mr. Avenatti's arrest and ultimate remand being widely reported nationwide, together with repeated mentions of AUSA Sagel by name. The judge in the Nike matter (the Hon. Paul G. Gardephe) later noted that the timing was especially curious seeing as the alleged conduct used by the government for the basis for the arrest and bail revocation was known by the government for months prior (dating back to July 2019).  Upon being booked in the Santa Ana jail on the night of January 14, Mr. Avenatti was placed in solitary confinement, in a wing of the jail generally reserved for violent inmates with disciplinary problems.[7]

On the morning of January 15, this Court remanded Mr. Avenatti to custody.  The defense is mindful and respectful of this Court's findings at that hearing and does not seek to relitigate those issues here.  Additional facts will emerge in the future, however, that will demonstrate that the government purposely misled the Court in successfully seeking Mr. Avenatti's remand.[8]  Following remand, Mr. Avenatti was transferred to

---

[7] As the Court is aware, from 1971 until 2019 (48 years), Mr. Avenatti had never been charged with any crime, let alone convicted of any crime, and had no history of violence.

[8] Among other things, the facts that will emerge in future briefing will show that the prosecution misled this Court as to critical issues relating to the obligation of Mr. Avenatti to pay his first wife, Mrs. Christine Avenatti Carlin, with whom he has two minor daughters who are entitled to child support.  These misrepresentations and omissions served as the

MCC in New York City and placed under abhorrent, brutal conditions that have been previously documented for the Court and never refuted by the government.  *See*, *e.g.*, Docket No. 164, pp. 6-13.

## B.   The March/April Release to Home Confinement

By way of Orders filed on March 27, 2020 [Docket No. 128], April 10, 2020 [Docket No. 140], April 13, 2020 [Docket No. 142] and April 23, 2020 [Docket No. 151], this Court permitted Mr. Avenatti to be released from MCC and placed on home confinement at the residence of Mr. Manheimer.  Pursuant to these Orders, Mr. Avenatti's release and placement on home confinement was conditioned on approximately 30 terms and conditions, including 24 specific conditions enumerated in the Court's Order of April 10, 2020 and at least 6 other conditions as set forth in the Court's Orders of April 13 and April 23.  Contrary to the government's claim, the Court's decision was not <u>only</u> centered on removing Mr. Avenatti from MCC or New

_____

underpinnings for the government's successful arguments to the Court that Mr. Avenatti should be remanded because he had "fraudulently" paid and "diverted" money to Ms. Carlin instead of paying his "real creditors," who AUSAs Sagel and Andre argued were Mr. Avenatti's second wife (Lisa Storie) and his former employee Jason Frank.  By way of example only, the prosecution failed to inform the Court (a) that Mrs. Carlin was a legitimate creditor of Mr. Avenatti's pursuant to a divorce court judgment/order entered against him over twelve years prior on July 23, 2007; (b) Mrs. Carlin's judgment predated that of all other creditors (including Mr. Frank and Lisa Storie) by at least eleven years and was entitled to preference; (c) the judgment provided that Mr. Avenatti's child and spousal support obligations automatically adjusted upward as Mr. Avenatti's income (from all sources) increased from $295,020 (his income in 2007); (d) if the government's numbers in their own indictment were accurate, Mrs. Carlin was due well over $5,500,000 as of the date of the transfers the government claimed were fraudulent and necessitated Mr. Avenatti's remand; (e) Mrs. Carlin and her attorney Mr. Ken Miller had provided this information, including substantial documentation, to AUSAs Sagel and Andre months prior in the Summer of 2019, including during a proffer session on July 25, 2019; and (f) Mrs. Carlin and Mr. Miller had made it clear to AUSAs Sagel and Andre repeatedly in July 2019 and thereafter that she was a legitimate creditor of Mr. Avenatti's and had a preference over all other creditors due to the amounts being owed pursuant to a child support judgment, even directing the prosecutors to *Ostler v. Smith*, 223 Cal.App.3d 33 (1990), the seminal case in California holding that child support can never be a fixed sum and always adjusts upward or downward depending on income.  AUSAs Sagel and Andre knew all of this, but in their zeal to have Mr. Avenatti's liberty taken from him, purposely misled the Court.

York City generally.  Were the Court only concerned with addressing those issues, he could have easily been transferred to another facility or city instead of being released to home confinement.  Instead, the Court properly recognized that Mr. Avenatti's health places him at a heightened risk.

### C.    The Government's Prior Positions Regarding Computer and Internet Access

Importantly, in connection with Mr. Avenatti's motion asking that he be released to home confinement, the government initially argued, in order to address their alleged "significant concerns," for a condition that would allow Mr. Avenatti to access the Internet and digital devices, but with PTS vested with the authority to monitor and address any related issues.  In fact, under the government's own proposal dated March 31 [Docket No. 131, pp. 1,6], there was no question that Mr. Avenatti could not only use a computer with internet access, but could also access the internet:

> 7.     Defendant's Use of Digital Devices:  Pretrial Services should be provided broad discretion to limit defendant's use of digital devices, such as a cell phone and computer, and be allowed to monitor defendant's use of any such digital devices to ensure compliance with the conditions of defendant's temporary release.  Defendant should only be allowed to use digital devices to communicate with family, friends, and legal counsel; prepare his defense to the pending criminal charges; and for the necessities of daily life, such as ordering food and groceries. . ."

Moreover, shortly after the government first raised its allegations that Mr. Avenatti had engaged in widespread internet usage in order to do research for his legal filings, this Court held a telephonic hearing on June 11, 2020 relating to privilege issues raised by the defense.  During this hearing, AUSA Sagel all but admitted that Mr. Avenatti's use of a computer to work on his defense (as opposed to actually going on the internet), was unimportant and "hardly the crux of this inquiry."  His statements at that

hearing, before the government's allegations of actual internet usage were debunked by the evidence and the government changed course,[9] are telling:

> When it really boils down to it, *what we are looking for* – when I say we are looking for it, I'm not sure that we are looking for anything.  But I think what the Court is seeking in this inquiry and what I think is the right thing to do is any e-mails between Mr. Steward and Mr. Manheimer as it relates to the filing of documents *is hardly the crux of this inquiry*.  I guess I would leave it at that.  *It really kind of boils down to who is the one who is searching, doing the research, and using that computer*? . . . But when it really boils down to it, I think that's just one piece of the puzzle of whether or not Mr. Avenatti is using a device *that is connected or has access to the Internet*.  ***That's what we're talking about***.  So when it really boils down to the search of the -- the communications between Mr. Manheimer and Mr. Steward, *if they're really just the sending of drafts or comments of drafts back and forth, I don't think anybody is going to ask to look further at that*.

[June 11, 2020 Transcript at 6:16-7:15 (emphasis added)].  It bears repeating that there is *no evidence* in the record establishing "the crux" of the matter as identified by AUSA Sagel on June 11 - that Mr. Avenatti ever searched the internet, did research on the internet, or used a computer that was connected to the internet or had access to the internet.

### D.    The Court's Framing of the Issue

On August 11, 2020, in ruling on Mr. Avenatti's motion regarding the Pretrial Services Report, the Court succinctly stated:  "[T]he ultimate question before Court is whether Avenatti violated the terms of his release by using a computer or other device *which permitted <u>him</u> to access the internet*." (emphasis added) [Docket No. 239, p. 3].  This ruling has not been appealed by the government and remains the law of the case.

