

**United States Department of Justice**

**United States Attorney's Office
Central District of California**

_BRETT A. SAGEL_                                    _411 W. 4th Street, Suite 8000_
_Phone:  (714) 338-3598_                            _Santa Ana, California  92701_
_E-mail:  Brett.Sagel@usdoj.gov_

March 4, 2020

**VIA EMAIL**

H. Dean Steward
107 Avenida Miramar, Suite C
San Clemente, California 92672
deansteward7777@gmail.com

Re:    Advice of Counsel Defense in <u>United States v. Michael John Avenatti</u>,
SA CR No. 19-061-JVS

Dear Counsel:

We are writing to inquire whether your client intends to assert a reliance on counsel defense at
trial regarding any of the counts in the indictment.  If so, please provide us with (1) written
notice of any such defense and the specific counts to which such a defense would apply; (2) the
names and contact information of the attorneys or law firms upon whose advice defendant relied;
and (3) any pretrial disclosure of any evidence and/or discovery defendant intends to rely upon in
support of such a defense at trial.  Fed. R. Crim. Proc. 16(b).  To the extent your client intends to
assert a reliance on counsel defense, please provide us with this information no later than close
of business March 6, 2020.

Additionally, as it relates to the bankruptcy fraud counts, please advise whether or not your client
continues to maintain any attorney-client privilege between himself and attorneys at Pachulski,
Stang, Ziehl and Jones, LLP, counsel for the debtor Eagan Avenatti, LLP ("EA LLP") in the
matter of <u>In re Eagan Avenatti LLP</u>, 8:19-bk-13560-CB.  Similarly, please advise whether or not
your client believes he maintains any attorney-client privilege between himself and attorneys at
Sulmeyer Kupetz, APC, regarding the same bankruptcy matter.

Moreover, the government believes the case law is pretty clear that discussions between your
client and counsel about information disclosed on public filings, specifically in the EA LLP
bankruptcy, cannot be considered confidential communications and therefore not covered by the
attorney-client privilege.  The government has enclosed portions of transcripts in which your
client asserted he advised counsel regarding allegations contained in the wire fraud and/or
bankruptcy fraud counts, as well as a statement you made at the bail revocation hearing alluding
to defendant obtaining advice of counsel prior to acting.  Your client's assertions of reliance on
counsel may similarly waive any attorney-client privilege he may have enjoyed.  Please let us
know if you disagree.

**Exhibit 1**                                                                                    **Page 1 of 43**

H. Dean Steward
RE:  United States v. Avenatti
March 4, 2020
Page 2

Please let us know if you have any questions or wish to discuss this matter further.

Very truly yours,

BRETT A. SAGEL
Assistant United States Attorney

cc:    Assistant United States Attorney Julian L. André

Enclosure

**Exhibit 1**

**Page 2 of 43**

```
 1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2               COUNTY OF LOS ANGELES - CENTRAL DISTRICT

 3    DEPT 44    JUDGE:  EDWARD B. MORETON, JR.

 4    JASON FRANK LAW PLC,            )
      Professional law corporation, )
 5                                    )
                           Plaintiff  )
 6                                    )
          Vs.                         ) Case No: BC706555
 7                                    )
      MICHAEL J. AVENATTI,            )
 8    An individual,                  )
                                      )
 9                         Defendant.  )
      _____ )
10

11

12

13              JUDGMENT DEBTOR EXAMINATION,

14    taken on behalf of the Applicant, at the Stanley Mosk

15    Courthouse, 111 North Hill Street, Los Angeles,

16    California, 90012, in Department 44, commencing at 11:57

17    a.m., Friday, March 15, 2019, before Winifred

18    McCray-Moody, C.S.R. No. 12747, (Morning Session), and

19    Ann Bonnette, C.S.R. No. 6108, (Afternoon Session).

20

21

22

23

24

25
```

**Exhibit 1**                                                    **Page 3 of 43**

JUDGMENT DEBTOR EXAMINATION, MARCH 15, 2019

```
 1       APPEARANCES:

 2       For the Applicant:

 3       LAW OFFICES OF FRANK SIMS & STOLPER, LLP

 4       BY:  ANDREW D. STOPLER, ESQ.

 5       19800 MacArthur Boulevard

 6       Suite 855

 7       Irvine, CA 92612

 8       (949) 201-2400

 9       astolper@lawfss.com

10

11       For the Defendant:

12       LAW OFFICES OF SHULMAN HODGES & BASTIAN, LLP

13       BY:  RONALD S. HODGES, ESQ.

14       100 Spectrum Center Drive

15       Suite 600

16       Irvine, CA 92618

17       (949) 340-3400

18       rhodges@shbllp.com

19

20

21

22

23

24

25
```

**Exhibit 1**                                                                                          **Page 4 of 43**

JUDGMENT DEBTOR EXAMINATION, MARCH 15, 2019

```
 1                         I N D E X

 2      WITNESS:              EXAMINATION      PAGE

 3      MICHAEL J. AVENATTI   BY MR. STOLPER   4, 6, 7, 9, 10

 4                                             13, 14, 15, 16

 5                                             26, 28, 29, 31

 6                                             35, 38, 44, 45

 7                                             46, 47, 48, 49

 8                                             50, 57, 58, 59

 9                                             60, 62, 64, 67,

10                                             68

11

12

13                         E X H I B I T S

14                           None.

15

16

17              INSTRUCTIONS NOT TO ANSWER

18              PAGE                LINE

19              6                   9
                9                   4
20              10                  11
                15                  8
21              16                  4
                18                  1
22              19                  8
                22                  25
23              46                  22
                47                  1
24

25
```

Exhibit 1

JUDGMENT DEBTOR EXAMINATION, MARCH 15, 2019

```
 1              LOS ANGELES, CALIFORNIA, FRIDAY, MARCH 15, 2019

 2                          11:19 A.M.

 3                          EXAMINATION

 4     BY MR. STOLPER:

 5     Q.      MR. AVANATTI, DO YOU UNDERSTAND YOU'RE UNDER

 6     OATH?

 7     A.      I'M SORRY, SIR?

 8     Q.      DO YOU UNDERSTAND YOU'RE UNDER OATH?

 9     A.      YES.

10     Q.      CAN YOU PLEASE STATE YOUR FULL NAME, PLEASE?

11     A.      MICHAEL JOHN AVANATTI.

12     Q.      WHAT IS YOUR CURRENT RESIDENTIAL ADDRESS?

13     A.      10000 SANTA MONICA BOULEVARD, NUMBER 2107, L.A.,

14     90067.

15     Q.      DO YOU OWN, OR DO YOU RENT?

16     A.      I RENT.

17     Q.      WHAT IS THE NAME THAT THE LEASE IS HELD IN?

18     A.      I THINK IT'S MY NAME, INDIVIDUAL.

19     Q.      WHAT'S THE TERM OF YOUR LEASE?

20     A.      I DON'T REMEMBER.

21     Q.      HOW LONG HAVE YOU LIVED THERE?

22     A.      AT THAT ADDRESS, ABOUT -- I THINK THREE MONTHS.

23     Q.      HOW LONG IN THAT BUILDING?

24     A.      I'VE HAD A UNIT IN THAT BUILDING SINCE MARCH OF

25     2017.
```

