NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
JULIAN L. ANDRÉ (Cal. Bar No. 251120)
Assistant United States Attorney
Major Frauds Section
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-6683
     Facsimile: (213) 894-6269
     Email:    Julian.L.Andre@usdoj.gov

BRETT A. SAGEL (Cal. Bar No. 243918)
Assistant United States Attorney
     Ronald Reagan Federal Building
     411 West Fourth Street, Suite 8000
     Santa Ana, California 92701
     Telephone:  (714) 338-3598
     Facsimile:  (714) 338-3708
     Email:    Brett.Sagel@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>          v.<br><br>MICHAEL JOHN AVENATTI,<br><br>        Defendant. | SA CR No. 19-061-JVS<br><br>GOVERNMENT'S CONSOLIDATED MOTION *IN LIMINE* TO ADMIT EVIDENCE OF DEFENDANT MICHAEL JOHN AVENATTI'S OTHER ACTS, CRIMES, AND WRONGS, AND TO ADMIT EVIDENCE OF DEFENDANT'S PRIOR CONVICTIONS IF DEFENDANT TESTIFIES AT TRIAL; DECLARATION OF JULIAN L. ANDRÉ; EXHIBITS<br><br>Hearing Date: October 19, 2020<br>Hearing Time: 9:00 a.m.<br>Location:    Courtroom of the<br>             Hon. James V. Selna |

    Plaintiff United States of America, by and through its counsel
of record, the United States Attorney for the Central District of
California and Assistant United States Attorneys Julian L. André and

Brett A. Sagel, hereby files its consolidated motion <u>in limine</u> to admit evidence of defendant MICHAEL JOHN AVENATTI's ("defendant") other acts, crimes, and wrongs, and to admit evidence of defendant's prior convictions should he testify at trial.

This motion is based upon the attached memorandum of points and authorities, the attached declaration of Julian L. André and exhibits, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: September 14, 2020            Respectfully submitted,

                                     NICOLA T. HANNA
                                     United States Attorney

                                     BRANDON D. FOX
                                     Assistant United States Attorney
                                     Chief, Criminal Division

                                     _____
                                     JULIAN L. ANDRÉ
                                     BRETT A. SAGEL
                                     Assistant United States Attorneys

                                     Attorneys for Plaintiff
                                     UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                                    PAGE

TABLE OF AUTHORITIES.............................................................iii

MEMORANDUM OF POINTS AND AUTHORITIES..............................................1

I.    INTRODUCTION................................................................1

II.   FACTUAL AND PROCEDURAL BACKGROUND...........................................3

      A.    The Indictment........................................................3

      B.    The Government's Notice to Defendant..................................8

III.  LEGAL STANDARDS.............................................................8

IV.   ARGUMENT...................................................................12

      A.    Defendant's Embezzlement of Settlement Funds from the
            Super Bowl Clients Falls Squarely within the Charged
            Conduct and Is Direct Evidence of the Alleged
            Fraudulent Scheme....................................................13

            1.    Additional Crimes, Wrongs, and Other Acts..........13

            2.    The Evidence to be Admitted........................14

            3.    Admissibility......................................15

      B.    Defendant's Failure to Pay Over to the IRS Payroll
            Taxes Withheld from EA LLP Employee's Paychecks Is
            Inextricably Intertwined with the Charges in the
            Indictment...........................................................17

            1.    Additional Crimes, Wrongs, and Other Acts..........17

            2.    The Evidence to be Admitted........................20

            3.    Admissibility......................................20

      C.    Defendant's Failure to Pay State Taxes for GBUS is
            Inextricably Intertwined with the Tax Charges and
            Further Proves Defendant's Knowledge, Motive, and
            Intent...............................................................22

            1.    Additional Crimes, Wrongs, and Other Acts..........22

            2.    The Evidence to be Admitted........................23

            3.    Admissibility......................................23

      D.    Defendant's Additional Fraudulent Conduct in
            Connection with the 2017 EA Bankruptcy is Direct

i

**TABLE OF CONTENTS (CONTINUED)**

DESCRIPTION                                                          PAGE

       Evidence of Defendant's Fraudulent Intent and Is
       Inextricably Intertwined with the Other Charges..........24

       1.   Additional Crimes, Wrongs, and Other Acts..........24

       2.   The Evidence to be Admitted........................26

       3.   Admissibility......................................27

  E.   Defendant's Numerous False and Perjurious Statements
      During Judgment Debtor Examinations in 2018 and 2019
      are Admissible For Multiple Reasons.....................29

       1.   Additional Crimes, Wrongs, and Other Acts..........29

       2.   The Evidence to be Admitted........................33

       3.   Admissibility......................................33

  F.   If Defendant Testifies at Trial, Defendant's Prior
      Honest Services Fraud and Extortion Convictions Should
      Be Admitted Under Rule 609.............................34

V.  CONCLUSION...................................................35

**TABLE OF AUTHORITIES**

<u>DESCRIPTION</u>                                                    <u>PAGE</u>

**FEDERAL CASES**

<u>Greco et al. v. NFL et al</u>,
        No. 3:13-cv-01005-M (NDTX)..................................13

<u>Huddleston v. United States</u>,
        485 U.S. 681 (1988).........................................10

<u>In re: Eagan Avenatti LLP</u>,
        No. 8:17-bk-11961-CB (C.D. Cal.)........................passim

<u>United States v. Avenatti</u>,
        No. 1:19-CR-373-PGG (S.D.N.Y.)..........................3, 34

<u>United States v. Bailleaux</u>,
        685 F.2d 1105 (9th Cir. 1982)...............................12

<u>United States v. Curtin</u>,
        489 F.3d 935 (9th Cir. 2007)............................10, 11

<u>United States v. Daly</u>,
        974 F.2d 1215 (9th Cir. 1992)................................9

<u>United States v. Diggs</u>,
        649 F.2d 731 (9th Cir. 1981)................................11

<u>United States v. Dorsey</u>,
        677 F.3d 944 (9th Cir. 2012).................................9

<u>United States v. Glenn</u>,
        667 F.2d 1269 (9th Cir. 1982)...............................35

<u>United States v. Hanson</u>,
        936 F.3d 876 (9th Cir. 2019)................................10

<u>United States v. Loftis</u>,
        843 F.3d 1173 (9th Cir. 2016)...................9, 16, 21, 28

<u>United States v. Major</u>,
        676 F.3d 803 (9th Cir. 2012)................................10

<u>United States v. McConney</u>,
        782 F.2d 1195 (9th Cir. 1984)...............................11

<u>United States v. Montgomery</u>,
        150 F.3d 983 (9th Cir. 1998)................................11

<u>United States v. Parker</u>,
        549 F.2d 1217 (9th Cir. 1977)...............................11

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                    PAGE

United States v. Ramirez-Jiminez,
  967 F.2d 1321 (9th Cir. 1992)..................................10

United States v. Romero,
  282 F.3d 683 (9th Cir. 2002)..................................12

United States v. Skillman,
  922 F.2d 1370 (9th Cir. 1990)..................................11

United States v. Soliman,
  813 F.2d 277 (9th Cir. 1987)...................................9

United States v. Tsinnijinnie,
  91 F.3d 1285 (9th Cir. 1996)..................................10

United States v. Vo,
  413 F.3d 1010 (9th Cir. 2005)....................17, 22, 24, 29

**STATE CASES**

Jason Frank Law, PLC v. Michael J. Avenatti,
  Los Angeles Superior Court, Case No. BC706555.................30

Michael Avenatti v. Lisa Storie Avenatti,
  Orange County Superior Court, Case No. 17D00-99-30...........30

**FEDERAL STATUTES**

18 U.S.C. § 1028A(a)(1)...............................................1

18 U.S.C. § 1343......................................................1

18 U.S.C. § 1344(1)...................................................1

18 U.S.C. § 1346.....................................................34

18 U.S.C. § 152(2)....................................................1

18 U.S.C. § 152(3)....................................................1

18 U.S.C. § 1951.....................................................34

18 U.S.C. § 875(d)...................................................34

26 U.S.C. § 7202......................................................1

26 U.S.C. § 7203......................................................1

26 U.S.C. § 7212(a)...................................................1

**TABLE OF AUTHORITIES (CONTINUED)**

<u>DESCRIPTION</u>                                                    <u>PAGE</u>

**FEDERAL RULES**

Federal Rule of Evidence 403................................11, 12, 13

Federal Rule of Evidence 404(b)...............................passim

Federal Rule of Evidence 609................................3, 34, 35

v

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.   INTRODUCTION**

3

Defendant MICHAEL JOHN AVENATTI ("defendant") is charged in a

4

36-count indictment with embezzling millions of dollars from his

5

legal clients (ten counts of wire fraud, in violation of 18 U.S.C.

