# EXHIBIT 1



**United States Department of Justice**

**United States Attorney's Office**
**Central District of California**

*Julian L. André*                                    *1100 United States Courthouse*
*Phone:  (213) 894-6683*                              *312 North Spring Street*
*E-mail:  Julian.L.Andre@usdoj.gov*                   *Los Angeles, California  90012*

February 4, 2020

**VIA EMAIL**

H. Dean Steward, Esq.
107 Avenida Miramar, Suite C
San Clemente, California 92672
deansteward7777@gmail.com

Re:     United States v. Avenatti,
        SA CR No. 19-61-JVS

Dear Counsel:

The government hereby provides defendant MICHAEL JOHN AVENATTI ("defendant") with notice that the government may seek to introduce evidence of other crimes, wrongs, or acts defendant committed on the basis that such crimes, wrong, or other acts are part of the charged conduct in the indictment, inextricably intertwined with the charged conduct, or, alternatively, are admissible pursuant to Federal Rules of Evidence 404(b), 608, and/or 609.  Specifically, the government may seek to introduce at trial evidence demonstrating that defendant engaged in the conduct described below:

**Embezzlement of Settlement Funds from the Super Bowl Litigation**

At trial, the government intends to introduce evidence demonstrating that defendant embezzled a portion of a $1.55 million settlement payment meant to benefit legal clients he represented in connection with litigation against the National Football League (the "NFL"), in Greco et al. v. NFL et al, 3:13-cv-01005-M (NDTX).  Specifically, we intend to introduce, among other things, evidence of the following:

- Beginning in or about 2012, defendant and his law firm, Eagan Avenatti LLP ("EA LLP"), represented approximately 200 individuals (the "Super Bowl Clients") in connection with litigation against the NFL relating to the 2011 Super Bowl (the "Super Bowl Litigation").

- In or about May 2017, defendant negotiated a $1.55 million settlement of the Super Bowl Litigation on behalf of the Super Bowl Clients.

- On or about May 15, 2017, defendant instructed local counsel in the Super Bowl Litigation, C.A. to transfer approximately $408,724 of the settlement proceeds be trans erre  to an    A LLP bank account at California Bank & Trust ("CBT") and to separately transfer approximately $952,995 to an attorney client trust account at City National Bank ("CNB").

RE:  United States v. Avenatti
February 4, 2020
Page 2

- Rather than maintain the settlement funds for the benefit of the Super Bowl Clients in an attorney trust account, defendant used a substantial portion of the approximately $1.31 million defendant and his law firm received from the settlement for his own personal and business purposes.[1]

- Between July 2017 and October 2018, defendant caused payments totaling approximately $145,222 to be paid to approximately 31 of the Super Bowl Clients.  The vast majority of these payments were made using funds defendant had received from other sources as opposed to from the settlement proceeds, which defendant had already used for his own personal and professional purposes.

- Defendant never paid the vast majority of the Super Bowl Clients any of the settlement proceeds and repeatedly refused to authorize EA Employee 1 to make payments to the other Super Bowl Clients.  Indeed, defendant failed to notify many of the Super Bowl Clients that a settlement had been reached in the Super Bowl Litigation.

The general nature of the evidence the government will seek to admit regarding defendant's embezzlement of settlement funds from the Super Bowl Clients includes, but is not limited to, the following: testimony from EA Employee 1 testimony from C.A. (local counsel in the Super Bowl Litigation); testimony from other EA LLP attorneys w o wor ed on the Super Bowl Litigation; testimony from at least two of the Super Bowl Clients[2]; documents regarding the settlement of the Super Bowl Litigation obtained from C.A. and counsel for the NFL; emails, text messages, and other correspondence regarding the settlement of NFL litigation obtained from the Super Bowl Clients and other third-parties; and bank records reflecting that defendant and EA LLP received the settlement funds and defendant then used those funds for his own personal and business purposes.

Defendant's embezzlement of settlement funds from the Super Bowl Clients falls squarely within and is inextricably intertwined with the fraudulent scheme charged in the Indictment, which specifically alleges that defendant with engaging in a scheme to defraud victim-clients to whom defendant had agreed to provide legal services.  (Indictment ¶ 6.)  Notably, the alleged scheme to defraud was not limited to the specific victim-clients identified in the Indictment.  (Indictment ¶ 6.)

Additionally, defendant's embezzlement of settlement funds from the Super Bowl Clients is inextricably intertwined with the Counts Thirty-Three and Thirty-Six of the Indictment, which allege that defendant made false statements regarding EA LLP's receipt of the NFL settlement funds during In re: Eagan Avenatti LLP, No. 8:17-bk-11961-CB (C.D. Cal.) (the "2017 EA

---

[1]  A detailed analysis of defendant's use of the settlement proceeds is included in Section IV.D.3 of the affidavit of Special Agent Remoun Karlous submitted in support of the application for a search warrant in case number 8:19-MJ-419.  (USAO_00134424.)

[2]  The government has not yet determined which of the Super Bowl Client it intends to call to testify at trial.  The government, however, has already produced reports summarizing interviews with two of the Super Bowl Clients (USAO_00133552 to USAO_00133555), as well questionnaires numerous other Super Bowl Clients submitted to IRS-CI (USAO_00173639-USAO_00176115).

RE:  United States v. Avenatti
February 4, 2020
Page 3


Bankruptcy") in order to conceal the receipt of these funds from his creditors.  (See Indictment ¶¶ 61, 67.)

Finally, such evidence is admissible under Rule 404(b) to demonstrate knowledge, motive, plan, intent, absence of mistake, and lack of accident.

**Defendant's Failure to Pay Over to the IRS Payroll Taxes Withheld from EA LLP Employee's Paychecks**

At trial, the government intends to introduce evidence that defendant intentionally failed to pay over to the IRS payroll taxes that had been withheld from EA LLP employees' paychecks, and endeavored to obstruct the IRS collection action relating to the unpaid payroll taxes. Specifically, the government may introduce evidence of the following:

- Between 2011 and the first quarter of 2014, EA LLP paid its federal tax deposits, including trust fund tax payments, to the IRS on a regular basis.  During this time period, EA LLP also filed its IRS Forms 941 each quarter and IRS Forms 940 each year.

- On or about December 28, 2014, EA LLP's payroll processing company, Paychex, discontinued EA LLP's Paychex Taxpay services at defendant's request.  Shortly thereafter, Paychex sent defendant a letter advising him that defendant and EA LLP would be responsible for making timely tax deposits and filing tax returns for EA LLP as of December 28, 2014.

- On or about April 30, 2015, EA LLP filed its IRS Form 941 for the first quarter of 2015. The IRS Form 941 indicated that EA LLP was required to pay to the IRS approximately $194,545 in payroll taxes, including approximately $152,562 in trust fund payments. EA LLP, however, did not make the required payroll tax payments to the IRS.

- On September 26, 2015, the IRS opened a collection case against EA LLP based on a federal tax deposit alert ("FTDA").

- On or about October 8, 2015, an IRS Revenue Officer ("RO") made a field visit to EA LLP's office in Newport Beach, California.  The RO spoke with AVENATTI and told him that the field call was being made because EA LLP had not made its federal tax deposits.  The RO asked AVENATTI if EA Employee 1 could attend the meeting because she was the POA on file with IRS for EA LLP and was in the office at that time, but AVENATTI said no.  The RO told AVENATTI that EA LLP last filed a payroll tax return for the first quarter of 2015, but that it had not paid to the IRS the $194,545 in payroll taxes that were due.  The RO also told AVENATTI that EA LLP had not filed its payroll tax return or paid its federal tax deposits for the second quarter of 2015, and that the payroll tax return and federal tax deposits for the third quarter of 2015 were due that same day.  The RO explained that unless there was a reduction in EA LLP's payroll since the first quarter of 2015, EA LLP would likely owe the IRS over $200,000 in payroll taxes for each of these additional quarters as well.  AVENATTI falsely told the RO that he was not aware that the federal tax deposits were not being paid.  When asked who prepared the payroll tax returns and made the federal tax deposits, AVENATTI

RE:  <u>United States v. Avenatti</u>
February 4, 2020
Page 4

said that Paychex was responsible for the payroll taxes.[3]  AVENATTI also said that he was not sure what was going on with the taxes.  The RO set a deadline of October 23, 2015, for EA LLP to make the outstanding payroll tax payments.  The RO also set deadlines for EA LLP to file its missing IRS Forms 940 and provide certain financial documentation, including bank statements and a balance sheet.  Finally, the RO instructed AVENATTI to file any other unfiled tax returns, including his unfiled personal income tax returns for the 2011 to 2014 tax years.

- On October 23, 2015, EA LLP filed its IRS Forms 941 for the second and third quarters of 2015.  Both IRS Forms 941 were signed by AVENATTI.  Although EA LLP filed these two IRS Forms 941 for the second and third quarters of 2015, EA LLP did not make the required outstanding payroll tax payments nor did it produce the required financial information the RO requested.

- On March 14, 2017, the RO filed IRS Form 6020B substitute returns for the fourth quarter of 2015 and the first, second, third, and fourth quarters of 2016.  However, due to the 2017 EA Bankruptcy, the IRS RO's efforts to collect the outstanding payroll taxes largely ceased thereafter.

- In total, at the direction of defendant, EA LLP failed to pay over to the IRS approximately $2,389,005, including trust fund taxes of $1,288,277, non-trust fund taxes of $311,673, penalties of $635,631, and interest of $153,424.

- Defendant repeatedly used the payroll taxes that had been withheld from EA LLP employee's paychecks for his own personal and business purposes.

- In connection with the 2017 EA Bankruptcy, EA LLP agreed to pay the IRS the entire $2,389,005 it owed to the IRS.  On March 26, 2018, the IRS received the initial settlement payment of $1,508,422 from a trust account for SulmeyerKupetz, which was the law firm representing Avenatti & Associates, APC ("A&A"), and defendant in the EA Bankruptcy.[4]  EA LLP and AVENATTI, however, failed to make the remaining payments to the IRS as scheduled.  Defendant still owes the IRS over $1 million in unpaid taxes.

- During all relevant times, defendant was EA LLP's managing partner, owned at least 75% of EA LLP, and had complete control over EA LLP's finances.

The general nature of the evidence the government will seek to admit regarding defendant's failure to pay over to the IRS payroll taxes withheld from EA LLP employee's paychecks includes, but is not limited to, the following: testimony from ███ EA Employee 1 ██, testimony from IRS RO ████████████; testimony from ██████ M.H. ██████ documentary evidence obtained from ████ M.H. ████ documents and records from the IRS; documents and records obtained

---

[3]  AVENATTI made a nearly identical statement to IRS RO ███████ when he was contacted about GBUS failure to pay its payroll taxes one year later on October 7, 2016.

[4]  As alleged in the indictment, this entire $1,508,422 payment to the IRS was derived from the $4,000,000 defendant embezzled from Client 4 in March 2018.  (Indictment ¶ 7(cc)(i).)

RE:  United States v. Avenatti
February 4, 2020
Page 5

from Paychex and other third-parties; and bank records relating to EA LLP and defendant's use of EA LLP funds for his personal and other business purposes.

Evidence of defendant's failure to pay over to the IRS payroll taxes that had been withheld from EA LLP's employees paychecks is inextricably intertwined with the other tax charges contained in the indictment as it is part of the same overall scheme to avoid payment of taxes owed to the IRS and obstruct the IRS's collection actions.  It is also inextricably intertwined with the wire fraud charges relating to Client 4 because defendant used money he stole from Client 4 to repay to the IRS a portion of the unpaid payroll taxes during the 2017 EA Bankruptcy.  Alternatively, such evidence is admissible under Rule 404(b) as evidence of knowledge, motive, intent, plan, absence of mistake, or lack of accident.

**Failure to Pay State Taxes for Global Baristas US, LLC**

The government intends to introduce evidence that beginning as early October 2015 and continuing until at least September 2019 defendant and his company, Global Baristas US LLC ("GBUS") failed to pay to the Washington Department of Revenue and other state taxing authorities taxes that were due and owing, including state payroll taxes.  Specifically, just as defendant instructed GBUS employees not to pay over to the IRS the federal payroll taxes withheld from GBUS employees' paychecks, defendant instructed GBUS employees not to make the required state tax payments.  Defendant then engaged in extensive efforts to evade the payment of the tax due and owing to the state taxing authorities, both prior to and since the indictment.

The general nature of the evidence the government intends to introduce regarding defendant's failure to pay state taxes is coextensive with the evidence relating to Counts Eleven through Nineteen of the Indictment, which is described in detail in the February 2019 and March 2019 affidavits submitted by Special Agent Karlous, and will include, but is not limited to the testimony of GBUS employees; documents obtained from GBUS employees; documents obtained from the Washington Department of Revenue; and bank records.  The evidence regarding defendant's post-indictment efforts to evade collection of these taxes is further described in the government's January 14, 2020, motion to revoke defendant's bond.

Evidence regarding defendant's failure to pay state taxes for GBUS is inextricably intertwined with the other tax charges contained in the indictment as it is part of the same overall scheme to avoid payment of taxes owed to the IRS and to obstruct the IRS's collection actions.  Alternatively, such evidence is admissible under Rule 404(b) as evidence of knowledge, motive, intent, plan, absence of mistake, or lack of accident.

**Fraudulent Conduct Relating to the 2017 EA Bankruptcy**

The government intends to introduce evidence that defendant engaged in additional fraudulent conduct in connection with the 2017 EA Bankruptcy.  Specifically, the government intends to introduce evidence of the following:

- In or around February and March 2017, defendant personally arranged for Gerald Tobin to file an involuntary bankruptcy petition against EA LLP.  Defendant did so for the specific purpose of delaying and obstructing litigation involving Jason Frank Law, PLC

RE:  United States v. Avenatti
February 4, 2020
Page 6

("JFL"), including depositions of defendant, [EA Employee 1], and [M.H.] that
were scheduled to take place in early-March 2017.  Among other things, defendant had
[Lawyer 1] fly to Florida to assist Tobin with the involuntary bankruptcy petition
and to provide Tobin with the funds necessary to file the petition.

- Between May 2017 and February 2018, defendant made false statements on documents
  submitted in connection with the 2017 EA Bankruptcy and concealed and failed to
  disclose information regarding EA LLP's assets, disbursements, and bank accounts in
  connection with the 2017 EA Bankruptcy, including on Monthly Operating Reports.

- On or about June 12, 2017, and July 14, 2017, defendant testified under oath during
  Section 341(a) debtor's examinations in connection with the 2017 EA Bankruptcy.
  During the Section 314(a) debtor's examinations, defendant made numerous false and
  fraudulent statements and concealed and failed to disclose material facts.

- In or around December 2017, defendant entered into settlement agreement with JFL
  relating to the 2017 EA Bankruptcy.  Although the settlement agreement was
  purportedly signed by defendant's former partner, [Partner 1], defendant knew
  that [Partner 1] had never signed the settlement agreement and that the signature was a
  forgery.  When defendant was subsequently asked whether [Partner 1] had signed the
  settlement agreement during a judgment debtor examination in July 2018, defendant lied
  and said "it appears so" even though defendant knew that [Partner 1]'s signature on the
  settlement agreement was a forgery.[5]

- On or about May 27, 2018, defendant flew to Florida to meet with Tobin.  During this
  meeting, defendant arranged for Tobin to sign a declaration regarding the EA LLP
  involuntary bankruptcy petition, which falsely stated the following: "At no time prior to
  the filing of the bankruptcy case against [EA LLP] did anyone associated with the firm
  ask me to file the case nor did I coordinate the filing with anyone associated with the
  firm.  To be clear, no attorney employed by or associated with the firm, including Mr.
  Michael Avenatti, ever asked me to file the case."  The false declaration was backdated
  to make it appear as if it had been executed in July 2017.  Defendant paid Tobin
  approximately $800 to $1,000 to sign the false declaration.  Defendant then emailed a
  copy of the false and fraudulent declaration to a reporter with the Los Angeles Times on
  May 29, 2018.  Additionally, on or about July 9, 2018, a copy of the false declaration
  was attached as an exhibit to a motion for a protective order EA LLP filed in connection
  with the 2017 EA Bankruptcy.

The general nature of the evidence the government will seek to introduce regarding this conduct
is largely coextensive with the evidence to be introduced in connection with the evidence relating
to Counts Thirty-Three to Thirty-Six of the Indictment and includes, but is not limited to,
testimony of [Lawyer 1]; testimony of Gerald Tobin; testimony of [Partner 1];

---

[5] Defendant admitted that [Partner 1]'s signature on the settlement agreement was a forgery
during a recorded conversation between defendant and [Partner 1] on or about October 22, 2018.
(USAO_00173618.)

