H. Dean Steward, SBN 85317
107 Avenida Miramar, Ste. C
San Clemente, CA 92672
Tel (949) 481-4900
Fax (949) 497-6753

Attorney for Defendant
MICHAEL JOHN AVENATTI

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | SA CR No. 19-061-JVS |
| Plaintiff, | DEFENDANT'S MOTION FOR A PROPER PRIVILEGE REVIEW, EVIDENTIARY HEARING AND DISCOVERY |
| v. | |
| MICHAEL JOHN AVENATTI, | [Declaration of Michael John Avenatti and [Proposed] Order filed concurrently herewith] |
| Defendant. | |

TO U.S. ATTORNEY NICOLA HANNA, AUSA JULIAN ANDRE and AUSA BRETT SAGEL, PLEASE TAKE NOTICE that Defendant MICHAEL JOHN AVENATTI ("Mr. Avenatti") by and through his counsel of record, H. Dean Steward, hereby moves for and files his Motion For a Proper Privilege Review, Evidentiary Hearing and Discovery. Defendant's motion is based on the attached memorandum of points and authorities; the files, records and transcripts in this case; the files, records and transcripts in the following matters relating to the search warrants referenced herein: (each filed in the United States District Court for the Central District of California): 8:19-MJ-103 (Hon. Douglas F. McCormick); 8:19-MJ-243 (Hon. Douglas F. McCormick); 8:19-MJ-244 (Hon. Douglas F. McCormick); 8:19-MJ-419 (Hon. Douglas F. McCormick); and 8:20-MJ-025 (Hon. Douglas F. McCormick), and such further evidence and argument as the Court may permit at a hearing on this matter.

Dated: September 14, 2020                    Respectfully submitted,

                                             /s/ H. Dean Steward
                                              H. DEAN STEWARD

                                             Attorney for Defendant
                                              MICHAEL JOHN AVENATTI

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

I.      INTRODUCTION ................................................................................ 1

II.     FACTUAL BACKGROUND ................................................................ 3

        A. Mr. Avenatti and Eagan Avenatti, LLP ................................. 3

        B. The Government's Search Warrant Applications and the
           Resulting Warrants ................................................................. 4

        C. The Improper Productions and Review ................................ 6

III.    ARGUMENT ........................................................................................ 7

        A. The Attorney-Client Privilege ............................................... 7

        B. The Work Product Doctrine .................................................. 9

        C. The Sixth Amendment ......................................................... 10

        D. The Government and the Filter Team Disregarded
           Fundamental Principles Protecting Mr. Avenatti's
           Attorney-Client Relationships and Infringed on
           Mr. Avenatti's Fundamental Rights ................................... 12

        E. Mr. Avenatti is Entitled to have a Magistrate or Special
           Master Conduct a Proper Review ....................................... 20

        F. Mr. Avenatti Is Entitled to An Evidentiary Hearing and
           Discovery Relating to the Filter Team's Review of Materials
           and Productions to the Prosecution Team, As Well as the
           `Prosecution Team's Review and Use of Such Materials ................ 21

IV.     CONCLUSION .................................................................................... 22

i

CERTIFICATE OF SERVICE.................................................................................23

# TABLE OF AUTHORITIES

## CASES:                                                                    Page

*DeMassa v. Nunez*,
770 F.2d 1505 (9th Cir. 1985)................................................................. 10

*Fisher v. United States*,
425 U.S. 391 (1976) ............................................................................ 8

*Gunnells v. Healthplan Servs., Inc.*,
348 F.3d 417 (4th Cir. 2003) ............................................................... 11

*Hickman v. Taylor*,
329 U.S. 495 (1947) ......................................................................... 9, 11

*Hunt v. Blackburn*,
128 U.S. 464 (1888) ............................................................................. 8

*In re Grand Jury Proceedings*,
727 F.2d 1352 (4th Cir. 1984)............................................................... 9

*In re Grand Jury Subpoena*,
870 F.3d 312 (4th Cir. 2017)............................................................... 10

*In re Grand Jury Subpoenas*,
454 F.3d 511 (6th Cir. 2006).......................................... 7, 11, 14, 15, 20

*In re Ingram*,
915 F. Supp. 2d 761 (E.D. La. 2012) ................................................... 16

*In re Perrigo Co.*,
128 F.3d 430 (6th Cir. 1997)............................................................... 12

*In re Search of Elec. Commc'ns*,
*802 F.3d 516 (3d Cir. 2015)* ............................................................... 14

*In re Search Warrant Issued June 13, 2019*,
942 F.3d 159 (2019)....................................................................*passim*

*In re The City of New York*,
607 F.3d 923 (2d Cir. 2010) ................................................................ 13

*Klitzman, Klitzman & Gallagher v. Krut*,
744 F.2d 955 (3d Cir. 1984) ........................................................ 12, 17

*Massachusetts v. Mellon*,
262 U.S. 447 (1923) ............................................................................ 13

*Mohawk Indus., Inc. v. Carpenter*,
558 U.S. 100 (2009) ............................................................................ 12

*NLRB v. Detroit Newspapers*,
185 F.3d 602 (6th Cir. 1999) ............................................................. 13

*NLRB v. Interbake Foods*, LLC,
637 F.3d 492 (4th Cir. 2011) ............................................................. 13

*Republic Gear Co. v. Borg-Warner Corp.*,
381 F.2d 551 (2d Cir. 1967) ................................................................. 8

*RSZ Holdings AVV v. PDVSA Petroleo S.A.*,
506 F.3d 350 (4th Cir. 2007) ............................................................. 16

*Strickland v. Washington*,
466 U.S. 668 (1984) ............................................................................ 10

*United States v. Brugman*,
655 F.2d 540 (4th Cir. 1981) ............................................................. 10

*United States v. Nobles*,
422 U.S. 225 (1975) ............................................................................ 11

*United States v. Philip Morris Inc.*,
314 F.3d 612 (D.C. Cir. 2003) ........................................................... 12

*United States v. Stewart*,
2002 WL 1300059 (S.D.N.Y. June 11, 2002) ................................... 17

*Upjohn Co. v. United States*,
449 U.S. 383 (1981) ...................................................................... 7, 8, 11

## **OTHER AUTHORITIES:**

U.S. Const. art. III .......................................................................... 13

U.S. Const. Amend. VI ..............................................................*passim*

Fed. R. Crim. P. 16(a)(2), (b)(2) ...................................................... 9

Fed. R. Civ. P. 26(b)(3) .................................................................... 9

Black's Law Dictionary 129 (6th ed. 1990) ...................................... 8

Model Rules of Prof'l Conduct r. 1.6 (a), (c) (Am. Bar Ass'n 1983) .................. 8

1 Geoffrey C. Hazard, Jr. et al.,
*The Law of Lawyering* § 10.14, 10-91 (4th ed. Supp. 2019)............................... 10

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

On September 2, a privilege review team in this matter (the "Filter Team") first disclosed to counsel for Defendant Michael John Avenatti ("Mr. Avenatti") that they had produced, and the prosecution team had received, approximately 299 attorney-client privileged documents reflecting communications between Mr. Avenatti and lawyers with whom he enjoyed an attorney-client privilege, and that the prosecution had reviewed at least some of those documents.  These documents total in excess of 1,000 pages and were in the possession of the prosecution team in some instances for over six months. The defense subsequently learned that the prosecution and the Filter Team knew as early as May 14, 2020 that these documents had been improperly provided to the prosecution team.  *See*, *e.g.*, Docket No. 261, Exhibit A.  They also later admitted in an email that this needed to be disclosed to the defense.  *See id*.

Despite these facts and the prosecution's absolute obligation to *immediately* alert the defense as to their possession and review of privileged documents, *not to mention their obligation not to possess and review privileged documents in the first place*, for almost four months, the prosecution and the Filter Team failed to inform the defense that the prosecutors were in possession of attorney-client privileged materials highly relevant to multiple charges in this case and had reviewed them.  They also inexplicably failed to alert the Court to this issue for months, including most recently at the status conferences held regularly in this case, with the last conference occurring just two days prior on Monday (August 31, 2020).

Multiple requests have been made, but no explanation has been provided as to why the prosecution team did not alert the defense at all, or why the Filter Team first alerted the defense on September 2, months after they collectively knew they had a problem and disclosure needed to be made.  Further, the defense is in the process of determining all of the issues and counts in the indictment to which these documents

relate.  At least some of the documents relate to the bankruptcy counts in the indictment (counts 33-36), which the prosecution has recently admitted in writing "have substantial overlap of evidence and witnesses" with counts 1-10 (the wire fraud counts).[1]  The defense is also attempting to confirm that no other privileged documents beyond the 299 are in the possession of the prosecution team and/or have been reviewed. Even though they have asked for this assurance from both the Filter Team and the prosecution, none has been forthcoming.  In addition, other questions relating to the Filter Team's review and production, and the prosecution team's review and use, of the documents have likewise gone unanswered.

Equally important, the defense has learned that the Filter Team and the protocol it has been using in this case are fundamentally flawed and were requested and obtained by the government in direct contravention of core legal principles and Constitutional norms. *See In re Search Warrant Issued June 13, 2019*, 942 F.3d 159 (2019).[2]  Among other things, the government engaged in misconduct by (i) requesting *ex parte* the appointment of, and utilizing, the Filter Team, (ii) failing to timely serve various search warrants on Mr. Avenatti and others with an interest in the resulting materials and the privileges, (iii) requesting and using a faulty and legally flawed search protocol when reviewing the materials for privilege, and (iv) rifling through and reviewing millions of documents protected by the attorney-client privilege and/or work product doctrine, including the over 1,000 pages now known to contain Mr. Avenatti's privileged information (and likely far more).  In sum, beginning in the early stages of this case and continuing until the present day, the government has deliberately disregarded the principles protecting the attorney-client privilege and the work product doctrine.  These errors were subsequently

---

[1] The defense will provide the documents to the Court *in camera* if requested.

[2] In this case, the Fourth Circuit found significant and fundamental problems, including Constitutional violations, with the appointment and use of a filter team and protocol under facts far less egregious than in this case.

2

compounded by Magistrate Judge Douglas F. McCormick, who was led to err by the prosecution.

For each of these reasons, as well as those set forth below, Mr. Avenatti respectfully requests that the Court order (1) that a proper and through review of the search warrant materials be conducted by a magistrate judge, or a special master, with ultimate privilege determinations made by a magistrate judge, in accordance with legal requirements and the Constitution; (2) all search warrant materials and documents previously produced by the Filter Team be disgorged by the prosecution team (which includes the investigating agents); (3) that no further review of the search warrant materials and documents occur by the Filter Team and the prosecution until the magistrate's review is completed, (4) that an evidentiary hearing be conducted so as to permit the defense to make adequate inquiry as requested herein as to issues surrounding the review, production and use of privileged materials, and (5) that the defense be permitted to conduct discovery as to the issues identified herein.

## II.    FACTUAL BACKGROUND

### A.    Mr. Avenatti and Eagan Avenatti, LLP

As of March 2019, Mr. Avenatti was a licensed attorney who had served as the Managing Partner of Eagan Avenatti, LLP (aka The Trial Group) ("EA" or "Eagan Avenatti, LLP"), a California law firm, since approximately 2011.  Mr. Avenatti was first licensed to practice law in California in June 2000 and later co-founded the firm in approximately August 2007 with two other attorneys.  By early March 2019, EA, Mr. Avenatti and the firm's other attorneys had represented literally thousands of clients over the years in connection with various investigations and cases across the United States. Some of those clients had been represented by EA and other attorneys of the firm in connection with federal criminal charges, or potential federal criminal charges, including

in the Central District of California.  *See, e.g.*, Declaration of Michael John Avenatti ("Avenatti Decl."), ¶¶ 1-2.

As of March 2019, the documents and materials relating to EA, Mr. Avenatti and other EA attorney's representation of clients were stored primarily (i) on the law firm's multiple servers; (ii) within the hard copy files of the firm, including within files kept by an employee with the initials "JR," the firm's Office Manager and lead paralegal; and (iii) on the personal devices of employees and attorneys of the firm, including Mr. Avenatti and JR, as well as the cloud.  These documents and materials collectively consisted of over one million emails, millions of pages of documents, and a huge amount of electronic data.  The servers alone held many terabytes of data.  As would be expected when dealing with a law firm's files, the information included vast amounts of information protected by the work product doctrine and the attorney-client privilege as of March 2019.  *See, e.g.*, Avenatti Decl., ¶¶ 3-4.

In addition, beginning in 2007 and continuing through approximately early 2019, Mr. Avenatti regularly used his EA email address to communicate with attorneys representing him in a myriad of various legal matters and likewise stored documents relating to those representations among the firm's files, including on its servers. Included among these files were communications between Mr. Avenatti and his counsel relating to potential criminal exposure of Mr. Avenatti and criminal investigations concerning Mr. Avenatti.  *See, e.g.*, Avenatti Decl. ¶ 5.

## B.  The Government's Search Warrant Applications and the Resulting Warrants

Beginning in March 2019, the government made various applications for search warrants relating to the investigation and prosecution of Mr. Avenatti.  The case numbers associated with the five search warrants at the center of this motion are as follows (each were filed in the Central District of California):  8:19-MJ-103 (Hon. Douglas F. McCormick); 8:19-MJ-243 (Hon. Douglas F. McCormick); 8:19-MJ-244 (Hon. Douglas

F. McCormick); 8:19-MJ-419 (Hon. Douglas F. McCormick); and 8:20-MJ-025 (Hon. Douglas F. McCormick). Each of the applications sought items and property to be searched and seized that was likely to include information protected by the attorney-client privilege and/or work product doctrine. In fact, the warrants from 243, 244 and 419 were specifically aimed directly at a law firm's files and electronic data, including that relating to Mr. Avenatti, EA and their clients. By way of the warrants, the prosecution targeted millions of pages of documents and materials for seizure and review, including EA's computer servers, which contained over one million emails, most of which would be covered by the attorney-client privilege or work product doctrine. Further, each of the applications associated with these warrants proposed substantially the same privilege assessment procedures for the handling of potentially privileged information. The warrants also subsequently included substantially the same privilege assessment procedures. *See*, *e.g.*, Exhibits A-C attached hereto.[3] They likewise contained substantially the same "special master" demand requirement.

