NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
JULIAN L. ANDRÉ (Cal. Bar No. 251120)
Assistant United States Attorney
Major Frauds Section
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-6683
     Facsimile: (213) 894-6269
     Email:    Julian.L.Andre@usdoj.gov

BRETT A. SAGEL (Cal. Bar No. 243918)
Assistant United States Attorney
     Ronald Reagan Federal Building
     411 West Fourth Street, Suite 8000
     Santa Ana, California 92701
     Telephone:  (714) 338-3598
     Facsimile:  (714) 338-3708
     Email:    Brett.Sagel@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br>          v.<br><br>MICHAEL JOHN AVENATTI,<br><br>     Defendant. | No. SA CR 19-61-JVS<br><br>GOVERNMENT'S OPPOSITION TO DEFENDANT MICHAEL JOHN AVENATTI'S MOTION FOR PRIVILEGE REVIEW, EVIDENTIARY HEARING, AND DISCOVERY; DECLARATIONS OF JULIAN L. ANDRÉ AND BRETT A. SAGEL; EXHIBITS<br><br>Hearing Date: October 19, 2020<br>Hearing Time: 9:00 a.m.<br>Location:     Courtroom of the<br>               Hon. James V. Selna |

     Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Julian L. André and Brett A. Sagel, hereby files its opposition to defendant MICHAEL JOHN

1   AVENATTI's Motion for a Privilege Review, Evidentiary Hearing, and

2   Discovery (CR 286).

3       This opposition is based upon the attached memorandum of points

4   and authorities, the declarations of Julian L. André and Brett A.

5   Sagel, the attached exhibits, a supplemental filing the government's

6   Privilege Review Team will seek leave to submit in camera, the files

7   and records in this case, and such further evidence and argument as

8   the Court may permit.

9    Dated: September 28, 2020          Respectfully submitted,

10                                      NICOLA T. HANNA
                                        United States Attorney
11
                                        BRANDON D. FOX
12                                      Assistant United States Attorney
                                        Chief, Criminal Division
13

14                                          /s/
                                        _____
15                                      JULIAN L. ANDRÉ
                                        BRETT A. SAGEL
16                                      Assistant United States Attorneys

17                                      Attorneys for Plaintiff
                                        UNITED STATES OF AMERICA

18

19

20

21

22

23

24

25

26

27

28

                                        2

# TABLE OF CONTENTS

DESCRIPTION                                                    PAGE

TABLE OF AUTHORITIES.................................................iii

MEMORANDUM OF POINTS AND AUTHORITIES..................................1

I.   INTRODUCTION....................................................1

II.  STATEMENT OF FACTS.............................................1

     A.   The March 25, 2019, Search Warrants......................1

     B.   Other Search Warrants....................................4

          1.   Global Baristas Warrant.............................4

          2.   EA Server Warrant...................................4

          3.   Defendant's MacBook Warrant.........................5

     C.   Special-Master Provisions................................6

     D.   Defendant's Knowledge of the Privilege Review
          Protocols................................................6

     E.   Inadvertent Review of EA Bankruptcy Emails..............12

III. ARGUMENT......................................................15

     A.   Defendant Has Not Demonstrated that He Has Standing to
          Challenge the Protocols in the Majority of the
          Warrants................................................15

     B.   Defendant's Primary Authority is Inapposite.............17

          1.   Scope..............................................18

          2.   Harm to Other Lawyers and Clients..................20

          3.   Use of Non-Lawyers.................................20

          4.   Advance Warning to Magistrate......................21

          5.   Adversarial Proceedings............................22

          6.   Summary............................................23

     C.   Privilege Review Teams Are Commonly Employed............24

     D.   The Ex Parte Application Was Proper.....................27

     E.   Defendant Has Made No Showing of a Privilege Violation...28

i

## <u>TABLE OF CONTENTS (CONTINUED)</u>

<u>DESCRIPTION</u>                                                                    <u>PAGE</u>

     F.   There Was No Sixth Amendment Violation...................30

     G.   Defendant's Proposed Remedies are Completely
         Inappropriate...........................................31

IV.  CONCLUSION..................................................33

1

**TABLE OF AUTHORITIES**

2

<u>DESCRIPTION</u>                                                                                      <u>PAGE</u>

3

**<u>FEDERAL CASES</u>**

4

<u>Black v. United States</u>,
    172 F.R.D. 511 (S.D. Fla. 1997).............................24

5

<u>Cohen v. United States</u>,
6    No. 1:18-mj-03161 (S.D.N.Y).............................23

7

<u>Commodity Futures Trading Comm'n v. Weintraub</u>,
    471 U.S. 343 (1985).......................................16

8

<u>Franks v. Delaware</u>,
9    438 U.S. 154 (1978).......................................27

10

<u>Heller v. New York</u>,
    413 U.S. 483 (1973).......................................27

11

<u>In re Calestini</u>,
12    321 F. Supp. 1313 (N.D. Cal. 1971)........................15

13

<u>In re Eagan Avenatti</u>,
    No. 8:19-bk-13560-SC (C.D. Cal.)..........................16

14

<u>In re Grand Jury (Impounded)</u>,
15    138 F.3d 978 (3d Cir. 1998)...............................30

16

<u>In re Ingram</u>,
    915 F. Supp. 2d 761 (D. Me. 2012).........................25

17

<u>In re Search Warrant Issued June 13, 2019</u>,
18    942 F.3d 159 (4th Cir. 2019)..........................passim

19

<u>McNeil v. Wisconsin</u>,
    501 U.S. 171 (1991).......................................30

20

<u>Media Gen. Operations, Inc. v. Buchanan</u>,
21    417 F.3d 424 (4th Cir. 2005)..............................27

22

<u>NLRB v. Interbake Foods, LLC</u>,
    637 F.3d 492 (4th Cir. 2011)..............................26

23

<u>United States v. Danielson</u>,
24    325 F.3d 1054 (9th Cir. 2003).........................26, 30

25

<u>United States v. de la Jara</u>,
    973 F.2d 746 (9th Cir. 1992)..............................30

26

<u>United States v. Dionisio</u>,
27    410 U.S. 1 (1973).........................................24

28

iii

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                    PAGE

United States v. Hansen,
        2019 WL 6137450 (D. Idaho 2019)...............................24

United States v. Lonich,
        2016 WL 1733633 (N.D. Cal. 2016)..............................25

United States v. SDI Future Health, Inc.,
        464 F. Supp. 2d 1027 (D. Nev. 2006).......................25, 31

United States v. Tillsy,
        2014 WL 6451248 (W.D. Wash. 2014)............................25

United States v. Western Titanium, Inc.,
        2010 WL 3789775 (S.D. Cal. 2010).............................25

United States v. Zolin,
        491 U.S. 554 (1989)..........................................27

Weil v. Investment/Indicators, Research, and Management, Inc.,
        647 F.2d 18 (9th Cir. 1981)..................................28

Wharton v. Calderon,
        127 F.3d 1201 (9th Cir. 1997)................................16

iv

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.   INTRODUCTION**

Defendant MICHAEL JOHN AVENATTI's ("defendant") Motion seeks to entirely up-end the privilege-review protocols that a Magistrate Judge approved and under which the parties have been operating for eighteen months.  In support of his Motion, defendant cites an out-of-Circuit opinion with entirely different facts, and the inadvertent review, by the Prosecution Team, of a handful of emails between defendant's office manager and his former law firm's bankruptcy counsel that were subsequently removed from the Prosecution Team's possession.  Defendant has cited no actual problems with the court-approved protocols nor has he identified a single document that is actually privileged and that the Prosecution Team has used to his detriment.  Nor has defendant established that he is entitled to discovery or an evidentiary hearing, both of which would constitute an impermissible fishing expedition and would unnecessarily delay the trial in this case.  Indeed, even if there were merit to defendant's claims (and there is not), the only remedy available to defendant is the suppression of the potentially privileged materials that have already been removed from the Prosecution Team's possession.  For these reasons, defendant's Motion should be denied.

