GOVERNMENT'S OPPOSITION TO DEFENDANT MICHAEL JOHN AVENATTI'S
MOTION FOR PRIVILEGE REVIEW, EVIDENTIARY HEARING, AND DISCOVERY

# EXHIBIT 1

AO 93 (Rev. 11/13) Search and Seizure Warrant (USAO CDCA Rev. 04/17)

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of ) <br> *(Briefly describe the property to be searched or identify the person by name and address)* ) ) <br> 10000 Santa Monica Boulevard, Unit 2107, ) <br> Los Angeles, CA 90067 ) ) ) | Case No. 8:19-MJ-00247 |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Central District of California *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

*See Attachment B*

Such affidavit(s) or testimony are incorporated herein by reference.

**YOU ARE COMMANDED** to execute this warrant on or before 14 days from the date of its issuance *(not to exceed 14 days)*

☒ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to the U.S. Magistrate Judge on duty at the time of the return through a filing with the Clerk's Office.

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for_____days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____.

| | |
|---|---|
| Date and time issued:  March 25, 2019, at 5:30 pm | **DOUGLAS F. McCORMICK** |
| | *Judge's signature* |
| City and state:   Laguna Beach, <del>Santa Ana</del>, CA | Douglas F. McCormick <br> Hon. <del>Autumn D. Spaeth</del>, United States Magistrate Judge <br> *Printed name and title* |

AUSA: J. Andre

**EXHIBIT 1**
**Page 1 of 25**

USAO_00066710

AO 93 (Rev. 11/13) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**EXHIBIT 1**
**Page 2 of 25**

USAO_00066711

Case 8:19-cr-00061-JVS Document 305-3 Filed 09/29/20 Page 4 of 285 Page ID #:4577
Case 8:19-mj-00249-DUTY SEALED Document 3 Filed 03/24/20 Filed 03/25/19 Page 3 of 25
Page ID #:354

## ATTACHMENT A

### PREMISES TO BE SEARCHED

The premises to be searched is Unit Number 2107 of the Ten Thousand residential condominium complex, located at 10000 Santa Monica Boulevard, Los Angeles, California 90067 ("SUBJECT PREMISES"). The Ten Thousand condominium complex is a 40-story luxury residential tower located on Santa Monica Boulevard. The building is a modern all-glass structure with floor to ceiling windows. The Ten Thousand condominium complex sits directly on the corner of Santa Monica Boulevard and Moreno Drive. The driveway to the main entrance is off Santa Monica Boulevard, which is a one way road. The driveway into the main entrance is screened for privacy by an evergreen hedge and is accessible from both Santa Monica Boulevard and Moreno Drive. The front doors are covered by a roof canopy. The front doors to the main entrance of the building are approximately two 12-15 foot glass doors accompanied by two doormen. Unit 2107 is located on the 21st floor.

i

**EXHIBIT 1**
**Page 3 of 25**

USAO_00066712

Case 8:19-cr-00061-JVS   Document 305-3   Filed 09/29/20   Page 5 of 285   Page ID #:4578
Case 8:19-cr-00061-JVS   Document 30   Document Filed 09/29/20   Page 5 of 285   Page ID #:4573
Page ID #:355

**ATTACHMENT B**

## I.   ITEMS TO BE SEIZED

1.   Evidence, contraband, fruits, and/or instrumentalities
of violations of 26 U.S.C. § 7201 (attempt to evade or defeat
tax); 26 U.S.C. § 7202 (willful failure to collect or pay over
tax); 26 U.S.C. § 7203 (willful failure to pay tax or file
return); 26 U.S.C. § 7212 (interference with administration of
internal revenue laws); 18 U.S.C. § 152 (concealment of assets
in bankruptcy); 18 U.S.C. § 157 (bankruptcy fraud); 18 U.S.C.
§ 371 (conspiracy); 18 U.S.C. § 1001 (false statements); 18
U.S.C. § 1014 (false statement to a bank or other federally
insured institution); 18 U.S.C. § 1028A (aggravated identity
theft); 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1344 (bank
fraud); and 18 U.S.C. § 1957 (money laundering) (the "Subject
Offenses"), namely:

a.   Records, documents, programs, applications, or
materials from January 2011 through the present relating to the
ownership of Global Baristas US, LLC ("GBUS"); Global Baristas,
LLC ("GB LLC"); GB Autosport, LLC ("GB Auto"); GB Hospitality
LLC ("GB Hospitality"); Doppio Inc. ("Doppio"); Eagan Avenatti
LLP ("EA LLP"); and Avenatti & Associates, APC ("A&A")
(collectively, the "Subject Entities").

b.   Records, documents, programs, applications, or
materials from January 2011 through the present relating to
Michael J. Avenatti's ("AVENATTI") control or management of any

i

**EXHIBIT 1**
**Page 4 of 25**

Case 8:19-cr-00061-JVS Document 305-3 Filed 09/29/20 Page 6 of 285 Page ID #:4579
Case 8:19-mj-00241-DUTY SEALED Document Filed 03/25/19 Page 5 of 25
Page ID #:356

of the Subject Entities and/or The X-Law Group, PC ("X-Law
Group").

      c.    Records, documents, programs, applications, or
materials from January 2011 through the present relating to the
organizational or management structure of any of the Subject
Entities and/or X-Law Group.

      d.    Records, documents, programs, applications, or
materials from January 2011 through the present relating to the
finances of any of the Subject Entities, including assets,
income, liabilities, accounts receivable, accounts payable, and
expenses.

      e.    Records, documents, programs, applications, or
materials from January 2011 through the present relating to the
personal finances of Michael Avenatti ("AVENATTI"), including
information relating to AVENATTI's assets, debts, income,
expenses, and net worth.

      f.    Records, documents, programs, applications, or
materials from January 2011 through the present relating to the
accounting records for AVENATTI and/or any of the Subject
Entities, including any Microsoft Dynamics NAV, QuickBooks, or
other electronic accounting data, files, or records.

      g.    Records, documents, programs, applications, or
materials from January 201 through the present relating to any
financial transactions, including any proposed or potential

**EXHIBIT 1**
**Page 5 of 25**

USAO_00066714

Case 8:19-cr-00061-JVS Document 305-3 Filed 09/29/20 Page 7 of 285 Page ID #:4580
Case 8:19-cr-00061-JVS Document 305-3 Filed 09/29/20 Page 7 of 285 Page ID #:4580
Page ID #:357

financial transactions, involving any of the Subject Entities, and/or AVENATTI.

h. Records, documents, programs, applications, or materials from January 2011 through the present relating to any payments, checks, credits, wire transfers, commodities, services, or other things of value paid, provided, delivered, or transferred, directly or indirectly, to AVENATTI and/or any of the Subject Entities

i. Records, documents, programs, applications, or materials from January 2011 through the present relating to any financial relationship between AVENATTI and/or any of the Subject Entities on one hand and X-Law Group and/or Filippo Marchino ("MARCHINO") on the other hand.

j. Records, documents, programs, applications, or materials from January 2011 through the present relating to financial decisions AVENATTI and/or JUDY REGNIER ("REGNIER") made on behalf of any of the Subject Entities, including decisions to authorize payments on behalf of any of the Subject Entities and transfer money to or from any of the Subject Entities.

k. Records, documents, programs, applications, or materials from January 2011 through the present relating to communications between AVENATTI and/or REGNIER and any financial institution regarding the transfer of funds to or from any

iii

**EXHIBIT 1**
**Page 6 of 25**

USAO_00066715

account associated with AVENATTI and/or any of the Subject
Entities.

        l.    Records, documents, programs, applications, or
materials from January 2011 through the present relating to any
loans or other financing agreements, including any proposed or
potential loans or other financing agreements, involving any of
the Subject Entities and/or AVENATTI.

        m.    Records, documents, programs, applications, or
materials from January 2011 through the present relating to the
payroll obligations of the Subject Entities.

        n.    Non-privileged records, documents, programs,
applications, or materials from January 2011 through the present
relating to the federal, state, and/or local tax obligations,
tax returns, tax liabilities, or tax payments of any of the
Subject Entities and/or AVENATTI.

        o.    Non-privileged records, documents, programs,
applications, or materials from January 2011 through the present
relating to any liens, levies, garnishments, judgments,
encumbrances, or tax-related investigations or actions
associated with any of the Subject Entities and/or AVENATTI.

        p.    Records, documents, programs, applications, or
materials from January 2011 through the present relating to
attorneys' fees or costs earned or collected by EA LLP, A&A,
and/or AVENATTI, including attorney-client fee contracts,

**EXHIBIT 1**
**Page 7 of 25**

USAO_00066716

engagement letters, fee agreements, cost-sharing agreements, fee-sharing agreements, settlement agreements, and client billing records, but excluding any such records relating to the representations of Stephanie Clifford or Julie Swetnick.

q. Records, documents, programs, applications, or materials from January 2011 through the present relating to any of the Subject Entities' and/or AVENATTI's contractual relationships, including drafts and final versions of any executed, proposed, or potential contracts and agreements, bills of sale, correspondence regarding payments, and correspondence regarding the cancellation or modification of contracts and/or agreements.

r. Records, documents, programs, applications, or materials from January 2011 through the present relating to any of the Subject Entities' and/or AVENATTI's bank account information.

s. Records, documents, programs, applications, or materials from January 2011 through the present relating to the physical whereabouts of AVENATTI, and/or REGNIER, including calendars and calendar entries.

t. Records, documents, programs, applications, or materials from January 1, 2014, to the present relating to AVENATTI and/or EA LLP's representation of G.B., including the approximately $1.6 million settlement payment that was

**EXHIBIT 1**
**Page 8 of 25**

USAO_00066717

Case 8:19-cr-00061-JVS Document 305-3 Filed 09/28/20 Page 10 of 285 Page ID #:4588
Case 8:19-mj-00261-DUTY *SEALED* Document 1 *SEALED* Filed 03/25/19 Page 9 of 25
Page ID #:360

transferred to one of AVENATTI's City National Bank attorney
trust account in or around January 2018.

    u. Records, documents, programs, applications, or
materials from January 1, 2017, to the present relating to
AVENATTI's, EA LLP's, X-Law Group, and/or MARCHINO's
representation of M.P. and L.T., including the approximately
$8,146,288 payment that was transferred to one of AVENATTI's
City National Bank attorney trust accounts in or around March
2018.

    v. Records, documents, programs, applications, or
materials from January 2013 through the present relating to the
payroll and tax preparation services that Paychex provided to EA
LLP and/or A&A, including any records, documents, programs,
applications, or materials relating to changes in the payroll
and tax services to be provided by Paychex.

    w. Records, documents, programs, applications, or
materials from January 2013 through the present relating to the
payroll and tax preparation services that Ceridian HCM Inc.
("Ceridian") provided to GBUS, including any records, documents,
programs, applications, or materials relating to changes in the
payroll and tax services to be provided by Ceridian.

    x. Records, documents, programs, applications, or
materials from January 2013 through the present relating to the
sale or purchase of TC Global, Inc. or Tully's Coffee.

**EXHIBIT 1**
**Page 9 of 25**

USAO_00066718

Case 8:19-cr-00061-JVS  Document 305-3  Filed 09/29/20  Page 11 of 285  Page ID #:4594
Case 8:19-mj-00246-DUTY  Document 3  *SEALED*  Filed 03/25/19  Page 10 of 25
Page ID #:361

y.   Records, documents, programs, applications, or materials from January 2013 through the present relating to the purchase or sale, including any proposed or attempted purchase or sale, of GBUS, GB LLC, or Doppio.

z.   Records, documents, programs, applications, or materials from January 2013 through the present relating to value of GBUS or GB LLC.

aa.   Records, documents, programs, applications, or materials from January 2013 through the present relating to GBUS's and GB LLC's merchant credit card processing accounts (the "merchant accounts"), including contracts, agreements, account applications, and correspondence regarding changes to the merchant accounts.

bb.   Records, documents, programs, applications, or materials from January 2011 through the present relating to the sale, rental, lease, purchase, maintenance, renovation, or remodeling of any of AVENATTI's residences, including his residences in Newport Beach, California; Laguna Beach, California; and Los Angeles, California.

cc.   Records, documents, programs, applications, or materials from January 2011 through the present relating to continuing legal education ("CLE") courses taken by AVENATTI, including any professional responsibility CLE courses, ethics CLE courses, or tax CLE courses.

vii

**EXHIBIT 1**
**Page 10 of 25**

USAO_00066719

Case 8:19-cr-00061-JVS  Document 305-3  Filed 09/29/20  Page 12 of 285  Page ID #:4595
Case 8:19-mj-00061-DUTY  Document 3  *SEALED*  Filed 03/25/19  Page 11 of 25
Page ID #:362

        dd.   Records, documents, programs, applications, or materials from January 2011 through the present relating to any of the Subject Entities' employee handbooks or manuals, employment contracts, compensation records, and employee lists.

        ee.   Records, documents, programs, applications, or materials relating to any locations or services used by AVENATTI and/or any of the Subject Entities to store physical or electronic records.

        ff.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

        gg.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

        i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

        ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

        iii. evidence of the attachment of other devices;

viii

**EXHIBIT 1**
**Page 11 of 25**

USAO_00066720

          iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

          v.   evidence of the times the device was used;

          vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

          vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

          viii.   records of or information about Internet Protocol addresses used by the device;

          ix.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal

ix

**EXHIBIT 1**
**Page 12 of 25**

USAO_00066721

digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS); and
security devices.

## II. SEARCH PROCEDURES FOR HANDLING POTENTIALLY PRIVILEGED INFORMATION

4.      The following procedures will be followed at the time
of the search in order to avoid unnecessary disclosures of any
privileged attorney-client communications or work product:

### A.    Non-Digital Evidence

5.      Law enforcement personnel conducting the investigation
("the Investigation Team") may be present at the search, but may
not search or review any item prior to it being given to them by
the "Privilege Review Team" (previously designated individual(s)
not participating in the investigation of the case).

6.      The Privilege Review Team will review documents to see
whether or not the document appears to contain or refer to
communications between AVENATTI, REGNIER,  MARCHINO and/or any
other lawyers from EA LLP, A&A, and the X-Law Group on the one
hand and any person on the other hand; contain the work product

x

**EXHIBIT 1**
**Page 13 of 25**

USAO_00066722

of AVENATTI, REGNIER, MARCHINO, and any other lawyers from EA
LLP, A&A, and the X-Law Group; or contain communications or
documents relating to the following law firms' representation of
AVENATTI, EA LLP, or A&A:  (a) Foster Pepper PLLC; (b) Osborn
Machler PLLC; (c) Eisenhower Carlson PLLC;
(d) Talmadge/Fitzpatrick/ Tribe, PPLC; (e) The Brager Tax Law
Group; (f) SulmeyerKupetz; (g) Baker & Hostetler LLP;
(h) Shulman Hodges & Bastian LLP; (i) Legal & Tax Consulting
Group; (j) Pachulski Stang Ziehl & Jones LLP; (k) Foley &
Lardner LLP; (l) Raines Feldman, LLP; and (m) Pansky Markle
Attorneys at Law (collectively, the "potentially privileged
information").  Those documents not containing or referring to
such communications or work product may be turned over to the
Investigation Team for review.

    7.  In consultation with a Privilege Review Team Assistant
United States Attorney ("PRTAUSA"), if appropriate, the
Privilege Review Team member will review any document identified
as appearing to contain potentially privileged information to
confirm that it contains potentially privileged information.  If
it does not, it may be returned to an Investigation Team member.
If a member of the Privilege Review Team confirms that a
document contains potentially privileged information, then the
member will review only as much of the document as is necessary
to determine whether or not the document is within the scope of
the warrant.  Those documents which contain potentially
privileged information but are not within the scope of the
warrant will be set aside and will not be subject to further

**EXHIBIT 1**
**Page 14 of 25**

USAO_00066723

Case 8:19-cr-00061-JVS Document 305-3 Filed 09/29/20 Page 16 of 285 Page ID #:4589
Case 8:19-cr-00061-JVS Document 305-3 SEALED Filed 05/28/19 Page 15 of 25
Page ID #:366

review or seizure absent subsequent authorization.  Those
documents which contain potentially privileged information and
are within the scope of the warrant will be seized and sealed
together in an enclosure, the outer portion of which will be
marked as containing potentially privileged information.  The
Privilege Review Team member will also make sure that the
locations where the documents containing potentially privileged
information were seized have been documented.

     8.   The seized documents containing potentially privileged
information will be delivered to the United States Attorney's
Office for further review by a PRTAUSA.  If that review reveals
that a document does not contain potentially privileged
information, or that an exception to the privilege applies, the
document may be returned to the Investigation Team.  If
appropriate based on review of particular documents, the PRTAUSA
may apply to the court for a finding with respect to the
particular documents that no privilege, or an exception to the
privilege, applies.

          **B.   Digital Evidence**

     9.   The Privilege Review Team will search for digital
devices capable of being used to facilitate the Subject Offenses
or capable of containing data falling within the scope of the
items to be seized.  The Privilege Review Team will then review
the identified digital devices as set forth herein.  The
Investigation Team will review only digital device data which
has been released by the Privilege Review Team.

**EXHIBIT 1**
**Page 15 of 25**

USAO_00066724

Case 8:19-cr-00061-DLB Document 305-3 Filed 09/29/20 Page 17 of 285 Page ID #:4590
Case 8:19-mj-00061-DUTY SEALED Document 3 SEALED Filed 05/28/19 Page 16 of 25
Page ID #:367

10.  The Privilege Review Team will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location.

11.  The Privilege Review Team and the Investigation Team shall complete both stages of the search discussed herein as soon as is practicable but not to exceed 180 days from the date of execution of the warrant.  The government will not search the digital device(s) beyond this 180-day period without obtaining an extension of time order from the Court.

12.  The Investigation Team will provide the Privilege Review Team and/or appropriate litigation support personnel[1] with a list of "scope key words" to search for on the digital devices, to include words relating to the items to be seized as detailed above.  The Privilege Review Team will conduct an initial review of the digital devices using the scope key words, and by using search protocols specifically chosen to identify documents and data that appear to be within the scope of the warrant.  The Privilege Review Team may also do a more detailed quality check of this data and the results of this initial review, to ensure that the key word search is effective. Documents and data that are identified by this initial review, after quality check, as not within the scope of the warrant will

---

[1] Litigation support personnel and computer forensics agents or personnel, including IRS Computer Investigative Specialists, are authorized to assist both the Privilege Review Team and the Investigation Team in processing, filtering, and transferring documents and data seized during the execution of the warrant.

xiii

**EXHIBIT 1**
**Page 16 of 25**

USAO_00066725

Case 8:19-cr-00061-JVS  Document 305-3  Filed 09/29/20  Page 18 of 285  Page ID #:4591
Case 8:19-mj-00061-DUTY  *SEALED*  Document 3  *SEALED*  Filed 05/28/19  Page 17 of 25  Page ID #:4591
Page ID #:368

be maintained under seal and not further reviewed absent subsequent authorization.

13.   The Investigation Team will also provide the Privilege Review Team with a list of "privilege key words" to search for among the documents and data that are identified by the initial review and quality check described above as appearing to fall within the scope of the warrant, to include specific words associated with AVENATTI, REGNIER, MARCHINO, and any of the following law firms (a) EA LLP; (b) A&A; (c) X-Law Group; (d) Foster Pepper PLLC; (e) Osborn Machler PLLC; (f) Eisenhower Carlson PLLC; (g) Talmadge/Fitzpatrick/ Tribe, PPLC; (h) The Brager Tax Law Group; (i) SulmeyerKupetz; (j) Baker & Hostetler LLP; (k) Shulman Hodges & Bastian LLP; (l) Legal & Tax Consulting Group; (m) Pachulski Stang Ziehl & Jones LLP; (n) Foley & Lardner LLP; (o) Raines Feldman, LLP; and (p) Pansky Markle Attorneys at Law.   The privilege key words shall also include the above referenced law firms' domain names and lawyers' email addresses, and generic words such as "privileged," "work product."   The Privilege Review Team will conduct a review of these documents and data using the privilege key words, and by using search protocols specifically chosen to identify documents and data containing potentially privileged information.   Documents or data which are identified by this review as not potentially privileged may be given to the Investigation Team.

14.   Documents or data that the privilege key word searches identify as potentially privileged will be reviewed by a

**EXHIBIT 1**
**Page 17 of 25**

USAO_00066726

Privilege Review Team member to confirm that they contain potentially privileged information. Documents or data that are determined by this review not to be potentially privileged may be given to the Investigation Team. Documents or data that are determined by this review to be potentially privileged will be given to the United States Attorney's Office for further review by a PRTAUSA. Documents or data identified by the PRTAUSA after review as not potentially privileged may be given to the Investigation Team. If, after review, the PRTAUSA determines it to be appropriate, the PRTAUSA may apply to the court for a finding with respect to particular documents or data that no privilege, or an exception to the privilege, applies. Documents or data that are the subject of such a finding may be given to the Investigation Team.

15. Documents or data identified by the PRTAUSA(s) after review as privileged (that are not subject to a finding by a court of no privilege or an exception to the privilege) or potentially privileged and outside the scope of the items to be seized shall be segregated and sealed together in an enclosure, the outer portion of which will be marked as containing potentially privileged information, and maintained by the investigative agency. Such data or documents shall not be accessible by or given to the Investigation Team at any time absent authorization of the Court. However, the Privilege Review Team may, in its discretion, store the privileged and potentially privileged data and documents in a folder or a set of folders in a document review platform database, such as

xv

EXHIBIT 1
Page 18 of 25

USAO_00066727

Case 8:19-cr-00061-DVS Document 305-3 Filed 09/29/20 Page 20 of 285 Page ID #:4592
Case 8:19-mj-00061-DUTY *SEALED* Document 3 *SEALED* Filed 05/28/19 Page 19 of 25
Page ID #:370

Relativity or Eclipse, that remains inaccessible to the
Investigation Team. The Privilege Review Team's access to this
separate document review platform database shall cease upon
expiration of the warrant. However, litigation support
personnel from the United States Attorney's Office, United
States Department of Justice, and/or the investigating agency
may continue to access this separately-maintained document
review database for the purpose of database maintenance.

16. The Investigation Team will search only the documents
and data that the Privilege Review Team provides to the
Investigation Team at any step listed above in order to locate
documents and data that are within the scope of the search
warrant. The Investigation Team does not have to wait until the
entire privilege review is concluded to begin its review for
documents and data that are within the scope of the search
warrant. The Privilege Review Team may also conduct the search
for documents and data within the scope of the search warrant if
that is more efficient. This second "scope" review is intended
only to ensure that the initial scope key word review
successfully eliminated data outside the scope of the search
warrant from seizure.

## C.  Additional Privilege Review Procedures

17. The Privilege Review Team will segregate any
identifiable documents and/or data relating to Stephanie
Clifford v. Donald J. Trump, No. 2:18-CV-2217-SJO-FFM (C.D.
Cal.), the representation of Stephanie Clifford, and/or the
representation of Julie Swetnick. Such documents and/or data

xvi

**EXHIBIT 1**
**Page 19 of 25**

USAO_00066728

Case 8:19-cr-00061-DVS Document 305-3 Filed 09/29/20 Page 21 of 285 Page ID #:4594
Case 8:19-mj-00061-DVS SEALED Document 3 Filed 03/28/19 Page 20 of 25
Page ID #:371

will be maintained under seal by the investigating agency
without further review as set forth in paragraphs 7 and 15 above
absent subsequent authorization from the Court.  This provision,
however, shall not preclude the Privilege Review Team or
Investigation Team from reviewing financial and accounting
records covered by paragraphs 1.d, 1.f, 1.g, and 1.r above,
which reference the representations of Ms. Clifford or Ms.
Swetnick.

18.  To the extent that any documents and/or data covered
by paragraph 1.p above, such as attorney-client fee contracts,
engagement letters, and client billing records, contain
information that is potentially protected by the attorney-client
privileged or the attorney-work-product doctrine, the Privilege
Review Team shall redact all such potentially privileged
information from the documents or data before releasing the
documents and/or data to the Investigation Team unless the
specific client agrees to waive the attorney-client privilege.

19.  If, upon review, a member of the Investigation Team
determines that a document or data appears to contain
potentially privileged information, the Investigation Team
member shall discontinue its review of the document or data and
shall immediately notify a member of the Privilege Review Team.
The Investigation Team member may record identifying information
regarding the potentially privileged document or data that is
reasonably necessary to identify the document or data for the
Privilege Review Team.  The Investigation Team shall not further
review any documents or data that appears to contain such

**EXHIBIT 1**
**Page 20 of 25**

USAO_00066729

Case 8:19-cr-00061-DVB Document 305-3 Filed 08/29/20 Page 22 of 285 Page ID #:4595
Case 8:19-mj-00061-DUTY SEALED Document 5 SEALED Page 22 of 25 Filed 03/25/19 Page 21 of 25
Page ID #:372

potentially privileged information until after the Privilege
Review Team has completed its review of the additional
potentially privileged information discovered by the
Investigation Team member.

    20.  In performing the reviews, both the Privilege Review
Team and the Investigation Team may:

        a.  search for and attempt to recover deleted,
"hidden," or encrypted data;

        b.  use tools to exclude normal operating system
files and standard third-party software that do not need to be
searched; and

        c.  use forensic examination and searching tools,
such as "EnCase," "FTK" (Forensic Tool Kit), Nuix, Axiom,
Relativity, and Eclipse, which tools may use hashing and other
sophisticated techniques.

    21.  If either the Privilege Review Team or the
Investigation Team, while searching a digital device, encounters
immediately apparent contraband or other evidence of a crime
outside the scope of the items to be seized, they shall
immediately discontinue the search of that device pending
further order of the Court and shall make and retain notes
detailing how the contraband or other evidence of a crime was
encountered, including how it was immediately apparent
contraband or evidence of a crime.

    22.  If the search determines that a digital device does
not contain any data falling within the list of items to be

**EXHIBIT 1**
**Page 21 of 25**

USAO_00066730

Case 8:19-cr-00061-DVS Document 305-3 Filed 09/29/20 Page 23 of 285 Page ID #:4596
Case 8:19-mj-00061-DVS SEALED Document 3 Document SEALED Filed 05/28/19 Page 22 of 25
Page ID #:373

seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

23. If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

24. If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the items to be seized (after the time for searching the device has expired) absent further court order.

25. The government may retain also a digital device if the government, within 14 days following the time period authorized by the Court for completing the search, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

26. After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

**EXHIBIT 1**
**Page 22 of 25**

USAO_00066731

Case 8:19-cr-00061-JVS Document 305-3 Filed 08/29/20 Page 24 of 285 Page ID #:4597
Case 8:19-mj-00061-DUTY SEALED Document 3 Document SEALED Filed 05/28/19 Page 23 of 25
Page ID #:374

27.   In order to search for data capable of being read or interpreted by a digital device, the Investigation Team is authorized to seize the following items:

a.   Any digital device capable of being used to commit, further or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

28.   During the execution of this search warrant, with respect to a biometric sensor-enabled device that is located at the SUBJECT PREMISES and falls within the scope of the warrant, the law enforcement personnel are authorized to: (1) depress the

xx

**EXHIBIT 1**
**Page 23 of 25**

USAO_00066732

Case 8:19-cr-00061-DVF    Document 305-3    Filed 08/29/20    Page 25 of 285   Page ID #:4592
Case 8:19-mj-00061-DUTY    Document 3    *SEALED*    Filed 03/25/19    Page 24 of 25
Page ID #:375

thumb- and/or fingerprints of AVENATTI, REGNIER, and/or MARCHINO
onto the fingerprint sensor of the device (only when the device
has such a sensor), and direct which specific finger(s) and/or
thumb(s) shall be depressed; and (2) hold the device in front of
the face of AVENATTI, REGNIER, and/or MARCHINO his or her eyes
open to activate the facial-, iris-, or retina-recognition
feature, in order to gain access to the contents of any such
device.

    29. The special procedures relating to digital devices
found in this warrant govern only the search of digital devices
pursuant to the authority conferred by this warrant and do not
apply to any search of digital devices pursuant to any other
court order.

### III. REQUESTS FOR APPOINTMENT OF A SPECIAL MASTER

    30. To the extent that AVENATTI, REGNIER, EA LLP, A&A,
and/or X-Law Group intend to request that a special master be
appointed to handle the review of any potentially privileged
information seized during the execution of this Search Warrant,
such a request must be filed with this Court within seven days
of the execution of this Search Warrant. The government will
then have seven days to file any opposition to such a request.

    31. Any request for the appointment of a special master
must, at a minimum, address the following issues: (a) the legal
basis for the request; (b) the anticipated role of the special
master, should one be appointed; (c) proposed search and review
procedures to be followed by the special master, should one be
appointed; (d) proposed procedures for the selection of a

**EXHIBIT 1**
**Page 24 of 25**

USAO_00066733

special master; (e) the names of at least three proposed special

masters; and (f) the party's ability to pay for any costs and

fees incurred by a special master.

**EXHIBIT 1**
**Page 25 of 25**

USAO_00066734

GOVERNMENT'S OPPOSITION TO DEFENDANT MICHAEL JOHN AVENATTI'S
MOTION FOR PRIVILEGE REVIEW, EVIDENTIARY HEARING, AND DISCOVERY

# EXHIBIT 2

Case 8:19-mj-00243-DUTY Document 1 Filed 09/28/20 Page 28 of 285 Page ID #:316
Case 8:19-mj-00243-DUTY Document 305-2 Filed 09/28/20 Page 2 of 285 Page ID #:316
100   Page ID #:316
AO 106 (Rev. 04/10) Application for a Search Warrant



# UNITED STATES DISTRICT COURT

for the

Central District of California

**UNDER SEAL**

In the Matter of the Search of ）
*(Briefly describe the property to be searched or identify the* ）
*person by name and address)* ）
）
4491 Rainbow Lane, ）
Yorba Linda, California 92886 ）
）
）

Case No. 8:19-MJ-243

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-2*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B-2*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of:

| Code Section | Offense Description |
|---|---|
| 26 U.S.C. § 7201 | Attempt to Evade or Defeat Tax |
| 26 U.S.C. § 7202 | Willful Failure to Collect or Pay Over Tax |
| 26 U.S.C. § 7203 | Willful Failure to Pay Tax or File Return |
| 26 U.S.C. § 7212 | Interference with Administration of Internal Revenue Laws |
| 18 U.S.C. § 152 | Concealment of Assets in Bankruptcy |
| 18 U.S.C. § 157 | Bankruptcy Fraud |
| 18 U.S.C. § 371 | Conspiracy |
| 18 U.S.C. § 1001 | False Statements |
| 18 U.S.C. § 1014 | False Statement to a Bank or Other Federally Insured Institution |
| 18 U.S.C. § 1028A | Aggravated Identity Theft |
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1344 | Bank Fraud |
| 18 U.S.C. § 1957 | Money Laundering |

///

///

///

**EXHIBIT 2**
**Page 1 of 84**

USAO_00066397

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

IRS CI Special Agent Remoun Karlous
_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _Marl 24, 2019_

_____
*Judge's signature*

City and state: _Santa Ana, CA_

United States Magistrate Judge Douglas F. McCormick
_____
*Printed name and title*

AUSAs: Julian L. André (213.894.6683) & Brett A. Sagel (714.338.3598)
DOUGLAS F. McCORMICK

EXHIBIT 2
Page 2 of 84

USAO_00066398

## ATTACHMENT A-2

### PREMISES TO BE SEARCHED

The premises to be searched is a residential home at 4491 Rainbow Lane, Yorba Linda, California 92886 ("SUBJECT PREMISES 2"). SUBJECT PREMISES 2 is a single-story, single-family residence. SUBJECT PREMISES 2 is located on the west side of Rainbow Lane, a cul-de-sac, and south of Weatherly Drive. SUBJECT PREMISES 2 has a beige-colored stucco exterior with a shingle roof and an attached two-car garage with a white garage door facing the street. The numbers "4491" are affixed to the front exterior of SUBJECT PREMISES 2 along the roof trim on the left hand side of the entryway in black numerals. The numbers "4491" are also painted on the street curb in front of SUBJECT PREMISES 2 with black numerals on a white background. SUBJECT PREMISES 2 is set back from the driveway approximately two car lengths.

i

**EXHIBIT 2**
**Page 3 of 84**

USAO_00066399

**ATTACHMENT B-2**

## I.   ITEMS TO BE SEIZED

1.   Evidence, contraband, fruits, and/or instrumentalities of violations of 26 U.S.C. § 7201 (attempt to evade or defeat tax); 26 U.S.C. § 7202 (willful failure to collect or pay over tax); 26 U.S.C. § 7203 (willful failure to pay tax or file return); 26 U.S.C. § 7212 (interference with administration of internal revenue laws); 18 U.S.C. § 152 (concealment of assets in bankruptcy); 18 U.S.C. § 157 (bankruptcy fraud); 18 U.S.C. § 371 (conspiracy); 18 U.S.C. § 1001 (false statements); 18 U.S.C. § 1014 (false statement to a bank or other federally insured institution); 18 U.S.C. § 1028A (aggravated identity theft); 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1344 (bank fraud); and 18 U.S.C. § 1957 (money laundering) (the "Subject Offenses"), namely:

a.   Records, documents, programs, applications, or materials from January 2011 through the present relating to the ownership of Global Baristas US, LLC ("GBUS"); Global Baristas, LLC ("GB LLC"); GB Autosport, LLC ("GB Auto"); GB Hospitality LLC ("GB Hospitality"); Doppio Inc. ("Doppio"); Eagan Avenatti LLP ("EA LLP"); and Avenatti & Associates, APC ("A&A") (collectively, the "Subject Entities").

b.   Records, documents, programs, applications, or materials from January 2011 through the present relating to Michael J. Avenatti's ("AVENATTI") control or management of any

i

**EXHIBIT 2**
**Page 4 of 84**

USAO_00066400

of the Subject Entities and/or The X-Law Group, PC ("X-Law Group").

     c.   Records, documents, programs, applications, or materials from January 2011 through the present relating to the organizational or management structure of any of the Subject Entities and/or X-Law Group.

     d.   Records, documents, programs, applications, or materials from January 2011 through the present relating to the finances of any of the Subject Entities, including assets, income, liabilities, accounts receivable, accounts payable, and expenses.

     e.   Records, documents, programs, applications, or materials from January 2011 through the present relating to the personal finances of Michael Avenatti ("AVENATTI"), including information relating to AVENATTI's assets, debts, income, expenses, and net worth.

     f.   Records, documents, programs, applications, or materials from January 2011 through the present relating to the accounting records for AVENATTI and/or any of the Subject Entities, including any Microsoft Dynamics NAV, QuickBooks, or other electronic accounting data, files, or records.

     g.   Records, documents, programs, applications, or materials from January 201 through the present relating to any financial transactions, including any proposed or potential

<div align="center">ii</div>

**EXHIBIT 2**
**Page 5 of 84**

USAO_00066401

financial transactions, involving any of the Subject Entities, and/or AVENATTI.

h. Records, documents, programs, applications, or materials from January 2011 through the present relating to any payments, checks, credits, wire transfers, commodities, services, or other things of value paid, provided, delivered, or transferred, directly or indirectly, to AVENATTI and/or any of the Subject Entities

i. Records, documents, programs, applications, or materials from January 2011 through the present relating to any financial relationship between AVENATTI and/or any of the Subject Entities on one hand and X-Law Group and/or Filippo Marchino ("MARCHINO") on the other hand.

j. Records, documents, programs, applications, or materials from January 2011 through the present relating to financial decisions AVENATTI and/or JUDY REGNIER ("REGNIER") made on behalf of any of the Subject Entities, including decisions to authorize payments on behalf of any of the Subject Entities and transfer money to or from any of the Subject Entities.

k. Records, documents, programs, applications, or materials from January 2011 through the present relating to communications between AVENATTI and/or REGNIER and any financial institution regarding the transfer of funds to or from any

iii

**EXHIBIT 2**
**Page 6 of 84**

USAO_00066402

account associated with AVENATTI and/or any of the Subject
Entities.

        l.    Records, documents, programs, applications, or
materials from January 2011 through the present relating to any
loans or other financing agreements, including any proposed or
potential loans or other financing agreements, involving any of
the Subject Entities and/or AVENATTI.

        m.    Records, documents, programs, applications, or
materials from January 2011 through the present relating to the
payroll obligations of the Subject Entities.

        n.    Non-privileged records, documents, programs,
applications, or materials from January 2011 through the present
relating to the federal, state, and/or local tax obligations,
tax returns, tax liabilities, or tax payments of any of the
Subject Entities and/or AVENATTI.

        o.    Non-privileged records, documents, programs,
applications, or materials from January 2011 through the present
relating to any liens, levies, garnishments, judgments,
encumbrances, or tax-related investigations or actions
associated with any of the Subject Entities and/or AVENATTI.

        p.    Records, documents, programs, applications, or
materials from January 2011 through the present relating to
attorneys' fees or costs earned or collected by EA LLP, A&A,
and/or AVENATTI, including attorney-client fee contracts,

iv

**EXHIBIT 2**
**Page 7 of 84**

USAO_00066403

engagement letters, fee agreements, cost-sharing agreements, fee-sharing agreements, settlement agreements, and client billing records, but excluding any such records relating to the representations of Stephanie Clifford or Julie Swetnick.

q.   Records, documents, programs, applications, or materials from January 2011 through the present relating to any of the Subject Entities' and/or AVENATTI's contractual relationships, including drafts and final versions of any executed, proposed, or potential contracts and agreements, bills of sale, correspondence regarding payments, and correspondence regarding the cancellation or modification of contracts and/or agreements.

r.   Records, documents, programs, applications, or materials from January 2011 through the present relating to any of the Subject Entities' and/or AVENATTI's bank account information.

s.   Records, documents, programs, applications, or materials from January 2011 through the present relating to the physical whereabouts of AVENATTI, and/or REGNIER, including calendars and calendar entries.

t.   Records, documents, programs, applications, or materials from January 1, 2014, to the present relating to AVENATTI and/or EA LLP's representation of G.B., including the approximately $1.6 million settlement payment that was

**EXHIBIT 2**
**Page 8 of 84**

USAO_00066404

transferred to one of AVENATTI's City National Bank attorney trust account in or around January 2018.

u.    Records, documents, programs, applications, or materials from January 1, 2017, to the present relating to AVENATTI's, EA LLP's, X-Law Group, and/or MARCHINO's representation of M.P. and L.T., including the approximately $8,146,288 payment that was transferred to one of AVENATTI's City National Bank attorney trust accounts in or around March 2018.

v.    Records, documents, programs, applications, or materials from January 2013 through the present relating to the payroll and tax preparation services that Paychex provided to EA LLP and/or A&A, including any records, documents, programs, applications, or materials relating to changes in the payroll and tax services to be provided by Paychex.

w.    Records, documents, programs, applications, or materials from January 2013 through the present relating to the payroll and tax preparation services that Ceridian HCM Inc. ("Ceridian") provided to GBUS, including any records, documents, programs, applications, or materials relating to changes in the payroll and tax services to be provided by Ceridian.

x.    Records, documents, programs, applications, or materials from January 2013 through the present relating to the sale or purchase of TC Global, Inc. or Tully's Coffee.

vi

**EXHIBIT 2**
**Page 9 of 84**

    y.   Records, documents, programs, applications, or materials from January 2013 through the present relating to the purchase or sale, including any proposed or attempted purchase or sale, of GBUS, GB LLC, or Doppio.

    z.   Records, documents, programs, applications, or materials from January 2013 through the present relating to value of GBUS or GB LLC.

    aa.  Records, documents, programs, applications, or materials from January 2013 through the present relating to GBUS's and GB LLC's merchant credit card processing accounts (the "merchant accounts"), including contracts, agreements, account applications, and correspondence regarding changes to the merchant accounts.

    bb.  Records, documents, programs, applications, or materials from January 2011 through the present relating to the sale, rental, lease, purchase, maintenance, renovation, or remodeling of any of AVENATTI's residences, including his residences in Newport Beach, California; Laguna Beach, California; and Los Angeles, California.

    cc.  Records, documents, programs, applications, or materials from January 2011 through the present relating to continuing legal education ("CLE") courses taken by AVENATTI, including any professional responsibility CLE courses, ethics CLE courses, or tax CLE courses.

**EXHIBIT 2**
**Page 10 of 84**

USAO_00066406

dd. Records, documents, programs, applications, or materials from January 2011 through the present relating to any of the Subject Entities' employee handbooks or manuals, employment contracts, compensation records, and employee lists.

ee. Records, documents, programs, applications, or materials relating to any locations or services used by AVENATTI and/or any of the Subject Entities to store physical or electronic records.

ff. Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

gg. With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

**EXHIBIT 2**
**Page 11 of 84**

USAO_00066407

     iv. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

     v. evidence of the times the device was used;

     vi. passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

     vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

     viii. records of or information about Internet Protocol addresses used by the device;

     ix. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

  2. As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

  3. As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal

**EXHIBIT 2**
**Page 12 of 84**

USAO_00066408

digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II. SEARCH PROCEDURES FOR HANDLING POTENTIALLY PRIVILEGED INFORMATION

4. The following procedures will be followed at the time of the search in order to avoid unnecessary disclosures of any privileged attorney-client communications or work product:

### A. Non-Digital Evidence

5. Law enforcement personnel conducting the investigation ("the Investigation Team") may be present at the search, but may not search or review any item prior to it being given to them by the "Privilege Review Team" (previously designated individual(s) not participating in the investigation of the case).

6. The Privilege Review Team will review documents to see whether or not the document appears to contain or refer to communications between AVENATTI, REGNIER, MARCHINO and/or any other lawyers from EA LLP, A&A, and the X-Law Group on the one hand and any person on the other hand; contain the work product

of AVENATTI, REGNIER, MARCHINO, and any other lawyers from EA
LLP, A&A, and the X-Law Group; or contain communications or
documents relating to the following law firms' representation of
AVENATTI, EA LLP, or A&A:  (a) Foster Pepper PLLC; (b) Osborn
Machler PLLC; (c) Eisenhower Carlson PLLC;
(d) Talmadge/Fitzpatrick/ Tribe, PPLC; (e) The Brager Tax Law
Group; (f) SulmeyerKupetz; (g) Baker & Hostetler LLP;
(h) Shulman Hodges & Bastian LLP; (i) Legal & Tax Consulting
Group; (j) Pachulski Stang Ziehl & Jones LLP; (k) Foley &
Lardner LLP; (l) Raines Feldman, LLP; and (m) Pansky Markle
Attorneys at Law (collectively, the "potentially privileged
information").  Those documents not containing or referring to
such communications or work product may be turned over to the
Investigation Team for review.

    7.    In consultation with a Privilege Review Team Assistant
United States Attorney ("PRTAUSA"), if appropriate, the
Privilege Review Team member will review any document identified
as appearing to contain potentially privileged information to
confirm that it contains potentially privileged information.  If
it does not, it may be returned to an Investigation Team member.
If a member of the Privilege Review Team confirms that a
document contains potentially privileged information, then the
member will review only as much of the document as is necessary
to determine whether or not the document is within the scope of
the warrant.  Those documents which contain potentially
privileged information but are not within the scope of the
warrant will be set aside and will not be subject to further

**EXHIBIT 2**
**Page 14 of 84**

USAO_00066410

review or seizure absent subsequent authorization.   Those
documents which contain potentially privileged information and
are within the scope of the warrant will be seized and sealed
together in an enclosure, the outer portion of which will be
marked as containing potentially privileged information.   The
Privilege Review Team member will also make sure that the
locations where the documents containing potentially privileged
information were seized have been documented.

    8.   The seized documents containing potentially privileged
information will be delivered to the United States Attorney's
Office for further review by a PRTAUSA.   If that review reveals
that a document does not contain potentially privileged
information, or that an exception to the privilege applies, the
document may be returned to the Investigation Team.   If
appropriate based on review of particular documents, the PRTAUSA
may apply to the court for a finding with respect to the
particular documents that no privilege, or an exception to the
privilege, applies.

    **B.**   **Digital Evidence**

    9.   The Privilege Review Team will search for digital
devices capable of being used to facilitate the Subject Offenses
or capable of containing data falling within the scope of the
items to be seized.   The Privilege Review Team will then review
the identified digital devices as set forth herein.   The
Investigation Team will review only digital device data which
has been released by the Privilege Review Team.

**EXHIBIT 2**
**Page 15 of 84**

USAO_00066411

10.  The Privilege Review Team will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location.

11.  The Privilege Review Team and the Investigation Team shall complete both stages of the search discussed herein as soon as is practicable but not to exceed 180 days from the date of execution of the warrant.  The government will not search the digital device(s) beyond this 180-day period without obtaining an extension of time order from the Court.

12.  The Investigation Team will provide the Privilege Review Team and/or appropriate litigation support personnel[1] with a list of "scope key words" to search for on the digital devices, to include words relating to the items to be seized as detailed above.  The Privilege Review Team will conduct an initial review of the digital devices using the scope key words, and by using search protocols specifically chosen to identify documents and data that appear to be within the scope of the warrant.  The Privilege Review Team may also do a more detailed quality check of this data and the results of this initial review, to ensure that the key word search is effective. Documents and data that are identified by this initial review, after quality check, as not within the scope of the warrant will

---

[1] Litigation support personnel and computer forensics agents or personnel, including IRS Computer Investigative Specialists, are authorized to assist both the Privilege Review Team and the Investigation Team in processing, filtering, and transferring documents and data seized during the execution of the warrant.

**EXHIBIT 2**
**Page 16 of 84**

USAO_00066412

be maintained under seal and not further reviewed absent
subsequent authorization.

13.   The Investigation Team will also provide the Privilege
Review Team with a list of "privilege key words" to search for
among the documents and data that are identified by the initial
review and quality check described above as appearing to fall
within the scope of the warrant, to include specific words
associated with AVENATTI, REGNIER, MARCHINO, and any of the
following law firms (a) EA LLP; (b) A&A; (c) X-Law Group; (d)
Foster Pepper PLLC; (e) Osborn Machler PLLC; (f) Eisenhower
Carlson PLLC; (g) Talmadge/Fitzpatrick/ Tribe, PPLC; (h) The
Brager Tax Law Group; (i) SulmeyerKupetz; (j) Baker & Hostetler
LLP; (k) Shulman Hodges & Bastian LLP; (l) Legal & Tax
Consulting Group; (m) Pachulski Stang Ziehl & Jones LLP; (n)
Foley & Lardner LLP; (o) Raines Feldman, LLP; and (p) Pansky
Markle Attorneys at Law.   The privilege key words shall also
include the above referenced law firms' domain names and
lawyers' email addresses, and generic words such as
"privileged," "work product."   The Privilege Review Team will
conduct a review of these documents and data using the privilege
key words, and by using search protocols specifically chosen to
identify documents and data containing potentially privileged
information.   Documents or data which are identified by this
review as not potentially privileged may be given to the
Investigation Team.

14.   Documents or data that the privilege key word searches
identify as potentially privileged will be reviewed by a

**EXHIBIT 2**
**Page 17 of 84**

USAO_00066413

Privilege Review Team member to confirm that they contain potentially privileged information. Documents or data that are determined by this review not to be potentially privileged may be given to the Investigation Team. Documents or data that are determined by this review to be potentially privileged will be given to the United States Attorney's Office for further review by a PRTAUSA. Documents or data identified by the PRTAUSA after review as not potentially privileged may be given to the Investigation Team. If, after review, the PRTAUSA determines it to be appropriate, the PRTAUSA may apply to the court for a finding with respect to particular documents or data that no privilege, or an exception to the privilege, applies. Documents or data that are the subject of such a finding may be given to the Investigation Team.

15. Documents or data identified by the PRTAUSA(s) after review as privileged (that are not subject to a finding by a court of no privilege or an exception to the privilege) or potentially privileged and outside the scope of the items to be seized shall be segregated and sealed together in an enclosure, the outer portion of which will be marked as containing potentially privileged information, and maintained by the investigative agency. Such data or documents shall not be accessible by or given to the Investigation Team at any time absent authorization of the Court. However, the Privilege Review Team may, in its discretion, store the privileged and potentially privileged data and documents in a folder or a set of folders in a document review platform database, such as

xv

**EXHIBIT 2**
**Page 18 of 84**

USAO_00066414

Relativity or Eclipse, that remains inaccessible to the Investigation Team.  The Privilege Review Team's access to this separate document review platform database shall cease upon expiration of the warrant.  However, litigation support personnel from the United States Attorney's Office, United States Department of Justice, and/or the investigating agency may continue to access this separately-maintained document review database for the purpose of database maintenance.

16.  The Investigation Team will search only the documents and data that the Privilege Review Team provides to the Investigation Team at any step listed above in order to locate documents and data that are within the scope of the search warrant.  The Investigation Team does not have to wait until the entire privilege review is concluded to begin its review for documents and data that are within the scope of the search warrant.  The Privilege Review Team may also conduct the search for documents and data within the scope of the search warrant if that is more efficient.  This second "scope" review is intended only to ensure that the initial scope key word review successfully eliminated data outside the scope of the search warrant from seizure.

## C.   **Additional Privilege Review Procedures**

17.  The Privilege Review Team will segregate any identifiable documents and/or data relating to Stephanie Clifford v. Donald J. Trump, No. 2:18-CV-2217-SJO-FFM (C.D. Cal.), the representation of Stephanie Clifford, and/or the representation of Julie Swetnick.  Such documents and/or data

**EXHIBIT 2**
**Page 19 of 84**

USAO_00066415

will be maintained under seal by the investigating agency
without further review as set forth in paragraphs 7 and 15 above
absent subsequent authorization from the Court.  This provision,
however, shall not preclude the Privilege Review Team or
Investigation Team from reviewing financial and accounting
records covered by paragraphs 1.d, 1.f, 1.g, and 1.r above,
which reference the representations of Ms. Clifford or Ms.
Swetnick.

18.   To the extent that any documents and/or data covered
by paragraph 1.p above, such as attorney-client fee contracts,
engagement letters, and client billing records, contain
information that is potentially protected by the attorney-client
privileged or the attorney-work-product doctrine, the Privilege
Review Team shall redact all such potentially privileged
information from the documents or data before releasing the
documents and/or data to the Investigation Team unless the
specific client agrees to waive the attorney-client privilege.

19.   If, upon review, a member of the Investigation Team
determines that a document or data appears to contain
potentially privileged information, the Investigation Team
member shall discontinue its review of the document or data and
shall immediately notify a member of the Privilege Review Team.
The Investigation Team member may record identifying information
regarding the potentially privileged document or data that is
reasonably necessary to identify the document or data for the
Privilege Review Team.  The Investigation Team shall not further
review any documents or data that appears to contain such

**EXHIBIT 2**
**Page 20 of 84**

USAO_00066416

Case 8:19-cr-00061-JVS Document 305-3 Filed 09/28/20 Page 48 of 285 Page ID #:4621
Case 8:19-mj-00243-DUTY *SEALED* Document 9-1 *SEALED* Filed 03/24/19 Page 22 of
100   Page ID #:336

potentially privileged information until after the Privilege
Review Team has completed its review of the additional
potentially privileged information discovered by the
Investigation Team member.

20.   In performing the reviews, both the Privilege Review
Team and the Investigation Team may:

a.    search for and attempt to recover deleted,
"hidden," or encrypted data;

b.    use tools to exclude normal operating system
files and standard third-party software that do not need to be
searched; and

c.    use forensic examination and searching tools,
such as "EnCase," "FTK" (Forensic Tool Kit), Nuix, Axiom,
Relativity, and Eclipse, which tools may use hashing and other
sophisticated techniques.

21.   If either the Privilege Review Team or the
Investigation Team, while searching a digital device, encounters
immediately apparent contraband or other evidence of a crime
outside the scope of the items to be seized, they shall
immediately discontinue the search of that device pending
further order of the Court and shall make and retain notes
detailing how the contraband or other evidence of a crime was
encountered, including how it was immediately apparent
contraband or evidence of a crime.

22.   If the search determines that a digital device does
not contain any data falling within the list of items to be

**EXHIBIT 2**
**Page 21 of 84**

USAO_00066417

seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

23. If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

24. If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the items to be seized (after the time for searching the device has expired) absent further court order.

25. The government may retain also a digital device if the government, within 14 days following the time period authorized by the Court for completing the search, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

26. After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

xix

**EXHIBIT 2**
**Page 22 of 84**

USAO_00066418

27. In order to search for data capable of being read or interpreted by a digital device, the Investigation Team is authorized to seize the following items:

a. Any digital device capable of being used to commit, further or store evidence of the offense(s) listed above;

b. Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c. Any magnetic, electronic, or optical storage device capable of storing digital data;

d. Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e. Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f. Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g. Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

28. During the execution of this search warrant, with respect to a biometric sensor-enabled device that is located at the SUBJECT PREMISES and falls within the scope of the warrant, the law enforcement personnel are authorized to: (1) depress the

xx

**EXHIBIT 2**
**Page 23 of 84**

USAO_00066419

thumb- and/or fingerprints of AVENATTI, REGNIER, and/or MARCHINO
onto the fingerprint sensor of the device (only when the device
has such a sensor), and direct which specific finger(s) and/or
thumb(s) shall be depressed; and (2) hold the device in front of
the face of AVENATTI, REGNIER, and/or MARCHINO his or her eyes
open to activate the facial-, iris-, or retina-recognition
feature, in order to gain access to the contents of any such
device.

29.   The special procedures relating to digital devices
found in this warrant govern only the search of digital devices
pursuant to the authority conferred by this warrant and do not
apply to any search of digital devices pursuant to any other
court order.

## III.  REQUESTS FOR APPOINTMENT OF A SPECIAL MASTER

30.   To the extent that AVENATTI, REGNIER, EA LLP, A&A,
MARCHINO, and/or X-Law Group intend to request that a special
master be appointed to handle the review of any potentially
privileged information seized during the execution of this
Search Warrant, such a request must be filed with this Court
within seven days of the execution of this Search Warrant.   The
government will then have seven days to file any opposition to
such a request.

31.   Any request for the appointment of a special master
must, at a minimum, address the following issues:   (a) the legal
basis for the request; (b) the anticipated role of the special
master, should one be appointed; (c) proposed search and review
procedures to be followed by the special master, should one be

**EXHIBIT 2**
**Page 24 of 84**

USAO_00066420

appointed; (d) proposed procedures for the selection of a
special master; (e) the names of at least three proposed special
masters; and (f) the party's ability to pay for any costs and
fees incurred by a special master.

**EXHIBIT 2**
**Page 25 of 84**

USAO_00066421

## AFFIDAVIT

I, Remoun Karlous, being duly sworn, declare and state as follows:

### I.  INTRODUCTION

1.   I am a Special Agent ("SA") with the Internal Revenue Service-Criminal Investigation ("IRS-CI") in the Los Angeles Field Office and have been so employed since April 1995.  As an IRS-CI SA, I have investigated numerous cases involving criminal violations of Title 18, Title 21, Title 26, and Title 31 of the United States Code, which have resulted in seizure, search, and arrest warrants.  In particular, I have investigated cases involving money laundering, international money laundering, securities fraud, tax evasion (domestic and international cases), and subscribing to false tax returns.

### II. PURPOSE OF AFFIDAVIT

2.   This affidavit is submitted in support of the following:

a.   An application for a warrant to search the residence of Michael J. Avenatti ("AVENATTI") located at 10000 Santa Monica Boulevard, Unit 2205, Los Angeles, California 90067 ("SUBJECT PREMISES 1"), as further described in Attachment A-1, for the list of items to be seized as set forth in Attachment B-1.

b.   An application for a warrant to search the residence of Judy K. Regnier ("REGNIER") located at 4491 Rainbow Lane, Yorba Linda, California 92886 ("SUBJECT PREMISES 2"), as

**EXHIBIT 2**
**Page 26 of 84**

USAO_00066422

further described in Attachment A-2 for the list of items to be seized as set forth in Attachment B-2.

        c.    An application for a warrant to search the business premises of The X-Law Group ("X-Law Group") located at 1910 West Sunset Boulevard, Suite 450, Los Angeles, California 90026 ("SUBJECT PREMISE 3" and, collectively with SUBJECT PREMISES 1 and SUBJECT PREMISES 2, the "SUBJECT PREMISES"), as further described in Attachment A-3 for the list of items to be seized as set forth in Attachment B-3.

        3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## III. **PROPERTY TO BE SEARCHED**

        4.    The property to be searched are the SUBJECT PREMISES, including any individuals, containers, or digital devices found therein, as described in Attachments A-1, A-2, and A-3. Attachments A-1, A-2, and A-3 are incorporated herein by reference.

## IV. **ITEMS TO BE SEIZED**

        5.    The requested search warrants seek authorization to seize from the SUBJECT PREMISES any evidence, fruits, or

2

**EXHIBIT 2**
**Page 27 of 84**

USAO_00066423

instrumentalities of violations of 26 U.S.C. § 7201 (attempt to
evade or defeat tax); 26 U.S.C. § 7202 (willful failure to
collect or pay over tax); 26 U.S.C. § 7203 (willful failure to
pay tax or file return); 26 U.S.C. § 7212 (interference with
administration of internal revenue laws); 18 U.S.C. § 152
(concealment of assets in bankruptcy); 18 U.S.C. § 157
(bankruptcy fraud); 18 U.S.C. § 371 (conspiracy); 18 U.S.C.
§ 1001 (false statements); 18 U.S.C. § 1014 (false statement to
a bank or other federally insured institution); 18 U.S.C.
§ 1028A (aggravated identity theft); 18 U.S.C. § 1343 (wire
fraud); 18 U.S.C. § 1344 (bank fraud); and 18 U.S.C. § 1957
(money laundering) (collectively, the "Subject Offenses").  The
list of items to be seized is set forth in Attachments B-1, B-2,
and B-3.  Attachments B-1, B-2, and B-3 are incorporated by
reference herein.

### V.  SUMMARY OF PROBABLE CAUSE

6.   AVENATTI was and is an attorney licensed to practice
law in the State of California.  AVENATTI practiced law through
Avenatti & Associates, APC ("A&A") and Eagan Avenatti LLP ("EA
LLP") in Newport Beach and Los Angeles, California.  AVENATTI
was the sole owner of A&A, which owned 75 percent of EA LLP.

7.   AVENATTI was also the principal owner and Chief
Executive Officer ("CEO") of Global Baristas US LLC ("GBUS"),
which operated Tully's Coffee ("Tully's") stores in Washington
and California.  In 2013, AVENATTI's company, Global Baristas
LLC ("GB LLC"), acquired TC Global Inc., which previously
operated Tully's, out of bankruptcy for approximately $9.2

3

**EXHIBIT 2**
**Page 28 of 84**

million.  AVENATTI's company, A&A, owned 100 percent of Doppio
Inc., which in turn owned 80 percent of GB LLC.  GB LLC wholly
owned GBUS, which handled the day-to-day business operations of
Tully's.

8.    There is probable cause to believe that AVENATTI and
others engaged in the following criminal conduct:  (a) tax
offenses relating to GBUS's failure to pay to the IRS payroll
taxes, including federal income taxes, Social Security taxes,
and Medicare taxes (collectively, "trust fund taxes") that GBUS
withheld from its employees' paychecks, and AVENATTI's
subsequent efforts to obstruct a related IRS collection action;
(b) tax offenses relating to the tax obligations of EA LLP and
A&A, including EA LLP's failure to pay to the IRS its payroll
taxes, and EA LLP's and A&A's failure to file federal corporate
or partnership tax returns and pay federal income taxes; (c) tax
offenses relating to AVENATTI's failure to file federal
individual income tax returns and pay federal income taxes
between 2011 and 2017; (d) fraud-related offenses relating to
loans AVENATTI and his companies obtained from The Peoples Bank
in Mississippi; (e) fraud and money laundering offenses relating
to a total of approximately $5 million that AVENATTI embezzled
from his legal clients (G.B., M.P., and L.T.) in 2018; and
(f) bankruptcy fraud offenses relating to AVENATTI's and EA
LLP's efforts to conceal assets and bank accounts during federal
bankruptcy proceedings involving AVENATTI and EA LLP.

9.    On March 22, 2019, in case number SA 19-241M, I
submitted an affidavit in support of an arrest warrant and

4

**EXHIBIT 2**
**Page 29 of 84**

USAO_00066425

criminal complaint charging AVENATTI with one count of bank
fraud, in violation of 18 U.S.C. § 1344(1), and one count of
wire fraud, in violation of 18 U.S.C. § 1343.  The Honorable
Douglas F. McCormick, United States Magistrate Judge, authorized
the arrest warrant that same day.  IRS-CI anticipates executing
the arrest warrant concurrently with the proposed search
warrants.

        10.  There is probable cause to believe that evidence of
the SUBJECT OFFENSES will be found at the SUBJECT PREMISES for
the following reasons:

            a.   First, SUBJECT PREMISES 1 is AVENATTI's personal
residence.  Based on my training and experience and evidence
obtained during the course of this investigation, I know that
SUBJECT PREMISES 1 is likely to contain AVENATTI's personal and
business records, as well as digital devices that are likely to
contain such records.

            b.   Second, SUBJECT PREMISES 2 is REGNIER's personal
residence.  Based on my training and experience and
investigation to date, as well as REGNIER's substantial
involvement in the alleged criminal conduct, I believe SUBJECT
PREMISES 2 is also likely to contain relevant business records
and/or digital devices containing such records.  For example, I
understand that EA LLP's and A&A's mail is currently being
forwarded to a mailbox at a Postal Annex store less than a mile
from SUBJECT PREMISES 2 and since EA LLP was evicted from their
offices in Newport Beach, California, between November 2018 and

**EXHIBIT 2**
**Page 30 of 84**

USAO_00066426

Case 8:19-cr-00061-DVG Document 305-3 Filed 09/28/20 Page 58 of 285 Page ID #:4631
Case 8:19-mj-00293-DUTY SEALED Document 9-12 SEALED Filed 03/24/19 Page 53 of
100   Page ID #:346

January 2019, I believe REGNIER has primarily been working from
her home.

        c.    Third, SUBJECT PREMISES 3 is the business
premises of The X-Law Group ("X-Law Group").  AVENATTI has been
leasing SUBJECT PREMISES 3 and used it as additional office
space for EA LLP since the summer of 2016.  Additionally, X-Law
Group was directly involved in a number of significant financial
transactions with GBUS, GB LLC, GB Autosport LLC ("GB Auto"), EA
LLP, and A&A.  Moreover, in 2018, Filippo Marchino ("MARCHINO"),
the Founding Partner of X-Law Group, was directly involved in
discussions with AVENATTI's clients, M.P. and L.T., regarding
the approximately $4 million that AVENATTI embezzled from M.P.
and L.T. in March 2018.

<div align="center">

## VI. STATEMENT OF PROBABLE CAUSE
</div>

**A.**    **February 2019 Warrant to Search GBUS Digital Devices**

    11.  On February 22, 2019, in case number 8:19-MJ-103, I
submitted an affidavit in support of an application for a
warrant to search seven digital devices in the custody of IRS-CI
in Laguna Niguel, California (the "February 2019 affidavit"),
which had been produced by former GBUS employees.  The Honorable
Douglas F. McCormick, United States Magistrate Judge, authorized
the warrant that same day (the "February 2019 search warrant").
The application for a search warrant in case number 8:19-MJ-103,
as well as my February 2019 affidavit in support thereof, are
attached hereto as Exhibit 1 and incorporated herein by

<div align="center">

6

**EXHIBIT 2**
**Page 31 of 84**
</div>

reference.[1] In summary, my February 2019 affidavit stated the following:

      a.    AVENATTI was and is an attorney licensed to practice law in the State of California. AVENATTI practiced law through A&A and EA LLP in Newport Beach, California. AVENATTI was the sole owner of A&A, which owned 75 percent of EA LLP.

      b.    AVENATTI was also the principal owner and Chief Executive Officer ("CEO") of GBUS, which operated Tully's stores in Washington and California. In 2013, AVENATTI's company, GB LLC, acquired TC Global Inc., which previously operated Tully's, out of bankruptcy for approximately $9.2 million. AVENATTI's company, A&A, owned 100 percent of Doppio Inc., which in turn owned 80 percent of GB LLC. GB LLC wholly owned GBUS, which handled the day-to-day business operations of Tully's.

      c.    There is probable cause to believe that between at least 2011 and the present AVENATTI committed federal offenses, including the following: (a) tax offenses relating to GBUS's payroll tax obligations and AVENATTI's efforts to obstruct an IRS collection action; (b) tax offenses relating to the tax obligations of EA LLP and A&A, including the payroll tax obligations of EA LLP; (c) tax offenses relating to AVENATTI's personal tax obligations; (d) fraud-related offenses relating to

---

    [1] The search warrant and application in case number 8:19-MJ-103 were filed under seal and remain under seal to protect the integrity of the government's ongoing investigation. Because the search warrants sought in connection with this application are likely to be executed concurrently with AVENATTI's arrest warrant, the government will likely be moving to unseal this application and the February 2019 search warrant after AVENATTI's arrest.

**EXHIBIT 2**
**Page 32 of 84**

USAO_00066428

loans AVENATTI and his companies obtained from The Peoples Bank
in Mississippi; and (e) wire fraud, money laundering, and
bankruptcy fraud offenses relating to an approximately $1.6
million settlement payment AVENATTI and EA LLP received in
January 2018, but failed to transfer to EA LLP's client or
disclose in federal bankruptcy proceedings involving AVENATTI
and EA LLP.

        d.    <u>First</u>, between the fourth quarter of 2015 and the
fourth quarter of 2017, inclusive, GBUS failed to file
employment tax returns and pay approximately $3,121,460 in
federal payroll taxes, including approximately $2,390,048 in
trust fund taxes, which had been withheld from GBUS employees'
paychecks.  Multiple former GBUS employees have said that
AVENATTI was responsible for all of GBUS's significant financial
and business decisions, including the decision not to pay the
payroll and trust fund taxes that GBUS owed to the IRS.  Indeed,
AVENATTI was well aware of GBUS's outstanding tax obligations,
yet repeatedly refused to authorize the required tax payments to
the IRS.

        e.    Although GBUS failed to pay to the IRS its
payroll taxes between the fourth quarter of 2015 and the fourth
quarter of 2017, AVENATTI caused substantial amounts of money to
be transferred from GBUS's or GB LLC's bank accounts during this
same time period.  For example, a preliminary analysis of GBUS's
and GB LLC's bank account records shows that between 2015 and
2017 AVENATTI caused a net of approximately $1.7 million to be
transferred from GBUS's or GB LLC's bank accounts to bank

8

**EXHIBIT 2**
**Page 33 of 84**

USAO_00066429

accounts associated with A&A or EA LLP.[2]  This money could have and should have been used to pay GBUS payroll tax obligations.

> f.    Additionally, after the IRS initiated a collection action relating to GBUS's outstanding payroll tax obligations in September 2016, issued an approximately $5,000,000 tax lien against GBUS in July 2017, and levied multiple GBUS bank accounts, AVENATTI directed repeated attempts to evade collection of those payroll taxes and obstruct the IRS collection action.  Among other things, AVENATTI took the following steps to evade the collection of payroll taxes due to the IRS and obstruct the IRS collection action:

> i.    In October 2016, when first contacted by an IRS Revenue Officer ("RO 1") regarding GBUS's unpaid payroll taxes, AVENATTI falsely stated that a third-party payroll company was responsible for filing GBUS's payroll tax returns and making GBUS's federal tax deposits.  AVENATTI, however, knew that GBUS's third-party payroll company, Ceridian HCM Inc., had discontinued the tax services it had previously provided to GBUS and was, therefore, no longer responsible for filing GBUS's payroll tax returns and making the necessary federal tax deposits.  AVENATTI was well aware that GBUS was not paying its payroll taxes.  GBUS employees repeatedly asked him to authorize

---

[2]  A further analysis of GBUS's and GB LLC's bank account records shows that between September 2015 and December 2017, AVENATTI caused a net of approximately $2,527,318 to be transferred from GBUS's and GB LLC's bank accounts to bank accounts associated with A&A and EA LLP.  Moreover, in September 2015 and October 2015 alone, when GBUS first stopped paying its payroll taxes to the IRS, AVENATTI caused a net of approximately $501,582 to be transferred to EA LLP's and A&A's bank accounts.

**EXHIBIT 2**
**Page 34 of 84**

USAO_00066430

the payment of GBUS's payroll taxes to the IRS, yet he refused to do so.

       ii.  In September 2017, after IRS RO 1 advised GBUS of the possibility of criminal proceedings and levied multiple GBUS bank accounts, including a GBUS account at KeyBank, AVENATTI directed GBUS employees to stop depositing cash receipts from the Tully's stores into the account at KeyBank.  Instead, in order to avoid the levies, AVENATTI directed GBUS employees to deposit all cash receipts from Tully's stores into a little-used bank account at Bank of America associated with his car racing entity, GB Auto.  Between September 2017 and December 2017, GBUS employees deposited approximately $859,784 in cash into the GB Auto account at AVENATTI's direction.

       iii. In late-September and early-October 2017, in order to avoid IRS levies issued to the sponsoring bank for GBUS's merchant credit card processing accounts ("merchant accounts"), AVENATTI directed GBUS's credit card processing company, TSYS Merchant Solutions ("TSYS"), to change the company name and Employer Identification Number ("EIN") associated with the merchant accounts from GBUS to GB LLC.  AVENATTI also directed TSYS to have all credit card receipts paid to a new bank account under the name of GB LLC, which AVENATTI and REGNIER had opened that same day in Orange County, California, instead of the bank accounts associated with GBUS, which were already subject to the IRS levies.

**EXHIBIT 2**
**Page 35 of 84**

USAO_00066431

          iv.   In November 2016, approximately one month after RO 1 first contacted AVENATTI, AVENATTI changed the name of the party to a contract with The Boeing Company ("Boeing") from GBUS to "GB Hospitality LLC," a company which does not appear to have ever been registered with any government agency or operated.  Later, in September 2017, after the IRS had issued levies to Boeing and a number of banks with which GBUS had accounts, Boeing cancelled the contract because GBUS had failed to make the required commission payments.  In connection with the cancellation of the contract, Boeing agreed to purchase two existing Tully's "kiosks" at Boeing facilities and other Tully's equipment in exchange for a total of $155,010 and the forgiveness of GBUS's debt to Boeing.  Although all of the Tully's locations were operated by GBUS, AVENATTI told an attorney at Boeing to use the name GB LLC on the two bills of sale for the kiosks and equipment, and instructed Boeing to wire the $155,010 payment to an attorney trust account associated with EA LLP rather than any of the bank accounts associated with GBUS.  Had the Boeing contract and subsequent bills of sale been under the name GBUS, Boeing would not have made the $155,010 payment due to the existing GBUS tax lien.  After receiving the $155,010 payment from Boeing, AVENATTI transferred the $155,010 to an A&A bank account, from which he then transferred $15,000 to his personal checking account, paid approximately $13,073 for rent at his residential apartment in Los Angeles, California (SUBJECT PREMISES 1), and paid approximately $8,459 to Neiman Marcus.  Indeed, out of the $155,010 Boeing transferred to the

<center>11</center>

**EXHIBIT 2**
**Page 36 of 84**

USAO_00066432

EA LLP trust account, it appears that only approximately half ever ended up in GBUS's bank accounts.

      g.   Second, AVENATTI's other companies, EA LLP and A&A, have repeatedly failed to meet their tax obligations despite generating substantial revenues. Between 2015 and 2017, EA LLP failed to file payroll tax returns and pay approximately $2.4 million in payroll taxes, including approximately $1,279,001 in trust fund taxes that had been withheld from EA LLP employees' paychecks. Just as he did in connection with GBUS, AVENATTI lied to the IRS when initially contacted regarding EA LLP's failure to pay its payroll taxes, and falsely claimed that a third-party payroll company, Paychex, was responsible for making the required tax payments even though the payroll company had notified AVENATTI in January 2015 that it was discontinuing various payroll tax services. Additionally, EA LLP has not filed partnership tax returns (IRS Form 1065) for the 2013, 2014, 2015, 2016, and 2017 tax years, even though EA LLP appears to have received approximately $137,890,016 of deposits into its bank accounts during these tax years. Indeed, AVENATTI's personal website claims that AVENATTI has recovered over one billion dollars in verdicts and settlements for his clients. Similarly, A&A has not filed corporate tax returns (IRS Form 1120S) for the 2011, 2012, 2013, 2014, 2015, 2016, or 2017 tax years, even though A&A appears to have received approximately $37,961,633 of deposits into its bank accounts during these tax years, including net payments of approximately $23,820,816 from EA LLP.

**EXHIBIT 2**
**Page 37 of 84**

USAO_00066433

       h.   <u>Third</u>, AVENATTI filed federal personal income tax returns for the 2009 and 2010 tax years indicating that he owed the IRS a total of approximately $850,438, plus interest and penalties. AVENATTI, however, did not pay the IRS the amounts he owed for those tax years.[3] AVENATTI then failed to file personal tax returns for the 2011 through 2017 tax years. During these tax years, AVENATTI generated substantial income and lived lavishly, yet largely failed to pay any federal income tax. A preliminary analysis of AVENATTI's personal bank accounts reflects that AVENATTI received net payments of approximately $8,464,064 from A&A and EA LLP between 2011 to 2017. AVENATTI also repeatedly used money that had been transferred from GBUS, GB LLC, and EA LLP to A&A to pay for personal expenses. Further, AVENATTI received proceeds of approximately $5.4 million when he sold his home in Laguna Beach, California in 2015. Finally, in connection with recent divorce proceedings, AVENATTI's wife said that AVENATTI told her that he earned $3.7 million dollars in 2016. His wife also said that their family's monthly expenses were over $200,000 per month. Financial and escrow company records show that from approximately September 2015 to September 2016, AVENATTI and his wife rented a home in Newport Beach for $100,000 per month, after making a $1,000,000 deposit.

---

[3] The tax due and owing to the IRS for the 2009 and 2010 tax years was not paid until November 2015, when AVENATTI sold his residence in Laguna Beach, California, upon which there was an IRS tax lien.

**EXHIBIT 2**
**Page 38 of 84**

USAO_00066434

         i.    Fourth, between approximately January 2014 and December 2014, AVENATTI obtained three separate loans from The Peoples Bank, a federally insured bank in Mississippi: (1) a $850,500 loan to GB LLC in January 2014; (2) a $2,750,000 loan to EA LLP in March 2014; and (3) a $500,000 loan to EA LLP in December 2014. In connection with these loans, AVENATTI provided The Peoples Bank with false federal personal income tax returns for the 2011, 2012, and 2013 tax years. In these purported tax returns, AVENATTI claimed that he earned $4,562,881 in adjusted gross income in 2011, $5,423,099 in adjusted gross income in 2012, and $4,082,803 in adjusted gross income in 2013. He also claimed that he had paid to the IRS $1,600,000 in estimated tax payments in 2012, and $1,250,000 in estimated tax payments in 2013. However, AVENATTI never filed personal income tax returns for the 2011, 2012, and 2013 tax years, and did not make any estimated tax payments during the 2012 and 2013 tax years. In fact, as noted above, at the time, AVENATTI still owed the IRS approximately $850,438 in unpaid personal income taxes, plus interest and penalties, from the 2009 and 2010 tax years. Additionally, in March 2014, AVENATTI provided The Peoples Bank with a 2012 federal tax return for EA LLP which claimed total income of $11,426,021 and ordinary business income of $5,819,456. However, the 2012 federal tax return EA LLP actually filed with the IRS in October 2014 claimed total income of only $6,212,605 and an ordinary business loss of $2,128,849.

**EXHIBIT 2**
**Page 39 of 84**

USAO_00066435

     j.    <u>Fifth</u>, between January 2018 and November 2018, AVENATTI defrauded one of EA LLP's client, G.B., out of the client's portion of an approximately $1.6 million settlement payment.  Specifically, in January 2018, AVENATTI arranged for the $1.6 million settlement payment to be transferred to one of his attorney trust accounts.  Rather than transfer his client's portion of the settlement proceeds to his client, AVENATTI used the entire $1.6 million for his own purposes, including to pay for expenses relating to GBUS.  He then lied to his client and claimed that the settlement payment was not due until March 2018.  When the fake March 2018 deadline passed, AVENATTI led his client to believe that the $1.6 million payment had never been received.  Additionally, AVENATTI failed to disclose in federal bankruptcy proceedings involving AVENATTI and EA LLP that he had received the $1.6 million settlement payment, despite being aware that he was required to do so.

     k.    AVENATTI has described REGNIER as his office manager, chief paralegal, and bookkeeper.  She appears to have worked for EA LLP (or its predecessor firm Eagan O'Malley & Avenatti LLP) in an administrative capacity since at least 2008.[4] At various times, REGNIER was a signatory on bank accounts associated with GBUS, GB LLC, GB Auto, EA LLP, and A&A.  REGNIER was personally involved in many of the events at issue in the government's investigation, including directing or executing the

_____

    [4] Although my February 2019 affidavit said that REGNIER worked for EA LLP since at least 2010, I have since reviewed publicly available information indicating that she worked at Eagan O'Malley & Avenatti since at least 2008.

15

**EXHIBIT 2**
**Page 40 of 84**

transfer of funds between various entities associated with
AVENATTI, directing the actions of GBUS employees, and
transmitting signed contracts and agreements on behalf of GBUS,
GB LLC, EA LLP, or A&A to other parties.

**B.   Additional Evidence Regarding the GBUS Tax Offenses**

12.   As noted in my February 2019 affidavit, between the
fourth quarter of 2015 and the fourth quarter of 2017, GBUS
failed to pay to the IRS approximately $3,121,460 in federal
payroll taxes, including approximately $2,390,048 in trust fund
taxes.  AVENATTI also repeatedly attempted to obstruct the IRS
collection action arising from GBUS's failure to pay its payroll
taxes.  Since I submitted my February 2019 affidavit, the
investigation has uncovered additional evidence regarding this
conduct.

13.   In my February 2019 affidavit, I noted that GBUS's
former controller, M.B., told IRS-CI that she sent AVENATTI an
email explaining the ramifications of GBUS not paying its
payroll taxes to the IRS.  (Ex. 1, ¶ 26.h.)  Based on my review
of evidence obtained from the February 2019 search warrant, I
have learned that on November 5, 2015, M.B. sent AVENATTI an
email[5] titled "Information only – Q4 2015 941 Payroll Tax."  The
email stated, in full, the following:

Michael,

Per you instruction, 941 payroll tax and unemployment
tax payments (federal withholding, Medicare and social

---

[5]  This email was sent to mavenatti@eaganavenatti.com.
Based on the evidence collected during IRS-CI's investigation, I
know that AVENATTI almost exclusively used his EA LLP email
address mavenatti@eaganavenatti.com to conduct business on
behalf of GBUS and his other companies.

16

**EXHIBIT 2**
**Page 41 of 84**

USAO_00066437

security) are not to be paid on an as-we-go basis but
will be paid in total at the 1/31/16 filing due
date.  Two implications result from this strategy:

1. Estimated total tax payment due at 1/31/16 will be
   about $575,000 - $600,000, exclusive of penalties
   and interest.

       a. 6 payrolls each with an $83,000 941 tax
          obligation for a total of $500,000
       b. Federal unemployment of about $8,200
       c. State (CA and WA) unemployment of about $28,000
       d. Washington L&I (workers comp) of about $50,000

2. Global Baristas is a semiweekly filer for 941 tax
   per the Internal Revenue Service.  Per Publication
   15 for semiweekly filers, if the pay day falls on a
   Saturday, Sunday, Monday and/or Tuesday, (Monday as
   the case of GB) then taxes are required to be
   deposited by the following Friday.  Again per
   Publication 15 "you are required to deposit 100% of
   your tax liability on or before the due
   date".  Deposit penalties are as follows:

       a. 2% - Deposit made 1-5 days late
       b. 5% - Deposit made 6-15 days late
       c. 10% - Deposit made 16 or more days late.  Also
          applies to amounts paid within 10 days of the date
          of the first notice the IRS sent asking for the tax
          due
       d. 15% - Amounts still unpaid more than 10 days after
          the date of the first notice the IRS sent asking for
          the tax due or the day on which you received notice
          and demand for immediate payment, whichever is
          earlier.

   I have attached Publication 15 for your
   reference.  Unemployment will also carry penalties and
   interest.

   Again, this is for your information, thus I am not
   looking for a response or direction.  I wanted to
   ensure that you were aware of the implications.

A copy of the "Employer's Tax Guide," IRS Publication 15 for

2015 was attached to the email.  M.B. forwarded a copy of this

17

**EXHIBIT 2**
**Page 42 of 84**

USAO_00066438

email to M.E., GBUS's former Director of Human Resources, on or about December 18, 2015.

14. As noted in my February 2019 affidavit, M.E. told IRS-CI that AVENATTI had instructed her not to file GBUS's quarterly payroll tax returns ("IRS Forms 941"). (Ex. 1, ¶ 30.1.) The following hard-copy documents M.E. produced to IRS-CI corroborate M.E.'s statements:

a. On July 29, 2016, M.E. sent AVENATTI and V.S. an email titled "Q2 Tax Filing Review." The email included a spreadsheet detailing amounts owed to various tax agencies, including a total of approximately $1,466,554 in federal payroll taxes due to the IRS for the fourth quarter of 2015, and the first and second quarters of 2016, as well as Federal Unemployment Tax Act ("FUTA") taxes due to the IRS for the 2015 tax year. The email also attached a letter that GBUS had received "from the IRS referring to the FUTA Unemployment Tax from 2015."[6] M.E. sent this email to AVENATTI over two months before AVENATTI told IRS RO 1 on October 7, 2016, that he was unaware that GBUS had failed to pay its payroll taxes, and blamed the error on GBUS's third-party payroll company. (See Ex. 1, ¶ 23(d).)

b. On October 27, 2016, M.E. sent AVENATTI and V.S. an email titled "Q3 Tax Filing Review." The email included an updated spreadsheet detailing GBUS's outstanding tax liabilities, including a total of approximately $1,953,850 in

---

[6] The attachment to this email was not included in the hard-copy documents that M.E. produced to IRS-CI.

18

**EXHIBIT 2**
**Page 43 of 84**

USAO_00066439

Case 8:19-cr-00061-DVS Document 305-3 Filed 09/28/20 Page 71 of 285 Page ID #:4644
Case 8:19-mj-00243-DVS SEALED Document 9 1/28/SEALED Filed 08/24/19 Page 44 of
100   Page ID #:359

federal payroll taxes due to the IRS for the fourth quarter of
2015 and the first through third quarters of 2016, as well as
FUTA taxes due to the IRS for the 2015 tax year.  M.E. appears
to have attached to the email drafts of GBUS's IRS Form 941 for
the third quarter of 2016.  AVENATTI responded later that same
day, "Thanks [M.E.]  Please do not file anything yet.  I am
having our outside CPA look at the attached and other tax
issues."

        c.   On January 30, 2017, M.E. sent AVENATTI and V.S.
an email titled "Q4 Tax filing Review."  The email included an
updated spreadsheet detailing GBUS's outstanding tax
liabilities, including a total of approximately $2,836,269 in
federal payroll taxes due to the IRS for the fourth quarter of
2015, the first through fourth quarters of 2016, and the first
quarter of 2017, as well as FUTA Unemployment taxes payments due
to the IRS for the 2015 and 2016 tax years.  AVENATTI responded
moments later:  "We are handling.  Thanks."

    15.  As noted in my February 2019 affidavit, GBUS's former
Director of Retail Operations, M.G., told IRS-CI that in
September 2017 AVENATTI had directed M.G. to deposit cash from
the Tully's stores at a Bank of America account associated with
GB Auto ("GB Auto BofA Account 7412").  (Ex. 1, ¶¶ 31.i-31.k.)
Based on my review of evidence obtained from the February 2019
search warrant, I have learned the following additional
information demonstrating that AVENATTI and REGNIER were already
aware of the IRS levy notices when AVENATTI directed the Tully's

**EXHIBIT 2**
**Page 44 of 84**

USAO_00066440

stores to deposit all cash into GB Auto BofA Account 7412. For example:

   a. On or about August 25, 2017, V.S. emailed a KeyBank representative and said: "There is a hold(s) on the account #4\*\*93 for Global Baristas Us, LLC; can you send me a copy of what order/lien this may be for, thanks." In response, the KeyBank representative told V.S. that KeyBank had two levies on the GBUS account, including one levy from the IRS. On August 28, 2017, another KeyBank representative sent a further response to V.S. advising V.S. that KeyBank was "required to sweep the available funds from the account and send them to the parties in the order" and that KeyBank "will probably be served randomly until the judgments are satisfied." V.S. then forwarded this email string to AVENATTI, who responded moments later stating "Please send me the email you sent him before his response."

 16. As noted in my February 2019 affidavit, M.G. also said that she would send AVENATTI text messages attaching pictures of the deposit slips after each cash deposit. (Ex. 1, ¶¶ 31.i-31.k.) Text messages M.G. produced to IRS-CI confirm that AVENATTI instructed M.G. to make these cash deposits and that M.G. sent him pictures of the deposit slips after most of the cash deposits. For example:

   a. On September 7, 2017, AVENATTI sent a text message to M.G. with the account information for GB Auto BofA Account 7412. Later that day, M.G. sent AVENATTI a text message stating: "On my way to the bank. If they ask is the business address and phone number for GB Autosport the Western Avenue

**EXHIBIT 2**
**Page 45 of 84**

USAO_00066441

address [i.e., GBUS's address]?"  AVENATTI responded via text
message, "Yes."  M.G. then sent AVENATTI a text message
attaching a deposit slip indicating that approximately $81,524
had been deposited into GB Auto BofA Account 7412.  AVENATTI
responded, "Thanks."

b.   On September 18, 2017, M.G. sent a text message
to AVENATTI asking:  "Are stores able to deposit at Key Bank
[sic] yet?"  Moments later, AVENATTI responded via text message
stating:  "Not yet but hopefully in next two days.  Can you
collect deposits tmrw and deposit pls?"

c.   On September 28, 2017, AVENATTI sent a text
message to M.G. and V.S. asking:  "When are we depositing
again?"  V.S. responded "Friday afternoon."  Moments later,
AVENATTI sent another text message asking: "When was the last
deposit and what did it include?"  After V.S. responded,
AVENATTI sent another text message stating: "It is important
that these deposits be made regularly.  Thanks."

d.   Between September 7, 2017, and December 1, 2017,
M.G. sent AVENATTI or AVENATTI and V.S. text messages with
pictures of deposit slips reflecting deposits into GB Auto BofA
Account 7412 on 24 separate occasions.  On multiple occasions,
AVENATTI responded to these text messages by stating, "Thanks."
Based on my review of bank account information, I know that the
information on the deposit slips directly corresponds to
deposits that were actually made into GB Auto BofA Account 7412.

17.  In my February 2019 affidavit, I indicated that on or
about September 29, 2017, AVENATTI instructed a TSYS

21

**EXHIBIT 2**
**Page 46 of 84**

Case 8:19-cr-00061-DVS Document 305-3 Filed 09/28/20 Page 74 of 285 Page ID #:4647
Case 8:19-mj-00293-DVS Y SEALED Document 9-1 SEALED Filed 03/24/19 Page 46 of
100   Page ID #:362

representative (TSYS Rep. 1") to change the name and EIN
associated with GBUS's merchant accounts from "Global Baristas
US LLC" to "Global Baristas, LLC."  (Ex. 1 ¶ 37.d.)  During this
conversation, AVENATTI suggested that he did not know why TSYS
was holding GBUS's funds.  Based on my review of evidence
obtained from the search warrant authorized in February 2019, I
have learned the following additional information demonstrating
that AVENATTI and REGNIER were already aware of the IRS levy
notices at that time:

     a.   On September 12, 2017, REGNIER sent an email to
V.S. titled "CBT Levy."  In this email, REGNIER listed the
amounts of various levies on the CB&T accounts since June 1,
2017, and asked V.S. to provide information regarding levies on
KeyBank and BofA.  In response, V.S. said, among other things,
that "IRS also hit tsys account 8-25-17, still confirming."

     b.   On or about September 28, 2017, V.S. sent an
email to AVENATTI titled "IRS Levies 9/20 and 9/25 and 9/27."
The email included, among other things, the following
information:  "9.25.17 tsys - $22,135.19 IRS levy."

     c.   On or about September 29, 2017, at approximately
10:57 a.m., V.S. sent an email to AVENATTI titled "Levies," in
which he stated that "IRS took as [sic] additional $23,73.02
from tsys yesterday."  Based on the timing of other emails
between AVENATTI and TSYS Rep. 1 on September 29, 2017, it
appears that AVENATTI received this email from V.S. before he
first called TSYS Rep. 1 on September 29, 2017.

**EXHIBIT 2**
**Page 47 of 84**

USAO_00066443

**C.     Additional Evidence Relating to AVENATTI's Scheme to Defraud His Legal Client, G.B.**

18.     As set forth in my February 2019 affidavit, AVENATTI engaged in a scheme to defraud his client, G.B., out of G.B.'s portion of an approximately $1.6 million settlement payment AVENATTI and EA LLP that received in January 2018 in connection with an arbitration proceeding against a Colorado-based company ("Company 1"). (See Ex. 1, § IV.G.)  Specifically, in January 2018, AVENATTI arranged for the $1.6 million settlement payment to be transferred to a City National Bank attorney trust account[7] ending in 5566 ("CNB Trust Account 5566"). (See id.)  AVENATTI then used the entire $1.6 million for his own purposes, including to pay for expenses relating to GBUS.[8]  (See id.) AVENATTI then lied to his client and claimed that the settlement payment was not due until March 2018. (See id.)  When the March 2018 deadline passed, AVENATTI led his client to believe that the $1.6 million payment had never been received. (See id.)

19.     On March 15, 2019, I participated in an interview of G.B.  The information G.B. provided during the interview was consistent with the information G.B. and his counsel had

---

[7]  I understand that the State Bar of California has specific rules that apply to the proper use of attorney trust accounts.  For example, I understand that Rule 1.15 of the State Bar of California states that "[f]unds belonging to the lawyer or the law firm shall not be deposited or otherwise commingled with funds held in a trust account."

[8]  AVENATTI and REGNIER were the only two signatories for CNB Trust Account 5566.  Moreover, based on a further review of the bank records for CNB Trust Account 5566, I have learned that REGNIER authorized at least eight of the payments from CNB Trust Account 5566.

**EXHIBIT 2**
**Page 48 of 84**

USAO_00066444

previously provided to IRS-CI and the Newport Beach Police Department ("NBPD"). During the interview, G.B.[9] also provided the following additional information:

a. On or about December 28, 2017, G.B. met with AVENATTI at EA LLP's offices in Newport Beach, California, to go over the proposed settlement agreement with Company 1. During this meeting, AVENATTI provided G.B. with a copy of the $1.9 million settlement agreement to review. The settlement agreement AVENATTI provided to G.B. listed the payment dates as $1.6 million on March 10, 2018, and $100,000 on March 10 of each of the next three years. As noted in my February 2019 affidavit, this information was false and the actual settlement agreement required Company 1 to pay G.B. $1.6 million on January 10, 2018, and $100,000 on January 10 of each of the three subsequent years. (Ex. 1, ¶ 75.e.)

b. Based on my review of documents produced by G.B.'s counsel, I know that on or about June 29, 2018, G.B. sent an email to REGNIER asking her to forward to G.B. the signed settlement agreement with Company 1. During his interview, G.B. said that sometime after he sent this email REGNIER brought him a physical copy of the fully-executed settlement agreement while G.B. was at EA LLP's offices. REGNIER handed AVENATTI the settlement agreement. AVENATTI flipped through the settlement

---

[9] G.B. previously pleaded guilty to a felony theft count in approximately September 2018 and was sentenced to probation. (See Ex. 1, ¶ 75 n.44.) During his interview, G.B. said that AVENATTI had encouraged him to plead guilty and that AVENATTI continued working with G.B. and one of G.B.'s companies after G.B.'s guilty plea.

24

**EXHIBIT 2**
**Page 49 of 84**

USAO_00066445

agreement and then handed it to G.B.  This copy of the
settlement agreement also falsely stated that the settlement
payments were due on March 10 of 2018 through 2021, as opposed
to January 10 of 2018 through 2021.

      c.  As noted in my February 2019 affidavit, between
April 2018 and November 2018, AVENATTI "advanced" G.B.
approximately $130,000 to help G.B. meet certain financial
obligations while he waited for his portion of the $1.6 million
settlement payment from Company 1.  During his interview, G.B.
said that in approximately October 2018, AVENATTI told G.B. that
AVENATTI would be able to loan G.B. another $100,000 sometime
during the first two weeks of January 2019.  Notably, under the
terms of the true settlement agreement, Company 1 was scheduled
to make an additional $100,000 settlement payment to AVENATTI's
trust account on January 10, 2019.  Thus, it appears that
AVENATTI was offering to loan G.B.'s own money to G.B.

    20.  During the interview on March 15, 2019, G.B's current
counsel also confirmed that AVENATTI still has not turned over
G.B.'s client file to his current attorneys despite repeated
requests that he do so.

**D.**    **Additional Evidence Relating to AVENATTI's Scheme to**
       **Defraud His Legal Clients, M.P. and L.T.**

    21.  As set forth in my February 2019 affidavit, it appears
that in or around March 2018 AVENATTI embezzled approximately $4
million from his client's M.P. and L.T.  (Ex. 1, ¶ 50.h n.31.)
Based on a further review of information I received from NBPD,
including recorded interviews of M.P. and L.T. and documents

**EXHIBIT 2**
**Page 50 of 84**

USAO_00066446

Case 8:19-cr-00061-DVS  Document 305-3  Filed 09/28/20  Page 78 of 285  Page ID #:4651
Case 8:19-mj-00243-DUTY  *SEALED*  Document 9-12  *SEALED*  Filed 03/24/19  Page 55 of
100   Page ID #:366

M.P. and L.T. provided to Newport Beach Police Department
("NBPD") and IRS-CI, I have learned the following information
regarding AVENATTI's scheme to defraud M.P. and L.T.:

     a.   In or around August 2017, M.P. and her business
manager, L.T., hired AVENATTI to assist them in separating from
one of the companies that M.P. owned ("MP Company 1").

     b.   On or about August 15, 2017, M.P. and L.T.
entered into an "Attorney-Client Fee Contract (Contingency)"
with AVENATTI and EA LLP.[10]  Under the terms of the agreement,
AVENATTI would receive 7.5 percent of the "recovery" or
transaction amount.  In other words, AVENATTI would receive 7.5
percent of the total amount M.P. would receive when she sold her
shares in MP Company 1 back to MP Company 1.  To the extent the
transaction resulted in multiple payments to M.P., AVENATTI was
to receive his entire 7.5 percent fee from the initial lump-sum
payment.  The agreement also authorized AVENATTI to retain
MARCHINO, the founding partner of X-Law Group, to serve as
outside or local counsel in connection with the representation.

     c.   On or about September 17, 2017, MP Company 1
entered into a "Common Stock Repurchase Agreement" with M.P.  In
sum, under the terms of the Common Stock Repurchase Agreement,
MP Company 1 agreed to repurchase 361,565 shares of MP Company 1
from M.P. for approximately $27,478,940, and to subsequently
repurchase from M.P. an additional 107,188 shares of MP Company
1 for approximately $8,146,288.  Thus, M.P. was to receive a

---

[10] The Attorney-Client Fee Contract identifies "Michael
Avenatti, Esq." as the attorney, but is signed by AVENATTI on
behalf of EA LLP.

**EXHIBIT 2**
**Page 51 of 84**

USAO_00066447

total of approximately $35,625,228 under the terms of the Common Stock Repurchase Agreement.  AVENATTI's fee of 7.5 percent would amount to approximately $2,671,892 out of the $35,625,228.

        d.   On or about September 18, 2017, MP Company 1 wired approximately $27,414,668 to AVENATTI's trust account at City National Bank ending in 4705 ("Avenatti CNB Trust Account 4705").[11]  After receiving the $27,414,668 wire on September 18, 2017, AVENATTI caused approximately $2,787,650 (which constituted AVENATTI's attorney fees for the entire $35,625,228 transaction amount) to be transferred to a separate bank account at City National Bank under the name "Michael Avenatti, Esq." ("Avenatti CNB Account 3504").[12]  Between September 21, 2017, and October 3, 2017, AVENATTI then caused the remaining $24,747,466 MP Company 1 had transferred to Avenatti CNB Trust Account 4705 to be transferred to M.P.'s personal bank account and the bank account for another company M.P. controlled ("MP Company 2").

        e.   On or about March 8, 2018, MP Company 1's Chief Financial Officer ("CFO") contacted M.P. and told her that MP Company 1 was prepared to repurchase the remaining 107,188 shares of MP Company 1 and would be making the final payment of approximately $8,146,288.  The CFO asked M.P. to confirm that the funds should again be wired to Avenatti CNB Trust Account 4705.  M.P. then forwarded this email to L.T.  M.P. and/or L.T. then spoke with AVENATTI.  AVENATTI agreed that MP Company 1

---

[11] AVENATTI and REGNIER were the only two signatories on Avenatti CNB Trust Account 4705.

[12] AVENATTI and REGNIER were the only two signatories on Avenatti CNB Account 3504.

27

**EXHIBIT 2**
**Page 52 of 84**

USAO_00066448

could wire the final payment to Avenatti CNB Trust Account 4705
and that he would then wire the money to M.P. and L.T.

     f.    On or about March 13, 2018, M.P. emailed MP
Company 1's CFO and confirmed that the wire information for
Avenatti CNB Trust Account 4705 was correct.

     g.    On or about March 14, 2018, MP Company 1 wired
approximately $8,146,288 to Avenatti CNB Trust Account 4705 to
be held in trust for M.P.

     h.    AVENATTI did not immediately transfer the
$8,146,288 funds to M.P. as he had promised to do and as he was
required to do under the Attorney-Client Fee Contract.  Rather,
based on my review of bank account records, I know that AVENATTI
used substantial portions of the $8,146,288 for his own personal
purposes.  For instance:

     i.    On March 15, 2018, AVENATTI caused
approximately $3,000,000 to be transferred to an EA LLP CB&T
attorney trust account ending in 4613 ("EA CB&T Trust Account
4613").[13]  AVENATTI then caused approximately $2,828,423 to be
transferred from EA CB&T Trust Account 4613 to an attorney trust
account for SulmeyerKupetz, which was the law firm representing
A&A and AVENATTI in the 2017 EA LLP bankruptcy proceedings, In
re: Eagan Avenatti, LLP, No. 8:17-BK-11961-CB (C.D. Cal.) (the
"2017 EA Bankruptcy"), later that same day.  As noted in my
February 2019 affidavit, on March 26, 2018, these funds were
then used to repay creditors in the 2017 EA Bankruptcy,

---

[13] AVENATTI and REGNIER were the only two signatories on EA
CB&T Trust Account 4613.

**EXHIBIT 2**
**Page 53 of 84**

USAO_00066449

including an approximately $1,508,442 payment to the IRS. (Ex. 1, ¶ 50.h.)

      ii.  Between March 20, 2018, and May 1, 2018, AVENATTI caused a total of approximately $786,138 of M.P.'s funds to be transferred to EA CB&T Trust Account 4613 and a total of approximately $260,000 to be paid to an EA LLP CB&T debtor in possession account ending in 0313 ("EA CB&T DIP Account 0313. Once M.P.'s funds had been transferred to EA CB&T Trust Account 4613, AVENATTI used M.P.'s funds for a variety of other improper and unauthorized purposes, including: (a) transferring a total of over $300,000 to bank accounts associated with GBUS and GB LLC; (b) transferring a total of over $275,000 to bank accounts associated with A&A; and (c) transferring a total of approximately $12,000 to his girlfriend at the time, M.M.

      i.  After AVENATTI received the $8,146,288 payment from MP Company 1 on March 14, 2018, L.T. and M.P. repeatedly asked AVENATTI when M.P. could expect to receive the funds. AVENATTI would often not respond to the L.T.'s calls or text messages. When AVENATTI did respond, he falsely represented to M.P. and L.T. that he would transfer the money to them at a later time and failed to disclose that he had already spent a substantial portion of M.P.'s funds for his own personal purposes. For instance:

      i.  On or about March 23, 2018, L.T. sent AVENATTI a text message stating: "Hi Michael, checking in on the

USAO_00066450

wire. Let me know when we should expect it to come our way. Thanks!"

  ii. On or about April 5, 2018, L.T. sent AVENATTI a text message stating "Good morning Michael! Just wanted to follow-up on the wire and plane[14] availability. Thanks!" AVENATTI responded that same day stating "In NYC – back tmrw and then we should be able to clear wire."

  iii. On or about April 23, 2018, L.T. sent AVENATTI a text message stating: "Good morning Michael. Please confirm after the wire is sent today. Thanks." Later that day, L.T. sent another text message later that day stating: "Can your office provide Fed Ref number for [M.P.'s] wire? It is neither posted nor pending status on our end." AVENATTI then responded "I will have [REGNIER] get it."

  iv. On or about April 24, 2018, L.T. sent AVENATTI a text message stating: "Just following up on the Fed Ref #. We haven't been able to track down [M.P.'s] wire yet." AVENATTI responded that "I've asked [REGNIER] to get you what u need."

  v. On or about April 24, 2018, M.P. met AVENATTI for lunch. M.P. asked AVENATTI if everything was okay with the money. AVENATTI responded that everything was okay and that he just needed to go to the bank once he got back to Newport Beach and sign the paperwork.

---

[14] As set forth in my February 2019 affidavit, AVENATTI had at least one private jet at this time. (Ex. 1, ¶ 65.m.)

**EXHIBIT 2**
**Page 55 of 84**

USAO_00066451

Case 8:19-cr-00061-DVS Document 305-3 Filed 09/28/20 Page 83 of 285 Page ID #:4656
Case 8:19-mj-00291-DUTY SEALED Document 91-2 SEALED Filed 03/22/19 Page 56 of
100   Page ID #:371

vi.   On or about April 25, 2018, L.T. sent an
email to REGNIER and AVENATTI stating: "Hi Judy [REGNIER], Can
you please provide me with the Fed Ref # for [M.P.'s] wire from
Monday?" AVENATTI responded less than an hour later "Pls
handle."

vii. On or about April 26, 2018, L.T. sent
another email to AVENATTI and REGNIER stating:

> We've been in contact with the bank all week and they
> have not been able to track the wire. Please provide
> the Fed Ref # with immediacy. This is becoming very
> urgent. There is $8M of [M.P.'s] money in the ether
> somewhere, and we have been given the runaround for
> over 6 weeks. I'm becoming extremely concerned.
> Please advise asap.

viii.   On or about April 30, 2018, AVENATTI
sent a text message to L.T. stating "I am dealing with getting a
summons issued from the SDNY and will call you shortly. Sorry
for delay." That same day, AVENATTI sent an email to REGNIER
and L.T. stating:

> Judy [REGNIER] -- I know you are trying to dig out
> from last week, but please get with [L.T.] and figure
> out what the issue is on the CNB wire. This needs to
> be a priority. If I need to do something or find a
> branch on the East coast let me know but I want this
> resolved. Thanks.

ix.   On or about May 1, 2018, L.T. responded to
AVENATTI's April 30, 2018, email stating:

> Hi Judy [REGNIER], The wire hasn't come through, and
> we can only trace it via the Fed Ref #. Please provide
> ASAP so we can see where it got held up. This is very
> urgent.   Thank you.

REGNIER responded "I asked the bank to put a trace on it. As
soon as I get the results I will let you know ASAP."

31

**EXHIBIT 2**
**Page 56 of 84**

USAO_00066452

Case 8:19-cr-00061-DVS   Document 305-3   Filed 09/28/20   Page 84 of 285   Page ID #:4657
Case 8:19-mj-00293-DUTY   SEALED   Document 3-12 SEALED   Filed 03/24/19   Page 57 of
100   Page ID #:372

      j.     Between March 14, 2018, and May 4, 2018, L.T. also repeatedly attempted to obtain information from AVENATTI's associate, MARCHINO, regarding the $8,146,288 payment from MP Company 1. For instance:

      i.    On or about March 14, 2018, MARCHINO sent a text message to L.T. stating: "Hi – let me know when the wires have been sent by [MP Company 1]. That way we can turn around quickly." L.T. responded that the wire had just been sent and that he would provide MARCHINO the wire information.

      ii.   On or about March 20, 2018, L.T. sent a text message to MARCHINO to ask if AVENATTI received the wire. MARCHINO responded: "Hi. No idea. Need to ask Michael [AVENATTI]. He's knee deep in the stormy."

      iii. On or about April 22, 2019, L.T. sent a text message to MARCHINO stating: "Please call me back." MARCHINO then asked if it was urgent. L.T. responded: "Same conversation as last time, so yes I'm concerned and losing patience."

      iv.   On or about May 3, 2018, L.T. sent a text message to MARCHINO stating: "Please call me back ASAP." MARCHINO responded: "I put a call in. Will have news shortly. Hang tight until tomorrow and I'll get this sorted for you." MARCHINO then sent L.T. another text message stating: "I've got you. Don't worry."

      k.    On or about May 4, 2018, AVENATTI caused two wire transfers in the amounts of $4,000,000 and $146,288 to be sent from Avenatti CNB Trust Account 4705 to one of M.P.'s companies

**EXHIBIT 2**
**Page 57 of 84**

USAO_00066453

("MP Company 3"). This amounted to just over half of the
$8,146,288 that was supposed to have been transferred to M.P on
or about March 14, 2018. Yet, after making these two wire
transfers, there was only $23 remaining in Avenatti CNB Trust
Account 4705.

        1.    After M.P. received the two wire transfers
totaling approximately $4,146,288 on or about May 4, 2018, L.T.
repeatedly contacted AVENATTI and MARCHINO in an attempt to find
out what happened to the other $4,000,000 of M.P.'s money.  L.T.
was largely unable to get a hold of AVENATTI.  MARCHINO,
however, repeatedly suggested that the third wire of $4,000,000
had already been sent.  For instance:

        i.    On or about May 4, 2018, MARCHINO sent a
text message to L.T. asking "Did the other 4 arrive?"  L.T.
responded that he would have to check on Monday.

        ii.    On or about May 7, 2018, MARCHINO sent L.T.
a text message asking if there were any updates.  L.T.
responded:  "No sign of it.  Do you have the Fed Ref # for
tracking?"  L.T. received no further response that day.

        iii. On or about May 9, 2018, MARCHINO sent a
text message to L.T. stating:  "I just got text from bank.  We
should have fed number shortly."

        iv.    On or about May 10, 2018, MARCHINO sent a
text message to L.T. and provided him with an IMAD wire transfer
reference number that purportedly corresponded to the final
$4,000,000 payment.

**EXHIBIT 2**
**Page 58 of 84**

USAO_00066454

   v. On or about May 11, 2018, AVENATTI emailed MARCHINO a wire transfer confirmation document detailing the $4,000,000 wire transfer from Avenatti CNB Trust Account 4705 that M.P. had already received on May 4, 2018. MARCHINO then forwarded this email to L.T. That same day MARCHINO and L.T. exchanged numerous text messages regarding the missing $4,000,000 payment. In these text messages, L.T. told MARCHINO that he needed the reference numbers for all three purported wire transfers. MARCHINO indicated that he had texted AVENATTI about this but had not heard back.

   vi. On or about May 24, 2018, L.T. sent a text message to AVENATTI asking him to "Please call me when you have a chance." AVENATTI does not appear to have responded to this text message.

   vii. On or about June 4, 2018, L.T. sent a text message to AVENATTI stating: "Hi Michael, I really need to talk to you. Please call me back so we can figure things out." AVENATTI does not appear to have responded to this text message.

   m. On or about August 6, 2018, current counsel for M.P. and L.T. sent a letter to AVENATTI advising him that they now represented M.P. and L.T. and demanded that AVENATTI immediately disburse to M.P. the remaining $4,000,000 that was owed to M.P. AVENATTI did not respond. AVENATTI still has not paid over to M.P. the remaining $4,000,000 he received from MP Company 1 on her behalf. Nor has AVENATTI turned over M.P. and L.T.'s client file to their current attorneys as they have repeatedly asked him to do.

<div align="center">34</div>

<div align="center">**EXHIBIT 2**
**Page 59 of 84**</div>

USAO_00066455

22.   Additionally, as set forth in my February 2019
affidavit, in connection with the EA Bankruptcy, EA LLP and
AVENATTI were required to close pre-petition bank accounts and
open new "debtor in possession" bank accounts.   (Ex. 1, ¶ 51.)
EA LLP and AVENATTI were also required to file with the
Bankruptcy Court a monthly operating report ("MOR") detailing
all funds received and disbursed by EA LLP.   (Id.)   AVENATTI,
however, failed to disclose the existence of Avenatti CNB Trust
Account 4705 or the funds he received from the Phan and Tran
representation to the Bankruptcy Court or his creditors.

**E.   Criminal Complaint and Arrest Warrant**

23.   On March 22, 2019, in case number SA 19-241M, I
submitted an affidavit in support of an arrest warrant and
criminal complaint charging AVENATTI with one count of bank
fraud, in violation of 18 U.S.C. § 1344(1), and one count of
wire fraud, in violation of 18 U.S.C. § 1343.   The Honorable
Douglas F. McCormick, United States Magistrate Judge, authorized
the arrest warrant that same day.   A true and correct copy of
the arrest warrant and criminal complaint are attached hereto as
Exhibit 2 and incorporated by reference herein.[15]

**F.   Probable Cause to Search AVENATTI's Residence (SUBJECT PREMISES 1)**

24.   Based on the evidence collected during the course of
this investigation, there is probable cause to believe that

---

[15]   A copy of the application for the February 2019 search
warrant, including my February 2019 affidavit, were also
incorporated by reference and attached to the criminal complaint
in case number SA 19-241M.   Accordingly, I have not included a
duplicate copy of the February 2019 search warrant application,
as part of Exhibit 2 to this affidavit.

**EXHIBIT 2**
**Page 60 of 84**

USAO_00066456

evidence of the SUBJECT OFFENSES will be found at SUBJECT
PREMISES 1.  For example:

a.   On or about November 14, 2018, AVENATTI was
arrested by the Los Angeles Police Department ("LAPD") on
suspicion of domestic violence.[16]  Based on my review of the LAPD
police report, I have learned that as of November 14, 2018,
AVENATTI resided in Unit 2205 at the Ten Thousand luxury
condominium complex ("Ten Thousand") located at 10000 Santa
Monica Boulevard in Los Angeles, California (i.e., SUBJECT
PREMISES 1.)

b.   Based on my review of bank records, I know that
A&A has been paying monthly rent to Ten Thousand since at least
March 2017.  Specifically, between March 2017 and August 2018,
approximately $227,736 (between $12,800 and $16,320 per month)
was paid to Ten Thousand from A&A CB&T Account 0661.
Additionally, on or about November 30, 2018, approximately
$69,119 was paid via cashier's check to Ten Thousand from an
account at City National Bank under the name "Avenatti LLP"
("Avenatti LLP CNB Account 1844").  Avenatti LLP CNB Account
1844 had been opened that very same day and the cashier's check
had been obtained by REGNIER.

c.   On March 7, 2019, in case number 8:19-MJ-151, the
Honorable Douglas F. McCormick authorized a warrant for
historical cell-site and prospective cell-site and GPS
information relating to cellular telephones used by AVENATTI and

---

[16]  AVENATTI was never formally charged with any crime in
connection with this arrest.

**EXHIBIT 2**
**Page 61 of 84**

USAO_00066457

REGNIER. Although I served the cell-site warrant on Verizon on March 7, 2019, I did not start receiving returns on the warrant until March 18, 2019. Based on IRS-CI's review of this data, I have learned the following:

      i.   On or about March 21, 2019, AVENATTI returned to the Los Angeles area after travelling to another state. AVENATTI was in the vicinity of SUBJECT PREMISES 1 that night.[17]

      ii.  On or about March 22, 2019, AVENATTI was in the vicinity of SUBJECT PREMISES 1 in the early morning hours as well during the night.

      iii. On or about March 23, 2019, AVENATTI was in the vicinity of SUBJECT PREMISES 1 early in the morning.

      d.   Based on my discussions with a United States Postal Inspector ("USPI"), I know that as recently as March 6, 2019, AVENATTI was receiving mail at 10000 Santa Monica Boulevard, Unit 2205 in Los Angeles, California (i.e., SUBJECT PREMISES 1.)

      e.   As noted in section VII below, based on my training and experience, I know that people who engage in fraud schemes and commit tax offenses frequently maintain hard copy and electronic records at their residences. Additionally, I know that lawyers often use portable laptop computers and cellular telephones to conduct business remotely from their

---

[17] The cell-site and GPS information IRS-CI obtained was only accurate to within approximately 900 meters of AVENATTI's cell phone.

**EXHIBIT 2**
**Page 62 of 84**

USAO_00066458

residences and/or while traveling.  Thus, lawyers typically keep such digital devices on their person or at their residences.

        f.    Here, I have reviewed numerous text messages sent by AVENATTI to GBUS employees.  I have also reviewed a number of emails AVENATTI appears to have sent after normal business hours, further suggesting that he uses his laptop and cellular telephone to conduct business.

        g.    On or about March 15, 2019, I participated in an interview with G.B.  During the interview, G.B. said that he frequently saw AVENATTI using a laptop computer.

        h.    I have also reviewed a profile of AVENATTI published by the New York Times Magazine on or about July 10, 2018.  This article explicitly noted that AVENATTI was using a laptop computer and an iPhone while he was being interviewed at a hotel in New York in May 2018.  See "The Fast and Furious Michael Avenatti," New York Times Magazine, July 10, 2018, available at https://www.nytimes.com/2018/07/10/magazine/michael-avenatti-stormy-daniels-donald-trump-media.html.

## G.    Probable Cause to Search REGNIER's Residence (SUBJECT PREMISES 2)

        25.  As noted in my February 2019 affidavit, AVENATTI has previously described REGNIER as his office manager, chief paralegal, and bookkeeper.  (Ex. 1, ¶ 20.i.)  REGNIER was personally involved in many of the events described in my February 2019 affidavit and herein, including directing or executing the transfer of funds between various entities

**EXHIBIT 2**
**Page 63 of 84**

USAO_00066459

associated with AVENATTI, directing the actions of GBUS employees, receiving and executing directives from AVENATTI, and transmitting signed contracts and agreements on behalf of AVENATTI, GBUS, GB LLC, EA LLP, or A&A to other parties.

26.   Based on my review of publicly available information and law enforcement databases, I know that REGNIER resides at 4491 Rainbow Lane, Yorba Linda, California (i.e., SUBJECT PREMISES 2.)

27.   Based on the evidence collected during the course of this investigation, there is probable cause to believe that evidence of the SUBJECT OFFENSES will be found at REGNIER's residence (i.e., SUBJECT PREMISES 2).   For example:

a.   Based on my discussions with a USPI, I understand that since approximately December 6, 2018, EA LLP's United States mail has been forwarded from EA LLP's prior offices in Newport Beach to Private Mailbox number 404 ("PMB 404") at 18032 Lemon Drive, Suite C.[18]   18032 Lemon Drive, Suite C is the address of a Postal Annex store located less than one mile from REGNIER's residence (SUBJECT PREMISES 2).   The USPI also provided me with a copy of the "Application for Delivery of Mail Through Agent" for PMB 404 dated on or about December 3, 2018. The application is signed by REGNIER on behalf of EA LLP, and indicates the PMB 404 will be used to receive mail for REGNIER, "Avenatti LLP," EA LLP, and A&A.   The application also lists

---

[18]   I also understand that EA LLP's United States mail was being forwarded to X-Law Group's office in Los Angeles (i.e., SUBJECT PREMISES 3) for a short period of time after EA LLP was evicted from its offices in Newport Beach, California.

**EXHIBIT 2**
**Page 64 of 84**

USAO_00066460

AVENATTI as the corporation's officer.  Due to the proximity of
PMB 404 to REGNIER's residence, I believe there is a strong
likelihood that REGNIER is collecting or storing EA LLP and A&A
mail, as well as other relevant records at her residence.

      b.    Based on my review of text messages produced by
M.G. and S.F., I know that REGNIER communicated with GBUS
employees using a cellular telephone.

      c.    Based on my review of toll records for AVENATTI's
and REGNIER's cell phones, I have learned the following:

      i.    Between January 1, 2019 and March 6, 2019,[19]
there were over 100 calls between AVENATTI's cell phone number
and REGNIER's cell phone number.  Often times, there would be
multiple calls between AVENATTI's cell phone and REGNIER's cell
phone each day.

      ii.    This information strongly suggests that
REGNIER still works for AVENATTI and that REGNIER and AVENATTI
do not work at the same location since EA LLP was evicted from
its law offices in Newport Beach, California, between November
2018 and January 2019.

      d.    On or about March 15, 2019, I participated in an
interview with G.B.  During the interview, G.B. said that in
December 2018 EA LLP's receptionist, H.W., told him via an
instant message that all of EA LLP's staff members were working
from home because EA LLP had been evicted from its offices.

---

[19]    The toll records for AVENATTI's and REGNIER's cell
phones that IRS-CI obtained from Verizon Wireless do not go past
March 6, 2019.

**EXHIBIT 2**
**Page 65 of 84**

USAO_00066461

        e.    Based on IRS-CI's review of the data obtained from the prospective cell-site and GPS information relating to a cellular telephone used by REGNIER, I have learned that from March 18, 2019 until March 22, 2019, REGNIER was in the vicinity of SUBJECT PREMISES 2 and PMB 404 during daytime and/or business hours, likely demonstrating that REGNIER has been working from home since EA LLP was evicted from its offices.

        f.    On March 22, 2019, IRS-CI SA James Kim attended a judgment debtor examination of AVENATTI in the In re: Eagan Avenatti, LLP, No. 8:18-CV-10644-VAP-KES, matter in Courtroom 8A of the United States Courthouse in Los Angeles. I learned from SA Kim that AVENATTI testified under oath that he believed EA LLP's QuickBooks records were likely with REGNIER.

        g.    On June 12, 2017, in connection with the 2017 EA Bankruptcy, AVENATTI testified under oath during a creditors meeting required under 11 U.S.C. § 341 ("341 meeting"). During this proceeding, AVENATTI testified that REGNIER was his "in-house bookkeeper" and she used "QuickBooks and Excel" for financial reporting.

        h.    Based on my training and experience, and investigation to date, I believe that REGNIER is working from home at SUBJECT PREMISES 2 and likely will maintain financial records of EA LLP and related entities at her home, as well as digital devices at SUBJECT PREMISES 2, all of which will likely contain evidence of the SUBJECT OFFENSES.

        i.    Additionally, as noted above and in section VII below, based on my training and experience I know that people

41

**EXHIBIT 2**
**Page 66 of 84**

USAO_00066462

engaged in fraud schemes frequently maintain hard copy and electronic business records at their residences. I also know that lawyers and those who work for law firms often use portable laptop computers and cellular telephones to conduct business and typically keep such digital devices on their person or at their residence.

**H.   Probable Cause to Search the Business Premises of X-Law Group (SUBJECT PREMISES 3)**

28.   Based on my review of publicly available information, including X-Law Group's website (www.thexlawgroup.com), I know X-Law Group is a law firm operating in Los Angeles, California. MARCHINO is X-Law Group's founding partner. X-Law Group's business premises are located at 1910 Sunset Boulevard, Suite 450, in Los Angeles, California (i.e., SUBJECT PREMISES 3).

29.   There are at least three reasons to believe that evidence of the SUBJECT OFFENSES will be found at the business premises of X-Law Group (SUBJECT PREMISES 3): (1) Since at least the summer of 2016, AVENATTI and EA LLP have been using X-Law Group's offices to conduct business; (2) X-Law Group has been involved in significant and suspicious financial transaction involving GBUS, GB LLC, EA LLP, A&A, and AVENATTI; and (3) X-Law Group's founding partner, MARCHINO, was directly involved in the representation of M.P. and L.T., and subsequent communications regarding the $4 million AVENATTI embezzled from M.P. in March 2018.

USAO_00066463

1.   AVENATTI's and EA LLP's Use of SUBJECT PREMISES 3
     to Conduct Business

30.   IRS-CI's investigation has revealed the following
facts establishing that AVENATTI has been using SUBJECT PREMISES
3 to conduct business and practice law since at least August
2016, and that SUBJECT PREMISES 3 is EA LLP's and A&A's current
business premises:

    a.   During AVENATTI's June 12, 2017, 341 meeting,
AVENATTI said the following:

        i.   In the summer of 2016, EA LLP entered into a
written agreement with X-Law Group.  Under the terms of this
agreement, X-Law Group would contribute various cases and assets
to EA LLP; EA LLP would get a percentage of the fees from those
cases; and X-Law Group would get a percentage of fees from
pending cases held by EA LLP.

        ii.   Some of the attorneys from X-Law Group also
worked for EA LLP.

    b.   On July 14, 2017, AVENATTI testified under oath
during the continued 341 meeting in connection with the 2017 EA
Bankruptcy.  During this proceeding, AVENATTI said the
following:

        i.   Since the summer of 2016, there was an
agreement in place between EA LLP and X-Law Group relating to
various EA LLP cases and X-Law Group's right to fees from those
cases.

**EXHIBIT 2**
**Page 68 of 84**

USAO_00066464

ii.   As part of this agreement, AVENATTI agreed that EA LLP would pay a portion of the salaries for certain X-Law Group attorneys.

iii. AVENATTI and/or EA LLP agreed to pay the rent for X-Law Group's office in Los Angeles

iv.   AVENATTI has known MARCHINO for approximately five years, and considers him a friend.

v.   MARCHINO and other X-Law Group lawyers were previously employed by EA LLP.

c.   Based on a preliminary review of bank records, I know the following:

i.   Between approximately September 2016 and July 2018, A&A and EA LLP paid to the International Church of the Foursquare a total of approximately $110,352.   Public records reflect that the International Church of the Foursquare owns SUBJECT PREMISES 3.

ii.   Between approximately March 2017 and June 2017, EA LLP paid MARCHINO a total of approximately $34,892.

d.   W-2 information EA LLP submitted to the IRS reflects that MARCHINO received approximately $83,333 in gross wages from EA LLP in 2016, and approximately $91,666 in gross wages from EA LLP in 2017.

e.   On or about January 24, 2018, AVENATTI filed a Substitution of Attorney form in the Superior Court of California, San Diego County in Carthey v. Pirch et al., No. 37-201823387.   The Substitution of Attorney form listed A&A's

44

**EXHIBIT 2**
**Page 69 of 84**

USAO_00066465

mailing address as 1910 West Sunset Boulevard, Suite 450 in Los Angeles, California (i.e., SUBJECT PREMISES 3).

      f.    On or about January 30, 2018, AVENATTI filed a declaration in the 2017 EA Bankruptcy. AVENATTI stated under the penalty of perjury that EA LLP "maintains an office in Los Angeles under an arrangement with The X-Law Group, P.C. ("X-Law Group") where X-Law Group is the primary tenant."

      g.    On March 7, 2019, AVENATTI filed a Voluntary Petition for Non-Individuals Filing for Bankruptcy on behalf of EA LLP in In re The Trial Group, LLP a/k/a Eagan Avenatti, LLP, No. 8:19-BK-10822 (C.D. Cal.) (the "2019 EA Bankruptcy").[20] The bankruptcy petition identifies the debtor's address as 1910 Sunset Boulevard, Suite 450 in Los Angeles, California (i.e., SUBJECT PREMISES 3).

      h.    On March 7, 2019, AVENATTI filed a Notice of Bankruptcy Filing on behalf of EA LLP in In re: Eagan Avenatti, LLP, No. 8:18-CV-10644-VAP-KES (C.D. Cal.). The attorney caption on the Notice of Bankruptcy Filing identifies AVENATTI's address as "1910 Sunset Boulevard, Suite 450," in Los Angeles, California (i.e., SUBJECT PREMISES 3).

---

    [20]  The 2019 EA Bankruptcy petition identifies the debtor as The Trial Group, LLP, but indicates that it was previously known as EA LLP. This petition appears to have been filed for the specific purpose of avoiding a judgment debtor exam of AVENATTI that had been scheduled for March 8, 2019, in In re: Eagan Avenatti, LLP, No. 8:18-CV-10644-VAP-KES (C.D. Cal.). AVENATTI did not have authorization to file such a petition because in February 2019 a receiver had been appointed to oversee EA LLP's business affairs and had the "sole authority regarding whether to file a petition for bankruptcy." On March 13, 2019, the Bankruptcy Court dismissed the 2019 EA Bankruptcy on those grounds.

**EXHIBIT 2**
**Page 70 of 84**

USAO_00066466

2.    X-Law Group's Involvement in Suspicious Financial
      Transactions

31.   As detailed in my February 2019 affidavit (Ex. 1),
IRS-CI's investigation to date has revealed the following facts
establishing that AVENATTI has used X-Law Group to conduct a
number of suspicious financial transactions:

a.    On or about November 2, 2015, AVENATTI caused
approximately $4,600,000 of the proceeds of the sale of his
residence in Laguna Beach, California, to be transferred from
GBUS CB&T Account 2240 to X-Law Group.  (See Ex. 1, ¶ 62.)

b.    On or about November 3, 2015, X-Law Group then
transferred approximately $3,600,000 to GB Auto BofA Account
7412.  (See id.)

c.    It appears that the remaining $1,000,000 that had
been transferred to X-Law Group was used to pay $1,000,000 in
deposits for AVENATTI's purchase of a residence in Newport
Beach, California.  (See id.)  For example:

i.    On September 28, 2015, AVENATTI paid a
$200,000 deposit to the escrow company handling the purchase of
the Newport Beach residence ("Escrow Company 1") via a cashier's
check purchased by X-Law Group.  (See Ex. 1, ¶ 63.)

ii.   On or about November 6, 2015, AVENATTI paid
an additional $800,000 deposit to Escrow Company 1 via two wire
transfers from X-Law Group's IOLTA attorney trust account in the
amounts of $450,000 and $350,000.  (See id.)

**EXHIBIT 2**
**Page 71 of 84**

USAO_00066467

### 3. X-Law Group's Involvement in the Scheme to Defraud M.P. and L.T.

32. As noted in section VI.D above, X-Law Group's founding partner, MARCHINO was directly involved in discussions with L.T. regarding the approximately $4 million AVENATTI embezzled from M.P. in March 2018. MARCHINO introduced M.P.'s business manager, L.T., to AVENATTI. Moreover, between March 2018 and May 2018, MARCHINO sent L.T. well over 50 text messages regarding the money that MP Company 1 transferred to Avenatti CNB Trust Account 4705 to be held in trust for M.P.'s benefit. In a number of these text messages, MARCHINO referenced communications or attempted communications with AVENATTI. Accordingly, there is probably to believe that X-Law Group's and MARCHINO's files and digital devices will contain additional evidence regarding AVENATTI's scheme to defraud M.P.

## VII. TRAINING AND EXPERIENCE REGARDING TAX OFFENSES AND FRAUD SCHEMES

33. In addition to the foregoing facts, based on my training, experience, and conversations with other law enforcement agents who have investigated tax offenses and complex fraud schemes, I have learned the following:

a. Individuals who carry out complex fraud schemes or commit tax offenses often use computers, cellular telephones, and mobile "smart phones" to conduct their fraudulent activities. For example, such individuals often use computers, cellular telephones, and mobile smart phones to conduct online banking, the records of which may be stored on digital devices rather than paper records, and to exchange communications,

47

**EXHIBIT 2**
**Page 72 of 84**

USAO_00066468

Case 8:19-cr-00061-JVS-SEALED Document 305-2 Filed 09/29/20 Page 100 of 285 Page ID
Case 8:19-mj-00249-DUTY SEALED Document 1-1 SEALED Filed 09/24/19 Page 73 of
100   Page ID #:388
Page ID #:388

including email and text messages.  Here, as noted above, I know
that AVENATTI, REGNIER, and others, such as MARCHINO from X-Law
Group, frequently conducted business via email and text message.

        b.    Individuals who carry out complex fraud schemes
or commit tax offenses often use USB storage devices (commonly
referred to as thumb-drives or memory sticks) and external hard
drives to store financial records, including banking records and
statements, other financial account records, checks, balances,
transactions, records of purchases, records reflecting the
transfer of assets, and records which are maintained, stored,
and utilized to conduct online banking activities.

        c.    Businesses, including law firms, often maintain
servers that host email accounts for their employees, and that
emails may be stored exclusively on those servers.  In other
instances, emails may be stored in the "cloud" or directly on
employees' computers.  For example, in this case, I know that
important information was exchanged over email, including
communications between AVENATTI or REGNIER and GBUS employees or
business partners.

        d.    Individuals who engage in fraud schemes or commit
tax offenses often keep records of their fraudulent activities,
including financial records, fraudulent documents, and
electronic communications, on computers, USB drives, external
hard drives, servers, or other digital devices for years after
the fraudulent scheme has been completed.

        e.    Businesses, including law firms, commonly
maintain paper records like bank statements, wire records,

48

**EXHIBIT 2**
**Page 73 of 84**

USAO_00066469

receipts, expense reports, ledgers, balance sheets, income statements, investment agreements, and other financial documents commonly used in fraudulent schemes on their premises.

   f. Lawyers and individuals who work for law firms often use portable laptop computers, mobile smart phones, or other digital devices to work remotely, including from their residences or while traveling.  For example, in this case, I have reviewed records demonstrating that AVENATTI sent emails, text messages, or other communications late at night or while traveling.

## VIII. **POTENTIAL PRIVILEGE ISSUES**

  34. As noted herein, AVENATTI is a licensed attorney, REGNIER worked or works as a paralegal for AVENATTI and for EA LLP, and X-Law Group is an active law-firm.  I also understand that at various times AVENATTI, EA LLP, and/or A&A may have had attorney-client relationships with other attorneys, including the following law firms: (a) Foster Pepper PLLC; (b) Osborn Machler PLLC; (c) Eisenhower Carlson PLLC; (d) Talmadge/Fitzpatrick/Tribe, PPLC; (e) The Brager Tax Law Group; (f) SulmeyerKupetz; (g) Baker & Hostetler LLP; (h) Shulman Hodges & Bastian LLP; (i) Legal & Tax Consulting Group; (j) Pachulski Stang Ziehl & Jones LLP; (k) Foley & Lardner LLP; (l) Raines Feldman, LLP; and (m) Pansky Markle Attorneys at Law.

  35. While the proposed search warrant primarily seeks financial records and non-privileged information there is a significant likelihood that the SUBJECT PREMISES will contain

<div align="center">49</div>

<div align="center">**EXHIBIT 2**</div>
<div align="center">**Page 74 of 84**</div>

USAO_00066470

documents and records that are covered by the attorney-client privilege or attorney-work-product doctrine. Accordingly, Attachments B-1, B-2, and B-3 to the proposed search warrants contains specific procedures designed to avoid unnecessary disclosures of any privileged attorney-client communications or attorney-work-product.

36. The privileged information sought by the proposed search warrant is limited to three former clients or potentials clients of AVENATTI, EA LLP, and A&A: (a) GBUS; (b) G.B.; and (c) M.P. and L.T. Each of these clients, however, have already executed, or indicated through counsel that they will execute, written waivers of the attorney-client-privilege.

a. First, as noted in my February 2019 affidavit, on February 19, 2019, the Chapter 7 bankruptcy trustee for GBUS (the "GBUS Trustee") executed a written waiver of the attorney-client privilege as to any communications between GBUS's officer, directors, employees, and agents, and any lawyer acting on GBUS's behalf, including any communications with AVENATTI. (Ex. 1, ¶ 83.a.) A copy of the GBUS Trustee's written waiver of the attorney-client privilege was attached as Exhibit 1 to my February 2019 affidavit.

b. Second, on March 18, 2019, G.B. executed a written waiver of the attorney-client privilege and attorney-work-product protections as to any legal advice G.B. sought or received from EA LLP, AVENATTI, and any other current or former EA LLP officers, directors, employees, or agents. G.B. also consented to the government's search of any of EA LLP's or

50

**EXHIBIT 2**
**Page 75 of 84**

USAO_00066471

AVENATTI's files relating to EA LLP's and AVENATTI's
representation of G.B.  A copy of the G.B.'s written waiver of
the attorney-client privilege is attached hereto as Exhibit 3.

      c.   Third, counsel for M.P. and L.T. informed the
government that M.P. and L.T. are both willing to execute
written waivers of the attorney-client privilege and attorney-
work-product protections as to legal advice M.P. and L.T. sought
or received from EA LLP, AVENATTI, MARCHINO, and/or any other
current or former officers, directors, employees, or agents of
EA LLP.  M.P. and L.T. are also willing to consent to the
government's search of the files of EA LLP, AVENATTI, and
MARCHINO relating to the representation of M.P. and L.T.  M.P.
and L.T. are expected to execute the written waivers of the
attorney-client privilege within the next seven days.

    37.  I am aware that AVENATTI represented the plaintiff in
Stephanie Clifford v. Donald J. Trump, No. 2:18-CV-2217-SJO-FFM
(C.D. Cal.), a lawsuit against the President of the United
States.  I am also aware that AVENATTI represented Julie
Swetnick, an individual who accused United States Supreme Court
Justice Brett Kavanaugh of sexual assault in connection with
Justice Kavanaugh's confirmation hearing in or around September
2018.  Given the likelihood that the SUBJECT PREMISES may
contain privileged information regarding these representations,
which are irrelevant to this investigation, Attachments B-1, B-
2, and B-3 to the proposed search warrants specifically
requires, in addition to the procedures to avoid unnecessary
disclosure of attorney-client privileged materials and attorney-

USAO_00066472

work-product, that any materials relating to AVENATTI's
representation of Ms. Clifford or Ms. Swetnick that are
identified by the Privilege Review Team, other than financial
and accounting records identified in paragraphs 1.d, 1.f, 1.g,
and 1.r of Attachments B-1, B-2, and B-3, be segregated and not
further reviewed.[21]

38.  Attachments B-1, B-2, and B-3 to the proposed search
warrants also set forth a procedure to allow AVENATTI and others
to seek the appointment of a special master within seven days of
the execution of the proposed search warrants.  Although the
government does not believe that the appointment of a special
master would be necessary in this investigation, the government
has included this provision to ensure that any such request is
handled in a timely manner and does not unnecessarily delay IRS-
CI's ongoing criminal investigation.

### IX.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES[22]

39.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I

---

[21] Other than non-privileged financial or accounting
records that may reference these representations, the only
documents or records relating to these representations that may
fall within the scope of the items to be seized would likely be
engagement letters and/or client billing records.  Nevertheless,
due the political nature of these representations and because
such records are irrelevant to this investigation, the privilege
review protocols set forth in Attachments B-1, B-2, and B-3 to
the proposed warrants calls for any such records to be
segregated and not further reviewed once identified.

[22] As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as

**EXHIBIT 2**
**Page 77 of 84**

USAO_00066473

know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

    a.    Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet. Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time. Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

    b.    Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device. That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them. For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the

---

paging devices, mobile telephones, and smart phones; digital
cameras; gaming consoles; peripheral input/output devices, such
as keyboards, printers, scanners, monitors, and drives; related
communications devices, such as modems, routers, cables, and
connections; storage media; and security devices.

**EXHIBIT 2**
**Page 78 of 84**

USAO_00066474

Case 8:19-cr-00061-JVS  Document 305-3  Filed 09/29/20  Page 106 of 285  Page ID of
Case 8:19-mj-00243-DUTY  SEALED  Document 1  SEALED  Filed 09/24/19  Page 79 of
100    Page 79 #:394
#:46710

form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

       c.    The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

       d.    Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

   40.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it is not always possible to search devices for data
during a search of the premises for a number of reasons,
including the following:

       a.    Digital data are particularly vulnerable to
inadvertent or intentional modification or destruction.  Thus,
often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above.  Also, there are now so

**EXHIBIT 2**
**Page 79 of 84**

USAO_00066475

Case 8:19-cr-00061-JVS  Document 305-3  Filed 09/29/20  Page 107 of 285  Page ID
Case 8:19-mj-00243-DUTY  SEALED  Document 1  SEALED  Filed 09/24/19  Page 80 of
100   Page ID #:395
#:4630

many types of digital devices and programs that it is difficult
to bring to a search site all of the specialized manuals,
equipment, and personnel that may be required.

      b.   Digital devices capable of storing multiple
gigabytes are now commonplace. As an example of the amount of
data this equates to, one gigabyte can store close to 19,000
average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

    41.  The search warrant requests authorization to use the
biometric unlock features of a device, based on the following,
which I know from my training, experience, and review of
publicly available materials:

      a.   Users may enable a biometric unlock function on
some digital devices. To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device. To
unlock a device enabled with a fingerprint unlock function, a
user places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second. To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

      b.   In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when
a device has been restarted or inactive, has not been unlocked
for a certain period of time (often 48 hours or less), or after

55

**EXHIBIT 2**
**Page 80 of 84**

USAO_00066476

a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress AVENATTI's, REGNIER's, and MARCHINO's thumbs and/or fingers on the device(s); and (2) hold the device(s) in front of AVENATTI's, REGNIER's, and MARCHINO's faces with their eyes open to activate the facial-, iris-, and/or retina-recognition feature.

## X.  REQUEST FOR SEALING

42.  I request that the search warrant, the search warrant application, and this affidavit be kept under seal to maintain the integrity of this investigation until further order of the Court, or until the government determines that these materials are subject to its discovery obligations in connection with criminal proceedings, at which time they may be produced to defense counsel. I make this request for several reasons.

a.  First, this criminal investigation is ongoing and is neither public nor known to AVENATTI and other subjects of the investigation. Disclosure of the search warrant, application, and this affidavit could cause AVENATTI and others to accelerate any existing or evolving plans to, and give them an opportunity to, destroy or tamper with evidence, tamper with

USAO_00066477

or intimidate witnesses, change patterns of behavior, or notify confederates.

      b.   Second, based on evidence collected to date and described herein, there is probable cause to believe that AVENATTI took a number of affirmative actions to obstruct the IRS civil collection action relating to GBUS's unpaid payroll taxes by, among other things, lying to RO 1, changing contracts, merchant accounts, and bank account information to avoid liens and levies imposed by the IRS, and instructing employees to deposit over $800,000 in cash from Tully's stores, which were owned and operated by GBUS, into a bank account associated with a separate entity to avoid liens and levies by the IRS.  If AVENATTI were to learn of the instant investigation he might engage in similarly obstructive conduct.

      c.   Third, a number of former GBUS employees have expressed concerns that AVENATTI might attempt to retaliate against them if he learned they were cooperating with the government's investigation.

      d.   Fourth, there is a possibility that some evidence relating to GBUS's operations may have already been lost when GBUS was evicted from its corporate offices and AVENATTI refused to pay the bill for GBUS's cloud-based server.  Although IRS-CI has been able to obtain some GBUS records, including the data stored on the SUBJECT DEVICES, from other sources, AVENATTI's apparent willingness to allow GBUS records to be lost or destroyed raises a concern that, were AVENATTI to learn of the

**EXHIBIT 2**
**Page 82 of 84**

USAO_00066478

instant investigation, he might not hesitate to destroy any
remaining GBUS records and other relevant evidence.

      e.   Fifth, the government is still attempting to
locate additional documentary evidence that is relevant to the
investigation, including emails and electronic records that may
be stored by AVENATTI, EA LLP, A&A, or other related entities.
If alerted to the government's investigation prior to the
execution of the proposed search warrants, it is therefore
possible that AVENATTI would attempt to destroy such records and
that the government would have no other means to obtain this
evidence.

43.   Other than what has been described herein, to my
knowledge, the United States has not attempted to obtain this
data by other means.

   ///
   ///
   ///

**EXHIBIT 2**
**Page 83 of 84**

USAO_00066479

## XI. CONCLUSION

44.   For all the reasons described above, there is probable
cause to believe that the items listed in Attachments B-1
through B-3, which constitute evidence, fruits, and
instrumentalities of violations of the Subject Offenses will be
found at the SUBJECT PREMISES, as described in Attachments A-1
through A-3.

_____
Remoun Karlous, Special Agent
Internal Revenue Service –
Criminal Investigation

Subscribed to and sworn before me
this **24** day of March 2019.

_____
HONORABLE DOUGLAS F. MCCORMICK
UNITED STATES MAGISTRATE JUDGE

**DOUGLAS F. McCORMICK**

59

**EXHIBIT 2**
**Page 84 of 84**

USAO_00066480

GOVERNMENT'S OPPOSITION TO DEFENDANT MICHAEL JOHN AVENATTI'S
MOTION FOR PRIVILEGE REVIEW, EVIDENTIARY HEARING, AND DISCOVERY

# EXHIBIT 3

AO 93 (Rev. 11/13) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>1000290795 | Date and time warrant executed:<br>03/25/2019      06:50PM | Copy of warrant and inventory left with:<br>copy left on living room table |
| Inventory made in the presence of :<br><div align=center>Kim Nathaniel</div> | | |
| Inventory of the property taken and name of any person(s) seized: | | |

See attached inventory.

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date:    05/08/2019

_____
*Executing officer's signature*

Jennifer Lau, Special Agent
*Printed name and title*

**EXHIBIT 3**
**Page 1 of 5**

USAO_00134279

# Inventory Listing of All Items Seized at Search Warrant Site

| **Site Name:** | **Investigation Number:** | **Report Date:** |
|---|---|---|
| Apartment | 1000290795 | Monday, March 25, 2019 |
| | **Starting Date and Time:** | |
| 10000 Santa Monica Blvd # 2107 | 03/25/2019 08:00 PM | |
| Los Angeles, CA 90067 | **Ending Date and Time:** | |
| | 03/25/2019 10:26 PM | |

| **Control #:** | 1 | **Evidence Box:** | 1 |
|---|---|---|---|
| **Location:** | Kitchen | **Locator Code:** | Cat D |
| **Found:** | On Island table | | |
| **Description:** | Seized per Warrant | Wire transfer detail re" Global Baristas US | |

| **Control #:** | 2 | **Evidence Box:** | 1 |
|---|---|---|---|
| **Location:** | Kitchen | **Locator Code:** | Cat D |
| **Found:** | On Island table | | |
| **Description:** | Seized per Warrant | Balance Sheet and home remodel expenses | |

| **Control #:** | 3 | **Evidence Box:** | 1 |
|---|---|---|---|
| **Location:** | Kitchen | **Locator Code:** | Cat D |
| **Found:** | On Island table | | |
| **Description:** | Seized per Warrant | Notice to pay rent or quit dated 2/11/19 | |

| **Control #:** | 4 | **Evidence Box:** | 1 |
|---|---|---|---|
| **Location:** | Kitchen | **Locator Code:** | Cat D |
| **Found:** | On Island table | | |
| **Description:** | Seized per Warrant | Personal expenses | |

| **Control #:** | 5 | **Evidence Box:** | 1 |
|---|---|---|---|
| **Location:** | Foyer | **Locator Code:** | Cat D |
| **Found:** | in trash bag | | |
| **Description:** | Seized per Warrant | Handwritten note with names and dollar amounts Notice to pay rent or quit Check payable to Michael Avenatti | |

| **Control #:** | 6 | **Evidence Box:** | 1 |
|---|---|---|---|
| **Location:** | Kitchen | **Locator Code:** | Cat D |
| **Found:** | on top of stove | | |
| **Description:** | Seized per Warrant | Divorce declaration, disposition, income expense statement | |

| **Control #:** | 7 | **Evidence Box:** | 1 |
|---|---|---|---|
| **Location:** | Kitchen | **Locator Code:** | Cat D |
| **Found:** | On Island table | | |
| **Description:** | Seized per Warrant | Orange County property judgement | |

Page 1 of 4

**EXHIBIT 3**
**Page 2 of 5**

USAO_00134280

| Control #: | 8 | Evidence Box: | 1 |
|---|---|---|---|
| Location: | Front Hall Corner | Locator Code: | Cat D |
| Found: | in a box | | |
| Description: | Seized per Warrant | Global Baristas Asset Purchase AGreement and Schedules | |

| Control #: | 9 | Evidence Box: | 1 |
|---|---|---|---|
| Location: | Front Hall Corner | Locator Code: | Cat D |
| Found: | Box labeled Mr. A personal files | | |
| Description: | Seized per Warrant | Letter and certificate for purchase of one share of Green Bay Packers | |

| Control #: | 10 | Evidence Box: | 1 |
|---|---|---|---|
| Location: | Foyer Closet | Locator Code: | Cat D |
| Found: | in jacket pocket | | |
| Description: | Seized per Warrant | photograph of income spreadsheet, photographs of private jets | |

| Control #: | 11 | Evidence Box: | 1 |
|---|---|---|---|
| Location: | Front Hall Corner | Locator Code: | Cat D |
| Found: | in a box | | |
| Description: | Seized per Warrant | Organization formation docs | |

| Control #: | 12 | Evidence Box: | 1 |
|---|---|---|---|
| Location: | Front Hall Corner | Locator Code: | Cat D |
| Found: | in a box | | |
| Description: | Seized per Warrant | Wire transaction detail, letter regarding owed rent, office phone list, publication 594, IRS Levy notices, IRS notice of owed taxes, FTB notice of proposed assessments, FTB protest procedures | |

| Control #: | 13 | Evidence Box: | 1 |
|---|---|---|---|
| Location: | Front Hall Corner | Locator Code: | Cat D |
| Found: | box w/ Mr. A's BofA records & important docs | | |
| Description: | Seized per Warrant | GE Autosports related bank records and invoices | |

| Control #: | 14 | Evidence Box: | 1 |
|---|---|---|---|
| Location: | Front Hall Corner | Locator Code: | Cat D |
| Found: | box w/Mr. A BofA docs important papers | | |
| Description: | Seized per Warrant | Tax related docs, JP Morgan financials, court filings, GB billings, client acctg | |

| Control #: | 15 | Evidence Box: | 3 |
|---|---|---|---|
| Location: | Front Hall Corner | Locator Code: | Digital |
| Found: | in a box | | |
| Description: | Seized per Warrant | 2 Apple ipad mini tablets s/n: F4PL3F93F193 s/n: F4NL4GVBF193 | |

Page 2 of 4

**EXHIBIT 3**
**Page 3 of 5**

USAO_00134281

| Control #: | 16 | Evidence Box: | 3 |
|---|---|---|---|
| Location: | Front Hall Corner | Locator Code: | Digital |
| Found: | Box labeled Mr. A | | |
| Description: | Seized per Warrant    sd card | | |

| Control #: | 17 | Evidence Box: | 3 |
|---|---|---|---|
| Location: | Walkin Closet Closet | Locator Code: | Digital |
| Found: | inside camo backpack | | |
| Description: | Seized per Warrant    2 thumb drives<br>1 iphone IMEI: 358542078484242<br>1 iphone no numbers listed on outside<br>1 ZTE phone s/n: none listed on outside of phone | | |

| Control #: | 18 | Evidence Box: | 3 |
|---|---|---|---|
| Location: | Front Hall Corner | Locator Code: | Digital |
| Found: | box w/Mr. A BofA docs important papers | | |
| Description: | Seized per Warrant    WD My Passport Ultra Drive s/n: WX71AB3N7592 | | |

| Control #: | 19 | Evidence Box: | 5 |
|---|---|---|---|
| Location: | Bedroom/WalkinCloset | Locator Code: | Digital |
| Found: | ON DRESSER | | |
| Description: | Seized per Warrant    MAC computer s/n: D25SD04VGG7V | | |

| Control #: | 20 | Evidence Box: | 1 |
|---|---|---|---|
| Location: | Front Hall Corner | Locator Code: | Cat D |
| Found: | white box labeled Mr. A "papers" | | |
| Description: | Seized per Warrant    Marina del Rey hospital records-expenses 2014, customs power of atty, GB Autosports LLC, 2014, Tyrian Systems Inc, Michael J Avenatti managing member 2012 | | |

| Control #: | 21 | Evidence Box: | 4 |
|---|---|---|---|
| Location: | Front Hall Corner | Locator Code: | Cat D |
| Found: | box labeled Judy's Office | | |
| Description: | Seized per Warrant    Business and personal financial records | | |

| Control #: | 22 | Evidence Box: | 2 |
|---|---|---|---|
| Location: | Front Hall Corner | Locator Code: | Cat C |
| Found: | white box labeled Mr. A "papers" | | |
| Description: | Seized per Warrant    Yellow folder labeled Marchino-Avenatti-riantos-2013 complaint | | |

| Control #: | 23 | Evidence Box: | 2 |
|---|---|---|---|
| Location: | Kitchen | Locator Code: | Cat C |
| Found: | On Island table | | |
| Description: | Seized per Warrant    Eagan Avenatti, LLP Bankruptcy Court Filing | | |

**EXHIBIT 3**
**Page 4 of 5**

USAO_00134282

| Control #: | 24 | | Evidence Box: | 2 |
|---|---|---|---|---|
| Location: | Front Hall Corner | | Locator Code: | Cat C |
| Found: | in a box | | | |
| Description: | Seized per Warrant | emails | | |

| Control #: | 25 | | Evidence Box: | 2 |
|---|---|---|---|---|
| Location: | Kitchen | | Locator Code: | Cat C |
| Found: | On Island table | | | |
| Description: | Seized per Warrant | operating agreements | | |

Page 4 of 4

**EXHIBIT 3**
**Page 5 of 5**

USAO_00134283

GOVERNMENT'S OPPOSITION TO DEFENDANT MICHAEL JOHN AVENATTI'S
MOTION FOR PRIVILEGE REVIEW, EVIDENTIARY HEARING, AND DISCOVERY

# EXHIBIT 4

AO 93 (Rev. 11/13) Search and Seizure Warrant (USAO CDCA Rev. 04/17)

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. 8:19-MJ-103 |
| | ) | |
| Seven Digital Devices in the Custody of the Internal Revenue Service–Criminal Investigation in Laguna Niguel, California | ) ) ) ) | |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Central District of California *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

*See Attachment B*

Such affidavit(s) or testimony are incorporated herein by reference.

**YOU ARE COMMANDED** to execute this warrant on or before <u>14 days from the date of its issuance</u> *(not to exceed 14 days)*

☒ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to <u>the U.S. Magistrate Judge on duty at the time of the return through a filing with the Clerk's Office.</u>

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for_____days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____.

| | |
|---|---|
| Date and time issued:   February 22, 2019, at 3:00 pm | **DOUGLAS F. McCORMICK** |
| | *Judge's signature* |
| City and state:   Santa Ana, CA | United States Magistrate Judge Douglas F. McCormick |
| | *Printed name and title* |

AUSAs: Julian L. André (213.894.6683) & Brett A. Sagel (714.338.3598)

**EXHIBIT 4**
**Page 1 of 20**

USAO_00065632

AO 93 (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

     I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**EXHIBIT 4**
**Page 2 of 20**

USAO_00065633

## ATTACHMENT A

PROPERTY TO BE SEARCHED

Forensic images of the following digital devices (the "SUBJECT DEVICES"), which are currently maintained in the custody of the Internal Revenue Service-Criminal Investigation ("IRS-CI") in Laguna Niguel, California:

1.    Dell XPS 128 GB Samsung SSD, bearing serial number S1D2NSAG5000777, provided to IRS-CI by M.E. on or about October 22, 2018 ("SUBJECT DEVICE 1");

2.    Dell Precision, Model M4800, bearing service tag number 252M262, provided to IRC-CI by S.F. on or about October 21, 2018 ("SUBJECT DEVICE 2");

3.    Seagate External Hard Drive, model number SRD00F1, bearing serial number NA44HLQH, provided to IRS-CI by M.G. on or about October 22, 2018 ("SUBJECT DEVICE 3");

4.    Samsung flash drive  provided to IRS-CI by V.S. on or about October 31, 2018 ("SUBJECT DEVICE 4");

5.    Seagate Hard Drive, bearing serial number 5VJC1GXV provided to IRS-CI by A.G. on or about November 13, 2018 ("SUBJECT DEVICE 5");

6.    Veeam 2GB flash drive provided to IRS-CI by A.G. on or about November 13, 2018 ("SUBJECT DEVICE 6"); and

7.    Seagate Hard Drive, bearing serial number 5VJC1GXV provided to IRS-CI by A.G. on or about November 20, 2018 ("SUBJECT DEVICE 7").

**EXHIBIT 4**
**Page 3 of 20**

**ATTACHMENT B**

## I. ITEMS TO BE SEIZED

1.     The items to be seized are evidence, contraband, fruits, and/or instrumentalities of violations of 26 U.S.C. § 7201 (attempt to evade or defeat tax); 26 U.S.C. § 7202 (willful failure to collect or pay over tax); 26 U.S.C. § 7203 (willful failure to pay tax or file return); 26 U.S.C. § 7212 (interference with administration of internal revenue laws); 18 U.S.C. § 152 (concealment of assets in bankruptcy); 18 U.S.C. § 157 (bankruptcy fraud); 18 U.S.C. § 371 (conspiracy); 18 U.S.C. § 1001 (false statements); 18 U.S.C. § 1014 (false statement to a bank or other federally insured institution); 18 U.S.C. § 1028A (aggravated identity theft); 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1344 (bank fraud); and 18 U.S.C. § 1957 (money laundering) (the "Subject Offenses"), namely:

a.     Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to the ownership of Global Baristas US, LLC ("GBUS"); Global Baristas, LLC ("GB LLC"); GB Autosport, LLC ("GB Auto"); GB Hospitality LLC ("GB Hospitality"); Doppio Inc. ("Doppio"); Eagan Avenatti LLP ("EA LLP"); and Avenatti & Associates, APC ("A&A") (collectively, the "Subject Entities").

i

**EXHIBIT 4**
**Page 4 of 20**

USAO_00065635

b.    Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to the sale or purchase of TC Global, Inc. or Tully's Coffee.

c.    Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to the purchase or sale of GBUS, GB LLC, or Doppio.

d.    Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to AVENATTI's control or management of any of the Subject Entities.

e.    Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to the organizational or management structure of any of the Subject Entities.

f.    Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to the finances of any of the Subject Entities, including assets, liabilities, accounts receivable, and accounts payable.

g.    Records, documents, correspondence, programs, applications, or materials from January 2013 through September

ii

**EXHIBIT 4**
**Page 5 of 20**

USAO_00065636

2018 that evidence, discuss, reflect, or relate to value of GBUS
or GB LLC.

      h.   Records, documents, correspondence, programs,
applications, or materials from January 2013 through September
2018 that evidence, discuss, reflect, or relate to the
accounting records for GBUS and GB LLC, including any Microsoft
Dynamics NAV accounting data, files, or records.

      i.   Records, documents, correspondence, programs,
applications, or materials from January 2013 through September
2018 that evidence, discuss, reflect, or relate to GBUS employee
handbooks or manuals, employment contracts, compensation
records, and employee lists.

      j.   Records, documents, correspondence, programs,
applications, or materials from January 2013 through September
2018 that evidence, discuss, reflect, or relate to the personal
finances of Michael J. Avenatti ("AVENATTI"), including
information relating to AVENATTI's assets, debts, income,
expenses, and net worth.

      k.   Records, documents, correspondence, programs,
applications, or materials from January 2013 through September
2018 that evidence, discuss, reflect, or relate to any financial
transactions, including any proposed or potential financial
transactions, involving any of the Subject Entities and/or
AVENATTI.

iii

**EXHIBIT 4**
**Page 6 of 20**

USAO_00065637

        l.    Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to financial decisions AVENATTI made on behalf of any of the Subject Entities, including decisions to authorize payments on behalf of any of the Subject Entities and transfer money to or from any of the Subject Entities.

        m.    Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to any loans or other financing agreements, including any proposed or potential loans or other financing agreements, involving any of the Subject Entities and/or AVENATTI.

        n.    Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to the payroll and tax preparation services that Ceridian HCM Inc. ("Ceridian") provided to GBUS, including any records, documents, correspondence, programs, applications, or materials evidencing, discussing, reflecting, or relating to changes in the payroll and tax services to be provided by Ceridian.

        o.    Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to the federal,

iv

**EXHIBIT 4**
**Page 7 of 20**

USAO_00065638

state, and/or local tax obligations, tax returns, tax
liabilities, or tax payments of any of the Subject Entities
and/or AVENATTI.

      p.   Records, documents, correspondence, programs,
applications, or materials from January 2013 through September
2018 that evidence, discuss, reflect, or relate to any liens,
levies, garnishments, judgments, encumbrances, or tax-related
investigations or actions associated with any of the Subject
Entities and/or AVENATTI.

      q.   Records, documents, correspondence, programs,
applications, or materials from January 2013 through September
2018 that evidence, discuss, reflect, or relate to GBUS's and GB
LLC's merchant credit card processing accounts (the "merchant
accounts"), including contracts, agreements, account
applications, and correspondence regarding changes to the
merchant accounts.

      r.   Records, documents, correspondence, programs,
applications, or materials from January 2013 through September
2018 that evidence, discuss, reflect, or relate to any of the
Subject Entities' and/or AVENATTI's contractual relationships,
including drafts and final versions of any executed, proposed,
or potential contracts and agreements, bills of sale,
correspondence regarding payments, and correspondence regarding
the cancellation or modification of contracts and/or agreements.

v

**EXHIBIT 4**
**Page 8 of 20**

USAO_00065639

s. Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to changes in any of the Subject Entities' and/or AVENATTI's bank account information.

t. Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses and forensic copies thereof.

u. With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

i. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

vi

**EXHIBIT 4**
**Page 9 of 20**

USAO_00065640

            iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

            v.   evidence of the times the device was used;

            vi.   passwords, encryption keys, and other access devices that may be necessary to access the device;

            vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

            viii.   records of or information about Internet Protocol addresses used by the device;

            ix.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

    2.   As used herein, the terms "records," "documents," "correspondence," "programs," "applications," and "materials" include records, documents, correspondence, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

**EXHIBIT 4**
**Page 10 of 20**

USAO_00065641

Case 8:19-cr-00061-JVS Document 305-3 Filed 09/28/20 Page 129 of 285 Page ID #:225
Case 8:19-cr-00061-JVS Document 305-3 Filed 09/28/20 Page 129 of 285 Page ID of 20
Page 4702:225

## II.   SEARCH PROCEDURES FOR HANDLING POTENTIALLY PRIVILEGED INFORMATION ON THE SUBJECT DEVICES

3.    In searching the SUBJECT DEVICES (including the forensic copies thereof), the following procedures will be followed at the time of the search in order to avoid unnecessary disclosures of any privileged attorney-client communications or attorney work product.

4.    Law enforcement personnel conducting the investigation and search and other individuals assisting law enforcement personnel in the search (the "Search Team") have already obtained custody of the SUBJECT DEVICES, which are capable of containing evidence of the Subject Offenses, or capable of containing data falling within the scope of the items to be seized.   The Search Team shall facilitate the transfer of the SUBJECT DEVICES to the "Privilege Review Team" (previously designated individuals not participating in the investigation of the case).   The Privilege Review Team, including a Privilege Review Team Assistant United States Attorney ("PRTAUSA") or PRTAUSAs, will then review the SUBJECT DEVICES as set forth herein.   The Search Team will review only data from the SUBJECT DEVICES that has been released by the Privilege Review Team to the Search Team.

5.    The Privilege Review Team will, in their discretion, either search each SUBJECT DEVICE where it is currently located

**EXHIBIT 4**
**Page 11 of 20**

USAO_00065642

or transport it to an appropriate law enforcement laboratory or
similar facility to be searched at that location.

6. The Privilege Review Team and the Search Team shall
complete the search discussed herein as soon as is practicable
but not more than 180 days from the date of execution of the
warrant. The government will not search the SUBJECT DEVICES
beyond this 180-day period without obtaining an extension of
time order from the Court.

7. The Search Team will provide the Privilege Review Team
and/or appropriate litigation support personnel[55] with a list of
"privilege key words" to search the SUBJECT DEVICES for
communications, data, or documents relating to the following law
firms: (a) Foster Pepper PLLC; (b) Osborn Machler PLLC;
(c) Eisenhower Carlson PLLC; (d) Talmadge/Fitzpatrick/Tribe,
PPLC; and (e) Brager Tax Law Group. Such "privilege key words"
shall include specific words like "Foster Pepper," "Osborn,"
"Machler," "Eisenhower," "Carlson," "Talmadge," "Fitzpatrick,"
"Tribe," "Brager," as well as other email addresses and domain
names associated with those individuals and law firms. Because
the Chapter 7 bankruptcy trustee for GBUS (the "GBUS Trustee")
has executed a waiver of the attorney-client privilege as to all

---

[55] Litigation support personnel and computer forensics
agents or personnel, including IRS Computer Investigative
Specialists, are authorized to assist both the Privilege Review
Team and the Search Team in processing, filtering, and
transferring data contained on the SUBJECT DEVICES.

ix

**EXHIBIT 4**
**Page 12 of 20**

USAO_00065643

communications between GBUS's officer, directors, employees, and agents, and any lawyer acting on GBUS's behalf (see Affidavit ¶ 83.a, Ex. 1), including AVENATTI, the "privilege key words" need not include specific words designed to capture all communications with AVENATTI or his law firms, EA LLP and A&A, or standard privilege terms.

8.    The Privilege Review Team will segregate and will not search or review the contents of AVENATTI's GBUS email accounts, including:   (1) MichaelA@globalbaristas.com; and (2) MAvenatti@globalbaristas.com.   Such data will be maintained under seal by the investigating agency without further review absent subsequent authorization as set forth in paragraph 12 below.

9.    The Privilege Review Team will conduct an initial review of the data on the SUBJECT DEVICES using the "privilege key words," and by using search protocols specifically chosen to identify documents or data containing potentially privileged information.   The Privilege Review Team may subject to this initial review all of the data contained in the SUBJECT DEVICES capable of containing any of the items to be seized.   Documents or data that are identified by this initial review as not potentially privileged may be given to the Search Team.

10.   All documents or data that the initial review identifies as containing any of the "privilege key words" will

x

**EXHIBIT 4**
**Page 13 of 20**

USAO_00065644

be reviewed by a Privilege Review Team member to confirm that
the documents or data contain potentially privileged
information.  Documents or data that are determined by this
secondary review not to be potentially privileged may be given
to the Search Team.  Documents or data that are determined by
this review to be potentially privileged or privileged will be
given to the United States Attorney's Office for further review
by the PRTAUSA(s).  Documents or data identified by the
PRTAUSA(s) after further review as not potentially privileged
may be given to the Search Team.  If, after further review, the
PRTAUSA(s) determines it to be appropriate, the PRTAUSA may
apply to the Court for a finding with respect to particular
documents or data that no privilege, or an exception to the
privilege, applies.  Documents or data that are the subject of
such a finding may be given to the Search Team.  In such an
instance, the PRTAUSA(s) shall conduct a review of the documents
or data to determine whether they fall within the scope of the
items to be seized prior to applying to the Court for relief.
Documents or data identified by the PRTAUSA(s) after review as
privileged will be maintained under seal by the investigating
agency without further review absent subsequent authorization as
set forth in paragraph 12 below.

     11.  The Privilege Review Team may, in its discretion, also
use "scope key words" to search any documents or data that were

**EXHIBIT 4**
**Page 14 of 20**

USAO_00065645

identified as potentially privileged using the "privilege key words" if the Privilege Review Team determines that such a procedure would allow the Privilege Review Team to complete its review of potentially privileged documents more effectively and efficiently. The Privilege Review Team may also, in its discretion, apply the "scope key words" to a subset of the potentially privileged data. At the Privilege Review Team's request, the Search Team may provide the Privilege Review Team and/or appropriate litigation support personnel with a list of "scope key words" designed to search for data relating to the items to be seized. These "scope key words" may then be applied to the potentially privileged data identified by using the "privilege key words." The Privilege Review Team may conduct a detailed quality check on any data that did not contain the "scope key words" to ensure that the scope key word search is effective. Additional "scope key words" designed to locate the items to be seized may also be applied at the discretion of the PRTAUSA(s). Any data or documents that contain both any of the "privilege key words" and any of "scope key words" shall be then reviewed by the Privilege Review Team and the PRTAUSA(s) in accordance with the procedures set forth in paragraph 9 above. Documents and data that are identified by the "scope key word" searches and quality checks as falling outside the scope of the warrant will be maintained under seal as set forth in paragraph

xii

**EXHIBIT 4**
**Page 15 of 20**

USAO_00065646

12 below and not further reviewed absent subsequent
authorization.

    12.   Documents or data identified by the PRTAUSA(s) after
review as privileged (that are not subject to a finding by a
court of no privilege or an exception to the privilege) or
potentially privileged and outside the scope of the items to be
seized shall be segregated and sealed together in an enclosure,
the outer portion of which will be marked as containing
potentially privileged information, and maintained by the
investigative agency.  Such data or documents shall not be
accessible by or given to the Search Team at any time absent
authorization of the Court.  However, the Privilege Review Team
may, in its discretion, store the privileged and potentially
privileged data and documents in a folder or a set of folders in
a document review platform database, such as Relativity or
Eclipse, that remains inaccessible to the Search Team.  The
Privilege Review Team's access to this separate document review
platform database shall cease upon expiration of the warrant.
However, litigation support personnel from the United States
Attorney's Office, United States Department of Justice, and/or
the investigating agency may continue to access this separately-
maintained document review database for the purpose of database
maintenance.

<div align="center">xiii</div>

**EXHIBIT 4**
**Page 16 of 20**

USAO_00065647

13. The Search Team will search only the documents and data that the Privilege Review Team provides to the Search Team at any step listed above in order to locate documents and data that are within the scope of the search warrant. The Search Team does not have to wait until the entire privilege review is concluded to begin its review for documents and data within the scope of the search warrant. The Privilege Review Team may also conduct the search for documents and data within the scope of the search warrant if that is more efficient, but is not required to do so. In conducting its review, the Search Team may, in its discretion, use key word searches and other searches to determine whether documents or data fall within the scope of the search warrant. Data that is identified after these scope reviews as outside the scope of the items to be seized will be maintained under seal by the Search Team and not further reviewed absent subsequent authorization from the Court.

14. All members of the Search Team shall be advised that AVENATTI may hold an individual attorney-client relationship with the law firms identified in paragraph 7 above or other law firms and lawyers not previously identified, and that communications with or records involving those law firms and lawyers may not be covered by GBUS Trustee's waiver of the attorney-client privilege. If, upon review, a member of the Search Team determines that a document or data from the SUBJECT

xiv

**EXHIBIT 4**
**Page 17 of 20**

USAO_00065648

DEVICES appears to contain potentially privileged information that may not be covered by GBUS's limited waiver of the attorney-client privilege, such as communications with the lawyers and law firms identified in paragraph 7 above or other law firms and lawyers not previously identified, the Search Team member shall discontinue its review of the document or data and shall immediately notify a member of the Privilege Review Team. The Search Team member may record identifying information regarding the potentially privilege document or data that is reasonably necessary to identity the document or data for the Privilege Review Team. The Search Team shall not further review any documents or data that appears to contain such potentially privileged information until after the Privilege Review Team has completed its review of the additional potentially privileged information discovered by the Search Team member.

15. In performing the reviews, both the Privilege Review Team and the Search Team may:

a. search for and attempt to recover deleted, "hidden," or encrypted data;

b. use tools to exclude normal operating system files and standard third-party software that do not need to be searched; and

c. use forensic examination and searching tools, such as "EnCase," "FTK" (Forensic Tool Kit), Nuix, Axiom,

**EXHIBIT 4**
**Page 18 of 20**

USAO_00065649

Relativity, and Eclipse, which tools may use hashing and other
sophisticated techniques.

16. If either the Privilege Review Team or the Search
Team, while searching a SUBJECT DEVICE encounters immediately
apparent contraband or other evidence of a crime outside the
scope of the items to be seized, they shall immediately
discontinue the search of that device pending further order of
the Court and shall make and retain notes detailing how the
contraband or other evidence of a crime was encountered,
including how it was immediately apparent contraband or evidence
of a crime.

17. If the search determines that a SUBJECT DEVICES does
contain data falling within the list of items to be seized, the
government may make and retain copies of such data, and may
access such data at any time.

18. The government may retain the SUBJECT DEVICES
(including any forensic copy thereof), which have already been
obtained by the Search Team, but may not access data falling
outside the scope of the other items to be seized (after the
time for searching the device has expired) on the SUBJECT
DEVICES absent further court order.

19. After the completion of the search of the SUBJECT
DEVICES, the government shall not access digital data falling

**EXHIBIT 4**
**Page 19 of 20**

USAO_00065650

outside the scope of the items to be seized absent further order
of the Court.

20. The special procedures relating to digital devices
found in this warrant govern only the search of digital devices
pursuant to the authority conferred by this warrant and do not
apply to any search of digital devices pursuant to any other
court order.

**EXHIBIT 4**
**Page 20 of 20**

USAO_00065651

GOVERNMENT'S OPPOSITION TO DEFENDANT MICHAEL JOHN AVENATTI'S
MOTION FOR PRIVILEGE REVIEW, EVIDENTIARY HEARING, AND DISCOVERY

# EXHIBIT 5

## LIMITED WAIVER OF ATTORNEY-CLIENT PRIVILEGE AND CONSENT TO SEARCH BY NANCY L. JAMES IN HER CAPACITY AS TRUSTEE FOR GLOBAL BARISTAS US, LLC

I, Nancy L. James, in my capacity as the Trustee for Global Baristas US LLC, hereby agree and state as follows:

1.     On or about October 24, 2018, a Chapter 7 involuntary bankruptcy petition was filed against Global Baristas US, LLC ("GBUS"), in the United States Bankruptcy Court for the Western District of Washington, in In re: Global Baristas US LLC, No. 18-14095-TWD (the "GBUS Bankruptcy"). On November 30, 2018, an Order for Relief was issued in connection with GBUS Bankruptcy, and I was appointed as the Trustee for GBUS.

2.     I understand that the Internal Revenue Service – Criminal Investigations ("IRS-CI") is in possession of certain GBUS business records and communications it obtained from former GBUS employees in both hard-copy and electronic form, as described in paragraph 3, below.

3.     In my capacity as Trustee for GBUS, I consent to the search of the following items currently in the possession of IRS-CI:

a.     A forensic image of a Dell XPS 128 GB Samsung SSD, bearing serial number S1D2NSAG5000777, provided to IRS-CI by M██ E██ on or about October 22, 2018.

b.     Hard-copy GBUS records provided by M██ E██ on or about October 22, 2018.

c.     A forensic image of a Dell Precision, Model M4800, bearing service tag number 252M262, provided to IRC-CI by S██ F██ on or about October 21, 2018.

d.     Hard-copy GBUS records provided by S██ F██ on or about October 21, 2018.

1

**EXHIBIT 5**
**Page 1 of 3**

USAO_00065833

e.    A forensic image of a Seagate External Hard Drive, model number
SRD00F1, bearing serial number NA44HLQH, provided to IRS-CI by M   G   on or about
October 22, 2018.

f.    Copies of text messages between M   G   and other GBUS
employees obtained from Grice on or about September 26, 2018.

g.    A forensic image of a Samsung flash drive provided to IRS-CI by V
S   on or about October 31, 2018.

h.    Hard-copy GBUS business records provided to IRS-CI by V   S
on or about October 31, 2018.

i.    A forensic image of a Seagate Hard Drive, bearing serial number
5VJC1GXV provided to IRS-CI by A   G   on or about November 13, 2018.

j.    A forensic image of a Veeam 2GB flash drive provided to IRS-CI by
A   G   on or about November 13, 2018.

k.    A forensic image of a Seagate Hard Drive, bearing serial number
5VJC1GXV provided to IRS-CI by A   G   on or about November 20, 2018.

4.    With respect to any GBUS business records, including those records and
communications in the possession of IRS-CI described in paragraph 3 above, in my capacity as
the Trustee for GBUS, I agree to waive any claims of the attorney-client privilege that may exist
between GBUS and any legal counsel acting on its behalf. More specifically, and subject to the
limitations below, I agree to waive the attorney-client privilege as to any attorney-client
communications which may exist between any officer, director, employee, or agent of GBUS on
the one hand, and on the other hand any lawyer acting on behalf of GBUS, including, but not
limited to, the following individuals and law firms: Michael Avenatti; Eagan Avenatti LLP;
Avenatti & Associates APC; Foster Pepper PLLC; Osborn Machler PLLC; Eisenhower Carlson
PLLC; and Talmadge/Fitzpatrick/Tribe, PPLC.

5.    This waiver of the attorney-client privilege is limited in that it does not apply to
any attorney-client privileged communications that took place after the involuntary petition was

2

**EXHIBIT 5**
**Page 2 of 3**

USAO_00065834

filed in the GBUS Bankruptcy on October 24, 2018. Nor does it apply to any communications between the Trustee of GBUS and any lawyers acting on behalf of the Trustee, including, but not limited to, Rory C. Livesey and the Livesey Law Firm. This waiver of the attorney-client privilege is further limited to the United States government and its employees and agents, for any purpose related to the official performance of their duties, and does not extend to any other individual, entity or third party.

6.    In my capacity as Trustee for GBUS, I also authorize any former or current officer, directors, employees, or agents of GBUS to disclose to the United States government all materials, written or oral, relating to any attorney-client privileged communications covered by the limited attorney-client privilege waiver set forth in paragraphs 5 and 6 above.

7.    I have read this Limited Waiver of the Attorney-Client Privilege and Consent to Search carefully and understand it thoroughly. I, in my capacity as Trustee for GBUS, have agreed to this Limited Waiver of the Attorney-Client Privilege and Consent to Search freely and voluntarily.

NANCY L. JAMES

2-19-19

Date

Trustee for Global Baristas US LLC

3

**EXHIBIT 5**
**Page 3 of 3**

USAO_00065835

GOVERNMENT'S OPPOSITION TO DEFENDANT MICHAEL JOHN AVENATTI'S
MOTION FOR PRIVILEGE REVIEW, EVIDENTIARY HEARING, AND DISCOVERY

# EXHIBIT 6

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) Case No. 8:19-MJ-419 |
| | ) |
| Ten Digital Devices in the Custody of the Internal Revenue Service – Criminal Investigation | ) |
| | ) |
| | ) |
| | ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of:

| Code Section | Offense Description |
|---|---|
| 26 U.S.C. § 7201 | Attempt to Evade or Defeat Tax |
| 26 U.S.C. § 7202 | Willful Failure to Collect or Pay Over Tax |
| 26 U.S.C. § 7203 | Willful Failure to Pay Tax or File Return |
| 26 U.S.C. § 7212 | Interference with Administration of Internal Revenue Laws |
| 18 U.S.C. § 152 | Concealment of Assets in Bankruptcy |
| 18 U.S.C. § 157 | Bankruptcy Fraud |
| 18 U.S.C. § 371 | Conspiracy |
| 18 U.S.C. § 1001 | False Statements |
| 18 U.S.C. § 1014 | False Statement to a Bank or Other Federally Insured Institution |
| 18 U.S.C. § 1028A | Aggravated Identity Theft |
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1344 | Bank Fraud |
| 18 U.S.C. § 1957 | Money Laundering |

///

///

///

**EXHIBIT 6**

**Page 1 of 86**

The application is based on these facts:

    *See attached Affidavit*

    ☒ Continued on the attached sheet.

☐ Delayed notice of_____days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

<table>
<tr><td></td><td>/s/</td></tr>
<tr><td></td><td>*Applicant's signature*</td></tr>
<tr><td></td><td>IRS-CI Special Agent Remoun Karlous</td></tr>
<tr><td></td><td>*Printed name and title*</td></tr>
</table>

Sworn to before me and signed in my presence.

Date:   May 24, 2019

City and state:  Santa Ana, CA

**DOUGLAS F. McCORMICK**
*Judge's signature*

United States Magistrate Judge Douglas F. McCormick
*Printed name and title*

AUSAs: Julian L. André (213.894.6683) & Brett A. Sagel (714.338.3598)

**EXHIBIT 6**
**Page 2 of 86**

USAO_00134448

### ATTACHMENT A

**PROPERTY TO BE SEARCHED**

The following digital devices (the "SUBJECT DEVICES") or forensic images thereof, which are currently maintained in the custody of the Internal Revenue Service-Criminal Investigation ("IRS-CI") in Los Angeles and Santa Ana, California:

1. Dell PowerEdge R410, bearing serial number 52RKCK1, obtained by IRS-CI from MixinIT via consent from the court-appointed receiver for Eagan Avenatti LLP ("EA LLP") on or about April 4, 2019 ("SUBJECT DEVICE 1");

2. Dell PowerEdge R710, bearing serial number 2GMPCK1, obtained by IRS-CI from MixinIT via consent from the court-appointed receiver for EA LLP on or about April 4, 2019 ("SUBJECT DEVICE 2");

3. HP ProLiant DL380 G7, bearing serial number A1979827, obtained by IRS-CI from MixinIT via consent from the court-appointed receiver for EA LLP on or about April 4, 2019 ("SUBJECT DEVICE 3");

4. HP ProLiant DL380 G7, bearing serial number A1979828, obtained by IRS-CI from MixinIT via consent from the court-appointed receiver for EA LLP on or about April 4, 2019 ("SUBJECT DEVICE 4");

5. HP ProLiant DL380 G7, bearing serial number A1884814, obtained by IRS-CI from MixinIT via consent from the court-appointed receiver for EA LLP on or about April 4, 2019 ("SUBJECT DEVICE 5");

**EXHIBIT 6**
**Page 3 of 86**

USAO_00134449

6.   HP ProLiant DL160 G6, bearing serial number MXQ9520ABM, obtained by IRS-CI from MixinIT via consent from the court-appointed receiver for EA LLP on or about April 4, 2019 ("SUBJECT DEVICE 6");

7.   A black USB drive marked "27989," which was seized by law enforcement agents from AVENATTI on March 25, 2019.  IRS-CI obtained the forensic image of the digital device from the United States Attorney's Office for the Southern District of New York ("SDNY USAO") on or about May 22, 2019 ("SUBJECT DEVICE 7");

8.   A blue and silver USB drive marked "RAEN," which was seized by law enforcement agents from AVENATTI on March 25, 2019.  IRS-CI obtained the forensic image of the digital device from the SDNY USAO on or about May 22, 2019 ("SUBJECT DEVICE 8");

9.   A silver and purple USB drive marked "8025328," which was seized by law enforcement agents from VENATTI on March 25, 2019.  IRS-CI obtained the forensic image of the digital device from the SDNY USAO on or about May 22, 2019 ("SUBJECT DEVICE 9"); and

10.  A compact disc containing scanned copies of miscellaneous documents that were seized by law enforcement agents from AVENATTI's briefcase on March 25, 2019.  The SDNY USAO scanned the documents and placed them on the disc and provided the disc to IRS-CI on or about May 17, 2019 ("SUBJECT DEVICE 10") (collectively, the "SUBJECT DEVICES").

**EXHIBIT 6**
**Page 4 of 86**

USAO_00134450

SUBJECT DEVICES 1 through 6 are currently held in the custody of IRS-CI in Los Angeles, California.  SUBJECT DEVICES 7 through 10 are currently held in the custody of IRS-CI in Santa Ana, California.

**EXHIBIT 6**
**Page 5 of 86**

USAO_00134451

<u>**ATTACHMENT B**</u>

I.   <u>**ITEMS TO BE SEIZED**</u>

1.   The items to be seized are evidence, contraband, fruits, and/or instrumentalities of violations of 26 U.S.C. § 7201 (attempt to evade or defeat tax); 26 U.S.C. § 7202 (willful failure to collect or pay over tax); 26 U.S.C. § 7203 (willful failure to pay tax or file return); 26 U.S.C. § 7212 (interference with administration of internal revenue laws); 18 U.S.C. § 152 (concealment of assets in bankruptcy); 18 U.S.C. § 157 (bankruptcy fraud); 18 U.S.C. § 1028A (aggravated identity theft); 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1344 (bank fraud); and 18 U.S.C. § 1957 (money laundering) (the "Subject Offenses"), namely:

a.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to the ownership of Global Baristas US, LLC ("GBUS"); Global Baristas, LLC ("GB LLC"); GB Autosport, LLC ("GB Auto"); GB Hospitality LLC ("GB Hospitality"); Doppio Inc. ("Doppio"); Eagan Avenatti LLP ("EA LLP"); Avenatti & Associates, APC ("A&A"); and Augustus LLP (collectively, the "Subject Entities").

b.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to Michael J. Avenatti's ("AVENATTI") control or management of any of the Subject Entities and/or The X-Law Group, PC ("X-Law Group").

i

**EXHIBIT 6**
**Page 6 of 86**

USAO_00134452

    c.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to the organizational or management structure of any of the Subject Entities and/or X-Law Group.

    d.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to the finances of any of the Subject Entities, including assets, income, liabilities, accounts receivable, accounts payable, and expenses.

    e.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to the personal finances of Michael Avenatti ("AVENATTI"), including information relating to AVENATTI's assets, debts, income, expenses, and net worth.

    f.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to the accounting records for AVENATTI and/or any of the Subject Entities, including any Microsoft Dynamics NAV, QuickBooks, or other electronic accounting data, files, or records.

    g.   Records, documents, programs, applications, or materials from January 201 through March 25, 2019, relating to any financial transactions, including any proposed or potential financial transactions, involving any of the Subject Entities, and/or AVENATTI.

    h.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to any payments, checks, credits, wire transfers, commodities,

ii

**EXHIBIT 6**
**Page 7 of 86**

USAO_00134453

Case 8:19-cr-00061-JVS SEALED Document 305-3 Filed 09/29/20 Page 151 of 205 Page ID
Case 8:19-mj-00419-DUTY SEALED Document 1 SEALED Filed 09/24/19 Page 8 of
330   Page ID #:514
#:4740

services, or other things of value paid, provided, delivered, or
transferred, directly or indirectly, to AVENATTI and/or any of
the Subject Entities.

        i.    Records, documents, programs, applications, or
materials from January 2011 through March 25, 2019, relating to
any financial relationship between AVENATTI and/or any of the
Subject Entities on one hand and X-Law Group and/or F.M. on the
other hand.

        j.    Records, documents, programs, applications, or
materials from January 2011 through March 25, 2019, relating to
financial decisions AVENATTI and/or J.R. made on behalf of any
of the Subject Entities, including decisions to authorize
payments on behalf of any of the Subject Entities and transfer
money to or from any of the Subject Entities.

        k.    Records, documents, programs, applications, or
materials from January 2011 through March 25, 2019, relating to
communications between AVENATTI and/or J.R. and any financial
institution regarding the transfer of funds to or from any
account associated with AVENATTI and/or any of the Subject
Entities.

        l.    Records, documents, programs, applications, or
materials from January 2011 through March 25, 2019, relating to
any loans or other financing agreements, including any proposed
or potential loans or other financing agreements, involving any
of the Subject Entities and/or AVENATTI.

**EXHIBIT 6**
**Page 8 of 86**

USAO_00134454

m.  Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to the payroll obligations of the Subject Entities.

n.  Non-privileged records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to the federal, state, and/or local tax obligations, tax returns, tax liabilities, or tax payments of any of the Subject Entities and/or AVENATTI.

o.  Non-privileged records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to any liens, levies, garnishments, judgments, encumbrances, or tax-related investigations or actions associated with any of the Subject Entities and/or AVENATTI.

p.  Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to attorneys' fees or costs earned or collected by EA LLP, A&A, and/or AVENATTI, including attorney-client fee contracts, engagement letters, fee agreements, cost-sharing agreements, fee-sharing agreements, settlement agreements, and client billing records, but excluding any such records relating to the representations of Stephanie Clifford or Julie Swetnick.

q.  Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to any of the Subject Entities' and/or AVENATTI's contractual relationships, including drafts and final versions of any executed, proposed, or potential contracts and agreements, bills of sale, correspondence regarding payments, and correspondence

iv

**EXHIBIT 6**
**Page 9 of 86**

USAO_00134455

regarding the cancellation or modification of contracts and/or agreements.

       r.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to any of the Subject Entities' and/or AVENATTI's bank account information.

       s.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to the physical whereabouts of AVENATTI, and/or J.R., including calendars and calendar entries.

       t.   Records, documents, programs, applications, or materials from April 1, 2011, to March 25, 2019, relating to AVENATTI and/or EA LLP's representation of Client 1, including the approximately $4 million settlement payment that was transferred to one of EA LLP's California Bank & Trust attorney trust account in or around January 2015.

       u.   Records, documents, programs, applications, or materials from December 2016 to March 25, 2019, relating to AVENATTI and/or EA LLP's representation of Client 2, including the approximately $2.75 million settlement payment that was transferred to one of EA LLP's California Bank & Trust attorney trust account in or around January 2017.

       v.   Records, documents, programs, applications, or materials relating to an agreement to purchase and the purchase of a private Honda jet from Honda Aircraft Company LLC and/or the funds used to purchase the private Honda jet.

**EXHIBIT 6**
**Page 10 of 86**

USAO_00134456

w. Records, documents, programs, applications, or materials from January 1, 2014, to March 25, 2019, relating to AVENATTI and/or EA LLP's representation of Client 3, including the approximately $1.6 million settlement payment that was transferred to one of AVENATTI's City National Bank attorney trust account in or around January 2018.

x. Records, documents, programs, applications, or materials from January 1, 2017, to March 25, 2019, relating to AVENATTI's, EA LLP's, X-Law Group, and/or F.M.'s representation of Client 4 and Client 5, including the approximately $8,146,288 payment that was transferred to one of AVENATTI's City National Bank attorney trust accounts in or around March 2018.

y. Non-privileged records, documents, programs, applications, or materials from March 7, 2013, to March 25, 2019, relating to the settlement of litigation against the National Football League ("NFL") relating to the 2011 Super Bowl (the "Super Bowl Litigation"), including documents reflecting settlement payments, attorney fees, costs, expenses, and the distribution of settlement proceeds to EA LLP, AVENATTI, and any of EA LLP or AVENATTI's clients in the Super Bowl Litigation.

z. Records, documents, programs, applications, or materials from January 2013 through March 25, 2019, relating to the payroll and tax preparation services that Paychex provided to EA LLP and/or A&A, including any records, documents, programs, applications, or materials relating to changes in the payroll and tax services to be provided by Paychex.

**EXHIBIT 6**
**Page 11 of 86**

USAO_00134457

aa.  Records, documents, programs, applications, or materials from January 2013 through March 25, 2019, relating to the payroll and tax preparation services that Ceridian HCM Inc. ("Ceridian") provided to GBUS, including any records, documents, programs, applications, or materials relating to changes in the payroll and tax services to be provided by Ceridian.

bb.  Records, documents, programs, applications, or materials from January 2013 through March 25, 2019, relating to the sale or purchase of TC Global, Inc. or Tully's Coffee.

cc.  Records, documents, programs, applications, or materials from January 2013 through March 25, 2019, relating to the purchase or sale, including any proposed or attempted purchase or sale, of GBUS, GB LLC, or Doppio.

dd.  Records, documents, programs, applications, or materials from January 2013 through March 25, 2019, relating to the value of GBUS or GB LLC.

ee.  Records, documents, programs, applications, or materials from January 2013 through March 25, 2019, relating to GBUS's and GB LLC's merchant credit card processing accounts (the "merchant accounts"), including contracts, agreements, account applications, and correspondence regarding changes to the merchant accounts.

ff.  Records, documents, programs, applications, or materials from January 2018 through March 25, 2019, relating to creation, formation, business purpose, ownership agreement, finances, of Augustus LLP.

**EXHIBIT 6**
**Page 12 of 86**

USAO_00134458

gg. Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to the sale, rental, lease, purchase, maintenance, renovation, or remodeling of any of AVENATTI's residences, including his residences in Newport Beach, California; Laguna Beach, California; and Los Angeles, California.

hh. Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to continuing legal education ("CLE") courses taken by AVENATTI, including any professional responsibility CLE courses, ethics CLE courses, or tax CLE courses.

ii. Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to any of the Subject Entities' employee handbooks or manuals, employment contracts, compensation records, and employee lists.

jj. Records, documents, programs, applications, or materials relating to any locations or services used by AVENATTI and/or any of the Subject Entities to store physical or electronic records.

kk. With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

i. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents,

viii

**EXHIBIT 6**
**Page 13 of 86**

USAO_00134459

browsing history, user profiles, e-mail, e-mail contacts, chat
and instant messaging logs, photographs, and correspondence;

            ii.  evidence of the presence or absence of
software that would allow others to control the device, such as
viruses, Trojan horses, and other forms of malicious software,
as well as evidence of the presence or absence of security
software designed to detect malicious software;

            iii. evidence of the attachment of other devices;

            iv.  evidence of counter-forensic programs (and
associated data) that are designed to eliminate data from the
device;

            v.   evidence of the times the device was used;

            vi.  passwords, encryption keys, and other access
devices that may be necessary to access the device;

            vii. applications, utility programs, compilers,
interpreters, or other software, as well as documentation and
manuals, that may be necessary to access the device or to
conduct a forensic examination of it;

            viii.    records of or information about
Internet Protocol addresses used by the device;

            ix.  records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

     2.   As used herein, the terms "records," "documents,"
"correspondence," "programs," "applications," and "materials"

ix

**EXHIBIT 6**
**Page 14 of 86**

USAO_00134460

include records, documents, correspondence, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

## II.  SEARCH PROCEDURES FOR HANDLING POTENTIALLY PRIVILEGED INFORMATION ON THE SUBJECT DEVICES

3.    In searching the SUBJECT DEVICES (including the forensic copies thereof), the following procedures will be followed at the time of the search in order to avoid unnecessary disclosures of any privileged attorney-client communications or attorney work product.

4.    Law enforcement personnel conducting the investigation and search and other individuals assisting law enforcement personnel in the search (the "Investigation Team") have already obtained custody of the SUBJECT DEVICES, which are capable of containing evidence of the Subject Offenses, or capable of containing data falling within the scope of the items to be seized.  The Investigation Team shall facilitate the transfer of the SUBJECT DEVICES to the "Privilege Review Team" (previously designated individuals not participating in the investigation of the case).  The Privilege Review Team, including a Privilege Review Team Assistant United States Attorney ("PRTAUSA") or PRTAUSAs, will then review the SUBJECT DEVICES as set forth herein.  The Investigation Team will review only data from the SUBJECT DEVICES that has been released by the Privilege Review Team to the Investigation Team.

x

**EXHIBIT 6**
**Page 15 of 86**

USAO_00134461

5.    The Privilege Review Team will, in their discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

6.    The Privilege Review Team and the Investigation Team shall complete the search discussed herein as soon as is practicable but not more than 180 days from the date of execution of the warrant.  The government will not search the SUBJECT DEVICES beyond this 180-day period without obtaining an extension of time order from the Court.

7.    The Investigation Team will provide the Privilege Review Team and/or appropriate litigation support personnel[29] with a list of "scope key words" to search for on the digital devices, to include words relating to the items to be seized as detailed above.  The Privilege Review Team will conduct an initial review of the SUBJECT DEVICES using the scope key words, and by using search protocols specifically chosen to identify documents and data that appear to be within the scope of the warrant.  The Privilege Review Team may also do a more detailed quality check of this data and the results of this initial review, to ensure that the key word search is effective. Documents and data that are identified by this initial review, after quality check, as not within the scope of the warrant will

_____

[29] Litigation support personnel and computer forensics agents or personnel, including IRS Computer Investigative Specialists, are authorized to assist both the Privilege Review Team and the Investigation Team in processing, filtering, and transferring documents and data seized during the execution of the warrant.

**EXHIBIT 6**
**Page 16 of 86**

USAO_00134462

be maintained under seal and not further reviewed absent subsequent authorization.

8. The Investigation Team will also provide the Privilege Review Team with a list of "privilege key words" to search for among the documents and data that are identified by the initial review and quality check described above as appearing to fall within the scope of the warrant, to include specific words associated with AVENATTI, J.R., F.M., and any of the following law firms (a) EA LLP; (b) A&A; (c) X-Law Group; (d) Foster Pepper PLLC; (e) Osborn Machler PLLC; (f) Eisenhower Carlson PLLC; (g) Talmadge/Fitzpatrick/ Tribe, PPLC; (h) The Brager Tax Law Group; (i) SulmeyerKupetz; (j) Baker & Hostetler LLP; (k) Shulman Hodges & Bastian LLP; (l) Legal & Tax Consulting Group; (m) Pachulski Stang Ziehl & Jones LLP; (n) Foley & Lardner LLP; (o) Raines Feldman, LLP; and (p) Pansky Markle Attorneys at Law. The privilege key words shall also include the above referenced law firms' domain names and lawyers' email addresses, and generic words such as "privileged," "work product." The Privilege Review Team will conduct a review of these documents and data using the privilege key words, and by using search protocols specifically chosen to identify documents and data containing potentially privileged information. Documents or data which are identified by this review as not potentially privileged may be given to the Investigation Team.

9. Documents or data that the privilege key word searches identify as potentially privileged will be reviewed by a Privilege Review Team member to confirm that they contain

<div align="center">xii</div>

**EXHIBIT 6**
**Page 17 of 86**

USAO_00134463

potentially privileged information.  Documents or data that are determined by this review not to be potentially privileged may be given to the Investigation Team.  Documents or data that are determined by this review to be potentially privileged will be given to the United States Attorney's Office for further review by a PRTAUSA.  Documents or data identified by the PRTAUSA after review as not potentially privileged may be given to the Investigation Team.  If, after review, the PRTAUSA determines it to be appropriate, the PRTAUSA may apply to the court for a finding with respect to particular documents or data that no privilege, or an exception to the privilege, applies.  Documents or data that are the subject of such a finding may be given to the Investigation Team.

10.  Documents or data identified by the PRTAUSA(s) after review as privileged (that are not subject to a finding by a court of no privilege or an exception to the privilege) or potentially privileged and outside the scope of the items to be seized shall be segregated and sealed together in an enclosure, the outer portion of which will be marked as containing potentially privileged information, and maintained by the investigative agency.  Such data or documents shall not be accessible by or given to the Investigation Team at any time absent authorization of the Court.  However, the Privilege Review Team may, in its discretion, store the privileged and potentially privileged data and documents in a folder or a set of folders in a document review platform database, such as Relativity or Eclipse, that remains inaccessible to the

**EXHIBIT 6**
**Page 18 of 86**

USAO_00134464

Investigation Team.  The Privilege Review Team's access to this separate document review platform database shall cease upon expiration of the warrant.  However, litigation support personnel from the United States Attorney's Office, United States Department of Justice, and/or the investigating agency may continue to access this separately-maintained document review database for the purpose of database maintenance.

11.  The Investigation Team will search only the documents and data that the Privilege Review Team provides to the Investigation Team at any step listed above in order to locate documents and data that are within the scope of the search warrant.  The Investigation Team does not have to wait until the entire privilege review is concluded to begin its review for documents and data that are within the scope of the search warrant.  The Privilege Review Team may also conduct the search for documents and data within the scope of the search warrant if that is more efficient.  This second "scope" review is intended only to ensure that the initial scope key word review successfully eliminated data outside the scope of the search warrant from seizure.

12.  The Privilege Review Team will segregate any identifiable documents and/or data that it discovers during the search of the Subject Devices relating to <u>Stephanie Clifford v. Donald J. Trump</u>, No. 2:18-CV-2217-SJO-FFM (C.D. Cal.), the representation of Stephanie Clifford, and/or the representation of Julie Swetnick.  Such documents and/or data will be maintained under seal by the investigating agency without

xiv

**EXHIBIT 6**
**Page 19 of 86**

USAO_00134465

further review as set forth in paragraphs 7 and 10 above absent subsequent authorization from the Court. This provision, however, shall not preclude the Privilege Review Team or Investigation Team from reviewing financial and accounting records covered by paragraphs 1.d, 1.f, 1.g, and 1.r above, which reference the representations of Ms. Clifford or Ms. Swetnick.

13. To the extent that any documents and/or data covered by paragraph 1.p above, such as attorney-client fee contracts, engagement letters, and client billing records, contain information that is potentially protected by the attorney-client privileged or the attorney-work-product doctrine, the Privilege Review Team shall redact all such potentially privileged information from the documents or data before releasing the documents and/or data to the Investigation Team unless the specific client agrees to waive the attorney-client privilege.

14. If, upon review, a member of the Investigation Team determines that a document or data appears to contain potentially privileged information, the Investigation Team member shall discontinue its review of the document or data and shall immediately notify a member of the Privilege Review Team. The Investigation Team member may record identifying information regarding the potentially privileged document or data that is reasonably necessary to identify the document or data for the Privilege Review Team. The Investigation Team shall not further review any documents or data that appears to contain such potentially privileged information until after the Privilege

xv

**EXHIBIT 6**
**Page 20 of 86**

USAO_00134466

Review Team has completed its review of the additional potentially privileged information discovered by the Investigation Team member.

15. In performing the reviews, both the Privilege Review Team and the Investigation Team may:

      a.   search for and attempt to recover deleted, "hidden," or encrypted data;

      b.   use tools to exclude normal operating system files and standard third-party software that do not need to be searched; and

      c.   use forensic examination and searching tools, such as "EnCase," "FTK" (Forensic Tool Kit), Nuix, Axiom, Relativity, and Eclipse, which tools may use hashing and other sophisticated techniques.

16. If either the Privilege Review Team or the Investigation Team, while searching a SUBJECT DEVICE encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, they shall immediately discontinue the search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

17. If the search determines that a SUBJECT DEVICES does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

<div align="center">xvi</div>

**EXHIBIT 6**
**Page 21 of 86**

USAO_00134467

18.   The government may retain the SUBJECT DEVICES (including any forensic copy thereof), which have already been obtained by the Investigation Team, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) on the SUBJECT DEVICES absent further court order.

19.   After the completion of the search of the SUBJECT DEVICES, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

20.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## III. REQUESTS FOR APPOINTMENT OF A SPECIAL MASTER

21.   To the extent that AVENATTI, EA LLP, or any other party intends to request that a special master be appointed to handle the review of any potentially privileged information seized during the execution of this Search Warrant, such a request must be filed with this Court within seven days of the execution of this Search Warrant.  The government will then have seven days to file any opposition to such a request.

22.   Any request for the appointment of a special master must, at a minimum, address the following issues:  (a) the legal basis for the request; (b) the anticipated role of the special master, should one be appointed; (c) proposed search and review

EXHIBIT 6
Page 22 of 86

USAO_00134468

procedures to be followed by the special master, should one be appointed; (d) proposed procedures for the selection of a special master; (e) the names of at least three proposed special masters; and (f) the party's ability to pay for any costs and fees incurred by a special master.

Case 8:19-cr-00061-JVS Document 305-3 Filed 03/28/20 Page 167 of 285 Page ID #:4440

## AFFIDAVIT

I, Remoun Karlous, being duly sworn, declare and state as follows:

### I.    INTRODUCTION

1.    I am a Special Agent ("SA") with the Internal Revenue Service-Criminal Investigation ("IRS-CI") in the Los Angeles Field Office and have been so employed since April 1995.  As an IRS-CI SA, I have investigated numerous cases involving criminal violations of Title 18, Title 21, Title 26, and Title 31 of the United States Code, which have resulted in seizure, search, and arrest warrants.  In particular, I have investigated cases involving money laundering, international money laundering, securities fraud, tax evasion (domestic and international cases), and subscribing to false tax returns.

### II.    PURPOSE OF AFFIDAVIT

2.    This affidavit is made in support of an application for a warrant to search the following digital devices or forensic images thereof, which are currently held in the custody of IRS-CI in Los Angeles and Santa Ana, California:[1]

a.    Dell PowerEdge R410, bearing serial number 52RKCK1, obtained by IRS-CI from MixinIT via consent from the court-appointed receiver for Eagan Avenatti LLP ("EA LLP") on or about April 4, 2019 ("SUBJECT DEVICE 1");

---

[1]  SUBJECT DEVICES 1 through 6 are currently held in the custody of IRS-CI in Los Angeles, California.  SUBJECT DEVICES 7 through 10 are currently held in the custody of IRS-CI in Santa Ana, California.

**EXHIBIT 6**
**Page 24 of 86**

USAO_00134470

Case 8:19-cr-00061-JVS Document 305-3 Filed 03/28/20 Page 168 of 285 Page ID #:4424

      b.   Dell PowerEdge R710, bearing serial number 2GMPCK1, obtained by IRS-CI from MixinIT via consent from the court-appointed receiver for EA LLP on or about April 4, 2019 ("SUBJECT DEVICE 2");

      c.   HP ProLiant DL380 G7, bearing serial number A1979827, obtained by IRS-CI from MixinIT via consent from the court-appointed receiver for EA LLP on or about April 4, 2019 ("SUBJECT DEVICE 3");

      d.   HP ProLiant DL380 G7, bearing serial number A1979828, obtained by IRS-CI from MixinIT via consent from the court-appointed receiver for EA LLP on or about April 4, 2019 ("SUBJECT DEVICE 4");

      e.   HP ProLiant DL380 G7, bearing serial number A1884814, obtained by IRS-CI from MixinIT via consent from the court-appointed receiver for EA LLP on or about April 4, 2019 ("SUBJECT DEVICE 5");

      f.   HP ProLiant DL160 G6, bearing serial number MXQ9520ABM, obtained by IRS-CI from MixinIT via consent from the court-appointed receiver for EA LLP on or about April 4, 2019 ("SUBJECT DEVICE 6");

      g.   A black USB drive marked "27989," which was seized by law enforcement agents from AVENATTI on March 25, 2019, upon his arrest. IRS-CI obtained the forensic image of the digital device from the United States Attorney's Office for the Southern District of New York ("SDNY USAO") on or about May 22, 2019 ("SUBJECT DEVICE 7");

**EXHIBIT 6**
**Page 25 of 86**

USAO_00134471

h.   A blue and silver USB drive marked "RAEN," which was seized by law enforcement agents from AVENATTI on March 25, 2019, upon his arrest.  IRS-CI obtained the forensic image of the digital device from the SDNY USAO on or about May 22, 2019 ("SUBJECT DEVICE 8");

i.   A silver and purple USB drive marked "8025328," which was seized by law enforcement agents from AVENATTI on March 25, 2019, upon his arrest.  IRS-CI obtained the forensic image of the digital device from the SDNY USAO on or about May 22, 2019  ("SUBJECT DEVICE 9"); and

j.   A compact disc containing scanned copies of miscellaneous documents that were seized by law enforcement agents from AVENATTI's briefcase on March 25, 2019, upon his arrest.  The SDNY USAO scanned the documents and placed them on the disc and provided the disc to IRS-CI on or about May 17, 2019 ("SUBJECT DEVICE 10") (collectively, the "SUBJECT DEVICES").

3.   The requested search warrant seeks authorization to seize any data on the SUBJECT DEVICES that constitutes evidence, contraband, instrumentalities, and/or fruits of violations of: 26 U.S.C. § 7201 (attempt to evade or defeat tax); 26 U.S.C. § 7202 (willful failure to collect or pay over tax); 26 U.S.C. § 7203 (willful failure to pay tax or file return); 26 U.S.C. § 7212 (interference with administration of internal revenue laws); 18 U.S.C. § 152 (concealment of assets and false oaths and declarations in bankruptcy); 18 U.S.C. § 157 (bankruptcy fraud); 18 U.S.C. § 1028A (aggravated identity theft); 18 U.S.C.

3

**EXHIBIT 6**
**Page 26 of 86**

USAO_00134472

Case 8:19-mj-00061-DUTY SEALED Document 1-1 SEALED Filed 05/24/19 Page 27 of
330   Page ID #:533
Case 8:19-mj-00061-DUTY SEALED Document 305-3 Filed 03/28/20 Page 170 of 285   Page ID
#:4243

§ 1343 (wire fraud); 18 U.S.C. § 1344 (bank fraud); and 18
U.S.C. § 1957 (money laundering) (the "Subject Offenses"), and
any SUBJECT DEVICE which is itself or which contains evidence,
contraband, fruits, or instrumentalities of the Subject
Offenses, and forensic copies thereof.

4.    The SUBJECT DEVICES are identified in Attachment A to
the search warrant application.  The list of items to be seized
is set forth in Attachment B to the search warrant application.
Attachments A and B are incorporated herein by reference.

5.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested warrant and does
not purport to set forth all of my knowledge of or investigation
into this matter.  Unless specifically indicated otherwise, all
conversations and statements described in this affidavit are
related in substance and in part only.

### III.  <u>SUMMARY OF PROBABLE CAUSE</u>

6.    AVENATTI was and is an attorney licensed to practice
law in the State of California.  AVENATTI practiced law through
Avenatti & Associates, APC ("A&A") and EA LLP in Newport Beach
and Los Angeles, California.  AVENATTI was the sole owner of
A&A, which owned at least 75 percent of EA LLP.

7.    AVENATTI was also the principal owner and Chief
Executive Officer ("CEO") of Global Baristas US LLC ("GBUS"),
which operated Tully's Coffee ("Tully's") stores in Washington

4

**EXHIBIT 6**
**Page 27 of 86**

USAO_00134473

and California.  In 2013, AVENATTI's company, Global Baristas LLC ("GB LLC"), acquired TC Global Inc., which previously operated Tully's, out of bankruptcy for approximately $9.15 million.  AVENATTI's company, A&A, owned 100 percent of Doppio Inc., which in turn owned 80 percent of GB LLC.  GB LLC wholly owned GBUS, which handled the day-to-day business operations of Tully's.

8.    As set forth herein and in the affidavits that I submitted in February 2019 (attached hereto as Exhibit 1) and March 2019 (attached hereto as Exhibit 3) in support of prior search warrant applications, there is probable cause to believe that between approximately 2011 and March 2019 AVENATTI engaged in the following criminal conduct: (a) wire fraud and money laundering offenses relating to millions of dollars AVENATTI embezzled from his legal clients; (b) tax offenses relating to GBUS's payroll tax obligations and AVENATTI's efforts to obstruct an IRS collection action; (c) tax offenses relating to the tax obligations of EA LLP and A&A, including the payroll tax obligations of EA LLP; (d) tax offenses relating to AVENATTI's personal tax obligations; (e) bank fraud and aggravated identity theft offenses relating to loans AVENATTI and his companies obtained from The Peoples Bank in Mississippi; and
(f) bankruptcy fraud offenses relating to false statements AVENATTI made in federal bankruptcy proceedings involving AVENATTI and EA LLP.

9.    <u>First</u>, between as early as January 2015 and continuing through at least March 2019, AVENATTI executed a scheme to

5

**EXHIBIT 6**
**Page 28 of 86**

USAO_00134474

defraud and embezzle money from clients to whom AVENATTI had agreed to provide legal services. AVENATTI's scheme to defraud his victim-clients generally operated in the following manner: (a) AVENATTI would negotiate a settlement on behalf of a victim-client that would require the payment of funds to the victim-client; (b) AVENATTI would cause the settlement proceeds to be deposited in or transferred to attorney trust accounts AVENATTI controlled; (c) AVENATTI would misrepresent, conceal, and falsely describe to the victim-client the true terms of the settlement and/or make false statements regarding the disposition of the settlement proceeds; (d) AVENATTI would embezzle and misappropriate settlement proceeds to which he was not entitled; and (e) AVENATTI would lull the victim-client to prevent the victim-client from discovering the embezzlement and misappropriation by, among other things, falsely denying the settlement proceeds had been paid, sending funds to the victim-client under the false pretense that such funds were "advances" on the purportedly yet-to-be received settlement proceeds, and falsely claiming that payment of the settlement proceeds to the victim-client had been delayed for legitimate reasons and would occur at a later time.

10. Specifically, there is probable cause to believe that AVENATTI defrauded and embezzled funds from the following victim-clients:

**EXHIBIT 6**
**Page 29 of 86**

USAO_00134475

a.  <u>Client 1</u>: Beginning as early as in or about 2012, AVENATTI and EA LLP represented Client 1[2] in connection with a lawsuit against the County of Los Angeles and others. Between in or about January 2015 and the present, AVENATTI defrauded Client 1 out of Client 1's portion of an approximately $4,000,000 settlement payment from the County of Los Angeles.

b.  <u>Client 2</u>: Beginning as early as in or about December 2016, AVENATTI and EA LLP represented Client 2 in connection with potential litigation against an individual with whom Client 2 had a personal relationship ("Individual 1"). Between in or about December 2016 and the present, AVENATTI defrauded Client 2 out of Client 2's portion of an approximately $2,750,000 settlement payment from Individual 1.

c.  <u>Client 3</u>: Beginning as early as in or about July 2014, AVENATTI and EA LLP represented Client 3[3] in connection with an intellectual property dispute against a Colorado-based company ("Company 1"). Between in or about December 2017 and

---

[2] As noted herein, on April 10, 2019, a ███████████████ returned a 36-count indictment against AVENATTI in <u>United States v. Avenatti</u>, SA CR No. 19-061-JVS (the "Indictment," Exhibit 4, attached). The Indictment refers to the victim-clients by number (<u>e.g.</u>, "Client 1") rather than by the victim-clients' initials or other identifiers. In the interest of protecting the client-victims' right to privacy should this affidavit later be unsealed, as well as to maintain consistency with the Indictment, the government is referring to the individuals in this affidavit in the same manner as the Indictment. The privilege review team and other agents executing the search will be provided with the names of the relevant client-victims before conducting a search of the SUBJECT DEVICES.

[3] In the affidavits I submitted in support of the February 2019 and March 2019 search warrant applications, Client 3 is referred to as G.B.

7

**EXHIBIT 6**
**Page 30 of 86**

USAO_00134476

the present, AVENATTI defrauded Client 3 out of Client 3's portion of an approximately $1,600,000 settlement payment from Company 1.

d.  Client 4 and Client 5:  Beginning as early as in or about August 2017, AVENATTI and/or EA LLP represented Client 4 and Client 5[4] in connection with their separation and divestment from one of the companies in which Client 4 and Client 5 owned shares ("Company 2").  (See Ex. 1, ¶ 50.h. n.31; Ex. 3, § VI.)  Between in or about March 2018 and the present, AVENATTI defrauded Client 4 out of $4,000,000 of Client 4's funds.

e.  Super Bowl Clients:  Beginning as early as in or about 2012, AVENATTI and EA LLP represented approximately 200 individuals (the "Super Bowl Clients") in connection with litigation against the National Football League ("NFL") relating to the 2011 Super Bowl (the "Super Bowl Litigation").  The evidence IRS-CI has collected to date demonstrates that AVENATTI embezzled substantial portions of the settlement proceeds from the Super Bowl Litigation intended for clients, which AVENATTI received in or about May 2017.

11.  Second, between the fourth quarter of 2015 and the third quarter of 2017, inclusive, GBUS failed to timely file employment tax returns (IRS Forms 941) and pay approximately $3,207,144 in federal payroll taxes, including approximately $2,390,048 in trust fund taxes, which had been withheld from

---

[4] In the affidavits I submitted in support of the February 2019 and March 2019 search warrant applications, Client 4 is referred to as M.P. and Client 5 is referred to as L.T.

8

**EXHIBIT 6**
**Page 31 of 86**

USAO_00134477

GBUS employees' paychecks. AVENATTI was responsible for all of GBUS's significant financial and business decisions, including the decision not to pay the payroll and trust fund taxes that GBUS owed to the IRS. Indeed, AVENATTI was well aware of GBUS's outstanding tax obligations, yet repeatedly refused to authorize the required tax payments to the IRS.

12. Additionally, after the IRS initiated a collection action relating to GBUS's outstanding payroll tax obligations in September 2016, issued an approximately $5,000,000 tax lien against GBUS in July 2017, and levied multiple GBUS bank accounts, AVENATTI directed repeated attempts to evade collection of those payroll taxes and obstruct the IRS collection action. Among other things, AVENATTI: (a) made false statements to an IRS Revenue Officer regarding GBUS's payroll taxes and AVENATTI's involvement in GBUS's finances; (b) directed GBUS employees to deposit the cash receipts from Tully's stores into a bank account associated with a different entity AVENATTI controlled; (c) changed the company name, Employer Identification Number ("EIN"), and bank account information associated with GBUS's merchant credit card processing accounts; (d) changed the company name on various contracts with The Boeing Company; and (e) caused significant amounts of GBUS's funds, which could and should have been used to pay GBUS's payroll taxes, to be transferred to other entities AVENATTI controlled, including EA LLP and A&A.

13. _Third_, AVENATTI filed federal personal income tax returns for the 2009 and 2010 tax years indicating that he owed

9

**EXHIBIT 6**
**Page 32 of 86**

USAO_00134478

the IRS a total of approximately $850,438, plus interest and penalties.  AVENATTI, however, did not pay the IRS the amounts he owed for those tax years.[5]  AVENATTI then failed to file personal tax returns for the 2011 through 2017 tax years. During these tax years, AVENATTI generated substantial income and lived lavishly, yet largely failed to pay any federal income tax.

14.  <u>Fourth</u>, AVENATTI's other companies, EA LLP and A&A, repeatedly failed to meet their tax obligations despite generating substantial revenues.  Between 2015 and 2017, EA LLP failed to file payroll tax returns and pay approximately $2.4 million in payroll taxes, including approximately $1,279,001 in trust fund taxes that had been withheld from EA LLP employees' paychecks.  Additionally, EA LLP did not file partnership tax returns (IRS Form 1065) for the 2013, 2014, 2015, 2016, and 2017 tax years.  Similarly, A&A did not file corporate tax returns (IRS Form 1120S) for the 2011, 2012, 2013, 2014, 2015, 2016, or 2017 tax years.

15.  <u>Fifth</u>, between approximately January 2014 and December 2014, AVENATTI obtained three separate loans from The Peoples Bank, a federally insured bank in Mississippi: (1) a $850,500 loan to GB LLC in January 2014; (2) a $2,750,000 loan to EA LLP in March 2014; and (3) a $500,000 loan to EA LLP in December 2014.  In connection with these loans, AVENATTI provided The

---

[5] The tax due and owing to the IRS for the 2009 and 2010 tax years was not paid until November 2015, when AVENATTI sold his residence in Laguna Beach, California, upon which there was an IRS tax lien.

**EXHIBIT 6**
**Page 33 of 86**

USAO_00134479

Peoples Bank with false federal individual income tax returns for the 2011, 2012, and 2013 tax years.  AVENATTI, however, never filed individual income tax returns for the 2011, 2012, and 2013 tax years, and did not make any estimated tax payments during the 2012 and 2013 tax years, as claimed on the returns submitted to The Peoples Bank.  In addition, in March 2014, AVENATTI provided The Peoples Bank with a 2012 federal tax return for EA LLP which differed materially from the federal tax return EA LLP actually filed with the IRS in October 2014.

16.  Sixth, in March 2017, AVENATTI, as the managing member of EA LLP, consented to EA LLP being placed in Chapter 11 bankruptcy (the "2017 EA Bankruptcy").  Among other things, the Chapter 11 bankruptcy guidelines and requirements: (a) required AVENATTI to close all pre-petition bank accounts controlled by EA LLP, immediately open debtor-in-possession ("DIP") bank accounts, and deposit all business revenues into the DIP operating account; and (b) required AVENATTI to file monthly operating reports ("MOR") for EA LLP and report all of EA LLP's financial information for the reporting period.  From approximately March 2017 through March 2018, AVENATTI failed to report, among other information, all revenues of EA LLP and payments and distributions AVENATTI, as an insider, received from EA LLP funds.  Additionally, between March 2017 and March 2018, AVENATTI defrauded the bankruptcy court, the Office of the United States Trustee, and the creditors of EA LLP, by concealing bank accounts controlled by EA LLP, the true revenues generated by EA LLP, and the sources of revenue to EA LLP.

**EXHIBIT 6**
**Page 34 of 86**

USAO_00134480

17.  On March 25, 2019, federal agents arrested AVENATTI in New York pursuant to a criminal complaint and arrest warrant issued in this district in case number 8:19-MJ-241, as well as pursuant to a separate criminal complaint and arrest warrant issued in the Southern District of New York in case number 19MAG2927.  Simultaneously with AVENATTI's arrest, IRS-CI executed search warrants issued in this district in case numbers 8:19-MJ-243, 8:19-MJ-244, and 8:19-MJ-247 at three locations associated with AVENATTI and EA LLP.  Upon AVENATTI's arrest, federal agents in New York seized several digital devices, forensic copies of which have been provided to IRS-CI (i.e., SUBJECT DEVICES 7 through 9), and miscellaneous documents found in AVENATTI's briefcase, scanned copies of which have been provided to IRS-CI (i.e., SUBJECT DEVICE 10).[6]  There is probable cause to believe that the digital devices and miscellaneous document found on AVENATTI at the time of his arrest (i.e., SUBJECT DEVICES 7 through 10) will contain evidence of the Subject Offenses, including business records, financial documents, and emails.

18.  Following AVENATTI's arrest and the execution of the March 2019 search warrants, IRS-CI learned that in or about November 2018 AVENATTI caused computer servers belonging to EA

---

[6] Federal agents in New York also seized a black Apple iPhone X, a silver Apple MacBook Pro, and a black and grey Apple iPad from AVENATTI upon his arrest.  Currently, the agents in New York are still attempting to gain access to the contents of these three digital devices.  If they are able to access these additional devices, we anticipate receiving forensic images of them and seeking a warrant to search the contents of these devices as well.

12

**EXHIBIT 6**
**Page 35 of 86**

USAO_00134481

LLP (<u>i.e.</u>, SUBJECT DEVICES 1 through 6) to be moved to a data center in Orange County, California, operated by MixinIT. On April 3, 2019, the court-appointed receiver for EA LLP consented to IRS-CI taking physical custody of the EA LLP servers so that IRS-CI could create forensic images of the EA LLP servers. There is probable cause to believe that the EA LLP servers (<u>i.e.,</u> SUBJECT DEVICES 1 through 6) will contain additional evidence of the Subject Offenses, including business records, financial documents, and emails.

## IV.   STATEMENT OF PROBABLE CAUSE

### A.   February 2019 Warrant to Search GBUS Digital Devices

19.   On February 22, 2019, in case number 8:19-MJ-103, I submitted an affidavit in support of an application for a warrant to search seven digital devices, which had been produced by former GBUS employees, in the custody of IRS-CI in Laguna Niguel, California (the "February 2019 affidavit"). The Honorable Douglas F. McCormick, United States Magistrate Judge, issued the warrant that same day (the "February 2019 search warrant"). The application for a search warrant in case number 8:19-MJ-103, as well as my February 2019 affidavit in support thereof, are attached hereto as Exhibit 1 and incorporated herein by reference.

### B.   March 2019 Criminal Complaint

20.   On March 22, 2019, in case number 8:19-MJ-241, I submitted an affidavit in support of a criminal complaint and arrest warrant against AVENATTI (the "complaint affidavit"). The criminal complaint charged AVENATTI with one count of bank

**EXHIBIT 6**
**Page 36 of 86**

USAO_00134482

fraud, in violation of 18 U.S.C. § 1344(1), relating to
AVENATTI's fraudulent scheme to obtain a $500,000 loan from The
Peoples Bank on or about December 12, 2014, and one count of
wire fraud, in violation of 18 U.S.C. § 1343, relating to
AVENATTI's fraudulent scheme to embezzle clients' funds,
specifically the $1.6 million settlement on behalf of Client 3.
The Honorable Douglas F. McCormick, United States Magistrate
Judge, issued the arrest warrant that same day.  The criminal
complaint in case number 8:19-MJ-241, as well as my complaint
affidavit in support thereof, are attached hereto as Exhibit 2
and incorporated herein by reference.[7]

C.   **March 2019 Warrants to Search Locations Associated with AVENATTI and EA LLP**

21.  On March 24, 2019, in case numbers 8:19-MJ-242, 8:19-
MJ-243, and 8:19-MJ-244, I submitted an affidavit in support of
applications for warrants to search AVENATTI's residence in Los
Angeles and two other locations (the "March 2019 affidavit").
The Honorable Douglas F. McCormick, United States Magistrate
Judge, issued the warrants that same day (the "March 2019 search
warrant").  The March 2019 affidavit in support for the search
warrants in case numbers 8:19-MJ-242,[8] 8:19-MJ-243, and 8:19-MJ-

---

[7] A copy of the application for the February 2019 search
warrant, including my February 2019 affidavit, were also
incorporated by reference and attached to the criminal complaint
in case number 8:19-MJ-241.  Accordingly, I have not included a
duplicate copy of the February 2019 search warrant application,
as part of Exhibit 2 to this affidavit.

[8] On March 25, 2019, to execute the warrant issued in case
number 8:19-MJ-242, IRS-CI agents went to 10000 Santa Monica
Boulevard, Unit 2205 in Los Angeles, California, the location
identified as the premise to be search in case number 8:19-MJ-

**EXHIBIT 6**
**Page 37 of 86**

USAO_00134483

244, is attached hereto as Exhibit 3 and incorporated herein by reference.[9]

22. The items to be seized set forth in Attachment B to this search warrant application are largely identical to the items to be seized set forth in Attachments B-1 through B-3 of the March 2019 search warrants. The items to be seized in Attachment B to this search warrant application principally differ from items to be seized set forth in Attachments B-1 through B-3 of the March 2019 warrants in that Attachment B to this search warrant application includes items pertaining to Client 1, Client 2, the private jet AVENATTI purchased using Client 2's settlement funds, the Super Bowl Clients, and a separate entity controlled by AVENATTI called "Augustus LLP." (See Attachment B ¶¶ 1.a, 1.t, 1.u, 1.v, 1.y, 1.ff.)

23. The privilege review protocols set forth in Attachment B to this search warrant application are also largely identical to the privilege review protocols set forth in Attachments B-1 through B-3 of the March 2019 search warrants. The principal

_____

242, and learned that AVENATTI moved from Unit 2205 to Unit 2107. As a result, IRS-CI SA Leia R. Bellis presented a new application for search warrant with an affidavit that she swore out for Unit 2107, to Judge McCormick on March 25, 2019, in case number 8:19-MJ-247. As the facts and circumstances related to the change in apartment numbers were the only different facts presented in that affidavit and warrant, I have not attached that warrant as an exhibit.

[9] A copy of the application for the February 2019 search warrant, including my February 2019 affidavit, and the criminal complaint, were also incorporated by reference and attached to the March 2019 search warrant applications and the affidavits attached thereto in case numbers 8:19-MJ-242, 8:19-MJ-243, and 8:19-MJ-244. Accordingly, I have not included a duplicate copy of the February 2019 search warrant application or the criminal complaint, as part of Exhibit 3 to this affidavit.

**EXHIBIT 6**
**Page 38 of 86**

USAO_00134484

difference is that the privilege review protocol set forth in Attachment B to this search warrant application does not address the search of physical locations and non-digital evidence because the instant search warrant application only covers the search of digital devices that are already in IRS-CI's custody.

## D. Additional Evidence Regarding AVENATTI's Scheme to Defraud His Legal Clients

24. As noted above, evidence establishing probable cause to believe AVENATTI committed all of the Subject Offenses is set forth in my February 2019 (Ex. 1) and March 2019 affidavit (Ex. 3). This evidence includes evidence that AVENATTI embezzled funds from at least two sets of his legal clients, namely, Client 3 (Ex. 1, § IV.G; Ex. 3, § VI.C), and Clients 4 and 5 (Ex. 3, § VI.D). In this section of the instant affidavit, I set forth additional evidence that IRS-CI has discovered since the execution of the March 2019 search warrants regarding the embezzlement offenses. This additional evidence shows that AVENATTI embezzled from additional victim-clients beyond those discussed in the February 2019 and March 2019 affidavits.

### 1. Evidence Regarding AVENATTI's Embezzlement of Client 1's Settlement Funds

25. There is probable cause to believe that in or about January 2015 AVENATTI embezzled Client 1's portion of a $4,000,000 settlement payment from the County of Los Angeles. As set forth in greater detail below, the evidence collected to date demonstrates that AVENATTI: (a) negotiated a $4,000,000 settlement with the County of Los Angeles on behalf of Client 1;

**EXHIBIT 6**
**Page 39 of 86**

USAO_00134485

(b) made false representations to Client 1 regarding the terms of the settlement agreement; (c) embezzled Client 1's portion of the $4,000,000 settlement payment; (d) provided Client 1 with periodic payments of $1,000 to $1,900, which AVENATTI falsely described as "advances" on the yet-to-be-received $4,000,000 settlement payment, in order to lull Client 1 and prevent Client 1 from discovering that AVENATTI embezzled Client 1's portion of the $4,000,000 settlement payment.

        a.   <u>The $4,000,000 Settlement Agreement with the County of Los Angeles</u>

26. Based on my review of publicly available court documents and records obtained from Hurrell Cantrall LLP, which represented the County of Los Angeles in litigation involving Client 1, I have learned the following:

        a.   In or about October 2012, EA LLP and AVENATTI filed a lawsuit against the County of Los Angeles and others on behalf of Client 1 (the "L.A. County Lawsuit").

        b.   In or about June 2013, the L.A. County Lawsuit was removed to the United States District Court for the Central District of California.

        c.   The L.A. County Lawsuit alleged that the County of Los Angeles violated Client 1's constitutional rights, causing Client 1 to suffer severe emotional distress and severe physical injuries, including paraplegia.

        d.   On or about November 7, 2014, the parties appeared in federal court for a status conference in connection

**EXHIBIT 6**
**Page 40 of 86**

USAO_00134486

with the L.A. County Lawsuit.  During the status conference, AVENATTI stated the following:

> Your Honor, for the last week or two, we've been in active settlement discussions involving a retired judge, Louis Meisinger. The good news is is [sic] that the parties have reached a tentative settlement relating to all material terms with the exception of one material term, which is providing some angst and for which Mr. Hurrell and I decided yesterday that perhaps the Court, based on Your Honor's experience, could assist us with resolving.
>
> And that one material term is mainly when the settlement dollars are to be paid to [Client 1], who, as the Court knows, is a paraplegic and is in need of the funds.

AVENATTI further stated:  "[Client 1] would like the moneys paid within 60 days, namely today or Monday so that he can utilize the money for his living expenses and other needs."

e.    On or about December 11, 2014, the parties filed a status report regarding the settlement of the L.A. County Lawsuit, which settlement required approval from the Los Angeles County Board of Supervisors.  In the status report, the parties stated they expected the settlement to be approved by the Board of Supervisors and funded by March 6, 2015.

f.    On or about January 6, 2015, AVENATTI sent an email to counsel for the County of Los Angeles regarding the settlement agreement.  AVENATTI stated:  "Can you please provide an update on the schedule?  We are trying to get [Client 1] taken care of."

g.    On or about January 13, 2015, the Board of Supervisors approved the settlement agreement for the L.A. County Lawsuit.

**EXHIBIT 6**
**Page 41 of 86**

USAO_00134487

Case 8:19-cr-00061-JVS Document 305-3 Filed 03/28/20 Page 185 of 285 Page ID #:4750

      h.   On or about January 21, 2015, AVENATTI emailed counsel for the County of Los Angeles the signature page for the settlement agreement with the County of Los Angeles.

      i.   On or about January 22, 2015, counsel for the County of Los Angeles sent AVENATTI via email and U.S. mail the fully executed settlement agreement.  The settlement agreement stated:

> In exchange for a complete resolution of the [L.A. County] Lawsuit, Defendants, by and through the County of Los Angeles, shall pay to Plaintiff **Four Million Dollas ($4,000,000)** (the "Settlement Funds"), subject to approval by the Los Angeles County Board of Supervisors.  The parties acknowledge that the Court in this matter has issued an order outlining a time table to present this settlement for approval by the Los Angeles County Board of Supervisors, and thereafter issuance of a settlement draft.  It is understood by the parties that if the time table is not complied with, this settlement agreement may be revoked by either party.
>
> The Parties expressly agree that the Lawsuit shall not be dismissed until five (5) business days following receipt by Eagan Avenatti of the Settlement Funds as provided above.

(Emphasis in original.)  The executed settlement agreement was signed by a representative for the County of Los Angeles, counsel for the County of Los Angeles, and AVENATTI, and purportedly signed by Client 1.[10]  The settlement agreement did not contain any confidentiality provisions.  Additionally, the settlement agreement was not dependent on the creation of any sort of trust for Client 1.

---

[10]  When IRS-CI interviewed Client 1, he indicated that the signature on the settlement agreement looked funny to him, but that it could possibly have been his signature.

**EXHIBIT 6**
**Page 42 of 86**

USAO_00134488

    j.   On or about January 22, 2015, AVENATTI sent an email to counsel for the County of Los Angeles instructing the County to make the check for the settlement payable to "Eagan Avenatti, LLP Client Trust Account."

    k.   On or about January 29, 2015, the Count of Los Angeles sent to AVENATTI and EA LLP via messenger: (1) a letter enclosing the "settlement check" of $4,000,000; (2) check number TS 0021400949, dated January 26, 2015, to "Eagan Avenatti, LLP Attorney Client Trust Account" in the amount of $4,000,000; and (3) a stipulation to dismiss the L.A. County Lawsuit and corresponding proposed order.

    l.   On or about February 10, 2015, the parties filed a stipulation to dismiss the L.A. County Lawsuit with prejudice. The order dismissing the L.A. County Lawsuit was entered later that same date.

    b.   <u>Bank Account Records Relating to the $4,000,000 Settlement and Client 1</u>

27.   Based on my review of bank records, I have learned the following regarding the disposition of the $4,000,000 settlement payment from the County of Los Angeles:

    a.   On or about January 29, 2015, the $4,000,000 settlement check (check number TS 0021400949) from the County of Los Angeles to EA LLP's attorney client trust account was deposited into EA LLP's California Bank & Trust ("CB&T") attorney trust account ending in 8541 ("EA Trust Account 8541"). Prior to the $4,000,000 deposit, EA Trust Account 8541 had an account balance of $0.00.

20

**EXHIBIT 6**
**Page 43 of 86**

USAO_00134489

b.    Between on or about January 30, 2015, and on or about March 30, 2015, a total of approximately $3,125,898 was transferred from EA Trust Account 8541 to a EA LLP's CB&T operating account ending in 2851 ("EA Account 2851").

c.    Between on or about January 30, 2015, and on or about March 30, 2015, approximately $1,721,000, the vast majority of which derived from the $4,000,000 settlement payment, was transferred from EA Account 2851 to A&A's CB&T account ending in 0661 ("A&A Account 0661").[11]  Substantial portions of the funds transferred to A&A Account 0661 were then used for AVENATTI's own purposes.[12]  For example, during this time period, AVENATTI made the following payments from A&A Account 0661 for his personal purposes:

i.    Between on or about January 30, 2015, and on or about February 27, 2015, A&A paid approximately $505,000 to GBUS.

ii.    Between on or about January 30, 2015, and on or about March 27, 2015, A&A paid a total of approximately

---

[11]  Prior to the transfer of approximately $3,125,898 from EA Trust Account 8541 to EA Account 2851, EA Account 2851 had an account balance of approximately $25,318.  Between January 30, 2015, and March 30, 2015, approximately $84,161 was transferred to EA Account 2851 from other sources, and approximately $50,000 that had originally been transferred from EA Account 2851 to A&A Account 0661 was transferred back to EA Account 2851.

[12]  Prior to the transfer of approximately $450,000 from EA Account 2851 to A&A Account 0661 on or about January 30, 2015, A&A Account had an account balance of approximately $17,491. Between January 30, 2015, and March 30, 2015, the only deposits into A&A Account 0661 came from EA Account 2851.

21

EXHIBIT 6
Page 44 of 86

USAO_00134490

$315,000 to GB Autosport LLC, which managed AVENATTI's car racing team.

   iii. Between on or about February 20, 2015, and on or about March 30, 2015, A&A paid approximately $220,000 to AVENATTI's personal Bank of America account.

   iv. Between on or about January 30, 2015, and on or about February 6, 2015, A&A paid a total of approximately $200,000 to Gallo Builders, Inc., a custom home builder in Newport Beach, California.[13]

   v. Between on or about February 3, 2015, and on or about March 18, 2015, A&A paid a total of approximately $82,236 to Porsche, including an approximately $79,800 payment on March 18, 2015.

   vi. Between on or about January 30, 2015, and on or about March 9, 2015, A&A paid a total of approximately $36,500 to AVENATTI's ex-wife, C.C.

   vii. On or about February 3, 2015, A&A paid approximately $80,372 to Chase Home Finance in connection with the mortgage on AVENATTI's residence in Laguna Beach, California.[14]

---

[13] During a Judgment Debtor examination on March 15, 2019, AVENATTI testified under oath and admitted that the payments from the A&A Account 0661 to Gallo Builders were personal expenses of AVENATTI at his personal residence and not business expenses of A&A.

[14] Bank records reflect that on or about January 29, 2015, a prior payment to Chase Home Finance of approximately $80,372 was returned to A&A Account 0661 due to insufficient funds in A&A Account 0661.

**EXHIBIT 6**
**Page 45 of 86**

USAO_00134491

d.   By no later than July 6, 2015, the entire $4,000,000 settlement payment from the County of Los Angeles for Client 1 had been drained from EA Trust Account 8541.[15]

e.   IRS-CI has yet to identify any direct payments from EA Trust Account 8541 to Client 1 of money that was traceable to the $4,000,000 settlement payment EA LLP received from the County of Los Angeles to hold in trust on Client 1's behalf.

28.   Rather than transfer Client 1's portion of the $4,000,000 settlement to Client 1, AVENATTI made relatively-small periodic payments to Client 1, which AVENATTI described as advances on the purportedly yet-to-be-received settlement payment.  (See infra ¶ 30.i.)  Specifically, based on IRS-CI's review of records for bank accounts AVENATTI controlled, I understand that between in or about July 2015 and in or about December 2018, AVENATTI caused EA LLP or A&A to make at least 69 payments, each ranging from approximately $1,000 to $1,900 and totaling approximately $122,200, to Client 1.  The $122,200 total, however, does not currently include any purported "advance" payments AVENATTI made to Client 1 between December 2018 and March 2019, as IRS-CI is still in the process of analyzing bank records for that time period.

29.   AVENATTI also appears to have paid for Client 1's rent at various assisted living facilities.  Specifically, based on

_____

[15] On March 31, 2015, approximately $3,034,514 was deposited into EA Trust Account 8541 from another source.  This intervening deposit makes it more difficult for IRS-CI to trace the disposition of the remaining portions of the $4,000,000 settlement payment.

**EXHIBIT 6**
**Page 46 of 86**

USAO_00134492

IRS-CI's review of bank records, I understand that between in or about February 2015 and in or about December 2018, AVENATTI caused a total of at least approximately $72,000 to be paid from bank accounts AVENATTI controlled to assisted living facilities where Client 1 resided.[16] This total, however, does not currently include any rent payments AVENATTI made on Client 1's behalf between December 2018 and March 2019, as IRS-CI is still in the process of analyzing bank records for that time period.

c. Information Client 1 Provided to IRS-CI

30. On or about March 31, 2019, IRS-CI SA Gerry Carmona and IRS-CI SA James Kim participated in an interview of Client 1. Client 1 was accompanied by his personal attorney. Based on my review of a memorandum summarizing the interview with Client 1 and discussions with SA Carmona and SA Kim, I understand that Client 1 provided, in substance and in part, the following information:

a. EA LLP and AVENATTI represented Client 1 in connection with a lawsuit against the County of Los Angeles. Client 1's parents and sister helped Client 1 select EA LLP and AVENATTI to represent Client 1.

b. Client 1 did not recall signing an engagement letter or contract with AVENATTI or EA LLP, but assumed a contract was signed.

---

[16] I understand that EA LLP also paid for Client 1's rent at assisted living and/or rehabilitation facilities prior to the execution of the settlement agreement with the County of Los Angeles in January 2015. Although additional financial analysis is necessary, IRS-CI currently believes that the total amount EA LLP paid prior to the execution of the January 2015 settlement agreement was between approximately $350,000 and $400,000.

24

EXHIBIT 6
Page 47 of 86

USAO_00134493

c.    Client 1 reviewed the signature page of the
January 21, 2015, settlement agreement with the County of Los
Angeles.  Client 1 thought his signature looked "funny" to him,
but said that he may have signed the document.  Client 1 said
that he was never presented with the full settlement agreement
and never saw the $4,000,000 settlement amount.

d.    AVENATTI told Client 1 that a settlement had been
reached with the County of Los Angeles.  AVENATTI may have told
Client 1 the amount Client 1 would receive after fees and
expenses, but Client 1 did not recall ever being told the
settlement was for $4,000,000.

e.    AVENATTI told Client 1 that under the terms of
the settlement agreement, he would receive approximately $46,000
per quarter for 10 years.  AVENATTI told Client 1 that the
County of Los Angeles does not pay settlements in a lump-sum and
would only pay the settlement in quarterly payments over a
certain period of time.  AVENATTI also told Client 1 that the
settlement proceeds could not be paid until the County of Los
Angeles approved a Special Needs Trust[17] for Client 1.

f.    Prior to the interview with IRS-CI, Client 1 had
never seen the $4,000,000 settlement payment from the County of
Los Angeles.  AVENATTI never told Client 1 that EA LLP had
received a $4,000,000 settlement payment from the County of Los
Angeles in January 2015.

_____

[17] A "Special Needs Trust" is a specialized trust that
allows for a person living with disabilities to maintain his or
her eligibility for public assistance benefits.  (See infra
¶ 32.)

25

EXHIBIT 6
Page 48 of 86

USAO_00134494

g.   Client 1 never authorized AVENATTI to use any of the settlement funds intended for Client 1 for AVENATTI's personal or business purposes.  AVENATTI never told Client 1 that Client 1's portion of the settlement funds would be used for AVENATTI's own personal or business purposes.

h.   Had Client 1 known that EA LLP received the $4,000,000 settlement payment, Client 1 would have wanted a lump-sum payment and would have put the money into a Special Needs Trust.  Client 1 had been advised by various people to create a Special Needs Trust so he would not lose his Supplemental Security Income ("SSI") or Medi-Cal benefits. AVENATTI told Client 1 that AVENATTI would create a Special Needs Trust for Client 1 and that he had created Special Needs Trusts for other clients in the past.

i.   Client 1 was shown a spreadsheet detailing approximately 69 payments, each ranging from $1,000 to $1,9000, to Client 1 from EA LLP or A&A between July 2015 and December 2018.  During this time period, Client 1 was told that the settlement had not been finalized, but that AVENATTI would "advance" Client 1 money against the settlement amount.  Client 1 said that he last received a payment from AVENATTI on or about March 18, 2019, while Client 1 was visiting family.

j.   Client 1 also said that AVENATTI paid Client 1's rent at various assisted living facilities.  Client 1 said that recently Client 1's rent had not been paid for a period of approximately six months, resulting in late fees.

26

**EXHIBIT 6**
**Page 49 of 86**

k.  In approximately 2017, Client 1 told AVENATTI he wanted to buy a house.  AVENATTI told Client 1 buying a house would be a good investment and agreed to help Client 1. AVENATTI found a real estate broker ("Broker 1") to represent Client 1.  AVENATTI, however, wanted Client 1 to deal with AVENATTI instead of dealing with Broker 1 directly.

l.  Client 1 eventually went into escrow on a property in the Canoga Park area.  While in escrow, AVENATTI told Client 1 that there was a problem and the County of Los Angeles still needed to approve Client 1's Special Needs Trust. AVENATTI told Client 1 he had a meeting with the County of Los Angeles to resolve the issue, but the story from AVENATTI went on and on and the house eventually fell out of escrow.

m.  Client 1 is no longer receiving SSI benefits. Client 1 said that, sometime in the three months prior to the interview with IRS-CI, Client 1 received a letter from SSI indicating that Client 1's SSI benefits would be stopped.[18] AVENATTI told Client 1 that this was a mistake and that AVENATTI would take care of it.

n.  In or about February or March 2019 (approximately one month before the interview with IRS-CI), AVENATTI told Client 1 that the County of Los Angeles was still not making the settlement payments because the Special Needs Trust still had not been approved.

---

[18]  Client 1's counsel subsequently provided IRS-CI with the documents Client 1 received from the Social Security Administration ("SSA").  (See infra ¶ 31.e.i.)

27

EXHIBIT 6
Page 50 of 86

USAO_00134496

Case 8:19-mj-00419-DUTY SEALED Document 1-1 SEALED Filed 05/24/19 Page 51 of
330 Page ID #:557
Case 8:19-cr-00061-JVS Document 305-3 Filed 03/28/20 Page 194 of 285 Page ID
#:4207

o.   On Friday, March 22, 2019, AVENATTI called
Client 1 and told Client 1 that AVENATTI was in Client 1's
neighborhood and wanted to stop by Client 1's residence.
AVENATTI told Client 1 that the Special Needs Trust had been
approved and asked Client 1 what kind of payment plan Client 1
wanted.

p.   The next day, Saturday, March 23, 2019, AVENATTI
returned to Client 1's residence with a document for Client 1 to
sign.  AVENATTI told Client 1 that the Special Needs Trust was
done and that once Client 1 signed the document he would start
receiving the settlement payments.  Client 1 did not read the
document.  Rather, AVENATTI pointed out the highlights of the
document to Client 1 and then had Client 1 sign the document.
AVENATTI had the document open to the specific page for Client 1
to sign.  AVENATTI did not have Client 1 date the document and
Client 1 did not recall there being a line for the date on the
signature page.  Client 1 did not receive a copy of the document
from AVENATTI.  AVENATTI instead told Client 1 that J.R.,
AVENATTI's office manager, would send Client 1 a copy of the
document at a later time.  AVENATTI also told Client 1 not to
discuss the matter with anyone or Client 1 would lose the money.

q.   During the March 23, 2019, meeting there was also
discussions regarding Client 1's portion of the settlement.
Based on these discussions, Client 1 understood that he was to
receive approximately $1.9 million.  AVENATTI told Client 1 that
AVENATTI's share had already been deducted or factored into the
$1.9 million settlement amount.

**EXHIBIT 6**
**Page 51 of 86**

USAO_00134497

r.   On Sunday, March 24, 2019, AVENATTI returned to Client 1's residence again.  During this meeting, AVENATTI wanted Client 1 to initial the document that Client 1 had signed on March 23, 2019.  AVENATTI told Client 1 that J.R. would be mad at AVENATTI if AVENATTI did not get Client 1's initials on the document.

s.   Client 1 also recalled signing a second document during the meetings on March 23 and March 24, 2019, which document stated that AVENATTI had done a diligent job representing Client 1.  AVENATTI told Client 1 that AVENATTI wanted to put the document on AVENATTI's website to show what a great job AVENATTI had done on Client 1's case.[19]  Client 1 also recalled AVENATTI asking Client 1 about Client 1's medication.

t.   Client 1 trusted AVENATTI with everything. AVENATTI was involved in any big decisions involving Client 1.

u.   Client 1 was asked whether any of Client 1's mental health issues affected his memory.  Client 1 said that his mental health issues have no impact on his memory, he has never had memory issues, and he does not take any medication for memory issues.

v.   SA Carmona and SA Kim both indicated that Client 1 appeared to be in full possession of his faculties throughout the interview and that Client 1 appeared to them to be intelligent and articulate.

---

[19]  On April 11, 2019, shortly after the Indictment was publicly disclosed, AVENATTI posted what appeared to be a copy of this document on Twitter.com in support of his claim that he is innocent of the charges.  I understand that AVENATTI has since deleted this message from his Twitter account.

29

**EXHIBIT 6**
**Page 52 of 86**

USAO_00134498

31.   Client 1 allowed IRS-CI to take photographs of text messages between Client 1 and AVENATTI and/or J.R., which were dated between April 2017 and March 2019.  Client 1 also provided a copy of a text message with a family friend, B.P.  Client 1's text messages, including the following, appear to be consistent with Client 1's statements to IRS-CI regarding the purported "advance" payments Client 1 received from AVENATTI and Client 1's attempt to purchase a house in 2017:

a.   Between in or about May 2017 and in or about June 2017, Client 1 sent AVENATTI and J.R. multiple text messages regarding Client 1's attempted purchase of a house.  For example, on or about May 24, 2017, Client 1 sent AVENATTI a text message asking if there was "[a]ny word from the seller on our latest offer?"  AVENATTI responded the next day and provided Client 1 with the details of the seller's counter offer and AVENATTI's planned response.

b.   On or about August 14, 2017, Client 1 sent a text message to B.P. stating: "House didn't close move is off for tomorrow."  The next day, on or about August 15, 2017, B.P. asked Client 1: "Any problem with close other than a delay?"  Client 1 responded:  "Waiting for the county to approve the special needs trust."

c.   Between 2017 and March 2019, Client 1 sent AVENATTI and/or J.R. numerous text messages asking AVENATTI and/or J.R. to deposit funds into Client 1's bank account. Client 1 often had to make repeated requests for funds before AVENATTI or J.R. made a deposit into Client 1's bank account.

**EXHIBIT 6**
**Page 53 of 86**

USAO_00134499

For example, on or about October 6, 2018, Client 1 sent AVENATTI two text messages stating:

> Just FYI I asked for a deposit last Friday to take place this past thurs. two days ago. That is a weeks notice. [J.R.] didn't do it till yesterday so the deposit is not available. I now have no money over the weekend. I literally have no money for food. This is really hard on me Michael, I don't know what to do.
>
> And it's a holiday weekend so the funds are not available at the earliest till Tuesday. That is if I can convince them to take off the hold.

d.   Between September 2017 and March 2019, Client 1 sent a number of text messages to AVENATTI and/or J.R. in which Client 1 indicated that his rent at his assisted living facility was late and requested that AVENATTI and/or J.R. send payment to his landlord. For example, on or about February 15, 2019, Client 1 sent AVENATTI and J.R. a text message stating that Client 1's landlord "just gave me a notice saying I have three days to pay the rent or else I have to move out."

e.   Between in or about October 2018 and in or about March 2019, Client 1 sent multiple text messages to AVENATTI and/or J.R. regarding Client 1's SSI benefits, including the following:

i.   On or about November 10, 2018, Client 1 appears to have sent J.R. photographs of a letter Client 1 received from SSA regarding Client 1's SSI benefits.[20]  Client 1

---

[20]  Although the photographs associated with this text message were no longer available on Client 1's phone when Client 1 met with IRS-CI, based on the date of the letter from SSA, the date of the text message to J.R., and Client 1's subsequent text messages to AVENATTI and/or J.R. regarding the SSA issue, I believe that photographs of the SSA letter were likely attached to this particular text message.

31

EXHIBIT 6
Page 54 of 86

USAO_00134500

Case 8:19-mj-00061-DUTY-SEALED Document 1-1 SEALED Filed 03/24/19 Page 5 of
330    Page ID #:561
Case 8:19-mj-00061-DUTY-SEALED Document 305-3 Filed 03/28/20 Page 198 of 285    Page ID #:671

subsequently provided, through his counsel, a copy of this
letter to IRS-CI.  The letter from SSA stated that SSA needed
additional information in order to further evaluate Client 1's
eligibility for SSI benefits, including information regarding:
(1) Client 1's rental agreement; (2) the "settlement award
letter" from the County of Los Angeles; (3) disbursements from
the settlement since October 2016; (4) verification that the
"trust has or has not been established"; and (5) a letter from
Client 1's attorney about "monthly loan amounts" since October
2016.

      ii.  On or about November 26, 2018, Client 1 sent
a text message to AVENATTI stating:  "I sent that letter [from]
SSI that is requesting docs from you to [J.R.] a week and a half
ago.  I included a doc you don't have which u will need to send
along with the rest, my rental agreement with [Client 1's
landlord].  I think it needs to be sent this week."  AVENATTI
responded that same day, "We will handle."

      iii. On or about January 21, 2019, Client 1 sent
a text message to AVENATTI and J.R. stating:  "I received a
letter from SSI on Saturday.  They have stopped my SSI as of
February because they did not receive the requested documents.
I will text the letter to [J.R.] as soon as I get up in my
chair."  AVENATTI responded that same day:  "This is in error.
We will fix it forthwith.  Don't worry."

      f.  On or about March 22, 2019, at approximately 7:00
p.m., after meeting with AVENATTI, Client 1 sent AVENATTI a text

**EXHIBIT 6**
**Page 55 of 86**

USAO_00134501

message telling him that he would be available to meet with AVENATTI again from 1:00 p.m. to 5:30 p.m. on March 23, 2019.

d.  Information Regarding the Purported Special Needs Trust for Client 1

32.  As noted above, between in or about January 2015 and in or about March 2019, AVENATTI falsely represented to Client 1 that the County of Los Angeles could not make the settlement payment until a Special Needs Trust for Client 1 had been approved.  (See supra ¶¶ 30.e., 30.n.)  Based on my review of publicly available information and discussions with a representative from the California Department of Health Care Services ("CA DHCS"), I have learned the following regarding Special Needs Trusts:

a.  A Special Needs Trust is a specialized trust that allows for a person living with disabilities to maintain his or her eligibility for public assistance benefits despite having assets that would make the person ineligible for those benefits.

b.  According to CA DHCS's website, there are two different types of Special Needs Trusts: (1) a first party Special Needs Trust; and (2) a third party Special Needs Trust. First party Special Needs Trusts are "funded with assets that belong to the trust beneficiary or to which the beneficiary was legally entitled (e.g., assets from an award or settlement, etc.).  Third party Special Needs Trusts are funded with "assets belonging to a person other than the trust beneficiary, and to which the beneficiary never had possession or legal interest."

33

**EXHIBIT 6**
**Page 56 of 86**

USAO_00134502

It appears that any Special Needs Trust for Client 1 would have
needed to be a first party Special Needs Trust.

      c.  First party Special Needs Trusts typically
require notice and payback to the State of California upon the
death of a beneficiary or earlier termination of the trust.
Based on my discussions with a CA DHCS representative, I
understand that such notice would typically need to be provided
to CA DHCS and to Medi-Cal through the Los Angeles County
Department of Public Social Services ("LA DPSS").

   33.  IRS-CI's investigation to date has not discovered any
evidence suggesting that AVENATTI made a legitimate effort to
establish a Special Needs Trust for Client 1, let alone that
AVENATTI submitted to the County of Los Angeles for approval a
Special Needs Trust for Client 1.

      a.  <u>First</u>, on or about April 5, 2019, after a
thorough search of Cal DHCS's records, CA DHCS's Special Needs
Trust Unit advised IRS-CI that it does not possess any documents
or records relating to an actual or proposed Special Needs Trust
for Client 1.

      b.  <u>Second</u>, on or about April 9, 2019, after
searching LA DPSS's case records from June 2015 to the present,
LA DPSS advised IRS-CI that it was unable to locate any Special
Needs Trust records relating to Client 1.  LA DPSS also
conducted a search for conservatorship/authorized representative
documents and found no such records for Client 1.

**EXHIBIT 6**
**Page 57 of 86**

USAO_00134503

e. <u>Information Regarding Client 1's SSI Benefits</u>

34.  As noted above, AVENATTI told Client 1 that AVENATTI would respond on Client 1's behalf to a request that Client 1 provide SSA information that SSA requested to evaluate Client 1's continued eligibility for SSI benefits, including information regarding the settlement agreement with the County of Los Angeles, the purported Special Needs Trust, and the monthly payments from AVENATTI.  (<u>See</u> <u>supra</u> ¶ 31.e.)  Based on discussions with Special Agents with SSA's Office of Inspector General, I have learned the following:

a.  On or about April 13, 2016, AVENATTI and EA LLP submitted a letter to SSA on behalf of Client 1.  In this letter, AVENATTI stated:

> From February 2014 to the present, this law firm has been advancing [Client 1] approximately $1,250 a month.  As of this time, the court has not entered an "award letter" to Client 1.

AVENATTI's statements to SSA appear to be consistent with the false statements that AVENATTI made to Client 1.

b.  On or about April 8, 2019, SSA advised IRS-CI that it had searched its files and was unable to locate any other letters from AVENATTI relating to Client 1.  SSA was also unable to locate any records of calls to SSA from AVENATTI or EA LLP.

f. <u>Information Regarding AVENATTI's Meetings with Client 1 on March 22, 23, and 24, 2019</u>

35.  The evidence IRS-CI has collected to date demonstrates that, after AVENATTI was accused of stealing Client 1's money during a public judgment debtor examination on March 22, 2019,

**EXHIBIT 6**
**Page 58 of 86**

USAO_00134504

AVENATTI met with Client 1 in an attempt to lull Client 1 and prevent Client 1 from discovering that AVENATTI had embezzled Client 1's portion of the $4,000,000 settlement payment.

   a.   <u>First</u>, on or about March 22, 2019, AVENATTI testified under oath during a judgment debtor examination in <u>In re: Eagan Avenatti, LLP</u>, No. 8:18-CV-10644-VAP-KES (C.D. Cal.), in Courtroom 8A of the United States Courthouse in Los Angeles. Based on my review of a transcript of those proceedings, I learned that AVENATTI was questioned regarding Client 1.  For example, AVENATTI was directly asked whether he stole Client 1's money and responded, "Absolutely not."

   b.   <u>Second</u>, as noted above, Client 1 told IRS-CI that AVENATTI met with Client 1 at Client 1's residence on March 22, 2019, and that AVENATTI then returned to Client's residence on March 23 and March 24, 2019, to have Client 1 sign two documents.

   c.   <u>Third</u>, cell-site and GPS information[21] for AVENATTI's cellular telephone confirmed that AVENATTI visited Client 1's residence on March 22, March 23, and March 24, 2019. Specifically, based on IRS-CI's review of the cell-site and GPS information, I have learned the following:

   i.   On March 22, 2019, at approximately 6:30 p.m., AVENATTI's cellular telephone was in the vicinity of Client 1's residence.

_____

   [21]   On March 7, 2019, in case number 8:19-MJ-151, the Honorable Douglas F. McCormick issued a warrant for historical cell-site and prospective cell-site and GPS information relating to the cellular telephone used by AVENATTI.

**EXHIBIT 6**
**Page 59 of 86**

USAO_00134505

       ii.  On March 23, 2019, at approximately 1:30 p.m., AVENATTI's cellular telephone was in the vicinity of Client 1's residence.

       iii. On March 24, 2019, at approximately 2:30 p.m., AVENATTI's cellular telephone was in the vicinity of Client 1's residence.

### 2. *Evidence Regarding AVENATTI's Embezzlement of Client 2's Settlement Funds*

36.  There is probable cause to believe that in or about January 2017, AVENATTI embezzled Client 2's portion of a $2,750,000 settlement payment from Individual 1.  As set forth in greater detail below, the evidence collected to date demonstrates that AVENATTI: (a) negotiated a $3,000,000 settlement with Individual 1 on behalf of Client 2; (b) made numerous false representations to Client 2 regarding the terms of the settlement agreement; (c) embezzled Client 2's portion of the initial $2,750,000 settlement payment from Individual 1 and used the funds to purchase a private jet; (d) provided Client 2 with monthly payments of approximately $16,000, which AVENATTI falsely described as monthly settlement payments from Individual 1, in order to lull Client 2 and prevent Client 2 from discovering that AVENATTI embezzled Client 2's portion of the initial $2,750,000 settlement payment.

### a.   Client 2's $3,000,000 Settlement Agreement with Individual 1

37.  Based on my review of documents IRS-CI obtained through the investigation, I have learned the following:

**EXHIBIT 6**
**Page 60 of 86**

USAO_00134506

a.    Between in or about December 2016 and in or about January 2017, EA LLP and AVENATTI represented Client 2 in connection with potential legal claims against Individual 1.

b.    On or about January 7, 2017, during a confidential mediation proceeding in Los Angeles, California, AVENATTI negotiated a settlement agreement between Client 2 and Individual 1. Under the terms of the settlement agreement, Individual 1 was required to make an initial payment to Client 2 of approximately $2,750,000 by on or about January 28, 2017, and an additional payment to Client 2 of approximately $250,000 on or about November 1, 2020, if certain additional specified conditions were met, for a total of approximately $3,000,000.

c.    Between on or about January 16, 2017, and on or about January 25, 2017, AVENATTI sent Individual 1's lawyer multiple emails regarding the status of the initial $2,750,000 settlement payment. AVENATTI also left Individual 1's lawyers a number of voicemails regarding the status of the settlement payment and expressing concern that the initial $2,750,000 settlement payment had yet to be received.

d.    On or about January 25, 2017, Individual 1 wired approximately $2,750,000 to EA LLP's CB&T attorney trust account ending in 8671 ("EA Trust Account 8671").

b.    <u>Bank Account Records Relating to the $2,750,000 Settlement Payment and Client 2</u>

38.  Based on IRS-CI's review of bank account records, I have learned the following information regarding the disposition of the initial $2,750,000 settlement payment from Individual 1:

38

**EXHIBIT 6**
**Page 61 of 86**

USAO_00134507

a.   As of on or about January 1, 2017, the account balance in EA Trust Account 8671 was approximately $0.23.

b.   On or about January 25, 2017, EA Trust Account 8671 received an approximately $2,750,000 wire transfer from Individual 1.

c.   On or about January 26, 2017, AVENATTI caused approximately $2,500,000 to be transferred from EA Trust Account 8671 to a Chase Bank attorney trust account for The X-Law Group ending in 7608 ("X-Law Account 7608").  That same day, at the direction of AVENATTI, The X-Law Group wired approximately $2,500,000 from X-Law Account 7608 to Honda Aircraft Company LLC.  I understand that these funds were applied to the purchase of a private Honda jet.

d.   On or about January 26, 2017, AVENATTI also caused the remaining $250,000 of the $2,750,000 settlement payment to be transferred from EA Trust Account 8671 to EA Account 2851 and then from EA Account 2851 to A&A Account 0661.

e.   Between on or about March 15, 2017, and on or about June 18, 2018, defendant AVENATTI caused approximately 11 payments totaling approximately $194,000 to be deposited into Client 2's bank account.  These payments were made from a variety of bank accounts controlled by AVENATTI, including A&A Account 0661, EA LLP's CB&T attorney trust account ending in 4613 ("EA Trust Account 4613"), EA LLP's CB&T attorney trust account ending in 3714 ("EA Trust Account 3714"), and a City National Bank account in the name of "Michal Avenatti Esq." ending in 3504 ("Avenatti Account 3504").  As noted below,

39

**EXHIBIT 6**
**Page 62 of 86**

USAO_00134508

AVENATTI falsely represented to Client 2 that these 11 payments constituted monthly settlement payments from Individual 1. (See infra ¶ 39.f.)

     c.   Information Provided by Client 2

39. On or about April 2, 2019, I participated in an interview with Client 2. I also participated in a follow-up interview with Client 2 on or about April 8, 2019. During these interviews, Client 2 provided, in substance and in part, the following information:

     a.   In or about December 2016, Client 2 retained EA LLP and AVENATTI to represent her in connection with potential claims against Individual 1. Under the terms of the attorney-client fee contract Client 2 signed, a copy of which was provided to IRS-CI, EA LLP was entitled to 33 percent of any recovery obtained prior to the filing of a lawsuit or arbitration claim, and 40 percent of any recovery obtained after the filing of a lawsuit or arbitration proceeding.

     b.   In or about January 2017, Client 2 and AVENATTI attended a mediation with Individual 1 in Los Angeles, California. At the conclusion of the mediation, AVENATTI told Client 2 that they had reached a settlement with Individual 1.

     c.   Client 2 told IRS-CI she believed that the total settlement amount was $3,600,000. AVENATTI did not provide Client 2 with an opportunity to read the settlement agreement before Client 2 signed the agreement. AVENATTI also did not give Client 2 a copy of the settlement agreement.

USAO_00134509

d.    AVENATTI falsely represented to Client 2 that, under the terms of the settlement agreement, Individual 1 would make an initial lump-sum payment, the entirety of which would be used to pay EA LLP's attorney fees (i.e., 33 percent of the total settlement amount) and costs, and then make approximately 96 monthly payments of approximately $20,000 over the course of the next eight years by which the remaining settlement funds would be paid to Client 2.    Client 2, however, understood that the first 12 monthly payments from Individual 1 would be approximately $16,000 per month because approximately $4,000 per month would be deducted to pay for Client 2's rent.[22]

e.    AVENATTI never disclosed to Client 2 that in January 2015 Individual 1 had wired an initial payment of $2,750,000 to EA Trust Account 8671.    AVENATTI never disclosed to Client 2 that AVENATTI used Client 2's portion of the $2,750,000 settlement payment for his own purposes, including to purchase a private jet.

f.    Client 2 confirmed that between March 2017 and June 2018 she received approximately 11 monthly payments totaling approximately $194,000.    AVENATTI falsely represented to Client 2 that these monthly payments were coming from Individual 1 in accordance with the terms of the settlement agreement.

g.    After Client 2 stopped receiving the purported monthly settlement payments in or about July 2018, AVENATTI

---

[22] On or about January 24, 2017, AVENATTI also caused a cashier's check to be purchased from EA Account 2851 for $51,935, which represented one year's rent for Client 2.

41

**EXHIBIT 6**
**Page 64 of 86**

USAO_00134510

represented to Client 2 that Individual 1 was not complying with the settlement agreement.  Between July 2018 and March 2019, AVENATTI repeatedly told Client 2 that AVENATTI would work on obtaining the missing monthly settlement payments from Individual 1.  Among other things, AVENATTI and Client 2 discussed the possibility of publicly attempting to garnish Individual 1's wages if Individual 1 did not make the monthly payments.

       h.  On or about March 24, 2019, AVENATTI met with Client 2 in Los Angeles, California.  During this meeting, AVENATTI told Client 2 that Client 2 would soon be receiving a payment from Individual 1 to make up for the purportedly missing monthly settlement payments from Individual 1 for July 2018 through March 2019.

      40.  Client 2 also produced documents to IRS-CI, including text message and email communications between Client 2 and AVENATTI.  The documents Client 2 produced to IRS-CI appear to be consistent with Client 2's statements to IRS-CI.  For example:

       a.  On or about July 31, 2018, Client 2 sent AVENATTI a text message stating:  "[S]orry to catch up so late but I have not received my deposit.  Is there anything we can do about the time, it's become a pattern of them not sending it unless you reach out."  AVENATTI responded:  "Still?  Let me see as this is not right.  I'm on it."

       b.  On or about September 25, 2018, Client 2 sent AVENATTI a text message stating:  "I wanted to follow up on the

<div align="center">42</div>

<div align="center">**EXHIBIT 6**<br>**Page 65 of 86**</div>

USAO_00134511

deposits and let you know I haven't received anything from them."  AVENATTI responded:  "???? I will find out what the hell is going on."

       c.   On or about February 24, 2019, Client 2 sent AVENATTI an email regarding a number of topics, including the settlement with Individual 1.  The email stated, in part:

> Maybe we can settle the agreement for a lump sum rather than the monthly. From my understanding the original lump sum from the agreement was 33% which covered legal fees the additional to be paid to me stretched over 8 years (2 of which have passed).  They are currently 8 months behind on payments totaling $160,000 with the rest of this year and the additional 5 years we are looking at 1.4 Million for a total $1,560,000. Maybe we can find a median to settle for a lump sum payout.

The email also referenced "filing publicly" against Individual 1.

       **3.**   ***Evidence Regarding AVENATTI's Embezzlement of Settlement Funds from the Super Bowl Litigation and Concealment of the Receipt of Funds from the Super Bowl Litigation During the 2017 EA Bankruptcy***

     41.   There is probable cause to believe that in or about May 2018 AVENATTI embezzled a portion of a $1.55 million settlement received on behalf of the Super Bowl Clients, who were represented by EA LLP in the Super Bowl Litigation.  As set forth in greater detail below, the evidence collected to date demonstrates that: (a) on or about May 11, 2018, AVENATTI and EA LLP negotiated a $1,550,000 settlement with the defendants in the Super Bowl Litigation on behalf of the Super Bowl Clients (approximately 200 individual plaintiffs), the litigation that resulted in this settlement was initiated in the Northern District of Texas on or about March 7, 2013; (b) on or about May

**EXHIBIT 6**
**Page 66 of 86**

USAO_00134512

15, 2017, AVENATTI requested that approximately $408,724 of the settlement proceeds be transferred to EA Account 2851 and approximately $952,995 be transferred to an attorney client trust account at City National Bank ("CNB"); (c) between July 2017 and October 2018, AVENATTI caused payments totaling approximately $145,222 to be made to approximately 31 of the Super Bowl Clients; (d) AVENATTI used the remainder of the approximately $1.31 million dollars AVENATTI and his law firm received from the settlement of the Super Bowl Litigation for AVENATTI's own personal and business purposes. There is also probable cause to believe that AVENATTI concealed the receipt of settlement proceeds and attorneys' fees from the Super Bowl Litigation during the 2017 EA Bankruptcy.

42. On March 25, 2019, I participated in an interview with J.R., EA LLP's office manager. In response to a question as to whether she was aware of AVENATTI taking money from client funds, J.R. said that the plaintiffs in the Super Bowl Litigation had not all been paid out. When asked how she knew, J.R. stated because some of the Super Bowl Clients called her asking for their portion of the settlement money. When the Super Bowl Clients called, J.R. referred them to AVENATTI. J.R. stated that she knew the settlement funds had come into the firm approximately two years earlier, however, AVENATTI did not authorize her to pay the Super Bowl Clients, even though there had been money available to pay them.

**EXHIBIT 6**
**Page 67 of 86**

USAO_00134513

Case 8:19-mj-00061-DUTY SEALED Document 1-1 SEALED Filed 03/28/19 Page 211 of 285 Page ID
Case 8:19-mj-00419-DUTY SEALED Document 41-1 SEALED Filed 05/24/19 Page 68 of
330 Page ID #:574
#:428

43. Based on my review of records obtained from EA LLP's
co-counsel in the Super Bowl Litigation, C.A., I have learned
the following:

a. On or about May 11, 2018, AVENATTI and EA LLP
negotiated a $1,550,000 settlement with the defendants in the
Super Bowl Litigation on behalf of the Super Bowl Clients
(approximately 200 individual plaintiffs).

b. On or about May 15, 2017, AVENATTI sent C.A. an
email requesting that C.A. transfer approximately $408,725 of
the settlement proceeds to EA Account 2851 and transfer
approximately $952,995 of the settlement proceeds to an attorney
client trust account at CNB ending in 3512 ("Avenatti Trust
Account 3512").

44. Based on IRS-CI's review of bank account records and
other records obtained during the investigation, I have learned
that between July 2017 and October 2018, AVENATTI caused
payments totaling approximately $145,222 to be made to
approximately 31 of the approximately 200 Super Bowl Clients.

45. Based on IRS-CI's review of bank account records, I
have learned the following regarding AVENATTI's use of the
settlement proceeds from the Super Bowl Litigation, which were
transferred from C.A.'s law firm to EA Account 2851 and Avenatti
Trust Account 3512:

a. After C.A.'s law firm wired approximately
$408,725 into EA Account 2851 on or about May 17, 2017, AVENATTI
used nearly all of the money to pay expenses of EA LLP,

45

EXHIBIT 6
Page 68 of 86

USAO_00134514

including salary to EA LLP employees, rent, and payments to the IRS, among others.

  b.  Avenatti Trust Account 3512 was opened on or about May 17, 2017. C.A.'s law firm wired approximately $952,995 of the settlement proceeds to Avenatti Trust Account 3512 that same day. AVENATTI then caused the following financial transactions:

  i.  Between May 17 and May 23, 2017, AVENATTI caused the purchase of three cashier's checks from Avenatti Trust Account 3512 totaling $640,000, which cashier's checks were then deposited into Avenatti Account 3504. Avenatti Account 3504 was also opened on or about May 17, 2017.

  ii.  Between May 17 and May 23, 2017, AVENATTI caused three wires transfers totaling $640,000 to be made from Avenatti Account 3504 to A&A Account 0661. Substantial portions of the funds transferred to A&A Account 0661 were then used for AVENATTI's own purposes, including a $40,000 wire transfer to C.C., AVENATTI's ex-wife; a $60,000 wire transfer to a bank account in the name of AVENATTI and L.S.A. (AVENATTI's wife at the time); and a $150,000 wire transfer to a GBUS bank account.

  iii.  Between June 6 and June 23, 2017, AVENATTI caused the purchase of three cashier's checks from Avenatti Trust Account 3512 totaling $300,000, which cashier's checks were then deposited into Avenatti Account 3504. During this same time period, AVENATTI caused three wire transfers totaling approximately $310,000 to be made from Avenatti Account 3504 to A&A Account 0061.

EXHIBIT 6
Page 69 of 86

USAO_00134515

46.  I have also participated in telephonic interviews of two of the Super Bowl Clients in the Super Bowl Litigation, who provided in substance and in part the following information:

a.  On March 27, 2019, I participated in an interview of D.W.  D.W. retained EA LLP to represent him against the NFL in D.W.'s attempt to obtain a refund for the tickets he purchased and other expenses related to his experience attending the 2011 Super Bowl in Dallas.  D.W. provided EA LLP with all of his receipts regarding his expenses, which totaled $7,045.  D.W. stated that J.R. was his contact at EA LLP, and after D.W. learned that there was a settlement with the NFL, D.W. called at least fifteen to twenty times in an attempt to find out what money he would be receiving.  He did not recall the exact date, but a few months prior to the telephonic interview with IRS-CI, D.W. stated that AVENATTI had contacted D.W. and told D.W. that he would get his money back.  To date, D.W. had not received any settlement money.

b.  On April 17, 2019, I participated in an interview of D.B.  D.B. retained EA LLP to represent him against the NFL in D.B.'s attempt to obtain a refund for the tickets and other expenses related to his experience attending the 2011 Super Bowl in Dallas.  D.B. had correspondence with at least two people at EA LLP, but had no contact with AVENATTI.  D.B. recalled receiving information from J.R. that a settlement had been reached with the NFL for about 200 victims, and that D.B. fell within one of the three types of victims that would be receiving settlement funds, but that D.B. needed to wait a few weeks for

47

**EXHIBIT 6**
**Page 70 of 86**

USAO_00134516

all of the settlement funds to be worked out.  D.B. called and
emailed EA LLP numerous times about his settlement money, but he
never got responses.  D.B. stated that his claim against the NFL
was for $5,269, but he still has yet to receive a dime in
settlement money.

    47.  I have reviewed the Confidential Settlement Agreement
and Release in the Super Bowl Litigation, which was a settlement
on behalf of the approximately 200 plaintiffs listed in Exhibit
A of the settlement agreement (i.e., the Super Bowl Clients").
The agreement provided, among other things, that "The NFL shall
pay to the plaintiffs an aggregate total sum of $1,550,000.00
("Settlement Consideration") on or before May 18, 2017."
AVENATTI signed the settlement agreement on behalf of the Super
Bowl Clients on or about May 11, 2017.  Both D.W. and D.B. are
listed in Exhibit A of the settlement agreement as plaintiffs
entitled to the benefit of the settlement consideration.[23]

    48.  Based on my review of documents from the 2017 EA
Bankruptcy, In re: Eagan Avenatti LLP, No. 8:17-bk-11961-CB, and
other evidence IRS-CI has collected during this investigation, I
have learned the following:

        a.  AVENATTI failed to disclose on the MOR for EA LLP
for the period May 1, 2017, through May 30, 2017 (the "May 2017
MOR") the funds AVENATTI received from the Super Bowl

_____

    [23] The privilege review team and other agents executing the
search will be provided with the names of the Super Bowl Clients
from the Super Bowl Litigation before conducting a search of the
SUBJECT DEVICES for non-privileged material.

**EXHIBIT 6**
**Page 71 of 86**

USAO_00134517

Litigation. AVENATTI signed the May 2017 MOR on behalf of EA LLP under the penalty of perjury.

b. AVENATTI failed to disclose to the Bankruptcy Court and the U.S. Trustee the existence of Avenatti Trust Account 3512 and Avenatti Account 3504, both of which appear to have been used to conceal the receipt of the settlement funds from the Super Bowl Litigation.

c. On or about June 12, 2017, defendant testified under oath at the Section 341(a) debtor's examination in the 2017 EA Bankruptcy and stated "no" when asked whether the debtor, EA LLP, had received any counsel fees from the Super Bowl Litigation. In truth and in fact, as discussed above in paragraphs 43 to 44, AVENATTI knew that AVENATTI and EA LLP had received fees from the Super Bowl Litigation, namely, two wire transfers totaling approximately $1,361,000, including attorneys' fees, on or about May 17, 2017.

**E.** **Evidence Relating to Augustus LLP**

49. Based on my review of the evidence IRS-CI has collected during this investigation to date, I have learned the following regarding Augustus LLP:

a. On March 25, 2019, during the interview with J.R., the office manager for EA LLP, J.R. stated that "Augustus LLP" is the name of a new company and/or law firm AVENATTI was starting.

b. I have reviewed Union Bank records that show that on or about February 13, 2019, AVENATTI caused business bank accounts at Union Bank to be opened under Augustus LLP. The

application to open the accounts listed AVENATTI's home address at 10000 Santa Monica Blvd, Unit 2107, Los Angeles, California, as the mailing address for Augustus LLP. On the forms submitted to Union Bank regarding the accounts, AVENATTI was listed as the owner/partner of the business and had signature authority over the accounts, as did J.R., who was listed as the office manager. The Augustus LLP bank records at Union Bank further reveal:

i. On or about March 19, 2019, at least twelve cashier's checks were purchased from Union Bank from the Augustus LLP accounts, including several made payable to individuals who were previously employed by EA LLP, as well as a $22,400 cashier's check made payable to SM10000 Property LLC, the property management company of AVENATTI's personal residence, for February and March rent.

ii. On or about March 21, 2019, AVENATTI caused a wire transfer in the amount of $1,398 to be paid to an assisted living facility for Client 1's rent;

iii. On or about March 22, 2019, AVENATTI caused a wire transfer in the amount of $6,000 to be paid to Client 2;

iv. AVENATTI also caused checks and cashier's checks to be written from the Augustus LLP bank account at Union Bank to attorneys that have represented AVENATTI in various legal matters.

c. I know from my review of IRS records based on information submitted to the IRS regarding Augustus LLP, that AVENATTI was listed as the general partner of Augustus LLP and AVENATTI's personal residence was listed as the business's

50

**EXHIBIT 6**
**Page 73 of 86**

USAO_00134519

address. In addition, the records indicate that Augustus LLP was established in December 2018 and is required to file Form 1065 partnership returns on an annual basis.

      d.   Based on my training and experience and the investigation to date, I believe that Augustus LLP is the latest in the line of companies that AVENATTI has used and is using to pay for both personal and business expenses and possibly launder the proceeds of his prior wire fraud scheme.

## F.   Probable Cause to Search the SUBJECT DEVICES

### 1.   *SUBJECT DEVICES 1 through 6 Obtained from MixinIT*

    50.   During the interview with IRS-CI on March 25, 2019, J.R., the office manager for EA LLP, stated, among other things, that EA LLP had previously maintained its computer servers at EA LLP's offices at 520 Newport Center Drive, in Newport Beach, California. J.R. further said that, when EA LLP received notice that it would be evicted from its offices in or around October or November 2018, AVENATTI caused the EA LLP servers to be moved to MixinIT, a company in Orange County that stored and managed computer servers.

    51.   On March 28, 2019, MixinIT provided records in response to a subpoena showing that EA LLP had contracted with MixinIT to store EA LLP's servers starting on November 19, 2018.

    52.   On April 3, 2019, the court-appointed receiver[24] for EA LLP authorized agents from IRS-CI to take possession of the EA

---

[24] EA LLP is currently a Judgment Debtor in a litigation with a former partner of EA LLP that arose from the 2017 EA LLP Bankruptcy. On February 12, 2019, the former partner filed a

**EXHIBIT 6**
**Page 74 of 86**

USAO_00134520

LLP servers from MixinIT, house the servers at IRS-CI's forensic lab, and create a forensic image of the servers.

53. On April 4, 2019, based on the consent of the court-appointed receiver, IRS-CI SA Nshan Tashchyan and SA John Weeks obtained SUBJECT DEVICES 1 through 6, which comprised the EA LLP servers, from MixinIT. After bringing SUBJECT DEVICES 1 through 6 to IRS-CI's forensic lab in Laguna Niguel, California, IRS-CI began making a forensic image of SUBJECT DEVICES 1 through 6. The forensic image of SUBJECT DEVICES 1 through 6 was completed on April 19, 2019.

54. Based on the evidence collected during the course of this investigation, there is probable cause to believe that evidence of the Subject Offenses will be found on SUBJECT DEVICES 1 through 6, which comprise the EA LLP servers. For example:

a. During March 25, 2019, interview with IRS-CI, J.R. stated that she can work on EA LLP matters remotely using a desktop connection, which allows her to use her EA LLP email as well as to access QuickBooks and excel spreadsheets. J.R. stated that the EA LLP emails were backed up on the EA LLP

_____

motion in the litigation seeking the appointment of a receiver for EA LLP and accusing AVENATTI of bankruptcy fraud. On February 13, 2019, AVENATTI acting on behalf of EA LLP, stipulated to the appointment of Brian Weiss as the EA LLP Receiver and consented to the jurisdiction of the Honorable Karen E. Scott, United States Magistrate Judge, to enter an order appointing the EA LLP Receiver. Judge Scott entered the order appointing the EA LLP Receiver later that same day. The order stated, among other things, that the EA LLP Receiver shall have the power to take possession of and manage the business of EA LLP. The order further required that EA LLP and AVENATTI immediately turn over all EA LLP property to the EA LLP Receiver and provide access to all EA LLP computer systems.

**EXHIBIT 6**
**Page 75 of 86**

USAO_00134521

servers stored at MixinIT.  J.R. stated when she logged into the servers remotely, she had access to emails and could download EA LLP documents like a virtual desktop.  J.R. stated in or around December 2018, around the time EA LLP was evicted from its offices, EA LLP obtained a service, Voice Nation, to answer the phone calls and the service sent the voicemails for AVENATTI to MA@augustusLLP.com and other voicemails to JR@augustusLLP.com.

b.   During the course of this investigation, I have reviewed evidence relating to the Subject Offenses including emails sent to and from AVENATTI and J.R. in which AVENATTI and J.R. used their EA LLP email addresses.  Many of the emails that I have reviewed that were sent to and from AVENATTI and J.R. also contained attachments that related to the Subject Offenses.

c.   I have reviewed under oath testimony that AVENATTI provided during the EA LLP Bankruptcy proceedings, as well as during judgment debtor examinations relating to litigation with his former partner.  In response to various questions about where AVENATTI kept financial documents and contracts, among other items, AVENATTI testified that they would have been kept at his offices.  During a judgment debtor examination on March 15, 2019, AVENATTI testified that he sometimes connects to a server when working on his computer.

55.  In addition to the foregoing facts, based my training and experience and discussions with other law enforcement agents who have investigated tax offenses and complex fraud schemes, as described more fully in my March 2019 affidavit (see Ex. 3,

53

EXHIBIT 6
Page 76 of 86

USAO_00134522

§ VII),[25] I believe SUBJECT DEVICES 1 through 6, namely, the EA LLP servers, will contain evidence of the Subject Offenses, including, among other items, emails and attachments that AVENATTI and J.R. sent and received from their EA LLP email addresses, financial documents and records, and other personal and business records.

### 2. *SUBJECT DEVICES 7 Through 10 Obtained During AVENATTI's Arrest*

56. On March 25, 2019, federal agents arrested AVENATTI in New York and found several digital devices among his personal belongings, including the original digital devices from which SUBJECT DEVICES 7 through 9 were forensically imaged. In addition, federal agents seized miscellaneous documents from AVENATTI's briefcase upon his arrest, and these documents were scanned and saved on SUBJECT DEVICE 10. On or about May 17, 2019, and May 22, 2019, the SDNY USAO provided to IRS-CI SUBJECT DEVICE 10, and SUBJECT DEVICES 7 through 9, respectively, which are currently held in the custody of IRS-CI in Santa Ana, California.

57. Based on the evidence set forth herein and in my prior affidavits, and my training and experience and discussions with other law enforcement agents who have investigated tax offenses and complex fraud schemes, which is described more fully in my March 2019 affidavit (see Ex. 3, § VII), I believe SUBJECT DEVICES 7 through 10 will likely contain other evidence of the

---

[25] The March 2019 affidavit included a section detailing my training, experience, and knowledge of tax offenses and fraud schemes (see Ex. 3, § VII), which is incorporated by reference herein.

**EXHIBIT 6**
**Page 77 of 86**

USAO_00134523

Subject Offenses, including, among other items, emails and attachments that AVENATTI and J.R. sent and received from their EA LLP email addresses, financial documents and records, and other personal and business records.

58. Additionally, SUBJECT DEVICES 7 through 9, are the forensic images of three USB drives that were found on AVENATTI's person upon arrest, while AVENATTI was in New York on March 25, 2019. SUBJECT DEVICE 10 contains miscellaneous documents AVENATTI had on his person at the time of his arrest. As stated above, AVENATTI met with Client 1 and Client 2 on March 22, 23, and 24, 2019 (see supra ¶¶ 35, 39.h), prior to travelling to New York on the evening of March 24, 2019. I therefore believe documents, correspondence, and records relating to AVENATTI's meetings with these two clients in the days immediately prior to his arrest, as well as documents relating to AVENATTI's and EA LLP's representation of Client 1 and Client 2, are likely to be found on SUBJECT DEVICES 7 through 10.

G. **The April 10, 2019, Indictment**

59. On April 10, 2019, a ███████████ in the Central District of California returned a thirty-six count indictment against AVENATTI, which included the following charges: (a) ten counts of wire fraud, in violation of 18 U.S.C. § 1343, involving AVENATTI's embezzlement of his clients' funds; (b) eight counts of willful failure to collect and pay over withheld taxes, in violation of 26 U.S.C. § 7202, relating to AVENATTI's and GBUS's failure to pay over to the IRS payroll

**EXHIBIT 6**
**Page 78 of 86**

USAO_00134524

taxes that had been withheld from GBUS employee' paychecks;
(c) one count of endeavoring to obstruct the administration of
the Internal Revenue Code, in violation of 26 U.S.C. § 7212(a),
relating to AVENATTI's attempt to obstruct and impede the IRS's
attempts to collect the payroll taxes GBUS owed to the IRS;
(d) ten counts of willful failure to file tax returns, in
violation of 26 U.S.C. § 7203, relating to AVENATTI's failure to
file individual tax returns for 2014 through 2017, failure to
file partnership tax returns for EA LLP for 2015 through 2017,
and failure to file corporate tax returns for A&A for 2015
through 2017; (e) two counts of bank fraud, in violation of 18
U.S.C. § 1344(1), relating to two loans AVENATTI obtained from
The People's Bank in 2014; (f) one count of aggravated identity
theft, in violation of 18 U.S.C. § 1028A(a)(1), relating to the
use of another person's means of identification in furtherance
of the bank fraud offense; (g) three counts of false declaration
in a bankruptcy, in violation of 18 U.S.C. § 152(3), relating to
AVENATTI's failure to disclose all of EA LLP's receipts on EA
LLP's monthly operating reports; and (h) one count of false oath
in a bankruptcy proceeding, in violation of 18 U.S.C. § 152(2),
related to AVENATTI's false testimony at a Section 341(a)
hearing during EA LLP's bankruptcy.  A copy of the indictment in
United States v. Michael John Avenatti, SA CR 19-61-JVS, is
attached hereto as Exhibit 4 and incorporated herein by
reference.

**EXHIBIT 6**
**Page 79 of 86**

USAO_00134525

## V.   POTENTIAL PRIVILEGE ISSUES

60.   As noted in my March 2019 affidavit, and above, AVENATTI is a licensed attorney and EA LLP and A&A are  law firms.  (See Ex. 3, § VII.)  I also understand that at various times AVENATTI, EA LLP, and/or A&A may have had attorney-client relationships with other attorneys, including the following law firms: (a) Foster Pepper PLLC; (b) Osborn Machler PLLC; (c) Eisenhower Carlson PLLC; (d) Talmadge/Fitzpatrick/Tribe, PPLC; (e) The Brager Tax Law Group; (f) SulmeyerKupetz; (g) Baker & Hostetler LLP; (h) Shulman Hodges & Bastian LLP; (i) Legal & Tax Consulting Group; (j) Pachulski Stang Ziehl & Jones LLP; (k) Foley & Lardner LLP; (l) Raines Feldman, LLP; and (m) Pansky Markle Attorneys at Law.  (See id.)

61.   Although the proposed search warrant primarily seeks financial records and non-privileged information, there is a significant likelihood that the SUBJECT DEVICES will contain documents and records that are covered by the attorney-client privilege or attorney-work-product doctrine.  Accordingly, Attachment B to the proposed search warrant contains specific procedures designed to avoid unnecessary disclosures of any privileged attorney-client communications or attorney-work-product.

62.   The privileged information sought by the proposed search warrant is limited to the following former clients or potential clients of AVENATTI, EA LLP, and A&A:  (a) GBUS; (b) Client 1; (c) Client 2; (d) Client 3; and (e) Client 4 and Client 5.  Each of these former clients or potential clients,

57

**EXHIBIT 6**
**Page 80 of 86**

USAO_00134526

however, has already executed a written waiver of the attorney-client-privilege.

   a.   First, as noted in my February 2019 affidavit, on February 19, 2019, the Chapter 7 bankruptcy trustee for GBUS (the "GBUS Trustee") executed a written waiver of the attorney-client privilege as to any communications between GBUS's officer, directors, employees, and agents, and any lawyer acting on GBUS's behalf, including any communications with AVENATTI. (Ex. 1, ¶ 83.a.)  A copy of the GBUS Trustee's written waiver of the attorney-client privilege was attached as Exhibit 1 to my February 2019 affidavit.

   b.   Second, on April 4, 2019, Client 1 executed a written waiver of the attorney-client privilege and attorney-work-product protections as to legal advice Client 1 sought or received from EA LLP, AVENATTI, and any other current or former EA LLP officers, directors, employees, or agents.  Client 1 also consented to the government's search of any of EA LLP's or AVENATTI's files relating to EA LLP's and AVENATTI's representation of Client 1.  A redacted copy of Client 1's written waiver of the attorney-client privilege is attached hereto as Exhibit 5.

   c.   Third, on April 8, 2019, Client 2 executed a written waiver of the attorney-client privilege and attorney-work-product protections as to legal advice Client 2 sought or received from EA LLP, AVENATTI, F.M. (an attorney with the X-Law Group), and any other current or former EA LLP officers, directors, employees, or agents.  Client 2 also consented to the

58

**EXHIBIT 6**
**Page 81 of 86**

USAO_00134527

government's search of any of EA LLP's or AVENATTI's files relating to EA LLP's and AVENATTI's representation of Client 2. A redacted copy of Client 2's written waiver of the attorney-client privilege is attached hereto as Exhibit 6.

        d. <u>Fourth</u>, on March 18, 2019, Client 3 executed a written waiver of the attorney-client privilege and attorney-work-product protections as to any legal advice Client 3 sought or received from EA LLP, AVENATTI, and any other current or former EA LLP officers, directors, employees, or agents. Client 3 also consented to the government's search of any of EA LLP's and AVENATTI's files relating to EA LLP's and AVENATTI's representation of Client 3. A redacted copy of Client 3's written waiver of the attorney-client privilege is attached hereto as Exhibit 7.

        e. <u>Fifth</u>, on April 4, 2019, Client 4 and Client 5 executed written waivers of the attorney-client privilege and attorney-work-product protections as to legal advice Client 4 and Client 5 sought or received from EA LLP, AVENATTI, F.M., and/or any other current or former officers, directors, employees, or agents of EA LLP. Client 4 and Client 5 also consented to the government's search of the files of EA LLP, AVENATTI, and F.M. relating to the representation of Client 4 and Client 5. A redacted copy of Client 4's and Client 5's written waivers of the attorney-client privilege are attached hereto as Exhibit 8.

    63. I am aware that AVENATTI represented the plaintiff in <u>Stephanie Clifford v. Donald J. Trump</u>, No. 2:18-CV-2217-SJO-FFM

<div align="center">59</div>

<div align="center">**EXHIBIT 6**
**Page 82 of 86**</div>

USAO_00134528

(C.D. Cal.), a lawsuit against the President of the United States.[26] I am also aware that AVENATTI represented Julie Swetnick, an individual who accused United States Supreme Court Justice Brett Kavanaugh of sexual assault in connection with Justice Kavanaugh's confirmation hearing in or around September 2018. Attachment B to the proposed search warrant specifically requires, in addition to the procedures to avoid unnecessary disclosure of attorney-client privileged materials and attorney-work-product, that any materials relating to AVENATTI's representation of Ms. Clifford or Ms. Swetnick that are identified by the Privilege Review Team, other than financial and accounting records identified in paragraphs 1.d, 1.f, 1.g, and 1.r of Attachment B, be segregated and not further reviewed absent subsequent authorization from this Court.[27]

64. Attachment B to the proposed search warrant also sets forth a procedure to allow EA LLP, AVENATTI, and/or others to seek the appointment of a special master within seven days of

---

[26] On May 22, 2019, AVENATTI was indicted in the Southern District of New York for wire fraud and aggravated identity theft, in connection with a scheme to defraud Ms. Clifford out of approximately $148,000. Although we are not seeking to seize information relating to AVENATTI's representation of Ms. Clifford at this time, such information could be relevant to this investigation at a later date or to the SDNY USAO's investigation.

[27] Other than non-privileged financial or accounting records that may reference these representations, the only documents or records relating to these representations that may fall within the scope of the items to be seized would likely be engagement letters and/or client billing records. Nevertheless, due the nature of these representations and the parties at issue therein, the privilege review protocols set forth in Attachment B to the proposed warrant calls for any such records to be segregated and not further reviewed once identified.

60

EXHIBIT 6
Page 83 of 86

USAO_00134529

the execution of the proposed search warrants.[28]  Although the
government does not believe that the appointment of a special
master would be necessary in this investigation, the government
has included this provision to ensure that any such request is
handled in a timely manner and does not unnecessarily delay IRS-
CI's ongoing criminal investigation.

### VI.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES

65.  The March 2019 affidavit also included a section
detailing my training experience on digital devices (see Ex. 3,
§ IX), which is incorporated by reference herein.

66.  The search of the SUBJECT DEVICES will likely take a
considerable amount of time for multiple reasons.  First, I
understand that the SUBJECT DEVICES contain approximately 10-15
terabytes of data.  Second, the search of the SUBJECT DEVICES
will require the use of a Privilege Review Team and the search
protocols set forth in Attachment B to the search warrant
application.

67.  Other than what has been described herein, to my
knowledge, the United States has not attempted to obtain this
data by other means.

### VII. REQUEST FOR SEALING

68.  I request that the search warrant, the search warrant
application, and this affidavit be kept under seal to maintain
the integrity of this ongoing investigation until further order

---

[28] An identical provision was included in Attachments B-1
through B-3 of the March 2019 warrants.  To date, no request for
the appointment of a special master has been made following the
execution of the March 2019 warrants on March 25, 2019.

61

**EXHIBIT 6**
**Page 84 of 86**

USAO_00134530

of the Court, or until the government determines that these materials are subject to its discovery obligations in connection with criminal proceedings, at which time they may be produced to defense counsel.

    a.  <u>First</u>, this criminal investigation is ongoing and not all aspects of the investigation are public or known to AVENATTI and other potential subjects of the investigation. Although the government anticipates producing the search warrant, the search warrant application, and this affidavit to defense counsel for AVENATTI shortly after the execution of the search warrants, public disclosure of these materials could cause other subjects of the government's ongoing investigation to accelerate any existing or evolving plans to, and give them an opportunity to, destroy or tamper with evidence, tamper with or intimidate witnesses, change patterns of behavior, or notify confederates.

    b.  <u>Second</u>, IRS-CI is still in the process of interviewing additional witnesses and subjects as part of its ongoing investigation. This affidavit and the March 2019 Affidavit, which remains sealed and is attached as an exhibit hereto, contain information regarding additional areas of investigation and certain facts regarding the pending charges against AVENATTI that are not publicly known at this time. Public disclosure of such information provide witnesses and other subjects of the investigation an opportunity to coordinate their statements prior to being interviewed by IRS-CI.

**EXHIBIT 6**
**Page 85 of 86**

USAO_00134531

c.  Underline{Third}, this Affidavit and the sealed March 2019 Affidavit contain detailed information regarding AVENATTI's victim-clients and cooperating government witnesses.  Although the identities of some of AVENATTI's victim-clients and some of the government's witnesses have now been reported in the press, the government is concerned that premature public disclosure of this affidavit will unnecessarily impact the victim-clients and witnesses right to privacy.  This is particularly true given the high-profile nature of the prosecution against AVENATTI.

## VIII.    CONCLUSION

69.  For the reasons described above, I respectfully submit there is probable cause to believe that evidence, fruits, and instrumentalities of the Subject Offenses, as described with particularity in Attachment B, will be found on the SUBJECT DEVICES, as described with particularity in Attachment A.


_____
/s/
Remoun Karlous, Special Agent
Internal Revenue Service –
Criminal Investigation


Subscribed to and sworn before me
this 24th day of May, 2019.

## DOUGLAS F. McCORMICK
_____
HONORABLE DOUGLAS F. McCORMICK
UNITED STATES MAGISTRATE JUDGE

**EXHIBIT 6**
**Page 86 of 86**

USAO_00134532

GOVERNMENT'S OPPOSITION TO DEFENDANT MICHAEL JOHN AVENATTI'S
MOTION FOR PRIVILEGE REVIEW, EVIDENTIARY HEARING, AND DISCOVERY

# EXHIBIT 7

## LIMITED WAIVER OF ATTORNEY-CLIENT PRIVILEGE
## AND CONSENT TO SEARCH BY ▆▆▆▆▆▆▆▆▆▆▆

I, ▆▆▆▆▆▆▆▆▆, hereby agree and state as follows:

1.  In or about 2012, I entered into an Attorney-Client Fee Contract (the "Agreement") with Eagan Avenatti LLP ("EA LLP") on behalf of myself. Under the terms of the Agreement, EA LLP was to represent me in connection with personal injury claims, among others, against the County of Los Angeles.

2.  Subject to the limitations set forth in paragraphs 3 and 4 below, I agree to waive any claims of the attorney-client privilege or attorney-work-product doctrine relating to any legal advice I sought or received from EA LLP and/or any of EA LLP's current or former officers, directors, employees, or agents, including, but not limited, to Michael J. Avenatti, Judy Regnier, Scott Sims, and Carlos Colorado, concerning ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

3.  This waiver of the attorney-client privilege does not apply to any attorney-client privileged documents or communications between me and any other attorneys acting on my behalf, including, but not limited to, Greenberg Gross LLP and Joshua M. Robbins.

4.  This waiver of the attorney-client privilege is limited to the United States government and its employees and agents, for any purpose related to the official performance of their duties, and does not extend to any other individual, entity or third party.

5.  I further authorize any former or current officer, directors, employees, or agents of EA LLP to disclose to the United States government all materials, written or oral, relating to any attorney-client privileged communications covered by the limited attorney-client privilege waiver set forth in paragraph 2 above.

6.  I further consent to the United States government searching any documents or materials relating to EA LLP's representation of me currently in possession of EA LLP and/or any of EA LLP's current or former employees and agents, including, but not limited, to Michael J. Avenatti, Judy Regnier, Scott Sims, and Carlos Colorado.

1

**EXHIBIT 7**
**Page 1 of 10**

USAO_00134884

7.      I have read this Limited Waiver of the Attorney-Client Privilege and Consent to Search carefully. I have discussed this Limited Waiver of the Attorney-Client Privilege and Consent to Search with my lawyer and fully understand the consequences of waiving the attorney-client privilege and attorney-work-product doctrine. No one has threatened or forced me to execute this Limited Waiver of the Attorney-Client Privilege and Consent to Search. I do so knowingly and voluntarily.



4/4/19
Date

I am _____'s attorney. I have carefully and thoroughly discussed every part of this Limited Waiver of the Attorney-Client Privilege and Consent to Search with my client. Further, I have fully advised my client of his rights and the consequences of waiving any attorney-client privilege or attorney-work-product protections. To the best of my knowledge, my client's decision to waive the attorney-client privilege and attorney-work product protections is an informed and voluntary one.

_____          April 5, 2019
JOSHUA M. ROBBINS                            Date
GREENBERG GROSS LLP
Attorneys for _____

2

**EXHIBIT 7**
**Page 2 of 10**

USAO_00134885

## LIMITED WAIVER OF ATTORNEY-CLIENT PRIVILEGE
## AND CONSENT TO SEARCH BY ▓▓▓▓

I, ▓▓▓▓▓▓ hereby agree and state as follows:

1.      In or about December 2016, I entered into an Attorney-Client Fee Contract (the "Agreement") with Eagan Avenatti LLP ("EA LLP") on behalf of myself.  Under the terms of the Agreement, EA LLP was to represent me in connection with claims relating to an individual that I had a prior relationship.

2.      Subject to the limitations set forth in paragraphs 3 and 4 below, I agree to waive any claims of the attorney-client privilege or attorney-work-product doctrine relating to any legal advice I sought or received from EA LLP and/or any of EA LLP's current or former officers, directors, employees, or agents, including, but not limited, to Michael J. Avenatti or Judy Regnier.

3.      This waiver of the attorney-client privilege does not apply to any attorney-client privileged documents or communications between me and any other attorneys acting on my behalf.

4.      This waiver of the attorney-client privilege is limited to the United States government and its employees and agents, for any purpose related to the official performance of their duties, and does not extend to any other individual, entity or third party.

5.      I further authorize any former or current officer, directors, employees, or agents of EA LLP to disclose to the United States government all materials, written or oral, relating to any attorney-client privileged communications covered by the limited attorney-client privilege waiver set forth in paragraph 2 above.

6.      I further consent to the United States government searching any documents or materials relating to EA LLP's representation of me currently in possession of EA LLP and/or any of EA LLP's current or former employees and agents, including, but not limited, to Michael J. Avenatti or Judy Regnier.

1

**EXHIBIT 7**
**Page 3 of 10**

USAO_00134887

7.      I have read this Limited Waiver of the Attorney-Client Privilege and Consent to Search carefully. I have discussed this Limited Waiver of the Attorney-Client Privilege and Consent to Search with my lawyer and fully understand the consequences of waiving the attorney-client privilege and attorney-work-product doctrine. No one has threatened or forced me to execute this Limited Waiver of the Attorney-Client Privilege and Consent to Search. I do so knowingly and voluntarily.

<br>

4/8/2019

_____          _____
                                                                        Date

<br>

I am ▓▓▓▓▓▓▓▓▓▓'s attorney. I have carefully and thoroughly discussed every part of this Limited Waiver of the Attorney-Client Privilege and Consent to Search with my client. Further, I have fully advised my client of her rights and the consequences of waiving any attorney-client privilege or attorney-work-product protections. To the best of my knowledge, my client's decision to waive the attorney-client privilege and attorney-work product protections is an informed and voluntary one.

_____          4/10/2019
DAVID GAMMILL                                          Date
Attorney for ▓▓▓▓▓▓▓▓

<br>

2

**EXHIBIT 7**
**Page 4 of 10**

USAO_00134888

## LIMITED WAIVER OF ATTORNEY-CLIENT PRIVILEGE
## AND CONSENT TO SEARCH BY ▨▨▨▨▨

I, ▨▨▨▨▨▨, hereby agree and state as follows:

1.      On or about July 2, 2014, I entered into an Attorney-Client Fee Contract (the

"Agreement") with Eagan Avenatti LLP ("EA LLP") on behalf of myself and my company, ▨▨▨

▨▨▨▨▨▨▨▨▨▨. Under the terms of the Agreement, EA LLP was to represent

me and my company in connection with claims relating to my intellectual property rights in

hardscape underlayment technology.

2.      Subject to the limitations set forth in paragraphs 3 and 4 below, I agree to waive

any claims of the attorney-client privilege or attorney-work-product doctrine relating to any legal

advice I and/or my company, ▨▨▨▨▨ sought or received from EA LLP and/or any of EA

LLP's current or former officers, directors, employees, or agents, including, but not limited, to

Michael J. Avenatti, Judy Regnier, John Adren, and Ahmed Ibrahim.

3.      This waiver of the attorney-client privilege does not apply to any attorney-client

privileged documents or communications between me or ▨▨▨▨▨ and any other attorneys

acting on my behalf, including, but not limited to, Larson O'Brien LLP, Stephen G. Larson,

Steven E. Bledsoe, and R.C. Harlan.

4.      This waiver of the attorney-client privilege is limited to the United States

government and its employees and agents, for any purpose related to the official performance of

their duties, and does not extend to any other individual, entity or third party.

5.      I further authorize any former or current officer, directors, employees, or agents

of EA LLP to disclose to the United States government all materials, written or oral, relating to

any attorney-client privileged communications covered by the limited attorney-client privilege

waiver set forth in paragraph 2 above.

6.      I further consent to the United States government searching any documents or

materials relating to EA LLP's representation of me and ▨▨▨▨▨ currently in possession of

1



**EXHIBIT 7**
**Page 5 of 10**

USAO_00134890

EA LLP and/or any of EA LLP's current or former employees and agents, including, but not limited, to Michael J. Avenatti, Judy Regnier, John Adren, and Ahmed Ibrahim.

7.    I have read this Limited Waiver of the Attorney-Client Privilege and Consent to Search carefully. I have discussed this Limited Waiver of the Attorney-Client Privilege and Consent to Search with my lawyer and fully understand the consequences of waiving the attorney-client privilege and attorney-work-product doctrine. No one has threatened or forced me to execute this Limited Waiver of the Attorney-Client Privilege and Consent to Search. I do so knowingly and voluntarily.

_____  3-18-19
                   Date

I am _____'s attorney. I have carefully and thoroughly discussed every part of this Limited Waiver of the Attorney-Client Privilege and Consent to Search with my client. Further, I have fully advised my client of his rights and the consequences of waiving any attorney-client privilege or attorney-work-product protections. To the best of my knowledge, my client's decision to waive the attorney-client privilege and attorney-work product protections is an informed and voluntary one.

_____  3/18/19
STEVEN E. BLEDSOE         Date
R.C. HARLAN
Larson O'Brien LLP
Attorneys for _____

2

**EXHIBIT 7**
**Page 6 of 10**

USAO_00134891

<u>LIMITED WAIVER OF ATTORNEY-CLIENT PRIVILEGE</u>
<u>AND CONSENT TO SEARCH BY</u> ▨▨▨▨▨▨▨

I, ▨▨▨▨▨▨▨ hereby agree and state as follows:

1.     On or about August 15, 2017, I entered into an Attorney-Client Fee Contract (the "Agreement") with Michael Avenatti, Esq. ("AVENATTI") and/or Eagan Avenatti LLP ("EA LLP"). Under the terms of the Agreement, AVENATTI and/or EA LLP were to represent me and ▨▨▨▨▨▨▨ in connection with our divestiture and exit from ▨▨▨▨▨▨▨▨▨▨▨▨ ▨▨▨▨▨▨▨

2.     Subject to the limitations set forth in paragraphs 3 and 4 below, I agree to waive any claims of the attorney-client privilege or attorney-work-product doctrine relating to any legal advice or services that I sought or received from AVENATTI, EA LLP, Filippo Marchino ("MARCHINO"), any of EA LLP's current or former officers, directors, employees, or agents, and/or any current or former employees or agents of AVENATTI.

3.     This waiver of the attorney-client privilege does not apply to any attorney-client privileged or attorney-work product documents or communications between me and any other attorneys acting on my behalf, including, but not limited to, Orrick Herrington & Sutcliffe LLP, Walter Brown, William Molinski, or any attorney-client privileged or attorney-work product documents arising out of any such separate representation.

4.     This waiver of the attorney-client privilege is limited to the United States government and its employees and agents, for any purpose related to the official performance of their duties, and does not extend to any other individual, entity or third party.

5.     I further authorize AVENATTI, EA LLP, MARCHINO, any current or former officers, directors, employees, or agents of EA LLP, and/or any current or former employees or agents of AVENATTI to disclose to the United States government all materials, written or oral, relating to any attorney-client privileged communications covered by the limited attorney-client privilege waiver set forth in paragraph 2 above.

**EXHIBIT 7**
**Page 7 of 10**

USAO_00134893

6.     I further consent to the United States government searching any documents or materials relating to AVENATTI's and/or EA LLP's representation of me currently in possession of AVENATTI, EA LLP, MARCHINO, any of EA LLP's current or former officers, directors, employees, or agents, and/or any current or former employees or agents of AVENATTI.

7.     I have read this Limited Waiver of the Attorney-Client Privilege and Consent to Search carefully. I have discussed this Limited Waiver of the Attorney-Client Privilege and Consent to Search with my lawyer and fully understand the consequences of waiving the attorney-client privilege and attorney-work-product doctrine. No one has threatened or forced me to execute this Limited Waiver of the Attorney-Client Privilege and Consent to Search. I do so knowingly and voluntarily.

04-04-2019
Date

I am _____ s attorney. I have carefully and thoroughly discussed every part of this Limited Waiver of the Attorney-Client Privilege and Consent to Search with my client. Further, I have fully advised my client of her rights and the consequences of waiving any attorney-client privilege or attorney-work-product protections. To the best of my knowledge, my client's decision to waive the attorney-client privilege and attorney-work product protections is an informed and voluntary one.

WALTER BROWN
WILLIAM MOLINSKI
Orrick Herrington & Sutcliffe LLP
Attorneys for _____

4-4-19
Date

**EXHIBIT 7**
**Page 8 of 10**

USAO_00134894

## LIMITED WAIVER OF ATTORNEY-CLIENT PRIVILEGE
## AND CONSENT TO SEARCH BY ▨▨▨▨▨

I, ▨▨▨▨▨ hereby agree and state as follows:

1.    On or about August 15, 2017, I entered into an Attorney-Client Fee Contract (the "Agreement") with Michael Avenatti, Esq. ("AVENATTI") and/or Eagan Avenatti LLP ("EA LLP"). Under the terms of the Agreement, AVENATTI and/or EA LLP were to represent me and ▨▨▨▨▨ in connection with our divestiture and exit from ▨▨▨▨▨ ▨▨▨▨▨.

2.    Subject to the limitations set forth in paragraphs 3 and 4 below, I agree to waive any claims of the attorney-client privilege or attorney-work-product doctrine relating to any legal advice or services that I sought or received from AVENATTI, EA LLP, Filippo Marchino ("MARCHINO"), any of EA LLP's current or former officers, directors, employees, or agents, and/or any current or former employees or agents of AVENATTI.

3.    This waiver of the attorney-client privilege does not apply to any attorney-client privileged or attorney-work product documents or communications between me and any other attorneys acting on my behalf, including, but not limited to, Orrick Herrington & Sutcliffe LLP, Walter Brown, William Molinski, or any attorney-client privileged or attorney-work product documents arising out of any such separate representation.

4.    This waiver of the attorney-client privilege is limited to the United States government and its employees and agents, for any purpose related to the official performance of their duties, and does not extend to any other individual, entity or third party.

5.    I further authorize AVENATTI, EA LLP, MARCHINO, any current or former officers, directors, employees, or agents of EA LLP, and/or any current or former employees or agents of AVENATTI to disclose to the United States government all materials, written or oral, relating to any attorney-client privileged communications covered by the limited attorney-client privilege waiver set forth in paragraph 2 above.

1

**EXHIBIT 7**
**Page 9 of 10**

USAO_00134895

Case 8:19-mj-00419-DUTY SEALED Document #1 SEALED Filed 06/24/19 Page 9 of 3
Page ID #:956
Case 8:19-cr-00061-JVS Document 305-3 Filed 09/20/20 Page 240 of 285 Page ID #:13617

6.　　I further consent to the United States government searching any documents or materials relating to AVENATTI's and/or EA LLP's representation of me currently in possession of AVENATTI, EA LLP, MARCHINO, any of EA LLP's current or former officers, directors, employees, or agents, and/or any current or former employees or agents of AVENATTI.

7.　　I have read this Limited Waiver of the Attorney-Client Privilege and Consent to Search carefully. I have discussed this Limited Waiver of the Attorney-Client Privilege and Consent to Search with my lawyer and fully understand the consequences of waiving the attorney-client privilege and attorney-work-product doctrine. No one has threatened or forced me to execute this Limited Waiver of the Attorney-Client Privilege and Consent to Search. I do so knowingly and voluntarily.

_____　　　　　　4/4/19
　　　　　　　　　　　　　　　　　　　　　　Date

I am �â–ˆâ–ˆâ–ˆâ–ˆâ–ˆ's attorney. I have carefully and thoroughly discussed every part of this Limited Waiver of the Attorney-Client Privilege and Consent to Search with my client. Further, I have fully advised my client of his rights and the consequences of waiving any attorney-client privilege or attorney-work-product protections. To the best of my knowledge, my client's decision to waive the attorney-client privilege and attorney-work product protections is an informed and voluntary one.

_____　　　　　　4.4.19
WALTER BROWN　　　　　　　　　　　　　　Date
WILLIAM MOLINSKI
Orrick Herrington & Sutcliffe LLP
Attorneys for ▮▮▮▮▮▮

2

**EXHIBIT 7**
**Page 10 of 10**

USAO_00134896

GOVERNMENT'S OPPOSITION TO DEFENDANT MICHAEL JOHN AVENATTI'S
MOTION FOR PRIVILEGE REVIEW, EVIDENTIARY HEARING, AND DISCOVERY

# EXHIBIT 8

AO 93 (Rev. 11/13) Search and Seizure Warrant (USAO CDCA Rev. 04/17)

# UNITED STATES DISTRICT COURT
### for the
Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br><br>A Silver Apple MacBook Pro with Serial No.<br>C02TP26RHTD8, a forensic image of which is<br>contained on DataLocker DL3 FE 1TB External<br>Hard Drive, Serial No. 04022722. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No. 8:20-MJ-00025 |

## SEARCH AND SEIZURE WARRANT

To:    Any authorized law enforcement officer

      An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Central District of California *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

      I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

*See Attachment B*

      Such affidavit(s) or testimony are incorporated herein by reference.

      **YOU ARE COMMANDED** to execute this warrant on or before <u>14 days from the date of its issuance</u> *(not to exceed 14 days)*
☒ in the daytime 6:00 a.m. to 10:00 p.m.  ☐ at any time in the day or night because good cause has been established.

      Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

      The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to <u>the U.S. Magistrate Judge on duty at the time of the return through a filing with the Clerk's Office.</u>

      ☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
      ☐ for_____days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____.

| | |
|---|---|
| Date and time issued:  <u>01/17/2020 at 10:30 am</u> | **DOUGLAS F. McCORMICK**<br>*Judge's signature* |
| City and state:  <u>Santa Ana, CA</u> | <u>United States Magistrate Judge Douglas F. McCormick</u><br>*Printed name and title* |

AUSAs:  Julian L. André (213.894.6683) & Brett A. Sagel (714.338.3598)

**EXHIBIT 8**
**Page 1 of 44**

USAO_00459978

AO 93 (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

| Certification |
|---|

     I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**EXHIBIT 8**
**Page 2 of 44**

USAO_00459979

<u>AFFIDAVIT</u>

I, Remoun Karlous, being duly sworn, declare and state as
follows:

## I.   <u>INTRODUCTION</u>

1.    I am a Special Agent ("SA") with the Internal Revenue
Service-Criminal Investigation ("IRS-CI") in the Los Angeles
Field Office and have been so employed since April 1995.  As an
IRS-CI SA, I have investigated numerous cases involving criminal
violations of Title 18, Title 21, Title 26, and Title 31 of the
United States Code, which have resulted in seizure, search, and
arrest warrants.  In particular, I have investigated cases
involving money laundering, international money laundering,
securities fraud, tax evasion (domestic and international
cases), and subscribing to false tax returns.

## II.  <u>PURPOSE OF AFFIDAVIT</u>

2.    This affidavit is made in support of an application
for a warrant to search the following digital device or a
forensic image thereof, which is currently held in the custody
of IRS-CI in Los Angeles, California:

a.    A silver Apple MacBook Pro with Serial No.
C02TP26RHTD8, which was seized by law enforcement agents from
Michael J. AVENATTI ("AVENATTI") on March 25, 2019 in New York,
New York, and of which IRS-CI obtained a forensic image
contained on DataLocker DL3 FE 1TB External Hard Drive, Serial
No. 04022722, from the United States Attorney's Office for the
Southern District of New York ("SDNY USAO") on or about November
22, 2019 (the "SUBJECT DEVICE").

**EXHIBIT 8**
**Page 3 of 44**

3.    The requested search warrant seeks authorization to
seize any data on the SUBJECT DEVICE that constitutes evidence,
contraband, instrumentalities, and/or fruits of violations of:
26 U.S.C. § 7201 (attempt to evade or defeat tax); 26 U.S.C.
§ 7202 (willful failure to collect or pay over tax); 26 U.S.C.
§ 7203 (willful failure to pay tax or file return); 26 U.S.C.
§ 7212 (interference with administration of internal revenue
laws); 18 U.S.C. § 152 (concealment of assets and false oaths
and declarations in bankruptcy); 18 U.S.C. § 157 (bankruptcy
fraud); 18 U.S.C. § 1028A (aggravated identity theft); 18 U.S.C.
§ 1343 (wire fraud); 18 U.S.C. § 1344 (bank fraud); and 18
U.S.C. § 1957 (money laundering) (the "Subject Offenses"), and
any SUBJECT DEVICE which is itself or which contains evidence,
contraband, fruits, or instrumentalities of the Subject
Offenses, and forensic copies thereof.

4.    The SUBJECT DEVICE is identified in Attachment A to
the search warrant application.  The list of items to be seized
is set forth in Attachment B to the search warrant application.
Attachments A and B are incorporated herein by reference.

5.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested warrant and does
not purport to set forth all of my knowledge of or investigation
into this matter.  Unless specifically indicated otherwise, all

**EXHIBIT 8**
**Page 4 of 44**

USAO_00459981

conversations and statements described in this affidavit are related in substance and in part only.

### III. SUMMARY OF PROBABLE CAUSE

6.    AVENATTI was and is an attorney licensed to practice law in the State of California.  AVENATTI practiced law through Avenatti & Associates, APC ("A&A") and EA LLP in Newport Beach and Los Angeles, California.  AVENATTI was the sole owner of A&A, which owned at least 75 percent of EA LLP.

7.    AVENATTI was also the principal owner and Chief Executive Officer ("CEO") of Global Baristas US LLC ("GBUS"), which operated Tully's Coffee ("Tully's") stores in Washington and California.  In 2013, AVENATTI's company, Global Baristas LLC ("GB LLC"), acquired TC Global Inc., which previously operated Tully's, out of bankruptcy for approximately $9.15 million.  AVENATTI's company, A&A, owned 100 percent of Doppio Inc., which in turn owned 80 percent of GB LLC.  GB LLC wholly owned GBUS, which handled the day-to-day business operations of Tully's.

8.    As set forth herein and in the affidavits that I submitted in February 2019 (attached hereto as Exhibit 1), March 2019 (attached hereto as Exhibit 3), and May 2019 (attached hereto as Exhibit 4) in support of prior search warrant applications, there is probable cause to believe that between approximately 2011 and March 2019 AVENATTI engaged in the following criminal conduct: (a) wire fraud and money laundering offenses relating to millions of dollars AVENATTI embezzled from his legal clients; (b) tax offenses relating to GBUS's payroll

3

**EXHIBIT 8**
**Page 5 of 44**

USAO_00459982

tax obligations and AVENATTI's efforts to obstruct an IRS
collection action; (c) tax offenses relating to the tax
obligations of EA LLP and A&A, including the payroll tax
obligations of EA LLP; (d) tax offenses relating to AVENATTI's
personal tax obligations; (e) bank fraud and aggravated identity
theft offenses relating to loans AVENATTI and his companies
obtained from The Peoples Bank in Mississippi; and
(f) bankruptcy fraud offenses relating to false statements
AVENATTI made in federal bankruptcy proceedings involving
AVENATTI and EA LLP.

    9. <u>First</u>, between as early as January 2015 and continuing
through at least March 2019, AVENATTI executed a scheme to
defraud and embezzle money from clients to whom AVENATTI had
agreed to provide legal services. AVENATTI's scheme to defraud
his victim-clients generally operated in the following manner:
(a) AVENATTI would negotiate a settlement on behalf of a victim-
client that would require the payment of funds to the victim-
client; (b) AVENATTI would cause the settlement proceeds to be
deposited in or transferred to attorney trust accounts AVENATTI
controlled; (c) AVENATTI would misrepresent, conceal, and
falsely describe to the victim-client the true terms of the
settlement and/or make false statements regarding the
disposition of the settlement proceeds; (d) AVENATTI would
embezzle and misappropriate settlement proceeds to which he was
not entitled; and (e) AVENATTI would lull the victim-client to
prevent the victim-client from discovering the embezzlement and
misappropriation by, among other things, falsely denying the

<div align="center">4</div>

**EXHIBIT 8**
**Page 6 of 44**

USAO_00459983

settlement proceeds had been paid, sending funds to the victim-client under the false pretense that such funds were "advances" on the purportedly yet-to-be received settlement proceeds, and falsely claiming that payment of the settlement proceeds to the victim-client had been delayed for legitimate reasons and would occur at a later time.

10.  Specifically, there is probable cause to believe that AVENATTI defrauded and embezzled funds from the following victim-clients:

a.  <u>Client 1</u>:  Beginning as early as in or about 2012, AVENATTI and EA LLP represented Client 1[1] in connection with a lawsuit against the County of Los Angeles and others. Between in or about January 2015 and the present, AVENATTI defrauded Client 1 out of Client 1's portion of an approximately $4,000,000 settlement payment from the County of Los Angeles.

b.  <u>Client 2</u>:  Beginning as early as in or about December 2016, AVENATTI and EA LLP represented Client 2 in connection with potential litigation against an individual with whom Client 2 had a personal relationship ("Individual 1").

---

[1]  As noted herein, on April 10, 2019, a federal grand jury returned a 36-count indictment against AVENATTI in <u>United States v. Avenatti</u>, SA CR No. 19-061-JVS (the "Indictment," Exhibit 5, attached).  The Indictment refers to the victim-clients by number (<u>e.g.</u>, "Client 1") rather than by the victim-clients' initials or other identifiers.  In the interest of protecting the client-victims' right to privacy should this affidavit later be unsealed, as well as to maintain consistency with the Indictment, the government is referring to the individuals in this affidavit in the same manner as the Indictment.  The privilege review team and other agents executing the search will be provided with the names of the relevant client-victims before conducting a search of the SUBJECT DEVICE.

**EXHIBIT 8**
**Page 7 of 44**

USAO_00459984

Between in or about December 2016 and the present, AVENATTI defrauded Client 2 out of Client 2's portion of an approximately $2,750,000 settlement payment from Individual 1.

      c.   <u>Client 3</u>:  Beginning as early as in or about July 2014, AVENATTI and EA LLP represented Client 3[2] in connection with an intellectual property dispute against a Colorado-based company ("Company 1").  Between in or about December 2017 and the present, AVENATTI defrauded Client 3 out of Client 3's portion of an approximately $1,600,000 settlement payment from Company 1.

      d.   <u>Client 4 and Client 5</u>:  Beginning as early as in or about August 2017, AVENATTI and/or EA LLP represented Client 4 and Client 5[3] in connection with their separation and divestment from one of the companies in which Client 4 and Client 5 owned shares ("Company 2").  (<u>See</u> Ex. 1, ¶ 50.h. n.31; Ex. 3, § VI.)  Between in or about March 2018 and the present, AVENATTI defrauded Client 4 out of $4,000,000 of Client 4's funds.

      e.   <u>Super Bowl Clients</u>:  Beginning as early as in or about 2012, AVENATTI and EA LLP represented approximately 200 individuals (the "Super Bowl Clients") in connection with litigation against the National Football League ("NFL") relating to the 2011 Super Bowl (the "Super Bowl Litigation").  The

---

[2]  In the affidavits I submitted in support of the February 2019 and March 2019 search warrant applications, Client 3 is referred to as G.B.

[3]  In the affidavits I submitted in support of the February 2019 and March 2019 search warrant applications, Client 4 is referred to as M.P. and Client 5 is referred to as L.T.

**EXHIBIT 8**
**Page 8 of 44**

USAO_00459985

evidence IRS-CI has collected to date demonstrates that AVENATTI embezzled substantial portions of the settlement proceeds from the Super Bowl Litigation intended for clients, which AVENATTI received in or about May 2017.

11.  Second, between the fourth quarter of 2015 and the third quarter of 2017, inclusive, GBUS failed to timely file employment tax returns (IRS Forms 941) and pay approximately $3,207,144 in federal payroll taxes, including approximately $2,390,048 in trust fund taxes, which had been withheld from GBUS employees' paychecks.  AVENATTI was responsible for all of GBUS's significant financial and business decisions, including the decision not to pay the payroll and trust fund taxes that GBUS owed to the IRS.  Indeed, AVENATTI was well aware of GBUS's outstanding tax obligations, yet repeatedly refused to authorize the required tax payments to the IRS.

12.  Additionally, after the IRS initiated a collection action relating to GBUS's outstanding payroll tax obligations in September 2016, issued an approximately $5,000,000 tax lien against GBUS in July 2017, and levied multiple GBUS bank accounts, AVENATTI directed repeated attempts to evade collection of those payroll taxes and obstruct the IRS collection action.  Among other things, AVENATTI: (a) made false statements to an IRS Revenue Officer regarding GBUS's payroll taxes and AVENATTI's involvement in GBUS's finances; (b) directed GBUS employees to deposit the cash receipts from Tully's stores into a bank account associated with a different entity AVENATTI controlled; (c) changed the company name,

7

**EXHIBIT 8**
**Page 9 of 44**

Employer Identification Number ("EIN"), and bank account
information associated with GBUS's merchant credit card
processing accounts; (d) changed the company name on various
contracts with The Boeing Company; and (e) caused significant
amounts of GBUS's funds, which could and should have been used
to pay GBUS's payroll taxes, to be transferred to other entities
AVENATTI controlled, including EA LLP and A&A.

13.   Third, AVENATTI filed federal personal income tax
returns for the 2009 and 2010 tax years indicating that he owed
the IRS a total of approximately $850,438, plus interest and
penalties.  AVENATTI, however, did not pay the IRS the amounts
he owed for those tax years.[4]  AVENATTI then failed to file
personal tax returns for the 2011 through 2017 tax years.
During these tax years, AVENATTI generated substantial income
and lived lavishly, yet largely failed to pay any federal income
tax.

14.   Fourth, AVENATTI's other companies, EA LLP and A&A,
repeatedly failed to meet their tax obligations despite
generating substantial revenues.  Between 2015 and 2017, EA LLP
failed to file payroll tax returns and pay approximately $2.4
million in payroll taxes, including approximately $1,279,001 in
trust fund taxes that had been withheld from EA LLP employees'
paychecks.  Additionally, EA LLP did not file partnership tax
returns (IRS Form 1065) for the 2013, 2014, 2015, 2016, and 2017

---

[4] The tax due and owing to the IRS for the 2009 and 2010 tax
years was not paid until November 2015, when AVENATTI sold his
residence in Laguna Beach, California, upon which there was an
IRS tax lien.

8

**EXHIBIT 8**
**Page 10 of 44**

USAO_00459987

tax years.  Similarly, A&A did not file corporate tax returns (IRS Form 1120S) for the 2011, 2012, 2013, 2014, 2015, 2016, or 2017 tax years.

15.  <u>Fifth</u>, between approximately January 2014 and December 2014, AVENATTI obtained three separate loans from The Peoples Bank, a federally insured bank in Mississippi: (1) a $850,500 loan to GB LLC in January 2014; (2) a $2,750,000 loan to EA LLP in March 2014; and (3) a $500,000 loan to EA LLP in December 2014.  In connection with these loans, among other false and fraudulent representations to The Peoples Bank, AVENATTI provided The Peoples Bank with false federal individual income tax returns for the 2011, 2012, and 2013 tax years.  AVENATTI, however, never filed individual income tax returns for the 2011, 2012, and 2013 tax years, and did not make any estimated tax payments during the 2012 and 2013 tax years, as claimed on the returns submitted to The Peoples Bank.  In addition, in March 2014, AVENATTI provided The Peoples Bank with a 2012 federal tax return for EA LLP which differed materially from the federal tax return EA LLP actually filed with the IRS in October 2014.

16.  <u>Sixth</u>, in March 2017, AVENATTI, as the managing member of EA LLP, consented to EA LLP being placed in Chapter 11 bankruptcy (the "2017 EA Bankruptcy").  Among other things, the Chapter 11 bankruptcy guidelines and requirements: (a) required AVENATTI to close all pre-petition bank accounts controlled by EA LLP, immediately open debtor-in-possession ("DIP") bank accounts, and deposit all business revenues into the DIP operating account; and (b) required AVENATTI to file monthly

9

**EXHIBIT 8**
**Page 11 of 44**

USAO_00459988

Case 8:19-mj-00061-JVS SEALED Document 305-3 Filed 09/28/30 Page 253 of 285 Page ID
Case 8:20-mj-00025-DUTY SEALED Document 2 SEALED Filed 05/17/20 Page 12 of 497
Page ID #:1006

operating reports ("MOR") for EA LLP and report all of EA LLP's
financial information for the reporting period.  From
approximately March 2017 through March 2018, AVENATTI failed to
report, among other information, all revenues of EA LLP and
payments and distributions AVENATTI, as an insider, received
from EA LLP funds.  Additionally, between March 2017 and March
2018, AVENATTI defrauded the bankruptcy court, the Office of the
United States Trustee, and the creditors of EA LLP, by
concealing bank accounts controlled by EA LLP, the true revenues
generated by EA LLP, and the sources of revenue to EA LLP.

17.  On March 25, 2019, federal agents arrested AVENATTI in
New York pursuant to a criminal complaint and arrest warrant
issued in this district in case number 8:19-MJ-241, as well as
pursuant to a separate criminal complaint and arrest warrant
issued in the Southern District of New York in case number
19MAG2927.  Simultaneously with AVENATTI's arrest, IRS-CI
executed search warrants issued in this district in case numbers
8:19-MJ-243, 8:19-MJ-244, and 8:19-MJ-247 at three locations
associated with AVENATTI and EA LLP.  Upon AVENATTI's arrest,
federal agents in New York seized several digital devices from
AVENATTI, including the SUBJECT DEVICE, a forensic copy of which
has been provided to IRS-CI.[5]  There is probable cause to believe

---

[5] Federal agents in New York seized various digital devices
from AVENATTI upon his arrest.  The Honorable Douglas F.
McCormick, United States Magistrate Judge, approved a search
warrant on May 24, 2019 to search various devices to which the
agents were able to gain access (See, Exhibit 4, attached).
Federal agents in New York also seized a silver Apple MacBook
Pro (the SUBJECT DEVICE), a black Apple iPhone X, and a black

**EXHIBIT 8**
**Page 12 of 44**

USAO_00459989

that the SUBJECT DEVICE found on AVENATTI at the time of his arrest will contain evidence of the Subject Offenses, including business records, financial documents, and emails.

<div align="center">

IV.   STATEMENT OF PROBABLE CAUSE

</div>

A.   February 2019 Warrant to Search GBUS Digital Devices

18.   On February 22, 2019, in case number 8:19-MJ-103, I submitted an affidavit in support of an application for a warrant to search seven digital devices, which had been produced by former GBUS employees, in the custody of IRS-CI in Laguna Niguel, California (the "February 2019 affidavit").  The Honorable Douglas F. McCormick, United States Magistrate Judge, issued the warrant that same day (the "February 2019 search warrant").  The application for a search warrant in case number 8:19-MJ-103, as well as my February 2019 affidavit in support thereof, are attached hereto as Exhibit 1 and incorporated herein by reference.

B.   March 2019 Criminal Complaint

19.   On March 22, 2019, in case number 8:19-MJ-241, I submitted an affidavit in support of a criminal complaint and arrest warrant against AVENATTI (the "complaint affidavit").  The criminal complaint charged AVENATTI with one count of bank fraud, in violation of 18 U.S.C. § 1344(1), relating to AVENATTI's fraudulent scheme to obtain a $500,000 loan from The

---

and grey Apple iPad from AVENATTI upon his arrest.  Since AVENATTI's arrest, the agents in New York were attempting to gain access to the contents of these three digital devices, and on or about November 19, 2019, agents were able to gain access to the SUBJECT DEVICE, and provided IRS-CI a forensic image of the SUBJECT DEVICE on or about November 22, 2019.

<div align="center">

11

</div>

**EXHIBIT 8**
**Page 13 of 44**

USAO_00459990

Case 8:19-mj-00061-JVS Document 305-3 Filed 09/28/30 Page 255 of 285 Page ID
Case 8:20-mj-00025-DUTY SEALED Document 2 SEALED Filed 03/17/20 Page 14 of 497
Page ID #:1008
#:4528

Peoples Bank on or about December 12, 2014, and one count of
wire fraud, in violation of 18 U.S.C. § 1343, relating to
AVENATTI's fraudulent scheme to embezzle clients' funds,
specifically the $1.6 million settlement on behalf of Client 3.
The Honorable Douglas F. McCormick, United States Magistrate
Judge, issued the arrest warrant that same day.  The criminal
complaint in case number 8:19-MJ-241, as well as my complaint
affidavit in support thereof, are attached hereto as Exhibit 2
and incorporated herein by reference.[6]

## C.    March 2019 Warrants to Search Locations Associated with AVENATTI and EA LLP

20.  On March 24, 2019, in case numbers 8:19-MJ-242, 8:19-
MJ-243, and 8:19-MJ-244, I submitted an affidavit in support of
applications for warrants to search AVENATTI's residence in Los
Angeles and two other locations (the "March 2019 affidavit").
The Honorable Douglas F. McCormick, United States Magistrate
Judge, issued the warrants that same day (the "March 2019 search
warrant").  The March 2019 affidavit in support for the search
warrants in case numbers 8:19-MJ-242,[7] 8:19-MJ-243, and 8:19-MJ-

---

[6] A copy of the application for the February 2019 search
warrant, including my February 2019 affidavit, were also
incorporated by reference and attached to the criminal complaint
in case number 8:19-MJ-241.  Accordingly, I have not included a
duplicate copy of the February 2019 search warrant application,
as part of Exhibit 2 to this affidavit.

[7] On March 25, 2019, to execute the warrant issued in case
number 8:19-MJ-242, IRS-CI agents went to 10000 Santa Monica
Boulevard, Unit 2205 in Los Angeles, California, the location
identified as the premise to be search in case number 8:19-MJ-
242, and learned that AVENATTI moved from Unit 2205 to Unit
2107.  As a result, IRS-CI SA Leia R. Bellis presented a new
application for search warrant with an affidavit that she swore
out for Unit 2107, to Judge McCormick on March 25, 2019, in case

12

**EXHIBIT 8**
**Page 14 of 44**

USAO_00459991

244, is attached hereto as Exhibit 3 and incorporated herein by reference.[8]

## D.    May 2019 Warrant to Search Digital Devices

21.   On or about May 24, 2019, in case number 8:19-MJ-419, I submitted an affidavit in support of an application for a warrant to search ten digital devices in the Custody of the Internal Revenue Service – Criminal Investigation (the "May 2019 affidavit"). The Honorable Douglas F. McCormick, United States Magistrate Judge, issued the warrant that same day (the "May 2019 search warrant"). The May 2019 affidavit in support for the search warrants in case numbers 8:19-MJ-419 is attached hereto as Exhibit 4 and incorporated herein by reference.[9]

22.   The items to be seized set forth in Attachment B to this search warrant application are identical to the items to be

---

number 8:19-MJ-247. As the facts and circumstances related to the change in apartment numbers were the only different facts presented in that affidavit and warrant, I have not attached that warrant as an exhibit.

[8] A copy of the application for the February 2019 search warrant, including my February 2019 affidavit, and the criminal complaint, were also incorporated by reference and attached to the March 2019 search warrant applications and the affidavits attached thereto in case numbers 8:19-MJ-242, 8:19-MJ-243, and 8:19-MJ-244. Accordingly, I have not included a duplicate copy of the February 2019 search warrant application or the criminal complaint, as part of Exhibit 3 to this affidavit.

[9] A copy of the application for the February 2019 search warrant, including my February 2019 affidavit, a copy of the criminal complaint filed in March 2019, a copy of the application for the March 2019 search warrant, including my March 2019 affidavit, and a copy of the indictment in United States v. Avenatti, SA CR No. 19-061-JVS filed in April 2019, were also incorporated by reference and attached to the May 2019 search warrant application and the affidavit attached thereto in case number 8:19-MJ-419. Accordingly, I have not included a duplicate copy of these documents as part of Exhibit 4 to this affidavit.

13

**EXHIBIT 8**
**Page 15 of 44**

USAO_00459992

seized set forth in Attachment B of the May 2019 search
warrant.

23.  The privilege review protocols set forth in Attachment
B to this search warrant application are also identical to the
privilege review protocols set forth in Attachment B of the May
2019 search warrant.  The privilege review protocol set forth in
Attachment B to this search warrant application does not address
the search of physical locations and non-digital evidence
because the instant search warrant application only covers the
search of a digital device that is already in IRS-CI's custody.

## E.    Additional Investigative Efforts

24.  Since the Court issued the warrant to search the ten
digital devices on or about May 24, 2019, in case number 8:19-
MJ-419, IRS-CI has continued to investigate potential criminal
conduct involving AVENATTI.  Among other things, IRS-CI has
interviewed additional witnesses, obtained documents from
various third-parties, and continued to review and analyze
documents and evidence obtained from the prior warrants.
Because I believe the additional evidence IRS-CI that has
obtained during its ongoing investigation is consistent with the
evidence presented in my prior affidavits and would not negate
any prior finding of probable cause, I have not summarized that
additional evidence herein.

## F.    Probable Cause to Search the SUBJECT DEVICES

25.  On March 25, 2019, federal agents arrested AVENATTI in
New York and found several digital devices among his personal
belongings, including the original digital device from which the

**EXHIBIT 8**
**Page 16 of 44**

USAO_00459993

Case 8:19-mj-00061-JVS Document 305-3 Filed 09/28/30 Page 258 of 285 Page ID
Case 8:20-mj-00028-DUTY SEALED Document 2 SEALED Filed 03/17/20 Page 17 of 497
Page ID #:1011
#:4834

SUBJECT DEVICE was forensically imaged. The SUBJECT DEVICE was
encrypted, but on or about November 19, 2019, federal agents in
New York were able to gain access to the SUBJECT DEVICE after
determining the password to the device, which included
AVENATTI's initials and what appeared to be a year. On or about
November 22, 2019, the SDNY USAO provided to IRS-CI, the SUBJECT
DEVICE, which is currently held in the custody of IRS-CI in Los
Angeles, California.

26. Based on the evidence set forth herein and in my prior
affidavits, and my training and experience and discussions with
other law enforcement agents who have investigated tax offenses
and complex fraud schemes, which is described more fully in my
March 2019 affidavit (see Ex. 3, § VII), I believe the SUBJECT
DEVICE will likely contain other evidence of the Subject
Offenses, including, among other items, emails and attachments
that AVENATTI sent and received from his email addresses,
financial documents and records, and other personal and business
records.

27. Additionally, the SUBJECT DEVICE is the forensic image
of the laptop found on AVENATTI's person upon arrest, while
AVENATTI was in New York on March 25, 2019. As described more
fully in my May 2019 affidavit (see Ex. 4, § IV.D.), AVENATTI
met with Client 1 and Client 2 on March 22, 23, and 24, 2019,
prior to travelling to New York on the evening of March 24,
2019. I therefore believe documents, correspondence, and
records relating to AVENATTI's meetings with these two clients
in the days immediately prior to his arrest, as well as

15

**EXHIBIT 8**
**Page 17 of 44**

documents relating to AVENATTI's and EA LLP's representation of Client 1 and Client 2, are likely to be found on the SUBJECT DEVICE.

G.    **The April 10, 2019, Indictment**

28.  On April 10, 2019, a grand jury in the Central District of California returned a thirty-six count indictment against AVENATTI, which included the following charges: (a) ten counts of wire fraud, in violation of 18 U.S.C. § 1343, involving AVENATTI's embezzlement of his clients' funds; (b) eight counts of willful failure to collect and pay over withheld taxes, in violation of 26 U.S.C. § 7202, relating to AVENATTI's and GBUS's failure to pay over to the IRS payroll taxes that had been withheld from GBUS employee' paychecks; (c) one count of endeavoring to obstruct the administration of the Internal Revenue Code, in violation of 26 U.S.C. § 7212(a), relating to AVENATTI's attempt to obstruct and impede the IRS's attempts to collect the payroll taxes GBUS owed to the IRS; (d) ten counts of willful failure to file tax returns, in violation of 26 U.S.C. § 7203, relating to AVENATTI's failure to file individual tax returns for 2014 through 2017, failure to file partnership tax returns for EA LLP for 2015 through 2017, and failure to file corporate tax returns for A&A for 2015 through 2017; (e) two counts of bank fraud, in violation of 18 U.S.C. § 1344(1), relating to two loans AVENATTI obtained from The People's Bank in 2014; (f) one count of aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1), relating to the use of another person's means of identification in furtherance

**EXHIBIT 8**
**Page 18 of 44**

USAO_00459995

of the bank fraud offense; (g) three counts of false declaration in a bankruptcy, in violation of 18 U.S.C. § 152(3), relating to AVENATTI's failure to disclose all of EA LLP's receipts on EA LLP's monthly operating reports; and (h) one count of false oath in a bankruptcy proceeding, in violation of 18 U.S.C. § 152(2), related to AVENATTI's false testimony at a Section 341(a) hearing during EA LLP's bankruptcy. A copy of the indictment in United States v. Michael John Avenatti, SA CR 19-61-JVS, is attached hereto as Exhibit 5 and incorporated herein by reference.

## V. POTENTIAL PRIVILEGE ISSUES

29. As noted in my March 2019 affidavit, my May 2019 affidavit, and above, AVENATTI is a licensed attorney and EA LLP and A&A are law firms. (See Ex. 3, § VII; Ex. 4, § V.) I also understand that at various times AVENATTI, EA LLP, and/or A&A may have had attorney-client relationships with other attorneys, including the following law firms: (a) Foster Pepper PLLC; (b) Osborn Machler PLLC; (c) Eisenhower Carlson PLLC; (d) Talmadge/Fitzpatrick/Tribe, PPLC; (e) The Brager Tax Law Group; (f) SulmeyerKupetz; (g) Baker & Hostetler LLP; (h) Shulman Hodges & Bastian LLP; (i) Legal & Tax Consulting Group; (j) Pachulski Stang Ziehl & Jones LLP; (k) Foley & Lardner LLP; (l) Raines Feldman, LLP; and (m) Pansky Markle Attorneys at Law. (See id.)

30. Although the proposed search warrant primarily seeks financial records and non-privileged information, there is a significant likelihood that the SUBJECT DEVICE will contain

**EXHIBIT 8**
**Page 19 of 44**

USAO_00459996

documents and records that are covered by the attorney-client
privilege or attorney-work-product doctrine.  Accordingly,
Attachment B to the proposed search warrant contains specific
procedures designed to avoid unnecessary disclosures of any
privileged attorney-client communications or attorney-work-
product.

31.  The potentially privileged information sought by the
proposed search warrant is limited to the following former
clients or potential clients of AVENATTI, EA LLP, and A&A:
(a) GBUS; (b) Client 1; (c) Client 2; (d) Client 3; and (e)
Client 4 and Client 5.  Each of these former clients or
potential clients, however, has already executed a written
waiver of the attorney-client-privilege.

a.  <u>First</u>, as noted in my February 2019 affidavit, on
February 19, 2019, the Chapter 7 bankruptcy trustee for GBUS
(the "GBUS Trustee") executed a written waiver of the attorney-
client privilege as to any communications between GBUS's
officer, directors, employees, and agents, and any lawyer acting
on GBUS's behalf, including any communications with AVENATTI.
(Ex. 1, ¶ 83.a.)  A copy of the GBUS Trustee's written waiver of
the attorney-client privilege was previously attached as Exhibit
1 to my February 2019 affidavit.

b.  <u>Second</u>, on April 4, 2019, Client 1 executed a
written waiver of the attorney-client privilege and attorney-
work-product protections as to legal advice Client 1 sought or
received from EA LLP, AVENATTI, and any other current or former
EA LLP officers, directors, employees, or agents.  Client 1 also

18

**EXHIBIT 8**
**Page 20 of 44**

USAO_00459997

consented to the government's search of any of EA LLP's or
AVENATTI's files relating to EA LLP's and AVENATTI's
representation of Client 1.  A redacted copy of Client 1's
written waiver of the attorney-client privilege was previously
attached as Exhibit 5 to my May 2019 affidavit.

      c.   _Third_, on April 8, 2019, Client 2 executed a
written waiver of the attorney-client privilege and attorney-
work-product protections as to legal advice Client 2 sought or
received from EA LLP, AVENATTI, F.M. (an attorney with the X-Law
Group), and any other current or former EA LLP officers,
directors, employees, or agents.  Client 2 also consented to the
government's search of any of EA LLP's or AVENATTI's files
relating to EA LLP's and AVENATTI's representation of Client 2.
A redacted copy of Client 2's written waiver of the attorney-
client privilege was previously attached as Exhibit 6 to my May
2019 affidavit.

      d.   _Fourth_, on March 18, 2019, Client 3 executed a
written waiver of the attorney-client privilege and attorney-
work-product protections as to any legal advice Client 3 sought
or received from EA LLP, AVENATTI, and any other current or
former EA LLP officers, directors, employees, or agents.  Client
3 also consented to the government's search of any of EA LLP's
and AVENATTI's files relating to EA LLP's and AVENATTI's
representation of Client 3.  A redacted copy of Client 3's
written waiver of the attorney-client privilege was previously
attached as Exhibit 7 to my May 2019 affidavit.

**EXHIBIT 8**
**Page 21 of 44**

USAO_00459998

     e.   <u>Fifth</u>, on April 4, 2019, Client 4 and Client 5 executed written waivers of the attorney-client privilege and attorney-work-product protections as to legal advice Client 4 and Client 5 sought or received from EA LLP, AVENATTI, F.M., and/or any other current or former officers, directors, employees, or agents of EA LLP.  Client 4 and Client 5 also consented to the government's search of the files of EA LLP, AVENATTI, and F.M. relating to the representation of Client 4 and Client 5.  A redacted copy of Client 4's and Client 5's written waivers of the attorney-client privilege were previously attached as Exhibit 8 to my May 2019 affidavit.

    32.  Redacted copies of the written waivers of the attorney-client privilege referenced in paragraph 31 above are attached hereto as Exhibit 6.

    33.  I am aware that AVENATTI represented the plaintiff in <u>Stephanie Clifford v. Donald J. Trump</u>, No. 2:18-CV-2217-SJO-FFM (C.D. Cal.), a lawsuit against the President of the United States.[10]  I am also aware that AVENATTI represented Julie Swetnick, an individual who accused United States Supreme Court Justice Brett Kavanaugh of sexual assault in connection with Justice Kavanaugh's confirmation hearing in or around September 2018.  Attachment B to the proposed search warrant specifically requires, in addition to the procedures to avoid unnecessary

---

[10]  On May 22, 2019, AVENATTI was indicted in the Southern District of New York for wire fraud and aggravated identity theft, in connection with a scheme to defraud Ms. Clifford out of approximately $148,000.  To the extent the SDNY USAO has sought to search the SUBJECT DEVICE for such information, I understand that the SDNY USAO would have obtained authorization to do so in the Southern District of New York.

**EXHIBIT 8**
**Page 22 of 44**

USAO_00459999

Case 8:20-mj-00025-DUTY *SEALED* Document 2 *SEALED* Filed 01/17/20 Page 23 of 497
Page ID #:1017
Case 8:19-cr-00061-JVS Document 305-3 Filed 09/28/20 Page 264 of 285 Page ID
#:4937

disclosure of attorney-client privileged materials and attorney-work-product, that any materials relating to AVENATTI's representation of Ms. Clifford or Ms. Swetnick that are identified by the Privilege Review Team, other than financial and accounting records identified in paragraphs 1.d, 1.f, 1.g, and 1.r of Attachment B, be segregated and not further reviewed absent subsequent authorization from this Court.[11]

34.  Attachment B to the proposed search warrant also sets forth a procedure to allow EA LLP, AVENATTI, and/or others to seek the appointment of a special master within seven days of the execution of the proposed search warrants.[12]  Although the government does not believe that the appointment of a special master would be necessary in this investigation, the government has included this provision to ensure that any such request is handled in a timely manner and does not unnecessarily delay IRS-CI's ongoing criminal investigation.

### VI.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES

35.  The March 2019 affidavit and May 2019 affidavit also included sections detailing my training and experience on

---

[11]  Other than non-privileged financial or accounting records that may reference these representations, the only documents or records relating to these representations that may fall within the scope of the items to be seized would likely be engagement letters and/or client billing records.  Nevertheless, due the nature of these representations and the parties at issue therein, the privilege review protocols set forth in Attachment B to the proposed warrant calls for any such records to be segregated and not further reviewed once identified.

[12] An identical provision was included in Attachments B-1 through B-3 of the March 2019 warrants.  To date, no request for the appointment of a special master has been made following the execution of the March 2019 warrants on March 25, 2019.

**EXHIBIT 8**
**Page 23 of 44**

USAO_00460000

digital devices (see Ex. 3, § IX; Ex. 5, § VI), which are
incorporated by reference herein.

36.  The search of the SUBJECT DEVICE could take a
considerable amount of time for multiple reasons.  I understand
that the SUBJECT DEVICE contains approximately 458 Gigabytes of
data.  First, the search of the SUBJECT DEVICE will require the
use of a Privilege Review Team and the search protocols set
forth in Attachment B to the search warrant application.
Second, although the contents of the SUBJECT DEVICE are not
extremely large in comparison to other digital devices typically
searched, the Privilege Review Team is in the process of
reviewing nearly twenty Terabytes of data from digital devices
previously seized and subject to the February 2019, March 2019,
and May 2019 search warrants.

37.  Other than what has been described herein, to my
knowledge, the United States has not attempted to obtain this
data by other means.[13]

## VII. CONCLUSION

38.  For the reasons described above, I respectfully submit
there is probable cause to believe that evidence, fruits, and
instrumentalities of the Subject Offenses, as described with

---

[13] The February 2019 search warrant, the complaint
affidavit, the March 2019 search warrant, and the May 2019
search warrant (Exhibits 1-4) were previously filed under seal
to maintain the integrity of the ongoing criminal investigation,
until further order of the Court.  As the Government does not
believe the bases to seal still exists to the same extent as
when it sought the prior affidavits to be filed under seal, the
Government does not seek to file this affidavit and related
documents under seal.  The Government will file separate motions
to unseal the related matters so that the exhibits to this
affidavit can similarly be filed publicly.

**EXHIBIT 8**
**Page 24 of 44**

USAO_00460001

particularity in Attachment B, will be found on the SUBJECT DEVICE, as described with particularity in Attachment A.

/s/
_____
Remoun Karlous, Special Agent
Internal Revenue Service -
Criminal Investigation

Subscribed to and sworn before me
this 17 th day of January, 2020.

## DOUGLAS F. McCORMICK
_____
HONORABLE DOUGLAS F. McCORMICK
UNITED STATES MAGISTRATE JUDGE

23

**EXHIBIT 8**
**Page 25 of 44**

USAO_00460002

Case 8:19-cr-00061-JVS Document 305-3 Filed 09/28/20 Page 267 of 285 Page ID
Case 8:20-mj-00025-DUTY SEALED Document 2 SEALED Filed 01/17/20 Page 26 of 497
Page ID #:1020
#:4840

<u>ATTACHMENT A</u>

<u>PROPERTY TO BE SEARCHED</u>

The following digital device or forensic images thereof, which is currently maintained in the custody of the Internal Revenue Service-Criminal Investigation ("IRS-CI") in Los Angeles, California:

A silver Apple MacBook Pro with Serial No. C02TP26RHTD8, which was seized by law enforcement agents from Michael J. AVENATTI ("AVENATTI") on March 25, 2019 in New York, New York, and of which IRS-CI obtained a forensic image contained on DataLocker DL3 FE 1TB External Hard Drive, Serial No. 04022722, from the United States Attorney's Office for the Southern District of New York ("SDNY USAO") on or about November 22, 2019 (the "SUBJECT DEVICE").

**EXHIBIT 8**
**Page 26 of 44**

USAO_00460003

Case 8:19-cr-00061-JVS Document 305-3 Filed 09/28/30 Page 268 of 285 Page ID of 497
Case 8:20-mj-00025-DUTY SEALED Document 2 SEALED Filed 01/17/20 Page 27 of 497
Page ID #:1021

<u>ATTACHMENT B</u>

I.   <u>ITEMS TO BE SEIZED</u>

     1.   The items to be seized are evidence, contraband,
fruits, and/or instrumentalities of violations of 26 U.S.C.
§ 7201 (attempt to evade or defeat tax); 26 U.S.C. § 7202
(willful failure to collect or pay over tax); 26 U.S.C. § 7203
(willful failure to pay tax or file return); 26 U.S.C. § 7212
(interference with administration of internal revenue laws); 18
U.S.C. § 152 (concealment of assets in bankruptcy); 18 U.S.C.
§ 157 (bankruptcy fraud); 18 U.S.C. § 1028A (aggravated identity
theft); 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1344 (bank
fraud); and 18 U.S.C. § 1957 (money laundering) (the "Subject
Offenses"), namely:

     a.   Records, documents, programs, applications, or
materials from January 2011 through March 25, 2019, relating to
the ownership of Global Baristas US, LLC ("GBUS"); Global
Baristas, LLC ("GB LLC"); GB Autosport, LLC ("GB Auto"); GB
Hospitality LLC ("GB Hospitality"); Doppio Inc. ("Doppio");
Eagan Avenatti LLP ("EA LLP"); Avenatti & Associates, APC
("A&A"); and Augustus LLP (collectively, the "Subject
Entities").

     b.   Records, documents, programs, applications, or
materials from January 2011 through March 25, 2019, relating to
Michael J. Avenatti's ("AVENATTI") control or management of any
of the Subject Entities and/or The X-Law Group, PC ("X-Law
Group").

i

**EXHIBIT 8**
**Page 27 of 44**

USAO_00460004

Case 8:19-mj-00061-JVS Document 305-3 Filed 09/28/30 Page 269 of 285 Page ID
Case 8:20-mj-00025-DUTY SEALED Document 2 SEALED Filed 03/17/20 Page 28 of 497
Page ID #: 1022
#: 4842

c.    Records, documents, programs, applications, or
materials from January 2011 through March 25, 2019, relating to
the organizational or management structure of any of the Subject
Entities and/or X-Law Group.

d.    Records, documents, programs, applications, or
materials from January 2011 through March 25, 2019, relating to
the finances of any of the Subject Entities, including assets,
debts, income, liabilities, accounts receivable, accounts
payable, and expenses.

e.    Records, documents, programs, applications, or
materials from January 2011 through March 25, 2019, relating to
the personal finances of AVENATTI, including information
relating to AVENATTI's assets, debts, income, expenses, and net
worth.

f.    Records, documents, programs, applications, or
materials from January 2011 through March 25, 2019, relating to
the accounting records for AVENATTI and/or any of the Subject
Entities, including any Microsoft Dynamics NAV, QuickBooks, or
other electronic accounting data, files, or records.

g.    Records, documents, programs, applications, or
materials from January 201 through March 25, 2019, relating to
any financial transactions, including any proposed or potential
financial transactions, involving any of the Subject Entities
and/or AVENATTI.

h.    Records, documents, programs, applications, or
materials from January 2011 through March 25, 2019, relating to
any payments, checks, credits, wire transfers, commodities,

**EXHIBIT 8**
**Page 28 of 44**

USAO_00460005

services, or other things of value paid, provided, delivered, or
transferred, directly or indirectly, to AVENATTI and/or any of
the Subject Entities.

     i.    Records, documents, programs, applications, or
materials from January 2011 through March 25, 2019, relating to
any financial relationship between AVENATTI and/or any of the
Subject Entities on one hand and X-Law Group and/or F.M. on the
other hand.

     j.    Records, documents, programs, applications, or
materials from January 2011 through March 25, 2019, relating to
financial decisions AVENATTI and/or J.R. made on behalf of any
of the Subject Entities, including decisions to authorize
payments on behalf of any of the Subject Entities and transfer
money to or from any of the Subject Entities.

     k.    Records, documents, programs, applications, or
materials from January 2011 through March 25, 2019, relating to
communications between AVENATTI and/or J.R. and any financial
institution regarding the transfer of funds to or from any
account associated with AVENATTI and/or any of the Subject
Entities.

     l.    Records, documents, programs, applications, or
materials from January 2011 through March 25, 2019, relating to
any loans or other financing agreements, including any proposed
or potential loans or other financing agreements, involving any
of the Subject Entities and/or AVENATTI.

**EXHIBIT 8**
**Page 29 of 44**

USAO_00460006

m.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to the payroll obligations of the Subject Entities.

n.   Non-privileged records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to the federal, state, and/or local tax obligations, tax returns, tax liabilities, or tax payments of any of the Subject Entities and/or AVENATTI.

o.   Non-privileged records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to any liens, levies, garnishments, judgments, encumbrances, or tax-related investigations or actions associated with any of the Subject Entities and/or AVENATTI.

p.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to attorneys' fees or costs earned or collected by EA LLP, A&A, and/or AVENATTI, including attorney-client fee contracts, engagement letters, fee agreements, cost-sharing agreements, fee-sharing agreements, settlement agreements, and client billing records, but excluding any such records relating to the representations of Stephanie Clifford or Julie Swetnick.

q.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to any of the Subject Entities' and/or AVENATTI's contractual relationships, including drafts and final versions of any executed, proposed, or potential contracts and agreements, bills of sale, correspondence regarding payments, and correspondence

iv

**EXHIBIT 8**
**Page 30 of 44**

regarding the cancellation or modification of contracts and/or agreements.

r.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to any of the Subject Entities' and/or AVENATTI's bank account information.

s.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to the physical whereabouts of AVENATTI, and/or J.R., including calendars and calendar entries.

t.   Records, documents, programs, applications, or materials from April 1, 2011, to March 25, 2019, relating to AVENATTI and/or EA LLP's representation of Client 1, including the approximately $4 million settlement payment that was transferred to one of EA LLP's California Bank & Trust attorney trust account in or around January 2015.

u.   Records, documents, programs, applications, or materials from December 2016 to March 25, 2019, relating to AVENATTI and/or EA LLP's representation of Client 2, including the approximately $2.75 million settlement payment that was transferred to one of EA LLP's California Bank & Trust attorney trust account in or around January 2017.

v.   Records, documents, programs, applications, or materials relating to an agreement to purchase and the purchase of a private Honda jet from Honda Aircraft Company LLC and/or the funds used to purchase the private Honda jet.

v

**EXHIBIT 8**
**Page 31 of 44**

USAO_00460008

w.   Records, documents, programs, applications, or materials from January 1, 2014, to March 25, 2019, relating to AVENATTI and/or EA LLP's representation of Client 3, including the approximately $1.6 million settlement payment that was transferred to one of AVENATTI's City National Bank attorney trust account in or around January 2018.

x.   Records, documents, programs, applications, or materials from January 1, 2017, to March 25, 2019, relating to AVENATTI's, EA LLP's, X-Law Group, and/or F.M.'s representation of Client 4 and Client 5, including the approximately $8,146,288 payment that was transferred to one of AVENATTI's City National Bank attorney trust accounts in or around March 2018.

y.   Non-privileged records, documents, programs, applications, or materials from March 7, 2013, to March 25, 2019, relating to the settlement of litigation against the National Football League ("NFL") relating to the 2011 Super Bowl (the "Super Bowl Litigation"), including documents reflecting settlement payments, attorney fees, costs, expenses, and the distribution of settlement proceeds to EA LLP, AVENATTI, and any of EA LLP or AVENATTI's clients in the Super Bowl Litigation.

z.   Records, documents, programs, applications, or materials from January 2013 through March 25, 2019, relating to the payroll and tax preparation services that Paychex provided to EA LLP and/or A&A, including any records, documents, programs, applications, or materials relating to changes in the payroll and tax services to be provided by Paychex.

**EXHIBIT 8**
**Page 32 of 44**

USAO_00460009

aa.  Records, documents, programs, applications, or materials from January 2013 through March 25, 2019, relating to the payroll and tax preparation services that Ceridian HCM Inc. ("Ceridian") provided to GBUS, including any records, documents, programs, applications, or materials relating to changes in the payroll and tax services to be provided by Ceridian.

bb.  Records, documents, programs, applications, or materials from January 2013 through March 25, 2019, relating to the sale or purchase of TC Global, Inc. or Tully's Coffee.

cc.  Records, documents, programs, applications, or materials from January 2013 through March 25, 2019, relating to the purchase or sale, including any proposed or attempted purchase or sale, of GBUS, GB LLC, or Doppio.

dd.  Records, documents, programs, applications, or materials from January 2013 through March 25, 2019, relating to the value of GBUS or GB LLC.

ee.  Records, documents, programs, applications, or materials from January 2013 through March 25, 2019, relating to GBUS's and GB LLC's merchant credit card processing accounts (the "merchant accounts"), including contracts, agreements, account applications, and correspondence regarding changes to the merchant accounts.

ff.  Records, documents, programs, applications, or materials from January 2018 through March 25, 2019, relating to creation, formation, business purpose, ownership agreement, finances, of Augustus LLP.

**EXHIBIT 8**
**Page 33 of 44**

USAO_00460010

Case 8:19-cr-00061-JVS Document 305-3 Filed 09/28/20 Page 275 of 285 Page ID
#:4849
Case 8:20-mj-00025-DUTY *SEALED* Document 2 *SEALED* Filed 01/17/20 Page 34 of 497
Page ID #:1028

gg.  Records, documents, programs, applications, or
materials from January 2011 through March 25, 2019, relating to
the sale, rental, lease, purchase, maintenance, renovation, or
remodeling of any of AVENATTI's residences, including his
residences in Newport Beach, California; Laguna Beach,
California; and Los Angeles, California.

hh.  Records, documents, programs, applications, or
materials from January 2011 through March 25, 2019, relating to
continuing legal education ("CLE") courses taken by AVENATTI,
including any professional responsibility CLE courses, ethics
CLE courses, or tax CLE courses.

ii.  Records, documents, programs, applications, or
materials from January 2011 through March 25, 2019, relating to
any of the Subject Entities' employee handbooks or manuals,
employment contracts, compensation records, and employee lists.

jj.  Records, documents, programs, applications, or
materials relating to any locations or services used by AVENATTI
and/or any of the Subject Entities to store physical or
electronic records.

kk.  With respect to any SUBJECT DEVICE containing
evidence falling within the scope of the foregoing categories of
items to be seized:

i.  evidence of who used, owned, or controlled
the device at the time the things described in this warrant were
created, edited, or deleted, such as logs, registry entries,
configuration files, saved usernames and passwords, documents,

**EXHIBIT 8**
**Page 34 of 44**

USAO_00460011

browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.  evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.  passwords, encryption keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.    records of or information about Internet Protocol addresses used by the device;

ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "correspondence," "programs," "applications," and "materials"

ix

**EXHIBIT 8**
**Page 35 of 44**

USAO_00460012

Case 8:20-mj-00025-DUTY SEALED Document 2 SEALED Filed 01/17/20 Page 36 of 497
Page ID #:1030

include records, documents, correspondence, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

## II.  SEARCH PROCEDURES FOR HANDLING POTENTIALLY PRIVILEGED INFORMATION ON THE SUBJECT DEVICE

3.     In searching the SUBJECT DEVICE (including the forensic copy thereof), the following procedures will be followed at the time of the search in order to avoid unnecessary disclosures of any privileged attorney-client communications or attorney work product.

4.     Law enforcement personnel conducting the investigation and search and other individuals assisting law enforcement personnel in the search (the "Investigation Team") have already obtained custody of the SUBJECT DEVICE, which is capable of containing evidence of the Subject Offenses, or capable of containing data falling within the scope of the items to be seized.  The Investigation Team shall facilitate the transfer of the SUBJECT DEVICE to the "Privilege Review Team" (previously designated individuals not participating in the investigation of the case).  The Privilege Review Team, including a Privilege Review Team Assistant United States Attorney ("PRTAUSA") or PRTAUSAs, will then review the SUBJECT DEVICE as set forth herein.  The Investigation Team will review only data from the SUBJECT DEVICE that has been released by the Privilege Review Team to the Investigation Team.

x

**EXHIBIT 8**
**Page 36 of 44**

USAO_00460013

5.    The Privilege Review Team will, in their discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

6.    The Privilege Review Team and the Investigation Team shall complete the search discussed herein as soon as is practicable but not more than 180 days from the date of execution of the warrant.  The government will not search the SUBJECT DEVICE beyond this 180-day period without obtaining an extension of time order from the Court.

7.    The Investigation Team will provide the Privilege Review Team and/or appropriate litigation support personnel[14] with a list of "scope key words" to search for on the SUBJECT DEVICE, to include words relating to the items to be seized as detailed above.  The Privilege Review Team will conduct an initial review of the SUBJECT DEVICE using the scope key words, and by using search protocols specifically chosen to identify documents and data that appear to be within the scope of the warrant.  The Privilege Review Team may also do a more detailed quality check of this data and the results of this initial review, to ensure that the key word search is effective. Documents and data that are identified by this initial review, after quality check, as not within the scope of the warrant will

---

[14] Litigation support personnel and computer forensics agents or personnel, including IRS Computer Investigative Specialists, are authorized to assist both the Privilege Review Team and the Investigation Team in processing, filtering, and transferring documents and data seized during the execution of the warrant.

xi

**EXHIBIT 8**
**Page 37 of 44**

USAO_00460014

be maintained under seal and not further reviewed absent subsequent authorization.

8. The Investigation Team will also provide the Privilege Review Team with a list of "privilege key words" to search for among the documents and data that are identified by the initial review and quality check described above as appearing to fall within the scope of the warrant, to include specific words associated with AVENATTI, J.R., F.M., and any of the following law firms (a) EA LLP; (b) A&A; (c) X-Law Group; (d) Foster Pepper PLLC; (e) Osborn Machler PLLC; (f) Eisenhower Carlson PLLC; (g) Talmadge/Fitzpatrick/ Tribe, PPLC; (h) The Brager Tax Law Group; (i) SulmeyerKupetz; (j) Baker & Hostetler LLP; (k) Shulman Hodges & Bastian LLP; (l) Legal & Tax Consulting Group; (m) Pachulski Stang Ziehl & Jones LLP; (n) Foley & Lardner LLP; (o) Raines Feldman, LLP; and (p) Pansky Markle Attorneys at Law. The privilege key words shall also include the above referenced law firms' domain names and lawyers' email addresses, and generic words such as "privileged," "work product." The Privilege Review Team will conduct a review of these documents and data using the privilege key words, and by using search protocols specifically chosen to identify documents and data containing potentially privileged information. Documents or data which are identified by this review as not potentially privileged may be given to the Investigation Team.

9. Documents or data that the privilege key word searches identify as potentially privileged will be reviewed by a Privilege Review Team member to confirm that they contain

xii

**EXHIBIT 8**
**Page 38 of 44**

USAO_00460015

Case 8:19-mj-00061-JVS Document 305-3 Filed 09/28/30 Page 280 of 285 Page ID #4853
Case 8:20-mj-00025-DUTY SEALED Document 2 SEALED Filed 03/17/20 Page 39 of 497
Page ID #:1033

potentially privileged information.  Documents or data that are
determined by this review not to be potentially privileged may
be given to the Investigation Team.  Documents or data that are
determined by this review to be potentially privileged will be
given to the United States Attorney's Office for further review
by a PRTAUSA.  Documents or data identified by the PRTAUSA after
review as not potentially privileged may be given to the
Investigation Team.  If, after review, the PRTAUSA determines it
to be appropriate, the PRTAUSA may apply to the court for a
finding with respect to particular documents or data that no
privilege, or an exception to the privilege, applies.  Documents
or data that are the subject of such a finding may be given to
the Investigation Team.

　　　10.  Documents or data identified by the PRTAUSA(s) after
review as privileged (that are not subject to a finding by a
court of no privilege or an exception to the privilege) or
potentially privileged and outside the scope of the items to be
seized shall be segregated and sealed together in an enclosure,
the outer portion of which will be marked as containing
potentially privileged information, and maintained by the
investigative agency.  Such data or documents shall not be
accessible by or given to the Investigation Team at any time
absent authorization of the Court.  However, the Privilege
Review Team may, in its discretion, store the privileged and
potentially privileged data and documents in a folder or a set
of folders in a document review platform database, such as
Relativity or Eclipse, which remains inaccessible to the

**EXHIBIT 8**
**Page 39 of 44**

USAO_00460016

Investigation Team.  The Privilege Review Team's access to this separate document review platform database shall cease upon expiration of the warrant.  However, litigation support personnel from the United States Attorney's Office, United States Department of Justice, and/or the investigating agency may continue to access this separately-maintained document review database for the purpose of database maintenance.

11.  The Investigation Team will search only the documents and data that the Privilege Review Team provides to the Investigation Team at any step listed above in order to locate documents and data that are within the scope of the search warrant.  The Investigation Team does not have to wait until the entire privilege review is concluded to begin its review for documents and data that are within the scope of the search warrant.  The Privilege Review Team may also conduct the search for documents and data within the scope of the search warrant if that is more efficient.  This second "scope" review is intended only to ensure that the initial scope key word review successfully eliminated data outside the scope of the search warrant from seizure.

12.  The Privilege Review Team will segregate any identifiable documents and/or data that it discovers during the search of the SUBJECT DEVICE relating to Stephanie Clifford v. Donald J. Trump, No. 2:18-CV-2217-SJO-FFM (C.D. Cal.), the representation of Stephanie Clifford, and/or the representation of Julie Swetnick.  Such documents and/or data will be maintained under seal by the investigating agency without

xiv

**EXHIBIT 8**
**Page 40 of 44**

USAO_00460017

further review as set forth in paragraphs 7 and 10 above absent subsequent authorization from the Court. This provision, however, shall not preclude the Privilege Review Team or Investigation Team from reviewing financial and accounting records covered by paragraphs 1.d, 1.f, 1.g, and 1.r above, which reference the representations of Ms. Clifford or Ms. Swetnick.

13. To the extent that any documents and/or data covered by paragraph 1.p above, such as attorney-client fee contracts, engagement letters, and client billing records, contain information that is potentially protected by the attorney-client privileged or the attorney-work-product doctrine, the Privilege Review Team shall redact all such potentially privileged information from the documents or data before releasing the documents and/or data to the Investigation Team unless the specific client agrees to waive the attorney-client privilege.

14. If, upon review, a member of the Investigation Team determines that a document or data appears to contain potentially privileged information, the Investigation Team member shall discontinue its review of the document or data and shall immediately notify a member of the Privilege Review Team. The Investigation Team member may record identifying information regarding the potentially privileged document or data that is reasonably necessary to identify the document or data for the Privilege Review Team. The Investigation Team shall not further review any documents or data that appears to contain such potentially privileged information until after the Privilege

xv

**EXHIBIT 8**
**Page 41 of 44**

USAO_00460018

Case 8:19-mj-00061-JVS  Document 305-3  Filed 09/28/20  Page 283 of 285  Page ID
Case 8:20-mj-00025-DUTY  *SEALED*  Document 2  *SEALED*  Filed 03/17/20  Page 42 of 497
Page ID #:1036
#:4856

Review Team has completed its review of the additional
potentially privileged information discovered by the
Investigation Team member.

15.  In performing the reviews, both the Privilege Review
Team and the Investigation Team may:

     a.  search for and attempt to recover deleted,
"hidden," or encrypted data;

     b.  use tools to exclude normal operating system
files and standard third-party software that do not need to be
searched; and

     c.  use forensic examination and searching tools,
such as "EnCase," "FTK" (Forensic Tool Kit), Nuix, Axiom,
Relativity, and Eclipse, which tools may use hashing and other
sophisticated techniques.

16.  If either the Privilege Review Team or the
Investigation Team, while searching a SUBJECT DEVICE encounters
immediately apparent contraband or other evidence of a crime
outside the scope of the items to be seized, they shall
immediately discontinue the search of that device pending
further order of the Court and shall make and retain notes
detailing how the contraband or other evidence of a crime was
encountered, including how it was immediately apparent
contraband or evidence of a crime.

17.  If the search determines that a SUBJECT DEVICES does
contain data falling within the list of items to be seized, the
government may make and retain copies of such data, and may
access such data at any time.

<div align="center">xvi</div>

<div align="center">**EXHIBIT 8**
**Page 42 of 44**</div>

USAO_00460019

18.   The government may retain the SUBJECT DEVICE
(including any forensic copy thereof), which has already been
obtained by the Investigation Team, but may not access data
falling outside the scope of the other items to be seized (after
the time for searching the device has expired) on the SUBJECT
DEVICE absent further court order.

19.   After the completion of the search of the SUBJECT
DEVICE, the government shall not access digital data falling
outside the scope of the items to be seized absent further order
of the Court.

20.   The special procedures relating to the SUBJECT DEVICE
found in this warrant govern only the search of the SUBJECT
DEVICE pursuant to the authority conferred by this warrant and
do not apply to any search of digital devices pursuant to any
other court order.

III. <u>REQUESTS FOR APPOINTMENT OF A SPECIAL MASTER</u>

21.   To the extent that AVENATTI, EA LLP, or any other
party intends to request that a special master be appointed to
handle the review of any potentially privileged information
seized during the execution of this Search Warrant, such a
request must be filed with this Court within seven days of the
execution of this Search Warrant.  The government will then have
seven days to file any opposition to such a request.

22.   Any request for the appointment of a special master
must, at a minimum, address the following issues:  (a) the legal
basis for the request; (b) the anticipated role of the special
master, should one be appointed; (c) proposed search and review

xvii

**EXHIBIT 8**
**Page 43 of 44**

USAO_00460020

procedures to be followed by the special master, should one be appointed; (d) proposed procedures for the selection of a special master; (e) the names of at least three proposed special masters; and (f) the party's ability to pay for any costs and fees incurred by a special master.

USAO_00460021