NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
JULIAN L. ANDRÉ (Cal. Bar No. 251120)
Assistant United States Attorney
Major Frauds Section
 1100 United States Courthouse
 312 North Spring Street
 Los Angeles, California 90012
 Telephone: (213) 894-6683
 Facsimile: (213) 894-6269
 Email: Julian.L.Andre@usdoj.gov

BRETT A. SAGEL (Cal. Bar No. 243918)
Assistant United States Attorney
 Ronald Reagan Federal Building
 411 West Fourth Street, Suite 8000
 Santa Ana, California 92701
 Telephone: (714) 338-3598
 Facsimile: (714) 338-3708
 Email: Brett.Sagel@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>   Plaintiff,<br><br>     v.<br><br>MICHAEL JOHN AVENATTI,<br><br>   Defendant. | No. SA CR 19-61-JVS<br><br>GOVERNMENT'S REVISED OPPOSITION TO DEFENDANT MICHAEL JOHN AVENATTI'S MOTION FOR PRIVILEGE REVIEW, EVIDENTIARY HEARING, AND DISCOVERY<br><br>[*DECLARATIONS OF JULIAN L. ANDRÉ AND BRETT A. SAGEL, AND EXHIBITS PREVIOUSLY FILED ON 9/28/2020*]<br><br>Hearing Date: October 19, 2020<br>Hearing Time: 9:00 a.m.<br>Location: Courtroom of the<br>     Hon. James V. Selna |

   Pursuant to the Court's September 29, 2020, Order (CR 313), plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Julian L. André and

Brett A. Sagel, hereby files its revised opposition to defendant

MICHAEL JOHN AVENATTI's Motion for a Privilege Review, Evidentiary

Hearing, and Discovery (CR 286).

This revised opposition is based upon the attached memorandum of

points and authorities, the previously filed declarations of Julian

L. André and Brett A. Sagel (CR 305-1 and CR 305-2), the previously

filed exhibits (CR 305-3 and CR 305-4), a supplemental filing the

government's Privilege Review Team will seek leave to submit <u>in</u>

<u>camera</u>, the files and records in this case, and such further evidence

and argument as the Court may permit.

Dated: September 30, 2020          Respectfully submitted,

                                   NICOLA T. HANNA
                                   United States Attorney

                                   BRANDON D. FOX
                                   Assistant United States Attorney
                                   Chief, Criminal Division


                                   _____/s/_____
                                   JULIAN L. ANDRÉ
                                   BRETT A. SAGEL
                                   Assistant United States Attorneys

                                   Attorneys for Plaintiff
                                   UNITED STATES OF AMERICA

# TABLE OF CONTENTS

DESCRIPTION                                                          PAGE

TABLE OF AUTHORITIES..................................................iii

MEMORANDUM OF POINTS AND AUTHORITIES...................................1

I.   INTRODUCTION.....................................................1

II.  STATEMENT OF FACTS...............................................1

     A.   The March 25, 2019, Search Warrants........................1

     B.   Other Search Warrants......................................2

          1.   Global Baristas Warrant...............................2

          2.   EA Server Warrant.....................................3

          3.   Defendant's MacBook Warrant...........................3

     C.   Special-Master Provisions..................................4

     D.   Defendant's Knowledge of the Privilege Review
          Protocols..................................................4

     E.   Inadvertent Review of EA Bankruptcy Emails.................7

III. ARGUMENT.........................................................9

     A.   Defendant Has Not Demonstrated that He Has Standing to
          Challenge the Protocols in the Majority of the
          Warrants...................................................9

     B.   Defendant's Primary Authority is Inapposite...............11

          1.   Scope................................................12

          2.   Harm to Other Lawyers and Clients....................13

          3.   Use of Non-Lawyers...................................14

          4.   Advance Warning to Magistrate........................15

          5.   Adversarial Proceedings..............................15

          6.   Summary..............................................17

     C.   Privilege Review Teams Are Commonly Employed..............17

     D.   The Ex Parte Application Was Proper.......................20

     E.   Defendant Has Made No Showing of a Privilege Violation...21

i

## TABLE OF CONTENTS (CONTINUED)

DESCRIPTION                                                                    PAGE

    F.   There Was No Sixth Amendment Violation...................22

    G.   Defendant's Proposed Remedies are Completely
        Inappropriate...........................................23

IV.  CONCLUSION..................................................25

**TABLE OF AUTHORITIES**

DESCRIPTION                                                                    PAGE

**FEDERAL CASES**

Black v. United States,
    172 F.R.D. 511 (S.D. Fla. 1997)..............................17

Cohen v. United States,
    No. 1:18-mj-03161 (S.D.N.Y)..............................17

Commodity Futures Trading Comm'n v. Weintraub,
    471 U.S. 343 (1985).........................................10

Franks v. Delaware,
    438 U.S. 154 (1978).........................................20

Heller v. New York,
    413 U.S. 483 (1973).........................................20

In re Eagan Avenatti,
    No. 8:19-bk-13560-SC (C.D. Cal.)..............................10

In re Grand Jury (Impounded),
    138 F.3d 978 (3d Cir. 1998).................................22

In re Ingram,
    915 F. Supp. 2d 761 (D. Me. 2012)..........................18

In re Search Warrant Issued June 13, 2019,
    942 F.3d 159 (4th Cir. 2019)............................passim

McNeil v. Wisconsin,
    501 U.S. 171 (1991).........................................23

Media Gen. Operations, Inc. v. Buchanan
    417 F.3d 424 (4th Cir. 2005)...............................20

NLRB v. Interbake Foods, LLC,
    637 F.3d 492 (4th Cir. 2011)...............................19

United States v. Danielson,
    325 F.3d 1054 (9th Cir. 2003)...........................18, 23

United States v. de la Jara,
    973 F.2d 746 (9th Cir. 1992)...............................22

United States v. Dionisio,
    410 U.S. 1 (1973)...........................................17

