UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

THE HONORABLE JAMES V. SELNA, JUDGE PRESIDING

UNITED STATES OF AMERICA,      )CERTIFIED TRANSCRIPT
                   Plaintiff,  )
     vs.                       )
                               )  SACR-19-00061-JVS
MICHAEL JOHN AVENATTI,         )
                   Defendant.  )
-----------------------------)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

October 19, 2020

SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(714) 543-0870

```
 1    APPEARANCES OF COUNSEL:

 2    For the Plaintiff:

 3    NICOLA T. HANNA
      United States Attorney
 4    BRANDON D. FOX
      Assistant United States Attorney
 5    Chief, Criminal Division
      JULIAN L. ANDRE
 6    Assistant United States Attorney
      Major Frauds Section
 7    1100 United States Courthouse
      312 North Spring Street
 8    Los Angeles, CA  90012
      (213) 894-6683
 9
      BRETT A. SAGEL
10    Assistant United States Attorney
      Ronald Reagan Federal Building
11    411 West Fourth Street, Suite 8000
      Santa Ana, CA  92701
12    (714) 338-3598

13    For the Defendant:

14    H. DEAN STEWARD
      H. DEAN STEWARD LAW OFFICES
15    107 Avenida Miramar, Suite C
      San Clemente, CA  92672
16    (949) 481-4900

17    ALSO PRESENT:

18    PATRICK FITZGERALD
      Assistant United States Attorney
19

20

21

22

23

24

25
```

| | | |
|---|---|---|
| | 1 | SANTA ANA, CALIFORNIA; MONDAY, OCTOBER 19, 2020; 8:38 A.M. |
| | 2 | THE CLERK:  Calling Item No. 2, SACR-19-00061-JVS, |
| 08:38 | 3 | United States of America versus Michael John Avenatti. |
| 08:38 | 4 | MR. SAGEL:  Good morning, Your Honor.  Brett Sagel |
| 08:38 | 5 | and Julian Andre on behalf of the United States, and sitting |
| 08:38 | 6 | right behind us is Assistant United States Attorney Patrick |
| 08:38 | 7 | Fitzgerald who's here on behalf of the Privilege Review |
| 08:38 | 8 | Team. |
| 08:38 | 9 | THE COURT:  Good morning. |
| 08:38 | 10 | MR. STEWARD:  And, Your Honor, Dean Steward on |
| 08:38 | 11 | behalf of Mr. Avenatti who is not present this morning.  We |
| 08:38 | 12 | have a waiver on file, and he hopes to join us by telephone. |
| 08:38 | 13 | THE COURT:  And is he on yet? |
| 08:38 | 14 | THE CLERK:  He should be on. |
| 08:38 | 15 | MR. STEWARD:  Mr. Avenatti, are you there? |
| 08:39 | 16 | THE DEFENDANT:  Yes.  Good morning, Your Honor. |
| 08:39 | 17 | Michael Avenatti. |
| 08:39 | 18 | THE COURT:  Good morning. |
| 08:39 | 19 | We have a number of motions on calendar.  Let's |
| 08:39 | 20 | begin with Avenatti's Motion to Sever. |
| 08:39 | 21 | Mr. Steward. |
| 08:39 | 22 | MR. STEWARD:  Submit, Your Honor. |
| 08:39 | 23 | THE COURT:  Mr. Sagel or Mr. Andre. |
| 08:39 | 24 | MR. SAGEL:  I'll handle this one, Your Honor. |
| 08:39 | 25 | Before I begin, I obviously appreciate Your Honor's |

| | | |
|---|---|---|
| 08:39 | 1 | tentative. I'm not going to rehash and reargue much of it. |
| 08:39 | 2 | I'm going to try and narrow our response, very narrow. If I |
| 08:39 | 3 | understand the Court's tentative, it's not a Rule 8 or Rule |
| 08:39 | 4 | 8(a) issue. We're really dealing with Rule 14. So I'm |
| 08:39 | 5 | going to skip the Rule 8 analysis and go straight to 14, and |
| 08:39 | 6 | I'm going to leave out the tax and the bankruptcy fraud |
| 08:39 | 7 | charges. I'm only going to focus on where we stand right |
| 08:39 | 8 | now in the tentative as it relates to bankruptcy fraud and |
| 08:40 | 9 | the client counts as Your Honor refers to them. |
| 08:40 | 10 | I guess what I'd focus on first is the Ninth |
| 08:40 | 11 | Circuit cases. Krieg is one. There are several of them in |
| 08:40 | 12 | our filings that basically say if the evidence is coming in |
| 08:40 | 13 | anyway, it's very hard to say that there would be prejudice. |
| 08:40 | 14 | THE COURT: But that's my point. If we go on to |
| 08:40 | 15 | the other rulings, very little of the evidence relating to |
| 08:40 | 16 | those other counts is going to come in. |
| 08:40 | 17 | MR. SAGEL: So that's where I'm going to focus on, |
| 08:40 | 18 | your rulings especially as it relates to 404(b) and the |
| 08:40 | 19 | inextricably intertwined. |
| 08:40 | 20 | THE COURT: Right. |
| 08:40 | 21 | MR. SAGEL: Let me focus on the bankruptcy fraud |
| 08:40 | 22 | charges themselves, the four counts. And I understand |
| 08:40 | 23 | there's more that's pled, and there will be more evidence |
| 08:40 | 24 | with them. My argument is two-fold. One is we think that |
| 08:40 | 25 | the bankruptcy fraud charges should remain. If not, the |

08:40  1    evidence should still come in either as inextricably

08:41  2    intertwined or 404(b), and a lot of it would be.

08:41  3            With regards to Count 33 and 36, the primary false

08:41  4    statement in those counts is the failure to disclose his

08:41  5    receipt of the Super Bowl clients' money.  Your Honor has

08:41  6    now in its tentative ruled that that comes in as part of our

08:41  7    case on the client counts.

08:41  8            So the evidence --

08:41  9            THE COURT:  Part of the 404(b) evidence.

08:41  10           MR. SAGEL:  Say that again.

08:41  11           THE COURT:  Part of the 404(b) evidence.

08:41  12           MR. SAGEL:  Okay.  So then in addition to getting

08:41  13   those clients' money and embezzling those clients' money, to

08:41  14   show that he could have been caught but he takes further

08:41  15   steps to hide that money -- his receipt of that money -- so

08:41  16   that nobody can see behind what happened to that money, to

08:41  17   see that he had not paid those clients, clients of Eagan

08:42  18   Avenatti, their money, it goes to first that it's

08:42  19   inextricably intertwined to that same evidence and then

08:42  20   alternatively, also goes to his motive, intent, lack of

08:42  21   mistake, preparation, and all the 404(b) factors that we've

08:42  22   cited.

08:42  23           Maybe I shouldn't have started with the Super Bowl

08:42  24   clients.  But then Count 35 is specifically his failure to

08:42  25   disclose and failure to list Client 3's money that he

08:42  1    embezzled.  So all the evidence on Client 3 is already

08:42  2    coming in inextricably intertwined to his stealing of Client

08:42  3    3's money.  He's opening up a new bank account, which is not

08:42  4    permitted by the bankruptcy, hiding that money and not

08:42  5    disclosing that money, and preventing others from seeing it.

08:42  6          So it's inextricably intertwined to that actual

08:42  7    count, and at worst, it goes again to all the 404(b)

08:42  8    factors, the intent to deceive these clients, and it goes

08:42  9    directly to that, that he's continuing to hide that money so

08:43  10   that nobody can uncover his fraud.

08:43  11         If he actually properly disclosed information to

08:43  12   the Bankruptcy Court, which he put his law firm in, which

08:43  13   was for all intents and purposes him -- he was the

08:43  14   controlling member who did all the filings and testified in

08:43  15   the 341 hearing under oath.  Every time he lied about those

08:43  16   things were also to cover his ongoing fraud, his ongoing

08:43  17   theft, of these clients' monies.

08:43  18         THE COURT:  Are you saying with regard to the

08:43  19   bankruptcy counts -- are you saying all allegations other

08:43  20   than those that relate to the clients, the specific clients,

08:43  21   and failure to disclose the clients' --

08:43  22         MR. SAGEL:  I guess it's a two-part answer to

08:43  23   that.  If Your Honor were to keep the severance as Your

08:43  24   Honor has stated, then I believe, yes, we would be willing

08:43  25   to only focus on the bankruptcy fraud charges as -- the

08:44  1    parts of the bankruptcy fraud that relates to the client,
08:44  2    but there's probably five or six of those items.
08:44  3            It's not only the nondisclosure of Client 3,
08:44  4    Client 4, and the Super Bowl clients in the specific counts,
08:44  5    but it's the stuff that -- borrowed money to buy his way out
08:44  6    of the bankruptcy pursuant to the settlement agreement, his
08:44  7    use of accounts to make loan payments to Clients 1 and 2
08:44  8    outside of the regular way of doing it once people were
08:44  9    looking at his Eagan Avenatti accounts because of the
08:44  10   bankruptcy, so there's more to it than that.
08:44  11           If our only way to proceed on Counts 33 through 36
08:44  12   is to whittle down the evidence to just the client counts,
08:44  13   I'd probably say we prefer the severance as Your Honor
08:44  14   suggested, but that we'd be permitted, as the rules would
08:44  15   allow us, to move in the evidence of the false statements
08:45  16   under penalty of perjury in 341 hearings and his monthly
08:45  17   operating reports and where the money went and then also the
08:45  18   judgment debtor exams that emanate from it, which is
08:45  19   consistent with Your Honor's tentative order as it relates
08:45  20   on the 404(b) aspect of the case.
08:45  21           The reason I say that is --
08:45  22           THE COURT:  Are you saying you'd only want to
08:45  23   offer that evidence supporting the client counts but not
08:45  24   separately offering the bankruptcy counts?
08:45  25           MR. SAGEL:  Can you repeat that?

