H. Dean Steward, SBN 85317
107 Avenida Miramar, Ste. C
San Clemente, CA 92672
Tel (949) 481-4900
Fax (949) 497-6753

Attorney for Defendant
MICHAEL JOHN AVENATTI

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | SA CR No. 19-061-JVS |
| Plaintiff, | DEFENDANT'S NOTICE OF MOTION AND MOTION TO REOPEN DETENTION HEARING (18 U.S.C. § 3142(f)) |
| v. | |
| MICHAEL JOHN AVENATTI, | |
| Defendant. | [[Proposed] Order filed concurrently herewith] |

    TO U.S. ATTORNEY NICOLA HANNA, AUSA ALEXANDER WYMAN, and AUSA BRETT SAGEL, PLEASE TAKE NOTICE that Defendant MICHAEL JOHN AVENATTI ("Mr. Avenatti") by and through his counsel of record, H. Dean Steward, hereby moves and files his Motion to Reopen Detention Hearing pursuant to 18 U.S.C. § 3142(f).  Defendant's motion is based on the attached memorandum of points and authorities; the evidence referenced in the attached; the files, records and transcripts in this case and the other cases cited herein; and such further evidence and argument as the Court may permit at a hearing on this matter.  In the event the government files an opposition, Defendant specifically requests an opportunity to file a Reply prior to the Court's ruling on the motion.

//

//

Dated:  May 7, 2021

Respectfully submitted,

/s/ H. Dean Steward
 H. DEAN STEWARD

Attorney for Defendant
MICHAEL JOHN AVENATTI

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .......................................................................... ii

I.    INTRODUCTION .................................................................................. 1

II.   FACTUAL BACKGROUND ................................................................. 2

    A. The March 2019 Arrest and Release ................................................... 2

    B. The January 2020 Detention ............................................................... 3

    C. The March/April 2020 Release to Home Confinement ...................... 7

    D. The Extensions of Mr. Avenatti's Temporary Release ...................... 7

    E. The Court's Statement at the April 7, 2021 Status Conference .......... 7

    F. The New Information and Facts ........................................................... 8

        1.   *Mr. Avenatti's Compliance With His Conditions of Temporary Release*

        2.   *Mr. Avenatti's Surety and His Ability to Post Significant Collateral*

        3.   *Mr. Avenatti's Ability to Secure a Third-Party Custodian*

        4.   *The Finding of Indigency By Two Courts*

        5.   *Mr. Avenatti's Current Financial Condition and Lack of Assets*

        6.   *The Admission Made by the Government in the Daniels Case*

        7.   *The Admissions Made by the Government in the Nike Case*

        8.   *The Seizure of Mr. Avenatti's Assets After January 15, 2020*

        9.   *The Suspension of Mr. Avenatti's Law License*

        10.  *The Widespread Media Coverage of Mr. Avenatti's Conviction*

        11.  *Mr. Avenatti's Unemployed Status*

        12.  *The Lack of Remand Following the Nike Verdict*

        13.  *The Lack of Remand in the Daniels Case*

        14.  *The Findings in Mr. Avenatti's Presentence Report*

        15.  *Mr. Avenatti's Record While Incarcerated*

        16.  *The Dismissal of the Contempt Charges*

17.   *The Absence of New Charges Against Mr. Avenatti*
18.   *The Exculpatory Information Given to the Government Before the Hearing by Mrs. Carlin and Her Attorney That Was Unknown to the Defense and the Recent Order Establishing the Falsity of the Government's Claims at the Detention Hearing*
19.   *The Covid-19 Pandemic and the Risk to Mr. Avenatti's Health*

III.   ARGUMENT ........................................................................ 20

A. The Bail Reform Act Generally ........................................ 20

B. Section 3142(f) of the Act ............................................... 22

C. The New Information Has a Material Bearing on the Issues ............ 22

D. Mr. Avenatti's Continued Detention is a Violation of Due Process ........................................................... 24

IV.   CONCLUSION ..................................................................... 25

CERTIFICATE OF SERVICE ...................................................... Attached

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>:                                                              <u>Page</u>

*Calderon v. Thompson*,
523 U.S. 538 (1998)............................................................................13

*Drake v. Kemp*,
762 F.2d 1449 (11th Cir. 1985) ........................................................13

*Oscanyon v. Arms Co.*,
103 U.S. 261 (1893)............................................................................13

*Smith v. Groose*,
205 F.3d 1045 (8th Cir. 2000) ..........................................................13

*Stack v. Boyle*,
342 U.S. 1 (1951)................................................................................21

*Thompson v. Calderon*,
120 F.3d 1045 (9th Cir. 1997)(en banc) ..........................................13

*United States v. Alaby*,
2020 U.S. Dist. LEXIS 84424 (S.D. Cal. 2020).............................23

*United States v. Barksdale*,
2008 WL 2620380 (E.D. Cal., July 1, 2008)................................1, 22

*United States v. Briggs*,
697 F.3d 98 (2d Cir. 2012) .............................................................2, 25

*United States v. Flores*,
679 F.2d 173 (9th Cir. 1982) ............................................................13

*United States v. Gebro*,
948 F.2d 1118 (9th Cir. 1991) ......................................................21, 22

*United States v. Gonzalez Claudio*,
806 F.2d 334 (2d Cir. 1986) ......................................................2, 21, 25

*United States v. Hir,*
517 F.3d 1081 (9th Cir. 2008) ...................................................................22

*United States v. Montalvo-Murillo,*
495 U.S. 711 (1990)...................................................................................21

*United States v. Motamedi,*
767 F.2dd 1403 (9th Cir. 1985) .................................................................21

*United States v. Myers,*
930 F.3d 1113, 1119 (9th Cir. 2019) .....................................................2, 24

*United States v. Parmer,*
2020 U.S. Dist. LEXIS 81930 (N.D. Cal. 2020) .......................................23

*United States v. Perez-Cornejo,*
2020 U.S. Dist. LEXIS 64355 (S.D. Cal. 2020) .......................................23

*United States v. Salerno,*
481 U.S. 739 (1987)..........................................................................2, 20, 24

*United States v. Shakur,*
817 F.2d 189 (2d Cir. 1987) ......................................................................20

*United States v. Soulati,*
2020 U.S. App. Lexis 39853 (9th Cir. 2020)............................................23

*United States v. Tortora,*
922 F.2d 880 (1st Cir. 1990)......................................................................21

*United States v. Ward,*
63 F. Supp. 2d 1203 (C.D. Cal. 1999) ...................................................1, 23

*United States v. Winsor,*
785 F.2d 755 (9th Cir. 1986) .....................................................................22

## **OTHER AUTHORITIES:**

The Bail Reform Act of 1984, 18 U.S.C. §§ 3141, *et seq.* ......................... *passim*

S. Rep. No. 98-225, as reprinted in 1984 U.S.C.CA.N. 3182 ............................20

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   <u>INTRODUCTION</u>

Pursuant to the Bail Reform Act and 18 U.S.C. § 3142(f), Defendant Michael John Avenatti ("Mr. Avenatti) respectfully requests that the Court reopen the prior detention hearing held nearly sixteen (16) months ago in this case on January 15, 2020.  As set forth herein, Mr. Avenatti's circumstances have changed materially and considerably since the Court remanded him.  There is also new information that bears on the Court's consideration of whether Mr. Avenatti's detention is appropriate – including information that demonstrates the Court can impose a combination of conditions that will reasonably assure Mr. Avenatti's appearance as required and the safety of any other person and the community.  *See* 18 U.S.C. § 3142(f); *United States v. Ward*, 63 F.Supp. 2d 1203 (C.D. Cal. 1999); *see also United States v. Barksdale*, 2008 WL 2620380, *2 n. 3 (E.D. Cal., July 1, 2008)("[o]nce a hearing is reopened, . . . it is reopened for the purpose of the court's receiving any information, within reason, not submitted at the original detention hearing. . . . The purpose of such rule is to allow the new information justifying reopening to be considered in context, taking into account information either side may have gathered.").

