# EXHIBIT D

1              UNITED STATES BANKRUPTCY COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                   SANTA ANA DIVISION

4

5    IN RE:                    )
                               )
6                              )
     EAGAN AVENATTI, LLP,      )   No. 8:17-bk-11961-CB
7                              )
              Debtor.          )
8                              )
     _____)
9

10

11

12

13        DEBTOR EXAMINATION OF MICHAEL AVENATTI

14                   PAGES 1 - 245

15    (PAGES 133 THROUGH 155 AND PAGES 174 THROUGH 190

16    WERE MARKED CONFIDENTIAL AND BOUND SEPARATELY)

17              TUESDAY, MARCH 22, 2019

18              LOS ANGELES,  CALIFORNIA

19

20

21

22

23

24
              Reported by Serena Wong
25            CSR #10250, RPR, CCRR #200

1

**Exhibit D**

USAO_00059873
00059979

```
 1              UNITED STATES BANKRUPTCY COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3                   SANTA ANA DIVISION

 4

 5   IN RE:                    )
                               )
 6                             )
     EAGAN AVENATTI, LLP,      )   No. 8:17-bk-11961-CB
 7                             )
              Debtor.          )
 8                             )
     _____)
 9

10

11

12

13

14

15          THE DEPOSITION OF MICHAEL AVENATTI,

16   taken at 345 350 W. 1st Street, Los Angeles,

17   California, on Friday, March 22,  2019, before

18   Serena Wong, CSR #10250, RPR, CCRR #200, Certified

19   Shorthand Reporter, in and for the State of

20   California.

21

22

23

24

25
```

**Exhibit D**

USAO_00059874
00059979

```
 1    APPEARANCES:

 2
      For the Debtor:
 3
          SHULMAN, HODGES & BASTIAN
 4        BY:  RONALD S. HODGES, ESQ.
          100 Spectrum Center Drive
 5        Suite 600
          Los Angeles, California  92618
 6        949.340.3400
          rhodges@shbllp.com
 7
      Fo the Claimant:
 8
          FRANK, SIMS, STOLPER
 9        BY:  ANDREW D. STOLPER, ESQ.
               JASON FRANK, ESQ.
10        19800 MacArthur Parkway
          Suite 855
11        Irvine, California  92612
          949.201.2400
12        astolper@lawfss.com

13    For the Receiver:

14        LANDAU, GOTTFRIED & BERGER, LLP
          BY:  JOHN P. REITMAN, ESQ.
15        1801 Century Park East
          Suite 700
16        Los Angeles, California 90067
          310.557.0056
17        jreitman@lgbfirm.com

18

19

20

21

22

23

24

25
```

3

**Exhibit D**

USAO_00059875
00059979

```
 1                          INDEX

 2

 3   WITNESS:  Michael Avenatti

 4

 5   EXAMINATION                                    PAGE

 6   Mr. Stolper                                      6

 7

 8

 9

10            INSTRUCTIONS NOT TO ANSWER

11                 Page      Line

12                  16         2
                    22        10
13                  26         5
                    29        18
14                  44        22
                    45        15
15                  45        19

16

17

18

19

20            INFORMATION REQUESTED

21                 None.

22

23

24

25
```

4

**Exhibit D**

USAO_00059876
00059979

```
 1                    INDEX TO EXHIBITS

 2   EXHIBITS                                 MARKED

 3   Exhibit 1                                   65

 4   Exhibit 4                                   94

 5   Exhibit 7                                  111

 6   Exhibit 23 (retained by counsel)          204

 7   Exhibit 25 (retained by counsel)          205

 8   Exhibit 28 (retained by counsel)          207

 9   Exhibit 28A                               207

10   Exhibit 47                                  74

11   Exhibit 60 (retained by counsel)          216

12   Exhibit 61                                224

13   Exhibit 75                                223

14   Exhibit 76                                   6

15   Exhibit 82                                  46

16

17

18

19

20

21

22

23

24

25
```

5

**Exhibit D**

USAO_00059877
00059979

```
1                    FRIDAY, MARCH 22, 219

2                  LOS ANGELES, CALIFORNIA

3

4                      MICHAEL M. AVENATTI,

5       was called as a witness, and having been first duly

6       sworn, was examined and testified as follows:

7

8                          EXAMINATION

9       BY MR. STOLPER:

10          Q    Good morning, Mr. Avenatti.   You understand

11      you're under oath?

12          A    Yes, sir.

13          Q    Mr. Avenatti, I first want to ask you some

14      questions about your productions in response to JFL's

15      notice.  On November 28, 2018, you were ordered by

16      Judge Scott to produce documents in response to the

17      notice; is that correct?

18          A    I don't know if it's correct or not as to

19      date.

20          Q    I'm going to go ahead and put up what I've

21      marked as Exhibit 70.  Sorry.  76.  Let's try this.

22      There you go.

23               (Exhibit 76 was marked.)

24          Q    BY MR. STOLPER:  Do you recognize that

25      document?
```

6

**Exhibit D**

USAO_00059878
00059979

```
 1        A    I haven't seen it before.

 2        Q    This is Judge Scott's Certification and Order

 3   To Show Cause Re Contempt.

 4             MR. HODGES:  Argumentative.

 5             THE WITNESS:  That's what the document says.

 6             (Simultaneous colloquy.)

 7             THE WITNESS:  Please let me finish.

 8   Otherwise, the court reporter can't take us both down

 9   at the same time, as you well know.

10             I understand that this is this document.

11        Q    BY MR. STOLPER:  Okay.  And this document is

12   a Certification and Order To Show Cause Re Contempt;

13   correct?

14             MR. HODGES:  Asked and answered.

15             THE WITNESS:  I think I just answered that.

16        Q    BY MR. STOLPER:  Is that correct, sir?

17        A    I just answered that, and I said that it was.

18        Q    Thank you.

19             Turning your attention to Paragraph 13, Judge

20   Scott wrote, "The parties appeared before the

21   Magistrate Judge in Mr. Avenatti's motion for

22   protective order."

23             And then if you go down to paragraph 17, it

24   says, "The Magistrate Judge ordered Mr. Avenatti to

25   documents responsive to the Subpoena, as narrowed by
```

7

**Exhibit D**

USAO_00059879

00059979

1  her ruling, within 'ten court days, so that would be

2  within two weeks' after entry of a protective order.

3  This was based on Mr. Avenatti's representation that he

4  could produce documents responsive to the subpoena

5  within the next probably 12 court days, so  a little

6  more than two weeks, probably by two weeks from this

7  Friday"; is that correct?

8          MR. HODGES:  Document speaks for itself.

9  Foundation as to what the judge ruled.

10          You can answer.

11          THE WITNESS:  You read the document

12  correctly.

13     Q    BY MR. STOLPER:  Does that refresh your

14  recollection as to whether or not on November 28 you

15  were ordered by Judge Scott to produce documents in

16  response to this?

17     A    This doesn't refresh my recollection.

18     Q    Do you disagree with Judge Scott's report and

19  recommendation that you were ordered to produce

20  documents on November 28, 2018?

21          MR. HODGES:  Argumentative; foundation.

22          THE WITNESS:  I don't know without reviewing

23  the file and the other pleadings and the transcripts,

24  including the transcripts that are referenced in this

25  document.

8

**Exhibit D**

USAO_00059880
00059979

1        Q    BY MR. STOLPER:  So you don't know whether or

2    not Judge Scott ordered you to produce on November 28?

3            MR. HODGES:  Objection.  Misstates testimony;

4    argumentative.  That's not what the witness said.

5            THE WITNESS:  Again, I'm going to stand by

6    what I said previously.  At some point in time, we were

7    ordered to produce documents.  I don't recall exactly

8    when it was, but I do recall documents were produced.

9    And I also know that you have thousands of pages of

10   documents, as evidenced by the bankers boxes that are

11   here in the well of the court today.

12       Q    BY MR. STOLPER:  Again, my question is very

13   simple, Mr. Avenatti.  On November 28, 2018, Judge

14   Scott ordered you to produce documents in response to

15   the notice.  True or false?

16       A    Sir, again, I'm going to stand on my prior

17   answer.  I know at some point in time, she ordered us

18   to produce documents.  I don't recall exactly when it

19   was.

20       Q    Do you believe that Judge Scott, in her

21   Certification and Order to Show Cause Re Contempt on

22   Paragraph 13, got the date incorrect when she said on

23   November 28 she ordered you to produce documents within

24   ten days?

25           MR. HODGES:  Foundation; argumentative.

9

**Exhibit D**

USAO_00059881
00059979

```
 1              THE WITNESS:  Sir, I don't know the exact
 2    date.  What I know is that at some point in time, we
 3    were ordered to produce documents; and we complied and
 4    did produce documents.  That's what I know.
 5              Now, I assume that date is correct.  It may
 6    be incorrect.  I don't know without the benefit of the
 7    transcripts.
 8         Q    BY MR. STOLPER:  And that production was
 9    ordered to be completed no later than December 26,
10    2018; correct?
11         A    I don't know that.
12         Q    Okay.  Let's turn to Paragraph 20 of Judge
13    Scott's order.  Maybe that will refresh your
14    recollection.  In italics, it's written, "Pursuant to
15    the Magistrate Judge's oral ruling at the November 28
16    hearing, Mr. Avenatti's production in response to the
17    subpoena was due by December 26 (i.e. ten court days
18    after the protective order was entered)."
19              Mr. Avenatti, does that refresh your
20    recollection that on November 28, you were ordered to
21    produce documents by December 26?
22              MR. HODGES:  Foundation.  First of all, you
23    read the document wrong.  The document speaks for
24    itself.  It's also been asked and answered, and it's
25    argumentative.
```

**Exhibit D**

USAO_00059882
00059979

```
 1              THE WITNESS:  Yeah, that's not -- your
 2    reading of the document is not correct, Mr. Stolper,
 3    No. 1.  No. 2, I'm going to stand by what I said
 4    previously.  I don't recall, as I sit here, the dates
 5    on which we were ordered to produce documents and when
 6    the document production was due by.  I don't have the
 7    benefit of the transcripts from the relevant hearing.
 8              I see the document that you're referencing.
 9    We produced documents.  You have thousands of pages of
10    documents, as evidenced by the bankers boxes full of
11    documents here in court today.  I thought I was here to
12    answer questions about assets and liabilities of the
13    firm.
14        Q    BY MR. STOLPER:  Mr. Avenatti, I'd like you
15    to answer my question.
16              Isn't it true that pursuant to the Magistrate
17    Judge's oral ruling at the November 28 hearing, you
18    were ordered to produce documents by December 26, 2018?
19              MR. HODGES:  Asked and answered;
20    argumentative.
21        Q    BY MR. STOLPER:  True or false, sir?
22              MR. HODGES:  You're arguing with the witness.
23    We can take this up with the judge later.  Let's move
24    on to a different subject.
25        Q    BY MR. STOLPER:  Go ahead.  Is that true or
```

11

**Exhibit D**

USAO_00059883
00059979

```
 1   false?

 2          THE WITNESS:  Mr. Stolper, you have my

 3   instruction.

 4      Q    BY MR. STOLPER:  Your answer is you don't

 5   know?

 6      A    My answer is --

 7          MR. HODGES:  Misstates testimony;

 8   argumentative.  Slow down.

 9          (Attorney-client discussion.)

10      Q    BY MR. STOLPER:  On January 4, 2018, you

11   showed up for a judgment debtor exam in this matter; is

12   that correct?

13      A    I don't recall.

14      Q    Let's go ahead and turn to paragraph 26 of

15   that same order.  Judge Scott wrote on January 4, 2019,

16   the parties appeared for the continued judgment debtor

17   exam of Mr. Avenatti as EA's managing partner.

18          Does that refresh your recollection that you

19   showed up for a judgment debtor's exam on January 4,

20   2019?

21      A    No.

22      Q    Do you believe reading this, reading Judge

23   Scott's order, that she got the date wrong?

24      A    Sir, at some point in January, I showed up

25   for a continuation of the debtor exam.  I don't recall
```

12

**Exhibit D**

USAO_00059884
00059979

```
 1    the exact date.
 2        Q    Okay.  Judge Scott goes on to write,
 3    "Mr. Avenatti admitted that the January 3rd document
 4    production was incomplete and that he planned to
 5    produce additional documents responsive to the
 6    subpoena."
 7             Is the judge accurate in her order accurately
 8    catching what you told her at the hearing on January 4?
 9             MR. HODGES:  Argumentative; document speaks
10    for itself.
11             THE WITNESS:  If you have the transcript, I
12    can confirm that for you.
13        Q    BY MR. STOLPER:  I don't need the transcript,
14    sir.  I want your best recollection.
15             Is your best recollection that you told Judge
16    Scott that the January 3rd document production was
17    incomplete and that you planned to produce additional
18    documents responsive to the subpoena?
19             MR. HODGES:  Asked and answered.
20             Do not guess.
21             THE WITNESS:  I don't recall.  If you have
22    the transcript, I'd like to read it.
23        Q    BY MR. STOLPER:  My question is your memory.
24             You have no memory of telling Judge Scott on
25    January 4 that you intended to complete a document
```

**Exhibit D**

USAO_00059885
00059979

```
 1   production in the future?

 2           MR. HODGES:  Argumentative; asked and

 3   answered.

 4           Counsel, with all respect, the judge has

 5   invited the opportunity come back.  If you'd like to

 6   ask questions about the assets and liability of the

 7   firm, we're prepared to do that.  Arguing over the

 8   scope of an order subject to the hearing Judge Phillips

 9   has not had yet is not getting us very far.

10           MR. STOLPER:  You can state your objections.

11   I'm not going to tolerate speaking objection.  Object

12   to form.

13           MR. HODGES:  Move on.

14      Q    BY MR. STOLPER:  On January 4, 2019, did you

15   represent to the court that your document production

16   was incomplete?  Yes or no?

17           MR. HODGES:  Asked and answered;

18   argumentative.

19           THE WITNESS:  I'm going to stand on my prior

20   answer.

21      Q    BY MR. STOLPER:  Which was you can't recall?

22           MR. HODGES:  That's not what he said.

23   Misstates testimony; argumentative.

24      Q    BY MR. STOLPER:  What was your prior answer?

25           MR. HODGES:  Improper form of the question.
```

14

**Exhibit D**

USAO_00059886
00059979

```
 1            THE WITNESS:  Mr. Stolper, check the
 2   transcript for my prior answer.
 3       Q    BY MR. STOLPER:  I'm going to assume Judge
 4   Scott got the order correct.
 5            Did you file an objection to the order?
 6       A    I'm sorry.
 7       Q    Did you file an objection to Judge Scott's
 8   order?
 9       A    I don't remember.
10       Q    On January 4, Judge Scott ordered you to
11   complete the production on or before January 10, 2019.
12   True or false?
13            MR. HODGES:  Misstates the record.
14            THE WITNESS:  Sir, I don't know if that's
15   true or false because I don't have the transcript.
16   And, again, I don't know what this has to do with the
17   assets and liabilities of the firm.
18       Q    BY MR. STOLPER:  Mr. Avenatti, true or false,
19   you were ordered to complete the production on or
20   before January 10, 2019?
21            MR. HODGES:  Asked and answered;
22   argumentative.
23            THE WITNESS:  Sir, I don't recall that.
24       Q    BY MR. STOLPER:  Do you take court seriously,
25   Mr. Avenatti?
```

15

**Exhibit D**

USAO_00059887
00059979

```
 1              MR. HODGES:  Argumentative.
 2              You're instructed not to answer the question.
 3      Q    BY MR. STOLPER:  Let me ask you a different
 4   question.
 5              Did you take the judge's order to produce
 6   documents in this case seriously?
 7              MR. HODGES:  You can answer.
 8              THE WITNESS:  I general take court orders
 9   seriously, Mr. Stolper.
10      Q    BY MR. STOLPER:  Did you take Judge Scott's
11   order in this case to produce documents seriously?
12      A    Yes.
13      Q    Mr. Avenatti, in defiance of the court's
14   order, you did not make any further production in
15   response to that order, did you, sir?
16      A    I don't think that's accurate, Mr. Stolper.
17      Q    You think you did make a production?  It
18   isn't a trick question.
19              You made a production to Mr. Frank?
20      A    I don't know what kind of show you're trying
21   to put on.  I'd ask you to tone it down as it relates
22   to asking me questions.  I'm not on trial here today,
23   sir.
24              Here is what I am going to tell you.  We have
25   produced documents.  You have thousands of pages of
```

16

1    documents as it relates to the collection of this

2    judgment, and that's what this is.  It's about a

3    collection of a judgment, just like millions of other

4    people have hearings relating to collection of

5    judgments.

6         So I don't know what grandiose stunt you're

7    trying to pull today.  I'm here to answer your

8    questions about the assets and liabilities of this

9    firm.

10    Q    Mr. Avenatti, did you produce any further

11    documents to JFL Law in response to the January 10

12    order?  Yes or no?

13    A    I believe we did.

14    Q    What documents did you produce?

15    A    Sir, I can't tell you which documents we

16    produced when.  But what I do know is we have produced

17    a litany of documents to Mr. Frank.  He's also

18    subpoenaed documents.  He has all kinds of documents.

19    That's how you were able to ask me four hours worth of

20    questions last Friday.  That's how you're able to come

21    here today with these banker boxes full of documents.

22    Q    The litany of documents you Bates labeled,

23    did you not, Mr. Avenatti?

24    A    No, I don't think all the documents were

25    Bates stamped.

17

USAO_00059889
00059979

1      Q    Let me ask you a different question.

2           Sitting here today, is it your testimony

3    under oath that you have fully produced all the

4    documents Judge Scott ordered you to produce to JFL

5    Law?

6      A    I don't know here -- as I sit here today

7    without reviewing the production, without going through

8    the transcript, without reviewing the order and the

9    document request.

10     Q    Sitting here today, you're not sure whether

11   you complied with Judge Scott's order; correct?

12     A    Sir, I'm going to stand on my prior answer.

13     Q    I want to make sure the record is clear.  You

14   testified you take Judge Scott's order seriously.  I

15   want to know if you can sit here today and testify

16   under oath that you have complied with the court's

17   order regarding the documents you're obligated to

18   produce to JFL Law.

19          Have you or have you not, sir?  It is not a

20   trick question, sir.

21     A    Sir, I believe we have complied.

22     Q    You believe you have fully complied with

23   Judge Scott's order to produce documents to JFL law; is

24   that correct?

25     A    I answered the question.

18

**Exhibit D**

USAO_00059890
00059979

1          Q     Let's go through the categories you were
2     ordered to produce, shall we?
3              Mr. Avenatti, have you produced Eagan
4     Avenatti's bank statements to the trust?
5          A     You already have them.
6          Q     I didn't ask that question.  I appreciate if
7     you answer the question I asked.
8              My question is:  Have you produced --
9          A     You have them.
10         Q     Again, not my question.
11             My question, sir, is:  Have you produced
12    Eagan Avenatti's bank statements from California Bank
13    and Trust to the present?  Yes or no?
14         A     You have the statements because you
15    subpoenaed them from the bank.  We are not under an
16    obligation to produce to you that which you already
17    have, Counsel.
18         Q     Is that no, you did not produce them,
19    Mr. Avenatti?
20         A     You have my answer.
21         Q     I'm not interested in what you think
22    Mr. Frank has.  I'm interested in what you did to
23    comply with the court's order.
24         A     I know you have them.
25         Q     How do you know?

19

**Exhibit D**

USAO_00059891
00059979

1      A      Because you told me you have them, and

2   Mr. Frank has told me that he has them, and he

3   referenced them last Friday, and they're in one of the

4   bankers boxes here today.  I mean, let's stop playing

5   games.  You have the documents.  Let's get to the

6   assets and liabilities of the firm.

7      Q      Mr. Avenatti, have you produced Eagan

8   Avenatti's retainer agreements to JFL Law?

9      A      You have the documents.

10     Q      I'm asking a different question, sir.  I'm

11  asking you very specifically, have you produced Eagan

12  Avenatti's retainer agreements to JFL Law?  Yes or no?

13     A      Sir, you have a case list of all the cases.

14  We've gone through the case list of all of the cases of

15  the firm in detail.  You know -- let me finish my

16  answer, please.  You know the status of all the cases.

17  It's not some big grand secret.  I believe that the

18  retainer agreements have been produced.  I may be wrong

19  about that, but I think they have been.

20     Q      So do you -- sitting here under oath, it's

21  your belief that you have produced Eagan Avenatti's

22  retainer agreements to JFL Law?

23           MR. HODGES:  Asked and answered;

24  argumentative.

25           THE WITNESS:  If you're going to repeat every

20

**Exhibit D**

USAO_00059892
00059979

```
 1    question that you asked me after I give an answer, this
 2    is going to be a very lengthy process.  In fact, for
 3    the record, I would like Her Honor on the bench for the
 4    entirety of this examination so she can witness this
 5    circus that you're conducting.
 6           Let me be clear.  You have the information.
 7    I believe they've been produced.
 8       Q    BY MR. STOLPER:  Did you produce them,
 9    Mr. Avenatti?
10       A    Did I physically produce them?  No.  I wasn't
11    obligated to physically produce them.
12       Q    Did you produce them -- did you produce Eagan
13    Avenatti's retainer agreements to JFL Law in any way,
14    shape, or form?
15       A    I believe we did at one point in time, but I
16    can't be certain without reviewing the production.
17       Q    Mr. Avenatti, have you produced Eagan
18    Avenatti's financial statements from 2013 to the
19    present, other than the ones that were filed in
20    bankruptcy?  Yes or no again?
21       A    Sir, you can say "yes or no" all you want.
22    I'm going to answer the question the way I see fit.
23    And the way I see fit is I believe that we've complied
24    with the order, but I cannot be -- in that regard, but
25    I can't be certain without reviewing the document
```

21

**Exhibit D**

USAO_00059893
00059979

 1   production.

 2       Q    That was an interesting answer with lots of

 3   vague platitudes.  I want an answer to my question,

 4   Mr. Avenatti.

 5           My specific question is:  Have you produced

 6   financial statements from 2013 to the present for Eagan

 7   Avenatti, other than the ones filed for bankruptcy?

 8           MR. HODGES:  Asked and answered.  Move on.

 9           MR. STOLPER:  Can you mark that?

10           (Transcript marked.)

11           THE WITNESS:  Please mark the prior answer.

12           MR. HODGES:  We can bring it up with the

13   judge.

14       Q    BY MR. STOLPER:  Mr. Avenatti, when you had

15   testified you thought you produced the retainer

16   agreements, can you tell me what steps you did to

17   collect those retainer agreements for production?

18       A    Sir, this was some time ago.  I don't recall

19   exactly.

20       Q    Approximately when do you think you produced

21   those retainer agreements some time ago?

22           MR. HODGES:  Asked and answered.

23           THE WITNESS:  I don't recall when I produced

24   after the production.

25       Q    BY MR. STOLPER:  The order of Judge Scott was

**Exhibit D**

USAO_00059894
00059979

```
 1    in 2019?

 2            MR. HODGES:  Asked and answered.

 3            THE WITNESS:  Sir, are you honestly claiming

 4    you don't know what cases the firm has?

 5        Q    BY MR. STOLPER:  Mr. Avenatti, I need you to

 6    answer my question.  You don't get to ask me questions.

 7    That's how it works.

 8        A    It will some day work that way.

 9        Q    You understand the order to produce documents

10    from Judge Scott was issued this year.

11            My question is:  In response to that order,

12    what steps did you take to produce Eagan Avenatti's

13    retainer agreements to JFL Law?

14        A    Sir, I don't recall.

15        Q    Did you produce the retainer agreements to

16    the Receiver in this case?  He's sitting in next to

17    you.

18        A    Mr. Stolper, I know who the Receiver is.

19        Q    Did you produce the retainer agreements to

20    the Receiver?

21        A    I don't know if they've been produced to him

22    or not.  I don't think they have.

23        Q    You think you produced them to JFL Law, but

24    you don't think you produced them to the Receiver; is

25    that correct?
```

23

**Exhibit D**

USAO_00059895
00059979

```
 1              MR. HODGES:  Argumentative; asked and
 2    answered.
 3              THE WITNESS:  Sir, please check my answers.
 4         Q    BY MR. STOLPER:  Mr. Avenatti, why did you --
 5    why do you think you've produced the retainer
 6    agreements to JFL Law, but you didn't produce them to
 7    the Receiver appointed by the court?
 8              MR. HODGES:  Argumentative.
 9              THE WITNESS:  I don't understand that
10    question.  What do you mean why do you think something?
11         Q    BY MR. STOLPER:  Mr. Weiss asked you for the
12    retainer agreements, did he not, sir?
13         A    I don't know that the retainer agreements
14    have been requested.  I know some agreements have been
15    requested.  I don't believe they've been on there.
16    They may have been on subsequent correspondence.
17    Here's what I will say.
18         Q    That doesn't answer my question.
19         A    I'm going to answer the questions the way I
20    want to answer the questions, sir.  I'm not on trial
21    here today.  I thought we were here to get to the
22    assets and liabilities of the firm.
23              What I will tell you is I have spent hours
24    going through a case list with Mr. Weiss to update him
25    on every case that the firm has and the status of those
```

**Exhibit D**

USAO_00059896
00059979

```
 1   cases.  That case list has been provided to your
 2   client, Mr. Frank, as well.  It's no big, grand secret,
 3   despite the circus show that you want to hold here
 4   today relating to the case list.
 5       Q    Have you provided to Mr. Weiss financial
 6   statements from 2013 to the present other than the
 7   schedules you filed for the bankruptcy?
 8            MR. HODGES:  Object.  Beyond the scope for
 9   this proceeding.
10            MR. REITMAN:  Mr. Weiss, did you ask
11   Mr. Avenatti to produce the retainer engagement
12   letters?
13            MR. WEISS:  Yes.
14       Q    BY MR. STOLPER:  Did he produce them?
15       A    No.
16       Q    Mr. Avenatti, does that refresh your
17   recollection as to whether or not you, in fact,
18   produced the retainer engagement letters to Mr. Weiss?
19       A    Sir, I have a spreadsheet of a request from
20   the Receiver.  That does not refresh my recollection.
21       Q    Does that refresh your recollection as to
22   whether or not Mr. Weiss asked you for the retainer
23   agreements?
24       A    It doesn't, actually.  We have no objection
25   to producing the retainer agreements to Mr. Weiss, no
```

**Exhibit D**

USAO_00059897
00059979

```
 1  problem.
 2      Q    I'm not asking whether you have an objection.
 3  I'm asking have you done so.
 4          Have you done so?
 5          (Transcript marked.)
 6          MR. HODGES:  Relevance; argumentative.  The
 7  issue is whether or not he's provided documents to you
 8  in furtherance of this examination, not whether he's
 9  done anything with or without the Receiver.  Move on.
10  He's instructed not to answer this line of question any
11  further.
12          MR. STOLPER:  Go ahead and mark that, please.
13      Q   BY MR. STOLPER:  Mr. Avenatti, did you
14  produce to Mr. Frank -- sorry.
15          Did you produce to JFL Law the ledger that
16  you maintain of loans between your entities?  Yes or
17  no?
18      A   I don't remember.
19      Q   Did you produce that information to
20  Mr. Weiss?
21          MR. HODGES:  Same objections.  Relevancy;
22  beyond the scope.
23          THE WITNESS:  There was no ledger requested
24  by Mr. Weiss.  He asked for a copy of the promissory
25  note that was made in connection with a payment that
```

26

**Exhibit D**

USAO_00059898
00059979

1    was made with the bankruptcy case, and we've been

2    trying to locate the promissory note.

3         Q     BY MR. STOLPER:  Let's talk about something

4    you did produce.  You did produce Eagan Avenatti's

5    partnership agreement; correct, sir?

6         A     We produced, I believe, the partnership

7    agreement as well as a dissociation letter.

8         Q     I want to be clear.  Are there any amendments

9    to the partnership agreement other than the, quote,

10   dissociation letter that you produced?

11        A     There may have been.  I don't recall as I sit

12   here today.

13        Q     Have you produced any other amendments to the

14   partnership agreement to Mr. Frank?

15        A     Sir, I don't recall the entirety of the

16   balance of the production to Mr. Frank.

17        Q     So there is a balance of the production to

18   Mr. Frank; is that correct, Mr. Avenatti?

19        A     When I say "the balance of the production,"

20   what I'm saying is I don't recall every document that's

21   been given to Mr. Frank over this multi-year process.

22   There was documents produced in connection with the

23   preceding arbitration.  There were documents produced

24   in connection with the bankruptcy.  There were

25   documents produced in connection with the debtor exam

                                                          27

**Exhibit D**

USAO_00059899
00059979

1    that occurred 12 or 18 months ago, and then there was

2    subsequent productions.  I can't tell you the entirety

3    of the production, as I sit here today.

4        Q    Do you recall producing to Mr. Frank, sitting

5    here today, any amendments to the partnership agreement

6    other than what you've characterized as a withdrawal?

7        A    Sir, I can't recall recall the entirety of

8    the production of documents.  The answer is I don't

9    know.  I may have; I may not have.

10       Q    Do you recall, other than the partnership

11   agreements that you've produced, which you've described

12   as a dissociation, that there are, in fact, other

13   written amendments to the partnership agreement with

14   Eagan Avenatti?

15       A    I don't recall as I sit here.

16       Q    You don't recall one way or another?

17            MR. HODGES:  Asked and answered;

18   argumentative.

19            THE WITNESS:  I stand on my answer.

20       Q    BY MR. STOLPER:  Why do you think there may

21   have been?

22       A    I don't know how to answer questions why I

23   may or may not think something.  I don't know how you

24   possibly have -- how any witness would answer that

25   question.

28

**Exhibit D**

USAO_00059900
00059979

```
 1        Q     Truthfully.   Truthfully.

 2              You testified --

 3        A     Truthfully?  You mean truthfully, like the

 4   way you behaved at a criminal prosecution tossed out

 5   because Judge Carney dismissed it because of your

 6   misconduct and your leaks to the press?  You mean

 7   truthfully like that, Mr. Stolper?  That's why you got

 8   kicked out of the U.S. Attorney's office.

 9        Q     Mr. Avenatti, I'm looking for truthful

10   answers to my questions.

11              You testified you may have had amendments to

12   the partnership agreement.  Why do you believe that

13   there may be other amendments to the partnership

14   agreement other than the dissociation?

15              MR. HODGES:  Argumentative; asked and

16   answered.

17              You're not going to repeat answers to

18   questions already posed.  You're instructed not to

19   answer.

20              MR. STOLPER:  I got a speech on how

21   Mr. Avenatti doesn't like me.  I'm looking for an

22   answer to my question.

23              MR. HODGES:  He didn't say anything about not

24   liking you.

25              MR. STOLPER:  His testimony was that he may
```

**Exhibit D**

USAO_00059901
00059979

```
 1   have -- he may have other amendments to the partnership
 2   agreement, and I'm entitled to know why he testified to
 3   that, what makes him think there may be other
 4   amendments to the partnership agreement.
 5          MR. HODGES:  I appreciate your explanation.
 6   That's been asked and answered.
 7       Q    BY MR. STOLPER:  Have you seen agreements to
 8   the partnership agreement besides the dissociation and
 9   the partnership agreement itself?
10       A    Sir, I don't recall.  I believe there may
11   have been amendments to the partnership agreement.  But
12   the firm began in 2007, I believe, so it's a very long
13   time ago.  I can't recall, as I sit here today, as to
14   whether the partnership agreement was amended in
15   writing or not.
16       Q    Do you remember what the subject --
17       A    It very well may have been.  And I don't know
18   exactly what's been produced, other than I know for a
19   fact the partnership agreement and the dissociation
20   letter was produced.
21       Q    Do you remember what the substance was of any
22   amendments that may have taken place with respect to
23   the Eagan Avenatti partnership agreement, other than
24   the document you referred to with the dissociation?
25          MR. HODGES:  Foundation; speculation.
```

30

**Exhibit D**

USAO_00059902
00059979

```
 1              THE WITNESS:  I don't.

 2      Q    BY MR. STOLPER:  Mr. Avenatti, have you

 3  produced Eagan Avenatti's federal and state tax returns

 4  from 2013 to the present?

 5      A    I don't remember.  We may have.

 6      Q    Do you recall what steps you took to gather

 7  those tax returns and produce them to JFL Law, if, in

 8  fact, that happened?

 9              MR. HODGES:  Foundation; argumentative.

10              THE WITNESS:  I don't.

11      Q    BY MR. STOLPER:  Would you have done that

12  yourself or would you have instructed an employee to do

13  that?

14      A    Sir, I don't.

15      Q    Who has the tax returns or copies of the tax

16  returns from EA from 2013 to the present, other than

17  the IRS?

18      A    I think they're in the files of the firm in

19  storage.

20      Q    Mr. Avenatti, have you produced all of Eagan

21  Avenatti's agreements with Avenatti & Associates to

22  Jason Frank Law in response to Judge Scott's order?

23      A    Sir, I don't recall without looking at the

24  entirety of the production, as well as the productions

25  that were made prior to the order, because we were not
```

31

**Exhibit D**

USAO_00059903
00059979

1    under an obligation to reproduce to you something that

2    was argumentative.

3        Q    So your testimony is that -- I'm sorry.

4             My question was simple.  Did you produce to

5    Jason Frank Law the agreements between Eagan Avenatti

6    and Avenatti & Associates?

7             MR. HODGES:  Foundation as to the existence

8    of any such documents.

9             You can answer.

10            THE WITNESS:  Sir, I just answered the

11   question.  I do not recall.  There's been a lot of

12   documents that have been produced over the years to

13   Mr. Frank and his counsel.  We were not under an

14   obligation to reproduce documents that had previously

15   been produced.

16       Q    BY MR. STOLPER:  When you say you weren't

17   under an obligation to produce documents that were

18   previously produced, where do you get that from?  Why

19   do you believe that to be true?

20       A    It's generally true.  It's generally true in

21   the law.

22       Q    Mr. Avenatti, did Eagan Avenatti file tax

23   returns each year -- federal tax returns from each year

24   from 2013 until the Receiver took over as the manager

25   of Eagan Avenatti?

