# EXHIBIT G

1                 OFFICE OF THE UNITED STATES TRUSTEE

2                       SANTA ANA DIVISION

3

4  In Re:                        )  Case No. 8:17-bk-11961-CB
                                 )
5  EAGAN AVENATTI, LLP,          )  Chapter 11
                                 )
6            Debtor.             )
   _____)
7

8                              341(a) MEETING

9                     MICHAEL HAUSER, Presiding

10                          --oOo--

11                       June 12, 2017

12                   411 West Fourth Street
                          Suite 7160
13               Santa Ana, California 92701

14 APPEARANCES:

15 For the Debtor:           IRA D. KHARASCH, ESQ.
                             ROBERT M. SAUNDERS, ESQ.
16                           Pachulski, Stang, Ziehl &
                                Jones, LLP
17                           10100 Santa Monica Boulevard
                             13th Floor
18                           Los Angeles, California 90067
                             (310) 277-6910
19

20 For the United States     MICHAEL HAUSER, ESQ.
     Trustee:                411 West Fourth Street
21                           Suite 7160
                             Santa Ana, California 92701
22                           (714) 338-3417

23

24

   Proceedings recorded by electronic sound recording;
25 transcript produced by transcription service.

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00060858

```
                                                                        ii

 1  APPEARANCES:   (cont'd.)

 2  For the United States and      NAJAH J. SHARIFF, ESQ.
     Its Agency, the Internal      United States Attorney's
 3   Revenue Service:                Office
                                   300 North Los Angeles Street
 4                                 Suite 7211
                                   Los Angeles, California 90012
 5                                 (213) 894-2534

 6  For Jason Frank Law and        SARA L. CHENETZ, ESQ.
     Scott Sims:                   Perkins Coie, LLP
 7                                 1888 Century Park East
                                   Suite 1700
 8                                 Los Angeles, California 90067
                                   (310) 788-3218
 9

10  For Stoll, Nussbaum and        THOMAS POLAS, ESQ.
     Polakov:
11

12  Transcriber:                   Briggs Reporting Company, Inc.
                                   4455 Morena Boulevard
13                                 Suite 104
                                   San Diego, California 92117
14                                 (310) 410-4151

15

16

17

18

19

20

21

22

23

24

25
```

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00060859

iii

I N D E X

| WITNESSES: | EXAMINATION |
|---|---|
| MICHAEL JOHN AVENATTI | 2 |
| | 116 |
| | 172 |

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00060860

1

1    SANTA ANA, CALIFORNIA  MONDAY, JUNE 12, 2017 10:00 AM

2    _____--oOo--

3         TRUSTEE HAUSER:  Good morning.  My name is Michael

4    Hauser.  I'm an attorney with the U.S. Trustee's Office.

5    Today's date is March -- I'm sorry.  Today's date is June

6    12, 2017.  It's approximately 10:00 o'clock in the morning.

7    This is the 341(a) of creditors in the Chapter 11 case of

8    Eagan Avenatti, LLP, case number 8:17-11961-CB.

9         Counsel for the Debtor, could you please make your

10   appearance for the record?

11        MR. KHARASCH:  Ira Kharasch and Rob Saunders of

12   Pachulski Stang, on behalf of the Debtor.

13        TRUSTEE HAUSER:  Okay.  And counsel for the United

14   States, could you please make your appearance on the record?

15        MS. SHARIFF:  Yes.  Najah Shariff, Assistant

16   United States Attorney, for the United States, on behalf of

17   its agency, the Internal Revenue Service.

18        TRUSTEE HAUSER:  Okay.  If there are any other

19   parties that want to make their appearance?  You can either

20   make it now, or after I finish my question, you can come up,

21   you can make -- you can come up to the table here and make

22   your appearance at that time.  So I'll leave that up to you.

23        Okay.  Hearing nothing, we will administer the

24   oath.

25        Mr. Avenatti, could you please raise your right

**Exhibit G**

USAO_00060861

2

1  hand.

2       MICHAEL JOHN AVENATTI – FOR THE DEBTOR – SWORN

3          THE WITNESS:  Yes.

4          TRUSTEE HAUSER:  Okay.  Could you please state

5  your name for the record and spell it?

6          THE WITNESS:  Michael John Avenatti, A-V-E-N-A-T-

7  T-I.

8          TRUSTEE HAUSER:  Okay.

9                   EXAMINATION

10 BY TRUSTEE HAUSER:

11 Q     And, Mr. Avenatti, you are the managing partner of the

12 Debtor, is that correct?

13 A     Yes.

14 Q     Okay.  And how long have you held that position?

15 A     Nearly 10 years.

16 Q     Okay.  And did you sign the statement of financial

17 affairs, which is docket item number 50 from the Florida

18 docket, and the amended schedules, which are docket items

19 number 104 through 108 on the Santa Ana docket?

20 A     Yes, sir.

21 Q     Okay.  You signed them under penalty of perjury, is

22 that correct?

23 A     Yes, sir.

24 Q     Okay.  And prior to signing them, did you review those

25 documents carefully?

*Briggs Reporting Company, Inc.*

**Exhibit G**

3

1  A    I reviewed the amended schedules more carefully than

2  the statement of financial affairs.  At the time that I

3  signed the statement of financial affairs I was in the

4  middle of a --

5  Q    If you could speak up just a bit, only because it's --

6  I'm seeing it's not picking up.

7  A    I'm sorry.  At the time that I signed the statement of

8  financial affairs I was in the middle of a rather large

9  trial and, as I recall, it was signed at about 2:30 in the

10 morning.

11 Q    Okay.  Okay.  So, you carefully reviewed the amended

12 schedules but not the statement of financial affairs, is

13 that correct?

14 A    Yes, sir.

15 Q    Okay.  And -- but to the best of your knowledge, is the

16 information contained in the amended schedules true and

17 correct?

18 A    To the best of my knowledge, yes.

19 Q    Okay.  And at this time, are there any changes that

20 need to be made, either to the amended schedules or to the

21 statement of financial affairs?

22 A    Well, I've become aware of the fact that I believe on

23 the statement of financial affairs, that there may need to

24 be some corrections, at least as it relates to one of the

25 answers --

*Briggs Reporting Company, Inc.*

**Exhibit G**

4

1       MR. KHARASCH:  Number four.

2       THE WITNESS:  "Number four."

3       TRUSTEE HAUSER:  Number four.  Okay.  We're going

4  to -- I'll make a note of that.  So SOFA number four.  We're

5  going to go through it pretty much question by question.  So

6  as we go through it, you can -- in addition to SOFA number

7  four, we can find out if there are any other changes that

8  need to be made.  In fact, that's probably going to be true

9  for the entire set of schedules as well.

10  BY TRUSTEE HAUSER:

11  Q    All right.  I'd like to move over to some corporate

12  governance issues.  What year was the Debtor formed?

13  A    2007, but it carried a different name a the time it was

14  formed in 2007.

15  Q    Okay.  So the predecessor name was?

16  A    Was Eagan, O'Malley and Avenatti, LLP.

17  Q    Okay.  And at what time did it become just Eagan

18  Avenatti?  Approximately?

19  A    I believe the name was formally changed in January of

20  2011.

21  Q    Okay.  And according to the list of equity holders,

22  which is docket item number 52 -- 51 from the Florida

23  docket, the equity holders in the Debtor are Avenatti and

24  Associates, APC, and Michael Eagan, individually, is that

25  correct?

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00060864

5

1  A     I believe Mr. Eagan holds his equity through the Law

2  Offices of Michael Q. Eagan, as opposed to individually, but

3  I may be mistaken about that.

4  Q     I'm sorry.  That was the law offices of what?

5  A     Michael Q. Eagan.

6  Q     And what's the split, 50-50?

7  A     No.  The split is 75-25 in favor of Avenatti and

8  Associates.

9  Q     Okay.  And has it always been that way?

10 A     No, it's changed over time.

11 Q     Okay.  Could you sort of give me what it was at the

12 inception, and then how it evolved?

13 A     As I recall, when we formed the firm it was 37-and-a-

14 half-percent to Mr. O'Malley, 37-and-a-half-percent to

15 Avenatti and Associates, and 25-percent to Mr. Eagan, and I

16 just don't recall whether that was held by him individually

17 or through this law office entity.

18 Q     Okay.  When -- and so O'Malley leaves in 2011?

19 A     2010.  At the end of 2010.

20 Q     Okay.  And then you, essentially, get all of O'Malley's

21 equity interest?

22 A     Correct.

23 Q     Okay.  Now, as the managing partner of the Debtor, you

24 are the firm's sole executive officer, is that correct?

25 A     Yes.

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00060865

6

1  Q    Okay.  Now, I just want to move over to sort of the

2  employees and staffing at the firm.  The Debtor has

3  approximately like 17, 18, 20 employees?

4  A    In that range, yes.

5  Q    Yeah, I mean -- okay.  Well, let's break it down.  How

6  many lawyers are there, including yourself, six, seven,

7  eight?

8  A    Let me count, if I could.  There's Mr. Eagan, there's

9  myself -- seven, I believe.

10 Q    Okay.  So there's seven lawyers.  And how many support

11 staff?

12 A    Approximately 11.

13 Q    Okay.  So there's a total of 18 employees, including

14 yourself, correct?

15 A    Yes, sir.

16 Q    Okay.  And can you break it out for me what the duties

17 of the different support staff are, you know, like

18 paralegal, IT, bookkeeper, et cetera?

19 A    We have individuals that perform secretarial functions.

20 Q    Okay.  How many of those?

21 A    Well, can I group secretarial and reception?

22 Q    Sure.  Yeah.  Absolutely.

23 A    Five, I believe.

24 Q    Okay.  And then the remaining six people?  Do you have

25 any paralegals?

*Briggs Reporting Company, Inc.*

**Exhibit G**

7

1  A    Yeah.  In fact, actually, let me rephrase that.  I
2  think it's, I think seven would really fall into
3  reception/secretarial.  And then I believe it's two that
4  would be classified as paralegal.
5  Q    Okay.  And that leaves two more people.
6  A    I actually think the total number, quite honestly, is
7  nine, closer to nine or 10 individuals total in support
8  staff.
9  Q    So you have -- do you have any internal bookkeeping or
10 financial person?
11 A    We have a individual that serves as the office
12 manager/paralegal/bookkeeper.
13 Q    Who is that?
14 A    Judy Regnier.
15 Q    Spell that last name for me.
16 A    R-E-G-N-I-E-R.
17 Q    She's the office manager, paralegal and bookkeeper?
18 A    Chief paralegal, yes.
19 Q    Okay.  And what kind of software do you guys use, like
20 QuickBooks or --
21 A    QuickBooks, Excel.
22 Q    Well --
23 A    For financial reporting?
24 Q    Correct.
25 A    Yes.

*Briggs Reporting Company, Inc.*

**Exhibit G**

8

1  Q     Like accounts payable, accounts receivable?

2  A     QuickBooks and Excel.

3  Q     And is that done on a monthly basis, on a quarterly

4  basis, on a --

5  A     We don't generate financial reports on a monthly or a

6  quarterly basis, generally.  We only use it for inputs and

7  outputs.

8  Q     Okay.  And is -- does your outside CPA, which we'll get

9  to later on, does she use the information from the

10 QuickBooks or the Excel to prepare the tax returns?

11 A     Yes.

12 Q     Okay.  That's Margorie Hendricks, right?

13 A     Yes.

14 Q     Okay.  We'll get to that later on.  So just to

15 summarize, of the nine support staff, we have seven

16 characterized as secretarial/receptionist, two as paralegal.

17 And then is, in addition to that, is that the office

18 manager, paralegal/manager, was she subsumed within the

19 paralegal category?

20 A     I think she'd be subsumed.

21 Q     Okay.  So -- all right.  Now, you use an outside

22 payroll service, Paychex, is that correct?

23 A     We use an outside payroll service.  I don't recall if

24 it's Paychex.  I think it is Paychex.

25 Q     Well, according to your monthly operating reports,

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00060868

9

1  you're paying them, so I'm just assuming that's your payroll

2  service.

3  A    Then that's the payroll service.

4  Q    And how long have you been using Paychex for?

5  A    Quite honestly, I don't know.  It's been a number of

6  years.

7  Q    Okay.  When --

8  A    I think it's the same service that we've used from the

9  inception of the firm.

10 Q    Okay.  For several years though?

11 A    Yeah.  It may have been as long as 10.

12 Q    Okay.  But with respect to the direct deposits on

13 federal and state payroll taxes, based upon what I've

14 reviewed on your MOR's, those are made directly by the firm,

15 as opposed to sending the money to Paychex, correct?

16 A    Well, they're made now directly by the firm, but at

17 some point they were being made Paychex, or at least were to

18 be made by Paychex.

19 Q    Okay.  At what time -- point in time did you move over

20 from sending the money to Paychex to doing the direct

21 deposits from the Debtor's account?

22 A    As I recall, sometime last -- sometime in 2016.

23 Q    Okay.  Now, as far as the overall management team of

24 the office, other than yourself and the office manager, is

25 there anyone else, like, does Mr. Eagan participate in the

10

1  overall management of the office?

2  A    No.

3  Q    So, it's Mr. Avenatti and Ms. Regnier, correct?

4  A    Yes.

5  Q    Anyone else?

6  A    No.

7  Q    Okay.  And is that a conscientious decision by Mr.

8  Eagan not to participate in management?

9  A    It's just, it's always been that way for 10 years.

10 Q    Okay.  Does he go -- does he work there everyday?

11 A    No.

12 Q    How many days a week does he come to work?

13 A    He maintains his own law practice in San Francisco,

14 separate and apart from the firm.

15 Q    So, for all intents and purposes, he does not work for

16 the firm, correct, he's just an equity holder?

17 A    Well, from time to time he does work in connection with

18 the firm, but he does not maintain an office presence at the

19 firm in Newport Beach.

20 Q    Okay.  And has it always been that way?

21 A    His level of involvement has fluctuated over time, but,

22 generally speaking, yes, it's always been that way.

23 Q    Okay.  So when we talked about the seven lawyers, did

24 you include Mr. Eagan, or did you exclude him?

25 A    I included him.

*Briggs Reporting Company, Inc.*

**Exhibit G**

11

1  Q    Okay.  As well as yourself, correct?

2  A    Yes.

3  Q    Now, if I were to ask you this question a year ago, how

4  many employees would you have had a year ago in June?

5  A    As of June, I think it would have been close to the

6  same, but -- well, it's tough because we -- there were three

7  lawyers that were terminated from the firm in May.  So --

8  Q    Well, let's make it easier.  Let's talk about January

9  of 2016.  How many employees were there at that time?

10 A    I would say it would be approximately the same, but

11 probably a few less.

12 Q    So, today we have 16.  We have seven lawyers and nine

13 support staff.  And so you're saying there was actually less

14 employees at the time?

15 A    Yes.

16 Q    So like 13, 14?

17 A    Probably in that range.

18 Q    Okay.  That's important for a variety of reasons,

19 including Mrs. Shariff's interests.  So you actually have

20 more employees than you did a year-and-a-half ago?

21 A    Yes, but our total payroll has gone down significantly.

22 Q    Okay.  Let's go over that, because that's kind of

23 important.  So, according to your monthly operating reports,

24 your monthly payroll is approximately $117,000, is that

25 correct?  I mean, I reading it right off of it.  So, does

*Briggs Reporting Company, Inc.*

**Exhibit G**

12

1  that sound correct?

2  A    That sounds a little low, but if that's the number

3  that --

4  Q    Well, let's just try it another way.  According to the

5  accrued expenses for April 2017, it shows payroll of

6  $117,000.  Does that sound like in the ballpark of what your

7  monthly payroll is?

8           MR. KHARASCH:  Docket 100, Michael?

9           TRUSTEE HAUSER:  It's "docket 100" at page 14 of

10  27.

11           MR. KHARASCH:  It must be Exhibit 4.

12  BY TRUSTEE HAUSER:

13  Q    I'm just asking you to take the representation, so we

14  can -- as a working number.  I mean --

15  A    Right.

16  Q    -- we don't have to all jump there.  Does that sound

17  correct to you?

18  A    It's sounds like it's in the ballpark.

19  Q    Is there any reason to believe it's not correct?

20  A    No.

21  Q    Okay.  So, when you have $117,000 in -- on the monthly

22  payroll -- and just for academic regularity, the monthly

23  budget, which your -- I apologize for that.  Which the Baker

24  Hostetler firm provided to our Florida office, showed a

25  monthly payroll of 132,000.  So I'm just saying, I think

Exhibit G

USAO_00060872

13

1  we're in the ballpark when we're talking 117, 130.  Okay.

2  And the point here is, it's of particular interest to the

3  I.R.S. in trying to fix their claim, but also just an

4  understanding what the monthly nut is.

5  A    So --

6  Q    Okay.

7  A    -- so, let me explain to you -- well, go ahead.  I'm

8  sorry.

9  Q    So, all I'm asking simply is, if it's around between

10  117 and $130,000 a month now, which I think we can agree on

11  that range, what was it back, let's say, in January of 2016?

12  A    It was significantly less than that.  How much less, I

13  cannot tell you with any specificity right now, other than

14  to say, it was hundreds of thousands of dollars -- I should

15  say, more back in January of '16.

16  Q    Okay.

17  A    I'm sorry.  I misspoke.

18  Q    No, that's fine.

19  A    Because the three attorneys that were terminated from

20  the firm collectively were making only in guaranteed payroll

21  somewhere in the range of $1,000,000.

22  Q    I'm talking about on a monthly basis.

23  A    Eighty-thousand a month.

24  Q    Okay.  So, you think the payroll was closer to 200,000

25  a month, because they were using like 120,000 back in

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00060873

14

1 January of 2016, and, in fact, probably all the way through

2 the termination date of May of 2016?

3 A    Through the termination date of May 20th of --

4 Q    I don't need the exact date, but May of 2016?

5 A    Yes, sir.

6 Q    Okay.  So, two-hundred-k through May of 2016.  And --

7 A    Well, let me --

8 Q    Sure.  No.  I want to make sure we get accurate

9 information here.

10 A    There was approximately $1,000,000 of payroll savings

11 when the three attorneys were terminated from the firm.  But

12 then additional employees were hired after that termination

13 date that took a portion of that approximate $1,000,000.

14 So, if it is -- if we just call it $130,000 a month now --

15 Q    Right.

16 A    -- then it was probably closer to maybe 170,000 a month

17 then.

18 Q    Okay.  Okay.  And just going back to year before that,

19 let's say to January of 2015, was, would it have been about

20 170,000 -- I'm sorry.  Would it have been, yeah, would it

21 have been about 170,000 in January of 2015?

22 A    It's tough for me to recall --

23 Q    Okay.

24 A    -- two-and-a-half years ago how many --

25 Q    I understand.

*Briggs Reporting Company, Inc.*

**Exhibit G**

15

1  A    Whether our payroll -- or whether the employee count

2  was the same as of --

3  Q    Okay.

4  A    -- that date or not.

5        TRUSTEE HAUSER:  Do you want to ask him -- you can

6  help --

7        MS. SHARIFF:  I'll wait until the end.

8        TRUSTEE HAUSER:  Okay.

9  BY TRUSTEE HAUSER:

10  Q    All right.  Let's move on to the Debtor's business

11  model.  I've read all the pleadings and the status

12  conference reports, so why don't you just briefly in your

13  own words describe the Debtor's business model to me.

14        I understand it's a contingency-based law firm.  Part

15  of it's class action, part of it's business litigation, part

16  of it's complex litigation.  But why don't you just explain

17  to me in your own words, elaborate a little bit more on what

18  the firm does, how, you know, it gets paid, its types of

19  cases, et cetera.

20  A    We represent predominantly plaintiffs in contingency

21  litigation, whether it be class action, which only accounts

22  for about 20-percent of our business, or in contingency type

23  cases of a business-related nature.

24        The vast majority of our compensation, I would say, 95-

25  percent, is derived from payments for attorney's fees and

**Exhibit G**

USAO_00060875

16

1   costs upon success.   Meaning, upon successful resolution of
2   the case, whether it be through settlement or verdict, we
3   are paid a percentage of those proceeds.
4   Q    Okay.  So, let's -- educate me on the life of a case.
5   So, you get a client, whether it's on a class action or
6   whether it's on a business case, and you enter into a
7   contract with them, correct?
8   A    Yes, sir.
9   Q    Okay.  And so that would be step one.  And pursuant to
10  that contract there's a contingency-fee clause or provision?
11  A    Yes.
12  Q    Okay.  And what is the typical contingency-fee
13  percentage in that contract?
14  A    It can range anywhere from 20- to 40-percent
15  generally --
16  Q    Okay.
17  A    -- but the standard is somewhere in the 30's.
18  Q    Okay.
19  A    And it can also increase over time.
20  Q    Okay.  So, in addition to the fees that the firm would
21  get, what about the costs?
22  A    It would depend on the case.  Sometimes the firm
23  advanced the costs in connection with the prosecution of the
24  case, other times the client agrees to advance the costs.
25  Generally, in class-action cases, which again --

**Exhibit G**

USAO_00060876

17

1 Q    Correct.

2 A    -- only account for about 20-percent of what we do --

3 Q    Right.

4 A    -- in those cases, obviously, the firm is going to

5 advance costs.

6 Q    Okay.  But you're saying, in other cases, the client

7 may advance costs?

8 A    Correct.

9 Q    And when the case settles and the funds are disbursed,

10 the first dollars out goes to the fees and the costs, and

11 the costs in the cases where the monies are advanced?

12 A    Generally that's true, but it's not 100-percent true

13 all the time.

14 Q    What would be the exception to that rule?

15 A    Well, if I understand your question correctly,

16 sometimes the fees are figured on the gross settlement

17 amount, before deduction for costs.

18 Q    Okay.  I understand.  Okay.

19 A    And sometimes the fees are calculated based on the

20 gross settlement, minus a deduction for costs, and then the

21 percentage is taken against that number.

22 Q    Right.  But putting aside that sort of intergranular

23 formula, what I'm simply trying to understand is, the case

24 settles, the funds are then first disbursed to your

25 attorney-client trust account.  You take your portion, and

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00060877

18

1  then it's sent, remitted to the client, or is it --

2  A      Generally speaking, that's true, but sometimes that is

3  not how the funds flow to the client.

4  Q      Okay.

5  A      Sometimes the funds are paid directly to the client.

6  Q      In which cases would that be the case?

7  A      As I sit here right now, I can't recall the exact

8  cases, but there have been cases over the life of the firm

9  where the money has been paid directly to the client, and

10 then the client has remitted costs and fees to the firm.

11 Q      Okay.  But not in a class action, right?

12 A      That would not take place in a class action, no.

13 Q      Okay.  So -- okay.  So we enter into this contract with

14 a hypothetical client.  There's a contingency fee of, let's

15 just say, average 30-percent.  Costs are either advanced in

16 class actions, and then in other cases the client may

17 advance costs.

18        Explain to me under operation of law under California,

19 what type of lien, if any, your firm would get on the fees,

20 or as well as the costs, if that applies.

21 A      By operation of law in California, immediately upon

22 execution of our fee contract, which provides for a lien on

23 the recovery.  Our firm has a lien on the recovery

24 associated with that case.

25        There's only been one instance in the history of the

**Exhibit G**

USAO_00060878

19

1 law firm where we evidently did not take a contractual lien

2 against the recovery, and that was an agreement that was

3 evidently agreed to behind my back, without my

4 authorization, and I only found out about it after the fact.

5     We have had a rule at the firm for the last 10 years,

6 that the only individual that is authorized to enter into

7 contingency-fee contracts, the only individual that is

8 authorized to sign those contracts is me.

9     But, in general, every time we negotiate and execute a

10 retainer agreement with a client, it specifically has a

11 contractual provision that provides the firm with a lien on

12 the proceeds.  Although under California law, that's not a

13 requirement, it is a preferred practice and, therefore, one

14 that we spell out in our retainer agreements.  That lien is

15 a silent lien under California law.  It need not be recorded

16 in order to be valid under California law.

17     So, from that point forward, whether we see the case to

18 conclusion, meaning settlement or verdict or not, we

19 maintain a lien on the settlement proceeds, even if we're

20 terminated.

21 Q   Okay.  So lien remains even if terminated.  Now, if the

22 client terminates you, do they enter into a new contract

23 with the new law firm, and the new law firm gets a lien?

24 A   Generally speaking, yes.

25 Q   Okay.  So let's call it "the second law firm."

*Briggs Reporting Company, Inc.*

**Exhibit G**

20

1  A     But that lien is junior to our lien.

2  Q     And, again, there's no requirement for recordation or

3  recording, like a UCC-1?  It's just, the contracts that

4  proceeds the second firm in time evidences the priority of

5  the lien?

6  A     That is correct.  And the subsequent counsel to us, in

7  your example of termination --

8  Q     Right.

9  A     -- has a fiduciary and ethical obligation to respect

10 the first-in-time lien that our law firm has, and cannot

11 engage in a negotiated settlement and disbursement of funds

12 without proper notice to our law firm, and without basically

13 written waiver of our lien rights in connection with those

14 cases.  Furthermore --

15 Q     Let me stop you, because I was just -- I didn't know

16 that.  I want to make sure.  So you're saying in a class

17 action when a law firm that has taken a case from your firm,

18 so we'll call it "the second law firm," is actually

19 negotiating a settlement, that they would have to loop you

20 in in some form or fashion?

21 A     Are you talking about a class action or any case?

22 Q     Why don't we just use -- we can use both.  I want to

23 hear both.  But let's say for class, purposes of class

24 action.

25 A     Well, let me say this.  There is an ethical obligation

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00060880

21

1  in the State of California, as expressed in formal ethics

2  opinions, that state that subsequent attorneys have an

3  ethical obligation to inform prior attorneys as to the

4  status of settlement.  And certainly cannot disburse funds,

5  make use of funds, et cetera, without providing adequate

6  notice and protection to prior counsel.  And I think that

7  that holds true in any type of case.  There's nothing that

8  I've seen that states that a class action would be viewed

9  any differently than any other case.

10 Q    Okay.  So, when you say status of settlement, so they

11 obviously -- not obviously, but they wouldn't have to get

12 your permission to settle or to get your permission as to

13 the parameters of the terms of settlement, but they would

14 have to inform you as to the status of the settlement,

15 correct?

16 A    Yes.  The decision to settle the case or not always

17 rests with the client.

18 Q    Right.

19 A    And in a class-action setting, is subject to approval

20 by the court, of course.

21 Q    Okay.  But just to be clear.  So the core issue then

22 from your perspective, and from the creditor's perspective,

23 would be to make sure that the bankruptcy estate would be

24 informed of the status of any given case, whether it be a

25 class action or other types of litigation, so that the firm

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00060881

22

1  could at least put together a cash-flow projection as to

2  what future income may be, or least have an understanding as

3  to what types of actions you may have to take, either

4  consensually or otherwise, in order to get your fees and

5  costs from your original agreement?

6  A    That is the first step.  And then the second step is,

7  that there is an affirmative obligation under the law to

8  segregate any and all monies that may be subject to the lien

9  as --

10 Q    So --

11 A    -- as claimed by the prior law firm.

12 Q    How would the second firm know how much funds to set

13 aside in, we'll call it an "escrow account" or an "impound

14 account," how would you -- how would they know what to put

15 aside?

16 A    Because if there is not a claimed amount for the fees

17 and costs, the entire fees and costs have to be escrowed and

18 set aside until that issue is resolved.  Subsequent counsel

19 cannot take it upon themselves to decide what portion of the

20 fees and costs are in dispute, disburse 90-percent of the

21 fees and costs for their own benefit, and leave 10-percent

22 in the account hoping that that might cover the amount.

23 Q    Okay.  And that applies to whether it's class action or

24 just all types of contingency litigation?

25 A    That's my understanding, yes.

**Exhibit G**

USAO_00060882

23

1  Q    That's your interpretation.  Okay.  So let's say you

2  then -- let's just say for sake of hypothetical, that case

3  settles.  They set aside the -- by the way, when -- just for

4  example, when a class action settles and the court awards,

5  let's say, $1,000,000 in attorney's fees, does the check go

6  from, let's say, the defendant directly into the attorney-

7  client trust account, or is there some sort of, you know,

8  specific type of account that's specific to class action

9  type litigation?

10  A    Sometimes the funds will flow through a claims

11  administrator.

12  Q    Okay.

13  A    And when we talk about funds, we're talking about the

14  funds for attorney's fees and costs, I'm assuming, as

15  opposed to funds that are being disseminated --

16  Q    Correct.

17  A    -- to class --

18  Q    Correct.  Yeah.

19  A    Okay.  So, sometimes those funds will flow through a

20  claims administrator, and sometimes those funds will flow

21  directly from the defendant to the attorney.

22  Q    So, if it flows to the claims administrator, how does

23  the -- is the claims administrator then advised by different

24  -- the first lienholder, the second lienholder, that there's

25  a dispute, and then they're instructed to set the funds into

*Briggs Reporting Company, Inc.*

**Exhibit G**

24

1  an escrow account?

