# EXHIBIT H

1                    OFFICE OF THE UNITED STATES TRUSTEE

2                            SANTA ANA DIVISION

3

4    In Re:                        )   Case No. 8:17-bk-11961-CB
                                   )
5    EAGAN AVENATTI, LLP,          )   Chapter 11
                                   )
6            Debtor.               )
     _____)
7

8                                     341(a) MEETING

9                        MICHAEL HAUSER, Presiding

10                             --oOo--

11                          July 14, 2017

12                      411 West Fourth Street
                             Suite 7160
13                  Santa Ana, California 92701

14   APPEARANCES:

15   For the Debtor:              IRA D. KHARASCH, ESQ.
                                  ROBERT M. SAUNDERS, ESQ.
16                                Pachulski, Stang, Ziehl &
                                     Jones, LLP
17                                10100 Santa Monica Boulevard
                                  13th Floor
18                                Los Angeles, California 90067
                                  (310) 277-6910
19

20   For the United States        MICHAEL HAUSER, ESQ.
        Trustee:                  411 West Fourth Street
21                                Suite 7160
                                  Santa Ana, California 92701
22                                (714) 338-3417

23

24

     Proceedings recorded by electronic sound recording;
25   transcript produced by transcription service.

*Briggs Reporting Company, Inc.*

Exhibit H

USAO_00061055

ii

1  APPEARANCES:   (cont'd.)

2  For the United States and         NAJAH J. SHARIFF, ESQ.
     Its Agency, the Internal        United States Attorney's
3    Revenue Service:                  Office
                                     300 North Los Angeles Street
4                                    Suite 7211
                                     Los Angeles, California 90012
5                                    (213) 894-2534

6  For Michael John Avenatti         MARK S. HOROUPIAN, ESQ.
     And Avenatti & Associates:      SulmeyerKupetz
7                                    333 South Grand Avenue
                                     Suite 3400
8                                    Los Angeles, California 90071
                                     (213) 626-2311
9

10 For Jason Frank and Jason         JASON M. FRANK, ESQ.
     Frank Law, PLC:                 Frank, Sims, Stolper, LLP
11                                   19800 Macarthur Boulevard
                                     Suite 855
12                                   Irvine, California 92612
                                     (949) 201-2400
13

14 For Jason Frank Law and           SARA L. CHENETZ, ESQ.
     Scott Sims:                     Perkins Coie, LLP
15                                   1888 Century Park East
                                     Suite 1700
16                                   Los Angeles, California 90067
                                     (310) 788-3218
17

18 For Stoll, Nussbaum and           TOM POLAS, ESQ.
     Polakov:
19

20 Transcriber:                      Briggs Reporting Company, Inc.
                                     4455 Morena Boulevard
21                                   Suite 104
                                     San Diego, California 92117
22                                   (310) 410-4151

23

24

25

*Briggs Reporting Company, Inc.*

Exhibit H

USAO_00061056

iii

1                          I N D E X

2   WITNESSES:                                    EXAMINATION

3   MICHAEL JOHN AVENATTI                               3
                                                       41
4                                                      48
                                                      121
5                                                     133

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Briggs Reporting Company, Inc.*

Exhibit H

USAO_00061057

1

1    SANTA ANA, CALIFORNIA  MONDAY, JULY 14, 2017 10:30 AM

2    _____--oOo--

3          TRUSTEE HAUSER:  Good morning.  My name is Michael

4    Hauser.  I'm an attorney with the U.S. Trustee's Office.

5    Today is July 14th, 2017.  It's approximately 10:30 in the

6    morning.  This is the continued 341(a) meeting of creditors

7    in the case of Eagan Avenatti, LLP, case number 8:17-11961-

8    CB.

9          Okay.  Counsel for the Debtor, could you please

10   make your appearance for the record?

11         MR. KHARASCH:  Ira Kharasch and Rob Saunders of

12   Pachulski Stang, for the Debtor.  And just one clarification

13   point.

14         TRUSTEE HAUSER:  Could you speak up, because I'm

15   barely getting you.

16         MR. KHARASCH:  Okay.  Ira Kharasch and Rob

17   Saunders of Pachulski Stang, for the Debtor.

18         TRUSTEE HAUSER:  Okay.

19         MR. KHARASCH:  And just a point of clarification,

20   Michael, that the official recording, your transcript of

21   this, will be the recording of the U.S. Trustee Office, not

22   the court reporter?

23         TRUSTEE HAUSER:  Correct.  I mean, it's clear that

24   our office under Section 343 -- or 341 presides over the

25   meeting.  We're required to record it, in this case,

2

1  digitally record it.  We then convert it to a CD.  It's kept

2  under lock and key for five years.  So, yes, we are the

3  official recorder.

4          And just for the records, to my left is a court

5  reporter.  The court reporter is here at the request of Ms.

6  Chenetz, who represents Mr. Frank and Mr. Sims and their

7  entities.

8          This is not the first time we've had a court

9  reporter at a 341 meeting.  I'm sure it won't be the last.

10 So if you want to make any further clarification, go ahead.

11          MR. KHARASCH:  That's it.

12          TRUSTEE HAUSER:  Okay.  Ms. Shariff, did you want

13 to make your appearance for the record?

14          MS. SHARIFF:  Yes.  Good morning.  Najah Shariff,

15 Assistant United States Attorney for the United States, on

16 behalf of its agency, the Internal Revenue Service.

17          TRUSTEE HAUSER:  Okay.  Are there any other

18 parties that want to make their appearance another time, or

19 they'll make it when they ask their questions?  Okay.  So,

20 there's other parties here but they'll come forward.  Okay.

21          Mr. Avenatti, could you please raise your right

22 hand?

23     MICHAEL JOHN AVENATTI – DEBTOR'S WITNESS – SWORN

24          THE WITNESS:  Yes, sir.

25          TRUSTEE HAUSER:  Okay.  Thank you.

Exhibit H

USAO_00061059

3

1                          EXAMINATION

2  BY TRUSTEE HAUSER:

3  Q    Do you have docket item number 147 in front of you?

4  A    I have 148 through 152.

5          MR. SAUNDERS:  Which one is that?

6          TRUSTEE HAUSER:  Okay.  Yeah, 148's fine.

7  Actually --

8          MR. SAUNDERS:  This is Rob Saunders.  We had, I

9  guess we had a corrected docket entry.  One-forty-seven

10 probably is the one that was not corrected, and then we --

11 148 was immediately corrected.

12          TRUSTEE HAUSER:  Okay.

13 BY TRUSTEE HAUSER:

14 Q    Let's just go to 149, because that's where my questions

15 start.  So, docket item 149 at page five of 15.

16 A    I'm there.

17 Q    Okay.  So, as best as I could discern, the lawsuits

18 that were added start in the middle of the page, starting

19 with Mr. Sims, Mr. Frank, and then the Eagan Avenatti

20 lawsuits in state court, the three on the bottom, is that

21 correct?

22 A    I believe that's correct.  Yes.

23 Q    Okay.  And the lawsuits with respect to Eagan Avenatti

24 v. Callaway and Birbrower, those were the lawsuits that you

25 referenced last time that are necessary to be brought in

*Briggs Reporting Company, Inc.*

Exhibit H

USAO_00061060

4

1  order to determine the allocation of fees pursuant to your

2  charging lien, is that correct?

3  A     Yes, sir.

4  Q     Okay.  And that would be for the work that was done

5  preceding the termination of your firm, is that correct?

6  A     Yes, sir.

7  Q     Okay.

8         TRUSTEE HAUSER:  And those lawsuits are proceeding

9  now, or do you need to get relief from stay, Mr. Kharasch,

10 in order to proceed on those?

11        MR. KHARASCH:  On Callaway and Birbrower to the

12 firm to --

13        TRUSTEE HAUSER:  Yes.

14        MR. KHARASCH:  -- to proceed?

15        TRUSTEE HAUSER:  To proceed, yeah.

16        MR. KHARASCH:  Yeah.  I don't think we need relief

17 from stay.

18 BY TRUSTEE HAUSER:

19 Q     Okay.  So are those lawsuits going forward as we speak?

20 A     Let me answer that, if I could.  The Callaway case --

21 Q     Yeah.

22 A     -- was stayed at the request of Mr. Stolper of, on

23 behalf of the defendant in that case.

24 Q     Okay.  And then the Birbrower?

25 A     In the Birbrower matter, I believe, that Mr. Stolper,

*Briggs Reporting Company, Inc.*

Exhibit H

5

1  in connection with that matter, has also taken the position

2  that it is required to be stayed due to the bankruptcy

3  filing.

4  A    Okay.  And has the -- in one case it's a judge, the

5  other case it's a JAMS matter.  Have they acknowledged that

6  and basically said they're staying the proceedings until

7  further notice?

8  A    The judge, over our objection, stayed the Callaway

9  matter.

10 Q    Okay.

11 A    I do not know if the arbitrator has rendered a decision

12 as it relates to the Birbrower matter, and whether that is

13 stayed or not.

14 Q    Okay.  And then above that there's a matter, Eagan

15 Avenatti v. Root and Madison Street Partners.  What is that

16 about?

17 A    That relates to the efforts of Mr. Root and Madison

18 Street Partners in conspiring with Mr. Stolper, Sims and

19 Frank, relating to assisting them in setting up their new

20 law firm behind the back of Eagan Avenatti in the early

21 months of 2016.  And I believe that matter is stayed at the

22 request of Root and Madison Street Partners.

23 Q    Okay.  And then with respect to the matters above that,

24 those are just, those are actually just claims, right?  In

25 other words, have you actually filed any formal action,

6

1  either in the pending arbitration with Mr. Frank and Mr.

2  Sims or -- in other words, is there an action anywhere

3  that's pending on those two matters?

4  A    I think the answer's yes and no.  There are counter-

5  claims that were asserted against Mr. Sims personally --

6           MR. KHARASCH:  In the arbitration.

7           THE WITNESS:  -- in --

8           MR. SAUNDERS:  Correct.  Yeah.

9           THE WITNESS:  -- in his arbitration.  There were

10  counter-claims asserted against Jason Frank Law in that

11  arbitration, but Jason Frank individually is not a party to

12  his arbitration.

13  BY TRUSTEE HAUSER:

14  Q    Okay.

15  A    So, there may in fact be claims asserted against Mr.

16  Frank individually.

17  Q    Separate and apart from the pending arbitration?

18  A    Yes, sir.

19  Q    Okay.  That's it.  Okay.  All right.

20       So moving on to B-75, which is docket item 149 at page

21  10 of 15.  So this was originally the list of lawsuits that

22  we call the, for lack of a better characterization, the

23  lawsuits in which Frank and Sims do not assert any interest.

24  These are lawsuits that are entirely Eagan Avenatti.

25       And it appears that you've added three matters at the

*Briggs Reporting Company, Inc.*

Exhibit H

USAO_00061063

7

1  bottom of the list.  One is a matter called, <u>Shahinian v.</u>

2  <u>Kimberly-Clark</u>, the other one is <u>Silva v. Minsky</u>, and the

3  other one is <u>Sweetman v. Carey</u>, is that correct?

4  A    That is what's reflected on here.  I don't have the

5  prior --

6  Q    I do.  I do.  I was looking at it last night.  So, in

7  other words, if you were to compare this to the original

8  list, and I'll be happy -- I'm just -- those are just the

9  ones that are added.  So you --

10 A    Mr. Saunders did my accounting.

11 Q    Okay.  So if you look at the original list, you'll see

12 that it ends with -- so, actually, <u>Sweetman v. Carey</u> was on

13 there then?

14 A    Correct.  As was <u>Silva v. Minsky</u>, and as was <u>Shahinian</u>

15 <u>v. Kimberly-Clark</u>.

16 Q    Okay.  So the original list had 20 items, this one has

17 23.  I'm trying to figure out what three items are on here

18 that were not on the original list.

19 A    The item seven, the <u>Greco</u> matter.

20 Q    Okay.  So that's <u>Greco v. NFL</u>?

21 A    Yes.  That was added.

22 Q    Okay.

23 A    You may recall, we had a discussion on the record

24 relating to the date on which, the date that needed to be

25 reflected --

Exhibit H

USAO_00061064

8

1  Q    Yeah.

2  A    -- and it was the date of the filing, as opposed to a

3  later date.

4  Q    I recall something along those lines.

5  A    All right.  So, seven was added.

6  Q    Okay.  And just -- and so seven was an add.  Okay.  And

7  then there's got to be two more here somewhere.

8  A    The Naqqs (phonetic) matter, 12 was added.

9  Q    Okay.

10 A    And number 20 was added.  Those are the three adds.

11 Q    Okay.  Okay.  And while we're on this list, have any of

12 these matters settled since the time that these cases were

13 filed?

14 A    Number seven was dismissed.

15 Q    You mean Greco v. NFL?  Okay.  So --

16 A    That case was dismissed.

17 Q    All right.  Why would you add the dismissed case?  It

18 wasn't pending.

19        MR. SAUNDERS:  I still think it was required to be

20 put on because it was existing at the time of the --

21        TRUSTEE HAUSER:  So between March 10th and --

22 well, at March 10th was it a pending case?

23        MR. SAUNDERS:  Yes, sir.

24        TRUSTEE HAUSER:  Okay.  That's -- that answers the

25 question.

*Briggs Reporting Company, Inc.*

Exhibit H

USAO_00061065

9

1 BY TRUSTEE HAUSER:

2 Q    My other question though, has any of these matters

3 settled?

4 A    Case seven was dismissed --

5 Q    Okay.

6 A    -- as I previously noted.

7 Q    Was it dismissed pursuant to a settlement agreement?

8 A    Unfortunately, I cannot answer that question.

9 Q    Okay.

10 A    I'm happy to have counsel converse with you privately

11 and figure out --

12 Q    Well, we can't -- I mean, this is a transparent

13 process.  I can't be a repository of, you know --

14 A    Well, unfortunately, I cannot comment on the

15 circumstances surrounding the dismissal of item seven.

16 Q    Okay.

17 A    With that caveat, none of these other cases have

18 settled since the filing of -- or since March 10th.

19 Q    Okay.  Have any of these other cases been dismissed for

20 any reason, absent settlement?

21 A    Item three was dismissed by court order.

22 Q    "By court order"?

23 A    Yes.  There is now a pending appeal.

24 Q    Okay.

25 A    Just give me one minute, please.

*Briggs Reporting Company, Inc.*

Exhibit H

USAO_00061066

10

1 | Q    No, no, take your time.

2 | A    Item 12, as I recall, that's an In Re matter relating

3 | to some discovery.  I don't -- that's not a traditional

4 | case.  I don't know if item 12 is still, technically, open

5 | or not.

6 | Q    I don't know what an "In Re" matter -- I don't do that

7 | type of law.

8 | A    My understanding is, is that this is an action that was

9 | initiated in order to obtain discovery in connection with

10 | another proceeding.

11 | Q    Okay.  And you think it's been dismissed?

12 | A    Well, I -- short answer is, I don't know.

13 | Q    But there's -- this is something where there -- you can

14 | go on PACER and check?

15 | A    Correct.

16 | Q    Okay.

17 | A    I just don't know as I sit here today.

18 | Q    Okay.  Any other comments on any other of the cases, as

19 | far as dismissals, settlement or any other disposition?

20 | A    The item 15, the Medline action, was transferred to the

21 | Northern District of Georgia, as reflected.  That was

22 | originally in California.  That may have been reflected on

23 | the prior version as pending in California.

24 | Q    Okay.

25 | A    The Meridian matter v. Kooshian, there was a opinion

*Briggs Reporting Company, Inc.*

Exhibit H

USAO_00061067

11

1 issued by the Ninth Circuit upholding the result in that

2 case.  So I believe, technically, that's closed.

3 Q    Meaning that there'll be no proceeds coming from that

4 lawsuit?

5 A    Correct.

6 Q    And what does that mean?

7 A    Correct.  There'll be -- well, there'll be no proceeds

8 to the firm coming from that lawsuit, unless there's further

9 collection activity or something of that nature.

10 Q    That's number 16, Meridian v. Kooshian, right?

11 A    Yes, sir.

12 Q    Okay.  Any other updates?

13 A    We're awaiting a decision from the California Supreme

14 Court on number 18.

15 Q    Okay.  And how long -- how long -- go ahead.

16 A    Technically, that matter is presently dismissed.  If

17 the California Supreme Court agrees with our position, then

18 that matter will be revived.  The California Supreme Court

19 has 90 days from the date of oral argument -- I argued

20 before the court on the 6th of June, so we would expect a

21 decision by September 6.

22 Q    Okay.

23 A    Twenty-one is noted.  There's a motion to dismiss

24 pending in that case, which was taken under submission on

25 June 5th.  We have not received a ruling yet.  And I don't

*Briggs Reporting Company, Inc.*

Exhibit H

USAO_00061068

12

1 have anything else.

2 Q    Okay.  Moving on to schedule E.  This would be docket

3 item 151, page two of 14.  Creditor 2.4 is listed as the

4 Employment Development Department, with a priority claim of

5 $712,893.  It's listed for payroll taxes.  It's also listed

6 as disputed and unliquidated.

7       I'm also looking at a separate document, docket item

8 number 11-1 from the claims register, which was filed on

9 July 5th by the same entity, Employment Development

10 Department, where they filed a proof of claim in the exact

11 same amount, with priority status.

12            TRUSTEE HAUSER:  Counsel, so did you just take the

13 figure from the EDD proof of claim and --

14            MR. KHARASCH:  We did.

15            TRUSTEE HAUSER:  Let me finish, okay?  And then

16 transfer that onto claim 2.4?

17            MR. KHARASCH:  Correct.

18            TRUSTEE HAUSER:  Okay.  At this time, have you had

19 an opportunity to reach out to the EDD to try and resolve

20 your disputes?

21            MR. KHARASCH:  No, not at this time.

22            TRUSTEE HAUSER:  Okay.

23 BY TRUSTEE HAUSER:

24 Q    Mr. Avenatti, do you have any idea as to what you

25 believe the claim is?

*Briggs Reporting Company, Inc.*

Exhibit H

USAO_00061069

13

1          MR. SAUNDERS:  Before he answers -- this is Rob
2  Saunders.

3          TRUSTEE HAUSER:  Yeah.

4          MR. SAUNDERS:  I did reach out to the EDD very
5  early on in our time -- I think it was even before, when we
6  were substituted, and began discussions with the bankruptcy
7  specialist on that.

8          TRUSTEE HAUSER:  Okay.

9  BY TRUSTEE HAUSER:

10 Q    And Mr. Saunders and Mr. Avenatti, either of you could
11 answer this question.  Do you have an idea of what you think
12 the number is?  I mean, it's somewhere between zero and
13 712,000, which -- where do you think it falls between that
14 number?  You obviously don't think it's 712,000.

15 A    Correct.  We believe it's significantly less than that,
16 but I can't give you a set dollar figure as I sit here right
17 now.

18 Q    Okay.

19 A    I don't know if Mr. Saunders has any other --

20         MR. SAUNDERS:  No, I don't have any additional
21 information now.

22         TRUSTEE HAUSER:  Okay.

23 BY TRUSTEE HAUSER:

24 Q    Where are you on filing all of your returns with the
25 EDD?

*Briggs Reporting Company, Inc.*

Exhibit H

USAO_00061070

14

1  A    My understanding is, they have all been filed, but I'm

2  not certain about that, but that's my understanding.

3  Q    Okay.  Because, as you may recall from the last hearing

4  with the I.R.S., one of the issues was simply getting the

5  returns in.

6  A    Yeah, let me be clear.  When you talk about the returns

7  with EDD, are you talking about something different than the

8  941's?

9  Q    Whatever returns you're required to submit to them.

10 A    The last time we were here, we were talking about the

11 940's and the 941's.  My understanding is, those have all

12 now been filed current.  That we are current on those.

13         TRUSTEE HAUSER:  Okay.  Are those I.R.S. specific

14 forms, Ms. Shariff?

15         MS. SHARIFF:  They're the federal, so I'm not sure

16 what the equivalent state forms would be.

17         THE WITNESS:  I don't know either.

18         TRUSTEE HAUSER:  Okay.  So, whatever they are, I

19 think it's important that you circle back with your people

20 and file the returns.  Because based on Ms. Shariff's

21 discussion last time, one of the ways to resolve these

22 issues is to get the returns.  Because if you don't get the

23 returns to them, they're simply estimating it based on prior

24 returns.

25         Is that correct, Ms. Shariff?

*Briggs Reporting Company, Inc.*

Exhibit H

USAO_00061071

15

1        MS. SHARIFF:  Well, sometimes it's based on prior

2   returns, sometimes it's based on income information that's

3   received by third parties.  So it's a combination of

4   factors, but it's estimated.  And the numbers could go

5   higher or lower, depending on what the actual amounts are

6   based on the returns filed.

7        TRUSTEE HAUSER:  So, bottom line is, I think you

8   need to do that, and the reason why I think you need to get

9   on top of that is because, unlike a general, unsecured

10  claim, a priority tax claim is treated pursuant to the

11  bankruptcy code.  So, specifically, 1129(a)(9)(C)(4),

12  priority tax claims.  And if that amount comes in, let's

13  say, very high, then you need to account for that in your

14  projections.

15        So you have 16 months from the time the case is

16  filed, in this case it would be March 10th, to pay off that

17  claim.  It's not as if you can file a plan a year from now

18  and say, we're going to pay them over five or seven years.

19  It doesn't work that way, unless they agreed to that

20  treatment, which rarely, if ever, happens.

21        So that's one of those things where there's no way

22  to cram them down, there's no way to really negotiate a

23  stretch out of time.  And I can tell you that their tax rate

24  is much -- I'm sorry, their interest rate is much higher

25  than the federal rate.  And if you look at the proof of

*Briggs Reporting Company, Inc.*

Exhibit H

16

1 claim, you will see that interest accrues, I believe --

2 unless it's 18-percent per annum, but I want to double

3 check.

