TRACY L. WILKISON
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
ALEXANDER C.K. WYMAN (Cal. Bar No. 295339)
Assistant United States Attorney
Major Frauds Section
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-2435
    Facsimile: (213) 894-6269
    Email:    Alex.Wyman@usdoj.gov

BRETT A. SAGEL (Cal. Bar No. 243918)
Assistant United States Attorney
    Ronald Reagan Federal Building
    411 West Fourth Street, Suite 8000
    Santa Ana, California 92701
    Telephone: (714) 338-3598
    Facsimile: (714) 338-3708
    Email:    Brett.Sagel@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. SA CR 19-061-JVS |
|---|---|
| Plaintiff, | GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE EVIDENCE OF WEALTH, SPENDING HABITS, DEBTS, FINANCIAL CONDITION AND LIFESTYLE (CR 475); DECLARATION OF ALEXANDER C.K. WYMAN, EXHIBITS 1-8 |
| v. | |
| MICHAEL JOHN AVENATTI, | |
| Defendant. | |

    Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorneys Brett A. Sagel and Alexander C.K. Wyman, hereby files its Opposition to defendant MICHAEL JOHN AVENATTI's Motion in Limine to Exclude Evidence of

Wealth, Spending Habits, Debts, Financial Condition and Lifestyle (CR 475).

This Opposition is based upon the attached memorandum of points and authorities, the attached Declaration of Alexander C.K. Wyman and accompanying exhibits, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: June 14, 2021                Respectfully submitted,

                                    TRACY L. WILKISON
                                    Acting United States Attorney

                                    SCOTT M. GARRINGER
                                    Assistant United States Attorney
                                    Chief, Criminal Division


                                    _____/s/_____
                                    BRETT A. SAGEL
                                    ALEXANDER C.K. WYMAN
                                    Assistant United States Attorneys

                                    Attorneys for Plaintiff
                                    UNITED STATES OF AMERICA

2

# TABLE OF CONTENTS

I.    INTRODUCTION.................................................1

II.   OVERVIEW OF THE CLIENT EMBEZZLEMENT COUNTS...................2

      1.   Defendant's Embezzlement of Geoffrey Johnson's
           Funds....................................................2

      2.   Defendant's Embezzlement of Alexis Gardner's
           Funds....................................................4

      3.   Defendant's Embezzlement of Gregory Barela's
           Funds....................................................5

      4.   Defendant's Embezzlement of Michelle Phan's Funds....6

      5.   Defendant's Embezzlement of the NFL Clients'
           Funds....................................................7

III.  ARGUMENT....................................................8

    A.   Evidence of Defendant's Debts and Lavish Lifestyle
       Expenses Is Not Prohibited Under Rule 404(b).............9

    B.   The Government's Anticipated Evidence of Defendant's
       Debts and Lifestyle Is Highly Probative of Material
       Issues.................................................13

    C.   The Government's Anticipated Evidence of Defendant's
       Debts and Lifestyle Is Not Unfairly Prejudicial.........19

