1

2

3

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

THE HONORABLE JAMES V. SELNA, JUDGE PRESIDING

UNITED STATES OF AMERICA,     )CERTIFIED TRANSCRIPT
                   Plaintiff, )
     vs.                      )
                              )  SACR-19-00061-JVS
MICHAEL JOHN AVENATTI,        )
                   Defendant. )
-----------------------------)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

June 28, 2021

SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(714) 543-0870

1    APPEARANCES OF COUNSEL:

2    For the Plaintiff:

3    NICOLA T. HANNA
     United States Attorney
4    BRANDON D. FOX
     Assistant United States Attorney
5    Chief, Criminal Division
     ALEXANDER WYMAN
6    Assistant United States Attorney
     Major Frauds Section
7    1100 United States Courthouse
     312 North Spring Street
8    Los Angeles, CA  90012
     (213) 894-6683
9
     BRETT A. SAGEL
10   Assistant United States Attorney
     Ronald Reagan Federal Building
11   411 West Fourth Street, Suite 8000
     Santa Ana, CA  92701
12   (714) 338-3598

13   For the Defendant:

14   H. DEAN STEWARD
     H. DEAN STEWARD LAW OFFICES
15   107 Avenida Miramar, Suite C
     San Clemente, CA  92672
16   (949) 481-4900

17

18

19

20

21

22

23

24

25

|    |    |
|----|----|
| 1  | SANTA ANA, CALIFORNIA; MONDAY, JUNE 30, 3021; 8:02 A.M. |
| 08:02  2 | THE CLERK:  Item No. 1, SACV-19-00061-JVS, United |
| 08:02  3 | States of America versus Michael John Avenatti. |
| 08:02  4 | Appearances on behalf off the government, please. |
| 08:02  5 | MR. SAGEL:  Good morning, Your Honor.  Brett Sagel |
| 08:02  6 | and Alexander Wyman on behalf of the United States. |
| 08:02  7 | THE COURT:  Good morning. |
| 08:02  8 | MR. STEWARD:  Good morning, Your Honor.  Dean |
| 08:02  9 | Steward with Mr. Avenatti.  He has joined us this morning. |
| 08:02 10 | THE COURT:  Good morning. |
| 08:02 11 | THE DEFENDANT:  Good morning. |
| 08:02 12 | THE COURT:  This matter is here for the pretrial |
| 08:02 13 | conference.  We have a number of motions to take up.  Let's |
| 08:02 14 | begin first with the government's motion with regard to |
| 08:02 15 | certain business records. |
| 08:02 16 | Who's going to address that?  Mr. Wyman. |
| 08:02 17 | MR. WYMAN:  Thank you, Your Honor. |
| 08:02 18 | We understand the Court's tentative and understand |
| 08:02 19 | that this is unlikely to change it.  I just want to |
| 08:02 20 | point that the record -- |
| 08:02 21 | THE COURT:  Well, just a minute.  If I were |
| 08:02 22 | prudent, wouldn't I have to look at each of these |
| 08:02 23 | certificates? |
| 08:03 24 | MR. WYMAN:  Yes, Your Honor. |
| 08:03 25 | THE COURT:  And wouldn't I have to look at each of |

08:03  1   the documents or at least give the other side the

08:03  2   opportunity to comment on the each of the documents for

08:03  3   problems other than strict compliance with the business

08:03  4   records rule?

08:03  5               MR. WYMAN:  Yes, Your Honor.

08:03  6               THE COURT:  Isn't that the end of the discussion?

08:03  7               MR. WYMAN:  It is, Your Honor.  The only thing I

08:03  8   wanted to point out was in the tentative the Court noted

08:03  9   that the custodian certificates were not attached.  I wanted

08:03  10  to make clear we did attach them to the reply, but we

08:03  11  understand the Court still needs to look at the underlying

08:03  12  records exception.

08:03  13              THE COURT:  Okay.

08:03  14              Mr. Steward.

08:03  15              MR. STEWARD:  Your Honor, we agree with the

08:03  16  Court's tentative.

08:03  17              THE COURT:  Okay.  Let's take up the government's

08:04  18  second motion with regard to the admission or exclusion of

08:04  19  certain statements by Mr. Avenatti.

08:04  20              Mr. Wyman.

08:04  21              MR. WYMAN:  Thank you, Your Honor.

08:04  22              We agree with the Court's tentative.  I did have

08:04  23  just a few clarifying questions if I may.

08:04  24              THE COURT:  Please.

08:04  25              MR. WYMAN:  On page 4 of the tentative, the Court

08:04  **1**  said that the Court will require the government to delete

08:04  **2**  colloquy between counsel and objections not sustained.

08:04  **3**        My question is when we prepared these excerpts, we

08:04  **4**  already did delete most of the colloquy that we didn't

08:04  **5**  believe was necessary for context.  So I was wondering

08:04  **6**  whether the Court had specific instances in mind.

08:04  **7**        THE COURT:  I just don't believe colloquy in

08:04  **8**  general is necessary.  The questions are framed to provide a

08:04  **9**  context for the answers.

08:05  **10**        MR. WYMAN:  In a couple of instances, there is

08:05  **11**  some colloquy that sort of changes the question posed.  For

08:05  **12**  example, the attorney asks the question.  There is an

08:05  **13**  objection.  The Court gives comments on it and then says,

08:05  **14**  for example, I understand the question to be this, and then

08:05  **15**  the defendant provides an answer.  So our take on those

08:05  **16**  particular excerpts was it's not clear from the context what

08:05  **17**  the question is without that colloquy.

08:05  **18**        THE COURT:  That's fine.  Confer with Mr. Steward

08:05  **19**  and see if there is any objection to those instances where

08:05  **20**  the colloquy is in fact necessary.

08:05  **21**        MR. WYMAN:  Yes, Your Honor.  Thank you.

08:05  **22**        There was one instance in the tentative where the

08:05  **23**  Court noted that the defendant objected to page 10 on

08:05  **24**  Exhibit I.  The Court said that the government did not

08:05  **25**  designate any excerpts from that page, which is correct.  I

08:05  1  believe, however, that the defense cited the wrong page in

08:05  2  Exhibit I.  Page 33 has similar testimony about the rent

08:06  3  that the defendant was paying.  So understanding the Court's

08:06  4  ruling on another motion in-limine, we intend to strike that

08:06  5  as well.  I wanted to make that clear for the record.

08:06  6          THE COURT:  Okay.

08:06  7          MR. WYMAN:  Next, the tentative said that the

08:06  8  Court will deal with the manner in which the recorded

08:06  9  statements should be handled.  I don't know whether Your

08:06  10  Honor wanted to address that now or at a later time.

08:06  11          THE COURT:  Well, if there are recordings, you

08:06  12  have to lay the foundation for the recording, and the

08:06  13  recording is the best evidence.

08:06  14          MR. WYMAN:  Yes, Your Honor, and I apologize.  I

08:06  15  meant the transcribed statements for which we do not also

08:06  16  have a video recording.  As Your Honor will likely recall,

08:06  17  there are two recordings for which we admit the recording

08:07  18  itself with the transcripts as an aid.  For the remaining

08:07  19  transcripts, we aren't sure how the Court would like us to

08:07  20  admit the evidence at the trial.

08:07  21          THE COURT:  Read it.

08:07  22          MR. WYMAN:  Read it with a government witness, an

08:07  23  attorney, for example?

08:07  24          THE COURT:  Right.  It would treat it just as a

08:07  25  deposition assuming it's a certified copy.

