TRACY L. WILKISON
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
ALEXANDER C.K. WYMAN (Cal. Bar No. 295339)
Assistant United States Attorney
Major Frauds Section
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-2435
    Facsimile: (213) 894-6269
    Email:    Alex.Wyman@usdoj.gov

BRETT A. SAGEL (Cal. Bar No. 243918)
Assistant United States Attorney
    Ronald Reagan Federal Building
    411 West Fourth Street, Suite 8000
    Santa Ana, California 92701
    Telephone: (714) 338-3598
    Facsimile: (714) 338-3708
    Email:    Brett.Sagel@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. SA CR 19-061-JVS |
|---|---|
| Plaintiff, | GOVERNMENT'S TRIAL MEMORANDUM FOR TRIAL ON COUNTS 1-10 |
| v. | Trial Date:  July 13, 2021 |
| MICHAEL JOHN AVENATTI, | Hearing Time: 8:00 AM |
| Defendant. | Location:    Courtroom of the Hon. James V. Selna |

    Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorneys Brett A. Sagel and Alexander C.K. Wyman, hereby files its Trial Memorandum.

1    This Trial Memorandum is based upon the attached memorandum of

2  points and authorities, the files and records in this case, and such

3  further evidence and argument as the Court may permit.

4   Dated: July 7, 2021              Respectfully submitted,

5                                    TRACY L. WILKISON
                                     Acting United States Attorney
6
                                     SCOTT M. GARRINGER
7                                    Assistant United States Attorney
                                     Chief, Criminal Division
8

9                                    _____/s/_____
                                     BRETT A. SAGEL
10                                   ALEXANDER C.K. WYMAN
                                     Assistant United States Attorneys
11
                                     Attorneys for Plaintiff
12                                   UNITED STATES OF AMERICA

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.    INTRODUCTION..................................................1

