H. Dean Steward, SBN 85317
17 Corporate Plaza, Suite 254
Newport Beach, California 92660
Tel (949) 481-4900
Fax (949) 706-9994

Attorney for Defendant
MICHAEL JOHN AVENATTI

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

        Plaintiff,

        v.

MICHAEL JOHN AVENATTI,

        Defendant.

SA CR No. 19-061-JVS

DEFENDANT'S *EX PARTE*
APPLICATION FOR AN IMMEDIATE
EVIDENTIARY HEARING REGARDING
IMPROPER AND PREJUDICIAL PUBLIC
COMMENTS/SOCIAL MEDIA POSTS
BY FORMER AUSA JULIAN ANDRE

      Defendant Michael John Avenatti, through counsel, hereby applies *ex parte* for an order setting an immediate evidentiary hearing regarding improper and prejudicial public comments/social media posts by former AUSA Julian Andre. The government opposes this application.  The requested relief is based on the attached declaration and its exhibits, the files and records in this case, and any other information that the Court may consider.

Dated: July 19, 2021

Respectfully submitted,

/s/ H. Dean Steward
H. DEAN STEWARD

Attorney for Defendant
MICHAEL JOHN AVENATTI

# DECLARATION OF H. DEAN STEWARD

I, H. Dean Steward, declare:

1.     I am currently appointed counsel for Defendant Michael John Avenatti ("Mr. Avenatti").  I was previously retained counsel for Mr. Avenatti from approximately May 15, 2019 through August of 2020.  I make this declaration in support of Mr. Avenatti's *Ex Parte* Application for An Immediate Evidentiary Hearing regarding Improper and Prejudicial Public Comments/Social Media Posts by Former AUSA Julian Andre.

2.     As of this filing, the parties are in the middle of jury selection, which began on July 13.

3.     Mr. Avenatti was arrested in connection with this matter on March 25, 2019 in New York City and made his first appearance in the Southern District of New York that same day.  Assistant U.S. Attorney Julian Andre ("AUSA Andre"), who had traveled from the Central District to New York for Mr. Avenatti's arrest, was present that day and represented the government at Mr. Avenatti's initial detention hearing.

4.     From the inception of this criminal case in late 2018[1] until February 19, 2021 of this year (approximately two and a half years), AUSA Andre, of the United States Attorney's Office for the Central District - Major Frauds Section, was the lead line prosecutor assigned by the Department of Justice to this case.  Indeed, AUSA Andre's name appears on the Criminal Complaint filed in late March before Mr. Avenatti's arrest [Dkt. 1], as well as the Indictment filed in April 2019 [Dkt. 16].  He also appears in over 75 subsequent filings by the government in this case, almost always immediately below

---

[1] The criminal investigation into Mr. Avenatti was launched by the Trump Department of Justice in the Fall of 2018, shortly after the *New York Times* published an op-ed on September 13, 2018 that was written by Mr. Avenatti and titled, "The Case for Indicting the President."  In the article, which was widely received, Mr. Avenatti advocated for the indictment of then President Trump due to his criminal conduct in arranging an illegal hush-money payment in the wanning days of the 2016 Presidential Election.

the name of the U.S. Attorney for the Central District and the Chief of the Criminal Division, and above the name of AUSA Brett Sagel.

5.     To describe AUSA Andre's involvement in this case and representation of the government as significant would be an understatement.  AUSA Andre participated in the investigation of Mr. Avenatti and countless witness interviews in 2018 through early 2021, including pre-indictment; participated in proceedings before the grand jury, which are required to be confidential; was privy to troves of confidential information and evidence in this case; filed numerous motions and requests with the Court; and represented the government at nearly every hearing, if not every hearing.

6.     In approximately February or March of this year, AUSA Andre left the U.S. Attorney's Office and became a junior partner at McDermott Will & Emery LLP in Los Angeles.  He filed a withdrawal in this case on February 19, 2021 [Dkt. 410].  The defense believes, however, that former AUSA Andre has remained in close contact with the agents, attorneys and USAO staff continuing to prosecute this matter, including in the weeks leading up to trial and since *voir dire* began on July 13.

7.     The defense has just discovered that former AUSA Andre has been publicly commenting and promoting misinformation about this case and Mr. Avenatti, including derogatory and prejudicial information about him, through the use of social media.  This conduct has spanned months, including in the days immediately before jury selection began and as recently as this weekend (in the middle of jury selection).  The conduct is even more egregious because former AUSA Andre has made it a point to make his personal knowledge and involvement in Mr. Avenatti's case known (including on a recent podcast) and has amplified information to the public and the press that he knows to be questionable <u>at best</u> (if not entirely false) and highly prejudicial.

8.     The U.S. Attorney's Office has been aware of this misconduct for months, including during jury selection, but failed to inform the defense or the Court and also appears to have done nothing about it.  This is apparent and easily proven because the

U.S. Attorney's Office for the Central District "follows" former AUSA Andre on social media (i.e. Twitter) from their official verified account ("US Attorneys L.A."; @USAO_LosAngeles – "The Official account of the U.S. Attorney's Office for the Central District of California").  This means that they are made aware in real time each time Mr. Andre comments on this case or promotes a post by another online user about this case by "retweeting" or "liking" it.[2]  This "follow" by the U.S. Attorney's office has also lent credibility and legitimacy to Andre's social media conduct and his posts, including his dissemination and promotion of derogatory and misleading information about Mr. Avenatti, including in the days leading up to, and during, jury selection.

9.     In the months leading up to jury selection and as recently as this weekend (i.e. in the middle of jury selection), former AUSA Andre has been promoting highly derogatory and/or substantially questionable articles and social media posts aimed at Mr. Avenatti.  <u>For instance, over this past weekend, in the middle of jury selection, Mr. Andre promoted a story published on Friday evening by reporter Meghann Cuniff that (a) mentioned Mr. Avenatti's 30-month sentence in the Nike related matter in New York; (b) discussed matters that occurred outside the presence of the venire last week; and (c) included a number of negative statements about Mr. Avenatti made by prospective jurors on Thursday during *voir dire* that occurred, at the direction of the Court, outside the presence of the rest of the venire.</u>  *See* Exhibit A.

