1

```
 1
 2
 3
 4                    UNITED STATES DISTRICT COURT
 5                  CENTRAL DISTRICT OF CALIFORNIA
 6                          SOUTHERN DIVISION
 7                             - - -
 8        THE HONORABLE JAMES V. SELNA, JUDGE PRESIDING
 9
          UNITED STATES OF AMERICA,    )CERTIFIED TRANSCRIPT
10                        Plaintiff,  )
             vs.                       )
11                                     ) SACR-19-00061-JVS
          MICHAEL JOHN AVENATTI,       )
12                        Defendant.  ) TRIAL DAY 6, Vol. 1
          -----------------------------)
13
14
15           REPORTER'S TRANSCRIPT OF PROCEEDINGS
16                  Santa Ana, California
17                     July 21, 2021
18
19                     SHARON A. SEFFENS, RPR
                       United States Courthouse
20                     411 West 4th Street, Suite 1-1053
                       Santa Ana, CA  92701
21                     (714) 543-0870
22
23
24
25
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

1   APPEARANCES OF COUNSEL:

2   For the Plaintiff:

3   NICOLA T. HANNA
    United States Attorney
4   BRANDON D. FOX
    Assistant United States Attorney
5   Chief, Criminal Division
    ALEXANDER WYMAN
6   Assistant United States Attorney
    Major Frauds Section
7   1100 United States Courthouse
    312 North Spring Street
8   Los Angeles, CA   90012
    (213) 894-6683
9
    BRETT A. SAGEL
10  Assistant United States Attorney
    Ronald Reagan Federal Building
11  411 West Fourth Street, Suite 8000
    Santa Ana, CA   92701
12  (714) 338-3598

13  For the Defendant:

14  MICHAEL JOHN AVENATTI, PRO SE

15  H. DEAN STEWARD, STANDBY COUNSEL
    H. DEAN STEWARD LAW OFFICES
16  107 Avenida Miramar, Suite C
    San Clemente, CA   92672
17  (949) 481-4900

18

19

20

21

22

23

24

25

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1

 2

 3                         I-N-D-E-X

 4                                              PAGE

 5  OPENING STATEMENT BY MR. SAGEL               38
    OPENING STATEMENT BY MR. AVENATTI            59
 6
    PLAINTIFF'S
 7  WITNESSES:          DIRECT   CROSS   REDIRECT   RECROSS

 8  PATRICK MCNICHOLAS      73

 9  PLAINTIFF'S
    EXHIBITS:                       MARKED    RECEIVED
10
    Exhibit 12                                 76
11  Exhibit 37                                 89
    Exhibit 40                                 95
12  Exhibit 51                                 97
    Exhibit 54                                 99
13  Exhibit 53                                102

14  DEFENSE
    WITNESSES:      DIRECT   CROSS   REDIRECT   RECROSS
15
     (None)
16
    DEFENSE
17  EXHIBITS:                        MARKED   RECEIVED

18   (None)

19

20

21

22

23

24

25
```

|       |    |                                                                 |
|-------|----|-----------------------------------------------------------------|
|       | 1  | SANTA ANA, CALIFORNIA; WEDNESDAY, JULY 21, 2021; 8:39 A.M.       |
| 08:38 | 2  | (Jury not present)                                              |
| 08:39 | 3  | THE CLERK:  Item 1, SACR-19-00061-JVS, United                   |
| 08:39 | 4  | States of America versus Michael John Avenatti.                 |
| 08:39 | 5  | MR. SAGEL:  Good morning, Your Honor.  Brett Sagel              |
| 08:39 | 6  | and Alexander Wyman on behalf of the United States.  At         |
| 08:39 | 7  | counsel is Special Agent Ramon Carlos with the Department of    |
| 08:39 | 8  | Treasury.                                                       |
| 08:39 | 9  | THE COURT:  Good morning.                                       |
| 08:39 | 10 | MR. AVENATTI:  Good morning, Your Honor.                        |
| 08:39 | 11 | Defendant Michael Avenatti, present, and joined by my           |
| 08:39 | 12 | advisory counsel Mr. Steward as well as Ms. Cefali and our      |
| 08:39 | 13 | trial tech assistants.                                          |
| 08:39 | 14 | THE COURT:  Good morning.                                       |
| 08:39 | 15 | At 5:28 yesterday Mr. Avenatti filed additional                 |
| 08:39 | 16 | objections to the proposed initial jury instructions.           |
| 08:39 | 17 | Did you in any way inform the government of your                |
| 08:40 | 18 | belated objections other simply filing them?                    |
| 08:40 | 19 | MR. AVENATTI:  No, Your Honor, I did not.  Many of              |
| 08:40 | 20 | those objections were made just to preserve the record.  We     |
| 08:40 | 21 | previously made many of those objections, and I wanted to       |
| 08:40 | 22 | make sure that the record is preserved.                         |
| 08:40 | 23 | THE COURT:  Sir, that's inaccurate.  Several new               |
| 08:40 | 24 | objections were made, one citing a new California case,          |
| 08:40 | 25 | People versus Stein at 94 Cal.App. 3d 235 (1979).  There was    |

08:40  1    also an objection that the quoted rules of professional

08:40  2    conduct are from the 2018 version rather than the version

08:40  3    that was in effect prior to that.

08:40  4           You would agree those are new arguments that have

08:40  5    never been made?

08:40  6           MR. AVENATTI:  Your Honor --

08:40  7           THE COURT:  You would agree that those are new

08:40  8    arguments that have never been made?  Yes or no.

08:41  9           MR. AVENATTI:  No, Your Honor.  Can I explain?

08:41  10          THE COURT:  Okay.  Thank you.  No, you may not.

08:41  11          I have had a chance to review the pleadings, and I

08:41  12   have the following comments.  Then I will be happy to hear

08:41  13   you.

08:41  14          One, Mr. Avenatti cites the Stein case for the

08:41  15   proposition that it would be improper and reversible error

08:41  16   to instruct the jury on the duties of a lawyer.  At page

08:41  17   239, the Stein Court says:  This instruction given to the

08:41  18   jury stated:  "Evidence has been presented tending to show

08:41  19   that the defendant may have violated" the applicable rules,

08:41  20   and this may be considered 'only insofar as it may tend to

08:41  21   prove that the defendant possessed the specific intent

08:41  22   required..."(Emphasis added.  (1)  We find that it was

08:41  23   improper to use the professional rules of conduct to show

08:41  24   that a violation of the rules, if any, would tend to prove

08:42  25   that the defendant possessed the specific intent required

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

08:42    1    when, in fact, the violation of the rules, if any, could

08:42    2    have occurred without any criminal intent.  Even though the

08:42    3    instructions did not presume a violation of the rules, the

08:42    4    only reasonable inference that the jury could have drawn was

08:42    5    that evidence of a violation was in fact evidence

08:42    6    establishing the required intent to commit the crimes

08:42    7    charged."

08:42    8         One, Stein is state law.  It's not binding on me.

08:42    9    Two, I disagree that it is improper to instruct on the law.

08:42   10    I believe that if the jury is properly instructed as to the

08:42   11    limited purpose for which such evidence may be considered,

08:42   12    that it is proper and helpful to the jury in assessing this

08:42   13    case.

08:42   14         The proposed jury instruction incorporated with

08:42   15    one exception the proposal that Mr. Avenatti made at Docket

08:43   16    539 on July 17.  The only thing that the Court did not carry

08:43   17    forward is subparagraph (e) of Rule of Professional Conduct

08:43   18    1.15.  Other than that, the Court incorporated verbatim the

08:43   19    requested language from the rules of professional conduct.

08:43   20         The Court also incorporated the paragraph that

08:43   21    appears at page 11 of the proposed instructions:  You should

08:43   22    keep in mind that the proof that the defendant failed to

08:43   23    comply with the rules governing a lawyer's duties, et

08:43   24    cetera, does not necessarily mean that the defendant is

08:43   25    guilty of the charged offenses of wire fraud.

08:44  1            In other words, with the exception of subparagraph

08:44  2      (e) of Rule 1.15, the Court incorporated in the current

08:44  3      draft all of the proposals that Mr. Avenatti made on

08:44  4      July 15.

08:44  5            It is accurate that the present jury instruction

08:44  6      on the lawyer's duties incorporates provisions from the 2018

08:44  7      version, that is, the current version of the Rules of

08:44  8      Professional Conduct.

08:44  9            The predecessor to Rule 1.4 is former Rule 3-500.

08:44  10     The predecessor to Rule 1.41 is Rule 3-510, Communication of

08:44  11     Settlement.  And the predecessor to Rule 1.15 is 4-100,

08:45  12     Preserving Identity of Funds and Property of the Client.  In

08:45  13     each case, the commentary indicates that the substance of

08:45  14     the former rule has been carried forward with additional

08:45  15     comment and detail to assist lawyers and the public.

08:45  16            Instead of reading the provisions from the current

08:45  17     Rules of Professional Conduct, I'm going to read the former

08:45  18     rules.  I passed out to the parties a copy of those, that

08:45  19     language.  I'm simply going to substitute that language.

08:45  20            In the current objection it's suggested that I

08:45  21     lead the instruction off with what is now on page 11, the

08:45  22     paragraph that focuses the jury's attention as to why this

08:45  23     might be relevant and appropriate to consider.  I will move

08:46  24     that to the beginning of the instruction, and I will read

08:46  25     the instruction as it exists simply substituting the former

8

08:46  1   version of Rule 1.14 and the former version of 1.41 and the
08:46  2   former version of 1.15.
08:46  3           Any comments?
08:46  4           MR. WYMAN:  No objection, Your Honor.
08:46  5           MR. AVENATTI:  Yes, Your Honor, briefly.  Last
08:46  6   Thursday on the 15th of July, at Docket 539 on page 3 at
08:46  7   lines 3 through 5 and the footnote, we brought to the
08:46  8   Court's attention the Stein case.  That's number one.  And,
08:46  9   again, we would continue to rely on that case.
08:46 10           Number two, just for the record, Your Honor, we
08:46 11   would renew our objections to any reading of the bar rules.
08:46 12   We believe that they're irrelevant in this case, so we renew
08:47 13   our objections for the record, including the objections
08:47 14   included at Docket 559, as well as the -- I also state our
08:47 15   objections to the new rules that have been proposed to be
08:47 16   read to the jury, Your Honor, just for the record.
08:47 17           THE COURT:  Anything further, Mr. Sagel?
08:47 18   Mr. Wyman?
08:47 19           MR. WYMAN:  No, Your Honor.  Thank you.
08:47 20           THE COURT:  Okay.  Then that's what we're going to
08:47 21   do.  I do not have time to edit and hand out a hard copy of
08:47 22   that rule, but I have put in your hands the new provisions
08:47 23   of the Rules of Professional Conduct that I am going to
08:47 24   read.  And I have advised you of the other change I'm going
08:47 25   to make, moving up the last paragraph to the first paragraph

```
08:47   1   of that instruction.
08:47   2          I received a pleading this morning filed at 8:11
08:47   3   with regard to Jencks materials.
08:47   4          Mr. Sagel, what's the status of the government's
08:47   5   Jencks production?
08:48   6          MR. SAGEL:  It all was produced in 2019 to
08:48   7   defendant.  He has been provided any additional Jencks well
08:48   8   before Your Honor's deadline.  And anytime we received
08:48   9   anything new such as since the deadline if we've interviewed
08:48  10   someone, we have provided it to him.  I actually did not
08:48  11   have a chance to see what he filed this morning, but --
08:48  12          THE COURT:  Were you not handed a copy when you
08:48  13   came in?
08:48  14          MR. SAGEL:  I was not.  I have been in this court
08:48  15   since 8:00 a.m., and I don't have my phone or anything with
08:48  16   me.  So I didn't know that anything was filed until I just
08:48  17   turned to Mr. Wyman.
08:48  18          THE COURT:  Notwithstanding that electronic filing
08:48  19   will constitute notice, I direct the parties with respect to
08:48  20   any pleading filed after the court day and any pleading
08:48  21   filed on the day of the court session to reach out and
08:48  22   notify directly the other side and to e-mail a copy; or if
08:49  23   the pleading was filed in the morning of the court session,
08:49  24   to present the other side a copy of that pleading
08:49  25   immediately upon the arrival of the other party.
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

08:49   1             Am I clear on that?

08:49   2             MR. AVENATTI:  Yes, Your Honor.

08:49   3             MR. SAGEL:  Yes, Your Honor.

08:49   4             THE COURT:  I believe in keeping sidebars to a

08:49   5   minimum in jury trials.  Our most important asset is the

08:49   6   time of the jury, so I infrequently entertain sidebars.  I

08:49   7   encourage the parties to bring to the Court's attention any

08:49   8   matter that might be taken up at sidebar in advance of the

08:49   9   court day or at the end of the day or during breaks.

08:49   10            With regard to the court day, I'm going to ask

08:49   11  throughout the trial that counsel appear at 8:30 so we can

08:49   12  assure that we have sufficient time to take up any new

08:49   13  matters in advance of the start time.  If any party believes

08:49   14  that time won't be sufficient, advise the courtroom deputy

08:50   15  so that we can have everybody know that they need to be here

08:50   16  earlier.

08:50   17            Any other matters anyone wants to take up at this

08:50   18  time?

08:50   19            MR. SAGEL:  Yes, Your Honor.  The government has a

08:50   20  few.  I will try and be quick, knowing the timing.

08:50   21            I will start as it relates to what we're going to

08:50   22  be doing this morning.  Mr. Avenatti mentioned either

08:50   23  himself or new individuals we've never seen before who are

08:50   24  here this morning, that they have some kind of presentation

08:50   25  for his opening.

08:50   1        Your Honor made it abundantly clear what needed to

08:50   2   be shown to the other side in advance.  Nothing has been

08:50   3   provided to the government.  I don't even know what it is

08:50   4   other than I was told there is a flip chart.  We would

08:50   5   object especially because we still don't know what it is.

08:50   6   We would object to him showing anything in opening.

08:50   7        And I would also mention there is still no

08:50   8   reciprocal discovery in this case, so I'm not even sure what

08:50   9   he would even be showing.

08:50  10        I would also point out that as far as I know, and

08:50  11   obviously we don't always see the filings on CJA requests,

08:51  12   but as far as I know, the two new individuals that he has

08:51  13   coming to court with him are not part of the CJA.  They're

08:51  14   not authorized.

08:51  15        So somehow Mr. Avenatti is now finally able to

08:51  16   bring something to court with him while asking the Court

08:51  17   this whole time to have the Court pay for attorneys and

08:51  18   paralegals.  So this does not need to be done with the

08:51  19   government's presence, but I don't know that the Court

08:51  20   should be paying for three paralegals and advisory counsel

08:51  21   for him when he can bring in tech support and other

08:51  22   individuals to support his case.

08:51  23        So, Your Honor, we'll defer to the Court how you

08:51  24   want to handle that and to ask him how and why he is now

08:51  25   bringing in new people to support his presentation.  But I

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

08:51   1   don't believe they're CJA.

08:51   2           THE COURT:  Well, on than point, Mr. Avenatti, you

08:51   3   are to file a response in camera no later than 9:00 a.m.

08:51   4   tomorrow.

08:51   5           MR. AVENATTI:  Understood, Your Honor.

08:51   6           THE COURT:  Okay.

08:51   7           MR. SAGEL:  As long as Dean Steward is still the

08:52   8   advisory counsel, our request to the Court -- obviously it's

08:52   9   in Your Honor's discretion -- that all communications

08:52   10  between the two parties goes through Mr. Steward.

08:52   11          I say that because we really don't trust any

08:52   12  communications with Mr. Avenatti directly about what later

08:52   13  was said, as long as Mr. Steward is either present or

08:52   14  Mr. Steward is the conduit of the communications.  But we do

08:52   15  not want to have direct communications with Mr. Avenatti

08:52   16  other than if it's in writing, if it's an e-mail or

08:52   17  something along those lines.  But we do not want

08:52   18  Mr. Avenatti coming over here and claiming what he did or

08:52   19  didn't say to us or vice versa.

08:52   20          I don't think it's conducive to what might come up

08:52   21  later with the Court.  As long as Mr. Steward is here, there

08:52   22  is no reason he either can't be present or be the one who

08:52   23  communicates with us.

08:52   24          THE COURT:  We haven't experienced that problem

08:52   25  yet.  If that problem arises, I will address it.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

13

08:52  1            MR. SAGEL:  With regard to openings --

08:52  2            THE COURT:  Well, let's come back to that.

08:53  3            Sir, have you exchanged or identified what you

08:53  4     intend to use in opening statement?

08:53  5            MR. AVENATTI:  Your Honor, I have no presentation

08:53  6     to use in opening statement.  The gentleman who is here is

08:53  7     merely here today to assist with exhibits.  That's number

08:53  8     one.

08:53  9            THE COURT:  Are you going to use any

08:53  10    demonstratives?

08:53  11           MR. AVENATTI:  I may write something on a flip

08:53  12    chart.  I haven't decided what I am going to write yet.  I

08:53  13    don't think I'm obligated to disclose what I'm going to

08:53  14    write.  If there is an objection when I write it, I'm sure

08:53  15    it will be made and Your Honor will rule on it.

08:53  16           THE COURT:  I asked about demonstratives, and you

08:53  17    said you have no demonstratives that you are going to use.

08:53  18           MR. AVENATTI:  Yes, provided that whatever I write

08:53  19    on the flip chart is not considered a demonstrative.  If

08:53  20    that's considered a demonstrative --

08:53  21           THE COURT:  If you're creating it in our presence,

08:53  22    so be it.

08:53  23           MR. AVENATTI:  Okay.  And that's the only thing

08:53  24    I'm intending on doing, Your Honor.  I'm not intending on

08:53  25    using any boards or anything of that nature.

08:53  1           I have some other housekeeping matters myself, but
08:54  2    I'll wait for Your Honor's response.
08:54  3           THE COURT:  Does the government have anything
08:54  4    further?
08:54  5           MR. SAGEL:  Very quickly, Your Honor.  With regard
08:54  6    to openings, Mr. Steward obviously knows what Your Honor's
08:54  7    motion in limine rulings were and what's relevant to this
08:54  8    case and what's relevant to the decisions.  I don't know if
08:54  9    there needs to be anything said about the underlying fact
08:54 10    and his work as a lawyer and some of the things that Your
08:54 11    Honor has already excluded, anything that has to do with his
08:54 12    handling of his Stormy Daniels matters.  Any of the things
08:54 13    that he has raised numerous times in this court but have
08:54 14    nothing to do with this actual case before the jury should
08:54 15    not be coming up in opening statements.
08:54 16           THE COURT:  I expect that Mr. Steward has advised
08:54 17    him concerning the Court's in-limine rulings.  He's aware of
08:54 18    those.  If you sense any violation, bring it to the Court's
08:54 19    attention.
08:54 20           MR. SAGEL:  Thank you, Your Honor.
08:54 21           We have one other matter, but it's about witnesses
08:54 22    for today and tomorrow.  I can take it up at any point.
08:55 23           THE COURT:  Let's take it up later.
08:55 24           Mr. Avenatti.
08:55 25           MR. AVENATTI:  Thank you, Your Honor.

08:55  1              A few things.  Number one, just for the record, we

08:55  2  would renew our objection on the jurors being masked during

08:55  3  the trial as it relates to --

08:55  4              THE COURT:  Next point.  Noted.

08:55  5              MR. AVENATTI:  Thank you, Your Honor.

08:55  6              Second, it's my intention to preserve the record

08:55  7  by asking for a mistrial after the opening statements.  I'm

08:55  8  assuming that there will be a break after my opening

08:55  9  statement so that I can make that record.

08:55  10             THE COURT:  That's fine.

08:55  11             MR. AVENATTI:  Thank you, Your Honor.

08:55  12             THE COURT:  And I will read the initial jury

08:55  13  instructions.  We will hear from the government, and then we

08:55  14  will take a break so that we don't have need to break during

08:55  15  your opening statement.

08:55  16             MR. AVENATTI:  I appreciate that, Your Honor.

08:55  17  Thank you.

08:55  18             Next, we would renew the objection under Rule 615.

08:55  19  I believe the government is entitled to have one

08:55  20  representative present for the trial.  We have a number of

08:55  21  agents under subpoena.  There is a good-faith basis to

08:55  22  believe that they're going to be testifying in the case, at

08:56  23  least in the defense case.

08:56  24             Therefore, we would renew the objection or request

08:56  25  under 615 for exclusion of the witnesses with the exception

08:56   1   of Mr. Carlos, who I understand is the government's

08:56   2   designee.

08:56   3            THE COURT:  Mr. Sagel, is your other agent here?

08:56   4            MR. SAGEL:  Yes.  He is in the back.  He is here.

08:56   5   He will be also -- the direct answer to the question is,

08:56   6   yes, he is here.

08:56   7            THE COURT:  Is he under subpoena?

08:56   8            MR. SAGEL:  Again, as I said --

08:56   9            THE COURT:  Is he under subpoena?

08:56   10           If you don't know -- Mr. Avenatti, is he under

08:56   11  subpoena?

08:56   12           MR. AVENATTI:  Yes.  He was served in this

08:56   13  courtroom.

08:56   14           MR. SAGEL:  And that's what I mentioned yesterday,

08:56   15  is we don't believe there is either proper service, proper

08:56   16  subpoena, or that they complied with the regulations.

08:56   17           THE COURT:  Have you complied with the Tui regs

08:56   18  with respect to either of these agents?

08:56   19           MR. AVENATTI:  All right.  Your Honor, under --

08:56   20           THE COURT:  Have you complied with the Tui

08:56   21  regulations with respect to either of these agents?

08:57   22           MR. AVENATTI:  No, because they're not required.

08:57   23           THE COURT:  All right.  If there has been no Tui

08:57   24  compliance, until proven otherwise, I regard the subpoenas

08:57   25  as ineffective and both agents may remain.

08:57   1          MR. SAGEL:  Thank you, Your Honor.

08:57   2          MR. AVENATTI:  Your Honor, the last issue I have

08:57   3   is we got a list of witnesses from the government late

08:57   4   yesterday.  I would like inquire --

08:57   5          THE COURT:  Just a minute.  My instruction was to

08:57   6   share that before you left court.

08:57   7          Did you share it with him yesterday, your batting

08:57   8   order?

08:57   9          MR. SAGEL:  Yes.  We sent an e-mail with the times

08:57   10  to Mr. Steward.

08:57   11         THE COURT:  What time?

08:57   12         MR. SAGEL:  I'd have to check my e-mails, which I

08:57   13  don't have, but I'd say about 5:00.

08:57   14         THE COURT:  I believe my instruction was to meet

08:57   15  and confer before you leave court.  That's what I want.

08:57   16         MR. AVENATTI:  Your Honor, the time was 5:10 p.m.

08:57   17  I have a copy here.

08:57   18         THE COURT:  Okay.  What time did we leave

08:58   19  yesterday?

08:58   20         MR. AVENATTI:  I believe, Your Honor, we left

08:58   21  around 2:30.

08:58   22         THE COURT:  It will be in the record.  State your

08:58   23  point.

08:58   24         MR. AVENATTI:  Okay.  Your Honor, we got the

08:58   25  batting order, to use your term, at 5:10 p.m.  I would like

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

08:58  1    to inquire as to who the first witness is going to be.  The

08:58  2    reason is this, Your Honor.  If it's going to be

08:58  3    Mr. McNicholas, there is going to be considerable work

08:58  4    product and mediation of settlement privilege issues,

08:58  5    including the issues we raised in our brief, and I think it

08:58  6    would make sense for us to know that now so that we don't

08:58  7    waste the jury's time, if we could --

08:58  8            THE COURT:  Did you advise the order, not simply

08:58  9    who's in the lineup but the order?

08:58  10           MR. SAGEL:  I'm sorry.  I don't have the e-mail in

08:58  11   front of me, but I'm not sure that it was.  But we have no

08:58  12   problem saying the order.  It is Mr. McNicholas, but I will

08:58  13   point out to the comment just made.  I would also jump to

08:58  14   the point that these privileges he keeps making are

08:58  15   frivolous.  Every exhibit that Mr. McNicholas will be

08:59  16   admitting and his statements --

08:59  17           THE COURT:  I think the Court will be deeming them

08:59  18   admitted.

08:59  19           MR. SAGEL:  Correct, Your Honor, that we would be

08:59  20   admitting through him.  He has -- with the statements of the

08:59  21   witness, he knows the exact exhibits.  The mediation

08:59  22   privilege is not his.  It's the client's.  The work product

08:59  23   is the firm's, not his, just like the privileges he waived

08:59  24   before or didn't bring before.

08:59  25           The privileges -- he's raising things that he's

08:59  1   said numerous times without pointing to anything and

08:59  2   purposely because he has no basis to keep this out.  As it

08:59  3   relates to Mr. McNicholas --

08:59  4          THE COURT:  It's 9:00.  I want to start.  Anything

08:59  5   further?

08:59  6          MR. AVENATTI:  No, Your Honor, other than I

08:59  7   thought this was the order of the witnesses and that's how I

08:59  8   prepared, because I understood that was Your Honor's

08:59  9   directive.  Mr. McNicholas is third on the list.

08:59  10         So, you know, again there's going to be a number

08:59  11  of issues relating to Mr. McNicholas, and I wish that I

09:00  12  would have gotten the order in which they were going to be

09:00  13  called.

09:00  14         THE COURT:  We'll cure that problem going forward.

09:00  15  Is that clear?

09:00  16         MR. SAGEL:  That's clear.

09:00  17         THE COURT:  I want to make that clear for both

09:00  18  sides.

09:00  19         Okay.  Then we will be in recess until the jury is

09:00  20  in place.

09:00  21              (Recess taken at 9:00 a.m.;

09:00  22               proceedings resumed at 9:09 a.m.)

09:00  23          (Jury present)

09:09  24         THE CLERK:  Item 1, SACR-19-00061-JVS, United

09:09  25  States of America versus Michael John Avenatti.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:09   1        MR. SAGEL:  Good morning, Your Honor.  Brett Sagel
09:09   2   and Alexander Wyman on behalf of the United States.  At
09:09   3   counsel table is Special Agent Ramon Carlos from the
09:09   4   Department of Treasury.
09:09   5        THE COURT:  Good morning.
09:09   6        MR. AVENATTI:  Good morning, Your Honor.
09:09   7   Defendant Michael Avenatti, present with my advisory
09:09   8   counsel, Mr. Steward, as well as Ms. Cefali.
09:09   9        THE COURT:  Good morning.
09:09  10        And good morning, ladies and gentlemen.  I have a
09:10  11   brief set of jury instructions to read to you which will
09:10  12   give you some assistance in how you approach your duties.
09:10  13   Then we will hear the opening statement of the government.
09:10  14        Then we will take a short break, and then we will
09:10  15   hear Mr. Avenatti's opening statement.  We're going to take
09:10  16   that short break so that we don't have to interrupt
09:10  17   Mr. Avenatti's opening statement.
09:10  18        Jurors, you are now the jury in this case, and I
09:10  19   want to take a few minutes to tell you something about your
09:10  20   duties as jurors and to give you some preliminary
09:10  21   instructions.  At the end of the trial I will give you more
09:10  22   detailed written instructions that will control your
09:10  23   deliberations.
09:10  24        When you deliberate, it will be your duty to weigh
09:10  25   and to evaluate all the evidence received in the case and in

09:10   1   that process to decide the facts.  To the facts as you find
09:10   2   them you will apply the law as I give it to you whether you
09:11   3   agree with it or not.  You must decide the case solely on
09:11   4   the evidence and the law before you and perform these duties
09:11   5   fairly and impartially.
09:11   6          You should not be influenced by any person's race,
09:11   7   color, religious beliefs, national ancestry, sexual
09:11   8   orientation, gender identity, or economic circumstances.
09:11   9   Also, do not allow yourself to be influenced by any personal
09:11   10  likes or dislikes, sympathy, prejudice, fear, public
09:11   11  opinion, or biases, including unconscious biases.
09:11   12         Unconscious biases are stereotypes, attitudes, or
09:11   13  preferences that people may consciously reject but may be
09:11   14  expressed without conscious awareness, control, or
09:11   15  intention.  Like conscious bias, unconscious bias can affect
09:11   16  how we evaluate information and make decisions.
09:11   17         This is a criminal case brought by the United
09:11   18  States government.  The government charges the defendant
09:12   19  with ten counts of wire fraud in violation of Section 1343
09:12   20  of Title 18 of the United States Code.
09:12   21         The charges against the defendant are contained in
09:12   22  the Indictment.  The Indictment simply describes the charges
09:12   23  the government brings against the defendant.  The Indictment
09:12   24  is not evidence and does not prove anything.
09:12   25         The defendant has pleaded not guilty to the

09:12  1    charges and is presumed innocent unless and until the
09:12  2    government proves the defendant guilty beyond a reasonable
09:12  3    doubt.  In addition, the defendant has the right to remain
09:12  4    silent and never has to prove innocence or present any
09:12  5    evidence.
09:12  6          In order to help you follow the evidence, I will
09:12  7    give you a brief summary of the elements of the crimes that
09:12  8    the government must prove to make its case.
09:12  9          In order to establish wire fraud, the government
09:12  10   must prove the existence of a scheme to defraud, or
09:13  11   alternatively a scheme for obtaining money or property by
09:13  12   means of false or fraudulent pretenses, representations, or
09:13  13   promises.  Although the government can prove both types of
09:13  14   schemes, it need only prove the existence of one type of
09:13  15   scheme.
09:13  16         In order for the defendant to be found guilty of
09:13  17   wire fraud based upon a scheme to obtain money or property,
09:13  18   the government must prove each of the following elements
09:13  19   beyond a reasonable doubt:
09:13  20         First, the defendant knowingly participated in or
09:13  21   devised a scheme or plan for obtaining money or property by
09:13  22   means of false or fraudulent pretenses, representations, or
09:13  23   promises; or omitted facts received from statements of half
09:13  24   truths that may constitute false or fraudulent
09:13  25   representations.

09:13  1    Second, the statements made or facts omitted as

09:13  2    part of the scheme were material; that is, they had a

09:14  3    natural tendency to influence or were capable of influencing

09:14  4    a person to part with money or property.

09:14  5    Third, the defendant acted with the intent to

09:14  6    defraud, that is, the intent to deceive and cheat.

09:14  7    Fourth, the defendant used or caused to be used

09:14  8    interstate wire communications to carry out or attempt to

09:14  9    carry out an essential part of the scheme.

09:14  10    In order to convict the defendant of wire fraud

09:14  11    based on omissions of material facts, you must find that the

09:14  12    defendant had a duty to disclose the omitted facts arising

09:14  13    out of a relationship of trust.

09:14  14    The duty can arise either out of a formal

09:14  15    fiduciary relationship or a formal trusting relationship in

09:14  16    which one party acts for the benefit of another and induced

09:14  17    the trusting party to relax the care and vigilance which

09:14  18    would have been ordinarily exercised.

09:14  19    In order for the defendant to be found guilty of

09:15  20    wire fraud based on a scheme to defraud, the government must

09:15  21    prove each of the following elements beyond a reasonable

09:15  22    doubt:

09:15  23    First, the defendant knowingly participated in or

09:15  24    devised a scheme or a plan to defraud.

09:15  25    Second, the scheme was material; that is, it had a

09:15    1    natural tendency to influence or was capable of influencing
09:15    2    a person to part with money or property.
09:15    3            Third, the defendant acted with intent to defraud,
09:15    4    that is, intent to deceive and cheat.
09:15    5            And fourth, the defendant used or caused to be
09:15    6    used an interstate wire communication to carry out or
09:15    7    attempt to carry out an essential part of the scheme.
09:15    8            Proof beyond a reasonable doubt is proof that
09:15    9    leaves you firmly convinced the defendant is guilty.  It is
09:15   10    not required that the government prove guilt beyond all
09:15   11    possible doubt.  A reasonable doubt is a doubt based upon
09:15   12    reason and common sense and is not based purely on
09:16   13    speculation.  It may arise from a careful and impartial
09:16   14    consideration of all the evidence or from a lack of
09:16   15    evidence.
09:16   16            If after a careful and impartial consideration of
09:16   17    all the evidence you are not convinced beyond a reasonable
09:16   18    doubt that the defendant is guilty, it is your duty to find
09:16   19    the defendant not guilty.
09:16   20            If on the other hand after a careful and impartial
09:16   21    consideration of the evidence you are convinced beyond a
09:16   22    reasonable doubt that the defendant is guilty, it is your
09:16   23    duty to find the defendant guilty.
09:16   24            The government charges the defendant with engaging
09:16   25    in a scheme to defraud his legal clients.  Because the

09:16    1    defendant was a licensed member of the State Bar of
09:17    2    California at all times relevant to the charges in this
09:17    3    case, the ethical duties that the defendant owed clients are
09:17    4    determined by California law.
09:17    5         You should keep in mind that proof that the
09:17    6    defendant failed to comply with the rules governing a
09:17    7    lawyer's duties, including receipt of client funds and/or
09:17    8    use of attorney/client trust accounts, does not necessarily
09:17    9    mean that the defendant is guilty of the charged offenses of
09:17   10    wire fraud.
09:17   11         You may consider, however, whether the defendant
09:17   12    failed to comply with the rules governing the receipt of
09:18   13    client funds and use of attorney/client trust accounts when
09:18   14    evaluating whether the government has proved the elements of
09:18   15    the offense, including whether the defendant engaged in a
09:18   16    scheme to defraud, whether the statements made or facts
09:18   17    omitted as part of the scheme were material, whether the
09:18   18    defendant acted with intent to defraud, and whether the
09:18   19    defendant had a duty to disclose an omitted fact arising out
09:18   20    of a relationship of trust.
09:18   21         Ultimately you will be asked to decide whether the
09:18   22    defendant violated the law and not whether he violated his
09:18   23    ethical obligations.
09:18   24         The State Bar imposed a number of legal duties,
09:18   25    ethical rules, and professional responsibility requirements

09:18    1    on lawyers licensed to practice law in the state of

09:18    2    California.  Among other things, the California Rules of

09:18    3    Professional Conduct and California law impose the following

09:18    4    duties on the lawyer's license to practice law in

09:19    5    California:

09:19    6            1.   The lawyer owes a fiduciary duty of the

09:19    7    highest order to his clients.  A lawyer's fiduciary duty to

09:19    8    his clients includes the duty to protect the information and

09:19    9    property of the clients and to keep such information or

09:19   10    property safe so not be lost or misused.

09:19   11            2.   The lawyer owes a duty of loyalty to his

09:19   12    clients.  The lawyer's loyalty to his clients must be

09:19   13    undivided.  A lawyer cannot act in a manner that will

09:19   14    disadvantage his clients.

09:19   15            3.   A member of the bar shall keep the client

09:19   16    reasonably informed about significant developments relating

09:19   17    to the employment or representation including promptly

09:19   18    complying with reasonable requests for information and

09:19   19    copies of significant documents when necessary to keep the

09:19   20    client so informed.

09:19   21            4(A)   A member shall communicate to the member's

09:20   22    clients:

09:20   23            (1)   All terms and conditions of any offer to the

09:20   24    client in a criminal matter; and

09:20   25            (2) all amounts, terms, and conditions of any

written offer of settlement made to a client in all other
matters.

(B)   As used in this role, client includes a
person who possesses the authority to accept an offer or
settlement or plea, or in a class action all of the named
representatives of the class.

(5)   (A) All funds received or held for the
benefit of clients by a member or law firm including
advances for costs and expenses shall be deposited in one or
more identifiable bank accounts labeled trust account,
client funds account, or words of similar import, maintained
in the state of California or with the consent of the client
in any other jurisdiction where a substantial relationship
between the client and the client's business in the other
jurisdiction.  No funds belonging to the member or law firm
shall be deposited therein or otherwise commingled therewith
except as follows:

(1)   Funds reasonably sufficient to pay bank
charges;

(2)   In the case of funds belonging in part to a
client and in part presently or potentially to the member or
law firm, the portion belonging to the member or law firm
must be withdrawn at the earliest reasonable time after the
member's interest in that portion becomes fixed.  However,
when the right of the member or law firm to receive a

09:21  1    portion of trust funds is disputed by a client, the disputed

09:21  2    portion shall not be withdrawn until the dispute is finally

09:21  3    resolved.

09:22  4             (B)   A member shall:

09:22  5             (1)   Promptly notify a client of the client's

09:22  6    funds, receipt of the client's funds, securities, or other

09:22  7    properties;

09:22  8             (2)   Identify and label securities and properties

09:22  9    of the client promptly upon receipt and place them in a safe

09:22  10   deposit box or other place of safekeeping as soon as

09:22  11   possible;

09:22  12            (3)   Maintain records of all funds and securities

09:22  13   or other properties of the client coming into the possession

09:22  14   of the member or law firm and render appropriate accounts to

09:22  15   the client regarding them, preserve such records for a

09:22  16   period of time of no less than five years after appropriate

09:22  17   distribution of such funds or properties, and comply with

09:22  18   any order where an audit of such funds issued pursuant to

09:22  19   the rules of procedure of the State Bar.

09:22  20            (4)   Promptly pay and deliver as requested by the

09:22  21   client any funds, securities, or other properties in the

09:22  22   possession of the member which the client is entitled to

09:23  23   receive.

09:23  24            (C)   The board of governors of the State Bar shall

09:23  25   have the authority to formulate and adopt standards as to

```
09:23   1    what records shall be maintained by the member and law firms
09:23   2    in accordance with Section (b)(3).  Standards formulated and
09:23   3    adopted by the board as from time to time amended shall be
09:23   4    effective and binding on all members.
09:23   5              Again, ladies and gentlemen, let me remind you
09:23   6    ultimately you will be asked to determine whether the
09:23   7    defendant violated the law, not whether he violated his
09:23   8    ethical obligations.
09:23   9              The evidence you are to consider in deciding what
09:23  10    the facts are consists of:
09:23  11              1.  the sworn testimony of any witness;
09:24  12              2.  the exhibits that are received into evidence;
09:24  13    and
09:24  14              3.  any facts to which the parties agree.
09:24  15              The following things are not evidence, and you
09:24  16    must not consider them as evidence in deciding the fact of
09:24  17    case:
09:24  18              1.  statements and arguments of the attorneys;
09:24  19              2.  questions and objections of the attorneys;
09:24  20              3.  testimony that I have instructed you to
09:24  21    disregard; and
09:24  22              4.  anything you may see or hear when the court is
09:24  23    not in session even if what you see or hear is done or said
09:24  24    by one of the parties or by one of the witnesses.
09:24  25              Evidence may be direct or circumstantial.  Direct
```

evidence is direct proof of a fact such as testimony by a witness about what that witness personally saw or heard or did.

Circumstantial evidence is indirect evidence. That is, proof of one or more facts from which you can find another fact. You are to consider both direct and circumstantial evidence. Either can be used to prove any fact. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give any evidence.

There are rules of evidence that control what can be received in evidence. When a lawyer asks a question or offers an exhibit in evidence and a lawyer on the other side thinks it is not permitted by the rules of evidence, that lawyer may object.

If I overrule the objection, the question may be answered or the exhibit received. If I sustain the objection, the question cannot be answered or the exhibit cannot be received. Whenever I sustain an objection to a question, you must ignore the question and must not guess what the answer would have been.

Sometimes I may order that evidence be stricken from the record and that you disregard or ignore it. That means that when you are deciding the case, you must not consider the evidence that I told you to disregard.

09:26  1          In deciding the facts of the case, you may have to

09:26  2  decide which testimony to believe and which testimony not to

09:26  3  believe.  You may believe everything a witness says or part

09:26  4  of it or none of it.

09:26  5          In considering the testimony of any witness, you

09:26  6  may take into account:

09:26  7          1.  the witness's opportunity and ability to see

09:26  8  or hear or know the things testified to;

09:26  9          2.  the witness's memory;

09:26  10          3.  the witness's manner while testifying;

09:26  11          4.  the witness's interest in the outcome of the

09:26  12  case, if any;

09:26  13          5.  the witness's bias or prejudice, if any;

09:26  14          6.  whether other evidence contradicted the

09:26  15  witness's testimony;

09:26  16          7.  the reasonableness of the witness's testimony

09:26  17  in light of all the evidence; and

09:26  18          8.  any other factors that bear on believability.

09:27  19          You must avoid bias, conscious or unconscious,

09:27  20  based on the witness's race, color, religious beliefs,

09:27  21  national ancestry, sexual orientation, gender identity,

09:27  22  gender, or economic circumstances in your determination of

09:27  23  credibility.

09:27  24          Sometimes a witness may say something that is not

09:27  25  consistent with something else he or she said.  Sometimes

09:27  1    different witnesses will give different versions of what

09:27  2    happened.  People often forget things or make mistakes in

09:27  3    what they remember.

09:27  4              Also, two people may see the same event but

09:27  5    remember it differently.  You may consider all these

09:27  6    differences, but do not decide that the testimony is untrue

09:27  7    just because it differs from other testimony.

09:27  8              However, if you decide that a witness has

09:27  9    deliberately testified untruthfully about something that is

09:27  10   important, you may choose not to believe anything that

09:28  11   witness said.  On the other hand, if you think a witness

09:28  12   testified untruthfully about some things but told the truth

09:28  13   about others, you may accept the part that you think is true

09:28  14   and ignore the rest.

09:28  15             The weight of the evidence as to a fact does not

09:28  16   necessarily depend on the number of witnesses who testify

09:28  17   about it.  What is important is how believable the witnesses

09:28  18   are and how much weight you think their testimony deserves.

09:28  19             Opinion testimony is allowed because of the

09:28  20   education and experience of a witness.  Such opinion

09:28  21   testimony should be judged like any other testimony.  You

09:28  22   may accept it or reject it and give it as much weight as you

09:28  23   think it deserves, considering the witness's education and

09:28  24   experience and the reasons given for the opinion and all

09:28  25   other evidence in the case.

33

09:28  1          I will now say a few words about your conduct as

09:28  2    jurors.

09:28  3          First, keep an open mind throughout the trial and

09:29  4    do not decide what the verdict should be until you and your

09:29  5    fellow jurors have completed your deliberations at the end

09:29  6    of the case.

09:29  7          Second, because you must decide this case based

09:29  8    only on the evidence received in the case and on my

09:29  9    instructions as to the law that applies, you must not be

09:29  10   exposed to any other information about the case or the

09:29  11   issues it involves during the course of your jury duty.

09:29  12          Thus, until the end of the case or unless I tell

09:29  13   you otherwise, do not communicate with anyone in any way and

09:29  14   do not let anyone else communicate with you in any way about

09:29  15   the merits of the case or anything to do with it.  These

09:29  16   restrictions include discussing the case in person, in

09:29  17   writing, by phone, tablet, or computer, or any other means

09:29  18   via e-mail, via text messaging, or any internet chat room,

09:29  19   blog, website, or application, including but not limited to

09:29  20   Facebook, YouTube, Twitter, Instagram, LinkedIn, Snapchat,

09:30  21   TikTok, or any other form of social media.

09:30  22          This restriction also applies to communicating

09:30  23   with your fellow jurors until I give you the case for

09:30  24   deliberation, and it applies to communicating with everyone

09:30  25   else including your family members, your employer, the media

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:30   1   or press, and the people involved in the trial, although you

09:30   2   may notify your family and your employer that you have been

09:30   3   seated as a juror in this case and how long you expect the

09:30   4   trial to last.

09:30   5           But if you are asked or approached in any way

09:30   6   about your jury service or anything about this case, you

09:30   7   must respond that you have been ordered not to discuss the

09:30   8   matter.  In addition you must report the contact to the

09:30   9   Court.

09:30   10          Because you will receive all the evidence and

09:30   11  legal instruction you may properly consider to return a

09:30   12  verdict, do not read, watch, or listen to any news or media

09:31   13  accounts about the case or anything to do with it.  Do not

09:31   14  do any research such as consulting dictionaries, searching

09:31   15  the internet, and using other reference materials; and do

09:31   16  not make any investigation or in any other way try to learn

09:31   17  about the case on your own.

09:31   18          Do not visit or view any place discussed in this

09:31   19  case, and do not use the internet or any other resource to

09:31   20  search for or view any place discussed in the case.  And do

09:31   21  not do any research about the case, the law, or the people

09:31   22  involved, including the parties, witnesses, and the lawyers

09:31   23  until you have been excused as jurors.

09:31   24          If you happen to read or hear anything touching on

09:31   25  this case in the media, turn away and report it to me as

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

soon as possible.  These rules protect each party's right to have this case decided only on the evidence that's been presented here in court.

Witnesses here in court take an oath to tell the truth, and the accuracy of their testimony is tested through the trial process.  If you do any research or investigation outside of the courtroom or gain information through improper communications, then your verdict may be influenced by inaccurate, incomplete, or misleading information that has not been tested by the trial process.

Each of the parties is entitled to a fair trial by an impartial jury, and if you decide the case based on information not presented in the court, you will have denied the parties a fair trial.  Remember that you have taken an oath to follow the rules, and it's very important that you follow these rules.

A juror who violates these rules jeopardizes the fairness of these proceedings.  If any juror is exposed to any outside information, please notify the Court immediately.

At the end of the trial you will have to make your decision based on what you recall of the evidence.  You will not have a written transcript of the trial.  I urge you to pay close attention to the testimony as it is given.

If you wish, you may take notes to help you

09:33    1    remember the evidence.  If you do take notes, please keep

09:33    2    them to yourself until you and your fellow jurors go to the

09:33    3    jury room to decide the case.  Do not let notetaking

09:33    4    distract you from being attentive.  When you leave court for

09:33    5    recesses, your notes should be left in the courtroom.  No

09:33    6    one will read your notes.

09:33    7         Whether or not you take notes, you should rely on

09:33    8    your own memory of the evidence.  Notes are only to assist

09:33    9    your memory.  You should not be overly influenced by your

09:33   10    notes or those of your fellow jurors.

09:33   11         The next phase of the trial will begin now.

09:33   12    First, each side may make an opening statement.  An opening

09:33   13    statement is not evidence.  It is simply an outline to help

09:33   14    you understand what that party expects the evidence will

09:33   15    show.  A party is not required to make an opening statement.

09:33   16         The government will then present evidence, and

09:33   17    counsel for the defendant may cross-examine.  Then if the

09:34   18    defendant chooses to offer evidence, counsel for the

09:34   19    government may cross-examine.

09:34   20         After the evidence has been presented, I will

09:34   21    instruct you on the law that applies to the case and the

09:34   22    attorneys will make closing arguments.  After that, you will

09:34   23    go to the jury room to deliberate on your verdict.

09:34   24         Ladies and gentlemen, our usual court day will be

09:34   25    9:00 to 12:00.  We will take a 15-minute break about 10:30.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:34   1   In the afternoon we will go from 1:30 to 4:30 with a
09:34   2   15-minute break about 3:00.  If you would like to take a
09:34   3   break at any other time, simply catch my eye or
09:34   4   Ms. Bredahl's eye, and we'll take a break.  I want you to be
09:34   5   comfortable at all times.
09:34   6           I do things other that preside at trials.  Trials
09:34   7   in and of themselves generate a lot of paperwork -- for
09:34   8   example, these jury instructions.  So you may see me doing
09:34   9   two things at once.  I assure I can do that.  I have been
09:34   10  doing this for a while.  If I think I missed something, I
09:34   11  just need to look over my shoulder, and Ms. Seffens is
09:35   12  generating a verbatim transcript.  So it's right there if I
09:35   13  think I missed a word or a phrase.
09:35   14          The important thing for you, ladies and gentlemen,
09:35   15  is not to infer from the fact that I may be doing two things
09:35   16  at once that what is going on is not important.  It's
09:35   17  important that you give your full attention to counsel as
09:35   18  they make their opening statements and eventually their
09:35   19  closing arguments and as the witness examinations go
09:35   20  forward.
09:35   21          I ask you to try and be prompt.  We can't go
09:35   22  forward unless we have everyone here.  We're somewhat like
09:35   23  those old-fashioned Christmas trees where if one light goes
09:35   24  out, all the lights go out.
09:35   25          We will do our best to start on time.  I have

09:35   1   directed the lawyers to come in early each day so that if we

09:35   2   have any matters to take up, we can get that done before our

09:35   3   9:00 start time.

09:35   4           Mr. Sagel, would you like to address the jury?

09:35   5           MR. SAGEL:  Yes, Your Honor.  Thank you.

09:36   6           In 2011, Geoffrey Johnson was in a really bad

09:36   7   place.  He had just suffered severe injuries, including

09:36   8   paraplegia which left him confined to a wheelchair for the

09:36   9   rest of his life.

09:36  10           Geoffrey Johnson hired a lawyer, the defendant,

09:36  11   Michael Avenatti, and his law firm, Eagan Avenatti, to

09:36  12   represent him in a civil rights case against the County of

09:36  13   Los Angeles.  Geoffrey Johnson trusted the defendant to

09:36  14   represent him, trusted him to get the best outcome possible

09:36  15   for him, with which Geoffrey Johnson was hoping to buy a

09:36  16   handicap-accessible home and van and some money for living

09:36  17   expenses to make living life in a wheelchair easier.

09:37  18           The defendant in January of 2015 obtained a

09:37  19   $4 million settlement from the County of Los Angeles on

09:37  20   behalf of Geoffrey Johnson.  The defendant deposited that

09:37  21   $4 million in an attorney/client trust account that he

09:37  22   controlled.  An attorney/client trust account is a special

09:37  23   account where you hold a client's money in trust.

09:37  24           The defendant did not tell Geoffrey Johnson that

09:37  25   the settlement was finalized.  The defendant did not tell

09:37  1  Geoffrey Johnson he received the $4 million.  The defendant
09:37  2  did not pay Geoffrey Johnson anything of that $4 million.
09:37  3  The defendant stole the entire amount of Geoffrey Johnson's
09:37  4  settlement check and used all of that money on himself and
09:37  5  his businesses.

09:37  6        From 2015 through 2019, defendant continued to lie
09:38  7  to Geoffrey Johnson to prevent Mr. Johnson from learning
09:38  8  that his settlement money was gone or from learning that
09:38  9  there even was settlement money.

09:38  10       You will learn that Geoffrey Johnson was the first
09:38  11 of several clients of the defendant from whom the defendant
09:38  12 stole their settlement money.

09:38  13       In addition to Geoffrey Johnson, there is Alexis
09:38  14 Gardner, Gregory Barela, and Michelle Phan.  Each of them
09:38  15 hired the defendant to represent them in cases that they
09:38  16 had, and with each of them the defendant stole all or part
09:38  17 of their settlement funds.

09:38  18       Defendant stole approximately $2 million from
09:38  19 Geoffrey Johnson.  He stole approximately $1,750,000 from
09:39  20 Alexis Gardner.  He stole between approximately $800,000 and
09:39  21 $900,000 from Gregory Barela, and he stole $4 million from
09:39  22 Michelle Phan.

09:39  23       Geoffrey Johnson, Alexis Gardner, Gregory Barela,
09:39  24 and Michelle Phan will each describe the circumstances and
09:39  25 interactions with the defendant as their lawyer.  They will

09:39   1   each describe their cases.  And each of their cases were

09:39   2   different, but all of them trusted Michael Avenatti.

09:39   3        They trusted defendant to represent them, trusted

09:39   4   him to obtain any settlement possible to hold their money in

09:39   5   trust and to pay them the money that they were entitled to.

09:39   6   They trusted defendant completely.  Defendant violated their

09:39   7   trust.  Defendant stole their money.

09:40   8        Throughout this trial the testimony and the

09:40   9   evidence will show that even though each of their cases were

09:40   10  different, the manner in which defendant stole their money

09:40   11  and lied to his clients were basically the same.

09:40   12       First, defendant would negotiate the settlement on

09:40   13  behalf of his clients.  Second, the defendant would lie

09:40   14  about the true terms of the settlement agreement and/or how

09:40   15  the payments under the settlement agreements would be made.

09:40   16  Third, the defendant would deposit the settlement money into

09:40   17  an attorney/client trust account that he controlled.

09:40   18       Fourth, defendant stole their money to use on

09:40   19  himself and his businesses, and finally defendant made false

09:40   20  statements to his clients and concealed the truth from his

09:40   21  clients to prevent them from realizing that he had already

09:41   22  stolen their money.

09:41   23       Throughout this trial you will hear testimony and

09:41   24  see evidence to show how defendant stole his clients' money

09:41   25  and how he lied to his clients.  I will briefly go over some

09:41  1   of that evidence with you right now.

09:41  2              Turning back to Geoffrey Johnson, for several

09:41  3   years other lawyers at defendant's law firm and a lawyer at

09:41  4   another law firm primarily handled Geoffrey Johnson's case.

09:41  5   But in the end of 2014, near the end of 2014, the case

09:41  6   looked like it was going to settle with the County of Los

09:41  7   Angeles, and defendant took over from there.

09:41  8              Defendant told the federal judge overseeing

09:41  9   Geoffrey Johnson's case that the parties, the County of Los

09:41  10  Angeles and the defendant representing Geoffrey Johnson, had

09:42  11  reached a settlement on all terms except for one, when the

09:42  12  money would be paid.

09:42  13             Defendant told the judge Mr. Johnson is a

09:42  14  paraplegic and is in need of the funds, and then told the

09:42  15  judge Mr. Johnson would like the moneys paid so that he can

09:42  16  utilize the money for his living expenses and other needs.

09:42  17  Soon thereafter the defendant reached out to the lawyer

09:42  18  representing the County of Los Angeles asking for an update

09:42  19  on when the settlement would be approved and finalized

09:42  20  because, in defendant's words, he was trying to take care of

09:42  21  Geoffrey Johnson.

09:42  22             Defendant told the Court, told the lawyers

09:42  23  representing the County of Los Angeles of the importance,

09:42  24  the need to get money to Geoffrey Johnson so he could pay

09:42  25  for his living expenses.  Defendant did obtain the

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:42   1   $4 million settlement on behalf of Geoffrey Johnson.

09:43   2          The County agreed to pay $4 million on that

09:43   3   settlement, but defendant didn't tell Geoffrey Johnson that

09:43   4   the settlement happened.  He had a duty to tell Geoffrey

09:43   5   Johnson that there was a settlement.  He failed to do so.

09:43   6          The defendant never even told Geoffrey Johnson

09:43   7   that the settlement was finalized, constantly lying to

09:43   8   Geoffrey Johnson that the County still needed to approve

09:43   9   things.  Just hold tight.  There needs to be further

09:43   10  approvals.

09:43   11         The settlement agreement that defendant told

09:43   12  Geoffrey Johnson about that they were waiting on approvals

09:43   13  was not even true.  He told Geoffrey Johnson that

09:43   14  Mr. Johnson would have to get quarterly payments from the

09:43   15  County over an extended period of time because the County

09:43   16  doesn't make lump-sum payments.  But the County did settle

09:44   17  the case, and the County did pay $4 million.

09:44   18         I apologize.  The screens are far away and things

09:44   19  might not be big enough, but a $4 million check from the

09:44   20  County of Los Angeles that was deposited into the Eagan

09:44   21  Avenatti, LLP, attorney/client trust account, defendant's

09:44   22  attorney/client trust account.

09:44   23         Defendant had a duty to tell Geoffrey Johnson he

09:44   24  received this check.  Defendant didn't tell Geoffrey Johnson

09:44   25  he received this check.  The matter with the County of Los

09:44  1    Angeles was complete when they signed the settlement
09:44  2    agreement and paid the $4 million, but defendant didn't tell
09:44  3    Mr. Johnson that the matter was complete.

09:44  4            In the defendant's own words, Geoffrey Johnson
09:44  5    needed the money to pay for his living expenses.  Defendant
09:44  6    paid none of the money, of that $4 million, to Geoffrey
09:45  7    Johnson.  By July 2015, within six months of the County of
09:45  8    Los Angeles paying $4 million, defendant had stolen and used
09:45  9    all of it on himself and his businesses and paid zero to
09:45  10   Geoffrey Johnson.

09:45  11           After the defendant stole Geoffrey Johnson's
09:45  12   money, defendant continued to lie to Geoffrey Johnson, so he
09:45  13   did not know what happened to the money or that there was
09:45  14   even a settlement.

09:45  15           For approximately four years defendant gave
09:45  16   Mr. Johnson small amounts of money, usually about $1,000 to
09:45  17   $1,900, periodically as defendant would call them advances
09:45  18   against future settlement money even though the settlement
09:45  19   money had already been paid.

09:46  20           Mr. Johnson hired the defendant hoping to have a
09:46  21   handicap-accessible home and van and money to pay his living
09:46  22   expenses, to make his life in a wheelchair easier.  And
09:46  23   despite a $4 million settlement, Geoffrey Johnson still had
09:46  24   none of these things.  Mr. Johnson had to constantly ask,
09:46  25   sometimes beg for money from the defendant for his living

44

09:46  1   expenses.

09:46  2        Defendant's office manager, Judy Regnier, did a

09:46  3   lot of things for defendant's firm and business, and she

09:46  4   will testify about the many things she did, including paying

09:46  5   money to Geoffrey Johnson, but everything that she did will

09:46  6   be at defendant's direction.

09:46  7        She will testify, as will others from the law

09:46  8   firm, that anything that happened at the law firm had to be

09:46  9   approved by the defendant, everything, including paying

09:47  10  Mr. Johnson his $1,000 to $1,900 payments.

09:47  11       Ms. Regnier deposited money, paid bills, sent

09:47  12  money to others, and what you will see and hear throughout

09:47  13  this trial is she didn't do any of those things without the

09:47  14  defendant saying who to pay, how much to pay, and what

09:47  15  account to pay it from.

09:47  16       Two years after the County of Los Angeles had

09:47  17  already paid the $4 million, Geoffrey Johnson wanted to buy

09:47  18  that handicap-accessible house using the proceeds from his

09:47  19  settlement that the defendant was telling him would soon be

09:47  20  arriving.

09:47  21       Defendant initially stated he will be able to buy

09:47  22  the house on an all-cash basis with the proceeds from the

09:47  23  settlement, even though those proceeds from the settlement

09:47  24  were long gone.  Defendant constantly delayed the house

09:48  25  purchase with excuse after excuse.  We're still waiting on

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:48    1    approvals from the County of Los Angeles.

09:48    2           And without even telling Geoffrey Johnson, then

09:48    3    the defendant tried to buy the house, filling out paperwork

09:48    4    to take out a loan, first in his name and then in Geoffrey

09:48    5    Johnson's name.  The home was never purchased.  Geoffrey

09:48    6    Johnson never got a house, and the defendant continued to

09:48    7    lie to him.

09:48    8           Defendant told him it's because the County, the

09:48    9    County of Los Angeles still hasn't approved things.  The

09:48   10    County of Los Angeles had nothing to do with it.  Their

09:48   11    matter with Geoffrey Johnson had concluded two and a half

09:48   12    years earlier.

09:48   13           On March 22nd, 2019, in a public hearing in which

09:48   14    defendant was testifying under oath, defendant was accused

09:49   15    of stealing Geoffrey Johnson's money.  Immediately after

09:49   16    being accused of stealing Geoffrey Johnson's money,

09:49   17    defendant went straight to Geoffrey Johnson's house in an

09:49   18    attempt to further lie and prevent Mr. Johnson from learning

09:49   19    what happened.

09:49   20           Defendant told him:  I've got some paperwork for

09:49   21    you.  The County of Los Angeles is finally going to pay your

09:49   22    money.  You just need to sign some new documents, new

09:49   23    documents that the defendant did not go over with Geoffrey

09:49   24    Johnson.  Defendant continued to lie to Geoffrey Johnson,

09:49   25    and Geoffrey Johnson still got none of his settlement money.

09:49  1          Alexis Gardner.  In December of 2016 Alexis
09:49  2   Gardner was essentially homeless, living in her car in Los
09:49  3   Angeles where she met the defendant.  She hired the
09:50  4   defendant, and the defendant promised her that he would help
09:50  5   her in her case against her former boyfriend, a professional
09:50  6   basketball player by the name of Hassan Whiteside.
09:50  7          Alexis Gardner trusted defendant, trusted him to
09:50  8   obtain the best outcome possible for her which, for her, she
09:50  9   was hoping to get a settlement that would help her pursue
09:50  10  her career.
09:50  11         The defendant set up a mediation, which you'll
09:50  12  hear is a manner in which parties can try and resolve their
09:50  13  case without going to a formal court case or formal
09:50  14  proceedings.  At that mediation defendant obtained a
09:50  15  $3 million settlement on behalf of Alexis Gardner with 2.75
09:50  16  million, $2,750,000 due that month, with an additional
09:50  17  $250,000 due at a later date.
09:51  18         The mediation lasted almost 15 hours, until about
09:51  19  midnight that night, and everybody just wanted to go home.
09:51  20  Defendant told Ms. Gardner:  Sign the last page, and I will
09:51  21  give you a copy later.  Defendant did not go over the
09:51  22  settlement agreement with his client.  Defendant did not
09:51  23  tell Ms. Gardner the true terms of the settlement agreement.
09:51  24         Defendant falsely told Ms. Gardner that the
09:51  25  settlement agreement called for her ex-boyfriend to pay

09:51    1    $16,000 a month for the next eight years.  Defendant never
09:51    2    provided Ms. Gardner with a copy of the real settlement
09:51    3    agreement with the real terms of the deal.
09:51    4            That month, pursuant to the real settlement
09:51    5    agreement, defendant received the $2.75 million into his
09:52    6    attorney/client trust account.  Immediately defendant
09:52    7    transferred $2.5 million to another attorney's client trust
09:52    8    account and instructed that attorney to wire that
09:52    9    $2.5 million to Honda Aircraft so the defendant could buy a
09:52    10   private plane.
09:52    11           Defendant used the remaining $250,000 for himself
09:52    12   and his businesses' expenses.  Of the $2.75 million
09:52    13   defendant received that month on behalf of Alexis Gardner,
09:52    14   defendant paid zero to Alexis Gardner.  Even though
09:52    15   defendant had a duty to tell Ms. Gardner the terms of her
09:52    16   settlement, had a duty to tell her he received the $2.75,
09:53    17   and had a duty to pay her her portion of the settlement
09:53    18   money, defendant did none of those things.
09:53    19           Defendant simply stole the entire $2.75 million
09:53    20   and used it on himself and his businesses and to buy a
09:53    21   private plane.  Over the next two years defendant continued
09:53    22   to lie to Alexis Gardner, telling her that Mr. Whiteside
09:53    23   needed to make these monthly payments.
09:53    24           Ms. Regnier at defendant's direction would deposit
09:53    25   money into Ms. Gardner's account directly to make it appear

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:53  1  as if Mr. Whiteside was making these payments and had made
09:53  2  these payments to prevent Ms. Gardner from knowing the true
09:53  3  terms and from knowing what the defendant had already done.
09:54  4          When defendant did not make these payments or did
09:54  5  not make them on time, defendant made Ms. Gardner believe it
09:54  6  was her ex-boyfriend who was missing his payments or not
09:54  7  fulfilling his obligations under the settlement agreement,
09:54  8  but Mr. Whiteside had fulfilled his obligation when he paid
09:54  9  the $2.75 directly into the defendant's trust account.
09:54  10          You will see and hear throughout this trial the
09:54  11  false statements that the defendant made to his clients
09:54  12  after the settlement moneys were already paid and how he
09:54  13  would prevent them from discovering what he had done.  Text
09:54  14  messages, for example, between Alexis Gardner and the
09:54  15  defendant will give you just some examples of these
09:54  16  communications.
09:54  17          In July 2018, a year and a half after the
09:55  18  settlement money came in, Ms. Gardner sends the defendant a
09:55  19  text message that says in part:  I have not received my
09:55  20  deposit.  Is there anything we can do about the time?  It
09:55  21  has become a pattern of them not sending it unless you reach
09:55  22  out.
09:55  23          Defendant replied:  Still?  Let me see, because
09:55  24  this is not right.  I'm on it.
09:55  25          In August of 2018, Ms. Gardner sends the defendant

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:55  1   a text:  Hi, Michael.  Just checking in.  I still haven't
09:55  2   received my deposit.  The defendant replied:  That's a
09:55  3   problem.  Let me find out what is happening.
09:55  4          September 2018:  Hi, Michael.  I wanted to follow
09:55  5   up on the deposits and let you know I haven't received
09:55  6   anything from them.  Defendant replies:  Question mark,
09:55  7   question mark, question mark, question mark.  I will find
09:55  8   out what the hell is going on.
09:55  9          Ms. Gardner will tell you when she is referring to
09:56  10  them, she is referring to her ex-boyfriend and his
09:56  11  management team that she believed were not making their
09:56  12  deposits based on the statements the defendant told her.
09:56  13  And the deposits are these monthly deposits that she
09:56  14  believed based on the false statements of the defendant were
09:56  15  Mr. Whiteside's obligation.
09:56  16          After the defendant stopped making the monthly
09:56  17  payments to Ms. Gardner entirely, defendant told Ms. Gardner
09:56  18  it was Mr. Whiteside not making the payments.  And she
09:56  19  believed him, that the reason she was getting no money was
09:56  20  that her ex-boyfriend was not fulfilling his obligations
09:56  21  under the agreement.
09:56  22          Based on this, Ms. Gardner would confide in the
09:56  23  defendant about the financial struggles and the financial
09:56  24  stresses she was under, and basically she was right back to
09:56  25  the same place she was in December 2016 when she met the

09:57   1   defendant.

09:57   2          Based on what defendant had told her, she believed

09:57   3   she was in that circumstance because her ex-boyfriend wasn't

09:57   4   making the payments.  Ms. Gardner's financial struggles and

09:57   5   financial problems were because the defendant did not pay

09:57   6   her her portion of the money that her ex-boyfriend did pay.

09:57   7          Gregory Barela.  Gregory Barela hired the

09:57   8   defendant to represent him in a case he had against another

09:57   9   company called BrockUSA.  Gregory Barela trusted the

09:57  10   defendant to represent him, to obtain the best possible

09:57  11   outcome for him, and to pay him any moneys he was due.

09:57  12          Defendant obtain a $1.9 million settlement on

09:57  13   behalf of Mr. Barela from BrockUSA.  The terms of the actual

09:57  14   settlement agreement called for Brock to pay Mr. Barela

09:58  15   $1.9 million with $1.6 million, $1,600,000, due on

09:58  16   January 10th of 2018, with $100,000 due on January 10th of

09:58  17   the next three years.  Defendant did not provide the actual

09:58  18   settlement agreement to Mr. Barela and did not tell

09:58  19   Mr. Barela about the true terms of the settlement agreement.

09:58  20          Instead, defendant provided and told Mr. Barela

09:58  21   about false terms.  He gave him a document that said that

09:58  22   the payment, the first with $1.6 million payment, would be

09:58  23   due on March 10th of 2018 and that the subsequent three

09:58  24   $100,000 payments would be due on March 10th of the next

09:58  25   three years.

09:59  1          In January of 2018, pursuant to the actual

09:59  2    settlement agreement, defendant received $1.6 million which

09:59  3    was deposited into his attorney/client trust account that he

09:59  4    set up.  Defendant paid none of the $1.6 million to Gregory

09:59  5    Barela.  Defendant did not tell Gregory Barela that he

09:59  6    received the $1.6 million and did not tell him that he had

09:59  7    already spent the $1.6 million.

09:59  8          Instead, defendant told Gregory Barela:  The money

09:59  9    is coming in March.  Charge up your credit cards, invest in

09:59  10   your new business.  You will be getting your money in March.

09:59  11         And in March, on March 10th, according to the

09:59  12   false statements defendant made, Gregory Barela started

09:59  13   asking:  Where is the settlement money?  The settlement

09:59  14   money in?  Defendant said:  Brock didn't pay.  When the

10:00  15   money did come in in January, defendant didn't pay Greg

10:00  16   Barela any money then.  And in March when defendant said the

10:00  17   money would be coming in, defendant still paid Gregory

10:00  18   Barela nothing.

10:00  19         By March of 2018 defendant had already spent and

10:00  20   used all but $600 of the $1.6 million intended for Gregory

10:00  21   Barela.  Mr. Barela sent countless texts and e-mail messages

10:00  22   to the defendant from March through November 2018 trying

10:00  23   desperately to find out whether his settlement money was

10:00  24   paid, whether Brock wired the money, whether Brock

10:00  25   transferred the money.  Did Brock finally pay?

10:00   1          Defendant constantly told Mr. Barela:  Brock
10:01   2   didn't pay.  Mr. Barela would constantly follow up with the
10:01   3   defendant:  Did you file anything to force them to pay our
10:01   4   money?  What did you file?  What was their response to the
10:01   5   filing?  At no point did defendant ever tell Mr. Barela:  I
10:01   6   received the $1.6 million.  I already spent the
10:01   7   $1.6 million.  There is none of the $1.6 million left.

10:01   8          Mr. Barela trusted the defendant and confided in
10:01   9   him about the extremely difficult financial situation he was
10:01  10   in by not having the settlement money he was counting on.
10:01  11   As a result, just like with Geoffrey Johnson, defendant
10:01  12   started giving some money to Gregory Barela which defendant
10:01  13   would refer to as advances against future payment of the
10:02  14   settlement money to help Mr. Barela out with his financial
10:02  15   problems.

10:02  16          The financial problems and struggles Mr. Barela
10:02  17   was facing was not because Brock did not pay, as the
10:02  18   defendant said.  The financial struggles were because the
10:02  19   defendant did not pay Mr. Barela his portion of the money
10:02  20   that Brock did pay.

10:02  21          Michelle Phan.  Michelle Phan was one of the
10:02  22   original social media influencers providing makeup and
10:02  23   beauty tutorials to her over eight million followers on
10:02  24   YouTube.  She is also the founder if Ipsy, a makeup
10:02  25   subscription service.

| | | |
|---|---|---|
| 10:02 | 1 | In 2017 Michelle Phan wanted to leave Ipsy, and |
| 10:02 | 2 | she and her business manager, Long Tran, hired the defendant |
| 10:02 | 3 | to help them negotiate with Ipsy to have Ipsy buy out her |
| 10:03 | 4 | ownership interest.  Ms. Phan and Mr. Tran trusted the |
| 10:03 | 5 | defendant, trusted the defendant to get the best outcome |
| 10:03 | 6 | possible for her and to pay her any moneys that were due to |
| 10:03 | 7 | her. |
| 10:03 | 8 | Defendant obtained a settlement agreement.  What |
| 10:03 | 9 | you will hear is called a common stock repurchase agreement |
| 10:03 | 10 | whereby Ipsy agreed to buy back her shares of stock, her |
| 10:03 | 11 | ownership in the company, for over $35 million, with the |
| 10:03 | 12 | first payment of over $27 million and a subsequent payment |
| 10:03 | 13 | for over $8 million. |
| 10:03 | 14 | Ipsy sent the initial payment owed under the |
| 10:03 | 15 | settlement agreement to the defendant's attorney/client |
| 10:03 | 16 | trust account as defendant directed.  When defendant |
| 10:03 | 17 | received -- let me back up for one second. |
| 10:03 | 18 | When defendant negotiated the deal on behalf of |
| 10:04 | 19 | Ms. Phan, defendant also negotiated a repurchase agreement, |
| 10:04 | 20 | a buyout of her manager Long Tran, her business manager, |
| 10:04 | 21 | Long Tran, as well as Ms. Phan's sister-in-law. |
| 10:04 | 22 | When the defendant received the initial payments |
| 10:04 | 23 | from Ipsy for all three of these individuals, defendant took |
| 10:04 | 24 | his entire fee, $2.8 million, from the transaction out of |
| 10:04 | 25 | the initial payment, which was fee covering both all money |

that was coming at the initial payments as well as future
payments that would be done under the agreement.

Because defendant had already taken his full fees
on the agreement on the initial payments, he was entitled to
no further money when subsequent payments came in.  In
March 2018, Ipsy decided to make the second payment early,
and defendant instructed that the money be deposited into
his attorney/client trust account again.

Long Tran, Ms. Phan's business manager, instructed
the defendant on how to forward the money, all of the money,
to Ms. Phan and Mr. Tran as obligated.  Unlike Mr. Johnson,
Mr. Gardner, and Mr. Barela, defendant provided the actual
settlement agreement and the actual terms of the settlement
agreement to Ms. Phan and Long Tran and paid them their
money properly with the initial payment.  But when time came
for the subsequent payment in March of 2018 that was due to
Ms. Phan and Mr. Tran, defendant engaged in the same scheme
to steal his clients' money and lie to his clients as he had
done with the previous three clients I have already
mentioned.

On March 14th, 2018, defendant received in his
attorney/client trust account the money for Long Tran and
Ms. Phan.  Defendant told Long Tran and Ms. Phan he would be
wiring and transferring their money to them, the full
amount.  But at that time, in March of 2018, defendant's law

10:06  1    firm was in bankruptcy, and defendant wanted to get out of

10:06  2    bankruptcy.

10:06  3            Instead of paying Long Tran and Michelle Phan the

10:06  4    money that they were owed and he told them he would pay

10:06  5    them, defendant immediately stole the next day $3 million of

10:07  6    Michelle Phan's money to pay his creditors, including the

10:07  7    IRS, the Internal Revenue Service, to be able to get his law

10:07  8    firm out of bankruptcy.

10:07  9            For more than a month defendant provided countless

10:07  10   excuses, lies to Michelle Phan and Long Tran about why

10:07  11   defendant had not transferred them their money.  At no point

10:07  12   did he tell either of them that he had already spent three

10:07  13   to four million dollars of Michelle Phan's money.

10:07  14           Defendant even met Michelle Phan at a party she

10:07  15   was hosting and went to lunch with her and provided her more

10:07  16   lies on why he didn't give her her money, but at no point

10:07  17   did he tell Michelle Phan:  I have already spent almost half

10:07  18   of your money.

10:07  19           A month and a half after defendant received

10:08  20   Michelle Phan's money, defendant made two wire transfers --

10:08  21   one for approximately $146,000 and one for $4 million, but

10:08  22   defendant made Michelle Phan and Long Tran believe he made

10:08  23   three wire transfers, two $4 million wire transfers and the

10:08  24   $146,000 wire transfer.

10:08  25           Michelle Phan only received $4,146,000

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

10:08  1    approximately into her account, and Long Tran was

10:08  2    frantically trying to find where that remaining $4 million

10:08  3    was of Michelle Phan's money, because defendant was saying

10:08  4    he transferred the full amount in two $4 million wire

10:08  5    transfers.  There was no second $4 million wire transfer.

10:08  6          The defendant continued to lie to them and tell

10:08  7    them there were two when he only transferred $4,146,000

10:08  8    rather than $8,146,000.  Defendant had stolen and used for

10:09  9    himself $4 million of Michelle Phan's money on himself and

10:09  10   his businesses, including to pay his creditors to get out of

10:09  11   bankruptcy.

10:09  12         He also used Michelle Phan's money to make

10:09  13   payments to Geoffrey Johnson, Alexis Gardner, and Gregory

10:09  14   Barela to prevent them from knowing what he had done with

10:09  15   their money.  You will hear as it relates to Geoffrey

10:09  16   Johnson, Alexis Gardner, Gregory Barela, and Michelle Phan

10:09  17   that other lawyers in defendant's firm oftentimes were

10:09  18   involved in the cases prior to it reaching settlement.

10:09  19         But by the time the cases were getting towards

10:09  20   settlement, defendant insisted that only he be involved in

10:10  21   the settlement negotiations, that only he be involved in the

10:10  22   settlement payments, only he be the one to talk to the

10:10  23   clients about the settlement, and only he be the one who

10:10  24   interacts with the clients after the settlement moneys were

10:10  25   paid.

10:10   1          Lawyers representing the County of Los Angeles,
10:10   2   Hassan Whiteside, and BrockUSA will testify about the true
10:10   3   terms of the agreements and the payments that were made
10:10   4   under the agreements.  They will also say how persistent the
10:10   5   defendant was to get paid under those agreements.
10:10   6          The bank records and the financial transactions in
10:10   7   this case will show you where the money went -- to defendant
10:10   8   and to pay defendant's expenses for himself and his
10:10   9   businesses, and where the money did not go, to defendant's
10:10  10   clients.
10:11  11          Geoffrey Johnson, Alexis Gardner, Gregory Barela,
10:11  12   and Michelle Phan all believed that defendant did a great
10:11  13   job for them, obtaining excellent settlement agreements on
10:11  14   their behalf.  They trusted that the defendant would be
10:11  15   truthful with them, truthful about their settlement
10:11  16   agreements, truthful about his receipt of the money, and
10:11  17   truthful about paying them their money.
10:11  18          Defendant violated his clients' trust that they
10:11  19   placed in him.  Defendant lied and stole from each of his
10:11  20   clients.
10:11  21          Ladies and gentlemen, at the end of this case, the
10:11  22   evidence will conclusively show that the defendant knowingly
10:11  23   defrauded his clients by making false statements and
10:11  24   representations to his clients in omitting and concealing
10:12  25   material information from his clients.

```
10:12   1          And at the end of this case, Mr. Wyman and I will
10:12   2    have another opportunity to talk to you again and go over
10:12   3    all the evidence and the testimony that came in in this
10:12   4    case.  And at the end of the case, the evidence, all the
10:12   5    evidence, will point to one conclusion, that the defendant
10:12   6    is guilty of all the counts charged in this case.
10:12   7          Thank you.
10:12   8          THE COURT:  Thank you, Mr. Sagel.
10:12   9          Ladies and gentlemen, we will take about a
10:12  10    ten-minute break here.  Please remember the admonition not
10:12  11    to discuss the case with anyone and not to form any opinions
10:12  12    on the issues in the case until it is submitted to you.  I
10:12  13    also admonish you again not to do any research about this
10:12  14    case.
10:12  15          So we will be in recess for ten minutes.
10:12  16          (Jury not present)
10:13  17          THE COURT:  When I read the initial jury
10:13  18    instructions, I neglected to read Instruction 15, the COVID
10:13  19    instruction.
10:13  20          Mr. Avenatti, I understand you wanted to make a
10:13  21    motion for mistrial and other relief at the end of your
10:13  22    opening statement.  Any motion you wish to make will be
10:13  23    deemed made at that time, and we will take your motion up at
10:13  24    the next break or the lunch break.
10:13  25          MR. AVENATTI:  I'm sorry, Your Honor.  I
```

| | | |
|---|---|---|
| 10:13 | 1 | misunderstood, and I apologize. |
| 10:13 | 2 | THE COURT:  You indicated at the end of your |
| 10:13 | 3 | opening statement you wanted to make a motion for mistrial |
| 10:14 | 4 | or for other relief? |
| 10:14 | 5 | MR. AVENATTI:  Yes, sir. |
| 10:14 | 6 | THE COURT:  Any motion that you will have made |
| 10:14 | 7 | then will be deemed made at that time, and we will take up |
| 10:14 | 8 | your motion at the next break or at the lunch break. |
| 10:14 | 9 | MR. AVENATTI:  Okay.  Just for the record, can I |
| 10:14 | 10 | make the motion now and we can take it up later since he has |
| 10:14 | 11 | already given his opening statement? |
| 10:14 | 12 | THE COURT:  We are on a ten-minute break.  We will |
| 10:14 | 13 | take it up later. |
| 10:14 | 14 | MR. AVENATTI:  Thank you. |
| 10:14 | 15 | THE COURT:  If you wish, it will be deemed having |
| 10:14 | 16 | been made at the end of the government's opening statement. |
| 10:14 | 17 | MR. AVENATTI:  Thank you, sir. |
| 10:14 | 18 | (Recess taken at 10:14 a.m.; |
| 10:14 | 19 | proceedings resumed at 10:29 a.m.) |
| 10:14 | 20 | (Jury present) |
| 10:29 | 21 | THE COURT:  Mr. Avenatti, would you like to |
| 10:29 | 22 | address the jury? |
| 10:29 | 23 | MR. AVENATTI:  I would, Your Honor.  Thank you. |
| 10:29 | 24 | Good morning.  A few days ago Mr. Sagel and |
| 10:29 | 25 | Mr. Wyman introduced themselves to you, and they told you |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

10:30   1    that they represented the United States of America.  Ladies

10:30   2    and gentlemen, for over 20 years I, too, have represented

10:30   3    the United States of America, and I have done it one citizen

10:30   4    at a time.

10:30   5          Let me be clear.  No crime was committed by me,

10:30   6    and I never intended to steal or defraud any client of any

10:30   7    money at all, not last week, not last month, not last year,

10:31   8    never.  I have pled not guilty for one reason:  Because I am

10:31   9    not guilty.

10:31   10         Let's start with Geoffrey Johnson.

10:31   11         THE COURT:  Sir, you're not going to put this in

10:31   12   the well.

10:31   13         MR. AVENATTI:  Your Honor.  I'm sorry.  We asked

10:31   14   your staff and --

10:31   15         THE COURT:  Apparently there was a

10:31   16   misunderstanding.  You're not going to put it in the well.

10:31   17         MR. AVENATTI:  Where would you like it?

10:31   18         THE COURT:  Right over there.

10:32   19         MR. AVENATTI:  Is that acceptable, Your Honor?

10:32   20         THE COURT:  That's fine.

10:32   21         MR. AVENATTI:  March 31st, 2019, the evidence will

10:32   22   show that on that date, over two years ago, Mr. Johnson met

10:32   23   with the government.  A gentleman by the name of Julian

10:33   24   Andre, a colleague of Mr. Sagel's, also an assistant U.S.

10:33   25   attorney, was present.

10:33  1        Mr. James Kim, the gentleman seated here in the
10:33  2   back row on the end in the black tie, he was also present.
10:33  3   He is a special agent with the United States government.
10:33  4   And a gentleman by the name of Jerry Komona, he, too, is a
10:33  5   special agent with the United States government.
10:33  6        On this date over two years ago, the evidence will
10:33  7   show that Geoffrey Johnson told the agents and the assistant
10:34  8   U.S. attorney that he signed the $4 million settlement
10:34  9   agreement.  And he also told the agents and the U.S.
10:34  10  attorney that not only had he signed it, but it had been
10:34  11  brought to him by me.
10:34  12       And they told him that I had brought the
10:34  13  $4 million settlement agreement to him to sign while he was
10:34  14  at a location called Sunrise of West Hills.  And the
10:35  15  evidence will show that Mr. Johnson was living at Sunrise of
10:35  16  West Hills because he needed medical care because of his
10:35  17  condition.  And the evidence will show that my firm and me
10:35  18  paid for all of that care for a very, very long time.
10:35  19       Ladies and gentlemen of the jury, it is said that
10:35  20  every trial is a fight for credibility, and this trial will
10:35  21  be no different.
10:35  22       MR. SAGEL:  Objection, Your Honor.
10:35  23       THE COURT:  Overruled.
10:35  24       MR. AVENATTI:  March 31st, 2019.  Please remember
10:36  25  that date.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

10:36   1          Mr. Sagel just told you at least twice, if not

10:36   2    three times, that I stole the entirety of Mr. Johnson's

10:36   3    $4 million settlement.  The evidence will show that that,

10:36   4    like this, is completely false.

10:36   5          Alexis Gardner.  Mr. Sagel told you that when she

10:37   6    came to know me, she was homeless.  The evidence will show

10:37   7    that that is true.  She was living in her car.  The evidence

10:37   8    will show that the night before she met me was the last

10:37   9    night she lived in her car.

10:37   10         She had been parking behind a supermarket in West

10:37   11   Hollywood hoping that the security officers would not knock

10:37   12   on her window in the middle of the night and tell her to

10:37   13   leave.  The evidence will show that as soon as she informed

10:37   14   me of this, sitting at a Starbucks in West Hollywood, I was

10:38   15   horrified.

10:38   16         The evidence will show that my firm and me

10:38   17   immediately made sure that she had a place to lay her head

10:38   18   at night, and that's exactly what we did.  And the evidence

10:38   19   will show that for Ms. Gardner, like for Mr. Johnson and

10:38   20   Mr. Barela and many, many others, we took money out of our

10:38   21   own pocket to assist them with their lives and with their

10:38   22   cases.

10:39   23         The evidence will show that the government does

10:39   24   not want to focus on any of those points.

10:39   25         Gregory Barela.  The evidence will show that

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 10:39 | 1 | Mr. Barela requested that me and my firm do quite a lot of |
| 10:39 | 2 | work for him on a number of different matters, and we were |
| 10:39 | 3 | entitled to be paid for that work. |
| 10:39 | 4 | You will hear evidence of Mr. Barela's significant |
| 10:39 | 5 | criminal record, including associated with defrauding |
| 10:40 | 6 | people, and you will hear evidence of Mr. Barela fabricating |
| 10:40 | 7 | calls and meetings that he claims happened that never |
| 10:40 | 8 | happened. |
| 10:40 | 9 | Ladies and gentlemen, this case didn't start with |
| 10:40 | 10 | a crime.  It started with a target. |
| 10:40 | 11 | THE COURT:  Mr. Avenatti, tell the jury what |
| 10:40 | 12 | you're going to do. |
| 10:40 | 13 | MR. AVENATTI:  And the evidence will show that. |
| 10:40 | 14 | The evidence will show that my family has a long history in |
| 10:40 | 15 | Southern California, over a hundred years when my ancestors |
| 10:41 | 16 | emigrated from Italy in the hope of a better life.  I grew |
| 10:41 | 17 | up in Utah. |
| 10:41 | 18 | MR. SAGEL:  Objection, Your Honor. |
| 10:41 | 19 | THE COURT:  Sustained.  Move on. |
| 10:41 | 20 | MR. AVENATTI:  After graduating law school, I |
| 10:41 | 21 | became a licensed member of the State Bar of California.  I |
| 10:41 | 22 | worked at two other law firms before forming my own firm |
| 10:41 | 23 | called Eagan O'Malley & Avenatti, LLC, in approximately |
| 10:41 | 24 | 2007.  That firm later became known as Eagan Avenatti, LLP. |
| 10:41 | 25 | And the evidence will show that during the |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

10:42  1    relevant time period, for all intents and purposes I owned
10:42  2    100 percent of the firm.  So what did the firm do?  Did the
10:42  3    firm represent big corporations or the federal government?
10:42  4    No.  Did we generally get paid by the hour where we would
10:42  5    send our bills or send our clients a bill every month for
10:42  6    the work we performed and expect to get a thousand dollars
10:42  7    an hour?  Absolutely not.
10:42  8         We represented thousands of the little guys.  We
10:43  9    represented the Davids versus the Goliaths.  We did it
10:43  10   across the country, and the evidence will show we were
10:43  11   blessed to do it very well.
10:43  12        We gave people who had no chance a fighting
10:43  13   chance.  We did it by doing exactly what I am doing right
10:43  14   now but in a civil context, in civil cases.
10:43  15        Now, how did we generally get paid?  We got paid
10:43  16   on what's called a contingency fee basis.  What that means
10:44  17   is you get a percentage of what you recover by way of a
10:44  18   judgment or a settlement.  You do all your work on the come.
10:44  19   You do all the work with the hope that if you do a good job,
10:44  20   you will get a good settlement or a good judgment.  And our
10:44  21   agreements with our clients provided that we were to get
10:44  22   paid based on what we recovered.
10:44  23        And not only did we expend our time, in some cases
10:45  24   thousands of hours, thousands, but we also took money from
10:45  25   our own pocket to pay the expenses along the way, to pay for

10:45   1   Mr. Johnson's medical care, which was extremely expensive.
10:45   2   You will hear evidence about that.  To pay for Ms. Gardner's
10:45   3   living arrangements and so she could eat and be comfortable
10:45   4   while we worked on her case.
10:45   5         We generally asked for nothing, nothing from our
10:46   6   clients up front, not a penny.  We, I, bore all the risk.
10:46   7   What do I mean by that?  What I mean is if the case went
10:46   8   south and there was no recovery, the client would be out
10:46   9   nothing.  We, I, would be out hundreds of thousands and in
10:46   10  some cases millions of dollars.
10:46   11        And that's separate and apart from the time that
10:47   12  would be expended along the way not just by me but by other
10:47   13  attorneys who worked with me, by our staff, and by others.
10:47   14  In many cases we were attempting to make chicken salad out
10:47   15  of chicken scratch.  We took cases that no one else would
10:47   16  touch because they were too risky.  But if we prevailed and
10:48   17  we were able to get a recovery, we were entitled to be paid.
10:48   18  We were entitled to be paid our percentage.  We were
10:48   19  entitled to be reimbursed our costs, our expenses out of
10:48   20  pocket.
10:48   21        Now, what do I mean when I say costs?  Ladies and
10:48   22  gentlemen, the evidence will show that when you litigate
10:48   23  cases of this complexity, of this magnitude, of this
10:48   24  duration, in order to stay in the game, in order to keep the
10:48   25  case going, in order to give your client that fighting

10:48  1    chance, you have to spend money.  You have to hire experts.

10:49  2    Experts sometimes cost hundreds of thousands if not millions

10:49  3    of dollars, as absurd as that may seem.

10:49  4            In fact, in this case you're going to hear from an

10:49  5    expert that the government hired, John Drum.  And we're

10:49  6    going to get to Mr. Drum's anticipated testimony in a

10:49  7    minute.  But you're going to hear that the government,

10:49  8    despite its vast resources and countless agents and

10:49  9    countless resources around the country, they have paid

10:49  10   Mr. Drum over $550,000 for his financial analysis.  And

10:50  11   that's just in connection with this case.

10:50  12           There's travel expenses.  There's what's called

10:50  13   transcript expenses where if somebody is deposed, which is

10:50  14   when someone raises their right hand -- it's usually not in

10:50  15   a courtroom.  It's in a conference room and you take

10:50  16   testimony.  You have a court reporter much like the court

10:50  17   reporter here today, and he or she will take down what is

10:50  18   said.

10:50  19           You gotta get a copy of that transcript for your

10:50  20   case.  And they don't work for free, nor would we ever ask

10:50  21   them to.  But somebody has got to pay for that, and the

10:50  22   evidence will show it's very extremely expensive.

10:51  23           There are filing fees.  There are research costs.

10:51  24   There are outside consultants.  And the evidence will show

10:51  25   that while a lot of firms would charge their clients for

10:51   1   things like photocopies, 25 cents for a photocopy, or a
10:51   2   phone call at a ridiculous rate so they could make money at
10:51   3   it, me and my firm, we never did any of that.
10:51   4           The evidence will show that I commonly referred to
10:51   5   that as like going to the car wash and they charge you for
10:51   6   water.  And if we successfully settle the matter for someone
10:52   7   such as Mr. Johnson, Mr. Barela, Ms. Gardner, Mr. Tran,
10:52   8   Ms. Phan, we were also entitled to be reimbursed for any
10:52   9   money that we had advanced directly to the clients in
10:52   10  anticipation that we might recover some money for them years
10:52   11  later.
10:52   12          We were entitled to get that money back.  And the
10:52   13  evidence will show that in some instances we advanced
10:52   14  enormous amounts of money to these clients.  So how did all
10:52   15  of this work?
10:52   16          Ladies and gentlemen of the jury, not only am I
10:53   17  going to refer back quite a bit to this March 31st date
10:53   18  during the trial, but you are going to get tired of seeing
10:53   19  me refer to this sheet that I just wrote at the top,
10:53   20  calculation, because this is what this case is all about.
10:53   21          It's about math, which I know is very
10:53   22  disappointing for many of us in this room, but this case is
10:54   23  about math.  What do I mean by that?  This case is about how
10:54   24  you calculate what a client is due after their settlement is
10:54   25  received.

10:54   1          And the evidence will show that you calculate that

10:54   2     in the following manner.  First, you have the settlement

10:54   3     amount.  I don't expect there to be a lot of controversy in

10:54   4     this case about what that amount is for each of these

10:55   5     clients.

10:55   6          I expect that the government will focus a lot of

10:55   7     your attention on number one, the settlement amount.  But

10:55   8     that's not the end of the story.  What gets deducted from

10:55   9     the settlement amount?  One thing that gets deducted are the

10:55   10    attorney's fees, the percentage of fees due my firm and me.

10:56   11         Two other things that get deducted are

10:56   12    out-of-pocket expenses associated with the case -- I touched

10:56   13    on those earlier -- as well as moneys advanced for the

10:56   14    clients.

10:57   15         The other things that get deducted from the

10:57   16    settlement amount are interest, if we choose to charge it,

10:57   17    at a reasonable rate, not a ridiculous rate, and fees for

10:57   18    any other work that we did outside the scope of our original

10:57   19    agreement, meaning if we are retained and the client wants

10:57   20    us to do X and during the course of the years we represent

10:57   21    him or her and the client says, hey, can you do Y, and Y

10:58   22    turns out to be quite a lot of extensive work, we are

10:58   23    entitled to be compensated for that work.

10:58   24         The evidence will show there is nothing illegal

10:58   25    about that.  It's not a crime.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

```
10:58    1              And what does this calculation result in?  It
10:58    2    results in number seven, the net amount paid to the client.
10:58    3    Now, the government spent a lot of time in its opening
10:59    4    talking about number one and number seven.  We're going to
10:59    5    spend a lot of time in this case talking about one through
10:59    6    seven because that is the only way that you can determine
10:59    7    whether I am guilty of anything.
10:59    8              It is the government's burden to prove, ladies and
10:59    9    gentlemen, each and every one of these items to the dollar.
10:59   10    This is a criminal case, a serious one.  This isn't a civil
10:59   11    case.  It's not a State Bar proceeding.  Close is not good
11:00   12    enough.  To the dollar, ladies and gentlemen.  And the
11:00   13    evidence will show that despite working on this case for
11:00   14    well over two years, despite all of the resources and agents
11:00   15    of the federal government, they still don't have the numbers
11:00   16    right.  It doesn't add up.
11:00   17              So what did they do?  They went out and they hired
11:00   18    a gentleman by the name of John Drum.  I referenced him
11:00   19    moments ago.  They paid him over a half a million dollars to
11:01   20    get it right.  They paid him to get it exactly right, to the
11:01   21    dollar, not an estimate, not, well, maybe it's in the
11:01   22    ballpark, not a guesstimate.  They paid him to get it right,
11:01   23    and the evidence will show that he failed.
11:01   24              We will show in this case that Mr. Drum's work,
11:01   25    much like the government's investigation and prosecution of
```

| | |
|---|---|
| 11:01 | 1 |
| 11:02 | 2 |
| 11:02 | 3 |
| 11:02 | 4 |
| 11:02 | 5 |
| 11:02 | 6 |

11:01  1   me, has been plagued by sloppiness and a lack of detail.  We

11:02  2   will show that it is smoke and mirrors.  And when we show

11:02  3   that Mr. Drum's math doesn't check out, it doesn't pencil,

11:02  4   as they say, it will require an acquittal, a finding of not

11:02  5   guilty, because this is not a civil case or a State Bar

11:02  6   proceeding.  This is a serious criminal matter.

11:03  7           I want to thank you in advance for your attention

11:03  8   to detail, for holding the government to their burden, to

11:03  9   pay attention to details like the date of March 31st, 2019,

11:03 10   to pay attention to the details relating to items one

11:03 11   through seven, not just one and seven, because details

11:03 12   matter.  They have to matter.  They must matter in the

11:03 13   United States of America in a criminal proceeding.

11:04 14           Ladies and gentlemen, at the end of this case, I

11:04 15   will rise before you again.  We will go back to these charts

11:04 16   among many other things, and I will ask you to find me not

11:04 17   guilty because that is exactly what I am.

11:04 18           Thank you.

11:04 19           THE COURT:  Thank you, Mr. Avenatti.

11:04 20           Ladies and gentlemen, I failed to read one

11:04 21   instruction, the COVID instruction.  So let me do that now.

11:04 22           I have some additional instructions concerning the

11:04 23   COVID-19 pandemic and the steps we will be taking to keep

11:04 24   all of us safe and healthy.  Individuals who are fully

11:04 25   vaccinated at their option may choose to wear or not wear a

11:04  1    mask.

11:04  2              Individuals who are not vaccinated must wear a

11:04  3    mask at all times.  The removal of the mask will be required

11:05  4    for testifying witnesses, jurors while being questioned

11:05  5    individually, and in-court identifications as permitted by

11:05  6    the judge.

11:05  7              A masked individual who is permitted to remove or

11:05  8    lower his or her mask will be required to wear a face shield

11:05  9    and/or speak behind a plexiglass barrier to maintain

11:05 10    appropriate physical distancing while the individual is not

11:05 11    wearing a mask.

11:05 12              Do not concern yourself with the reasons why a

11:05 13    participant may or may not have worn a mask or face shield.

11:05 14    You should not draw any conclusions or be influenced in any

11:05 15    manner based solely on whether someone wears a mask or face

11:05 16    shield during the trial.

11:05 17              I order that in-court proceedings be conducted in

11:05 18    this manner and a manner that allows for all participants to

11:05 19    practice social distancing.  An exception may be permitted

11:05 20    for counsel who choose not to physically distance from each

11:05 21    other or their clients.

11:05 22              Throughout this trial please immediately notify

11:06 23    the Court of any change in your health and the health of

11:06 24    those you live with or have had close contact with.  Do not

11:06 25    report to the courthouse if you have developed symptoms

| | | |
|---|---|---|
| 11:06 | 1 | associated with COVID-19, have reason to believe that you |
| 11:06 | 2 | have COVID-19, have taken a COVID-19 test and are awaiting |
| 11:06 | 3 | results, or have learned that you have had close contact |
| 11:06 | 4 | with anyone who has been suspected or diagnosed with |
| 11:06 | 5 | COVID-19 within the last 14 days. |
| 11:06 | 6 | Instead immediately contact the courtroom deputy |
| 11:06 | 7 | at the number that has been provided to you who will |
| 11:06 | 8 | determine whether it is safe for you to report to the |
| 11:06 | 9 | courthouse.  If you have any questions about COVID-19 or any |
| 11:06 | 10 | of the procedures, please send me a note by giving it to the |
| 11:06 | 11 | courtroom deputy.  I want us all to stay safe and healthy. |
| 11:06 | 12 | Thank you for your understanding and cooperation. |
| 11:06 | 13 | Would the government call its first witness, |
| 11:07 | 14 | please. |
| 11:07 | 15 | MR. WYMAN:  Yes, Your Honor. |
| 11:07 | 16 | The United States calls Patrick McNicholas. |
| 11:07 | 17 | PATRICK MCNICHOLAS, GOVERNMENT'S WITNESS, SWORN |
| 11:07 | 18 | THE CLERK:  If you will be seated, please. |
| 11:07 | 19 | If you will please state and spell your first and |
| 11:07 | 20 | last name. |
| 11:07 | 21 | THE WITNESS:  Patrick McNicholas, |
| 11:07 | 22 | M-c-N-i-c-h-o-l-a-s. |
| 11:07 | 23 | THE CLERK:  And the first name, please. |
| 11:07 | 24 | THE WITNESS:  Patrick, traditional spelling. |
| 11:08 | 25 | THE CLERK:  P-a-t-r-i-c-k? |

73

| | | |
|---|---|---|
| 11:08 | 1 | THE WITNESS:  Correct. |
| 11:08 | 2 | THE COURT:  Mr. Wyman. |
| 11:08 | 3 | MR. WYMAN:  Thank you, Your Honor. |
| 11:08 | 4 | DIRECT EXAMINATION |
| 11:08 | 5 | BY MR. WYMAN: |
| 11:08 | 6 | Q    Good morning, Mr. McNicholas. |
| 11:08 | 7 | A    Good morning. |
| 11:08 | 8 | Q    What do you do for a living? |
| 11:08 | 9 | A    I am a trial lawyer. |
| 11:08 | 10 | Q    And what kind of cases do you take? |
| 11:08 | 11 | A    They're all contingency cases normally on behalf of |
| 11:08 | 12 | consumers suing entities. |
| 11:08 | 13 | Q    So is that all civil litigation? |
| 11:08 | 14 | A    Yes. |
| 11:08 | 15 | Q    What is the name of your law firm? |
| 11:08 | 16 | A    McNicholas & McNicholas. |
| 11:08 | 17 | Q    Do you typically represent one side or the other in |
| 11:08 | 18 | those cases that you mentioned? |
| 11:08 | 19 | A    Yes.  It's almost always the plaintiff. |
| 11:08 | 20 | Q    And what does that mean, to represent the plaintiff? |
| 11:08 | 21 | A    The plaintiff is the person that is bringing the case. |
| 11:08 | 22 | Q    Do you practice law here in California? |
| 11:08 | 23 | A    I do, yes. |
| 11:08 | 24 | Q    So are you a member of the State Bar of California? |
| 11:08 | 25 | A    I am. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 11:08 | 1 | Q    As a member of the State Bar, are you generally |
| 11:08 | 2 | familiar with the California Rules of Professional Conduct? |
| 11:08 | 3 | A    Yes. |
| 11:09 | 4 | Q    Do you and your law firm ever work with other firms as |
| 11:09 | 5 | co-counsel on cases? |
| 11:09 | 6 | A    We do, yes. |
| 11:09 | 7 | Q    Have you ever worked with the law firm Eagan Avenatti? |
| 11:09 | 8 | A    We have, yes. |
| 11:09 | 9 | Q    Did you work with Eagan Avenatti on a case involving a |
| 11:09 | 10 | client named Geoffrey Johnson? |
| 11:09 | 11 | A    Yes, we did. |
| 11:09 | 12 | Q    Who was the lead trial attorney from Eagan Avenatti on |
| 11:09 | 13 | that? |
| 11:09 | 14 | A    Michael Avenatti. |
| 11:09 | 15 | Q    Do you see that Michael Avenatti here in court today? |
| 11:09 | 16 | A    I do. |
| 11:09 | 17 | Q    Can you please identify him for the record by where he |
| 11:09 | 18 | is sitting or standing and an article of clothing he is |
| 11:09 | 19 | wearing. |
| 11:09 | 20 | A    He is the gentleman that is now standing in a blue suit |
| 11:09 | 21 | with a striped blue tie. |
| 11:09 | 22 |        THE COURT:  The record will indicate that the |
| 11:09 | 23 | witness has identified the defendant. |
| 11:09 | 24 |        (Defendant Avenatti identified) |
| 11:09 | 25 |        MR. WYMAN:  Thank you, Your Honor. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

75

| | | |
|---|---|---|
| 11:09 | 1 | BY MR. WYMAN: |
| 11:09 | 2 | Q   Now, approximately when did you begin working on |
| 11:09 | 3 | Mr. Johnson's case with the defendant? |
| 11:09 | 4 | A   I think we were brought into the case in the first |
| 11:10 | 5 | quarter of 2014. |
| 11:10 | 6 | Q   Okay.  I want to show you a document.  There is a bunch |
| 11:10 | 7 | of binders behind you.  If you could pull the binder labeled |
| 11:10 | 8 | Volume 1.  It should have Exhibits 1 through 100. |
| 11:10 | 9 | A   (Witness complies.)  All right.  I have that in front |
| 11:10 | 10 | of me. |
| 11:10 | 11 | Q   If you could please take a look at Exhibit 12. |
| 11:10 | 12 | A   (Witness complies.)  I have that in front of me. |
| 11:10 | 13 | Q   Do you recognize Exhibit 12? |
| 11:10 | 14 | A   I do. |
| 11:10 | 15 | Q   What is it? |
| 11:10 | 16 | A   This is a document from my office from the Johnson file |
| 11:11 | 17 | entitled new case data sheet. |
| 11:11 | 18 | Q   Was this a document that your office created? |
| 11:11 | 19 | A   Yes. |
| 11:11 | 20 | Q   In connection with the Johnson case? |
| 11:11 | 21 | A   Yes. |
| 11:11 | 22 | Q   And is this a fair and accurate copy of that document |
| 11:11 | 23 | that your office created? |
| 11:11 | 24 |           MR. AVENATTI:  Leading. |
| 11:11 | 25 |           THE COURT:  I'm sorry? |

| | | |
|---|---|---|
| 11:11 | 1 | MR. AVENATTI:  Leading, Your Honor. |
| 11:11 | 2 | THE COURT:  Overruled. |
| 11:11 | 3 | THE WITNESS:  It is, yes. |
| 11:11 | 4 | MR. WYMAN:  Your Honor, the government moves to |
| 11:11 | 5 | admit Exhibit 12. |
| 11:11 | 6 | MR. AVENATTI:  Objection, Your Honor.  Hearsay. |
| 11:11 | 7 | THE COURT:  Mr. Wyman. |
| 11:11 | 8 | MR. WYMAN:  I'm sorry, Your Honor.  There are no |
| 11:11 | 9 | statements offered for the truth, Your Honor. |
| 11:11 | 10 | THE COURT:  What is it being offered for? |
| 11:11 | 11 | MR. WYMAN:  For context, Your Honor.  This is a |
| 11:11 | 12 | document that his office created for this case. |
| 11:11 | 13 | THE COURT:  Overruled.  Exhibit 12 will be |
| 11:11 | 14 | received. |
| 11:11 | 15 | MR. WYMAN:  Thank you, Your Honor. |
| 11:12 | 16 | (Exhibit 12 received in evidence) |
| 11:12 | 17 | MR. WYMAN:  Permission to publish? |
| 11:12 | 18 | THE COURT:  You may.  Anytime an exhibit is in |
| 11:12 | 19 | evidence, you may publish it without permission of the |
| 11:12 | 20 | Court. |
| 11:12 | 21 | MR. WYMAN:  Thank you, Your Honor. |
| 11:12 | 22 | BY MR. WYMAN: |
| 11:12 | 23 | Q   Would you please pull up the bottom of page 2 and where |
| 11:12 | 24 | it says co-counsel.  Mr. McNicholas, what information is |
| 11:12 | 25 | provided for co-counsel? |

77

| | | |
|--|--|--|
| 11:12 | 1 | A    It says Eagan Avenatti and then their address. |
| 11:12 | 2 | Q    And you said Eagan Avenatti was co-counsel on this case |
| 11:12 | 3 | with you? |
| 11:12 | 4 | A    Yes. |
| 11:12 | 5 | Q    Right below where that where it says defense, what is |
| 11:12 | 6 | listed there? |
| 11:12 | 7 | A    Hurrell Cantrall. |
| 11:12 | 8 | Q    And who is Hurrell Cantrall? |
| 11:12 | 9 | A    That is a defense firm in Los Angeles that was |
| 11:12 | 10 | defending this case. |
| 11:12 | 11 | Q    If you can now go back to page 1, please, in the middle |
| 11:12 | 12 | where it says nature of case.  What is listed as the nature |
| 11:13 | 13 | of the case here? |
| 11:13 | 14 | A    Violation of civil rights. |
| 11:13 | 15 | Q    So in this case was Mr. Johnson suing another party for |
| 11:13 | 16 | a civil rights violation? |
| 11:13 | 17 | A    He was, yes. |
| 11:13 | 18 | Q    Is Mr. Johnson a paraplegic? |
| 11:13 | 19 | A    Yes. |
| 11:13 | 20 | Q    Did he suffer injuries while in L.A. County Jail? |
| 11:13 | 21 | A    He did, yes. |
| 11:13 | 22 | MR. AVENATTI:  Objection. |
| 11:13 | 23 | THE COURT:  Overruled. |
| 11:13 | 24 | THE WITNESS:  Yes. |
| | 25 | |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 11:13 | 1 | BY MR. WYMAN: |
| 11:13 | 2 | Q    Were those injuries the source of this lawsuit? |
| 11:13 | 3 | A    Yes. |
| 11:13 | 4 | Q    Now, right above that form it says matter type, |
| 11:13 | 5 | contingency, hourly, or blend.  Do you see that? |
| 11:13 | 6 | A    Yes, I do.  Thank you. |
| 11:13 | 7 | Q    And what does that mean? |
| 11:13 | 8 | A    So a contingency case means the fee to be earned by the |
| 11:14 | 9 | lawyer is contingent upon the outcome of the case.  So that |
| 11:14 | 10 | is, if there is no recovery, then the attorney takes no fee. |
| 11:14 | 11 | If there is a recovery, then there would be a percentage of |
| 11:14 | 12 | the recovery taken by the attorney. |
| 11:14 | 13 | Q    What type of case was Mr. Johnson's case? |
| 11:14 | 14 | A    It was a contingency fee. |
| 11:14 | 15 | Q    Did you have an agreement with the defendant's law firm |
| 11:14 | 16 | about how your respective firms would split up any fee |
| 11:14 | 17 | earned in Mr. Johnson's case? |
| 11:14 | 18 | A    We did, yes. |
| 11:14 | 19 | Q    What was that agreement? |
| 11:14 | 20 | A    It was 75 percent to Eagan Avenatti and 25 percent to |
| 11:14 | 21 | my firm. |
| 11:14 | 22 | Q    What were your -- generally speaking, what were your |
| 11:14 | 23 | responsibilities on the Johnson case given that you had |
| 11:14 | 24 | split it up with another firm? |
| 11:14 | 25 | A    I was in an assist role.  They had brought me into the |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

11:14    1    case because I'd handled other similar cases.  So I did work
11:14    2    as they requested.
11:14    3    Q    And can you give me a few examples?  What type of work
11:15    4    did you provide on the case?
11:15    5    A    So from time to time they would call me about legal
11:15    6    theories, about what type of discovery should be done.  I
11:15    7    did the expert witness depositions.  I think I appeared once
11:15    8    or twice in court, and I attended a mediation with
11:15    9    Mr. Avenatti.
11:15   10    Q    Did you interact with the client, Mr. Johnson, at all?
11:15   11    A    I did not.
11:15   12    Q    Who did you understand to be primarily responsible for
11:15   13    communicating with Mr. Johnson?
11:15   14    A    Eagan Avenatti.
11:15   15    Q    Did you ever speak to Mr. Johnson?
11:15   16    A    No.
11:15   17    Q    When you joined the case, who from Eagan Avenatti
11:15   18    appeared to you to be primarily responsible for the
11:15   19    day-to-day handling of the case?
11:15   20    A    Carlos Colorado.
11:15   21    Q    Was he another attorney at Eagan Avenatti?
11:16   22    A    I believe he was an associate with the firm at that
11:16   23    time.
11:16   24    Q    What did you understand the defendant's role to be on
11:16   25    the case?

11:16   1    A    He was the lead attorney ultimately responsible for the

11:16   2    case.  I think he was the one that brought the case in, and

11:16   3    he was ultimately responsible for resolution and trial.

11:16   4    Q    Before the end of the case, which we will get to in a

11:16   5    minute, did the defendant appear to have much involvement in

11:16   6    the daily operations of the case?

11:16   7    A    No.

11:16   8    Q    Did he appear to have a strong understanding of the

11:16   9    facts of the case?

11:16   10   A    No.

11:16   11   Q    At some point did the parties in Mr. Johnson's case

11:16   12   enter into mediation?

11:16   13   A    Yes.

11:16   14   Q    At a high level what is mediation?

11:16   15   A    Mediation would be best described as an out-of-court

11:16   16   attempt at resolving the case with a third-party neutral.

11:17   17   Q    And who oversees a mediation?  What kind of third-party

11:17   18   neutral would that be?

11:17   19   A    It can be a retired judge or it could be a lawyer.

11:17   20   Q    And in the case of Mr. Johnson's mediation, who oversaw

11:17   21   that?

11:17   22   A    That was Judge Meisinger.

11:17   23   Q    Is he a retired judge, like you said?

11:17   24   A    Yes.

11:17   25   Q    Did you participate in a mediation proceeding on behalf

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| 11:17 | 1 | of Mr. Johnson? |
| 11:17 | 2 | A    I did, yes. |
| 11:17 | 3 | Q    Who else participated from Mr. Johnson's side? |
| 11:17 | 4 | A    Mr. Avenatti was present, and I believe, although I |
| 11:17 | 5 | don't have a specific recollection, that Jason Frank may |
| 11:17 | 6 | have at some point in time been present. |
| 11:17 | 7 | Q    Is he another attorney? |
| 11:17 | 8 | A    He was -- at Eagan Avenatti. |
| 11:17 | 9 | Q    Was the client, Mr. Johnson, present at the mediation? |
| 11:17 | 10 | A    He was not. |
| 11:17 | 11 | Q    Do you recall approximately when this mediation |
| 11:17 | 12 | proceeding took place? |
| 11:18 | 13 | A    Fourth quarter of 2014. |
| 11:18 | 14 | Q    Now, at some point during the mediation process, did |
| 11:18 | 15 | the parties reach a tentative settlement? |
| 11:18 | 16 | MR. AVENATTI:  Objection, Your Honor.  Mediation |
| 11:18 | 17 | and 408, privilege. |
| 11:18 | 18 | THE COURT:  Overruled. |
| 11:18 | 19 | THE WITNESS:  The answer is yes. |
| 11:18 | 20 | BY MR. WYMAN: |
| 11:18 | 21 | Q    In reaching the amount of the settlement, did the |
| 11:18 | 22 | parties discuss certain factors that went into calculating |
| 11:18 | 23 | an appropriate amount? |
| 11:18 | 24 | MR. AVENATTI:  Same objection, Your Honor. |
| 11:18 | 25 | THE COURT:  Overruled. |

11:18    1                THE WITNESS:  Yes.

11:18    2    BY MR. WYMAN:

11:18    3    Q    What are some of those factors?

11:18    4                MR. AVENATTI:  Your Honor, same objection.  Could

11:18    5    I have a standing objection?

11:18    6                THE COURT:  Yes.

11:18    7                MR. AVENATTI:  Thank you.

11:18    8                THE WITNESS:  The factors that go in it are

11:18    9    obviously the damages, the damage model, which in this case

11:18   10    were extensive.  There's two types of damages.  There is

11:18   11    economic damages, which in this case were primarily past and

11:18   12    future medical expenses.

11:18   13                And then there is another category which is

11:19   14    referred to as noneconomic general damages of pain and

11:19   15    suffering, which would also be extensive because of the

11:19   16    nature of the injuries in this case.  So you first consider

11:19   17    how big are the damages, and then you would consider what

11:19   18    are the risk factors going forward.  And then there's a

11:19   19    variety of risk factors.

11:19   20    BY MR. WYMAN:

11:19   21    Q    Once a tentative settlement had been reached in this

11:19   22    case, what remains to be done for the settlement to be

11:19   23    finalized?

11:19   24    A    Okay.  In this particular instance, because it was a

11:19   25    governmental entity, the County of Los Angeles, we reached a

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

11:19   1   tentative settlement at the mediation.  It then has to go

11:19   2   through a series of processes with the County of Los

11:19   3   Angeles.  Ultimately it has to be approved by the Board of

11:19   4   Supervisors.

11:19   5   Q    And in your experience does that take some time?

11:20   6   A    It does.

11:20   7   Q    I'm going to shift gears now a little bit and ask you

11:20   8   about something called a special needs trust.  Are you

11:20   9   familiar with that term?

11:20   10  A    I am.

11:20   11  Q    In your experience representing plaintiffs in civil

11:20   12  rights lawsuits like this, have you used special needs

11:20   13  trusts before?

11:20   14  A    Yes.

11:20   15  Q    Based on that experience are you familiar with how

11:20   16  special needs trusts can be used in settling civil rights

11:20   17  cases?

11:20   18          MR. AVENATTI:  Your Honor, objection.  Seeks

11:20   19  testimony, potentially expert testimony.

11:20   20          THE COURT:  Lay the foundation.

11:20   21  BY MR. WYMAN:

11:20   22  Q    As the attorney representing plaintiffs in civil rights

11:20   23  cases, what has been your exposure to special needs trusts?

11:20   24  A    It's been vast over a long period of time.  It's not

11:20   25  just for civil rights cases.  It's for all sorts of cases,

| | | |
|---|---|---|
| 11:21 | 1 | particularly when you have a serious injury. |
| 11:21 | 2 | Q    Approximately how many cases would you say you have |
| 11:21 | 3 | done involving a special needs trust? |
| 11:21 | 4 | A    More than 100, less than 150. |
| 11:21 | 5 | Q    And in those cases were you representing the plaintiff? |
| 11:21 | 6 | A    Yes. |
| 11:21 | 7 | Q    And in those cases was the special needs trust |
| 11:21 | 8 | established for the plaintiff? |
| 11:21 | 9 | A    Yes. |
| 11:21 | 10 | Q    Was it established as part of the settlement process? |
| 11:21 | 11 |           MR. AVENATTI:  Your Honor, relevance. |
| 11:21 | 12 |           THE COURT:  Overruled. |
| 11:21 | 13 |           THE WITNESS:  Yes. |
| 11:21 | 14 | BY MR. WYMAN: |
| 11:21 | 15 | Q    Based on your experience in handling over a hundred |
| 11:21 | 16 | cases involving special needs trusts, are you familiar with |
| 11:21 | 17 | how they can be used in settling these types of cases? |
| 11:21 | 18 | A    Yes, I am. |
| 11:21 | 19 | Q    And from that experience do you have an understanding |
| 11:21 | 20 | of the benefits that these types of trusts can provide? |
| 11:22 | 21 |           MR. AVENATTI:  Your Honor, I'm going to reassert |
| 11:22 | 22 | the objection relating to expert testimony. |
| 11:22 | 23 |           THE COURT:  Overruled. |
| 11:22 | 24 |           THE WITNESS:  Yes. |
| | 25 | |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

85

| | | |
|---|---|---|
| 11:22 | 1 | BY MR. WYMAN: |
| 11:22 | 2 | Q    What is your understanding of the types of benefits -- |
| 11:22 | 3 | well, let me back up.  What is your understanding at a high |
| 11:22 | 4 | level of what a special needs trust is? |
| 11:22 | 5 | A    A special needs trust is exactly what it's called.  It |
| 11:22 | 6 | is a trust set up for clients to address special needs.  So |
| 11:22 | 7 | it's there for the protection of the clients so that third |
| 11:22 | 8 | parties -- for example, people with liens, governmental |
| 11:22 | 9 | entities with liens, healthcare providers -- can't reach in |
| 11:22 | 10 | and take that money and so that they don't get cut off from |
| 11:22 | 11 | other benefits. |
| 11:22 | 12 | Q    Okay.  So as I understand it, some of the benefits you |
| 11:22 | 13 | are describing are that it can sort of shield the money for |
| 11:22 | 14 | benefits? |
| 11:22 | 15 | MR. AVENATTI:  Leading. |
| 11:23 | 16 | THE COURT:  Sustained. |
| 11:23 | 17 | BY MR. WYMAN: |
| 11:23 | 18 | Q    Well, you mentioned benefits just a minute ago.  How |
| 11:23 | 19 | does a special needs trust help someone keep their benefits? |
| 11:23 | 20 | A    Okay.  So again, it's a trust, so the client never |
| 11:23 | 21 | actually takes possession of the money.  It's for the |
| 11:23 | 22 | protection of the client.  So the trust then gets |
| 11:23 | 23 | administered to meet the needs of the client, number one. |
| 11:23 | 24 | And number two, it prevents third parties from |
| 11:23 | 25 | being able to reach that money.  So if a healthcare provider |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

11:23  1    has a lien or the County was providing services, so that

11:23  2    they can't reach the money and/or to keep their benefits

11:23  3    from being taken away from them.

11:23  4    Q    Now, this may be an obvious question based on what you

11:23  5    just answered, but what kind of individual who you would be

11:24  6    representing would be a good candidate for a special needs

11:24  7    trust?

11:24  8              MR. AVENATTI:  Your Honor, objection.

11:24  9    Speculation.  Hypothetical.  Foundation.

11:24  10             THE COURT:  Sustained.

11:24  11   BY MR. WYMAN:

11:24  12   Q    Based on your experience representing -- in the prior

11:24  13   cases where you represented plaintiffs who have had a

11:24  14   special needs trust, is there a typical type of person you

11:24  15   have done that for?

11:24  16             MR. AVENATTI:  Same objection.

11:24  17             THE COURT:  Overruled.

11:24  18             THE WITNESS:  I'd say there is a typical type of

11:24  19   person, but more specifically certain criteria that you look

11:24  20   for.

11:24  21   BY MR. WYMAN:

11:24  22   Q    And what are those criteria?

11:24  23   A    Well, if it's any person who could lose a portion of

11:24  24   their settlement, number one.  So that would be one

11:24  25   criteria.  Or, number two, have benefits cut off if you

11:24   1   don't establish a special needs trust.

11:24   2           And number three, you look at the amount of money

11:25   3   involved, because if it's low enough, you're not going to do

11:25   4   it because the cost of administering the trust and setting

11:25   5   it up wouldn't be beneficial.

11:25   6           The first two criteria, if they're met, you are

11:25   7   generally going to set up a special needs trust or a

11:25   8   structure.  But at the very least you're going to advise the

11:25   9   client of that option.

11:25  10   Q    In the context of resolving a lawsuit, how does someone

11:25  11   go about setting up a special needs trust from the

11:25  12   perspective of the plaintiff's attorney like yourself?

11:25  13           MR. AVENATTI:  Objection, Your Honor.  It seeks

11:25  14   improper expert testimony.  Foundation.  It's an incomplete

11:25  15   hypothetical.  Speculation.

11:25  16           THE COURT:  I believe there are others that are

11:25  17   going to testify on this topic.

11:25  18           MR. WYMAN:  Your Honor, we don't intend to elicit

11:25  19   testimony from others if his testimony is allowed.

11:26  20           THE COURT:  I'm going to sustain the objection.

11:26  21   BY MR. WYMAN:

11:26  22   Q    In your prior experience with special needs trusts for

11:26  23   a plaintiff, when did you have to set up that special needs

11:26  24   trust?

11:26  25           MR. AVENATTI:  Same objection.

| | | |
|---|---|---|
| 11:26 | 1 | THE COURT:  Sustained. |
| 11:26 | 2 | BY MR. WYMAN: |
| 11:26 | 3 | Q    Now, during the settlement discussions in Mr. Johnson's |
| 11:26 | 4 | case, did you ever discuss the prospect of a special needs |
| 11:26 | 5 | trust with the defendant? |
| 11:26 | 6 | A    I do not recall doing that. |
| 11:26 | 7 | Q    Do you recall the defendant ever telling you that |
| 11:26 | 8 | Mr. Johnson wanted a special needs trust to be established |
| 11:26 | 9 | for him? |
| 11:27 | 10 | A    I do not recall that. |
| 11:27 | 11 | Q    Do you recall the topic of special needs trusts ever |
| 11:27 | 12 | coming up with the defendant? |
| 11:27 | 13 | A    I do not. |
| 11:27 | 14 | Q    Now, at some point did the parties reach a final |
| 11:27 | 15 | settlement in Mr. Johnson's case? |
| 11:27 | 16 | A    We did, yes. |
| 11:27 | 17 | Q    How much was that settlement for? |
| 11:27 | 18 | A    Ultimately $4 million. |
| 11:27 | 19 | Q    Could you please take a look in that binder at |
| 11:27 | 20 | Exhibit 37. |
| 11:27 | 21 | A    (Witness complies.)  I have it in front of me. |
| 11:27 | 22 | Q    Do you recognize this document? |
| 11:28 | 23 | A    I do. |
| 11:28 | 24 | Q    What is it? |
| 11:28 | 25 | A    Well, it's a cover letter dated January 22, 2015, from |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 11:28 | 1 | Hurrell Cantrall signed by Charles Phan with an enclosure, |
| 11:28 | 2 | which is a three-page document entitled settlement agreement |
| 11:28 | 3 | and release of all claims. |
| 11:28 | 4 | Q    Did you receive this document from Hurrell Cantrall? |
| 11:28 | 5 | A    I believe my office did, yes. |
| 11:28 | 6 | Q    And is this a fair and accurate copy of the letter and |
| 11:28 | 7 | settlement agreement that you received? |
| 11:28 | 8 | A    It is, yes. |
| 11:28 | 9 | MR. WYMAN:  Your Honor, the government moves to |
| 11:28 | 10 | admit Exhibit 37 into evidence. |
| 11:28 | 11 | MR. AVENATTI:  No objection, Your Honor. |
| 11:28 | 12 | THE COURT:  Thirty-seven will be received. |
| 11:28 | 13 | (Exhibit 37 received in evidence) |
| 11:28 | 14 | MR. WYMAN:  If we could publish the first page, |
| 11:29 | 15 | please.  And if we could blow up the date, please. |
| 11:29 | 16 | BY MR. WYMAN: |
| 11:29 | 17 | Q    Mr. McNicholas, what is the date of the letter |
| 11:29 | 18 | enclosing the settlement agreement? |
| 11:29 | 19 | A    January 22nd, 2015. |
| 11:29 | 20 | Q    If we could go to the second page of the exhibit now, |
| 11:29 | 21 | which is the first page of the settlement agreement.  Do you |
| 11:29 | 22 | see that? |
| 11:29 | 23 | A    Yes. |
| 11:29 | 24 | Q    Looking at the first paragraph, who are the parties to |
| 11:29 | 25 | this agreement? |

90

| | | |
|---|---|---|
| 11:29 | 1 | A    The plaintiff, Mr. Johnson, the defendant, County of |
| 11:29 | 2 | Los Angeles, Sheriff Baca. |
| 11:29 | 3 | Q    To your knowledge is this the entire settlement |
| 11:29 | 4 | agreement entered into between Mr. Johnson and the County of |
| 11:29 | 5 | Los Angeles and related parties? |
| 11:29 | 6 | A    It is. |
| 11:29 | 7 | Q    To your knowledge was there ever an addendum to this |
| 11:29 | 8 | settlement agreement? |
| 11:29 | 9 | A    There was not. |
| 11:29 | 10 | Q    Is this settlement agreement confidential? |
| 11:30 | 11 | A    No. |
| 11:30 | 12 | Q    Is there any part of this agreement that is |
| 11:30 | 13 | confidential? |
| 11:30 | 14 | A    No. |
| 11:30 | 15 | Q    How do you know that? |
| 11:30 | 16 | A    Because it's a resolution against the governmental |
| 11:30 | 17 | entity, the County of Los Angeles, and by law it cannot be |
| 11:30 | 18 | confidential. |
| 11:30 | 19 | Q    Focusing on the second paragraph of the first page of |
| 11:30 | 20 | the agreement under the heading Agreement, will you please |
| 11:30 | 21 | read that first sentence there. |
| 11:30 | 22 | A    In exchange for a complete resolution of the lawsuit, |
| 11:30 | 23 | defendants by and through the County of Los Angeles shall |
| 11:30 | 24 | pay to plaintiff $4 million, paren, the settlement funds, |
| 11:30 | 25 | close paren, subject to approval by the Los Angeles County |

11:31   1    Board of Supervisors.

11:31   2    Q    The $4 million referenced there, does this agreement

11:31   3    direct payment of those settlement funds into a special

11:31   4    needs trust?

11:31   5    A    It does not.

11:31   6             MR. WYMAN:  If you would go to the next paragraph,

11:31   7    please.

11:31   8    BY MR. WYMAN:

11:31   9    Q    Based on this paragraph where did you understand the

11:31   10   $4 million from the County to be sent?

11:31   11   A    To the Eagan Avenatti client trust account.

11:31   12   Q    In your experience as an attorney representing

11:31   13   plaintiffs, have you received settlement funds on behalf of

11:31   14   a client before?

11:31   15   A    Yes.

11:31   16   Q    And what kind of bank account did you use to receive

11:31   17   those settlement funds?

11:31   18             MR. AVENATTI:  Objection, Your Honor.  Relevance.

11:31   19   Foundation.

11:31   20             THE COURT:  Sustained.

11:31   21             MR. WYMAN:  I'm sorry.  On relevance or

11:31   22   foundation, Your Honor?

11:32   23             THE COURT:  Relevance.

11:32   24   BY MR. WYMAN:

11:32   25   Q    You just mentioned attorney/client trust account for

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

11:32   1    this agreement.  What is an attorney/client trust account?

11:32   2    A    An attorney/client trust account is an account that,

11:32   3    when you have a law firm, the State Bar rules require you to

11:32   4    set up specifically as a separate account in your law firm.

11:32   5    Q    And is an attorney/client trust account different than

11:32   6    a regular bank account?

11:32   7              MR. AVENATTI:  Objection, Your Honor.  Seeks

11:32   8    improper expert opinion testimony.

11:32   9              THE COURT:  Overruled.

11:32   10              THE WITNESS:  It's completely different.

11:32   11   BY MR. WYMAN:

11:32   12   Q    And how so?

11:32   13   A    So, for example, you can have an operating account, a

11:32   14   general account that you run your law firm day to day, you

11:32   15   write checks in and out of.  The client trust account is

11:32   16   exactly that.  It is an account where moneys are deposited

11:33   17   in trust for the client.  So all the moneys that go into the

11:33   18   client trust account are in fact the client moneys.

11:33   19              So when you receive a settlement such as this one,

11:33   20   that's client money and it has to go into the client trust

11:33   21   account.

11:33   22   Q    Now, based on this agreement and your understanding

11:33   23   that the settlement funds would be deposited into the Eagan

11:33   24   Avenatti trust account, what was your expectation at that

11:33   25   time of what would happen to Mr. Johnson's settlement funds

93

| | | |
|---|---|---|
| 11:33 | 1 | after they were deposited? |
| 11:33 | 2 |        MR. AVENATTI:  Objection.  Relevance. |
| 11:33 | 3 |        THE COURT:  Sustained. |
| 11:33 | 4 | BY MR. WYMAN: |
| 11:33 | 5 | Q    In this agreement, Exhibit 37, is there anything in |
| 11:33 | 6 | there about Mr. Johnson receiving periodic payments from the |
| 11:34 | 7 | settlement funds? |
| 11:34 | 8 |        MR. AVENATTI:  Best evidence, Your Honor. |
| 11:34 | 9 |        THE COURT:  Sustained. |
| 11:34 | 10 | BY MR. WYMAN: |
| 11:34 | 11 | Q    Under the terms of this agreement, once the County made |
| 11:34 | 12 | that $4 million payment, would there be anything left for |
| 11:34 | 13 | you and the other parties to the lawsuit to be waiting on? |
| 11:34 | 14 |        MR. AVENATTI:  Same objection. |
| 11:34 | 15 |        THE COURT:  Overruled. |
| 11:34 | 16 |        THE WITNESS:  No. |
| 11:34 | 17 | BY MR. WYMAN: |
| 11:34 | 18 | Q    Once the parties -- once the County made that payment, |
| 11:34 | 19 | what was left to do on the case? |
| 11:34 | 20 | A    Nothing at that point in time. |
| 11:34 | 21 | Q    Did you ever go over this agreement with Geoffrey |
| 11:34 | 22 | Johnson? |
| 11:34 | 23 | A    I did not. |
| 11:34 | 24 | Q    Do you know whether the defendant ever went over this |
| 11:34 | 25 | agreement with Geoffrey Johnson? |

| | | |
|---|---|---|
| 11:34 | 1 | A    I do not know. |
| 11:34 | 2 | MR. WYMAN:  If we could go to the last page, the |
| 11:35 | 3 | signature. |
| 11:35 | 4 | BY MR. WYMAN: |
| 11:35 | 5 | Q    Do you see a signature there above the name Geoffrey |
| 11:35 | 6 | Johnson? |
| 11:35 | 7 | A    I do. |
| 11:35 | 8 | Q    Do you know whether that is Geoffrey Johnson's actual |
| 11:35 | 9 | signature? |
| 11:35 | 10 | A    I don't know. |
| 11:35 | 11 | Q    If you could please turn now to what has been marked as |
| 11:35 | 12 | government's Exhibit 40. |
| 11:35 | 13 | A    (Witness complies.)  I have that in front of me. |
| 11:35 | 14 | Q    Do you recognize Exhibit 40? |
| 11:35 | 15 | A    I do. |
| 11:35 | 16 | Q    And what is it? |
| 11:36 | 17 | A    The cover page is again from Hurrell Cantrall dated |
| 11:36 | 18 | January 29, 2015, signed by Charles Phan. |
| 11:36 | 19 | MR. AVENATTI:  Your Honor, before the document is |
| 11:36 | 20 | in evidence, I don't think it's appropriate for the witness |
| 11:36 | 21 | to describe it to the jury. |
| 11:36 | 22 | THE COURT:  I agree. |
| 11:36 | 23 | BY MR. WYMAN: |
| 11:36 | 24 | Q    Mr. McNicholas, is this a letter you received? |
| 11:36 | 25 | A    It is. |

95

| | | |
|---|---|---|
| 11:36 | 1 | Q    And is it a fair and accurate copy of that letter and |
| 11:36 | 2 | attachment that you received? |
| 11:36 | 3 | A    It is. |
| 11:36 | 4 |         MR. WYMAN:  The government moves to admit |
| 11:36 | 5 | Exhibit 40, Your Honor. |
| 11:36 | 6 |         MR. AVENATTI:  Objection, Your Honor.  Hearsay. |
| 11:36 | 7 |         THE COURT:  Overruled. |
| 11:36 | 8 |         (Exhibit 40 received in evidence) |
| 11:36 | 9 | BY MR. WYMAN: |
| 11:36 | 10 | Q    Now, if we could focus on the letter here, the date at |
| 11:36 | 11 | the top.  What is the date on this letter? |
| 11:36 | 12 | A    January 29th, 2015. |
| 11:36 | 13 |         MR. WYMAN:  And if we could go to page 2, now, |
| 11:37 | 14 | please. |
| 11:37 | 15 | BY MR. WYMAN: |
| 11:37 | 16 | Q    What is this we're looking at here? |
| 11:37 | 17 | A    It's a settlement check. |
| 11:37 | 18 |         MR. AVENATTI:  Your Honor, I don't believe the |
| 11:37 | 19 | check is in evidence. |
| 11:37 | 20 |         THE COURT:  I received the entire exhibit. |
| 11:37 | 21 | BY MR. WYMAN: |
| 11:37 | 22 | Q    What is the date on this check? |
| 11:37 | 23 | A    January 26th, 2015. |
| 11:37 | 24 | Q    And the amount? |
| 11:37 | 25 | A    $4 million. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | | |
|---|---|---|---|
| 11:37 | 1 | Q | Who is it made payable to? |
| 11:37 | 2 | A | The Eagan Avenatti, LLP, attorney/client trust account. |
| 11:37 | 3 | Q | And the remitter of the check? |
| 11:37 | 4 | A | I'm sorry? |
| 11:37 | 5 | Q | Whose name is at the top of the check there? |
| 11:37 | 6 | A | The County of Los Angeles. |
| 11:37 | 7 | Q | If you could please now look at Exhibit 51. |
| 11:38 | 8 | A | (Witness complies.) |
| 11:38 | 9 | Q | Do you recognize this document? |
| 11:38 | 10 | A | I do. |
| 11:38 | 11 | Q | Is this an e-mail chain that you're on? |
| 11:38 | 12 | A | It is, yes. |
| 11:38 | 13 | Q | And is it a fair and accurate copy of that e-mail |
| 11:38 | 14 | | chain? |
| 11:38 | 15 | A | Yes, it is. |
| 11:38 | 16 | | MR. WYMAN:  The government moves to admit |
| 11:38 | 17 | | Exhibit 51, Your Honor. |
| 11:38 | 18 | | MR. AVENATTI:  Objection, Your Honor.  Hearsay, |
| 11:38 | 19 | | multiple levels. |
| 11:38 | 20 | | THE COURT:  Sustained. |
| 11:38 | 21 | | MR. WYMAN:  May I be heard briefly, Your Honor? |
| 11:38 | 22 | | The e-mail was to the defendant. |
| 11:39 | 23 | | THE COURT:  It appears to be communication to and |
| 11:39 | 24 | | from Mr. Avenatti.  The objection will be overruled.  So 51 |
| 11:39 | 25 | | will be received. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 11:39 | 1 | MR. WYMAN:  Thank you. |
| 11:39 | 2 | (Exhibit 51 received in evidence) |
| 11:39 | 3 | BY MR. WYMAN: |
| 11:39 | 4 | Q    Focusing on the earliest e-mail on page 2 two, what is |
| 11:39 | 5 | this e-mail about? |
| 11:39 | 6 | A    He is asking us -- well, the author, Charles Phan, who |
| 11:39 | 7 | was with the defense firm, is asking if he can get an |
| 11:39 | 8 | electronic signature on the stipulation for the filing of |
| 11:39 | 9 | the dismissal. |
| 11:39 | 10 | Q    And what was the filing of the dismissal? |
| 11:39 | 11 | A    What is a dismissal? |
| 11:39 | 12 | Q    Yes. |
| 11:39 | 13 | A    Okay.  It dismisses the entire action.  So it might be |
| 11:40 | 14 | received if the case gets dismissed and the whole case goes |
| 11:40 | 15 | away. |
| 11:40 | 16 | Q    If we could go now to page 1.  After the defendant's |
| 11:40 | 17 | response, can you please read the first line of your e-mail |
| 11:40 | 18 | there. |
| 11:40 | 19 | A    Thank you, and have a nice evening. |
| 11:40 | 20 | Q    I'm sorry.  I will put it up on the screen for you.  So |
| 11:40 | 21 | it's starting with:  Stip looks fine. |
| 11:40 | 22 | A    Stip looks fine.  It's a matter of timing with the |
| 11:40 | 23 | funding.  Do you guys have any issues with the stip? |
| 11:40 | 24 | Q    What did you mean by in the matter of timing with the |
| 11:40 | 25 | funding? |

98

| | | |
|---|---|---|
| 11:40 | 1 | A    Generally at the end of the case there can be an issue |
| 11:40 | 2 | as, you know, do we get the check first or do we dismiss |
| 11:40 | 3 | first?  So that has to be worked out as to how that |
| 11:41 | 4 | mechanically occurs. |
| 11:41 | 5 | Q    And once the money is paid, is there any reason to |
| 11:41 | 6 | delay the dismissal? |
| 11:41 | 7 |          MR. AVENATTI:  Objection, Your Honor.  Foundation. |
| 11:41 | 8 | Speculation. |
| 11:41 | 9 |          THE COURT:  Overruled. |
| 11:41 | 10 |          THE WITNESS:  No. |
| 11:41 | 11 | BY MR. WYMAN: |
| 11:41 | 12 | Q    Once the settlement figure was finalized, did your firm |
| 11:41 | 13 | calculate the portion of the fee that you were owed? |
| 11:41 | 14 | A    Yes. |
| 11:41 | 15 | Q    If you would please take a look at Exhibit 54. |
| 11:41 | 16 | A    (Witness complies.)  I have it in front of me. |
| 11:41 | 17 | Q    I'm sorry.  Before we move on, just real quickly on |
| 11:41 | 18 | Exhibit 51, can you just read the defendant's response to |
| 11:41 | 19 | your e-mail on February 3rd, 2015. |
| 11:41 | 20 | A    Thanks.  I will handle. |
| 11:42 | 21 | Q    And do you recognize the other name on that e-mail, |
| 11:42 | 22 | Scott Sims? |
| 11:42 | 23 | A    Yes, I do. |
| 11:42 | 24 | Q    And who is Scott Sims? |
| 11:42 | 25 | A    Scott Sims was a lawyer in the Eagan Avenatti office at |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 11:42 | 1 | that time. |
| 11:42 | 2 | Q    Okay.  Thank you. |
| 11:42 | 3 |      Now if you could please look at Exhibit 54. |
| 11:42 | 4 | A    I have it in front of me. |
| 11:42 | 5 | Q    Do you recognize this document? |
| 11:42 | 6 | A    Yes. |
| 11:42 | 7 | Q    What is it? |
| 11:42 | 8 | A    It is McNicholas & McNicholas case accounting sheet. |
| 11:42 | 9 | Q    Is this a case accounting sheet that your office |
| 11:42 | 10 | prepared? |
| 11:42 | 11 | A    Yes. |
| 11:42 | 12 | Q    In connection with which case? |
| 11:42 | 13 | A    Geoffrey Ernest Johnson. |
| 11:42 | 14 | Q    And is this a fair and accurate copy of that accounting |
| 11:42 | 15 | sheet prepared by your office? |
| 11:42 | 16 | A    It is, yes. |
| 11:42 | 17 |      MR. WYMAN:  The government moves to admit |
| 11:42 | 18 | Exhibit 54, Your Honor. |
| 11:42 | 19 |      MR. AVENATTI:  Objection, Your Honor.  Hearsay. |
| 11:42 | 20 |      THE COURT:  Overruled. |
| 11:42 | 21 |      (Exhibit 54 received in evidence) |
| 11:42 | 22 | BY MR. WYMAN: |
| 11:42 | 23 | Q    Now, does your office put an accounting sheet like this |
| 11:43 | 24 | together for all of your cases? |
| 11:43 | 25 | A    Yes. |

```
11:43   1    Q     Why?
11:43   2              MR. AVENATTI:  Objection, Your Honor.  Relevance.
11:43   3              THE COURT:  Overruled.
11:43   4              THE WITNESS:  Well, it's necessary to account,
11:43   5    number one, for the client's fund, and, number two, so that
11:43   6    we have an accurate accounting within our law firm of money
11:43   7    coming in and money going out.  And, you know, ultimately
11:43   8    you have to pay your taxes, so these have to be accurate.
11:43   9    BY MR. WYMAN:
11:43   10   Q     Now, at the top of this page, it says gross settlement
11:43   11   and then the figure $4 million.  Do you see that?
11:43   12   A     I do.
11:43   13   Q     What does that mean?
11:43   14   A     That was the total amount of the settlement, the gross
11:43   15   resolution.
11:43   16   Q     And slightly below that it says gross attorney fees,
11:43   17   and then $1.6 million.  Do you see that?
11:43   18   A     I do.
11:44   19   Q     What does that mean?
11:44   20   A     Well, 40 percent of $4 million is 1.6 million.  And the
11:44   21   attorney's fees charged were pursuant to the Eagan Avenatti
11:44   22   fee agreement with the client, so that would be the gross
11:44   23   fee.
11:44   24   Q     And what was your understanding of where the 40 percent
11:44   25   came from?
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

11:44  1   A    The Eagan Avenatti fee agreement with the client.

11:44  2   Q    Right below there are several names under that heading

11:44  3   division of attorney fees.  I see a name Richard Beada.  Who

11:44  4   is Richard Beada?

11:44  5   A    I don't know him.  I know that through -- I recall

11:44  6   through conversations he was a criminal attorney that was

11:44  7   involved, and he may have been the person that referred the

11:44  8   case to Eagan Avenatti.

11:44  9   Q    Next to your firm under this heading, what is listed as

11:45  10  the total fee?

11:45  11  A    $350,000 -- for my firm?

11:45  12  Q    Yes.

11:45  13  A    $350,000.

11:45  14  Q    Then below that it says McNicholas & McNicholas fees

11:45  15  and costs.  Do you see that?

11:45  16  A    I see it on my paper document.

11:45  17  Q    Okay.  And under that heading it says costs per ledger

11:46  18  and lists the number $2,776.43.  Do you see that?

11:46  19  A    I do.

11:46  20  Q    What does costs per ledger mean?

11:46  21  A    Those were costs that McNicholas & McNicholas had

11:46  22  incurred on the case.  And then it says per ledger because

11:46  23  there is a ledger of the costs.

11:46  24  Q    Based on your understanding of the fee agreement in

11:46  25  place with Mr. Johnson, was your firm entitled to recover

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 11:46 | 1 | its costs from the settlement of the case? |
| 11:46 | 2 | A    Yes. |
| 11:46 | 3 | Q    So based on those fees and costs, what was the total |
| 11:46 | 4 | amount that your firm was entitled to recover from |
| 11:47 | 5 | Mr. Johnson's settlement? |
| 11:47 | 6 | A    $352,776.43. |
| 11:47 | 7 | Q    Did your firm receive payment for your work on |
| 11:47 | 8 | Mr. Johnson's case? |
| 11:47 | 9 | A    We did, yes. |
| 11:47 | 10 | Q    Would you please take a look at Exhibit 53. |
| 11:47 | 11 | A    (Witness complies.) |
| 11:47 | 12 | Q    Do you recognize that exhibit? |
| 11:47 | 13 | A    I do. |
| 11:47 | 14 | Q    What is it? |
| 11:47 | 15 | A    That is a check from Eagan Avenatti to my firm. |
| 11:47 | 16 | Q    Is this a fair and accurate copy of that check? |
| 11:47 | 17 | A    It is, yes. |
| 11:47 | 18 | MR. WYMAN:  The government moves to admit |
| 11:47 | 19 | Exhibit 53, Your Honor. |
| 11:47 | 20 | MR. AVENATTI:  Hearsay, Your Honor. |
| 11:47 | 21 | THE COURT:  Overruled.  Fifty-three will be |
| 11:47 | 22 | received. |
| 11:47 | 23 | (Exhibit 53 received in evidence) |
| 11:47 | 24 | BY MR. WYMAN: |
| 11:47 | 25 | Q    What is the amount on this check? |

11:47    1    A    $350,000.

11:47    2    Q    So is it your understanding that this check was your

11:48    3    portion of the fees from Mr. Johnson's case?

11:48    4    A    Yes.

11:48    5    Q    And who was the -- who paid the check?  What is the

11:48    6    remitter name at the top line?

11:48    7    A    Eagan Avenatti.

11:48    8    Q    And focusing on the signature in the bottom right, do

11:48    9    you know whose signature that is?

11:48   10    A    I do not.

11:48   11    Q    What is the date of this check?

11:48   12    A    April 1st, 2015.

11:48   13    Q    We looked a minute ago at the settlement check from

11:48   14    January.  Do you know why you received your portion of the

11:48   15    settlement funds over two months after the final settlement

11:48   16    had been approved?

11:48   17    A    I do not.

11:48   18    Q    Do you know whether this money came out of the money

11:48   19    paid by the County for Mr. Johnson's settlement?

11:48   20    A    I do not know that.

11:49   21           MR. WYMAN:  If we could pull up Exhibit 54 again.

11:49   22    BY MR. WYMAN:

11:49   23    Q    Exhibit 54, your firm's accounting sheet, based on

11:49   24    these calculations, what was the defendant's firm entitled

11:49   25    to recover from the $4 million settlement fee?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 11:49 | 1 | MR. AVENATTI:  Objection, Your Honor.  Calls for |
| 11:49 | 2 | speculation. |
| 11:49 | 3 | THE COURT:  Overruled. |
| 11:49 | 4 | THE WITNESS:  $1,050,000. |
| 11:49 | 5 | BY MR. WYMAN: |
| 11:49 | 6 | Q    And that would be their portion of the fee? |
| 11:49 | 7 | A    That would be Eagan Avenatti's fee in the case. |
| 11:49 | 8 | Q    Based on your understanding, would he also be entitled |
| 11:49 | 9 | to recover costs incurred by the firm on connection with the |
| 11:49 | 10 | Johnson matter? |
| 11:49 | 11 | A    Yes. |
| 11:49 | 12 | Q    Do you know what his firm's costs were? |
| 11:49 | 13 | A    I do not know. |
| 11:49 | 14 | Q    Based on your understanding of the fee arrangement, |
| 11:49 | 15 | were your respective firms allowed to recoup their costs up |
| 11:50 | 16 | until the time of the final settlement? |
| 11:50 | 17 | A    Yes. |
| 11:50 | 18 | Q    How about costs after the settlement? |
| 11:50 | 19 | A    I would have to look at the fee agreement to know that. |
| 11:50 | 20 | Q    When you reach a settlement on behalf of a client, do |
| 11:50 | 21 | you typically provide an accounting like this to the client? |
| 11:50 | 22 | A    Yes. |
| 11:50 | 23 | MR. AVENATTI:  Objection.  Foundation. |
| 11:50 | 24 | THE COURT:  Overruled. |
| | 25 | |

| | | |
|---|---|---|
| 11:50 | 1 | BY MR. WYMAN: |
| 11:50 | 2 | Q    That was a yes? |
| 11:50 | 3 | A    Yes. |
| 11:50 | 4 | Q    Why do you do that? |
| 11:50 | 5 | A    Well, the client has to know and see in writing what |
| 11:50 | 6 | moneys came in, the exact amount of the settlement, which |
| 11:50 | 7 | they're entitled to.  And then they're entitled to see what |
| 11:50 | 8 | is coming out for costs, to whom the fees are going, and |
| 11:50 | 9 | what each and every cost is in the case. |
| 11:50 | 10 | When the check is written to my firm, that's |
| 11:50 | 11 | client money and it goes into the client's trust account, |
| 11:50 | 12 | and the client has to authorize the moneys going out of the |
| 11:51 | 13 | client trust fund because they're in essence paying their |
| 11:51 | 14 | moneys to you from your client trust account. |
| 11:51 | 15 | Q    Did you send a copy of this accounting to Geoffrey |
| 11:51 | 16 | Johnson? |
| 11:51 | 17 | A    I did not.  My firm did not. |
| 11:51 | 18 | Q    Why not? |
| 11:51 | 19 | A    We had no contact with the client. |
| 11:51 | 20 | Q    Do you know if the defendant's firm sent an accounting |
| 11:51 | 21 | of fees and costs to Mr. Johnson? |
| 11:51 | 22 | A    I do not know. |
| 11:51 | 23 | Q    Based on the respective roles of the two firms in the |
| 11:51 | 24 | engagement, did you expect Eagan Avenatti to send an |
| 11:51 | 25 | accounting like this to Geoffrey Johnson? |

| 11:51 | 1 | MR. AVENATTI:  Leading. |
|---|---|---|

11:51   1        MR. AVENATTI:  Leading.

11:51   2        THE COURT:  Overruled.

11:51   3        THE WITNESS:  Yes.

11:51   4   BY MR. WYMAN:

11:51   5   Q    Just a few final questions for you.  Based on the

11:51   6   settlement agreement, what was your expectation of how

11:51   7   Mr. Johnson would receive his portion of the settlement

11:51   8   funds?

11:51   9        MR. AVENATTI:  Speculation, Your Honor.

11:52  10        THE COURT:  Overruled.

11:52  11        THE WITNESS:  Well, traditionally what would

11:52  12   happen in this instance is there would be a check written to

11:52  13   the Eagan Avenatti client trust fund, client trust account,

11:52  14   for $4 million.  And then it would be disbursed.  I had no

11:52  15   information one way or the other as to whether there was

11:52  16   going to be a structure, whether there was going to be any

11:52  17   sort of trust account set up, special needs account.  So I

11:52  18   had no expectation other than what I just described.

11:52  19   BY MR. WYMAN:

11:52  20   Q    Do you know whether the defendant ever disbursed

11:52  21   Mr. Johnson's settlement funds to him?

11:52  22   A    I do not know, no.

11:52  23        MR. WYMAN:  One moment, Your Honor.

11:52  24        (Government counsel conferring)

11:53  25   BY MR. WYMAN:

| | | |
|---|---|---|
| 11:53 | 1 | Q    After the County paid the $4 million check in January |
| 11:53 | 2 | of 2015, was the case over at that point? |
| 11:53 | 3 | A    Yes. |
| 11:53 | 4 | MR. WYMAN:  Thank you.  No further questions. |
| 11:53 | 5 | THE COURT:  Mr. Avenatti. |
| 11:53 | 6 | Why don't we take the lunch break.  We will come |
| 11:53 | 7 | back at 1:25.  Please remember the admonition not to discuss |
| 11:53 | 8 | the case with anyone and not to form any opinions on the |
| 11:53 | 9 | case until the matter is submitted to you.  And please don't |
| 11:54 | 10 | do any research. |
| 11:54 | 11 | (Jury not present) |
| 11:54 | 12 | THE COURT:  Sir, you may step down. |
| 11:54 | 13 | Mr. Avenatti, the motion that you desired to |
| 11:54 | 14 | present at the end of the government's opening statement may |
| 11:54 | 15 | be presented to the Court now and deemed presented as of |
| 11:54 | 16 | now. |
| 11:54 | 17 | MR. AVENATTI:  Thank you, Your Honor. |
| 11:54 | 18 | I would move for a mistrial for the same reasons |
| 11:54 | 19 | previously stated in our objections relating to the voir |
| 11:54 | 20 | dire procedures, as well as the objections relating to the |
| 11:55 | 21 | COVID-19 virus and delta variant. |
| 11:55 | 22 | I would also move for a mistrial due to the prior |
| 11:55 | 23 | objections lodged concerning the initial instructions |
| 11:55 | 24 | including those relating to the bar rules read to the jury, |
| 11:55 | 25 | Your Honor. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

11:55   1          Make these objections to preserve the record and

11:55   2      the motion.

11:55   3              THE COURT:  The motion is denied.

11:55   4              We will be in recess.

11:55   5                  (Recess taken at 11:55 a.m.)

11:55   6                      *    *    *

11:55   7

11:55   8

11:55   9

11:55   10

11:55   11

11:55   12

11:55   13

11:55   14

11:55   15

11:55   16

11:55   17

11:55   18

11:55   19

11:55   20

11:55   21

11:55   22

11:55   23

11:55   24

11:55   25

```
11:55    1
11:55    2
11:55    3
11:55    4                           CERTIFICATE
11:55    5
11:55    6           I hereby certify that pursuant to Section 753,
11:55    7    Title 28, United States Code, the foregoing is a true and
11:55    8    correct transcript of the stenographically reported
11:55    9    proceedings held in the above-entitled matter and that the
11:55   10    transcript page format is in conformance with the
11:55   11    regulations of the Judicial Conference of the United States.
11:55   12
11:55   13    Date:  July 22, 2021
11:55   14
11:55   15
11:55                            /s/   Sharon A. Seffens  7/22/21
11:55   16                       _____
11:55   17                       SHARON A. SEFFENS, U.S. COURT REPORTER
11:55
        18
        19
        20
        21
        22
        23
        24
        25
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**MR. AVENATTI: [72]** 4/10 4/19 5/6 5/9 8/5 10/2 12/5 13/5 13/11 13/18 13/23 14/25 15/5 15/11 15/16 16/12 16/19 16/22 17/2 17/16 17/20 17/24 19/6 20/6 58/25 59/5 59/9 59/14 59/17 59/23 60/13 60/17 60/19 60/21 61/24 63/13 63/20 75/24 76/1 76/6 77/22 81/16 81/24 82/4 82/7 83/18 84/11 84/21 85/15 86/8 86/16 87/13 87/25 89/11 91/18 92/7 93/2 93/8 93/14 94/19 95/6 95/18 96/18 98/7 99/19 100/2 102/20 104/1 104/23 106/1 106/9 107/17

**MR. SAGEL: [22]** 4/5 9/6 9/14 10/3 10/19 12/7 13/1 14/5 14/20 16/4 16/8 16/14 17/1 17/9 17/12 18/10 18/19 19/16 20/1 38/5 61/22 63/18

**MR. WYMAN: [27]** 8/4 8/19 72/15 73/3 74/25 76/4 76/8 76/11 76/15 76/17 76/21 87/18 89/9 89/14 91/6 91/21 94/2 95/4 95/13 96/16 96/21 97/1 99/17 102/18 103/21 106/23 107/4

**THE CLERK: [5]** 4/3 19/24 72/18 72/23 72/25

**THE COURT: [100]** 4/9 4/14 4/23 5/7 5/10 8/17 8/20 9/12 9/18 10/4 12/2 12/6 12/24 13/2 13/9 13/16 13/21 14/3 14/16 14/23 15/4 15/10 15/12 16/3 16/7 16/9 16/17 16/20 16/23 17/5 17/11 17/14 17/18 17/22 18/8 18/17 19/4 19/14 19/17 20/5 20/9 58/8 58/17 59/2 59/6 59/12 59/15 59/21 60/11 60/15 60/18 60/20 61/23 63/11 63/19 70/19 73/2 74/22 75/25 76/2 76/7 76/10 76/13 76/18 77/23 81/18 81/25 82/6 83/20 84/12 84/23 85/16 86/10 86/17 87/16 87/20 88/1 89/12 91/20 91/23 92/9 93/3 93/9 93/15 94/22 95/7 95/20 96/20 96/23 98/9 99/20 100/3 102/21 104/3 104/24 106/2 106/10 107/5 107/12 108/3

**THE WITNESS: [18]** 72/21 72/24 73/1 76/3 77/24 81/19 82/1 82/8 84/13 84/24 86/18 92/10 93/16 98/10 100/4 104/4 106/3 106/11

## $

**$1,000 [2]** 43/16 44/10
**$1,050,000 [1]** 104/4
**$1,600,000 [1]** 50/15
**$1,750,000 [1]** 39/19
**$1,900 [2]** 43/17 44/10
**$1.6 [11]** 50/15 50/22 51/2 51/4 51/6 51/7 51/20 52/6 52/7 52/7 100/17
**$1.6 million [11]** 50/15 50/22 51/2 51/4 51/6 51/7 51/20 52/6 52/7 52/7 100/17
**$1.9 [2]** 50/12 50/15
**$1.9 million [2]** 50/12 50/15
**$100,000 [2]** 50/16 50/24
**$146,000 [2]** 55/21 55/24
**$16,000 [1]** 47/1
**$2 [1]** 39/18
**$2 million [1]** 39/18
**$2,750,000 [1]** 46/16
**$2,776.43 [1]** 101/18
**$2.5 [2]** 47/7 47/9
**$2.5 million [2]** 47/7 47/9
**$2.75 [5]** 47/5 47/12 47/16 47/19 48/9
**$2.75 million [3]** 47/5 47/12 47/19
**$2.8 [1]** 53/24
**$2.8 million [1]** 53/24
**$250,000 [1]** 47/17 47/11
**$27 [1]** 53/12
**$27 million [1]** 53/12
**$3 [2]** 46/15 55/5
**$3 million [2]** 46/15 55/5
**$35 [1]** 53/11
**$35 million [1]** 53/11
**$350,000 [3]** 101/11 101/13 103/1
**$352,776.43 [1]** 102/6
**$4 [34]** 38/19 38/21 39/1 39/2 39/21 42/1 42/2 42/17 42/19 43/2 43/6 43/8 43/23 44/17 55/21 55/23 56/2 56/4 56/5 56/9 61/8 61/13 62/3 88/18 90/24 91/2 91/10 93/12 95/25 100/11 100/20 103/25 106/14 107/1
**$4 million [31]** 38/19 38/21 39/1 39/21 42/1

42/2 42/17 42/19 43/2 43/6 43/8 44/17 55/21 55/23 56/2 56/4 56/5 56/9 61/8 61/13 62/3 88/18 90/24 91/2 91/10 93/12 95/25 100/20 103/25 106/14 107/1

**$4,146,000 [2]** 55/25 56/7
**$550,000 [1]** 66/10
**$600 [1]** 51/20
**$8 [1]** 53/13
**$8 million [1]** 53/13
**$8,146,000 [1]** 56/8
**$800,000 [1]** 39/20
**$900,000 [1]** 39/21

## '

**'only [1]** 5/20

## /

**/s [1]** 109/15

## 0

**0870 [1]** 1/21

## 1

**1-1053 [1]** 1/20
**1.14 [1]** 8/1
**1.15 [4]** 6/18 7/2 7/11 8/2
**1.4 [1]** 7/9
**1.41 [2]** 7/10 8/1
**1.6 million [1]** 100/20
**100 [3]** 7/11 75/8 84/4
**100 percent [1]** 64/2
**102 [1]** 3/13
**1053 [1]** 1/20
**107 [1]** 2/16
**10:14 [1]** 59/18
**10:29 [1]** 59/19
**10:30 [1]** 36/25
**10th [5]** 50/16 50/16 50/23 50/24 51/11
**11 [2]** 6/21 7/21
**1100 [1]** 2/7
**11:55 [1]** 108/5
**12 [6]** 3/10 75/11 75/13 76/5 76/13 76/16
**12:00 [1]** 36/25
**1343 [1]** 21/19
**14 [1]** 72/5
**14th [1]** 54/21
**15 [3]** 7/4 46/18 58/18
**15-minute [2]** 36/25 37/2
**150 [1]** 84/4
**15th of [1]** 8/6
**17 [1]** 6/16
**18 [1]** 21/20
**19 [7]** 70/23 72/1 72/2 72/2 72/5 72/9 107/21
**1979 [1]** 4/25
**1:25 [1]** 107/7
**1:30 [1]** 37/1
**1st [1]** 103/12

## 2

**2.75 [1]** 46/15
**20 [1]** 60/2
**2007 [1]** 63/24
**2011 [1]** 38/6
**2014 [4]** 41/5 41/5 75/5 81/13
**2015 [11]** 38/18 39/6 43/7 88/25 89/19 94/18 95/12 95/23 98/19 103/12 107/2
**2016 [2]** 46/1 49/25
**2017 [1]** 53/1
**2018 [14]** 5/2 7/6 48/17 48/25 49/4 50/16 50/23 51/1 51/19 51/22 54/6 54/16 54/21 54/25
**2019 [6]** 9/6 39/6 45/13 60/21 61/24 70/9
**2021 [3]** 1/17 4/1 109/13
**21 [3]** 1/17 4/1 109/15
**213 [1]** 2/8
**22 [2]** 88/25 109/13
**22nd [1]** 45/13 89/19
**235 [1]** 4/25
**239 [1]** 5/17

## 3

**3-500 [1]** 7/9
**3-510 [1]** 7/10
**312 [1]** 2/7
**31st [4]** 60/21 61/24 67/17 70/9
**338-3598 [1]** 2/12
**3598 [1]** 2/12
**37 [5]** 3/11 88/20 89/10 89/13 93/5
**38 [1]** 3/5
**3:00 [1]** 37/2
**3d [1]** 4/25
**3rd [1]** 98/19

## 4

**4-100 [1]** 7/11
**40 [5]** 3/11 94/12 94/14 95/5 95/8
**40 percent [2]** 100/20 100/24
**408 [1]** 81/17
**411 [2]** 1/20 2/11
**481-4900 [1]** 2/17
**4900 [1]** 2/17
**4:30 [1]** 37/1
**4th [1]** 1/20

## 5

**500 [1]** 7/9
**51 [6]** 3/12 96/7 96/17 96/24 97/2 98/18
**510 [1]** 7/10
**53 [4]** 3/13 102/10 102/19 102/23
**539 [2]** 6/16 8/6
**54 [7]** 3/12 98/15 99/3 99/18 99/21 103/21 103/23
**543-0870 [1]** 1/21
**559 [1]** 8/14
**59 [1]** 3/5
**5:00 [1]** 17/13
**5:10 [2]** 17/16 17/25
**5:28 [1]** 4/15

## 6

**615 [2]** 15/18 15/25
**6683 [1]** 2/8

## 7

**7/22/21 [1]** 109/15
**714 [2]** 1/21 2/12
**73 [1]** 3/8
**75 percent [1]** 78/20
**753 [1]** 109/6
**76 [1]** 3/10

## 8

**8000 [1]** 2/11
**89 [1]** 3/11
**894-6683 [1]** 2/8
**8:00 [1]** 9/15
**8:11 [1]** 9/2
**8:30 [1]** 10/11
**8:39 [1]** 4/1

## 9

**90012 [1]** 2/8
**92672 [1]** 2/16
**92701 [2]** 1/20 2/11
**94 [1]** 4/25
**949 [1]** 2/17
**95 [1]** 3/11
**97 [1]** 3/12
**99 [1]** 3/12
**9:00 [5]** 12/3 19/4 19/21 36/25 38/3
**9:09 [1]** 19/22

## 1

**15 [1]** 67/1
**19 percent [1]** 78/20
**26th [1]** 95/23
**28 [1]** 109/7
**29 [1]** 94/18
**29th [1]** 95/12
**2:30 [1]** 17/21

**A**

**a.m [8]** 4/1 9/15 12/3 19/21 19/22 59/18 59/19 108/5

**ability [1]** 31/7

**able [5]** 11/15 44/21 55/7 65/17 85/25

**about [58]** 12/12 13/16 14/9 14/21 17/13 20/19 26/16 30/2 32/9 32/12 32/13 32/17 33/1 33/10 33/14 34/6 34/6 34/13 34/17 34/21 36/25 37/2 40/14 42/12 43/16 44/4 46/18 48/20 49/23 50/19 50/21 52/9 55/10 56/23 57/2 57/15 57/16 57/17 58/9 58/13 65/2 67/20 67/21 67/23 67/23 68/4 68/25 69/4 69/5 72/9 78/16 79/5 79/6 81/11 93/6 97/5 104/18

**above [3]** 78/4 94/5 109/9

**above-entitled [1]** 109/9

**Absolutely [1]** 64/7

**absurd [1]** 66/3

**abundantly [1]** 11/1

**accept [2]** 27/4 32/13 32/22

**acceptable [1]** 60/19

**accessible [3]** 38/16 43/21 44/18

**accordance [1]** 29/2

**according [1]** 51/11

**account [42]** 27/10 27/11 31/6 38/21 38/22 38/23 40/17 42/21 42/22 44/15 47/6 47/8 47/25 48/9 51/3 53/16 54/8 54/22 56/1 91/11 91/16 91/25 92/1 92/2 92/2 92/4 92/5 92/6 92/13 92/14 92/15 92/16 92/18 92/21 92/24 96/2 100/4 105/11 105/14 106/13 106/17 106/17

**accounting [10]** 99/8 99/9 99/14 99/23 100/6 103/23 104/21 105/15 105/20 105/25

**accounts [2]** 25/8 25/13 27/10 28/14 34/13

**accuracy [1]** 35/5

**accurate [9]** 7/5 75/22 89/6 95/1 96/13 99/14 100/6 100/8 102/16

**accused [2]** 45/14 45/16

**acquittal [1]** 70/4

**across [1]** 64/10

**act [1]** 26/13

**acted [3]** 23/5 24/3 25/18

**action [2]** 27/5 97/13

**acts [1]** 23/16

**actual [7]** 14/14 50/13 50/17 51/1 54/12 54/13 94/8

**actually [2]** 47/10 85/21

**add [1]** 69/16

**added [1]** 5/22

**addendum [1]** 90/7

**addition [3]** 22/3 34/8 39/13

**additional [5]** 4/15 7/14 9/7 46/16 70/22

**address [5]** 12/25 38/4 59/22 77/1 85/6

**administered [1]** 85/23

**administering [1]** 87/4

**admit [6]** 76/5 89/10 95/4 96/16 99/17 102/18

**admitted [1]** 18/18

**admitting [2]** 18/16 18/20

**admonish [1]** 58/13

**admonition [2]** 58/10 107/7

**adopt [1]** 28/25

**adopted [1]** 29/3

**advance [4]** 10/8 10/13 11/2 70/7

**advanced [3]** 67/9 67/13 68/13

**advances [3]** 27/9 43/17 52/13

**advise [3]** 10/14 18/8 87/8

**advised [2]** 8/24 14/16

**advisory [4]** 4/12 11/22 12/8 20/7

**affect [1]** 21/15

**afternoon [1]** 37/1

**again [11]** 8/9 16/8 19/10 29/5 54/8 58/2 58/13 70/15 85/20 94/17 107/10

**against [8]** 21/21 21/23 38/12 43/18 46/5 50/8 52/13 90/16

**agent [5]** 4/7 16/3 20/3 61/3 61/5

**agents [8]** 15/21 16/18 16/21 16/25 61/7 61/9 66/8 69/14

**ago [6]** 59/21 60/22 61/23 63/18 85/18 108/21

**agree [5]** 5/4 5/7 21/3 29/14 94/22

**agreed [2]** 42/2 53/10

**agreement [50]** 40/14 42/11 43/2 46/22 46/23 46/25 47/3 47/5 48/7 49/21 50/14 50/18 50/19 51/2 53/8 53/9 53/15 53/19 54/2 54/4 54/13 54/14 61/9 61/13 68/19 78/15 78/19 89/2 89/7 89/18 89/21 89/25 90/4 90/8 90/10 90/12 90/20 90/20 91/2 92/1 92/22 93/5 93/11 93/21 93/25 100/22 101/1 101/24 104/19 106/6

**agreements [7]** 40/15 57/3 57/4 57/5 57/13 57/16 64/21

**Aircraft [1]** 47/9

**ALEXANDER [3]** 2/5 4/6 20/2

**Alexis [15]** 39/13 39/20 39/23 46/1 46/1 46/7 46/15 47/13 47/14 47/22 48/14 56/13 56/16 57/11 62/5

**all [58]** 7/3 9/6 12/9 16/19 16/23 20/25 24/10 24/14 24/17 25/2 26/23 26/25 27/1 27/5 27/7 28/12 29/4 31/17 32/5 32/24 34/7 35/7 37/24 39/4 39/16 40/2 41/11 43/9 44/22 51/20 53/23 53/25 54/10 57/12 58/3 58/4 58/6 60/7 61/18 64/1 64/18 64/19 65/6 67/14 67/20 69/14 70/24 71/3 71/18 72/11 73/11 73/13 75/9 79/10 83/25 89/3 92/17 99/24

**all-cash [1]** 44/22

**allow [1]** 21/9

**allowed [3]** 32/19 87/19 104/15

**allows [1]** 71/18

**almost [3]** 46/18 55/17 73/19

**along [3]** 12/17 64/25 65/12

**already [14]** 14/11 40/21 43/19 44/17 48/3 48/12 51/7 51/9 52/6 54/3 54/19 55/12 55/17 59/11

**also [32]** 5/1 6/20 8/14 11/7 11/10 16/5 18/13 21/9 32/4 33/22 52/24 53/19 56/12 57/4 58/13 60/24 61/2 61/9 64/24 67/8 82/15 104/8 107/22

**alternatively [1]** 22/11

**although [3]** 22/13 34/1 81/4

**always [2]** 11/11 73/19

**am [12]** 8/23 10/1 13/12 60/8 64/13 67/16 69/7 70/17 73/9 73/20 81/10 84/18

**amended [1]** 29/3

**AMERICA [6]** 1/9 4/4 19/25 60/1 60/3 70/13

**among [2]** 26/2 70/16

**amount [17]** 39/3 54/25 56/4 68/3 68/4 68/7 68/9 68/16 69/2 81/21 81/23 87/2 95/24 100/14 102/4 102/25 105/6

**amounts [3]** 26/25 43/16 67/14

**Ana [4]** 1/16 1/20 2/11 4/1

**analysis [1]** 66/10

**ancestors [1]** 63/15

**ancestry [2]** 21/7 31/21

**Andre [1]** 60/24

**Angeles [26]** 2/8 38/13 38/19 41/7 41/10 41/18 41/23 42/20 43/1 43/8 44/16 45/1 45/9 45/10 45/21 46/3 57/1 77/9 82/25 83/3 90/2 90/5 90/17 90/23 90/25 96/6

**another [11]** 23/16 30/6 41/4 47/7 50/8 58/2 77/15 78/24 79/21 81/19

**answer [3]** 16/5 30/21 81/19

**answered [3]** 30/17 30/18 86/5

**anticipated [1]** 66/6

**anticipation [1]** 67/10

**any [84]** 4/17 5/24 6/1 6/2 8/3 8/11 9/7 9/20 9/20 10/7 10/12 10/13 10/17 12/11 13/9 13/25 14/12 14/18 14/22 21/6 21/9 22/4 26/23 26/25 27/13 28/18 28/21 29/11 29/14 30/7 30/10 31/5 31/12 31/13 31/18 32/21 33/10 33/3 33/14 33/17 33/18 33/21 34/5 34/12 34/14 34/16 34/16 34/19 34/20 34/21 35/6 35/18 35/19 37/3 38/2 40/4 44/13 50/11 51/16 53/6 58/11 53/21 53/21 54/1 54/11 54/18 56/15 62/13 62/13 63/24 66/3 66/5 67/5 67/7 68/13 68/13 70/4 71/5 74/1 74/4 77/12 79/2 80/15 82/14 83/24 84/10 85/12 91/12 92/4 92/19 94/11 98/2 98/3 101/9 106/15 107/15 107/20 107/20

**anyone [6]** 10/17 33/13 33/14 58/11 72/4 107/8

**anything [26]** 8/17 9/20 9/24 9/25 14/3 14/9 14/11 19/1 19/4 21/24 29/22 32/10 33/15 34/6 34/13 34/24 39/2 44/8 48/20 49/6 52/3 69/7 93/5 93/12

**anytime [2]** 9/8 76/18

**apart [1]** 65/11

**apologize [2]** 42/18 59/1

**Apparently [1]** 60/15

**appear [4]** 10/11 47/25 80/5 80/8

**APPEARANCES [1]** 2/1

**appeared [2]** 79/7 79/18

**appears [2]** 6/21 96/23

**applicable [1]** 5/19

**application [1]** 33/19

**applies [4]** 33/9 33/22 33/24 36/21

**apply [1]** 21/2

**appreciate [1]** 15/16

**approach [1]** 20/12

**approached [1]** 34/5

**appropriate [6]** 7/23 28/14 28/16 71/10 81/23 94/20

**approval [1]** 90/25

**approvals [3]** 42/10 42/12 45/1

**approve [1]** 42/8

**approved [4]** 41/19 44/9 45/9 83/3 103/16

**approximately [10]** 39/18 39/19 39/20 43/15 55/21 56/1 63/23 75/2 81/11 84/2

**April [1]** 103/12

**April 1st [1]** 103/12

**are [61]** 5/2 5/4 5/7 10/23 11/13 12/3 13/9 13/17 18/14 20/18 21/12 21/21 24/17 24/21 25/3 29/9 29/10 29/12 29/15 30/6 30/11 30/24 32/18 34/5 36/8 42/18 49/13 59/12 66/23 66/23 66/24 67/18 68/9 68/11 68/16 68/19 68/22 70/24 71/2 72/2 73/24 74/1 76/8 82/3 82/8 82/17 82/18 83/8 83/12 84/16 85/13 85/13 86/22 87/6 87/16 87/16 89/24 92/16 92/18 101/2 105/8

**arguments [5]** 5/4 5/8 29/18 36/22 37/19

**arise [2]** 23/14 24/13

**arises [1]** 12/25

**arising [2]** 23/12 25/19

**around [2]** 17/21 66/19

**arrangement [1]** 104/14

**arrangements [1]** 65/3

**arrival [1]** 9/25

**arriving [1]** 44/20

**article [1]** 74/18

**as [101]** 4/12 4/12 5/20 6/10 7/22 7/25 8/14 8/14 9/9 10/21 11/10 11/10 11/12 11/12 12/7 12/7 12/13 12/13 12/21 12/21 14/10 15/3 16/8 16/25 18/1 19/2 20/8 20/8 20/20 21/1 21/2 23/1 25/17 27/3 27/17 28/10 28/10 28/20 28/25 29/3 29/16 30/1 32/15 32/22 32/22 33/1 33/9 34/3 34/14 34/23 34/25 35/1 35/24 37/17 37/19 39/25 43/17 44/7 48/1 52/11 52/13 52/17 53/16 53/21 53/21 54/1 54/11 54/18 56/15 62/13 62/13 63/24 66/3 66/5 67/5 67/7 68/13 70/4 71/5 74/7 74/4 77/12 79/2 80/15 82/14 83/2 84/10 85/12 91/12 92/4 92/19 94/11 98/2 98/3 101/9 106/15 107/15 107/20 107/20

**ask [7]** 10/10 11/24 37/21 43/24 66/20 70/16 83/7

**asked [6]** 13/16 25/21 29/6 34/5 60/13 65/5

**asking [6]** 11/16 15/7 41/18 51/13 97/6 97/7

**asks [1]** 30/12

**assessing [1]** 6/12

**asset [1]** 10/5

**assist [5]** 7/15 13/7 36/8 62/21 78/25

**assistance [1]** 20/12

**assistant [5]** 2/4 2/6 2/10 60/24 61/7

**assistants [1]** 4/13

**associate [1]** 79/22

**associated [3]** 63/5 68/12 72/1

**assuming [1]** 15/8

**assure [2]** 10/12 37/9

**attachment [1]** 95/2

# A

**attempt [4]** 23/8 24/7 45/18 80/16
**attempting [1]** 65/14
**attended [1]** 79/8
**attention [10]** 7/22 8/8 10/7 14/19 35/24 37/17 68/7 70/7 70/9 70/10
**attentive [1]** 36/4
**attitudes [1]** 21/12
**attorney [37]** 2/3 2/4 2/6 2/10 25/8 25/13 38/21 38/22 40/17 42/21 42/22 47/6 47/8 51/3 53/15 54/8 54/22 60/25 61/8 61/10 74/12 78/10 78/12 79/21 80/1 81/7 83/22 87/12 91/12 91/25 92/1 92/2 92/5 96/2 100/16 101/3 101/6
**attorney's [3]** 47/7 68/10 100/21
**attorney/client [17]** 25/8 25/13 38/21 38/22 40/17 42/21 42/22 47/6 51/3 53/15 54/8 54/22 91/25 92/1 92/2 92/5 96/2
**attorneys [5]** 11/17 29/18 29/19 36/22 65/13
**audit [1]** 28/18
**August [1]** 48/25
**author [1]** 97/6
**authority [2]** 27/4 28/25
**authorize [1]** 105/12
**authorized [1]** 11/14
**AVENATTI [58]** 1/11 2/14 3/5 4/4 4/11 4/15 5/14 6/15 7/3 10/22 11/15 12/2 12/12 12/15 12/18 14/24 16/10 19/25 20/7 38/11 38/11 40/2 42/21 58/20 59/21 63/11 63/23 63/24 70/19 74/7 74/9 74/12 74/14 74/15 74/24 77/1 77/2 78/20 79/9 79/14 79/17 79/21 81/4 81/8 91/11 92/24 96/2 96/24 98/25 100/21 101/1 101/8 102/15 103/7 105/24 106/13 107/5 107/13
**Avenatti's [3]** 20/15 20/17 104/7
**Avenida [1]** 2/16
**avoid [1]** 31/19
**awaiting [1]** 72/2
**aware [1]** 14/17
**awareness [1]** 21/14
**away [4]** 34/25 42/18 86/3 97/15

# B

**Baca [1]** 90/2
**back [13]** 13/2 16/4 41/2 49/24 53/10 53/17 61/2 67/12 67/17 70/15 77/11 85/3 107/7
**bad [1]** 38/6
**ballpark [1]** 69/22
**bank [5]** 27/10 27/18 57/6 91/16 92/6
**bankruptcy [4]** 55/1 55/2 55/8 56/11
**bar [13]** 8/11 25/1 25/24 26/15 28/19 28/24 63/21 69/11 70/5 73/24 74/1 92/3 107/24
**Barela [36]** 39/14 39/21 39/23 50/7 50/7 50/9 50/13 50/14 50/18 50/19 50/20 51/5 51/5 51/8 51/12 51/16 51/18 51/21 51/21 52/1 52/2 52/5 52/8 52/12 52/14 52/16 52/19 54/12 56/14 56/16 57/11 62/20 62/25 63/1 63/6 67/7
**Barela's [1]** 63/4
**barrier [1]** 71/9
**based [28]** 22/17 23/11 23/20 24/11 24/12 31/20 33/7 35/12 35/17 35/19 42/19 44/9 44/22 50/2 64/22 71/15 83/15 84/15 86/4 86/12 91/9 92/22 101/24 102/3 103/23 104/8 104/14 105/23 106/5
**basically [2]** 40/11 49/24
**basis [4]** 15/21 19/2 44/22 64/16
**basketball [1]** 46/6
**batting [2]** 17/7 17/25
**be [165]**
**Beada [2]** 101/3 101/4
**bear [1]** 31/18
**beauty [1]** 52/23
**became [2]** 63/21 63/24
**because [37]** 11/5 12/11 16/22 19/2 19/8 24/25 32/7 32/19 33/7 34/10 41/20 42/15 45/8 48/23 50/3 50/5 52/17 52/18 54/3 56/3 60/8 61/16 61/16 65/16 67/20 69/6 70/5 70/11 70/17 79/1 82/15 82/24 87/3 87/4 90/16 101/22 105/13

# B (second column)

**become [1]** 48/21
**becomes [1]** 109/4
**been [32]** 5/5 5/8 5/18 7/14 8/15 9/7 9/14 11/2 16/23 23/18 30/21 34/2 34/7 34/23 35/2 35/10 36/20 37/9 43/19 59/16 61/10 62/10 70/1 72/4 72/7 81/6 82/21 83/23 83/24 94/11 101/7 103/16
**before [17]** 9/8 10/23 14/14 17/6 17/15 18/24 18/24 21/4 38/2 62/8 63/22 70/15 80/4 83/13 91/14 94/19 98/17
**beg [1]** 43/25
**begin [2]** 36/11 75/2
**beginning [1]** 7/24
**behalf [14]** 4/6 20/2 38/20 40/13 42/1 46/15 47/13 50/13 53/18 57/14 73/11 80/25 91/13 104/20
**behind [3]** 62/10 71/9 75/7
**being [7]** 15/2 36/4 45/16 71/4 76/10 85/25 86/3
**belated [1]** 4/18
**beliefs [2]** 21/7 31/20
**believability [1]** 31/18
**believable [1]** 32/17
**believe [21]** 6/10 8/12 10/4 12/1 15/19 15/22 16/15 17/14 17/20 31/3 31/3 31/3 32/10 48/5 55/22 72/1 79/22 81/4 87/16 89/5 95/18
**believed [5]** 49/11 49/14 49/19 50/2 57/12
**believes [1]** 10/13
**belonging [3]** 27/15 27/20 27/22
**below [4]** 77/5 100/16 101/2 101/14
**beneficial [1]** 87/5
**benefit [2]** 23/16 27/8
**benefits [9]** 84/20 85/2 85/11 85/12 85/14 85/18 85/19 86/2 86/25
**best [7]** 37/25 38/14 46/8 50/10 53/5 80/15 93/8
**better [1]** 63/16
**between [6]** 12/10 27/14 30/8 39/20 48/14 90/4
**beyond [7]** 22/2 22/19 23/21 24/8 24/10 24/17 24/21
**bias [4]** 21/15 21/15 31/13 31/19
**biases [3]** 21/11 21/11 21/12
**big [3]** 42/19 64/3 82/17
**bill [1]** 64/5
**bills [2]** 44/11 64/5
**binder [2]** 75/7 88/19
**binders [1]** 75/7
**binding [2]** 6/8 29/4
**bit [2]** 67/17 83/7
**black [1]** 61/2
**blend [1]** 78/5
**blessed [1]** 64/11
**blog [1]** 33/19
**blow [1]** 89/15
**blue [2]** 74/20 74/21
**board [4]** 28/24 29/3 83/3 91/1
**boards [1]** 13/25
**bore [1]** 65/6
**both [5]** 16/25 19/17 22/13 30/6 53/25
**bottom [2]** 76/23 103/8
**box [1]** 28/10
**boyfriend [7]** 46/5 46/25 48/6 49/10 49/20 50/3 50/6
**BRANDON [1]** 2/4
**break [6]** 15/8 15/14 15/14 20/14 20/16 36/25 37/2 37/3 37/4 58/10 58/24 58/24 59/8 59/8 59/12 107/6
**breaks [1]** 10/9
**Bredahl's [1]** 37/4
**BRETT [3]** 2/9 4/5 20/1
**brief [3]** 18/5 20/11 22/7
**briefly [1]** 8/5 40/25 76/12
**bring [5]** 10/7 11/16 11/21 14/18 18/24
**bringing [2]** 11/25 73/21
**brings [1]** 21/23
**Brock [8]** 50/14 51/14 51/24 51/24 51/25 52/1 52/17 52/20
**BrockUSA [5]** 50/9 50/13 57/2

# B (third column)

**brought [7]** 8/7 21/17 61/11 61/12 75/4 78/25 90/21 124
**Building [2]** 2/10
**bunch [1]** 75/6
**burden [2]** 69/8 70/8
**business [6]** 27/14 44/3 51/10 53/2 53/20 54/9
**businesses [6]** 39/5 40/19 43/9 47/20 56/10 57/9
**businesses' [1]** 47/12
**buy [8]** 38/15 44/17 44/21 45/3 47/9 47/20 53/3 53/10
**buyout [1]** 53/20

# C

**CA [4]** 1/20 2/8 2/11 2/16
**Cal.App [1]** 4/25
**calculate [3]** 67/24 68/1 98/13
**calculating [1]** 81/22
**calculation [2]** 67/20 69/1
**calculations [1]** 103/24
**CALIFORNIA [16]** 1/5 1/16 4/1 4/24 25/2 25/4 26/2 26/2 26/3 26/5 27/12 63/15 63/21 73/22 73/24 74/2
**call [4]** 43/17 67/2 72/13 79/5
**called [11]** 19/13 46/25 50/9 50/14 53/9 61/14 63/23 64/16 66/12 83/8 85/5
**calls [3]** 63/7 72/16 104/1
**came [9]** 9/13 48/18 54/5 54/15 58/3 62/6 100/25 103/18 105/6
**camera [1]** 12/3
**can [34]** 5/9 10/11 10/15 11/21 14/22 15/9 21/15 22/13 23/14 30/5 30/7 34/17 37/9 38/2 41/15 46/12 48/20 59/9 59/10 68/21 69/6 74/17 77/11 79/3 80/19 83/16 84/17 84/20 85/13 92/13 97/7 97/17 98/1 98/18
**can't [4]** 12/22 37/21 85/9 86/2
**candidate [1]** 86/6
**cannot [4]** 26/13 30/18 30/19 90/17
**Cantrall [5]** 77/7 77/8 89/1 89/4 94/17
**capable [2]** 23/3 24/1
**car [4]** 46/2 62/7 62/9 67/5
**cards [1]** 51/9
**care [5]** 23/17 41/20 61/16 61/18 65/1
**career [1]** 46/10
**careful [3]** 24/13 24/16 24/20
**Carlos [4]** 4/7 16/1 20/3 79/20
**carried [1]** 7/14
**carry [5]** 6/16 23/8 23/9 24/6 24/7
**case [136]**
**cases [29]** 39/15 40/1 40/1 40/9 56/18 56/19 62/22 64/14 64/23 65/10 65/14 65/15 65/23 73/10 73/11 73/18 74/5 79/1 83/17 83/23 83/25 83/25 84/2 84/5 84/7 84/16 84/17 86/13 99/24
**cash [1]** 44/22
**catch [1]** 37/3
**category [1]** 82/13
**caused [2]** 23/7 24/5
**Cefali [2]** 4/12 20/8
**CENTRAL [1]** 1/5
**cents [1]** 67/1
**certain [2]** 81/22 86/19
**CERTIFICATE [1]** 109/4
**CERTIFIED [1]** 1/9
**certify [1]** 109/6
**cetera [1]** 6/24
**chain [2]** 96/11 96/14
**chance [5]** 5/11 9/11 64/12 64/13 66/1
**change [3]** 8/24 71/23
**charge [4]** 51/9 66/25 67/5 68/16
**charged [5]** 6/7 6/25 25/9 58/6 100/21
**charges [7]** 21/18 21/21 21/22 22/1 24/24 25/2 27/19
**Charles [3]** 89/1 94/18 97/6
**chart [3]** 11/4 13/12 13/19
**charts [1]** 70/15
**chat [1]** 33/18
**cheat [2]** 23/6 24/4

**C**

**check [22]** 17/12 39/4 42/19 42/24 42/25 70/3 95/17 95/19 95/22 96/3 96/5 98/2 102/15 102/16 102/25 103/2 103/5 103/11 103/13 105/10 106/12 107/1
**checking [1]** 49/1
**checks [1]** 92/15
**chicken [2]** 65/14 65/15
**Chief [1]** 2/5
**choose [4]** 32/10 68/16 70/25 71/20
**chooses [1]** 36/18
**Christmas [1]** 37/23
**circumstance [1]** 50/3
**circumstances [3]** 21/8 31/22 39/24
**circumstantial [4]** 29/25 30/4 30/7 30/9
**cites [1]** 5/14
**citing [1]** 4/24
**citizen [1]** 60/3
**civil [12]** 38/12 64/14 64/14 69/10 70/5 73/13 77/14 77/16 83/11 83/16 83/22 83/25
**CJA [3]** 11/11 11/13 12/1
**claiming [1]** 12/18
**claims [2]** 63/7 89/3
**class [2]** 27/5 27/6
**clear [6]** 10/1 11/1 19/15 19/16 19/17 60/5
**Clemente [1]** 2/16
**client [72]** 7/12 25/7 25/8 25/13 25/13 26/15 26/20 26/24 27/1 27/3 27/11 27/12 27/14 27/21 28/1 28/5 28/9 28/13 28/15 28/21 28/22 38/21 38/22 40/17 42/21 42/22 46/22 47/6 47/7 51/3 53/15 54/8 54/22 60/6 65/8 65/25 67/24 68/19 68/21 69/2 74/10 81/9 85/20 85/22 85/23 87/9 91/11 91/14 91/25 92/1 92/2 92/5 92/15 92/17 92/18 92/18 92/20 92/20 96/2 100/22 101/1 104/20 104/21 105/5 105/11 105/12 105/13 105/14 105/19 106/13
**client's [7]** 18/22 27/14 28/5 28/6 38/23 100/5 105/11
**clients [37]** 24/25 25/3 26/7 26/8 26/9 26/12 26/12 26/14 26/22 27/8 39/11 40/11 40/13 40/20 40/21 40/25 48/11 54/18 54/19 56/23 56/24 57/10 57/20 57/23 57/24 57/25 64/5 64/21 65/6 66/25 67/9 67/14 68/5 68/14 71/21 85/6 85/7
**clients' [3]** 40/24 54/18 57/18
**close [5]** 35/24 69/11 71/24 72/3 90/25
**closing [2]** 36/22 37/19
**clothing [1]** 74/18
**co [4]** 74/5 76/24 76/15 77/2
**co-counsel [4]** 74/5 76/24 76/25 77/2
**Code [2]** 21/20 109/7
**colleague [1]** 60/24
**color [2]** 21/7 31/20
**Colorado [1]** 79/20
**come [6]** 12/20 13/2 38/1 51/15 64/18 107/6
**comfortable [2]** 37/5 65/3
**coming [11]** 11/13 12/18 14/15 28/13 51/9 51/17 54/1 88/12 100/7 105/8
**comment [2]** 7/15 18/13
**commentary [1]** 7/13
**comments [2]** 5/12 8/3
**commingled [1]** 27/16
**commit [1]** 6/6
**committed [1]** 60/5
**common [2]** 24/12 53/9
**commonly [1]** 67/4
**communicate [3]** 26/21 33/13 33/14
**communicates [1]** 12/23
**communicating [3]** 33/22 33/24 79/13
**communication [3]** 7/10 24/6 96/23
**communications [7]** 12/9 12/12 12/14 12/15 23/8 35/8 48/16
**company [2]** 50/9 53/11
**compensated [1]** 73/4
**complete [3]** 43/1 43/3 90/22
**completed [1]** 33/5
**completely [3]** 40/6 62/4 92/10
**complexity [1]** 65/23

**compliance [1]** 16/24
**complied [3]** 74/6 75/7 75/11
**complies [7]** 75/9 75/12 88/21 94/13 96/8 98/16 102/11
**comply [4]** 6/23 25/6 25/12 28/17
**complying [1]** 26/18
**computer [1]** 33/17
**concealed [1]** 40/20
**concealing [1]** 57/24
**concern [1]** 71/12
**concerning [3]** 14/17 70/22 107/23
**concluded [1]** 45/11
**conclusion [1]** 58/5
**conclusions [1]** 71/14
**conclusively [1]** 57/22
**condition [1]** 61/17
**conditions [2]** 26/23 26/25
**conducive [1]** 12/20
**conduct [10]** 5/2 5/23 6/17 6/19 7/8 7/17 8/23 26/3 33/1 74/2
**conducted [1]** 71/17
**conduit [1]** 12/14
**confer [1]** 17/15
**conference [2]** 66/15 109/11
**conferring [1]** 106/24
**confide [1]** 49/22
**confided [1]** 52/8
**confidential [2]** 90/10 90/13 90/18
**confined [1]** 38/8
**conformance [1]** 109/10
**connection [4]** 66/11 75/20 99/12 104/9
**conscious [2]** 21/14 21/15 31/19
**consciously [1]** 21/13
**consent [1]** 27/12
**consider [10]** 7/23 25/11 29/9 29/16 30/6 30/25 32/5 34/11 82/16 82/17
**considerable [1]** 18/3
**consideration [3]** 24/14 24/16 24/21
**considered [4]** 5/20 6/11 13/19 13/20
**considering [2]** 31/5 32/23
**consistent [1]** 31/25
**consists [1]** 29/10
**constantly [5]** 42/7 43/24 44/24 52/1 52/2
**constitute [2]** 9/19 22/24
**consultants [1]** 66/24
**consulting [1]** 34/14
**consumers [1]** 73/12
**contact [5]** 34/8 71/24 72/3 72/6 105/19
**contained [1]** 21/21
**context [2]** 64/14 76/11 87/10
**contingency [2]** 64/16 73/11 78/5 78/8 78/14
**contingent [1]** 78/9
**continue [1]** 8/9
**continued [6]** 39/6 43/12 45/6 45/24 47/21 56/6
**contradicted [1]** 31/14
**control [2]** 20/22 21/14 30/11
**controlled [2]** 38/22 40/17
**controversy [1]** 68/3
**conversations [1]** 101/6
**convict [1]** 23/10
**convinced [3]** 24/9 24/17 24/21
**cooperation [1]** 72/12
**copies [1]** 26/19
**copy [16]** 7/18 8/21 9/12 9/22 9/24 17/17 46/21 47/2 66/19 75/22 89/6 95/1 96/13 99/14 102/16 105/15
**corporations [1]** 64/3
**correct [3]** 18/19 73/1 109/8
**cost [3]** 66/2 87/4 105/9
**costs [17]** 27/9 65/19 65/21 66/23 101/15 101/17 101/20 101/21 101/23 102/1 102/3 104/9 104/12 104/15 104/18 105/8 105/21
**could [24]** 6/1 6/4 18/7 41/24 47/9 65/3 67/2 75/7 75/11 80/19 82/4 86/23 88/19 89/14 89/15 89/20 94/2 94/11 95/10 95/13 96/7 97/16 99/3 103/21
**counsel [18]** 2/1 2/15 4/7 4/12 10/11 11/20 12/8 20/3 20/8 36/17 36/18 37/17 71/20 74/5

76/24 76/25 77/2 106/24
**counting [1]** 52/19
**countless [4]** 51/21 55/9 66/8 66/9
**country [2]** 64/10 66/9
**counts [2]** 21/19 58/6
**County [37]** 38/12 38/19 41/6 41/9 41/18 41/23 42/2 42/8 42/15 42/16 42/17 42/20 42/25 43/7 44/16 45/1 45/8 45/9 45/10 45/21 57/1 77/20 82/25 83/2 86/1 90/1 90/4 90/17 90/23 90/25 91/10 93/11 93/18 96/6 103/19 107/1
**course [2]** 33/11 68/20
**court [45]** 1/4 5/17 6/16 6/18 6/20 7/2 9/14 9/20 9/21 9/23 10/9 10/10 11/13 11/16 11/16 11/17 11/19 11/23 12/8 12/21 14/13 17/6 17/15 18/17 29/22 34/9 35/3 35/4 35/13 35/19 36/4 36/24 41/22 46/13 66/16 66/16 71/5 71/17 71/23 74/15 76/20 79/8 80/15 107/15 109/16
**Court's [4]** 8/8 10/7 14/17 14/18
**courthouse [1]** 1/19 2/7 71/25 72/9
**courtroom [7]** 10/14 16/13 35/7 36/5 66/15 72/6 72/11
**cover [2]** 88/25 94/17
**covering [1]** 53/25
**COVID [9]** 58/18 70/21 70/23 72/1 72/2 72/2 72/5 72/9 107/21
**COVID-19 [7]** 70/23 72/1 72/2 72/2 72/5 72/9 107/21
**created [3]** 75/18 75/23 76/12
**creating [1]** 13/21
**credibility [2]** 31/23 61/20
**credit [1]** 51/9
**creditors [2]** 55/6 56/10
**crime [3]** 60/5 63/10 68/25
**crimes [2]** 6/6 22/7
**criminal [9]** 2/5 6/2 21/17 26/24 63/5 69/10 70/6 70/13 101/6
**criteria [4]** 86/19 86/22 86/25 87/6
**cross [4]** 3/7 3/14 36/17 36/19
**cross-examine [2]** 36/17 36/19
**cure [1]** 19/14
**current [4]** 7/2 7/7 7/16 7/20
**cut [2]** 85/10 86/25

**D**

**daily [1]** 80/6
**damage [1]** 82/9
**damages [5]** 82/9 82/10 82/11 82/14 82/17
**Daniels [1]** 14/12
**data [1]** 75/17
**date [13]** 46/17 60/22 61/6 61/25 67/17 70/9 89/15 89/17 95/10 95/11 95/22 103/11 109/13
**dated [2]** 88/25 94/17
**Davids [1]** 64/9
**day [13]** 1/12 9/20 9/21 10/9 10/9 10/10 36/24 38/1 55/5 79/19 79/19 92/14 92/14
**days [2]** 59/24 72/5
**deadline [2]** 9/8 9/9
**deal [2]** 47/3 53/18
**DEAN [3]** 2/15 2/15 12/7
**deceive [2]** 23/6 24/4
**December 2016 [1]** 49/25
**December [2]** 46/1 49/25
**decide [11]** 21/1 21/3 25/21 30/10 31/2 32/6 32/8 33/4 33/7 35/12 36/3
**decided [3]** 13/12 35/2 54/6
**deciding [4]** 29/9 29/16 30/24 31/1
**decision [1]** 35/22
**decisions [2]** 14/8 21/16
**deducted [4]** 68/8 68/9 68/11 68/15
**deemed [4]** 58/23 59/7 59/15 107/15
**deeming [1]** 18/17
**defendant [216]**
**defendant's [20]** 41/3 41/20 42/21 43/4 44/2 44/3 44/6 47/24 48/9 53/15 54/25 56/17 57/8 57/9 78/15 79/24 97/16 98/18 103/24 105/20
**defendants [1]** 90/23
**defending [1]** 77/10

**D**

**defense [6]** 3/14 3/16 15/23 77/5 77/9 97/7
**defer [1]** 11/23
**defraud [9]** 22/10 23/6 23/20 23/24 24/3 24/25 25/16 25/18 60/6
**defrauded [1]** 57/23
**defrauding [1]** 63/5
**delay [1]** 98/6
**delayed [1]** 44/24
**deliberate [2]** 20/24 36/23
**deliberately [1]** 32/9
**deliberation [1]** 33/24
**deliberations [2]** 20/23 33/5
**deliver [1]** 28/20
**delta [1]** 107/21
**demonstrative [2]** 13/19 13/20
**demonstratives [3]** 13/10 13/16 13/17
**denied [2]** 35/13 108/3
**Department [2]** 4/7 20/4
**depend [1]** 32/16
**deposed [1]** 66/13
**deposit [5]** 28/10 40/16 47/24 48/20 49/2
**deposited [10]** 27/9 27/16 38/20 42/20 44/11 51/3 54/7 92/16 92/23 93/1
**depositions [1]** 79/7
**deposits [4]** 49/5 49/12 49/13 49/13
**deputy [2]** 10/14 72/6 72/11
**describe [2]** 39/24 40/1 94/21
**described [2]** 80/15 106/18
**describes [1]** 21/22
**describing [1]** 85/13
**deserves [2]** 32/18 32/23
**designee [1]** 16/2
**desired [1]** 107/13
**desperately [1]** 51/23
**despite [4]** 43/23 66/8 69/13 69/14
**detail [3]** 7/15 70/1 70/8
**detailed [1]** 20/22
**details [3]** 70/9 70/10 70/11
**determination [1]** 31/22
**determine [3]** 29/6 69/6 72/8
**determined [1]** 25/4
**developed [1]** 71/25
**developments [1]** 26/16
**devised [2]** 22/21 23/24
**diagnosed [1]** 72/4
**dictionaries [1]** 34/14
**did [96]** 4/17 4/19 6/3 6/16 9/10 12/18 17/7 17/18 18/8 30/3 38/24 38/25 39/2 41/25 42/16 42/17 43/13 44/2 44/4 44/5 45/23 46/21 46/22 47/18 48/4 48/4 50/5 50/6 50/17 50/18 51/5 51/6 51/15 51/25 52/3 52/4 52/5 52/17 52/19 52/20 55/12 55/17 57/9 57/12 62/18 64/2 64/2 64/4 64/9 64/13 64/15 64/23 67/13 67/14 68/18 69/17 74/1 74/11 75/2 77/20 77/21 78/15 79/24 80/5 80/8 80/11 80/25 81/12 81/14 81/21 87/23 88/4 88/14 88/16 89/4 89/5 91/9 91/16 93/21 93/23 97/24 98/12 102/7 102/9 105/15 105/17 105/17 105/24
**didn't [30]** 9/16 12/19 18/24 42/3 42/24 43/2 44/13 51/14 51/15 52/2 55/16 63/9
**differences [1]** 32/6
**different [8]** 32/1 32/1 40/2 40/10 61/21 63/2 92/5 92/10
**differently [1]** 32/5
**differs [1]** 32/7
**difficult [1]** 52/9
**dire [1]** 107/20
**direct [12]** 3/7 3/14 9/19 12/15 16/5 29/25 29/25 30/1 30/6 30/9 73/4 91/3
**directed [2]** 38/1 53/16
**direction [2]** 44/6 47/24
**directive [1]** 19/9
**directly [5]** 9/22 12/12 47/25 48/9 67/9
**disadvantage [1]** 26/14
**disagree [1]** 6/9
**disappointing [1]** 67/22
**disbursed [2]** 106/14 106/20

**disclose [3]** 13/13 23/12 25/19
**disclosing [1]** 23/15
**discovering [1]** 63/19
**discovery [2]** 11/8 79/6
**discretion [1]** 12/9
**discuss [5]** 34/7 58/11 81/22 88/4 107/7
**discussed [2]** 34/18 34/20
**discussing [1]** 33/16
**discussions [1]** 88/3
**dislikes [1]** 21/10
**dismiss [1]** 98/6
**dismissal [4]** 97/9 97/10 97/11 98/6
**dismissed [1]** 97/14
**dismisses [1]** 97/13
**dispute [1]** 28/2
**disputed [2]** 28/1 28/1
**disregard [3]** 29/21 30/23 30/25
**distance [1]** 71/20
**distancing [2]** 71/10 71/19
**distinction [1]** 30/8
**distract [1]** 36/4
**distribution [1]** 28/17
**DISTRICT [2]** 1/4 1/5
**division [1]** 1/6 2/5 101/3
**do [115]**
**Docket [3]** 6/15 8/6 8/14
**document [50]** 50/21 75/6 75/16 75/18 75/22 76/12 88/22 89/2 89/4 94/19 96/9 99/5 101/16
**documents [26]** 26/19 45/22 45/23
**does [20]** 6/24 11/18 14/3 21/24 25/8 51/25 62/23 69/1 73/20 78/7 83/5 83/6 85/19 87/10 91/2 91/5 99/23 100/13 100/19 101/20
**doesn't [42]** 42/16 69/16 70/3 70/3
**doing [8]** 10/22 13/24 37/8 37/10 37/15 64/13 64/13 88/6
**dollar [3]** 69/9 69/12 69/21
**dollars [5]** 55/13 64/6 65/10 66/3 69/19
**don't [30]** 9/15 11/3 11/5 11/11 11/19 12/1 12/11 12/20 13/13 14/8 15/14 16/10 16/15 17/13 18/6 18/10 20/16 66/20 68/3 69/15 81/5 85/10 87/1 87/18 94/10 94/20 95/18 101/5 107/6 107/9
**done [13]** 11/18 29/23 38/2 48/3 48/13 54/2 54/19 56/14 60/3 79/6 82/22 84/3 86/15
**doubt [9]** 22/3 22/19 23/22 24/8 24/11 24/11 24/11 24/18 24/22
**down [2]** 66/17 107/12
**draft [1]** 7/3
**draw [1]** 71/14
**drawn [1]** 6/4
**Drum [3]** 66/5 66/10 69/18
**Drum's [3]** 66/6 69/24 70/3
**due [12]** 46/16 46/17 50/15 50/16 50/23 50/24 53/6 54/16 67/24 68/10 107/22
**duration [1]** 65/24
**during [10]** 10/9 15/2 15/14 33/11 63/25 67/18 68/20 71/16 81/14 88/3
**duties [10]** 5/16 6/23 7/6 20/12 20/20 21/4 25/3 25/7 25/24 26/4
**duty [16]** 20/24 23/12 23/14 24/18 24/23 25/19 26/6 26/7 26/8 26/11 33/11 42/4 42/23 47/15 47/16 47/17

**E**

**e-mail [14]** 9/22 12/16 17/9 18/10 33/18 51/21 96/11 96/13 96/22 97/4 97/5 97/17 98/19 98/21
**e-mails [1]** 17/12
**each [18]** 7/13 22/18 23/21 35/1 35/11 36/12 38/1 39/14 39/16 39/24 40/1 40/1 60/9 57/19 68/4 69/9 71/20 105/9
**Eagan [26]** 38/11 42/20 63/23 63/24 74/7 74/9 74/12 77/1 77/2 78/20 79/14 79/17 79/21 81/8 91/11 92/23 96/2 98/25 100/21 101/1 101/8 102/15 103/7 104/7 105/24 106/13
**earlier [3]** 10/16 45/12 68/13
**earliest [2]** 27/23 97/4
**early [2]** 38/1 54/6
**earned [2]** 78/8 78/17
**easier [2]** 38/17 43/22

**eat [1]** 65/3
**economic [3]** 27/8 82/2 82/11
**edit [1]** 8/21
**education [2]** 32/20 32/23
**effect [1]** 5/3
**effective [1]** 29/4
**eight [2]** 47/1 52/23
**either [10]** 10/22 12/13 12/22 16/15 16/18 16/21 23/14 30/7 30/9 55/12
**electronic [2]** 9/18 97/8
**elements [4]** 22/7 22/18 23/21 25/14
**elicit [1]** 87/18
**else [5]** 31/25 33/14 33/25 65/15 81/3
**emigrated [1]** 63/16
**Emphasis [1]** 5/22
**employer [2]** 33/25 34/2
**employment [1]** 26/17
**enclosing [1]** 89/18
**enclosure [1]** 89/1
**encourage [1]** 10/7
**end [19]** 10/9 20/21 33/5 33/12 35/21 41/5 41/5 57/21 58/1 58/4 58/21 59/2 59/16 61/2 68/8 70/14 80/4 98/1 107/14
**engaged [2]** 25/15 54/17
**engagement [1]** 105/24
**engaging [1]** 24/24
**enormous [1]** 67/14
**enough [3]** 42/19 69/12 87/3
**enter [1]** 80/12
**entered [1]** 90/4
**entertain [1]** 10/6
**entire [6]** 39/3 47/19 53/24 90/3 95/20 97/13
**entirely [1]** 49/17
**entirety [1]** 62/2
**entities [2]** 73/12 85/9
**entitled [21]** 15/19 28/22 35/11 40/5 54/4 63/3 65/17 65/18 65/19 67/8 67/12 68/23 75/17 89/2 101/25 102/4 103/24 104/8 105/7 105/7 109/9
**entity [2]** 82/25 90/17
**Ernest [1]** 99/13
**error [1]** 5/15
**especially [1]** 11/5
**essence [1]** 105/13
**essential [2]** 23/9 24/7
**essentially [1]** 46/2
**establish [2]** 22/9 87/1
**established [3]** 84/8 84/10 88/8
**establishing [1]** 6/6
**estimate [1]** 69/21
**et [1]** 6/23
**ethical [4]** 25/3 25/23 25/25 29/8
**evaluate [2]** 20/25 21/16
**evaluating [1]** 25/14
**even [15]** 6/2 11/3 11/8 11/9 29/23 39/9 40/9 42/6 42/13 43/14 43/18 44/23 45/2 47/14 54/14
**evening [1]** 97/19
**event [1]** 32/4
**eventually [1]** 37/18
**ever [12]** 52/5 66/20 74/4 74/7 79/15 88/4 88/7 88/11 90/7 93/21 93/24 106/20
**every [5]** 18/15 61/20 64/5 69/9 105/9
**everybody [1]** 10/15 46/19
**everyone [2]** 33/24 37/22
**everything [3]** 31/3 44/5 44/9
**evidence [91]** 5/18 6/5 6/5 6/11 20/25 21/4 21/24 22/5 22/6 24/14 24/15 24/17 24/21 29/9 29/12 29/15 29/16 29/25 30/1 30/4 30/7 30/9 30/10 30/11 30/12 30/13 30/14 30/22 30/25 31/14 31/17 32/15 32/25 33/8 34/10 35/2 35/22 36/1 36/8 36/13 36/14 36/16 36/18 36/20 40/9 40/24 41/1 57/22 58/3 58/4 58/5 60/21 61/6 61/15 61/17 62/3 62/6 62/7 62/13 62/16 62/18 62/23 62/25 63/4 63/13 63/14 63/25 64/10 65/2 65/22 66/22 66/24 67/4 67/13 68/1 68/24 69/23 76/16 76/19 89/10 89/13 93/8 94/20 95/8 95/19 97/2 99/21 102/23

**E**

**ex [6]** 46/25 48/6 49/10 49/20 50/3 50/6
**ex-boyfriend [6]** 46/25 48/6 49/10 49/20 50/3 50/6
**exact [2]** 18/21 105/6
**exactly [6]** 62/18 64/13 69/20 70/17 85/5 92/16
**EXAMINATION [1]** 73/4
**examinations [1]** 37/19
**examine [2]** 36/17 36/19
**example [4]** 37/8 48/14 85/8 92/13
**examples [2]** 48/15 79/3
**excellent [1]** 57/13
**except [2]** 27/17 41/11
**exception [4]** 6/15 7/1 15/25 71/19
**exchange [1]** 90/22
**exchanged [1]** 13/3
**excluded [1]** 14/11
**exclusion [1]** 15/25
**excuse [2]** 44/25 44/25
**excused [1]** 34/23
**excuses [1]** 55/10
**exercised [1]** 23/18
**exhibit [40]** 3/10 3/11 3/11 3/12 3/12 3/13 18/15 30/13 30/17 30/18 75/11 75/13 76/5 76/13 76/16 76/18 88/20 89/10 89/13 89/20 93/5 94/12 94/14 95/5 95/8 95/20 96/7 96/17 97/2 98/15 98/18 99/3 99/19 99/21 102/10 102/12 102/19 102/23 103/21 103/23
**Exhibit 12 [4]** 75/11 75/13 76/5 76/13
**Exhibit 37 [3]** 88/20 89/10 93/5
**Exhibit 40 [3]** 94/12 94/14 95/5
**Exhibit 51 [3]** 96/7 96/17 98/18
**Exhibit 53 [2]** 102/10 102/19
**Exhibit 54 [4]** 98/15 99/3 99/18 103/21
**exhibits [6]** 3/9 3/17 13/7 18/21 29/12 75/8
**existence [2]** 22/10 22/14
**exists [1]** 7/25
**expect [6]** 14/16 34/3 64/6 68/3 68/6 105/24
**expectation [3]** 92/24 106/6 106/18
**expects [1]** 36/14
**expend [1]** 64/23
**expended [1]** 65/12
**expenses [15]** 27/9 38/17 41/16 41/25 43/5 43/22 44/1 47/12 57/8 64/25 65/19 66/12 66/13 68/12 82/12
**expensive [2]** 65/1 66/22
**experience [10]** 32/2 32/24 83/5 83/11 83/15 84/15 84/19 86/12 87/22 91/12
**experienced [1]** 12/24
**expert [6]** 66/5 79/7 83/19 84/22 87/14 92/8
**experts [2]** 66/1 66/2
**explain [1]** 5/9
**exposed [2]** 33/10 35/18
**exposure [1]** 83/23
**expressed [1]** 21/14
**extended [1]** 42/15
**extensive [3]** 68/22 82/10 82/15
**extremely [3]** 52/9 65/1 66/22
**eye [2]** 37/3 37/4

**F**

**fabricating [1]** 63/6
**face [3]** 71/8 71/13 71/15
**Facebook [1]** 33/20
**facing [1]** 52/17
**fact [12]** 6/1 6/5 14/9 25/19 29/16 30/1 30/6 30/8 32/15 37/15 66/4 92/18
**factors [6]** 31/18 81/21 82/3 82/8 82/18 82/19
**facts [12]** 21/1 21/1 22/23 23/1 23/11 23/12 25/16 29/10 29/14 30/5 31/1 80/9
**failed [6]** 6/22 25/6 25/12 42/5 69/23 70/20
**fair [8]** 35/11 35/14 75/22 89/6 95/1 96/13 99/14 102/16
**fairly [1]** 21/5
**fairness [1]** 35/18
**faith [1]** 15/21
**false [10]** 22/12 22/22 22/24 40/19 48/11 49/14 50/21 51/12 57/23 62/4

**falsely [1]** 46/24
**familiar [4]** 71/25 83/23 84/14
**family [3]** 33/25 34/2 63/14
**far [3]** 11/10 11/12 42/18
**fashioned [1]** 37/23
**fear [1]** 21/10
**February [1]** 98/19
**February 3rd [1]** 98/19
**federal [2]** 2/10 41/8 64/3 69/15
**fee [18]** 53/24 53/25 64/16 78/8 78/10 78/14 78/16 98/13 100/22 100/23 101/1 101/10 101/24 103/25 104/6 104/7 104/14 104/19
**fees [13]** 54/3 66/23 68/10 68/10 68/17 100/16 100/21 101/3 101/14 102/3 103/3 105/8 105/21
**fellow [4]** 33/5 33/23 36/2 36/10
**few [7]** 10/20 15/1 20/19 33/1 59/24 79/3 106/5
**fiduciary [3]** 23/15 26/6 26/7
**Fifty [1]** 102/21
**Fifty-three [1]** 102/21
**fight [1]** 61/20
**fighting [2]** 64/12 65/25
**figure [2]** 98/12 100/11
**file [4]** 12/3 52/3 52/4 75/16
**filed [7]** 4/15 9/2 9/11 9/16 9/20 9/21 9/23
**filing [6]** 4/18 9/18 52/5 66/23 97/8 97/10
**filings [1]** 11/11
**filling [1]** 45/3
**final [4]** 88/14 103/15 104/16 106/5
**finalized [5]** 38/25 41/19 42/7 82/23 98/12
**finally [5]** 11/15 28/2 40/19 45/21 51/25
**financial [10]** 49/23 49/23 50/4 50/5 52/9 52/14 52/16 52/18 57/6 66/10
**find [11]** 5/22 21/11 23/11 24/18 24/23 30/5 49/3 49/7 51/23 56/2 70/16
**finding [1]** 70/4
**fine [4]** 15/10 60/20 97/21 97/22
**firm [50]** 27/8 27/15 27/22 27/22 27/25 28/14 38/11 41/3 41/4 44/3 44/8 44/8 55/1 55/8 56/17 61/17 62/16 63/1 63/22 63/24 64/2 64/2 64/3 67/3 68/10 73/15 74/4 74/7 77/9 78/15 78/21 78/24 79/22 92/3 92/4 92/14 97/7 98/12 100/6 101/9 101/11 101/25 102/4 102/7 102/15 103/24 104/9 105/10 105/17 105/20
**firm's [3]** 18/23 103/23 104/12
**firmly [1]** 24/9
**firms [7]** 29/1 63/20 76/25 74/4 78/16 104/15 105/23
**first [26]** 8/25 18/1 22/20 23/23 33/3 36/12 39/10 40/12 45/4 50/22 53/12 68/2 72/13 72/19 72/23 75/4 82/16 87/6 89/14 89/21 89/24 90/19 90/21 97/17 98/2 98/3
**five [1]** 28/16
**fixed [1]** 27/24
**flip [3]** 11/4 13/11 13/19
**focus [3]** 62/24 68/6 95/10
**focuses [1]** 7/22
**focusing [3]** 90/19 97/4 103/8
**follow [5]** 22/6 35/15 35/16 49/4 52/2
**followers [1]** 52/23
**following [6]** 5/12 22/18 23/21 26/3 29/15 68/2
**follows [1]** 27/17
**footnote [1]** 8/7
**force [1]** 52/3
**foregoing [1]** 109/7
**forget [1]** 32/2
**form [4]** 33/21 58/11 78/4 107/8
**formal [2]** 23/14 23/15 46/13 46/13
**format [1]** 109/10
**former [7]** 7/9 7/14 7/17 7/25 8/1 8/2 46/5
**forming [1]** 63/22
**formulate [1]** 28/25
**formulated [1]** 29/2
**forward [7]** 6/17 7/14 19/14 37/20 37/22 54/10 82/18
**found [2]** 22/16 23/19
**foundation [7]** 83/20 86/9 87/14 91/19 91/22

98/7 104/23
**founder [4]** 72/24
**four [2]** 43/15 55/13
**four million [1]** 55/13
**fourth [5]** 2/11 23/7 24/5 40/18 81/13
**FOX [1]** 2/4
**Frank [1]** 81/5
**frantically [1]** 56/2
**fraud [7]** 6/25 21/19 22/9 22/17 23/10 23/20 25/10
**Frauds [1]** 2/6
**fraudulent [3]** 22/12 22/22 22/24
**free [1]** 66/20
**frivolous [1]** 18/15
**front [8]** 18/11 65/6 75/9 75/12 88/21 94/13 98/16 99/4
**fulfilled [1]** 48/8
**fulfilling [2]** 48/7 49/20
**full [4]** 37/17 54/3 54/24 56/4
**fully [1]** 70/24
**fund [3]** 100/5 105/13 106/13
**funding [2]** 97/23 97/25
**funds [27]** 7/12 25/7 25/13 27/7 27/11 27/15 27/18 27/20 28/1 28/6 28/6 28/12 28/17 28/18 28/21 39/17 41/14 90/24 91/3 91/13 91/17 92/23 92/25 93/7 103/15 106/8 106/21
**further [6]** 8/17 14/4 19/5 42/9 45/18 54/5 107/4
**future [4]** 43/18 52/13 54/1 82/12

**G**

**gain [1]** 35/7
**game [1]** 65/24
**Gardner [31]** 39/14 39/20 39/23 46/1 46/2 46/7 46/15 46/20 46/23 46/24 47/2 47/13 47/14 47/15 47/22 48/2 48/5 48/14 48/18 48/25 49/9 49/17 49/17 49/22 54/12 56/3 56/16 57/11 62/5 62/19 67/7
**Gardner's [3]** 47/25 50/4 65/2
**gave [3]** 43/15 50/21 64/12
**gears [1]** 83/7
**gender [3]** 21/8 31/21 31/22
**general [2]** 82/14 92/14
**generally [7]** 64/4 64/15 65/5 74/1 78/22 87/7 98/1
**generate [1]** 37/7
**generating [1]** 37/12
**gentleman [3]** 13/6 60/23 61/1 61/4 69/18 74/20
**gentlemen [15]** 20/10 29/5 36/24 37/14 57/21 58/9 60/2 61/19 63/9 65/22 67/16 69/9 69/12 70/14 70/20
**Geoffrey [61]** 38/6 38/10 38/13 38/15 38/20 38/24 39/1 39/2 39/3 39/7 39/10 39/13 39/19 39/23 41/2 41/4 41/9 41/10 41/21 41/24 42/1 42/3 42/4 42/6 42/8 42/12 42/13 42/23 42/24 43/4 43/6 43/10 43/11 43/12 43/23 44/5 44/17 45/2 45/4 45/5 45/11 45/15 45/16 45/17 45/23 45/24 45/25 52/11 56/13 56/15 57/11 60/10 61/7 74/10 93/21 93/25 94/5 94/8 99/13 105/15 105/25
**get [30]** 38/2 38/14 41/24 42/14 46/9 53/5 55/1 55/7 56/10 57/5 64/4 64/6 64/15 64/17 64/20 64/21 65/17 66/6 66/19 67/12 67/18 68/11 68/15 69/20 69/20 69/22 80/4 85/10 97/7 98/2
**gets [4]** 68/8 68/9 85/22 97/14
**getting [3]** 49/19 51/10 56/19
**give [15]** 20/12 20/20 20/21 21/2 22/7 30/10 32/1 32/22 33/23 37/17 46/21 48/15 55/16 65/25 79/3
**given [6]** 5/17 30/9 32/24 35/24 59/11 78/23
**giving [2]** 52/12 72/10
**go [25]** 36/2 36/23 37/1 37/19 37/21 37/24 40/25 45/23 46/19 46/21 57/9 58/2 70/15 77/11 82/8 83/1 87/11 89/20 91/6 92/17 92/20 93/21 94/2 95/13 97/16
**goes [4]** 12/10 37/23 97/14 105/11
**going [48]** 7/17 7/19 8/20 8/23 8/24 10/10

## G

**going.. [42]** 10/21 13/9 13/12 13/13 13/17
15/22 18/1 18/2 18/3 19/12 19/12 19/14 20/15
37/16 41/6 45/21 46/13 49/8 60/11 60/16
63/12 65/25 66/4 66/6 66/7 67/5 67/17 67/18
69/4 82/18 83/7 84/21 87/3 87/7 87/8 87/17
87/20 100/7 105/8 105/12 106/16 106/16
**Goliaths [1]** 64/9
**gone [2]** 39/8 44/24
**good [18]** 4/5 4/9 4/10 4/14 15/21 20/1 20/5
20/6 20/9 20/10 59/24 64/19 64/20 64/20
69/11 73/6 73/7 86/6
**good-faith [1]** 15/21
**got [7]** 17/3 17/24 45/6 45/20 45/25 64/15
66/21
**gotta [1]** 66/19
**gotten [1]** 19/12
**governing [3]** 6/23 25/6 25/12
**government [41]** 4/17 10/19 11/3 14/3 15/13
15/19 17/3 20/13 21/18 21/18 21/23 22/2 22/8
22/9 22/13 22/18 23/20 24/9 25/22 25/24
36/16 36/19 60/23 61/3 61/5 62/23 64/3 66/5
66/7 68/6 69/3 69/15 70/8 72/13 76/4 89/9
95/4 96/16 99/17 102/18 106/24
**government's [9]** 9/4 11/19 16/1 59/16 69/8
69/25 72/17 94/12 107/14
**governmental [3]** 82/25 85/8 90/16
**governors [1]** 28/24
**graduating [1]** 63/20
**great [1]** 57/12
**Greg [1]** 51/15
**Gregory [17]** 39/14 39/21 39/23 50/7 50/7
50/9 51/4 51/5 51/8 51/12 51/17 51/20 52/12
56/13 56/16 57/11 62/25
**grew [1]** 63/16
**gross [4]** 100/10 100/14 100/16 100/22
**guess [1]** 30/20
**guesstimate [1]** 69/22
**guilt [1]** 24/10
**guilty [17]** 6/25 21/25 22/2 22/16 23/19 24/9
24/18 24/19 24/22 24/23 25/9 58/6 60/8 60/9
69/7 70/5 70/17
**guys [2]** 64/8 97/23

## H

**had [54]** 5/11 23/2 23/12 23/25 25/19 38/7
39/16 40/21 41/10 42/4 42/23 43/8 43/19
43/23 43/24 44/8 44/16 45/11 45/11 47/15
47/16 47/17 48/1 48/3 48/8 48/13 50/2 50/8
51/6 51/19 54/3 54/18 55/11 55/12 56/8 56/14
61/10 61/10 61/12 62/10 62/17 64/12 67/9
71/24 72/3 78/23 78/25 82/21 86/13 101/21
103/16 105/19 106/14 106/18
**half [6]** 22/23 45/11 48/17 55/17 55/19 69/19
**hand [4]** 8/21 24/20 32/11 66/14
**handed [1]** 9/12
**handicap [3]** 38/16 43/21 44/18
**handicap-accessible [3]** 38/16 43/21 44/18
**handle [2]** 11/24 98/20
**handled [2]** 41/4 79/1
**handling [3]** 14/12 79/19 84/15
**hands [1]** 8/22
**HANNA [1]** 2/3
**happen [3]** 34/24 92/25 106/12
**happened [7]** 32/2 42/4 43/13 44/8 45/19
63/7 63/8
**happening [1]** 49/3
**happy [1]** 5/12
**hard [1]** 8/21
**has [37]** 5/18 7/14 9/7 10/19 11/2 11/12 14/11
14/11 14/13 14/16 16/23 18/20 19/2 21/25
22/3 22/4 25/14 32/8 35/16 36/20 48/21 59/10
63/14 66/21 70/1 72/4 72/7 74/23 83/1 83/3
83/23 86/1 92/20 94/11 98/3 105/5 105/12
**hasn't [1]** 45/9
**Hassan [4]** 46/6 57/2
**have [120]**
**haven't [4]** 12/24 13/12 49/1 49/5
**having.. [2]** 52/10 59/15

**he [108]** 9/7 9/11 11/9 11/12 11/21 11/24
11/24 13/22 14/9 14/14 16/5 16/6 16/9 16/9
16/9 16/10 16/12 18/14 18/20 18/21 18/23
19/2 25/22 29/7 31/25 38/7 38/21 39/1 39/19
39/20 39/21 40/17 40/21 40/25 41/15 41/20
41/24 42/4 42/5 42/13 42/23 42/25 43/12
44/21 46/4 47/16 48/8 48/12 48/13 50/8 50/11
51/21 51/3 51/5 51/6 52/9 52/10 54/4 54/18
54/23 55/4 55/4 55/12 55/12 55/16 55/17
55/22 56/4 56/7 56/12 56/14 56/20 56/21
56/22 56/23 59/10 61/2 61/3 61/4 61/8 61/9
61/10 61/13 61/16 63/7 66/17 69/23 74/17
74/18 74/20 77/17 77/20 77/21 79/21 79/22
80/1 80/2 80/3 80/8 80/23 81/7 81/8 81/10
97/6 97/7 101/6 101/7 104/8
**he's [3]** 14/17 18/25 18/25
**head [1]** 62/17
**heading [4]** 90/20 101/2 101/9 101/17
**health [2]** 71/23 71/23
**healthcare [2]** 85/9 85/25
**healthy [2]** 70/24 72/11
**hear [19]** 5/12 15/13 20/13 20/15 29/22 29/23
31/8 34/24 40/23 44/12 46/12 48/10 53/9
56/15 63/4 63/6 65/2 66/4 66/7
**heard [2]** 30/2 96/21
**hearing [1]** 45/13
**Hearsay [5]** 76/6 95/6 96/18 99/19 102/20
**held [2]** 27/7 109/9
**hell [1]** 49/8
**help [8]** 22/6 35/25 36/13 46/4 46/9 52/14
53/3 85/19
**helpful [1]** 6/12
**her [47]** 46/2 46/4 46/5 46/5 46/5 46/8 46/8
46/10 46/25 47/15 47/16 47/17 47/17
47/22 48/6 49/10 49/12 49/20 50/2 50/3 50/6
50/6 50/6 52/23 53/2 53/3 53/6 53/6 53/7
53/10 53/10 53/20 53/20 55/15 55/15 55/16
55/16 56/1 62/7 62/9 62/12 62/12 62/17 65/4
68/21 71/2
**here [21]** 10/15 10/24 12/18 12/21 13/6 13/7
16/3 16/4 16/6 17/17 35/3 35/4 37/22 58/10
61/1 66/17 73/22 74/15 77/13 95/10 95/16
**hereby [1]** 109/6
**hey [1]** 68/21
**Hi [2]** 49/1 49/4
**high [2]** 80/14 85/3
**highest [1]** 26/7
**Hills [2]** 61/14 61/16
**him [42]** 9/20 11/6 11/13 11/16 11/21 11/24
14/17 17/7 38/8 38/12 38/14 38/14
38/15 40/4 44/19 45/7 45/8 45/20 46/7 49/19
50/8 50/10 51/10 51/21 51/6 52/9 57/19
61/11 61/12 61/13 63/2 68/21 69/18 69/19
69/20 69/22 74/17 88/9 101/5 106/21
**himself [9]** 10/23 39/4 40/19 43/9 47/11 47/20
56/9 56/9 57/8
**hire [1]** 66/1
**hired [8]** 39/10 39/15 43/20 46/3 50/7 53/2
66/5 69/17
**his [78]** 10/25 11/22 11/25 14/10 14/11 14/12
18/16 18/22 18/23 24/25 25/22 26/7 26/8
26/11 26/12 26/14 29/7 38/9 38/11 39/5 39/8
40/11 40/13 40/19 40/20 40/20 40/24 40/25
41/16 41/25 43/5 43/9 43/21 43/22 43/25
44/10 44/18 45/4 45/25 46/22 47/5 47/12
47/20 48/6 48/7 48/8 48/11 49/10 49/20 51/3
51/23 52/14 52/19 53/24 54/3 54/8 54/18
54/18 54/21 55/6 55/7 56/10 56/10 57/8 57/16
57/18 57/19 57/23 57/24 57/25 59/11 61/16
66/10 71/8 76/12 87/19 104/12 106/7
**history [1]** 63/14
**hold [3]** 38/23 40/4 42/9
**holding [1]** 70/8
**Hollywood [2]** 62/11 62/14
**home [4]** 38/16 43/21 45/5 46/19
**homeless [2]** 46/2 62/6
**Honda [1]** 47/9
**Honor [88]** 4/5 4/10 4/19 5/6 5/9 8/4 8/5 8/10
8/16 8/19 10/2 10/3 10/19 11/1 11/23 12/5

13/5 13/15 13/24 14/5 14/11 14/20 14/25 15/5
15/8 15/11 16/18 17/5 17/17 17/19 17/22
17/24 18/2 18/19 19/6 20/1 20/6 38/5 58/25
59/23 60/13 60/19 61/22 63/18 72/15 73/3
74/25 76/1 76/4 76/6 76/8 76/9 76/15
76/21 81/16 81/24 82/4 83/18 84/11 84/21
86/8 87/13 87/18 89/9 89/11 91/18 91/22 92/7
93/8 94/19 95/5 95/6 95/18 96/17 96/18 96/21
98/7 99/18 99/19 100/2 102/19 102/20 104/1
106/9 106/23 107/17 107/25
**Honor's [5]** 9/8 12/9 14/2 14/6 19/8
**HONORABLE [1]** 1/8
**hope [2]** 63/16 64/19
**hoping [4]** 38/15 43/20 46/9 62/11
**horrified [1]** 62/15
**hosting [1]** 55/15
**hour [2]** 64/4 64/7
**hourly [1]** 78/5
**hours [2]** 46/18 64/24
**house [6]** 44/18 44/22 44/24 45/3 45/6 45/17
**housekeeping [1]** 14/1
**how [32]** 11/23 11/24 19/7 20/12 21/16 30/10
32/17 32/18 34/3 40/14 40/24 40/25 44/14
48/12 54/10 57/4 64/15 67/14 67/23 78/16
82/17 83/15 84/2 84/17 85/18 87/10 88/17
90/15 92/12 98/3 104/18 106/6
**however [3]** 25/11 27/24 32/8
**hundred [3]** 63/15 84/15
**hundreds [2]** 65/9 66/2
**Hurrell [5]** 77/7 77/8 89/1 89/4 94/17
**hypothetical [2]** 86/9 87/15

## I

**I'd [4]** 17/12 17/13 79/1 86/18
**I'll [1]** 14/2
**I'm [25]** 7/17 7/19 8/24 10/10 11/8 13/13
13/13 13/14 13/24 13/24 15/7 18/11 18/11
18/24 58/25 60/13 75/25 76/8 83/7 84/21
87/20 91/21 96/4 97/20 98/17
**I've [1]** 45/20
**I-N-D-E-X [1]** 3/3
**identifiable [1]** 27/10
**identifications [1]** 71/5
**identified [3]** 13/3 74/23 74/24
**identify [2]** 28/8 74/17
**identity [3]** 7/12 21/8 31/21
**ignore [3]** 30/20 30/23 32/14
**illegal [1]** 68/24
**immediately [8]** 9/25 35/20 45/15 47/6 55/5
62/17 71/22 72/6
**impartial [4]** 24/13 24/16 24/20 35/12
**impartially [1]** 21/5
**import [1]** 27/11
**importance [1]** 41/23
**important [7]** 10/5 32/10 32/17 35/15 37/14
37/16 37/17
**impose [1]** 26/3
**imposed [1]** 25/24
**improper [6]** 5/15 5/23 6/9 35/8 87/14 92/8
**inaccurate [2]** 4/23 35/9
**include [1]** 33/16
**included [1]** 8/14
**includes [2]** 26/8 27/3
**including [17]** 8/13 18/5 21/11 25/7 25/15
26/17 27/8 33/19 33/25 34/22 38/7 44/4 44/9
55/6 56/10 63/5 107/24
**incomplete [2]** 35/9 87/14
**incorporated [4]** 6/14 6/18 6/20 7/2
**incorporates [1]** 7/6
**incurred [2]** 101/22 104/9
**indicate [1]** 74/22
**indicated [1]** 59/2
**indicates [1]** 7/13
**Indictment [3]** 21/22 21/22 21/23
**indirect [1]** 30/4
**individual [3]** 71/7 71/10 86/5
**individually [1]** 71/5
**individuals [6]** 10/23 11/12 11/22 53/23 70/24
71/2

**J**

**induced** [1]  23/16
**ineffective** [1]  16/25
**infer** [1]  37/15
**inference** [1]  6/4
**influence** [2]  23/3 24/1
**influenced** [5]  21/6 21/3 35/8 36/9 71/14
**influencers** [1]  52/22
**influencing** [2]  23/3 24/1
**inform** [1]  4/17
**information** [12]  21/16 26/8 26/9 26/18 33/10 35/7 35/9 35/13 35/19 57/25 76/24 106/15
**informed** [3]  26/16 26/20 62/13
**infrequently** [1]  10/6
**initial** [10]  4/16 15/12 14 53/22 53/25 54/1 54/4 54/15 58/17 107/23
**initially** [1]  44/21
**injuries** [4]  38/7 77/20 78/2 82/16
**injury** [1]  84/1
**innocence** [1]  22/4
**innocent** [1]  22/1
**inquire** [2]  17/4 18/1
**insisted** [1]  56/20
**insofar** [1]  5/20
**Instagram** [1]  33/20
**instance** [2]  82/24 106/12
**instances** [1]  67/13
**Instead** [5]  7/16 50/20 51/8 55/3 72/6
**instruct** [3]  5/16 6/9 36/21
**instructed** [5]  6/10 29/20 47/8 54/7 54/9
**instruction** [14]  5/17 6/14 7/5 7/21 7/24 7/25 9/1 17/5 17/14 34/11 58/18 58/19 70/21 70/21
**instructions** [12]  4/16 6/3 6/21 15/13 20/11 20/21 20/22 33/9 37/8 58/18 70/22 107/23
**intend** [2]  13/4 87/18
**intended** [2]  51/20 60/6
**intending** [2]  13/24 13/24
**intent** [9]  5/21 5/25 6/2 6/6 23/5 23/6 24/3 24/4 25/18
**intention** [2]  15/6 21/15
**interact** [1]  79/10
**interactions** [1]  39/25
**interacts** [1]  56/24
**interest** [4]  27/24 31/11 53/4 68/16
**Internal** [1]  55/7
**internet** [3]  33/18 34/15 34/19
**interrupt** [1]  20/16
**interstate** [2]  23/8 24/6
**interviewed** [1]  9/9
**introduced** [1]  59/25
**invest** [1]  51/9
**investigation** [3]  34/16 35/6 69/25
**involved** [7]  34/1 34/22 56/18 56/20 56/21 87/3 101/7
**involvement** [1]  80/5
**involves** [1]  33/11
**involving** [3]  74/9 84/3 84/16
**Ipsy** [8]  52/24 53/1 53/3 53/3 53/10 53/14 53/23 54/6
**irrelevant** [1]  8/12
**IRS** [1]  55/7
**is** [260]
**isn't** [1]  69/10
**issue** [2]  17/2 98/1
**issued** [1]  28/18
**issues** [6]  18/4 18/5 19/11 33/11 58/12 97/23
**it** [162]
**it's** [41]  6/8 7/20 12/8 12/16 12/16 12/20 14/21 15/6 18/2 18/22 19/4 35/15 37/12 37/16 45/8 66/14 66/15 66/22 67/21 68/25 69/11 69/21 73/19 83/24 83/24 83/25 85/5 85/7 85/20 85/21 86/23 87/3 87/14 88/25 90/16 92/10 94/20 95/17 97/21 97/22 100/4
**Italy** [1]  63/16
**Item** [2]  4/3 19/24
**items** [2]  69/9 70/10
**its** [5]  22/8 66/8 69/3 72/13 102/1

**J**

**Jail** [1]  77/20
**JAMES** [2]  1/8 61/1
**January** [12]  38/18 50/16 50/16 51/1 51/15 88/25 89/19 94/18 95/12 95/23 103/14 107/1
**January 10th** [2]  50/16 50/16
**January 22** [1]  88/25
**January 22nd** [1]  89/19
**January 26th** [1]  95/23
**January 29** [1]  94/18
**January 29th** [1]  95/12
**Jason** [1]  81/5
**Jencks** [3]  9/3 9/5 9/7
**jeopardizes** [1]  35/17
**Jerry** [1]  61/4
**job** [2]  57/13 64/19
**JOHN** [6]  1/11 2/14 4/4 19/25 66/5 69/18
**Johnson** [85]  38/6 38/10 38/13 38/15 38/20 38/24 39/1 39/2 39/7 39/10 39/13 39/19 39/23 41/2 41/10 41/13 41/15 41/21 41/24 42/1 42/3 42/5 42/6 42/8 42/12 42/13 42/14 42/23 42/24 43/3 43/4 43/7 43/10 43/12 43/16 43/20 43/23 43/24 44/5 44/10 44/17 45/2 45/6 45/11 45/18 45/24 45/24 45/25 52/11 54/11 56/13 56/16 57/11 60/10 60/22 61/7 61/15 62/19 67/7 74/10 75/16 75/20 77/15 77/18 78/23 79/10 79/13 79/15 81/1 81/9 88/9 90/1 90/4 93/6 93/22 93/25 94/6 99/13 101/25 104/10 105/16 105/21 105/25 106/7
**Johnson's** [25]  39/3 41/4 41/9 43/11 45/5 45/15 45/16 45/17 62/2 65/1 75/3 78/13 78/17 80/11 80/20 81/3 88/3 88/13 92/25 94/8 102/5 102/8 103/3 103/19 106/21
**joined** [2]  4/11 79/17
**judge** [8]  1/8 41/8 41/13 41/15 71/6 80/19 80/22 80/23
**judged** [1]  32/21
**judgment** [2]  64/18 64/20
**Judicial** [1]  109/11
**Judy** [1]  44/2
**Julian** [1]  60/23
**July** [8]  1/17 4/1 6/16 7/4 8/6 43/7 48/17 109/13
**July 15** [1]  7/4
**July 17** [1]  6/16
**July 2015** [1]  48/17
**July 2018** [1]  48/17
**jump** [1]  18/13
**jurisdiction** [2]  27/13 27/15
**juror** [3]  34/3 35/17 35/18
**jurors** [10]  15/2 20/18 20/20 33/2 33/5 33/23 34/23 36/2 61/16 71/4
**jury** [35]  4/2 4/16 5/16 5/18 6/4 6/10 6/12 6/14 7/5 8/16 10/5 10/6 14/14 15/12 19/19 19/23 20/11 20/18 33/11 34/6 35/12 36/3 36/23 37/8 38/4 58/16 58/17 59/20 59/22 61/19 63/11 67/16 94/21 107/11 107/24
**jury's** [2]  7/22 18/7
**just** [31]  4/20 8/10 16/9 15/1 17/5 18/13 18/23 32/7 37/11 38/7 42/9 45/22 46/19 48/15 49/1 52/11 59/9 62/1 65/12 66/11 67/19 70/11 83/25 85/18 86/5 91/25 98/17 98/18 106/5 106/18
**JVS** [3]  1/11 4/3 19/24

**K**

**keep** [12]  6/22 19/2 25/5 26/9 26/15 26/19 33/3 36/1 65/24 70/23 85/19 86/2
**keeping** [1]  10/6
**keeps** [1]  18/14
**Kim** [1]  61/1
**kind** [5]  10/24 73/10 80/17 86/5 91/16
**knock** [1]  62/11
**know** [37]  9/16 10/15 11/3 11/5 11/10 11/12 11/19 14/8 16/10 18/6 19/10 31/8 43/13 49/5 62/6 67/21 90/15 93/24 94/1 94/8 94/10 98/2 100/7 101/5 101/5 103/9 103/14 103/18 103/20 104/12 104/13 104/19 105/15 105/20 105/22 106/20 106/22

**knowing** [4]  10/20 48/2 48/3 56/14
**knowingly** [3]  22/20 23/7 23/11
**knowledge** [2]  90/3 90/7
**known** [1]  63/24
**knows** [2]  14/6 18/21
**Komona** [1]  61/4

**L**

**L.A** [1]  77/20
**label** [1]  28/8
**labeled** [2]  27/10 75/7
**lack** [2]  24/14 70/1
**ladies** [15]  20/10 29/5 36/24 37/14 57/21 58/9 60/1 61/19 63/9 65/21 67/16 69/8 69/12 70/14 70/20
**language** [6]  6/19 7/19 7/19
**last** [12]  8/5 8/25 17/2 34/4 46/20 60/7 60/7 60/7 62/8 72/5 72/20 94/2
**lasted** [1]  46/18
**late** [1]  17/3
**later** [10]  12/3 12/12 12/21 14/23 46/17 46/21 59/10 59/13 63/24 67/11
**law** [42]  2/15 6/8 6/9 21/2 21/4 25/4 25/22 26/1 26/3 26/4 27/8 27/15 27/22 27/22 27/25 28/14 29/1 29/7 30/8 33/9 34/21 36/21 38/11 41/3 41/4 44/7 44/8 53/21 54/25 55/7 63/20 63/22 73/15 73/22 74/4 74/7 78/15 90/17 92/3 92/4 92/14 100/6
**lawsuit** [4]  78/2 87/10 90/22 93/13
**lawsuits** [1]  83/12
**lawyer** [16]  5/16 14/10 26/6 26/11 26/13 30/12 30/13 30/15 38/10 39/25 41/3 41/17 73/9 78/9 80/19 98/25
**lawyer's** [6]  6/23 7/6 25/7 26/4 26/7 26/12
**lawyers** [8]  7/15 26/1 34/22 38/1 41/3 41/22 56/17 57/1
**lay** [2]  62/17 83/20
**lead** [3]  7/21 74/12 80/1
**Leading** [4]  75/24 76/1 85/15 106/1
**learn** [2]  34/16 39/10
**learned** [1]  72/3
**learning** [3]  39/7 39/8 45/18
**least** [3]  15/23 62/1 87/8
**leave** [5]  17/15 17/18 36/4 53/1 62/13
**leaves** [1]  24/9
**ledger** [4]  101/17 101/20 101/22 101/23
**left** [7]  17/6 17/20 36/5 38/8 52/7 93/12 93/19
**legal** [4]  24/25 25/24 34/11 79/5
**less** [2]  28/16 84/4
**let** [10]  29/5 33/14 36/3 48/23 49/3 49/5 53/17 60/5 70/21 85/3
**let's** [3]  13/2 14/23 60/10
**letter** [7]  88/25 89/6 89/17 94/24 95/1 95/10 95/11
**level** [2]  80/14 85/4
**levels** [1]  96/19
**license** [1]  26/4
**licensed** [2]  25/1 26/1 63/21
**lie** [9]  39/6 40/13 43/12 45/7 45/18 45/24 47/22 54/18 56/6
**lied** [2]  40/11 40/25 57/19
**lien** [1]  86/1
**liens** [2]  85/8 85/9
**lies** [2]  55/10 55/16
**life** [4]  38/9 38/17 43/22 63/16
**light** [2]  31/17 37/23
**lights** [1]  37/24
**like** [26]  17/4 17/25 18/23 21/15 32/21 37/2 37/22 38/4 41/6 41/15 52/11 59/21 60/17 62/4 62/19 66/16 67/1 67/5 69/25 70/9 80/23 83/12 87/12 99/23 104/21 105/25
**likes** [1]  21/10
**limine** [2]  14/7 14/17
**limited** [2]  6/11 33/19
**line** [2]  97/17 103/6
**lines** [2]  8/7 12/17
**lineup** [1]  18/9
**LinkedIn** [1]  33/20
**list** [2]  17/3 19/9

**L**

listed [3]  77/6 77/12 101/9
listen [1]  34/12
lists [1]  101/18
litigate [1]  65/22
litigation [1]  73/13
little [2]  64/8 83/7
live [1]  71/24
lived [1]  62/9
lives [1]  62/21
living [12]  38/16 38/17 41/16 41/25 43/5
43/21 43/25 46/2 61/15 62/7 65/3 73/8
LLC [1]  63/23
LLP [3]  42/21 63/24 96/2
loan [1]  45/4
location [1]  61/14
lodged [1]  107/23
long [19]  12/7 12/13 12/21 34/3 44/24 53/2
53/20 53/21 54/9 54/14 54/22 54/23 55/3
55/10 55/22 56/1 61/18 63/14 83/24
look [10]  37/11 75/11 86/19 87/2 88/19 96/7
98/15 99/3 102/10 104/19
looked [2]  41/6 103/13
looking [2]  89/24 95/16
looks [2]  97/21 97/22
Los [26]  2/8 38/13 38/19 41/6 41/9 41/18
41/23 42/20 42/25 43/8 44/16 45/1 45/9 45/10
45/21 46/2 57/1 77/9 82/25 83/2 90/2 90/5
90/17 90/23 90/25 96/6
lose [1]  86/23
lost [1]  26/10
lot [9]  37/7 44/3 63/1 66/25 68/3 68/6 68/22
69/3 69/5
low [1]  87/3
lower [1]  71/8
loyalty [2]  26/11 26/12
lump [1]  42/16
lump-sum [1]  42/16
lunch [4]  55/15 58/24 59/8 107/6
lying [1]  42/7

**M**

made [31]  4/20 4/21 4/24 5/5 5/8 6/15 7/3
11/1 13/15 18/13 23/1 25/16 27/1 40/15 40/19
48/1 48/5 48/11 51/12 55/20 55/22 55/22 57/3
58/23 59/6 59/9 62/17 93/11 93/18 96/1
magnitude [1]  65/23
mail [14]  9/22 12/16 17/19 18/10 33/18 51/21
96/11 96/13 96/22 97/4 97/5 97/17 98/19
98/21
mails [1]  17/12
maintain [1]  28/12 71/9
maintained [2]  27/11 29/1
Major [1]  2/6
make [30]  4/22 8/25 15/9 18/6 19/17 21/16
22/8 32/2 34/16 35/21 36/12 36/15 36/22
37/18 38/17 42/16 43/22 47/23 47/25 48/4
48/5 54/6 56/12 58/20 58/22 59/3 59/10 65/14
67/2 108/1
makes [1]  30/8
makeup [2]  52/22 52/24
making [7]  18/14 48/1 49/11 49/16 49/18 50/4
57/23
management [1]  49/11
manager [5]  44/2 53/2 53/20 53/20 54/9
manner [8]  26/13 31/10 40/10 46/12 68/2
71/15 71/18 71/18
many [9]  4/19 4/21 44/4 62/20 62/20 65/14
67/22 70/16 84/2
March [1]  45/13 50/23 50/24 51/9 51/10
51/11 51/11 51/16 51/19 51/22 54/6 54/16
54/21 54/25 60/21 61/24 67/17 70/9
March 10th [3]  50/23 50/24 51/11
March 14th [1]  54/21
March 2018 [1]  54/6
March 22nd [1]  45/13
March 31st [4]  60/21 61/24 67/17 70/9
mark [4]  49/6 49/7 49/7 49/7
marked [1]  3/9 3/17 94/11

**mask** [7]  71/1 71/3 71/3 71/8 71/11 71/13
71/16
masked [1]  15/2 71/7
material [5]  23/2 23/11 23/25 25/17 57/25
materials [2]  9/3 34/15
math [3]  67/21 67/23 70/3
matter [18]  10/8 14/21 26/24 34/8 42/25 43/3
45/11 67/6 70/6 70/12 70/12 70/12 78/4 97/22
97/24 104/10 107/9 109/9
matters [7]  10/13 10/17 14/1 14/12 27/2 38/2
63/2
may [48]  5/10 5/19 5/20 5/20 6/11 11/11
16/25 21/13 21/13 22/24 24/13 25/11 29/22
29/25 30/15 30/16 30/22 31/1 31/3 31/6 31/24
32/4 32/5 32/10 32/13 32/22 34/2 34/11 35/8
35/25 36/12 36/17 36/19 37/8 37/15 66/3
70/25 71/13 71/13 71/19 76/18 76/19 81/5
86/4 96/21 107/1 107/12 107/14
maybe [1]  69/21
MCNICHOLAS [27]  3/8 18/3 18/12 18/15 19/3
19/9 19/11 72/16 72/17 72/21 73/6 73/16
73/16 76/24 89/17 94/24 99/8 99/8 101/14
101/14 101/21 101/21
me [37]  6/8 9/16 18/11 29/5 34/25 37/8 48/23
49/3 53/17 60/5 60/5 61/11 61/17 62/6 62/8
62/14 62/16 63/1 65/12 65/13 67/3 67/19
68/10 70/7 70/10 70/11 72/10 75/10 75/12
78/25 79/3 79/5 85/3 88/21 94/13 98/16 99/4
mean [12]  6/24 25/9 65/7 65/7 65/21 67/23
73/20 78/7 97/24 100/13 100/19 101/20
meaning [1]  68/19
means [6]  22/12 22/22 30/24 33/17 64/16
78/8
mechanically [1]  98/4
media [5]  33/21 33/25 34/12 34/25 52/22
mediation [17]  18/4 18/21 46/11 46/14 46/18
79/8 80/12 80/14 80/15 80/17 80/20 80/25
81/9 81/11 81/14 81/16 83/1
medical [3]  61/16 65/1 82/12
meet [2]  17/14 85/23
meetings [1]  63/7
Meisinger [1]  80/22
member [15]  25/1 26/15 26/21 27/8 27/15
27/21 27/22 27/25 28/4 28/14 28/22 29/1
63/21 73/24 74/1
member's [2]  26/21 27/24
members [2]  29/4 33/25
memory [3]  31/9 36/8 36/9
mention [1]  11/7
mentioned [6]  10/22 16/14 54/20 73/18 85/18
91/25
merely [1]  13/7
merits [1]  33/15
message [1]  48/19
messages [2]  48/14 51/21
messaging [1]  33/18
met [6]  46/3 49/25 55/14 60/22 62/8 87/6
MICHAEL [12]  1/11 2/14 4/4 4/11 19/25 20/7
38/11 40/2 49/1 49/4 74/14 74/15
Michelle [20]  39/14 39/22 39/24 52/21 52/21
53/1 55/3 55/6 55/10 55/13 55/14 55/17 55/20
55/22 55/25 56/9 56/12 56/16 57/12
middle [2]  62/12 77/11
midnight [1]  46/19
might [6]  7/23 10/8 12/20 42/19 67/10 97/13
million [64]  38/19 38/21 39/1 39/2 39/18
39/21 42/1 42/2 42/17 42/19 43/2 43/6 43/8
43/23 44/17 46/15 46/16 47/5 47/7 47/9 47/12
47/19 50/12 50/15 50/15 50/22 51/2 51/4 51/6
51/7 51/20 52/6 52/7 52/7 52/23 53/11 53/12
53/13 53/24 55/5 55/13 55/23 56/2 56/4
56/5 56/9 61/8 61/13 62/3 69/19 88/18 90/24
91/2 91/10 93/12 95/25 100/11 100/17 100/20
100/20 103/25 106/14 107/1
millions [2]  65/10 66/2
mind [3]  6/22 25/5 33/3
minimum [1]  10/5
minute [9]  17/5 36/25 37/2 58/10 59/12 66/7
80/5 85/18 103/13

minutes [2]  20/19 58/15
Miramar [1]  42/16
mirrors [1]  70/2
misleading [1]  35/9
missed [2]  37/10 37/13
missing [1]  48/6
mistakes [1]  32/2
mistrial [15]  57/ 58/21 59/3 107/18 107/22
misunderstanding [1]  60/16
misunderstood [1]  59/1
misused [1]  26/10
model [1]  82/9
moment [1]  106/23
moments [1]  69/19
money [104]  22/11 22/17 22/21 23/4 24/2
38/16 38/23 39/4 39/18 39/9 39/12 40/4 40/5
40/7 40/10 40/16 40/18 40/22 40/24 41/12
41/16 41/24 43/5 43/6 43/12 43/13 43/16
43/18 43/19 43/21 43/25 44/5 44/11 44/12
45/15 45/16 45/22 45/25 47/18 47/25 48/18
49/19 50/6 51/8 51/10 51/13 51/14 51/15
51/16 51/17 51/23 51/24 51/25 52/4 52/10
52/12 52/14 52/19 53/25 54/5 54/7 54/10
54/10 54/15 54/18 54/22 54/24 55/4 55/6
55/11 55/13 55/16 55/18 55/20 56/3 56/9
56/12 56/15 57/7 57/9 57/16 57/17 60/7 62/20
64/24 66/1 67/2 67/9 67/10 67/12 67/14 85/10
85/13 85/21 85/25 86/2 87/2 92/20 98/5 100/6
100/7 103/18 103/18 105/11
moneys [12]  41/15 48/12 50/11 53/6 56/24
68/13 92/16 92/17 92/18 105/6 105/12 105/14
month [8]  46/16 47/1 47/4 47/13 55/9 55/19
60/7 64/5
monthly [3]  47/23 49/13 49/16
months [2]  43/7 103/15
more [7]  20/21 27/10 30/5 55/9 55/15 84/4
86/19
morning [17]  4/5 4/9 4/10 4/14 9/2 9/11 9/23
10/22 10/24 20/1 20/5 20/6 20/9 20/10 59/24
73/6 73/7
most [1]  10/5
motion [11]  14/7 58/21 58/22 58/23 59/3 59/6
59/8 59/10 107/13 108/2 108/3
move [5]  7/23 63/19 98/17 107/18 107/22
moves [6]  76/4 89/9 95/4 96/16 99/17 102/18
moving [1]  8/25
MR [5]  3/5 3/5 19/3 54/12 89/17
Mr. [134]
Mr. Avenatti [4]  4/15 5/14 6/15 7/3 10/22
11/15 12/2 12/12 12/15 13/8 14/6 16/10
58/20 59/21 63/11 70/19 79/9 81/4 96/24
107/5 107/13
Mr. Avenatti's [2]  20/15 20/17
Mr. Barela [17]  50/13 50/14 50/18 50/19
50/20 51/21 52/1 52/2 52/5 52/8 52/14 52/16
52/19 62/20 63/1 63/6 67/7
Mr. Barela's [1]  63/4
Mr. Carlos [1]  16/1
Mr. Drum [1]  66/10
Mr. Drum's [3]  66/6 69/24 70/3
Mr. Gardner [1]  54/12
Mr. James [1]  61/1
Mr. Johnson [29]  39/7 41/13 41/15 42/14
43/3 43/16 43/20 43/24 44/10 45/18 54/11
60/22 61/15 62/19 67/7 77/15 77/18 79/10
79/13 79/15 81/1 81/9 88/8 90/1 90/4 93/6
101/25 105/21 106/7
Mr. Johnson's [16]  62/2 65/1 75/3 78/13
78/17 80/11 80/20 81/3 88/3 88/15 92/25
102/5 102/8 103/3 103/19 106/21
Mr. McNicholas [8]  18/3 18/12 18/15 19/9
19/11 73/6 76/24 94/24
Mr. Sagel [8]  8/17 9/4 16/3 38/4 58/8 59/24
62/1 62/5
Mr. Sagel's [1]  60/24
Mr. Steward [9]  4/12 12/10 12/13 12/14 12/21
14/6 14/16 17/10 20/8
Mr. Tran [5]  53/4 54/11 54/17 67/7
Mr. Whiteside [4]  47/22 48/1 48/8 49/18

**M**

**Mr. Whiteside's [1]** 49/15
**Mr. Wyman [6]** 8/18 9/17 58/1 59/25 73/2 76/7
**Ms [7]** 4/12 46/20 46/24 48/2 54/17 54/23 54/23
**Ms. [27]** 20/8 37/4 37/11 44/11 46/23 47/2 47/15 47/24 47/25 48/5 48/18 48/25 49/9 49/17 49/17 49/22 50/4 53/4 53/19 53/21 54/9 54/11 54/14 62/19 65/2 67/7 67/8
**Ms. Bredahl's [1]** 37/4
**Ms. Cefali [1]** 20/8
**Ms. Gardner [12]** 46/23 47/2 47/15 48/5 48/18 48/25 49/9 49/17 49/17 49/22 62/19 67/7
**Ms. Gardner's [3]** 47/25 50/4 65/2
**Ms. Phan [5]** 53/4 53/19 54/11 54/14 67/8
**Ms. Phan's [2]** 53/21 54/9
**Ms. Regnier [2]** 44/11 47/24
**Ms. Seffens [1]** 37/11
**much [8]** 30/10 32/18 32/22 44/14 66/16 69/25 80/5 88/17
**multiple [1]** 96/19
**must [19]** 21/3 22/8 22/10 22/18 23/11 23/20 26/12 27/23 29/16 30/20 30/20 30/24 31/19 33/7 33/9 34/7 34/8 70/12 71/2
**my [29]** 4/11 9/15 15/6 15/8 17/5 17/12 17/14 20/7 33/8 37/3 37/11 48/19 49/2 61/17 62/16 63/1 63/14 63/15 63/22 67/3 68/10 75/16 78/21 89/5 101/11 101/16 102/15 105/10 105/17
**myself [1]** 14/1

**N**

**name [14]** 45/4 45/5 46/6 60/23 61/4 69/18 72/20 72/23 73/15 94/5 96/5 98/21 101/3 103/6
**named [2]** 27/5 74/10
**names [1]** 101/2
**national [2]** 21/7 31/21
**natural [2]** 23/3 24/1
**nature [4]** 13/25 77/12 77/12 82/16
**near [1]** 41/5
**necessarily [3]** 6/24 25/8 32/16
**necessary [2]** 26/19 100/4
**need [8]** 10/15 11/15 15/14 22/14 37/11 41/14 41/24 45/22
**needed [5]** 11/1 42/8 43/5 47/23 61/16
**needs [27]** 14/9 41/16 42/9 83/8 83/12 83/16 83/23 84/3 84/7 84/16 85/4 85/5 85/6 85/19 85/23 86/6 86/14 87/1 87/7 87/11 87/22 87/23 88/4 88/8 88/11 91/4 106/17
**neglected [1]** 58/18
**negotiate [2]** 40/12 53/3
**negotiated [2]** 52/18 53/19
**negotiations [1]** 56/21
**net [1]** 69/2
**neutral [2]** 80/16 80/18
**never [13]** 5/5 5/8 10/23 22/4 42/6 45/5 45/6 47/1 60/6 60/8 63/7 67/3 85/20
**new [15]** 4/23 4/24 5/4 5/7 8/15 8/22 9/9 10/12 10/23 11/12 11/25 45/22 45/22 51/10 75/17
**news [1]** 34/12
**next [12]** 15/4 15/18 36/11 47/1 47/21 50/17 50/24 55/5 58/24 59/8 91/6 101/9
**nice [1]** 97/19
**NICOLA [1]** 2/3
**night [5]** 46/19 62/8 62/9 62/12 62/18
**no [48]** 4/19 5/8 5/9 5/10 8/4 8/19 11/7 12/3 12/22 13/5 13/17 16/22 19/17 19/19 19/25 27/15 28/16 30/8 36/5 49/19 52/5 54/5 55/11 55/16 56/5 60/5 61/21 64/4 64/12 65/8 65/15 76/8 78/10 78/10 79/16 80/7 80/10 89/11 90/11 90/14 93/16 98/10 105/19 106/14 106/18 106/22 107/4
**none [9]** 3/15 3/18 31/4 43/6 43/24 45/25 47/18 51/4 52/7
**noneconomic [1]** 82/14

**normally [1]** 73/11
**North [1]** 27/1
**not [167]**
**note [1]** 72/10
**Noted [1]** 15/4
**notes [7]** 35/25 36/1 36/5 36/6 36/7 36/8 36/10
**notetaking [1]** 36/3
**nothing [7]** 11/2 14/14 45/10 51/18 65/5 65/5 65/9 68/24 93/20
**notice [1]** 9/19
**notify [5]** 9/22 28/5 34/2 35/19 71/22
**Notwithstanding [1]** 9/18
**November [1]** 51/22
**November 2018 [1]** 51/22
**now [35]** 7/21 11/15 11/24 18/6 20/18 33/1 36/11 41/1 59/10 64/14 64/15 65/21 69/3 70/21 74/20 75/2 77/11 78/4 81/14 83/7 86/4 88/3 88/14 89/20 92/22 94/11 95/10 95/13 96/7 97/16 99/3 99/23 100/10 107/15 107/16
**number [22]** 8/10 13/7 15/1 15/20 19/10 25/24 32/16 63/2 68/7 69/2 69/4 69/4 72/7 85/23 85/24 86/24 86/25 87/2 100/5 100/5 101/18
**numbers [1]** 69/15
**numerous [2]** 14/13 19/1

**O**

**O'Malley [1]** 63/23
**oath [3]** 35/4 35/15 45/14
**object [3]** 11/5 11/6 30/15
**objection [38]** 5/1 7/20 8/4 13/14 15/2 15/18 15/24 30/16 30/18 30/21 36/18 76/6 77/22 81/16 81/24 82/4 82/5 83/18 84/22 86/8 86/16 87/13 87/20 87/25 89/11 92/7 93/2 93/14 95/6 96/18 96/24 98/7 99/19 100/2 104/1 104/23
**objections [14]** 4/16 4/18 4/20 4/21 4/24 8/11 8/13 8/13 8/15 29/19 107/19 107/20 107/23 108/1
**obligated [2]** 13/13 54/11
**obligation [2]** 48/8 49/15
**obligations [4]** 25/23 29/8 48/7 49/20
**obtain [6]** 22/17 40/4 41/25 46/8 50/10 50/12
**obtained [3]** 38/18 46/14 53/8
**obtaining [3]** 22/11 22/21 57/13
**obvious [1]** 86/4
**obviously [4]** 11/11 12/8 14/6 82/9
**occurred [1]** 6/2
**occurs [1]** 98/4
**off [3]** 7/21 85/10 86/25
**offense [1]** 25/15
**offer [4]** 26/23 27/1 27/4 36/18
**offered [2]** 76/9 76/10
**offers [1]** 30/13
**office [10]** 44/2 75/16 75/18 75/23 76/12 89/5 98/25 99/9 99/15 99/23
**officers [1]** 62/11
**OFFICES [1]** 2/5
**often [1]** 62/17
**oftentimes [1]** 56/17
**Okay [15]** 5/10 8/20 12/6 13/23 17/18 17/24 19/19 59/9 75/6 82/24 85/12 85/20 97/13 99/2 101/17
**old [1]** 37/23
**old-fashioned [1]** 37/23
**omissions [1]** 23/11
**omitted [5]** 22/23 23/1 23/12 25/17 25/19
**omitting [1]** 57/24
**once [9]** 37/9 37/16 79/7 82/21 93/11 93/18 93/18 98/5 98/12
**one [47]** 4/24 5/14 6/8 6/15 8/8 12/22 13/8 14/21 15/1 15/19 22/14 23/16 27/9 29/24 29/24 30/5 36/6 37/23 41/11 52/21 53/17 55/21 55/21 56/22 56/23 58/5 60/3 60/8 65/15 68/7 68/9 69/4 69/5 69/9 69/10 70/10 70/11 70/20 73/17 80/2 85/23 86/24 92/19 100/5 106/15 106/23

**only [17]** 8/4 6/16 13/23 22/14 33/8 35/2 36/8 62/23 56/7 56/20 58/6 59/9 62/25 64/24 64/5 64/23 67/16 69/6
**open [1]** 33/3
**opening [23]** 3/5 3/5 10/25 11/6 13/4 13/6 14/15 15/7 15/8 15/15 20/13 20/15 20/17 36/12 36/12 36/15 37/18 58/22 59/3 59/11 59/16 69/3 107/14
**openings [2]** 13/1 14/6
**operating [1]** 92/13
**operations [1]** 80/6
**opinion [5]** 21/11 32/19 32/20 32/24 92/8
**opinions [2]** 58/11 107/8
**opportunity [2]** 31/7 58/2
**option [2]** 70/25 87/9
**order [19]** 17/8 17/25 18/8 18/9 18/12 19/7 19/12 22/6 22/9 22/16 23/10 23/19 26/7 28/18 30/22 65/24 65/24 65/25 71/17
**ordered [1]** 34/7
**ordinarily [1]** 23/18
**orientation [2]** 21/8 31/21
**original [2]** 52/22 68/18
**other [60]** 4/18 6/18 7/1 8/24 9/22 9/24 9/25 10/17 11/2 11/4 11/21 12/16 14/1 14/21 16/3 19/6 24/20 26/2 27/1 27/13 27/14 28/6 28/10 28/13 28/21 30/13 31/14 31/18 32/7 32/11 32/21 32/25 33/10 33/17 33/21 34/15 34/16 34/19 37/3 37/6 41/3 41/16 56/17 58/21 59/4 63/22 65/12 68/11 68/15 68/18 70/16 71/21 73/17 74/4 79/1 85/11 93/13 98/21 106/15 106/18
**others [7]** 32/13 44/7 44/12 62/20 65/13 87/16 87/19
**otherwise [3]** 16/24 27/16 33/13
**our [28]** 4/12 8/11 8/13 8/14 10/5 12/8 13/21 15/2 18/5 36/24 37/25 38/2 52/3 62/20 64/5 64/5 64/20 64/21 64/23 65/6 65/5 65/13 65/18 65/19 65/19 68/18 100/6 107/19
**out [44]** 7/18 8/21 9/21 11/10 18/13 19/2 23/8 23/9 23/13 23/14 24/6 24/7 25/19 37/24 37/24 41/17 45/3 45/4 48/22 49/3 49/8 51/23 52/14 53/3 53/24 55/1 55/8 56/10 62/20 65/8 65/9 65/14 65/19 68/12 68/22 69/17 70/3 80/15 92/15 98/3 100/7 103/18 105/18 105/12
**outcome [6]** 31/11 38/14 46/8 50/11 53/5 78/9
**outline [1]** 36/13
**outside [4]** 35/7 35/19 66/24 68/18
**over [27]** 12/18 37/11 40/25 41/7 42/15 45/23 46/21 47/21 52/23 53/11 53/12 53/13 58/2 60/2 60/18 60/22 61/6 63/15 66/10 69/14 69/19 83/24 84/15 93/21 93/24 103/15 107/2
**overly [1]** 36/9
**overrule [1]** 30/16
**overruled [21]** 61/23 76/2 76/13 77/23 81/18 81/25 84/12 84/23 86/17 92/9 93/15 95/7 96/24 98/9 99/20 100/3 102/21 104/3 104/24 106/2 106/10
**oversaw [1]** 80/20
**overseeing [1]** 41/8
**oversees [1]** 80/17
**owed [4]** 25/3 53/14 55/4 98/13
**owes [2]** 26/6 26/11
**own [6]** 34/17 36/8 43/4 62/21 63/22 64/25
**owned [1]** 64/1
**ownership [2]** 53/4 53/11

**P**

**P-a-t-r-i-c-k [1]** 72/25
**p.m [2]** 17/16 17/25
**page [20]** 3/4 5/16 6/21 7/21 8/6 46/20 76/23 77/11 89/2 89/14 89/20 89/21 90/19 94/2 94/17 95/13 97/4 97/16 100/10 109/10
**page 1 [2]** 77/11 97/16
**page 11 [1]** 6/21
**page 3 [1]** 8/6
**paid [34]** 41/12 41/15 43/2 43/6 43/9 43/19 44/11 44/17 47/14 48/8 48/12 51/4 51/17 51/24 54/14 56/25 57/5 61/18 63/3 64/4 64/15

## P

**paid...** [13] 64/15 64/22 65/17 65/18 66/9 69/2 69/19 69/20 69/22 98/5 103/5 103/19 107/1
**pain** [1] 82/14
**pandemic** [1] 70/23
**paper** [1] 101/16
**paperwork** [3] 37/7 45/3 45/20
**paragraph** [8] 6/20 7/22 8/25 8/25 89/24 90/19 91/6 91/9
**paralegals** [2] 11/18 11/20
**paraplegia** [1] 38/8
**paraplegic** [2] 41/14 77/18
**paren** [2] 90/24 90/25
**parking** [1] 62/10
**part** [15] 11/13 23/2 23/4 23/9 24/2 24/7 25/17 27/20 27/21 31/3 32/13 39/16 48/19 84/10 90/12
**participant** [1] 71/13
**participants** [1] 71/18
**participate** [1] 80/25
**participated** [3] 22/20 23/23 81/3
**particular** [1] 82/24
**particularly** [1] 84/1
**parties** [21] 7/18 9/19 10/7 12/10 29/14 29/24 34/22 35/11 35/14 41/9 46/12 80/11 81/15 81/22 85/8 85/24 88/14 89/24 90/5 93/13 93/18
**party** [10] 9/25 10/13 23/16 23/17 36/14 36/15 55/14 77/15 80/16 80/17
**party's** [1] 35/1
**passed** [1] 7/18
**past** [1] 82/11
**PATRICK** [5] 3/8 72/16 72/17 72/21 72/24
**pattern** [1] 48/21
**pay** [42] 11/17 27/18 28/20 35/24 39/2 40/5 41/24 42/2 42/17 43/5 43/21 44/14 44/14 44/15 45/21 46/25 47/17 50/5 50/6 50/11 50/14 51/14 51/15 51/25 52/2 52/3 52/17 52/19 52/20 53/6 55/4 55/6 56/10 57/8 64/25 64/25 65/2 66/21 70/9 70/10 90/24 90/25
**payable** [1] 96/1
**paying** [7] 11/20 43/8 44/4 44/9 55/3 57/17 105/13
**payment** [14] 50/22 50/22 52/13 53/12 53/12 53/14 53/25 54/6 54/15 54/16 91/3 93/12 93/18 102/7
**payments** [22] 40/15 42/14 42/16 44/10 47/23 48/1 48/2 48/4 48/6 49/17 49/18 50/4 50/24 53/22 54/1 54/2 54/4 54/5 56/13 56/22 57/3 93/6
**pencil** [1] 70/3
**penny** [1] 65/6
**people** [10] 4/25 11/25 21/13 32/2 32/4 34/1 34/21 63/6 64/12 85/8
**per** [3] 101/17 101/20 101/22
**percent** [5] 64/2 78/20 78/20 100/20 100/24
**percentage** [4] 64/17 65/18 68/10 78/11
**perform** [1] 21/4
**performed** [1] 64/6
**period** [4] 28/16 42/15 64/1 83/24
**periodic** [1] 93/6
**periodically** [1] 43/17
**permission** [2] 76/17 76/19
**permitted** [4] 30/14 71/5 71/7 71/19
**persistent** [1] 57/4
**person** [9] 23/4 24/2 27/4 33/16 73/21 86/14 86/19 86/23 101/7
**person's** [1] 21/6
**personal** [1] 21/9
**personally** [1] 30/2
**perspective** [1] 87/12
**Phan** [25] 39/14 39/22 39/24 52/21 52/21 53/1 53/4 53/19 54/11 54/14 54/17 54/23 54/23 55/3 55/10 55/14 55/17 55/22 55/25 56/16 57/12 67/8 89/1 94/18 97/6
**Phan's** [8] 53/21 54/9 55/6 55/13 55/20 56/3 56/9 56/12
**phase** [1] 36/11
**phone** [3] 9/15 33/17 67/2

**photocopies** [1] 67/1
**photocopy** [1] 67/1
**phrase** [1] 37/13
**physical** [1] 71/10
**physically** [1] 71/20
**place** [10] 19/20 28/9 28/10 34/18 34/20 38/7 49/25 62/17 81/12 101/25
**placed** [1] 57/19
**plagued** [1] 70/1
**plaintiff** [10] 1/10 2/2 73/19 73/20 73/21 84/5 84/8 87/23 90/1 90/24
**plaintiff's** [3] 3/6 3/9 87/12
**plaintiffs** [4] 83/11 83/22 86/13 91/13
**plan** [2] 22/21 23/24
**plane** [2] 47/10 47/21
**player** [1] 46/6
**plea** [1] 27/5
**pleaded** [1] 21/25
**pleading** [5] 9/2 9/20 9/20 9/23 9/24
**pleadings** [1] 5/11
**please** [28] 35/19 36/1 58/10 61/24 71/22 72/10 72/14 72/18 72/19 72/23 74/17 75/11 76/23 77/11 88/19 89/15 89/15 90/20 91/7 94/11 95/14 96/7 97/17 98/15 99/3 102/10 107/17 107/9
**pled** [1] 60/8
**plexiglass** [1] 71/9
**pocket** [2] 62/21 64/25 65/20 68/12
**point** [17] 11/10 12/2 14/22 15/4 17/23 18/13 18/14 52/5 55/11 55/16 58/5 80/11 81/6 81/14 88/14 93/20 107/2
**pointing** [1] 19/1
**points** [1] 25/14
**portion** [13] 27/22 27/24 28/1 28/2 47/17 50/6 52/19 86/23 98/13 103/3 103/14 104/6 106/7
**possessed** [2] 5/21 5/25
**possesses** [1] 27/4
**possession** [3] 28/13 28/22 85/21
**possible** [8] 24/11 28/11 35/1 38/14 40/4 46/8 50/10 53/6
**potentially** [2] 27/21 83/19
**practice** [4] 26/1 26/4 71/19 73/22
**predecessor** [3] 7/9 7/10 7/11
**preferences** [1] 21/13
**prejudice** [2] 21/10 31/13
**preliminary** [1] 20/20
**prepared** [3] 19/8 99/10 99/15
**presence** [2] 11/19 13/21
**present** [20] 4/2 4/11 7/5 9/24 12/13 12/22 15/20 19/23 20/7 22/4 58/16 59/20 60/25 61/2 81/4 81/6 81/9 107/11 107/14
**presentation** [3] 10/24 11/25 13/5
**presented** [6] 5/18 35/3 35/13 36/20 107/15 107/15
**presently** [1] 27/21
**preserve** [4] 4/20 15/6 28/15 108/1
**preserved** [1] 4/22
**Preserving** [1] 7/12
**preside** [1] 37/6
**PRESIDING** [1] 1/8
**press** [1] 34/1
**presume** [1] 6/3
**presumed** [1] 22/1
**pretenses** [2] 12/12 22/22
**prevailed** [1] 65/16
**prevent** [6] 39/7 40/21 45/18 48/2 48/13 56/14
**prevents** [1] 85/24
**previous** [1] 71/4
**previously** [2] 4/21 107/19
**primarily** [4] 41/4 79/12 79/18 82/11
**prior** [5] 5/3 56/18 86/12 87/22 107/22
**private** [2] 47/10 47/21
**privilege** [3] 18/4 18/22 81/17
**privileges** [3] 18/14 18/23 18/25
**PRO** [1] 2/14
**problem** [5] 12/24 12/25 18/12 19/14 49/3
**problems** [3] 50/5 52/15 52/16
**procedure** [1] 28/19

**procedures** [2] 72/10 107/20
**proceed** [3] 20/25 29/10 35/1
**proceeding** [5] 59/3 60/7 70/1 100/23 101/12
**proceedings** [7] 1/15 19/22 35/18 46/14 59/19 71/17 109/9
**proceeds** [3] 44/18 44/22 44/23
**process** [5] 21/1 35/10 81/14 84/10
**processes** [1] 83/2
**produced** [1] 9/6
**product** [2] 18/4 18/22
**production** [1] 9/5
**professional** [11] 5/1 5/23 6/17 6/19 7/8 7/17 8/23 25/25 26/3 46/5 74/2
**promised** [1] 46/4
**promises** [2] 22/13 22/23
**prompt** [1] 37/21
**promptly** [4] 26/17 28/5 28/9 28/20
**proof** [6] 6/22 24/8 24/8 25/5 30/1 30/5
**proper** [3] 6/12 16/15 16/15
**properly** [3] 6/10 34/11 54/15
**properties** [5] 28/7 28/8 28/13 28/17 28/21
**property** [8] 7/12 22/11 22/17 22/21 23/4 24/2 26/9 26/10
**proposal** [1] 6/15
**proposals** [1] 7/3
**proposed** [4] 4/16 6/14 6/21 8/15
**proposition** [1] 5/15
**prosecution** [1] 69/25
**prospect** [1] 88/4
**protect** [2] 26/8 35/1
**protection** [2] 85/7 85/22
**prove** [9] 5/21 5/24 21/24 22/4 22/8 22/17 22/13 22/14 22/18 23/21 24/10 30/7 69/8
**proved** [1] 25/14
**proven** [1] 16/24
**proves** [1] 22/2
**provide** [4] 50/17 79/4 84/20 104/21
**provided** [12] 9/7 9/10 11/3 13/18 47/2 50/20 54/12 55/9 55/15 64/21 72/7 76/25
**provider** [1] 85/25
**providers** [1] 85/9
**providing** [2] 52/22 86/1
**provisions** [2] 7/6 7/16 8/22
**public** [3] 7/15 21/10 45/13
**publish** [3] 76/17 76/19 89/14
**pull** [3] 75/7 76/23 103/21
**purchase** [1] 44/25
**purchased** [1] 45/5
**purely** [1] 24/12
**purpose** [1] 6/11
**purposely** [1] 19/2
**purposes** [1] 64/1
**pursuant** [5] 28/18 47/4 51/1 100/21 109/6
**pursue** [1] 46/9
**put** [5] 8/22 60/11 60/16 97/20 99/23

## Q

**quarter** [2] 75/5 81/13
**quarterly** [1] 42/14
**question** [11] 16/5 30/12 30/16 30/18 30/20 30/20 49/6 49/7 49/7 49/7 86/4
**questioned** [1] 71/4
**questions** [4] 29/19 72/9 106/5 107/4
**quick** [1] 10/20
**quickly** [2] 14/5 98/17
**quite** [3] 63/1 67/17 68/22
**quoted** [1] 5/1

## R

**race** [2] 21/6 31/20
**raised** [2] 14/13 18/5
**raises** [1] 66/14
**raising** [1] 18/25
**Ramon** [2] 4/7 20/3
**rate** [3] 67/2 68/17 68/17
**rather** [2] 5/2 56/8
**reach** [8] 9/21 48/21 81/15 85/9 85/25 86/2 88/14 104/20
**reached** [4] 41/11 41/17 82/21 82/25
**reaching** [2] 56/18 81/21

**R**

read [16] 7/17 7/24 8/16 8/24 15/12 20/11 34/12 34/24 36/6 58/17 58/18 70/20 90/21 97/17 98/18 107/24
reading [7] 7/16 8/11
Reagan [1] 2/10
real [4] 47/2 47/3 47/4 98/17
realizing [1] 40/21
really [2] 12/11 38/6
reason [7] 12/22 18/2 24/12 49/19 60/8 72/1 98/5
reasonable [11] 6/4 22/2 22/19 23/21 24/8 24/11 24/17 24/22 26/18 27/23 68/17
reasonableness [1] 31/16
reasonably [2] 26/16 27/18
reasons [3] 32/24 71/12 107/18
reassert [1] 84/21
recall [7] 35/22 81/11 88/6 88/7 88/10 88/11 101/5
receipt [5] 25/7 25/12 28/6 28/9 57/16
receive [8] 27/25 28/23 34/10 89/4 91/16 92/19 102/7 106/7
received [47] 3/9 3/17 6/9 9/8 20/25 22/23 27/7 29/12 30/12 30/17 30/19 33/8 39/1 42/24 42/25 47/5 47/13 47/16 48/19 49/2 49/5 51/2 51/6 52/6 53/17 53/22 54/21 55/19 55/25 67/25 76/14 76/16 89/7 89/12 89/13 91/13 94/24 95/2 95/8 95/20 96/25 97/2 97/14 99/21 102/22 102/23 103/14
receiving [1] 93/6
recess [6] 19/19 19/21 58/15 59/18 108/4 108/5
recesses [1] 36/5
reciprocal [1] 11/8
recognize [7] 75/13 88/22 94/14 96/9 98/21 99/5 102/12
recollection [1] 81/5
record [15] 4/20 4/22 8/10 8/13 8/16 15/1 15/6 15/9 17/22 30/23 59/9 63/5 74/17 74/22 108/11
records [4] 28/12 28/15 29/1 57/6
recoup [1] 104/15
recover [6] 64/17 67/10 101/25 102/4 103/25 104/9
recovered [1] 64/22
recovery [5] 65/8 65/17 78/10 78/11 78/12
RECROSS [2] 3/7 3/14
REDIRECT [2] 3/7 3/14
refer [3] 52/13 67/17 67/19
reference [1] 34/15
referenced [2] 69/18 91/2
referred [3] 67/4 82/14 101/7
referring [2] 49/9 49/10
regard [5] 9/3 10/10 13/1 14/5 16/24
regarding [1] 28/15
Regnier [3] 44/2 44/11 47/24
regs [1] 16/17
regular [1] 92/6
regulations [3] 16/16 16/21 109/11
reimbursed [2] 65/19 67/8
reject [2] 21/13 32/22
related [1] 90/5
relates [4] 10/21 15/3 19/3 56/15
relating [7] 19/11 26/16 70/10 84/22 107/19 107/20 107/24
relationship [5] 23/13 23/15 23/15 25/20 27/13
relax [1] 23/17
release [1] 89/3
relevance [6] 84/11 91/18 91/21 91/23 93/2 100/2
relevant [5] 7/23 14/7 14/8 25/2 64/1
relief [2] 58/21 59/4
religious [2] 21/7 31/20
rely [2] 8/9 36/7
remain [2] 16/25 22/3
remaining [2] 47/11 56/2
remains [1] 82/22
remember [7] 32/3 32/5 35/14 36/1 58/10

61/24 107/7
remind [1] 29/6
remitter [2] 96/3 103/6
removal [1] 71/3
remove [1] 71/7
render [1] 28/14
renew [8] 8/11 8/12 15/2 15/18 15/24
replied [2] 48/23 49/2
replies [1] 49/6
report [4] 34/8 34/25 71/25 72/8
reported [1] 109/8
reporter [3] 109/16 109/17 109/16
REPORTER'S [1] 1/15
represent [10] 38/12 38/14 39/15 40/3 50/8 50/10 64/3 68/20 73/17 73/20
representation [1] 26/17
representations [4] 22/12 22/22 22/25 57/24
representative [1] 15/20
representatives [1] 27/6
represented [5] 60/1 60/2 64/8 64/9 86/13
representing [10] 41/10 41/18 41/23 57/1 83/11 83/22 84/5 86/6 86/12 91/12
repurchase [2] 53/9 53/19
request [2] 12/8 15/24
requested [4] 6/19 28/20 63/1 79/2
requests [2] 11/11 26/18
require [2] 70/4 92/3
required [8] 5/22 5/25 6/6 16/22 24/10 36/15 71/3 71/8
requirements [1] 25/25
research [6] 34/14 34/21 35/6 58/13 66/23 107/10
resolution [4] 80/3 90/16 90/22 100/15
resolve [1] 46/12
resolved [1] 28/3
resolving [2] 80/16 87/10
resource [1] 34/19
resources [3] 66/8 66/9 69/14
respect [3] 9/19 16/18 16/21
respective [2] 78/16 104/15 105/23
respond [1] 34/7
response [5] 12/3 14/2 52/4 97/17 98/18
responsibilities [1] 78/23
responsibility [1] 25/25
responsible [4] 79/12 79/18 80/1 80/3
rest [2] 32/14 38/9
restriction [1] 33/22
restrictions [1] 33/16
result [2] 52/11 69/1
results [2] 69/2 72/3
resumed [2] 19/22 59/19
retained [1] 68/19
retired [2] 80/19 80/23
return [1] 34/11
Revenue [1] 55/7
reversible [1] 5/15
review [1] 5/11
Richard [2] 101/3 101/4
ridiculous [2] 67/2 68/17
right [24] 16/19 16/23 23/2 27/25 35/1 37/12 41/1 48/24 49/24 60/18 64/13 66/14 69/16 69/20 69/20 69/22 75/9 77/5 78/4 101/2 103/8 83/22 83/25
rights [7] 38/12 77/14 77/16 83/12 83/16 83/22 83/25
rise [1] 70/15
risk [3] 65/6 82/18 82/19
risky [1] 65/16
role [3] 27/3 78/25 79/24
roles [1] 105/23
Ronald [1] 2/10
room [5] 33/18 36/3 36/23 66/15 67/22
row [1] 61/2
RPR [1] 1/19
rule [12] 6/17 7/2 7/9 7/9 7/10 7/10 7/11 7/14 8/1 8/22 13/15 16/21
rules [28] 5/1 5/19 5/23 5/24 6/1 6/3 6/19 6/23 7/7 7/17 7/18 8/11 8/15 8/23 25/6 25/12 25/25 26/2 28/19 30/11 30/14 35/1 35/15 35/16 35/17 74/2 92/3 107/24

rulings [2] 14/7 14/17
run [1] 82/4

**S**

SACR [3] 1/11 4/3 19/24
SACR-19-00061-JVS [3] 1/11 4/3 19/24
safe [5] 26/10 28/9 70/24 72/8 72/11
safekeeping [1] 28/10
SAGEL [12] 2/9 3/5 4/5 8/17 9/4 16/3 20/1 38/4 58/8 59/24 62/1 62/5
Sagel's [1] 60/24
said [32] 12/13 13/17 14/9 16/8 19/1 29/23 31/25 32/11 50/21 51/14 51/16 52/18 61/19 66/18 77/2 80/23
salad [1] 65/14
same [10] 32/4 40/11 49/25 54/17 81/24 82/4 86/16 87/25 93/14 107/18
San [1] 2/16
Santa [4] 1/16 1/20 2/11 4/1
saw [1] 30/2
say [10] 12/11 12/19 17/13 31/24 33/1 57/4 65/21 70/4 84/2 86/18
saying [3] 18/12 44/14 56/3
says [14] 5/17 31/3 48/19 68/21 76/24 77/1 77/5 77/12 78/4 100/10 100/16 101/14 101/17 101/22
scheme [15] 22/10 22/11 22/15 22/17 22/21 23/2 23/9 23/20 23/24 24/25 24/7 24/25 25/16 25/17 54/17
schemes [1] 22/14
school [1] 63/20
scope [1] 68/18
Scott [3] 98/22 98/24 98/25
scratch [1] 65/15
screen [1] 97/3
screens [1] 42/18
SE [1] 2/14
search [1] 34/20
searching [1] 34/14
seated [3] 34/3 61/1 72/18
second [10] 15/6 23/1 23/25 33/7 40/13 53/17 54/6 56/5 89/20 90/19
Section [4] 2/6 21/19 29/2 109/6
Section 1343 [1] 21/19
securities [4] 28/6 28/8 28/12 28/21
security [1] 62/11
see [23] 9/11 11/11 29/22 29/23 31/7 32/4 37/8 40/24 44/12 48/10 48/23 74/15 78/5 89/22 94/5 100/11 100/7 101/3 101/15 101/16 101/18 105/5 105/7
seeing [1] 67/18
seeks [3] 83/18 87/13 92/7
seem [1] 66/3
seen [1] 10/23
SEFFENS [4] 1/19 37/11 109/15 109/16
SELNA [1] 1/8
send [5] 64/5 64/5 72/10 105/15 105/24
sending [1] 48/21
sends [2] 48/18 48/25
sense [3] 14/18 18/6 24/12
sent [6] 17/9 44/11 51/21 53/14 91/10 105/20
sentence [1] 90/21
separate [2] 65/11 92/4
September [1] 49/4
September 2018 [1] 49/4
series [1] 83/2
serious [3] 69/10 70/6 84/1
served [1] 16/12
service [4] 16/15 34/6 52/25 55/7
services [1] 86/1
session [3] 9/21 9/23 29/23
set [8] 20/11 46/11 51/4 85/6 87/7 87/23 92/4 106/17
setting [1] 87/4 87/11
settle [3] 41/6 42/16 67/6
settlement [120]
settling [2] 83/16 84/17
seven [6] 69/2 69/4 69/6 70/11 70/11 89/12
several [4] 4/23 39/11 41/2 101/2

**S**
**severe [1]** 38/7
**sexual [2]** 21/7 31/21
**shall [10]** 26/15 26/21 27/9 27/16 28/2 28/4 28/24 29/1 29/3 90/23
**share [2]** 17/6 17/7
**shares [1]** 53/10
**SHARON [3]** 1/19 109/15 109/16
**she [34]** 31/25 44/3 44/4 44/5 44/7 44/13 46/3 46/3 46/8 49/9 49/10 49/11 49/13 49/18 49/19 49/24 49/24 49/25 49/25 50/3 50/3 52/24 53/2 55/14 62/5 62/6 62/7 62/8 62/9 62/10 62/13 62/17 65/3 66/17
**sheet [7]** 67/19 75/17 99/8 99/9 99/15 99/23 103/23
**Sheriff [1]** 90/2
**shield [4]** 71/8 71/13 71/16 85/13
**shift [1]** 83/7
**short [2]** 20/14 20/16
**should [13]** 6/21 11/20 14/14 21/6 25/5 32/21 33/4 36/5 36/7 36/9 71/14 75/8 79/6
**shoulder [1]** 37/11
**show [36]** 5/18 5/23 36/15 40/9 40/24 57/7 57/22 60/22 61/7 61/15 61/17 62/3 62/6 62/8 62/13 62/16 62/23 62/25 63/13 63/14 63/25 64/10 65/22 66/22 66/24 67/4 67/13 68/1 68/24 69/13 69/23 69/24 70/2 70/2 75/6
**showing [2]** 11/6 11/9
**shown [1]** 11/2
**side [7]** 9/22 9/24 11/2 30/13 36/12 73/17 81/3
**sidebar [1]** 10/8
**sidebars [1]** 10/4 10/6
**sides [1]** 19/18
**sign [3]** 45/22 46/20 61/13
**signature [6]** 94/3 94/5 94/9 97/8 103/8 103/9
**signed [5]** 43/1 61/8 61/10 89/1 94/18
**significant [3]** 26/16 26/19 63/4
**silent [1]** 22/4
**similar [2]** 27/11 79/1
**simply [8]** 4/18 7/19 7/25 18/8 21/22 36/13 37/3 47/19
**Sims [3]** 98/22 98/24 98/25
**since [3]** 9/9 9/15 59/10
**sir [6]** 4/23 13/3 59/5 59/17 60/11 107/12
**sister [1]** 53/2
**sitting [2]** 62/14 74/18
**situation [1]** 52/9
**six [1]** 43/7
**slightly [1]** 100/16
**sloppiness [1]** 70/1
**small [1]** 43/16
**smoke [1]** 70/2
**Snapchat [1]** 33/20
**so [64]** 8/12 9/16 10/6 10/11 10/15 11/8 11/15 11/18 11/23 13/22 15/9 15/14 18/6 19/10 20/16 26/10 26/20 37/8 37/12 38/1 41/15 41/24 42/5 43/12 47/9 58/15 64/2 65/3 67/2 67/14 69/17 70/21 73/13 73/24 77/15 78/8 78/9 79/1 79/5 82/16 85/6 85/7 85/10 85/12 85/20 85/20 85/22 85/25 86/1 86/24 92/12 92/13 92/17 92/19 96/24 97/13 97/20 98/3 100/5 100/8 100/22 102/3 103/2 106/17
**social [3]** 33/21 52/22 71/19
**solely [2]** 21/3 71/15
**some [24]** 10/24 14/1 14/10 20/12 20/20 32/12 38/16 40/25 45/20 45/22 48/15 52/12 64/23 65/10 67/10 67/13 70/22 80/11 81/6 81/14 82/3 83/5 85/12 88/14
**somebody [2]** 66/13 66/21
**somehow [1]** 11/15
**someone [6]** 9/10 66/14 67/6 71/15 85/19 87/10
**something [9]** 11/16 12/17 13/11 20/19 31/24 31/25 32/9 37/10 83/8
**sometimes [5]** 30/22 31/24 31/25 43/25 66/2
**somewhat [1]** 37/22
**soon [5]** 28/10 35/1 41/17 44/19 62/13
**sorry [9]** 18/10 58/25 60/13 75/25 76/8 91/21

96/4 97/20 98/17
**sort [2]** 85/13 86/11
**sorts [1]** 83/25
**source [1]** 78/2
**south [1]** 65/8
**SOUTHERN [1]** 1/6 63/15
**speak [2]** 71/9 79/15
**speaking [1]** 78/22
**special [28]** 4/7 20/3 38/22 61/3 61/5 83/8 83/12 83/16 83/23 84/3 84/7 84/16 85/4 85/5 85/6 85/19 86/6 86/14 87/7 87/11 87/22 87/23 88/4 88/8 88/11 91/3 106/17
**specific [3]** 5/21 5/25 81/5
**specifically [2]** 86/19 92/4
**speculation [6]** 24/13 86/9 87/15 98/8 104/2 106/9
**spell [1]** 72/19
**spelling [1]** 72/24
**spend [2]** 66/1 69/5
**spent [6]** 51/7 51/19 52/6 55/12 55/17 69/3
**split [2]** 78/16 78/24
**Spring [1]** 2/7
**staff [2]** 60/14 65/13
**standards [2]** 28/25 29/2
**STANDBY [1]** 2/15
**standing [3]** 74/18 74/20 82/5
**Starbucks [1]** 62/14
**start [7]** 10/13 10/21 19/4 37/25 38/3 60/10 63/9
**started [3]** 51/12 52/12 63/10
**starting [1]** 97/21
**state [16]** 6/8 8/14 17/22 25/1 25/24 26/1 27/12 28/19 28/24 63/21 69/11 70/5 72/19 73/24 74/1 92/3
**stated [3]** 5/18 44/21 107/19
**statement [17]** 3/5 3/5 13/4 13/6 15/9 15/15 20/13 20/15 20/17 36/12 36/13 36/15 58/22 59/3 59/11 59/16 107/14
**statements [16]** 14/15 15/7 18/16 18/20 22/23 23/1 25/16 29/18 37/18 40/20 48/11 49/12 49/14 51/12 57/23 76/9
**STATES [22]** 1/4 1/9 1/19 2/3 2/4 2/6 2/7 2/10 4/4 4/6 19/25 20/2 21/18 21/20 60/1 60/3 61/3 61/5 70/13 72/16 109/7 109/11
**status [1]** 9/4
**stay [2]** 65/24 72/11
**steal [2]** 54/18 60/6
**stealing [2]** 45/15 45/16
**Stein [5]** 4/25 5/14 5/17 6/8 8/8
**stenographically [1]** 109/8
**step [1]** 107/12
**steps [1]** 70/23
**stereotypes [1]** 21/12
**STEWARD [12]** 2/15 2/15 4/12 12/7 12/10 12/13 12/14 12/21 14/6 14/16 17/10 20/8
**still [12]** 11/5 11/7 12/7 42/8 43/23 44/25 45/9 45/25 48/23 49/1 51/17 69/15
**stip [3]** 97/21 97/22 97/23
**stipulation [1]** 97/8
**stock [2]** 53/9 53/10
**stole [16]** 39/3 39/12 39/16 39/18 39/19 39/20 39/21 40/7 40/10 40/18 40/24 43/11 47/19 55/5 57/19 62/2
**stolen [3]** 40/22 43/8 56/8
**stopped [1]** 49/16
**Stormy [1]** 68/8
**story [1]** 68/8
**straight [1]** 45/17
**Street [3]** 1/20 2/7 2/11
**stresses [1]** 49/24
**stricken [1]** 30/22
**striped [1]** 74/21
**strong [1]** 80/8
**structure [1]** 87/8 106/16
**struggles [4]** 49/23 50/4 52/16 52/18
**subject [1]** 90/25
**submitted [2]** 58/12 107/9
**subparagraph [2]** 6/17 7/1
**subpoena [5]** 15/21 16/7 16/9 16/11 16/16

**subpoenas [1]** 16/24
**subscription [1]** 52/25
**subsequent [4]** 50/23 53/12 54/5 54/16
**substance [1]** 7/13
**substantial [1]** 27/13
**substitute [1]** 7/19
**substituting [1]** 7/25
**successfully [1]** 67/6
**such [11]** 6/11 9/9 26/9 28/15 28/17 28/18 30/1 32/20 34/14 67/7 92/19
**suffer [1]** 77/20
**suffered [1]** 38/7
**suffering [1]** 82/15
**sufficient [3]** 10/12 10/14 27/18
**suggested [1]** 7/20
**suing [2]** 73/12 77/15
**suit [1]** 74/20
**Suite [3]** 1/20 2/11 2/16
**sum [1]** 42/16
**summary [1]** 22/7
**Sunrise [2]** 61/14 61/15
**supermarket [1]** 62/10
**Supervisors [2]** 83/4 91/1
**support [2]** 11/21 11/22 11/25
**sure [5]** 4/22 11/8 13/14 18/11 62/17
**suspected [1]** 72/4
**sustain [3]** 30/17 30/19 87/20
**Sustained [8]** 63/19 85/16 86/10 88/1 91/20 93/3 93/9 96/20
**sworn [2]** 29/11 72/17
**sympathy [1]** 21/10
**symptoms [1]** 71/25

**T**
**table [1]** 20/3
**tablet [1]** 33/17
**take [34]** 10/12 10/17 14/22 14/23 15/14 20/14 20/15 20/19 31/6 35/4 35/25 36/1 36/7 36/25 37/2 37/4 38/2 41/20 45/4 58/9 58/23 59/7 59/10 59/13 66/15 66/17 73/10 75/11 83/5 85/10 88/19 98/15 102/10 107/6
**taken [9]** 10/8 19/21 35/14 54/3 59/18 72/2 78/12 86/3 108/5
**takes [2]** 78/10 85/21
**taking [1]** 70/23
**talk [2]** 56/22 58/2
**talking [2]** 69/4 69/5
**target [1]** 63/10
**taxes [1]** 100/8
**team [1]** 49/11
**tech [2]** 4/13 11/21
**tell [23]** 20/19 33/12 35/4 38/24 38/25 42/3 42/4 42/23 42/24 43/2 46/23 47/15 47/16 49/9 50/18 51/5 51/6 52/5 55/12 55/17 56/6 62/12 63/11
**telling [4]** 44/19 45/2 47/22 88/7
**ten [4]** 21/19 58/10 58/15 59/12
**ten-minute [2]** 58/10 59/12
**tend [2]** 5/20 5/24
**tendency [2]** 23/3 24/1
**tending [1]** 5/18
**tentative [3]** 81/15 82/21 83/1
**term [2]** 17/25 83/9
**terms [14]** 26/23 26/25 40/14 41/11 46/23 47/3 47/15 48/3 50/13 50/19 50/21 54/13 57/3 93/11
**test [1]** 72/2
**tested [2]** 35/5 35/10
**testified [3]** 31/8 32/9 32/12
**testify [5]** 32/16 44/4 44/7 57/2 87/17
**testifying [4]** 15/22 31/10 45/14 71/4
**testimony [28]** 29/11 29/20 30/1 31/2 31/2 31/5 31/15 31/16 32/6 32/27 32/18 32/19 32/21 32/21 35/5 35/24 40/8 40/23 58/3 66/6 66/16 83/19 83/19 84/22 87/14 87/19 87/19 92/8
**text [4]** 33/18 48/13 48/19 49/1
**texts [1]** 51/21
**than [14]** 5/2 6/18 11/4 12/2 12/3 12/16 19/6 28/16 55/9 56/8 84/4 84/4 92/5 106/18

**T**

**thank [29]** 5/10 8/19 14/20 14/25 15/5 15/11 15/17 17/1 38/5 58/7 58/8 59/14 59/17 59/23 70/7 70/18 70/19 72/12 73/3 74/25 76/15 76/21 78/6 82/7 97/1 97/19 99/2 107/4 107/17
**Thanks [1]** 98/20
**that [421]**
**that's [20]** 4/23 8/8 8/20 13/7 13/20 13/23 15/10 16/14 17/15 19/7 19/16 35/2 49/2 60/20 62/18 65/11 66/11 68/8 92/20 105/10
**their [42]** 32/18 35/5 37/18 37/18 39/12 39/17 39/25 40/1 40/1 40/4 40/6 40/7 40/9 40/10 40/18 40/22 45/10 46/12 49/11 52/4 54/14 54/24 55/11 56/15 57/14 57/15 57/17 62/21 62/21 66/14 66/25 67/24 70/8 70/25 71/21 77/1 85/19 86/2 86/24 104/6 104/15 105/13
**them [38]** 4/18 18/17 21/2 28/9 28/15 29/16 36/2 39/14 39/15 39/16 40/2 40/3 40/5 40/21 43/17 48/5 48/13 48/21 49/6 49/10 52/3 53/3 54/14 54/24 55/4 55/5 55/11 55/12 56/6 56/7 56/14 57/13 57/15 57/17 62/21 66/21 67/10 86/3
**themselves [2]** 37/7 59/25
**then [29]** 5/12 8/20 15/13 19/19 20/13 20/14 20/14 35/8 36/16 36/17 41/14 45/2 45/4 51/16 59/7 77/1 78/10 78/11 82/13 82/17 82/18 83/1 85/22 100/11 100/17 101/14 101/22 105/7 106/14
**theories [1]** 79/6
**there [61]** 4/25 11/4 11/7 12/21 13/14 14/9 15/8 15/21 16/15 16/23 18/3 30/11 37/12 39/9 39/13 41/7 42/5 42/9 43/13 48/20 52/7 56/5 56/7 60/15 60/18 65/8 66/23 66/23 66/24 68/24 75/6 76/8 77/6 78/10 78/11 78/11 82/10 82/13 85/7 86/14 86/18 87/16 90/7 90/9 90/12 90/21 91/2 93/5 93/6 93/12 94/5 96/5 97/18 98/1 98/5 101/2 101/23 106/12 106/15 106/16
**there's [5]** 19/10 66/12 66/12 82/10 82/18
**thereafter [1]** 41/17
**Therefore [1]** 15/24
**therein [1]** 27/16
**therewith [1]** 27/16
**these [28]** 16/18 16/21 18/14 21/4 32/5 33/15 35/1 35/16 35/17 35/18 37/8 43/24 47/23 48/1 48/2 48/4 48/15 49/13 53/23 67/14 68/4 69/9 70/15 84/17 84/20 100/8 103/24 108/1
**they [43]** 10/15 10/24 16/16 19/12 23/2 32/3 37/18 39/15 39/25 40/3 40/5 40/6 42/12 43/1 55/4 57/4 57/14 57/18 59/25 60/1 61/12 65/16 66/9 66/20 67/2 67/5 69/9 69/15 69/17 69/17 69/19 69/20 69/22 70/4 70/12 70/12 78/25 79/2 79/5 84/17 85/19 86/17 86/18
**they're [10]** 8/12 11/13 12/1 15/22 16/22 73/11 87/6 105/7 105/7 105/13
**thing [4]** 6/16 13/23 37/14 68/9
**things [24]** 14/10 14/12 15/1 18/25 26/2 29/15 31/8 32/2 32/12 37/6 37/9 37/15 42/9 42/18 43/24 44/3 44/4 44/13 45/9 47/18 67/1 68/11 68/15 70/16
**think [14]** 12/20 13/13 18/5 18/17 32/11 32/13 32/18 32/23 37/10 37/13 75/4 79/7 80/2 94/20
**thinks [1]** 30/14
**third [8]** 19/9 23/5 24/3 40/16 80/16 80/17 85/7 85/24
**third-party [2]** 80/16 80/17
**Thirty [1]** 89/12
**Thirty-seven [1]** 89/12
**this [135]**
**those [27]** 4/20 4/21 5/4 5/7 7/18 12/17 14/18 36/10 37/23 44/13 44/23 47/18 57/5 62/24 68/13 71/24 73/18 78/7 82/3 84/5 84/7 86/22 91/3 91/17 101/21 102/3 107/24
**though [5]** 6/2 40/9 43/18 44/23 47/14
**thought [1]** 19/7
**thousand [1]** 64/6
**thousands [5]** 64/8 64/24 64/24 65/9 66/2
**three [12]** 11/20 50/17 50/23 50/25 53/23 54/19 55/12 55/23 62/2 87/2 89/2 102/21
**three-page [1]** 89/2

**through [14]** 8/7 12/10 18/20 35/5 35/7 39/6 34/2 68/5 70/19 98/23 100/25 107/9 107/11 107/17
**throughout [7]** 10/11 33/3 40/8 40/23 44/12 48/10 71/22
**Thursday [1]** 8/6
**Thus [1]** 33/12
**tie [2]** 61/2 74/21
**tight [1]** 42/9
**TikTok [1]** 33/21
**time [43]** 8/21 10/6 10/12 10/13 10/14 10/18 11/17 17/11 17/16 17/18 18/7 27/23 28/16 29/3 29/3 37/3 37/25 38/3 42/15 48/5 48/20 54/15 54/25 56/19 58/23 59/7 60/4 61/18 64/1 64/23 65/11 69/3 69/5 79/5 79/23 81/6 83/5 83/24 92/25 93/20 99/1 104/16
**times [7]** 14/13 17/9 19/1 25/2 37/5 62/2 71/3
**timing [3]** 10/20 97/22 97/24
**tired [1]** 67/18
**Title [2]** 21/20 109/7
**today [1]** 13/7 14/22 66/17 74/15
**together [1]** 99/24
**told [29]** 11/4 30/25 32/12 41/8 41/13 41/14 41/22 41/22 42/11 42/13 45/8 45/20 46/20 46/24 49/12 49/17 50/2 50/20 51/8 52/1 54/23 55/4 59/25 61/7 61/9 61/12 62/1 62/5
**tomorrow [2]** 12/4 14/22
**too [3]** 60/2 61/4 65/16
**took [6]** 41/7 53/23 62/20 64/24 65/15 81/12
**top [5]** 67/19 95/11 96/5 100/10 103/6
**topic [2]** 87/17 88/11
**total [3]** 100/14 101/10 102/3
**touch [1]** 65/16
**touched [1]** 35/18
**touching [1]** 34/24
**towards [1]** 56/19
**traditional [1]** 72/24
**traditionally [1]** 106/11
**Tran [15]** 53/2 53/4 53/20 53/21 54/9 54/11 54/14 54/17 54/22 54/23 55/3 55/10 55/22 56/1 67/7
**transaction [1]** 57/6
**transactions [1]** 57/6
**transcript [8]** 1/9 1/15 35/23 37/12 66/13 66/19 109/8 109/10
**transfer [1]** 55/24 56/5
**transferred [5]** 47/7 51/25 55/11 56/4 56/7
**transferring [1]** 54/24
**transfers [2]** 55/20 55/23 55/23 56/5
**travel [1]** 66/12
**Treasury [2]** 4/8 20/4
**trees [1]** 37/23
**trial [28]** 1/12 4/13 10/11 15/3 15/20 20/21 33/3 34/1 34/4 35/6 35/10 35/11 35/14 35/21 35/23 36/11 40/8 40/23 44/13 48/10 61/20 61/20 67/18 71/16 71/22 73/9 74/12 80/3
**trials [3]** 10/5 37/6 37/6
**tried [1]** 45/3
**true [9]** 32/13 40/14 42/13 46/23 48/2 50/19 57/2 62/7 109/7
**trust [59]** 12/11 23/13 25/8 25/13 25/20 27/10 28/1 38/21 38/22 38/23 40/5 40/7 40/17 42/21 42/22 47/6 47/7 48/9 51/3 53/16 54/8 54/22 57/18 83/8 84/3 84/7 85/4 85/5 85/6 85/19 85/20 85/22 86/7 86/14 87/1 87/4 87/7 87/11 87/24 88/5 88/8 91/4 91/11 91/25 92/1 92/2 92/5 92/15 92/17 92/18 92/20 92/24 96/2 105/11 105/13 105/14 106/13 106/13 106/17
**trusted [13]** 38/13 38/14 40/2 40/3 40/3 40/6 46/7 46/7 50/9 52/8 53/4 53/5 57/14
**trusting [2]** 23/15 23/17
**trusts [7]** 83/13 83/16 83/23 84/16 84/20 87/22 88/11
**truth [4]** 32/12 35/5 40/20 76/9
**truthful [4]** 57/15 57/15 57/16 57/17
**truths [1]** 22/24
**try [4]** 10/20 34/16 37/21 46/12
**trying [3]** 41/20 51/22 56/2
**Tui [3]** 16/17 16/20 16/23
**turn [2]** 34/25 94/11

**turned [1]** 9/17
**turning [1]** 41/2
**turns [1]** 68/22
**tutorials [1]** 52/23
**twice [2]** 62/1 79/8
**Twitter [1]** 33/20
**two [27]** 6/9 8/10 11/12 12/10 32/4 37/9 37/15 44/16 45/11 47/21 55/20 55/23 56/4 56/7 60/22 61/6 63/22 68/11 69/14 82/10 85/24 86/25 87/6 97/4 101/15 105/23
**type [7]** 22/14 78/4 78/13 79/3 79/6 86/14 86/18
**types [5]** 22/13 82/10 84/17 84/20 85/2
**typical [2]** 86/14 86/18
**typically [2]** 73/17 104/21

**U**

**U.S [4]** 60/24 61/8 61/9 109/16
**ultimately [1]** 25/21 29/6 80/1 80/3 83/3 88/18 100/7
**unconscious [4]** 21/11 21/12 21/15 31/19
**under [21]** 15/18 15/21 15/25 16/7 16/9 16/10 16/19 40/15 45/14 48/7 49/21 49/24 53/14 54/2 57/4 57/5 90/20 93/11 101/2 101/9 101/17
**underlying [1]** 14/9
**understand [7]** 16/1 36/14 58/20 79/12 79/24 85/12 91/9
**understanding [11]** 72/12 80/8 84/19 85/2 85/3 92/22 100/24 101/24 103/2 104/8 104/14
**understood [2]** 12/5 19/8
**undivided [1]** 26/13
**UNITED [22]** 1/4 1/9 1/19 2/3 2/4 2/6 2/7 2/10 4/3 4/6 19/24 20/2 21/17 21/20 60/1 60/3 61/3 61/5 70/13 72/16 109/7 109/11
**unless [4]** 22/1 33/12 37/22 48/21
**Unlike [1]** 54/11
**until [14]** 9/16 16/24 19/19 22/1 28/2 33/4 33/12 33/23 34/23 36/2 46/18 58/12 104/16 107/9
**untrue [1]** 32/6
**untruthfully [2]** 32/9 32/12
**up [38]** 8/25 10/8 10/12 10/17 12/20 14/15 14/22 14/23 38/2 46/11 49/5 51/4 51/9 52/2 53/17 58/23 59/7 59/10 59/13 63/17 65/6 69/16 76/23 78/6 78/24 85/3 85/6 87/5 87/7 87/11 87/23 88/12 89/15 92/4 97/20 103/21 104/15 106/17
**update [1]** 41/18
**upon [5]** 9/25 22/17 24/11 28/9 78/9
**urge [1]** 35/23
**us [8]** 12/19 12/23 18/6 67/22 68/20 70/24 72/11 97/6
**use [11]** 5/23 13/4 13/6 13/9 13/17 17/25 25/8 25/13 34/19 40/18 91/16
**used [16]** 23/7 23/7 24/5 24/6 27/3 30/7 39/4 43/8 47/11 47/20 51/20 56/8 56/12 83/12 83/16 84/17
**using [1]** 13/25 34/15 44/18
**usual [1]** 36/24
**usually [2]** 43/16 66/14
**Utah [1]** 63/17
**utilize [1]** 41/16

**V**

**vaccinated [2]** 70/25 71/2
**van [2]** 38/16 43/21
**variant [1]** 107/21
**variety [1]** 82/19
**vast [2]** 66/8 83/24
**verbatim [2]** 6/18 37/12
**verdict [4]** 33/4 34/12 35/8 36/23
**versa [1]** 12/19
**version [7]** 5/2 5/2 7/7 7/7 8/1 8/1 8/2
**versions [1]** 32/1
**versus [4]** 4/4 4/25 19/25 64/9
**very [4]** 14/5 35/15 61/18 61/18 64/11 66/22 67/21 87/8
**via [2]** 33/18 33/18

**V**

**vice** [1] 12/19
**view** [2] 34/18 34/20
**vigilance** [1] 23/17
**violated** [7] 5/19 25/22 25/22 29/7 29/7 40/6 57/18
**violates** [1] 35/17
**violation** [8] 5/24 6/1 6/3 6/5 14/18 21/19 77/14 77/16
**virus** [1] 107/21
**visit** [1] 34/18
**voir** [1] 107/19
**Vol** [1] 1/12
**Volume** [1] 75/8
**vs** [1] 1/10

**W**

**wait** [1] 14/2
**waiting** [3] 42/12 44/25 93/13
**waived** [1] 18/23
**want** [12] 11/24 12/15 12/17 17/15 19/4 19/17 20/19 37/4 62/24 70/7 72/11 75/6
**wanted** [9] 4/21 44/17 46/19 49/4 53/1 55/1 58/20 59/3 88/8
**wants** [2] 10/17 68/19
**was** [135]
**wash** [1] 67/5
**wasn't** [1] 50/3
**waste** [1] 18/7
**watch** [1] 34/12
**water** [1] 67/6
**way** [10] 4/17 33/13 33/14 34/5 34/16 64/17 64/25 65/12 69/6 106/15
**we** [135]
**we'll** [3] 11/23 19/14 37/4
**we're** [8] 8/20 10/21 20/15 37/22 44/25 66/5 69/4 95/16
**we've** [2] 9/9 10/23
**wear** [4] 70/25 70/25 71/2 71/8
**wearing** [2] 71/11 74/19
**wears** [1] 71/15
**website** [1] 33/19
**WEDNESDAY** [1] 4/1
**week** [1] 60/7
**weigh** [1] 20/24
**weight** [5] 30/8 30/10 32/15 32/18 32/22
**well** [24] 4/12 8/14 9/7 12/2 13/2 20/8 53/21 54/1 60/12 60/16 64/11 64/12 65/14 91/9 85/3 85/18 86/23 88/25 97/6 100/4 100/20 105/5 106/11 107/20
**went** [17] 45/17 55/15 57/7 65/7 69/17 81/22 93/24
**were** [50] 4/20 4/24 9/12 14/7 19/12 23/2 23/3 25/17 40/1 40/5 40/9 41/11 42/12 44/24 48/12 49/11 49/14 50/5 52/18 53/6 55/4 56/7 56/17 56/19 56/24 57/3 63/2 64/10 64/21 65/14 65/16 65/17 65/17 65/18 65/18 67/8 67/12 75/4 78/2 78/22 78/22 82/10 82/11 84/5 93/1 98/13 100/21 101/21 104/12 104/15
**West** [6] 1/20 2/11 61/14 61/16 62/10 62/14
**what** [129]
**what's** [5] 9/4 14/7 14/8 64/16 66/12
**whatever** [1] 13/18
**wheelchair** [3] 38/8 38/17 43/22
**when** [43] 6/1 9/12 11/21 13/14 20/24 25/13 26/19 27/25 29/22 30/12 30/24 36/4 41/11 41/19 43/1 48/4 48/8 49/9 49/25 51/14 51/16 53/16 53/18 53/22 54/5 54/15 56/7 58/17 62/5 63/15 65/21 66/14 70/2 75/2 79/17 81/11 84/1 87/23 92/3 92/19 104/20 105/10
**Whenever** [1] 30/19
**where** [21] 27/13 28/18 37/23 38/23 46/3 51/14 56/2 57/7 57/9 60/17 64/4 66/13 74/17 76/23 77/5 77/5 77/12 86/13 91/9 92/16 100/24
**whereby** [1] 53/10
**whether** [25] 23/25 25/11 25/14 25/15 25/16 25/17 25/18 25/21 25/22 29/6 29/7 31/14 36/7 51/23 51/24 51/24 69/7 71/15 72/8 93/24 94/8

**when** [33] 5/10 7/2 13/22 20/11 23/18 23/17 28/22 29/14 30/5 31/2 31/2 38/8 38/15 40/10 45/13 46/8 46/11 46/12 51/2 52/12 53/25 65/1 66/13 67/21 80/4 82/9 82/11 82/13 82/15 89/2 89/21 99/12 105/6
**while** [11] 1/16 31/10 37/10 61/13 65/4 66/25 71/4 71/10 77/20
**Whiteside** [6] 46/6 47/22 48/1 48/8 49/18 57/2
**Whiteside's** [1] 49/15
**who** [36] 10/23 12/22 13/6 16/1 18/1 27/4 32/16 35/17 44/14 48/6 56/23 64/12 65/13 70/24 71/2 71/7 71/20 72/4 72/7 74/12 77/8 79/12 79/17 80/17 80/20 81/3 86/5 86/13 86/23 89/24 96/1 97/6 98/24 101/3 103/5 103/5
**who's** [1] 18/9
**whole** [2] 11/17 97/14
**whom** [2] 39/11 105/8
**whose** [2] 96/5 103/9
**why** [7] 7/22 11/24 55/10 55/16 71/12 100/1 103/14 105/4 105/18 107/6
**will** [139]
**window** [1] 62/12
**wire** [16] 6/25 21/19 22/9 22/17 23/8 23/10 23/20 24/6 25/10 47/8 55/20 55/23 55/23 55/24 56/4 56/5
**wired** [1] 51/24
**wiring** [1] 54/24
**wish** [4] 19/11 35/25 58/22 59/15
**withdrawn** [2] 27/23 28/2
**within** [2] 43/7 72/5 100/6
**without** [7] 6/2 19/1 21/14 44/13 45/2 46/13 76/19
**witness** [25] 18/1 18/21 29/11 30/2 30/2 31/3 31/5 31/24 32/8 32/11 32/11 32/20 37/19 37/23 72/17 74/23 75/9 75/12 79/7 88/21 94/13 94/20 96/8 98/16 102/11
**witness's** [9] 31/7 31/9 31/10 31/11 31/13 31/15 31/16 31/20 32/23
**witnesses** [13] 3/7 3/14 14/21 15/25 17/3 19/7 29/24 32/1 32/16 32/17 34/22 35/4 71/4
**won't** [1] 10/14
**word** [1] 37/13
**words** [5] 7/1 27/11 33/1 41/20 43/4
**work** [19] 14/10 18/3 18/22 63/2 63/3 64/6 64/18 64/19 66/20 67/15 68/18 68/22 68/23 69/24 74/4 74/9 79/1 79/3 102/7
**worked** [5] 63/22 65/4 65/13 74/7 98/3
**working** [2] 69/13 75/2
**worn** [1] 71/13
**would** [89] 5/4 5/7 5/15 5/24 8/9 8/11 11/4 11/6 11/7 11/9 11/10 15/2 15/18 15/24 17/4 17/25 18/6 18/13 18/19 19/12 23/18 30/21 37/2 38/4 40/12 40/13 40/15 40/16 41/12 41/15 41/19 42/14 43/17 44/19 46/4 46/9 47/24 48/13 49/22 50/22 50/24 51/17 52/2 52/3 54/2 54/23 55/4 57/14 59/21 59/23 60/17 62/11 64/4 65/8 65/9 65/12 65/15 66/20 66/25 72/13 76/23 78/11 78/16 79/5 80/15 80/18 82/15 82/17 84/2 86/5 86/6 86/24 91/6 92/23 92/25 93/12 98/15 100/22 102/10 104/6 104/7 104/8 104/19 106/7 106/11 106/12 106/14 107/18 107/22
**wouldn't** [1] 87/5
**write** [6] 13/11 13/12 13/14 13/14 13/18 92/15
**writing** [2] 12/16 33/17 105/5
**written** [5] 20/22 27/1 35/23 105/10 106/12
**wrote** [1] 67/19
**WYMAN** [9] 2/5 4/6 8/18 9/17 20/2 58/1 59/25 73/2 76/7

**Y**

**year** [2] 48/17 60/7
**years** [16] 28/16 41/3 43/15 44/16 45/12 47/1 47/21 50/17 50/25 60/2 60/22 61/6 63/15 67/10 68/20 69/14
**yes** [69] 5/8 8/5 10/2 10/3 10/19 13/18 16/4 16/6 16/12 17/9 38/5 59/5 72/15 73/14 73/19

73/23 74/3 74/6 74/8 74/11 75/19 75/21 76/3 80/13 80/24 81/2 81/19 82/1 82/6 83/14 84/6 84/9 84/13 84/18 84/24 88/16 89/5 89/8 89/23 91/15 96/12 96/15 97/12 98/14 98/23 99/6 99/11 99/16 99/25 101/12 102/2 102/9 102/17 103/4 104/11 104/17 104/22 105/2 105/3 106/3 107/3
**yesterday** [5] 4/15 16/14 17/4 17/7 17/19 74/24 77/4 77/15 79/12 79/24 83/24 89/8
**yet** [2] 12/25 13/12
**you** [351]
**you'll** [1] 46/11
**you're** [9] 13/21 60/11 60/16 63/12 66/4 66/7 87/3 87/8 96/11
**your** [193]
**yourself** [4] 21/9 36/2 71/12 87/12
**YouTube** [2] 33/20 52/24

**Z**

**zero** [2] 43/9 47/14