1        **UNITED STATES DISTRICT COURT**

2     **CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

3       **HONORABLE JAMES V. SELNA, U.S. DISTRICT JUDGE**

4

5   UNITED STATES OF AMERICA,          )
                                       )
6                 Plaintiff,           )   <u>**CERTIFIED TRANSCRIPT**</u>
                                       )
7         vs.                          )   Case No.
                                       )   SACR-19-00061-JVS
8   MICHAEL JOHN AVENATTI,             )
                                       )   **TRIAL DAY 6**
9                 Defendant.           )   **VOLUME 2**
                                       )

10

11

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16             WEDNESDAY, JULY 21, 2021

17                  1:26 P.M.

18             SANTA ANA, CALIFORNIA

19

20

21

22

23

24          **DEBBIE HINO-SPAAN, CSR 7953, CRR**
            FEDERAL OFFICIAL COURT REPORTER
25           411 WEST 4TH STREET, ROOM 1-053
                SANTA ANA, CA 92701
                dhinospaan@yahoo.com

**UNITED STATES DISTRICT COURT**

```
 1                    APPEARANCES OF COUNSEL:

 2

 3    FOR THE PLAINTIFF:

 4            NICOLA T. HANNA
              United States Attorney
 5            BY:  BRETT SAGEL
                   Assistant United States Attorney
 6            411 West 4th Street
              Suite 8000
 7            Santa Ana, California 92701
              714-338-3598
 8            brett.sagel@usdoj.gov

 9            NICOLA T. HANNA
              United States Attorney
10            BY:  ALEXANDER WYMAN
                   Assistant United States Attorney
11            312 North Spring Street
              Suite 1100
12            Los Angeles, California 90012
              213-894-2435
13            alex.wyman@usdoj.gov

14    FOR THE DEFENDANT IN PRO SE:

15            MICHAEL JOHN AVENATTI, ESQ.

16

17    STANDBY COUNSEL FOR MR. AVENATTI:

18            H. DEAN STEWARD LAW OFFICES
              BY:  H. DEAN STEWARD, ESQ.
19            17 Corporate Plaza
              Suite 254
20            Newport Beach, California 92660
              949-481-4900
21            deansteward7777@gmail.com

22

23

24

25
```

UNITED STATES DISTRICT COURT

I N D E X

**WITNESSES**                                                            **PAGE**

**PATRICK McNICHOLAS, CALLED BY THE PLAINTIFF**
    Cross-Examination by Mr. Avenatti                          7
    Redirect Examination by Mr. Wyman                         62
    Recross-Examination by Mr. Avenatti                       65

**THOMAS HURRELL, CALLED BY THE PLAINTIFF**
    Direct Examination by Mr. Wyman                           68
    Cross-Examination by Mr. Avenatti                         87

EXHIBITS

| EXHIBIT | | IN EVIDENCE | WITHDRAWN OR REJECTED |
|---|---|---|---|
| 47-1 | McNicholas & McNicholas Client Costs Advanced re Johnson v. Baca | 38 | |
| 17 | Attorney Fee Split Agreement Between McNicholas and EA 10/20/2014 | 45 | |
| 24 | 11/11/2014 e-mails with Avenatti re Johnson - Draft Settlement Agreement with Attachment | 72 | |
| 26 | 11/17/2014 e-mail from Avenatti to Hurrell re Johnson | 73 | |
| 30 | 12/8/2014 e-mail from Hurrell to Avenatti re Johnson - Executed Settlement Agreement | 74 | |

**UNITED STATES DISTRICT COURT**

```
 1                              I N D E X
                             (Continued:)
 2
                               EXHIBITS
 3
                                                          WITHDRAWN
 4                                              IN           OR
       EXHIBIT                                EVIDENCE     REJECTED
 5
       32        1/6/2015 e-mail from Avenatti    76
 6               to Hurrell re Johnson - Joint
                 Report re settlement
 7
       33        1/8/2015 e-mail from Hurrell     78
 8               to Avenatti re G. Johnson

 9     34        1/12/2015 e-mail from           79
                 Avenatti to Hurrell re
10               Johnson - Executed Settlement
                 Agreement
11
       35        E-mail from Hurrell to          80
12               Avenatti re G. Johnson

13     38        1/22/2015 e-mail from Hurrell   85
                 to Avenatti re Signature
14               Page.  Johnson Settlement
                 with attachment
15
       31        12/11/2014 Joint Report in      97
16               Johnson v. Baca, CV
                 13-4496-MMM-AJW
17

18

19

20

21

22

23

24

25
```

**SANTA ANA, CALIFORNIA; WEDNESDAY, JULY 21, 2021**

**1:26 P.M.**

**- - -**

01:26PM   **(Out of the presence of the jury.)**

THE COURT:  Can we have the witness on the stand, please.  -

MR. AVENATTI:  Your Honor, I have one issue, very, very brief I wanted to raise.

01:27PM   THE COURT:  Yes.

MR. AVENATTI:  Your Honor, just for the record, I renew the *Jencks* 26.2 motion that we filed earlier.  It's my plan to do so after each witness testifies, and I'd also like to briefly put on the record the witness statements that we've 01:27PM been provided.  We had a recent problem in New York with this, and I want to avoid it in this trial, Your Honor.

THE COURT:  The Government's under an ongoing obligation with respect to each witness to provide any *Jencks* material that has not been provided by the time the witness 01:27PM finishes his direct.  There's no need to make that request every time, Mr. Avenatti.

MR. AVENATTI:  Understood, Your Honor.  And the obligation also extends to 26.2; correct?

THE COURT:  Yes.

01:28PM   MR. AVENATTI:  Okay.  Your Honor, before

```
 1   Mr. McNicholas takes the stand --
 2             THE COURT:  Sir, you should advise the courtroom
 3   deputy that you had matters to raise.  We're cutting into the
 4   jury's time.
 5             MR. AVENATTI:  Your Honor, I apologize.  I didn't
 6   mean to do that.  In the future, I will inform the deputy.
 7             THE COURT:  Fine.
 8             MR. AVENATTI:  This will take 30 seconds.
 9             THE COURT:  Go.
10             MR. AVENATTI:  Thank you.  Your Honor, as it relates
11   to Mr. McNicholas, we've been provided four *Jencks* 26.2
12   statements:  One dated 4/2/2019, one dated 2/21/2020, one dated
13   6/22/2021, and one dated 7/12/2021, for the record.  To the
14   extent that I've misstated that, I'm sure Government counsel
15   will correct me.  Thank you.
16             THE COURT:  Bring the jury in, please.
17             MR. WYMAN:  Your Honor, should we call the witness
18   again?
19             THE COURT:  Yes, please.
20             THE COURTROOM DEPUTY:  All rise.
21             **(In the presence of the jury.)**
22             THE COURT:  Good afternoon, ladies and gentlemen.
23             Mr. Avenatti?
24             MR. AVENATTI:  Thank you, Your Honor.
25   ///
```

01:28PM 5
01:28PM 10
01:28PM 15
01:29PM 20
01:30PM 25

<u>**PATRICK McNICHOLAS, GOVERNMENT WITNESS, RESUMED THE STAND**</u>

**CROSS-EXAMINATION**

BY MR. AVENATTI:

Q    Mr. McNicholas, good afternoon.

01:30PM  A    Good afternoon.

Q    It has been a while since you and I have seen each other; correct?

A    Correct.

Q    Did you do anything unethical or illegal relating to

01:30PM  Mr. Johnson's settlement?

A    No.

Q    You're certain of that?

A    Yes.

Q    And yet you testified earlier that you were paid

01:30PM  attorney's fees from the settlement; am I correct?

A    That's correct.

Q    And you were paid costs; correct?

A    Correct.

Q    And can you describe for the jury, generally, in your

01:31PM  experience, what are costs?

A    Costs are case-related, out-of-pocket expenses.

Q    And they can take any number of different forms in various cases; correct?

A    Correct.

01:31PM  Q    Depends on the case; am I right?

```
 1   A     That's correct.
 2   Q     Sometimes cases involve expert fees; right?
 3   A     Yes.
 4   Q     And in those cases, in your experience, experts can cost
 5   hundreds of thousands if not millions of dollars, can they not?
 6   A     Yes.
 7   Q     And costs can include transcripts for things like
 8   depositions and hearings; right?
 9   A     Yes.
10   Q     And filing fees?
11   A     Yes.
12   Q     And travel expenses?
13   A     Yes.
14   Q     And some firms charge for photocopies; right?
15   A     Yes.
16   Q     Does your firm charge for photocopies?
17   A     Yes.
18   Q     How much do you charge for a photocopy?
19   A     Today?
20   Q     How much did you charge Mr. Johnson, if anything, for a
21   photocopy?
22   A     I don't remember.  I'd have to look at the document.
23   Q     If you did charge Mr. Johnson for a photocopy, in your
24   mind, would there be anything wrong with that?
25   A     No.
```

```
 1   Q      Why?

 2   A      It's a case-related cost.

 3   Q      And you were entitled at the end of the case to be

 4   reimbursed 100 percent of every dime you advanced or paid on

 5   Mr. Johnson's behalf; correct?

 6   A      Yes.

 7   Q      Nothing illegal about that; right?

 8   A      That's correct.

 9   Q      Nothing unethical in your decades of experience; right?

10   A      Correct.

11   Q      I want to ask you if you agree or disagree with the

12   following statement, sir:  Michael Avenatti stole the entire

13   amount of Geoffrey Johnson's $4 million settlement check.

14              MR. WYMAN:  Objection, Your Honor.  Calls for

15   speculation.  Relevance.

16              THE COURT:  Overruled.

17              THE WITNESS:  I have no idea.

18   Q   BY MR. AVENATTI:  Well, sir, let me ask you.  Didn't you

19   testify earlier today that you were paid cost and fees from the

20   $4 million settlement check?

21   A      I did.

22   Q      So let me ask you again.  Do you agree or disagree with

23   the following statement:  Michael Avenatti stole the entire

24   amount of Geoffrey Johnson's $4 million settlement check.

25   A      Of the check?  Face amount?  No.
```

01:32PM 5
01:32PM 10
01:33PM 15
01:33PM 20
01:33PM 25

```
 1   Q     You disagree with that statement; correct?

 2   A     Let me just make sure we're clear as to --

 3   Q     Let me strike the question and ask a better question.

 4   A     Thank you.

 5   Q     Sir, earlier before the jury, you testified that you were

 6   paid over $350,000 in connection with Mr. Johnson's settlement;

 7   correct?

 8   A     Yes.

 9   Q     And that was out of the $4 million settlement check;

10   right?

11   A     That is correct.

12   Q     So I'm going to ask you again:  Isn't it true that

13   Michael Avenatti did not steal the entire $4 million Johnson

14   settlement check?

15   A     As defined, I would agree with that.

16   Q     Because approximately $350,000 of that money went to you

17   and your firm for the work you had done; right?

18   A     That's correct.

19   Q     Before taking the stand this morning, did you meet with

20   the Government or communicate with the Government in connection

21   with your testimony?

22   A     Yes.

23   Q     How many times?

24   A     Meet with, twice.  Communicate with, more than five, less

25   than ten.
```

```
 1   Q     So if I understand your testimony, you met with them

 2   twice, but you communicated with them between five and ten

 3   times?

 4   A     Correct.

 5   Q     Describe what you mean by "communicate with."

 6   A     Other than -- anything other than in person.

 7   Q     Well, can you please describe for the jury the methods by

 8   which you communicated those five to ten times.

 9   A     Phone and e-mail.

10   Q     You communicated directly with the Government by e-mail?

11   A     Well, with me or my office.  So I'm including any

12   communications they had with my office.

13   Q     And by "phone," were you interviewed by the Government?

14   A     No.

15   Q     Do you recall having a telephone conversation on

16   April 2nd, 2019, with members from the U.S. Attorney's Office

17   and a special agent?

18   A     I recall that I had phone conversations.  I don't recall

19   specifically what you're referring to there.

20   Q     You don't dispute it though?

21   A     I do not.

22   Q     Do you think that that was your first communication with

23   the Government relating to the Johnson matter on or about

24   April 2nd, 2019?

25   A     I can say in the general time frame, probably.
```

01:36PM (5)
01:36PM (10)
01:36PM (15)
01:37PM (20)
01:37PM (25)

**UNITED STATES DISTRICT COURT**

```
 1   Q    You then had a sit-down meeting with members from the
 2   U.S. Attorney's Office and Mr. Kim, a special agent, on or
 3   about February 21st of 2020 in Los Angeles.  Do you recall
 4   that?
```
01:37PM
```
 5   A    I recall the sit-down meeting.  I'll accept your
 6   representation as the date being accurate.
 7   Q    You don't have any reason to believe that that's not
 8   accurate?
 9   A    I do not.
```
01:37PM
```
10   Q    And that meeting lasted about two and a half hours; is
11   that right?
12   A    Sounds about right.
13   Q    Then on June 22nd, 2021, you had a Webex videoconference
14   relating to this case; correct?
```
01:38PM
```
15   A    Correct.
16   Q    And can you estimate for me how long that lasted?
17   A    Hour, maybe an hour and a half.
18   Q    And you and your attorney were present; right?
19   A    No.
```
01:38PM
```
20   Q    What's incorrect about what I asked?
21   A    I think at some point in time there was an attorney on the
22   Zoom call for a portion of it.  But if you're saying present on
23   the Zoom, yes.  With me, no.  For a portion of the time, yes.
24   Q    I should have been clear in my question.  I meant on the
```
01:39PM
```
25   Webex Zoom call.
```

```
 1   A     Correct.

 2   Q     You had an attorney present for at least part of that

 3   time?

 4   A     Correct.

 5   Q     And Mr. Ramon Carlos, Special Agent Ramon Carlos seated

 6   immediately to my left, he was also present for that call; am I

 7   right?

 8   A     That, I don't remember.

 9   Q     Do you remember Mr. James Kim, Special Agent James Kim,

10   being present?

11   A     No.  I'm not saying he was or wasn't.  I just don't

12   remember one way or the other.

13   Q     Do you remember Mr. Alex Wyman and Mr. Brett Sagel being

14   present?

15              MR. WYMAN:  Objection.  Relevance, Your Honor.

16              THE COURT:  Overruled.

17              THE WITNESS:  Yes.

18   Q     BY MR. AVENATTI:  And I think you testified that that

19   Zoom call lasted about an hour to an hour and a half.  Am I

20   right about that?

21   A     That was my testimony, yes.

22   Q     And during that discussion, you discussed the details of

23   what had happened relating to Mr. Johnson's settlement;

24   correct?

25   A     We basically reviewed the documents.  That's what we did.
```

```
 1   Q    And when you say "the documents" -- well, strike that.
 2        What do you mean, "we reviewed the documents"?
 3   A    The documents that I testified from here today were the
 4   documents that I reviewed with the U.S. Attorney.
01:40PM  5   Q    And when you say "reviewed," can you explain to the jury
 6   what you mean by that.
 7   A    I read them and then they asked me questions about them.
 8   Q    How did you get the documents before the Zoom meeting?
 9   A    They were sent to my office.
01:40PM 10   Q    They were sent to you?
11   A    They were probably sent to me and to my office.  And then
12   I had them printed out and I had them in front of me.
13   Q    So they e-mailed them to you?
14   A    Probably, yes.
01:40PM 15   Q    Okay.  And so then you sat on the Zoom call, and you
16   would look at the document -- well, strike that.
17        The Government would direct you to a document, you
18   would pull it out, you would look at it, and they'd start
19   asking you questions.  Do I have it right?
01:41PM 20   A    Yes, you do.
21   Q    Okay.  And then would they interrupt you from time to
22   time and ask you other questions?
23   A    I'm sure they did.
24   Q    Why are you sure that they did?
01:41PM 25   A    Because lawyers always do.
```

UNITED STATES DISTRICT COURT

| | | |
|---|---|---|
| | 1 | Q     And lawyers, when they prepare witnesses, this is often |
| | 2 | how it's done, isn't it? |
| | 3 | A     I would say "yes." |
| | 4 | Q     In your decades of experience; right? |
| 01:41PM | 5 | A     Yes. |
| | 6 | Q     Okay.  Did you review documents -- well, strike that. |
| | 7 |        Did you review each of the documents that you were |
| | 8 | shown here today? |
| | 9 | A     Yes. |
| 01:41PM | 10 | Q     During the hour- to hour-and-a-half call? |
| | 11 | A     Yes. |
| | 12 | Q     And you provided comments about them to the Government; |
| | 13 | right? |
| | 14 | A     Yes. |
| 01:41PM | 15 | Q     I'm not certain how many exhibits you were shown earlier |
| | 16 | today, but suffice it to say, during the Zoom call, you |
| | 17 | reviewed documents beyond what you were shown today; is that |
| | 18 | right? |
| | 19 | A     That, I don't remember. |
| 01:42PM | 20 | Q     All right.  Do you have a recollection of being shown, |
| | 21 | give or take, ten documents during the call? |
| | 22 | A     It was, give or take, around the number that I testified |
| | 23 | to from today in court. |
| | 24 | Q     Okay.  So if the number is seven, it's give or take |
| 01:42PM | 25 | seven; if it's ten, it's give or take ten? |

**UNITED STATES DISTRICT COURT**

```
        1    A    Correct.
        2    Q    Okay.  And your review of those documents, did that help
        3    you prepare to testify here today?
        4    A    Yes.
01:42PM  5    Q    And during that call, did the Government -- well, strike
        6    that.
        7             During that call did the Government provide any
        8    input?
        9    A    No.
01:42PM 10    Q    So they just asked you questions?
       11    A    Correct.
       12    Q    And they asked you questions beyond some of the questions
       13    that you testified here today; right?
       14    A    Probably.
01:43PM 15    Q    That's your best recollection?
       16    A    It is.
       17    Q    And then on July 12th, 2021, you had another meeting with
       18    the Government in person; right?
       19    A    I'll accept your representation of the date.  But, yes, I
01:43PM 20    did have a meeting with them.
       21    Q    It's about two weeks ago?
       22    A    That's correct.
       23    Q    And where did that meeting take place?
       24    A    In this building.
01:43PM 25    Q    This very courthouse?
```

```
 1    A    This very courthouse.

 2    Q    And you were obviously present; right?

 3    A    Yes.

 4    Q    Okay.  And Special Agent Ryan Roberson was present;

01:43PM  5    right?

 6    A    I believe so.

 7    Q    Do you see him in the courtroom here today?

 8    A    Yes.

 9    Q    He's seated to your left of Mr. Kim; right?

01:44PM 10    A    Correct.

11    Q    Okay.  And Mr. Special Agent Ramon Carlos was also

12    present, the gentleman to my left; right?

13    A    Correct.

14    Q    And Mr. Kim, who's seated in the back of the courtroom,

01:44PM 15    was also present; right?

16    A    He was.

17    Q    And Mr. Wyman was present?

18    A    He was also.

19    Q    And Mr. Sagel?

01:44PM 20    A    Correct.

21    Q    So there was about six people in the meeting; am I right?

22    A    That's correct.

23    Q    Was anybody else in the meeting?

24    A    I don't think so.

01:44PM 25    Q    And the meeting started about 3:00 o'clock -- 3:30;
```

1   right?

2   A    I know it started in the afternoon.  I'll accept that

3   representation as accurate.

4   Q    3:32, does that sound about right?

01:44PM 5   A    That sounds about right.

6   Q    Okay.  And that meeting lasted about an hour and a half;

7   right?

8   A    Correct.

9   Q    What happened during that meeting?

01:45PM 10  A    We went through the same documents.

11  Q    The same documents that you spent an hour to an hour and

12  a half going over on the call that we were just talking about;

13  right?

14  A    That's correct.

01:45PM 15  Q    What was your understanding as to why it was necessary to

16  go over the same documents?

17  A    The same thing I do when I'm preparing for trial, so that

18  you don't waste a lot of time, so that it's accurate, so that

19  people's memories are refreshed.

01:45PM 20  Q    And during that meeting, were notes being taken?

21  A    I don't remember.  I didn't take any notes.

22  Q    Well, in your mind -- strike that.

23       Do you have a doubt, as you sit there today, as to

24  whether notes were being taken in this hour-and-a-half meeting

01:45PM 25  with multiple federal agents?

```
 1   A    I wouldn't say it's a doubt.  I would say I don't remember
 2   one way or the other.
 3   Q    During that meeting were you asked questions by the
 4   Government?
 5   A    I was.
 6   Q    About what?
 7   A    Same questions, same documents.
 8   Q    But your answers varied a little bit; right?  Strike
 9   that.
10        No one ever gives the exact same answer twice, in
11   your litigation experience, do they?
12   A    Generally, not.
13   Q    Okay.  And do you have any reason to believe that
14   you're different -- any different than most witnesses?
15   A    Probably not.
16   Q    Okay.  So when you met with the Government for an hour
17   and a half with the multiple federal agents and the multiple
18   U.S. attorneys, you gave answers that were at least somewhat
19   different than what you've been telling them before; right?
20   A    I don't think they're somewhat different.  I may have used
21   different language, but substantively they're the same.
22   Q    Well, words matter, you would agree with that; right,
23   sir?
24   A    I would.
25   Q    Can you tell the jury which documents exactly you
```

01:46PM (line 5)
01:46PM (line 10)
01:46PM (line 15)
01:46PM (line 20)
01:47PM (line 25)

```
 1  reviewed only about two weeks ago?
 2  A    I think it was the same documents we went through in court
 3  here today.
 4  Q    Did you feel that that meeting was necessary?
 5  A    Definitely.
 6  Q    Even though you had the call previously?
 7  A    Yes.
 8  Q    Why?  Why was it necessary?
 9            MR. WYMAN:  Objection, Your Honor.  Relevance.
10            THE COURT:  Overruled.
11            THE WITNESS:  Because my recall of these events,
12  given it was a long time ago, was dependent on these documents.
13  So reviewing them was helpful to me.
14  Q    BY MR. AVENATTI:  And your review of these documents
15  during this meeting was in preparation for your testimony here
16  today; right?
17  A    Correct.
18  Q    And it helped refresh your recollection so that you could
19  then come to court today, take the stand and testify to the
20  jury; correct?
21  A    Correct.
22  Q    And that was also true for the Webex call that you had
23  back in June; am I right?
24  A    You're right.
25            MR. AVENATTI:  If we can have Exhibit 37, please.
```

1      It's in evidence, Your Honor.

2      THE COURT:  Correct.

3   Q    BY MR. AVENATTI:  Do you have that there, sir?

4   A    I do.

01:49PM 5   Q    And if we can go to the next page.  Do you have that?

6   A    I have it in front of me.

7   Q    Okay.  And Mr. Johnson is a party to this agreement;

8   correct?

9   A    He is.

01:49PM 10  Q    Does the figure $4 million appear anywhere in the

11  agreement?

12  A    Yes.

13  Q    Can you please direct the jury's attention to where the

14  sum of money of $4 million appears in the agreement.

01:50PM 15  A    Sixth full paragraph, second line.

16  Q    Could you please read that entire first sentence for me.

17  A    "In exchange for a complete resolution of the

18       lawsuit, defendants, by and through the County of

19       Los Angeles, shall pay to plaintiff $4 million."

01:50PM 20       Would you like the rest of it?

21  Q    Yes, please.

22  A    "(The settlement funds), subject to approval by

23       the Board of Supervisors."

24  Q    Please continue.

01:50PM 25  A    "The parties acknowledge that the Court in this

UNITED STATES DISTRICT COURT

```
 1              matter has issued an order outlining a timetable to
 2              present this settlement for approval by the
 3              Los Angeles County Board of Supervisors and
 4              thereafter, issuance of a settlement draft."
01:51PM  5   Q   And then it continues:
 6                  "It is understood by the parties that if the
 7              timetable is not complied with, this settlement
 8              agreement may be revoked by either party."
 9                  Did I read that correctly?
01:51PM 10   A   You did.
11   Q   Can we please have the next sentence in the document.
12   A   The next paragraph?
13   Q   Yes.  I'm going to see if I can pull it up for the
14   benefit of the jury.  Perfect.
01:51PM 15                  Sir, please read that, beginning with "the parties."
16   A   "The parties expressly agree that the lawsuit
17              shall not be dismissed until (5)" -- the number
18              five -- "business days following receipt by Eagan
19              Avenatti of the settlement funds as provided --"
01:52PM 20   Q   "Above."
21   A   -- "above."
22   Q   Did you read this document at the time?
23   A   It would have been my custom and practice to.  I don't
24   have a recollection, but that would have been my custom and
01:52PM 25   practice.
```

| | |
|---|---|
| 1 | Q    Could you please explain to the jury what your |
| 2 | understanding, based on your involvement in the Johnson matter, |
| 3 | was relating to this sentence "the parties expressly agree," |
| 4 | in layman's terms. |
| 01:52PM 5 | A    In writing they agree.  That's what "expressly agrees" |
| 6 | means. |
| 7 | Q    Right.  But the balance of this sentence.  I asked a bad |
| 8 | question.  I'm sorry. |
| 9 | A    I'm not sure what you're asking me to -- |
| 01:52PM 10 | Q    Yeah, let me start over.  I apologize. |
| 11 |         Can you please explain to the jury in layman's terms |
| 12 | what this sentence means, which reads: |
| 13 |         "The parties expressly agree that the lawsuit |
| 14 |         shall not be dismissed until (5) business days |
| 01:53PM 15 |         following receipt by Eagan Avenatti of the |
| 16 |         settlement funds as provided above." |
| 17 | A    That means when Eagan Avenatti received the check, five |
| 18 | days after that the case would be dismissed. |
| 19 | Q    And if Eagan Avenatti did not receive the check, the case |
| 01:53PM 20 | would not be dismissed; right? |
| 21 | A    That would follow, yes. |
| 22 | Q    Okay.  Was this settlement agreement ever confidential? |
| 23 | A    No. |
| 24 | Q    In fact, on direct examination, you testified that it |
| 01:53PM 25 | couldn't be confidential because it involved the County of |

**UNITED STATES DISTRICT COURT**

```
 1   Los Angeles, a governmental entity; right?
 2   A    Correct.
 3   Q    How about the dismissal that we were just talking about,
 4   the dismissal of the lawsuit, was that confidential?
 5   A    No.
 6   Q    Are you sure?
 7   A    Yes.
 8   Q    How can you be so sure that the dismissal, like the
 9   settlement agreement, was not confidential?
10   A    It's a public entity defendant.  It's required to be
11   disclosed.
12   Q    Involved in a public lawsuit; right?
13   A    Yes.
14   Q    In a public federal court; right?
15   A    Yes.
16   Q    Where the filings in the case are open to the public;
17   right?
18   A    Correct.
19   Q    And in this case, Mr. Johnson's case, isn't it true that
20   at any point in time, anyone could go down to the court or even
21   online and would have access, for the most part, to the
22   documents?
23   A    That question is a little broad, but I would answer it
24   "yes."
25   Q    I mean, filings in cases like this case and
```

01:54PM 5
01:54PM 10
01:54PM 15
01:54PM 20
01:55PM 25

```
            1    Mr. Johnson's, they're presumptively open to the public; right?
            2    A     That is correct.
            3    Q     You could access them; right?
            4    A     I probably couldn't, but most people probably could.
 01:55PM    5    Q     Fair enough.  Fair enough, sir.  I probably couldn't
            6    either.
            7              Mr. Johnson could have accessed them; right?
            8    A     That, I have no idea about.
            9    Q     Well, do you have any reason to believe that he couldn't
 01:55PM   10    access the documents -- strike that.
           11              Are you aware of any evidence that suggests that
           12    Mr. Johnson would not have access to these documents on the
           13    public record?
           14    A     Well, he was a paraplegic and I don't know if he was still
 01:55PM   15    in jail at that time.
           16    Q     Sir, you didn't know if your own client was still in
           17    jail?
           18    A     I did not know.
           19    Q     Was it your understanding at the time of this settlement
 01:56PM   20    that Mr. Johnson was in jail?
           21    A     I don't remember one way or the other.
           22    Q     I want you to assume for the sake of my question that he
           23    was no longer in custody.  Okay?  Do you have any reason to
           24    doubt that representation?
 01:56PM   25    A     I'll accept that as true.
```

**UNITED STATES DISTRICT COURT**

1    Q    Okay.  Assuming that he was no longer in custody, do you

2    have any evidence to suggest that Mr. Johnson would not have

3    the same public access to these documents just like anybody

4    else?

01:56PM 5    A    I really don't know one way or the other what his

6    capabilities to do that would have been.

7    Q    Sir, assuming, for the sake of argument, that he had

8    online access, would you dispute my statement that he would

9    have access to the documents?

01:56PM 10            MR. WYMAN:  Objection.  Calls for speculation.

11            THE COURT:  Overruled.

12            THE WITNESS:  No.

13    Q    BY MR. AVENATTI:  Can we please go to the last page of

14    the exhibit.

01:57PM 15            This is generally what is called a signature page on

16    a settlement agreement; correct?

17    A    Correct.

18    Q    And the signature page is where the parties to the

19    lawsuit sign the document acknowledging that they agree with

01:57PM 20    each of its terms; right?

21    A    Correct.

22    Q    And there's a big underlined, bolded statement right

23    above the signatures.  Do you see that?

