1          **UNITED STATES DISTRICT COURT**

2      **CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

3        **HONORABLE JAMES V. SELNA, U.S. DISTRICT JUDGE**

4

5   UNITED STATES OF AMERICA,          )
                                       )
6               Plaintiff,             )   <u>**CERTIFIED TRANSCRIPT**</u>
                                       )
7        vs.                           )   Case No.
                                       )   SACR-19-00061-JVS
8   MICHAEL JOHN AVENATTI,             )
                                       )   **TRIAL DAY 7**
9               Defendant.             )   **VOLUME 2**
    _____)

10

11

12

13

14

15              REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                 THURSDAY, JULY 22, 2021

17                        1:34 P.M.

18                  SANTA ANA, CALIFORNIA

19

20

21

22

23   _____

24            **DEBBIE HINO-SPAAN, CSR 7953, CRR**
              FEDERAL OFFICIAL COURT REPORTER
25            411 WEST 4TH STREET, ROOM 1-053
                  SANTA ANA, CA 92701
                  dhinospaan@yahoo.com

**UNITED STATES DISTRICT COURT**

```
 1                      APPEARANCES OF COUNSEL:

 2

 3    FOR THE PLAINTIFF:

 4            NICOLA T. HANNA
              United States Attorney
 5            BY:  BRETT SAGEL
                   Assistant United States Attorney
 6            411 West 4th Street
              Suite 8000
 7            Santa Ana, California 92701
              714-338-3598
 8            brett.sagel@usdoj.gov

 9            NICOLA T. HANNA
              United States Attorney
10            BY:  ALEXANDER WYMAN
                   Assistant United States Attorney
11            312 North Spring Street
              Suite 1100
12            Los Angeles, California 90012
              213-894-2435
13            alex.wyman@usdoj.gov

14    FOR THE DEFENDANT IN PRO SE:

15            MICHAEL JOHN AVENATTI, ESQ.

16

17    STANDBY COUNSEL FOR MR. AVENATTI:

18            H. DEAN STEWARD LAW OFFICES
              BY:  H. DEAN STEWARD, ESQ.
19            17 Corporate Plaza
              Suite 254
20            Newport Beach, California 92660
              949-481-4900
21            deansteward7777@gmail.com

22

23

24

25
```

**I N D E X**

**WITNESSES**                                                    **PAGE**

**GEOFFREY JOHNSON, CALLED BY THE GOVERNMENT**
     Cross-Examination by Mr. Avenatti                          8
     Redirect Examination by Mr. Wyman                          54
     Recross-Examination by Mr. Avenatti                        62

**NSHAN TASHCHYAN, CALLED BY THE GOVERNMENT**
     Direct Examination by Mr. Wyman                            67
     Cross-Examination by Mr. Avenatti                          80

**EXHIBITS**

| EXHIBIT | | IN EVIDENCE | WITHDRAWN OR REJECTED |
|---------|---|-------------|------------------------|
| 176-1 | Barela Text Messages - Forensic Report | 77 | |

**UNITED STATES DISTRICT COURT**

|   |   |
|---|---|
| 1 | **SANTA ANA, CALIFORNIA; THURSDAY, JULY 22, 2021** |
| 2 | **1:34 P.M.** |
| 3 | **- - -** |
| 4 | |
| 01:34PM  5 | **(Sidebar out of the presence of the jury:)** |
| 6 | THE COURT:  Mr. Avenatti, you had an issue? |
| 7 | MR. AVENATTI:  Your Honor, I just want to make sure |
| 8 | that my understanding of Your Honor's prior ruling is correct; |
| 9 | namely, that our request for *Jencks* in 26.2 has been deemed |
| 01:34PM 10 | made in connection with each witness. |
| 11 | THE COURT:  Yes. |
| 12 | MR. AVENATTI:  Okay. |
| 13 | THE COURT:  And you'll recall that I instructed the |
| 14 | Government to ensure that prior to the time the witness |
| 01:34PM 15 | completes his direct, that if there's any outstanding *Jencks* |
| 16 | material, they provide it to you. |
| 17 | MR. AVENATTI:  Thank you, Your Honor. |
| 18 | I do want to make one formal request, and we're at a |
| 19 | place in the record just before the lunch break where I was |
| 01:34PM 20 | asking Mr. Johnson about whether he had signed the settlement |
| 21 | agreement with the County, which, obviously, is a critical |
| 22 | document in this case.  He gave an interview with the |
| 23 | Government on March 31st, 2019.  He has some notes in front of |
| 24 | him now.  I've made copies over the break.  I apologize for not |
| 01:34PM 25 | having copies prior to that.  There is a reference in the notes |

1    from the Government, the typewritten memorandum.

2            THE COURT:  302?

3            MR. AVENATTI:  It's similar to 302, but it's

4    equivalent because it's the IRS.  On the second page of the

01:34PM 5    memorandum, at paragraph 7, the typewritten memorandum states

6    as follows:

7            "AUSA Andre presented a letter dated

8            January 22nd, 2015, Attachment 1, for Johnson to

9            review."  That is now in evidence as Exhibit 37.

01:34PM 10            "Johnson reviewed the last page of the document

11            which contained his signature.  Johnson stated that

12            his signature looked funny to him.  The G and the E

13            in his signature looked funny.  Johnson stated that

14            he may have signed the document but his signature

01:34PM 15            looks funny."

16                Paragraph 8:

17            "Avenatti went to Sunrise of West Hills to

18            deliver this document to Johnson.  Johnson lived at

19            Sunrise for two to three years.  Avenatti came to

01:34PM 20            Sunrise by himself to visit Johnson.  Avenatti told

21            Johnson he was pleased and hope Johnson would be

22            pleased too.  Avenatti informed Johnson a

23            settlement had been reached."

24                And it goes on from there.

01:34PM 25                Your Honor, we would like -- and at the end of the

memo it states that it was prepared from notes made during and

immediately after the interview with Geoffrey Johnson.  And the

date of this memorandum is March 31st.  It's unclear as to when

exactly the typewritten memorandum was prepared.

01:34PM          Your Honor, we would make a request that the

Government provide the handwritten notes to Your Honor in

camera relating to these specific areas, because we believe

that it may be *Brady*.  This is a critical point in what those

handwritten notes say, which was contemporaneous with

01:34PM Mr. Johnson's interview.  As to whether he signed this document

or not is critically important in this case.

          THE COURT:  If such notes exist, I would presume

they exist or the agent didn't retain the notes.

          MR. SAGEL:  All notes were retained, Your Honor.

01:34PM But I think our position has always been they're not *Jencks* of

Mr. Johnson.  The information -- so anything that would be

*Brady* in such interview is being provided to the defendant.  He

has paragraphs, as he said, 7 and 8, the information that could

be deemed *Brady*, *Giglio*, *Jencks*, and I'll --

01:34PM          THE COURT:  Okay.  You're saying the notes in that

report are not *Jencks* as to Mr. Johnson?

          MR. SAGEL:  Correct.

          THE COURT:  I think that's right.

          MR. AVENATTI:  Your Honor, we don't necessarily

01:34PM agree with that, but we don't even have to go down that road,

Your Honor.  Our point -- or my point is as follows:  If there's a handwritten note that states that he signed this document, it's *Brady*.  Doesn't matter whether it's *Jencks* or not.  And we're not -- Your Honor, we're asking that Your Honor look at the handwritten notes -- that's all we're asking for -- and Your Honor can make the call.

THE COURT:  Would you attempt to obtain any such notes that reference the signature?

MR. SAGEL:  I will.

I feel like we're going down a slippery slope because now we're going to hear this about every 302 that doesn't impeach a witness and doesn't create it.  We don't mind doing it because our position has been the same the whole time.  It's not *Jencks* for the witness.  And if he had any *Brady*, he has.  But if that's what Your Honor wants, we can do it.

THE COURT:  Do you know whether those notes have been produced?

MR. SAGEL:  The underlying notes have not.  The notes that the agents have taken --

THE COURT:  Go back to the agent's notes of that date's interview, either highlight it or put a flag on anything that references the paragraphs that Mr. Avenatti has read, and I'll look at it in camera.

MR. AVENATTI:  Thank you, Your Honor.  Appreciate it.

```
 1              MR. SAGEL:  Paragraphs 7 and 8?

 2              MR. AVENATTI:  Anything relating to whether he

 3   signed or reviewed the settlement agreement, which is

 4   Attachment 1 and Document 37.  So at a minimum, it's

 5   paragraphs 7 and 8.

 6              If there's anything else in the handwritten notes

 7   relating to that issue, I'd like Your Honor to see it.

 8              THE COURT:  Okay.

 9              (In the presence of the jury.)

10              THE COURT:  Good afternoon, ladies and gentlemen.

11              Mr. Avenatti, would you like to continue?

12              MR. AVENATTI:  Yes, Your Honor.  Thank you.

13        GEOFFREY JOHNSON, GOVERNMENT WITNESS, RESUMED THE STAND

14                     CROSS-EXAMINATION (resumed)

15   BY MR. AVENATTI:

16   Q    Good afternoon, Mr. Johnson.

17   A    Good afternoon.

18   Q    Right before we broke for lunch, I was asking you about

19   your signature or the signature block, I should say, on

20   Exhibit 37.  Do you recall that?

21   A    Yes.

22   Q    Hopefully we can pull that up for the jury.

23              And, sir, do you recall that when you met with the

24   Government for the very first time on March 31st, 2019, an

25   assistant U.S. attorney by the name of Julian Andre asked you
```

01:34PM (line 5)
01:34PM (line 10)
01:34PM (line 15)
01:35PM (line 20)
01:36PM (line 25)

```
 1   whether you had signed this document?

 2   A     Do I recall that?

 3   Q     Yes.

 4   A     I don't.

 5   Q     Let me see if I can refresh your recollection.  Do you

 6   have some notes in front of you there, sir?

 7   A     No.

 8   Q     I'm sorry.

 9   A     Okay.

10   Q     Sir, do you -- I don't want you to testify as to the

11   content of this document, but do you see the date on the first

12   page?

13   A     Yes.

14   Q     And if you go to paragraph 7.

15   A     Right.

16   Q     Do you see paragraph 7?

17   A     Yes, I do.

18   Q     Does that refresh your recollection that the first time

19   you met with the Government on March 31st, 2019, you informed

20   one of the assistant U.S. attorneys that you may have signed

21   this document?

22   A     Yes.

23   Q     And you were being truthful with the agents and the

24   Government when you stated that you may have signed the

25   document; right?
```

```
 1   A    Yes.
 2   Q    And then if I could direct your attention to paragraph 8
 3   in the document.  Does that refresh your recollection that when
 4   you met with the Government on March 31st, 2019, your very
01:38PM  5   first meeting, that you informed the Government that I had
 6   brought the settlement agreement to you when you lived at
 7   Sunrise?
 8   A    You mean the document or the idea of the settlement
 9   agreement?
01:38PM 10   Q    Sir, if I direct your attention, please, to paragraph 8,
11   the first sentence.
12          MR. WYMAN:  Your Honor, this is improper refreshing
13   of the witness's recollection.  He hasn't even asked that
14   question yet.
01:38PM 15          THE COURT:  Sustained.
16   Q    BY MR. AVENATTI:  Mr. Johnson, isn't it true that I
17   delivered the settlement agreement showing the $4 million to
18   you when you lived at Sunrise?
19   A    You never told me the settlement was for $4 million.
01:39PM 20          MR. AVENATTI:  Move to strike.  It's nonresponsive,
21   Your Honor.
22          THE COURT:  It's Stricken.
23          Sir, please listen to the question and try to answer
24   the precise question that was put to you.
01:39PM 25          MR. WYMAN:  Your Honor, if he's using this to
```

|   | 1 | refresh his recollection, it should be closed when he's |
|---|---|---|

```
        1   refresh his recollection, it should be closed when he's

        2   answering the question.

        3            THE COURT:  Don't look at it for the time being,

        4   okay?

01:39PM  5   Q    BY MR. AVENATTI:  Mr. Johnson, isn't it true that I

        6   brought a copy of the settlement agreement that is up on the

        7   screen to you at Sunrise of West Hills to deliver it to you?

        8   A    I don't recall you having that document with you.

        9   Q    Isn't it true that when you met with the agents from the

01:40PM 10   federal government on March 31st, 2019, you specifically told

       11   them that Avenatti went to Sunrise of West Hills to deliver the

       12   document to you?

       13   A    I just don't recall that.

       14   Q    Well, take a look at paragraph 8 on page 2.

01:41PM 15   A    If you delivered the document --

       16   Q    Wait a minute.  There's no pending question.

       17            Mr. Johnson, when you met with the Government, you

       18   understood that they were taking notes of everything that you

       19   said?

01:41PM 20   A    Yes.

       21   Q    And you understood that it was of critical importance

       22   that you were truthful and complete in your answers to the

       23   questions that the U.S. attorneys asked you; right?

       24   A    Yes.

01:41PM 25   Q    And they asked you about the settlement agreement, the
```

```
 1   one that's on the screen, didn't they?

 2   A     Yes, they did.

 3   Q     And one of the things that you told them was that I had

 4   gone to Sunrise of West Hills to deliver that document to you;

 5   isn't that true?

 6   A     Appears to be what I said, yes.

 7              MR. AVENATTI:  Let's have Exhibit 1, please.

 8   Q     BY MR. AVENATTI:  And before we get to that, what were

 9   the years that you lived at Sunrise of West Hills?

10   A     December of 2012 through 2015.

11              MR. AVENATTI:  And can we have that settlement

12   agreement again -- back?  I'm sorry.  37.

13   Q     BY MR. AVENATTI:  Sir, what are the dates on that

14   signature page?

15   A     Dated 1 -- my signature is dated January 2nd, 2015.

16   Q     And as of that date you were living at Sunrise; right?

17   A     Yes.

18              MR. AVENATTI:  Let's go to Exhibit 1, please.

19   Q     BY MR. AVENATTI:  And, Mr. Johnson, you can feel free to

20   refer to your books of exhibits if that's easier for you.

21   Okay, sir?

22   A     Okay.  What was this exhibit?

23   Q     It's Exhibit 1.

24   A     Okay.  Okay.

25   Q     Mr. Johnson, I believe it's your position that this was
```

01:41PM

01:42PM

01:43PM

01:43PM

01:44PM

1    the written agreement that we first entered into in connection

2    with us assisting you; is that right?

3    A    It appears to be the contingency agreement.

4    Q    And if I could direct your attention to the date at the

01:44PM 5    top of the document, do you see it's dated November 8th, 2011?

6    A    Yes.

7    Q    And if you look at paragraph 2, "Scope of Services."  Do

8    you see that, sir?

9    A    Yes.

01:45PM 10   Q    And these were the services that me and my firm agreed we

11   would perform for you in exchange for a percentage of monies

12   that we recovered from the claims targeting Los Angeles County;

13   right?

14   A    Yes.

01:45PM 15   Q    And this paragraph set forth what our agreement was

16   relating to what work we would do for you in exchange for that

17   money; right?

18   A    Yes.

19   Q    And then if we go to paragraph 3, "Client's Duties."  Do

01:46PM 20   you see that, sir?

21   A    Yes.

22   Q    And this reads:

23        "Client agrees to be truthful with attorney,

24        to cooperate, to keep attorney informed of

01:46PM 25        developments, to abide by this agreement, and to

```
 1          pay bills for costs on time."
 2              Did I read that correctly?
 3   A    Yes.
 4   Q    And then if we go to paragraph 4, can you see that?
 5   A    Yes.
 6   Q    Paragraph 4 provided that we were to get, only for the
 7   scope of services in this agreement, 40 percent of any
 8   settlement or judgment; is that right?
 9   A    Yes.
10   Q    And it also states that if any part of your settlement or
11   judgment was to be deferred or paid later, we were supposed to
12   be paid first; right?
13              MR. WYMAN:  Objection.  Document speaks for itself.
14   I don't know where he's referring to.
15              THE COURT:  Overruled.
16   Q    BY MR. AVENATTI:  That was our deal.
17   A    Where does it say that?
18   Q    Sure.  In the second paragraph, in paragraph 4, "If
19   payment of all or any part of the amount to be received will be
20   deferred," and then it goes on to define the term "recovery,"
21   which is the term that you used to determine how much me and my
22   firm would get paid.
23              Do you see that?
24   A    Yes.  Yes.
25   Q    That was our deal; right?
```

```
 1   A      That's what it says.

 2   Q      And that's what you agreed to?

 3   A      Yes.

 4   Q      Then if we go to the next paragraph -- I'm sorry,

 5   paragraph 5, "Negotiability of Fees."  Do you see that, sir?

 6   A      Yes.

 7   Q      It says, "The rates set forth above are not set by law

 8   but were negotiated between attorney and client."

 9          Do you see that?

10   A      Yes.

11   Q      And then paragraph 6, "Costs, Disbursements and

12   Expenses."

13   A      Yes.

14   Q      "Client will reimburse attorney for all

15          out-of-pocket litigation and trial costs and

16          expenses from the proceeds received by client, if

17          any, at the conclusion of litigation."

18          Did I read that correctly?

19   A      Yes.

20   Q      "Costs and expenses," in quotes, "include filing

21          and court fees, investigative expenses, process

22          fees, investigative fees, graphic art and filming

23          fees, PowerPoint fees, computer animation fees,

24          expert fees, deposition costs, photocopying charges,

25          mock trials or focus groups, jury fees, computerized
```

01:48PM (line 5)
01:49PM (line 10)
01:49PM (line 15)
01:49PM (line 20)
01:50PM (line 25)

```
         1        research, jury trial consultant fees, telephone toll

         2        charges, travel costs, mail messenger and other

         3        delivery charges, postage and any other necessary

         4        expenses in this matter."

01:50PM  5            Did I read that correctly?

         6   A    Yes.

         7   Q    "Client authorizes attorney to incur all reasonable

         8        costs and to hire any investigators, consultants or

         9        expert witnesses reasonably necessary in attorney's

01:50PM 10        judgment."

        11            Did I read that correctly, sir?

        12   A    Yes.

        13   Q    And that was our deal; right?

        14   A    That's what it says.

01:51PM 15   Q    And that's what we agreed to the first time that I met

        16   you; right?

        17   A    I just don't recall going over this document with you the

        18   first time we met.

        19   Q    You don't deny signing it; right?

01:51PM 20   A    It appears that I signed it, yes.

        21   Q    Well, you're not -- you're not suggesting that me or

        22   Mr. Baeda pulled a fast one on you by having you sign this, are

        23   you?

        24   A    No.

01:51PM 25   Q    Okay.
```

|   |   |   |
|---|---|---|
| | 1 | Paragraph 9.  Do you have that there, sir? |
| | 2 | A    Yes. |
| | 3 | Q    "Client represents that client does not know of |
| | 4 | any related legal matters that would require legal |
| 01:52PM | 5 | services to be provided under this agreement." |
| | 6 | Did I read that correctly? |
| | 7 | A    Yes. |
| | 8 | Q    "If such a matter arises later, client agrees that |
| | 9 | this agreement does not apply to any such related |
| 01:52PM | 10 | legal matters and a separate agreement for provision |
| | 11 | of services and payment for those services will be |
| | 12 | required if client desires attorney to perform that |
| | 13 | additional legal work." |
| | 14 | Did I read that correctly? |
| 01:52PM | 15 | A    Yes. |
| | 16 | Q    Sir, can you please take as much time as you would like |
| | 17 | with this document.  And I would like you to direct, if you |
| | 18 | could, the jury's attention to the part of the document where |
| | 19 | it required me and my firm to pay for your living expenses or |
| 01:53PM | 20 | medical care. |
| | 21 | MR. WYMAN:  Objection, Your Honor. |
| | 22 | THE COURT:  Overruled. |
| | 23 | MR. WYMAN:  Relevance and foundation. |
| | 24 | THE COURT:  Overruled. |
| 01:54PM | 25 | THE WITNESS:  I don't see any place that it says |

| | |
|---|---|
| 1 | that. |
| 2 | Q    BY MR. AVENATTI:  Mr. Johnson, could you please direct |
| 3 | the jury's attention to the portion of the document where it |
| 4 | says that me or my firm were required to assist you with your |
| 01:54PM 5 | benefits, your SSI benefits. |
| 6 | A    I don't think there's anything like that in here. |
| 7 | Q    Mr. Wyman asked you about trying to buy a house.  Do you |
| 8 | remember that? |
| 9 | A    Yes. |
| 01:54PM 10 | Q    Can you please direct the jury's attention -- well, |
| 11 | strike that. |
| 12 |          The agent, Mr. Goeders, that you mentioned -- |
| 13 | A    Yes. |
| 14 | Q    -- that was someone that I had reached out to for your |
| 01:55PM 15 | benefit; is that right? |
| 16 | A    Yes, I believe so. |
| 17 | Q    Can you please direct the jury's attention to the portion |
| 18 | of the document that talks about the fact that me and my firm |
| 19 | were obligated to assist you in finding a home and a real |
| 01:55PM 20 | estate agent. |
| 21 | A    I don't believe there's anything in that document that |
| 22 | would cover that. |
| 23 | Q    Can you please direct the jury's attention to the part of |
| 24 | the document that required me and my firm to pay your rent. |
| 01:55PM 25 | A    I don't believe there's anything in the document that |

covers that.

Q    Can you please direct the jury's attention to the part of

the document that required me or my firm to pay for your

father's hearing aids, which is a question that Mr. Wyman asked

01:56PM  you about on direct.

A    I don't believe there's anything in there about that.

Q    I think Mr. Wyman asked you about dental care.  Is there

anything in the agreement that obligated me and my firm to pay

for your dental care, sir?

01:56PM  A    Not in this agreement, no.

Q    Is it fair to say, sir, that from 2011 until early 2019,

you dealt with Judy Regnier from my office much more than you

dealt with me?

A    From 2011 to 2015?

01:57PM  Q    No.  From 2011 until early 2019.

A    Oh.  Pound for pound, yes.

Q    When you asked for money to be deposited and things of

that nature, you understood that I wasn't going to be doing

that; right?  You understood Judy was going to be handling

01:57PM  that?

A    My understanding would -- typically it would be Judy.

Q    You had the understanding that I was traveling around the

country representing plaintiffs and trying cases during that

time period, didn't you?

01:58PM  A    I assumed you had other clients, yes, and that you were

```
           1   busy.
           2   Q    Well, not only did you assume, I mean, you knew that,
           3   right, from things that you saw?
           4   A    Yes.
01:58PM    5   Q    You knew that I was not handling the day-to-day
           6   accounting and banking transactions relating to you; right?
           7   A    For the most part.  When Judy was out of town, you did.
           8   Q    On a few occasions perhaps; right?
           9   A    On a number of occasions.
01:58PM   10   Q    Can you estimate for the jury?  It's less than ten, isn't
          11   it?
          12   A    Probably.
          13   Q    Okay.  And you can't identify those specific
          14   transactions, can you, as you sit there today?
01:59PM   15   A    Well, the ones that are in the exhibits that are between
          16   you and I, the text, those I can identify.  But beyond that, I
          17   can't.
          18   Q    Beyond what may be in the exhibits, you don't have any
          19   independent recollection of those transactions; is that right?
01:59PM   20   A    I have vague recollections of you helping me when she's
          21   unavailable.
          22   Q    Sir, are you aware of the fact that from 2011 until early
          23   2019 that I didn't even know how to send a wire transfer
          24   online?
02:00PM   25   A    No, I wasn't aware of that.
```

**UNITED STATES DISTRICT COURT**

```
 1   Q    Now, you recently have taken steps to hold other people
 2   responsible for what you claim to be money that was due you
 3   that you were not paid, meaning people other than me; isn't
 4   that true?
 5   A    My understanding is that's confidential.
 6            THE COURT:  Sir, I'll direct you to answer the
 7   questions.  If a matter is relevant to a private
 8   confidentiality agreement, it doesn't insulate that, that
 9   information from an inquiry here in court, so I direct you to
10   answer.
11            THE WITNESS:  Okay.
12            Could you repeat the question, please.
13   Q    BY MR. AVENATTI:  You have recently taken steps to hold
14   people, other than me, responsible for money that you claim you
15   did not receive; right?
16   A    Yes.
17   Q    And those people include Judy Regnier; right?
18   A    We have not taken steps -- I mean, define "taken steps."
19   Q    Well, isn't it true, sir, yes or no, that you have sued
20   Judy Regnier, claiming that she is the one that is responsible
21   for you not receiving your money?
22   A    To my knowledge --
23   Q    Isn't that true, sir?
24   A    -- we have not sued Judy Regnier.
25   Q    So if it was later shown that, in fact, you have sued
```

02:01PM  5
02:01PM 10
02:01PM 15
02:01PM 20
02:02PM 25

```
 1   Judy Regnier, or a lawsuit was filed in your name against Judy
 2   Regnier, that would be very upsetting to you; right?
 3   A    Well, okay.
 4   Q    No, sir, I'm sorry.  Let me strike my question.  I just
 5   want you to answer my question, please.  Okay?
 6   A    Okay.
 7   Q    All right.  As you sit there today, you are not aware of
 8   anyone filing a lawsuit against Judy Regnier in your name; is
 9   that correct?
10   A    Yes, I am.
11   Q    Oh, you are?
12   A    Yes.
13   Q    Okay.  So one of the persons that you were seeking to
14   hold responsible for you not getting the money that you claim
15   you are due is Judy Regnier; is that right?
16   A    Yes.
17   Q    Okay.  Another person that you claimed was responsible
18   for you not getting the money that you claim you are due is
19   Jason Frank; right?  Yes?
20   A    That's --
21   Q    Sir, I'm sorry.
22   A    Yes.
23   Q    Yes.  Okay.
24        Another person that you have claimed is responsible
25   for you not getting your money is Scott Sims; right?
```

1    A    Yes.

2    Q    Another person that you claim is responsible for you not

3    getting your money is a gentleman by the name of Michael Q.

4    Eagan, E-a-g-a-n; right?

02:04PM 5    A    Yes.

6    Q    How about Patrick McNicholas?  Have you ever claimed that

7    Patrick McNicholas is responsible for you not getting the money

8    you claim you are owed?

9    A    I'm not sure who that is.

02:04PM 10    Q    Now, in connection with your efforts to hold other people

11    responsible for you not getting the money that you claim you

12    are owed, meaning people other than me, you have filed various

13    actions; right?

14    A    Yes.

02:04PM 15    Q    And one of the things that -- strike that.

16         One of the matters that you filed was an arbitration

17    proceeding, which is like a lawsuit, seeking to hold other

18    people responsible for you not getting your money; right?

19    A    Yes.

02:05PM 20    Q    And did you testify in connection with that arbitration

21    proceeding under oath?

22    A    Yes.

23    Q    Did you testify in a sworn deposition as well as at the

24    actual arbitration, or was it only one instance?

