TRACY L. WILKISON
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
ALEXANDER C.K. WYMAN (Cal. Bar No. 295339)
Assistant United States Attorney
Major Frauds Section
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-2435
     Facsimile: (213) 894-6269
     Email:   Alex.Wyman@usdoj.gov

BRETT A. SAGEL (Cal. Bar No. 243918)
Assistant United States Attorney
     Ronald Reagan Federal Building
     411 West Fourth Street, Suite 8000
     Santa Ana, California 92701
     Telephone:  (714) 338-3598
     Facsimile:  (714) 338-3708
     Email:      Brett.Sagel@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

                  UNITED STATES DISTRICT COURT

              FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,              SA CR No. 19-061-JVS

              Plaintiff,               GOVERNMENT'S RESPONSE TO
                                       DEFENDANT'S REQUEST FOR A CURATIVE
                   v.                  JURY INSTRUCTION AT THE BEGINNING
                                       OF TRIAL ON TUESDAY, JULY 27, 2021
MICHAEL JOHN AVENATTI,                 (CR 580)

              Defendant.


        Plaintiff United States of America, by and through its counsel

of record, the United States Attorney for the Central District of

California and Assistant United States Attorneys Brett A. Sagel and

Alexander C.K. Wyman, hereby files its Response to Defendant's

Request for a Curative Jury Instruction at the Beginning of Trial on

Tuesday, July 27, 2021 (CR 580).

1        This Response is based upon the attached memorandum of points

2   and authorities, the files and records in this case, and such further

3   evidence and argument as the Court may permit.

4   Dated: July 25, 2021              Respectfully submitted,

5                                     TRACY L. WILKISON
                                      Acting United States Attorney
6
                                      SCOTT M. GARRINGER
7                                     Assistant United States Attorney
                                      Chief, Criminal Division
8

9                                     _____/s/_____
                                      BRETT A. SAGEL
10                                    ALEXANDER C.K. WYMAN
                                      Assistant United States Attorneys
11
                                      Attorneys for Plaintiff
12                                    UNITED STATES OF AMERICA

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Defendant MICHAEL JOHN AVENATTI is on trial for 10 counts of wire fraud.  The government charged, and is presenting at trial, theories of fraud that include a scheme to obtain money or property by means of both false statements to his victim-clients and the omission of material facts that defendant had a duty to disclose to his victim-clients, as well as a scheme to defraud through embezzlement.  Defendant requests a "curative" instruction concerning evidence about defendant's role in maintaining Geoffrey Johnson's supplemental security income ("SSI") and in purchasing a house for Mr. Johnson, issues that were primarily presented in evidence through the testimony and exhibits of Elsa Guerrero and Tom Goeders.  (CR 580.)  No such instruction is necessary.

The testimony and exhibits concerning these issues are highly relevant to crucial issues at trial.  First, they are relevant to establishing that defendant made fraudulent statements in furtherance of his scheme to obtain money or property.  Second, they establish the scope of the fiduciary relationship that defendant held with Mr. Johnson -- which was broader than the ordinary attorney-client relationship -- and which, in turn, establishes the scope of defendant's duties of disclosure to Mr. Johnson for purposes of proving defendant's material omissions.  Third, this evidence, which includes defendant lying repeatedly to third parties about Mr. Johnson's settlement funds, is highly probative of defendant's intent to defraud, which is a necessary element regardless of the type of fraudulent scheme the jury finds.  Finally, this evidence rebuts what appears from defendant's opening statement to be his primary defense,

1  namely, that he was entitled to all the funds he took from his

2  victim-clients because, as his six-factor calculation chart

3  indicates, he was entitled to be paid for "any other work that [he]

4  did outside the scope of [his] original agreement" with the client.

5  (RT 7/21/2021, Vol. I, at 68.)

6  Accordingly, no curative or limiting instruction on these issues

7  is necessary, especially not one that instructs the jury to

8  "disregard and ignore all such evidence and testimony" about these

9  important issues.  To the extent the Court believes otherwise, the

10  government respectfully requests additional guidance from the Court

11  as to the specific issues such a limiting instruction would be

12  designed to address prior to proposing an alternative instruction.

13  **II.  ARGUMENT**

14      **A.  The Evidence at Issue Proves that Defendant Made False**
          **Statements in Furtherance of His Scheme to Defraud**

15

16  <u>First</u>, the evidence at trial has demonstrated, and additional

17  evidence will establish further, that defendant concealed his theft

18  of Geoffrey Johnson's settlement funds principally by lying to Mr.