---

[9] In June, the government initially based their effort to have Mr. Avenatti remanded on the allegation that Mr. Avenatti had engaged in widespread use of the internet.  When it was later discovered that there was no evidence to support this allegation and it was completely debunked by the PTS report and Mr. Manheimer's testimony, the government pivoted to arguing that Mr. Avenatti's brief use of a computer with the internet disabled was enough to have him remanded.

**E.     The Pretrial Services Report**

The Pretrial Services Digital Forensic Examination Report (the "Report") provides no evidence that Mr. Avenatti violated any of his conditions of release.  Despite a thorough forensic examination of _five_ devices found in Mr. Manheimer's residence (following a top to bottom search by multiple officers), the Report makes it clear that no evidence was found suggesting Mr. Avenatti had accessed the Internet.  See, e.g., page 4: "It does not appear this device was used to access internet web sites of evidentiary interest."  Further, while the Report references that various Word and pdf files relating to Mr. Avenatti's criminal cases were located on Mr. Manheimer's computer and attached to various emails[10] sent to and from Mr. Avenatti's lawyers through Mr. Manheimer, this is hardly surprising considering that (a) Mr. Manheimer is a permitted conduit and assistant for Mr. Avenatti in all of his legal matters and (b) Mr. Manheimer has routinely assisted Mr. Avenatti and his counsel on Mr. Avenatti's cases with a multitude of tasks, including creating pdfs (_see_, _e.g._, Manheimer deposition testimony [Docket No. 200-1 at 53:3-6]; Steward Decl. ¶¶ 9-10).  Most importantly, addressing the Court's ruling from August 11, 2020, there is nothing in the Report suggesting, let alone establishing, that Mr. Avenatti used "a computer or other device _which permitted him to access the internet._" (emphasis added).

**F.     Mr. Manheimer's Testimony**

In an effort to have Mr. Avenatti remanded to custody, the government relies on an incomplete and distorted presentation of the testimony from Mr. Manheimer's _three and a half hour_ public deposition on June 17, 2020.[11]  Moreover, the government treats

---

[10] Mr. Manheimer utilizes a cloud-based email program, Gmail, which means that few emails are saved or accessible locally on the computer that was searched.  They are instead stored on a cloud server.  In other wordsAs a result, the emails referenced in the Report are only a subset of all of the emails that were sent to and from Mr. Avenatti via Mr. Manheimer.

[11] The manner in which the government conducted Mr. Manheimer's deposition was generally improper, overly intrusive, and prejudicial to Mr. Manheimer and Mr. Avenatti.  It

10

select portions of Mr. Manheimer's testimony as gospel when it suits their effort to remand Mr. Avenatti, but then remarkably claims in that same motion that Mr. Manheimer's testimony is completely untrustworthy and cannot be relied upon.  In reality, an objective reading of Mr. Manheimer's deposition reveals the following, all of which demonstrate that the government's attempt to remand Mr. Avenatti is unreasonable (citations are to the Manheimer deposition transcript and his changes as permitted under the federal rules – Docket Nos. 200-1 and 200-2):  **(a)** Mr. Manheimer has not observed Mr. Avenatti violating any of his conditions of release nor does he have any reason to believe that he has [100:2-8]; **(b)** Mr. Avenatti has taken his bail conditions seriously at all times and they have been important to him [110:16-25]; **(c)** when Mr. Manheimer heard that the government was alleging Mr. Avenatti had violated his bail conditions, he was "shocked" and "didn't know where it was coming from." [8-12]; **(d)** Mr. Manheimer acts as Mr. Avenatti's paralegal, including sending and receiving emails, printing emails, taking dictation, replying to emails, and doing "all the work," including internet searches, to assist with Mr. Avenatti's defense [17:4-12]; **(e)**

---

was correctly described by one media outlet as "chaotic."  *See* "Feds Probe Avenatti's Custodian in Chaotic Phone Deposition" available at: https://www.law360.com/articles/1284204/feds-probe-avenatti-s-custodian-in-chaotic-phone-deposition.  Among other things, (a) AUSAs Sagel and Andre both asked questions of Mr. Manheimer in a "tag team" effort until defense counsel objected to their continued use of the tactic; (b) the government asked a litany of questions that were irrelevant to the reason the Court granted the deposition, including questions relating to whether Mr. Manheimer has had anyone spend the night at his residence, how often Mr. Manheimer goes running or surfing, what kind of non-monetary support/gifts Mr. Avenatti has received since his release (i.e. food), Mr. Manheimer's social media accounts and habits, the details of Mr. Manheimer's banking information, how often Mr. Avenatti has seen his minor daughters, what Mr. Avenatti has done with his minor daughters when they visited, and whether Mr. Manheimer has ever witnessed Mr. Avenatti attempt to remove his ankle bracelet; and (c) the government required that Mr. Avenatti call-in to the deposition on the same phone line that they established for the general public, which resulted in him not being able to hear questions and answers in many instances because, as the press reported, observers did not mute their phones while at the same time they were engaging in various activities such as loudly watching TV, eating, talking to others, picking up take-out food, and literally yelling things to others like "Take out the trash!" "Where's my laundry?" and "I'm on the deposition!"

Mr. Manheimer sends Mr. Steward PDFs, among other things, related to Mr. Avenatti's cases.  He assists in compiling documents and converting them to PDF [52:22 – 53:9, 65:6-8]; **(f)** Mr. Manheimer has scanned documents for Mr. Avenatti [42:17-19]; **(g)** it is very difficult for Mr. Manheimer to keep track of everything he has done for Mr. Avenatti [55:1-2]; **(h)** Mr. Avenatti does not access the internet and any searches on the internet must have been done by Mr. Manheimer [66:20 – 67:3]; **(i)** when asked whether Mr. Avenatti searched for specific articles, Mr. Manheimer testified "No" and further testified that any searches and attaching of articles was done by Mr. Manheimer [70:2-4, 71:21 – 72:15]; **(j)** Mr. Manheimer does not recall Mr. Avenatti creating any document from scratch on Mr. Manheimer's computer [79:17-19]; **(k)** Mr. Manheimer has taken steps to ensure Mr. Avenatti does not access the Internet.  They include ensuring that all of his devices have passwords unknown to Mr. Avenatti and that "everything goes through [Manheimer]" [17:4-12]; **(l)** Mr. Manheimer's internet access at his home is through a Wi-Fi router that is password protected and Mr. Avenatti does not have the password [43:4-8]; **(m)** Mr. Manheimer has not seen Mr. Avenatti access the internet since his release [44:9-12] and since his release, Mr. Avenatti has not done anything to lead Mr. Manheimer to believe Mr. Avenatti has accessed the internet [44:17-20]; **(n)** Mr. Avenatti has not said anything to lead Mr. Manheimer to believe Mr. Avenatti has accessed the internet [44:21-24]; **(o)** since Mr. Avenatti's release, Manheimer has not done anything to attempt to conceal his internet usage or any websites visited on any of his devices [48:9-25; 107:20 – 108:6]; **(p)** Mr. Manheimer has not seen Mr. Avenatti use any digital device to conduct any financial transactions [98:17-20]; **(q)** Mr. Manheimer has not conducted any financial transactions on Mr. Avenatti's behalf nor has he used the Internet to access any bank or financial account of Mr. Avenatti  [98:21-23; 99:3-6]; **(r)** Mr. Manheimer has searched the Internet for Mr. Steward in connection with Mr. Avenatti's legal cases [17:18-20]; **(s)** Mr. Manheimer does not recall every search because he has his own life and is doing his own things.  [18:11-14]; **(t)** Mr.