JUDGMENT DEBTOR EXAMINATION, MARCH 15, 2019

```
1    CALIFORNIA NATIONAL BANK -- CALIFORNIA CITY NATIONAL

2    BANK?

3    A.      I THINK SO.

4    Q.      ARE THERE ANY OTHER SIGNATORIES ON THAT ACCOUNT?

5    A.      I'M NOT CERTAIN.  I DON'T THINK SO.

6    Q.      IS THAT IOLTA ACCOUNT SOLELY FOR CLIENTS' FUNDS?

7    A.      THAT IOLTA ACCOUNT IS FOR WHATEVER IS PERMITTED

8    BY LAW.

9    Q.      DO YOU PUT MONEY, OTHER THAN CLIENTS' MONEY, IN

10   THAT ACCOUNT?

11   A.      AS A GENERAL PROPOSITION, NO.

12   Q.      OKAY.  AND WHEN YOU WERE IN CONTROL OF EAGAN

13   AVENATTI, THEY HAD AN ACTUAL ACCOUNT AS WELL?

14   A.      YES.

15   Q.      AND THERE IS ALSO AN IOLTA ACCOUNT HELD IN THE

16   NAME OF MICHAEL J. AVENATTI; CORRECT?

17   A.      I DON'T UNDERSTAND.  I THOUGHT YOU WERE JUST

18   TALKING ABOUT THAT ACCOUNT.

19   Q.      WELL, LET ME ASK YOU A MORE GENERAL QUESTION.

20   IN GENERAL, DO YOU PAY FOR PERSONAL EXPENSES OUT OF YOUR

21   IOLTA ACCOUNTS?

22   A.      IT DEPENDS IF I'M ENTITLED TO FEES OR NOT.

23   Q.      SO YOU DO SOMETIMES PAY FOR EXPENSES OUT OF THE

24   IOLTA ACCOUNT?

25   A.      GENERALLY, NO.  I FOLLOW THE ETHICAL RULES OF
```