6

§ 1343); failing to pay over to the Internal Revenue Service ("IRS")

7

millions in withheld payroll taxes (eight counts of willful failure

8

to pay over withheld taxes, in violation of 26 U.S.C. § 7202);

9

obstructing the IRS's efforts to collect the unpaid payroll taxes

10

(one count of endeavoring to obstruct the administration of the

11

Internal Revenue Code, in violation of 26 U.S.C. § 7212(a)); failing

12

to file tax returns for himself and his law firms (ten counts of

13

willful failure to file tax return, in violation of 26 U.S.C.

14

§ 7203); committing bank fraud and identity theft (two counts of bank

15

fraud, in violation of 18 U.S.C. § 1344(1), and one count of

16

aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1));

17

and making false and fraudulent statements during bankruptcy

18

proceedings (three counts of false declaration in bankruptcy, in

19

violation of 18 U.S.C. § 152(3), and one count of false testimony

20

under oath in bankruptcy, in violation of 18 U.S.C. § 152(2)).  (CR

21

16 (the "Indictment").)

22

<u>First</u>, the government moves to admit at trial evidence that

23

defendant engaged in additional criminal conduct, wrongs, and other

24

acts, which were not specifically identified in the Indictment,

25

including evidence establishing the following acts:

26

1.   In 2017, defendant embezzled a portion of a $1.55 million

27

settlement payment meant to benefit clients (the "Super Bowl

28

Clients") he represented in connection with litigation against the National Football League ("NFL").

2.   Between 2015 and 2017, defendant willfully failed to pay over to the Internal Revenue Service ("IRS") payroll taxes that had been withheld from the paychecks of the employees at his law firm, Eagan Avenatti LLP ("EA LLP"), and endeavored to obstruct the IRS collection action relating to EA LLP's unpaid payroll taxes.

3.   Between 2014 and 2018, defendant failed to pay state taxes for his coffee company, Global Baristas US, LLC ("GBUS").

4.   In 2017 and 2018, defendant engaged in additional fraudulent conduct relating to In re: Eagan Avenatti LLP, No. 8:17-bk-11961-CB (C.D. Cal.) (the "2017 EA Bankruptcy"), including arranging for an individual to file the involuntary bankruptcy petition, submitting to the United States Bankruptcy Court a settlement agreement that contained a forged signature, and making additional false statements during the 2017 EA Bankruptcy.

5.   In 2018 and 2019, defendant committed perjury during judgment debtor examinations in an effort to conceal his fraudulent and criminal conduct.

Evidence of the additional criminal conduct set forth above is plainly admissible at trial.  Defendant's additional criminal conduct falls squarely within and is direct evidence of the charged offenses or, at a minimum, is inextricably intertwined with the charged offenses.  But assuming arguendo that defendant's additional acts and crimes are not part of, or inextricably intertwined with, the charged conduct, evidence of defendant's other acts is admissible under Federal Rule of Evidence 404(b), which is a "rule of inclusion, not exclusion."  Indeed, this evidence is critical to proving defendant's

knowledge, motive, plan, fraudulent intent, and absence of mistake, has substantial probative value, and there are no countervailing concerns that would substantially outweigh the evidence's relevance.

Moreover, the presentation of evidence regarding defendant's additional acts can be accomplished efficiently and effectively, and will not significantly prolong the trial in this matter.  Almost all of the witnesses necessary to prove the other acts will testify at trial regarding the allegations in the indictment.  And most of the documentary evidence, such as emails or bank records, will be introduced as evidence as to the charged offenses.

Second, should defendant testify at trial, the government moves to admit evidence of defendant's recent convictions for extortion and honest services wire fraud in United States v. Avenatti, No. 1:19-CR-373-PGG (the "SDNY Extortion Case"), in the Southern District of New York ("SDNY"), pursuant to Federal Rule of Evidence 609.  Notably, defendant's convictions in the SDNY Extortion Case directly relates to defendant's truthfulness, and defendant's pattern and practice of deceiving his clients.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   The Indictment

On April 10, 2019, a federal grand jury returned the 36-count Indictment against defendant.  (CR 16.)  As alleged in the Indictment, defendant has engaged in an extensive pattern of interconnected financial fraud and tax offenses dating back to as early as 2011. (CR 16; see also CR 78, Exs. 1-3.)[1]

---

[1]   The evidence supporting the charges in the indictment, as well as many of the additional crimes and other acts set forth herein, is described in greater detail in the three search warrant

3

1    First, between as early as January 2015 and continuing through

2    at least March 2019, defendant executed a scheme to defraud and

3    embezzle money from his legal clients.  Defendant's scheme to defraud

4    his victim-clients generally operated in the following manner:

5    (a) defendant would negotiate a settlement on behalf of a victim-

6    client that would require the payment of funds to the victim-client;

7    (b) defendant would cause the settlement proceeds to be deposited in

8    or transferred to attorney trust accounts defendant controlled;

9    (c) defendant would misrepresent, conceal, and falsely describe to

10   the victim-client the true terms of the settlement and/or make false

11   statements regarding the disposition of the settlement proceeds;

12   (d) defendant would embezzle and misappropriate settlement proceeds

13   to which he was not entitled; and (e) defendant would lull the

14   victim-client to prevent the victim-client from discovering the

15   embezzlement and misappropriation by, among other things, denying the

16   settlement proceeds had been paid, sending funds to the victim-client

17   under the false pretense that such funds were "advances" on the

18   purportedly yet-to-be received settlement proceeds, and claiming that

19   payment of the settlement proceeds to the victim-client had been

20   delayed for legitimate reasons and would occur at a later time.

21       Although the alleged scheme to defraud was not limited to any

22   particular victim-clients, the Indictment specifically alleges the

23   following four instances in which defendant embezzled client funds:

24   (a) defendant defrauded "Client 1" out of Client 1's portion of an

25   approximately $4,000,000 settlement payment from the County of Los

26   Angeles defendant received on Client 1's behalf in January 2015;

27

28   affidavits submitted in connection with the government's January 2020
     motion to revoke defendant's bond.  (CR 78.)

                                       4

1   (b) defendant defrauded "Client 2" out of Client 2's portion of an

2   approximately $2,750,000 settlement payment that defendant received

3   on Client 2's behalf in January 2017; (c) defendant defrauded "Client

4   3" out of Client 3's portion of an approximately $1,600,000

5   settlement payment defendant received on Client 3's behalf in January

6   2018; and (d) defendant defrauded "Client 4" and "Client 5" out of

7   $4,000,000 that defendant received on Client 4's behalf in March

8   2018.  (Indictment ¶ 7.)

9        Defendant used the funds he stole from his legal clients for his

10  own purposes, including to fund his lavish lifestyle; pay for

11  expenses relating to his various businesses, including GBUS; and to

12  make lulling payments to his other victims.  (Id.)  And defendant

13  made a number of false statements during the 2017 EA Bankruptcy

14  proceedings and subsequent judgment debtor proceedings in order to

15  prevent his victim-clients from learning he had stolen their money.

16  (Id. at ¶ 7(k).)

17       Second, between 2015 and 2017, GBUS failed to timely file

18  employment tax returns (IRS Forms 941) and pay approximately

19  $3,207,144 in federal payroll taxes, including approximately

20  $2,390,048 in trust fund taxes, which had been withheld from GBUS

21  employees' paychecks.  (Indictment ¶¶ 9-18.)  Defendant was

22  responsible for GBUS's significant financial and business decisions,

23  including the decision not to pay the payroll and trust fund taxes

24  that GBUS owed to the IRS.  (Id.)  Indeed, defendant repeatedly

25  refused to authorize the required tax payments to the IRS.  (Id.)

26       Third, after the IRS initiated a collection action relating to

27  GBUS's outstanding payroll tax obligations in September 2016, issued

28  an approximately $5,000,000 tax lien against GBUS in July 2017, and

levied multiple GBUS bank accounts, defendant engaged in extensive efforts to evade collection of those payroll taxes and obstruct the IRS collection action.  (Indictment ¶¶ 19-26.)  Among other things, defendant: (a) directed GBUS employees to deposit the cash receipts from Tully's stores into a bank account associated with a different entity; (b) defendant changed the company name, Employer Identification Number, and bank account information associated with GBUS's merchant credit card processing accounts; (c) changed the company name on various contracts with The Boeing Company; and (d) caused significant amounts of GBUS's funds, which could and should have been used to pay GBUS's payroll taxes, to be transferred to other entities defendant controlled, including EA LLP and Avenatti & Associates, APC ("A&A"), and then used the funds for his personal purposes and to make lulling payments to the wire fraud victims named in the indictment.  (Id. at ¶ 26.)