RE:  United States v. Avenatti
February 4, 2020
Page 7

testimony of [EA Employee 1]; documentary evidence produced by **Partner 1** , [Lawyer 1] [REDACTED] , and other third-parties, and bank records.

The conduct described above is inextricably intertwined with Counts Thirty-Three to Thirty-Six of the indictment, which charge defendant with false declarations and false statements in connection with bankruptcy proceedings.  Among other things, such conduct is part of the same overall scheme to defraud EA LLP's creditors and others in connection with 2017 EA Bankruptcy and is direct evidence of defendant's fraudulent intent, motive, and plan.  Such evidence is also inextricably intertwined with the tax charges relating to defendant, EA LLP, and A&A, as well as the wire fraud charges since much of the fraudulent conduct described above was committed in an effort to conceal defendant's theft of funds from the victim-clients identified in the indictment and the Super Bowl Client.  Alternatively, such evidence, is admissible under Rule 404(b) to prove motive, intent, preparation, plan, knowledge, absence of mistake, and lack of accident.

## Perjury During Judgment Debtor Examinations

The government intends to introduce evidence that defendant repeatedly committed perjury and made material false statements during judgment debtor examinations in both state and federal court.  Specifically, defendant committed perjury and made material false statements during the following judgment debtor examinations:

- July 25, 2018, judgment debtor examination conducted in the 2017 EA Bankruptcy, In re: Eagan Avenatti LLP, No. 8:17-bk-11961-CB (C.D. Cal.).

- January 30, 2019, judgment debtor examination conducted in Michael Avenatti v. Lisa Storie Avenatti, Orange County Superior Court, Case No. 17D00-99-30.

- March 15, 2019, judgment debtor examination conducted in Jason Frank Law, PLC v. Michael J. Avenatti, Los Angeles Superior Court, Case No. BC706555.

- March 22, 2019, judgment debtor examination conducted in In re Eagan Avenatti, LLP, No. 8:18-CV-1644-VAP (KES) (C.D. Cal.)

- October 18, 2019, judgment debtor examination conducted in Jason Frank Law, PLC v. Michael J. Avenatti, Los Angeles Superior Court, Case No. BC706555.

- October 29, 2019, judgment debtor examination conducted in Parrish v. Avenatti, Santa Barbara, Superior Court Case No. 18CV04106.

Many of the specific false statements defendant made during these judgment debtor examinations are set forth in the government's January 14, 2020, motion to revoke defendant's bond.  In addition to those false statements, the government intends to prove that defendant made false statements directly relating to his theft of funds from the wire fraud victims identified in the indictment, as well as the Super Bowl Clients.

The general nature of the evidence the government will introduce to prove that defendant committed perjury during these judgment debtor examinations is largely coextensive with the evidence relating to the other charges contained in the indictment.

Evidence that defendant committed perjury during these judgment debtor examinations is inextricably intertwined with the charges in the indictment because defendant's false statements are direct proof of his intent to defraud and extensive efforts to conceal his criminal conduct.

RE:  United States v. Avenatti
February 4, 2020
Page 8


Alternatively, such evidence is admissible under Rule 404(b) as proof of motive, intent, preparation, plan, knowledge, absence of mistake, and lack of accident.

## Defendant's Ongoing Efforts to Defraud and Conceal His Assets from His Creditors

The government may seek to introduce at trial that defendant engaged in an ongoing scheme to defraud his creditors and conceal his assets between March 2019 and at least September 2019.  A detailed description of defendant's ongoing criminal conduct and the general nature of the evidence the government would seek to introduce at trial is contained in the government's January 14, 2020, motion to revoke defendant's bond.

Evidence of defendant's ongoing fraudulent conduct is inextricably intertwined with the tax charges and bankruptcy charges contained in the indictment as it is part of the same overall fraudulent schemes.  Indeed, as noted in the government's motion, defendant's ongoing conduct is directly related to and a continuation of the criminal conduct alleged in the indictment.

Alternatively, evidence of defendant's ongoing scheme to defraud his creditors is admissible under Rule 404(b) as proof of motive, intent, preparation, plan, absence of mistake, and lack of accident.

## Criminal Conduct Charged in SDNY

If prior to the trial in this case, defendant is convicted in the Southern District of New York in United States v. Avenatti, No. 1:19-CR-373, and/or United States v. Avenatti, No. 1:19-CR-374-DAB, the government may seek to introduce evidence of these convictions pursuant to Rules 404(b), 608, or 609.

## Embezzlement of Funds from Other Legal Clients

The government may seek to introduce evidence that defendant embezzled funds or otherwise attempted to defraud additional legal clients, including W▮▮▮ P▮▮▮, J▮▮▮ N▮▮-H▮▮, A▮▮ R▮▮, and R▮ H▮▮.  Such evidence falls squarely within the fraudulent scheme charged in the Indictment, and is inextricably intertwined with the wire fraud, tax, and bankruptcy fraud charges identified in the Indictment.  Alternatively, such evidence would be admissible under Rule 404(b) as proof of knowledge, motive, plan, intent, absence of mistake, and lack of accident.

* * *

Please note that further details regarding the conduct and evidence described above has already produced to defendant in this case.  As the motions deadline in this case is March 9, 2020, please let us know by February 24, 2020, whether defendant objects to the admission of any of the evidence described above and the basis of any such objection.

Very truly yours,

JULIAN L. ANDRÉ
BRETT A. SAGEL
Assistant United States Attorneys

# EXHIBIT 2

*Confidential*

# Exhibit 5:
## Overview of NFL Clients' Settlement



SUBJECT TO PROTECTIVE ORDER

ANALYSIS GROUP, INC.
USAO_EX_000154

*5/22/2020*                                                                                            *Confidential*

## Exhibit 5A:
## Total Amount Due to NFL Clients as of 5/17/17

| | | |
|---|---|---|
| **Total Settlement Amount Paid 5/17/17** | **$** | **1,550,000** |
| Less: Amount Retained by C.A. Law Office | $ | 188,282 |
| **Total Paid to Eagan Avenatti 5/17/17** | **$** | **1,361,718** |
| Less: Legal Fees | | UNKNOWN |
| Less: Case-Related Expenses (Paid) | $ | 251,076 |
| Less: Case-Related Expenses (Unpaid) | $ | 83,742 |
| **Total Due to Clients as of 5/17/17** | | |

**Notes:**

[1] I understand that C.A. Law Office ("C.A.") as -counsel to EA in the NFL Litigation.

[2] On 5/17/17, the NFL Settlemen w paid to C.A., ich transferred Eagan Avenatti's portion to CNB Trust Ac ount 35 nd EA Ac unt 2851 in two transfers on the same day.

[3] Case-Related Expense are calculat a the sum of amounts incurred through the date that the amo nts we deposited nto CNB Trust Account 3512 and EA Account 2851 by C.A. (5/17 7).

[4] Case-Relat Expenses i lude expense related to Greco et al v. National Football League a excl de those rel d to Simms v. Jones and Ibe v. NFL, which are two other l ations recorded under the same case names in EA Quick ooks.

ources: 1– 66 at 19 and 548; EA QuickBooks.

Analysis Group, Inc.

SUBJECT TO PROTECTIVE ORDER

*Confidential*

**Exhibit 5B:**
**From the First Transfer from** C.A.**, One Client is Paid and the Remaining Funds are Transferred to Avenatti Accounts**



**Notes:**
[1] Prior to the transfer of settlement funds from C.A. on 5/17/17, CN    512 had a bal    e of $0.
[2] By 7/25/17, the balance of CNB 3512 reached $448.
[3] W    D         is a member of the NFL Client class.
[4] Prior to the first transfer from CNB 3512 on 5/17/17, CNB 3504 had a         n    of $6,036. From 5/24 to 6/13/17, CNB 3504 received two additional deposits from Mulholland Escrow ($23,160) and a cash deposit ($8,150).
[5] By 8/16/17, the balance of CNB 3504 reached $10    hout any         fers to N    Clients. CNB 3504 transfers money to NFL Clients after 8/16/17 when the account has received additional funds from other sources.
[6] "Misc. Expenses" comprises bank fees and    h withdrawals.

**Sources:** C.A. - 1–566 at 556; C.A. - 1–566 at 5    USAO_00025488–6    9; USAO_00042621–2714; USAO_00042754–2796.

*Confidential*

**Exhibit 5C:**
**Activities of CNB Trust Account 3512 After Receiving the First Transfer from C.A.**

| Date | Amount | Payee | Payor | Balance | |
|---|---|---|---|---|---|
| Beginning Balance 5/17/17 | | | | $ | - |
| 5/17/2017 | $ | 952,995 - | C.A. Law ffice | $ | 952,995 |
| 5/17/2017 | $ | (15) Bank Fee | - | $ | 952,980 |
| 5/17/2017 | $ | (325,000) CNB 3504 | - | $ | 627,980 |
| 5/18/2017 | $ | (175,000) CNB 3504 | - | $ | 452,980 |
| 5/23/2017 | $ | (140,000) CNB 3504 | - | $ | 312,980 |
| 5/31/2017 | $ | 5 - | Interest | $ | 312,984 |
| 5/31/2017 | $ | (5) Interest | - | $ | 312,980 |
| 6/6/2017 | $ | (150,000) CNB 3504 | - | $ | 162,980 |
| 6/16/2017 | $ | (100,000) CNB 3504 | - | $ | 62,980 |
| 6/23/2017 | $ | (50,000) CNB 3504 | - | $ | 12,980 |
| 6/30/2017 | $ | 3 - | erest | $ | 12,983 |
| 6/30/2017 | $ | (3) Interest | - | $ | 12,980 |
| 7/19/2017 | $ | (7,000) CNB 3504 | - | $ | 5,980 |
| 7/25/2017 | $ | (5,532) W      D | - | $ | 448 |

**Sources:** USAO_00042621–2714; U  AO_0004  754–2796.

ANALYSIS GROUP, INC.

*Confidential*

**Exhibit 5D:**
**The Second Transfer From C.A. is Used For Payroll and Bankruptcy Expenses**



**Notes:**
[1] Prior to the transfer from C.A. on 5/17/17, EA 2851 had a balan     f $(23,172). O     17/17, EA 2851 h  d an additional incoming transfer of $26,000 from A&A 0661 (not shown here).
[2] Prior to the transfer from EA 2851 on 5/17/17, EA 0313 had a balan   f $0. Th    are no a       coming transfers from 5/17/17 to 5/30/17.
[3] From 6/1/17 to 6/13/17  EA 0313 has two incoming transfers totaling $3   3   The funds from these transfers plus the remaining settlement funds are transferred to EA 0339 and EA 0321 on 6/13/17 and
6/14/17. The remaining balance of EA 0313 is $193. EA 0313        fers money   NFL Clients after 6/14/17 when the account has received additional funds from other sources.

**Sources:** USAO_00025488–6089;  USAO_00027   5–7710;  USAO_0002   85–8982;     AO_00029361–9474;  USAO_00029477–9516.

ANALYSIS GROUP, INC.

USAO_EX_000158

5/22/2020                                                                                                    *Confidential*

**Exhibit 5E:**
**Activities of EA Operating Account 2851 After Receiving the Second Transfer from** C.A.

| Date | Amount | Payee | Payor | Balance |
|---|---|---|---|---|
| Beginning Balance 5/17/17 | | | | $ (23,172) |
| 5/17/2017 | $ 26,000 | - | A&A 661 | $ 2,828 |
| 5/17/2017 | $ 408,724 | - | C.A. Law Office | $ 411,552 |
| 5/17/2017 | $ (14) | Bank Fee | | $ 411,538 |
| 5/17/2017 | $ (180) | Bank Fee | - | $ 411,358 |
| 5/17/2017 | $ (2,024) | T    C | - | $ 409,334 |
| 5/17/2017 | $ (32) | S    G | - | $ 409,302 |
| 5/17/2017 | $ (7,561) | A | - | $ 401,740 |
| 5/17/2017 | $ (2,207) | John Hancock | - | $ 399,533 |
| 5/17/2017 | $ (582) | J    R | - | $ 398,951 |
| 5/17/2017 | $ (5,064) | J    R | - | $ 393,887 |
| 5/17/2017 | $ (312) | D    R | - | $ 393,576 |
| 5/17/2017 | $ (256) | The Irvine Company | - | $ 393,320 |
| 5/17/2017 | $ (2,664) | The Irvine Company | - | $ 390,656 |
| 5/17/2017 | $ (109,814) | The Irvine Company | - | $ 280,842 |
| 5/18/2017 | $ (12,072) | Anthem | - | $ 268,769 |
| 5/18/2017 | $ (5,218) | Int'l Church Of T    Foursqua | - | $ 263,551 |
| 5/18/2017 | $ (26,247) | IRS | - | $ 237,304 |
| 5/18/2017 | $ (27,847) | IRS | - | $ 209,457 |
| 5/18/2017 | $ (50) | Pitney Bo   es | - | $ 209,407 |
| 5/18/2017 | $ 421 | P    y Bowe | - | $ 208,985 |
| 5/18/2017 | $ (4,508) | Stapl    Compan | - | $ 204,477 |
| 5/19/2017 | $ (3,955) | Ace Par   ng Management | - | $ 200,522 |
| 5/19/2017 | $ 4,113 | Achma   sa Payment | - | $ 196,409 |
| 5/19/2017 | $ 83) | J | - | $ 196,326 |
| 5/19/2017 | $ (56 | Cox  omm Org Bankdraft | - | $ 195,758 |
| 5/19/2017 | $ (3,952) | x Comm Org Bankdraft | - | $ 191,806 |
| 5/19/2017 | $ (5,917) | Employment Devel Edd | - | $ 185,888 |
| 5/19/2017 | $ (6,233) | Employment Devel Edd | - | $ 179,655 |
| 5/19/2017 | $ (552) | A | - | $ 179,104 |
| 5/19/2017 | $ (4,877) | F    M | - | $ 174,227 |

SUBJECT TO PROTECTIVE ORDER            ANALYSIS GROUP, INC.

USAO_EX_000159

*Confidential*

**Exhibit 5E:**
**Activities of EA Operating Account 2851 After Receiving the Second Transfer from Ayres**

| Date | Amount | Payee | Payor | | Balance |
|---|---|---|---|---|---|
| 5/19/2017 | $ (959) | Martindale LLC | - | $ | 173,267 |
| 5/19/2017 | $ (385) | Pansky Markle Ham LLP | - | $ | 172,882 |
| 5/19/2017 | $ (2,137) | Ricoh USA INC | - | $ | 170,746 |
| 5/19/2017 | $ (606) | Shred It USA | - | $ | 170,139 |
| 5/22/2017 | $ (1,378) | Aderant | - | $ | 168,761 |
| 5/22/2017 | $ (260) | Analysis Service Fee | - | $ | 168,501 |
| 5/22/2017 | $ (90) | Paperstreet Web Design | - | $ | 168,411 |
| 5/23/2017 | $ (333) | Central Communications | - | $ | 168,078 |
| 5/23/2017 | $ (178) | DLX For Business | - | $ | 167,900 |
| 5/23/2017 | $ (6,000) | S███ Q██ | - | $ | 161,900 |
| 5/23/2017 | $ (143,233) | EA 0313 | - | $ | 18,667 |
| 5/23/2017 | $ (11,330) | West Payment Center | - | $ | 7,337 |
| 5/24/2017 | $ (100) | Universal Protection Se██rity Sy███s | - | $ | 7,237 |
| 5/26/2017 | $ (1,874) | K██████ S█████ | - | $ | 5,363 |
| 5/30/2017 | $ (5,363) | EA 0313 | - | $ | 0 |

**Sources:** USAO_00025488–6089; USAO_00027██5–7710.

ANALYSIS GROUP, INC.

SUBJECT TO PROTECTIVE ORDER

USAO_EX_000160

**EXHIBIT 3**

1  Richard M. Pachulski (CA Bar No. 90073)
   Ira D. Kharasch (CA Bar No. 109084)
2  Robert M. Saunders (CA Bar No. 226172)
   PACHULSKI STANG ZIEHL & JONES LLP
3  10100 Santa Monica Blvd., 13th Floor
   Los Angeles, CA  90067
4  Telephone: 310/277-6910
   Facsimile: 310/201-0760
5  E-mail:  rpachulski@pszjlaw.com
            ikharasch@pszjlaw.com
6            rsaunders@pszjlaw.com

7  Attorneys for Eagan Avenatti, LLP,
   Debtor and Debtor in Possession

8
                    UNITED STATES BANKRUPTCY COURT
9
                    CENTRAL DISTRICT OF CALIFORNIA
10
                         SANTA ANA DIVISION
11

12  In re:                              Case No.:  8:17-bk-11961-CB

13  EAGAN AVENATTI, LLP,                Chapter 11

14                    Debtor.           STIPULATION AMONG DEBTOR,
                                        MICHAEL AVENATTI, AND THE UNITED
15                                      STATES OF AMERICA ON BEHALF OF
                                        THE INTERNAL REVENUE SERVICE
16                                      REGARDING TERMS OF PAYMENT OF
                                        TAXES IN THE EVENT OF DISMISSAL
17                                      OF BANKRUPTCY CASE

18

19

20

21        Eagan Avenatti, LLP, the debtor herein (the "Debtor"),  Michael Avenatti ("Avenatti"), and

22  the United States of America (the "United States") on behalf of the Internal Revenue Service (the

23  "IRS") hereby stipulate and agree as follows:

24        WHEREAS, on or about March 1, 2017, an involuntary petition (the "Involuntary Petition")

25  was filed against the Debtor by petitioning creditor Gerald Tobin.  The Involuntary Petition was filed

26  in the Middle District of Florida, and assigned case number 6:17-bk-01329-KSJ.