Importantly, each of the warrants was obtained *ex parte*, with no opportunity for Mr. Avenatti, any attorney or any client to object to the scope of the warrant or the review procedures before issuance or immediately thereafter. They were also subsequently held under seal for months on end at the request of the government.

As with the warrant at issue in *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159 (2019), the privilege assessment procedures contained in the warrants obtained in this case were woefully inadequate and improper. Among other defects, the warrants unilaterally granted a judicial function (review of documents for privilege) to the executive branch. The warrants also permitted the production of documents to the prosecution team without any court order or judicial oversight, and without any

---

[3] In the interest of not inundating the Court, the defense is not filing each of the applications and warrants but will promptly do so upon request.

opportunity of Mr. Avenatti, EA or any of their clients to review the documents and materials *prior to* production to the prosecution team and to object.  *See id*.

The warrants also permitted production of documents to the prosecution after only a cursory computerized key word search was applied as opposed to a comprehensive document by document review for privilege.  In other words, after a small subset of key "privilege words" unilaterally chosen by the Investigative Team were applied to millions of pages of documents, any documents that did not include those key words would be automatically and immediately produced to the prosecution without any further review. As a result, if an email or document did not include one of the words, it was automatically assumed to not be privileged and was immediately turned over.  Further, if the Investigative Team did not give the name of one of Mr. Avenatti's attorneys or a key word relating to their representation of Mr. Avenatti to the Filter Team, then those documents would likewise be automatically produced.

Moreover, the warrants further permitted non-attorneys to be involved in the review and also seemed to suggest that the prosecution could contact clients of Mr. Avenatti or EA and seek a waiver of the attorney-client privilege, which would be entirely improper for the reasons clearly articulated by the Fourth Circuit.

Finally, the applications and the warrants included a "special master" request provision that placed the burden on Mr. Avenatti and others to demand, within seven days of the execution of the warrant, a special master if they wanted the privilege review conducted by the judicial branch.

Each of these defects rendered the warrants improper and made it a near certainty that privileged documents would be produced to the prosecution team and reviewed in violation of the rights of Mr. Avenatti, EA and the law firm's clients.

### C.    The Improper Productions and Review

On September 2, 2020, the Filter Team first disclosed to counsel for Mr. Avenatti that they had produced, and the prosecution team had received, approximately 299

attorney-client privileged documents reflecting communications between Mr. Avenatti and lawyers with which he enjoyed the privilege, and that the prosecution had reviewed at least some of those documents.  These documents total in excess of 1,000 pages and were in the possession of the prosecution team in some instances for over six months.  The defense subsequently learned that the prosecution and the Filter Team knew as early as May 14, 2020 that these documents had been improperly provided to the prosecution team.  *See*, *e.g.*, Docket No. 261, Exhibit A.  They also later admitted in an email sent among them that this needed to be disclosed.  *See id*.  Neither the prosecution team nor the Filter Team informed the defense or the Court of this problem for months.  An explanation has been requested by the defense, but none has been provided.

Some of the documents relate to the bankruptcy counts in the indictment (counts 33-36), which the prosecution has recently admitted in writing "have substantial overlap of evidence and witnesses" with counts 1-10 (the wire fraud counts).  The defense is also attempting to confirm that no other privileged documents beyond the 299 are in the possession of the prosecution team and/or have been reviewed.  They have asked for this confirmation from both the Filter Team and the prosecution repeatedly, but none has been provided.  In addition, other questions relating to the Filter Team's review and production, and the prosecution team's review and use, of the documents have been ignored.

III.   **ARGUMENT**

   A.   **The Attorney-Client Privilege**

The attorney-client privilege is the "oldest of the privileges for confidential communications known to the common law." *See Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981); *see also In re Grand Jury Subpoenas*, 454 F.3d 511, 519 (6th Cir. 2006) (explaining that "[t]he privilege protecting confidential communications between an attorney and his client dates back to the Tudor dynasty").  The attorney-client privilege empowers a client — as the privilege holder —

"to refuse to disclose and  to prevent any other person from disclosing confidential communications between him and his attorney." *See Black's Law Dictionary* 129 (6th ed. 1990).

The purpose of the attorney-client privilege is to ensure "full and frank communication" between a client and his lawyer and "thereby promote broader public interests in the observance of law and administration of justice." *See Upjohn Co.*, 449 U.S. at 389, 101 S.Ct. 677.  As the Supreme Court has consistently emphasized, the attorney-client privilege exists because "sound legal advice or advocacy serves public ends and . . . such advice or advocacy depends upon the lawyer's being fully informed by the client."  *Id.*; *see also Hunt v. Blackburn*, 128 U.S. 464, 470, 9 S.Ct. 125, 32 L.Ed. 488 (1888) ("The rule which places the seal of secrecy upon communications between client and attorney is founded upon the necessity, in the interest and administration of justice, of the aid of persons having knowledge of the law and skilled in its practice, which assistance can only be safely and readily availed of when free from the consequences or the apprehension of disclosure.")  Nowhere is this more important than in connection with the representation of a criminal defendant, as in this case, who is fighting for his liberty and faces significant prison time if convicted.

Further, in proceedings such as these, lawyers are obliged to protect the attorney-client privilege to the maximum possible extent on behalf of their clients. *See Republic Gear Co. v. Borg-Warner Corp.*, 381 F.2d 551, 556 (2d Cir. 1967) (recognizing that lawyer has duty to invoke claim of privilege on client's behalf); Model Rules of Prof'l Conduct r. 1.6(a), (c) (Am. Bar Ass'n 1983) (explaining that lawyer owes duty of confidentiality to client and must prevent unauthorized disclosure of confidential information).  Accordingly, Mr. Avenatti is entitled to pursue the legal positions herein not only on his own behalf, as the client, but also on behalf of each of his clients whose information was seized by the government.  *See Fisher v. United States*, 425 U.S. 391, 402 n.8, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976) ("[I]t is universally accepted that the

8

attorney-client privilege may be raised by the attorney[.]"); *In re Grand Jury Proceedings*, 727 F.2d 1352, 1354-55 (4th Cir. 1984) (emphasizing that a lawyer "is entitled to raise [a claim of] privilege on behalf of his ... client").

### B.    The Work Product Doctrine

Even though the work-product doctrine is not as established in history as the attorney-client privilege, it is no less important. The Supreme Court explicitly recognized and explained the work-product doctrine more than 70 years ago in its seminal decision in *Hickman v. Taylor,* 329 U.S. 495, 510-11, 67 S.Ct. 385, 91 L.Ed. 451 (1947).  In *Hickman*, the Court underscored that a lawyer must be able to "work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." Id. at 510, 67 S.Ct. 385.  Elaborating on that principle, the Court emphasized that "[p]roper preparation of a client's case demands that [a lawyer] assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference." *Id.* at 511, 67 S.Ct. 385.  Indeed, in a stern warning, the Court cautioned that absent strong protection for work product, "[i]nefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial," all to the detriment of clients and "the cause of justice." *Id.*

Thus, the Supreme Court has explicitly approved what it called "a qualified privilege," to be held by *lawyer and client alike*, "for certain materials prepared by an attorney 'acting for his client in anticipation of litigation.' " *See United States v. Nobles*, 422 U.S. 225, 237-38, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975) (quoting *Hickman*, 329 U.S. at 508, 67 S.Ct. 385). That privilege is the work-product doctrine, which has now been incorporated into the Federal Rules of Civil Procedure, see Fed. R. Civ. P. 26(b)(3), and the Federal Rules of Criminal Procedure, see Fed. R. Crim. P. 16(a)(2), (b)(2).  "The Work-product privilege, while properly construed more narrowly than attorney-client privilege, nevertheless operates for a similar purpose: that is, *that people should be free*

9

*to make requests of their attorneys without fear, and that their attorneys should be free*
*to conduct research and prepare litigation strategies without fear that these*
*preparations will be subject to review by outside parties." In re Grand Jury Subpoenas*,
454 F.3d at 520 (emphasis added).

There are two types of attorney work product that are within the ambit of the
doctrine: (1) fact work product, which is "a transaction of the factual events involved,"
and (2) opinion work product, which "represents the actual thoughts and impressions of
the attorney." *See In re Grand Jury Subpoena*, 870 F.3d 312, 316 (4th Cir. 2017)
(internal quotation marks omitted).

## C.     The Sixth Amendment

Critically, the attorney-client privilege and the work-product doctrine jointly
support the Sixth Amendment's guarantee of effective assistance of counsel. *See* U.S.
Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right ... to
have the Assistance of Counsel for his defence."); *Strickland v. Washington*, 466 U.S.
668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (analyzing Sixth Amendment right to
effective assistance of counsel). As the Fourth Circuit has held in assessing the interplay
between the attorney-client privilege and the Sixth Amendment, "[t]he essence of the
Sixth Amendment right to effective assistance of counsel is, indeed, privacy of
communication with counsel." *United States v. Brugman*, 655 F.2d 540, 546 (4th Cir.
1981). *See also*, *DeMassa v. Nunez*, 770 F.2d 1505, 1507 (9th Cir. 1985) (describing
Sixth Amendment as a "source" for the expectation of privacy in attorney-client
communications); 1 Geoffrey C. Hazard, Jr. et al., *The Law of Lawyering* § 10.14, 10-91
(4th ed. Supp. 2019) (explaining that "[t]he attorney-client privilege has ties to the Sixth
Amendment"). Absent privacy of communications and the "full and frank" discussions
that flow therefrom, a lawyer could be deprived of the information necessary to prepare
and present his client's defense and, as a result, a client, such as Mr. Avenatti, could be

deprived of due process and his right to a proper defense. *See Upjohn Co.*, 449 U.S. at 389, 101 S.Ct. 677.

In a similar vein, the work-product doctrine fulfills an essential and important role in ensuring the Sixth Amendment right to effective assistance of counsel. The Supreme Court has recognized that the work-product doctrine is vital to "assur[e] the proper functioning of the criminal justice system," in that it "provid[es] a privileged area within which [a lawyer] can analyze and prepare his client's case." *See Nobles*, 422 U.S. at 238, 95 S.Ct. 2160; *see also In re Grand Jury Subpoenas*, 454 F.3d at 520.  Without that "privileged area," a lawyer's ability to plan and present his client's defense will be impaired. *See Nobles*, 422 U.S. at 238, 95 S.Ct. 2160; *see also Hickman*, 329 U.S. at 511, 67 S.Ct. 385.

**D.    The Government and the Filter Team Disregarded Fundamental Principles Protecting Mr. Avenatti's Attorney-Client Relationships and Infringed on Mr. Avenatti's Fundamental Rights**

By (i) requesting *ex parte* the appointment of, and utilizing, the Filter Team, (ii) failing to timely serve the Search Warrants on Mr. Avenatti and others with an interest in the resulting materials, (iii) requesting and using a faulty and legally flawed protocol when reviewing the materials for privilege, and (iv) rifling through and reviewing millions of pages of documents protected by the attorney-client privilege and/or work product doctrine, including the over 1,000 pages now known to contain Mr. Avenatti's privileged information (and likely far more), the government deliberately and completely disregarded the foregoing principles protecting attorney-client relationships. *See Upjohn Co.*, 449 U.S. at 389, 101 S.Ct. 677 (emphasizing importance of attorney-client privilege); *Nobles*, 422 U.S. at 237-38, 95 S.Ct. 2160 (recognizing significance of protecting lawyer work product); *cf. Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 434 (4th Cir. 2003) (explaining that court abuses discretion in ignoring applicable legal principles). Critically, the government also failed to recognize that an adverse party's

review of privileged materials seriously injures the privilege holder. *See United States v. Philip Morris Inc.*, 314 F.3d 612, 622 (D.C. Cir. 2003) (concluding that a party had demonstrated the likelihood of irreparable harm predicated on "the general injury caused by the breach of the attorney-client privilege and the harm resulting from the disclosure of privileged documents to an adverse party"), abrogated on other grounds by *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 103, 130 S.Ct. 599, 175 L.Ed.2d 458 (2009); *In re Perrigo Co.*, 128 F.3d 430, 437 (6th Cir. 1997) (explaining that "forced disclosure of privileged material may bring about irreparable harm"); *Klitzman, Klitzman & Gallagher v. Krut*, 744 F.2d 955, 960-61 (3d Cir. 1984) (ruling that law firm had demonstrated likelihood of irreparable harm where government seized thousands of files containing privileged information).  Indeed, at bottom, the Filter Team and its protocol are incompatible with the historical protection of the attorney-client privilege and the work-product doctrine afforded by the Courts.

There is clear appearance of — and potential for — improprieties when government agents are authorized to rummage through a million plus pages of attorney-client communications, particularly when the vast majority of those communications relate to the investigations at issue.  It is no wonder then that those improprieties subsequently surfaced in this case.  Moreover, <u>judicial</u> functions are involved in *all aspects* of assessing and deciding privilege issues.  Accordingly, those functions were required to be performed by a magistrate judge or a special master.  At no time was the default position permitted to be what the government demanded, and what the magistrate judge permitted and ordered at their request when issuing the warrants *ex parte,* namely review by a Filter Team that was part of the <u>executive</u> branch.