**II.   STATEMENT OF FACTS**

**A.   The March 25, 2019, Search Warrants**

On March 25, 2019, IRS-CI executed several search warrants relevant to defendant's Motion.  Those warrants were executed at the residence of defendant's former paralegal and office manager ("EA Employee 1") (see No. 8:19-mj-242, Def. Ex. A); at a separate law

1  firm ("Law Firm 1") (see No. 8:19-mj-244, Def. Ex. B); and at

2  defendant's residence (see No. 8:19-mj-247, Gov't Ex. 1).[1]

3       As is typical in covert investigations, the search warrants were

4  obtained through application to a magistrate judge, without advance

5  notice to defendant.  The affidavit in support of the warrants

6  included a separate section dealing with potential privilege issues.

7  (Gov't Ex. 2 at 74-79.)  Because the searches involved premises used

8  or controlled by attorneys, special provisions were added to the

9  search protocols to prevent the disclosure of privileged information.

10 Among those provisions were the following:

- Law enforcement agents who were investigating the crimes at issue (the "Investigation Team") were permitted to be present at the search locations but could not "search or review any item prior to it being given to them" by a separate team designated specifically to review such materials for privilege and who were not part of the investigation of the case (the "Privilege Review Team").  (See, e.g., Def. Ex. A at x.[2])

- The Privilege Review Team was instructed to screen and filter out documents that contained privileged communications from defendant or his associates, work product created by those persons or entities, and any communications or documents related to the representation of defendant or his law firms by a series of attorneys who were believed to have represented them in the various legal proceedings in which defendant was involved.  (Id. at x-xi.)

- Documents that contained potentially privileged information were to be segregated from the Investigation Team and not produced to that team unless an exception to the privilege was subsequently determined to apply.  (Id.)

- The warrants authorized the government to use litigation support personnel and IRS Computer Investigative Specialists

---

[1] Defendant does not list the warrant to search his residence in his Motion.  (See Mot. at 1 (listing the five other search warrants, but not identifying No. 8:19-mj-247).)

[2] Because the privilege protocols were the same for each of the three search warrants executed on March 25, 2020, citations in this brief are only to one.  Similarly, the government has only attached one of the March 2019 Search Warrant Applications and supporting Affidavits (without exhibits) to this Opposition.  (Ex. 2.)

in "processing, filtering, and transferring documents and data seized during execution of the warrant."  (<u>Id.</u> at xiii.)

- After a "scope review" to determine what materials fell within the items to be seized as authorized by the warrant, the Privilege Review Team was to employ search terms, also referred to as key words, provided by the Investigation Team to further isolate any potentially privileged documents. These key words included names of the law firms and attorneys representing defendant and his entities, the domain names of those firms, email addresses associated with those attorneys, as well as generic terms such as "privileged" and "work product" that might be associated with potentially privileged materials.  The Privilege Review Team would then "conduct a review of these documents and data using the privilege key words, and by using search protocols specifically chosen to identify documents and data containing potentially privileged information." (<u>Id.</u> at xiv.)

- Documents that appeared to be privileged to members of the Privilege Review Team would then be provided to a Privilege Review Team Assistant United States Attorney ("PRTAUSA"), who could perform a secondary review to determine if the documents were subject to privilege protection.  If the PRTAUSA believed that a document was privileged, but that a recognized exception to that privilege applied, the PRTAUSA was to apply to the Court for an order finding that the exception applied.  (<u>Id.</u> at xv.)

- The Investigation Team would search and review only those documents that the Privilege Review Team determined were not privileged.  However, if a member of the Investigation Team came across a document that "appears to contain potentially privileged information, the Investigation Team member shall discontinue its review of the document or data and shall immediately notify a member of the Privilege Review Team." (<u>Id.</u> at xvii.)  "The Investigation Team shall not further review any documents or data that appears to contain such potentially privileged information until after the Privilege Review Team has completed its review of the additional potentially privileged information discovered by the Investigation Team Member."  (<u>Id.</u> at xvii-xviii.)

Although the affidavits to the three warrants remained under seal, IRS-CI agents left a copy of the applicable search warrant (including Attachments "A" and "B," in which the privilege protocols were stated, to each warrant) at each search location.  The IRS-CI agents who searched defendant's residence left a copy of the warrant to search defendant residence (No. 8:19-mj-247, Gov't Ex. 1) -- which

included identical review and privilege protocols as the other March 2019 warrants -- and the search inventory on defendant's living-room table (Gov't Ex. 3).

**B.   Other Search Warrants**

   1.   <u>Global Baristas Warrant</u>

   In February 2019, the government obtained a warrant to search seven digital devices that IRS-CI had obtained from former employees of defendant's coffee company, Global Baristas US LLC ("GBUS").  At the time of the search warrant, GBUS was in Chapter 7 bankruptcy proceedings.  Although this search did not implicate the same privilege concerns as did the three warrants discussed above -- defendant did not use a GBUS email account or maintain any legal files at GBUS -- it also contained privilege-review protocols.[3]  (<u>See</u> No. 8:19-mj-103, Gov't Ex. 4 at 11-20; CR 1, Ex. 1 (Aff.).)  Further diminishing any privilege concerns, the Chapter 7 bankruptcy trustee for GBUS had already executed a written waiver of the attorney-client privilege as to all communications between any GBUS officer, director, employee, or agent, and any lawyer acting on GBUS's behalf, including any communications with defendant.  (<u>See</u> Gov't Ex. 5.)

   2.   <u>EA Server Warrant</u>

   On April 3, 2019, the court-appointed Receiver (the "EA Receiver") for Eagan Avenatti LLP ("EA LLP") consented to IRS-CI creating a forensic copy of EA LLP's computer servers (the "EA Server"), which were in the possession of MixinIT, a company in Orange County that stores and manages computer servers.  (CR 55, Ex.

---

   [3] The protocols set forth in the February 2019 warrant varied slightly from those in the March 2019 warrants because the privilege concerns were different.

4

7.)  In April 2020, IRS-CI took temporary custody of the EA Server, created a forensic copy of the EA Server at IRS-CI's offices, and then returned the original EA Server to the EA Receiver later that month.  (CR 55, Ex. 5 at 3, ¶ 8.)  On May 24, 2019, the government obtained a warrant to search the six digital devices that constituted the EA Server, as well as three digital devices and a disc containing scanned images of the hard-copy materials that the U.S. Attorney's Office in the Southern District of New York had seized from defendant's briefcase during his arrest in New York.  (See No. 8:19-mj-419, Def. Ex. C; Gov't Ex. 6.)  The affidavit supporting that warrant included a section specifically dealing with potential privilege issues, and identified a number of law firms and lawyers with whom defendant and/or his companies may have had attorney-client relationships.  (Gov't Ex. 6 at 80-84.)  The affidavit also advised the Magistrate Judge that the devices contained approximately 10 to 15 terabytes of data.  (Id. at 84.)  Attached to that affidavit were privilege waivers signed by the five victims identified in the indictment.  (Gov't Ex. 7.)