United States v. Hansen,
    2019 WL 6137450 (D. Idaho 2019)............................18

**TABLE OF AUTHORITIES (CONTINUED)**

<u>DESCRIPTION</u>                                                                    <u>PAGE</u>

<u>United States v. Lonich</u>,
      2016 WL 1733633 (N.D. Cal. 2016)..............................18

<u>United States v. SDI Future Health, Inc.</u>,
      464 F. Supp. 2d 1027 (D. Nev. 2006).......................19, 23

<u>United States v. Tillsy</u>,
      2014 WL 6451248 (W.D. Wash. 2014)...........................18

<u>United States v. Western Titanium, Inc.</u>,
      2010 WL 3789775 (S.D. Cal. 2010).............................18

<u>United States v. Zolin</u>,
      491 U.S. 554 (1989)........................................20

<u>Weil v. Investment/Indicators, Research, and Management, Inc.</u>,
      647 F.2d 18 (9th Cir. 1981)................................21

<u>Wharton v. Calderon</u>,
      127 F.3d 1201 (9th Cir. 1997)..............................10

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

Defendant MICHAEL JOHN AVENATTI's ("defendant") Motion seeks to entirely up-end the privilege-review protocols that a Magistrate Judge approved and under which the parties have been operating for eighteen months.  In support of his Motion, defendant cites an out-of-Circuit opinion with entirely different facts, and the inadvertent review, by the Prosecution Team, of a handful of emails between defendant's office manager and his former law firm's bankruptcy counsel that were subsequently removed from the Prosecution Team's possession.  Defendant has cited no actual problems with the court-approved protocols nor has he identified a single document that is actually privileged and that the Prosecution Team has used to his detriment.  Nor has defendant established that he is entitled to discovery or an evidentiary hearing, both of which would constitute an impermissible fishing expedition and would unnecessarily delay the trial in this case.  Indeed, even if there were merit to defendant's claims (and there is not), the only remedy available to defendant is the suppression of the potentially privileged materials that have already been removed from the Prosecution Team's possession.  For these reasons, defendant's Motion should be denied.

### II.   STATEMENT OF FACTS

#### A.   The March 25, 2019, Search Warrants

On March 25, 2019, IRS-CI executed several search warrants, namely, at the residence of defendant's former paralegal and office manager ("EA Employee 1") (see No. 8:19-mj-242, Def. Ex. A); at a separate law firm ("Law Firm 1") (see No. 8:19-mj-244, Def. Ex. B); and at defendant's residence (see No. 8:19-mj-247, Gov't Ex. 1).

The search warrants were obtained through application to a magistrate judge, without advance notice to defendant.  The affidavit in support of the warrants included a separate section dealing with potential privilege issues.  (Gov't Ex. 2 at 74-79.)  The warrants contained specific protocols detailing procedures to be followed to prevent the disclosure of privileged information, including the use of a Privilege Review Team.  (<u>See, e.g.</u>, Def. Ex. A at x-xviii.[1])

IRS-CI agents left a copy of the applicable search warrant (including Attachments "A" and "B," in which the privilege protocols were stated, to each warrant) at each search location.  The IRS-CI agents who searched defendant's residence left a copy of the warrant to search defendant residence (No. 8:19-mj-247, Gov't Ex. 1) -- which included identical review and privilege protocols as the other March 2019 warrants -- and the search inventory on defendant's living-room table (Gov't Ex. 3).[2]

**B.   Other Search Warrants**

    1.   <u>Global Baristas Warrant</u>

In February 2019, the government obtained a warrant to search seven digital devices that IRS-CI had obtained from former employees of defendant's coffee company, Global Baristas US LLC ("GBUS").  GBUS was in Chapter 7 bankruptcy proceedings at the time.  Because this search did not implicate the same privilege concerns as did the three warrants discussed above -- defendant did not use a GBUS email

---

[1] Because the privilege protocols were the same for each of the three search warrants executed on March 25, 2020, citations in this brief are only to one.  Similarly, the government has only attached one of the March 2019 Search Warrant Applications and supporting Affidavits (without exhibits) to this Opposition.  (Gov't Ex. 2.)

[2] Defendant does not list the warrant to search his residence in his Motion.  (<u>See</u> Mot. at 1 (listing the five other search warrants, but not identifying No. 8:19-mj-247).)

1  account or maintain any legal files at GBUS, and the GBUS bankruptcy

2  trustee had waived the attorney-client privilege (Gov't Ex. 5) -- it

3  contained slightly different privilege-review protocols.  (See No.

4  8:19-mj-103, Gov't Ex. 4 at 11-20; CR 1, Ex. 1 (Aff.).)

5          2.  EA Server Warrant

6      On April 3, 2019, the court-appointed Receiver (the "EA

7  Receiver") for Eagan Avenatti LLP ("EA LLP") consented to IRS-CI

8  creating a forensic copy of EA LLP's computer servers (the "EA

9  Server").  (CR 55, Ex. 7.)  On May 24, 2019, the government obtained

10 a warrant to search the six digital devices that constituted the EA

11 Server, as well as digital devices and hard-copy materials seized

12 from defendant's briefcase during his arrest in New York.  (See No.

13 8:19-mj-419, Def. Ex. C; Gov't Ex. 6.)  The affidavit supporting that

14 warrant included a section specifically dealing with potential

15 privilege issues, and identified a number of law firms and lawyers

16 with whom defendant and/or his companies may have had attorney-client

17 relationships.  (Gov't Ex. 6 at 80-84.)  The affidavit also advised

18 the Magistrate Judge that the devices contained approximately 10 to

19 15 terabytes of data.  (Id. at 84.)  Attached to that affidavit were

20 privilege waivers signed by the five victim-clients identified in the

21 indictment.  (Gov't Ex. 7.)  The privilege-review protocols were

22 nearly identical to the privilege-review protocols for the March 2019

23 warrants.  (Def. Ex. C.)