08:45  1        THE COURT:  Are you saying you could live with
08:45  2  just offering that evidence as part of Counts 1 through 10
08:45  3  and not submitting Counts 33 to 36?
08:46  4        MR. SAGEL:  Yes, if I'm understanding it.  If our
08:46  5  choice is limiting it to those things that are directly
08:46  6  related to the client counts and our choice is going forward
08:46  7  with Counts 33 through 36 on a limited basis or using it as
08:46  8  inextricably intertwined and/or 404(b) evidence for Counts 1
08:46  9  through 10, we'd go with the latter and sever it the way
08:46  10  Your Honor suggested but still be permitted to use that
08:46  11  evidence.
08:46  12        THE COURT:  Okay.
08:46  13        MR. SAGEL:  Obviously I'm doing this quickly.  If
08:46  14  Your Honor needed us to, you know, present what these
08:46  15  specific factual scenarios are, we will.  But we obviously
08:46  16  understand the Court's tentative which potentially will be
08:46  17  ordered later today, and as long as it's consistent, we
08:46  18  understand the confines.  If Your Honor needs us to provide
08:46  19  any details on what it is we're looking to do -- most of it
08:46  20  is in our motion one way or the other with regards to the
08:47  21  certain clients and the certain false statements -- we can
08:47  22  do that as well.
08:47  23        THE COURT:  Okay.
08:47  24        MR. SAGEL:  With that, unless Your Honor has any
08:47  25  questions, we would submit.

08:47  1          THE COURT:  Mr. Steward.

08:47  2          MR. STEWARD:  I would only respond, Your Honor,

08:47  3     that counsel's attempt to explain how he would like to get

08:47  4     some of this evidence in the back door proves the point that

08:47  5     we need a clean first ten counts.  If they've got evidence

08:47  6     that they think applies to those counts, let them try and

08:47  7     present it.  The Court can rule, and I'm sure I would

08:47  8     object.  But the way they are suggesting to do it just

08:47  9     doesn't make any sense.  The best way to do it is as the

08:47  10    Court suggests in the tentative, and I submit.

08:47  11         THE COURT:  Well, it seems to me that there are

08:47  12    allegations in the bankruptcy counts that would be

08:47  13    permissible to offer in terms of furtherance of the scheme

08:48  14    to defraud the clients.  So my inclination is to sever it as

08:48  15    I've indicated but to allow that evidence to be submitted.

08:48  16         If you'd like the government to pin that down, I

08:48  17    don't have any trouble if the government would be willing to

08:48  18    put in a brief statement of what those allegations are.

08:48  19         MR. STEWARD:  Yes, Your Honor.  That would give us

08:48  20    the opportunity to object in writing after we take a look at

08:48  21    what they propose to do.

08:48  22         THE COURT:  Sure.

08:48  23         MR. STEWARD:  I mean, who knows?  Maybe we

08:48  24    wouldn't even object.

08:48  25         THE COURT:  Right.

08:48    1          MR. STEWARD:  But the bottom line is we need

08:48    2    Counts 1 through 10 and then the evidentiary side of what

08:48    3    comes in and what doesn't.

08:48    4          THE COURT:  Right.

08:48    5          MR. STEWARD:  The Court can rule on that.

08:48    6          THE COURT:  Okay, well, that's -- I'm going to

08:49    7    sever as indicated.

08:49    8          How much time would you need to give me that

08:49    9    statement?

08:49   10          MR. SAGEL:  If we could have until the end of the

08:49   11    week, but I probably could do it even before then.

08:49   12          THE COURT:  The end of the week is fine.

08:49   13          In Count 1, with respect to this motion, I

08:49   14    discussed a trial date, and I want to address that for a

08:49   15    moment.

08:49   16          As I indicated in the tentative, it's 49 days from

08:49   17    saying it's a go to summoning a panel to trial.  Since the

08:49   18    beginning of April -- or the beginning of September, the

08:49   19    county has been in the red zone.  One of the things to get

08:49   20    out of that is that you've got to get a two-week average of

08:49   21    infections below four per thousand.  It's been holding

08:50   22    fairly steadily about 4.6.

08:50   23          So I just have no crystal ball as I indicate as to

08:50   24    when we're going to get to that area.  But when we get to

08:50   25    that area, I'm going to set a trial date and then circle

| | | |
|---|---|---|
| 08:50 | 1 | back to our ability to conduct jury trials. |
| 08:50 | 2 | MR. SAGEL:  We appreciate that, Your Honor.  I |
| 08:50 | 3 | think at some point -- I don't know if you want to take it |
| 08:50 | 4 | up now or towards the end after we have more definitive |
| 08:50 | 5 | answers on certain parts of the case, and I think Mr. Andre |
| 08:50 | 6 | may cover it, but we fully appreciate what Your Honor is |
| 08:50 | 7 | saying.  With regards to a date uncertain, we might ask for |
| 08:50 | 8 | slightly more just for -- |
| 08:50 | 9 | THE COURT:  For planning purposes, sure. |
| 08:50 | 10 | MR. SAGEL:  Correct. |
| 08:50 | 11 | THE COURT:  I want you to meet and confer.  I |
| 08:50 | 12 | think we are talking about January at the earliest. |
| 08:50 | 13 | MR. SAGEL:  Understood. |
| 08:50 | 14 | THE COURT:  Maybe late January.  But any date that |
| 08:50 | 15 | we would pick now -- I don't object to picking a date so we |
| 08:51 | 16 | all have a known target, but I think we have to realize that |
| 08:51 | 17 | it's dependent on conditions. |
| 08:51 | 18 | MR. SAGEL:  Absolutely understood. |
| 08:51 | 19 | THE COURT:  Okay, let's turn to the government's |
| 08:51 | 20 | motion with regard to the reciprocal discovery on the |
| 08:51 | 21 | motions. |
| 08:51 | 22 | MR. STEWARD:  Your Honor, my intention is to |
| 08:51 | 23 | submit on that as well.  I would just ask for a deadline of |
| 08:51 | 24 | December 1 instead of November 20.  Since our December 8 |
| 08:51 | 25 | trial date looks like it's not going to go, I would ask for |

08:51    1    that extra time for the productions.

08:51    2            MR. SAGEL:  Your Honor, if I could address two

08:51    3    quick things.  I may sound like a broken record.  We

08:51    4    obviously appreciate your tentative, and we fully support

08:51    5    what Your Honor put out with regards to this motion.

08:52    6            In probably 99 percent of my cases, I would say I

08:52    7    wouldn't need to say anything else, and I would say that

08:52    8    this is 100 percent fine.  The reason I say 99 percent is

08:52    9    that you have a defendant who is acting in good faith.

08:52   10            In Your Honor's orders, it says rolling production

08:52   11    starting within seven days to conclude by November 20.  He's

08:52   12    already had a deadline, and he just blew it off with really

08:52   13    no explanation whatsoever, an explanation that isn't founded

08:52   14    in any facts.  To say that he can just start rolling

08:52   15    production in seven days and continue it until November 20

08:52   16    or whatever the date may be, we just have no confidence in

08:52   17    appropriate productions in that way.

08:52   18            I think, if possible, what we would ask for is

08:52   19    some form of stricter guidance.  We divide it up into

08:53   20    categories in our motion.  For example, he's put out that

08:53   21    there that he has all these documents separate from the

08:53   22    government's discovery that he's going to use at trial.

08:53   23    There is no reason that can't be produced right away.  All

08:53   24    this stuff that he has from third parties that he's obtained

08:53   25    separate from the government can be done in another timely

08:53  1   fashion.

08:53  2           There are different categories of things.  What we

08:53  3   don't want to be doing is two weeks from now coming back to

08:53  4   Your Honor and saying Your Honor gave him an order to do

08:53  5   rolling production in seven days and continuing until a

08:53  6   certain date, and we get one page, or we get our Production

08:53  7   2 back to us or something that's just obviously not in good

08:53  8   faith.

08:53  9           THE COURT:  Well, I guess I'm not willing to

08:53  10  predict today what Mr. Steward or Mr. Avenatti is going to

08:53  11  do or not do.  I don't think I really could be any clearer

08:53  12  in putting some teeth in this order.  I think the record

08:53  13  will be sufficient right now if I conclude it's appropriate

08:53  14  to simply default him on coming forward with pretrial

08:54  15  materials and so on, but that remedy needs to be a very

08:54  16  considered one.

08:54  17          MR. SAGEL:  Understood.  I appreciate that.

08:54  18          Then the second part of Your Honor's ruling is as

08:54  19  it relates to the advice of counsel.  I fully understand

08:54  20  what Your Honor is saying, but I just want to make sure

08:54  21  there is no ambiguity there when Your Honor is saying he

08:54  22  should disclose his intent to rely on advice of counsel and

08:54  23  all evidence that would support such advice.

08:54  24          The government in our motion listed out the

08:55  25  categories of things, such as the names of attorneys, any

08:55  1    correspondence between them, and I can go through it, but

08:55  2    it's in -- I guess what we are concerned with as it relates

08:55  3    to good faith of what's being turned over is whether or not

08:55  4    we are getting the full disclosure, especially since it may

08:55  5    only come, you know, two to three weeks or four weeks before

08:55  6    a trial date, to be tracking things down that their

08:55  7    disclosures are all those categories of things we asked for

08:55  8    in our motion.