As a result, Mr. Avenatti respectfully requests the opportunity to present this information to the Court during a reopened hearing in context (as permitted under the law), after which he will request that the Court amend its January 15, 2020 detention order.[1]  In addition, seeing as Mr. Avenatti has been subject to the detention order for nearly 16 months at this juncture, with numerous trial delays and continuances having occurred due to the COVID-19 pandemic through no fault of his own, Mr. Avenatti's

---

[1] Under the law, this motion is not the proper procedural mechanism by which to present all of the details relating to the new information and facts, nor is it appropriate for arguing the merits of amending the detention order.  Those are properly addressed after the hearing is reopened and the Court has received the information and facts in context. The only question raised by this motion is whether the defendant has met the requirements of section 3142(f) to allow the hearing to be reopened.

continued detention under the existing Order violates his right to due process under the Fifth and Sixth Amendments to the United States Constitution.  *See*, *e.g.*, *United States v. Salerno*, 481 U.S. 739, 747 n.4 (1987); *United States v. Torres*, 2021 U.S. App. LEXIS 12147, __ F.3d __ (Apr. 23, 2021); *United States v. Myers*, 930 F.3d 1113, 1119 (9th Cir. 2019); *United States v. Briggs*, 697 F.3d 98, 103 (2d Cir. 2012); *United States v. Gonzales Claudio*, 806 F.2d 334, 340-41 (2d Cir. 1986).

Before bringing this motion, undersigned counsel conferred with U.S. Pretrial Services ("PS") by telephone and email on May 4-5 regarding their position as to whether Mr. Avenatti should be placed on regular bond and, if so, the conditions of such bond.  Ms. Shakira Davis, the Special Offender Specialist who has supervised Mr. Avenatti since his temporary release on April 24, 2020 (and during his prior release in 2019), informed the defense that PS <u>supports</u> Mr. Avenatti being placed on regular bond. PS has also agreed to the set of conditions attached to this motion. *See* Exhibit A.

## II.     FACTUAL BACKGROUND

### A.     The March 2019 Arrest and Release

Mr. Avenatti was arrested on a criminal complaint in this case on March 25, 2019 in New York City.  He was placed under the supervision of PS on that same date, under the following conditions as requested by the government:  $300,000 personal recognizance bond, cosigned by two financially responsible persons; travel limited to SDNY, EDNY, CDCA, and points in between for travel to court/personal attorney; temporary additional domestic travel upon consent of AUSAs and approval of AUSAs and PS; surrender travel documents within 48 hours, and no new applications; pretrial supervision as directed by PS; defendant to be released on his own signature with remaining conditions to be met by April 5, 2019; report to PS any transaction of $5,000 or greater in any account controlled by the defendant; and report to CDCA on April 1, 2019, at 2:00 p.m.  He was subsequently assigned for supervision to Ms. Shakira Davis

of the U.S. Pretrial Office in the Central District.  <u>Importantly, at the time of this hearing, the government did not claim or argue that Mr. Avenatti was a flight risk</u>.

Within a couple of days, Mr. Avenatti returned from New York to his home in Los Angeles and then surrendered his American and Italian passports, both of which he had with him in New York when he was released.  On April 1, 2019, Avenatti appeared before this Court for arraignment.  He was ordered released on the same bail conditions as previously set on the date of his arrest.  <u>Once again, the government did not claim or argue that Mr. Avenatti was a flight risk</u>.

On June 6, 2019, Mr. Avenatti requested that his conditions of release be modified to allow increased travel and argued that there was nothing suggesting that he was a flight risk.  [Dkt. 40, pp. 3-5].  The government opposed the request for modification at the hearing but <u>did not dispute that Mr. Avenatti posed no risk of flight</u>.  On June 10, 2019, the court (Magistrate Judge John D. Early) agreed with the defense, overruled the objection of the government, and modified Mr. Avenatti's travel restrictions as follows: travel restricted to SDNY, EDNY, SDFL, and CDCA, with domestic travel to other locations permitted with at least two business days' notice to PS prior to travel to such other location(s).  It was further ordered that international travel required prior Court permission.  All other conditions remained unchanged and in effect.  [Dkt. 42].

Importantly, between March 25, 2019 and mid-January 2020, Mr. Avenatti never missed a single court appearance in any of his three criminal proceedings, this case included.  Indeed, Mr. Avenatti has never failed to appear for court in connection with any of his three pending criminal matters.  Nor has he ever attempted to flee prosecution.

**B.     The January 2020 Detention**

1.     <u>The government timed Mr. Avenatti's arrest to coincide with a high-profile State Bar hearing.</u>

On the evening of January 14, 2020, without notice and despite knowing full well that Mr. Avenatti was scheduled to depart for New York on a commercial flight five

hours later in order to assist with trial preparation and be present for the Nike related trial (set for the following Tuesday in the Southern District of New York), the government caused Mr. Avenatti to be arrested in downtown Los Angeles.  This came as a complete shock to Mr. Avenatti and his counsel, both of whom had no idea that the government was going to seek to have Mr. Avenatti remanded, especially as he prepared to depart to attend trial across the country in another case.  It was even more shocking considering that Mr. Avenatti had enjoyed a fully cooperative relationship with Pretrial Services since his release on bail in March 2019 (approximately ten months) and was unaware of any issues or complaints relating to any alleged violations of his bail conditions.

The government chose to arrest Mr. Avenatti not at his residence as is customary, or even at the airport.  Instead, the prosecution purposely chose to have Mr. Avenatti arrested while he was attending a high-profile State Bar hearing at which the media was present.  As planned, a media circus resulted, with Mr. Avenatti's arrest and ultimate remand being widely reported nationwide.  The judge in Mr. Avenatti's Nike related criminal matter (case No. 1:19-CR-00373-PGG (SDNY) (the "Nike Case") (the Hon. Paul G. Gardephe) later noted that the timing was especially curious seeing as the alleged conduct purportedly justifying Mr. Avenatti's arrest and bail revocation was known by the government for months prior (dating back to July 2019).  Upon being booked in the Santa Ana jail on the night of January 14, Mr. Avenatti was placed in solitary confinement, in a wing of the jail generally reserved for violent inmates with disciplinary problems.[2]  In his life, Mr. Avenatti had never before spent a night in jail.

In advance of the detention hearing, the government filed approximately 850 pages of briefing and materials.  [Dkt. 78, 78-1, 78-2, 78-3, 98].  Mr. Avenatti, who was understandably shaken and disoriented from the events that had unfolded approximately 18 hours earlier, had less than approximately 30 minutes to review the dense materials

---

[2] As the Court is aware, from 1971 until 2019 (48 years), Mr. Avenatti had never been charged with any crime, let alone convicted of any crime, and had no history of violence.

4

with his counsel, in lock-up, before the detention hearing began on January 15, 2020.