**Exhibit D**

USAO_00059904
00059979

```
 1        A     The '18 has not been filed yet.  But to the
 2   best of my knowledge, yes.
 3        Q     And did Eagan Avenatti file state tax returns
 4   for each of those years, with the exception of 2018?
 5        A     I believe that's true.
 6        Q     Are you the person who signed those tax
 7   returns?
 8        A     I don't remember.
 9        Q     Is there somebody else at Eagan Avenatti who
10   was authorized to sign tax returns prior to the
11   Receiver taking over?
12        A     I don't know.  When you say "authorized" --
13        Q     Were you the managing partner at Eagan
14   Avenatti until the Receiver took over Eagan Avenatti?
15        A     I don't know how to answer that question.
16   Generally, yes.
17        Q     Were there times where you were not the
18   managing partner from 2013 to the time the Receiver
19   took over?
20        A     No.
21        Q     So during that entire time period, you were
22   the sole managing partner at Eagan Avenatti; correct?
23        A     I think that's true.
24        Q     You're not sure, though?
25              MR. HODGES:  Argumentative.
```

33

**Exhibit D**

USAO_00059905
00059979

```
 1        Q    BY MR. STOLPER:  I understand you think it's
 2   true.  I want certainty, if you can be certain.
 3             Can you be certain you were the sole managing
 4   partner from 2013 to the time that Mr. Weiss took over
 5   as the Receiver?
 6        A    Sir, I answered your question.
 7        Q    You think so, but you're not sure?
 8             MR. HODGES:  He answered.
 9        Q    BY MR. STOLPER:  You think, but --
10             MR. HODGES:  Asked and answered.  He's not
11   going to answer again.
12             MR. STOLPER:  He didn't answer the first
13   time.  I want him to answer my question.
14        Q    BY MR. STOLPER:  Are you sure you were the
15   managing partner in 2013 at the time Mr. Weiss took
16   over?
17             MR. HODGES:  Asked and answered.  Move on.
18        Q    BY MR. STOLPER:  Mr. Avenatti, can you answer
19   my question?
20             MR. HODGES:  You can keep asking.  The
21   objections, they're going to stand.
22             MR. STOLPER:  You're directing him not to
23   answer my question as to whether or not he was the
24   managing partner from 2013 to the time Mr. Weiss took
25   over?
```

34

**Exhibit D**

USAO_00059906
00059979

```
 1              MR. HODGES:  If you lean over the podium at

 2    me again --

 3              MR. STOLPER:  I'm --

 4              MR. HODGES:  -- we'll bring the judge out.

 5    What I'm telling you is listen to the answer the first

 6    time so you don't have to ask three more times.

 7              MR. STOLPER:  I think the answer was "I think

 8    so."  I'd like an answer.

 9         Q    BY MR. STOLPER:  Are you certain you were the

10    managing partner at Eagan Avenatti in 2013 to the time

11    Mr. Weiss took over as the Receiver?

12              MR. HODGES:  How is that answer not an

13    answer?

14              MR. STOLPER:  It suggests he's unsure.

15              MR. HODGES:  It gives you state of mind as to

16    what he thinks.

17         Q    BY MR. STOLPER:  Are you sure, Mr. Avenatti?

18         A    Mr. Stolper, I think so.

19         Q    Mr. Avenatti, did you produce to Jason Frank

20    Law all agreements that you had with Gerald Tobin?

21              MR. HODGES:  Foundation; assumes facts not in

22    evidence.

23              THE WITNESS:  I believe so.

24         Q    BY MR. STOLPER:  When do you believe you did

25    that?
```

**Exhibit D**

USAO_00059907
00059979

```
 1        A    I don't recall.

 2        Q    When you say you believe so, is that the same

 3   thing as you believe so, but you're not sure?  You

 4   believe so?

 5             MR. HODGES:  Argumentative.

 6             THE WITNESS:  I'm not going to answer the

 7   question.

 8        Q    BY MR. STOLPER:  Did you produce all your

 9   agreements with X Law Group and Filippo Marchino to

10   Jason Frank Law?

11             MR. HODGES:  Foundation; assumes facts not in

12   evidence.

13             THE WITNESS:  We've been through this.  It's

14   Marchino.  I keep explaining to you it's Marchino.

15   Separate and apart from that, I believe so.

16        Q    BY MR. STOLPER:  Have you produced -- by the

17   way, that was done in response to Judge Scott's order?

18        A    Sir, I don't recall.  There's been a lot of

19   documents produced over the years.  Thousands of pages

20   of documents have been produced.  I can't tell you what

21   document was produced when without looking at the

22   correspondence and the production.

23        Q    Have you produced Eagan Avenatti's Quickbook

24   records to Jason Frank Law?

25        A    I don't know.
```

36

**Exhibit D**

USAO_00059908
00059979

1        Q     Did you produce Jason Frank's Quickbook

2    records to Jason Frank Law in response to the court's

3    order?

4        A     I don't know.  I don't remember.

5        Q     Mr. Avenatti, did you produce Quickbook

6    records to Mr. Weiss?

7              MR. HODGES:  Foundation; beyond the scope.

8              THE WITNESS:  I don't believe so.

9        Q     BY MR. STOLPER:  Why not?

10             MR. HODGES:  Relevancy; beyond the scope.

11       Q     BY MR. STOLPER:  Why not?

12       A     I'm not going to answer the question.

13       Q     Did Mr. Weiss ask you for the Quickbook

14   records?

15       A     Mr. Stolper, you don't represent Mr. Weiss,

16   and I'm not here on trial.  I'm here to answer

17   questions relating to your clients; your clients'

18   supposed efforts for the collection of a debt.  That's

19   what I thought I was here for today.

20       Q     Mr. Avenatti, my question is simple.  Did

21   Mr. Weiss request that you produce Eagan Avenatti's

22   QuickBook records?  Yes or no?

23       A     I believe he asked for all the books and

24   records.

25       Q     And did you include the QuickBook records in

**Exhibit D**

USAO_00059909
00059979

```
 1    your production to Mr. Weiss?

 2         A    I don't believe they've been produced here.

 3         Q    Why not?

 4         A    I don't know the answer to that question.

 5         Q    Do you have them?

 6         A    I don't have them.

 7         Q    Who has them?

 8         A    I don't know the answer.

 9              MR. HODGES:  Speculation.

10              THE WITNESS:  I'm sorry.

11         Q    BY MR. STOLPER:  You don't know who has Eagan

12    Avenatti's QuickBook records?

13              MR. HODGES:  Asked and answered; lacks

14    foundation.

15         Q    BY MR. STOLPER:  When was the last time you

16    interacted with Eagan Avenatti's QuickBook records?

17         A    Probably about eight years ago.

18         Q    Okay.  Does Eagan Avenatti have someone who

19    works with QuickBooks?

20         A    No.

21         Q    Did Eagan Avenatii have someone who works

22    with the QuickBooks?

23         A    Yes.

24         Q    Who is that?

25         A    Judy Regnier.
```

**Exhibit D**

USAO_00059910
00059979

1      Q    And she still works for you through Avenatti

2  &amp; Associates; correct?

3      A    Yes.

4      Q    Did you instruct her to produce QuickBook

5  records of Eagan Avenatii?

6      A    I don't recall.  I may have.

7      Q    Have you disciplined Ms. Regnier for not

8  doing so?

9      A    I'm not going to answer that question.

10     Q    Mr. Avenatti, have you produced a privilege

11  log to Jason Frank Law?

12     A    I don't recall.  We may have.

13     Q    Have you produced a privilege log to Jason

14  Frank Law in response to Judge Scott's order compelling

15  you to produce documents?

16         MR. HODGES:  Asked and answered.

17         THE WITNESS:  I don't recall.  We may have.

18     Q    BY MR. STOLPER:  Did you produce a schedule

19  of K-1s that Eagan provided to either you or to Michael

20  Eagan to Jason Frank Law in response to Judge Scott's

21  order?

22     A    I believe we provided copies.

23     Q    By "we," you mean you?

24     A    Meaning the firm.

25     Q    Okay.  Is there anybody else at the firm who

**Exhibit D**

USAO_00059911
00059979

```
 1   would have undertaken that responsibility,
 2   Mr. Avenatti?
 3            MR. HODGES:  Speculation; foundation.
 4            THE WITNESS:  Sir, at one point in time,
 5   Mr. Regnier assisted in gathering documents for the
 6   production.  I don't recall -- I don't recall which
 7   production that was because there's been so many
 8   productions.  So I believe we've provided copies of the
 9   K-1s.
10       Q   BY MR. STOLPER:  Did you provide copies of
11   the K-1s to Jason Frank Law in response to Judge
12   Scott's order?
13            MR. HODGES:  Asked and answered;
14   argumentative.
15            THE WITNESS:  Again, I believe that we did
16   provide copies of the K-1s.  And, in any event, I
17   believe that Mr. Frank already had them from prior
18   productions.
19       Q   BY MR. STOLPER:  Who at Eagan Avenatii was
20   responsible for complying with Judge Scott's order to
21   produce documents?
22       A   I was.
23       Q   You alone, sir?
24       A   Sir, I don't know if you're seeking a legal
25   conclusion or what, but I was responsible for complying
```

40

**Exhibit D**

USAO_00059912

00059979

```
 1   with the order.
 2       Q    Did anybody help you in your compliance with
 3   Judge Scott's order to produce documents?
 4       A    Ms. Regnier.
 5       Q    Is there anybody else who helped you with
 6   compliance other than counsel?
 7       A    Not that I can recall.  There may have been,
 8   but not that I can recall.
 9       Q    Mr. Avenatti, on July 11, 2018, the
10   bankruptcy court issued a restraining order against you
11   and Eagan Avenatti; correct?
12       A    I don't recall whether that's correct or not.
13   I know that there was an order that you sought that was
14   denied.
15       Q    Mr. Avenatti, do you recall whether or not
16   you and Eagan Avenatti are subject to a restraining
17   order issued by Judge Bauer?
18       A    I know that we are subject to an order.  I
19   don't recall the details of the order as I sit here
20   right now.
21       Q    So you know you're subject to an order, but
22   you're unsure sitting here what that order allows you
23   to do or forbids you from doing; is that correct?
24            MR. HODGES:  Asked and answered.
25       Q    BY MR. STOLPER:  Mr. Avenatti?
```

**Exhibit D**

USAO_00059913
00059979

```
 1        A     You have my answer.

 2        Q     Mr. Avenatti, what do you understand the

 3   restraining order to be restraining you from doing?

 4              MR. HODGES:  Assumes facts.  Lacks foundation

 5   that he believes it's a restraining order.  He just

 6   answer that.

 7              THE WITNESS:  Sir, I'd be happy to talk with

 8   you about the order, if you'd like to give me a copy.

 9        Q     BY MR. STOLPER:  Mr. Avenatti, my first

10   question is:  Do you believe you're subject to a

11   restraining order?  Yes or no?

12        A     Sir --

13              MR. HODGES:  Asked and answered.

14              THE WITNESS:  Sir, I've already answered that

15   question.

16        Q     BY MR. STOLPER:  You didn't answer that

17   question.

18              MR. HODGES:  Now you're arguing with him.

19   He says he did.  If you don't believe so, check the

20   record.

21              MR. STOLPER:  No.  Actually, I'm entitled to

22   an answer to my question.

23        Q     BY MR. STOLPER:  Mr. Avenatti, sitting here

24   today, are you subject to a restraining order as to

25   what you can do with the assets of Eagan Avenatti and
```

42

**Exhibit D**

USAO_00059914
00059979

```
 1    other assets?  Yes or no?
 2              MR. HODGES:  Asked and answered;
 3    argumentative.
 4              You're not going to answer that question now
 5    since it's been posed now for the third time.
 6              MR. HODGES:  Sir.
 7              MR. STOLPER:  Can you mark that, please.
 8              THE WITNESS:  As well as preceding two
 9    answers.
10              (Transcript marked.)
11       Q    BY MR. STOLPER:  Mr. Avenatti, what is your
12    understanding of what you're supposed to be doing with
13    money coming in for Eagan Avenatti, if anything?
14       A    Maintaining the normal course and scope of
15    the business of the firm.
16       Q    Okay.  What's your understanding about what
17    limitations that -- let me strike that.
18              Prior to Mr. Weiss being appointed as the
19    Receiver for Eagan Avenatii, what was your
20    understanding as to what limitations the court
21    subjected you to with respect to monies coming in to
22    Eagan Avenatii?
23              MR. HODGES:  Foundation; assumes facts.
24              THE WITNESS:  Sir, I don't recall.  First of
25    all, I don't understand what time period we're talking
```

43

**Exhibit D**

```
 1    about.
 2        Q    BY MR. STOLPER:  Prior to Mr. Weiss becoming
 3    the Receiver, subsequent to July 11, 2018.
 4        A    Sir, I don't recall what my understanding
 5    during that time period was.
 6        Q    What's your understanding sitting here today
 7    as to what obligations you had under Judge Bauer's July
 8    11, 2018, order?
 9             MR. HODGES:  Assumes facts; lacks foundation.
10             THE WITNESS:  Sir, I don't recall.  I know
11    that -- I know that I was permitted to carry on the
12    normal course and scope of business of the law firm.
13        Q    BY MR. STOLPER:  Did you comply with Judge
14    Bauer's July 11, 2018, order?
15        A    To the best of my knowledge, I did.
16        Q    When you say "to the best of my knowledge,"
17    how do you know that you complied with it if you don't
18    know what the order is, sir?
19             MR. HODGES:  Argumentative.
20        Q    BY MR. STOLPER:  How is that possible?
21             MR. HODGES:  Argumentative.
22             You don't need to answer the question as
23    phrased.
24        Q    BY MR. STOLPER:  Mr. Avenatti, you just
25    testified that "I believe I complied with the order."
```

44

**Exhibit D**

USAO_00059916
00059979

```
 1              What is that belief based upon?

 2        A    The fact that I, unlike you, generally comply

 3    with orders.

 4        Q    So based upon your habit of complying with

 5    court orders?

 6        A    Unlike you.

 7        Q    Unlike me; correct?

 8        A    Yeah.  You remember Broadcom?

 9        Q    Now, Mr. Avenatti, did you comply with Judge

10    Bauer's order on July 11, 2018, in the same way that

11    you complied with Judge Scott's order to produce

12    documents?

13              MR. HODGES:  Argumentative; beyond the scope;

14    relevancy.

15              You don't need to answer that question.

16        Q    BY MR. STOLPER:  Did you provide the same

17    level of compliance to both orders, Mr. Avenatti?

18              MR. HODGES:  Argumentative.

19              You don't need to answer the question.  It's

20    beyond the scope.

21              MR. HODGES:  If you keep it up, we're going

22    to ask for the judge.

23              THE WITNESS:  Sir, I want the judge on the

24    bench for the duration of this.

25              THE COURT REPORTER:  Mr. Avenatti, can you
```

45

**Exhibit D**

USAO_00059917
00059979

1     put a microphone in front of you.  I'm having a hard

2     time hearing you.

3              THE WITNESS:  Sure.  I said I want the judge

4     on the bench for the duration of this circus show.

5              (Exhibit 82 was marked.)

6        Q    BY MR. STOLPER:  I've marked Exhibit 82 an

7     order entered by Judge Bauer entered July 11, 2018.

8              Do you remember this order, sir?

9        A    No, I don't have an independent recollection

10    of it.

11       Q    Okay.  Do you remember the obligations that

12    were imposed upon you by Judge Bauer in this order on

13    July 11, 2018?

14       A    I don't.

15       Q    At the time the order came out, did you

16    review the order to make sure that you would comply

17    with it in the future?

18       A    I reviewed it at some point in time after

19    conversing with my counsel.

20       Q    Let's look at what the order requires.

21    "Eagan Avenatii was restrained from assigning,

22    encumbering in any way transferring any proceeds,

23    attorneys' fees, costs, rights to payments, and

24    accounts receivable it is or may be entitled to receive

25    from the lawsuits and the clients listed on Exhibit A

46

**Exhibit D**

USAO_00059918
00059979

```
 1    of the Frank declaration; is that correct?

 2           MR. HODGES:  Document speaks for itself.

 3           THE WITNESS:  That's what the document says,

 4    but that was not the entirety of the order.

 5       Q    BY MR. STOLPER:  But that's part of the

 6    order; right?

 7       A    No.  That's not -- look, that's what the

 8    document says, but that's not the entirety of the

 9    order.  And, in fact, the court subsequently clarified

10    what this order provided for and what it did not

11    provide for.

12       Q    One of the cases that was listed on Exhibit A

13    was Medline versus Kimberly-Clark; correct?

14       A    I don't recall.

15       Q    Let me refresh your recollection.  This is

16    Exhibit A.  That's line 14.  That's Medline versus

17    Kimberly-Clark; correct?

18       A    Yep.

19       Q    Now, Eagan Avenatii was obtaining $35,000 a

20    month in payment from Medline for its services;

21    correct?

22           MR. HODGES:  Foundation.

23           THE WITNESS:  I believe that's true.

24           MR. STOLPER:  Can I get 82-A, please.

25           MR. HODGES:  Are you at a good breaking
```

47

**Exhibit D**

USAO_00059919
00059979

```
 1    point?
 2             MR. STOLPER:  No.  Five more minutes.
 3             THE WITNESS:  I need to go to the bathroom.
 4             MR. HODGES:  Let's go off the record.  He's
 5    leaving anyway.
 6             MR. STOLPER:  Okay.  Off the record.  let the
 7    record reflect that the witness has excused himself.
 8             (Recess taken.)
 9             MR. STOLPER:  I'd like to mark Exhibit 82-A.
10             Your Honor, I have got checks that were -- I
11    have documents that were --
12             Mr. Avenatti, you have a counsel.
13             THE WITNESS:  Mr. Stolper, please don't
14    lecture me.
15             MR. STOLPER:  Your Honor, I have checks that
16    I plan to show.  These were already filed in court.
17    I'll give Your Honor the document control number --
18    it's for this case -- document 51-3.
19             THE COURT:  What were they filed in
20    connection with?
21             MR. STOLPER:  I believe this is in support of
22    Mr. Frank's declaration for appointment for receiver.
23             MR. HODGES:  Your Honor, I would ask the
24    court to indulge Mr. Avenatti, given his concerns over
25    issues of privilege for the client's of the firm.  I
```

48

**Exhibit D**

USAO_00059920
00059979

```
 1    appreciate that I am here on his behalf, but there are
 2    certain issues he would like to address with Your
 3    Honor.
 4            THE COURT:  All right.  This is a privilege
 5    objection?
 6            THE WITNESS:  Yes, Your Honor.
 7            To begin with, I was not aware that these
 8    document had been previously been filed.  When I had
 9    reviewed the voluminous files by Mr. Frank, I had not
10    noticed these checks.  This goes to a current client of
11    the firm who is embroiled in a significant piece of
12    litigation.  Counsel now wants to ask about the terms
13    of our engagement with that client.  That is
14    privileged, as it relates to how much they pay us or
15    what our arrangement is with that client.
16            THE COURT:  Well, just for a moment, I
17    understood that the issue here was whether or not they
18    could publish the image of the document, and I haven't
19    actually heard a question yet about the document.
20            THE WITNESS:  The documents are checks.
21            THE COURT:  Okay.
22            THE WITNESS:  And they want to get into the
23    relationship or the terms of the engagement between the
24    client and the firm and how much they pay the firm.
25    And that is privileged, Your Honor.  And the defendants
```

49

**Exhibit D**

USAO_00059921
00059979

```
 1    in that case are not permitted to learn what the terms
 2    of our engagement are because it can have an impact on
 3    that case, a significant impact on the case.
 4              THE COURT:  Well, let me ask, first of all,
 5    is there an objection to the publication of the image
 6    of the document that he's talking about?
 7              THE WITNESS:  There is.
 8              THE COURT:  What is the content of the
 9    document that is privileged or problematic?
10              MR. STOLPER:  I can approach, Your Honor.
11              THE WITNESS:  They are checks.
12              THE COURT:  Right.  So is it the name on the
13    check?  Is it the amount on the check?  What's the
14    privileged content?
15              THE WITNESS:  It's the amount and the name of
16    the check, because it discloses what the terms of the
17    engagement are, basically.  And that's what counsel is
18    going to get into, and that's privileged.
19              THE COURT:  Well, let me hear from counsel.
20    I haven't heard a question, yet.
21              MR. STOLPER:  So, Your Honor, prior to Your
22    Honor taking the bench, I asked Mr. Avenatti, is this a
23    current client?  It's listed on his bankruptcy
24    schedules.  It's not a secret.  It's a publicly filed
25    case where Mr. Eagan Avenatti is counsel of record.
```

50

**Exhibit D**

USAO_00059922
00059979

1    It's Medline versus Kimberly-Clark.  It's filed in the

2    Northern District of Georgia.

3              Before the break, I asked Mr. Avenatti -- and

4    we can pull the transcript -- they're paying you

5    $35,000 a month?  Mr. Avenatti said that they were.

6    Now I'm going to go to the checks and ask where the

7    money is going now, whether it's going to Eagan

8    Avenatti or someplace else.  That's my interest.

9              THE COURT:  All right.  Do you need to

10   reference the checks to ask that question?

11             MR. STOLPER:  Only to the extent that they --

12   if Mr. Avenatti will stipulate they're going to Eagan

13   Avenatti, LLP.  The content of the check is germane,

14   because I'd like to ask Mr. Avenatti if he's continuing

15   to get checks; and if so, where are they being

16   deposited?

17             THE COURT:  I mean, that seems like a

18   question about the assets of Eagan Avenatti.  It

19   doesn't seem like it invades anything privileged.  On

20   the other hand, it doesn't seem like you need to

21   publish the checks themselves in order to ask those

22   questions.

23             So maybe we can just ask the questions.

24             MR. STOLPER:  I can do that, Your Honor.

25        Q    BY MR. STOLPER:  Mr. Avenatti, are you --

51

**Exhibit D**

USAO_00059923
00059979

```
 1    Eagan Avenatti is still listed as counsel of record in

 2    Medline v. Kimberly-Clark in the Northern District of

 3    Georgia; correct?

 4         A    I think that's true.

 5         Q    And Eagan Avenatti is still counsel for

 6    Medline; is that correct?

 7         A    It's either Eagan Avenatti or Avenatti, LLP.

 8         Q    Which is it?

 9         A    I don't recall.

10         Q    Okay.  Is Medline still writing checks to

11    Eagan Avenatti?

12         A    I don't know.  I believe so.

13         Q    Okay.  Where are those checks being

14    deposited?

15         A    You asked me this, I believe, last Friday;

16    and I answered it then, and I'll answer it again now.

17              At City National Bank.

18         Q    Are they being deposited with Eagan Avenatti?

19    Or are you taking control of that money?

20         A    No.  They're being deposited into the account

21    that we discussed last Friday.

22         Q    Not my question.

23              Are they being deposited into an account

24    that's controlled by the Receiver of Eagan Avenatti?

25    Are they being deposited into an account that you alone
```

**Exhibit D**

USAO_00059924
00059979

```
 1   control?

 2        A    I don't recall that there's been any payment

 3   since the appointment of the Receiver.

 4        Q    Okay.  Prior to the appointment of the

 5   Receiver, where were these checks being deposited?

 6        A    At an account at City National Bank.

 7        Q    Is that an Eagan Avenatti account at City

 8   National Bank or is that an account held in some name?

 9        A    I don't recall.  I don't recall where they

10   were being deposited prior to the appointment of the

11   Receiver.

12        Q    Do you recall whether or not -- well, the

13   Receiver was appointed approximately a month ago.

14             The last check that you received for $35,000,

15   was that money deposited into an Avenatti, LLP,

16   account, an Eagan Avenatti account, a trust account?

17   Do you have any recollection as to where that check was

18   deposited?

19             MR. HODGES:  Asked and answered.

20             THE WITNESS:  I don't have any recollection

21   of where it was deposited.

22        Q    BY MR. STOLPER:  How long has the account --

23   how long have you had accounts at City National --

24   well, strike that.

25             Is it a newly opened account at City National
```

**Exhibit D**

USAO_00059925
00059979

```
 1   Bank?
 2        A    Sir, at present, there is no Eagan Avenatti,
 3   LLP, bank account anywhere.
 4        Q    So how are you depositing checks made payable
 5   to Eagan Avenatti, LLP?
 6             MR. HODGES:  Objection.
 7             THE WITNESS:  I don't think I testified that
 8   I was.
 9        Q    BY MR. STOLPER:  Are the checks sent by
10   Medline to you, and then payable to Eagan Avenatti,
11   LLP?
12        A    I don't recall, but I don't believe so.
13        Q    When did the checks stop being made payable
14   to Eagan Avenatti, LLP?
15        A    Sir, I don't -- I don't know if they have
16   stopped being made payable to Eagan Avenatti, LLP, to
17   be clear, so I don't -- I don't know.
18        Q    You said Avenatti, LLP, may be counsel of
19   record now; is that correct?
20        A    Sir, I don't know what you mean by "counsel
21   of record."  I think that on the captions in the
22   Northern District of Georgia, it still reads as Eagan
23   Avenatti, LLP.
24        Q    Has Medline signed a new engagement with
25   Avenatti, LLP, that you're aware of?
```

54

**Exhibit D**

USAO_00059926
00059979

```
 1        A     Not that I can recall.

 2        Q     Have you directed Medline to change the payee

 3   of the checks from Eagan Avenatti, LLP, to Avenatti,

 4   LLP?

 5             MR. HODGES:  Your Honor, I'm going to object

 6   based on the attorney-client privilege.  And I'm

 7   actually going to instruct the witness not to answer,

 8   pending a ruling by the court.  The question posed

 9   specifically asked for a communication between

10   Mr. Avenatti and the client.

11             MR. STOLPER:  Not for the purpose of legal

12   advice, Your Honor.

13             THE COURT:  So the question was whether he's

14   given instructions about who the check should be

15   addressed to?

16             MR. STOLPER:  Yes, Your Honor.

17             THE COURT:  Can we just ask that more general

18   subject?  Because I think I heard him recall he didn't

19   know who the checks were addressed to before or after.

20   But the general question is:  Have you ever given

21   instructions as to who to write the check to?  And

22   that's a yes or no question.  I don't think that would

23   reveal the content of any particular attorney-client

24   communications.

25        Q     BY MR. STOLPER:  In the last year, have you
```

**Exhibit D**

USAO_00059927

00059979

1    ever provided Medline any instruction about who their

2    checks ought to be made payable to?

3              MR. HODGES:  And with all respect, I do think

4    that calls for privilege, specifically, referring to

5    the substance of the communication.

6              MR. STOLPER:  Your Honor, if I may, it's not

7    legal advice.  A lawyer telling someone who to write

8    the check to is not -- it's not a legal question.  It's

9    the same thing if your drycleaner says, "Make it

10   payable to ABC Dry Cleaners."  It has nothing to do

11   with the subject matter of the representation.  It's

12   simply the economics of it.

13             THE COURT:  Counsel, how would that implicate

14   asking or giving legal advice?

15             MR. HODGES:  Your Honor, the scope of the

16   privilege is not limited to legal advice.  It's any

17   communication in furtherance of the representation.

18   That's the standard for attorney-client privilege.

19             MR. STOLPER:  Well, if I may, Your Honor, the

20   checks themselves are not -- would not be privileged.

21   If Medline wrote a check to somebody else, it would be

22   perfectly appropriate to ask, "Why did you write this

23   check?"  They would say, "Well, my lawyer told me to

24   send it to this account or send it to that account."

25             That's not legal advice, Your Honor.  That's

56

**Exhibit D**

USAO_00059928
00059979

```
 1    simply directing of the payment.  It has nothing to do
 2    with the -- it has no connection to the underlying
 3    substance of the advice that Mr. Avenatti's firm is
 4    providing in connection with litigation.
 5            And I'm attempting to establish, as I think
 6    the Court understands, that Mr. Avenatti may have
 7    directed money that should be going to Eagan Avenatti
 8    to a different account.
 9            THE COURT:  Yes, I agree.  I'm going to
10    overrule that objection.  I don't think that
11    instructions about logistics like that are actually the
12    type of communication that would be in furtherance of
13    the confidential nature of the attorney-client
14    communication.
15        Q    BY MR. STOLPER:  Mr. Avenatti, have you had
16    any communications with Medline in the last six months
17    directing them to change the payee of checks from Eagan
18    Avenatti to some other entity?
19        A    Not that I recall.
20        Q    So, without that, do you have any reason to
21    believe that the Medline checks have been written to
22    anyone other than Eagan Avenatti?
23        A    Sir, I don't know.  I think I answered that
24    previously.
25        Q    How long has Avenatti, LLP, been in
```

57

**Exhibit D**

USAO_00059929
00059979

1     existence?

2          A    I don't remember.

3          Q    More than a year?

4               MR. HODGES:   Foundation.

5               THE WITNESS:   Sir, you asked a lot of

6     questions of me last Friday in this regard, and we've

7     covered this ground.

8               But to be clear, I don't recall how long it's

9     been in existence.  And it may have been -- there may

10    have been a name change effectuated from another entity

11    that made it Avenatti, LLP.

12         Q    BY MR. STOLPER:  What would have been that

13    entity, sir?

14         A    Sir, I can't recall, as I sit here, without

15    the documents.

16         Q    Does Avenatti, LLP, have any partners other

17    than yourself?

18         A    Yes.

19         Q    Who?

20         A    Me and Avenatti & Associates, I believe.

21         Q    And Avenatti & Associates is another --

22    that's a professional corporation; correct?

23         A    It's been in existence since 2006.

24         Q    Okay.  Are there any partners for Avenatti,

25    LLP, that are not controlled by you?

58

**Exhibit D**

USAO_00059930

00059979

```
 1        A    No.

 2        Q    How long have you been practicing law through

 3   Avenatti, LLP, as opposed to Eagan Avenatti, LLP?

 4        A    Sir, I've practiced -- just to be clear, I've

 5   practiced law under a number of different entities over

 6   the last ten years.

 7        Q    That wasn't my question, sir.

 8             My question is:  How long have you been

 9   practicing law under Avenatti, LLP, versus Eagan

10   Avenatti, LLP?

11             THE COURT:  Do you mean -- the question seems

12   to imply that one excludes the other.  I thought I

13   heard the witness basically saying that he might have

14   been working for both at the same time.

15        Q    BY MR. STOLPER:  Is that the case,

16   Mr. Avenatti?

17        A    Her Honor is correct.

18        Q    Okay.  Other than possibly Medline, what

19   other clients -- public clients does Avenatti, LLP,

20   have?

21        A    I don't recall, as I sit here.

22        Q    Any other clients besides Medline?

23             MR. HODGES:  Asked and answered.

24             THE WITNESS:  I'm sure there's clients.  I

25   don't know, when you say "public clients," what you
```

59

**Exhibit D**

USAO_00059931
00059979

```
 1 │ mean by that.
 2 │     Q    BY MR. STOLPER:  Sorry.  Representations for
 3 │ filed litigation, either state, federal, or bankruptcy
 4 │ court.
 5 │     A    You know, I just don't remember, as I sit
 6 │ here.
 7 │     Q    Do you believe, sitting here, that Avenatti,
 8 │ LLP, has other clients?
 9 │     A    Do I believe that?  Yes.  But I don't know,
10 │ as I sit here, that -- I could be thinking of a client
11 │ that in reality is a client of Avenatti & Associates,
12 │ but may be a client of Avenatti, LLP.  I just --
13 │     Q    Have you ever sent a client a retainer
14 │ agreement for Avenatti, LLP, as opposed to Eagan
15 │ Avenatti or Avenatti & Associates?
16 │     A    Sir, I may have.  I just -- I don't remember.
17 │     Q    Have you done so in the last six months?
18 │     A    Again, I may have.  I just don't recall.
19 │     Q    Does Avenatti, LLP, maintain separate
20 │ insurance?
21 │         MR. HODGES:  Your Honor, this is beyond the
22 │ scope.  I'm not sure what the relevancy of the dealings
23 │ of Avenatti, LLP, have to do with the ability to
24 │ collect a debt from Eagan Avenatti.
25 │         THE COURT:  Would you like to address that
```

60

**Exhibit D**

USAO_00059932
00059979

```
 1   relevancy objection?

 2           MR. STOLPER:  Certainly, Your Honor.  The

 3   witness testified that the Medline money may have been

 4   -- may be going to Avenatti, LLP.  It is our right and,

 5   frankly, I think, my obligation to explore whether

 6   Avenatti, LLP, is in fact real, as opposed to just a

 7   name that Mr. Avenatti is using to hide assets from

 8   Mr. Frank -- from Eagan Avenatti and then Mr. Frank and

 9   -- I'm sorry -- Mr. Frank's law firm, JFL law.

10           So to the extent Mr. Avenatti has testified

11   that Avenatti, LLP, may be counsel of record for

12   Medline, and I have checks that used to go to Eagan

13   Avenatti that we seem to have lost the trail of, I'm

14   trying to explore whether or not Avenatti, LLP, is

15   essentially an alter ego or a shell or something where

16   Mr. Avenatti is hiding assets from Mr. Frank's firm.

17           THE COURT:  And to the extent that it has

18   insurance, how does that figure into your argument?

19           MR. STOLPER:  Because if it doesn't have

20   insurance, Your Honor, if it doesn't have offices and

21   he can't remember if he sent out a retainer letter and

22   he's not sure if he has any clients, you put those

23   things together, it doesn't sound like a law firm.  It

24   sounds like a name he's using to hide assets.  I'm

25   trying to understand what bundle of legitimacy this
```

61

**Exhibit D**

USAO_00059933
00059979

```
 1    purported law firm has.

 2            THE COURT:  Counsel.

 3            MR. HODGES:  Your Honor, I think you've

 4    touched on the very issue.  The third party has

 5    individual rights.  There is a standard by which

 6    counsel must adhere to in order to get discovery from

 7    third parties in the context of a judgment debtor exam.

 8    There's been no threshold shown.  In order to get

 9    evidence from a --

10            THE COURT:  Counsel, can you speak into the

11    mic so the court reporter can hear you?

12            MR. HODGES:  In order to get discovery

13    pertaining to third parties in the context of a

14    judgment debtor exam, pursuant to the rules under the

15    State of California, they must make a showing that

16    these entities -- counsel must affirm or a witness must

17    affirm that these entities either owe Mr. Avenatti a

18    debt or that these entities are holding assets for the

19    benefit of Mr. Avenatti.  They don't get to conduct the

20    examination of a judgment debtor to determine whether

21    or not third parties hold such property or rights or

22    own (sic) money to the judgment debtor.

23            They need to make the affirmative showing.

24    The forms -- it's a check-the-box form in the state

25    court.  They must affirm those two things under penalty
```

62

**Exhibit D**

USAO_00059934
00059979

```
 1    of perjury.  Otherwise, notice needs to be given to the
 2    third parties.  And discovery regarding the assets,
 3    liabilities of a third party are improper and beyond
 4    the scope of a judgment debtor exam.
 5            He's inquiring into things such as insurance
 6    of a third party.  That doesn't -- it's not even
 7    indicative of an alter ego, regardless of any other
 8    argument put before Your Honor.
 9            THE COURT:  Well, I understand that counsel
10    is trying to figure out if there are -- where the
11    assets of Eagan Avenatti are, and he's trying to
12    determine if some of those assets might, in fact, have
13    been diverted to Avenatti, LLP.
14            And, you know, to the extent that there are
15    questions about how it holds assets and its legal
16    existence, that seems to me to be within the broad
17    scope of trying to identify whether any of the assets
18    might belong to Eagan Avenatti, and so I'll let counsel
19    proceed on that basis.
20        Q    BY MR. STOLPER:  Mr. Avenatti, does Avenatti,
21    LLP, maintain separate insurance?
22        A    I believe so, but it's not obligated to do so
23    under the law.
24        Q    Who pays for that insurance?
25        A    Sir, I -- I don't know what you mean by that.
```