2  A    Hypothetically that may happen.  But whether the claims

3  administrator is notified or not, the subsequent attorney

4  has an obligation to ensure that the funds do not flow

5  directly to the subsequent attorney with knowledge of that

6  lien.

7       Furthermore, if the defendant in the case is put on

8  notice of the lien, the defendant cannot cause the monies to

9  be paid without providing adequate notice and protection to

10  the first attorney.  So let me give you an example.

11       If it is non-class-action case, let's just take a

12  personal injury case for the sake of argument, and my firm

13  was prior counsel and we were terminated, and a subsequent

14  law firm was brought in by the plaintiff.  And, ultimately,

15  they settle the case for $10,000,000.  Normally what is

16  required to happen is, when the defendant issues that check

17  for $10,000,000, they are required to put our law firm name

18  on the check together with the name of the plaintiff and the

19  subsequent law firm.

20       And then generally what happens is, an agreement is

21  reached between the client and the two law firms as to

22  what's going to happen to those monies.  Under California

23  law, the client is entitled to their monies immediately,

24  their portion of the monies.

25       Then, normally what happens is, the disputed amount of

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00060884

25

1  the fees and costs, and it may be the entire amount, gets

2  put into an escrow account with -- requiring two signatures,

3  or gets deposited into the court on an interpleader action

4  or something of that nature.  Because under California law a

5  defendant can also be held liable for issuing payment to the

6  subsequent attorney directly, without accounting for the

7  primary attorney's lien rights.

8  Q   Okay.  So, continuing on in the hypothetical --

9  A   But, obviously, if it's -- if the prior attorney

10  doesn't know the case has settled, or if the subsequent

11  attorney refuses to provide information about the

12  settlement, then there's no way for the prior attorney to

13  adequately take steps to protect his or her rights or to

14  seek to adjudicate that amount.

15  Q   So -- but let's just say in one of these class-action

16  suits that are pending, because you know that the prior

17  attorney is not adhering to their ethical obligations,

18  hypothetically or allegedly, do you then just take it upon

19  yourself to write a letter to the defendant in the case to

20  say, by the way, we just want to let you know, we're the

21  senior lienholder on the liens on attorney's fees.  To the

22  extent you reach a settlement or make a payment, that the

23  funds need to include your law firm's name on the check?

24  A   You may do that.  You may also file a notice of the

25  lien in the record in the underlying case, which operates as

*Briggs Reporting Company, Inc.*

**Exhibit G**

26

1  providing notice to all parties and their counsel of the

2  existence of your lien.

3  Q    Okay.  And let's just now take that hypothetical to the

4  cases that are in dispute in this case.  Have you have to do

5  that in every single case?

6  A    We did that in every single case.  We provided some

7  notice to the opposing counsel and party or parties of the

8  existence of our lien rights in some 16 or 17 matters.

9  Q    Yeah.  I believe you have 17 of what we'll call, the

10 "disputed matters."  And we'll get to that, although you're

11 answering a lot of -- which is great.  You're answering a

12 lot of questions in advance, but there's no problem with

13 that.

14      So you filed a notice of lien in every single one of

15 these cases.  So the defendant is on notice that -- again,

16 whether it's settled by consensual settlement or by it goes

17 to verdict, either way, they then are required to put your

18 name on the check.

19      According to what we discussed, the client then gets

20 their -- see, I don't understand how the client -- the

21 client gets their portion, but if you don't know what the

22 costs are.  Because the fees are going to be a fixed amount,

23 right?  It's like the pie never gets bigger with the fees.

24 So if the contingency was originally 30-percent, it's not

25 like the first firm gets 30 and the other firm gets 10 or --

27

1  so that pie is always going to be 30-percent of fees.  But

2  how do you know how much my costs were expended before you

3  cut a check to the client?

4  A    In some cases you may know, in some cases you may not.

5  So there may be a holdback for costs to account for

6  something.

7  Q    But you take my point?

8  A    Yeah.

9  Q    Yeah.  So, I mean, there may -- even then there may

10  have to be, as part of the escrowed funds, a sort of a cost

11  sub-account because someone may not have communicated the

12  fact that your firm had expended -- being firm number one,

13  $100,000 in costs prior to firm number two taking the case.

14  And that information may have not made its way to either the

15  claims administrator or the plaintiff or whoever received

16  the check, correct?

17  A    There could be an instance like that, sure.

18  Q    Is that a concern that you have, that the funds will be

19  distributed and there won't be enough left to cover the

20  costs expended by your firm in each of these cases?

21  A    I have significant concerns about each of these cases.

22  Q    I'm just talking about -- I understand, but I'm just

23  trying focus on the cost aspect of it.

24  A    Well, that's one of the concerns, but the bigger

25  concern is, is that in our view, we're entitled to millions

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00060887

28

1  of dollars in fees in those cases, and we have no idea,

2  generally, what -- we have very little idea as to what's

3  happened in those cases.

4  Q    Sure.

5  A    And, even though we're provided notice of our lien

6  rights in connection with these cases, that doesn't mean

7  those lien rights have been respected.

8  Q    Right.

9  A    It doesn't mean that those lien rights have been

10 respected by subsequent counsel.  In fact, there's reason to

11 believe that they've been absolutely not respected by

12 subsequent counsel.  And it doesn't mean that the defendant

13 in those cases have adhered to their ethical obligations in

14 connection with their obligations in those cases.

15 Q    Okay.  So you're the fiduciary of this estate.  And so

16 it's your position as a fiduciary of this estate, who's

17 trying to collect fees and costs from these 17 lawsuits,

18 that you don't believe that the subsequent law firm who's

19 taken the 17 cases is adhering to their ethical obligations

20 to provide you with information, generally speaking?

21 A    "Generally speaking," that's true.  I'll give you an

22 example, a very simple example.  There is a large class

23 action case that our law firm was predominantly handling.

24 Two other law firms were involved, but we did 90-percent of

25 the work through May of 2016.  This is the Callaway v.

**Exhibit G**

USAO_00060888

29

1  Mercedes Benz case.

2  Q    Okay.  And I've actually reviewed the dockets on the --
3  that --

4  A    So, if you've reviewed the docket, you know the
5  following.  There was a deadline to file a class cert motion
6  in that case, as I recall, in late May of 2016 or early
7  June.  That deadline was met.  The hearing on the -- and
8  there was a trial set in that case, as I recall, for
9  December of 2016.  Following the filing of that motion for
10  class cert --

11  Q    This is a May of 2016, the class cert motion?

12  A    Yes.

13  Q    Okay.

14  A    May or June.

15  Q    Okay.  Now, at this point, this is kind of the timing
16  when, exactly when the three attorneys were leaving the firm
17  or being terminated?

18  A    Were terminated from the firm.

19  Q    Okay.

20  A    They were terminated about, as I recall, 10 days before
21  the class cert motion was due.  They were already working on
22  the class cert motion well before their termination date.

23  Q    Okay.  So they were assigned to do the class cert
24  motion?

25  A    They were working on the class cert motion.

**Exhibit G**

USAO_00060889

30

1   Q    Yeah.   That's what I'm saying.

2   A    Yes.

3   Q    That that was their responsibility.

4   A    And our firm had expended significant amounts of

5   resources in connection with that case in the form of not

6   only costs, but, more importantly, overhead, secretarial

7   help, and we are paying the salaries of the attorneys that

8   are working on that matter.

9        And the firm has a contractual agreement with the

10   client in that case, the firm, not the individual attorneys

11   working on that case.   Just like in the instance of other

12   cases in our firm, it's the firm on one side of the

13   contract, not an individual attorney, and the client on the

14   other side of the case.

15       So, the case cert motion's filed.   There's a trial date

16   in the case.   The class cert motion hearing date is

17   voluntarily continued, I believe, five times by counsel for

18   the plaintiffs.   Now --

19   Q    Were you aware of that?

20   A    We were aware of the -- of it after the fact --

21   Q    Right.

22   A    -- just by reviewing the docket.

23   Q    Right.   Right.

24   A    Well, when you are a plaintiff's class action attorney,

25   you want your class cert motion heard sooner rather than

*Briggs Reporting Company, Inc.*

**Exhibit G**

31

1   later.  Because if you're successful, there's significant

2   additional value that is brought to bear in the case, and

3   it's a way to put pressure on the defendant to settle the

4   case or to face trial.  So --

5   Q   Do you think these attorneys purposely delayed filing

6   the class cert motion, knowing that they were going to set

7   up a new law firm and then take advantage of doing the class

8   certification themselves?

9   A    No.  The delay in the hearing on the class cert motion

10  took place after they had been terminated.  But here's my

11  point.  The class cert motion is filed.  The hearing on that

12  motion is continued, I believe, five times.  Then, lo and

13  behold, the class cert motion is withdrawn, withdrawn

14  voluntarily by the plaintiffs.  The deadline to file the

15  class cert motion has now passed.

16      You would not withdraw a class cert motion in a case

17  like that unless there had been a settlement in the case.

18  There's no reason to.  It makes no sense.  You would never

19  do that.

20      And so, my belief is that there is a settlement in this

21  case, but no one will tell us what the settlement is.

22  Furthermore, there's been no activity in that case in eight

23  months --

24   Q   Okay.

25   A    -- which is unheard of in a --

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00060891

32

1 Q    I've got it.  I understand.  I'm going to stop you.

2       So I looked at the order there where you had filed a

3 motion to get information about the settlement.  And I want

4 to say it's Judge Selna, but I could be off.  I think it's

5 judge -- and he said that the reason the attorneys didn't

6 have to give you the settlement information was because it

7 wasn't finalized.  I'm just telling you my reading of it.

8 So, help -- I'm trying to reconcile the -- your

9 characterization as a -- ethics obligation versus what the

10 judge has said as what they're required to do.

11 A    So, when it is going to be final?

12 Q    No, I'm just, I'm trying to -- I'm not a class action

13 lawyer, I'm a bankruptcy lawyer.  My job is to -- I get

14 cases of every kind, restaurants, Orange County Register.  I

15 mean, you name it, we see it, okay.  And so, I need to be

16 educated by the parties as to how this works.  But if I see

17 a piece of information that doesn't square with it, I need

18 to reconcile it, okay?

19 A    So it's been, it's been some six months since this case

20 supposedly, tentatively settled.  There's been no

21 application for approval of a settlement.  There's been no

22 disclosure made to the court or to the plaintiffs in that

23 case, whose rights are impacted, by the way, by this

24 continued delay, in a very significant way.

25      It is highly unusual in my experience to have a case

*Briggs Reporting Company, Inc.*

**Exhibit G**

33

1  sit dormant of this magnitude for this long, highly unusual.

2  Q    Why do you think that is taking place?

3  A    I think that the subsequent attorneys, or the attorneys

4  that took that case with them, are purposely dragging their

5  feet on a finalization of the settlement, hoping to gain an

6  advantage in connection with minimizing the fees against --

7  or the fees of Eagan Avenatti.  And that is why that case

8  has taken so long to, quote, "be finalized."

9      Because,  otherwise, plaintiffs' attorneys do not

10 purposely delay settlement of cases and subsequent payment

11 of their fees and costs.  They generally don't do that.

12 That's not something that is in their interest.

13 Q    Okay.  So, kind of getting away from the specific

14 cases, we can -- we'll get back to that.  Your firm enters

15 into the contract.  There's a contingency-fee arrangement

16 for fees and costs.  There's a lien on attorney's fees.

17 It's a secret lien that doesn't have to be recorded.  The

18 second firm comes along.  They get a junior lien.

19     With respect to your claim for fees, is that based upon

20 the work that your firm does up until the day that your firm

21 is terminated?

22 A    It's based on a whole host of factors.  That's one of

23 many factors as to what the firm may be entitled to.

24 There's hours spent, risk taken, quality of work performed,

25 status of the case upon the date of termination, length of

34

1 the case, significant milestones in the case prior to

2 termination, value as it related to experts or other

3 decisions that were made along the way.  There are a whole

4 host of factors.  It's not just a simple, how many hours did

5 you spend on a case?

6      Because, otherwise, what would happen is, every time an

7 attorney was at a law firm and the case was getting ready to

8 settle, they would cause the client to terminate the first

9 law firm, take the case with them, and then claim, well, the

10 first firm only spent 2,000 hours on the case, and even at

11 $1,000 an hour, the fee that the first firm gets is

12 $2,000,000.  And, you know, I, attorney B, will pocket,

13 let's assume it's a $30,000,000 case with a 30-percent

14 contingency, may pocket $7,000,000 in fees.  So it's not

15 just a simple arithmetic relating to hours.

16 Q   Okay.  So it's understood, and I just needed some

17 education on if there was a formula, and you're saying it's

18 an amalgam of factors.  Is it fact-specific to each case?

19 A   Yes.

20 Q   Okay.  Now -- and, again, this is -- I don't know if

21 you can answer this question.  But, generally speaking, when

22 prior to your firm -- so you take on the client and then you

23 file the lawsuit.  It could be class action, it could be

24 just, you know, a complex litigation lawsuit.  Is there a

25 significant amount of costs that your firm incurs prior to

**Exhibit G**

USAO_00060894

35

1  actually filing the lawsuit, or is it case by case in a

2  sense?

3  A    It's "case by case."

4  Q    Are there some cases where it's tens of thousands of

5  dollars, or even a six-figure number?

6  A    We've had cases where we've advanced over $3,000,000 in

7  costs in a particular case.

8  Q    Okay.

9  A    We've had other cases where we haven't advanced any

10 costs because the client has agreed to pay the costs, for

11 instance.

12 Q    Okay.  So, it can be anywhere from zero to, as you

13 said, three --

14 A    Seven figures.

15 Q    "Seven figures."  If you -- and, again, if you're at

16 liberty to say this.  If you can't, you can't.  If you took

17 the 17 lawsuits that are in -- we'll just call them "in

18 dispute," for lack of a better term, that are listed on

19 schedule -- well, it's referenced on B-77, but it's actually

20 docket item 114 -- actually, no.  I'm sorry.  It's

21 referenced on schedule B --

22         MR. SAUNDERS:  Seventy-four.

23 BY TRUSTEE HAUSER:

24 Q    -- seventy four.

25         TRUSTEE HAUSER:  Thank you, Rob.

**Exhibit G**

USAO_00060895

36

1  BY TRUSTEE HAUSER:

2  Q    If you just -- on docket item 105.  If you just took

3  those 17 -- and I'll wait for you to get there.  I

4  apologize.  It's page three of 10.

5  A    It's the 17 cases that --

6  Q    "It's the 17 cases."

7  A    All right.

8  Q    Okay.  So the 17 cases listed on schedule B-74, docket

9  item 105, do you have an aggregate cost figure in mind as to

10 what your firm would be owed?

11 A    It's less than $1,000,000.  It's six figures, but it's

12 far less than $1,000,000.

13 Q    Is it more than a half a million or less than a half a

14 million?

15 A    It's probably less an a half-a-million dollars.  But

16 you're only -- I just want to be clear.  We're only talking

17 about out-of-pocket costs, is that right?

18 Q    Yeah, but I thought that's -- when you say -- I thought

19 under the agreement, that that's the only kind of costs you

20 could recover?

21 A    Well, costs are a small component of what we're owed in

22 those cases.  We're also owed fees.

23 Q    I'm sorry --

24 A    I just want to make sure that there's a distinction

25 between costs and fees.

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00060896

37

1  Q    I -- even in our world where there's an absolute

2  distinction between fees and expenses.  I mean, there's no,

3  there's -- we don't ever muddle those two terms together, at

4  least not purposefully.  So --

5  A    Because, again, you could have a case where you don't

6  advance any costs, because the client pays the costs, but

7  the case settles for 3,000,000 or $10,000,000.

8  Q    I understand.  I was just trying to figure out just one

9  component --

10 A    Right.

11 Q    -- of this.  I didn't know if --

12 A    It's less an a half-a-million dollars.

13 Q    Yeah.  I didn't know if you were going to say

14 $10,000,000.  So, okay.  So the costs here, just in order of

15 magnitude, is less than a half-a-million dollars.  Is it

16 more than 250?

17 A    It may be less than 250.

18 Q    Okay.  Is it somewhere between 100,000 and 200,000?

19 A    It's probably somewhere between one and 300,000 --

20 Q    Okay.

21 A    -- in total.

22 Q    At least we have a range.  All right.  So -- and that's

23 the aggregate for all 17 cases?

24 A    In costs.

25 Q    Yeah.  No, I understand.  I'm a very linear -- you'll

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00060897

38

1  notice, I just do one thing and then I move on to the next.

2  A    Got it.  I just want to make sure I understood.

3  Q    I didn't think we'd be here if it was 100 to 300,000.

4  A    Okay.

5  Q    Okay.  Okay.  Now -- okay.  You answered that question.

6  Can you give me -- are you at liberty to discuss what you

7  think the aggregate amount of the fees in the 17 cases that

8  you think the firm is owed, or a range?  And if you are,

9  that will be helpful.  If not, then --

10 A    Millions of dollars, provided though that it is

11 impossible for me to answer that question without knowing

12 what those cases either will settle for or have settled for,

13 or what fees have been agreed to in some of those cases, et

14 cetera.  Without that basic information, I can't perform my

15 fiduciary function.

16 Q    Okay.  So just, I want to put a finer point on that

17 issue.  So, on the 17 cases that are set forth at docket

18 item 105, which is schedule B-74, none of those cases have a

19 disclosed settlement amount?

20 A    I believe one of those cases does.  The Birbrower case.

21 Q    Okay.  And I am familiar with that docket as well.

22 A    The total attorney's fees in that case have yet to be

23 ruled upon by the court in connection with the settlement.

24 Q    My understanding is, I'm reading the docket, there's a

25 hearing on September 1.  There's been a motion to file fees.

**Exhibit G**

USAO_00060898

39

1  I think it was filed in June.  There was a cutoff date or

2  something.  There's some sort of amicus or do-gooder firm

3  out of D.C. that's trying to get involved in that.  But --

4  and I forgot what the fees were?  They're a little bit north

5  of $1,000,000 in that case, right?

6  A    Yeah.  I think it's --

7  Q    Well, why don't we just say a million, just for --

8  okay.  And pursuant to our discussion earlier, that pot can

9  never be bigger or smaller.  That's what the court's going

10 to allow in fees, and the only issue is how it's divided

11 between the various law firms, correct?

12 A    Yes.

13 Q    In other words, there's no negotiation or no

14 discussions or no ruling by any court, other than the one on

15 September 1st, that once those fees are fixed, they're

16 fixed.  It's a pie of $1,000,000, and then it's simply a

17 matter of the allocation of that $1,000,000 between the

18 various different law firms involved?

19 A    Yes, sir.

20 Q    So it would be the law firm number two, and I think

21 their co-counsel is Yule and something or other.  I don't

22 even know if there's other co-counsel involved.  So, there's

23 at least two firms plus yourself.  So there's at least three

24 law firms I know about.  And, again, the pie will be divided

25 but it does not expand.  It's not like because your

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00060899

40

1  argument's more compelling that that $1,000,000 goes to 1.5

2  million?

3  A    You are correct.

4  Q    Okay.  So we have a pie of $1,000,000 in the Birbrower

5  deal.  And you kind of told me that those funds -- the

6  defendant, which is Quorn in that case -- I've actually

7  eaten their product, probably a --

8  A    You're a plaintiff.

9  Q    Yeah.  I just, I didn't keep all -- I read the thing.

10 I didn't keep all of the box things and everything you're

11 supposed to do, so.  That check, if I understand, Quorn will

12 either send a check to the plaintiff directly, or to a

13 claims administrator, correct?

14 A    Well, actually, the --

15 Q    Is there a third?

16 A    -- the settlement agreement in that case, as I recall,

17 that was negotiated by the lawyers that took the case,

18 provides that the attorney's fees are going to be paid

19 directly to the Yule firm --

20 Q    Okay.

21 A    -- and to the Yule firm's trust account, which we

22 maintain is improper, because it does not provide adequate

23 protection to the estate relating to the estate's claim on

24 those fees.

25 Q    Which -- on that bankruptcy estate?

**Exhibit G**

41

1  A    Correct.

2  Q    Yeah.  The gist of what I got from looking at just like

3  bankruptcy 360 articles, which I know, believe me, from

4  having my own hearings, was that Judge Gee --

5  A    You mean the National Enquirer?

6  Q    We know -- I mean, we're underpaid.  Okay.  That Judge

7  Gee, Dolly Gee was presiding over that hearing where you

8  were contesting the fees, correct?

9  A    Yes.

10  Q    Okay.  And Judge Dolly Gee basically said, my job is to

11  approve settlement, my job is to approve fees, but my job is

12  not to resolve your fee dispute.  So, essentially, it's your

13  job, as the fiduciary of this bankruptcy estate, to make

14  sure that this bankruptcy estate is protected with respect

15  to those fees, correct?

16  A    Yes.  And so what we've done is we filed a lien.

17  Q    I was going to ask you what steps you've taken.  Okay.

18  So you filed a notice of lien, which does what?  What's the

19  practical effect of that?

20  A    Provides notice to all of the parties and their counsel

21  of the existence of our lien.

22  Q    Including the defendant, which you said there's some

23  sort of -- that once they know about it, they should know

24  not to write a check without your name on it, is that

25  correct?

**Exhibit G**

USAO_00060901

42

1  A    That's correct, although we have a concern, in light of

2  the language in the settlement agreement, that the defendant

3  is going to seek safe harbor by the language in the

4  settlement agreement, authorizing the defendant to pay the

5  entirety of their fees to the Yule firm.

6      And then if we go to the defendant and say, why did you

7  do this?  The defendant's going to say, well, the court

8  approved the settlement, and the settlement had a provision

9  in it that stated that the monies could be paid in their

10 entirety to the Yule firm.  So, therefore, we wash our hands

11 of it, and, you know, take it up with somebody else.

12 Q    Right.  So -- and that was my next question.  Who do

13 you take it up with now?  What's your step?  Do you have to

14 sue, do you have to sue back to the plaintiff?

15 A    Wait.  You have to bring under California law, you'd

16 have to bring an action against the plaintiff to have the

17 existence of your lien adjudicated and the amount of that

18 lien.  And then you could bring a subsequent action against

19 the subsequent attorneys, as well as co-counsel attorneys.

20 But you have no guarantee, if the monies have not been

21 handled appropriately, that the monies will still be there

22 by the time all of that is completed.

23 Q    Okay.  So, just so I'm clear.  So, you sue the

24 plaintiff in state court, right?  Would it be district court

25 or state court?

*Briggs Reporting Company, Inc.*

**Exhibit G**

43

1  A      It would be in state court.

2  Q      "State court."  Do you also name in that same action,

3  do you name both the law firms involved, Yule firm and -- or

4  do you -- it sounded like you make -- you actually have to

5  file another suit against them?

6  A      Under California law, you first have to sue the client

7  independently and acquire a judgment in that case.

8  Q      So, let me understand this.  So, if you don't come to

9  some consensual resolution with law firm number two, which

10 in this case is the Frank, Sims, Stolper firm, you're going

11 to have to go into state court 17 times, file 17 different

12 lawsuits, and then file a second, a tertiary lawsuit against

13 the firms, we're talking about 34 lawsuits.  Am I

14 mischaracterizing what may be the worst-case scenario?

15 A      Potentially, but generally that doesn't happen.

16 Q      But where are we now?  In other words, right now,

17 you're saying the Yule firm -- if on September 1 the

18 motion's approved allowing the fees, and you're saying the

19 way that agreement's drafted, that Quorn is then to cut a

20 check to the Yule firm, is that correct?  I want to make

21 sure I'm not mischaracterizing at least your understanding

22 of that.

23 A      That's my understanding.

24 Q      Okay.

25 A      I didn't have anything to do with the settlement

*Briggs Reporting Company, Inc.*

**Exhibit G**

44

1  agreement, but that's my reading of this.

2  Q    No.  What I'm understanding is, as a fiduciary of the

3  estate, what you would need to do and what -- and, frankly,

4  what kind of funds would have to be expended on behalf of

5  the estate in order -- in just this one lawsuit to recover

6  the fees, which apparently seems to be, now that you've

7  explained to me the cost part of it, the focus, the

8  allocation of fees to the estate.  I mean, how much money

9  would that cost the estate?  Tens of thousands of dollars,

10  right?

11  A    Correct, but certainly far less than the amount that's

12  owed to the estate.

13  Q    No, no, no.  I'm not -- I'm just trying to understand

14  the --

15  A    Generally what happens under these circumstances is,

16  subsequent counsel -- I mean, this is what happens 95-

17  percent of the time.

18  Q    Yeah.

19  A    Subsequent counsel respects the lien rights of the

20  prior law firm, the defendant respects the lien rights of

21  the prior law firm, and all of the money gets tied up.  When

22  all of the money gets tied up, there's an incentive for

23  everyone to seek a resolution that's beneficial for all of

24  the attorneys involved, so that the attorney's can get their

25  money --

**Exhibit G**

USAO_00060904

45

1  Q    Is there --

2  A    -- generally speaking.

3  Q    -- is there any dispute at this time about, on the 17

4  lawsuits, about Eagan Avenatti's -- at least the fact that

5  their lien's perfected validly under California law?

6  A    Well, from my perspective --

7  Q    Well, it's not from -- I mean, it's -- what I'm saying

8  is, in the course of dealing with this dispute, has the

9  subsequent law firm, the Frank, Sims law firm ever said, we

10 actually dispute your lien.  We don't even think you've got

11 a valid lien?

12 A    In the Birbrower case, yes.

13 Q    And how is that possible?  I mean, you have a written

14 contract, right?

15 A    Well, because the written contract evidently that was

16 -- remember, I told you that single instance in the --

17 Q    Okay.

18 A    -- in the 10 years that I've run the law firm --

19 Q    Right.

20 A    -- where the contract did not include a lien?

21 Q    Right.

22 A    Well, subsequent to the termination of the three

23 attorneys, we discovered that, in fact, the fee contract

24 that evidently was entered into with Ms. Birbrower --

25 Q    Yeah.

**Exhibit G**

USAO_00060905

46

1  A    -- that evidently the lien provision had been deleted

2  without my knowledge or consent, prior to entering into that

3  agreement.

4  Q    Who handled that on behalf of the firm?

5  A    Scott Sims.

6  Q    Okay.  Has the firm taken any action against him for

7  failing to -- you know, I assume maybe, whether it's an

8  employment agreement or just under common law, for failing

9  to carry out his obligations under the employment contract

10  or other legal theory?

11  A    There's a pending arbitration involving Mr. Sims.  I

12  don't recall if that claim has been made in that case, but,

13  certainly, if the firm is ultimately damaged by way of

14  that --

15  Q    Right.

16  A    -- deliberate failure, then we would absolutely seek

17  recovery of those monies from Mr. Sims.  Because at no point

18  in time did I ever consent, nor would I have ever consented

19  to take a case without us having a valid lien in the case.

20  I would have declined the representation.

21  Q    Understand.  So, potentially, on schedule B, which

22  lists all the assets not a real property of the estate, you

23  may want to amend that to include a cause of action against

24  Scott Sims for failing to properly -- if that's what you

25  think you have, because you're supposed to list all of the

**Exhibit G**

USAO_00060906

47

1  claims at the time of filing.

2       So on March 10th you believed that he violated either

3  the terms of the contract or under some theory of law, for

4  failing to include -- for actually purposely deleting that

5  provision, that you would never have done in your 20 years

6  of practice?

7  A    I have never knowingly, nor would I ever knowingly

8  enter into a fee agreement or contract with a client or

9  prospective client of the firm in a contingency case, where

10 the client insisted on deleting the lien provision and we

11 would agree to that.  That would be a major red flag and

12 something that we would never do.

13 Q    Understood.  Okay.

14 A    But, again, I want to be clear.  I'm not exactly

15 certain what the position is of Mr. Sims and Mr. Frank and

16 Mr. Yule at this point as to whether they dispute our

17 entitlement to a lien.  When we first raised this issue, we

18 were told, what lien?  You don't have a lien.  And that was

19 rather shocking to me.  That was in July of last year.

20      So we went back and dug through some e-mails and found

21 this fee agreement that had not been presented to me for my

22 signature, that evidently did not have a lien provision in

23 it, which was news to us.

24      Can we take a break when you have a chance?

25 Q    Yeah.  I just, I kind of just want to finish a thought,

**Exhibit G**

USAO_00060907

48

1 because this is going to go a lot longer than I thought,

2 which is fine, because I'm getting a lot of good information

3 from you.  But, yeah, we'll -- give me five more minutes,

4 okay, and then --

5 A    No, sure.

6 Q    I'm just trying a complete a thought here.

7 A    I just need to run to the restroom.

8 Q    I completely understand.  I'm sure there's other people

9 in the same boat.

10     Okay.  So, let me just finish this portion with this

11 question.  If tomorrow you all sat in a room and got a

12 mediator or -- and resolved this thing, your expectation

13 would be that millions of dollars of fees -- I mean, that

14 would be your ask, be allocated to the, for the benefit of

15 the bankruptcy estate, correct?