4      I'm not sure if the interest rate is on here, but

5 I know that the EDD interest rate is much higher than the

6 federal rate, and that's something you need to take into

7 account when you're talking about a number that's this high.

8 So it behooves you to get your arms around this number.

9 BY TRUSTEE HAUSER:

10 Q   Okay.  With respect to the rest of the schedules, the

11 only other amendment that I could find was at page -- 151,

12 page nine of 14, and that would be creditor 3.39, which is

13 Stoll, Nussbaum and Polakov, represented by Mr. Polas, who's

14 here today.  And there's a proof of claim -- I'm sorry.

15 There's, the amount listed is unknown, and it's listed as

16 unliquidated and disputed.  What is the nature of this

17 dispute?

18 A   Mr. Stoll and his law firm claims that they are due

19 fees from a prior case that was resolved on behalf of

20 clients back in 2011.  That matter is presently stayed

21 pending a determination of an issue relating to a settlement

22 agreement, which is pending before the California Court of

23 Appeal in the Second District.

24      I'm aware that the proof of claim was filed for, I

25 believe, in excess of $35,000,000, which we believe has

17

1  absolutely no basis whatsoever, and in fact, is

2  sanctionable.

3  Q    Okay.  I'm a little confused.  You said there's

4  something before the Second Appellate District Court of

5  Appeals?

6  A    There is a Orange County matter that is pending where

7  the firm is a defendant.

8  Q    "The firm," meaning Eagan Avenatti or Stoll --

9  A    Well, actually the firm initiated the action against

10 Stoll, Nussbaum --

11 Q    Okay.

12 A    -- seeking a declaratory judgment that they were not

13 owed anything because they had been terminated by the

14 clients.  They filed a counter-claim against the firm and

15 others.  That matter has been pending in Orange County

16 Superior Court for, I believe, now the better part of five

17 years.

18      There is a settlement agreement that was executed by

19 Mr. Stoll, that we believe resolves the claim against the

20 firm.  He disagrees.  That issue of the settlement agreement

21 and its scope and applicability is up at the Court of Appeal

22 at the state level before the Second District.

23      The Orange County matter has been stayed pending that

24 determination, which we would expect within the next six

25 months or thereabouts.

*Briggs Reporting Company, Inc.*

Exhibit H

USAO_00061074

18

1  Q    Okay.  Do you know why this creditor wasn't originally

2  listed on the schedules?

3  A    I don't.

4  Q    Who's representing your firm in that matter?

5  A    I believe Mr. Baker.

6  Q    Okay.  Same guy who's representing you in the

7  arbitration?  Does he handle most of the state court

8  matters?  So, for example, is he handling the stuff that's

9  been stayed that we talked about earlier, on the Birbrower

10 and Callaway?

11 A    I think we're handling the matter in Callaway.

12 Q    Okay.

13 A    I believe he may be handling the Birbrower matter.

14 Q    Okay.

15 A    The Root matter we're handling.

16      TRUSTEE HAUSER:  Mr. Kharasch, depending on the

17 scope of the employment or whatever, you need to look into

18 that to determine whether it needs to be employed or --

19      MR. KHARASCH:  We've made inquiries and started

20 asking about that.

21      TRUSTEE HAUSER:  Okay.  You're going to have to

22 speak up just a bit.  We're not --

23      MR. KHARASCH:  We've made inquiries about that.

24 Right now, there's been no decision to retain Mr. Baker on

25 behalf of the estate for compensation.

*Briggs Reporting Company, Inc.*

Exhibit H

USAO_00061075

19

BY TRUSTEE HAUSER:

Q    Okay.  That concludes my questions regarding the
amendments in the schedules.  We'll move on now to the May
operating report, which is docket item number 126.

    First thing I'd want to look at is page 23 of 36.
Okay.  And so what we're looking at is California Bank and
Trust bank statement.  I direct your attention to the middle
of the page there where it says, "deposits, credits."  Do
you see where it starts with May 2nd?

A    Yes, sir.

Q    Okay.  So what it looks like there from May 2nd through
May 15th, there was transfers into the estate, do you see
that?  In various amounts, starting with 16,000, 14,000,
7,500, 2,100, 1,200.  In fact, there's transfers all the way
through the 17th.

    I take it that those are transfers from you to the
Debtor, correct?

A    I believe that's what constitutes the amount on the
first page of the --

Q    Okay.  No, no, I appreciate that.  Okay.  So that is,
if we go back to page one where it shows -- this is at page
one of -- 20 of 36, loan from M.M. Avenatti (phonetic) for
89,400.  That 89,400 is these on-line transfers that I'm
referring to at page 23 of 36?

A    I haven't added it up, but I believe that to be the

20

1  case.

2  Q    That's all.  I'm just trying to confirm that.

3  A    Yeah.

4  Q    Okay.  It's not from another source?

5  A    Not that I know of.

6  Q    Okay.  And then you get to May 17th, and then there's a

7  $408,000 wire in from Ayers Law Offices.  Was that from the

8  settlement?

9  A    That was from a matter that was resolved, yes.

10 Q    Okay.  So it wasn't a loan or any other arrangement?

11 A    No, sir.

12 Q    Okay.  So it was settlement of some sort.

13      Now I'd like to direct your attention to page 17 of 36.

14 If you look at the bottom of the page there's a header

15 called, "non-operating expenses."  Do you see that?

16 A    Yes.

17 Q    Okay.  And below that, there's three line items.  One

18 is called, "interest expense," one's called, "legal and

19 professional," another one's, "other."  I'd like you to

20 focus on the line item that says, "legal and professional."

21 Do you see that?  It has nothing next to it.  That's kind of

22 the point.

23      So, in the month of May, did -- first of all, did you

24 receive a bill from the Pachulski firm for the month of May?

25              MR. SAUNDERS:  Not in time when this was filled

*Briggs Reporting Company, Inc.*

Exhibit H

USAO_00061077

21

1   out.

2           TRUSTEE HAUSER:  Okay.  So, Mr. Kharasch, if you

3   can tell me this, since you send through the billing.  For

4   the month of May when do you generate a bill?

5           MR. KHARASCH:  I was a little -- it was -- we were

6   late on -- we try to generate them in the middle of the next

7   month, but --

8           TRUSTEE HAUSER:  Okay.

9           MR. KHARASCH:  -- with all the activity, we

10  never --

11          TRUSTEE HAUSER:  Okay.  But the bill has been

12  generated, correct?

13          MR. KHARASCH:  It -- yes.

14          TRUSTEE HAUSER:  Okay.

15  BY TRUSTEE HAUSER:

16  Q    So, Mr. Avenatti, do you know how much was billed by

17  the Pachulski firm in the month of May?

18  A    I just received the bill, I think, yesterday.  I have

19  not looked at it yet.

20          TRUSTEE HAUSER:  Mr. Kharasch, do you know?

21          MR. KHARASCH:  I think it was about $185,000.

22          TRUSTEE HAUSER:  Okay.

23  BY TRUSTEE HAUSER:

24  Q    So we talked about this last time.  It's important that

25  you put that information where it says, "legal and

22

1   professional," so that we can keep an idea of how much --

2   that's an administrative expense.  An administrative expense

3   has to, under the bankruptcy code, has to be paid on the

4   effective date, unless the holder of that administrative

5   claim agrees to an alternate treatment.

6           MR. KHARASCH:  The effective date of a plan of

7   reorganization.

8           TRUSTEE HAUSER:  Yeah.  So, if you were to file a

9   plan in January, and the effective date, let's say -- or

10  confirm a plan in January, and the effective date's 30 days

11  later, that's due under the bankruptcy code, unless they

12  agree to take payment over time.

13          Either way, that would have to be in the

14  spreadsheet that you would submit to the court, so the court

15  can determine feasibility.  Do you have funds to pay this

16  administrative claim, either on the effective date, over a

17  period of time which they agree to.

18          So, you know, by the time we get -- since there's

19  no money in the estate at this current time to pay this

20  firm, the only we can have tracking, how much they're

21  accruing, is through this operating report.

22          MR. SAUNDERS:  Whatever we receive we'll list.

23          TRUSTEE HAUSER:  Right.

24          MR. SAUNDERS:  We didn't have the bill.

25          TRUSTEE HAUSER:  Okay.

*Briggs Reporting Company, Inc.*

Exhibit H

23

1         MR. SAUNDERS:  Yeah.  We'll --

2         TRUSTEE HAUSER:  So --

3         MR. KHARASCH:  We will make sure to get it, the

4  information to them before the next one's due.

5         TRUSTEE HAUSER:  Right.  So what will happen is,

6  for next -- so, the next operating report is due tomorrow.

7  I don't expect to see it until Monday.  We don't expect

8  people to file reports on Saturday.  So, the next report

9  should have the month of June on it.  And then on the

10 cumulative, you would add what was for May plus June, okay?

11        MR. SAUNDERS:  Understood.

12        TRUSTEE HAUSER:  It just helps everyone keep

13 track.

14        MR. SAUNDERS:  Whatever we have we'll list.

15        TRUSTEE HAUSER:  Yeah.

16 BY TRUSTEE HAUSER:

17 Q    Because there -- a lot of really good things could

18 happen in this case.  One is, you could settle with Frank

19 and Sims.  One is, Kimberly-Clark could settle tomorrow.

20 But until these things happen, we have an administratively

21 insolvent case.  Are you with me?

22 A    I understand what you're saying.

23 Q    Right.  So, I mean, we're in a situation where --

24 A    Kimberly-Clark is not the only case we have.

25 Q    I didn't say it was.  It could be another case, it

*Briggs Reporting Company, Inc.*

Exhibit H

24

1 could be five other cases.  But, a, you're not allowed to

2 disclose settlement to us until it's finalized, and -- or

3 even in some cases, when it is finalized, you said you

4 can't.  So, you know, there's no transparency there.

5      There's no -- this isn't like a company that has sales

6 revenue, where there's sort of a rhytthm to the case.  And

7 so, until, you know, we see money coming in otherwise, right

8 now you have an administratively insolvent case.

9      Now, with respect to your loan, you understand that

10 absent court approval, that you have no claim against the

11 estate, you understand that?

12         MR. KHARASCH:  He's been advised by his counsel.

13 BY TRUSTEE HAUSER:

14 Q    You're just giving money and you can't jump up six

15 months from now and say, I have an administrative claim,

16 because you never sought court approval.

17 A    I don't know what the -- I'm not a bankruptcy --

18 Q    No, I'm just telling you this, so that, hopefully,

19 afterwards you'll discuss it with your attorney, and you'll

20 take whatever action you want.  I'm not telling you what to

21 do.

22 A    I'm not worried about the $89,400 at this point.

23 Q    You shouldn't be, because it's -- there's no court

24 approval for it.

25         Okay.  Let's move on to the statement of financial

*Briggs Reporting Company, Inc.*

Exhibit H

USAO_00061081

25

1  affairs, docket item number 161.  Okay.  So we're just going

2  to hit all the spots where there were changes.  Page two of

3  23, the change there was, in the year 2017 you showed that

4  the revenue, gross revenue in the old statement was 35,000.

5  You've now increased that to 525, is that correct, $525,000?

6  A     Yes, sir.

7  Q     Okay.

8  A     As I referenced earlier, I don't know what happened on

9  the prior SOFA.

10  Q     Okay.

11  A     Okay.

12  Q     Okay.  The next change is going to be at page four of

13  23, question number four.

14  A     Yes, sir.

15  Q     You said, see attachment to question four.  That's

16  going to be at page 13 of 23.  At page 13 of 23 you get to a

17  spreadsheet.  And what this is is, these are payments or

18  transfers made within one year before the filing of the

19  case.  So, the case was filed on March 10th, 2017.  These

20  would be payments from March 16th through the filing date --

21  or the order for relief, which is March of 2017.

22       So the first one I want to ask you about is, on April

23  22nd, 2016, that's one, two, three, four -- five entries

24  down, there was a payment made from Eagan Avenatti to

25  Peoples Bank.  You list the relationship as a lender.  You

Exhibit H

USAO_00061082

26

1  also listen -- list on the amount of 331,000, then you put

2  the reason the payment was made, it was a loan repayment.

3  And then in parenthesis you put, "you personally guaranteed

4  that loan."  Do you see that?

5  A    I see that.

6  Q    Okay.  The question is, was the Peoples Bank loan made

7  for the benefit of the firm, or for an entity other than the

8  firm?

9  A    "For the benefit of the firm."

10 Q    So, what were the -- first of all, when was the loan

11 made, what year?

12 A    My best recollection is, it was made in December of

13 '14.

14 Q    Okay.  What were the terms of the loan?

15 A    I don't recall.

16 Q    Well, was it a -- if it was made December 2014, it was

17 paid back in April 2016, when was the maturity date of the

18 loan?

19 A    I don't recall the maturity date of the loan.  I'm

20 sorry.

21 Q    Was it a term loan with like a specified period, or was

22 it some kind of line of credit, was it --

23 A    I believe it was a term loan.  It may have been a line

24 of credit.

25 Q    Okay.  And why did the firm need to borrow those funds

**Briggs Reporting Company, Inc.**

Exhibit H

USAO_00061083

27

1  in December of 2014?

2  A    Just for general cash-flow purposes.

3  Q    Was there some event that was taking place?

4  A    There was no event.  It is pretty unusual to have a

5  contingency firm of our presence that deals in the level of

6  cases that we deal with, that does not have a five or

7  $10,000,000 line of credit.  In fact, most firms that --

8  most contingency firms do not fund their cases, et cetera,

9  out of cash flow.  We generally have been able to do that.

10 And I think that -- I forget the amount, the total amount of

11 this loan, it was than $331,000.  As I recall, it had been

12 paid down significantly.

13 Q    Was the original amount like seven figures, like a

14 million dollars?

15 A    It may have been.  It was not multi-millions of

16 dollars.  I don't remember exactly what the amount was.  I

17 think there was a UCC that had been filed in connection with

18 it.

19 Q    Securing your assets, you personally, or assets of the

20 Debtor?

21 A    "Assets of the Debtor."  I don't know if one was filed

22 against me personally or not.  I just don't remember.

23 Q    Okay.

24 A    But it's since been released.

25 Q    Yeah.  Okay.  My next question would be on the next

28

1  page, which is page 14 of 23.  There's a series of loan

2  repayments from the firm to you, starting in May of 2016,

3  going through January of 2017 on the next page.

4      So, let's start with the first one, May 23rd, 2016,

5  loan repayment of $220,000.  My first question is, was the

6  terms of the loan reduced to writing?

7  A    I don't believe so.

8  Q    So this is an oral agreement between the firm and

9  yourself, and you're the managing partner so, essentially,

10 it was a discussion between you and yourself?  I mean, it

11 didn't have to go to anyone for approval, right?

12 A    No.  It's an interest-free loan.

13 Q    Okay.  Well, that's what I was going to ask you next.

14 So, the terms of the loan -- there was nothing in writing.

15 You -- the firm needed the money?

16 A    From time to time, I inject capital into the firm, as

17 needed, for the reason that I had previously stated.  And

18 when cash flow permits, those monies are repaid interest

19 free.

20 Q    Okay.  But you're using different terms.  Injecting

21 capital, that's not a loan.

22 A    Well, injecting monies, I should say.

23 Q    Okay.  So you -- on May 23rd there was a loan made.

24 Would that be like, just like we see in these bank

25 statements, you would just wire funds from your personal

Exhibit H

USAO_00061085

29

1 bank account --

2 A    This is a repayment.

3 Q    I'm sorry.  But I'm starting with when the loan was

4 originally made.  Would you have wired money from your

5 personal account into the firm's bank account, just like we

6 saw on the bank statements we were going over earlier?

7 A    Generally, yes, but there may be other circumstances.

8 I don't know.

9 Q    Would funds ever come from third-party entities that --

10 business interests that you have, other than the firm?

11 A    They might.

12 Q    So, but "they might"?  Okay.  Did that in fact happen?

13 A    Did that happen in connection with this?

14 Q    In any of these loans that we're going to go over?

15 A    I'm sure there was an occasion of that.

16 Q    So, one of your entities made a loan to the Debtor, and

17 then rather than repaying the entity, the firm just repaid

18 you personally?

19 A    I don't know.  I would have to look at each, at each --

20 Q    No, we're not going to solve this -- you know, if

21 someone's really interested, their going to have to do a

22 2004 exam, get ledgers.  I'm just trying to get the big

23 picture.

24 A    Yeah.  I --

25 Q    Okay.

*Briggs Reporting Company, Inc.*

Exhibit H

USAO_00061086

30

1  A    -- I can't answer your question without the documents.

2  Q    But that did occur,  So, let's just call it, you know,

3  Global Baristas, just to use an entity.

4  A    I don't know that Global Baristas has ever loaned money

5  to the firm.

6  Q    Okay.  Give me another entity that you have, that you

7  think that --

8  A    Well, I mean, Avenatti and Associates.

9  Q    Okay.  All right.  So, there was nothing in writing.

10  If I asked you the same question for all of these

11  transactions, would your answer be the same, that,

12  essentially, these were oral agreements between you and the

13  firm?

14  A    I think that's accurate.  Yes.

15  Q    Were there any of these agreements that were ever in

16  writing?

17  A    Any instance where I've ever loan money to the firm

18  that was in writing?

19  Q    Yes.

20  A    Ever?

21  Q    Well, within the year period we're referring to.  This

22  is a one-year look back.

23  A    Yeah.  I don't know that these loan -- I don't know

24  that the loan repayments here, to be clear, relate to loans

25  that were made to the firm within the same year.

31

1  Q    No, I understand that.

2  A    I've waited a considerable amount of time for, for

3  all --

4        MR. SAUNDERS:  Yeah, he's aware of that.  You

5  knows that the timing's different.

6        THE WITNESS:  Okay.

7  BY TRUSTEE HAUSER:

8  Q    Okay.  But were any of these loans, which were repaid

9  within the one year, ever reduced to writing?

10 A    I don't know.  I would have to go back and look.

11 Q    Okay.

12 A    Because I don't know the timing associated with each of

13 these and what it related to.

14 Q    Okay.  Now you talk about "injecting capital."  These

15 loan repayments were being made at a time when it appears

16 the payroll taxes were not being made.

17 A    Well, that's the claim.

18 Q    Okay.  All right.  I'm just trying to understand why

19 monies were going out of the firm at a time when it had

20 trouble making its payroll taxes.  I mean, unless you think

21 that claim is zero, if you do, then --

22 A    Well, as I've stated, we dispute those claims.

23 Q    Okay.

24        TRUSTEE HAUSER:  Did you want to interject about

25 your claim at this point or?

*Briggs Reporting Company, Inc.*

Exhibit H

USAO_00061088

32

1        MS. SHARIFF:  Did I -- I'm sorry, what?

2        TRUSTEE HAUSER:  You had indicated you wanted to

3  discuss --

4        MS. SHARIFF:  Right.  So --

5        TRUSTEE HAUSER:  Why don't you state your name for

6  the record and --

7        MS. SHARIFF:  Yes.  This is Ms. Shariff.  I am

8  waiting to hear back from the I.R.S., because a lot of these

9  returns were -- that were unfiled, that were provided to my

10 office, were provided -- some were provided yesterday and

11 the day before.  And so, I'm awaiting verification.

12        So, my questions are probably going to be at the

13 end.  I don't want to have to ask questions if, you know,

14 I.R.S. can answer those questions or -- so, I want to do it

15 altogether.

16        TRUSTEE HAUSER:  Okay.

17 BY TRUSTEE HAUSER:

18 Q    Moving on.  So we just covered question 4.1.  Moving on

19 to page six of 23, the change made to there is -- if you

20 look at lawsuit 7.18 through the next page, 7.22, these were

21 the same lawsuits that you added to the schedules, correct?

22 A    I believe that's true, yes.

23 Q    Okay.  Then at page seven of 23 you added a claim

24 against Mr. Sims for theft of the laptop, which we discussed

25 at the last meeting.  Was that a laptop that was issued to

*Briggs Reporting Company, Inc.*

Exhibit H

USAO_00061089

33

1  him by the firm or?

2  A    Yes.

3  Q    And it was specifically said that the laptop was not --

4  is property of the firm and it's not your personal property?

5  A    There's no question that that laptop was the property

6  of the firm.  When we demanded that he return it, he

7  actually returned the -- this should say, "theft of laptop

8  computer hard drive."  When we demanded that he return it

9  after his termination from the firm, he returned the laptop

10 but had replaced the hard drive in the laptop.

11 Q    So, you really wanted the hard drive back?

12 A    Yes.

13 Q    Okay.

14 A    It's property of the estate.

15 Q    Okay.

16       TRUSTEE HAUSER:  I mean, Mr. Kharasch, have you

17 made demand for turnover?

18       MR. KHARASCH:  We have not yet gotten to that

19 part.

20       TRUSTEE HAUSER:  Okay.  Because there's a really

21 simple motion called a 542 motion, that you can make if it's

22 truly property of the estate.  It's not that hard.

23 BY TRUSTEE HAUSER:

24 Q    Okay.  Question number 13, which is at the bottom of

25 page seven of 23.  There's no change here, but I just want

*Briggs Reporting Company, Inc.*

Exhibit H

34

1  to make sure we get this for the record.

2       So this question basically asks whether the firm,

3  within two years prior to the filing, transferred any

4  property out of the ordinary course of business to third-

5  party entities.  And so, let me just kind of hone in,

6  because I think we talked about this last time.  Did the

7  firm within two years prior to the filing of this case, for

8  example, transfer any funds to any of your business

9  interests?  And I'll use Global Baristas as one example, but

10 I don't even know all your business interests.

11 A    Outside the ordinary course of business?

12 Q    Well, I can't imagine how transferring monies Global

13 Baristas would be -- even $100, would be in the ordinary

14 course of business, because that's not part of the business

15 model of Eagan law firm.