IV.   CONCLUSION.................................................21

**TABLE OF AUTHORITIES**

**Cases**

Tellabs, Inc. v. Makor Issues & Rights, Ltd.,

  551 U.S. 308 (2007) ............................................. 16

United States v. Bailleaux,

  685 F.2d 1105 (9th Cir. 1982) .................................. 20

United States v. Bensimon,

  172 F.3d 1121 (9th Cir. 1999) .................................. 18

United States v. Blitz,

  151 F.3d 1002 (9th Cir. 1998) .................................. 20

United States v. Cohen,

  539 F. App'x 743 (9th Cir. 2013) ............................... 15

United States v. Dorsey,

  677 F.3d 944 (9th Cir. 2012) .................................... 9

United States v. Flores,

  510 F. App'x 594 (9th Cir. 2013) ............................... 17

United States v. Holden,

  625 F. App'x 316 (9th Cir. 2014) ............................... 15

United States v. Holmes, No. 5:18-CR-00258-EJD-1, 2021 WL 2044470

  (N.D. Cal. May 22, 2021) ....................................... 17

United States v. Loftis,

  843 F.3d 1173 (9th Cir. 2016) ..................... 9, 10, 11, 14

United States v. Mende,

  43 F.3d 1298 (9th Cir. 1995) ............................... 19, 20

United States v. Mitchell,

  172 F.3d 1104 (9th Cir. 1999) ................. 15, 16, 17, 18

ii

<u>United States v. Naranjo</u>,
  634 F.3d 1198 (11th Cir. 2011)....................................16
<u>United States v. Navarro-Ordas</u>,
  770 F.2d 959 (11th Cir. 1985)....................................16
<u>United States v. Patterson</u>,
  819 F.2d 1495 (9th Cir. 1987)....................................19
<u>United States v. Reyes</u>,
  660 F.3d 454 (9th Cir. 2011).........................14, 15, 17, 19
<u>United States v. Ruvalcaba-Garcia</u>,
  923 F.3d 1183 (9th Cir. 2019)....................................13
<u>United States v. Soliman</u>,
  813 F.2d 277 (9th Cir. 1987)......................................9
<u>United States v. Wanland</u>,
  657 F. App'x 631 (9th Cir. 2016).................................15
<u>United States v. Weygandt</u>,
  681 F. App'x 630 (9th Cir. 2017).................................15
**Federal Rules of Evidence**
Fed. R. Evid. 401..........................................1, 13, 19
Fed. R. Evid. 403.......................................1, 2, 19, 20
Fed. R. Evid. 404.....................................1, 9, 10, 11, 12

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

Defendant MICHAEL JOHN AVENATTI grossly mischaracterizes his financial success as an attorney in seeking to exclude evidence of his lavish lifestyle.  During the time period alleged in the Indictment (January 2015 to March 2019), defendant funded his lifestyle, despite being constantly in debt, largely with the misappropriated client funds he is charged with stealing (and by failing to pay taxes he and his businesses owed) -- not by earning large fees through his law firm.  For example, defendant did not purchase the private jet that he references throughout his motion with the "fruits of his labor," nor was it one of the "benefits of his success" (Mot. at 4); the private jet, like many of defendant's extravagant expenses, was paid for with the proceeds of his fraud.

Defendant seeks to exclude evidence of the lavish lifestyle he chose to live as well as his debts and financial condition under Federal Rules of Evidence 401, 403, and 404(b), by claiming that such evidence is irrelevant and unfairly prejudicial and that he failed to receive notice that the government would be using such evidence.  The Court should deny defendant's motion.

The government put defendant on notice that such evidence is central to his charges as early as the Indictment (CR 16 ¶¶ 7(i), (p), (w), (cc)), again in the government's formal Rule 404(b) notice (CR 284-1 Ex. 1 at 1-3), and repeatedly in pretrial litigation (see, e.g., CR 299 Ex. 1; CR 361).  As the government has explained, and as is evident from the charged scheme in the Indictment (CR 16 ¶ 7), evidence of defendant's extravagant expenses and lavish lifestyle during the charged time period is essential to prove how defendant

used the funds he misappropriated -- which he often commingled with other funds in accounts he used to make these purchases -- and to demonstrate the financial motive for his crimes.  So, too, is evidence of the significant debts defendant -- or his businesses -- owed, including to the IRS, to other law firms, and to creditors in his bankruptcy proceedings, many of whom he paid using victim settlement funds.  Moreover, although such evidence may be somewhat prejudicial to defendant, its prejudice flows not from what it says about his character but rather from its probative value because it demonstrates that he used his clients' funds on himself; that is not the type of "unfair" prejudice that Rule 403 excludes.

## II.   OVERVIEW OF THE CLIENT EMBEZZLEMENT COUNTS

In the client counts set for trial on July 13, 2021, the government has charged defendant with embezzling millions of dollars from five of his clients.  (CR 16 ¶¶ 1-8.)  With regard to each of these clients, defendant is alleged in the Indictment to have stolen their money for his own personal use.

### 1.   <u>Defendant's Embezzlement of Geoffrey Johnson's Funds</u>

First, defendant is alleged to have stolen millions from Geoffrey Johnson, a paraplegic man on whose behalf defendant negotiated a $4 million settlement with the County of Los Angeles for alleged constitutional rights violations in connection with the incident that led to his paraplegia.  (<u>Id.</u> ¶¶ 7(f)-(l).)  As detailed in the Indictment, defendant never transferred to Mr. Johnson his share of the settlement -- which, under the fee arrangement, was $2.4

million minus costs[1] -- but instead commingled the settlement funds with his other accounts, "including [defendant's] personal bank account and bank accounts associated with GBUS [defendant's company that owned the 'Tully's Coffee' chain] and GB Auto [defendant's company that managed his car-racing team]," and used the funds "to pay [defendant's] personal expenses." (Id. ¶ 7(i).)  Summary charts prepared by the government's financial analyst John Drum, which were produced to defendant in May 2020 and attached to a prior government filing as a future trial exhibit (CR 299 Ex. 1, reattached hereto as Exhibit 1), show precisely how defendant used Mr. Johnson's money. Among other expenses, these charts show that defendant spent Mr. Johnson's money at the Montage Resort & Spa in Laguna Beach ($13,608), on GB Auto ($50,000), and on various payroll expenses totaling hundreds of thousands of dollars.  (Ex. 1 at 7-11.)