08:07  1           MR. WYMAN:  Thank you, Your Honor.

08:07  2           Lastly, in the tentative, the Court said if the

08:07  3   recordings are played the Court is likely to require the

08:07  4   distribution of transcripts.  Sometimes we will pass out

08:07  5   actual hard copies of transcripts, and other times we would

08:07  6   simply sync the transcript to an audio recording.

08:07  7           THE COURT:  Either works.

08:07  8           MR. WYMAN:  Thank you, Your Honor.  I have no

08:07  9   further questions on this one.

08:07  10          THE COURT:  Okay.  Thank you.

08:07  11          Mr. Steward.

08:07  12          MR. STEWARD:  Briefly, Your Honor.  Your Honor, we

08:08  13  set out a fairly complete discussion on the rule of

08:08  14  completeness.  Obviously we stand by that.  I understand the

08:08  15  Court's rulings.  Some of this I believe we will have to

08:08  16  actually see how the government is going to try and present

08:08  17  this in order to fully understand what the issue may be

08:08  18  there.

08:08  19          THE COURT:  Sir, the government has made its

08:08  20  designations.  You have had double the usual time to reply

08:08  21  to the government's motions.  If you had objections or you

08:08  22  had 106 additions, I would have expected you to put it in

08:08  23  your opposition.

08:08  24          MR. STEWARD:  All right.  I will leave it at that.

08:08  25  I do have significant foundational concerns.  I just thought

08:08   1   I would point that out for the Court.  We will be watching

08:08   2   very closely how the government intends to establish

08:08   3   foundation, and we're going to keep their feet to the fire.

08:08   4           THE COURT:  That's fair.  That's all that is

08:08   5   required -- or the minimum I guess that is required I

08:08   6   suppose for each of these is to lay the proper foundation.

08:09   7           Anything further, Mr. Steward?

08:09   8           MR. STEWARD:  No, Your Honor.  Thank you.

08:09   9           THE COURT:  Okay.  Thank you.

08:09  10           Let's take up the government's final motion with

08:09  11   regard to exclusion of facts underlying the settlements.

08:09  12           MR. SAGEL:  Your Honor, obviously we agree with

08:09  13   your tentative.  I just want to clarify one thing, and I'll

08:09  14   give you one example.  In our motion, we mention that we

08:09  15   think minimal facts are necessary to establish why the

08:09  16   crimes are within what they are looking for.

08:09  17           For example, Jeffrey Johnson, who was at the time

08:09  18   of his injuries at the Twin Towers facility by Los Angeles

08:09  19   County, we want to ask him questions like did you suffer any

08:09  20   injuries that led to you being a paraplegic?  Approximately

08:10  21   when did you suffer them?  Where did you suffer those?  Were

08:10  22   you arrested?  Were the charges dropped.  We want just to

08:10  23   set up where he was when he meets Mr. Avenatti and what

08:10  24   leads to basically his claims and the charges.

08:10  25           We're not going to get into any real detail.  It

| | | |
|---|---|---|
| 08:10 | 1 | will basically be just five or six questions and sometimes |
| 08:10 | 2 | even less for each crime just to set up what they retained |
| 08:10 | 3 | him for and what they were basically suing the other side |
| 08:10 | 4 | for or what they were trying to get a settlement for. |
| 08:10 | 5 | That's it.  We just want to make sure that those |
| 08:10 | 6 | introductory type questions to establish it, which is what's |
| 08:10 | 7 | in the Indictment, doesn't open the door for any underlying |
| 08:10 | 8 | facts other than that. |
| 08:10 | 9 | THE COURT:  You're permitted to go into the |
| 08:10 | 10 | basics. Basically, I think the jury needs to know what type |
| 08:10 | 11 | of claim it is and I suppose how the client got |
| 08:10 | 12 | Mr. Avenatti, but it's going to be very sparse. |
| 08:10 | 13 | MR. SAGEL:  Extremely.  I might have even given |
| 08:11 | 14 | more what we actually intend to ask.  With most of the |
| 08:11 | 15 | clients we are talking about, we have three or four |
| 08:11 | 16 | questions basically. |
| 08:11 | 17 | THE COURT:  Okay. |
| 08:11 | 18 | Mr. Steward. |
| 08:11 | 19 | MR. STEWARD:  Your Honor, I think what counsel |
| 08:11 | 20 | just described in our view would open the door. |
| 08:11 | 21 | THE COURT:  Sir, it's not going to open the door. |
| 08:11 | 22 | I think they can ask a few questions to establish what the |
| 08:11 | 23 | generic claim was so that the jury has at least some |
| 08:11 | 24 | fundamental understanding and can differentiate that |
| 08:11 | 25 | settlement from the other settlements.  I described the |

08:11   1   basic subject matter of each of those settlements in the

08:11   2   tentative.  I don't think we need a heck of a lot more than

08:11   3   that.

08:11   4           MR. STEWARD:  I understand, Your Honor.  And I

08:11   5   agree of course with the top half of page 9, the Court

08:11   6   outlining the relevance of admissible portions.  We

08:11   7   certainly agree with that.  We think that the other six

08:11   8   items in the bottom half of the page should also be fair

08:11   9   game.

08:11   10          In counsel's example of the injuries at the jail,

08:12   11  I think that's more than outlining exactly what the claim

08:12   12  was about and would open the door towards a number of other

08:12   13  questions.  But, again --

08:12   14          THE COURT:  We will have to wait and see.  The

08:12   15  government is on notice to keep it brief, and I don't intend

08:12   16  to really allow the door to be opened to get into the

08:12   17  underlying stories of these other cases.

08:12   18          MR. STEWARD:  That's fine, Your Honor, as long as

08:12   19  the government doesn't open that door.

08:12   20          THE COURT:  Well, we will have to see.

08:12   21          MR. STEWARD:  Agreed.  Thanks.

08:12   22          THE COURT:  With regard to the items discussed on

08:12   23  page 1, I don't see how any of those items is relevant to

08:12   24  the settlement.  I assume that the retainer agreements will

08:12   25  come in.  Retainer agreements say what the deal is.  I

08:12  **1**  assume it's a straight percentage plus costs.

08:12  **2**       MR. STEWARD:  Well, let's assume it's a percentage

08:13  **3**  plus costs and it's a very, very high figure.  It seems to

08:13  **4**  me that the jury would be entitled to know things like the

08:13  **5**  quality of the work and the challenges to justify it.

08:13  **6**       THE COURT:  I disagree, and I will tell you why.

08:13  **7**  If the settlement was for $10 million and the terms were

08:13  **8**  there, without regard to the quality of the work, without

08:13  **9**  regard to the challenges of the representation, I see no

08:13  **10**  need to get into any of that.  We're looking at a sum

08:13  **11**  specified, and we're looking to see where it went and why

08:13  **12**  and if that was permissible.  I don't see how any of these

08:13  **13**  factors bear on that.

08:13  **14**       MR. STEWARD:  Although, let's take the $10 million

08:13  **15**  example, and the fees there are $3,300,000 to the attorney.

08:13  **16**  I think any typical juror is going to think, oh, my gosh,

08:13  **17**  that's an awful lot of money.  They are entitled to an

08:13  **18**  explanation as to the quality of work, the challenge of the

08:13  **19**  work, that sort of thing.

08:13  **20**       THE COURT:  Sir, it's a contract.