II.   THE CLIENT EMBEZZLEMENT COUNTS................................1

III.  STATEMENT OF FACTS...........................................2

    A.   Embezzlement of Geoffrey Johnson's Funds.................2

    B.   Embezzlement of Alexis Gardner's Funds..................3

    C.   Embezzlement of Gregory Barela's Funds..................5

    D.   Embezzlement of Michelle Phan's Funds...................6

IV.   ELEMENTS OF THE CHARGED OFFENSES.............................8

V.    LEGAL AND EVIDENTIARY ISSUES.................................9

    A.   Authorized or Agency Admissions.........................9

    B.   The Government Has Identified for the Defense the
       Business Records It Intends to Introduce at Trial.......11

    C.   Redactions in Trial Exhibits...........................12

    D.   Cross-Examination of Defendant.........................13

    E.   Impeachment Issues.....................................14

    F.   Defendant's Other Fraud Charges........................15

    G.   Lack of Reciprocal Discovery or Affirmative Defenses....17

    H.   Privilege Issues that Defendant May Attempt to Raise....18

VI.   CONCLUSION..................................................20

**<u>TABLE OF AUTHORITIES</u>**

**Cases**

<u>Bullcoming v. New Mexico</u>,

  564 U.S. 647 (2011) ...........................................12

<u>Cassel v. Superior Court</u>,

  244 P.3d 1080 (Cal. 2011) ....................................20

<u>Melendez-Diaz v. Massachusetts</u>,

  557 U.S. 305 (2009) ..........................................12

<u>Ohler v. United States</u>,

  529 U.S. 753 (2000) ..........................................13

<u>Olam v. Cong. Mortg. Co.</u>,

  68 F. Supp. 2d 1110 (N.D. Cal. 1999) .........................20

<u>United States v. Aceves-Rosales</u>,

  832 F.2d 1155 (9th Cir. 1987) ................................17

<u>United States v. Black</u>,

  767 F.2d 1334 (9th Cir. 1985) ................................13

<u>United States v. Bonds</u>,

  608 F.3d 495 (9th Cir. 2010) .................................11

<u>United States v. Cuozzo</u>,

  962 F.2d 945 (9th Cir. 1992) .................................13

<u>United States v. Duran</u>,

  41 F.3d 540 (9th Cir. 1994) ..................................17

<u>United States v. Martin</u>,

  278 F.3d 988 (9th Cir. 2002) .................................19

<u>United States v. Miranda-Uriarte</u>,

  649 F.2d 1345 (9th Cir. 1981) ................................13

<u>United States v. Morales</u>,

  680 F. App'x 548 (9th Cir. 2017) .............................15

*United States v. Ruehle,*

  583 F.3d 600 (9th Cir. 2009) .......................................... 19

*United States v. Scholl,*

  166 F.3d 964 (9th Cir. 1999) .......................................... 17

**Statutes**

18 U.S.C. § 152(2) ...................................................... 1

18 U.S.C. § 152(3) ...................................................... 1

18 U.S.C. § 1028A(a)(1) ................................................. 1

18 U.S.C. § 1343 ........................................................ 1

18 U.S.C. § 1344(1) ..................................................... 1

26 U.S.C. § 7202 ........................................................ 1

26 U.S.C. § 7203 ........................................................ 1

26 U.S.C. § 7212(a) ..................................................... 1

Cal. Evid. Code § 1119(a) .............................................. 20

Cal. Bus. & Prof. Code § 7028(A) ................................... 14, 15

**Rules**

Fed. R. Evid. 609(a)(2) ................................................ 14

Fed. R. Evid. 609(b)(1) ................................................ 14

Fed. R. Evid. 801(d)(2)(C) ............................................. 10

Fed. R. Evid. 801(d)(2)(D) ............................................. 10

Fed. R. Evid. 806(A)-(C) ............................................... 11

Fed. R. Evid. 902(11) .................................................. 11

Fed. R. Crim. P. 16(b) ................................................. 17

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

Jury trial on the severed client embezzlement counts is set to begin with jury selection on July 13, 2021, at 8:00 a.m.  Opening statements, to be followed by the government's case-in-chief, are scheduled to begin on July 20, 2021, at 8:30 a.m.  The government estimates approximately three weeks for its case-in-chief, not including jury selection.  The government anticipates calling approximately 30 witnesses.  Defendant is currently on temporary release pending trial.

## II.   THE CLIENT EMBEZZLEMENT COUNTS

On April 10, 2019, a grand jury returned a 36-count Indictment charging defendant MICHAEL JOHN AVENATTI with 10 counts of wire fraud, in violation of 18 U.S.C. § 1343, eight counts of willful failure to collect and pay over-withheld taxes, in violation of 26 U.S.C. § 7202, one count of endeavoring to obstruct the administration of the Internal Revenue Code, in violation of 26 U.S.C. § 7212(a), 10 counts of willful failure to file tax returns, in violation of 26 U.S.C. § 7203, two counts of bank fraud, in violation of 18 U.S.C. § 1344(1), one count of aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1), three counts of making a false declaration in bankruptcy, in violation of 18 U.S.C. § 152(3), and one count of providing false testimony under oath in bankruptcy, in violation of 18 U.S.C. § 152(2).

The Court has severed the first 10 counts from the remaining counts in the Indictment.  The trial set to proceed on July 13, 2021, concerns only the 10 wire fraud counts (counts 1-10).

## III. STATEMENT OF FACTS

The evidence at trial will prove the following:

Between approximately January 2015 and March 2019, defendant, then an attorney licensed to practice law in the State of California, defrauded at least five victim-clients -- Geoffrey Johnson, Alexis Gardner, Gregory Barela, Michelle Phan, and Long Tran -- by stealing almost $10 million in settlement funds belonging to them.

Defendant's scheme to defraud these victim-clients was simple: first, he would negotiate, on behalf of a client, a settlement that would require the payment of funds to the client; then, he would misrepresent, conceal, and falsely describe to the client the true terms of the settlement and/or the disposition the settlement proceeds; next, he would cause the settlement proceeds to be deposited into a bank account that defendant controlled; he would then embezzle and misappropriate settlement proceeds to which he was not entitled; and finally, he would lull the client to prevent the client from discovering his embezzlement and misappropriation by, among other things, falsely denying that the settlement proceeds had been paid, sending funds to the client under the false pretense that such funds were "advances" on the purportedly yet-to-be received settlement proceeds, and falsely claiming that payment of the settlement proceeds to the client had been delayed for legitimate reasons and would occur at a later time.

### A.   Embezzlement of Geoffrey Johnson's Funds

First, from approximately November 2011 through January 2015, defendant and his law firm represented Mr. Johnson in connection with a lawsuit against the County of Los Angeles and others, alleging violations of Mr. Johnson's constitutional rights that led to severe

2

emotional distress and severe physical injuries, including paraplegia (the "L.A. County Lawsuit").  On or about January 21, 2015, defendant negotiated a settlement of the L.A. County Lawsuit on behalf of Mr. Johnson, whereby the County of Los Angeles would pay $4 million to Mr. Johnson to dismiss his L.A. County Lawsuit.  Mr. Johnson was entitled to receive the $4 million settlement payment, less attorneys' fees, costs, and expenses.

In January 2015, defendant lied to Mr. Johnson about the settlement agreement and concealed and failed to disclose defendant's receipt of the $4 million settlement payment.  By July 2015, defendant caused all of the $4 million settlement proceeds to be transferred or spent without Mr. Johnson's knowledge or consent.