10.    By way of further example, for months, Mr. Andre has also been promoting and amplifying other negative, malicious and, in some cases, substantially questionable (if not outright false), social media posts, articles and podcasts about Mr. Avenatti, including on the eve of jury selection.  These have included, but not been limited to the

---

[2] On Twitter, individuals can promote and cause other social media posts to be more widely read and disseminated through one of two methods – "retweeting" or "liking" a tweet.  Both accomplish the same goal – lending credibility to the tweet and causing more people to read the tweet.  Tweets sent by a user are often seen by far more individuals than their followers – generally, one need not "follow" someone to see their public tweets and posts.

following: "The disgraced SoCal attorney was sentenced to 30 months in prison for an extortion scheme – and now he heads to trial in Orange County," July 8, 2021 (discussing Mr. Avenatti's recent sentencing in the Nike case); a June 16, 2021 podcast mocking Mr. Avenatti and his "trilogy of cases" and comparing it to the Star Wars trilogy, all the while misstating the facts surrounding the charges; "Avenatti update:  To the surprise of absolutely no one, Judge Selna this morning denied Avenatti's latest bid to delay the trial.  Potential jurors are to fill put written questionnaires starting this morning.  In-person voir dire begins Thursday," July 13, 2021; "Disgraced Lawyer Michael Avenatti is Set to Face Fraud Charges in Orange County," July 6, 2021; "Michael Avenatti's embezzlement trial will begin as planned on July 13," June 22, 2021; "Michael Avenatti's embezzlement trial will begin as planned after a California federal judge said the celebrity attorney had exaggerated claims that prosecutors waited until the 'eleventh hour' to reveal that one of their key witnesses suffers from PTSD," June 22, 2021; posts on May 28, 2021 regarding Mr. Avenatti's attempt to be released on bail and the Court's denial of that request; and posts on April 7, 2021 regarding jury selection and Mr. Avenatti's request for a trial continuance, "Judge Selna says Avenatti's lawyer Dean Steward may ask for a trial continuance, so he warns him: 'Sir, you're free to make that motion, but I tell you right now, it is highly unlikely.'  No more delays!"

11.    On July 6, 2021, a mere seven days before jury selection began and approximately six weeks <u>after</u> the jury summonses for this case were already distributed and received by the venire, Mr. Andre retweeted (i.e. distributed and promoted) a highly prejudicial article about Mr. Avenatti that described, among other things, information this Court <u>had already ruled would be excluded at trial and could not be placed before the jury by the government</u>.  *See* Exhibit B.

12.    The extrajudicial conduct described above in paragraphs 7-11 constitutes a significant and purposeful interference with Mr. Avenatti's constitutional rights, including his right to due process and a fair trial under the Sixth and Fourteenth

Amendments.  *See, e.g.,* Browning, John G. "Prosecutorial misconduct in the digital age." 77 Alb. L. Rev. 881, 903-04 (2013) ("A prosecutor commenting online about ongoing trials is one form of potential misconduct.  But what about doing so about a pending case or an open investigation?  Prosecutors can alter the direction of a case, shape public opinion, and potentially taint the jury pool by engaging in such conduct."); Gershman, Bennett L. "The Prosecutor's Duty of Silence." 79 Alb. L. Rev. 1183, 1184 (2016) ("The power of the prosecutor, combined with the influence of the media, makes for a dangerous combination.").  It also likely violates California Rules of Professional Conduct 3.6 and 3.8(e) relating to trial publicity and extrajudicial statements in a criminal proceeding.  These rules are specifically applicable to federal prosecutors pursuant to 28 U.S.C. § 530B(a).  The conduct also violates the prohibition against publicly making comments or disseminating information that "may reasonably be expected to influence the outcome of a pending or future trial."  28 C.F.R. § 50.2 (b)(2) & 50.2 (c)(restrictions on extrajudicial speech).  *See also,* 28 C.F.R. § 50.2(b)(6)(iv) (restricting communications about a defendant's character or about their opinion as to a defendant's guilt).  And it also likely violates multiple sections of the Justice Manual, including Section 1-9.000 ("Personal Use of Social Media"), as well as Department of Justice policy as set forth in a March 24, 2014 DOJ Memorandum on the subject.  *See* Exhibit C.  All of this is true regardless of whether Mr. Andre departed the department in February or March, because he continues to have affirmative obligations relating to this case and the administration of justice.  Further, because they "follow" Mr. Andre's social media posts (i.e. are aware of what he posts and what he "likes"), the U.S. Attorney's Office prosecuting this case has been aware of his conduct, which has spanned months, in real time and yet they have evidently done nothing to curtail it or stop it and prevent prejudice to Mr. Avenatti.

13.     Even though similar conduct is thankfully rare, when it has surfaced, it has rightly resulted in swift judicial action and severe penalties imposed on the government,

including vacating convictions.  *See*, *e.g.*, *United States v. Bowen*, 969 F. Supp. 2d 546 (E.D. La. 2013) (Hon. K. Engelhardt[3] vacating multiple serious felony convictions due to online posts by member(s) of the U.S. Attorney's Office), affirmed at *United States v. Bowen*, 799 F.3d 336 (5th Cir. 2015).  *See also*, "New Orleans U.S. attorney resigns amid scandal over anonymous online postings," Washington Post, December 6, 2012 (describing multiple resignations and investigations resulting from online comments aimed at an individual under criminal investigation).

14.     Accordingly, for each of the above reasons, the defense respectfully requests an immediate evidentiary hearing so that the defense may inquire and present evidence concerning, at a minimum:  (a) Mr. Andre's conduct, including his dissemination, promotion and amplification of prejudicial and highly questionable (if not outright false) information about Mr. Avenatti on the eve of trial and during jury selection; (b) the U.S. Attorney's Office knowledge of and possible participation in this conduct; (c) Mr. Andre's communications with the current prosecution team in this case since March 1, 2021; and (d) the USAO's potential knowledge of, and involvement in, the public dissemination of prejudicial information concerning Mr. Avenatti and this case during the time period March 1, 2021 to the present.

15.     At 9:55 a.m. on the morning of July 19, 2021, I contacted the government and requested their position as to this Application, which I stated I would file no later than 1:00 p.m.  Despite the exchange of multiple emails on the subject, the government still has yet to provide their position; it is now well beyond 1:00 p.m.  Accordingly, the defense assumes the government opposes the Application and the requested relief.

//

//

//

---

[3] Judge Engelhardt was subsequently elevated to the Fifth Circuit Court of Appeals in 2018.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this Declaration is executed at Newport Beach, California.