24    A    I do.

01:57PM 25    Q    "CAUTION" -- all caps -- "READ BEFORE SIGNING."  Do you

| | | |
|---|---|---|
| | 1 | see that? |
| | 2 | A    I do. |
| | 3 | Q    Did I read that correctly? |
| | 4 | A    You did. |
| 01:57PM | 5 | Q    You've seen that before; right? |
| | 6 | A    I have. |
| | 7 | Q    And this is one of the documents that you looked at when |
| | 8 | you met with the multiple federal agents and assistant U.S. |
| | 9 | attorneys in getting ready to testify here today; right? |
| 01:58PM | 10 | A    It is. |
| | 11 | Q    You spent some time on this document both in your |
| | 12 | in-person meeting as well as on the Webex; right? |
| | 13 | A    Correct. |
| | 14 | Q    Did anybody ever ask you about this "CAUTION:  READ |
| 01:58PM | 15 | BEFORE SIGNING" part? |
| | 16 | A    No. |
| | 17 | Q    Let's look at the paragraph above that. |
| | 18 |         By the way, before we get to that paragraph, is |
| | 19 | there any way to read this document -- well, strike that. |
| 01:59PM | 20 |         You read the document in your meeting; right? |
| | 21 | A    Yes. |
| | 22 | Q    Did you see the $4 million that's on the first page in |
| | 23 | the middle of the page? |
| | 24 | A    I did. |
| 01:59PM | 25 | Q    It's bolded; right? |

**UNITED STATES DISTRICT COURT**

```
           1    A     It is.

           2    Q     Did you see the dismissal language?

           3    A     I read the document.

           4    Q     So you saw the dismissal language; right?

01:59PM    5    A     Correct.

           6    Q     Now let's go back to the last page, top paragraph:  "The

           7    parties" --

           8          By the way, Mr. Johnson was a party to this

           9    agreement; right?

01:59PM   10    A     Correct.

          11    Q     So that includes him?

          12    A     Yes.

          13    Q     "The parties further agree that they have read

          14          and fully understand this agreement, that the

02:00PM   15          opportunity has been afforded to discuss the terms

          16          and contents of this agreement with legal counsel,

          17          or that such a discussion with legal counsel has

          18          occurred."

          19          Did I read that correctly?

02:00PM   20    A     You did.

          21    Q     Explain to the jury your understanding of what that

          22    means.

          23    A     Well, what it would mean in lay terms is, it's just

          24    stressing that the parties, including in this case Mr. Johnson,

02:00PM   25    reads the agreement, and then they want you to discuss it with
```

```
 1   your attorney to make sure that you understand the terms of the

 2   agreement.

 3   Q    And this language actually is retrospective, meaning the

 4   party who signs it is acknowledging and agreeing that that

 5   happened -- right? -- that they've read it and they've either

 6   consulted with their attorney or they've had the opportunity to

 7   do so; right?

 8   A    That's accurate.

 9        MR. AVENATTI:  If I could please have Exhibit 53.

10   Q    Can you see Exhibit 53, sir?

11   A    I have it in front of me, yes.

12        MR. AVENATTI:  Can we blow up the amount and the

13   date, please.

14   Q    Sir, is your best recollection that you received this

15   check on or about April 1st of 2015?

16   A    Based upon the document, yes.

17   Q    You don't have any reason to quarrel with that?

18   A    I do not.

19   Q    And this was a check for your portion of the attorney's

20   fees; is that right?

21   A    My firm's portion.

22   Q    Your firm's portion.  Fair enough.

23        By the way, who owns your firm?

24   A    My brother and me.

25   Q    Your brother Matt; is that right?
```

02:00PM  5
02:02PM 10
02:02PM 15
02:02PM 20
02:02PM 25

```
 1  A     That's correct.
 2  Q     Okay.  Now, you received another check for the costs,
 3  your out-of-pocket cost in the case; isn't that true?
 4  A     I don't know if that's true or not.  I saw it reflected in
02:02PM 5  the case accounting, but I don't know if that's true or not.
 6  Q     As you sit here today, are you claiming that you're owed
 7  additional money from the Johnson case?
 8  A     No.
 9  Q     Do you have any evidence to suggest to you that your firm
02:03PM 10  was not paid that money in a timely manner?
11  A     No.
12         MR. AVENATTI:  Maybe we can have the back of the
13  check as well.
14  Q     You deposited the check, right, or your firm did, sir?
02:03PM 15  A     We did.
16  Q     Did you personally?
17  A     No.
18  Q     Why not?
19  A     I wouldn't know how to do that mechanically.  We have an
02:03PM 20  accounting department that does it; so they deposit it.
21  Q     What do you mean you wouldn't know how to do it
22  mechanically?
23  A     I've never taken a check made out to my firm and had to
24  deal with the bank and depositing it, getting the signatures,
02:04PM 25  accounting for it, that sort of thing.
```

```
 1   Q    That's not what you do; right?

 2   A    That's not what I do, correct.

 3   Q    And that was not what you were doing at the time this

 4   check was issued to you, was it?

 5   A    That is correct.

 6   Q    And it was not what you were doing at the time that you

 7   represented Mr. Johnson; right?

 8   A    I think I understand the question, but, yes, that's right.

 9   Q    Okay.  And how big was your law firm at the time you were

10   representing Mr. Johnson?

11   A    You mean the number of attorneys?

12   Q    We'll start there.

13   A    My best recollection is about ten.

14   Q    About ten attorneys and about 20 staff?  Or is that too

15   high?

16   A    That would be a fair estimate.

17   Q    So about 30 people total; right?

18   A    I'd say 25 to 30.

19   Q    And you had people at your law firm who were in charge of

20   the accounting relating to things like depositing checks;

21   right?

22   A    Yes.

23   Q    And making payments; am I right?

24   A    Correct.

25   Q    And keeping track of cost; am I right?
```

```
 1   A     You're right.

 2   Q     And sending wire transfers; right?

 3   A     That's correct.

 4   Q     And sending checks to clients; am I right?

 5   A     Yes.

 6   Q     And all of the other things that would generally be

 7   attended with accounting functions at a law firm, that was not

 8   you, was it?

 9   A     That's correct.

10   Q     Because you were the -- in charge of the law firm; right?

11   A     Well, that's actually not correct.  My brother was the

12   managing partner at that time.

13   Q     You were on the letterhead, as they say; right?

14   McNicholas & McNicholas.

15   A     I was.

16   Q     You were a partner, an equity partner in the firm; right?

17   A     Yes.

18   Q     And how long have you been practicing again, sir?

19   A     Since 1986.

20   Q     A long time.  We would agree with that; right?

21   A     I would agree with that.

22   Q     Okay.  And in your experience over the last three

23   decades, equity partners at law firms with approximately 30

24   people are generally not dealing with day-to-day accounting

25   issues, are they?
```

```
 1              MR. WYMAN:  Objection.  Calls for speculation.
 2   Personal knowledge.
 3              THE COURT:  Sustained.
 4   Q    BY MR. AVENATTI:  Sir, in your experience over the last
 5   30 years, at least as it related to your firm, equity partners
 6   at your level are not dealing with the day-to-day accounting
 7   functions similar to this, based on your personal experience;
 8   am I right?
 9              MR. WYMAN:  Same objection, Your Honor.
10              THE COURT:  Sustained.
11   Q    BY MR. AVENATTI:  The deposit of this check and the
12   tracking of the cost on the Johnson matter was somebody else's
13   responsibility other than yours; am I right?
14   A    That's correct.
15   Q    If at the time that this check came to you -- well,
16   strike that.
17              Did you know how to send a wire transfer as of this
18   date from your bank account?
19   A    No.
20              MR. AVENATTI:  Can we please have Exhibit 54.
21              THE WITNESS:  I have it in front of me.
22   Q    BY MR. AVENATTI:  Before we get to that, let me ask you a
23   couple general questions.
24              You would call yourself a successful plaintiff's
25   lawyer, would you not?
```

```
 1              MR. WYMAN:  Objection.  Relevance.

 2              THE COURT:  Sustained.

 3    Q    BY MR. AVENATTI:  I want to ask you a couple questions

 4    about your background, sir.  As of the time that you were

02:08PM 5    representing Mr. Johnson, were you litigating cases throughout

 6    California?

 7    A    Yes.

 8    Q    Were you litigating cases outside of California?

 9    A    Well, I have litigated cases outside of California.  At

02:08PM 10   that particular time, I don't remember if I was.

 11   Q    At the time you were representing Mr. Johnson, can you

 12   estimate for the jury, to the nearest 50, how many cases you

 13   were working on?

 14   A    At that time?

02:08PM 15   Q    Yes, sir.

 16   A    I would say 50 to 60.

 17   Q    And at that time your focus was representing those 50 to

 18   60 clients in those cases; am I right?

 19   A    That was one of my focuses.

02:09PM 20   Q    Well, that was your main professional focus, was it not?

 21   A    I'll -- yes.

 22   Q    Okay.  The administrative details were left to others

 23   that you trusted at your firm, people that work for you; right?

 24   A    That's correct.

02:09PM 25   Q    You trusted them to do the right thing for you; right?
```

```
 1              MR. WYMAN:  Objection.  Cumulative, Your Honor.
 2              THE COURT:  Sustained.
 3              MR. AVENATTI:  Let's go to Exhibit 54.  Great, we
 4    got it up.
 5    Q    And you testified on direct examination by the
 6    Government --
 7              By the way, before I forget, when you were meeting
 8    with the Government, whether by Webex or in person, did any of
 9    them ask you any cross-examination questions?
10    A    No.
11    Q    Now, if you look at Exhibit 54, you testified under
12    direct examination by the Government that -- by Mr. Wyman, that
13    this was a summary of your cost on the case, the accounting on
14    the case; right?
15    A    Correct.
16    Q    And what's the date of this document?  You see on the
17    lower right-hand corner?
18    A    Looks like a computer run of 4/6/15.
19    Q    Do you have any reason to dispute that date?
20    A    No.
21    Q    Let's go back to the check.  Do you remember, you were
22    asked a question about -- by Mr. Wyman about -- that it had
23    taken months to get your money?
24    A    I remember that question.
25    Q    Okay.  What's the date on the check?
```

02:09PM  5
02:10PM 10
02:10PM 15
02:10PM 20
02:11PM 25

**UNITED STATES DISTRICT COURT**

```
         1   A    4/1/2015.

         2        MR. AVENATTI:  Let's go back to Exhibit 54.

         3   Q    Mr. McNicholas, where is Geoff Johnson's signature on

         4   this document?

02:11PM  5   A    It's not on this document.

         6   Q    You didn't steal his money, did you?

         7   A    No.

         8   Q    The absence of his signature doesn't mean he did anything

         9   wrong, in your mind, does it?

02:11PM 10   A    No, it does not.

        11   Q    Were these all of your fees and costs -- strike that.

        12        Does this document reflect all of your fees and

        13   costs from the Johnson case?

        14   A    Yes.

02:12PM 15   Q    As you sit there today, do you have any idea how much

        16   money me and my firm advanced for Mr. Johnson at any point in

        17   time?

        18   A    I do not.

        19   Q    Did anyone from the Government ever ask you that

02:12PM 20   question?

        21   A    No.

        22        MR. AVENATTI:  I'd like to publish for the witness

        23   and the Court only, and Government counsel, obviously,

        24   Exhibit 47.

02:13PM 25   Q    Sir, if you could turn to Exhibit 47 in your notebook.
```

**UNITED STATES DISTRICT COURT**

```
 1    A    I have it in front of me.
 2              THE COURT:  47 is not in evidence.
 3              MR. AVENATTI:  I understand that, Your Honor.  I'm
 4    going to try to lay a foundation.
 5              THE COURT:  Okay.
 6    Q    BY MR. AVENATTI:  Sir, what is Exhibit 47?
 7    A    It's a document from my law firm entitled "Client Costs
 8    Advance."
 9    Q    And does this relate to the Johnson matter?
10    A    It does.
11    Q    And did you produce this document from your files to the
12    Government?
13    A    Yes.  My office did.
14    Q    And when did that happen, roughly?
15    A    I do not remember when that was.
16    Q    In the last two years; fair estimate?
17    A    Yes.
18    Q    Yes?
19    A    Yes.
20    Q    And are all of these costs legitimate, to the best of
21    your knowledge?
22    A    Well, there's a number of them that I wrote off.  But,
23    yes, they're legitimate.
24    Q    I want to direct your attention to the first page only.
25    Do you see that?
```

1    A     Yes.

2    Q     Is there any cost on this first page that is bogus, to

3    the best of your knowledge?

4    A     No.

02:15PM  5    Q     And this is the same amount in the right hand -- lower

6    right-hand corner that you ultimately sought reimbursement for;

7    right?

8    A     No.  That's not right.

9    Q     The $2,776.43?

02:15PM 10    A     I don't think that's correct.

11    Q     Let's check.

12          MR. AVENATTI:  First of all, Your Honor, I'd move

13    Exhibit 47 into evidence.

14          MR. WYMAN:  No objection, Your Honor.

02:15PM 15          THE COURT:  47 will be received.

16          **(Exhibit No. 47-1 received.)**

17          MR. AVENATTI:  And, Your Honor, just the first page,

18    if that's okay.  I should have been clear.

19          THE COURT:  Any objection?

02:15PM 20          MR. WYMAN:  That's fine, Your Honor.

21          THE COURT:  47, page 1 will be received.

22          MR. AVENATTI:  Can we please publish that for the

23    jury.  Maybe if we can blow that up a bit.  I think that's near

24    impossible to see.

02:16PM 25    Q     Do you see at the bottom it's $2,776.43?  Do you see

1    that?

2    A    I do.

3          MR. AVENATTI:  Okay.  Let's go back to the unsigned

4    document, Exhibit 54.

02:16PM 5    Q    What's the cost amount there, sir?

6    A    2,776.43.

7    Q    It's the exact same number; right?

8    A    It is.

9    Q    So does this refresh your recollection that these are the

02:17PM 10   costs that you billed Mr. Johnson for?

11   A    It does.

12   Q    All right.  Let's talk about some of these costs.

13          Exhibit 47, please, at the top.

14          We've got court copies and expert witness depo fees.

02:17PM 15   Do you see that?

16   A    I do.

17   Q    Nothing unusual about that; right?

18   A    No.

19   Q    Pretty commonplace for a complicated case; right?

02:17PM 20   A    I would say those are customary charges.

21   Q    In your over three decades of experience; right?

22   A    Yes.

23   Q    Okay.  Then you charged Mr. Johnson for some meals.  Do

24   you see that?

02:17PM 25   A    I do.

```
 1   Q    And then you charged him for some parking; right?

 2   A    That's correct.

 3   Q    And you charge him for telephone Internet.  Do you see

 4   that?

 5   A    I do.

 6   Q    Nothing unethical about that; right?

 7   A    No.

 8   Q    Nothing illegal about it?

 9   A    Correct.

10   Q    And then the next line, transportation, you charged him

11   for an Uber; right?

12   A    Right.

13   Q    And then underneath that, videotaping, conferencing,

14   et cetera.  That was another cost you incurred; right?

15   A    That's correct.

16   Q    And then underneath that, we have photocopy costs.  Do

17   you see that?

18   A    I do.

19   Q    And maybe we can expand it out a little to the right so

20   the jury can see the costs associated with the photocopy -- or

21   photocopying, I should say.

22        You charged Mr. Johnson 25 cents a page for copies;

23   right?

24   A    That's correct.

25   Q    Including one entry for 50 cents; is that right?
```

02:18PM (line 5)
02:18PM (line 10)
02:18PM (line 15)
02:19PM (line 20)
02:19PM (line 25)

```
  1   A    That's accurate.
  2             MR. AVENATTI:  And then if we can just blow up maybe
  3   the amounts on the right-hand side.
  4   Q    And, sir, if you need me to blow it up with the
02:19PM  5   categories, I'm happy to do that.
  6             But maybe if we can just pull up -- pull up that
  7   column on the right-hand side for the benefit of the witness
  8   and the jury.
  9             Can you see that, sir?
02:20PM 10   A    I can.
 11   Q    You're not embarrassed about billing Mr. Johnson for any
 12   of these costs, are you?
 13   A    No.
 14   Q    Why aren't you embarrassed?
02:20PM 15             MR. WYMAN:  Objection.  Relevance.
 16             THE COURT:  Sustained.
 17   Q    BY MR. AVENATTI:  Sir, there's nothing unusual about
 18   billing clients for costs, no matter how minor, when their
 19   cases are resolved, is there?
02:20PM 20   A    It's customary to keep track of everything, whether it's
 21   large or small, and include it on the case accounting sheet.
 22   Q    Sir, that's not my question.  There's nothing unusual
 23   about billing a client for out-of-pocket costs when a case
 24   resolves no matter how small, even if it's 50 cents; right?
02:20PM 25   A    I would say it's not unusual.
```

```
 1   Q     And, in fact, that's what you did in connection with
 2   Mr. Johnson's case?
 3   A     We did, yes.
 4   Q     But that doesn't make you unethical, does it?
 5   A     No, it does not.
 6   Q     And, in your mind, it doesn't make you a criminal either,
 7   does it?
 8   A     No, it does not.
 9   Q     As you sit here today -- well, strike that.
10         Were these all of the costs incurred in connection
11   with the Johnson case?
12   A     From my firm?
13   Q     No.  In total.
14   A     I don't believe so, no.
15   Q     And why don't you believe that?
16   A     The basis of my statement is that we had an agreement for
17   splitting fees and that Eagan Avenatti was going to advance all
18   the costs.  So these were probably just miscellaneous ancillary
19   costs that my firm picked up in the normal course of business.
20   Q     And the case had already been on file or being worked for
21   about 18 months before you had even got involved in the case;
22   isn't that right?
23   A     I don't know, but I'll accept that representation.
24   Q     Do you have any reason to doubt my statement if I were to
25   say that it was about 18 months?  I mean, we can get the docket
```

02:21PM 5
02:21PM 10
02:21PM 15
02:21PM 20
02:22PM 25

**UNITED STATES DISTRICT COURT**

```
           1    if you want.

           2    A     I do not.

           3    Q     You don't have any reason to quarrel with that?

           4    A     I do not.

02:22PM    5    Q     As you sit there today, is there any doubt in your mind

           6    that the amount of money that my firm advanced for the benefit

           7    of Mr. Johnson was exponentially greater than this $2,000?

           8    A     I can assume that's true.  I don't know how much you

           9    advanced -- your firm advanced.

02:22PM   10    Q     My question is -- I'm sorry.  I don't want to cut you

          11    off.  Did I let you finish?

          12    A     I completed my answer.

          13    Q     Based on what you observed relating to the depositions,

          14    the filings and all of the work that had gone into

02:22PM   15    Mr. Johnson's case, do you have any reason to dispute the fact

          16    that me and my firm advanced exponentially greater monies?

          17              MR. WYMAN:  Objection.  Calls for speculation.

          18              THE COURT:  Sustained.

          19    Q     BY MR. AVENATTI:  Sir, were you aware at the time that my

02:23PM   20    firm was advancing money on behalf of Mr. Johnson?

          21    A     I know that was in the agreement, but I was unaware of any

          22    amounts advanced by Eagan Avenatti.

          23    Q     You were aware that multiple depositions were being

          24    taken, for instance; right?

02:23PM   25    A     That's correct.
```

```
 1  Q     And you knew that you and your firm weren't paying for

 2  them; right?

 3  A     That is correct.

 4  Q     And so at the time you assumed that me and my firm were

 5  paying for them; right?

 6  A     Not necessarily.

 7  Q     Okay.  What's wrong about what I just asked?

 8  A     Because in a lot of these instances, and specifically with

 9  respect to depositions, the deposition companies either don't

10  charge if the case doesn't recover, they hold off until the end

11  of the case, they discount their bills.  A lot of the vendors

12  and experts will do the case on a lien.  There's a lot of firms

13  that actually operate by not advancing costs by doing it on a

14  lien or an arrangement with a vendor.

15  Q     Do you have any evidence that any of those arrangements

16  were in place in connection with this case?

17  A     I do not.

18  Q     No evidence whatsoever, do you?

19  A     Do not.

20  Q     Just complete speculation; right?  Or you're not even

21  speculating that that happened; am I right?

22  A     The last statement is correct.

23  Q     Thank you.

24        MR. AVENATTI:  Can I have Exhibit 17 only for the

25  witness and the benefit of the Court, please.
```

02:23PM  5
02:24PM 10
02:24PM 15
02:24PM 20
02:25PM 25

**UNITED STATES DISTRICT COURT**

1          THE WITNESS:  17?

2    Q    BY MR. AVENATTI:  Yes, sir.

3    A    One moment.  I have that in front of me.

4    Q    Is this a document that you signed on or about

02:25PM 5    October 20th, 2014, relating to the Geoffrey Johnson matter?

6    A    It is.

7    Q    And is this the document that your firm relied on in

8    order to accept the $350,000 check for the fee?

9    A    This in combination with my firm's agreement with Eagan

02:26PM 10   Avenatti and the retainer between Eagan Avenatti and the

11   client.

12   Q    And did you maintain this document in the ordinary course

13   of your business in connection with the Johnson matter?

14   A    We did.

02:26PM 15         MR. AVENATTI:  Your Honor, we would move 17 into

16   evidence.

17         THE COURT:  Any objection?

18         MR. WYMAN:  No objection, Your Honor.

19         THE COURT:  17 will be received.

02:26PM 20         **(Exhibit Number No. 17 received.)**

21         MR. AVENATTI:  Can we please publish that for the

22   benefit of the jury.

23   Q    By the way, before I forget, we were just talking about

24   that Exhibit 47 with a list of the costs.  Is that one of the

02:26PM 25   documents that you spoke with the Government about when you met

```
         1    with them or when you had the Webex call?
         2    A     Yes.
         3    Q     You did?
         4    A     Yes.
02:27PM   5    Q     What did you speak about relating to that document?
         6    A     They asked me similar questions, if it was a document that
         7    was kept in the ordinary course of business, did I recognize
         8    the document, was it accurate.
         9    Q     And did you tell them it was accurate?
02:27PM  10    A     I did.
        11    Q     And did you tell them that it reflected your cost?
        12    A     Yes.
        13    Q     Okay.  Going back to 17, is this another document that
        14    you spoke to the agents and the assistant U.S. attorneys about
02:27PM  15    when you met with them?
        16    A     It is.
        17    Q     Both in the meeting that you had as well as the Webex
        18    conference?
        19    A     Yes.
02:27PM  20    Q     And this document provides for the fee split of 75/25; is
        21    that right?
        22    A     In part, but, yes, that's accurate.
        23    Q     And my firm was getting 75 percent because you understood
        24    we had originated the case, number one, meaning we had signed
02:28PM  25    up the client initially; am I right?
```

**UNITED STATES DISTRICT COURT**

```
 1  A    Correct.
 2  Q    We were taking the lead role in the case; am I right?
 3  A    Correct.
 4  Q    We were agreeing to advance almost all, if not all, of
 5  the costs; right?
 6  A    Correct.
 7  Q    We had been working on the case for about 18 months;
 8  right?
 9  A    I'll accept that as true.
10  Q    And if the case went to trial, I was expected to go try
11  the case; right?
12  A    That was my understanding.
13  Q    That was our deal; right?
14  A    That's my understanding, yes.
15  Q    Okay.  And this case settled on the eve of trial, didn't
16  it?
17  A    Yes.
18  Q    And it settled at a second mediation; right?
19  A    I think that's accurate, yes.
20  Q    And it settled in front of a judge by the name of Louis
21  Meisinger; right?
22  A    That's correct.
23  Q    Former chief settlement judge of the Superior Court of
24  Los Angeles County; right?
25  A    That, I'm not sure of, but I know it was Meisinger,
```

```
         1   Judge Meisinger.
         2   Q    In connection with the Johnson mediation, you came to
         3   learn that I had resolved a number of cases in front of
         4   Judge Meisinger; isn't that true?
02:29PM   5              MR. WYMAN:  Objection.  Relevance.
         6              THE COURT:  Sustained.
         7   Q    BY MR. AVENATTI:  Now, there was a first mediation in
         8   this Johnson case, wasn't there?
         9   A    I believe there was.
02:29PM  10   Q    Do you know someone by the name of Linda Lefkowitz?
        11   A    I know she's a mediator and I know I've mediated in front
        12   of her.
        13   Q    You weren't at the first mediation for Mr. Johnson, were
        14   you?
02:29PM  15   A    I don't have a recollection of that.  So if you're asking
        16   me to accept that as true, I would.
        17   Q    I am.
        18   A    And I do.
        19   Q    Thank you.
02:30PM  20   A    You're welcome.
        21   Q    Now, Mr. Johnson did not sign this document, did he?
        22   A    Not on the copy that I have.
        23   Q    Well, there's a number down here in the right-hand corner
        24   of the document.  It's in bold, "GEJ USAO 00046."  Do you see
02:30PM  25   that?
```

```
 1   A     I do.

 2   Q     And that's called a Bates stamp number, isn't it?

 3   A     It is.

 4   Q     And a Bates stamp number in general is, when a party has

02:30PM 5   to produce documents, like in connection with a subpoena,

 6   they'll usually put an identifier in the right-hand corner, or

 7   their attorneys will, so then the documents can be identified

 8   as coming from that party.  Is that a fair statement of what

 9   happens?

02:31PM 10  A     That's accurate.

11   Q     Okay.  And at some point in time you received a subpoena

12   from the U.S. Attorney's Office in connection with this case;

13   am I right?

14   A     That's accurate.

02:31PM 15  Q     And they asked you to produce all of your records

16   relating to the Johnson settlement?

17   A     They didn't ask me that, but they certainly with the

18   subpoena, and we responded to it.

19   Q     All right.  What did they ask you?

02:31PM 20  A     I don't remember, but it wasn't --

21              MR. WYMAN:  Objection.  Relevance.

22              THE COURT:  Overruled.

23   Q     BY MR. AVENATTI:  It was a broad subpoena; right?  Well,

24   strike that.

02:31PM 25              You produced this document in connection with this
```

```
 1    subpoena?

 2    A     That's correct.

 3    Q     All right.  Did you hide anything from the Government?

 4    A     No.  But there's certain attorney-client documents you can

02:31PM 5    produce.

 6    Q     Okay.  But you didn't withhold this document because we

 7    have it; right?

 8    A     That's correct.

 9    Q     Okay.  As you sit here today, are you aware of any

02:32PM 10   specific evidence that you have a signed copy of this

11   agreement?

12   A     I do not.

13   Q     You don't have any such evidence; right?

14   A     That I have it?

02:32PM 15   Q     No, sir.  Are you aware, as you sit here today, of any

16   evidence that suggests to you that there's actually a document

17   with Mr. Johnson's signature on it similar to this document,

18   Exhibit 17?

19   A     Definitely not in my file.

02:32PM 20   Q     You don't know if it was ever in your file, do you?

21   A     I know if it was in my file, it would be produced.

22   Q     So if it was in your file, it would be produced.  And

23   it's not in your file?

24   A     Correct.

02:32PM 25   Q     Okay.  What is Rule of Professional Conduct 2-200 at the
```

```
  1    top of the page?
  2    A    Okay.  So that was the rule that was in effect at the time
  3    this document was executed.
  4    Q    Sir --
02:32PM 5         I'm going to move to strike.
  6              -- I'm just asking you a question.  As you sit here
  7    today, what is Rule 2-200?
  8              THE COURT:  Denied.
  9    Q    BY MR. AVENATTI:  Please continue with your answer.
02:33PM 10   A    2-200 was, as this says, a rule of professional conduct
  11   which was in effect at that time which requires a fee-splitting
  12   agreement to be in writing and disclosed to the client before
  13   the case resolves, in writing, and that he agrees to it or she
  14   agrees to it.
02:33PM 15   Q    There's no signature on this document, is there?
  16   A    That's not on this document.
  17   Q    And there's no signature on the client accounting that
  18   you testified to from Mr. Wyman; right?
  19   A    That's accurate.
02:33PM 20   Q    You still took the money, didn't you?
  21   A    Yes.  We accepted the referral fee.
  22   Q    Sir, it wasn't just a referral fee, you did work.  You
  23   accepted the money; right?
  24   A    That's fair.  Yes.
02:34PM 25   Q    And you accepted the cost money; right?
```

```
 1  A    Correct.

 2  Q    Doesn't make you unethical or a criminal, does it?

 3  A    No, it does not.

 4  Q    My handwriting is terrible, but can you see this?

 5  A    "Calculation, settlement amount, attorney's

 6       fees, out-of-pocket expenses, advances, interest,

 7       fees for other work, net amount due client."

 8  Q    Do you see that?

 9  A    Yeah.  I feel like I'm at the DMV.  Go ahead.

10  Q    Now, in Mr. Johnson's case, you know what Item 1 is;

11  right?  $4 million?

12  A    Yes.

13  Q    The attorney's fees as a percentage you have at

14  40 percent or $1.6 million; am I correct?

15  A    That's correct.

16  Q    And if your firm and my firm pocketed $1.6 million, would

17  that be stealing the money?

18  A    Are you asking me if the gross fee was 1.6 million between

19  the two firms?

20  Q    Yes.

21  A    That would be -- I'm assuming that was the fee that was

22  reflected in the --

23  Q    Strike that.  Strike that.  Let me ask a better question.

24       If the settlement amount was $4 million and the

25  percentage fee was $1.6 million --
```

02:34PM  5
02:35PM 10
02:35PM 15
02:35PM 20
02:36PM 25

**UNITED STATES DISTRICT COURT**

```
 1   A     I'm with you.
 2   Q     All right -- and you and I, our firms, took $1.6 million
 3   and we put the car -- we put the money in the trunk of a car
 4   and we went to Vegas and we put it on black, would that be
 5   criminal conduct, in your experience, sir?
 6   A     No.
 7   Q     "Out-of-pocket expenses."  Do you see that?
 8   A     I do.
 9   Q     Now, we know what your out-of-pocket expenses were.  You
10   just testified to them before the jury; right?
11   A     That's correct.
12   Q     $2700 and change; right?
13   A     Yes.
14   Q     You have no idea what my out-of-pocket expenses were or
15   those of my firm, do you?
16   A     I do not.
17   Q     But in your experience and pursuant to your understanding
18   of the Johnson case, we would be entitled to get them back,
19   wouldn't we?
20   A     Yes.
21   Q     "Advances."  Now, you did not advance any money to
22   Mr. Johnson or for his living arrangements, did you?
23   A     We did not.
24   Q     Do you know whether me and my firm did?
25   A     I do not.
```

02:36PM (lines 5, 10, 15, 20)
02:37PM (line 25)

54

```
 1   Q    Assuming that we did advance that money, in your

 2   experience we'd be entitled to recoup it; right?

 3             MR. WYMAN:  Objection.  Calls for speculation.

 4             THE COURT:  Overruled.

 5             THE WITNESS:  It would depend on the terms of your

 6   agreement with the client.

 7   Q    BY MR. AVENATTI:  Provided that the terms of the

 8   agreement -- or the agreement or the client had agreed, we'd be

 9   entitled to reimbursement; right?

10   A    Correct.

11   Q    Now, you've known some firms to charge interest on their

12   costs and advances, have you not?

13   A    Yes.

14   Q    And then you've known firms to deduct for other work they

15   might do for clients in connection with cases; right?

16   A    I'm not sure what you're asking me on Number 6.

17   Q    When you're retained on a case, you're asked to work on

18   that specific legal matter; correct?

19   A    Yes.

20   Q    All right.  So correct -- so in connection with the

21   Johnson matter, for instance, you were asked to come on board

22   and help with the then pending federal civil rights case;

23   right?

24   A    Yes.

25   Q    And that was the scope of what you were to do in that
```

02:37PM  5
02:37PM 10
02:37PM 15
02:38PM 20
02:38PM 25

**UNITED STATES DISTRICT COURT**

```
 1   case; am I right?
 2   A    Correct.
 3   Q    That was your obligation, your duty to Mr. Johnson was to
 4   work on that case; right?
 5   A    Yes.
 6   Q    Okay.  If Mr. Johnson would have asked you to do work
 7   beyond that case, let's say in connection with his social
 8   security application, that would not have been covered by that
 9   agreement; am I right?
10   A    That's correct.
11   Q    Because you didn't agree, as part of your 25 percent, to
12   handle anything relating to his social security application;
13   right?
14   A    Correct.
15   Q    So if you did that work, you would be entitled to be
16   compensated for it unless you agreed just to do it for free;
17   right, as a general proposition, sir?
18   A    As a general proposition, the best way I can answer it, is
19   it would be subject to a separate agreement.
20   Q    Right.  Of some sort; correct?
21   A    Yes.
22   Q    But it wouldn't be covered under the first agreement?
23   A    Would not.
24   Q    And you wouldn't be expected to do all this additional
25   work for the same amount of money that you were going to get
```

```
        1   paid just for working on the federal civil rights case; am I
        2   right?
        3   A    That one I can't answer.
        4   Q    Well, no, I'm asking you what you would expect.  You
02:39PM  5   would expect if you do additional work, to potentially get
        6   additional compensation; right?
        7   A    Not under the circumstances you just gave me.
        8   Q    Okay.  Well, let me ask you this:  Sir, have you done
        9   multiple -- have you worked on multiple matters for clients
02:40PM 10   before?
       11   A    Probably.
       12   Q    That occasionally happens; right?
       13   A    Yes, it does.
       14   Q    Do you only charge them one time?
02:40PM 15   A    Generally, yes.
       16   Q    It depends on what the work is, though, right, and how
       17   prolonged it is?  It depends?
       18   A    I'm doing my best to answer these questions.  But it
       19   starts with the agreement.
02:40PM 20   Q    All right.  Let me strike that question.  It's a terrible
       21   question.  It's a terrible question.  I apologize.
       22        It depends on what you're asked to do and what the
       23   agreement with the client is, doesn't it?
       24   A    Starts with the agreement.
02:40PM 25   Q    With the client?
```

```
 1  A      Correct.

 2  Q      Okay.

 3  A      If there's additional work to be done, then that would be

 4  the subject of a separate agreement with the client.

02:40PM  5  Q      Okay.  And that agreement would then control what you

 6  were to get paid, in your experience; right?

 7  A      The agreement you have with the client would control.

 8  Q      Okay.  And then going back to my calculation, we have the

 9  amount at the bottom, net amount due to client.  Do you see

02:41PM 10  that?

11  A      I do.

12  Q      Okay.  Now, if you didn't know the exact amount of the

13  out-of-pocket expenses, could you calculate the net amount due

14  to client?

02:41PM 15  A      No.

16  Q      It's impossible, right, in your business?

17  A      You need to know what the fees charged and the costs to

18  get to the actual number for the client.

19  Q      You've got to know every line item; right?

02:42PM 20  A      Okay.  What is the question you're asking?

21  Q      Sir, in order to get -- I'm just rephrasing what you just

22  said.  In order to get to the right amount at the bottom, the

23  amount due to client, you've got to know the other line items,

24  what the amounts are so you can do the calculation; right?

02:42PM 25  A      I agree with that.
```

UNITED STATES DISTRICT COURT

1   Q     Otherwise you're just making it up; right?

2   A     I don't know about that.  But you need to have all the

3   costs and the fees itemized.