02:05PM 25    A    I believe it was only one instance, the deposition.

24

Q    And when was that deposition?

A    It was 2000 -- my best recollection is 2020.

Q    And in that deposition, very similar to when you took the stand here today, you raised your right hand and you swore to

02:06PM tell the truth, the whole truth, and nothing but the truth, so help you God; correct?

A    Yes.

Q    And at the deposition you were represented by a lawyer who is with us here today; am I right?

02:06PM A    That's right.

Q    And can you point him out to the jury, please.  Is it the gentleman sitting in the front row here?

A    With the blue -- that's him.

Q    And what is his name?

02:06PM      MR. WYMAN:  Objection.  Relevance, Your Honor.

      THE COURT:  Overruled.

      THE WITNESS:  Drew Harbur.

Q    BY MR. AVENATTI:  And how long did that deposition last, do you remember?

02:06PM A    I think it was a full day approximately.

Q    And was there anything that you testified in that deposition to, under oath, that was untrue?

A    No.

Q    Now, after that deposition, was there an actual

02:07PM arbitration hearing similar to this, but not in a courtroom,

UNITED STATES DISTRICT COURT

        1   relating to your claims against other people?

        2   A    Yes.

        3   Q    And when did that arbitration proceeding take place?

        4   A    2020, I believe.

02:07PM  5   Q    It was late 2020; right?

        6   A    Okay.

        7   Q    And how long did that arbitration proceeding last?

        8   A    I think, like, two days, day and a half.

        9   Q    And it was in front of a retired judge; am I right?

02:08PM 10   A    Yes, I believe so.

       11   Q    Do you remember his name?

       12   A    No, I don't.

       13   Q    And at the end of that arbitration, was there a decision

       14   rendered?

02:08PM 15   A    Yes.

       16   Q    Please tell the jury what the decision was.

       17   A    That the people that we were suing were not responsible.

       18   Q    And that was despite what you had claimed; right?

       19   A    That's right.

02:09PM 20   Q    And as you sit here today, sir, have you claimed that any

       21   people, other than those in the arbitration, were responsible?

       22   A    No.

       23   Q    Is it your testimony that you have not reached any

       24   settlements with any other parties relating to the fact that

02:09PM 25   you believe that they are responsible for you not getting your

```
        1   money?

        2   A     My understanding is that's confidential.

        3             THE COURT:  Sir, I, again, order you to answer the

        4   question.  If you're relying on a duty of confidentiality as

02:10PM 5   part of a settlement agreement or with some other party, that

        6   does not override your right to give relevant testimony here.

        7   So please answer the question.

        8             THE WITNESS:  Could you repeat the question.

        9   Q    BY MR. AVENATTI:  Have you entered into any settlement

02:10PM 10  agreements or other agreements with parties that you claimed

       11   had responsibility for you not receiving your money?

       12   A     Yes.

       13   Q     Which parties?

       14   A     Michael Eagan.

02:10PM 15  Q     And how much did Michael Eagan agree to pay you in

       16   connection with the settlement?

       17             MR. WYMAN:  Objection.  Relevance, Your Honor.

       18             THE COURT:  Overruled.

       19             THE WITNESS:  $1.5 million.

02:11PM 20  Q    BY MR. AVENATTI:  And when did Michael Eagan agree to pay

       21   you $1.5 million?

       22   A     Probably early 2020.

       23   Q     Did you get the money?

       24   A     Yes.

02:11PM 25  Q     To the best of your knowledge, has Michael Eagan been
```

**UNITED STATES DISTRICT COURT**

|      | 1 | charged with any crimes associated with your representation, |

1    charged with any crimes associated with your representation,

2    sir?

3    A    Not that I know of.

4    Q    Did you ever talk about the fact that Michael Eagan had

02:12PM 5    agreed to pay you $1.5 million with any of the government

6    agents or assistant U.S. attorneys?

7    A    No.

8    Q    Do you know if your attorney did, one way or the other?

9    A    I don't believe he would have.

02:12PM 10   Q    But you don't know?

11   A    I don't know.

12   Q    When you gave your deposition in connection with the

13   arbitration -- do you remember I was asking you about that

14   moments ago?

02:12PM 15   A    Yes.

16   Q    Were you asked about the retention agreement that we've

17   been talking about?

18   A    Is that the contingency agreement?

19   Q    Yes, sir.

02:13PM 20   A    I just don't recall.

21   Q    But you were asked about the relationship between you and

22   my firm and me and others; correct?

23   A    I believe so.

24   Q    And you were asked about what your expectations were

02:13PM 25   relating to the money; right?

```
 1   A    Relating to what money?

 2   Q    To whatever money might be recovered.

 3   A    I was asked about what?

 4   Q    Strike the question.  Let me ask a better question.

 5              During the all-day deposition that occurred -- do

 6   you remember you testified it was all day?

 7   A    Yeah.

 8   Q    You were asked about what services were provided to you

 9   and what costs were paid on your behalf; right?

10   A    Yes, I believe I was.

11   Q    And after the deposition, were you given an opportunity

12   to review it, to make sure that everything you had said was

13   truthful and accurate and correct?

14   A    Yes.

15   Q    And who gave you the deposition transcript to review?

16   Was that the same gentleman here in the courtroom today?

17   A    Yes, I believe so.

18   Q    Did you review it?

19   A    Yes.

20   Q    Did you make any corrections, additions, or changes?

21   A    No.

22   Q    So it was 100 percent accurate; is that right?

23   A    I believe so.

24   Q    And as you sit here today, you stand behind whatever you

25   testified to then, don't you?
```

```
 1   A     Yes.
 2              MR. AVENATTI:  Can we have 37 back, please.
 3              THE WITNESS:  Okay.
 4   Q    BY MR. AVENATTI:  Now, in connection with that
 5   arbitration proceeding, you claimed that you were due the
 6   $4 million from the County of Los Angeles pursuant to this
 7   agreement; right?
 8   A     Yes, I believe so.
 9   Q    So you sought -- that's a terrible question.  I'll strike
10   it.  I'm sorry.
11              In that arbitration proceeding, what you wanted was
12   you wanted the arbitrator to say, "Mr. Johnson was entitled to
13   $4 million pursuant to this agreement, and he didn't get it,
14   and, therefore, he's now entitled to X"; right?
15   A     I don't -- wouldn't put it that way.
16   Q    Sir, in the arbitration proceeding, you sought to enforce
17   the fact that you were entitled to proceeds from this
18   $4 million settlement; right?
19   A     Yes.
20   Q    And in that proceeding, just like you told the Government
21   on March 31st, 2019, you admitted that this was a valid
22   agreement, didn't you?
23   A     I don't recall that question.
24              MR. AVENATTI:  Your Honor, one moment, please.
25              (Pause in proceedings.)
```

```
 1              MR. AVENATTI:  If we can have the signature page

 2     back at the top --

 3              THE WITNESS:  Yes.

 4              MR. AVENATTI:  -- with the statement immediately

 5     below and Mr. Johnson's signature, please.  Thank you.

 6     Q    Can you see that, Mr. Johnson?

 7     A    Yes.

 8     Q    "The parties further agree that they have read and

 9          fully understand this agreement, that the

10          opportunity has been afforded to discuss the terms

11          and contents of this agreement with legal counsel,

12          and/or that such a discussion with legal counsel has

13          occurred."

14              Did I read that correctly?

15     A    Yes.

16     Q    And then immediately before your signature it states:

17     "CAUTION:  READ BEFORE SIGNING"; am I right?

18     A    Yes.

19     Q    And the first page of the document specifically refers --

20     I'm sorry.  The second page of the document, the first page of

21     the settlement agreement, at the top under "Recitals"

22     specifically refers to the lawsuit that we've been talking

23     about now for days, doesn't it?

24     A    The one with -- against the County?

25     Q    Yes.
```

A      Yes.

Q      And the amount of $4 million is on the first page of the document as well; right?

A      Yes.

02:20PM  Q      Now, sir, you would agree with me that if someone came before this jury and told the jury that Michael Avenatti stole the entirety of Geoffrey Johnson's $4 million settlement check, that that would be completely false; right?

              MR. WYMAN:  Objection.  Vague.

02:21PM        THE COURT:  Overruled.

              THE WITNESS:  No.  I was told --

Q      BY MR. AVENATTI:  Sir.  Sir, here's my question.  You answered "No."  My question is this:  Is it your position that if you -- strike that.

02:21PM        Is it your position that if your claim was settled for $4 million, that me and my firm were not entitled to a penny?

A      No, that's not my position.

Q      Okay.  So let me ask my question again:  You would agree

02:21PM  that if someone came before this jury and told them, "Michael Avenatti stole the entirety of Mr. Johnson's $4 million settlement check," that would be completely false; right?

A      No.

Q      It's your position that the $4 million settlement check,

02:22PM  the $4 million, me and my firm were not entitled to a dime.  Is

```
 1   that your position?
 2   A     No.
 3   Q     Okay.
 4   A     If you let me explain --
 5            THE COURT:  Sir, he gets to ask the questions at
 6   this point.
 7   Q     BY MR. AVENATTI:  Sir, under the agreement that you
 8   signed, me and my firm were entitled to get a percentage of the
 9   proceeds and all of our out-of-pocket expenses and advances to
10   you, weren't we?
11   A     Yes.
12   Q     And at the time that the settlement proceeds came in, we
13   had been supporting you for years?
14   A     Yes.
15   Q     Now, you also gave a deposition in the actual case
16   against the County of Los Angeles.  Do you remember that?
17   A     Yes.
18   Q     And did you tell the truth in that deposition?
19   A     Yes.
20   Q     And you were given an opportunity to review that
21   testimony before or shortly after the deposition as well;
22   correct?
23   A     Yes.
24   Q     Have you ever previously claimed or testified that you
25   suffer from mental illness?
```

02:22PM
02:22PM
02:23PM
02:23PM
02:24PM

```
        1   A     Before this action?

        2   Q     No.  Let me see if I can clarify the question for you.

        3         Before you took the stand today, have you ever

        4   previously claimed or testified that you suffer from a mental

02:24PM 5   illness?

        6         MR. WYMAN:  Objection, Your Honor.  I think that's

        7   asked and answered from this morning.

        8         THE COURT:  Overruled.

        9         THE WITNESS:  I just don't recall what I -- if I've

02:25PM 10  ever said that.

       11   Q     BY MR. AVENATTI:  Sir, isn't it true that you testified

       12   in a deposition on December 12th, 2013, that you suffered from

       13   serious mental illness, including hallucinations?

       14   A     I may have.

02:25PM 15  Q     You think you may have because that's true; right?

       16         MR. WYMAN:  Objection.  Argumentative.

       17         THE COURT:  Overruled.

       18         THE WITNESS:  I suppose it is true, yes.

       19   Q     BY MR. AVENATTI:  And, Mr. Johnson, you previously

02:26PM 20  testified that your mental condition impacts your memory as

       21   well; right?

       22   A     I don't recall if I said that or not.

       23   Q     But you may have?

       24   A     I may have.

02:26PM 25  Q     Who is Dr. Alisa Cross?
```

```
         1   A     My psychiatrist.

         2   Q     And you started seeing her in approximately 2008 and

         3   2009; correct?

         4   A     Yes.

02:27PM  5   Q     And she prescribed Abilify for hallucinations for you;

         6   right?

         7   A     Yes.

         8   Q     And you previously claimed under oath that you had

         9   suffered hallucinations every day?

02:27PM 10   A     There was a time when it was every day.

        11   Q     At least once a day; correct?

        12   A     Yes.

        13   Q     And that you believed that people in cars and helicopters

        14   were following you; is that correct?

02:28PM 15              MR. WYMAN:  Objection.  401, 403.

        16              THE COURT:  Sustained.

        17   Q     BY MR. AVENATTI:  And Dr. Cross specifically told you,

        18   Mr. Johnson, that, unfortunately, you had problems with your

        19   brain and chemical imbalances, didn't she?

02:28PM 20   A     Yes.

        21   Q     Who is Dr. Zackler?

        22   A     He is the psychiatrist that you hired to evaluate me in

        23   preparation for the deposition for the County lawsuit.

        24   Q     And who is Dr. Fields?

02:29PM 25   A     I don't recall a Dr. Fields.
```

```
      1   Q     How about a Dr. Dick?

      2   A     Dr. Dick, I believe, was my primary care physician.  Oh,

      3   Dr. Fields was my primary care physician when I was in

      4   Libertyville.

02:29PM 5   Q     Mr. Johnson, do you remember being asked under oath about

      6   an instance where you thought another patient was sending you

      7   messages by clicking their jaw?

      8               MR. WYMAN:  Same objections, Your Honor.

      9               THE COURT:  Sustained.

02:29PM 10  Q     BY MR. AVENATTI:  And Mr. Johnson, you were prescribed,

     11   at one point, Abilify for potential psychiatric episodes; am I

     12   right?

     13               MR. WYMAN:  Objection.  Asked and answered and

     14   cumulative at this point.

02:30PM 15              THE COURT:  Sustained.

     16   Q     BY MR. AVENATTI:  Now, Mr. Wyman asked you about

     17   CareMeridian and whether you had to pay CareMeridian $175,000.

     18   Do you recall that?

     19   A     Yes.

02:30PM 20  Q     Did anyone ask you to pay any money directly to

     21   CareMeridian?

     22   A     No.

     23   Q     As you sit here today, do you have any idea what the

     24   billing dispute was between my office and CareMeridian?

02:30PM 25  A     No.
```

| | |
|---|---|
| 1 | Q    I believe under direct examination, you said that you |
| 2 | wanted to buy a home and get a van and you wanted to -- and I |
| 3 | wrote it down -- live independently.  Do you recall that? |
| 4 | A    Yes. |
| 02:31PM 5 | Q    Sir, in the last ten years, is there any one individual |
| 6 | who paid more of your bills and supported you more financially |
| 7 | so that you could live independently other than me? |
| 8 | A    No. |
| 9 | Q    Sir, you're not an expert on special needs trusts.  Would |
| 02:32PM 10 | you agree with me? |
| 11 | A    Yes.  Correct. |
| 12 | Q    So you don't know what they require or what they don't |
| 13 | require; is that fair? |
| 14 | A    I only know some basic information about it. |
| 02:32PM 15 | Q    You don't know the nuances as it relates to how many has |
| 16 | to be received or when it has to be received or how it has to |
| 17 | be held, and things of that nature, do you? |
| 18 | A    Correct. |
| 19 | Q    Now, Mr. Wyman asked you a question about when you had |
| 02:32PM 20 | gone and spoken with, I believe it was a paralegal.  Do you |
| 21 | remember that questioning? |
| 22 | A    Yeah. |
| 23 | Q    And you said -- you stated that I was, I think you said, |
| 24 | furious; right? |
| 02:33PM 25 | A    Yes. |

| | |
|---|---|
| 1 | Q    And we can pull out the notes, but that occurred around |
| 2 | 2012 or '13; right? |
| 3 | A    I just don't recall exactly when it occurred. |
| 4 | MR. AVENATTI:  Your Honor, one moment, please. |
| 02:33PM 5 | **(Pause in proceedings.)** |
| 6 | Q    BY MR. AVENATTI:  I believe Mr. Wyman asked you a |
| 7 | question and you testified that I offered, quote, "whatever you |
| 8 | needed"; is that right? |
| 9 | A    In -- |
| 02:34PM 10 | Q    Sir, was that your testimony? |
| 11 | A    Yes. |
| 12 | Q    And at one point in time, I offered to send you whatever |
| 13 | amount of money that you wanted or needed, and you told me that |
| 14 | you did not want to accept any more than $1900; right? |
| 02:34PM 15 | A    That's right. |
| 16 | Q    That was a limit that you told me about; right? |
| 17 | A    That's right. |
| 18 | Q    That wasn't a limit that I put on you, was it? |
| 19 | A    No, it was not. |
| 02:34PM 20 | MR. AVENATTI:  Your Honor, may I approach with a |
| 21 | document to refresh? |
| 22 | THE COURT:  You may.  Well, first of all, let's |
| 23 | establish the basis for refreshing. |
| 24 | Q    BY MR. AVENATTI:  Mr. Johnson, moments ago I asked you |
| 02:35PM 25 | about when you had reached out to this paralegal, at which |

1   point you testified that, according to your testimony earlier,

2   that I became, quote, "furious."  Do you recall that?

3   A    Yes.

4   Q    Okay.  And then I asked you when that occurred, and you

02:35PM  5   didn't recall exactly; right?

6   A    Yes.

7   Q    So let me show you a document and see if it refreshes

8   your recollection.

9   A    Okay.

02:35PM 10          MR. WYMAN:  Your Honor, improper refreshing.

11          THE COURT:  Overruled.

12          MR. AVENATTI:  May I approach?

13          THE COURT:  You may.

14   Q    BY MR. AVENATTI:  Mr. Johnson, you also met with the

02:36PM 15   Government on June 24th, 2021.  Do you recall that?

16   A    Yes.

17   Q    And Mr. Wyman was there; right?

18          MR. WYMAN:  Your Honor, I'm going to, again, object

19   if he's asking questions with the document open.  It's not

02:37PM 20   proper refreshing of his recollection.

21          THE COURT:  Sir, turn the document over for the time

22   being, please.

23   Q    BY MR. AVENATTI:  Do you recall that Mr. Wyman was

24   present along with Special Agent Carlos?

02:37PM 25   A    Yes.

```
          1    Q    Now, I'd like to direct your attention to paragraph 7 of

          2    that document, and we'll see if it refreshes your recollection

          3    about this issue relating to the paralegal.

          4    A    Okay.  Okay.

02:37PM   5    Q    Does that refresh your recollection that this incident

          6    that you described, if it occurred, occurred in 2012?

          7    A    It doesn't say that.

          8          THE COURT:  That's not the question, sir.  The

          9    question is whether it refreshes your recollection.

02:38PM  10          THE WITNESS:  No.

         11    Q    BY MR. AVENATTI:  You first learned of the special needs

         12    trust sometime in 2012; am I correct?

         13    A    Yes.

         14    Q    From someone named Sean and someone named Mary; right?

02:38PM  15    A    Yes.

         16    Q    And they referred you at that time to a paralegal; right?

         17    A    No.

         18          MR. WYMAN:  Your Honor, again, this is not proper

         19    refreshing.

02:39PM  20          THE COURT:  Sir, turn that document over unless

         21    Mr. Avenatti asks you to look at a specific passage to refresh

         22    your recollection.  Okay?

         23          THE WITNESS:  Okay.

         24          THE COURT:  Thank you.

02:39PM  25    Q    BY MR. AVENATTI:  Sir, are you generally familiar with
```

UNITED STATES DISTRICT COURT

40

```
          1  what the attorney-client privilege is?
          2  A    Yes.
          3  Q    And the attorney-client privilege means that when you
          4  communicate with something -- strike that.
02:39PM   5          The communicating -- strike that.
          6          The attorney-client privilege generally is when you
          7  communicate something to one of your lawyers, that it's
          8  protected.  That's your understanding; right?
          9  A    Yes.
02:39PM  10  Q    Do you have any idea what the impact -- when you have a
         11  lawyer, what the impact is of going to some other paralegal and
         12  discussing your case with them is?  Do you have any idea what
         13  the impact, if any, is?
         14          MR. WYMAN:  Objection.  Calls for a legal conclusion
02:40PM  15  and speculation.
         16          THE COURT:  Sustained.
         17  Q    BY MR. AVENATTI:  Sir, you're not an expert on the
         18  attorney-client privilege; right?
         19  A    Correct.
02:40PM  20  Q    You have no idea what the impact may or may not be of
         21  talking to paralegals that don't work for your attorneys, do
         22  you?
         23          MR. WYMAN:  Same objection.
         24          THE COURT:  Sustained.  Asked and answered.
02:40PM  25  Q    BY MR. AVENATTI:  You were asked about some loan
```

```
 1   documents that you claimed you did not sign.  Do you recall
 2   that?
 3   A    Yes.
 4   Q    Do you have any idea who signed those document?
 5   A    No.
 6   Q    Do you have any evidence that I ever signed those
 7   documents?
 8   A    Personally, I do not.
 9   Q    At one point in time we allowed you to use one of our
10   firm credit cards; am I right?
11   A    I believe so, yes.
12   Q    And what was that for?
13   A    I don't recall.
14   Q    It was for one or more of your personal expenses?
15   A    I just don't recall.
16   Q    And after you were late on your rent, sir, you were able
17   to stay.  I think that was your testimony; right?
18   A    Yes.
19   Q    And that was because we paid it; right?
20   A    Yes.
21           MR. AVENATTI:  Let's take a look at Exhibit 108,
22   please.
23           THE WITNESS:  Okay.
24           MR. AVENATTI:  Can we have it for the jury, please.
25           THE COURT:  It's not in.
```

```
 1              MR. AVENATTI:  Your Honor, I thought that came in
 2    except not for the truth of the matter asserted.
 3              MR. WYMAN:  I believe that's correct, Your Honor.
 4              THE COURTROOM DEPUTY:  Which exhibit?
 5              MR. AVENATTI:  108.
 6              THE COURT:  Let me look at my notes.
 7              THE COURTROOM DEPUTY:  I have it in, Judge.
 8              THE COURT:  Okay.  Correct.  Not for the truth.
 9    Proceed.
10              MR. AVENATTI:  Thank you, Your Honor.
11              Can we blow that up, please.
12    Q    Can you see that, Mr. Johnson?
13    A    Yes.
14    Q    Okay.  And it's dated November 1st, 2018, at the top;
15    right?
16    A    Yes.
17    Q    And then in the first paragraph -- by the way, this is
18    addressed to you, not to me; right?
19    A    Yes.
20    Q    And the first paragraph reads:
21              "On November 1, 2018, we talked with you and
22         completed your redetermination for supplemental
23         security income, SSI."
24              Am I correct about that?
25    A    Yes.
```

**UNITED STATES DISTRICT COURT**

```
 1   Q    And you got this letter after you got on the phone with
 2   SSI, and they asked you some questions.  They did an interview;
 3   am I right?
 4   A    Yes.
 5   Q    And I wasn't on that call, was I?
 6   A    No.
 7   Q    Was Judy on the call?
 8   A    No.
 9   Q    Was anyone from my office on the call?
10   A    No.
11   Q    And then it reads:
12             "We have stored your redetermination
13        electronically in our records.  Attached is a
14        summary of your statements for your review."
15             Do you see that?
16   A    Yes.
17   Q    And other than these two pages, were there other -- was
18   there a summary of additional statements that was attached
19   pursuant to what SSI states in the letter?
20   A    I don't recall.
21   Q    You don't know one way or the other; right?
22   A    Correct.
23   Q    But there's no summary listed on these two pages.  You
24   would agree with that, would you not?
25   A    Yes.
```

```
 1   Q     So the document appears to be incomplete; isn't that
 2   right?
 3   A     Yes.
 4   Q     And then Mr. Wyman asked you a question about this second
 5   page of the exhibit.  There's some items in green.  Do you see
 6   that?
 7   A     Yes.
 8   Q     Did you put the green markings on this page?
 9   A     I believe that they did.
10   Q     Who's "they"?
11   A     The Social Security Administration.
12   Q     And the very first document that they asked for is a
13   document called "New Rental Agreement"; right?
14   A     Yes.
15   Q     Do you know what they were asking for relating to that?
16   A     My vague recollection is that it was for the rental
17   agreement for the house once Freedom to Live stopped being the
18   leaseholder.
19   Q     Did you ever send that to them?
20   A     I believe I sent it either to you or to them.
21   Q     Do you have a recollection, a specific recollection, sir,
22   of ever sending that document, as you sit here today?  Meaning,
23   as you sit here today, do you recall, "Yes, I sent it, and here
24   is when I sent it"?
25   A     Not definitively.
```

**UNITED STATES DISTRICT COURT**

```
 1    Q    In the text messages that Mr. Wyman was going over with

 2    you, did you see the rental agreement in any of those text

 3    messages?

 4    A    I don't recall.

02:47PM 5    Q    Sir, it's not your testimony, is it, that you and I did

 6    not speak for a year?

 7    A    No.

 8    Q    Because that's not true, is it?

 9    A    No.

02:48PM 10   Q    Now, at one point in time, you had a concern about your

11    parents, and specifically your father trying to get his hands

12    on your money, didn't you?

13              MR. WYMAN:  Objection.  Relevance.

14              THE COURT:  Mr. Avenatti?

02:49PM 15              MR. AVENATTI:  Your Honor, if you give me a little

16    latitude, I'll lay some foundation, perhaps.

17              THE COURT:  Objection sustained.

18    Q    BY MR. AVENATTI:  Sir, at one point in time you

19    instructed me not to discuss your case with your family, didn't

02:49PM 20   you?

21              MR. WYMAN:  Objection.  Relevance.

22              THE COURT:  Overruled.

23              THE WITNESS:  I believe I did, yes.

24    Q    BY MR. AVENATTI:  And that's because you did not want

02:49PM 25   them to know the details of what was going on with your case
```

```
 1    and your money; right?
 2                MR. WYMAN:  Same objection.
 3                THE COURT:  Sustained.
 4    Q    BY MR. AVENATTI:  Sir, as you sit there today, you don't
 5    know exactly how much money you claim that you're owed, do you?
 6    A    I do.
 7    Q    What is the exact amount of money that you claim you're
 8    owed?
 9    A    $1.9 million.
10    Q    Even though you got 1.5 million from Mr. Eagan; right?
11    A    Yes.
12    Q    So you believe you're entitled to the 1.9 plus the 1.5
13    for a total of $3.4 million?
14    A    Yes.
15    Q    Do you believe that you have to pay me or the firm any
16    money back for all of the money that was advanced to you and
17    for your benefit across so many years?
18    A    I do believe I have to pay it back.
19    Q    Do you know how much that is?
20    A    No.
21    Q    Has the Government ever told you how much it is?
22    A    There were some discussions about that.
23    Q    Was that in preparation for your testimony here today?
24    A    I think it was the first meeting with the Government.
25    Q    And at that first meeting they told you you were due how
```

|   |   |
|---|---|
| 1 | much, $2.4 million? |
| 2 | A    I don't remember how much they told me I was due. |
| 3 | Q    Has anyone ever told you that you were due the entire |
| 4 | $4 million? |
| 02:52PM 5 | A    Yes. |
| 6 | Q    Who told you that? |
| 7 | A    My attorneys. |
| 8 | Q    Okay.  Well, I don't want to get into what your attorneys |
| 9 | told you. |
| 02:52PM 10 | Sir, do you know anyone who is close to you, is a |
| 11 | friend or a family member, who posts to social media about me |
| 12 | or this case? |
| 13 | MR. WYMAN:  Objection.  Relevance. |
| 14 | THE COURT:  Sustained. |
| 02:53PM 15 | MR. AVENATTI:  Your Honor, I'm wrapping up. |
| 16 | Q    Sir, did you ever tell the Social Security Administration |
| 17 | that you suffered from mental illness? |
| 18 | MR. WYMAN:  Objection.  Relevance. |
| 19 | THE COURT:  Sustained. |
| 02:54PM 20 | Q    BY MR. AVENATTI:  Sir, when's the last time that you met |
| 21 | with the Government in preparation for your testimony here |
| 22 | today? |
| 23 | A    Monday of this week. |
| 24 | Q    So three days ago? |
| 02:54PM 25 | A    Yes. |

|   |   |   |
|---|---|---|
| | 1 | Q     On the 19th of July? |
| | 2 | A     Yes. |
| | 3 | Q     And how long did you meet with them? |
| | 4 | A     About two hours maybe, hour and 45. |
| 02:54PM | 5 | Q     And did you talk about the case? |
| | 6 | A     This case? |
| | 7 | Q     Yes. |
| | 8 | A     Yes. |
| | 9 | Q     And did you talk about the documents that you were going |
| 02:55PM | 10 | to be shown here today? |
| | 11 | A     Yes. |
| | 12 | Q     Did you talk about the settlement agreement? |
| | 13 | A     Which settlement agreement? |
| | 14 | Q     Document 37. |
| 02:55PM | 15 | A     Yes, I believe we did. |
| | 16 | Q     What was said about the settlement agreement when you met |
| | 17 | with the Government? |
| | 18 | A     That -- we looked at the signature line and we talked |
| | 19 | about did I sign it, and that's all I can remember. |
| 02:55PM | 20 | Q     And what did you tell them when they asked you if you |
| | 21 | signed it? |
| | 22 | A     I may have signed it. |
| | 23 | Q     You told them that just Monday; right? |
| | 24 | A     Yeah. |
| 02:56PM | 25 | Q     "Yes"? |