19  Johnson about the need for the County of Los Angeles to approve a

20  special needs trust before Mr. Johnson could receive his settlement

21  funds.  That lie enabled defendant to avoid paying Mr. Johnson the

22  substantial settlement that he was owed in January 2015, and it was

23  effective.  For four years, until defendant's arrest in this case,

24  Mr. Johnson continued to believe -- based on defendant's lies -- that

25  Mr. Johnson was waiting on the County of Los Angeles to approve the

26  special needs trust before he could receive his settlement funds.

27  Mr. Johnson testified to this at trial.  (RT 7/22/2021, Vol. I,

28  at 41-46.)  Specifically, Mr. Johnson testified that he discussed

2

establishing a special needs trust "multiple times" with defendant (id. at 41), and that he believed defendant was actively trying to establish a special needs trust for him while the settlement with the County was being finalized (id. at 44-45).  Mr. Johnson further testified that defendant then offered him "advances" on his future settlement (even though the settlement had already been paid out in January 2015), which defendant paid him periodically in amounts of less than $2000 ("[b]ecause the SSI rules state that you can only have -- you have to have less than $2,000 in your bank account" (id. at 45)) until March 2019 when defendant was arrested.  During this time period when defendant was paying Mr. Johnson small "advances" rather than the lump sum payment of approximately $2 million from the settlement that he was owed -- July 2015 to March 2019 -- Mr. Johnson testified that defendant was telling him that the settlement with the County "hadn't been completed and that the County had to approve the special-needs trust first."  (Id. at 46.)  And when Mr. Johnson spoke to another individual about setting up a special needs trust for him, Mr. Johnson testified that defendant became "furious," saying that "we have to keep it in the family" and telling Mr. Johnson that "[y]ou don't go outside the firm."  (Id. at 43-44.)  In short, Mr. Johnson's testimony shows that defendant concealed the fraud from Mr. Johnson by falsely stating, repeatedly over four years, that Mr. Johnson could not receive his money until the County approved the special needs trust as required to finalize the settlement.

These were lies.  And the government charged these lies as material false statements in furtherance of the scheme in the Indictment (CR 16 ¶¶ 7(g), (j), (k), (l)), which previously led the Court to find that "the subject of special needs trust is highly

3

1   relevant to the Counts involving" Mr. Johnson.  (CR 371 at 15.)  The

2   testimony of Ms. Guerrero and Mr. Goeders strongly corroborated Mr.

3   Johnson's testimony about these lies.  For example, Ms. Guerrero

4   testified on direct examination that in November 2018 -- almost four

5   years after defendant received the $4 million settlement from the

6   County -- Mr. Johnson told her that "he was not sure if [defendant]

7   established a special-needs trust."  (RT 7/23/2021, Vol. I, at 85-

8   87.)  Trial Exhibit 108, admitted through Ms. Guerrero, similarly

9   refers to Mr. Johnson's confusion about the special needs trust by

10  asking Mr. Johnson, in November 2018, for "verification that trust

11  has or has not been established."  (Trial Ex. 108 at 1.)  Similarly,

12  Mr. Goeders testified that defendant initially told him (in mid-2017)

13  that Mr. Johnson had a "trust" with settlement funds that allowed Mr.

14  Johnson to make an all-cash offer on a house.  (RT 7/23/2021, Vol.

15  II, at 35-36.)  Mr. Goeders's emails, which were introduced as trial

16  exhibits through his testimony, are littered with references (based

17  on defendant's statements to Mr. Goeders) to the "G. Johnson Trust"

18  and to defendant being the "Special Manager" of that alleged trust.

19  (See, e.g., Trial Exs. 76-77, 79.)  And when it came time to close

20  escrow, which Mr. Goeders explained is when the full purchase amount

21  of the house was required to be sent to the seller (RT 7/23/2021,

22  Vol. II, at 38), defendant told Mr. Goeders that "[t]he funds were

23  not available to close" because "he was waiting for L.A. County to

24  approve a special needs trust that the money could be deposited in so

25  that Mr. Johnson would not lose his SSI benefits" (id. at 42-43).

26      Accordingly, the statements that defendant made to Mr. Goeders

27  about Mr. Johnson, and the statements that Mr. Johnson made to Ms.

28  Guerrero in the context of his SSI benefits, are extremely probative

of the lies that defendant is alleged to have told Mr. Johnson to conceal his embezzlement of Mr. Johnson's money.  The testimony by Ms. Guerrero and Mr. Goeders about their interactions with defendant and Mr. Johnson -- even if they were in the context of defendant failing to maintain Mr. Johnson's SSI benefits or help him purchase a house after promising to -- are highly relevant to proving the false statements underlying one of the government's theories of wire fraud.