12

Manheimer's memory as to all of the things he did for Mr. Avenatti and his lawyers in late May and early June is not great because it was around the one-year anniversary of his father's death [54:11-14]; **(u)** Mr. Manheimer's main computer, his MacBook laptop, is password protected and Mr. Avenatti does not have the password to unlock the computer.  There was one time, possibly two, Mr. Manheimer believes, when Mr. Steward directed Mr. Avenatti and Mr. Manheimer to use the computer for something related to one of Mr. Avenatti's cases, while the Internet was disabled and with Mr. Manheimer supervising everything Mr. Avenatti did "right next to him, right behind him"  [34:7 – 35:24; 73:1-7]; **(v)** Mr. Avenatti has not asked to use the MacBook [34:22-24]; **(x)** Mr. Avenatti never had access to Manheimer's other two computers [37:4-8]; **(y)** Mr. Manheimer has an iPad that is password protected and Mr. Avenatti does not know the password.  Mr. Avenatti has never been seen using the iPad and has not asked to use the iPad [38:3-24]; **(z)** Mr. Avenatti has not been seen possessing any tablet [39:5-8]; **(aa)** Mr. Manheimer has a smart phone that is password protected and Mr. Avenatti does not know the password.  Mr. Avenatti has never asked to use the phone except for a conference call with Officer Davis of Pre-trial Services and Mr. Manheimer [39:12 – 40:17]; **(bb)** Mr. Avenatti has not been seen possessing any smart phone [40:18-20]; **(cc)** Mr. Avenatti has not been seen using Mr. Manheimer's Apple TV for any other purpose other than watching TV [41:21-25]; **(dd)** Mr. Manheimer has done other things with other lawyers for Mr. Avenatti other than Mr. Steward [62:8-20]; **(ee)** Mr. Manheimer has communicated with at least six lawyers for Mr. Avenatti via email.  [112:4-14; 113:20-22]; **(ff)** Mr. Manheimer did not discuss his testimony with Mr. Avenatti before the deposition nor did he talk with Mr. Avenatti about what he was going to say [102:14-19]; and **(gg)** Mr. Manheimer has not received any compensation or promise of compensation for serving as Mr. Avenatti's third-party custodian [8:3-12].

Most importantly, again addressing the Court's ruling from August 11, 2020, there is nothing in Mr. Manheimer's testimony establishing that Mr. Avenatti used "a computer or other device *which permitted <u>him</u> to access the internet."* (emphasis added).

## III.   ARGUMENT

### A.   Mr. Avenatti's Constitutional Right to Work on His Defense Must Be Respected and Afforded Deference

For months now, the government has complained time and again that Mr. Avenatti is working on his criminal defense by, among other things, drafting and editing documents.  The Sixth Amendment to the United States Constitution and over 200 years of legal jurisprudence, however, guarantee Mr. Avenatti this right.  It is black-letter law in the United States that a criminal defendant is permitted to protect his liberty, defend himself and assist counsel in his criminal defense.  *See, e,g.*, *McCoy v. Louisiana*, 138 S.Ct. 1500, 1507-08 (2018) (noting that the Sixth Amendment "speaks of the assistance of counsel of counsel, and an assistant, however expert, is still an assistant" and that "the accused, not a lawyer, is master of his own defense.") (quoting *Faretta v. California*, 422 U.S. 806, 819-20 (1975) and *Gannett Co. v. DePasquale*, 443 U.S. 368, 382 n. 10 (1979); *see also*, *United States v. Read*, 918 F.3d 712 (9th Cir. 2019).  Indeed, the "Sixth Amendment does not provide merely that a defense shall be made for the accused; *it grants to the accused personally the right to make his defense* . . . The need to protect the individual's role in the defense is punctuated by the fact that *it is the defendant and no one else who confronts a loss of liberty*."  *Faretta*, 422 U.S. at 819, 834.  Thus, Mr. Avenatti is permitted to review documents and discovery, draft documents, work and comment on pleadings, communicate with his counsel, and conduct research in connection with each of his legal matters, this case included.  This is especially true for Mr. Avenatti, who has skills and knowledge as a 20-year attorney.

14

Meanwhile, the government, in its effort to convict Mr. Avenatti, is not permitted to infringe on these rights or attempt to intimidate Mr. Avenatti into not assisting in his defense. Nor is the government permitted to pursue the erection of barriers and obstacles to prevent Mr. Avenatti from exercising these most basic of Constitutional rights. Undersigned counsel knows of no authority holding otherwise. Accordingly, Mr. Avenatti's exercise of his right to participate in his defense must be respected and afforded significant deference at all times, including in connection with the Motion.

### B. The Evidence Is Insufficient to Demonstrate Mr. Avenatti Violated Any of His Bail Conditions

The government has failed to offer any evidence that Mr. Avenatti has accessed the internet since his release or "violated the terms of his release by using a computer or other device which *permitted <u>him</u> to access the internet*." *See* Order at p.3 [Docket No. 229] (emphasis added). Nor is there any evidence that Mr. Avenatti (a) possessed, used or accessed any "internet-enabled devices" outside the presence of counsel or (b) possessed, used or accessed any device that offered or allowed internet access. [Docket No. 140, ¶¶ 12,13].

Further, Mr. Avenatti's use of Mr. Manheimer's computer, on one or two occasions over three months ago, at the direction of his counsel, to specifically work on his criminal defense, with the internet disabled, under the supervision of Mr. Manheimer, does not constitute a violation of his bail conditions. In an effort to argue otherwise, the government takes a number of liberties with the facts and evidence in its Motion, including suggesting that Mr. Manheimer merely turned off the Wi-Fi at the computer [Docket No. 15, fn. 7]. But there is no evidence of this. During their over three-hour deposition of Mr. Manheimer, the government never asked Mr. Manheimer about how the Internet "was not accessible" or how he "turned the Internet off." Generally, the Internet is turned off by powering an internet router down, disconnecting or unplugging the router, and/or turning off the Wi-Fi connection on the computer. All of these

15

approaches provide the same result – a computer that is unable to access the internet and a computer user who is unable to access the internet.

And even if Mr. Manheimer had turned off the Wi-Fi at the computer, Mr. Avenatti's use of that computer would not have constituted a violation his bail conditions.  As the table attached as Exhibit B shows, the words "enabling" and "disabling" are commonly used as synonyms for "turning on" and "turning off' WiFi on digital devices, and the term "internet-disabled" is commonly used - by the U.S. government, news media, technology experts, telecommunications companies, and web app developers, to name a few - to refer to devices where the WiFi function has been turned off, blocked, or rendered inoperable.[12]

All of this is consistent with the Webster's dictionary definition of "enable," which is to "make (something) possible, practical, or easy," or "to cause (a feature or capability of a computer) to be active or available for use."[13]  To "disable," by the Webster's definition, is "to make ineffective or inoperative."[14]  Similarly, Dictionary.com provides a definition for "enable" specific to a digital technology context:  "to make (a device, a system, or feature) active or functional; turn on."[15]  The Macmillan Dictionary also provides a definition for "enable" in a computing context: "To allow a device or system to work," as in, "Please enable Javascript in your browser." Here too, "enable" is presented as synonymous with "turn on."[16]

---

[12] To give just one example (in addition to those provided in Exhibit B), to turn WiFi on or off in Windows Operating Systems, users select commands labeled "enabled" and "disabled."

[13] https://www.merriam-webster.com/dictionary/enable, visited September 10, 2020.  In other words, to cause an already *existing feature or capability* (i.e. internet access) to be active and available for use.

[14] https://www.merriam-webster.com/dictionary/disable, visited September 10, 2020.

[15] https://www.dictionary.com/browse/enable, visited September 10, 2020.