**Exhibit 1**                                                    **Page 7 of 43**

1    THE STATE OF CALIFORNIA, AND I HAVE AN INCREDIBLY

2    ACCOMPLISHED LAWYER, WHO IS A SPECIALIST IN ETHICS, THAT

3    I RELY ON FOR ETHICS ADVICE ON CONSISTENT BASIS.

4    Q.    SO GENERALLY, IT'S YOUR PRACTICE NOT TO PAY

5    PERSONAL EXPENSES DIRECTLY OUT OF YOUR IOLTA ACCOUNT;

6    CORRECT?

7    A.    I DON'T KNOW WHAT YOU MEAN BY "GENERAL

8    PRACTICE."  I THINK -- WELL, I DON'T KNOW WHAT YOU MEAN

9    BY "GENERAL PRACTICE."

10   Q.    WELL, IS IT YOUR GENERAL PRACTICE NOT TO PAY

11   PERSONAL EXPENSES, ROUGHLY, OUT OF YOUR IOLTA ACCOUNT?

12   A.    IT DEPENDS ON THE CIRCUMSTANCES OF WHETHER I'M

13   ENTITLED TO THE FEES OR NOT.

14   Q.    WHAT CIRCUMSTANCES DO YOU PAY PERSONAL EXPENSES

15   DIRECTLY OUT OF YOUR IOLTA ACCOUNT?

16   A.    SIR, I CAN'T -- I CAN'T GUESS AS TO OR

17   HYPOTHESIZE OR SPECULATE AS TO WHAT YOU'RE ASKING.

18   Q.    WELL, I'M ASKING IF YOU CO-MINGLE PERSONAL FUNDS

19   WITH CLIENTS' FUNDS IN THE IOLTA ACCOUNT.  THAT'S WHAT

20   I'M ASKING YOU.

21   A.    THAT'S A DIFFERENT QUESTION, AND GENERALLY THE

22   WAY THAT YOU'RE PHRASING IT, NO.  BUT YOU'RE CERTAINLY

23   PERMITTED TO PAY EXPENSES OUT OF THE IOLTA ACCOUNT IF

24   YOU'RE ENTITLED TO THE FEES.  THAT'S MY UNDERSTANDING, I

25   BELIEVE.  AGAIN, I WOULD HAVE TO LOOK AT THE RULES AND

JUDGMENT DEBTOR EXAMINATION, MARCH 15, 2019

1    REGULATION.  I'D HAVE TO CONSULT WITH MY ADVOCATE

2    COUNSEL.

3    Q.    SO SOMETIMES IN THE IOLTA ACCOUNT THAT YOU HELD,

4    THERE'S MONEY THAT YOU ARE PERSONALLY ENTITLED TO; IS

5    THAT CORRECT?

6    A.    YES.

7    Q.    OKAY.  AND SOMETIMES DIRECTLY OUT OF THOSE IOLTA

8    ACCOUNTS YOU WILL PAY EXCLUSIVELY PERSONAL EXPENSES;

9    CORRECT?

10   A.    I DON'T KNOW.

11   Q.    YOU DON'T KNOW IF YOU'VE EVER DONE THAT?

12            MR. HODGES:  OBJECTION.  ASKED AND ANSWERED,

13   COUNSEL.  ARGUMENTATIVE.

14   BY MR. STOLPER:

15   Q.    HAVE YOU EVER PAID A NANNY DIRECTLY OUT OF YOUR

16   PERSONAL -- OUT OF YOUR IOLTA ACCOUNT?

17   A.    SIR, I HAVE NO IDEA, AND WHAT I WOULD SAY IS

18   THAT ANY PAYMENTS THAT I HAVE EVER MADE OUT OF AN IOLTA

19   ACCOUNT WERE PROPER AND IN ACCORDANCE WITH STATE LAW AND

20   ETHICAL LIABILITIES, AND I ROUTINELY CONSULT WITH MY

21   ETHICS COUNSEL RELATING TO THE TRANSFER OF FUNDS.

22   Q.    DID YOU EVER CONSULT WITH AN ETHICS COUNSEL

23   ABOUT WHETHER OR NOT YOU PAID YOUR NANNY OUT OF AN IOLTA

24   ACCOUNT?

25            MR. HODGES:  THAT CALLS FOR ATTORNEY-CLIENT

**Exhibit 1**                                                    **Page 9 of 43**

JUDGMENT DEBTOR EXAMINATION, MARCH 15, 2019

```
 1              THE WITNESS:  I DON'T KNOW HOW TO ANSWER THAT

 2      QUESTION.

 3      BY MR. STOLPER:

 4      Q.      WELL, IS IT YOUR PRACTICE TO PAY PERSONAL

 5      EXPENSES OUT OF AN IOLTA ACCOUNT?

 6      A.      I'VE ANSWERED THAT QUESTION.

 7      Q.      I DIDN'T GET AN ANSWER.

 8      A.      NO. YOU DID GET AN ANSWER.  YOU DIDN'T LIKE THE

 9      ANSWER.

10              MR. HODGES:  NO.  WE'RE NOT GOING TO GO BACK

11      THERE, TO TAKE A REVIEW OF THE RECORD, COUNSEL.  YOU

12      KNOW, THAT'S AN IMPROPER QUESTION.

13      BY MR. STOLPER:

14      Q.      WHAT -- WELL, I'M GOING TO ASK THE QUESTION,

15      BECAUSE I DIDN'T GET IT ANSWERED.  IS IT YOUR PRACTICE

16      TO TAKE PERSONAL EXPENSES OUT OF IOLTA ACCOUNTS?

17              MR. HODGES:  ASKED AND ANSWERED.  ARGUMENTATIVE.

18              THE WITNESS:  SIR, I DON'T KNOW WHAT YOU MEAN.

19      I'M GOING TO GO BACK TO WHAT I'VE SAID.  WHEN I MAKE

20      PAYMENTS OUT OF ACCOUNTS, THEY ARE PROPER, THEY ARE IN

21      ACCORDANCE WITH CALIFORNIA LAW AND RULINGS AND

22      REGULATIONS GOVERNING LAWYERS, AND I ROUTINELY RELY ON

23      ETHICS ADVICE FROM AT LEAST ONE, IF NOT MORE, PREEMINENT

24      LAWYERS WHO ARE ETHICAL SPECIALISTS IN THE STATE OF

25      CALIFORNIA, PERIOD.
```

**Exhibit 1**                                                    **Page 10 of 43**

1            UNITED STATES BANKRUPTCY COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3                 SANTA ANA DIVISION

4

5   IN RE:                    )
                              )
6                             )
    EAGAN AVENATTI, LLP,      )   No. 8:17-bk-11961-CB
7                             )
            Debtor.           )
8                             )
    _____)
9

10

11

12

13       DEBTOR EXAMINATION OF MICHAEL AVENATTI

14                 PAGES 1 - 245

15   (PAGES 133 THROUGH 155 AND PAGES 174 THROUGH 190

16    WERE MARKED CONFIDENTIAL AND BOUND SEPARATELY)

17            TUESDAY, MARCH 22, 2019

18            LOS ANGELES,  CALIFORNIA

19

20

21

22

23

24
             Reported by Serena Wong
25           CSR #10250, RPR, CCRR #200

                                                    1

**Exhibit 1**                                    **Page 11 of 43**

1              UNITED STATES BANKRUPTCY COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                   SANTA ANA DIVISION

4

5    IN RE:                    )
                               )
6                              )
     EAGAN AVENATTI, LLP,      )   No. 8:17-bk-11961-CB
7                              )
                Debtor.        )
8                              )
     _____)
9

10

11

12

13

14

15              THE DEPOSITION OF MICHAEL AVENATTI,

16   taken at 345 350 W. 1st Street, Los Angeles,

17   California, on Friday, March 22,  2019, before

18   Serena Wong, CSR #10250, RPR, CCRR #200, Certified

19   Shorthand Reporter, in and for the State of

20   California.

21

22

23

24

25

2

**Exhibit 1**                                      **Page 12 of 43**

```
1    APPEARANCES:

2
     For the Debtor:
3
          SHULMAN, HODGES & BASTIAN
4         BY:  RONALD S. HODGES, ESQ.
          100 Spectrum Center Drive
5         Suite 600
          Los Angeles, California  92618
6         949.340.3400
          rhodges@shbllp.com
7
     Fo the Claimant:
8
          FRANK, SIMS, STOLPER
9         BY:  ANDREW D. STOLPER, ESQ.
               JASON FRANK, ESQ.
10        19800 MacArthur Parkway
          Suite 855
11        Irvine, California  92612
          949.201.2400
12        astolper@lawfss.com

13   For the Receiver:

14        LANDAU, GOTTFRIED & BERGER, LLP
          BY:  JOHN P. REITMAN, ESQ.
15        1801 Century Park East
          Suite 700
16        Los Angeles, California 90067
          310.557.0056
17        jreitman@lgbfirm.com

18

19

20

21

22

23

24

25
```

3

Exhibit 1                                                   Page 13 of 43

```
1                           INDEX

2

3   WITNESS:  Michael Avenatti

4

5   EXAMINATION                                    PAGE

6   Mr. Stolper                                     6

7

8

9

10            INSTRUCTIONS NOT TO ANSWER

11                 Page      Line

12                 16          2
                   22         10
13                 26          5
                   29         18
14                 44         22
                   45         15
15                 45         19

16

17

18

19

20            INFORMATION REQUESTED

21                 None.

22

23

24

25
```

4

Exhibit 1                                Page 14 of 43

```
1                        INDEX TO EXHIBITS

2    EXHIBITS                                      MARKED

3    Exhibit 1                                       65

4    Exhibit 4                                       94

5    Exhibit 7                                      111

6    Exhibit 23 (retained by counsel)              204

7    Exhibit 25 (retained by counsel)              205

8    Exhibit 28 (retained by counsel)              207

9    Exhibit 28A                                    207

10   Exhibit 47                                      74

11   Exhibit 60 (retained by counsel)              216

12   Exhibit 61                                     224

13   Exhibit 75                                     223

14   Exhibit 76                                       6

15   Exhibit 82                                      46

16

17

18

19

20

21

22

23

24

25
```

5

Exhibit 1                                                    Page 15 of 43

```
 1                    FRIDAY, MARCH 22, 219

 2                 LOS ANGELES, CALIFORNIA

 3

 4                    MICHAEL M. AVENATTI,

 5    was called as a witness, and having been first duly

 6    sworn, was examined and testified as follows:

 7

 8                         EXAMINATION

 9    BY MR. STOLPER:

10        Q    Good morning, Mr. Avenatti.  You understand

11    you're under oath?

12        A    Yes, sir.

13        Q    Mr. Avenatti, I first want to ask you some

14    questions about your productions in response to JFL's

15    notice.  On November 28, 2018, you were ordered by

16    Judge Scott to produce documents in response to the

17    notice; is that correct?

18        A    I don't know if it's correct or not as to

19    date.

20        Q    I'm going to go ahead and put up what I've

21    marked as Exhibit 70.  Sorry.  76.  Let's try this.

22    There you go.

23             (Exhibit 76 was marked.)

24        Q    BY MR. STOLPER:  Do you recognize that

25    document?
```

**Exhibit 1**                                                      **Page 16 of 43**

1    story.