Fourth, defendant filed federal individual income tax returns for the 2009 and 2010 tax years indicating that he owed the IRS a total of approximately $850,438, plus interest and penalties. (Indictment ¶ 27-31.)  Defendant, however, did not pay the IRS the amounts he owed for those tax years.[2]  (Id.)  Defendant then failed to file individual tax returns (IRS Forms 1040) for the 2011 through 2017 tax years. (Id.)  During these tax years, defendant generated and received substantial income (including the money he stole from his victim-clients) and lived lavishly, yet largely failed to pay any federal income tax.

---

[2] The remaining tax due for the 2009 and 2010 tax years was not paid until November 2015, when defendant sold his residence in Laguna Beach, California, upon which there was an IRS tax lien.

Fifth, defendant's law firms, EA LLP and A&A repeatedly failed to meet their tax obligations despite generating substantial revenues. (Indictment ¶¶ 32-41.) EA LLP did not file partnership tax returns (IRS Forms 1065) for the 2013 through 2017 tax years. (Id. at ¶¶ 32-36.) Similarly, A&A did not file corporate tax returns (IRS Forms 1120S) for the 2011 through or 2017 tax years. (Id. at 37-41.)

Sixth, in 2014, defendant obtained three separate loans from The Peoples' Bank, a federally insured bank in Mississippi. (See Indictment ¶¶ 46-47.) In connection with these loans, defendant provided The Peoples Bank with false federal individual income tax returns for the 2011, 2012, and 2013 tax years. (Id.) Defendant, however, never filed individual income tax returns for the 2011, 2012, and 2013 tax years, and did not make any estimated tax payments during the 2012 and 2013 tax years, as claimed on the returns submitted to The Peoples Bank. (Id.) Defendant also knowingly provided The Peoples Bank with altered financial information regarding both EA LLP and GBUS. (Id.; see also CR 195 at 19-20; CR 195-1, Exs. 8-10.) Moreover, defendant committed aggravated identity theft by using his accountant M.H.'s name and preparer tax identification number on the false tax returns he submitted to The Peoples Bank. (Indictment ¶ 49.)

Seventh, in March 2017, defendant, as the managing member of EA LLP, consented to EA LLP being placed in Chapter 11 bankruptcy. From approximately March 2017 through March 2018, defendant failed to report as required, among other information, all revenues of EA LLP and payments and distributions defendant, as an insider, received from EA LLP funds. (Indictment ¶¶ 50-63.) Additionally, between March 2017 and March 2018, defendant defrauded the bankruptcy court,

the Office of the United States Trustee, and the creditors of EA LLP, by concealing bank accounts controlled by EA LLP, the true revenues generated by EA LLP, and the sources of revenue to EA LLP.  (Id.) Among other things, defendant failed to report and concealed EA LLP's receipt of settlement funds relating to Client 3 (Count 35) and the Super Bowl Clients (Counts 33 and 36).  Defendant also used money he stole from Client 4 to make a $1,508,422 settlement payment to the IRS (one of EA LLP's many creditors) as part of a settlement to dismiss the 2017 EA Bankruptcy.  (Indictment ¶ 7(cc)(i)); see also Debtor's Motion for Order Approving Settlement and Dismissing Case, 2017 EA Bankruptcy, Dkt. 343 (C.D. Cal. Jan. 30, 2018).

**B.    The Government's Notice to Defendant**

On February 4, 2020, the government provided written notice that it intended to introduce at trial the evidence described in this motion to defendant.[3]  (André Decl. ¶ 1.)  The government has already produced to defendant the relevant discovery regarding the additional crimes, wrongs, and other acts described in this motion.

**III. LEGAL STANDARDS**

Under Rule 404(b)(1), "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  The Ninth Circuit, however, has held that "Rule 404(b) applies solely to evidence of 'other' acts, not to evidence of the

---

[3]  The government has not moved to admit all of the additional crimes, wrong, and other acts it described in its February 2020 notice.  Rather, this motion focuses on the evidence it is most likely to seek to admit at trial.  Should the government later seek to admit at trial any additional evidence set forth in its prior notice or any subsequent notice, it will notify the defense and the Court prior to seeking to admit such evidence or eliciting any testimony regarding those additional topics from any witnesses.

8

very acts charged as crimes in the indictment." <u>United States v.</u>
<u>Loftis</u>, 843 F.3d 1173, 1176 (9th Cir. 2016).  When an indictment
alleges a general scheme, as is the case here, "evidence of uncharged
transactions is not evidence of 'other' crimes or acts under Rule
404(b), because it is evidence of part of the crime charged in the
indictment--the overall scheme to defraud."  <u>Id.</u>

Additionally, it is well-settled that "evidence should not be
considered 'other crimes' or 'other act' evidence within the meaning
of Rule 404(b) if 'the evidence concerning the "other" act and the
evidence concerning the crime charged are inextricably intertwined.'"
<u>United States v. Dorsey</u>, 677 F.3d 944, 951 (9th Cir. 2012) (quoting
<u>United States v. Soliman</u>, 813 F.2d 277, 279 (9th Cir. 1987)).  The
Ninth Circuit has applied the "inextricably intertwined" doctrine in
two categories of cases: (1) where the other act "constitutes a part
of the transaction that serves as the basis for the criminal charge,"
and (2) where it was necessary to admit the other act evidence "in
order to permit the prosecutor to offer a coherent and comprehensible
story regarding the commission of the crime."  <u>Loftis</u>, 843 F.3d at
1178 (citations omitted); <u>see</u> <u>also</u> <u>United States v. Daly</u>, 974 F.2d
1215, 1217 (9th Cir. 1992) ("evidence concerning other acts that are
inextricably intertwined with the charged acts may be admitted" to
"put [defendant's] illegal conduct into context and to rebut his
[defense].").  Inextricably intertwined evidence is considered
"direct evidence, used to flesh out the circumstances surrounding the
crime with which the defendant has been charged, thereby allowing the

9

jury to make sense of the testimony in its proper context." United States v. Ramirez-Jiminez, 967 F.2d 1321, 1327 (9th Cir. 1992).[4]

Even if the other act evidence is not part of the charged conduct and the inextricably intertwined exception does not apply, other act evidence is still admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). The test for admitting such evidence under Rule 404(b) is whether: (1) it tends to prove a material fact; (2) the prior act is not too remote in time; (3) the evidence is sufficient to support a finding that the defendant committed the act; and (4) where knowledge and intent are at issue, the act is similar to that charged. See United States v. Hanson, 936 F.3d 876, 882 (9th Cir. 2019) (quoting United States v. Tsinnijinnie, 91 F.3d 1285, 1288-89 (9th Cir. 1996)). Crucially, the Ninth Circuit has repeatedly held that "Rule 404(b) 'is a rule of inclusion -- not exclusion.'" United States v. Major, 676 F.3d 803, 808 (9th Cir. 2012) (quoting United States v. Curtin, 489 F.3d 935, 944 (9th Cir. 2007)).

As the Supreme Court explained in Huddleston v. United States, 485 U.S. 681 (1988), "[e]xtrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining the mental state is by drawing inferences from

---

[4] United States v. Williford, 764 F.2d 1493, 1499 (11th Cir. 1985) ("Evidence, not part of the crime charged but pertaining to the chain of events explaining the context, motive and set-up of the crime, is properly admitted if linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury.").

conduct." 485 U.S. at 685; see also Curtin, 489 F.3d at 944 ("Rule 404(b) is a rule of inclusion – not exclusion – which references at least three categories of other 'acts' encompassing the inner workings of the mind: motive, intent, and knowledge."); United States v. Diggs, 649 F.2d 731 (9th Cir. 1981), overruled on other grounds by United States v. McConney, 782 F.2d 1195 (9th Cir. 1984) (en banc) (evidence defendant used a bank to fraudulently obtain money from other persons admissible in prosecution for mail and wire fraud); United States v. Ford, 632 F.2d 1354, 1375 (9th Cir. 1980) (evidence of embezzlement of funds from a trust admissible to prove intent to embezzle funds in a pension credit scheme).  District courts have wide discretion in deciding whether to admit Rule 404(b) evidence.