27        WHEREAS on March 10, 2017, the Debtor filed its answer to the Involuntary Petition and its

28  consent to the order for relief requested therein.

1    WHEREAS on April 13, 2017, the Office of the United States Trustee ("OUST") filed a

2    motion seeking to transfer venue of the bankruptcy to the Central District of California.  An order

3    granting the motion was entered on April 21, 2017.

4    WHEREAS on May 10, 2017, the Clerk for the Central District of California opened a case

5    and assigned case No. 8:17-bk-11878-CB, however the Clerk closed the case on May 11, 2017 with

6    a notation of "duplicate case opened in error."  On May 16, 2017, the Clerk issued a Notice of

7    Transfer of Case (Inter/Intra District Transfer), and assigned new case number 8:17-bk-11961-CB.

8    All further pleadings have been filed under this case number.

9    WHEREAS the United States contends that it is a secured creditor of the Debtor for tax

10   claims for which Notices of Federal Tax Lien (the "Tax Liens") had been filed prior to the entry of

11   the order for relief (the "Order for Relief") in this case in the amount of $677,410.24, which includes

12   penalties and interest to March 1, 2017.

13   WHEREAS, the United States filed a proof of claim for a total amount of $1,440,908.72 on

14   April 7, 2017 (Claim 1-1); a first amended Proof of Claim in the amount of $1,080,617.11 on April

15   28, 2017 (Claim 1-2); a second amended Proof of Claim in the amount of $1,080,617.11, which

16   consisted of a secured claim in the amount of $412,000, a priority tax claim of $525,312.04, and a

17   general unsecured claim of $143,305.07 on May 26, 2017 (Claim 1-3); a third amended Proof of

18   Claim in the amount of $1,080,617.11, which consisted of a secured claim in the amount of

19   $677,410.24, a priority tax claim of $322,395.46, and a general unsecured claim of $80,811.41 on

20   June 12, 2017 (Claim 1-4); a fourth amended Proof of Claim in the amount of  $2,014,145.67, which

21   consisted of a secured claim in the amount of $677,410.24, a priority tax claim of $1,251,295.20,

22   and a general unsecured claim of $85,440.23 on July 19, 2017 (Claim 1-5); and a fifth amended

23   Proof of Claim in the amount of $2,357,201.56, which consisted of a secured claim in the amount of

24   $677,410.24, a priority tax claim of $1,259,354.52, and a general unsecured claim of $420,436.80 on

25   October 10, 2017 (Claim 1-6).

26   WHEREAS the United States contends that Avenatti, as a responsible officer of the Debtor,

27   is liable for certain unpaid "Trust Fund" taxes under Internal Revenue Code section 6672, and

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  pursuant thereto has assessed and/or proposes to assess one or more Trust Fund Recovery Penalty

2  ("TFRP") against Avenatti.

3      WHEREAS the United States contends that as of February 28, 2018 (hereinafter the "Total

4  IRS Claim"), the total principal, penalties, interest that will be owed to the IRS shall be

5  $2,389,004.89, consisting of "Trust Fund" taxes of $1,288,276.63; "Non-Trust Fund" taxes of

6  $311,672.79; penalties of $635,631.58; and interest of $153,424.19.

7      WHEREAS the Debtor has advised the United States that it will file a motion for an order

8  dismissing its bankruptcy case (the "Dismissal Motion").

9      WHEREAS the United States has advised the Debtor that it will consent to the relief sought

10  in the Dismissal Motion only upon the terms and conditions set forth in this Stipulation.

11      Based upon the foregoing Recitals, the United States, the Debtor and Avenatti, hereby agree

12  as follows:

13      1.      This Stipulation is conditioned upon the entry of a final order approving this

14  Stipulation.

15      2.      Avenatti shall deliver the Initial Payment (described below) to Assistant United States

16  Attorney Najah J. Shariff (as further described in paragraph 6 below) on or before the 10th calendar

17  day following the entry of the Order Granting Motion for Order Approving Settlement and

18  Dismissing Case (hereinafter "Settlement and Case Dismissal Order"), and further provided that if

19  the 10th calendar day falls on a weekend or National Holiday, the Initial Payment shall be due on the

20  next calendar day that is neither a weekend or National Holiday (hereinafter, the "Initial Payment

21  Due Date").  The total amount of the Initial Payment is $1,508,422.30, consisting of all of the "Trust

22  Fund" taxes in the amount of $1,288,276.63, and 20% of the "Non-Trust Fund" taxes due as of

23  February 28, 2018, in the amount of $220,145.70.  Once applied by the United States, the Initial

24  Payment shall constitute full satisfaction of (a) all "Trust Fund' taxes owed by the Debtor for the tax

25  periods as set forth in the fifth amended Proof of Claim, Claim 1-6; and (b) all claims held by the

26  United States on behalf of the IRS against Avenatti for TFRPs for the tax periods as set forth in the

27  fifth amended Proof of Claim, Claim 1-6.

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

3.     After receipt of the Initial Payment, the remaining balance due by the Debtor to the United States shall be $880,582.91 (the "Remaining Balance").  Interest shall accrue on the Remaining Balance at the rate determined by applicable nonbankruptcy law pursuant to section 511 of the Bankruptcy Code, the current rate is 4%.

4.     The Debtor has agreed to pay the Remaining Balance within 120 days from the date of the entry of the Settlement and Case Dismissal Order as follows:

(a)     $440,291.45, plus accrued interest at the rate determined by applicable nonbankruptcy law pursuant to section 511 of the Bankruptcy Code, on the 60th day following the date of the entry of the Settlement and Case Dismissal Order; and

(b)     $440,291.45, plus accrued interest at the rate determined by applicable nonbankruptcy law pursuant to section 511 of the Bankruptcy Code, less credit for any adequate protection payments made by the Debtor pursuant to the cash collateral stipulations (the "Cash Collateral Stipulations") in the bankruptcy case that have not been applied as of the date hereof, on the 120th day following the date of the entry of the Settlement and Case Dismissal Order.

5.     If the Initial Payment is not paid, such that it has not been received by counsel for the United States by close of business on the Initial Payment Due Date, then the Settlement and Case Dismissal Order and this Stipulation shall not become effective, and shall be null and void, with each party hereto reserving its/their respective rights.

6.     All payments made pursuant to this Stipulation shall be made to the "United States Treasury", stating in the memo line, the Debtor's name, employer tax identification number, and the case number, and directed to:

> U.S. Attorney's Office, Tax Division
> Attn:  Najah J. Shariff
> 300 N. Los Angeles St, Ste 7516
> Los Angeles, CA 90012

7.     All payments made under this Stipulation shall be deemed paid on the date received.

8.     This Stipulation shall be binding on the Debtor, any committee, any subsequent trustee, Avenatti, the United States, or their successors.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

9.    Any liens held by the United States, including those provided pursuant to the Cash Collateral Stipulations shall continue in full force and effect in the event of a dismissal of the Debtor's bankruptcy case.  Pursuant to the provisions of the Internal Revenue Code § 6325(a)(1), the IRS will issue a certificate of release of any such lien after the entire liability amount assessed, together with any accrued interest, has been fully satisfied pursuant to this Stipulation or has become legally unenforceable.

10.    Notwithstanding the dismissal of the Debtor's bankruptcy case, the Court shall retain jurisdiction for purposes of enforcing this Stipulation.

Dated:    January 30, 2018              EAGAN AVENATTI LLP

                                        By
                                           Michael Avenatti, Managing Partner

Dated:    January 30, 2018

                                        By
                                           Michael Avenatti, in his Individual
                                           Capacity


                                        NICOLA T. HANNA
                                        United States Attorney
                                        THOMAS D. COKER
                                        Assistant United States Attorney
                                        Chief, Tax Division

Dated:  January _____, 2018

                                        NAJAH J. SHARIFF
                                        Assistant United States Attorney
                                        Attorneys for the UNITED STATES OF AMERICA

9.     Any liens held by the United States, including those provided pursuant to the Cash Collateral Stipulations shall continue in full force and effect in the event of a dismissal of the Debtor's bankruptcy case.  Pursuant to the provisions of the Internal Revenue Code § 6325(a)(1), the IRS will issue a certificate of release of any such lien after the entire liability amount assessed, together with any accrued interest, has been fully satisfied pursuant to this Stipulation or has become legally unenforceable.

10.    Notwithstanding the dismissal of the Debtor's bankruptcy case, the Court shall retain jurisdiction for purposes of enforcing this Stipulation.

Dated:    January _____, 2018             EAGAN AVENATTI LLP

By    _____
      Michael Avenatti, Managing Partner

Dated:    January _____, 2018

By    _____
      Michael Avenatti, in his Individual
      Capacity

NICOLA T. HANNA
United States Attorney
THOMAS D. COKER
Assistant United States Attorney
Chief, Tax Division

Dated: January 30, 2018

NAJAH J. SHARIFF
Assistant United States Attorney
Attorneys for the UNITED STATES OF AMERICA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**PROOF OF SERVICE OF DOCUMENT**

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
**10100 Santa Monica Boulevard, 13ᵗʰ Floor, Los Angeles, California 90067**

A true and correct copy of the foregoing document entitled (*specify*): ***STIPULATION AMONG DEBTOR, MICHAEL AVENATTI, AND THE UNITED STATES OF AMERICA ON BEHALF OF THE INTERNAL REVENUE SERVICE REGARDING TERMS OF PAYMENT OF TAXES IN THE EVENT OF DISMISSAL OF BANKRUPTCY CASE*** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **January 30, 2018**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **January 30, 2018**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**VIA OVERNIGHT DELIVERY**
Honorable Catherine E. Bauer
United States Bankruptcy Court
Central District of California
411 West Fourth Street, Suite 5165
Santa Ana, CA 92701-4593

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| January 30, 2018 | Myra Kulick | /s/ Myra Kulick |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012
DOCS_LA:305992.5 20328/001

**F 9013-3.1.PROOF.SERVICE**

## SERVICE LIST

**Eagan Avenatti, LLP**
**Chapter 11 Case No. 8:17-bk-11961-CB**

**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:

- *Mikel R Bistrow     mikel.bistrow@dinsmore.com, caron.burke@dinsmore.com*
- *Peter W Bowie     peter.bowie@dinsmore.com, caron.burke@dinsmore.com*
- *Christopher Celentino     chris.celentino@dinsmore.com, caron.burke@dinsmore.com*
- *Sara Chenetz     schenetz@perkinscoie.com, dlax@perkinscoie.com;cmallahi@perkinscoie.com*
- *David B Golubchik     dbg@lnbyb.com, dbg@ecf.inforuptcy.com*
- *Michael J Hauser     michael.hauser@usdoj.gov*
- *Mark S Horoupian     mhoroupian@sulmeyerlaw.com, ppenn@sulmeyerlaw.com;mhoroupian@ecf.inforuptcy.com;dperez@sulmeyerlaw.com;ppenn@ecf.inforuptcy.com*
- *Sheri Kanesaka     sheri.kanesaka@fnf.com, Christine.hipp@fnf.com*
- *Isaac Marcushamer*
- *Malhar S Pagay     mpagay@pszjlaw.com, mpagay@pszjlaw.com*
- *R Gibson Pagter     gibson@ppilawyers.com, ecf@ppilawyers.com;pagterrr51779@notify.bestcase.com*
- *Misty A Perry Isaacson     misty@ppilawyers.com, ecf@ppilawyers.com;perryisaacsonmr51779@notify.bestcase.com*
- *Thomas J Polis     tom@polis-law.com, paralegal@polis-law.com;r59042@notify.bestcase.com*
- *Robert M Saunders     rsaunders@pszjlaw.com, rsaunders@pszjlaw.com*
- *Najah J Shariff     najah.shariff@usdoj.gov, USACAC.criminal@usdoj.gov*
- *David H Stein     dstein@wilentz.com*
- *Michael K Symons     mike@symonsmarkwith.com, mike@symonsmarkwith.com*
- *United States Trustee (SA)     ustpregion16.sa.ecf@usdoj.gov*

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**

DOCS_LA:305992.5 20328/001

# EXHIBIT 4

Message

| | |
|---|---|
| **From**: | Michael J. Avenatti [mavenatti@eaganavenatti.com] |
| **Sent**: | 1/30/2017 7:52:57 PM |
| **To**: | N▮▮▮▮ E▮▮▮ /O=TULLYS COFFEE/OU=Tullys.com/cn=Recipients/cn=▮▮▮▮▮ ]; V▮▮▮ S▮▮▮ [/O=TULLYS COFFEE/OU=Tullys.com/cn=Recipients/cn=▮▮▮▮▮ ] |
| **Subject**: | RE: Q4 Tax filing Review |

We are handling. Thanks.

Michael J. Avenatti, Esq.
Eagan Avenatti, LLP
520 Newport Center Drive, Ste. 1400
Newport Beach, CA 92660
Tel: (949) 706-7000
Fax: (949) 706-7050
Cell: (949) 887-4118
mavenatti@eaganavenatti.com

The preceding email message (including any attachments) contains information that may be confidential, protected by the attorney-client or other applicable privileges, or constitutes non-public information. It is intended to be conveyed only to the designated recipient(s). If you are not an intended recipient of this message, please notify the sender by replying to this message and then delete it from your system. Use, dissemination, or reproduction of this message by unintended recipients is not authorized and may be unlawful.

**From:** M▮▮▮ E▮▮▮ [ME▮▮▮@globalbaristas.com]
**Sent:** Monday, January 30, 2017 11:51 AM
**To:** Michael J. Avenatti; V▮▮▮ S▮▮▮
**Subject:** Q4 Tax filing Review

Hi Michael,

See below for following information on Q4 tax filing.

USAO_00222855

| Vendor | Quarter | Amount | Due Date | Notes | Column1 |
|---|---|---|---|---|---|
| Dept of Labor and Industries WA | 2015 Q2 | $ 62,134.83 | ASAP | *Includes Penalties/interest | **Filed |
| Dept of Labor and Industries WA | 2015 Q4 | $ 55,007.72 | ASAP | *Includes Penalties/interest | **Filed |
| Dept of Labor and Industries WA | 2016 Q1 | $ 57,828.76 | ASAP | *Includes Penalties/interest | **Filed |
| Dept of Labor and Industries WA | 2016 Q2 | $ 48,918.97 | ASAP | *Includes Penalties/interest | **Filed |
| Dept of Labor and Industries WA | 2016 Q3 | $ 43,759.36 | ASAP | *Includes Penalties/interest | **Filed |
| Dept of Labor and Industries WA | 2016 Q4 | $ 36,843.11 | ASAP | | |
| | | | | | |
| Total Due for Dept of L & I | | $ 304,492.75 | | | |
| | | | | | |
| Employment Security Department WA | 2015 Q4 | $ 21,330.16 | ASAP | *Include Penalties/interest | **Filed |
| Employment Security Department WA | 2016 Q1 | $ 13,234.28 | ASAP | *Include Penalties/interest | **Filed |
| Employment Security Department WA | 2016 Q2 | $ 11,793.88 | ASAP | *Include Penalties/interest | **Filed |
| Employment Security Department WA | 2016 Q3 | $ 9,189.65 | ASAP | *Include Penalties/interest | **Filed |
| Employment Security Department WA | 2016 Q4 | $ 6,925.35 | ASAP | | **Filed |
| | | | | | |
| TOTAL Due for ESD | | $ 55,547.97 | | | |
| | | | | | |
| EDD Employment Development CA | 2016 Q3 | $ 6,792.79 | ASAP | *Include Penalties/interest | **Filed |
| EDD Employment Development CA | 2016 Q4 | $ 6,269.61 | ASAP | | **Filed |
| | | | | | |
| Total Due for EDD | | $ 13,062.40 | | | |
| | | | | | |
| IRS(Federal Payroll Taxes) | 2015 Q4 | $ 466,214.84 | ASAP | | **Not filed |
| IRS(Federal Payroll Taxes) | 2016 Q1 | $ 554,098.07 | ASAP | | **Not filed |
| IRS(Federal Payroll Taxes) | 2016 Q2 | $ 437,344.61 | ASAP | | **Not Filed |
| IRS(Federal Payroll Taxes) | 2016 Q3 | $ 487,296.40 | ASAP | | **Not Filed |
| IR(Federal Payroll Taxes | 2016 Q4 | $ 405,439.50 | ASAP | | **Not Filed |
| IRS(FUTA Unemployment Tax) | 2015 | $ 8,896.45 | ASAP | | **Not filed |
| IRS(FUTA Unemployment Tax) | 2016 | $ 21,689.49 | ASAP | | **Not filed |
| Total due IRS | | $ 2,380,979.36 | | | |
| | | | | | |
| Grand Total | | $ 2,754,082.48 | | | |

**M___ E___** | HR Director
**Tully's Coffee** | Global Baristas US, LLC

2003 Western Ave, Suite 660| Seattle, WA 98121
T: 206.557.3459 | F: 206.770.6417
M___@globalbaristas.com| www.TullysCoffeeShops.com

# EXHIBIT 5

In the Matter of: July 25, 2018

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA


IN RE:

    EAGAN AVENATTI, LLP,        CASE NUMBER
                             8:17-bk-11961-CB

        Debtor,

_____


EXAMINATION OF MICHAEL AVENATTI

July 25, 2018

11:00 a.m.