       1.    <u>The government and the magistrate judge improperly assigned judicial functions to the Filter Team</u>

The government, by requesting, and the magistrate judge, by authorizing, the Filter Team and its protocol improperly assigned judicial functions to the executive

branch.  Determinations of whether a lawyer's communications or a lawyer's documents are protected by the attorney-client privilege or work-product doctrine are a judicial function.  *See NLRB v. Interbake Foods*, LLC, 637 F.3d 492, 498, 500 (4th Cir. 2011) (concluding that, in deciding whether to enforce an administrative subpoena seeking potentially privileged documents, a court "cannot delegate" an in camera review of documents to an agency, but must itself decide a claim of privilege); *see also In re The City of New York*, 607 F.3d 923, 947 (2d Cir. 2010) (observing that evaluating privilege claim is always a judicial function).  Indeed, the Constitution vests "[t]he judicial Power" solely in the federal courts, *see* U.S. Const. art. III, § 1, which includes "the duty of interpreting and applying" the law, *see Massachusetts v. Mellon*, 262 U.S. 447, 488, 43 S.Ct. 597, 67 L.Ed. 1078 (1923).  Put simply, a court is not entitled to delegate its judicial power and related functions to the executive branch, especially when, as here, the executive branch is an interested party in the pending dispute. *See Interbake Foods*, 637 F.3d at 501 (affirming refusal "to delegate" to an administrative law judge the judiciary's "responsibility to decide the issue of privilege"); *NLRB v. Detroit Newspapers*, 185 F.3d 602, 606 (6th Cir. 1999) (concluding that "district court had the obligation ... to determine whether the ubpoenaed documents were protected by some privilege, and had no discretion to delegate that duty").

Here, the privilege assessment provisions of the filter protocol directly contravened that nondelegation principle.  Those provisions erroneously authorized the executive branch — that is, the Filter Team — to make decisions on the attorney-client privilege and the work-product doctrine.  This was improper and violated Mr. Avenatti's rights as a client, as an attorney, and as a defendant, as well as those of countless of his clients.  A court cannot simply delegate its responsibility to decide privilege issues to another government branch.  *See*, *e.g.*, *Interbake Foods*, 637 F.3d at 498, 500-01. 637 F.3d at 498, 500-01 (recognizing that court must decide privilege disputes); *see also In re The City of New York*, 607 F.3d at 947 (observing that evaluating privilege claim

is a judicial function).  And yet this is what the government led the magistrate judge to do in this case by way of their requests.

To make matters worse, the privilege assessment provisions delegated judicial functions to non-lawyer members of the Filter Team, including litigation support personnel and computer forensic agents and personnel.  On information and belief, this included non-attorneys and contract attorneys without the requisite experience.  The Third Circuit has strongly criticized a similar protocol and explicitly ruled that nonlawyer federal agents could not make privilege determinations.  *See In re Search of Elec. Commc'ns, 802 F.3d 516, 530 & n.54 (3d Cir. 2015)*.

In addition to the separation of powers issues that arise from the filter protocol's delegation of judicial functions to the Filter Team, there are other apparent legal problems therewith. There is the possibility that a filter team — even if composed entirely of trained lawyers — will make errors in privilege determinations and in transmitting seized materials to an investigation or prosecution team.  ***Indeed, this is exactly what has transpired here with the transmission of at least 1,000 pages of privileged material (and likely more) and subsequent review by the prosecution of untold number of privileged documents.[4]***  The Sixth Circuit recognized several years ago that such filter teams present "reasonably foreseeable risks to privilege" and "have been implicated ... in leaks of confidential information to prosecutors." *See In re Grand Jury Subpoenas*, 454 F.3d at 523 (explaining that a filter team might "have an interest in preserving privilege, but it also possesses a conflicting interest in pursuing the investigation, and ... some [filter] team attorneys will make mistakes or violate their ethical obligations. It is thus logical to suppose that [filter] teams pose a serious risk to holders of privilege.").  As the Sixth Circuit also emphasized, filter team errors can arise from differences of opinion regarding privilege. *See In re Grand Jury Subpoenas*, 454

---

[4] As stated above, the defense is continuing to review the materials produced to the prosecution to determine the full extent of the improper disclosure and review of the privileged materials.

F.3d at 523. In explaining that problem, the court elaborated that a filter team's members "might have a more restrictive view of privilege" than the subject of the search, given their prosecutorial interests in pursuing the underlying investigations. *Id*. That "more restrictive view of privilege" could cause privileged documents to be misclassified and erroneously provided to an investigation or prosecution team as in this case. *Id*. As aptly explained by the Sixth Circuit, when describing one infamous error as follows: "In *United States v. Noriega*, 764 F. Supp. 1480 (S.D. Fla. 1991), . . . the government's [filter] team missed a document obviously protected by attorney-client privilege, by turning over tapes of attorney-client conversations to members of the investigating team. This Noriega incident points to an obvious flaw in the [filter] team procedure: the government's fox is left in charge of the [law firm's] henhouse, and may err by neglect or malice, as well as by honest differences of opinion. *See In re Grand Jury Subpoenas*, 454 F.3d at 523 (emphasis added). Here, the government, aided by the magistrate, purposely engineered and implemented a protocol designed to do just this - place the government's fox in charge of Mr. Avenatti's and his law firm's henhouse - thus all but guaranteeing that documents protected by the attorney-client privilege and work product doctrine would be reviewed and erroneously provided to the prosecution. It is thus no surprise that this is exactly what subsequently occurred.

> 2.     <u>The government and the magistrate judge prematurely and improperly authorized the Filter Team and its protocol in *ex parte* proceedings</u>

As explained above, the government successfully pursued the appointment of the Filter Team and the adoption of a protocol *ex parte*, with no notice to Mr. Avenatti or his clients. This was a fundamental error and infringed on the rights of Mr. Avenatti as a client, as a defendant, and as an attorney to thousands of clients, as well as Mr. Avenatti's clients themselves. Among other things, proceeding *ex parte* denied the magistrate judge information as to the voluminous amount of the documents and

materials to be seized and reviewed, as well as details relating to the fact that millions of pages and documents unrelated to the scope of the investigation into Mr. Avenatti were going to rifled through by the government.  Without presenting this information to the magistrate judge, the government should not have sought the appointment of the Filter Team or the protocol.  And without first obtaining this information, the appointment of the Filter Team and its protocol by the magistrate judge was improper and failed to show adequate deference to the attorney-client privilege and work product doctrine.

Moreover, the magistrate judge should have declined the government's ex parte invitations with respect to the Filter Team and insisted on conducting adversarial proceedings on whether to authorize the Filter Team and the filter protocol as proposed by the government.  *See*, *e.g.*, *RSZ Holdings AVV v. PDVSA Petroleo S.A.*, 506 F.3d 350, 356 (4th Cir. 2007) (emphasizing that ex parte proceedings are "greatly disfavored"); *In re Ingram*, 915 F. Supp. 2d 761, 763-64 (E.D. La. 2012) (assessing briefing from parties on propriety of filter team).  In subsequent contested proceedings, the judges could have been fully informed about the relevant background of (i) Mr. Avenatti's various lawyers and his relationship with them, (ii) Eagan Avenatti, LLP and its clients, and (iii) the volume and nature of the seized materials.  In addition to Mr. Avenatti, the clients of Eagan Avenatti, LLP and the other lawyers of the firm could have been heard by the judge.  All of this would have helped ensure that a proper procedure for review and production was implemented and that the risk of privileged materials being produced was all but eliminated.  If the magistrate judge had conducted adversarial proceedings after the searches but before approving the Filter Team and its protocol in this case, the judges would have been fully informed of the materials that were seized. The judge would then have heard from Mr. Avenatti, other lawyers from the firm, and possibly also from the clients of the firm through their lawyers, *before* the Filter Team reviewed any seized materials.  In failing to conduct adversarial proceedings prior to authorizing the Filter Team and its protocol, the magistrate judge prematurely granted the *ex parte*

requests of the Assistant United States Attorneys.

Furthermore, in summarily approving the Filter Team and its protocol *ex parte*, the magistrate judge gave no indication that he had weighed any of the important legal principles that protect attorney-client relationships.  Indeed, the filter protocol and warrants authorized government agents and prosecutors to rummage through approximately one hundred thousand of Mr. Avenatti's email files, as well as over 1.9 million other email files on the firm's servers, and tens of thousands of other documents, many of which constituted work product of the firm and were protected from disclosure. The vast majority of these documents concerned other clients and other matters. The court's authorization, at the urging of AUSAs Sagel and Andre, of such an extensive review of client communications and lawyer discussions by government agents and prosecutors was made in complete disregard of the attorney-client privilege, the work-product doctrine, and the Sixth Amendment.  *See, e.g., Klitzman, Klitzman & Gallagher v. Krut*, 744 F.2d at 961 (criticizing seizures of client files from law firm because government made no effort to limit seizures of firm's materials, and thereby "trampl[ed]" on attorney-client privilege and work-product protections as to all clients); *United States v. Stewart*, No. 1:02-cr-00396, 2002 WL 1300059, at *5, *10 (S.D.N.Y. June 11, 2002) (explaining that search of lawyer's office raised Sixth Amendment concerns and appointing special master where documents seized from law firm were likely to contain privileged information relating to criminal defendants). The magistrate judge committed clear error by failing to explicitly weigh and address the foundational principles that protect attorney-client relationships.

In addition, as set forth above in the Statement of Facts, various privilege assessment procedures contained in the warrants were woefully inadequate and improper under the law.  As but one example, the review provision allowing the Investigative Team to unilaterally choose the "privilege words" to be applied to the search warrant materials was especially dubious and placed the Investigative Team in a position to

predetermine what materials would be found to be privileged and which would be produced to the prosecution.

> ### 3. Mr. Avenatti and others were entitled to proper notice of the warrants and the magistrate's directives relating to the Filter Team and the protocol before any review occurred

To compound the errors committed by the government and the magistrate, no effort was made by the government to properly and timely serve the warrants, the applications, or the provisions relating to the appointment of the Filter Team and the adoption of the protocol on Mr. Avenatti, his clients, the clients of Eagan Avenatti, LLP and others as required.  For instance, the government, in its application filed on May 23, 2019, informed the magistrate:  "Attachment B to the proposed search warrant also sets forth a procedure to allow EA LLP, AVENATTI, and/or others to seek the appointment of a special master within seven days of the execution of the proposed search warrants. [fn] Although the government does not believe that the appointment of a special master would be necessary in this investigation, the government has included this provision to ensure that any such request is handled in a timely manner and does not unnecessarily delay IRS-CI's ongoing criminal investigation."  Case 8:19-mj-00419-DUTY, Docket No. 1, pp. 60-61.  In its footnote, the government stated, "An identical provision was included in Attachments B-1 through B-3 of the March 2019 warrants.  To date, no request for the appointment of a special master has been made following the execution of the March 2019 warrants on March 25, 2019."  *Id*. at 61.  The warrant issued by the magistrate subsequently included the provision requested by the government requiring that a request for a special master "must be filed with this Court within seven days of the execution of this Search Warrant," together with other requirements were such a request to be made.  *See* Case 8:19-mj-00419-DUTY, Docket No. 4, pp. xvii-xviii.

These facts evidence significant misconduct on the part of the government.  *First*, by default, any privilege review was required to be performed by the magistrate or a

special master appointed by the magistrate – not by the government (the executive branch), *see infra*.  No prior "request" for a special master was "required" by anyone for this to occur.  It was mandated by law.  *Second*, the government's statement to the magistrate that they did not believe that a special master was necessary was a deliberate and purposeful misstatement of the law designed to ensure that the government was improperly placed in charge of the privilege review – i.e. placed in charge of the henhouse.  *Third*, the procedure requested by the government and subsequently included by the magistrate was fundamentally flawed because no provision was included to ensure that proper, timely notice was provided to Mr. Avenatti, his attorneys, his clients, other attorneys of Eagan Avenatti, LLP, and other clients of the law firm so they could request the appointment of a special master (although such a request was not required under the law) and take appropriate action.  Moreover, the government subsequently undertook no efforts to properly and timely serve the applications and the warrants on these parties, let alone within seven days of the execution of the warrants.  Indeed, the government kept the warrants under seal for months thereafter.

As a result, the government advocated for and engineered a provision in the search warrants that they knew could never be utilized by Mr. Avenatti and others in a timely manner (i.e. within seven days of the execution of the warrants) because Mr. Avenatti and the others would not know about it until long after the time had expired and they had lost their ability to request a special master.  This was patently improper and demonstrated an egregious disregard for the attorney-client privilege and Mr. Avenatti's rights and the rights of others, including their right to due process and their right to protect their privileged information from review and disclosure.

### 4. Privileged documents should not have been produced to, let alone reviewed by, the prosecution team

For each of the reasons set forth above, the Filter Team should have never been vested with the power to review any materials, make any privilege determinations and

produce materials to the prosecution team, especially with no prior judicial approval and oversight.  Further, no privileged materials should have been reviewed by the prosecution.  The government - the Filter Team and the prosecution - violated Mr. Avenatti's rights, and the rights of others, by doing so.

### E.      Mr. Avenatti Is Entitled to Have a Magistrate Judge or Special Master Conduct a Proper Review

In light of the facts and law as detailed above and the failures of the Filter Team and the prosecution, Mr. Avenatti and others with a vested interest in the materials are entitled to have a proper and through review of the materials conducted by a magistrate judge, or a special master, with ultimate determinations made by a magistrate judge.  In the interim, all materials and documents previously produced by the Filter Team should be disgorged by the prosecution.  The defense has requested that no further review of the materials occur by the Filter Team and the prosecution, but that request has been refused.

Any argument by the government that a review by a magistrate of seized materials will unduly delay the government's investigations and the trial in this case should be rejected.  As the Fourth Circuit held in an analogous case just last year:

> The government chose to proceed by securing a search warrant for the Law Firm and seeking and obtaining the magistrate judge's approval of the Filter Protocol. The government should have been fully aware that use of a filter team in these circumstances was ripe for substantial legal challenges, and should have anticipated that those challenges could delay its investigations. And, in any event, delay in the government's investigations here does not outweigh the harm to the Law Firm and its clients caused by the Filter Team's review.

*In re Search Warrant Issued June 13, 2019*, 942 F.3d at 181-82 (citing *In re Grand Jury Subpoenas*, 454 F.3d at 523-24).  The result here should be no different.  It was the government's choice to proceed in the manner they did.  They should not now be rewarded for their malfeasance.