### 3.  Defendant's MacBook Warrant

On January 16, 2020, the government obtained a warrant to search defendant's MacBook that had been seized from him upon his arrest in New York on March 25, 2019.[4]  (See No. 8:20-mj-25, Gov't Ex. 8.)  The affidavit incorporated by reference the prior affidavits.  (Id. at 13-16.)  The affidavit again specifically addressed privilege issues (id. at 19-23), and the warrant included the same privilege-review protocols as the EA Server warrant (id. at 36-44).

---

[4] The search had been delayed because the computer was in New York and had been encrypted.

5

C.   **Special-Master Provisions**

In addition to containing privilege-review protocols, the March 2019 search warrants and subsequent search warrants provided a mechanism for defendant and the entities being searched to seek appointment of a special master.  In particular, the search warrants provided that:

> To the extent that AVENATTI, [EA Employee 1], EA LLP, A&A, [F.M.], and/or [Law Firm 1] intend to request that a special master be appointed to handle the review of any potentially privileged information seized during the execution of this Search Warrant, such a request must be filed with this Court within seven days of the execution of this Search Warrant.  The government will then have seven days to file any opposition to such a request.

> Any request for the appointment of a special master must, at a minimum, address the following issues:  (a) the legal basis for the request; (b) the anticipated role of the special master, should one be appointed; (c) proposed search and review procedures to be followed by the special master, should one be appointed; (d) proposed procedures for the selection of a special master; (e) the names of at least three proposed special masters; and (f) the party's ability to pay for any costs and fees incurred by a special master.

(Def. Ex. A at xxi-xxii.)

Although the provisions relating to the appointment of a special master were set forth in the search warrant attachments that were left at each search location on March 25, 2019, including defendant's residence (and subsequently produced to defense counsel), neither defendant nor any of the other searched persons or entities have ever sought the appointment of a special master or otherwise challenged the search protocols.

D.   **Defendant's Knowledge of the Privilege Review Protocols**

Defendant has been on notice of the search-review protocols since the initial warrants were executed in March 2019.  The government discussed the material that was seized as a result of the

March 25, 2019, search warrants during the first status conference on May 15, 2019, noting that "those materials are still going through a privilege review process.  The materials have been -- all of those devices have been imaged.  They are going to be processed and go through a privilege review."  (CR 107, 5/15/19 RT at 5:15-19.)

Throughout the pendency of this case, the government has continued to provide defendant and the Court with updates about the process that was being employed to identify and segregate potentially privileged information.  For example, in early July 2019, the parties filed a joint status report.  (CR 44.)  The government's portion of that report detailed the digital evidence that had been seized in the investigation and stated that the government "is reviewing the contents of each of these devices, pursuant to the privilege review and other search protocols set forth in the search warrants," and that the Privilege Review Team would be "overseeing the initial scope review and subsequent privilege review."  (Id. at 8.)  Although defendant complained that the government had not provided defendant with a forensic copy of the EA Server, defendant did not raise any concerns about the privilege-review protocols.  (See id.)

On July 10, 2019, the government sent defense counsel a detailed letter regarding the privilege review that cited each of the search warrants by Bates-number, and noted that the "warrants require the government to follow specific procedures when reviewing digital devices and other evidence in order to avoid unnecessary disclosures of attorney-client communications or attorney work product."  (Gov't Ex. 9.)  "In order to ensure that the government's Privilege Review Team is able to conduct a thorough privilege review and avoid any inadvertent disclosure of privileged materials," the government

requested that defendant provide the government with the "names and identifying information . . . for any law firms or attorneys with whom defendant or his companies . . . may have had privileged communications." (Id.) Following some intermediate correspondence (Gov't Exs. 10-11), on July 24, 2019, defense counsel said in an e-mail that he could not respond to the government's letter or provide information regarding who may have represented defendant because defendant did not have access to the EA Server. (Gov't Ex. 12.)

On July 26, 2019, the government again requested the names of attorneys or law firms that had represented defendant or his companies, noting that the defense's "cooperation would facilitate and expedite the privilege review." (Gov't Ex. 13.) On July 28, 2019, defense counsel forwarded his prior July 24 email and stated that his response remained the same. (Gov't Ex. 14.)

On July 22, 2019, the government also provided a further status report to the Court, in which it noted:

> The USAO and IRS-CI are reviewing the contents of the digital devices referenced above, pursuant to the privilege review and other search protocols set forth in the applicable search warrants. The search warrants issued in connection with this investigation require the USAO and IRS-CI to follow specific procedures when reviewing digital devices and other evidence in order to avoid unnecessary disclosures of attorney-client communications or attorney work product, including the use of a Privilege Review Team.

(CR 49 at 2-3.)

Following the July 2019 status report, defendant filed a motion to obtain a complete forensic copy of the EA Server and the EA LLP devices seized from EA Employee 1's residence. (CR 50.) The government and the EA Receiver both opposed the motion. (CR 55; CR

59; CR 60.)[5]   The government attached as exhibits to its opposition the warrants to search the EA Server and EA Employee 1's residence. (CR 61, Exs. 17-18.)  On August 26, 2019, the Court denied defendant's motion, adopting the following factual findings:

> First, and foremost, Avenatti agreed that the Receiver could take possession of the Subject Devices.  Second, the Subject Devices are the property of EA LPP; the information is the property of EA LLP and/or its clients.  Third, Avenatti transferred his interest in EA LLP to his former wife.

(CR 63 at 4 (internal citations omitted).)  The Court also noted that the government had offered to make the devices available for defendant to review at IRS-CI's offices while the privilege review was ongoing, and that such review could be supervised by the Privilege Review Team.  (Id.)

On September 3, 2019, the government again agreed that defendant would be able to review the devices at IRS-CI's offices and that the Privilege Review Team would be responsible for working with defendant to review and produce any requested materials.  (Gov't Ex. 15.)  The government also said the Privilege Review Team AUSAs (who were copied on the letter) "will be available to discuss with you and address any substantive issues regarding the content of the digital devices that may arise during your review."  (Id.)  Between September 2019 and October 2019, defendant and his counsel dealt directly with the

---

[5] The government's opposition detailed the facts regarding defendant's stipulation to the appointment of the EA Receiver and the issuance of a restraining order against EA LLP and defendant.  (CR 55 at 4-5, Ex. 1.)  Among other things, the Stipulated Receivership Order required the EA Receiver to take possession of all of EA LLP's property, including "past and current client engagement contracts, case files, books and records, electronic files, and other documents."  (Id., Ex. 2 (emphasis added).)

Privilege Review Team, and met with the Privilege Review Team on at least two occasions to review the EA LLP devices.  (See CR 99 at 9.)

During the December 2, 2019, status conference, government counsel provided the Court with an update regarding the progress of the government's privilege review and the status of productions to the defense.[6]  (CR 109, 12/2/2019 RT 4:23-5:21.)  In turn, defense counsel expressed appreciation for the Privilege Review Team's efforts:

> [W]e have visited the Privilege Review Filter Team, Taint Team, whatever you want to call them, in Los Angeles twice, and they have been very cooperative.  We have requested files.  They have electronically given us what we needed . . . .  Like I said, they have been very cooperative in terms of being available for us and giving us what we request.

(CR 109, 12/2/2019 RT 5:23-6:8.)

At a January 30, 2020, status conference, the parties again addressed the status of the privilege review.  (CR 111, 1/30/2020 RT 3:12-9:8.)  With respect to the documents on the EA Server, government counsel explained that "[o]nce they've been reviewed for privilege, they'll be released to the prosecution team, and then they'll actually end up being reproduced to the defense so the defense knows what we have." (CR 111, 1/30/2020 RT 4:17-5:21.)