24          3.  Defendant's MacBook Warrant

25     On January 16, 2020, the government obtained a warrant to search

26 defendant's previously encrypted MacBook that had been seized from

27 him upon his arrest in New York on March 25, 2019.  (See No. 8:20-mj-

28 25, Gov't Ex. 8.)  The affidavit incorporated by reference the prior

affidavits, specifically addressed privilege issues, and included the same privilege-review protocols as the EA Server warrant.  (Id. at 13-16, 19-23, 36-44.)

### C.   Special-Master Provisions

The March 2019 search warrants and subsequent search warrants also provided a mechanism for defendant and the entities being searched to seek appointment of a special master.  The provisions detailed when such a request should be made and what issues the request should address.  (See, e.g., Def. Ex. A at xxi-xxii.) Although the provisions relating to the appointment of a special master were set forth in the search warrant attachments that were left at each search location on March 25, 2019, including defendant's residence (and subsequently produced to defendant), neither defendant nor any of the other searched persons or entities have sought the appointment of a special master or challenged the search protocols.

### D.   Defendant's Knowledge of the Privilege-Review Protocols

Defendant has been on notice of the search and privilege-review protocols since the initial warrants were executed in March 2019.

First, as noted above, the applicable search protocols were attached to the warrant to search defendant's residence (Gov't Ex. 1), a copy of which was left on his living room table (Gov't Ex. 3). Copies of the warrants, applications, and supporting affidavits were also produced to defendant in discovery.  (See Gov't Ex. 9.)

Second, throughout the pendency of this case, the government has regularly provided defendant and the Court with detailed information regarding the process that was being employed to identify and segregate potentially privileged information.  The government discussed the digital search warrant materials during the first

4

status conference in this case in May 2019, noting that "[t]hey are going to be processed and go through a privilege review." (CR 107, 5/15/19 RT at 5:15-19.) Since then, the government has continued to regularly update the Court and defendant regarding the privilege-review process. (See, e.g., 7/8/2019 Joint Status Report, CR 44 at 8; 7/22/2019 Gov't Status Report, CR 49 at 2-3; CR 109, 12/2/2019 RT 4:23-6:8; CR 111, 1/30/2020 RT 3:12-9:8; 2/18/2020 Gov't Status Report, CR 99; CR 164, 4/27/2020 RT 3:24-4:17.) At no point, during these status conferences or in response to the government's status reports, did defendant object to the privilege-review protocols.

Third, in July 2019, the government sent defense counsel a detailed letter regarding the privilege review that cited each of the search warrants by produced Bates-number. (Gov't Ex. 9.) "In order to ensure that the government's Privilege Review Team is able to conduct a thorough privilege review and avoid any inadvertent disclosure of privileged materials," the government requested that defendant provide the government with the "names and identifying information . . . for any law firms or attorneys with whom defendant or his companies . . . may have had privileged communications." (Id.) Following some intermediate correspondence (Gov't Exs. 10-11), however, defense counsel said that he could not respond to the government's letter or provide information regarding who may have represented defendant because defendant did not have access to the EA Server (Gov't Ex. 12). See also Gov't Exs. 13-14 (defendant again declining to provide attorney information upon a follow-up request by the government).

Fourth, defendant has twice litigated issues relating to the EA LLP digital devices, yet never objected to the privilege-review

protocols.  In July 2019, defendant filed a motion to obtain a complete forensic copy of the EA Server and the EA LLP devices seized from EA Employee 1's residence (CR 50), which the government and the EA Receiver both opposed (CR 55; CR 59; CR 60).  The Court denied defendant's motion, finding, among other things, that defendant did not have an ownership interest in the EA Server or the contents thereof.[3]  (CR 63 at 4 (internal citations omitted).)  Then, in June 2020, eight months after the Fourth Circuit had issued the decision that defendant primarily relies upon in the present Motion, defendant again sought access to the EA Server and other EA LLP devices through the Privilege Review Team.  (See CR 178; CR 193; CR 195.)  The Court again denied defendant's request.  (CR 204, 7/6/2020 RT 11-13; CR 199.)  At no point in connection with either motion (CR 50; CR 178; CR 195) did defendant challenge the privilege-review protocols.

Finally, defendant has been provided multiple opportunities to meet directly with the Privilege Review Team and review the EA LLP devices, including the EA Server.  (See Gov't Ex. 15.)  Between September 2019 and October 2019, defendant and his counsel dealt directly with the Privilege Review Team, and met with the Privilege Review Team on at least two occasions to review the EA LLP devices.  (See CR 99 at 9.)  In fact, defense counsel has repeatedly expressed appreciation for the Privilege Review Team's efforts.  (See CR 109,

---

[3] The government's opposition detailed the facts regarding defendant's stipulation to the appointment of the EA Receiver and the issuance of a restraining order against EA LLP and defendant.  (CR 55 at 4-5, Ex. 1.)  Among other things, the Stipulated Receivership Order required the EA Receiver to take possession of all of EA LLP's property, including "past and current client engagement contracts, case files, books and records, electronic files, and other documents."  (Id., Ex. 2 (emphasis added).)  The government also attached as exhibits to its opposition the warrants to search the EA Server and EA Employee 1's residence.  (CR 61, Exs. 17-18.)

12/2/2019 RT 5:23-6:8 (stating the Privilege Review Team has been "been very cooperative in terms of being available for us and giving us what we request"); CR 162, 4/27/2020 RT 5:9-25 (sating "the filter team has been very accommodating" and "cooperative"); CR 178 ("[T]he defense has previously enjoyed a professional, cooperative relationship with the Privilege Review Team with no disputes.").)