08:55  9            THE COURT:  I think what you've asked for is

08:55  10   appropriate and ought to be a roadmap.  I think even if you

08:55  11   haven't spelled them out it's pretty obvious those are the

08:55  12   nuts and bolts of an advice-of-counsel defense.

08:55  13           MR. SAGEL:  Understood, Your Honor.  With that, we

08:55  14   would submit, Your Honor.

08:55  15           THE COURT:  Okay.

08:55  16           MR. SAGEL:  Thank you.

08:55  17           THE COURT:  Any objection to pushing the date for

08:55  18   the production to December 1 rather than November 20?

08:56  19           MR. SAGEL:  The final production date?

08:56  20           THE COURT:  Yes.

08:56  21           MR. SAGEL:  No objection.

08:56  22           THE COURT:  Okay.  Then we'll do that.

08:56  23           MR. SAGEL:  Your Honor, if possible, in light of

08:56  24   that, could we also have the advice-of-counsel disclosure

08:56  25   and the intent and the evidence related to that also on

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

08:56    1    December 1 so it's a date certain?

08:56    2              THE COURT:  No.

08:56    3              MR. SAGEL:  Thank you, Your Honor.

08:56    4              THE COURT:  I mean, we're going to have a date

08:56    5    certain.  I expect the trial date to be continued on the

08:56    6    record, you know, in the next couple of weeks after you have

08:56    7    folks have had a chance to talk, and that will give us

08:57    8    another date certain.

08:57    9              MR. SAGEL:  Understood, Your Honor.

08:57   10              THE COURT:  Okay.

08:57   11              MR. STEWARD:  Your Honor, going back to the

08:57   12    advice-of-counsel defense, my only comment is setting a date

08:57   13    certain like that -- I don't know that there's any case law

08:57   14    that supports a specific date like that.  I've used with

08:57   15    government counsel the example of the Michael's case where

08:57   16    we didn't really address that issue until we got into trial

08:57   17    and really it was a jury instruction issue.

08:57   18              Because of all the case law that does not set any

08:57   19    particular dates, we'd object to the date certain of

08:57   20    December 1 and ask the Court to make it a date reasonably in

08:57   21    advance of the trial date.

08:57   22              THE COURT:  That's what the tentative proposes.

08:57   23              MR. STEWARD:  Thank you, Your Honor.

08:57   24              THE COURT:  Okay, let's move to the government's

08:57   25    other bad acts motion.

08:58   1             Mr. Andre.

08:58   2             MR. STEWARD:  Your Honor, if it helps the Court

08:58   3   and counsel, I intend to restrict my comments just to the

08:58   4   Super Bowl litigation.  On the rest of it, I intend to

08:58   5   submit.

08:58   6             MR. ANDRE:  Your Honor, given the Court's ruling

08:58   7   on severance, we would also submit.  We obviously agree with

08:58   8   respect to the ruling with respect to all clients, and we'll

08:58   9   address any comments that Mr. Steward may make regarding

08:58   10  this.

08:58   11            THE COURT:  Okay.

08:58   12            MR. STEWARD:  Your Honor, the Super Bowl

08:58   13  litigation or issue is different than the other sorts of

08:58   14  things that the government is proposing here.  The reason

08:58   15  for that is it's really -- it's a separate stand-alone

08:58   16  litigation issue.  It has allegations, witnesses, and most

08:59   17  importantly defenses.  So if that comes in, the government

08:59   18  talks about putting on perhaps two, perhaps three, of the

08:59   19  ticket holders, but there were dozens and dozens, if not --

08:59   20  my recollection is there's something like 200 of them.

08:59   21            Each one of them would have a different

08:59   22  understanding of what the litigation was, what the deal with

08:59   23  Mr. Avenatti was, and it would be our intention to

08:59   24  aggressively defend against the allegations, including

08:59   25  calling a number of these folks.  What we would end up with

08:59   1    is the classic trial within a trial.

08:59   2           So for those reasons, Your Honor, I think it's

08:59   3    going to extend this case.  I think it's going to draw us

08:59   4    off into an area that really is separate and apart from what

08:59   5    the allegations of 1 through 10 are.  It's also going to

08:59   6    have an effect on jury selection, because perhaps those that

08:59   7    haven't heard of Mr. Avenatti have heard of the NFL and have

09:00   8    a position, or feelings, or whatever.  It's going to draw

09:00   9    out the jury selection as well as the trial itself.

09:00   10           It really is a unique set of facts that could

09:00   11   easily be eliminated here, particularly for Counts 1 through

09:00   12   10.  I would submit it.

09:00   13           THE COURT:  How does that differ from any other

09:00   14   type of 404(b) evidence?

09:00   15           MR. STEWARD:  I'm sorry, Your Honor?

09:00   16           THE COURT:  How does that differ for any other

09:00   17   type of Rule 404(b) evidence?  It's a different story.  It's

09:00   18   a different set of events.

09:00   19           MR. STEWARD:  Well, as we always have to analyze,

09:00   20   it makes a trial within a trial.  It extends things out.  It

09:00   21   adds prejudice.  In particular, it increases the difficulty

09:00   22   of jury selection in a situation which is already difficult.

09:00   23           THE COURT:  Any other points you want to address,

09:00   24   Mr. Steward?

09:00   25           MR. STEWARD:  No, Your Honor, not on that.

09:00  1           THE COURT:  Okay.

09:00  2           Mr. Andre.

09:00  3           MR. ANDRE:  Your Honor, we obviously agree with

09:00  4   the tentative with respect to the NFL clients.  This is not

09:01  5   complicated.  He received the money.  He failed to pay the

09:01  6   clients.  He failed to disclose the settlement to them

09:01  7   consistent with past practice.

09:01  8           They talk about the NFL making jury selection more

09:01  9   challenging.  I don't think the fact that this involves

09:01  10  football is prejudicial.

09:01  11          Unless the Court has any questions, we submit.

09:01  12          THE COURT:  Well, the tentative is going to be the

09:01  13  order of the Court, but I would expect the evidence to be

09:01  14  presented to be precise and to the point.  We are not going

09:01  15  to have an extended trial within a trial.

09:01  16          MR. ANDRE:  Your Honor, we absolutely understand

09:01  17  that, and that is fully our intent.

09:01  18          THE COURT:  Let's turn to Mr. Avenatti's remaining

09:01  19  motions.  The motion for grand jury materials was withdrawn

09:01  20  and we have the request to exclude certain experts and the

09:02  21  request for a Daubert hearing.

09:02  22          Mr. Steward.

09:02  23          MR. STEWARD:  Yes, Your Honor.  I'm going to

09:02  24  submit as to Mr. Drum and also Ms. Kaas, and address only

09:02  25  Professor Mohr and the inadvisability of allowing his

09:02 1    testimony.  Our suggestion is that the government is

09:02 2    inviting reversible error here by having the Court admit the

09:02 3    testimony for their purported ethics expert, Professor Mohr,

09:02 4    over our objections.

09:02 5              THE COURT:  You would agree that he's an ethics

09:02 6    expert, wouldn't you?

09:02 7              MR. STEWARD:  Yes.  But in this particular case,

09:02 8    an ethics expert -- two problems.  One, the jury is going to

09:02 9    think, wow, if this guy says that's the way the State Bar

09:02 10   rules are, then Avenatti is guilty.

09:02 11             Also, it's highly prejudicial in the sense that we

09:03 12   have almost a judge-like figure telling the jury what these

09:03 13   rules are.  The problem is it's virtually a directed verdict

09:03 14   coming from an expert like this.  The government in the Nike

09:03 15   case back in the Southern District of New York tried to do

09:03 16   the same thing, and Judge Gardephe excluded it based upon

09:03 17   lots and lots of case law, which says that this Court is the

09:03 18   one that should instruct the jury about what the law is,

09:03 19   what these rules are, not somebody coming out under the

09:03 20   guise of a professorship to try and tell the jury the way

09:03 21   they should be looking at this particular evidence.

09:03 22             A legal expert -- an ethics expert shouldn't be

09:03 23   permitted to come before the jury in this case and offer

09:03 24   testimony in reliance on the bar rules or an ethics opinion

09:04 25   because this isn't an ethics case.  It's a criminal case.

09:04   1    The Court's statement in the tentative that we are not
09:04   2    challenging the methodology's reliance on the California
09:04   3    Rules of Professional Conduct -- that's at the top of the
09:04   4    Court's tentative on page 16 -- is incorrect.  We are
09:04   5    challenging every aspect of his testimony, this included,
09:04   6    and I hope we made that clear in our reply.
09:04   7         This is not an attorney grievance proceeding where
09:04   8    Mr. Avenatti is being charged with violating his duties
09:04   9    under the Rules of Professional Conduct or other ethical
09:04   10   rules.  Whether Mr. Avenatti did or did not violate his
09:04   11   ethical duties and ethical obligations to his clients --
09:04   12        THE COURT:  But wait a minute.  Among those
09:04   13   ethical obligations is the obligation to make disclosures to
09:04   14   the clients, right?
09:04   15        MR. STEWARD:  Correct.
09:04   16        THE COURT:  He had an obligation.
09:04   17        MR. STEWARD:  Right.  And everybody on this jury
09:04   18   is going to know that.  You don't need an expert for that.
09:04   19        THE COURT:  I'm not sure.
09:05   20        MR. STEWARD:  The average man wouldn't know that a
09:05   21   duty of fair dealing between an attorney and client was
09:05   22   mandatory?  Of course they would, Your Honor.  That's my
09:05   23   whole point here.
09:05   24        THE COURT:  Well, my point is that there are
09:05   25   special rules with regard to self-dealing or dealing --

09:05  1   having any transactions with a client that aren't obvious to

09:05  2   the public.  The restrictions on an attorney and the

09:05  3   attorney-client relationship as to what he can do

09:05  4   businesswise wouldn't be the same as if you had a car dealer

09:05  5   and a car customer.