          1.      <u>The government's claim that Mr. Avenatti's should be remanded centered on the false allegation that he diverted money to his ex-wife instead of paying other creditors.</u>

At the detention hearing, the government's arguments centered on their claims that Mr. Avenatti should be remanded because he had "fraudulently paid" and "diverted" money to Mrs. Christine Carlin (his first wife) and other creditors, instead of paying his "real creditors," who AUSAs Sagel and Andre argued were Mr. Avenatti's second wife (Ms. Lisa Storie) and his former employee Jason Frank (who is represented by AUSAs Sagel close friend, disgraced former AUSA Andrew Stolper, whom Mr. Avenatti fired from his law firm for fraud and theft in May 2016).  Indeed, the claims relating to Mrs. Carlin served as the underpinnings for the government's successful arguments to the Court that Mr. Avenatti should be remanded because he had "fraudulently" paid and "diverted" money to Mrs. Carlin instead of other creditors.  Mr. Sagel went so far as to claim at the detention hearing that the money Mr. Avenatti had paid to Mrs. Carlin was a bribe in exchange for her serving as Mr. Avenatti's surety:  "For all intents and purposes, when you look at the cash transaction, he paid her to be a surety.  She made a couple hundred thousand dollars off of it.  Maybe minus 50,000 for the car she bought him." [Transcript, Dkt. 94, p.22:19-22].  The government's theory for remand hinged on their position that Mr. Avenatti had money to pay Ms. Storie and Mr. Frank while on pretrial release, but instead hid the money and undertook efforts to pay others or incur other expenses in lieu of paying them.  AUSA Sagel's principle argument was that these facts showed that Mr. Avenatti was an "economic danger to the community."  [Transcript, Dkt. 94, p. 24:6-7].  The government did not argue that Mr. Avenatti was a flight risk.

At the conclusion of the detention hearing, the Court ordered Mr. Avenatti detained and his bond revoked [Dkt. 83], focusing on Mr. Avenatti's moving of monies,

concealing of funds and structuring of funds.[3]  [Transcript, Dkt. 94, pp. 36:21-37:4].
The Court further found that there was an ongoing danger that Mr. Avenatti would
engage in similar conduct if allowed to remain on release.  *See id*. at 37:11-12.
Importantly, the Court did not find Mr. Avenatti to be a flight risk.

 Following remand, Mr. Avenatti was flown to New Jersey under tight security and
transferred to the Metropolitan Correctional Center ("MCC") in New York City.  He was
immediately placed in solitary confinement in the notorious "10 South" unit of the jail,[4]
a unit of only six to seven individual cells that is considered the highest security pre-trial
facility in the United States and holds those individuals classified as the most dangerous
and who pose dire national security threats to the United States (i.e. international
terrorists and drug kingpins, such as Joaquin Guzman ("El Chapo") and Sayfullo Saipov,
who currently faces eight murder charges and the death penalty for an alleged terror
attack carried out in New York City in 2017).[5]  The abhorrent and brutal conditions of 10
South have been widely reported and routinely described by experts as being
"diabolical," a form of torture, and worse than those at Guantanamo Bay.  The
conditions of Mr. Avenatti's confinement and treatment at the hands of the government
have been previously documented for the Court in detail and never refuted with any

---

[3] The Ninth Circuit subsequently affirmed this determination, which was based solely on the information and facts filed and presented in connection with the January 15 detention hearing.

[4] The extreme isolation and brutal conditions of 10 South have been described as "a punitive measure that is unworthy of the United States as a civilized democracy," according to a former special monitor on torture and punishment for the United Nations who investigated the case of one prisoner held in the unit.

[5] The government has never adequately explained why Mr. Avenatti, a 48-year-old American attorney with no history of crime or violence and who had yet to be convicted of anything, was held in solitary confinement for 24 hours a day in the highest security pre-trial unit in the United States, which is almost uniformly reserved for suspected terrorists and those facing the death penalty for acts against the national interests of the United States.

6

evidence.  *See*, *e.g.*, Dkt. 164, pp. 6-13.

### C.    The March/April 2020 Release to Home Confinement

By way of Orders entered on March 27, 2020 [Dkt. 128], April 10, 2020 [Dkt. 140], April 13, 2020 [Dkt. 142] and April 23, 2020 [Dkt. 151], this Court permitted Mr. Avenatti to be temporarily released from MCC and placed on home confinement for 90 days at the residence of a third-party custodian - Mr. Jay Manheimer - due to the COVID-19 pandemic.  Pursuant to these Orders, Mr. Avenatti's release was conditioned on approximately 30 terms and conditions, including 24 specific conditions enumerated in the Court's Order of April 10, 2020 and at least 6 other conditions as set forth in the Court's Orders of April 13 and April 23.

### D.    The Extensions of Mr. Avenatti's Temporary Release

On July 6, 2020, this Court extended Mr. Avenatti's temporary release for an additional 60 days as a result of the COVID-19 pandemic.  [Dkt. 199].  On September 16, 2020, this Court granted Mr. Avenatti's *ex parte* application to extend his temporary release to October 6, 2020 on the same conditions as previously granted.  [Dkt. 291]. Importantly, the government not only did not oppose this application, but instead consented to Mr. Avenatti being able to remain on home confinement for additional time.  Thereafter, this Court granted additional *ex parte* applications to extend Mr. Avenatti's temporary release on the same conditions as previously granted.  [Dkt. 314, 352, 384, 390, 425].  The last extension [Dkt. 425] permitted Mr. Avenatti to remain on temporary release until May 31, 2021.

### E.    The Court's Statement at the April 7, 2021 Status Conference

On April 7, 2021, the parties appeared at a status conference in this matter regarding a number of issues related to the trial.  During the status conference, the Court informed the parties as follows as it related to Mr. Avenatti's custody status:

> With regard to the logistics concerning Mr. Avenatti, I've been holding off ruling on the government's motion to have him remanded. One of the

factors in my mind is to the extent that Mr. Avenatti is readily available to Mr. Steward, particularly during the period of the COVID virus outbreaks at MDC, it made sense to allow him to have that access. I'm likely to continue to have the same view and not remand him prior to trial. I think I extended the date to the end of May, if I'm correct, May 31st. . . . I'll revisit it. As near as I can tell, there have not been any additional problems with regard to Mr. Avenatti's compliance since we visited the issue of his use of a computer with the ability to access the internet, but let's take a look at that at the end of May. I do think if he were out of custody, it would greatly facilitate the defense's ability to prepare and present the defense case.

[Transcript, p. 6:2-20.]

### F.    The New Information and Facts

Since the date of the detention hearing approximately (16) months ago, significant information and facts have emerged that were not known to Mr. Avenatti in January 2020 and that clearly demonstrate he can be placed on bail in a manner that will reasonably assure his appearance as required and the safety of the community.  While more robust details will be provided at the reopened hearing (if permitted), this information can be summarized by way of the following proffer:

1.    *Mr. Avenatti's Compliance With His Conditions of Temporary Release*

Since his temporary release to home confinement due to COVID-19 over a year ago on April 24, 2020, Mr. Avenatti has taken the terms of his release seriously and has been fully compliant with each of his approximate 30 bond conditions.  Among other things, Mr. Avenatti (a) did everything he was required to do prior to being released from MCC, including being placed in solitary confinement and securing the $1 million bond; (b) met all of the requirements relating to his travel to California from New York with no issues; (c) promptly reported to Pretrial Services upon his arrival and regularly thereafter; (d) has timely made all necessary financial reports and disclosures to Pre Trial Services as required (24 separate reports over the last eleven months), including asset and financial account disclosures; (e) has avoided all prohibited contact with witnesses; (f) has complied with the orders of his release in his other two criminal matters pending in the Southern District of New York and made all associated court appearances; (g) has

executed all documents as required by this Court; (h) has complied with the General Conditions of Release set forth in the Central District of California Release Order and Bond Form; (i) has maintained an exceptional relationship and perfect record with Pretrial Services ("PTS"); (j) has been monitored regularly and consistently by PTS through in-person, unannounced visits, FaceTime calls and emails (through Mr. Jay Manheimer as directed by PTS) and 24-hour electronic monitoring; (k) has remained confined in Mr. Manheimer's 1,000 square foot, two-bedroom, one-bath apartment; and (l) in over a year, has never left Mr. Manheimer's property nor asked for the opportunity to leave, even for medical or dental care, with one exception – to receive the first dose of the vaccine approximately ten days ago.  Further, Mr. Avenatti has not engaged in any improper financial transactions, dissipated assets or improperly accessed any financial accounts.  There is also **no evidence** that he has harmed any members of the community or attempted to.[6]  All of this is highly material as to whether there are conditions of release that will reasonably assure Mr. Avenatti's appearance as required and the safety of the community.  Indeed, Mr. Avenatti's spotless record over the last year conclusively demonstrates that there *are* appropriate conditions that can be implemented short of incarceration that will protect the community.