63

**Exhibit D**

USAO_00059935
00059979

```
 1        Q    Well, have any monies from Medline, $35,000 a
 2   month, been used to pay for insurance for Avenatti,
 3   LLP?
 4             MR. HODGES:  Lacks foundation; assumes fact
 5   that insurance exists.  The witness testified he wasn't
 6   sure one way or the other.
 7             THE COURT:  I think if he understands the
 8   question, he can answer it.
 9             THE WITNESS:  Not to my knowledge.
10        Q    BY MR. STOLPER:  Let's go ahead and turn to
11   what's been marked as Exhibit 1.
12             Mr. Avenatti, one of the clients of Eagan
13   Avenatti was -- or one of the cases that Eagan Avenatti
14   handled was Greco versus National Football League;
15   correct?
16        A    Yes.
17        Q    And that was a case about seating at the
18   Super Bowl; correct?
19        A    Yes.
20        Q    And  that was a case that you scheduled in
21   bankruptcy court as an Eagan Avenatti case; correct?
22        A    I don't recall that.
23        Q    Let me turn to what's been marked as Exhibit
24   1.  Mr. Avenatti, Exhibit 1 is one of your bankruptcy
25   schedules.  It's document 212 in the bankruptcy case.
```

64

**Exhibit D**

USAO_00059936
00059979

```
 1   I've indicated on page 3 of 7, Number 7, Greco versus

 2   NFL, U.S. District Court, Northern District of Texas.

 3            (Exhibit 1 was marked.)

 4        Q    BY MR. STOLPER:  Does that refresh your

 5   recollection as to whether or not Greco was scheduled

 6   as an Eagan Avenatti case?

 7        A    Yes.

 8        Q    And was Greco handled by Eagan Avenatti, as

 9   opposed to other law firms that you claim to be

10   associated with?

11        A    It was handled by multiple firms.

12        Q    Was it handled by -- was it handled by the

13   Law Offices of Chris Ayers; correct?

14        A    Yes.  Eagan Avenatti, me personally, and

15   Avenatti & Associates, and --

16        Q    And on the separate computer records --

17            THE COURT:  Let the witness finish the

18   answer.

19            THE WITNESS:  It was handled by Eagan

20   Avenatti, Mr. Ayers, Mr. -- I think the Ayers Law

21   Office, me individually, Avenatti & Associates, and

22   there may have been another firm, as well.

23            MR. STOLPER:  Exhibit 46.  I've placed what's

24   been marked as Exhibit 46 in front of the witness.

25   It's the Eagan, O'Malley, Avenatti partnership
```

65

**Exhibit D**

USAO_00059937
00059979

```
 1    agreement.

 2            (Exhibit 46 was marked.)

 3            MR. HODGES:  Yes, I do.  It's designated as

 4    confidential.

 5            MR. STOLPER:  Your Honor, I think the

 6    question is actually better for the Receiver.  It's

 7    Eagan Avenatti's partnership agreement, and the

 8    Receiver is probably the one who gets to make those

 9    decisions as to whether or not it's confidential for

10    the law firm.

11            MR. HODGES:  Well, with respect, Your Honor,

12    the protective order, I believe, issued by this court

13    allows all parties in interest to designate documents.

14    But my objection is noted.  The document specifically

15    is already marked confidential.

16            But let the record reflect, I'm handing it to

17    the Receiver.

18            MR. REITMAN:  Your Honor, from the Receiver's

19    perspective, this document is marked confidential.  I

20    don't see any reason for -- my client doesn't see any

21    reason for it to be in the public record.

22            I guess the real question is what is it about

23    this agreement that counsel intends to ask questions

24    about?

25            THE COURT:  Well, let me first ask if you can
```

66

**Exhibit D**

USAO_00059938
00059979

```
 1    tell me, without disclosing something you think is
 2    confidential, what is it about that document that
 3    merits a confidentiality designation?
 4              MR. REITMAN:  Your Honor, it covers ownership
 5    percentages.  It covers contributions.  It covers
 6    issues relating to how the partners will deal with each
 7    other or deal in the context of the partnership.
 8              THE COURT:  So these are financial issues
 9    relating to the members of the partnership and the
10    business?
11              MR. REITMAN:  That's correct, Your Honor.
12              MR. STOLPER:  If I may, Your Honor, the
13    agreement is dated, I believe -- and I have my copy
14    over there.  But I believe it's dated 2007.  The
15    contributions were made in 2007.  I have no interest or
16    desire to publish those contributions.  I don't care
17    about them.  I simply intend to ask about the
18    obligations the partners have to one another as set
19    forth in the agreement.
20              I have no objection to, you know, it not
21    fully being entered into the public record.  That said,
22    I think as we go through my questions, I think it's
23    probably best to handle it case by case, and I won't
24    publish anything until the court gives me permission to
25    do so.
```

67

**Exhibit D**

USAO_00059939
00059979

```
 1              THE COURT:  All right.  Let's proceed that
 2    way, then.
 3         Q    BY MR. STOLPER:  Mr. Avenatti, Eagan Avenatti
 4    is a limited partnership; correct?
 5         A    Yes.
 6         Q    Who are the limited partners?
 7         A    Presently?
 8         Q    Yes.
 9         A    You asked me this last Friday.  We went over
10    all this.
11              Avenatti & Associates, APC -- although
12    there's an issue actually as to whether it -- legally
13    it is a partnership anymore.
14         Q    Who else are the partners?
15         A    I think you just answered that question.
16         Q    No.  I asked you who the partners are, and
17    you said Avenatti & Associates --
18         A    There's an issue, sir, as to whether it's
19    actually still a partnership by law because I think
20    that you have to have at least two partners to have a
21    partnership, but I may be wrong on that.
22         Q    So right now the only partner that you're
23    aware of is Avenatti, APC?
24         A    They don't really want to be a partner.
25         Q    I understand.
```

**Exhibit D**

USAO_00059940
00059979

 1              Prior to it just being Avenatti, Avenatti &
 2      Associates, who were the limited partners of Eagan
 3      Avenatti?
 4          A    At what period of time?
 5          Q    Well, let's start with who is the most recent
 6      partner to have resigned.
 7          A    Mr. Eagan dissociated himself from the firm
 8      back in 2012.
 9          Q    And did Mr. Eagan provide written
10      notification in 2012 of his dissociation?
11          A    There's a letter that's been provided that's
12      been produced relating to the dissociation that was
13      provided to Mr. Frank and to the Receiver.
14          Q    Thank you.  My question is --
15          A    I want to clarify the prior answer.  I want
16      to clarify a prior answer.
17              I don't know the legal implications of the
18      partners, whether the partnership still exists legally
19      or not, and I'm not taking the position on that because
20      I have not researched that issue.  So my speculation
21      should not be taken as gospel on that.  I just want to
22      be clear.
23              THE COURT:  We understand your answers here
24      today are providing facts, not legal opinions.
25              THE WITNESS:  Fine.

69

**Exhibit D**

USAO_00059941
00059979

```
 1        Q    BY MR. STOLPER:  When Mr. Eagan dissociated
 2   from the firm, did he provide you a written notice of
 3   that dissociation at the time that it took place?
 4        A    I think I answered that question.
 5             THE COURT:  I heard him say there was a
 6   letter.
 7             MR. STOLPER:  Yes, there was a letter, and I
 8   will get the letter in a minute.  That letter is not
 9   signed by Mr. Eagan.  That's why I'm asking, Your
10   Honor.
11        Q    BY MR. STOLPER:  Did Mr. Eagan provide you a
12   written dissociation from Eagan Avenatti in 2012?
13        A    Sir, I don't remember when it was provided.
14   But if your copy is not signed, we can get you a signed
15   copy because it was signed by two parties, both me and
16   Mr. Eagan.  And I certainly have a signed copy, and I
17   think that a duly signed copy was previously provided
18   to Mr. Frank in another context.
19        Q    It was not.  But I won't debate with the
20   witness at this point in time.
21             The Eagan Avenatti partnership agreement has
22   a competition clause in it; correct?
23        A    I believe so.
24             MR. STOLPER:  And, Your Honor, I'd like to
25   read the competition clause.  I don't think it's going
```

**Exhibit D**

USAO_00059942
00059979

```
 1    to implicate any confidentiality interest.  I can show
 2    the Court.
 3            THE COURT:  Any objection to that?
 4            All right.  Hearing none.  You can go ahead,
 5    sir.
 6            MR. STOLPER:  It says, "Except as set forth
 7    below, each Founding Partner agrees that while he
 8    is a partnership of the Firm, he will not engage
 9    or have an interest, directly or indirectly, in
10    any other business venture which would interfere with
11    the performance of his duties as a partner or
12    attorney of the Firm or which competes with any
13    material part of the Firm's business, without the
14    express written consent of each of the Founding
15    Partners."
16        Q    BY MR. STOLPER:  And that's an agreement you
17    entered into with the other limited partners on
18    approximately 1 August 2007; correct, sir?
19        A    And it was changed.
20        Q    When was it changed?
21        A    I don't recall exactly when it was changed.
22    Mr. O'Malley was terminated from the firm in 2010, and
23    I don't remember if it was before or after that.  But
24    it was agreed between Mr. Eagan and I that I could
25    operate my own firm, Avenatti & Associates, or
```

71

**Exhibit D**

USAO_00059943
00059979

```
 1    otherwise, without any issue, and he was permitted to
 2    do the same.
 3        Q    Paragraph 29.5 is an amendment.  "This
 4    agreement may be amended only with unanimous written
 5    consent of the Founding Partners."
 6            Mr. Avenatti, have you produced to Jason
 7    Frank Law or to the Receiver their unanimous written
 8    consent that relieves you of your competition
 9    obligations under the Eagan Avenatti Limited
10    Partnership agreement?
11            MR. HODGES:  Lacks foundation; assumes facts
12    not in evidence.
13            THE WITNESS:  Sir, first of all, upon
14    Mr. O'Malley's departure, I believe that by law that
15    partnership agreement was automatically either
16    nullified or amended, one of the two.
17            But second, separately from that, I don't
18    recall if we memorialized it in writing or not, but it
19    was -- there was two partners, at that point in time,
20    Mr. Eagan and I.  And it was agreed that there were no
21    issues with me having my own firm.  That was never an
22    issue, and it certainly wasn't an issue after his
23    dissociation from the firm.
24        Q    BY MR. STOLPER:  To the best of your
25    recollection, is there an amendment signed in writing
```

72

**Exhibit D**

USAO_00059944
00059979

```
 1    by the partners to the Eagan O'Malley -- excuse me --
 2    the Eagan, O'Malley, Avenatti partnership agreement
 3    that governs competition?
 4         A    There may be.  I just don't know as I sit
 5    here.
 6         Q    Why do you think there may be?
 7              THE COURT:  Counsel, I guess at this point, I
 8    understand that you're looking for assets of Eagan
 9    Avenatti that may have gone to other entities, but
10    whether or not those other entities were formed in
11    violation of an anti-competition clause, is that
12    relevant to finding the assets?
13              MR. STOLPER:  It is, Your Honor, because what
14    Mr. Avenatti did, and we'll get to that in a moment,
15    was he diverted assets from Eagan Avenatti to his own
16    individual interests.  And our belief is that's in
17    violation of his obligations under the partnership
18    agreement, that he basically took the corporate assets
19    and took it to himself.
20              THE COURT:  Well, let's explore whether he
21    took the corporate assets without regard to whether it
22    was in violation of anything.
23              MR. STOLPER:  That's fine, Your Honor.
24              Let me go ahead and turn to -- I have a few
25    more questions concerning Mr. Eagan's departure from
```

73

**Exhibit D**

USAO_00059945
00059979

1      the firm, because that's going to go to whether or not,

2      as Mr. Avenatti has foreshadowed, whether or not it was

3      a partnership or not and, therefore, who we can collect

4      from.

5              And with that, I'd like to go ahead and mark

6      the withdrawal that Mr. Avenatti has referred to, which

7      is Exhibit 47.

8              Any objection?

9              MR. HODGES:  May I see it?

10             THE COURT:  Sure.

11             (Exhibit 47 was marked.)

12             MR. HODGES:  For the record, the discussion

13     is that the document is, in fact, marked confidential.

14     The firm has designated it as confidential, and it is

15     my position that it should remain confidential.

16             Candidly, I don't know what the relevancy is

17     with respect to the current assets and liabilities of

18     the firm, but I'll reserve that for the questions.

19             As to the document, I think it should be

20     outside of the public record.

21             MR. REITMAN:  Your Honor, the Receiver does

22     not object to it being --

23             THE COURT:  All right.  You can use the

24     document in your questioning, sir.

25        Q    BY MR. STOLPER:  First of all, Mr. Avenatti,

74

**Exhibit D**

USAO_00059946
00059979

```
 1    this is the withdrawal of what we've marked as Exhibit
 2    47.  Thank you.
 3            This is the withdrawal document of Mr. Eagan
 4    you were just referring to in your testimony?
 5         A    Yes, sir.
 6         Q    This is an unsigned copy of it?
 7            MR. HODGES:  Actually, misstates the record.
 8            MR. STOLPER:  I'm sorry.
 9         Q    BY MR. STOLPER:  I'm sorry.  Unsigned by
10    Mr. Eagan.
11         A    This copy is unsigned, but we both signed it.
12         Q    Okay.  And did you witness Mr. Eagan sign
13    this document?
14         A    What do you mean did I witness it?
15         Q    Were you with him when he signed it?
16         A    I don't remember if I was with him.
17         Q    Can you read the document and confirm that
18    all the representations contained therein are true
19    under penalty of perjury?
20         A    I mean, I think, generally, the statements
21    are true.
22         Q    Is there anything in there that you think is
23    untrue?
24         A    No.  I think, generally, it's true.
25         Q    When was this document signed?
```

75

**Exhibit D**

USAO_00059947

00059979

```
1        A    I don't recall.

2        Q    Was it within the last year?

3             MR. HODGES:  Asked and answered.  Foundation.

4             THE COURT:  I think he's asking you if you

5    have any general recollection of when it was signed.

6             THE WITNESS:  Your Honor, I don't recall.

7             THE COURT:  Okay.

8        Q    BY MR. STOLPER:  Well, it relates to things

9    that took place in 2012.

10            So my question is:  Was this document signed

11   in approximately 2012?  Or is it something that you

12   prepared more recently?

13            THE COURT:  And, again, I think he's asking

14   if you can -- you may not recall specifically when it

15   was signed, but if you can pinpoint it as to before or

16   after 2012, he's asking if you can do that.

17            THE WITNESS:  Sir, I'm almost certain it was

18   after 2012, but I don't recall when it was signed.

19       Q    BY MR. STOLPER:  Was it done before or after

20   Eagan Avenatti consented to bankruptcy?

21       A    I don't recall.

22       Q    So it could have been after the bankruptcy?

23            MR. HODGES:  Argumentative; foundation.

24            THE COURT:  You don't recall one way or the

25   other?
```

**Exhibit D**

USAO_00059948
00059979

```
 1              THE WITNESS:  It could have been before or
 2    after.  I don't know.
 3         Q    BY MR. STOLPER:  And this document is -- just
 4    to make sure I understand it, this is your -- you and
 5    Mr. Eagan agreeing that he is withdrawing from the
 6    Eagan Avenatti partnership no later than February 16,
 7    2012.
 8              Am I understanding that correctly?
 9         A    Whatever the document says, it says.
10         Q    Well, what it says is Mr. -- Mr. Eagan's
11    limited role at the firm effectively ceased long ago,
12    and certainly no later than February 16, 2012.
13              Am I to take that that your intention and --
14    I'll take that as your intention was that Mr. Eagan was
15    no longer a partner as of February 17, 2012?
16         A    I don't think that's entirely true.
17         Q    Okay.
18         A    I think that's a complicated issue.
19         Q    Well, why don't you tell me why you think
20    this -- when do you think Mr. Eagan ceased being a
21    partner of Eagan Avenatti?
22              MR. HODGES:  Foundation.
23              THE WITNESS:  At some point between February
24    16, 2012, and certainly prior to the appointment of the
25    Receiver.
```

77

**Exhibit D**

USAO_00059949
00059979

```
 1        Q    BY MR. STOLPER:  Okay.  So, previously, I
 2   asked you when Mr. Eagan said -- when I asked you when
 3   Mr. Eagan withdrew from the partnership, you testified
 4   it was 2012.
 5             Now is it your testimony that Mr. Eagan may
 6   have been a partner at Eagan Avenatti up until
 7   Mr. Reitman was appointed Receiver?
 8        A    No, that's not my testimony, and that's not
 9   what I said.  What I said was that he had dissociated
10   from the firm, in my view, back in 2012, and in his
11   view, as evidenced by the document; but that that's
12   different than withdrawing as a partner.
13        Q    Okay.  My question is -- it's not supposed to
14   be a trick question, Mr. Avenatti.
15             When did Michael Eagan, in your mind, cease
16   being a partner of Eagan Avenatti?
17             MR. HODGES:  Legal conclusion; foundation.
18             MR. STOLPER:  I asked for what his perception
19   was.
20             MR. HODGES:  Relevancy.
21             THE COURT:  Well, I understood Mr. Avenatti
22   has given a date as to when Mr. Eagan dissociated from
23   the firm.
24             How are you using that term, sir?  Does that
25   mean something different than no longer being a
```

78

**Exhibit D**

USAO_00059950
00059979

```
 1   partner?
 2             THE WITNESS:  Your Honor, that's a legal -- I
 3   believe that's a legal term as it relates to
 4   partnership law, as opposed to formal withdrawal for
 5   giving up your partnership interest.  And my
 6   understanding is that those are two different legal
 7   terms, but I'm not an expert on partnership law.
 8             THE COURT:  So as I understand the objection
 9   here, you have a recollection and are willing to give
10   testimony about when Mr. Eagan dissociated from the
11   firm, but feel it would be a legal conclusion to
12   testify as to when he was no longer a partner at the
13   firm?
14             MR. HODGES:  Yes, that's correct.
15             THE COURT:  When did he dissociate from the
16   firm?
17             THE WITNESS:  Well, pursuant to the
18   agreement, I mean, I believe it's February 16, 2016.
19             MR. STOLPER:  I apologize, Your Honor.  I
20   don't understand the distinction.  Does Mr. Eagan own
21   an interest in Eagan Avenatti or not, is kind of where
22   I'm going?
23             THE WITNESS:  He doesn't.
24             MR. STOLPER:  Okay.  When did Mr. Eagan stop
25   having an interest in Eagan Avenatti?
```

79

**Exhibit D**

USAO_00059951
00059979

```
 1              THE WITNESS:  That calls for a legal

 2    conclusion because it -- it goes to when he ceased

 3    being a partner.

 4              MR. STOLPER:  And I --

 5              THE WITNESS:  He doesn't -- he doesn't

 6    currently have an interest in the firm, and he has not

 7    had an interest in the firm since Mr. Frank got his

 8    judgment, so that should end the inquiry.

 9              MR. STOLPER:  Your Honor, I apologize.  I

10    really am trying to ask -- I feel like I'm being forced

11    to ask the magic question, as opposed to just a good

12    one.

13              My question is simple:  When did Mr. Eagan

14    cease being a partner of Eagan Avenatti, in

15    Mr. Avenatti's mind?  I'm not interested in the legal

16    conclusion.  I'm interested in his perception of when

17    his partner left him.

18              THE COURT:  All right.  Well, with that

19    limitation, I'm not asking you for a legal opinion,

20    just asking you for when you thought that Mr. Eagan no

21    longer had an ownership interest in the firm.

22              Is that a question you can respond to?

23              THE WITNESS:  I don't recall.

24         Q    BY MR. STOLPER:  Okay.  Was it before or

25    after the bankruptcy?
```

80

**Exhibit D**

USAO_00059952
00059979

```
 1        A    I don't recall.

 2        Q    So it's possible that Mr. Eagan -- in your

 3   mind, Mr. Eagan was still your partner at the time of

 4   the bankruptcy?

 5        A    Sir, there's all kinds of things that are

 6   possible.

 7        Q    Well, I'm asking what your perception is,

 8   Mr. Avenatti.  It's not -- again, whether, in a

 9   two-person partnership, this person is your partner, I

10   don't think, is a difficult question.

11             I just -- I'm trying to get to an answer

12   here, which is at what point in time did Mr. Eagan, in

13   your mind, cease to be your partner?  Or has he?

14        A    Sir, he is no longer a partner in the firm.

15   He dissociated from the firm in February of 2012, which

16   is reflected in the agreement.

17        Q    But dissociating from the firm and leaving

18   the partnership aren't the same things in your mind,

19   sir?

20        A    Well, again, now we're getting into a legal

21   conclusion as to whether, in fact --

22             THE COURT:  Well, I think he's just asking

23   you whether you think those are different things.

24             THE WITNESS:  And I do.

25        Q    BY MR. STOLPER:  Okay.  What is the
```

81

**Exhibit D**

USAO_00059953
00059979

```
 1    distinction that you're drawing between dissociating
 2    from the firm and leaving the partnership?
 3         A    There are legal differences between
 4    dissociating from a firm and withdrawing as a
 5    partnership from the firm, relating to equity and the
 6    legal consequences associated with that.  That's my
 7    understanding.
 8         Q    Let me ask, when did Mr. Eagan formally
 9    withdraw from Eagan Avenatti?
10              MR. HODGES:  Assumes facts; foundation.
11              THE WITNESS:  I don't recall.
12         Q    BY MR. STOLPER:  Did Mr. Eagan formally
13    withdraw from Eagan Avenatti?
14         A    I believe it is reflected on the document,
15    yes.
16              THE COURT:  So --
17              THE WITNESS:  Yes.
18              THE COURT:  -- we're using the term "formally
19    withdraw."  Is that the equivalent of "dissociating"?
20              MR. STOLPER:  I'm sorry.  I don't mean to
21    laugh, Your Honor.  I'm just trying to understand when
22    Mr. -- if he's saying Mr. Eagan left the partnership.
23    I don't understand the difference between leaving the
24    partnership and dissociating.  What's left behind?
25    I feel like Mr. Frank -- I candidly feel Mr. Avenatti
```

82

**Exhibit D**

USAO_00059954
00059979

```
 1   is being evasive as to this point.
 2           THE COURT:  Well, I think you're trying to --
 3   as I understand it, you're trying to get -- as a
 4   partner, he had certain rights to certain income, and
 5   maybe we could just ask directly.
 6           Does he still have rights to income?
 7           THE WITNESS:  No.
 8           THE COURT:  When did he lose those rights?
 9           THE WITNESS:  He lost them, I mean, at least
10   a year ago, if not years ago.  He doesn't have any
11   right to any income, Your Honor, and he hasn't had any
12   right to any income since Mr. Frank got his judgment.
13           MR. STOLPER:  So at least a year ago and
14   perhaps years ago doesn't actually give me an answer,
15   Your Honor.
16           THE COURT:  Well, I guess his point, does it
17   matter?  If it is something that happened before the
18   judgment, you know, what does having a cutoff there
19   matter?
20           MR. STOLPER:  Your Honor, when Mr. Eagan
21   departed the partnership matters for a whole host of
22   reasons, not the least of which is, as Mr. Avenatti has
23   alluded to, once he leaves the partnership, it may no
24   longer be a partnership, it may no longer provide
25   Mr. Avenatti or, frankly, Mr. Eagan, the protections of
```

83

**Exhibit D**

USAO_00059955
00059979

1    being an LLP.  That's one issue.

2            The second issue is whether or not Mr. Eagan

3    authorized certain fraudulent transfers, which we're

4    going to be talking about hopefully soon.  And I intend

5    to ask Mr. Avenatti about Mr. Eagan's management role

6    in the partnership, certainly, since 2012.

7            So, again, Your Honor, basic questions about

8    the entity, who is the judgment debtor, are perfectly

9    permissible in judgment debtor exams.  This is a

10   partnership.  I'm simply asking who are the partners

11   and when did they leave.  It is not meant to be -- I

12   mean, candidly, it's not meant to be a game of cat and

13   mouse over what "dissociated" means versus "leaving the

14   partnership."

15           I've asked Mr. Avenatti a crisp question.

16   When was Michael Eagan no longer a partner of Eagan

17   Avenatti?  And I've been given an answer of sometime

18   between the last year and 2012.  I would like a better

19   answer than that.

20           If he doesn't have any idea, doesn't recall,

21   can't say, I will accept that answer and move on.  But

22   then I intend to impeach Mr. Avenatti with some of his

23   other statements he's made along the way about the role

24   of Mr. Eagan to try and get some clarity on this

25   critical point to the judgment creditor.

84

**Exhibit D**

USAO_00059956
00059979

```
 1              THE COURT:  Well, I did understand him to be
 2   saying that he had a date when he was dissociated, and
 3   he did not have a date or know a date when he was no
 4   longer a partner.
 5              MR. HODGES:  You're correct, Your Honor.
 6       Q    BY MR. STOLPER:  Did Mr. Eagan receive any
 7   payments from the firm after February 16, 2012?
 8       A    I'm sure he did.
 9       Q    And those were payments he was entitled to?
10       A    If he received payments, and I'm almost
11   certain that he did, yes, they would have been payments
12   he was entitled to.
13       Q    So dissociated with the firm means he doesn't
14   work there, but he's still entitled to payments from
15   the firm; is that correct, sir?
16       A    I don't understand your question, sir.
17       Q    Well, I'm trying to understand, when you say
18   he dissociated from the firm in 2012, why he's getting
19   payments after 2012?
20       A    Sir, even if he was dissociated, that would
21   not necessarily mean he was not entitled to payments
22   from the firm.
23       Q    Why was Mr. Eagan entitled to payments from
24   the firm after he dissociated?  What is the basis for
25   his receiving those payments?
```

**Exhibit D**

USAO_00059957
00059979

```
 1              MR. HODGES:  Legal conclusion, Your Honor.
 2      Foundation.
 3          Q    BY MR. STOLPER:  Well, why did you pay him
 4      that money?
 5          A    What money?  I don't understand the
 6      foundation.  What money?  Are there specific payments
 7      you want to ask me about from 2012 or '13 or '14 or '15
 8      that predate Mr. Frank's judgment by years?  And if so,
 9      why?
10              MR. STOLPER:  Again, Your Honor, I'm just
11      trying understand -- trying to get answers to my
12      question.
13          Q    BY MR. STOLPER:  To the extent Mr. Eagan was
14      receiving payments from Eagan Avenatti after February
15      16, 2012, what would be the basis for providing money
16      to someone who you testified was already dissociated
17      from Eagan Avenatti?
18              MR. HODGES:  Lacks foundation; assumes facts;
19      incomplete hypothetical.
20              THE COURT:  Well, I understand Mr. Avenatti
21      has said that there were some payments made.  I
22      understand the nature of the question is just were they
23      being made because there was a contractual obligation,
24      a partnership obligation?
25              Why were assets of Eagan Avenatti being paid
```

86

**Exhibit D**

USAO_00059958
00059979

```
 1    to Mr. Eagan at that point, if you know?

 2          THE WITNESS:  I -- I don't recall, Your

 3    Honor.  I'm sure they were paid for any number of

 4    reasons, and Your Honor referenced a couple of them.

 5      Q    BY MR. STOLPER:  So you can't remember why

 6    Mr. Eagan was receiving payments?

 7      A    Mr. Stolper, if you'd like to ask me about a

 8    specific payment, then I will endeavor to try to answer

 9    your question, although I don't know that I'll be able

10    to without the backup or some -- something else to

11    refresh my recollection.

12      Q    Mr. Avenatti, after February 16, 2012, did

13    Mr. Eagan have a management role at Eagan Avenatti?

14      A    I don't know what you mean by "management

15    role."

16      Q    I mean, you testified he was dissociated.  We

17    have learned he was getting payments after February 16,

18    2012.

19          Can he be disassociated with a firm and

20    simultaneously be a manager of it?

21      A    I don't know.  I think that calls for a legal

22    conclusion.

23      Q    Well, from your perspective, was Mr. Eagan

24    helping you manage Eagan Avenatti after February 16,

25    2012?
```

87

**Exhibit D**

USAO_00059959
00059979

```
1        A    I don't know.  I'd have to -- I'd have to
2   contemplate that because I don't know what you mean by
3   "manage."  He certainly wasn't managing the day-to-day
4   operations of the firm.
5        Q    Was he managing any operations of the firm
6   after February 16, 2012?
7        A    As I sit here right now, I don't know.
8        Q    So it's possible, in your mind, that
9   Mr. Eagan dissociated from the firm on February 16,
10  2012, and yet still had some management role?
11            MR. HODGES:  This was --
12            THE COURT:  I think we have covered that.
13       Q    BY MR. STOLPER:  In the document that has
14  been marked as 47, you stated that "Mr. Eagan has no
15  management responsibility at the firm, nor was he a
16  party to any financial decisions of the firm.  For the
17  avoidance of all doubt, at all times, those decisions
18  were left to the sole and absolute discretion of
19  Michael Avenatti."
20            Does that refresh your recollection as to
21  whether or not you believed that Mr. Eagan had any
22  management role at Eagan Avenatti after February 16,
23  2012?
24       A    It does not.
25       Q    What management role, if any, do you believe
```

88

**Exhibit D**

USAO_00059960
00059979

1    Mr. Eagan had after February 16, 2012, at Eagan

2    Avenatti?

3                MR. HODGES:   Your Honor, this is

4    argumentative.   This has now been asked four times.

5                THE COURT:   Instead of focusing on

6    management, can we focus on something that would have

7    to do with control of assets, signatory bank account,

8    something that would be more direct at figuring out if

9    Mr. Eagan was directing or in charge of money, since

10   that's the focus of what we're doing here?

11               THE WITNESS:   Mr. Eagan never directed any

12   monies, Your Honor.   Okay?   He wasn't a signatory on

13   any bank accounts.   They know that.   I don't -- I don't

14   understand what we're doing.

15       Q    BY MR. STOLPER:   Did Mr. Eagan ever negotiate

16   on behalf of the firm after February 16, 2016, the

17   terms of payments with Eagan Avenatti's clients?

18               MR. HODGES:   Speculation; foundation.

19               THE COURT:   He's asking if you know.

20               THE WITNESS:   He may have.   As I sit here

21   now, I don't recall.

22       Q    BY MR. STOLPER:   Did Mr. Eagan have input

23   into Mr. Frank's contract with Eagan Avenatti that gave

24   rise to this proceeding?

25       A    I don't believe so.

**Exhibit D**

USAO_00059961
00059979

```
 1        Q    Did Mr. Frank have any --
 2        A    Oh, wait a minute.  I don't know what you
 3   mean by that.  When you say =- are you talking about
 4   when it was originally negotiated?
 5        Q    Yes.
 6        A    Or otherwise?
 7        Q    At any point in time.
 8        A    He may have.  I don't remember if I consulted
 9   with him on it or -- but, I mean, he may have.  I just
10   don't remember.
11        Q    Did Mr. Eagan have input into Mr. Sims'
12   employment contracts?
13             MR. HODGES:  Relevancy; beyond the scope.
14   With all respect, this is intended --
15             THE COURT:  I mean, if he had input or if he
16   didn't have input, how is that going to help you find
17   assets?
18             MR. STOLPER:  Because we're trying to show
19   that Mr. Eagan exercised control of the firm or didn't,
20   so we know whether or not we can pursue either
21   Mr. Eagan individually or possibly Mr. Avenatti
22   individually.  That's why.
23             MR. HODGES:  That's actually beyond the scope
24   of a judgment debtor exam.  The issue here is focused
25   on assets of the entity or liabilities of the entity,
```

**Exhibit D**

USAO_00059962
00059979

```
 1   not the viability of claims based on questions that go
 2   beyond the scope of the order.
 3            MR. STOLPER:  Your Honor, if I may, it also
 4   goes to the question of fraudulent transfer.
 5            We're trying to establish whether or not
 6   Mr. Eagan had any controls over things like employee
 7   agreements, client agreements.  Mr. Avenatti has
 8   testified he didn't have any control over money.  But,
 9   with due respect, Your Honor, I want to explore this
10   more because the record is quite muddy.
11            Mr. Avenatti has said he was dissociated from
12   the firm, yet he managed the firm and got payments, and
13   he may or may not have been a partnership.  It is a
14   hodgepodge of, frankly, contradictory testimony.  And
15   so I want to really delve into it and try and get
16   clarity as to what Eagan's role was.
17            THE COURT:  In the time that remains, it
18   would seem to the court that rather than delving into
19   that, that trying to ask some questions that are more
20   specifically focused on following money and who was
21   moving money where might be better at trying to locate
22   assets against which the judgment can be collected.
23            MR. STOLPER:  Very well, Your Honor.  I'll
24   move on to a different topic.
25            THE WITNESS:  Your Honor, can we take a lunch
```

91

**Exhibit D**

USAO_00059963
00059979

```
 1   break now?

 2            THE COURT:  We had talked about doing it at

 3   12:00.  It's 12:20.  Are there any objections to doing

 4   that?

 5            MR. STOLPER:  None, Your Honor.

 6            THE COURT:  All right.  Since we have got a

 7   subject matter break, we'll break for lunch.  Everyone

 8   will be back in an hour.

 9            THE CLERK:  This court now stands in recess.

10            (Recess taken.)

11       Q    BY MR. STOLPER:  Did Avenatti & Associates

12   work on Greco v. NFL?

13       A    Yes, among other firms.

14       Q    Did Avenatti, LLP, work on Greco versus NFL?

15       A    No.

16       Q    Did the office of Mr. Ayers work on Greco

17   versus NFL?

18       A    Yes, among other things.

19       Q    What other firms worked on Greco versus NFL?

20       A    I don't remember all the firms.  I named

21   previously a number of firms and attorneys that worked

22   on the case.

23       Q    Did the clients in Greco versus NFL have a

24   written fee agreement with Eagan Avenatti?

25       A    I don't recall.
```

92

**Exhibit D**

USAO_00059964
00059979

```
 1        Q    Have you produced fee agreements between

 2   Eagan Avenatti and the plaintiffs in Greco versus NFL?

 3             MR. HODGES:   Asked and answered, Your Honor.

 4   That was covered before Your Honor took the bench.  He

 5   asked the specific question of whether or not all

 6   retainers were turned over to both his client and to

 7   the Receiver; and, in fact, Receiver's counsel brought

 8   it up.

 9             THE WITNESS:   I don't recall.  These have

10   been retainer agreements from back in, I think, 2011 or

11   2012.  I just don't remember.

12        Q    BY MR. STOLPER:  You don't know if you

13   produced those to JFL Law?

14        A    I don't remember.

15        Q    Did you produce retainer agreements to the

16   Receiver in this case?

17        A    No.  And there would be no need to because

18   that's not an open matter.

19        Q    Did the Receiver ask for the retainer

20   agreements?

21        A    Not for the NFL case.

22        Q    Now, Mr. Avenatti, is there a written fee

23   agreement between Avenatti & Associates and the

24   plaintiffs in the NFL case?

25        A    There may have been.  I don't remember.
```

**Exhibit D**

USAO_00059965
00059979

1      Q    Have those been produced, either to the

2    Receiver or to JFL Law?

3      A    Well, the Receiver never requested them

4    because, again, this is an old matter.  I don't know if

5    they were produced to JFL or not.