16 A    That's my belief, but I don't know.  I mean, for all I

17 know --

18 Q    I understand what the -- you made the qualifier.  But

19 I'm saying, assuming, based upon your 20-plus years of

20 experience in doing these lawsuits, I assume when you take

21 in the lawsuit, you do a cost litigation -- risk-litigation

22 analysis, and you wouldn't take the case if you didn't think

23 it was worth a certain amount.

24     So, based upon your 20 years plus of experience,

25 assuming when you get the settlement information, it is what

**Exhibit G**

USAO_00060908

49

1  it is, okay.  I guess part of the question I have is, if

2  some of these cases don't -- you said only one case has

3  settled, and that's the -- as far as you know, correct?

4  A    Well, no, because I think the <u>Callaway</u> case has

5  settled.

6  Q    Well, let's just say two have settled, okay?

7  A    Okay.

8  Q    Then you've got 15 other cases out there, right?

9  A    Uh-huh.

10 Q    So, you would have to have a settlement agreement that

11 essentially would agree to a certain allocation, even though

12 you don't know what the settlement amount is.  Do you

13 understand what I'm saying?

14 A    Well, we'd like to know what the settlement --

15 Q    But I'm saying, let's just say in 15 cases nobody

16 knows, because they haven't settled, right?

17 A    Right.

18 Q    So how would you resolve that?

19 A    So you would agree to a percentage of the fees.

20 Q    Okay.  That's something you'd be willing to do on

21 behalf of the bankruptcy estate?

22 A    Of course.  Some of those cases we would not assert,

23 perhaps, any amount to the fees because they were in their

24 infancy.

25 Q    Okay.  So --

**Exhibit G**

USAO_00060909

50

1  A    They were in their infancy at the time that the

2  attorneys were terminated.  So, our entitlement in some of

3  those cases may be, may be de minimis.

4       Now, in the Callaway case, the agreement specifically

5  provided that no matter what happened, Eagan Avenatti was

6  entitled to a minimum of 25-percent of the fees, As an

7  absolute baseline, 25-percent of the fees.  Well, the

8  discussion that was had before the attorneys were terminated

9  from the firm routinely talked about the fees in that case

10  being worth 20 or $30,000,000.

11       So, at a minimum in that case, if that's what happened,

12  and I don't know what happened -- I'd love to know, but I

13  don't know.  No one will tell me.  In that case, if the fees

14  are $20,000,000, and the fee contract with the client says

15  that we get a minimum of 25-percent, we'd be entitled, at a

16  minimum to 5,000,000.

17       And, quite honestly, depending on when that case

18  settled in relation to when the attorneys were terminated, I

19  would assert we may be entitled to 80 or 90-percent of those

20  fees, because our firm did upwards of 90-percent of the work

21  before May, which was when the vast majority of the work was

22  done --

23  Q    Okay.

24  A    -- to the best of my knowledge.

25  Q    But that's a case that's on the verge of settling based

**Exhibit G**

USAO_00060910

51

1  objectively on the docket.  But there's 15 other cases there

2  where you have no -- I mean, for example, let's just

3  hypothetically say they all go to jury trial, which means

4  they're not going to be settlers, right?

5      And they involve significant appellate work, whatever,

6  how do you negotiate even in the consensual format where you

7  all agree we want to work this out, how would you come to

8  some percentage when it may be that there's hundreds, if not

9  thousands of hours going forward on some specific cases.

10 How would you ever come to an arrangement on those types of

11 cases, where it's just an unknown?

12 A    You would take it on a case-by-case basis, with an

13 understanding of what the current status of the case was.

14 And you would value the case at that juncture, just like you

15 would value any other case, based on your professional

16 experience, et cetera.

17 Q    I guess what I'm saying though, can you come to a

18 settlement next week not knowing how these 15 other cases

19 are going to play out?

20 A    Sure.  I think that's possible.

21 Q    I mean, I just, I need to understand what -- in the

22 context of bankruptcy, whether a settlement is even

23 feasible, given the way you've described the dynamics.  But

24 from your side of the table, you could come to some

25 arrangement as a certain percentage of fees, even though you

**Exhibit G**

52

1  don't even know what the settlement amount would be or how

2  long it may take to get to that settlement or verdict in a

3  particular case?

4  A    Correct.  Because there is a large number of those

5  cases that were in their infancy at the time that the

6  attorneys were terminated, and not a lot of work had been

7  put forward in those cases.  And there had not been any

8  significant value, in my -- or the value was de minimis.

9  And so --

10 Q    Okay.  Of the --

11 A    And so --

12 Q    -- of the 17 cases, would you say more than five are

13 what we'll call "infancy" cases?

14 A    Yeah, I would say more than five.

15 Q    More than 10?

16 A    I'd have to look at the list.

17 Q    Okay.  So, at least five.  Okay.  So, that leaves 12

18 cases, and of the 12 we've got Quorn, with a lien attorney

19 defect issue, and then the Callaway, which will settle.  So

20 that leaves, that leaves 10 non-infancy, non-settled cases,

21 correct?

22 A    It may in fact a number smaller than that.

23 Q    I understand.  I'm trying to just, for purposes of

24 administrating a bankruptcy case, understand what's in play

25 here, you know, and whether a settlement can be reached

*Briggs Reporting Company, Inc.*

**Exhibit G**

53

1 before a plan of reorganization if filed, or whether the

2 plan is going to be, our plan is to either mediate or

3 litigate, and, you know, the parties will, you know, get

4 their money based upon the outcome of that, which would not

5 be, you know, just from my perspective, the preferred way of

6 going, because this is the plan to do a plan.  You're not

7 accomplishing any liquidation of claims.

8       It brings about a lot of uncertainty to creditors.

9 Your projections would be wildly speculative, not because of

10 you, but just because of the factors we've talked about, you

11 know, mainly, what the dollar amount would be settled and in

12 what year, you know.  But you think it can be done though,

13 despite those variables?

14 A    I think it can be done easily.

15 Q    Okay.

16          TRUSTEE HAUSER:  And this -- before we take a

17 break, I just want to ask Mr. Kharasch.  What is the -- at

18 the last status -- or the only status conference we've had

19 here, Mr. Pachulski represented to the court that there was

20 a good-faith attempt by both parties to enter into a

21 mediation, and that they were looking for a mediator who

22 understood the dynamics of both bankruptcy and contingency-

23 based litigation.  And on that issue I completely agree that

24 you need to understand both.

25          Where are you on that?  Is that still making

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00060913

54

1  progress or has it stalled, or is it completely off the

2  table?

3          MR. KHARASCH:  No, it's still on the table.  We're

4  still in discussions about what the parameters, the

5  conditions of going forward with the mediation would be in

6  terms of providing what kind of information to either side

7  and what the understanding would be as to how it would work,

8  and that has not been resolved.  And if it's not resolved,

9  there will be no mediation.  And if it's resolved, then

10 we'll go, and we should know in the next couple of days.

11         TRUSTEE HAUSER:  And if it's -- well, let's hope

12 it goes to mediation.  But if it doesn't, you're back to the

13 JAMS panel?

14         MR. KHARASCH:  We'll just be assessing our options

15 when --

16         TRUSTEE HAUSER:  Obviously.  Okay.  You'll be

17 assessing your options.  Okay.

18         Okay.  We're going to take a break now.  Let's

19 call it -- show of hands, anyone want to go 10 or five or

20 what do we want to go here as far a break?  Five minutes?

21 Okay.

22         We're going to go off the record now for a break

23 of about five minutes.  Off the record.

24     (Proceedings recessed briefly.)

25         TRUSTEE HAUSER:  Okay.  So we're back on the

**Exhibit G**

USAO_00060914

55

1  record in the case of Eagan Avenatti, 341 meeting of the

2  creditors.  Today's June 12th, 2017.  It's now approximately

3  11:45 a.m.

4        Mr. Avenatti, you realize that you are still under

5  oath?

6        THE WITNESS:  Yes, sir.

7        TRUSTEE HAUSER:  Okay.  Thank you.

8  BY TRUSTEE HAUSER:

9  Q   I'd like you to look at the April monthly operating

10 report, that would be April 2017, docket item 100.  And let

11 me know when you have a copy of that in front of you.

12 A   I have it.

13 Q   Okay.  I'd like you to look at page one of 27, so that

14 would be the first page of the document.  And what it shows

15 there at line item number four is current receipts of --

16 yeah, I'm sorry, total receipts this period of $126,158.  Do

17 you see that?

18 A   Yes, sir.

19 Q   Okay.  What was the source of those funds?

20 A   As I recall, those are fees received, legal fees.

21 Q   Okay.  And were those from the -- any contingency

22 cases?

23 A   I don't believe so.

24 Q   Do you recall, was it from one case or more than one

25 case?

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00060915

56

1  A    "More than one case."

2  Q    How many cases?

3  A    I believe three.

4  Q    Okay.  Were they from any of the cases listed on

5  schedule B-75, which is a list of the cases that were

6  pending -- and I'll be happy to hand you that document, if

7  you don't have it in front of you.  So, schedule B-75 is the

8  list of cases, of the non-disputed cases, and it's docket

9  item 114.  Do you have that in front of you, sir?

10 A    Yes.

11 Q    Okay.  So what I'm trying to figure out is, on docket

12 item 114, there's 20 lawsuits that were pending that were in

13 the non-disputed class.  So, were the fees from any of those

14 cases?

15 A    Yeah.  Some of the fees were from some of these cases,

16 or at least one of these cases.

17 Q    Could you tell me which case that would be?

18 A    Medline.

19 Q    Okay.  And that's --

20 A    Number 13 on the list.

21 Q    Okay.  So number 13.  Okay.  And so, was that settled

22 in its entirety?

23 A    No.

24 Q    Okay.  So what was the reason why there was fees

25 disbursed if it wasn't settled?

*Briggs Reporting Company, Inc.*

**Exhibit G**

57

1  A     Because a portion of the fee agreement with that client

2  provides for a monthly payment amount.

3  Q     Okay.  So, I see it's Kimberly-Clark.  I've looked at

4  the docket.  I'm somewhat familiar with, you know, what

5  happened there.  But -- so that's not the Bahamas Surgery

6  Center case or it is?

7  A     No, it's a different case.

8  Q     But the defendant's also Kimberly-Clark in that case?

9  A     Yes, sir.

10 Q     Okay.

11 A     Bahamas is listed as number two on the list, and --

12 Q     Got it.  Okay.

13 A     -- the other case is number 13.

14 Q     Okay.  So, the agreement there is to pay you on a

15 monthly basis?

16 A     It's a hybrid agreement that provides for a monthly

17 retainer amount plus a percentage of the recovery.

18 Q     Okay.  So how much did you get from them approximately?

19 A     I don't recall exactly the amount.

20 Q     More than 50 or less than 50?

21 A     Quite honestly, I don't remember.

22 Q     Okay.  But the number's 126,000, correct?

23 A     During that month I don't remember -- correct.

24 Q     Okay.

25 A     That number, the 126,158.75 is correct.

**Exhibit G**

USAO_00060917

58

1  Q    Okay.  And it came from three cases, and one of them's

2  the Medline?

3  A    Two -- yeah, two or three cases.

4  Q    Okay.  Do you remember the other case?

5  A    I don't as I sit here.

6  Q    Okay.  Were they any of the 20 cases listed on B-75?

7  A    Separate and apart from Medline?

8  Q    Correct.  Yes.

9  A    I think a portion may have been from the Meridian v.

10 Kooshian case, but I may be mistaken about that.  But that's

11 number 14 on the list.

12 Q    I see it.  I mean, did that case settle or -- what

13 would be the basis for disbursement of fees in that case?

14 A    It had to do with the appeal that was pending.

15 Q    Right.  But I'm saying, was that a contingency case?

16 A    It was a, as I recall, that was a hybrid case.  It was

17 a piggyback on top of a prior contingency case that had been

18 resolved some time ago.

19 Q    Right.  Because, I mean, I understand the business

20 model is, there's no disbursement of fees until either

21 settlement or verdict.

22 A    Well, but, again -- so, we have some cases where we

23 bill on an hourly basis, but that's very, very rare.  We

24 have other cases that are on a full contingency basis, and

25 then we have some cases that are done on what's called a

**Exhibit G**

USAO_00060918

59

1  "hybrid" basis.  Where in addition to the client advancing

2  costs, the client may advance or pay certain fees.

3  Q    Okay.  So, you think it might be Meridian?

4  A    I believe it may be.  Yeah.

5  Q    Any other cases?

6  A    Not that I recall right now.

7  Q    Is it -- is this list -- now that we're looking at

8  schedule B-75, which is document number 114, to the best of

9  your knowledge is this list an accurate list of those cases

10 where lawsuits have been filed at the time this bankruptcy

11 case was filed, which was when I say -- I'll use the filing

12 date as March 10th, because that's the -- you guys consented

13 to the relief in Florida.

14 A    I think this list is in accordance with a specific

15 request that you had made to --

16 Q    Correct.

17 A    -- to our counsel --

18 Q    Right.

19 A    -- with certain parameters.

20 Q    Right.

21 A    And to the best of my knowledge, we met exactly what

22 you asked for.

23 Q    Okay.  But what I'm trying to understand --

24         TRUSTEE HAUSER:  And, Ira, maybe you can answer

25 this, as I was communicating with you.  Is, obviously, in a

**Exhibit G**

USAO_00060919

60

1   bankruptcy case you're getting a snapshot in time?

2          MR. KHARASCH:  Right.

3          TRUSTEE HAUSER:  The snapshot in time, the period

4   in question here would be, March 10th.  That's the filing

5   date.  Was it your understanding when you put together these

6   cases, these were cases that were pending as of March 10th?

7          MR. KHARASCH:  That's my understanding.

8          TRUSTEE HAUSER:  Okay.

9          THE WITNESS:  Well, I will say this.  That's

10  clearly not the case because, as you can see, some of the

11  information post dates March 10th.

12  BY TRUSTEE HAUSER:

13  Q   Well, I mean, I was looking to see whether like a

14  lawsuit was filed after March 10th, and I looked at like --

15  is it Cruxson v. Milo (phonetic), which is number five, that

16  was filed two days before March 10th.  So I was looking at

17  these dates to try and figure out whether this was an

18  accurate list of all the lawsuits that had been filed prior

19  to March 10th.

20         MR. KHARASCH:  Yeah, it's column one, Michael.

21  He's -- that's really the -- is where -- my understanding is

22  that these were the cases that were on file, even though

23  column number four gets updated information post-lawsuit

24  filing, which is what Michael wanted -- Hauser, wanted.

25  So --

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00060920

61

1        TRUSTEE HAUSER:  Yeah.  Simply put, I wanted a

2   list of all lawsuits filed, whether in state or federal

3   court, as of March 10th.  And if I mis-communicated that, I

4   apologize.

5   BY TRUSTEE HAUSER:

6   Q    But does this list accurately reflect --

7   A    I think it does.

8   Q    Okay.  And since March 10th, has the firm filed any

9   additional lawsuits, whether it be in state or federal

10  court?

11  A    I think we may have, but I don't know if it's been

12  filed or just served and not filed --

13  Q    Okay.  So we're talking about maybe one lawsuit, not

14  more than that?

15  A    Maybe one or two at the most.

16  Q    Okay.  Looking at this list of 20 cases, have there

17  been any formal settlements in any of these 20 cases since

18  the filing of the bankruptcy case?  So that would be March

19  10th.

20  A    No.

21  Q    Okay.  So, if none of these lawsuits have been settled,

22  and you only got monies from two cases, it's fair to say

23  that unless one of these lawsuits settles, there's no income

24  source to the firm, completely putting aside the dispute

25  with the Frank Sims firm, okay.  Just from looking at --

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00060921

62

1  this is, in other words, this is the income source for the
2  firm on a going-forward basis, correct, these 20 lawsuits?
3  A    Generally, I think that's true.
4  Q    Right.  And with the exception of the hybrid cases that
5  may pay on a monthly basis, the two you described, the pure
6  contingency lawsuits, the firm will not see any money until
7  they either settle or go to verdict, correct?
8  A    I think that's true.
9  Q    Okay.  I'm just trying to confirm the business model.
10     So now let's jump back to the April operating report.
11 So, the $126,000 in total receipts would have to have come
12 from a hybrid situation, because none of those lawsuits
13 settled, correct?
14 A    Yes.
15 Q    Okay.  Okay.  Now I'd like you to turn to page two of
16 27 of the April monthly operating report.  So, page two of
17 27 is a disbursement log.  And very simply put, it's,
18 essentially, the firm's checkbook, just like a person would
19 have a check register at home.  And what we notice when we
20 review that is that there was, there was no rent payment for
21 the Orange County and L.A. offices, is that correct, in the
22 month of April?
23 A    That is correct.
24 Q    Okay.  And is that because the firm did not have
25 sufficient cash on hand to meet those obligations?

**Exhibit G**

63

1  A     No.   That was because we did not know whether, in light
2  of the bankruptcy, we were supposed to be making rent
3  payments in accordance with those leases or not.
4  Q     But this is April.  This is the April --
5  A     Right.
6  Q     So your lawyers -- I'm not going to ask you that.  It
7  was your understanding that you weren't sure whether you
8  were supposed to make April rent payments?
9  A     Correct.
10 Q     Okay.  If you had to make them, would there have been
11 sufficient cash on hand to make them?
12 A     We would have arranged to get sufficient cash in order
13 to make them.
14 Q     Okay.  Just want to understand the dynamic there.
15 Okay, so -- now, there appears to be other obligations
16 though that were not paid during the month of April.  And
17 what I'd like you to do is keep your hand on page two of 27,
18 which is the actual disbursements, and I want to compare it
19 to the accrual-based accounting that's on page 14 of 27.
20 And I'll just go through them rather quickly.  I'm going to
21 show you items that were accrued but not paid.  A very
22 simply concept.
23     So, are you at page 14 of 27?
24 A     Yes, sir.
25 Q     Okay.  And, again, if you keep your hand on the other

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00060923

64

1  one, you can see what was actually paid.  So, for example --

2  and I want you to draw your eye down to the line item that

3  says, it's a header called, "operating expenses."  It's

4  about middle of the page.  It's below gross profit.  So you

5  have header, sales revenue, cost of goods sold, gross

6  profit, and then you get "operating expenses."

7  A    Uh-huh.

8  Q    Okay.  So, for example, payroll taxes accrued, well,

9  it's 66,244, but if you actually look at the second and

10 third line items on the disbursement log, you'll see that

11 there was only 32,000 disbursed.  Okay.  So, my --

12 A    I think the delta was disbursed in the first week of

13 May, accounting for the last payroll period.

14 Q    We'll get to it, but I just, I'm just saying it's -- if

15 you actually look at -- and I don't want to jump around

16 here, but if you look at delinquent taxes, which is at page

17 11 of 27, if you look at the very bottom box there, and you

18 see where it says, "amount delinquent," and it says 34,080?

19     What I'm simply saying is, it does not appear that the

20 firm made its payroll tax deposits timely for the month of

21 April.

22 A    My understanding is, is that the payroll taxes were

23 paid timely for the month of April.

24 Q    Okay.  I'm just saying, the report itself does -- when

25 you see delinquent, that's -- I mean, when we read a report,

**Exhibit G**

USAO_00060924

65

1  just so you know, that means it wasn't paid timely.  And

2  when you compare the amount accrued on page 14, which says

3  66, versus the actual disbursed on page two, the delta is a

4  delinquency.  So, I'm just -- you know, the document speaks

5  for itself.  Perhaps you should -- who prepared this, the

6  firm, the law firm?

7  A    The firm, with consultation with counsel.  So we need

8  to definitely check this.

9  Q    You should, because the -- I can tell you, reading

10 these all the time, the impression here is, you couldn't

11 make the rent payment, and you couldn't make your taxes.

12 I'm just telling you the impression it leaves very

13 distinctly to someone who reviews this.  So, let me go

14 through a few more things.

15      Again, you have the rent expense accrued of 59,297.  If

16 you look at the actual ledger, you'll see no payment to the

17 Irvine Company for April.  No payment to, I think it's

18 called, "Four Square International (phonetic)."

19      If you go down to telephone and utilities, you'll see

20 that you accrued expense of $4,573, but did not pay the

21 telephone and utilities on the disbursement log.  Same thing

22 for office supplies.  And then there's a rather large item

23 called, cost-related -- case-related costs of $8,000, which

24 does not show up in the disbursement log.

25      So, in other words, your total operating costs for the

*Briggs Reporting Company, Inc.*

**Exhibit G**

66

1  month was $360,00 on an accrual basis, but the actual amount

2  disbursed was around 170,000.  So it's about $190,000 delta.

3  Now, I'll circle back to the, maybe where some of that is,

4  but.

5      One of the line items I want you to look at for the May

6  operating report, which is due June 15th.

7          TRUSTEE HAUSER:  And, Mr. Kharasch, I'd appreciate

8  if you took special attention to this, is on page 14 of 27.

9  At the very bottom there, there's a line item for legal and

10  professional fees.  And I understand it was blank in April

11  because your firm was not engaged until --

12          MR. KHARASCH:  Yeah.  Well, retroactively, May

13  12th.

14          TRUSTEE HAUSER:  Okay.  Is Baker Hostetler

15  claiming any accrual of fees in the interim?

16          MR. KHARASCH:  don't know.

17          TRUSTEE HAUSER:  Okay.  If they are, then you need

18  to include them.  I'm not going to ask you to amend this

19  document, but for the purposes of May report, which is filed

20  on June 15th, your fees, and if Baker has any fees that

21  they're going to seek, I would break it out and put and

22  asterisk there saying, Baker asked for the month of April

23  for whatever amount, so that we don't lump those two figures

24  together.  Does that make sense to you?

25          MR. KHARASCH:  Yes.

**Exhibit G**

USAO_00060926

67

1          TRUSTEE HAUSER:  Bobby, are you with me on that?

2          MR. SAUNDERS:  Yes.

3          TRUSTEE HAUSER:  Okay.

4          TRUSTEE HAUSER:  The reason why that's important

5   is -- and I can tell you is, this is the first case I've

6   been with the Pachulski firm, where as debtor's counsel

7   they've not taken a retainer.  And that number's going to be

8   significant upon  administrative claims in this case, and so

9   people are going to want to track that figure.  And the only

10  way to do that is to have an accurate figure.  So, that's

11  why that line item's important.

12  BY TRUSTEE HAUSER:

13  Q    I want to confirm, if you'll look at the operating

14  expenses, the first line item there is payroll to insiders

15  and it says, "zero."  And that should be correct, because

16  under our local bankruptcy rules -- and the only insiders I

17  can -- from the schedules and the documents, are yourself

18  and Mr. Eagan.

19       You're not allowed to take any form of remuneration,

20  that's kind of a broad term, until such time that you file

21  what's called, "a notice of insider compensation."  That's a

22  form, and it has to be served on all these different

23  parties.  And then 14 days has to go by without objection,

24  and then only then can you disburse to yourself and any

25  other insider, the amount you're requesting.

**Exhibit G**

USAO_00060927

68

1    So I don't know if that was explained to you, but
2 that's the procedure.  It's Local Bankruptcy Rule 2014-1.
3 And you just need to make sure you're in line with that.
4    Do you anticipate taking any funds in the form of
5 compensation, or any in any other type of compensation,
6 whether it's a draw or repayment of a loan, during the
7 course of this case?
8 A    I mean, I guess it depends on how long the case goes
9 and what the revenues are to the firm.
10 Q    Okay.  If you can speak up just -- we're not picking
11 up.  Okay.
12    All right.  Moving on to page 12 of 27, I want to focus
13 on the top of the page there on the accounts payable.  And
14 it lists accounts payable for the month of April, that's the
15 30 days or less box, of $215,000.  My question is, and this
16 is important, is, do you know whether subsumed within that
17 figure is the unpaid rent, the unpaid payroll taxes that
18 we've talked about, the unpaid case-related costs, the items
19 that were accrued but not paid, do you know that?
20 A    I believe that that number does include what you just
21 mentioned.
22 Q    Well, let's be careful, because the number is 215,000.
23 The number -- the difference between the accrued expenses
24 and the actual paid, so it's three -- if you look at the
25 figures, you've got accrued expenses of 360, you had actual

*Briggs Reporting Company, Inc.*

**Exhibit G**

69

1  disbursed of 170.  That means that there's a delta of

2  $190,000 between what was accrued versus what was paid out.

3  So, the 215 doesn't mirror that number.

4      Do you know whether in the 215, for example, was the

5  unpaid rent in there, which is a big number, it's, you know,

6  66,000, was that in there as a -- would you typically put

7  that in the AP category?

8  A    Yes, we typically would.

9  Q    Okay.  Would you typically have put the case-related

10 costs, which was an $86,000 figure, in that figure?

11 A    Typically, we would.

12 Q    Okay.  Those were the two very large items.  What about

13 payroll taxes, which was around 34,000?

14 A    I would expect that to be included within that figure.

15 Q    Okay.

16      TRUSTEE HAUSER:  For the month of May, whether

17 it's you, Mr. Saunders, whoever's going over it, you need to

18 make sure that's clear.  Because if we don't know what's

19 subsumed within the AP, then we don't know the

20 administrative solvency of the case.

21      So, I mean, when I looked at it, I go, wow, is

22 that 215 in addition to the unpaid rent and the -- or -- and

23 I didn't know that.  So, it might be helpful if -- and I

24 don't know if you can footnote on this form or just do a

25 separate sheet, actually do a breakout of the AP.  Because

*Briggs Reporting Company, Inc.*

**Exhibit G**

70

1  right -- the reality is right now that, from a cash

2  position, the case is on a razor's edge, okay?  And it may

3  change dramatically, based upon the way these contingency

4  cases -- but that's the way it is today.

5          So, is that something you can do, so that there's

6  no -- so when I look at the AP, there's like a separate

7  sheet?  It may be only five items, but then it will be

8  really transparent, case-related costs, unpaid payroll,

9  unpaid this, unpaid that.

10          It essentially should be -- if it's the way you

11  described, it's, you'd look at the accrual line items and

12  figure out, for example, like on a case-related cost, you

13  see 86, you look at the disbursement log.  The disbursement

14  log is almost entirely payroll, payroll taxes and insurance

15  in this particular month.

16          So, it's -- in this particular case actually,

17  you'd really see a disbursement log that's under a page.  So

18  it's actually not a monumental task to do that.  It's just,

19  in other words, you're truing up the accrual versus

20  disbursements and making sure you're not doubling counting

21  the AP.  Are you with me on that?

22          MR. SAUNDERS:  I am with you.

23          TRUSTEE HAUSER:  Okay.

24          Is everyone else following along with this?  Okay.

25          So, before May is filed -- and, Ira, is May on

**Exhibit G**

USAO_00060930

71

1  track to be filed in June 15th, the May operating report?

2        MR. KHARASCH:  That's my understanding -- right?

3        TRUSTEE HAUSER:  Yeah.  So on all these items

4  we're going over, really careful attention --

5        MR. KHARASCH:  Right.

6        TRUSTEE HAUSER:  -- so we have a very clean

7  operating report.

8  BY TRUSTEE HAUSER:

9  Q    Okay.  Going back to page 12 of 27, at the top there

10 there's a box that says, "accounts receivable."  And for

11 both pre and post it was zero.  However, if you look at the

12 balance sheet that was filled out, which is at page 15 of

13 27, you'll see accounts receivable of $35,000.

14    So, in other words -- I can just show it to you so you

15 don't have to keep looking around.  Your balance sheet, page

16 15 of 27, shows AR of 35,000, but then the box on page 12 of

17 27 shows zero.  So, is it -- which one's correct?

18 A    I believe the balance sheet is correct and the accounts

19 receivable box is incorrect.

20 Q    Okay.  Okay.  And so, where did that AR come from?

21 A    I believe that's from the <u>Medline</u> case.

22 Q    Okay.  So, in addition to being paid from the <u>Medline</u>,

23 you also booked an AR of -- okay.  And so what event

24 occurred that --

25 A    One of the payments that is due from <u>Medline</u>.

*Briggs Reporting Company, Inc.*

**Exhibit G**

72

1  Q    Okay.  So they were supposed to pay you but they
2  didn't, and so you booked it as an AR?
3  A    No.  As I -- I believe that we bill in April for --
4  Q    Okay.
5  A    So we send out a bill in April --
6  Q    Okay.
7  A    -- for our payment in May, and that's why this is a
8  $35,000 accrual.
9  Q    Okay.  So you send out the bill and it's due and
10 payable within 30 days?
11 A    I believe so, yeah.
12 Q    Okay.  And is that something that, with this particular
13 client, is a monthly occurrence?
14 A    Yes.
15 Q    So we will see that next month for May, an
16 additional --
17 A    I hope so.
18 Q    Right.  And the way this will work is, when you do the
19 May, the -- if that AR isn't paid off, that will drop down
20 to over 30 days past due.  Are you with me?  And then we'll
21 see the new receivable on top of that.
22 A    Understood.
23 Q    Okay.  Okay.  Let's go to page 11 of 27, bottom box,
24 focusing on the post-petition tax liabilities.  There's the
25 delinquency for $34,080.  To the best of your knowledge, has

*Briggs Reporting Company, Inc.*

**Exhibit G**

73

1  that been cured?