16      I mean, if you told me you bought stuff at Staples

17 every month, yeah, that would be ordinary course.  But

18 there's no reason why Eagan Avenatti, as a law firm, would

19 be transferring money to your personal business interests in

20 the ordinary course of business.  So, any transfer, from my

21 perspective, would be outside the ordinary course of

22 business.  The order of magnitude makes a difference.  No

23 one really cares about $100.

24           MR. KHARASCH:  Are you including loan repayments

25 as well?

35

1          TRUSTEE HAUSER:  It's really clear here that it
2  says, "any transfers."  It's the movement of money from
3  Eagan Avenatti to third parties.  It says, "both outright
4  transfers, transfers" -- let me ask it another way.
5  BY TRUSTEE HAUSER:
6  Q    In your experience, does Eagan Avenatti transfer funds
7  to your business interests from time to time?  Without
8  regard to time frame, just to make this a little bit earlier
9  for you to conceptually get your arms around.
10 A    Yes.
11 Q    Okay.  So then, the only question becomes is, whether
12 it occurred within two years prior to the filing?
13 A    I believe the answer to this question 13 is accurate as
14 reflected on this document.
15 Q    Okay.  The next change was at page 11 of 23.  If you
16 look in the middle of page, question number 30, payments,
17 distributions or withdrawals to insiders.  And then you
18 reference an attachment, which is SOFA number 30, and that's
19 at page 17 of 23.  If you look specifically at page 19 of
20 23, you will see compensation to Mr. Avenatti starting in
21 March of 2016, going all the way through February of 2017.
22      Let me ask you a question.  It has a term, "origination
23 fees."  What does that refer to?
24 A    Pursuant to my agreement with the firm, I am entitled
25 to origination fees on matters that I originate for the

*Briggs Reporting Company, Inc.*

Exhibit H

USAO_00061092

36

1 firm, which generally are 85- to 90-percent of the matters

2 that the firm has.

3 Q    Is there a written contract between you and the firm

4 with respect to the origination fees?

5 A    Yes.

6 Q    Okay.  And what are the -- is there a typical set of

7 terms with respect to the origination fee?

8 A    Anywhere from 15- to 25-percent of the gross fees

9 obtained.

10 Q    So, when a matter settles, where you originated -- when

11 you say, "originated," that means you bought the client into

12 the firm?

13 A    I brought the "client into the firm," and then the

14 client is a client of the firm --

15 Q    Okay.

16 A    -- not a client of me individually.

17 Q    Okay.  And, obviously, because these are typically

18 contingency cases, you wouldn't get a payment until the

19 matter is settled everyone knows what the benefit was,

20 correct?

21 A    Correct, but some of those origination fees are then

22 deferred, depending on the cash flow availability of the

23 firm.

24 Q    Right.  But I'm saying, none of the origination fees

25 would ever be paid up front in anticipation of an outcome

37

1  which nobody knows the -- okay.  So, it's fair to say that

2  no origination fees are paid until after a matter is either

3  settled or it goes to verdict, right?

4  A     Correct.

5  Q     Okay.  And it's 15- to 20-percent --

6  A     No, 15- to 25-percent, depending on the matter.

7  Q     -- of the -- so, if the firm were to bring in

8  $1,000,000 in fees, it's 15- to 25-percent of that amount?

9  A     Correct.

10 Q     Okay.  No, I was just -- you know, the contingency

11 rates, usually, I think you said something like 33- to 40-

12 percent?

13 A     I can range anywhere from the low 20's --

14 Q     Right.

15 A     -- to 45-percent.

16 Q     And I just want to make sure it wasn't a 15-percent

17 slice.  So it's 15- to 20-percent (sic) of whatever the

18 gross amount is brought in by the firm?

19 A     You keep trying to cut my five-percent.  It's 15- to

20 25-percent.

21 Q     Okay.  I'm sorry about that.  So -- okay.  So -- but

22 your -- what you also said is, these wouldn't necessarily

23 track with the settlement, because it's possible that you

24 would defer taking the fee.  What -- for as long as how

25 long, I mean?

*Briggs Reporting Company, Inc.*

Exhibit H

38

1 A    Years.

2 Q    Okay.  And if someone were to say, the $22,000, what

3 case was that from, would you know?

4 A    Maybe, maybe not.  I mean, as I sit here today, just

5 based on the schedules --

6 Q    Right.  But who would, I mean, who would know?  Who

7 would be keeping track and saying, okay, that $40,000, you

8 know, on May 16th, that was for an origination fee for case

9 number whatever?

10 A    Let's assume for the sake of argument that I'm owed

11 $2,000,000 in origination fees as of this date.

12 Q    Right.

13 A    If I want to take down $22,000 of those origination

14 fees --

15 Q    Right.

16 A    -- from the firm, and if cash flow permits --

17 Q    Right.

18 A    -- then I'll take down $22,000, and it's reflected as

19 set forth under the schedule.

20 Q    Right.  But is there a ledger somewhere, like in

21 QuickBooks, where it just says, amount of origination fees

22 owed to Mr. Avenatti?  You know, and what you're saying, is

23 it accumulates.  So it might be up to two or $3,000,000.

24 A    There's -- yeah.  There's not a ledger in QuickBooks,

25 but there's a spreadsheet that is kept relating to

*Briggs Reporting Company, Inc.*

Exhibit H

USAO_00061095

39

1   origination fees for each attorney within the firm.

2   Q    Okay.

3   A    That's all -- and that's always been the case.

4   Q    Okay.  That's all I was trying to figure out, is there

5   a paper trail.  So if someone wanted to see, why did Mr.

6   Avenatti get, you know, $50,000, they can look to it and

7   say, we know it's from case x.  That's all.

8        In June of 2016, there was a rather large disbursement

9   for $718,000, and it's broken up into three parts,

10  compensation, origination fees and repayment.  Do you know

11  how much each of those was?

12  A    Not as I sit here today.

13  Q    Do you know where the lion's share was?

14  A    I believe "the lion's share" was origination fees.

15  Q    Okay.  And, again, the way you described it, it could

16  have been that those were deferred for years.  You have this

17  sort of a ledger where the balance kind of keeps going up

18  and up, and then at some point when you feel the firm has

19  enough cash, you'll draw down, or you'll get -- you'll make

20  the distribution to yourself?

21  A    Yes, sir.

22  Q    Are you in charge of cash management for the firm?

23  A    I don't know what you mean by "cash management."

24  Q    Well, I mean, making sure that the firm has the ability

25  -- enough cash on hand to pay its bills, to pay its taxes,

Exhibit H

USAO_00061096

40

1  to, you know --

2  A    Generally, yes, but I would not agree with the

3  absolute, that I'm in charge of every aspect of that.

4  Q    I didn't say you were.  I'm just, I'm trying to

5  understand whether -- sometimes people use bankers to assist

6  them in saying, look, you know, your cash flow is running

7  tight.  You better not -- do you ever use outside banks to

8  assist you in the cash management of the firm?  Do you have

9  a banking relationship?

10 A    We have a "banking relationship," but I would not

11 describe it as me consulting with that banking relationship

12 for the purposes you've ask me.

13 Q    Okay.  All right.  I have no more questions on this

14 document -- I'm sorry, that's not true.  I apologize.  We

15 just finished with question number 30.  I wish we were done,

16 but we're not.

17      Let's try and power through this.  All right.  So we

18 got through question 30.  I just want to see if there's any

19 more questions on here.  Thirty, 31, 32.  Actually, I was

20 at, thereabout, was the final question on the statement of

21 financials.

22           TRUSTEE HAUSER:  So, at this time we have two

23 options.  One is, we can take a brief break.  If there's a

24 show of hands, if you'd want to take -- or I can just open

25 the floor to questions, and we can power through this.

*Briggs Reporting Company, Inc.*

Exhibit H

41

1        THE WITNESS:  I'd like a bathroom break, if you

2 don't mind.

3        TRUSTEE HAUSER:  Okay.  Let's call -- right now

4 it's 11:21.  If everyone can be back here by 11:30 sharp,

5 that would be great.

6        Okay.  So we are going off the record.

7     (Proceedings recessed briefly.)

8        TRUSTEE HAUSER:  Okay.  So we are back on the

9 record in the case of Eagan Avenatti.  Again, today is July

10 14th, 2017.

11        Mr. Avenatti, you realize that you are still under

12 oath?

13        THE WITNESS:  Yes, sir.

14        TRUSTEE HAUSER:  Okay.  I finished my questioning.

15 I'm opening up the floor to creditors.  Mr. Polas, why don't

16 you state your appearance for the record, and go ahead and

17 proceed.  State who you represent, and go ahead and ask your

18 questions.

19        MR. POLAS:  Yeah.  My name is Tom Polas, it's P-O-

20 L-A-S, and I represent the Stoll Law Firm, that filed a

21 proof of claim for approximately $35,000,000 that was

22 discussed at the earlier session.

23                    FURTHER EXAMINATION

24 BY MR. POLAS:

25 Q    Mr. Avenatti, I have a few questions of you.

Exhibit H

USAO_00061098

42

1 A    Good morning.

2 Q    Good morning.  We're still morning?  Okay.

3      Let me ask you -- Mr. Hauser asked you some questions

4 earlier about your law firm, the entity, the Debtor, being

5 funded by parties or entities you're related to, correct,

6 sir?  That is your -- do you have entities that fund cash-

7 flow problems, cash-flow shortages for this law firm?

8 A    I think I answered correctly, yes.

9 Q    Okay, you do.  Okay.  Let me ask you, in the last 90

10 days, what are the names of those entities that funded cash-

11 flow issues with this law firm?

12 A    I believe me, personally, and Avenatti and Associates.

13 Q    And to the best of your recollection, those are the

14 only two entities that have funded the firm, let's say, over

15 the last 90 days?

16 A    To the best of my recollection, as I sit here today

17 without the benefit of the documents, yes.

18 Q    Okay.  Now let me ask you, you're obviously the

19 controlling person, the controlling person of these

20 entities, you individually testified, correct?  So,

21 obviously that's you, individually, correct?

22 A    I don't know what entity you're talking about.

23 Q    You said Avenatti and Associates, you're the

24 controlling person of that entity, correct, sir?

25 A    Yes, sir.

43

1  Q     And is that a corporation, a LLC?  What is that?

2  A     It's a corporation.

3  Q     Okay.  What percentage of shares do you know in that

4  entity, sir?

5  A     A hundred-percent.

6  Q     Okay.  Now let me ask you, you've testified you

7  individually and Avenatti and Associates have funded cash-

8  flow problems over the last 90 days for the firm.  How were

9  those monies transferred to the Debtor entity?  Is it via

10 wire, cash, check?  How is that handled?

11 A     Without having the documents, I don't know.  It may be

12 one or more of what you just described.

13 Q     So, I described three possible methods, wire, cash or

14 check.  Which of those three would these transfers be in the

15 form of?

16 A     Well, I think I just answered that question.  It would

17 be one or more of those.

18 Q     Okay.  Let me ask you, when the transfers to the

19 corporation from your related entity, or you individually,

20 is via wire, which bank accounts are these coming from?

21 A     It would depend on the transfer.

22 Q     What do you mean by that?

23 A     Exactly what I said, it would depend on the transfer.

24 Q     Depending on what, the day, the week, the amount?

25 What's the contingencies that this depends upon, these

*Briggs Reporting Company, Inc.*

Exhibit H

44

1  transfers would depend on?

2  A    Wait --

3          MR. KHARASCH:  I object --

4          THE WITNESS:  -- I don't understand the question.

5  BY MR. POLAS:

6  Q    Well, I don't understand your response.  You said that

7  whether --

8          MR. KHARASCH:  Well, let's start with the question

9  again.

10  BY MR. POLAS:

11  Q    The question is --

12  A    There's no foundation to the question, but go ahead.

13  Q    Okay.  We'll let your lawyer make those legal

14  objections.

15      Let me ask you, sir, you've testified that there's

16  various -- this entity, Avenatti and Associates, makes

17  transfers to the business, the Debtor law corporation,

18  during cash-flow shortages, correct, sir?

19  A    I've already answered that question.

20  Q    Okay.  I was asked to repeat the question by your

21  counsel, that's why I did.  What was your answer, sir?

22  A    I'm going to stand on my answer, sir.

23  Q    Okay.  Then don't have your counsel ask me again to

24  repeat the question if you're not going to answer it.

25  A    Don't argue with me, please.

*Briggs Reporting Company, Inc.*

Exhibit H

USAO_00061101

45

1  Q    I'll ask my questions, sir, how I choose to answer and

2  ask them.

3      Okay.  Back to the question.  Your testimony 30 seconds

4  ago was that, it depends on something, which you didn't

5  answer, whether those transfers to the law corporation are

6  via wire, cash or check, isn't that correct, sir?  My

7  question is, what are the "depends," what are the different

8  conditions?

9  A    I don't know.

10  Q    You don't know?  Okay.  Interesting.  Now my follow-up

11  question is, from which bank accounts did these monies come

12  into the corporation?

13  A    You already -- you already asked me that.

14  Q    And what was your response, sir?

15  A    Sir, please let me finish.  Without having the specific

16  transfer documentation in front of me, I cannot answer your

17  question.  You are asking me, without any foundation, as to

18  some transfer during some period of time --

19  Q    Ninety days is the period of time, sir.

20  A    Sir, can you please just not interrupt me.  Just let me

21  finish my question -- my answer, and I'll let you finish

22  your question.

23  Q    Okay.

24  A    Sound fair?

25  Q    That's fair.

*Briggs Reporting Company, Inc.*

Exhibit H

46

1  A    Okay.  Without the specifics I can't answer your

2  question, sir.

3  Q    Who would have the specifics of this -- the details, I

4  should say, the details of these transfers into the

5  corporation?

6  A    The firm.

7  Q    "The firm."  This firm, the Debtor entity?

8  A    Yes, I believe so.

9  Q    Okay.  So, if we took a 2004 exam and requested these

10  documents, we would obtain this information, correct, sir?

11  A    I can't answer that question.  I don't know whether

12  you'd have obtained it or not, I don't know whether the 2004

13  would be granted or not.  I would have to rely on my

14  counsel.

15  Q    Okay.  So sitting here today, you don't know what banks

16  these accounts are held that transfer monies into the

17  corporation?

18  A    Sir, I think I've answered your question.

19  Q    And do you know the bank account numbers in which these

20  accounts are held at, that transfers monies into the

21  corporation?

22       MR. HOROUPIAN:  You know, this is Mark Horoupian.

23  I'm Mr. Avenatti and Avenatti and Associates' counsel.  I'm

24  going to object and direct my client not to answer these

25  questions.  Because the bank accounts of third-party

*Briggs Reporting Company, Inc.*

Exhibit H

47

1  lenders' bank account numbers are not relevant to the

2  Debtor's assets and liabilities and statement of financial

3  affairs.

4          MR. POLAS:  It's relevant --

5          MR. HOROUPIAN:  Let's move on.

6          MR. POLAS:  -- it's relevant to the Debtor's

7  operations.

8          MR. HOROUPIAN:  I've directing him not to answer.

9          MR. POLAS:  You're directing him not to answer?

10         MR. HOROUPIAN:  (Indiscernible) -- yes.

11         MR. POLAS:  Okay.  Now who are you again, sir?

12         MR. HOROUPIAN:  I just said.  I'm Mark Horoupian,

13  Sulmeyer Kulpetz, and I'm Mr. Avenatti's and Avenatti and

14  Associates' counsel.

15         MR. POLAS:  You're the Debtor's counsel?

16         MR. HOROUPIAN:  No, I did not say that.  Avenatti

17  and Associates is not the debtor --

18         MR. POLAS:  Non-debtor third party.

19         MR. HOROUPIAN:  -- nor is Michael Avenatti.

20         MR. POLAS:  Okay.

21         I have no further questions now.  I reserve to ask

22  at the end of the session.

23         TRUSTEE HAUSER:  Sure.

24         MR. POLAS:  Thank you.

25         TRUSTEE HAUSER:  And at this time is there anyone

48

1 else who would like to ask questions of the -- of Mr.

2 Avenatti?

3          MR. FRANK:  Yes, I would.

4          TRUSTEE HAUSER:  Okay.  Please come forward, state

5 your name for the record, and proceed.

6          MR. FRANK:  Jason Frank on behalf of Jason Frank

7 and Jason Frank Law, PLC.

8                    FURTHER EXAMINATION

9 BY MR. FRANK:

10 Q    Good morning, Mr. Avenatti.  Obviously we know each

11 other.  For purposes of having a clear record, I'm going to

12 do my best to refer to myself in the third person as Mr.

13 Frank, and I ask that you do the same.  Is that agreeable?

14 A    I don't know exactly what you're suggesting.

15 Q    So, rather than -- if you're referring in an answer to

16 me, rather than saying, "you" or "I," you refer to "Mr.

17 Frank."  Is that agreeable?

18 A    I'm going to refer to you in whatever way that I deem

19 fit, and it will be professional.

20 Q    Thank you.  Last time we were here you were given a

21 deadline to prepare new schedules of June 30th.  Why did you

22 not file your new schedules by June 30th?

23 A    I'm not going to answer that question.

24 Q    I'm sorry?

25          MR. KHARASCH:  He had time constraints.  He was

*Briggs Reporting Company, Inc.*

Exhibit H

49

1 not in a position to file them at the time -- at that time.

2 BY MR. FRANK:

3 Q   Okay.  How -- why were the -- well, let me ask you

4 this.  Mr. Avenatti, are you finding it difficult to

5 practice law, manage your various companies, and fulfill

6 your obligations in this case, meaning your bankruptcy

7 obligations, in a timely and accurate manner?

8        MR. HOROUPIAN:  I just -- this line of questioning

9 is starting to -- it's getting personal.  This doesn't

10 relate to the obligations and the assets of the estate.

11 This is now --

12        MR. KHARASCH:  There's -- I'm Mr. Kharasch.  I

13 disagree because --

14        MR. HOROUPIAN:  There's a personal dispute here.

15        MR. KHARASCH:  Yeah.  Fair enough.

16        MR. HOROUPIAN:  This is just, this is needling and

17 antagonism.

18        MR. FRANK:  Okay.

19 BY MR. FRANK:

20 Q   Mr. Avenatti, you -- I want to ask some questions about

21 the Bahamas v. Kimberly-Clark class action.  You have a

22 verdict that you obtained of $454,000,000, is that correct?

23 A   Despite your efforts, yes.

24 Q   And --

25 A   Would you like to ask me --

*Briggs Reporting Company, Inc.*

Exhibit H

50

1  Q    -- that's in post-trial briefing?

2  A    -- would you like to ask me some questions about your

3  interference in that matter?

4  Q    That's in post-trial briefing?  Is that in post-trial

5  briefing?

6  A    Yes.

7  Q    In a class action, if there is a settlement or

8  judgment, as part of the process the plaintiff will be able

9  to submit an application for attorney's fees, is that

10  correct?

11  A    Yes.

12  Q    And the benchmark award for attorney's fees in the

13  Ninth Circuit is 25-percent of the amount, true?

14  A    Yes.

15  Q    So, if Eagan Avenatti and the plaintiff were to obtain

16  a $454,000,000 verdict or a judgment, then the fees could be

17  over $100,000,000, true?

18  A    The total attorney's fees awarded, yes.

19  Q    When the plaintiff files the application for attorney's

20  fees, are you going to request that any portion of the fees

21  be awarded to you personally, as opposed to the Debtor law

22  firm?

23  A    Yes.

24  Q    How much?

25  A    Well, let me be clear.  We haven't made that

Exhibit H

USAO_00061107

51

1  determination yet, but probably.  But no determination's

2  been made, because we're not there yet.

3  Q    How much?

4  A    We don't know yet.

5  Q    You say "we," who is going to be involved in that

6  decision?

7  A    I can't speculate on who's going to be involved.

8  Q    You are the managing partner of Eagan Avenatti,

9  correct?

10 A    I think that's already been established.

11 Q    You also own, I believe, 75-percent of the equity of

12 the firm?

13 A    Correct.

14 Q    And you are the lead counsel of -- in the Kimberly-

15 Clark case, correct?

16        MR. KHARASCH:  I think he answered the question.

17 The firm hasn't made the decision yet, or whoever's supposed

18 to be --

19 BY MR. FRANK:

20 Q    I believe the question is, is he the lead counsel in

21 the Kimberly-Clark case?  Is that true?

22 A    I personally am the lead counsel, which was clarified

23 by the court as a result of your conduct in attempting to

24 have the firm removed as counsel, Mr. Frank, which you are

25 well aware of.

*Briggs Reporting Company, Inc.*

Exhibit H

52

1   Q     Mr. Avenatti, if you make the decision --

2   A     You've been contacting Spaulding (phonetic) in an

3   attempt to do that, didn't you?

4   Q     Mr. Avenatti, if you make --

5   A     Didn't you?

6   Q     -- Mr. Avenatti, if you make the decision --

7   A     Didn't you do that?

8   Q     Mr. Avenatti --

9   A     You attempted to undercut the interest --

10          MS. CHENETZ:  Mr. Hauser, there's only one witness

11   here.  Only one person answering -- asking questions.

12   BY MR. FRANK:

13   Q     Mr. Avenatti, if you make the decision to request that

14   a portion of the fees be awarded to you personally, as

15   opposed to the Debtor law firm, is there anyone at Eagan

16   Avenatti who could overrule your decision?

17   A     I can't speculate as to the situation you're

18   describing, Mr. Frank.  Like I said, we haven't decided how

19   that's going to be handled.  We're more concerned with other

20   matters right now.

21   Q     Mr. Avenatti, is there anyone at the law firm who can

22   overrule your decision, if you decide to request that fees

23   be awarded to you personally, as opposed to the law firm?