These charts further show that defendant transferred hundreds of thousands of dollars of Mr. Johnson's money to his operating account with California Bank & Trust (the "A&A 0661 account").  This money was used to replenish the A&A 0661 account after significant personal expenses defendant had just incurred resulting in a negative balance of the account.  For example, on January 26, 2015, defendant wired $60,000 to Villas & Apartments Abroad LLC from the A&A 0661 account (Ex. 2 at 98), which documents show was to pay for a vacation in Mexico for defendant, his family, and a number of their friends (Ex. 3).  Defendant then wired over $80,000 to Chase Home Finance in what appears to be a home mortgage payment (Ex. 2 at 98), resulting in the

---

[1] Evidence at trial will show that the costs incurred by defendant or his firm in connection with each client's case were minimal compared to the amount of the respective settlement received.

1  A&A 0661 account having a balance of -$62,761.22 on January 28, 2015
2  (id. at 99).  Defendant caused Mr. Johnson's $4 million settlement
3  check to be deposited the next day (January 29, 2015), and wired a
4  total of $450,000 of that money to replenish the A&A 0661 account the
5  following day (January 30, 2015).  (Ex. 1 at 4, 7; Ex. 2 at 96.)  He
6  then continued to make large personal purchases from the A&A 0661
7  account.  On January 30 alone (the day he transferred Mr. Johnson's
8  money into the A&A 0661 account), defendant sent $26,500 to his first
9  ex-wife, $60,000 to his car-racing company GB Auto, $100,000 to Gallo
10 Builders (a home construction company working on defendant's house),
11 and $250,000 to his coffee company GBUS.  (Ex. 2 at 98.)

12         2.    Defendant's Embezzlement of Alexis Gardner's Funds
13         Second, the Indictment alleges that defendant negotiated a $3
14 million settlement on behalf of Alexis Gardner with an initial
15 payment of $2.75 million to be paid in January 2017.  (CR 16 ¶¶ 7(m)-
16 (q).)  It further alleges that defendant received that the first
17 installment of $2.75 million in an attorney-client trust account on
18 January 25, 2017.  (Id. ¶ 7(o).)  Rather than transferring to Ms.
19 Gardner the portion of this settlement to which she was entitled --
20 $1.75 million minus costs -- the Indictment alleges that, the
21 following day, defendant transferred $2.5 million of Ms. Gardner's
22 settlement funds to another law firm and then immediately directed
23 that law firm to wire the entire $2.5 million to the Honda Aircraft
24 Company, LLC, to purchase defendant's private jet.  (Id. ¶ 7(p).)[2]
25 That same day (January 26, 2017), defendant transferred the remaining
26
27 ───────────────
28        [2] The government's summary charts show the same simple
   disbursements of Ms. Gardner's settlement funds as well.  (See Ex. 1
   at 23-24.)

                                  4

$250,000 of Ms. Gardner's settlement funds to the A&A 0661 account (id.; Ex. 4 at 108), which bank records show defendant then used in the following weeks to pay various personal expenses at, for example, the upscale restaurant Javier's Crystal Cove (January 31), Equinox (February 8), and Traditional Jewelers ($7,432.25 on February 13) (Ex. 4 at 110, 114).  Defendant also wrote checks from that account to a pool and spa specialists company apparently for work on his house ($2,000 on January 31) and to Ferrari Financial Services, Inc. to pay the lease on his Ferrari sports car ($4,899.49 on February 24).  (Id. at 112, 118.)

In March 2017, approximately a month and a half after defendant purchased the private jet using Ms. Gardner's money, defendant consented to having his law firm Eagan Avenatti LLP ("EA LLP") placed in Chapter 11 bankruptcy.  In re: Eagan Avenatti LLP, No. 8:17-bk-11961-CB (C.D. Cal).[3]  In connection with the bankruptcy, in April and July 2017, defendant signed under penalty of perjury a Statement of Financial Affairs (Form 207) and an amended Statement of Financial Affairs (Form 207), which required EA LLP to disclose, among other things, gross revenue from the business in 2017 up through the filing date.  Id. (Dkt. 52, 161).  Defendant failed to disclose EA LLP's receipt of Ms. Gardner's settlement proceeds in January 2017 on either document.  (Id.; CR 361 at 5-6.)

3.   Defendant's Embezzlement of Gregory Barela's Funds

Next, the Indictment alleges that defendant negotiated a settlement on behalf of Gregory Barela and received an initial payment of $1.6 million on Mr. Barela's behalf in January 2018.  (CR

_____

[3] The bankruptcy was initially filed in the Middle District of Florida but was transferred to the Central District of California.