08:13  **21**       MR. STEWARD:  Well, I understand that, but it

08:13  **22**  seems to me that there are instances, particularly in this

08:14  **23**  case, where additional information is the sort of thing that

08:14  **24**  the jury needs to understand the whole picture of what

08:14  **25**  happened, because remember it's not just --

08:14  1          THE COURT:  It's what happened to the money.  It's

08:14  2  not what happened to the client.

08:14  3          MR. STEWARD:  Well, it's not did he take money?

08:14  4  The question is did he take money to which he wasn't

08:14  5  entitled?  That's where the quality of the work and the

08:14  6  challenges of the work come in.

08:14  7          THE COURT:  If his fee is one-third, how does the

08:14  8  quality of the work come to bear?

08:14  9          MR. STEWARD:  Because any typical juror who hears

08:14  10  that a lawyer is getting $3,300,000 as a fee is going to

08:14  11  want to know why.  How did that happen?  It's an awful lot

08:14  12  of money.

08:14  13          THE COURT:  I will allow the testimony to the

08:14  14  effect that that's a reasonable and customary contingency

08:14  15  fee in that particular frame, but we're not going to get

08:14  16  into this.

08:14  17          MR. STEWARD:  I understand the Court's ruling.  If

08:14  18  we could at least explore that it's a reasonable fee.

08:14  19          THE COURT:  You can explore that the state of the

08:15  20  percentage is reasonable and customary for that type of

08:15  21  injury.  We're not going to go beyond that.

08:15  22          MR. STEWARD:  Understood.

08:15  23          THE COURT:  Okay, let's take up your motion,

08:15  24  Mr. Steward.

08:15  25          MR. STEWARD:  Your Honor, given the Court's

08:15  1    tentative, we agree with that and submit.

08:15  2                THE COURT:  Okay.  Who is going to address this?

08:15  3    Mr. Wyman.

08:15  4                MR. WYMAN:  Your Honor, we understand the Court's

08:15  5    tentative.  I just want to ask a couple of questions to make

08:15  6    sure that the evidence we introduce doesn't run afoul of

08:15  7    where the Court drew the line on this type of evidence.

08:15  8                First, am I correct in understanding the Court's

08:15  9    tentative ruling that any direct use of victim funds is

08:15  10   permissible even if it is, for example, the purchase of a

08:15  11   private jet or something showing an extravagant purchase?

08:16  12                THE COURT:  Well, you can show where the funds

08:16  13   went, and I think that's what the expert's set of charts

08:16  14   say.  But if there is some potentially inflammatory injury

08:16  15   that is beyond where the money went, I think there should be

08:16  16   some potential redactions, and I suggest that in the

08:16  17   tentative.  I'm sure Mr. Steward will flyspeck those charts

08:16  18   and bring anything that is potentially troublesome to the

08:16  19   Court's attention.

08:16  20                MR. WYMAN:  Yes, Your Honor.  And then perhaps

08:16  21   when we disclose our exhibits next week, we can meet and

08:16  22   confer with Mr. Steward about any problematic things he

08:16  23   sees.

08:16  24                My question next is about redactions.  We don't

08:16  25   intend to introduce a large number of bank records, but we

08:16  1  do intend to introduce the relevant bank statements, for

08:16  2  example, from the accounts where the victims' money went

08:16  3  during the time period that he is alleged to have spent it.

08:16  4  And while we don't intend to highlight, for example, every

08:17  5  line item, these statements do have personal purchases by

08:17  6  the defendant at clothing stores, at restaurants, car

08:17  7  expenses, for example.

08:17  8       Does the Court want us to redact those statements,

08:17  9  or can we introduce them as long as we don't highlight the

08:17  10  extravagant nature of some of the irrelevant purchases?

08:17  11       THE COURT:  Meet and confer on the appropriate

08:17  12  redactions.

08:17  13       MR. WYMAN:  Yes, Your Honor.  Thank you.

08:17  14       The next question we had was regarding the

08:17  15  evidence of his debts.  We understand the Court's tentative

08:17  16  to say reference only to the generic nature of the debt.  I

08:17  17  certainly understand that and agree with it.

08:17  18       I want to clarify what that means practically

08:17  19  speaking.  For example, about $2.8 million of one of the

08:17  20  victim's money was sent to a law firm, which then sent the

08:17  21  money to pay off the defendant's bankruptcy creditors,

08:18  22  including about $1.5 million to the IRS.  The check will

08:18  23  show that, and we expect a witness will testify that the

08:18  24  amount of money had to go to the IRS in order for the

08:18  25  defendant to get out of bankruptcy.

08:18   1          Similarly, another victim's money was sent to a

08:18   2   law firm that had been hired by the defendant in a tax

08:18   3   dispute with the IRS.  Now, we understand that getting into

08:18   4   those matters may be something that the defense does not

08:18   5   want.

08:18   6          We approached the defense about a possible

08:18   7   stipulation on the use of the money for those particular law

08:18   8   firms.  But without being able to say why money is going to

08:18   9   other law firms and importantly explain that they relate to

08:18   10   matters unrelated to the defendant in this case, we can't

08:18   11   establish that these are improper uses of the funds.  So we

08:19   12   were hoping that we can get into at least that level of

08:19   13   detail.

08:19   14          THE COURT:  You can get into a high level of

08:19   15   detail, but we're not going to get into the nitty-gritty.  I

08:19   16   think alimony and child support payments were also in that.

08:19   17   I think you can refer to those, but we're not going to go

08:19   18   any further.

08:19   19          Now, in considering this motion, I obviously

08:19   20   engaged in a balancing test with respect to each category.

08:19   21   I think the paying off of personal debts is far less

08:19   22   inflammatory than the lifestyle expenditures.  I think

08:19   23   without question those debts create a potential motive.  And

08:19   24   I think the balance here is struck in favor of admitting the

08:19   25   debts as probative of --

08:19  **1**          MR. WYMAN:  Thank you, Your Honor.  Understood.

08:19  **2**          The last question we have is sort of a combination

08:19  **3**   of the debt side of the equation and the lavish lifestyle

08:20  **4**   side.  At least two of the victims in this case are likely

08:20  **5**   to testify that they hired the defendant in part because of

08:20  **6**   his rather opulent office space.  They will also likely

08:20  **7**   testify that at the time they retained him he did not

08:20  **8**   disclose to them that his firm was actually in bankruptcy

08:20  **9**   and that that would have mattered to them both in whether to

08:20  **10**  retain him and whether to trust him with their settlement

08:20  **11**  funds.

08:20  **12**          I wanted to clarify with the Court whether that

08:20  **13**  testimony would be permissible under the Court's ruling or

08:20  **14**  if the balance is against that.

08:20  **15**          THE COURT:  I don't think the reasons why the

08:20  **16**  victim retained him are relevant, and I don't think his

08:20  **17**  office setting would be relevant.  The fact that he was in

08:21  **18**  bankruptcy may or may not have gone to whether or not the

08:21  **19**  victim would retain him.  But, in fact, he was retained with

08:21  **20**  a contract which specified the specific amount.

08:21  **21**          Make an offer of proof at the time of trial if you

08:21  **22**  want to get into that kind of material, but given that

08:21  **23**  specific example, I wouldn't allow those two questions.

08:21  **24**          MR. WYMAN:  Thank you, Your Honor.

08:21  **25**          And if you will indulge me with just one more

08:21   1   level of detail, with regard to one of these victims, the

08:21   2   contract that the defendant negotiated on this victim's

08:21   3   behalf actually called for two separate payments, and the

08:21   4   second one didn't need to go through the defendant's

08:21   5   attorney/client trust account.  It could have gone directly

08:21   6   to the victim.