To lull and prevent Mr. Johnson from discovering that defendant had embezzled Mr. Johnson's portion of the $4 million settlement payment, defendant made payments ranging from approximately $1,000 to $1,900 to be made to Mr. Johnson, as well as causing payments to be made to various assisted living facilities to pay for rent on Mr. Johnson's behalf.  Defendant falsely represented to Mr. Johnson that these payments were "advances" on the settlement payment from the County of Los Angeles, which defendant falsely represented had not yet been received.

B.   **Embezzlement of Alexis Gardner's Funds**

Second, from approximately December 2016 through March 2019, defendant and his law firm represented Ms. Gardner in connection with potential litigation against Hassan Whiteside, an individual with whom Ms. Gardner had a personal relationship.  On or about January 7, 2017, defendant negotiated a settlement on behalf of Ms. Gardner with Mr. Whiteside.  Under the terms of the settlement agreement, Mr.

3

Whiteside was required to make an initial payment to Ms. Gardner of approximately $2.75 million by on or about January 28, 2017, and an additional payment to Ms. Gardner of approximately $250,000 on or about November 1, 2020, if certain additional specified conditions were met, for a total of approximately $3 million. Ms. Gardner was entitled to receive the initial $2.75 million settlement payment, less attorneys' fees, costs, and expenses.

To conceal the true details of the settlement agreement from Ms. Gardner, defendant did not provide a copy of the settlement agreement to Ms. Gardner, and falsely represented to Ms. Gardner the terms of the settlement agreement, including that Mr. Whiteside would pay Ms. Gardner the settlement funds through approximately 96 monthly payments over the course of the next eight years.

On or about January 25, 2017, defendant received the initial $2.75 million settlement payment, which he concealed and failed to disclose to Ms. Gardner that he had received. On or about January 26, 2017, defendant caused $2.5 million of the $2.75 million settlement payment to be transferred to an attorney trust account for another law firm to transfer the entire $2.5 million to Honda Aircraft Company, LLC, to purchase a private airplane for defendant's company, Passport 420. Defendant also caused the remaining $250,000 of the $2.75 million settlement payment to be transferred to accounts defendant controlled.

To lull and prevent Ms. Gardner from discovering that defendant had embezzled her portion of the initial $2.75 million settlement payment, between March 15, 2017, and June 18, 2018, defendant made approximately 11 payments, totaling approximately $194,000, into Ms. Gardner's bank account. Defendant falsely represented to Ms. Gardner

4

that these payments constituted the monthly settlement payments.
From June 2018 until March 2019, after defendant stopped making the
purported monthly payments to Ms. Gardner, defendant falsely
represented to Ms. Gardner that Mr. Whiteside was not complying with
the settlement agreement and that defendant was working on obtaining
the missing monthly settlement payments purportedly due to Ms.
Gardner from Mr. Whiteside.

### C.   Embezzlement of Gregory Barela's Funds

Third, from approximately July 2014 through November 2018,
defendant and his law firm represented Mr. Barela in connection with
an intellectual property dispute against a Colorado-based company,
Brock USA, LLC ("Brock").  Between on or about December 22, 2017, and
on or about December 28, 2017, defendant negotiated a settlement
agreement on behalf of Mr. Barela with Brock whereby Brock would make
an initial payment of $1.6 million by January 10, 2018, and three
additional payments of $100,000 by January 10 of 2019, 2020, and
2021, respectively, for a total of $1.9 million.  Mr. Barela was
entitled to receive the initial $1.6 million settlement payment, less
attorneys' fees, costs, and expenses.

On or about December 28, 2017, at a meeting with Mr. Barela to
discuss the proposed settlement agreement with Brock, defendant
provided an altered copy of the settlement agreement to Mr. Barela,
which falsely represented the payment schedule as $1.6 million due by
March 10, 2018, and $100,000 due by March 10 of each of the three
subsequent years.

On January 5, 2018, defendant received in his bank account the
initial $1.6 million settlement payment as he instructed Brock to
send it, and defendant concealed and failed to disclose to Mr. Barela

1    that defendant had this money.  Between January 5, 2018, and March

2    14, 2018, defendant used nearly all the initial $1.6 million

3    settlement payment for his own purposes and to pay for his personal

4    expenses.

5        To lull and prevent Mr. Barela from discovering that defendant

6    had embezzled Mr. Barela's portion of the initial $1.6 million

7    settlement payment, from March 2018 to November 2018, defendant

8    falsely represented to Mr. Barela that Brock had not made the initial

9    $1.6 million settlement payment, and that defendant was working on

10   obtaining the purportedly missing $1.6 million settlement payment.