Dated: July 19, 2021                    /s/ H. Dean Steward
                                        H. Dean Steward

7

# Exhibit A



■ Events    ⚲ Sign In    United States



☰
MENU
🔍
SEARCH

PRO ▶

# THE**RECORDER**

Topics ˅    Surveys & Rankings ˅    Cases ˅    All Sections ˅

 f
 in
🐦
🖨
©

# Tech Problems Delay Avenatti Trial Opening Amid Pandemic Jury Pool Splitting



Michael Avenatti (Photo by David Handschuh/NYLJ)

The snafu is a procedural one, but it encompasses issues Avenatti's lawyer, H. Dean Steward, has raised about the constitutionality of the jury selection process that could arise again in an appeal should Avenatti be convicted.

July 16, 2021 at 09:53 PM

**Meghann M. Cuniff** ↗

Criminal Law

⊘ 6 minute read

Technological problems have delayed opening statements in Michael Avenatti's federal criminal trial in California by at least a day, driven by pandemic-related procedures that Avenatti's lawyer has argued warrant a mistrial.

The 118 people who remain in the jury pool are to be split into three groups for group voir dire, with two groups watching from other rooms via a live video feed. As potential jurors are dismissed from the courtroom, others would be brought in from the overflow rooms. Questioning was to begin Friday, but the quality of the audio to the other rooms was so poor the jurors there couldn't understand it.

Courthouse tech experts tried to fix it with no success, and U.S. District Judge James V. Selna's clerk said "the cavalry" from the Central District of California's headquarters in Los Angeles was en route to Santa Ana to help. With no quick fix in sight, jurors were dismissed for the weekend, and so many couldn't return on Monday, which is the trial's normal dark day, that Selna said voir dire will instead resume Tuesday. Opening statements had been tentatively scheduled for that day at 9 a.m.

"Murphy's Law: What can go wrong, will go wrong. And I'm afraid it did today," Selna told each group.

The snafu is a procedural one, but it encompasses issues Avenatti's lawyer, H. Dean Steward, has raised about the constitutionality of the jury selection process that could arise again in an appeal should Avenatti be convicted. Steward has twice asked for a mistrial based on access issues in jury selection, arguing that splitting the jurors hinders Avenatti's ability to properly observe all of them.

Already sentenced to 30 months in prison for convictions in New York involving an extortion plot against Nike, Avenatti is facing significantly more time under federal wire fraud charges in California that accuse him embezzling five client settlements.

"Mr. Avenatti has a Constitutional right and a right under [Federal Rules of Criminal Procedure] Rule 43 to personally observe all aspects of voir dire—the plan adopted by the Court does not adequately respect those rights because it permits Mr. Avenatti to only be present in the courtroom with approximately 28 prospective jurors while 90 or more other prospective jurors are located elsewhere during voir dire," according to objections filed late Thursday.

Steward said Avenatti didn't see prospective jurors handed their written questionnaires or instructions, and he couldn't watch them fill it out because they did so in three groups and while individual voir dire was going on in Selna's courtroom.

---

Event
### The American Lawyer Industry Awards 2021
Honoring outstanding legal achievements focused at the national level, largely around Big Law and in-house departments.

Get More Information

---

"Mr. Avenatti was not able to be present because he was incapable of being in four places (the courtroom and all three private jury rooms) at one time," according to the filing.

Selna rejected the latest mistrial motion Friday morning. He said when rejecting the first one on Thursday that a paralegal had access to the jury rooms, and he detailed Friday the capacity restrictions he said warrant splitting the jury pool. Only one courtroom has capacity for all 118 potential jurors, but Selna is allowing social distancing because of the covid-19 pandemic.

"I see no practical way to comply with Mr. Avenatti's request that the jurors not be split into different locations," the judge said."Mr Avenatti is free to himself observe or to have an observer" in the other rooms.

"Today those areas are open to the public and anybody can go down there and inspect and if someone wants to observe the court proceedings from there, they can do that," Selna said. "So your request is noted, and it's denied."

Steward suggested waiting until after the pandemic and using the 124-person courtroom, but Selna replied, "Well, sir, we are in the pandemic, and I'm going to proceed using pandemic procedures."

Steward also has objected to jurors wearing masks during voir dire and during trial. Selna has said masks are optional only for vaccinated jurors, though he asked the 40 jurors during individual voir dire if they were comfortable lowering their mask to show their face, and all but a few were. The jurors were on the witness stand behind plexiglass when they did so.

Of the 180 Orange County, California, residents summoned for jury duty, 147 completed written questionnaires on Tuesday. Most said they'd never heard of Avenatti, but 40 were selected for individual questioning, mostly regarding their written answers to questions about Avenatti and their opinion of lawyers. Selna granted Steward's request to strike 14 based on the voir dire. They include people who said they knew of Avenatti's criminal case involving Nike.

One man who was dismissed answered the question "What is your opinion of civil trial lawyers?" with a single word: "Crooks." He told Steward he believes some lawyers "skim off the top" and that he couldn't set aside his bias during trial. Another man who was dismissed affectionately used a profanity while describing civil lawyers as "rich."

"Good for them. I believe in capitalism," he wrote.

"It's hard for me to understand whether that's kind of a negative thing or a positive thing," Steward said.

"It's a jealousy thing, sir. They're doing good in life. Better than me, and I would like to climb the ladder," the man answered. He went on to say that he would hold Avenatti to a higher standard as a criminal defendant because he's a lawyer, which sealed his dismissal.

Another man was questioned because he indicated he knew Avenatti had sued President Trump, but Steward opted not to try to try strike him after he asked the man if he had any other thoughts on that and the man replied, "And I like it."

"You like the fact that he was suing Mr. Trump?" Steward asked.

"Yes," the man answered.

"I have no further questions," Steward said with a smile.

Several other jurors were individually questioned Friday, including a man who answered the written question "Is there any reason you may be prejudiced against the government or defense?" with, "When I first saw Mr. Avenatti, I immediately thought of embezzlement. Whether this will prejudice me in any applicable way is hard to say."

The man told Steward he was wondering to himself what kind of case it was when he saw Avenatti and deduced that he wasn't a violent crime or computer hacking suspect.

"Based on his demeanor, and the way he seemed to address the world, the style of his shoes, I thought, 'Well, not violent crime etc. etc. etc. I'm going to have to say probably embezzlement,'" the man said, adding that Avenatti looked like "the kind of guy" who'd be charged with embezzlement.

Steward moved to strike him, but Selna denied the request because he said the man made clear he hadn't decided whether Avenatti was guilty or not, and that he can be fair during trial.