4   Q     You've got to have all the information to get to the

02:42PM 5   right number?

6   A     That's correct.

7          MR. AVENATTI:  One moment, Your Honor.  I'm sorry.

8   Q     Did you ever enter into a proffer agreement or any other

9   agreement with the Government in connection with this matter?

02:43PM 10  A     I don't know what a proffer agreement is.

11  Q     Did you ever sign any agreement relating to your

12  testimony in this case?

13  A     No.

14  Q     Have you ever testified in any other matter relating to

02:44PM 15  Geoffrey Johnson?

16  A     No.

17  Q     Are you aware of any other effort by Mr. Johnson to

18  recover monies due him?

19          MR. WYMAN:  Objection.  Calls for speculation, lack

02:44PM 20  of personal knowledge, and relevance.

21          THE COURT:  Overruled.

22          THE WITNESS:  Yes.

23  Q     BY MR. AVENATTI:  What are you aware of?

24  A     I'm aware that he brought a lawsuit, was represented by

02:45PM 25  Callahan & Blaine in Orange County, and there were various

```
 1   named defendants, one of which was Eagan Avenatti, I think
 2   Michael Avenatti, Jason Frank, and there may have been other
 3   defendants.  But beyond that, I don't know who they are.
 4   Q    Let me see if I can help you.  Scott Sims, do you recall
 5   he was a defendant?
 6   A    I did not know that one way or the other.
 7   Q    Michael Eagan, do you recall he was a defendant?
 8              MR. WYMAN:  Objection.  Relevance.
 9              THE COURT:  Sustained.
10   Q    BY MR. AVENATTI:  Mr. McNicholas, Jason Frank is a close
11   friend of yours, is he not?
12   A    He is.
13              MR. WYMAN:  Objection.  Relevance.
14              THE COURT:  Sustained.  Answer will be stricken.
15              Let's move on, Mr. Avenatti.
16              MR. AVENATTI:  Goes to bias, Your Honor.
17              THE COURT:  Move on.
18              MR. AVENATTI:  I don't want to run afoul of the
19   Court.  Am I precluded from asking any questions about
20   Jason Frank?
21              THE COURT:  For the time being, yes.
22   Q    BY MR. AVENATTI:  Sir, do you have any knowledge relating
23   to Mr. Johnson's psychiatric condition at the time you
24   represented him?
25              MR. WYMAN:  Objection.  Calls for speculation,
```

```
 1   personal knowledge.
 2           THE COURT:  Lay the foundation.
 3   Q    BY MR. AVENATTI:  Sir, in connection with your
 4   representation -- strike that.
 5           In connection with our representation of
 6   Mr. Johnson, various claims were made in connection with his
 7   case relating to his psychiatric condition.  Do you recall
 8   that?
 9   A    I don't specifically recall that, but I'll accept it as
10   true if that's your representation.  And it would be common in
11   this scenario.
12   Q    Do you have a recollection that at the time that we were
13   representing Mr. Johnson, he gave a deposition under oath, a
14   sworn deposition in connection with that case?
15   A    I don't -- I wasn't present at it, but I believe he did
16   give a deposition.
17   Q    Did you ever read the deposition?
18   A    I believe I did prior to the summary judgment motion.
19   Q    Do you have a recollection that that deposition detailed
20   Mr. Johnson's inability to accurately remember things?
21   A    I don't have a recollection one way or the other.
22   Q    How long did you represent Mr. Johnson?
23   A    I believe that Eagan Avenatti asked me to join the case in
24   the first quarter of 2014.  Believe the case resolved by way of
25   mediation in the fourth quarter of 2014.  And that it was
```

02:46PM 5
02:47PM 10
02:47PM 15
02:48PM 20
02:48PM 25

**UNITED STATES DISTRICT COURT**

|     |     |
|-----|-----|
| 1 | concluded in the first quarter of 2015. |
| 2 | MR. AVENATTI:  Your Honor, may I have one moment? |
| 3 | THE COURT:  Yes. |
| 4 | **(Pause in proceedings.)** |

02:49PM  5   Q    BY MR. AVENATTI:  Sir, one last question:  As you sit on
6   that -- or in that witness box right now before this jury, you
7   don't know whether I committed any crime in connection with
8   Mr. Johnson, do you?
9   A    I do not.
02:49PM 10   MR. AVENATTI:  Nothing further.
11   THE COURT:  Ladies and gentlemen, we'll take the
12   midafternoon break.  We'll be in recess for 15 minutes.  Please
13   remember the admonition not to discuss the case with anyone.
14   Do not form any opinions on issues in the case until it's
02:50PM 15   submitted to you.  Please don't do any research.
16   THE COURTROOM DEPUTY:  All rise.
17   **(Out of the presence of the jury.)**
18   THE COURT:  You may step down, sir.
19   In terms of examination of witnesses, we're only
02:50PM 20   going to go two rounds: direct, cross, redirect, recross.  If I
21   sense some unfairness, it would be unusual, but we would go to
22   another round.  So anticipate that you need to concentrate your
23   examinations.
24   We'll be in recess.
02:51PM 25   **(Recess from 3:02 p.m. to 3:08 p.m.)**

| | |
|---|---|
| 1 | **(In the presence of the jury.)** |
| 2 | THE COURT:  Mr. Wyman, any redirect? |
| 3 | MR. WYMAN:  Yes, Your Honor.  Briefly. |
| 4 | **REDIRECT EXAMINATION** |
| 03:08PM 5 | BY MR. WYMAN: |
| 6 | Q    Mr. McNicholas, on cross-examination the defendant asked |
| 7 | you about the $350,000 check that was sent to your firm.  Do |
| 8 | you remember that? |
| 9 | A    I do. |
| 03:09PM 10 | Q    Do you know where the money in that check came from? |
| 11 | A    I do not. |
| 12 | Q    So you don't know if it came from the settlement funds |
| 13 | from the County of Los Angeles to Mr. Johnson? |
| 14 | A    That's correct. |
| 03:09PM 15 | Q    Could you take a look at Exhibit 37. |
| 16 | MR. WYMAN:  If we could pull up the signature page, |
| 17 | please, which I believe is page 4 of the exhibit.  Please pull |
| 18 | up the portion above Mr. Johnson's name. |
| 19 | THE WITNESS:  I have that in front of me. |
| 03:09PM 20 | Exhibit 37. |
| 21 | Q    BY MR. WYMAN:  You were asked on cross-examination about |
| 22 | this document.  Do you recall? |
| 23 | A    Yes. |
| 24 | Q    And the defendant asked you questions about the bold |
| 03:10PM 25 | "CAUTION:  READ BEFORE SIGNING" portions? |

```
 1    A     Yes.

 2    Q     Did you ever see Mr. Johnson sign this document?

 3    A     I did not.

 4    Q     Did you ever see him be presented with this document?

 5    A     I did not.

 6    Q     Do you know whether Mr. Johnson ever actually signed this

 7    document?

 8    A     I do not.  No.

 9    Q     Between your firm and Eagan Avenatti, which firm was

10    responsible for communicating with the client, Geoffrey

11    Johnson?

12    A     Eagan Avenatti was.

13    Q     And which firm was responsible for having Mr. Johnson

14    sign court documents and settlement documents?

15    A     Eagan Avenatti.

16    Q     You were also asked on cross-examination about whether

17    this settlement agreement would have been accessible to the

18    public.  Do you remember that?

19    A     I do.

20    Q     Based on your experience representing plaintiffs, do you

21    typically have your clients learn about their settlements

22    through public filings, public --

23          MR. AVENATTI:  Objection, Your Honor.

24    Argumentative.

25          THE COURT:  Overruled.
```

03:10PM (lines 5, 10, 15, 20)
03:11PM (line 25)

1           THE WITNESS:  No.

2    Q    BY MR. WYMAN:  Now, you were also asked on

3    cross-examination about this chart that the defendant showed

4    you.  Do you remember that?

03:11PM 5    A    I do.

6    Q    And he asked you about whether you knew what Eagan

7    Avenatti's costs were in Mr. Johnson's case, and you don't

8    know; right?

9    A    I do not know.

03:11PM 10   Q    At the mediation or shortly thereafter, whenever you

11   learned that there would be a tentative settlement for

12   Mr. Johnson in the amount of $4 million, did you expect that

13   taking that settlement amount of $4 million and then

14   subtracting attorney's fees and costs and these other items,

03:11PM 15   that after doing all that Mr. Johnson would get zero dollars?

16   A    No.

17           MR. WYMAN:  One moment, Your Honor.

18           THE COURT:  Mr. Avenatti?

19           MR. WYMAN:  One moment, Your Honor.

03:12PM 20           **(Counsel conferred off the record.)**

21   Q    BY MR. WYMAN:  Your expectation was that Mr. Johnson

22   would get something from the settlement; correct?

23   A    Absolutely, yes.

24           MR. WYMAN:  Thank you, Your Honor.  No further

03:12PM 25   questions.

UNITED STATES DISTRICT COURT

**RECROSS-EXAMINATION**

BY MR. AVENATTI:

Q    Mr. McNicholas, you have no idea what agreements existed between me and my firm, on the one hand, and Mr. Johnson, do you?

A    I do not.

Q    And you have no idea how much money was advanced by me and my firm for Mr. Johnson, do you?

A    I do not.

Q    And you have no idea how much money me and my firm advanced from Mr. Johnson's basic living needs or for how long, do you?

A    I do not.

Q    And you not only never saw Mr. Johnson sign the agreement, you never saw Mr. Johnson, period.

A    During the course of the litigation, that's accurate.

Q    Not one time?

A    That is accurate.

Q    You never spoke to him?

A    Correct.

Q    You never texted with him?

A    That's correct.

Q    You never e-mailed with him?

A    Also correct.

Q    You made no effort at any point in time to ever have any

```
 1   direct communication with Mr. Johnson; correct?

 2   A    That is correct.

 3   Q    You had the ability to do so, but you chose not to;

 4   correct?

 5   A    That's not correct.

 6   Q    Sir, at any point in time you could have communicated

 7   with Mr. Johnson; isn't that true?  "Yes" or "no"?

 8   A    Physically I could have done that.

 9   Q    When we were on a break moments ago, you were in the

10   conference room on the right-hand side here; right?

11   A    I was.

12   Q    Who else was in the room?

13   A    The gentleman who I think his first name is Ryan and Mark

14   Byrne.

15   Q    There was three people in the room other than you.  We're

16   only up to two people.  Who's the third person?

17   A    Mr. Hurrell.

18   Q    So during the break we just had, you were in the

19   conference room with Mr. Hurrell -- you understand he's a

20   witness in this case; right?

21   A    I do.

22   Q    Your attorney, Mr. Byrne; right?

23   A    Yes.

24   Q    And who was the other person?

25   A    I think it was Ryan from the U.S. Attorney's Office.  The
```

03:13PM (line 5)
03:14PM (line 10)
03:14PM (line 15)
03:14PM (line 20)
03:15PM (line 25)

**UNITED STATES DISTRICT COURT**

```
 1    gentleman that you asked me to identify in the courtroom.

 2    Q    The gentleman who was seated to the left of Mr. Kim, who

 3    now is absent from the courtroom?

 4    A    That's correct.

 5    Q    And during the lunch break, who did you communicate with?

 6              MR. WYMAN:  Objection.  Beyond the scope,

 7    Your Honor.

 8              THE COURT:  Sustained.

 9    Q    BY MR. AVENATTI:  Isn't it true during the lunch break

10    you also communicated with Mr. Hurrell?

11              MR. WYMAN:  Objection.

12              THE COURT:  Sustained.

13    Q    BY MR. AVENATTI:  Sir, did you have an understanding when

14    you left that witness chair before the break, that you could

15    not be communicating with other witnesses while you were still

16    sworn in as a witness?

17              MR. WYMAN:  Same objection, and relevance.

18              THE COURT:  Sustained.

19    Q    BY MR. AVENATTI:  The amount of money that Mr. Johnson

20    was due, if any, was a direct result of Items 1 through 6 on

21    this chart; isn't that true?

22    A    Yes.

23    Q    Can you see it?

24    A    Yes.

25              MR. AVENATTI:  One moment, Your Honor.
```

03:15PM  5
03:15PM 10
03:15PM 15
03:16PM 20
03:16PM 25

```
 1            (Counsel conferred off the record.)
 2            MR. AVENATTI:  Nothing further, Your Honor.  We
 3  would ask that the witness be available in the defendant's
 4  case.
 5            THE COURT:  Very good.  Anything --
 6            Sir, you may step down.  Thank you.
 7            THE WITNESS:  Thank you.
 8            THE COURT:  Would the Government call its next
 9  witness, please.
10            MR. WYMAN:  United States calls Thomas Hurrell.
11       THOMAS HURRELL, GOVERNMENT WITNESS, WAS SWORN
12            THE COURTROOM DEPUTY:  If you'll please state and
13  spell your first and last name.
14            THE WITNESS:  First name is Thomas, T-h-o-m-a-s,
15  last name Hurrell, H-u-r-r-e-l-l.
16            THE COURTROOM DEPUTY:  Thank you.
17            THE COURT:  Mr. Wyman.
18                      DIRECT EXAMINATION
19  BY MR. WYMAN:
20  Q    Good afternoon, Mr. Hurrell.
21  A    Good afternoon.
22  Q    What do you do for work?
23  A    I'm an attorney.
24  Q    What is the name of your law firm?
25  A    Hurrell Cantrall.
```

03:17PM (line 5)
03:17PM (line 10)
03:18PM (line 15)
03:18PM (line 20)
03:18PM (line 25)

```
  1   Q    What type of law do you practice?
  2   A    We practice -- we do a number of things, but civil rights
  3   litigation, defending police officers and their departments,
  4   new product liability, employment law, and a few other things.
03:18PM 5   Q    Do you typically represent the plaintiff's side or the
  6   defense?
  7   A    The defense.
  8   Q    Have you ever represented the County of Los Angeles in a
  9   civil rights lawsuit?
03:19PM 10  A    Yes.
 11   Q    Are you familiar with a lawsuit filed against the County
 12   of Los Angeles by an individual named Geoffrey Johnson?
 13   A    Yes, I am.
 14   Q    How are you familiar with that lawsuit?
03:19PM 15  A    It was assigned to my firm.
 16   Q    And did you personally work on it?
 17   A    I did.
 18   Q    Were you the lead attorney for the defense on that case?
 19   A    Yes.
03:19PM 20  Q    Did that lawsuit concern alleged civil rights violations
 21   in connection with injuries suffered by Mr. Johnson?
 22   A    It did.
 23   Q    Apart from you personally, did anyone else at your law
 24   firm work on that case with you?
03:19PM 25  A    Yes.
```

```
 1    Q    Who was that?

 2    A    Primarily was an associate, Charles Phan.

 3    Q    And who represented the plaintiff, Geoffrey Johnson?

 4    A    Mr. Avenatti and I believe Mr. McNicholas as well.

03:19PM 5    Q    Do you recognize Mr. Avenatti in the courtroom here

 6    today?

 7    A    Yes.

 8    Q    Can you please identify him by where he is standing and

 9    an article of clothing he is wearing?

03:20PM 10   A    He's standing at defense counsel table, and I'm

11    color-blind, but he has a nice suit and tie on.

12              MR. AVENATTI:  Thank you, sir.

13              THE COURT:  The record will indicate the witness has

14    identified the defendant.

03:20PM 15   Q    BY MR. WYMAN:  At some point during the Johnson case, did

16    the two parties enter into mediation?

17    A    We did.

18    Q    And were you present at that mediation?

19    A    I'm sure I was.  I don't recall.  But I know I was there.

03:20PM 20   Q    Do you recall approximately when it took place?

21    A    I believe in October of 2014.

22    Q    At the mediation were the parties able to reach a

23    tentative resolution of the lawsuit?

24    A    Yes.  Either there or shortly thereafter.

03:20PM 25   Q    Did that tentative resolution provide for a settlement
```

```
         1    amount?
         2    A     Yes.
         3    Q     For how much?
         4    A     $4 million.
03:21PM  5    Q     At that point, when the parties had a tentative
         6    resolution, what remained to be done for the settlement to
         7    become finalized?
         8    A     A number of things.  First that -- the county defendant
         9    was the L.A. County Sheriff's Department, and they had to
03:21PM 10    prepare what's called a corrective action plan.  And then after
        11    that was completed, it would have to go through two boards, the
        12    Los Angeles County Claims Board and the Los Angeles County
        13    Board of Supervisors.
        14    Q     Can that process that you described take some time?
03:21PM 15    A     It takes quite a few months.
        16    Q     Did you explain that to the defendant?
        17    A     Yes.
        18    Q     Can you please take a look in the binder -- it should be
        19    the one in front of you -- Exhibit 24.
03:21PM 20    A     Okay.
        21    Q     Do you recognize this document?
        22    A     Yes.
        23    Q     Is this an e-mail exchange that you were on?
        24    A     Yes, it is.
03:22PM 25    Q     And is it a fair and accurate copy of that e-mail
```

```
 1   exchange?
 2   A     Yes.
 3             MR. WYMAN:  Your Honor, the Government moves to
 4   admit Exhibit 24 into evidence.
 5             THE COURT:  Any objection?
 6             MR. AVENATTI:  Yes, Your Honor.  Multiple levels of
 7   hearsay, and I think it requires an examination of each portion
 8   of the e-mail -- I mean e-mail string, Your Honor.
 9             THE COURT:  The first e-mail on page 1 is a
10   transmittal.  There's no hearsay there.  Second e-mail is from
11   Mr. Avenatti.  It's a party admission.  The next e-mail that
12   begins "Michael," the problem I foresee, it's a communication
13   sent to Mr. Avenatti.  And on page 2, Mr. Avenatti replies,
14   party admission.  Final e-mail on page 2 is from Mr. Avenatti,
15   party admission.
16             Document will be received.
17             (Exhibit No. 24 received.)
18             MR. WYMAN:  Thank you, Your Honor.
19             If we can pull up the bottom of page 1.
20   Q    BY MR. WYMAN:  And, Mr. Hurrell, focusing on your e-mail
21   toward the bottom of that page where you are proposing language
22   for the settlement agreement, do you see that?
23   A     Yes, I do.
24   Q    What are you proposing -- what language are you proposing
25   to the defendant here?
```

| | |
|---|---|
| 1 | A    Do you want me to read it? |
| 2 | Q    Well, I guess at a high level, what is the purpose of |
| 3 | this language in the settlement agreement? |
| 4 | A    That if the -- the Court had established a timeline to |
| 03:24PM 5 | complete various aspects of the settlement.  And if the |
| 6 | timeline was not complied with, either party could withdraw |
| 7 | from the agreement. |
| 8 | Q    And focusing a little bit higher up on the e-mail chain, |
| 9 | did the defendant respond? |
| 03:24PM 10 | A    Yes.  He said that would be fine. |
| 11 | Q    Please take a look at Exhibit 26 now. |
| 12 | A    Okay. |
| 13 | Q    Do you recognize this document? |
| 14 | A    Yes. |
| 03:24PM 15 | Q    Is this another e-mail exchange that you were on with the |
| 16 | defendant? |
| 17 | A    It is. |
| 18 | MR. WYMAN:  Your Honor, the Government moves to |
| 19 | admit Exhibit 26. |
| 03:24PM 20 | MR. AVENATTI:  No objection, Your Honor. |
| 21 | THE COURT:  26 will be received. |
| 22 | **(Exhibit No. 26 received.)** |
| 23 | Q    BY MR. WYMAN:  What is the date of this e-mail exchange? |
| 24 | A    November 17, 2014. |
| 03:25PM 25 | Q    And your e-mail, at the bottom you say, "Go ahead and get |

1   signatures on the settlement agreement and return to me."

2          Why are you telling the defendant to get signatures

3   on the agreement at this point, in November 2014?

4   A    I wouldn't be able to conclude the settlement without

03:25PM 5   signed documents.

6   Q    At this point were the parties close to finalizing the

7   settlement agreement?

8   A    Well, I believe the language of the agreement had been

9   finalized.

03:25PM 10  Q    And in response, did the defendant write back, "No

11  problem"?

12  A    That's correct.

13  Q    Now, if you could please look at Exhibit 30.  Do you

14  recognize this document?

03:26PM 15  A    Yes, I do.

16  Q    Is this another e-mail exchange that you were on with the

17  defendant?

18  A    Yes.

19          MR. WYMAN:  Government moves to admit Exhibit 30,

03:26PM 20  Your Honor.

21          THE COURT:  Any objection?

22          MR. AVENATTI:  No objection.

23          THE COURT:  30 will be received.

24          **(Exhibit No. 30 received.)**

03:26PM 25  Q    BY MR. WYMAN:  Focusing on the earliest e-mail, on

```
         1   page 2, what is Mr. Phan asking here?

         2   A    He's asking Mr. Avenatti to -- about the settlement

         3   agreement and getting it signed.

         4   Q    And it says "fully executed version" -- I'm sorry, "the

03:27PM  5   executed version."  Does that mean signed?

         6   A    Yes.

         7   Q    And what is the date of this e-mail?

         8   A    December 2nd, 2014.

         9   Q    This is a couple of weeks after the last e-mail; is that

03:27PM 10   right?

        11   A    It is.

        12   Q    Do you remember waiting on the defendant to provide the

        13   agreement with Mr. Johnson's signatures?

        14   A    Yes.  It took some time for us to get it back.

03:27PM 15   Q    And if we could scroll up, what did the defendant write

        16   in response to you?

        17   A    Well, his first e-mail after that says that he was

        18   questioning why we were asking for that now and thought that

        19   this may be some attempt to delay payment.

03:28PM 20   Q    And I apologize, but the screens are a little far away.

        21   Would you mind reading the first -- well, the bulk of the

        22   e-mail, starting with "Please have Tom."

        23   A    Sure.  It says:

        24            "Please have Tom call me.  This is the first

03:28PM 25        I have heard of this.  If the plan is for you to
```

UNITED STATES DISTRICT COURT

```
 1              try to use this fact to delay the payment, we need
 2              to have an immediate status conference with the
 3              Court and get a trial date."
 4    Q    What did you make of that e-mail response to you?
03:28PM  5    A    It's lawyer talk.
 6    Q    Let me ask it a different way.  What did you understand
 7    him to be telling you in response?
 8    A    He seemed to imply that we were using the fact that the
 9    signature -- the document hadn't been signed as a way to delay
03:29PM 10    payment.  And he was saying he would go down and get a trial
11    date if we couldn't get it cleared up, I guess.
12    Q    If you could please turn now to Exhibit 32.
13    A    Okay.
14    Q    Is this another e-mail exchange that you were on with the
03:29PM 15    defendant?
16    A    Yes.
17              MR. WYMAN:  Government moves to admit Exhibit 32,
18    Your Honor.
19              MR. AVENATTI:  No objection, Your Honor.
03:29PM 20              THE COURT:  32 will be received.
21              (Exhibit No. 32 received.)
22    Q    BY MR. WYMAN:  In the middle of page 1, the defendant is
23    asking you how things looked for getting on the agenda.  Do you
24    see that?
03:29PM 25    A    Yes.
```

UNITED STATES DISTRICT COURT

```
          1    Q    What does that mean?

          2    A    Well, the County Board of Supervisors has a meeting, I

          3    think, every couple weeks, and there's an agenda set for each

          4    meeting.  And that's what that means.

03:30PM   5    Q    And the date of this e-mail?

          6    A    December 22nd, 2014.

          7    Q    What did you say in response to that?

          8    A    I said that things seemed to be moving along nicely and

          9    that I hoped to have specifics on when it will go before the

03:30PM  10    board after the 1st of the year.

         11    Q    At the top of this e-mail string, the defendant writes

         12    back on January 6th.  Do you see that?

         13    A    Yes.

         14    Q    Can you please read that, read his response to the jury?

03:30PM  15    A    It says:

         16             "Tom, hope you are well.  Can you please

         17         provide an update on the schedule?  We are trying

         18         to get Geoff taken care of."

         19    Q    Who did you understand Geoff to be in this e-mail?

03:31PM  20    A    The plaintiff.

         21    Q    Can you please go to the next exhibit, Exhibit 33.

         22    A    I have it.

         23    Q    Is this another e-mail exchange that you were on with the

         24    defendant?

03:31PM  25    A    Yes.
```

UNITED STATES DISTRICT COURT

|  |  |  |
|--|--|--|

1          MR. WYMAN:  Government moves to admit Exhibit 33,

2    Your Honor.

3          THE COURT:  Any objection?

4          MR. AVENATTI:  No objection, Your Honor.

03:31PM 5          THE COURT:  33 will be received.

6          **(Exhibit No. 33 received.)**

7          MR. WYMAN:  Thank you.

8          If we can blow up the content of the e-mail, please.

9    Q    BY MR. WYMAN:  This is now January 8th, 2015.  What are

03:31PM 10   you telling the defendant in this e-mail?

11   A    I tell him that I'm trying to get confirmation on the

12   exact date when it will go before the Board of Supervisors.

13   And I was told that the settlement was going to be going before

14   the board this month, in January.

03:32PM 15   Q    And I take it from the subject line, G. Johnson, that

16   you're referring to Mr. Johnson's case?

17   A    Yes.

18   Q    If we can go to Exhibit 34, please.

19   A    Okay.  I have it.

03:32PM 20   Q    Is this another e-mail exchange that you were on with the

21   defendant?

22   A    Yes.

23          MR. WYMAN:  Government moves to admit Exhibit 34,

24   Your Honor.

03:32PM 25          THE COURT:  Any objection?

**UNITED STATES DISTRICT COURT**

1          MR. AVENATTI:  No objection.

2          THE COURT:  34 will be received.

3          **(Exhibit No. 34 received.)**

4     Q    BY MR. WYMAN:  Focusing on the bottom for -- Mr. Phan is

03:32PM 5  e-mailing.  What is the date of Mr. Phan's e-mail?

6     A    January 12, 2015.

7     Q    And what is he e-mailing about?

8     A    We still hadn't gotten the executed settlement agreement

9     back from Mr. Avenatti's office.

03:32PM 10 Q    And the executed settlement agreement, again, is the one

11    with the signatures?

12    A    That's right.

13    Q    And that would have been the signatures from the

14    plaintiff and Mr. Avenatti, the defendant?

03:33PM 15 A    Yes.

16    Q    And then if we can scroll up a little bit to the next --

17    well, the remainder of the e-mails on this page, what are the

18    remainder of the e-mails on this page about?

19    A    Mr. Avenatti responds that he'll get us the signed

03:33PM 20 agreement as soon as he's provided the date that the matter is

21    going to be placed on the board's agenda.  And then I respond,

22    saying, "It's on for tomorrow."

23    Q    Did you have an understanding of why the defendant did

24    not want to provide the signature pages until he had a date?

03:33PM 25 A    No.

**UNITED STATES DISTRICT COURT**

|      |                                                              |
|------|--------------------------------------------------------------|
| 1    | Q     Did that strike you as unusual?                        |
| 2    | A     A bit.  Yeah.                                           |
| 3    | Q     And this is January 12th, 2015.  So we're now about a  |
| 4    | month after Mr. Phan had asked for the settlement agreement in |
| 03:34PM 5 | early December?                                         |
| 6    | A     That's right.                                          |
| 7    | Q     If we can take a look at Exhibit 35, please.           |
| 8    | A     Okay.                                                  |
| 9    | Q     Is this another e-mail exchange that you were on?      |
| 03:34PM 10 | A     Yes.                                              |

1    Q    Did that strike you as unusual?

2    A    A bit.  Yeah.

3    Q    And this is January 12th, 2015.  So we're now about a

4    month after Mr. Phan had asked for the settlement agreement in

03:34PM 5    early December?

6    A    That's right.

7    Q    If we can take a look at Exhibit 35, please.

8    A    Okay.

9    Q    Is this another e-mail exchange that you were on?

03:34PM 10   A    Yes.

11            MR. WYMAN:  Government moves to admit Exhibit 35,

12   Your Honor.

13            THE COURT:  Any objection?

14            MR. AVENATTI:  No, sir.

03:34PM 15            THE COURT:  35 will be received.

16            **(Exhibit No. 35 received.)**

17   Q    BY MR. WYMAN:  Focusing on your e-mail on page 2, what

18   are you telling the defendant here?

19   A    This is on the 13th, Tuesday?

03:35PM 20   Q    Yes.

21   A    And I'm telling Mr. Avenatti that the settlement was

22   approved today, meaning that date.

23   Q    And you said that day was January 13th, 2015?

24   A    That's correct.

03:35PM 25   Q    After the Board of Supervisors approved the settlement,

| | |
|---|---|
| 1 | was the settlement considered final? |
| 2 | A    Yes. |
| 3 | Q    I can show you what's already in evidence as Government's |
| 4 | Exhibit 37.  Can you see that it's a cover page from your law |
| 03:35PM  5 | firm? |
| 6 | A    Yes. |
| 7 | Q    And there is an enclosure, the document attached to the |
| 8 | letter.  Do you recognize that document? |
| 9 | A    Yes, I do. |
| 03:35PM 10 | Q    What is it? |
| 11 | A    It's the settlement agreement. |
| 12 | Q    Is this the final settlement agreement between the County |
| 13 | of Los Angeles and Geoffrey Johnson? |
| 14 | A    Yes. |
| 03:36PM 15 | Q    Was there ever another agreement between the County and |
| 16 | Geoffrey Johnson? |
| 17 | A    No. |
| 18 | Q    Was there ever a supplement to this agreement? |
| 19 | A    Not that I'm aware of, no. |
| 03:36PM 20 | Q    Was this agreement ever amended? |
| 21 | A    Not to my knowledge. |
| 22 | Q    And as the lead attorney for the County, would you know |
| 23 | if it had been? |
| 24 |         MR. AVENATTI:  Objection.  Speculation, Your Honor. |
| 03:36PM 25 |         THE COURT:  Overruled. |

```
 1                THE WITNESS:  Yes, I would know.
 2     Q    BY MR. WYMAN:  Is this agreement confidential?
 3     A    No.
 4     Q    Is there any portion of it that's confidential?
 5     A    No, there wouldn't be.
 6     Q    Did you ever meet Mr. Johnson?
 7     A    I don't believe so, no.
 8                MR. WYMAN:  If we can pull up the signature page of
 9     this document.  Page 4 of the exhibit.
10     Q    BY MR. WYMAN:  Mr. Hurrell, could you please take a look
11     at the signature above the name Geoffrey Johnson?
12     A    Okay.
13     Q    Do you know whether that is Mr. Johnson's actual
14     signature?
15     A    No, I don't.
16                MR. WYMAN:  If we can focus -- or turn to page 2 of
17     the exhibit, first page of the settlement agreement.  And the
18     second paragraph under the heading "Agreement," about halfway
19     down.
20     Q    BY MR. WYMAN:  How much did the County of Los Angeles
21     agree to pay Mr. Johnson to settle his lawsuit?
22     A    $4 million.
23     Q    Does the agreement call for quarterly payments from the
24     County to Mr. Johnson?
25     A    No.
```

1    Q    Does the agreement involve a special needs trust?

2    A    No.

3    Q    If the settlement agreement had called for the County to

4    make payments either quarterly or to a special needs trust,

03:38PM 5  would that have needed to be spelled out in the agreement?

6              MR. AVENATTI:  Objection.  Speculation, Your Honor.

7              THE COURT:  Sustained.

8    Q    BY MR. WYMAN:  Have you had cases involving special needs

9    trusts before?

03:38PM 10            MR. AVENATTI:  Relevance, Your Honor.

11             THE COURT:  Overruled.

12             THE WITNESS:  Many, many years ago.

13   Q    BY MR. WYMAN:  If this agreement -- well, if the

14   settlement between the County and Mr. Johnson called for

03:38PM 15 quarterly payments rather than a lump sum, would that need to

16   be spelled out in the agreement?

17   A    Yes.

18   Q    In settlement agreements like this one, is it necessary

19   to state where the payment will be made or to whom?

03:39PM 20 A    Generally the payee should be listed in there.

21   Q    And so if it's being paid to an attorney-client trust

22   account, is that usually spelled out in the agreement?

23             MR. AVENATTI:  Objection, Your Honor.  Speculation.

24             THE COURT:  Overruled.

03:39PM 25            MR. AVENATTI:  Foundation.