49

```
        1   A     Yes.

        2   Q     Who did you tell that to?

        3   A     Oh, the settlement agreement?  I'm sorry.  I thought we

        4   were talking about the contingency.

02:56PM  5         Could you repeat the question.

        6   Q     Sure.  I was asking you about Document 37.

        7   A     Okay.

        8   Q     We can put it up on the screen real quick for you.

        9         The signature page, please.

02:56PM 10   A     Yeah.  We discussed the signature and how the first letter

       11   of each word looked different.

       12   Q     BY MR. AVENATTI:  But you told them you may have signed

       13   it?  I think that was your testimony moments ago.

       14         MR. WYMAN:  Objection --

02:57PM 15         MR. AVENATTI:  Strike that.

       16   Q     Sir, you stand behind your testimony thus far under

       17   cross-examination, do you not?

       18   A     Yes.

       19   Q     Okay.  You don't wish to change anything, do you?

02:57PM 20   A     No.

       21   Q     Okay.  And did you review other documents with the

       22   Government on Monday?

       23   A     Yes.

       24   Q     What else do you remember reviewing?

02:57PM 25   A     Oh, geez.
```

```
 1   Q    There was a lot of documents; is that fair?

 2   A    Yeah.

 3   Q    Who was present when you met with the Government on

 4   Monday?

 5        MR. WYMAN:  Objection.  Relevance, Your Honor.

 6        THE COURT:  Overruled.

 7        THE WITNESS:  Well, it was on Zoom.  So I only know

 8   who I saw, and that was Brett.

 9   Q    BY MR. AVENATTI:  Mr. Sagel?

10   A    Yes.  And my attorney, Drew Harbur.  And, yeah, that's --

11   I think the rest of them were off camera.

12   Q    And you got into some details during that meeting that

13   were a little different than meetings before; right?

14   A    It was basically a rehash of the previous -- the previous

15   meeting.

16   Q    But you didn't say the exact same thing, obviously;

17   right?

18   A    Well, I answered the questions the same.

19   Q    So you answered the questions the exact same way as you

20   did before?

21        MR. WYMAN:  Objection.  Asked and answered.

22        THE COURT:  Sustained.

23   Q    BY MR. AVENATTI:  You've had three meetings with the

24   Government, as I understand it: one on March 31st, 2019, one

25   about a week ago, and another back in June.  Do I have that
```

```
              1    right?
              2    A    When were the three meetings?
              3    Q    Well, I'm going to ask you.  But my understanding is
              4    March 31st, 2019, June 24, 2021, and then on Monday.
02:59PM       5    A    Yes, I believe that's correct.
              6    Q    And did you talk about that signature on that settlement
              7    agreement at all three meetings?
              8    A    I don't recall.
              9    Q    You know you talked about it at the first meeting and the
02:59PM      10    last meeting; right?
             11    A    I'm pretty sure we talked about it at this second one as
             12    well.
             13    Q    That's your best recollection?
             14    A    Yeah.
02:59PM      15              MR. AVENATTI:  Your Honor, one moment, please.
             16              (Pause in proceedings.)
             17    Q    BY MR. AVENATTI:  Mr. Johnson, if I could direct your
             18    attention to Doc 122, Exhibit 122.
             19    A    Okay.
03:00PM      20    Q    Mr. Johnson, you actually looked at this document across
             21    a couple of days in March of 2019, didn't you?
             22    A    My recollection is that it was on Saturday.
             23    Q    And then we met again on Sunday, didn't we?
             24    A    I just don't remember.
03:01PM      25    Q    You don't dispute that we met on Sunday about the
```

|  |  |
|---|---|
| 1 | document as well, do you? |
| 2 | MR. WYMAN:  Objection.  Asked and answered. |
| 3 | THE COURT:  Overruled. |
| 4 | THE WITNESS:  No. |
| 03:01PM 5 | Q    BY MR. AVENATTI:  And the initials next to various |
| 6 | paragraphs in this document -- |
| 7 | A    Yes. |
| 8 | Q    -- did I make those initials? |
| 9 | A    No.  I did. |
| 03:02PM 10 | Q    And you signed it as well; correct? |
| 11 | A    Yes, I did. |
| 12 | MR. AVENATTI:  Nothing further, Your Honor.  Thank |
| 13 | you. |
| 14 | THE COURT:  Thank you. |
| 03:02PM 15 | Ladies and gentlemen, we'll take the midafternoon |
| 16 | break here.  We'll be in recess for 15 minutes. |
| 17 | Please remember the admonition not to discuss the |
| 18 | case with anyone and not to form any opinions on the issues of |
| 19 | the case, and please don't do any research. |
| 03:02PM 20 | So 15 minutes, ladies and gentlemen. |
| 21 | THE COURTROOM DEPUTY:  Court is now in recess. |
| 22 | **(Out of the presence of the jury.)** |
| 23 | THE COURT:  Okay.  We'll be in recess. |
| 24 | **(Recess from 3:02 p.m. to 3:21 p.m.)** |
| 03:18PM 25 | **(Sidebar out of the presence of the jury:)** |

```
 1              MR. AVENATTI:  Your Honor, we've handed you the

 2   memorandum of interview, one page from July 19, 2021, of

 3   Mr. Johnson.  We've highlighted in the middle of the page, "No

 4   new information was provided by Johnson."

 5              At the top it shows that the interview lasted

 6   approximately an hour 45 minutes.  There's no reference on here

 7   to any discussion about the signature on the settlement

 8   agreement or any of the other matters that Mr. Johnson just

 9   testified to.  We believe that that would be Jencks.  If this

10   is Jencks, that would certainly be Jencks.  And we'd like those

11   handwritten notes provided.

12              THE COURT:  They're not going to be provided.

13              MR. SAGEL:  Maybe it might behoove the defendant to

14   talk to his advisory counsel or figure out himself what Jencks

15   is, and I don't think -- I think that might save us from these

16   sidebars, because he just truly does not know what Jencks is.

17              Second of all, he's now asking about things that the

18   witness specifically told him the exact same thing that's in

19   that document that was a rehash of prior interviews, and no new

20   information was provided and he's just wasting the jury's time.

21              THE COURT:  Your request is noted and denied.

22              MR. AVENATTI:  Okay.  Your Honor, I understand that.

23   If Mr. Johnson, during that interview, said that he may have

24   signed the document, putting Jencks aside, that would be Brady

25   and it should have been produced.  So I've made the request.
```

```
 1   We'd like the notes provided to Your Honor in camera.  I
 2   understand Your Honor's ruling.  We believe that they should be
 3   provided, and I respect Your Honor's ruling.
 4               THE COURT:  Okay.
 5               (In the presence of the jury.)
 6               THE COURT:  Ladies and gentlemen, the last hour of
 7   the day is always the toughest.  So if you need to get up and
 8   stretch, please do that.
 9               Mr. Wyman, redirect?
10               MR. WYMAN:  Yes, Your Honor.  Thank you.
11                          REDIRECT EXAMINATION
12   BY MR. WYMAN:
13   Q    Good afternoon, Mr. Johnson.
14   A    Good afternoon.
15   Q    You were asked by the defendant on cross-examination
16   about when he met you when you were in jail.  Do you recall
17   that?
18   A    Yes.
19   Q    And how when he met you, the goal was just to get you out
20   of prison at that time, not to sue the County of Los Angeles?
21   A    Yes.
22               MR. WYMAN:  Can we please pull up Exhibit 1.
23   Q    BY MR. WYMAN:  This is the contingency fee agreement that
24   he had you sign when he met you in jail; is that right?
25   A    Yes.
```

03:22PM (line 5)
03:23PM (line 10)
03:23PM (line 15)
03:23PM (line 20)
03:23PM (line 25)

1    MR. WYMAN:  Can we please pull up paragraph 2,

2    "Scope of services."

3    Q    BY MR. WYMAN:  Can you please read that paragraph.

4    A    "Client is hiring attorney to represent client in

03:24PM 5        the matter of client's affirmative claims against

6        the County of Los Angeles and the Los Angeles County

7        Sheriff's Department arising out of their negligence

8        and gross misconduct in arresting client and failing

9        to properly treat client and ensure his safety.

03:24PM 10       Attorney will provide those legal services

11       reasonably required to represent client and take

12       reasonable steps to inform client of progress and to

13       respond to client's inquiries."

14   Q    Thank you.  Now, you also went over paragraphs 4 and 6 of

03:24PM 15   this agreement, which I believe the defendant described as "our

16   deal on fees and costs."  Do you remember that?

17   A    Yes.

18   Q    Did you understand from this agreement that the defendant

19   could take his attorney's fees and costs without paying you

03:25PM 20   your money?

21   A    No.

22           MR. WYMAN:  Can you please pull up Exhibit 37.  And

23   the signature page of the agreement.

24           THE WITNESS:  Okay.

03:25PM 25   Q    BY MR. WYMAN:  Right above the signature there's that

```
      1    paragraph that the defendant had you read and then that sort of

      2    "CAUTION:  READ BEFORE SIGNING."

      3              Do you see that?

      4    A    Yes.

03:25PM  5    Q    He also went over other parts of this agreement with you

      6    which has certain representations.  Do you remember that?

      7    A    Yes.

      8    Q    I didn't hear him ask you if he went over those

      9    provisions with you.  So I'll ask you, did he go over these

03:26PM 10    provisions with you?

     11    A    No, he did not.

     12              MR. WYMAN:  Now if we could focus on Mr. Johnson's

     13    signature, please.

     14    Q    Now, the defendant on cross-examination asked you about

03:26PM 15    an interview that you gave to federal agents on March 31st of

     16    2019.  Do you recall that?

     17    A    Yes.

     18    Q    He focused on a statement you made that you may have

     19    signed this document.  Did you also tell the agents that your

03:26PM 20    signature looked funny to you in that same interview?

     21    A    Yes.

     22    Q    Did you also say that the G and the E in the signature

     23    looked funny?

     24    A    Yes.

03:26PM 25    Q    And when you told the agents that you may have signed
```

1    this document, did you say that you may have signed this

2    document but your signature looks funny to you?

3    A    Yes.

4    Q    The defendant also asked you about the statements you

03:27PM 5    made in that March 31st, 2019, interview about the time that

6    the defendant told you about the settlement in your case.  Do

7    you remember that?

8    A    Could you repeat that question.

9    Q    Of course.  He asked you questions about that time when

03:27PM 10   he told you about the settlement?

11   A    Yes.

12   Q    When you were asked about that conversation on

13   March 31st, 2019, did you tell agents that the defendant may

14   have told you an amount after fees and expenses, but that he

03:27PM 15   never told you it was $4 million?

16   A    I don't understand the question.

17   Q    When you were interviewed on March 31st, 2019 --

18   A    Okay.

19   Q    -- did you tell the federal agents who were interviewing

03:28PM 20   you that during that conversation at Sunrise, the defendant did

21   not say it was for a settlement for $4 million?

22   A    Yes, I did.

23   Q    Did you also tell the agents during that interview that

24   the defendant told you it would be quarterly payments of

03:28PM 25   $46,000 a quarter when he met with you at Sunrise?

**UNITED STATES DISTRICT COURT**

1   A     Yes, I did.

2   Q     And during that interview on March 31st, 2019, did you

3   tell the agents that you were never presented with the full

4   settlement agreement, referring to Exhibit 37?

03:28PM  5   A     I believe I did.

6   Q     Sitting here today, do you recall the defendant ever

7   showing you this agreement?

8   A     No.

9   Q     And sitting here today, do you recall signing this

03:29PM 10   agreement?

11   A     I just don't recall.

12   Q     Now, you talked about the defendant paying your living

13   expenses for a while.  Do you remember that?

14   A     Yes.

03:29PM 15   Q     You were asked about CareMeridian and how the defendant's

16   firm was paying your expenses there?

17   A     Yes.

18   Q     Did you know for a fact whether or not the defendant's

19   firm was actually paying those bills?

03:29PM 20   A     No, I did not.

21   Q     Now, you went over, I think, a lot of the places that

22   you've lived, CareMeridian and Sunrise and Freedom to Live.

23   And I think your testimony on cross-examination was that you

24   moved to Freedom to Live in mid-2015 or 2016; is that right?

03:29PM 25   A     I believe so, yes.

```
 1   Q     And that the defendant had you move there?
 2              MR. AVENATTI:  Objection.  Misstates the testimony.
 3              THE COURT:  Overruled.
 4              MR. WYMAN:  I'll rephrase anyway.
 5   Q     Did the defendant have a part in you moving to Freedom to
 6   Live?
 7   A     He paid for it.
 8   Q     And did you discuss moving there with him in mid-2015 or
 9   2016?
10   A     Yes, I did.
11   Q     And when you had that conversation about moving to
12   Freedom to Live, did he mention that he had already received a
13   $4 million settlement from the Los Angeles County on your
14   behalf?
15   A     No, he did not.
16   Q     If you knew that you had millions of dollars in
17   settlement money, would you have decided to move to Freedom to
18   Live?
19   A     I believe I would have.
20   Q     Would you at some point have moved out of Freedom to
21   Live?
22   A     Yes.
23   Q     Would you have purchased your own house?
24   A     Yes, I would.
25   Q     And would you have purchased a van?
```

03:30PM (lines 5, 10, 15, 20, 25)

| | |
|---|---|
| 1 | A     Yes, I would have. |
| 2 | Q     Did you want to be dependent on the defendant for your |
| 3 | living expenses? |
| 4 | A     No, I did not. |
| 03:31PM 5 | Q     Did you want to be asking him for money so that you could |
| 6 | pay for dental, your rent, your father's hearing aids? |
| 7 | A     No. |
| 8 | Q     And if you had received approximately $2 million or |
| 9 | whatever your portion of the settlement was in January 2015, |
| 03:31PM 10 | would you have been asking the defendant and his firm to cover |
| 11 | those costs from 2015 to 2019? |
| 12 | A     No. |
| 13 | Q     Now, I think on cross the defendant said something to the |
| 14 | effect of, "At the time the settlement proceeds came in, we had |
| 03:32PM 15 | been paying your legal expenses for years."  Do you remember |
| 16 | that? |
| 17 | MR. AVENATTI:  Misstates the testimony of |
| 18 | questioning, Your Honor. |
| 19 | THE COURT:  Overruled. |
| 03:32PM 20 | THE WITNESS:  Could you repeat that. |
| 21 | Q     BY MR. WYMAN:  Of course. |
| 22 | During cross-examination, I believe the defendant |
| 23 | said something to the effect of, "At the time the settlement |
| 24 | proceeds came in, we had been paying your legal expenses for |
| 03:32PM 25 | years."  Do you remember that? |

**UNITED STATES DISTRICT COURT**

```
 1              MR. AVENATTI:  Same objection.

 2              THE COURT:  Overruled.

 3              THE WITNESS:  I believe so, yes.

 4   Q    BY MR. WYMAN:  Did he tell you in 2015 when the

 5   settlement proceeds came in?

 6   A    No.

 7   Q    And in that --

 8              MR. WYMAN:  Well, let's pull up Exhibit 122,

 9   paragraph 1.1.

10   Q    BY MR. WYMAN:  And this is the document that you signed,

11   that the defendant gave you on March 23rd, 2019; is that right?

12   A    Yes.

13   Q    And in that document, in March 2019, how much did it say

14   you were owed at that point?

15   A    $1.9 million.

16   Q    Now, the defendant asked you at length about attempts at

17   holding other people responsible, in arbitrations and lawsuits.

18   Do you remember that?

19   A    Yes.

20   Q    And he talked about a settlement with Michael Eagan?

21   A    Yes.

22   Q    Did you ever work directly with Michael Eagan?

23   A    No.

24   Q    Is he a named partner of the defendant's law firm, to

25   your knowledge?
```

```
 1              MR. AVENATTI:  Objection as to time, Your Honor.
 2              THE COURT:  Clarify, please.
 3              MR. WYMAN:  Of course.
 4   Q     During the time period when you were represented by Eagan
 5   Avenatti, did you understand that Michael Eagan was a named
 6   partner of that law firm?
 7   A     Yes.
 8   Q     Now, the defendant asked you about a number of people
 9   whom you've sued to hold them responsible for your loss.  I
10   didn't hear him say himself.  Did you sue the defendant?
11   A     Yes, I believe we did.
12   Q     And he asked you about how you have sought to enforce the
13   $4 million settlement and your right to receive it.  Is that
14   because you were never paid anything from your $4 million
15   settlement?
16   A     Yes.
17   Q     Who was the person you believe to be responsible for you
18   never getting that money?
19   A     Michael Avenatti.
20              MR. WYMAN:  Nothing further, Your Honor.
21              THE COURT:  Mr. Avenatti.
22                       RECROSS-EXAMINATION
23   BY MR. AVENATTI:
24   Q     Mr. Johnson, you're not changing your testimony from
25   earlier today about whether you signed Exhibit 37 or not, are
```

```
         1    you?

         2    A     No.

         3    Q     You stand by what you testified to when I was asking you

         4    questions about Exhibit 37; right?

03:35PM  5              MR. WYMAN:  Objection.  Asked and answered.

         6              THE COURT:  Sustained.

         7    Q   BY MR. AVENATTI:  You understand, sir, that Michael Eagan

         8    is someone different than Michael Avenatti; right?

         9    A     Yes, I do.

03:35PM 10    Q     And you accepted the $1.5 million payment from Mr. Eagan

        11    happily, did you not?

        12              MR. WYMAN:  Objection.  Argumentative.

        13              THE COURT:  Sustained.

        14    Q   BY MR. AVENATTI:  Mr. Johnson, you accepted the

03:36PM 15    $1.5 million only a few months ago, holding Mr. Eagan

        16    responsible; correct?

        17    A     Yes.

        18    Q     And as you sit there today, you're not claiming that I

        19    wasn't entitled to be reimbursed for all of the money that was

03:36PM 20    spent for you and your case along the way, are you?

        21              MR. WYMAN:  Objection.  Asked and answered.

        22              THE COURT:  Sustained.

        23    Q   BY MR. AVENATTI:  Sir, is it your position that all of

        24    the money that was spent over the years doesn't get deducted?

03:36PM 25              MR. WYMAN:  Same objection.
```

64

|       |    |                                                            |
|-------|----|------------------------------------------------------------|
|       | 1  |            THE COURT:  Sustained.                          |
|       | 2  | Q    BY MR. AVENATTI:  Mr. Johnson, what is your position |
|       | 3  | relating to the fees and expenses that were advanced on your |
|       | 4  | behalf?                                                     |
| 03:37PM | 5 |            MR. WYMAN:  Objection.  Asked and answered.  Vague. |
|       | 6  |            THE COURT:  Sustained.                          |
|       | 7  |            MR. AVENATTI:  It's recross, Your Honor.  Just  |
|       | 8  | trying to follow up on what --                             |
|       | 9  |            THE COURT:  Next question.                      |
| 03:37PM | 10 | Q    BY MR. AVENATTI:  Mr. Johnson, did I or anyone at my firm |
|       | 11 | ever prevent you from getting any medical care that you    |
|       | 12 | requested?                                                 |
|       | 13 |            MR. WYMAN:  Objection.  Beyond the scope and asked |
|       | 14 | and answered.                                              |
| 03:37PM | 15 |            THE COURT:  Sustained.                          |
|       | 16 |            MR. AVENATTI:  One moment, Your Honor.          |
|       | 17 |            **(Counsel conferred off the record.)**         |
|       | 18 | Q    BY MR. AVENATTI:  Mr. Johnson, Mr. Wyman asked you some |
|       | 19 | questions about what else you told the federal agents on   |
| 03:38PM | 20 | March 31st, 2019.                                          |
|       | 21 | A    Yes.                                                  |
|       | 22 | Q    Do you recall those questions?                        |
|       | 23 | A    Yes.                                                  |
|       | 24 | Q    How long did you meet with them?                      |
| 03:38PM | 25 |            MR. WYMAN:  Objection.  Relevance.              |

**UNITED STATES DISTRICT COURT**

1              THE COURT:  Overruled.

2              THE WITNESS:  I think it was about, like, an hour

3     and a half, two hours.

4     Q    BY MR. AVENATTI:  And other than what Mr. Wyman just

03:39PM 5     asked you on redirect, do you recall anything else you told him

6     during that meeting?  It's a yes-or-no question.

7     A    Yes.

8     Q    And one of the things you recall is that you told him

9     that you may have signed the agreement; right?

03:39PM 10             MR. WYMAN:  Objection.  Asked and answered.

11             THE COURT:  Sustained.

12             MR. AVENATTI:  Nothing further, Your Honor.  Thank

13     you.

14             We'd like him -- we'd like Mr. Johnson available in

03:39PM 15    the defense case potentially.

16             THE COURT:  Sir, you may be excused but you're

17     subject to recall.

18             We'll take a brief break here, ladies and gentlemen.

19             **(Recess from 3:39 p.m. to 3:43 p.m.)**

03:39PM 20            **(Out of the presence of the jury.)**

21             MR. SAGEL:  Your Honor, briefly, while we're

22     waiting, with regards to the in-camera document, is that

23     something you want us to do like a manual filing with the

24     clerk's office under seal in camera or do you want me to just

03:43PM 25    bring it to court?

|  | |
|---|---|
| 1 | THE COURT:  It's in the record. |
| 2 | MR. SAGEL:  The normal way we do it? |
| 3 | THE COURT:  Yeah, since we're on the record, |

4    Mr. Avenatti made an in-camera filing overnight with respect to

5    the additional --

6              THE REPORTER:  I'm sorry, Your Honor.  Did you say

7    "on the record" or "off the record"?

8              THE COURT:  "On the record."  Do you want me to

9    start over?

10             THE REPORTER:  Yes, please.

11             THE COURT:  Mr. Avenatti made an in-camera filing

12   yesterday or today with regard to -- we'll get back to this.

13             THE CLERK:  Are you ready for the jury?

14             THE COURT:  Yes.

03:44PM 15        **(In the presence of the jury.)**

16             THE COURT:  Mr. Wyman.

17             MR. WYMAN:  Your Honor, we would request leave to

18   call the next witness since -- our anticipated next witness

19   appears to have left, and so we would like to call Nshan

03:46PM 20   Tashchyan, who is also noticed for being a witness today.

21             MR. AVENATTI:  Your Honor, I was given an order --

22             THE COURT:  Sir.

23             THE COURTROOM DEPUTY:  Microphone.

24             MR. AVENATTI:  Your Honor, I was given an order of

03:46PM 25   witnesses.  I'll do whatever Your Honor would like, but --

|        |                                                                    |
|--------|--------------------------------------------------------------------|
| 1      | THE COURT:  Let's proceed.  Let's proceed.                         |
| 2      | Presumably, if you had the three witnesses yesterday, you          |
| 3      | conducted overnight your preparation, or your preparation for      |
| 4      | those witnesses during the lunchtime.                              |
| 03:46PM 5 | MR. WYMAN:  Thank you, Your Honor.  The                         |
| 6      | United States calls Special Agent Nshan Tashchyan.                 |
| 7      | **NSHAN TASHCHYAN, GOVERNMENT WITNESS, WAS SWORN**                 |
| 8      | THE COURTROOM DEPUTY:  If you'll please state and                  |
| 9      | spell your first and last name.                                    |
| 03:47PM 10 | THE WITNESS:  Nshan Tashchyan.  The first name is              |
| 11     | spelled N-s-h-a-n, and the last name, T-a-s-h-c-h-y-a-n.           |
| 12     | THE COURTROOM DEPUTY:  Thank you.                                  |
| 13     | **DIRECT EXAMINATION**                                             |
| 14     | BY MR. WYMAN:                                                      |
| 03:47PM 15 | Q    Good afternoon, Special Agent Tashchyan.                  |
| 16     | A    Good afternoon.                                               |
| 17     | Q    Where do you work?                                            |
| 18     | A    I work for the IRS Criminal Investigation division.           |
| 19     | Q    What is your title at the IRS Criminal Investigation          |
| 03:47PM 20 | division?                                                      |
| 21     | A    A special agent, computer investigative specialist.           |
| 22     | Q    How long have you been a computer investigative              |
| 23     | specialist?                                                        |
| 24     | A    Since 2016, about five years.                                 |
| 03:47PM 25 | Q    What are your primary responsibilities as a computer      |

```
 1   investigative specialist?

 2   A     To preserve the electronic evidence in a

 3   forensically-sound manner, basically to assist the agents that

 4   are conducting the investigation with seizing and analyzing the

 5   electronic evidence that comes off computers, cell phones,

 6   et cetera.

 7   Q     What kind of training did you receive to become a

 8   computer investigative specialist?

 9   A     It's several trainings, and it's a continuous training

10   every year.  I started with a six-week basic training.  And

11   almost every year there's additional several trainings, with

12   the exception of last year.

13   Q     Are you familiar with the Government's investigation into

14   the defendant, Michael Avenatti?

15   A     Yes, I am.

16   Q     Were you one of the primary investigative agents on that

17   investigation?

18   A     No.  I was the computer investigative specialist assisting

19   the primary agents.

20   Q     And as the computer investigative specialist assisting

21   the agents, what was your involvement in this investigation?

22   A     I was involved with several of the search warrants, where

23   I seized electronic devices, imaged them.

24   Q     And when you say "imaged," does that mean you made a

25   forensic image of a digital device?
```

03:48PM — lines 5, 10, 15, 20
03:49PM — line 25

A     Yes.