**B.   The Evidence at Issue Proves Defendant's Material Omissions**

Second, this evidence is an important aspect of the government's omission theory of fraud.  As the Ninth Circuit Model Criminal Jury Instructions state, "To convict defendant of wire fraud based on omissions of material facts, [the jury] must find that defendant had a duty to disclose the omitted fact arising out of a relationship of trust.  That duty can arise either out of a formal fiduciary relationship, or an informal, trusting relationship in which one party acts for the benefit of another and induces the trusting party to relax the care and vigilance which it would ordinarily exercise."  As Mr. Johnson's attorney, defendant held a formal fiduciary relationship with Mr. Johnson under which he owed certain duties of disclosure.  Importantly, however, because of the lengths to which defendant went to build trust in his clients, defendant also held an informal fiduciary relationship with certain of his clients that extends beyond the duties of an attorney under the California Rules of Professional Conduct.  Indeed, Mr. Johnson testified to the overwhelming amount of trust he placed in defendant: "I trusted Michael.  I trusted him with everything.  He helped get me out of jail.  He got a settlement for me.  I trusted him."  (RT 7/22/2021, Vol. I, at 80.)  Evidence concerning the important life

5

1   responsibilities with which Mr. Johnson entrusted defendant to help

2   him -- maintaining his SSI benefits and purchasing a house -- is

3   essential to establish the informal -- and broader -- fiduciary

4   relationship that defendant established with Mr. Johnson.

5        The evidence that the government presented through Ms. Guerrero

6   and Mr. Goeders is highly probative of that relationship.  For

7   example, Ms. Guerrero introduced Trial Exhibit 70, which defendant

8   sent the Social Security Administration ("SSA") in April 2016,

9   instructing the agency handling Mr. Johnson's SSI benefits that

10  "[a]ll further inquiries should be directed to my attention."  (Trial

11  Ex. 70.)  Similarly, Mr. Goeders's testimony demonstrated that

12  defendant assumed responsibility on behalf of Mr. Johnson for

13  purchasing a home that was supposedly to be purchased with Mr.

14  Johnson's settlement money.  As Mr. Goeders testified, defendant

15  instructed him "not to discuss any more business deals -- business

16  dealings related to the transaction with Mr. Johnson" and "was

17  seemingly unhappy with [Mr. Goeders]" when he discovered that Mr.

18  Goeders had simply asked Mr. Johnson what escrow period he wanted.

19  (RT 7/23/2021, Vol. II, at 39.)  In other words, the evidence has

20  shown -- and will continue to show -- that defendant inserted himself

21  as the principal responsible party for numerous aspects of Mr.

22  Johnson's life beyond the scope of services identified in the sole

23  retainer/fee agreement between Mr. Johnson and defendant/Eagan

24  Avenatti.  The scope of defendant's fiduciary relationship with Mr.

25  Johnson is correspondingly broader, as are the duties of disclosure

26  that he owed to Mr. Johnson, and the government is entitled --

27  indeed, required -- to prove to the jury what the scope of that

28  relationship was to establish its omissions theory of fraud.

**C.   The Evidence at Issue Proves Defendant's Intent to Defraud**

Third, the evidence presented through Ms. Guerrero and Mr. Goeders shows that defendant lied repeatedly to third parties about Mr. Johnson and, specifically, the settlement that he negotiated with the County on Mr. Johnson's behalf.  For example, Ms. Guerrero introduced as Exhibit 70 the letter that defendant sent the SSA in April 2016 (over a year after defendant received, and spent, the entirety of Mr. Johnson's settlement funds), in which defendant told the SSA (again, falsely) that, "[f]rom February 2014 to the present, [Eagan Avenatti] has been advancing Mr. Johnson approximately $1,250 a month.  As of this time, the court has not entered an 'award letter' to Mr. Johnson."  (Trial Ex. 70.)  That defendant lied to the SSA about the status of Mr. Johnson's settlement -- or at the very least misled the SSA by saying the court had not entered an "award letter" -- shows that he sought to conceal his theft of Mr. Johnson's settlement funds, which is highly probative of his intent to defraud.

With regard to Mr. Goeders, defendant initially lied and told him that Mr. Johnson "had won a settlement with L.A. County and that he wanted to purchase a house," which "was going to be an all-cash purchase."  (RT 7/23/2021, Vol. II, at 32.)  Then, as the time to pay for the house approached, defendant lied to Mr. Goeders, saying that "[t]he funds were not available to close" because "he was waiting for L.A. County to approve a special needs trust that the money could be deposited in so that Mr. Johnson would not lose his SSI benefits."  (Id. at 42-43.)  Again, defendant's lies about Mr. Johnson's settlement funds are extremely relevant evidence of defendant's intent to conceal his theft, his intent to deceive and cheat Mr. Johnson, and, accordingly, his intent to defraud.