[16] https://www.macmillandictionary.com/us/dictionary/american/enable, visited September 10, 2020.

16

The dictionary definitions of "offer" and "allow" are also illuminating. To "offer" is to "present for acceptance or rejection" and "to make available."[17]  To "allow" is to "permit" or "fail to restrain or prevent."[18]  There is no evidence that Mr. Avenatti at any time accessed, used or possessed any digital device that (a) made the internet available to him or (b) failed to restrain or prevent him from accessing it.  In fact, Mr. Manheimer repeatedly testified to the exact opposite.

In addition, if the government's logic is correct and "internet-enabled" is understood as referring to any device ever "*capable*"[19] of accessing the Internet under a specific set of circumstances, then defendant's current computer would still be "internet-enabled" even with disabling software installed, because it would still technically retain its native ability to provide access to the internet, even with that ability temporarily constrained by software.  Moreover, if "internet-enabled digital device" is understood to refer to any digital device *capable* of providing internet access under certain conditions (for example, when its Wi-Fi capability is enabled or turned on), defendant's conditions would also preclude him using any number of common household items capable of connecting to Wi-Fi, including "smart" televisions, household heating and cooling systems, and alarm systems, to name a few.[20]  This was obviously not the intent of the Court.  Rather, the conditions were directed at preventing Mr. Avenatti from having actual access to the internet, so he would not be able to in turn access financial accounts and move assets or transfer monies.  This is why the Court correctly centered the issue in

---

[17] https://www.merriam-webster.com/dictionary/offer, visited September 10, 2020.

[18] https://www.merriam-webster.com/dictionary/allow, visited September 10, 2020.

[19] Critically, the word "capable" is not included within the bail conditions relating to the use of devices.

[20] When the prosecution examined Mr. Manheimer, they inquired about whether Mr. Avenatti watches Netflix and Mr. Manheimer's Apple TV.  He confirmed that Mr. Avenatti does.  Similarly, Mr. Manheimer testified that he facilitated a video FaceTime call with PTS and Mr. Avenatti.  And yet, the government does not argue that these uses were a violation of defendant's bail conditions, which would be expected if their true understanding of the bail condition is as they claim.

17

its August Order on whether Mr. Avenatti had used a device that "permitted him to access the internet." Accordingly, the Motion should be denied.

**C.      If There Was a Violation, It Was Not Purposeful and Instead Resulted from a Reasonable Misinterpretation of the Bail Conditions**

As set forth in paragraphs 11-13 of the concurrently filed Declaration of H. Dean Steward, to the extent that the Court decides any technical violation of the bail conditions occurred, it was done at the advice and direction of counsel, and resulted from an honest mistake and misinterpretation, for which counsel and the defendant apologize to the Court and PTS.

Moreover, for over three months now, Mr. Avenatti has had a computer that permits him to do exactly what the government claims he did improperly in late May. As a result, the likelihood of Mr. Avenatti "re-violating" is effectively zero. This is especially true in light of his spotless history of compliance over the last five months with all of the other numerous bail conditions imposed by the Court in connection with his release to home confinement. As set forth above, Mr. Avenatti has fully complied with his other release obligations and has enjoyed an exceptional relationship with Pretrial Services at all times. The government has no evidence to the contrary.

**D.      There Were No Misrepresentations Made to the Court and the Government's Liberties with the Evidence Should Not be Credited**

Throughout the Motion, the government claims that Mr. Avenatti, through his counsel, made a number of misrepresentations to the Court. In doing so, the government takes great liberties with the evidence and the facts. By way of example only,[21] the government claims that Docket No. 179 filed by the defense was not accurate but then offers no *evidence* showing how it was inaccurate – only suspicion and innuendo. This

---

[21] In the interest of brevity, the defense will not address every instance of the government claiming that the defense misled the Court. Suffice it to say that the defense stands by its representations. Moreover, the government's argument that the defense was under an affirmative obligation to answer their questions at various hearings upon demand is without any basis.

stands in stark contrast to Mr. Manheimer's testimony and the declaration of undersigned counsel submitted with this opposition, both of which are entirely consistent with the filing.

Similarly, the government claims that "six" pleadings were "created using Manheimer's computer" and that Defendant "wrote substantial portions of the May 27, 2020 Status Report" [Docket No. 262, p. 15.]  But this is not a fair characterization of the evidence.  During his deposition, Mr. Manheimer acknowledged printing documents to pdf for Mr. Steward and other lawyers of Mr. Avenatti's so they could be filed.  [54.7-11].  While technically this is "creating" a pdf, it is hardly the same as drafting a document from scratch (which Mr. Manheimer testified did not occur).  Further, often when Mr. Manheimer would receive a document from one of Mr. Avenatti's lawyers, he would save that document to his computer, thus "creating" a new file on his computer.  This would in turn make him "the author" of the document on his computer.  The same thing would happen if he made any changes to a document for any reason (i.e. at the direction of Mr. Avenatti) and saved the document under a different name.  This does not mean Mr. Avenatti drafted any document from scratch on Mr. Manheimer's computer.  In sum, it proves nothing.

The  government has no evidence that Mr. Avenatti physically typed any portion of the May 27, 2020 Status Report or any other document filed in this case for that matter.[22]  In fact, the government has no idea what Mr. Avenatti was working on at the direction of his counsel in late May/early June (nor, for that matter, should they).

---

[22] The government makes much out of Mr. Avenatti knowing the content of a footnote in the Status Report and informing the Court at the June 1, 2020 Status Conference that there had not been an effort to mislead the Court.  This is ridiculous.  One need not draft a document to be familiar with its contents nor is it misconduct for Mr. Avenatti, a former trial lawyer, to appreciate the importance of the Court being informed that there had been no effort to mislead the Court by the defense.  Had the hearing been in person, Mr. Avenatti could have reminded counsel of this fact, who could have in turn notified the Court.

Further, the government's complaints about the defense's representations that Mr. Avenatti did not have access to a computer to review over 1,000,000 pages of discovery in this case ring hollow.  There is a significant difference between (i) Mr. Avenatti briefly using Mr. Manheimer's only functioning computer, which Mr. Manheimer uses to work from home as a writer, for one or two urgent tasks at the direction of his counsel, under Mr. Manheimer's supervision and with the internet disabled, versus (ii) Mr. Avenatti having access to a dedicated computer, for hours upon hours every day, to review over a million of pages of discovery without direct supervision.

Finally, the government's attacks on Mr. Manheimer are without merit.  Mr. Manheimer is nearly fifty years old with no criminal record.  He has never been arrested, let alone charged with any crime.  He is not a lawyer nor does he have experience in the legal arena.  He lives a simple life and, before this ordeal, he had never been deposed before, let alone by two federal prosecutors looking to lock someone up.  He also testified that he does not recall everything he has done for Mr. Avenatti and his lawyers but it has been a lot.  [Docket No. 200-2 at 6].  He further stated that one of the reasons he does not recall the specifics is because he has his own life [18:11-14] – as would be expected.  Demanding that someone remember every website they visited on the internet, every document they printed, and every document they briefly edited or saved, all at the direction of other people weeks prior and relating to a field and subject matter in which they have no expertise, is unrealistic.  Especially when the person being examined is being asked to do the same thing nearly every day by many lawyers in connection with multiple cases.  In sum, Mr. Manheimer testified as would be expected of a lay witness – with candor and humility, and an imperfect memory at times.[23]

---

[23] The government also takes issue with Mr. Manheimer's deposition changes [Docket No. 200-2].  But those changes were made as allowed by the FRCP and only after the government expressly agreed that Mr. Manehimer could review the transcript and make changes if necessary.  Further, the corrections cut both ways – some are helpful to the government and some are helpful to the defense.  Again, this is what one would expect from an honest witness attempting to make sure his testimony is as accurate as possible.