2         Q    Mr. Avenatti, were you paying Ms. Regnier

3    separately from Eagan Avenatti on May 17, 2017?

4         A    I may have been.  I don't recall.

5         Q    All right.  Mr. Avenatti, this is an account

6    agreement wherein you're setting up the Michael

7    J. Avenatti, Esquire, trust account; correct, sir?

8         A    This is the first time I've ever seen this

9    document, separate and apart from signing it, so the

10   document says what it says.

11        Q    Let me ask you more directly.

12             Mr. Avenatti, did you set up an

13   attorney-client trust account at City National Bank on

14   or about May the 7th, 2017 (sic)?

15        A    Yes.  And there was absolutely nothing wrong

16   with that.  And I was permitted to do it, and I

17   specifically consulted with counsel before doing it.

18        Q    Which counsel did you consult with before

19   doing it?

20             (Attorney-client discussion.)

21        Q    BY MR. STOLPER:  Mr. Avenatti, which counsel

22   did you consult with before doing that?

23        A    I don't recall the specific counsel, but I

24   know we had a lot of attorneys involved at the time

25   relating to our bankruptcy petition.  I mean, that's

119

Exhibit 1                                        Page 17 of 43

1    how we ran up, you know, almost $1.3 million in fees.

2         Q    So I just want to make sure I understand your

3    testimony and that it's clear.

4              Your testimony is that you requested advice

5    of counsel to open up this bank account on May the 7th,

6    2017?

7         A    No.

8              MR. HODGES:  Calls for privileged

9    communication, Your Honor, the way the question is

10   phrased.

11             MR. STOLPER:  I didn't ask what the advice

12   was.  I just asked if he sought advice.

13             THE WITNESS:  No, I'm -- sir, I'm not going

14   to get into specific topics that I sought advice about.

15   But what I will say is, generally, we conducted

16   ourselves aboveboard at all times, and we made certain

17   that we followed all of the ethical rules and

18   obligations, as well as those of the bankruptcy court.

19   And one of the ways we did that was by consulting

20   counsel on a consistent basis.

21             THE COURT:  Well, I understood the witness to

22   already testify that he did -- I heard him say he did

23   consult with counsel prior to opening this trust

24   account.  So with that, I think that testimony is

25   already established.

Exhibit 1                                                        Page 18 of 43

1    $950,000 and change from the NFL settlement; correct,

2    sir?

3        A    Sir, I don't have a recollection of doing

4    that.  I'm sure if the money was wired there, he didn't

5    just do it on his own.  But I don't have a

6    recollection.  But what I do know is that these funds

7    were handled appropriately at all times pursuant to

8    California law, as well as ethical considerations, as

9    well as in reliance upon the advice of counsel that I

10   have previously noted.

11       Q    Mr. Avenatti, when you directed Mr. Ayers to

12   divide this money -- the NFL money up, with $409,000

13   going to the bankruptcy, and the rest of the money

14   going to your personal account, on what basis did you

15   decide what the split should be?

16           MR. HODGES:  Your Honor, objection.  That

17   lacks foundation.  Assumes facts that there was any

18   such conversation or direction.

19           THE WITNESS:  And it's also work product,

20   Your Honor, relating to the settlement of a case.

21           THE COURT:  I understand that he's asked you

22   the basis upon which you instructed someone to split

23   the money.  If you never instructed anyone or you don't

24   remember that, you can answer the question that way,

25   but that's what I understand him to be asking.

123

Exhibit 1                                          Page 19 of 43

```
 1              THE WITNESS:  Sir, as I sit here right now, I
 2    do not recall.  But what I do recall was specifically
 3    consulting with counsel, as I've mentioned, including
 4    ethics counsel, and this was done pursuant to
 5    California law.
 6         Q    BY MR. STOLPER:  Counsel was sitting with you
 7    at the 341(a) hearing on June 12, 2017, when you
 8    testified that you didn't maintain a separate trust
 9    account; is that correct, Mr. Avenatti?
10         A    Sir, again, I'm not going to agree with the
11    predicate of your question because it's not as simple
12    as you would like it to be for all the reasons I
13    previously noted relating to the 341(a) hearing.  Okay?
14    I have been truthful and honest at all times.  That's
15    number one.
16              Number two, I do -- I did have a lawyer
17    there.  I do not recall which lawyer was present.
18         Q    If you look at the front page of the exhibit,
19    Mr. Avenatti, I think it will tell you which lawyers
20    were present.
21              You actually had multiple lawyers at that
22    hearing, didn't you, sir?
23         A    There were two lawyers present at that
24    hearing, yes.
25         Q    And were those the lawyers that you consulted
```

124

Exhibit 1                                          Page 20 of 43

1  with and received advice of counsel concerning whether

2  or not it was appropriate for you to open up a separate

3  attorney-client trust account on May 17, 2017, and then

4  testify that that didn't happen?

5      A    Mr. Stolper, that's not what happen happened.

6  Okay?  And that's number one.  Number two, I've already

7  told you I don't recall which lawyers I consulted.

8  Number three, I individually worked on that case, as

9  did a number of other firms.  So, again, there was

10  nothing improper about any of the movement of those

11  monies.

12     Q    Let me turn your attention to what's been

13  marked as Exhibit 11.  This is an e-mail between

14  Mr. Ayers and Mr. Avenatti.

15          I will show it to them for objections.

16          (Attorney-client discussion.)

17          MR. STOLPER:  For the record, it's an e-mail

18  between Mr Ayers, Mr. Avenatti, and what appears to be

19  a banker.

20          MR. HODGES:  Your Honor, first, I'm going to

21  request that these be placed under the terms of the

22  protective order and marked confidential.