In addition to satisfying the four-part test under Rule 404(b), evidence of other crimes must also satisfy the Federal Rule of Evidence 403 balancing test -- its probative value must not be substantially outweighed by the danger of unfair prejudice.  United States v. Montgomery, 150 F.3d 983, 1000-01 (9th Cir. 1998).  "Once it has been established that the evidence offered serves one of [the purposes authorized by Rule 404(b)(2)], . . . the only conditions justifying the exclusion of the evidence are those described in Rule 403."  Major, 676 F.3d at 808 (second change and ellipsis in original).  Rule 404(b) evidence "is not rendered inadmissible because it is of a highly prejudicial nature . . . . The best evidence often is."  United States v. Parker, 549 F.2d 1217, 1222 (9th Cir. 1977).  In order for the evidence to be excluded, there must be a showing of unfair prejudice.  United States v. Skillman, 922 F.2d 1370, 1374 (9th Cir. 1990) ("'[U]nfair prejudice' within the meaning of the rule occurs when the evidence has 'an undue tendency

1  to suggest a decision on an improper basis, commonly, though not

2  necessarily, an emotional one.'"); United States v. Bailleaux, 685

3  F.2d 1105, 1111 (9th Cir. 1982) ("All evidence which tends to

4  establish the guilt of a defendant is, in one sense, prejudicial to

5  that defendant, but that does not mean that such evidence should be

6  excluded.").  Moreover, to the extent there is any concern regarding

7  defendant being prejudiced by evidence admitted under Rule 404(b),

8  such prejudice can be ameliorated by limiting instructions that

9  define the limited purposes for which the particular evidence is to

10 be considered.  See United States v. Romero, 282 F.3d 683, 688 n.1

11 (9th Cir. 2002) ("Any possible prejudicial impact of the testimony

12 was lessened by the court's limiting instruction.").

13 **IV.  ARGUMENT**

14      The government seeks to admit evidence at trial demonstrating

15 that defendant engaged in additional criminal conduct and other acts

16 falling into the five general categories described above and below.

17 For each category, the government has set forth below: (1) the

18 additional crimes and other acts the government seeks to admit;

19 (2) the general nature of the evidence establishing that defendant

20 committed the additional crimes and other acts[5]; and (3) the

21 admissibility of the additional crimes and other acts.

22      Rule 403 does not preclude admission of the conduct and other

23 acts described below as the evidence is highly probative of

24

25      [5]  Although all of the evidence referenced herein has been
   produced to defendant, the government has not attached as exhibits to
26 this motion all of the documentary evidence it would seek to admit at
   trial.  To the extent the Court wishes to review any of the other
27 specific evidence relating to defendant's additional crimes and other
   acts referenced herein, the government will gladly submit such
28 evidence to the Court in connection with this motion or in advance of
   trial.

defendant's state of mind, fraudulent intent, knowledge, and motive as to the charges in the indictment, as well as an integral part of defendant's overall pattern of criminal conduct.  The fact that the evidence would help establish defendant's guilt is not the type of "unfair" prejudice that warrants the exclusion of the evidence at trial.  Nor would the other acts evidence confuse or mislead the jury, cause undue delay, or waste time.  Fed. R. Evid. 403.

A. **Defendant's Embezzlement of Settlement Funds from the Super Bowl Clients Falls Squarely within the Charged Conduct and Is Direct Evidence of the Alleged Fraudulent Scheme**

1. Additional Crimes, Wrongs, and Other Acts

At trial, the government will be introducing evidence of defendant and EA LLP's representation of approximately 200 clients (the "Super Bowl Clients") and the negotiated settlement of $1.55 million in connection with litigation against the National Football League (the "NFL"), in Greco et al. v. NFL et al, No. 3:13-cv-01005-M (NDTX) (the "Super Bowl Litigation").  (See CR 78, Ex. 3 at ¶¶ 41-48.)  This evidence falls squarely within the bankruptcy fraud charges in Counts 33 and 36, which allege that defendant failed to disclose his receipt of the settlement proceeds during the 2017 EA Bankruptcy.  (Id.)  The government, however, also seeks to admit evidence demonstrating defendant embezzled a substantial portion of the $1.55 million settlement.

Defendant negotiated the $1.55 million settlement for the Super Bowl Clients in May 2017.  (Id. at ¶¶ 43, 47.)  Shortly thereafter, defendant instructed local counsel in the Super Bowl Litigation to transfer $408,724 of the settlement proceeds to an EA LLP bank account at California Bank & Trust and to separately transfer approximately $952,995 to an attorney client trust account at City

13

National Bank.  (Id.)  Rather than transfer the settlement proceeds to the Super Bowl Clients or maintain the settlement funds in an attorney trust account, defendant transferred a substantial portion of the approximately $1.31 million defendant and his law firm received from the settlement to other bank accounts he controlled, including A&A's bank account, and/or used the funds for his own personal and business purposes.[6]  (Id. at ¶ 45.)  Between July 2017 and October 2018, defendant only paid 31 out of the over 200 individual Super Bowl Clients a total of approximately $145,222. (Id. at ¶ 44.)  Defendant never paid the vast majority of the Super Bowl Clients any of the settlement proceeds and repeatedly refused to authorize EA LLP's office manager ("EA Employee 1") to make payments to other Super Bowl Clients.  (Id. at ¶ 42.)  Indeed defendant failed to even notify many of the Super Bowl Clients that a settlement had been reached in the Super Bowl Litigation.  (See id. at ¶ 46.)

          2.    The Evidence to be Admitted

     The testimonial and documentary evidence proving that defendant stole the Super Bowl Clients' settlement funds, includes, but is not limited to, the following: testimony from EA LLP's former office manager ("EA Employee 1") regarding her discussions with defendant and the Super Bowl Clients; testimony from C.A., who served as local counsel in the Super Bowl Litigation; testimony from other EA LLP attorneys who worked on the Super Bowl Litigation; brief testimony

---

          [6] Only 1 out of the 31 payments to Super Bowl Clients can be traced to the initial settlement payment EA LLP received.  The other 30 payments were made using funds defendant received from other sources.  The government produced to defendant draft summary charts reflecting, among other things, the tracing of the Super Bowl Clients' settlement proceeds in March 2020 and again in May 2020. (See André Decl. Ex. 2.)

from at most two of the Super Bowl Clients[7]; documents regarding the settlement of the Super Bowl Litigation obtained from C.A. and counsel for the NFL; emails, text messages, and other correspondence regarding the settlement of NFL litigation; electronic search warrant evidence; and bank records and summary testimony reflecting that defendant's receipt and use of the settlement funds.

Other than the Super Bowl Clients, all of the witnesses who are expected to testify regarding defendant's embezzlement of the Super Bowl Client's settlement funds are already expected to testify at trial regarding other issues, including as to the wire fraud and bankruptcy fraud charges. Similarly, almost all of the documentary evidence regarding defendant's theft of the NFL settlement funds will be introduced in connection with the false statements defendant made during the 2017 EA Bankruptcy as charged in Counts 33 and 36.

### 3.   Admissibility

Defendant's embezzlement of the Super Bowl Litigation settlement funds in 2017 is admissible for multiple reasons.

First, this criminal conduct falls squarely within the charged scheme to defraud. (Indictment ¶ 6.) The Indictment alleges that between 2015 and 2019, defendant engaged in a scheme to defraud "clients to whom defendant had agreed to provide legal services." (Indictment ¶ 6.) The scheme to defraud was not limited to the specific victim-clients identified in the Indictment. (Indictment ¶ 6.) Thus, evidence that defendant defrauded the Super Bowl Clients

---

[7] The government has not yet determined which of the Super Bowl Clients it will call to testify at trial. The government, however, has already produced reports summarizing interviews with two of the Super Bowl Clients, as well questionnaires numerous other Super Bowl Clients submitted to IRS-CI in connection with this investigation.

in 2017 is admissible as an "uncharged transaction" that is part of the "overall scheme to defraud." Loftis, 843 F.3d at 1176.

Second, defendant's embezzlement of funds from the Super Bowl Clients is inextricably intertwined with and direct evidence of the bankruptcy fraud charges in the indictment. Counts 33 and 36 allege that defendant made false statements regarding EA LLP's receipt of the Super Bowl Litigation settlement funds during the 2017 EA Bankruptcy in order to conceal the receipt of those funds. (Indictment ¶¶ 61, 67.) Evidence of defendant's receipt and use of the Super Bowl settlement funds is therefore both "part of the transaction that serves as the basis for the criminal charge" and "necessary to offer a coherent and comprehensible story regarding the commission of the crime." Loftis, 843 at 1178 (citations omitted).

Third, EA LLP's receipt and defendant's subsequent use of the NFL settlement funds is direct evidence for the willful failure to file tax return charges set forth in Counts 23, 26, and 29 of the Indictment. (Indictment ¶¶ 31, 36, 41.) These charges require the government to prove that defendant and his companies, EA LLP and A&A, had an obligation to file federal tax returns for the 2017 calendar year. (Id.) The fact that EA LLP received over $1.3 million, a substantial portion of which was transferred to A&A and/or used for defendant's own purposes is direct proof of defendant's obligation to file the required tax returns and that defendant acted willfully.

Fourth, even if not directly admissible, evidence of defendant's embezzlement from the Super Bowl Clients is admissible under Rule 404(b) to demonstrate defendant's knowledge, motive, plan, absence of mistake, and lack of accident as to the wire fraud, willful failure to file tax returns, and bankruptcy fraud charges in the indictment.