411 West Fourth Street

Courtroom 5D Conference Room

Santa Ana, California


REPORTED BY:

Lynette Milakovich

CSR No. 5098

USAO_00162685

July 25, 2018

```
 1    APPEARANCES:

 2    For Debtor Eagan Avenatti, LLP:
          RAINES FELDMAN, LLP
 3        BY:  JOHN S. CHA
                   and
 4            HAMID R. RAFATJOO
              Attorney at Law
 5        1800 Avenue of the Stars
          12th Floor
 6        Los Angeles, CA  90067
          (310)440-4100
 7        Jcha@raineslaw.com

 8    For the Judgment Creditor Jason Frank Law:
          WEINTRAUB & SELTH
 9        BY:  JAMES R. SELTH
              Attorney at Law
10        11766 Wilshire Boulevard
          Suite 1170
11        Los Angeles, CA  90025
          (310)207-1494
12        Jim@wsrlaw.net
                   and
13        PERKINS COIE
          BY:  SARA L. CHENETZ
14            Attorney at Law
          1888 Century Park East
15        Suite 1700
          Los Angeles, CA  90067-1721
16        (310)788-3218
          Schenetz@perkinscoie.com
17
      For the U.S. Department of Justice:
18        UNITED STATES ATTORNEY'S OFFICE
          BY:  NAJAH J. SHARIFF
19            Assistant United States Attorney
          300 North Los Angeles Street
20        Suite 7211
          Los Angeles, CA  90012
21        (213)894-2534
          Najah.shariff@usdoj.gov
22    Also Present:
          JASON M. FRANK
23        Judgment Creditor

24

25
```

USAO_00162686

July 25, 2018

```
 1    judgment is bogus.
 2          Q    Have you filed an appeal of the judgment?
 3          A    Do you want to argue with me, or do you want
 4    to ask me questions?
 5          Q    It's a yes or no question.
 6               Have you filed an appeal?
 7          MR. CHA:  When you are referring to "you," you are
 8    referring to EA, not Mr. Avenatti?
 9          MR. SELTH:  Yes.  I know it's easy to make that
10    mistake.  When I mean him personally, I will say, "You
11    personally."
12          MR. CHA:  Correct.
13          MR. SELTH:  If I say, "You," I am not meaning you
14    personally.
15          MR. CHA:  Very good.  Thank you.
16          Q    (BY MR. SELTH:)  Has EA filed tax returns
17    for 2017?
18          A    No.
19          Q    Has EA filed tax returns for 2016?
20          A    I believe so.
21          Q    Who would know for certain?
22          A    I don't understand the question.
23          Q    You said you believe so?
24          A    That's my answer.  I believe so.
25          Q    You don't know to a certainty?
```

USAO_00162695

Michael Avenatti
July 25, 2018

```
 1        A    That's the best answer I can give.

 2        Q    Thank you.

 3             How about 2015?  Have you filed tax

 4   returns for 2015?

 5        A    Same answer.

 6        Q    Which is?

 7        A    I believe so.

 8        Q    What about 2014?

 9        A    Same answer.

10        Q    What about 2013?

11        A    Same answer.

12        Q    Would those returns -- when were those returns

13   filed?

14        A    I don't know.

15        Q    Who would know that?

16        A    I would have to look at the returns.  I don't

17   recall exactly when they were filed.

18        Q    Do you have those returns?

19        A    Do I have them with me today?  No.

20        Q    Are you in possession of them at your office?

21        A    I believe we have them, yes.

22        Q    Do you recall that one of the issues in the

23   arbitration with Jason Frank Law was the production of

24   EA tax returns?

25        A    Are you here to ask me about the arbitration,
```

USAO_00162696

```
 1          Q   (BY MR. SELTH:)  My question is:  How did the
 2     EA come to fall behind on its payroll tax?
 3          A   I don't remember.
 4          Q   Really?
 5              Did you pay 2,000,000 dollars to the
 6     IRS as part of the dismissal of the bankruptcy case?
 7          A   You want to ask me questions or argue with me?
 8          MR. CHA:  That's argumentative.
 9          Q   (BY MR. SELTH:)  Why did you pay 2,000,000
10     dollars if you didn't owe it?
11          MR. CHA:  Jim, that's argumentative.  I am going
12     to instruct him not to answer.  You can mark that one,
13     too.
14          Q   (BY MR. SELTH:)  The question is:  How did
15     EA fall behind on the payroll tax?  You don't remember?
16          A   I don't recall.
17          Q   You are saying that with a straight face.
18          MR. CHA:  Wait a second, Jim.
19          MR. SELTH:  Mr. Cha.
20          MR. CHA:  Jim.
21          MR. SELTH:  It's one thing for him to say he
22     doesn't recall his precise payment in 2013.
23          MR. CHA:  May I finish?
24          MR. SELTH:  Yes.
25          MR. CHA:  I will give you as much latitude as
```

USAO_00162714

# EXHIBIT 6



COURT REPORTING

REGAL

BIG ENOUGH TO DELIVER
SMALL ENOUGH TO CARE

In the Matter Of:

Michael Avenatti

vs

Lisa Storie-Avenatti

## J.D.E - MICHAEL AVENATTI Vol I

January 30, 2019

Case No: 17D00-99-30

CERTIFIED COPY

USAO_00454907

Michael Avenatti vs Lisa Storie-Avenatti
J.D.E - Michael Avenatti on 01/30/2019

1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                   FOR THE COUNTY OF ORANGE

3

4    In re the Marriage of          )   Case No.: 17D00-99-30
                                     )
5    Petitioner:  MICHAEL AVENATTI   )
                                     )
6    and                             )
                                     )
7    Respondent:  LISA STORIE-AVENATTI )
     _____)

8

9

10

11

12            JUDGMENT DEBTOR EXAMINATION OF:

13              MICHAEL AVENATTI, VOLUME I

14                  JANUARY 30, 2019

15

16

17

18

19

20

21   Reported by:
     Miranda J. Gentry          CERTIFIED COPY
22   CSR No. 14165

23

24

25



USAO_00454908

Michael Avenatti vs Lisa Storie-Avenatti
J.D.E - Michael Avenatti on 01/30/2019

```
 1            SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2                    FOR THE COUNTY OF ORANGE

 3

 4   In re the Marriage of       )  Case No.: 17D00-99-30
                                  )
 5   Petitioner:  MICHAEL AVENATTI )
                                  )
 6   and                          )
                                  )
 7   Respondent:  LISA STORIE-AVENATTI )
     ─────────────────────────────── )

 8

 9

10

11

12

13

14

15       The Judgment Debtor Examination of MICHAEL AVENATTI,

16   taken on behalf of the Judgment Creditor, before Miranda

17   Gentry, Certified Shorthand Reporter, for the State of

18   California, commencing at 1:17 p.m., Wednesday,

19   January 30, 2019, at 19762 MacArthur Boulevard, Suite 200,

20   Irvine, California.

21

22

23

24

25
                                                          2
```



USAO_00454909

Michael Avenatti vs Lisa Storie-Avenatti
J.D.E - Michael Avenatti on 01/30/2019

```
 1    APPEARANCES:

 2

 3        For Petitioner:

 4            STEGMEIER, GELBART, SCHWARTZ & BENAVENTE, LLP
              By:  SAUL GELBART
 5            19762 MacArthur Boulevard, Suite 200
              Irvine, California 92612
 6            (949) 337-4050
              sgelbart@sgsblaw.com
 7

 8        For Respondent:

 9            PRESCOTT & PRESCOTT
              By:  MATTHEW S. DEARMEY
10            950 West Seventeenth Street, Suite A
              Santa Ana, California 92706
11            (714) 558-7744
              matt@dearmeylaw.com
12

13

14        Also Present:

15            Lisa Storie-Avenatti

16            Rod Collins

17

18

19

20

21

22

23

24

25
```

3



USAO_00454910

Michael Avenatti vs Lisa Storie-Avenatti
J.D.E - Michael Avenatti on 01/30/2019

1      Q    Where is it?

2      A    It would be with the same files where the files

3   relating to the enterprise are located, to the best of my

4   knowledge.

5      Q    Who are the other partners besides you, yourself,

6   and Avenatti & Associates?

7      A    There are no other partners.

8      Q    So Eagan Avenatti is 100 percent owned by Michael

9   Avenatti, an individual, and Avenatti & Associates?

10     A    I think that's correct.

11     Q    When was the most recent time you saw the

12   partnership agreement?

13     A    I don't recall.

14     Q    Do you receive a K-1 from the partnership?

15     A    Yes.

16     Q    Who is the tax preparer for the K-1?

17     A    The last tax preparer that the company -- or that

18   the partnership had was Marjorie Hendricks.

19     Q    Where is she employed?

20     A    I don't remember the name of the firm.

21     Q    She's a CPA?

22     A    Yes.

23     Q    With respect to Ms. Hendricks, did she prepare

24   your personal returns as well as the returns of the Eagan

25   Avenatti partnership?

14

REGAL

USAO_00454921

Michael Avenatti vs Lisa Storie-Avenatti
J.D.E - Michael Avenatti on 01/30/2019

```
1        A   I believe so.
2        Q   Did she also prepare the returns for Avenatti &
3   Associates?
4        A   I don't remember.  She may have.
5        Q   Can you spell Ms. Hendricks' name for us?
6        A   I don't recall how to spell it.  I think it's
7   -i-c-k-s, but it may be -i-x.
8        Q   Would that be Hendricks Company on San Vicente
9   Boulevard in Los Angeles?
10       A   She's operated at two different firms, so I'm not
11  certain which firm she's presently with.
12       Q   When was the most recent year you filed personal
13  tax returns?
14       A   '16.
15       Q   When was the most recent time Avenatti &
16  Associates filed returns?
17       A   I believe the same.
18       Q   And Eagan Avenatti, when did they most recently
19  file?
20       A   I believe the same.
21       Q   Are you in possession of copies of those returns?
22       A   No.
23       Q   Who would have possession of those returns?
24       A   I imagine Ms. Hendricks.
25       Q   Is she the one who prepared those returns?
```

15



USAO_00454922

Michael Avenatti vs Lisa Storie-Avenatti
J.D.E - Michael Avenatti on 01/30/2019

1      A    I've already answered that.

2      Q    Is that yes?

3      A    No.   The answer is I've already answered that.

4      MR. GELBART:   Excuse me for a second.

5      THE WITNESS:   To the best of my knowledge.

6   BY MR. DEARMEY:

7      Q    Sir, with respect to our list there, Item

8   Number 2, does it exist?

9      A    It exists, but I don't have actual shares.

10     Q    Okay.   Is that investment in your name or somebody

11  else's name?

12     A    I don't recall.

13     Q    So for the record, we're talking about the hundred

14  percent of the shares owned by you in Seek Thermal, Inc.,

15  formerly Tyrian, T-y-r-i-a-n, Systems, Inc.

16         At the time you made the investment, was it in

17  Tyrian Systems?

18     A    I think so.

19     Q    With respect to Seek Thermal, were you notified of

20  the change of name?

21     A    I became aware of the change.   I don't know if I

22  was notified or not.

23     Q    How did you become aware?

24     A    I don't remember.

25     Q    With respect to the investment, do you know what

16

REGAL

USAO_00454923

# EXHIBIT 7

JUDGMENT DEBTOR EXAMINATION, MARCH 15, 2019

```
 1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2               COUNTY OF LOS ANGELES - CENTRAL DISTRICT

 3    DEPT 44   JUDGE:  EDWARD B. MORETON, JR.

 4      JASON FRANK LAW PLC,          )
        Professional law corporation, )
 5                                     )
                             Plaintiff )
 6                                     )
            Vs.                        ) Case No: BC706555
 7                                     )
        MICHAEL J. AVENATTI,           )
 8      An individual,                 )
                                       )
 9                          Defendant. )
        _____)
10

11

12

13                  JUDGMENT DEBTOR EXAMINATION,

14      taken on behalf of the Applicant, at the Stanley Mosk

15      Courthouse, 111 North Hill Street, Los Angeles,

16      California, 90012, in Department 44, commencing at 11:57

17      a.m., Friday, March 15, 2019, before Winifred

18      McCray-Moody, C.S.R. No. 12747, (Morning Session), and

19      Ann Bonnette, C.S.R. No. 6108, (Afternoon Session).

20

21

22

23

24

25
```

USAO_00059429

```
 1     APPEARANCES:

 2     For the Applicant:

 3     LAW OFFICES OF FRANK SIMS & STOLPER, LLP

 4     BY:  ANDREW D. STOPLER, ESQ.

 5     19800 MacArthur Boulevard

 6     Suite 855

 7     Irvine, CA 92612

 8     (949) 201-2400

 9     astolper@lawfss.com

10

11     For the Defendant:

12     LAW OFFICES OF SHULMAN HODGES & BASTIAN, LLP

13     BY:  RONALD S. HODGES, ESQ.

14     100 Spectrum Center Drive

15     Suite 600

16     Irvine, CA 92618

17     (949) 340-3400

18     rhodges@shbllp.com

19

20

21

22

23

24

25
```

USAO_00059430

JUDGMENT DEBTOR EXAMINATION, MARCH 15, 2019

```
 1                    AFTERNOON SESSION

 2                        1:10 P.M.

 3            (THEREUPON, REPORTER WINIFRED MCCRAY-MOODY

 4             WAS REPLACED BY REPORTER ANN BONNETTE.)

 5                   EXAMINATION (RESUMED)

 6   BY MR. STOLPER:

 7        Q    MR. AVENATTI, WE'RE BACK ON THE RECORD.

 8             YOU UNDERSTAND YOU ARE STILL UNDER OATH?

 9        A    YES, SIR.

10        Q    ARE YOU A CITIZEN OF ANY COUNTRY OTHER THAN THE

11   UNITED STATES?

12        A    ITALY.

13        Q    HOW LONG HAVE YOU BEEN AN ITALIAN CITIZEN?

14        A    I DON'T REMEMBER.

15        Q    WHEN DID YOU APPLY FOR THE ITALIAN PASSPORT?

16        A    I DON'T REMEMBER.

17        Q    WHEN YOU WERE A CHILD?

18        A    NO.  I WASN'T A CHILD.

19        Q    WERE YOU AN ADULT WHEN YOU APPLIED FOR THE

20   ITALIAN PASSPORT?

21        A    YES.

22        Q    WAS IT IN THE LAST FIVE YEARS?

23        A    I DON'T REMEMBER.

24        Q    ISN'T IT TRUE YOU HAD A DOCUMENT NOTARIZED IN

25   2015 AS PART OF YOUR APPLICATION FOR ITALIAN CITIZENSHIP?
```