Moreover, the government should be supportive of ensuring that a proper review is conducted and that justice is done.  As the Fourth Circuit correctly observed:

> Due to the appearances of unfairness caused by the Filter Team, and in view of the other problems associated with the Filter Team, it is surprising that the government has so vigorously supported it. We simply observe that prosecutors have a responsibility to not only see that justice is done, but to also ensure that justice appears to be done. *See In re Search Warrant for Law Offices*, 153 F.R.D. at 59 ("The appearance of [j]ustice must be served, as well as the interests of [j]ustice.").  Federal agents and prosecutors rummaging through law firm materials that are protected by attorney-client privilege and the workproduct doctrine is at odds with the appearance of justice.

*In re Search Warrant Issued June 13, 2019*, 942 F.3d at 183.

**F.**   **Mr. Avenatti Is Entitled to An Evidentiary Hearing and Discovery Relating to the Filter Team's Review of Materials and Productions to the Prosecution Team, As Well as the Prosecution Team's Review and Use of Such Materials**

The defense is entitled to an evidentiary hearing and discovery concerning the Filter Team's review of the search warrant materials and their subsequent productions to the prosecution, as well as the prosecution team's review and use of protected materials. Only then can the defense determine whether to seek the disqualification of the prosecution team, dismissal of one or more charges in the indictment, and/or other relief.[5]

Among other things and at a minimum, the defense is entitled to statements under oath, under cross-examination, relating to how the privilege review was conducted, when and by whom; what documents were produced to the prosecution and when; what documents were reviewed by the prosecution, by whom, and for how long; what other

---

[5] The defense expressly reserves all rights in this regard.

privileged materials and documents have been produced and reviewed; how such documents have been utilized by the prosecution; whether any other potentially privileged or protected documents were provided to the prosecution team; and why the defense was not notified until early September that privileged materials had been produced even though the Filter Team and the prosecution knew of the issue months prior in mid-May.

The defense and the Court must also be assured that no other privileged or potentially privileged materials were provided to the prosecution team at any point in time during this case.  The defense has made inquiries to the Filter Team and the prosecution relating to these issues, but those inquiries have been largely ignored.

## IV.   <u>CONCLUSION</u>

For each of the reasons set forth above, Mr. Avenatti respectfully requests that the Court grant the motion.


Dated:  September 14, 2020          Respectfully submitted,
                                    /s/ H. Dean Steward
                                    H. DEAN STEWARD

                                    Attorney for Defendant
                                    MICHAEL JOHN AVENATTI

22

**<u>EXHIBIT A</u>**

UNDER SEAL

AO 93 (Rev. 11/13) Search and Seizure Warrant (USAO CDCA Rev. 04/17)

# UNITED STATES DISTRICT COURT
### for the
Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) | Case No. 8:19-MJ-243 |
| | ) | |
| 4491 Rainbow Lane, | ) | |
| Yorba Linda, California 92886 | ) | |
| | ) | |
| | ) | |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Central District of California *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-2*

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

*See Attachment B-2*

Such affidavit(s) or testimony are incorporated herein by reference.

**YOU ARE COMMANDED** to execute this warrant on or before <u>14 days from the date of its issuance</u> *(not to exceed 14 days)*

☒ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to <u>the U.S. Magistrate Judge on duty at the time of the return through a filing with the Clerk's Office.</u>

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for_____days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:   *March 04, 2015 at 6:15pm*          /s/
                                                                                    *Judge's signature*

City and state:   Santa Ana, CA          United States Magistrate Judge Douglas F. McCormick
                                                                        *Printed name and title*

AUSAs:  Julian L. André (213.894.6683) & Brett A. Sagel (714.338.3598)     **DOUGLAS F. McCORMICK**

AO 93 (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

| Certification |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A-2

**PREMISES TO BE SEARCHED**

The premises to be searched is a residential home at 4491 Rainbow Lane, Yorba Linda, California 92886 ("SUBJECT PREMISES 2"). SUBJECT PREMISES 2 is a single-story, single-family residence. SUBJECT PREMISES 2 is located on the west side of Rainbow Lane, a cul-de-sac, and south of Weatherly Drive. SUBJECT PREMISES 2 has a beige-colored stucco exterior with a shingle roof and an attached two-car garage with a white garage door facing the street. The numbers "4491" are affixed to the front exterior of SUBJECT PREMISES 2 along the roof trim on the left hand side of the entryway in black numerals. The numbers "4491" are also painted on the street curb in front of SUBJECT PREMISES 2 with black numerals on a white background. SUBJECT PREMISES 2 is set back from the driveway approximately two car lengths.

<u>ATTACHMENT B-2</u>

I.   <u>ITEMS TO BE SEIZED</u>

     1.   Evidence, contraband, fruits, and/or instrumentalities
of violations of 26 U.S.C. § 7201 (attempt to evade or defeat
tax); 26 U.S.C. § 7202 (willful failure to collect or pay over
tax); 26 U.S.C. § 7203 (willful failure to pay tax or file
return); 26 U.S.C. § 7212 (interference with administration of
internal revenue laws); 18 U.S.C. § 152 (concealment of assets
in bankruptcy); 18 U.S.C. § 157 (bankruptcy fraud); 18 U.S.C.
§ 371 (conspiracy); 18 U.S.C. § 1001 (false statements); 18
U.S.C. § 1014 (false statement to a bank or other federally
insured institution); 18 U.S.C. § 1028A (aggravated identity
theft); 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1344 (bank
fraud); and 18 U.S.C. § 1957 (money laundering) (the "Subject
Offenses"), namely:

          a.   Records, documents, programs, applications, or
materials from January 2011 through the present relating to the
ownership of Global Baristas US, LLC ("GBUS"); Global Baristas,
LLC ("GB LLC"); GB Autosport, LLC ("GB Auto"); GB Hospitality
LLC ("GB Hospitality"); Doppio Inc. ("Doppio"); Eagan Avenatti
LLP ("EA LLP"); and Avenatti & Associates, APC ("A&A")
(collectively, the "Subject Entities").

          b.   Records, documents, programs, applications, or
materials from January 2011 through the present relating to
Michael J. Avenatti's ("AVENATTI") control or management of any

i

of the Subject Entities and/or The X-Law Group, PC ("X-Law Group").

      c.  Records, documents, programs, applications, or materials from January 2011 through the present relating to the organizational or management structure of any of the Subject Entities and/or X-Law Group.

      d.  Records, documents, programs, applications, or materials from January 2011 through the present relating to the finances of any of the Subject Entities, including assets, income, liabilities, accounts receivable, accounts payable, and expenses.

      e.  Records, documents, programs, applications, or materials from January 2011 through the present relating to the personal finances of Michael Avenatti ("AVENATTI"), including information relating to AVENATTI's assets, debts, income, expenses, and net worth.

      f.  Records, documents, programs, applications, or materials from January 2011 through the present relating to the accounting records for AVENATTI and/or any of the Subject Entities, including any Microsoft Dynamics NAV, QuickBooks, or other electronic accounting data, files, or records.

      g.  Records, documents, programs, applications, or materials from January 201 through the present relating to any financial transactions, including any proposed or potential

ii

financial transactions, involving any of the Subject Entities, and/or AVENATTI.

h.   Records, documents, programs, applications, or materials from January 2011 through the present relating to any payments, checks, credits, wire transfers, commodities, services, or other things of value paid, provided, delivered, or transferred, directly or indirectly, to AVENATTI and/or any of the Subject Entities

i.   Records, documents, programs, applications, or materials from January 2011 through the present relating to any financial relationship between AVENATTI and/or any of the Subject Entities on one hand and X-Law Group and/or Filippo Marchino ("MARCHINO") on the other hand.

j.   Records, documents, programs, applications, or materials from January 2011 through the present relating to financial decisions AVENATTI and/or JUDY REGNIER ("REGNIER") made on behalf of any of the Subject Entities, including decisions to authorize payments on behalf of any of the Subject Entities and transfer money to or from any of the Subject Entities.

k.   Records, documents, programs, applications, or materials from January 2011 through the present relating to communications between AVENATTI and/or REGNIER and any financial institution regarding the transfer of funds to or from any

iii

account associated with AVENATTI and/or any of the Subject
Entities.

     l.   Records, documents, programs, applications, or
materials from January 2011 through the present relating to any
loans or other financing agreements, including any proposed or
potential loans or other financing agreements, involving any of
the Subject Entities and/or AVENATTI.

     m.   Records, documents, programs, applications, or
materials from January 2011 through the present relating to the
payroll obligations of the Subject Entities.

     n.   Non-privileged records, documents, programs,
applications, or materials from January 2011 through the present
relating to the federal, state, and/or local tax obligations,
tax returns, tax liabilities, or tax payments of any of the
Subject Entities and/or AVENATTI.

     o.   Non-privileged records, documents, programs,
applications, or materials from January 2011 through the present
relating to any liens, levies, garnishments, judgments,
encumbrances, or tax-related investigations or actions
associated with any of the Subject Entities and/or AVENATTI.

     p.   Records, documents, programs, applications, or
materials from January 2011 through the present relating to
attorneys' fees or costs earned or collected by EA LLP, A&A,
and/or AVENATTI, including attorney-client fee contracts,

engagement letters, fee agreements, cost-sharing agreements, fee-sharing agreements, settlement agreements, and client billing records, but excluding any such records relating to the representations of Stephanie Clifford or Julie Swetnick.

q.   Records, documents, programs, applications, or materials from January 2011 through the present relating to any of the Subject Entities' and/or AVENATTI's contractual relationships, including drafts and final versions of any executed, proposed, or potential contracts and agreements, bills of sale, correspondence regarding payments, and correspondence regarding the cancellation or modification of contracts and/or agreements.

r.   Records, documents, programs, applications, or materials from January 2011 through the present relating to any of the Subject Entities' and/or AVENATTI's bank account information.

s.   Records, documents, programs, applications, or materials from January 2011 through the present relating to the physical whereabouts of AVENATTI, and/or REGNIER, including calendars and calendar entries.

t.   Records, documents, programs, applications, or materials from January 1, 2014, to the present relating to AVENATTI and/or EA LLP's representation of G.B., including the approximately $1.6 million settlement payment that was

transferred to one of AVENATTI's City National Bank attorney trust account in or around January 2018.

u. Records, documents, programs, applications, or materials from January 1, 2017, to the present relating to AVENATTI's, EA LLP's, X-Law Group, and/or MARCHINO's representation of M.P. and L.T., including the approximately $8,146,288 payment that was transferred to one of AVENATTI's City National Bank attorney trust accounts in or around March 2018.

v. Records, documents, programs, applications, or materials from January 2013 through the present relating to the payroll and tax preparation services that Paychex provided to EA LLP and/or A&A, including any records, documents, programs, applications, or materials relating to changes in the payroll and tax services to be provided by Paychex.

w. Records, documents, programs, applications, or materials from January 2013 through the present relating to the payroll and tax preparation services that Ceridian HCM Inc. ("Ceridian") provided to GBUS, including any records, documents, programs, applications, or materials relating to changes in the payroll and tax services to be provided by Ceridian.

x. Records, documents, programs, applications, or materials from January 2013 through the present relating to the sale or purchase of TC Global, Inc. or Tully's Coffee.

y.  Records, documents, programs, applications, or materials from January 2013 through the present relating to the purchase or sale, including any proposed or attempted purchase or sale, of GBUS, GB LLC, or Doppio.

z.  Records, documents, programs, applications, or materials from January 2013 through the present relating to value of GBUS or GB LLC.

aa.  Records, documents, programs, applications, or materials from January 2013 through the present relating to GBUS's and GB LLC's merchant credit card processing accounts (the "merchant accounts"), including contracts, agreements, account applications, and correspondence regarding changes to the merchant accounts.

bb.  Records, documents, programs, applications, or materials from January 2011 through the present relating to the sale, rental, lease, purchase, maintenance, renovation, or remodeling of any of AVENATTI's residences, including his residences in Newport Beach, California; Laguna Beach, California; and Los Angeles, California.

cc.  Records, documents, programs, applications, or materials from January 2011 through the present relating to continuing legal education ("CLE") courses taken by AVENATTI, including any professional responsibility CLE courses, ethics CLE courses, or tax CLE courses.

dd.  Records, documents, programs, applications, or materials from January 2011 through the present relating to any of the Subject Entities' employee handbooks or manuals, employment contracts, compensation records, and employee lists.

ee.  Records, documents, programs, applications, or materials relating to any locations or services used by AVENATTI and/or any of the Subject Entities to store physical or electronic records.

ff.  Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

gg.  With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.  evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.  evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii.  evidence of the attachment of other devices;

iv. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v. evidence of the times the device was used;

vi. passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii. records of or information about Internet Protocol addresses used by the device;

ix. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2. As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3. As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal

digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS); and
security devices.

## II.   SEARCH PROCEDURES FOR HANDLING POTENTIALLY PRIVILEGED INFORMATION

4.   The following procedures will be followed at the time
of the search in order to avoid unnecessary disclosures of any
privileged attorney-client communications or work product:

### A.   Non-Digital Evidence

5.   Law enforcement personnel conducting the investigation
("the Investigation Team") may be present at the search, but may
not search or review any item prior to it being given to them by
the "Privilege Review Team" (previously designated individual(s)
not participating in the investigation of the case).

6.   The Privilege Review Team will review documents to see
whether or not the document appears to contain or refer to
communications between AVENATTI, REGNIER,  MARCHINO and/or any
other lawyers from EA LLP, A&A, and the X-Law Group on the one
hand and any person on the other hand; contain the work product

of AVENATTI, REGNIER, MARCHINO, and any other lawyers from EA
LLP, A&A, and the X-Law Group; or contain communications or
documents relating to the following law firms' representation of
AVENATTI, EA LLP, or A&A: (a) Foster Pepper PLLC; (b) Osborn
Machler PLLC; (c) Eisenhower Carlson PLLC;
(d) Talmadge/Fitzpatrick/ Tribe, PPLC; (e) The Brager Tax Law
Group; (f) SulmeyerKupetz; (g) Baker & Hostetler LLP;
(h) Shulman Hodges & Bastian LLP; (i) Legal & Tax Consulting
Group; (j) Pachulski Stang Ziehl & Jones LLP; (k) Foley &
Lardner LLP; (l) Raines Feldman, LLP; and (m) Pansky Markle
Attorneys at Law (collectively, the "potentially privileged
information"). Those documents not containing or referring to
such communications or work product may be turned over to the
Investigation Team for review.