The government's February 18, 2020, status report further explained the privilege-review process that was occurring:

> Pursuant to the terms of the applicable search warrants, the USAO's Privilege Review Team has been conducting a review of the digital devices and hard-copy documents referenced above to determine whether any of the materials contain privileged or potentially privileged information. The Privilege Review Team has also been reviewing the digital devices referenced above to identify materials falling within the scope of the search warrants.

---

[6] This status conference took place after the Fourth Circuit decision that forms the core of defendant's Motion.

10

(CR 99 at 10.)  Again, defendant did not object to the procedures that were being employed to ensure that privileged materials were not inadvertently provided to the Prosecution Team.  In fact, at a status conference on April 27, 2020, defendant raised the possibility of reviewing further materials on the EA LLP devices, and stated "the filter team has been very accommodating" and "cooperative."  (CR 162, 4/27/2020 RT 5:9-25.)

In June 2020, defendant again sought access to the EA Server and other EA LLP devices through the Privilege Review Team so he could conduct his own searches.  (See CR 178;[7] CR 193.)  The government opposed the request.  (CR 195.)  The Court agreed with the government, stating:

> Last fall the government's production wasn't proceeding I think as everyone had hoped it would.  As an accommodation, the government offered to make the taint team available to assist in the searches, and on two occasions in October, Mr. Avenatti availed himself of that opportunity.  He didn't make any further effort to avail himself of that opportunity thereafter until the issue came up last month.

(CR 204, 7/6/2020 RT 11-13.)  The Court denied defendant's request for further access to the EA LLP devices.  (Id. at 13; CR 199.)

At no point during defendant's renewed motion for access to the EA LLP devices in June 2020 (CR 178, 195) did defendant challenge the privilege-review protocols; on the contrary, defendant sought to work within the confines of the protocols despite the fact that the Fourth Circuit had issued the decision that defendant primarily relies upon in the present Motion eight months earlier.  Indeed, until this Motion, defendant has never objected to having a filter team

---

[7] In his June 7, 2020, filing, defendant described his positive working relationship with the Privilege Review Team:  "[T]he defense has previously enjoyed a professional, cooperative relationship with the Privilege Review Team with no disputes."  (CR 178.)

comprised of government lawyers conduct the privilege review of the materials seized in this case.

### E.   Inadvertent Review of EA Bankruptcy Emails

In May 2020, while reviewing search-warrant materials that the Privilege Review Team had recently released to the Prosecution Team, the Prosecution Team came across a small number of emails between EA Employee 1 and EA LLP's bankruptcy counsel[8] relating to the preparation of documents to be filed in EA LLP's bankruptcy proceeding.  (See Gov't Ex. 17.)  Upon encountering these emails, the Prosecution Team -- as required by the privilege protocols -- immediately contacted the Privilege Review Team:

> Last night while reviewing the documents the Privilege Review Team recently released to us, Brett and I came across a handful of emails between [EA Employee 1] and Eagan Avenatti LLP's counsel in the bankruptcy proceeding (Robert Saunders from Pachulski Stang Ziehl Jones) relating to the preparation of Eagan Avenatti's LLP Monthly Operating Reports (MORs) which needed to be filed with the bankruptcy court. I have attached two examples[9] of these documents.  Brett and I do not believe these communications are privileged, but we wanted to double check with you out of an abundance of caution to make sure they were not released to us inadvertently.  Until we hear back from you, we will simply skip any similar documents we come across in the database and mark them for further review by the privilege review team.

---

[8] During the EA LLP Bankruptcy, Robert Saunders from Pachulski Stang Ziehl Jones represented EA LLP, while defendant (and A&A) were separately represented by Mark Horoupian of SulmeyerKupetz.  (See Gov't Ex. 16.)

[9] As the Prosecution Team does not have copies of the documents, the Privilege Review Team will be seeking leave to submit these two exemplars to the Court in an in camera filing and serving them on defendant.  The Privilege Review Team can also provide any/all of the remaining 299 documents that were removed from the database to the Court upon request.

1    (Gov't Ex. 17 at 1; André Decl. ¶¶ 3-4; Sagel Decl. ¶¶ 3-4.)[10]

2    Although the Prosecution Team may have briefly encountered other

3    documents involving EA LLP's bankruptcy while searching through the

4    government's Relativity database on May 13, 2020, or at other times,

5    the Prosecution Team reviewed the content of only a small number of

6    those documents during its review on May 13 and May 14, 2020.  (André

7    Decl. ¶ 9; Sagel Decl. ¶ 5; Gov't Ex. 19.)[11]  The Prosecution Team

8    does not recall reviewing the contents of any other documents

9    involving EA LLP's bankruptcy counsel.  (André Decl. ¶ 9; Sagel Decl.

10   ¶ 5.)

11        The Privilege Review Team analyzed the documents that the

12   Prosecution Team had identified and, on June 24, 2020, responded:

13        Upon review with the assistance of a PRT contract attorney,
         <u>we have decided to remove any such emails from the</u>
14       <u>prosecution team database in an abundance of caution</u>.
         Leidos located 179 of these documents in the prosecution
15       team database (299 documents total including family
         members[12]), and will be removing the 299 documents from the
16       clean workspace at our direction.

17   (Gov't Ex. 17 at 4) (emphasis added).  On June 26, 2020, the

18   Prosecution Team responded:

19

20   _____

21        [10] That same day, the Prosecution Team emailed the investigating
     agents and informed them that if they came across any of these
     documents, the documents should be tagged for privilege review but
22   should not be reviewed substantively.  (Gov't Ex. 17 at 2-3.)

23        [11] Information from the government's Relativity database
     indicates that the government may have "viewed" approximately 75 out
24   of the 299 potentially privileged documents, primarily during their
     review on May 13 and 14, 2020.  (Gov't Ex. 19.)  Government counsel
25   believes they likely skipped over most of those documents without
     reviewing the substance of the documents and/or noticing whether or
26   not the documents referenced EA LLP's bankruptcy counsel.  (André
     Decl. ¶ 9; Sagel Decl. ¶ 5.)

27        [12] "Family members" are related documents.  For example, if an
     email is identified as a potentially privileged document, all emails
28   within that email string and/or any attachments to those emails would
     be "family members."

13

> Although Brett and I did not believe those documents were
> privileged, we appreciate you taking a cautious approach to
> these issues.  Since we already reproduced copies of those
> particular documents to the defense, however, we believe we
> will need to advise defendant that the Privilege Review
> Team has clawed those documents back, that the Prosecution
> Team no longer has access to those particular documents,
> and that if the defense intends to rely on any of those
> documents at trial they would need to produce them to the
> Prosecution Team pursuant to defendant's reciprocal
> discovery obligations.  Our preference would be that the
> Privilege Review Team send defendant a letter to advising
> him that the documents have been clawed back, copying us
> and attaching a list of the relevant Bates-numbers.

(Id.)  The Prosecution Team further stated, "This email will also

confirm that I have deleted the sample documents I had attached to

the initial email I sent you on May 14, 2020.  I have not opened the

files since we sent them to you on May 14, 2020." (Id.)

On July 6, 2020, the Privilege Review Team indicated by email

that it was still working on the "claw back" of the potentially

privileged documents. (Id. at 6.)  On August 31, 2020, the Privilege

Review Team told the Prosecution Team they would be writing a letter

to the defense regarding the "clawback" issue.  (Id. at 9.)  On

September 2, 2020, the Privilege Review Team again conferred with the

Prosecution Team to ensure that the information to be included in the

letter to defense counsel was accurate, in particular that the

Prosecution Team saw only a small number of EA Employee 1's emails

with bankruptcy counsel and had not reviewed any more since the

Privilege Review Team removed them from the database.  (Id. at 7.)