### E.   Inadvertent Review of EA Bankruptcy Emails

In May 2020, while reviewing search-warrant materials that the Privilege Review Team had recently released to the Prosecution Team, the Prosecution Team came across a small number of emails between EA Employee 1 and EA LLP's bankruptcy counsel[4] relating to the preparation of documents to be filed in EA LLP's bankruptcy proceeding.  (See Gov't Ex. 17.)  Upon encountering these emails, the Prosecution Team -- as required by the privilege-review protocols (Def. Ex. A at xvii) -- immediately contacted the Privilege Review Team out of an abundance of caution to make sure the Privilege Review Team did not inadvertently release the emails to the Prosecution Team.  (Gov't Ex. 17 at 1; André Decl. ¶¶ 3-4; Sagel Decl. ¶¶ 3-4.)[5] Although the Prosecution Team may have briefly encountered other documents involving EA LLP's bankruptcy counsel while searching through the government's Relativity database on May 13, 2020, or at other times, the Prosecution Team reviewed the content of only a

---

[4] During the EA LLP Bankruptcy, Robert Saunders from Pachulski Stang Ziehl Jones represented EA LLP, while defendant and Avenatti & Associates APC ("A&A") were separately represented by Mark Horoupian of SulmeyerKupetz.  (See Gov't Ex. 16.)  Thus, any privilege over these documents would likely be held by EA LLP, not defendant.

[5] That same day, the Prosecution Team emailed the investigating agents and informed them that if they came across any similar documents, the documents should be tagged for privilege review but should not be reviewed substantively.  (Gov't Ex. 17 at 2-3.)

small number of those documents during its review on May 13 and May 14, 2020.  (André Decl. ¶ 9; Sagel Decl. ¶ 5; Gov't Ex. 19.)[6]

The Privilege Review Team analyzed the documents that the Prosecution Team had identified and, on June 24, 2020, responded:

> Upon review with the assistance of a PRT contract attorney, <u>we have decided to remove any such emails from the prosecution team database in an abundance of caution</u>. Leidos located 179 of these documents in the prosecution team database (299 documents total including family members[7]), and will be removing the 299 documents from the clean workspace at our direction.

(Gov't Ex. 17 at 4 (emphasis added).)  On June 26, 2020, the Prosecution Team thanked the Privilege Review Team for "taking a cautious approach," requested that the Privilege Review Team advise defendant that the 299 documents had been clawed back from the Prosecution Team, and confirmed that it had deleted the two exemplars it had previously emailed the Privilege Review Team.  (<u>Id.</u>)

On July 6, 2020, the Privilege Review Team indicated by email that it was still working on the "claw back" of the potentially privileged documents. (<u>Id.</u> at 6.)  On August 31, 2020, the Privilege Review Team told the Prosecution Team they would be writing a letter to the defense regarding the "clawback" issue.  (<u>Id.</u> at 9.)  On September 2, 2020, the Privilege Review Team again conferred with the

---

[6] Information from the government's Relativity database indicates that the government may have "viewed" approximately 75 out of the 299 potentially privileged documents, primarily during their review on May 13 and 14, 2020.  (Gov't Ex. 19.)  Government counsel believes they likely skipped over most of those documents without reviewing the substance of the documents and/or noticing whether or not the documents referenced EA LLP's bankruptcy counsel.  (André Decl. ¶ 9; Sagel Decl. ¶ 5.)

[7] "Family members" are related documents.  For example, if an email is identified as a potentially privileged document, all emails within that email string and/or any attachments to those emails would be "family members."

Prosecution Team to ensure that the information to be included in the letter to defense counsel was accurate.  (Id. at 7.)  The Privilege Review Team then wrote to defense counsel to alert them of the claw back of the documents.[8]  (Mot. at 1.)

## III. ARGUMENT

Having expressed no concern for eighteen months about the way the government was carefully filtering out potentially privileged materials from the items seized from defendant and his shuttered law firm, defendant now -- without identifying a single privileged document -- invokes an out-of-Circuit case and claims violations of his rights and those of his former clients.  These eleventh-hour challenges to a well-established practice should be rejected.

### A.   Defendant Has Not Demonstrated that He Has Standing to Challenge the Protocols in the Majority of the Warrants

Defendant argues that he is "entitled to pursue the legal positions herein not only on his own behalf, as the client, but also on behalf of each of his clients whose information was seized by the government." (Mot. at 8.)  This blanket statement is insufficient to establish that defendant has standing to challenge the search protocols for all of the warrants.

As an initial matter, the bulk of the potentially privileged material came from the EA Server, in which the Court has found -- twice -- that defendant had (and has) no possessory or ownership interest.  (CR 63 at 4; see also CR 199.)  Likewise, the documents on the EA Server do not belong to defendant.  (CR 63 at 4.)

---

[8] The letter was not provided to the Prosecution Team, and thus cannot be attached here.

Second, defendant does not have a basis to assert the attorney-client privilege on behalf of EA LLP -- the privilege belongs to EA LLP, which is now controlled by a bankruptcy trustee.  See Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 349 (1985) (holding that bankruptcy trustee has "authority to assert and waive the corporation's attorney-client privilege").  "Displaced managers may not assert the privilege over the wishes of current managers, even as to statements that the former might have made to counsel concerning matters within the scope of their corporate duties."  Id.

Third, the EA Receiver voluntarily gave the EA Server to the government to copy and ultimately search.  (CR 63 at 1.)  "The attorney-client privilege is an evidentiary rule designed to prevent the forced disclosure in a judicial proceeding of certain confidential communications between a client and a lawyer.  We held that the rule does not apply where there is no forced disclosure of a confidential communication in a judicial proceeding."  Wharton v. Calderon, 127 F.3d 1201, 1205 (9th Cir. 1997).  Without forced disclosure of the EA LLP materials, defendant cannot claim that a violation of privilege has occurred.