09:05  6          MR. STEWARD:  But yet, Your Honor, by allowing an

09:05  7   expert, a professor, to come in and talk about these rules,

09:05  8   it adds a luster to that testimony that it doesn't deserve.

09:05  9          THE COURT:  It's not a luster.  It's the truth.

09:05  10  The rules are what the rules are.

09:05  11         MR. STEWARD:  Then why don't we just give them the

09:05  12  rules.

09:05  13         THE COURT:  Well, I'm going to deny the motion

09:05  14  with respect to the ethics expert, but if you want to

09:05  15  propose a set of jury instructions that you think would

09:06  16  adequately advise the jury with regard to the ethical

09:06  17  obligation, I'll certainly consider that.  But for present

09:06  18  purposes, I'm not going to strike the ethics expert.

09:06  19         MR. STEWARD:  And that would be -- I'm sorry, I

09:06  20  didn't mean to interrupt.

09:06  21         THE COURT:  Go ahead.

09:06  22         MR. STEWARD:  That would be in lieu of Professor

09:06  23  Mohr testifying if we came up with appropriate jury

09:06  24  instructions?

09:06  25         THE COURT:  Potentially.

09:06  1          MR. STEWARD:  Okay.  I think we can do that, Your

09:06  2  Honor, but I just wanted to if I can --

09:06  3          THE COURT:  Well, I'm not signing off on that.

09:06  4  I'm just saying this is an avenue that you can explore.  You

09:06  5  made a suggestion that the problem could be cured with a

09:06  6  jury instruction.  Let's see if that's so.

09:06  7          MR. STEWARD:  Understood.  Your Honor, I would

09:06  8  note that from a District Court case in the Southern

09:06  9  District of New York (2001) In Re: Public Offering

09:06  10  Securities Litigation, which is at 174 F.Supp.2d 61 -- and,

09:06  11  again, it's the Southern District of New York -- the Court

09:06  12  there noted:  "The rule prohibiting experts from providing

09:07  13  their legal opinions or conclusions is so well-established

09:07  14  that it is often deemed a basic premise and assumption of

09:07  15  evidence law a kind of axiomatic principle."

09:07  16          And it's that kind of case law that the Southern

09:07  17  District of New York judge, Judge Gardephe, went ahead and

09:07  18  excluded the expert.  We would suggest that it should be the

09:07  19  same here.  Mohr's testimony must be excluded for all of the

09:07  20  reasons above, as well as those cited in our brief.

09:07  21          We would certainly like to take a run at some jury

09:07  22  instructions, and we feel that we could craft those that

09:07  23  would eliminate the need for Professor Mohr.  But we're

09:07  24  still seeking his exclusion, jury instructions aside, for

09:07  25  the reasons I just set out and the ones we put in both our

09:07   1   motion and our reply.

09:08   2           Thank you.

09:08   3           THE COURT:  Would you submit, Mr. Andre?

09:08   4           MR. ANDRE:  Given the Court's ruling, yes.  We

09:08   5   will try to work with him for an appropriate jury

09:08   6   instruction.  We can reevaluate whether his testimony is

09:08   7   necessary at that point.

09:08   8           I'd like to clarify one issue with respect to

09:08   9   Ms. Kaas, which is not to argue against the tentative which

09:08   10  we appreciate.  She did not actually work on Client 1's

09:08   11  case.  She worked on other matters with the two law firms

09:08   12  that have been identified.  That being said, we'll work with

09:08   13  the defense on a stipulation, and as long as the Court is

09:08   14  willing to consider an alternate expert if we can't reach an

09:08   15  agreement on that point, we would submit.

09:08   16          THE COURT:  Okay.  If you're going to go the

09:08   17  instruction route with regard to the ethics expert, I'd like

09:08   18  to see something within the next 30 days, please.

09:08   19          MR. STEWARD:  I'm sorry, Your Honor.  Within the

09:08   20  next 30 days?

09:08   21          THE COURT:  30 days, yes.

09:08   22          MR. STEWARD:  Thank you, Your Honor.

09:08   23          THE COURT:  Let's take up the final motion with

09:09   24  regard to the privilege review and related -- I'd like to

09:09   25  begin with further clarifications as to what the 300 plus

```
09:09   1    documents consisted of and what counts they're related to.
09:09   2    My sense is they're related to the bankruptcy counts.
09:09   3              MR. STEWARD:  Your Honor, in answer to the Court's
09:09   4    invitation to set out what's contained in there, they're
09:09   5    referenced in Footnote 2 of the revised reply, and they are
09:09   6    the 79 privilege documents that the Prosecution Team has
09:09   7    admitted receiving, accessing, and at least somewhat
09:09   8    reviewing.
09:09   9              THE COURT:  Sir, would you answer my question as
09:09   10   to what the materials in your Exhibit B relate to?
09:10   11             MR. STEWARD:  Yes, Your Honor.  This is the
09:10   12   material that we're shouting about.
09:10   13             THE COURT:  Tell me -- I hope your not shouting.
09:10   14   Tell me what counts the materials relate to.
09:10   15             MR. STEWARD:  1 through 10 -- really all of them.
09:10   16   I mean, it's a mishmash of privileged documents that were
09:10   17   seized from the various law firms, went over to the
09:10   18   Privilege Review Team, and then apparently by mistake
09:10   19   somehow gets over to the prosecution.
09:10   20             THE COURT:  Right.
09:10   21             MR. STEWARD:  That's what these are.
09:10   22             THE COURT:  So if I went through the 700 pages,
09:10   23   it'd be obvious to me as to what materials related to Counts
09:10   24   1 through 10?
09:10   25             MR. STEWARD:  Yes.  You would certainly know, for
```

09:10     1     example --
09:10     2              THE COURT:  Would it be obvious to me?
09:10     3              MR. STEWARD:  Yes.
09:10     4              THE COURT:  Okay.  Would you like to provide the
09:10     5     Court some assistance with a brief memorandum pointing out
09:10     6     to me the documents --
09:10     7              MR. STEWARD:  Yes, we would be happy to do that,
09:10     8     Your Honor.
09:10     9              Would the Court want the entire printed hard copy
09:10    10     of that material?  We can do that.  It's going to kill some
09:11    11     trees to do it, but we can do it.
09:11    12              THE COURT:  No.  I mean, I've got it online.  I
09:11    13     mean, I can look it up from the descriptions.
09:11    14              MR. STEWARD:  When would you like that by, Your
09:11    15     Honor?
09:11    16              THE COURT:  When can you do it?
09:11    17              MR. STEWARD:  What's today, Monday?  Friday.
09:11    18              THE COURT:  When would be convenient?
09:11    19              MR. STEWARD:  Friday.
09:11    20              THE COURT:  Okay.
09:11    21              MR. STEWARD:  And flowing from that, Your Honor,
09:11    22     are the exhibits to our revised reply -- from our pages 1
09:11    23     through 5 in the revised reply, Exhibits 1 and Exhibit 2.
09:11    24     Those are first.  Exhibit 1 is a log of documents provided
09:11    25     to us by the government wherein various members of the

09:11   1   Prosecution Team have reviewed documents that have been

09:11   2   given to them by the Privilege Review Team, and government

09:11   3   counsel can correct me if I've got that wrong.

09:12   4          It shows, for example, everybody on the

09:12   5   Prosecution Team -- paralegal, I think agents, certainly

09:12   6   government counsel -- looking at with the time and date

09:12   7   various documents, and it's got the Bates numbers next to

09:12   8   them.  Exhibit 2 is the same list, except we've taken out --

09:12   9   the defense created it.  We've taken out everybody except

09:12   10  the two prosecutors, and it goes on for five pages.

09:12   11         Our point is we believe that this is way more than

09:12   12  a handful of documents, that some of the documents the

09:12   13  prosecutors looked at more than once, and that they're

09:12   14  trying to give us the impression that they looked at that

09:12   15  and saw, oh, law firm, better not look at that.  That's not

09:12   16  what happened.  They kept --

09:12   17         THE COURT:  But didn't their review of certain

09:12   18  documents trigger the request to the Privilege Review Team

09:13   19  to see if there had been a leak, if you will?

09:13   20         MR. STEWARD:  Yes, which the Privilege Review Team

09:13   21  as I understand did.  But then they sat on it for five

09:13   22  months, didn't notify the Court, didn't notify us for five

09:13   23  full months.  That second exhibit to our revised reply is

09:13   24  the critical document because it shows how many times, which

09:13   25  documents, and when over months.  These prosecutors looked

09:13  1    at these documents.

09:13  2         Now, we've asked a number of questions of the

09:13  3    government.  We don't seem to be able to get answers to

09:13  4    whether or not any other privileged or potentially

09:13  5    privileged documents were produced to the prosecution by the

09:13  6    Privilege Review Team and reviewed by any member of the

09:13  7    Prosecution Team.  We would suggest that we're entitled to

09:14  8    at least that assurance that everything they have given us

09:14  9    so far is the world of documents that the prosecution looked

09:14  10   at that were erroneously given to them by the Filter Team.