      2.    *Mr. Avenatti's Surety and His Ability to Post Significant Collateral*

At the detention hearing in January 2020, Mr. Avenatti was unaware of the willingness of his current surety to serve as Mr. Avenatti's surety and guarantee Mr.

---

[6] Any claim by the government that Mr. Avenatti violated the conditions of his release by inappropriately using a computer, not connected to the internet, to work on legal filings for this case at the direction of his counsel *approximately one year ago*, is without merit for all of the reasons set forth in detail in (a) the Opposition [Dkt. No. 271] to the Government's Motion to Terminate and Not Further Extend Defendant Michael John Avenatti's Temporary Release and (b) the accompanying declarations filed with the Opposition, including that of Mr. Avenatti's counsel.  Rather than repeat that information here, the defense refers the Court to the detailed argument and facts contained in the defendant's filings, which show that Mr. Avenatti has fully complied with his conditions.

Avenatti's compliance with bail conditions and his appearance by signing a $1,000,000 personal guarantee supported by collateral in the form of a deed of trust on a piece of real property with equity well in excess of $500,000. This is significant new information.

### 3. Mr. Avenatti's Ability to Secure a Third-Party Custodian

At the detention hearing in January 2020, Mr. Avenatti was unaware of the willingness of Mr. Jay Manheimer (and others) to serve as a third-party custodian for Mr. Avenatti if he was placed on home confinement as part of his bail conditions. This is also significant new information.

### 4. The Finding of Indigency By Two Courts

Since the detention hearing, this Court [Dkt. 253] and the Southern District of New York (the Hon. Jesse M. Furman presiding, Case No. 1:19-CR-00374-JMF (the "Daniels Case"), Dkt. 73], have found that Mr. Avenatti is indigent and therefore entitled to appointed counsel. Both courts did so after extensive information was submitted establishing this fact. Both courts have also received regular updates of Mr. Avenatti's financial condition. In light of this, Mr. Avenatti can hardly remain the economic danger to the community that the government claimed at the January 2020 detention hearing.

### 5. Mr. Avenatti's Current Financial Condition and Lack of Assets

Mr. Avenatti presently has no meaningful funds left. As a result, he does not have liquid assets to transfer or move anywhere and thus cannot "harm" individuals in the community as the government claimed at the detention hearing, even if he desired to. The defense has requested repeatedly that that if the government has any evidence that Mr. Avenatti has any liquid assets greater than $1,000 to access or transfer, they immediately disclose it to the Court and the defense. They have disclosed nothing and their continued silence on the issue speaks volumes. Over the last 30 months (beginning no later than in October 2018), AUSAs Sagel and Andre, the assigned AUSAs in New York, the DOJ, the Los Angeles and New York offices of the FBI, and the Criminal

Division of the IRS have all scoured Mr. Avenatti's finances and banking transactions. They claim to have left no stone unturned and to have examined nearly all, if not all, of his financial transactions (personal and business) since at least early 2011 (the last ten years). It is uncontested that Mr. Avenatti has practically no liquid assets left and therefore cannot possibly remain the economic threat to the community the government claims him to be. Against this backdrop, the government's argument that Mr. Avenatti's financial resources allow him to pose an economic threat to the community lacks merit.

6. *The Admission Made by the Government in the Daniels Case*

On August 28, 2020, the AUSAs in the Daniels Case admitted that they have no basis for challenging Mr. Avenatti's claims of indigency. [Dkt. 86 in Case No. 1:19-CR-00374-JMF, p. 1]. In other words, the government has acknowledged that despite their vast resources and investigation, they have no evidence of any significant funds or assets available for Mr. Avenatti to launder, move, structure, dissipate or transfer to anyone, thus permitting him to harm other creditors or members of the community.

7. *The Admissions Made by the Government in the Nike Case*

After the detention hearing and in connection with the Nike trial, the government repeatedly referenced Mr. Avenatti's alleged poor financial condition, lack of assets and income, deep indebtedness, and alleged inability to acquire any substantial money as evidence that Mr. Avenatti committed extortion and honest services fraud against Nike and his client. In February 2020 they offered this evidence and argument before the jury over the repeated objection of the defense. In fact, this evidence and argument served as one of the centerpieces of the prosecution, with the prosecution calling Mr. Avenatti's former Office Manager, Judy Regnier, to establish Mr. Avenatti's alleged desperate financial condition and lack of assets.[7] The record in the Nike Case is replete with references to the government's claims in that case before the judge and jury that Mr.

---

[7] AUSAs Brett Sagel and Julian Andre travelled to New York and were present in the courtroom when Ms. Regnier testified on behalf of the government in the *Nike* trial.

Avenatti was deeply in debt, had negligible assets and no way of paying any expenses. Indeed, the government made their claim that Mr. Avenatti was broke and deeply in debt a central theme of their closing argument:

> And that is why we are here today. Because Michael Avenatti, facing a mountain of debts, saw a light at the end of the tunnel. He saw a way to walk out from under those debts . . . And so Avenatti took what Gary Franklin told him and he used it. He used it to shake down Nike, to line his own pockets, to try to pay off his debts.

[Nike Trial Transcript, February 11, 2020, p. 2127:13-22]

> ….
> But you know why he did it here. You know why he made these demands. It starts with the amount of money. The $12 million up front is a lot of money to anyone, but in this case it was really important to Michael Avenatti. He needed that money right away. . . . Why did he need that money?  Here's a stipulation.  Government Exhibit S4. It says, On October 22, 2018, a civil order was entered in the Superior Court of California, against the defendant, that totaled approximately $2,219,669.60 as of March 1, 2019. And the defendant hadn't paid it.  Here's the second one. Another court order. This one for $2,194,301.87. Court order in October 2018, and the defendant had not paid it by March.  Third one. This one November 2018, court orders Avenatti to pay $5,054,287.75. Hadn't paid it.  Fourth one. Court order, in January 2019, to pay $1,530,216.07. Hadn't paid it. Separate judgments. So what does that add up to?  Just under $11 million in mounting debts, all ordered by courts, in the months leading up to this extortion scheme.  That's not all. You heard the testimony of Ms. Regnier, the defendant's longtime office manager. You heard that the defendant's law firm was collapsing financially in March 2019, and it actually had been evicted from its offices. . . . [T]his wasn't about Franklin for Avenatti. This was about getting out from under this debt. About a get-rich-quick scheme to clear $11 million in debt.

[Nike Trial Transcript, February 11, 2020, pp. 2164-66.]

The government's claims in the Nike Case regarding Mr. Avenatti's financial condition are factual admissions, admissible against them. *See*, *e.g.*, *Oscanyon v. Arms Co.*, 103 U.S. 261, 263 (1893); *United States v. Flores*, 679 F.2d 173, 177-78 (9th Cir. 1982).    Further, having prevailed - over the repeated objections of Mr. Avenatti both

before and during trial in the *Nike* Case - and after having successfully argued to the jury that Mr. Avenatti was in a desperate financial position with no other way to generate income or pay his debts, the government is not permitted to now take an entirely inconsistent position in this case as it relates to bail and claim the exact opposite, namely that Mr. Avenatti had and has considerable wealth, assets and income to use to harm the community.  To do so in this case would constitute a violation of Mr. Avenatti's due process rights and cannot be allowed.  *See, e.g., Thompson v. Calderon*, 120 F.3d 1045, 1058 (9th Cir. 1997)(en banc), *rev'd on other grounds, Calderon v. Thompson*, 523 U.S. 538 (1998); *Smith v. Groose*, 205 F.3d 1045 (8th Cir. 2000); *Drake v. Kemp*, 762 F.2d 1449, 1479 (11th Cir. 1985) (Clark, J., concurring) ("Such actions reduce criminal trials to mere gamesmanship and rob them of their supposed search for truth.").