6      Q    Do you recall taking steps to find the

7    Avenatti & Associates retainer agreement, if any, and

8    producing those to JFL Law?

9      A    I don't have specific recollection of doing

10   that, but that doesn't mean it didn't happen.

11     Q    As part of the Eagan Avenatti Bankruptcy, he

12   was required to file with regard to money he was taking

13   in; is that correct?

14          MR. HODGES:  Foundation; speculation.

15          THE WITNESS:  I don't know what was required

16   to be filed or wasn't required to be filed.  We had

17   bankruptcy counsel to handle the filing.

18          (Exhibit 4 was marked.)

19     Q    BY MR. STOLPER:  I placed on the Elmo Exhibit

20   4, a document filed in the bankruptcy, document

21   8:17-bk-11961-CB.

22          Does this form of report look familiar to

23   you, Mr. Avenatti?

24     A    Okay.  I've seen this form before.  I think

25   this one is from -- what? -- June of '17.

**Exhibit D**

USAO_00059966
00059979

```
1        Q    Actually, it's from May of 2017.

2             It says for the month ending 5/31/2017; is

3    that correct?

4        A    That's what -- that's what it says.

5        Q    Okay.  And you signed each and every one of

6    these monthly operating reports under penalty of

7    perjury; correct, sir?

8        A    I don't know if I signed every one of them.

9        Q    Okay.  But you signed this one under penalty

10   of perjury; isn't that correct, sir?

11       A    Actually, if I could see the signature and

12   what the attestation is, I'd like to do that before I

13   answer the question.

14       Q    Sure.  Page 19, "I, Michael J. Avenatti,

15   Managing Partner, declare under penalty of perjury that

16   I have fully read and understood the foregoing

17   debtor-in-possession operating report and that the

18   information contained herein is true and correct to the

19   best of my knowledge."

20            That's your signature after that; correct,

21   sir?

22       A    That's correct, yeah.

23       Q    Going back to the first page of the operating

24   report, this is information that you certified was true

25   and correct; correct, sir?
```

95

**Exhibit D**

USAO_00059967
00059979

```
1        A     Sir, all of the information in the report I

2   attested to pursuant to the language that you just

3   read, including that it was true to the best of my

4   knowledge, etc.

5        Q     Okay.  Now, one of the things that you

6   certified was true and correct, that during the period

7   of May of 2017 to July 31, 2017, the accounts

8   receivable post-filing were $409,953.70; correct?

9             MR. HODGES:  Misstates the record.

10            THE WITNESS:  Yeah, that's not correct.

11       Q     BY MR. STOLPER:  Receipts during current

12   period, accounts receivable post-filing $409,953.70.

13            Did the I read that correctly?

14       A     Well, you read the number correctly.

15       Q     All right.  What do you understand that

16   number to be?

17       A     $409,953.70.

18       Q     What does it represent, though?

19       A     I don't know what it represents.

20       Q     Well, when you signed this -- when you filed

21   this document under penalty of perjury and you attested

22   to this number, $409,953.70, what were you attesting

23   to, sir?

24       A     Sir, I don't remember what I was attesting to

25   at the time.  These documents were prepared by our
```

**Exhibit D**

USAO_00059968
00059979

```
 1   bankruptcy counsel and presented to me for signature.

 2        Q    Okay.  So would it be fair to say that at the

 3   time, you understood the receipts during the current

 4   period accounts receivable post-filing to be --

 5             THE COURT REPORTER:  Counsel, please start

 6   your question again.

 7        Q    BY MR. STOLPER:  At the time you signed this

 8   document, which is document 126, which has been marked

 9   as Exhibit 4, you swore under penalty of perjury that

10   the receipts during current period, accounts receivable

11   post-filing is $409,953.70; correct?

12        A    No, that's not correct.  Not in the way --

13   not in the way that you are using these terms.

14        Q    What is incorrect about the question?

15             MR. HODGES:  Object to the form, Your Honor.

16   It's argumentative.

17             THE COURT:  I think what he had previously

18   said is that he attested to the accuracy of the numbers

19   pursuant to the attestation language in the form.

20             THE WITNESS:  Yes.

21             THE COURT:  So he's disputing that that's the

22   same as swearing under penalty of perjury.

23             MR. STOLPER:  Understood.  Okay.

24        Q    BY MR. STOLPER:  Is that number true?  Was

25   that number true and correct when you signed this
```

**Exhibit D**

USAO_00059969
00059979

```
 1   attestation?

 2        A    That -- sir, I don't recall as I sit here

 3   now.  I have no idea.

 4        Q    Well, you wouldn't have signed the

 5   attestation if you thought that number was wrong; is

 6   that correct, Mr. Avenatti?

 7        A    Well, sir, as a general proposition, I don't

 8   sign documents under that attestation that I know to be

 9   false.  But, again, I mean, it's to the best of my

10   knowledge, and these documents were prepared by

11   bankruptcy counsel.

12        Q    Okay.  As part of this, it asks what the

13   general account numbers are for Eagan Avenatti while

14   it's in bankruptcy.  And there's two different numbers

15   there, 2851 and 0313.

16             Do you see that?

17        A    I see that.

18        Q    And you understand that while Eagan Avenatti

19   is in bankruptcy, it's supposed to be depositing the

20   money it's taking into the account that is under

21   supervision of the bankruptcy court; correct?

22        A    No.

23        Q    You didn't understand that all receipts must

24   be deposited into the general account, as it says at

25   the bottom of the form?
```

98

**Exhibit D**

USAO_00059970
00059979

1      A    Sir, what I understood was that I should be

2    taking direction from our bankruptcy counsel that we

3    paid an enormous amount of money to in connection with

4    the bankruptcy.

5      Q    Do you see on the form, Mr. Avenatti, where

6    it says, "All receipts must be deposited into the

7    general account"?

8           Did I read that correctly?

9      A    Yeah, I see that statement on the page.

10     Q    Okay.  Did you follow that direction in the

11   course of the bankruptcy of Eagan Avenatti?  Were you

12   depositing the receipts into the general account?

13     A    Sir, I don't recall exactly what the deposit

14   or the deposit procedure was on each and every deposit.

15   What I do know is that we routinely sought counsel from

16   our bankruptcy counsel, as well as Epic's counsel, and

17   that we did everything aboveboard.

18     Q    Again, I'm just asking a logistical question.

19          Do you have any specific recollection of

20   taking money for Eagan Avenatti and depositing it

21   somewhere other than the general account that you set

22   forth on the bankruptcy schedule?  Those are the

23   accounts numbered 2851 and 0313.

24     A    Sir, I don't have recollection one way or the

25   other because I generally don't deposit the monies.

99

**Exhibit D**

USAO_00059971
00059979

```
 1        Q    Okay.  Now, as part of this operating report,
 2   you attached the bank records for those two account
 3   numbers; correct, sir?
 4             MR. HODGES:  Foundation.
 5             THE WITNESS:  I don't remember that.  First
 6   of all, I didn't attach anything because bankruptcy
 7   counsel handled all these filings.
 8        Q    BY MR. STOLPER:  Attached to this document
 9   are bankruptcy -- are account documents; correct, sir?
10        A    I don't know whether that's true or false.
11        Q    Okay.  Well, you can look at document number
12   126, page 20 of 36 -- it's the same filing on PACER --
13   and it has California Bank and Trust, and it has
14   account number 0313.
15             Do you see what I'm pointing to, sir?
16        A    Yeah, I see what you're pointing to.
17        Q    It says, "Eagan Avenatti, LLP, debtor in
18   possession account"; correct?
19        A    Your Honor, can I --
20             MR. HODGES:  Can I have a moment, Your Honor?
21             THE COURT:  You can confer with counsel.
22             (Attorney-client discussion.)
23             THE WITNESS:  I'm sorry.  The question?
24        Q    BY MR. STOLPER:  In addition to having that
25   same bank account number, it says, in terms of the
```

**Exhibit D**

USAO_00059972
00059979

```
 1    account title, "Eagan Avenatti, LLP, debtor in
 2    possession account"?
 3        A    You're asking me if that's what this page
 4    says?
 5        Q    Yes.
 6        A    Yes, that's what this page says.
 7        Q    And this was an account you opened or you
 8    caused to be opened when Eagan Avenatti was the debtor
 9    in possession; correct, sir?
10        A    I don't know if that's true or false.  I'm
11    assuming that's true based on what the title of the
12    account is.
13        Q    Okay.  You don't recall, as managing partner
14    of Eagan Avenatti, setting up a debtor --
15             THE COURT REPORTER:  Counsel, I need the
16    question again.
17        Q    BY MR. STOLPER:  You don't recall, as the
18    managing partner of Eagan Avenatti, setting up a debtor
19    in possession account as part of the bankruptcy of
20    Eagan Avenatti?
21        A    Sir, this is almost two years ago, and
22    there's a lot that has transpired in my life over the
23    last two years.  I don't have a firm recollection of
24    opening this account.
25        Q    Okay.  In addition to attaching that account,
```

101

**Exhibit D**

USAO_00059973
00059979

```
 1    you also attached the other account you specified on

 2    the first page of your schedule, 2851.

 3            Do you see that?

 4            THE COURT:  I do think he said he didn't

 5    attach things.  Bankruptcy counsel attached it.  But

 6    with that modification --

 7       Q    BY MR. STOLPER:  Is that correct, sir?

 8       A    I'm sorry.  I lost the question.

 9       Q    I'll reask, Your Honor.

10       A    The document says that number, sir.

11       Q    And that is the -- that is the California

12    Bank and Trust account that you caused your counsel to

13    file that is the Eagan Avenatti, LLP, account; correct?

14       A    No, that's not correct.  I didn't cause my

15    counsel to file this, okay?  I'm not an expert on

16    bankruptcy law or the requirements of being in

17    bankruptcy.  So we followed direction from our counsel

18    as to the receipt of monies, posting of monies, the

19    filling out of reports, the filing of documents and

20    bank statements and the like.

21       Q    Okay.  Now, on this bank record that was

22    filed by your counsel in the Eagan Avenatti bankruptcy,

23    it shows on May 17, 2017, a wire in.

24            Do you see where I've circled that?  And it's

25    page 23 of 36 of the exhibit.
```

**Exhibit D**

USAO_00059974
00059979

```
 1        A    I see the -- I see the -- the entry.

 2        Q    Okay.  And it's an entry for -- it says,

 3   deposits, wire in, $408,723.70, Org Ayers Law Office.

 4             Did I read that correctly?

 5        A    Yes.

 6        Q    And that's money that Eagan Avenatti, LLP,

 7   received from the Ayers Law Office; correct, sir?

 8        A    I'm assuming so.  I don't have a independent

 9   recollection of this transaction.

10        Q    I understand.

11             But you do have an independent recollection

12   that the Ayers Law Office was your co-counsel on Greco

13   v. The NFL; correct, sir?

14        A    The Ayers Law Office was our co-counsel on --

15   on a number of matters.

16        Q    But one of them was Greco v. The NFL;

17   correct, sir?

18        A    Yes.  We've already established that,

19   together with a bunch of other attorneys and firms.

20        Q    And this $408,723 is money that Eagan

21   Avenatti received as part of the settlement of Greco

22   versus NFL; correct, sir?

23        A    I don't recall that.

24        Q    You're not sure if -- we'll come back to that

25   in a minute.
```

**Exhibit D**

USAO_00059975
00059979

```
 1              Mr. Avenatti, as part of your obligations of
 2    being a debtor in possession, you sat for a -- what's
 3    called a 341(a) hearing.
 4              Do you recall that?
 5         A    I recall sitting for one, but I don't think
 6    it was complete.
 7         Q    That's fine.  And, sir, do you recall
 8    testifying in your 341(a) hearing concerning whether or
 9    not you had separate attorney-client trust accounts
10    besides the one for Eagan Avenatti?
11         A    Sir, I don't have a recollection of that.  I
12    don't remember when the 341(a) exam was.  I also
13    understood that I had the ability to review the
14    transcript and make changes, I think, and also it was
15    not complete, so I -- I don't recall saying that.
16         Q    Okay.  Well --
17         A    I don't recall being asked that question.
18         Q    Maybe I can refresh your recollection.  This
19    is page 187 and 188 from the June 12, 2017,
20    341(a) hearing.  And I'm going to go ahead and read.
21              "Do you maintain a separate office for the
22    practice of law apart from Eagan Avenatti, LLP?"
23              Answer, "I don't know what you mean by that.
24    Well, I do have a separate physical location."
25              That's one question.
```

**Exhibit D**

USAO_00059976
00059979

```
 1              "Separate and apart from the Law Office of

 2      Eagan Avenatti?"

 3              "Correct."

 4              "A different location?"

 5              "No."

 6              "Do you have a separate phone number for your

 7      practice" --

 8              "Do you have a separate phone number for your

 9      practice as Michael Avenatti?"

10              "Yes."

11              Question, "Do you maintain separate

12      malpractice insurance?"

13              "No."

14              "Do you maintain separate trust accounts?"

15              "From time to time, I have, yes."

16              "Do you currently?"

17              "No, I don't believe so."

18              That's your testimony on June 12, 2017;

19      correct?

20              MR. HODGES:  Well, Your Honor, lacks

21      foundation.  There's been no foundation laid that this

22      document is from that transcript or that that is the

23      official transcript at all.

24              In fact, I didn't even see reference to

25      Mr. Avenatti's name other than in the context of a
```

105

**Exhibit D**

USAO_00059977
00059979

1  question.

2       THE COURT:  Are you asking him if he

3  remembers independently giving that testimony?

4       Q    BY MR. STOLPER:  Do you remember that,

5  Mr. Avenatti?

6       A    Sir, I -- I don't remember independently, and

7  I don't think that was the totality of the testimony on

8  that topic.

9       Q    I'm handing the witness the totality of

10  testimony from June 12, 2017.  I direct the witness to

11  the pages that I just read, specifically pages 187 and

12  188.  I'd ask the witness to confirm that that was, in

13  fact, his testimony under penalty of perjury; that he

14  did not currently, as of June 12, 2017, maintain a

15  separate trust account.

16       A    Sir, this doesn't refresh my recollection.

17       Q    Okay.  Does it refresh your recollection that

18  you -- well, let me ask you a question, Mr. Avenatti.

19       Did you maintain a separate trust account on

20  June 12, 2017?

21       A    I -- well, I don't understand your question

22  when you say "you."  But, generally, I -- I may have.

23  I don't know.

24       Q    So now your testimony is it's possible on

25  June 12, 2017, you may have maintained a separate trust

106

**Exhibit D**

USAO_00059978
00059979

```
 1   account, notwithstanding your testimony that on June

 2   12, 2017, in the judgment debtor -- excuse me -- in the

 3   341(a) exam that, "No, I don't believe so."

 4              MR. HODGES:  Lacks foundation; argumentative.

 5              THE COURT:  Do you want to rephrase that

 6   question with the "you" being clarified.  I think that

 7   was the source of confusion.

 8        Q    BY MR. STOLPER:  The question, Mr. Avenatti,

 9   is:  Did you maintain a separate attorney-client trust

10   account on June 12, 2017?

11        A    It's the same answer, sir.  I may have.  I

12   don't recall.  And I don't know what you mean by "you."

13        Q    You don't understand when I say "you," what I

14   mean?

15              MR. HODGES:  Argumentative.

16              THE COURT:  When I read the testimony that

17   was on the screen, it seemed to refer to having a

18   client trust account for Eagan Avenatti, a client trust

19   account for Mr. Avenatti, individually.

20              MR. STOLPER:  Separate from Eagan Avenatti,

21   correct.

22        Q    BY MR. STOLPER:  Did you maintain an

23   attorney-client trust account separate from Eagan

24   Avenatti on June 12, 2017?

25        A    Sir, I may have.  I don't recall as I sit
```

**Exhibit D**

USAO_00059979

00059979

```
 1   here.
 2        Q    Do you have any explanation as to why your
 3   testimony at the 341(a) hearing states clearly to the
 4   creditors of Eagan Avenatti that you were not
 5   maintaining a separate attorney-client trust account at
 6   that time?
 7        A    Well, sir --
 8             MR. HODGES:  Foundation; argumentative.
 9             THE WITNESS:  -- I don't agree with your
10   characterization of the testimony.  You haven't dealt
11   with the entirety of my testimony during the 341, and
12   the 341 was never complete, to the best of my
13   knowledge.  And I was never permitted an opportunity to
14   review my testimony to make any corrections or
15   additions, nor was my counsel permitted to ask
16   follow-up questions to clarify answers that I had
17   given.  So I don't agree with the predicate of your
18   question.
19             You asked me did I maintain a separate trust
20   account as of that date.  I may have.  I don't recall.
21        Q    BY MR. STOLPER:  Okay.  Could you flip to
22   page 182 of the 341(a) hearing, please.
23        A    Okay.
24        Q    I'll go ahead and read.
25             "Going back, I know we talked a lot about B75
```

108

**Exhibit D**

USAO_00059980
00059979

1        of the schedules of the roughly 20 lawsuits.  Is

2   -- did Eagan Avenatti file a lawsuit against the NFL in

3   connection with the Super Bowl?

4            Answer, "Yes."

5            Question, "Is that on the list?"

6            Answer, "No."

7            Question, "Why not?"

8            "Because it wasn't pending at the time the

9   list was prepared."

10           "Was it pending as of March 1, 2017?"

11           "As of March 1, I believe so."

12           Question -- now, we're on page 183 -- "Did

13   you receive any counsel fees in that case?"

14           Answer, "No."

15           "By 'you,' I mean the debtor, Eagan Avenatti,

16   LLP."

17           "I -- I understood the question."

18           "Was there co-counsel in that case?"

19           "Yes."

20           "Who was co-counsel?"

21           "Chris Ayers."

22           "Is he at a law firm -- or she?"

23           "He had a law firm.  He had a law firm."

24           "What's the name of it?"

25           "I think it's the Ayers Law Office."

109

**Exhibit D**

USAO_00059981
00059979

```
 1          Sir, in your 341(a) hearing, you testified

 2   under penalty of perjury that Eagan Avenatti received

 3   no fees in the NFL case; correct?

 4     A    Sir, I don't -- I don't believe that's

 5   correct, okay.  And I think there's other testimony

 6   later on relating to this issue, so I'm not going to

 7   agree with the predicate of your question.

 8     Q    You were also asked in the 341(a) hearing

 9   whether or not you had co-counsel in the NFL case, and

10   you identified the Law Office of Chris Ayers.

11          THE COURT REPORTER:  Counsel, slow down.

12     Q    BY MR. STOLPER:  You were also asked in the

13   341(a) hearing whether you had co-counsel in the NFL

14   case, and you identified the Law Offices of Chris

15   Ayers; correct, sir?

16     A    I -- I don't have an independent recollection

17   of that, sir.  I've told you who worked on that case

18   and who were the co-counsel.  We've dealt with that at

19   least three times now.

20     Q    I understand.

21          Is it your testimony that in the

22   341(a) hearing on June 12, 2017, you also identified

23   Avenatti & Associates as co-counsel?

24     A    Sir, I don't know.  I may have.  I would have

25   to review the entirety of the transcript.
```

**Exhibit D**

USAO_00059982
00059979

1          Q     Okay.  Let's go ahead and turn to what's been

2     marked as Exhibit 7.

3                (Exhibit 7 was marked.)

4                Your Honor, Exhibit 7 is Mr. Avenatti opening

5     up a separate attorney-client trust account on May 17,

6     2017.  It was produced to us by City National Bank.  It

7     has no confidentiality designation.  I've redacted the

8     account numbers.

9                Permission to publish?

10               MR. HODGES:  Your Honor, we have a number of

11    objections to this document.  Number one, we've never

12    been provided with advance notice to actually make a

13    designation.  Had we done so -- in fact, we would like

14    that to be done now.

15               Second of all, there's no foundation with

16    respect to the representations by counsel as to what

17    this is.  There's no declaration from any custodian of

18    City National Bank that this is actually a true and

19    correct copy of any document pertaining to a trust

20    account of Mr. Avenatti.

21               Furthermore, this is beyond the scope of a

22    judgment debtor exam, and this pertains to

23    Mr. Avenatti's trust accounts, not one belonging to

24    Eagan Avenatti.

25               The document goes beyond just a mere couple

111

**Exhibit D**

USAO_00059983
00059979

1    of pages.  It also includes purported copies of

2    cancelled checks, which pertain to various clients, and

3    information that may reveal information that's

4    protected by confidential settlement agreements.

5            I just don't know the breadth of the issues

6    that this document creates and --

7            THE WITNESS:  And privileged.

8            MR. HODGES:  I beg your pardon?

9            THE WITNESS:  And privileged.

10            MR. HODGES:  I indicated that it may, in

11   fact, intrude on attorney-client privilege, so I would

12   object.

13            THE COURT:  Well, as to the notice issue, my

14   understanding is these were subpoenaed in the case, and

15   te subpoenas were served on all the parties.

16            MR. STOLPER:  That's correct, Your Honor.

17            THE COURT:  So there was information

18   available that these documents were being subpoenaed

19   and sought.  With regard to that there wasn't notice

20   ahead of time at the judgment debtor exam, that's not

21   typical that you would necessarily have a chance to

22   review all the proposed exhibits ahead of time.

23            If there's not foundation as to this

24   particular document, I think he's still got a chance to

25   ask if you remember anything about this account, and

112

**Exhibit D**

USAO_00059984
00059979

```
 1    he's using this to try and prompt your recollection.

 2    If you don't remember and you can't testify about it,

 3    then you can tell us that.  But I don't think it bars

 4    him asking the question.

 5            MR. STOLPER:  Thank you, Your Honor.

 6            MR. HODGES:  Your Honor, if I may, there are

 7    two issues that have not been addressed.  First and

 8    foremost, the issue of privilege as well as the concern

 9    expressed by the Receiver.  And I'd like to get these

10    documents to the Receiver and his counsel so he can

11    sound in, because this touches upon the precise concern

12    we articulated at the onset.

13            Secondly, it's my understanding of Your

14    Honor's protective order that we are allowed to

15    designate documents as confidential as they are

16    presented to us.  You correctly have stated that it is

17    not typical to get documents in advance of a judgment

18    debtor exam.

19            Certainly, the protective order was intended

20    to provide Mr. Avenatti and the firm certain

21    protections.  And this is the first opportunity we have

22    to avail ourselves of those protections, which is why I

23    am now asserting the issue and designating them as

24    confidential.

25            THE COURT:  How is this the first
```

113

**Exhibit D**

USAO_00059985
00059979

```
 1    opportunity, if you knew that these documents had been

 2    produced by the bank?

 3             MR. HODGES:  I speak for myself, Your Honor.

 4    I am not aware of any subpoena having been properly

 5    served.  I'm not suggesting one way or the other.  I

 6    was not involved in the process.

 7             THE COURT:  Right.  You were only recently

 8    retained.

 9             MR. HODGES:  But nonetheless, Your Honor, the

10    protective order was only something that was recently

11    issued by this court, and this is the first opportunity

12    that we have learned that they intend to utilize this

13    in a public proceeding.

14             THE WITNESS:  Your Honor, we were not given a

15    copy of the documents that were produced in response to

16    the subpoena.

17             THE COURT:  Did you request one?

18             THE WITNESS:  Yes.

19             THE COURT:  When did that happen?

20             THE WITNESS:  It happened some time ago

21    contemporaneous when we found out about this.  And by

22    the way, I will also note that I don't believe that we

23    were given proper advance notice of these subpoenas to

24    these banks.

25             In fact, we found out about it, in some
```

114

**Exhibit D**

USAO_00059986
00059979

```
 1   instances -- and as I sit here, I don't know if this
 2   was one of those instances, admittedly -- after the
 3   fact, okay.  We were purposely kept in the dark about
 4   this.
 5           We were not given a copy of the documents
 6   contemporaneous or at any point in time.  This is the
 7   first I've ever seen of these documents, so we
 8   absolutely are marking them confidential, Your Honor.
 9   And, also, they pertain to other clients that have no
10   relevance to these proceedings, and it invades the
11   attorney-client privilege, as well.
12           THE COURT:  What is the basis of the
13   privilege objection?
14           THE WITNESS:  Basis of the privilege
15   objection is that it -- that in some of these
16   instances, it shows settlement amounts and other monies
17   that were received on behalf of clients.  And that is,
18   one, confidential; and, number two, it's privileged.
19           THE COURT:  Does the Receiver have an
20   objection they want to voice?
21           MR. REITMAN:  One moment, Your Honor.
22           THE COURT:  Okay.
23           MR. STOLPER:  Your Honor, while they're going
24   through this, this issue was briefed before, Your
25   Honor, this very issue, the question of bank
```

115

**Exhibit D**

USAO_00059987
00059979

```
 1    statements.  Your Honor ruled on this issue to

 2    determine that bank statements are not confidential,

 3    and they're not, and that any argument that bank

 4    statements are privileged, as an attorney-client

 5    communication, I'm sorry, that doesn't pass.  That's

 6    simply -- that's not the law.

 7              These aren't communications between --

 8    regarding the subject matter of any litigation between

 9    any lawyer and any client.  These are checks and wires.

10    And that's what a judgment debtor exam is meant to

11    examine, and that's what I would like to examine now,

12    Your Honor.

13              MR. HODGES:  It is not a bank statement of

14    the judgment debtor.  I'm not going to argue with

15    counsel about the scope of a judgment debtor once he

16    actually starts asking questions about the assets and

17    liabilities of the judgment debtor.  We've been here

18    since this morning.  He's yet to ask that question.

19              THE COURT:  This is a trust account for --

20              MR. STOLPER:  So, Your Honor --

21              MR. HODGES:  That's correct.

22              MR. STOLPER:  What the evidence is about to

23    show, Your Honor, is that Mr. Avenatti took the NFL

24    settlement, which was an Eagan Avenatti case; and after

25    lying on the 341(a) hearing and saying he had no other
```

116

**Exhibit D**

USAO_00059988
00059979

```
 1    trust accounts, set up a separate, secret trust

 2    account, broke the NFL money up, and sent most of it to

 3    his secret account, denying Eagan Avenatti the majority

 4    of that money.

 5           This is Mr. Avenatti on May 7, 2017, the same

 6    day as the NFL wire came in, signing to set up his

 7    separate trust account.  That's the relevance of this,

 8    Your Honor.

 9           THE COURT:  Well, I'm going to allow

10    questions that go to that particular issue.

11           MR. STOLPER:  Thank you, Your Honor.

12           THE COURT:  If there are other transactions

13    that are extraneous, then either -- those can be

14    blocked out on the overhead projector.  They don't need

15    to be brought up if they're not relevant to that

16    particular line of questioning.

17           MR. STOLPER:  Very well, Your Honor.  Thank

18    you.

19      Q    BY MR. STOLPER:  Mr. Avenatti, is this your

20    signature?

21           THE WITNESS:  I'm sorry.  Did counsel want to

22    be heard?

23           MR. REITMAN:  Your Honor, the Court asked

24    whether the Receiver had objection.  The Receiver does

25    not object.
```

117

**Exhibit D**

USAO_00059989
00059979

```
 1              THE COURT:  Okay.
 2      Q    BY MR. STOLPER:  Mr. Avenatti, is that your
 3   signature on page 2 of the exhibit?
 4      A    Yes.
 5      Q    And is that the date 5/17/2017 -- May 17,
 6   2017?
 7      A    That's what it says.
 8      Q    And flipping to the next page, does that
 9   appear to be the signature of Judy Regnier?
10      A    Yes.
11      Q    And Ms. Regnier was the office manager of
12   Eagan Avenatti; correct?
13      A    Well, that was one of her roles, but not the
14   entirety.
15      Q    Okay.  But she was the office manager of
16   Eagan Avenatti; correct?
17      A    But she also worked for me individually, as
18   well as for Avenatti & Associates.
19      Q    Mr. Avenatti, is it true that you listed Judy
20   Regnier as an employee of Eagan Avenatti on your
21   bankruptcy schedule, including her monthly
22   compensation?
23      A    Sir, I'm not debating with you.  I'm not
24   debating with you that she was an employee of Eagan
25   Avenatti, but I am -- that only tells part of the
```

118

**Exhibit D**

USAO_00059990
00059979

1   story.

2       Q    Mr. Avenatti, were you paying Ms. Regnier

3   separately from Eagan Avenatti on May 17, 2017?

4       A    I may have been.  I don't recall.

5       Q    All right.  Mr. Avenatti, this is an account

6   agreement wherein you're setting up the Michael

7   J. Avenatti, Esquire, trust account; correct, sir?

8       A    This is the first time I've ever seen this

9   document, separate and apart from signing it, so the

10  document says what it says.

11      Q    Let me ask you more directly.

12           Mr. Avenatti, did you set up an

13  attorney-client trust account at City National Bank on

14  or about May the 7th, 2017 (sic)?

15      A    Yes.  And there was absolutely nothing wrong

16  with that.  And I was permitted to do it, and I

17  specifically consulted with counsel before doing it.

18      Q    Which counsel did you consult with before

19  doing it?

20           (Attorney-client discussion.)

21      Q    BY MR. STOLPER:  Mr. Avenatti, which counsel

22  did you consult with before doing that?

23      A    I don't recall the specific counsel, but I

24  know we had a lot of attorneys involved at the time

25  relating to our bankruptcy petition.  I mean, that's

**Exhibit D**

USAO_00059991
00059979

 1 | how we ran up, you know, almost $1.3 million in fees.
 2 | Q    So I just want to make sure I understand your
 3 | testimony and that it's clear.
 4 |      Your testimony is that you requested advice
 5 | of counsel to open up this bank account on May the 7th,
 6 | 2017?
 7 | A    No.
 8 |      MR. HODGES:  Calls for privileged
 9 | communication, Your Honor, the way the question is
10 | phrased.
11 |      MR. STOLPER:  I didn't ask what the advice
12 | was.  I just asked if he sought advice.
13 |      THE WITNESS:  No, I'm -- sir, I'm not going
14 | to get into specific topics that I sought advice about.
15 | But what I will say is, generally, we conducted
16 | ourselves aboveboard at all times, and we made certain
17 | that we followed all of the ethical rules and
18 | obligations, as well as those of the bankruptcy court.
19 | And one of the ways we did that was by consulting
20 | counsel on a consistent basis.
21 |      THE COURT:  Well, I understood the witness to
22 | already testify that he did -- I heard him say he did
23 | consult with counsel prior to opening this trust
24 | account.  So with that, I think that testimony is
25 | already established.

120

**Exhibit D**

USAO_00059992
00059979

1    Q    BY MR. STOLPER:  And would that have been the

2    Pachulski firm, Mr. Avenatti?

3    A    Sir, I think I told you I don't recall who we

4    consulted with.  We had a lot of lawyers involved at

5    the time.

6    Q    Was there any other bankruptcy firm that you

7    were consulting with besides the Pachulski firm at the

8    time?

9    A    Yes.

10   Q    What firm was that?

11   A    I don't recall.  And there were other

12   lawyers -- there were other ethics lawyers involved as

13   well.

14   Q    Do you recall the names of any of the other

15   ethics lawyers you're saying were involved in the

16   decision to open up this attorney-client trust account

17   on May the 17th, 2017?

18   A    Not as I sit here today.

19   Q    Do you have any retainer agreements with the

20   other lawyers besides the Pachulski firm that deal with

21   the question of whether or not you were permitted to

22   open up the bank account -- the separate

23   attorney-client trust account on May the 17, 2017?

24   A    I may have.  I have no idea.

25   Q    Now, the day that you opened up this account,

121

**Exhibit D**

USAO_00059993
00059979

```
 1   Mr. Avenatti, you received a wire from the Ayers Law
 2   Firm; isn't that true?
 3       A    I don't recall that.  I may have; I may not
 4   have.  I don't know.
 5       Q    I'm just going to publish that wire, Your
 6   Honor, to avoid objection.
 7            Do you recall the other account showed a wire
 8   for roughly $409,000 coming into the operating account
 9   that you attached to your bankruptcy petition?
10            Do you remember that, Mr. Avenatti?
11            MR. HODGES:  Foundation; hearsay.
12            THE WITNESS:  Yeah.  I don't -- I don't
13   recall it that way.  I recall that we -- I asked for --
14   or was asked questions about this -- this $409,000
15   amount, and I answered questions about it.
16            THE COURT:  We looked at that statement?
17            THE WITNESS:  Yes.
18       Q    BY MR. STOLPER:  And here, in the incoming
19   wire section, it says, "Michael J. Avenatti, Esquire,
20   credit party; originator, Ayers Law Office; amount
21   $952,994.57"; is that correct?
22       A    That's what this document says.
23       Q    Well, that's what happened; correct, sir?
24            You directed the Ayers Law Office to wire to
25   your trust account that you set up on May the 17, 2017,
```

122

**Exhibit D**

USAO_00059994
00059979

```
 1    $950,000 and change from the NFL settlement; correct,

 2    sir?

 3        A    Sir, I don't have a recollection of doing

 4    that.  I'm sure if the money was wired there, he didn't

 5    just do it on his own.  But I don't have a

 6    recollection.  But what I do know is that these funds

 7    were handled appropriately at all times pursuant to

 8    California law, as well as ethical considerations, as

 9    well as in reliance upon the advice of counsel that I

10    have previously noted.

11        Q    Mr. Avenatti, when you directed Mr. Ayers to

12    divide this money -- the NFL money up, with $409,000

13    going to the bankruptcy, and the rest of the money

14    going to your personal account, on what basis did you

15    decide what the split should be?

16            MR. HODGES:  Your Honor, objection.  That

17    lacks foundation.  Assumes facts that there was any

18    such conversation or direction.

19            THE WITNESS:  And it's also work product,

20    Your Honor, relating to the settlement of a case.

21            THE COURT:  I understand that he's asked you

22    the basis upon which you instructed someone to split

23    the money.  If you never instructed anyone or you don't

24    remember that, you can answer the question that way,

25    but that's what I understand him to be asking.
```

**Exhibit D**

USAO_00059995
00059979

```
 1            THE WITNESS:  Sir, as I sit here right now, I
 2   do not recall.  But what I do recall was specifically
 3   consulting with counsel, as I've mentioned, including
 4   ethics counsel, and this was done pursuant to
 5   California law.
 6       Q    BY MR. STOLPER:  Counsel was sitting with you
 7   at the 341(a) hearing on June 12, 2017, when you
 8   testified that you didn't maintain a separate trust
 9   account; is that correct, Mr. Avenatti?
10       A    Sir, again, I'm not going to agree with the
11   predicate of your question because it's not as simple
12   as you would like it to be for all the reasons I
13   previously noted relating to the 341(a) hearing.  Okay?
14   I have been truthful and honest at all times.  That's
15   number one.
16            Number two, I do -- I did have a lawyer
17   there.  I do not recall which lawyer was present.
18       Q    If you look at the front page of the exhibit,
19   Mr. Avenatti, I think it will tell you which lawyers
20   were present.
21            You actually had multiple lawyers at that
22   hearing, didn't you, sir?
23       A    There were two lawyers present at that
24   hearing, yes.
25       Q    And were those the lawyers that you consulted
```

**Exhibit D**

USAO_00059996
00059979

1   with and received advice of counsel concerning whether

2   or not it was appropriate for you to open up a separate

3   attorney-client trust account on May 17, 2017, and then

4   testify that that didn't happen?