2  A      Yes.

3  Q      Okay.  Okay.  I want you to look at that same page,

4  page 11 of 27, there's a chart.  And that chart is a list of

5  payments on leases and executory contracts.  And this is

6  just sort of a comment.  There's a column that says, "post-

7  petition payments."  And someone put in n/a.  That's really

8  not an option.  It's has to be a number.

9      So it's either going to be -- and it's the number of

10 post-petition payments that have been missed.  So, if you're

11 current, you put zero, and if you miss one payment, you put

12 in one.

13     So let's just use the Irvine Company lease.  So you see

14 there the 50,710 for the Irvine Company, which is three

15 items down.  That should have been one, because you didn't

16 make the payment in April, for whatever reason.  And then

17 you did carry over the number, so that is correct on the

18 right hand, far, right-hand column.  But putting in the n/a

19 is confusing and not accurate.

20     So, if you're down one payment, you put one multiplied

21 by the amount of the payment and carry it over to the column

22 on the far right, and then you foot everything down so you

23 have a total.  And that way we know what the post-petition

24 administrative delinquency is on your obligations.

25     So that's across the board.  It's, again, it's either,

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00060933

74

1 the number's either zero, one, two or whatever, multiplied

2 by the payment amount and carry it over.  Because what this

3 does is it paints a picture as to whether the Debtor is

4 insolvent, administratively insolvent.  It's a bankruptcy

5 term that's used.  It's a red flag, okay.

6     Okay.  I'd like to turn to page 21 of 27.  And these

7 are the actual deposits slips and checks that were written

8 for the month of April, with one exception.  I would note

9 that there's a check number 16970 that was written in March

10 to some gal.  I noticed that in the March disbursement

11 report, that that was actually a $14,000 check that was a

12 disbursement to a trial transcription company, a gal named

13 Ann Kawaser (phonetic), correct?

14 A    Wait, which check number is it?

15 Q    It's an out-of-sequence check, which obviously anyone

16 who reads these saw that -- you can see the check numbers,

17 and so there was a $14,000 check, which was written in

18 March.  It's not your fault.  I mean, if they put a March

19 check in there, I'm just pointing that out.  But that was

20 disbursed in the month of March and it's on the March

21 disbursement.

22          MR. KHARASCH:  You mean April.

23          TRUSTEE HAUSER:  No, no.  See, what happen is --

24 so, Ira, here's the March disbursement log.  That was a

25 check written in March.  Look at the date of the check.

**Exhibit G**

USAO_00060934

75

1          MR. KHARASCH:  I see.  I see, I see.  Okay.

2          TRUSTEE HAUSER:  And look at the sequence number.

3          MR. KHARASCH:  Yeah.

4          TRUSTEE HAUSER:  You can just tell the number is

5  out of sequence.

6          MR. KHARASCH:  Got it.

7          TRUSTEE HAUSER:  Do you understand?

8          MR. KHARASCH:  Right.

9          TRUSTEE HAUSER:  Okay.

10  BY TRUSTEE HAUSER:

11  Q    Now, I want to focus on the deposit slips.  There's

12  three deposit slips.  One of them's for 35,000.  Is that

13  from Medline?

14  A    To the best of my knowledge, yeah.

15  Q    Okay.  What about the 10,000?

16  A    I don't know.

17  Q    Who makes these deposits into the bank?

18  A    Ms. Regnier.

19  Q    Okay.  But you don't know the source of the $10,000?

20  A    Well, as I stated earlier, the source of the -- I mean,

21  this would be included within the monies --

22  Q    Okay.

23  A    -- that I referenced earlier.

24  Q    Okay.  I just wanted to know if you knew specifically.

25  What about the 6,658?

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00060935

76

```
 1  A     Same answer, as I sit here.
 2  Q     Okay.  So, are you personally, or any other party
 3  putting, actually putting money into the firm to keep it
 4  afloat?
 5  A     From time to time I have deposited money into the firm
 6  to assist in the payment of the expenses of the firm.
 7  Q     Okay.  And did that occur in April?
 8  A     I don't recall.  I don't believe so.
 9  Q     Did it occur in May?
10  A     No.  No, I don't believe so.
11  Q     Okay.  So, I'm looking at deposits, credits.  So it
12  would show up -- if you look at page 17 of 27, where it
13  shows deposits, and there's some on-line transfers.  Would
14  you typically do an on-line transfer into the account?
15  A     If I made a deposit into the firm?
16  Q     Correct.  Would you do it like old school, the way thee
17  other ones were deposit slips, or would you do it with an
18  on-line transfer?
19  A     I've done it both ways.  It could depend.
20  Q     Okay.  I think it would be useful to know -- and this
21  would go to the first page, I guess, of the, of this
22  document, which is page one of 27.  When we see -- for
23  example, this month, we see receipts of $126,000.
24  A     Right.
25  Q     To the extent any of those funds are essentially cash
```

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00060936

77

1 contributions, whether it's from Mr. Avenatti or third

2 parties, people would want to know, so we know whether the

3 firm is being sustained by its own collection of

4 receivables, as opposed to contributions.

5 There's nothing wrong with the contributions, but from

6 a long-term analysis in looking at feasibility over the

7 course of the case, I think you'd -- so, let's just say

8 hypothetically in this, in April, 25,000 was contributed by

9 Mr. Avenatti.

10 If you could put an asterisk next to the 126, drop it

11 down here and say, of the 126,000 receipts, 25,000 was

12 wired. And it would help whether it was wired or actually

13 deposited with a deposit slip, so people can look at that

14 and there's transparency.

15 MR. KHARASCH: Sure.

16 TRUSTEE HAUSER: Okay?

17 MR. KHARASCH: Uh-huh.

18 BY TRUSTEE HAUSER:

19 Q Okay. So now we've kind of gone through May and we've

20 seen some of the issues that I think -- so you're going to

21 take a --

22 TRUSTEE HAUSER: Now we know for May what the

23 operating report should look like. Are we on the same page?

24 MR. KHARASCH: Okay.

25 TRUSTEE HAUSER: No, I just want to make sure.

*Briggs Reporting Company, Inc.*

**Exhibit G**

78

1        MR. KHARASCH:  Yeah.

2        TRUSTEE HAUSER:  And, obviously, feel free to call

3 me if there's a question.  But I think without that

4 information it's kind of hard to figure out where the

5 money's coming from.  Whether it's from the collection of

6 settled lawsuits or the principals.

7 BY TRUSTEE HAUSER:

8 Q    So let's move on to May.  So, this reflects April.

9 We're now, today's June 12th, but we already kind of know

10 what happened in May.  So, I don't have the report in front

11 of me.

12       TRUSTEE HAUSER:  I will have it in front of me --

13 it's going to be filed timely?

14       MR. KHARASCH:  Yes.

15       THE WITNESS:  Yes, sir.

16 BY TRUSTEE HAUSER:

17 Q    Okay.  If I had it in front of me, would it show that

18 the Debtor met its monthly obligations in May for its

19 expenses?

20 A    Yes.

21 Q    Okay.  So, did -- in May, did the Debtor cure its

22 delinquency on its -- I'll call it "delinquency" because it

23 was made on the April rent?

24 A    Yes.

25 Q    Did you make a double payment for rent in May?

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00060938

79

1  A    Yes.

2  Q    So you made the April rent payments, particularly the

3  Irvine Company rent, which is the bulk of it, 50-something

4  thousand, and you made it in May -- I'm sorry --

5  A    Yes.

6  Q    Yeah.  Okay.  What about the -- and you already

7  answered the question, the tax delinquency was cured?

8  A    To the best of my knowledge, there's no tax

9  delinquency.

10 Q    Okay.  And for the month of May itself, was there any

11 delinquency on the taxes or on any other obligations?

12 A    Not that I know of.

13 Q    Okay.  Now, at the end of April, if you were to look at

14 the April MOR, and just accept my representation, on the

15 first page of the MOR there's $18,006 in cash on hand.  Were

16 did you get the funds in May to meet the May obligations, if

17 there was only $18,000 in cash on hand?

18 A    From some of the cases that I referenced earlier, as

19 well as -- you asked me this earlier.  I don't recall if I

20 made a contribution in May or not to the firm.  I told you

21 earlier I didn't think that I had.

22 Q    Correct.

23 A    But now that I'm thinking about it, I may have.  I

24 don't have the May report in front of me --

25 Q    No, I understand that.

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00060939

80

1  A    -- so, it's difficult for me to answer that question.

2  Q    Okay.  But that's why it's important to include that

3  information.

4  A    And we will.

5  Q    Okay.  I mean, the way I see it is, your monthly nut is

6  somewhere between 300 to 360.  The payroll is an absolute

7  pay, the rent's an absolute pay, and the I.R.S. is an

8  absolute pay, as well as the EDD.  It seems like your only

9  wiggle room is your case-related costs, which is a big item.

10 You with me on this?

11 A    Yes, sir.

12 Q    So, and -- so, it seems like you have wiggle room with

13 your vendors to pay that.  In other words, that becomes your

14 accounts payable.  You float that for 30 days.  But beyond

15 that, there's no other people you can really late pay, is

16 that a fair assessment of your budget?

17 A    I mean, I think that's fair.

18 Q    Right.  So it kind of puts you at around, close to 300

19 a month as a monthly nut, right --

20 A    I --

21 Q    -- on a cash basis?

22 A    -- I think you're right.

23 Q    Okay.  Now, in the month of May, did your accounts

24 payable go up further or did it go down?  So -- and we were

25 at, let me just give you -- so we were at around --

**Exhibit G**

81

1  A     I don't think it went up.  But I don't have it in front

2  of me, but I don't think it went up.

3  Q     Okay.  It was at 240.  I didn't go over 300,000?

4  A     I don't believe so.

5  Q     Okay.  But we'll see it in three days in the mail.

6        Okay.  So let's kind of look a little bit longer term.

7  We've kind of established that on a cash basis the firm

8  needs $300,000 to timely meet its obligations to the I.R.S.,

9  to Irvine Company, to payroll, to insurance, et cetera.  It

10  could have some wiggle room with its case-related costs,

11  which is not an insignificant component.

12        So, from July 1st through December 31st, that would be

13  $1.8 million in, essentially, fixed costs that you really

14  can't get out from under.  And that could be bare bones

15  because there could be some cases that you have trials for

16  where, you know, like where you'd have to ramp up case

17  costs, right?

18  A     Yes.

19  Q     Okay.  But just looking at what I think to be a

20  relatively bare-bones number of 1.8 million over a six-month

21  horizon, where do you see the revenue stream coming in to

22  meet the $1.8 million obligation, and that doesn't even the

23  professional fees of the Pachulski firm or other

24  professionals, without even coming to this case, whether it

25  be the Debtors or committee, et cetera?

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00060941

82

1   A       Well, one of the -- out of one of the 35-plus cases

2   that we have an interest in --

3   Q       Okay.

4   A       -- at least.  And if not, then I imagine that I'll put

5   a few million dollars into the firm.

6   Q       Okay.  And that's all I was looking for was just,

7   what's your perspective on it.  But when we talk about the

8   35 cases, we have to clearly divide that into the B-75

9   basket, which is on schedule B-75, and the B-74 basket,

10  which is the, we'll call it the "disputed," right?  I

11  mean --

12  A       Sure.

13  Q       -- I mean, because with this escrow system and tying

14  the funds up, and, you know, them not recognizing liens,

15  it's -- that doesn't seem to be -- absent a mediation and a

16  resolution of the matter, again, which could make this whole

17  go very, very quickly, but absent that, the likelihood of

18  funds coming out of the disputed basket, not real soon, not

19  within six months, right, if it doesn't settle, is what I'm

20  saying?

21  A       I don't think I understand the question.

22  Q       If you don't resolve through mediation, or if you go

23  into mediation and it goes to binding arbitration in May,

24  and they rule in a manner that allows you to start

25  collecting fees, there's no more misunderstanding as to the

*Briggs Reporting Company, Inc.*

**Exhibit G**

83

1 allocation --

2 A    I want to be clear about something.

3 Q    Yeah.

4 A    Our view of the arbitration -- first of all, our view

5 is, we don't belong in arbitration.  But separate and apart

6 from that, the clients are not parties to the arbitration,

7 right?

8         MR. KHARASCH:  And just to narrow question, let me

9 just kind of just --

10         TRUSTEE HAUSER:  Sure.

11         MR. KHARASCH:  I think all Mr. Hauser wants to

12 know is that, with regard to the disputed 17 lawsuits, the

13 timing.  What's -- that it's difficult to imagine without a

14 successful mediation, his view is, is it -- without that, is

15 it realistic to expect any of the cash to come into this

16 estate within six months?

17         THE WITNESS:  I don't know.  Because I don't know,

18 for instance, I don't know whether the other attorneys in

19 those cases want to get their money or not, or whether

20 they've taken their money in contravention of our lien

21 right.  That's going to have a big impact on their appetite

22 for resolving the fee dispute.  If they had figured out a

23 way to disregard our lien rights and pay themselves, then I

24 would probably agree with you.  If they haven't, then I

25 might disagree with you.  But what I will say is this, even

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00060943

84

1 separate and apart from the 17 cases that are in dispute --

2 BY TRUSTEE HAUSER:

3 Q    Yeah.

4 A    -- there's still, I believe, 20 cases.

5 Q    No, I mean, I take your point.  So you've brought up an

6 interesting point.  So, their incentive to settle is, from

7 your perspective, if they adhere to their ethical

8 obligations, and all these funds are tied up, they have

9 maybe not as much incentive to settle as you do, but a large

10 part because they're cash starved, also, correct?

11 A    Yes.  And, furthermore, there's a case out of Vegas

12 that we have a significant lien right in.  We have a 30-

13 percent lien right relating to a development project.

14 Evidently that case has settled.

15     I don't know how that development project, which at one

16 point in time it was talked about that project may be worth

17 80 or $100,000,000, to which our firm would be entitled to

18 30-percent, I don't know how that development project goes

19 forward without an adjudication of our lien.  Because no

20 business person in their right mind, no developer is going

21 to go develop that project unless our lien is adjudicated.

22     Now, if they figured our a workaround, you know, to

23 basically disregard our lien rights, then, perhaps.  But I

24 would think there'd be an incentive to get that resolved.

25 Q    So, let's talk about the workaround, because I'm

*Briggs Reporting Company, Inc.*

**Exhibit G**

85

1  concerned.  So --

2  A    I'm concerned, too.

3  Q    -- you're saying that the Frank Sims firm, as well as

4  their co-counsel, may have figured out a way -- and I --

5  whether you believe it's ethical or not, to essentially take

6  at least what they believe is their minimum fees, and then

7  leave enough fees, but essentially starve you guys out.  Do

8  you have any knowledge that that might be taking place, or

9  it just concerns you that their conduct would lead you to

10 believe, from everything you know --

11 A    There's been nothing that's occurred in the Callaway

12 case in eight months.  I have never had a contingency case

13 that I have been actively litigating, especially a class

14 action, where I've been on the plaintiff's side and I've

15 done nothing for eight months in a case when the class cert

16 hearing was days away.  So, that doesn't smell right.

17 Something is going on in that case.  That's first.

18      Secondly, this Vegas case that settled, there is

19 something that is gone on in connection with that case,

20 because I would think that the client, putting Mr. Frank and

21 Mr. Sims aside, the client would want to get our lien amount

22 adjudicated so that the development could go forward.

23 Because, otherwise, right now, they have a 30-percent

24 partner that they have no control over, namely, our law

25 firm.

*Briggs Reporting Company, Inc.*

**Exhibit G**

86

1  Q     So, is that, I'm looking at --

2  A     The AEP matter.

3  Q     Yeah.  Okay.  I just want to make sure I understand

4  what -- okay.  District Court of Clark County, Nevada.

5  Okay.  And that's the type of matter where -- because it's

6  not a class action, a settlement wouldn't be readily

7  ascertainable in the docket?

8  A     Correct.  I understand there's been some land lease

9  entered into in connection with that settlement, but no one

10 seems to be in a big hurry to have our lien rights

11 adjudicated there.  I don't know how they move forward with

12 their project without that being adjudicated.

13 Q     As fiduciary of this estate, what actions have you

14 taken to obtain information?  Have you made demand on them

15 and said --

16 A     We sought to enforce our lien in the district court in

17 Nevada.

18 Q     Does that mean you filed a notice of lien?

19 A     We had filed a notice of lien, and then we sought by

20 motion to adjudicate that lien.  Mr. Frank showed up and

21 argued that it should be arbitrated pursuant to the fee

22 agreement.  An arbitration proceeding had been filed prior

23 to that.  We didn't believe we belonged in arbitration.

24      The court ruled that the adjudication of that lien did

25 in fact belong in arbitration.  We filed a notice of appeal

**Exhibit G**

USAO_00060946

87

1  of that decision.  But, regardless -- here's the problem.

2  It doesn't make any sense to me as to how that development

3  would go forward unless there's been some indemnification by

4  Mr. Frank, or some purported workaround relating to our lien

5  rights in Nevada.

6  Q    So, it sounds to me that, by the arbitration sweeping

7  in these 17 lawsuits under its jurisdiction, it's prevented

8  the bankruptcy estate from asserting its rights in the cases

9  on a one-by-one basis?  Well, you just told me that you went

10 into Nevada and the judge said, it's the arbitrator's, it's

11 the arbitrator's jurisdiction.

12 A    It's separate arbitration though --

13 Q    Yeah.

14 A    -- from the arbitration of Mr. Frank, to be clear.

15 This is a different arbitration that Mr. Frank caused the

16 Nevada client to initiate against our law firm.  This is a

17 separate arbitration.

18 Q    And where is that pending?

19 A    JAMS.

20 Q    But it's completely separate from the one -- I'd only

21 thought there was one JAMS arbitration.

22 A    There's three JAMS arbitrations.  There's one involving

23 Mr. Sims, one involving Mr. Frank, and one involving this

24 Nevada client.

25 Q    This is taking place in Orange County, the arbitration?

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00060947

88

1  A    I think that's where it was filed.

2  Q    And that Nevada JAMS matter specifically deals with the

3  authentic -- whatever the name of it, matter is, just on

4  that one matter?

5  A    Yes.

6  Q    Okay.  And then the other 16 lawsuits are, have come

7  under the Frank JAMS arbitration, for lack of a better --

8  A    Well, again, we don't believe that that is appropriate,

9  but Mr. Frank has purported to try to get the arbitration in

10 his arbitration to make a sweeping ruling eradicating our

11 fee rights in those -- in all of the cases.

12 Q    No, I understand.  So there -- the Frank Sims position

13 is that the -- essentially has cut off the estate's,

14 bankruptcy estate's right to assert its lien rights in these

15 various different causes of action by putting it under the

16 umbrella of the arbitration?

17 A    That's what they've purported to do.

18 Q    Have you appealed that ruling?

19 A    No.  The arbitration is stayed, and it was stayed by

20 operation of the bankruptcy.

21 Q    Is that ruling appealable by the JAMS panel?

22 A    Ultimately, it would be appealable, but the likelihood

23 of success on appeal under California law would be slim to

24 none.

25 Q    No, I understand.

**Exhibit G**

89

1 A     Yeah.

2 Q     I mean, in certain matters when you appeal them, it's

3 -- so, this ruling in the context of the appeal has really

4 taken away the bankruptcy estate's right to go into each

5 court and assert its rights, whether it's in federal court

6 or -- I mean, you couldn't even sue on the state court then,

7 right?

8 A     Well, no.  Our position is, we could sue in state court

9 because -- this is the fundamental disagreement, and this is

10 important, okay.  These are not Mr. Frank's cases.  These

11 were cases where on one side of the contract you have Eagan

12 Avenatti, and on the other side of the contract you have the

13 client.  The fee agreements were not with Mr. Frank

14 individually, period.

15     Now, he may have a subsequent fee agreement relating to

16 those cases with him individually, although my guess is that

17 it's with his new law firm.  Okay.  He may have originated

18 the case, but that's completely separate and apart from the

19 contractual rights to the fees from those cases.

20     And so, for instance, in the Nevada case --

21 Q     Right.

22 A     -- the firm has a significant, multi-million-dollar

23 interest now that that case has settled.  I don't have all

24 the terms of the settlement.  I don't know the monetary

25 compensation associated with it, I don't know what the

*Briggs Reporting Company, Inc.*

**Exhibit G**

90

1  status of the development is, I don't know anything.

2      And here's the other thing I don't know.  I don't know

3  whether Mr. Frank and the other lawyers have been paid from

4  the settlement in contravention of our lien rights.  Same

5  thing in Callaway.  Now they shouldn't have, in my view, but

6  I don't know.

7  Q    But let's just stick with the Nevada lawsuit.  We had

8  discussed earlier that in order to enforce your rights

9  you've had to bring two lawsuits in state court.  One would

10 be actually suing the plaintiff, correct?  Is that right?

11 A    In California.

12 Q    Yeah.

13 A    Under California law.

14 Q    And then you would have to sue, I'd call it either a

15 secondary or tertiary lawsuit against the actual other

16 attorneys, correct?

17 A    Yes.

18 Q    If, in fact, you actually learned that the Nevada

19 lawsuit has settled, let's just skip over the step of how

20 you'd figure that out --

21 A    It has settled.  We've been informed by Mr. Frank that

22 it is settled.

23 Q    Okay.  What are your -- what is the estate's rights as

24 far as being able to go after and enforce its lien and get

25 its allocation of the fees, as you understand it?

*Briggs Reporting Company, Inc.*

**Exhibit G**

91

1  A    We pursued a motion in Nevada state court --

2  Q    Okay.

3  A    -- to enforce our lien rights --

4  Q    And what happened?

5  A    -- for 30-percent of the, of the proceeds from the

6  settlement.

7  Q    Right.  And you have sued --

8  A    -- or a consideration.

9  Q    And that would have been a lawsuit against the

10  plaintiff, correct?

11  A    Yes, under Nevada law.

12  Q    Okay.  Which is similar to what you described here in

13  California, right?

14  A    Yes.

15  Q    Okay.  What happened with that?

16  A    So we filed the motion --

17  Q    Wouldn't it be a lawsuit?

18  A    No.  You can actually -- Nevada's different than

19  California.

20  Q    Okay.

21  A    In California, you can't file -- you can file your lien

22  to provide notice in the underlying action, but you actually

23  have to launch a separate proceeding in order to adjudicate

24  your lien rights.  In Nevada, you can actually have your

25  lien rights adjudicated by way of the underlying action.

*Briggs Reporting Company, Inc.*

**Exhibit G**

92

1  Q    Okay.  But you still, you file it in state court, as

2  opposed to -- where was the actual lawsuit pending?

3  A    State court in Nevada.

4  Q    And do you file it actually before the same judge?

5  A    Yes.

6  Q    Okay.  So you file your motion to enforce your lien

7  right, correct?

8  A    Yes.

9  Q    So you have a lien prior in time to the secondary firm?

10 A    Right.

11 Q    Okay.  What happened with that motion?

12 A    Mr. Frank, on behalf of the client --

13 Q    Right.

14 A    -- sought to have that motion denied, arguing that our

15 lien right had not matured yet, and, therefore, we were not

16 entitled to anything from that case.  And that in the event

17 we were entitled to anything, it was limited to, as I

18 recall, 2.75 or $3,000,000 in cash.  And in any event, he

19 argued that the adjudication should take place in

20 arbitration pursuant to the fee agreement with the client.

21 Q    And what did the judge have to say about that?

22 A    The judge denied the motion based on the fact that she

23 ruled that it belonged in arbitration.  She did not reach

24 the merits of the motion.

25 Q    Okay.  So what it seems to me like is, in listening to

**Exhibit G**

USAO_00060952

93

1  -- or reading about the <u>Quorn</u> settlement and what Judge

2  Dolly Gee said there, and what happened in Nevada, is these

3  judges are hearing about this arbitration and are saying, we

4  don't have jurisdiction to rule over your lien rights -- and

5  if I'm wrong, tell me I'm wrong.  And, therefore, that's why

6  he denied your motion, and that's why Judge Dolly Gee said,

7  it's not my issue.  You guys figure it out on your own in

8  your arbitration, right?  I mean, that's the net effect of

9  what's going on here.

10  A    "That's the net effect," although I do not believe that

11  the -- we're talking about two different -- well --

12  Q    I understand it's two different things.  But,

13  essentially, I'm trying to get pattern here, where these

14  judges are not allowing you to enforce your rights because

15  of the pending arbitration.  I'm simple -- it's -- if you

16  agree with it, yes, if you don't agree, no.  It doesn't

17  matter to me.

18  A    I think that the judges are not allowing us to enforce

19  our lien rights because of a pending arbitration, but we're

20  talking about different arbitrations, or they are finding

21  that we have to adjudicate in a separate forum our lien

22  right.

23  Q    But in the Nevada case, where you went in on motion,

24  that judge said, because of the arbitration I'm not going to

25  rule on your motion.  Was that what happened?

*Briggs Reporting Company, Inc.*

**Exhibit G**

94

1  A    Because of an arbitration clause and an arbitration

2  that the client had initiated, I'm not going to rule on your

3  motion.   In the Mercedes case, we filed a lawsuit against

4  the client in Orange County Superior Court along the lines

5  of what I stated earlier.

6  Q    Right.

7  A    Okay?

8  Q    Right.

9  A    Mr. Frank's law firm shows up to represent the client.

10 After we filed the bankruptcy, they sought to stay that case

11 in state court, claiming that the client had some claim

12 against the law firm for something, which I have no idea

13 what the claim is.  But they told the judge, well, if we

14 have to answer we're going to assert a cross-claim in the

15 state court proceeding, so, therefore, the case should be

16 stayed.

17     We argued against the stay because we want to

18 adjudicate our lien rights, and the court agreed with Mr.

19 Frank's -- I think it was Mr. Stolper from his firm that

20 showed up, that that case should be stayed.  So,

21 basically --

22 Q    Yeah --

23 A    -- stopped us from adjudicating our lien rights.

24 Q    Yeah.  That's -- I'm certainly not trying to understand

25 the -- on a granular level this matter.  I never will, and

**Exhibit G**

USAO_00060954

95

1 that's not my role here.  What I'm trying to understand is

2 the interplay between the bankruptcy estate and the Frank

3 Sims firm, as far as the bankruptcy estate's ability to

4 collect its fees, and what the Frank Sims firm is either is

5 or isn't doing to prevent that.

6      And from what you've described, on two occasions at

7 least, where you've sought to start the process of trying to

8 enforce the lien rights, you've been stymied due to the

9 efforts, apparently, the very successful efforts of by Mr.

10 Frank.

11 A    Very successful.  We have been stonewalled repeatedly

12 on our ability to get information, very basic information.

13 Has the case settled, what are the terms of the settlement,

14 and has anybody gotten any money from the settlement and, if

15 so, who?  I mean, it's pretty straightforward.

16      We can fight as to who may be entitled to what, but I

17 would like to know the basic information, and I find it very

18 hard to believe that Mr. Frank and Mr. Sims and their law

19 firm have not received any compensation from any of these

20 cases over the last year.

21      Because you talk about our overhead and our nut --

22 Q    Yeah.

23 A    -- as somebody that started a new law firm 10 years

24 ago.  You don't just start a new law firm and all of the

25 sudden the money starts flowing in.  So, they've got to be

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00060955

96

1  getting their money from somewhere, and I find it very hard

2  to believe that these 17 cases have not resulted in any

3  compensation to them or their law firm.

4  Q    No, no.  I hear what you're saying.

5  A    And if it hasn't, then I would have thought that they

6  would have been aggressively litigating these cases to get

7  paid as soon as possible, as opposed to having no months of

8  activity in a major class-action case, which prior to their

9  termination I was repeatedly told was on the verge of

10 potentially settling, and they were going to get huge fees

11 from.

12 Q    Yeah.  Again, my role is not to adopt your view or

13 their view, but simply understand the interplay between the

14 parties.  And you know that, right?  Because even if I did

15 adopt a view it would be irrelevant, because I -- this is an

16 administrative hearing --

17 A    I'm just trying to answer your questions.  I'm sorry.

18 Q    And you are, and you are.  And that -- but I'm just

19 trying to understand.  I mean, once you tell me that they

20 keep trying to stop you, whatever, kind of the rest of it is

21 you're advocating -- there's nothing I can do one way or the

22 other, and it's not my role, so.

23     Okay.  Let's circle back to the April monthly operating

24 report.  And, again, this is docket item 100, page 14 of 27.

25 And just let me know when you get there.

97

1 A    I'm there.

2 Q    Okay.  So at the very top of the page that says, "sales

3 revenue," and it has a number of $17,000,000.  How did you

4 arrive at that figure?