24   A     I don't know.

25   Q     Who would that be, if it isn't you?

*Briggs Reporting Company, Inc.*

Exhibit H

53

1  A    I can't speculate.

2  Q    Well, does Mr. Eagan have the right to overrule that
3  decision?

4  A    I can't speculate.

5  Q    Does Mr. Abbott (phonetic) -- does Mr. Eagan have a
6  contractual right to overrule decisions that you make in
7  relationship -- any decisions?

8  A    Maybe.  I would have to think about it.

9  Q    Okay.  Does Mr. Eagan -- is that -- would that be in
10  your partnership agreement with Mr. Eagan?

11  A    I don't know.

12  Q    Now, in addition, is there any other entity that would
13  be entitled to any portion of the Kimberly-Clark fees, other
14  than the firm and, potentially, you?

15  A    I believe Mr. Herron (phonetic) is entitled to a
16  percentage of the fees.

17  Q    And Mr. Herron made an appearance into the case post-
18  petition, is that correct?

19  A    "Post-petition."

20  Q    Correct?

21         TRUSTEE HAUSER:  Well, let's --

22         MR. FRANK:  "Post-petition," meaning after the
23  filing of this bankruptcy.

24         TRUSTEE HAUSER:  Yeah.  Just make clear for the
25  record.  That would have been March -- well, the order for

Exhibit H

USAO_00061110

54

1  relief in this case is March 10, 2017.

2          THE WITNESS:  He technically filed his appearance

3  in the case on the first day of trial, which, as I recall,

4  was March, it was in late March.

5  BY MR. FRANK:

6  Q    Did he take any witnesses in that case?

7  A    I don't remember.

8  Q    Did he perform the opening or closing statement?

9  A    No.

10 Q    Did he conduct the voir dire of the jury?

11 A    No.

12 Q    Did he argue any motions to the court?

13 A    Well, actually, when you say, did he conduct the voir

14 dire, he certainly assisted in the voir dire, yes.

15 Q    You asked the questions, he may have given you some

16 advice, is that correct?  You asked the questions of the

17 jury?

18 A    Yes.

19 Q    Okay.  Did Mr. Herron argue any motions to the court?

20 A    I believe he did.

21 Q    Okay.  Does Eagan Avenatti have a written agreement

22 with Mr. Herron to share any portion of the fee?

23 A    Yes.

24 Q    What is that percentage?

25 A    I don't remember.

*Briggs Reporting Company, Inc.*

Exhibit H

55

1   Q    Where is that agreement?

2   A    The firm has the agreement.

3   Q    And that agreement was entered into after March 1st?

4   A    I don't remember when the agreement was entered into.

5   Q    When you say, "the firm has the agreement," where would

6   it be stored?

7   A    At the firm's offices.

8   Q    Where, in particular, in the firm's office?

9   A    I don't know.

10  Q    Is it be in your office or Ms. Regnier's office?

11  A    I think I just answered, "I don't know."

12  Q    You're the managing partner of the firm, correct, as

13  we've established.  I'm just curious why you wouldn't know

14  where the agreement would be with Mr. Herron, to share fees

15  in one of the biggest assets of the law firm?

16  A    Sir, I told you the agreement would be at the offices

17  of the firm.  I can't tell you the exact file cabinet that

18  it would be located.

19  Q    I'm just asking which office, your office or Judy's

20  office?

21  A    You mean, Ms. Regnier?

22  Q    Ms. Regnier's.

23  A    I don't know.

24  Q    Other than Mr. Herron, is there any other entity that

25  is -- or person that is entitled to a portion of the fee in

*Briggs Reporting Company, Inc.*

Exhibit H

56

1 the Kimberly-Clark case?

2 A    Not that I can recall.

3 Q    Have you any referral fee agreements in relationship to

4 the Bahamas v. Kimberly-Clark case?

5 A    Not that I can recall.

6 Q    Do you have any agreement with Mr. Baker to provide any

7 portion of the fees in the Kimberly-Clark case -- we'll

8 start with the Bahamas-Kimberly-Clark case.

9 A    No.

10 Q   There was a witness who testified in that case, I

11 believe, Mr. Edgid (phonetic).  Do you have any agreement

12 with Mr. Edgid's counsel to sharing any fees in the Bahamas

13 v. Kimberly-Clark case?

14 A    No.

15 Q    Do you have any agreement to share fees with Mr.

16 Edgid's counsel in relationship to any case that your firm

17 is representing a plaintiff against Kimberly-Clark?

18 A    As you know, Mr. Frank, and as Mr. Stolper knows,

19 there's an agreement relating to the qui tam litigation that

20 is pending against Kimberly Clark.

21 Q    And what is the percentage of the fee that you're

22 sharing with Mr. Edgid's counsel in the qui tam action?

23 A    I haven't looked at the agreement in over two years.  I

24 don't recall.

25 Q    When you entered into this agreement, who was

*Briggs Reporting Company, Inc.*

Exhibit H

57

1  representing Eagan Avenatti, when you negotiated the terms

2  of this agreement?

3  A    I believe I was.

4  Q    Anyone else on behalf of the firm?

5  A    Not that I can recall.

6  Q    Okay.  And is this agreement in writing?

7  A    I believe it is.

8  Q    And is it located at the firm?

9  A    Yes, but I can't tell you which file cabinet.

10 Q    Okay.  Same -- you have a friend named Michael Ward

11 (phonetic), is that -- do you have any agreements with Mr.

12 Ward to share any portion of the fee in the Kimberly-

13 Clark case -- in any of the Kimberly-Clark cases?

14 A    Not that I recall.

15 Q    Do you have any agreement with Mr. Herron that if he's

16 awarded a portion of the fee, that he will pay you some

17 portion of that back to you personally?

18 A    Absolutely not.

19 Q    So you have that agreement with anyone?  Do you have an

20 agreement with any party, that if they are awarded a portion

21 of the fee in any of the Kimberly-Clark litigation, that

22 they will pay some of that fee back to you personally?

23 A    No.

24 Q    Do you have agreement to share any portion of the fee

25 in the Kimberly-Clark Bahamas class action with Filippo

*Briggs Reporting Company, Inc.*

Exhibit H

58

1  Marchino?

2  A     There is an agreement in place relating to -- or

3  between the firm and the X-Law Group, relating to various

4  cases and the X-Law Group's right to fees from those cases.

5  As I sit here right now, I do not recall if the Bahamas case

6  is one of those cases.

7  Q     Okay.  And I believe at the last exam, you were

8  requested to provide a copy of that in writing to Mr.

9  Hauser.  Did you provide that agreement?

10  A     I don't know that to be the case or not.  I have not

11  had a chance to review the audio or any transcript from that

12  prior proceeding.

13            MR. KHARASCH:  I don't recall --

14            THE WITNESS:  I don't recall that.

15  BY MR. FRANK:

16  Q     Well, let's ask it differently then.  This agreement,

17  was it in writing with the X-Law Group?

18  A     Yes.

19  Q     When was it reached?

20  A     Last year at some point.

21  Q     The summer?

22  A     I believe so.

23  Q     Can you give us any more specifics?  The month, July,

24  August, September?

25  A     No.

*Briggs Reporting Company, Inc.*

Exhibit H

59

1  Q    Was it after I left the firm?

2  A    After you were fired?

3  Q    Okay.  After I was fired, if you'd like to state it

4  like that.

5  A     Well, you were terminated.  Right, you remember being

6  walked out?

7         MR. KHARASCH:  All right.  Let's just keep to

8  the --

9         THE WITNESS:  Yeah, it was after you were

10 terminated from the firm.

11 BY MR. FRANK:

12 Q    And you have complete control to decide if I should be

13 terminated, correct, at the firm?

14 A    Sir, I don't think that goes to the assets or

15 liabilities.

16 Q    All right.  When you negotiated this agreement with the

17 X-Law Group, who was negotiating on behalf of Eagan

18 Avenatti?

19 A    I was.

20 Q    Anyone else on behalf of Eagan Avenatti?

21 A    No.

22 Q    Who was negotiating it on behalf of the X-Law Group?

23 A    Mr. Marchino.

24 Q    And anyone else on behalf of the X-Law Group?

25 A    No.

*Briggs Reporting Company, Inc.*

Exhibit H

60

1  Q      How long have you known Mr. Marchino?

2  A      Five years, approximately.

3  Q      He's a friend of yours, correct?

4  A      Yes.

5  Q      And is part of this agreement you gave him a piece of

6  your cases that you've estimated is worth $17,000,000?  And

7  by "him," I mean, the X-Law Group, correct?

8  A      I don't know that the estimate was included at the

9  time.  So, I mean, as phrased, I'll say, no.

10 Q      Where is a -- do you have a copy of this agreement?

11 A      There should be a copy at the firm's offices.

12 Q      One of these files, but you don't know where, correct?

13         TRUSTEE HAUSER:  Sir, just to kind of calm this

14 thing down.  The fact of the matter is, if he says, in his

15 office, it doesn't really matter what file cabinet --

16         MR. FRANK:  That's fine.

17         TRUSTEE HAUSER:  -- it is.

18         MR. FRANK:  That's fair.

19         TRUSTEE HAUSER:  Okay.

20 BY MR. FRANK:

21 Q      This agreement provided that the X-Law Group would get

22 a piece of certain cases at Eagan Avenatti.  Was it a

23 percentage?

24 A      As I recall, yes, but I haven't looked at the agreement

25 in the better part of a year.

*Briggs Reporting Company, Inc.*

Exhibit H

61

1  Q    And in addition, as part of this agreement, did you
2  agree that you would start paying the attorneys at the X-Law
3  Group, you would pay a portion or all of their salaries?
4  A    Yes.
5  Q    And did you also agree to pay the rent for their office
6  in Los Angeles?
7  A    There was an oral agreement that we will do so for a
8  period of time, yes.
9  Q    So, the agreement to pay the X-Law Group's rent was an
10 oral agreement, separate and apart from this written
11 agreement to share fees?
12 A    I don't recall if it was included in the written
13 agreement or if it was a separate oral agreement, Mr. Frank.
14 Q    And if you look at schedule -- if you look at the
15 operating account, you've got a list of employees, your
16 operating statement, which I believe is docket 126 --
17 document number 126.  If you turn to page, I believe it's
18 five of six -- or five of 16, excuse me.  And I'm looking at
19 the bottom.  It also says on the main document, page eight
20 of 36 at the top.
21 A    Got it.
22 Q    You got it before you?
23 A    Yeah.
24 Q    Can you please let us know which people on this list
25 are people from the X-Law Group?

62

1  A    I don't understand the question.

2  Q    There is a list of people that Eagan Avenatti is paying

3  salaries to, correct?

4  A    Yes.

5  Q    Okay.  Which of these people are people who work at the

6  X-Law Group?

7  A    Well, I don't know if they technically still work at

8  the X-Law Group or not, but a number of these people at some

9  point in time worked at the X-Law Group.  Is that your

10 question?

11 Q    Okay.  Who are those people?

12 A    Thomas Cassaro, Michael Diaz, Alfredo Garcia, Mr.

13 Marchino, Mr. Rogers.  I think that's it.

14 Q    Did you purchase the X-Law Group, meaning, Eagan

15 Avenatti -- let me strike that.

16     Did Eagan Avenatti purchase the X-Law Group as part of

17 this agreement?

18 A    No.

19 Q    So the X-Law Group still continues to operate as a

20 separate law firm?

21 A    Yes.

22 Q    By the way, on the top there's a employer or someone

23 who gets the payroll, it says, "a driver to go."  What is

24 that?

25 A    That is a car service that the firm uses from time to

63

1  time.

2  Q    You have a personal chauffeur named, I believe, is

3  James Cameron (phonetic), is that correct?

4  A    Mr. Frank, you know, I don't have a personal chauffeur

5  named James Cameron.  So, no, I disagree with that.

6  Q    So, the car service, the -- it's an Escalade that is

7  used by the car service, is that correct?

8  A    From time to time the firm uses an Escalade for various

9  purposes associated with going to court appearances and the

10 like.  And I utilize that, as well as other people

11 associated with the firm, adding considerable time savings

12 and for various efficiency purposes associated with

13 conducting the business of the firm.

14 Q    Does the firm own the Escalade?

15 A    No.

16 Q    Does the firm lease the Escalade?

17 A    No.

18 Q    Who own's the Escalade?

19 A    I don't think that's relevant to the assets and

20 liabilities of the firm.  It's not the firm.

21 Q    Has the firm ever owned a Escalade?

22 A    No.

23 Q    Has the firm ever leased an Escalade?

24 A    Not that I can recall.

25 Q    Has the firm ever owned any vehicle?

*Briggs Reporting Company, Inc.*

Exhibit H

USAO_00061120

64

1  A    I don't know.

2           TRUSTEE HAUSER:  Where's this going?

3           MR. FRANK:  I just want to know --

4           THE WITNESS:  It's going towards harassment.

5  BY MR. FRANK:

6  Q    The -- and, again, you're paying -- the firm is paying

7  $5,000 a month to have a personal driver, is that correct?

8  A    I've answered your question.  He's not a personal

9  driver, Mr. Frank.

10 Q    Do you, by the way, do you use this Mr. Cameron for

11 your personal business?

12          MR. SAUNDERS:  What does Mr. Cameron have to do

13 with the, this list on the payroll?

14          MR. FRANK:  I just want to know if the firm -- if

15 the creditors are being required to have to fund a personal

16 -- a driver, if it's going to be -- if it's being shared by

17 Mr. Avenatti for personal purposes, I'd like know, because

18 we may make a claim that the estate should not be

19 responsible for that entire amount.  So I'm just asking if

20 he uses the driver, driving service for personal reasons.

21          MR. SAUNDERS:  Mr. Frank, do you have an objection

22 to the firm paying the $5,000 a month?

23          MR. FRANK:  I do.

24          MR. SAUNDERS:  Okay.  The firm will cease from,

25 this point forward, paying the $5,000 a month based on the

*Briggs Reporting Company, Inc.*

Exhibit H

65

1  objection of Mr. Frank.

2         MR. FRANK:  Thank you.

3         MR. SAUNDERS:  How about that?

4         TRUSTEE HAUSER:  First of all, it's not my

5  decision as to what the firm should and should not expend

6  funds on.  If you believe it's in the sound business

7  judgment of the Debtor to make that expenditure because it

8  helps the firm generate revenues, then you should do that.

9  Someone who disagrees can raise that with the court.  Okay.

10        This is an administrative hearing.  I'm not the

11 judge.  I don't make a determination as to what's

12 appropriate or not as far as the expenses of the firm.

13        It's clear that Mr. Frank thinks it's not

14 justified.  You're the managing partner, you think it is.

15 He can raise it with the court through his attorney, but I

16 think we've exhausted this issue.

17        THE WITNESS:  I agree.

18        TRUSTEE HAUSER:  We get it.  Let's --

19        MR. FRANK:  I'm moving on.

20        TRUSTEE HAUSER:  Okay.

21 BY MR. FRANK:

22 Q   Can you turn to your schedule, the latest one you

23 filed, which is, I believe, it's docket 149, and I'm looking

24 at schedule A.  Do you have that before you?

25 A   Yes.

66

1   Q      The two accounts that are listed here at California

2   Bank and Trust, I just want to clarify, these were the only

3   two bank accounts that Eagan Avenatti used prior to the

4   petition being filed?

5   A      No, that's not accurate.

6   Q      Let me state it differently.  As of the date of the

7   bankruptcy petition, did Eagan Avenatti own or control any

8   other bank accounts, other than these two accounts?

9   A      Well, there was a trust account, which we touched on

10  last time.  But other than that, no, not to the best of my

11  knowledge.

12  Q     Why have you not listed the trust account on the

13  schedule?

14  A     Because the trust account does not belong to the firm.

15  Q     Is there any money in the trust account?

16  A     Sir, I can't answer that question right now.  I don't

17  know.  It's irrelevant anyway.

18  Q     So, is the trust account being operated separately from

19  the Debtor-in-possession accounts?

20  A     I don't understand that question.

21  Q     Well, you've opened up Debtor-in-possession accounts,

22  correct?

23          MR. SAUNDERS:  Yeah.  They're not, the trust

24  accounts are not DIP accounts.  They're not property of the

25  estates.  They're technically -- you could never put a trust

*Briggs Reporting Company, Inc.*

Exhibit H

USAO_00061123

67

1  in a DIP --

2       MR. FRANK:  Okay.  So there's a trust account that

3  potentially has money in it?

4       MR. SAUNDERS:  Correct.

5       MR. FRANK:  And -- but it's not being listed on

6  any of these schedules?

7       MR. SAUNDERS:  Correct.  It's not property of the

8  estate.

9  BY MR. FRANK:

10 Q    Question number 10, and this is, I believe this is the

11 third time you submitted a schedule that says, accounts

12 receivable, does the Debtor have any accounts receivable?"

13 You answered, "no."  Is that an accurate statement?

14      MR. SAUNDERS:  Where are you?

15      MR. FRANK:  It's question number 10 on schedule A.

16      TRUSTEE HAUSER:  It helps if you refer to the

17 docket number at the top.

18      MR. FRANK:  Sorry.  Docket number --

19      TRUSTEE HAUSER:  No, that's fine.  But be sure it

20 says, "DOC" at the top.

21      MR. FRANK:  Yes.  Docket number 149.

22      TRUSTEE HAUSER:  Okay.  And then tell him what

23 page, one of 15 --

24 BY MR. FRANK:

25 Q    So we are at docket 149, page one of 15, part three at

*Briggs Reporting Company, Inc.*

Exhibit H

68

1  the bottom there's a question 10.  It says, "does the Debtor

2  have any accounts receivable?"  And the answer was, "no."

3  And I believe you signed this under penalty of perjury, and

4  so I just want to make that that is an accurate statement.

5  A    Sir, I believe these schedules are accurate, as

6  attested to on page 15 of 15, that I have a reasonable

7  belief that the information is true and correct.

8  Q    And what was your understanding of what accounts

9  receivable refers to?

10  A    I don't understand your question.

11  Q    Well, when you answered the question, does the Debtor

12  have any accounts receivable, and you said, no, what was

13  your understanding of what accounts receivable referred to?

14  A    I don't recall exactly what I understood as of the time

15  that I signed this document, sir.

16  Q    What do you understand --

17         MR. KHARASCH:  Why don't we take a short break?  I

18  just want to clarify a few things with my client.

19         TRUSTEE HAUSER:  Sure.

20         MR. KHARASCH:  It will just take a minute.

21         TRUSTEE HAUSER:  Okay.  So we're going to go off

22  the record?

23         MR. KHARASCH:  Yes.

24         TRUSTEE HAUSER:  So, we're going to go back on the

25  record?

*Briggs Reporting Company, Inc.*

Exhibit H

USAO_00061125

69

1      MR. KHARASCH:  Right.

2      TRUSTEE HAUSER:  Okay.

3   (Proceedings recessed briefly.)

4      TRUSTEE HAUSER:  Okay.  We are back on the record

5 in the case of Eagan Avenatti.  It's, again, it's July 14th,

6 2017.

7      Mr. Avenatti, you understand you're still under

8 oath, correct?

9      THE WITNESS:  Understood.

10      TRUSTEE HAUSER:  Okay.  Thank you.

11 BY MR. FRANK:

12 Q   At the break I believe the question was pending, what

13 was your understanding of what the term "accounts

14 receivable" means on this form?

15 A    In this context, my understanding is, is that accounts

16 receivable does not include contingency fees owed on any

17 case, including cases that you took from the firm.

18 Q    Putting aside contingency cases that have not yet

19 resolved, is there any case that was at the firm that has

20 resolved but the firm is still owed more money?

21 A    Yes.

22 Q    Where is that listed on your schedule?

23 A    Well, off the top of my head, I believe that the Skaden

24 (phonetic) has resolved, hasn't it?

25 Q    Of the cases -- other than the cases that are --

*Briggs Reporting Company, Inc.*

Exhibit H

70

1  A    No, I want to answer your question.  The Skaden case

2  that you took from the firm, after you and Mr. Stolper told

3  a room full of people that it was a dog of a case and there

4  was no case, I believe that case has been resolved.  And

5  that fees are about to be paid or are going to be paid --

6           MR. KHARASCH:  But that's not -- okay.  Go ahead.

7           THE WITNESS:  And so, that is, in answer to your

8  question, Mr. Frank, we're entitled to monies from that

9  case.  Now, I don't --

10           MR. KHARASCH:  Well, just to clarify.  We don't,

11  at least I don't consider that an account receivable,

12  because it's not due and payable right now to this firm.

13  There's a claim.  A claim is not an account receivable.

14           THE WITNESS:  Okay.

15           MR. KHARASCH:  There's a little ambiguity here,

16  which is why we --

17           TRUSTEE HAUSER:  Can I kind of short-cut this?

18           MR. KHARASCH:  Sure.

19           TRUSTEE HAUSER:  Because, I mean, unless there's

20  some, you know, in the weeds -- I'm not going to --

21           MR. FRANK:  Yeah.

22           TRUSTEE HAUSER:  -- cut you off.  I'm just going

23  to say, as far as I understand -- this is not an area of law

24  that I practice in, but as far as I understand, this firm is

25  primarily a contingency-fee law firm, whether it's

*Briggs Reporting Company, Inc.*

Exhibit H

71

1  malpractice or other litigation.

2         And there are some situations where there's a

3  hybrid, because I think I asked at the last 341, and you

4  said like -- I said, I think it was <u>Meridian</u> or something or

5  other, or something to do -- but by and large, you get paid

6  when a contingency case settles or goes to verdict and

7  there's no appeal, is that a fair statement?

8         THE WITNESS:  Yes.

9         TRUSTEE HAUSER:  Okay.  So, rather than arguing

10 about the definition of accounts receivable for the next

11 hour, it's fair to say that the fees that are going to be

12 generated in the future are going to be settled, entered

13 verdicts, from those cases listed on your schedule at the

14 time this case was filed, additional lawsuits that will be

15 filed during the course of this case, and any allocation of

16 fees that you receive from your dispute with Mr. Frank and

17 Mr. Sims?

18        THE WITNESS:  Yes.

19        TRUSTEE HAUSER:  What I'm simply trying to

20 restate --

21        MR. KHARASCH:  Including those cases that -- I

22 getting to Mr. Frank's question --

23        TRUSTEE HAUSER:  Right.

24        MR. KHARASCH:  -- is the list of cases that are

25 part of -- and those are not accounts receivable, but they

72

1   are assets of the firm.  I would not call them receivables.