5

16 ¶¶ 7(r)-(x).)  Instead of transferring to Mr. Barela his portion of the settlement proceeds, the Indictment alleges that defendant used Mr. Barela's settlement funds "for [defendant's] own purposes, including to pay for expenses relating to GBUS." (Id. ¶ 7(w).)  The government's summary charts showing Mr. Drum's financial analysis detail what these expenses were.  (Ex. 1 at 32-40.)  Specifically, defendant used over $1 million of Mr. Barela's settlement funds to pay off his debts related to his coffee business (such as charges to coffee roasters and bakeries), debts defendant owed to other attorneys who were not involved in representing Mr. Barela, including $617,840 to Edward Ricci, $16,147 to Miller Nash Graham & Dunn LLP, $30,000 to James R. Gailey & Associates P.A., $17,000 to Richard Beada, $37,000 to Coblentz Patch Duffy & Bass LLP, and $27,000 to Dennis Brager (who represented defendant in a tax dispute with the IRS involving GBUS).  (Ex. 1 at 34-37.)  Despite receiving Mr. Barela's money and using it to pay off defendant's debts, defendant failed to disclose EA LLP's receipt of Mr. Barela's settlement payment on the January Monthly Operating Report for EA LLP that he was required to file in connection with EA LLP's 2017 bankruptcy proceedings.  (CR 16 ¶ 65; CR 361 at 6-7.)

####4.   Defendant's Embezzlement of Michelle Phan's Funds

Finally, the Indictment alleges that defendant negotiated a stock repurchase agreement on behalf of Michelle Phan and Long Tran in late 2017.  (CR 16 ¶¶ 7(y)-(gg).)  The agreement called for two payments to Ms. Phan, the second of which (for $8,146,288) defendant accepted on Ms. Phan's behalf on March 14, 2018.  (Id. ¶ 7(bb).)  Since defendant had already taken his fee out of the first payment, the entire $8,146,288 was required to be transferred to Ms. Phan.

1    (Id. ¶ 7(z).)   The Indictment alleges, however, that defendant

2    transferred a total of only $4,146,288 to Ms. Phan on May 4, 2018,

3    and only after he had used almost all of the remaining $4 million for

4    his own purposes.  (Id. ¶ 7(cc).)   As shown in Mr. Drum's summary

5    charts, these purposes included sending over $2.8 million to

6    defendant's bankruptcy attorneys at SulmeyerKupetz to pay off

7    defendant's debts with the IRS and other creditors,[4] as well as

8    various payments of thousands of dollars to GBUS (for his coffee

9    company), to Passport 420 (the entity he created to purchase his

10   private jet), and to his erstwhile girlfriend M.M.  (Ex. 1 at 48-50.)

11   He also made various transfers to other accounts he controlled, which

12   he then used for personal expenses.  For example, at the end of March

13   2018, defendant transferred approximately $20,000 of Ms. Phan's money

14   to the A&A 0661 account.  (Id. at 48-49.)   Bank records show that, in

15   April 2018, defendant used that account to incur charges at "Blue

16   Chip Racing" (April 11, likely related to defendant's car-racing

17   hobby), Bergdorf Goodman (for $800.22 on April 16), and the upscale

18   restaurant Ristorante di Giorgio Baldi in Santa Monica (for $476.68

19   on April 23), and sent wires totaling $16,320.27 in rent at his

20   luxury apartment and thousands to Passport 420.  (Ex. 5 at 122-24.)

21   He also issued checks to pay the lease on his Ferrari and to pay his

22   personal driver J.C.  (Id. at 126.)

23        5.   Defendant's Embezzlement of the NFL Clients' Funds

24        In addition to the five clients identified in the Indictment,

25   the government intends to introduce evidence at trial that defendant

26   ──────────────

27        [4] As described in the government's supplemental statement of
     bankruptcy-related acts, crimes, and wrongs, defendant made this
28   payment as part of defendant's stipulation to get the EA LLP
     bankruptcy dismissed.  (CR 361 at 8.)

1   misappropriated money belonging to approximately 200 clients he
2   represented in connection with litigation involving the NFL Super
3   Bowl.  (See generally CR 284 at 13-17; CR 371 at 9.)  Mr. Drum's
4   financial analysis shows that the majority of the NFL clients'
5   settlement funds -- $957,000 -- was transferred to defendant's A&A
6   0661 account between May 17 and August 16, 2017.  (Ex. 1 at 55.)
7   Bank records from the A&A 0661 account show that, after defendant
8   commingled the NFL client funds with other funds in this account,
9   defendant used the funds in the account for various personal
10  expenses, including $11,000 at Traditional Jewelers on May 24, 2017,
11  $232,875 at HTP Motorsport on May 31, 2017, to fund his car-racing
12  hobby, and $13,000 on June 20, 2017, to pay his rent on his luxury
13  apartment, as well as another monthly payment in the thousands on his
14  Ferrari.  (Ex. 6 at 131, 134, 138, 140; Ex. 7.)  Although defendant
15  ultimately sent a small amount of money to some of the NFL clients,
16  none of it came from the settlement proceeds sent to defendant's
17  attorney-client trust account.  (See Ex. 1 at 55, 57.)