08:21   7           Had this victim known that the defendant's law

08:21   8   firm was in bankruptcy, she will likely testify she would

08:22   9   have had the money go straight to her, and that is the money

08:22   10  that the defendant misappropriated from her.  I do think

08:22   11  it's relevant if not for why she initially retained the

08:22   12  defendant but for why she trusted him with her money.

08:22   13          THE COURT:  The trust was there always, and he had

08:22   14  the duty to handle the money properly.  I don't see why

08:22   15  getting into that level is significant.  The point is

08:22   16  whether he put through a trust account or put it directly to

08:22   17  her the allegations are that he diverted the money.  So I

08:22   18  don't see that that distinction is relevant.

08:22   19          MR. WYMAN:  Very well, Your Honor.  If we intend

08:22   20  to go there at all, we will make an offer of proof to the

08:22   21  Court.

08:22   22          THE COURT:  Okay.  Thank you.

08:22   23          Mr. Steward.

08:22   24          MR. STEWARD:  Briefly again, Your Honor.  Counsel

08:22   25  mentioned that they intend to elicit testimony about funds

08:22 1   coming in and then funds going here and were used for a

08:23 2   particular purpose or sent to a particular law firm.  My

08:23 3   guess is that they are going to want Mr. Drum, the expert to

08:23 4   say that.  I just wanted to alert the Court that we are

08:23 5   concerned about Mr. Drum becoming a fact witness as opposed

08:23 6   to an expert witness.

08:23 7           THE COURT:  Well, he is an expert in accounting.

08:23 8   I think he can trace the money and state where it went

08:23 9   without being a fact witness.

08:23 10          MR. STEWARD:  If, for example, he tries to say

08:23 11  what the purpose was, obviously that's not something he can

08:23 12  do.

08:23 13          THE COURT:  True.

08:23 14          MR. STEWARD:  Again, I guess we're going to see

08:23 15  exactly what he says when he gets here in order to determine

08:23 16  it, but I did want to highlight that issue for the Court.

08:23 17          Also, I think when I started I said I agree with

08:23 18  the Court's tentative.  I have to take that back.  I

08:23 19  submitted originally.  There are a couple of points in

08:23 20  there, for example, on the debts that I don't agree with.  I

08:23 21  just wanted to make that clear.

08:23 22          THE COURT:  That's fine.

08:24 23          In his most recent filing, Mr. Avenatti raised a

08:24 24  number of issues, some mechanical, some not.  So why don't

08:24 25  we address those.

08:24  1          As to the impact of Mr. Avenatti's sentencing in
08:24  2    the Nike case, I understand that that has now been continued
08:24  3    to July 9.
08:24  4          MR. STEWARD:  July 8, Your Honor.  It was changed
08:24  5    a day or two ago.
08:24  6          THE COURT:  Okay, July 8.  In any event, we plan
08:24  7    to use days that week to bring in jurors in groups of about
08:24  8    50 to fill out the questionnaire.  I agree that whatever
08:24  9    publicity is going to flow from the sentencing ought to be
08:24  10   out there so that we can accurately gauge what knowledge, if
08:25  11   any, the jurors have of that sentencing and what effect it
08:25  12   has on them.
08:25  13         So what I propose is that we start instead of
08:25  14   beginning next week that we begin on the day of trial with
08:25  15   maybe 50 in the morning, 50 in the afternoon, and 50 the
08:25  16   next day.  I will work out the particulars with the Clerk's
08:25  17   Office to see what works, just begin in that fashion and
08:25  18   maybe give ourselves a day to look at those questionnaires
08:25  19   and see what peremptories or challenges for cause would be
08:25  20   appropriate just on the basis of the questionnaires.
08:25  21         What's your thoughts?
08:25  22         MR. SAGEL:  I've been before Your Honor for I
08:25  23   think it's close to 17 years now, so I know that when you
08:25  24   give a tentative it's very well-thought out and so forth,
08:25  25   but I will attempt to tell you why I think that might not

08:25  1  be --

08:25  2          THE COURT:  Well, don't we need Mr. Avenatti here

08:26  3  for that process if he wants to be?

08:26  4          MR. SAGEL:  We do.

08:26  5          THE COURT:  And hasn't he expressed that he wants

08:26  6  to be?

08:26  7          MR. STEWARD:  He expresses that now, Your Honor.

08:26  8          THE COURT:  Well, you put it in the papers.

08:26  9          MR. SAGEL:  With slight indulgence, what

08:26  10  Mr. Avenatti didn't do is both tell the truth to the Court

08:26  11  in the Southern District of New York and here, and what he

08:26  12  basically is asking is to be in violation of his conditions

08:26  13  of release.

08:26  14          THE COURT:  Tell me about that.

08:26  15          MR. SAGEL:  On March 30 when the defendant asked

08:26  16  for a continuance of his May sentence in that case to move

08:26  17  it to June, he did not say one word that he had a trial in

08:26  18  this matter.  He did not say that he had this hearing on

08:26  19  June 28.  He asked the Court for a sentencing date that

08:26  20  conflicted with today's date.  Only when I mentioned to the

08:26  21  SDNY prosecutors did he file something to exclude June 28

08:26  22  because I have a status conference.  He did not mention the

08:27  23  trial.  He did not mention this date.

08:27  24          Then when he asked for a continuance about a week

08:27  25  ago of his June 30 sentencing -- let me back up.  The minute

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

08:27  1    he got his continuance in the Southern District of New York
08:27  2    without ever mentioning this trial, he came to Your Honor in
08:27  3    a status conference about five days later asking that this
08:27  4    trial needed to be continued because his sentencing just got
08:27  5    put on.  At that point, he didn't say that he was the one
08:27  6    who caused the conflict between those two things.
08:27  7            Then last week when he asked for a continuance of
08:27  8    the Nike sentence, he didn't list out the dates he had here.
08:27  9    He did not list out the dates that we have 150 jurors coming
08:27  10   into this courthouse next week.  And then when the Court set
08:27  11   it for the 9th, the defendant's position to the Court when
08:27  12   the AUSA asked to advance it one day, the defendant is able
08:27  13   and willing -- and I can pull up the actual language --
08:28  14   basically he is available on the 8th.
08:28  15           He wasn't available.  He had a court date here,
08:28  16   which his conditions of release require him to be here for a
08:28  17   matter that he is even saying right now he must be present.
08:28  18   He hasn't even asked this Court to travel.
08:28  19           THE COURT:  Then you should share those facts with
08:28  20   the AUSAs in the Southern District of New York.  The fact of
08:28  21   the matter is that Judge Gardephe has continued it for
08:28  22   whatever reason.  I have to work around that whether I think
08:28  23   that grant was justified or obtained under false pretenses
08:28  24   or whatever.  That's the reality.  He needs to be here, and
08:28  25   he has to be in New York on the 8th.

08:28    1           MR. SAGEL:  Then I would propose this alternative.

08:28    2    Again, I do not know how the Clerk's Office and the Jury

08:28    3    Commission is working exactly.  What I do know is that I

08:28    4    know 150 people were planning on showing up, and now they

08:28    5    have to change their plans and everybody else has to.

08:29    6           What the defendant has done is always to delay

08:29    7    this case.  Your Honor has to approve his travel.  If you

08:29    8    look at his request previously in this matter when they

08:29    9    asked for sentencing there, there is no reason that for a

08:29   10    1:00 sentencing on June 8 that he cannot be back that night

08:29   11    from a flight from New York.