11   From April 2018 to November 2018, defendant caused multiple payments

12   totaling approximately $130,000 to be paid to Mr. Barela, which

13   payments defendant falsely claimed represented "advances" on Mr.

14   Barela's portion of the $1.6 million settlement payment so that Mr.

15   Barela could meet certain financial obligations while he was

16   purportedly "waiting" for Brock to make the $1.6 million settlement

17   payment.

18       **D.    Embezzlement of Michelle Phan's Funds**

19       Finally, from approximately August 2017 until August 2018,

20   defendant represented both Ms. Phan and Mr. Tran in connection with

21   their separation and divestment from IPSY, a company in which Ms.

22   Phan and Mr. Tran owned shares.  On September 17, 2017, defendant

23   negotiated "Common Stock Repurchase Agreements" with IPSY on behalf

24   of Ms. Phan and Mr. Tran.  Under the terms of Ms. Phan's Common Stock

25   Repurchase Agreement, IPSY agreed to repurchase initial shares of

26   stock from Ms. Phan for approximately $27,478,940, and thereafter

27   additional shares of stock for approximately $8,146,288, which

28   resulted in a total repurchase amount of approximately $35,625,228.

1    On September 18, 2017, IPSY wired approximately $27,414,668 for

2  Ms. Phan to an attorney trust account controlled by defendant.[1]

3  Approximately $2,787,651 of this amount constituted defendant's total

4  attorneys' fees, costs, and expenses in this matter, which defendant

5  withdrew from the account that same day.  By October 3, 2017,

6  defendant caused the remainder of the initial $27,414,668 payment to

7  be transferred to bank accounts associated with Ms. Phan.

8    On March 8, 2018, IPSY informed Ms. Phan and Mr. Tran that IPSY

9  was ready to repurchase the remaining shares from Ms. Phan as

10 contemplated in the Common Stock Repurchase Agreement.  Defendant

11 told Mr. Tran that IPSY should wire the remaining $8,146,288 payment

12 due to Ms. Phan to defendant's attorney trust account, and that

13 defendant would then wire the $8,146,288 payment from defendant's

14 trust account to Ms. Phan.  On March 14, 2018, following defendant's

15 instructions, IPSY transferred approximately $8,146,288 to

16 defendant's account, but defendant retained and did not transfer the

17 $8,146,288 payment to Ms. Phan as defendant had promised to do.

18    The following day, on March 15, 2018, defendant withdrew $3

19 million of Ms. Phan's money and paid over $2.8 million of it to his

20 bankruptcy attorney to pay off creditors, including the IRS, to get

21 defendant's law firm out of bankruptcy.  Between March 15, 2018, and

22 May 4, 2018, defendant caused approximately $4 million out of the

23 $8,146,288 payment from IPSY due to Ms. Phan to be used for

24 defendant's own purposes and failed to disclose to Ms. Phan and Mr.

25

26

27    [1] On September 18, 2017, IPSY also wired into the same attorney
   trust account controlled by defendant $984,750 and $475,000 for Mr.
28 Tran and Ms. Phan's sister-in-law pursuant to repurchase agreements
   defendant negotiated on their behalf with IPSY.

1    Tran that defendant had used approximately $4 million of Ms. Phan's
2    funds for defendant's own purposes.
3           To lull and prevent Ms. Phan and Mr. Tran from discovering that
4    defendant had embezzled approximately $4 million from the
5    approximately $8,146,288 payment defendant received from IPSY,
6    between March 14, 2018, and on or about May 3, 2018, defendant
7    falsely represented and promised Ms. Phan and Mr. Tran that defendant
8    would transfer Ms. Phan's funds to Ms. Phan at a later date, and that
9    defendant needed to go to the bank to fill out paperwork to
10   effectuate the wire transfers.
11   **IV.   ELEMENTS OF THE CHARGED OFFENSES**
12          The government may establish wire fraud by proving the existence
13   of either a scheme to defraud or, alternatively, a scheme for
14   obtaining money or property by means of false or fraudulent
15   pretenses, representations, or promises.  Although the government can
16   prove both types of schemes, it only needs to prove the existence of
17   one type of scheme.
18          To convict defendant of wire fraud based on a scheme to obtain
19   money or property, the government must prove the following four
20   elements beyond a reasonable doubt: (1) defendant knowingly
21   participated in or devised a scheme or plan for obtaining money or
22   property by means of false or fraudulent pretenses, representations,
23   or promises, or omitted facts; deceitful statements of half-truths
24   may constitute false or fraudulent representations; (2) the
25   statements made or facts omitted as part of the scheme were material;
26   that is, they had a natural tendency to influence, or were capable of
27   influencing, a person to part with money or property; (3) defendant
28   acted with the intent to defraud, that is, the intent to deceive and

cheat; and (4) defendant used, or caused to be used, an interstate wire communication to carry out or attempt to carry out an essential part of the scheme.  For defendant to be found guilty of wire fraud based on omissions of material facts, the government must prove that defendant had a duty to disclose the omitted facts arising out of a relationship of trust.  That duty can arise out of either a formal fiduciary relationship or an informal, trusting relationship in which one party acts for the benefit of another and induces the trusting party to relax the care and vigilance which it would ordinarily exercise.