"I think he differentiated in his sum of mind from his mental process to figure out what this case is about," the judge said.

---

## You Might Like

July 12, 2021
### 'Really Fantastical': At Sanctions Hearing, Judge Pushes Kraken Lawyers About Evidence Behind Election Fraud Claims

By Jacqueline Thomsen

🕐 1 minute read

July 08, 2021
### Michael Avenatti Gets 30-Month Prison Sentence for Nike Extortion,

June 15, 2021
### Western NY Judge Rejects Harvey Weinstein's Protests, Approves

Exhibit B





*Photo by Stephanie Keith/Getty Images*

## Disgraced Lawyer Michael Avenatti Is Set to Face Fraud Charges in Orange County

Shortly after he's sentenced in an extortion scheme involving Nike, Stormy Daniels's former attorney will head to trial for allegedly conning clients out of settlement money

**By Meghann Cuniff** - July 6, 2021

In a Santa Ana federal courthouse, potential jurors are set to start filling out questionnaires next week in a fraud case against one of the Trump era's forgotten celebrities: Michael Avenatti.

The looming courtroom spectacle will spotlight years of alleged financial crimes by Avenatti, who rocketed to fame in 2018 when he sued then-President Donald Trump on behalf of porn star Stormy Daniels, but for years was entangled in complicated court proceedings involving large debts and broken Los Angeles-area law partnerships.

It's set to begin five days after Avenatti is due in New York City for sentencing on a felony conviction handed down by a jury there in January 2020 related to an extortion scheme against Nike. Prosecutors in that case say they want him to serve "very substantial prison time." Probation officials say he's legally eligible for an 11- to 14-year sentence, but are instead recommending eight years. His lawyers, meanwhile, are asking for six months followed by a year of home confinement, saying the loss of his law license and his "epic fall and public shaming" will already deter him from future crimes.

"The Court may take judicial notice of this fact, as Avenatti's cataclysmic fall has been well-documented," a sentencing memo says. "He cannot go anywhere in public without inducing and subjecting himself to vitriolic comments and abuse. These circumstances alone would deter anyone in Avenatti's shoes from engaging in similar conduct."

Whatever happens in New York, the California case presents a significant threat to the once-lauded lawyer's future freedom. Under federal guidelines, he could face at least ten years in prison if convicted, in addition to his New York sentence, and prosecutors have shown no willingness to negotiate leniency. Prosecutors frequently make their disdain for him clear in court documents that lament his "unfounded accusations" about their handling of evidence as an attempt to delay the proceedings "ad infinitum" and distract from his "egregious criminal conduct." They recently accused him of trying "to embarrass or intimidate" his former paralegal by disclosing information about her that was subject to a protective order.

And during a June 28 court hearing, the lead prosecutor, Brett Sagel, accused Avenatti of purposely scheduling conflicting court dates in New York to try to disrupt the proceedings in Orange County. The jury selection had been scheduled for July 6 and 7, but the trial judge, James V. Selna, postponed it to July 13 after Avenatti's sentencing in the Nike case was moved to July 8. The judge expects opening statements on July 20.

Sagel objected to the delay, telling Selna: "What I do know is 150 [potential jurors] who are planning on showing up are now going to have to change their plans, and everybody else, because of what the defendant has done, which is always to delay this case."

Sagel shares some small-world background with Avenatti: both grew up in St. Louis, Missouri, and Sagel earned a law degree from George Washington University School of Law a year before Avenatti. Their paths diverged from there. Sagel joined the U.S. Attorney's Office in Santa Ana in 2004 and earned a name for himself by prosecuting Orange County Sheriff Mike Carona for corruption.

The second prosecutor, Alexander Wyman, joined the case in February 2021 after Sagel's former co-counsel, Julian Andre, left the U.S. Attorney's Office for private practice.

They'll face off against a familiar face at the Orange County federal courthouse.

Avenatti's lawyer, H. Dean Steward, is a longtime criminal defense attorney who, in addition to his private practice, often is appointed clients through the federal defender's office. (He started out as Avenatti's privately retained counsel but is now being paid with taxpayer money after Avenatti was determined to be indigent.)

With a distinctly folksy demeanor, Steward dusted off his COVID cobwebs last month by defending Orange County chiropractor Susan Poon, who was accused of health care fraud in the first criminal trial in the Central District of California since March 2020. Jurors convicted Poon on all counts.

Steward has requested a new trial over the fact that jurors were masked during the proceedings, which he said hindered his ability to analyze their reactions and demeanor. Steward declined to comment to *Los Angeles*, but told the *Los Angeles Daily Journal* that he expects similar problems during Avenatti's trial.

Steward raised the issue with Judge Selna during the June 28 hearing, but Selna said jurors will be allowed to wear masks if they choose.

They won't, however, hear much about Avenatti's luxurious lifestyle, which has included a home in Newport Beach's exclusive Lido Isle and a Ferrari he was ordered to give his second ex-wife in their divorce. The judge ordered prosecutors not to detail Avenatti's jet-setting ways, including "dining at fancy restaurants making expensive purchases, and otherwise projecting a lifestyle and

wealth," saying the evidence presents a "fascinating sparkle" that would be more prejudicial than probative.

Meanwhile, in a foundation for a possible post-conviction appeal, Steward has repeatedly questioned his own ability to effectively represent Avenatti. He unsuccessfully asked to delay the trial in May, writing in a court document that he simply wouldn't be able to effectively defend Avenatti if trial proceeds July 13.

"Since entering my appearance, I have worked on this case diligently," Steward wrote. "However, my review of the discovery in this case and ability to prepare for trial has been slowed due to the sheer amount of discovery, the pandemic, and my other criminal cases. As the Court is aware, I am in my 70s, with pre-existing health conditions."

Steward over the years has offered a glimpse at a possible narrative for Avenatti's defense: he's repeatedly described the prosecution as essentially a debt collection effort by the U.S. Attorney's Office on behalf of a former prosecutor in the Orange County office, Andrew Stolper.

Stolper worked with Avenatti after leaving the prosecutor's office in 2013, but he's since formed his own firm and is representing another ex-Avenatti law partner, Jason Frank, as he tries to collect approximately $15 million owed to him by Avenatti and the now-bankrupt Eagan Avenatti law firm.