84

```
 1              THE WITNESS:  It usually would be, yes.
 2    Q    BY MR. WYMAN:  And is that also true if the payment is
 3    being directed to a trust?
 4    A    That works a little differently.
03:39PM  5    Q    How do you mean?
 6    A    The settlement amount would be broken up, and usually
 7    there would be, perhaps, an addendum or built into the
 8    settlement agreement to specify the specific amount going into
 9    a trust or annuity, and a lot of technical financial
03:40PM 10    information in there too.
11    Q    Those details and that information, would that need to be
12    spelled out either in the agreement or as an addendum to the
13    agreement?
14              MR. AVENATTI:  Speculation.
03:40PM 15              THE COURT:  Overruled.
16              THE WITNESS:  Yes.  It would have to be.
17    Q    BY MR. WYMAN:  This agreement from this paragraph, it
18    just called for a $4 million lump sum payment?
19    A    That's correct.
03:40PM 20    Q    Did the County end up making that $4 million payment?
21    A    Yes.
22    Q    Did anyone provide you with instructions of where to have
23    that payment sent?
24    A    I believe Mr. Avenatti's office did.
03:41PM 25    Q    If you could please take a look at Exhibit 38.
```

A     Okay.  I have it.

Q     Is this another e-mail exchange between you and the defendant?

A     It's between my secretary and Mr. Avenatti.

03:41PM          MR. WYMAN:  One moment, Your Honor.

Q     Is this an e-mail exchange from your e-mail account?

A     Yes.

Q     And are you familiar with this e-mail exchange?

A     I am.

03:42PM          MR. WYMAN:  Your Honor, the Government moves to admit Exhibit 38.

          THE COURT:  Any objection?

          MR. AVENATTI:  Point of clarification, Your Honor. Is it just the e-mail?  No objection to the first two pages of 38, Your Honor.

          MR. WYMAN:  Well, no, Your Honor, we would be moving to admit the e-mail with the attachment.

          THE COURT:  What's the objection to the attachment?

          MR. AVENATTI:  Duplicative, Your Honor.

03:42PM          THE COURT:  Overruled.

          38 will be received.

          **(Exhibit No. 38 received.)**

          MR. WYMAN:  If we can please pull up the bottom of page 1.

03:42PM Q     What is your assistant asking the defendant in this

1    e-mail?

2    A    Asking Mr. Avenatti how he'd like the check made payable.

3    Q    And what is his response?

4    A    He -- Eagan Avenatti, LLP, attorney-client trust account.

03:43PM 5    Q    And what is the date of this e-mail?

6    A    January 22nd, 2015.

7    Q    I want to show you now what is already in evidence as

8    Government's Exhibit 40.  Do you recognize this as another

9    letter from your law firm?

03:43PM 10    A    Yes.

11    Q    And what is the date of that letter?

12    A    January 29th, 2015.

13    Q    If you could go to the next page, please.  Do you

14    recognize this attachment to the letter?

03:43PM 15    A    Yes.

16    Q    What is it?

17    A    It's a check for $4 million.

18    Q    Once your law firm sent the defendant's law firm this

19    check from the County for $4 million, were the County's

03:44PM 20    obligations under the settlement agreement complete?

21    A    Yes.

22    Q    And at that point, was the case for all intense and

23    purposes finished?

24    A    Yes, it was done.

03:44PM 25    Q    To your knowledge, did the defendant ever send Geoffrey

```
 1    Johnson the settlement funds from this check?
 2    A     I don't know.
 3    Q     After you sent this check to the defendant, did you ever
 4    discuss the Johnson matter again with the defendant?
 5    A     I don't recall doing so, no.
 6    Q     And after sending him this check, would there have been
 7    any reason to discuss the Johnson matter with the defendant?
 8              MR. AVENATTI:  Speculation, Your Honor.
 9              THE COURT:  Sustained.
10    Q     BY MR. WYMAN:  After the settlement, did the defendant
11    ever reach out to you about getting a special needs trust
12    established for Mr. Johnson?
13    A     No.  Not that I recall.
14    Q     To your knowledge, in March of 2019, did the County of
15    Los Angeles establish a special needs trust for Mr. Johnson in
16    connection with this lawsuit?
17    A     Not that I'm aware of.
18              MR. WYMAN:  One moment, Your Honor.
19              No further questions.  Thank you.
20              THE COURT:  Mr. Avenatti.
21                        **CROSS-EXAMINATION**
22    BY MR. AVENATTI:
23    Q     Good afternoon, Mr. Hurrell.
24    A     Good afternoon.
25    Q     Nothing unusual about having settlement monies sent to an
```

03:44PM  5
03:45PM 10
03:45PM 15
03:45PM 20
03:46PM 25

|  | 1 | attorney-client trust account, in your experience, is there? |
|--|---|--|
|  | 2 | A    No.  Not at all. |
|  | 3 | Q    In fact, it's more unusual to have money sent someplace |
|  | 4 | other than an attorney-client trust account, in your |
| 03:46PM | 5 | experience; right? |
|  | 6 | A    There's different vehicles of transmitting, but it's not |
|  | 7 | unusual. |
|  | 8 | Q    Not at all? |
|  | 9 | A    No. |
| 03:46PM | 10 | Q    Happens all the time? |
|  | 11 | A    It does. |
|  | 12 | Q    All right.  And how long have you been practicing, sir, |
|  | 13 | in litigation? |
|  | 14 | A    36 years. |
| 03:46PM | 15 | Q    And how long have you been representing the County of |
|  | 16 | Los Angeles? |
|  | 17 | A    For about 25 years. |
|  | 18 | Q    And the County of Los Angeles, is it fair to say, gets |
|  | 19 | sued all the time? |
| 03:46PM | 20 | A    They do. |
|  | 21 | Q    You have a lot of work, don't you? |
|  | 22 | A    From them and a lot of other places. |
|  | 23 | Q    Okay.  And when you settle these cases brought by |
|  | 24 | plaintiffs against the County of Los Angeles, over 95 percent |
| 03:47PM | 25 | of the time they're represented by lawyers; is that right? |

**UNITED STATES DISTRICT COURT**

```
 1              MR. WYMAN:  Objection.  Relevance.
 2              THE COURT:  Sustained.
 3   Q    BY MR. AVENATTI:  Sir, how many cases do you estimate
 4   that you have settled for the County of Los Angeles in the last
 5   25 years?
 6              MR. WYMAN:  Same objection.
 7              THE COURT:  Sustained.
 8   Q    BY MR. AVENATTI:  Sir, is it fair to say that there have
 9   been hundreds, if not thousands of occasions where you had
10   settled the case and a lawyer on the other side has directed
11   you to make the check payable to the attorney-client trust
12   account?
13   A    I would say I don't know about hundreds, but it happens a
14   lot.
15   Q    So that didn't raise any red flags with you; right?
16   A    No.
17   Q    Because it's commonplace?
18   A    That's correct.
19   Q    Do you recall that Mr. Johnson gave a deposition in the
20   case in which you were representing the County of Los Angeles?
21   A    Me, personally?
22   Q    No.  I'm sorry, Mr. Johnson.  Let me ask a better
23   question.
24              You were the lead lawyer for the County of
25   Los Angeles in the case involving Mr. Johnson; right?
```

(Timestamps in left margin: 03:47PM at lines 5, 10, 15; 03:48PM at lines 20, 25)

```
 1   A      That's right.

 2   Q      And I was the lead lawyer for Mr. Johnson; right?

 3   A      Yes.

 4   Q      And from time to time during the case, you and I didn't

 5   see eye to eye.  Is that fair to say?

 6              MR. WYMAN:  Objection.  Relevance.

 7              THE COURT:  Overruled.

 8              THE WITNESS:  Few times.

 9   Q   BY MR. AVENATTI:  But, for the most part, we enjoyed a

10   professional relationship; right?

11   A      That's right.

12   Q      We got along pretty well?

13   A      We did.

14   Q      And we ultimately reached a settlement working with one

15   another that was helpful to both of our clients; right?

16   A      That's correct.

17              THE COURT:  Sir, would you get up a little bit

18   closer to the mic, please.  Pull it up.

19   Q   BY MR. AVENATTI:  And in your experience representing the

20   County of Los Angeles against individuals suing the County of

21   Los Angeles, sometimes the plaintiffs' lawyers, they get a

22   little bumpy, for lack of a better term; is that fair?

23              MR. WYMAN:  Objection.  Relevance.

24              THE COURT:  Sustained.

25   Q   BY MR. AVENATTI:  Sir, in your experience around the time
```

03:48PM  (line 5)
03:48PM  (line 10)
03:48PM  (line 15)
03:49PM  (line 20)
03:49PM  (line 25)

                   of representing the County of Los Angeles, when the Johnson

                   settlement was reached, was it unusual for attorneys

                   representing plaintiffs to be pushing the County to get the

                   cases settled as quickly as possible?

03:49PM    5           MR. WYMAN:  Objection.  Calls for speculation.

                   Foundation.

                           THE COURT:  Overruled.

                           THE WITNESS:  Do you mean to get the money?

           Q    BY MR. AVENATTI:  Yes.

03:50PM   10    A    After a settlement has been reached?  Yes.

           Q    Yes, meaning that was wasn't unusual at all; right?

           A    Well, it takes a long time.  So they want it as quick as

                   possible.

           Q    The plaintiffs' attorneys, in your experience around this

03:50PM   15    time, want their money, the money for the clients, the money

                   for others for costs as soon as possible; right?

           A    That's true.

           Q    And around the time of the settlement of Mr. Johnson's

                   case, there was a process by which the settlement had to be

03:50PM   20    approved by the County before any money could be disbursed; am

                   I right?

           A    That's correct.

           Q    And I think you testified under questioning from

                   Mr. Wyman that that process included a corrective report?

03:50PM   25    A    A corrective action plan.

```
 1   Q    Corrective action plan; is that right?

 2   A    That's correct.

 3   Q    And those things take time to put together, don't they?

 4   A    They do.

 5   Q    And in this instance, the burden of putting together the

 6   corrected action plan, that was not on me, was it?

 7   A    No.

 8   Q    I didn't have anything to do with that; right?

 9   A    That's right.

10   Q    And it wasn't on Mr. Johnson; am I right?

11   A    That's correct.

12   Q    And it wasn't anyone who worked for me's obligation to do

13   that; right?

14   A    Right.

15   Q    And, actually, it wasn't your obligation to do it either,

16   was it?

17   A    No.  That's correct.  It's not on me.

18   Q    And it wasn't on anyone that worked for you; right?

19   A    That's correct.

20   Q    This was the obligation of the senior leadership for the

21   Los Angeles County Sheriff's Department; right?

22   A    Well, it's not exactly senior leadership, but it's -- it's

23   their responsibility.

24   Q    And when you settled the -- strike that.

25        When we reached the initial agreement for a
```

03:51PM (line 5)
03:51PM (line 10)
03:51PM (line 15)
03:51PM (line 20)
03:52PM (line 25)

**UNITED STATES DISTRICT COURT**

1    $4 million settlement, you made it clear to me that this was

2    going to be a lengthy process, didn't you?

3    A    I don't remember specifically, but I'm sure I would have

4    told you that.

03:52PM 5    Q    And then we had a conference before a federal judge that

6    was presiding over the case; right?

7    A    We did.

8    Q    And she wanted to know what the status of the settlement

9    was because we had a firm trial date, didn't we?

03:52PM 10   A    I think you're right about that, yes.

11   Q    Yep.  It was a few weeks before we were supposed to

12   actually impanel a jury like this and start a trial.  Do you

13   remember that?

14   A    I don't remember the trial -- when the trial was, but I

03:52PM 15   know it was moved.

16   Q    And do you remember that the -- that her Honor was

17   adamant that the settlement be finalized as soon as possible.

18   Do you recall that?

19   A    Yes.  She gave us a timetable.

03:53PM 20   Q    A very small timetable.  Do you remember that?  A tight

21   timetable.

22   A    Tighter than I'm used to.  That's correct.

23   Q    And she made it clear to both of us that if the

24   settlement was not done on that timetable, she was going to set

03:53PM 25   the matter for trial and we were going to impanel a jury and

**UNITED STATES DISTRICT COURT**

begin the case.  Do you remember that?

A    I don't remember that, but that would be characteristic of her.

Q    Based on your experience before her Honor; right?

03:53PM  5    A    That's correct.

Q    Okay.  And you made it clear to her that this was going to be not impossible, but it was going to be difficult because of all the things that had to happen to get the settlement done.  And it was around the holidays, meaning Christmas and

03:54PM 10    Hanukkah and New Year's and Thanksgiving.  Do you remember that?

A    You know, I don't remember that, but it would make sense for me to say that.

Q    Well, if you look at the documents in front of you that

03:54PM 15    you were asked about on direct, if you look at the dates, does that refresh your recollection that we were dealing with this in November and December of 2013?

A    That's right.

Q    And the County Board of Supervisors around the holidays,

03:54PM 20    they don't meet on a regular agenda generally, do they?

A    I don't know a lot about that, but that's probably true.

Q    And the leadership in the sheriff's department, they were dragging their feet -- well, strike that.

It was taking a while to get the corrective action

03:54PM 25    plan from the Sheriff's Department.  Do you remember that?

1   A    Well, it always takes a while.  And in this case, they

2   seemed to have expedited it.

3   Q    They expedited it.  But it went from taking a long time

4   to maybe taking a while.  Is that fair to say?

03:55PM 5   A    Sure.

6   Q    You would agree with that?

7   A    Yes.

8   Q    Okay.  And if you go to Exhibit 32 -- maybe we can have

9   that published for the jury -- I think it's the second page, if

03:55PM 10   I'm not mistaken, there's a statement in the document where you

11   talk about a "small problem in the report," quote/unquote.

12   A    Okay.

13   Q    And the date is December 11, 2014; right?

14   A    Yes.

03:56PM 15   Q    So at that point you were still waiting on the corrective

16   action plan from the sheriff's department before the matter

17   could even be put on the agenda.  Am I right?

18   A    I don't remember when the corrective action plan was

19   completed.  I think the report is -- looks like Exhibit 31.

03:57PM 20   Q    But if you go to the first page of Exhibit 32, does that

21   refresh your recollection that the matter was still not on the

22   agenda yet?  Middle of the page.

23   A    Yeah, I think you're right.

24   Q    You write:

03:57PM 25         "Things seem to be moving along nicely.  I

```
          1            hope to have specifics on when it will go before

          2            the board after the first of the year.  Happy

          3            holidays, Michael."

          4                   That's what you wrote; am I correct?

03:57PM   5     A    Yes.

          6     Q    And now I'd like to direct your attention to Exhibit 31.

          7     Exhibit 31 -- well, strike that.

          8                   Do you recognize Exhibit 31?

          9     A    Yes.  I'm reading it right now.  Okay.

03:58PM  10     Q    Did you read this -- well, strike that.

         11                   Your office approved this document; correct?

         12     A    I believe so, yes.

         13     Q    And your office, together with my office, caused this

         14     document to be filed before that federal judge that we were

03:59PM  15     speaking about earlier, the Honorable Ms. Morrow, as I recall.

         16     A    That's correct.

         17     Q    Was everything in it true, to the best of your knowledge,

         18     at the time that it was filed?

         19     A    I believe so.

03:59PM  20     Q    It's dated December 11, 2014; right?

         21     A    That's right.

         22                   MR. AVENATTI:  Your Honor, we would offer

         23     Exhibit 31.

         24                   MR. WYMAN:  No objection, Your Honor.

03:59PM  25                   THE COURT:  31 will be received.
```

**UNITED STATES DISTRICT COURT**

```
 1              (Exhibit No. 31 received.)
 2              MR. AVENATTI:  If we can have the first page of 31
 3      for the jury.
 4      Q    BY MR. AVENATTI:  And, sir, that's the date at the top in
03:59PM 5   blue, where it says, "Filed December 11, 2014"; right?
 6      A    That's right.
 7      Q    And your name's in the upper left-hand corner of this
 8      page; right?
 9      A    Right.
04:00PM 10  Q    It's called the "Caption Page"; am I correct?
11      A    You are.
12      Q    And this was a joint report regarding the status of the
13      corrective action plan for the settlement of the entire action.
14      Am I right?
04:00PM 15  A    It was the report that gave an update on the corrective
16      action plan.
17      Q    Because her Honor had required it.  Do you remember that?
18      A    Yes.
19      Q    Okay.  This wasn't just something you and I came up with
04:00PM 20  on our own.  This was something that she demanded to know
21      about?
22      A    That's correct.
23      Q    Do you recall she was keeping very close tabs on the
24      settlement process?  Do you recall that?
04:00PM 25  A    I think she was, yeah.
```

```
 1    Q    Yes, she was.
 2              Now, on the second page of the status report, we
 3    provided an update to the Court as to what was going on with
 4    the settlement.  Do you remember that?
 5    A    Yes, I see that.
 6    Q    Okay.  And by the way, this document wasn't confidential,
 7    was it?
 8    A    No.
 9    Q    It wasn't filed under seal or hidden from anybody, was
10    it?
11    A    No.
12    Q    Any member of the public could go down to the courthouse
13    or access it online, to the best of your knowledge; right?
14    A    That's correct.
15    Q    And did I ever ask you to hide this?
16    A    I don't think there would be a reason to do that.
17    Q    And I never did it; right?
18    A    Not to my knowledge.
19    Q    Did I ever ask you to hide anything in connection with
20    this case?
21    A    I'm not sure what you mean by "hide," but --
22    Q    Well, keep hidden from someone, anyone.
23    A    No.
24    Q    Did I ever say, "We've got to file this stuff
25    confidentially because I don't want people to see this"?
```

1    A    No.

2    Q    And in this document we recited what had happened in

3    connection with the settlement process thus far, and the

4    corrective action plan; correct?

04:02PM 5    A    That's right.

6    Q    And then at the bottom of this page we told the Court,

7    your office and my office, by way of the instant status report:

8              "Defendants" --

9                  Those would be your clients; right?

04:02PM 10   A    That's right.

11   Q    -- "hereby respectfully inform the Court, plaintiff,

12        and his counsel" -- "and plaintiff and his counsel

13        that the CAP" -- which is the corrective action

14        plan -- "has been completed by the Los Angeles

04:02PM 15        County Sheriff's Department and that the settlement

16        will be submitted for placement onto the Los Angeles

17        County Claims Board agenda shortly for the

18        recommendation on the approval of the settlement."

19        Correct?

04:03PM 20   A    That's correct.

21   Q    And then we asked the Court to move some of the deadlines

22   in order to give us enough time for that to happen; right?

23   A    We asked that they -- the Court vacate a hearing date.

24   Q    And just so the jury knows, meaning cancel the hearing

04:03PM 25   date and move it later; right?

```
 1  A    I don't think anything was being moved later.  There was a
 2  hearing date that was just canceled.
 3  Q    You are correct.  We were asking that this just be
 4  canceled, and if something happened, it was our intention to
 5  notify the Court; is that fair?
 6  A    Right.
 7  Q    Okay.  Now, sir, it wouldn't have mattered if you got the
 8  signature page to the settlement agreement weeks prior at this
 9  point relating to the settlement; correct?
10          MR. WYMAN:  Objection.  Vague.
11          THE COURT:  Rephrase the question.
12          MR. AVENATTI:  I'm sorry, sir?
13          THE COURT:  Rephrase, please.
14  Q    BY MR. AVENATTI:  Sir, do you remember on direct
15  examination Mr. Wyman asked you a number of questions about the
16  signature page to the settlement agreement?
17  A    Yes.
18  Q    Okay.  The signature page to the settlement agreement,
19  your receipt of that never delayed the settlement ultimately,
20  did it?
21  A    Not in this case, no.
22  Q    What delayed the settlement in this case was waiting for
23  the corrective action plan, waiting for the Board of
24  Supervisors to put the matter on the agenda, and ultimately
25  approving the settlement; is that fair?
```

A     Right.  I wouldn't characterize it as a delay.  It just is a time period that has to go by.

Q     I'm not casting aspersions on your client, okay.

My question is, the settlement took as long as it did, not because of anything having to do with the signature page to the settlement agreement; is that fair?

A     Yes.

Q     Yes?

A     Yes, that's fair.

Q     And you'll recall -- and I may have asked you this before, and if I did, I apologize to you and the jury -- you may recall that her Honor said if this didn't happen, we were going to go to trial pretty quickly.  Do you remember that?

A     I don't actually.  But it's something she would say, uh-huh.

Q     You don't have any reason to quarrel with me about that?

A     I don't.

Q     All right.  In your mind, would there have been anything improper with me taking the position that I didn't want to give you the settlement agreement signature page until I actually knew we weren't going to trial?

MR. WYMAN:  Objection.  Relevance.  Calls for speculation.

THE COURT:  Overruled.

Q     BY MR. AVENATTI:  Nothing unusual about that; right?

```
 1    A    It's unusual, but for a reason that doesn't really concern
 2    you.  You, the plaintiff's lawyer.
 3    Q    I'm sorry?
 4    A    In most cases, I need a signed agreement early on.  The
 5    agreement is contingent upon the approvals.  But in this case,
 6    it didn't delay anything.
 7    Q    And in this case, it wasn't contingent on the signature
 8    of the settlement agreement; right?  Strike that.  That's a bad
 9    question.
10         In this case, it didn't delay anything?
11    A    That's right.
12    Q    In your experience have you been involved in cases where
13    people sign settlement agreements and then, for whatever
14    reason, the matter doesn't settle, and then the parties are
15    fighting over the settlement agreement as opposed to the
16    underlying matter?  Have you had that experience?
17              MR. WYMAN:  Objection.  Relevance.
18              THE COURT:  Overruled.
19              THE WITNESS:  I didn't understand your question.
20    I'm sorry.
21    Q    BY MR. AVENATTI:  Have you had the experience over the
22    last 25 years in executing settlement agreements, et cetera,
23    where sometimes a party will sign a settlement agreement but,
24    for whatever reason, the settlement does not get effectuated.
25    And then there's a battle over the settlement agreement and
```

         1    whether it's binding or not as opposed to litigating the

         2    underlying matter?

         3              MR. WYMAN:  Objection.  Compound question and

         4    relevance.

04:07PM   5              THE COURT:  Overruled.

         6              THE WITNESS:  I've heard of that.  I've not had that

         7    experience myself.

         8    Q    BY MR. AVENATTI:  But you've heard of that happening?

         9    A    Sure.

04:08PM  10    Q    Okay.  At one point you were asked a question by

        11    Mr. Wyman, and he asked you about my tone in the e-mail

        12    correspondence.  Do you recall that question generally?

        13    A    No.  I don't recall.

        14    Q    Do you recall giving an answer, "I just thought it was

04:08PM  15    lawyer talk"?

        16    A    Oh, sure.

        17    Q    All right.  And what did that relate to, sir?

        18    A    You know, you were threatening me that you were going to

        19    get a trial date, and I -- that's just lawyer talk.  I don't

04:08PM  20    really pay attention to that, okay?

        21    Q    Plaintiffs' lawyers threaten stuff like that all the

        22    time, don't they?

        23    A    Some do.

        24    Q    And a lot of people threaten a lot of things when they're

04:09PM  25    trying to settle cases, right, as a general proposition?

```
 1    A     They threaten all through the process.
 2    Q     So plaintiffs' lawyers don't just threaten at the end,
 3    they threaten at the beginning, the middle, and the end; is
 4    that fair?
 5    A     A lot of them do, sure.
 6    Q     Kind of comes with the territory over the last 25-plus
 7    years; right?
 8    A     It does.
 9    Q     Sir, immediately before taking the stand, did you have
10    occasion to be in the conference room outside those doors on
11    the right-hand side meeting with anyone?
12              MR. WYMAN:  Objection.  Relevance.
13              THE COURT:  Overruled.
14              THE WITNESS:  I was in there with some other people,
15    but I was in there primarily by myself for a long time.
16    Q     BY MR. AVENATTI:  But you weren't in there by yourself
17    the entire time, were you?
18    A     No.
19    Q     Right.  At one point Mr. McNicholas was in the room while
20    he was on the stand, while we were on a break; right?
21    A     He was.
22    Q     And his lawyer was in there; right?
23    A     At times he came and went.
24    Q     And special agent -- well, he's no longer in the
25    courtroom, but Special Agent Roberson was also in the room;
```

```
 1    right?
 2    A     At times he was, yes.
 3    Q     What did you talk about?
 4    A     The special agent and I were talking about San Diego.
 5    That's where he -- I grew up and he lives.  Mr. McNicholas and
 6    I were talking about that we hadn't seen each other in a while,
 7    and -- I didn't really talk with his lawyer.  He was mainly
 8    just telling me stories about people we mutually knew.
 9    Q     And at the time that you were speaking with
10    Mr. McNicholas during the lunch break -- not the lunch break,
11    we'll get to that in a minute -- during the afternoon break,
12    you understood that he was presently under oath; right?
13                MR. WYMAN:  Objection.  Relevance.
14                THE COURT:  Overruled.
15                THE WITNESS:  Yeah, I would assume so.
16    Q     BY MR. AVENATTI:  You understood he was in the middle of
17    his testimony but we were just on a break?
18    A     That's right.
19    Q     And then at the lunch break, did you have occasion to
20    speak with Mr. McNicholas out in the hallway by the big
21    windows?
22    A     Yes.
23    Q     And did you understand at that point that he was also
24    under oath and in the middle of his testimony?
25    A     Yes.
```

```
 1   Q    At any point during today or yesterday, or any other day,

 2   for that matter, did Mr. Wyman or Mr. Sagel or any of the

 3   agents tell you that you were not supposed to be communicating

 4   with agents or with individuals who were under oath while on

 5   the stand?

 6   A    No.  I know that I shouldn't be communicating with anybody

 7   that's under oath --

 8   Q    Thank you.

 9   A    -- about the substance of their testimony.

10   Q    They didn't tell you that you shouldn't be communicating

11   with Mr. McNicholas at all while he was under oath, did they?

12            MR. WYMAN:  Objection.  Asked and answered.

13   Relevance.

14            THE COURT:  Sustained.  Asked and answered.

15   Q    BY MR. AVENATTI:  While you've been here today, sir, have

16   you spoken to any other individuals that you understood were

17   going to be called to testify in this case?

18   A    No.

19   Q    Now, before testifying here today, Mr. Hurrell, how many

20   times have you communicated with the Government about this

21   case?

22   A    It's been a long time.  There's been quite a few

23   communications over the course of time this case has been

24   pending.

25   Q    Can you estimate for me how many?
```

```
  1   A     Maybe seven or eight.

  2   Q     How many of those have been meetings?

  3   A     Two.  One in person, one audio.

  4   Q     And then I take it that the other approximately five or
04:14PM  5   six were by telephone?

  6   A     No.  They were just by e-mail.

  7   Q     Well, on July 14th, didn't you have a meeting with

  8   Mr. Roberson, Mr. James Kim -- I'm sorry, Special

  9   Agent Roberson, Special Agent Kim, and Assistant United States
04:14PM 10   Attorney Alex Wyman?

 11   A     That sounds about right.  I don't recall the date, but...

 12   Q     And it lasted about 40 minutes.  It was -- it was

 13   actually via teleconference; am I right?

 14   A     That's right.
04:14PM 15   Q     Okay.  What did you talk about?

 16   A     They -- Mr. Wyman just took me through the questions that

 17   he intended to ask me at trial.

 18   Q     So it was kind of like a dress rehearsal?

 19   A     That's correct.
04:15PM 20   Q     And did you answer the questions during the dress

 21   rehearsal?

 22   A     I did.

 23   Q     And did you take breaks during the dress rehearsal so

 24   that they could ask you other questions or have you clarify
04:15PM 25   things?
```

```
  1    A    I don't know about -- we didn't take any breaks, but at

  2    times I would clarify things for them.

  3    Q    And at times they would ask you questions; right?

  4    A    That's right.

04:15PM  5    Q    Of all of your communications with the Government over

  6    the last two and a half years relating to this matter, was that

  7    the most extensive meeting, whether it be in person or by

  8    telephone, that you've had with the Government?

  9    A    There were two.  They were virtually identical.

04:15PM 10    Q    When was the other one?

 11    A    I think a few weeks before the telephone conversation.

 12    Q    And was that in person or was that on the telephone?

 13    A    That was in person.

 14    Q    And you met with Special Agent Roberson, Special Agent

04:16PM 15    Carlos, and then both Mr. Sagel and Mr. Wyman; am I correct?

 16    A    I think so.  I don't remember the names of everybody.

 17    Q    And was that another dress rehearsal?

 18    A    Yes.

 19    Q    And did you ask them any questions during these dress

04:16PM 20    rehearsals?

 21    A    I think I did, yeah.

 22    Q    And did they answer your questions?

 23    A    Pretty much, yeah.

 24    Q    And do you recall that when you met with them in person,

04:17PM 25    one or more agents were taking handwritten notes?
```

```
 1    A    I don't know.  I wasn't paying attention to that.

 2    Q    Who picked which documents to ask you about during these

 3    meetings?  Did you pick the documents or did Mr. Wyman or

 4    Mr. Sagel or the agents?

 5    A    Mr. Wyman.

 6    Q    So he walked you through each of the documents that you

 7    testified to about here today; is that right?

 8    A    Yes.

 9    Q    And did he walk you through other documents that you

10    haven't been shown today yet?

11    A    Yes.

12    Q    What do you recall being -- well, strike that.

13         And did those documents help refresh your

14    recollection about various things relating to Mr. Johnson's

15    testimony?

16    A    Not Mr. Johnson's testimony --

17    Q    I mean --

18    A    -- but the settlement, yes.

19    Q    Thank you.  Let me ask a better question.

20         And did those documents that you were shown that you

21    haven't been shown today help refresh your recollection in

22    preparation for your testimony here today?

23    A    Yes.

24    Q    And what do you recall about those documents that you

25    were shown then, but you haven't been shown now?
```

04:17PM (lines 5, 9–10)
04:18PM (lines 15, 20, 25)

```
 1              MR. WYMAN:  Objection.  Those aren't in evidence,
 2    Your Honor.
 3              THE COURT:  Overruled.
 4              THE WITNESS:  Well, one is I don't -- I didn't
 5    remember when the mediation was, whether I attended.  And they
 6    showed me an invoice from the mediation company that had the
 7    date on it.  And I also saw a portion of the transcript from
 8    the telephonic hearing we had with Judge Morrow.  And I think
 9    that was about it.
10    Q    BY MR. AVENATTI:  And was that when you met with him in
11    person or on the telephone?
12    A    Well, in person.  And I had the same documents accessible
13    when we talked on the phone.
14    Q    So I want to make sure that I have this right.  When you
15    met with Mr. Wyman, Mr. Sagel, Mr. Roberson and Special Agent
16    Carlos, you could not recall whether you actually went to the
17    mediation relating to Mr. Johnson; is that right?
18    A    Right.  I couldn't -- I'm sure I did.  I just couldn't
19    remember it.
20    Q    You couldn't remember if you were actually there or not?
21    A    I don't remember the event.
22    Q    Okay.  You did not remember the event?
23    A    That's right.
24    Q    And they showed you a document, an invoice, to basically
25    show that you were there?
```

A    Well, the invoice was shown to me to refresh my memory as
to the date.  I don't think the invoice stated that I was there
or not.

Q    So you didn't recall the mediation even occurring until
04:20PM they reminded you of it?

A    Yeah.  I have a vague recollection.

Q    But I am correct that you didn't even recall the
mediation occurring until they reminded you of it by showing
you the document?  That statement is correct, is it not?

04:20PM A    Well, partially.  I know there was a -- I knew that we did
some form of dispute resolution to get to the settlement.  I
just didn't remember the specifics of it.

Q    Meaning you didn't remember whether it was a settlement
conference or a mediation or what happened in connection with
04:21PM the resolution, basically?

A    That's right.

Q    And who showed you the invoice?

A    Mr. Wyman.

Q    And what did he tell you when he showed you the invoice?

04:21PM A    I don't think he told me anything.  He just showed it to
me because I couldn't recall the date.

Q    Well, or that it even happened.