Q     What is a forensic image?

A     It is the exact, unaltered, beat-to-beat copy of the electronic media.  If it's hard drive, it's basically a copy of the whole hard drive.  It copies all hard drive without altering the data that's on it.

Q     Did you make forensic images of servers from the law firm Eagan Avenatti?

A     I did.

Q     Were those servers seized pursuant to a federal search warrant?

A     Yes.

Q     Who conducted the seizure of those servers?

A     It was me and another agent, John Weeks, who assisted me to seize those devices.

Q     Where did you seize them?

A     We seized them from a data center that was located in Santa Ana.

Q     Now, we're talking about servers.  At a high level, can you please describe what a server is?

A     Sure.  It's basically a computer on the network of computers that provides services of software or data to the other computers on the network.

      So basically, for example, if you have an e-mail server in the organization, that's where all the e-mails will

1   be located, and the users -- all the organization will connect

2   to that server with their own computers and access those

3   e-mails.

4   Q    So can a server contain quite a bit of information?

03:50PM 5   A    Yes.

6   Q    E-mails?

7   A    E-mails, data, sometimes software.  And people have to

8   connect to that server to have access to that software.

9   Q    And after you seized the servers, did you make forensic

03:50PM 10  images?

11  A    I did.

12  Q    Where did you do that?

13  A    The imaging process was done at our office located in

14  Laguna Niguel.

03:50PM 15  Q    At the IRS?

16  A    Yes.

17  Q    What tool or method did you use to make forensic images

18  of those servers?

19  A    Several tools were used.  Three of the servers were

03:51PM 20  virtual servers, and for those, I had to use my laptop.  I

21  connected a server with the network cable.  I was able to

22  access those virtual machines and images.

23         The other three servers were physical servers.  I

24  had to boot them up with the hard drive that I have that has

03:51PM 25  its own operating system.  It has forensic tools on it.  And

UNITED STATES DISTRICT COURT

```
 1    using those tools, I was able to image them.
 2    Q    Had you previously received training on those tools that
 3    you used --
 4    A    Yes.
 5    Q    -- for the servers?
 6         Based on your training and experience, are those
 7    tools commonly accepted tools for forensic imaging?
 8    A    Yes, they are.
 9    Q    Did you also image an iMac computer?
10    A    I did.
11    Q    Where was that computer seized from?
12    A    That was seized from Mr. Avenatti's apartment.
13    Q    Did you personally seize the computer?
14    A    No.  I was -- on that date I was at a different location,
15    and the agents that seized it, they were the ones that provided
16    me with all the electronic -- along with all the other
17    electronic devices that were seized from the apartment.
18    Q    And how are you able to identify where it was seized
19    from?
20    A    By looking at the chain of custody paperwork.  And, also,
21    I compared it with the inventory of all the items that were
22    seized from the apartment to make sure that I wasn't missing
23    anything.
24    Q    When you say "chain of custody paperwork," what does that
25    mean?
```

03:51PM (line 5)
03:51PM (line 10)
03:52PM (line 15)
03:52PM (line 20)
03:52PM (line 25)

**UNITED STATES DISTRICT COURT**

```
 1   A     Every time we seize a device, there's a chain of custody
 2   paperwork that's prepared during the seizure that identifies
 3   where the device was found, which room, who found it, so later
 4   on we can identify where that device actually came from.
 5   Q     And where did this iMac computer come from?
 6   A     It came from the apartment.  I just don't recall the exact
 7   location, where in the apartment.
 8   Q     When you say "the apartment," you're referring to the
 9   defendant's apartment?
10   A     Yes.
11   Q     What tool did you use -- or tools did you use to make an
12   image of the iMac computer?
13   A     For the iMac, I use a tool that's called MacQuisition.
14   It's a special tool designed for the forensic imaging of Apple
15   products.
16   Q     Had you previously received training on that tool for
17   forensic imaging?
18   A     Yes, I have.
19   Q     And have you made other forensics images using that tool
20   before?
21   A     Yes.
22   Q     Based on your training and experience, is it a commonly
23   accepted method or tool for forensic imaging of Apple
24   computers?
25   A     Yes.
```

1    Q    Once you made forensic images of the digital devices,

2    such as the servers from the defendant's law firm and computer

3    from his apartment, did you label the images in a way such that

4    they would be identifiable?

03:53PM  5    A    Yes, I did.

6    Q    What did you do with the images at that point?

7    A    I made several copies of them.  Kept one copy to myself,

8    and another copy was sent over to DOJ cyber lab.

9    Q    Is that in D.C.?

03:54PM 10    A    Yes.

11    Q    Do you know whether the materials from those digital

12    device images were subjected to a privilege review?

13    A    I believe they were.

14    Q    What is a privilege review?

03:54PM 15    A    It's basically a group of agents or attorneys

16    conducting -- or reviewing the evidence that has been seized to

17    make sure that it doesn't contain any client-attorney privilege

18    before that evidence is presented to the agents that are

19    conducting the investigation.

03:54PM 20    Q    So the agents and attorneys conducting the privilege

21    review, will they be separate from the prosecution team --

22    A    Yes.

23    Q    -- of agents and attorneys?

24        So the prosecution team of agents and attorneys

03:54PM 25    would not necessarily receive all the documents on those

```
 1  digital devices if they went through a privilege review?
 2  A     No.
 3           THE COURT:  Wait a minute.  That's ambiguous.
 4           Is it correct that they wouldn't receive all the
 5  documents that were seized because of the privilege review?
 6           THE WITNESS:  Yes.
 7           THE COURT:  Okay.
 8           MR. WYMAN:  Thank you, Your Honor.
 9  Q     Apart from the Eagan Avenatti servers and the iMac
10  computer, did you and other agents also make forensic images of
11  certain individuals' cell phones?
12  A     Yes, we did.
13  Q     In addition to imaging the cell phones, did you extract
14  data from those cell phones?
15  A     Yes.
16  Q     What tool did you use to extract that data?
17  A     It's a software called Cellebrite.
18  Q     What is Cellebrite, at a high level?
19  A     It's a forensic software especially designed for
20  extracting data from cell phones and tablets.
21  Q     And is Cellebrite a commonly-accepted tool for extracting
22  data, based on your training and experience?
23  A     Yes.
24  Q     When you use Cellebrite to extract data from a cell
25  phone, does it create a report?
```

03:54PM  5
03:55PM 10
03:55PM 15
03:55PM 20
03:55PM 25

UNITED STATES DISTRICT COURT

```
 1   A    Yes.  That option is there to create a report of all the
 2   items that you want to appear on that report.
 3   Q    Could you please take a look at what's been marked as
 4   Exhibit 124.  And I apologize, it should be in Volume II.  It
 5   might not be in front of you.
 6   A    This is Volume I.
 7   Q    I think it should be right behind you.
 8   A    I'm sorry, which exhibit was it?
 9   Q    124.
10   A    Okay.
11   Q    Do you recognize this document?
12   A    I do.
13   Q    What is it?
14   A    This is the extraction report of -- this is the extraction
15   report from Tom Goeders's cell phone.
16   Q    So is Tom Goeders or Tom Goeders one of the individuals
17   whose cell phones was imaged?
18   A    Yes.
19   Q    Do you see that this report appears to have certain
20   redactions throughout or areas that have been whited out?
21   A    Yes.
22   Q    Other than those redactions, is this a fair and accurate
23   copy of the extraction report that you created for Tom
24   Goeders's cell phone?
25   A    Yes, it is.
```

```
  1  Q    Would you please --
  2            THE COURT:  Ladies and gentlemen, let me give you a
  3  brief explanation for this term "redaction."  That means that
  4  something has been blacked out either because of privilege,
03:57PM  5  privacy, or it just simply doesn't have to do -- have anything
  6  to do with this case.  You're not to concern yourself with any
  7  of the redactions.
  8            MR. WYMAN:  Thank you, Your Honor.
  9  Q    Can you please turn now to Exhibit 176.  That's probably
03:57PM 10  Volume III.
 11  A    Okay.
 12  Q    Do you recognize this document?
 13  A    Yes.  This is the extraction report for Greg Barela's cell
 14  phone.
03:58PM 15  Q    Is Gregory Barela another one of the individuals whose
 16  cell phone was imaged in this case?
 17  A    Yes.
 18  Q    Other than the redactions in this report, is this a fair
 19  and accurate copy of the extraction report for Gregory Barela's
03:58PM 20  cell phone?
 21  A    Yes, it is.
 22            MR. WYMAN:  Your Honor, I would request to
 23  conditionally admit just the first page of Exhibit 176 subject
 24  to later testimony by Mr. Barela.
03:58PM 25            MR. AVENATTI:  Your Honor, Objection.  Foundation.
```

```
 1                    THE COURT:  Page 1 of 176 will be received
 2       provisionally.
 3                    MR. WYMAN:  Thank you, Your Honor.
 4                    (Exhibit Number 176-1 received.)
03:58PM  5           MR. WYMAN:  Your Honor, may I publish it, the first
 6       page?
 7                    THE COURT:  Any objection publishing this first
 8       page?
 9                    MR. AVENATTI:  Your Honor already admitted it
03:59PM 10       provisionally.
11                    THE COURT:  Yes.  But any objection?
12                    MR. AVENATTI:  I do object to the publication before
13       the foundation is laid.  Actually, yeah, Your Honor, I'm going
14       to stand on the objection.
03:59PM 15           THE COURT:  Okay.  We won't publish it at this time.
16                    MR. WYMAN:  Your Honor, I'm not seeking to publish
17       any content, just the extraction report cover page, basically
18       to explain it to the jury.
19                    THE COURT:  First page has content.  It will not be
04:00PM 20       published at this time.
21                    MR. WYMAN:  Thank you, Your Honor.
22       Q    In these reports, is there a cover page to the extraction
23       reports?
24       A    Yes, there is.
04:00PM 25       Q    And the reports, do they include text messages and other
```

```
 1   types of messages and phone calls?
 2   A      It will include whatever you choose to include.  If you
 3   want to extract text messages, then it will include the text
 4   messages.
```
04:00PM `5   Q      The text messages in the extraction reports and the phone`
```
 6   calls, for that matter, what time zone are they in?
 7   A      A lot of times they're in UTC.
 8   Q      And for the exhibits we are focusing on, what time zone
 9   are they in?
```
04:00PM `10  A      They are in UTC.`
```
11   Q      What is UTC?
12   A      UTC is a universally accepted time standard.  Basically,
13   when we compare it with the Pacific Standard Time which we are
14   in currently, it is about seven or eight hours ahead of us,
```
04:01PM `15  depending on the time of the year.  Because of Daylight`
```
16   Savings, between spring to fall, it's about seven hours ahead.
17   The rest of the year it's about eight hours ahead of us.
18   Q      So the timestamps on the text messages and phone calls in
19   these reports will be either seven or eight hours ahead of the
```
04:01PM `20  time in California?`
```
21   A      Yes.
22   Q      Was a forensic image of various digital devices
23   belonging -- also made belonging to a woman named Judy Regnier?
24   A      Yes.
```
04:01PM `25  Q      Did that include cell phones and iPad?`

| | | |
|---|---|---|
| | 1 | A    Cell phone, iPad, and, I believe, other devices. |
| | 2 | Q    And was an extraction report created for the data from |
| | 3 | those digital devices belonging to Ms. Regnier? |
| | 4 | A    Yes. |
| 04:02PM | 5 | Q    Would you please look at Exhibits 260, 261, 262, and 263. |
| | 6 | A    Okay. |
| | 7 | Q    Do you recognize these documents? |
| | 8 | A    Yes.  This looked like pages from the extraction report of |
| | 9 | Judy's cell phone. |
| 04:02PM | 10 | Q    Have you compared these -- let me ask you another |
| | 11 | question. |
| | 12 |         Are these fair and accurate pages from an overall |
| | 13 | extraction of Ms. Regnier's digital devices? |
| | 14 | A    Yes. |
| 04:03PM | 15 | Q    Did you personally run the Cellebrite extraction on |
| | 16 | Ms. Regnier's devices? |
| | 17 | A    I did not.  That was done by another computer investigator |
| | 18 | specialist, John Weeks. |
| | 19 | Q    How do you know that Mr. Weeks performed that extraction? |
| 04:03PM | 20 | A    Because on the day of the search warrant, he was the one |
| | 21 | that was assigned to handle the devices from Judy's residence |
| | 22 | and he was there personally.  And he was the one who imaged the |
| | 23 | devices at the residence and provided the forensic images to |
| | 24 | me. |
| 04:03PM | 25 |         MR. WYMAN:  One moment, Your Honor. |

```
 1   Q     Have you reviewed the full extraction report from
 2   Ms. Regnier's devices?
 3   A     I have.
 4   Q     Are these exhibits, 260 through 263, fair and accurate
 5   copies of excerpts from that extraction report?
 6   A     Yes.
 7               MR. WYMAN:  Thank you.  No further questions.
 8               THE COURT:  Mr. Avenatti.
 9                         CROSS-EXAMINATION
10   BY MR. AVENATTI:
11   Q     Good afternoon, sir.
12   A     Good afternoon.
13   Q     Can you give me the pronunciation of your last name
14   again, because I want to make sure I get it right.
15   A     Tashchyan.
16   Q     Tashchyan?
17   A     Yes.
18   Q     If at any point in time I don't get it right, please let
19   me know.
20   A     That's fine.  Okay.
21   Q     Thank you.
22               Now, sir, on direct examination, you talked about
23   preserving evidence in a forensically competent manner?
24   A     Uh-huh.
25   Q     Correct?
```

```
 1              THE COURT:  Sir, you need to say "yes" or "no."
 2              THE WITNESS:  Yes.
 3    Q    BY MR. AVENATTI:  Can you explain to the jury what you
 4    mean when you say "preserving evidence in a forensically
 5    competent manner."
 6    A    Sure.  There's -- there are certain methods that we have
 7    to follow whenever we come across an electronic device.  We
 8    have to make sure it's handled a certain way, depending on
 9    the -- what condition the device is, and we do have certain
10    tools that we have to use to forensically image those devices,
11    to make sure that the evidence is not altered.
12    Q    Why do you have to use the forensic tools?
13    A    Because without the forensic tools, you can't just look at
14    the device and copy the stuff out.  At that point you'll be
15    altering the device.  By using the forensic tools, you're
16    guaranteeing that none of the information that's extracted from
17    those devices is altered.
18    Q    Because if you don't use the forensic tools, you run the
19    risk that the information is altered or not legitimate; right?
20    A    Yes.
21    Q    Yes?
22    A    Yes.
23    Q    So let's just say I have a cell phone, a smartphone --
24    A    Yes.
25    Q    -- with text messages on it.  If you're involved in an
```

1    investigation, why can't you just open my cell phone and start

2    taking pictures of my cell phone, of the text messages?

3    A    You can, but that is not the forensically sound way of

4    doing it, especially if you have special tools designed to

04:06PM  5    extract that evidence.

6    Q    Just taking pictures of a cell phone -- text messages on

7    a cell phone, that's not forensically appropriate, in your

8    experience; right?

9    A    Depends.  There have been some certain times that the tool

04:06PM 10    couldn't be used and that was the only way to preserve the

11    evidence.

12    Q    But absent those instances, those rare instances, the

13    best thing to do is to get the device, hook it up to your

14    computer or software, and get a forensic image of the device;

04:07PM 15    right?

16    A    It is.  But, again, the only way to use that method, the

17    correct method, is to make sure the phone is unlocked and you

18    have the PIN code for the phone.  If you don't have the

19    passcode, you cannot forensically extract the data using the

04:07PM 20    software.  At that point the only option you have, if the phone

21    is open, is to take pictures of those text messages.

22    Q    Well, if the phone is open, then presumably it would be

23    unlocked; right?

24    A    It is, but as soon as you connect it to the computer to

04:07PM 25    use the forensic software, it's going to ask you -- it's like

1    connecting your phone to any computer.  It wants to trust it.

2    The only way to do it is to enter the passcode.

3    Q    But if you have a witness who is cooperating with the

4    Government and is willing to give the Government their

04:07PM 5    cell phone to be imaged, then in your experience, the proper

6    thing to do to properly preserve the text message would be --

7    or text messages would be to image the phone; right?

8    A    It is.  But if we were just talking about one or two text

9    messages, a lot of times it's easier just to take a picture of

04:08PM 10   that text message than to image the whole phone.

11   Q    You are familiar, are you not, with apps that are freely

12   available out on the Internet that allows you to create a

13   supposed text message to anybody; right?

14   A    I'm pretty sure, yes.

04:08PM 15   Q    I'm sorry?  Yes?

16   A    I'm not familiar with those apps, but I'm pretty sure

17   those apps do exist.

18   Q    Okay.  I don't know if they're called spoofing.  Have you

19   ever heard anything called a spoofing app?

04:08PM 20            MR. WYMAN:  Objection.  Relevance.

21            THE COURT:  Overruled.

22            THE WITNESS:  I've never heard of it.

23   Q    BY MR. AVENATTI:  Okay.  Are you familiar with the fact

24   that people can create text messages on their phone that look

04:08PM 25   like they were actually sent or received but they weren't

```
 1   actually sent or received?  Are you familiar with that, sir?
 2   A    I'm not.  But I'm pretty sure it does exist.
 3   Q    And because those apps exist, that's one of the reasons
 4   why you've got to use these, I think you called them common
 5   tools, when it comes to the federal government's investigation
 6   in criminal matters; right?
 7   A    Yes.
 8   Q    That's why you've got to use things like Cellebrite, so
 9   you make sure that the evidence is authentic?
10   A    Yes.
11   Q    Did anyone restrict you in what you could image from the
12   devices?
13   A    No.
14   Q    Did anyone tell you, "Don't image this part of the
15   devices"?
16   A    There is no way to do that.  Once you start imaging,
17   you're imaging the whole device.
18   Q    It's not piecemeal thing?
19   A    No.  After it's imaged, then you can do scope review and
20   extract just the items that are within the scope of that search
21   warrant or whatever that person consented to.  But when you're
22   conducting forensic image, you're imaging the whole thing.
23   Q    So you were asked about a number of extraction reports by
24   Mr. Wyman.  Do you recall that?
25   A    Yes.
```

04:09PM (lines 5)
04:09PM (line 10)
04:09PM (line 15)
04:10PM (line 20)
04:10PM (line 25)

1    Q    Those are not the entire images of those devices, are

2    they?

3    A    No.  Because the entire image also contains software

4    files, whole bunch of stuff.  In this situation, this is only

04:10PM 5    the extraction of the text messages from that cell phone.

6    Q    But it's not the extraction of all the text messages, is

7    it?

8    A    No, it's not.

9    Q    It's not.  Who told you or instructed you as to which

04:10PM 10   text messages should be extracted?

11   A    Well, in this specific situation, whatever the people

12   consented to or whatever the scope of the warrant was,

13   that's -- based on that, I believe, the text messages were

14   extracted.

04:11PM 15   Q    Well, you had the entirety of the device imaged; right?

16   A    Yes.

17             MR. WYMAN:  Your Honor, I'm not sure which exhibit

18   we're talking about here.  So I would object as vague as to the

19   exhibit.

04:11PM 20            MR. AVENATTI:  Your Honor, let me be specific.  I

21   was trying to shortcut it.

22   Q    If you could turn to 123, which I believe is the

23   extraction report from Mr. Geoff Johnson's phone.

24   A    Okay.

04:12PM 25   Q    Do you have that, sir?

A      Yes.

Q      These are only text messages between Mr. Johnson and

Mr. Tom Goeders; right?

A      Looks like it.

04:12PM 5   Q      There's no text messages there between me and

Mr. Johnson, are there?

A      Nope.  Looks like all the communication is between Tom and

Geoff.

Q      No messages there between Mr. Johnson and members of his

04:13PM 10   family, is there?

A      No.

Q      No messages there between Mr. Johnson and anyone else

about me, other than if it's with Mr. Goeders; right?

A      I'm not sure.  I haven't read all the text messages.

04:13PM 15   Q      Well, all the text messages in this document are between

Mr. Johnson and Mr. Goeders; right?

A      In this report, yes.  But you have to understand, once you

extract all the data from the cell phone, then within the

forensic software you can choose whatever it is you want to

04:13PM 20   create the report based on.  In this situation, looks like it

was only for the communication between Geoff and Tom.

Q      So that's my question.  Who made that choice?

A      I don't recall.  I was either asked or either -- it would

have been -- since Geoff was consenting, it would have been --

04:14PM 25   I don't exactly recall.

Q    You don't remember or you don't recall who made that

choice, but somebody did; right?

A    Somebody asked me to create a report based on those two

communications and that's what the report was created on.

04:14PM 5  Q    So as you sit here today, you don't know if there were

other text messages on that phone about me, do you?

A    No.  Because I didn't read every single text message on

there.

Q    And nobody asked you to look for those messages, either

04:14PM 10  did they, as you can recall?

A    I don't recall.

Q    Let's go to Exhibit 124.  I think you were asked about

that.  I believe you testified that this was from Mr. Goeders'

cell phone; right?

04:15PM 15  A    Yes.

Q    Sir, take your time, but the only text messages I see

from this cell phone are the ones between me or Mr. Johnson and

Mr. Goeders; am I right about that?

A    Yes.

04:15PM 20  Q    There's no other text messages about me or Mr. Johnson

that Mr. Goeders may have had with other people; am I correct?

A    In this situation, Mr. Goeders only consented to text

communication between certain phone numbers, and I believe

those are the phone numbers that the report was created for.

04:15PM 25  Q    So you got his phone?

1    A      Uh-huh.  Yes.

2    Q      He consented to allow you to forensically image the

3    entire phone; am I right?  Because I think you -- strike that.

4           I think you testified earlier that you can't half

04:15PM 5    forensic a phone.  You either fully forensic image it or you

6    don't.  Am I right about that?

7    A      Yes.  But the forensic tool allows you just to -- let's

8    say -- you can just image just the text messages.  In this

9    situation he only consented for me to image the text messages.

04:16PM 10   But the problem is, I can't just choose specific text messages

11   to image.  I have to image all the text messages, then go in

12   there and just bookmark the phone numbers that he's consenting

13   to, and then create a separate report based on those.  That's

14   what happened in this situation.

04:16PM 15   Q      So Mr. Goeders allowed the Government to forensically

16   image all of the text messages on his phone and then consented

17   to only allow the Government to extract those messages with

18   Mr. Johnson and Mr. Avenatti, me; correct?

19   A      Yes.  He gave me the phone numbers.  He went through the

04:16PM 20   phone -- he gave me the phone numbers that he specifically

21   consented to, and I create the report based on that.

22   Q      And he didn't consent to anyone else, any other numbers

23   other than Mr. Johnson and me.  Am I right about that?  I just

24   want to make sure the record is clear.

04:17PM 25          MR. WYMAN:  Objection.  Asked and answered.

                    THE COURT:  Sustained.

Q    BY MR. AVENATTI:  How about Exhibit 176?  I believe you
said that's the extraction report for Mr. Barela?

A    Yes.

Q    Did Mr. Barela put any restrictions on the Government's
ability to extract messages from his cell phone?

A    I don't recall.  I know he was a consent again, but I
don't recall if he provided me the phone numbers for which he
consented to.  This happened sometime in early 2019.  I don't
recall.

Q    But you recall that you forensically imaged the entirety
of Mr. Barela's cell phone?

A    Yes.

Q    Other than me and a gentleman by the name of John
Arden -- well, strike that.

        All of the images within this exhibit appear to be
text messages relating to communications that Mr. Barela had
with either me or Mr. Arden.  Can you take a look and tell me
if I'm wrong about that?

A    I can see other names and phone numbers here.

Q    Agreed, sir.  But I believe that either me and Mr. Arden
are party to all of those messages.

A    Yes.

Q    Am I correct about that?

A    Yes.

```
 1   Q    So if there was a message about me but I -- neither I or
 2   Mr. Arden were a party to it, it would not be included in this
 3   report; correct?
 4   A    Actually, I don't recall how I was asked to create this
 5   report, if it was based on -- if he consented to communication
 6   between second phone numbers or if I was asked.  I don't recall
 7   exactly.
 8   Q    I understand that, sir.  My question is a little more
 9   nuanced, which is, based on looking at the document, if
10   Mr. Barela had a message with someone about me but I wasn't a
11   party to it and Mr. Arden was not a party to it, it would not
12   appear within this report, based on your review; am I correct?
13              MR. WYMAN:  Objection.  Asked and answered.
14              THE COURT:  Overruled.
15              THE WITNESS:  Yes.
16   Q    BY MR. AVENATTI:  How long have you been working on this
17   case?
18   A    Since 2019.
19   Q    So over two years?
20   A    Over two years.
21   Q    And during that two-year time period, have you generated
22   various reports and written work product?
23   A    No, because I was -- I'm not the investigative agent.  I
24   was only assisting them with the electronic devices.
25   Q    Have you generated written communications about your work
```

```
 1   in connection with the case?
 2   A    I have -- believe I did create a report on the meeting
 3   with Greg Barela.
 4   Q    My question, I don't think -- perhaps it's not clear.
 5            Have you generated e-mails and text messages with
 6   others about your work in connection with this case over the
 7   last two-plus years?
 8   A    Most likely.
 9   Q    And why do you say that?  Because that's commonplace when
10   you're working on an investigation?
11   A    Yes.
12   Q    Yes, sir?
13   A    Yes.
14   Q    And before you sent those text messages and those
15   e-mails, they were, obviously, something that you created;
16   right?
17   A    They would have been e-mails.  When it comes out to cases,
18   I don't communicate with text messages.  They might have been
19   e-mails with either prosecutors or agents.
20   Q    In connection with this case and the issues you've been
21   testifying about here today; right?
22   A    In connection to this case, yeah.
23   Q    And your work on this case has been working on these
24   forensic images that we've been talking about here today?
25   A    Part of it.
```

1          MR. AVENATTI:  Your Honor, one moment, please.

2          **(Counsel conferred off the record.)**

3          MR. AVENATTI:  Sir, thank you.

4          Your Honor, nothing further at this time.

04:22PM 5          MR. WYMAN:  Nothing from the Government, Your Honor.

6          THE COURT:  May the witness be excused?

7          MR. AVENATTI:  Your Honor, we may call him in our

8   case.

9          THE COURT:  Sir, you're excused for now but you'll

04:22PM 10  be on call.  Thank you.