7

1    In addition, defendant's claim that the evidence of his actions
2  -- or, rather, his inactions -- that resulted in Mr. Johnson losing
3  his SSI benefits would permit defendant to be "convicted for
4  committing legal malpractice" (CR 580 at 3), ignores the obvious
5  inference that defendant's actions were intentional, not negligent.
6  By the time defendant was supposed to provide information to the SSA
7  in late 2018, defendant had already been accused of embezzlement by
8  two clients, Gregory Barela and Michelle Phan.  The SSA sought
9  information regarding Mr. Johnson's settlement with the County of Los
10 Angeles, whether a trust was established for Mr. Johnson, and any
11 disbursements made to Mr. Johnson.  Had defendant responded
12 truthfully to the SSA's request, defendant would have revealed the
13 lies he had provided to Mr. Johnson for over four years.  Defendant,
14 alternatively, could have provided false statements to the SSA -- as
15 he did in 2016 (Trial Ex. 70) -- that would have likely resulted in
16 Mr. Johnson retaining his benefits.  Defendant, however, chose not to
17 respond, despite promising his client that defendant would respond
18 and despite repeated reminders from his paralegal (see Trial Exs.
19 110, 113 (to be offered through a subsequent witness)), resulting in
20 Mr. Johnson losing his benefits.  Defendant's purposeful choice was
21 hardly negligence or simple malpractice, but a conscious act in his
22 scheme to defraud, specifically to further conceal his theft and his
23 intent to deceive and cheat Mr. Johnson.

24    **D.    The Evidence at Issue Rebuts the Principal Defense that**
           **Defendant Has Presented Thus Far in Trial**
25

26    Fourth, the government respectfully disagrees that it is
27 irrelevant that defendant "caus[ed] [Mr. Johnson] not to get his
28 Social Security benefits or not able to maintain the benefits."  (CR

580 at 2-3 (quoting Court's statements at RT 7/23/2021, Vol. I, at 117).)   To the extent that such evidence was irrelevant prior to trial, defendant made it relevant when he presented his defense during opening statements.   During his opening statement, defendant created a chart of six items that he argued are necessary to calculate the net settlement amount to the client.   He has used this chart repeatedly throughout cross-examination with different witnesses.   One of the items on this chart concerns fees defendant claims he was entitled to receive for other work he performed for his clients.   As defendant stated in opening, "[t]he other things that get deducted from the settlement amount are interest, if we choose to charge it, at a reasonable rate, not a ridiculous rate, and <u>fees for any other work that we did outside the scope of our original agreement</u>, meaning if we are retained and the client wants us to do X and during the course of the years we represent him or her and the client says, hey, can you do Y, and Y turns out to be quite a lot of extensive work, we are entitled to be compensated for that work." (RT 7/21/2021 at 68 (emphasis added).)

It is apparent, both from this opening statement and from his cross-examination of various witnesses, that defendant intends to present a defense that he was entitled to compensation for other work he allegedly performed for his clients "outside the scope of [their] original agreement."   Principal among the other "work" that defendant performed for Mr. Johnson are maintaining Mr. Johnson's SSI benefits and helping him search for a house.   Indeed, defendant made this explicit in his cross-examination of Mr. Johnson.   After asking Mr. Johnson at length about his contingency fee agreement with defendant (Trial Exhibit 1), defendant asked, rhetorically, "Mr. Johnson, could

1  you please direct the jury's attention to the portion of the document
2  where it says that me or my firm were required to assist you with
3  your benefits, your SSI benefits"?  (RT 7/22/2021, Vol. II, at 18.)
4  Defendant then asked, "Can you please direct the jury's attention to
5  the portion of the document that talks about the fact that me and my
6  firm were obligated to assist you in finding a home and a real estate
7  agent"?  (Id.)  This testimony is relevant because it appears to
8  relate to defendant's defense that he provided "other work" for Mr.
9  Johnson "outside the scope of [their] original agreement" for which
10 defendant was "entitled to be compensated."  (RT 7/21/2021 at 68.)
11 Simply put, the government is entitled to rebut that defense with
12 evidence from Ms. Guerrero and Mr. Goeders, among others, to show
13 that defendant did not perform outside work for which he was entitled
14 to be compensated, particularly since defendant appears to be
15 claiming that factor (when combined with the other items 1-6 in his
16 calculation) somehow results in the client being entitled to nothing.

17 **III.  CONCLUSION**

18      For the foregoing reasons, the government respectfully disagrees
19 that any limiting or curative instruction is necessary to address any
20 evidence or testimony presented through Ms. Guerrero or Mr. Goeders,
21 or any related evidence or testimony presented through other
22 witnesses.  Should the Court adopt a limiting instruction, however,
23 defendant's instruction is inappropriate because it asks the jury to
24 "disregard and ignore" relevant and proper evidence.  Moreover,
25 should the Court decide to provide such an instruction, the
26 government would respectfully request additional guidance from the
27 Court as to the specific issues such a limiting instruction would be
28 designed to address prior to proposing an alternative instruction.