**E.      Remanding Mr. Avenatti To Custody is Punitive and Unnecessary, Especially In light of the Pandemic and its Health Risks**

Even characterizing the facts in the most negative fashion to Mr. Avenatti, as the government is wont to do, remanding Mr. Avenatti to custody is punitive and unnecessary.  At worst, Mr. Avenatti used a computer on one or two occasions to work on his legal defense at the direction of his criminal defense counsel.  He did not access the internet, attempt to access the internet, or ever have the ability to access the internet. He did not intentionally violate this Court's Orders, nor did he purposely disrespect this Court or any other Court.  The facts and circumstances surrounding Mr. Avenatti's alleged conduct pale in comparison to most cases in which violations warranting remand are found to have occurred.

Moreover, the risks to Mr. Avenatti were he to be remanded remain unusually high.  *See generally*, Asfour Decl.  The Court has already found that extraordinary circumstances existed that justified Mr. Avenatti's release.  These circumstances centered on the health of Mr. Avenatti and the risk to him and others were he to remain in custody.  None of these circumstances have diminished.  The prosecution also offers no evidence to rebut this Court's prior determination that Mr. Avenatti's health places him at a heightened risk.  *And the evidence submitted with this opposition (i.e. the Asfour Decl.) only further solidifies that prior determination.*  Even if the Court finds that Mr. Avenatti engaged in a technical violation of his bail conditions, such a violation does not warrant Mr. Avenatti suffering serious injury or a death sentence.  *See*, *e.g.*, *U.S. v. Zuckerman*, 2020 WL 1659880, at *6 (S.D.N.Y. April 3, 2020) ("When the Court sentenced [the defendant], the Court did not intend for that sentence to include incurring a great and unforeseen risk of severe illness or death brought on by a global pandemic."); *U.S. v. Park*, 2020 WL 1970603, *2, 6 (S.D.N.Y. April 24, 2020) ("The Court fears that leaving Ms. Park any longer at FCI Danbury may convert a three-year prison sentence into a death sentence.  And that the Court cannot allow. . . The nature of prisons –

crowded, with shared sleeping spaces and common areas, and often with limited access to medical assistance and hygienic products – put those incarcerated inside a facility with an outbreak at heightened risk.").

The government asserts, without any evidence, that the current health risk to Mr. Avenatti is less than the health risk that he faced when this Court ordered him released on March 27.  This claim has no basis in fact and defies science and logic.  A simple comparison of the data from March 27, 2020 [the date of the Order at Docket No. 128] and from two days ago shows the drastic increase in risk, cases and deaths.  *See* Exhibit A attached hereto. Even though cases of COVID-19 in California and Los Angeles and Orange Counties have decreased for the moment from their peak of a few weeks ago, they are still *exponentially greater* than when this Court correctly demonstrated concern for Mr. Avenatti's health and ordered him released.  Moreover, public health experts still predict a coming "second wave" of the virus, "possibly at a catastrophic scale."[24]

Meanwhile, Mr. Avenatti's health conditions and risk for serious health complications or even death were he to contract the virus have remained constant.  Mr. Avenatti is not healthier today than when he was ordered released.  And while the prosecutors, in their enthusiasm to remand Mr. Avenatti for any conceivable reason, may think that it would be no big deal were Mr. Avenatti to contract the virus in a crowded jail that is at capacity (i.e. no beds), where social distancing and adequate protections are impossible to implement, the real life consequences could be catastrophic.  *See*, *e.g.*, Asfour Decl.  Indeed, the result could very well be Mr. Avenatti's death or serious, permanent injury, including permanent heart or lung damage, and/or diminished cognitive ability.  *See id*.

Moreover, any attempt by the government to use claims of alleged low cases at

---

[24] Dr. Robert Redfield, director of the CDC, has predicted that Fall 2020 may be the "worst" in U.S. history, from a public health perspective. https://www.webmd.com/lung/news/20200812/redfield-this-fall-could-be-the-worse-weve-seen. *See also* https://www.washingtonpost.com/health/coronavirus-fall-projections-second-wave/2020/09/04/6edb3392-ed61-11ea-99a1-71343d03bc29_story.html

SAJ and MCC Los Angeles should be given little weight, especially in light of the well documented issues surrounding the reporting of COVID-19 cases in jails and prisons, including by the BOP.[25]  *See*, *e.g.*, Exhibit C attached hereto.  In fact, a low case number means nothing unless it is considered with data reflecting the rate of testing because, as we all now know, unless you are doing widespread testing, you do not know whether a facility or community actually has a low infection rate.  You don't find what you don't look for.  Further, any number the government may attempt to use is still greater than the number of confirmed cases during the pandemic at Mr. Manheimer's residence: ZERO.

Nor does a low number lead to the determination that the risk to Mr. Avenatti is minimal.  *See*, *e.g.*, *U.S. v. White*, 2020 WL 3960830 (D. Md. July 10, 2020) (that there are currently no reported cases of coronavirus at a prison "is not dispositive of whether an extraordinary and compelling reason exists" to reduce a sentence . . . and "it makes little sense to wait for such an outbreak before considering defendant's request for health-based compassionate release . . ." and "while the BOP's efforts at containing the spread of COVID-19 are commendable, they by no means eliminate the risks to prisoners like White . . . the happy fact that there have been no positive tests yet at [the prison] does not prevent the finding of extraordinary and compelling reasons for release."); *U.S. v. Rountree*, 2020 WL 2610923, at *5 (N.D.N.Y. May 18, 2020) (prisons are "powder kegs for infection" that have allowed "the COVID-19 virus to spread with uncommon and frightening speed."); *U.S. v. Young*, 2020 WL 2514673, at *2 (D. Mass. May 15, 2020) ("the virus can appear suddenly and spread quickly in the prison population").[26]

---

[25] https://www.cnn.com/2020/08/08/us/federal-prison-coronavirus-outbreak-invs/index.html

[26] In July, the American Medical Association confirmed that "COVID-19 case rates have been substantially higher and escalating much more rapidly in prisons than in the U.S. population."  The Journal article further provides a telling chart on the rate of coronavirus infection in prisons versus the wider population, and there can be no dispute – prisons are vastly

In addition, Mr. Avenatti's exposure to people and risks is far less on home confinement than it could ever be at any correctional facility.[27]  Indeed, other than his attorneys, Mr. Avenatti has not had any significant personal interaction with anyone who has not either tested negative for COVID-19, or has the antibodies, or both.  By design, his exposure to the outside world since April 24, 2020 has been very limited.  While he is confined to Mr. Manheimer's residence, Mr. Avenatti has also retained the ability to limit his contact with persons who are at high risk for contracting the virus and transmitting it, as well as persons who fail to take precautions.  If he is remanded to custody, Mr. Avenatti will no longer have the ability to utilize these self-protective measures or distance himself from individuals – whether inmates or staff – who are unable or refuse to take such precautions. He will likewise have no ability to voluntarily follow a litany of recent CDC guidelines to avoid becoming infected.[28]

Finally, the defense previously enumerated the many burdens and impediments to preparing Mr. Avenatti's defense that resulted from Mr. Avenatti's previous incarceration, including but not limited to his lack of access to counsel and discovery. [Docket No. 164, pp. 6-13].  They will not be repeated here.  But as the Court is aware, were Mr. Avenatti to be remanded to custody now, he would almost certainly face the same, if not more serious, challenges when it comes to participating in his defense, reviewing discovery and preparing for his two remaining trials, including the trial set in

_____

more dangerous.  *See* B. Saloner, Ph D., et al., *Covid-19 Cases and Deaths in Federal & State Prisons*, J. Am. Med. Assoc. (July 8, 2020).  The researchers found that the infection rate for prisoners was 5.5 times higher than the U.S. population and the death rate in the prison population was 3.0 times higher.