23          In addition, I'm advised that the actual

24  resolution of the case with the NFL was done by way of

25  a confidential settlement.  And to the extent that this

Exhibit 1                                                    Page 21 of 43

```
 1   wherever it went, provided that it wasn't for some
 2   illegal purpose, was perfectly ethical and legal, as I
 3   have completely stated time and time again in
 4   connection with this.
 5        Q    BY MR. STOLPER:  Mr. Avenatti, did you take
 6   any of the money that you received as part of the money
 7   transferred to you from the Ayers Law Office and turn
 8   around and provide that money to the clients you were
 9   representing?
10        A    Yeah, as I recall we did, but I -- I don't
11   have a firm recollection of that, as I sit here today.
12   I don't remember the totality of the settlement amount
13   and -- and the flow of the money.
14             What I do remember is that we sought advice
15   from ethics counsel and others, and it was handled
16   aboveboard.  That's what I recall.
17        Q    Approximately how much of the money you
18   received in the settlement did you provide to the
19   clients?
20        A    I -- I don't have a recollection, and I don't
21   have a recollection that any of this money was due to
22   clients.  In fact, the costs were far in excess, as I
23   recall, of any settlement amount.
24        Q    Did you provide the clients a reconciliation
25   upon the settlement of the NFL case, showing them how
```

153

Exhibit 1                                                    Page 22 of 43

```
 1   much money came in and what happened?
 2            MR. HODGES:  Again, that presupposes that
 3   there was money paid in the context of a confidential
 4   settlement.  That's the precise reason we cleared this
 5   courthouse.  No sooner do we invite the public back
 6   into this proceeding that we now attempt to go around
 7   the back door and have Mr. Avenatti admit that monies
 8   were paid in furtherance of a confidential settlement.
 9            THE COURT:  Well, I don't believe that he has
10   to admit that in order to answer this question.
11            I think the question is just if there was
12   some kind of statement that was provided to clients at
13   the end of the case that explained to them what
14   financial transactions, if any, had been made.  And it
15   could have been something that just showed that costs
16   were paid by the firm and nothing was paid by the other
17   side.
18            So I understand the question to just be, in
19   that limited scope, was there some sort of financial
20   accounting or receipt, for lack of a better term,
21   provided to the clients.
22            THE WITNESS:  Yes.
23       Q   BY MR. STOLPER:  Do you recall how that
24   information was communicated?
25       A   I don't.
```

154

Exhibit 1                                          Page 23 of 43

1     Q    Is that your practice in each case that at

2     the end of the case, that you provide the client a

3     statement of how the money, assuming money was received

4     as part of a settlement, how the money was dealt with?

5     A    Generally, yes, but not always, because it's

6     not required in every matter.

7     Q    Did you maintain those records?  Are they

8     available, if you wanted to find them?

9     A    I have no idea because I haven't looked for

10    them.

11    Q    You previously looked at what was marked as

12    Exhibit -- where is the original?  Do you know?

13         THE WITNESS:  Your Honor, could I take a

14    bathroom break?

15         THE COURT:  Yes.  I'm sure our court reporter

16    would like a stretch break, as well.

17         MR. STOLPER:  Probably a gun to shoot me,

18    too, Your Honor.

19         THE COURT:  Can we all be back in ten

20    minutes?

21         MR. STOLPER:  Yes, Your Honor.

22         THE CLERK:  This court now stands in recess.

23         (Recess taken.)

24         (Open session proceedings resume.)

25    ////

155

Exhibit 1                                                    Page 24 of 43

```
 1              THE CLERK:  Please remain seated and come to
 2    order.  This court is once again in session.
 3              The Honorable Karen E. Scott, Magistrate
 4    Judge, presiding.
 5              THE COURT:  All right.  Counsel, you can
 6    continue.
 7              MR. STOLPER:  Thank you, Your Honor.
 8        Q    BY MR. STOLPER:  Mr. Avenatti, you understand
 9    you're still under oath?
10        A    Yes.
11        Q    Who is Michael Hauser?
12        A    Michael Hauser.  I believe he's an attorney
13    in the bankruptcy court.
14        Q    He was the U.S. trustee overseeing the
15    bankruptcy of Eagan Avenatti; correct?
16        A    I think he's an assistant.  I don't know what
17    his exact title is.  He's not the U.S. trustee, no.
18        Q    He was the assistant U.S. trustee who handled
19    the 341(a) examination of you; correct?
20        A    I don't have a recollection of that.
21        Q    Okay.  Did you ever tell Mr. Hauser about
22    this account that you opened up on May the 17th, 2017?
23        A    Sir, I don't know if I did or didn't, but I
24    certainly wasn't under obligation to.  Again, we
25    consulted with bankruptcy counsel, and they told us
```

156

Exhibit 1                                              Page 25 of 43

```
 1    what we had to.

 2            I may have disclosed it, but I have not

 3    reviewed the transcript.

 4       Q    Mr. Avenatti, who is Gregory Barela?

 5       A    Gregory Barela is currently on felony

 6    probation for making false statements in an effort to

 7    get paid money.  He's a former client of the firm.  I

 8    think he's been convicted two or three times of various

 9    felonies.

10       Q    Was Mr. Barela a client of Eagan Avenatti?

11       A    I don't recall which firm he was a client of.

12    I think -- I think he was a client of Eagan Avenatti,

13    but I'm not certain.

14            MR. STOLPER:  Your Honor, I'd like to go

15    ahead and publish the retention agreement between

16    Mr. Barela and Eagan Avenatti.  If it pleases the

17    Court, Mr. Barela's attorney is here, and he authorized

18    me to do so without a confidentiality objection.

19            THE COURT:  Is there any other objection

20    anyone wants to raise with that?

21            MR. HODGES:  I have not seen the document,

22    Your Honor.  If I may?  Thank you.

23            MR. STOLPER:  Without objection, may I

24    proceed, Your Honor?

25            THE COURT:  Hearing no objections, you can
```

157

Exhibit 1                                                        Page 26 of 43

1    Q    BY MR. STOLPER:  Now, Mr. Avenatti, you've

2  received payment as part of the resolution in the

3  Barela v. Brock matter; correct?

4    A    Not full payment.

5    Q    I understand.  You've received partial

6  payment in the Barela v. Brock matter; correct, sir?

7    A    Correct.

8    Q    Now, Mr. Avenatti, did you disclose to the

9  bankruptcy court that you were handling the Barela v.

10  Brock matter as part of your required disclosures of

11  the cases you were handling?

12    A    Sir, I don't recall what the required

13  disclosures were, but I will tell you that we, at all

14  times, adhered to the letter of the law in connection

15  with the bankruptcy matter, and, in fact, we

16  consistently consulted with bankruptcy counsel and

17  others to ensure that we did so.

18    Q    I'm handing you what's already been marked as

19  Exhibit 1, which is your disclosure of all the matters

20  that Eagan Avenatti has handled.