Defendant's theft of the Super Bowl Clients' settlement funds proves multiple material points or elements of the charged offenses, is not too remote in time to the charged offenses (it occurred during the alleged scheme), is supported by the extensive documentary and testimonial evidence as described above, and is similar to the charged offenses, particularly, the wire fraud charges.  See generally United States v. Vo, 413 F.3d 1010, 1018 (9th Cir. 2005).

**B.   Defendant's Failure to Pay Over to the IRS Payroll Taxes Withheld from EA LLP Employee's Paychecks Is Inextricably Intertwined with the Charges in the Indictment**

1.   Additional Crimes, Wrongs, and Other Acts

At trial, the government intends to introduce evidence that between 2015 and 2017 defendant intentionally failed to pay over to the IRS payroll taxes that had been withheld from EA LLP employees' paychecks, and endeavored to obstruct the IRS collection action relating to EA LLP's payroll taxes.  (See CR 78, Ex. 1 at ¶¶ 49.)

Between 2011 and the first quarter of 2014, EA LLP largely paid its federal tax deposits.  (Id.)  EA LLP also filed its IRS Forms 941 each quarter and IRS Forms 940 each year.  (Id.)  However, in December 2014, EA LLP's payroll processing company, Paychex, discontinued EA LLP's Taxpay services at defendant's request and advised defendant that EA LLP would be responsible for making timely tax deposits and filing tax returns for EA LLP.  (Id. at ¶ 52.)

In April 2015, EA LLP filed its IRS Form 941 for the first quarter of 2015 indicating that EA LLP was required to pay to the IRS $194,545 in payroll taxes.  (Id. at ¶ 49.)  EA LLP, however, did not make the required tax payments to the IRS at that time.  (Id.)

In September 2015, the IRS opened a collection case against EA LLP.  (Id.)  In October 2015, an IRS Revenue Officer ("RO 2") made a

17

field visit to EA LLP's office in Newport Beach, California.  (Id.) RO 2 spoke with defendant and told him that the field call was being made because EA LLP had not made its federal tax deposits.  (Id.)  RO 2 told defendant that EA LLP last filed a payroll tax return for the first quarter of 2015, but that it had not paid to the IRS the $194,545 in payroll taxes that were due.  (Id.)  RO 2 also told defendant that EA LLP had not filed its payroll tax return or paid its federal tax deposits for the second quarter of 2015, and that the payroll tax return and federal tax deposits for the third quarter of 2015 were due that same day.  (Id.)  In response, defendant lied and told RO 2 that he was not aware that the federal tax deposits were not being paid.  (Id.)  When asked who prepared the payroll tax returns and made the federal tax deposits, defendant again lied and told RO 2 that Paychex was responsible for the payroll taxes and that he did not know what was going on.[8]  (Id.)  RO 2 set deadlines for EA LLP to make the outstanding payroll tax payments, file its missing IRS Forms 941, provide certain financial documentation, including bank statements and a balance sheet.  (Id.)  RO 2 also instructed defendant to file any other unfiled tax returns, including his unfiled individual tax returns for the 2011 to 2014 tax years.  (Id.)

Later in October 2015, EA LLP filed its IRS Forms 941 for the second and third quarters of 2015, both of which were signed by defendant.  EA LLP, however, did not make the required payroll tax payments to the IRS associated with these two IRS Forms 941, or produce to the IRS the financial information RO 2 had requested.

---

[8]  Notably, in October 2016, defendant made a nearly identical false statement to a separate IRS Revenue Officer ("RO 1") regarding GBUS's failure to pay its payroll taxes as alleged in Count 19 of the Indictment.  (Indictment ¶ 21.)

1    (Id.)  And between October 2015 and March 2017 when the 2017 EA

2    Bankruptcy began, EA LLP did not make any further payroll tax

3    payments to the IRS or file its required IRS Forms 941.  (Id.)

4    Defendant also continued to obstruct the collection efforts by

5    refusing to provide RO 2 with any further financial information

6    regarding EA LLP.  (Id.)  However, due to the filing of the 2017 EA

7    Bankruptcy in March 2017, RO 2 was required to cease her efforts to

8    collect the outstanding payroll taxes.  (Id.)

9         In total between 2015 and 2017, at the direction of defendant,

10   EA LLP failed to pay over to the IRS approximately $2,389,005,

11   including trust fund taxes of $1,288,277, non-trust fund taxes of

12   $311,673, penalties of $635,631, and interest of $153,424.  (Id.; see

13   André Decl. Ex. 3.)  During this same time period, defendant

14   repeatedly used the payroll taxes that had been withheld from EA LLP

15   employee's paychecks for his own personal and business purposes.

16   (See CR 78, Ex. 1 at ¶¶ 55, 58.)

17        In January 2018, EA LLP agreed to pay the IRS the entire

18   $2,389,005 it owed to the IRS as part of a settlement to have the

19   2017 EA Bankruptcy dismissed.  (André Decl. Ex. 3; see CR 78, Ex. 1

20   at ¶ 50.)  In March 2018, the IRS received the initial payment of

21   $1,508,422 from a trust account for SulmeyerKupetz, which was the law

22   firm representing A&A and defendant individually in the EA

23   Bankruptcy.  (Id.) However, the entire $1,508,422 payment to the IRS

24   came from the $4,000,000 defendant embezzled from Client 4 in March

25   2018.  (Indictment ¶ 7(cc)(i).)  Defendant and EA LLP did not make

26   the remaining settlement payments and still owes the IRS over $1

27   million in unpaid taxes.   (CR 78, Ex. 1 at ¶ 50.)

28

2.   <u>The Evidence to be Admitted</u>

The testimonial and documentary evidence proving that defendant willfully failed to pay over to the IRS payroll taxes withheld from EA LLP employee's paychecks and obstructed the IRS's collection action, includes, but is not limited to, the following: testimony from EA Employee 1 regarding payment of EA LLP's payroll taxes; testimony from IRS RO 2 regarding the IRS's collection action; testimony from defendant's former accountant, M.H., regarding EA LLP's taxes; documentary evidence obtained from M.H.; documents and records from the IRS regarding EA LLP's payroll taxes; documents and records obtained from Paychex and other third-parties; electronic search warrant evidence, including emails involving defendant; and bank records and summary testimony relating to EA LLP's finances and defendant's use of EA LLP funds during the relevant time periods.

All of the witness who would testify regarding defendant's failure to pay EA LLP's payroll taxes are already expected to testify as to other issues during the trial.  At most, the government will need to introduce a relatively small number of additional documents, such as the stipulation defendant signed (André Decl. Ex. 3).

3.   <u>Admissibility</u>

Evidence regarding defendant's failure to pay EA LLP's payroll taxes is admissible for multiple reasons.

<u>First</u>, defendant's actions regarding EA LLP's payroll taxes is direct proof of defendant's knowledge of his obligation to pay GBUS's payroll taxes, as well as his obligation to file his individual tax returns, EA LLP's tax returns, and A&A's tax returns.  Indeed, in October 2015 RO 2 directly discussed those obligations with defendant.  Yet, defendant failed to file the required tax returns

and pay taxes for at least three years <u>after</u> his discussion with RO 2.  Thus, this evidence proves that defendant acted willfully, which is an element of most of the tax charges.

<u>Second</u>, defendant's failure to pay over to the IRS payroll taxes that had been withheld from EA LLP's employees' paychecks is inextricably intertwined with the other tax charges in the Indictment as it is part of the same overall scheme to avoid payment of taxes owed and to obstruct the IRS's collection actions.  For example, defendant's failure to pay EA LLP's payroll taxes between 2015 and 2017 coincides with defendant's failure to pay GBUS's payroll taxes and failure to file tax returns for himself, EA LLP, and A&A during the same time period.  Thus, this evidence is necessary for the government to "offer a coherent and comprehensible story regarding the commission of the crime." <u>Loftis</u>, 843 F.3d at 1178.

<u>Third</u>, this criminal conduct is inextricably intertwined with the wire fraud charges relating to Client 1.  Defendant stole Client 1's portion of a $4,000,000 proceeds in January 2015, and then immediately began using the funds for his own purposes.  By April 2015 defendant had largely depleted all of the money he stole from Client 1.  Having run out of the money that he had stolen from Client 1, defendant then stopped paying EA LLP's payroll taxes and began using those funds for his own personal or business purposes instead.

<u>Fourth</u>, this criminal conduct is inextricably intertwined with the wire fraud charges relating to Client 4 and the bankruptcy fraud charges.  The IRS was one of EA LLP's most significant creditors during the 2017 EA Bankruptcy.  As noted above, defendant used money he stole from Client 4 to repay to the IRS a portion of the unpaid payroll taxes in connection with a settlement agreement regarding the

2017 EA Bankruptcy.  (See Indictment ¶ 7(cc)(i).)  Thus, defendant's failure to pay EA LLP's payroll taxes, the inclusion of this debt in the 2017 EA Bankruptcy, and the settlement with the IRS proves that defendant had the motive and intent to steal Client 4's funds.