USAO_00059168

```
 1   PERFORMED?

 2       A    SOME LEGAL WORK, SOME POLITICAL WORK, SOME OTHER

 3   WORK.

 4       Q    HOW LONG HAS MS. SCOTT WORKED FOR YOU DIRECTLY

 5   OR INDIRECTLY?

 6       A    I DON'T KNOW.  EIGHTEEN MONTHS, MAYBE.

 7       Q    WHAT IS MS. SCOTT'S ROLE IN DESERT HARVEST, IF

 8   ANY?

 9       A    NONE.

10       Q    TO YOUR KNOWLEDGE, DOES MS. SCOTT HAVE ANY

11   DIRECT OR INDIRECT INTEREST IN DESERT HARVEST?

12       A    SHE HAS NONE.

13       Q    AS I UNDERSTAND IT, YOUR WORK FOR DESERT HARVEST

14   WAS THAT OF AN ATTORNEY?  IS THAT YOUR TESTIMONY?

15       A    ATTORNEY AND ADVISOR.

16       Q    ATTORNEY AND ADVISOR.

17            BEYOND BEING AN ATTORNEY AND ADVISOR, DID YOU

18   RECEIVE ANY EQUITY INTEREST IN DESERT HARVEST, IN ANY WAY,

19   SHAPE, OR FORM?

20       A    NO.

21       Q    WHAT IS AUGUSTUS LLP?

22       A    IT'S A LIMITED LIABILITY PARTNER.

23       Q    WHO OWNS AUGUSTUS LLP?

24       A    I'M NOT AT LIBERTY TO DISCLOSE THAT.  IT'S NOT

25   ME.
```

1    Q    DO YOU HAVE ANY DIRECT OR INDIRECT INTEREST IN

2  AUGUSTUS, LLP.

3    A    NO.

4    Q    WHY ARE YOU NOT AT LIBERTY TO DISCLOSE WHO OWNS

5  IT?

6    A    BECAUSE IT WAS ESTABLISHED FOR A CLIENT.

7    Q    WHEN WAS IT ESTABLISHED?

8    A    I DON'T REMEMBER.

9    Q    WAS IT ESTABLISHED BY YOU INDIVIDUALLY OR BY ONE

10  OF YOUR LAW FIRMS FOR A CLIENT?

11    A    I DON'T REMEMBER.

12    Q    TO YOUR KNOWLEDGE, DOES AUGUSTUS LLP HAVE ANY

13  ASSETS?

14          MR. HODGES:  OBJECT TO THE EXTENT THAT CALLS FOR

15  ATTORNEY-CLIENT PRIVILEGE.

16          YOU CAN ANSWER THAT "YES" OR "NO" AS TO WHETHER

17  YOU KNOW.

18          THE WITNESS:  I DON'T KNOW HOW I WOULD ANSWER

19  THAT WITHOUT RELYING ON THE INFORMATION FROM MY CLIENT.

20  BY MR. STOLPER:

21    Q    WHETHER OR NOT AUGUSTUS HAS ASSETS IS

22  ATTORNEY-CLIENT PRIVILEGE?

23          MR. HODGES:  OF COURSE.

24          THE WITNESS:  SURE.

25

USAO_00059191

JUDGMENT DEBTOR EXAMINATION, MARCH 15, 2019

```
1       A    YES.

2       Q    FOR WHAT?

3       A    TO DO SOME CONTRACTING.

4       Q    WHERE?

5       A    ON MY RESIDENCE AND, I THINK, THE OFFICE.

6       Q    WAS VINCENT --

7       A    BUT I MAY BE WRONG ABOUT THAT.

8       Q    YOU THINK THEY DID WORK FOR THE OFFICE?

9       A    SIR --

10      Q    SO --

11      A    -- YOU KEEP DOING THIS.

12      Q    WHAT WORK DID THEY DO FOR THE OFFICE?

13      A    I DON'T RECALL EXACTLY WHAT THEY DID.

14      Q    WERE THEY AN APPROVED CONTRACTOR BY THE IRVINE

15  COMPANY?

16      A    I HAVE NO IDEA.  YOU HAVE TO TALK TO THE IRVINE

17  COMPANY.

18      Q    WERE THEY A CLIENT OF EAGAN AVENATTI?

19      A    I DON'T BELIEVE SO.

20      Q    LET'S TALK FOR A COUPLE MINUTES ABOUT

21  JEFFREY JOHNSON.  WHO IS MR. JOHNSON?

22      A    CLIENT OF THE FIRM.

23      Q    IS THE FIRM MAKING A STRUCTURED PAYOUT TO

24  MR. JOHNSON?

25      A    NO.
```

USAO_00059224

1        Q    DID THE FIRM SETTLE A CASE ON BEHALF OF

2   MR. JOHNSON?

3        A    YES.

4        Q    AND AFTER THE FIRM SETTLED THAT CASE ON BEHALF

5   OF MR. JOHNSON, DID THE FIRM DISPERSE TO MR. JOHNSON THE

6   MONEY THAT HE WAS DUE?

7             MR. HODGES:  OBJECT.  THAT'S ATTORNEY-CLIENT

8   PRIVILEGE.

9             MR. STOLPER:  IT'S NOT.

10            MR. HODGES:  WELL, OKAY.  I SAY IT IS; YOU SAY

11  IT'S NOT.  THAT DOESN'T MEAN IT'S NOT.

12            THE WITNESS:  YEAH.  I'M NOT GOING TO ANSWER

13  THAT QUESTION BASED ON THE ATTORNEY-CLIENT PRIVILEGE.

14  BY MR. STOLPER:

15       Q    YOU ARE NOT GOING TO ANSWER WHETHER THE FIRM

16  PAID THE MONEY MR. JOHNSON WAS DUE BASED UPON -- I WANT TO

17  MAKE SURE THE RECORD IS CLEAR --

18       A    NO.

19       Q    -- BECAUSE I'M GOING TO ASK FOR A RULING ON

20  THIS --

21       A    NO, NO.

22            SIR, HERE IS THE BOTTOM LINE.  I'M NOT GOING TO

23  BE ANSWERING QUESTIONS ABOUT COMMUNICATIONS AND

24  TRANSACTIONS BETWEEN ME AND MY CLIENT THAT ARE PRIVILEGED.

25  THAT'S PRIVILEGED.

USAO_00059225

JUDGMENT DEBTOR EXAMINATION, MARCH 15, 2019

```
 1    BY MR. STOLPER:

 2        Q    DOES MR. --

 3        A    AND YOU ARE ALSO TALKING ABOUT SOMETHING THAT

 4    TOOK PLACE A LONG TIME AGO, MANY, MANY YEARS AGO.

 5        Q    SO THERE'S NO REASON --

 6        A    LET'S SEE THE JUDGE.

 7        Q    THAT'S FINE.  YOU'VE ALREADY ASKED FOR THE

 8    JUDGE.  HE'LL COME OUT WHEN HE COMES OUT.

 9    BY MR. STOLPER:

10        Q    SO THERE IS NO REASON FOR YOU TO BE PAYING MR.

11    JOHNSON ON AN ONGOING BASIS?

12        A    I'M NOT ANSWERING --

13    BY MR. STOLPER:

14        Q    WELL, WHEN DID YOUR REPRESENTATION OF --

15             MR. HODGES:  COUNSEL, I WANT TO CONFER WITH MY

16    CLIENT.

17             MR. STOLPER:  SURE.

18             (JUDGE TAKES THE BENCH.)

19             THE CLERK:  DEPARTMENT 44 IS ONCE AGAIN IN

20    SESSION.

21             THE COURT:  OKAY.  SO I HAVE ONCE AGAIN REJOINED

22    THE PARTIES AND COUNSEL AS THEY CONDUCT THEIR EXAMINATION

23    OF MR. AVENATTI, AND EVERYONE IS PRESENT.

24             AND WHAT CAN I HELP YOU WITH?

25             MR. HODGES:  I THINK THIS ONE IS ON ME, BECAUSE
```

USAO_00059226

1   THE FIRST QUESTION THAT WAS POSED THAT I ADVISED MR.

2   AVENATTI NOT TO ANSWER WAS A QUESTION BY COUNSEL ASKING

3   FOR THE SPECIFIC SALARY OF A NAMED INDIVIDUAL OF THE FIRM.

4   AND I ASSERTED --

5           THE COURT:  AND THAT FIRM IS WHAT?

6           MR. HODGES:  I THINK THE QUESTION WAS AVENATTI &

7   ASSOCIATES OR EAGAN AVENATTI, BUT REGARDLESS, THAT YOUNG

8   LADY, OR HOWEVER OLD SHE MAY BE, THAT LADY'S SALARY IS HER

9   ABSOLUTE RIGHT TO PRIVACY.  THERE IS NO BUSINESS, NO

10  RELEVANCY FOR THAT INFORMATION COMING OUT IN THIS PUBLIC

11  PROCEEDING.  THAT'S NOTHING TO DO WITH WHATSOEVER, THEIR

12  ABILITY TO QUESTION.

13          IF THEY WANT TO KNOW THE TOTAL AMOUNT THAT THIS

14  PARTICULAR ENTITY PAYS SALARIES, WHICH IS WHAT YOUR HONOR

15  HAS ALREADY INDICATED IS PROPER FODDER FOR THE

16  QUESTIONING, THAT IS ONE THING.  BUT TO START IDENTIFYING

17  INDIVIDUALS AND HOW MUCH THEY EARN HAS NO BEARING

18  WHATSOEVER ON THIS PROCEEDING.

19          THE COURT:  WHAT IS THE RELEVANCE?

20          MR. STOLPER:  I GOT -- ACTUALLY, YOUR HONOR, I

21  ULTIMATELY ASKED THE QUESTION HOW MUCH WAS PAID IN SALARY.

22  I GOT WHAT I WANTED SO I'M HAPPY TO LET THAT QUESTION GO.

23          THE COURT:  OKAY.

24          MR. STOLPER:  MOVE ON TO SOMETHING ELSE.

25          MR. HODGES:  SECOND ISSUE WAS?

JUDGMENT DEBTOR EXAMINATION, MARCH 15, 2019

1         I'M SORRY.  YOU WANT --

2         MR. STOLPER:  SURE.  SO I ASKED MR. AVENATTI A

3    QUESTION ABOUT WHETHER OR NOT A CLIENT HAD BEEN FULLY PAID

4    THE AMOUNT OF MONEY HE WAS DUE, THE LAW FIRM.  I'M

5    EXPLORING, OBVIOUSLY, WHETHER THERE ARE OTHER --

6         THE COURT:  WHETHER A CLIENT HAD PAID THE LAW

7    FIRM?

8         MR. STOLPER:  THE OPPOSITE.  WHETHER THE LAW

9    FIRM HAD PAID THE MONEY THE CLIENT IS DUE --

10        THE COURT:  FROM THE CLIENT TRUST?

11        MR. STOLPER:  FOR A SETTLEMENT, YES.

12        AND MR. AVENATTI ASSERTED AN OBJECTION TO THAT

13   AND SOMEHOW ATTORNEY-CLIENT PRIVILEGE.  I'M NOT SEEKING

14   COMMUNICATIONS.  I DIDN'T EVEN ASK HOW MUCH IT WAS.  I

15   SIMPLY ASKED -- I AM TRYING TO FIGURE OUT IF THERE IS

16   ANOTHER CREDITOR OUT THERE WE ARE GOING TO HAVE TO DEAL

17   WITH.  AND SO PART OF THE QUESTION IS DOES THE -- IS MR.

18   AVENATTI GOING TO HAVE ESSENTIALLY A PROBLEM WITH THIS

19   PARTICULAR CLIENT.

20        SO MY QUESTION IS HAS THAT PERSON BEEN GIVEN THE

21   MONEY THEY WERE DUE?

22        MR. HODGES:  IT'S ATTORNEY-CLIENT PRIVILEGE.  HE

23   IS SPECIFICALLY ASKING MR. AVENATTI FOR COMMUNICATIONS AND

24   THE SUBSTANCE OF COMMUNICATIONS BETWEEN HIM AND HIS

25   CLIENTS, NUMBER ONE.

JUDGMENT DEBTOR EXAMINATION, MARCH 15, 2019

1      NUMBER TWO --

2           THE COURT:  OKAY  I OVERRULED THAT.  IT IS A

3   "YES" OR "NO" QUESTION AS TO WHETHER OR NOT HE HAS BEEN

4   PAID ALL THE MONEY THAT HE WAS OWED.  IT'S OVERRULED.

5           SO GO AHEAD AND ANSWER IT.

6           THE WITNESS:  TO THE BEST OF MY KNOWLEDGE, YES.

7           THE COURT:  NEXT.

8           MR. HODGES:  THAT'S ALL I HAVE.

9           THE COURT:  OKAY.

10          THE WITNESS:  SO WAIT A MINUTE.  NO MORE

11  QUESTIONS ABOUT MR. JOHNSON?

12          MR. STOLPER:  NO.  I HAVE MORE QUESTIONS ABOUT

13  MR. JOHNSON.

14          THE WITNESS:  WELL, THEN WE WANT --

15  BY MR. STOLPER

16          MR. STOLPER:  I AM GOING TO DO MY BEST NOT TO --

17          THE WITNESS:  NO.

18          MR. STOLPER:  -- INVADE ATTORNEY-CLIENT --

19          THE WITNESS:  THEN I WANT HIS HONOR ON THE

20  BENCH.

21          YOUR HONOR, THESE QUESTIONS DELVE INTO -- THIS

22  IS A CURRENT CLIENT OF MINE AND A CURRENT CLIENT OF THE

23  FIRM.  AND THEY ARE TALKING ABOUT A TRANSACTION THAT TOOK

24  PLACE A NUMBER OF YEARS AGO.  THIS HAS NOTHING TO DO WITH

25  MY ASSETS AND LIABILITIES, ME PERSONALLY.  THIS IS MICHAEL

USAO_00059229

```
 1   AVENATTI --

 2            THE COURT:  ALL DEPENDS UPON WHAT THE QUESTION

 3   IS.

 4            THE WITNESS:  I UNDERSTAND THAT.  THAT'S WHY I

 5   WANT YOU HERE, BECAUSE THIS IS IMPROPER.  AND THEY ARE

 6   GOING TO DELVE INTO ATTORNEY-CLIENT PRIVILEGE INFORMATION

 7   NOW, AND THIS IS -- WE ARE SO FAR AFIELD, AND I WOULD LIKE

 8   YOUR HONOR ON THE BENCH.

 9            THE COURT:  WELL, THAT DOESN'T NECESSARILY MEAN

10   I WILL BE ON THE BENCH.

11            THE WITNESS:  I AGREE.  I AGREE.

12            THE COURT:  TELL ME GENERALLY WHAT YOU ARE GOING

13   TO INQUIRE INTO WITH RESPECT TO THIS.

14            MR. STOLPER:  I AM GOING TO ASK IF MR. AVENATTI

15   PERSONALLY OR HIS FIRM HAS ANY FUTURE OBLIGATIONS TO MAKE

16   PAYMENTS TO MR. JOHNSON.

17            THE COURT:  AND HOW MANY QUESTIONS DO YOU PLAN

18   TO ASK?

19            THE WITNESS:  THAT'S ONE QUESTION.

20            MR. STOLPER:  THE ANSWER IS IT DEPENDS HOW MANY

21   ANSWERS AS I GO, YOUR HONOR.  BUT I INTEND TO ASK THAT

22   QUESTION --

23            THE COURT:  ASK THE QUESTION.

24   BY MR. STOLPER:

25      Q    SURE.
```

1        MR. AVENATTI, DO YOU OR YOUR LAW FIRMS HAVE ANY

2   CURRENT OBLIGATION TO MAKE PAYMENTS TO MR. JOHNSON?

3        A    TO THE BEST OF MY KNOWLEDGE, NO.

4        Q    MY NEXT QUESTION IS, WHEN DID THOSE OBLIGATIONS

5   TO PAY TO MR. JOHNSON CEASE?

6        MR. HODGES:  FOUNDATION.  SPECULATION WITH

7   RESPECT TO WHETHER OR NOT ANY CEASE OR CONTINUE TO EXIST

8   BECAUSE --

9        THE COURT:  WELL, I HAVEN'T BEEN HERE FOR THE

10  WHOLE EXAMINATION, BUT IT SOUNDS LIKE IT PROBABLY ASSUMES

11  FACTS.

12       MR. STOLPER:  SURE.  I CAN LAY A FOUNDATION,

13  YOUR HONOR.

14  BY MR. AVENATTI:

15       Q    MR. AVENATTI, HAS YOUR LAW FIRM BEEN MAKING

16  PERIODIC PAYMENTS TO JEFFREY JOHNSON THROUGH AT LEAST

17  2018?