  7. In consultation with a Privilege Review Team Assistant
United States Attorney ("PRTAUSA"), if appropriate, the
Privilege Review Team member will review any document identified
as appearing to contain potentially privileged information to
confirm that it contains potentially privileged information. If
it does not, it may be returned to an Investigation Team member.
If a member of the Privilege Review Team confirms that a
document contains potentially privileged information, then the
member will review only as much of the document as is necessary
to determine whether or not the document is within the scope of
the warrant. Those documents which contain potentially
privileged information but are not within the scope of the
warrant will be set aside and will not be subject to further

review or seizure absent subsequent authorization. Those documents which contain potentially privileged information and are within the scope of the warrant will be seized and sealed together in an enclosure, the outer portion of which will be marked as containing potentially privileged information. The Privilege Review Team member will also make sure that the locations where the documents containing potentially privileged information were seized have been documented.

8. The seized documents containing potentially privileged information will be delivered to the United States Attorney's Office for further review by a PRTAUSA. If that review reveals that a document does not contain potentially privileged information, or that an exception to the privilege applies, the document may be returned to the Investigation Team. If appropriate based on review of particular documents, the PRTAUSA may apply to the court for a finding with respect to the particular documents that no privilege, or an exception to the privilege, applies.

**B. Digital Evidence**

9. The Privilege Review Team will search for digital devices capable of being used to facilitate the Subject Offenses or capable of containing data falling within the scope of the items to be seized. The Privilege Review Team will then review the identified digital devices as set forth herein. The Investigation Team will review only digital device data which has been released by the Privilege Review Team.

10.  The Privilege Review Team will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location.

11.  The Privilege Review Team and the Investigation Team shall complete both stages of the search discussed herein as soon as is practicable but not to exceed 180 days from the date of execution of the warrant.  The government will not search the digital device(s) beyond this 180-day period without obtaining an extension of time order from the Court.

12.  The Investigation Team will provide the Privilege Review Team and/or appropriate litigation support personnel[1] with a list of "scope key words" to search for on the digital devices, to include words relating to the items to be seized as detailed above.  The Privilege Review Team will conduct an initial review of the digital devices using the scope key words, and by using search protocols specifically chosen to identify documents and data that appear to be within the scope of the warrant.  The Privilege Review Team may also do a more detailed quality check of this data and the results of this initial review, to ensure that the key word search is effective. Documents and data that are identified by this initial review, after quality check, as not within the scope of the warrant will

---

[1] Litigation support personnel and computer forensics agents or personnel, including IRS Computer Investigative Specialists, are authorized to assist both the Privilege Review Team and the Investigation Team in processing, filtering, and transferring documents and data seized during the execution of the warrant.

be maintained under seal and not further reviewed absent subsequent authorization.

13. The Investigation Team will also provide the Privilege Review Team with a list of "privilege key words" to search for among the documents and data that are identified by the initial review and quality check described above as appearing to fall within the scope of the warrant, to include specific words associated with AVENATTI, REGNIER, MARCHINO, and any of the following law firms (a) EA LLP; (b) A&A; (c) X-Law Group; (d) Foster Pepper PLLC; (e) Osborn Machler PLLC; (f) Eisenhower Carlson PLLC; (g) Talmadge/Fitzpatrick/ Tribe, PPLC; (h) The Brager Tax Law Group; (i) SulmeyerKupetz; (j) Baker & Hostetler LLP; (k) Shulman Hodges & Bastian LLP; (l) Legal & Tax Consulting Group; (m) Pachulski Stang Ziehl & Jones LLP; (n) Foley & Lardner LLP; (o) Raines Feldman, LLP; and (p) Pansky Markle Attorneys at Law. The privilege key words shall also include the above referenced law firms' domain names and lawyers' email addresses, and generic words such as "privileged," "work product." The Privilege Review Team will conduct a review of these documents and data using the privilege key words, and by using search protocols specifically chosen to identify documents and data containing potentially privileged information. Documents or data which are identified by this review as not potentially privileged may be given to the Investigation Team.

14. Documents or data that the privilege key word searches identify as potentially privileged will be reviewed by a

Privilege Review Team member to confirm that they contain potentially privileged information. Documents or data that are determined by this review not to be potentially privileged may be given to the Investigation Team. Documents or data that are determined by this review to be potentially privileged will be given to the United States Attorney's Office for further review by a PRTAUSA. Documents or data identified by the PRTAUSA after review as not potentially privileged may be given to the Investigation Team. If, after review, the PRTAUSA determines it to be appropriate, the PRTAUSA may apply to the court for a finding with respect to particular documents or data that no privilege, or an exception to the privilege, applies. Documents or data that are the subject of such a finding may be given to the Investigation Team.

15. Documents or data identified by the PRTAUSA(s) after review as privileged (that are not subject to a finding by a court of no privilege or an exception to the privilege) or potentially privileged and outside the scope of the items to be seized shall be segregated and sealed together in an enclosure, the outer portion of which will be marked as containing potentially privileged information, and maintained by the investigative agency. Such data or documents shall not be accessible by or given to the Investigation Team at any time absent authorization of the Court. However, the Privilege Review Team may, in its discretion, store the privileged and potentially privileged data and documents in a folder or a set of folders in a document review platform database, such as

Relativity or Eclipse, that remains inaccessible to the
Investigation Team.  The Privilege Review Team's access to this
separate document review platform database shall cease upon
expiration of the warrant.  However, litigation support
personnel from the United States Attorney's Office, United
States Department of Justice, and/or the investigating agency
may continue to access this separately-maintained document
review database for the purpose of database maintenance.

16.  The Investigation Team will search only the documents
and data that the Privilege Review Team provides to the
Investigation Team at any step listed above in order to locate
documents and data that are within the scope of the search
warrant.  The Investigation Team does not have to wait until the
entire privilege review is concluded to begin its review for
documents and data that are within the scope of the search
warrant.  The Privilege Review Team may also conduct the search
for documents and data within the scope of the search warrant if
that is more efficient.  This second "scope" review is intended
only to ensure that the initial scope key word review
successfully eliminated data outside the scope of the search
warrant from seizure.

C.   **Additional Privilege Review Procedures**

17.  The Privilege Review Team will segregate any
identifiable documents and/or data relating to Stephanie
Clifford v. Donald J. Trump, No. 2:18-CV-2217-SJO-FFM (C.D.
Cal.), the representation of Stephanie Clifford, and/or the
representation of Julie Swetnick.  Such documents and/or data

xvi

will be maintained under seal by the investigating agency
without further review as set forth in paragraphs 7 and 15 above
absent subsequent authorization from the Court. This provision,
however, shall not preclude the Privilege Review Team or
Investigation Team from reviewing financial and accounting
records covered by paragraphs 1.d, 1.f, 1.g, and 1.r above,
which reference the representations of Ms. Clifford or Ms.
Swetnick.

18. To the extent that any documents and/or data covered
by paragraph 1.p above, such as attorney-client fee contracts,
engagement letters, and client billing records, contain
information that is potentially protected by the attorney-client
privileged or the attorney-work-product doctrine, the Privilege
Review Team shall redact all such potentially privileged
information from the documents or data before releasing the
documents and/or data to the Investigation Team unless the
specific client agrees to waive the attorney-client privilege.

19. If, upon review, a member of the Investigation Team
determines that a document or data appears to contain
potentially privileged information, the Investigation Team
member shall discontinue its review of the document or data and
shall immediately notify a member of the Privilege Review Team.
The Investigation Team member may record identifying information
regarding the potentially privileged document or data that is
reasonably necessary to identify the document or data for the
Privilege Review Team. The Investigation Team shall not further
review any documents or data that appears to contain such

potentially privileged information until after the Privilege
Review Team has completed its review of the additional
potentially privileged information discovered by the
Investigation Team member.

20. In performing the reviews, both the Privilege Review
Team and the Investigation Team may:

a. search for and attempt to recover deleted,
"hidden," or encrypted data;

b. use tools to exclude normal operating system
files and standard third-party software that do not need to be
searched; and

c. use forensic examination and searching tools,
such as "EnCase," "FTK" (Forensic Tool Kit), Nuix, Axiom,
Relativity, and Eclipse, which tools may use hashing and other
sophisticated techniques.

21. If either the Privilege Review Team or the
Investigation Team, while searching a digital device, encounters
immediately apparent contraband or other evidence of a crime
outside the scope of the items to be seized, they shall
immediately discontinue the search of that device pending
further order of the Court and shall make and retain notes
detailing how the contraband or other evidence of a crime was
encountered, including how it was immediately apparent
contraband or evidence of a crime.

22. If the search determines that a digital device does
not contain any data falling within the list of items to be

seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

23. If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

24. If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the items to be seized (after the time for searching the device has expired) absent further court order.

25. The government may retain also a digital device if the government, within 14 days following the time period authorized by the Court for completing the search, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

26. After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

27. In order to search for data capable of being read or interpreted by a digital device, the Investigation Team is authorized to seize the following items:

a. Any digital device capable of being used to commit, further or store evidence of the offense(s) listed above;

b. Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c. Any magnetic, electronic, or optical storage device capable of storing digital data;

d. Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e. Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f. Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g. Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

28. During the execution of this search warrant, with respect to a biometric sensor-enabled device that is located at the SUBJECT PREMISES and falls within the scope of the warrant, the law enforcement personnel are authorized to: (1) depress the

thumb- and/or fingerprints of AVENATTI, REGNIER, and/or MARCHINO
onto the fingerprint sensor of the device (only when the device
has such a sensor), and direct which specific finger(s) and/or
thumb(s) shall be depressed; and (2) hold the device in front of
the face of AVENATTI, REGNIER, and/or MARCHINO his or her eyes
open to activate the facial-, iris-, or retina-recognition
feature, in order to gain access to the contents of any such
device.

29.   The special procedures relating to digital devices
found in this warrant govern only the search of digital devices
pursuant to the authority conferred by this warrant and do not
apply to any search of digital devices pursuant to any other
court order.

III.  **REQUESTS FOR APPOINTMENT OF A SPECIAL MASTER**

30.   To the extent that AVENATTI, REGNIER, EA LLP, A&A,
MARCHINO, and/or X-Law Group intend to request that a special
master be appointed to handle the review of any potentially
privileged information seized during the execution of this
Search Warrant, such a request must be filed with this Court
within seven days of the execution of this Search Warrant.  The
government will then have seven days to file any opposition to
such a request.

31.   Any request for the appointment of a special master
must, at a minimum, address the following issues:  (a) the legal
basis for the request; (b) the anticipated role of the special
master, should one be appointed; (c) proposed search and review
procedures to be followed by the special master, should one be

appointed; (d) proposed procedures for the selection of a
special master; (e) the names of at least three proposed special
masters; and (f) the party's ability to pay for any costs and
fees incurred by a special master.

**<u>EXHIBIT B</u>**

AO 93 (Rev. 11/13) Search and Seizure Warrant (USAO CDCA Rev. 04/17)



# UNITED STATES DISTRICT COURT

for the

Central District of California

**UNDER SEAL**

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

1910 West Sunset Boulevard, Suite 450,
Los Angeles, California 90026

)
)
)
)
)
)
)
)
)

Case No. 8:19-MJ-244

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Central District of California *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-3*

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

*See Attachment B-3*

Such affidavit(s) or testimony are incorporated herein by reference.

**YOU ARE COMMANDED** to execute this warrant on or before <u>14 days from the date of its issuance</u> *(not to exceed 14 days)*

☒ in the daytime 6:00 a.m. to 10:00 p.m.     ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to <u>the U.S. Magistrate Judge on duty at the time of the return through a filing with the Clerk's Office.</u>

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for ____ days *(not to exceed 30)*     ☐ until, the facts justifying, the later specific date of _____.

Date and time issued: **March 24, 2019 at 1:15 pm** _____     /S/ _____

Lajan Beach                                                     *Judge's signature*

City and state:    ~~Santa Ana, CA~~          <u>United States Magistrate Judge Douglas F. McCormick</u>

**DOUGLAS F. MCCORMICK**
*Printed name and title*

AUSAs:  Julian L. André (213.894.6683) & Brett A. Sagel (714.338.3598)

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

| Inventory made in the presence of : |
|---|

| Inventory of the property taken and name of any person(s) seized: |
|---|

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A-3

**PREMISES TO BE SEARCHED**

The premises to be searched is Suite 450 of the commercial office building located at 1910 West Sunset Boulevard, Los Angeles, California 90026 ("SUBJECT PREMISES 3"). SUBJECT PREMISES 3 is situated on the south side of Sunset Boulevard between Park Avenue to the west and the overpass intersection of Glendale Boulevard to the east. The building consists of one (1) ground floor and seven (7) floors above the ground floor. The "citibank" commercial sign is affixed to the top and directly above the seventh (7th) floor of the exterior north, east, and west sides of the building.

SUBJECT PREMISES 3 has a pedestrian entrance on Glendale Boulevard or the east side of the building, and a pedestrian front entrance located and accessible from the south side of Sunset Boulevard, with that entrance facing north. The fixed glass pane above the two pedestrian doors contains three lines of white lettering that has "1910" on the first line, "Rolf K. McPherson" on the second line, and "BUILDING" on the third line.

On the east side of the SUBJECT PREMISES 3's lobby, an electronic directory exists listing the building's tenants and their respective suites. The X-Law Group, P.C. is listed in the electronic directory with the number 450, and located on the fourth floor.