The Privilege Review Team then wrote to defense counsel to alert them

of the claw back of the documents.[13]  (Mot. at 1.)

_____

[13] The letter was not provided to the Prosecution Team, and thus
cannot be attached here.

14

1  **III. ARGUMENT**

2      Having expressed no concern for eighteen months about the way

3  the government was carefully filtering out potentially privileged

4  materials from the items seized from defendant and his shuttered law

5  firm, defendant now invokes an out-of-circuit case and claims

6  violations of his rights and those of his former clients.  Defendant

7  makes these baseless assertions without identifying a single document

8  that would be subject to a valid claim of privilege, or establishing

9  that a breach of that privilege has occurred.  These eleventh-hour

10 challenges to a well-established practice should be rejected.

11      **A.   Defendant Has Not Demonstrated that He Has Standing to
            Challenge the Protocols in the Majority of the Warrants**

12

13      Defendant argues that he is "entitled to pursue the legal

14 positions herein not only on his own behalf, as the client, but also

15 on behalf of each of his clients whose information was seized by the

16 government." (Mot. at 8.)  This blanket statement[14] is insufficient to

17 establish that defendant has standing to challenge the search

18 protocols for all of the warrants.

19      As an initial matter, the bulk of the potentially privileged

20 material came from the EA Server, in which the Court has found --

21 twice -- that defendant had (and has) no possessory or ownership

22 interest in the materials on the EA Servers.  (CR 63 at 4; see also

23 CR 199.)  The transfer of a bankrupt party's legal files to a

24 receiver is supported by law.  See In re Calestini, 321 F. Supp. 1313

25 (N.D. Cal. 1971) (transferring to receiver bankrupt party's rights to

26

27      [14] Because the Prosecution Team is walled-off from the unfiltered
    products of the search warrants, the Prosecution Team is unable to
28 determine exactly what documents are at issue, as defendant has not
    identified them.

personal injury cause of action and related legal files in possession of third party attorney).  Thus, the documents on the EA Server do not belong to defendant.

Second, defendant does not have a basis to assert the attorney-client privilege on behalf of EA LLP -- the privilege belongs to EA LLP, which is now controlled by a bankruptcy trustee.  See Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 349 (1985) (holding that bankruptcy trustee has "authority to assert and waive the corporation's attorney-client privilege").  Indeed, "[d]isplaced managers may not assert the privilege over the wishes of current managers, even as to statements that the former might have made to counsel concerning matters within the scope of their corporate duties."  Id.

Third, the EA Receiver voluntarily gave the EA Server to the government to copy and ultimately search.  (CR 63 at 1.)  "The attorney-client privilege is an evidentiary rule designed to prevent the forced disclosure in a judicial proceeding of certain confidential communications between a client and a lawyer.  We held that the rule does not apply where there is no forced disclosure of a confidential communication in a judicial proceeding."  Wharton v. Calderon, 127 F.3d 1201, 1205 (9th Cir. 1997).  Without forced disclosure of the EA LLP materials, defendant cannot claim that a violation of privilege has occurred.

Fourth, to the extent defendant is seeking to enforce the privilege as to clients of EA LLP, they are no longer defendant's clients, as he is prohibited from practicing law (Gov't Ex. 21), and EA LLP is now controlled by a bankruptcy trustee, In re Eagan Avenatti, No. 8:19-bk-13560-SC.  Thus, at best, defendant is seeking

16

to enforce a privilege on behalf of unnamed former clients of his

former law firm, now controlled by a bankruptcy trustee, with respect

to unidentified disputes.[15]

Finally, defendant has no basis to challenge the search of the

GBUS (Global Baristas) devices, which are unlikely to contain

privileged information and were property of the bankruptcy estate, or

the search of devices seized from Law Firm 1, which was a completely

separate law firm in which defendant had no ownership or management

interests.  Indeed, defendant's supporting declaration does not

mention these devices, let alone attempt to claim that he has a basis

to assert privilege over any documents reviewed or seized in

connection with those two warrants (Nos. 8:19-mj-103, 8:19-mj-244).

For these reasons, the Court should view defendant's privilege

claims with significant skepticism.

### B.   Defendant's Primary Authority is Inapposite

Defendant primarily relies upon a Fourth Circuit decision issued

after five of the six warrants defendant challenges were executed,

and that (a) arises from entirely distinguishable facts, and (b) is

not binding on this Court.  In re Search Warrant Issued June 13,

2019, 942 F.3d 159 (4th Cir. Oct. 31, 2019).[16]  In that case, federal

law enforcement was investigating drug dealing by a target

(identified as "Client A" in the opinion).  Id. at 165.  Through the

---

[15] Defendant's asserted concern for the rights of his former clients is not credible, given that he stipulated to turn over all of his clients' materials to the EA Receiver in February 2019 and has expressed no interest in protecting his former clients' rights for the past eighteen months.

[16] Each of the other Fourth Circuit cases defendant cites in his Motion are also cited by In re Search Warrant, and defendant's Motion simply copies verbatim from significant portions of the In re Search Warrant opinion.

17

investigation, law enforcement began to suspect that Client A's attorney, "Lawyer A," might be obstructing the government's efforts, triggering the crime-fraud exception to the attorney-client privilege.  _Id._  Thus, the IRS obtained a warrant to search the offices of the law firm at which Lawyer A practiced.  _Id._  That warrant was obtained _ex parte_ and provided for the use of a filter team to review the seized information to remove any privileged information that did not fall within the scope of the warrant.  _Id._ The IRS executed the warrant and seized large amounts of digital data.  _Id._

Three days after execution of the warrant, the law firm reached out to the United States Attorney's Office that had obtained the warrant and objected to the seizure, in particular to the use of a filter team.  _Id._ at 167-68.  The law firm demanded return of all of the privileged information seized, or, in the alternative, that it be submitted to a magistrate judge for an _in camera_ inspection.  When it did not receive a response from the government, one week later, the law firm filed a motion seeking injunctive relief.  _Id_.  The district court held a hearing and denied the injunction.  _Id_. at 169.  An expedited appeal followed.

The Fourth Circuit reversed the district court's decision and took issue with the filter protocols that the magistrate judge had approved in the search warrant.  As set forth below, many of the facts that the Fourth Circuit used as the basis of its decision stand in stark contrast to the facts of this case.

               1.   Scope

In _In re Search Warrant_, the government sought the client files of one attorney as to one client because that is where the

malfeasance was to be found, but then seized a vast amount of the law firm's files in the process. Namely, of the 52,000 emails seized by the government, only .02% of those were between Client A and Lawyer A. Id. at 172.

In this case, by contrast, the Indictment and search warrant affidavits allege that defendant engaged in an extensive pattern of fraudulent conduct for nearly a decade. Defendant, who held the largest ownership shares in the two law firms in question, is alleged to have used those firms, and their client trust accounts, to embezzle his own clients' settlement proceeds, as well as to commit bank fraud, identity theft, bankruptcy fraud, and a host of tax offenses. (See CR 16.) To obtain the evidence of these crimes, the government needed to conduct a search of the files of defendant, his office manager, and the now-bankrupt law firm that he had controlled.