Fourth, to the extent defendant is seeking to enforce the privilege as to clients of EA LLP, they are no longer defendant's clients, as he is prohibited from practicing law (Gov't Ex. 21), and EA LLP is now controlled by a bankruptcy trustee, In re Eagan Avenatti, No. 8:19-bk-13560-SC.  Thus, at best, defendant is seeking to enforce a privilege on behalf of unnamed former clients of his

10

former law firm, now controlled by a bankruptcy trustee, with respect to unidentified disputes.[9]

Finally, defendant has no basis to challenge the search of the GBUS (Global Baristas) devices, which are unlikely to contain privileged information and were property of the bankruptcy estate, or the search of devices seized from Law Firm 1, which was a completely separate law firm in which defendant had no ownership or management interests.  Indeed, defendant's supporting declaration does not mention these devices, let alone attempt to claim that he has a basis to assert privilege over any documents reviewed or seized in connection with those two warrants (Nos. 8:19-mj-103, 8:19-mj-244).

For these reasons, the Court should view defendant's privilege claims with significant skepticism.

**B.    Defendant's Primary Authority is Inapposite**

Defendant primarily relies upon a Fourth Circuit decision issued after five of the six warrants defendant challenges were executed, and that (a) arises from entirely distinguishable facts, and (b) is not binding on this Court.  In re Search Warrant Issued June 13, 2019, 942 F.3d 159 (4th Cir. Oct. 31, 2019).[10]  In that case, federal law enforcement was investigating criminal activity by a target, "Client A," and potential obstruction of justice by Client A's attorney, "Lawyer A," triggering the crime-fraud exception to the attorney-client privilege.  Id. at 165.  Thus, the IRS obtained a

---

[9] Having previously stipulated to turn over all of his clients' materials to the EA Receiver and failed to raise any purported rights of his former clients for eighteen months, defendant's sudden concern for his former clients is dubious.

[10] Each of the other Fourth Circuit cases defendant cites in his Motion are also cited by In re Search Warrant, and defendant's Motion simply copies verbatim from significant portions of the In re Search Warrant opinion.

warrant to search the offices of the law firm at which Lawyer A practiced.  Id.  That warrant was obtained ex parte and provided for the use of a filter team to review the seized information to remove any privileged information that did not fall within the scope of the warrant.  Id.

Three days after execution of the warrant, the law firm raised an objection to the seizure with the government, in particular to the use of a filter team, and demanded return of all of the privileged information seized, or, in the alternative, that it be submitted to a magistrate judge for an in camera inspection.  Id. at 167-68.  When the government did not respond, the law firm filed a motion seeking injunctive relief one week later.  Id.  The district court denied the injunction.  Id. at 169.

In an expedited appeal, the Fourth Circuit reversed the district court's decision and took issue with the filter protocols that the magistrate judge had approved in the search warrant.  As set forth below, many of the facts that the Fourth Circuit used as the basis of its decision stand in stark contrast to the facts of this case.

       1.   Scope

In In re Search Warrant, the government sought the client files of one attorney as to one client because that is where the malfeasance was to be found, but then seized a vast amount of the law firm's files in the process.  Id. at 172.  Namely, of the 52,000 emails seized by the government, only .02% of those were between Client A and Lawyer A.  Id. at 172.

In this case, by contrast, the Indictment and search warrant affidavits allege that defendant engaged in an extensive pattern of fraudulent conduct for nearly a decade.  Defendant, who had owned and

managed EA LLP, allegedly used that firm, its digital devices, and its client trust accounts, to embezzle his own clients' settlement proceeds, as well as to commit bank fraud, identity theft, bankruptcy fraud, and a host of tax offenses.  (See CR 16.)  In other words, it was the illicit way defendant operated his legal practice that required the government to search digital devices belonging to his former law firm.  The search required here was much broader than the search that was appropriate in the Fourth Circuit case, and was likely to return far more responsive documents.  As a result, use of a filter team was far more appropriate to handle the filtering of those materials than a process entailing the submission of thousands (or hundreds of thousands) of documents to a magistrate judge.[11]

### 2. Harm to Other Lawyers and Clients

The Fourth Circuit found that the district court did not properly weigh the irreparable harm that would be suffered by the law firm (separate and apart from Lawyer A) and its clients (separate and apart from Client A) if the filter team reviewed their privileged communications and work product.  In re Search Warrant, 942 F.3d at at 175.  In essence, the Fourth Circuit sought to protect the privacy and privilege of the other clients of that white-collar defense firm.

Here, defendant had been the managing partner and owner of EA LLP and it was his malfeasance that was under investigation.  Defendant's victim-clients had already executed written-waivers of the attorney-client privilege, which allowed the government to obtain

---

[11] The EA Server alone contained approximately 16 million files.  Approximately 115,000 non-privileged documents or files from the devices searched were ultimately released to the Prosecution Team.  Even focusing on just the documents released to the Prosecution Team, the government submits that is simply not reasonable to impose such an extensive review upon a busy magistrate judge.

their communications with defendant and with other lawyers at EA LLP. (See Gov't Ex. 2 at 75-76; Gov't Ex. 6 at 81-82; Gov't Ex. 7.)  Thus, the heart of the case was contained in the materials seized and many of the potential privileges in those materials had already been waived.

Moreover, to the extent defendant claims he is protecting the privileges of EA LLP's clients: (1) he is no longer allowed to practice law in California and therefore has no clients (Gov't Ex. 21); and (2) he personally stipulated to turn over control of EA LLP, including all of EA LLP's files, to the EA Receiver in February 2019.

### 3.   Use of Non-Lawyers

The Fourth Circuit took issue with the fact that the warrant authorized the government to use non-lawyers to make privilege decisions about the seized materials, such as authorizing "paralegals and IRS and DEA agents to designate seized documents as non-privileged."  In re Search Warrant, 942 F.3d at 177.  Here, the privilege review was performed by contract attorneys in the United States Attorney's Office Privilege Review Team, supervised by two Assistant United States Attorneys.  (CR 49, n.1.)  Defendant's argument that the warrant "delegated judicial functions to non-lawyer members of the Filter Team, including litigation support personnel and computer forensic agents" (Mot. at 14) misses the mark.  The filter protocol said that litigation support personnel and computer forensic agents could assist with "processing, filtering, and transferring documents," but that the privilege determinations would be made by the Privilege Review Team and, in particular, the Privilege Review Team AUSAs.  (Def. Ex. A at x-xiii.)