09:14  11        Even now while this motion was pending, the

09:14  12   government informed us and the Court approximately ten days

09:14  13   ago at Docket No. 343 that there's a problem with their

09:14  14   database and that they had found even more privileged

09:14  15   documents in the prosecution's database.

09:14  16        This appears to be a pervasive problem, and we're

09:14  17   entitled to answers.  The defense needs to know what other

09:14  18   privileged or potentially privileged documents have been

09:14  19   produced, reviewed, and/or clawed back by the prosecution.

09:14  20   The Prosecution Team and the Filter Team have an affirmative

09:14  21   obligation to tell us this.  This shouldn't be complicated

09:14  22   or controversial.

09:14  23        In this case, Your Honor, we cited the Fourth

09:15  24   Circuit in In Re Search Warrant, a 6/13/19 case.  I agree

09:15  25   with government that no other Circuit has saluted that case.

09:15  1    But the flip side of that coin is there's no other,
09:15  2    including the Ninth Circuit, authority holding contra to
09:15  3    what the Fourth Circuit case says or specifically addressing
09:15  4    this issue.  As far as we can tell, the first time it was
09:15  5    addressed in the Circuit Court is this particular case.
09:15  6         The cases cited by the government are ones that
09:15  7    aren't on point.  They don't address the makeup and the
09:15  8    constitutional structure of using a Taint Team like this.
09:15  9    Importantly, Your Honor, the government says we were on
09:15  10   notice that we could have asked for a magistrate or a
09:15  11   special master.
09:16  12        The only thing that we received -- that
09:16  13   Mr. Avenatti received was one of the search warrants on his
09:16  14   living room table back when all of these search warrants
09:16  15   were served, but that's not one of the search warrants that
09:16  16   we are challenging.  We didn't know what was in the other
09:16  17   search warrants.  We could have guessed that it was same,
09:16  18   but we didn't know that and weren't served it until we got
09:16  19   the search warrants as part of the discovery process.
09:16  20        THE COURT:  Are you saying prior to that you
09:16  21   weren't aware of the two other warrants that were served?
09:16  22        MR. STEWARD:  Correct.  We weren't aware that we
09:16  23   could have asked for --
09:16  24        THE COURT:  No, no, no.  You weren't aware of the
09:16  25   two other warrants?

09:16  1          MR. STEWARD:  Well, we were aware of the warrants.

09:16  2     We weren't aware of the section in each of them allowing us

09:16  3     to ask for a magistrate or a special master because we

09:16  4     didn't have copies of them.  The first copy we got was on

09:17  5     the living room table.  We're not challenging that warrant.

09:17  6          THE COURT:  And you didn't get the other two

09:17  7     warrants until discovery was made?

09:17  8          MR. STEWARD:  I believe that's correct.

09:17  9          THE COURT:  Okay.

09:17  10          MR. STEWARD:  I believe that's correct.  So, Your

09:17  11     Honor, we are challenging on constitutional and other bases

09:17  12     the structure of the Filter Team as per that Fourth Circuit

09:17  13     case.  It's my understanding that they've asked for en banc

09:17  14     treatment of that case.  I don't know whether that's been

09:17  15     decided or not.  I don't believe it has.

09:17  16          But in any event, I agree with the government, not

09:17  17     by any precedent on this Court, but (a) it's some precedent;

09:17  18     and (b) the logic of it just makes an awful lot of sense.

09:17  19     The right to be able to ask for the special master or the

09:17  20     magistrate is illusory if we don't know about it.  In this

09:18  21     case, on the warrants we've challenged, we did not know

09:18  22     about it.

09:18  23          I submit, Your Honor.

09:18  24          THE COURT:  Well, I guess that brings up the

09:18  25     question as to whether your client has standing to challenge

09:18  1   the other two warrants.

09:18  2           MR. STEWARD:  The other warrants, Your Honor, have

09:18  3   to do with the Eagan Avenatti Law Firm.

09:18  4           THE COURT:  Did your client assert standing to

09:18  5   have challenged those warrants?

09:18  6           MR. STEWARD:  Yes.  The answer is yes.  He owned

09:18  7   the Eagan Avenatti Law Firm.  I don't know how much more

09:18  8   standing you can get than that.

09:18  9           THE COURT:  It leaves me wondering how it is that

09:18  10  a warrant served on his law firm didn't get to his

09:18  11  attention.

09:18  12          MR. STEWARD:  That assumes that they gave -- that

09:18  13  the government gave somebody at the law firm a copy of the

09:18  14  portion that allows for the requesting of a special master

09:18  15  or magistrate.  Normally --

09:19  16          MR. STEWARD:  Is that a faulty assumption?

09:19  17          MR. STEWARD:  Well, I can tell you what my

09:19  18  experience is.  What you get is you get the face page of the

09:19  19  warrant, and you get an inventory.  You don't get anything

09:19  20  else other than that.  But there's no facts one way or the

09:19  21  other before the Court on that.  I think the Court has to

09:19  22  assume standing because Eagan Avenatti was Mr. Avenatti at

09:19  23  that time.

09:19  24          THE COURT:  Or was it the receiver?

09:19  25          MR. STEWARD:  You'd have to look at the timing of

09:19  1   it, Your Honor.

09:19  2          THE COURT:  Okay.

09:19  3          MR. STEWARD:  But I don't think the government

09:19  4   has -- well, I'll just leave it at that.

09:19  5          THE COURT:  Okay.

09:19  6          Mr. Andre.

09:19  7          MR. ANDRE:  Your Honor, I'm just going through

09:19  8   this kind of piece by piece to respond to Mr. Steward.

09:19  9          The first thing I'd note is the Court requested

09:20  10  that Mr. Steward and the defense provide the Court with

09:20  11  guidance as to those 79 documents and 700 pages.  We would

09:20  12  request that they be required to serve whatever they file

09:20  13  with the Court and the Privilege Review Team so the

09:20  14  Privilege Review Team at least has an opportunity to

09:20  15  litigate against those assertions.

09:20  16         Our understanding -- we don't have access to these

09:20  17  documents, and we probably never will -- is that they all

09:20  18  were involved with the Pachulski Firm and the bankruptcy.

09:20  19  So how they relate to Counts 1 through 10 we don't know,

09:20  20  but --

09:20  21         THE COURT:  Mr. Steward is going to tell me.

09:20  22         MR. ANDRE:  Okay.  And will the Court require him

09:20  23  to serve --

09:20  24         THE COURT:  Yes.

09:20  25         MR. ANDRE:  Thank you.  One second, Your Honor.

09:20    1              THE COURT:  Sure.

09:20    2              (Government counsel conferring with Mr.

09:20    3      Fitzgerald)

09:20    4              MR. ANDRE:  Mr. Steward spoke at length about his

09:21    5      Exhibit 2 and about how this shows kind of a pervasive

09:21    6      problem.  The reality is very different than that, Your

09:21    7      Honor.  Throughout this entire 18-month time period, the

09:21    8      government has worked incredibly diligently and carefully to

09:21    9      try to avoid any potential privilege issues.  In fact, this

09:21   10      is how we ended up here, because AUSA Sagel and I saw a

09:21   11      potential issue.  We followed the protocols.  We notified

09:21   12      the Privilege Review Team.

09:21   13              Some of the facts Mr. Steward references, though,

09:21   14      are not accurate.  He references the paralegal.  As we

09:21   15      explained in our declaration, or at least in I believe my

09:21   16      declaration, our paralegal did a batch edit of these

09:21   17      documents, meaning she groups them, tags them for

09:21   18      production.  The database records don't show her ever

09:21   19      reviewing any of these documents.  I believe the database

09:21   20      records show one agent reviewing one document but never

09:21   21      tagging it, and that seems to be just a random date.

09:22   22              What the records --

09:22   23              THE COURT:  What do you mean by never tagging it?

09:22   24              MR. ANDRE:  The way our database system is set up

09:22   25      is we have -- for us to review documents that have been

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:22  1    released to us or produced to us from third parties, we have
09:22  2    a coding system where we can tag whether the document is
09:22  3    relevant, whether we think it might be a trial exhibit,
09:22  4    whether -- what issue it relates to.
09:22  5           Of the 79 documents, only eight have the entry
09:22  6    update.  Update is what would show up if we had tagged the
09:22  7    document.  What's in both AUSA Sagel's and in my declaration
09:22  8    is if we were reviewing a document substantively, we tag it
09:22  9    so we know it has already been reviewed, what it relates to,
09:22  10   et cetera.
09:22  11          Only eight of these documents were tagged.  They
09:22  12   were all tagged on the night of May 13.  In fact, that's
09:23  13   what these records show.  All of these documents, other than
09:23  14   maybe seven or eight, were viewed -- which means they were
09:23  15   accessed and popped up on the screen for however long -- on
09:23  16   May 13, the night before we notified the Privilege Review
09:23  17   Team.
09:23  18          As indicated in AUSA Sagel's declaration -- and as
09:23  19   you can see it through Exhibit 2 of his brief and I think
09:23  20   it's in one of our -- I believe AUSA Sagel viewed 55
09:23  21   documents between 8:30 and 9:00 on May 13.  That's not
09:23  22   enough time to be doing a substantive review of these
09:23  23   documents.
09:23  24          The reality is when we're reviewing these things
09:23  25   there's a couple things to keep in mind.  One, these have

09:23   1   all been reviewed for privilege.  They've all been released

09:23   2   to us.  We're not conducting a secondary probative review.