       8.    *The Seizure of Mr. Avenatti's Assets After January 15, 2020*

Following Mr. Avenatti's remand to custody 16 months ago, various assets and funds of Mr. Avenatti's were seized by one or more creditors, eliminating Mr. Avenatti's ability to transfer, move, hide, structure or divert those funds and assets.  One cannot transfer, move, hide, structure, or divert what one no longer owns or has access to.

       9.    *The Suspension of Mr. Avenatti's Law License*

Following Mr. Avenatti's February 2020 conviction in the Nike Case, the State Bar of California suspended Mr. Avenatti's law license as of May 4, 2020.  The State Bar prominently states this fact on their website multiple times and informs consumers and members of the public that Mr. Avenatti is not permitted to practice law.  Further, Mr. Avenatti is not practicing law and has no clients.  He also has no ability to get clients.  Nor does he have any funds held in trust or even an attorney-client trust account or business bank account.  As a result, there is no risk to the community that Mr. Avenatti will continue to practice law and receive monies on behalf of clients.

      10.    *The Widespread Media Coverage of Mr. Avenatti's Conviction*

Mr. Avenatti's February 2020 conviction in the Nike Case received widespread

press coverage across the country with nearly every story commenting on the significant prison time Mr. Avenatti could face.  The details were reported on NBC, CBS, ABC, CNN and Fox News, blasted across social media, and printed in countless newspapers and web articles.  As a result, Mr. Avenatti's ability to harm the community by "luring" or "duping" someone or an institution into doing business with him, or engaging in any significant financial transaction with him, is practically nonexistent.

> 11.    *Mr. Avenatti's Unemployed Status*

Mr. Avenatti's remand and subsequent conviction have left him unemployed with no access to any meaningful income, cash flow, or funds, thus making it nearly impossible, if not impossible, for him to structure, move, conceal or divert any monies or funds.  Mr. Avenatti presently relies entirely on friends and family to support him.

> 12.    *The Lack of Remand Following the Nike Verdict*

Following Mr. Avenatti's February 2020 conviction in the Nike Case, the government did not request that Mr. Avenatti's bail in that case be revoked and Mr. Avenatti remanded to custody.  Nor did Judge Gardephe order that Mr. Avenatti's bail be revoked and that he be detained pre-sentencing.  Mr. Avenatti remains on bail in that case on the same conditions originally set on March 25, 2019.[8]

> 13.    *The Lack of Remand in the Daniels Case*

Since the January 2020 detention hearing in this matter, neither the government nor the court in the Daniels Case has sought Mr. Avenatti's remand to custody for any reason.  He remains on bail in that case on the same conditions originally set on May 28, 2019, which are:  $300,000 unsecured personal recognizance bond; travel restricted to SDNY, EDNY, CDCA, and points in between for travel to court/personal attorney; additional domestic travel with prior notification to PS; surrender travel documents

---

[8] Importantly, neither at the time of his arraignment nor at any point thereafter did the government claim or argue that Mr. Avenatti was a flight risk in that case.

14

within 48 hours and no new applications; pretrial supervision as directed by PS; defendant to be released on his own signature; no contact with alleged victim except through counsel; compliance with standard conditions.  [Dkt. 4, 5].[9]

14.     *The Findings in Mr. Avenatti's Presentence Report*

In preparation for Mr. Avenatti's sentencing in the Nike Case, the U.S. Probation Office prepared an extensive report relating to Mr. Avenatti, his then current circumstances and his history.  The 51-page report was filed in the Nike Case approximately one year ago on May 13, 2020 [Dkt. 295] after the government and Mr. Avenatti were provided an opportunity to respond and object to any portions they disagreed with.  The report found "[Mr. Avenatti] is not viewed as a flight risk or a danger to the community."  Importantly, the government never objected to this finding nor requested that it be changed in any way.

15.     *Mr. Avenatti's Record While Incarcerated*

As set forth in his SENTRY report, Mr. Avenatti did not violate any institutional rules or regulations during his incarceration at MCC (January 17, 2020 to April 24, 2020).  This information was included the Presentence Report referenced above.

16.     *The Dismissal of the Contempt Charges*

In connection with their efforts to have Mr. Avenatti remanded, the government relied upon the fact that Mr. Avenatti was facing contempt charges as a result of his alleged failure to pay support to his second wife (Ms. Lisa Storie).  *See*, *e.g.*, Dkt. 78, Exh. 30.  Those charges have since been dismissed by the Superior Court.

17.     *The Absence of New Charges Against Mr. Avenatti*

In connection with the detention hearing, the government claimed that Mr. Avenatti's actions while on pretrial release amounted to violations of state and federal criminal statutes.  Some of this conduct occurred in the Spring and Summer of 2019 and

---

[9] Like in the Nike Case, neither at the time of his arraignment in the Daniels Case nor at any point thereafter did the government claim or argue that Mr. Avenatti was a flight risk.

the government has known about this conduct for nearly two years at this juncture.  And yet no additional charges have been brought against Mr. Avenatti since the detention hearing, nor is there any indication that any charges are forthcoming.  Instead, the claims by the government appear to have been made for the sole purpose of remanding Mr. Avenatti on the eve of the Nike trial.

18.   *The Exculpatory Information Given to the Government Before the Hearing by Mrs. Carlin and Her Attorney That Was Unknown to the Defense and the Recent Order Establishing the Falsity of the Government's Claims at the Detention Hearing*

Unbeknownst to the defense as of the detention hearing, in the Summer of 2019, AUSAs Sagel and Andre had been given significant information and documents by Mr. Avenatti's first wife, Mrs. Christine Avenatti Carlin, and her attorney, Mr. Ken Miller, demonstrating that the claims AUSAs Sagel and Andre later made in their detention submission and during the detention hearing were untrue and they knew them to be untrue.  Had the defense been aware of this, the defense would have presented this fact to the Court, together with the information and documents AUSAs Sagel and Andre had been provided.

To be clear, the claims relating to Mrs. Carlin served as the underpinnings for the government's successful arguments to the Court that Mr. Avenatti should be remanded because he had "fraudulently" paid and "diverted" money to Mrs. Carlin instead of other creditors.  In fact, Mr. Sagel went so far as to claim at the detention hearing that the money Mr. Avenatti had paid to Mrs. Carlin was a bribe in exchange for her serving as Mr. Avenatti's surety:  "For all intents and purposes, when you look at the cash transaction, he paid her to be a surety.  She made a couple hundred thousand dollars off of it.  Maybe minus 50,000 for the car she bought him."  [Dkt. 94, p.22:19-22].  As the defense would learn after the detention hearing, Mr. Sagel accused Mr. Avenatti (and Mrs. Carlin) of committing a crime, knowing full well at the time, and having documents

16

in his possession showing, that the payments were legitimate support payments and were required pursuant to a court ordered judgment issued in **2007** (12 years prior).