5       A    Mr. Stolper, that's not what happen happened.

6   Okay?  And that's number one.  Number two, I've already

7   told you I don't recall which lawyers I consulted.

8   Number three, I individually worked on that case, as

9   did a number of other firms.  So, again, there was

10  nothing improper about any of the movement of those

11  monies.

12      Q    Let me turn your attention to what's been

13  marked as Exhibit 11.  This is an e-mail between

14  Mr. Ayers and Mr. Avenatti.

15              I will show it to them for objections.

16              (Attorney-client discussion.)

17              MR. STOLPER:  For the record, it's an e-mail

18  between Mr Ayers, Mr. Avenatti, and what appears to be

19  a banker.

20              MR. HODGES:  Your Honor, first, I'm going to

21  request that these be placed under the terms of the

22  protective order and marked confidential.

23              In addition, I'm advised that the actual

24  resolution of the case with the NFL was done by way of

25  a confidential settlement.  And to the extent that this

**Exhibit D**

USAO_00059997
00059979

```
 1    document refers to specific amounts attributed to that

 2    settlement, that may very well constitute a violation

 3    of that confidentiality provision.

 4           I'm going to also offer the Receiver and his

 5    counsel an opportunity to review that, as well.  But I

 6    don't see a way to overcome the confidentiality issue

 7    with respect to the terms of settlement.

 8           THE WITNESS:  And that was a material term of

 9    the settlement, Your Honor.  I will tell you that.

10           THE COURT:  While the Receiver is looking at

11    this, Mr. Stolper, is there a way to ask the questions

12    you intend to ask without revealing the -- any

13    confidential terms of the settlement agreement?

14           MR. STOLPER:  So, first of all, I don't know

15    what the terms of the settlement agreement are, Your

16    Honor, other than Mr. Avenatti saying that this e-mail

17    reflects that.  I don't know.  The amount of money

18    that's referenced in the e-mail, again, I can't speak

19    to whether or not that's -- I don't know if that's the

20    total amount, partial payment.  I don't know.

21           I do want to ask what that money is.  I'm

22    happy to do that.  I'm happy to do that confidentially.

23    We can clear the courtroom, and I can ask those couple

24    questions.  But most of the e-mail deals with

25    Mr. Avenatti splitting up the money and directing it to
```

**Exhibit D**

USAO_00059998
00059979

1    various places.

2          What I can also tell the Court is that we've

3    already seen the money.  We've already seen the bank

4    records.  So I don't know that there's much served at

5    this point in time, if that answers the court's

6    question.

7          MR. HODGES:  Okay.  I'm going to agree with

8    counsel that we're wasting time, then.  I'm not sure

9    what purpose it serves either.

10         But he has not addressed the fundamental

11   issue that Mr. Avenatti represents, as an officer of

12   the court, that this was a confidential settlement, and

13   he's duty-bound to assert that confidentiality.  I'm

14   suspecting that it's a considerable amount of money,

15   and that he would be putting his client in significant

16   jeopardy if those terms were disclosed.

17         THE WITNESS:  I mean, if Mr. Stolper were to

18   agree on the record to refund the NFL its money, you

19   know -- but I doubt that's going to happen.

20         THE COURT:  Let's hear from counsel for the

21   Receiver.

22         MR. REITMAN:  Counsel, notwithstanding the

23   testimony and the comments, the e-mail string here does

24   not identify a client, does not identify funds going to

25   a client.  It relates to a closed case, apparently, as

127

**Exhibit D**

USAO_00059999
00059979

```
 1    sums of money which may be some, all of something.  It
 2    doesn't say what they relate to.  On that basis, the
 3    Receiver does not object.
 4           THE COURT:  All right.  Well, as to the
 5    document itself, it may not be objectionable.  If you
 6    intend to ask, does this number represent, you know,
 7    the payment of the settlement agreement and the fact
 8    that that is the total amount of the settlement
 9    agreement, it would be confidential.  Then if we're
10    going to do a question like that, I think that would
11    merit confidentiality protection, if that's a
12    confidential settlement agreement.
13           So we can either briefly clear the court,
14    have you ask that question, or you can phrase it a
15    different way that doesn't reveal that, or we can
16    collect those and do this at the end.
17           MR. STOLPER:  I'm going to ask what the
18    amount that Mr. Avenatti is causing to be split up.  I
19    intend to ask if that is the total amount that was paid
20    as part of the settlement, so I think it would make
21    sense to clear the courtroom and ask that one question.
22           THE WITNESS:  The answer is I don't recall.
23    That way we don't have to clear the courtroom.
24           THE COURT:  Very good, then.
25           MR. STOLPER:  Your Honor, may I publish?
```

**Exhibit D**

USAO_00060000
00059979

```
 1            MR. HODGES:  Your Honor, he just indicated
 2    that the foundational question needed to be asked to
 3    determine whether or not it's appropriate.  I don't
 4    know how he's established that foundation at this
 5    point.
 6            THE COURT:  Well, I heard someone say that if
 7    you just looked at the e-mail, you have no idea how
 8    this related to the settlement.  It wouldn't identify
 9    what any terms of the settlement are.
10            MR. HODGES:  I understand that, Your Honor,
11    but the Receiver wouldn't know that.  Mr. Avenatti is
12    in the best position to know that.  And, in fact, he
13    has represented, as an officer of the court, that it
14    does pertain to a confidential settlement.
15            THE WITNESS:  Your Honor, if I could just be
16    heard on this.
17            MR. STOLPER:  Your Honor, I'm sorry.
18            THE COURT:  Let him be heard.
19            THE WITNESS:  I have clients to protect,
20    okay.  I have duties relating to my clients that I have
21    to protect, so I appreciate the Court hearing from me.
22            What is the purpose of publishing?  This is
23    not a trial.  We don't have a jury here.  What is the
24    purpose of, quote, "publishing" these documents?
25            THE COURT:  It's simply to ask questions
```

129

**Exhibit D**

USAO_00060001
00059979

 1    about them.

 2          THE WITNESS:  Well, that's fine.  I mean, he

 3    can hand me the document if he wants to ask me

 4    questions about it, and that way we can have some

 5    semblance of confidentiality for the benefit of the

 6    clients; unless this is something more than that, which

 7    it shouldn't be, so --

 8          THE COURT:  There is a protective order in

 9    place.  Can you ask these questions in a way that

10    doesn't implicate any of the information that's being

11    claimed to be confidential here?

12          MR. STOLPER:  I apologize, Your Honor.  I

13    don't really understand.  I don't understand what's

14    being claimed to be confidential.  I understood the

15    concern was disclosing the total settlement amount that

16    the NFL paid in this case.  Mr. Avenatti has already

17    disclosed he doesn't recall the numbers contained

18    herein.  With that put aside, I don't -- I just

19    apologize.  I'm happy to address confidentiality

20    concern.  I just don't understand what that concern is

21    right now.

22          THE WITNESS:  Your Honor, let me -- let me be

23    clear about this.  Other than the fact that the case

24    was settled, everything else is confidential, pursuant

25    to the settlement agreement, including that any monies

**Exhibit D**

USAO_00060002
00059979

```
 1   were paid at all, which I have not stated any monies

 2   have been paid, just to be clear.

 3            So the fact that monies may have been paid,

 4   in and of itself, is confidential under the settlement

 5   agreement.  And that's not a big surprise because we

 6   see that all the time in settlement agreements.  Just

 7   the mere payment of the monies can be a violation or an

 8   attestation to that can be a violation of the

 9   settlement agreement, so that's the concern.  That's

10   the issue.

11            And I don't want to be on the hook for

12   refunding money to the NFL, and I don't think the

13   Receiver wants to be on the hook for refunding money to

14   the NFL if money was paid.

15            THE COURT:  Again, this seems like certainly

16   an area that is legitimate for exploration, but perhaps

17   in a confidential setting.

18            MR. STOLPER:  That's fine, Your Honor.  Let's

19   clear the courtroom.

20            THE COURT:  Okay.  So because we're going to

21   be discussing the terms of a confidential settlement

22   agreement, I'm going to ask the members of the public

23   who are here to exit.  When we move on to a different

24   topic, then we will reopen the courtroom.

25            MR. HODGES:  And for the record, Your Honor,
```

131

**Exhibit D**

USAO_00060003
00059979

```
 1    I want to make sure that we're clear that this portion

 2    of the transcript is absolutely sealed, pursuant to

 3    terms of the protective order, and may not be

 4    disseminated.

 5              THE COURT:  Yes.

 6              MR. HODGES:  Thank you, Your Honor.

 7              THE COURT:  So that will go both for our

 8    court reporter, who's employed by the court, and the

 9    privately retained court reporter as well.

10              (Proceedings held in closed session pursuant

11               to protective order and bound separately.)

12    ////

13    ////

14    ////

15    ////

16    ////

17    ////

18    ////

19    ////

20    ////

21    ////

22    ////

23    ////

24    ////

25    ////
```

**Exhibit D**

USAO_00060004
00059979

```
 1              THE COURT:  All right.  The record will

 2     reflect at this point that all the members of the

 3     public who were sitting in the gallery have left the

 4     courtroom.

 5          Q    BY MR. STOLPER:  Mr. Avenatti, the document

 6     that was placed before you before --

 7          A    I need to ask a point of clarification, just

 8     so I'm protected.

 9              Even providing this testimony outside of the

10     presence of the public at large violates the settlement

11     agreement.  And I don't have the settlement agreement

12     in front of me, but there may be a clause in the

13     settlement agreement -- and, Your Honor, I'm not saying

14     that there is, but I've seen this in other settlement

15     agreements that I've negotiated -- there may be a

16     clause that states if we're compelled to disclose the

17     terms of the settlement, that you have to give them

18     advance notice so they can come in and object to it,

19     meaning the defendant.

20              MR. HODGES:  I don't mean to be tag-teaming

21     this, Your Honor, but that -- that is precisely the

22     comment that I was going to make now that the public is

23     not here.

24              The fact that we have cleared the public from

25     this proceeding does not absolve Mr. Avenatti from
```

**Exhibit D**

USAO_00060005
00059979

```
 1    potential prejudice for disclosing confidential terms.
 2    There is very likely -- in every confidential agreement
 3    I have ever entered into on behalf of a client, it
 4    contains a provision that says you may not disclose
 5    this without providing notice to the other party so
 6    that they can assert their rights of confidentiality as
 7    well.  And I --
 8            THE COURT:  You know, it has been well-known
 9    that one of the assets that's going to be the subject
10    of this exam was income through settlements to Eagan
11    Avenatti.  We've had months to discuss issues about
12    confidentiality.
13            There was an order that went out just earlier
14    this week saying if there was a particular area that
15    someone knew as a category of documents that was going
16    to be subject to some kind of an objection, to try and
17    bring that up, and it was precisely to avoid
18    speculating here today that there might be some
19    confidentiality agreement that might contain some
20    clause that might apply.  And on those speculative
21    grounds, the Court can't say that that's a reason not
22    to inquire about these assets.
23            Again, the nature of the exam should be
24    trying to figure out what money was received by Eagan
25    Avenatti.  That's what we're here for.
```

134

**Exhibit D**

USAO_00060006
00059979

```
 1              MR. HODGES:  Your Honor, I'm sorry, what I
 2    would suggest, then, is that we actually locate a copy
 3    of the confidentiality provision in this agreement and
 4    table this issue to a future date so that we are not,
 5    in fact, running afoul of specific terms that are going
 6    to put not only Mr. Avenatti and the Receiver in
 7    jeopardy, but the client that is a party to this
 8    agreement.
 9              THE WITNESS:  Your Honor, can I make this
10    suggestion?  First of all, I take Your Honor's point,
11    and it's a good one, but this was -- this predated the
12    judgment by a year, okay?  So I didn't know that we
13    were going to be answering questions about things back
14    in 2012, and '16, and '17, and '15, and '14.  So that's
15    number one.  I did not anticipate that.  Maybe I should
16    have, but I didn't.
17              MR. STOLPER:  This is 2017.  It was after the
18    judgment.
19              THE COURT:  In any event, it represents a
20    significant pot of potential assets to Eagan Avenatti.
21              THE WITNESS:  The judgment was issued in
22    2018, not '17.
23              MR. STOLPER:  During the bankruptcy.  I
24    apologize, Your Honor.
25              THE WITNESS:  It was before the judgment,
```

135

**Exhibit D**

USAO_00060007
00059979

```
 1    okay?  That's number one.
 2             Number two, I don't understand why we can't
 3    accomplish what he should want to accomplish as it
 4    relates to these monies without getting into the terms
 5    of the settlement.  If he wants to know where did the
 6    money go, I mean, isn't that what we should be talking
 7    about, as opposed to the details of the settlement?
 8             THE COURT:  I understand he wants to know
 9    where did 100 percent of the money go, and that's where
10    we're running into a problem.  If there's testimony
11    about this represents all the proceeds from the case,
12    and here's where it went, then that's exactly what I
13    anticipate he wants to ask.
14             THE WITNESS:  All right.  Well, maybe we
15    should just take it question by question, then, and
16    maybe we won't have a problem.
17             THE COURT:  Okay.  Let's try that.
18             (Exhibit 11 was marked.)
19        Q    BY MR. STOLPER:  Mr. Avenatti, you -- sorry.
20             The e-mail that I previously showed you that
21    is marked as Exhibit 11, these are e-mails that you
22    exchanged with Chris Ayers and others concerning the
23    settlement in the NFL case; correct, sir?
24        A    To the best of my knowledge.
25        Q    And in these e-mails, Mr. Avenatti, you
```

**Exhibit D**

USAO_00060008
00059979

```
 1    directed -- well, let's -- actually, let's go back.
 2             Mr. Ayers wrote to you -- and, Your Honor,
 3    I'm going to publish since it's just us here in the
 4    Courtroom.
 5             Chris Ayers to, among others, you.  "As you
 6    saw in the previous e-mail, we should receive a wire on
 7    the 17th or 18th."
 8             That's May 17th or 18th; correct,
 9    Mr. Avenatti?
10       A    I -- I don't know what he meant there.
11       Q    Well, he sent the e-mail on May 10th;
12    correct?
13       A    Sir, he sent the e-mail on May 10th, but I
14    don't know what he meant by the 17th or 18th, and I
15    certainly don't have a recollection of what he meant
16    then.
17       Q    Okay.  And Mr. Ayers said that $188,281.73
18    should go to him; correct, sir?
19             MR. HODGES:  Misstates the document.  It says
20    it should go to a law office.
21             THE WITNESS:  Sir, whatever the document
22    says, it says.
23       Q    BY MR. STOLPER:  Okay.  But you agree with
24    that?  That's how much Chris Ayers was due in the NFL
25    settlement; correct, sir?
```

137

USAO_00060009
00059979

```
 1        A    No, I don't agree with that.  That's a
 2   different question.
 3        Q    Okay.  Is that how much Mr. Ayers was due in
 4   the NFL settlement?
 5        A    I have -- I have no recollection of what he
 6   was due.
 7        Q    Mr. Ayers said the total amount was 1.55
 8   million; correct?
 9             MR. HODGES:  I'm sorry, Counsel.  I'm looking
10   at a document.  Are you referring to the same e-mail?
11             MR. STOLPER:  Sure.  In the amount --
12        Q    BY MR. STOLPER:  As you saw in the previous
13   e-mail, we should receive a wire on the 17th or 18th in
14   the amount of $1.55 million.
15             MR. HODGES:  Thank you for pointing that out.
16        Q    BY MR. STOLPER:  That's how much the NFL
17   settlement was; correct, Mr. Avenatti?
18             MR. HODGES:  I'm going to object, Your Honor.
19   If he says "I don't know," then I'm going to be fine
20   with that, but -- and I'm not presupposing an answer --
21             THE WITNESS:  I don't recall.
22             MR. HODGES:  -- but to the extent --
23             THE WITNESS:  I don't recall.
24             MR. HODGES:  Okay.
25             THE COURT REPORTER:  One at a time.
```

**Exhibit D**

USAO_00060010
00059979

```
 1              THE WITNESS:  I don't recall.

 2       Q    BY MR. STOLPER:  Mr. Ayers goes on to write,

 3   "The balance of 1.3 million and change should be

 4   transferred to an account as designated by Eagan

 5   Avenatti, LLP.  Mr. Avenatti's firm will send you their

 6   wiring instructions."

 7              That's what Mr. Ayers wrote you; correct,

 8   sir?

 9              MR. HODGES:  Speaks for itself.  Actually,

10   lacks foundation as to whether Mr. Ayers actually

11   authored this.

12              THE WITNESS:  I have no idea.

13       Q    BY MR. STOLPER:  So you don't know if

14   Mr. Ayers sent you this e-mail?

15       A    Well, that's a different -- sir, I have no

16   independent recollection of getting this e-mail, and I

17   don't know if this is what he wrote or not.

18       Q    Okay.  Did you respond to this e-mail,

19   Mr. Avenatti?

20       A    Sir, I can't tell you how many -- I may have;

21   I may not have.  I don't know.

22       Q    Is your e-mail address Michael --

23   mavenatti@eaganavenatti.com?

24       A    Mr. Stolper, if you have a response you'd

25   like me to look at, I'd be happy to look at it.
```

139

**Exhibit D**

USAO_00060011
00059979

```
1        Q    I just asked you is your e-mail address
2   mavenatti@eaganavenatti.com?
3        A    In 2017, yeah.
4        Q    Okay.  Did anybody else have access to that
5   e-mail besides you?
6        A    They may have at that time.  I don't
7   remember.
8        Q    Who else may have had access to that e-mail
9   besides you at that time?
10       A    Sir, I can't speculate as to who might have
11  had access.  Mr. Ayers, may have had access.  Others
12  may have had access.
13       Q    Okay.  Isn't it true that you responded to
14  Mr. Ayers and others on May 15, 2017?
15       A    I don't have an independent recollection of
16  that.
17       Q    Okay.  Isn't it true you told Shamar,
18  "Following up on Chris' e-mail below, in addition to
19  the $188,000 transfer request by Chris, please complete
20  the following additional two wires when the monies are
21  received."  First, $408,723.70 to the California Bank
22  and Trust, last account number -- four last digits
23  2851.
24            Sir, that's what you wrote back; correct?
25       A    Sir, I don't have an independent recollection
```

140

**Exhibit D**

USAO_00060012
00059979

1    of that.

2        Q    Do you have a recollection of directing

3    Mr. Ayers and his bank to split the money up between

4    the Eagan Avenatti account and your personal trust

5    account you set up on May 17?

6        A    Sir, you asked me that previously, and I

7    answered that I don't have a recollection of that.  I'm

8    not saying it didn't happen.  I just don't have a

9    recollection of it.

10       Q    You then requested Mr. Ayers' banker to send

11   $952,994.57 to the City National Bank account.

12            Do you recall directing him to do that?

13       A    I don't have an independent recollection.

14       Q    And you directed him to send it to the

15   account 3512.  You don't remember that, either?

16       A    Sir, I think my answer has been clear.

17       Q    It says, attorney-client trust account.  Are

18   you the one who directed Mr. Ayers to send it to the

19   attorney-client trust account?

20            MR. HODGES:  Asked and answered.

21            THE WITNESS:  Sir, I don't have a

22   recollection of that.

23       Q    BY MR. STOLPER:  Okay.  The address that you

24   set forth for that account, 520 Newport Center Drive,

25   Suite 1400, Newport Beach, California 92660, that was

141

**Exhibit D**

USAO_00060013
00059979

1    the office address of Eagan Avenatti.  True or false?

2         A    That was the office address of me,

3    individually, when I represented clients individually,

4    including the plaintiffs in the NFL case.  It was the

5    office address of Avenatti & Associates.  It was the

6    office address of Eagan Avenatti.  It was the office

7    address of other entities at the time, as I recall.

8         Q    Was it also the address of Eagan Avenatti?

9              MR. HODGES:  Asked and answered.

10             MR. STOLPER:  Sir, I missed it.

11             THE WITNESS:  I just said that.

12             THE COURT:  I think he did include that that

13   was one of the entities that had an address at that

14   location.

15        Q    BY MR. STOLPER:  I'm sorry.  Do you have any

16   recollection of -- I apologize.

17             Do you have any recollection of correcting

18   Mr. Ayers when he said this money is due to Eagan

19   Avenatti and saying, "No, Mr. Ayers, it's due to me

20   individually and/or Avenatti & Associates"?

21             MR. HODGES:  Foundation as to the existence

22   of those comments.

23             THE WITNESS:  He never said that.  That's an

24   absolute lie.

25             THE COURT:  I think his question was if you

142

**Exhibit D**

USAO_00060014
00059979

1    ever recall having a conversation like that with him.

2            THE WITNESS:  Well, Your Honor, that wasn't

3    the question.

4            THE COURT:  Okay.

5            MR. STOLPER:  That actually was the question.

6            THE WITNESS:  Can I have the question read

7    back, please.

8            MR. STOLPER:  I'll just restate the question.

9            THE WITNESS:  I'd like to -- can I hear the

10   question, please?

11           MR. STOLPER:  No, actually --

12           THE WITNESS:  Are you striking the question?

13           MR. STOLPER:  Your Honor, I'm going to

14   withdraw the question and ask a question.

15           THE COURT:  Very good.

16      Q    BY MR. STOLPER:  Did you ever have a

17   conversation with Chris Ayers, correcting his notion

18   that the money should be sent to Eagan Avenatti as set

19   forth in his e-mail to you?

20      A    That wasn't his notion, sir.  I may have; I

21   may not have.  I don't recall as I sit here right now.

22      Q    Did you ever make it clear to Mr. Ayers that

23   it wasn't just Eagan Avenatti working on this case --

24           THE COURT REPORTER:  Counsel, slow down.

25      Q    BY MR. STOLPER:  Sorry.

143

**Exhibit D**

USAO_00060015
00059979

```
 1          Did you ever make it clear to Mr. Ayers that
 2   other firms that you controlled, besides Eagan
 3   Avenatti, were working on the NFL case?
 4          MR. HODGES:  Foundation.
 5          THE WITNESS:  Sir, I think that was
 6   well-known.  I may or may not have.  I don't recall.
 7          MR. STOLPER:  Let's go ahead and turn to
 8   Exhibit 12, and I think this will also -- is best done
 9   confidentially.
10          THE COURT:  All right.  What is this exhibit?
11          MR. STOLPER:  This is a declaration from
12   Mr. Ayers, Your Honor.  I want to ask --
13          THE COURT:  It's still about the terms of the
14   settlement?
15          MR. STOLPER:  It is, Your Honor, and then we
16   can shift back after that.
17          (Exhibit 12 was marked.)
18     Q   BY MR. STOLPER:  Mr. Avenatti, I've marked as
19   Exhibit 12, a declaration we obtained from Chris Ayers.
20   I'm going to go ahead and read --
21          MR. HODGES:  Your Honor, may we have an
22   opportunity to read it?
23          THE COURT:  Certainly.
24     Q   BY MR. STOLPER:  Mr. Avenatti --
25          MR. STOLPER:  I'm going to question him.  I
```

**Exhibit D**

USAO_00060016
00059979

```
 1    don't need you to review it.  There's no

 2    confidentiality issue here.

 3              MR. HODGES:  Maybe I have one.

 4              MR. STOLPER:  A confidentiality objection?

 5    It's a closed courtroom and a declaration.

 6              MR. HODGES:  Your Honor, may I have an

 7    opportunity to review the exhibit before questions are

 8    posed to my client?

 9              THE COURT:  How long is it?

10              MR. STOLPER:  Three pages, four pages.

11              THE COURT:  Do you think you can review it

12    pretty quickly?

13              MR. HODGES:  Absolutely.

14        Q    BY MR. STOLPER:  Mr. Avenatti, have you had a

15    chance to review Exhibit 12?

16        A    Very quickly.

17        Q    Is there anything you read in your quick

18    review that you disagree with?

19        A    Yes, there's a number of things.

20        Q    What are they?

21        A    Well --

22              MR. HODGES:  Your Honor, that's an improper

23    question.  I object to the form.

24              THE COURT:  And I think we do need to figure

25    out, like, how this relates to locating assets of Eagan
```

**Exhibit D**

USAO_00060017
00059979

```
 1   Avenatti.

 2           MR. STOLPER:  I'm sorry, Your Honor.

 3           Mr. Ayers is -- we asked Mr. Ayers whether or

 4   not there was any truth to Mr. Avenatti's contention

 5   that he was working on behalf of a different law firm,

 6   other than Eagan Avenatti, on the NFL case.  Mr. Ayers

 7   was co-counsel.

 8           Mr. Ayers said, at all times, I understood

 9   Michael Avenatti to be acting as a lawyer from Eagan

10   Avenatti, LLP and not any other law firm.  So I'm

11   curious to know from Mr. Avenatti if he has

12   disagreements with Mr. Ayers' recollection, and, if so,

13   what the basis of those disagreements are.

14           Ultimately, I think it's no secret, we intend

15   to file fraudulent transfer actions against

16   Mr. Avenatti for having taken this money from Eagan

17   Avenatti in the course of the bankruptcy.

18           THE COURT:  So I understand you've got a

19   document in which Mr. Ayers stated an opinion, and your

20   question is you want to ask Mr. Avenatti if he

21   disagrees with that opinion?

22           MR. STOLPER:  Yes, Your Honor.

23           THE COURT:  And I think we've heard him say

24   yes?

25           MR. STOLPER:  And I asked what he disagreed
```

**Exhibit D**

USAO_00060018
00059979

```
 1    with.
 2              THE COURT:  Okay.  So he's -- so he's going
 3    to disagree that he was not just working on behalf of
 4    Eagan Avenatti, but was working on behalf of other
 5    entities.  He's testified to that.
 6              MR. STOLPER:  Okay.
 7              THE COURT:  Okay.  So it seems like we've
 8    covered this.
 9              MR. STOLPER:  Sure.  Let me ask -- let me
10    just ask one follow-up question.
11         Q    BY MR. STOLPER:  Is there anyone that you can
12    testify, sitting here today, that was aware that you
13    were working in the NFL case on behalf of Avenatti &
14    Associates, other than you?
15              MR. HODGES:  Speculation.  Foundation.
16              THE WITNESS:  There's all kinds of people.
17         Q    BY MR. STOLPER:  Who?
18         A    There's all kinds of people.
19         Q    Who?
20         A    All of the clients, the Court, the settlement
21    judge, countless people.
22         Q    Okay.  So the clients -- your testimony is
23    the clients knew you were working on their behalf on
24    behalf of Avenatti & Associates?
25         A    I believe that many of the clients knew that
```

147

**Exhibit D**

USAO_00060019
00059979

```
 1    I was working on their behalf, individually, or through
 2    Avenatti & Associates, as well as the settlement judge.
 3    I believe it was the magistrate judge in the Northern
 4    District of Dallas that assisted with the settlement of
 5    the case.  We went to mediation.  I mean, there's all
 6    kinds of people that knew that.
 7         Q    Again, all I want to make sure is that the
 8    settlement judge, your clients, and others knew that
 9    you were working on behalf of Avenatti & Associates, as
10    opposed to Eagan Avenatti.
11              MR. HODGES:  Misstates testimony.  Testimony
12    is they may have known.
13              THE WITNESS:  I've answered the question.
14              MR. STOLPER:  I don't think that you have.
15         Q    BY MR. STOLPER:  Did you tell the settlement
16    judge, for example, that you were there on behalf of
17    Avenatti & Associates, and not just Eagan Avenatti?
18              MR. HODGES:  Your Honor, with all respect,
19    I'd instruct my client not to answer that, based on
20    mediation privileges discussed in a settlement
21    conference.  As counsel knows, nothing is permissible
22    from the context of mediation.
23         Q    BY MR. STOLPER:  Let me ask a different
24    question:  Did you ever file any document with any
25    court in the Northern District of Texas, or anywhere,
```

148

**Exhibit D**

USAO_00060020
00059979

```
 1    that shows that you were practicing law in this matter

 2    on behalf of Avenatti & Associates, in addition to

 3    Eagan Avenatti?

 4         A    I very well may have.  I don't recall.

 5         Q    And that -- and you very well may have in the

 6    Northern District of Texas or some other court?

 7              Where would you have filed that document, so

 8    I can go find it?

 9              THE COURT:  If you remember.

10              THE WITNESS:  Sir, I don't have a

11    recollection.  I don't have all of the matters or all

12    of the files in front of me, relating to this matter.

13    And that's my testimony.  But there's no question that

14    I worked on the case, individually.  There's no

15    question Avenatti & Associates worked on the case

16    extensively.  We put a lot of time into this case.

17              MR. STOLPER:  Your Honor, I'm just going to

18    follow the money from this point forward, so they can

19    open this back up.

20              THE COURT:  Okay.

21              MR. HODGES:  Your Honor, to the extent

22    counsel intends to attach Exhibit 12, I just want it

23    noted, for the record, lack of foundation and hearsay

24    objections.

25              No one has been here to actually authenticate
```

149

**Exhibit D**

USAO_00060021
00059979

 1   this as being attributable to Mr. Ayers at all.  Thank
 2   you.
 3        Q    BY MR. STOLPER:  Mr. Avenatti, after you
 4   transferred --
 5             THE COURT:  Speak in the mic, please.
 6             MR. STOLPER:  I apologize.
 7        Q    BY MR. STOLPER:  After you directed Mr. Ayers
 8   to transfer the $950,000 and change to your personal
 9   trust account, what did you do with the money?
10             MR. HODGES:  Assumes facts.  Lacks foundation
11   as to any such communications.  Your Honor, with all
12   respect, this is now badgering and argumentative.
13             THE COURT:  Can we rephrase it, so he doesn't
14   have to adopt something he's already denied in order to
15   answer your question?
16             MR. STOLPER:  Well, Actually, I didn't think
17   that was controversial.
18        Q    BY MR. STOLPER:  Mr. Avenatti, your trust
19   account received a -- the trust account you opened up
20   on May 5th, 2017, received a wire from the Ayers Law
21   Office for $952,994.57; correct?
22             MR. HODGES:  Asked and answered.
23             THE COURT:  You're asking him if he recalls
24   that financial transaction?
25             MR. STOLPER:  Yes.

150

**Exhibit D**

USAO_00060022
00059979

```
1            THE WITNESS:  Sir, I don't recall the

2    transaction, but that doesn't mean it did or did not --

3            THE COURT REPORTER:  I didn't get the last

4    part of your answer.

5            THE WITNESS:  I don't recall that transaction

6    independently, sir, but that does not mean it didn't

7    happen.

8        Q    BY MR. STOLPER:  So your bank records show

9    that you received this wire from the Ayers Law Office

10   for $950,000.

11           Mr. Avenatti, do you remember what you did

12   with that money?

13           MR. HODGES:  Objection.  That lacks

14   foundation and that is hearsay.  It also assumes facts

15   not in evidence.

16           The fact that counsel puts a document down in

17   front of the Court and this witness doesn't mean it

18   reflects an actual transfer occurred.

19           THE COURT:  I understand his question.  He's

20   using the document to try and prompt the witness's

21   recollection.  He's saying this appears to be a

22   transfer into the account.  What happened to the money?

23   That's a pretty standard question in a judgment debtor

24   exam.

25        Q    BY MR. STOLPER:  Mr. Avenatti?
```

151

**Exhibit D**

USAO_00060023
00059979

```
1     A    What happened to the money?

2     Q    Yeah.

3     A    Whatever I wanted to happen to the money

4  because I was entitled to the money, sir, pursuant to

5  the work on the case, the expenses that were paid in

6  the case, the enormous costs that were advanced in the

7  case.  I believe Avenatti & Associates advanced over

8  $2 million in cost on the case.

9            So I don't have a firm recollection of what

10 happened to it, but whatever happened to it, as long as

11 it wasn't for illegal purposes, was perfectly legal as

12 counsel advised me at the time.

13    Q    Do you remember if you transferred that money

14 to a different account after you received it into the

15 Avenatti -- excuse me -- into the Michael J. Avenatti

16 trust account?

17    A    I may have.  I would have expected to.  And

18 there was nothing wrong with that.

19    Q    Do you remember which account you would have

20 transferred the $952,000 you received from the Ayers

21 Law Office on May 17, 2017?

22         MR. HODGES:  Foundation.  Assumes facts.

23         THE WITNESS:  None of this money was due

24 Eagan Avenatti.  None of it.  I don't have a

25 recollection of where the money was transferred to, but
```

**Exhibit D**

USAO_00060024
00059979

1    wherever it went, provided that it wasn't for some

2    illegal purpose, was perfectly ethical and legal, as I

3    have completely stated time and time again in

4    connection with this.

5        Q    BY MR. STOLPER:  Mr. Avenatti, did you take

6    any of the money that you received as part of the money

7    transferred to you from the Ayers Law Office and turn

8    around and provide that money to the clients you were

9    representing?

10       A    Yeah, as I recall we did, but I -- I don't

11   have a firm recollection of that, as I sit here today.

12   I don't remember the totality of the settlement amount

13   and -- and the flow of the money.

14            What I do remember is that we sought advice

15   from ethics counsel and others, and it was handled

16   aboveboard.  That's what I recall.

17       Q    Approximately how much of the money you

18   received in the settlement did you provide to the

19   clients?

20       A    I -- I don't have a recollection, and I don't

21   have a recollection that any of this money was due to

22   clients.  In fact, the costs were far in excess, as I

23   recall, of any settlement amount.

24       Q    Did you provide the clients a reconciliation

25   upon the settlement of the NFL case, showing them how

                                                    153

**Exhibit D**

USAO_00060025
00059979

1   much money came in and what happened?

2            MR. HODGES:  Again, that presupposes that

3   there was money paid in the context of a confidential

4   settlement.  That's the precise reason we cleared this

5   courthouse.  No sooner do we invite the public back

6   into this proceeding that we now attempt to go around

7   the back door and have Mr. Avenatti admit that monies

8   were paid in furtherance of a confidential settlement.