5 A    Well, this is on an accrual basis.

6 Q    Okay.

7 A    Which, quite honestly, I understand that that's the

8 basis upon which these statements are supposed to be

9 submitted.

10 Q    That's correct.

11 A    I would argue that an accrual basis perhaps for a law

12 firm that operates on a cash basis --

13 Q    Yeah.

14 A    -- may not be appropriate, but the rules are the rules.

15 I get it.

16 Q    Right.

17 A    So, therefore, we accrued fees, a significant portion

18 of these fees are from the Kimberly-Clark class-action

19 case --

20 Q    Okay.

21 A    -- that was, the verdict was rendered in April.  And

22 currently, the judgment in that case is over $454,000,000.

23 And the defendants in the case, Kimberly-Clark and Halyard,

24 have had to recognize that judgment and reserve for it in

25 their SEC filings.

*Briggs Reporting Company, Inc.*

**Exhibit G**

98

1  Q    Here's what I would suggest.  First of all, you're

2  absolutely right.  This is an accrual-based document.  The

3  problem is, this form can only take into account so many

4  different business models, and it's clearly not -- you know,

5  it doesn't capture what your firm does.

6       So it's not your fault that we haven't come up with a

7  form for accrual -- for a law firm, but we only get a law

8  firm like every five years, so it's just -- but I don't

9  think that $17,000,000 is an appropriate number.

10      Why don't you think about this.  Whatever number you

11 come -- 17 isn't the right number.  Come up with a number,

12 and then with that number drop an asterisk and explain what

13 it is.

14 A    Well, I think from what you're saying, is that probably

15 you just -- it's not when -- you don't accrue the revenue

16 just because you get a verdict.

17 Q    Yeah.

18 A    It would be more appropriate probably to accrue it --

19 Q    When there's a realistic expectation of payment, and

20 whether it's on a 30, 60, 90, 120 day, or even six month.  I

21 mean, we have healthcare cases all the time where that's a

22 very slow receivable.

23 A    Right.  Where there's no -- at least --

24 Q    Yeah.

25 A    -- where there's no stay pending appeal.

*Briggs Reporting Company, Inc.*

**Exhibit G**

99

1  Q    But at least you can book the receivable.  You

2  understand you're dealing with Medicare.  They cut fees, you

3  know, all the times.  But here, you're dealing with a much

4  different dynamic.  So, the fact that there's a verdict I

5  don't believe is a basis for what we're trying to figure out

6  here, to book it as a receivable.

7            MR. KHARASCH:  Michael -- sorry.

8            TRUSTEE HAUSER:  Yeah.  No, sure.  Well, I know --

9            MR. KHARASCH:  The marker would be in a sole

10 market instance.

11           TRUSTEE HAUSER:  Yeah.  Sure.

12           MR. KHARASCH:  Do you make that statement with

13 keeping GAP principles in mind, because GAP principles

14 dictate that you should accrue it.

15           TRUSTEE HAUSER:  No.  I'm keeping it in the

16 principles of the purpose of a bankruptcy case is to confirm

17 a Chapter 11 plan.  At the end of the day in a confirmation

18 hearing, one of the key things a judge is looking to is

19 feasibility.  One of the things the judge's, particularly in

20 division, rely on are the monthly operating reports, as well

21 as cash-flow projections, expert witnesses, et cetera.  But

22 it's tethered to, what was the performance during the case?

23           And, of course, in this particular case, there may

24 be assumptions.  Often times the performance during the case

25 bears no relationship to what's going to happen in the

*Briggs Reporting Company, Inc.*

**Exhibit G**

100

1 future.  This may be one of those cases.

2         But this number, in the terms of what's trying to

3 be accomplished in the bankruptcy, you may be very well that

4 on a GAP-accounting basis, 17 makes sense, but for the

5 purpose of trying to understand the Debtor' performance, the

6 Debtor's ability to meet its obligations, even before plan

7 confirmation, the number doesn't serve any purpose.

8         And so, in that context, I don't think the

9 $17,000,000 is useful at all.  I think a number that's more

10 useful is, there is a settlement.  The appeal time has

11 passed, and the only thing you're waiting for is the process

12 to play out and get the check.

13         Now that process in this world may be six months,

14 so someone should drop a footnote and say, you know, we

15 booked $600,000 from a settlement, and expect to collect on

16 that in whatever period of time.  Because it appears every

17 case is a different creature.  That's the only way it makes

18 sense to me.  And then people could look at it and track it.

19         MR. KHARASCH:  Okay.  So you're -- but bottom line

20 is, you don't expect to be -- the balance sheet or the P&L

21 to be based on GAP if GAP says that's what you're supposed

22 to do?

23         TRUSTEE HAUSER:  No.  I mean, look, we've had --

24 I've already done over 1,000 Chapter 11 cases.  And all

25 we're trying to figure out is, based upon the performance

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00060960

101

1  during the case -- you know, these are signed under penalty

2  of perjury.  Do the projections on a going forward make any

3  sense?

4         This particular case will probably, as some cases

5  are, the projections often aren't even tethered to what goes

6  on during the case, because there's something that changes

7  dramatically, either the client gets a big piece of business

8  that didn't even exist during the case.  Do you see what I'm

9  saying?

10        Here, probably the biggest factor's going to be

11 the settlement of the dispute with the Frank, Sims, Stolper

12 firm.  Because if that settles, then you're going to have a

13 whole different set of assumptions based upon whatever

14 formula the mediator comes with.  But the -- having said

15 that, the $17,000,000 number serves no purpose to anyone.

16        MR. KHARASCH:  So maybe the test is a reasonable

17 expected -- reasonable expectation of payment within three

18 to four months?  Because it could be just a verdict --

19        TRUSTEE HAUSER:  It could even be --

20        TRUSTEE HAUSER:  -- without a stay pending appeal,

21 which would push someone to either pay you or --

22        TRUSTEE HAUSER:  Correct.

23        MR. KHARASCH:  -- settle with you.

24        TRUSTEE HAUSER:  So, I think you would put in the

25 number, and then you'd have to footnote it with saying, the

*Briggs Reporting Company, Inc.*

**Exhibit G**

102

1   matter here settled or went to verdict.

2          MR. KHARASCH:  Right.

3          TRUSTEE HAUSER:  Based upon our experience -- and

4   it hasn't been appealed.  And based upon our business model

5   and how we do business, we expect collection of part or all

6   this amount within the following milestones, your time

7   frame.

8          And, again, if the matter, whether it goes to

9   mediation or -- if the claim with the Frank Sims firm is

10  liquidated, that it going to put a whole new spin on the

11  case anyways.

12         And this performance now, where the Debtor's

13  obviously in somewhat of a vulnerable, cash-starved

14  situation, may not be reflective of what goes on going

15  forward.  You'll have these 20 cases in the pipeline

16  already, some of them are going to be going to trial in '18.

17  But I'm just saying, the $17,000,000 number makes no sense

18  at all.

19         At least with the -- booking the AR based upon an

20  actual settlement or an actual verdict with no appeal makes

21  sense for two reasons.  One, the expectation of actually

22  collecting that money is way more realistic than a deal with

23  Kimberly-Clark where they've hired Gibson Dunn to appeal it,

24  which could go, rage on for years.  Okay.  But it gives

25  transparency.

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00060962

103

1          So when someone sees a revenue number, they're

2   like, okay, drop a footnote.  Okay.  This revenue came from

3   three sources.  We settled matter one, and we expect to get

4   paid, let's say half-a-million dollars within the next four

5   months.

6          The second source of the revenue was from a

7   verdict, which was not appealed.  The appeal period has

8   passed.  If it hasn't passed, you shouldn't book it.  Wait

9   until the appeal period has passed.  But if it's passed,

10  say, okay, based upon whatever post-motion, whatever the

11  protocol is in your world, which I'm not familiar with, the

12  reasonable expectation from a time of a verdict, where

13  there's no appeal.  Because even then, they may be what,

14  post-trial motions that delay it for --

15          MR. KHARASCH:  A stay, that would cause a stay.

16  Yeah.

17          TRUSTEE HAUSER:  Yeah.  And if you have a lack of

18  comfort level because of that, maybe you shouldn't book it

19  until you have more clarity on it.  But -- and there's also,

20  I mean, just for academic regularity, I mean, there's a sort

21  of a catch-all provision at the end of every one of these

22  operating reports, which no one ever seems to fill out.

23  Which says, has there been any meaningful developments in

24  this case?  And you can fill in -- it's the last page, it's

25  page 16 of 27.  And you could certainly somewhere in there

**Exhibit G**

USAO_00060963

104

1 put in that we did get a settlement or we did get a verdict,

2 but there are these issues which we think will delay

3 collection for a year, and, therefore, we have not booked it

4 as an account receivable.  I mean, I grant you, this is a

5 difficult operation to capture all of the information, but I

6 think it's doable.

7         MR. KHARASCH:  Uh-huh.  I agree.

8         TRUSTEE HAUSER:  Once you -- so, do you -- because

9 everyone's going to look at the main report, so we need to

10 have some kind of an agreement.

11         MR. KHARASCH:  Right.  I think what we'll do is

12 we'll footnote -- whatever we decide to do on this, we'll

13 footnote it and explain what gross revenue includes.

14         TRUSTEE HAUSER:  Okay.

15         MR. KHARASCH:  And how -- and what the test is.

16         TRUSTEE HAUSER:  And you're break it out by -- if

17 -- by the case by case, right?

18         MR. KHARASCH:  If we use them.  Maybe, we may come

19 to the conclusion that we won't even use those certain

20 cases.  Like the Kimberly-Clark, we may just take that out.

21         TRUSTEE HAUSER:  I can't imagine how you could use

22 that.

23         MR. KHARASCH:  Right.  Okay.  Got it.

24         THE WITNESS:  Well --

25         MR. KHARASCH:  And I can see your point.  So,

**Exhibit G**

USAO_00060964

105

1 we'll just come to --

2      THE WITNESS:  I'm happy to discuss that.  I mean,

3 I may have a different view of that.  If Kimberly-Clark and

4 Halyard have to book a reserve --

5 BY TRUSTEE HAUSER:

6 Q    Right.

7 A    -- pursuant to the requirements of the Securities and

8 Exchange Commission and GAP, if they have to book a reserve

9 for the entire $454,000,000 verdict amount -- which they do.

10 There's no question about that, okay.  If they have to book

11 that reserve, then I don't think it is inappropriate for us

12 to book on an accrual basis a small fraction of the fees

13 that would actually be due for that verdict.  But we're

14 going to do exactly what you tell us to do.

15      But just as an academic, as an academic discussion, I

16 don't think it paints an accurate picture for us not to

17 accrue any professional fees, when 25-percent of

18 $454,000,000 is over $110,000,000.

19      MR. KHARASCH:  Yeah, but I see your point.  I

20 mean, I think the point is, whatever we do, it should paint

21 an accurate picture of anticipated cash flow and what's

22 really going to come --

23      TRUSTEE HAUSER:  I can't force you to do

24 something.

25      THE WITNESS:  No, we're going to do what you tell

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00060965

106

1  us to do.

2  BY TRUSTEE HAUSER:

3  Q    I think to do is what I've suggested, which is, you can

4  if -- on the Kimberly-Clark, that's something that you

5  should put the last page and simply say, one of our cases

6  went to verdict.  It's name is, case name, case number.

7  It's now on appeal.  I'm not -- have they even filed the

8  notice of appeal yet?  I'm not even sure.

9  A    No, we're in post-trial motion.

10 Q    Is in post-trial motion, but we expect an appeal.  If

11 it settles or whatever, we'll then book it.  Because,

12 obviously, the -- obviously, you -- I'm not even remotely

13 suggesting you can set it.  But I could imagine, between now

14 and the appeal, some settlement could materialize.  I mean,

15 that has happened before in your experience, correct?

16 A    Yes.

17 Q    That they use the settlement -- the appeal as leverage

18 on you guys, and then you sit down and you settle the

19 matter.

20 A    That would not be unusual.

21 Q    Okay.  But, again, I just think that the reality of

22 when you put together your cash-flow projections for a plan,

23 the judge is ultimately going to decide feasibility.  I just

24 think this number, for me, doesn't make sense.  And I think

25 it'd be better off if you were to put matters that settled

**Exhibit G**

USAO_00060966

107

1 that go to appeal, or aren't going to be collectible for

2 whatever reason for a long -- in, let's agree to the last

3 page?

4          MR. KHARASCH:  Sure.

5          TRUSTEE HAUSER:  And we all know to look at the

6 last page.  So I need matters that settles but -- or gets a

7 verdict, but is -- you can put it on the last page.  When I

8 call it the "last page," it's --

9          MR. KHARASCH:  Sixteen.

10          TRUSTEE HAUSER:  Yeah.  It's going to be always

11 that questionnaire.  And I think in the reality, despite

12 the differences in the parties, I mean, I think if -- as

13 when I do show you, if someone asks whether a case settles

14 or it's gone to verdict, I mean, obviously, most of this you

15 could -- a lot you can get from the PACER docket.  But if

16 there's one of these cases where no one can figure it out

17 from the PACER docket, that you would give them the

18 information, despite whatever differences are in this case,

19 correct?

20          MR. KHARASCH:  Could you repeat that?  I was just

21 writing your --

22          TRUSTEE HAUSER:  I was saying that, in the spirit

23 of cooperation, if someone wanted to know whether a case

24 settled, and they weren't easily -- it wasn't easily

25 ascertainable from the PACER docket, that you'd provide that

**Exhibit G**

USAO_00060967

108

1  information?

2         MR. KHARASCH:  Yeah, presumably we would, unless

3  somebody shouldn't be involved that we --

4         TRUSTEE HAUSER:  Okay.  Got it.  We've got to trek

5  on here.

6  BY TRUSTEE HAUSER:

7  Q    Skip that part.  Okay.  We're going to go to the

8  schedules now, and we're talking about the docket's item 104

9  through 108.  And, Mr. Avenatti, if you could turn to docket

10 item 105, page one of 10.  It says, "schedule A/B, assets

11 and real property."  It looks like this.

12 A    I have it.

13 Q    Okay.  So, I'm just going to go through this.  A lot of

14 it I'm just going to ask you to confirm, and then I'll have

15 specific questions about some of the items.  So, could you

16 please confirm that the Debtor owns no real property?

17 A    Confirmed.

18 Q    Okay.  At the time of filing, at the time of filing the

19 -- and item number three, where it lists checking/savings,

20 it list two bank accounts at California Bank and Trust.  Is

21 that the amount of money that was in the Debtor's bank

22 accounts at the time of filing, which would have been March

23 10th?

24 A    I believe so, yes.

25 Q    Okay.  Now, with respect to -- and I believe that this

**Exhibit G**

USAO_00060968

109

1  gentleman here raised a good question, which I'm going to

2  ask.

3          TRUSTEE HAUSER:  I'm sorry, your name, sir?

4  I'm Michael Simon for Industry Providers (phonetic).

5          TRUSTEE HAUSER:  "Michael Simon."

6  BY TRUSTEE HAUSER:

7  Q    Do you also have an attorney-client trust account?

8  A    Yes.

9  Q    Okay.  And where is that held?

10 A    California Bank and Trust.

11 Q    Okay.  And how much money is in that account at this

12 time?

13 A    I don't know the exact balance, but it's not

14 significant.

15 Q    Okay.  Let's do order of magnitude.  More than 100,000

16 or less than 100,000?

17 A    "Less than 100,000."

18 Q    Okay.  More than 50 or less than 50?

19 A    "Less than 50."

20 Q    More than 25 or less than 25?

21 A    I'm sure it's less than 25.

22 Q    Okay.  So you have less than $25,000.  And you only

23 have one attorney-client trust account?

24 A    Yes, sir.

25 Q    And are there any other types of accounts, like escrow

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00060969

110

1  accounts, or other types of accounts where funds would be
2  held in connection with the lawsuits that are on page 75 --
3  or --
4  A    In connection with the firm's business relating to
5  those cases?
6  Q    Yeah.  Yeah.
7  A    No.
8  Q    So there's been no escrow account or separate account
9  where there's, you know, partial settlement, and someone has
10 wired in money, and you set up an account?  I just need to
11 -- okay.  So it's just that one attorney-client trust, and
12 it's still at California Bank and Trust?
13 A    Yes, sir.
14 Q    Okay.  Okay.  Moving to the next page, which is -- I
15 just need you to look at page two of 10.
16 A    I'm there.
17 Q    And just review that and confirm for me that the
18 information that listed -- is on there is true and correct.
19 A    To the best of my knowledge, it is.
20 Q    Okay.  Let's move over to page three of 10 on docket
21 item 105, at lines 70 -- first of all, at lines 43 to 70 --
22 60 -- I'm sorry, 59, if you can just confirm the accuracy of
23 the information there.
24 A    To the best of my knowledge, it's accurate.
25 Q    Okay.  And the same for line 70.

**Exhibit G**

USAO_00060970

111

1  A    Same.

2  Q    Okay.  So you've listed a promissory note of $100,000.

3  You've listed it as uncollectible.  Who's that note from?

4  A    That is a promissory note that was executed on behalf

5  of a prior client of the firm.  And I guess, technically,

6  perhaps, still a client of the firm.

7  Q    Who's that?

8  A    I am trying to recall the exact client name.  I know

9  what the case related to.

10 Q    How long is the -- how long is they've they been

11 delinquent on the note?

12 A    I believe two or three years.

13 Q    Okay.  And the firm has made collection efforts with

14 regard to the note?

15 A    Yes.

16 Q    And they've been unsuccessful heretofore?

17 A    Unfortunately, yes.

18 Q    Okay.  All right.  And then we have B-74, and that

19 lists the disputed lawsuits, and we've already discussed

20 those at length, so we're not -- and then on B-75, we have

21 discussed that as well.  That's all the pending lawsuits

22 that existed at the time of filing, correct?

23 A    Yeah, I believe that's correct.

24 Q    Okay.  And there's been no formal settlements of any of

25 these lawsuits, correct?

*Briggs Reporting Company, Inc.*

**Exhibit G**

112

1  A     On B-75, no.

2  Q     Right.  Okay.  And you said that since the time of

3  filing you may have filed one or two lawsuits.  You're not

4  sure, because they've been served, or you --

5  A     Yeah.  Whatever I said before I believe is accurate.

6  Q     Okay.  All right.  I'm just trying, I'm just trying to

7  get the status of the assets here.

8       Okay.  Moving on to schedule D and E.  And the reason

9  I'm putting them together is, the I.R.S. claims start on

10 schedule D, as do the EDD claims.  And then some of them are

11 also listed as priority tax claims.  So, the I.R.S. lists a

12 secured -- and then Ms. Shariff can chime in, because,

13 apparently, there was an amended proof of claim.  But on

14 page two of six of docket item 106 --

15 A     I'm there.

16 Q     Okay.  You'll see, Department of Treasury, I.R.S.,

17 disputed secured claim of $412,000.

18         TRUSTEE HAUSER:  Before I ask you the question,

19 I'm going to ask Ms. Shariff what that number -- what she

20 believes the number is based upon, is it proof of claim 1-4?

21         MS. SHARIFF:  Yes.

22         TRUSTEE HAUSER:  Okay.  I'm going to give you the

23 floor and you can tell me, if that number higher or lower

24 than what is --

25         MS. SHARIFF:  It is higher.

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00060972

113

1        TRUSTEE HAUSER:  And what is, what is the amount
2   that's reflected on the POC?

3        MS. SHARIFF:  It is -- the secured claim amount is
4   $677,410.24.

5        TRUSTEE HAUSER:  Okay.  So I'll just call it 677
6   on the secured.  Now, Ms. Shariff, going over to the -- and
7   I can just show you page 107 -- I'm sorry, docket item 107,
8   page one of 13, you list a priority tax claim of $525,000.
9   What -- has that number gone up or down on the POC 1-4?

10       MS. SHARIFF:  It has gone down.  The priority
11  claim amount is $322,395.46.

12       TRUSTEE HAUSER:  Okay.  So what it seems to me
13  from reviewing all these proofs of claim is that from the
14  beginning of the case, starting with claim 1-1 through
15  today, that the aggregate secured and priority of claim has
16  always been around $1,000,000, but the allocation of secured
17  versus priority has changed, is that correct?

18       MS. SHARIFF:  Well, not exactly.  So, if you go
19  from claim 1-1 to 1-4, claim 1-1 had a series of -- the
20  priority claim especially was based on a number of unfiled
21  returns.  And since claim 1-1 was filed, a number of those
22  returns have been filed.  And so, the priority claim amount
23  has, in fact, decreased.

24       Now, with respect to one particular period, which
25  is the second quarter 2015, I believe that period is a

*Briggs Reporting Company, Inc.*

**Exhibit G**

114

1  secured claim, but based on the prior schedule of about

2  412,000, the I.R.S. then amended the claim to drop that to

3  priority.

4          But since the amended schedules filed on June 8th,

5  the I.R.S. has brought that back as secured.  But generally

6  speaking, the priority claims are now a smaller amount,

7  mostly because many of the returns that were not filed were

8  filed, and the I.R.S. has accepted those returns.  And the

9  actual amounts of the payroll have been much lesser than

10 what was estimated.

11         TRUSTEE HAUSER:  Okay.  But the overall dollar

12 amount appears to be --

13         MS. SHARIFF:  The same.

14         TRUSTEE HAUSER:  "The same."

15         MS. SHARIFF:  Yes.

16         TRUSTEE HAUSER:  Okay.  I mean, what I'm saying

17 is --

18         MS. SHARIFF:  Well -- yes, from the prior proof of

19 claim.

20         TRUSTEE HAUSER:  Right.  So, I mean, ultimately,

21 whether it's priority or secured, from your perspective on

22 the proof of claim 1-4, they're going to have to pay

23 $1,000,000 16 months from the time of filing, with the

24 default judgment rate, unless you guys come to an agreement

25 otherwise, correct?

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00060974

115

1              MS. SHARIFF:  I'm not sure what -- it's going to
2    be about a million --
3              TRUSTEE HAUSER:  Okay.
4              MS. SHARIFF:  -- because they're all payroll, so.
5              TRUSTEE HAUSER:  Pursuant to statute 1129(a)(9) --
6              MS. SHARIFF:  Yes.
7              TRUSTEE HAUSER:  -- (A), (C) and (D).  With (C)
8    and (D) the treatment is not that much different unless you
9    come to an alternate agreement.
10             MS. SHARIFF:  That's right.
11             TRUSTEE HAUSER:  Okay.  All right.
12             And, Mr. Saunders, you're in discussions with the
13   I.R.S. about the claim?
14             MR. SAUNDERS:  Yes.  We've entered into a
15   stipulation with the I.R.S., the Debtor has, and we're going
16   to continue those discussions because of the change in the
17   proof of claim amount.
18             MS. SHARIFF:  I do have some questions regarding
19   the proof of claim --
20             TRUSTEE HAUSER:  Go.
21             MS. SHARIFF:  -- but I can wait until you're done
22   with your questions to proceed, or I don't know how you want
23   to --
24             TRUSTEE HAUSER:  I don't have any -- on the I.R.S.
25   claims I have no further questions, so.

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00060975

116

1      MS. SHARIFF:  So, do you want me --

2      TRUSTEE HAUSER:  Yeah.  Now is a good time to go

3  in and ask your questions.

4      MS. SHARIFF:  Okay.

5              FURTHER EXAMINATION

6  BY MS. SHARIFF:

7  Q   Good afternoon, Mr. Avenatti.

8  A   Hi.

9  Q   My name is Ms. Shariff.  I represent the United States

10 on behalf of the I.R.S.  And if I could focus your attention

11 -- the amended proof of claim was filed by the I.R.S., I

12 believe, on Friday, and it is reflected on PACER effective,

13 I think, June 12th.

14     In preparation for this meeting, I did get some

15 information from the I.R.S., and I would like to focus your

16 attention on the most current taxpayer year.  This is with

17 respect to the payroll.  Because as you can see,

18 essentially, the entire proof of claim, except for the

19 partnership penalties, are all payroll related.

20     And so, piggybacking on some of the questions

21 previously asked, if we go to the current period of the 941

22 taxes, that's the second quarter for 2017, based on the tax

23 filing by your law firm in the past, it looks like for

24 payroll, the payroll deposits are due bi-weekly, so every

25 two weeks.

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00060976

117

1      And so -- and this is going to be just generally

2   speaking.  For every quarter, based on that bi-weekly

3   deposit, there should be about six deposits made, because

4   there's about three months per quarter.

5      And for the second quarter, based on the I.R.S.

6   records, there have been no deposits made in April.  So the

7   first quarter ended March, I believe, March 31st, and April

8   1 would begin the second quarter.  And there are no payroll

9   deposits made in April based on the I.R.S. records, however,

10  I -- and I think your most recent monthly operating report

11  shows a delinquency of 34,000 if we go to page, I believe --

12  was it seven or 11?

13          TRUSTEE HAUSER:  Eleven of 27.

14  BY MS. SHARIFF:

15  Q    Eleven of --

16          TRUSTEE HAUSER:  -- at the bottom.

17          MS. SHARIFF:  Yes.

18  BY MS. SHARIFF:

19  Q    And I think that would actually be reflected on -- is

20  reflected on the I.R.S. records.  Is there -- and my

21  question is, do you know -- I know you said that the

22  payments were made, but I.R.S. hasn't received them, so.

23  A    Well, if you look, for instance, on page two of 27 on

24  document 100 --

25  Q    Uh-huh.  I know.  I saw that, and it says, "April

**Exhibit G**

USAO_00060977

118

1   12th," but I.R.S. has no record of receiving any payments in

2   April.  I.R.S. received payment -- two payments on May 18th,

3   and then a payment on May 31st.

4   A    Well, but if you look, for instance, on page 17 of 27.

5   So, on page two of 27 there's an EFTPS Federal Payroll Tax

6   Payment of 26,384.18.  And then if you look at the bank

7   statement on 17 of 27, on the 19th, evidently that charge

8   was deducted, 26,384.18.

9   Q    Right.  But based on the I.R.S. records, there is no

10  deposit made for the entire -- the first payment made for

11  the second quarter is May 18th.  And --

12  A    Well, I mean, 30 -- or 26,384.18 was deducted pursuant

13  to this bank statement.

14  Q    Okay.  That's -- okay.  So if we -- when I look at the

15  first quarter, there was a payment of $26,384.18 made on

16  April 19th, but then it was removed by -- I think what's

17  occurring is, part of the problem is -- so if you go to

18  first quarter, there should have been a total of six

19  payments made, because your -- the Debtor's a bi-weekly

20  depositor?

21  A    It's actually -- we're actually on the 15th and the

22  last day of the month.

23  Q    Okay.  So it's twice a month, right?

24  A    Yeah.  It's the 15th and then whatever the last day of

25  the month is.

*Briggs Reporting Company, Inc.*

**Exhibit G**

119

1  Q    Right.  And so, for first quarter there were no

2  payments made February -- January and February.  So, there

3  was a payment made in, on March 17th.  That was the first

4  payment made for 2017, when there should have been two

5  payments made in January and two thousand -- two payments in

6  February.

7      And then there was a payment made April 13th for

8  $26,384.18, but then it was removed.  The deposit was made

9  and removed on the same day.

10 A    I don't know what "removed" means.

11 Q    Well, it was deposited and then taken out.

12 A    All I can --

13 Q    So --

14 A    -- all I can go by is --

15 Q    Right.

16 A    -- this deduction from the bank account, and I don't

17 see the money coming back.  So, I don't --

18 Q    So, first quarter, there's only been two payments made.

19 And second quarter, which is the quarter that we're on,

20 second quarter there's been three payments made, but there's

21 no payments made for second quarter in April.  And part of

22 the problem is because I think, you know, the Debtor --

23     MR. SAUNDERS:  But -- and not -- could you -- so

24 three payments were made in the second quarter.  Could you

25 give us -- do you have the amounts and the date of those

**Exhibit G**

USAO_00060979

120

1 payments?

2        MS. SHARIFF:  Yes, I do.  There were two payments

3 made on May 18th.  The first payment is $27,847.43.  And the

4 second payment on May 18th was $26,246.84.  And then a third

5 payment was made on May 31st, which is $25,613.43.

6        Part of the problem could be that because the

7 payments were not all made during the first quarter, some of

8 the payments that maybe your office manager -- because I

9 think you said that the -- there's no third party handling

10 your payroll anymore, right?

11        MR. SAUNDERS:  Correct.

12        MS. SHARIFF:  Right.  So --

13        MR. SAUNDERS:  Well, there's a third party

14 handling the payroll, but we've taken over the payment of

15 the taxes.

16        TRUSTEE HAUSER:  So Paychex still handles

17 everything else, but they're just doing the --

18        MS. SHARIFF:  Right, right, right.  In terms of

19 the payment of the taxes.

20        And so there might be some confusion as to, you

21 know, where the payments are going.  But with payroll, if

22 you make it timely and you state what period it's supposed

23 to go towards, I.R.S. applies it to that period.  I.R.S.

24 doesn't generally designate, you know, go and back pay taxes

25 or payroll.