2   But some of the actions owned by the firm that are listed in

3   the schedules that have been filed, we can't list all of

4   them --

5           TRUSTEE HAUSER:  Right.

6           MR. KHARASCH:  -- these are, these are cases that

7   will generate one day a receivable when there's a court

8   order that says, pay x dollars to --

9           TRUSTEE HAUSER:  I'm not sure why we need to get

10  caught up in the terminology, unless there's something from

11  a bankruptcy point of view.

12          MR. FRANK:  Let me see if I can help you clear it

13  up.

14          MR. KHARASCH:  Well, only because there trying --

15  you know, I'm just explaining why we answered --

16          TRUSTEE HAUSER:  But, I mean, I've asked him on

17  the record, essentially --

18          MR. KHARASCH:  Yes, you did.

19          TRUSTEE HAUSER:  Because I think everyone wants to

20  know here the ability of this firm to generate -- I mean,

21  the whole purpose of a Chapter 11 is to confirm a plan.  In

22  order to confirm a plan, you have to be able to fund it.

23          MR. KHARASCH:  Right.

24          TRUSTEE HAUSER:  There are a variety of claims

25  here, certain of which have to be paid pursuant to the

*Briggs Reporting Company, Inc.*

Exhibit H

73

1  bankruptcy code, such as the I.R.S. and the EDD, which,

2  depending -- whatever the allowed amount of those claims

3  are, have to be treated statutorily.  That's a given.  So we

4  need -- in order to even fund -- have a plan that's

5  feasible, that's level-one threshold that has to be met.

6  Okay.

7        You then get on to whatever the allowed amount of

8  the claims of the general -- we'll call the "GUC's," the

9  general unsecured creditors.  And then you have this

10 gentleman's claim, which seems to be a large claim.  In

11 fact, you have the Stoll claim.  And then you have the Frank

12 and Sims' claims.  Well, those are the potentially large

13 claims that can go from zero to a very large general,

14 unsecured claim, in addition to the dispute over the

15 allocation of the fees that are -- Okay.

16       So, what I try and deal with at the 341's is

17 understanding what the potential ability of the debtor is to

18 fund the plan.  So I don't know why we want to spend a heck

19 of a lot of time on receivables -- I'll allow you to pursue

20 it if it's going to enlighten us on that.  But have I

21 described generally what the business model of this firm is?

22       MR. FRANK:  Yes.

23       TRUSTEE HAUSER:  From 90,000 feet.  I

24 understand --

25       MR. FRANK:  Yes.

*Briggs Reporting Company, Inc.*

Exhibit H

74

1          TRUSTEE HAUSER:  Okay.

2          MR. FRANK:  Let me see if I can clear this up.

3  BY MR. FRANK:

4  Q    You've listed cases that are disputed that are

5  presently at FSS.  I believe there's 17 cases listed.

6  You've also listed cases that are currently pending at your

7  firm.  Other than those cases, are there any cases that have

8  previously resolved that you are owed -- or the firm is owed

9  money on?

10          MR. KHARASCH:  As of what date?

11          MR. FRANK:  As of the date of the petition.

12          MR. KHARASCH:  Okay.

13          THE WITNESS:  I've already answered that question.

14  BY MR. FRANK:

15  Q    Which is?

16  A    I'm going to stand on my prior answer, Mr. Frank.

17          TRUSTEE HAUSER:  Look, honestly, I -- it would be

18  helpful if I clarified.

19  BY TRUSTEE HAUSER:

20  Q    So, this would be a case that was not listed on the 23

21  lawsuits on B-75.  Remember, we went through them this

22  morning.  It wouldn't be any of the Frank Sims' groups of

23  disputed cases.  It would have been a case that had already

24  settled and, therefore, wasn't listed, okay, and somehow,

25  maybe fell through the cracks.  That's all we're trying to

*Briggs Reporting Company, Inc.*

Exhibit H

75

1  figure out.

2  A    And the answer is, not that I can think of right now,

3  but there may be one or more.

4  Q    Okay.

5  A    Not that, not that readily springs to mind.

6  Q    Is there anything -- what is the order of magnitude, or

7  you can't even think of --

8  A    Right.  I don't know that I fully understand the

9  question, but, regardless, nothing that I can think of as I

10  sit here right now.

11  Q    Okay.  If I thought I understood it, it's that you've

12  listed all the lawsuits that were pending as of March 10th.

13  There's two baskets of lawsuits.  One is, we'll call the

14  "Frank Sims" basket, and then the other one is on B, I

15  believe, 75.

16      So I'll go to it.  It's at, it's page -- it's document

17  number 149, page eight of 16 -- I'm sorry, I should say nine

18  of 15.  And these are the list of the 23 cases that were

19  pending at the time this case was filed on March 10th,

20  correct?

21  A    Yes.

22  Q    Okay.  So I think the question was simply, if I'm

23  getting it correctly, is, were you owed any revenues from

24  cases that may have settled prior to March 10th, that are

25  not listed on this list of 23 cases?

*Briggs Reporting Company, Inc.*

Exhibit H

76

1   A    I don't believe so, but I'm going to --

2   Q    Okay.

3   A    -- stand by my prior answer.

4   Q    Okay.  If for some reason -- what I would ask you to do

5 then is to, when you get back to your office, review

6 whatever ledger or whatever document, and if necessary,

7 amend the schedules.

8   A    Understood.

9   Q    Okay.

10        MR. FRANK:  One moment.

11     (Pause.)

12 BY MR. FRANK:

13   Q    Did the firm receive any money after -- as a result of

14 the dismissal of the NFL Greco case, or the Greco v. NFL

15 case?

16   A    I'm not going to answer that question.

17   Q    Last time you were here you indicated the firm did not

18 receive any fees from that case.  Was that an accurate

19 statement?

20   A    I don't recall what I stated previously.  I haven't had

21 the benefit of the record.  But I'm not going to answer any

22 questions relating to the dismissal concerning that case.

23   Q    Who was -- did you have a co-counsel on that case?

24   A    Ms. Chenetz asked me that question last time.  Yes.

25   Q    Who was that co-counsel?

*Briggs Reporting Company, Inc.*

Exhibit H

77

1  A      She asked me that question as well.  Mr. Ayers.

2  Q      And there was a payment, we saw it earlier today, of

3  $408,000 from Mr. Ayers.  What did that relate to?

4  A      I'm not going to answer that question.

5            MR. SAUNDERS:  Wait.  There was a payment from

6  mister --

7            MR. FRANK:  From Mr. Ayers.

8            TRUSTEE HAUSER:  We went over the May --

9            THE WITNESS:  Mr. Hauser asked me about that

10  earlier.

11            TRUSTEE HAUSER:  Yeah.

12            MR. FRANK:  And that was the MOR?

13            TRUSTEE HAUSER:  It's on the May operating report,

14  page 23 of 36.  If you look at the middle of the page,

15  there's a wire transfer in on May 17th of $408,723 --

16            MR. SAUNDERS:  Right.

17            TRUSTEE HAUSER:  -- from Ayers Law Office.  Yeah,

18  we talked about this.

19  BY MR. FRANK:

20  Q      In addition, you -- you talked about a number of

21  actions that you have against former clients of the firm,

22  including Kimberly Birbrower and Callaway.  Do you also have

23  an action pending against AEP, Authentic Entertainment

24  Properties?

25  A      No, I know who AEP is.  I don't think that we have an

78

1  action pending against them.  I believe that there was a

2  lien filed in Las Vegas.  You are attempting to thwart that

3  lien and have it rendered meaningless.  There is an

4  arbitration proceeding that you have sought to throw that

5  lien into.  We opposed that.  So, I don't -- I think,

6  technically, we don't have an action in which we are a

7  plaintiff and they are a defendant.  But you're well aware

8  of the dispute relating to AEP and the settlement of that

9  case.

10  Q    Do you know an attorney named Justin Jones?

11  A    Yes, Mr. Frank.

12  Q    Who's Mr. Jones?

13  A    "Mr. Jones" is the attorney who is attempting to

14  collect the millions of dollars due from that case for the

15  benefit of the firm, by way of asserting a lien in Las

16  Vegas.

17  Q    And he's filed -- he's taken action in Nevada state

18  court, and that has been appealed, correct?  The judge

19  dismissed the request, and you're now appealing that to the

20  Supreme Court, is that correct?

21  A    Well, not exactly.  The judge agreed with you, that it

22  would have to go to arbitration, and we disagreed with that.

23  And that decision is being appealed to the Nevada Supreme

24  Court.

25  Q    Is the firm paying Mr. Jones for his services?

*Briggs Reporting Company, Inc.*

Exhibit H

USAO_00061135

79

1  A    Yes.

2  Q    Has the firm received approval to retain Mr. Jones --

3  A    I don't believe --

4  Q    -- from the bankruptcy court?

5  A    -- I don't believe so, but I also don't believe any

6  payments have been made to Mr. Jones since the filing.  I

7  may be wrong about that, but I don't believe so.

8  Q    Does Michael Eagan still own 25-percent of the firm?

9  A    To the best of my knowledge.

10 Q    And is it Michael Eagan or The Law Offices of Michael

11 Eagan?

12 A    I don't remember.

13 Q    Would that be in the partnership agreement, that

14 information?

15 A    I don't know.

16       TRUSTEE HAUSER:  Actually, it's supposed to be

17 listed in the bankruptcy documents.

18       So, in the Florida docket there's a list of

19 equity/security holders.  So this is docket 51 from the

20 Florida docket, which is 6:17-01329.  And it was a document

21 signed by Mr. Avenatti on April 16th, 2017.  It lists the

22 equity holders, it lists Michael Eagan, Michael Q. Eagan as

23 an equity holder, and it lists the other equity holder as

24 Avenatti and Associates.  It does not break out the

25 percentage.  However -- so, that would answer, who are the

80

1  equity holders.

2  To your question of the percentage, in the most

3  recently-filed documents and statement of financial affairs,

4  I believe it listed Mr. Avenatti's percentage, and this is

5  at docket item 161, question 28, it lists Michael J.

6  Avenatti, 75-percent.

7  So, the only discrepancy I see, is that in the

8  original list of equity holders it listed the equity holder

9  as Avenatti and Associates, APC.  On the document I just

10 described it listed Michael Avenatti individually.  So I

11 would just ask for a clarification --

12 THE WITNESS:  The equity is held by Avenatti and

13 Associates, APC, but I, individually, and the managing

14 partner of the firm, and I think that's the --

15 TRUSTEE HAUSER:  I understand.

16 THE WITNESS:  -- myriad of the two issues.

17 BY TRUSTEE HAUSER:

18 Q   Okay.  So the equity holder's Avenatti and Associates,

19 APC.  It's clearly under -- we've asked this many times.

20 You're the managing partner of the LLP.  We get that.  And

21 -- but is it true though, that Michael Q. Eagan individually

22 is the 25-percent holder?

23 A   Now that we've had the benefit of that, that refreshes

24 my recollection that, yes, I believe that's accurate.  He

25 holds it individually, as opposed to through his other

*Briggs Reporting Company, Inc.*

Exhibit H

81

1  entity.

2  Q    Okay.  And if you go back and find differently, you'll

3  make the change?  Okay.  Hopefully that clears up that

4  issue.

5  BY MR. FRANK:

6  Q    Are there any agreements in place with Mr. Eagan to buy

7  out his equity?

8  A    No.

9  Q    Now you indicated that Avenatti and Associates at times

10 has loaned money to the law firm.  What other entities that

11 you own or control have loaned money to the firm?

12 A    I think at times Global Baristas may have loaned money

13 to the firm, but I don't know if that actually was loaned to

14 the firm or to Avenatti and Associates, without having the

15 benefit of the records.

16 Q    And would it have been from Global Baristas or their

17 parent companies, which I think are Dolov (phonetic) -- I

18 apologize if I'm getting the name wrong.  Doppia (phonetic)?

19 What is the name of the parent companies of Global?

20 A    I'm not going to answer questions as to the corporate

21 structure of third parties, Mr. Frank.

22 Q    Okay.  All right.  When these loans were made by

23 whoever it was -- which entity was it that that made these

24 loans?

25 A    Mr. Frank, to be clear, your question presupposes that

*Briggs Reporting Company, Inc.*

Exhibit H

82

1  the loans were made.  And if you listened to my answer that

2  I just provided, I told you that I was not certain that the

3  loans were made to the firm or to another entity that I can

4  control, or that I control.  So, I don't understand the

5  foundation of your question.

6  Q    My question is, which Global Baristas' entity or

7  related entity made the loan?

8  A    I don't know what loan you're talking about, and I

9  would need to have my records to be able to answer your

10 question.

11 Q    The loans to either the firm, or the loans to Avenatti

12 and Associates, which, in turn, made the loan to Eagan

13 Avenatti?

14 A    Well, I never said that.  You said that.  I never

15 testified to that.

16 Q    Okay.

17 A    So, without the benefit of the documents, I can't

18 answer your questions.

19 Q    And what documents would you need to look at?

20        MR. SAUNDERS:  Well, right now, he's filling out

21 questions and answering about the statements and schedules.

22 If they're not a creditor, if they're not listed -- they're

23 -- if they're not a creditor, then it's -- I'm not sure why

24 we're asking about this.  If they're listed on the questions

25 to transfers to insiders, you know, question number four,

*Briggs Reporting Company, Inc.*

Exhibit H

83

1  number 30 of the SOFA's.  So, you know, what are we talking

2  about?

3  BY MR. FRANK:

4  Q    Has the --

5         MR. SAUNDERS:  What question are we, on these

6  schedules are we talking about?

7         MR. FRANK:  It would be insider transactions.  And

8  so, I'm trying to understand if -- well, I'll ask the next

9  question.

10 BY MR. FRANK:

11 Q    Has the firm paid money to Global Baristas or its

12 related entities?

13        MR. SAUNDERS:  In what period of time, 10 years,

14 five years?

15 BY MR. FRANK:

16 Q    The last four years?

17        TRUSTEE HAUSER:  Let's kind of just revisit what's

18 already been done, and then we'll just, I'll just add on,

19 because I think I can -- I've got to help cut through some

20 of this mess here.

21 BY TRUSTEE HAUSER:

22 Q    Okay.  So, on docket 161, question number 13, I'd asked

23 -- the question states, "were there any transfers to third-

24 party entities within two years?"  We had some back and

25 forth and the answer was, "to the best of my knowledge, no."

*Briggs Reporting Company, Inc.*

Exhibit H

84

1   Is that -- that's correct, right?

2   A    To the best of my knowledge, no.  That's correct.

3   Q    Yeah.  Okay.  So the question now, which --

4   A    If we determine that to be false, then we'll amend.

5   Q    I understand.  The question now simply extends that

6   period from two to four years, which is relevant, because

7   3439 of the Uniform Fraudulent Transfer Act, which can be

8   used under Section 544 of the Bankruptcy Code, allows you to

9   go back four years.  So I think it's relevant to ask, I

10  mean, on a solvency or insolvency that's from three to fours

11  ago, but -- which would be a major issue.  But the issue

12  simply extends it to a four-year look back.

13  A    And the answer is, I don't know.

14  Q    Okay.  Let me ask you this.  This is a much broader and

15  maybe easier question to ask -- answer.  Did Global

16  Baristas, or any other entities which you have a controlling

17  interest, under the definition of the bankruptcy Code it's a

18  20-percent or more interest, ever loan or simply give money

19  to Eagan Avenatti, since Eagan Avenatti's formation?

20  A    That probably occurred, yeah.

21       TRUSTEE HAUSER:  Okay.  I think beyond that,

22  you're probably going to have to take a 2004 exam and ask

23  for bank records.  And then the court can decide whether to

24  issue a protective order and what's the scope, because it's

25  really beyond, I think -- in other words, if you're asking

Exhibit H

USAO_00061141

85

1  questions specifically here, obviously, that's well within

2  the scope.  But there's no four-year look back, so we'd

3  probably get an answer on that.  So that deals with monies

4  going from Eagan Avenatti to third parties.

5          I understand what you want to get.  You want to

6  know if when monies went back and forth between -- in his

7  private companies.  That's what question 13 is designed in

8  part to capture.  That's monies going out.

9          Whether monies came in in the last two years, I'm

10 not sure there's really a question in the SOFA that says

11 something along the lines of within the last two years, or

12 even year, did you actually receive -- if it was a loan and

13 it hasn't been repaid back, that would be on schedule F.

14         So, for example, if Global Baristas --

15         MR. KHARASCH:  If it's still owed.

16         TRUSTEE HAUSER:  Of course "if it's still owed,"

17 yeah.

18         So if Global Baristas had lent money in the last

19 year -- or, actually, at any time, and it wasn't repaid

20 back, that would have to be on schedule F.  You don't have

21 the option not to list creditors, in an effort to, let's

22 say, conceal a transaction.  That's not an option.

23         But if the money was loaned, let's say,

24 hypothetically, from Global Baristas to the Debtor, and the

25 money was paid back, there -- I'm not aware of off the top

86

1  of my head, and someone here who's smarter than I can
2  correct this, whether that transaction would be captured
3  anywhere in the schedules or statement of financial affairs.
4  A loan that was made but repaid within a year or even two,
5  where would that have to be disclosed?
6          MR. FRANK:  I assumed it'd have to be disclosed in
7  a insider transaction of when money is being paid from the
8  Debtor's estate to an insider.
9          TRUSTEE HAUSER:  Well, that is question 13.  It
10  says --
11          MR. FRANK:  Right.  That's what I'm getting at.
12          TRUSTEE HAUSER:  And I've asked it like twice
13  now --
14          MR. FRANK:  Yeah.
15          TRUSTEE HAUSER:  -- so I can't ask it a third
16  time.
17          MR. FRANK:  Okay.
18          TRUSTEE HAUSER:  So that question asks, 13 is,
19  within two years prior to the filing did the Debtor, Eagan
20  Avenatti, transfer either outright and with some
21  (indiscernible) condition, funds to any of these, whether
22  it's his or -- it could be a third party.  He's answered,
23  "no" under penalty of perjury.
24          If you want to a 2004 exam and drill down deeper
25  on that, you can do that.  But I don't -- you know, we just

87

1  keeping asking the same question over and over again.

2  You've locked in some testimony here, okay.

3  BY MR. FRANK:

4  Q    Earlier you described how there's a ledger kept of

5  origination fees that are owed to you.  Are you currently

6  owed origination fees?

7  A    I don't know.

8  Q    Is that listed on your schedule anywhere?

9  A    There's no list listing origination fees due me on the

10 schedules.

11        TRUSTEE HAUSER:  So, that's actually a good point.

12 And it may be something you just overlooked, because you're

13 the managing partner.  But if, in fact, the firm has an

14 agreement, and again, it's oral, whereby you get 15- to 25-

15 percent -- I know it's not 20, then that is probably -- not

16 probably, that's a contingent claim against the estate.

17        Would you agree with that, Mr. Kharasch?

18        MR. KHARASCH:  Well, the claim -- the origination

19 fees just, arguably, don't arise until the money ever comes

20 in.

21        TRUSTEE HAUSER:  But it's -- I said, it's a

22 contingent claim for --

23        MR. KHARASCH:  Yeah.  We heard that, yeah.

24        TRUSTEE HAUSER:  Okay.  And I understand how

25 that's -- so, you'd probably put down, Michael Avenatti,

*Briggs Reporting Company, Inc.*

Exhibit H

88

1   contingent claim origination fees on cases of 15- to 25-

2   percent --

3           MR. KHARASCH:  We can make that clarification.

4           TRUSTEE HAUSER:  (Indiscernible.) I think though,

5   the reason why it's important is, when someone's trying to

6   assess the ability of the -- we're going back to funding a

7   plan, okay.

8           MR. KHARASCH:  Right.

9           TRUSTEE HAUSER:  We get these disputes and

10  everyone doesn't like each other -- just looking from a nuts

11  and bolts.  If you look at even, at the Kimberly-Clark case,

12  if all of the sudden, you know, 15- to 20-percent of that

13  fee goes to Mr. Avenatti, because it's just oral agreement,

14  people need to understand that, because it goes into the

15  feasibility of the plan, and the ability to fund a plan.

16  That's all.  That would be my concern.

17          MR. KHARASCH:  Right.

18          TRUSTEE HAUSER:  But in terms of beyond that, go

19  deeper and go to that dispute.  And they can --

20          MR. KHARASCH:  That's a good point.

21          TRUSTEE HAUSER:  So --

22          MR. KHARASCH:  Understood.

23          MR. FRANK:  And I guess -- wouldn't fee-sharing

24  agreements be to subject to the same issue, that they should

25  be listed as creditors?

Exhibit H

89

1        TRUSTEE HAUSER:  Well, if -- when you say, "fee-
2  sharing agreement," so, for example --
3        MR. FRANK:  So, for example, if --
4        TRUSTEE HAUSER:  The X-Group, right?
5        MR. FRANK:  No.  If Eagan Avenatti has a fee-
6  sharing agreement with Bill Herron, in which when the
7  Kimberly-Clark money comes in, Eagan Avenatti's going to pay
8  10-percent to Bill Herron.  That would seem to be something
9  that the creditors would need to know, because that's going
10 to depend --
11       MR. KHARASCH:  But isn't that the client?  That's
12 an interesting question.  Isn't it the client that -- if
13 it's a fee sharing, it's the client's obligation to pay the
14 money to them, not the estate.
15       MR. FRANK:  Not necessarily.  Not the way that I
16 understand Mr. Avenatti in the past has structured such
17 agreements.
18       MR. KHARASCH:  That's absolutely --
19       MS. CHENETZ:  And if I --
20       MR. KHARASCH:  -- that's absolutely false.
21       MS. CHENETZ:  And just to add a thought here on
22 the bankruptcy.  It sounds like it's an executory contract
23 that the Debtor's a party to, therefore, it should be on
24 schedule G.
25       MS. SHARIFF:  I'm sorry, I didn't hear you.