18  **III. ARGUMENT**

19      Defendant's motion fails because the evidence he seeks to
20  exclude is highly relevant to the charges and is not unfairly
21  prejudicial, and because it is not "other act" evidence and, even if
22  it were, he received ample notice of the government's intent to
23  introduce it at trial.  The Court should deny defendant's motion and
24  permit the government to admit relevant evidence of defendant's
25  debts, financial condition, and lavish spending.

26
27
28

### A.   Evidence of Defendant's Debts and Lavish Lifestyle Expenses Is Not Prohibited Under Rule 404(b)

Defendant's Rule 404(b) argument misses the mark for several reasons.  First, the evidence he describes in his motion is not "other act" evidence.  "Rule 404(b) applies solely to evidence of 'other' acts, not to evidence of the very acts charged as crimes in the indictment."  United States v. Loftis, 843 F.3d 1173, 1176 (9th Cir. 2016).  Alternatively, it is well-settled that "evidence should not be considered 'other crimes' or 'other act' evidence within the meaning of Rule 404(b) if 'the evidence concerning the "other" act and the evidence concerning the crime charged are inextricably intertwined.'"  United States v. Dorsey, 677 F.3d 944, 951 (9th Cir. 2012) (quoting United States v. Soliman, 813 F.2d 277, 279 (9th Cir. 1987)).  The Ninth Circuit has applied the "inextricably intertwined" doctrine in two categories of cases: (1) where the other act "constitutes a part of the transaction that serves as the basis for the criminal charge," and (2) where it was necessary to admit the other act evidence "in order to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime."  Loftis, 843 F.3d at 1178 (citations omitted).

As described above, the Indictment repeatedly alleges that defendant used settlement funds belonging to his clients for his own personal and business expenses, including to purchase a private jet and buy his way out of bankruptcy.  (See, e.g., CR 16 ¶¶ 7(i), (p), (w), (cc).)  Not only are these expenses "the very acts charged as crimes in the indictment," Loftis, 843 F.3d at 1176, they are necessary to prove that defendant was not sending the money to his clients.  Without the ability to prove to the jury what defendant

used his clients' money for, the government cannot adequately prove that defendant misappropriated their money for himself.  Accordingly, with regard to the charges directly traceable to client funds (which are detailed in Mr. Drum's summary charts, Ex. 1 at 1-60), there can be no question that evidence of such expenses is admissible, even if it does involve defendant buying a private jet shortly before entering bankruptcy and incurring other extravagant expenses.

Moreover, as is evident from Mr. Drum's analysis and the bank records described above, defendant commingled a significant amount of client funds with funds from other sources in his various bank accounts, which he often used for personal expenses and to fund his lavish lifestyle.  Although the government has no intention of overwhelming the jury with a gratuitous display of defendant's extravagance (and the Court can always limit the evidence as cumulative at trial), the government must be able to prove to the jury that these other accounts to which defendant was wiring client funds (such as the A&A 0661 account) were also for defendant's -- and not his clients' -- personal benefit.  The same is true for funds and accounts traceable to other client settlement funds such as the NFL Super Bowl clients, which defendant largely wired to the A&A 0661 account and then used for personal expenses.  See Loftis, 843 F.3d at 1176 (where, as here, the indictment alleges a general scheme, "evidence of uncharged transactions is not evidence of 'other' crimes or acts under Rule 404(b), because it is evidence of part of the crime charged in the indictment--the overall scheme to defraud").

In fact, because of the extent to which defendant commingled client funds with his other accounts, it is often impossible to determine whether certain purchases were made with client funds or

10

funds from another source.  Evidence of defendant's expenses from the charged timeframe and from the relevant accounts into which defendant deposited or commingled client funds is therefore not "other act" evidence.  Id.

Second, to the extent such evidence could be considered "other act" evidence under the purview of Rule 404(b), the government has provided ample notice to defendant of its intent to introduce such evidence.  As discussed above, the government first provided notice that such personal expenses were relevant in the Indictment.  (See, e.g., CR 16 ¶¶ 7(i), (p), (w), (cc).)  Then, on February 2, 2020, the government provided formal, written notice to defendant that it would be introducing certain of this evidence at trial, including that "defendant used a substantial portion of the approximately $1.31 million defendant and his law firm received from the [NFL] settlement for his own personal and business purposes," and directing defendant to where he could find a "detailed analysis of defendant's use of the settlement proceeds."  (CR 284-1 at 2 & n.1.)  As the government stated in its letter to defendant, such evidence is not only inextricably intertwined with the charged conduct but also relevant to proving motive, among other things.  (Id. at 3.)