08:29   12           I would ask especially since the protocols are

08:29   13    slightly different now than they were when we were setting

08:29   14    the three groups of 50 that maybe we have the 150 come in on

08:29   15    that Friday, the 9th.  I say that because that gives us time

08:29   16    to review them prior to the 13th or whatever that next week

08:29   17    is.  I don't know if it's possible, and if they are going to

08:29   18    have to be called to change their date that they can be

08:29   19    changed to have two groups of 75 on the Friday.

08:29   20           THE COURT:  We can only have 50 socially spaced in

08:29   21    the Clerk's area.  I understand that the protocols have

08:30   22    changed.  Fully vaccinated people don't need to wear a mask

08:30   23    or socially distance.  Unless everybody is fully vaccinated,

08:30   24    I'm going to at a minimum maintain social distance.  So that

08:30   25    means as a practical matter we can't call in 150.  I'm not

08:30    1    going to do that.  There are inevitably people who are not

08:30    2    vaccinated.  I'm not going to endanger their health by

08:30    3    abandoning social distancing.  I'm not going to endanger the

08:30    4    health of people who are vaccinated.  The vaccine is great,

08:30    5    but it's not a silver bullet.  We can still get it.

08:30    6            MR. SAGEL:  I don't disagree with that at all.  I

08:30    7    guess the only question I would have is what are the options

08:30    8    of spacing them out then over the day of Friday because I do

08:30    9    think --

08:30   10            THE COURT:  Well, we can pull in two groups of 50

08:30   11    on Friday so we can at least get 100 people and start

08:31   12    working on those subject to logistics that I need to work

08:31   13    out with the Clerk's Office.  And we could pull in another

08:31   14    50 on Monday and maybe work Monday afternoon on the

08:31   15    questionnaires that were filled out Friday.  Let's keep that

08:31   16    thought in mind.

08:31   17            MR. SAGEL:  Anything that keeps the process

08:31   18    moving.

08:31   19            THE COURT:  The process is going to keep moving.

08:31   20            MR. SAGEL:  I get that, and I appreciate that,

08:31   21    and so it's also feasible for the parties to be able to have

08:31   22    the time to actually digest these questionnaires, give them

08:31   23    back to the Court to decide who is going to need to come

08:31   24    back again --

08:31   25            THE COURT:  We are going to have a session in

08:31   1   court on the record where we have all the questionnaires,

08:31   2   and you can raise whatever objections you want to the basic

08:31   3   questionnaires.  Some will be self-evident.  Some will

08:32   4   require further voir dire to see whether it's really an

08:32   5   issue for cause.  We will engage in that process.

08:32   6           MR. SAGEL:  I appreciate that.  I guess my only

08:32   7   final question -- I'm sure your courtroom deputy will let us

08:32   8   know -- is what is the timing of when we could know that?

08:32   9           THE COURT:  We will check it out today.

08:32   10           MR. SAGEL:  Thank you, Your Honor.

08:32   11           THE COURT:  Okay.  Also, Mr. Steward notes that

08:32   12   Mr. Avenatti would be out of pocket for three days.  Well,

08:32   13   first of all, he's out of pocket for the three days, but he

08:32   14   won't be out of pocket for three days surrounding June 30.

08:32   15   So there is no net loss of opportunity to visit with his

08:32   16   client.

08:32   17           Also, I don't know whether Mr. Steward intends to

08:32   18   go back to New York for the sentencing or not.

08:32   19           MR. STEWARD:  I do not.

08:32   20           THE COURT:  Okay.  I can understand why

08:33   21   Mr. Avenatti may need time with his counsel before the

08:33   22   hearing, but I don't see the need after the hearing.

08:33   23           So what do you propose for trial, Mr. Steward?

08:33   24           MR. STEWARD:  Your Honor, in terms of scheduling,

08:33   25   what the Court originally suggested, which was the 13th we

08:33  1    start the procedures, I'm concerned in addition to him not

08:33  2    being here or not being here that if he is sentenced on the

08:33  3    8th at like 1:30 in the afternoon that the publicity will

08:33  4    start in earnest on that day but then really rocket into

08:33  5    Friday, Saturday, and Sunday.

08:33  6            THE COURT:  That's fair.

08:33  7            As I said initially, I think we are going to need

08:33  8    as they say in the securities area time for the market to

08:33  9    absorb the information.  I don't think we can accomplish

08:33  10   that by pulling people in on Friday.  Unless people hear

08:34  11   something on the radio or TV, which I hope they won't

08:34  12   Thursday night, Friday would be the next opportunity for

08:34  13   this information to get in the press.

08:34  14           Well, we will clarify the actual logistics.  I

08:34  15   think 50 on Tuesday morning, 50 Tuesday afternoon, and 50

08:34  16   Wednesday morning, and then we will build in a little space

08:34  17   for the lawyers and Court to absorb the questionnaires, and

08:34  18   then we will get going.  Okay, that's what we're going to

08:34  19   do.

08:34  20           Mr. Steward has a number of objections with regard

08:34  21   to COVID.  First, let me say conditions are fluid.  My own

08:34  22   view is that unless everybody is vaccinated we are going to

08:35  23   observe social distancing.  If you walk around the

08:35  24   courtroom, you will see sheets of paper on various seats.

08:35  25   That's how we will initially stretch out people.

08:35   1          In his last trial, Judge Carter asked the jurors
08:35   2   whether they would be comfortable sitting one by one, and
08:35   3   they said they weren't, and they didn't.  He didn't require
08:35   4   that.
08:35   5          As far as Mr. Steward and Mr. Avenatti being with
08:35   6   or without masks, I assume Mr. Avenatti is fully vaccinated
08:35   7   at this point.
08:35   8          MR. STEWARD:  He is now, Your Honor.
08:35   9          THE COURT:  So it's your option for both of you.
08:35   10  If Mr. Avenatti chooses to wear a mask, I have got an
08:35   11  instruction that I prepared for a criminal case that I
08:35   12  thought was going to go last week.  We will deal with that.
08:35   13  If he wants to wear his mask, that's fine.  I will tell the
08:36   14  jurors not to infer anything from it.  It's a health issue.
08:36   15         So the current plan is the jurors will be socially
08:36   16  spaced.  It's their option to mask or unmask.  It's
08:36   17  physically impossible to call 150 jurors even if we had no
08:36   18  pandemic and seat them in this room.  I don't have 150
08:36   19  seats.  That's that issue.
08:36   20         With regard to witnesses, witnesses will testify
08:36   21  with their mask off and potentially with a shield so you can
08:36   22  see their expressions and you can see their faces.
08:36   23         Anything further with what we are going to do to
08:37   24  deal with COVID?
08:37   25         MR. SAGEL:  Your Honor, depending on what choice

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

08:37    1    Mr. Avenatti makes regarding wearing a mask, there may be an

08:37    2    issue with -- if Your Honor could ask if he could remove his

08:37    3    mask just for witnesses to identify him.

08:37    4            THE COURT:  Oh, sure.

08:37    5            MR. STEWARD:  Your Honor, the only other thing I

08:37    6    wanted to mention is I understand the jurors in the jury

08:37    7    selection process, voir dire, will be masked.  Is that

08:37    8    correct?

08:37    9            THE COURT:  If they are socially distanced, it

08:37   10    will be at their choice.