To convict defendant of wire fraud based on a scheme to defraud, the government must prove the following four elements beyond a reasonable doubt: (1) defendant knowingly participated in or devised a scheme or plan to defraud; (2) the scheme was material; that is, it had a natural tendency to influence, or was capable of influencing, a person to part with money or property; (3) defendant acted with the intent to defraud, that is, the intent to deceive and cheat; and (4) defendant used, or caused to be used, an interstate wire communication to carry out or attempt to carry out an essential part of the scheme.

## V.   LEGAL AND EVIDENTIARY ISSUES

### A.   Authorized or Agency Admissions

Several of the witnesses that the government intends to call in its case-in-chief worked for defendant -- either directly, at his law firm, or indirectly, at a partnering law firm -- in connection with defendant's representation of the victim-clients.  In certain instances, these witnesses are expected to testify that defendant directed them to communicate with a victim on his behalf.  For

example, Judy Regnier, a paralegal who worked for defendant at Eagan Avenatti LLP ("EA LLP"), is expected to testify that she communicated frequently with Mr. Johnson and other victims on behalf of defendant. Similarly, Filippo Marchino, an attorney from the law firm X-Law Group, is expected to testify that his law firm partnered with defendant and/or EA LLP, including in connection with defendant's representation of Ms. Phan and Mr. Tran. Mr. Marchino will testify regarding communications that he had with Mr. Tran on behalf of defendant, including copying messages that defendant sent him on the messaging application Signal and pasting them into text messages to Mr. Tran. Moreover, Mr. Marchino's text messages themselves will corroborate that they are coming from defendant, as some of them include instructions such as "Pls give this to Long [Tran]."

These communications between Ms. Regnier or Mr. Marchino and defendant's victims are admissible non-hearsay as authorized admissions under Federal Rules of Evidence 801(d)(2)(C) and 801(d)(2)(D). These Rules dictate that a statement is a non-hearsay party admission if it is offered against a defendant and is either "a statement by a person authorized by the [defendant] to make a statement concerning the subject," Fed. R. Evid. 801(d)(2)(C), or "a statement by the [defendant's] agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship," Fed. R. Evid. 801(d)(2)(D). In other words, they permit statements where the declarant received "specific authority from a party to make a statement concerning a particular subject" or where a statement "is made within the scope of an employment or agency relationship." United States v. Bonds, 608 F.3d 495, 502 (9th Cir. 2010).

**B.    The Government Has Identified for the Defense the Business Records It Intends to Introduce at Trial**

The government intends to introduce various business records at trial.  As discussed in the government's motion in limine, Rule 902(11) permits the admission of self-authenticating business records.  Specifically, the Rule dictates that certified domestic records of a regularly conducted activity "are self-authenticating" and therefore "require no extrinsic evidence of authenticity in order to be admitted."  Fed. R. Evid. 902(11).  To qualify under this provision, the records in question must be "[t]he original or a copy of a domestic record that meets the requirements of Rule 803(6)(A)-(C), as shown by a certification of the custodian or another qualified person."  Id.  The Rule also requires that the proponent of such evidence provide an adverse party, prior to trial, with "reasonable written notice of the intent to offer the record -- and . . . make the record and certification available for inspection -- so that the party has a fair opportunity to challenge them."  Id.

Under Rule 803(6)(A)-(C), a business record is admissible if: (A) "the record was made at or near the time by -- or from information transmitted by -- someone with knowledge"; (B) "the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit"; and (C) "making the record was a regular practice of the activity."  Fed. R. Evid. 806(A)-(C).  Moreover, admitting business records under Rule 902(11) without testimony from a custodian of records does not violate a defendant's rights to confront witnesses because business records are not testimonial in nature.  See Bullcoming v. New Mexico, 564 U.S. 647, 659 n.6 (2011) ("Elaborating

11

1    on the purpose for which a 'testimonial report' is created, we

2    observed in [Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009)]

3    that business and public records 'are generally admissible absent

4    confrontation . . . because -- having been created for the

5    administration of an entity's affairs and not for the purpose of

6    establishing or proving some fact at trial -- they are not

7    testimonial.'" (quoting Melendez-Diaz, 557 U.S. at 324)).