Amid Avenatti's meteoric rise to fame on cable television, Stolper secured court judgments and conducted examinations that helped publicly expose Avenatti's dire financial straits and his alleged misuse of client money. (One of the judgments landed the same day Avenatti was in New Hampshire talking to Democrats and a newspaper editorial board about a possible presidential bid.) The lead Internal Revenue Services agent in the Orange County criminal case attended Stolper's courtroom questioning of Avenatti as part of the debt proceedings in March 2019, and prosecutors plan to use some of Avenatti's answers as evidence in his upcoming trial.

The case has been split in two, with the first trial focused on allegations that he swindled clients out of settlement money and the second, scheduled for October, focused on tax and bankruptcy fraud charges. The former allegations involve five of Avenatti's cases, including a lawsuit on behalf of Geoff Johnson, who was paralyzed during a suicide attempt at the Los Angeles County Jail in 2011.

Prosecutors say Avenatti obtained a $4 million settlement, but only paid him $900 to $1,900 every month for four years while lying to him about the status of the settlement. After Stolper questioned him about the whereabouts of the money during the March debt exam, prosectors say Avenatti went directly from the courthouse to Johnson's home and had him sign a document attesting to Avenatti's ethical handling of his case.

Another charge involves a $3 million settlement he negotiated for client Alexis Gardner against her ex-boyfriend, Miami Heat player Hassan Whiteside. Prosecutors say Avenatti used $2.5 million of the money to buy a jet, and spent another $250,000 on various expenses including lease payments on a Ferrari and an outstanding tab at the posh Newport Beach restaurant Javier's.

As for the judge who'll be running the show, no jurist is likely to go easy on an attorney accused of stealing from clients, but Judge Selna also is generally conservative, and his orderly demeanor makes him even more unlikely to cut Avenatti a break at sentencing.

Like most judges, Selna sees a broad range of cases and doesn't usually make headlines. His most high-profile decision of late is probably his 2019 recusal of Judge David O. Carter from a lawsuit over south Orange County cities' refusal to build a homeless shelter, after the cities said Carter was biased against them.

---

***Stay on top of the latest in L.A. news, food, and culture. Sign up for our newsletters today.***

Exhibit C

Office of the Deputy Attorney General

The Deputy Attorney General                    *Washington, D.C. 20530*

March 24, 2014

MEMORANDUM FOR ALL DEPARTMENT EMPLOYEES

FROM:              James M. Cole
                   Deputy Attorney General

SUBJECT:           Guidance on the Personal Use of
                   <u>Social Media by Department Employees</u>

     This memorandum provides guidance to Department employees regarding their responsibilities when using social media.  It is critically important that Department employees understand that engaging in internet and electronic communications regarding matters affecting the Department, as with other forms of communication, implicate the Department's core mission of administering justice in a fair, effective, and even-handed manner.  Before using social media to communicate about matters affecting the Department, employees should ask themselves at least two common sense questions:  "Is there any risk that I am disclosing confidential or non-public information?"  "Might my use of social media adversely affect the Department's mission?"  The exercise of sound judgment will go a long way towards ensuring that Department employees meet the high standards we have set for them.

     While the tools and technologies of social media present new ways to connect with friends, colleagues, and the world, Department employees should remain aware that existing policies apply when communicating about matters affecting the Department.  Importantly, Department employees are required to adhere to certain government-wide standards of conduct and rules of professional conduct that apply to online communications at all times, regardless of whether they are at work, outside the office, or using government equipment.  Additional guidance is discussed in the attached memorandum, but the following standards, rules, and policies warrant particular attention:

- **Protection of Information:** Department employees must properly safeguard confidential, privileged, classified, privacy-protected and/or sensitive Department information.  Attorneys must comply with additional rules of professional conduct that prohibit them from disclosing information learned in the course of representing the United States, including confidential case information related to matters personally handled by the attorney or matters handled by all other Department attorneys or offices.

- **Case-Related Comments or Information:**  Department employees are generally restricted from publicly releasing any comments or information that may reasonably be expected to influence the outcome of a pending or future trial, including observations about a defendant's character or about their opinion as to a defendant's guilt.

Memorandum for All Department Employees                                             Page 2
Subject: Guidance on the Personal Use of Social Media by Department Employees

- **Comments about Judges:** Department employees should not make false statements or statements in reckless disregard for the truth about a judge's qualifications or integrity.

- **Discrimination or Harassment:** Department employees should not make comments that can be perceived as showing prejudice based on race, gender, sexual orientation or any other protected basis.

- **Attempts at Anonymous Communications:**  Department employees must recognize that attempts to post, comment, or share information without revealing their names or identities often are unsuccessful.  Employees must take care not to engage in activity anonymously (or using a pseudonym) that they otherwise would not be permitted to engage in if their identities were known.

- **Use of Department Computers and Official Time:**  Employees using Departmental computer systems and electronic devices are subject to certain guidelines, including restrictions on the use of Department computers and prohibitions on tools that hide the user's identity.

All supervisors should ensure that Department employees receive this guidance, and fully understand these important standards, rules, and policies.  If employees have questions or concerns, please contact human resources, a designated ethics or professional responsibility officer, or a supervisor.


Attachment

## GUIDANCE ON THE PERSONAL USE OF SOCIAL MEDIA BY DEPARTMENT EMPLOYEES

**Introduction**

As the internet and electronic communications take an ever increasing role in our work and personal lives, we must always be mindful of our responsibilities as Department of Justice employees.  More specifically, various forms of social media[1] give employees the opportunity to interact with friends and colleagues, but as with other forms of communication, employees need to be aware of the potential for pitfalls.  The line between public and private, personal and professional, is often blurred, especially when an employee using social media includes his or her Department affiliation or title, or comments on matters related to his or her work, or the work of the Department.

As a result, when using social media, Department employees should use caution and, as in everything they do, exhibit sound judgment and common sense.  Before using social media to communicate about matters affecting the Department, employees should ask themselves:  "Is there any risk that I am disclosing confidential or non-public information?"  "Might my use of social media adversely affect the Department's mission?"  "Are there Department policies and procedures governing my conduct such that I should consult a supervisor or ethics officer prior to posting, commenting, or blogging online?"  By resolving these and other issues discussed more fully below, Department employees will go a long way to assuring that they conduct themselves in a manner consistent with the high standards we have set for Department employees.[2]

Two types of social media commenting merit special attention and should cause Department employees to exercise extreme care:  comments that can be perceived as showing prejudice based on race, gender, sexual orientation, or any other protected basis; and comments on the work of the Department, including cases and investigations.  It is critically important that Department employees act, and are perceived to act by the public we serve, in a fair, just, and unbiased manner.  Online comments by Department employees exhibiting animus based on any protected basis, including race, gender, or sexual orientation, that adversely affect our ability to

---

[1] For the purposes of this memorandum, "social media" covers tools and technologies that allow an employee to share communications, postings or information, or participate in social networking, including but not limited to: blogs (*e.g.* Twitter, Tumblr), social networks (*e.g.,* Facebook, LinkedIn, Google+), video and photo sharing websites (*e.g* Instagram, Flickr), on-line forums and discussion boards (including commenting on-line using media websites), and automated data feeds.  "Social media" does not include non-public tools and technologies, such as Departmental intranet sites.