A    Well, he didn't show me the invoice to say that it
happened because I don't remember that, but it was more the
04:21PM date.

| | |
|---|---|
| 1 | Q    And this was at the in-person meeting and on the |
| 2 | telephone call; right? |
| 3 | A    The invoice was at the in-person meeting. |
| 4 | Q    On or about June 25th, 2021? |
| 04:22PM 5 | A    That sounds about right. |
| 6 | MR. AVENATTI:  One moment, Your Honor, please. |
| 7 | **(Counsel conferred off the record.)** |
| 8 | Q    BY MR. AVENATTI:  Sir, I just have a couple final |
| 9 | questions. |
| 04:22PM 10 | As you sit there today, do you have any idea how |
| 11 | much, if any, net monies Geoffrey Johnson has ever been due in |
| 12 | connection with the case? |
| 13 | A    I would not know that. |
| 14 | Q    You don't know it now; right? |
| 04:23PM 15 | A    I don't. |
| 16 | Q    And you've never known it; right? |
| 17 | A    That's correct. |
| 18 | Q    And, sir, as you sit there today, do you have any idea, |
| 19 | one way or another, whether I did anything unethical or illegal |
| 04:23PM 20 | in connection with Mr. Johnson's settlement? |
| 21 | A    I don't have any knowledge of that. |
| 22 | Q    You have -- you are aware of no knowledge or evidence |
| 23 | that I ever did anything unethical or illegal, to the best of |
| 24 | your knowledge; right? |
| 04:23PM 25 | A    That's right. |

```
            1                    MR. AVENATTI:  Nothing further.

            2                    THE COURT:  Anything further?

            3                    MR. WYMAN:  No, Your Honor.  Thank you.

            4                    THE COURT:  May the witness be excused?

04:23PM      5                    MR. WYMAN:  Yes.

            6                    MR. AVENATTI:  Your Honor, we would still like him

            7      available in our case.

            8                    THE COURT:  Sir, you'll be subject to recall.

            9      You're excused for now.  Thank you.

04:24PM     10                    Ladies and gentlemen, we're going to stop here for

           11      the day.  We'll resume tomorrow at 9:00 o'clock.

           12                    In giving you the initial instructions, I neglected

           13      to tell you one thing about timing.  If we get to the end of

           14      the day and we need five, ten more minutes to wrap up a

04:24PM     15      witness, I'll turn to you.  If you've got a commitment to be

           16      out of here at 4:30, you'll be out of here at 4:30.  If you can

           17      accommodate the situation, so be it.  But 4:30, you can plan on

           18      making your arrangements -- other arrangements based on that.

           19                    Please remember the admonition not to discuss the

04:24PM     20      case with anyone, not to form any opinions on the issues in the

           21      case until it's submitted to you.  You're also not to do any

           22      research.

           23                    So I trust you'll have a good evening.  We'll see

           24      you in the morning.

04:25PM     25                    THE COURTROOM DEPUTY:  All rise.
```

```
 1              (Out of the presence of the jury.)
 2              THE COURT:  Let me be clear on what the ground rules
 3      are for witnesses.  With the exception of Mr. Avenatti, from
 4      the time a witness takes the stand until the witness completes
04:25PM 5      his or her testimony, there shall be no substantive discussions
 6      with the witness about the testimony by anyone.  Applies to all
 7      witnesses except Mr. Avenatti.
 8              MR. WYMAN:  Understood, Your Honor.
 9              THE COURT:  Any questions about that?
04:26PM 10             MR. AVENATTI:  Nothing from the defense, Your Honor.
11              THE COURT:  Anything before we adjourn?
12              MR. SAGEL:  Real briefly, Your Honor.  The
13      Government plans on having Geoffrey Johnson here tomorrow.
14      We've talked to Ms. Bredahl.  I'd like to say two things for
04:26PM 15      the record.  Because of his health concerns, he's actually
16      living in a facility right now due to complications with his
17      health.  We don't believe it's conducive for him to travel
18      through public access because he's indigent.  The marshals'
19      only capabilities is a -- their only handicap-accessible van is
04:26PM 20      a prisoner van, which we do not believe is acceptable.
21              The Government has rented a handicap-accessible van
22      to bring him here.  To any extent the defendant believes that's
23      a benefit to Mr. Johnson, we're letting him know right now that
24      we've rented a handicap-accessible van to bring Mr. Johnson to
04:27PM 25      and from court tomorrow.
```

1          THE COURT:  Is he in custody presently?

2          MR. SAGEL:  No.  He's in a home -- a nursing

3  facility.

4          THE COURT:  Nursing home.

04:27PM  5          MR. SAGEL:  And due to I believe it's simply the

6  allegations in this case, he would not be able to pay for his

7  own way or does not want to pay for his own way out of pocket,

8  which is normally how our witnesses have to do it.  They pay

9  and we reimburse.  As such, we've rented a handicap-accessible

04:27PM 10  van to bring him here.

11          THE COURT:  Okay.  Do you have something else?

12          MR. SAGEL:  No, Your Honor.

13          THE COURT:  Mr. Avenatti?

14          MR. AVENATTI:  Your Honor, just one request relating

04:27PM 15  to Mr. Johnson.  We would ask that he be in the witness box at

16  the time that the jury is brought into the courtroom.  There's

17  no allegation that anything I did or did not do led to his

18  medical condition.  And I think it's highly prejudicial to have

19  him take the stand in light of the facts of his condition.

04:28PM 20          MR. WYMAN:  We have no objection to that.  And I

21  think it's necessary logistically to get him to the stand.

22          THE COURT:  That's fine.  Okay.  If there's no

23  objection to that, that's what we'll do.

24          MR. AVENATTI:  Your Honor, one last thing, which is

04:28PM 25  I'm assuming that -- well, we have three more witnesses that

```
 1    were going to testify today.  They gave us an order of
 2    witnesses after Your Honor made the statement this morning.
 3    I'm assuming, then, that after Mr. Hurrell, we're going to go
 4    three, four, five --
04:28PM 5           THE COURT:  No.  Go ahead.
 6           MR. AVENATTI:  If I'm wrong, that's fine.  I just --
 7    I'd like to give the order of witnesses.
 8           THE COURT:  Well, I think they're entitled to change
 9    the lineup, but they need to tell you before we go home today.
04:29PM 10    You ought to know before you leave the courthouse what the
 11    order is tomorrow.
 12           MR. AVENATTI:  And, Your Honor, I'm deeply
 13    appreciative of that and I thank Your Honor.
 14           THE COURT:  Well, it's a rule I enforce for
04:29PM 15    everyone.
 16           MR. AVENATTI:  And I'm still appreciative of it
 17    because I've tried cases in front of other judges that I
 18    haven't had the benefit of the rule, Your Honor.
 19           But my point, I guess, would be this:  If they give
04:29PM 20    me a witness order and then we don't get to those other
 21    witnesses, I still have to prepare for those witnesses for that
 22    day.
 23           THE COURT:  Okay.
 24           MR. AVENATTI:  And --
04:29PM 25           THE COURT:  That's why I directed that the parties
```

1    provide their best estimate of the time for direct and they

2    provide their -- and the opposing party provide the best

3    estimate for cross-examination.

4             MR. AVENATTI:  The only request I would make,

04:29PM  5    Your Honor, is in light of the rule that you've laid out, which

6    I think makes eminent sense, if they don't call the witnesses,

7    then, on that day, they should either be required to call them

8    in order the next day or lose the ability to call them.

9             THE COURT:  Sir, they could call the witnesses in

04:30PM 10    any order they desire as long as they tell you at the end of

11    the preceding day.

12             MR. AVENATTI:  Understood, Your Honor.

13             THE COURT:  Anything else?

14             MR. WYMAN:  Not from the Government, Your Honor.

04:30PM 15             THE COURT:  Okay.  Thank you.  We'll be in recess.

16             THE COURTROOM DEPUTY:  All rise.

17             **(Proceedings concluded at 4:30 p.m.)**

18                          **--oOo--**

19

20

21

22

23

24

25

1          *CERTIFICATE OF OFFICIAL REPORTER*

2

3    COUNTY OF LOS ANGELES    )
                              )
4    STATE OF CALIFORNIA      )

5              I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME

6    COURT REPORTER, in and for the United States District Court for

7    the Central District of California, do hereby certify that

8    pursuant to Section 753, Title 28, United States Code that the

9    foregoing is a true and correct transcript of the

10   stenographically reported proceedings held in the

11   above-entitled matter and that the transcript page format is in

12   conformance with the regulations of the Judicial Conference of

13   the United States.

14

15   *Date:  July 21, 2021*

16

17

18

19                          */S/ DEBBIE HINO-SPAAN*
                          _____

20                          *Debbie Hino-Spaan, CSR No. 7953*
                          *Federal Official Court Reporter*
21

22

23

24

25

**UNITED STATES DISTRICT COURT**

**$**

$2,000 [1] - 43:7
$2,776.43 [2] - 38:9, 38:25
$2700 [1] - 53:12
$350,000 [4] - 10:6, 10:16, 45:8, 62:7

**/**

/S [1] - 118:19

**0**

00046 [1] - 48:24

**1**

1 [7] - 38:21, 52:10, 67:20, 72:9, 72:19, 76:22, 85:24
1-053 [1] - 1:24
1.6 [5] - 52:14, 52:16, 52:18, 52:25, 53:2
1/12/2015 [1] - 4:9
1/22/2015 [1] - 4:13
1/6/2015 [1] - 4:5
1/8/2015 [1] - 4:7
10/20/2014 [1] - 3:17
100 [1] - 9:4
11 [3] - 95:13, 96:20, 97:5
11/11/2014 [1] - 3:18
11/17/2014 [1] - 3:20
1100 [1] - 2:11
12 [1] - 79:6
12/11/2014 [1] - 4:15
12/8/2014 [1] - 3:22
12th [2] - 16:17, 80:3
13-4496-MMM-AJW
   [1] - 4:16
13th [2] - 80:19, 80:23
14th [1] - 107:7
15 [1] - 61:12
17 [10] - 2:18, 3:16, 44:24, 45:1, 45:15, 45:19, 45:20, 46:13, 50:18, 73:24
18 [3] - 42:21, 42:25, 47:7
1986 [1] - 32:19
1:26 [2] - 1:16, 5:2
1st [2] - 29:15, 77:10

**2**

2 [6] - 1:9, 72:13, 72:14, 75:1, 80:17, 82:16
2,776.43 [1] - 39:6
2-200 [3] - 50:25, 51:7, 51:10
2/21/2020 [1] - 6:12
20 [1] - 31:14
2013 [1] - 94:17
2014 [13] - 45:5, 60:24, 60:25, 70:21, 73:24, 74:3, 75:8, 77:6, 95:13, 96:20, 97:5
2015 [8] - 29:15, 61:1, 78:9, 79:6, 80:3, 80:23, 86:6, 86:12
2019 [3] - 11:16, 11:24, 87:14
2020 [1] - 12:3
2021 [6] - 1:15, 5:1, 12:13, 16:17, 112:4, 118:15
20th [1] - 45:5
21 [3] - 1:15, 5:1, 118:15
213-894-2435 [1] - 2:12
21st [1] - 12:3
22nd [3] - 12:13, 77:6, 86:6
24 [4] - 3:18, 71:19, 72:4, 72:17
25 [6] - 31:18, 40:22, 55:11, 88:17, 89:5, 102:22
25-plus [1] - 104:6
254 [1] - 2:19
25th [1] - 112:4
26 [5] - 3:20, 73:11, 73:19, 73:21, 73:22
26.2 [3] - 5:12, 5:23, 6:11
28 [1] - 118:8
29th [1] - 86:12
2nd [3] - 11:16, 11:24, 75:8

**3**

30 [10] - 3:22, 6:8, 31:17, 31:18, 32:23, 33:5, 74:13, 74:19, 74:23, 74:24
31 [9] - 4:15, 95:19, 96:6, 96:7, 96:8, 96:23, 96:25, 97:1, 97:2
312 [1] - 2:11
32 [7] - 4:5, 76:12, 76:17, 76:20, 76:21, 95:8, 95:20
33 [5] - 4:7, 77:21, 78:1, 78:5, 78:6

**4**

34 [5] - 4:9, 78:18, 78:23, 79:2, 79:3
35 [5] - 4:11, 80:7, 80:11, 80:15, 80:16
36 [1] - 88:14
37 [4] - 20:25, 62:15, 62:20, 81:4
38 [7] - 3:14, 4:13, 84:25, 85:11, 85:15, 85:21, 85:22
3:00 [1] - 17:25
3:02 [1] - 61:25
3:08 [1] - 61:25
3:30 [1] - 17:25
3:32 [1] - 18:4

**4**

4 [22] - 9:13, 9:20, 9:24, 10:9, 10:13, 21:10, 21:14, 21:19, 27:22, 52:11, 52:24, 62:17, 64:12, 64:13, 71:4, 82:9, 82:22, 84:18, 84:20, 86:17, 86:19, 93:1
4/1/2015 [1] - 36:1
4/2/2019 [1] - 6:12
4/6/15 [1] - 35:18
40 [3] - 52:14, 86:8, 107:12
411 [2] - 1:24, 2:6
45 [1] - 3:16
47 [9] - 36:24, 36:25, 37:2, 37:6, 38:13, 38:15, 38:21, 39:13, 45:24
47-1 [2] - 3:14, 38:16
4:30 [4] - 113:16, 113:17, 117:17
4TH [1] - 1:24
4th [1] - 2:6

**5**

5 [2] - 22:17, 23:14
50 [5] - 34:12, 34:16, 34:17, 40:25, 41:24
53 [2] - 29:9, 29:10
54 [5] - 33:20, 35:3, 35:11, 36:2, 39:4

**6**

6 [3] - 1:8, 54:16, 67:20
6/22/2021 [1] - 6:13
60 [2] - 34:16, 34:18
62 [1] - 3:4
65 [1] - 3:4

**68** [1] - 3:6
**6th** [1] - 77:12

**7**

7 [1] - 3:3
7/12/2021 [1] - 6:13
714-338-3598 [1] - 2:7
72 [1] - 3:18
73 [1] - 3:20
74 [1] - 3:22
75 [1] - 46:23
75/25 [1] - 46:20
753 [1] - 118:8
76 [1] - 4:5
77 [1] - 4:7
79 [1] - 4:9
7953 [2] - 1:23, 118:20

**8**

80 [1] - 4:11
8000 [1] - 2:6
85 [1] - 4:13
87 [1] - 3:6
8th [1] - 78:9

**9**

90012 [1] - 2:12
92660 [1] - 2:19
92701 [2] - 1:25, 2:7
949-481-4900 [1] - 2:20
95 [1] - 88:24
97 [1] - 4:15
9:00 [1] - 113:11

**A**

ability [2] - 66:3, 117:8
able [3] - 70:22, 74:4, 115:6
above-entitled [1] - 118:11
absence [1] - 36:8
absent [1] - 67:3
absolutely [1] - 64:23
accept [9] - 12:5, 16:19, 18:2, 25:25, 42:23, 45:8, 47:9, 48:16, 60:9
acceptable [1] - 114:20
accepted [3] - 51:21, 51:23, 51:25
access [9] - 24:21, 25:3, 25:10, 25:12, 26:3, 26:8, 26:9, 98:13, 114:18

accessed [1] - 25:7
accessible [6] - 63:17, 110:12, 114:19, 114:21, 114:24, 115:9
accommodate [1] - 113:17
account [7] - 33:18, 83:22, 85:6, 86:4, 88:1, 88:4, 89:12
accounting [10] - 30:5, 30:20, 30:25, 31:20, 32:7, 32:24, 33:6, 35:13, 41:21, 51:17
accurate [16] - 12:6, 12:8, 18:3, 18:18, 29:8, 41:1, 46:8, 46:9, 46:22, 47:19, 49:10, 49:14, 51:19, 65:16, 65:18, 71:25
accurately [1] - 60:20
acknowledge [1] - 21:25
acknowledging [2] - 26:19, 29:4
action [13] - 71:10, 91:25, 92:1, 92:6, 94:24, 95:16, 95:18, 97:13, 97:16, 99:4, 99:13, 100:23
actual [2] - 57:18, 82:13
adamant [1] - 93:17
addendum [2] - 84:7, 84:12
additional [5] - 30:7, 55:24, 56:5, 56:6, 57:3
adjourn [1] - 114:11
administrative [1] - 34:22
admission [3] - 72:11, 72:14, 72:15
admit [9] - 72:4, 73:19, 74:19, 76:17, 78:1, 78:23, 80:11, 85:11, 85:17
admonition [2] - 61:13, 113:19
Advance [1] - 37:8
advance [4] - 42:17, 47:4, 53:21, 54:1
advanced [9] - 9:4, 36:16, 43:6, 43:9, 43:16, 43:22, 65:7, 65:11
Advanced [1] - 3:14
advances [3] - 52:6, 53:21, 54:12

advancing [2] - 43:20, 44:13
advise [1] - 6:2
afforded [1] - 28:15
afoul [1] - 59:18
afternoon [9] - 6:22, 7:4, 7:5, 18:2, 68:20, 68:21, 87:23, 87:24, 105:11
agenda [8] - 76:23, 77:3, 79:21, 94:20, 95:17, 95:22, 99:17, 100:24
agent [4] - 11:17, 12:2, 104:24, 105:4
Agent [10] - 13:5, 13:9, 17:4, 17:11, 104:25, 107:9, 108:14, 110:15
agents [8] - 18:25, 19:17, 27:8, 46:14, 106:3, 106:4, 108:25, 109:4
ago [5] - 16:21, 20:1, 20:12, 66:9, 83:12
agree [16] - 9:11, 9:22, 10:15, 19:22, 22:16, 23:3, 23:5, 23:13, 26:19, 28:13, 32:20, 32:21, 55:11, 57:25, 82:21, 95:6
agreed [2] - 54:8, 55:16
agreeing [2] - 29:4, 47:4
Agreement [5] - 3:16, 3:19, 3:23, 4:10, 82:18
agreement [79] - 21:7, 21:11, 21:14, 22:8, 23:22, 24:9, 26:16, 28:9, 28:14, 28:16, 28:25, 29:2, 42:16, 43:21, 45:9, 50:11, 51:12, 54:6, 54:8, 55:9, 55:19, 55:22, 56:19, 56:23, 56:24, 57:4, 57:5, 57:7, 58:8, 58:9, 58:10, 58:11, 63:17, 65:15, 72:22, 73:3, 73:7, 74:1, 74:3, 74:7, 74:8, 75:3, 75:13, 79:8, 79:10, 79:20, 80:4, 81:11, 81:12, 81:15, 81:18, 81:20, 82:2, 82:17, 82:23, 83:1, 83:3, 83:5, 83:13, 83:16, 83:22, 84:8, 84:12, 84:13,

84:17, 86:20, 92:25, 100:8, 100:16, 100:18, 101:6, 101:20, 102:4, 102:5, 102:8, 102:15, 102:23, 102:25
agreements [4] - 65:3, 83:18, 102:13, 102:22
agrees [3] - 23:5, 51:13, 51:14
ahead [3] - 52:9, 73:25, 116:5
Alex [2] - 13:13, 107:10
alex.wyman@usdoj. gov [1] - 2:13
ALEXANDER [1] - 2:10
allegation [1] - 115:17
allegations [1] - 115:6
alleged [1] - 69:20
almost [1] - 47:4
amended [1] - 81:20
AMERICA [1] - 1:5
amount [23] - 9:13, 9:24, 9:25, 29:12, 38:5, 39:5, 43:6, 52:5, 52:7, 52:24, 55:25, 57:9, 57:12, 57:13, 57:22, 57:23, 64:12, 64:13, 67:19, 71:1, 84:6, 84:8
amounts [3] - 41:3, 43:22, 57:24
Ana [1] - 2:7
ANA [3] - 1:17, 1:25, 5:1
ancillary [1] - 42:18
ANGELES [1] - 118:3
Angeles [26] - 2:12, 12:3, 21:19, 23:2, 24:1, 47:24, 62:13, 69:8, 69:12, 71:12, 81:13, 82:20, 87:15, 88:16, 88:18, 88:24, 89:4, 89:20, 89:25, 90:20, 90:21, 91:1, 92:21, 99:14, 99:16
annuity [1] - 84:9
answer [11] - 19:10, 24:23, 43:12, 51:9, 55:18, 56:3, 56:18, 59:14, 103:14, 107:20, 108:22
answered [2] - 106:12, 106:14
answers [2] - 19:8, 19:18

anticipate [1] - 61:22
apart [1] - 69:23
apologize [5] - 6:5, 23:10, 56:21, 75:20, 101:11
appear [1] - 21:10
APPEARANCES [1] - 2:1
application [2] - 55:8, 55:12
applies [1] - 114:6
appreciative [2] - 116:13, 116:16
approval [2] - 21:22, 22:2, 99:18
approvals [1] - 102:5
approved [4] - 80:22, 80:25, 91:20, 96:11
approving [1] - 100:25
April [3] - 11:16, 11:24, 29:15
argument [1] - 26:7
argumentative [1] - 63:24
arrangement [1] - 44:14
arrangements [4] - 44:15, 53:22, 113:18
article [1] - 70:9
aspects [1] - 73:5
aspersions [1] - 101:3
assigned [1] - 69:15
Assistant [3] - 2:5, 2:10, 107:9
assistant [3] - 27:8, 46:14, 85:25
associate [1] - 70:2
associated [1] - 40:20
assume [3] - 25:22, 43:8, 105:15
assumed [1] - 44:4
assuming [6] - 26:1, 26:7, 52:21, 54:1, 115:25, 116:3
attached [1] - 81:7
attachment [4] - 4:14, 85:17, 85:18, 86:14
Attachment [1] - 3:19
attempt [1] - 75:19
attended [2] - 32:7, 110:5
attention [5] - 21:13, 37:24, 96:6, 103:20, 109:1
attorney [15] - 12:18, 12:21, 13:2, 29:1, 29:6, 50:4, 66:22, 68:23, 69:18, 81:22, 83:21, 86:4, 88:1, 88:4, 89:11

Attorney [7] - 2:4, 2:5, 2:9, 2:10, 3:16, 14:4, 107:10
attorney's [5] - 7:15, 29:19, 52:5, 52:13, 64:14
Attorney's [4] - 11:16, 12:2, 49:12, 66:25
attorney-client [6] - 50:4, 83:21, 86:4, 88:1, 88:4, 89:11
attorneys [8] - 19:18, 27:9, 31:11, 31:14, 46:14, 49:7, 91:2, 91:14
audio [1] - 107:3
available [2] - 68:3, 113:7
AVENATTI [112] - 1:8, 2:15, 2:16, 5:8, 5:11, 5:22, 5:25, 6:5, 6:8, 6:10, 6:24, 7:3, 9:18, 13:18, 20:14, 20:25, 21:3, 26:13, 29:9, 29:12, 30:12, 33:4, 33:11, 33:20, 33:22, 34:3, 35:3, 36:2, 36:22, 37:3, 37:6, 38:12, 38:17, 38:22, 39:3, 41:2, 41:17, 43:19, 44:24, 45:2, 45:15, 45:21, 48:7, 49:23, 51:9, 54:7, 58:7, 58:23, 59:10, 59:16, 59:18, 59:22, 60:3, 61:2, 61:5, 61:10, 63:23, 65:2, 67:9, 67:13, 67:19, 67:25, 68:2, 70:12, 72:6, 73:20, 74:22, 76:19, 78:4, 79:1, 80:14, 81:24, 83:6, 83:10, 83:23, 83:25, 84:14, 85:13, 85:19, 87:8, 87:22, 89:3, 89:8, 90:9, 90:19, 90:25, 91:9, 96:22, 97:2, 97:4, 100:12, 100:14, 101:25, 102:21, 103:8, 104:16, 105:16, 106:15, 110:10, 112:6, 112:8, 113:1, 113:6, 114:10, 115:14, 115:24, 116:6, 116:12, 116:16, 116:24, 117:4, 117:12
Avenatti [48] - 3:3, 3:4, 3:6, 3:18, 3:21, 88:4, 89:11

3:22, 4:5, 4:8, 4:9, 4:12, 4:13, 5:21, 6:23, 9:12, 9:23, 10:13, 22:19, 23:15, 23:17, 23:19, 42:17, 43:22, 45:10, 59:1, 59:2, 59:15, 60:23, 63:9, 63:12, 63:15, 64:18, 70:4, 70:5, 72:11, 72:13, 72:14, 75:2, 79:14, 79:19, 80:21, 85:4, 86:2, 86:4, 87:20, 114:3, 114:7
avenatti [1] - 115:13
Avenatti's [4] - 64:7, 79:9, 84:24
avoid [1] - 5:16
aware [11] - 25:11, 43:19, 43:23, 50:9, 50:15, 58:17, 58:23, 58:24, 81:19, 87:17, 112:22

**B**

Baca [2] - 3:15, 4:16
background [1] - 34:4
bad [2] - 23:7, 102:8
balance [1] - 23:7
bank [2] - 30:24, 33:18
based [7] - 23:2, 29:16, 33:7, 43:13, 63:20, 94:4, 113:18
basic [1] - 65:11
basis [1] - 42:16
Bates [2] - 49:2, 49:4
battle [1] - 102:25
Beach [1] - 2:19
become [1] - 71:7
BEFORE [3] - 26:25, 27:15, 62:25
begin [1] - 94:1
beginning [2] - 22:15, 104:3
begins [1] - 72:12
behalf [2] - 9:5, 43:20
believes [1] - 114:22
benefit [7] - 22:14, 41:7, 43:6, 44:25, 45:22, 114:23, 116:18
best [12] - 16:15, 29:14, 31:13, 37:20, 38:3, 55:18, 56:18, 96:17, 98:13, 112:23, 117:1, 117:2
better [5] - 10:3, 52:23, 89:22, 90:22, 109:19

**Between** [1] - 3:16
**between** [10] - 11:2,
45:10, 52:18, 63:9,
65:4, 81:12, 81:15,
83:14, 85:2, 85:4
**beyond** [4] - 15:17,
16:12, 55:7, 59:3
**Beyond** [1] - 67:6
**bias** [1] - 59:16
**big** [3] - 26:22, 31:9,
105:20
**billed** [1] - 39:10
**billing** [3] - 41:11,
41:18, 41:23
**bills** [1] - 44:11
**binder** [1] - 71:18
**binding** [1] - 103:1
**bit** [6] - 19:8, 38:23,
73:8, 79:16, 80:2,
90:17
**black** [1] - 53:4
**Blaine** [1] - 58:25
**blind** [1] - 70:11
**blow** [5] - 29:12,
38:23, 41:2, 41:4,
78:8
**blue** [1] - 97:5
**board** [4] - 54:21,
77:10, 78:14, 96:2
**Board** [10] - 21:23,
22:3, 71:12, 71:13,
77:2, 78:12, 80:25,
94:19, 99:17, 100:23
**board's** [1] - 79:21
**boards** [1] - 71:11
**bogus** [1] - 38:2
**bold** [2] - 48:24, 62:24
**bolded** [2] - 26:22,
27:25
**bottom** [9] - 38:25,
57:9, 57:22, 72:19,
72:21, 73:25, 79:4,
85:23, 99:6
**box** [2] - 61:6, 115:15
**break** [12] - 61:12,
66:9, 66:18, 67:5,
67:9, 67:14, 104:20,
105:10, 105:11,
105:17, 105:19
**breaks** [2] - 107:23,
108:1
**Bredahl** [1] - 114:14
**BRETT** [1] - 2:5
**Brett** [1] - 13:13
**brett.sagel@usdoj.
gov** [1] - 2:8
**brief** [1] - 5:9
**briefly** [5] - 5:14, 62:3,
114:12
**bring** [4] - 6:16,

114:22, 114:24,
115:10
**broad** [2] - 24:23,
49:23
**broken** [1] - 84:6
**brother** [3] - 29:24,
29:25, 32:11
**brought** [3] - 58:24,
88:23, 115:16
**building** [1] - 16:24
**built** [1] - 84:7
**bulk** [1] - 75:21
**bumpy** [1] - 90:22
**burden** [1] - 92:5
**business** [6] - 22:18,
23:14, 42:19, 45:13,
46:7, 57:16
**but..** [1] - 107:11
**BY** [69] - 2:5, 2:18, 3:3,
3:5, 7:3, 9:18, 13:18,
20:14, 21:3, 26:13,
33:4, 33:11, 33:22,
34:3, 37:6, 41:17,
43:19, 45:2, 48:7,
49:23, 51:9, 54:7,
58:23, 59:10, 59:22,
60:3, 61:5, 62:5,
62:21, 64:2, 64:21,
65:2, 67:9, 67:13,
67:19, 68:19, 70:15,
72:20, 73:23, 74:25,
76:22, 78:9, 79:4,
80:17, 82:2, 82:10,
82:20, 83:8, 83:13,
84:2, 84:17, 87:10,
87:22, 89:3, 89:8,
90:9, 90:19, 90:25,
91:9, 97:4, 100:14,
101:25, 102:21,
103:8, 104:16,
105:16, 106:15,
110:10, 112:8
**Byrne** [2] - 66:14,
66:22

**C**

**CA** [1] - 1:25
**calculate** [1] - 57:13
**calculation** [3] - 52:5,
57:8, 57:24
**California** [7] - 2:7,
2:12, 2:19, 34:6,
34:8, 34:9, 118:7
**CALIFORNIA** [4] - 1:2,
1:17, 5:1, 118:4
**Callahan** [1] - 58:25
**CALLED** [2] - 3:3, 3:5
**cancel** [1] - 99:24
**canceled** [2] - 100:2,

100:4
**Cantrall** [1] - 68:25
**CAP** [1] - 99:13
**capabilities** [2] - 26:6,
114:19
**caps** [1] - 26:25
**Caption** [1] - 97:10
**car** [2] - 53:3
**care** [1] - 77:18
**Carlos** [5] - 13:5,
17:11, 108:15,
110:16
**Case** [1] - 1:7
**case** [84] - 7:21, 7:25,
9:2, 9:3, 12:14,
23:18, 23:19, 24:16,
24:19, 24:25, 28:24,
30:3, 30:5, 30:7,
35:13, 35:14, 36:13,
39:19, 41:21, 41:23,
42:2, 42:11, 42:20,
42:21, 43:15, 44:10,
44:11, 44:12, 44:16,
46:24, 47:2, 47:7,
47:10, 47:11, 47:15,
48:8, 49:12, 51:13,
52:10, 53:18, 54:17,
54:22, 55:1, 55:4,
55:7, 56:1, 58:12,
60:7, 60:14, 60:23,
60:24, 61:13, 61:14,
64:7, 66:20, 68:4,
69:18, 69:24, 70:15,
78:16, 86:22, 89:10,
89:20, 89:25, 90:4,
91:19, 93:6, 94:1,
95:1, 98:20, 100:21,
100:22, 102:5,
102:7, 102:10,
106:17, 106:21,
106:23, 112:12,
113:7, 113:20,
113:21, 115:6
**case-related** [2] -
7:21, 9:2
**cases** [20] - 7:23, 8:2,
8:4, 24:25, 34:5,
34:8, 34:9, 34:12,
34:18, 41:19, 48:3,
54:15, 83:8, 88:23,
89:3, 91:4, 102:4,
102:12, 103:25,
116:17
**casting** [1] - 101:3
**categories** [1] - 41:5
**caused** [1] - 96:13
**CAUTION** [3] - 26:25,
27:14, 62:25
**Central** [1] - 118:7
**CENTRAL** [1] - 1:2