11          I think we'll stop here for the day, ladies and

12  gentlemen.  We'll resume tomorrow at 9:00.  Please remember the

13  admonition not to discuss the case with anyone and not to form

14  any opinions on the issues in the case.  Please don't do any

04:22PM 15  research.

16          I'm probably getting a little bit repetitive, but I

17  need to do this so that it's foremost in everyone's mind what

18  the ground rules are.

19          So you're excused at this time.  See you in the

04:22PM 20  morning.  Have a good evening.

21          THE COURTROOM DEPUTY:  All rise.

22          **(Out of the presence of the jury.)**

23          THE COURT:  We have two items:  One, I want to put

24  on the record the explanation for why we took a short break

04:23PM 25  after Mr. Johnson's testimony.  The parties had agreed that the

```
 1   jury would not be exposed to Mr. Johnson moving around in his
 2   wheelchair.  They agreed that at all times in front of the jury
 3   he would be in the witness box.  We took the break so that he
 4   could get out of the witness box without the presence of the
 5   jury.
 6         The other item is Mr. Avenatti put in a declaration
 7   in camera either yesterday or this morning with regard to the
 8   fact that he now has audiovisual and other assistance that he
 9   didn't have previously.  I've concluded that there is nothing
10   in that that's inconsistent with his financial representations
11   to the Court and nothing inconsistent with respect to his
12   representations to secure CJA counsel.
13         Anything further before we adjourn?
14         MR. SAGEL:  Nothing from the Government, Your Honor.
15         THE COURT:  Mr. Avenatti?
16         MR. AVENATTI:  No, sir.  Thank you.
17         THE COURT:  Okay.  And you're going to share
18   tomorrow's lineup?
19         MR. WYMAN:  Yes, Your Honor.
20         THE COURT:  Very good.  We'll be adjourned.  See you
21   at 8:30.
22         THE COURTROOM DEPUTY:  All rise.  This Court is now
23   in recess.
24         (Proceedings concluded at 4:27 p.m.)
25                        --oOo--
```

04:23PM  5
04:24PM 10
04:24PM 15
04:24PM 20

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2

 3    COUNTY OF LOS ANGELES   )
                              )
 4    STATE OF CALIFORNIA     )

 5              I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME

 6    COURT REPORTER, in and for the United States District Court for

 7    the Central District of California, do hereby certify that

 8    pursuant to Section 753, Title 28, United States Code that the

 9    foregoing is a true and correct transcript of the

10    stenographically reported proceedings held in the

11    above-entitled matter and that the transcript page format is in

12    conformance with the regulations of the Judicial Conference of

13    the United States.

14

15    Date:  July 22, 2021

16

17

18

19                             /S/ DEBBIE HINO-SPAAN

20                             Debbie Hino-Spaan, CSR No. 7953
                               Federal Official Court Reporter
21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**

**$**

**$175,000** [1] - 35:17
**$1900** [1] - 37:14
**$46,000** [1] - 57:25

**'**

**'13** [1] - 37:2

**/**

**/S** [1] - 94:19

**1**

**1** [9] - 5:8, 8:4, 12:7, 12:15, 12:18, 12:23, 42:21, 54:22, 77:1
**1-053** [1] - 1:24
**1.1** [1] - 61:9
**1.5** [7] - 26:19, 26:21, 27:5, 46:10, 46:12, 63:10, 63:15
**1.9** [3] - 46:9, 46:12, 61:15
**100** [1] - 28:22
**108** [2] - 41:21, 42:5
**1100** [1] - 2:11
**122** [3] - 51:18, 61:8
**123** [1] - 85:22
**124** [3] - 75:4, 75:9, 87:12
**12th** [1] - 33:12
**15** [2] - 52:16, 52:20
**17** [1] - 2:18
**176** [4] - 76:9, 76:23, 77:1, 89:2
**176-1** [2] - 3:15, 77:4
**19** [1] - 53:2
**19th** [1] - 48:1
**1:34** [2] - 1:16, 4:2
**1st** [1] - 42:14

**2**

**2** [5] - 1:9, 11:14, 13:7, 55:1, 60:8
**2.4** [1] - 47:1
**2000** [1] - 24:2
**2008** [1] - 34:2
**2009** [1] - 34:3
**2011** [5] - 13:5, 19:11, 19:14, 19:15, 20:22
**2012** [4] - 12:10, 37:2, 39:6, 39:12
**2013** [1] - 33:12
**2015** [7] - 5:8, 12:10, 12:15, 19:14, 60:9, 60:11, 61:4

**2016** [3] - 58:24, 59:9, 67:24
**2018** [2] - 42:14, 42:21
**2019** [23] - 4:23, 8:24, 9:19, 10:4, 11:10, 19:11, 19:15, 20:23, 29:21, 50:24, 51:4, 51:21, 56:16, 57:5, 57:13, 57:17, 58:2, 60:11, 61:11, 61:13, 64:20, 89:9, 90:18
**2020** [4] - 24:2, 25:4, 25:5, 26:22
**2021** [6] - 1:15, 4:1, 38:15, 51:4, 53:2, 94:15
**213-894-2435** [1] - 2:12
**22** [3] - 1:15, 4:1, 94:15
**22nd** [1] - 5:8
**23rd** [1] - 61:11
**24** [1] - 51:4
**24th** [1] - 38:15
**254** [1] - 2:19
**26.2** [1] - 4:9
**260** [2] - 79:5, 80:4
**261** [1] - 79:5
**262** [1] - 79:5
**263** [2] - 79:5, 80:4
**28** [1] - 94:8
**2nd** [1] - 12:15

**3**

**3** [1] - 13:19
**3.4** [1] - 46:13
**302** [3] - 5:2, 5:3, 7:11
**312** [1] - 2:11
**31st** [15] - 4:23, 6:3, 8:24, 9:19, 10:4, 11:10, 29:21, 50:24, 51:4, 56:15, 57:5, 57:13, 57:17, 58:2, 64:20
**37** [11] - 5:9, 8:4, 8:20, 12:12, 29:2, 48:14, 49:6, 55:22, 58:4, 62:25, 63:4
**3:02** [1] - 52:24
**3:21** [1] - 52:24
**3:39** [1] - 65:19
**3:43** [1] - 65:19

**4**

**4** [21] - 10:17, 10:19, 14:4, 14:6, 14:18, 29:6, 29:13, 29:18, 31:2, 31:7, 31:16,

31:21, 31:24, 31:25, 47:4, 55:14, 57:15, 57:21, 59:13, 62:13, 62:14
**40** [1] - 14:7
**401** [1] - 34:15
**403** [1] - 34:15
**411** [2] - 1:24, 2:6
**45** [2] - 48:4, 53:6
**4:27** [1] - 93:24
**4th** [1] - 2:6
**4TH** [1] - 1:24

**5**

**5** [1] - 15:5
**54** [1] - 3:5

**6**

**6** [2] - 15:11, 55:14
**62** [1] - 3:5
**67** [1] - 3:7

**7**

**7** [8] - 1:8, 5:5, 6:18, 8:1, 8:5, 9:14, 9:16, 39:1
**714-338-3598** [1] - 2:7
**753** [1] - 94:8
**77** [1] - 3:15
**7953** [2] - 1:23, 94:20

**8**

**8** [8] - 3:4, 5:16, 6:18, 8:1, 8:5, 10:2, 10:10, 11:14
**80** [1] - 3:7
**8000** [1] - 2:6
**8:30** [1] - 93:21
**8th** [1] - 13:5

**9**

**9** [1] - 17:1
**90012** [1] - 2:12
**92660** [1] - 2:19
**92701** [2] - 1:25, 2:7
**949-481-4900** [1] - 2:20
**9:00** [1] - 92:12

**A**

**abide** [1] - 13:25
**Abilify** [2] - 34:5, 35:11
**ability** [1] - 89:6

**able** [4] - 41:16, 70:21, 71:1, 71:18
**above-entitled** [1] - 94:11
**absent** [1] - 82:12
**accept** [1] - 37:14
**accepted** [6] - 63:10, 63:14, 71:7, 72:23, 74:21, 78:12
**access** [3] - 70:2, 70:8, 70:22
**according** [1] - 38:1
**accounting** [1] - 20:6
**accurate** [6] - 28:13, 28:22, 75:22, 76:19, 79:12, 80:4
**action** [1] - 33:1
**actions** [1] - 23:13
**actual** [3] - 23:24, 24:24, 32:15
**addition** [1] - 74:13
**additional** [4] - 17:13, 43:18, 66:5, 68:11
**additions** [1] - 28:20
**addressed** [1] - 42:18
**adjourn** [1] - 93:13
**adjourned** [1] - 93:20
**Administration** [2] - 44:11, 47:16
**admit** [1] - 76:23
**admitted** [2] - 29:21, 77:9
**admonition** [2] - 52:17, 92:13
**advanced** [2] - 46:16, 64:3
**advances** [1] - 32:9
**advisory** [1] - 53:14
**afforded** [1] - 30:10
**afternoon** [9] - 8:10, 8:16, 8:17, 54:13, 54:14, 67:15, 67:16, 80:11, 80:12
**Agent** [3] - 38:24, 67:6, 67:15
**agent** [6] - 6:13, 18:12, 18:20, 67:21, 69:14, 90:23
**agent's** [1] - 7:20
**agents** [24] - 7:19, 9:23, 11:9, 27:6, 56:15, 56:19, 56:25, 57:13, 57:19, 57:23, 58:3, 64:19, 68:3, 68:16, 68:19, 68:21, 71:15, 73:15, 73:18, 73:20, 73:23, 73:24, 74:10, 91:19
**ago** [6] - 27:14, 37:24, 47:24, 49:13, 50:25,

63:15
**agree** [8] - 6:25, 26:15, 26:20, 30:8, 31:5, 31:19, 36:10, 43:24
**agreed** [7] - 13:10, 15:2, 16:15, 27:5, 89:21, 92:25, 93:2
**agreement** [46] - 4:21, 8:3, 10:6, 10:9, 10:17, 11:16, 11:25, 12:12, 13:1, 13:3, 13:15, 13:25, 14:7, 17:5, 17:9, 17:10, 19:8, 19:10, 21:8, 26:5, 27:16, 27:18, 29:7, 29:13, 29:22, 30:9, 30:11, 30:21, 32:7, 44:17, 45:2, 48:12, 48:13, 48:16, 49:3, 51:7, 53:8, 54:23, 55:15, 55:18, 55:23, 56:5, 58:4, 58:7, 58:10, 65:9
**Agreement** [1] - 44:13
**agreements** [2] - 26:10
**agrees** [2] - 13:23, 17:8
**ahead** [4] - 78:14, 78:16, 78:17, 78:19
**aids** [2] - 19:4, 60:6
**alex.wyman@usdoj.gov** [1] - 2:13
**ALEXANDER** [1] - 2:10
**Alisa** [1] - 33:25
**all-day** [1] - 28:5
**allow** [2] - 88:2, 88:17
**allowed** [2] - 41:9, 88:15
**allows** [2] - 83:12, 88:7
**almost** [1] - 68:11
**altered** [3] - 81:11, 81:17, 81:19
**altering** [2] - 69:6, 81:15
**ambiguous** [1] - 74:3
**AMERICA** [1] - 1:5
**amount** [5] - 14:19, 31:2, 37:13, 46:7, 57:14
**Ana** [2] - 2:7, 69:18
**ANA** [3] - 1:17, 1:25, 4:1
**analyzing** [1] - 68:4
**Andre** [2] - 5:7, 8:25
**ANGELES** [1] - 94:3
**Angeles** [8] - 2:12,

13:12, 29:6, 32:16, 54:20, 55:6, 59:13
**animation** [1] - 15:23
**answer** [6] - 10:23, 21:6, 21:10, 22:5, 26:3, 26:7
**answered** [15] - 31:13, 33:7, 35:13, 40:24, 50:18, 50:19, 50:21, 52:2, 63:5, 63:21, 64:5, 64:14, 65:10, 88:25, 90:13
**answering** [1] - 11:2
**answers** [1] - 11:22
**anticipated** [1] - 66:18
**anyway** [1] - 59:4
**apart** [1] - 74:9
**apartment** [8] - 71:12, 71:17, 71:22, 72:6, 72:7, 72:8, 72:9, 73:3
**apologize** [2] - 4:24, 75:4
**app** [1] - 83:19
**appear** [3] - 75:2, 89:16, 90:12
**APPEARANCES** [1] - 2:1
**Apple** [2] - 72:14, 72:23
**apply** [1] - 17:9
**appreciate** [1] - 7:24
**approach** [2] - 37:20, 38:12
**appropriate** [1] - 82:7
**apps** [4] - 83:11, 83:16, 83:17, 84:3
**arbitration** [12] - 23:16, 23:20, 23:24, 24:25, 25:3, 25:7, 25:13, 25:21, 27:13, 29:5, 29:11, 29:16
**arbitrations** [1] - 61:17
**arbitrator** [1] - 29:12
**Arden** [5] - 89:15, 89:18, 89:21, 90:2, 90:11
**areas** [2] - 6:7, 75:20
**Argumentative** [2] - 33:16, 63:12
**arises** [1] - 17:8
**arising** [1] - 55:7
**arresting** [1] - 55:8
**art** [1] - 15:22
**aside** [1] - 53:24
**asserted** [1] - 42:2
**assigned** [1] - 79:21
**assist** [3] - 18:4, 18:19, 68:3

**assistance** [1] - 93:8
**assistant** [3] - 8:25, 9:20, 27:6
**Assistant** [2] - 2:5, 2:10
**assisted** [1] - 69:14
**assisting** [4] - 13:2, 68:18, 68:20, 90:24
**associated** [1] - 27:1
**assume** [1] - 20:2
**assumed** [1] - 19:25
**attached** [2] - 43:13, 43:18
**Attachment** [2] - 5:8, 8:4
**attempt** [1] - 7:7
**attempts** [1] - 61:16
**attention** [11] - 10:2, 10:10, 13:4, 17:18, 18:3, 18:10, 18:17, 18:23, 19:2, 39:1, 51:18
**Attorney** [4] - 2:4, 2:5, 2:9, 2:10
**attorney** [16] - 8:25, 13:23, 13:24, 15:8, 15:14, 16:7, 17:12, 27:8, 40:1, 40:3, 40:6, 40:18, 50:10, 55:4, 55:10, 73:17
**attorney's** [2] - 16:9, 55:19
**attorney-client** [4] - 40:1, 40:3, 40:6, 40:18
**attorneys** [10] - 9:20, 11:23, 27:6, 40:21, 47:7, 47:8, 73:15, 73:20, 73:23, 73:24
**audiovisual** [1] - 93:8
**AUSA** [1] - 5:7
**authentic** [1] - 84:9
**authorizes** [1] - 16:7
**available** [2] - 65:14, 83:12
**Avenatti** [28] - 3:4, 3:5, 3:7, 4:6, 5:17, 5:19, 5:20, 5:22, 7:22, 8:11, 11:11, 31:6, 31:21, 39:21, 45:14, 62:5, 62:19, 62:21, 63:8, 66:4, 66:11, 68:14, 69:8, 74:9, 80:8, 88:18, 93:6, 93:15
**AVENATTI** [101] - 1:8, 2:15, 2:16, 4:7, 4:12, 4:17, 5:3, 6:24, 7:24, 8:2, 8:12, 8:15, 10:16, 10:20, 11:5,

12:7, 12:8, 12:11, 12:13, 12:18, 12:19, 14:16, 18:2, 21:13, 24:18, 26:9, 26:20, 29:2, 29:4, 29:24, 30:1, 30:4, 31:12, 32:7, 33:11, 33:19, 34:17, 35:10, 35:16, 37:4, 37:6, 37:20, 37:24, 38:12, 38:14, 38:23, 39:11, 39:25, 40:17, 40:25, 41:21, 41:24, 42:1, 42:5, 42:10, 45:15, 45:18, 45:24, 46:4, 47:15, 47:20, 49:12, 49:15, 50:9, 50:23, 51:15, 51:17, 52:5, 52:12, 53:1, 53:22, 59:2, 60:17, 61:1, 62:1, 62:23, 63:7, 63:14, 63:23, 64:2, 64:7, 64:10, 64:16, 64:18, 65:4, 65:12, 66:21, 66:24, 76:25, 77:9, 77:12, 80:10, 81:3, 83:23, 85:20, 89:2, 90:16, 92:1, 92:3, 92:7, 93:16
**Avenatti's** [1] - 41:12
**aware** [3] - 20:22, 20:25, 22:7

**B**

**baeda** [1] - 16:22
**banking** [1] - 20:6
**Barela** [8] - 3:15, 76:15, 76:24, 89:3, 89:5, 89:17, 90:10, 91:3
**Barela's** [3] - 76:13, 76:19, 89:12
**based** [11] - 71:6, 72:22, 74:22, 85:13, 86:20, 87:3, 88:13, 88:21, 90:5, 90:9, 90:12
**basic** [2] - 36:14, 68:10
**basis** [1] - 37:23
**Beach** [1] - 2:19
**beat** [2] - 69:3
**beat-to-beat** [1] - 69:3
**became** [1] - 38:2
**become** [1] - 68:7
**BEFORE** [2] - 30:17, 56:2
**behalf** [3] - 28:9, 59:14, 64:4

**behind** [3] - 28:24, 49:16, 75:7
**behoove** [1] - 53:13
**belonging** [3] - 78:23, 79:3
**below** [1] - 30:5
**benefit** [2] - 18:15, 46:17
**benefits** [2] - 18:5
**best** [4] - 24:2, 26:25, 51:13, 82:13
**better** [1] - 28:4
**between** [15] - 15:8, 20:15, 27:21, 35:24, 78:16, 86:2, 86:5, 86:7, 86:9, 86:12, 86:15, 86:21, 87:17, 87:23, 90:6
**Beyond** [1] - 64:13
**beyond** [2] - 20:16, 20:18
**billing** [1] - 35:24
**bills** [3] - 14:1, 36:6, 58:19
**bit** [2] - 70:4, 92:16
**blacked** [1] - 76:4
**block** [1] - 8:19
**blow** [1] - 42:11
**blue** [1] - 24:13
**bookmark** [1] - 88:12
**books** [1] - 12:20
**boot** [1] - 70:24
**box** [2] - 93:3, 93:4
**Brady** [6] - 6:8, 6:17, 6:19, 7:3, 7:14, 53:24
**brain** [1] - 34:19
**break** [6] - 4:19, 4:24, 52:16, 65:18, 92:24, 93:3
**Brett** [1] - 50:8
**BRETT** [1] - 2:5
**brett.sagel@usdoj. gov** [1] - 2:8
**brief** [2] - 65:18, 76:3
**briefly** [1] - 65:21
**bring** [1] - 65:25
**broke** [1] - 8:18
**brought** [2] - 10:6, 11:6
**bunch** [1] - 85:4
**busy** [1] - 20:1
**buy** [2] - 18:7, 36:2
**BY** [60] - 2:5, 2:18, 3:4, 3:6, 8:15, 10:16, 11:5, 12:8, 12:13, 12:19, 14:16, 18:2, 21:13, 24:18, 26:9, 26:20, 29:4, 31:12, 32:7, 33:11, 33:19,

34:17, 35:10, 35:16, 37:6, 37:24, 38:14, 38:23, 39:11, 39:25, 40:17, 40:25, 45:18, 45:24, 46:4, 47:20, 49:12, 51:17, 52:5, 54:12, 54:23, 55:3, 55:25, 60:21, 61:4, 61:10, 62:23, 63:7, 63:14, 63:23, 64:2, 64:10, 64:18, 65:4, 67:14, 80:10, 81:3, 83:23, 89:2, 90:16

**C**

**CA** [1] - 1:25
**cable** [1] - 70:21
**California** [5] - 2:7, 2:12, 2:19, 78:20, 94:7
**CALIFORNIA** [4] - 1:2, 1:17, 4:1, 94:4
**CALLED** [2] - 3:4, 3:6
**camera** [9] - 6:7, 7:23, 50:11, 54:1, 65:22, 65:24, 66:4, 66:11, 93:7
**cannot** [1] - 82:19
**cards** [1] - 41:10
**care** [6] - 17:20, 19:7, 19:9, 35:2, 35:3, 64:11
**CareMeridian** [6] - 35:17, 35:21, 35:24, 58:15, 58:22
**Carlos** [1] - 38:24
**cars** [1] - 34:13
**case** [25] - 4:22, 6:11, 32:15, 40:12, 45:19, 45:25, 47:12, 48:5, 48:6, 52:18, 52:19, 57:6, 63:20, 65:15, 76:6, 76:16, 90:17, 91:1, 91:6, 91:20, 91:22, 91:23, 92:8, 92:13, 92:14
**Case** [1] - 1:7
**cases** [2] - 19:23, 91:17
**CAUTION** [2] - 30:17, 56:2
**cell** [27] - 68:5, 74:11, 74:13, 74:14, 74:20, 74:24, 75:15, 75:17, 75:24, 76:13, 76:16, 76:20, 78:25, 79:1, 79:9, 81:23, 82:1, 82:2, 82:6, 82:7, 83:5, 85:5, 86:18,

87:14, 87:17, 89:6,
89:12
**Cellebrite** [6] - 74:17,
74:18, 74:21, 74:24,
79:15, 84:8
**center** [1] - 69:17
**Central** [1] - 94:7
**CENTRAL** [1] - 1:2
**certain** [8] - 56:6,
74:11, 75:19, 81:6,
81:8, 81:9, 82:9,
87:23
**certainly** [1] - 53:10
**CERTIFICATE** [1] -
94:1
**CERTIFIED** [1] - 1:6
**certify** [1] - 94:7
**cetera** [1] - 68:6
**chain** [3] - 71:20,
71:24, 72:1
**change** [1] - 49:19
**changes** [1] - 28:20
**changing** [1] - 62:24
**charged** [1] - 27:1
**charges** [3] - 15:24,
16:2, 16:3
**check** [3] - 31:7,
31:22, 31:24
**chemical** [1] - 34:19
**choice** [2] - 86:22,
87:2
**choose** [3] - 78:2,
86:19, 88:10
**CJA** [1] - 93:12
**claim** [10] - 21:2,
21:14, 22:14, 22:18,
23:2, 23:8, 23:11,
31:15, 46:5, 46:7
**claimed** [11] - 22:17,
22:24, 23:6, 25:18,
25:20, 26:10, 29:5,
32:24, 33:4, 34:8,
41:1
**claiming** [2] - 21:20,
63:18
**claims** [3] - 13:12,
25:1, 55:5
**clarify** [2] - 33:2, 62:2
**clear** [2] - 88:24, 91:4
**CLERK** [1] - 66:13
**clerk's** [1] - 65:24
**clicking** [1] - 35:7
**client** [20] - 13:23,
15:8, 15:14, 15:16,
16:7, 17:3, 17:8,
17:12, 40:1, 40:3,
40:6, 40:18, 55:4,
55:8, 55:9, 55:11,
55:12, 73:17
**client's** [2] - 55:5,

55:13
**Client's** [1] - 13:19
**client-attorney** [1] -
73:17
**clients** [1] - 19:25
**close** [1] - 47:10
**closed** [1] - 11:1
**Code** [1] - 94:8
**code** [1] - 82:18
**common** [1] - 84:4
**commonly** [3] - 71:7,
72:22, 74:21
**commonly-accepted**
[1] - 74:21
**commonplace** [1] -
91:9
**communicate** [3] -
40:4, 40:7, 91:18
**communicating** [1] -
40:5
**communication** [4] -
86:7, 86:21, 87:23,
90:5
**communications** [3] -
87:4, 89:17, 90:25
**compare** [1] - 78:13
**compared** [2] - 71:21,
79:10
**competent** [2] - 80:23,
81:5
**complete** [1] - 11:22
**completed** [1] - 42:22
**completely** [2] - 31:8,
31:22
**completes** [1] - 4:15
**computer** [19] - 15:23,
67:21, 67:22, 67:25,
68:8, 68:18, 68:20,
69:21, 71:9, 71:11,
71:13, 72:5, 72:12,
73:2, 74:10, 79:17,
82:14, 82:24, 83:1
**computerized** [1] -
15:25
**computers** [5] - 68:5,
69:22, 69:23, 70:2,
72:24
**concern** [2] - 45:10,
76:6
**concluded** [2] - 93:9,
93:24
**conclusion** [2] -
15:17, 40:14
**condition** [2] - 33:20,
81:9
**conditionally** [1] -
76:23
**conducted** [2] - 67:3,
69:13
**conducting** [5] - 68:4,

73:16, 73:19, 73:20,
84:22
**Conference** [1] -
94:12
**conferred** [2] - 64:17,
92:2
**confidential** [2] - 21:5,
26:2
**confidentiality** [2] -
21:8, 26:4
**conformance** [1] -
94:12
**connect** [3] - 70:1,
70:8, 82:24
**connected** [1] - 70:21
**connecting** [1] - 83:1
**connection** [11] -
4:10, 13:1, 23:10,
23:20, 26:16, 27:12,
29:4, 91:1, 91:6,
91:20, 91:22
**consent** [2] - 88:22,
89:7
**consented** [9] - 84:21,
85:12, 87:22, 88:2,
88:9, 88:16, 88:21,
89:9, 90:5
**consenting** [2] -
86:24, 88:12
**consultant** [1] - 16:1
**consultants** [1] - 16:8
**contain** [2] - 70:4,
73:17
**contained** [1] - 5:11
**contains** [1] - 85:3
**contemporaneous** [1]
- 6:9
**content** [3] - 9:11,
77:17, 77:19
**contents** [1] - 30:11
**contingency** [4] -
13:3, 27:18, 49:4,
54:23
**continue** [1] - 8:11
**continuous** [1] - 68:9
**conversation** [3] -
57:12, 57:20, 59:11
**cooperate** [1] - 13:24
**cooperating** [1] - 83:3
**copies** [5] - 4:24, 4:25,
69:5, 73:7, 80:5
**copy** [8] - 11:6, 69:3,
69:4, 73:7, 73:8,
75:23, 76:19, 81:14
**Corporate** [1] - 2:18
**correct** [30] - 4:8,
6:22, 22:9, 24:6,
27:22, 28:13, 32:22,
34:3, 34:11, 34:14,
36:11, 36:18, 39:12,