[27] The risks inherent to correctional facilities have been the subject of extensive reporting and analysis by leading public health experts, including in testimony before Congress.

[28] *See*, *e.g.*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html, visited September 10, 2020.

this matter.  His access to counsel and information would drastically decrease,[29] while the number of additional practical, logistical, and scheduling challenges of proceeding with Mr. Avenatti's case would increase, further burdening the Court and the government, and causing unneeded delays.

### F.     Mr. Manheimer Should Be Permitted to Remain as Mr. Avenatti's Third-Party Custodian

Contrary to the claims of the government, there is no evidence or deposition testimony suggesting that Mr. Manheimer is no longer a proper third-party custodian for Mr. Avenatti.  Nor can the government point to anything from PTS that questions Mr. Manheimer's ability or qualification to remain in his role.  He has done everything asked of him by PTS and has enjoyed an excellent, issue-free relationship with PTS.  Finally, Mr. Manheimer works from home and only occasionally leaves his residence, meaning he is a uniquely qualified custodian because he can supervise Mr. Avenatti on an almost hourly basis.  There is no legitimate reason to order Mr. Manheimer replaced.[30]

## IV.   <u>CONCLUSION</u>

The Court should deny the motion and order that Mr. Avenatti remain on home confinement for an additional sixty (60) days under the conditions previously imposed.

Dated:  September 11, 2020          Respectfully submitted,
                                                          /s/ H. Dean Steward
                                                          H. DEAN STEWARD

                                                          Attorney for Defendant
                                                          MICHAEL JOHN AVENATTI

---

[29] For instance, upon the advice of his physician, undersigned counsel has not been able to visit any client in jail or prison since early March.  Counsel also understands that all attorney visits at the Santa Ana Jail are presently "no contact."  *See* Steward Decl. ¶15.  It is impossible to prepare for a case of this magnitude under these conditions.  *See id*. at ¶¶15-16.

[30] If necessary, the defense will identify a new third-party custodian.

25

**<u>EXHIBIT A – STATISTICS/DATA</u>**

## COVID-19 STATISTICS/DATA

| Description | As of March 27 | As of Sept 9 |
|---|---|---|
| Total U.S. Cases | 85,500[1] | 6.3 million+[2] |
| Daily New U.S. Cases | 17,330[3] | 33,201[4] |
| Total U.S. Deaths | 1,296[5] | 190,714[6] |
| Total CA Cases* | 4,600[7] | 749,196[8] |
| CA New Daily Cases | 855[9] | 3,083[10] |
| Total CA Deaths | 110[11] | 13,990[12] |
| Total LA County Cases[13] | 1,465 | 249,859 |
| Total LA County Deaths[14] | 26 | 6,090 |
| Total OC Cases | 321[15] | 50,190[16] |

---

[1] https://khn.org/morning-breakout/first-edition-march-27-2020/
[2] https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html
[3] https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html
[4] https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html
[5] https://khn.org/morning-breakout/first-edition-march-27-2020/
[6] https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html
[7] https://www.latimes.com/projects/california-coronavirus-cases-tracking-outbreak/
[8] https://www.nytimes.com/interactive/2020/us/california-coronavirus-cases.html#county
[9] https://www.nytimes.com/interactive/2020/us/california-coronavirus-cases.html#county
[10] https://www.nytimes.com/interactive/2020/us/california-coronavirus-cases.html#county
[11] https://www.sacbee.com/news/coronavirus/article241587491.html
[12] https://www.nytimes.com/interactive/2020/us/california-coronavirus-cases.html#county
[13] Los Angeles County Department of Health
(http://publichealth.lacounty.gov/phcommon/public/media/mediapubhpdetail.cfm?prid=2285 and
http://publichealth.lacounty.gov/media/coronavirus/data/index.htm)
[14] Los Angeles County Department of Health
(http://publichealth.lacounty.gov/phcommon/public/media/mediapubhpdetail.cfm?prid=2285 and
http://publichealth.lacounty.gov/media/coronavirus/data/index.htm)
[15] Orange County data (as reported in https://www.ocregister.com/2020/03/27/orange-county-releases-coronavirus-case-counts-by-city-announces-2-more-deaths/)
[16] Orange County Health Care Agency (https://occovid19.ochealthinfo.com/coronavirus-in-oc)

| | | |
|---|---|---|
| Total OC Deaths | 3[17] | 1,065[18] |
| 7 Day Daily Moving Average – U.S. Cases | 12,127[19] | 36,733[20] |
| 7 Day Daily Moving Average – CA Cases | 519[21] | 3,880[22] |
| Total Projected U.S. Deaths | | 410,000[23] |
| Total Cases in U.S. Jails/Prisons | | 121,156[24] |
| Total Deaths in U.S. Jails/Prisons | | 1,017[25] |
| Total Cases in CA Jails/Prisons** | | 11,388[26] |
| Total Deaths in CA Jails/Prisons | | 59[27] |
| Total Cases in BOP | 14[28] | 13,144[29] |
| Total Deaths in BOP | 0[30] | 118[31] |

---

[17] Orange County data (as reported in https://www.ocregister.com/2020/03/27/orange-county-releases-coronavirus-case-counts-by-city-announces-2-more-deaths/)

[18] Orange County Health Care Agency (https://occovid19.ochealthinfo.com/coronavirus-in-oc)

[19] https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html

[20] https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html

[21] https://www.nytimes.com/interactive/2020/us/california-coronavirus-cases.html#county

[22] https://www.nytimes.com/interactive/2020/us/california-coronavirus-cases.html#county

[23] Total deaths predicted by January 1, 2021: https://www.cnbc.com/2020/09/04/key-coronavirus-forecast-predicts-over-410000-total-us-deaths-by-jan-1.html

[24] This represents a five percent increase from the week before. "New cases among prisoners reached an all-time high in early August after slowing down in June. The growth in recent weeks was driven by big jumps in prisoners testing positive in Florida, California and the federal Bureau of Prisons." https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons

[25] https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons

[26] https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons

[27] https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons

[28] https://www.reuters.com/article/us-health-coronavirus-usa-inmates-insigh/spread-of-coronavirus-accelerates-in-u-s-jails-and-prisons-idUSKBN21F0TM

[29] https://www.bop.gov/coronavirus/

[30] https://www.usnews.com/news/us/articles/2020-03-28/federal-inmate-serving-time-for-drug-charge-is-first-inmate-to-die-from-covid-19

[31] https://www.bop.gov/coronavirus/

\* "Experts say the true number of people infected [in CA] is unknown and likely much higher than official tallies."[32]

\*\*The number of known cases per 10,000 people in CA Jails/Prisons is 494 percent higher than in CA overall.[33]



Source: Statista https://www.statista.com/chart/21895/covid-in-prison-system/



Source: https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons

---

[32] https://www.latimes.com/projects/california-coronavirus-cases-tracking-outbreak/