21        I'm going to hand it to you, and I'm going to

22  ask you to identify for me the Barela v. Brock matter

23  on the schedule, because I don't see it.

24        MR. HODGES:  Your Honor, the document is a

25  public record.  It speaks for itself.  Do we really

164

Exhibit 1                                    Page 27 of 43

```
1        A     It depends.

2        Q     Okay.  What does that depend upon?

3        A     It can depend on all -- a number of things,

4    including whether the money is coming by wire or not.

5        Q     Of the $1.6 million that was wired in the

6    Barela v. Brock matter, how much of that money did you

7    report as revenue for Eagan Avenatti as part of the

8    bankruptcy?

9              MR. HODGES:  Foundation.  Lacks foundation.

10             THE WITNESS:  I don't recall.  We reported

11   anything and everything we were required to report.

12       Q     BY MR. STOLPER:  Mr. Avenatti, is it your

13   position that the money that came in, in the Barela v.

14   Brock matter does not -- did not belong to Eagan

15   Avenatti?

16       A     Sir, I don't know, as I sit here right now,

17   one way or the other.  What I do know is, like I said

18   earlier, we consistently consulted counsel who advised

19   us on these matters.

20       Q     Mr. Avenatti, I'm asking you a very simple

21   question:  Was the Barela money that came in, any part

22   of that, property of Eagan Avenatti?

23             MR. HODGES:  Asked and answered.

24             THE WITNESS:  Sir, I don't recall.  I recall

25   that we relied on counsel in connection with all these
```

176

Exhibit 1                                                      Page 28 of 43

```
 1   matter.
 2       Q    BY MR. STOLPER:  And that includes -- and
 3   just so we're clear, you're asserting a reliance upon
 4   counsel as to how the money that came in for the Barela
 5   v. Brock was allocated as between Eagan Avenatti and/or
 6   other entities; is that correct?
 7       A    No, that's not correct.
 8       Q    To the extent you're asserting a reliance of
 9   counsel -- a reliance of counsel claim, what is it
10   you're -- what is that claim?  What are you relying
11   upon counsel for?
12       A    I'm not asserting any claim.
13       Q    Okay.  Well --
14       A    All I'm saying is, is that in the course of
15   the bankruptcy proceeding, as it related to the receipt
16   of monies and the payment of monies and the reporting
17   of monies and the operating reports and the like, we
18   relied upon counsel that we had retained in connection
19   with the matter.
20       Q    Did you -- without getting into what the
21   advice was, did you consult with counsel as to how the
22   payment -- how the settlement money that came in, in
23   the Barela v. Brock matter ought to be allocated
24   between the judgment debtor, Eagan Avenatti, and other
25   entities that you controlled?
```

177

Exhibit 1                                               Page 29 of 43

1        A     I'm not going to get into -- that calls for

2    privileged communication.

3        Q     No, it does not.

4        A     No.  You asked me did I consult with counsel

5    about X, Y, and Z.

6              MR. STOLPER:  Your Honor, to the extent he's

7    asserting a reliance upon counsel, I would like an

8    answer to my question.

9              MR. HODGES:  He's actually not asserted

10   advice of counsel defense.  He's merely indicated he

11   conferred with counsel on the topic.  There's a

12   distinction under the law.

13             THE COURT:  Well, I think that was the

14   question:  Has he conferred with counsel on the topic?

15             MR. HODGES:  Then I would object --

16             THE WITNESS:  Yes.

17             MR. HODGES:  -- on the basis of privilege.

18             THE WITNESS:  Answer is yes.

19        Q     BY MR. STOLPER:  So with that answer,

20   Mr. Avenatti, which counsel did you confer with on the

21   topic of how the money that came in for the Barela v.

22   Brock matter should be allocated between the judgment

23   debtor, Eagan Avenatti, and other entities that you

24   controlled?

25             THE COURT:  The question is just which

178

Exhibit 1                                          Page 30 of 43

```
 1              THE COURT:  Do you recall receiving money
 2   into your trust account and then sending it to
 3   Mr. Ricci?
 4              THE WITNESS:  I don't recall that.
 5       Q    BY MR. STOLPER:  Do you recall receiving
 6   money from Mr. Barela into any trust account -- strike
 7   that.
 8              Do you recall receiving money from Mr. Brock
 9   on behalf of Mr. Barela in any trust account?
10              MR. HODGES:  Asked and answered.
11              THE WITNESS:  Your Honor, I've answered this
12   question.
13              THE COURT:  This is a yes or no question.
14              THE WITNESS:  Sir, I have a recollection of
15   receiving settlement monies at some point in time
16   relating to Mr. Barela.
17       Q    BY MR. STOLPER:  And I believe you've already
18   testified that was approximately $1.6 million; correct?
19              (Simultaneous colloquy.)
20              THE COURT REPORTER:  One at a time.
21       Q    BY MR. STOLPER:  Did Mr. Barela ever
22   authorize you to take any of his money or any of the
23   money that was obtained as part of the settlement and
24   send it to Ed Ricci?
25       A    Sir, all transfers of these monies were
```

Exhibit 1                                                      Page 31 of 43

1    legitimate, ethical, and legal under California law at

2    all times.  I don't have a recollection if he did or he

3    didn't, but I disagree with your predicate which is

4    that somehow these were his monies.  They weren't his

5    monies.

6        Q    The money that came in for the Barela

7    settlement wasn't Mr. Barela's money?

8        A    Sir, you have my testimony.

9        Q    All right.  Did Mr. Barela ever authorize you

10   to send money obtained as part of his settlement to

11   Global Baristas on or about January 12, 2018?

12       A    Same answer, sir.

13       Q    Mr. Avenatti, did you inform Mr. Barela

14   promptly when the money for his settlement came in?

15            MR. HODGES:  Vague and ambiguous as to the

16   term "promptly."

17            THE WITNESS:  I don't recall, as I sit here.

18       Q    BY MR. STOLPER:  Did you provide Mr. Barela a

19   statement after his settlement came in, showing how

20   money was used?

21       A    I don't recall, as I sit here, without

22   looking at the documents.

23       Q    Did Mr. Rechey --

24            MR. HODGES:  May I have a moment, Your Honor,

25   real quickly with the Receiver?