Fifth, even if not directly admissible, such evidence is admissible under Rule 404(b) as evidence of knowledge, motive, intent, plan, absence of mistake, or lack of accident.  This fraudulent conduct proves multiple material points or elements of the charged offenses, is not too remote in time to the charged offenses, is supported by extensive documentary and testimonial evidence,[9] and is similar to the charged financial fraud offenses and, particularly, the tax offenses.  See Vo, 413 F.3d at 1018.

### C. Defendant's Failure to Pay State Taxes for GBUS is Inextricably Intertwined with the Tax Charges and Further Proves Defendant's Knowledge, Motive, and Intent

#### 1. Additional Crimes, Wrongs, and Other Acts

The government intends to introduce at trial evidence that defendant and his company, GBUS, failed to pay to the Washington Department of Revenue and other state taxing authorities taxes that were due and owing, including state payroll taxes.  Specifically, just as defendant instructed GBUS employees not to pay over to the IRS the federal payroll taxes withheld from GBUS employees' paychecks, defendant instructed GBUS employees not to make the required state tax payments.  Defendant then engaged in extensive efforts to evade the payment of the tax due and owing to the state

---

[9] Indeed, defendant cannot dispute that EA LLP failed to pay these payroll taxes as he personally signed the stipulation setting forth the unpaid payroll taxes in both his individual capacity and as EA LLP's managing partner.  (André Decl. Ex. 3.)

22

taxing authorities, which had also issued tax liens and attempted to levy GBUS bank accounts.[10]

      2.   The Evidence to be Admitted

      The testimonial and documentary evidence establishing that defendant and his company, GBUS, failed to pay state taxes and then evaded the collection of those taxes is almost entirely coextensive with the evidence that defendant failed to pay over to the IRS GBUS's federal payroll taxes and obstructed the IRS collection case.  This evidence will include, but is not limited to, the following: testimony from numerous GBUS employees; testimony from EA Employee 1; documents obtained from GBUS employees; documents obtained from the Washington Department of Revenue; electronic search warrant evidence, including emails in which defendant refused to authorize payment of the outstanding taxes; and bank records and summary testimony reflecting defendant's use of GBUS funds during the relevant time periods.  Indeed, there are numerous emails in which GBUS employees simultaneously and explicitly advised defendant of GBUS's outstanding federal and state tax debts.  (See, e.g., André Decl. Ex. 4.)

      3.   Admissibility

      Evidence regarding defendant's failure to pay state taxes for GBUS is admissible for multiple reasons.

      First, defendant's failure to pay state taxes is inextricably intertwined with the other tax charges in the indictment because it is part of the same overall scheme to avoid payment of taxes owed to

---

[10] Defendant continued to evade the payment of these state taxes after he was indicted in this case.  (See CR 98.)  The government does not intend to introduce evidence regarding defendant's post-indictment efforts to evade the payment of the state taxes during its case-in-chief, but will seek to cross examine defendant regarding such conduct if he chooses to testify at trial.

the IRS and to obstruct the IRS's collection actions.  Indeed, it would be nearly impossible for the government to present evidence regarding defendant's failure to pay GBUS's federal payroll taxes, without also explaining that GBUS failed to pay its state taxes.

<u>Second</u>, even if not directly admissible, such evidence is admissible under Rule 404(b) as evidence of knowledge, motive, intent, plan, absence of mistake, or lack of accident.  For example, such evidence is obviously relevant to the GBUS-related payroll tax charges and other tax charges in the indictment for the reasons set forth above.  This evidence, however, also demonstrates that defendant and his companies were in significant debt and further establishes defendant's motive to steal from his victim-clients during this same time period.  Indeed, defendant used funds he stole from some of his victim-client to pay for certain GBUS expenses. (Indictment ¶ 7(w).)  Thus, defendant's failure to pay state taxes prove a material point or element, are not too remote in time to the charged offensive, are supported by extensive evidence, and are similar to the charged fraud offenses.  See <u>Vo</u>, 413 F.3d at 1018.

> **D.  Defendant's Additional Fraudulent Conduct in Connection with the 2017 EA Bankruptcy is Direct Evidence of Defendant's Fraudulent Intent and Is Inextricably Intertwined with the Other Charges**

### 1.  <u>Additional Crimes, Wrongs, and Other Acts</u>

Defendant is charged with making numerous false and fraudulent statements during the 2017 EA Bankruptcy.  The government also intends to introduce evidence that defendant engaged in additional fraudulent conduct in connection with the 2017 EA Bankruptcy.

<u>First</u>, in or around February and March 2017, defendant personally arranged for an individual named Gerald Tobin to file an

1   involuntary bankruptcy petition against EA LLP in Florida.  Defendant

2   arranged for Tobin to file the involuntary bankruptcy petition to

3   delay and obstruct litigation involving Jason Frank Law, PLC ("Jason

4   Frank Law"), including to avoid the depositions of defendant, EA

5   Employee 1, and M.H. that were scheduled to take place in early-March

6   2017.  Among other things, defendant had another lawyer with whom

7   defendant worked ("Lawyer 1") fly to Florida to assist Tobin with

8   preparing the involuntary bankruptcy petition, and to provide Tobin

9   with the funds necessary to file the petition.[11]

10      Second, in addition to the specific false statements identified

11  in Counts 33 through 35 of the indictment, defendant made numerous

12  other false statements on documents submitted in connection with the

13  2017 EA Bankruptcy as well as defendant concealed and failed to

14  disclose information regarding EA LLP's assets, disbursements, and

15  bank accounts, including on the Monthly Operating Reports defendant

16  was required to submit.  For example, defendant concealed and failed

17  to disclose the receipt of funds relating to his representation of

18  Clients 4 and 5 in September 2017 (see Indictment ¶ 7(z)), as well as

19  the new attorney trust account he had set up to receive those funds.

20      Third, on or about June 12 and July 14, 2017, defendant

21  testified under oath during two Section 341(a) debtor's examinations

22  in connection with the 2017 EA Bankruptcy.  In addition to the

23  specific false and fraudulent statement alleged in Count 36 of the

24  indictment, defendant made numerous additional false and fraudulent

25

26  ─────────────

27      [11] In or around May 2018, defendant also arranged for Tobin to
    sign a false declaration regarding the filing of EA LLP involuntary
    bankruptcy petition.  (See André Decl. Ex. 1 at 6.)  The government,
28  however, does not currently intend to introduce evidence of this
    additional fraudulent conduct during its case-in-chief.

statements as well as defendant concealed and failed to disclose
material facts during the Section 341(a) debtor examinations.  For
example, during the June 12, 2017, Section 341(a) examination,
defendant falsely testified that Paychex was handling EA LLP's
payroll taxes as of 2015 even though he cancelled that service in
December 2014.  Similarly, during the July 14, 2017, Section 341(a)
examination defendant falsely testified that he "understood" that EA
LLP's 2014 and 2015 tax returns had been filed, even though defendant
knew at the time that EA LLP had not yet filed its 2013, 2014, or
2015 returns.  Indeed, the 2012 Form 1065 EA LLP filed in October
2014 was the last federal tax return EA LLP had filed with the IRS.

Fourth, defendant engaged in fraudulent conduct in order to
ensure that EA LLP could exit the 2017 EA Bankruptcy.  In or around
December 2017, defendant entered into settlement agreement with Jason
Frank Law relating to the 2017 EA Bankruptcy.  (See CR 78, Ex. 4.)
Although the settlement agreement was purportedly signed by
defendant's former partner ("Partner 1"), defendant knew that Partner
1 had never signed the settlement agreement and that the signature
was a forgery.  And when asked whether Partner 1 had signed the
settlement agreement during a judgment debtor examination in July
2018, defendant lied and said "it appears so" even though defendant
knew that Partner 1's signature was a forgery.  Indeed, during a
recorded conversation in October 2018, defendant admitted that he
knew Partner 1 did not sign the settlement agreement.

2.    The Evidence to be Admitted

There is extensive testimonial and documentary evidence
establishing that defendant engaged in additional criminal conduct
described above.  This evidence will include, but is not limited to,

the following: testimony of EA Employee 1 regarding the 2017 EA Bankruptcy; testimony of Lawyer 1 regarding his discussions with defendant and the filing of the involuntary bankruptcy petition; testimony of Partner 1; publicly filed documents from the 2017 EA Bankruptcy; recordings of defendant's testimony during the Section 341(a) debtor's examinations; documentary and electronic evidence provided by Lawyer 1, Partner 1, and other third-parties; electronic search warrant evidence; and bank records and summary testimony.