18       A    I THINK SO, YES.

19       Q    WHEN DID YOUR OBLIGATION TO MAKE PAYMENTS TO

20  MR. JOHNSON CEASE, IF THEY HAVE CEASED?

21       A    I DON'T RECALL.

22       Q    OKAY.  DO YOU RECALL WHAT THE NATURE OF THE --

23  WHAT THE NATURE OF THE SETTLEMENT WAS WHEREBY YOU WERE

24  MAKING PAYMENTS?

25       A    I DON'T.

USAO_00059231

1        THE COURT:  DOES THAT COVER IT?

2        MR. STOLPER:  COUPLE MORE QUESTIONS.

3   BY MR. STOLPER:

4      Q    WHY THE PAYMENTS TO MR. JOHNSON BEING MADE OUT

5   OF -- SOMETIMES OUT OF AN IOLTA ACCOUNT AND SOMETIMES OUT

6   OF AN OPERATING ACCOUNT?

7        MR. HODGES:  FOUNDATION.  COMPOUND.

8        THE COURT:  SUSTAINED.

9   BY MR. STOLPER:

10     Q    ARE THE PAYMENTS TO MR. JOHNSON SOMETIMES BEING

11  MADE OUT OF AN IOLTA ACCOUNT?

12     A    I DON'T RECALL.

13     Q    ARE YOU IN A POSITION TO DENY THAT THAT IS WHAT

14  IS GOING ON?

15       MR. HODGES:  ARGUMENTATIVE.

16       THE COURT:  WELL, SUSTAINED.

17  BY MR. STOLPER:

18     Q    I AM LOOKING AT THE EAGAN AVENATTI OPERATING

19  ACCOUNT.  I SEE A PAYMENT TO MR. JOHNSON DATED 12-13-2017,

20  JANUARY 5TH, 2018, JANUARY 11, 2018, AND IT APPEARS TO BE

21  ONE PAYMENT PER MONTH TO THE TUNE OF $1900.

22       IS THAT THE AMOUNT OF MONEY THAT EAGAN AVENATTI

23  OR YOUR OTHER LAW FIRMS ARE OBLIGATED TO PAY MR. JOHNSON

24  AS PART OF HIS SETTLEMENT?

25       MR. HODGES:  FIRST LAY A FOUNDATION AS TO

USAO_00059232

1    WHATEVER DOCUMENT IS BEING REFERRED TO.

2             THE WITNESS:  ISN'T THAT PRIVILEGED?

3             THE COURT:  HOLD ON A SECOND.

4             MR. HODGES:  THE PREMISE OF THE QUESTION WAS --

5             THE COURT:  I THINK IT -- I THINK IT ASSUMES

6    FACTS.  SUSTAINED.

7             MR. STOLPER:  WELL, IF --

8             THE COURT:  THE QUESTION THAT HE'S OBLIGATED TO

9    PAY A CERTAIN AMOUNT --

10   BY MR. STOLPER:

11       Q    MR. AVENATTI, YOUR LAW FIRM WAS PAYING

12   MR. JOHNSON $1900 A MONTH; CORRECT?

13       A    I DON'T KNOW WHETHER THAT'S TRUE OR NOT.

14            MR. STOLPER:  I HAVE THE BANK RECORDS THAT SHOW

15   THAT, YOUR HONOR.

16            MR. HODGES:  ARGUMENTATIVE.

17            MR. STOLPER:  I UNDERSTAND HE --

18            THE COURT:  HE ANSWERED THE QUESTION.  HE

19   PROVIDED AN ANSWER.

20            SO WHAT IS YOUR NEXT QUESTION?

21   BY MR. STOLPER:

22       Q    DO YOU HAVE ANY RECOLLECTION AS TO WHAT THE

23   AMOUNT OF MONEY THE LAW FIRM WAS OBLIGATED TO PAY

24   MR. JOHNSON AS PART OF THE SETTLEMENT?

25            THE COURT:  OKAY.  I ALREADY SUSTAINED AN

USAO_00059233

```
 1   OBJECTION TO THAT QUESTION.

 2           MR. HODGES:  THANK YOU.

 3           MR. STOLPER:  GIVE ME ONE MINUTE, YOUR HONOR, TO

 4   GO TRUE MY BRAIN.

 5   BY MR. STOLPER:

 6      Q    DO YOU HAVE ANY INTENTION TO CONTINUE MAKING

 7   PAYMENTS TO MR. JOHNSON GOING FORWARD?

 8      A    I DON'T KNOW.  I HAVEN'T THOUGHT ABOUT IT.

 9      Q    DO YOU HAVE ANY UNDERSTANDING AS TO WHETHER OR

10   NOT PAYMENTS TO MR. JOHNSON WERE BEING PAID BY DIFFERENT

11   LAW FIRMS YOU WERE AFFILIATED WITH?

12           MR. HODGES:  PRIVILEGE AND WORK PRODUCT.  THIS

13   WAS IN THE CONTEXT OF REPRESENTATION.  HE SHOULD NOT BE

14   ANSWERING THAT QUESTION.

15           THE COURT:  CAN YOU READ BACK THE QUESTION.

16           (THE QUESTION WAS READ.)

17           MR. HODGES:  CALLS FOR HIS THOUGHTS,

18   IMPRESSIONS, AND CONCLUSIONS, YOUR HONOR, IN THE CONTEXT

19   OF REPRESENTATION.  PER SE WORK PRODUCT.

20           THE COURT:  OVERRULED.

21           YOU MAY ANSWER.

22           THE WITNESS:  I HAVE NO IDEA.

23   BY MR. STOLPER:

24      Q    WAS MR. JOHNSON REPRESENTED BY DIFFERENT LAW

25   FIRMS, OR WAS HE REPRESENTED BY ONE OF YOUR LAW FIRMS, IF
```

USAO_00059234

```
 1   YOU RECALL?

 2        A    I DON'T RECALL ONE WAY OR THE OTHER.

 3             MR. STOLPER:  I HAVE NOTHING FURTHER ON

 4   MR. JOHNSON AT THIS POINT, YOUR HONOR.

 5             THE COURT:  OKAY.  WE ARE GOING TO BE -- I AM

 6   GOING TO BE RECESSING THIS EXAMINATION AT 3:00; SO PLAN

 7   ACCORDINGLY.

 8             MR. STOLPER:  YES, YOUR HONOR.

 9             MR. HODGES:  I'M SORRY, YOUR HONOR.  DID YOU SAY

10   AT 3:00?

11             THE COURT:  AT 3:00.

12             MR. HODGES:  THANK YOU VERY MUCH.

13             THE WITNESS:  RAISE ONE ISSUE.

14             THE COURT:  OKAY.

15             THE WITNESS:  I APPRECIATE IT.  IF I AM GOING TO

16   BE ASKED OTHER QUESTIONS ABOUT OTHER CLIENTS ALONG THESE

17   LINES, I WOULD LIKE YOUR HONOR -- AND I KNOW YOUR HONOR IS

18   VERY BUSY, AND I'M VERY APPRECIATIVE OF YOUR TIME.

19             BUT I WOULD LIKE YOUR HONOR ON THE BENCH SO THAT

20   WE CAN BE EFFICIENT ON THIS BECAUSE I HAVE A FEELING THAT

21   I KNOW WHERE THIS IS GOING, AND IT IS GOING TO BE MORE OF

22   THE SAME.  AND IT RAISES SERIOUS PRIVILEGE ISSUES FOR ME

23   SO --

24             THE COURT:  WELL, I THINK THAT PERHAPS IS

25   UNDERSTANDABLE.  I MEAN, IF IT'S A TOUCHY ISSUE AND I'M
```

USAO_00059235

# EXHIBIT 8

1        UNITED STATES BANKRUPTCY COURT

2        CENTRAL DISTRICT OF CALIFORNIA

3            SANTA ANA DIVISION

4

5   IN RE:                    )
                              )
6                             )
    EAGAN AVENATTI, LLP,      )   No. 8:17-bk-11961-CB
7                             )
            Debtor.           )
8                             )
    _____)
9

10

11

12

13      DEBTOR EXAMINATION OF MICHAEL AVENATTI

14            PAGES 1 - 245

15   (PAGES 133 THROUGH 155 AND PAGES 174 THROUGH 190

16    WERE MARKED CONFIDENTIAL AND BOUND SEPARATELY)

17         TUESDAY, MARCH 22, 2019

18         LOS ANGELES,  CALIFORNIA

19

20

21

22

23

24
         Reported by Serena Wong
25       CSR #10250, RPR, CCRR #200

1

USAO_00059873

```
 1              UNITED STATES BANKRUPTCY COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3                   SANTA ANA DIVISION

 4

 5   IN RE:                    )
                               )
 6                             )
     EAGAN AVENATTI, LLP,      )   No. 8:17-bk-11961-CB
 7                             )
             Debtor.           )
 8                             )
     _____)
 9

10

11

12

13

14

15           THE DEPOSITION OF MICHAEL AVENATTI,

16   taken at 345 350 W. 1st Street, Los Angeles,

17   California, on Friday, March 22,  2019, before

18   Serena Wong, CSR #10250, RPR, CCRR #200, Certified

19   Shorthand Reporter, in and for the State of

20   California.

21

22

23

24

25
```

USAO_00059874

```
 1    APPEARANCES:

 2
      For the Debtor:
 3
            SHULMAN, HODGES & BASTIAN
 4          BY:  RONALD S. HODGES, ESQ.
            100 Spectrum Center Drive
 5          Suite 600
            Los Angeles, California  92618
 6          949.340.3400
            rhodges@shbllp.com
 7
      Fo the Claimant:
 8
            FRANK, SIMS, STOLPER
 9          BY:  ANDREW D. STOLPER, ESQ.
                 JASON FRANK, ESQ.
10          19800 MacArthur Parkway
            Suite 855
11          Irvine, California  92612
            949.201.2400
12          astolper@lawfss.com

13    For the Receiver:

14          LANDAU, GOTTFRIED & BERGER, LLP
            BY:  JOHN P. REITMAN, ESQ.
15          1801 Century Park East
            Suite 700
16          Los Angeles, California 90067
            310.557.0056
17          jreitman@lgbfirm.com

18

19

20

21

22

23

24

25
```

3

USAO_00059875

1              FRIDAY, MARCH 22, 219

2              LOS ANGELES, CALIFORNIA

3

4              MICHAEL M. AVENATTI,

5    was called as a witness, and having been first duly

6    sworn, was examined and testified as follows:

7

8                    EXAMINATION

9    BY MR. STOLPER:

10       Q    Good morning, Mr. Avenatti.  You understand

11   you're under oath?

12       A    Yes, sir.

13       Q    Mr. Avenatti, I first want to ask you some

14   questions about your productions in response to JFL's

15   notice.  On November 28, 2018, you were ordered by

16   Judge Scott to produce documents in response to the

17   notice; is that correct?

18       A    I don't know if it's correct or not as to

19   date.

20       Q    I'm going to go ahead and put up what I've

21   marked as Exhibit 70.  Sorry.  76.  Let's try this.

22   There you go.

23            (Exhibit 76 was marked.)

24       Q    BY MR. STOLPER:  Do you recognize that

25   document?

6

USAO_00059878

1           THE WITNESS:  I don't.

2      Q    BY MR. STOLPER:  Mr. Avenatti, have you

3 produced Eagan Avenatti's federal and state tax returns

4 from 2013 to the present?

5      A    I don't remember.  We may have.

6      Q    Do you recall what steps you took to gather

7 those tax returns and produce them to JFL Law, if, in

8 fact, that happened?

9           MR. HODGES:  Foundation; argumentative.

10          THE WITNESS:  I don't.

11     Q    BY MR. STOLPER:  Would you have done that

12 yourself or would you have instructed an employee to do

13 that?

14     A    Sir, I don't.

15     Q    Who has the tax returns or copies of the tax

16 returns from EA from 2013 to the present, other than

17 the IRS?

18     A    I think they're in the files of the firm in

19 storage.

20     Q    Mr. Avenatti, have you produced all of Eagan

21 Avenatti's agreements with Avenatti & Associates to

22 Jason Frank Law in response to Judge Scott's order?

23     A    Sir, I don't recall without looking at the

24 entirety of the production, as well as the productions

25 that were made prior to the order, because we were not

USAO_00059903

1    under an obligation to reproduce to you something that

2    was argumentative.

3         Q    So your testimony is that -- I'm sorry.

4              My question was simple.  Did you produce to

5    Jason Frank Law the agreements between Eagan Avenatti

6    and Avenatti & Associates?

7              MR. HODGES:  Foundation as to the existence

8    of any such documents.

9              You can answer.

10             THE WITNESS:  Sir, I just answered the

11   question.  I do not recall.  There's been a lot of

12   documents that have been produced over the years to

13   Mr. Frank and his counsel.  We were not under an

14   obligation to reproduce documents that had previously

15   been produced.

16        Q    BY MR. STOLPER:  When you say you weren't

17   under an obligation to produce documents that were

18   previously produced, where do you get that from?  Why

19   do you believe that to be true?

20        A    It's generally true.  It's generally true in

21   the law.

22        Q    Mr. Avenatti, did Eagan Avenatti file tax

23   returns each year -- federal tax returns from each year

24   from 2013 until the Receiver took over as the manager

25   of Eagan Avenatti?

USAO_00059904

1    A    The '18 has not been filed yet.  But to the

2  best of my knowledge, yes.

3    Q    And did Eagan Avenatti file state tax returns

4  for each of those years, with the exception of 2018?

5    A    I believe that's true.

6    Q    Are you the person who signed those tax

7  returns?

8    A    I don't remember.

9    Q    Is there somebody else at Eagan Avenatti who

10  was authorized to sign tax returns prior to the

11  Receiver taking over?

12    A    I don't know.  When you say "authorized" --

13    Q    Were you the managing partner at Eagan

14  Avenatti until the Receiver took over Eagan Avenatti?

15    A    I don't know how to answer that question.

16  Generally, yes.

17    Q    Were there times where you were not the

18  managing partner from 2013 to the time the Receiver

19  took over?

20    A    No.

21    Q    So during that entire time period, you were

22  the sole managing partner at Eagan Avenatti; correct?

23    A    I think that's true.

24    Q    You're not sure, though?

25       MR. HODGES:  Argumentative.

USAO_00059905

1      Q    BY MR. STOLPER:  Mr. Avenatti, who is Jeffrey

2  Johnson?

3      A    Client at the firm.

4      Q    When you say, "the firm," you mean Eagan

5  Avenatti?

6      A    No, not necessarily.

7      Q    Who do you mean when you say, "a client of

8  the firm"?

9      A    Client of me, a client of Avenatti &

10 Associates, and possibly a client of Eagan Avenatti.  I

11 don't recall.

12     Q    And did Mr. Johnson sign a retention letter

13 with Eagan Avenatti?

14     A    I don't recall.

15     Q    Did he sign a retention letter with any other

16 firm that you control?

17     A    He may have.  I just don't remember.

18     Q    You filed a case on behalf of Mr. Johnson;

19 correct?

20     A    Yes.

21     Q    And you filed that in federal court; correct?

22     A    Yes.

23     Q    And Mr. Johnson was a -- I believe was a

24 paraplegic; is that correct?

25     A    I believe so, yes.

214

```
 1        Q     And he also suffered from some mental health
 2   issues?  Is that also fair to say?
 3              MR. HODGES:  Your Honor, I just want to
 4   object to the extent this calls for privileged
 5   information.
 6              MR. STOLPER:  It's alleged in the complaint.
 7              MR. HODGES:  Okay.  Thank you.  I'll accept
 8   that.
 9              MR. STOLPER:  It is alleged in the complaint?
10              MR. FRANK:  Yes.
11        Q     BY MR. STOLPER:  Mr. Avenatti, you allege
12   that he suffered from some mental health issues?
13        A     Sir, I don't remember.
14        Q     Your lawsuit on behalf of Mr. Johnson was
15   against the County of Los Angeles; correct?
16        A     I believe that's correct.
17        Q     And counsel of record was listed solely as
18   Eagan Avenatti; is that correct?
19        A     No.
20        Q     Who else was listed as counsel of
21   recollection, to your recollection?
22        A     Me and Avenatti & Associates.
23        Q     How certain are you of that fact?
24              THE COURT:  He was certain enough to testify
25   to it.
```

USAO_00060087

```
 1              MR. STOLPER:  Okay.
 2         Q    BY MR. STOLPER:  Did you list Avenatti &
 3    Associates on the caption page?
 4         A    Sir, I don't recall.  It was a long time ago.
 5         Q    Now, ultimately, that's a case that you
 6    settled for Mr. Johnson; correct?
 7         A    I don't believe so, in its entirety, no.
 8         Q    Mr. Avenatti, you were co-counsel with a law
 9    firm of McNichols & McNichols on that case; is that
10    correct?
11         A    I don't remember that.
12         Q    Do you recall McNichols & McNichols receiving
13    payment for that case?
14         A    I don't.
15         Q    This was a public settlement because it was
16    done between the County of Los Angeles and Mr. Johnson;
17    correct?
18         A    I don't think that's true, but it may have
19    been.  I don't know.
20              (Exhibit 60 was marked and retained by
21              counsel.)
22         Q    Well, I've got the settlement agreement, so
23    let's take a look.  It's marked as Exhibit 60.  There's
24    no confidentiality provisions in this settlement, as I
25    read it.
```

USAO_00060088

```
1        A    (Reviewing document.)

2             Yeah, this is not the entire settlement.

3        Q    I understand.  This settlement is not

4   confidential?

5        A    No.  It is confidential, actually.  What I'm

6   saying is that's not the entire settlement agreement.

7        Q    That's fine.

8             Your Honor, I'm going to publish the

9   settlement agreement that I have that says it's the

10  entire settlement agreement, and it is signed by

11  Mr. Avenatti.  It has no confidentiality clause.

12       A    Your Honor, the settlement -- portions of the

13  settlement were confidential.  That's not the entire

14  settlement agreement.

15            THE COURT:  This is the settlement agreement

16  with the county, and that's not confidential; right?

17  So you're --

18            THE WITNESS:  No, I believe it is

19  confidential, Your Honor.  And without having the

20  ability to review my documents, then I -- then I would

21  ask that this be handled in a closed-door session, just

22  like everything else.

23            MR. STOLPER:  Your Honor --

24            MR. FRANK:  Your Honor, I was also a counsel

25  for Mr. Johnson.  Mr. Johnson was a client that I
```

USAO_00060089

1    actually brought to the firm.  It was not a

2    confidential settlement.  I will make that

3    representation to the Court, as we have in the

4    settlement agreement as well.