**ATTACHMENT B-3**

## I.    ITEMS TO BE SEIZED

1.    Evidence, contraband, fruits, and/or instrumentalities of violations of 26 U.S.C. § 7201 (attempt to evade or defeat tax); 26 U.S.C. § 7202 (willful failure to collect or pay over tax); 26 U.S.C. § 7203 (willful failure to pay tax or file return); 26 U.S.C. § 7212 (interference with administration of internal revenue laws); 18 U.S.C. § 152 (concealment of assets in bankruptcy); 18 U.S.C. § 157 (bankruptcy fraud); 18 U.S.C. § 371 (conspiracy); 18 U.S.C. § 1001 (false statements); 18 U.S.C. § 1014 (false statement to a bank or other federally insured institution); 18 U.S.C. § 1028A (aggravated identity theft); 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1344 (bank fraud); and 18 U.S.C. § 1957 (money laundering) (the "Subject Offenses"), namely:

a.    Records, documents, programs, applications, or materials from January 2011 through the present relating to the ownership of Global Baristas US, LLC ("GBUS"); Global Baristas, LLC ("GB LLC"); GB Autosport, LLC ("GB Auto"); GB Hospitality LLC ("GB Hospitality"); Doppio Inc. ("Doppio"); Eagan Avenatti LLP ("EA LLP"); and Avenatti & Associates, APC ("A&A") (collectively, the "Subject Entities").

b.    Records, documents, programs, applications, or materials from January 2011 through the present relating to Michael J. Avenatti's ("AVENATTI") control or management of any

i

of the Subject Entities and/or The X-Law Group, PC ("X-Law Group").

        c.   Records, documents, programs, applications, or materials from January 2011 through the present relating to the organizational or management structure of any of the Subject Entities and/or X-Law Group.

        d.   Records, documents, programs, applications, or materials from January 2011 through the present relating to the finances of any of the Subject Entities, including assets, income, liabilities, accounts receivable, accounts payable, and expenses.

        e.   Records, documents, programs, applications, or materials from January 2011 through the present relating to the personal finances of Michael Avenatti ("AVENATTI"), including information relating to AVENATTI's assets, debts, income, expenses, and net worth.

        f.   Records, documents, programs, applications, or materials from January 2011 through the present relating to the accounting records for AVENATTI and/or any of the Subject Entities, including any Microsoft Dynamics NAV, QuickBooks, or other electronic accounting data, files, or records.

        g.   Records, documents, programs, applications, or materials from January 201 through the present relating to any financial transactions, including any proposed or potential

ii

financial transactions, involving any of the Subject Entities, and/or AVENATTI.

        h.    Records, documents, programs, applications, or materials from January 2011 through the present relating to any payments, checks, credits, wire transfers, commodities, services, or other things of value paid, provided, delivered, or transferred, directly or indirectly, to AVENATTI and/or any of the Subject Entities

        i.    Records, documents, programs, applications, or materials from January 2011 through the present relating to any financial relationship between AVENATTI and/or any of the Subject Entities on one hand and X-Law Group and/or Filippo Marchino ("MARCHINO") on the other hand.

        j.    Records, documents, programs, applications, or materials from January 2011 through the present relating to financial decisions AVENATTI and/or JUDY REGNIER ("REGNIER") made on behalf of any of the Subject Entities, including decisions to authorize payments on behalf of any of the Subject Entities and transfer money to or from any of the Subject Entities.

        k.    Records, documents, programs, applications, or materials from January 2011 through the present relating to communications between AVENATTI and/or REGNIER and any financial institution regarding the transfer of funds to or from any

iii

account associated with AVENATTI and/or any of the Subject
Entities.

l.   Records, documents, programs, applications, or
materials from January 2011 through the present relating to any
loans or other financing agreements, including any proposed or
potential loans or other financing agreements, involving any of
the Subject Entities and/or AVENATTI.

m.   Records, documents, programs, applications, or
materials from January 2011 through the present relating to the
payroll obligations of the Subject Entities.

n.   Non-privileged records, documents, programs,
applications, or materials from January 2011 through the present
relating to the federal, state, and/or local tax obligations,
tax returns, tax liabilities, or tax payments of any of the
Subject Entities and/or AVENATTI.

o.   Non-privileged records, documents, programs,
applications, or materials from January 2011 through the present
relating to any liens, levies, garnishments, judgments,
encumbrances, or tax-related investigations or actions
associated with any of the Subject Entities and/or AVENATTI.

p.   Records, documents, programs, applications, or
materials from January 2011 through the present relating to
attorneys' fees or costs earned or collected by EA LLP, A&A,
and/or AVENATTI, including attorney-client fee contracts,

iv

engagement letters, fee agreements, cost-sharing agreements, fee-sharing agreements, settlement agreements, and client billing records, but excluding any such records relating to the representations of Stephanie Clifford or Julie Swetnick.

q.  Records, documents, programs, applications, or materials from January 2011 through the present relating to any of the Subject Entities' and/or AVENATTI's contractual relationships, including drafts and final versions of any executed, proposed, or potential contracts and agreements, bills of sale, correspondence regarding payments, and correspondence regarding the cancellation or modification of contracts and/or agreements.

r.  Records, documents, programs, applications, or materials from January 2011 through the present relating to any of the Subject Entities' and/or AVENATTI's bank account information.

s.  Records, documents, programs, applications, or materials from January 2011 through the present relating to the physical whereabouts of AVENATTI, and/or REGNIER, including calendars and calendar entries.

t.  Records, documents, programs, applications, or materials from January 1, 2014, to the present relating to AVENATTI and/or EA LLP's representation of G.B., including the approximately $1.6 million settlement payment that was

transferred to one of AVENATTI's City National Bank attorney trust account in or around January 2018.

u.   Records, documents, programs, applications, or materials from January 1, 2017, to the present relating to AVENATTI's, EA LLP's, X-Law Group, and/or MARCHINO's representation of M.P. and L.T., including the approximately $8,146,288 payment that was transferred to one of AVENATTI's City National Bank attorney trust accounts in or around March 2018.

v.   Records, documents, programs, applications, or materials from January 2013 through the present relating to the payroll and tax preparation services that Paychex provided to EA LLP and/or A&A, including any records, documents, programs, applications, or materials relating to changes in the payroll and tax services to be provided by Paychex.

w.   Records, documents, programs, applications, or materials from January 2013 through the present relating to the payroll and tax preparation services that Ceridian HCM Inc. ("Ceridian") provided to GBUS, including any records, documents, programs, applications, or materials relating to changes in the payroll and tax services to be provided by Ceridian.

x.   Records, documents, programs, applications, or materials from January 2013 through the present relating to the sale or purchase of TC Global, Inc. or Tully's Coffee.

        y.    Records, documents, programs, applications, or
materials from January 2013 through the present relating to the
purchase or sale, including any proposed or attempted purchase
or sale, of GBUS, GB LLC, or Doppio.

        z.    Records, documents, programs, applications, or
materials from January 2013 through the present relating to
value of GBUS or GB LLC.

        aa.   Records, documents, programs, applications, or
materials from January 2013 through the present relating to
GBUS's and GB LLC's merchant credit card processing accounts
(the "merchant accounts"), including contracts, agreements,
account applications, and correspondence regarding changes to
the merchant accounts.

        bb.   Records, documents, programs, applications, or
materials from January 2011 through the present relating to the
sale, rental, lease, purchase, maintenance, renovation, or
remodeling of any of AVENATTI's residences, including his
residences in Newport Beach, California; Laguna Beach,
California; and Los Angeles, California.

        cc.   Records, documents, programs, applications, or
materials from January 2011 through the present relating to
continuing legal education ("CLE") courses taken by AVENATTI,
including any professional responsibility CLE courses, ethics
CLE courses, or tax CLE courses.

dd. Records, documents, programs, applications, or materials from January 2011 through the present relating to any of the Subject Entities' employee handbooks or manuals, employment contracts, compensation records, and employee lists.

ee. Records, documents, programs, applications, or materials relating to any locations or services used by AVENATTI and/or any of the Subject Entities to store physical or electronic records.

ff. Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

gg. With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

viii

iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.  evidence of the times the device was used;

vi.  passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.  records of or information about Internet Protocol addresses used by the device;

ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.  As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal

ix

digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II. SEARCH PROCEDURES FOR HANDLING POTENTIALLY PRIVILEGED INFORMATION

4.   The following procedures will be followed at the time of the search in order to avoid unnecessary disclosures of any privileged attorney-client communications or work product:

### A.   Non-Digital Evidence

5.   Law enforcement personnel conducting the investigation ("the Investigation Team") may be present at the search, but may not search or review any item prior to it being given to them by the "Privilege Review Team" (previously designated individual(s) not participating in the investigation of the case).

6.   The Privilege Review Team will review documents to see whether or not the document appears to contain or refer to communications between AVENATTI, REGNIER,  MARCHINO and/or any other lawyers from EA LLP, A&A, and the X-Law Group on the one hand and any person on the other hand; contain the work product

of AVENATTI, REGNIER, MARCHINO, and any other lawyers from EA LLP, A&A, and the X-Law Group; or contain communications or documents relating to the following law firms' representation of AVENATTI, EA LLP, or A&A:  (a) Foster Pepper PLLC; (b) Osborn Machler PLLC; (c) Eisenhower Carlson PLLC; (d) Talmadge/Fitzpatrick/ Tribe, PPLC; (e) The Brager Tax Law Group; (f) SulmeyerKupetz; (g) Baker & Hostetler LLP; (h) Shulman Hodges & Bastian LLP; (i) Legal & Tax Consulting Group; (j) Pachulski Stang Ziehl & Jones LLP; (k) Foley & Lardner LLP; (l) Raines Feldman, LLP; and (m) Pansky Markle Attorneys at Law (collectively, the "potentially privileged information").  Those documents not containing or referring to such communications or work product may be turned over to the Investigation Team for review.

7.  In consultation with a Privilege Review Team Assistant United States Attorney ("PRTAUSA"), if appropriate, the Privilege Review Team member will review any document identified as appearing to contain potentially privileged information to confirm that it contains potentially privileged information.  If it does not, it may be returned to an Investigation Team member. If a member of the Privilege Review Team confirms that a document contains potentially privileged information, then the member will review only as much of the document as is necessary to determine whether or not the document is within the scope of the warrant.  Those documents which contain potentially privileged information but are not within the scope of the warrant will be set aside and will not be subject to further

review or seizure absent subsequent authorization. Those documents which contain potentially privileged information and are within the scope of the warrant will be seized and sealed together in an enclosure, the outer portion of which will be marked as containing potentially privileged information. The Privilege Review Team member will also make sure that the locations where the documents containing potentially privileged information were seized have been documented.

8. The seized documents containing potentially privileged information will be delivered to the United States Attorney's Office for further review by a PRTAUSA. If that review reveals that a document does not contain potentially privileged information, or that an exception to the privilege applies, the document may be returned to the Investigation Team. If appropriate based on review of particular documents, the PRTAUSA may apply to the court for a finding with respect to the particular documents that no privilege, or an exception to the privilege, applies.

**B.    Digital Evidence**

9. The Privilege Review Team will search for digital devices capable of being used to facilitate the Subject Offenses or capable of containing data falling within the scope of the items to be seized. The Privilege Review Team will then review the identified digital devices as set forth herein. The Investigation Team will review only digital device data which has been released by the Privilege Review Team.

10. The Privilege Review Team will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location.

11. The Privilege Review Team and the Investigation Team shall complete both stages of the search discussed herein as soon as is practicable but not to exceed 180 days from the date of execution of the warrant. The government will not search the digital device(s) beyond this 180-day period without obtaining an extension of time order from the Court.

12. The Investigation Team will provide the Privilege Review Team and/or appropriate litigation support personnel[1] with a list of "scope key words" to search for on the digital devices, to include words relating to the items to be seized as detailed above. The Privilege Review Team will conduct an initial review of the digital devices using the scope key words, and by using search protocols specifically chosen to identify documents and data that appear to be within the scope of the warrant. The Privilege Review Team may also do a more detailed quality check of this data and the results of this initial review, to ensure that the key word search is effective. Documents and data that are identified by this initial review, after quality check, as not within the scope of the warrant will

---

[1] Litigation support personnel and computer forensics agents or personnel, including IRS Computer Investigative Specialists, are authorized to assist both the Privilege Review Team and the Investigation Team in processing, filtering, and transferring documents and data seized during the execution of the warrant.

be maintained under seal and not further reviewed absent subsequent authorization.

13. The Investigation Team will also provide the Privilege Review Team with a list of "privilege key words" to search for among the documents and data that are identified by the initial review and quality check described above as appearing to fall within the scope of the warrant, to include specific words associated with AVENATTI, REGNIER, MARCHINO, and any of the following law firms (a) EA LLP; (b) A&A; (c) X-Law Group; (d) Foster Pepper PLLC; (e) Osborn Machler PLLC; (f) Eisenhower Carlson PLLC; (g) Talmadge/Fitzpatrick/ Tribe, PPLC; (h) The Brager Tax Law Group; (i) SulmeyerKupetz; (j) Baker & Hostetler LLP; (k) Shulman Hodges & Bastian LLP; (l) Legal & Tax Consulting Group; (m) Pachulski Stang Ziehl & Jones LLP; (n) Foley & Lardner LLP; (o) Raines Feldman, LLP; and (p) Pansky Markle Attorneys at Law. The privilege key words shall also include the above referenced law firms' domain names and lawyers' email addresses, and generic words such as "privileged," "work product." The Privilege Review Team will conduct a review of these documents and data using the privilege key words, and by using search protocols specifically chosen to identify documents and data containing potentially privileged information. Documents or data which are identified by this review as not potentially privileged may be given to the Investigation Team.

14. Documents or data that the privilege key word searches identify as potentially privileged will be reviewed by a

xiv

Privilege Review Team member to confirm that they contain
potentially privileged information.  Documents or data that are
determined by this review not to be potentially privileged may
be given to the Investigation Team.  Documents or data that are
determined by this review to be potentially privileged will be
given to the United States Attorney's Office for further review
by a PRTAUSA.  Documents or data identified by the PRTAUSA after
review as not potentially privileged may be given to the
Investigation Team.  If, after review, the PRTAUSA determines it
to be appropriate, the PRTAUSA may apply to the court for a
finding with respect to particular documents or data that no
privilege, or an exception to the privilege, applies.  Documents
or data that are the subject of such a finding may be given to
the Investigation Team.