In short, it was the illicit way defendant operated his law practice that required the government to seize documents belonging to that business. The search required here was much broader than the search that was appropriate in the Fourth Circuit case, and was likely to return far more responsive documents. As a result, use of a filter team was far more appropriate to handle the filtering of those materials than a process entailing the submission of thousands (or hundreds of thousands) of documents to a magistrate judge.[17]

---

[17] The EA Server alone contained approximately 16 million files. Approximately 115,000 non-privileged documents or files from the devices searched were ultimately released to Prosecution Team. Even focusing on just the documents released to the Prosecution Team, the government submits that is simply not reasonable to impose such an extensive review upon a busy magistrate judge.

2.   Harm to Other Lawyers and Clients

The Fourth Circuit found that the district court did not properly weigh the irreparable harm that would be suffered by the law firm (separate and apart from Lawyer A) and its clients (separate and apart from Client A) if the filter team reviewed their privileged communications and work product.  In re Search Warrant, 942 F.3d at at 175.  In essence, the Fourth Circuit sought to protect the privacy and privilege of the other clients of that white-collar defense firm.

Here, defendant had been the managing partner and owner of EA LLP and it was his malfeasance that was under investigation. Defendant's victim-clients had also already executed written-waivers of the attorney-client privilege, which allowed the government to obtain their communications with defendant and with other lawyers at EA LLP.  (See Ex. 2 at 75-76; Ex. 6 at 81-82; Ex. 7.)   Thus, the heart of the case was contained in the materials seized and many of the potential privileges in those materials had already been waived.

Moreover, to the extent defendant claims he is protecting the privileges of EA LLP's clients: (1) he is no longer allowed to practice law in California and therefore has no clients (Gov't Ex. 21); and (2) he personally stipulated to turn over control of EA LLP, including all of EA LLP's files, to the EA Receiver in February 2019.

3.   Use of Non-Lawyers

The Fourth Circuit took issue with the fact that the warrant authorized the government to use non-lawyers to make privilege decisions about the seized materials, such as authorizing "paralegals and IRS and DEA agents to designate seized documents as non-privileged."  In re Search Warrant, 942 F.3d at 177.

Here, the privilege review was performed by contract attorneys in the United States Attorney's Office Privilege Review Team, supervised by two Assistant United States Attorneys.  (CR 49, n.1.) Defendant's argument that the warrant "delegated judicial functions to non-lawyer members of the Filter Team, including litigation support personnel and computer forensic agents" (Mot. at 14) misses the mark.  Instead, the filter protocol said that litigation support personnel and computer forensic agents could assist with "processing, filtering, and transferring documents," but that the privilege determinations would be made by the Privilege Review Team and, in particular, the Privilege Review Team AUSAs.  (Def. Ex. A at x-xiii.)

### 4.   Advance Warning to Magistrate

The Fourth Circuit also found that the magistrate's decision to authorize the search warrant was uninformed because the magistrate did not know the amount of materials that would be seized that were not related to the facts under investigation.  Id. at 178.

In this case, by contrast, the search warrant affidavits set forth specifically how defendant had used his law-firm trust accounts to transfer money improperly withheld from clients, and used his law-firm email account to engage in extensive additional criminal conduct.  (See CR 1, Ex. 1 (GBUS Aff.); Gov't Ex. 2 (March 2019 Aff.); Gov't Ex. 6 (May 2019 Aff.).)  The March 2019 affidavit specifically notified the Magistrate Judge that "there is a significant likelihood that the SUBJECT PREMISES will contain documents and records that are covered by the attorney-client privilege or attorney-work-product doctrine" and that "proposed search warrants contains specific procedures designed to avoid unnecessary disclosures of any privileged attorney-client

communications or attorney-work-product." (Gov't Ex. 2 at 74.)  And the May 2019 affidavit contained similar language regarding privilege issues, explicitly advising the Magistrate Judge that the devices likely contained 10 to 15 terabytes of data.  (Gov't Ex. 6 at 80-84.)

Thus, here, the Magistrate Judge was aware of the nature and volume of materials that would be searched and approved their filtering through the privilege protocols included in the warrants.

### 5.   Adversarial Proceedings

Finally, the Fourth Circuit faulted the magistrate judge for not using adversarial proceedings to determine how the privilege material should be reviewed.  In re Search Warrant, 942 F.3d at 178.  The Fourth Circuit forgave the law firm for waiting ten days to institute those proceedings to halt the search of the firm's privileged files.

Here, the government and Magistrate Judge invited adversarial proceedings, if any were necessary.  The government specifically invited defendant to seek a special master to conduct the review should he be concerned about the protocols that the government had proposed.  (Def. Ex. A at xxi.)  That process was spelled out in the attachments to the warrants, including the one left on defendant's living room table on March 25, 2019.  (Gov't Ex. 1 at 24-25; Gov't Ex. 3.)  At no time since the March 2019 warrants were executed -- eighteen months ago -- has defendant sought a special master or otherwise challenged the nature of the protocols or how they were being applied.  There were no objections at various status conferences; there were no objections in connection with defendant's two motions for access to the EA Server; there were no objections in numerous communications with government counsel; there were not even any objections when defendant was given the opportunity to meet with

1   the Privilege Review Team and review the EA Server.   Instead,

2   defendant, on multiple occasions, spoke of the Privilege Review Team

3   being "very cooperative in terms of being available for us and giving

4   us what we request."  (CR 109, 12/2/2019 RT 5:23-6:8.)

5       Defendant has therefore waived his right to bring these

6   arguments, by failing to raise them since March 2019.[18]  See In re

7   Search Warrant, 942 F.3d at 184 (Rushing, J., concurring) ("[T]he

8   burden remains on the parties to voice their objections, and

9   accommodate the orderly resolution of those objections, in the normal

10  course.").

11          6.   Summary

12      The Fourth Circuit decision should be read for what it

13  represents: a response to a "unique" set of facts that differ

14  significantly from the facts here.  Id. at 183.  Imposing a special

15  master in every case that might potentially involve privileged

16  material would be extremely burdensome.  For example, the special

17  master's team in the Michael Cohen case -- cited in the Fourth

18  Circuit opinion -- took more than four months to complete its review,

19  at a cost of more than $960,000.  Cohen v. United States, No. 1:18-

20  mj-03161 (S.D.N.Y) at CR 63, 97, 102, 106.[19]  Other special masters

21  have taken more than two years to conduct their reviews.  Black v.

23      [18] Nor can defendant argue that he lacked any basis to challenge
    the privilege-review protocols until he learned that potentially
24  privileged documents were clawed back from the Prosecution Team.  The
    clawback occurred consistent with the privilege-review protocols: the
25  protocols expressly addressed this potential factual scenario and, as
    set forth herein, the protocols were in fact followed.  Learning that
26  the privilege-review protocols were followed does not excuse
    defendant's failure to challenge the protocols in the first place.

27      [19] Defendant sought to intervene in the Cohen case on behalf of
    his then-client Stephanie Clifford and personally attended hearings
28  regarding the search protocols and appointment of a special master.
    See, e.g., Hearing Transcript, Cohen, Dkt. 38 (Apr. 26, 2018).

1  <u>United States</u>, 172 F.R.D. 511, 514 n.4 (S.D. Fla. 1997).  Similarly,

2  the government submits that magistrate judges do not have sufficient

3  time or staff to perform the sort of extensive document-by-document

4  review that the panel required in the Fourth Circuit case.  Imposing

5  those sorts of costs and delays in every case would give short shrift

6  to the public's substantial interest in expedient investigations and

7  prosecutions, <u>United States v. Dionisio</u>, 410 U.S. 1, 17 (1973), and

8  might in many cases make investigations of lawyers and law firms

9  suspected of wrongdoing prohibitively expensive.