### 4.   Advance Warning to Magistrate

The Fourth Circuit also found that the magistrate's decision to authorize the search warrant was uninformed because the magistrate did not know the amount of materials that would be seized that were not related to the facts under investigation.   Id. at 178.

In this case, by contrast, the government fully informed the Magistrate Judge about the nature and volume of the materials.   The search warrant affidavits set forth specifically how defendant had used his law-firm trust accounts to transfer money improperly withheld from clients, and used his law-firm email account to engage in extensive additional criminal conduct.   (See CR 1, Ex. 1 (GBUS Aff.); Gov't Ex. 2 (March 2019 Aff.); Gov't Ex. 6 (May 2019 Aff.).) The March 2019 affidavit specifically notified the Magistrate Judge that "there is a significant likelihood that the SUBJECT PREMISES will contain documents and records that are covered by the attorney-client privilege or attorney-work-product doctrine" and that "proposed search warrants contains specific procedures designed to avoid unnecessary disclosures of any privileged attorney-client communications or attorney-work-product." (Gov't Ex. 2 at 74.)   And the May 2019 affidavit contained similar language regarding privilege issues, explicitly advising the Magistrate Judge that the devices likely contained 10 to 15 terabytes of data.   (Gov't Ex. 6 at 80-84.)

### 5.   Adversarial Proceedings

Finally, the Fourth Circuit faulted the magistrate judge for not using adversarial proceedings to determine how the privilege material should be reviewed, and forgave the law firm for waiting ten days to institute those proceedings.   In re Search Warrant, 942 F.3d at 178.

15

Here, the government and Magistrate Judge invited adversarial proceedings, if any were necessary.  The government specifically invited defendant to seek a special master to conduct the review should he be concerned about the privilege-review protocols.  (Def. Ex. A at xxi.)  That process was spelled out in the attachments to the warrants, including the one left on defendant's living room table on March 25, 2019.  (Gov't Ex. 1 at 24-25; Gov't Ex. 3.)  At no time since the March 2019 warrants were executed has defendant sought a special master or otherwise challenged the nature of the protocols or how they were being applied.  There were no objections at various status conferences; there were no objections in connection with defendant's two motions for access to the EA Server; there were no objections in numerous communications with government counsel; and there were no objections raised when defendant met with the Privilege Review Team and reviewed the EA Server.  Instead, defendant, on multiple occasions, spoke of the Privilege Review Team being "very cooperative."  (<u>See, e.g.</u>, CR 109, 12/2/2019 RT 5:23-6:8.)

Defendant has thus waived his right to bring these arguments by failing to raise them since March 2019. [12]  <u>See</u> <u>In re Search Warrant</u>, 942 F.3d at 184 (Rushing, J., concurring) ("[T]he burden remains on the parties to voice their objections, and accommodate the orderly resolution of those objections, in the normal course.").

_____

[12] Nor can defendant argue that he lacked any basis to challenge the privilege-review protocols until he learned that potentially privileged documents were clawed back from the Prosecution Team.  The clawback occurred consistent with the privilege-review protocols: the protocols expressly addressed this potential factual scenario and, as set forth herein, the protocols were in fact followed.  Learning that the privilege-review protocols were followed does not excuse defendant's failure to challenge the protocols in the first place.

6. <u>Summary</u>

The Fourth Circuit decision should be read for what it represents: a response to a "unique" set of facts that differ significantly from the facts here. <u>Id.</u> at 183. Imposing a special master in every case that might potentially involve privileged material would be extremely burdensome. For example, the special master's team in the Michael Cohen case -- cited in the Fourth Circuit opinion -- took more than four months to complete its review, at a cost of more than $960,000. <u>Cohen v. United States</u>, No. 1:18-mj-03161 (S.D.N.Y) at CR 63, 97, 102, 106. Other special masters have taken more than two years to conduct their reviews. <u>Black v. United States</u>, 172 F.R.D. 511, 514 n.4 (S.D. Fla. 1997). Similarly, the government submits that magistrate judges do not have sufficient time or staff to perform the sort of extensive document-by-document review that the panel required in the Fourth Circuit case. Imposing those sorts of costs and delays in every case would give short shrift to the public's substantial interest in expedient investigations and prosecutions, <u>United States v. Dionisio</u>, 410 U.S. 1, 17 (1973), and might in many cases make investigations of lawyers and law firms suspected of wrongdoing prohibitively expensive.

For these reasons, the Fourth Circuit's analysis in <u>In re Search Warrant</u> should not govern the procedures employed in this investigation. When the analysis of that opinion is removed from defendant's Motion, there remain no serious challenges to the privilege-review process employed here.

**C.  Privilege Review Teams Are Commonly Employed**

Defendant -- having known about the means by which the government was filtering the search-warrant materials for a year and

17

a half -- now claims that the entire process is invalid and improper. Yet, despite the Fourth Circuit's non-binding opinion, the protocols approved in these search warrants are frequently used in this Circuit and others to sort through potentially privileged materials seized during government investigations.[13] See, e.g., United States v. Danielson, 325 F.3d 1054, 1072-73 (9th Cir. 2003) (suggesting use of filter team to avoid inadvertent disclosure of privileged materials regarding defendant's trial strategy);[14] United States v. Hansen, 2019 WL 6137450 (D. Idaho 2019) (denying defendant's claim of privilege and authorizing use of a taint team); United States v. Lonich, 2016 WL 1733633 (N.D. Cal. 2016) (ruling on whether documents were privileged after filter team conducted initial review); United States v. Tillsy, 2014 WL 6451248 (W.D. Wash. 2014) (suppressing two documents that were inadvertently produced but finding no issue with use of taint team to conduct privilege review); In re Ingram, 915 F. Supp. 2d 761, 765 (D. Me. 2012) ("[T]he Court finds that the government's proposed filter team protocol shows proper deference to any attorney-client or work product privileges while allowing the government's investigation to proceed."); United States v. Western Titanium, Inc., 2010 WL 3789775 (S.D. Cal. 2010) (ruling on whether

---

[13] Defendant also claims the use of key word searches is inappropriate to find potentially privileged documents. (Mot. at 6.) Defendant should have raised that issue in July 2019 when the government asked defendant to provide the Privilege Review Team with the names of his various attorneys to ensure that all privileged material was identified. (See Gov't Exs. 9-14.)