09:23   3   We're just looking through them quickly to see if there's

09:23   4   something we might need for trial.

09:23   5          Secondarily, some of these documents could be

09:23   6   attachments that on their face wouldn't be privileged.  They

09:24   7   could be completely irrelevant where we just skip over them

09:24   8   without even paying attention.  That's what the record shows

09:24   9   happened.

09:24   10          But under any circumstance, what the record

09:24   11   clearly shows is when we thought there could be a potential

09:24   12   issue, we did what we were supposed to.  We notified the

09:24   13   Privilege Review Team, and they took steps to handle it.

09:24   14   That's what the protocols required, and that's what we've

09:24   15   done, and that's what we will continue to do because we

09:24   16   aren't interested in privileged materials.  We want to make

09:24   17   sure this stuff is handled right.

09:24   18          He mentioned that we've sat on this for five

09:24   19   months.  That's not accurate.  We identified the issue on

09:24   20   May 14.  Saw the documents the night of May 13 and

09:24   21   identified the issue May 14.  The Privilege Review Team

09:24   22   looked into it.  Given the size of the database -- you know,

09:24   23   there's -- I think there's, you know, just from the

09:24   24   Privilege Review Team 110,000 documents.  They looked into

09:25   25   it.  It took them about a month, month-and-a-half, to do

09:25  1  that.  Then it took I believe a couple months to notify the

09:25  2  defense.  They notified them at our request.

09:25  3              THE COURT:  But their only key for going to

09:25  4  analyze the production was your identification of two

09:25  5  documents?

09:25  6              MR. ANDRE:  Correct, Your Honor.

09:25  7              THE COURT:  So they had to go from those two

09:25  8  documents I assume to look at the entire database to see if

09:25  9  there were other privileged documents that were

09:25  10  inadvertently released?

09:25  11             MR. ANDRE:  I'm not exactly sure what process they

09:25  12  did, but my understanding is --

09:25  13             THE COURT:  But the lead they had consisted of two

09:25  14  documents?

09:25  15             MR. ANDRE:  Yes, we sent them two examples, and

09:25  16  then they looked at those two examples.  I believe they had

09:25  17  our vendor run searches to identify other potential

09:25  18  documents, and that's how they ended up with the 299 they

09:25  19  clawed back.

09:25  20             THE COURT:  Okay.

09:25  21             MR. ANDRE:  Again, I mean, I think this is a heck

09:25  22  of a process that does take some time.

09:26  23             THE COURT:  So when did the clawback occur?

09:26  24             MR. ANDRE:  We were notified I want to say on

09:26  25  June 24 or June 26 that they would be clawing back these

09:26   1    documents.  We requested they notify the defense.  We felt
09:26   2    it was best to come from the Privilege Review Team since we
09:26   3    didn't at that time even know which documents had been
09:26   4    clawed back.
09:26   5           My understanding is it took them some time to get
09:26   6    that done.  The Court noted in its tentative that the timing
09:26   7    was less than optimal.  We agree.  It wasn't on that day.
09:26   8    They notified them at our request and flagged an issue that
09:26   9    from our perspective really shouldn't be an issue because we
09:26   10   did what the protocols required.
09:26   11          Unless the Court has any questions -- further
09:26   12   questions about the review from me -- and obviously the
09:26   13   Court can ask Mr. Fitzgerald any questions it may have --
09:26   14   I'd like to move on to the Fourth Circuit issue and the
09:27   15   notice issue instead.
09:27   16          THE COURT:  Okay.
09:27   17          MR. ANDRE:  It's interesting that they are trying
09:27   18   to get around the fact that we left a copy of the search
09:27   19   warrant protocols on his living room table on March 25.
09:27   20          THE COURT:  Mr. Steward said he's not challenging
09:27   21   results of that warrant.
09:27   22          MR. ANDRE:  I know he's not challenging the
09:27   23   results of that warrant, but that doesn't change the fact
09:27   24   that that warrant was provided to him, and it listed out the
09:27   25   protocols.  But even if you're not focusing on that

09:27    1    particular warrant, these were produced in discovery in

09:27    2    June 2019.  We sent them a detailed letter on July 2019 that

09:27    3    cited them by Bates number.  We've discussed this privilege

09:27    4    review at every status conference we've had with this Court

09:27    5    in pretty great detail.

09:27    6           So to suggest that he did not have notice about

09:27    7    how this process was happening --

09:27    8           THE COURT:  So at least as of June 29 they had all

09:28    9    the warrants and would be on notice of the parallel

09:28   10    provisions in the warrants, other than the one that was at

09:28   11    Mr. Avenatti's house.

09:28   12           MR. ANDRE:  Absolutely, Your Honor.  And we cited

09:28   13    them -- the Court's tentative references our July letter,

09:28   14    July 2019 letter.  It cites each warrant by Bates number.

09:28   15    At that point, we hadn't even started the review.  We were

09:28   16    still asking them for more information so that we could do

09:28   17    this appropriately.  I mean, some of the documents had been

09:28   18    processed, but no one had really I believe looked at

09:28   19    anything from those devices.

09:28   20           The Court also mentioned the standing.  The Court

09:28   21    has already ruled on this issue.  The defendant stipulated

09:28   22    to turn over control of Eagan Avenatti, LLP, to the receiver

09:28   23    in February 2019.  Months before any of the searches the

09:29   24    receiver provided us with the ability to make a copy of the

09:29   25    server, and then we searched it.

09:29  1          The Court has already held in connection with

09:29  2     their Motion to Compel twice that as of March 2019 defendant

09:29  3     did not have an ownership interest or management control of

09:29  4     Eagan Avenatti, LLP.  The defendant also doesn't have

09:29  5     authority to assert their privilege.  That is now controlled

09:29  6     by the bankruptcy trustee.

09:29  7          So as far as standing, the only -- and it's not an

09:29  8     open question.  The defendant has the burden to establish

09:29  9     standing.  The defendant has the burden to establish

09:29 10     privilege.  He has not done so.

09:29 11          The Court has already ruled that the Eagan

09:29 12     Avenatti devices are not his.  That's the law of the case,

09:29 13     and they weren't his at the time.  And you can see the

09:29 14     exhibits that are cited.  It's Docket CR-55.  It's our

09:30 15     initial motion.  I believe the Court's ruling on that -- I

09:30 16     don't have the docket number, but the Court's initial ruling

09:30 17     from either July or August 2019 specifically addressed this

09:30 18     issue.  He didn't own the company.

09:30 19          At that time, ownership had been passed to his

09:30 20     second wife.  Control had been passed to the receiver.  The

09:30 21     only actual warrant he absolutely had standing to challenge

09:30 22     is the search of his residence, which he's not challenging.

09:30 23          So I think the standing issue at least dealing

09:30 24     with notice is dispositive, and the Court's prior ruling is

09:30 25     dispositive.  Again, he hasn't actually established that if

09:30  1   there is privileged material in here that the privilege is
09:30  2   his.
09:30  3          With respect to -- our understanding is that these
09:30  4   documents involved the Pachulski Firm.  The Pachulski Firm
09:31  5   represented Eagan Avenatti, LLP.  They did not represent the
09:31  6   defendant.  And in his response to our surreply, he concedes
09:31  7   they didn't represent him individually.
09:31  8          So that means that the control of the privilege
09:31  9   transferred first to the receiver and at a minimum is now
09:31  10  with the bankruptcy trustee.  I'll note that although he
09:31  11  challenges the bankruptcy, he filed documents in that
09:31  12  bankruptcy proceeding, the current bankruptcy proceeding,
09:31  13  last Wednesday.  For the last month, the defendant has been
09:31  14  arguing in the Bankruptcy Court that Eagan Avenatti, LLP,
09:31  15  has an obligation to indemnify it, while now claiming
09:31  16  contrary to his prior under oath testimony that the trustee
09:31  17  doesn't matter.
09:31  18         Your Honor, give me just one second to look
09:31  19  through my notes.
09:31  20         (Pause in proceedings)
09:31  21         MR. ANDRE:  Then, Your Honor, the last thing I'd
09:31  22  note is defense counsel talks about assurances.  I'll note
09:32  23  the defendant has all of these documents.  Every document
09:32  24  that the Privilege Review Team has provided us we've
09:32  25  reproduced to him.  He has had them ever since May.  He

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:32  1    hasn't identified a single document beyond what we've

09:32  2    identified and clawed back as being potentially privileged

09:32  3    or privileged.

09:32  4            THE COURT:  But if I heard Mr. Steward correctly,

09:32  5    he suggests that there may be in that production a trove of

09:32  6    privileged -- or meaning trove of privileged documents that

09:32  7    you are aware of and haven't turned back.

09:32  8            MR. ANDRE:  Your Honor, we've --

09:32  9            THE COURT:  Is that accurate?

09:32  10           MR. ANDRE:  No, Your Honor.

09:32  11           THE COURT:  Is it fair to say the government is

09:32  12   not aware of any privileged documents that it has in the

09:32  13   production -- presently in the production from the Privilege

09:32  14   Review Team?

09:32  15           MR. ANDRE:  Your Honor, it's -- I want to respond

09:32  16   to this carefully because --

09:32  17           THE COURT:  Yes.  Please.

09:32  18           MR. ANDRE:  -- what they're trying to do is --

09:32  19           THE COURT:  But also directly.

09:32  20           MR. ANDRE:  I will answer directly.  The two

09:32  21   instances in which we've seen documents that we thought

09:33  22   required initial review we've notified the Privilege Review

09:33  23   Team.  We have not looked at every document the Privilege

09:33  24   Review Team has released to us.  We are not conducting a

09:33  25   secondary privilege review.