Long after the hearing, the defense discovered that Mrs. Carlin and Mr. Miller had provided substantial information and documentation to AUSAs Sagel and Andre months prior to the hearing, including during a proffer session on July 25, 2019 (following a grand jury subpoena), that substantiated her claim to money due from Mr. Avenatti and that **the payments she had received were legitimate**.  They further learned that Mrs. Carlin and Mr. Miller had also made it clear to AUSAs Sagel and Andre repeatedly in July 2019 and in the months that followed that she was a legitimate creditor of Mr. Avenatti's and had a preference over all other creditors due to the amounts being owed pursuant to a child support judgment, even directing the prosecutors to *Ostler v. Smith*, 223 Cal.App.3d 33 (1990), the seminal case in California holding that child support can never be a fixed sum and always adjusts upward or downward depending on income. They had also informed AUSAs Sagel and Andre that (a) Mrs. Carlin was a creditor of Mr. Avenatti's pursuant to a divorce court judgment/order entered against him on July 23, 2007, which she provided to the government; (b) Mrs. Carlin's judgment predated that of all other creditors (including Mr. Frank and Ms. Lisa Storie) by at least eleven years and was entitled to preference; (c) the judgment provided that Mr. Avenatti's child and spousal support obligations automatically adjusted upward as Mr. Avenatti's income (from all sources) increased from $295,020 (his income in 2007);[10] and (d) if the government's numbers in their own indictment were accurate, Mrs. Carlin was due well over $5,500,000 as of the date of the transfers in 2019 that the government claimed were fraudulent and necessitated Mr. Avenatti's remand.  *In addition, on February 11, 2020, approximately one month after the January 15, 2020 hearing, the government first produced to the defense an exculpatory document (a 2011 email) that undercuts the*

---

[10] This is a standard provision used in divorce judgments in California, a fact Mrs. Carlin and her counsel explained to AUSA Sagel and Andre in the Summer of 2019.

*government's claims at the remand hearing.*[11]  *This document had been in the possession of the government since the* <u>Summer of 2019</u> *but was not provided to the defense before or at the remand hearing.  It was only produced one month* <u>after</u> *the government successfully had Mr. Avenatti remanded.  The defense has asked for an explanation repeatedly as to why this email was not produced until* <u>after</u> *Mr. Avenatti was remanded and the government has ignored the requests.*

**Further, there can now be no dispute that Mr. Avenatti's 2019 payments to Mrs. Carlin relied on by the prosecution for remand were legal and legitimate.**  On June 12, 2020, Mrs. Carlin, through her family law attorneys, filed a lengthy Request for Order in the Los Angeles Superior Court family court (Case No. YD051533) seeking an order finding that Mr. Avenatti owes Mrs. Carlin over $5,644,000 in back child and spousal support, plus interest, for the years 2011-2019, pursuant to the judgment she obtained against Mr. Avenatti in 2007.  To support the motion, Mrs. Carlin's counsel relied on the government's exact numbers in their indictment, as well as the numbers used by Mr. Avenatti's second wife (Ms. Lisa Storie) to obtain her own judgment against Mr. Avenatti.  In connection with the motion, Mrs. Carlin also submitted a May 22, 2020 declaration under penalty of perjury attesting to the past due amounts owed for child support, including for years 2011-2019, totaling over $5,000,000.

Following a hearing on the motion, the judge assigned to the case, the Hon. Thomas Trent Lewis (ret.),[12] ordered Mr. Avenatti on April 21, 2021 to pay Mrs. Avenatti-Carlin $6,423,552 plus interest for (a) back child and spousal support for the

---

[11] The email (USAO _00262149-50) demonstrates that the 2007 judgment issued by the Family Court was always understood to require child support payments that fluctuated with Mr. Avenatti's income. It also establishes that it was the routine practice of Mr. Avenatti and Mrs. Carlin to amicably resolve disputes relating to the amount of support due. Finally, it proves that Mr. Avenatti was obligated to pay Mrs. Carlin in amount far greater than that claimed by the government at the detention hearing.

[12] Judge Lewis is widely considered to be one of the foremost authorities on family law in the State of California. He has over 40 years of family law experience and previously served as the Supervising Judge for the Los Angeles County Family Law Division where he oversaw the operations of nearly 70 family law departments in the county.

years 2011-2019 and (b) $280,000 in college expenses. **Accordingly, the government's representations to this Court in connection with the remand hearing that Mr. Avenatti did not owe money to Mrs. Carlin when he made the payments to her in 2019, he had paid Mrs. Carlin to be his surety, and had diverted money to her instead of paying "real creditors," have now all been shown to be false.**

The defense has also recently learned that in approximately March/April of last year (after the remand hearing), Mrs. Carlin and her counsel provided additional exculpatory information and documents to the government that further show the falsity of the factual representations and arguments made by the government at the detention hearing.[13]  None of this information has been brought to the Court's attention voluntarily

---

[13] Mrs. Carlin is referenced in the complaint filed in March 2019 [Dkt. 1].  She was subpoenaed to testify before the grand jury in this case in 2019 and subsequently sat for an interview with AUSAs Sagel and Andre on July 25, 2019.  The government later produced a Memorandum of Interview from the July 25, 2019 interview to the defense on October 5, 2019 (USAO_00173598) but failed to produce any handwritten notes from the interview.  In March 2020, after Mr. Avenatti's remand, the government provided follow-up questions to Mrs. Carlin, through her counsel, relating to her 2019 interview.  The government has not produced those questions or the emails relating to them.  On or about April 1, 2020, the government conducted a subsequent interview/proffer session with Mrs. Carlin's counsel relating to the 2019 interview.  This lasted approximately 2.5 hours.  The defense has learned that during this interview, the government was confronted with the fact that (a) statements they attributed to Mrs. Carlin in their Memorandum of Mrs. Carlin's July 25, 2019 interview were not accurate (i.e. the memo did not reflect what the government had actually been told during the interview) and (b) the government's representations made to the defense and the Court that Mrs. Carlin had informed them that Mr. Avenatti did not owe Mrs. Carlin money when he made payments to her, including while on bond, were demonstrably false.  Despite repeated requests, the government refuses to provide the notes from the July 2019 interview, the questions the government sent in March 2020 and the related emails, and all notes and memoranda relating to the April 2020 interview/proffer session.  The government is now attempting to claim, as part of its effort to avoid producing exculpatory information that is damaging to the government and should have been produced long ago, that Mrs. Carlin, after having been a witness for the last two years, is suddenly no longer a witness and therefore they can withhold the exculpatory *Brady* information, including as it relates to Mr. Avenatti's bond.  This is improper and highly prejudicial to the defendant.

19

by the government as required nor did the government inform the defense.  Further, despite repeated recent requests to the government that all of this information be provided, including pursuant to *Brady*, it still has not been provided to the defense.

19.     *The Covid-19 Pandemic and the Risk to Mr. Avenatti's Health*

After Mr. Avenatti's remand on January 15, 2020, the COVID-19 pandemic began sweeping across the nation and infiltrating America's prisons and jails, including pretrial facilities.  The pandemic continues to pose a threat as of this filing.  *See*, *e.g.*, Opposition to the Government's Motion to Terminate and Not Further Extend Defendant Michael John Avenatti's Temporary Release [Dkt. 271], pp. 21-25, Exhs. A-C; Declaration of F. Ramzi Asfour, M.D. (filed under seal) [Dkt. 280]; *Ex Parte* Application [Dkt. 420].[14] Mr. Avenatti's health conditions render him especially susceptible to contracting the virus and suffering death or serious, permanent injury, including permanent heart or lung damage, and/or diminished cognitive ability were he to be infected.  *See id*.