9            THE COURT:  Well, I don't believe that he has

10  to admit that in order to answer this question.

11           I think the question is just if there was

12  some kind of statement that was provided to clients at

13  the end of the case that explained to them what

14  financial transactions, if any, had been made.  And it

15  could have been something that just showed that costs

16  were paid by the firm and nothing was paid by the other

17  side.

18           So I understand the question to just be, in

19  that limited scope, was there some sort of financial

20  accounting or receipt, for lack of a better term,

21  provided to the clients.

22           THE WITNESS:  Yes.

23      Q    BY MR. STOLPER:  Do you recall how that

24  information was communicated?

25      A    I don't.

154

**Exhibit D**

USAO_00060026
00059979

1      Q      Is that your practice in each case that at

2   the end of the case, that you provide the client a

3   statement of how the money, assuming money was received

4   as part of a settlement, how the money was dealt with?

5      A      Generally, yes, but not always, because it's

6   not required in every matter.

7      Q      Did you maintain those records?  Are they

8   available, if you wanted to find them?

9      A      I have no idea because I haven't looked for

10  them.

11     Q      You previously looked at what was marked as

12  Exhibit -- where is the original?  Do you know?

13            THE WITNESS:  Your Honor, could I take a

14  bathroom break?

15            THE COURT:  Yes.  I'm sure our court reporter

16  would like a stretch break, as well.

17            MR. STOLPER:  Probably a gun to shoot me,

18  too, Your Honor.

19            THE COURT:  Can we all be back in ten

20  minutes?

21            MR. STOLPER:  Yes, Your Honor.

22            THE CLERK:  This court now stands in recess.

23            (Recess taken.)

24            (Open session proceedings resume.)

25  ////

**Exhibit D**

USAO_00060027
00059979

```
 1            THE CLERK:  Please remain seated and come to
 2    order.  This court is once again in session.
 3            The Honorable Karen E. Scott, Magistrate
 4    Judge, presiding.
 5            THE COURT:  All right.  Counsel, you can
 6    continue.
 7            MR. STOLPER:  Thank you, Your Honor.
 8        Q    BY MR. STOLPER:  Mr. Avenatti, you understand
 9    you're still under oath?
10        A    Yes.
11        Q    Who is Michael Hauser?
12        A    Michael Hauser.  I believe he's an attorney
13    in the bankruptcy court.
14        Q    He was the U.S. trustee overseeing the
15    bankruptcy of Eagan Avenatti; correct?
16        A    I think he's an assistant.  I don't know what
17    his exact title is.  He's not the U.S. trustee, no.
18        Q    He was the assistant U.S. trustee who handled
19    the 341(a) examination of you; correct?
20        A    I don't have a recollection of that.
21        Q    Okay.  Did you ever tell Mr. Hauser about
22    this account that you opened up on May the 17th, 2017?
23        A    Sir, I don't know if I did or didn't, but I
24    certainly wasn't under obligation to.  Again, we
25    consulted with bankruptcy counsel, and they told us
```

**Exhibit D**

USAO_00060028
00059979

```
 1    what we had to.
 2          I may have disclosed it, but I have not
 3    reviewed the transcript.
 4       Q    Mr. Avenatti, who is Gregory Barela?
 5       A    Gregory Barela is currently on felony
 6    probation for making false statements in an effort to
 7    get paid money.  He's a former client of the firm.  I
 8    think he's been convicted two or three times of various
 9    felonies.
10       Q    Was Mr. Barela a client of Eagan Avenatti?
11       A    I don't recall which firm he was a client of.
12    I think -- I think he was a client of Eagan Avenatti,
13    but I'm not certain.
14          MR. STOLPER:  Your Honor, I'd like to go
15    ahead and publish the retention agreement between
16    Mr. Barela and Eagan Avenatti.  If it pleases the
17    Court, Mr. Barela's attorney is here, and he authorized
18    me to do so without a confidentiality objection.
19          THE COURT:  Is there any other objection
20    anyone wants to raise with that?
21          MR. HODGES:  I have not seen the document,
22    Your Honor.  If I may?  Thank you.
23          MR. STOLPER:  Without objection, may I
24    proceed, Your Honor?
25          THE COURT:  Hearing no objections, you can
```

157

**Exhibit D**

USAO_00060029
00059979

```
 1   proceed.

 2       Q    BY MR. STOLPER:  Mr. Avenatti, does this

 3   refresh your recollection that Mr. Barela is a client

 4   of or was a client of Eagan Avenatti, and not of one of

 5   these other entities?

 6       A    No, because this is not the only retention

 7   agreement that existed with Mr. Barela.  We represented

 8   him on multiple matters.  And I don't believe this

 9   agreement is complete, either.

10       Q    Sir, do you have reason to believe that

11   Mr. Barela also retained another entity that you

12   controlled?

13       A    Yeah.  Sir, as I sit here right now, I don't

14   know one way or the other.  My best recollection is

15   that he may have.  I just don't know.  But I know that

16   there are other retention agreements, and I believe

17   that there was an amendment to this retention

18   agreement.

19       Q    And have you produced that retention -- these

20   other retention agreements to Mr. Frank, as part of

21   this lawsuit -- sorry -- to JFL law as part of this

22   lawsuit?

23       A    I don't believe I've been asked to prepare or

24   to produce this.  And if we were, we may have produced

25   it.  Again, you asked me this at the beginning of the
```

158

**Exhibit D**

USAO_00060030
00059979

```
 1   examination, I can't recite for you every document
 2   that's been produced in connection with this matter.
 3        Q    Well, let me ask you, just generally, did you
 4   produce retention agreements between Eagan Avenatti and
 5   its clients to JFL law?
 6             MR. HODGES:  It's been asked and answered,
 7   Your Honor.  That was asked long ago before Your Honor
 8   took the bench in this proceeding.
 9             THE WITNESS:  For 45 minutes, we dealt with
10   these production issues, Your Honor.  I've answered
11   these questions.
12             THE COURT:  Well, I think this is a yes or
13   no.  Do you recall if you produced any retainer
14   agreements --
15             THE WITNESS:  I believe that over the many
16   years, we have produced retainer agreements to
17   Mr. Frank, whether it be in connection with arbitration
18   or otherwise.
19             MR. STOLPER:  Sorry.  I should ask a more
20   precise question.
21        Q    BY MR. STOLPER:  Did you produce any
22   retention agreements to Mr. Frank in response to Judge
23   Scott's order compelling you to do so?
24             MR. HODGES:  That was also asked and
25   answered, but I understand your position, Your Honor.
```

159

**Exhibit D**

USAO_00060031
00059979

```
 1            THE WITNESS:  I don't recall one way or the

 2   other.  Mr. Stolper, I'd have to review the balance of

 3   the production.  But, again, we were under no

 4   obligation to reproduce to Mr. Frank documents that

 5   were previously produced and that -- or that Mr. Frank

 6   already had.

 7       Q    BY MR. STOLPER:  Mr. Avenatti, the

 8   attorney-client agreement you had with Mr. Barela

 9   entitled you to a 40 percent contingency recovery; is

10   that correct?

11       A    That's incorrect.

12       Q    Okay.  What is your understanding of the

13   amount of the contingency you're entitled to recover

14   from monies obtained by you for Mr. Barela?

15            THE COURT:  This is with regard to Eagan

16   Avenatti's representation of Mr. Barela?

17            MR. STOLPER:  We'll start with that, Your

18   Honor, yes.

19            MR. HODGES:  Objection, Your Honor.  Vague

20   and ambiguous objection.  Mr. Avenatti has already

21   testified there were multiple matters that the firm

22   represented Mr. Barela.

23       Q    BY MR. STOLPER:  Okay.  Well, let's talk

24   about the Barela v. Brock matter.

25            On the Barela v. Brock matter -- and just so
```

160

**Exhibit D**

USAO_00060032
00059979

```
 1    we're clear, is this retention letter the retention

 2    letter for the Barela v. Brock matter?

 3              MR. HODGES:  Your Honor, while the witness is

 4    looking at this document, is counsel willing to make a

 5    representation that Eco Alliance, LLC has also

 6    authorized the publication of this document?  This

 7    appears to be more than one client.

 8              MR. STOLPER:  I have no idea, Your Honor.

 9              MR. HODGES:  Well, then --

10              MR. STOLPER:  Actually, Your Honor, the

11    answer is yes.

12              THE COURT:  Okay.

13              THE WITNESS:  I'm not aware of anything

14    demonstrating that counsel in the gallery represents

15    Eco Alliance, LLC.

16              MR. STOLPER:  He said that he did.

17              THE COURT:  Counsel is making a

18    representation here.

19              UNIDENTIFIED SPEAKER:  I represent all of

20    Mr. Barela's entities insofar as their claims with

21    respect to Mr. Avenatti.

22              THE WITNESS:  Well, Eco Alliance isn't an

23    entity of Mr. Barela's, so therefore, that's not going

24    to help us.

25              MR. STOLPER:  Regardless, Your Honor, I'm
```

161

**Exhibit D**

USAO_00060033
00059979

```
 1    going to go ahead and question the witness about this.

 2             THE COURT:  Go ahead.

 3             THE WITNESS:  Well, it's --

 4        Q    BY MR. STOLPER:  Mr. Avenatti, my question is

 5    does this retention agreement govern the dispute you

 6    handled for Mr. Barela against Brock?

 7        A    No.

 8        Q    Where is that retention agreement?

 9        A    Sir, I -- I don't know.  I haven't looked for

10    it --

11        Q    With respect to --

12        A    -- but this is not the totality of the

13    retention agreement, nor is it the totality of all the

14    retention agreements or agreements with Mr. Barela

15    relating to the fees and of the cots of the case.

16        Q    Is this part of the retention agreement that

17    you have with Mr. Barela?

18        A    I don't know, as I sit here right now,

19    because I haven't looked for the balance of the

20    documents.

21        Q    What is your understanding of what

22    contingency percentage Eagan Avenatti was entitled to

23    retain in the Barela v. Brock matter?

24        A    I don't have a recollection, as I sit here

25    right now, but it was far in excess of 40 percent,
```

**Exhibit D**

USAO_00060034
00059979

1    especially in light of the additional work that was

2    done for him.

3         Q    So, in excess of 50 percent, you think?

4         A    Sir, I'm not going to speculate or guess as

5    to this issue without having the balance of the

6    documents.

7         Q    And this is a document you believe you

8    produced to us?

9              Your Honor, I'm sorry.  The reason we're

10   going around in circles is Mr. Avenatti says, I need

11   the documents, and then he hasn't given us the

12   documents, and so it's a very frustrating situation

13   from the judgment creditors' perspective.  I'll

14   continue with my questioning, but it is -- I think we

15   need to revisit this document question because

16   Mr. Avenatti has trouble remembering things unless the

17   document is put in front of him, and he doesn't, then,

18   produce the documents.

19             THE COURT:  Well, I understood him to testify

20   that he didn't recall which documents he had or he

21   hadn't produced.

22             MR. STOLPER:  Well, I can represent he's

23   produced no additional documents since the last time

24   we -- since the order came out recommending that he be

25   held in contempt.  We've received none.

**Exhibit D**

USAO_00060035
00059979

1        Q     BY MR. STOLPER:  Now, Mr. Avenatti, you've

2    received payment as part of the resolution in the

3    Barela v. Brock matter; correct?

4        A     Not full payment.

5        Q     I understand.  You've received partial

6    payment in the Barela v. Brock matter; correct, sir?

7        A     Correct.

8        Q     Now, Mr. Avenatti, did you disclose to the

9    bankruptcy court that you were handling the Barela v.

10   Brock matter as part of your required disclosures of

11   the cases you were handling?

12       A     Sir, I don't recall what the required

13   disclosures were, but I will tell you that we, at all

14   times, adhered to the letter of the law in connection

15   with the bankruptcy matter, and, in fact, we

16   consistently consulted with bankruptcy counsel and

17   others to ensure that we did so.

18       Q     I'm handing you what's already been marked as

19   Exhibit 1, which is your disclosure of all the matters

20   that Eagan Avenatti has handled.

21            I'm going to hand it to you, and I'm going to

22   ask you to identify for me the Barela v. Brock matter

23   on the schedule, because I don't see it.

24            MR. HODGES:  Your Honor, the document is a

25   public record.  It speaks for itself.  Do we really

164

**Exhibit D**

USAO_00060036
00059979

```
 1   need to labor the record?

 2           THE COURT:  Well, let me ask, Counsel,

 3   whether it's on the schedule or whether it's not on the

 4   schedule, how does that help you find assets of Eagan

 5   Avenatti?

 6           MR. STOLPER:  Because, Your Honor,

 7   Mr. Avenatti concealed -- this is an Eagan Avenatti

 8   case that Mr. Avenatti concealed from the bankruptcy.

 9   He then took the money and sent it to another separate

10   account, denying Eagan Avenatti that recovery, in turn

11   denying Mr. Frank's law firm from obtaining that

12   recovery.  It's a fraudulent transfer.  And so the

13   fact --

14           THE COURT:  His testimony about whether it is

15   or isn't on the schedule isn't going to help in that

16   regard.

17           MR. STOLPER:  Okay.  I'll move on, Your

18   Honor.

19      Q    BY MR. STOLPER:  You received a $1.6 million

20   on behalf of Greg Barela in the Barela v. Brock case;

21   correct, sir?

22           MR. HODGES:  Your Honor, I will admonish the

23   witness that to the extent that constitutes a violation

24   of any confidentiality provision of the settlement

25   agreement, he needs to answer cautiously.
```

**Exhibit D**

USAO_00060037
00059979

```
 1              THE COURT:  And let me just ask counsel to be
 2     clear for the record.  When you say "you," do you mean
 3     Mr. Avenatti, personally, or do you mean Eagan
 4     Avenatti, or do you mean somebody else?
 5              MR. STOLPER:  I'm sorry, Your Honor.
 6        Q    BY MR. STOLPER:  Did Mr. Avenatti, through
 7     any entity, receive a $1.6 million transfer as part of
 8     the Barela v. Brock matter?
 9              (Attorney-client discussion.)
10              THE WITNESS:  Your Honor, there's a
11     confidentiality clause in the settlement agreement.
12              (Exhibit 16 was marked and bound under
13               separate cover.)
14        Q    BY MR. STOLPER:  Let me go ahead and put up
15     what's been marked as Exhibit 16.
16              This is a bank record of the Michael
17     J. Avenatti --
18              THE WITNESS:  Wait a minute.  Wait a minute.
19     Wait a minute.
20              THE COURT:  So I understood that you've
21     interposed an objection, and you've moved on to a
22     different question.
23              MR. STOLPER:  Correct.  I'm going to show a
24     document.
25              What I have before you, Your Honor, is a
```

166

**Exhibit D**

USAO_00060038
00059979

```
 1    Michael J. Avenatti attorney-client trust account,

 2    ending in 5566.  And what I'd like to do is show a wire

 3    transfer that came in from Brock to Mr. Avenatti.

 4           THE COURT:  Is this getting into confidential

 5    settlement terms, potentially, then, again?

 6           MR. HODGES:  He just disclosed some by virtue

 7    of referencing a specific figure.

 8           MR. STOLPER:  Mr. Barela's lawyer is present.

 9    He can assert whatever he needs to assert.

10           MR. HODGES:  Your Honor, may I?  And I want

11    to illustrate the concern here.

12           Prior to Mr. Stolper making reference to the

13    NFL, he asks questions about a confidential settlement.

14    He then proceeds to present a document for Mr. Ayers

15    that specifically put Mr. Stolper on notice of the

16    confidential terms of that settlement, and, in fact,

17    Mr. Ayers advised him, that before anyone could get

18    into any information pertaining to that confidential

19    settlement, the NFL and the parties to that case must

20    first be given notice.

21           Mr. Stolper knew that before he presented

22    questions to this witness in an attempt to bait him to

23    violate that confidentiality provision.  My concern is

24    the very same now as it was then.  We have not yet been

25    provided with a copy of the confidentiality agreement.
```

167

**Exhibit D**

USAO_00060039
00059979

1    Mr. Avenatti represents that it is subject to a

2    confidentiality agreement.

3         Notwithstanding the fact that counsel may be

4    present in the Courtroom, representing one of those

5    parties, that's not the extent of the obligations under

6    a typical confidentiality provision.

7         Unless and until all parties to a

8    confidential settlement are provided notice, it is not

9    fair game for any questioning in any public proceeding.

10        MR. STOLPER:  If I may, Your Honor?

11   Mr. Avenatti doesn't represent Brock.  His only client

12   in the case was Barela, who is here with new counsel.

13   So I -- while Mr. Avenatti's interest in protecting

14   Brock's confidentiality is -- I don't quite understand

15   where it's coming from, other than I think Mr. Avenatti

16   doesn't want to get into the questioning of what he did

17   with Mr. Barela's money.

18        MR. HODGES:  Your Honor, Mr. Avenatti has

19   answered questions for hours.  What Mr. Avenatti

20   doesn't want to do is violate a cannon of ethics, nor

21   does he want to violate express terms of a written

22   contract that would not only put his client or former

23   client in jeopardy, but his law firm, the Receiver, and

24   everybody else that's present.  He's duty bound to

25   assert this.

168

**Exhibit D**

USAO_00060040

00059979

```
 1              THE COURT:  We've already addressed this in
 2    the other line of questioning that if the question is
 3    going to ask about specific amounts that were paid
 4    under settlement that has confidential terms, then
 5    we'll just do that in a non-public setting.
 6              So is that the kind of question you want to
 7    ask here?
 8              MR. STOLPER:  What I'll do, Your Honor, is I
 9    will skip the total amount and just ask what happened
10    with the money.  How is that?
11              MR. HODGES:  That presumes money.  Again,
12    Your Honor, typically --
13              THE COURT:  Well, as I understand it, you've
14    got some evidence that there was some money that went
15    into an account.
16              MR. STOLPER:  Well, let me just -- I'll just
17    ask.  I mean --
18              MR. HODGES:  No, no, no.  Wait.
19              MR. STOLPER:  Your Honor, the issue -- so
20    what I have is a bank record.  So I have no access to
21    any confidential documents between Mr. Barela or
22    Mr. Brock.  Candidly, I have no duties to Mr. Barela
23    or Mr. Brock.  My duty is to JFL law.  What I have are
24    bank records, which we lawfully obtained.  Those bank
25    records reflect payments from one party to another.
```

169

**Exhibit D**

USAO_00060041

00059979

```
 1   That's not confidential.  It's simply a transaction.
 2           THE COURT:  So what do you want to ask him
 3   about the bank records?
 4           MR. STOLPER:  I intend to ask Mr. Avenatti if
 5   the money he received from Brock is money that belongs
 6   to Mr. Barela.
 7           THE WITNESS:  No.
 8           MR. STOLPER:  I'm going to ask that -- sorry.
 9   I apologize.  If the money he obtained from Brock was
10   money that belongs to Eagan Avenatti, and that if it,
11   in turn, was paid to Mr. Barela.
12           THE COURT:  So you want to ask him if he
13   received money from Mr. Brock.
14           MR. STOLPER:  From -- correct.  It's a
15   company, but, yes.
16           THE COURT:  Okay.  From Brock that should
17   have been -- if he personally received money that
18   should have gone to Eagan Avenatti.
19           MR. STOLPER:  Correct.
20           THE COURT:  All right.  So that presumes that
21   there was money that was received; right?
22           MR. STOLPER:  It does, Your Honor.  And --
23           MR. HODGES:  Which may very well violate the
24   terms of a confidentiality provision because I suspect
25   that that confidentiality provision says what most do,
```

170

USAO_00060042
00059979

```
 1    and that they may only identify the fact that the case

 2    has been resolved.  And when we start referencing the

 3    existence of a dollar, we have now gone beyond the

 4    terms of a confidentiality provision because now we

 5    know that something was paid.  That's a problem.

 6         MR. STOLPER:  Forgive me, Your Honor, I don't

 7    understand what Mr. Avenatti's interest is in this

 8    particular confidentiality.  Because Mr. -- let me

 9    finish -- Mr. Barela is here represented by counsel;

10    right?  To the extent that there's a concern about

11    trampling on Mr. Barela's confidentiality rights, that

12    is perfectly within his counsel's purview.

13         Mr. Avenatti has -- no longer has, as far as

14    I can tell, he has no obligation to Mr. Barela, because

15    he has new lawyers, and I have no idea what

16    obligations, if any, he has to Brock.  But as the Court

17    knows, it is no surprise that we're going to be getting

18    into questions of payments that a law firm receives as

19    part of its ordinary business.  And that's what I'm

20    here to question him about.

21         MR. HODGES:  That's half of the equation,

22    Your Honor.

23         THE COURT:  Again, if it has to do with

24    whether money was received pursuant to a confidential

25    settlement agreement, then that deserves confidential
```

**Exhibit D**

USAO_00060043
00059979

```
 1    treatment, and we'll treat it that way.
 2            MR. STOLPER:  Understood, Your Honor.  Let's
 3    go into closed courtroom, then.
 4            THE COURT:  All right.
 5            MR. STOLPER:  Your Honor, Mr. Barela's lawyer
 6    asked if he could remain.
 7            THE COURT:  Is there any objection to that?
 8            MR. HODGES:  There is, Your Honor.
 9            THE COURT:  On what basis?
10            MR. HODGES:  That before anything may be
11    disseminated to anyone regarding the terms of the
12    settlement, all parties to that settlement, not just
13    Mr. Barela, but Mr. Brock, and any other party to that
14    case must first be provided notice, just as Mr. Ayers
15    said in the context of the NFL case, so that they can
16    assert their rights.
17            I don't question counsel's ability to
18    adequately protect Mr. Barela's rights.  We're talking
19    about the parties that aren't here.  That's the
20    integrity of the system that Mr. Avenatti is duty bound
21    to assert the confidentiality for.
22            THE COURT:  Mr. Barela was a party to this
23    agreement.  He could share it with his attorney.
24            MR. STOLPER:  Thank you, Your Honor.
25            THE COURT:  So Mr. Barela's attorney can
```

172

**Exhibit D**

USAO_00060044
00059979

1    stay, but the other members of the public can clear the

2    Courtroom now, please.

3              (Proceedings held in closed session and bound

4              under separate cover.)

5    ////

6    ////

7    ////

8    ////

9    ////

10   ////

11   ////

12   ////

13   ////

14   ////

15   ////

16   ////

17   ////

18   ////

19   ////

20   ////

21   ////

22   ////

23   ////

24   ////

25   ////

173

**Exhibit D**

USAO_00060045
00059979

```
 1          Q    BY MR. STOLPER:  Mr. Avenatti, you received a

 2   $1.6 million payment in the Barela v. Brock matter; is

 3   that true?

 4          A    Sir, I --

 5               MR. HODGES:  Your Honor, may I have a moment

 6   with the Receiver?

 7               THE COURT:  You may.

 8               (Attorney-client discussion.)

 9               MR. HODGES:  Thank you.

10               MR. REITMAN:  Your Honor, just to be clear,

11   is this portion of the testimony going to be under

12   seal?

13               THE COURT:  Yes.  Whenever the Courtroom has

14   been sealed, the testimony that occurs during that time

15   will be under seal.

16               MR. REITMAN:  Thank you.

17          Q    BY MR. STOLPER:  I've placed on the Elmo

18   what's been marked as Exhibit 16.  This is the second

19   page.  Mr. Avenatti, this is a wire transfer between

20   Brock and Michael J. Avenatti, attorney-client trust

21   account.

22               Do you see that?

23          A    I see what's on the page.

24          Q    Okay.  Do you recall having Brock, as part of

25   the settlement, wire $1.6 million to the Michael
```

174

**Exhibit D**

USAO_00060046
00059979

1    J. Avenatti attorney-client trust account?

2       A   I don't.

3       Q   It says, "Brock settlement payment."  Does

4    that refresh your recollection this is a settlement

5    payment for the Barela v. Brock matter?

6       A   Sir, do you have the affidavit for the

7    custodian for this document?  I don't trust your

8    documents.

9       Q   Mr. Avenatti, my question is simple:  Do you

10   recall getting a $1.6 million wire in the Barela v.

11   Brock matter as part of the settlement?

12      A   I think at one time that happened, yes.

13      Q   Okay.

14      A   That's different than the question you asked

15   me before.

16      Q   Do you recall having the $1.6 million sent to

17   the Michael J. Avenatti attorney trust account?

18      A   I don't.

19      Q   Do you recall directing that money to the

20   Eagan Avenatti attorney trust account?

21      A   I may have.  I don't recall, as I sit here

22   today, one way or the other.

23      Q   Typically, when you settle a case,

24   Mr. Avenatti, do you tell the opposing party where to

25   wire the funds?

175

**Exhibit D**

USAO_00060047
00059979

1        A     It depends.

2        Q     Okay.  What does that depend upon?

3        A     It can depend on all -- a number of things,

4    including whether the money is coming by wire or not.

5        Q     Of the $1.6 million that was wired in the

6    Barela v. Brock matter, how much of that money did you

7    report as revenue for Eagan Avenatti as part of the

8    bankruptcy?

9              MR. HODGES:  Foundation.  Lacks foundation.

10             THE WITNESS:  I don't recall.  We reported

11   anything and everything we were required to report.

12       Q     BY MR. STOLPER:  Mr. Avenatti, is it your

13   position that the money that came in, in the Barela v.

14   Brock matter does not -- did not belong to Eagan

15   Avenatti?

16       A     Sir, I don't know, as I sit here right now,

17   one way or the other.  What I do know is, like I said

18   earlier, we consistently consulted counsel who advised

19   us on these matters.

20       Q     Mr. Avenatti, I'm asking you a very simple

21   question:  Was the Barela money that came in, any part

22   of that, property of Eagan Avenatti?

23             MR. HODGES:  Asked and answered.

24             THE WITNESS:  Sir, I don't recall.  I recall

25   that we relied on counsel in connection with all these

**Exhibit D**

USAO_00060048
00059979

```
 1   matter.
 2        Q    BY MR. STOLPER:  And that includes -- and
 3   just so we're clear, you're asserting a reliance upon
 4   counsel as to how the money that came in for the Barela
 5   v. Brock was allocated as between Eagan Avenatti and/or
 6   other entities; is that correct?
 7        A    No, that's not correct.
 8        Q    To the extent you're asserting a reliance of
 9   counsel -- a reliance of counsel claim, what is it
10   you're -- what is that claim?  What are you relying
11   upon counsel for?
12        A    I'm not asserting any claim.
13        Q    Okay.  Well --
14        A    All I'm saying is, is that in the course of
15   the bankruptcy proceeding, as it related to the receipt
16   of monies and the payment of monies and the reporting
17   of monies and the operating reports and the like, we
18   relied upon counsel that we had retained in connection
19   with the matter.
20        Q    Did you -- without getting into what the
21   advice was, did you consult with counsel as to how the
22   payment -- how the settlement money that came in, in
23   the Barela v. Brock matter ought to be allocated
24   between the judgment debtor, Eagan Avenatti, and other
25   entities that you controlled?
```

177

**Exhibit D**

USAO_00060049
00059979

1     A     I'm not going to get into -- that calls for

2     privileged communication.

3     Q     No, it does not.

4     A     No.  You asked me did I consult with counsel

5     about X, Y, and Z.

6           MR. STOLPER:  Your Honor, to the extent he's

7     asserting a reliance upon counsel, I would like an

8     answer to my question.

9           MR. HODGES:  He's actually not asserted

10    advice of counsel defense.  He's merely indicated he

11    conferred with counsel on the topic.  There's a

12    distinction under the law.

13          THE COURT:  Well, I think that was the

14    question:  Has he conferred with counsel on the topic?

15          MR. HODGES:  Then I would object --

16          THE WITNESS:  Yes.

17          MR. HODGES:  -- on the basis of privilege.

18          THE WITNESS:  Answer is yes.

19    Q     BY MR. STOLPER:  So with that answer,

20    Mr. Avenatti, which counsel did you confer with on the

21    topic of how the money that came in for the Barela v.

22    Brock matter should be allocated between the judgment

23    debtor, Eagan Avenatti, and other entities that you

24    controlled?

25          THE COURT:  The question is just which

**Exhibit D**

USAO_00060050
00059979

```
 1    lawyer?

 2              MR. STOLPER:  Correct.

 3              THE WITNESS:  As I sit here right now, I

 4    don't recall.  I'd have to look at my notes from

 5    documents.

 6         Q    BY MR. STOLPER:  Do you recall which law firm

 7    it would have been?

 8         A    I don't.

 9         Q    When you say you need to consult your notes,

10    what notes are you referring to?

11         A    I'd have to look to see if I have any notes

12    or anything relating to this, and then they might shed

13    some light on it.

14         Q    Mr. Avenatti, after the $1.6 million came in,

15    in Barela v. Brock, how -- first of all, that money

16    came into an attorney-client trust account; correct?

17         A    Sir, I don't recall.

18         Q    Okay.  The money that came in for the Barela

19    v. Brock matter, that was a settlement for Mr. Barela;

20    correct?

21         A    Sir, I don't agree with the predicate to your

22    question, okay?  That's the problem.  You keep asking

23    me questions that have predicates that I've disagreed

24    with, and then you load your next question with them,

25    so I don't know how to answer the question.
```

**Exhibit D**

USAO_00060051
00059979

```
 1        Q    Was the $1.6 million that we saw wired in to

 2   the Michael J. Avenatti trust account part of the

 3   settlement that was due to -- strike that.

 4             Was the $1.6 million that we saw wired in to

 5   the Michael J. Avenatti trust account part of the

 6   settlement that you obtained on behalf of Mr. Barela?

 7        A    Sir, when you say "that we saw," you refer to

 8   a document that I did not agree with the predicate to,

 9   and I did not agree with your assertions relating to

10   the document.

11             What I can recall is that $1.6 million was

12   received and, yes, it related to a matter for

13   Mr. Barela.

14        Q    How much of the $1.6 million that came in

15   related to a matter for Mr. Barela did you remit to

16   Mr. Barela?

17        A    I don't recall.

18        Q    Was it any money?

19        A    I don't recall, as I sit here right now,

20   because I don't have the accounting records in front

21   me.  What I can recall is he still owes us money.

22        Q    How much money does Mr. Barela owe?

23             When you say "us," do you mean Michael J.

24   Avenatti, Avenatti & Associates, or Eagan Avenatti?

25        A    One or more of those firms or individuals.  I
```

180

**Exhibit D**

USAO_00060052
00059979

1    don't know, as I sit here right now.

2        Q    How much money does Mr. Barela owe each of

3    those firms?

4        A    I -- I can't answer that question without

5    looking at the documents.

6        Q    What is the basis for your claim that

7    Mr. Barela owes money to Eagan Avenatti?

8        A    Because we did a bunch of work for him and

9    we weren't paid for it, and we also advanced a bunch of

10   costs.

11       Q    Was Mr. Barela an hourly client?

12       A    In some instances, yes.

13       Q    What was the hourly rate Mr. Barela was

14   supposed to pay?

15       A    I don't recall, as I sit here.

16       Q    Mr. Avenatti, I'm going to show you what I've

17   previously marked as Exhibit 16, which you are

18   maintaining you're not sure what it is.  I'm going to

19   walk through the document and ask you a couple of

20   questions.

21           THE COURT:  Does this still relate to the

22   confidential settlement?