*Briggs Reporting Company, Inc.*

**Exhibit G**

121

1  BY MS. SHARIFF:

2  Q    So, one of the questions I had is, the 941 tax returns

3  for the first quarter has not been filed yet.  And so,

4  I.R.S. wants to know when -- and that was due, technically,

5  on April 30th.

6  A    My understanding is, is that that has been filed.  And

7  if it has not been filed, then we can file it, you know,

8  forthwith.

9  Q    Right.  I.R.S. records show no tax return filed for the

10 first quarter in 2017.  Also, there is no record for the 940

11 taxes, tax return for 2016, which was due January 30th, as

12 well as the 940 tax returns for 2015, which was due January

13 30th, 2016.

14      In addition -- so I was wondering when those tax

15 returns could be expected to be filed, because part of the

16 problem here is -- and as I said, from the first claim filed

17 to now, you know, your priority tax claims have decreased,

18 and it's actually to your advantage when you file the

19 returns.  Because usually -- and -- well, I don't know in

20 this case, because you did say your employee number sort of

21 increased, right?  But I --

22 A    But the total payroll went down.

23 Q    "But the total."  See, so it's to your advantage, and

24 it has been to your -- the Debtor's advantage, because I

25 believe the original priority claim estimated by I.R.S. was

**Exhibit G**

USAO_00060981

122

1  over 600,000, and it has now gone down to 322.

2      So, there are four tax returns still not filed that are

3  part of the priority claim, and, for example, I.R.S.'s

4  estimated 941 taxes for first quarter is almost 90,000.  So

5  that's January, February, March.  So once you file your

6  return, it could decrease to 20,000 to 30,000 less.  So it

7  is in your client's -- I mean, in your -- in the Debtor's

8  interest to file the returns, so that the I.R.S. can, you

9  know, figure out what it is.

10     One of the other questions --

11 A   So, we will work with Mr. Saunders to try to get you

12 answers to the questions you've posed relating to when the

13 returns --

14 Q   Right.

15 A   -- were filed.  And if they haven't been filed, getting

16 them filed, as well as listing each of the payments.

17 Q   Right.  So if they were filed, we would want to know

18 the date it was filed, and a copy of the returns.  If, for

19 some reason, it wasn't filed, I would ask that you forward

20 the returns to me, and then I will send it to I.R.S., rather

21 than you just sending it -- you know, I.R.S. is a huge

22 agency.  And it's much easier once the cases are in

23 litigation to --

24 A   We'll get it Mr. Saunders, and then he can --

25 Q   Okay.  Great.  Thank you.  I wanted to also bring to

*Briggs Reporting Company, Inc.*

**Exhibit G**

123

1  your attention that -- as I indicated, the I.R.S.'s claim in

2  this case is basically all payroll.  And based on a review

3  of the claim, it looks like the payroll issue started, I

4  want to say the last quarter in 2014.  The last quarter in

5  2014 is when it looks like withholdings were not 100-percent

6  paid.

7      And then the first and second quarter in 2015 there's

8  almost just -- not even dealing with any penalty and

9  interest, there's almost 400,000 of withholdings not paid.

10 Almost 200,000 in the first quarter, and almost the same

11 amount in the second quarter of 2015.

12     Was the law firm handling payment of the payroll in

13 2015?

14 A    No.  My understanding is, Paychex was.

15 Q    Do you have any idea why Paychex wasn't paying almost

16 200,000 --

17 A    No.  And my understanding is that there is a dispute as

18 to some of those numbers, but I can't quantify for you what

19 that dispute is.

20 Q    That they were paid?

21 A    Yeah.  We dispute the amount of the money that the

22 service claims is due.

23 Q    So then, should I -- should the I.R.S. be anticipating

24 an objection to claim?

25 A    Not necessarily.  I think --

*Briggs Reporting Company, Inc.*

**Exhibit G**

124

1  Q    Okay.

2  A    -- I think Mr. Saunders and --

3  Q    Okay.

4  A    -- Mr. Kharasch are going to handle that.

5  Q    Okay.  So, I think -- and then in 2016, which was last

6  year, there was an issue every single quarter of about

7  50,000 in delinquent withholdings.  So, it's not that the

8  Debtor hasn't, I don't believe, fully paid, but they're not

9  making all of their deposits.  And these amounts are not

10  based on estimated I.R.S. projections, but are actual

11  amounts listed on returns filed by the Debtor.

12      So, if there are any, you know, disputes, then the

13  Debtor would have to file amended returns, and then you have

14  to take into account there's statute of limitations on that.

15  A    Got it.

16  Q    But -- so, beginning -- going back to December 31st,

17  2014 until the present, either the returns haven't been

18  filed, or the payroll has not been paid based on the returns

19  filed, and it's continuing to the present time.  So it's a

20  problem for the I.R.S.

21  A    And I understand that.  But my understanding is, is

22  that everything since the filing of the bankruptcy has been

23  paid and filed on time.  Now, I understand the word

24  delinquent that we were covering --

25           TRUSTEE HAUSER:  Right, right.

*Briggs Reporting Company, Inc.*

**Exhibit G**

125

1        THE WITNESS:  -- earlier, but -- and we will run

2   this to ground.  But my understanding is, is that everything

3   within the last, you know, two months --

4        TRUSTEE HAUSER:  Well -- yeah.  Well, here's the

5   thing.  So I think on this issue you have Ms. Shariff who's,

6   you know, appears in all of her cases, and endeavors to

7   essentially work constructively with you and your lawyers to

8   come to agreement on these amounts.

9        And so, regardless of what numbers are in here,

10  the bottom line is, they haven't received the money, they

11  haven't received the money.  You kind of need to resolve

12  that and -- as well as the other issues she's raised.  I

13  mean, their goal in these cases, based upon my experience,

14  is to try and true up whatever numbers.

15       MS. SHARIFF:  Yeah.

16       TRUSTEE HAUSER:  And if you have disputes, you can

17  at least, you know, narrow them to maybe a specific quarter

18  here or there.  But --

19       THE WITNESS:  Understood.

20       TRUSTEE HAUSER:  -- they're very cooperative on

21  these issues, and they want to get to the same goal, which

22  is to figure out what the right number is, and then have a

23  plan where they get paid.

24       MS. SHARIFF:  Right.  Because I can tell you that

25  what -- if it continues, where there's delinquency and

**Exhibit G**

USAO_00060985

126

1  unfiled returns, what the I.R.S. will request my office to

2  do is to file a motion to dismiss.  And so, you know -- and

3  then when that happens, you know, that becomes a problem.

4  So --

5              THE WITNESS:  Understood.

6              MS. SHARIFF:  Yeah.

7              THE WITNESS:  I get it.

8              MS. SHARIFF:  And rather than -- if you could, you

9  know, your lawyers -- and Mr. Saunders has been working very

10 closely with my office.  Instead of formally filing an

11 objection, if you could informally try to resolve some of

12 these issues, we're happy to, you know, work with the I.R.S.

13 and your law firm to try to resolve any discrepancies there

14 might be.

15             THE WITNESS:  I'll make sure that's what we do.

16             MS. SHARIFF:  Thank you very much.

17             THE WITNESS:  Thank you.

18 BY MS. SHARIFF:

19 Q    I did have one question, one other question, not so

20 much connected to the proof of claim.  But based on what you

21 have stated regarding the schedules that were filed, and

22 specifically with respect to, I believe, schedule B, that

23 was amended on June 8th.  It sounded to me like there was a

24 lot of uncertainty as to, you know, how much money would be

25 collected with respect to all these different lawsuits that

**Exhibit G**

USAO_00060986

127

1  are pending.

2      And I was -- I'm required to ask you, despite the

3  unknown numbers, there is an estimated 45,000,000 that has

4  been stated on line item 77.  Would you be able to tell us

5  how you went about estimating that amount?

6          TRUSTEE HAUSER:  So, just so everyone's following

7  along.  So we're at docket item 105, page five of 10, B-77.

8  There is an estimate -- I'll just read it for you, Mr.

9  Avenatti.  It says:

10             "The Debtor estimates that it will

11         receive approximately $45,000,000 of

12         fees and costs over time that are due

13         from the contingency cases listed

14         collectively in lines 74 and 75."

15         So that would be the whole basket of the cases.

16         And I -- and your question is?

17         THE WITNESS:  I think that is a conservative

18  number, and, unfortunately, I cannot in a public setting --

19         MS. SHARIFF:  Okay.

20         THE WITNESS:  -- go case by case and tell you what

21  I think the value is on each of these cases, because --

22         TRUSTEE HAUSER:  Understood.

23         THE WITNESS:  -- otherwise I would be --

24         TRUSTEE HAUSER:  Understood.  Yeah.

25         THE WITNESS:  I'm sure the defendants would love

*Briggs Reporting Company, Inc.*

**Exhibit G**

128

1  to know what I think each of these cases is worth.

2  BY MS. SHARIFF:

3  Q    In your opinion, it's a conservative estimate?

4  A    Absolutely.

5  Q    Okay.  And there is some sort of formula or way that

6  you determine that.  It's not a purely arbitrary --

7  A    It's not a pie-in-the-sky number, no.

8  Q    So, for example, the Government could rely on it

9  somewhat, right, when it bases its secured claim or --

10  A    Absolutely.

11  Q    Okay.  Well, thank you for that.

12  A    Thank you.

13  BY TRUSTEE HAUSER:

14  Q    Okay.  All right.  We're going to jump into schedule F

15  and just, I'm going to go over some specific claims.  First

16  of all, Mr. Avenatti, if you could just look at schedule F,

17  and it starts at docket item 107 -- actually, it starts at

18  page two of 13.  We'll call it three of 13 with claim 3-1.

19  And there's approximately 30 -- or, I'm sorry, 44 claims

20  listed through page nine of 13.  If yo could just review

21  those and tell me that the information contained in there is

22  accurate, and then I'm just going to ask a few questions

23  about a few particular claims.

24  A    To the best of my knowledge and belief, this is

25  accurate.

*Briggs Reporting Company, Inc.*

**Exhibit G**

129

1 Q    So, I want to ask you about just a few claims.  Claim

2 3.24, which is on page six of 13, where it says, "Jason

3 Frank Law."  And it says, "basis for the claim,

4 arbitration."

5     If you could just tell me in the simplest of terms,

6 because we've spent a lot of time on this today.  Break down

7 for me in the arbitration -- you've already told me that the

8 17 lawsuits are now part of the arbitration, is that

9 correct?

10 A    Well, yes and no.  Mr. Frank has attempted to make them

11 part of the arbitration.  In some ways they're part of the

12 arbitration.  Our position is, they're not part of the

13 arbitration.  So, I guess that's a disputed point.

14 Q    Well, I understand the whole thing's in dispute.  But,

15 I mean, he's alleging that, is what I'm saying?

16 A    He is trying to shoot one of those 17 cases into the

17 arbitration, so that he can get --

18 Q    No, I got it.  I got the rest.  Please.  I'm not trying

19 to cut you off, I just, I get there's a very --

20 A    I just don't want a record of me consenting that those

21 are in the arbitration.

22 Q    Nothing in -- I don't think anything you've given today

23 would give anyone the impression that you've consented to

24 anything with respect to the arbitration.

25     Now, putting aside the 17-lawsuit issue, what we're

**Exhibit G**

USAO_00060989

130

1  sort of the other bullet points --

2  A    Mr. Frank maintains that he is due additional monies

3  relating to his profit share -- relating to an independent

4  contractor agreement that he entered into with the firm.

5  Q    Right.  So, I mean, I was just reading your Baker

6  Hostetler status conference report from Florida.  And they

7  basically summarized it as bonus payments, is that correct?

8  Demand for billions of dollars in bonus payments?

9  A    I would say bonus payments and profit share monies.

10 Q    Okay.  Now, are those in connection with specific cases

11 or -- that have already been settled --

12 A    Specific cases that were already settled, as well as

13 specific fees already received by the firm.  So this is

14 separate and apart from the 17 cases.

15 Q    Right, and I just want to make sure.  So it's not

16 forward looking, it's based upon cases already settled or

17 went to verdict, where the firm has already received funds.

18 And he's alleging that he didn't receive the -- his portion

19 pursuant to his understanding of the contract?

20 A    Correct.

21 Q    Okay.  In addition to the bonus payments, there's some

22 reference here about some other healthcare benefits and

23 other things.  But is that the bulk of it, the bonus

24 payments?

25 A    The profit share is the bulk of it.

*Briggs Reporting Company, Inc.*

**Exhibit G**

131

1  Q    Yeah.  But you call it -- I mean, is it a hybrid of

2  bonus payments and profit share?  Are those --

3  A    Yes.

4  Q    Okay.  Beyond that, is there any other part of the

5  claim that is significant?  I can't imagine the healthcare

6  benefits would be, in the scheme of things, a large amount.

7  A    "In the scheme of things," it's not.

8  Q    Okay.  Are there any other parts of the claims that are

9  worth discussing?

10 A    Not in my view.

11 Q    Well, I don't -- not necessarily -- but that he's

12 alleged, that I would need to know about?

13 A    Mr. Frank claims past-due profit share payments.

14 Q    But we went over that.  Bonus payments, profit --

15 A    Right.  Past -- yeah.  I was just going to list them.

16 Q    I'm sorry.  Go ahead.

17 A    Past-due bonus payments, additional salary and

18 compensation for the year 2016.

19 Q    How much is that?

20 A    I believe he's claiming somewhere in the neighborhood

21 of $300,000, and this would be for the time period after he

22 was terminated, not before his termination.

23 Q    Okay.  I get it.

24 A    And then, I believe, there's some claim for healthcare

25 benefits during that same time period.  I think that's a

*Briggs Reporting Company, Inc.*

**Exhibit G**

132

1  fair summary.

2  Q    Okay.  So we've got 17 lawsuits which he's alleging the

3  bonus payments, profit share on past settlements/verdicts

4  and additional salary.  Is that it?  I mean, I'm not saying

5  that's it.

6  A    I think so.  Yeah.

7  Q    Okay.  All right.  So let's move over to the Scott

8  Sims' claim, which is three dash -- 3.35, which is on the

9  next page.  It's the last claim.  I think as you indicated,

10 that's a separate arbitration, right?

11 A    Yes.

12 Q    Also before JAMS?

13 A    I believe it is.

14 Q    Okay.  And --

15 A    It may be before ADR.

16 Q    Okay.

17 A    I'm not certain.

18 Q    Okay.  And do you know how much he's asking for?

19 A    No.

20 Q    Okay.  Do you know what the basis of what his claim is,

21 in other words --

22 A    He claims that he is due additional profit-share

23 payments.

24 Q    Is that the bonus profit share, just like the -- Mr.

25 Frank?

**Exhibit G**

USAO_00060992

133

1  A    Yeah.  I don't know if there's a bonus component to
2  that or not.  I think it's just a profit share.
3  Q    Do you have any idea of how much he's asking for?
4  A    I don't recall.
5  Q    Is it more than $1,000,000?
6  A    I don't think so.
7  Q    Is it more than $500,000?
8  A    My guess is it's 500,000 to $1,000,000, but I don't
9  know that a specific number was put in the claim.
10 Q    Okay.  And other than that component, I mean, is he
11 also asking for the additional salary for the rest of the
12 year?  I mean, does it mirror the other aspects of it in
13 healthcare benefits?
14 A    No.
15 Q    So, it's just the 500 to $1,000,000 for the profit
16 share, as best you understand it?
17 A    My best understanding is, is that Mr. Sims is not
18 claiming that he was inappropriately terminated from the
19 firm and, therefore, he is not claiming additional
20 compensation beyond May 20th of 2016.
21 Q    All right.  So it's just profit share.  All right.
22 Moving on to claim 3.41, which is the X-Law Group, which
23 listed at $17,000,000.  We've tried to obtain written
24 documentation from David Golubchik who represents -- David's
25 not here today.  And it's just -- we haven't received it

**Exhibit G**

USAO_00060993

134

1  yet, let's just put it that way.  We've asked for it for a

2  few weeks now.

3       Is there a written agreement between your firm and the

4  X-Law Group?

5  A    Yes.

6  Q    Okay.  So, what's essentially the terms of that

7  agreement?

8  A    That agreement provided generally that the X-Law Group

9  was going to contribute various cases and assets to Eagan

10 Avenatti in exchange for a percentage -- Eagan Avenatti

11 would receive a percentage of those cases.  The X-Law Group

12 would take a diminished percentage in those cases.  But in

13 exchange the X-Law Group would also get a percentage of then

14 pending cases held by EA.  In a nutshell, that's the

15 agreement.

16 Q    Okay.  So -- and some of those cases are part of the

17 disputed cases, right?  I'm guessing.  I could be wrong.

18 A    No.

19 Q    They're all part of the new basket, we'll call it, "the

20 B-75 basket"?

21 A    Correct.

22 Q    Okay.  So they get a percentage of the B-75 basket.

23 And none of the cases they brought in are part of the

24 disputed basket, they're part of the B-75 basket, right?

25 A    Correct.

**Exhibit G**

135

1  Q    Just so I -- so I'm talking about document 114, B-75,
2  which is the list of 20.  So -- and I assume this is normal.
3  They bring you some cases that they have.  They want to
4  share the benefits and expenses of prosecuting.  Are -- and
5  they're all contingency, right?  So, in that case, who --
6  are they all contingency or no?
7  A    I'm thinking.
8  Q    Okay.
9  A    I think they are, yes.
10 Q    Okay.  And so they initially had the lien with the
11 client, right?  And then do you get -- do you then enter
12 into a contract with the client so that you have the lien,
13 or --
14 A    Yes.
15 Q    Okay.  So -- but then the agreement you have sort of
16 supercedes the priority of liens type situation?
17 A    That's an interesting legal question, and I'm not
18 certain.  I think that if there was a dispute, that the X-
19 Law Group could probably make a colorable lien claim
20 directly against the client in those cases, but I'm not
21 certain of that --
22 Q    Okay.
23 A    -- because I don't know what the law would provide
24 under those circumstances.
25 Q    According to the schedules, you're not disputing their

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00060995

136

1  -- the $17,000,000 amount?  That's just contingent on

2  liquidating because the cases haven't settled or gone

3  through --

4  A    Yeah.  Again, that's an estimate, because --

5  Q    But you're not disputing -- in other words, you're not

6  in a dispute with them about allocation of fees --

7  A    No.

8  Q    -- or whatever?

9  A    No.  No.

10 Q    Okay.  Is Kimberly-Clark one of the cases that's part

11 of this fee-sharing situation?

12 A    Yes.

13 Q    Okay.  Just to understand that though, do -- would they

14 get --

15 A    Actually --

16 Q    -- would they get a percentage of the Kimberly-Clark

17 case, or your deal was, you don't get the Kimberly-Clark

18 percentage, you get a percentage of our other basket of

19 cases?

20 A    And I wanted to go back and amend my prior answer.

21 Q    Okay.

22 A    As I sit here, I do not recall if -- because we have a

23 few cases against Kimberly-Clark.  I don't recall if the

24 Bahamas case is one of the cases that's subject to the

25 agreement that we mentioned earlier.

*Briggs Reporting Company, Inc.*

**Exhibit G**

137

1  Q    Okay.  All right.

2  A    So, I believe at least one of the Kimberly-Clark cases

3  is, but I don't recall if it's Bahamas or another case.

4  Q    Okay.  So, just so I understand though.  The -- is the

5  written agreement between the X-Law Group and the Debtor,

6  does that essentially supercede the lien on attorney fees

7  that the X-Law Group has on the cases they brought to you?

8  Because you've kind of changed the arrangement, where their

9  percentage is not just in those cases, but it's from other

10 cases in the basket of cases that they didn't bring in.

11 A    So, I don't think the -- and this is just my opinion --

12 Q    That's all I'm asking for.

13 A    -- based on my experience and my understanding of the

14 law, so don't take this as gospel.  But I believe the X-Law

15 Group would still maintain a lien on the cases that they

16 originally had and brought to the firm, but would not have a

17 direct lien on the other cases in which they have an

18 interest.  I think that's --

19 Q    Okay.

20 A    -- I think that's appropriate.  I think that's correct.

21 Q    Okay.

22 A    Because they're not a party to -- they were never a

23 part to any fee contract with the second portion of what we

24 were talking about.

25 Q    Okay.  Last claim on page nine of 13, the Wilentz,

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00060997

138

1 Goldman and Spitzer claim, you list them as disputed.  And

2 it says, "base for claim, settlement agreement."  How many

3 cases were they involved with you?

4 A    I think two.

5 Q    Okay.  And when you say "settlement agreement," the

6 cases settled and, for whatever reason, they didn't get paid

7 their allocation?

8 A    No, that's not what happened.

9 Q    Okay.  Then tell me what happened.

10 A    What happened was, there was a case that was tried to

11 verdict in 2008 in New Jersey, where we obtained a

12 $41,000,000 jury verdict, 41,000,000 and change.  There was

13 a trial tech firm that was used in connection with that

14 case.

15     There was subsequent litigation between the trial tech

16 firm and the Wilentz firm relating to various issues, one of

17 which was some work that the trial tech firm had done in the

18 $41,000,000 jury verdict case.  And then they had other

19 issues between the two of them, which I had nothing to do

20 with, didn't know anything about except -- ultimately, that

21 litigation went on for a number of years, and the Wilentz

22 firm sought to have us contribute to a settlement that the

23 Wilentz firm reached with the trial tech firm, and wanted us

24 to contribute to the settlement.  That's what this claim

25 relates to.

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00060998

139

1  Q    Okay.  So they don't have any lien on any cases that

2  are --

3  A    None.

4  Q    So it's truly an unsecured claim?

5  A    Based on my understanding of what an unsecured claim

6  is, yes.

7  Q    I'm saying, there's no lien on attorney's fees --

8  A    No.

9  Q    Okay.

10 A    No.

11 Q    Moving on to schedule G, page -- docket item 108, page

12 106.  And we're going to start trying move through this a

13 little quicker.  Item 2.3, there's a 36-month remaining on

14 the Irvine Company lease.  Do you intend to assume or reject

15 that lease?

16 A    We haven't made a decision yet.  We're going to consult

17 with counsel.

18 Q    Understood.

19         TRUSTEE HAUSER:  Counsel, you realize we're --

20         MR. KHARASCH:  Yeah.

21         TRUSTEE HAUSER:  -- actually, believe it or not,

22 less than 30 days away from the deadline.

23         MR. KHARASCH:  We are.  Correct.

24         TRUSTEE HAUSER:  Okay.  So.

25 //

*Briggs Reporting Company, Inc.*

**Exhibit G**

140

1  BY TRUSTEE HAUSER:

2  Q    So the answer is, you're not sure.  Is there a

3  escalation clause under the terms of the lease?

4  A    I do not believe so, but I'm not certain.

5  Q    So it's at, like it's at 52,000 now.  It's not going to

6  go up to 55 and then 57 and then --

7  A    I thought you meant an escalation clause as a result of

8  bankruptcy.  I think there is, I think there is an

9  escalation, but I believe it's de minimis, but I don't have

10 it in front of me.

11 Q    Okay.  But just order of magnitude.  So, currently the

12 Irvine Company lease is 52,000 and change.  Do you know what

13 the number is going to be two, three years down the road?

14 A    I don't.  I think it's within a few thousand dollars of

15 that.

16 Q    Okay.  So it's not like $70,000?

17 A    Not that I know of.

18 Q    Okay.  I didn't see Mr. Kharasch's schedule H.  I don't

19 know if that was an omission or whether there's simply no

20 co-debtors in this case.

21        MR. KHARASCH:  I believe that was that there's no

22 co-debtors on any --

23 BY TRUSTEE HAUSER:

24 Q    Do you know what that means?  So, for example --

25 A    I believe I do.

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00061000

141

1  Q    -- if you were -- if you signed a guaranty on the

2  lease, which is just the Debtor's, that that means you're a

3  co-obligor.  And there's actually a schedule in bankruptcy

4  called, "schedule H," where you're supposed to list people

5  who are not the Debtor who are also obligated on the -- so,

6  did you sign a guaranty on the lease?

7           MR. KHARASCH:  In your initial capacity?

8           THE WITNESS:  No.

9           MR. KHARASCH:  That's fine.

10  BY TRUSTEE HAUSER:

11  Q    Okay.  Well, even if it's not individual, did your --

12           MR. KHARASCH:  I thought that -- yeah.  But I

13  thought that was --

14           TRUSTEE HAUSER:  No, I know, but are there any --

15           MR. KHARASCH:  Anything?

16  BY TRUSTEE HAUSER:

17  Q    Are there any third parties that are -- whether it's

18  you or your professional corporation --

19           MR. KHARASCH:  Right.

20  BY TRUSTEE HAUSER:

21  Q    -- or another entity that you own, that are

22  guaranteeing any obligations of the Debtor?  That's the

23  purpose of schedule H.

24  A    Well, due to the conduct of Mr. Frank, I had to

25  personally guarantee the expert fees in the Kimberly-Clark

*Briggs Reporting Company, Inc.*

**Exhibit G**

142

1 case that we just tried.

2 Q    Okay.

3 A    So, I mean, I had just thought of that.  I guess, is

4 technically, does that mean --

5 Q    Yeah.

6 A    -- we need to --

7         MR. KHARASCH:  That would be a co-debtor.

8 BY TRUSTEE HAUSER:

9 Q    You would amend it and just --

10 A    Okay.

11 Q    -- say that you are --

12 A    I just thought of that.

13 Q    Yeah.  Yeah.  So, I mean, that would be an example.

14 But -- so, you know, the whole purpose of this thing is -- I

15 would like the May operating report to be filed timely, but

16 if you need an extra day for accuracy, I'd rather have them

17 accurate than --

18         MR. KHARASCH:  Right.  Okay.

19         TRUSTEE HAUSER:  Or even two.  But, I mean, I

20 don't it to go beyond that.  But as we went through this, I

21 mean, part of this was obviously to get the answer, and part

22 of it was, hopefully, for lack of a better term, educational

23 for you in understanding what we sort of expect to see.

24         MR. SAUNDERS:  Very.  Thank you.

25         TRUSTEE HAUSER:  Okay.  So, you know, if you can

**Exhibit G**

USAO_00061002

143

1  kind of go over that with a fine tooth comb, as well as the

2  schedules themselves.  Okay.

3  BY TRUSTEE HAUSER:

4  Q    All right.  Moving on to --

5          TRUSTEE HAUSER:  You're keeping a list of this,

6  Ira?

7          MR. KHARASCH:  Yeah.

8          TRUSTEE HAUSER:  Okay.

9  BY TRUSTEE HAUSER:

10 Q    Moving on to statement of financial affairs.  This is

11 docket item 50.  That was filed in Florida.  Do you have a

12 copy of that with you, sir?

13 A    Yes, sir.

14 Q    Okay.  So, statement of financial affairs number one

15 asks you to list -- I'm going to go from 2015 to forward.

16 In 2015 it shows the gross revenue of the firm at $6.5

17 million.  And, again, they're asking for gross revenue.

18 That's a top line item number.  Is that accurate?  That's

19 before deductions or expenses.  It's not a net figure.

20 Sometimes people will put a net as opposed to gross, so.

21 A    I believe so, but we need to confirm that number,

22 because it's an even number for instance.

23 Q    It's just the fact that's it so round, it's just

24 obviously --

25 A    Yeah, I -- well, the short answer is, to the best --

**Exhibit G**

USAO_00061003

144

1  well, the short answer is, we need to confirm that number.

2  Q     Okay.  Moving up to 2016, where it lists $7,770,000 for

3  gross revenue, is that correct?

4  A     Same answer.

5  Q     "Same answer" being, you're going to double check and

6  then --

7  A     Correct.

8  Q     -- amend, if necessary?

9  A     Correct.

10 Q     All right.

11        TRUSTEE HAUSER:  Ira, are you putting that down?

12        MR. KHARASCH:  Yup.

13 BY TRUSTEE HAUSER:

14 Q     And then year to date.  So you have from January 1,

15 2017 to the filing date, which in this case is March 10th --

16 A     Well, that's clearly not correct.

17 Q     Okay.  So that's definitely not correct.  What do you

18 think that number is?  Again, it's through March 10th.

19        MR. KHARASCH:  It's through -- yeah, as of March

20 10th, not --

21        TRUSTEE HAUSER:  Because this is, again, this is a

22 snapshot as of the date of filing, from January 1, 2017

23 through March 10 of this year, gross revenues.

24        MR. KHARASCH:  Well, it sounds like we'll have to

25 reconfirm that as well, I would think.

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00061004

145

1  BY TRUSTEE HAUSER:

2  Q    But, I mean, your gut reaction is, it's seems too --

3  A    My gut reaction in seeing this here, this is the first

4  time I've really -- I mean, clearly, I read this before we

5  filed it, but -- I mean, we brought in more than $35,000

6  during that --

7  Q    You think it's in the hundreds of thousands of dollars?

8  A    That's what I would expect.

9  Q    Okay.

10        TRUSTEE HAUSER:  What's your goal for amending the

11  schedules?