Exhibit H

USAO_00061146

90

1          MS. CHENETZ:  As described, these sound like

2   executory contracts to which the Debtor is a party, and,

3   therefore, they should be on schedule G.

4          THE WITNESS:  Mr. Hauser, the last time I came

5   here for a 341, I was told it was going to be two-and-a-half

6   hours.  I was here until almost -- for five hours.  We lost

7   a client to the firm that afternoon, that was going to pay

8   the firm $90,000 a month on a hybrid matter.

9          I lost that case, lost that client because the

10  client had come for the meeting from out of town, and didn't

11  appreciate having to wait three hours, and I was late.  So

12  that was $90,000 a month to our law firm, which would have

13  been about $1.1 million over 12 months.

14          Despite that, I stayed and I answered questions.

15  I've come here today to answer questions.  I'm willing to

16  continue to stay here and answer questions, but I'm not

17  going to be here all day.  And to the extent that some of

18  these debates occur, they should take place, in my view,

19  outside of my presence and outside of the 341.  We're doing

20  everything we can to be cooperative, but we already lost

21  $1,000,000 plus, that's only for one year, as a result of

22  this.

23          And so, if Mr. Frank wants to ask his questions,

24  he should do so in a 2004.  At some point in time this

25  becomes abusive, and it doesn't help the other creditors in

*Briggs Reporting Company, Inc.*

Exhibit H

USAO_00061147

91

1  the case for us to be losing revenue as a result of this.

2  So --

3          MR. KHARASCH:  Let's keep trying to get through.

4          TRUSTEE HAUSER:  All right.  Is there another

5  question?

6  BY MR. FRANK:

7  Q    Who is this client that you lost?

8  A    I'm not going to answer that question.

9          MS. SHARIFF:  I would have to agree here.  I mean,

10  there's -- this is a 341 meeting.  And if this kind of

11  detail -- you know, it needs to be in a 2004.  As a

12  representative of the, one of the biggest secured creditors

13  in this case, we cannot afford to lose million dollar, you

14  know, revenue.

15          MR. FRANK:  It didn't happen.  Trust me.

16          MS. SHARIFF:  Well, a potential --

17          TRUSTEE HAUSER:  Okay, okay.  Let's --

18          THE WITNESS:  I'm going to go to the bathroom.

19          TRUSTEE HAUSER:  Okay.  All right.

20          We're going to --

21          THE WITNESS:  But this kind of conduct should not

22  be allowed to occur --

23          MS. SHARIFF:  Right.

24          THE WITNESS:  -- ever.  That is completely

25  outrageous.  Let's put that man under oath.

*Briggs Reporting Company, Inc.*

Exhibit H

92

1          TRUSTEE HAUSER:  All right.

2          MR. KHARASCH:  I think we'll do the lunch break

3 right now.

4          TRUSTEE HAUSER:  Okay.  We'll go off the record.

5      (Proceedings recessed briefly.)

6          TRUSTEE HAUSER:  We are back on the record in the

7 case of Eagan Avenatti.  It's still July 14th, 2017.

8          Mr. Avenatti, you are still under oath, correct?

9          THE WITNESS:  Yes, sir.

10          TRUSTEE HAUSER:  Okay.  Great.

11          Mr. Frank, do you want to proceed?

12          MR. FRANK:  Thank you.

13 BY MR. FRANK:

14 Q    Mr. Avenatti, can you turn to document number 149,

15 which are in the schedules, and it's page nine of 15,

16 schedule E-75, or Exhibit E-75?

17          MR. KHARASCH:  What page?

18          MR. FRANK:  Nine of 15.

19 BY MR. FRANK:

20 Q    Do you have that before you?

21 A    Yes.

22 Q    It's my understanding this is a list of cases that were

23 pending at the firm as of the date that you consented to the

24 bankruptcy on March 10th, is that correct?

25 A    That's not correct.

*Briggs Reporting Company, Inc.*

Exhibit H

93

1  Q   Okay.  Can you please tell us what -- tell me what's

2  incorrect about that?

3  A   Well, I've already answered questions as to what this

4  document -- or what this schedule is.  We had a number of

5  questions that I answered that were proffered by Mr. Hauser

6  in connection with this, and I'm going to stand on that

7  testimony.

8  Q   Has the firm filed any cases after March 10th that are

9  not on this list?

10  A   I don't know, but it wouldn't surprise me, because

11  that's not what is required on this list.

12       TRUSTEE HAUSER:  So, yeah.  Let me help out there.

13  So this list is -- bankruptcy schedules are a snapshot in

14  time, and they're supposed to reflect the Debtor's assets

15  and liabilities as of the date of the filing of the case, or

16  in this case, the entry of the order for relief, which was

17  March 10, 2017.

18       So, this should reflect those cases that were

19  pending as of March 10, 2017.

20  BY TRUSTEE HAUSER:

21  Q   Mr. Avenatti, just indulge me.  Does it accurately

22  reflect that?

23  A   That were filed on the public record.  We had a

24  discussion, you may recall, before the creation of the

25  schedule.  This does not include other matters that were not

*Briggs Reporting Company, Inc.*

Exhibit H

USAO_00061150

94

1  public, except --

2  Q    Okay.  Help me out, because I'm not in that world.

3  When you say, other matters that aren't public --

4  A    Well, for instance, if we represented a party in

5  arbitration, in a confidential arbitration proceeding or

6  something of that nature, we can't list it on the schedules.

7  Q    So, these -- so, if the case was not publically filed,

8  it's not on this list?

9  A    Correct.

10  Q    Okay.

11  A    And we've talked about that in the past.

12  Q    Okay.

13       TRUSTEE HAUSER:  So, basically, because of the,

14  again, alleged -- I'm not vouching for Mr. Avenatti's

15  testimony.  Because of the alleged confidentiality or

16  privacy or whatever, that's probably something more in the

17  2004 exam, if you want to get the full scope of what existed

18  on March 10th.

19  BY TRUSTEE HAUSER:

20  Q    Now, you had a follow-up question, which was, since

21  March 10th, 2017, have there been any publically filed

22  cases, either in district court or state court, or some

23  other venue.,that I can't think of off the top of my head?

24  A    I don't recall.  It wouldn't surprise me if there was.

25       MR. KHARASCH:  But we would not have put them on

*Briggs Reporting Company, Inc.*

Exhibit H

USAO_00061151

95

1  here, even if we had --

2          TRUSTEE HAUSER:  I didn't --

3          MR. KHARASCH:  Just to clarify.

4          TRUSTEE HAUSER:  Of course.

5          MR. KHARASCH:  Right.

6          TRUSTEE HAUSER:  Because this is not a moving

7  target.

8          MR. KHARASCH:  Mr. Frank -- correct.

9          TRUSTEE HAUSER:  It's not a monthly operating

10 report.

11         MR. KHARASCH:  Correct.

12         TRUSTEE HAUSER:  So I would not expect you to have

13 amended the document, because you have -- you know, every

14 time you file a lawsuit.

15 BY TRUSTEE HAUSER:

16 Q    What I'm simply asking is, subsequent to March 10th,

17 2017, are there any publically-filed lawsuits which your

18 firm represents either the plaintiff or the defendant?

19 A    It would not surprise me if there are.  I don't know as

20 I sit here today --

21 Q    Okay.  Okay.  So the --

22 A    -- but that wouldn't surprise me.

23 Q    Okay.

24         TRUSTEE HAUSER:  So, then again, you take the 2004

25 exam and you could -- I think that would be something that

Exhibit H

96

1  would be within the scope of what the assets of the firm

2  are.  And I can't imagine the judge not granting that

3  request for a list of the cases that have been filed

4  subsequent to the order for relief being entered on March

5  10th.

6  BY MR. FRANK:

7  Q    We earlier talked about your agreement with the X-Law

8  Group, and you said that certain matters they're going to be

9  entitled to a percentage of the fee, and you didn't know

10 what the percentage was.  Can you identify which matters the

11 X-Law Group's entitled to a percentage of the fee as listed

12 on Exhibit B-75?

13 A    Not without the agreement with the X-Law Group in front

14 of me.

15 Q    And if went through each matter and asked you if

16 there's a fee-sharing agreement, would you be able to answer

17 those questions?  And by "fee-sharing agreement," I mean, a

18 fee sharing agreement with any other entity, other than the

19 X-Law Group?

20 A    On some I would, but on others, possibly not.

21 Q    Well, let's go through them very quickly.  On Alvarez

22 v. Campbell (phonetic), is there a fee-sharing agreement

23 with any entity?

24 A    I don't know.

25 Q    Is this a case that was brought by the X-Law Group?

97

1  A    I believe it is.

2  Q    Bahamas Surgery v. Kimberly-Clark, we've talked a

3  little bit about that.  You testified that there is a fee-

4  sharing agreement with Bill Herron.  And other than that,

5  there's no other fee-sharing agreements, correct?

6  A    I've already answered questions about that.  I'm not

7  going to answer any more questions about it.

8  Q    Well, let me just make sure we're clear.  There are no

9  other fee-sharing agreements on the Bahamas v. Kimberly-

10 Clark case, other than Bill Herron?

11       TRUSTEE HAUSER:  Let's try this another way.

12 BY TRUSTEE HAUSER:

13 Q    Mr. Avenatti, you have documentation on each of these

14 cases, and any other pending cases, as to the fee-sharing

15 structure in those cases, correct?

16 A    I have documentation?

17 Q    I'm asking you whether you have in your books and

18 records at the office, all fee-sharing agreements relative

19 to the cases listed on document 149, page nine of 15?

20 A    Yes, sir.

21 Q    Okay.  And those documents would explain from the gross

22 fees that are received, from either settlement or if the

23 case goes to verdict, how those fees are allocated between

24 your firm, you individually, and various other law firms,

25 correct?

98

1  A    Perhaps not with me individually, but with other law

2  firms.

3  Q    That's right, because the originating thing is -- okay.

4  But -- okay.

5        TRUSTEE HAUSER:  So, I would think because there's

6  23 lawsuits here, and there may more lawsuits, you'd

7  probably have to do a 2004 exam asking for those documents.

8  I think they're, frankly, within the scope of a 2004,

9  because if you're trying to understand how the case is going

10  to be funded, you would want to know how those fees are

11  going to be split between various different entities.

12        And I'm actually -- I think the committee would

13  probably want to see your analysis as well, because they

14  would want to know that.  So, I don't think the court would

15  deny that type of request, but it would probably take us a

16  very long time, and you'd probably get answers along the

17  lines of, I don't have the document in front of me.  So, I

18  think it makes sense simply to do that within the context of

19  a 2004.

20        MR. KHARASCH:  Yeah.  I don't know if some of

21  those -- I mean, some of the agreements, part of it might be

22  subject to confidentiality because they're with the client.

23        TRUSTEE HAUSER:  Well, the court will issue a --

24        MR. KHARASCH:  Right.

25        TRUSTEE HAUSER:  -- protective order.  And that's

99

1  why it's really not appropriate in an administrative

2  hearing for --

3          MR. KHARASCH:  Right.

4          TRUSTEE HAUSER:  -- us to resolve this issue.

5  It's just -- I think the question's legitimate.  I think

6  people want to know if the business model in this case is

7  getting revenues from settlement, verdict of cases, and if

8  it's being split five different ways, but I don't think that

9  in the context of a 341 exam, given the time constraints,

10  and given the issues of alleged confidentiality and where

11  the documents are, that it would be productive -- excuse me

12  (clearing throat), to go through the list and have arguments

13  about it.

14          So, having said that, let's move on to another

15  topic.

16          MR. FRANK:  Okay.  Let me follow-up just on

17  another point you raised.

18  BY MR. FRANK:

19  Q    With respect to these matters, are there any documents

20  that would indicate what origination percentage you're

21  entitled to?

22  A    I've already answered this question.

23  BY TRUSTEE HAUSER:

24  Q    But just to make it -- life easy.  I had asked you the

25  question.  I think you said there was an oral agreement.

100

1  There's no written document.  But there is some kind of a

2  ledger that keeps sort of track of -- for all attorneys, I

3  think you indicated, of originating fees, right?

4  A    I think that's a fair summary.

5  Q    Okay.  So, that --

6         MR. FRANK:  This goes to a different issue.  Mr.

7  Avenatti testified that sometimes he gets 15-percent,

8  sometimes he gets 20-percent or 25-percent.

9         TRUSTEE HAUSER:  Right.

10        MR. FRANK:  And so, what I would like to know is,

11 in which case is he getting 15-percent, in which case is he

12 getting 20-percent?  Is that in writing?  What can I look at

13 to figure out which case --

14        TRUSTEE HAUSER:  Right.  I --

15        MR. FRANK:  -- that applies to.

16        TRUSTEE HAUSER:  Right.  And I think the answer is

17 that there is some kind of ledger at the office, that

18 essentially accounts for origination fees for all the

19 attorneys, including him.  And I think he testified that his

20 fees accrue because there's not always money to put out the

21 fees.

22        So, if his testimony is correct, I mean, when you

23 do your document request in your 2004, you're going to ask

24 for any and all documents which identify who's entitled to

25 origination fees, the amount of the fees, what are the cases

101

 1  that, you know, where there are originating fees that come

 2  -- in other words, you need that spreadsheet, that document

 3  that exists, he's testified existed.

 4          MR. FRANK:  Right.  I'm familiar with the

 5  spreadsheets, so maybe this is why I --

 6          TRUSTEE HAUSER:  Well, then you know it exists.

 7          MR. FRANK:  But I don't know that the spreadsheet

 8  would indicate which case is getting which percentage.  And

 9  that is why I'm asking the question, is there a separate

10  document out there that says, this type of case you get 15-

11  percent, this type of case you get 20-percent.  That's all

12  I'm asking.

13          TRUSTEE HAUSER:  I think you're --

14          MR. FRANK:  Then I would ask for that in the 2004.

15  BY TRUSTEE HAUSER:

16  Q    Mr. Avenatti, is there a document that actually breaks

17  down the percentage of what you, for example, would get in a

18  particular case?  Does it --

19  A    As I've testified to, yes.

20  Q    Okay.

21          TRUSTEE HAUSER:  So, you would need to ask for the

22  document.  There may be multiple documents.  And, again,

23  they'd be required to turn it over.  If not, Ms. Chenetz is

24  certainly capable of doing motions to compel.  And, you

25  know.  God, I hope there's not a discovery dispute, but

*Briggs Reporting Company, Inc.*

Exhibit H

USAO_00061158

102

1  that's -- it's a Judge Bauer issue.  It's not something I

2  think we can resolve today.

3  BY MR. FRANK:

4  Q    Mr. Avenatti, can you turn to document 161, which is

5  the summary of amended schedules that you filed last night

6  -- the statement of financial affairs.  And I want to turn

7  to page five of 23.  Are you there?

8  A    Yes.

9  Q    Is this the list of -- tell me what, what is on this

10 list?

11         TRUSTEE HAUSER:  Well, maybe I can help out.

12         MR. FRANK:  Well, let me --

13         TRUSTEE HAUSER:  It's -- so this is a standard

14 question.  In other words, these forms are not unique to

15 this particular case.  So this is a standard question which

16 basically asks for all, as it says, "all legal actions,"

17 including administrative proceedings, court actions, et

18 cetera, that, again, were pending at the time this case was

19 filed, whether the firm was a plaintiff or the firm was a

20 defendant.

21         MR. FRANK:  Right.  Not if they were representing

22 a party --

23         TRUSTEE HAUSER:  Yeah.  So --

24         MR. FRANK:  -- as I understand it.

25         TRUSTEE HAUSER:  -- so, the reality is, in this

*Briggs Reporting Company, Inc.*

Exhibit H

103

1  particular case -- so like I'll give you an example.  If you

2  look at 7.2, <u>Birbrower v. Quorn</u>.  I probably would not have

3  listed that if I was their attorney, but probably out of an

4  abundance of caution because they, at one time, had a

5  retention agreement with Birbrower, they have an economic

6  interest in that lawsuit.

7           So I don't think it's horrible that they listed

8  it, it's just, typically, you're listing whether you're a

9  plaintiff or a defendant in an action, as opposed to whether

10 you're, at one time, were the class-action lawyer for -- in

11 that case.

12          MR. FRANK:  Right.

13          TRUSTEE HAUSER:  So -- but this is an unusual

14 case, so.

15          MR. FRANK:  Understood.

16 BY MR. FRANK:

17 Q    I notice that the <u>Stoll</u> case is not listed here.  Is

18 that just an inadvertent omission?

19          TRUSTEE HAUSER:  Let's see.

20     (Pause.)

21          THE WITNESS:  Well, it's not listed here but it's

22 certainly reflected in the schedules.

23 BY MR. FRANK:

24 Q    And I didn't see the <u>O'Malley</u> lawsuit, am I correct?

25 A    Yeah, I believe that case was resolved outside of the

104

1  one year, but maybe I'm mistaken about that.

2        TRUSTEE HAUSER:  So, the answer -- and so this is,
3  essentially, let's say there was an action pending, and it
4  was one year and one day before the filing, he wouldn't have
5  to list it.  I have no idea.  I don't have the document in
6  front of me.

7        MR. FRANK:  Yeah, the --

8        TRUSTEE HAUSER:  I don't even know what the
9  O'Malley lawsuit is.

10        MR. FRANK:  So, the O'Malley lawsuit was a claim
11  brought against Mr. Avenatti personally, Mr. Eagan
12  personally, as well as the firm, that I believe was not
13  resolved until May of 2016.  So, it would have been within
14  the year.

15        TRUSTEE HAUSER:  Okay.

16  BY MR. FRANK:

17  Q   So, Mr. Avenatti, are you -- are there any other cases
18  where Eagan Avenatti is a party, as either a plaintiff or a
19  defendant, that you've not listed on the schedules?

20  A   Mr. Frank, not that I can think of right now, but if or
21  your counsel are aware of any, please inform us and we'd be
22  happy to look into it and put them on the document.  I mean,
23  as opposed to engaging in a game of gotcha.

24       You're well aware of the O'Malley matter.  I believe it
25  was resolved more than a year prior to this.  We'll look at,

*Briggs Reporting Company, Inc.*

Exhibit H

105

1  we'll look at it.  If it wasn't we'll put it on.  The Stoll

2  matter was disclosed in the schedules.  But if you or your

3  counsel are aware of anything else that should be included

4  in here, please let us know, so we can consider it.

5  Q    With respect to the O'Malley lawsuit, I understand you

6  said the case was settled.  Was the payment on that

7  settlement, because -- well, let me preface this, so you --

8  for people following along.  As I understand it, you settled

9  that case on behalf of yourself personally, on behalf of

10  Avenatti and Associates, as well as Eagan Avenatti and Mike

11  Eagan, correct?

12  A    I am barred from disclosing facts relating to the

13  resolution of that case by an agreement, and, therefore, I'm

14  not going to answer your question.

15  Q    I believe there was a public filing by Mr. O'Malley.  I

16  can give you the --

17         TRUSTEE HAUSER:  Well, let me ask you a question.

18  If -- I'm not sure what the lawsuit's about, but unless you

19  think the firm as a defendant paid too much money to

20  someone, because the only issue would be whether it's a

21  fraudulent transfer.  I mean, so, if you -- but even if

22  that's the case, that's a granular detail that would go

23  beyond a 341.

24         So, for example, if you think in the context of

25  that settlement, that the firm, essentially, fraudulently

*Briggs Reporting Company, Inc.*

Exhibit H

106

1 transferred funds under the ruse -- I'm not sure where

2 you're going with it.  That the level of detail would have

3 to be, here's the lawsuit, here's the docket, here's what

4 was alleged, here's what was, you know, agreed to.  What was

5 the basis for you paying that?  I mean, that's a whole,

6 that's a multi-hour deal to unpack that.

7        MR. FRANK:  Well, I guess the question that I had

8 was, was the money in that settlement paid by Eagan Avenatti

9 entirely, was it apportioned between the parties?  In which

10 case I think it would have had to be listed as an insider

11 transaction because --

12        TRUSTEE HAUSER:  Okay.  I understand.  But even

13 then, there's so many aspects of that, okay, as to how it

14 was apportioned.  But if what you're saying is, that would

15 have come within the, you know, question 13, two-year role,

16 you know, I don't know.  I mean, I think that's going to

17 have fall under a 2004 exam.  There's multiple parties.  I

18 don't know why, who paid what.  I don't think in the next

19 hour we're going to be able to resolve that.

20        MS. CHENETZ:  There's a basic question it seems

21 though, as to whether or not a payment was made to Mr.

22 O'Malley by the Debtor within 90 days of -- O'Malley had to

23 be an insider of the year if it was, and there's no -- the

24 facts, you know --

25 //

Exhibit H

USAO_00061163

107

1  BY TRUSTEE HAUSER:

2  Q    Well, let me ask a simple question.  Was the payment to

3  Mr. O'Malley more than one year before the bankruptcy case

4  was filed?

5  A    I believe it was, but I'm not certain about that.

6  Q    Okay.  So, that takes it --

7  A    Mr. O'Malley, at the time of the payment, wouldn't -- I

8  don't know what the definition of an insider is, but Mr.