Several months later, in May 2020, the government produced draft versions of Mr. Drum's summary charts, which detail defendant's uses of the clients' funds.  Given that defendant received these charts in May 2020, the government filed them in opposing defendant's motion to exclude Mr. Drum (CR 299), and the Court acknowledged them in denying defendant's motion to exclude Mr. Drum (CR 371 at 13, 14), defendant

cannot claim he was not on notice of the government's intent to introduce the evidence described in the charts at trial.[5]

Third, other than challenging its relevance, defendant does not argue that evidence of his debts and lavish lifestyle would not be proper under a Rule 404(b) analysis; he merely claims that the government has failed to provide notice.  To the extent that such evidence constitutes "other act" evidence, and to the extent that the government's prior notices were insufficient, even defendant acknowledges in his motion that the government confirmed to defense counsel by email that the government intended to introduce such evidence to prove defendant's use of the funds and to demonstrate financial motive.  (Mot. at 6; Wyman Decl. ¶ 9, Ex. 8.)  Even if that was the first time defendant learned of the government's intent to introduce such evidence, which it was not, it still came approximately six weeks before trial, and clearly in enough time for defendant to challenge such evidence through the instant motion in limine.  And if defendant believed that the government's response was inadequate or not sufficiently specific, he could have informed the government as much or requested further detail, but he did not substantively respond at all to the government's response.  (See Wyman Decl. ¶ 9, Ex. 8.)

For all of these reasons, and for the reasons discussed below establishing the relevance of such evidence, defendant's challenges to the government's evidence under Rule 404(b) fail.

---

[5] And the government clearly put defendant on notice about the government's intent to introduce evidence related to his law firm's bankruptcy and related other acts in its supplemental filing on this topic.  (CR 361.)

**B.    The Government's Anticipated Evidence of Defendant's Debts and Lifestyle Is Highly Probative of Material Issues**

Under Rule 401 of the Federal Rules of Evidence, evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence . . . and the fact is of consequence in determining the action."  Fed. R. Evid. 401(a)-(b). "Relevancy simply requires that the evidence logically advance a material aspect of the party's case."  United States v. Ruvalcaba-Garcia, 923 F.3d 1183, 1188 (9th Cir. 2019) (quotations omitted).

Much of the evidence defendant describes in his motion is not only relevant but essential to proving defendant's guilt because it demonstrates how he spent the money he misappropriated and, crucially, that he did not provide it to his clients as he was required to.  Setting aside those transactions that are directly traceable to client settlement funds (or funds commingled with client settlement funds), which should unquestionably be admitted, evidence of defendant's debts and lavish lifestyle during the time period alleged in the Indictment is independently relevant because it establishes defendant's financial motive for committing his crimes. By all accounts, and as the government's evidence will show at trial, defendant enjoyed a lifestyle of luxury, flash, and glamour that exceeded his legitimate means from his law practice and other professional activities.  He needed his clients' money to fund that lifestyle (for example, by purchasing a private jet with Ms. Gardner's money).  Moreover, as the evidence will show, at all times during the charged scheme, defendant and his businesses had considerable debts and obligations and defendant also misappropriated his clients' money for defendant and his businesses to stay afloat.

13

Evidence of that financial motive is therefore "necessary to offer a coherent and comprehensible story regarding the commission of the crime." Loftis, 843 F.3d at 1178 (citations omitted). It is also relevant to defendant's intent to defraud and, at least with regard to the expenses paid for with victim funds, to proving defendant's scheme to defraud, which are two of the four elements of wire fraud. Ninth Circuit Model Criminal Jury Instruction No. 8.124. Indeed, most of the specifically charged interstate wire communications (those in counts one, two, three, five, six, seven, and eight) relate to defendant misappropriating his clients' funds to pay for his lifestyle and outstanding debts. (CR 16 ¶ 8.)

Ninth Circuit law confirms that such evidence is relevant and admissible to prove financial motive in fraud cases. In United States v. Reyes, 660 F.3d 454 (9th Cir. 2011), for example, a former executive of a company was convicted of a fraudulent scheme involving backdated stock options. On appeal, the defendant objected to the introduction of evidence that, during the relevant time period, he received backdated options worth approximately $130 million and exercised approximately $2 million worth of those options. Id. at 463. Rejecting the defendant's argument that such evidence was irrelevant and unduly prejudicial, the Ninth Circuit noted that the evidence was admitted because it "related to motive, knowledge, and intent, and because it demonstrated that Reyes made money in the backdating scheme." Id. The Court acknowledged previous Ninth Circuit opinions -- cited by defendant here -- discouraging the introduction of evidence "simply to show that [the defendant] is wealthy," but nevertheless held that "the government was allowed to introduce evidence about [the defendant's] motivation for his

involvement in the backdating scheme, his scienter, even if such evidence is generally not sufficient, standing alone, to prove intent to defraud." Id. at 464 (citing United States v. Mitchell, 172 F.3d 1104, 1108-09 (9th Cir. 1999)). Under the circumstances in Reyes, and because the jury was properly instructed on the elements, the Ninth Circuit held that the details of the defendant's personal gain constituted "probative evidence of [the defendant's] motive, knowledge, and intent to participate in the backdating scheme." Id.