08:37   11            MR. STEWARD:  I wanted to impose an objection to

08:37   12    that.  I think it's as important during the voir dire

08:37   13    process as it with a witness that they be unmasked.  For the

08:37   14    record, I would make that objection.

08:37   15            THE COURT:  It's noted.

08:38   16            Mr. Steward raises some issues with regard to

08:38   17    Jencks material and other disclosures.  Do you want to

08:38   18    address that?

08:38   19            MR. SAGEL:  Briefly.  Mr. Steward has been a

08:38   20    criminal defense attorney for a lot of years.  There are

08:38   21    many cases I have had with him.  Somehow he has lost any

08:38   22    idea of what the criminal discovery rules are in this case.

08:38   23    He doesn't know what Brady is.  He doesn't know what Jencks

08:38   24    is.  He keeps asking for things he that (a) he has had for

08:38   25    two years and (b) demanding things that he is not entitled

08:38 1    to.

08:38 2           The government has complied with its discovery

08:38 3    obligations for two years in advance in most cases.  We have

08:38 4    and will continue to do so.  There is nothing more he is

08:38 5    entitled to that he doesn't have, and anytime we get

08:38 6    anything new, we provide it to him.  We get e-mails almost

08:39 7    daily asking for something nonsensical.  Usually and

08:39 8    typically we try and reply every time.  Mostly, it's what --

08:39 9    by now we have complied, and we will continue to comply.

08:39 10   That is our response.

08:39 11          He has Jencks material.  He has had it since 2019

08:39 12   in most cases, and we will continue.  As we are meeting with

08:39 13   witnesses now, any new statements they give, we will

08:39 14   continue to give it.  There's nothing more I can say on that

08:39 15   point.

08:39 16          THE COURT:  Respectfully, Jencks doesn't require

08:39 17   you to turn that over until the witnesses testify.

08:39 18          MR. SAGEL:  That's true.  And when he asks for

08:39 19   strict compliance of it, strict compliance would be handing

08:39 20   it to him at that point, but yet we have been giving it to

08:39 21   him two years in advance, which is well in advance of Your

08:39 22   Honor's deadline, and we will continue to do so.

08:39 23          THE COURT:  Do you want to address any other

08:39 24   points with regard to disclosures?

08:39 25          MR. SAGEL:  Just off the top of my head, there's a

08:39   1   part about the medical backgrounds of these individuals.  He

08:39   2   loses sight of the requirement of it being in the

08:39   3   government's possession.  If something like that is in our

08:40   4   possession, we have turned it over.

08:40   5         That's why they know about some of these people

08:40   6   who have stated it to us in a witness interview.  They have

08:40   7   been given that information.  The minute the government has

08:40   8   anything that even borderline falls within a discovery

08:40   9   obligation we have turned it over to them.  We do not need

08:40  10   to go out and get medical records or anything like that for

08:40  11   any of these witnesses that's not in our possession.

08:40  12         With regards to Brady material they mentioned, (a)

08:40  13   it's just not Brady, and (b) they have been given anything

08:40  14   that exists.  Your Honor's criminal order as I would

08:40  15   highlight asks for specificity when raising any kind of

08:40  16   discovery dispute.  And yet all we get are these global

08:40  17   grandiose statements about what we haven't done, and there

08:40  18   is never any specificity because it just doesn't exist.

08:40  19         With that, if there is any other particular

08:40  20   discovery area, I can address that.

08:41  21         THE COURT:  Thank you.

08:41  22         Mr. Steward.

08:41  23         MR. STEWARD:  Your Honor, of the 36 witnesses on

08:41  24   the government's list, there are no statements at all for

08:41  25   ten of them.

08:41   1           THE COURT:  What if they don't have any

08:41   2   statements?

08:41   3           MR. STEWARD:  I don't believe that.  I believe the

08:41   4   government is holding out.  I have believed that from the

08:41   5   beginning, and I believe it today.

08:41   6           THE COURT:  Do you have any basis for that belief?

08:41   7           MR. STEWARD:  Not on those at the moment.

08:41   8           THE COURT:  Well, sir, you have got witness

08:41   9   statements for 10 of the 36.  Do you have any facts to

08:41  10   support that the government is holding out with respect to

08:41  11   the other 26?

08:41  12           MR. STEWARD:  Yes.  I'll give you an example, the

08:41  13   Johnson case, one of the victims in this case.  Recall that

08:41  14   the government seized the server from the law firm.  The

08:41  15   server from the law firm contains medical, psychiatric, all

08:41  16   kinds of records on Mr. Johnson.  We don't have any access

08:41  17   to that anymore.  They have it.  They haven't given it to

08:42  18   us.  That's a clear example.

08:42  19           I have another example.  It has to do with

08:42  20   nondisclosure.

08:42  21           May I hand this up?  I just gave it to government

08:42  22   counsel.

08:42  23           THE COURT:  Please.

08:42  24           (Document handed to the Court)

08:42  25           MR. STEWARD:  What the Court is looking at are two

08:42  1    different exhibits, A and B.  A is a Memorandum of Interview

08:42  2    of Mr. Johnson where in a highlighted portion at page 2

08:42  3    right at the end it talks about whether or not Mr. Johnson

08:42  4    had seen the settlement in the case.  And he says he thinks

08:43  5    he may have -- that Mr. Avenatti brought it to him, and he

08:43  6    thinks he may have signed it.  That's kind of the bottom

08:43  7    line there.

08:43  8         If you look right in the middle on page 3,

08:43  9    paragraphs 7 and 8, which we have underlined, and then if

08:43  10   you go to Exhibit B, which is primarily a settlement

08:43  11   document, and the Bates number at the bottom ends with 564,

08:43  12   it talks about the settlement for Mr. Johnson being

08:43  13   $4 million.  Then at the end, Mr. Johnson signs it.

08:43  14        It says:  "The parties further agree that they

08:43  15   have read and fully understood the agreement, that the

08:43  16   opportunity has been afforded to discuss the terms and

08:43  17   contents of the agreement with legal counsel, and that such

08:43  18   a discussion with legal counsel has occurred," and then he

08:44  19   signs it.

08:44  20        We believe that the notes of the agent underlying

08:44  21   Exhibit A would be Brady.  Either they are impeaching, which

08:44  22   is helpful to us, or perhaps they're totally different than

08:44  23   this summary report.

08:44  24        THE COURT:  Whose testimony would they impeach?

08:44  25   Mr. Johnson?

08:44  1           MR. STEWARD:  No.  They would impeach the

08:44  2  government's case, the allegation in the Indictment saying

08:44  3  that Mr. Johnson was completely unaware of the settlement.

08:44  4  We believe that the notes would contradict that.

08:44  5           THE COURT:  Okay.  But have you not received

08:44  6  previously this Memorandum of Interview by the Department of

08:44  7  the Treasury, Internal Revenue Service, criminal

08:44  8  investigation?  Have you not previously received that?

08:44  9           MR. STEWARD:  I have it.

08:44  10           THE COURT:  When did you first get it?

08:44  11           MR. STEWARD:  I couldn't tell you.  It was a long

08:44  12  time ago.

08:45  13           THE COURT:  So where is the nondisclosure of Brady

08:45  14  material assuming it's Brady material?

08:45  15           MR. STEWARD:  The notes of the agent because these

08:45  16  two conflict, and we believe that the notes would show that.

08:45  17           THE COURT:  What notes?