8         On July 6, 2021, the government disclosed its exhibit list to

9    defendant and provided defendant with electronic copies of a full set

10   of the government's trial exhibits via the government's file-sharing

11   system.  In disclosing its exhibits, the government informed the

12   defense that it currently intends to rely on Rule 902(11) to

13   introduce records from the following businesses, which the government

14   identified for the defense by exhibit number: (1) California Bank &

15   Trust; (2) Chase Bank; (3) City National Bank; (4) Honda Aircraft

16   Company; and (5) The People's Bank.  The government previously

17   produced all of the records and accompanying custodian-of-record

18   declarations in discovery, and the government will have the

19   declarations available at trial for the Court's inspection.

20   **C.   Redactions in Trial Exhibits**

21        This case involves defendant's representation of his clients in

22   their respective legal matters, some of which resolved in

23   confidential settlement agreements.  Many of the government's trial

24   exhibits contain either personal identifying information of victims

25   or other third parties or information related to the underlying facts

26   of the matters that this Court properly held is irrelevant and should

27   not be admitted at trial.  (CR 512 at 7-9.)  Consistent with the

28   Court's ruling, the government has redacted its trial exhibits

                                   12

accordingly to remove references to such information.   The government

raised this issue with the defense in providing an electronic set of

its trial exhibits to the defense -- who has long since had the

unredacted versions of the documents through discovery -- and

requested that the defense identify any objections they may have to

the government's redactions prior to trial.   As of the time of this

filing, the government has received no objections.

### D.   Cross-Examination of Defendant

A defendant who testifies at trial waives his right against

self-incrimination and subjects himself to cross-examination

concerning all matters reasonably related to the subject matter of

his testimony.   See Ohler v. United States, 529 U.S. 753, 759 (2000)

("It has long been held that a defendant who takes the stand in his

own behalf cannot then claim the privilege against cross-examination

on matters reasonably related to the subject matter of his direct

examination" (internal citation and quotation marks omitted)).   A

defendant has no right to avoid cross-examination on matters that

call into question his claim of innocence.   United States v. Miranda-

Uriarte, 649 F.2d 1345, 1353-54 (9th Cir. 1981).   The scope of a

defendant's waiver is co-extensive with the scope of relevant cross-

examination.   United States v. Cuozzo, 962 F.2d 945, 948 (9th Cir.

1992); United States v. Black, 767 F.2d 1334, 1341 (9th Cir. 1985)

("What the defendant actually discusses on direct does not determine

the extent of permissible cross-examination or his waiver.   Rather,

the inquiry is whether 'the government's questions are reasonably

related' to the subjects covered by the defendant's testimony.").

This Court has already ruled that, if defendant testifies, the

government may cross-examine defendant regarding his convictions of

wire fraud, extortion, and attempted extortion in the Southern District of New York case involving defendant's extortion of Nike. (See CR 371 at 10 ("There can be little doubt that these crimes involve dishonest or false statements.  The Motion is granted: the conviction 'must be admitted.'" (citing Fed. R. Evid. 609(a)(2)).)

### E.  Impeachment Issues

The government produced criminal histories for its witnesses, some of whom have prior convictions.  Federal Rule of Evidence 609 governs impeachment of a witness with evidence of a criminal conviction.  Under Rule 609(a), a witness in a criminal case may be impeached by evidence of a felony conviction that occurred within the last 10 years preceding the witness's testimony.  Felony convictions more than 10 years old, however, are inadmissible unless the Court determines that the probative value of the conviction substantially outweighs the prejudicial effect of admitting the conviction.  Fed. R. Evid. 609(b)(1).

On July 2, 2021, defense counsel informed the government that they intend to cross-examine two government witnesses regarding convictions more than 10 years old.  First, defendant intends to cross-examine one of the NFL victim-clients regarding a 2003 federal conviction for mail fraud.  Although the conviction is old, it is a felony conviction that involves an act of dishonesty.  As such, the government does not object to defendant cross-examining the witness regarding this conviction.

Second, the defense indicated that they intend to cross-examine one of defendant's victims, Mr. Barela, regarding a misdemeanor conviction from 2003 for contracting without a license, under California Business & Professions Code Section 7028(A).  That section states, in relevant part, that "it is a misdemeanor for a person to engage in the business

14

of, or act in the capacity of, a contractor" in the State of California

if "[t]he person is not licensed in accordance with this chapter."  Cal.

Bus. & Prof. Code § 7028(a).  By its terms, a conviction under this

section does not require an act of dishonesty.  The conviction is also a

misdemeanor from 18 years ago.  Accordingly, the probative value of this

conviction, if any, is next to nothing, while the prejudicial effect is

possibly quite high.  See United States v. Morales, 680 F. App'x 548,

552 (9th Cir. 2017) ("[T]he conviction was more than ten years old, and

because it was not for a crime involving dishonesty or false statements,

it was of limited probative value relative to its prejudicial effect.").