[2] Based on particular operational concerns, agencies and components may retain existing policies or promulgate additional guidelines on the use of social media so long as they are consistent with the guidance provided in this memorandum.

carry out our important mission will not be tolerated, as explained in this policy.  Likewise, Department employees should not post or comment about Department cases or investigations when their comments could reveal non-public information, influence the outcome of an investigation or proceeding, or adversely affect the subject of an investigation, a defendant, party, or witness in a case.

In addition, Department employees must recognize that attempts to post, comment, or share information without revealing their names or identities often are unsuccessful.  Employees therefore must take care not to engage in activity anonymously, or using a pseudonym, that they otherwise would not be permitted to engage in if their identities were known.  The applicable rules and standards of conduct apply equally whether an employee uses social media anonymously (or using a pseudonym) or while properly identified.

**Standards Governing Communications by Department Employees**

Department employees should remain aware that, even though there are new ways to connect with the world, existing policies, rules, and standards are still implicated when communicating about matters affecting the Department.  Attorneys should also recognize that they have additional responsibilities under the applicable local court rules and rules of professional conduct, and should consult those rules when considering a particular communication.

It is important to note that while vastly accelerating the speed of communication and greatly broadening the size of the audience, the advent of social media neither restricts nor expands the existing limitations on Department employee speech.[3]  Department employees do not surrender their First Amendment rights as a result of their employment; however, the Supreme Court and lower courts have held that the Government may restrict the speech of its employees when employees are not speaking as private citizens on matters of public concern or when the Government's interest in the efficient provision of public services outweighs its employees' interest in the speech.  This memorandum is intended to educate and remind Department employees about the limitations in their communications that derive from their status as government employees.[4]  To that end, this memorandum on the personal use of social media:

---

[3] While the focus of this memorandum is to provide guidance for communications made on social media, Department employees should recognize that the standards and rules of appropriate professional conduct stated in this guidance are not limited to internet or electronic communications, but rather apply to any public communication, whether written or oral.

[4] The memorandum provides only internal Department of Justice guidance.  It is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal.  Nor are any limitations hereby placed on otherwise lawful litigative prerogatives of the Department of Justice.

(1) reinforces the relevant government-wide standards of conduct that apply to all employees' online communications, including when an employee is not at work and not using government equipment;

(2) reiterates the relevant attorney rules of professional conduct that apply to Department attorneys' online communications, including when an attorney is not at work and not using government equipment;

(3) reminds employees of the rules regarding their use of Department computers and equipment and use of official time; and

(4) provides guidelines for personal social media activities that may impact employees' official work for the Department.

This memorandum is not intended to limit or restrict strictly personal social media activities that do not affect the Department and involve the use of personal computers or other devices.[5] Finally, this memorandum is not intended to cover the use of social media by employees in the course of their officially sanctioned work for the Department.

## I.      Government-Wide Standards of Conduct

All Department employees are required to adhere to certain government-wide standards of conduct that apply to online communications at all times.  In general, the restrictions on Department employee communications are contained in statute and the Code of Federal Regulations (C.F.R.).  While not exhaustive, the following restrictions apply to all employees, and violations may be cause for disciplinary action by the Department:

- **Ethical standards:**  Employees shall not engage in criminal, infamous, dishonest, immoral, or notoriously disgraceful conduct, or other conduct prejudicial to the Government.  5 C.F.R. § 735.203.

- **Misuse of Position:**  Employees shall not use their public office for private gain, for the endorsement of any product, service, or enterprise, or for the private gain of friends, relatives, or other acquaintances.  Also, employees shall not use or permit the use of their Government position or title or any authority associated with their public office in a manner that is intended to coerce or induce another person to provide any benefit, financial or otherwise, to themselves or to friends, relatives, or persons with whom the

---

[5] This memorandum is consistent with and does not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to: (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are incorporated into this memorandum and are controlling.  5 U.S.C. § 2302(b)(13).

employees are affiliated in a nongovernmental capacity.  Finally, with limited exceptions,[6] employees shall not use their Government position or title in a manner that could reasonably be construed to imply that the Government endorses or sanctions their personal activities or those of another.  5 C.F.R. § 2635.702.

- **Use of Non-Public Information:** Employees shall not allow the improper use of non-public information to further their own private interest or that of another, whether by engaging in financial transactions using such information, through advice or recommendation, or by knowing unauthorized disclosure.  Non-public information is information that that the employee gains by reason of Federal employment and that he or she knows or reasonably should know has not been made available to the general public. 5 C.F.R. § 2635.703.

- **Political Activity:**  Certain restrictions on political activity by Department employees apply regardless of whether they are on duty or on their personal time. Hatch Act (5 U.S.C. §§ 7321-7326).  For example, no employee may solicit, accept, or receive political contributions, at any time or in any forum.  *Id.* § 7323(a)(2).  Other restrictions are discussed further below and in the footnoted memoranda.[7]

- **Discrimination and Harassment:**  All employees are responsible for treating fellow employees with basic respect and dignity, and must not harass or discriminate against fellow employees based on race, color, religion, national origin, sex, gender identity, age, disability (physical or mental), genetic information, status as a parent, sexual orientation, marital status, political affiliation, or any other non-merit factor.  *See* 5 U.S.C. §§ 2301-2302 (prohibited personnel practices); DOJ Order 1200.1, Chapter 4-1, Equal Employment Opportunity Program; Attorney General Memorandum, Prevention of Harassment in the Workplace (Dec. 14, 1998); *see also* American Bar Association Model Rules of Professional Conduct ("Model Rules") Rule 8.4(d) & 8.4 cmt. [3].

- **Case-Related Comments or Information:**  Subject to limited exceptions, all Department employees are restricted from publicly releasing any comments or information that "may reasonably be expected to influence the outcome of a pending or

---

[6] *See* 5 C.F.R. § 2635.702(b), (c).