**cents** [3] - 40:22,
40:25, 41:24
**certain** [3] - 7:12,
15:15, 50:4
**certainly** [1] - 49:17
**CERTIFICATE** [1] -
118:1
**CERTIFIED** [1] - 1:6
**certify** [1] - 118:7
**cetera** [2] - 40:14,
102:22
**chain** [1] - 73:8
**chair** [1] - 67:14
**change** [2] - 53:12,
116:8
**characteristic** [1] -
94:2
**characterize** [1] -
101:1
**charge** [11] - 8:14,
8:16, 8:18, 8:20,
8:23, 31:19, 32:10,
40:3, 44:10, 54:11,
56:14
**charged** [5] - 39:23,
40:1, 40:10, 40:22,
57:17
**charges** [1] - 39:20
**Charles** [1] - 70:2
**chart** [2] - 64:3, 67:21
**check** [30] - 9:13,
9:20, 9:24, 9:25,
10:9, 10:14, 23:17,
23:19, 29:15, 29:19,
30:2, 30:13, 30:14,
30:23, 31:4, 33:11,
33:15, 35:21, 35:25,
38:11, 45:8, 62:7,
62:10, 86:2, 86:17,
86:19, 87:1, 87:3,
87:6, 89:11
**checks** [2] - 31:20,
32:4
**chief** [1] - 47:23
**chose** [1] - 66:3
**Christmas** [1] - 94:9
**circumstances** [1] -
56:7
**civil** [5] - 54:22, 56:1,
69:2, 69:9, 69:20
**claiming** [1] - 30:6
**Claims** [2] - 71:12,
99:17
**claims** [1] - 60:6
**clarification** [1] -
85:13
**clarify** [2] - 107:24,
108:2
**clear** [7] - 10:2, 12:24,
38:18, 93:1, 93:23,

94:6, 114:2
**cleared** [1] - 76:11
**client** [25] - 25:16,
41:23, 45:11, 46:25,
50:4, 51:12, 51:17,
52:7, 54:6, 54:8,
56:23, 56:25, 57:4,
57:7, 57:9, 57:14,
57:18, 57:23, 63:10,
83:21, 86:4, 88:1,
88:4, 89:11, 101:3
**Client** [2] - 3:14, 37:7
**clients** [9] - 32:4,
34:18, 41:18, 54:15,
56:9, 63:21, 90:15,
91:15, 99:9
**close** [3] - 59:10, 74:6,
97:23
**closer** [1] - 90:18
**clothing** [1] - 70:9
**Code** [1] - 118:8
**color** [1] - 70:11
**color-blind** [1] - 70:11
**column** [1] - 41:7
**combination** [1] - 45:9
**coming** [1] - 49:8
**comments** [1] - 15:12
**commitment** [1] -
113:15
**committed** [1] - 61:7
**common** [1] - 60:10
**commonplace** [2] -
39:19, 89:17
**communicate** [4] -
10:20, 10:24, 11:5,
67:5
**communicated** [6] -
11:2, 11:8, 11:10,
66:6, 67:10, 106:20
**communicating** [5] -
63:10, 67:15, 106:3,
106:6, 106:10
**communication** [3] -
11:22, 66:1, 72:12
**communications** [3] -
11:12, 106:23, 108:5
**companies** [1] - 44:9
**company** [1] - 110:6
**compensated** [1] -
55:16
**compensation** [1] -
56:6
**complete** [4] - 21:17,
44:20, 73:5, 86:20
**completed** [4] - 43:12,
71:11, 95:19, 99:14
**completes** [1] - 114:4
**complicated** [1] -
39:19
**complications** [1] -

114:16
**complied** [2] - 22:7, 73:6
**Compound** [1] - 103:3
**computer** [1] - 35:18
**concentrate** [1] - 61:22
**concern** [2] - 69:20, 102:1
**concerns** [1] - 114:15
**conclude** [1] - 74:4
**concluded** [2] - 61:1, 117:17
**condition** [4] - 59:23, 60:7, 115:18, 115:19
**conducive** [1] - 114:17
**Conduct** [1] - 50:25
**conduct** [2] - 51:10, 53:5
**Conference** [1] - 118:12
**conference** [7] - 46:18, 66:10, 66:19, 76:2, 93:5, 104:10, 111:14
**conferencing** [1] - 40:13
**conferred** [3] - 64:20, 68:1, 112:7
**confidential** [7] - 23:22, 23:25, 24:4, 24:9, 82:2, 82:4, 98:6
**confidentially** [1] - 98:25
**confirmation** [1] - 78:11
**conformance** [1] - 118:12
**connection** [26] - 10:6, 10:20, 42:1, 42:10, 44:16, 45:13, 48:2, 49:5, 49:12, 49:25, 54:15, 54:20, 55:7, 58:9, 60:3, 60:5, 60:6, 60:14, 61:7, 69:21, 87:16, 98:19, 99:3, 111:14, 112:12, 112:20
**considered** [1] - 81:1
**consulted** [1] - 29:6
**content** [1] - 78:8
**contents** [1] - 28:16
**contingent** [2] - 102:5, 102:7
**continue** [2] - 21:24, 51:9
**Continued** [1] - 4:1
**continues** [1] - 22:5

**control** [2] - 57:5, 57:7
**conversation** [2] - 11:15, 108:11
**conversations** [1] - 11:18
**copies** [2] - 39:14, 40:22
**copy** [3] - 48:22, 50:10, 71:25
**corner** [5] - 35:17, 38:6, 48:23, 49:6, 97:7
**Corporate** [1] - 2:18
**correct** [124] - 5:23, 6:15, 7:7, 7:8, 7:15, 7:16, 7:17, 7:18, 7:23, 7:24, 8:1, 9:5, 9:8, 9:10, 10:1, 10:7, 10:11, 10:18, 11:4, 12:14, 12:15, 13:1, 13:4, 13:24, 16:1, 16:11, 16:22, 17:10, 17:13, 17:20, 17:22, 18:8, 18:14, 20:17, 20:20, 20:21, 21:2, 21:8, 24:2, 24:18, 25:2, 26:16, 26:17, 26:21, 27:13, 28:5, 28:10, 30:1, 31:2, 31:5, 31:24, 32:3, 32:9, 32:11, 33:14, 34:24, 35:15, 38:10, 40:2, 40:9, 40:15, 40:24, 43:25, 44:3, 44:22, 47:1, 47:3, 47:6, 47:22, 50:2, 50:8, 50:24, 52:1, 52:14, 52:15, 53:11, 54:10, 54:18, 54:20, 55:2, 55:10, 55:14, 55:20, 57:1, 58:6, 62:14, 64:22, 65:20, 65:22, 65:24, 66:1, 66:2, 66:4, 66:5, 67:4, 74:12, 80:24, 84:19, 89:18, 90:16, 91:22, 92:2, 92:11, 92:17, 92:19, 93:22, 94:5, 96:4, 96:11, 96:16, 97:10, 97:22, 98:14, 99:4, 99:19, 99:20, 100:3, 100:9, 107:19, 108:15, 111:7, 111:9, 112:17, 118:9
**corrected** [1] - 92:6
**corrective** [12] - 71:10, 91:24, 91:25, 92:1, 94:24, 95:15, 95:18, 97:13, 97:15,

99:4, 99:13, 100:23
**correctly** [3] - 22:9, 27:3, 28:19
**correspondence** [1] - 103:12
**cost** [12] - 8:4, 9:2, 9:19, 30:3, 31:25, 33:12, 35:13, 38:2, 39:5, 40:14, 46:11, 51:25
**Costs** [2] - 3:14, 37:7
**costs** [27] - 7:17, 7:20, 7:21, 8:7, 30:2, 36:11, 36:13, 37:20, 39:10, 39:12, 40:16, 40:20, 41:12, 41:18, 41:23, 42:10, 42:18, 42:19, 44:13, 45:24, 47:5, 54:12, 57:17, 58:3, 64:7, 64:14, 91:16
**Counsel** [3] - 64:20, 68:1, 112:7
**counsel** [7] - 6:14, 28:16, 28:17, 36:23, 70:10, 99:12
**COUNSEL** [2] - 2:1, 2:16
**COUNTY** [1] - 118:3
**county** [1] - 71:8
**County** [37] - 21:18, 22:3, 23:25, 47:24, 58:25, 62:13, 69:8, 69:11, 71:9, 71:12, 77:2, 81:12, 81:15, 81:22, 82:20, 82:24, 83:3, 83:14, 84:20, 86:19, 87:14, 88:15, 88:18, 88:24, 89:4, 89:20, 89:24, 90:20, 91:1, 91:3, 91:20, 92:21, 94:19, 99:15, 99:17
**County's** [1] - 86:19
**couple** [5] - 33:23, 34:3, 75:9, 77:3, 112:8
**course** [5] - 42:19, 45:12, 46:7, 65:16, 106:23
**COURT** [111] - 1:1, 1:24, 5:6, 5:10, 5:17, 5:24, 6:2, 6:7, 6:9, 6:16, 6:19, 6:22, 9:16, 13:16, 20:10, 21:2, 26:11, 33:3, 33:10, 34:2, 35:2, 37:2, 37:5, 38:15, 38:19, 38:21, 41:16, 43:18, 45:17, 45:19,

48:6, 49:22, 51:8, 54:4, 58:21, 59:9, 59:14, 59:17, 59:21, 60:2, 61:3, 61:11, 61:18, 62:2, 63:25, 64:18, 67:8, 67:12, 67:18, 68:5, 68:8, 68:17, 70:13, 72:5, 72:9, 73:21, 74:21, 74:23, 76:20, 78:3, 78:5, 78:25, 79:2, 80:13, 80:15, 81:25, 83:7, 83:11, 83:24, 84:15, 85:12, 85:18, 85:20, 87:9, 87:20, 89:2, 89:7, 90:7, 90:17, 90:24, 91:7, 96:25, 100:11, 100:13, 101:24, 102:18, 103:5, 104:13, 105:14, 106:14, 110:3, 113:2, 113:4, 113:8, 114:2, 114:9, 114:11, 115:1, 115:4, 115:11, 115:13, 115:22, 116:5, 116:8, 116:14, 116:23, 116:25, 117:9, 117:13, 117:15, 118:6
**Court** [15] - 21:25, 36:23, 44:25, 47:23, 59:19, 73:4, 76:3, 98:3, 99:6, 99:11, 99:21, 99:23, 100:5, 118:6, 118:20
**court** [8] - 15:23, 20:2, 20:19, 24:14, 24:20, 39:14, 63:14, 114:25
**courthouse** [4] - 16:25, 17:1, 98:12, 116:10
**courtroom** [8] - 6:2, 17:7, 17:14, 67:1, 67:3, 70:5, 104:25, 115:16
**COURTROOM** [6] - 6:20, 61:16, 68:12, 68:16, 113:25, 117:16
**cover** [1] - 81:4
**covered** [2] - 55:8, 55:22
**crime** [1] - 61:7
**criminal** [3] - 42:6, 52:2, 53:5
**cross** [7] - 35:9, 61:20, 62:6, 62:21,

63:16, 64:3, 117:3
**Cross** [2] - 3:3, 3:6
**CROSS** [2] - 7:2, 87:21
**cross-examination** [6] - 35:9, 62:6, 62:21, 63:16, 64:3, 117:3
**Cross-Examination** [2] - 3:3, 3:6
**CROSS-EXAMINATION** [2] - 7:2, 87:21
**CRR** [1] - 1:23
**CSR** [2] - 1:23, 118:20
**cumulative** [1] - 35:1
**custody** [3] - 25:23, 26:1, 115:1
**custom** [2] - 22:23, 22:24
**customary** [2] - 39:20, 41:20
**cut** [1] - 43:10
**cutting** [1] - 6:3
**CV** [1] - 4:16

## D

**Date** [1] - 118:15
**date** [31] - 12:6, 16:19, 29:13, 33:18, 35:16, 35:19, 35:25, 73:23, 75:7, 76:3, 76:11, 77:5, 78:12, 79:5, 79:20, 79:24, 80:22, 86:5, 86:11, 93:9, 95:13, 97:4, 99:23, 99:25, 100:2, 103:19, 107:11, 110:7, 111:2, 111:21, 111:25
**dated** [5] - 6:12, 6:13, 96:20
**dates** [1] - 94:15
**DAY** [1] - 1:8
**day-to-day** [2] - 32:24, 33:6
**days** [3] - 22:18, 23:14, 23:18
**deadlines** [1] - 99:21
**deal** [2] - 30:24, 47:13
**dealing** [3] - 32:24, 33:6, 94:16
**DEAN** [2] - 2:17, 2:18
**deansteward7777@gmail.com** [1] - 2:20
**Debbie** [1] - 118:20
**DEBBIE** [3] - 1:23, 118:5, 118:19
**decades** [4] - 9:9, 15:4, 32:23, 39:21

**December** [7] - 75:8, 77:6, 80:5, 94:17, 95:13, 96:20, 97:5
**deduct** [1] - 54:14
**deeply** [1] - 116:12
**DEFENDANT** [1] - 2:14
**Defendant** [1] - 1:9
**defendant** [34] - 24:10, 59:5, 59:7, 62:6, 62:24, 64:3, 70:14, 71:8, 71:16, 72:25, 73:9, 73:16, 74:2, 74:10, 74:17, 75:12, 75:15, 76:15, 76:22, 77:11, 77:24, 78:10, 78:21, 79:14, 79:23, 80:18, 85:3, 85:25, 86:25, 87:3, 87:4, 87:7, 87:10, 114:22
**defendant's** [2] - 68:3, 86:18
**defendants** [4] - 21:18, 59:1, 59:3, 99:8
**defending** [1] - 69:3
**defense** [5] - 69:6, 69:7, 69:18, 70:10, 114:10
**defined** [1] - 10:15
**definitely** [2] - 20:5, 50:19
**delay** [6] - 75:19, 76:1, 76:9, 101:1, 102:6, 102:10
**delayed** [2] - 100:19, 100:22
**demanded** [1] - 97:20
**denied** [1] - 51:8
**department** [3] - 30:20, 94:22, 95:16
**Department** [4] - 71:9, 92:21, 94:25, 99:15
**departments** [1] - 69:3
**dependent** [1] - 20:12
**depo** [1] - 39:14
**deposit** [2] - 30:20, 33:11
**deposited** [1] - 30:14
**depositing** [2] - 30:24, 31:20
**deposition** [7] - 44:9, 60:13, 60:14, 60:16, 60:17, 60:19, 89:19
**depositions** [4] - 8:8, 43:13, 43:23, 44:9
**deputy** [2] - 6:3, 6:6
**DEPUTY** [6] - 6:20, 61:16, 68:12, 68:16,

113:25, 117:16
**describe** [3] - 7:19, 11:5, 11:7
**described** [1] - 71:14
**desire** [1] - 117:10
**detailed** [1] - 60:19
**details** [3] - 13:22, 34:22, 84:11
**dhinospaan@yahoo. com** [1] - 1:25
**Diego** [1] - 105:4
**different** [8] - 7:22, 19:14, 19:19, 19:20, 19:21, 76:6, 88:6
**differently** [1] - 84:4
**difficult** [1] - 94:7
**dime** [1] - 9:4
**DIRECT** [1] - 68:18
**Direct** [1] - 3:6
**direct** [14] - 5:20, 14:17, 21:13, 23:24, 35:5, 35:12, 37:24, 61:20, 66:1, 67:20, 94:15, 96:6, 100:14, 117:1
**directed** [3] - 84:3, 89:10, 116:25
**directly** [1] - 11:10
**disagree** [3] - 9:11, 9:22, 10:1
**disbursed** [1] - 91:20
**disclosed** [2] - 24:11, 51:12
**discount** [1] - 44:11
**discuss** [6] - 28:15, 28:25, 61:13, 87:4, 87:7, 113:19
**discussed** [1] - 13:22
**discussion** [2] - 13:22, 28:17
**discussions** [1] - 114:5
**dismissal** [5] - 24:3, 24:4, 24:8, 28:2, 28:4
**dismissed** [4] - 22:17, 23:14, 23:18, 23:20
**dispute** [5] - 11:20, 26:8, 35:19, 43:15, 111:11
**District** [2] - 118:6, 118:7
**DISTRICT** [3] - 1:1, 1:2, 1:3
**DIVISION** [1] - 1:2
**DMV** [1] - 52:9
**docket** [1] - 42:25
**document** [54] - 8:22, 14:16, 14:17, 22:11, 22:22, 26:19, 27:11,

27:19, 27:20, 28:3, 29:16, 35:16, 36:4, 36:5, 36:12, 37:7, 37:11, 39:4, 45:4, 45:7, 45:12, 46:5, 46:6, 46:8, 46:13, 46:20, 48:21, 48:24, 49:25, 50:6, 50:16, 50:17, 51:3, 51:15, 51:16, 62:22, 63:2, 63:4, 63:7, 71:21, 72:16, 73:13, 74:14, 76:9, 81:7, 81:8, 82:9, 95:10, 96:11, 96:14, 98:6, 99:2, 110:24, 111:9
**documents** [41] - 13:25, 14:1, 14:2, 14:3, 14:4, 14:8, 15:6, 15:7, 15:17, 15:21, 16:2, 18:10, 18:11, 18:16, 19:7, 19:25, 20:2, 20:12, 20:14, 24:22, 25:10, 25:12, 26:3, 26:9, 27:7, 45:25, 49:5, 49:7, 50:4, 63:14, 74:5, 94:14, 109:2, 109:3, 109:6, 109:9, 109:13, 109:20, 109:24, 110:12
**dollars** [2] - 8:5, 64:15
**done** [9] - 10:17, 15:2, 56:8, 57:3, 66:8, 71:6, 86:24, 93:24, 94:9
**doors** [1] - 104:10
**doubt** [5] - 18:23, 19:1, 25:24, 42:24, 43:5
**down** [9] - 12:1, 12:5, 24:20, 48:23, 61:18, 68:6, 76:10, 82:19, 98:12
**draft** [1] - 22:4
**Draft** [1] - 3:18
**dragging** [1] - 94:23
**dress** [5] - 107:18, 107:20, 107:23, 108:17, 108:19
**due** [9] - 52:7, 57:9, 57:13, 57:23, 58:18, 67:20, 112:11, 114:16, 115:5
**duplicative** [1] - 85:19
**during** [23] - 13:22, 15:10, 15:16, 15:21, 16:5, 16:7, 18:9, 18:20, 19:3, 20:15, 65:16, 66:18, 67:5,

67:9, 70:15, 90:4, 105:10, 105:11, 106:1, 107:20, 107:23, 108:19, 109:2
**duty** [1] - 55:3

**E**

**e-mail** [50] - 3:20, 3:22, 4:5, 4:7, 4:9, 4:11, 4:13, 11:9, 11:10, 71:23, 71:25, 72:8, 72:9, 72:10, 72:11, 72:14, 72:20, 73:8, 73:15, 73:23, 73:25, 74:16, 74:25, 75:7, 75:9, 75:17, 75:22, 76:4, 76:14, 77:5, 77:11, 77:19, 77:23, 78:8, 78:10, 78:20, 79:5, 80:9, 80:17, 85:2, 85:6, 85:8, 85:14, 85:17, 86:1, 86:5, 103:11, 107:6
**e-mailed** [2] - 14:13, 65:23
**e-mailing** [2] - 79:5, 79:7
**e-mails** [3] - 3:18, 79:17, 79:18
**EA** [1] - 3:16
**Eagan** [16] - 22:18, 23:15, 23:17, 23:19, 42:17, 43:22, 45:9, 45:10, 59:1, 59:7, 60:23, 63:9, 63:12, 63:15, 64:6, 86:4
**earliest** [1] - 74:25
**early** [2] - 80:5, 102:4
**effect** [2] - 51:2, 51:11
**effectuated** [1] - 102:24
**effort** [2] - 58:17, 65:25
**eight** [1] - 107:1
**either** [11] - 22:8, 25:6, 29:5, 42:6, 44:9, 70:24, 73:6, 83:4, 84:12, 92:15, 117:7
**embarrassed** [2] - 41:11, 41:14
**eminent** [1] - 117:6
**employment** [1] - 69:4
**enclosure** [1] - 81:7
**end** [7] - 9:3, 44:10, 84:20, 104:2, 104:3, 113:13, 117:10
**enforce** [1] - 116:14

**enjoyed** [1] - 90:9
**enter** [2] - 58:8, 70:16
**entire** [6] - 9:12, 9:23, 10:13, 21:16, 97:13, 104:17
**entitled** [8] - 9:3, 37:7, 53:18, 54:2, 54:9, 55:15, 116:8, 118:11
**entity** [2] - 24:1, 24:10
**entry** [1] - 40:25
**equity** [3] - 32:16, 32:23, 33:5
**ESQ** [2] - 2:15, 2:18
**establish** [1] - 87:15
**established** [2] - 73:4, 87:12
**estimate** [8] - 12:16, 31:16, 34:12, 37:16, 89:3, 106:25, 117:1, 117:3
**et** [2] - 40:14, 102:22
**eve** [1] - 47:15
**evening** [1] - 113:23
**event** [2] - 110:21, 110:22
**events** [1] - 20:11
**EVIDENCE** [2] - 3:13, 4:4
**evidence** [17] - 21:1, 25:11, 26:2, 30:9, 37:2, 38:13, 44:15, 44:18, 45:16, 50:10, 50:13, 50:16, 72:4, 81:3, 86:7, 110:1, 112:22
**exact** [4] - 19:10, 39:7, 57:12, 78:12
**exactly** [2] - 19:25, 92:22
**Examination** [5] - 3:3, 3:4, 3:4, 3:6, 3:6
**EXAMINATION** [5] - 7:2, 62:4, 65:1, 68:18, 87:21
**examination** [12] - 23:24, 35:5, 35:9, 35:12, 61:19, 62:6, 62:21, 63:16, 64:3, 72:7, 100:15, 117:3
**examinations** [1] - 61:23
**except** [1] - 114:7
**exception** [1] - 114:3
**exchange** [13] - 21:17, 71:23, 72:1, 73:15, 73:23, 74:16, 76:14, 77:23, 78:20, 80:9, 85:2, 85:6, 85:8
**excused** [2] - 113:4, 113:9

**executed** [5] - 51:3, 75:4, 75:5, 79:8, 79:10
**Executed** [2] - 3:23, 4:10
**executing** [1] - 102:22
**Exhibit** [54] - 20:25, 29:9, 29:10, 33:20, 35:3, 35:11, 36:2, 36:24, 36:25, 37:6, 38:13, 38:16, 39:4, 39:13, 44:24, 45:20, 45:24, 50:18, 62:15, 62:20, 71:19, 72:4, 72:17, 73:11, 73:19, 73:22, 74:13, 74:19, 74:24, 76:12, 76:17, 76:21, 77:21, 78:1, 78:6, 78:18, 78:23, 79:3, 80:7, 80:11, 80:16, 81:4, 84:25, 85:11, 85:22, 86:8, 95:8, 95:19, 95:20, 96:6, 96:7, 96:8, 96:23, 97:1
**exhibit** [5] - 26:14, 62:17, 77:21, 82:9, 82:17
**EXHIBIT** [2] - 3:13, 4:4
**exhibits** [1] - 15:15
**EXHIBITS** [2] - 3:11, 4:2
**existed** [1] - 65:3
**expand** [1] - 40:19
**expect** [3] - 56:4, 56:5, 64:12
**expectation** [1] - 64:21
**expected** [2] - 47:10, 55:24
**expedited** [2] - 95:2, 95:3
**expenses** [7] - 7:21, 8:12, 52:6, 53:7, 53:9, 53:14, 57:13
**experience** [24] - 7:20, 8:4, 9:9, 15:4, 19:11, 32:22, 33:4, 33:7, 39:21, 53:5, 53:17, 54:2, 57:6, 63:20, 88:1, 88:5, 90:19, 90:25, 91:14, 94:4, 102:12, 102:16, 102:21, 103:7
**expert** [2] - 8:2, 39:14
**experts** [2] - 8:4, 44:12
**explain** [5] - 14:5, 23:1, 23:11, 28:21, 71:16

**exponentially** [2] - 43:7, 43:16
**expressly** [4] - 22:16, 23:3, 23:5, 23:13
**extends** [1] - 5:23
**extensive** [1] - 108:7
**extent** [2] - 6:14, 114:22
**eye** [2] - 90:5

**F**

**face** [1] - 9:25
**facility** [2] - 114:16, 115:3
**fact** [6] - 23:24, 42:1, 43:15, 76:1, 76:8, 88:3
**facts** [1] - 115:19
**fair** [18] - 25:5, 29:22, 31:16, 37:16, 49:8, 51:24, 71:25, 88:18, 89:8, 90:5, 90:22, 95:4, 100:5, 100:25, 101:6, 101:9, 104:4
**familiar** [3] - 69:11, 69:14, 85:8
**far** [2] - 75:20, 99:3
**February** [1] - 12:3
**FEDERAL** [2] - 1:24, 118:5
**Federal** [1] - 118:20
**federal** [8] - 18:25, 19:17, 24:14, 27:8, 54:22, 56:1, 93:5, 96:14
**fee** [8] - 45:8, 46:20, 51:11, 51:21, 51:22, 52:18, 52:21, 52:25
**Fee** [1] - 3:16
**fee-splitting** [1] - 51:11
**fees** [15] - 7:15, 8:2, 8:10, 9:19, 29:20, 36:11, 36:12, 39:14, 42:17, 52:6, 52:7, 52:13, 57:17, 58:3, 64:14
**feet** [1] - 94:23
**few** [6] - 69:4, 71:15, 90:8, 93:11, 106:22, 108:11
**fighting** [1] - 102:15
**figure** [1] - 21:10
**file** [7] - 42:20, 50:19, 50:20, 50:21, 50:22, 50:23, 98:24
**filed** [5] - 5:12, 69:11, 96:14, 96:18, 98:9
**Filed** [1] - 97:5

**files** [1] - 37:11
**filing** [1] - 8:10
**filings** [4] - 24:16, 24:25, 43:14, 63:22
**final** [4] - 72:14, 81:1, 81:12, 112:8
**finalized** [3] - 71:7, 74:9, 93:17
**finalizing** [1] - 74:6
**financial** [1] - 84:9
**fine** [5] - 6:7, 38:20, 73:10, 115:22, 116:6
**finish** [1] - 43:11
**finished** [1] - 86:23
**finishes** [1] - 5:20
**firm** [44] - 8:16, 10:17, 29:23, 30:9, 30:14, 30:23, 31:9, 31:19, 32:7, 32:10, 32:16, 33:5, 34:23, 36:16, 37:7, 42:12, 42:19, 43:6, 43:9, 43:16, 43:20, 44:1, 44:4, 45:7, 46:23, 52:16, 53:15, 53:24, 62:7, 63:9, 63:13, 65:4, 65:8, 65:10, 68:24, 69:15, 69:24, 81:5, 86:9, 86:18, 93:9
**firm's** [3] - 29:21, 29:22, 45:9
**firms** [7] - 8:14, 32:23, 44:12, 52:19, 53:2, 54:11, 54:14
**first** [25] - 11:22, 21:16, 27:22, 37:24, 38:2, 38:12, 38:17, 48:7, 48:13, 55:22, 60:24, 61:1, 66:13, 68:13, 68:14, 71:8, 72:9, 75:17, 75:21, 75:24, 82:17, 85:14, 95:20, 96:2, 97:2
**five** [8] - 10:24, 11:2, 11:8, 22:18, 23:17, 107:4, 113:14, 116:4
**flags** [1] - 89:15
**focus** [3] - 34:17, 34:20, 82:16
**focuses** [1] - 34:19
**focusing** [5] - 72:20, 73:8, 74:25, 79:4, 80:17
**follow** [1] - 23:21
**following** [4] - 9:12, 9:23, 22:18, 23:15
**FOR** [3] - 2:3, 2:14, 2:16
**foregoing** [1] - 118:9
**foresee** [1] - 72:12

**forget** [2] - 35:7, 45:23
**form** [3] - 61:14, 111:11, 113:20
**format** [1] - 118:11
**former** [1] - 47:23
**forms** [1] - 7:22
**foundation** [7] - 37:4, 60:2, 83:25, 91:6
**four** [2] - 6:11, 116:4
**fourth** [1] - 60:25
**frame** [1] - 11:25
**Frank** [3] - 59:2, 59:10, 59:20
**free** [1] - 55:16
**friend** [1] - 59:11
**front** [44] - 14:12, 21:6, 29:11, 33:21, 37:1, 45:3, 47:20, 48:3, 48:11, 62:19, 71:19, 94:14, 116:17
**full** [1] - 21:15
**fully** [2] - 28:14, 75:4
**functions** [2] - 32:7, 33:7
**funds** [5] - 21:22, 22:19, 23:16, 62:12, 87:1
**future** [1] - 6:6

**G**

**GEJ** [1] - 48:24
**general** [6] - 11:25, 33:23, 49:4, 55:17, 55:18, 103:25
**generally** [9] - 7:19, 19:12, 26:15, 32:6, 32:24, 56:15, 83:20, 94:20, 103:12
**gentleman** [4] - 17:12, 66:13, 67:1, 67:2
**gentlemen** [3] - 6:22, 61:11, 113:10
**Geoff** [3] - 36:3, 77:18, 77:19
**Geoffrey** [13] - 9:13, 9:24, 45:5, 58:15, 63:10, 69:12, 70:3, 81:13, 81:16, 82:11, 86:25, 112:11, 114:13
**given** [1] - 20:12
**Government** [32] - 6:14, 10:20, 11:10, 11:13, 11:23, 14:17, 15:12, 16:5, 16:7, 16:18, 19:4, 19:16, 35:6, 35:8, 35:12, 36:19, 36:23, 37:12, 45:25, 50:3, 58:9,

68:8, 72:3, 73:18, 85:10, 106:20, 108:5, 108:8, 114:13, 114:21, 117:14
**government** [5] - 74:19, 76:17, 78:1, 78:23, 80:11
**GOVERNMENT** [2] - 7:1, 68:11
**Government's** [3] - 5:17, 81:3, 86:8
**governmental** [1] - 24:1
**great** [1] - 35:3
**greater** [2] - 43:7, 43:16
**grew** [1] - 105:5
**gross** [1] - 52:18
**ground** [1] - 114:2
**guess** [3] - 73:2, 76:11, 116:19

**H**

**H-u-r-r-e-l-l** [1] - 68:15
**half** [9] - 12:10, 12:17, 13:19, 15:10, 18:6, 18:12, 18:24, 19:17, 108:6
**halfway** [1] - 82:18
**hallway** [1] - 105:20
**hand** [11] - 35:17, 38:5, 38:6, 41:3, 41:7, 48:23, 49:6, 65:4, 66:10, 97:7, 104:11
**handicap** [4] - 114:19, 114:21, 114:24, 115:9
**handicap-accessible** [4] - 114:19, 114:21, 114:24, 115:9
**handle** [1] - 55:12
**handwriting** [1] - 52:4
**handwritten** [1] - 108:25
**HANNA** [2] - 2:4, 2:9
**Hanukkah** [1] - 94:10
**happy** [2] - 41:5, 96:2
**heading** [1] - 82:18
**health** [2] - 114:15, 114:17
**heard** [3] - 75:25, 103:6, 103:8
**hearing** [4] - 99:23, 99:24, 100:2, 110:8
**hearings** [1] - 8:8
**hearsay** [2] - 72:7, 72:10

held [1] - 118:10
help [5] - 16:2, 54:22, 59:4, 109:13, 109:21
helped [1] - 20:18
helpful [2] - 20:13, 90:15
hereby [1] - 99:11, 118:7
hidden [2] - 98:9, 98:22
hide [4] - 50:3, 98:15, 98:19, 98:21
high [2] - 31:15, 73:2
higher [1] - 73:8
highly [1] - 115:18
HINO [3] - 1:23, 118:5, 118:19
Hino [1] - 118:20
HINO-SPAAN [3] - 1:23, 118:5, 118:19
Hino-Spaan [1] - 118:20
hold [1] - 44:10
holidays [3] - 94:9, 94:19, 96:3
home [3] - 115:2, 115:4, 116:9
Honor [81] - 5:8, 5:11, 5:16, 5:22, 5:25, 6:5, 6:10, 6:17, 6:24, 9:14, 13:15, 20:9, 21:1, 33:9, 35:1, 37:3, 38:12, 38:14, 38:17, 38:20, 45:15, 45:18, 58:7, 59:16, 61:2, 62:3, 63:23, 64:17, 64:19, 64:24, 67:7, 67:25, 68:2, 72:3, 72:6, 72:8, 72:18, 73:18, 73:20, 74:20, 76:18, 76:19, 78:2, 78:4, 78:24, 80:12, 81:24, 83:6, 83:10, 83:23, 85:5, 85:10, 85:13, 85:15, 85:16, 85:19, 87:8, 87:18, 93:16, 94:4, 96:22, 96:24, 97:17, 101:12, 110:2, 112:6, 113:3, 113:6, 114:8, 114:10, 114:12, 115:12, 115:14, 115:24, 116:2, 116:12, 116:13, 116:18, 117:5, 117:12, 117:14
HONORABLE [1] - 1:3
Honorable [1] - 96:15
hope [2] - 77:16, 96:1

hoped [1] - 77:9
hour [11] - 12:17, 13:19, 15:10, 18:6, 18:11, 18:24, 19:16
hour-and-a-half [2] - 15:10, 18:24
hours [1] - 12:10
hundreds [3] - 8:5, 89:9, 89:13
HURRELL [2] - 3:5, 68:11
Hurrell [19] - 3:21, 3:22, 4:6, 4:7, 4:9, 4:11, 4:13, 66:17, 66:19, 67:10, 68:10, 68:15, 68:20, 68:25, 72:20, 82:10, 87:23, 106:19, 116:3