40:19, 42:3, 42:8,
42:24, 43:22, 51:5,
52:10, 63:16, 74:4,
80:25, 82:17, 87:21,
88:18, 89:24, 90:3,
90:12, 94:9
**corrections** [1] - 28:20
**correctly** [7] - 14:2,
15:18, 16:5, 16:11,
17:6, 17:14, 30:14
**Costs** [1] - 15:11
**costs** [10] - 14:1,
15:15, 15:20, 15:24,
16:2, 16:8, 28:9,
55:16, 55:19, 60:11
**Counsel** [2] - 64:17,
92:2
**counsel** [4] - 30:11,
30:12, 53:14, 93:12
**COUNSEL** [2] - 2:1,
2:16
**country** [1] - 19:23
**County** [10] - 4:21,
13:12, 29:6, 30:24,
32:16, 34:23, 54:20,
55:6, 59:13
**COUNTY** [1] - 94:3
**couple** [1] - 57:1
**course** [3] - 57:9,
60:21, 62:3
**court** [4] - 15:21, 21:9,
52:21, 65:25
**Court** [4] - 93:1,
93:22, 94:6, 94:20
**COURT** [101] - 1:1,
1:24, 4:6, 4:11, 4:13,
5:2, 6:12, 6:20, 6:23,
7:7, 7:16, 7:20, 8:8,
8:10, 10:15, 10:22,
11:3, 14:15, 17:22,
17:24, 21:6, 24:16,
26:3, 26:18, 31:10,
32:5, 33:8, 33:17,
34:16, 35:9, 35:15,
37:22, 38:11, 38:13,
38:21, 39:8, 39:20,
39:24, 40:16, 40:24,
41:25, 42:6, 42:8,
45:14, 45:17, 45:22,
46:3, 47:14, 47:19,
50:6, 50:22, 52:3,
52:14, 52:23, 53:12,
53:21, 54:4, 54:6,
59:3, 60:19, 61:2,
62:2, 62:21, 63:6,
63:13, 63:22, 64:1,
64:6, 64:9, 64:15,
65:1, 65:11, 65:16,
66:1, 66:3, 66:8,
66:11, 66:14, 66:16,

66:22, 67:1, 74:3,
74:7, 76:2, 77:1,
77:7, 77:11, 77:15,
77:19, 80:8, 81:1,
83:21, 89:1, 90:14,
92:6, 92:9, 92:23,
93:15, 93:17, 93:20,
94:6
**courtroom** [2] - 24:25,
28:16
**COURTROOM** [8] -
42:4, 42:7, 52:21,
66:23, 67:8, 67:12,
92:21, 93:22
**cover** [4] - 18:22,
60:10, 77:17, 77:22
**covers** [1] - 19:1
**create** [1] - 7:12,
74:25, 75:1, 83:12,
83:24, 86:20, 87:3,
88:13, 88:21, 90:4,
91:2
**created** [5] - 75:23,
79:2, 87:4, 87:24,
91:15
**credit** [1] - 41:10
**crimes** [1] - 27:1
**criminal** [1] - 84:6
**Criminal** [2] - 67:18,
67:19
**critical** [3] - 4:21, 6:8,
11:21
**critically** [1] - 6:11
**Cross** [3] - 3:4, 3:7,
33:25
**CROSS** [2] - 8:14,
80:9
**cross** [7] - 34:17,
49:17, 54:15, 56:14,
58:23, 60:13, 60:22
**Cross-Examination**
[2] - 3:4, 3:7
**cross-examination** [5]
- 49:17, 54:15,
56:14, 58:23, 60:22
**CROSS-**
**EXAMINATION** [2] -
8:14, 80:9
**CRR** [1] - 1:23
**CSR** [2] - 1:23, 94:20
**cumulative** [1] - 35:14
**custody** [3] - 71:20,
71:24, 72:1
**cyber** [1] - 73:8

---

**D**

**D.C** [1] - 73:9
**data** [12] - 69:6, 69:17,
69:22, 70:7, 74:14,

74:16, 74:20, 74:22, 74:24, 79:2, 82:19, 86:18
**Date** [1] - 94:15
**date** [5] - 6:3, 9:11, 12:16, 13:4, 13:4, 71:14
**date's** [1] - 7:21
**dated** [5] - 5:7, 12:15, 13:5, 42:14
**dates** [1] - 12:13
**DAY** [1] - 1:8
**day-to-day** [1] - 20:5
**Daylight** [1] - 78:15
**days** [4] - 25:8, 30:23, 47:24, 51:21
**deal** [4] - 14:16, 14:25, 16:13, 55:16
**dealt** [2] - 19:12, 19:13
**DEAN** [2] - 2:17, 2:18
**deansteward7777@ gmail.com** [1] - 2:20
**Debbie** [1] - 94:20
**DEBBIE** [3] - 1:23, 94:5, 94:19
**December** [2] - 12:10, 33:12
**decided** [1] - 59:17
**decision** [2] - 25:13, 25:16
**declaration** [1] - 93:6
**deducted** [1] - 63:24
**deemed** [2] - 4:9, 6:19
**DEFENDANT** [1] - 2:14
**Defendant** [1] - 1:9
**defendant** [25] - 6:17, 53:13, 54:15, 55:15, 55:18, 56:1, 56:14, 57:4, 57:6, 57:13, 57:20, 57:24, 58:6, 58:12, 59:1, 59:5, 60:2, 60:10, 60:13, 60:22, 61:11, 61:16, 62:8, 62:10, 68:14
**defendant's** [5] - 58:15, 58:18, 61:24, 72:9, 73:2
**defense** [1] - 65:15
**deferred** [2] - 14:11, 14:20
**define** [2] - 14:20, 21:18
**definitively** [1] - 44:25
**deliver** [4] - 5:18, 11:7, 11:11, 12:4
**delivered** [2] - 10:17, 11:15
**delivery** [1] - 16:3
**denied** [1] - 53:21
**dental** [3] - 19:7, 19:9,

60:6
**deny** [1] - 16:19
**Department** [1] - 55:7
**dependent** [1] - 60:2
**deposited** [1] - 19:17
**deposition** [18] - 15:24, 23:23, 23:25, 24:1, 24:3, 24:8, 24:18, 24:22, 24:24, 27:12, 28:5, 28:11, 28:15, 32:15, 32:18, 32:21, 33:12, 34:23
**DEPUTY** [8] - 42:4, 42:7, 52:21, 66:23, 67:8, 67:12, 92:21, 93:22
**describe** [1] - 69:20
**described** [2] - 39:6, 55:15
**designed** [3] - 72:14, 74:19, 82:4
**desires** [1] - 17:12
**despite** [1] - 25:18
**details** [2] - 45:25, 50:12
**determine** [1] - 14:21
**developments** [1] - 13:25
**device** [13] - 68:25, 72:1, 72:3, 72:4, 73:12, 81:7, 81:9, 81:14, 81:15, 82:13, 82:14, 84:17, 85:15
**devices** [19] - 68:23, 69:15, 71:17, 73:1, 74:1, 78:22, 79:1, 79:3, 79:13, 79:16, 79:21, 79:23, 80:2, 81:10, 81:17, 84:12, 84:15, 85:1, 90:24
**dhinospaan@yahoo. com** [1] - 1:25
**Dick** [2] - 35:1, 35:2
**different** [4] - 49:11, 50:13, 63:8, 71:14
**digital** [7] - 68:25, 73:1, 73:11, 74:1, 78:22, 79:3, 79:13
**dime** [1] - 31:25
**Direct** [1] - 3:7
**DIRECT** [1] - 67:13
**direct** [17] - 4:15, 10:2, 10:10, 13:4, 17:17, 18:2, 18:10, 18:17, 18:23, 19:2, 19:5, 21:6, 21:9, 36:1, 39:1, 51:17, 80:22
**directly** [2] - 35:20, 61:22
**Disbursements** [1] -

15:11
**discuss** [5] - 30:10, 45:19, 52:17, 59:8, 92:13
**discussed** [1] - 49:10
**discussing** [1] - 40:12
**discussion** [2] - 30:12, 53:7
**discussions** [1] - 46:22
**dispute** [2] - 35:24, 51:25
**District** [2] - 94:6, 94:7
**DISTRICT** [3] - 1:1, 1:2, 1:3
**division** [2] - 67:18, 67:20
**DIVISION** [1] - 1:2
**Doc** [1] - 51:18
**Document** [2] - 8:4, 49:6
**document** [57] - 4:22, 5:10, 5:14, 5:18, 6:10, 7:3, 9:1, 9:11, 9:21, 9:25, 10:3, 10:8, 11:8, 11:12, 11:15, 12:4, 13:5, 14:13, 16:17, 17:17, 17:18, 18:3, 18:18, 18:21, 18:24, 18:25, 19:3, 30:19, 30:20, 31:3, 37:21, 38:7, 38:19, 38:21, 39:2, 39:20, 41:4, 44:1, 44:12, 44:13, 44:22, 48:14, 51:20, 52:1, 52:6, 53:19, 53:24, 56:19, 57:1, 57:2, 61:10, 61:13, 65:22, 75:11, 76:12, 86:15, 90:9
**documents** [8] - 41:1, 41:7, 48:9, 49:21, 50:1, 73:25, 74:5, 79:7
**DOJ** [1] - 73:8
**dollars** [1] - 59:16
**done** [2] - 70:13, 79:17
**down** [3] - 6:25, 7:10, 36:3
**Dr** [8] - 33:25, 34:17, 34:21, 34:24, 34:25, 35:1, 35:2, 35:3
**Drew** [2] - 24:17, 50:10
**drive** [4] - 69:4, 69:5, 70:24
**due** [7] - 21:2, 22:15, 22:18, 29:5, 46:25,

47:2, 47:3
**during** [14] - 6:1, 19:23, 28:5, 50:12, 53:23, 57:20, 57:23, 58:2, 60:22, 62:4, 65:6, 67:4, 72:2, 90:21
**Duties** [1] - 13:19
**duty** [1] - 26:4

## E

**e-mail** [1] - 69:24
**e-mails** [8] - 69:25, 70:3, 70:6, 70:7, 91:5, 91:15, 91:17, 91:19
**Eagan** [16] - 23:4, 26:14, 26:15, 26:20, 26:25, 27:4, 46:10, 61:20, 61:22, 62:4, 62:5, 63:7, 63:10, 63:15, 69:8, 74:9
**EAGAN** [1] - 23:4
**early** [5] - 19:11, 19:15, 20:22, 26:22, 89:9
**easier** [2] - 12:20, 83:9
**effect** [2] - 60:14, 60:23
**efforts** [1] - 23:10
**eight** [3] - 78:14, 78:17, 78:19
**either** [12] - 7:21, 44:20, 76:4, 78:19, 86:23, 87:9, 88:5, 89:18, 89:21, 91:19, 93:7
**electronic** [8] - 68:2, 68:5, 68:23, 69:4, 71:16, 71:17, 81:7, 90:24
**electronically** [1] - 43:13
**end** [2] - 5:25, 25:13
**enforce** [2] - 29:16, 62:12
**ensure** [2] - 4:14, 55:9
**enter** [1] - 83:2
**entered** [2] - 13:1, 26:9
**entire** [4] - 47:3, 85:1, 85:3, 88:3
**entirety** [4] - 31:7, 31:21, 85:15, 89:11
**entitled** [9] - 29:12, 29:14, 29:17, 31:16, 31:25, 32:8, 46:12, 63:19, 94:11
**episodes** [1] - 35:11

**equivalent** [1] - 5:4
**especially** [2] - 74:19, 82:4
**ESQ** [2] - 2:15, 2:18
**establish** [1] - 37:23
**estate** [1] - 18:20
**estimate** [1] - 20:10
**et** [1] - 68:6
**evaluate** [1] - 34:22
**evening** [1] - 92:20
**EVIDENCE** [1] - 3:14
**evidence** [12] - 5:9, 41:6, 68:2, 68:5, 73:16, 73:18, 80:23, 81:4, 81:11, 82:5, 82:11, 84:9
**exact** [6] - 46:7, 50:16, 50:19, 53:18, 69:3, 72:6
**exactly** [6] - 6:4, 37:3, 38:5, 46:5, 86:25, 90:7
**EXAMINATION** [5] - 8:14, 54:11, 62:22, 67:13, 80:9
**Examination** [5] - 3:4, 3:5, 3:5, 3:7, 3:7
**examination** [7] - 36:1, 49:17, 54:15, 56:14, 58:23, 60:22, 80:22
**example** [1] - 69:24
**except** [1] - 42:2
**exception** [1] - 68:12
**excerpts** [1] - 80:5
**exchange** [2] - 13:11, 13:16
**excused** [4] - 65:16, 92:6, 92:9, 92:19
**EXHIBIT** [1] - 3:14
**Exhibit** [19] - 5:9, 8:20, 12:7, 12:18, 12:23, 41:21, 51:18, 54:22, 55:22, 58:4, 61:8, 62:25, 63:4, 75:4, 76:9, 76:23, 77:4, 87:12, 89:2
**exhibit** [7] - 12:22, 42:4, 44:5, 75:8, 85:17, 85:19, 89:16
**Exhibits** [1] - 79:5
**EXHIBITS** [1] - 3:12
**exhibits** [12] - 12:20, 20:15, 20:18, 78:8, 80:4
**exist** [5] - 6:12, 6:13, 83:17, 84:2, 84:3
**expectations** [1] - 27:24
**Expenses** [1] - 15:12

expenses [4] - 15:16, 15:20, 15:21, 16:4, 17:19, 32:9, 41:14, 57:14, 58:13, 58:16, 60:3, 60:15, 60:24, 64:3
experience [5] - 71:6, 72:22, 74:22, 82:8, 83:5
expert [4] - 15:24, 16:9, 36:9, 40:17
explain [3] - 32:4, 77:18, 81:3
explanation [2] - 76:3, 92:24
exposed [1] - 93:1
extract [10] - 74:13, 74:16, 74:24, 78:3, 82:5, 82:19, 84:20, 86:18, 88:17, 89:6
extracted [3] - 81:16, 85:10, 85:14
extracting [2] - 74:20, 74:21
extraction [20] - 75:14, 75:23, 76:13, 76:19, 77:17, 77:22, 78:5, 79:2, 79:8, 79:13, 79:15, 79:19, 80:1, 80:5, 84:23, 85:5, 85:6, 85:23, 89:3

**F**

fact [9] - 18:18, 20:22, 21:25, 25:24, 27:4, 29:17, 58:18, 83:23, 93:8
failing [1] - 55:8
fair [7] - 19:11, 36:13, 50:1, 75:22, 76:18, 79:12, 80:4
fall [1] - 78:16
false [2] - 31:8, 31:22
familiar [6] - 39:25, 68:13, 83:11, 83:16, 83:23, 84:1
family [3] - 45:19, 47:11, 86:10
far [1] - 49:16
fast [1] - 16:22
father [1] - 45:11
father's [2] - 19:4, 60:6
FEDERAL [2] - 1:24, 94:5
Federal [1] - 94:20
federal [6] - 11:10, 56:15, 57:19, 64:19,

69:10, 84:5
fee [1] - 54:23
fees [13] - 15:21, 15:22, 15:23, 15:24, 15:25, 16:1, 55:16, 55:19, 57:14, 64:3
Fees [1] - 15:5
few [2] - 20:8, 63:15
fields [3] - 34:24, 34:25, 35:3
figure [1] - 53:14
filed [3] - 22:1, 23:12, 23:16
files [1] - 85:4
filing [5] - 15:20, 22:8, 65:23, 66:4, 66:11
filming [1] - 15:22
financial [1] - 93:10
financially [1] - 36:6
fine [1] - 80:20
firm [22] - 13:10, 14:22, 17:19, 18:4, 18:18, 18:24, 19:3, 19:8, 27:22, 31:16, 31:25, 32:8, 41:10, 46:15, 58:16, 58:19, 60:10, 61:24, 62:6, 64:10, 69:7, 73:2
first [27] - 8:24, 9:11, 9:18, 10:5, 10:11, 13:1, 14:12, 16:15, 16:18, 30:19, 30:20, 31:2, 37:22, 39:11, 42:17, 42:20, 44:12, 46:24, 46:25, 49:10, 51:9, 67:9, 67:10, 76:23, 77:5, 77:7, 77:19
five [1] - 67:24
flag [1] - 7:21
focus [2] - 15:25, 56:12
focused [1] - 56:18
focusing [1] - 78:8
follow [2] - 64:8, 81:7
following [1] - 34:14
follows [2] - 5:6, 7:1
FOR [3] - 2:3, 2:14, 2:16
foregoing [1] - 94:9
foremost [1] - 92:17
Forensic [1] - 3:15
forensic [27] - 68:25, 69:2, 69:7, 70:9, 70:17, 70:25, 71:7, 72:14, 72:17, 72:23, 73:1, 74:10, 74:19, 78:22, 79:23, 81:12, 81:13, 81:15, 81:18, 82:14, 82:25, 84:22,

86:19, 88:5, 88:7, 91:24
forensically [10] - 68:3, 80:23, 81:4, 81:10, 82:3, 82:7, 82:19, 88:2, 88:15, 89:11
forensically-sound [1] - 68:3
forensics [1] - 72:19
form [2] - 52:18, 92:13
formal [1] - 4:18
format [1] - 94:11
forth [2] - 13:15, 15:7
foundation [3] - 17:23, 45:16, 77:13
Foundation [1] - 76:25
Frank [1] - 22:19
free [1] - 12:19
Freedom [7] - 44:17, 58:22, 58:24, 59:5, 59:12, 59:17, 59:20
freely [1] - 83:11
friend [1] - 47:11
front [6] - 4:23, 9:6, 24:12, 25:9, 75:5, 93:2
full [3] - 24:20, 58:3, 80:1
fully [2] - 30:9, 88:5
funny [6] - 5:12, 5:13, 5:15, 56:20, 56:23, 57:2
furious [2] - 36:24, 38:2

**G**

geez [1] - 49:25
generally [2] - 39:25, 40:6
generated [3] - 90:21, 90:25, 91:5
gentleman [4] - 23:3, 24:12, 28:16, 89:14
gentlemen [7] - 8:10, 52:15, 52:20, 54:6, 65:18, 76:2, 92:12
geoff [1] - 85:23
Geoff [3] - 86:8, 86:21, 86:24
Geoffrey [2] - 6:2, 31:7
GEOFFREY [2] - 3:4, 8:13
Giglio [1] - 6:19
given [4] - 28:11, 32:20, 66:21, 66:24
goal [1] - 54:19

God [1] - 24:6
Goeders [10] - 18:12, 75:16, 86:3, 86:13, 86:16, 87:18, 87:21, 87:22, 88:15
Goeders' [1] - 87:13
Goeders's [2] - 75:15, 75:24
government [2] - 11:10, 27:5
Government [25] - 4:14, 4:23, 5:1, 6:6, 8:24, 9:19, 9:24, 10:4, 10:5, 11:17, 29:20, 38:15, 46:21, 46:24, 47:21, 48:17, 49:22, 50:3, 50:24, 83:4, 88:15, 88:17, 92:5, 93:14
GOVERNMENT [4] - 3:4, 3:6, 8:13, 67:7
Government's [2] - 68:13, 89:5
government's [1] - 84:5
graphic [1] - 15:22
green [2] - 44:5, 44:8
Greg [2] - 76:13, 91:3
Gregory [2] - 76:15, 76:19
gross [1] - 55:8
ground [1] - 92:18
group [1] - 73:15
groups [1] - 15:25
guaranteeing [1] - 81:16

**H**

half [3] - 25:8, 65:3, 88:4
hallucinations [3] - 33:13, 34:5, 34:9
hand [1] - 24:4
handed [1] - 53:1
handle [1] - 79:21
handled [1] - 81:8
handling [2] - 19:19, 20:5
hands [1] - 45:11
handwritten [6] - 6:6, 6:9, 7:2, 7:5, 8:6, 9:7, 10:21, 10:25, 17:21, 24:15, 26:17, 29:24, 33:6, 35:8, 37:4, 37:20, 38:10, 38:18, 39:18, 42:1, 42:3, 42:10, 45:15, 47:15, 50:5, 51:15, 52:12, 53:1, 53:22, 54:1, 54:10, 60:18, 62:1, 62:20, 64:7, 64:16, 65:12, 65:21, 66:6, 66:17, 66:21, 66:24, 66:25, 67:5, 74:8, 76:8, 76:22, 76:25, 77:3, 77:5, 77:9, 77:13, 77:16, 77:21, 79:25, 85:17, 85:20, 92:1, 92:4, 92:5, 92:7, 93:14, 93:19
HANNA [2] - 2:4, 2:9
happily [1] - 63:11
Harbur [2] - 24:17, 50:10
hard [4] - 69:4, 69:5, 70:24
hear [3] - 7:11, 56:8,

62:10
heard [2] - 83:19, 83:22
hearing [3] - 19:4, 24:25, 60:6
held [2] - 36:17, 94:10
helicopters [1] - 34:13
help [1] - 24:6
helping [1] - 20:20
hereby [1] - 94:7
high [2] - 69:19, 74:18
highlight [1] - 7:21
highlighted [1] - 53:3
Hills [5] - 5:17, 11:7, 11:11, 12:4, 12:9
himself [2] - 5:20, 53:14, 62:10
Hino [1] - 94:20
HINO [3] - 1:23, 94:5, 94:19
Hino-Spaan [1] - 94:20
HINO-SPAAN [3] - 1:23, 94:5, 94:19
hire [1] - 16:8
hired [1] - 34:22
hiring [1] - 55:4
hold [6] - 21:1, 21:13, 22:14, 23:10, 23:17, 62:9
holding [2] - 61:17, 63:15
home [2] - 18:19, 36:2
Honor [73] - 4:7, 4:17, 5:25, 6:5, 6:6, 6:14, 6:24, 7:1, 7:4, 7:6, 7:15, 7:24, 8:7, 8:12, 10:12, 10:21, 10:25, 17:21, 24:15, 26:17, 29:24, 33:6, 35:8, 37:4, 37:20, 38:10, 38:18, 39:18, 42:1, 42:3, 42:10, 45:15, 47:15, 50:5, 51:15, 52:12, 53:1, 53:22, 54:1, 54:10, 60:18, 62:1, 62:20, 64:7, 64:16, 65:12, 65:21, 66:6, 66:17, 66:21, 66:24, 66:25, 67:5, 74:8, 76:8, 76:22, 76:25, 77:3, 77:5, 77:9, 77:13, 77:16, 77:21, 79:25, 85:17, 85:20, 92:1, 92:4, 92:5, 92:7, 93:14, 93:19
Honor's [3] - 4:8, 54:2, 54:3
HONORABLE [1] - 1:3

**hook** [1] - 82:13
**hope** [1] - 5:21
**hopefully** [1] - 8:22
**hour** [4] - 48:4, 53:6, 54:6, 65:2
**hours** [6] - 48:4, 65:3, 78:14, 78:16, 78:17, 78:19
**house** [3] - 18:7, 44:17, 59:23

## I

**idea** [6] - 10:8, 35:23, 40:10, 40:12, 40:20, 41:4
**identifiable** [1] - 73:4
**identifies** [1] - 72:2
**identify** [4] - 20:13, 20:16, 71:18, 72:4
**II** [1] - 75:4
**III** [1] - 76:10
**illness** [4] - 32:25, 33:5, 33:13, 47:11
**iMac** [5] - 71:9, 72:5, 72:12, 72:13, 74:9
**image** [21] - 68:25, 69:2, 71:1, 71:9, 72:12, 78:22, 81:10, 82:14, 83:7, 83:10, 84:11, 84:14, 84:22, 85:3, 88:2, 88:5, 88:8, 88:9, 88:11, 88:16
**imaged** [9] - 68:23, 68:24, 75:17, 76:16, 79:22, 83:5, 84:19, 85:15, 89:11
**images** [14] - 69:7, 70:10, 70:17, 70:22, 72:19, 73:1, 73:3, 73:6, 73:12, 74:10, 79:23, 85:1, 89:16, 91:24
**imaging** [9] - 70:13, 71:7, 72:14, 72:17, 72:23, 74:13, 84:16, 84:17, 84:22
**imbalances** [1] - 34:19
**immediately** [3] - 6:2, 30:4, 30:16
**impact** [4] - 40:10, 40:11, 40:13, 40:20
**impacts** [1] - 33:20
**impeach** [1] - 7:12
**importance** [1] - 11:21
**important** [1] - 6:11
**improper** [2] - 10:12, 38:10

**IN** [2] - 2:14, 3:13
**in-camera** [2] - 65:22, 66:4, 66:11
**incident** [1] - 39:5
**include** [7] - 15:20, 21:17, 77:25, 78:2, 78:3, 78:25
**included** [1] - 90:2
**including** [1] - 33:13
**income** [1] - 42:23
**incomplete** [1] - 44:1
**inconsistent** [2] - 93:10, 93:11
**incur** [1] - 16:7
**independent** [1] - 20:19
**independently** [2] - 36:3, 36:7
**individual** [1] - 36:5
**individuals** [2] - 75:16, 76:15
**individuals'** [1] - 74:11
**inform** [1] - 55:12
**information** [9] - 6:16, 6:18, 21:9, 36:14, 53:4, 53:20, 70:4, 81:16, 81:19
**informed** [4] - 5:22, 9:19, 10:5, 13:24
**initials** [2] - 52:5, 52:8
**inquiries** [1] - 55:13
**inquiry** [1] - 21:9
**instance** [3] - 23:24, 23:25, 35:6
**instances** [2] - 82:12
**instructed** [3] - 4:13, 45:19, 85:9
**insulate** [1] - 21:8
**Internet** [1] - 83:12
**interview** [14] - 4:22, 6:2, 6:10, 6:17, 7:21, 43:2, 53:2, 53:5, 53:23, 56:15, 56:20, 57:5, 57:23, 58:2
**interviewed** [1] - 57:17
**interviewing** [1] - 57:19
**interviews** [1] - 53:19
**inventory** [1] - 71:21
**Investigation** [2] - 67:18, 67:19
**investigation** [8] - 68:4, 68:13, 68:17, 68:21, 73:19, 82:1, 84:5, 91:10
**investigative** [10] - 15:21, 15:22, 67:21, 67:22, 68:1, 68:8,

68:16, 68:18, 68:20, 90:23
**investigator** [1] - 79:17
**investigators** [1] - 16:8
**involved** [2] - 68:22, 81:25
**involvement** [1] - 68:21
**iPad** [2] - 78:25, 79:1
**IRS** [4] - 5:4, 67:18, 67:19, 70:15
**issue** [3] - 4:6, 8:7, 39:3
**issues** [3] - 52:18, 91:20, 92:14
**item** [1] - 93:6
**items** [5] - 44:5, 71:21, 75:2, 84:20, 92:23
**itself** [1] - 14:13