[33] https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons

**<u>EXHIBIT B  - USAGE OF TERMS</u>**

| **SOURCE** | **USE** |
|---|---|
| 1. TechRepublic.com: An online trade publication for IT professionals. | Online article title: "**Disable Internet access on a Windows PC**: Learn several options **for disabling Internet access** on a single system while still allowing other systems on the same network to access the Internet."[1] |
| 2. Linksys.com: The website of the wireless networking equipment company.[2] | Router feature description: "**Allow Users to Disable Internet Access** – This option allows the user to prohibit any connections.  Select **Enabled** if you want to be able to prohibit any and all internet connections.  Otherwise, keep the default setting **Disabled**."[3] |
| 3. U.S. Department of Defense publication | From "Best Practices for Keeping Your Home Network Secure:" "To prevent attackers from probing the network via home entertainment devices, if possible, disconnect these systems from the Internet when not in use. Some ISP modems/routers have a standby button you can use to **disable the Internet** connection."[4] |
| 4. *Forbes*: "Want To Work From Home? Master These Three Skills" | "The novelist, Jonathan Franzen, author of *Freedom,* famously removed his laptop's Wi-Fi card, so he could write a novel without getting distracted by the internet. This represents a hardcore approach, but **you can disable internet access** for 30 or 60 minutes using apps like Freedom or Rescue Time software."[5] |
| 5. U.S. Customs & Border Protection policy | "Officers will either request that the traveler **disable connectivity to any network (e.g., by placing the device in airplane mode)**, or, where warranted by national security, law enforcement, officer safety, or other operational considerations, **Officers will themselves disable network connectivity**."[6] |
| 6. LifeWire.com: A technology website with 6 million unique monthly visitors.[7] | "**How to Disable A Network Connection**." Article guides readers through seven steps, including selecting "Disable" under the "Network Connections" screen in Windows XP. Once all steps are completed, "The internet connection is disabled." "Windows XP supports a Repair option for wireless connections. This feature **disables and re-enables the Wi-Fi** connection in one step."[8] |
| 7. MIT.edu: The top-ranked computer science school in the world.[9] | Instructions for accessing the internet on campus: "For guests visiting the campus, IS&T provides an open wireless network called MIT GUEST. It doesn't require authentication and is not encrypted. **Visitors need to make sure their wireless card is on and enabled** before selecting MIT GUEST as their wireless network option."[10] |
| 8. Microsoft.com | "Windows Forum" article: "**How to enable WiFi** on Windows 7."[11] |
| 9. Sonos.com: The website of audio product company | Article: "How to **disable or enable WiFi** on your Sonos players. |
| 10. Lenovo.com | From "How to turn wireless WiFi on/off…": "Under Wireless Devices, **choose whether to enable or disable** WiFi and Bluetooth."[12] |
| 11. Cox.com: Telecommunications company website | Modem instructions: "**Enable WiFi** by pressing this button for 3 seconds."[13] |
| 12. CenturyLink.com: Telecommunications company website | "**Enable WiFi on a laptop**: Sometimes the wireless on your computer accidentally gets turned off…Some laptops have a WiFi button that can be switched On or Off. The location of the button varies, but most frequently is found on the front edge or just above the keyboard. **When enabled**, the button should be illuminated as blue or green."[14] |

| | | |
|---|---|---|
| 13. | ComputerHope.com: Computer help site | "Laptops today all have <u>Wi-Fi</u> (wireless Internet) built-in, allowing people to connect to the Internet from almost anywhere. For security reasons, compatibility, or other reasons, you may want to **enable and disable the Wi-Fi on your laptop**."[15] |
| 14. | Wall Street Journal | "He purchased a new mobile phone with Google's Android  operating system, put it in airplane mode, **disabled the WiFi a**nd stuck it in the glove compartment of his pickup truck."[16] |
| 15. | Ford.com: Ford Motor Company website | "How to turn your vehicle into a WiFi hotspot:" "…**Enable WiFi on your phone and mobile devices**…"[17] |

---

[1] https://www.techrepublic.com/article/disable-internet-access-on-a-windows-pc/

[2] https://www.bloomberg.com/profile/company/126157Z:US

[3] https://www.linksys.com/nz/support-article?articleNum=135071

[4] https://dodcio.defense.gov/Portals/0/Documents/Cyber/Slicksheet_BestPracticesForKeepingYourHomeNetworkSecure_Web_update.pdf

[5] https://www.forbes.com/sites/bryancollinseurope/2020/02/13/work-from-home/#724364d55606

[6] https://www.cbp.gov/sites/default/files/assets/documents/2018-Jan/CBP-Directive-3340-049A-Border-Search-of-Electronic-Media-Compliant.pdf

[7] https://www.thedrum.com/news/2017/03/02/the-verge-rebrand-aboutcom-launches-fourth-vertical-site

[8] https://www.lifewire.com/enabling-network-connections-in-windows-818245

[9] https://news.mit.edu/2020/qs-world%E2%80%99s-no-1-university-2020-21-0609

[10] https://ist.mit.edu/news/mitnet_options

[11] https://answers.microsoft.com/en-us/windows/forum/all/how-to-enable-wifi-on-windows-7/65baceb5-1aac-4222-bce7-b7d66e4b46b7

[12] https://support.lenovo.com/us/en/solutions/ht500407

[13] https://www.cox.com/residential/support/netgear-c6300bd.html

[14] https://www.centurylink.com/home/help/internet/wireless/enable-wifi-on-a-laptop.html

[15] https://www.computerhope.com/issues/ch001410.htm

[16] https://www.wsj.com/articles/oracles-man-in-washington-fans-the-flames-against-rival-tech-giants-11581615873

[17] https://owner.ford.com/support/how-tos/sync-technology/myford-touch/phone/how-to-turn-your-vehicle-into-a-wifi-hotspot.html

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**<u>EXHIBIT C - NY TIMES ARTICLE</u>**

Case 8:19-cr-00061-JVS Document 278 Filed 09/14/20 Page 40 of 44 Page ID #:3905

**The New York Times** | https://nyti.ms/3hxhdOs

# Coronavirus Cases Rise Sharply in Prisons Even as They Plateau Nationwide

Prison officials have been reluctant to do widespread virus testing even as infection rates are escalating.

By Timothy Williams, Libby Seline and Rebecca Griesbach

Published June 16, 2020   Updated June 30, 2020

Cases of the coronavirus in prisons and jails across the United States have soared in recent weeks, even as the overall daily infection rate in the nation has remained relatively flat.

The number of prison inmates known to be infected has doubled during the past month to more than 68,000. Prison deaths tied to the coronavirus have also risen, by 73 percent since mid-May. By now, the five largest known clusters of the virus in the United States are not at nursing homes or meatpacking plants, but inside correction institutions, according to data The New York Times has been collecting about confirmed coronavirus cases since the pandemic reached American shores.

And the risk of more cases appears imminent: The swift growth in virus cases behind bars comes as demonstrators arrested as part of large police brutality protests across the nation have often been placed in crowded holding cells in local jails.

A muddled, uneven response by corrections officials to testing and care for inmates and workers is complicating the spread of the coronavirus. In interviews, prison and jail officials acknowledged that their approach has largely been based on trial and error, and that an effective, consistent response for U.S. correctional facilities remains elusive.

"If there was clearly a right strategy, we all would have done it," said Dr. Owen Murray, a University of Texas Medical Branch physician who oversees correctional health care at dozens of Texas prisons. "There is no clear-cut right strategy here. There are a lot of different choices that one could make that are going to be in-the-moment decisions."

The inconsistent response to the spread of the coronavirus in correctional facilities is in contrast with efforts to halt its spread in other known incubators of the virus: Much of the cruise ship industry has been closed down. Staff members and residents of nursing homes in several states now face compulsory testing. Many meat processing plants have been shuttered for extensive cleaning.