Exhibit 1                                                    Page 32 of 43

```
 1   put on the Elmo, with permission, what's been marked as
 2   Exhibit 25, which is a copy of the Eagan Avenatti, LLP,
 3   trust account for September of 2017.
 4        A    Your Honor, what was the -- what was the use
 5   in not disclosing the amount of the confidential
 6   settlement if he's now going to disclose the amount by
 7   way of this document?
 8             MR. HODGES:  Yeah.
 9             MR. STOLPER:  I haven't published it, Your
10   Honor.
11             THE COURT:  Right.  So, as I understand it,
12   you're giving it to counsel to look at to see if
13   there's an objection, and I hear there is an objection
14   to publishing the amount.
15             MR. HODGES:  There will be, Your Honor, yes,
16   and the document does reflect amounts.
17        Q    BY MR. STOLPER:  Now, Mr. Avenatti, when you
18   were in bankruptcy, as part of your monthly operating
19   reports, you had to disclose to the bankruptcy court
20   whether or not you were getting paid any money as an
21   insider; correct?
22        A    I don't believe that's correct.  It may be.
23   I have no idea.  I advised -- I relied on the advice of
24   bankruptcy counsel relating to all of those matters.
25             (Exhibit 28 was marked and retained by
```

Exhibit 1                                                    Page 33 of 43

```
 1              counsel.)
 2      Q    BY MR. STOLPER:  Well, let's look at what's
 3  been marked as Exhibit 28, which is -- this is the
 4  October operating report for 2017.
 5              Does that document look familiar to you?
 6      A    No.
 7      Q    Okay.  Well, isn't it true that you signed
 8  this document, as the managing partnership of Eagan
 9  Avenatti?
10      A    Sir.  We were talking about the other
11  document, as well as some generalities relating to
12  these documents.  We didn't prepare these.  They were
13  prepared by bankruptcy counsel.
14              (Exhibit 28A was marked and retained by
15              counsel.)
16      Q    BY MR. STOLPER:  Sir, did you sign what's
17  been marked as Exhibit 28A, as the managing partner of
18  Eagan Avenatti?
19      A    Yes.
20      Q    And when you signed it, you represented that
21  you thought that the previous information was true and
22  complete to the best of your knowledge; correct?
23      A    I -- I signed it pursuant to this
24  attestation.
25      Q    Okay.  And one of the things that you're
```

**Exhibit 1**                                                      **Page 34 of 43**

```
 1    attesting to quotes?  As the debtor in possession
 2    during the period provided compensation or remuneration
 3    to any officers, directors, principals, or other
 4    insiders without appropriate authorization.
 5              And you wrote "no"; correct?
 6        A    Well, no, I didn't write "no."  Our
 7    bankruptcy counsel wrote "no."
 8        Q    But then you, on the bottom of the page, you
 9    signed and agreed with that; correct?
10        A    I signed this document.  I was given all
11    kinds of documents to sign.  Bankruptcy counsel was
12    preparing these reports, which is one of the reasons
13    why they billed us over a million dollars.
14        Q    In addition, there is a schedule that has
15    schedule of amounts paid insiders.  It's actually two
16    different tables.  It's on page 13 of the exhibit.
17              In both places, your bankruptcy counsel
18    indicated "none" above your signature; correct?
19        A    I -- I don't know whether that's true or not.
20    You're just showing me a page of a document.
21        Q    Well, it says, gross compensation paid during
22    the month; name of insider, it says, "none."
23              Am I reading that correct?
24        A    Sir, I'm not quibbling with what's on the
25    page.  I don't have an independent recollection of
```

Exhibit 1                                                    Page 35 of 43

```
 1   this.
 2        Q    But you stand by your signature that this was
 3   true and correct, to the best of your knowledge, at the
 4   time that you signed it; right?
 5        A    Sir --
 6        Q    Let me finish.
 7             That you didn't receive any compensation in
 8   October of 2017, from Eagan Avenatti; correct?
 9        A    Sir, without the documents, I'm not prepared
10   to answer your question.  So I can't answer your
11   question.  I'm sorry.
12        Q    What documents do you need to answer my
13   question as to whether or not you certified that you
14   didn't receive any compensation from Eagan Avenatti in
15   October of 2017?
16        A    Well, I disagree with your predicate -- to
17   the predicate of your question, first of all.
18        Q    Okay.  What documents do you need,
19   Mr. Avenatti, to answer that question truthfully?
20        A    Sir, whatever documents went into the
21   preparation of this report; I'd want to consult with my
22   bankruptcy counsel; I'd want to find out what they
23   consulted; I'd want to go back and refresh my
24   recollection as to what communications I had with my
25   bankruptcy counsel, relating to the preparation of this
```

Exhibit 1                                                    Page 36 of 43

```
 1   report.  I was not preparing these reports.
 2        Q    Did you take the preparation of these reports
 3   seriously?
 4        A    Yes.
 5        Q    And as part of that serious preparation, can
 6   you stand by your statement that you didn't receive the
 7   representation of the bankruptcy court that you didn't
 8   receive any compensation as an insider in October of
 9   2017?
10        A    Sir, you just asked me that question, and I'm
11   going to stand by my prior answer.
12        Q    Mr. Avenatti, I'm not trying to trick you.
13   I'm just trying to ask whether or not you stand by your
14   jurat, your statement, that to the best of your
15   knowledge, you didn't receive any compensation?
16             MR. HODGES:  Asked and answered.
17             THE WITNESS:  I've answered the questioned,
18   sir.
19        Q    BY MR. STOLPER:  Well, let me ask you a
20   question:  Sitting here today, do you have any reason
21   to believe that what's contained on page 13 of 16 is
22   not correct?
23        A    Sir, I would have to consult -- the fact that
24   you're asking me about it, if -- you know, I'll answer
25   it this way:  Yes, I do have reason to believe, based
```

Exhibit 1                                          Page 37 of 43

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3         HONORABLE JAMES V. SELNA, JUDGE PRESIDING

4   UNITED STATES OF AMERICA,        )
                                     )
5                                    )
                                     )
6                    Plaintiff,      )
                                     )
7                                    )
                                     )
8        Vs.                         )   No. SACR19-00061-JVS
                                     )
9                                    )
                                     )
10  MICHAEL JOHN AVENATTI,           )
                                     )
11                                   )
                                     )
12                   Defendant.      )
                                     )
13  _____)

14

15

16        REPORTER'S TRANSCRIPT OF PROCEEDINGS

17              BAIL REVIEW HEARING

18             SANTA ANA, CALIFORNIA

19          WEDNESDAY, JANUARY 15, 2020

20

21

22          MIRIAM V. BAIRD, CSR 11893
        OFFICIAL U.S. DISTRICT COURT REPORTER
23       411 WEST FOURTH STREET, SUITE 1-053
            SANTA ANA, CALIFORNIA 92701
24              MVB11893@AOL.COM