The evidence to be presented regarding defendant's additional fraudulent conduct is largely coextensive with the evidence the government already plans to present at trial.  All of the witnesses necessary to prove the additional acts described above are already scheduled to testify at trial as to the other charges in the indictment.  And the vast majority of the documentary evidence regarding these additional acts is likely to be admitted in connection with the bankruptcy fraud charges or other charges.

3.   Admissibility

Evidence regarding defendant's other acts in connection with the 2017 EA Bankruptcy is admissible for multiple reasons.

First, defendant's additional fraudulent conduct relating to the 2017 EA Bankruptcy is direct proof of defendant's fraudulent intent. The "intent to deceive any creditor, the trustee, or the bankruptcy judge" is an element of the bankruptcy fraud charges set forth in Counts 33 through 36.  This evidence proves that defendant's intent from the outset of the EA 2017 Bankruptcy and throughout the proceedings was to deceive his creditors, the trustee, and the court.

Second, this additional fraudulent conduct is inextricably intertwined with the bankruptcy fraud charges in the indictment.

Among other things, it is part of the same overall scheme to defraud EA LLP's creditors and others in connection with the 2017 EA Bankruptcy.  Again, the government is entitled to present "a coherent and comprehensible story regarding the commission of the crime." Loftis, 843 F.3d at 1178.  It cannot do so without explaining how and why the 2017 EA Bankruptcy began and providing proper context for defendant's actions throughout the bankruptcy proceedings.

Third, the additional fraudulent conduct is inextricably intertwined with the wire fraud and tax charges.  Although defendant's primary purpose was to defraud his creditors, defendant clearly sought to conceal his wire fraud scheme and tax offenses throughout the 2017 EA Bankruptcy.  This is important and compelling evidence of defendant's knowledge and fraudulent intent, and establishes defendant's consciousness of guilt.

Fourth, such evidence is at a minimum admissible under Rule 404(b) to prove motive, intent, preparation, plan, knowledge, absence of mistake, and lack of accident.  For example, the fact that defendant made false statements about EA LLP's taxes during the Section 341(a) debtor's examination proves that defendant knew that it was illegal for him to have failed to make EA LLP's federal tax payments and file EA LLP's federal partnership tax returns prior to the examination.  Likewise, it proves defendant's knowing and willful conduct regarding his failure to file 2016 and 2017 tax returns for himself, EA LLP, and A&A, all of which were due after the Section 341(a) examination.  Thus, defendant's additional fraudulent conduct during the 2017 EA Bankruptcy proves material points and elements, are not too remote in time to the charged offensive, are supported by

extensive evidence, and are similar to the charged financial fraud offenses.  See Vo, 413 F.3d at 1018.

**E.   Defendant's Numerous False and Perjurious Statements During Judgment Debtor Examinations in 2018 and 2019 are Admissible For Multiple Reasons**

1.   Additional Crimes, Wrongs, and Other Acts

At trial, the government will seek to introduce evidence demonstrating that defendant made numerous false and materially misleading statements under oath during various judgment debtor examinations in 2018 and 2019.[12]  Below are the most relevant examples of defendant's false and perjurious statements from these judgment debtor examinations.[13]

First, during the July 25, 2018, judgment debtor examination conducted in the 2017 EA Bankruptcy, defendant falsely testified that he believed that EA LLP had filed its 2013 to 2016 tax returns. (André Decl. Ex. 5.)  Defendant also claimed to not recall how EA LLP had fallen $2 million behind in its payroll tax obligations.  (Id.) Defendant, however, was well aware that EA LLP had not filed tax returns for any tax years since 2012, and that defendant had

---

[12] Defendant also made a number of specific admissions during these judgment debtor examinations and the Section 341(a) debtor's examination, which the government will seek to admit in its case-in-chief as the statements of a party opponent under Federal Rule of Evidence 801(d)(2).  Those statements are not addressed herein as they are undoubtedly admissible at trial.

[13] The government does not currently intend to introduce evidence in its case-in-chief regarding defendant's false statements during two judgement debtor examinations that took place after defendant was indicted, namely, the October 18, 2019, judgment debtor examination conducted in Jason Frank Law, PLC v. Michael J. Avenatti, Los Angeles Superior Court, Case No. BC706555, and the October 29, 2019, judgment debtor examination conducted in Parrish v. Avenatti, Santa Barbara, Superior Court Case No. 18CV04106.

personally directed that EA LLP's payroll taxes no longer be paid to the IRS.

Second, during the January 30, 2019, judgment debtor examination conducted in Michael Avenatti v. Lisa Storie Avenatti, Orange County Superior Court, Case No. 17D00-99-30, defendant falsely testified that he had most recently filed his individual tax returns, EA LLP's partnership tax returns, and A&A's corporate tax returns for the 2016 tax years.[14]  (André Decl. Ex. 6.)  These statements were false. Defendant last filed an individual tax return (IRS Form 1040) for the 2010 tax year, last filed a partnership return (IRS Form 1065) for EA LLP for the 2012 tax year, and last filed a corporate return (IRS Form 1120S) for A&A for the 2010 tax year.

Third, during the March 15, 2019, judgment debtor examination conducted in Jason Frank Law, PLC v. Michael J. Avenatti, Los Angeles Superior Court, Case No. BC706555, defendant made numerous false statements under oath.  For example, defendant provided false testimony regarding the payment of Client 1's settlement proceeds. (André Decl. Ex. 7.)  When asked whether Client 1 had been paid all the money that he was owed, defendant falsely stated "to the best of my knowledge, yes" (id.), when in truth and in fact Client 1 had not received his settlement proceeds and defendant was still making bi-monthly lulling payments to Client 1.   Similarly, when defendant was asked whether he or his law firms have "any current obligation to

---

[14] The government does not intend to mention during its case-in-chief that this judgment debtor examination related to defendant's divorce proceeding or introduce any specific evidence of his debts to his second-wife, Lisa Storie.  If at any point during the trial the government intends to reference defendant's divorce proceedings or defendant's extensive child and/or spousal support debts it will provide the Court and the defense with advance notice so that defendant has an opportunity to raise any objections.

make payments to [Client 1]," defendant stated "to the best of my knowledge, no" (id.), even though defendant knew neither defendant nor his firm ever paid Client 1 his portion of the 2015 $4 million settlement with the County of Los Angeles.

Defendant also lied about his ownership interest in a separate company called Augustus LLP.  In response to the question, "Who owns Augustus LLP?" defendant answered, "I'm not at liberty to disclose that.  It's not me." (André Decl. Ex. 7.)  Defendant then answered "no" to the question, "do you have any direct or indirect interest in Augustus LLP?" (Id.)  In December 2018, however, defendant established a company called Augustus LLP, and on February 13, 2019, defendant caused business bank accounts at Union Bank to be opened under the name Augustus LLP. (See CR 78, Ex. 3 at ¶ 49.)  The application to open the accounts listed defendant's home address as the mailing address for Augustus LLP and identified defendant as the owner/partner of the business. (Id.)  Defendant used this account to make payroll payments to a number of EA LLP employees, to pay his own rent, and to make further lulling payments in early-2019 to Client 1 and Client 2 as part of the wire fraud charges. (Id.)

Fourth, during the March 22, 2019, judgment debtor examination conducted in In re Eagan Avenatti, LLP, No. 8:18-CV-1644-VAP (KES) (C.D. Cal.), defendant again made numerous false statements under oath. (André Decl. Ex. 8.)  For example, defendant falsely testified that "to best of [defendant's] knowledge" EA LLP had filed federal tax returns for each year since 2013, other than for the 2018 tax year (which had "not been filed yet"), and that copies of the tax returns were "in the files of the firm in storage." (Id.)  Again, defendant knew at the time that this statement was false.

31

Defendant also made additional false statements regarding his victim-clients, including Client 1 and Client 4.  (Id.)  Among other things, defendant falsely claimed that the settlement agreement between Client 1 and Los Angeles County was confidential, that he did not recall settling Client 1's case for $4 million, that he did not recall receiving a $4 million settlement payment from Los Angeles County for Client 1, that he did not recall when the last time he had made a payment to Johnson, and that the bi-monthly payments to Client 1 were "an advance on future settlement monies."  (Id.)  And when asked directly whether he had stolen Client 1's settlement money, defendant lied and said "absolutely not."  (Id.)  All of these statements were knowingly false and designed to conceal defendant's theft of Client 1's money.  (Indictment ¶ 7(f)-(k).)  Indeed, immediately after this judgment debtor examination, defendant travelled to Client 1's residence and told him the settlement agreement with Los Angeles County had just been finalized and that Client 1 would finally be receiving his settlement proceeds.  (Id. at ¶ 7(k).)  Then over the course of the next two days, defendant returned to Client 1's home twice more to have him sign an agreement defendant falsely claimed was necessary to effectuate the settlement agreement and the creation of a Special Needs Trust.  (Id.)