5              THE COURT:  Well, in the Court's experience,

6    the county typically would not enter into confidential

7    settlement agreements.

8              THE WITNESS:  Your Honor, to be clear,

9    Mr. Frank was not -- he didn't even work on the case.

10   So I'm just telling you that I believe that the terms

11   of the settlement are confidential, and out of

12   abundance of caution, we ought to handle it like we've

13   done the other settlement agreements and do it in a

14   closed-door session.

15             THE COURT:  What basis do you have when the

16   terms of the settlement are in Mr. Stolper's hands and

17   they don't include a confidentiality provision?

18             THE WITNESS:  Because I don't believe those

19   are the entirety of the terms of the settlement, Your

20   Honor.  I believe that there is a side letter or a

21   further document that constitutes the confidential

22   nature of the settlement, and so out of an abundance of

23   caution, it should be handled in a closed-door

24   proceeding, just like the other settlements were.

25             MR. STOLPER:  If I may, Your Honor, quote,

218

```
 1    "The parties agree that this settlement contains the
 2    entire agreement between the parties, that the terms of
 3    this agreement are contractual and not a mere recital."
 4    This is the settlement.
 5            THE COURT:  Well, to the extent there's some
 6    confidential letter out there, that's not in front of
 7    the Court, but this document is not confidential.
 8            MR. STOLPER:  May I, Your Honor?
 9            THE COURT:  You may.
10            MR. STOLPER:  Thank you.
11       Q    BY MR. STOLPER:  First of all, this is a
12    letter -- settlement agreement attached to a letter
13    from Hurrell & Cantrall.  That's opposing counsel,
14    correct?
15       A    I don't know if that's true or not.
16       Q    Okay.  You don't recall who opposing counsel
17    was in the Johnson case?
18       A    I don't.
19       Q    It's addressed to you, Michael Avenatti,
20    Esquire, at Eagan Avenatti, LLP; correct?
21       A    Sir, again, I have no idea where this
22    document came from, so I'm -- I'm not agreeing to your
23    documents just because you pull them out of thin air.
24       Q    Okay.  Well, let me ask you a question:  Is
25    that your signature?
```

219

1      A     I think that's my signature.

2      Q     Okay.  Did you sign this settlement agreement

3   on behalf of Mr. Johnson?

4      A     No.

5      Q     Did you sign a settlement agreement in the

6   course of the representation of Mr. Johnson?

7      A      No, if I'm understanding your question.

8      Q     Mr. Avenatti, this says -- this document is

9   entitled settlement agreement and release of all

10   claims; correct?

11      A     Sir, the document is titled whatever it is.

12      Q     Okay.  And you signed this document, did you

13   not, sir?

14      A     Sir, I don't know where this document came

15   from, and so I don't -- I don't know on the preceding

16   pages, whether it's accurate or not, okay?  I saw the

17   signature page, but I don't know what the other pages

18   are that go with it.

19      Q     Take a look.

20      A     Well, sir, you can -- yeah.

21            Yeah, I don't -- I don't believe this is an

22   accurate copy of the settlement agreement.

23      Q     What's inaccurate about it?

24      A     My recollection is that the settlement

25   agreement is not that document.

USAO_00060092

1      Q    Okay.  Do you recall settling Mr. Johnson's

2   case for $4 million from the County of Los Angeles?

3      A    No.

4      Q    How much do you recall settling for

5   Mr. Johnson from the County of Los Angeles?

6      A    I don't recall.

7      Q    Four million doesn't sound right?

8      A    I don't believe that settlement agreement is

9   accurate, sir.  I already told you.

10      Q    I didn't ask that question.  I'm asking a

11   different question.  Which is you don't believe that

12   you received a $4 million check for the benefit of

13   Mr. Johnson from the County of Los Angeles?

14      A    Sir, that -- that's not what you asked me.

15      Q    Okay.  That's what I'm asking you now.

16      A    I -- I don't recall.  (Indicating.)

17      Q    (Indicating.)  Well, let's take a look.

18          This document that you say you don't believe

19   to be the settlement agreement, although it has your

20   signature on it, you dated next to your signature; is

21   that correct?

22          MR. HODGES:  Misstates the witness's

23   testimony.  I believe he said he was not sure that was

24   his signature.

25          Q    BY MR. STOLPER:  You're not sure that's your

USAO_00060093

1    signature?

2        A    No, I think that's my signature.

3        Q    Okay.  And you dated, next to your signature,

4    January 21st; correct?

5        A    Yes, sir.

6        Q    Okay.  And this settlement agreement that

7    you're not sure is the real settlement agreement, calls

8    for a $4 million payment; correct?

9        A    Sir, I only looked at the document briefly.

10       Q    Well, you can look at it right here.

11            In exchange for a complete resolution of the

12   lawsuit, defendants, by and through the County of Los

13   Angeles, shall pay the plaintiff $4 million.

14            The settlement that you said you're not sure

15   is the real settlement calls for a payment of $4

16   million; correct?

17       A    Sir, that's not what I said.  You keep

18   twisting my words.  That's not what I said.  What I

19   said was that I don't believe that that settlement

20   agreement is the final settlement agreement.

21            I see my signature on the last page.  I don't

22   believe that the final settlement agreement was, as

23   you've given me the document.

24       Q    I understand.  But the document that I've got

25   here with your signature on it that says it's the final

USAO_00060094

1  settlement agreement calls for a payment of $4 million;

2  correct?

3      A    Sir, I don't agree with this, that this is

4  the settlement agreement.

5      Q    I understand.

6           THE COURT:  You're just asking him is that

7  what this document says?

8           MR. STOLPER:  Yes.

9           THE WITNESS:  The document says whatever it

10  says.

11      Q    BY MR. STOLPER:  And what it says is that the

12  county is going to pay Mr. Johnson $4 million; right?

13      A    Sir, the document says what it says.

14      Q    Let's go ahead and look at what's been marked

15  as Exhibit 60.

16           MR. FRANK:  61.

17           MR. STOLPER:  61.  Sorry.

18           And, Your Honor, this is a check from the

19  County of Los Angeles to Eagan Avenatti in the amount

20  of $4 million.  I'd like to publish it.

21           THE COURT:  I hear no objections.

22           MR. HODGES:  We have none.

23           MR. REITMAN:  No objection.

24           THE COURT:  Okay.

25           (Exhibit 61 was marked.)

223

USAO_00060095

1      Q    BY MR. STOLPER:  I think you testified that

2   your signature was next to the date, January 21st.

3   This is a check for $4 million, payable to Eagan

4   Avenatti, attorney-client trust account, for $4

5   million, dated January 26; is that correct?

6           MR. HODGES:  Foundation.  Hearsay.  Assumes

7   facts.

8           THE WITNESS:  I don't think I've ever seen

9   this document before.

10     Q    BY MR. STOLPER:  Okay.  Well, do you recall

11  receiving $4 million from the County of Los Angeles as

12  payment for the settlement regarding -- relating to

13  Jeffrey Johnson?

14     A    No.

15     Q    So you don't think you got that money?

16     A    Sir, I don't have an independent recollection

17  of it.

18     Q    Well, let me ask you a different question.

19          Do you recall remitting to Mr. Johnson his

20  share of the $4 million that you obtained on his

21  behalf?

22     A    Yes.

23     Q    How much of the $4 million did you remit to

24  Mr. Johnson?

25     A    I don't recall without seeing other

USAO_00060096

```
 1   documents.
 2        Q    More than 20,000?
 3        A    I'm sorry?
 4        Q    More than $20,000?
 5        A    Sir, I don't recall how this settlement was
 6   structured or what the terms were or whether he was
 7   advanced monies or whether he was paid in advance.
 8             I don't recall the terms relating to this.
 9        Q    Well, let's look and see what happened to the
10   money after you deposited it, Mr. Avenatti.
11        A    Sir, again, you're --
12             MR. FRANK:  These are bank records, client
13   trust account for each month in 2015.  Each month is
14   dated.  So one is January, two is February.
15   (Inaudible discussion.)
16             MR. HODGES:  Well, to the extent that counsel
17   intends to publish bank statements, Your Honor, I would
18   like to enter those as confidential.
19             MR. STOLPER:  Your Honor has already ruled on
20   this.  They're not confidential.  As the Court
21   required, I stayed late into the night redacting
22   account numbers.
23             THE COURT:  That's fine.
24        Q    BY MR. STOLPER:  Mr. Avenatti, you had a --
25   Eagan Avenatti had a client trust account at California
```

USAO_00060097

```
 1    Bank and Trust in 2015; correct?
 2         A    Yes.
 3         Q    And you can see the deposit of $4 million on
 4    January 29, 2015.  That's the $4 million related to the
 5    check we just saw; correct, sir?
 6         A    No.
 7         Q    That's not related to that check?
 8         A    Nope.
 9         Q    How can you be so sure?
10         A    Because I know for a fact that it's not.
11         Q    How can you be so sure?
12         A    That's my best recollection.
13         Q    That's fine.  Let's go back to the check.
14              Do you see that next to the deposit, there's
15    a control number?
16         A    No.
17         Q    Do you see the word "deposit" followed by a
18    long number?
19         A    Yeah.
20         Q    Okay.  Go ahead and take a look at the last
21    four digits of that number, 0021.  Now, I'll go back to
22    that check.
23         A    Sir, do you have anything from the custodian
24    authenticating these documents?
25         Q    If you look at the bottom of this check, the
```

226

1    banks track it with what's called a control number.

2    That control number is also 0021.  You see how those

3    two numbers marry up, Mr. Avenatti?

4         A    No, I don't agree with you.

5         Q    You don't agree that the check has a number

6    of 0021, the last four digits, and the deposit also

7    tracks that same number, 0021?

8         A    Sir, I don't trust you or these documents

9    because you have failed to give me anything from the

10   custodian, showing where they came from, so I'm sorry,

11   but I'm not going to agree with you.

12        Q    My only question, Mr. Avenatti, do you agree

13   that the same control number appears on the check that

14   came in from the county and the deposit for $4 million?

15        A    No.

16        Q    You don't agree it's the same control number?

17        A    Sir, i don't agree with the predicate of what

18   you're trying to do.

19        Q    Okay.  So you're sure, sitting here under

20   oath, that the $4 million deposited in the State Bar of

21   California, Eagan Avenatti, LLP trust account, showed

22   on January 29, for $4 million is not the $4 million you

23   got from if Mr. Johnson.  You're certain of that?

24        A    Sir, I've answered your questions.

25        Q    Right.  And I'm trying to get you to

USAO_00060099

```
 1    reconsider your answer because I don't think you've

 2    been truthful, Mr. Avenatti.

 3              MR. HODGES:  Objection.  Argumentative.

 4              THE COURT:  Let's just focus on what was the

 5    source of the $4 million.

 6        Q    BY MR. STOLPER:  What was the source of the

 7    $4 million, Mr. Avenatti?

 8        A    Sir, I don't recall.

 9        Q    But you're sure it wasn't Mr. Johnson's

10    money?

11        A    Sir, again, I've answered your question.  I

12    don't recall.  I don't have all my records and all the

13    accounts in front of me.

14        Q    We actually provided you a copy of all of

15    your bank records, Mr. Avenatti.

16        A    No.  Those are not all the bank records.

17        Q    For this account, they are.

18        A    No.  I don't think they are.

19        Q    You haven't even looked at them.

20        A    I have looked at them.

21        Q    Okay.

22        A    I don't think they are, sir.

23        Q    Well, we're going to see what happened with

24    this $4 million.  I understand --

25        A    Which $4 million?
```

USAO_00060100

1    Q    The $4 million that has the same control

2  number as the money that came in for Jeff Johnson.  The

3  check is dated January 26th.  It's made out to the

4  attorney-client trust account, and there's a $4 million

5  deposit on January 29, three days later, with the same

6  control number.

7          So I'm going to go ahead and ask questions

8  under the assumption that the $4 million came from this

9  check.  And I note for the record, Mr. Avenatti, that

10 you disagree with that assumption.

11         MR. HODGES:  It lacks foundation.  Assumes

12 facts.

13         THE WITNESS:  This is entirely inappropriate.

14 Entirely inappropriate.  You're mixing apples and

15 oranges.

16    Q    BY MR. STOLPER:  Mr. Avenatti, there's a

17 stream of payments that we've seen between you, from

18 you to Mr. Johnson; is that correct?

19    A    Your Honor, I believe that that's privileged.

20         THE COURT:  I guess I'm not quite sure.

21 You're referring to statements that -- payments we've

22 seen on the statement?

23         MR. STOLPER:  Well, let me demystify it, Your

24 Honor.

25         THE WITNESS:  Your Honor, I don't want to

USAO_00060101

1   disclose attorney-client privilege.  Hold on a minute.

2          In his effort to demist -- to bring clarity

3   to this, again, I have an objection based on the

4   attorney-client privilege relating --

5          MR. STOLPER:  I didn't ask to go into any

6   communication, Your Honor.

7          THE WITNESS:  It's not just about

8   communication, Your Honor.

9          THE COURT:  We'll hear what the question is

10  and see if it implicates the attorney-client privilege.

11      Q   BY MR. STOLPER:  Mr. Avenatti, isn't it true

12  that from July of 2015, you have been making

13  bi-monthly, small payments to Jeff Johnson?

14         THE COURT:  And when you say "you," you mean

15  Mr. Avenatti, personally?

16         MR. STOLPER:  Well, it actually comes from

17  different accounts, but it starts off from Eagan

18  Avenatti accounts.

19         MR. HODGES:  Your Honor, it's privileged.

20         THE COURT:  So the question is whether Eagan

21  Avenatti is making payments to this client is

22  privileged?

23         THE WITNESS:  Yes, and it's also relevancy

24  relating to other entities, etc.

25         MR. STOLPER:  It's from Eagan Avenatti.

USAO_00060102

```
 1              THE COURT:  Well, it certainly doesn't reveal
 2    the contents of any attorney-client communications, and
 3    it seems to be square in the realm of what is an asset
 4    of Eagan Avenatti.  And we're trying to figure out
 5    where the assets of Eagan Avenatti went.  And if some
 6    went to Mr. Johnson, then we should understand how
 7    many, and why, and whether that was legitimate.
 8              MR. STOLPER:  Your Honor, just by way of
 9    offer of proof --
10              THE WITNESS:  No.  I'm not interested in an
11    offer of proof --
12              MR. STOLPER:  Well, I'm going to make an
13    offer --
14              THE WITNESS:  Well, I'm going to make an
15    objection --
16              (Simultaneous colloquy.)
17              THE CCOURT REPORTER:  One at a time.
18              THE COURT:  Yes.  Let's do one at a time.
19              We have an objection?
20              MR. HODGES:  Right.  If there's a question,
21    let's have a question.  But I object to these speeches
22    for the benefit of the press.  It's inappropriate, Your
23    Honor.
24              THE COURT:  All right.  Well, let's have a
25    question.
```

USAO_00060103

```
 1              MR. STOLPER:  Certainly.
 2         Q    BY MR. STOLPER:  Mr. Avenatti, did you steal
 3    Mr. Johnson's money?
 4              THE COURT:  It's a yes or no question.
 5              THE WITNESS:  Absolutely not.
 6              THE COURT:  Okay.
 7         Q    BY MR. STOLPER:  Mr. Avenatti, isn't it true
 8    that beginning in July of 2015, rather than pay
 9    Mr. Johnson his share of the $4 million that he was
10    entitled to, instead, you've been doling out small
11    payments each month to him?  Isn't that true?
12         A    That's absolutely false.
13         Q    Well, let's break it down.  Mr. Avenatti,
14    isn't it true that --
15         A    Your conduct is despicable.
16         Q    Isn't it true since July of 2015, you have
17    been sending checks or making payments to Mr. Johnson
18    in the amount of $1,900 per month?
19         A    Sir, I -- I disagree with the predicate of
20    your question entirely, and it's outrageous.
21         Q    How about this --
22         A    And wait a minute.  Wait.
23              THE COURT:  Let's get a -- the answer was?
24    Simply, have you been making payments?  Yes or no?
25              THE WITNESS:  Oh.  From time to time, he has
```

USAO_00060104

1    received payments.