15.  Documents or data identified by the PRTAUSA(s) after
review as privileged (that are not subject to a finding by a
court of no privilege or an exception to the privilege) or
potentially privileged and outside the scope of the items to be
seized shall be segregated and sealed together in an enclosure,
the outer portion of which will be marked as containing
potentially privileged information, and maintained by the
investigative agency.  Such data or documents shall not be
accessible by or given to the Investigation Team at any time
absent authorization of the Court.  However, the Privilege
Review Team may, in its discretion, store the privileged and
potentially privileged data and documents in a folder or a set
of folders in a document review platform database, such as

xv

Relativity or Eclipse, that remains inaccessible to the
Investigation Team.  The Privilege Review Team's access to this
separate document review platform database shall cease upon
expiration of the warrant.  However, litigation support
personnel from the United States Attorney's Office, United
States Department of Justice, and/or the investigating agency
may continue to access this separately-maintained document
review database for the purpose of database maintenance.

16.  The Investigation Team will search only the documents
and data that the Privilege Review Team provides to the
Investigation Team at any step listed above in order to locate
documents and data that are within the scope of the search
warrant.  The Investigation Team does not have to wait until the
entire privilege review is concluded to begin its review for
documents and data that are within the scope of the search
warrant.  The Privilege Review Team may also conduct the search
for documents and data within the scope of the search warrant if
that is more efficient.  This second "scope" review is intended
only to ensure that the initial scope key word review
successfully eliminated data outside the scope of the search
warrant from seizure.

C.  **Additional Privilege Review Procedures**

17.  The Privilege Review Team will segregate any
identifiable documents and/or data relating to Stephanie
Clifford v. Donald J. Trump, No. 2:18-CV-2217-SJO-FFM (C.D.
Cal.), the representation of Stephanie Clifford, and/or the
representation of Julie Swetnick.  Such documents and/or data

will be maintained under seal by the investigating agency
without further review as set forth in paragraphs 7 and 15 above
absent subsequent authorization from the Court.  This provision,
however, shall not preclude the Privilege Review Team or
Investigation Team from reviewing financial and accounting
records covered by paragraphs 1.d, 1.f, 1.g, and 1.r above,
which reference the representations of Ms. Clifford or Ms.
Swetnick.

18.  To the extent that any documents and/or data covered
by paragraph 1.p above, such as attorney-client fee contracts,
engagement letters, and client billing records, contain
information that is potentially protected by the attorney-client
privileged or the attorney-work-product doctrine, the Privilege
Review Team shall redact all such potentially privileged
information from the documents or data before releasing the
documents and/or data to the Investigation Team unless the
specific client agrees to waive the attorney-client privilege.

19.  If, upon review, a member of the Investigation Team
determines that a document or data appears to contain
potentially privileged information, the Investigation Team
member shall discontinue its review of the document or data and
shall immediately notify a member of the Privilege Review Team.
The Investigation Team member may record identifying information
regarding the potentially privileged document or data that is
reasonably necessary to identify the document or data for the
Privilege Review Team.  The Investigation Team shall not further
review any documents or data that appears to contain such

potentially privileged information until after the Privilege
Review Team has completed its review of the additional
potentially privileged information discovered by the
Investigation Team member.

20. In performing the reviews, both the Privilege Review
Team and the Investigation Team may:

  a. search for and attempt to recover deleted,
"hidden," or encrypted data;

  b. use tools to exclude normal operating system
files and standard third-party software that do not need to be
searched; and

  c. use forensic examination and searching tools,
such as "EnCase," "FTK" (Forensic Tool Kit), Nuix, Axiom,
Relativity, and Eclipse, which tools may use hashing and other
sophisticated techniques.

21. If either the Privilege Review Team or the
Investigation Team, while searching a digital device, encounters
immediately apparent contraband or other evidence of a crime
outside the scope of the items to be seized, they shall
immediately discontinue the search of that device pending
further order of the Court and shall make and retain notes
detailing how the contraband or other evidence of a crime was
encountered, including how it was immediately apparent
contraband or evidence of a crime.

22. If the search determines that a digital device does
not contain any data falling within the list of items to be

seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

23. If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

24. If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the items to be seized (after the time for searching the device has expired) absent further court order.

25. The government may retain also a digital device if the government, within 14 days following the time period authorized by the Court for completing the search, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

26. After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

27.    In order to search for data capable of being read or interpreted by a digital device, the Investigation Team is authorized to seize the following items:

a.    Any digital device capable of being used to commit, further or store evidence of the offense(s) listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

28.    During the execution of this search warrant, with respect to a biometric sensor-enabled device that is located at the SUBJECT PREMISES and falls within the scope of the warrant, the law enforcement personnel are authorized to: (1) depress the

thumb- and/or fingerprints of AVENATTI, REGNIER, and/or MARCHINO onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the face of AVENATTI, REGNIER, and/or MARCHINO his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.

29.  The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

**III.  REQUESTS FOR APPOINTMENT OF A SPECIAL MASTER**

30.  To the extent that AVENATTI, REGNIER, EA LLP, A&A, MARCHINO, and/or X-Law Group intend to request that a special master be appointed to handle the review of any potentially privileged information seized during the execution of this Search Warrant, such a request must be filed with this Court within seven days of the execution of this Search Warrant.  The government will then have seven days to file any opposition to such a request.

Any request for the appointment of a special master must, at a minimum, address the following issues:  (a) the legal basis for the request; (b) the anticipated role of the special master, should one be appointed; (c) proposed search and review procedures to be followed by the special master, should one be

xxi

appointed; (d) proposed procedures for the selection of a special master; (e) the names of at least three proposed special masters; and (f) the party's ability to pay for any costs and fees incurred by a special master.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**EXHIBIT C**

27
28

AO 93 (Rev. 11/13) Search and Seizure Warrant (USAO CDCA Rev. 04/17)

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br><br>Ten Digital Devices in the Custody of the Internal Revenue Service – Criminal Investigation | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 8:19-MJ-419 |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

        An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Central District of California *(identify the person or describe the property to be searched and give its location)*:

     *See Attachment A*

        I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

     *See Attachment B*

     Such affidavit(s) or testimony are incorporated herein by reference.

        **YOU ARE COMMANDED** to execute this warrant on or before <u>14 days from the date of its issuance</u> *(not to exceed 14 days)*

  ☒ in the daytime 6:00 a.m. to 10:00 p.m.  ☐ at any time in the day or night because good cause has been established.

        Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

        The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to <u>the U.S. Magistrate Judge on duty at the time of the return through a filing with the Clerk's Office.</u>

     ☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

  ☐ for _____ days *(not to exceed 30)*  ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:  <u>May 24, 2019, at 11:30 am</u>

                                **DOUGLAS F. McCORMICK**
                                       *Judge's signature*

City and state:  <u>Santa Ana, CA</u>             <u>United States Magistrate Judge Douglas F. McCormick</u>
                                             *Printed name and title*

AUSAs:  Julian L. André (213.894.6683) & Brett A. Sagel (714.338.3598)

AO 93 (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

| Certification |
|---|

     I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____


_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

**PROPERTY TO BE SEARCHED**

The following digital devices (the "SUBJECT DEVICES") or forensic images thereof, which are currently maintained in the custody of the Internal Revenue Service-Criminal Investigation ("IRS-CI") in Los Angeles and Santa Ana, California:

1.    Dell PowerEdge R410, bearing serial number 52RKCK1, obtained by IRS-CI from MixinIT via consent from the court-appointed receiver for Eagan Avenatti LLP ("EA LLP") on or about April 4, 2019 ("SUBJECT DEVICE 1");

2.    Dell PowerEdge R710, bearing serial number 2GMPCK1, obtained by IRS-CI from MixinIT via consent from the court-appointed receiver for EA LLP on or about April 4, 2019 ("SUBJECT DEVICE 2");

3.    HP ProLiant DL380 G7, bearing serial number A1979827, obtained by IRS-CI from MixinIT via consent from the court-appointed receiver for EA LLP on or about April 4, 2019 ("SUBJECT DEVICE 3");

4.    HP ProLiant DL380 G7, bearing serial number A1979828, obtained by IRS-CI from MixinIT via consent from the court-appointed receiver for EA LLP on or about April 4, 2019 ("SUBJECT DEVICE 4");

5.    HP ProLiant DL380 G7, bearing serial number A1884814, obtained by IRS-CI from MixinIT via consent from the court-appointed receiver for EA LLP on or about April 4, 2019 ("SUBJECT DEVICE 5");

6. HP ProLiant DL160 G6, bearing serial number MXQ9520ABM, obtained by IRS-CI from MixinIT via consent from the court-appointed receiver for EA LLP on or about April 4, 2019 ("SUBJECT DEVICE 6");

7. A black USB drive marked "27989," which was seized by law enforcement agents from AVENATTI on March 25, 2019. IRS-CI obtained the forensic image of the digital device from the United States Attorney's Office for the Southern District of New York ("SDNY USAO") on or about May 22, 2019 ("SUBJECT DEVICE 7");

8. A blue and silver USB drive marked "RAEN," which was seized by law enforcement agents from AVENATTI on March 25, 2019. IRS-CI obtained the forensic image of the digital device from the SDNY USAO on or about May 22, 2019 ("SUBJECT DEVICE 8");

9. A silver and purple USB drive marked "8025328," which was seized by law enforcement agents from VENATTI on March 25, 2019. IRS-CI obtained the forensic image of the digital device from the SDNY USAO on or about May 22, 2019 ("SUBJECT DEVICE 9"); and

10. A compact disc containing scanned copies of miscellaneous documents that were seized by law enforcement agents from AVENATTI's briefcase on March 25, 2019. The SDNY USAO scanned the documents and placed them on the disc and provided the disc to IRS-CI on or about May 17, 2019 ("SUBJECT DEVICE 10") (collectively, the "SUBJECT DEVICES").

SUBJECT DEVICES 1 through 6 are currently held in the custody of IRS-CI in Los Angeles, California.  SUBJECT DEVICES 7 through 10 are currently held in the custody of IRS-CI in Santa Ana, California.

**ATTACHMENT B**

I.   **ITEMS TO BE SEIZED**

     1.    The items to be seized are evidence, contraband, fruits, and/or instrumentalities of violations of 26 U.S.C. § 7201 (attempt to evade or defeat tax); 26 U.S.C. § 7202 (willful failure to collect or pay over tax); 26 U.S.C. § 7203 (willful failure to pay tax or file return); 26 U.S.C. § 7212 (interference with administration of internal revenue laws); 18 U.S.C. § 152 (concealment of assets in bankruptcy); 18 U.S.C. § 157 (bankruptcy fraud); 18 U.S.C. § 1028A (aggravated identity theft); 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1344 (bank fraud); and 18 U.S.C. § 1957 (money laundering) (the "Subject Offenses"), namely:

        a.    Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to the ownership of Global Baristas US, LLC ("GBUS"); Global Baristas, LLC ("GB LLC"); GB Autosport, LLC ("GB Auto"); GB Hospitality LLC ("GB Hospitality"); Doppio Inc. ("Doppio"); Eagan Avenatti LLP ("EA LLP"); Avenatti & Associates, APC ("A&A"); and Augustus LLP (collectively, the "Subject Entities").

        b.    Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to Michael J. Avenatti's ("AVENATTI") control or management of any of the Subject Entities and/or The X-Law Group, PC ("X-Law Group").

c. Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to the organizational or management structure of any of the Subject Entities and/or X-Law Group.

d. Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to the finances of any of the Subject Entities, including assets, income, liabilities, accounts receivable, accounts payable, and expenses.

e. Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to the personal finances of Michael Avenatti ("AVENATTI"), including information relating to AVENATTI's assets, debts, income, expenses, and net worth.

f. Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to the accounting records for AVENATTI and/or any of the Subject Entities, including any Microsoft Dynamics NAV, QuickBooks, or other electronic accounting data, files, or records.

g. Records, documents, programs, applications, or materials from January 201 through March 25, 2019, relating to any financial transactions, including any proposed or potential financial transactions, involving any of the Subject Entities, and/or AVENATTI.

h. Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to any payments, checks, credits, wire transfers, commodities,

services, or other things of value paid, provided, delivered, or transferred, directly or indirectly, to AVENATTI and/or any of the Subject Entities.

i.    Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to any financial relationship between AVENATTI and/or any of the Subject Entities on one hand and X-Law Group and/or F.M. on the other hand.

j.    Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to financial decisions AVENATTI and/or J.R. made on behalf of any of the Subject Entities, including decisions to authorize payments on behalf of any of the Subject Entities and transfer money to or from any of the Subject Entities.

k.    Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to communications between AVENATTI and/or J.R. and any financial institution regarding the transfer of funds to or from any account associated with AVENATTI and/or any of the Subject Entities.

l.    Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to any loans or other financing agreements, including any proposed or potential loans or other financing agreements, involving any of the Subject Entities and/or AVENATTI.

      m.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to the payroll obligations of the Subject Entities.

      n.   Non-privileged records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to the federal, state, and/or local tax obligations, tax returns, tax liabilities, or tax payments of any of the Subject Entities and/or AVENATTI.

      o.   Non-privileged records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to any liens, levies, garnishments, judgments, encumbrances, or tax-related investigations or actions associated with any of the Subject Entities and/or AVENATTI.

      p.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to attorneys' fees or costs earned or collected by EA LLP, A&A, and/or AVENATTI, including attorney-client fee contracts, engagement letters, fee agreements, cost-sharing agreements, fee-sharing agreements, settlement agreements, and client billing records, but excluding any such records relating to the representations of Stephanie Clifford or Julie Swetnick.

      q.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to any of the Subject Entities' and/or AVENATTI's contractual relationships, including drafts and final versions of any executed, proposed, or potential contracts and agreements, bills of sale, correspondence regarding payments, and correspondence

regarding the cancellation or modification of contracts and/or agreements.

r.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to any of the Subject Entities' and/or AVENATTI's bank account information.

s.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to the physical whereabouts of AVENATTI, and/or J.R., including calendars and calendar entries.