10       For these reasons, the Fourth Circuit's analysis in <u>In re Search</u>

11 <u>Warrant</u> should not govern the procedures employed in this

12 investigation.  When the analysis of that opinion is removed from

13 defendant's Motion, there remain no serious challenges to the

14 privilege review process employed here.

15       **C.   Privilege Review Teams Are Commonly Employed**

16       Defendant -- having known about the means by which the

17 government was filtering the search-warrant materials for a year and

18 a half -- now claims that the entire process is invalid and improper.

19 Yet, despite the Fourth Circuit's non-binding opinion, the protocols

20 approved in these search warrants are frequently used in this Circuit

21 and others to sort through potentially privileged materials seized

22 during government investigations.[20]  <u>See</u>, <u>e.g.</u>, <u>United States v.</u>

23 <u>Hansen</u>, 2019 WL 6137450 (D. Idaho 2019) (denying defendant's claim of

24

25       [20] Defendant's claim that the use of key word searches is an
     inappropriate method to find potentially privileged documents is
26   meritless, especially considering that in July 2019 defendant
     repeatedly declined the government's invitation to provide the
27   Privilege Review Team with the names of all of his various attorneys
     to ensure that all privileged material was identified.  (<u>See</u> Gov't
28   Exs. 10-14.)  If defendant believed the use of key words was an
     inappropriate method, he should have raised that issue at that time.

privilege and authorizing government to search a particular folder on
defendant's computer through the use of a taint team); United States
v. Lonich, 2016 WL 1733633 (N.D. Cal. 2016) (ruling on documents for
which filter team and defense disagreed as to privileged status after
filter team conducted initial review of seized items); United States
v. Tillsy, 2014 WL 6451248 (W.D. Wash. 2014) (suppressing two
documents that were inadvertently produced by taint team but finding
no issue with use of taint team to conduct privilege review); In re
Ingram, 915 F. Supp. 2d 761, 765 (D. Me. 2012) ("[T]he Court finds
that the government's proposed filter team protocol shows proper
deference to any attorney-client or work product privileges while
allowing the government's investigation to proceed."); United States
v. Western Titanium, Inc., 2010 WL 3789775 (S.D. Cal. 2010) (ruling
on whether privilege applied to seized documents that were filtered
by privilege AUSA and then produced to prosecution team); United
States v. SDI Future Health, Inc., 464 F. Supp. 2d 1027, 1039 (D.
Nev. 2006) (in noting that searches of attorney offices require
heightened scrutiny, court suggested that "it may be incumbent on the
Government to have a taint team review of all records before they are
reviewed by the investigating agents or the prosecuting team").

One of the leading Ninth Circuit cases regarding Sixth Amendment
claims even notes that the use of filter teams -- including those in
which the government makes the privilege determinations -- are a way
to avoid inadvertent disclosure of privileged material regarding a

defendant's trial strategy.  United States v. Danielson, 325 F.3d 1054, 1072-73 (9th Cir. 2003).[21]

Defendant claims that the privilege protocols were an improper delegation of judicial functions to the executive branch, and relies on another Fourth Circuit case, NLRB v. Interbake Foods, LLC, 637 F.3d 492 (4th Cir. 2011), for this proposition.  Defendant's misreads that case.  Interbake Foods held that making a privilege determination becomes a judicial function only when the privilege determination is a necessary predicate to a separate act that can itself only be performed by a court, such as ordering compliance with a subpoena.  Id. at 499 ("[O]nly the district court determines whether to enforce the subpoena and, in making that determination, evaluates the claims of privilege. . . . [I]n carrying out this judicial function, the court cannot delegate its task of conducting in camera review to an ALJ.").  Interbake Foods does not stand for the proposition that the executive branch is prohibited from making initial determinations of privilege, especially when questions about the application of that privilege are to be resolved by the court. Resolution of such questions by the Court is exactly what is contemplated by the protocols used here provide.  See Def. Ex. A at 12 ("If appropriate based on review of particular documents, the PRTAUSA may apply to the court for a finding with respect to the particular documents that no privilege, or an exception to the privilege, applies.").

---

[21] Danielson involved the government's exposure to privileged information regarding defendant's trial strategy, in violation of the Sixth Amendment right to counsel.  As discussed further below, there is no basis for a Sixth Amendment claim here.

D.   **The _Ex Parte_ Application Was Proper**

Again citing to the Fourth Circuit decision, defendant argues that it was improper for the government to seek the warrant, with its attendant privilege protocols, through _ex parte_ proceedings with the magistrate judge. (Motion at 15-17.) Defendant's argument lacks merit.

As even the Fourth Circuit has noted, determinations about the reasonableness of a warrant, and the reasonableness of a particular mode of executing that warrant, are routinely made through _ex parte_ proceedings. _Media Gen. Operations, Inc. v. Buchanan_, 417 F.3d 424, 429 (4th Cir. 2005) (holding that search warrant applications are "necessarily ex parte") (quoting _Franks v. Delaware_, 438 U.S. 154, 169 (1978)). The Supreme Court has also endorsed procedures by which lower courts may make final privilege determinations on an _ex parte_ basis. _See_ _United States v. Zolin_, 491 U.S. 554, 572 (1989) (in camera proceeding to determine the applicability of the crime-fraud exception); _Heller v. New York_, 413 U.S. 483, 493 (1973) (holding that a target was not entitled to "an adversary hearing prior to a seizure").

Defendant, however, argues:

> If the magistrate judge had conducted adversarial proceedings after the searches but before approving the Filter Team and its protocol in this case, the judges would have been fully informed of the materials that were seized. The judge would then have heard from Mr. Avenatti, other lawyers from the firm, and possibly also from the clients of the firm through their lawyers, before the Filter Team reviewed any seized materials.

(Mot. at 16.) But defendant did have the opportunity to commence such an adversarial process -- just as the law firm did in the Fourth Circuit case -- immediately upon learning that EA LLP's files had

27

been seized.  Defendant could have also asked for a special master to be employed to prevent government personnel from seeing any potentially privileged documents.  Both of those options were available to defendant long before the privilege-review process began.[22]  Defendant did neither, and instead sat on his rights as the Privilege Review Team completed the laborious task of filtering the seized materials.  Defendant should not now be allowed to complain that the entire process was invalid.

**E.  Defendant Has Made No Showing of a Privilege Violation**

"As with all evidentiary privileges, the burden of proving that the attorney-client privilege applies rests not with the party contesting the privilege, but with the party asserting it." Weil v. Investment/Indicators, Research, and Management, Inc., 647 F.2d 18, 25 (9th Cir. 1981).  With respect to the handful of documents that were inadvertently reviewed by the Prosecution Team and later clawed back by the Privilege Review Team, defendant has not proffered facts showing that the documents were protected by any recognized privilege.  Nor has defendant shown that he has standing to assert any such privileges, as described above.