[14] Danielson involved the government's exposure to privileged information regarding defendant's trial strategy, in violation of the Sixth Amendment right to counsel. In addressing the Sixth Amendment violation, the Ninth Circuit noted that the government's use of a filter team including to make the privilege determinations is a way to avoid inadvertent disclosure of privileged material. Danielson, 325 F.3d at 1072-73. As discussed below, there is no basis for a Sixth Amendment claim in the present case.

privilege applied to seized documents that were filtered by privilege AUSA); <u>United States v. SDI Future Health, Inc.</u>, 464 F. Supp. 2d 1027, 1039 (D. Nev. 2006) (suggesting that "it may be incumbent on the Government to have a taint team review of all records before they are reviewed by the investigating agents or the prosecuting team").

Defendant claims that the privilege protocols were an improper delegation of judicial functions to the executive branch, and relies on another Fourth Circuit case, <u>NLRB v. Interbake Foods, LLC</u>, 637 F.3d 492 (4th Cir. 2011), for this proposition. Defendant's misreads that case. <u>Interbake Foods</u> held that making a privilege determination becomes a judicial function only when the privilege determination is a necessary predicate to a separate act that can itself only be performed by a court, such as ordering compliance with a subpoena. <u>Id</u>. at 499 ("[O]nly the district court determines whether to enforce the subpoena and, in making that determination, evaluates the claims of privilege. . . . [I]n carrying out this judicial function, the court cannot delegate its task of conducting <u>in camera</u> review to an ALJ."). <u>Interbake Foods</u> does not stand for the proposition that the executive branch is prohibited from making initial determinations of privilege, especially when questions about the application of that privilege are to be resolved by the court. Resolution of such questions by the Court is exactly what is contemplated by the protocols used here provide. <u>See</u> Def. Ex. A at 12 ("If appropriate based on review of particular documents, the PRTAUSA may apply to the court for a finding with respect to the particular documents that no privilege, or an exception to the privilege, applies.").

1    **D.   The <u>Ex Parte</u> Application Was Proper**

2         Again citing to the Fourth Circuit decision, defendant argues

3    that it was improper for the government to seek the warrant, with its

4    attendant privilege protocols, through <u>ex parte</u> proceedings with the

5    magistrate judge. (Motion at 15-17.)  As even the Fourth Circuit has

6    noted, determinations about the reasonableness of a warrant, and the

7    reasonableness of a particular mode of executing that warrant, are

8    routinely made through <u>ex parte</u> proceedings.  <u>Media Gen. Operations,</u>

9    <u>Inc. v. Buchanan</u>, 417 F.3d 424, 429 (4th Cir. 2005) (holding that

10   search warrant applications are "necessarily ex parte") (quoting

11   <u>Franks v. Delaware</u>, 438 U.S. 154, 169 (1978)).  The Supreme Court has

12   also endorsed procedures by which lower courts may make final

13   privilege determinations on an <u>ex parte</u> basis.  <u>See</u> <u>United States v.</u>

14   <u>Zolin</u>, 491 U.S. 554, 572 (1989) (in camera proceeding to determine

15   the applicability of the crime-fraud exception); <u>Heller v. New York</u>,

16   413 U.S. 483, 493 (1973) (holding that a target was not entitled to

17   "an adversary hearing prior to a seizure").

18        Defendant, however, argues that the Magistrate Judge should have

19   conducted adversarial proceedings after the searches but before

20   approving the privilege review protocols.  (Mot. at 16.)  But

21   defendant had the opportunity to commence such an adversarial process

22   -- just as the law firm did in the Fourth Circuit case -- immediately

23   upon learning that EA LLP's files had been seized.  Defendant could

24   have also asked for a special master to be employed to prevent

25   government personnel from seeing any potentially privileged

26   documents.  Both of those options were available to defendant long

27

28

                                         20

before the privilege-review process began.[15]  Defendant did neither, and instead sat on his rights as the Privilege Review Team completed the laborious task of filtering the seized materials.  Defendant cannot now complain that the entire process was invalid.

### E.  Defendant Has Made No Showing of a Privilege Violation

"As with all evidentiary privileges, the burden of proving that the attorney-client privilege applies rests not with the party contesting the privilege, but with the party asserting it."  Weil v. Investment/Indicators, Research, and Management, Inc., 647 F.2d 18, 25 (9th Cir. 1981).  With respect to the handful of documents that were inadvertently reviewed by the Prosecution Team and later clawed back by the Privilege Review Team, defendant has not proffered facts showing that the documents were protected by any recognized privilege or that defendant has standing to assert any such privileges.

The fact that 299 potentially privileged documents made their way into the Prosecution Team's database does not mean that any privilege was violated.  The chronology shows that the Prosecution Team and Privilege Review Team complied with the privilege-review protocols, the documents were removed from the Prosecution Team's database "out of an abundance of caution," and the defense was then notified.[16]

---

[15] As of July 22, 2019, the Privilege Review Team had not begun its substantive review of the EA Server materials.  (CR 49 at 4-5.)

[16] Defendant takes issue with the amount of time that elapsed between when the materials were first identified and when he was notified of the claw back of the material.  (Mot. at 1.)  In fact, the Prosecution Team promptly stopped reviewing the materials, the Privilege Review Team analyzed and removed the documents within weeks, and defendant was then notified of these events by letter.  (See Gov't Ex. 17.)  Although this may not have happened as quickly as defendant would have wished, the time it took to alert defense that the government was following the protocols in the warrant is of

As of May 8, 2020, defendant had been provided with all of the documents that the Privilege Review Team released to the Prosecution Team (CR 168), other than 174 additional documents that were produced to the defense on July 29, 2020 (CR 293).  Defendant is thus able to determine what materials the Prosecution Team has been able to review and use in its case against him.  Nonetheless, five months later defendant has still not identified a single document in that universe that he claims is privileged and should not have been disclosed to the Prosecution Team.