09:33  1          What we can say and what we've told them is if we
09:33  2  see something we will tell them.  I know the Privilege
09:33  3  Review Team is looking into those two documents we
09:33  4  identified last week or a week-and-a-half ago to see if
09:33  5  there is anything else.  They are working through that
09:33  6  process, and they'll continue working through that process.
09:33  7  But we can't say definitively that there's nothing in there
09:33  8  that the defendant is going to stand up in two weeks or a
09:33  9  month and say, ah-ha, this is it.  We're not aware of any.
09:33  10  That's the issue.  We are not aware of anything else in that
09:33  11  database --
09:33  12          THE COURT:  Why?
09:33  13          MR. ANDRE:  -- beyond what we've identified for
09:33  14  the Privilege Review Team.  I know they're looking into it,
09:33  15  and maybe AUSA Fitzgerald can address that question.
09:34  16          THE COURT:  Okay.  Thank you.
09:34  17          Mr. Fitzgerald.
09:34  18          MR. FITZGERALD:  Yes, Your Honor.  Patrick
09:34  19  Fitzgerald, Assistant United States Attorney, on the
09:34  20  Privilege Review Team.
09:34  21          In answer to the Court's last question, we do
09:34  22  believe that there are additional documents in the over
09:34  23  112,000 that we produced to the Privilege Team that on
09:34  24  further review we will probably claw back, so in that
09:34  25  technical sense, yes.  There are I believe having reviewed

09:34  1   additional documents additional documents that we should

09:34  2   claw back.

09:34  3        We did the initial clawback that produced the 299.

09:34  4   When we heard from the Prosecution Team that there were

09:35  5   these additional documents of which notice was given in

09:35  6   Docket No. 343, we went back and I directed that a more

09:35  7   extensive search occur given that we hadn't found these two

09:35  8   documents.

09:35  9        We now have about -- based on those further

09:35  10  broader I hope overinclusive searches, we found about 10,000

09:35  11  documents out of the over 100,000 documents that I would

09:35  12  like to take a second look at.  We've gone through 3,000 of

09:35  13  those, and we have about 7,000 that we're still looking at.

09:35  14       What's important I think for today's purposes also

09:35  15  is that given this development we have locked out the

09:35  16  Prosecution Team from the entire pool of documents that we

09:36  17  produced to them, so the status quo is preserved while we

09:36  18  conduct this further review.

09:36  19       My hope is given the progress we've made so far

09:36  20  that in two weeks that further review will be completed, and

09:36  21  definitely as soon as that review is done, we will notify

09:36  22  defense counsel about what it is we found.

09:36  23       In regard to those searches and that review, I do

09:36  24  want to emphasize to the Court that in this case we have

09:36  25  consistently in determining what goes through the filter not

09:36   1   really determined at the end of the day whether something is

09:36   2   privileged in the sense that the defendant is the privilege

09:36   3   holder, which in part isbecause Judge McCormick told us to

09:37   4   protect all privileged documents whether or not the

09:37   5   defendant was the privilege holder.

09:37   6           But even equally fundamentally, we have just tried

09:37   7   to filter things to avoid any litigation or any issues even

09:37   8   arising.  Obviously we're here today because that endeavor

09:37   9   was not entirely successful, but that is our goal.

09:37   10          So unlike what the defense said in the reply, the

09:37   11  fact that we have clawed back documents does not mean that

09:37   12  they are privileged or they -- it simply means we have

09:37   13  determined on the Privilege Review side that we will treat

09:37   14  them as privileged to avoid issues as much as we can with

09:37   15  the case.  Of course, we then with very, very rare

09:37   16  exceptions produce everything we see ourselves to the

09:37   17  defense.

09:38   18          So, for example, out of the about 160,000

09:38   19  documents that we've been reviewing, over 40,000 we have

09:38   20  just treated as privileged and produced those just to the

09:38   21  defense.  The Prosecution Team has never seen them.

09:38   22          So, again, the fact that we are pulling back

09:38   23  documents does not mean necessarily that privileged

09:38   24  documents went through.  What it means is that documents not

09:38   25  consistent with our broad policy of avoiding problems --

09:38   1    documents in that category went through.

09:38   2            If there's any other questions the Court has, I

09:38   3    can answer them.  Obviously it depends on the content of the

09:38   4    documents if I'll need to address the Court in-camera.

09:38   5            THE COURT:  I assume you'll make a filing with the

09:39   6    Court when you've completed the second review, and an

09:39   7    in-camera filing will be provided to the defense.

09:39   8            MR. FITZGERALD:  We will, Your Honor, yes.

09:39   9            THE COURT:  Okay.

09:39   10           THE DEFENDANT:  Your Honor, could I have an

09:39   11   opportunity to speak with Mr. Steward?

09:39   12           THE COURT:  No, Mr. Avenatti.

09:39   13           MR. STEWARD:  He was asking, Your Honor, to speak

09:39   14   with me.

09:39   15           THE COURT:  Oh, sure.  You've got a cell phone to

09:39   16   do that?

09:39   17           MR. STEWARD:  I do.  Five minutes?

09:39   18           THE COURT:  Okay.  Why don't we take a short break

09:39   19   and let you do that.

09:39   20           MR. STEWARD:  Thank you, Your Honor.

09:39   21           THE COURT:  Okay.

09:39   22           (Recess)

09:48   23           THE COURT:  Mr. Steward, I believe it's your

09:48   24   chance to respond.

09:48   25           MR. STEWARD:  Thank you, Your Honor.

09:48   1          MR. STEWARD:  Your Honor, my client reminds me
09:49   2    that we addressed the standing issue in both our revised
09:49   3    reply, which is Document 345, and in our surreply, Document
09:49   4    355, and I'd refer those citations to the Court.
09:49   5          What we are most concerned about now --
09:49   6          THE COURT:  Give me those numbers again, please.
09:49   7          MR. STEWARD:  I'm sorry?
09:49   8          THE COURT:  The docket numbers.
09:49   9          MR. STEWARD:  Yes.  Revised reply 345, surrereply
09:49  10    355.
09:49  11          THE COURT:  Okay.  Thank you.
09:49  12          MR. STEWARD:  We are most concerned now -- we
09:49  13    learned just a moment ago there are about 10,000 new
09:49  14    documents that we were unaware of.  We are concerned that we
09:49  15    don't know what they are, whether the government has
09:49  16    reviewed them, studied them.  We have nothing on them other
09:49  17    than what Mr. Fitzgerald just told us.
09:50  18          THE COURT:  Well, I agree.  There are a number of
09:50  19    matters that have to be explored, and there are certain
09:50  20    things we just can't accomplish today.  I guess my proposal
09:50  21    at this point is to put this off for two or three weeks and
09:50  22    come back and have a hearing dedicated only to this matter.
09:50  23          MR. STEWARD:  That's what I was going to ask for,
09:50  24    Your Honor.  I would appreciate that.  If we could have
09:50  25    three weeks, that would be great.

09:50  1            THE COURT:  Mr. Fitzgerald, when do you think

09:50  2   you'll -- you indicated about two weeks.

09:50  3            MR. FITZGERALD:  Yes, Your Honor.  That's our best

09:50  4   estimate at this point.  Again, at the risk of beating a

09:50  5   dead horse, let me just emphasize that the 10,000 are not

09:50  6   new documents.  They are documents that the defense has had

09:50  7   through the Prosecution Team and discovery for quite some

09:50  8   time.

09:50  9            Again, I mentioned them in response to the Court's

09:51  10  question of if we have gone back through and looked through

09:51  11  the over 100,000 documents that we produced to the

09:51  12  Prosecution Team and through them to the defense, the

09:51  13  documents that went through the filter.  I mentioned them

09:51  14  because we really -- you know, in a realistic time period,

09:51  15  we are not going to be able to look back and look at every

09:51  16  single one of the over 100,000 documents.  But we did cause

09:51  17  searches to be done that produced about ten percent that I

09:51  18  feel are the ones that potentially could raise any sort of

09:51  19  privilege issue, and we are now focusing our efforts in

09:51  20  re-reviewing that ten percent.

09:51  21            MR. ANDRE:  Your Honor --

09:51  22            THE COURT:  Mr. Andre.

09:51  23            MR. ANDRE:  May I have one moment?

09:52  24            THE COURT:  Sure.