## III.   ARGUMENT

### A.     The Bail Reform Act Generally

The Bail Reform Act of 1984, 18 U.S.C. §§ 3141, *et seq*., requires that a court should "bear in mind that it is only a 'limited group of offenders' who should be denied bail pending trial."  *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987) (quoting S. Rep. No. 98-225 at 7, as reprinted in 1984 U.S.C.C.A.N. 3182, 3189); *see also United States v. Salerno*, 481 U.S. 739, 755 (1987) (suggesting that "detention prior to trial or without trial is the carefully limited exception to liberty before trial").  One charged with a crime is, after all, presumed innocent.  *Stack v. Boyle*, 342 U.S. 1, 4 (1951).  A single individual unnecessarily detained before trial is one individual too many, and the increasing use of the practice places tremendous wear on our constitutional system.  *See United States v. Montalvo-Murillo*, 495 U.S. 711, 723-24 (1990) (Stevens, J., dissenting,

---

[14] In the interest of not over-burdening the Court, the defense will not repeat the same facts and evidence set forth in the Opposition, the Declaration of Dr. Asfour and in the *Ex Parte* Application, but instead incorporates them herein by reference.

20

joined by Brennan and Marshall, JJ.).  Due to the critical interests involved, therefore, a "case-by-case" approach is required <u>at all stages of a case</u> in assessing the propriety of continued pretrial detention.  *See United States v. Gonzalez Claudio*, 806 F.2d 334, 340 (2d Cir. 1986) (discussing due process analysis for evaluating propriety of prolonged pretrial detention and the interest at stake) (citations omitted).  This is especially true once a defendant has been detained for over one year.

The Act requires the release of a person facing trial under the least restrictive condition or combination of conditions that will reasonably assure the appearance of the person as required and the safety of the community.  *See United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991); *United States v. Motamedi*, 767 F.2dd 1403, 1405 (9th Cir. 1985).  Only in rare circumstances should release be denied, and doubts regarding the propriety of release must be resolved in favor of release.  *See Gebro*, 948 F.2d at 1121; *Motamedi*, 767 F.2d at 1405.  The Bail Reform Act requires release unless <u>no combination of conditions</u> can reasonably assure the appearance of the person and the safety of the community.  18 U.S.C. § 3142.  Further, § 3142 does not seek ironclad guarantees and the requirement that conditions of release will "reasonably assure" the safety of the community cannot be read to require a set of conditions that make it a near certainty that the community will be protected at all times under any conceivable set of circumstances.  *See*, *e.g.*, *United States v. Tortora*, 922 F.2d 880, 884 (1st Cir. 1990) (where the issue is the safety of the community, Congress did not require guarantees in enacting the Bail Reform Act).

Critically, "A finding that a defendant is a danger to any other person or the community must be supported by 'clear and convincing evidence.'"  *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008).  <u>Moreover, this requirement remains constant throughout a case, and must take into account changed circumstances, the introduction of new facts and information, and the passage of time.</u>

Finally, the determination of pretrial release under § 3142 neither requires nor permits a pretrial determination of guilt. *See Gebro*, 948 F.2d at 1121-22. The evidence of guilt is relevant only in terms of likelihood that the defendant will fail to appear. *See United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986).

### B. Section 3142(f) of the Act

Section 3142(f) of the Bail Reform Act specifically provides that a detention hearing may be reopened before or after a detention determination by a judicial officer, at any time before trial, if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community. *See* 18 U.S.C. § 3142(f). Further, once a hearing is reopened, it is reopened for the purpose of the court receiving in context any information, within reason, not submitted at the original detention hearing. *See*, *e.g.*, *United States v. Barksdale*, 2008 WL 2620380, *2 n. 3 (E.D. Cal., July 1, 2008). In other words, the law specifically allows for the presentation of new facts and information to the Court that may evidence changed circumstances, thus warranting a revocation or amendment of the prior detention order.

### C. The New Information Has a Material Bearing on the Issues

As set forth above in Section II.F, significant information and facts have emerged that were not known to Mr. Avenatti as of the date of the detention hearing and that have a material bearing on the issue of whether there are conditions of release that will reasonably assure the appearance of Mr. Avenatti and the safety of the community. This information bears directly on the question of whether Mr. Avenatti should be released under the Bail Reform Act and the law interpreting the Act, including in the Ninth Circuit. *See*, *e.g.*, *United States v. Ward*, 63 F.Supp. 2d 1203 (C.D. Cal. 1999) (granting request to reopen detention hearing on the grounds that defendant's immediate family was now willing to post upwards of one million dollars of real property to secure his

release and appearance but were not present and were not contacted regarding the need for a large real property bond at the time of the first detention hearing); *United States v. Alaby*, 2020 U.S. Dist. LEXIS 84424 (S.D. Cal. 2020) (granting request to reopen detention hearing due to COVID-19 risks and defendant's father-in-law agreeing to serve as surety); *United States v. Perez-Cornejo*, 2020 U.S. Dist. LEXIS 64355 (S.D. Cal. 2020) (finding that defendant sufficiently pled new evidence to challenge the court's initial detention findings when defendant was able to present evidence that his son could act as a surety and also provide housing); *United States v. Parmer*, 2020 U.S. Dist. LEXIS 81930 (N.D. Cal. 2020) (finding there was a sufficient change of circumstances to justify pretrial release of a previously detained inmate due to COVID-19 and the availability of a spot in a sober living residential facility, and holding "the pandemic is changing behavior and the way courts assess risk of flight and community safety.").

Among other things, this information goes to whether Mr. Avenatti remains a financial or economic danger to the community; whether Mr. Avenatti has any assets to dissipate, move or transfer; whether Mr. Avenatti has the means or opportunity to commit any additional financial harm to the community or financial crimes, and if so, under what set of circumstances; whether Mr. Avenatti has the means or opportunity to defraud any creditors; whether Mr. Avenatti has any monies to move, conceal or structure; and whether it is still true that absolutely no set of conditions of release exist that will reasonably assure the safety of the community, which is required for Mr. Avenatti's continued pretrial detention.  *See United States v. Soulati*, 2020 U.S. App. Lexis 39853 (9th Cir. 2020)(reversing district court's detention order and decision which found that set of conditions agreed to by Pretrial Services were insufficient). Accordingly, the hearing should be reopened so that the defense may present the information and facts to the Court in context.

23

### D.     Mr. Avenatti's Continued Detention is a Violation of Due Process

Finally, as noted above, Mr. Avenatti has been subject to the Court's January 15, 2020 detention order for nearly 16 months.  During that time period, the trial in this matter has been continued numerous times as a result of the COVID-19 pandemic.  None of these trial delays have resulted from any action or inaction on the part of Mr. Avenatti.  As a result, Mr. Avenatti's continued detention in this case under that Order violates his right to due process under the Fifth and Sixth Amendments to the United States Constitution.  As the Ninth Circuit recently held in *United States v. Torres*, 2021 U.S. App. LEXIS 12147 *24; __ F.3d __ (Apr. 23, 2021):

> It is undisputed that at some point, pretrial detention can "become excessively prolonged, and therefore punitive," resulting in a due process violation. *United States v. Salerno*, 481 U.S. 739, 747 n.4, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987). The point at which detention constitutes a due process violation requires a case-by-case analysis. *United States v. Gelfuso*, 838 F.2d 358, 359-60 (9th Cir. 1988) (adopting case-by-case analysis and declining to express a "view as to the point at which detention in a particular case might become excessively prolonged and violate due process"). A due process violation occurs when detention becomes punitive rather than regulatory, meaning there is no regulatory purpose that can rationally be assigned to the detention or the detention appears excessive in relation to its regulatory purpose. *Salerno*, 481 U.S. at 747.