23           MR. STOLPER:  It does, Your Honor.

24           THE COURT:  Okay.

25       Q    BY MR. STOLPER:  This is a bank record that

181

**Exhibit D**

USAO_00060053
00059979

```
 1    we obtained from the City National Bank, and this is

 2    for the Michael J. Avenatti attorney-client trust

 3    account.

 4              That's your address, sir, 520 Newport Center

 5    Drive, Suite 1400, or was it at that point in time?

 6              MR. HODGES:  Your Honor, objection.  Lacks

 7    foundation.  Hearsay.  There's no --

 8              THE COURT:  You can finish.

 9              MR. HODGES:  There is absolutely no

10    authentication of this document, whatsoever.

11              THE COURT:  All right.  I understand the

12    question just to be whether the address on the document

13    was, in fact, his address.

14              MR. HODGES:  No.  Well, my understanding of

15    the question was is this bank document, from this

16    particular bank, containing certain information.

17              THE COURT:  No one is asking the witness to

18    authenticate the document.  It's just about the

19    information.

20        Q    BY MR. STOLPER:  First of all, was your

21    address, in January of 2018, 520 Newport Center Drive,

22    Suite 1400?

23        A    I think we've already established that, sir.

24        Q    Okay.  And did you bank at City National

25    Bank?
```

**Exhibit D**

USAO_00060054
00059979

```
 1              MR. HODGES:  This has been asked and
 2    answered, Your Honor.
 3              MR. STOLPER:  I'm trying to lay a foundation,
 4    Your Honor.  He's denying this is his bank record, Your
 5    Honor.  I've got to lay a foundation.
 6              THE WITNESS:  First of all, this is the first
 7    time I've ever seen this document in the proceeding.
 8              MR. HODGES:  Your Honor, my client can't
 9    authenticate the bank's records, regardless of what
10    question is posed.
11              THE COURT:  Right.  What you can do is you
12    can ask him if he remembers this account, if he
13    remembers this statement, if he remembers these
14    transactions.
15              MR. STOLPER:  I just asked him if he
16    remembered having an account at this bank, Your Honor.
17    I'm going to get there next.
18              THE COURT:  Okay.
19        Q    BY MR. STOLPER:  Mr. Avenatti?
20        A    Is the name of the bank anywhere on this
21    document?
22              MR. HODGES:  The record should reflect that
23    counsel is now changing pages, not the page that he
24    specifically asked Mr. Avenatti about.  And the record
25    will reflect it does not identify a bank.
```

183

**Exhibit D**

USAO_00060055
00059979

```
 1        Q    BY MR. STOLPER:  That's fine.  Did you ever

 2   bank at City National -- did you have an account at --

 3   yes -- at CNB.com?  Does that help?

 4             MR. HODGES:  Well, object to the form of that

 5   question to the extent that doesn't have somebody's

 6   initials on it.

 7        Q    BY MR. STOLPER:  Do you see where it says,

 8   "CNB.com," Mr. Avenatti?

 9        A    That's the question?  Do I see that?  Yes.

10        Q    Okay.  Do you understand CNB to be the

11   initials for City National Bank?

12        A    They're the initials for all kind of things.

13        Q    Is the one of those things City National

14   Bank?

15        A    I don't know.

16        Q    You don't know if CNB is --

17             THE COURT:  I think all you're trying to ask

18   him is did he have an account at the time at City

19   National Bank.

20        Q    BY MR. STOLPER:  Did you, Mr. Avenatti?

21        A    I believe so.

22             THE COURT:  Okay.

23        Q    BY MR. STOLPER:  Mr. Avenatti, the records

24   show that the $1.6 million came into this account on or

25   about January 5th, 2018.
```

**Exhibit D**

USAO_00060056
00059979

```
 1              MR. HODGES:  I'm sorry.  I can't hear
 2   counsel.
 3              MR. STOLPER:  Sorry.
 4       Q    BY MR. STOLPER:  The records indicate the
 5   wire came in on or about January 5, 2018.
 6              Do you see that?
 7              MR. HODGES:  That lacks foundation and
 8   assumes facts that this reflects anything.  This is
 9   hearsay.  There's been no authentication of this
10   document.  And he's offering it now to prove the
11   existence of a transfer.
12              THE COURT:  I understand that all that
13   question was, was asking if he saw on the document a
14   line item relating to a particular transaction.
15              MR. HODGES:  You can answer.
16              THE WITNESS:  Sir, I see what's on the page,
17   but there's no authentication to these records, and I
18   don't agree that they're authentic or legitimate.
19       Q    BY MR. STOLPER:  I understand.
20              After you received money into the Michael
21   J. Avenatti attorney-client trust account, you then
22   sent it to someone by the name of Ed Ricci; isn't that
23   true?
24              MR. HODGES:  Lacks foundation.  Assumes facts
25   not in evidence.
```

185

**Exhibit D**

USAO_00060057
00059979

```
 1              THE COURT:  Do you recall receiving money

 2     into your trust account and then sending it to

 3     Mr. Ricci?

 4              THE WITNESS:  I don't recall that.

 5        Q    BY MR. STOLPER:  Do you recall receiving

 6     money from Mr. Barela into any trust account -- strike

 7     that.

 8              Do you recall receiving money from Mr. Brock

 9     on behalf of Mr. Barela in any trust account?

10              MR. HODGES:  Asked and answered.

11              THE WITNESS:  Your Honor, I've answered this

12     question.

13              THE COURT:  This is a yes or no question.

14              THE WITNESS:  Sir, I have a recollection of

15     receiving settlement monies at some point in time

16     relating to Mr. Barela.

17        Q    BY MR. STOLPER:  And I believe you've already

18     testified that was approximately $1.6 million; correct?

19              (Simultaneous colloquy.)

20              THE COURT REPORTER:  One at a time.

21        Q    BY MR. STOLPER:  Did Mr. Barela ever

22     authorize you to take any of his money or any of the

23     money that was obtained as part of the settlement and

24     send it to Ed Ricci?

25        A    Sir, all transfers of these monies were
```

186

**Exhibit D**

USAO_00060058
00059979

```
 1    legitimate, ethical, and legal under California law at
 2    all times.   I don't have a recollection if he did or he
 3    didn't, but I disagree with your predicate which is
 4    that somehow these were his monies.   They weren't his
 5    monies.
 6         Q    The money that came in for the Barela
 7    settlement wasn't Mr. Barela's money?
 8         A    Sir, you have my testimony.
 9         Q    All right.  Did Mr. Barela ever authorize you
10    to send money obtained as part of his settlement to
11    Global Baristas on or about January 12, 2018?
12         A    Same answer, sir.
13         Q    Mr. Avenatti, did you inform Mr. Barela
14    promptly when the money for his settlement came in?
15              MR. HODGES:  Vague and ambiguous as to the
16    term "promptly."
17              THE WITNESS:  I don't recall, as I sit here.
18         Q    BY MR. STOLPER:  Did you provide Mr. Barela a
19    statement after his settlement came in, showing how
20    money was used?
21         A    I don't recall, as I sit here, without
22    looking at the documents.
23         Q    Did Mr. Rechey --
24              MR. HODGES:  May I have a moment, Your Honor,
25    real quickly with the Receiver?
```

187

**Exhibit D**

USAO_00060059
00059979

```
 1                THE COURT:  Yes.
 2                MR. HODGES:  Thank you.
 3           Q     BY MR. STOLPER:  Did Ed Ricci provide legal
 4     services to Mr. Barela?
 5           A     I don't recall.  I don't think he did.
 6           Q     Looking at the money that came in to this
 7     Michael J. Avenatti attorney-client trust account for
 8     $1.6 million, I just want to ask you -- I'll ask you
 9     generally -- did Mr. Barela approve any disbursements
10     of that money to any of the entities that are listed
11     here?  You can look at it.  It's Dillanos Coffee, Burt
12     Contracting, a bakery, Global Baristas, any of the
13     money that went out of the attorney-client trust
14     account, was any of that money disbursed at
15     Mr. Barela's direction?
16           A     Sir, it may have been.  I don't know without
17     looking at other documents and further considering the
18     matter.  I don't know.
19           Q     Okay.  Well, let's look more specifically --
20           A     But it wasn't -- it wasn't his money.
21           Q     It was all of your money?
22           A     No.  I didn't say that.
23           Q     Whose money was it?
24           A     I said it --
25           Q     Whose money was it?
```

**Exhibit D**

USAO_00060060
00059979

```
1        A    It was --

2        Q    Sorry.  Whose money was it?

3        A    Mr. Stolper, the money was handled pursuant

4   to California law and ethical requirements legitimately

5   at all times, okay.  We represented Mr. Barela on a

6   number of matters.

7        Q    Whose money was it, Mr. Avenatti?

8        A    Which money?

9        Q    The 1.6 million that came in, in the Barela

10  v. Brock settlement.  Whose money was that once it came

11  in?

12       A    I believe it was the money of the various

13  firms that had operated or worked on his behalf.

14       Q    None of that money belonged to Mr. Barela?

15       A    I -- I don't know.  I'd have to look at other

16  documents.  I don't believe so.

17       Q    Did you send Mr. Barela a statement after the

18  $1.6 million was obtained, showing him how the money

19  was accounted for?

20       A    Sir, you asked me that.  I said I didn't

21  recall, I'd have to look at other documents.

22       Q    Are those documents that Eagan Avenatti

23  maintains in the ordinary course?

24       A    I don't know because I haven't looked for the

25  documents.
```

189

**Exhibit D**

USAO_00060061
00059979

1        Q    My question wasn't to have you look for the

2   documents.

3            My question is in the ordinary course of

4   business, does Eagan Avenatti maintain copies of client

5   statements that it provides to them after a settlement

6   is reached?

7        A    Generally, yes.

8            MR. STOLPER:  I think we're done with this

9   particular one, Your Honor.  Let me move on.

10           THE COURT:  All right.  So we can invite the

11   gallery back in?

12           MR. STOLPER:  Yes.

13           (Open session proceedings resumed.)

14   ////

15   ////

16   ////

17   ////

18   ////

19   ////

20   ////

21   ////

22   ////

23   ////

24   ////

25   ////

190

**Exhibit D**

USAO_00060062
00059979

 1      Q    BY MR. STOLPER:  Mr. Avenatti, have you ever

 2   opened up a bank account outside the United States?

 3           MR. HODGES:  Are you asking him personally?

 4   That violates his right to privacy, Your Honor.

 5           THE COURT:  How is that tied to assets of

 6   Eagan Avenatti?

 7           MR. STOLPER:  Well, first of all, I want to

 8   know if there's accounts.  Then I want to ask what

 9   monies are in those accounts.

10           MR. HODGES:  Your Honor, that goes beyond the

11   scope.  Mr. Avenatti is not here as a judgment debtor.

12           MR. STOLPER:  That's not --

13           MR. HODGES:  May I finish?

14           Mr. Avenatti has rights to privacy.  There's

15   an opportunity for counsel to ask that in the proper

16   forum, the context of the state court across the

17   street, but not in this proceeding.

18           THE COURT:  I think if you can phrase

19   questions in terms of where has money from Eagan

20   Avenatti gone, those would be appropriate.

21           MR. STOLPER:  I will try and do that, Your

22   Honor, but obviously Mr. Avenatti and I have a

23   disagreement about whose money is whose.  So let me try

24   to ask him more generally.

25      Q    BY MR. STOLPER:  Mr. Avenatti, you retain

191

**Exhibit D**

USAO_00060063
00059979

```
 1   Italian citizenship as an adult; correct?

 2           THE COURT:  Is there an objection to that?

 3           MR. HODGES:  I'm going to let you answer that

 4   question.

 5           (Attorney-client discussion.)

 6           MR. HODGES:  Objection.  Relevancy.  Beyond

 7   the scope.

 8           MR. STOLPER:  Let me ask a general question.

 9       Q   BY MR. STOLPER:  While you were managing

10   partner of Eagan Avenatti, did you obtain Italian

11   citizenship?

12           MR. HODGES:  Same objection.  It's beyond the

13   scope.  This is far afield from assets and liabilities.

14   We're now at 3:30 in the afternoon, and the words --

15   what are assets and what are the liabilities of the

16   entity has actually yet to be asked.

17           THE COURT:  Well, if he has Italian

18   citizenship or not, how does that pertain to the

19   assets?

20           MR. STOLPER:  My next question is going to be

21   with that Italian citizenship, did he open up an

22   Italian bank account?  My next question is going to be

23   after opening up an Italian bank account, did he

24   transfer money in?  Then my question is going to be

25   where did that money come from?  And if it's from Eagan
```

192

**Exhibit D**

USAO_00060064
00059979

1    Avenatti or Avenatti & Associates or someplace else,

2    then I'm going to follow-up with it.

3         Your Honor, I'm trying to explore where the

4    money went for Eagan Avenatti, and I'm concerned that

5    some of it may no longer be in the U.S.

6         THE COURT:  It seems that that could be

7    pursued by getting right to the heart of the question

8    immediately.

9         MR. STOLPER:  The challenge, Your Honor, is

10   if I say, did you ever wire Eagan Avenatti money from

11   the U.S. to your overseas bank account, Mr. Avenatti,

12   as I said, he and I have a disagreement as to what the

13   firm's money is.  And that's really what today's

14   judgment debtor exam is really frankly focused on.

15        And so it's hard for me to -- if I ask that

16   question, as sure as he's sitting there, Mr. Avenatti

17   is going to say, no, because he has a different

18   perspective than the judgment creditor has.

19        THE WITNESS:  No.  Because that's the answer.

20   That's the answer, counsel.

21        THE COURT:  And at this point, you're

22   entitled to his testimony about the assets of Eagan

23   Avenatti.

24        MR. STOLPER:  Correct.

25        THE COURT:  If he tells you something that

**Exhibit D**

USAO_00060065
00059979

1    you think is inconsistent with documents or something

2    else, then at some point in time, you can show that,

3    but here we're just trying to figure out where the

4    assets might be.

5             MR. STOLPER:  Correct, Your Honor.  And so

6    if, for example, while he was managing partner at Eagan

7    Avenatti, he opened up an overseas bank account in

8    wherever, a question that I would want to ask, then, is

9    okay, where did the money come from to fund that bank

10   account.  At which point he may say, Avenatti &

11   Associates, he may say I don't remember, but it's from

12   this bank.  And then I would want to go look for that

13   money to try and follow it down.

14            But I can't -- you're asking -- respectfully,

15   Your Honor, by not allowing me to ask the predicates,

16   you're allowing Mr. Avenatti to basically foreclose any

17   inquiry into whether there's overseas assets because

18   he's simply going to say there are no overseas assets

19   that belong to Eagan Avenatti, as opposed to me trying

20   to determine for ourselves and, frankly, for the

21   Receiver to determine for himself, whether or not that

22   money is, in fact, his personal money, as opposed to

23   Eagan Avenatti money.

24            THE COURT:  I guess I'm not quite sure.  If

25   you ask him, did you fund any overseas bank accounts

**Exhibit D**

USAO_00060066
00059979

```
 1   with money from Eagan Avenatti, and he says, no --

 2           MR. STOLPER:  Right.  But where this gets --

 3   he will take money from Eagan Avenatti, and then he

 4   will wire it to Avenatti & Associates, and then he'll

 5   wire it overseas.  And that money may belong to Eagan

 6   Avenatti.  It may be a fraudulent transfer.

 7           He will have testified one way, but because

 8   of his testimony, I won't be able to follow the trail,

 9   if you will, follow the bread crumbs, to figure out for

10   myself whether to give Mr. Avenatti's testimony credit

11   as to whether or not this was Eagan Avenatti money or

12   somebody else's money.

13           THE COURT:  Well, let's try and ask the

14   questions focused on assets and not on Italian

15   citizenship and matters that seem pretty collateral.

16           MR. STOLPER:  How about this, Your Honor.

17   You transferred --

18           THE WITNESS:  Your Honor, I'd like to be

19   heard on one thing.

20           THE COURT:  Let's let him finish.  We don't

21   have a question pending right now.

22           MR. STOLPER:  How about, Your Honor, if I

23   asked, Mr. Avenatti, have you transferred any assets

24   outside of the United States in excess of $10,000 in

25   the last four years?
```

**Exhibit D**

USAO_00060067
00059979

```
 1              MR. HODGES:  I would object on the right to
 2    privacy to the extent he's asking about transfers of
 3    personal resources.  We are not here for Mr. Avenatti's
 4    judgment debtor exam.  That is beyond the scope of the
 5    order.  That is beyond the scope of a proper judgment
 6    debtor examination, period.
 7              Mr. Stolper has just made an offer of proof
 8    as to the relevancy of this line of questioning.  He
 9    has now posited the ultimate question five times.  He
10    refuses to ask that because he's presupposing the
11    answer.  And so he wants to tread upon Mr. Avenatti's
12    right to privacy regarding all sorts of information,
13    knowing that at the end of the day, after he elicits
14    that private information, he's going to get a no, that
15    leads to nothing having to do with the collection of
16    monies.
17              THE COURT:  If you have some documents you
18    want to ask him about that you think show something
19    else, otherwise I don't see how going down that path is
20    going to demonstrate to you that these are assets of
21    Eagan Avenatti.
22              MR. STOLPER:  I'll make one last run, and
23    then I'll move on.
24              THE COURT:  Okay.
25              MR. STOLPER:  My last run is this:  If he
```

196

**Exhibit D**

USAO_00060068
00059979

 1   were to say, yes, I transferred -- I'll make up a

 2   number -- $50,000 overseas.  And I'd say, where?  He'd

 3   say, the bank of ABC, but that was my personal money.

 4   As the judgment creditor, what I would then do is avail

 5   myself of process to figure out is this $50,000, in

 6   fact, Mr. Avenatti's money or is this $50,000 property

 7   of Eagan Avenatti?

 8             And the reason that -- and, Your Honor, you

 9   know, that's ultimately where -- and I'm not saying

10   overseas bank accounts.  But ultimately a huge part of

11   the recovery of the judgment creditor in the case is

12   going to come from fraudulent transfers that were made

13   by Mr. Avenatti taking money that was due to the firm

14   and diverting it.  And that's what we've been spending

15   a lot of time here really talking about and questioning

16   Mr. Avenatti about.

17             And so this question of is there money

18   overseas, that is an important question for us to know

19   the answer to.  And I respect that Mr. Avenatti will --

20   I fully anticipate Mr. Avenatti will say, that's my own

21   money, but I'm not required to take him at his word.

22   I'm entitled, as the judgment creditor, to follow that

23   money and make sure that that money is, in fact, money

24   that belongs to Mr. Avenatti, individually, as opposed

25   to money that was siphoned away from Eagan Avenatti.

197

**Exhibit D**

USAO_00060069
00059979

```
 1            That's my last -- my last old college try on
 2    that one, Your Honor.
 3            MR. HODGES:  You don't get to go through the
 4    backdoor.  You need to make a showing.  You don't get
 5    to trample upon this gentleman's right to privacy by
 6    asking about the existence of bank accounts.  He's here
 7    on behalf of an entity, and we are allowed to focused
 8    on the assets and liabilities of the entity.
 9            Counsel can certainly ask if there's been any
10    transfer from that entity or transfer of monies
11    belonging to that entity to a personal account, but
12    that is not what he's suggesting.
13            THE COURT:  I think it would be too broad to
14    permit questioning on every personal asset on the
15    theory that if I go and do more research on it, I might
16    discover some impropriety.  So in the absence of some
17    threshold showing that you believe there's some account
18    out there that there's some reason to believe is linked
19    to income that should have gone to Eagan Avenatti,
20    those questions seem too broad.
21            But you can certainly ask about transfers of
22    funds that were specific to legal matters that Eagan
23    Avenatti was involved in or that you have some other
24    reason to believe would be assets of Eagan Avenatti.
25            MR. STOLPER:  Very well, Your Honor.
```

**Exhibit D**

USAO_00060070
00059979

1       Q     BY MR. STOLPER:  Mr. Avenatti, have you ever

2   caused an overseas bank account to be opened up where

3   the correspondent address is 520 Newport Center Drive,

4   Suite 1400?

5           MR. HODGES:  Well, I would object.  It

6   violates his right to privacy to the extent that

7   account was opened up in his name for his personal

8   benefit, regardless of what address he subscribed to

9   it.  Mr. Avenatti has already testified that particular

10  address was used by numerous entities.

11          MR. STOLPER:  Your Honor, the rent was paid

12  and then not paid by Eagan Avenatti.  That's the

13  business address of Eagan Avenatti.

14          I think that's -- I appreciate the Court's

15  time, but I'm trying to narrow it without -- I don't

16  think it has to have the magic words "Eagan Avenatti."

17  If he's opening up an overseas bank account, using his

18  business address, where the rent for that business is

19  being paid for by the law firm, I think that's a fair

20  question.

21          MR. HODGES:  Except for the fact that

22  Mr. Avenatti has testified under oath that there's

23  multiple entities, third parties, who have rights, that

24  utilize the same address.  It's very curious to me as

25  to why counsel keeps dodging the ultimate question and

199

**Exhibit D**

USAO_00060071
00059979

1   doesn't focus his question on Eagan Avenatti because,

2   whether he likes it or not, that's the judgment debtor

3   here.

4            THE WITNESS:  Your Honor --

5            MR. STOLPER:  Respectfully, Your Honor, these

6   are not third parties.  It's Avenatti & Associates;

7   Avenatti, LLP; Eagan Avenatti; and the Law Offices of

8   Michael J. Avenatti.  There is no third-party interest

9   that I'm attempting to invade.  All these entities are

10  simply Michael Avenatti in different form.

11           THE WITNESS:  Your Honor --

12           THE COURT:  If he used his personal -- if he

13  used a business address and put his personal name on it

14  and it's a personal account, I'm not sure that that

15  gets you close enough to it being tied to Eagan

16  Avenatti.

17           MR. STOLPER:  Very well, Your Honor.

18           THE WITNESS:  Your Honor, I've never had any

19  foreign bank accounts, okay?

20           And, now, I'd like to be heard on something.

21           THE COURT:  When you say, you've never had

22  any foreign bank accounts, you mean you, personally?

23           THE WITNESS:  Me, personally; Eagan Avenatti;

24  Avenatti & Associates.  No foreign bank accounts, okay?

25           THE COURT:  Okay.

200

**Exhibit D**

USAO_00060072
00059979

```
 1            THE WITNESS:  All right.  Now, I'd like to be
 2   heard on something.
 3            MR. STOLPER:  Your Honor, I'd like to
 4   continue my questioning.
 5            THE WITNESS:  No.  I'd like to be heard on
 6   something because this is very important, Your Honor,
 7   okay?  I'm a trial lawyer by trade.  That's what I do.
 8            THE COURT:  Is this an objection?
 9            THE WITNESS:  Yeah, it is an objection.  And
10   here's what I'm going to object to because I've sat
11   here patiently all day and I've watched something that
12   is entirely improper.  And if I did it in any other
13   courtroom here or in a trial, I'd be held in contempt
14   and locked up likely and rightfully so.
15            Here's what's not proper.  If I have a
16   witness on the stand, I can't ask a question of the
17   witness without a predicate -- without some foundation
18   for the question.  I've got to have some evidence of
19   it.  I can't have a guy on the stand and say, when did
20   you stop beating your wife, unless I have evidence that
21   he actually beat his wife at some point in time, etc.
22   You can't do that.
23            And what I've witnessed here today, Your
24   Honor, is abhorrent.  It's outrageous, what I've seen.
25   What I've witnessed time and time again by Mr. Stolper
```

201

**Exhibit D**

USAO_00060073
00059979

```
 1   is he makes these grandiose statements to Your Honor,

 2   and these predicate questions, and he make it sound

 3   like they're facts; i.e., that I had foreign bank

 4   accounts, or he had some evidence of this, and he has

 5   no evidence.  And it's happened 50 times here today.

 6            And I would ask that counsel be admonished

 7   that if he's going to ask a question, he needs to have

 8   some basis for the question.  And that's all I'm asking

 9   you.

10            THE COURT:  My view is it just needs to be

11   tied to Eagan Avenatti.  So if he's going to ask, does

12   Eagan Avenatti own a yacht, he doesn't have to have a

13   reason to think they own a yacht.  But maybe the answer

14   is yes, maybe the answer is no.  At least it's directed

15   at discovering what are the assets of Eagan Avenatti.

16   So that's what we're going to focus on from here.

17            MR. STOLPER:  Thank you, Your Honor.

18       Q   BY MR. STOLPER:  Who is Nadjat-Haiem?

19            I apologize if I'm mispronouncing that.

20            Mr. Avenatti?

21       A   I don't recall.

22       Q   Isn't it true that Nadjat-Haiem was a client

23   of Eagan Avenatti?

24       A   Yeah.  Nadjat-Haiem, I believe, works for the

25   Internal Revenue Service.  So I'm going to say, no,
```

202

**Exhibit D**

USAO_00060074
00059979

```
 1    Nadjat-Haiem has never been a client of Eagan Avenatti,

 2    Mr. Stolper.  That would be another example of --

 3         Q    I apologize.  I dropped her first name.

 4    It's Jennifer Nadjat-Haiem.

 5         A    I'm sorry.  What's the question?

 6         Q    Who is Jennifer Nadjat-Haiem?

 7         A    Jennifer Hiem was a client of the firm.

 8         Q    And when you say, "of the firm," she was a

 9    client of Eagan Avenatti; correct?

10         A    I don't know if that's true or not.

11         Q    Who was she a client of?

12         A    Well, she was a client of mine.

13         Q    You, individually?

14         A    Well, she was a client of me.  She may have

15    been a client of Avenatti & Associates.  She may have

16    been a client of Eagan Avenatti.  She was a client of

17    the X Law firm.  I don't recall who exactly she was a

18    client of.

19         Q    And Ms. Hiem settled the matter; correct?

20         A    Yes.

21         Q    And, forgive me, was this settlement

22    confidential or not, do you know?

23         A    Yes, it was confidential.

24         Q    Who was the -- sorry.

25              This was a public filing; correct, a public
```

**Exhibit D**

USAO_00060075
00059979

```
 1   case?

 2       A    She had a public lawsuit, correct.

 3       Q    Okay.  And that was filed in Orange County

 4   Superior Court -- sorry -- L.A. County Superior Court;

 5   correct?

 6       A    I don't recall where it was filed.  It may

 7   have been.

 8            (Inaudible discussion.)

 9            (Exhibit 23 was marked and retained by

10             counsel.)

11       Q    BY MR. STOLPER:  I've marked what -- I'm

12   going to hand the witness what's been marked as Exhibit

13   23.  I'm not going to announce what the amount of the

14   check is, but there is a check.

15            Mr. Avenatti, that check is made payable to

16   Eagan Avenatti, LLP; correct, sir?

17       A    Ah, yes.

18       Q    Actually, it's made payable to the client --

19   it's made payable to Eagan Avenatti for the benefit of

20   the client; correct?

21            MR. HODGES:  Your Honor, that misstates the

22   document.

23            THE WITNESS:  Yeah.  That's not what the

24   document says.

25       Q    BY MR. STOLPER:  Let me see.  It says, pay to
```

**Exhibit D**

USAO_00060076

00059979

1    the order of Eagan Avenatti, LLP, as attorney for

2    Jennifer Nadjat-Haiem; correct?

3        A    That's what the document says.

4        Q    Did you deposit -- and this check is dated

5    September 18, 2017; correct?

6        A    I don't know.  Whatever the document is

7    dated, it's dated.  Yeah, it's dated September 18,

8    2017.

9        Q    This was a case you worked on with the X Law

10   Group; correct?

11       A    I think I just said that.

12            THE COURT:  I'm not sure I did hear that.

13            MR. STOLPER:  I didn't hear that.

14            THE WITNESS:  Yeah, I mentioned the X Law

15   Group.  But, yes.

16       Q    BY MR. STOLPER:  And when you received this

17   check, where did you deposit it?

18       A    I don't recall.

19       Q    Well, isn't it true that you deposited it in

20   the Eagan Avenatti, LLP attorney-client trust account?

21       A    I -- I don't know.  I can't tell you every

22   check that we received and where it went.

23            (Exhibit 25 was marked and retained by

24            counsel.)

25       Q    BY MR. STOLPER:  Well, let me go ahead and

**Exhibit D**

USAO_00060077
00059979

```
 1   put on the Elmo, with permission, what's been marked as
 2   Exhibit 25, which is a copy of the Eagan Avenatti, LLP,
 3   trust account for September of 2017.
 4       A    Your Honor, what was the -- what was the use
 5   in not disclosing the amount of the confidential
 6   settlement if he's now going to disclose the amount by
 7   way of this document?
 8           MR. HODGES:  Yeah.
 9           MR. STOLPER:  I haven't published it, Your
10   Honor.
11           THE COURT:  Right.  So, as I understand it,
12   you're giving it to counsel to look at to see if
13   there's an objection, and I hear there is an objection
14   to publishing the amount.
15           MR. HODGES:  There will be, Your Honor, yes,
16   and the document does reflect amounts.
17       Q    BY MR. STOLPER:  Now, Mr. Avenatti, when you
18   were in bankruptcy, as part of your monthly operating
19   reports, you had to disclose to the bankruptcy court
20   whether or not you were getting paid any money as an
21   insider; correct?
22       A    I don't believe that's correct.  It may be.
23   I have no idea.  I advised -- I relied on the advice of
24   bankruptcy counsel relating to all of those matters.
25               (Exhibit 28 was marked and retained by
```

**Exhibit D**

USAO_00060078
00059979

```
 1              counsel.)
 2       Q    BY MR. STOLPER:  Well, let's look at what's
 3   been marked as Exhibit 28, which is -- this is the
 4   October operating report for 2017.
 5              Does that document look familiar to you?
 6       A    No.
 7       Q    Okay.  Well, isn't it true that you signed
 8   this document, as the managing partnership of Eagan
 9   Avenatti?
10       A    Sir.  We were talking about the other
11   document, as well as some generalities relating to
12   these documents.  We didn't prepare these.  They were
13   prepared by bankruptcy counsel.
14              (Exhibit 28A was marked and retained by
15              counsel.)
16       Q    BY MR. STOLPER:  Sir, did you sign what's
17   been marked as Exhibit 28A, as the managing partner of
18   Eagan Avenatti?
19       A    Yes.
20       Q    And when you signed it, you represented that
21   you thought that the previous information was true and
22   complete to the best of your knowledge; correct?
23       A    I -- I signed it pursuant to this
24   attestation.
25       Q    Okay.  And one of the things that you're
```

**Exhibit D**

USAO_00060079
00059979

```
 1    attesting to quotes?  As the debtor in possession
 2    during the period provided compensation or remuneration
 3    to any officers, directors, principals, or other
 4    insiders without appropriate authorization.
 5            And you wrote "no"; correct?
 6        A   Well, no, I didn't write "no."  Our
 7    bankruptcy counsel wrote "no."
 8        Q   But then you, on the bottom of the page, you
 9    signed and agreed with that; correct?
10        A   I signed this document.  I was given all
11    kinds of documents to sign.  Bankruptcy counsel was
12    preparing these reports, which is one of the reasons
13    why they billed us over a million dollars.
14        Q   In addition, there is a schedule that has
15    schedule of amounts paid insiders.  It's actually two
16    different tables.  It's on page 13 of the exhibit.
17            In both places, your bankruptcy counsel
18    indicated "none" above your signature; correct?
19        A   I -- I don't know whether that's true or not.
20    You're just showing me a page of a document.
21        Q   Well, it says, gross compensation paid during
22    the month; name of insider, it says, "none."
23            Am I reading that correct?
24        A   Sir, I'm not quibbling with what's on the
25    page.  I don't have an independent recollection of
```

208

**Exhibit D**

USAO_00060080
00059979

```
 1   this.
 2       Q    But you stand by your signature that this was
 3   true and correct, to the best of your knowledge, at the
 4   time that you signed it; right?
 5       A    Sir --
 6       Q    Let me finish.
 7            That you didn't receive any compensation in
 8   October of 2017, from Eagan Avenatti; correct?
 9       A    Sir, without the documents, I'm not prepared
10   to answer your question.  So I can't answer your
11   question.  I'm sorry.
12       Q    What documents do you need to answer my
13   question as to whether or not you certified that you
14   didn't receive any compensation from Eagan Avenatti in
15   October of 2017?
16       A    Well, I disagree with your predicate -- to
17   the predicate of your question, first of all.
18       Q    Okay.  What documents do you need,
19   Mr. Avenatti, to answer that question truthfully?
20       A    Sir, whatever documents went into the
21   preparation of this report; I'd want to consult with my
22   bankruptcy counsel; I'd want to find out what they
23   consulted; I'd want to go back and refresh my
24   recollection as to what communications I had with my
25   bankruptcy counsel, relating to the preparation of this
```

**Exhibit D**

USAO_00060081
00059979

```
 1   report.  I was not preparing these reports.
 2        Q    Did you take the preparation of these reports
 3   seriously?
 4        A    Yes.
 5        Q    And as part of that serious preparation, can
 6   you stand by your statement that you didn't receive the
 7   representation of the bankruptcy court that you didn't
 8   receive any compensation as an insider in October of
 9   2017?
10        A    Sir, you just asked me that question, and I'm
11   going to stand by my prior answer.
12        Q    Mr. Avenatti, I'm not trying to trick you.
13   I'm just trying to ask whether or not you stand by your
14   jurat, your statement, that to the best of your
15   knowledge, you didn't receive any compensation?
16             MR. HODGES:  Asked and answered.
17             THE WITNESS:  I've answered the questioned,
18   sir.
19        Q    BY MR. STOLPER:  Well, let me ask you a
20   question:  Sitting here today, do you have any reason
21   to believe that what's contained on page 13 of 16 is
22   not correct?
23        A    Sir, I would have to consult -- the fact that
24   you're asking me about it, if -- you know, I'll answer
25   it this way:  Yes, I do have reason to believe, based
```

**Exhibit D**

USAO_00060082
00059979

1    on your accusatory questioning on this matter, so that

2    would give me reason to believe, which is another

3    reason why I would want to consult the documents, as

4    well as my bankruptcy counsel, who prepared this

5    report.

6        Q    Other than the fact that you're being asked

7    about it under oath in federal court, do you have any

8    other reason to believe that the information contained

9    on page 13 of 16 is inaccurate?

10       A    Sir, I can't answer the question without

11   consulting the documents and consulting with my

12   bankruptcy counsel --

13       Q    Isn't it --

14       A    -- who prepared the report.

15       Q    Can I have that back, please?

16            After you received the settlement for

17   Jennifer Nadjat-Haiem, you wired her what she was due;

18   correct?

19            MR. HODGES:  Objection.  Again, Your Honor,

20   this is confidential.

21            MR. STOLPER:  I didn't ask what the amount

22   was.

23            MR. HODGES:  The notion -- this three times

24   in a row, Your Honor.  The notion that money was paid

25   may, in fact, violate the terms of the confidentiality

**Exhibit D**

USAO_00060083
00059979

1    agreement.

2         MR. STOLPER:  It was a publicly filed suit,

3    and the case was dismissed after a settlement, Your

4    Honor.  There's nothing shocking at all that money may

5    have been paid.

6         MR. HODGES:  Most confidential settlements

7    result from publicly filed lawsuits.  It has nothing to

8    do with the confidential nature of the actual

9    resolution of the public lawsuit.  That's the focus.

10        THE COURT:  Again, if you're asking if money

11   was paid out, pursuant to the confidential settlement

12   agreement, then that does seem to implicate the

13   confidentiality terms, but --

14        MR. STOLPER:  Again, your Honor, I don't -- I

15   don't know that it's paid out pursuant to a

16   confidentiality agreement.  They're saying that.  I

17   don't have the agreement.  I have no reason to believe

18   that that's the case.

19        THE COURT:  That's the representation.

20        MR. STOLPER:  Okay.  Let's go ahead and clear

21   the Courtroom.

22        THE COURT:  All right.  So we're going to

23   discuss another confidential agreement?

24        MR. HODGES:  Before we do that, can we take a

25   two-minute restroom break?

**Exhibit D**

USAO_00060084
00059979

```
 1              THE WITNESS:  Or ten.

 2              THE COURT:  We're here until 4:30.  So if we

 3     can make it a five-minute break?  Be back by 4:00.

 4              MR. HODGES:  Thank you.

 5              THE CLERK:  This court now stands in recess.

 6              (Recess taken.)

 7              THE CLERK:  Please remain seated, and come to

 8     order.  This court is once again in session.

 9              The Honorable Karen E. Scott, magistrate

10     judge presiding.

11              MR. STOLPER:  May I proceed, Your Honor?

12              THE COURT:  You may.

13       Q    BY MR. STOLPER:  Mr. Avenatti, you understand

14     you're still under oath?

15       A    Yes.

16              I thought we were going to talk about the

17     settlement.  Is the public supposed to be in the

18     Courtroom?

19              MR. STOLPER:  I've changed topics, Your

20     Honor.

21              THE COURT:  Okay.

22              THE WITNESS:  Well, are we going to come back

23     to the other topic?

24              THE COURT:  If he doesn't want to, he doesn't

25     have to.
```

213

**Exhibit D**

USAO_00060085
00059979

1     Q     BY MR. STOLPER:   Mr. Avenatti, who is Jeffrey

2     Johnson?

3     A     Client at the firm.

4     Q     When you say, "the firm," you mean Eagan

5     Avenatti?

6     A     No, not necessarily.

7     Q     Who do you mean when you say, "a client of

8     the firm"?

9     A     Client of me, a client of Avenatti &

10    Associates, and possibly a client of Eagan Avenatti.  I

11    don't recall.

12    Q     And did Mr. Johnson sign a retention letter

13    with Eagan Avenatti?

14    A     I don't recall.

15    Q     Did he sign a retention letter with any other

16    firm that you control?

17    A     He may have.  I just don't remember.

18    Q     You filed a case on behalf of Mr. Johnson;

19    correct?

20    A     Yes.

21    Q     And you filed that in federal court; correct?

22    A     Yes.

23    Q     And Mr. Johnson was a -- I believe was a

24    paraplegic; is that correct?