12        MR. KHARASCH:  So the schedules --

13        TRUSTEE HAUSER:  Everything, schedules, statement

14  of financial affairs?  Again, accuracy being slightly more

15  important than --

16        THE WITNESS:  Well, amend our -- do we have

17  amendments on the schedules or --

18        MR. KHARASCH:  Some minor amendments that we've

19  got to look at and clean up.

20        THE WITNESS:  Because I thought we were talking

21  about amendments on the (indiscernible).

22        MR. KHARASCH:  That, too, but there's been

23  certain --

24        THE WITNESS:  Okay.

25        MR. KHARASCH:  -- certain things that have come up

*Briggs Reporting Company, Inc.*

**Exhibit G**

146

1  in our discussions about reconfirming and other stuff.  This

2  is a -- this would be these numbers, item number four,

3  questions to insiders and --

4          TRUSTEE HAUSER:  There's going to be some more

5  stuff.

6          MR. KHARASCH:  -- and then probably some more

7  stuff.

8          THE WITNESS:  Next week, early week?

9          MR. KHARASCH:  I would -- you know, 10 days to two

10  week -- I mean --

11          TRUSTEE HAUSER:  Ten to 14 days?

12          MR. KHARASCH:  Yeah.

13          TRUSTEE HAUSER:  I just want to get a commitment

14  on the record.  So we're talking by June 30th, let's say, no

15  later?

16          MR. KHARASCH:  Yeah.

17          TRUSTEE HAUSER:  Okay.

18          MR. KHARASCH:  That should be no problem.

19  BY TRUSTEE HAUSER:

20  Q   Moving down the line here, first of all, if you could

21  confirm that information on the rest of the page, I'd

22  appreciate it, page one of 10.

23  A   I believe that's accurate.

24  Q   Okay.  And then everything on page two of 10, is that

25  correct?  These would be payments made to non-insiders

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00061006

147

1  within 90 days of the filing.  So, essentially, it's the 90

2  days preceding March 10th.  And it kind of tells us who got

3  paid and who didn't.  It's a preference analysis.  It's to

4  see if you preferred some creditors over another.

5       And I'm just confirming, asking you to confirm that

6  these are the creditors who got paid within 90 days

7  preceding the March 10th filing -- date, I should say,

8  because I wasn't actually -- so, for example, just to give

9  you -- where it says, "3.6, Irvine Company," that just means

10 within 90 days before March 10th, those were the payments

11 made to the Irvine Company.  Does that look correct, that

12 they were paid --

13 A    That looks correct, but there may be other smaller

14 creditors that --

15 Q    Yeah.  I mean, this is where the software -- I mean,

16 someone from the firm --

17 A    No, I understand.

18 Q    -- needs to go back --

19 A    I mean, that's why I was just looking to see if there

20 was a schedule beyond 3.8, if there was an attachment here.

21 So we'll confirm --

22 Q    Yeah.  I went through it pretty carefully.

23 A    Okay.

24 Q    There's no attachments.

25 A    Okay.

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00061007

148

1  Q    Now moving on to question four, payments or other

2  transfers of property made within one year before filing,

3  and this is to insiders.  So you're definitially (sic) an

4  insider, take my word for it.  And it says that you've not

5  received any payments or transfers.  I know from the

6  information in the own -- the status report filed by your

7  own firm, that that's not accurate.

8        Specifically, according to the status conference report

9  -- which I can't tell because they put a docket item over a

10 docket item, but it was filed by the Baker Hostetler firm.

11 They represented that in 2015 your compensation was

12 1,000,000 -- now this doesn't cover 2015, but we'll get to

13 that in a second.  But in 2016 it was 180 -- $850,000.  I

14 assume they obtained that information from you or someone at

15 your firm.  Does that sound right?

16 A    I mean, roughly, but in looking at this, this includes

17 expense reimbursements and other transfers.  So, other types

18 of transfers --

19 Q    Yeah.  No, it's a wide, it's a wide net.

20 A    Right.

21 Q    It's --

22 A    So, I mean, clearly, this box "none" is incorrect, and

23 so we're going to have to amend that.

24 Q    Yeah.  I mean, the design of this box is to capture

25 preferential payments within one year.  So, it clearly is

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00061008

149

1  intended to include, for example, repayments of loans.

2  A     Understood.

3           TRUSTEE HAUSER:  So -- okay.  So that needs to be

4  amended, Ira?

5           MR. KHARASCH:  Correct.

6           TRUSTEE HAUSER:  Okay.  Now, just to slow down

7  before we go on, there's language in here, and it's not just

8  to you, insiders.  Insiders could be entities in which you

9  control.

10          MR. SAUNDERS:  Okay.

11          TRUSTEE HAUSER:  And if you read that fine print,

12  it includes affiliates and affiliate -- definition of

13  affiliate in the bankruptcy code is an entity in which you

14  have 20-percent or more interest.

15          So, I don't know how many entities you control,

16  but I certainly am familiar with the arrangement with Baker

17  and Hostetler's retainer.  So, that -- those entities, for

18  example, in Washington State, if they received any payments

19  within one year, that would be captured in here.

20          MR. KHARASCH:  Because they were an affiliate of

21  an insider, is what you're saying?

22          TRUSTEE HAUSER:  Read the definition --

23          MR. KHARASCH:  Yeah.

24          TRUSTEE HAUSER:  Yeah.  I mean, I don't see how

25  you --

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00061009

150

1          MR. KHARASCH:  I'm -- distribute --

2          TRUSTEE HAUSER:  Yeah.

3          MR. KHARASCH:  You know.  I don't disagree.

4          TRUSTEE HAUSER:  Okay.  Okay.  And so, you would

5   have to essentially look at the books and records of the

6   Debtor in the one year preceding the filing.  So that would

7   be March 10th, 2016 through March 10, 2017, which is the

8   filing date, and see if there were any transfer -- again,

9   it's a very broad category.

10         So any funds, essentially, that went to entities

11  which you control.  I mean, just to use a very specific

12  example, Global Baristas or any of its subsidiaries.  Okay?

13  So that would have to be captured.  And there's another spot

14  that we get to, which we'll talk about, where those types of

15  transfers would be captured.  So that one you have to really

16  focus in.  Because, I mean, clearly, in addition to your

17  payments, the other entities have to be included.

18  BY TRUSTEE HAUSER:

19  Q    Okay.  And is the rest of the page correct,

20  repossession setoffs?

21  A    "Setoffs," I think, is incorrect actually.

22  Q    Okay.  What setoffs were there within the 90 days?

23  A    Well, my reading of this -- before the filing of the

24  case?

25  Q    Yeah.  Why, were there any setoffs after the filing?

*Briggs Reporting Company, Inc.*

**Exhibit G**

151

1   That would even be more surprising.

2           MR. KHARASCH:  Within 90 days.

3   BY TRUSTEE HAUSER:

4   Q    Well, what -- tell me, what setoffs were there after

5   the filing?

6   A    There was California Bank and Trust took possession of

7   that security account on the credit card.

8   Q    I have no idea what you're talking about.

9   A    I thought that this was disclosed somewhere.

10          MR. KHARASCH:  Yeah, there was some bank.  I think

11  we did --

12          MR. SAUNDERS:  Yeah, we disclosed it.

13          MR. KHARASCH:  One of the pre-petition bank

14  accounts.

15          MR. SAUNDERS:  They had frozen it.

16          MR. KHARASCH:  That the bank --

17          MR. SAUNDERS:  There was $100,000 in the --

18          THE WITNESS:  I know when we disclosed it.  In

19  connection with the -- you wanted assurance of the accounts

20  being closed --

21          TRUSTEE HAUSER:  Okay.

22          THE WITNESS: -- and the opening of the DIP

23  accounts.

24  BY TRUSTEE HAUSER:

25  Q    Probably in Maryland, but, yeah, it's our office.

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00061011

152

1  A    You're right, Maryland.  I'm sorry.

2  Q    Yeah.

3  A    And so, one of the accounts was, there was a security

4  agreement relating to the corporate credit card issued by

5  California Bank and Trust.

6  Q    Okay.

7  A    So it's secured by, it was secured by a cash balance in

8  the account.

9  Q    Okay.

10 A    And so when we filed and they got notification of the

11 filing, they seized that account.  So --

12 Q    They froze it or they actually took the funds?

13 A    Do you remember, Rob?  I don't remember.

14      MR. SAUNDERS:  Well, it was referred to as frozen.

15 I haven't seen documentation.

16      TRUSTEE HAUSER:  And how much money are we talking

17 about?

18      MR. SAUNDERS:  One-hundred thousand.

19      TRUSTEE HAUSER:  Okay.

20      MR. SAUNDERS:  Maybe a little bit more with

21 interest --

22      TRUSTEE HAUSER:  I mean, obviously, you should

23 look and see if it's a violation of 362 as -- yeah.

24      MR. KHARASCH:  It didn't sound like it, but it's

25 an issue we haven't got to yet.

*Briggs Reporting Company, Inc.*

**Exhibit G**

153

1          TRUSTEE HAUSER:  Okay.  But we're talking about
2  how much money, just so --
3          MR. KHARASCH:  A hundred grand.
4          TRUSTEE HAUSER:  "A hundred grand."  Okay.
5          THE WITNESS:  So I don't know if that goes here or
6  where it goes, but I just thought of that when I read this
7  definition of setoff, Mr. Hauser.
8  BY TRUSTEE HAUSER:
9  Q    No, I understand.  I think that might, that box might
10 be it.  Looking at the next page and a half, that's just,
11 it's a list of all of the lawsuits that was on B-74,
12 correct?
13 A    I believe that's correct.
14 Q    Okay.  And questions eight, nine and 10 on page five of
15 10, are those accurate?  That would include assignments,
16 gifts, losses?
17 A    Nine is probably -- I would be surprised if nine is
18 accurate, but we will confirm.
19 Q    Okay.  Number 13 is another one of those questions
20 that --
21 A    Ten, 10 is not accurate.  Yeah, 10 is not accurate.
22 Q    What kind of losses from fire and theft in --
23 A    Mr. Sims stole a laptop from the law firm and has
24 refused to return the hard drive from the laptop, which
25 contains a number of information necessary for our business

**Exhibit G**

USAO_00061013

154

1  affairs.

2  Q    Was there a police report filed on that?

3  A    We haven't filed a police report yet.  We're hoping

4  that Mr. Sims sees the error of his ways and returns the

5  hard drive, because there's no question that it's property

6  of the estate.

7  Q    Okay.

8          TRUSTEE HAUSER:  So, I mean, Ira, you'll file a

9  542 turnover motion, if necessary, then --

10         MR. KHARASCH:  We -- if necessary.

11         TRUSTEE HAUSER:  Okay.

12  BY TRUSTEE HAUSER:

13  Q    Okay.  Let's move on to question number 13 on page six

14  of 10.  There's a question that says, "transfers that aren't

15  already labeled or listed," and this is a two-year look

16  back.  And it's tethered to the bankruptcy code.  There's a

17  reason why they've enlarged that period.  And it essentially

18  is any transfers made to any parties within two years that

19  are outside the ordinary course.

20     So, are you aware of any outside-the-ordinary-course

21  transfers to, for example, any of your entities within two

22  years prior to March 10th, 2017?

23  A    I guess I would have to know exactly what "outside the

24  ordinary course" means.

25  Q    Well, your law firm.  So, what you do for a law firm is

**Exhibit G**

USAO_00061014

155

1 -- if you look at your operating expenses, you have a

2 monthly nut of $300,000.  So in your ordinary course you pay

3 your employees, you pay your rent, you pay your case costs,

4 you pay the I.R.S., you pay your insurance bill.  That's

5 ordinary course.

6      Transferring $1,000,000 to Global Baristas would be

7 outside the ordinary course, or even transferring 100,000.

8 And I'm just hypothetically using that as an example.  So

9 any transfers -- and this goes back two years.  So this

10 would include not just transfers to, you know, entities that

11 are controlled by you, but outside the ordinary course to

12 any third party.  See, this is designed to capture a

13 fraudulent transfer.  So it could be to a relative of yours,

14 it could be to a friend of yours, it could be to an entity

15 you control or an entity you don't control.  It's a very

16 broad net.

17      That's essentially a 548 net, which Ira knows what it

18 is and everyone else does who does bankruptcy.  And given

19 the fact that the Debtor, essentially, probably has been

20 insolvent for the last two years -- or, arguably?

21 A    Well, yeah, I don't agree that we were --

22 Q    I'm not asking you to agree.

23 A    I understand.

24 Q    I'm just saying that it's part of the -- so, that needs

25 to be thoroughly looked at.  And the way to thoroughly look

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00061015

156

1 at it is, you only have two bank -- bank accounts at

2 California Bank and Trust when you filed, right?  And I saw

3 that you didn't close any accounts within one year prior to

4 filing, correct?

5 A    I think that's accurate.

6 Q    Okay.  And then two years -- see, there's a question

7 here that says, did you close any -- it's question number 18

8 on the next page.  And you said that you did not close any

9 financial accounts within one year prior to the filing of

10 this case, is that correct?

11 A    Again, to the best of my knowledge, that's correct.

12 Q    Okay.  So then --

13 A    I mean, we'll confirm that.

14 Q    -- so then the only accounts you've had for the last

15 year and a half are the California Bank and Trust accounts,

16 plus the attorney-client trust account, correct?

17 A    I think that's true.

18 Q    Okay.  So then, for purposes of question 13 though, you

19 have to see what accounts were open, in addition to those

20 accounts, going back two years.  And then have someone look

21 at those and see if there's any transfers out of the

22 accounts that don't fit into the operating expense budget

23 that we kind of went over.

24 A    Understood.

25 Q    Yeah.  The other thing is, let's say, for example, you

**Exhibit G**

USAO_00061016

157

1 settled a case a year-and-a-half ago, and the settlement

2 never hit the Debtor-in-possession account -- or let's say,

3 never hit your California Bank and Trust accounts.  And

4 there were -- in other words, so you had this case and it

5 settled a year-and-a-half ago, and you had the defendant or

6 the client, instead of remitting the funds into the

7 California Bank and Trust account, just directly wire it to

8 a third party, I'm just going to use Global Barista just as

9 an example.  See what I'm saying?

10     So, if someone were to get the bank records and they

11 look at it, they may not see a transfer out, but that's

12 because it never even hit the account.  So you settle a

13 case, right, and typically the monies would come into the

14 trust account or directly into the two California Bank and

15 Trust accounts, correct?

16 A    Yes.

17 Q    Okay.  But let's say a case settled, let's say a year-

18 and-a-half ago, and the monies never hit those accounts, but

19 they were directed by you or someone else, to just go to

20 Global Baristas.  You said, I'd just, I'd rather have it to

21 there, as an example.

22         MR. KHARASCH:  So that's a hypothetical of an out-

23 of-the-ordinary-course transaction?

24         TRUSTEE HAUSER:  Yeah.

25 //

**Exhibit G**

USAO_00061017

158

1  BY TRUSTEE HAUSER:

2  Q    What I'm saying is, you need to capture those.  So that

3  would not be just looking at the bank statements for the

4  last two years.  Which, by the way, again, if you look at

5  your disbursement log, it would not take a lot of time.  I

6  mean, believe me, as complicated of a mess -- as complicated

7  of a dispute as this is, the actual disbursement log is

8  super short.

9       So someone should be able to go over the last two

10  years' disbursements pretty quickly and flag those, but then

11  the real question is, are there funds that never made their

12  way into the accounts of this company for the last two

13  years, because they were just directed to go elsewhere?

14      And that's something you might only know, or a few

15  people.  I don't -- I mean, I wouldn't expect more than you

16  and the office manager, Ms. Regnier, to know that, right?  I

17  mean, your employees would have no knowledge of that?

18  A    In your hypothetical, I guess it would depend on the

19  example you've given.

20  Q    I'm not sure what you're saying.

21  A    Well, I mean, it would depend on the facts of the

22  example.

23          MR. KHARASCH:  Right.  I mean, the point is, we'll

24  just review, while we're reviewing everything else, we'll

25  just take a look and make sure that --

**Exhibit G**

USAO_00061018

159

1        TRUSTEE HAUSER:  I think the way you would do that

2  is, you'd go back two years on the settlements and see which

3  monies made it into --

4  BY TRUSTEE HAUSER:

5  Q   Do you have a list of all the cases that went to --

6  settled and went to verdict in the last two years?

7  A   I don't know if we have that list compiled, but we can

8  figure it out.

9        MR. KHARASCH:  We'll go over whatever information

10  is available.

11        TRUSTEE HAUSER:  Yeah.  Because, I mean, bottom

12  line is, this one you said you didn't look at carefully, but

13  when amend it and file it under penalty of perjury, that --

14  you're kind -- you're stuck with that one.  I mean, we've

15  now spent three hours and 25 minutes going -- so, I mean,

16  that has to be, you know, pretty close to 100-percent.

17        MR. KHARASCH:  Right.

18        TRUSTEE HAUSER:  So, I mean, you look at what you

19  need to look at, but I've kind of outlined as clearly as I

20  can what --

21        MR. KHARASCH:  Right.  And it's obviously an

22  important question for your office --

23        TRUSTEE HAUSER:  Yeah.

24        MR. KHARASCH:  -- and the lien creditors.  Right.

25  //

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00061019

160

1  BY TRUSTEE HAUSER:

2  Q    Okay.  Okay.  Now to question 18, just confirm that,

3  closed financial accounts within the last year.  You did not

4  close any financial accounts?

5  A    Not that I can recall, but we'll confirm that.

6  Q    Okay.  Everything on page eight of 10 correct?

7  A    I think so, but, again, we'll confirm this.

8  Q    Okay.  Moving on to question number 26.  Does Ms.

9  Hendrix, does she prepare the tax returns for the Debtor?

10  A    She has in the past.

11  Q    Okay.  Is she going to be doing the 940's and the

12  941's?  Those are the payroll tax returns.

13  A    No, I think we do those internally.

14  Q    So, Ms. Regnier's responsible for that?

15  A    I think that that's what we've done recently relating

16  to the filing.

17  Q    Well, in addition to the payroll tax returns, who

18  actually files the tax return for the LLP?

19  A    Ms. Hendrix.

20  Q    Okay.  So she does -- okay.  And she prepares the K-

21  1's?

22  A    Yes.

23  Q    Okay.  But Ms. Regnier does the 940's and 941's?

24  A    Yes.

25  Q    Okay.  Okay.  How long has Ms. Hendrix been doing the

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00061020

161

1  tax returns?

2  A    I want to say five or six years.  It may have been

3  longer than that.

4  Q    Okay.  Are there any other professionals, CPA's, tax

5  accountants or lawyers, who participated in the preparation

6  of the tax returns in the last two years?

7  A    Not that I recall.

8  Q    So, your sort of in-house bookkeeper then is Ms.

9  Regnier, correct?

10  A    Yes.

11  Q    And as you earlier testified, she uses QuickBooks,

12  Excel, something along those lines?

13  A    Correct.

14  Q    Okay.  And question number 26(b), have you had any

15  audited financials prepared in the last three years?

16  A    No.

17  Q    Question number 26(c) -- so who has the Debtor's books

18  and records, Ms. Hendrix or it's in the firm itself or both?

19  A    "The firm itself.

20  Q    Okay.  Any other parties, other than the firm, that --

21  A    No, I don't believe so.

22  Q    Okay.  Twenty-six(d) basically asks you whether you've

23  submitted financial information to institutions to obtain

24  credit in the last two years.  This situation, we're trying

25  to guess what kind of loan or, perhaps, maybe another entity

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00061021

162

1   of yours is trying to get a loan, and you're trying to show

2   the bona fides of the law firm, as so you submit financials

3   to that institution.

4   A    I'll have to look at the timing relating to the two

5   years --

6   Q    Okay.

7   A    -- to see if this is accurate or not.

8   Q    Okay.

9   A    This is two years prior to March 10th?

10  Q    It's two years before March 10th, correct.

11  A    And even when we amend, it's two years prior to March

12  10th --

13  Q    It's always going to be --

14  A    -- or it's two years --

15  Q    -- it's always going to be the filing date.  So when

16  you see one year before the filing -- that filing date never

17  changes.

18  A    Got it.

19  Q    Okay.  And --

20        MR. KHARASCH:  Well, the order for relief is --

21        TRUSTEE HAUSER:  Well, yeah, in this case, "order

22  for relief."  But, actually, if you look at the PACER

23  docket, yeah, it's March 10th as the date filed for -- I'm

24  sorry, as the -- you're going to go by the date filed or the

25  order for relief?

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00061022

163

1          MR. KHARASCH:  "The order for relief."

2          TRUSTEE HAUSER:  Okay.

3          MR. KHARASCH:  Yeah.

4  BY TRUSTEE HAUSER:

5  Q    Okay.  Question 30 is another sort of -- it looks like

6  it's wrong.  Payments, distributions or withdrawals given to

7  insiders.  This is a one-year look back.  It includes

8  salary.  And, again, according to the status conference

9  report, in the one-year period you received hundreds of

10 thousands of dollars.

11     So, you need to take a look at that and -- but it's a

12 pretty broad -- it's salary, it's other compensation, draws,

13 bonuses, loans, stock, you know, all kinds of stuff.

14          MR. KHARASCH:  It's almost like a restatement of

15 number four really.

16          TRUSTEE HAUSER:  Yeah.  There's some duplication

17 here.

18          MR. KHARASCH:  Yeah.

19          TRUSTEE HAUSER:  But better to always over

20 disclose than under-disclose.

21 BY TRUSTEE HAUSER:

22 Q    Okay.  Number 31 essentially asks you whether -- I

23 doubt this applies, but, you know, maybe in connection with

24 the other entities, do you ever have any other consolidated

25 sort of presentation tax return?  Okay.

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00061023

164

1          TRUSTEE HAUSER:  Well, I've finished my questions.
2   I kind of want to know when the amendments, we've talked
3   about June 30th as being --
4          MR. KHARASCH:  As an outside date, yeah.
5          TRUSTEE HAUSER:  "As an outside date."
6          MR. KHARASCH:  Uh-huh.
7          TRUSTEE HAUSER:  And then on the May MOR, that
8   will be filed no later than Friday, is that fair to say?
9          THE WITNESS:  Why don't we say Monday at the very
10  latest.  You said two potential days.  We'll try to get it
11  done by Monday.
12         TRUSTEE HAUSER:  Okay.  Don't let it go beyond
13  Monday.  I mean, it just -- okay.
14         THE WITNESS:  We want to make sure that we do it
15  exactly as --
16         TRUSTEE HAUSER:  I can live with Monday.
17         THE WITNESS:  All right.  Thank you.
18         MR. SAUNDERS:  Just to let you know, I'm out of
19  town the next couple of days.
20         TRUSTEE HAUSER:  Okay.
21         MR. KHARASCH:  Yeah, that's fine.
22         MR. SAUNDERS:  (Indiscernible.) I just want to let
23  you know in terms of factoring that in, so.
24         MR. KHARASCH:  We'll get it in Monday.
25         TRUSTEE HAUSER:  Okay.  Monday's fine.  Monday's

*Briggs Reporting Company, Inc.*

**Exhibit G**

165

1  fine.  I mean, we've given people four days before.  Okay.

2  So I'll expect those on Monday the 19th of June.  If

3  something unexpected, you know, the best thing to do is e-

4  mail me, e-mail Ms. Chenetz, tell them what the unexpected

5  stuff is, so that everyone knows if something weird

6  happened, you know, the computer crashed, something.

7        At this time I'm going to open the floor to anyone

8  who wants to ask questions.

9        MR. KHARASCH:  Should we take a five-minute break?

10        TRUSTEE HAUSER:  It depends.  If nobody to  asks

11  questions --

12        MS. CHENETZ:  Yeah.

13        MR. POLAS:  You can have a continued hearing when

14  -- after we see the amended schedules and -- I mean, we've

15  gone four hours on this thing, but there's a lot of

16  information we still need to see filed in the schedules,

17  signed under penalty of perjury, and then we can ask the

18  follow-up questions.

19        MR. KHARASCH:  Well, we'd prefer to wrap it up

20  today.  I mean, like if there's a -- if there's issues that

21  the U.S. Trustee decides that are necessary to look at on

22  the amended schedules, which may not be much of anything.

23        TRUSTEE HAUSER:  Well, when -- and, Tom, who do

24  you represent, just to --

25        MR. POLAS:  I represent Stoll Nussbaum, creditors

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00061025

166

1 of about 35,000,000, I think that's the amount of our proof

2 of claim.

3          TRUSTEE HAUSER:  Okay.  Where -- just out of

4 curiosity, what that's about?

5          MR. POLAS:  There is a -- I mean, maybe my state

6 court counsel can --

7          TRUSTEE HAUSER:  In a nutshell.

8          MR. POLAS:  (Indiscernible.)

9          UNIDENTIFIED SPEAKER:  There was a lawsuit, which

10 is not on the schedule for some reason, Eagan Avenatti sued

11 Stoll, Nussbaum and Polakov, and there was a cross-

12 complaint, an order for attorney's fees, the roll out of a

13 settlement which were not paid to my client.

14          TRUSTEE HAUSER:  Okay.  So your client is alleging

15 that you're owed $35,000,000?

16          MR. POLAS:  Well, it's 5,000,000 principle,

17 correct?

18          UNIDENTIFIED SPEAKER:  Correct, 5.4.

19          MR. POLAS:  And there's 16,000,000 in pre-judgment

20 interest, I believe?

21          UNIDENTIFIED SPEAKER:  Correct.

22          MR. POLAS:  Yeah.

23 BY TRUSTEE HAUSER:

24 Q    Okay.  Mr. Avenatti, do you know anything about that?

25 A    I know about the case, but we're not here to adjudicate

**Exhibit G**

USAO_00061026

167

1  it, so I --

2  Q    No, I'm not -- I'm just want --

3  A    Yeah.

4  Q    It's not about adjudicating --

5          MR. POLAS:  It wasn't on the schedules, which

6  (indiscernible) filing, but whatever.

7          TRUSTEE HAUSER:  You're required to list all

8  pending lawsuits, whether you believe they have any merit or

9  not.

10         Ira --

11         MR. KHARASCH:  We'll add that to the list of

12 things on the -- we'll add to the schedules.

13         TRUSTEE HAUSER:  Okay.  All right.

14         MS. CHENETZ:  Mr. Hauser.

15         MS. CHENETZ:   We would like to ask questions.

16 I'd like to take a couple minutes break and use the restroom

17 at least.

18         TRUSTEE HAUSER:  Okay.  And you also want to see

19 schedules and ask -- or all the amendments and then ask

20 questions?

21         MS. CHENETZ:  I'd like to ask questions today.

22 And if the amendments raise additional questions, we'll

23 raise them at that time.

24         TRUSTEE HAUSER:  All right.  Mr. Lefhauser

25 (phonetic)?

*Briggs Reporting Company, Inc.*

**Exhibit G**

168

1          MR. LEFHAUSER:  I had a handful of questions I'd
2    like to ask --
3          TRUSTEE HAUSER:  No, you're going to be able to
4    ask your questions.  There's no question about that.  I'm
5    just trying to figure out -- all right.
6          Here's what we're going to do.  We're going to let
7    them ask their questions today, but you're going to file
8    your amendments, there may be a few more, by June 30th.
9          MR. KHARASCH:  Uh-huh.
10         TRUSTEE HAUSER:  And then, I can tell you with my
11   schedule, that there's nothing that I'm going to schedule
12   between June 30th and July 10.  I've got a massive 341 on
13   July 10 in WJ Asset (phonetic), which is going to require
14   all of my attention that week, plus it's July 4th.
15         So, we're looking at somewhere --
16         UNIDENTIFIED SPEAKER:  Can we go to 17 of July, is
17   that what you're looking at?
18         TRUSTEE HAUSER:  I'm just, I'm looking the week of
19   the 10th.  The 10th is --
20         UNIDENTIFIED SPEAKER:  You have too much stuff.
21         TRUSTEE HAUSER:  Say it again?
22         UNIDENTIFIED SPEAKER:  I thought you said you were
23   too booked up that week.
24         TRUSTEE HAUSER:  No, no.  Between June 30th and
25   July 10th, I said I absolutely can't.  I'm now looking at

**Exhibit G**

USAO_00061028

169

1   the 11th, which it's possible.  The 12th is no good for me.

2          Well, first of all, generally speaking, does

3   Fridays work for anyone, particularly those if you're

4   driving in from L.A.?  It's kind of a tough commute.

5          MR. KHARASCH:  Which day?

6          TRUSTEE HAUSER:  Friday the 14th.

7          MR. KHARASCH:  And this is -- are we talking right

8   -- well --

9          TRUSTEE HAUSER:  I'm talking about a continued 341

10  on July 14th.

11         MR. KHARASCH:  Let me have -- can I just take a

12  few minutes, because Mr. Avenatti also had, has kind of a

13  hard stop he's working around.