9  O'Malley --

10  Q    Well, I can tell you.  There's a statutory definition

11  in Section 10131 of the code.  That's an officer, director

12  or someone who owns 20-percent or more of an entity.  So,

13  the shareholder or the equity holder.  And then there's also

14  case law defining what a non-statutory insider means, a

15  control person of the company.  It sounds like he was being

16  pushed out, and this lawsuit was --

17  A    Mr. O'Malley left the firm --

18  Q    Left town, whatever.  Okay.

19  A    -- December of 2010.

20  Q    Okay.

21  A    And had no further involvement at the firm, no role in

22  the firm --

23  Q    Okay.

24  A    -- no management at the firm, no partnership at the

25  firm, nothing at the firm since December of 2010.  So any

108

1  payment that would have been made to Mr. O'Malley after

2  December of 2010, I don't believe --

3          MR. KHARASCH:  He's clearly not an insider.

4          THE WITNESS:  -- would not -- I do not believe

5  that would constitute a payment to an insider.

6          TRUSTEE HAUSER:  Right, right.  The only -- look.

7  The only possible thing this could be is a -- is, would they

8  fall under a fraudulent transfer for some bizarre reason, if

9  they think that monies were paid to Mr. O'Malley for no

10 consideration or not equivalent consideration.  I don't

11 know.  I don't know where you're going with the O'Malley

12 situation.

13         So let's say he was paid $1,000,000, okay.  But

14 that was to settle -- because he had left the firm and he's

15 arguing that's what he was owed as an equity partner.

16 Unless you think he was overpaid, then there's really --

17 it's a non-issue.  It would have to be that he was paid an

18 amount that wasn't for an equivalent exchange.  In other

19 words, the settlement was too rich.

20         MR. FRANK:  There's two issues.  One would be that

21 issue.  The other issue would be if the defendants, the

22 actual defendants were in partners, meaning Mr. Avenatti,

23 Mr. Eagan, in their individual capacity, and the firm is

24 paying their debt.  That would be an insider transaction

25 that would be subject to clawback, and this was

*Briggs Reporting Company, Inc.*

Exhibit H

109

1  approximately a $3,000,000 settlement, so that's a

2  significant sum of money that the firm may have been paying

3  to satisfy the debts of its insiders.

4          TRUSTEE HAUSER:  And I can tell you, that sounds

5  very complicated and something that we're not going to be

6  able to attack in a 341 exam.

7      (Pause.)

8  BY MR. FRANK:

9  Q    The Meridian-Kooshian case, you indicated that that

10 case has been dismissed.  Did the firm get any fees or money

11 as a result of that dismissal?

12 A    I think I was clear when I said that I don't know if

13 technically the case has been dismissed.  There was a

14 judgment obtained in the case.  The defendant in the case

15 filed an appeal to the Ninth Circuit.  We opposed the appeal

16 in the Ninth Circuit.

17     There was, as I recall, a per curiam opinion issued by

18 the Ninth Circuit upholding the judgment issued by the

19 district court.  And I don't know if the time for Mr.

20 Kooshian to appeal to -- for an en banc or to file a writ of

21 certiorari before the United States Supreme Court has run or

22 not.  That is the status of that case.

23     The firm had previously been paid a sum of money to

24 handle that appeal, but that was a long time ago.  And the

25 firm is not due any money from the judgment issued in favor

Exhibit H

110

1  of the plaintiff of that case against Mr. Kooshian.

2  Q    So, the firm is not going to be owed any further money

3  in relation to that case, as just a broader statement?

4  A    I think that's true.

5  Q    Okay.  Can you turn to your latest operating report,

6  which is docket number 126, and it's page, it looks like 17

7  of 36.  On sales revenue, you list gross accounts receivable

8  $409,953.70 in that month.  Was this actually money that

9  came into the firm?

10          TRUSTEE HAUSER:  Yeah. We've kind of covered that.

11 That's the --

12          MR. FRANK:  Is that the -- that's what I was

13 trying to --

14          TRUSTEE HAUSER:  Yeah.  That's the Ayers --

15          MR. FRANK:  It didn't quite add up.

16          TRUSTEE HAUSER:  -- that's the wire from Ayers,

17 right, Mr. Avenatti?   The revenue, where it says "409,953,"

18 if you turn to page 23 --

19          THE WITNESS:  Yes, sir.  Yes, sir.

20          TRUSTEE HAUSER:  -- that's the -- okay.

21          MR. FRANK:  Well, it doesn't add up, is -- was

22 what I'm trying to figure out.

23          TRUSTEE HAUSER:  It doesn't add up exactly.  Do

24 you happen to know why?  It looks like there was a $1,230

25 deposit, as opposed to -- so that looks like it may have

*Briggs Reporting Company, Inc.*

Exhibit H

111

1 been the difference, but let's add 1,230 and see if that

2 works.

3          THE WITNESS:  That is the difference.

4          TRUSTEE HAUSER:  Yeah, that is.

5          MR. FRANK:  Okay.  Thank you.

6          TRUSTEE HAUSER:  All right.

7 BY MR. FRANK:

8 Q    And then there's -- so, it is, again, that's money that

9 came into the firm.  Then there's a -- the next column over

10 it says, $17.7 million cumulative post-petition.  Is that

11 money that has come into the firm?

12          TRUSTEE HAUSER:  We went over this last time.

13 BY MR. FRANK:

14 Q    Or is this the -- is this the --

15          TRUSTEE HAUSER:  We talked -- let me just cut this

16 short, because I don't want to spend too time on this.

17          Our Office disagrees with that characterization.

18 Their position is that if Kimberly-Clark -- because we

19 talked about this last time, had to set aside reserves under

20 GAP or whatever, then they believe that they should consider

21 it an account receivable.

22          I don't think any judge, or anyone who reasonably

23 looks at a feasibility analysis, is going to look at this

24 document and say, you guys have a cumulative post-petition,

25 you know, accounts receivable of -- it's nonsense, okay.  I

*Briggs Reporting Company, Inc.*

Exhibit H

112

1  don't mean to characterize the -- but I'm saying, in a

2  realistic bankruptcy format, no one's going to look at this

3  document and say -- if they want to do that every month,

4  they can do it.

5         What I would look at is, simply, you know, the

6  bank statements speak for themselves.  You pay creditors

7  with cash flow, not with a account receivable of $17,000,000

8  or some number, because Kimberly-Clark had a set aside

9  reserve.

10         So, I don't spend any more time on that.  I

11  already sent an e-mail saying, I disagree with it.  I don't

12  think you should put the number in there.  You should take

13  it out.  The way this firm works, it's really kind of, when

14  you get the money in, you get the money in.  You don't

15  really have a receivable in these cases.

16         But having said that, I can't force them to change

17  that number, but I don't -- you know, it's going to be

18  meaningless if they try and put that number before a judge.

19  And Mr. Kharasch knows that.  But that's enough.  I don't

20  want to talk about that anymore.

21  BY MR. FRANK:

22  Q    And earlier we talked about, there was a number that

23  was increased, I believe it was your, the income that you

24  made pre-petition from January 1 to the time of the filing.

25  It was increased to 500,000-something and change.  What was

113

1  the reason for the increase?

2  A    Accuracy.  Because we were told by Mr. Hauser to take a

3  look at that, as I recall.

4         MR. FRANK:  Another five more minutes.

5         TRUSTEE HAUSER:  So you're talking about docket

6  161, page two of 23, compared to the Florida docket, item

7  50, we're talking about gross income from January 1, 2017 to

8  the filing date.  It went from 35,000 to 525.  I can recall

9  I'd asked him whether that was correct.  In fact, I wrote

10  "no correct" at the initial 341.  I said, you need to go

11  back and look at that.

12         I guess if you're asking him -- you know, it's

13  probably because --

14         MR. FRANK:  I didn't know that --

15         TRUSTEE HAUSER:  He's going to tell you he made a

16  mistake.  I can --

17         MR. FRANK:  If it's just a mistake, it happens.

18         TRUSTEE HAUSER:  He's not going to tell you he did

19  it intentionally, I'm pretty sure of that.

20         MR. FRANK:  Understood.

21  BY MR. FRANK:

22  Q    What I'm trying to understand is, was this a settlement

23  that came in, was it firm revenue?  What was that money?

24  Was this a loan that you made to the firm?  That's what I'm

25  trying to figure out, where this money came from.

Exhibit H

USAO_00061170

114

1  A    Mr. Frank, those are the revenues of the firm for the

2  time period listed.  I mean, I -- without the documents, I

3  can't tell you exactly what came from what, but I believe

4  that number's accurate.

5            TRUSTEE HAUSER:  But if they were to request the

6  documents, you have those books and records at the firm?

7            THE WITNESS:  I believe we have books and records

8  reflecting that amount.  I mean, whether they're entitled to

9  it or not, we're not --

10           TRUSTEE HAUSER:  That's what a judge --

11           THE WITNESS:  -- we're not going to make that

12 decision.

13           TRUSTEE HAUSER:  A judge is going to make that

14 decision.

15           THE WITNESS:  Yeah.

16           TRUSTEE HAUSER:  Okay.  But you do have books and

17 records which would enable them to ascertain what the

18 525,000 or 35,000 came from?

19           THE WITNESS:  Yes.

20           TRUSTEE HAUSER:  Whether it be settlement or

21 hybrid or whatever?

22           THE WITNESS:  Yes, sir.

23 BY MR. FRANK:

24 Q    Other than the <u>Meridian</u> -- excuse me, it's not the

25 <u>Meridian</u> case, the <u>Medline-Kimberly-Clark</u> case, is there any

115

1  other case that Eagan Avenatti is receiving a monthly fee?

2          TRUSTEE HAUSER:  Actually, my notes from the last

3  meeting, when I asked that question on the hybrid, the

4  testimony was, two cases, Medline and Meridian.

5          Is there any more than that, Mr. Avenatti?

6          THE WITNESS:  Yeah.  I don't know if we're

7  presently receiving anything in Meridian, but there may be

8  one or two other cases.  I know there's a couple cases that

9  we're getting ready to sign up.  Yeah, that's my answer.

10 BY MR. FRANK:

11 Q    In the cases that you're ready to sign up, can you tell

12 us what the monthly fee is going to be?

13 A    No, because it hasn't been finalized yet.

14 Q    We know from an earlier filing application with Baker

15 Hostetler, that the Global Baristas paid $100,000 retainer

16 for Baker Hostetler.  Is that a -- I'm just trying to

17 understand what the accounting is for Eagan Avenatti as it

18 relates to that loan, or was it a loan?

19 A    I don't recall how that was treated from an accounting

20 perspective.

21 Q    Does --

22 A    But, in any event, it's been returned, so.

23 Q    The full 100,000?

24          TRUSTEE HAUSER:  Actually, it was a lot more.  It

25 was closer to 175,000, I believe.

*Briggs Reporting Company, Inc.*

Exhibit H

116

1          THE WITNESS:  No.

2          TRUSTEE HAUSER:  You don't think so?

3          THE WITNESS:  No.

4  BY MR. FRANK:

5  Q    My understanding is, it was supposed to be two

6  installments, one 100,000, then another $20,000 payment.  I

7  thought --

8  A    The full --

9  Q    -- that some portion --

10  A    -- the full amount was returned.

11  Q    And the full amount was returned to Global Baristas or

12  to Eagan Avenatti?

13  A     No, the full amount was returned to Global Baristas or

14  put on, in the -- on deposit somewhere, or I forget exactly

15  how it was handled, but it was basically negated.

16  Q    Does Avenatti and Associates do its banking at

17  California Bank and Trust?

18  A    I'm not going to be answering question about Avenatti

19  and Associates.

20  Q    All of your other entities that you own, do they do

21  their banking at California Bank and Trust?

22  A    Same answer.

23          TRUSTEE HAUSER:  That's the -- that's beyond the

24  scope of the, of the meeting.

25  //

117

1 BY MR. FRANK:

2 Q    How are we going to be able to determine from looking

3 at your records, which entity paid money to the firm?  So,

4 this goes to a 2004 examination.  I want to know what

5 documents I should be asking for.

6 A    Mr. Frank, I'm not going to tell you how to --

7 Q    Okay.

8 A    -- how to do your job.

9 Q    So, let me ask the question then.  When money comes

10 into the firm or goes out from the firm, you said it

11 sometimes -- strike that.

12     When you deal with your own companies, you said at

13 times you will wire the money, true?

14 A    Mr. Frank, I'm not going to answer questions about what

15 I do with companies that are non-debtors in this case.

16 Q    Well, again, those are insiders.  And we are trying to

17 -- his companies, if the firm is paying money to companies

18 that he owns 20-percent of or more, is an insider.  And I

19 want to be able to determine what money is flowing out of

20 the firm.

21     And I can tell you from looking at a bank statement, I

22 won't be able to determine that unless I know  -- I may see

23 a wire to a certain bank, and then I'm able to figure out,

24 okay, that's through Avenatti and Associates.  So, that is

25 -- I am trying to figure out what kind of examination we can

*Briggs Reporting Company, Inc.*

Exhibit H

USAO_00061174

118

1  ask for, so that we can determine --

2          MR. KHARASCH:  I don't think that's the purpose of

3  a 341 --

4          MR. FRANK:  -- if there were insider transactions.

5          MR. KHARASCH:  --  is to, how to figure out how to

6  determine what you're going to do on your next 2004 exam.

7          TRUSTEE HAUSER:  Well, I certainly -- Ms. Chenetz

8  doesn't need my legal advice on how to craft a discovery,

9  you know, plan on how to -- I understand what you want to

10 capture, and you have Mr. Avenatti here, and he's got his

11 law firm, he's got other business interests, and you want to

12 understand the financial activity between him, his -- I get

13 it.

14         The discovery plan you're going to have to come

15 up, which essentially captures those various transactions

16 going back and forth, if they exist.  I mean, you may have

17 to depose multiple entities, you know.

18 BY MR. FRANK:

19 Q    You have on your creditors' list, you have a company

20 called, "Developing Opportunities and Solutions, LLC."  Who

21 are they?

22 A    What are you looking at?

23 Q    We are looking at document number 151, page five of 14.

24 A    The claim for $2,193.30?

25 Q    Yes.

*Briggs Reporting Company, Inc.*

Exhibit H

USAO_00061175

119

1  A    I have no idea.  I have no idea who that is or what

2  they do.  Perhaps it's -- I don't know.  I can't even

3  speculate.  I have no idea.

4  Q    You've got a creditor listed as Wilentz, Goldman and

5  Spitzer, PA.  Are you currently co-counsel with Wilentz on

6  any cases?

7  A    No.

8  Q    Do you have co-counsel in the <u>Lofton</u> (phonetic) case?

9  A    Yes.

10  Q    Who are they?

11  A    It's a local North Carolina firm.

12  Q    What's the name of the firm?

13  A    I'm blanking right now on the name of the firm.  I

14  forget.

15  Q    And do you have a fee-sharing agreement with them, or

16  do you pay them by the hour?

17  A    I don't remember.

18  Q    As you sit here today, you don't know if your firm is

19  paying money to this firm?

20  A    Mr. Frank, I just answered your question.  By the way,

21  Developing Opportunities and Solutions, LLC, I just looked

22  it up on my phone.  This relates to the service that is

23  provided on our copiers at the law firm.  So that's what

24  accounts for the $2,193.30 payment.

25  Q    It is correct there has not been -- has there been any

*Briggs Reporting Company, Inc.*

Exhibit H

USAO_00061176

120

1   -- well, let me ask the question.  Has there been any

2   settlement agreement reached in the Lofton matter from the

3   date of March 10th, 2017 to -- 2016 to the present?

4   A     No.

5   Q     Is there any money owed to the firm from the

6   Lofton matter today?

7   A     Not that I can think of as I sit here today.

8   Q     And has any money been paid to the firm since March

9   10th of 2016 relating to the Lofton matter?

10          TRUSTEE HAUSER:  '16 or 17?

11          MR. FRANK:  "'16" -- '16.

12          THE WITNESS:  I don't believe so.

13          MR. FRANK:  Give me one second.

14      (Pause.)

15          TRUSTEE HAUSER:  Do you want to go off the record

16   for a second or?

17          MS. CHENETZ:  Sure.  That would be great.  Thanks.

18          TRUSTEE HAUSER:  Okay.  We're going to go off the

19   record.

20          MS. CHENETZ:  That's fine.

21          TRUSTEE HAUSER:  Okay.

22      (Proceedings recessed briefly.)

23          TRUSTEE HAUSER:  We are back on the record in the

24   case of Eagan Avenatti.  Today is July 14, 2017.

25          Mr. Avenatti, you're still under oath.  Okay.

*Briggs Reporting Company, Inc.*

Exhibit H

121

1                        FURTHER EXAMINATION

2  BY MS. CHENETZ:

3  Q     Good afternoon, Mr. Avenatti.

4  A     Is Mr. Frank done with his questions?

5            TRUSTEE HAUSER:  I think so.

6            MS. CHENETZ:  Yes.

7            MR. FRANK:  As of right now, yes.  Obviously, we

8  haven't looked at those last schedules that we got last

9  night.

10           THE WITNESS:  Well, that's interesting, because I

11 was just asked a bunch of questions about them.

12           TRUSTEE HAUSER:  Let's just go forward and wrap

13 this up.

14 BY MS. CHENETZ:

15 Q     Do you solely manage Eagan Avenatti at this point in

16 time?

17 A     No, I don't believe so.

18 Q     Who else is involved in management of the firm?

19 A     Mr. Eagan from time to time.

20 Q     And Mr. Marchino -- I'm sorry if I'm pronouncing it

21 wrong, is he involved in management of the firm?

22 A     I'm sorry?

23 Q     I may be pronouncing it wrong.  I apologize.  Filippo

24 Marchino from the X-Law Group?

25 A     Mr. Marchino?

**Briggs Reporting Company, Inc.**

Exhibit H

USAO_00061178

122

1  Q    "Marchino."

2  A    No.

3  Q    So he's just an employee of the firm?

4  A    No, he's not an employee of the firm.

5  Q    I believe the operating report from May, which is

6  document 126 --

7  A    Are you asking if he is presently, or was he in May,

8  counsel?

9  Q    Okay.  Is he presently an employee of the firm?

10 A    No.

11 Q    When did -- was he ever an employee of the firm?

12 A    I mean, I guess it would depend on the legal definition

13 of "employee of the firm," but, generally, at some point in

14 time, he was considered an employee of the firm.

15        TRUSTEE HAUSER:  Well, let's just ask it another

16 way, because I want to kind of cut through it.

17 BY TRUSTEE HAUSER:

18 Q    So, looking at document number 126, which is the May

19 monthly operating report, page eight of 36 has a payroll

20 run.  It lists Mr. Marchino as -- under the purpose of the

21 payment as payroll, 4,877.

22 A    I believe the last payment made to him was in June.

23 Q    Okay.  And so why was he being paid that amount?

24 A    Pursuant to the agreement that was reached with him

25 last year.

*Briggs Reporting Company, Inc.*

Exhibit H

123

1  Q    Which basically provides what?  What does he have to do

2  to get that 4,077 (sic)?  Does he have to show up to the

3  office, does --

4  A    Assist on various cases, work on various cases.

5  Q    Does he physically come into the office or does he work

6  at a remote location or?

7  A    From time to time he physically comes to the Orange

8  County location, as well as the Los Angeles location.

9  Q    Okay.  And is the -- was he terminated pursuant to the

10 terms of the agreement, or was there some other reason why

11 he's no longer on the payroll?

12 A    Pursuant to the terms of the agreement.

13 Q    So, it's as of May 2017, pursuant to the agreement.  If

14 we were to get a copy of it, it would say that that's the

15 last month in which you're going to receive a payment?

16 A    No, it was June.

17 Q    Okay.  I'm sorry, June.  So, June would be the last

18 month?

19 A    Yes.

20 Q    So we'll see on the next monthly operating report

21 another payroll to Mr. Marchino?

22 A    Yes, sir.

23 Q    Okay.

24        TRUSTEE HAUSER:  Go ahead.

25 //

*Briggs Reporting Company, Inc.*

Exhibit H

124

1  BY MS. CHENETZ:

2  Q    Are there any other X-Law Group attorneys who no longer

3  work at Eagan Avenatti as well?

4          TRUSTEE HAUSER:  We went over a number of people

5  on the --

6          THE WITNESS:  There may be.

7          TRUSTEE HAUSER:  Was Mr. Cassaro an attorney or

8  was he a paralegal or --

9          THE WITNESS:  No, "paralegal."  I don't believe

10  Mr. Diaz, although he -- well, strike that.

11          What's your question?

12          TRUSTEE HAUSER:  She wanted to know whether there

13  are any other attorneys being employed from the X-Law Group

14  by Eagan Avenatti?

15          THE WITNESS:  Yeah, I answered that question.  I

16  think her answer was (sic) was, are there any other

17  attorneys that are no longer employed?

18  BY MS. CHENETZ:

19  Q    Right.

20  A    No.

21  Q    So Mr. Rogers remains an employee of Eagan Avenatti?

22  A    Yes, ma'am.

23  Q    Are you currently an officer of any company, other than

24  Eagan Avenatti and Avenatti and Associates?

25  A    I'm not going to answer that question.

Exhibit H

USAO_00061181

125

1  Q    Why?

2        MR. KHARASCH:  What does that have to pertain with

3  in this case?

4        MS. CHENETZ:  It deals with the management of the

5  Debtor.  If Mr. Avenatti is the primary person to manage the

6  Debtor, and he is working for other companies as well, it

7  limits his time and resources to run the Debtor, so it's a

8  fair subject of inquiry.

9        THE WITNESS:  Ms. Chenetz --

10       MR. HOROUPIAN:  You can ask, you can ask how much

11 time he devotes to the operation of the Debtor.

12       MS. CHENETZ:  That's not my question.

13       MR. HOROUPIAN:  He's not going to answer questions

14 about his own personal financial affairs.

15       MS. CHENETZ:  It wasn't about his financial

16 affairs.

17       MR. HOROUPIAN:  It is about his financial affairs.

18       MS. CHENETZ:  -- it was just a yes-or-no question.

19       THE WITNESS:  Ms. Chenetz --

20       MR. HOROUPIAN:  He's not going to answer the

21 question.