Similarly, in United States v. Weygandt, 681 F. App'x 630, 633 (9th Cir. 2017), the Ninth Circuit affirmed a fraud conviction following a trial in which the government made references to the defendant's wealth to show that the defendant had alternatives to fraud but engaged in a scheme to increase his personal earnings. The Ninth Circuit found no clear error in the admission of that evidence, recognizing that, while "financial condition alone has little probative value and risks unfair prejudice," "such evidence may be admissible if it proves motive, knowledge, or intent." Id. Indeed, the Ninth Circuit has repeatedly affirmed the introduction of such evidence in fraud prosecutions to prove financial motive. See, e.g., United States v. Wanland, 657 F. App'x 631, 635 (9th Cir. 2016) ("[T]he district court did not abuse its discretion in admitting evidence related to [the defendant's] wealth and lifestyle because it was relevant to prove [the defendant's] intent and motive to evade taxes."); United States v. Holden, 625 F. App'x 316, 318 (9th Cir. 2014) ("[T]he district court did not abuse its discretion by admitting into evidence [the defendant's] salary and business draws . . . as relevant to motive, not as general evidence of [the defendant]'s wealth."); United States v. Cohen, 539 F. App'x 743, 745

15

(9th Cir. 2013) ("The district court did not abuse its discretion by admitting evidence about [the defendant's] lavish lifestyle because a description of his lifestyle was probative of the manner in which [the defendant] conducted his scheme and relevant to whether the money he received was an investment, a loan, or funds he spent rather than funds he intended to repay.").

The Supreme Court has also weighed in on this issue in a related context.  In a securities fraud action, the Supreme Court noted that the absence of a motive allegation was not fatal to a plaintiff's claim, but observed that "motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 325 (2007).  Lastly, other circuits have also recognized that "[e]vidence that a defendant personally profited from a fraud may provide circumstantial evidence of an intent to participate in that fraud." United States v. Naranjo, 634 F.3d 1198, 1207 (11th Cir. 2011); see also United States v. Navarro-Ordas, 770 F.2d 959, 966-67 (11th Cir. 1985) (affirming fraud conviction based partly on evidence that the defendant stood to profit personally from the scheme in the form of a lucrative job and ownership stake in a bank).

Despite the clear probative value of this evidence and the weight of authority affirming its admissibility, defendant claims that it is irrelevant to the charged offenses by relying on inapposite cases such as Mitchell, 172 F.3d 1104.  In Mitchell, the government introduced evidence of the defendant's poverty to demonstrate motive to commit a bank robbery.  Id. at 1106-07. Although the Ninth Circuit in Mitchell disapproved of the use of financial evidence to prove the defendant's lack of economic means

under the circumstances in that case, it noted that it was not handing down a blanket rule for all scenarios.  Rather, the Court recognized that, when it comes to the admissibility of such evidence, "[n]o general proposition can properly resolve all cases, because the multiplicity of circumstances in human conduct is too great."  Id. at 1109.  Under the particular circumstances presented in Mitchell, the Court held the evidence to be improper because it "did not show more than the mere fact that the defendant is poor."  Id.  As noted above, the Ninth Circuit distinguished Mitchell in admitting such evidence in Reyes, where the government introduced evidence of the defendant's wealth to show his motivation for committing his fraudulent crimes. Reyes, 660 F.3d at 464 (citing Mitchell, 172 F.3d at 1108-09).  As the Ninth Circuit has explained in another case, "wealth evidence, unlike poverty evidence, does not entail the same risk of unfair prejudice."  United States v. Flores, 510 F. App'x 594, 595 (9th Cir. 2013); see also United States v. Holmes, No. 5:18-CR-00258-EJD-1, 2021 WL 2044470, at *4 (N.D. Cal. May 22, 2021) ("[T]he force of Mitchell's holding is diminished because 'wealth evidence, unlike poverty evidence, does not entail the same risk of unfair prejudice.'" (quoting Flores, 510 F. App'x at 595)).