08:45  18           MR. STEWARD:  The notes of the agent for the

08:45  19  interview on March 31, 2019, taken by I believe the case

08:45  20  agent.  We have no notes of any agents whatsoever.  We

08:45  21  believe at a minimum they are Jencks but more likely they

08:45  22  are Brady.  In this case, we believe these two documents

08:45  23  show that.

08:45  24           THE COURT:  Your presumption is that the agent

08:45  25  took notes.  Your presumption is that the agent had a

08:45  1    practice other than discarding the notes once a formal

08:45  2    report of the interview was prepared?

08:45  3          MR. STEWARD:  Based on my experience over the

08:46  4    years, yes.

08:46  5          THE COURT:  Won't you be able to ask the agent

08:46  6    that?  I assume that the agent is going to testify.

08:46  7          MR. STEWARD:  Yes, of course I will be able to do

08:46  8    that.  But what is going to happen is we are going to turn

08:46  9    to traditional Jencks processes where we start the

08:46  10   cross-examination with -- and I'm happy to do that, but it

08:46  11   just seems to me to be a waste of time.

08:46  12         THE COURT:  Your representation, Mr. Sagel, is

08:46  13   that all Jencks material has been produced.  And I assume if

08:46  14   there were notes underlying this March 31, 2019, IRS report

08:46  15   they would have been produced.  Is that right?

08:46  16         MR. SAGEL:  That's appropriate under Jencks.  And

08:46  17   our position is the notes of the agent are Jencks.  So we

08:46  18   have turned over the actual formalized reports, and if there

08:46  19   is any material different between the underlying notes and

08:46  20   the reports, we have turned those over, too.

08:46  21         THE COURT:  Okay.

08:47  22         MR. STEWARD:  Again, our emphasize is on Brady

08:47  23   rather than Jencks.

08:47  24         THE COURT:  Well, the government has expressed a

08:47  25   thorough knowledge of its Brady obligations.  And I assume

08:47  1   the government is able to differentiate between Brady and
08:47  2   Jencks and has produced materials relevant under each
08:47  3   whether they are relevant under either one of those
08:47  4   doctrines.  Is that right, Mr. Sagel?
08:47  5            MR. SAGEL:  That is, Your Honor.  Just for point
08:47  6   of clarification as well is if a witness says in an
08:47  7   interview -- and let me be clear.  None have.  If someone
08:47  8   has said something that would exonerate the defendant, how
08:47  9   we produce that to them meets our disclosure obligation.  We
08:47  10  need to tell them that there is Brady material, whether it's
08:48  11  in the notes of the agent, in a formalized report, or an
08:48  12  e-mail from myself to Mr. Steward.  That isn't what's going
08:48  13  on here.
08:48  14           What I am saying is if Mr. Steward believes these
08:48  15  highlighted paragraphs in this memorandum are Brady
08:48  16  material, he has that material.  We have provided that to
08:48  17  him.  Unless there is something diametrically opposite or
08:48  18  materially different in the underlying notes, he has the
08:48  19  information he's asking for.  We have produced it, and we
08:48  20  will continue to do so.
08:48  21           MR. STEWARD:  But that's not Brady at all.  He's
08:48  22  talking about exoneration, which is not Brady.  Brady is
08:48  23  helpful to the defense.  So if there is material in the
08:48  24  notes that's different than what's in the summary, we're
08:48  25  entitled to it.  And that's the cramped version of Brady

08:48   1   that they have been singing for two years now.

08:48   2           THE COURT:  I just heard Mr. Sagel say that if

08:48   3   there were contradictions in the underlying notes they would

08:49   4   have been produced.  That's his representation.

08:49   5           MR. STEWARD:  Well, I'll hold him to it.

08:49   6           THE COURT:  I think you should.

08:49   7           You raised the possibility, Mr. Steward, that 609

08:49   8   may come into play with respect to some of the government's

08:49   9   witnesses.  So be it.  I think everybody understands what is

08:49   10  admissible and not admissible under 609, so we will just

08:49   11  wait and see.

08:49   12          MR. STEWARD:  That's fine, Your Honor.

08:49   13          MR. SAGEL:  They also mention in that same

08:49   14  paragraph that they will confer with the government.  They

08:49   15  have never done so.  After they filed this, I sent

08:49   16  Mr. Steward an e-mail asking for who these witnesses,

08:49   17  plural, and what these convictions, plural, are.

08:49   18          THE COURT:  Finally, I guess you raised mediation

08:49   19  privilege.  I'm not sure what you are getting at there, Mr.

08:50   20  Steward.

08:50   21          MR. STEWARD:  Yes, Your Honor, this was kind of

08:50   22  news to me.  I didn't realize there was a mediation

08:50   23  privilege.  Apparently it's a state court privilege, but

08:50   24  federal courts have recognized it.  If the Court would like

08:50   25  me to do a pocket brief on that particular issue, there are

08:50  1   a number of witnesses who are involved in mediation,

08:50  2   including one who is a mediator, and the subject of that

08:50  3   individual's testimony is the mediation as I understand it.

08:50  4   So we believe that it's privileged, and we wanted to bring

08:50  5   that to the Court's attention.

08:50  6          THE COURT:  Okay.  Well, let's brief it.

08:50  7          MR. STEWARD:  Thank you.

08:50  8          The other thing I would note, Your Honor, is

08:50  9   roughly a third of the government's witness list are

08:50  10  attorneys who have represented Mr. Avenatti at some time or

08:50  11  another.  And I understand that the government claims to

08:50  12  have or appears to have waivers from the five victims in

08:50  13  this case.  But there is a great deal of work product, and

08:51  14  the client of course cannot waive the use of work product.

08:51  15  That still remains privileged, and the privilege stays of

08:51  16  course with the attorney.  We wanted to bring that up as

08:51  17  well.  It may well surface.

08:51  18         THE COURT:  Okay.  Any other specific items you

08:51  19  want to address, Mr. Steward?

08:51  20         MR. STEWARD:  I don't believe so.  No, Your Honor.

08:51  21  Thank you.

08:51  22         THE COURT:  Mr. Sagel, are there any issues you

08:51  23  want to bring up?

08:51  24         MR. SAGEL:  Yes, Your Honor.  There are a few

08:51  25  practical housekeeping -- and I may be going backwards on

08:51   1   some of this, so I apologize.

08:51   2         For scheduling purposes for witnesses, if we're

08:51   3   starting the questionnaire process on the 13th, is there a

08:51   4   date certain that even if flew through the voir dire process

08:52   5   we're not starting any witnesses until like the 20th, or

08:52   6   should we have some prepared for the latter part of that

08:52   7   week because we're obviously going to have to move people?

08:52   8         THE COURT:  Why don't we say we're going to start

08:52   9   opening statements and the evidence on the 20th.  I think

08:52   10  it's going to take a while for me to go through the

08:52   11  questionnaires.  And then I indicated we would conduct

08:52   12  individual voir dire with respect to any juror who indicated

08:52   13  that he or she had a reaction to the publicity about

08:52   14  Mr. Avenatti or who had feelings about Mr. Avenatti.

08:52   15        I have your respective statements of the case,

08:52   16  which I will read.  I will do a little minor tweaking and

08:52   17  get that back to you today or tomorrow.  Individual voir

08:52   18  dire can take a while.

08:53   19        MR. SAGEL:  I agree, so that was part of the

08:53   20  reason for my question.  Again, we have mentioned it before

08:53   21  and obviously we are going to have to see how it plays out,

08:53   22  but I believe with the robust questionnaire that we have in

08:53   23  this case that individualized voir dire should be limited.