The Court should therefore prohibit defendant from cross-examining Mr.

Barela on this irrelevant conviction.

**F.   Defendant's Other Fraud Charges**

As noted above, defendant was charged in a 36-count Indictment

involving tax, bank, and bankruptcy fraud charges, although the

upcoming trial will concern only the first 10 counts.  Defendant has

also been charged in two separate indictments in the Southern

District of New York.  Consistent with the Court's prior Orders, the

government does not intend to introduce evidence of -- or refer at

trial to -- defendant's other charges except as permitted by the

Court in its prior Orders.  Nevertheless, should defendant open the

door to discussion of the other counts and charges through cross-

examination, the government must be able to elicit appropriate

limited information about these other matters involving defendant.

For example, if defendant cross-examines Ms. Regnier, his

paralegal, about all the times that she met with the government or

the amount of time she spent being interviewed by the government,

possibly including the interviews related to the charges in the

Southern District of New York, the government should be able to elicit on redirect that much of her time spent being interviewed concerned matters other than the clients whose settlement funds defendant is alleged to have stolen.

Similarly, the government disclosed on June 14, 2021, that "Analysis Group, the firm where our financial expert, John Drum, is employed, ha[d] been paid a total of $567,107 so far for their work in this matter."  The government then detailed the "rough approximations for how much [Analysis Group was] paid for varying tasks in this matter," which included several tasks related to the other charges, totaling hundreds of thousands in fees, such as: "Analyzing the finances of Eagan Avenatti LLP and Avenatti & Associates: ~$223,000"; "Analyzing Michael Avenatti's personal finances: ~$112,000"; and "Evaluating financial statements provided to The People's Bank: ~$34,000."  In fact, the fees related to the sole task that Mr. Drum is expected to testify about at the upcoming trial -- "Tracing the flows of funds related to settlement payments owed to Geoffrey Johnson, Alexis Gardner, Greg Barela, Long Tran, and NFL clients' settlement funds" -- totaled only ~$198,000.[2]  Despite providing this detailed breakdown in writing to defendant, defendant immediately represented to the Court in a filing in discussing Mr. Drum's tracing of the client funds that, "[t]o date, Mr. Drum has been paid over $567,000 by the government to conduct his alleged financial 'analysis.'"  (CR 508 at 4 n.3.)  Should defendant cross-examine Mr. Drum at trial concerning the full amount of money that

---

[2] The government's letter inadvertently excluded reference to Ms. Phan, but Mr. Drum is expected to testify about the tracing analysis that he conducted with respect to her funds as well.

16

Analysis Group has been paid in this matter, the government should be permitted to elicit on redirect that much -- indeed, most -- of the payments were for work on other matters involving defendant.  Without that clarification, the jurors will be left with a misleading impression, to the prejudice of the government.

### G.   Lack of Reciprocal Discovery or Affirmative Defenses

As of the date of this filing, defendant has produced a total of six pages in reciprocal discovery -- two documents that defendant had Mr. Johnson sign immediately after being confronted about stealing Mr. Johnson's money during a judgment debtor examination on March 22, 2019.  The government intends to admit these documents as exhibits in its case-in-chief because they corroborate Mr. Johnson's testimony and are highly probative of defendant's intent to defraud and consciousness of guilt.

Defendant has not produced to the government any additional reciprocal discovery to which the government may be entitled under Rules 16(b) and 26.2 of the Federal Rules of Criminal Procedure and this Court's Order.  Therefore, the Court under its broad discretion should exclude any non-impeachment evidence defendant attempts to introduce absent a showing of good cause.  See United States v. Scholl, 166 F.3d 964, 972 (9th Cir. 1999); United States v. Duran, 41 F.3d 540, 545-46 (9th Cir. 1994); United States v. Aceves-Rosales, 832 F.2d 1155, 1156-57 (9th Cir. 1987). (See also CR 512 at 9 ("The Government notes that in terms of his reciprocal discovery obligations under Federal Rule of Criminal Procedure 16(b), Avenatti has produced a total of six pages.  (Reply, p. 4.)  Thus looms the question as to what if any information Avenatti will be allowed to present.").)

1      Further, defendant has not provided the government with notice

2 of any affirmative defenses, and the deadline that the Court set for

3 him to disclose an advice of counsel defense (June 23, 2021) has now

4 passed.  The Court should likewise prevent defendant from introducing

5 by evidence, arguments, or questioning of witnesses that defendant

6 retained or relied on counsel relating to the client embezzlement

7 counts.