[7] These restrictions are set forth in two memoranda, one for career employees, **http://www.justice.gov/jmd/ethics/docs/pol-activ-dag-career-employees.pdf**, and one for non-career appointees, **http://www.justice.gov/jmd/ethics/docs/pol-activ-dag-noncareer-employees.pdf**.  Additional information is available on the Department's ethics website, **http://www.justice.gov/jmd/ethics/politic.html** and the U.S. Office of Special Counsel web site, "Frequently Asked Questions Regarding Social Media and the Hatch Act," U.S. Office of Special Counsel (April 4, 2012) at: **http://www.osc.gov/documents/hatchact/federal/Social%20Media%20and%20the%20Hatch%20Act%202012.pdf**.

future trial." 28 C.F.R. § 50.2 (b)(2) & § 50.2 (c) (restrictions on extrajudicial speech).[8] In particular, Department employees shall not communicate with non-Department individuals concerning their observations about a defendant's character or about their opinion as to a defendant's guilt. *Id.* § 50.2(b)(6)(iv).

## II.    Rules of Professional Conduct

Department attorneys are required to adhere to applicable rules of professional conduct in their communications, regardless of whether they are at work or outside the office, the medium of communication, the forum in which they are communicating, whether they are using government equipment, and whether they communicate anonymously or pseudonymously.  These rules apply to Department attorneys who engage in all types of Department work, including litigation, investigation, and providing legal advice.  Moreover, the rules require attorneys to make reasonable efforts to ensure that non-lawyers working with the attorney conduct themselves in a manner that is compatible with the rules.  *See* Model Rule 5.3.  The Department may discipline attorneys for violations of applicable rules of professional conduct.  The following professional conduct principles are contained in the American Bar Association Model Rules of Professional Conduct;[9] although this list is not exhaustive, it highlights rules that attorneys should be particularly mindful of when using social media:

- **Protection of Information:** Department attorneys are required to safeguard and are prohibited from disclosing confidential Department information relating to the representation of the United States (or other clients (*e.g.*, *Bivens* defendants)).  *See* Model Rule 1.6(a).  The relevant Model Rules also prohibit a Department attorney from disclosing information learned in the course of representing the United States, including confidential case information related to matters personally handled by the attorney or matters handled by all other Department attorneys or offices.  *See* Model Rule 1.6 & cmt. [2], [3], [4], [5], [20]; Model Rule 1.10 & cmt. [2].  Confidential information is broadly defined and applies to "all information relating to [a] representation whatever its source," as well as information that reasonably could lead to the discovery of confidential information.  Model Rule 1.6 cmt. [3] & [4].  This includes, but is not limited to, information deemed privileged, classified, privacy protected and/or sensitive.

---

[8] *See* 28 C.F.R. § 50.2 (b)(3) & § 50.2 (c) (discussing limited information that may be released to the public).

[9] The Model Rules are cited because most jurisdictions' versions of the professional responsibility rules are based on the Model Rules.  A Department lawyer, when confronting an issue of professional conduct, should consider the rules that apply to that particular situation because, in most instances, a specific jurisdiction's rules will govern, rather than (or in some cases, in addition to) the Model Rules.

- **False or Misleading Statements:** Department attorneys should not make a false statement of material fact or law regarding their representation of a client to a third person or engage in conduct involving dishonesty, fraud, deceit, or misrepresentation. *See* Model Rules 4.1 & 8.4(c).
- **Comments about Judges:** Attorneys should not make false statements or statements in reckless disregard for the truth about a judge's qualifications or integrity. Model Rule 8.2.
- **Conflict of Interest:** Attorneys should not make statements that would result in the Department attorney being materially limited or impaired in representing the United States, such as by posting personal opinions contrary to those that the attorney is advocating on behalf of the United States, comments that can be perceived as showing prejudice based on race, gender, sexual orientation or any other protected basis, or comments that may cause the attorney to be called as a witness.  *See* Model Rule 1.7(a)(2); Model Rule 8.4(d) & cmt. [3]; Model Rule 3.7(a).[10]
- **Trial Publicity:** Attorneys should not make statements they know or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding, or that are likely to heighten condemnation of an accused in a prosecution being handled by the Department.[11]  Model Rules 3.6 & 3.8(f); *see also* USAM §§ 1-7.000 et. seq. (establishing specific guidelines restricting the release of information relating to criminal and civil cases by Department attorneys).

## III.    Use of Department Computers and Official Time

All employees have a duty to protect and conserve Government property and shall not use such property, or allow its use, for other than authorized purposes.  5 C.F.R. § 2635.704.  Further, employees shall use official time in an honest effort to perform official duties.  5 C.F.R. §2635.705.  Use of Departmental computer systems, including Blackberries and all electronic devices, is subject to the same restrictions on use as are other government-furnished resources provided for the use of employees.  While Departmental computer systems are provided for

---

[10] Although the Department may be able to consent to an attorney's continued representation of the United States notwithstanding the conflict of interest created by such comments, the decision whether to consent may involve a time-consuming investigation and assessment of the extent to which the conflict might impair the Department attorney's ability to effectively represent the United States in a particular matter or at all.  In addition, the attorney may need to consider whether his or her statements are required to be disclosed subject to the Government's discovery obligations.  *See, e.g.*, Deputy Attorney General Memorandum, Guidance on the Use, Preservation, and Disclosure of Electronic Communications in Federal Criminal Cases (March 30, 2011).

[11] The local court rules implemented by courts also govern attorneys' conduct and frequently contain restrictions on attorney speech related to matters pending before the court.

official use, some personal use of government computer systems is permitted in accordance with existing policy on personal use of government property, where there is negligible cost to the government and no interference with official business. *See* 28 C.F.R. § 45.4; DOJ Order 2740.1A.

Employees must keep the following restrictions and guidelines in mind when using Department computers and computer systems during working hours or nonworking hours. Note that unauthorized or improper use of Department computers and equipment could result in loss of use or limitations on the use of equipment, disciplinary or adverse actions, and/or criminal penalties:

- **Limited expectation of privacy:** Employees should not expect privacy in the use of Department computers or computer systems except in very limited circumstances when the Department has specifically authorized them to engage in attorney-client communications *with private clients*, for example, employees sued in their individual capacity or approved pro bono clients. *See* 28 C.F.R. § 50.15; DOJ Policy Statement on Pro Bono Legal and Volunteer Services. System administrators and others with access privileges may receive authorization from Department senior management officials to review an employee's computer activity, including email communications and internet activity, when there is a legitimate government purpose to do so. DOJ Order 2740.1A, §3(e), (f).