**I**

idea [9] - 9:17, 25:8, 36:15, 53:14, 65:3, 65:7, 65:10, 112:10, 112:18
identical [1] - 108:9
identified [2] - 49:7, 70:14
identifier [1] - 49:6
identify [2] - 67:1, 70:8
illegal [5] - 7:9, 9:7, 40:8, 112:19, 112:23
immediate [1] - 76:2
immediately [2] - 13:6, 104:9
impanel [2] - 93:12, 93:25
imply [1] - 76:8
impossible [3] - 38:24, 57:16, 94:7
improper [1] - 101:19
IN [3] - 2:14, 3:12, 4:4
in-person [2] - 27:12, 112:1, 112:3
inability [1] - 60:20
include [2] - 8:7, 41:21
included [1] - 91:24
includes [1] - 28:11
including [3] - 11:11, 28:24, 40:25
incorrect [1] - 12:20
incurred [2] - 40:14, 42:10
indicate [1] - 70:13
indigent [1] - 114:18
individual [1] - 69:12
individuals [3] - 90:20, 106:4, 106:16

inform [2] - 6:6, 99:11
information [3] - 58:4, 84:10, 84:11
initial [2] - 92:25, 113:12
injuries [1] - 69:21
input [1] - 16:8
instance [3] - 43:24, 54:21, 92:5
instances [1] - 44:8
instant [1] - 99:7
instructions [2] - 84:22, 113:12
intended [1] - 107:17
intense [1] - 86:22
intention [1] - 100:4
interest [2] - 52:6, 54:11
Internet [1] - 40:3
interrupt [1] - 14:21
interviewed [1] - 11:13
invoice [8] - 110:6, 110:24, 111:1, 111:2, 111:17, 111:19, 111:23, 112:3
involve [2] - 8:2, 83:1
involved [4] - 23:25, 24:12, 42:21, 102:12
involvement [1] - 23:2
involving [2] - 83:8, 89:25
issuance [1] - 22:4
issue [1] - 5:8
issued [2] - 22:1, 31:4
issues [3] - 32:25, 61:14, 113:20
Item [1] - 52:10
item [1] - 57:19
itemized [1] - 58:3
Items [1] - 67:20
items [2] - 57:23, 64:14

**J**

jail [3] - 25:15, 25:17, 25:20
James [3] - 13:9, 107:8
JAMES [1] - 1:3
January [8] - 77:12, 78:9, 78:14, 79:6, 80:3, 80:23, 86:6, 86:12
Jason [3] - 59:2, 59:10, 59:20
Jencks [3] - 5:12, 5:18, 6:11

JOHN [2] - 1:8, 2:15
Johnson [100] - 3:14, 3:18, 3:21, 3:22, 4:6, 4:8, 4:10, 4:12, 4:14, 4:16, 8:20, 8:23, 10:13, 11:23, 21:7, 23:2, 25:7, 25:12, 25:20, 26:2, 28:8, 28:24, 30:7, 31:7, 31:10, 33:12, 34:5, 34:11, 36:13, 36:16, 37:9, 39:10, 39:23, 40:22, 41:11, 42:11, 43:7, 43:20, 45:5, 45:13, 48:2, 48:8, 48:13, 48:21, 49:16, 53:18, 53:22, 54:21, 55:3, 55:6, 58:15, 58:17, 60:6, 60:13, 60:22, 61:8, 62:13, 63:2, 63:6, 63:11, 63:13, 64:12, 64:15, 64:21, 65:4, 65:8, 65:14, 65:15, 66:1, 66:7, 67:19, 69:12, 69:21, 70:3, 70:15, 78:15, 81:13, 81:16, 82:6, 82:11, 82:21, 82:24, 83:14, 87:1, 87:4, 87:7, 87:12, 87:15, 89:19, 89:22, 89:25, 90:2, 91:1, 92:10, 110:17, 112:11, 114:13, 114:23, 114:24, 115:15
Johnson's [25] - 7:10, 9:5, 9:13, 9:24, 10:6, 13:23, 24:19, 25:1, 36:3, 42:2, 43:15, 50:17, 52:10, 59:23, 60:20, 62:18, 64:7, 65:11, 75:13, 78:16, 82:13, 91:18, 109:14, 109:16, 112:20
join [1] - 60:23
joint [1] - 97:12
Joint [2] - 4:6, 4:15
judge [4] - 47:20, 47:23, 93:5, 96:14
JUDGE [1] - 1:3
Judge [3] - 48:1, 48:4, 110:8
judges [1] - 116:17
judgment [1] - 60:18
Judicial [1] - 118:12
July [3] - 16:17, 107:7, 118:15
JULY [2] - 1:15, 5:1

June [3] - 12:13, 20:23, 112:4
jury [31] - 5:5, 6:16, 6:21, 7:19, 10:5, 11:7, 14:5, 19:25, 20:20, 22:14, 23:1, 23:11, 28:21, 34:12, 38:23, 40:20, 41:8, 45:22, 53:10, 61:6, 61:17, 62:1, 77:14, 93:12, 93:25, 95:9, 97:3, 99:24, 101:11, 114:1, 115:16
jury's [2] - 6:4, 21:13

**K**

keep [1] - 41:20, 98:22
keeping [2] - 31:25, 97:23
kept [1] - 46:7
Kim [8] - 12:2, 13:9, 17:9, 17:14, 67:2, 107:8, 107:9
kind [2] - 104:6, 107:18
knowledge [15] - 33:2, 37:21, 38:3, 58:20, 59:22, 60:1, 81:21, 86:25, 87:14, 96:17, 98:13, 98:18, 112:21, 112:22, 112:24
known [2] - 54:11, 54:14, 112:16
knows [1] - 99:24

**L**

L.A [1] - 71:9
lack [2] - 58:19, 90:22
ladies [3] - 6:22, 61:11, 113:10
laid [1] - 117:5
language [8] - 19:21, 28:2, 28:4, 29:3, 72:21, 72:24, 73:3, 74:8
large [1] - 41:21
last [15] - 26:13, 28:6, 32:22, 33:4, 37:16, 44:22, 61:5, 68:13, 68:15, 75:9, 89:4, 102:22, 104:6, 108:6, 115:24
lasted [5] - 12:10, 12:16, 13:19, 18:6, 107:12
LAW [1] - 2:17
law [14] - 31:9, 31:19,

32:7, 32:10, 32:23, 37:7, 68:24, 69:1, 69:4, 69:23, 81:4, 86:9, 86:18
**lawsuit** [14] - 21:18, 22:16, 23:13, 24:4, 24:12, 26:19, 58:24, 69:9, 69:11, 69:14, 69:20, 70:23, 82:21, 87:16
**lawyer** [10] - 33:25, 76:5, 89:10, 89:24, 90:2, 102:2, 103:15, 103:19, 104:22, 105:7
**lawyers** [6] - 14:25, 15:1, 88:25, 90:21, 103:21, 104:2
**lay** [3] - 28:23, 37:4, 60:2
**layman's** [2] - 23:4, 23:11
**lead** [5] - 47:2, 69:18, 81:22, 89:24, 90:2
**leadership** [3] - 92:20, 92:22, 94:22
**learn** [2] - 48:3, 63:21
**learned** [1] - 64:11
**least** [3] - 13:2, 19:18, 33:5
**leave** [1] - 116:10
**led** [1] - 115:17
**Lefkowitz** [1] - 48:10
**left** [7] - 13:6, 17:9, 17:12, 34:22, 67:2, 67:14, 97:7
**left-hand** [1] - 97:7
**legal** [3] - 28:16, 28:17, 54:18
**legitimate** [2] - 37:20, 37:23
**lengthy** [1] - 93:2
**less** [1] - 10:24
**letter** [4] - 81:8, 86:9, 86:11, 86:14
**letterhead** [1] - 32:13
**letting** [1] - 114:23
**level** [2] - 33:6, 73:2
**levels** [1] - 72:6
**liability** [1] - 69:4
**lien** [2] - 44:12, 44:14
**light** [2] - 115:19, 117:5
**Linda** [1] - 48:10
**line** [5] - 21:15, 40:10, 57:19, 57:23, 78:15
**lineup** [1] - 116:9
**list** [1] - 45:24
**listed** [1] - 83:20
**litigated** [1] - 34:9

**litigating** [3] - 34:5, 34:8, 103:1
**litigation** [4] - 19:11, 65:16, 69:3, 88:13
**lives** [1] - 105:5
**living** [3] - 53:22, 65:11, 114:16
**LLP** [1] - 86:4
**logistically** [1] - 115:21
**look** [14] - 8:22, 14:16, 14:18, 27:17, 35:11, 62:15, 71:18, 73:11, 74:13, 80:7, 82:10, 84:25, 94:14, 94:15
**looked** [2] - 27:7, 76:23
**looks** [2] - 35:18, 95:19
**LOS** [1] - 118:3
**Los** [26] - 2:12, 12:3, 21:19, 22:3, 24:1, 47:24, 62:13, 69:8, 69:12, 71:12, 81:13, 82:20, 87:15, 88:16, 88:18, 88:24, 89:4, 89:20, 89:25, 90:20, 90:21, 91:1, 92:21, 99:14, 99:16
**lose** [1] - 117:8
**Louis** [1] - 47:20
**lower** [2] - 35:17, 38:5
**lump** [2] - 83:15, 84:18
**lunch** [1] - 67:5, 67:9, 105:10, 105:19

---

**M**

**mail** [50] - 3:20, 3:22, 4:5, 4:7, 4:9, 4:11, 4:13, 11:9, 11:10, 71:23, 71:25, 72:8, 72:9, 72:10, 72:11, 72:14, 72:20, 73:8, 73:15, 73:23, 73:25, 74:16, 74:25, 75:7, 75:9, 75:17, 75:22, 76:4, 76:14, 77:5, 77:11, 77:19, 77:23, 78:8, 78:10, 78:20, 79:5, 80:9, 80:17, 85:2, 85:6, 85:8, 85:14, 85:17, 86:1, 86:5, 103:11, 107:6
**mailed** [2] - 14:13, 65:23
**mailing** [2] - 79:5, 79:7
**mails** [3] - 3:18, 79:17,

79:18
**main** [1] - 34:20
**maintain** [1] - 45:12
**managing** [1] - 32:12
**manner** [1] - 30:10
**March** [1] - 87:14
**Mark** [1] - 66:13
**marshals'** [1] - 114:18
**material** [1] - 5:19
**Matt** [1] - 29:25
**matter** [27] - 11:23, 19:22, 22:1, 23:2, 33:12, 37:9, 41:18, 41:24, 45:5, 45:13, 54:18, 54:21, 58:9, 58:14, 79:20, 87:4, 87:7, 93:25, 95:16, 95:21, 100:24, 102:14, 102:16, 103:2, 106:2, 108:6, 118:11
**mattered** [1] - 100:7
**matters** [2] - 6:3, 56:9
**McNicholas** [20] - 3:3, 3:14, 3:16, 6:1, 6:11, 7:1, 7:4, 32:14, 36:3, 59:10, 62:6, 65:3, 70:4, 104:19, 105:5, 105:10, 105:20, 106:11
**me's** [1] - 92:12
**meals** [1] - 39:23
**mean** [17] - 6:6, 11:5, 14:2, 14:6, 24:25, 28:23, 30:21, 31:11, 36:8, 42:25, 72:8, 75:5, 77:1, 84:5, 91:8, 98:21, 109:17
**meaning** [7] - 29:3, 46:24, 80:22, 91:11, 94:9, 99:24, 111:13
**means** [5] - 23:6, 23:12, 23:17, 28:22, 77:4
**meant** [1] - 12:24
**mechanically** [2] - 30:19, 30:22
**mediated** [1] - 48:11
**mediation** [15] - 47:18, 48:2, 48:7, 48:13, 60:25, 64:10, 70:16, 70:18, 70:22, 110:5, 110:6, 110:17, 111:4, 111:8, 111:14
**mediator** [1] - 48:11
**medical** [1] - 115:18
**meet** [4] - 10:19, 10:24, 82:6, 94:20
**meeting** [28] - 12:1, 12:5, 12:10, 14:8,

16:17, 16:20, 16:23, 17:21, 17:23, 17:25, 18:6, 18:9, 18:20, 18:24, 19:3, 20:4, 20:15, 27:12, 27:20, 35:7, 46:17, 77:2, 77:4, 104:11, 107:7, 108:7, 112:1, 112:3
**meetings** [2] - 107:2, 109:3
**Meisinger** [4] - 47:21, 47:25, 48:1, 48:4
**member** [1] - 98:12
**members** [2] - 11:16, 12:1
**memories** [1] - 18:19
**memory** [1] - 111:1
**met** [9] - 11:1, 19:16, 27:8, 45:25, 46:15, 108:14, 108:24, 110:10, 110:15
**methods** [1] - 11:7
**mic** [1] - 90:18
**Michael** [7] - 9:12, 9:23, 10:13, 59:2, 59:7, 72:12, 96:3
**MICHAEL** [2] - 1:8, 2:15
**midafternoon** [1] - 61:12
**middle** [6] - 27:23, 76:22, 95:22, 104:3, 105:16, 105:24
**might** [1] - 54:15
**million** [25] - 9:13, 9:20, 9:24, 10:9, 10:13, 21:10, 21:14, 21:19, 27:22, 52:11, 52:14, 52:16, 52:18, 52:24, 52:25, 53:2, 64:12, 64:13, 71:4, 82:22, 84:18, 84:20, 86:17, 86:19, 93:1
**millions** [1] - 8:5
**mind** [7] - 8:24, 18:22, 36:9, 42:6, 43:5, 75:21, 101:18
**minor** [1] - 41:18
**minute** [1] - 105:11
**minutes** [3] - 61:12, 107:12, 113:14
**miscellaneous** [1] - 42:18
**misstated** [1] - 6:14
**mistaken** [1] - 95:10
**moment** [5] - 45:3, 58:7, 61:2, 64:17, 64:19, 67:25, 85:5, 87:18, 112:6
**moments** [1] - 66:9

**money** [27] - 10:16, 21:14, 30:7, 30:10, 35:23, 36:6, 36:16, 43:6, 43:20, 51:20, 51:23, 51:25, 52:17, 53:3, 53:21, 54:1, 55:25, 62:10, 65:7, 65:10, 67:19, 88:3, 91:8, 91:15, 91:20
**monies** [4] - 43:16, 58:18, 87:25, 112:11
**month** [2] - 78:14, 80:4
**months** [5] - 35:23, 42:21, 42:25, 47:7, 71:15
**morning** [3] - 10:19, 113:24, 116:2
**Morrow** [2] - 96:15, 110:8
**most** [6] - 19:14, 24:21, 25:4, 90:9, 102:4, 108:7
**motion** [2] - 5:12, 60:18
**move** [7] - 38:12, 45:15, 51:5, 59:15, 59:17, 99:21, 99:25
**moved** [2] - 93:15, 100:1
**moves** [8] - 72:3, 73:18, 74:19, 76:17, 78:1, 78:23, 80:11, 85:10
**moving** [3] - 77:8, 85:16, 95:25
**MR** [200] - 2:16, 5:8, 5:11, 5:22, 5:25, 6:5, 6:8, 6:10, 6:17, 6:24, 7:3, 9:14, 9:18, 13:15, 13:18, 20:9, 20:14, 20:25, 21:3, 26:10, 26:13, 29:9, 29:12, 30:12, 33:1, 33:4, 33:9, 33:11, 33:20, 33:22, 34:1, 34:3, 35:1, 35:3, 36:2, 36:22, 37:3, 37:6, 38:12, 38:14, 38:17, 38:20, 38:22, 39:3, 41:2, 41:15, 41:17, 43:17, 43:19, 44:24, 45:2, 45:15, 45:18, 45:21, 48:5, 48:7, 49:21, 49:23, 51:9, 54:3, 54:7, 58:7, 58:19, 58:23, 59:8, 59:10, 59:13, 59:16, 59:18, 59:22, 59:25, 60:3, 61:2,

61:5, 61:10, 62:3,
62:5, 62:16, 62:21,
63:23, 64:2, 64:17,
64:19, 64:21, 64:24,
65:2, 67:6, 67:9,
67:11, 67:13, 67:17,
67:19, 67:25, 68:2,
68:10, 68:19, 70:12,
70:15, 72:3, 72:6,
72:18, 72:20, 73:18,
73:20, 73:23, 74:19,
74:22, 74:25, 76:17,
76:19, 76:22, 78:1,
78:4, 78:7, 78:9,
78:23, 79:1, 79:4,
80:11, 80:14, 80:17,
81:24, 82:2, 82:8,
82:10, 82:16, 82:20,
83:6, 83:8, 83:10,
83:13, 83:23, 83:25,
84:2, 84:14, 84:17,
85:5, 85:10, 85:13,
85:16, 85:19, 85:23,
87:8, 87:10, 87:18,
87:22, 89:1, 89:3,
89:6, 89:8, 90:6,
90:9, 90:19, 90:23,
90:25, 91:5, 91:9,
96:22, 96:24, 97:2,
97:4, 100:10,
100:12, 100:14,
101:22, 101:25,
102:17, 102:21,
103:3, 103:8,
104:12, 104:16,
105:13, 105:16,
106:12, 106:15,
110:1, 110:10,
112:6, 112:8, 113:1,
113:3, 113:5, 113:6,
114:8, 114:10,
114:12, 115:2,
115:5, 115:12,
115:14, 115:20,
115:24, 116:6,
116:12, 116:16,
116:24, 117:4,
117:12, 117:14
**multiple** [8] - 18:25,
19:17, 27:8, 43:23,
56:9, 72:6
**mutually** [1] - 105:8

**N**

**name** [9] - 47:20,
48:10, 62:18, 66:13,
68:13, 68:14, 68:15,
68:24, 82:11
**name's** [1] - 97:7
**named** [2] - 59:1,

69:12
**names** [1] - 108:16
**near** [1] - 38:23
**nearest** [1] - 34:12
**necessarily** [1] - 44:6
**necessary** [5] - 18:15,
20:4, 20:8, 83:18,
115:21
**need** [11] - 5:20, 41:4,
57:17, 58:2, 61:22,
76:1, 83:15, 84:11,
102:4, 113:14, 116:9
**needed** [1] - 83:5
**needs** [6] - 65:11,
83:1, 83:4, 83:8,
87:11, 87:15
**neglected** [1] - 113:12
**net** [4] - 52:7, 57:9,
57:13, 112:11
**never** [9] - 30:23,
65:14, 65:15, 65:19,
65:21, 65:23, 98:17,
100:19, 112:16
**New** [2] - 5:15, 94:10
**new** [1] - 69:4
**Newport** [1] - 2:19
**next** [10] - 21:5, 22:11,
22:12, 40:10, 68:8,
72:11, 77:21, 79:16,
86:13, 117:8
**nice** [1] - 70:11
**nicely** [2] - 77:8, 95:25
**NICOLA** [2] - 2:4, 2:9
**normal** [1] - 42:19
**normally** [1] - 115:8
**North** [1] - 2:11
**notebook** [1] - 36:25
**notes** [4] - 18:20,
18:21, 18:24, 108:25
**nothing** [13] - 9:7, 9:9,
39:17, 40:6, 40:8,
41:17, 41:22, 61:10,
68:2, 87:25, 101:25,
113:1, 114:10
**notify** [1] - 100:5
**November** [3] - 73:24,
74:3, 94:17
**number** [17] - 7:22,
15:22, 15:24, 22:17,
31:11, 37:22, 39:7,
46:24, 48:3, 48:23,
49:2, 49:4, 57:18,
58:5, 69:2, 71:8,
100:15
**Number** [2] - 45:20,
54:16
**nursing** [1] - 115:2
**Nursing** [1] - 115:4

**O**

**o'clock** [2] - 17:25,
113:11
**oath** [6] - 60:13,
105:12, 105:24,
106:4, 106:7, 106:11
**objection** [57] - 9:14,
13:15, 20:9, 26:10,
33:1, 33:9, 34:1,
35:1, 38:14, 38:19,
41:15, 43:17, 45:17,
45:18, 48:5, 49:21,
54:3, 58:19, 59:8,
59:13, 59:25, 63:23,
67:6, 67:11, 67:17,
72:5, 73:20, 74:21,
74:22, 76:19, 78:3,
78:4, 78:25, 79:1,
80:13, 81:24, 83:6,
83:23, 85:12, 85:14,
85:18, 89:1, 89:6,
90:6, 90:23, 91:5,
96:24, 100:10,
101:22, 102:17,
103:3, 104:12,
105:13, 106:12,
110:1, 115:20,
115:23
**obligation** [6] - 5:18,
5:23, 55:3, 92:12,
92:15, 92:20
**obligations** [1] - 86:20
**observed** [1] - 43:13
**obviously** [2] - 17:2,
36:23
**occasion** [2] - 104:10,
105:19
**occasionally** [1] -
56:12
**occasions** [1] - 89:9
**occurred** [1] - 28:18
**occurring** [2] - 111:4,
111:8
**October** [2] - 45:5,
70:21
**OF** [7] - 1:2, 1:5, 1:14,
2:1, 118:1, 118:3,
118:4
**offer** [1] - 96:22
**Office** [4] - 11:16,
12:2, 49:12, 66:25
**office** [12] - 11:11,
11:12, 14:9, 14:11,
37:13, 79:9, 84:24,
96:11, 96:13, 99:7
**officers** [1] - 69:3
**OFFICES** [1] - 2:17
**Official** [1] - 118:20
**OFFICIAL** [3] - 1:24,

118:1, 118:5
**often** [1] - 15:1
**once** [1] - 86:18
**one** [47] - 5:8, 6:12,
6:13, 13:12, 19:2,
19:10, 25:21, 26:5,
27:7, 34:19, 40:25,
45:3, 45:24, 46:24,
56:3, 56:14, 58:7,
59:1, 59:6, 60:21,
61:2, 61:5, 64:17,
64:19, 65:4, 65:17,
67:25, 71:19, 79:10,
83:18, 85:5, 87:18,
90:14, 103:10,
104:19, 107:3,
108:10, 108:25,
110:4, 112:6,
112:19, 113:13,
115:14, 115:24
**ongoing** [1] - 5:17
**online** [3] - 24:21,
24:25, 25:1
**oOo** [1] - 117:18
**open** [2] - 24:16, 25:1
**operate** [1] - 44:13
**opinions** [2] - 61:14,
113:20
**opportunity** [2] -
28:15, 29:6
**opposed** [2] - 102:15,
103:1
**opposing** [1] - 117:2
**OR** [2] - 3:12, 4:4
**Orange** [1] - 58:25
**order** [11] - 22:1, 45:8,
57:21, 57:22, 99:22,
116:1, 116:7,
116:11, 116:20,
117:8, 117:10
**ordinary** [2] - 45:12,
46:7
**originated** [1] - 46:24
**otherwise** [1] - 58:1
**ought** [1] - 116:10
**out-of-pocket** [8] -
7:21, 30:3, 41:23,
52:6, 53:7, 53:9,
53:14, 57:13
**outlining** [1] - 22:1
**outside** [3] - 34:8,
34:9, 104:10
**overruled** [21] - 9:16,
13:16, 20:10, 26:11,
49:22, 54:4, 58:21,
63:25, 81:25, 83:11,
83:24, 84:15, 85:20,
90:7, 91:7, 101:24,
102:18, 103:5,
104:13, 105:14,

110:3
**owed** [1] - 30:6
**own** [4] - 25:16, 97:20,
115:7
**owns** [1] - 29:23

**P**

**p.m** [3] - 61:25, 117:17
**P.M** [2] - 1:16, 5:2
**PAGE** [1] - 3:2
**page** [45] - 21:5,
26:13, 26:15, 26:18,
27:22, 27:23, 28:6,
37:24, 38:2, 38:17,
38:21, 40:22, 51:1,
62:16, 62:17, 72:9,
72:13, 72:14, 72:19,
72:21, 75:1, 76:22,
79:17, 79:18, 80:17,
81:4, 82:8, 82:9,
82:16, 82:17, 85:24,
86:13, 95:9, 95:20,
95:22, 97:2, 97:8,
98:2, 99:6, 100:8,
100:16, 100:18,
101:6, 101:20,
118:11
**Page** [2] - 4:14, 97:10
**pages** [2] - 79:24,
85:14
**paid** [9] - 7:14, 7:17,
9:4, 9:19, 10:6,
30:10, 56:1, 57:6,
83:21
**paragraph** [7] - 21:15,
22:12, 27:17, 27:18,
28:6, 82:18, 84:17
**paraplegic** [1] - 25:14
**parking** [1] - 40:1
**part** [6] - 13:2, 24:21,
27:15, 46:22, 55:11,
90:9
**partially** [1] - 111:10
**particular** [1] - 34:10
**parties** [16] - 21:25,
22:6, 22:15, 22:16,
23:3, 23:13, 26:18,
28:7, 28:13, 28:24,
70:16, 70:22, 71:5,
74:6, 102:14, 116:25
**partner** [3] - 32:12,
32:16
**partners** [2] - 32:23,
33:5
**party** [12] - 21:7, 22:8,
28:8, 29:4, 49:4,
49:8, 72:11, 72:14,
72:15, 73:6, 102:23,
117:2

**PATRICK** [2] - 3:3, 7:1
**Pause** [1] - 61:4
**pay** [6] - 21:19, 82:21, 103:20, 115:6, 115:7, 115:8
**payable** [2] - 86:2, 89:11
**payee** [1] - 83:20
**paying** [3] - 44:1, 44:5, 109:1
**payment** [8] - 75:19, 76:1, 76:10, 83:19, 84:2, 84:18, 84:20, 84:23
**payments** [4] - 31:23, 82:23, 83:4, 83:15
**pending** [2] - 54:22, 106:24
**people** [13] - 17:21, 25:4, 31:17, 31:19, 32:24, 34:23, 66:15, 66:16, 98:25, 102:13, 103:24, 104:14, 105:8
**people's** [1] - 18:19
**percent** [5] - 9:4, 46:23, 52:14, 55:11, 88:24
**percentage** [2] - 52:13, 52:25
**perfect** [1] - 22:14
**perhaps** [1] - 84:7
**period** [2] - 65:15, 101:2
**person** [15] - 11:6, 16:18, 27:12, 35:8, 66:16, 66:24, 107:3, 108:7, 108:12, 108:13, 108:24, 110:11, 110:12, 112:1, 112:3
**personal** [4] - 33:2, 33:7, 58:20, 60:1
**personally** [4] - 30:16, 69:16, 69:23, 89:21
**Phan** [4] - 70:2, 75:1, 79:4, 80:4
**Phan's** [1] - 79:5
**phone** [4] - 11:9, 11:13, 11:18, 110:13
**photocopies** [2] - 8:14, 8:16
**photocopy** [5] - 8:18, 8:21, 8:23, 40:16, 40:20
**photocopying** [1] - 40:21
**physically** [1] - 66:8
**pick** [1] - 109:3
**picked** [2] - 42:19,

109:2
**place** [3] - 16:23, 44:16, 70:20
**placed** [1] - 79:21
**placement** [1] - 99:16
**places** [1] - 88:22
**plaintiff** [6] - 21:19, 70:3, 77:20, 79:14, 99:11, 99:12
**Plaintiff** [1] - 1:6
**PLAINTIFF** [3] - 2:3, 3:3, 3:5
**plaintiff's** [3] - 33:24, 69:5, 102:2
**plaintiffs** [3] - 63:20, 88:24, 91:3
**plaintiffs'** [4] - 90:21, 91:14, 103:21, 104:2
**plan** [15] - 5:13, 71:10, 75:25, 91:25, 92:1, 92:6, 94:25, 95:16, 95:18, 97:13, 97:16, 99:4, 99:14, 100:23, 113:17
**plans** [1] - 114:13
**Plaza** [1] - 2:18
**pocket** [9] - 7:21, 30:3, 41:23, 52:6, 53:7, 53:9, 53:14, 57:13, 115:7
**pocketed** [1] - 52:16
**point** [19] - 12:21, 24:20, 36:16, 49:11, 65:25, 66:6, 70:15, 71:5, 74:3, 74:6, 85:13, 86:22, 95:15, 100:9, 103:10, 104:19, 105:23, 106:1, 116:19
**police** [1] - 69:3
**portion** [9] - 12:22, 12:23, 29:19, 29:21, 29:22, 62:18, 72:7, 82:4, 110:7
**portions** [1] - 62:25
**position** [1] - 101:19
**possible** [4] - 91:4, 91:13, 91:16, 93:17
**potentially** [1] - 56:5
**practice** [4] - 22:23, 22:25, 69:1, 69:2
**practicing** [2] - 32:18, 88:12
**preceding** [1] - 117:11
**precluded** [1] - 59:19
**prejudicial** [1] - 115:18
**preparation** [2] - 20:15, 109:22
**prepare** [4] - 15:1,

16:3, 71:10, 116:21
**preparing** [1] - 18:17
**presence** [5] - 5:5, 6:21, 61:17, 62:1, 114:1
**present** [14] - 12:18, 12:22, 13:2, 13:6, 13:10, 13:14, 17:2, 17:4, 17:12, 17:15, 17:17, 22:2, 60:15, 70:18
**presented** [1] - 63:4
**presently** [2] - 105:12, 115:1
**presiding** [1] - 93:6
**presumptively** [1] - 25:1
**pretty** [4] - 39:19, 90:12, 101:13, 108:23
**previously** [1] - 20:6
**primarily** [2] - 70:2, 104:15
**printed** [1] - 14:12
**prisoner** [1] - 114:20
**PRO** [2] - 2:14
**problem** [4] - 5:15, 72:12, 74:11, 95:11
**proceedings** [2] - 61:4, 118:10
**PROCEEDINGS** [1] - 1:14
**Proceedings** [1] - 117:17
**process** [7] - 71:14, 91:19, 91:24, 93:2, 97:24, 99:3, 104:1
**produce** [4] - 37:11, 49:5, 49:15, 50:5
**produced** [3] - 49:25, 50:21, 50:22
**product** [1] - 69:4
**professional** [3] - 34:20, 51:10, 90:10
**Professional** [1] - 50:25
**proffer** [2] - 58:8, 58:10
**prolonged** [1] - 56:17
**proposing** [3] - 72:21, 72:24
**proposition** [3] - 55:17, 55:18, 103:25
**provide** [10] - 5:18, 16:7, 70:25, 75:12, 77:17, 79:24, 84:22, 117:1, 117:2
**provided** [9] - 5:15, 5:19, 6:11, 15:12, 22:19, 23:16, 54:7,

79:20, 98:3
**provides** [1] - 46:20
**psychiatric** [2] - 59:23, 60:7
**public** [12] - 24:10, 24:12, 24:14, 24:16, 25:1, 25:13, 26:3, 63:18, 63:22, 98:12, 114:18
**publish** [3] - 36:22, 38:22, 45:21
**published** [1] - 95:9
**pull** [10] - 14:18, 22:13, 41:6, 62:16, 62:17, 72:19, 82:8, 85:23, 90:18
**purpose** [1] - 73:2
**purposes** [1] - 86:23
**pursuant** [2] - 53:17, 118:8
**pushing** [1] - 91:3
**put** [8] - 5:14, 49:6, 53:3, 53:4, 92:3, 95:17, 100:24
**putting** [1] - 92:5