## J

**jail** [2] - 54:16, 54:24
**JAMES** [1] - 1:3
**January** [3] - 5:8, 12:15, 60:9
**Jason** [1] - 22:19
**jaw** [1] - 35:7
**Jencks** [13] - 4:9, 4:15, 6:15, 6:19, 6:21, 7:3, 7:14, 53:9, 53:10, 53:14, 53:16, 53:24
**John** [3] - 69:14, 79:18, 89:14
**JOHN** [2] - 1:8, 2:15
**JOHNSON** [2] - 3:4, 8:13
**Johnson** [53] - 4:20, 5:8, 5:10, 5:11, 5:13, 5:18, 5:20, 5:21, 5:22, 6:2, 6:16, 6:21, 8:16, 10:16, 11:5, 11:17, 12:19, 12:25, 18:2, 29:12, 30:6, 33:19, 34:18, 35:5, 35:10, 37:24, 38:14, 42:12, 51:17, 51:20, 53:3, 53:4, 53:8, 53:23, 54:13, 62:24, 63:14, 64:2, 64:10, 64:18, 65:14, 86:2, 86:6, 86:9, 86:12, 86:16, 87:17, 87:20, 88:18, 88:23, 93:1
**Johnson's** [7] - 6:10, 30:5, 31:7, 31:21, 56:12, 85:23, 92:25

**judge** [1] - 25:9
**JUDGE** [1] - 1:3
**Judge** [1] - 42:7
**judgment** [3] - 14:8, 14:11, 16:10
**Judicial** [1] - 94:12
**Judy** [13] - 19:12, 19:19, 19:21, 20:7, 21:17, 21:20, 21:24, 22:1, 22:8, 22:15, 43:7, 78:23
**Judy's** [2] - 79:9, 79:21
**Julian** [1] - 8:25
**JULY** [2] - 1:15, 4:1
**July** [3] - 48:1, 53:2, 94:15
**June** [3] - 38:15, 50:25, 51:4
**jury** [24] - 4:5, 8:9, 8:22, 15:25, 16:1, 20:10, 24:11, 25:16, 31:6, 31:20, 41:24, 52:22, 52:25, 54:5, 65:20, 66:13, 66:15, 77:18, 81:3, 92:22, 93:1, 93:2, 93:5
**jury's** [7] - 17:18, 18:3, 18:10, 18:17, 18:23, 19:2, 53:20

## K

**keep** [1] - 13:24
**kept** [1] - 73:7
**kind** [1] - 68:7
**knowledge** [3] - 21:22, 26:25, 61:25

## L

**lab** [1] - 73:8
**label** [1] - 73:3
**ladies** [7] - 8:10, 52:15, 52:20, 54:6, 65:18, 76:2, 92:11
**Laguna** [1] - 70:14
**laid** [1] - 77:13
**laptop** [1] - 70:20
**last** [12] - 5:10, 24:18, 25:7, 36:5, 47:20, 51:10, 54:6, 67:9, 67:11, 68:12, 80:13, 91:7
**lasted** [1] - 53:5
**late** [2] - 25:5, 41:16
**latitude** [1] - 45:16
**law** [5] - 15:7, 61:24, 62:6, 69:7, 73:2
**LAW** [1] - 2:17

**lawsuit** [5] - 22:1, 22:8, 23:17, 30:22, 34:23
**lawsuits** [1] - 61:17
**lawyer** [2] - 24:8, 40:11
**lawyers** [1] - 40:7
**lay** [1] - 45:16
**learned** [1] - 39:11
**leaseholder** [1] - 44:18
**least** [1] - 34:11
**leave** [1] - 66:17
**left** [1] - 66:19
**legal** [10] - 17:4, 17:10, 17:13, 30:11, 30:12, 40:14, 55:10, 60:15, 60:24
**legitimate** [1] - 81:19
**length** [1] - 61:16
**less** [1] - 20:10
**letter** [4] - 5:7, 43:1, 43:19, 49:10
**level** [2] - 69:19, 74:18
**Libertyville** [1] - 35:4
**likely** [1] - 91:8
**limit** [2] - 37:16, 37:18
**line** [1] - 48:18
**lineup** [1] - 93:18
**listed** [1] - 43:23
**listen** [1] - 10:23
**litigation** [2] - 15:15, 15:17
**Live** [7] - 44:17, 58:22, 58:24, 59:6, 59:12, 59:18, 59:21
**live** [2] - 36:3, 36:7
**lived** [5] - 5:18, 10:6, 10:18, 12:9, 58:22
**living** [4] - 12:16, 17:19, 58:12, 60:3
**loan** [1] - 40:25
**located** [3] - 69:17, 70:1, 70:13
**location** [2] - 71:14, 72:7
**look** [14] - 7:5, 7:23, 11:3, 11:14, 13:7, 39:21, 41:21, 42:6, 75:3, 79:5, 81:13, 83:24, 87:9, 89:18
**looked** [8] - 5:12, 5:13, 48:18, 49:11, 51:20, 56:20, 56:23, 79:8
**looking** [2] - 71:20, 90:9
**looks** [5] - 5:15, 57:2, 86:4, 86:7, 86:20
**Los** [8] - 2:12, 13:12,

29:6, 32:16, 54:20, 55:6, 59:13
**LOS** [1] - 94:3
**loss** [1] - 62:9
**lunch** [2] - 4:19, 8:18
**lunchtime** [1] - 67:4

# M

**machines** [1] - 70:22
**MacQuisition** [1] - 72:13
**mail** [2] - 16:2, 69:24
**mails** [8] - 69:25, 70:3, 70:6, 70:7, 91:5, 91:15, 91:17, 91:19
**manner** [3] - 68:3, 80:23, 81:5
**manual** [1] - 65:23
**March** [18] - 4:23, 6:3, 8:24, 9:19, 10:4, 11:10, 29:21, 50:24, 51:4, 51:21, 56:15, 57:5, 57:13, 57:17, 58:2, 61:11, 61:13, 64:20
**marked** [1] - 75:3
**markings** [1] - 44:8
**Mary** [1] - 39:14
**material** [1] - 4:16
**materials** [1] - 73:11
**matter** [8] - 7:3, 16:4, 17:8, 21:7, 42:2, 55:5, 78:6, 94:11
**matters** [5] - 17:4, 17:10, 23:16, 53:8, 84:6
**McNicholas** [2] - 23:6, 23:7
**mean** [6] - 10:8, 20:2, 21:18, 68:24, 71:25, 81:4
**meaning** [3] - 21:3, 23:12, 44:22
**means** [2] - 40:3, 76:3
**media** [2] - 47:11, 69:4
**medical** [2] - 17:20, 64:11
**meet** [2] - 48:3, 64:24
**meeting** [10] - 10:5, 46:24, 46:25, 50:12, 50:15, 51:9, 51:10, 65:6, 91:2
**meetings** [4] - 50:13, 50:23, 51:2, 51:7
**member** [1] - 47:11
**members** [1] - 86:9
**memo** [1] - 6:1
**memorandum** [6] - 5:1, 5:5, 6:3, 6:4,

53:2
**memory** [1] - 33:20
**mental** [5] - 32:25, 33:4, 33:13, 33:20, 47:17
**mention** [1] - 59:12
**mentioned** [1] - 18:12
**message** [6] - 83:6, 83:10, 83:13, 87:7, 90:1, 90:10
**messages** [42] - 35:7, 45:1, 45:3, 77:25, 78:1, 78:3, 78:4, 78:5, 78:18, 81:25, 82:2, 82:6, 82:21, 83:7, 83:9, 83:24, 85:5, 85:6, 85:10, 85:13, 86:2, 86:5, 86:9, 86:12, 86:14, 86:15, 87:6, 87:9, 87:16, 87:20, 88:8, 88:9, 88:10, 88:11, 88:16, 88:17, 89:6, 89:17, 89:22, 91:5, 91:14, 91:18
**Messages** [1] - 3:15
**messenger** [1] - 16:2
**met** [17] - 8:23, 9:19, 10:4, 11:9, 11:17, 16:15, 16:18, 38:14, 47:20, 48:16, 50:3, 51:23, 51:25, 54:16, 54:19, 54:24, 57:25
**method** [4] - 70:17, 72:23, 82:16, 82:17
**methods** [1] - 81:6
**MICHAEL** [2] - 1:8, 2:15
**Michael** [15] - 23:3, 26:14, 26:15, 26:20, 26:25, 27:4, 31:6, 31:20, 61:20, 61:22, 62:5, 62:19, 63:7, 63:8, 68:14
**microphone** [1] - 66:23
**mid-2015** [2] - 58:24, 59:8
**midafternoon** [1] - 52:15
**middle** [1] - 53:3
**might** [5] - 28:2, 53:13, 53:15, 75:5, 91:18
**million** [28] - 10:17, 10:19, 26:19, 26:21, 27:5, 29:6, 29:13, 29:18, 31:2, 31:7, 31:16, 31:21, 31:24, 31:25, 46:9, 46:10,

46:13, 47:1, 47:4, 57:15, 57:21, 59:13, 60:8, 61:15, 62:13, 62:14, 63:10, 63:15
**millions** [1] - 59:16
**mind** [2] - 7:12, 92:17
**minimum** [1] - 8:4
**minute** [2] - 11:16, 74:3
**minutes** [3] - 52:16, 52:20, 53:6
**misconduct** [1] - 55:8
**missing** [1] - 71:22
**misstates** [2] - 59:2, 60:17
**mock** [1] - 15:25
**moment** [6] - 29:24, 37:4, 51:15, 64:16, 79:25, 92:1
**moments** [3] - 27:14, 37:24, 49:13
**Monday** [5] - 47:23, 48:23, 49:22, 50:4, 51:4
**money** [32] - 13:17, 19:17, 21:2, 21:14, 21:21, 22:14, 22:18, 22:25, 23:3, 23:7, 23:11, 23:18, 26:1, 26:11, 26:23, 27:25, 28:1, 28:2, 35:20, 37:13, 45:12, 46:1, 46:5, 46:7, 46:16, 55:20, 59:17, 60:5, 62:18, 63:19, 63:24
**monies** [1] - 13:11
**months** [1] - 63:15
**morning** [3] - 33:7, 92:20, 93:7
**most** [2] - 20:7, 91:8
**move** [3] - 10:20, 59:1, 59:17
**moved** [2] - 58:24, 59:20
**moving** [4] - 59:5, 59:8, 59:11, 93:1
**MR** [178] - 2:16, 4:7, 4:12, 4:17, 5:3, 6:14, 6:22, 6:24, 7:9, 7:18, 7:24, 8:1, 8:2, 8:12, 8:15, 10:12, 10:16, 10:20, 10:25, 11:5, 12:7, 12:8, 12:11, 12:13, 12:18, 12:19, 14:13, 14:16, 17:21, 17:23, 18:2, 21:13, 24:15, 24:18, 26:9, 26:17, 26:20, 29:2, 29:4, 29:24, 30:1, 30:4, 31:9, 31:12,

32:7, 33:6, 33:11, 33:16, 33:19, 34:15, 34:17, 35:8, 35:10, 35:13, 35:16, 37:4, 37:6, 37:20, 37:24, 38:10, 38:12, 38:14, 38:18, 38:23, 39:11, 39:18, 39:25, 40:14, 40:17, 40:23, 40:25, 41:21, 41:24, 42:1, 42:3, 42:5, 42:10, 45:13, 45:15, 45:18, 45:21, 45:24, 46:2, 46:4, 47:13, 47:15, 47:18, 47:20, 49:12, 49:14, 49:15, 50:5, 50:9, 50:21, 50:23, 51:15, 51:17, 52:2, 52:5, 52:12, 53:1, 53:13, 53:22, 54:10, 54:12, 54:22, 54:23, 55:1, 55:3, 55:22, 55:25, 56:12, 59:2, 59:4, 60:17, 60:21, 61:1, 61:4, 61:8, 61:10, 62:1, 62:3, 62:20, 62:23, 63:5, 63:7, 63:12, 63:14, 63:21, 63:23, 63:25, 64:2, 64:5, 64:7, 64:10, 64:13, 64:16, 64:18, 64:25, 65:4, 65:10, 65:12, 65:21, 66:2, 66:17, 66:21, 66:24, 67:5, 67:14, 74:8, 76:8, 76:22, 76:25, 77:3, 77:5, 77:9, 77:12, 77:16, 77:21, 79:25, 80:7, 80:10, 81:3, 83:20, 83:23, 85:17, 85:20, 88:25, 89:2, 90:13, 90:16, 92:1, 92:3, 92:5, 92:7, 93:14, 93:16, 93:19

# N

**name** [11] - 8:25, 22:1, 22:8, 23:3, 24:14, 25:11, 67:9, 67:10, 67:11, 80:13, 89:14
**named** [5] - 39:14, 61:24, 62:5, 78:23
**namely** [1] - 4:9
**names** [1] - 89:20
**nature** [2] - 19:18, 36:17
**necessarily** [2] - 6:24, 73:25
**necessary** [2] - 16:3,

16:9
**need** [3] - 54:7, 81:1, 92:17
**needed** [2] - 37:8, 37:13
**needs** [2] - 36:9, 39:11
**negligence** [1] - 55:7
**Negotiability** [1] - 15:5
**negotiated** [1] - 15:8
**network** [3] - 69:21, 69:23, 70:21
**never** [6] - 10:19, 57:15, 58:3, 62:14, 62:18, 83:22
**New** [1] - 44:13
**new** [2] - 53:4, 53:19
**Newport** [1] - 2:19
**next** [5] - 15:4, 52:5, 64:9, 66:18
**NICOLA** [2] - 2:4, 2:9
**Niguel** [1] - 70:14
**nobody** [1] - 87:9
**none** [1] - 81:16
**nonresponsive** [1] - 10:20
**normal** [1] - 66:2
**North** [1] - 2:11
**note** [1] - 7:2
**noted** [1] - 53:21
**notes** [22] - 4:23, 4:25, 6:1, 6:6, 6:9, 6:12, 6:13, 6:14, 6:20, 7:5, 7:8, 7:16, 7:18, 7:19, 7:20, 8:6, 9:6, 11:18, 37:1, 42:6, 53:11, 54:1
**nothing** [9] - 24:5, 52:12, 62:20, 65:12, 92:4, 92:5, 93:9, 93:11, 93:14
**noticed** [1] - 66:20
**November** [3] - 13:5, 42:14, 42:21
**NSHAN** [3] - 3:6, 67:7, 67:11
**Nshan** [3] - 66:19, 67:6, 67:10
**nuanced** [1] - 90:9
**nuances** [1] - 36:15
**Number** [1] - 77:4
**number** [3] - 20:9, 62:8, 84:23
**numbers** [6] - 87:23, 87:24, 88:12, 88:19, 88:20, 88:22, 89:8, 89:20, 90:6

**O**

**oath** [4] - 23:21, 24:22, 34:8, 35:5
**object** [3] - 38:18, 77:12, 85:18
**Objection** [1] - 76:25
**objection** [38] - 14:13, 17:21, 24:15, 26:17, 31:9, 33:6, 33:16, 34:15, 35:13, 40:14, 40:23, 45:13, 45:17, 45:21, 46:2, 47:13, 47:18, 49:14, 50:5, 50:21, 52:2, 59:2, 61:1, 62:1, 63:5, 63:12, 63:21, 63:25, 64:5, 64:13, 64:25, 65:10, 77:7, 77:11, 77:14, 83:20, 88:25, 90:13
**objections** [1] - 35:8
**obligated** [2] - 18:19, 19:8
**obtain** [1] - 7:7
**obviously** [3] - 4:21, 50:16, 91:15
**occasions** [2] - 20:8, 20:9
**occurred** [7] - 28:5, 30:13, 37:1, 37:3, 38:4, 39:6
**OF** [7] - 1:2, 1:5, 1:14, 2:1, 94:1, 94:3, 94:4
**offered** [2] - 37:7, 37:12
**office** [5] - 19:12, 35:24, 43:9, 65:24, 70:13
**OFFICES** [1] - 2:17
**Official** [1] - 94:20
**OFFICIAL** [3] - 1:24, 94:1, 94:5
**once** [5] - 34:11, 44:17, 73:1, 84:16, 86:17
**one** [43] - 4:18, 9:20, 12:1, 12:3, 16:22, 21:20, 22:13, 23:15, 23:16, 23:24, 23:25, 27:8, 29:24, 30:24, 35:11, 36:5, 37:4, 37:12, 40:7, 41:9, 41:14, 43:21, 45:10, 45:18, 50:24, 51:11, 51:15, 53:2, 64:16, 65:8, 68:16, 73:7, 75:16, 76:15, 79:20, 79:22, 79:25, 83:8, 84:3, 92:1, 92:23

**ones** [3] - 20:15, 71:15, 87:17
**online** [1] - 20:24
**oOo** [1] - 93:25
**open** [4] - 38:19, 82:1, 82:21, 82:22
**operating** [1] - 70:25
**opinions** [2] - 52:18, 92:14
**opportunity** [3] - 28:11, 30:10, 32:20
**option** [2] - 75:1, 82:20
**OR** [1] - 3:13
**order** [3] - 26:3, 66:21, 66:24
**organization** [2] - 69:25, 70:1
**out-of-pocket** [2] - 15:15, 32:9
**outstanding** [1] - 4:15
**overall** [1] - 79:12
**overnight** [2] - 66:4, 67:3
**override** [1] - 26:6
**overruled** [18] - 14:15, 17:22, 17:24, 24:16, 26:18, 31:10, 33:8, 33:17, 38:11, 45:22, 50:6, 52:3, 59:3, 60:19, 61:2, 65:1, 83:21, 90:14
**owed** [5] - 23:8, 23:12, 46:5, 46:8, 61:14
**own** [3] - 59:23, 70:2, 70:25

**P**

**P.M** [2] - 1:16, 4:2
**p.m** [5] - 52:24, 65:19, 93:24
**Pacific** [1] - 78:13
**page** [24] - 5:4, 5:10, 9:12, 11:14, 12:14, 30:1, 30:19, 30:20, 31:2, 44:5, 44:8, 49:9, 53:2, 53:3, 55:23, 76:23, 77:1, 77:6, 77:8, 77:17, 77:19, 77:22, 94:11
**PAGE** [1] - 3:3
**pages** [4] - 43:17, 43:23, 79:8, 79:12
**paid** [9] - 14:11, 14:12, 14:22, 21:3, 28:9, 36:6, 41:19, 59:7, 62:14
**paperwork** [3] - 71:20, 71:24, 72:2

**Paragraph** [1] - 17:1
**paragraph** [24] - 5:5, 5:16, 9:14, 9:16, 10:2, 10:10, 11:14, 13:7, 13:15, 13:19, 14:4, 14:6, 14:18, 15:4, 15:5, 15:11, 39:1, 42:17, 42:20, 55:1, 55:3, 56:1, 61:9
**paragraphs** [6] - 6:18, 7:22, 8:1, 8:5, 52:6, 55:14
**paralegal** [3] - 36:20, 37:25, 39:3, 39:16, 40:11
**paralegals** [1] - 40:21
**parents** [1] - 45:11
**part** [10] - 14:10, 14:19, 17:18, 18:23, 19:2, 20:7, 26:5, 59:5, 84:14, 91:25
**parties** [5] - 25:24, 26:10, 26:13, 30:8, 92:25
**partner** [2] - 61:24, 62:6
**parts** [1] - 56:5
**party** [5] - 26:5, 89:22, 90:2, 90:11
**passage** [1] - 39:21
**passcode** [2] - 82:19, 83:2
**patient** [1] - 35:6
**Patrick** [2] - 23:6, 23:7
**Pause** [5] - 29:25, 37:5, 51:16
**pay** [13] - 14:1, 17:19, 18:24, 19:3, 19:8, 26:15, 26:20, 27:5, 35:17, 35:20, 46:15, 46:18, 60:6
**paying** [6] - 55:19, 58:12, 58:16, 58:19, 60:15, 60:24
**payment** [4] - 14:19, 17:11, 63:10
**payments** [1] - 57:24
**pending** [1] - 11:16
**penny** [1] - 31:17
**people** [17] - 21:1, 21:3, 21:14, 21:17, 23:10, 23:12, 23:18, 25:1, 25:17, 25:21, 34:13, 61:17, 62:8, 70:7, 83:24, 85:11, 87:21
**percent** [2] - 14:7, 28:22
**percentage** [2] -

13:11, 32:8
**perform** [2] - 13:11, 17:12
**performed** [1] - 79:19
**perhaps** [3] - 20:8, 45:16, 91:4
**period** [2] - 19:24, 62:4, 90:21
**person** [5] - 22:17, 22:24, 23:2, 62:17, 84:21
**personal** [1] - 41:14
**personally** [4] - 41:8, 71:13, 79:15, 79:22
**persons** [1] - 22:13
**phone** [47] - 43:1, 74:25, 75:15, 75:24, 76:14, 76:16, 76:20, 78:1, 78:5, 78:18, 79:1, 79:9, 81:23, 82:1, 82:2, 82:6, 82:7, 82:17, 82:18, 82:20, 82:22, 83:1, 83:5, 83:7, 83:10, 83:24, 85:5, 85:23, 86:18, 87:6, 87:14, 87:17, 87:23, 87:24, 87:25, 88:3, 88:5, 88:12, 88:16, 88:19, 88:20, 89:6, 89:8, 89:12, 89:20, 90:6
**phones** [2] - 68:5, 74:11, 74:13, 74:14, 74:20, 75:17, 78:25
**photocopying** [1] - 15:24
**physical** [2] - 70:23
**physician** [2] - 35:2, 35:3
**picture** [1] - 83:9
**pictures** [3] - 82:2, 82:6, 82:21
**piecemeal** [1] - 84:18
**PIN** [1] - 82:18
**place** [3] - 4:19, 17:25, 25:3
**places** [1] - 58:21
**Plaintiff** [1] - 1:6
**PLAINTIFF** [1] - 2:3
**plaintiffs** [1] - 19:23
**Plaza** [1] - 2:18
**pleased** [2] - 5:21, 5:22
**plus** [2] - 46:12, 91:7
**pocket** [2] - 15:15, 32:9
**point** [18] - 6:8, 7:1, 24:11, 32:6, 35:11, 35:14, 37:12, 38:1, 41:9, 45:10, 45:18,

59:20, 61:14, 73:6, 80:18, 81:14, 82:20
**portion** [3] - 18:3, 18:17, 60:9
**position** [10] - 6:15, 7:13, 12:25, 31:13, 31:15, 31:18, 31:24, 32:1, 63:23, 64:2
**postage** [1] - 16:3
**posts** [1] - 47:11
**potential** [1] - 35:11
**potentially** [2] - 65:15
**pound** [2] - 19:16
**PowerPoint** [1] - 15:23
**precise** [1] - 10:24
**preparation** [5] - 34:23, 46:23, 47:21, 67:3
**prepared** [3] - 6:1, 6:4, 72:2
**prescribed** [2] - 34:5, 35:10
**presence** [9] - 4:5, 8:9, 52:22, 52:25, 54:5, 65:20, 66:15, 92:22, 93:4
**present** [2] - 38:24, 50:3
**presented** [3] - 5:7, 58:3, 73:18
**preserve** [3] - 68:2, 82:10, 83:6
**preserving** [2] - 80:23, 81:4
**presumably** [2] - 67:2, 82:22
**presume** [1] - 6:12
**pretty** [4] - 51:11, 83:14, 83:16, 84:2
**prevent** [1] - 64:11
**previous** [2] - 50:14
**previously** [7] - 32:24, 33:4, 33:19, 34:8, 71:2, 72:16, 93:9
**primary** [1] - 35:2, 35:3, 67:25, 68:16, 68:19
**prison** [1] - 54:20
**privacy** [1] - 76:5
**private** [1] - 21:7
**privilege** [11] - 40:1, 40:3, 40:6, 40:18, 73:12, 73:14, 73:17, 73:20, 74:1, 74:5, 76:4
**PRO** [1] - 2:14
**problem** [1] - 88:10
**problems** [1] - 34:18
**proceed** [3] - 42:9,

67:1
**proceeding** [8] - 23:17, 23:21, 25:3, 25:7, 29:5, 29:11, 29:16, 29:20
**PROCEEDINGS** [1] - 1:14
**Proceedings** [1] - 93:24
**proceedings** [4] - 29:25, 37:5, 51:16, 94:10
**proceeds** [7] - 15:16, 29:17, 32:9, 32:12, 60:14, 60:24, 61:5
**process** [2] - 15:21, 70:13
**produced** [2] - 7:17, 53:25
**product** [1] - 90:22
**products** [1] - 72:15
**progress** [1] - 55:12
**pronunciation** [1] - 80:13
**proper** [3] - 38:20, 39:18, 83:5
**properly** [2] - 55:9, 83:6
**prosecution** [2] - 73:21, 73:24
**prosecutors** [1] - 91:19
**protected** [1] - 40:8
**provide** [3] - 4:16, 6:6, 55:10
**provided** [13] - 6:17, 14:6, 17:5, 28:8, 53:4, 53:11, 53:12, 53:20, 54:1, 54:3, 71:15, 79:23, 89:8
**provides** [1] - 69:22
**provision** [1] - 17:10
**provisionally** [2] - 77:2, 77:10
**provisions** [2] - 56:9, 56:10
**psychiatric** [1] - 35:11
**psychiatrist** [2] - 34:1, 34:22
**publication** [1] - 77:12
**publish** [3] - 77:5, 77:15, 77:16
**published** [1] - 77:20
**publishing** [1] - 77:7
**pull** [6] - 8:22, 37:1, 54:22, 55:1, 55:22, 61:8
**pulled** [1] - 16:22
**purchased** [2] - 59:23, 59:25

**pursuant** [5] - 29:6, 29:13, 43:19, 69:10, 94:8
**put** [9] - 7:21, 10:24, 29:15, 37:18, 44:8, 49:8, 89:5, 92:23, 93:6
**putting** [1] - 53:24

## Q

**quarter** [1] - 57:25
**quarterly** [1] - 57:24
**questioning** [2] - 36:21, 60:18
**questions** [12] - 11:23, 21:7, 32:5, 38:19, 43:2, 50:18, 50:19, 57:9, 63:4, 64:19, 64:22, 80:7
**quick** [1] - 49:8
**quite** [1] - 70:4
**quote** [2] - 37:7, 38:2
**quotes** [1] - 15:20

## R

**raised** [1] - 24:4
**rare** [1] - 82:12
**rates** [1] - 15:7
**reached** [4] - 5:23, 18:14, 25:23, 37:25
**read** [13] - 7:22, 14:2, 15:18, 16:5, 16:11, 17:6, 17:14, 30:8, 30:14, 55:3, 56:1, 86:14, 87:7
**READ** [2] - 30:17, 56:2
**reads** [3] - 13:22, 42:20, 43:11
**ready** [1] - 66:13
**real** [2] - 18:19, 49:8
**REALTIME** [1] - 94:5
**reasonable** [2] - 16:7, 55:12
**reasonably** [2] - 16:9, 55:11
**reasons** [1] - 84:3
**receive** [5] - 21:15, 62:13, 68:7, 73:25, 74:4
**received** [12] - 14:19, 15:16, 36:16, 59:12, 60:8, 71:2, 72:16, 77:1, 77:4, 83:25, 84:1
**receiving** [2] - 21:21, 26:11
**recently** [2] - 21:1, 21:13