As the toll in prisons has increased, so has fear among inmates who say the authorities have done too little to protect them. There have been riots and hunger strikes in correctional facilities from Washington State to New York. And even the known case numbers are most likely a significant undercount because testing has been extremely limited inside prisons and because some places that test do not release the results to the public.

"It's like a sword hanging over my head," said Fred Roehler, 77, an inmate at a California prison who has chronic inflammatory lung disease and other respiratory ailments. "Any officer can bring it in."

Public officials have long warned that the nation's correctional facilities would most likely become vectors in the pandemic because they are often overcrowded, unsanitary places where social distancing is impractical, bathrooms and day rooms are shared by hundreds of inmates, and access to cleaning supplies is tightly controlled. Many inmates are 60 or older, and many suffer from respiratory illnesses or heart conditions.

---

**Latest Updates: The Coronavirus Outbreak** ›

Updated 2h ago

- A scaled-back Republican stimulus plan fails in the Senate, dimming prospects for a deal before the election.

- A new study warns the virus is 'a life-threatening disease in people of all ages.'

- The C.D.C. says health screenings at airports were not effective in the 'current phase of the pandemic.'

More live coverage: **Markets**

In response, local jails have discharged thousands of inmates since February, many of whom had been awaiting trials to have charges heard or serving time for nonviolent crimes. State prison systems, where people convicted of more serious crimes are housed, have been more reluctant to release inmates.

Testing for the virus within the nation's penal institutions varies widely, and has become a matter of significant debate.

Republican-led states like Texas, Tennessee and Arkansas — which generally spend less on prisoners than the national average — have found themselves at the forefront of testing inmates.

In Texas, the number of prisoners and staff members known to be infected has more than quadrupled to 7,900 during the past three weeks after the state began to test every inmate.

Yet states that typically spend far more on prisons have carried out significantly less testing.

California, which spends $12 billion annually on its prison system, has tested fewer than 7 percent of inmates in several of its largest, most crowded facilities, according to the state's data. Other Democratic-led states that also spend heavily on prisons, including New York, Oregon and Colorado, have also conducted limited testing despite large outbreaks in their facilities.

New York has tested about 3 percent of its 40,000 prison inmates; more than 40 percent of those tested were infected.

Critics say that the dearth of testing in some facilities has meant that prison and public health officials have only vague notions about the spread of the virus, which has allowed some elected officials to suggest that it is not present at all.

"We have really no true idea of how bad the problem is because most places are not yet testing the way they should," said Dr. Homer Venters, who served as chief medical officer for the New York City jail system and now works for a group called Community Oriented Correctional Health Services, which strives to improve health care services in local jails. "I think a lot of times some of the operational challenges of either not having adequate quarantine policies or adequate medical isolation policies are so vexing that places simply decide that they can just throw up their hands."

---

**CORONAVIRUS SCHOOLS BRIEFING:** *It's back to school — or is it?*    Sign Up

Most state prison systems have conducted few tests. Systems in Illinois, Mississippi and Alabama have tested fewer than 2.5 percent of inmates. And in Louisiana, officials had tested several dozen of its 31,000 inmates in March when the warden and medical director at one of the state's largest prisons died of the coronavirus. The state has since announced plans to test every inmate.

Prison officials in states where only a limited number of inmates have been tested say they are following federal guidelines. The Centers for Disease Control and Prevention recommend that only prisoners with symptoms be tested.

Prisons that have conducted mass testing have found that about one in seven tests of inmates have come back positive, the Times database shows. The vast majority of inmates who have tested positive have been asymptomatic.

Public health officials say that indicates the virus has been present in prison populations for far longer than had previously been understood.

"If you don't do testing, you're flying blind," said Carlos Franco-Paredes, an infectious-disease specialist at the University of Colorado School of Medicine.

Case 8:19-cr-00061-JVS   Document 278   Filed 09/14/20   Page 42 of 44   Page ID #:3907

But in California, there continues to be reluctance to test each of the state's 114,000 inmates, despite growing criticism to take a more aggressive approach. One in six inmates in the state's prisons have been tested, and the state has released some inmates who were later found to have the virus, raising fears that prison systems could seed new infections outside penal institutions.

"Nothing significant had been done to protect those most vulnerable to the virus," said Marie Waldron, the Republican minority leader of the California State Assembly.



An inmate cleaned a jail cell at Las Colinas Women's Detention Facility in Santee, Calif., in April. Sandy Huffaker/Agence France-Presse — Getty Images

But J. Clark Kelso, who oversees prison health care in California, said that mass testing would provide only a snapshot of the virus's spread.

"Testing's not a complete solution," Mr. Kelso said. "It gives you better information, but you don't want to get a false sense of security."

California's health department has recommended that a facility's prison inmates and staff members be given priority for testing once an infection has been identified there.

But the state prison system has conducted mass testing at only a handful of institutions where infections have been found, according to state data. In one of those facilities, the California Institution for Men in Chino, nearly 875 people have tested positive and 13 inmates have died.

Instead, California has employed surveillance testing, which involves testing a limited number of inmates at each state prison regardless of the known infection rate.

That method, Mr. Kelso said, had led officials to conclude that a vast majority of its prisons are free of the virus.

"We're not 100 percent confident because we're not testing everyone," he said. "As we learn every single day from what we're doing, we may suddenly decide, 'No, we actually have to test all of them.' We're not at that point yet."

In interviews, California prison inmates say prison staff have sometimes refused to test them, even after they complained about symptoms similar to the coronavirus. Several prisoners said they had been too weak to move for weeks at a time, but were never permitted to see a nurse and had never been tested.

"I had chest pains. I couldn't breathe," said Althea Housley, 43, an inmate at Folsom State Prison, where no inmates have tested positive, according to state data. "They told us it was the flu going around, but I ain't never had a flu like that."

Mr. Kelso did not dispute the prisoners' accounts.

In Texas, mass testing has found that nearly 8,000 inmates and guards have been infected. Sixty-two people have died, including some who had not exhibited symptoms.

Dr. Murray, the physician who oversees much of Texas' prison health care system, said the disparate approaches taken by prison authorities might actually be beneficial as officials compare notes.

"I'm glad we've got 50 states and everyone is trying to do something a little different — whether that's by intent or not," he said, "because it's really the only basis that we're going to have for comparison later on."

But Baleegh Brown, 31, an inmate at a California prison, said he was displeased about being part of what he considered a science experiment. His prison has had more than 170 infections.

He said that he and his cellmate were confined to a 6-by-9-foot space for about 22 hours each day as the prison tries to prevent the virus from spreading further. Mr. Brown said he had a weakened immune system after a case of non-Hodgkin's lymphoma, making him particularly vulnerable to illness.

"We need more testing here so everyone knows for sure," he said. "And for me, my body has been compromised, so I don't know how it is going to react. That makes all you don't know even scarier."

Brendon Derr, Danya Issawi and Maura Turcotte contributed reporting.

## **CERTIFICATE OF SERVICE**

I, H. Dean Steward, am a citizen of the United States, and am at least 18 years of age. My business address is 107 Avenida Miramar, Ste. C, San Clemente, CA 92672.  I am not a party to the above-entitled action.  I have caused, on September 11, 2020, service of the defendant's:

DEFENDANT'S OPPOSITION TO THE GOVERNMENT'S MOTION TO TERMINATE AND NOT FURTHER EXTEND DEFENDANT'S TEMPORARY RELEASE [DOCKET NO. 262]

on the following party, using the Court's ECF system:

AUSA BRETT SAGEL AND AUSA JULIAN ANDRE

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 11, 2020

/s/ H. Dean Steward

H. Dean Steward