25

                UNITED STATES DISTRICT COURT

Exhibit 1                                    Page 38 of 43

**A P P E A R A N C E S**

**IN BEHALF OF THE PLAINTIFF,**        BRETT A. SAGEL
**UNITED STATES OF AMERICA:**          AUSA - OFFICE OF US
                                       ATTORNEY
                                       SANTA ANA BRANCH OFFICE
                                       411 WEST FOURTH STREET
                                       SUITE 8000
                                       SANTA ANA, CA 92701

                                       JULIAN LUCIEN ANDRE
                                       AUSA - OFFICE OF US
                                       ATTORNEY
                                       MAJOR FRAUDS SECTION
                                       312 NORTH SPRING STREET
                                       11TH FLOOR
                                       LOS ANGELES, CA 90012


**IN BEHALF OF THE DEFENDANT,**        H. DEAN STEWARD
**MICHAEL JOHN AVENATTI:**             H. DEAN STEWARD LAW OFFICES
                                       107 AVENIDA MIRAMAR SUITE C
                                       SAN CLEMENTE, CA 92672

                                        - AND -

                                       THOMAS D. WARREN
                                       PIERCE BAINBRIDGE BECK
                                       PRICE AND HECHT LLP
                                       355 SOUTH GRAND AVENUE 44TH
                                       FLOOR
                                       LOS ANGELES, CA 90071

UNITED STATES DISTRICT COURT

Exhibit 1                                                    Page 39 of 43

```
 1        SANTA ANA, CALIFORNIA; WEDNESDAY, JANUARY 15, 2020; 1110

 2                              ---

 3             THE CLERK:  Calling Item Number 1, SACR19-0061,

 4   United States of America versus Michael John Avenatti.

 5             Counsel, please state your appearance for the

 6   record.

 7             MR. SAGEL:  Good morning, Your Honor.

 8             Bret Sagel and Julian Andre on behalf of the

 9   United States.

10             THE COURT:  Good morning.

11             MR. STEWARD:  Your Honor, Dean Steward, and with me

12   at counsel table is attorney Thomas Warren.  Mr. Warren will

13   be filing a notice of association in this case later today.

14   He would ask to participate this morning.  Mr. Avenatti is

15   with us.  He's at the moment in custody.

16             THE COURT:  Good morning.

17             THE DEFENDANT:  Good morning, Your Honor.

18             THE COURT:  I look forward to seeing Mr. Warren's

19   notice of appearance.  Be happy to have you participate

20   today, sir.

21             MR. WARREN:  I appreciate that, Your Honor.

22             THE COURT:  The first question is, the defendant

23   prepared to go forward?  The government has made quite a

24   substantial showing which you probably didn't receive until

25   early last night.
```

UNITED STATES DISTRICT COURT

**Exhibit 1**                                                    **Page 40 of 43**

```
 1   that there should be a debtor's prison here; that somebody
 2   who doesn't pay their debts should go into custody under
 3   these circumstances.  That, of course, is just wholly unfair.
 4         THE COURT:  Only if they do certain things like
 5   move their money around and disguise it.  California statutes
 6   deal specifically with that problem where there's an
 7   outstanding judgment.
 8         MR. STEWARD:  Okay.  But I would suggest that, for
 9   example, getting a cashier's check so it keeps it out of a
10   California bank account simply holding onto that check is not
11   in any sense a violation of either the California statute or
12   the Washington statute.  Again, it's just making it so that
13   he doesn't make it easier for creditors.  He's done that a
14   lot.  There's no doubt about that.  I suggest it doesn't go
15   over the line.  It doesn't in any way violate the statute
16   that the government has suggested.
17         Also, they talk about an exclusive resorts
18   membership.  The reality is Mr. Avenatti purchased that
19   membership in 2009, many, many years ago.  What he has to pay
20   is yearly dues.  That's what he did.  The membership itself
21   is quite valuable and is transferable.  If he doesn't pay
22   that, he loses an asset.  So that's what he's done here.
23         THE COURT:  Did he report that payment to the
24   pretrial services officer?
25         MR. STEWARD:  You know, Your Honor, I haven't gone
```

```
1    over every single payment that he reported or didn't, but
2    he's told me he did report everything.  So I'll assume that's
3    true.  Ms. Davis is here.  Perhaps, she can enlighten on us
4    on whether he did or not.
5              I would note, Your Honor, that the terms of the
6    bail require him to report to pretrial, not receive approval
7    from them, but simply to let them know I spent on such and
8    such date $6,500 that went to Steward or whoever it may be.
9    There was never a requirement that they approve it.  Indeed,
10   it would be difficult for them to figure out whether it's an
11   appropriate expense or not.  I would suggest, overall, if you
12   step back and look at the government's filing, they talk
13   about mail and wire fraud.  I don't see any specifics about
14   where that is there.  That's the kind of thing that, frankly,
15   if they think that occurred, supersede.  Indict him a fourth
16   time.  Whatever.  This is just not the appropriate forum to
17   make an allegation like that, particularly which is so sparse
18   in terms of details.  There's just no details at all.  The
19   structuring financial transactions, again, his intent was not
20   to defeat reporting requirements.  His intention was to pay
21   creditors on perhaps a monthly basis.
22             As the Court is aware, he has two other cases.  One
23   of them is supposed to start trial this Tuesday.  He -- had
24   he not been arrested last night, he would have been on a
25   plane working with his lawyers back in New York City today.
```

UNITED STATES DISTRICT COURT

**Exhibit 1**                                                          **Page 42 of 43**

```
1    He's been obviously unable to do that.  In terms of the
2    overall picture of danger to the community when you're
3    talking economics, specifically as to Mr. Avenatti, where is
4    the danger?  He hasn't stolen any money from anybody.  He has
5    avoided creditors, yes.  He feels he did it in an above board
6    and legal manner.  The fact that he approached counsel and
7    received legal advice supports the fact that certainly his
8    mental state was not to defraud or otherwise give any trouble
9    to anybody else.
10           He hasn't paid Jason Frank.  That's unfortunate.
11   He's got a lot of other creditors as well.  None of these
12   people have actual court judgements.  For example, the
13   government talks about spousal support.  $2.5 million debt to
14   Ms. Storie.  The reality is there is no $2.5 million court
15   ordered judgment or debt.  What it is is a monthly payment
16   that he supposed to be making --
17           THE COURT:  Pursuant to what?
18           MR. STEWARD:  I'm sorry?
19           THE COURT:  Pursuant to what?
20           MR. STEWARD:  A Superior Court order --
21           THE COURT:  Order.
22           MR. STEWARD:  I agree with that, but I know very
23   little about that sort of thing.
24           THE COURT:  The point is there as a judicial
25   directive to do that.
```

UNITED STATES DISTRICT COURT

**Exhibit 1**                                                    **Page 43 of 43**