During the examination, defendant testified that it was "absolutely false" that Client 4 had accused defendant of stealing $4 million. (André Decl. Ex. 8.)  However, defendant knew that in August 2018 Client 4's new lawyers has demanded that defendant return the $4 million he had stolen from Client 4.  (Id. Ex. 9.)  Defendant also knew by December 2018 that the Newport Beach Police Department was investigating defendant's theft of Client 4's money.  (Id. Ex. 10.)

1          2.   <u>The Evidence to be Admitted</u>

2          There is extensive documentary and testimonial evidence

3     demonstrating that defendant repeatedly committed perjury during his

4     judgment debtor examinations.   This evidence is almost entirely

5     coextensive with the evidence the government will present at trial

6     regarding the charges in the indictment.   The same evidence the

7     government will introduce to prove that defendant stole Client 1's

8     money or failed to file tax returns, also proves defendant lied under

9     oath.   The only additional evidence to be admitted would be

10    additional portions of defendant's judgment debtor examinations, and

11    potentially a few additional emails or other documents.

12          3.   <u>Admissibility</u>

13          The additional false and perjurious statements described above

14    are admissible for multiple reasons.

15          <u>First</u>, defendant's false statements regarding Client 1 during

16    the March 15, 2019, and March 22, 2019, judgment debtor examination

17    are integral to the wire fraud charges relating to Client 1.   (<u>See</u>

18    Indictment ¶ 7(k).)   As alleged in the indictment and explained

19    above, defendant traveled to Client 1's residence immediately after

20    the March 22, 2019, examination to lull and prevent Client 1 from

21    discovering defendant's embezzlement of Client 1's settlement.   (<u>Id.</u>)

22    Defendant's false and perjurious statements regarding Client 1 are a

23    part of the alleged scheme to defraud Client 1, and constitute direct

24    proof of defendant's knowledge and fraudulent intent.   This evidence

25    is also inextricably intertwined, as it is necessary to tell a

26    complete story of the wire fraud charges.

27          <u>Second</u>, all of defendant's false and perjurious statements are

28    inextricably intertwined with the charges in the indictment because

33

these false statements were part of defendant's overall financial fraud scheme, his scheme to defraud his creditors and victim-clients, and efforts to conceal his extensive fraudulent and illegal conduct.

Third, defendant's false statements are likewise admissible under Rule 404(b) to prove motive, intent, plan, knowledge, absence of mistake, and lack of accident.  For example, defendant false statements regarding the topics identified above prove that defendant knew what he had done was wrong and illegal.  These false statements are particularly relevant to establishing defendant's fraudulent intent and state of mind.  Moreover, defendant's additional false statements are not too remote in time, are supported by extensive evidence, and are similar to the charged financial fraud offenses.

### F.   If Defendant Testifies at Trial, Defendant's Prior Honest Services Fraud and Extortion Convictions Should Be Admitted Under Rule 609

On February 14, 2020, a jury in the SDNY found defendant guilty of honest services wire fraud, in violation of 18 U.S.C. §§ 1343, 1346; transmission of interstate communications with intent to extort, in violation of 18 U.S.C. § 875(d); and attempted extortion, in violation of 18 U.S.C. § 1951.  Verdict, SDNY Extortion Case, Dkt. 265.[15]  If defendant chooses to testify at trial, the government is entitled to introduce evidence of defendant's prior convictions in the SDNY Extortion Case under Federal Rule of Evidence 609.

Under Rule 609(a)(2), evidence of a prior criminal conviction, regardless of punishment, "must be admitted if the court can readily determine that establishing the elements of the crime required proving — or the witness's admitting — a dishonest act or false

---

[15] At defendant's request, the sentencing in the SNDY Extortion Case was recently continued to December 9, 2020.

34

1  statement."  Defendant's prior convictions required proving a

2  dishonest act.  Defendant's honest services wire fraud conviction

3  required the government to prove that the "scheme or artifice to

4  defraud engaged in by [defendant] involved a material

5  misrepresentation, omission, false statement, false pretense, or

6  concealment of fact from or to [defendant's legal client]."  Final

7  Jury Instructions, Avenatti, No. 1:19-cr-373-PGG, Dkt. 261 at 36

8  (S.D.N.Y. Feb. 12, 2020).  Similarly, defendant's extortion

9  conviction required the government to prove defendant acted with the

10 intent to extort money from Nike, i.e., "the intent to obtain money

11 from an entity, with the entity's consent, but where that consent was

12 caused or induced by the wrongful use of fear of harm to the entity's

13 reputation."  Id. at 22.  Thus, defendant's convictions in the SDNY

14 Extortion Case are automatically admissible under Rule 609(a)(2),

15 regardless of their probative value or prejudicial effect.  United

16 States v. Glenn, 667 F.2d 1269, 1272 (9th Cir. 1982) ("Convictions

17 involving 'dishonesty or false statement' within the meaning of rule

18 609(a)(2) are automatically admissible.").[16]

19 **V.   CONCLUSION**

20      For the foregoing reasons, the government respectfully requests

21 that this Court admit at trial evidence of the additional crimes and

22 other acts described herein, and allow the government to admit

23 evidence of defendant's prior convictions should defendant choose to

24 testify in his own defense.

25

26      [16] Defendant's convictions are alternatively admissible under
    Rule 609(a)(1)(B), as evidence of a prior criminal conviction
27  punishable by imprisonment for more than one year, which "must be
    admitted in a criminal case in which the witness is a defendant, if
28  the probative value of the evidence outweighs its prejudicial
    effect."

<u>**DECLARATION OF JULIAN L. ANDRÉ**</u>

I, Julian L. André, declare as follows:

1.    I am an Assistant United States Attorney ("AUSA") in the United States Attorney's Office for the Central District of California (the "USAO").  I, together with AUSA Brett A. Sagel, am assigned to represent the government in the prosecution of defendant MICHAEL JOHN AVENATTI ("defendant") in <u>United States v. Michael John Avenatti</u>, SA CR 19-61-JVS.  I submit this declaration in support of the government's consolidated motion <u>in limine</u> to admit evidence of defendant's other acts, crimes, and wrongs, and to admit evidence of defendant's prior convictions should he testify at trial.

2.    Attached hereto as Exhibit 1 is a true and correct redacted copy of a February 4, 2020, letter to defense counsel providing notice that the government intended to introduce at trial the evidence set forth in the instant motion.  To date, defendant has not responded to this letter.

3.    Attached hereto as Exhibit 2 is a true and correct redacted copy of a draft summary chart the government produced to defendant on May 26, 2020.

4.    Attached hereto as Exhibit 3 is a true and correct copy of a Stipulation Among Debtor, Michael Avenatti, and the United States of America on behalf of the Internal Revenue Service regarding Terms of Payment of Taxes in the Event of Dismissal of Bankruptcy Case, which was publicly filed on January 30, 2018, in <u>In re: Eagan Avenatti LLP</u>, No. 8:17-bk-11961-CB (C.D. Cal.).

5.    Attached hereto as Exhibit 4 is a true and correct redacted copy of an email from defendant to two Global Baristas U.S., LLC, employees dated January 30, 2017.

6.    Attached hereto as Exhibit 5 is a true and correct copy of excerpts of defendant's July 25, 2018, judgment debtor examination conducted in the 2017 EA Bankruptcy, In re: Eagan Avenatti LLP, No. 8:17-bk-11961-CB (C.D. Cal.).

7.    Attached hereto as Exhibit 6 is a true and correct copy of excerpts of defendant's January 30, 2019, judgment debtor examination conducted in Michael Avenatti v. Lisa Storie Avenatti, Orange County Superior Court, Case No. 17D00-99-30.

8.    Attached hereto as Exhibit 7 is a true and correct copy of excerpts of defendant's March 15, 2019, judgment debtor examination conducted in Jason Frank Law, PLC v. Michael J. Avenatti, Los Angeles Superior Court, Case No. BC706555.

9.    Attached hereto as Exhibit 8 is a true and correct redacted copy of excerpts of defendant's March 22, 2019, judgment debtor examination conducted in In re Eagan Avenatti, LLP, No. 8:18-CV-1644-VAP (KES) (C.D. Cal.).

10.   Attached hereto as Exhibit 9 is a true and correct redacted copy of an August 6, 2018, letter from counsel for Client 4 to defendant.

11.   Attached hereto as Exhibit 10 is a true and correct redacted copy of a December 12, 2018, email from Eagan Avenatti LLP's former office manager to defendant.

12.   The government has redacted the names and identifying information of certain victims, witnesses, and other individuals referenced in the exhibits attached to this declaration to protect the individual's privacy rights.  The government, however, has not redacted the name of Client 1, Geoffrey Johnson, because Mr. Johnson

previously authorized the government to refer to him by his name in connection with these proceedings.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and that this declaration is executed at Los Angeles, California, on September 14, 2020.

_____
JULIAN L. ANDRÉ