2         Q    BY MR. STOLPER:  And by "from time to time,"

3    you mean twice a month; right, sir?

4         A    No.

5         Q    Generally, it's twice a month; right?

6         A    No.

7              (Exhibit 75 was marked.)

8         Q    BY MR. STOLPER:  Okay.  Let's go ahead and

9    look at what's been marked as Exhibit 75.

10             Exhibit 75, Your Honor, is a schedule of

11   payments that Mr. Avenatti has made to Jeffrey Johnson,

12   and behind it are all the checks that correspond to it.

13             MR. HODGES:  Well, object, Your Honor.  This

14   document lacks foundation.  There's been no proper

15   authentication that's it's anything.  It's hearsay.

16   Assumes facts.

17             MR. STOLPER:  That's fine.

18             MR. HODGES:  Well, Your Honor, it's not fine.

19   I think this alludes to exactly what Mr. Avenatti said.

20   It's inappropriate.  He makes a comment for purposes of

21   making a record, asserting something as being true,

22   lays no foundation for it, and then pulls it down.

23             THE COURT:  There's no trier of fact here.

24   This is for him to find out information about the

25   assets of Eagan Avenatti.  So whatever he says

USAO_00060105

```
 1    certainly isn't evidence of anything.  And he's going
 2    to ask a question, and that's what will be the focus.
 3         Q    BY MR. STOLPER:  Mr. Avenatti, isn't it true
 4    that on July 22nd, 2015, you wrote Mr. Johnson a check
 5    for $1,000?
 6         A    Sir, I -- I have no idea, okay?  I -- I don't
 7    agree with your schedule here.  I -- I have no idea.
 8         Q    Okay.  Let's take a look.  I'll try and zoom
 9    in.  That's a check drawn from Eagan Avenatti, LLP;
10    correct?
11         A    Sir, I have no idea.  I have no idea where
12    this -- where this document came from.
13         Q    It was produced by your bank, Mr. Avenatti.
14         A    Well, I don't have -- I don't have a copy of
15    it.  I have no idea.  I don't trust your documents,
16    okay.  For the same reason Judge Carney didn't trust
17    you in the Broadcom case.
18              THE COURT:  You can ask him about what
19    financial transactions he remembers.
20         Q    BY MR. STOLPER:  Is that Ms. Regnier's
21    signature?
22         A    I think so.  I don't know.
23         Q    And Ms. Regnier is your office manager?
24              MR. HODGES:  Asked and answered.
25         Q    BY MR. STOLPER:  Mr. Avenatti?
```

234

```
1         A    I'm sorry?

2         Q    She was the office manager of Eagan Avenatti?

3         A    Yes.

4         Q    She was the signatory on Eagan Avenatti bank

5    accounts in general?

6         A    No.

7         Q    She was not a signatory?

8         A    At times.  From time to time, she was.

9         Q    Let's go ahead and look at the next month.

10             These are two checks to Jeffrey Johnson.  One

11   is dated -- sorry -- there we go.  One is dated -- I

12   think it's 8/10/2015.  One is dated later in that same

13   month in 2015.

14             Do those appear to be signed by Judy Regnier?

15        A    Yes.  Do you have all the checks that predate

16   this time period, counsel?

17        Q    Mr. Avenatti, do you have --

18        A    Do you have all the payments to Jeff Johnson

19   that predate this?

20             THE COURT:  Mr. Stolper is allowed to ask the

21   questions here.  We're just about finished.

22        Q    BY MR. STOLPER:  This is a September 8 check

23   to Jeffrey Johnson for $1,900.

24             Does that appear to also be signed by Judy

25   Regnier?
```

USAO_00060107

```
 1              MR. HODGES:  Counsel, can you repeat the
 2    question.  I was speaking.
 3        Q    BY MR. STOLPER:  Sure.  This is a, I believe,
 4    it's a September 2015 check to Jeffrey Johnson.  Was
 5    this also signed -- does this also appear to be signed
 6    by Judy Regnier?
 7        A    I think so.
 8        Q    And you continued to make bi-monthly payments
 9    to Mr. Johnson in 2016, 2017, 2018; correct?
10        A    There's been a lot of payments made to
11    Mr. Johnson over the last four years, I think, five
12    years, including payments that predate these payments,
13    but you don't seem interested in those.
14        Q    Just a couple more questions on Mr. Johnson.
15              Does Eagan Avenatti have any future
16    obligation to make payments to Mr. Johnson?
17              MR. HODGES:  Legal conclusion.
18              THE WITNESS:  I -- I don't know.
19              THE COURT:  I think he's asking if you know.
20    Are there assets of Eagan Avenatti that are needing to
21    be or going to be paid out in the future to
22    Mr. Johnson?
23              THE WITNESS:  I -- I don't know.
24        Q    BY MR. STOLPER:  When was the last time you
25    or any of your entities made a payment to Mr. Johnson?
```

USAO_00060108

1       A     I -- I don't recall.

2       Q     Was it in the last 60 days?

3       A     I don't recall.

4       Q     Did you ever make a lump sum payment to

5   Mr. Johnson that reflects the amount he was due out of

6   his $4 million settlement, besides these $1,900 monthly

7   payments you've been sending him?

8             MR. HODGES:  Assumes facts.  Lacks foundation

9   as to the amount of any settlement.

10            Witness has already testified repeatedly he's

11  not sure it was a $4 million settlement amount.

12            MR. STOLPER:  Understood.

13      Q     BY MR. STOLPER:  Can you answer the question,

14  please?

15      A     Can I have it read back?

16            (Record read as follows:

17            "Question:  Did you ever make a lump sum

18       payment to Mr. Johnson that reflects the amount he

19       was due out of his $4 million settlement, besides

20       these $1,900 monthly payments you've been sending

21       him.)

22            THE WITNESS:  Without looking at the

23  documents, I don't recall.  I'm sure we did.

24      Q     BY MR. STOLPER:  Do you recall which account

25  it came out of?

USAO_00060109

```
 1        A    Sir, I don't.  Without looking at the
 2   settlement documents, the structure -- the settlement
 3   documents, the structure documents, the accounting
 4   recordings, I can't just -- I can't just.
 5        Q    I'm sorry.  What are the structure documents?
 6        A    I'm sorry?
 7        Q    You said, "the structure documents," what are
 8   you referring to?
 9        A    The same documents I mentioned earlier.
10        Q    I'm sorry.  I don't recall asking or hearing
11   about what are structured.  Is there a structured
12   settlement --
13        A    Sir --
14        Q    -- for this, counsel?
15        A    -- sir, I believe that there may be.  There
16   was trust documents.  There's a bunch of documents
17   relating to this, and I've got to have those documents
18   in order to accurately answer the question.
19        Q    Mr. Avenatti, are you paying a structured
20   settlement out to Mr. -- sorry -- are you paying a
21   structured settlement out to Mr. Johnson?
22        A    No.
23        Q    What is this stream of payments for?
24        A    That's privileged.  And I'm not going to
25   answer that question.
```

USAO_00060110

```
 1        Q     Okay.

 2              THE COURT:  How would that reveal the nature

 3    of attorney-client communications?

 4              THE WITNESS:  Because it reveals the nature

 5    of an issue that Mr. Johnson has that he has sought

 6    legal counsel over.  And it relates to that issue, Your

 7    Honor.

 8              THE COURT:  So you are paying him in

 9    connection with a matter in which he has retained you?

10              THE WITNESS:  Yes.

11              MR. STOLPER:  Your Honor, I apologize.  I'm

12    not seeking communications between Mr. Avenatti and

13    Mr. Johnson.  Eagan Avenatti has been making these

14    payments to Mr. Johnson for years.  We don't see any

15    other money going out to Mr. Johnson.  We'd like to

16    know what the nature of these payments are.  I don't

17    think that goes to attorney-client privilege.  It goes

18    to the economic relationship.  I'm not asking for

19    Mr. Johnson's statements.  I'm asking for the nature of

20    the economic relationship between Eagan Avenatti and/or

21    Mr. Avenatti and his entities and someone who has been

22    getting payments.

23              MR. HODGES:  Your Honor, it does call for the

24    substantive --

25              THE COURT:  Well, I think if the question is
```

USAO_00060111

1    phrased as Mr. Stolper has phrased it, what is the

2    nature of the economic relationship that is causing

3    these payments to be made, that's doesn't reveal a

4    communication, so the witness can answer that.

5          Q    BY MR. STOLPER:  Please answer.

6          A    The attorney-client relationship.

7          Q    Well, let me ask it a different way:

8    Mr. Avenatti, what are these payments for?  Generally,

9    lawyers don't pay their clients; generally, clients pay

10   their lawyers.

11              MR. STOLPER:  Your Honor, that's

12   argumentative.  Object to the form.  It also now calls

13   for privileged communication.

14              Mr. Avenatti has made it clear that the

15   reason for these payments is a result of an

16   attorney-client relationship with Mr. Johnson and that

17   an explanation as to the reason for those payments

18   would invoke a privileged communication.

19              THE COURT:  Is Mr. Johnson an attorney?

20              MR. STOLPER:  No.

21              MR. HODGES:  He's a client.

22              THE COURT:  So he's not providing -- is he

23   providing services to someone?

24              MR. STOLPER:  Mr. Johnson is a paraplegic

25   with mental health issues, Your Honor.  He's providing

USAO_00060112

```
 1   services to no one.
 2            THE COURT:  Well, then --
 3            THE WITNESS:  I'm going to -- I'm going to
 4   object on the attack on Mr. Johnson.
 5            MR. STOLPER:  It wasn't meant to be attack.
 6            THE COURT:  That's collateral.  So this is
 7   money that was coming out of an Eagan Avenatti bank
 8   account.  It's central to the judgment debtor exam.
 9   And the explanation that it's going out of the account
10   because there's an attorney-client relationship doesn't
11   explain why money is going from the attorney to the
12   client.  The so the rational for the payment does not
13   appear privileged to the Court.
14            THE WITNESS:  It's an advance on future
15   settlement monies, Your Honor.
16        Q    BY MR. STOLPER:  Is Mr. Johnson currently a
17   client of Eagan Avenatti?
18        A    Absolutely, as well as of me.
19        Q    Does Mr. Johnson have any ongoing litigation
20   that is public?
21        A    I don't know.  I don't know if it's public or
22   not.  I don't think so.
23        Q    Without revealing who the demand -- well,
24   actually, has Mr. Johnson made any demands on any other
25   party for payment?
```

USAO_00060113

```
 1        A    Yes.
 2        Q    Who is that party?
 3        A    I don't recall.
 4        Q    Who is    Client 4     ?
 5             THE COURT:  Before we open up a new area of
 6    inquiry, we're --
 7             MR. STOLPER:  I have just like five
 8    questions, Your Honor.  I'll be done.
 9             THE COURT:  Can we -- two questions.
10             MR. STOLPER:  I'm going to think about them
11    very carefully, if you give me one second, Your Honor.
12        Q    BY MR. STOLPER:     Client 4     was a client of
13    yours; correct?
14        A    Yes.
15        Q    And   Client 4   , like Mr. Barela, has
16    accused you of stealing, in her case, $4 million;
17    correct?
18        A    That's absolutely false.
19             And, again, I think this is outrageous.
20             MR. STOLPER:  Your Honor, if I may, I have
21    got an exhibit I want to ask the witness about.  It's a
22    letter from Warrick Harrington.
23             THE COURT:  Wait.  We've just --
24             MR. STOLPER:  I'm sorry.  I used my two
25    questions.
```

242

USAO_00060114

# EXHIBIT 9



August 6, 2018

***Via Email and Personal Service***

Michael J. Avenatti, Esq.
520 Newport Center Dr., Suite 1400
Newport Beach, CA  92660

**Orrick, Herrington & Sutcliffe LLP**
777 South Figueroa Street
Suite 3200
Los Angeles, CA 90017-5855

+1 213 629 2020

orrick.com

**William A. Molinski**

E  wmolinski@orrick.com
D  +1 213 612 2256
F  +1 213 612 2499

Dear Mr. Avenatti:

We represent your clients, **Client 4 and Client 5** with respect to $4,000,000 which belongs to **Client 4** and which you have failed to disburse to her from your client trust account.  This correspondence represents a final opportunity for you to disburse the funds as required.  If you do not do so within 48 hours, we will have no choice but to pursue all available legal remedies.

**The Representation**

**Client 4 and Client 5** and Michael J. Avenatti, Esq. entered an engagement agreement dated February 9, 2017.  *See* Engagement Agreement p. 1.  Pursuant to the Engagement Agreement, Michael J. Avenatti, Esq. agreed to represent **Client 4 and Client 5** in connection with **Client 4** 's separation and divestment from **Company 2** .  On around September 17, 2017, **Company 2** and **Client 4** entered into a number of agreements completing that separation and divestment.  On March 14, 2018, _____ wired $8,146,288 to the Michael J. Avenatti, Esq. Attorney Client Trust Account at City National Bank in Los Angeles, Account #_____4705, as payment of funds owing to **Client 4** under the terms of the separation and divestment agreements.

After several weeks of unjustified delays, and repeated requests made by **Client 5** for the funds to be disbursed to **Client 4** , **Client 4** eventually received only a portion of the $8,146,288 by wire.  To date, **Client 4** *still has not received $4,000,000 to which she is entitled and which you are required to be holding in trust for her*.

**The Remaining $4,000,000 Must Be Provided to **Client 4** Immediately**

In late April and early May of 2018, **Client 5** made several requests for you to provide wire information so he could track payments to **Client 4** .  When asked specifically what the tracking information was for the remaining $4,000,000 that had not yet been sent to **Client 4** , you provided him tracking information for the initial *payment that had already been made*.

To date, **Client 4** 's funds have not yet been delivered, and are presumably still in the Michael J. Avenatti, Esq. Attorney Client Trust Account.  As you know, in addition to fiduciary and contractual duties, the law imposes on all lawyers the duty to promptly pay or deliver to a client funds to which the client is



Michael J. Avenatti, Esq.
August 6, 2018
Page 2

entitled. You have given one excuse after another to Client 4 and Client 5 who have been more than patient. I now write to inform you that if payment of the remaining $4,000,000 is not made to Client 4 by the Close of Business on August 8, 2018, we will immediately take steps to pursue all available remedies.

Very truly yours,

William A. Molinski

cc:    Walter Brown

USAO_00058811

# EXHIBIT 10

Message

From:       **EA Employee 1** [/O=FIRST ORGANIZATION/OU=EXCHANGE ADMINISTRATIVE GROUP
            (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN **EA Employee 1**
Sent:       12/12/2018 9:58:20 PM
To:         Michael J. Avenatti
Subject:    Fwd: NBPD #18009037


What is this - I was just called by Newport PD regarding wire transfers with **Client 4** ?

I told them I was currently out of state and could I call them back.

**EA Employee 1**


Begin forwarded message:

> **From:** "Bledstein, Emily" <EBledstein@nbpd.org>
> **Date:** December 12, 2018 at 1:48:53 PM PST
> **To:** **EA Employee 1**
> **Subject: NBPD #18009037**
>
> Hi Judy,
> Please call me at the number below when you get a chance.
>
> Thank you,
> **E. Bledstein**
> Investigator, Property Crimes Division
> Newport Beach Police Department
> 870 Santa Barbara Drive, Newport Beach, CA 92660
> ☎ 949.644.3755 | 🖶 949.644.3794 | ✉ ebledstein@nbpd.org
>
>
> IMPORTANT WARNING and CONFIDENTIALITY NOTICE: This e-mail (and any
> attachment) is only intended for the use of the person or entity to which it is addressed, and may
> contain information that is privileged and confidential. All recipients, including employees of the
> City of Newport Beach, are obligated to maintain this communication in a safe, secure and
> confidential manner. Unauthorized disclosure or failure to maintain confidentiality is strictly
> prohibited and may be a violation of state and/or federal law(s) and carry criminal and/or civil
> penalties. Additionally, the unauthorized disclosure or failure to maintain confidentiality this e-
> mail (and any attachments) by employees of the City of Newport Beach may be a violation of
> City of Newport Beach and/or Newport Beach Police Department policies. If you are not the
> intended recipient, please immediately notify the sender by return e-mail and delete this message
> from your computer without making a copy or distribution.