t.   Records, documents, programs, applications, or materials from April 1, 2011, to March 25, 2019, relating to AVENATTI and/or EA LLP's representation of Client 1, including the approximately $4 million settlement payment that was transferred to one of EA LLP's California Bank & Trust attorney trust account in or around January 2015.

u.   Records, documents, programs, applications, or materials from December 2016 to March 25, 2019, relating to AVENATTI and/or EA LLP's representation of Client 2, including the approximately $2.75 million settlement payment that was transferred to one of EA LLP's California Bank & Trust attorney trust account in or around January 2017.

v.   Records, documents, programs, applications, or materials relating to an agreement to purchase and the purchase of a private Honda jet from Honda Aircraft Company LLC and/or the funds used to purchase the private Honda jet.

      w.   Records, documents, programs, applications, or materials from January 1, 2014, to March 25, 2019, relating to AVENATTI and/or EA LLP's representation of Client 3, including the approximately $1.6 million settlement payment that was transferred to one of AVENATTI's City National Bank attorney trust account in or around January 2018.

      x.   Records, documents, programs, applications, or materials from January 1, 2017, to March 25, 2019, relating to AVENATTI's, EA LLP's, X-Law Group, and/or F.M.'s representation of Client 4 and Client 5, including the approximately $8,146,288 payment that was transferred to one of AVENATTI's City National Bank attorney trust accounts in or around March 2018.

      y.   Non-privileged records, documents, programs, applications, or materials from March 7, 2013, to March 25, 2019, relating to the settlement of litigation against the National Football League ("NFL") relating to the 2011 Super Bowl (the "Super Bowl Litigation"), including documents reflecting settlement payments, attorney fees, costs, expenses, and the distribution of settlement proceeds to EA LLP, AVENATTI, and any of EA LLP or AVENATTI's clients in the Super Bowl Litigation.

      z.   Records, documents, programs, applications, or materials from January 2013 through March 25, 2019, relating to the payroll and tax preparation services that Paychex provided to EA LLP and/or A&A, including any records, documents, programs, applications, or materials relating to changes in the payroll and tax services to be provided by Paychex.

aa. Records, documents, programs, applications, or materials from January 2013 through March 25, 2019, relating to the payroll and tax preparation services that Ceridian HCM Inc. ("Ceridian") provided to GBUS, including any records, documents, programs, applications, or materials relating to changes in the payroll and tax services to be provided by Ceridian.

bb. Records, documents, programs, applications, or materials from January 2013 through March 25, 2019, relating to the sale or purchase of TC Global, Inc. or Tully's Coffee.

cc. Records, documents, programs, applications, or materials from January 2013 through March 25, 2019, relating to the purchase or sale, including any proposed or attempted purchase or sale, of GBUS, GB LLC, or Doppio.

dd. Records, documents, programs, applications, or materials from January 2013 through March 25, 2019, relating to the value of GBUS or GB LLC.

ee. Records, documents, programs, applications, or materials from January 2013 through March 25, 2019, relating to GBUS's and GB LLC's merchant credit card processing accounts (the "merchant accounts"), including contracts, agreements, account applications, and correspondence regarding changes to the merchant accounts.

ff. Records, documents, programs, applications, or materials from January 2018 through March 25, 2019, relating to creation, formation, business purpose, ownership agreement, finances, of Augustus LLP.

gg.  Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to the sale, rental, lease, purchase, maintenance, renovation, or remodeling of any of AVENATTI's residences, including his residences in Newport Beach, California; Laguna Beach, California; and Los Angeles, California.

hh.  Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to continuing legal education ("CLE") courses taken by AVENATTI, including any professional responsibility CLE courses, ethics CLE courses, or tax CLE courses.

ii.  Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to any of the Subject Entities' employee handbooks or manuals, employment contracts, compensation records, and employee lists.

jj.  Records, documents, programs, applications, or materials relating to any locations or services used by AVENATTI and/or any of the Subject Entities to store physical or electronic records.

kk.  With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

i.  evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents,

browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

        ii.  evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

        iii. evidence of the attachment of other devices;

        iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

        v.  evidence of the times the device was used;

        vi.  passwords, encryption keys, and other access devices that may be necessary to access the device;

        vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

        viii.    records of or information about Internet Protocol addresses used by the device;

        ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

    2.  As used herein, the terms "records," "documents," "correspondence," "programs," "applications," and "materials"

include records, documents, correspondence, programs,
applications, and materials created, modified, or stored in any
form, including in digital form on any digital device and any
forensic copies thereof.

## II.  SEARCH PROCEDURES FOR HANDLING POTENTIALLY PRIVILEGED INFORMATION ON THE SUBJECT DEVICES

3.    In searching the SUBJECT DEVICES (including the
forensic copies thereof), the following procedures will be
followed at the time of the search in order to avoid unnecessary
disclosures of any privileged attorney-client communications or
attorney work product.

4.    Law enforcement personnel conducting the investigation
and search and other individuals assisting law enforcement
personnel in the search (the "Investigation Team") have already
obtained custody of the SUBJECT DEVICES, which are capable of
containing evidence of the Subject Offenses, or capable of
containing data falling within the scope of the items to be
seized.  The Investigation Team shall facilitate the transfer of
the SUBJECT DEVICES to the "Privilege Review Team" (previously
designated individuals not participating in the investigation of
the case).  The Privilege Review Team, including a Privilege
Review Team Assistant United States Attorney ("PRTAUSA") or
PRTAUSAs, will then review the SUBJECT DEVICES as set forth
herein.  The Investigation Team will review only data from the
SUBJECT DEVICES that has been released by the Privilege Review
Team to the Investigation Team.

5.    The Privilege Review Team will, in their discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

6.    The Privilege Review Team and the Investigation Team shall complete the search discussed herein as soon as is practicable but not more than 180 days from the date of execution of the warrant.  The government will not search the SUBJECT DEVICES beyond this 180-day period without obtaining an extension of time order from the Court.

7.    The Investigation Team will provide the Privilege Review Team and/or appropriate litigation support personnel[29] with a list of "scope key words" to search for on the digital devices, to include words relating to the items to be seized as detailed above.  The Privilege Review Team will conduct an initial review of the SUBJECT DEVICES using the scope key words, and by using search protocols specifically chosen to identify documents and data that appear to be within the scope of the warrant.  The Privilege Review Team may also do a more detailed quality check of this data and the results of this initial review, to ensure that the key word search is effective. Documents and data that are identified by this initial review, after quality check, as not within the scope of the warrant will

---

[29] Litigation support personnel and computer forensics agents or personnel, including IRS Computer Investigative Specialists, are authorized to assist both the Privilege Review Team and the Investigation Team in processing, filtering, and transferring documents and data seized during the execution of the warrant.

be maintained under seal and not further reviewed absent
subsequent authorization.

8. The Investigation Team will also provide the Privilege
Review Team with a list of "privilege key words" to search for
among the documents and data that are identified by the initial
review and quality check described above as appearing to fall
within the scope of the warrant, to include specific words
associated with AVENATTI, J.R., F.M., and any of the following
law firms (a) EA LLP; (b) A&A; (c) X-Law Group; (d) Foster
Pepper PLLC; (e) Osborn Machler PLLC; (f) Eisenhower Carlson
PLLC; (g) Talmadge/Fitzpatrick/ Tribe, PPLC; (h) The Brager Tax
Law Group; (i) SulmeyerKupetz; (j) Baker & Hostetler LLP;
(k) Shulman Hodges & Bastian LLP; (l) Legal & Tax Consulting
Group; (m) Pachulski Stang Ziehl & Jones LLP; (n) Foley &
Lardner LLP; (o) Raines Feldman, LLP; and (p) Pansky Markle
Attorneys at Law. The privilege key words shall also include
the above referenced law firms' domain names and lawyers' email
addresses, and generic words such as "privileged," "work
product." The Privilege Review Team will conduct a review of
these documents and data using the privilege key words, and by
using search protocols specifically chosen to identify documents
and data containing potentially privileged information.
Documents or data which are identified by this review as not
potentially privileged may be given to the Investigation Team.

9. Documents or data that the privilege key word searches
identify as potentially privileged will be reviewed by a
Privilege Review Team member to confirm that they contain

potentially privileged information.  Documents or data that are determined by this review not to be potentially privileged may be given to the Investigation Team.  Documents or data that are determined by this review to be potentially privileged will be given to the United States Attorney's Office for further review by a PRTAUSA.  Documents or data identified by the PRTAUSA after review as not potentially privileged may be given to the Investigation Team.  If, after review, the PRTAUSA determines it to be appropriate, the PRTAUSA may apply to the court for a finding with respect to particular documents or data that no privilege, or an exception to the privilege, applies.  Documents or data that are the subject of such a finding may be given to the Investigation Team.

10.  Documents or data identified by the PRTAUSA(s) after review as privileged (that are not subject to a finding by a court of no privilege or an exception to the privilege) or potentially privileged and outside the scope of the items to be seized shall be segregated and sealed together in an enclosure, the outer portion of which will be marked as containing potentially privileged information, and maintained by the investigative agency.  Such data or documents shall not be accessible by or given to the Investigation Team at any time absent authorization of the Court.  However, the Privilege Review Team may, in its discretion, store the privileged and potentially privileged data and documents in a folder or a set of folders in a document review platform database, such as Relativity or Eclipse, that remains inaccessible to the

Investigation Team.  The Privilege Review Team's access to this separate document review platform database shall cease upon expiration of the warrant.  However, litigation support personnel from the United States Attorney's Office, United States Department of Justice, and/or the investigating agency may continue to access this separately-maintained document review database for the purpose of database maintenance.

11.  The Investigation Team will search only the documents and data that the Privilege Review Team provides to the Investigation Team at any step listed above in order to locate documents and data that are within the scope of the search warrant.  The Investigation Team does not have to wait until the entire privilege review is concluded to begin its review for documents and data that are within the scope of the search warrant.  The Privilege Review Team may also conduct the search for documents and data within the scope of the search warrant if that is more efficient.  This second "scope" review is intended only to ensure that the initial scope key word review successfully eliminated data outside the scope of the search warrant from seizure.

12.  The Privilege Review Team will segregate any identifiable documents and/or data that it discovers during the search of the Subject Devices relating to Stephanie Clifford v. Donald J. Trump, No. 2:18-CV-2217-SJO-FFM (C.D. Cal.), the representation of Stephanie Clifford, and/or the representation of Julie Swetnick.  Such documents and/or data will be maintained under seal by the investigating agency without

further review as set forth in paragraphs 7 and 10 above absent
subsequent authorization from the Court.  This provision,
however, shall not preclude the Privilege Review Team or
Investigation Team from reviewing financial and accounting
records covered by paragraphs 1.d, 1.f, 1.g, and 1.r above,
which reference the representations of Ms. Clifford or Ms.
Swetnick.

13.  To the extent that any documents and/or data covered
by paragraph 1.p above, such as attorney-client fee contracts,
engagement letters, and client billing records, contain
information that is potentially protected by the attorney-client
privileged or the attorney-work-product doctrine, the Privilege
Review Team shall redact all such potentially privileged
information from the documents or data before releasing the
documents and/or data to the Investigation Team unless the
specific client agrees to waive the attorney-client privilege.

14.  If, upon review, a member of the Investigation Team
determines that a document or data appears to contain
potentially privileged information, the Investigation Team
member shall discontinue its review of the document or data and
shall immediately notify a member of the Privilege Review Team.
The Investigation Team member may record identifying information
regarding the potentially privileged document or data that is
reasonably necessary to identify the document or data for the
Privilege Review Team.  The Investigation Team shall not further
review any documents or data that appears to contain such
potentially privileged information until after the Privilege

Review Team has completed its review of the additional potentially privileged information discovered by the Investigation Team member.

15.  In performing the reviews, both the Privilege Review Team and the Investigation Team may:

      a.  search for and attempt to recover deleted, "hidden," or encrypted data;

      b.  use tools to exclude normal operating system files and standard third-party software that do not need to be searched; and

      c.  use forensic examination and searching tools, such as "EnCase," "FTK" (Forensic Tool Kit), Nuix, Axiom, Relativity, and Eclipse, which tools may use hashing and other sophisticated techniques.

16.  If either the Privilege Review Team or the Investigation Team, while searching a SUBJECT DEVICE encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, they shall immediately discontinue the search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

17.  If the search determines that a SUBJECT DEVICES does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

xvi

18.  The government may retain the SUBJECT DEVICES (including any forensic copy thereof), which have already been obtained by the Investigation Team, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) on the SUBJECT DEVICES absent further court order.

19.  After the completion of the search of the SUBJECT DEVICES, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

20.  The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## III. <u>REQUESTS FOR APPOINTMENT OF A SPECIAL MASTER</u>

21.  To the extent that AVENATTI, EA LLP, or any other party intends to request that a special master be appointed to handle the review of any potentially privileged information seized during the execution of this Search Warrant, such a request must be filed with this Court within seven days of the execution of this Search Warrant.  The government will then have seven days to file any opposition to such a request.

22.  Any request for the appointment of a special master must, at a minimum, address the following issues:  (a) the legal basis for the request; (b) the anticipated role of the special master, should one be appointed; (c) proposed search and review

procedures to be followed by the special master, should one be appointed; (d) proposed procedures for the selection of a special master; (e) the names of at least three proposed special masters; and (f) the party's ability to pay for any costs and fees incurred by a special master.

# CERTIFICATE OF SERVICE

I, H. Dean Steward, am a citizen of the United States, and am at least 18 years of age. My business address is 107 Avenida Miramar, Ste. C, San Clemente, CA 92672.  I am not a party to the above-entitled action.  I have caused, on September 14, 2020, service of the defendant's:

MOTION FOR A PROPER PRIVILEGE REVIEW, EVIDENTIARY HEARING
AND DISCOVERY

on the following party, using the Court's ECF system:

AUSA BRETT SAGEL AND AUSA JULIAN ANDRE

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 14, 2020

/s/ H. Dean Steward

H. Dean Steward