The fact that 299 potentially privileged documents made their way into the Prosecution Team's database does not mean that any privilege was violated.  The chronology shows that, as the prosecution team was reviewing the materials, they identified these

---

[22] At the May 15, 2019, status conference, government counsel stated that the digital materials were being imaged and would then be processed and provided to the Privilege Review Team for their analysis. (CR 107, 5/15/19 RT 5:15-19.)  Indeed, as of July 22, 2019, the Privilege Review Team had not yet begun a substantive review of materials from the EA Server.  (CR 49 at 4-5.)

documents as potentially privileged, stopped their review of the documents, and promptly contacted the Privilege Review Team for guidance. This is exactly what the privilege protocols required. Those documents were then removed from the database, "out of an abundance of caution," and the defense was notified.[23]

As of May 8, 2020, defendant had been provided with all of the documents that the Filter Team released to the Prosecution Team (CR 168), other than 174 additional documents that were produced to defense on July 29, 2020 (CR 293). Defendant is thus able to determine what materials the Prosecution Team has been able to review and use in its case against him. Nonetheless, five months later defendant has still not identified a single document in that universe that he claims is privileged and should not have been disclosed to the Prosecution Team. Defendant has waived the privilege with respect to any materials he has been provided and for which he has not yet sought relief from the Court based on alleged privilege violations. As the Third Circuit wrote:

> Capano waived his attorney work product privilege with regard to the seized documents by failing to file a timely motion to compel their return. Within a few weeks after the seizure of the file, Capano was on notice both of the seizure and of the government's unwillingness to recognize his attorney work product privilege with regard to the seized file. Yet, he waited nearly four months to seek a

_____

[23] Defendant takes issue with the amount of time that elapsed between when the materials were first identified and when he was notified of the claw back of the material. (Mot. at 1.) In fact, the Prosecution Team promptly stopped reviewing the materials, the Privilege Review Team analyzed and removed the documents within weeks, and defendant was then notified of these events by letter. (See Gov't Ex. 17.) Although this may not have happened as quickly as defendant would have wished, the time it took to alert defense that the government was following the protocols in the warrant is of no moment. In any case, the government moved as expeditiously as it could given that the discovery in this case involves large computer databases, litigation support personnel who maintain them, and PRTAUSAs who also carry full case-loads.

1    judicial vindication of his claim of privilege.  This delay
2    is inconsistent with the purpose behind the attorney work
     product privilege, and thus the district court did not
3    abuse its discretion in determining that Capano's delay
     waived the privilege.

4   _In re Grand Jury (Impounded)_, 138 F.3d 978, 983 (3d Cir. 1998).  The

5   Ninth Circuit agrees, instructing that, when "determining whether the

6   privilege should be deemed to be waived, the circumstances

7   surrounding the disclosure are to be considered."  _United States v._

8   _de la Jara_, 973 F.2d 746, 749–50 (9th Cir. 1992).  "[W]e will deem

9   the privilege to be waived if the privilege holder fails to pursue

10  all reasonable means of preserving the confidentiality of the

11  privileged matter."  _Id._ at 750.  Defendant has fallen far short of

12  that standard here.

13      **F.   There Was No Sixth Amendment Violation**

14      Defendant cites to the Sixth Amendment, at least in principle

15  (Mot. at 10-11), but does not attempt to establish any such violation

16  -- as he cannot.  The Sixth Amendment right to counsel does not

17  attach "until a prosecution is commenced . . . whether by way of

18  formal charge, preliminary hearing, indictment, information, or

19  arraignment."  _McNeil v. Wisconsin_, 501 U.S. 171, 175 (1991).  To

20  prove a Sixth Amendment violation, a defendant must show that the

21  alleged "improper interference by the government with the

22  confidential relationship between a criminal defendant and his

23  counsel . . . substantially prejudices" the defendant.  _Danielson_,

24  325 F.3d at 1069.  Here, any communications on the seized devices

25  were created in advance of defendant's arrest and indictment,

26  removing them from Sixth Amendment concern.  As to prejudice,

27  defendant has been given access to the materials that the government

28  seized, and has copies of the few documents that the Prosecution Team

                                    30

inadvertently reviewed.  He has not argued that the seizure of these materials has prejudiced his defense of the criminal case, much less substantially so.

G.   **Defendant's Proposed Remedies are Completely Inappropriate**

The "general remedy for violation of the attorney-client privilege is to suppress introduction of the privileged information at trial." SDI Future Health, Inc., 464 F. Supp. at 1047.  To the extent any of the 299 documents were privileged (which defendant has failed to establish), such relief is unnecessary because the government already self-suppressed those documents by removing them from the Prosecution Team's possession.  Instead, defendant now seeks to: employ a magistrate judge or special master to review all of the search warrant materials; require the Prosecution Team return all search warrant materials in its possession (over 115,000 files totaling over 900,000 pages); require the Privilege Review Team or Prosecution Team to halt entirely further review of any documents; conduct unspecified discovery; and be granted an evidentiary hearing. None of defendant's proposed remedies is appropriate.

First, as noted above, the use of a filter team in this case is consistent with Ninth Circuit practice and is particularly fitting considering the volume of material involved in the investigation. Asking a magistrate judge to review millions of documents would be impractical, and even defendant has avoided seeking a special master until now.  The fact that a handful of documents (which do not appear to involve defendant's own communications or his own lawyers) were seen by the Prosecution Team and then quickly removed from the database to which the Prosecution Team has access should not throw the entire process out the window.

31

1    Second, disgorgement of all the search warrant materials from

2    the Prosecution Team and a halt on further review is unreasonable

3    considering that defendant has slept on these purported rights for a

4    year and a half, during which time massive efforts have been

5    undertaken to sort, filter, Bates number, and produce over a million

6    pages of materials.  Restarting that process is unnecessary and would

7    be a waste of time and resources.  Defendant has been given

8    opportunities to review all of these materials -- including the EA

9    Server -- and until now has raised no objections to the process.

10    Third, to the extent defendant claims he is asserting the rights

11    of his former law firm's former clients, defendant's requested remedy

12    is illogical.  The Privilege Review has already been completed, thus

13    there is no likelihood of any further harm to their rights.  More

14    fundamentally, defendant has not provided the Court with any evidence

15    suggesting that his former clients' privileged communications have

16    been released to the Prosecution Team.

17    Finally, discovery and an evidentiary hearing are not justified

18    by defendant's Motion.  Despite the fact that defendant has access to

19    all of the documents that the Prosecution Team has seen, he has not

20    identified a single document whose possession by the Prosecution Team

21    violates his privileges.  As it is his burden to prove these

22    documents are in fact privileged, his failure to do so means that

23    there are no facts in dispute that need to be resolved through

24    discovery and/or a hearing.[24]  Nor has defendant provided this Court

25

26    [24] Defendant attempts to shift his burden to establish a
violation to the government by arguing that the government has failed
27    to confirm that no other privileged documents are in the Prosecution
Team's possession.  (Mot. at 6.)  If at any point the Prosecution
28    Team determines that other materials appear to contain potentially

32

with any evidence demonstrating that the privilege review protocols
were not complied with here.  Rather, contemporaneous documentary
evidence confirms that the Prosecution Team followed the protocols
and promptly notified the Privilege Review Team when it encountered
potentially privileged materials.  Under these circumstances,
defendant's request for an evidentiary hearing and discovery amount
to nothing more than a fishing expedition.

At bottom, defendant's motion appears to be a just another delay
tactic.  For eighteen months defendant did not raise any concerns
regarding the privilege review process.  Nor did he raise any
concerns after the Fourth Circuit decision was issued in October of
last year.  Yet now that this case is less than three months from
trial, defendant seeks to have the Court delay these proceedings for
months, if not years, so that a magistrate judge can conduct a new
privilege review of materials that have already been reviewed for
privilege by the Privilege Review Team and were reproduced to
defendant at least four months ago.

**IV.   CONCLUSION**

For the foregoing reasons, the government respectfully requests
that this Court deny defendant's motion.

---

privileged information, the Prosecution Team will continue to follow
the applicable privilege review protocols, as it did when it
encountered materials involving EA LLP's bankruptcy counsel.

33