Defendant has waived the privilege with respect to any materials he has been provided and for which he has not yet sought relief from the Court based on alleged privilege violations.  The Ninth Circuit has instructed that when "determining whether the privilege should be deemed to be waived, the circumstances surrounding the disclosure are to be considered."  United States v. de la Jara, 973 F.2d 746, 749-50 (9th Cir. 1992).  "[W]e will deem the privilege to be waived if the privilege holder fails to pursue all reasonable means of preserving the confidentiality of the privileged matter."  Id. at 750; see also In re Grand Jury (Impounded), 138 F.3d 978, 983 (3d Cir. 1998) (holding privilege as to seized documents was waived by waiting four months to raise claim with the court).  Defendant has fallen far short of that standard here.

## F.   There Was No Sixth Amendment Violation

Defendant cites to the Sixth Amendment, at least in principle (Mot. at 10-11), but does not attempt to establish any such violation

---

no moment.  In any case, the government moved as expeditiously as it could given that the discovery in this case involves large computer databases, litigation support personnel who maintain them, and Privilege Review Team AUSAs who also carry full case-loads.

1  -- as he cannot.  The Sixth Amendment right to counsel does not

2  attach "until a prosecution is commenced . . . whether by way of

3  formal charge, preliminary hearing, indictment, information, or

4  arraignment."  <u>McNeil v. Wisconsin</u>, 501 U.S. 171, 175 (1991).  To

5  prove a Sixth Amendment violation, a defendant must show that the

6  alleged "improper interference by the government with the

7  confidential relationship between a criminal defendant and his

8  counsel . . . substantially prejudices" the defendant.  <u>Danielson</u>,

9  325 F.3d at 1069.  Here, any communications on the seized devices

10  were created in advance of defendant's arrest and indictment,

11  removing them from Sixth Amendment concern.  As to prejudice,

12  defendant has been given access to the materials that the government

13  seized, and has copies of the few documents that the Prosecution Team

14  inadvertently reviewed.  He has not argued that the seizure of these

15  materials has prejudiced his defense of this criminal case, much less

16  substantially so.

17       **G.   Defendant's Proposed Remedies are Completely Inappropriate**

18       The "general remedy for violation of the attorney-client

19  privilege is to suppress introduction of the privileged information

20  at trial."  <u>SDI Future Health, Inc.</u>, 464 F. Supp. at 1047.  To the

21  extent any of the 299 documents were privileged (which defendant has

22  failed to establish), such relief is unnecessary because the

23  government already self-suppressed those documents by removing them

24  from the Prosecution Team's possession.  Instead, defendant now seeks

25  to: employ a magistrate judge or special master to review all of the

26  search warrant materials; require the Prosecution Team to return all

27  search warrant materials in its possession (over 115,000 files

28  totaling over 900,000 pages); require the Privilege Review Team or

Prosecution Team to halt entirely further review of any documents; conduct unspecified discovery; and be granted an evidentiary hearing. None of defendant's proposed remedies is appropriate.

First, as noted above, the use of a filter team in this case is consistent with Ninth Circuit practice and is particularly fitting considering the volume of material involved in the investigation. Asking a magistrate judge to review millions of documents would be impractical, and even defendant has avoided seeking a special master. The fact that a handful of documents (which did not appear to involve defendant's own communications or his own lawyers) were seen by the Prosecution Team and then removed from the Prosecution Team's possession should not throw the entire process out the window.

Second, disgorgement of all the search warrant materials from the Prosecution Team and a halt on further review is unreasonable considering that defendant has slept on these purported rights for a year and a half, during which time massive efforts have been undertaken to sort, filter, Bates number, and produce over a million pages of materials.  Restarting that process is unnecessary and would be a waste of time and resources.

Third, to the extent defendant claims he is asserting the rights of his former law firm's former clients, defendant's requested remedy is illogical.  Because the Privilege Review has already been completed, there is no likelihood of any further harm to their rights.

Finally, discovery and an evidentiary hearing are not justified by defendant's Motion.  Despite the fact that defendant has access to all of the documents that the Prosecution Team has seen, defendant has not identified a single document whose possession by the

24

Prosecution Team violates his privileges.  As it is defendant's
burden to prove these documents are in fact privileged, his failure
to do so means that there are no facts in dispute to be resolved
through discovery and/or a hearing.[17]  Nor has defendant provided this
Court with any evidence demonstrating that the privilege-review
protocols were not complied with here.  Rather, contemporaneous
documentary evidence confirms that the Prosecution Team complied with
the protocols.

At bottom, defendant's motion appears to be a just another delay
tactic.  For eighteen months defendant did not raise any concerns
regarding the privilege-review process.  Nor did he raise any
concerns after the Fourth Circuit decision was issued in October
2019.  Yet now that this case is less than three months from trial,
defendant seeks to have the Court delay these proceedings for months,
if not years, so that a magistrate judge can conduct a new privilege
review of materials that have already been reviewed for privilege by
the Privilege Review Team and reproduced to defendant.

**IV.   CONCLUSION**

For the foregoing reasons, the government respectfully requests
that this Court deny defendant's motion.

---

[17] Defendant attempts to shift his burden to establish a
privilege violation to the government by arguing that the government
has failed to confirm that no other privileged documents are in the
Prosecution Team's possession.  (Mot. at 6.)  If at any point the
Prosecution Team determines that other materials appear to contain
potentially privileged information, the Prosecution Team will
continue to follow the applicable privilege-review protocols, as it
did when it encountered materials involving EA LLP's bankruptcy
counsel.