09:52  25            (Government counsel conferring with

| | | |
|---|---|---|
| 09:52 | 1 | Mr. Fitzgerald) |
| 09:52 | 2 | MR. FITZGERALD:  Your Honor, again to clarify, the |
| 09:52 | 3 | 10,000 is the pool that we're looking through to see if |
| 09:52 | 4 | there is anything that could potentially raise an issue. |
| 09:52 | 5 | I'm confident based on that we have gone through 3,000 |
| 09:52 | 6 | already that the vast majority of those documents will not |
| 09:52 | 7 | raise any sort of issue whatsoever and will not be clawed |
| 09:52 | 8 | back.  But, again, once we've completed that review, we will |
| 09:52 | 9 | give that information to defense counsel. |
| 09:52 | 10 | Again, I'll remind defense counsel that the |
| 09:52 | 11 | defense has all these documents.  So if the defense feels |
| 09:52 | 12 | there's something in the over 100,000 that raises privilege |
| 09:53 | 13 | issues, the way to raise that is to see it in their |
| 09:53 | 14 | database, contact me, and I will take a look at it, instead |
| 09:53 | 15 | of waiting for us to claw something back and then being |
| 09:53 | 16 | concerned about that.  Logically, the defense should be |
| 09:53 | 17 | concerned about the documents we're not clawing back, not |
| 09:53 | 18 | the documents that we are clawing back. |
| 09:53 | 19 | THE COURT:  Okay.  But assuming -- |
| 09:53 | 20 | Mr. Andre, please. |
| 09:53 | 21 | MR. ANDRE:  Your Honor -- |
| 09:53 | 22 | THE COURT:  Go ahead. |
| 09:53 | 23 | MR. ANDRE:  I did want to add on to a couple of |
| 09:53 | 24 | points in response to Mr. Steward if that's okay. |
| 09:53 | 25 | THE COURT:  Okay. |

| | |
|---|---|
| 09:53 | 1 |
| 09:53 | 2 |
| 09:53 | 3 |
| 09:53 | 4 |
| 09:53 | 5 |

MR. ANDRE:  First, we'll note -- and we've noted
this before -- every document we've produced -- they are
fully searchable with load files.  So the defense can search
through the materials that the Privilege Review Team
released to us.  They can search, for example, for a
lawyer's name and go through their own process.  You know,
what AUSA Fitzgerald and the Privelege Review Team is doing
is what we think is the right thing to do, which is to try
to make sure there aren't any issues here, which has been
our concern throughout the entire time.

Mr. Steward mentioned his surreply -- or the
response to the surreply at Docket 355.

THE COURT:  Yes.

MR. STEWARD:  If I could just address that real
quick again.  There is a particular -- with respect to the
Pachulski Firm, the defendant is effectively arguing that
Eagan Avenatti, LLP, ceased to exist sometime before 2017,
and, therefore, he maybe possibly still holds privilege.

The reason this argument is concerning -- and I
have additional documents that I can produce if the Court
would like -- is that is inconsistent with his own under
oath statements and his own actions.  In June 2017 during
the Section 341 hearing, defendant testified under oath that
he owned 75 percent of Eagan Avenatti, LLP.  Michael Eagan
owned 25 percent.

09:55  1          In January 2019, he testified under oath in a
09:55  2  judgment debtor examination in connection with his divorce
09:55  3  proceedings that the two partners in Eagan Avenatti, LLP,
09:55  4  were himself individually and Avenatti & Associates, his
09:55  5  company.  I mean, it's still like the company.
09:55  6          Again, as we mentioned earlier, in February 2019,
09:55  7  he stipulated turning over control of Eagan Avenatti, LLP,
09:55  8  to the receiver.  In March 2019, he himself attempted to put
09:55  9  Eagan Avenatti in bankruptcy.  That was rejected because the
09:55  10  receiver was the only person who had the authority to do
09:55  11  that.  As I mentioned earlier, as recently as last week, he
09:55  12  was filing documents in the current bankruptcy proceeding.
09:55  13          The reason we find this concerning is it's kind of
09:55  14  a pattern in which he will kind of say whatever he thinks he
09:55  15  needs to at the time.  I have his prior testimony.  We did
09:56  16  want to submit them after we saw his responsive reply to the
09:56  17  Court.  We'd like an opportunity to do it.
09:56  18          THE COURT:  If you want to submit those in the
09:56  19  next round of briefing, that's fine.
09:56  20          MR. STEWARD:  Thank you, Your Honor.
09:56  21          THE COURT:  Assuming that the Privilege Review
09:56  22  Team can accomplish its work in the next two weeks and get
09:56  23  its report, I suggest that we have a hearing on November 16
09:56  24  at 9:00 a.m. and that any further briefs come in by
09:56  25  November 9.  Now, if we need to adjust that in light of the

09:56  1  ability of the Privilege Review Team to complete its task,
09:56  2  well, we'll do that, but at least we've got a schedule for
09:56  3  another hearing on this issue.
09:56  4      MR. ANDRE:  That's fine with the government, Your
09:56  5  Honor.  Thank you.
09:56  6      MR. STEWARD:  That's fine with the defense, Your
09:56  7  Honor.
09:56  8      THE COURT:  For today's purposes, I'm simply going
09:56  9  to reserve on this last motion.
09:56  10     There are a couple things -- anything else with
09:57  11 regard to the motions on the calendar for today?
09:57  12     MR. STEWARD:  Not today, Your Honor.
09:57  13     MR. SAGEL:  Not from the government, Your Honor.
09:57  14     THE COURT:  Okay.  I want to share some thoughts
09:57  15 with you looking forward to our trial.  I think we're going
09:57  16 to need a fairly large venire.  We will probably call 150.
09:57  17     For a trial that is limited to Counts 1 through
09:57  18 10, I believe your estimate previously was two weeks.
09:57  19     MR. SAGEL:  I think we were saying two weeks when
09:57  20 we were expecting 1 through 10 and 33, but I believe
09:57  21 comfortably within two weeks if it's Counts 1 through 10.
09:57  22     THE COURT:  Okay.
09:57  23     MR. SAGEL:  And that's just for the trial aspects,
09:57  24 not the jury selection --
09:57  25     THE COURT:  Right.  I understand.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:57  **1**          We'll probably seat a jury of 12 plus four.  With

09:58  **2**  the uncertainties -- the health uncertainties out there, I

09:58  **3**  want four alternates.

09:58  **4**          On the issue of prescreening, we could have the

09:58  **5**  jury commissioner prescreen these folks for time.  I think

09:58  **6**  I'd tell them three weeks just to be safe, or if people

09:58  **7**  won't agree to that, they'll come in a day or two before,

09:58  **8**  and they'll be screened for excuses by the magistrate judge.

09:58  **9**  You don't have to tell me now, but I'd like to know what

09:58  **10** path we're going down.

09:58  **11**         I think we need to use a questionnaire in this

09:58  **12** case.  At a minimum, we need a screening questionnaire for

09:58  **13** people who know about Mr. Avenatti, have feelings about him

09:58  **14** or his business dealings, learned about settlements and so

09:59  **15** on.

09:59  **16**         I'd be open to a broader questionnaire, but at a

09:59  **17** minimum, I'd use a screening questionnaire the day the

09:59  **18** jurors show up.  Five questions just so that we'd know right

09:59  **19** off the bat who we'd need to have some concerns about as to

09:59  **20** possible prejudice or bias with regard to knowledge of

09:59  **21** Mr. Avenatti.  So you don't have to tell me now, but we're

09:59  **22** going to have one of those two questionnaires.

09:59  **23**         With regard to the Indictment, in this case, it

09:59  **24** would be my inclination to read the jury an agreed summary

09:59  **25** of Counts 1 through 10 and not read the Indictment.  I'm

09:59  **1**   pretty sure I'd want to do that.  You can try to talk me out

09:59  **2**   of it, but that's the preferred route.

09:59  **3**          Jury instructions, basically we've got pattern

09:59  **4**   instructions that cover the counts, and hopefully the Ninth

10:00  **5**   Circuit will correct the fraud instruction in light of

10:00  **6**   Miller.  If not, we can do it ourselves.  So I don't see

10:00  **7**   that as being terribly burdensome.  But I would like to get

10:00  **8**   the jury instructions -- the joint jury instructions no

10:00  **9**   later than the week before trial.

10:00  **10**  The way that I ask that those be submitted is to

10:00  **11**  be submitted in one joint packet with all the instructions

10:00  **12**  in the order that you would expect the Court to read them.

10:00  **13**  If someone has an objection, the objection is on the

10:00  **14**  instruction.  If someone has a counterproposal, it's right

10:00  **15**  behind it with any objections to the counterproposal.  I've

10:00  **16**  found that over the years that's the most efficient way to

10:00  **17**  settle the instructions.

10:00  **18**  Okay, any other thoughts or topics to take up

10:00  **19**  today?

10:00  **20**          MR. STEWARD:  Not from the defense, Your Honor.

10:01  **21**          MR. SAGEL:  One issue, Your Honor.  I'm not going

10:01  **22**  to argue it.  There is obviously one outstanding motion --

10:01  **23**          THE COURT:  There is.

10:01  **24**          MR. SAGEL:  -- before Your Honor.  We're not going

10:01  **25**  to argue it.  It's all in writing.  I just point it out so

10:01   1   that if Your Honor's rulings have been based on not granting

10:01   2   it, I don't know if we need to come back every 14 days or if

10:01   3   Your Honor is just looking at every 14 days or 28 days or

10:01   4   whatever to the request be determined at that moment.

10:01   5         We don't plan on filing or arguing anything

10:01   6   further, but we just note -- I don't know if Your Honor

10:01   7   wants anything further from us going forward when a request

10:01   8   is made and so forth.

10:01   9         THE COURT:  However you want to do it.  I've been

10:01  10   thinking about this issue.  Although it doesn't directly

10:01  11   bear on the merits of the government's position, one thing

10:02  12   that is in the back of my mind is the current situation in

10:02  13   the community and in the jails.  As I say, it doesn't bear

10:02  14   strictly on the merits, but it is in the back of my mind.

10:02  15   But, more importantly, the motion has not been lost from my

10:02  16   radar.

10:02  17         Okay, thank you very much.

10:02  18         MR. SAGEL:  Thank you Your Honor.

10:02  19         MR. STEWARD:  Thank you, Your Honor.

10:02  20         (Whereupon, the proceedings were concluded.)

10:02  21                    *    *    *

10:02  22

10:02  23

10:02  24

10:02  25

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**CERTIFICATE**


I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.


Date:  October 23, 2020


/s/   Sharon A. Seffens  10/23/20

SHARON A. SEFFENS, U.S. COURT REPORTER