Indeed, in *Torres*, the government conceded that the length of the defendant's detention (21 months from the date of detention until the scheduled trial date) weighed in favor of recognizing a due process violation.  They did so despite, among other things, the defendant's five prior felony convictions, an outstanding arrest warrant for failure to report (a violation of his probation), his possession of ammunition as a felon, and his admission that he possessed 46 grams of methamphetamine.  In response, the Ninth Circuit stated: "We agree" while citing to *United States v. Myers*, 930 F.3d 1113, 1119 (9th Cir. 2019) (explaining that "delays approaching one year are presumptively prejudicial" for Sixth Amendment purposes) (citation omitted) and *United States v.*

24

*Gonzales Claudio*, 806 F.2d 334, 340-41 (2d Cir. 1986) (describing the ninety-day period as a "point of reference in our consideration of the constitutional limit on such detention"). *Id*. at *25-26. The court further held that regardless of the risks associated with a defendant's release, due process imposes some limit on the length of detention. *Id*. at *28 (citing to *United States v. Briggs*, 697 F.3d 98, 103 (2d Cir. 2012) ("There is no bright-line limit on the length of detention that applies in all circumstances; but for every of set of circumstances, due process does impose some limit.").[15]

Here, Mr. Avenatti's has no history of violence and no history of failure to appear. He likewise does not have a lengthy criminal record nor is there any confession in this case or history of possession of narcotics or ammunition. The government's concerns regarding Mr. Avenatti being an alleged "financial danger to the community" cannot, at this point, overcome Mr. Avenatti's right to due process as guaranteed by the Constitution. Thus, the detention hearing should be re-opened and the Court should grant Mr. Avenatti bail on the conditions attached as Exhibit A.

## IV. **CONCLUSION**

For each of the reasons stated above, defendant respectfully requests that the Court grant the motion and reopen the detention hearing pursuant to 18 U.S.C. § 3142(f).

Dated: May 7, 2021

Respectfully submitted,

/s/ H. Dean Steward
H. DEAN STEWARD
Attorney for Defendant
MICHAEL JOHN AVENATTI

---

[15] The *Torres* court ultimately declined to find a due process violation due to the defendant's substance abuse, access to ammunition, significant criminal history including violent offenses, and a history of failing to appear, coupled with the defendant's confession, but warned: "The length of Torres's pretrial detention is significant under any metric and is deeply troubling . . . all parties agree that at some point, regardless of the risks associated with Torres's release, due process will require that he be released if not tried." *Id*. at *28 (citation omitted).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**<u>EXHIBIT A</u>**

## *PROPOSED CONDITIONS OF BOND*

1. Mr. Avenatti to be placed on regular bond as opposed to temporary release.

2. Defendant shall maintain the current $1,000,000 bond, with at least $500,000 of the bond secured by the full deeding of real property or liquid funds deposited with the Clerk of the Court.

3. Defendant shall be subject to supervision as directed by Pretrial Services.

4. Defendant shall not leave the Central District of California without prior approval of pretrial services. Defendant shall adhere to a reasonable curfew to be determined by pretrial services.

5. Defendant shall participate in the Location Monitoring Program and abide by all requirements of the program, under the direction of Pretrial Services, which shall include a location monitoring bracelet. Defendant must pay all of the costs of the Location Monitoring Program based upon his ability to pay as determined by Pretrial Services and will be financially responsible for any lost or damaged equipment.

6. Defendant may possess, use and access digital devices that offer or allow internet access, but shall not access any financial or banking account websites. In order to determine compliance with this condition, defendant agrees to submit to a search of his person and/property by Pretrial Services. At the discretion of Pretrial Services, defendant shall allow internet monitoring software to be used on his devices and shall pay all of the costs associated with such software.

7. Defendant shall not open, either directly or indirectly, any new bank accounts, credit card accounts or other financial accounts without notifying and obtaining the prior approval of Pretrial Services.

8. Defendant shall not engage in any financial transactions exceeding $500, either directly or indirectly, without notifying and obtaining the prior approval of Pretrial Services.

9. Defendant shall not sell, transfer, or give away any asset valued at $500 or more, either directly or indirectly without notifying and obtaining prior approval of Pretrial Services.

10. Defendant shall provide to Pretrial Services every two weeks a report (or other documentation approved by Pretrial Services) detailing all of defendant's financial transactions, including any transaction under $500, during the prior two-week period.

11. Defendant shall avoid all contact (except in the presence of counsel), directly or indirectly, with any person who the government has identified as victim or potential witness in this case prosecution and investigation, except for Christine Avenatti Carlin and except as required for Defendant's participate in ongoing civil lawsuits where he has been named as

the Defendant. Defendant shall not engage in any substantive discussions with these parties regarding this prosecution and investigation (except in the presence of counsel).

**12.** Defendant shall comply with all court orders in this case and any orders and conditions of release in *United States v. Avenatti*, No. 1:19-CR-373-PGG (SDNY), and *United States v. Avenatti*, No. 1:19-CR-374-JMF (SDNY).

**13.** Defendant shall not apply for a passport or other travel document during the pendency of this case.

**14.** Defendant shall comply with the General Conditions of Release set forth in the Central District of California Release Order and Bond Form.

From: **Shakira Davis** <Shakira_Davis@cacp.uscourts.gov>
Date: Wed, May 5, 2021, 11:54 PM
Subject: RE: Mr. Avenatti
To: deansteward7777_gmail.com <deansteward7777@gmail.com>

I have no objection to these proposed conditions.

---

**From:** Dean Steward <deansteward7777@gmail.com>
**Sent:** Wednesday, May 5, 2021 11:51 AM
**To:** Shakira Davis <Shakira_Davis@cacp.uscourts.gov>
**Subject:** Mr. Avenatti

**CAUTION - EXTERNAL:**

Ms. Davis-

Here are the revised conditions, changed to reflect your comments (ie. #6). Please let me know if these are acceptable, or give me a call with any comments or other suggestions. I'd be grateful if you could respond by email.

Thanks,

Dean

--



949-481-4900   www.deansteward.com

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

On Tue, May 4, 2021 at 1:45 PM Shakira Davis <Shakira_Davis@cacp.uscourts.gov> wrote:

Hello Mr. Steward,

Officer Gudino and I reviewed the proposed conditions and we do not have any objection to the proposed modification. The only addition I would make is that the deft be required to participate in monitoring software and pay all of the cost associated with this program.

 **SHAKIRA DAVIS**
SPECIAL OFFENDER SPECIALIST
**UNITED STATES DISTRICT COURT**
**CALIFORNIA CENTRAL PRETRIAL SERVICES**
300 North Los Angeles Street
Los Angeles, CA 90012-3308
Office: (213) 894-8211  Mobile: (213) 247-9262  Fax: (213) 894-0231
Email: shakira_davis@cacp.uscourts.gov

**From:** Dean Steward <deansteward7777@gmail.com>
**Sent:** Tuesday, May 4, 2021 10:55 AM
**To:** Shakira Davis <Shakira_Davis@cacp.uscourts.gov>
**Subject:** Michael Avenatti

<mark>CAUTION - EXTERNAL:</mark>

Hi Ms. Davis-

Here's what we were thinking. I made the changes we talked about. If there are other changes, additions or problems, happy to chat about them.

cell for me: 714-296-7686

Thanks,

Dean

--

 H. DEAN STEWARD
ATTORNEY- PROFESSIONAL CORPORATION

949-481-4900  www.deansteward.com

<mark>**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.</mark>

## **CERTIFICATE OF SERVICE**

I, H. Dean Steward, am a citizen of the United States, and am at least 18 years of age. My business address is 107 Avenida Miramar, Ste. C, San Clemente, CA 92672.  I am not a party to the above-entitled action.  I have caused, on May 7, 2021, service of the:

DEFENDANT'S NOTICE OF MOTION AND MOTION TO REOPEN DETENTION HEARING (18 U.S.C. § 3142(f))

on the following party, using the Court's ECF system:

AUSA BRETT SAGEL AND AUSA ALEXANDER WYMAN

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 7, 2021

/s/ H. Dean Steward

H. Dean Steward