25    A     I believe so, yes.

214

**Exhibit D**

USAO_00060086
00059979

```
 1        Q    And he also suffered from some mental health
 2   issues?  Is that also fair to say?
 3             MR. HODGES:  Your Honor, I just want to
 4   object to the extent this calls for privileged
 5   information.
 6             MR. STOLPER:  It's alleged in the complaint.
 7             MR. HODGES:  Okay.  Thank you.  I'll accept
 8   that.
 9             MR. STOLPER:  It is alleged in the complaint?
10             MR. FRANK:  Yes.
11        Q    BY MR. STOLPER:  Mr. Avenatti, you allege
12   that he suffered from some mental health issues?
13        A    Sir, I don't remember.
14        Q    Your lawsuit on behalf of Mr. Johnson was
15   against the County of Los Angeles; correct?
16        A    I believe that's correct.
17        Q    And counsel of record was listed solely as
18   Eagan Avenatti; is that correct?
19        A    No.
20        Q    Who else was listed as counsel of
21   recollection, to your recollection?
22        A    Me and Avenatti & Associates.
23        Q    How certain are you of that fact?
24             THE COURT:  He was certain enough to testify
25   to it.
```

215

**Exhibit D**

USAO_00060087
00059979

```
 1              MR. STOLPER:  Okay.

 2       Q    BY MR. STOLPER:  Did you list Avenatti &

 3   Associates on the caption page?

 4       A    Sir, I don't recall.  It was a long time ago.

 5       Q    Now, ultimately, that's a case that you

 6   settled for Mr. Johnson; correct?

 7       A    I don't believe so, in its entirety, no.

 8       Q    Mr. Avenatti, you were co-counsel with a law

 9   firm of McNichols & McNichols on that case; is that

10   correct?

11       A    I don't remember that.

12       Q    Do you recall McNichols & McNichols receiving

13   payment for that case?

14       A    I don't.

15       Q    This was a public settlement because it was

16   done between the County of Los Angeles and Mr. Johnson;

17   correct?

18       A    I don't think that's true, but it may have

19   been.  I don't know.

20            (Exhibit 60 was marked and retained by

21            counsel.)

22       Q    Well, I've got the settlement agreement, so

23   let's take a look.  It's marked as Exhibit 60.  There's

24   no confidentiality provisions in this settlement, as I

25   read it.
```

216

USAO_00060088
00059979

```
 1       A     (Reviewing document.)
 2             Yeah, this is not the entire settlement.
 3       Q     I understand.   This settlement is not
 4   confidential?
 5       A     No.   It is confidential, actually.   What I'm
 6   saying is that's not the entire settlement agreement.
 7       Q     That's fine.
 8             Your Honor, I'm going to publish the
 9   settlement agreement that I have that says it's the
10   entire settlement agreement, and it is signed by
11   Mr. Avenatti.   It has no confidentiality clause.
12       A     Your Honor, the settlement -- portions of the
13   settlement were confidential.   That's not the entire
14   settlement agreement.
15             THE COURT:   This is the settlement agreement
16   with the county, and that's not confidential; right?
17   So you're --
18             THE WITNESS:   No, I believe it is
19   confidential, Your Honor.   And without having the
20   ability to review my documents, then I -- then I would
21   ask that this be handled in a closed-door session, just
22   like everything else.
23             MR. STOLPER:   Your Honor --
24             MR. FRANK:   Your Honor, I was also a counsel
25   for Mr. Johnson.   Mr. Johnson was a client that I
```

217

**Exhibit D**

USAO_00060089
00059979

1    actually brought to the firm.  It was not a

2    confidential settlement.  I will make that

3    representation to the Court, as we have in the

4    settlement agreement as well.

5              THE COURT:  Well, in the Court's experience,

6    the county typically would not enter into confidential

7    settlement agreements.

8              THE WITNESS:  Your Honor, to be clear,

9    Mr. Frank was not -- he didn't even work on the case.

10   So I'm just telling you that I believe that the terms

11   of the settlement are confidential, and out of

12   abundance of caution, we ought to handle it like we've

13   done the other settlement agreements and do it in a

14   closed-door session.

15             THE COURT:  What basis do you have when the

16   terms of the settlement are in Mr. Stolper's hands and

17   they don't include a confidentiality provision?

18             THE WITNESS:  Because I don't believe those

19   are the entirety of the terms of the settlement, Your

20   Honor.  I believe that there is a side letter or a

21   further document that constitutes the confidential

22   nature of the settlement, and so out of an abundance of

23   caution, it should be handled in a closed-door

24   proceeding, just like the other settlements were.

25             MR. STOLPER:  If I may, Your Honor, quote,

218

**Exhibit D**

USAO_00060090
00059979

1    "The parties agree that this settlement contains the

2    entire agreement between the parties, that the terms of

3    this agreement are contractual and not a mere recital."

4    This is the settlement.

5              THE COURT:  Well, to the extent there's some

6    confidential letter out there, that's not in front of

7    the Court, but this document is not confidential.

8              MR. STOLPER:  May I, Your Honor?

9              THE COURT:  You may.

10             MR. STOLPER:  Thank you.

11       Q    BY MR. STOLPER:  First of all, this is a

12   letter -- settlement agreement attached to a letter

13   from Hurrell & Cantrall.  That's opposing counsel,

14   correct?

15       A    I don't know if that's true or not.

16       Q    Okay.  You don't recall who opposing counsel

17   was in the Johnson case?

18       A    I don't.

19       Q    It's addressed to you, Michael Avenatti,

20   Esquire, at Eagan Avenatti, LLP; correct?

21       A    Sir, again, I have no idea where this

22   document came from, so I'm -- I'm not agreeing to your

23   documents just because you pull them out of thin air.

24       Q    Okay.  Well, let me ask you a question:  Is

25   that your signature?

219

**Exhibit D**

USAO_00060091

00059979

```
 1        A    I think that's my signature.
 2        Q    Okay.  Did you sign this settlement agreement
 3   on behalf of Mr. Johnson?
 4        A    No.
 5        Q    Did you sign a settlement agreement in the
 6   course of the representation of Mr. Johnson?
 7        A    No, if I'm understanding your question.
 8        Q    Mr. Avenatti, this says -- this document is
 9   entitled settlement agreement and release of all
10   claims; correct?
11        A    Sir, the document is titled whatever it is.
12        Q    Okay.  And you signed this document, did you
13   not, sir?
14        A    Sir, I don't know where this document came
15   from, and so I don't -- I don't know on the preceding
16   pages, whether it's accurate or not, okay?  I saw the
17   signature page, but I don't know what the other pages
18   are that go with it.
19        Q    Take a look.
20        A    Well, sir, you can -- yeah.
21             Yeah, I don't -- I don't believe this is an
22   accurate copy of the settlement agreement.
23        Q    What's inaccurate about it?
24        A    My recollection is that the settlement
25   agreement is not that document.
```

**Exhibit D**

USAO_00060092
00059979

```
 1          Q    Okay.  Do you recall settling Mr. Johnson's

 2   case for $4 million from the County of Los Angeles?

 3          A    No.

 4          Q    How much do you recall settling for

 5   Mr. Johnson from the County of Los Angeles?

 6          A    I don't recall.

 7          Q    Four million doesn't sound right?

 8          A    I don't believe that settlement agreement is

 9   accurate, sir.  I already told you.

10          Q    I didn't ask that question.  I'm asking a

11   different question.  Which is you don't believe that

12   you received a $4 million check for the benefit of

13   Mr. Johnson from the County of Los Angeles?

14          A    Sir, that -- that's not what you asked me.

15          Q    Okay.  That's what I'm asking you now.

16          A    I -- I don't recall.  (Indicating.)

17          Q    (Indicating.)  Well, let's take a look.

18               This document that you say you don't believe

19   to be the settlement agreement, although it has your

20   signature on it, you dated next to your signature; is

21   that correct?

22               MR. HODGES:  Misstates the witness's

23   testimony.  I believe he said he was not sure that was

24   his signature.

25          Q    BY MR. STOLPER:  You're not sure that's your
```

221

**Exhibit D**

USAO_00060093
00059979

```
 1    signature?

 2         A    No, I think that's my signature.

 3         Q    Okay.  And you dated, next to your signature,

 4    January 21st; correct?

 5         A    Yes, sir.

 6         Q    Okay.  And this settlement agreement that

 7    you're not sure is the real settlement agreement, calls

 8    for a $4 million payment; correct?

 9         A    Sir, I only looked at the document briefly.

10         Q    Well, you can look at it right here.

11              In exchange for a complete resolution of the

12    lawsuit, defendants, by and through the County of Los

13    Angeles, shall pay the plaintiff $4 million.

14              The settlement that you said you're not sure

15    is the real settlement calls for a payment of $4

16    million; correct?

17         A    Sir, that's not what I said.  You keep

18    twisting my words.  That's not what I said.  What I

19    said was that I don't believe that that settlement

20    agreement is the final settlement agreement.

21              I see my signature on the last page.  I don't

22    believe that the final settlement agreement was, as

23    you've given me the document.

24         Q    I understand.  But the document that I've got

25    here with your signature on it that says it's the final
```

**Exhibit D**

USAO_00060094
00059979

```
 1    settlement agreement calls for a payment of $4 million;

 2    correct?

 3        A    Sir, I don't agree with this, that this is

 4    the settlement agreement.

 5        Q    I understand.

 6             THE COURT:  You're just asking him is that

 7    what this document says?

 8             MR. STOLPER:  Yes.

 9             THE WITNESS:  The document says whatever it

10    says.

11        Q    BY MR. STOLPER:  And what it says is that the

12    county is going to pay Mr. Johnson $4 million; right?

13        A    Sir, the document says what it says.

14        Q    Let's go ahead and look at what's been marked

15    as Exhibit 60.

16             MR. FRANK:  61.

17             MR. STOLPER:  61.  Sorry.

18             And, Your Honor, this is a check from the

19    County of Los Angeles to Eagan Avenatti in the amount

20    of $4 million.  I'd like to publish it.

21             THE COURT:  I hear no objections.

22             MR. HODGES:  We have none.

23             MR. REITMAN:  No objection.

24             THE COURT:  Okay.

25             (Exhibit 61 was marked.)
```

223

**Exhibit D**

USAO_00060095
00059979

```
 1        Q    BY MR. STOLPER:  I think you testified that

 2   your signature was next to the date, January 21st.

 3   This is a check for $4 million, payable to Eagan

 4   Avenatti, attorney-client trust account, for $4

 5   million, dated January 26; is that correct?

 6             MR. HODGES:  Foundation.  Hearsay.  Assumes

 7   facts.

 8             THE WITNESS:  I don't think I've ever seen

 9   this document before.

10        Q    BY MR. STOLPER:  Okay.  Well, do you recall

11   receiving $4 million from the County of Los Angeles as

12   payment for the settlement regarding -- relating to

13   Jeffrey Johnson?

14        A    No.

15        Q    So you don't think you got that money?

16        A    Sir, I don't have an independent recollection

17   of it.

18        Q    Well, let me ask you a different question.

19             Do you recall remitting to Mr. Johnson his

20   share of the $4 million that you obtained on his

21   behalf?

22        A    Yes.

23        Q    How much of the $4 million did you remit to

24   Mr. Johnson?

25        A    I don't recall without seeing other
```

224

**Exhibit D**

USAO_00060096
00059979

```
 1    documents.

 2        Q    More than 20,000?

 3        A    I'm sorry?

 4        Q    More than $20,000?

 5        A    Sir, I don't recall how this settlement was

 6    structured or what the terms were or whether he was

 7    advanced monies or whether he was paid in advance.

 8             I don't recall the terms relating to this.

 9        Q    Well, let's look and see what happened to the

10    money after you deposited it, Mr. Avenatti.

11        A    Sir, again, you're --

12             MR. FRANK:  These are bank records, client

13    trust account for each month in 2015.  Each month is

14    dated.  So one is January, two is February.

15    (Inaudible discussion.)

16             MR. HODGES:  Well, to the extent that counsel

17    intends to publish bank statements, Your Honor, I would

18    like to enter those as confidential.

19             MR. STOLPER:  Your Honor has already ruled on

20    this.  They're not confidential.  As the Court

21    required, I stayed late into the night redacting

22    account numbers.

23             THE COURT:  That's fine.

24        Q    BY MR. STOLPER:  Mr. Avenatti, you had a --

25    Eagan Avenatti had a client trust account at California
```

225

**Exhibit D**

USAO_00060097
00059979

1   Bank and Trust in 2015; correct?

2       A   Yes.

3       Q   And you can see the deposit of $4 million on

4   January 29, 2015.  That's the $4 million related to the

5   check we just saw; correct, sir?

6       A   No.

7       Q   That's not related to that check?

8       A   Nope.

9       Q   How can you be so sure?

10      A   Because I know for a fact that it's not.

11      Q   How can you be so sure?

12      A   That's my best recollection.

13      Q   That's fine.  Let's go back to the check.

14          Do you see that next to the deposit, there's

15  a control number?

16      A   No.

17      Q   Do you see the word "deposit" followed by a

18  long number?

19      A   Yeah.

20      Q   Okay.  Go ahead and take a look at the last

21  four digits of that number, 0021.  Now, I'll go back to

22  that check.

23      A   Sir, do you have anything from the custodian

24  authenticating these documents?

25      Q   If you look at the bottom of this check, the

226

**Exhibit D**

```
 1   banks track it with what's called a control number.
 2   That control number is also 0021.  You see how those
 3   two numbers marry up, Mr. Avenatti?
 4        A    No, I don't agree with you.
 5        Q    You don't agree that the check has a number
 6   of 0021, the last four digits, and the deposit also
 7   tracks that same number, 0021?
 8        A    Sir, I don't trust you or these documents
 9   because you have failed to give me anything from the
10   custodian, showing where they came from, so I'm sorry,
11   but I'm not going to agree with you.
12        Q    My only question, Mr. Avenatti, do you agree
13   that the same control number appears on the check that
14   came in from the county and the deposit for $4 million?
15        A    No.
16        Q    You don't agree it's the same control number?
17        A    Sir, i don't agree with the predicate of what
18   you're trying to do.
19        Q    Okay.  So you're sure, sitting here under
20   oath, that the $4 million deposited in the State Bar of
21   California, Eagan Avenatti, LLP trust account, showed
22   on January 29, for $4 million is not the $4 million you
23   got from if Mr. Johnson.  You're certain of that?
24        A    Sir, I've answered your questions.
25        Q    Right.  And I'm trying to get you to
```

**Exhibit D**

USAO_00060099
00059979

1    reconsider your answer because I don't think you've

2    been truthful, Mr. Avenatti.

3              MR. HODGES:  Objection.  Argumentative.

4              THE COURT:  Let's just focus on what was the

5    source of the $4 million.

6        Q    BY MR. STOLPER:  What was the source of the

7    $4 million, Mr. Avenatti?

8        A    Sir, I don't recall.

9        Q    But you're sure it wasn't Mr. Johnson's

10   money?

11       A    Sir, again, I've answered your question.  I

12   don't recall.  I don't have all my records and all the

13   accounts in front of me.

14       Q    We actually provided you a copy of all of

15   your bank records, Mr. Avenatti.

16       A    No.  Those are not all the bank records.

17       Q    For this account, they are.

18       A    No.  I don't think they are.

19       Q    You haven't even looked at them.

20       A    I have looked at them.

21       Q    Okay.

22       A    I don't think they are, sir.

23       Q    Well, we're going to see what happened with

24   this $4 million.  I understand --

25       A    Which $4 million?

**Exhibit D**

USAO_00060100

00059979

1     Q    The $4 million that has the same control

2   number as the money that came in for Jeff Johnson.  The

3   check is dated January 26th.  It's made out to the

4   attorney-client trust account, and there's a $4 million

5   deposit on January 29, three days later, with the same

6   control number.

7          So I'm going to go ahead and ask questions

8   under the assumption that the $4 million came from this

9   check.  And I note for the record, Mr. Avenatti, that

10   you disagree with that assumption.

11          MR. HODGES:  It lacks foundation.  Assumes

12   facts.

13          THE WITNESS:  This is entirely inappropriate.

14   Entirely inappropriate.  You're mixing apples and

15   oranges.

16     Q    BY MR. STOLPER:  Mr. Avenatti, there's a

17   stream of payments that we've seen between you, from

18   you to Mr. Johnson; is that correct?

19     A    Your Honor, I believe that that's privileged.

20          THE COURT:  I guess I'm not quite sure.

21   You're referring to statements that -- payments we've

22   seen on the statement?

23          MR. STOLPER:  Well, let me demystify it, Your

24   Honor.

25          THE WITNESS:  Your Honor, I don't want to

**Exhibit D**

USAO_00060101
00059979

1   disclose attorney-client privilege.  Hold on a minute.

2          In his effort to demist -- to bring clarity

3   to this, again, I have an objection based on the

4   attorney-client privilege relating --

5          MR. STOLPER:  I didn't ask to go into any

6   communication, Your Honor.

7          THE WITNESS:  It's not just about

8   communication, Your Honor.

9          THE COURT:  We'll hear what the question is

10  and see if it implicates the attorney-client privilege.

11      Q    BY MR. STOLPER:  Mr. Avenatti, isn't it true

12  that from July of 2015, you have been making

13  bi-monthly, small payments to Jeff Johnson?

14         THE COURT:  And when you say "you," you mean

15  Mr. Avenatti, personally?

16         MR. STOLPER:  Well, it actually comes from

17  different accounts, but it starts off from Eagan

18  Avenatti accounts.

19         MR. HODGES:  Your Honor, it's privileged.

20         THE COURT:  So the question is whether Eagan

21  Avenatti is making payments to this client is

22  privileged?

23         THE WITNESS:  Yes, and it's also relevancy

24  relating to other entities, etc.

25         MR. STOLPER:  It's from Eagan Avenatti.

**Exhibit D**

USAO_00060102
00059979

```
 1              THE COURT:  Well, it certainly doesn't reveal
 2     the contents of any attorney-client communications, and
 3     it seems to be square in the realm of what is an asset
 4     of Eagan Avenatti.  And we're trying to figure out
 5     where the assets of Eagan Avenatti went.  And if some
 6     went to Mr. Johnson, then we should understand how
 7     many, and why, and whether that was legitimate.
 8              MR. STOLPER:  Your Honor, just by way of
 9     offer of proof --
10              THE WITNESS:  No.  I'm not interested in an
11     offer of proof --
12              MR. STOLPER:  Well, I'm going to make an
13     offer --
14              THE WITNESS:  Well, I'm going to make an
15     objection --
16              (Simultaneous colloquy.)
17              THE CCOURT REPORTER:  One at a time.
18              THE COURT:  Yes.  Let's do one at a time.
19              We have an objection?
20              MR. HODGES:  Right.  If there's a question,
21     let's have a question.  But I object to these speeches
22     for the benefit of the press.  It's inappropriate, Your
23     Honor.
24              THE COURT:  All right.  Well, let's have a
25     question.
```

231

**Exhibit D**

USAO_00060103
00059979

```
 1              MR. STOLPER:  Certainly.
 2         Q    BY MR. STOLPER:  Mr. Avenatti, did you steal
 3    Mr. Johnson's money?
 4              THE COURT:  It's a yes or no question.
 5              THE WITNESS:  Absolutely not.
 6              THE COURT:  Okay.
 7         Q    BY MR. STOLPER:  Mr. Avenatti, isn't it true
 8    that beginning in July of 2015, rather than pay
 9    Mr. Johnson his share of the $4 million that he was
10    entitled to, instead, you've been doling out small
11    payments each month to him?  Isn't that true?
12         A    That's absolutely false.
13         Q    Well, let's break it down.  Mr. Avenatti,
14    isn't it true that --
15         A    Your conduct is despicable.
16         Q    Isn't it true since July of 2015, you have
17    been sending checks or making payments to Mr. Johnson
18    in the amount of $1,900 per month?
19         A    Sir, I -- I disagree with the predicate of
20    your question entirely, and it's outrageous.
21         Q    How about this --
22         A    And wait a minute.  Wait.
23              THE COURT:  Let's get a -- the answer was?
24    Simply, have you been making payments?  Yes or no?
25              THE WITNESS:  Oh.  From time to time, he has
```

**Exhibit D**

USAO_00060104
00059979

1    received payments.

2       Q    BY MR. STOLPER:  And by "from time to time,"

3    you mean twice a month; right, sir?

4       A    No.

5       Q    Generally, it's twice a month; right?

6       A    No.

7            (Exhibit 75 was marked.)

8       Q    BY MR. STOLPER:  Okay.  Let's go ahead and

9    look at what's been marked as Exhibit 75.

10           Exhibit 75, Your Honor, is a schedule of

11   payments that Mr. Avenatti has made to Jeffrey Johnson,

12   and behind it are all the checks that correspond to it.

13           MR. HODGES:  Well, object, Your Honor.  This

14   document lacks foundation.  There's been no proper

15   authentication that's it's anything.  It's hearsay.

16   Assumes facts.

17           MR. STOLPER:  That's fine.

18           MR. HODGES:  Well, Your Honor, it's not fine.

19   I think this alludes to exactly what Mr. Avenatti said.

20   It's inappropriate.  He makes a comment for purposes of

21   making a record, asserting something as being true,

22   lays no foundation for it, and then pulls it down.

23           THE COURT:  There's no trier of fact here.

24   This is for him to find out information about the

25   assets of Eagan Avenatti.  So whatever he says

233

**Exhibit D**

USAO_00060105
00059979

```
 1    certainly isn't evidence of anything.  And he's going

 2    to ask a question, and that's what will be the focus.

 3        Q    BY MR. STOLPER:  Mr. Avenatti, isn't it true

 4    that on July 22nd, 2015, you wrote Mr. Johnson a check

 5    for $1,000?

 6        A    Sir, I -- I have no idea, okay?  I -- I don't

 7    agree with your schedule here.  I -- I have no idea.

 8        Q    Okay.  Let's take a look.  I'll try and zoom

 9    in.  That's a check drawn from Eagan Avenatti, LLP;

10    correct?

11        A    Sir, I have no idea.  I have no idea where

12    this -- where this document came from.

13        Q    It was produced by your bank, Mr. Avenatti.

14        A    Well, I don't have -- I don't have a copy of

15    it.  I have no idea.  I don't trust your documents,

16    okay.  For the same reason Judge Carney didn't trust

17    you in the Broadcom case.

18             THE COURT:  You can ask him about what

19    financial transactions he remembers.

20        Q    BY MR. STOLPER:  Is that Ms. Regnier's

21    signature?

22        A    I think so.  I don't know.

23        Q    And Ms. Regnier is your office manager?

24             MR. HODGES:  Asked and answered.

25        Q    BY MR. STOLPER:  Mr. Avenatti?
```

234

**Exhibit D**

USAO_00060106
00059979

```
 1        A    I'm sorry?

 2        Q    She was the office manager of Eagan Avenatti?

 3        A    Yes.

 4        Q    She was the signatory on Eagan Avenatti bank

 5    accounts in general?

 6        A    No.

 7        Q    She was not a signatory?

 8        A    At times.  From time to time, she was.

 9        Q    Let's go ahead and look at the next month.

10             These are two checks to Jeffrey Johnson.  One

11    is dated -- sorry -- there we go.  One is dated -- I

12    think it's 8/10/2015.  One is dated later in that same

13    month in 2015.

14             Do those appear to be signed by Judy Regnier?

15        A    Yes.  Do you have all the checks that predate

16    this time period, counsel?

17        Q    Mr. Avenatti, do you have --

18        A    Do you have all the payments to Jeff Johnson

19    that predate this?

20             THE COURT:  Mr. Stolper is allowed to ask the

21    questions here.  We're just about finished.

22        Q    BY MR. STOLPER:  This is a September 8 check

23    to Jeffrey Johnson for $1,900.

24             Does that appear to also be signed by Judy

25    Regnier?
```

235

**Exhibit D**

USAO_00060107
00059979

```
 1          MR. HODGES:  Counsel, can you repeat the
 2    question.  I was speaking.
 3       Q    BY MR. STOLPER:  Sure.  This is a, I believe,
 4    it's a September 2015 check to Jeffrey Johnson.  Was
 5    this also signed -- does this also appear to be signed
 6    by Judy Regnier?
 7          A    I think so.
 8          Q    And you continued to make bi-monthly payments
 9    to Mr. Johnson in 2016, 2017, 2018; correct?
10          A    There's been a lot of payments made to
11    Mr. Johnson over the last four years, I think, five
12    years, including payments that predate these payments,
13    but you don't seem interested in those.
14       Q    Just a couple more questions on Mr. Johnson.
15          Does Eagan Avenatti have any future
16    obligation to make payments to Mr. Johnson?
17          MR. HODGES:  Legal conclusion.
18          THE WITNESS:  I -- I don't know.
19          THE COURT:  I think he's asking if you know.
20    Are there assets of Eagan Avenatti that are needing to
21    be or going to be paid out in the future to
22    Mr. Johnson?
23          THE WITNESS:  I -- I don't know.
24       Q    BY MR. STOLPER:  When was the last time you
25    or any of your entities made a payment to Mr. Johnson?
```

236

**Exhibit D**

USAO_00060108
00059979

1       A    I -- I don't recall.

2       Q    Was it in the last 60 days?

3       A    I don't recall.

4       Q    Did you ever make a lump sum payment to

5    Mr. Johnson that reflects the amount he was due out of

6    his $4 million settlement, besides these $1,900 monthly

7    payments you've been sending him?

8            MR. HODGES:  Assumes facts.  Lacks foundation

9    as to the amount of any settlement.

10           Witness has already testified repeatedly he's

11   not sure it was a $4 million settlement amount.

12           MR. STOLPER:  Understood.

13      Q    BY MR. STOLPER:  Can you answer the question,

14   please?

15      A    Can I have it read back?

16           (Record read as follows:

17           "Question:  Did you ever make a lump sum

18      payment to Mr. Johnson that reflects the amount he

19      was due out of his $4 million settlement, besides

20      these $1,900 monthly payments you've been sending

21      him.)

22           THE WITNESS:  Without looking at the

23   documents, I don't recall.  I'm sure we did.

24      Q    BY MR. STOLPER:  Do you recall which account

25   it came out of?

237

USAO_00060109
00059979

1      A      Sir, I don't.  Without looking at the

2   settlement documents, the structure -- the settlement

3   documents, the structure documents, the accounting

4   recordings, I can't just -- I can't just.

5      Q      I'm sorry.  What are the structure documents?

6      A      I'm sorry?

7      Q      You said, "the structure documents," what are

8   you referring to?

9      A      The same documents I mentioned earlier.

10      Q      I'm sorry.  I don't recall asking or hearing

11   about what are structured.  Is there a structured

12   settlement --

13      A      Sir --

14      Q      -- for this, counsel?

15      A      -- sir, I believe that there may be.  There

16   was trust documents.  There's a bunch of documents

17   relating to this, and I've got to have those documents

18   in order to accurately answer the question.

19      Q      Mr. Avenatti, are you paying a structured

20   settlement out to Mr. -- sorry -- are you paying a

21   structured settlement out to Mr. Johnson?

22      A      No.

23      Q      What is this stream of payments for?

24      A      That's privileged.  And I'm not going to

25   answer that question.

238

**Exhibit D**

USAO_00060110
00059979

```
 1        Q    Okay.
 2             THE COURT:  How would that reveal the nature
 3   of attorney-client communications?
 4             THE WITNESS:  Because it reveals the nature
 5   of an issue that Mr. Johnson has that he has sought
 6   legal counsel over.  And it relates to that issue, Your
 7   Honor.
 8             THE COURT:  So you are paying him in
 9   connection with a matter in which he has retained you?
10             THE WITNESS:  Yes.
11             MR. STOLPER:  Your Honor, I apologize.  I'm
12   not seeking communications between Mr. Avenatti and
13   Mr. Johnson.  Eagan Avenatti has been making these
14   payments to Mr. Johnson for years.  We don't see any
15   other money going out to Mr. Johnson.  We'd like to
16   know what the nature of these payments are.  I don't
17   think that goes to attorney-client privilege.  It goes
18   to the economic relationship.  I'm not asking for
19   Mr. Johnson's statements.  I'm asking for the nature of
20   the economic relationship between Eagan Avenatti and/or
21   Mr. Avenatti and his entities and someone who has been
22   getting payments.
23             MR. HODGES:  Your Honor, it does call for the
24   substantive --
25             THE COURT:  Well, I think if the question is
```

239

**Exhibit D**

USAO_00060111
00059979

```
 1     phrased as Mr. Stolper has phrased it, what is the
 2     nature of the economic relationship that is causing
 3     these payments to be made, that's doesn't reveal a
 4     communication, so the witness can answer that.
 5          Q     BY MR. STOLPER:  Please answer.
 6          A     The attorney-client relationship.
 7          Q     Well, let me ask it a different way:
 8     Mr. Avenatti, what are these payments for?  Generally,
 9     lawyers don't pay their clients; generally, clients pay
10     their lawyers.
11               MR. STOLPER:  Your Honor, that's
12     argumentative.  Object to the form.  It also now calls
13     for privileged communication.
14               Mr. Avenatti has made it clear that the
15     reason for these payments is a result of an
16     attorney-client relationship with Mr. Johnson and that
17     an explanation as to the reason for those payments
18     would invoke a privileged communication.
19               THE COURT:  Is Mr. Johnson an attorney?
20               MR. STOLPER:  No.
21               MR. HODGES:  He's a client.
22               THE COURT:  So he's not providing -- is he
23     providing services to someone?
24               MR. STOLPER:  Mr. Johnson is a paraplegic
25     with mental health issues, Your Honor.  He's providing
```

**Exhibit D**

USAO_00060112
00059979

```
 1    services to no one.

 2              THE COURT:  Well, then --

 3              THE WITNESS:  I'm going to -- I'm going to

 4    object on the attack on Mr. Johnson.

 5              MR. STOLPER:  It wasn't meant to be attack.

 6              THE COURT:  That's collateral.  So this is

 7    money that was coming out of an Eagan Avenatti bank

 8    account.  It's central to the judgment debtor exam.

 9    And the explanation that it's going out of the account

10    because there's an attorney-client relationship doesn't

11    explain why money is going from the attorney to the

12    client.  The so the rational for the payment does not

13    appear privileged to the Court.

14              THE WITNESS:  It's an advance on future

15    settlement monies, Your Honor.

16         Q    BY MR. STOLPER:  Is Mr. Johnson currently a

17    client of Eagan Avenatti?

18         A    Absolutely, as well as of me.

19         Q    Does Mr. Johnson have any ongoing litigation

20    that is public?

21         A    I don't know.  I don't know if it's public or

22    not.  I don't think so.

23         Q    Without revealing who the demand -- well,

24    actually, has Mr. Johnson made any demands on any other

25    party for payment?
```

241

**Exhibit D**

```
 1        A    Yes.

 2        Q    Who is that party?

 3        A    I don't recall.

 4        Q    Who is Michelle Phan?

 5             THE COURT:  Before we open up a new area of

 6     inquiry, we're --

 7             MR. STOLPER:  I have just like five

 8     questions, Your Honor.  I'll be done.

 9             THE COURT:  Can we -- two questions.

10             MR. STOLPER:  I'm going to think about them

11     very carefully, if you give me one second, Your Honor.

12        Q    BY MR. STOLPER:  Michelle Fan was a client of

13     yours; correct?

14        A    Yes.

15        Q    And Michelle Fan, like Mr. Barela, has

16     accused you of stealing, in her case, $4 million;

17     correct?

18        A    That's absolutely false.

19             And, again, I think this is outrageous.

20             MR. STOLPER:  Your Honor, if I may, I have

21     got an exhibit I want to ask the witness about.  It's a

22     letter from Warrick Harrington.

23             THE COURT:  Wait.  We've just --

24             MR. STOLPER:  I'm sorry.  I used my two

25     questions.
```

242

**Exhibit D**

USAO_00060114
00059979

```
 1              THE COURT:  You've used your two questions,

 2    and it's past 4:30.

 3              MR. STOLPER:  Understood, Your Honor.  Thank

 4    you for indulging us on the bench.

 5              MR. FRANK:  Your Honor, before you leave, I

 6    have a concern.  Jeffrey Johnson was a client that I

 7    brought into Eagan Avenatti.  I have these concerns

 8    that he was not paid settlement proceeds that he was

 9    supposed to be paid.  I have now learned this

10    information.

11              I have feel I have a moral obligation to let

12    him know this, but I do not want to be accused of

13    defamation.  I don't want to be accused of

14    interfering with a contractual relationship.  And so --

15    but I'm not sure I have ethical obligations, but I may.

16    But I certainly have moral obligations to let

17    Mr. Johnson and his family know that this money may

18    have been stolen from him.

19              MR. HODGES:  Your Honor, I object to this

20    speech.

21              THE WITNESS:  This is outrageous.

22              THE COURT:  Are you asking for relief from

23    the Court?

24              MR. FRANK:  So I am asking for relief from

25    the Court that we may contact Mr. Johnson and/or his
```

243

**Exhibit D**

USAO_00060115
00059979

```
 1    family, so that we can ask him what these streams of
 2    payments are for and find out if he has been paid this
 3    full amount of money.
 4              THE COURT:  This is not an issue that is
 5    before the Court or been briefed.  The Court is not in
 6    a position to start making rulings on issues about who
 7    can and can't communicate with whom.
 8              So if there's some motion that you feel you
 9    need to bring to the Court, can you do that.
10    Otherwise, you can talk with your own ethical advisors
11    and determine what you think is the appropriate course
12    of action.
13              MR. FRANK:  Thank you, Your Honor.
14              THE WITNESS:  And I want to state for the
15    record that these accusations are absolutely
16    outrageous.
17              THE COURT:  We understand your position.
18              MR. STOLPER:  Thank you, Your Honor.  Have a
19    nice weekend.  Oh, I thought we were done.
20              THE COURT:  Right.  We'll conclude these
21    proceedings.  And, again, the portions of the
22    transcript where the public was excluded will be
23    ordered sealed.
24              MR. HODGES:  Thank you, Your Honor.
25              MR. STOLPER:  Again, Your Honor, thank you.
```

244

**Exhibit D**

USAO_00060116
00059979

1          THE CLERK:  This concludes the Court's

2     calendar.  This court is now adjourned.

3               (WHEREUPON THE PROCEEDINGS WERE

4                ADJOURNED AT 4:42 P.M.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

245

**Exhibit D**

USAO_00060117
00059979

```
 1  STATE OF CALIFORNIA  )
                         ) ss
 2  COUNTY OF LOS ANGELES)

 3

 4                  REPORTER'S CERTIFICATION

 5

 6          I, Serena Wong, Certified Shorthand Reporter

 7  in and for the State of California, do hereby certify:

 8          That the proceedings were taken before me at

 9  the time and place herein set forth;

10          That the testimony and proceedings were

11  reported stenographically by me and later transcribed

12  into typewriting under my direction;

13          That the foregoing is a true record of the

14  testimony and proceedings taken at that time.

15

16          IN WITNESS WHEREOF, I have subscribed my name

17  on this date:  4/9/19.

18

19

20          _____

21                  Serena Wong, CSR No. 10250

22

23

24

25
```

246

**Exhibit D**

USAO_00060118
00059979