14         THE WITNESS:  If you recall, we had slated two

15  hours for this, and I had rescheduled things, and we're now

16  almost at 2:00 o'clock, and I'm already late to where I'm

17  supposed to be.  So, if we're going to have a continued 341,

18  then my preference would be we stop now and we come back at

19  the continued 341.  I didn't anticipate this going four

20  hours.

21         TRUSTEE HAUSER:  Okay.  Well, let me just ask the

22  parties here.  I mean, do you -- I mean, how many hours of

23  questions do you have?  Because --

24         MS. CHENETZ:  Less than an hour, and probably can

25  make it less than a half hour.

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00061029

170

1          MR. KHARASCH:  All right.  If he's got to go, I

2  mean, I -- I mean, we've been here four hours.  If we have

3  to continue it, we have to continue it.  And, you know,

4  given -- I get the need to, for the opportunity for people

5  to ask questions.

6          TRUSTEE HAUSER:  I mean, if we come back on July

7  14th you can --

8          MS. CHENETZ:  It's a while, because this case is

9  four months old by then, you know, I --

10          TRUSTEE HAUSER:  Okay.  Why don't we do this.  Why

11  don't we -- go ahead and start asking your questions.

12          MR. SAUNDERS:  I'm already late.  I mean,

13  Michael --

14          TRUSTEE HAUSER:  What -- I mean, can you just,

15  could you put them off?  Say, look, you're in the middle of

16  a --

17          THE WITNESS:  I already have put them off, because

18  I had planned on being here from -- until 12:30, because we

19  had anticipated two hours.  That's what had been discussed.

20  You know, I understand that --

21          TRUSTEE HAUSER:  Can I be blunt?  There are a lot

22  of, there's a lot of issues here.

23          THE WITNESS:  No, I understand.  I'm not

24  criticizing anybody.

25          TRUSTEE HAUSER:  The April report has got a lot

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00061030

171

1  things that -- so, a lot of it is just a lot of loose ends,

2  the nature of the case.

3            THE WITNESS:  Right, but those loose ends are not

4  going to be, they're not going to be rectified in the next

5  30 minutes.  And so, if we're going to have to come back

6  anyway, and I can assure you --

7            TRUSTEE HAUSER:  Well, here's the thing.  I can't

8  hold you here, sir.

9            THE WITNESS:  Okay.

10           TRUSTEE HAUSER:  I mean, I -- so, I think what I

11  would ask is, you hang for another half an hour.  Let them

12  get a half-an-hour's worth of questions in.  It's 2:13.  Why

13  don't we call it 2:45 and you're out, okay?  And then we'll

14  -- in the meantime you can think of a continued date

15  following asking some questions.  So we'll call it 2:45,

16  okay?

17           UNIDENTIFIED SPEAKER:  Are you looking for the

18  continued hearing to be July 14th, the tentative?

19           TRUSTEE HAUSER:  It works for me.  I don't know if

20  it works for anyone else.

21           UNIDENTIFIED SPEAKER:  Well, I guess we'll do a

22  show of hands.

23           MS. CHENETZ:  Can we take a five-minute break?

24           TRUSTEE HAUSER:  Well, I'd rather just -- let's

25  ask the question, unless you have -- if you've got to go the

**Exhibit G**

USAO_00061031

172

1  ladies' room, I understand.  That's another issue.

2          MR. KHARASCH:  Yeah, we all need to  -- we all

3  need a five-minute break.

4          TRUSTEE HAUSER:  Okay.  We'll go off the record.

5      (Proceedings recessed briefly.)

6          TRUSTEE HAUSER:  Okay.  We are back on the record

7  in the Chapter 11 341 meeting in the case of Eagan Avenatti.

8          Mr. Avenatti, you are still under oath.  If you

9  can just confirm that, I'd appreciate it.

10          THE WITNESS:  Understood.

11          TRUSTEE HAUSER:  Okay.

12          MS. CHENETZ:  Mr. Hauser, may -- is it okay if we

13  use --

14          TRUSTEE HAUSER:  Yeah.  No, if you can say your

15  name for the record and -- actually, let me just move this

16  down the line here.

17          Sorry about that, sir.

18          I'm just trying -- and go ahead.  And if you could

19  speak up just a bit so it picks up your voice.

20                    FURTHER EXAMINATION

21  BY MS. CHENETZ:

22  Q    Good afternoon, Mr. Avenatti.

23  A    Good afternoon.

24  Q    I'm Sara Chenetz.  We've met before.  I'm an attorney

25  with Perkins Coie, counsel for Jason Frank Law and Scott

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00061032

173

1  Sims in this case.

2      And just for the record, you've spent a lot of time

3  earlier today talking about disputes between the Debtor and

4  Jason Frank Law and Mr. Sims.  It's not going to surprise

5  anyone to know they disagree with many of the

6  characterizations of disputes and the arbitrations and

7  litigations that are pending.  And much of that's a topic

8  for another day.

9      But going back, and I know we talked about it a lot, B-

10 75 of the schedules that lists roughly 20 lawsuits.  Is --

11 did Eagan Avenatti file a lawsuit against the NFL in

12 connection with the Super Bowl?

13 A   Yes.

14 Q   Is that on this list?

15 A   No.

16 Q   Why not?

17 A   Because it wasn't pending as of the time that this list

18 was prepared.

19 Q   Was it pending as of March 1st, 2017?

20 A   "As of March 1st," I believe so.

21 Q   Okay.  Do you -- is it your understanding that the

22 answers to the schedules are to be as of what date?

23 A   Well, later on in the examination I was told March

24 10th.

25 Q   That's the date the Debtor consented to be a debtor in

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00061033

174

1  bankruptcy?

2        UNIDENTIFIED SPEAKER:  Is that the date?

3        THE WITNESS:  Yes.  It's the -- I believe that's

4  the date.

5  BY MS. CHENETZ:

6  Q    Okay.  So was the Super Bowl NFL litigation pending on

7  March 10th?

8  A    I believe it was pending on March 10th, but that was

9  not what I understood this case list to have required.

10 Q    So was that case dismissed since March 10th?

11 A    Yes.

12 Q    Was it settled?

13 A    I can't answer that question.

14 Q    It's not, it's not public information?

15 A    I can't answer anything relating to the disposition of

16 that case.

17 Q    Did you receive any counsel fees from that case?

18 A    No.

19 Q    You, by "you," I mean the Debtor, Eagan Avenatti, LLP?

20 A    I understood the question.

21 Q    Was there co-counsel in that case?

22 A    Yes.

23 Q    Who was co-counsel?

24 A    Chris Ayers.

25 Q    Is he at a law firm, or she?

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00061034

175

1  A     He had a, he had a law firm.

2  Q     What's the name of it?

3  A     I think Ayers Law Office.

4  Q     What court was it pending in?

5  A     U.S. District Court Dallas.

6  Q     Are there any other cases that Eagan Avenatti, LLP was

7  counsel of record as of March that -- this year, that are

8  not in this list?

9  A     I don't think so, but I would have to go back through

10 the list.

11 Q     In the Kimberly-Clark case that was just tried, Eagan

12 Avenatti is counsel of record for plaintiffs?

13 A     I am counsel of record for plaintiffs.  I don't know

14 if, technically, the firm is counsel of record for the

15 plaintiffs, but I am counsel of record, and I was named as

16 class counsel, individually.

17 Q     So, you practice both with Eagan Avenatti, LLP and

18 individually?

19 A     I don't know how to answer that question.  I don't know

20 what you mean by it.

21 Q     Well, if you -- who is counsel?  What does the caption

22 show?  Who's the plaintiff on the caption, the plaintiff's

23 counsel?

24 A     The plaintiff's counsel lists me.  And when class

25 certification was obtained, I was named as class counsel.

*Briggs Reporting Company, Inc.*

**Exhibit G**

176

1  And there was a subsequent order by the court finding that I

2  had, individually, had been named as class counsel.

3  Q    Was Eagan Avenatti, LLP co-counsel?

4  A    I don't know.  It depends on the context of what you're

5  asking me that question.  I don't know what you mean by "co-

6  counsel."

7  Q    Co-counsel for the class in the case?

8  A    I don't know.  I would have to think about it in that

9  context.  I don't know technically whether they would be

10 considered co-counsel or not, and I think it would depend on

11 the context.

12 Q    What could make the difference?

13 A    Any number of things could make the difference.  I

14 don't know.

15 Q    Such as?

16 A    There's any number of things that could make a

17 difference as to whether someone would be technically co-

18 counsel or not, depending on the circumstances of the case,

19 procedurally and otherwise.

20 Q    Is Eagan Avenatti, LLP entitled to any fees in the

21 Kimberly-Clark litigation?

22 A    Yes.

23 Q    And are you separately entitled to fees as well?

24 A    I believe so.

25 Q    Are there any -- are you separately counsel on any of

*Briggs Reporting Company, Inc.*

**Exhibit G**

177

1  the other cases listed on this list of 20 cases?

2  A    In a -- on an individual basis?

3  Q    Yes.

4  A    I don't think so, but I would have to give more thought

5  to that than a mere 30 seconds, truth be told.

6  Q    Well, is that some information you can include when you

7  amend the schedules, if there's --

8  A    If we're required to do so, then we'll certainly

9  consider it.

10  Q    When you say you're individually counsel in a case, is

11  that Michael Avenatti, Esquire, is that Avenatti and

12  Associates, something else, a combination of things?

13  A    It would depend on the case.

14  Q    So there are cases where you -- if I understand your --

15  recall testimony correctly, when you were talking about who

16  the equity holders were, I think you said, you own your

17  equity as -- I may be not saying this precisely, Avenatti

18  and Associates or something similar to that, is that

19  correct?

20  A    My equity in the firm is owned through Avenatti and

21  Associates.

22  Q    Is Avenatti and Associates the entity that is class

23  counsel in Kimberly-Clark?

24  A    No.

25  Q    Is that, is it just Michael Avenatti?

**Exhibit G**

USAO_00061037

178

1  A    I was named individually as class counsel pursuant to

2  the court's order, which the court then reaffirmed as a

3  result of the motion that your client caused to be filed in

4  the class case, seeking to vitiate our fees from that case

5  in March of this year.

6  Q    Do you maintain a separate office for the practice of

7  law apart from Eagan Avenatti, LLP?

8  A    I don't know what you mean by that.

9  Q    Well --

10  A    Do I have a separate physical location?

11  Q    That's one question.

12  A    Separate and apart from the offices of Eagan

13  Avenatti --

14  Q    Correct.

15  A    -- a different location?  No.

16  Q    Do you have a separate phone number --

17  A    Yes, I have a separate phone number.

18  Q    -- for your practice as Michael Avenatti?

19  A    Yes.

20  Q    Do you maintain separate malpractice insurance?

21  A    No.

22  Q    Do you maintain separate trust accounts?

23  A    From time to time I have, yes.

24  Q    Do you currently?

25  A    No, I don't believe so.

*Briggs Reporting Company, Inc.*

**Exhibit G**

179

1  Q    Are there any matters in which cases have settled and

2  your firm is owed counsel fees that have yet to be paid?

3  A    Yes.

4  Q    In approximately how many cases?

5  A    Well, at least two, if not a few more.

6  Q    Could you name those?

7  A    Yes.  Authentic Entertainment, the Callaway case, the

8  Birbrower case.  And I believe your client controls

9  additional cases for which we're owed millions of dollars of

10 fees, but you and your client have refused to give us that

11 information, so I can't give you the details about it.

12 Q    My question is of cases that have settled.

13 A    Yes.

14 Q    The --

15 A    And I answered your question.

16 Q    What makes you think the Authentic case has settled?

17 A    Well, Mr. Frank sent us an e-mail telling us the case

18 had settled.

19 Q    Okay.  And what makes you think the Callaway case has

20 settled?

21 A    Because I believe a filing was made in a federal court

22 stating that the case -- that a tentative settlement,

23 whatever that means, has been reached, but no one will give

24 us any details about it.

25 Q    Other than cases that Frank, Sims and Stolper is now

**Exhibit G**

USAO_00061039

180

1  counsel of record, are there any cases in which Eagan

2  Avenatti, LLP is owed fees that have not been paid?

3  A    Well, I don't know all the cases in which Frank Sims

4  and Stolper are counsel of record, so I don't --

5  Q    That's right -- okay.

6  A    Can I just finish?  So, I don't know that I can answer

7  that question.

8  Q    Well, if you look at the schedules again, and the list

9  of cases at 7-B -- I think 73 is the number.

10         MR. KHARASCH:  You're talking about the amended

11  schedule, Sara?

12         MS. CHENETZ:  Yes, I am.

13         MR. KHARASCH:  Okay.

14         MR. KHARASCH:  She's talking about these.  This

15  list.

16         MS. CHENETZ:  I think Mr. Karaskik (phonetic) just

17  gave you the packet?  Kharasch.  I'm sorry.

18  BY MS. CHENETZ:

19  Q    Looking at that list, other than cases on this list,

20  are there any cases in which Eagan Avenatti is owed fees?

21  A    I don't think I'm at liberty to discuss --

22         TRUSTEE HAUSER:  First of all, I'm not even clear.

23  Are we talking about B-74, which is the disputed portfolio,

24  or B-75, which is the undisputed portfolio?

25         MS. CHENETZ:  B-74.

*Briggs Reporting Company, Inc.*

**Exhibit G**

181

1           TRUSTEE HAUSER:  Okay.  So B-74 is -- you're not
2  even looking at the right one.
3           THE WITNESS:  Yeah.  I didn't think this was the
4  list I was supposed to be looking at.
5           TRUSTEE HAUSER:  You're -- you can use this.
6           MR. KHARASCH:  Okay, which -- now I'm confused.
7           TRUSTEE HAUSER:  It's B-74.  B-74 is the list of
8  what we'd call the "disputed" cases.  Here you go.
9           MR. KHARASCH:  I thought you -- okay.  All right.
10           TRUSTEE HAUSER:  And so it starts here, and then
11  it goes on.  It starts with <u>Authentic Entertainment</u>.  You
12  should have it at docket item 105, page three of 10.
13           THE WITNESS:  All right.  Let me get there.
14           MR. KHARASCH:  All right.  Okay.
15           So the question is, are there any other cases --
16           TRUSTEE HAUSER:  I didn't ask the question, so
17  I'll be quiet.
18  BY MS. CHENETZ:
19  Q    The question is, any cases not on that list in which
20  the Debtor is owed legal fees?
21  A    I can't --
22           MR. KHARASCH:  But wait.  It's cases not on this
23  list?
24           MS. CHENETZ:  Correct.
25           MR. KHARASCH:  So we're not really looking at

**Exhibit G**

USAO_00061041

182

1  this.  So we're looking at -- well, the only other list --

2          TRUSTEE HAUSER:  Would be B-75.

3          MR. KHARASCH:  Right.

4          MS. CHENETZ:  No, no.  Because there could be

5  cases that are completed that would not be on B-75, because

6  B-75, as I understand it, is pending actions.

7          TRUSTEE HAUSER:  Right.  I asked him, I thought,

8  whether since the time of the filing, whether there were any

9  lawsuits filed.  No, I mean, new cases came in.

10          MS. CHENETZ:  Right.

11          TRUSTEE HAUSER:  And his answer was, he didn't

12  think so, because he was trip out the service (sic), or

13  something.  Is that correct, sir?

14          THE WITNESS:  That is correct.

15          TRUSTEE HAUSER:  Okay.

16          THE WITNESS:  That is what you asked me.  That is

17  what I answered.  And B-75 was created pursuant to your

18  request of publically-filed cases.

19          TRUSTEE HAUSER:  That's correct.

20          THE WITNESS:  Okay.

21          MR. KHARASCH:  So we're really talking about just,

22  I mean, just B-75?

23          MS. CHENETZ:  Yeah.  Because there could be cases

24  that were filed, settled or not currently pending, that the

25  Debtor's still owed money.

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00061042

183

1          MR. KHARASCH:  I see.  So they're not pending

2   anymore.  They were dismissed, they were whatever, they were

3   concluded.  So this is whether there's a receivable on

4   there --

5          MS. CHENETZ:  Correct.

6          MR. KHARASCH:  -- for amounts due and owing?

7          THE WITNESS:  I don't know as I sit here today.  I

8   would have to go back and look to see what's included and

9   not included on the schedules.

10  BY MS. CHENETZ:

11  Q    So you don't if the Debtor-in-possession is owed any

12  money from cases that were completed prior to the filing of

13  bankruptcy?

14  A    No, I know we're owed millions of dollars pursuant to

15  the cases -- let me finish, pursuant to the cases that your

16  clients took from the law firm.  That I know for certain.

17  Now, if you're asking me, are we owed fees from cases that

18  were settled before we filed, I don't think so.

19  Q    Where there judgments entered?

20         MR. KHARASCH:  Well, I think your question went to

21  whether there were judgments or not.

22         MS. CHENETZ:  Well, you'd have the judgment, and

23  then sometimes judgment-debtors don't collect so fast.

24         MR. KHARASCH:  Right, right.

25         MS. CHENETZ:  So, I'm just --

**Exhibit G**

USAO_00061043

184

1  BY MS. CHENETZ:

2  Q    So the Debtor has no receivables, other than for

3  lawsuits that are pending or the disputed receivables on

4  cases in which Eagan Avenatti was formerly counsel?

5  A    To be honest with you, I don't understand your

6  question.  I'm lost.

7  Q    I'll try again.

8  A    Okay.

9  Q    Prior to -- are you owed money in any cases that were

10 completed either by settlement or litigation/arbitration,

11 prior to May of 2016?

12 A    If I understand your question, I don't think so, but I

13 would have to go back and actually review all the cases in

14 order to make sure that that statement's accurate.

15 Q    In the ordinary course of Eagan Avenatti's business,

16 does it keep a list of parties who owe money to the firm?

17 A    Generally speaking, yes.

18 Q    And would that include former clients or current

19 clients who owe you money?

20 A    It may or may not.  I don't think we would set up, for

21 instance, a receivable under those circumstances that -- of

22 what you're talking about.

23        MR. KHARASCH:  Which is basically what she's

24 asking, the existence of a receivable --

25        THE WITNESS:  Yeah.  I don't think --

**Exhibit G**

USAO_00061044

185

1          MR. KHARASCH:  -- for something that --

2          THE WITNESS:  -- I don't think that we would --

3          MR. KHARASCH:  -- that a client owes.

4          THE WITNESS:  I don't think we would establish a

5    receivable on the books for that.

6    BY MS. CHENETZ:

7    Q    You could be owed money -- even if you didn't put it on

8    a receivable list you might still be owed money?

9    A    I don't disagree.  I was only addressing what you asked

10   me.

11   Q    In the retainer agreement between Kimberly-Clark and

12   the plaintiffs, who is counsel, who's listed as counsel in

13   the retainer agreement?

14   A    I don't recall.  I would have to look at the retainer

15   agreement.

16   Q    Are any of the cases on B-75 close to settlement?

17   A    I'm not at liberty to disclose that unless it's been

18   publically filed.

19   Q    Why is that?

20   A    Because you're not -- because neither you nor your

21   client is prior counsel in the case.  And so, therefore, if

22   that were the case, there would be confidentiality concerns.

23   If you or your client was prior counsel, then your fiduciary

24   obligations would overcome those confidentiality concerns

25   pursuant to the law in California.  So that's why --

*Briggs Reporting Company, Inc.*

**Exhibit G**

186

1  Q     So, are you --

2  A     -- that's why I'm not at liberty to disclose that.

3  Q     -- so, are you saying that throughout the pendency of

4  this bankruptcy case, you're not going to be able to

5  disclose the anticipated timing of sources of revenue?

6        MR. KHARASCH:  He's done projections, but they're

7  only guesses.  But he can only that as to when things -- he

8  can't, can't state for sure when things are going to settle,

9  but he can make educated guesses.  So -- but he's just

10 saying, he can't talk about what cases are close to

11 settlement, what aren't.  He's disclosed a lot of the

12 information on the amended schedule.

13 BY MS. CHENETZ:

14 Q    Has the Debtor assigned any rights it has to payments

15 to other parties?

16 A    I don't think I understand what you're asking me.

17 Q    Have you agreed with anyone to, say, when I get paid on

18 a case I'll give you money?

19 A    Well, there's the agreement that was referenced

20 previously relating the X-Law Group.  I think that would fit

21 within the -- I think that's --

22        TRUSTEE HAUSER:  I agree.

23 BY MS. CHENETZ:

24 Q    When did you reach that agreement with the X-Law Group?

25 A    The summer of last year.

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00061046

187

1  Q    Did the two firms formally merge?

2  A    I don't know what you mean by "formally merge," but

3  from a legal standpoint I would say, no, because the X-Law

4  Group continues in existence to this day with their own

5  cases.

6  Q    Are you handling matters independently from X-Law Group

7  attorneys?  Is Eagan Avenatti doing so?

8         MR. KHARASCH:  I'm not sure I understand the

9  question.

10         THE WITNESS:  I don't understand it either.

11 BY MS. CHENETZ:

12 Q    So, the attorneys at X-Law Group, if I understand it

13 correctly, are now employees of Eagan Avenatti?

14 A    Some of the attorneys are.  I don't think it's all of

15 the attorneys, but I don't know, because I don't know all

16 the attorneys at the X-Law Group.

17         MR. KHARASCH:  Well, they've been -- the X-Law

18 Group maintains its own separate existence, and has, and its

19 own separate cases, so.

20 BY MS. CHENETZ:

21 Q    So, some of the X-Law Group attorneys are also

22 attorneys at Eagan Avenatti?

23 A    Yes.  Yes, that's true.

24 Q    And do they work part-time at Eagan Avenatti?

25 A    No.

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00061047

188

1  Q    They work full-time at Eagan Avenatti?

2  A    I don't know what you mean by "part-time" or "full-

3  time."  All I know is, is that we pay them a salary for

4  their work they do at the firm in connection with the cases

5  on behalf of the firm.  But that doesn't preclude them from

6  also handling other matters that Eagan Avenatti has nothing

7  to do with, that are only being handled by the X-Law Group.

8  Q    Is -- the Peoples Bank of Biloxi, Mississippi, they

9  have a lien again Eagan Avenatti?

10  A    No, they do not.

11  Q    Are you aware that --

12  A    Absolutely not.

13  Q    Are you aware they filed a financing statement against

14  the firm?

15  A    "They filed a financing statement," and they

16  subsequently filed a release of that financing statement

17  sometime ago.  And we've provided a copy of the release.

18  I'm not aware of any outstanding UCC's against the firm.

19  Q    Have you ever lent money to the firm?

20  A    Yes.

21  Q    Do you --

22  A    On a number of occasions.

23  Q    Have you ever been paid back on those loans?

24  A    Yes.

25  Q    About how much in the past year?

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00061048

189

1   A    I would have to, I would have to look at the records,

2   pursuant to the discussion that I had with Mr. Hauser.

3   Q    And you'll include information on those loans in the

4   amended schedules?

5        MR. KHARASCH:   Number 14 -- yeah, number four in

6   the SOFA's.

7        TRUSTEE HAUSER:   Four-thirty.   There's about three

8   or four claims that they should capture.

9        MR. KHARASCH:   Right.   Let's do a breakdown.

10  BY MS. CHENETZ:

11  Q    Are there any promissory notes that were issued from

12  Eagan Avenatti to you personally?

13  A    There may be, but none that I can recall right now.

14  Q    When you -- you talked earlier about putting money into

15  the firm and making contributions to the firm.   Are you

16  talking about equity contributions?

17       MR. KHARASCH:   No, he's, he was talking about

18  loans to the firm.

19       THE WITNESS:   That is what I was talking about.

20  BY MS. CHENETZ:

21  Q    Does the firm pay interest when they repay these loans?

22  A    No.

23  Q    Is a schedule maintained of the loans?

24  A    I don't believe we maintain a separate schedule of the

25  loans, no.

*Briggs Reporting Company, Inc.*

**Exhibit G**

190

1  Q    Are they unsecured loans?

2  A    If I understand what "unsecured" means in this context,

3  I think so.

4  Q    In the past years, how much money have you lent to the

5  firm, do you think, approximately?

6  A    I --

7          UNIDENTIFIED SPEAKER:  That's going to be covered

8  in the amendment to schedules.

9          MS. CHENETZ:  Okay.  I guess we'll get it after we

10 see those.

11 BY MS. CHENETZ:

12 Q    Why did Global Baristas pay the retainer to Baker

13 Hostetler when the case was pending in Florida?

14         MR. KHARASCH:  What or when -- when was this?

15         MS. CHENETZ:  Why?

16         MR. KHARASCH:  "Why."

17         THE WITNESS:  As I sit here today, I do not recall

18 exactly why the money came from that account to Baker.  I

19 don't recall why we decided to pay it that way.

20 BY MS. CHENETZ:

21 Q    Who is "we" --

22 A    As I -- what's that?

23 Q    -- who is "we" in that answer?

24 A    After consultation with counsel.

25 Q    You said "we decided to pay" the retainer that way.

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00061050

191

1         MR. KHARASCH:  Well, I presume they made it
2 because it was a source of cash that was readily available.
3 I mean, at the time --
4         MS. CHENETZ:  Well, can the witness answer?
5         THE WITNESS:  Prior to the payment, I consulted
6 with counsel.  After that consultation it was decided that
7 the payment would come from that account, and that's why it
8 was paid.
9 BY MS. CHENETZ:
10 Q    And what account was it specifically?
11 A    I don't recall exactly which account it was.
12 Q    A Global Baristas' account?
13 A    Yes.
14 Q    Do you own Global Baristas?
15 A    Most of it, yes.
16 Q    Was that retainer returned --
17 A    Yes.
18 Q    -- to Global Baristas?
19 A    That the retainer -- well, the retainer was returned by
20 Baker, yes.
21 Q    Why did that happen?
22 A    That happened because there was a bogus claim of
23 fraudulent transfer levied against Baker.  That's why.
24 Q    By -- who levied this fraudulent claim?
25 A    Which has since been dismissed.  A alleged creditor of

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00061051

192

1  Global.

2  Q    Has Darryl Tubin (phonetic) never work for Eagan

3  Avenatti?

4  A    As an employee, no.

5  Q    As -- in any capacity?

6  A    I'm sorry?

7  Q    In any capacity?

8  A    He provided services to the firm.

9  Q    What kind of services?

10  A    He provided investigatory services to the firm.

11  Q    As a -- is he a private investigator?

12  A    I don't know if he's licensed as a private

13  investigator, but he did private investigatory type work for

14  the firm.

15  Q    In connection with a particular case?

16  A    In connection with a potential case, yes.

17  Q    Was that case filed?

18  A    Not by us.

19  Q    Have you ever spoken to him personally?

20  A    No.

21  Q    Do you know if anyone else at Eagan Avenatti ever spoke

22  to him?

23  A    Yes.

24  Q    Who?

25  A    I believe Mr. Marchino spoke to him, and I believe at

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00061052

193

1  some point Ms. Regnier may have spoken to him, but I'm not

2  certain about that.

3  Q    Do you have any knowledge of when was the last time

4  either of them spoke to Mr. Tubin?

5  A    I don't know.

6  Q    Do you have any knowledge of whether either of them

7  spoke to Mr. Tubin about why he filed the involuntary case?

8  A    Not that I know of.

9  Q    Does the firm maintain a lockbox?

10        MR. KHARASCH:  Why don't you explain what a

11  "lockbox" is, so everybody --

12  BY MS. CHENETZ:

13  Q    A deposit account where money -- there's limits on

14  where money can be removed.

15        MR. KHARASCH:  Where a bank, where a bank like

16  providing financing and --

17        MS. CHENETZ:  Most typically.

18        MR. KHARASCH:  -- receivables go into a separate

19  account, and it -- I think -- do you have a bank that's

20  provided financing?

21        THE WITNESS:  None.

22        MR. KHARASCH:  That's what I think.

23        THE WITNESS:  I don't believe the firm maintains a

24  lockbox, if I understand what a lockbox is.

25        MS. CHENETZ:  Can you bear with me one -- I know

**Exhibit G**

USAO_00061053

194

1  it's -- but can you bear with me for 30 seconds?

2       (Pause.)

3            MR. KHARASCH:  And, Sara, I told her -- we're

4  really at the 30 minutes.  He's got to, he's got to go.

5            MS. CHENETZ:  All right.  We'll pick it up another

6  time then.

7            TRUSTEE HAUSER:  All right.  So the proposed date

8  for the continued meeting is July 14th at 10:00 o'clock.  Is

9  there any reason why anyone can't make it on that day?

10 Okay.

11           So there's not going to be any further notice,

12 written notice given.  So it's going to be continued to July

13 14th at 10:00 o'clock right here.  And this will continue

14 the meeting of creditors to that date.  Thank you very much.

15      (Proceedings concluded.)

16

17           I certify that the foregoing is a correct

18 transcript from the electronic sound recording of the

19 proceedings in the above-entitled matter.

20 /s/ Holly Martens                      1-22-19
   Transcriber                            Date

21

22

23

24

25

*Briggs Reporting Company, Inc.*

**Exhibit G**

USAO_00061054