22       THE WITNESS:  -- in light of the $454,000,000 that

23 we just obtained, I think I'm doing an okay job.  But I'm

24 not going to answer your question as posed, okay?

25 //

*Briggs Reporting Company, Inc.*

Exhibit H

USAO_00061182

126

1  BY MS. CHENETZ:

2  Q    So you're refusing to answer you're an officer of any

3  entity, other than the Debtor and Avenatti and Associates?

4  A    I'm refusing to answer the question as posted, Ms.

5  Chenetz.

6        MR. KHARASCH:  That's an improper 341(a) question.

7  BY MS. CHENETZ:

8  Q    Are you a director of any entity other than Eagan

9  Avenatti?

10        MR. KHARASCH:  This has nothing to do with the

11  debts or assets (indiscernible.)

12        MS. CHENETZ:  It deals with the management of the

13  Debtor.

14        MR. HOROUPIAN:  Same objection.

15        MR. KHARASCH:  Yeah.

16        MR. HOROUPIAN:  Some direction --

17        MS. CHENETZ:  (Indiscernible.)

18        MR. HOROUPIAN:  If you want to talk to the

19  percentage of time as time he spends, that's a relevant

20  question, but you don't want to do that, because you don't

21  want to hear the answer.

22  BY MS. CHENETZ:

23  Q    Does Eagan Avenatti currently have any clients that are

24  paying the firm on an hourly basis?

25  A    Yes.

*Briggs Reporting Company, Inc.*

Exhibit H

USAO_00061183

127

1  Q    About how many?

2  A    I don't know, a handful.

3  Q    More than five?

4  A    No, I think five's probably a fair estimate.

5  Q    Approximately how much does the firm bill in hourly

6  fees a month?

7  A    It varies.  Sometimes more than others.  It would vary,

8  but, generally, not a lot.

9  Q    Over $20,000 a month?

10  A    Sometimes, but rarely.

11  Q    Over $50,000 a month?

12  A    Generally, no.

13  Q    Have you collected any hourly fees since the case,

14  bankruptcy case started?

15  A    I believe we have.

16  Q    Approximately how much?

17  A    I can't estimate it for you without looking at

18  documents.

19  Q    Of the matters listed on B-75, are any of those matters

20  in which the firm is paid hourly?  It's a list of 23 cases.

21  I think it's on 147 of the --

22          MR. KHARASCH:  Which document number?

23          TRUSTEE HAUSER:  So it would be document number

24  149 --

25          MS. CHENETZ:  "One-forty-nine."  Sorry.

*Briggs Reporting Company, Inc.*

Exhibit H

USAO_00061184

128

1           TRUSTEE HAUSER:  -- page --

2           MS. CHENETZ:  Nine.

3           TRUSTEE HAUSER:  -- "nine" of 15.

4           THE WITNESS:  And, Ms. Chenetz, who are you asking

5  questions on behalf of, which creditors?

6           MS. CHENETZ:  "Which creditors?"

7           THE WITNESS:  Yeah.

8           MS. CHENETZ:  I think you're aware of who my

9  clients are, Jason Frank Law and Scott Sims.

10          THE WITNESS:  So you were asking me about B-75?

11          MR. KHARASCH:  Page nine of -- yes, page nine of

12  15.

13          THE WITNESS:  What's the question?  I'm sorry.

14 BY MS. CHENETZ:

15 Q    Are any of the matters listed on the schedule matters

16 in which Eagan Avenatti is to be paid hourly by its clients?

17 A    I believe number 12.

18 Q    Unitis v. Yahoo (phonetic)?

19 A    Yes.  I believe out of this list that's the only one.

20 Q    So there are additional clients of the firm which pay

21 hourly that are not on the list at this point in time?

22 A    Yes.

23 Q    Who are those clients?

24          MR. KHARASCH:  That's inappropriate.  I mean,

25 these are confidential clients.  They're not public --

129

1  they're not part of the lawsuit.

2          MS. CHENETZ:  The creditors need to be -- have a

3  way of getting in the sense of likely revenues of the firm,

4  and -- you know, to consider what a plan could look like.

5          MR. KHARASCH:  We can't disclose client names.

6  They're confidential.  You're kidding me?

7          MS. CHENETZ:  Well, we can deal with, you know, a

8  confidentiality or protective order separately.  I'm not --

9          MR. KHARASCH:  Well, we're at a 341 hearing.

10          MS. CHENETZ:  Okay.  That's what I'm saying.

11  We'll -- another time we'll talk about how to share that

12  kind of information, maintaining confidentiality.

13  BY MS. CHENETZ:

14  Q    Does Avenatti and Associates have clients separate and

15  apart from Eagan Avenatti at this point in time?

16  A    I'm not going to answer that question.

17  Q    Why?

18          MR. HOROUPIAN:  Avenatti and Associates is not a

19  debtor.  It's not subject to this 341(a) examination.

20  BY MS. CHENETZ:

21  Q    Mr. Avenatti, when a client confers with you about

22  possible representation, do they confer with you and say,

23  I'd like Eagan Avenatti to be my client or Avenatti and

24  Associates, or do you make that decision?

25  A    Well, first of all, what my clients may or may not say

Exhibit H

130

1  to me is privileged, counsel, so I'm not going to answer

2  that question.

3  Q    When you're interested in representing a party, how do

4  you determine whether to propose that client be represented

5  by Eagan Avenatti or Avenatti and Associates?

6  A    Well, first of all, I think it's irrelevant, because of

7  your inclusion of Avenatti and Associates.  But, secondly,

8  even if it was relevant, that would constitute my work-

9  product, and I wouldn't.

10  Q    Is Eagan -- is Avenatti and Associates currently

11  counsel for any parties in litigation in court?

12  A    I'm not going to answer that question either.

13  Q    Why?

14  A    Because Eagan -- or because Avenatti and Associates is

15  not a debtor in this case.

16  Q    Is Eagan Avenatti and Avenatti and Associates co-

17  counsel on any matter currently?

18  A    Not that I can recall as I sit here right now.

19  Q    Were they co-counsel on any matter within the past

20  year?

21  A    I don't know.

22  Q    Approximately how many matters have there been since

23  Eagan Avenatti was formed in which it was co-counsel with

24  Avenatti and Associates?

25  A    I don't know.

131

1  Q     More than 10?

2  A     No, it would be less than 10.

3  Q     Less than five?

4  A     Less than 10's probably my -- the best estimate that I

5  could give you.  It may be zero.  Somewhere between zero and

6  10.

7  Q     Does Eagan Avenatti own equity in any other entity?

8  A     Not that I know of.

9  Q     Is Eagan Avenatti owed any money, other than counsel

10  fees from clients, former clients?

11  A     I think we touched on this in the first 341.  There was

12  a promissory note that was listed.  I know Mr. Hauser asked

13  a number of questions along these lines.  I'm going to stand

14  on our -- on my prior answers.

15  Q     Anything in addition to that promissory note?

16  A     Again, I'm going to stand on my prior answers in the

17  first 341 that we had, because I think this was covered at

18  length.

19  Q     My recollection, it may not be complete, is that there

20  was discussion of the note.  I don't recall if there was any

21  discussion, other amounts that may be owed to the firm.

22         TRUSTEE HAUSER:  Well, looking at my notes, there

23  was schedule B-71.  There was some notes receivable.  And

24  the testimony was, he thought it would take -- Mr. Avenatti

25  testified he thought it would take two to three years to

132

1  collect on that note, because I asked him why he wrote it

2  down to zero.

3      Is that pretty much it?

4      THE WITNESS:  Yeah, I think that's accurate.  And,

5  of course, we're owed the money from the cases that -- the

6  17 cases that your clients --

7      TRUSTEE HAUSER:  Well, yeah.  I'm just talking

8  about schedule B-71, which is specifically a note

9  receivable.

10 BY MS. CHENETZ:

11 Q    Right.  And I was excluding money that you're owed from

12 clients of your firm or former clients.  Is there any other

13 money owed to the firm, besides this note, current clients

14 and former clients?

15 A    Not that I can think of right now.

16     MS. CHENETZ:  I don't have any more questions at

17 the moment, but can I have a moment to confer with my -- Mr.

18 Frank?

19     TRUSTEE HAUSER:  Sure.  We'll go off the record

20 for a moment.

21     (Proceedings recessed briefly.)

22     TRUSTEE HAUSER:  We are back on the record in the

23 case of Eagan Avenatti.

24     Mr. Avenatti, you understand you're still under

25 oath?

*Briggs Reporting Company, Inc.*

Exhibit H

USAO_00061189

133

1          THE WITNESS: Yes.

2          TRUSTEE HAUSER: Okay. Ms. Shariff, did you want

3  to ask some questions?

4          MS. SHARIFF: Yes, I do.

5                    FURTHER EXAMINATION

6  BY MS. SHARIFF:

7  Q    Mr. Avenatti, I have a few questions regarding the --

8  well, the claim that the I.R.S. has filed is going to be

9  amended based on the returns that my office has received,

10  and it has been represented that those returns have been

11  filed or will be filed with the I.R.S. formally by -- okay.

12          So, one of the questions that I have regarding the 941,

13  the payroll taxes, the tax returns that were provided to my

14  office yesterday. They're signed by you. Were they

15  prepared by an accountant or some sort of a tax

16  professional?

17  A    They were prepared by our payroll company.

18  Q    Your "payroll company"? And who's the payroll company?

19  A    I think it was -- I think it's Paychex.

20  Q    Okay.

21          TRUSTEE HAUSER: Yeah, that's right.

22  BY MS. SHARIFF:

23  Q    And the payroll taxes, the deposits that are made,

24  they're supposed to be made, I believe, bi-weekly with

25  respect to the 941's and the 940 taxes. Are they being

*Briggs Reporting Company, Inc.*

Exhibit H

USAO_00061190

134

1   deposited by someone within the law firm or an outside

2   payroll company?

3   A    Now within the law firm.

4   Q    Okay, "now within the law firm."  And I think that's

5   what you said at the prior 341 meeting.  What about in 2016,

6   do you recall if it was being handled by --

7   A    I understood it was Paychex, but it may have been

8   handled internally.

9   Q    Okay.

10  A    I don't know.

11  Q    So, I -- based on the information that I have to date,

12  it appears that there were no deposits made into the -- all

13  four quarters in 2016 to the I.R.S. in terms of the 941.

14       And so that's a concern because, based on the returns

15  that I received yesterday, the priority tax claim is going

16  to increase -- and this is just rough numbers.  I.R.S. will

17  confirm the numbers and amend the proof of claim, but it's

18  going to increase from what it is now, which is 322,000 and

19  change, to 1.2 million.

20       And part of the reason for that increase is -- well,

21  based on the returns filed, but also because there have been

22  no deposits made.  So, the amounts that you included in the

23  returns are going to have to be paid, and those amounts are

24  much higher than what the I.R.S. has initially estimated.

25       In 2017, the first quarter tax return, the 941 has been

*Briggs Reporting Company, Inc.*

Exhibit H

USAO_00061191

135

1  filed.  In the first quarter the deposit amounts, I believe,

2  are around $51,965.90.  And the tax return says that the

3  taxes due are $155,893.88.

4      The reason I bring this up is that post-petition --

5  well, in 2017, again, there's about 100,000 -- $103,000

6  difference between what is due first quarter and what was

7  actually deposited.

8      And so, we -- the Government wants to make sure that

9  going forward, where not going to continue to have, you

10 know, deposits that are not going to fully pay the payroll.

11 Because then that becomes post-petition issues.

12     Is there going to be something put in place by --

13 A   There has been something put in place to ensure this

14 post the initial 341 that we had.

15 Q   Okay.

16 A   I can't, I can't comment on the exact amounts that are

17 due, or whether deposits were made or not made, you know, as

18 I sit here today.  But as it relates to post-petition, my

19 understanding is that all that's current.

20 Q   So, you had stated earlier -- you testified earlier

21 that the payroll -- and I apologize if I'm misstating what

22 you said.  But you said to the fact that the payroll taxes

23 are being disputed.

24     And my question to you, are the payroll taxes that are

25 now going to be amended in the amended proof of claim, is

*Briggs Reporting Company, Inc.*

Exhibit H

136

1  based on the returns that your office provided.  So, what

2  would be the basis of your dispute?  Would it be --

3  A    Well, we understood that the deposits were being made

4  by the payroll company, and evidently there's an issue

5  relating --

6  Q    Right.

7  A    -- to that.

8  Q    So that will be with the payroll company, not with the

9  Government, right, or I.R.S.?  Because based on I.R.S.'s

10 records, there are no deposits made in 2016.  And the last

11 deposit was in the fourth quarter 2015, but it was not for,

12 you know -- it was like 22,000, almost $23,000.

13     So, we just want to make sure that going forward, that

14 there isn't going to be this issue of not paying the payroll

15 taxes, because it's only going to -- it appears to be like a

16 pyramiding.  And that the returns will be filed timely, so

17 that the Government can be made aware of what's going on.

18 A    I believe everything since March 10th has been handled

19 in a timely manner.

20 Q    So, right now what --

21 A    And we'll continue to do that.

22 Q    Okay.  And so the partnership returns are not filed.

23 Do you have any idea when those --

24 A    The '16 return is on extension.

25 Q    Okay.

*Briggs Reporting Company, Inc.*

Exhibit H

137

1  A    We understood the '14 and '15 were filed.  We saw your
2  e-mail yesterday or the --
3  Q    Okay.
4  A    -- day before, relating to you not having a record of
5  the '14 and '15 returns, and we're trying to run that to
6  ground now.
7  Q    Okay.  Great.  Because that's what the proof of claim
8  says, and that' based on the I.R.S. records, the '14 and '15
9  returns are -- you know, I.R.S. does not, doesn't have it in
10 its -- I don't anticipate that is going to be a huge amount
11 of taxes, but still, we just want to make sure that whatever
12 amounts are available is going to be there.
13 A    Understood.
14          MS. SHARIFF:  I think those are all my questions.
15          TRUSTEE HAUSER:  Okay.  If there's no other
16 questions, then this will conclude the meeting of --
17          MS. CHENETZ:  Is -- just one question.
18          TRUSTEE HAUSER:  Sure.
19 BY MS. CHENETZ:
20 Q    Are -- does the Debtor plan on filing further amendment
21 to the schedules or statement of financial affairs at this
22 point?
23          MR. KHARASCH:  We might file some minor ones.
24          MS. CHENETZ:  Can you set a deadline for that?
25          TRUSTEE HAUSER:  Well, when you say, "set a

*Briggs Reporting Company, Inc.*

Exhibit H

USAO_00061194

138

1  deadline," I mean, we set a deadline last time and,

2  unfortunately, it wasn't met.  There's a difference between

3  me asking for a document by a date certain and getting a

4  drop-dead date from a court and putting it into a scheduling

5  order.  Here's what I would suggest.

6          We have a status conference coming up on, I want

7  to say it's --

8          MR. KHARASCH:  Do you remember, Rob?

9          MR. SAUNDERS:  Yeah, it's July 26.

10         TRUSTEE HAUSER:  -- two weeks from yesterday, or

11 is that -- or two weeks from --

12         MR. SAUNDERS:  It would be July 26th, whatever

13 that is.

14         TRUSTEE HAUSER:  -- two weeks from Wednesday.

15 Okay.  So -- I'm sorry.  So it's a week from this coming

16 Wednesday then.

17         So, Mr. Kharasch, whatever amendments need to be

18 made, whether it's to the statement of financial affairs or

19 to the schedules themselves, could you get them in at least

20 two days prior to July 26th, so that would mean the 24th, or

21 10 days from now?  I mean, at this point we should be done

22 to, as you said --

23         MR. KHARASCH:  (Indiscernible.)

24         TRUSTEE HAUSER:  -- minor amendments.  The point

25 being would be, if you would commit to the 24th, then Ms.

*Briggs Reporting Company, Inc.*

Exhibit H

USAO_00061195

139

1  Chenetz could say, your Honor, they committed to the 24th to

2  make any final changes.  They need the final document.

3  They're entitled to it.  I mean, we are four months, over --

4  more than four months into the case.

5          And I understand the (indiscernible) part, you

6  inherited this situation.  I get that.  That's why I've

7  tried to be as flexible as possible.  But at some point you

8  need to say, we're done with amendments, and -- I mean, Rule

9  1009 says what it says, but the reality is -- you know, can

10 you commit maybe by the 24th to -- I mean, what are you

11 thinking about in term of amendments, just so I understand?

12          MR. SAUNDERS:  We have to go back, you know,

13 adding him as a creditor the contingent-creditor concept.

14          TRUSTEE HAUSER:  Okay.  So things that we actually

15 discussed today, not --

16          MR. SAUNDERS:  I would think.  That's --

17          TRUSTEE HAUSER:  Okay.

18          MR. SAUNDERS:  We're going to have to go over some

19 of the questions and whatever.

20          TRUSTEE HAUSER:  Yeah.  Okay.  I understand.

21          MR. SAUNDERS:  I'm sure --

22          TRUSTEE HAUSER:  So it would have been things we

23 covered today?

24          MR. SAUNDERS:  I think so.

25          TRUSTEE HAUSER:  Going back and looking at your

140

1  notes and saying --

2          MR. SAUNDERS:  Yeah.

3          TRUSTEE HAUSER:  -- either we're going to add or

4  we're not going to add.  Do you think you can get that on

5  file by the 24th?  I think a Monday, is that right?  Yeah.

6  It will be a week from Monday.

7          MR. SAUNDERS:  It's not me, it's you.

8          TRUSTEE HAUSER:  Well, what it does is, it puts a

9  finality to this part of the case.

10          THE WITNESS:  What is a 1009?

11          TRUSTEE HAUSER:  A rule, I believe it's -- of the

12  top of my head is, it basically allows a debtor to amend

13  schedules at any time during the course of the case.  It

14  often comes up, frankly, in the terms of consumer cases.  It

15  doesn't --

16          MR. KHARASCH:  Well, we're going to do the best we

17  can.

18          TRUSTEE HAUSER:  -- it doesn't mean -- let me be

19  clear.  It doesn't mean that you have -- I have -- you have

20  signed the documents under penalty of perjury.  You have

21  signed the amended documents under penalty of perjury.  We

22  have had 341's asking, is everything true and correct?  So,

23  to do an amendment two months from now, I'm saying, you

24  know, Rule 1009 would be extremely bad form, probably

25  subject to --

*Briggs Reporting Company, Inc.*

Exhibit H

USAO_00061197

141

1          THE WITNESS:  I don't even know what the rule is.
2  I was just --
3          TRUSTEE HAUSER:  It's simply --
4          THE WITNESS:  No, you referenced it, so that's why
5  I'm asking.
6          TRUSTEE HAUSER:  Okay.  And it simply allows the
7  debtor to make amendments as necessary through the course of
8  the case.
9          MR. KHARASCH:  I will talk to the -- huddle with
10  my client, and we will do the best we can to --
11          TRUSTEE HAUSER:  It would actually be in your
12  benefit.
13          MR. KHARASCH:  Not a question.
14          TRUSTEE HAUSER:  Because, otherwise, you have Ms.
15  Chenetz saying, your Honor, we don't even have final
16  schedules.  We're almost five months into this case.
17          MR. KHARASCH:  Right.  I got it.
18          TRUSTEE HAUSER:  So play the cards as you wish,
19  you know.  I'm a terrible poker player.  Yeah.
20          MR. KHARASCH:  I know.  I've got a client who's
21  spread very thin.
22          TRUSTEE HAUSER:  I understand that, too, and I get
23  that.  I was hoping maybe there's someone at the firm who --
24  I know Ms. Regnier had a death in the family, but who maybe
25  could fill the gaps on some of these issues.

*Briggs Reporting Company, Inc.*

Exhibit H

142

1        THE WITNESS:  I do want to say this on the record.
2   I am here this afternoon, now.  This is the second 341.
3        TRUSTEE HAUSER:  Yeah.
4        THE WITNESS:  I am here as a representative of the
5   Debtor.  To the extent that Ms. Chenetz, Mr. Frank, Mr.
6   Sims, Mr. Stolper, or any other creditor in connection with
7   this case, or any other party, would like to ask me
8   questions relating to our assets and liabilities and the
9   schedules, et cetera, I am here to answer the questions.
10  So --
11       MR. KHARASCH:  But we will do the best we can to
12  file any amendments as soon as we can.
13       THE WITNESS:  No, I understand that.  But my
14  point's a little different.  So to the extent that anybody
15  has any other questions --
16       TRUSTEE HAUSER:  Sir --
17       THE WITNESS:  -- I am here to answer those
18  questions.  I just want to make sure that we are --
19       TRUSTEE HAUSER:  I finished my questions two hours
20  ago.  The U.S. Trustee doesn't have any further questions.
21       Mr. Polas, he didn't have any further questions.
22  The committee is playing the -- its role.  And so, it's
23  really a matter of whether Ms. Chenetz has any questions.
24       I think we've kind of established that this sort
25  of deep dive into understanding the value of the portfolio

*Briggs Reporting Company, Inc.*

Exhibit H

143

1  is not going to be done in the context of a 341 exam.  The

2  issue of Mr. Avenatti's relationship with his various

3  entities, is, again, a 341, not -- I'm sorry, a 2004

4  examination.  So, those seem to be the two areas that you

5  want to ask a lot of questions about, but given that that's

6  much more appropriate for a 2004.

7          I mean, if you're going to ask for bank statements

8  from third-party entities, what you're going to need in

9  order to put it in front of him, that can't be done today,

10 and it wouldn't be appropriate anyways.

11         So, given those parameters, I think we're going to

12 conclude the meeting at this time.

13     (Proceedings concluded.)

14

15         I certify that the foregoing is a correct

16 transcript from the electronic sound recording of the

17 proceedings in the above-entitled matter.

18 /s/ Holly Martens            1-22-19
   Transcriber                  Date

19

20

21

22

23

24

25

*Briggs Reporting Company, Inc.*

Exhibit H

USAO_00061200