The other cases defendant relies upon similarly stand for the unremarkable proposition, as stated by defendant, that "[e]vidence of an individual's 'lavish spending habits, without a connection to an individual's participation in criminal activity, is irrelevant." (Mot. at 8 (emphasis added) (quoting Holmes, 2021 WL 2044470, at *4); see also Mot. at 9 ("The fact that a defendant is rich or poor, without more, 'has little tendency to establish that the person committed a crime to get more money . . . .'" (emphasis added)

17

(quoting Mitchell, 172 F.3d at 1110)).)  Here, unlike in the cases defendant relies on, the government is not seeking simply to introduce evidence of lavish spending "without more"; to the contrary, there is a very strong connection between defendant's financial condition, debts, and spending and his criminal activity. Defendant misleadingly cites United States v. Bensimon, 172 F.3d 1121 (9th Cir. 1999), for the proposition that "the admission of [a] defendant's bankruptcy filing as evidence of financial motive [is] reversable [sic] error."  That is not what Bensimon held.  Rather, the panel in Bensimon cited Mitchell and held, consistent with Mitchell, that "a petition for bankruptcy is not in and of itself evidence of a specific and immediate financial need such that it would be relevant to showing [the defendant's] motive."  Id. at 1129 (emphasis added).  To be admissible, "poverty evidence must be accompanied by something more," id., and here it is because, among other reasons, defendant stole over $2.8 million of Ms. Phan's settlement money and used it to pay off his bankruptcy creditors to get the EA LLP bankruptcy dismissed.  (Ex. 1 at 48; CR 361 at 8.)

    The government is not seeking to introduce evidence that defendant was wealthy or poor.  Rather, the government intends to present evidence demonstrating defendant's expenditures on both outstanding obligations and to live a life of wealth and luxury for which he lacked the means to pay, which provided a clear financial motive for him to steal from his clients.  The government will present evidence showing that defendant was constantly in debt at the same time he was jet-setting around the world, dining at fancy restaurants, making expensive purchases, and otherwise projecting a lifestyle of wealth that his bank accounts could not support.  As in

<u>Reyes</u>, it is reasonable to infer that defendant understood he could only live this lifestyle by executing the fraud scheme with which he is charged. 660 F.3d at 464. This evidence is therefore relevant and should be admitted under Rule 401.

What is irrelevant, and should not be admitted at trial, is the four-page recitation in defendant's motion of his purported career highlights prior to the charged scheme in this case. It does not matter in the slightest -- either to this motion or to the charges against defendant -- how much money he earned as an attorney prior to 2014, when he was negotiating a settlement on behalf of Mr. Johnson, because, by that point, the money was all gone. What matters is that defendant was broke and/or in debt and needed to steal his clients' money to pay off his debts and fund his lavish lifestyle.

### C. The Government's Anticipated Evidence of Defendant's Debts and Lifestyle Is Not Unfairly Prejudicial

Given the high probative value of defendant's debts and chosen lavish lifestyle in demonstrating the financial motive for his crimes, defendant is not entitled to the exclusion of this evidence under Rule 403. <u>See</u> <u>United States v. Mende</u>, 43 F.3d 1298, 1302 (9th Cir. 1995) ("Under the terms of the rule, the danger of prejudice must not merely outweigh the probative value of the evidence, but substantially outweigh it."); <u>United States v. Patterson</u>, 819 F.2d 1495, 1505 (9th Cir. 1987) (Rule 403 is "an extraordinary remedy to be used sparingly").

Defendant's arguments to the contrary are unpersuasive. The government is not seeking to "inflame the jurors and alienate them from [defendant]." (Mot. at 10.) Nor is it likely to achieve that effect on the basis that "most Americans do not have the ability to

travel by private jet, accumulate personal wealth or spend in a lavish manner," since defendant, like most Americans, similarly did not have the ability to spend in that fashion; he relied on his clients' funds to do so.  As a result, this evidence is only prejudicial to defendant in that it illustrates his financial motive and is therefore probative of defendant's crimes, and that is not the type of "unfair" prejudice that Rule 403 is designed to prevent.  <u>See United States v. Bailleaux</u>, 685 F.2d 1105, 1111 & n.2 (9th Cir. 1982) (evidence is only <u>unfairly</u> prejudicial under Rule 403 when it "not only has a significant impact on the defendant's case" but "results in some unfairness to the defendant because of its <u>non-probative</u> aspect" -- that is, its tendency to "affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged" (emphasis added)); <u>United States v. Blitz</u>, 151 F.3d 1002, 1009 (9th Cir. 1998) ("some prejudice" does not necessarily constitute "unfair prejudice"); <u>see also</u> <u>Reyes</u> (admission of evidence of financial gain from scheme "fell far short of meeting the level required to find unfair prejudice").  Nor has defendant come close to demonstrating that the prejudice he claims he would suffer <u>substantially outweighs</u> the high probative value of this evidence.  <u>See</u> <u>Mende</u>, 43 F.3d at 1302.

This evidence is also unlikely to waste time.  As discussed above, defendant's finances and legal career prior to the events described in the charged scheme are irrelevant -- and do not become relevant through the admission of the evidence at issue here -- so there will be no need for a "mini trial concerning [defendant's] career, finance, and the thousands of clients he successfully represented."  (Mot. at 10.)  Accordingly, Rule 403 does not provide

a basis to exclude evidence of defendant's debts, financial condition, or lavish lifestyle.

**IV.   CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court deny defendant's motion in its entirety.