08:53   24        THE COURT:  I agree with that.  What's going to

08:53   25  take time is we have to pull them in one by one.  That takes

08:53  1   time.

08:53  2           MR. SAGEL:  Understood, Your Honor.

08:53  3           As to the questionnaire, in the government's

08:53  4   mind -- Your Honor, we have provided it to the defense with

08:53  5   all of our witnesses and names, and they have added theirs.

08:53  6   We gave it to them, and we are waiting on any final

08:53  7   feedback.  We haven't heard anything, but we're ready.  We

08:53  8   can print them.  We can provide it to the Court.  We think

08:53  9   it's ready right now, so I don't know how Your Honor wants

08:53  10  us to proceed with that.

08:54  11          THE COURT:  Send me the current version.

08:54  12          Mr. Steward, if you have any further proposed

08:54  13  changes, get them to the government no later than next

08:54  14  Monday -- not Monday but Tuesday.  Monday is the 5th of

08:54  15  July.

08:54  16          MR. STEWARD:  Will do, Your Honor.

08:54  17          THE COURT:  Okay, anything else we ought to take

08:54  18  up this morning?

08:54  19          MR. SAGEL:  Yes.  For clarification sake, in Your

08:54  20  Honor's minute order, criminal order, asking for statements

08:54  21  from the witnesses for the government in-camera under seal,

08:54  22  the government will do whatever Your Honor wants obviously.

08:54  23  But I just want to forewarn you about the potential volumes

08:54  24  of things, so I just wanted to see what it is that you

08:54  25  wanted.

08:54  1          We can provide obviously every Memorandum of

08:54  2     Interview for our witnesses from this case that met with us

08:54  3     and will be speaking on this case.  Some of those

08:55  4     individuals, for example -- Your Honor's criminal order said

08:55  5     all statements, and several of them have thousands of

08:55  6     e-mails.  I don't think you want every e-mail they have ever

08:55  7     written, but I just want to make sure you are not asking for

08:55  8     all statements in that regard but just the Memorandum of

08:55  9     Interview.

08:55  10          THE COURT:  Right.

08:55  11          MR. SAGEL:  The next clarifying question is when

08:55  12     we provide each of these Memorandums of Interview to the

08:55  13     defense, if the witness is shown 50 to 75 exhibits, we

08:55  14     attached the exhibits to the end of it to help them to make

08:55  15     it easier for them to see what the document was they were

08:55  16     looking at.  When you attach 50 to 75 exhibits, again, they

08:55  17     become quite voluminous.  Do you want the exhibits or just

08:55  18     the actual memorandum itself?

08:55  19          THE COURT:  Whatever is attached to the

08:55  20     memorandum.

08:55  21          MR. SAGEL:  Will do.

08:55  22          Then, finally, some of the witnesses -- the office

08:55  23     manager, for example -- also interviewed with SDNY AUSAs

08:56  24     numerous times.  I can go through them, but nearly all of

08:56  25     her statements to them are somewhat irrelevant to this case.

08:56  1    I can provide all those statements as well, but I just want

08:56  2    to clarify that.

08:56  3               THE COURT:  Just the statements given in this

08:56  4    case.

08:56  5               MR. SAGEL:  With that -- I said finally, but I

08:56  6    have one more question.  Some of the witnesses met with

08:56  7    either the Newport Beach Police Department or the State Bar

08:56  8    that is related to this case, but they are statements to

08:56  9    other entities.  Do you want their whole statements from

08:56  10   there as well or --

08:56  11              THE COURT:  If you have them.

08:56  12              MR. SAGEL:  No problem.

08:56  13              With the Court's indulgence, I would just like to

08:56  14   go through a couple of things.  I met and talked to your

08:56  15   courtroom deputy beforehand.  One of our witnesses is in a

08:56  16   wheelchair that is a motorized wheelchair.  I will find out

08:57  17   from his counsel the weight of his wheelchair because I have

08:57  18   been told that sometimes is a problem.  I just want to let

08:57  19   you know that if he has to testify to the left or right or

08:57  20   in a place other than the witness stand if his wheelchair is

08:57  21   too heavy for the lift if that's okay.

08:57  22              THE COURT:  We'll find out what the weight limit

08:57  23   is.

08:57  24              MR. SAGEL:  Just for the record, Your Honor had

08:57  25   ordered them to turn over any notice of advice of counsel 20

08:57    1    days -- whenever the 23rd was.  We have received no notice

08:57    2    just for the record.  And we have also received no

08:57    3    reciprocal discovery since the six pages we have spoken of.

08:57    4            (Government counsel conferring)

08:57    5            MR. SAGEL:  I understand there is going to be

08:57    6    limitations in court due to COVID protocols.  One issue we

08:58    7    just want to alert the Court to as to at least one extra

08:58    8    body sometimes is numerous witnesses have their own counsel,

08:58    9    and their counsel would like to be present for their

08:58   10    testimony.  Just for the Court's practical knowledge, when

08:58   11    we are finding out who can be on a certain day, there is at

08:58   12    least one other body who is going to be present for some of

08:58   13    the witnesses.

08:58   14            THE COURT:  Well, we will have to arrange for

08:58   15    overflow via video, and we'll do that.

08:58   16            (Government counsel conferring)

08:58   17            MR. SAGEL:  I guess the one final question I have

08:58   18    for Your Honor is does Your Honor plan on having -- we will

08:58   19    obviously have a hearing to go over, for example, the

08:58   20    questionnaires.  Is Your Honor planning on having any other

08:58   21    hearing between now and the start of trial to go over the

08:59   22    jury instructions, verdict form, or any of that?

08:59   23            THE COURT:  I will get out this week an initial

08:59   24    set of jury instructions, which as I have previously

08:59   25    indicated will be a little more robust than the usual Ninth

08:59    1    Circuit pattern beginning instructions.  I will provide

08:59    2    instructions on the duty of counsel and basic fraud

08:59    3    allegations, which will be drawn from your joint submission.

08:59    4            MR. SAGEL:  Thank you, Your Honor.  We appreciate

08:59    5    that.  Nothing else.

08:59    6            THE COURT:  Mr. Steward.

08:59    7            MR. STEWARD:  Just the exhibits that I showed the

08:59    8    Court today, they need some redaction, so my intent is to

08:59    9    redact them according to the local rules and then file them

08:59   10    if that's okay with the Court.

08:59   11            THE COURT:  That's fine.

08:59   12            Okay, thank you very much.

08:59   13            (Whereupon, the proceedings were concluded.)

08:59   14                          *    *    *

08:59   15

08:59   16

08:59   17

08:59   18

08:59   19

08:59   20

08:59   21

08:59   22

08:59   23

08:59   24

08:59   25

08:59  1
08:59  2
08:59  3
08:59  4
08:59  5                          **CERTIFICATE**
08:59  6
08:59  7          I hereby certify that pursuant to Section 753,
08:59  8   Title 28, United States Code, the foregoing is a true and
08:59  9   correct transcript of the stenographically reported
08:59  10  proceedings held in the above-entitled matter and that the
08:59  11  transcript page format is in conformance with the
08:59  12  regulations of the Judicial Conference of the United States.
08:59  13
08:59  14  Date:  July 5, 2021
08:59  15
08:59  16
08:59                         /s/   Sharon A. Seffens  7/5/21
08:59  17                     _____
08:59                         SHARON A. SEFFENS, U.S. COURT REPORTER
08:59  18
08:59  19
       20
       21
       22
       23
       24
       25