8      **H.   Privilege Issues that Defendant May Attempt to Raise**

9      Defendant recently raised various privilege issues in a status

10 report, including the attorney-client privilege, the work-product

11 privilege, and the "mediation privilege."  (CR 511 at 8-9.)  To the

12 extent he intends to object to any <u>documentary</u> evidence on the basis

13 of any of these privileges, his objections should be overruled.  The

14 Court has given defendant numerous opportunities to identify any

15 documents he believes are covered by a privilege and should not be in

16 the prosecution team's possession; he has never done so.[3]

17      As for testimony at trial, all the victim-clients who are

18 expected to testify have waived their attorney-client privilege over

19 communications with defendant.  As the privilege holders, they, and

20 not defendant, can decide -- and have decided -- unilaterally to

21

22      [3] Defendant twice attempted to continue the motions deadline (CR
260, 274), which this Court denied each time (CR 263, 295 ("Avenatti
23 may apply for the late filing of any motion upon a particularized
showing of good cause relating the specific issues raised by any late
24 tendered motion.")).  At the October 19, 2020 motions hearing, the
Court set a new briefing schedule, to which defendant agreed,
25 specifically to address any outstanding issues related to a motion on
privilege issues.  (CR 371 at 16.)  Defendant first filed an <u>ex parte</u>
26 application for a new briefing schedule (CR 359), this Court denied
the application (CR 363), and defendant filed a notice of withdrawal
27 of his privilege motion (CR 378).  The Court then provided <u>additional</u>
dates for defendant to file any renewed privilege motion, including
28 at the January 6, 2021 status conference whereby the Court set a
deadline of January 22, 2021; defendant filed nothing.

waive their privilege.  In a recent status report, defendant stated that the government's witness list includes several of his attorneys, although he did not identify who the attorneys were (and the government's witness list has many attorneys on it).  (CR 511 at 9.) It is unclear to whom defendant is referring, and it is difficult to conceive how the government's evidence concerning defendant's embezzlement from his clients could implicate <u>defendant's</u> attorney-client privilege with <u>his</u> attorneys.  Nevertheless, to the extent defendant attempts to object at trial on the basis that testimony implicates his attorney-client privilege with his own attorneys, he must satisfy the Ninth Circuit's eight-part test for determining whether information is covered by the attorney-client privilege: "(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived." <u>United States v. Ruehle</u>, 583 F.3d 600, 607 (9th Cir. 2009). "Because it impedes full and free discovery of the truth, the attorney-client privilege is strictly construed." <u>United States v. Martin</u>, 278 F.3d 988, 1000 (9th Cir. 2002); <u>Ruehle</u>, 583 F.3d at 609.

In the same status report, defendant raised the issue of a "mediation privilege."  (CR 511 at 8.)  During the June 28, 2021 hearing, defense counsel indicated that he wished to brief the issue after acknowledging that the existence of a mediation privilege "was kind of news to me.  I didn't realize there was a mediation privilege."  (RT 6/28/2021 at 35:21-23.)  Defendant has not filed anything on the issue, and the one case he cited in his status report

1  was <u>Cassel v. Superior Court</u>, 244 P.3d 1080 (Cal. 2011).  That case
2  discussed the impact of California Evidence Code Section 1119, which
3  the California Supreme Court described as "govern[ing] the general
4  admissibility of oral and written communications generated during the
5  mediation process."  <u>Cassel</u>, 244 P.3d at 1087.  Section 1119, by its
6  terms, applies to "any arbitration, administrative adjudication,
7  civil action, **or other noncriminal** proceeding in which, pursuant to
8  law, testimony can be compelled to be given."  Cal. Evid. Code
9  § 1119(a) (emphasis added).  It does not apply to criminal cases such
10  as this one.  <u>See also</u> <u>Olam v. Cong. Mortg. Co.</u>, 68 F. Supp. 2d 1110,
11  1132-33 (N.D. Cal. 1999) ("While not couched in terms of competence
12  to testify, section 1119 broadly prohibits the admission of evidence
13  about things said during a mediation -- and expressly directs courts
14  not to compel disclosure of any such evidence in <u>any non-criminal</u>
15  <u>proceeding</u>." (emphasis added)); <u>Cassel</u>, 244 P.3d at 1098 (Chin, J.,
16  concurring) (reasoning that, under majority's holding, "[a]ttorneys
17  participating in mediation will not be held accountable for any
18  incompetent or fraudulent actions during that mediation <u>unless the</u>
19  <u>actions are so extreme as to engender a criminal prosecution against</u>
20  <u>the attorney</u>," which is what is happening here (emphasis added)).
21  **VI.  CONCLUSION**
22      The government requests leave to supplement this trial
23  memorandum as may become appropriate during the course of trial.