- **Prohibited Uses of Department Computers:** Non-official use of Department computers that could cause congestion, delay, or disruption of service is prohibited.[12] Additional prohibitions include the unauthorized use of internet sites that cause additional charges to the Department, viewing or downloading sexually explicit material, and use for commercial purposes or in support of outside employment or business activities. A list of other prohibited activities on Department computers can be found in DOJ Order 2740.1A, § 3(c).

- **Political Activity:** While on duty, in a Federal facility, using Federal property such as a computer, or while representing the Department, employees are prohibited from engaging in activity directed toward the success or failure of a political party, a candidate for partisan political office, or a partisan political group. Hatch Act (5 U.S.C. §§ 7321-7326).

- **Attempts at Anonymity/Pseudonymity:** Employees must remember that internet activity and posts made from Department computers can be traced back to the Department through the Internet Protocol (IP) address. Note that employees are

---

[12] For example, electronic greeting cards, video, sound or other large file attachments can degrade the performance of the entire network, and should not be viewed or sent on Department computers. Accessing continuous data streams (such as viewing streaming video or listening to streaming audio/radio on a media website) could also degrade the performance of the entire network and is inappropriate when not for official purposes.

prohibited from using anonymizer sites or similar tools that hide the user's identity on Department computers (sites that attempt to hide the user's identity from the internet sites being visited).  DOJ Order 2740.1A, § 3(c)(2)(e).

## IV.    Personal Social Media Activity Guidelines

The following guidelines apply to employees' personal social media activities:

- **Department computers:**  Only on a limited basis, where there is negligible expense to the Department and no interference with official business, may personal social media activities be conducted on Department computers, telecommunications devices, and networks, provided such activity does not interfere with the conduct of Department business and does not violate the computer and equipment usage restrictions discussed above in DOJ Order 2740.1A and 28 C.F.R. § 45.4.
- **Use of title and email address:**  Employees may use their official title and Department affiliation on their personal social media page for professional identification or biographic data as long as they do not create an impression that they are speaking in an official capacity.  Employees should not use their government email addresses when setting up personal social media accounts.
- **Communicating in personal capacity:**  Employees must avoid stating, implying, or creating the impression that they are communicating in an official capacity on behalf of the Department in their personal social media activities.[13]  To the extent that there may be confusion about whether an employee is communicating in an official or personal capacity, the employee must include a disclaimer indicating that the employee is communicating in a personal capacity.[14]
- **Work or Department-related posts:**  Employees may post, comment, or share public information on matters related to their work or the work of the Department provided such communications fully comport with the restrictions set forth in this guidance.  As discussed above, Department employees must properly safeguard privileged, confidential, classified, privacy-protected and/or sensitive Department information. Attorneys must also comply with the applicable jurisdiction's Rules of Professional

---

[13] Implying that one is communicating in an official capacity on behalf of the Department may, for attorneys, also constitute dishonesty, fraud, deceit or misrepresentation, which is prohibited by Model Rule 8.4(c).

[14] For example, DOJ Order 2740.1A provides that "[o]ne acceptable disclaimer is 'The contents of this message are mine personally and do not reflect any position of the Government or my agency.'"  DOJ Order 2740.1A, § 3(d).

Conduct.  Finally, absent express supervisory approval, employees should not engage in official Department business on personal social media pages.[15]

- **Engaging with colleagues:**  Employees are permitted to engage with colleagues, including superiors and subordinates, on their personal social media sites.  That said, care must be exercised to ensure that other rules are not inadvertently violated.  For example, supervisors who "friend" their subordinates on their social media pages should ensure that they do not solicit contributions for personal causes on their pages in a way that could violate the regulation that prohibits fundraising from subordinates.  *See* 5 C.F.R. §2635.808(c)).

- **Political activity:**  While most employees can engage in certain political activities while away from the workplace on their own time, including on their social media pages, some prohibitions exist, such as the prohibition on fundraising described above.  Employees must understand the prohibitions that apply to their positions and be mindful of them as they engage in personal social media activities.  *See* Hatch Act (5 U.S.C. §§ 7321-7326) and other restrictions discussed above in footnote 7 and the associated text.

- **Discrimination and harassment:**  As with Department communications, employees may be subject to discipline if they use social media to engage in harassing or discriminatory conduct toward other employees (or individuals or groups) based on their race, color, religion, national origin, sex, gender identity, age, disability (physical or mental), genetic information, status as a parent, sexual orientation, marital status, political affiliation, or any other protected status.

- **Anonymous and pseudonymous postings:**  As indicated previously, employees should recognize that attempts to post anonymously or pseudonymously are often unsuccessful, and therefore should take care not to engage in activity that they otherwise would not be permitted to engage in if their identity was known.  The applicable rules and standards of conduct apply equally whether an employee uses social media anonymously (or using a pseudonym) or while properly identified.

The exercise of sound judgment and an awareness of applicable rules will go a long way towards avoiding problems that may result in violations of the Standards of Conduct, Rules of Professional Conduct, or Department policy, or potential disruptions to the efficiency of the Department.  If you have questions or concerns about the above guidance, or are unsure how it may apply to you, please contact human resources, a designated ethics or professional responsibility officer, or your supervisor.

---

[15] As discussed above, attorneys should also recognize that online communications may need to be reviewed and potentially disclosed in accordance with applicable statutes, the United States Constitution, or Department policies.

**<u>CERTIFICATE OF SERVICE</u>**

I, H. Dean Steward, am a citizen of the United States, and am at least 18 years of age. My business address is 17 Corporate Plaza, Suite 254 in Newport Beach, California 92660.  I am not a party to the above-entitled action.  I have caused, on July 19, 2021, service of the:

DEFENDANT'S *EX PARTE* APPLICATION FOR AN IMMEDIATE EVIDENTIARY
HEARING REGARDING IMPROPER AND PREJUDICIAL PUBLIC
COMMENTS/SOCIAL MEDIA POSTS BY FORMER AUSA JULIAN ANDRE

on the following party, using the Court's ECF system:

AUSA BRETT SAGEL AND AUSA ALEXANDER WYMAN

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 19, 2021

<u>/s/ H. Dean Steward</u>

H. Dean Steward