**Q**

**quarrel** [3] - 29:17, 43:3, 101:16
**quarter** [3] - 60:24, 60:25, 61:1
**quarterly** [3] - 82:23, 83:4, 83:15
**questioning** [2] - 75:18, 91:23
**questions** [26] - 14:7, 14:19, 14:22, 16:10, 16:12, 19:3, 19:7, 33:23, 34:3, 35:9, 46:6, 56:18, 59:19, 62:24, 64:25, 87:19, 100:15, 107:16, 107:20, 107:24, 108:3, 108:19, 108:22, 112:9, 114:9
**quick** [1] - 91:12
**quickly** [2] - 91:4, 101:13
**quite** [2] - 71:15, 106:22
**quote/unquote** [1] - 95:11

**R**

**raise** [3] - 5:9, 6:3, 89:15
**Ramon** [2] - 13:5, 17:11

rather [1] - 83:15
**re** [10] - 3:14, 3:18, 3:21, 3:22, 4:6, 4:6, 4:8, 4:9, 4:12, 4:13
**reach** [2] - 70:22, 87:11
**reached** [4] - 90:14, 91:2, 91:10, 92:25
**READ** [3] - 26:25, 27:14, 62:25
**read** [17] - 14:7, 21:16, 22:9, 22:15, 22:22, 27:3, 27:19, 27:20, 28:3, 28:13, 28:19, 29:5, 60:17, 73:1, 77:14, 96:10
**reading** [2] - 75:21, 96:9
**reads** [2] - 23:12, 28:25
**ready** [1] - 27:9
**real** [1] - 114:12
**really** [4] - 26:5, 102:1, 103:20, 105:7
**REALTIME** [1] - 118:5
**reason** [12] - 7:7, 19:13, 25:9, 25:23, 29:17, 35:19, 42:24, 43:3, 43:15, 87:7, 98:16, 101:16, 102:1, 102:14, 102:24
**receipt** [3] - 22:18, 23:15, 100:19
**receive** [1] - 23:19
**received** [27] - 23:17, 29:14, 30:2, 38:15, 38:16, 38:21, 45:19, 45:20, 49:11, 72:16, 72:17, 73:21, 73:22, 74:23, 74:24, 76:20, 76:21, 78:5, 78:6, 79:2, 79:3, 80:15, 80:16, 85:21, 85:22, 96:25, 97:1
**recent** [1] - 5:15
**recess** [3] - 61:12, 61:24, 117:15
**Recess** [1] - 61:25
**recited** [1] - 99:2
**recognize** [9] - 46:7, 70:5, 71:21, 73:13, 74:14, 81:8, 86:8, 86:14, 96:8
**recollection** [16] - 15:20, 16:15, 20:18, 22:24, 29:14, 31:13, 39:9, 48:15, 60:12, 60:19, 60:21, 94:16, 95:21, 109:14,

109:21, 111:6
**recommendation** [1] - 99:18
**record** [9] - 5:11, 5:14, 6:13, 25:13, 64:20, 68:1, 70:13, 112:7, 114:15
**records** [1] - 49:15
**recoup** [1] - 54:2
**recover** [2] - 44:10, 58:18
**Recross** [1] - 3:4
**RECROSS** [1] - 65:1
**recross** [1] - 61:20
**Recross-Examination** [1] - 3:4
**RECROSS-EXAMINATION** [1] - 65:1
**red** [1] - 89:15
**redirect** [2] - 61:20, 62:2
**Redirect** [1] - 3:4
**REDIRECT** [1] - 62:4
**referral** [2] - 51:21, 51:22
**referring** [2] - 11:19, 78:16
**reflect** [1] - 36:12
**reflected** [3] - 30:4, 46:11, 52:22
**refresh** [7] - 20:18, 39:9, 94:16, 95:21, 109:13, 109:21, 111:1
**refreshed** [1] - 18:19
**regarding** [1] - 97:12
**regular** [1] - 94:20
**regulations** [1] - 118:12
**rehearsal** [4] - 107:18, 107:21, 107:23, 108:17
**rehearsals** [1] - 108:20
**reimburse** [1] - 115:9
**reimbursed** [1] - 9:4
**reimbursement** [2] - 38:6, 54:9
**REJECTED** [2] - 3:13, 4:4
**relate** [2] - 37:9, 103:17
**related** [3] - 7:21, 9:2, 33:5
**relates** [1] - 6:10
**relating** [20] - 7:9, 11:23, 12:14, 13:23, 23:3, 31:20, 43:13,

45:5, 46:5, 49:16, 55:12, 58:11, 58:14, 59:22, 60:7, 100:9, 108:6, 109:14, 110:17, 115:14
**relationship** [1] - 90:10
**Relevance** [14] - 13:15, 34:1, 41:15, 48:5, 49:21, 59:8, 59:13, 89:1, 90:6, 90:23, 101:22, 102:17, 104:12, 105:13
**relevance** [7] - 9:15, 20:9, 58:20, 67:17, 83:10, 103:4, 106:13
**relied** [1] - 45:7
**remainder** [2] - 79:17, 79:18
**remained** [1] - 71:6
**remember** [45] - 8:22, 13:8, 13:9, 13:12, 13:13, 15:19, 18:21, 19:1, 25:21, 34:10, 35:21, 35:24, 37:15, 49:20, 60:20, 61:13, 62:8, 63:18, 64:4, 75:12, 93:3, 93:13, 93:14, 93:16, 93:20, 94:1, 94:2, 94:10, 94:12, 94:25, 95:18, 97:17, 98:4, 100:14, 101:13, 108:16, 110:5, 110:19, 110:20, 110:21, 110:22, 111:12, 111:13, 111:24, 113:19
**reminded** [2] - 111:5, 111:8
**renew** [1] - 5:12
**rented** [3] - 114:21, 114:24, 115:9
**rephrase** [2] - 100:11, 100:13
**rephrasing** [1] - 57:21
**replies** [1] - 72:13
**Report** [2] - 4:6, 4:15
**report** [7] - 91:24, 95:11, 95:19, 97:12, 97:15, 98:2, 99:7
**reported** [1] - 118:10
**REPORTER** [3] - 1:24, 118:1, 118:6
**Reporter** [1] - 118:20
**REPORTER'S** [1] - 1:14
**represent** [2] - 60:22, 69:5

**representation** [8] - 12:6, 16:19, 18:3, 25:24, 42:23, 60:4, 60:5, 60:10
**represented** [6] - 31:7, 58:24, 59:24, 69:8, 70:3, 88:25
**representing** [11] - 31:10, 34:5, 34:11, 34:17, 60:13, 63:20, 88:15, 89:20, 90:19, 91:1, 91:3
**request** [3] - 5:20, 115:14, 117:4
**required** [3] - 24:10, 97:17, 117:7
**requires** [2] - 51:11, 72:7
**research** [2] - 61:15, 113:22
**resolution** [6] - 21:17, 70:23, 70:25, 71:6, 111:11, 111:15
**resolved** [3] - 41:19, 48:3, 60:24
**resolves** [2] - 41:24, 51:13
**respect** [2] - 5:18, 44:9
**respectfully** [1] - 99:11
**respond** [2] - 73:9, 79:21
**responded** [2] - 49:18
**responds** [1] - 79:19
**response** [7] - 74:10, 75:16, 76:4, 76:7, 77:7, 77:14, 86:3
**responsibility** [2] - 33:13, 92:23
**responsible** [2] - 63:10, 63:13
**rest** [1] - 21:20
**result** [1] - 67:20
**resume** [1] - 113:11
**RESUMED** [1] - 7:1
**retained** [1] - 54:17
**retainer** [1] - 45:10
**retrospective** [1] - 29:3
**return** [1] - 74:1
**review** [4] - 15:6, 15:7, 16:2, 20:14
**reviewed** [6] - 13:25, 14:2, 14:4, 14:5, 15:17, 20:1
**reviewing** [1] - 20:13
**revoked** [1] - 22:8
**right-hand** [8] - 35:17, 38:6, 41:3, 41:7,

48:23, 49:6, 66:10, 104:11
**rights** [5] - 54:22, 56:1, 69:2, 69:9, 69:20
**rise** [4] - 6:20, 61:16, 113:25, 117:16
**Roberson** [6] - 17:4, 104:25, 107:8, 107:9, 108:14, 110:15
**role** [1] - 47:2
**ROOM** [1] - 1:24
**room** [7] - 66:10, 66:12, 66:15, 66:19, 104:10, 104:19, 104:25
**roughly** [1] - 37:14
**round** [1] - 61:22
**rounds** [1] - 61:20
**Rule** [2] - 50:25, 51:7
**rule** [5] - 51:2, 51:10, 116:14, 116:18, 117:5
**rules** [1] - 114:2
**run** [2] - 35:18, 59:18
**Ryan** [3] - 17:4, 66:13, 66:25

**S**

**SACR-19-00061-JVS** [1] - 1:7
**Sagel** [6] - 13:13, 17:19, 106:2, 108:15, 109:4, 110:15
**SAGEL** [5] - 2:5, 114:12, 115:2, 115:5, 115:12
**sake** [2] - 25:22, 26:7
**San** [1] - 105:4
**SANTA** [3] - 1:17, 1:25, 5:1
**Santa** [1] - 2:7
**sat** [1] - 14:15
**saw** [5] - 28:4, 30:4, 65:14, 65:15, 110:7
**scenario** [1] - 60:11
**schedule** [1] - 77:17
**scope** [2] - 54:25, 67:6
**Scott** [1] - 59:4
**screens** [1] - 75:20
**scroll** [2] - 75:15, 79:16
**SE** [1] - 2:14
**seal** [1] - 98:9
**seated** [4] - 13:5, 17:9, 17:14, 67:2
**second** [6] - 21:15,

47:18, 72:10, 82:18, 95:9, 98:2
**seconds** [2] - 6:8
**secretary** [1] - 85:4
**Section** [1] - 118:8
**security** [2] - 55:8, 55:12
**see** [35] - 17:7, 22:13, 26:23, 27:1, 27:22, 28:2, 29:10, 35:16, 37:25, 38:24, 38:25, 39:15, 39:24, 40:3, 40:17, 40:20, 41:9, 48:24, 52:4, 52:8, 53:7, 57:9, 59:4, 63:2, 63:4, 67:23, 72:22, 76:24, 77:12, 81:4, 90:5, 98:5, 98:25, 113:23
**seem** [1] - 95:25
**SELNA** [1] - 1:3
**send** [2] - 33:17, 86:25
**sending** [2] - 32:2, 32:4, 87:6
**senior** [2] - 92:20, 92:22
**sense** [3] - 61:21, 94:12, 117:6
**sent** [10] - 14:9, 14:10, 14:11, 62:7, 72:13, 84:23, 86:18, 87:3, 87:25, 88:3
**sentence** [5] - 21:16, 22:11, 23:3, 23:7, 23:12
**separate** [2] - 55:19, 57:4
**set** [2] - 77:3, 93:24
**settle** [4] - 82:21, 88:23, 102:14, 103:25
**settled** [7] - 47:15, 47:18, 47:20, 89:4, 89:10, 91:4, 92:24
**Settlement** [4] - 3:19, 3:23, 4:10, 4:14
**settlement** [95] - 4:6, 7:10, 7:15, 9:13, 9:20, 9:24, 10:6, 10:9, 10:14, 13:23, 21:22, 22:2, 22:4, 22:7, 22:19, 23:16, 23:22, 24:9, 25:19, 26:16, 47:23, 49:16, 52:5, 52:24, 62:12, 63:14, 63:17, 64:11, 64:13, 64:22, 70:25, 71:6, 72:22, 73:3, 73:5, 74:1, 74:4, 74:7, 75:2, 78:13,

79:8, 79:10, 80:4, 80:21, 80:25, 81:1, 81:11, 81:12, 82:17, 83:3, 83:14, 83:18, 84:6, 84:8, 86:20, 87:1, 87:10, 87:25, 90:14, 91:2, 91:10, 91:18, 91:19, 93:1, 93:8, 93:17, 93:24, 94:8, 97:13, 97:24, 98:4, 99:3, 99:15, 99:18, 100:8, 100:9, 100:16, 100:18, 100:19, 100:22, 100:25, 101:4, 101:6, 101:20, 102:8, 102:13, 102:15, 102:22, 102:23, 102:24, 102:25, 109:18, 111:11, 111:13, 112:20

**settlements** [1] - 63:21

**seven** [3] - 15:24, 15:25, 107:1

**shall** [4] - 21:19, 22:17, 23:14, 114:5

**sheet** [1] - 41:21

**sheriff's** [2] - 94:22, 95:16

**Sheriff's** [4] - 71:9, 92:21, 94:25, 99:15

**shortly** [3] - 64:10, 70:24, 99:17

**show** [4] - 81:3, 86:7, 110:25, 111:23

**showed** [6] - 64:3, 110:6, 110:24, 111:17, 111:19, 111:20

**showing** [1] - 111:8

**shown** [10] - 15:8, 15:15, 15:17, 15:20, 109:10, 109:20, 109:21, 109:25, 111:1

**side** [6] - 41:3, 41:7, 66:10, 69:5, 89:10, 104:11

**sign** [8] - 26:19, 48:21, 58:11, 63:2, 63:14, 65:14, 102:13, 102:23

**Signature** [1] - 4:13

**signature** [19] - 26:15, 26:18, 36:3, 36:8, 50:17, 51:15, 51:17, 62:16, 76:9, 79:24, 82:8, 82:11, 82:14,

100:8, 100:16, 100:18, 101:5, 101:20, 102:7

**signatures** [7] - 26:23, 30:24, 74:1, 74:2, 75:13, 79:11, 79:13

**signed** [10] - 45:4, 46:24, 50:10, 63:6, 74:5, 75:3, 75:5, 76:9, 79:19, 102:4

**SIGNING** [3] - 26:25, 27:15, 62:25

**signs** [1] - 29:4

**similar** [3] - 33:7, 46:6, 50:17

**simply** [1] - 115:5

**Sims** [1] - 59:4

**sit** [13] - 12:1, 12:5, 18:23, 30:6, 36:15, 42:9, 43:5, 50:9, 50:15, 51:6, 61:5, 112:10, 112:18

**sit-down** [2] - 12:1, 12:5

**situation** [1] - 113:17

**six** [2] - 17:21, 107:5

**sixth** [1] - 21:15

**small** [4] - 41:21, 41:24, 93:20, 95:11

**social** [2] - 55:7, 55:12

**someone** [2] - 48:10, 98:22

**someplace** [1] - 88:3

**sometimes** [3] - 8:2, 90:21, 102:23

**somewhat** [2] - 19:18, 19:20

**soon** [3] - 79:20, 91:16, 93:17

**sorry** [9] - 23:8, 43:10, 58:7, 75:4, 89:22, 100:12, 102:3, 102:20, 107:8

**sort** [2] - 30:25, 55:20

**sought** [1] - 38:6

**sound** [1] - 18:4

**sounds** [4] - 12:12, 18:5, 107:11, 112:5

**SOUTHERN** [1] - 1:2

**Spaan** [1] - 118:20

**SPAAN** [3] - 1:23, 118:5, 118:19

**speaking** [2] - 96:15, 105:9

**special** [9] - 11:17, 12:2, 83:1, 83:4, 83:8, 87:11, 87:15, 104:24, 105:4

**Special** [10] - 13:5, 13:9, 17:4, 17:11,

104:25, 107:8, 107:9, 108:14, 110:15

**specific** [3] - 50:10, 54:18, 84:8

**specifically** [4] - 11:19, 44:8, 60:9, 93:3

**specifics** [3] - 77:9, 96:1, 111:12

**specify** [1] - 84:8

**speculating** [1] - 44:21

**speculation** [13] - 9:15, 26:10, 33:1, 43:17, 44:20, 54:3, 58:19, 59:25, 83:23, 84:14, 87:8, 91:5, 101:23

**Speculation** [2] - 81:24, 83:6

**spell** [1] - 68:13

**spelled** [4] - 83:5, 83:16, 83:22, 84:12

**spent** [2] - 18:11, 27:11

**Split** [1] - 3:16

**split** [1] - 46:20

**splitting** [2] - 42:17, 51:11

**spoken** [1] - 106:16

**Spring** [1] - 2:11

**staff** [1] - 31:14

**stamp** [2] - 49:2, 49:4

**STAND** [1] - 7:1

**stand** [10] - 5:6, 6:1, 10:19, 20:19, 104:9, 104:20, 106:5, 114:4, 115:19, 115:21

**STANDBY** [1] - 2:16

**standing** [2] - 70:8, 70:10

**start** [4] - 14:18, 23:10, 31:12, 93:12

**started** [2] - 17:25, 18:2

**starting** [1] - 75:22

**starts** [2] - 56:19, 56:24

**state** [2] - 68:12, 83:19

**STATE** [1] - 118:4

**statement** [12] - 9:12, 9:23, 10:1, 26:8, 26:22, 42:16, 42:24, 44:22, 49:8, 95:10, 111:9, 116:2

**statements** [2] - 5:14, 6:12

**STATES** [2] - 1:1, 1:5

**States** [9] - 2:4, 2:5, 2:9, 2:10, 68:10, 107:9, 118:6, 118:8, 118:13

**status** [5] - 76:2, 93:8, 97:12, 98:2, 99:7

**steal** [2] - 10:13, 36:6

**stealing** [1] - 52:17

**stenographically** [1] - 118:10

**step** [2] - 61:18, 68:6

**STEWARD** [2] - 2:17, 2:18

**still** [10] - 25:14, 25:16, 51:20, 67:15, 79:8, 95:15, 95:21, 113:6, 116:16, 116:21

**stole** [2] - 9:12, 9:23

**stop** [1] - 113:10

**stories** [1] - 105:8

**Street** [2] - 2:6, 2:11

**STREET** [1] - 1:24

**stressing** [1] - 28:24

**stricken** [1] - 59:14

**strike** [25] - 10:3, 14:1, 14:16, 15:6, 16:5, 18:22, 19:8, 25:10, 27:19, 33:16, 36:11, 42:9, 49:24, 51:5, 52:23, 56:20, 60:4, 80:1, 92:24, 94:23, 96:7, 96:10, 102:8, 109:12

**string** [2] - 72:8, 77:11

**stuff** [2] - 98:24, 103:21

**subject** [5] - 21:22, 55:19, 57:4, 78:15, 113:8

**submitted** [3] - 61:15, 99:16, 113:21

**subpoena** [5] - 49:5, 49:11, 49:18, 49:23, 50:1

**substance** [1] - 106:9

**substantive** [1] - 114:5

**substantively** [1] - 19:21

**subtracting** [1] - 64:14

**successful** [1] - 33:24

**sued** [1] - 88:19

**suffered** [1] - 69:21

**suffice** [1] - 15:16

**suggest** [2] - 26:2, 30:9

**suggests** [2] - 25:11, 50:16

**suing** [1] - 90:20

**suit** [1] - 70:11

**Suite** [3] - 2:6, 2:11, 2:19

**sum** [3] - 21:14, 83:15, 84:18

**summary** [2] - 35:13, 60:18

**Superior** [1] - 47:23

**Supervisors** [8] - 21:23, 22:3, 71:13, 77:2, 78:12, 80:25, 94:19, 100:24

**supplement** [1] - 81:18

**supposed** [2] - 93:11, 106:3

**sustained** [18] - 33:3, 33:10, 34:2, 35:2, 41:16, 43:18, 48:6, 59:9, 59:14, 67:8, 67:12, 67:18, 83:7, 87:9, 89:2, 89:7, 90:24, 106:14

**sworn** [2] - 60:14, 67:16

**SWORN** [1] - 68:11

## T

**table** [1] - 70:10

**tabs** [1] - 97:23

**technical** [1] - 84:9

**teleconference** [1] - 107:13

**telephone** [8] - 11:15, 40:3, 107:5, 108:8, 108:11, 108:12, 110:11, 112:2

**telephonic** [1] - 110:8

**ten** [9] - 10:25, 11:2, 11:8, 15:21, 15:25, 31:13, 31:14, 113:14

**tentative** [4] - 64:11, 70:23, 70:25, 71:5

**term** [1] - 90:22

**terms** [9] - 23:4, 23:11, 26:20, 28:15, 28:23, 29:1, 54:5, 54:7, 61:19

**terrible** [3] - 52:4, 56:20, 56:21

**territory** [1] - 104:6

**testified** [14] - 7:14, 10:5, 13:18, 14:3, 15:22, 16:13, 23:24, 35:5, 35:11, 51:18, 53:10, 58:14, 91:23, 109:7

**testifies** [1] - 5:13

**testify** [6] - 9:19, 16:3, 20:19, 27:9, 106:17, 116:1
**testifying** [1] - 106:19
**testimony** [13] - 10:21, 11:1, 13:21, 20:15, 58:12, 105:17, 105:24, 106:9, 109:15, 109:16, 109:22, 114:5, 114:6
**texted** [1] - 65:21
**Thanksgiving** [1] - 94:10
**THE** [142] - 2:3, 2:14, 3:3, 3:5, 5:6, 5:10, 5:17, 5:24, 6:2, 6:7, 6:9, 6:16, 6:19, 6:20, 6:22, 7:1, 9:16, 9:17, 13:16, 13:17, 20:10, 20:11, 21:2, 26:11, 26:12, 33:3, 33:10, 33:21, 34:2, 35:2, 37:2, 37:5, 38:15, 38:19, 38:21, 41:16, 43:18, 45:1, 45:17, 45:19, 48:6, 49:22, 51:8, 54:4, 54:5, 58:21, 58:22, 59:9, 59:14, 59:17, 59:21, 60:2, 61:3, 61:11, 61:16, 61:18, 62:2, 62:19, 63:25, 64:1, 64:18, 67:8, 67:12, 67:18, 68:5, 68:7, 68:8, 68:12, 68:14, 68:16, 68:17, 70:13, 72:5, 72:9, 73:21, 74:21, 74:23, 76:20, 78:3, 78:5, 78:25, 79:2, 80:13, 80:15, 81:25, 82:1, 83:7, 83:11, 83:12, 83:24, 84:1, 84:15, 84:16, 85:12, 85:18, 85:20, 87:9, 87:20, 89:2, 89:7, 90:7, 90:8, 90:17, 90:24, 91:7, 91:8, 96:25, 100:11, 100:13, 101:24, 102:18, 102:19, 103:5, 103:6, 104:13, 104:14, 105:14, 105:15, 106:14, 110:3, 110:4, 113:2, 113:4, 113:8, 113:25, 114:2, 114:9, 114:11, 115:1, 115:4, 115:11, 115:13, 115:22,

116:5, 116:8, 116:14, 116:23, 116:25, 117:9, 117:13, 117:15, 117:16
**thereafter** [3] - 22:4, 64:10, 70:24
**they've** [3] - 29:5, 29:6
**third** [1] - 66:16
**THOMAS** [3] - 3:5, 68:11, 68:14
**Thomas** [2] - 68:10, 68:14
**thousands** [2] - 8:5, 89:9
**threaten** [5] - 103:21, 103:24, 104:1, 104:2, 104:3
**threatening** [1] - 103:18
**three** [5] - 32:22, 39:21, 66:15, 115:25, 116:4
**throughout** [1] - 34:5
**tie** [1] - 70:11
**tight** [1] - 93:20
**tighter** [1] - 93:22
**timeline** [2] - 73:4, 73:6
**timely** [1] - 30:10
**timetable** [6] - 22:1, 22:7, 93:19, 93:20, 93:21, 93:24
**timing** [1] - 113:13
**Title** [1] - 118:8
**today** [35] - 8:19, 9:19, 14:3, 15:8, 15:16, 15:17, 15:23, 16:3, 16:13, 17:7, 18:23, 20:3, 20:16, 20:19, 27:9, 30:6, 36:15, 42:9, 43:5, 50:9, 50:15, 51:7, 70:6, 80:22, 106:1, 106:15, 106:19, 109:7, 109:10, 109:21, 109:22, 112:10, 112:18, 116:1, 116:9
**together** [3] - 92:3, 92:5, 96:13
**Tom** [3] - 75:22, 75:24, 77:16
**tomorrow** [5] - 79:22, 113:11, 114:13, 114:25, 116:11
**tone** [1] - 103:11
**took** [6] - 51:20, 53:2, 70:20, 75:14, 101:4, 107:16

**top** [5] - 28:6, 39:13, 51:1, 77:11, 97:4
**total** [2] - 31:17, 42:13
**toward** [1] - 72:21
**track** [2] - 31:25, 41:20
**tracking** [1] - 33:12
**transcript** [3] - 110:7, 118:9, 118:11
**TRANSCRIPT** [2] - 1:6, 1:14
**transcripts** [1] - 8:7
**transfer** [1] - 33:17
**transfers** [1] - 32:2
**transmittal** [1] - 72:10
**transmitting** [1] - 88:6
**transportation** [1] - 40:10
**travel** [2] - 8:12, 114:17
**TRIAL** [1] - 1:8
**trial** [15] - 5:16, 18:17, 47:10, 47:15, 76:3, 76:10, 93:9, 93:12, 93:14, 93:25, 101:13, 101:21, 103:19, 107:17
**tried** [1] - 116:17
**true** [20] - 10:12, 20:22, 24:19, 25:25, 30:3, 30:4, 30:5, 43:8, 47:9, 48:4, 48:16, 60:10, 66:7, 67:9, 67:21, 84:2, 91:17, 94:21, 96:17, 118:9
**trunk** [1] - 53:3
**trust** [12] - 83:1, 83:4, 83:21, 84:3, 84:9, 86:4, 87:11, 87:15, 88:1, 88:4, 89:11, 113:23
**trusted** [2] - 34:23, 34:25
**trusts** [1] - 83:9
**try** [3] - 37:4, 47:10, 76:1
**trying** [3] - 77:17, 78:11, 103:25
**Tuesday** [1] - 80:19
**turn** [4] - 36:25, 76:12, 82:16, 113:15
**twice** [3] - 10:24, 11:2, 19:10
**two** [14] - 12:10, 16:21, 20:1, 37:16, 52:19, 61:20, 66:16, 70:16, 71:11, 85:14, 107:3, 108:6, 108:9, 114:14
**type** [1] - 69:1

**typically** [2] - 63:21, 69:5

# U

**U.S** [9] - 1:3, 11:16, 12:2, 14:4, 19:18, 27:8, 46:14, 49:12, 66:25
**Uber** [1] - 40:11
**ultimately** [4] - 38:6, 90:14, 100:19, 100:24
**unaware** [1] - 43:21
**under** [14] - 5:17, 35:11, 55:22, 56:7, 60:13, 82:18, 86:20, 91:23, 98:9, 105:12, 105:24, 106:4, 106:7, 106:11
**underlined** [1] - 26:22
**underlying** [2] - 102:16, 103:2
**underneath** [2] - 40:13, 40:16
**understood** [8] - 5:22, 22:6, 46:23, 105:12, 105:16, 106:16, 114:8, 117:12
**unethical** [7] - 7:9, 9:9, 40:6, 42:4, 52:2, 112:19, 112:23
**unfairness** [1] - 61:21
**United** [9] - 2:4, 2:5, 2:9, 2:10, 68:10, 107:9, 118:6, 118:8, 118:13
**UNITED** [2] - 1:1, 1:5
**unless** [1] - 55:16
**unsigned** [1] - 39:3
**unusual** [13] - 39:17, 41:17, 41:22, 41:25, 61:21, 80:1, 87:25, 88:3, 88:7, 91:2, 91:11, 101:25, 102:1
**up** [29] - 22:13, 29:12, 35:4, 38:23, 41:2, 41:4, 41:6, 42:19, 46:25, 58:1, 62:16, 62:18, 66:16, 72:19, 73:8, 75:15, 76:11, 78:8, 79:16, 82:8, 84:6, 84:20, 85:23, 90:17, 90:18, 97:19, 105:5, 113:14
**update** [3] - 77:17, 97:15, 98:3
**upper** [1] - 97:7
**USAO** [1] - 48:24

# V

**vacate** [1] - 99:23
**vague** [1] - 111:6
**Vague** [1] - 100:10
**van** [5] - 114:19, 114:20, 114:21, 114:24, 115:10
**varied** [1] - 19:8
**various** [5] - 7:23, 58:25, 60:6, 73:5, 109:14
**Vegas** [1] - 53:4
**vehicles** [1] - 88:6
**vendor** [1] - 44:14
**vendors** [1] - 44:11
**version** [2] - 75:4, 75:5
**via** [1] - 107:13
**videoconference** [1] - 12:13
**videotaping** [1] - 40:13
**violations** [1] - 69:20
**virtually** [1] - 108:9
**VOLUME** [1] - 1:9
**vs** [1] - 1:7

# W

**waiting** [4] - 75:12, 95:15, 100:22, 100:23
**walk** [1] - 109:9
**walked** [1] - 109:6
**WAS** [1] - 68:11
**waste** [1] - 18:18
**wearing** [1] - 70:9
**Webex** [7] - 12:13, 12:25, 20:22, 27:12, 35:8, 46:1, 46:17
**WEDNESDAY** [2] - 1:15, 5:11
**weeks** [7] - 16:21, 20:1, 75:9, 77:3, 93:11, 100:8, 108:11
**welcome** [1] - 48:20
**WEST** [1] - 1:24
**West** [1] - 2:6
**whatsoever** [1] - 44:18
**windows** [1] - 105:21
**wire** [2] - 32:2, 33:17
**withdraw** [1] - 73:6
**WITHDRAWN** [2] - 3:12, 4:3
**withhold** [1] - 50:6
**witness** [24] - 5:6, 5:13, 5:14, 5:18, 5:19, 6:17, 36:22,

39:14, 41:7, 44:25,
61:6, 66:20, 67:14,
67:16, 68:3, 68:9,
70:13, 113:4,
113:15, 114:4,
114:6, 115:15,
116:20

**WITNESS** [25] - 7:1,
9:17, 13:17, 20:11,
26:12, 33:21, 45:1,
54:5, 58:22, 62:19,
64:1, 68:7, 68:11,
68:14, 82:1, 83:12,
84:1, 84:16, 90:8,
91:8, 102:19, 103:6,
104:14, 105:15,
110:4

**WITNESSES** [1] - 3:2

**witnesses** [14] - 15:1,
19:14, 61:19, 67:15,
114:3, 114:7, 115:8,
115:25, 116:2,
116:7, 116:21,
117:6, 117:9

**words** [1] - 19:22

**works** [1] - 84:4

**wrap** [1] - 113:14

**write** [3] - 74:10,
75:15, 95:24

**writes** [1] - 77:11

**writing** [3] - 23:5,
51:12, 51:13

**wrote** [2] - 37:22, 96:4

**WYMAN** [87] - 2:10,
6:17, 9:14, 13:15,
20:9, 26:10, 33:1,
33:9, 34:1, 35:1,
38:14, 38:20, 41:15,
43:17, 45:18, 48:5,
49:21, 54:3, 58:19,
59:8, 59:13, 59:25,
62:3, 62:5, 62:16,
62:21, 64:2, 64:17,
64:19, 64:21, 64:24,
67:6, 67:11, 67:17,
68:10, 68:19, 70:15,
72:3, 72:18, 72:20,
73:18, 73:23, 74:19,
74:25, 76:17, 76:22,
78:1, 78:7, 78:9,
78:23, 79:4, 80:11,
80:17, 82:2, 82:8,
82:10, 82:16, 82:20,
83:8, 83:13, 84:2,
84:17, 85:5, 85:10,
85:16, 85:23, 87:10,
87:18, 89:1, 89:6,
90:6, 90:23, 91:5,
96:24, 100:10,
101:22, 102:17,

103:3, 104:12,
105:13, 106:12,
110:1, 113:3, 113:5,
114:8, 115:20,
117:14

**Wyman** [20] - 3:4, 3:6,
13:13, 17:17, 35:12,
35:22, 51:18, 62:2,
68:17, 91:24,
100:15, 103:11,
106:2, 107:10,
107:16, 108:15,
109:3, 109:5,
110:15, 111:18

## Y

**year** [2] - 77:10, 96:2

**Year's** [1] - 94:10

**years** [9] - 33:5, 37:16,
83:12, 88:14, 88:17,
89:5, 102:22, 104:7,
108:6

**yesterday** [1] - 106:1

**York** [1] - 5:15

**yourself** [2] - 33:24,
104:16

## Z

**zero** [1] - 64:15

**Zoom** [7] - 12:22,
12:23, 12:25, 13:19,
14:8, 14:15, 15:16