**recess** [4] - 52:16, 52:21, 52:23, 93:23
**Recess** [2] - 52:24, 65:19
**Recitals** [1] - 30:21
**recognize** [3] - 75:11, 76:12, 79:7
**recollection** [18] - 9:5, 9:18, 10:3, 10:13, 11:1, 20:19, 24:2, 38:8, 38:20, 39:2, 39:5, 39:9, 39:22, 44:16, 44:21, 51:13, 51:22
**recollections** [1] - 20:20
**record** [10] - 4:19, 64:17, 66:1, 66:3, 66:7, 66:8, 88:24, 92:2, 92:24
**records** [1] - 43:13
**recovered** [2] - 13:12, 28:2
**recovery** [1] - 14:20
**Recross** [1] - 3:5
**RECROSS** [1] - 62:22
**recross** [1] - 64:7
**Recross-Examination** [1] - 3:5
**RECROSS-EXAMINATION** [1] - 62:22
**redaction** [1] - 76:3
**redactions** [4] - 75:20, 75:22, 76:7, 76:18
**redetermination** [2] - 42:22, 43:12
**Redirect** [1] - 3:5
**redirect** [2] - 54:9, 65:5
**REDIRECT** [1] - 54:11
**refer** [1] - 12:20
**reference** [3] - 4:25, 7:8, 53:6
**references** [1] - 7:22
**referred** [1] - 39:16
**referring** [3] - 14:14, 58:4, 72:8
**refers** [2] - 30:19, 30:22
**refresh** [7] - 9:5, 9:18, 10:3, 11:1, 37:21, 39:5, 39:21
**refreshes** [1] - 38:7, 39:2, 39:9
**refreshing** [5] - 10:12, 37:23, 38:10, 38:20, 39:19
**regard** [2] - 66:12,

93:7
**regards** [1] - 65:22
**Regnier** [10] - 19:12, 21:17, 21:20, 21:24, 22:1, 22:2, 22:8, 22:15, 78:23, 79:3
**Regnier's** [3] - 79:13, 79:16, 80:2
**regulations** [1] - 94:12
**rehash** [2] - 50:14, 53:19
**reimburse** [1] - 15:14
**reimbursed** [1] - 63:19
**REJECTED** [1] - 3:14
**related** [2] - 17:4, 17:9
**relates** [1] - 36:15
**relating** [13] - 6:7, 8:2, 8:7, 13:16, 20:6, 25:1, 25:24, 27:25, 28:1, 39:3, 44:15, 64:3, 89:17
**relationship** [1] - 27:21
**Relevance** [9] - 24:15, 26:17, 45:13, 45:21, 47:13, 47:18, 50:5, 64:25, 83:20
**relevance** [1] - 17:23
**relevant** [2] - 21:7, 26:6
**relying** [1] - 26:4
**remember** [22] - 18:8, 24:19, 25:11, 27:13, 28:6, 32:16, 35:5, 36:21, 47:2, 48:19, 49:24, 51:24, 52:17, 55:16, 56:6, 57:7, 58:13, 60:15, 60:25, 61:18, 87:1, 92:12
**rendered** [1] - 25:14
**rent** [3] - 18:24, 41:16, 60:6
**Rental** [1] - 44:13
**rental** [2] - 44:16, 45:2
**repeat** [5] - 21:12, 26:8, 49:5, 57:8, 60:20
**repetitive** [1] - 92:16
**rephrase** [1] - 59:4
**Report** [1] - 3:15
**report** [29] - 6:21, 74:25, 75:1, 75:2, 75:14, 75:15, 75:19, 75:23, 76:13, 76:18, 76:19, 77:17, 79:2, 79:8, 80:1, 80:5, 85:23, 86:17, 86:20, 87:3, 87:4, 87:24, 88:13, 88:21, 89:3, 90:3, 90:5, 90:12,

91:2
**reported** [1] - 94:10
**REPORTER** [5] - 1:24, 66:6, 66:10, 94:1, 94:6
**Reporter** [1] - 94:20
**REPORTER'S** [1] - 1:14
**reports** [7] - 77:22, 77:23, 77:25, 78:5, 78:19, 84:23, 90:22
**represent** [2] - 55:4, 55:11
**representation** [1] - 27:1
**representations** [3] - 56:6, 93:10, 93:12
**represented** [2] - 24:8, 62:4
**representing** [1] - 19:23
**represents** [1] - 17:3
**request** [7] - 4:9, 4:18, 6:5, 53:21, 53:25, 66:17, 76:22
**requested** [1] - 64:12
**require** [3] - 17:4, 36:12, 36:13
**required** [6] - 17:12, 17:19, 18:4, 18:24, 19:3, 55:11
**research** [3] - 16:1, 52:19, 92:15
**residence** [2] - 79:21, 79:23
**respect** [3] - 54:3, 64:4, 93:11
**respond** [1] - 55:13
**responsibilities** [1] - 67:25
**responsibility** [1] - 26:11
**responsible** [17] - 21:2, 21:14, 21:20, 22:14, 22:17, 22:24, 23:2, 23:7, 23:11, 23:18, 25:17, 25:21, 25:25, 61:17, 62:9, 62:17, 63:16
**rest** [2] - 50:11, 78:17
**restrict** [1] - 84:11
**restrictions** [1] - 89:5
**resume** [1] - 92:12
**RESUMED** [1] - 8:13
**resumed** [1] - 8:14
**retain** [1] - 6:13
**retained** [1] - 6:14
**retention** [1] - 27:16
**retired** [1] - 25:9
**review** [14] - 5:9,

28:12, 28:15, 28:18, 32:20, 43:14, 49:21, 73:12, 73:14, 73:21, 74:1, 74:5, 84:19, 90:12
**reviewed** [3] - 5:10, 8:3, 80:1
**reviewing** [2] - 49:24, 73:16
**rise** [2] - 92:21, 93:22
**risk** [1] - 81:19
**road** [1] - 6:25
**ROOM** [1] - 1:24
**room** [1] - 72:3
**row** [1] - 24:12
**rules** [1] - 92:18
**ruling** [3] - 4:8, 54:2, 54:3
**run** [2] - 79:15, 81:18

**S**

**SACR-19-00061-JVS** [1] - 1:7
**safety** [1] - 55:9
**SAGEL** [10] - 2:5, 6:14, 6:22, 7:9, 7:18, 8:1, 53:13, 65:21, 66:2, 93:14
**Sagel** [1] - 50:9
**Santa** [2] - 2:7, 69:18
**SANTA** [3] - 1:17, 1:25, 4:1
**Saturday** [1] - 51:22
**save** [1] - 53:15
**Savings** [1] - 78:16
**Scope** [2] - 13:7, 55:2
**scope** [5] - 14:7, 64:13, 84:19, 84:20, 85:12
**Scott** [1] - 22:25
**screen** [1] - 11:7, 12:1, 49:8
**SE** [1] - 2:14
**seal** [1] - 65:24
**Sean** [1] - 39:14
**search** [4] - 68:22, 69:10, 79:20, 84:20
**second** [7] - 5:4, 14:18, 30:20, 44:4, 51:11, 53:17, 90:6
**Section** [1] - 94:8
**secure** [1] - 93:12
**security** [1] - 42:23
**Security** [2] - 44:11, 47:16
**see** [26] - 8:7, 9:5, 9:11, 9:16, 13:5, 13:8, 13:20, 14:4,

14:23, 15:5, 15:9, 17:25, 30:6, 33:2, 38:7, 39:2, 42:12, 43:15, 44:5, 45:2, 56:3, 75:19, 87:16, 89:20, 92:19, 93:20
**seeing** [1] - 34:2
**seeking** [3] - 22:13, 23:17, 77:16
**seize** [4] - 69:15, 69:16, 71:13, 72:1
**seized** [12] - 68:23, 69:10, 69:17, 70:9, 71:11, 71:12, 71:15, 71:17, 71:18, 71:22, 73:16, 74:5
**seizing** [1] - 68:4
**seizure** [2] - 69:13, 72:2
**SELNA** [1] - 1:3
**send** [3] - 20:23, 37:12, 44:19
**sending** [2] - 35:6, 44:22
**sent** [7] - 44:20, 44:23, 44:24, 73:8, 83:25, 84:1, 91:14
**sentence** [1] - 10:11
**separate** [3] - 17:10, 73:21, 88:13
**serious** [1] - 33:13
**server** [6] - 69:20, 69:25, 70:2, 70:4, 70:8, 70:21
**servers** [13] - 69:7, 69:10, 69:13, 69:19, 70:9, 70:18, 70:19, 70:20, 70:23, 71:5, 73:2, 74:9
**Services** [1] - 13:7
**services** [9] - 13:10, 14:7, 17:5, 17:11, 28:8, 55:2, 55:10, 69:22
**set** [3] - 13:15, 15:7
**settled** [1] - 31:15
**settlement** [40] - 4:20, 5:23, 8:3, 10:6, 10:8, 10:17, 10:19, 11:6, 11:25, 12:11, 14:8, 14:10, 26:5, 26:9, 26:16, 29:18, 30:21, 31:7, 31:22, 31:24, 32:12, 48:12, 48:13, 48:16, 49:3, 51:6, 53:7, 57:6, 57:10, 57:21, 58:4, 59:13, 59:17, 60:9, 60:14, 60:23, 61:5, 61:20, 62:13, 62:15

**settlements** [1] - 25:24
**seven** [3] - 78:14, 78:16, 78:19
**several** [5] - 68:9, 68:11, 68:22, 70:19, 73:7
**share** [1] - 93:17
**Sheriff's** [1] - 55:7
**short** [1] - 92:24
**shortcut** [1] - 85:21
**shortly** [1] - 32:21
**show** [1] - 38:7
**showing** [2] - 10:17, 58:7
**shown** [2] - 21:25, 48:10
**shows** [1] - 53:5
**sidebar** [2] - 4:5, 52:25
**sidebars** [1] - 53:16
**sign** [4] - 16:22, 41:1, 48:19, 54:24
**signature** [23] - 5:11, 5:12, 5:13, 5:14, 7:8, 8:19, 12:14, 12:15, 30:1, 30:5, 30:16, 48:18, 49:9, 49:10, 51:6, 53:7, 55:23, 55:25, 56:13, 56:20, 56:22, 57:2
**signed** [23] - 4:20, 5:14, 6:10, 7:2, 8:3, 9:1, 9:20, 9:24, 16:20, 32:8, 41:4, 41:6, 48:21, 48:22, 49:12, 52:10, 53:24, 56:19, 56:25, 57:1, 61:10, 62:25, 65:9
**SIGNING** [2] - 30:17, 56:2
**signing** [2] - 16:19, 58:9
**similar** [3] - 5:3, 24:3, 24:25
**simply** [1] - 76:5
**Sims** [1] - 22:25
**single** [1] - 87:7
**sit** [10] - 20:14, 22:7, 25:20, 28:24, 35:23, 44:22, 44:23, 46:4, 63:18, 87:5
**sitting** [3] - 24:12, 58:6, 58:9
**situation** [6] - 85:4, 85:11, 86:20, 87:22, 88:9, 88:14
**six** [1] - 68:10
**six-week** [1] - 68:10
**slippery** [1] - 7:10

**slope** [1] - 7:10
**smartphone** [1] - 81:23
**Social** [2] - 44:11, 47:16
**social** [1] - 47:11
**software** [10] - 69:22, 70:7, 70:8, 74:17, 74:19, 82:14, 82:20, 82:25, 85:3, 86:19
**someone** [7] - 18:14, 31:5, 31:20, 39:14, 63:8, 90:10
**sometime** [2] - 39:12, 89:9
**sometimes** [1] - 70:7
**soon** [1] - 82:24
**sorry** [11] - 9:8, 12:12, 15:4, 22:4, 22:21, 29:10, 30:20, 49:3, 66:6, 75:8, 83:15
**sort** [1] - 56:1
**sought** [3] - 29:9, 29:16, 62:12
**sound** [2] - 68:3, 82:3
**SOUTHERN** [1] - 1:2
**Spaan** [1] - 94:20
**SPAAN** [3] - 1:23, 94:5, 94:19
**speaks** [1] - 14:13
**special** [5] - 36:9, 39:11, 67:21, 72:14, 82:4
**Special** [3] - 38:24, 67:6, 67:15
**specialist** [7] - 67:21, 67:23, 68:1, 68:8, 68:18, 68:20, 79:18
**specific** [6] - 6:7, 20:13, 39:21, 44:21, 85:11, 85:20, 88:10
**specifically** [7] - 11:10, 30:19, 30:22, 34:17, 45:11, 53:18, 88:20
**speculation** [1] - 40:15
**spell** [1] - 67:9
**spelled** [1] - 67:11
**spent** [2] - 63:20, 63:24
**spoken** [1] - 36:20
**spoofing** [2] - 83:18, 83:19
**spring** [1] - 78:16
**Spring** [1] - 2:11
**SSI** [4] - 18:5, 42:23, 43:2, 43:19
**stand** [2] - 24:4, 28:24, 33:3, 49:16,

63:3, 77:14
**STAND** [1] - 8:13
**standard** [1] - 78:12
**Standard** [1] - 78:13
**STANDBY** [1] - 2:16
**start** [3] - 66:9, 82:1, 84:16
**started** [2] - 34:2, 68:10
**STATE** [1] - 94:4
**state** [1] - 67:8
**statement** [2] - 30:4, 56:18
**statements** [3] - 43:14, 43:18, 57:4
**States** [8] - 2:4, 2:5, 2:9, 2:10, 67:6, 94:6, 94:8, 94:13
**states** [6] - 5:5, 6:1, 7:2, 14:10, 30:16, 43:19
**STATES** [2] - 1:1, 1:5
**stay** [1] - 41:17
**stenographically** [1] - 94:10
**steps** [5] - 21:1, 21:13, 21:18, 55:12
**STEWARD** [2] - 2:17, 2:18
**stole** [2] - 31:6, 31:21
**stop** [1] - 92:11
**stopped** [1] - 44:17
**stored** [1] - 43:12
**STREET** [1] - 1:24
**Street** [2] - 2:6, 2:11
**stretch** [1] - 54:8
**Stricken** [1] - 10:22
**strike** [12] - 10:20, 18:11, 22:4, 23:15, 28:4, 29:9, 31:14, 40:4, 40:5, 49:15, 88:3, 89:15
**stuff** [2] - 81:14, 85:4
**subject** [2] - 65:17, 76:23
**subjected** [1] - 73:12
**sue** [2] - 54:20, 62:10
**sued** [4] - 21:19, 21:24, 21:25, 62:9
**suffer** [2] - 32:25, 33:4
**suffered** [3] - 33:12, 34:9, 47:17
**suggesting** [1] - 16:21
**suing** [1] - 25:17
**Suite** [3] - 2:6, 2:11, 2:19
**summary** [3] - 43:14, 43:18, 43:23
**Sunday** [2] - 51:23, 51:25

**UNITED STATES DISTRICT COURT**

**Sunrise** [13] - 5:17, 5:19, 5:20, 10:7, 10:18, 11:7, 11:11, 12:4, 12:9, 12:16, 57:20, 57:25, 58:22
**supplemental** [1] - 42:22
**supported** [1] - 36:6
**supporting** [1] - 32:13
**suppose** [1] - 33:18
**supposed** [2] - 14:11, 83:13
**sustained** [19] - 10:15, 34:16, 35:9, 35:15, 40:16, 40:24, 45:17, 46:3, 47:14, 47:19, 50:22, 63:6, 63:13, 63:22, 64:1, 64:6, 64:15, 65:11, 89:1
**swore** [1] - 24:4
**SWORN** [1] - 67:7
**sworn** [1] - 23:23
**system** [1] - 70:25

**T**

**T-a-s-h-c-h-y-a-n** [1] - 67:11
**tablets** [1] - 74:20
**talks** [1] - 18:18
**targeting** [1] - 13:12
**TASHCHYAN** [2] - 3:6, 67:7
**Tashchyan** [6] - 66:20, 67:6, 67:10, 67:15, 80:15, 80:16
**team** [2] - 73:21, 73:24
**telephone** [1] - 16:1
**ten** [2] - 20:10, 36:5
**term** [3] - 14:20, 14:21, 76:3
**terms** [1] - 30:10
**terrible** [1] - 29:9
**testified** [13] - 24:21, 28:6, 28:25, 32:24, 33:4, 33:11, 33:20, 37:7, 38:1, 53:9, 63:3, 87:13, 88:4
**testify** [3] - 9:10, 23:20, 23:23
**testifying** [1] - 91:21
**testimony** [17] - 25:23, 26:6, 32:21, 37:10, 38:1, 41:17, 45:5, 46:23, 47:21, 49:13, 49:16, 58:23, 59:2, 60:17, 62:24, 76:24, 92:25
**Text** [1] - 3:15
**text** [40] - 20:16, 45:1,

45:2, 77:25, 78:3, 78:5, 78:18, 81:25, 82:2, 82:6, 82:21, 83:6, 83:7, 83:8, 83:10, 83:13, 83:24, 85:5, 85:6, 85:10, 85:13, 86:2, 86:5, 86:14, 86:15, 87:6, 87:7, 87:16, 87:20, 87:22, 88:8, 88:9, 88:10, 88:11, 88:16, 89:17, 91:5, 91:14, 91:18
**THE** [139] - 2:3, 2:14, 3:4, 3:6, 4:6, 4:11, 4:13, 5:2, 6:12, 6:20, 6:23, 7:7, 7:16, 7:20, 8:8, 8:10, 8:13, 10:15, 10:22, 11:3, 14:15, 17:22, 17:24, 17:25, 21:6, 21:11, 24:16, 24:17, 26:3, 26:8, 26:18, 26:19, 29:3, 30:3, 31:10, 31:11, 32:5, 33:8, 33:9, 33:17, 33:18, 34:16, 35:9, 35:15, 37:22, 38:11, 38:13, 38:21, 39:8, 39:10, 39:20, 39:23, 39:24, 40:16, 40:24, 41:23, 42:7, 42:8, 45:14, 45:17, 45:22, 45:23, 46:3, 47:14, 47:19, 50:6, 50:7, 50:22, 52:3, 52:4, 52:14, 52:21, 52:23, 53:12, 53:21, 54:4, 54:6, 55:24, 59:3, 60:19, 60:20, 61:2, 61:3, 62:2, 62:21, 63:6, 63:13, 63:22, 64:1, 64:6, 64:9, 64:15, 65:1, 65:2, 65:11, 65:16, 66:1, 66:3, 66:6, 66:8, 66:10, 66:11, 66:13, 66:14, 66:16, 66:22, 66:23, 67:1, 67:8, 67:10, 67:12, 74:3, 74:6, 74:7, 76:2, 77:1, 77:7, 77:11, 77:15, 77:19, 80:8, 81:1, 81:2, 83:21, 83:22, 89:1, 90:14, 90:15, 92:6, 92:9, 92:21, 92:23, 93:15, 93:17, 93:20, 93:22
**therefore** [1] - 29:14
**three** [8] - 5:19, 47:24,

50:23, 51:2, 51:7, 67:2, 70:19, 70:23
**throughout** [1] - 75:20
**THURSDAY** [2] - 1:15, 4:1
**timestamps** [1] - 78:18
**title** [1] - 67:19
**Title** [1] - 94:8
**today** [24] - 20:14, 22:7, 24:4, 24:9, 25:20, 28:16, 28:24, 33:3, 35:23, 44:22, 44:23, 46:4, 46:23, 47:22, 48:10, 58:6, 58:9, 62:25, 63:18, 66:12, 66:20, 87:5, 91:21, 91:24
**toll** [1] - 16:1
**Tom** [7] - 75:15, 75:16, 75:23, 86:3, 86:7, 86:21
**tomorrow** [1] - 92:12
**tomorrow's** [1] - 93:18
**took** [4] - 24:3, 33:3, 92:24, 93:3
**tool** [1] - 70:17, 72:11, 72:13, 72:14, 72:16, 72:19, 72:23, 74:16, 74:21, 82:9, 88:7
**tools** [14] - 70:19, 70:25, 71:1, 71:2, 71:7, 72:11, 81:10, 81:12, 81:13, 81:15, 81:18, 82:4, 84:5
**top** [5] - 13:5, 30:2, 30:21, 42:14, 53:5
**total** [1] - 46:13
**toughest** [1] - 54:7
**town** [1] - 20:7
**training** [8] - 68:7, 68:9, 68:10, 71:2, 71:6, 72:16, 72:22, 74:22
**trainings** [2] - 68:9, 68:11
**transactions** [3] - 20:6, 20:14, 20:19
**transcript** [3] - 28:15, 94:9, 94:11
**TRANSCRIPT** [2] - 1:6, 1:14
**transfer** [1] - 20:23
**travel** [1] - 16:2
**traveling** [1] - 19:22
**treat** [1] - 55:9
**TRIAL** [1] - 1:8
**trial** [2] - 15:15, 16:1
**trials** [1] - 15:25

**true** [12] - 10:16, 11:5, 11:9, 12:5, 21:4, 21:19, 21:23, 33:11, 33:15, 33:18, 45:8, 94:9
**truly** [1] - 53:16
**trust** [2] - 39:12, 83:1
**trusts** [1] - 36:9
**truth** [6] - 24:5, 32:18, 42:2, 42:8
**truthful** [4] - 9:23, 11:22, 13:23, 28:13
**try** [1] - 10:23
**trying** [5] - 18:7, 19:23, 45:11, 64:8, 85:21
**turn** [4] - 38:21, 39:20, 76:9, 85:22
**two** [13] - 5:19, 25:8, 43:17, 43:23, 48:4, 65:3, 83:8, 87:3, 90:19, 90:20, 90:21, 91:7, 92:23
**two-plus** [1] - 91:7
**two-year** [1] - 90:21
**types** [1] - 78:1
**typewritten** [3] - 5:1, 5:5, 6:4
**typically** [1] - 19:21

**U**

**U.S** [5] - 1:3, 8:25, 9:20, 11:23, 27:6
**unaltered** [1] - 69:3
**unavailable** [1] - 20:21
**unclear** [1] - 6:3
**under** [10] - 17:5, 23:21, 24:22, 30:21, 32:7, 34:8, 35:5, 36:1, 49:16, 65:24
**underlying** [1] - 7:18
**understood** [4] - 11:18, 11:21, 19:18, 19:19
**unfortunately** [1] - 34:18
**United** [8] - 2:4, 2:5, 2:9, 2:10, 67:6, 94:6, 94:8, 94:13
**UNITED** [2] - 1:1, 1:5
**universally** [1] - 78:12
**unless** [1] - 39:20
**unlocked** [2] - 82:17, 82:23
**untrue** [1] - 24:22
**up** [13] - 8:22, 11:6, 42:11, 47:15, 49:8, 54:7, 54:22, 55:1,

55:22, 61:8, 64:8, 70:24, 82:13
**upsetting** [1] - 22:2
**users** [1] - 70:1
**UTC** [4] - 78:7, 78:10, 78:11, 78:12

**V**

**Vague** [1] - 31:9
**vague** [4] - 20:20, 44:16, 64:5, 85:18
**valid** [1] - 29:21
**van** [2] - 36:2, 59:25
**various** [4] - 23:12, 52:5, 78:22, 90:22
**virtual** [2] - 70:20, 70:22
**visit** [1] - 5:20
**VOLUME** [1] - 1:9
**Volume** [3] - 75:4, 75:6, 76:10
**vs** [1] - 1:7

**W**

**wait** [2] - 11:16, 74:3
**waiting** [1] - 65:22
**wants** [2] - 7:15, 83:1
**warrant** [4] - 69:11, 79:20, 84:21, 85:12
**warrants** [1] - 68:22
**WAS** [1] - 67:7
**wasting** [1] - 53:20
**week** [3] - 47:23, 50:25, 68:10
**weeks** [1] - 79:19
**Weeks** [2] - 69:14, 79:18
**West** [6] - 2:6, 5:17, 11:7, 11:11, 12:4, 12:9
**WEST** [1] - 1:24
**wheelchair** [1] - 93:2
**whited** [1] - 75:20
**whole** [7] - 7:13, 24:5, 69:5, 83:10, 84:17, 84:22, 85:4
**willing** [1] - 83:4
**wire** [1] - 20:23
**wish** [1] - 49:19
**WITHDRAWN** [1] - 3:13
**WITNESS** [27] - 8:13, 17:25, 21:11, 24:17, 26:8, 26:19, 29:3, 30:3, 31:11, 33:9, 33:18, 39:10, 39:23, 41:23, 45:23, 50:7, 52:4, 55:24, 60:20,

61:3, 65:2, 67:7,
67:10, 74:6, 81:2,
83:22, 90:15
**witness** [12] - 4:10,
4:14, 7:12, 7:14,
53:18, 66:18, 66:20,
83:3, 92:6, 93:3,
93:4
**witness's** [1] - 10:13
**WITNESSES** [1] - 3:3
**witnesses** [4] - 16:9,
66:25, 67:2, 67:4
**woman** [1] - 78:23
**word** [1] - 49:11
**wrapping** [1] - 47:15
**written** [3] - 13:1,
90:22, 90:25
**wrote** [1] - 36:3
**WYMAN** [71] - 2:10,
10:12, 10:25, 14:13,
17:21, 17:23, 24:15,
26:17, 31:9, 33:6,
33:16, 34:15, 35:8,
35:13, 38:10, 38:18,
39:18, 40:14, 40:23,
42:3, 45:13, 45:21,
46:2, 47:13, 47:18,
49:14, 50:5, 50:21,
52:2, 54:10, 54:12,
54:22, 54:23, 55:1,
55:3, 55:22, 55:25,
56:12, 59:4, 60:21,
61:4, 61:8, 61:10,
62:3, 62:20, 63:5,
63:12, 63:21, 63:25,
64:5, 64:13, 64:25,
65:10, 66:17, 67:5,
67:14, 74:8, 76:8,
76:22, 77:3, 77:5,
77:16, 77:21, 79:25,
80:7, 83:20, 85:17,
88:25, 90:13, 92:5,
93:19
**Wyman** [17] - 3:5, 3:7,
18:7, 19:4, 19:7,
35:16, 36:19, 37:6,
38:17, 38:23, 44:4,
45:1, 54:9, 64:18,
65:4, 66:16, 84:24

# Y

**year** [7] - 45:6, 68:10,
68:11, 68:12, 78:15,
78:17, 90:21
**years** [12] - 5:19, 12:9,
32:13, 36:5, 46:17,
60:15, 60:25, 63:24,
67:24, 90:19, 90:20,
91:7

**yes-or-no** [1] - 65:6
**yesterday** [3] - 66:12,
67:2, 93:7
**yourself** [1] - 76:6

# Z

**Zackler** [1] - 34:21
**zone** [2] - 78:6, 78:8
**Zoom** [1] - 50:7