1

2

3

4                 UNITED STATES DISTRICT COURT

5                CENTRAL DISTRICT OF CALIFORNIA

6                      SOUTHERN DIVISION

7                          - - -

8        THE HONORABLE JAMES V. SELNA, JUDGE PRESIDING

9
         UNITED STATES OF AMERICA,      )CERTIFIED TRANSCRIPT
10                      Plaintiff,  )
             vs.                    )
11                                  )  SACR-19-00061-JVS
         MICHAEL JOHN AVENATTI,     )
12                      Defendant.  )TRIAL DAY 12, VOL. 1
         ------------------------------)
13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                 Santa Ana, California

17                   July 30, 2021

18

19                      SHARON A. SEFFENS, RPR
                        United States Courthouse
20                      411 West 4th Street, Suite 1-1053
                        Santa Ana, CA  92701
21                      (714) 543-0870

22

23

24

25

```
 1   APPEARANCES OF COUNSEL:

 2   For the Plaintiff:

 3   NICOLA T. HANNA
     United States Attorney
 4   BRANDON D. FOX
     Assistant United States Attorney
 5   Chief, Criminal Division
     ALEXANDER WYMAN
 6   Assistant United States Attorney
     Major Frauds Section
 7   1100 United States Courthouse
     312 North Spring Street
 8   Los Angeles, CA  90012
     (213) 894-6683
 9
     BRETT A. SAGEL
10   Assistant United States Attorney
     Ronald Reagan Federal Building
11   411 West Fourth Street, Suite 8000
     Santa Ana, CA  92701
12   (714) 338-3598

13   For the Defendant:

14   MICHAEL JOHN AVENATTI, PRO SE

15   H. DEAN STEWARD, ADVISORY COUNSEL
     H. DEAN STEWARD LAW OFFICES
16   107 Avenida Miramar, Suite C
     San Clemente, CA  92672
17   (949) 481-4900

18

19

20

21

22

23

24

25
```

```
1

2                           I-N-D-E-X

3

4     PLAINTIFF'S
      WITNESSES:              DIRECT    CROSS    REDIRECT    RECROSS
5
      JOEL WEINER
6       (Continued)            14        19
      ALEXIS GARDNER           67
7
      PLAINTIFF'S
8     EXHIBITS:                                 MARKED      RECEIVED

9     Exhibit 149                                             15
      Exhibit 132                                             71
10    Exhibit 160                                             90

11    DEFENSE
      WITNESSES:        DIRECT    CROSS     REDIRECT    RECROSS
12
       (None)
13
      DEFENSE
14    EXHIBITS:                              MARKED       RECEIVED

15     (None)

16

17

18

19

20

21

22

23

24

25
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

4

```
         1    SANTA ANA, CALIFORNIA; FRIDAY, JULY 30, 2021; 8:31 A.M.
         2              (Jury not present)
08:31    3              THE CLERK:  Item 1, SACR-19-00061-JVS, United
08:31    4    States of America versus Michael John Avenatti.
08:31    5              MR. SAGEL:  Good morning, Your Honor.  Brett Sagel
08:31    6    and Alexander Wyman on behalf of the United States.  Also at
08:31    7    counsel table is Special Agent Ramon Carlos.
08:31    8              THE COURT:  Good morning.
08:31    9              MR. AVENATTI:  Good morning, Your Honor.  Michael
08:31   10    Avenatti present with advisory counsel, Mr. Dean Steward and
08:31   11    Ms. Cummings-Cefali, and Mr. Repking on the technology
08:31   12    issues, Your Honor.
08:31   13              For the Court's information, Mr. Repking, today
08:31   14    will be his last day.  The paralegal will be taking over his
08:32   15    duties starting Tuesday if that's acceptable to the Court.
08:32   16    She will be sitting at counsel table.
08:32   17              THE COURT:  That's fine.  Thank you.
08:32   18              Drew Harbur filed a motion to quash the criminal
08:32   19    subpoena.  You are proposing that the Court hear it on
08:32   20    August 3 at 9:00 a.m.  If I hear it on that date, I will
08:32   21    hear it at 8:30, the usual time for taking up matters such
08:32   22    as this.
08:32   23              Does that give you enough time, Mr. Avenatti, to
08:32   24    respond?
08:32   25              MR. AVENATTI:  Your Honor, I wasn't aware of the
```

08:32  1    filing.  I don't know when it was filed.

08:32  2              THE COURT:  Well, it was filed yesterday at 2:52.

08:32  3              MR. AVENATTI:  Okay.

08:32  4              THE CLERK:  It hasn't hit the docket yet, so

08:32  5    that's why.  It will be on this morning.

08:32  6              MR. AVENATTI:  Okay.  So I wasn't aware of it,

08:32  7    Your Honor.  I wasn't provided -- I'm now aware of it.

08:32  8              THE COURT:  Okay.

08:32  9              MR. AVENATTI:  You are proposing to hear it on

08:32  10   August 3?

08:33  11             THE COURT:  Yeah, next Tuesday when we start up

08:33  12   again.

08:33  13             MR. AVENATTI:  Your Honor, if I could have until

08:33  14   the 4th.

08:33  15             THE COURT:  That's fine.  We'll take it up at 8:30

08:33  16   on the 4th, and Mr. Harbur's counsel will be so advised.

08:33  17             MR. AVENATTI:  And, Your Honor, can I file an

08:33  18   opposition the day before, or when do you --

08:33  19             THE COURT:  That's fine.  You can do it the day

08:33  20   before.

08:33  21             MR. AVENATTI:  Okay.  Thank you.

08:33  22             THE COURT:  Okay.

08:33  23             Mr. Avenatti, I would ask that when you file

08:33  24   various documents titled trial brief, that you provide a

08:33  25   further description.  No one is ever going to be able to

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

08:33  1    find anything at least conveniently on a given topic that
08:33  2    the label is just "Trial Brief."  So I would ask that you --
08:33  3    for example, today's filing at Docket 609, the docket just
08:33  4    says "Trial Brief," pleading styled "Defendant's Submission
08:34  5    Regarding Government's Failure to Produce Statements of
08:34  6    Ms. Regnier and Request for an Evidentiary Hearing."  It can
08:34  7    be a short hearing, but I think there ought to be some
08:34  8    further description so I and others looking for the docket
08:34  9    can find the docket.
08:34  10          MR. AVENATTI:  Your Honor, I couldn't agree more.
08:34  11   I have not been physically filing the documents, but I'll
08:34  12   make sure that from here on out we have an adequate
08:34  13   description in the docket.
08:34  14          THE COURT:  Okay.  And I would ask your advisory
08:34  15   counsel who actually makes the electronic filings to do
08:34  16   that.
08:34  17          MR. AVENATTI:  We will make sure that happens,
08:34  18   Your Honor.
08:34  19          THE COURT:  Very good.
08:34  20          Now, with regard to the pleading that was filed at
08:34  21   8:16 this morning, we will take that matter up when the
08:34  22   government has had an adequate opportunity to review the
08:34  23   request and respond.  Ms. Regnier is local, so if for any
08:34  24   reason she needs to come back, she can since she's local.
08:35  25   Moreover, she is on notice that she may be recalled in

08:35   1    defendant's case-in-chief.

08:35   2            MR. SAGEL:  Just for clarification, she is no

08:35   3    longer local, Your Honor.  She lives out of state.

08:35   4            THE COURT:  Okay.  Well, nevertheless the Court

08:35   5    indicated to her that she could be recalled.

08:35   6            MR. SAGEL:  That is correct, Your Honor.

08:35   7            MR. AVENATTI:  Your Honor, we don't have to debate

08:35   8    this now, but recalling her doesn't cure the problem on the

08:35   9    26.2 and the Jencks Act.  There's two options.  Her

08:35   10   testimony either gets stricken, or we are entitled to a

08:35   11   mistrial.  But we don't have to debate that now, Your Honor.

08:35   12           THE COURT:  Well, we were going to take up what,

08:35   13   if anything, used by way of refreshing recollection should

08:35   14   be admitted under Rule 612 of the Federal Rules of Evidence.

08:36   15   I asked the government to be prepared to express its view as

08:36   16   to the meaning of the term "adverse party" in Rule 612(b).

08:36   17           Mr. Wyman.

08:36   18           MR. WYMAN:  Yes, Your Honor.  Thank you.

08:36   19           Rule 612, as Your Honor is aware, governs the

08:36   20   process by which a party may refresh a witness's

08:36   21   recollection.  It is not a basis for admission of otherwise

08:36   22   inadmissible evidence.

08:36   23           My understanding is the only provision under Rule

08:36   24   612 that allows for the admission of a portion of a document

08:36   25   is where that portion of the document is necessary for the

08:36   1    jury to evaluate the testimony given by the witness.
08:36   2            So, for example, if we ask the witness, "Who
08:36   3    represented you?" and the witness didn't recall, and I
08:36   4    handed the witness a piece of paper that says Michael
08:36   5    Avenatti, the defense could introduce that piece of paper so
08:36   6    that the jury could evaluate the witness's answer in light
08:37   7    of the document I used to refresh recollection.
08:37   8            What the defendant has been doing is asking
08:37   9    specific questions of witnesses like, you know, isn't it
08:37   10   true that so and so said something on this date?  And when
08:37   11   they don't remember, he shows them the document and seeks to
08:37   12   read from it.  That's improper because the law is very clear
08:37   13   that Rule 612 is not a way of back-door admitting
08:37   14   inadmissible evidence.
08:37   15           To Your Honor's point, he is also not an adverse
08:37   16   party under that rule.  I don't know if Your Honor sees that
08:37   17   I provided your courtroom deputy two treatises that I've
08:37   18   highlighted.
08:37   19           THE COURT:  Well --
08:37   20           MR. WYMAN:  I apologize.  I found very little case
08:37   21   law on the definition of "adverse party," but I found two
08:37   22   treatises that basically are in line with my understanding
08:37   23   of the definition of that rule is basically a party adverse
08:37   24   to the person trying to refresh the recollection.
08:38   25           So, for example, if the defendant wants to admit

08:38  1  evidence of a prior statement by a government witness, we

08:38  2  would be the adverse party in that instance because we are

08:38  3  the party adverse to the information being provided.

08:38  4          THE COURT:  Mr. Avenatti.

08:38  5          MR. AVENATTI:  Your Honor, I don't believe there

08:38  6  has been any violation of the rule.

08:38  7          THE COURT:  Sir, that's not the question.  You

08:38  8  purported to offer documents that have been used to refresh

08:38  9  recollection.  The question I posed at the end of the day

08:38  10  yesterday was:  What's the meaning of adverse party?

08:38  11          I believe Mr. Wyman is correct that when you used

08:38  12  a document to refresh a witness's recollection, you were not

08:38  13  the adverse party.  You were the proponent.  Mr. Wyman

08:38  14  brings to my attention, and I already looked at the Wright &

08:39  15  Gold Treatise on Evidence, Section 6183 (Ed. 2d).  There the

08:39  16  authors said:

08:39  17          "One possible definition is that an 'adverse

08:39  18  party' is a party whose interests are adverse to the party

08:39  19  who called the witness to testify."  This is clearly not the

08:39  20  meaning intended by 612 since a witness's memory might be

08:39  21  refreshed with a writing on cross-examination, making the

08:39  22  party calling the witness the one in need of the rights

08:39  23  granted to an adverse party.

08:39  24          Moreover, the Ninth Circuit reaches the same

08:39  25  conclusion in United States versus Gallegos, 974 F.2d 1344

08:40   1   at 2 (Ninth Circuit 1992).

08:40   2        So I decline to accept any of the -- admit any of

08:40   3   the documents that you offered based on the fact that you

08:40   4   used them to refresh recollection.

08:40   5        MR. AVENATTI:  Could I be heard, Your Honor?

08:40   6        THE COURT:  Yes.

08:40   7        MR. AVENATTI:  Okay.  Your Honor, first of all, I

08:40   8   was just handed this about two minutes before you took the

08:40   9   bench, so I don't know when the Court received it.  And by

08:40   10  this, I mean --

08:40   11       THE COURT:  Well, I have already done my

08:41   12  independent research on the question that I posed yesterday,

08:41   13  anticipating that others would do research likewise.  And

08:41   14  apparently Mr. Wyman did.

08:41   15       MR. AVENATTI:  Your Honor, I understand that.  I'm

08:41   16  just informing the Court for the record that I was handed

08:41   17  this two minutes before Your Honor took the bench.  I have

08:41   18  not had a chance to look at it.  I will say that I believe

08:41   19  that 612 when it discusses adverse party, what is meant by

08:41   20  that is whether the party is adverse to the witness or

08:41   21  adverse to the party that called the witness.

08:41   22       In this criminal case, of course, we're talking

08:41   23  about government witnesses.  I am using documents to refresh

08:41   24  recollection of those witnesses.  I believe if they say

08:41   25  their recollection has been refreshed by way of the

08:41　1　document, I'm entitled to put the document into evidence

08:41　2　under 612.

08:41　3　　　　　There is also a best evidence issue, Your Honor,

08:41　4　relating to the best evidence rule and its applicability in

08:42　5　this situation.

08:42　6　　　　　THE COURT:  Sir, you are free to supplement your

08:42　7　position in writing.  If you do that, I will revisit it.

08:42　8　But the passage I read from Wright clearly rejects your

08:42　9　interpretation that you are the adverse party under 612, as

08:42　10　does the Ninth Circuit in Gallegos.

08:42　11　　　　　I'd be happy to revisit this issue after you have

08:42　12　had an opportunity to do your own independent research.

08:42　13　　　　　Okay, is there anything else we should take up at

08:42　14　this time?

08:42　15　　　　　MR. AVENATTI:  Two issues from the defendant, Your

08:42　16　Honor.

08:42　17　　　　　First of all, I received some correspondence

08:42　18　through Mr. Steward last night relating to this redaction

08:42　19　issue concerning some of the government exhibits.  I'm going

08:42　20　to go through the exhibits this weekend, and I will propose

08:42　21　redactions to the government no later than Sunday evening.

08:43　22　　　　　And then if there's any issues, I think those can

08:43　23　probably can be brought up to the Court.  Hopefully those

08:43　24　will be minimal.  So that was my first issue.

08:43　25　　　　　The second issue, Your Honor, is -- and I preview

08:43  1    this for the Court so that we don't have any problems before

08:43  2    the jury during the cross-examination of Mr. Weiner's

08:43  3    testimony.  And that is that yesterday Mr. Sagel elicited

08:43  4    quite a lot of testimony from Mr. Weiner regarding the fact

08:43  5    that I was allegedly anxious to get the money and was there

08:43  6    any reason for me to be anxious, and was there any

08:43  7    suggestion that somehow the deal would really fall apart and

08:43  8    that it really wasn't going to be paid.  I mean, we heard

08:43  9    quite a lot of questions and testimony about that, including

08:43  10   on pages 85 and 87 of the afternoon transcript.

08:43  11          THE COURT:  Yes.  I remember that.

08:43  12          MR. AVENATTI:  Okay.

08:44  13          The reason why I bring that up, Your Honor, is

08:44  14   there is a long history relating to trying to get this

08:44  15   mediation set up and what had transpired during that history

08:44  16   and what caused me to believe that this deal would likely

08:44  17   fall apart.

08:44  18          THE COURT:  Sir, you're free to cross-examine on

08:44  19   that subject.

08:44  20          MR. AVENATTI:  Fair enough, Your Honor.  I just

08:44  21   wanted to --

08:44  22          THE COURT:  Sir, you are free to cross-examine on

08:44  23   that subject.  You don't need to give me a preview of your

08:44  24   cross-examination.

08:44  25          MR. AVENATTI:  And I appreciate that, Your Honor.

08:44  1   I just didn't want you to think that I was going into the
08:44  2   merits, because I'm not.
08:44  3              THE COURT:  That's fine.
08:44  4              Are those your two matters, Mr. Avenatti?
08:44  5              MR. AVENATTI:  Ms. Cummings-Cefali passed me a
08:44  6   note.  Is there any update relating to the issue with the
08:44  7   juror?
08:44  8              THE COURT:  Not yet.
08:44  9              MR. AVENATTI:  Thank you.
08:44  10             MR. SAGEL:  Nothing from the government, Your
08:44  11  Honor.
08:45  12             THE COURT:  Okay.  Then we will be in recess until
08:45  13  the jury comes in.
08:45  14                  (Recess taken at 8:45 a.m.;
08:45  15                   proceedings resumed at 9:02 a.m.)
08:45  16                  (Jury present)
09:02  17             THE CLERK:  Item 1, SACR-19-00061-JVS, United
09:02  18  States of America versus Michael John Avenatti.
09:02  19             MR. SAGEL:  Good morning, Your Honor.  Brett Sagel
09:02  20  and Alexander Wyman on behalf of the United States.  And at
09:03  21  counsel table is Special Agent Ramon Carlos.
09:03  22             THE COURT:  Good morning.
09:03  23             MR. AVENATTI:  Good morning, Your Honor.  Michael
09:03  24  Avenatti, joined by Mr. Steward, Ms. Cummings-Cefali, and
09:03  25  Mr. Repking.

14

09:03   1              THE COURT:  Good morning.

09:03   2              And good morning, ladies and gentlemen.

09:03   3              Mr. Sagel.

09:03   4        JOEL WEINER, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

09:03   5              THE CLERK:  Sir, you are reminded that you are

09:03   6    still under the oath you took yesterday.

09:03   7              THE WITNESS:  Yes.

09:03   8              THE CLERK:  And if you could please state your

09:03   9    name again for the record.

09:03   10             THE WITNESS:  Joel Weiner.

09:03   11             THE CLERK:  Thank you.

09:03   12                  DIRECT EXAMINATION (Continued)

09:03   13   BY MR. SAGEL:

09:03   14   Q    Good morning, Mr. Weiner.

09:03   15   A    Good morning.

09:03   16   Q    Do you have Volume 3 of the exhibits in front of you?

09:03   17   It's Exhibit 149.

09:03   18   A    Yes.

09:03   19   Q    Do you see Exhibit 149?

09:03   20   A    Yes.

09:03   21   Q    And do you recognize what Exhibit 149 is?

09:04   22   A    Yes.

09:04   23   Q    Is it a wire confirmation related to the transaction we

09:04   24   spoke of yesterday?

09:04   25   A    Yes, it appears to be.

09:04    1    Q    Is it a fair and accurate copy of the wire confirmation

09:04    2    regarding the Gardner/Whiteside matter that we discussed

09:04    3    yesterday?

09:04    4    A    It's a fair and accurate copy of this document as it

09:04    5    was provided to me.

09:04    6    Q    And if you look in the bottom right corner, in addition

09:04    7    to the USAO Bates number, there is a K Bates number; is that

09:04    8    correct?

09:04    9    A    Yes.

09:04   10    Q    And that stands for the first letter of your firm when

09:04   11    you provided these documents to the government?

09:04   12    A    Yes.

09:04   13              MR. SAGEL:  Your Honor, at this time the

09:04   14    government moves into evidence Exhibit 149.

09:04   15              MR. AVENATTI:  Objection, Your Honor.

09:04   16    Authentication, foundation, hearsay.

09:04   17              THE COURT:  Overruled.  Exhibit 149 will be

09:04   18    received.

09:04   19              (Exhibit 149 received in evidence)

09:04   20    BY MR. SAGEL:

09:04   21    Q    If we could start on the top half, how much -- what's

09:05   22    the amount of the wire transfer?

09:05   23    A    $2,750,000.

09:05   24    Q    And if you were to look just below that, there is a,

09:05   25    like, date.  I think it looks like a debit val and it has a

09:05   1   date, and it has a credit val and a date?

09:05   2   A    Yes.

09:05   3   Q    What's the date?

09:05   4   A    It says 17/01/25, which is January 25th, 2017.

09:05   5   Q    In January 25, 2017, based on your understanding via a

09:05   6   phone call with defendant, is the date your client paid this

09:05   7   $2.75 million?

09:05   8   A    Yes.

09:05   9   Q    And if you were to look at the top on the right side,

09:05   10  the beneficiary, where the money was sent, did the wire go

09:06   11  into the Eagan Avenatti, LLC, trust account?

09:06   12  A    Yes.  On the top third on the right side it says

09:06   13  reference to Eagan Avenatti, LLP, client trust.

09:06   14  Q    And then the last line of that same section that you're

09:06   15  looking at, what does it say?

09:06   16  A    It says "Whiteside/Gardner 1-7-17."

09:06   17  Q    And what happened on 1/7/17?

09:06   18  A    That is the date of the settlement.

09:06   19  Q    And if you were to look at the very bottom of this

09:06   20  page, it has both the beneficiary and the originator.  Do

09:06   21  you see that?

09:07   22  A    Yes.

09:07   23  Q    Who is the originator of this $2.75 million wire

09:07   24  transfer?

09:07   25  A    Hassan Whiteside, care of Intersect Capital.

09:07  1   Q    After Mr. Whiteside made this $2.75 million wire

09:07  2   transfer, did you have any further conversations with the

09:07  3   defendant about Mr. Whiteside not making his payment under

09:07  4   the agreement?

09:07  5   A    No.

09:07  6   Q    After this wire transfer, did you have any

09:07  7   conversations with the defendant about Mr. Whiteside not

09:07  8   making monthly payments under the agreement?

09:07  9   A    No.

09:07  10  Q    Under the settlement agreement -- and if you need me to

09:07  11  bring it up, I can.  Under the settlement agreement between

09:08  12  Mr. Whiteside and Ms. Gardner, were they allowed to contact

09:08  13  each other after the agreement?

09:08  14  A    I believe the agreement provides that they were not to

09:08  15  contact each other.

09:08  16  Q    And we talked about how there was a $250,000 payment

09:08  17  that was going to be paid approximately three years later.

09:08  18  Do you recall that?

09:08  19  A    Yes.  I think the agreement says it was to be paid by

09:08  20  November 1st, 2020, if I remember correctly.

09:08  21  Q    And was part of that second payment to ensure that each

09:08  22  of the parties complied with the agreement during that

09:08  23  interim time?

09:08  24  A    I think the agreement sort of speaks for itself.

09:08  25  That's my recollection and understanding of what it says.

09:09   1   Q   Let me ask a specific question.  Was Ms. Gardner

09:09   2   allowed to contact Mr. Whiteside after the agreement?

09:09   3   A   The agreement provides that she was not to contact

09:09   4   Mr. Whiteside.

09:09   5   Q   And there were potentials for penalties if she did; is

09:09   6   that correct?

09:09   7   A   Yes.

09:09   8   Q   At any time after the $2.75 million was paid, did you

09:09   9   learn that Ms. Gardner reached out to Mr. Whiteside or

09:09  10   representatives of Mr. Whiteside?

09:09  11   A   Ten months later it was brought to my attention that

09:09  12   she had tried to reach out to him through Instagram or by

09:09  13   attending a game, that she intended to attend a game.

09:09  14   Q   After that happened, did you have a conversation with

09:10  15   the defendant?

09:10  16   A   Yes.

09:10  17   Q   And what was your conversation with the defendant?

09:10  18   A   Bring to his attention that the client was attempting

09:10  19   to contact my client and that was contrary to the agreement,

09:10  20   and I asked him if he would see that his client would

09:10  21   comply.

09:10  22   Q   And what did the defendant say?

09:10  23   A   He said he wasn't aware of that, that he would contact

09:10  24   her right away and make sure that she complies with the

09:10  25   agreement.

09:10   1   Q   During that conversation did defendant say anything to

09:10   2   you about Mr. Whiteside hasn't been making his monthly

09:10   3   obligation?

09:10   4   A   No.

09:10   5   Q   Did you ever tell the defendant you do not know why the

09:10   6   client was not making his monthly obligations to

09:10   7   Ms. Gardner?

09:11   8   A   There would be no reason for me to say that because

09:11   9   there weren't any monthly obligations at that time.

09:11   10   Q   Did you ever have any conversations with the defendant

09:11   11   about further actions he would have to take against your

09:11   12   client for his failure to make monthly obligations?

09:11   13   A   I'm sorry.  Could you repeat that?

09:11   14   Q   Did the defendant ever reach out to you -- I'll use a

09:11   15   date parameter.  After the $2.75 million was wired on

09:11   16   January 25th, 2017, until March of 2019, did defendant ever

09:11   17   contact you to say he was going to need to take further

09:11   18   action against your client for failing to make monthly

09:11   19   obligations?

09:11   20   A   No.

09:11   21            MR. SAGEL:  No further questions, Your Honor.

09:11   22            THE COURT:  Mr. Avenatti.

09:11   23                   CROSS-EXAMINATION

09:11   24   BY MR. AVENATTI:

09:13   25   Q   Mr. Weiner, good morning.

09:13   1   A   Good morning.

09:13   2   Q   You and I have never spoken before regarding this case,

09:13   3   is that right, this criminal matter?

09:13   4   A   Correct.

09:13   5   Q   I have not had the opportunity to interview you before

09:13   6   you testified here today; is that right?

09:13   7   A   Correct.

09:13   8   Q   You have been interviewed by the government, though,

09:13   9   previously; am I right about that?

09:13   10   A   Correct.

09:13   11   Q   We will come back to that in a moment.  I want to

09:14   12   direct your attention if I could to Exhibit 135, which was

09:14   13   the first document that Mr. Sagel asked you about yesterday

09:14   14   afternoon on direct.

09:14   15        MR. AVENATTI:  Joe, if you could bring that up for

09:14   16   the benefit of the jury, please.  And just the top portion

09:14   17   of the e-mail, if you could blow that up for the jury,

09:14   18   please.

09:14   19   BY MR. AVENATTI:

09:14   20   Q   Do you have that, sir?

09:14   21   A   Yes.

09:14   22   Q   We're going to come back to this document in a minute,

09:15   23   but I want to ask you a very simple, straightforward

09:15   24   question.  What is the date on this e-mail?

09:15   25   A   There are two e-mails here.  The first one is dated

09:15  1    December 21st, 2016, and the second one is dated

09:15  2    December 22nd, 2016.

09:15  3    Q    So I'm referring to the one at the top that Mr. Sagel

09:15  4    asked you about, December 22nd, 2016; right?

09:15  5    A    Correct.

09:15  6    Q    Now, you see that I have written that date on this

09:15  7    white piece of paper here, right?

09:15  8    A    Let me put my glasses on.

09:15  9    Q    Fair enough.  Take your time.

09:16  10   A    Yes.

09:16  11   Q    Do you see the arrow that I have written above this

09:16  12   date?

09:16  13   A    Yes.

09:16  14   Q    I want to ask you about the time period before

09:16  15   December 22, 2016.  Do you have that date in mind?

09:16  16   A    Yes.

09:16  17   Q    Now, Mr. Sagel didn't ask you any questions about what

09:16  18   happened before December 22, 2016; did he?

09:16  19   A    Sort of.

09:16  20   Q    What do you mean, sort of?

09:16  21   A    I mean he asked when we first communicated before that

09:16  22   date.

09:16  23   Q    How long before that date?

09:17  24   A    My recollection is maybe a couple of weeks.

09:17  25   Q    All right.  We're going to get to that in a minute.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:17  1    You were not the first person that I communicated with as it

09:17  2    related to Ms. Gardner's allegations against Mr. Whiteside,

09:17  3    as it related to representatives of Mr. Whiteside; were you?

09:17  4    A    No.

09:17  5    Q    Who is Joe McLean, M-c-L-e-a-n?

09:17  6    A    My client's financial advisor.

09:17  7    Q    And Mr. Sagel just asked you about a company -- and

09:17  8    we're going to come back to this -- by the name of Intersect

09:17  9    Capital.  Do you remember he asked you about the originator

09:18  10   for the money?

09:18  11   A    Yes.

09:18  12   Q    Isn't it true that Mr. McLean is the managing partner

09:18  13   of Intersect Capital?

09:18  14   A    I don't know his exact position at Intersect Capital.

09:18  15   Q    He has a senior role at Intersect Capital, right?

09:18  16   A    That's my understanding.

09:18  17   Q    Is that his company?

09:18  18   A    That's my understanding.

09:18  19   Q    He manages money for high- profile professional

09:18  20   athletes, including many NBA players like your client,

09:18  21   Mr. Whiteside, correct?

09:18  22            MR. SAGEL:  Objection, Your Honor.  Relevance.

09:18  23            THE COURT:  Sustained.

09:18  24   BY MR. AVENATTI:

09:18  25   Q    Who is Pat Riley?

| | | |
|---|---|---|
| 09:18 | 1 | A    He is an executive for a team in the NBA to my |
| 09:19 | 2 | knowledge. |
| 09:19 | 3 | Q    For the Miami Heat, correct? |
| 09:19 | 4 | A    Correct. |
| 09:19 | 5 | Q    And at this time your client played for the Miami Heat, |
| 09:19 | 6 | right? |
| 09:19 | 7 | A    Yes. |
| 09:19 | 8 | Q    Now, how did you get involved in attempting to mediate |
| 09:19 | 9 | this matter -- well, strike that. |
| 09:19 | 10 | A    I don't want to waive any privileges, so -- |
| 09:19 | 11 | Q    I don't want you to waive any privilege.  Strike the |
| 09:19 | 12 | question.  Let me ask this question. |
| 09:19 | 13 | I did not contact you seeking to resolve |
| 09:19 | 14 | Ms. Gardner's claims; did I? |
| 09:20 | 15 | A    I think I contacted you. |
| 09:20 | 16 | Q    Sir, you became aware that I had sent a letter to |
| 09:20 | 17 | Mr. McLean informing him that I represented Ms. Gardner in |
| 09:20 | 18 | opening up a dialogue about potentially resolving her |
| 09:20 | 19 | claims, right? |
| 09:20 | 20 | A    Yes. |
| 09:20 | 21 | Q    And you became aware of that in early December 2016, |
| 09:20 | 22 | right? |
| 09:20 | 23 | A    Yes. |
| 09:21 | 24 | Q    And you also became aware of the fact that after I sent |
| 09:21 | 25 | the letter to Mr. McLean requesting that we open up a |

09:21  1    dialogue about how this matter was going to be resolved,
09:21  2    that I had a telephone conversation with Mr. McLean.  Do you
09:21  3    remember that?
09:21  4    A    I don't.
09:21  5    Q    You did not learn, sir, prior to reaching out to me --
09:21  6    well, strike that.  Did you learn prior to reaching out to
09:21  7    me that Mr. McLean and I had spoken and he told me to,
09:21  8    quote, go fuck myself?
09:21  9          MR. SAGEL:  Objection.  Foundation.  Asked and
09:21  10    answered, Your Honor.  No record of the phone call.
09:21  11          THE COURT:  Sustained.
09:21  12    BY MR. AVENATTI:
09:21  13    Q    Did you learn that Mr. McLean had told me to, quote,
09:21  14    take my best shot and file whatever lawsuit I wanted to?
09:22  15          MR. SAGEL:  Objection.  Relevance, and Your
09:22  16    Honor's prior motion in-limine ruling.
09:22  17          THE COURT:  Sustained.
09:22  18    BY MR. AVENATTI:
09:22  19    Q    Sir, you learned prior to reaching out to me relating
09:22  20    to the mediation that my communications with Mr. McLean had
09:22  21    gotten or had gone nowhere.  Is that fair to say?
09:22  22          MR. SAGEL:  Same objections, Your Honor.
09:22  23          THE COURT:  Overruled.
09:22  24          THE WITNESS:  Again, I don't want to waive any
09:22  25    privileges, so I'm not quite sure how to answer that.

```
09:22   1    BY MR. AVENATTI:
09:22   2    Q    Well, I don't think we are citing a factual --
09:22   3    something you learned factually waives any privileges.
09:22   4    A    What's the question again?
09:22   5         THE COURT:  He asserted privilege.  Next question.
09:22   6    BY MR. AVENATTI:
09:22   7    Q    Mr. Weiner, when you contacted me for the first time,
09:23   8    were you aware that I had had discussions with Mr. McLean
09:23   9    about trying to set up a mediation and they were
09:23   10   unsuccessful?
09:23   11   A    Again, I assert the privilege.  I assert the
09:23   12   attorney/client privilege on that.
09:23   13   Q    Do you dispute that prior to you reaching out to me, I
09:23   14   had attempted to set up a mediation with other
09:23   15   representatives of Mr. Whiteside?
09:23   16   A    Again, I assert the privilege, but frankly I don't have
09:23   17   a recollection of it anyway.
09:23   18        MR. AVENATTI:  Your Honor, I don't think it's
09:23   19   privileged.
09:23   20        THE COURT:  He has testified that he doesn't have
09:23   21   a recollection.  Next question.
09:24   22        MR. AVENATTI:  Can I attempt to refresh his
09:24   23   recollection, Your Honor?
09:24   24        THE COURT:  It's your prerogative.
09:24   25        MR. AVENATTI:  Thank you.
```

26

09:24    1              (Document handed to the witness)
09:24    2   BY MR. AVENATTI:
09:24    3   Q    Mr. Weiner, does this refresh your recollection that
09:24    4   prior to you reaching out to me, I had attempted to contact
09:24    5   Mr. McLean in an effort to set up a resolution process?
09:25    6   A    It occurs to me that this falls in the motion
09:25    7   in-limine.
09:25    8   Q    Sir, I'm just asking you, does this refresh your
09:25    9   recollection that that's what happened?
09:25   10   A    It does not.
09:25   11   Q    Prior to you reaching out to me to set up the
09:25   12   mediation, did you learn that I had sent a letter to Pat
09:25   13   Riley of the Miami Heat regarding your client and the
09:25   14   allegations of Ms. Gardner?
09:26   15   A    I don't recall the timing, but I became aware that a
09:26   16   letter was sent.
09:26   17   Q    And you and I subsequently communicated about that
09:26   18   letter that had been sent to the Miami Heat as it related to
09:26   19   getting a mediation set up and the timing of that mediation;
09:26   20   didn't we?
09:26   21   A    Again, I don't recall the exact timing of when I saw
09:26   22   that and when we talked, but I was aware of the letter and
09:26   23   we talked and we set up mediation.  I do recall that.
09:26   24   Q    Let me see if I can refresh your recollection as to the
09:26   25   timing.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

27

09:26  1              MR. AVENATTI:  May I approach, Your Honor?

09:26  2              THE COURT:  You may.

09:27  3              (Document handed to the witness)

09:27  4   BY MR. AVENATTI:

09:27  5   Q    Sir, does this refresh your recollection that the

09:27  6   letter that was sent to Mr. Pat Riley of the Miami Heat was

09:27  7   sent before you first reached out to me?

09:27  8              MR. SAGEL:  Objection.  That wasn't what he said

09:27  9   his recollection needed to be refreshed on.  It was about

09:27  10  when they had a communication.

09:27  11             THE COURT:  Overruled.

09:28  12             THE WITNESS:  Again, I think this falls within the

09:28  13  motion in-limine.

09:28  14  BY MR. AVENATTI:

09:28  15  Q    I'm just asking about the date, sir.

09:28  16  A    I mean, the date of the letter says December 12, 2016,

09:28  17  but I don't recall when I saw this in relation to my first

09:28  18  conversations with you.  It was around the same time, but I

09:28  19  don't know exactly.

09:28  20  Q    Well, let me see if I can use another document to

09:28  21  refresh your recollection.

09:28  22             MR. AVENATTI:  May I approach, Your Honor?

09:28  23             THE COURT:  You may.

09:28  24             (Document handed to the witness)

       25

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:28   1   BY MR. AVENATTI:

09:28   2   Q    Sir, if you could direct your attention to the second

09:29   3   to the last page, there is an e-mail there.  And I want to

09:29   4   ask you -- my question is:  Does that refresh your

09:29   5   recollection as to when you first contacted me in connection

09:29   6   with setting up a mediation?

09:30   7   A    It looks like my first communication with you was on

09:30   8   December 12th, 2016, at 6:28 p.m., based on this e-mail

09:30   9   chain.

09:30   10  Q    And at that time you knew about my letter to Pat Riley

09:30   11  of the Miami Heat, correct?

09:30   12  A    Yes.

09:30   13  Q    And during that first communication -- strike that.

09:30   14  Prior to that date and time, you and I had never

09:30   15  communicated on any other matter; had we?

09:31   16  A    Not that I can recall.

09:31   17  Q    This was the first time we had met; is that fair to

09:31   18  say?  And it was by e-mail?

09:31   19  A    Yes.

09:31   20  Q    And you sent me an e-mail on or about December 12th,

09:31   21  2016, and you said that you had been contacted by Hassan

09:31   22  Whiteside's representatives in connection with representing

09:31   23  him in the above-referenced matter.  Do you recall sending

09:31   24  me an e-mail that said that?

09:31   25           MR. SAGEL:  Objection, Your Honor.  He's using the

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

29

| | | |
|---|---|---|
| 09:31 | 1 | document improperly.  Hearsay. |
| 09:31 | 2 | THE COURT:  Sustained. |
| 09:31 | 3 | BY MR. AVENATTI: |
| 09:31 | 4 | Q    Sir, do you recall sending me an e-mail on December |
| 09:31 | 5 | 12th, 2016, in which you said that you had been contacted by |
| 09:31 | 6 | Mr. Whiteside's representatives and that's why you were |
| 09:31 | 7 | reaching out to me? |
| 09:32 | 8 | A    That's what this first e-mail says. |
| 09:32 | 9 | THE COURT:  Sir, he's asking for your |
| 09:32 | 10 | recollection, not what the e-mail says. |
| 09:32 | 11 | THE WITNESS:  I vaguely recall that, yes. |
| 09:32 | 12 | BY MR. AVENATTI: |
| 09:32 | 13 | Q    You vaguely recall that? |
| 09:32 | 14 | A    Yes. |
| 09:32 | 15 | Q    And do you recall also telling me that all further |
| 09:32 | 16 | communications from that point forward should be directed to |
| 09:32 | 17 | your attention? |
| 09:32 | 18 | A    Yes. |
| 09:32 | 19 | Q    And do you recall also telling me that you were going |
| 09:32 | 20 | to be in touch with the Miami Heat relating to the letter |
| 09:32 | 21 | that I had sent? |
| 09:32 | 22 | A    Yes. |
| 09:32 | 23 | Q    And you asked me if I had time to have a call with you |
| 09:32 | 24 | later that week as it related to the Whiteside matter, |
| 09:32 | 25 | right? |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:32  1   A    Yes.

09:32  2   Q    And do you recall that I responded by thanking you for

09:32  3   the e-mail and telling you that I was generally available

09:33  4   for a call?

09:33  5   A    Yes.

09:33  6   Q    And do you recall almost immediately after that, I

09:33  7   asked you if you were authorized to accept service on behalf

09:33  8   of Mr. Whiteside or whether it would be necessary for me to

09:33  9   get a process server?

09:33  10            MR. SAGEL:  Objection, Your Honor, 403.

09:33  11            THE COURT:  Sustained.

09:33  12   BY MR. AVENATTI:

09:33  13   Q    Sir, our very next communication after that was not

09:33  14   about me being anxious to set up a mediation.  It was about

09:33  15   whether you would accept service of a lawsuit that I was

09:33  16   getting ready to file on behalf of my client, right?

09:33  17            MR. SAGEL:  Same objection.

09:33  18            THE COURT:  Sustained.

09:33  19            Mr. Avenatti, if I sustain an objection to the

09:34  20   question, you are not entitled to ask the same question

09:34  21   again.

09:34  22   BY MR. AVENATTI:

09:34  23   Q    Do you recall that on December 14th we had a discussion

09:34  24   regarding whether there was going to be a mediation or not?

09:34  25   And again we're talking about before December 22nd, 2016.

09:34   1    A     At some point in that time frame we had a discussion

09:34   2    about a mediation.  I remember that.

09:34   3    Q     And do you recall telling me in connection with that

09:35   4    discussion that you were going to have to work on

09:35   5    Mr. Whiteside and his other representatives in order to get

09:35   6    the mediation set up?

09:35   7    A     I don't know about the words "work on," but I probably

09:35   8    said I need to coordinate the timing.

09:35   9    Q     Do you have a recollection of informing me on

09:35   10   December 16, 2016, that you were making some progress with

09:35   11   your client but you weren't in a position to commit to a

09:35   12   mediation?  Do you recall that generally?

09:36   13   A     Yes.

09:36   14   Q     Do you recall that we had another telephone call on the

09:36   15   afternoon of December 16th about setting up the potential

09:36   16   mediation around 3:30 that afternoon?

09:36   17   A     That's what this e-mail chain indicates.  I don't

09:36   18   recall it specifically.

09:36   19   Q     Do you have any reason to dispute the fact that we had

09:36   20   a call that afternoon, the afternoon of December 16th, 2016,

09:36   21   at 3:30 p.m. about whether we were going to actually be able

09:36   22   to mediate or not?

09:37   23   A     I remember we were in discussions to arrange for the

09:37   24   mediation.

09:37   25   Q     Do you have a recollection that on December 20th, 2016,

| | | |
|---|---|---|
| 09:37 | 1 | I informed you that if we were not able to have a mediation, |
| 09:37 | 2 | that I was going to be filing a lawsuit against |
| 09:37 | 3 | Mr. Whiteside? |
| 09:38 | 4 | A    By what date? |
| 09:38 | 5 | Q    December 20th, 2016. |
| 09:38 | 6 | A    I vaguely recall that, yes. |
| 09:38 | 7 | Q    Do you have some doubt as to whether that happened? |
| 09:38 | 8 | A    No. |
| 09:38 | 9 | Q    When I informed you of that, did you doubt it? |
| 09:39 | 10 | A    I don't recall. |
| 09:39 | 11 | Q    Do you have a recollection of thinking Avenatti is full |
| 09:39 | 12 | of it; he's not really going to sue if we don't go to |
| 09:39 | 13 | mediation? |
| 09:39 | 14 |              MR. SAGEL:  Objection, 403. |
| 09:39 | 15 |              THE COURT:  Sustained. |
| 09:39 | 16 | BY MR. AVENATTI: |
| 09:39 | 17 | Q    Now, let's go back to, while we have it on the screen, |
| 09:39 | 18 | 135. |
| 09:39 | 19 |           Do you see that at the top?  It's on the screen. |
| 09:39 | 20 | We can also turn to the hard copy if that's easier. |
| 09:40 | 21 | A    Yes, I see it. |
| 09:40 | 22 | Q    Now, do you see that the Honorable Louis Meisinger is |
| 09:40 | 23 | copied on this e-mail?  Do you see that? |
| 09:40 | 24 | A    Yes, I do. |
| 09:40 | 25 | Q    Do you know what communications took place between me |

09:40  1    and Judge Meisinger prior to this e-mail being sent -- as it
09:40  2    related to this matter?
09:40  3    A    Not specifically, no.  I think your office had
09:40  4    contacted his office for availability of mediation, but
09:40  5    that's all I know.
09:40  6    Q    Now, Mr. Sagel asked you some questions about how
09:40  7    mediation works.  Do you remember that?
09:40  8    A    Yes.
09:40  9    Q    I want to ask you some more questions for the benefit
09:41  10   of the jury.  Here's my first question.  Now, in a mediation
09:41  11   it's not like a setting like this, like a courtroom; is it?
09:41  12   A    No.
09:41  13   Q    It's generally held in a conference center with
09:41  14   multiple conference rooms, right?
09:41  15   A    The answer is, yes, at least before the pandemic.
09:41  16   Q    Fair enough.  And we're talking about before the
09:41  17   pandemic, so let's focus our attention on that time period,
09:41  18   fair?
09:41  19   A    Yes.
09:41  20   Q    All right.  And when you have one of these mediations,
09:41  21   the parties are divided up.  They are not all in the same
09:41  22   room generally; are they?
09:41  23   A    Correct.
09:41  24   Q    One side is in one conference room and the other side
09:41  25   is in another conference room, right?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:41  1   A    That's typically the way it's done these days and in

09:41  2   those days.

09:42  3   Q    And that's how this mediation was done.  Ms. Gardner

09:42  4   and I were in one conference room, and you and Mr. Whiteside

09:42  5   were in a conference room way down the hall, right?

09:42  6   A    Yes.

09:42  7   Q    But it wasn't just you and Mr. Whiteside in the

09:42  8   conference room; was it?

09:42  9   A    No.

09:42  10  Q    Mr. McLean, who I had had the conversation with, was

09:42  11  also in the conference room; wasn't he?

09:42  12  A    Mr. McLean also attended the mediation, yes.

09:42  13  Q    Because Mr. McLean was the money guy, right?

09:42  14           MR. SAGEL:  Objection.  403, Your Honor.

09:42  15           THE COURT:  Sustained.

09:42  16  BY MR. AVENATTI:

09:42  17  Q    Who else attended other than you, Mr. McLean, and

09:42  18  Mr. Whiteside for your side?

09:42  19           MR. SAGEL:  Objection, 403 at this time, Your

09:43  20  Honor.

09:43  21           THE COURT:  Sustained.

09:43  22  BY MR. AVENATTI:

09:43  23  Q    Now, during the mediation Judge Meisinger would speak

09:43  24  with your side and then he would come and speak with our

09:43  25  side, and he would basically go back and forth, conduct

09:43  1   shuttle diplomacy; is that fair?

09:43  2   A    Yes.

09:43  3   Q    All of the individuals at the mediation were never in

09:43  4   the same room together; is that right?

09:43  5   A    I'm trying to make sure I understand your question.

09:43  6   That's correct.  There was no joint session with everybody

09:43  7   together.

09:43  8   Q    And why was that?

09:43  9   A    That's the way Judge Meisinger handled mediations and

09:43  10  the way the parties preferred to proceed.

09:43  11  Q    And in a mediation, unlike generally in a court

09:44  12  setting, the parties and their lawyers can have

09:44  13  communications with the mediator without the other parties

09:44  14  present, right?

09:44  15  A    Yes.

09:44  16  Q    And that's how this mediation was conducted.  Judge

09:44  17  Meisinger would have communications with you and Mr. McLean

09:44  18  and Mr. Whiteside, and then he would come and have

09:44  19  communications with Ms. Gardner and with me, right?

09:44  20  A    Yes.

09:44  21  Q    And you expected that some of your communications with

09:44  22  Mr. Meisinger would be confidential and we would not find

09:44  23  out about them and vice versa, right?

09:44  24            MR. SAGEL:  At this time, Your Honor, 403.

09:44  25            THE COURT:  Sustained.  I think they have had

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:44  1   adequate examination with regard to events prior to reaching
09:44  2   the settlement agreement.  Let's move on to another topic.
09:44  3   BY MR. AVENATTI:
09:45  4   Q    You were asked about how long the mediation took.  Do
09:45  5   you recall that?
09:45  6   A    I recall being asked when we started and stopped -- I
09:45  7   don't remember the exact question, but roughly, yes.
09:45  8          THE COURT:  Mr. Avenatti, move on to another
09:45  9   topic.  I think we have the event sufficiently in the record
09:45  10  prior to reaching the settlement.  Let's move on.
09:45  11  BY MR. AVENATTI:
09:45  12  Q    Sir, do you have a recollection that there was a
09:45  13  disagreement about when the money would be paid?
09:45  14          THE COURT:  Sir, I direct you to move on to
09:45  15  another topic.
09:45  16          MR. AVENATTI:  Sir, I am asking about the payment
09:45  17  date.
09:45  18          THE COURT:  Sir, it's prior to the settlement
09:45  19  agreement being reached.  Move on to another topic.  I find
09:45  20  under Rule 403 that there is minimal probative value to
09:45  21  this, and the expenditure of time outweighs any probative
09:45  22  value.  Move on.
09:46  23  BY MR. AVENATTI:
09:46  24  Q    Sir, let me ask you about the payment date in the
09:46  25  settlement agreement, Exhibit 139, paragraph two.

37

09:47  1    A    I see it.

09:47  2    Q    Now, Mr. Sagel asked you about this provision in the

09:47  3    settlement agreement on direct relating to the January 28th

09:47  4    date and then the January 21st date.  Do you recall that?

09:47  5    A    Yes.

09:47  6    Q    And there was an agreement between the parties that the

09:47  7    payment would be made no later than January 28th but that

09:47  8    you and your client and his other representatives would make

09:47  9    best efforts to make the payment on or before January 21st,

09:47  10   2017; correct?

09:47  11   A    That's what this paragraph says, yes.

09:47  12   Q    And that was a term that was suggested by Judge

09:47  13   Meisinger; wasn't it?

09:48  14   A    That would be covered by a mediation privilege.

09:48  15         THE COURT:  Sir, the mediation privilege doesn't

09:48  16   apply in this context.  Answer the question.

09:48  17         MR. AVENATTI:  Thank you, Your Honor.

09:48  18         THE WITNESS:  What's the question?

09:48  19   BY MR. AVENATTI:

09:48  20   Q    That was a term that was suggested by Judge Meisinger,

09:48  21   correct?  Yes or no?

09:48  22   A    I don't know because -- I just don't know, because he

09:48  23   was going back and forth between the rooms.  So I don't know

09:48  24   if it was his suggestion or your suggestion or whose

09:48  25   suggestion, but it ended up in the agreement.

| | | |
|---|---|---|
| 09:48 | 1 | Q    Do you have a recollection of you and I actually |
| 09:48 | 2 | physically together with Judge Meisinger when he suggested |
| 09:49 | 3 | this term? |
| 09:49 | 4 |               MR. SAGEL:   403, Your Honor. |
| 09:49 | 5 |               THE COURT:   Sustained. |
| 09:49 | 6 | BY MR. AVENATTI: |
| 09:49 | 7 | Q    Now, after this settlement agreement was signed -- |
| 09:49 | 8 | well, strike that.  You were asked about the signature page |
| 09:49 | 9 | of the settlement agreement.  Let's go to the signature |
| 09:49 | 10 | page, page 5 of 5.  Do you see that, sir? |
| 09:49 | 11 | A    Yes. |
| 09:49 | 12 | Q    Now, in your experience when parties reach a settlement |
| 09:49 | 13 | agreement, very often they don't sign on the same physical |
| 09:50 | 14 | page; do they? |
| 09:50 | 15 | A    Sometimes they do.  Sometimes they don't. |
| 09:50 | 16 | Q    So sometimes one party will sign on one copy of the |
| 09:50 | 17 | page and another party will sign on another copy of the |
| 09:50 | 18 | page, so there will be two signature pages, right? |
| 09:50 | 19 | A    Sometimes. |
| 09:50 | 20 | Q    That's not this agreement, though; is it? |
| 09:50 | 21 | A    Both signatures are on the same page. |
| 09:50 | 22 | Q    And do you recall that both parties signed two copies |
| 09:50 | 23 | of the settlement agreement in original form at the |
| 09:50 | 24 | mediation, one for your client and one for my client? |
| 09:51 | 25 | A    I don't recall whether it happened that way or if there |

09:51  1   was one signature and a copy was made.  I don't know.

09:51  2   Q    You were not present when Ms. Gardner signed the

09:51  3   agreement, correct, meaning in the same room?

09:51  4   A    Correct.  I was not in the same room.  I was at the

09:51  5   mediation in a different room.

09:51  6   Q    And I was not present when your client signed the

09:51  7   agreement?

09:51  8   A    Correct.

09:51  9   Q    Do you know if Judge Meisinger was in the room with me

09:51  10  and my client when she signed this agreement?

09:51  11  A    I don't know.

09:52  12  Q    Do you know if Judge Meisinger brought the agreement

09:52  13  into the room with me and my client to have her sign it?

09:52  14          THE COURT:  Mr. Avenatti, let's move on to events

09:52  15  subsequent to the settlement being accomplished.

09:52  16  BY MR. AVENATTI:

09:52  17  Q    Do you know one way or the other as to whether my

09:52  18  client reviewed the agreement before she signed it?

09:52  19  A    I don't know.

09:52  20  Q    Let's go to Exhibit 141, another exhibit that Mr. Sagel

09:52  21  asked you about.

09:52  22          MR. AVENATTI:  Would you blow up the top e-mail.

09:53  23  BY MR. AVENATTI:

09:53  24  Q    Now, this is January 16th, 2017; right?

09:53  25  A    Yes.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

40

09:53  1    Q    Yes?

09:53  2    A    Yes.

09:53  3    Q    And it's about five days before that best-efforts

09:53  4    deadline in the settlement agreement of January 21st, 2017;

09:53  5    right?  You can go back and take a look at the settlement

09:54  6    agreement.  It's Exhibit 139.

09:54  7    A    Yes.

09:54  8    Q    And you understood me to be reaching out to see if the

09:54  9    payment was going to be made before that best-efforts

09:54  10   deadline that had been agreed to in the settlement

09:54  11   agreement, right?

09:54  12   A    I mean, the e-mail says what it says.  That's how I

09:54  13   understood it.

09:54  14   Q    And at the time you understood that we were expecting

09:54  15   payment by the best-efforts deadline, right?

09:54  16            MR. SAGEL:  Objection to "we."

09:54  17            THE COURT:  Rephrase the question.

09:55  18   BY MR. AVENATTI:

09:55  19   Q    Sir, you understood at the time that the side opposite

09:55  20   of you and your client, namely, the side that I was

09:55  21   representing, was expecting payment before the best-efforts

09:55  22   deadline, right?

09:55  23   A    I didn't know what you were expecting.

09:55  24   Q    Well, what was your understanding when you got 141 when

09:55  25   I asked:  Are we looking good for this week?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:55  1   A    You wanted to know if the settlement payment would be
09:55  2   made by the end of that week.
09:55  3   Q    And the end of that week was the best-efforts deadline,
09:55  4   right, approximately?
09:55  5   A    Approximately.
09:56  6   Q    You were asked about Exhibit 144.  Now, before we get
09:56  7   to 144, we talked about Mr. McLean earlier.  Do you recall
09:56  8   that?
09:56  9   A    I'm not sure I understand the question.
09:56  10  Q    Before we get to Exhibit 144 -- do you have it in the
09:56  11  binder in front of you?
09:56  12  A    Yes.
09:56  13  Q    All right.  Before we get to Exhibit 144, let me ask
09:57  14  you this.  Isn't it true that the money had to come from Joe
09:57  15  McLean?
09:57  16  A    Joe was the client's financial advisor, and he was
09:57  17  going to be the person handling the financial transaction.
09:57  18  Q    The same guy that I had conversed with long before you,
09:57  19  right?
09:57  20       MR. SAGEL:  Asked and answered, relevance.
09:57  21       THE COURT:  Sustained.
09:57  22  BY MR. AVENATTI:
09:57  23  Q    Sir, what's the date on 144?
09:57  24  A    It refers to e-mails on 144 are dated January 20th,
09:58  25  2017, and the first e-mail is dated January 16th, 2017.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:58  1  Q    Was it your understanding as of that time period that

09:58  2  Mr. McLean and I were on good terms?

09:58  3            MR. SAGEL:  Objection.  Relevance, Your Honor.

09:58  4            THE COURT:  Sustained.

09:58  5  BY MR. AVENATTI:

09:58  6  Q    Sir, isn't it true as of this date that you knew that I

09:58  7  had considerable concerns whether Mr. McLean was actually

09:58  8  going to send the money due to my prior dealings with him?

09:58  9  A    No.

09:58  10  Q    You didn't know one way or the other; did you?

09:58  11  A    I had no reason to believe that there was any concern

09:58  12  about that.

09:58  13  Q    You had not heard about my communications with

09:58  14  Mr. McLean?

09:59  15            MR. SAGEL:  Objection.

09:59  16            MR. AVENATTI:  Your Honor, I'm following up on the

09:59  17  answer.

09:59  18            THE COURT:  Sustained.

09:59  19  BY MR. AVENATTI:

09:59  20  Q    You hadn't had any discussions with Mr. McLean about

09:59  21  his run-in with me?

09:59  22            MR. SAGEL:  Same objection.

09:59  23            THE COURT:  Sustained.

09:59  24  BY MR. AVENATTI:

09:59  25  Q    Let's go to Exhibit 149 at the top under money transfer

43

| | | |
|---|---|---|
| 10:00 | 1 | system. |
| 10:00 | 2 | A    Yes. |
| 10:00 | 3 | Q    Sir, why does that say "care of Intersect Capital?" |
| 10:00 | 4 | A    That is the company that was my client's financial |
| 10:00 | 5 | advisor. |
| 10:00 | 6 | Q    That was Mr. McLean's company, correct? |
| 10:00 | 7 | A    Yes. |
| 10:01 | 8 | Q    How many times did you meet with the government before |
| 10:01 | 9 | you were called to testify yesterday about this case? |
| 10:01 | 10 | A    I don't recall any in-person meetings. |
| 10:01 | 11 | Q    How many telephones calls did you have with any |
| 10:01 | 12 | government agents or Mr. Sagel or Mr. Andre or Mr. Wyman |
| 10:01 | 13 | before you testified here yesterday? |
| 10:01 | 14 | A    A few. |
| 10:01 | 15 | Q    What's a few?  Is that three? |
| 10:02 | 16 | A    I don't know because there were various continuances |
| 10:02 | 17 | and things because of the pandemic, so I was checking on |
| 10:02 | 18 | scheduling to see.  I just don't recall how many there would |
| 10:02 | 19 | be. |
| 10:02 | 20 | Q    Do you recall the first time that you communicated with |
| 10:02 | 21 | them about this was in 2019?  Am I right? |
| 10:02 | 22 | A    Yes. |
| 10:02 | 23 | Q    And was that in person or on the telephone? |
| 10:02 | 24 | A    Telephone. |
| 10:02 | 25 | Q    And was that on April 3, 2019? |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 10:02 | 1 | A    That sounds like the right time frame. |
| 10:02 | 2 | Q    Would it help you if perhaps I showed you a document to |
| 10:02 | 3 | refresh your recollection? |
| 10:02 | 4 | A    Not really. |
| 10:02 | 5 | Q    And who was on that -- well, strike that.  Was that the |
| 10:03 | 6 | first call that you had with the government relating to the |
| 10:03 | 7 | allegations in this case? |
| 10:03 | 8 | MR. SAGEL:  Objection.  Asked and answered. |
| 10:03 | 9 | THE COURT:  Overruled. |
| 10:03 | 10 | THE WITNESS:  Probably. |
| 10:03 | 11 | BY MR. AVENATTI: |
| 10:03 | 12 | Q    And who do you recall being present on that call in |
| 10:03 | 13 | early April 2019? |
| 10:03 | 14 | A    I don't recall exactly, but it was probably Mr. Sagel, |
| 10:03 | 15 | and there was another AUSA back then who might have been on |
| 10:03 | 16 | the call. |
| 10:03 | 17 | Q    Mr. Andre? |
| 10:03 | 18 | A    I think so. |
| 10:03 | 19 | Q    Were there any agents on the call such as Special Agent |
| 10:03 | 20 | Carlos or Special Agent Kim? |
| 10:04 | 21 | A    I'm not sure. |
| 10:04 | 22 | Q    How long did that call last, roughly? |
| 10:04 | 23 | A    I don't recall. |
| 10:04 | 24 | Q    Was it more or less than a half hour? |
| 10:04 | 25 | A    I really don't have much recollection of it.  I'm |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 10:04 | 1 | pretty sure it would have been less than a half hour, but I |
| 10:04 | 2 | don't really recall the call specifically. |
| 10:04 | 3 | Q    Did they ask you generally about some of the same |
| 10:04 | 4 | topics that Mr. Sagel asked you about on direct? |
| 10:04 | 5 | A    I don't remember if they were asking me questions about |
| 10:04 | 6 | the context of the case at that time. |
| 10:05 | 7 | Q    Well, they were asking you about your involvement in |
| 10:05 | 8 | the settlement of Ms. Gardner's claims against |
| 10:05 | 9 | Mr. Whiteside, right?  I mean, that was the entire purpose |
| 10:05 | 10 | of the call; am I right? |
| 10:05 | 11 | A    Again I don't remember the call specifically.  I think |
| 10:05 | 12 | at some point they contacted me and asked if I had |
| 10:05 | 13 | represented my client in connection with the settlement with |
| 10:05 | 14 | Ms. Gardner. |
| 10:05 | 15 | Q    Well, let me see if I can refresh your recollection. |
| 10:05 | 16 | MR. AVENATTI:  Can I approach, Your Honor? |
| 10:05 | 17 | THE COURT:  You may. |
| 10:05 | 18 | (Document handed to the witness) |
| 10:05 | 19 | BY MR. AVENATTI: |
| 10:06 | 20 | Q    Mr. Weiner, does this document refresh your |
| 10:06 | 21 | recollection that the purpose of the call was to discuss the |
| 10:06 | 22 | civil matter between Ms. Gardner and Mr. Whiteside? |
| 10:06 | 23 | A    No. |
| 10:06 | 24 | Q    Isn't it true that on March 29, 2019, Mr. Sagel reached |
| 10:06 | 25 | out to you and asked to have a call with you about that |

| | | |
|---|---|---|
| 10:06 | 1 | matter? |
| 10:06 | 2 | A    I don't recall the specific date, but somewhere around |
| 10:06 | 3 | that time frame I did get contacted by Mr. Sagel about this |
| 10:06 | 4 | matter. |
| 10:06 | 5 | Q    And you subsequently set up the call that we were just |
| 10:06 | 6 | discussing, right? |
| 10:06 | 7 | A    I really don't remember the details. |
| 10:07 | 8 | Q    Take a look at 1039 and tell me if that refreshes your |
| 10:07 | 9 | recollection that that was the purpose of the call. |
| 10:07 | 10 | A    It does not. |
| 10:07 | 11 | Q    Sir, isn't it true that on or about April 2nd, 2019, |
| 10:07 | 12 | you told Mr. Sagel that you would have time the next day to |
| 10:07 | 13 | chat about this matter? |
| 10:07 | 14 |          MR. SAGEL:  Vague as to this matter, Your Honor. |
| 10:07 | 15 |          THE COURT:  Overruled. |
| 10:07 | 16 |          THE WITNESS:  I have no specific recollection of |
| 10:07 | 17 | that. |
| 10:07 | 18 | BY MR. AVENATTI: |
| 10:07 | 19 | Q    Do you dispute that you wrote that on or about |
| 10:07 | 20 | April 2nd, 2019? |
| 10:07 | 21 | A    I'm sorry.  That I wrote what? |
| 10:08 | 22 | Q    Do you dispute that on or about April 2nd, 2019, you |
| 10:08 | 23 | wrote to Mr. Sagel and you told him that you would have some |
| 10:08 | 24 | time the next day to chat about this matter? |
| 10:08 | 25 | A    I don't dispute that. |

47

| | | |
|---|---|---|
| 10:08 | 1 | Q    All right.  Now, after April 2019 what was the next |
| 10:08 | 2 | discussion that you had with Mr. Sagel or anyone from the |
| 10:08 | 3 | government regarding this case? |
| 10:08 | 4 | A    I don't recall the specific conversations. |
| 10:09 | 5 | Q    Well, I mean, can you estimate for the jury when the |
| 10:09 | 6 | next time was between April of 2019 and when you took the |
| 10:09 | 7 | stand here today? |
| 10:09 | 8 | A    Probably over the next, I don't know, within the week |
| 10:09 | 9 | or two after that, I guess. |
| 10:09 | 10 | Q    A week or two after April of 2019? |
| 10:09 | 11 | A    Around that time frame. |
| 10:09 | 12 | Q    And was that another telephone call? |
| 10:09 | 13 | A    I don't think I ever met with them in person. |
| 10:09 | 14 | Q    Do you recall how long that telephone call lasted? |
| 10:09 | 15 | A    No. |
| 10:09 | 16 | Q    When was the next time after that? |
| 10:09 | 17 | A    I don't know. |
| 10:09 | 18 | Q    Was it before or after July 1st, 2021, which was |
| 10:10 | 19 | earlier this month? |
| 10:10 | 20 | A    Before. |
| 10:10 | 21 | Q    Was it in 2019 or 2020? |
| 10:10 | 22 | A    I don't recall. |
| 10:10 | 23 | Q    I take it that that was another telephone because you |
| 10:10 | 24 | have already made it clear you didn't meet with them, right? |
| 10:10 | 25 | A    Yes. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 10:10 | 1 | Q    How long did that call last? |
| 10:10 | 2 | A    I don't recall the specific conversations back in 2019. |
| 10:10 | 3 | Q    Did you meet with them by telephone at all in 2020? |
| 10:11 | 4 | A    I don't recall specifically, but again generally I had |
| 10:11 | 5 | been -- had some contacts with them regarding the timing of |
| 10:11 | 6 | when this trial would take place. |
| 10:11 | 7 | Q    When was the next time you had any contact with them, |
| 10:11 | 8 | any communications related to the substance of the case? |
| 10:11 | 9 | A    The only time I can remember is a couple of weeks ago. |
| 10:11 | 10 | Q    That was on July 6, 2021; correct? |
| 10:12 | 11 | A    That sounds right. |
| 10:12 | 12 | Q    And you met with Special Agent Carlos, Special Agent |
| 10:12 | 13 | Roberson, Special Agent Kim, and both Assistant U.S. |
| 10:12 | 14 | Attorneys, Mr. Wyman and Mr. Sagel; right? |
| 10:12 | 15 | A    It was a phone call, and I believe they were all on the |
| 10:12 | 16 | call. |
| 10:12 | 17 | Q    And there was a gentleman by the name of the Michael |
| 10:12 | 18 | Verde present, right? |
| 10:12 | 19 | A    Yes. |
| 10:12 | 20 | Q    Was he your counsel at the time? |
| 10:12 | 21 | A    He is a lawyer at my firm who was advising me, yes. |
| 10:12 | 22 | Q    Was that the last time you communicated with anyone |
| 10:12 | 23 | from the government before you were called to testify |
| 10:12 | 24 | yesterday relating to any of the substance of this case? |
| 10:13 | 25 | A    I don't recall any phone calls after that relating to |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

10:13  1  the substance.

10:13  2  Q    Well, I'm not limiting it only to phone calls.  Any

10:13  3  communications regarding the substance after July 6th, 2021?

10:13  4  A    I was asked to review the voicemails that were played

10:13  5  yesterday.  And I can't recall -- there may have been one or

10:14  6  two quick conversations, or, not conversations, maybe

10:14  7  e-mails about the scheduling and about the exhibits and that

10:14  8  sort of thing.

10:14  9  Q    And during the meeting that took place -- I'm sorry.

10:14  10  Strike that.  During the video conference that took place on

10:14  11  July 6, 2021, it lasted about an hour and a half, right?

10:14  12  A    Did you say video conference?

10:14  13  Q    Yes.  On July 6, 2021, did you have a Webex video

10:14  14  conference, the conference we were just speaking about?

10:14  15  A    I think it was Webex, but I can't recall whether it was

10:14  16  a phone call.

10:14  17        MR. AVENATTI:  Your Honor, can I approach?

10:14  18        THE COURT:  You may.

10:14  19        (Document handed to the witness)

10:14  20  BY MR. AVENATTI:

10:15  21  Q    Mr. Weiner, I have handed you a document.  Does this

10:15  22  refresh your recollection that the conference we were

10:15  23  talking about occurred via video conference?

10:15  24  A    No.

10:15  25  Q    Take a look at the first page, upper right-hand corner.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

```
10:15    1   Does that refresh your recollection it was by video
10:15    2   conference on or about July 6th, 2021?
10:16    3   A      No.
10:16    4   Q      Now, during this -- we'll just call it a call; is that
10:16    5   fair?
10:16    6   A      Yes.
10:16    7   Q      During this call you were asked about the documents
10:16    8   that Mr. Sagel used on direct examination, right, at least a
10:16    9   number of them?
10:16   10   A      Yeah, exactly.  I don't know if it was every single
10:16   11   one, but, yes.
10:16   12   Q      And generally Mr. Sagel went through what questions he
10:16   13   was going to ask you before you testified, right?
10:16   14   A      It wasn't really a Q&A.  He just sort of said these are
10:16   15   the exhibits I'm going to ask you about and talked generally
10:17   16   about it.
10:17   17   Q      Well, he didn't just tell you what exhibits he was
10:17   18   going to ask about.  He sought answers from you; didn't he?
10:17   19   A      Again, it wasn't a question-and-answer sort of format.
10:17   20   We talked about the exhibits, and he may have asked me some
10:17   21   questions.
10:17   22   Q      Well, do you recall Mr. Sagel explaining to you at the
10:17   23   very start of the meeting that it was important that you
10:17   24   answer all questions truthfully and completely to the best
10:17   25   of your ability?
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 10:17 | 1 | A    You mean during that interview or in trial? |
| 10:17 | 2 | Q    No -- during that interview. |
| 10:17 | 3 | A    I don't recall specifically. |
| 10:17 | 4 | Q    Well, I mean, sir, this was only three weeks ago, |
| 10:17 | 5 | right? |
| 10:17 | 6 | A    Yes. |
| 10:17 | 7 | Q    Okay.  Do you believe you have a pretty good memory? |
| 10:17 | 8 | A    I don't know how to answer that. |
| 10:18 | 9 | Q    Well, I'm asking you, do you think you have a good |
| 10:18 | 10 | memory? |
| 10:18 | 11 | A    It gets me by. |
| 10:18 | 12 | Q    Okay.  Well, let's take a look at the document that |
| 10:18 | 13 | I've given you.  Take a look at the first page.  My question |
| 10:18 | 14 | is:  Does it refresh your recollection that Mr. Sagel said |
| 10:18 | 15 | that you needed to be truthful when answering questions? |
| 10:18 | 16 | A    He didn't need to tell me that.  You know, I just -- I |
| 10:18 | 17 | don't remember him saying that. |
| 10:18 | 18 | Q    You don't remember him saying that even after reviewing |
| 10:18 | 19 | this document? |
| 10:18 | 20 | A    I have never seen this document. |
| 10:18 | 21 | Q    I understand.  You have no recollection of Mr. Sagel |
| 10:18 | 22 | saying that; is that right? |
| 10:18 | 23 | A    I don't recall. |
| 10:18 | 24 | Q    One of the documents that Mr. Sagel asked you questions |
| 10:18 | 25 | about was Exhibit 135.  Do you remember that? |

10:19  1    A    I remember that's one of the documents that he sent to
10:19  2    me that was expected to be an exhibit.
10:19  3    Q    But you don't recall whether he asked you any questions
10:19  4    about it in your meeting only three weeks ago?
10:19  5    A    I don't recall any specific questions about it.  The
10:19  6    document kind of is what it is.
10:20  7    Q    All right.  Take a look at paragraph six of the
10:20  8    document that I handed you to refresh your recollection.  My
10:20  9    question is:  After reading paragraph six, does it refresh
10:20  10   your recollection that in fact Mr. Sagel asked you questions
10:20  11   about Exhibit 135?
10:20  12   A    Again, it was just a very busy period.  I just don't
10:20  13   remember.  That doesn't refresh my recollection.
10:20  14   Q    Do you dispute the fact that Mr. Sagel asked you about
10:20  15   Exhibit 135 when you met with the government on July 6th?
10:20  16   A    No.
10:21  17        MR. AVENATTI:  Please go to tab 135, next page --
10:21  18   or actually the first page is fine, Joe.  Blow up the top
10:21  19   half again.
10:21  20   BY MR. AVENATTI:
10:21  21   Q    When Mr. Sagel brought up this document to you, isn't
10:21  22   it true that you told him that it's somewhat common to send
10:21  23   these incomplete settlement agreements before mediation?
10:21  24   A    I don't recall.
10:21  25   Q    Take a look at paragraph six in the document that I

10:21  1    handed you and tell me if that refreshes your recollection

10:21  2    that that's what you told Mr. Sagel and his colleagues just

10:21  3    three weeks ago.

10:21  4    A    It doesn't refresh my recollection.  I just remember

10:22  5    having a discussion on those specifics.

10:22  6    Q    Do you dispute that that is what you told Mr. Sagel

10:22  7    three weeks ago?

10:22  8    A    No.

10:22  9    Q    All right.  Take a look at Exhibit 139.

10:22  10        MR. AVENATTI:  In particular, let's go to the next

10:22  11   page and blow up the top.

10:22  12   BY MR. AVENATTI:

10:22  13   Q    Mr. Sagel also asked you about this document three

10:23  14   weeks ago in preparation for your testimony; didn't he?

10:23  15   A    Yes.

10:23  16   Q    And at the time you told him that it is common practice

10:23  17   for settlement payments to be made into an attorney/client

10:23  18   trust account, right?

10:23  19   A    Yes, I think so.

10:24  20   Q    Did Mr. Sagel ever ask you any questions about what had

10:24  21   happened before December 22nd, 2016 -- in any of your

10:24  22   meetings with the government?

10:24  23        MR. SAGEL:  Vague as to anything that happened

10:24  24   before that date, Your Honor.

10:24  25        THE COURT:  Overruled.

| | | |
|---|---|---|
| 10:24 | 1 | THE WITNESS:  I really don't recall, I mean, if |
| 10:25 | 2 | the focus was the settlement agreement and payment, so I |
| 10:25 | 3 | don't remember. |
| 10:25 | 4 | BY MR. AVENATTI: |
| 10:25 | 5 | Q    You don't remember? |
| 10:25 | 6 | A    I don't remember. |
| 10:25 | 7 | Q    All right.  As you sit here today, you don't recall |
| 10:25 | 8 | that happening? |
| 10:25 | 9 | A    Correct. |
| 10:25 | 10 | Q    Did he ever ask you any questions about my dealings |
| 10:25 | 11 | with Mr. McLean before December 22nd, 2016? |
| 10:25 | 12 | A    Not that I recall. |
| 10:25 | 13 | Q    Did he ever ask you any questions about my dealings |
| 10:25 | 14 | with Mr. Pat Riley of the Miami Heat before December 22nd, |
| 10:25 | 15 | 2016? |
| 10:25 | 16 | A    Not that I recall. |
| 10:25 | 17 | Q    Did he ever ask you any questions about any telephone |
| 10:25 | 18 | conversations I had with Mr. McLean before you reached out |
| 10:25 | 19 | to him? |
| 10:25 | 20 | A    Not that I recall. |
| 10:25 | 21 | Q    Now, you were asked about this provision of the |
| 10:26 | 22 | settlement agreement relating to the $250,000 what I'll |
| 10:26 | 23 | describe as a holdback payment.  Do you recall that? |
| 10:26 | 24 | A    Yes. |
| 10:26 | 25 | Q    And why exactly was that part of the settlement? |

10:26   1   A     That's what the parties agreed to.

10:26   2   Q     Who demanded that that be part of the settlement

10:26   3   agreement?

10:26   4               MR. SAGEL:  Objection, 403, Your Honor.

10:26   5               MR. AVENATTI:  Sustained.

10:26   6   BY MR. AVENATTI:

10:26   7   Q     Mr. Sagel asked you a question on direct about this

10:26   8   $250,000 payment, and I believe you responded that it was to

10:27   9   protect the parties.  Do you recall that generally?

10:27  10   A     No.

10:27  11   Q     The $250,000 provision wasn't to protect the parties.

10:27  12   It was to protect your client, Mr. Whiteside, right?

10:27  13   A     It was a term of the agreement that the parties agreed

10:27  14   to.

10:27  15   Q     And it was in the agreement to protect your client,

10:27  16   Mr. Whiteside.  It had nothing to do with protecting

10:27  17   Ms. Gardner; did it?

10:27  18   A     Any agreement for the reasons stated in the agreement.

10:27  19   Q     Sir, isn't it true that it was in the agreement to

10:27  20   protect Mr. Whiteside and had nothing to do with protecting

10:27  21   Ms. Gardner?  Just answer that question, please.

10:27  22   A     My answer is that it's a term that the parties agreed

10:27  23   to for the reasons stated in the agreement.

10:28  24               MR. AVENATTI:  Move to strike as nonresponsive.

10:28  25               THE COURT:  Denied.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

10:28  1        We will take the mid-morning break here, ladies

10:28  2    and gentlemen.  We will be in recess for 15 minutes.  Please

10:28  3    remember the admonition not to discuss the case with anyone

10:28  4    and not to form any opinions on the issues in the case until

10:28  5    it is submitted to you.  And please do no research.

10:28  6                       (Recess taken at 10:28 a.m.;

10:28  7                        proceedings resumed at 10:45 a.m.)

10:28  8                  (Jury not present)

10:45  9        THE COURT:  Mr. Avenatti.

10:45  10       MR. AVENATTI:  Thank you, Your Honor.

10:45  11       Your Honor, my request relating to Jencks and 26.2

10:45  12   in this case at this point are well established.  I have one

10:45  13   memorandum of interview that I was provided by the

10:45  14   government at USAO 1143456.  It's a four-page memo that

10:45  15   relates to a memo on interview that took place on July 6th,

10:45  16   2021.

10:45  17       I think Your Honor has a copy of it because it was

10:45  18   used to refresh recollection of the witness.  At the end it

10:46  19   also refers to a subsequent e-mail that was received on

10:46  20   July 11, 2021.  I have no memorandum of interview or notes

10:46  21   from any interview of Mr. Weiner that took place in 2019 or

10:46  22   2020.

10:46  23       I think that the witness established on

10:46  24   cross-examination that the government had contact with the

10:46  25   witness.  I would like those notes so I can complete my

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

10:46  1  cross-examination, and I believe it's a violation of Jencks
10:46  2  and 26.2.  I can't cross-examine witnesses, Your Honor,
10:46  3  unless I'm provided the materials that I'm entitled to.
10:46  4  It's a fundamental violation of my right to due process.
10:46  5          THE COURT:  Mr. Sagel.
10:46  6          MR. SAGEL:  The July 6, 2021, interview is the
10:46  7  only interview of Mr. Weiner.  Every communication that took
10:46  8  place before, the early ones, were to obtain the records of
10:46  9  the settlement agreement that defendant had never given to
10:47 10  his client, so we needed to get it from Mr. Weiner.
10:47 11          Every other meeting that he keeps referring to and
10:47 12  that Mr. Weiner would follow up on was to find out when the
10:47 13  trial was going to be.  He's gotten all substantive Jencks.
10:47 14  There is nothing else, Your Honor.
10:47 15          MR. AVENATTI:  Your Honor, the e-mail
10:47 16  correspondence between Mr. Weiner and Mr. Sagel in 2019 was
10:47 17  specifically to talk about the litigation, the civil
10:47 18  litigation matter between Ms. Gardner and Mr. Whiteside.  We
10:47 19  have no notes from that meeting, and it is not sufficient
10:47 20  under Campbell just merely for the Court to make an inquiry
10:47 21  and for Mr. Sagel to stand up and say, well, they have
10:47 22  everything.
10:47 23          We don't have anything for two years, Your Honor,
10:47 24  and I'm entitled to those communications under Jencks and
10:47 25  26.2.

10:47  1          THE COURT:  If they exist.

10:47  2          MR. AVENATTI:  Well, can we get a representation

10:47  3  that no notes were taken during those interactions before

10:47  4  July 6, 2021?

10:48  5          THE COURT:  Mr. Sagel.

10:48  6          MR. SAGEL:  Any representation -- the problem is

10:48  7  Mr. Avenatti still doesn't know what Jencks is.  The notes

10:48  8  of an agent is not Mr. Weiner's statement.  So I'm not sure

10:48  9  if there are notes or not, but they still would not be

10:48  10  Jencks at least.  Again, he still needs to research what

10:48  11  Jencks is.

10:48  12          THE COURT:  Spell that out for me.

10:48  13          MR. SAGEL:  I'm not sure if there are any notes

10:48  14  because the only communications we had early on was there

10:48  15  was a confidential settlement agreement, and we sent him a

10:48  16  grand jury subpoena to get records.

10:48  17          There needed to be a discussion if he wanted to

10:48  18  make sure that these documents would be treated in a

10:48  19  confidential manner.  The communications were about keeping

10:48  20  them pursuant to a protective order because they didn't

10:48  21  trust the defendant with these documents.

10:48  22          Those were all the communications.  They had

10:48  23  nothing to do with this case or testifying in this matter.

10:48  24  Every subsequent communication had to do with when this

10:49  25  trial was going to be, and mostly not to do with Mr. Weiner

10:49  1    testifying but actually was going to be about his client.

10:49  2           We then agreed to let Mr. Weiner testify since he

10:49  3    was the one who received the communications from the

10:49  4    defendant and not his client.  Every communication was not

10:49  5    about the substance of his testimony in the slightest.  The

10:49  6    only time we had a communication or a meeting about the

10:49  7    substance of his testimony was July 6th of 2021.

10:49  8           So getting back to the notes issue, if that's what

10:49  9    I was supposed to spell out, is Jencks requires prior

10:49  10   statements of that witness.  If an agent took notes of that

10:49  11   witness, of that meeting, those would be the statements of

10:49  12   the agent.

10:49  13          If there is something in those notes that are

10:49  14   Brady or Giglio or some other evidentiary rule, yes, we

10:49  15   would have to turn those over.  But if the notes are -- and

10:50  16   again I don't even know as I sit here that there were any --

10:50  17   the notes were Mr. Weiner wants to keep these documents

10:50  18   confidential because they are pursuant to a confidentiality

10:50  19   agreement.  That has nothing to do with the substance of his

10:50  20   testimony, Brady, Giglio, or Jencks of that witness.

10:50  21          MR. AVENATTI:  Your Honor, if you look at 1039 --

10:50  22   I think you have a copy of it -- it was one of the documents

10:50  23   I used to refresh the recollection of the witness.  It

10:50  24   relates to this contact by Mr. Sagel on or about March 29,

10:50  25   2019.  I don't know if the Court has 1039.

| | | |
|---|---|---|
| 10:50 | 1 | MR. SAGEL:  Which was provided to defendant. |
| 10:50 | 2 | MR. AVENATTI:  May I approach just quickly, Your |
| 10:50 | 3 | Honor? |
| 10:50 | 4 | THE COURT:  Please. |
| 10:51 | 5 | (Court reviewing document) |
| 10:51 | 6 | THE COURT:  Okay. |
| 10:51 | 7 | MR. AVENATTI:  So on or about March 29th, |
| 10:51 | 8 | Mr. Sagel reached out to Mr. Weiner and he wanted to chat |
| 10:51 | 9 | about a civil matter in which he believed that Mr. Weiner |
| 10:51 | 10 | represented one of the parties.  They then had a |
| 10:51 | 11 | conversation around -- |
| 10:51 | 12 | THE COURT:  I recall this was used with the |
| 10:51 | 13 | witness. |
| 10:51 | 14 | MR. AVENATTI:  They then had a conversation about |
| 10:51 | 15 | the civil matter on April 3, 2019.  I don't have any notes |
| 10:51 | 16 | from that.  Now, Mr. Sagel -- this is the third time he's |
| 10:51 | 17 | disparaged me by saying I don't know what Jencks is.  Your |
| 10:51 | 18 | Honor, I can assure you I have read more on Jencks in the |
| 10:51 | 19 | last week than Mr. Sagel has in the last ten years. |
| 10:51 | 20 | I am very well versed on what the law is in the |
| 10:51 | 21 | Ninth Circuit and the Supreme Court relating to Jencks.  Why |
| 10:51 | 22 | is this?  Because we are continually confronted with |
| 10:51 | 23 | problems with -- |
| 10:51 | 24 | THE COURT:  Sir, please hold your voice down.  I |
| 10:52 | 25 | can hear you. |

10:52   1           MR. AVENATTI:  I'm sorry.  I don't mean to be

10:52   2   yelling, Your Honor.  I apologize.  It's the mask.  Your

10:52   3   Honor, I am well versed in what the law is relating to

10:52   4   Jencks.  Jencks includes text messages, e-mails, statements

10:52   5   of witnesses, statements that are adopted by witnesses.  It

10:52   6   can be agent notes that are adopted by the witness.  It can

10:52   7   be agent notes that are read back to the witness.  There is

10:52   8   a whole litany of case law about Jencks.  I'm very well

10:52   9   versed in it at this point.

10:52   10          The fact of the matter is, Your Honor, why would

10:52   11  we have this memorandum of interview typewritten from

10:52   12  July 6, 2021, but we don't have any notes from the two years

10:52   13  prior to that when they clearly talked to Mr. Weiner about

10:52   14  the substance of the case?

10:52   15          Your Honor, I think I have a solution.  All notes

10:52   16  relating to the contacts by the prosecution or investigation

10:52   17  team with Mr. Weiner, let's have them submitted to Your

10:53   18  Honor in camera, and Your Honor can decide if they're

10:53   19  Jencks.  And if they are, we get them and we'll make a

10:53   20  determination as to what motions we're going to file.

10:53   21          This is a continual problem in the case -- and

10:53   22  we're going to file on this -- because the two government

10:53   23  agents they called about the text messages and the other

10:53   24  things, no Jencks, Your Honor.  Actually I think we had one

10:53   25  interview statement from one of the government witnesses.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

10:53   1   They both testified on the stand that they had e-mail

10:53   2   communications about this case for I think about two years.

10:53   3   We didn't get any of those e-mail communications.  Those are

10:53   4   all Jencks.  It's textbook Jencks.

10:53   5          THE COURT:  They are not by definition textbook

10:53   6   Jencks.  It depends on the content.

10:53   7          MR. AVENATTI:  If they are communicating by e-mail

10:53   8   about the substance of this case that they then testify

10:53   9   about, it's Jencks.  And the fact of the matter --

10:53   10         THE COURT:  But you just stated the

10:53   11  qualification -- if they're statements about the substance

10:54   12  of this case.

10:54   13         MR. AVENATTI:  Correct.

10:54   14         THE COURT:  Okay.

10:54   15         MR. AVENATTI:  Correct.  And those two government

10:54   16  agents that the government called, I established -- and this

10:54   17  was not just by accident -- I established on

10:54   18  cross-examination that they had been communicating by e-mail

10:54   19  about this case.

10:54   20         We weren't given any of those e-mails before they

10:54   21  testified.  I still don't have them.  And, Your Honor, it's

10:54   22  not good enough for the government to come in and tell Your

10:54   23  Honor, well, we have just given them anything.  Let's have

10:54   24  some citations with Bates stamp numbers so that the court of

10:54   25  appeal if necessary -- hopefully it won't be necessary -- so

10:54  1  that somebody can actually determine whether stuff was
10:54  2  actually produced.
10:54  3      Let's have actual brass tacks citation to Bates
10:54  4  stamp numbers so when the government tells Your Honor we've
10:54  5  given Avenatti the text messages from Regnier, give me the
10:54  6  Bates stamp numbers.  To quote Your Honor the other day,
10:55  7  let's get to the bottom of this.  This isn't complicated.
10:55  8  Either the stuff was produced or it wasn't.  And if it was
10:55  9  produced, let's get a Bates stamp number.
10:55  10     THE COURT:  The representation was that any Jencks
10:55  11  material, that is, communications between the government and
10:55  12  Mr. Weiner that go to the substance of the case, were
10:55  13  produced.
10:55  14     I would ask the government if there are e-mails
10:55  15  that don't fall in that category, present it to the Court
10:55  16  for in-camera review.
10:55  17     MR. SAGEL:  Will do, Your Honor.
10:55  18     THE COURT:  That's what you asked for, and that's
10:55  19  what I'm going to do with respect to Mr. Weiner.
10:55  20     MR. AVENATTI:  I'm not --
10:55  21     THE COURT:  Sir, we've got a jury sitting here.
10:55  22  We can come back to this, and I'm sure we will, but we've
10:55  23  got a jury sitting here and we're going to commence.
10:55  24     MR. AVENATTI:  I'm not going to limit it to
10:55  25  e-mail.  That's all I'm going to say.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

```
10:55    1              (Jury present)
10:56    2              THE COURT:  Ladies and gentlemen, I'm trying out a
10:56    3    lavalier mic today because the court reporter is having
10:56    4    difficulty hearing me with this mask getting in the way of
10:56    5    the regular microphone.  I clipped essentially like a card
10:56    6    key here to keep the mic from wobbling around.  So let me
10:56    7    know when we break for lunch whether this is better or not.
10:57    8              Plus, a tech is going to come down and see if they
10:57    9    can adjust the sensitivity of this mic.  So let me know if
10:57   10    you have still have a problem before we go for lunch.
10:57   11              Mr. Avenatti.
10:57   12    BY MR. AVENATTI:
10:57   13    Q    Mr. Weiner, you were asked a number of questions on
10:57   14    direct about events taking place in 2019, the year 2019.  Do
10:57   15    you recall those questions by Mr. Sagel generally?
10:57   16    A    Not really.
10:57   17    Q    Well, do you recall on direct examination yesterday
10:57   18    afternoon and then earlier today Mr. Sagel was asking you
10:57   19    about things that happened in 2019, the year 2019?
10:58   20    A    I guess, you know, if you want to tell me the specific
10:58   21    questions.
10:58   22    Q    Well, he was asking you about the mediation and the
10:58   23    settlement, for instance, in 2019?
10:58   24              MR. SAGEL:  It was in 2017, Your Honor.
10:58   25              MR. AVENATTI:  I'm sorry, 2017.  I stand
```

10:58  1    corrected.

10:58  2    BY MR. AVENATTI:

10:58  3    Q    He was asking you about events four years ago, in 2017,

10:58  4    correct?

10:58  5    A    I think some of his questions pertained to that, yes.

10:58  6    Q    And then I was just asking you about events that took

10:58  7    place three weeks ago, right?

10:58  8    A    Yes.

10:58  9    Q    My question is:  In your experience does your memory

10:58  10   get better with time?

10:58  11   A    I don't know how to answer that.

10:58  12   Q    Well, how about just straightforward.  In your

10:58  13   experience does your memory get better with time?

10:58  14   A    I don't know if it gets better or worse.

10:59  15   Q    Do you have an explanation as to why you seem to have a

10:59  16   much better memory as it relates to 2017 than you do as it

10:59  17   relates to events of three weeks ago?

10:59  18   A    I don't think that's the case except with respect to,

10:59  19   you know, you're asking about on the one hand a phone call

10:59  20   in the midst of many other phone calls, and on the other

10:59  21   hand you're asking about a bigger proceeding.

10:59  22   Q    Well, do you regularly have phone calls and telephone

10:59  23   conferences with Assistant U.S. Attorneys and federal

10:59  24   agents?  Does that happen on a regular basis in your line of

10:59  25   work?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 10:59 | 1 | A    No. |
| 10:59 | 2 | Q    Now, is it fair to say that you do not know of any |
| 10:59 | 3 | communications -- strike that.  Is it fair to say that you |
| 10:59 | 4 | do not know the substance of any communications that I may |
| 10:59 | 5 | have had with Judge Meisinger relating to the |
| 11:00 | 6 | Gardner/Whiteside matter? |
| 11:00 | 7 | MR. SAGEL:  Objection.  Asked and answered and |
| 11:00 | 8 | previously sustained. |
| 11:00 | 9 | THE COURT:  Sustained. |
| 11:00 | 10 | BY MR. AVENATTI: |
| 11:00 | 11 | Q    Sir, is it fair to say that you don't have any |
| 11:00 | 12 | firsthand knowledge of any communications I had with Alexis |
| 11:00 | 13 | Gardner relating to the Gardner/Whiteside matter -- any |
| 11:00 | 14 | firsthand knowledge, sir? |
| 11:00 | 15 | A    That's correct. |
| 11:00 | 16 | Q    Do you have any firsthand knowledge of any |
| 11:00 | 17 | communications that I had with anyone else on the Whiteside |
| 11:00 | 18 | team other than you?  Legal team?  Business team? |
| 11:00 | 19 | MR. SAGEL:  Objection, relevance. |
| 11:00 | 20 | THE COURT:  Overruled. |
| 11:00 | 21 | THE WITNESS:  No. |
| 11:00 | 22 | BY MR. AVENATTI: |
| 11:00 | 23 | Q    Do you have any firsthand knowledge of any |
| 11:00 | 24 | communications that I had with Mr. McLean? |
| 11:01 | 25 | A    No. |

| | | |
|---|---|---|
| 11:01 | 1 | MR. AVENATTI:  Nothing further. |
| 11:01 | 2 | MR. SAGEL:  No redirect, Your Honor. |
| 11:01 | 3 | THE COURT:  May the witness be excused? |
| 11:01 | 4 | MR. AVENATTI:  We reserve the right to recall him, |
| 11:01 | 5 | Your Honor. |
| 11:01 | 6 | THE COURT:  Sir, you may be excused, but you are |
| 11:01 | 7 | subject to recall.  Thank you. |
| 11:01 | 8 | MR. SAGEL:  The government calls Alexis Gardner, |
| 11:01 | 9 | Your Honor. |
| 11:01 | 10 | I apologize, Your Honor, because the other witness |
| 11:02 | 11 | is in the witness room.  Ms. Gardner was down the hall. |
| 11:02 | 12 | THE COURT:  Okay. |
| 11:02 | 13 | ALEXIS GARDNER, GOVERNMENT'S WITNESS, SWORN |
| 11:04 | 14 | THE CLERK:  If I could please have you state and |
| 11:04 | 15 | spell your first and last name. |
| 11:04 | 16 | THE WITNESS:  My name is Alexis Gardner.  That's |
| 11:04 | 17 | A-l-e-x-i-s.  Last name, G-a-r-d-n-e-r. |
| 11:04 | 18 | THE CLERK:  Thank you. |
| 11:04 | 19 | THE COURT:  Could you pull the mic a little bit |
| 11:04 | 20 | closer to you, please.  Thank you. |
| 11:04 | 21 | Mr. Sagel. |
| 11:04 | 22 | MR. SAGEL:  Thank you, Your Honor. |
| 11:04 | 23 | DIRECT EXAMINATION |
| 11:04 | 24 | BY MR. SAGEL: |
| 11:04 | 25 | Q    Good morning, Ms. Gardner. |

| | | |
|---|---|---|
| 11:04 | 1 | A    Good morning. |
| 11:04 | 2 | Q    Where do you currently live -- not address, just city. |
| 11:04 | 3 | A    Los Angeles, California. |
| 11:04 | 4 | Q    What do you for a living? |
| 11:04 | 5 | A    Well, I'm currently a full-time student at Los Angeles |
| 11:05 | 6 | City College in the Theater Department. |
| 11:05 | 7 | Q    Make sure the microphone picks you up so we'll be able |
| 11:05 | 8 | to hear you. |
| 11:05 | 9 | A    Okay. |
| 11:05 | 10 | Q    You said you're in the Theater Department? |
| 11:05 | 11 | A    Yes.  I am a full-time student in the Theater Academy, |
| 11:05 | 12 | and I also sing and write music. |
| 11:05 | 13 | Q    And the singing and writing music is separate from |
| 11:05 | 14 | being a student? |
| 11:05 | 15 | A    Yes. |
| 11:05 | 16 | Q    What's your educational background? |
| 11:05 | 17 | A    Well, I'm currently in my second year of college, and I |
| 11:05 | 18 | also went to Marshall University for one year in 2009 and |
| 11:06 | 19 | 2010.  From K through 12, I went to 13 different schools, so |
| 11:06 | 20 | I have been to a lot of schools for my education. |
| 11:06 | 21 | Q    In approximately December 2016 were you in Los Angeles |
| 11:06 | 22 | at that time? |
| 11:06 | 23 | A    Yes. |
| 11:06 | 24 | Q    Where were you living in December of 2016? |
| 11:06 | 25 | A    Various places.  The Sofitel Hotel on La Cienega.  I |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 11:06 | 1 | can't remember the name of the apartment complex.  There was |
| 11:06 | 2 | also an apartment complex on Sunset Boulevard over by the |
| 11:06 | 3 | Home Depot. |
| 11:06 | 4 | Q    Your answer proved that I asked a very bad question, so |
| 11:06 | 5 | let me ask the follow-up question.  Prior to staying at the |
| 11:07 | 6 | Sofitel Hotel, so in November and the very beginning part of |
| 11:07 | 7 | December 2016, where were you living? |
| 11:07 | 8 | A    In my car. |
| 11:07 | 9 | Q    Why were you living in your car? |
| 11:07 | 10 | A    I was just very displaced with life, and I didn't |
| 11:07 | 11 | really have anywhere else to go. |
| 11:07 | 12 | Q    Do you know who Michael Avenatti is? |
| 11:07 | 13 | A    Yes. |
| 11:07 | 14 | Q    Did there come a time in December 2016 in which you met |
| 11:07 | 15 | Michael Avenatti? |
| 11:07 | 16 | A    Yes. |
| 11:07 | 17 | Q    What were the circumstances of how you were put in |
| 11:07 | 18 | touch with the defendant? |
| 11:07 | 19 | A    My mother via phone had -- I was just kind of going |
| 11:08 | 20 | through it, and I called my mother who was not entirely |
| 11:08 | 21 | friendly at the time.  And she kind of told me to hold on |
| 11:08 | 22 | and she would call me back, and she had someone that could |
| 11:08 | 23 | meet me and would be able to help me. |
| 11:08 | 24 | Q    And who was that person? |
| 11:08 | 25 | A    Michael. |

```
11:08   1   Q    Did you meet Mr. Avenatti?
11:08   2   A    Yes, that same day.
11:08   3   Q    And where was that?
11:08   4   A    At the Starbucks on Santa Monica Boulevard, the one
11:08   5   that's attached by the pavilion.
11:08   6   Q    There's probably about a couple hundred Starbucks on
11:08   7   that one street.
11:08   8   A    Right off of, I guess to be more specific, Santa Monica
11:08   9   and Robertson.
11:09  10   Q    Okay.  Who was at the meeting -- and you met
11:09  11   Mr. Avenatti at that Starbucks?
11:09  12   A    Yes.
11:09  13   Q    Who was there other than you and the defendant?
11:09  14   A    Patrons of Starbucks and the people that work there.
11:09  15   As far as just the meeting, it was just him and I.
11:09  16   Q    If I could have you look at Exhibit 132.  It should be
11:09  17   in binder two, Volume 2.
11:10  18   A    (Witness complies.)  Okay.
11:10  19   Q    Do you have Exhibit 132 in front of you?
11:10  20   A    Yes.
11:10  21   Q    Do you recognize that document?  Actually let me make
11:10  22   it even easier.  If you could turn to page 3 of Exhibit 132.
11:10  23   Do you recognize your signature on that document?
11:10  24   A    Yes.
11:10  25   Q    Do you recognize that this is a document that defendant
```

| 11:10 | 1 | had you sign during that meeting? |
| 11:10 | 2 | MR. AVENATTI:  Leading. |
| 11:10 | 3 | THE COURT:  Overruled. |
| 11:10 | 4 | THE WITNESS:  Yes. |
| 11:10 | 5 | BY MR. SAGEL: |
| 11:10 | 6 | Q    Is this a fair and accurate copy of the document you |
| 11:10 | 7 | signed that day? |
| 11:10 | 8 | A    Yes. |
| 11:10 | 9 | MR. SAGEL:  At this time, Your Honor, the |
| 11:10 | 10 | government moves to admit Exhibit 132. |
| 11:10 | 11 | MR. AVENATTI:  No objection. |
| 11:11 | 12 | THE COURT:  132 will be received. |
| 11:11 | 13 | (Exhibit 132 received in evidence) |
| 11:11 | 14 | MR. SAGEL:  If we could highlight the top portion |
| 11:11 | 15 | for now. |
| 11:11 | 16 | BY MR. SAGEL: |
| 11:11 | 17 | Q    Do you see that this document is titled |
| 11:11 | 18 | "Attorney/Client Fee Contract (Contingency)"? |
| 11:11 | 19 | A    Yes. |
| 11:11 | 20 | Q    On the day you met the defendant at the Starbucks, why |
| 11:11 | 21 | were you meeting him that day? |
| 11:11 | 22 | A    I'm not quite sure how to answer your question, but -- |
| 11:12 | 23 | Q    Let me ask it in a different way and we'll maybe go bit |
| 11:12 | 24 | by bit.  Did you know when you were meeting the defendant |
| 11:12 | 25 | that day that he was a lawyer? |

11:12   1   A    Yes.

11:12   2   Q    Why were you meeting with a lawyer that day at the

11:12   3   Starbucks?

11:12   4   A    So that -- so that I could have someone to basically

11:12   5   speak for me in a place where I didn't feel like I had a

11:12   6   voice.

11:12   7   Q    Prior to that meeting did you have a long-term

11:12   8   relationship with an individual by the name of Hassan

11:12   9   Whiteside?

11:12   10  A    (No response)

11:12   11  Q    Are you hesitant to answer because of the settlement

11:12   12  agreement?

11:12   13          THE COURT:  I don't think we need to address that

11:13   14  question.

11:13   15          MR. SAGEL:  Can she just be told that she's not

11:13   16  violating the confidentiality of that agreement?

11:13   17          THE COURT:  I don't think we need the answer to

11:13   18  that question.  Next question.

11:13   19  BY MR. SAGEL:

11:13   20  Q    Look at the first paragraph of this document, this

11:13   21  attorney/client fee contract.

11:13   22  A    (Witness complies.)

11:13   23  Q    The first paragraph says:  "This attorney/client fee

11:13   24  contract (this agreement) is a written fee contract that

11:13   25  California law requires lawyers to have with their clients.

11:13  1    It is between Eagan Avenatti, LLP, the attorney, and Alexis

11:13  2    Gardner, the client."

11:13  3            Do you remember this document being provided to

11:13  4    you that day during the meeting?

11:13  5    A    Yes.

11:13  6    Q    You had already mentioned that on page 3 that's your

11:13  7    signature to this agreement?

11:13  8    A    Yes.

11:14  9    Q    And next to your signature it's dated 12/5/16, and also

11:14  10   on the first page at the top it's also December 5th, 2016;

11:14  11   is that correct?

11:14  12   A    Yes.

11:14  13   Q    If you look at paragraph two of this document on

11:14  14   page 1, it says:  "Scope of Services."  Can you read the

11:14  15   portion after it says "Scope of Services."

11:14  16   A    "Client is hiring attorney to represent client in

11:14  17   connection with her affirmative claims arising out of the

11:14  18   her personal relationship with" --

11:15  19   Q    You can state his name.

11:15  20   A    Do I have to?

11:15  21   Q    You do.

11:15  22   A    -- "Hassan Whiteside.  Attorney will provide those

11:15  23   legal services reasonably required to represent client and

11:15  24   take reasonable steps to inform client of progress and to

11:15  25   respond to client's inquiries."

11:15   1    Q    At this time were you hiring defendant to do anything

11:15   2    for you other than this matter?

11:15   3    A    No.

11:15   4    Q    Other than this agreement that I am having you look at

11:15   5    right now, did you ever sign any other attorney/client fee

11:15   6    contract with the defendant?

11:15   7    A    No.

11:15   8    Q    If you look at paragraph four, there is a section

11:15   9    called legal fees, costs, and billing practices.  Do you see

11:15   10   that paragraph?  And that says:  "Attorney will receive a

11:15   11   contingent fee of 33 percent if a recovery defined below is

11:16   12   obtained between the date of this agreement and prior to

11:16   13   filing of a lawsuit or arbitration proceeding and contingent

11:16   14   fee of 40 percent of any recovery obtained after a filing of

11:16   15   a lawsuit or an arbitration proceeding."

11:16   16        Did the defendant discuss with you how he would be

11:16   17   paid if he were to represent you?

11:16   18   A    Yes.

11:16   19   Q    And what was your understanding of that?

11:16   20   A    That he will -- what you just read, that he would

11:16   21   receive 33 percent of what was recovered.

11:16   22   Q    And did you have to pay defendant anything in advance?

11:16   23   A    No.

11:17   24   Q    During that meeting when you signed this agreement, did

11:17   25   you understand you were hiring the defendant to represent

11:17   1   you?

11:17   2   A    Yes.

11:17   3   Q    What happened after that meeting?  That was a very poor

11:17   4   question.  Let me ask again.  After you left Starbucks that

11:17   5   day, did you have any communications with the defendant

11:17   6   about where you were going to be living next?

11:17   7   A    Yes.

11:17   8   Q    And you probably already answered this based on my poor

11:17   9   question before, but where did you stay next after this

11:17   10   meeting?

11:17   11   A    The Sofitel Hotel on La Cienega across from the Beverly

11:17   12   Center.

11:17   13   Q    And who did you work with to determine your living

11:18   14   situation?

11:18   15   A    Originally my contact was with Michael, and then

11:18   16   Michael connected me with his paralegal, Tom Cassaro.

11:18   17   Q    And you say that his paralegal, Tom Cassaro -- you

11:18   18   understood Mr. Cassaro to work at the defendant's firm?

11:18   19   A    Yes.

11:18   20   Q    I didn't ask you this.  The individual you met with at

11:18   21   the Starbucks on December 5th, 2016, is he in the courtroom?

11:18   22   A    Yes.

11:18   23   Q    Can you identify him by some article of clothing and

11:18   24   where he is.

11:18   25   A    (Witness pointing)  He is sitting at the table.

| | | |
|---|---|---|
| 11:19 | 1 | Q    Is he the individual who stood up a moment ago? |
| 11:19 | 2 | A    Yes. |
| 11:19 | 3 | THE COURT:  The record will indicate that the |
| 11:19 | 4 | witness has identified the defendant. |
| 11:19 | 5 | BY MR. SAGEL: |
| 11:19 | 6 | Q    Did you learn after hiring the defendant that there |
| 11:19 | 7 | would be a mediation involving your ex-boyfriend? |
| 11:19 | 8 | A    Yes. |
| 11:19 | 9 | Q    How soon after you met with the defendant did you learn |
| 11:19 | 10 | that there would be a mediation? |
| 11:19 | 11 | A    Within a couple weeks. |
| 11:20 | 12 | Q    And then after learning that there was a mediation, did |
| 11:20 | 13 | you actually attend a mediation? |
| 11:20 | 14 | A    Yes. |
| 11:20 | 15 | Q    And how long after that was it? |
| 11:20 | 16 | A    I don't understand the question. |
| 11:20 | 17 | Q    Do you remember between learning there would be a |
| 11:20 | 18 | mediation, was it shortly thereafter that you actually |
| 11:20 | 19 | attended that mediation? |
| 11:20 | 20 | A    Yes. |
| 11:20 | 21 | Q    Between the time you hired the defendant and the date |
| 11:20 | 22 | of the mediation, how long was it? |
| 11:20 | 23 | A    Roughly a month and a couple days. |
| 11:21 | 24 | Q    During the mediation who were you with? |
| 11:21 | 25 | A    Pretty much myself for most of it.  I was with Michael. |

| | | |
|---|---|---|
| 11:21 | 1 | I also saw the judge as well, but I spent most of the time |
| 11:21 | 2 | in a conference room with Michael. |
| 11:21 | 3 | Q    Did you ever communicate with the other side during |
| 11:21 | 4 | your mediation? |
| 11:21 | 5 | A    No. |
| 11:21 | 6 | Q    Did you have any -- let me back up.  Going into the |
| 11:21 | 7 | mediation, did you ever tell the defendant what you wanted |
| 11:21 | 8 | to get out of the case, what you were looking to get out of |
| 11:21 | 9 | the mediation? |
| 11:22 | 10 | A    The only thing I wanted was a roof over my head and to |
| 11:22 | 11 | not wonder where my meals were coming from. |
| 11:22 | 12 | Q    Did you ever tell the defendant how much you were |
| 11:22 | 13 | looking to get? |
| 11:22 | 14 | A    No. |
| 11:22 | 15 | Q    Did the defendant ever tell you how much you would be |
| 11:22 | 16 | getting through this mediation process prior to it? |
| 11:22 | 17 | A    No. |
| 11:22 | 18 | Q    How long was the mediation the process?  How long were |
| 11:22 | 19 | you there for? |
| 11:22 | 20 | A    A while, and it was a very long day.  I can't tell you |
| 11:23 | 21 | how many hours, but it went well into the evening.  It went |
| 11:23 | 22 | well into evening.  It was a long day.  I feel like it was, |
| 11:23 | 23 | like, a 15-hour day. |
| 11:23 | 24 | Q    What happened at the -- let me ask this question first. |
| 11:23 | 25 | Did your matter with Mr. Whiteside conclude that day?  Was |

11:23   1    there an agreement reached to your understanding?

11:23   2    A    Yes.

11:23   3    Q    How did you learn that there was an agreement reached

11:23   4    at the end of the mediation?

11:23   5    A    Michael came into the conference room where I was, and

11:23   6    he told me that they reached an agreement.  He told me the

11:23   7    amount and he told me to sign it and told me some things

11:23   8    about it, and he told me that everybody was kind of trying

11:24   9    to get out of there because we had been there so long.  And

11:24   10   he told me to sign it and that he would give me a copy.

11:24   11   Q    So let's walk through that.  Did you sign the

11:24   12   settlement agreement?

11:24   13   A    Yes.

11:24   14   Q    When you signed the settlement agreement, did the

11:24   15   defendant go over the document with you?

11:24   16   A    No.

11:24   17   Q    Did he have you -- did he read to you the portions of

11:24   18   the settlement agreement?

11:24   19   A    He told me some things but not everything.

11:24   20   Q    As it relates to the money or the amount of the

11:24   21   settlement, did he tell you that?

11:24   22   A    Yes.

11:25   23   Q    What did he tell you that you would be receiving as

11:25   24   part of the settlement?

11:25   25   A    He told me that they had settled for $3 million.

```
11:25   1   Q    Did he tell you how you would receive -- at that time
11:25   2   did he tell you how you would receive that money?
11:25   3   A    Yes.
11:25   4   Q    What did he tell you about how you would receive that
11:25   5   money?
11:25   6   A    He told me primarily I would receive a lump sum, and
11:25   7   then I would receive $20,000 a month direct deposited into
11:25   8   my bank account for the next eight years.
11:25   9   Q    And when you say you would receive a lump sum, did he
11:25   10  describe to you what the lump sum was about?
11:25   11  A    He never gave me a number of what the lump sum was.  He
11:25   12  just said lump sum.
11:25   13  Q    Did he tell you what the lump sum payment would be used
11:26   14  for?
11:26   15  A    So that I could get on my feet, pay off some of my
11:26   16  debt, and furnish my apartment.  I wouldn't have to worry
11:26   17  about that.
11:26   18  Q    And did he ever say to you when he would receive his
11:26   19  legal fees out of the settlement?
11:26   20  A    No.
11:26   21  Q    Did you know when his payment pursuant -- like, the
11:26   22  33 percent that you referred to, do you know when he was
11:26   23  going to receive that 33 percent?
11:26   24  A    It wasn't something that we had had a conversation
11:26   25  about, but my assumption was that it would be taken before I
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

80

```
11:26   1   would see what I would receive.
11:26   2        MR. SAGEL:  Actually if we can put up 132, if you
11:27   3   can pull up the very bottom paragraph of page 1.
11:27   4   BY MR. SAGEL:
11:27   5   Q   In your fee agreement contract, there is a paragraph at
11:27   6   the bottom of page 1 that says:  "If payment of all or any
11:27   7   part of the amount to be received will be deferred, such as
11:27   8   in the case of an annuity, a structured settlement, or
11:27   9   periodic payments, the recovery for purposes of calculating
11:27  10   the attorneys' fees will be the initial lump-sum payment
11:27  11   plus the present value as of the time of the binding
11:27  12   resolution of the payments to be received thereafter."
11:27  13        Is that where your understanding came from that he
11:27  14   would get his attorneys' fees at the beginning?
11:27  15   A   Well, he kept on telling me that I would get a lump
11:28  16   sum, and after not receiving it, at some point I just
11:28  17   assumed.
11:28  18   Q   Did he tell you anything that night when you signed the
11:28  19   settlement agreement about it being confidential?
11:28  20   A   Yes.
11:28  21   Q   What did he say about that?
11:28  22   A   He told me that it was confidential.  I couldn't tell
11:28  23   anybody about it.  He told me that my ex knew how my mother
11:28  24   was, and so they made it a part of the agreement that I
11:29  25   couldn't tell my mother.
```

11:29  1   Q    Did the defendant tell you anything about what would

11:29  2   happen to your settlement if you disclosed it to anybody?

11:29  3   A    Not to my recollection, but I had a general fear of

11:29  4   losing it if I did.

11:29  5   Q    If I have could have you look at Exhibit 139.

11:29  6        MR. SAGEL:  It's already in evidence, Your Honor.

11:29  7   BY MR. SAGEL:

11:29  8   Q    If you could look at page 5 of 139.

11:29  9   A    (Witness complies.)

11:29  10  Q    Is that your signature on page 5 of 139?

11:30  11  A    Yes.

11:30  12  Q    If you can read through the five pages.  Did defendant

11:30  13  ever give you this document?

11:30  14  A    No.

11:30  15  Q    When was the first time you saw this document in full?

11:30  16  A    When I sat down with the AUSAs.

11:30  17  Q    The first paragraph of page 139 says:  "This agreement

11:30  18  is dated as of the 7th day of January of 2017."  To your

11:30  19  recollection was that the day of your mediation?

11:30  20  A    Yes.

11:31  21  Q    If I can have you look at page 2, paragraph -- the

11:31  22  number two, payment.  Do you see that paragraph?

11:31  23  A    Yes.

11:31  24  Q    The paragraph says:  "As full and final settlement of

11:31  25  any and all claims and disputes, Whiteside will pay Gardner

11:31   1   the total sum of $3 million, the payment amount, as follows:
11:31   2   $2,750,000 using the best efforts to pay on or before
11:31   3   January 21st, 2017, but in no event any later than
11:31   4   January 28, 2017; and $250,000 on November 1st, 2020,
11:31   5   assuming Gardner has not been previously determined by the
11:32   6   arbiter to have violated the terms of this agreement."
11:32   7            I'm going to start with the first part of that.
11:32   8   Did defendant ever tell you that there was a $2,750,000
11:32   9   payment being made by no later than January 28th, 2017?
11:32  10   A    No.
11:32  11   Q    This paragraph that I just read to you, were these the
11:32  12   terms that defendant told you was the settlement at the end
11:32  13   of that night?
11:32  14   A    The 3 million, yes, but everything else, no, I didn't
11:32  15   know about that.
11:32  16   Q    If you look at page 3, the paragraph that starts with
11:32  17   the number five, advice of counsel, the paragraph says:
11:33  18   "Each party to this agreement" -- and if you look on the
11:33  19   first page, you're one of the parties to the agreement.
11:33  20   "Each party to this agreement has reviewed the agreement
11:33  21   independently, has had an opportunity to consult counsel, is
11:33  22   fully informed of the terms and effect of this agreement,
11:33  23   and has not relied in any way on any inducement,
11:33  24   representation, or advice of any other party in deciding to
11:33  25   enter into this agreement."

83

11:33   1          Did the defendant go over this advice of counsel

11:33   2     paragraph with you when you signed it?

11:33   3     A     No.

11:33   4     Q     So when you signed this agreement, did you even know

11:33   5     that this paragraph was there?

11:33   6     A     No.

11:33   7     Q     If you didn't see this agreement, why did you sign

11:34   8     page 5?

11:34   9     A     Because it was late and everybody was trying to leave,

11:34  10     and the lights were pretty much basically off in the

11:34  11     building.  So, I mean, I trusted my lawyer, and I also

11:34  12     trusted that I would get a copy of the agreement.

11:34  13     Q     When you say you trusted your lawyer, who was that?

11:34  14     A     Michael.

11:34  15     Q     After you left that mediation and signed the agreement,

11:35  16     what was your understanding of when you would be paid next

11:35  17     or when you would receive any money?

11:35  18     A     I didn't know.

11:35  19     Q     Did defendant ever tell you a date you were to expect

11:35  20     the money?

11:35  21     A     No.

11:35  22     Q     From the time of the mediation, which was January 7,

11:35  23     through January 25th, so for about three weeks, did you ever

11:35  24     have any discussions with the defendant that you were

11:35  25     worried that the settlement was falling apart?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

84

11:35   1    A      No.

11:35   2    Q      During those same three-week period, did you ever have

11:35   3    any concerns that the other side of the agreement was trying

11:35   4    to back out of the agreement?

11:35   5    A      Not to my recollection, no.

11:36   6    Q      Were you ever concerned that the $2.75 million was not

11:36   7    going to be deposited?

11:36   8    A      I didn't know about the 2.75 -- I thought I was getting

11:36   9    monthly deposits.  So, no, I never had a concern about it

11:36   10   because I didn't know about it.

11:36   11   Q      Soon after the settlement agreement, did you wind up

11:36   12   getting a new place to live?

11:36   13   A      Yes.

11:36   14   Q      Something more permanent than the -- let me ask you a

11:36   15   different way.  You mentioned the Sofitel Hotel and then you

11:37   16   mentioned a couple of apartments.  Were those apartments

11:37   17   like Airbnb's, short-term rentals?

11:37   18   A      Yes.

11:37   19   Q      So after the settlement agreement, did you then move

11:37   20   into a place that was slightly more permanent?

11:37   21   A      Yes.

11:37   22   Q      Who helped you with that process?

11:37   23   A      Michael and Tom Cassaro.

11:37   24   Q      Ms. Gardner, if you could look at Exhibit 146, which I

11:37   25   believe is in evidence, if you could look at the third page

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| 11:37 | 1 | of it. |
| 11:37 | 2 | A    (Witness complies.) |
| 11:37 | 3 | Q    Is that your signature on page 3? |
| 11:38 | 4 | A    Yes. |
| 11:38 | 5 | Q    And if you were to look at page 2, is that a letter |
| 11:38 | 6 | that defendant prepared on your behalf to get this apartment |
| 11:38 | 7 | you were going to live in? |
| 11:38 | 8 | A    Yes. |
| 11:38 | 9 | Q    Did you have any discussions with him about getting |
| 11:38 | 10 | this place to live? |
| 11:38 | 11 | A    Yes. |
| 11:38 | 12 | Q    How was this apartment going to be paid for?  To your |
| 11:38 | 13 | understanding what was going to pay for this apartment? |
| 11:38 | 14 | A    Money from my agreement, but at the time I thought it |
| 11:39 | 15 | came from the lump sum, the original money.  I didn't have |
| 11:39 | 16 | much of a rental history, so it wasn't the easiest for me to |
| 11:39 | 17 | get an apartment.  So for her to allow me to live there, |
| 11:39 | 18 | these were the only terms that she would agree to. |
| 11:39 | 19 | Q    And those terms including having the defendant assist |
| 11:39 | 20 | you with it? |
| 11:39 | 21 | A    Yes. |
| 11:39 | 22 | Q    And then when you say you were thinking that it would |
| 11:39 | 23 | be paid for from your lump sum, did you believe that that |
| 11:39 | 24 | money would be coming from Mr. Whiteside? |
| 11:39 | 25 | A    Yes. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

11:39   1           MR. AVENATTI:  Leading.

11:39   2           THE COURT:  Overruled.

11:39   3   BY MR. SAGEL:

11:39   4   Q    Did the defendant ever tell you he would be the one

11:39   5   paying for your apartment?

11:40   6   A    No.

11:40   7   Q    You mentioned before when defendant was describing the

11:40   8   terms of the settlement agreement to you.  Did he tell you

11:40   9   anything about -- if I have it right, you said you were

11:40   10  going to be paid monthly over eight years; is that correct?

11:40   11  A    Yes.

11:40   12  Q    What, if anything, did defendant tell you would happen

11:40   13  with your monthly payments in the first year because of this

11:40   14  apartment versus latter years?

11:40   15  A    So the first year my payments would only be $18,000 a

11:40   16  month because of the reduction of the rate, which was

11:40   17  roughly 5,000 or 4,000 a month.  Then after the year they

11:40   18  would go up to $20,000 a month.

11:41   19  Q    Who told you that?

11:41   20  A    Michael.

11:41   21  Q    And did the defendant ever tell you, whether it was the

11:41   22  $16,000 or the $20,000, did he ever tell you who would be

11:41   23  making those payments to you?

11:41   24  A    Yes -- my ex.

11:41   25  Q    And how did he tell you your ex-boyfriend would be

```
11:41   1   making those payments to you?
11:41   2   A    It would be a direct deposit on the 15th of every
11:41   3   month.
11:41   4   Q    If you could look at Exhibit 147, which is in evidence,
11:41   5   this is a cashier's check for $51,935 to Rachel Dourec.  Do
11:42   6   you see that?
11:42   7   A    Yes.
11:42   8   Q    Do you know what this represented?
11:42   9   A    It represented the year of my rent for my residence, so
11:42   10  12 months of roughly $4,000.
11:42   11  Q    And the security deposit?
11:42   12  A    Yes.
11:42   13  Q    After your settlement agreement -- let me go back.  In
11:42   14  January 25th, 2017, did defendant tell you he received a
11:43   15  $2.75 million wire transfer into his trust account from
11:43   16  Hassan Whiteside?
11:43   17  A    No.
11:43   18  Q    Would you have expected the defendant to tell you that
11:43   19  if he had received a $2.75 million wire transfer into his
11:43   20  account from Hassan Whiteside?
11:43   21  A    Yes.
11:43   22  Q    Why?
11:43   23  A    Because that's what I needed to help me.  I thought
11:43   24  that he would be honest and truthful with what we discussed.
11:43   25  Q    And after you moved into this residence that you just
```

11:43  1    talked about where Ms. Dourec was the landlord, did you

11:44  2    continue to have contact with the defendant?

11:44  3    A    Yes.

11:44  4    Q    And why did you have communications with the defendant

11:44  5    going forward?

11:44  6    A    Several reasons.  For one, he seemed to genuinely care

11:44  7    about my well-being.  As the year living in this apartment

11:44  8    went on, my deposits stopped coming.  They became late.  And

11:44  9    then months went by, and I would keep in contact just, for

11:44  10   one, just because I would reach out to him so that he could

11:45  11   reach out to the other side to secure the -- to, I guess,

11:45  12   get the deposit for me.

11:45  13   Q    When you reached out to the defendant when your

11:45  14   deposits weren't on time, why were you reaching out to the

11:45  15   defendant for that reason?

11:45  16   A    I had bills to pay.

11:45  17   Q    Who did you think was making those monthly deposits?

11:45  18   A    My ex.

11:45  19   Q    Why did you think your ex-boyfriend was making those

11:45  20   monthly deposits?

11:45  21   A    Because Michael told me that that's where they were

11:45  22   coming from.

11:45  23   Q    And when those monthly deposits were late, why did you

11:45  24   think it was your ex-boyfriend who was late with those

11:45  25   payments?

89

| | | |
|---|---|---|
| 11:46 | 1 | A    Because when I would call Michael, he would tell me |
| 11:46 | 2 | that they -- that he was going to call them to get them to |
| 11:46 | 3 | send it and to see why it was late or why it hadn't come. |
| 11:46 | 4 | Q    You mentioned them, and I have been referring to your |
| 11:46 | 5 | ex-boyfriend.  Who is them? |
| 11:46 | 6 | A    My ex and his team, so his lawyer and his financial |
| 11:46 | 7 | advisor. |
| 11:46 | 8 | Q    And who told you that he would reach out to them? |
| 11:46 | 9 | A    Michael.  He told me that he would reach out to them. |
| 11:46 | 10 | That's how he referred to them. |
| 11:46 | 11 | Q    If I could have you look at Exhibit 160, please.  There |
| 11:47 | 12 | is about 28 pages.  If you could just read through it and |
| 11:47 | 13 | tell me, once you have seen it, if you recognize what these |
| 11:47 | 14 | 28 pages are. |
| 11:47 | 15 | A    (Witness reading)  They are my text message |
| 11:47 | 16 | correspondence between Michael and I. |
| 11:47 | 17 | Q    Did you take screenshots from your cell phone or cell |
| 11:47 | 18 | phones of your correspondence between yourself and the |
| 11:47 | 19 | defendant? |
| 11:47 | 20 | A    Yes. |
| 11:47 | 21 | Q    Are these true and accurate copies of text message |
| 11:47 | 22 | correspondence between you and the defendant? |
| 11:47 | 23 | A    Yes. |
| 11:47 | 24 | MR. SAGEL:  At this time, Your Honor, the |
| 11:47 | 25 | government moves to admit Exhibit 160. |

11:47    1        MR. AVENATTI: Objection, Your Honor. Hearsay,

11:47    2   authentication, foundation.

11:48    3        THE COURT: 160 will be received.

11:48    4        To the extent any of these messages are from

11:48    5   Mr. Avenatti, that's for the truth. To the extent they're

11:48    6   from the witness, they will be received for notice. That

11:48    7   is, she said that or sent that to Mr. Avenatti, not that

11:48    8   what's in there is true.

11:48    9        (Exhibit 160 received in evidence)

11:48   10   BY MR. SAGEL:

11:48   11   Q   Now, let's start with the first page. The date on this

11:48   12   first page is March 24th, 2018; is that correct?

11:48   13   A   Yes.

11:48   14   Q   And these aren't all of your text messages with Michael

11:48   15   Avenatti; is that correct?

11:48   16   A   I want to say no because I didn't fully read through

11:49   17   page by page, so I'm going to say no. But on the ones that

11:49   18   I did see, yes.

11:49   19   Q   Of the ones you see you know you sent and received, but

11:49   20   you don't know if these are all the text messages?

11:49   21   A   Yes.

11:49   22        MR. AVENATTI: Leading.

11:49   23        THE COURT: Sustained.

11:49   24        MR. AVENATTI: Move to strike the answer, Your

11:49   25   Honor.

| | | |
|---|---|---|
| 11:49 | 1 | THE COURT:  It will be stricken. |
| 11:49 | 2 | BY MR. SAGEL: |
| 11:49 | 3 | Q    The first text messages on this page is March 24th, |
| 11:49 | 4 | 2018.  Do you see that? |
| 11:49 | 5 | A    Yes. |
| 11:49 | 6 | Q    Did you have any text message communications between |
| 11:49 | 7 | yourself and the defendant between 2017 and 2018? |
| 11:49 | 8 | A    Yes. |
| 11:49 | 9 | Q    Can I have you look at page 2 at the bottom.  There is |
| 11:50 | 10 | a text message that you send to defendant on March 28, 2018. |
| 11:50 | 11 | Do you see that? |
| 11:50 | 12 | A    Yes. |
| 11:50 | 13 | Q    Can you tell the jury what you wrote to the defendant |
| 11:50 | 14 | on March 28? |
| 11:50 | 15 | A    "Hey, Michael.  Hope all is well.  Quick question.  Any |
| 11:50 | 16 | update on my deposit for this month?" |
| 11:50 | 17 | Q    When you say any update on my deposit, what are you |
| 11:50 | 18 | referring to? |
| 11:50 | 19 | A    To the monthly deposit I was supposed to receive on |
| 11:50 | 20 | March 15th. |
| 11:50 | 21 | Q    And who were you expecting the update to come from? |
| 11:50 | 22 | A    Michael, because Michael had the correspondence, so I |
| 11:50 | 23 | was expecting him to update me. |
| 11:50 | 24 | Q    And he had the correspondence with whom? |
| 11:50 | 25 | A    With my ex and his counsel. |

11:51  1   Q    And that was based on your understanding of what he

11:51  2   told you?

11:51  3   A    Yes.

11:51  4   Q    And what was defendant's reply?

11:51  5   A    "Did you not get it?"

11:51  6   Q    If you would turn to the next page, you replied to his

11:51  7   "Did you not get it?"

11:51  8   A    "No."

11:51  9   Q    And what did he say when you said no?

11:51  10  A    "I will find out," with four exclamation points.

11:51  11  Q    And what was your understanding when he said, "I will

11:51  12  find out," with the exclamation points?

11:51  13  A    That he would call them and find out why they haven't

11:51  14  sent my deposit.

11:51  15  Q    And if you look down two text messages, the 8:02 p.m.

11:52  16  one, that's on April 6th; is that correct?

11:52  17  A    Yes.

11:52  18  Q    Did you send another text message to defendant at that

11:52  19  point?

11:52  20  A    Yes.

11:52  21  Q    What did you text the defendant at that time?

11:52  22  A    "Hey, Michael.  I'm at a dinner.  Let's talk tomorrow.

11:52  23  I didn't get my deposit yet."

11:52  24  Q    When you refer to your deposit, is that the same

11:52  25  deposit we were talking about before?

11:52    1    A    Yes.

11:52    2    Q    What was the defendant's response to you?

11:52    3    A    "Okay.  I will make sure it happens Monday."

11:52    4    Q    And what was your understanding of what he would do to

11:52    5    make sure it happened Monday?

11:52    6    A    Contact my ex.

11:53    7    Q    Then do you see four days later on April 10th, you send

11:53    8    another text and it starts on this page and continues to the

11:53    9    next.  Can you read what you wrote to the defendant on

11:53   10    April 10.

11:53   11    A    "Hey, Michael.  I still didn't get the deposit.  It's

11:53   12    the 10th.  So you think they can just send last month's and

11:53   13    this month's together so we don't have to figure it out

11:53   14    again next week?"

11:53   15    Q    Let's start with what you wrote.  "It's the 10th."  Why

11:53   16    are you talking about last month and next month on the 10th?

11:53   17    A    Because they had already -- per my understanding, they

11:53   18    had already missed March, and this was five days prior to

11:54   19    the 15th of April.  So with them making it happen, so to

11:54   20    speak, I was trying to see if he could ensure that I got

11:54   21    April's as well as March's so we didn't have to go through

11:54   22    the same correspondence within the next week.

11:54   23    Q    When you said, "So you think they can just send," who

11:54   24    are you referring to as they?

11:54   25    A    My ex and his counsel.

94

11:54   1    Q    What was the defendant's response to your text message?

11:54   2    A    "Yes.  I will make it happen."

11:54   3    Q    Several days later on April 17th, you will see that

11:54   4    there is a text message that starts on the bottom of page 4

11:54   5    and continues to page 5.  Do you recognize what you're

11:55   6    sending to defendant there?

11:55   7    A    Yes.

11:55   8    Q    What are you sending to the defendant there?

11:55   9    A    My Chase account number and routing number.

11:55   10   Q    Do you know why you are sending the defendant your

11:55   11   banking information there?

11:55   12   A    He asked me to send it to him.

11:55   13   Q    What did he tell you was the reason he needed your

11:55   14   Chase banking account information?

11:55   15   A    To send to them.

11:55   16   Q    At that point you had received some deposits; is that

11:55   17   correct?

11:55   18   A    Yes.

11:55   19   Q    And who did you think was making the deposits up until

11:55   20   that point?

11:55   21   A    My ex.

11:55   22   Q    Do you know why they would need your banking deposit

11:55   23   information at this point?

11:55   24   A    (No response)

11:55   25   Q    Let me ask a different question.  Had it changed?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

11:56   1   A     No.

11:56   2   Q     Do you know why the defendant over a year after your

11:56   3   settlement agreement is asking you for your banking account

11:56   4   information for the deposits?

11:56   5   A     No.

11:56   6   Q     Did defendant tell you at this time that he or his

11:56   7   office manager were making the deposits into your banking

11:56   8   account?

11:56   9   A     No.

11:56   10   Q     Did he ever tell you that he or his office manager were

11:56   11   making the deposits into your account?

11:56   12   A     No.

11:56   13   Q     Would you have expected him to tell you that if he and

11:56   14   his office manager were making the deposits into your

11:56   15   account?

11:57   16   A     It's a tough question.  That wasn't what I was

11:57   17   expecting, but -- that wasn't what I was expecting at all.

11:57   18   I was expecting that it was someone else.  So I guess, yes,

11:57   19   yes, yes.  If he would make a deposit versus it coming from

11:57   20   them, I would have expected that he would have told me.

11:57   21   Q     On the same date, April 17th, that you sent your bank

11:57   22   account information to the defendant, right below that you

11:57   23   send another text message to the defendant started with

11:57   24   "hey."  Do you see that?

11:57   25   A     Yes.

| | | |
|---|---|---|
| 11:57 | 1 | Q    What did you say? |
| 11:57 | 2 | A    "Hey, Michael.  They sent me 34K." |
| 11:57 | 3 | Q    And who are you referring to as they? |
| 11:58 | 4 | A    My ex and his attorney. |
| 11:58 | 5 | Q    If I could have you look -- |
| 11:58 | 6 | MR. SAGEL:  Do you want to take the break now? |
| 11:58 | 7 | THE COURT:  We'll take it now. |
| 11:58 | 8 | Ladies and gentlemen, we will take the lunch break |
| 11:58 | 9 | at this time.  We will be in recess until 1:30.  Please |
| 11:58 | 10 | remember the admonition not to discuss the case with anyone |
| 11:58 | 11 | and not to form any opinions on the issues in the case until |
| 11:58 | 12 | it is submitted to you.  And do not do any research. |
| 11:58 | 13 | We'll see you at 1:30. |
| 11:58 | 14 | (Jury not present) |
| 11:58 | 15 | THE COURT:  You may step down. |
| 11:59 | 16 | We will be in recess. |
| 11:59 | 17 | (Recess taken at 11:59 a.m.) |
| 11:59 | 18 | *    *    * |
| 11:59 | 19 | |
| 11:59 | 20 | |
| 11:59 | 21 | |
| 11:59 | 22 | |
| 11:59 | 23 | |
| 11:59 | 24 | |
| 11:59 | 25 | |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

11:59     1

11:59     2

11:59     3

11:59     4                         CERTIFICATE

11:59     5

11:59     6          I hereby certify that pursuant to Section 753,

11:59     7     Title 28, United States Code, the foregoing is a true and

11:59     8     correct transcript of the stenographically reported

11:59     9     proceedings held in the above-entitled matter and that the

11:59    10     transcript page format is in conformance with the

11:59    11     regulations of the Judicial Conference of the United States.

11:59    12

11:59    13     Date:  July 31, 2021

11:59    14

11:59    15
11:59
11:59    16                    /s/   Sharon A. Seffens  7/31/21
11:59                                _____
11:59    17                    SHARON A. SEFFENS, U.S. COURT REPORTER

         18

         19

         20

         21

         22

         23

         24

         25

MR. AVENATTI: [61]  4/9 4/25 5/3 5/6 5/9
5/13 5/17 5/21 6/10 6/17 7/7 9/5 10/5 10/7
10/15 11/15 12/12 12/20 12/25 13/5 13/9
13/23 15/15 20/15 25/18 25/22 25/25 27/1
27/22 36/16 37/17 39/22 42/16 45/16 49/17
52/17 53/10 55/5 55/24 56/10 57/15 58/2
59/21 60/2 60/7 60/14 61/1 62/7 62/13 62/15
63/20 63/24 64/25 67/1 67/4 71/2 71/11 86/1
90/1 90/22 90/24
MR. SAGEL: [47]  4/5 7/2 7/6 13/10 13/19
15/13 19/21 22/22 24/9 24/15 24/22 27/8
28/25 30/10 30/17 32/14 34/14 34/19 35/24
38/4 40/16 41/20 42/3 42/15 42/22 44/8 46/14
53/23 55/4 57/6 58/6 58/13 60/1 63/17 64/24
66/7 66/19 67/2 67/8 67/22 71/9 71/14 72/15
80/2 81/6 89/24 96/6
MR. WYMAN: [2]  7/18 8/20
THE CLERK: [8]  4/3 5/4 13/17 14/5 14/8
14/11 67/14 67/18
THE COURT: [96]  4/8 4/17 5/2 5/8 5/11 5/15
5/19 5/22 6/14 6/19 7/4 7/12 8/19 9/4 9/7 10/6
10/11 11/6 12/11 12/18 13/22 13/8 13/12
13/22 14/1 15/17 19/22 22/23 24/11 24/17
24/23 25/5 25/20 25/24 27/2 27/11 27/23 29/2
29/9 30/11 30/18 32/15 34/15 34/21 35/25
36/8 36/14 36/18 37/15 38/5 39/14 40/17
41/21 42/4 42/18 42/23 44/9 45/17 46/15
49/18 53/25 55/25 56/9 57/5 58/1 58/5 58/12
60/4 60/6 60/12 60/24 62/5 62/10 62/14 63/10
63/18 63/21 64/2 66/9 66/20 67/3 67/6 67/12
67/19 71/3 71/12 72/13 72/17 76/3 86/2 90/3
90/23 91/1 96/7 96/15
THE WITNESS: [12]  14/7 14/10 24/24 27/12
29/11 37/18 44/10 46/16 54/1 66/21 67/16
71/4

**$**

$16,000 [1]  86/22
$18,000 [1]  86/15
$2,750,000 [3]  15/23 82/2 82/8
$2.75 [8]  16/7 16/23 17/1 18/8 19/15 84/6
87/15 87/19
$2.75 million [8]  16/7 16/23 17/1 18/8 19/15
84/6 87/15 87/19
$20,000 [3]  79/7 86/18 86/22
$250,000 [5]  17/16 54/22 55/8 55/11 82/4
$3 [2]  78/25 82/1
$3 million [1]  82/1
$4,000 [1]  87/10
$51,935 [1]  87/5

**'**

'adverse [1]  9/17

**/**

/s [1]  97/15

**0**

0870 [1]  1/21

**1**

1-1053 [1]  1/20
1-7-17 [1]  16/16
1/7/17 [1]  16/17
10 [1]  93/10
1039 [3]  46/8 59/21 59/25
1053 [1]  1/20
107 [1]  2/16
10:28 [1]  56/6
10:45 [1]  56/7
10th [4]  93/7 93/12 93/15 93/16
11 [1]  56/20
1100 [1]  2/7
1143456 [1]  56/14
11:59 [1]  96/17
12 [4]  1/12 27/16 68/19 87/10
12/5/16 [1]  73/9
12th [3]  28/8 28/20 29/5

13 [1]  68/19
132 [2]  1/9 70/16 70/19 70/22 71/10 71/9
71/13 80/2
1344 [1]  9/25
135 [6]  20/12 32/18 51/25 52/11 52/15 52/17
139 [7]  36/25 40/6 53/9 81/5 81/8 81/10 81/17
14 [1]  3/6
141 [2]  39/20 40/24
144 [6]  41/6 41/7 41/10 41/13 41/23 41/24
146 [1]  84/24
147 [1]  87/4
149 [8]  3/9 14/17 14/19 14/21 15/14 15/17
15/19 42/25
14th [1]  30/23
15 [2]  3/9 56/2
15-hour [1]  77/23
15th [1]  91/20
15th of [2]  87/2 93/19
16 [2]  31/10 73/9
160 [5]  3/10 89/1 89/25 90/3 90/9
16th [4]  31/15 31/20 39/24 41/25
17 [2]  16/16 16/17
17/01/25 [1]  16/4
17th [2]  94/3 95/21
19 [1]  3/6
1992 [1]  10/1
1:30 [2]  96/9 96/13
1st [3]  17/20 47/18 82/4

**2**

2.75 [1]  84/8
2009 [1]  68/18
2010 [1]  68/19
2016 [24]  21/1 21/2 21/4 21/15 21/18 23/21
27/16 28/8 28/21 29/5 30/25 31/10 31/20
31/25 32/5 53/21 54/11 54/15 68/21 68/24
69/7 69/14 73/10 75/21
2017 [18]  16/4 16/5 19/16 37/10 39/24 40/4
41/25 41/25 64/24 64/25 65/3 65/16 81/18
82/3 82/4 82/9 87/14 91/7
2018 [4]  90/12 91/4 91/7 91/10
2019 [22]  19/16 43/21 43/25 44/13 45/24
46/11 46/20 46/22 47/1 47/6 47/10 47/21 48/2
56/21 57/16 59/25 60/15 64/14 64/14 64/19
64/19 64/23
2020 [5]  17/20 47/21 48/3 56/22 82/4
2021 [15]  1/17 4/1 47/18 48/10 49/3 49/11
49/13 50/2 56/16 56/20 57/6 58/4 59/7 61/12
97/13
20th [3]  31/25 32/5 41/24
21 [1]  97/15
213 [1]  2/8
21st [5]  21/1 37/4 37/9 40/4 82/3
22 [2]  21/15 21/18
22nd [6]  21/2 21/4 30/25 53/21 54/11 54/14
24th [2]  90/12 91/3
25 [2]  16/4 16/5
25th [4]  16/4 19/16 83/23 87/14
26.2 [4]  7/9 56/11 57/2 57/25
28 [6]  82/4 89/12 89/14 91/10 91/14 97/7
28th [3]  37/3 37/7 82/9
29 [2]  45/24 59/24
29th [1]  60/7
2:52 [1]  5/2
2d [1]  9/15
2nd [3]  46/11 46/20 46/22

**3**

3 million [1]  82/14
30 [2]  1/17 4/1
31 [1]  97/13
312 [1]  2/7
33 [1]  74/11
33 percent [3]  74/21 79/22 79/23
338-3598 [1]  2/12
34K [1]  96/2
3598 [1]  2/12
3:30 [1]  31/16
3:30 p.m [1]  31/21

4,000 [1]  86/17
40 percent [1]  74/14
403 [8]  30/10 32/14 34/14 34/19 35/24 36/20
38/4 55/4
411 [2]  1/20 2/11
481-4900 [1]  2/17
4900 [1]  2/17
4th [3]  1/20 5/14 5/16

**5**

5,000 [1]  86/17
543-0870 [1]  1/21
5th [2]  73/10 75/21

**6**

609 [1]  6/3
612 [9]  7/14 7/16 7/19 7/24 8/13 9/20 10/19
11/2 11/9
6183 [1]  9/15
6683 [1]  2/8
67 [1]  3/6
6:28 [1]  28/8
6th [6]  49/3 50/2 52/15 56/15 59/7 92/16

**7**

7/31/21 [1]  97/15
71 [1]  3/9
714 [2]  1/21 2/12
753 [1]  97/6
7th [1]  81/18

**8**

8000 [1]  2/11
85 [1]  12/10
87 [1]  12/10
894-6683 [1]  2/8
8:02 p.m [1]  92/15
8:16 [1]  6/21
8:30 [2]  4/21 5/15
8:31 [1]  4/1
8:45 [1]  13/14

**9**

90 [1]  3/10
90012 [1]  2/8
92672 [1]  2/16
92701 [2]  1/20 2/11
949 [1]  2/17
974 [1]  9/25
9:00 [1]  4/20
9:02 [1]  13/15

**A**

a.m [7]  4/1 4/20 13/14 13/15 56/6 56/7 96/17
ability [1]  50/25
able [5]  5/25 31/21 32/1 68/7 69/23
about [131]  21/11 28/23 97/9
above [3]  21/11 28/23 97/9
above-entitled [1]  97/9
above-referenced [1]  28/23
Academy [1]  68/11
accept [3]  10/2 30/7 30/15
acceptable [1]  4/15
accident [1]  62/17
accomplished [1]  39/15
account [12]  16/11 53/18 79/8 87/15 87/20
94/9 94/14 95/3 95/8 95/11 95/15 95/22
accurate [4]  15/1 15/4 71/6 89/21
across [1]  75/11
Act [1]  7/9
action [1]  19/18
actions [1]  19/11
actual [1]  63/3
actually [13]  6/15 31/21 38/1 42/7 52/18 59/1
61/24 63/1 63/2 70/21 76/13 76/18 80/2
addition [1]  15/6
address [2]  68/2 72/13
adequate [3]  6/12 6/22 36/1

**A**
**adjust** [1] 64/9
**admission** [2] 7/21 7/24
**admit** [4] 8/25 10/12 71/10 89/25
**admitted** [1] 7/14
**admitting** [1] 8/13
**admonition** [2] 56/3 96/10
**adopted** [2] 61/5 61/6
**advance** [1] 74/22
**adverse** [14] 7/16 8/15 8/21 8/23 9/2 9/3 9/10 9/13 9/18 9/23 10/19 10/20 10/21 11/9
**advice** [3] 82/17 82/24 83/1
**advised** [1] 5/16
**advising** [1] 48/21
**advisor** [4] 22/6 41/16 43/5 89/7
**advisory** [3] 2/15 4/10 6/14
**affirmative** [1] 73/17
**after** [38] 11/11 17/1 17/6 17/13 18/2 18/8 18/14 19/15 23/24 30/6 30/13 38/7 47/1 47/9 47/10 47/16 47/18 48/25 49/3 51/18 52/9 73/15 74/14 75/3 75/9 76/6 76/9 76/12 76/15 80/16 83/15 84/11 84/19 86/17 87/13 87/25 95/2
**afternoon** [7] 12/10 20/14 31/15 31/16 31/20 31/20 64/18
**again** [19] 5/12 14/9 24/24 25/4 25/11 25/16 26/21 27/12 30/21 30/25 45/11 48/4 50/19 52/12 52/19 58/10 59/16 75/4 93/14
**against** [5] 19/11 19/18 22/2 32/2 45/8
**agent** [12] 4/7 13/21 44/19 44/20 48/12 48/12 48/13 58/8 59/10 59/12 61/6 61/7
**agents** [5] 43/12 44/19 61/23 62/16 65/24
**ago** [10] 48/9 51/4 52/4 53/3 53/7 53/14 65/3 65/7 65/17 76/1
**agree** [2] 6/10 85/18
**agreed** [5] 40/10 55/1 55/13 55/22 59/2
**agreement** [80] 17/4 17/8 17/10 17/11 17/13 17/14 17/19 17/22 17/24 18/2 18/3 18/19 18/25 36/2 36/19 36/25 37/3 37/6 37/25 38/7 38/9 38/13 38/20 38/23 39/3 39/7 39/12 39/18 40/4 40/6 40/11 54/2 54/22 55/3 55/13 55/15 55/18 55/19 55/23 57/9 58/15 59/19 72/12 72/16 72/24 73/7 74/4 74/12 74/24 78/1 78/3 78/6 78/12 78/18 78/20 80/5 80/19 80/24 81/17 82/6 82/18 82/19 82/20 82/20 82/22 82/23 82/23 82/24 83/7 83/15 84/3 84/4 84/11 84/19 85/14 86/8 87/13 95/3
**agreements** [1] 52/23
**Airbnb's** [1] 84/17
**ALEXANDER** [2] 2/5 4/6 13/20
**ALEXIS** [6] 3/6 66/12 67/8 67/13 67/16 73/1
**all** [27] 10/7 11/17 21/25 29/15 33/3 33/20 33/21 35/3 41/13 47/1 48/3 48/15 50/24 52/7 53/9 54/7 57/13 58/22 61/15 62/4 63/25 80/6 81/25 90/14 90/20 91/15 95/17
**allegations** [3] 22/2 26/14 44/7
**allegedly** [1] 12/5
**allow** [1] 85/17
**allowed** [2] 17/12 18/2
**allows** [1] 7/24
**almost** [1] 30/6
**already** [8] 9/14 10/11 47/24 73/6 75/8 81/6 93/17 93/18
**also** [18] 4/6 8/15 11/3 23/24 29/15 29/19 32/20 34/11 34/12 53/13 56/19 68/12 68/18 69/2 73/9 73/10 77/1 83/11
**am** [9] 10/23 20/9 39/16 43/21 45/10 60/20 61/3 68/11 74/4
**AMERICA** [3] 1/9 4/4 13/18
**amount** [5] 15/22 78/7 78/20 80/7 82/1
**Ana** [1] 1/16 1/20 2/11 4/1
**Andre** [2] 43/12 44/17
**Angeles** [4] 2/8 68/3 68/5 68/21
**annuity** [1] 80/8
**another** [16] 27/20 31/14 33/25 36/2 36/8 36/16 36/19 38/17 38/17 39/20 44/15 47/12 47/23 92/18 93/8 95/23
**answer** [16] 8/6 24/25 33/15 37/16 42/17 50/19 50/24 51/8 55/21 55/22 65/11 69/4

71/22 72/11 72/17 90/24
**answered** [5] 16/6 44/24 44/24 46/7 78/23
**answering** [1] 51/15
**answers** [1] 50/18
**anticipating** [1] 10/13
**anxious** [3] 12/5 12/6 30/14
**any** [80] 6/23 9/6 10/2 10/2 11/22 12/1 12/6 12/6 13/6 17/2 17/6 18/8 19/9 19/10 21/17 23/10 23/11 24/24 25/3 28/15 31/19 36/21 42/11 42/20 43/10 43/11 44/19 48/7 48/8 48/24 48/25 49/2 52/3 52/5 53/20 53/21 54/10 54/13 54/17 54/17 55/18 56/4 56/21 58/6 58/13 59/16 60/15 61/12 62/3 62/20 63/10 66/2 66/4 66/11 66/12 66/13 66/14 66/16 66/23 66/23 74/5 74/14 75/5 77/6 80/6 81/25 82/3 82/23 82/23 82/24 83/7 83/24 84/3 85/9 90/4 91/6 91/15 91/17 96/11 96/12
**any of** [1] 80/2
**anybody** [2] 80/23 81/2
**anyone** [5] 47/2 48/22 56/3 66/17 96/10
**anything** [13] 6/1 7/13 11/13 19/1 53/23 57/23 62/23 74/1 74/22 80/18 81/1 86/9 86/12
**anyway** [1] 25/17
**anywhere** [1] 69/11
**apart** [3] 12/7 12/17 83/25
**apartment** [10] 69/1 69/2 79/16 85/6 85/12 85/13 85/17 86/5 86/14 88/7
**apartments** [2] 84/16 84/16
**apologize** [3] 8/20 61/2 67/10
**apparently** [1] 10/14
**appeal** [1] 62/25
**APPEARANCES** [1] 2/1
**appears** [1] 14/25
**applicability** [1] 11/4
**apply** [1] 37/16
**appreciate** [1] 12/25
**approach** [5] 27/1 27/22 45/16 49/17 60/2
**approximately** [4] 17/17 41/4 41/5 68/21
**April** [15] 43/25 44/13 46/11 46/20 46/22 47/1 47/6 47/10 60/15 92/16 93/7 93/10 93/19 94/3 95/21
**April 10** [1] 93/10
**April 10th** [1] 93/7
**April 17th** [2] 94/3 95/21
**April 2019** [1] 44/13
**April 2nd** [2] 46/11 46/20 46/22
**April 3** [2] 43/25 60/15
**April 6th** [1] 92/16
**April of** [1] 47/10
**April's** [1] 93/21
**arbiter** [1] 82/6
**arbitration** [2] 74/13 74/15
**are** [50] 4/19 5/9 7/10 8/22 9/2 9/18 11/6 11/9 12/22 13/4 14/5 14/5 20/25 25/2 30/20 33/21 33/21 33/22 38/21 40/25 41/24 50/14 56/12 58/9 58/13 59/13 59/18 60/22 61/5 61/6 61/7 61/19 62/3 62/5 62/7 63/14 67/6 72/11 89/14 89/15 89/21 90/4 90/20 91/17 93/16 93/24 94/8 94/10 96/3
**aren't** [1] 90/14
**arising** [1] 73/17
**around** [6] 27/18 31/16 46/2 47/11 60/11 64/6
**arrange** [1] 31/23
**arrow** [1] 21/11
**article** [1] 75/23
**as** [42] 4/22 7/15 7/19 11/9 15/4 22/1 22/3 26/18 26/24 28/5 29/24 32/7 33/1 39/17 42/1 42/6 44/19 46/14 53/23 54/7 54/23 55/24 59/16 61/20 65/15 65/16 65/16 70/15 70/15 77/1 78/20 78/23 80/7 80/11 81/18 81/24 82/1 88/7 93/21 93/22 93/25 94/25
**asked** [38] 7/15 18/20 20/13 21/4 21/21 22/7 22/9 24/9 29/23 30/7 33/6 36/4 36/6 37/2 38/8 39/21 40/25 41/6 41/20 44/8 45/4 45/12 45/25

49/4 50/7 50/20 51/24 52/3 52/10 52/11 53/13 54/21 90/4 90/13 90/13 90/23 69/7 69/4 69/12
**asking** [15] 8/8 26/8 27/15 29/9 36/16 45/5 45/7 51/9 64/18 64/22 65/3 65/6 65/19 65/21 95/3
**assert** [3] 25/11 25/11 25/16
**asserted** [1] 25/5
**assist** [1] 85/19
**Assistant** [5] 2/4 2/6 2/10 48/13 65/23
**assumed** [1] 80/17
**assuming** [1] 82/5
**assumption** [1] 79/25
**assure** [1] 60/18
**athletes** [1] 22/20
**attached** [1] 70/5
**attempt** [1] 25/22
**attempted** [2] 25/14 26/4
**attempting** [2] 18/18 23/8
**attend** [2] 18/13 76/13
**attended** [3] 34/12 34/17 76/19
**attending** [1] 18/13
**attention** [9] 9/14 18/11 18/18 20/12 28/2 29/17 33/17
**attorney** [15] 2/3 2/4 2/6 2/10 25/12 53/17 71/18 72/21 72/23 73/1 73/16 73/22 74/5 74/10 96/4
**attorney/client** [6] 25/12 53/17 71/18 72/21 72/23 74/5
**Attorneys** [2] 48/14 65/23
**attorneys'** [2] 80/10 80/14
**August** [2] 4/20 5/10
**August 3** [2] 4/20 5/10
**AUSA** [1] 44/15
**AUSAs** [1] 81/16
**authentication** [2] 15/16 90/2
**authorized** [1] 30/7
**authors** [1] 9/16
**availability** [1] 33/4
**available** [1] 30/3
**AVENATTI** [30] 1/11 2/14 4/4 4/10 4/23 5/23 8/5 9/4 13/4 13/18 13/24 16/11 16/13 19/22 30/19 32/11 36/8 39/14 56/9 58/7 63/5 64/11 69/12 69/15 70/1 70/11 73/1 90/5 90/7 90/15
**Avenida** [1] 2/16
**aware** [11] 4/25 5/6 5/7 7/19 18/23 23/16 23/21 23/24 25/8 26/15 26/22
**away** [1] 18/24

**B**
**back** [18] 6/24 8/13 20/11 20/22 22/8 32/17 34/25 37/23 40/5 44/15 48/2 59/8 61/7 63/22 69/22 77/6 84/4 87/13
**back-door** [1] 8/13
**background** [1] 68/16
**bad** [1] 69/4
**bank** [2] 79/8 95/21
**banking** [5] 94/11 94/14 94/22 95/3 95/7
**based** [5] 10/3 16/5 28/8 75/8 92/1
**basically** [5] 8/22 8/23 34/25 72/4 83/10
**basis** [2] 7/21 65/24
**Bates** [6] 15/7 15/7 62/24 63/3 63/6 63/9
**be** [98]
**became** [5] 23/16 23/21 23/24 26/15 88/8
**because** [31] 8/12 9/2 13/2 19/8 34/13 37/22 37/22 43/16 43/17 47/23 56/17 58/14 58/20 59/18 60/22 61/22 64/3 67/10 72/11 78/9 83/9 84/10 86/13 86/16 87/23 88/10 88/21 89/1 90/16 91/22 93/17
**been** [20] 6/11 8/8 9/6 9/8 10/25 19/2 20/8 26/18 28/21 29/5 40/10 44/15 45/1 48/5 49/5 62/18 68/20 78/9 82/5 89/4
**before** [45] 5/18 5/20 10/8 10/17 12/1 20/2 20/5 21/14 21/18 21/21 27/3 27/7 30/25 33/15 33/16 37/9 39/18 40/3 40/9 40/21 41/6 41/10 41/13 41/18 43/8 43/13 43/17 48/23 50/13 52/23 53/21 53/24 54/11 54/14 57/8 58/3 62/20 64/10 75/9 79/25 82/2 86/7 92/25
**beginning** [2] 69/6 80/14

**B**

**behalf [5]** 4/6 13/20 30/7 30/16 85/6
**being [12]** 9/3 30/14 33/1 36/6 36/19 39/15 44/12 68/14 73/3 80/19 82/9 88/7
**believe [13]** 9/5 9/11 10/18 10/24 12/16 17/14 42/11 48/15 51/7 55/8 57/1 84/25 85/23
**believed [1]** 60/9
**below [3]** 15/24 74/11 95/22
**bench [2]** 10/9 10/17
**beneficiary [2]** 16/10 16/20
**benefit [2]** 20/16 33/9
**Beverly [1]** 75/11
**bigger [1]** 65/21
**billing [1]** 74/9
**bills [1]** 88/16
**binder [2]** 41/11 70/17
**binding [1]** 80/11
**bit [3]** 67/19 71/23 71/24
**blow [4]** 20/17 39/22 52/18 53/11
**both [6]** 16/20 38/21 38/22 48/13 62/1
**bottom [7]** 15/6 16/19 63/7 80/3 80/6 91/9 94/4
**Boulevard [2]** 69/2 70/4
**boyfriend [5]** 76/7 86/25 88/19 88/24 89/5
**Brady [2]** 59/14 59/20
**BRANDON [1]** 2/4
**brass [1]** 63/3
**break [4]** 56/1 64/7 96/6 96/8
**BRETT [3]** 2/9 4/5 13/19
**brief [3]** 5/24 6/2 6/4
**bring [4]** 12/13 17/11 18/18 20/15
**brings [1]** 9/14
**brought [4]** 11/23 18/11 39/12 52/21
**building [1]** 2/10 83/11
**Business [1]** 66/18
**busy [1]** 52/12

**C**

**CA [4]** 1/20 2/8 2/11 2/16
**calculating [1]** 80/9
**CALIFORNIA [5]** 1/5 1/16 4/1 68/3 72/25
**call [32]** 16/6 24/10 29/23 30/4 31/14 31/20 44/6 44/12 44/16 44/19 44/22 45/2 45/10 45/11 45/21 45/25 46/5 46/9 47/12 47/14 48/1 48/15 48/16 49/16 50/4 50/4 50/7 65/19 69/22 89/1 89/2 92/13
**called [8]** 9/19 10/21 43/9 48/23 61/23 62/16 69/20 74/9
**calling [1]** 9/22
**calls [6]** 43/11 48/25 49/2 65/20 65/22 67/8
**came [3]** 78/5 80/13 85/15
**camera [2]** 61/18 63/16
**Campbell [1]** 57/20
**can [43]** 5/17 5/19 6/6 6/9 6/24 11/22 11/23 17/11 25/22 26/24 27/20 28/16 32/20 35/12 40/5 45/15 45/16 47/5 48/9 49/17 56/25 58/2 60/18 60/25 61/6 61/6 61/18 63/1 63/22 64/9 72/15 73/14 73/19 75/23 80/3 81/12 81/21 91/9 91/13 93/9 93/12 93/23
**can't [5]** 49/5 49/15 57/2 69/1 77/20
**Capital [6]** 16/25 22/9 22/13 22/14 22/15 43/3
**car [2]** 69/8 69/9
**card [1]** 64/5
**care [3]** 16/25 43/3 88/6
**Carlos [4]** 4/7 13/21 44/20 48/12
**case [27]** 7/1 8/20 10/22 20/2 43/9 44/7 45/6 47/3 48/8 48/24 56/3 56/4 56/12 58/23 61/8 61/14 61/21 62/2 62/12 62/19 63/12 65/18 77/8 80/8 96/10 96/11
**cashier's [1]** 87/5
**Cassaro [4]** 75/16 75/17 75/18 84/23
**category [1]** 63/15

**caused [1]** 12/16
**cell [2]** 89/17 89/17
**center [2]** 33/13 75/12
**CENTRAL [1]** 1/5
**CERTIFICATE [1]** 97/4
**CERTIFIED [1]** 1/9
**certify [1]** 97/6
**chain [2]** 28/9 31/17
**chance [1]** 10/18
**changed [1]** 94/25
**Chase [2]** 94/9 94/14
**chat [3]** 46/13 46/24 60/8
**check [1]** 87/5
**checking [1]** 43/17
**chief [2]** 2/5 7/1
**Cienega [2]** 68/25 75/11
**Circuit [4]** 9/24 10/1 11/10 60/21
**circumstances [1]** 69/17
**citation [1]** 63/3
**citations [1]** 62/24
**citing [1]** 25/2
**city [2]** 68/2 68/6
**civil [4]** 45/22 57/17 60/9 60/15
**claims [5]** 23/14 23/19 45/8 73/17 81/25
**clarification [1]** 7/2
**clear [2]** 8/12 47/24
**clearly [3]** 9/19 11/8 61/13
**Clemente [1]** 2/16
**client [38]** 16/6 16/13 18/18 18/19 18/20 19/6 19/12 19/18 22/20 23/5 25/12 26/13 30/16 31/11 37/8 38/24 38/24 39/6 39/10 39/13 39/18 40/20 45/13 53/17 55/12 55/15 57/10 59/1 59/4 71/18 72/21 72/23 73/2 73/16 73/16 73/23 73/24 74/5
**client's [4]** 22/6 41/16 43/4 73/25
**clients [1]** 72/25
**clipped [1]** 64/5
**closer [1]** 67/20
**clothing [1]** 75/23
**Code [1]** 97/7
**colleagues [1]** 53/2
**college [2]** 68/6 68/17
**come [13]** 6/24 20/11 20/22 22/8 34/24 35/18 41/14 62/22 63/22 64/8 69/14 89/3 91/21
**comes [1]** 13/13
**coming [5]** 77/11 85/24 88/8 88/22 95/19
**commence [1]** 63/23
**commit [1]** 31/11
**common [2]** 52/22 53/16
**communicate [1]** 77/3
**communicated [6]** 21/21 22/1 26/17 28/15 43/20 48/22
**communicating [2]** 62/7 62/18
**communication [8]** 27/10 28/7 28/13 30/13 57/7 58/24 59/4 59/6
**communications [26]** 24/20 29/16 32/25 35/13 35/17 35/19 35/21 42/13 48/8 49/3 57/24 58/14 58/19 58/22 59/3 62/2 62/3 63/11 66/3 66/4 66/12 66/17 66/24 75/5 88/4 91/6
**company [4]** 22/7 22/17 43/4 43/6
**complete [1]** 56/25
**completely [1]** 50/24
**complex [2]** 69/1 69/2
**complicated [1]** 63/7
**complied [1]** 17/22
**complies [5]** 18/24 70/18 72/22 81/9 85/2
**comply [1]** 18/21
**concern [2]** 42/11 84/9
**concerned [1]** 84/6
**concerning [1]** 11/19
**concerns [2]** 42/7 84/3
**conclude [1]** 77/25
**conclusion [1]** 9/25
**conduct [1]** 34/25
**conducted [1]** 35/16
**conference [18]** 33/13 33/14 33/24 33/25 34/4 34/5 34/8 34/11 49/10 49/12 49/14 49/14 49/22 49/23 50/2 77/2 78/5 97/11

**conferences [1]** 65/23
**confidential [2]** 58/15 58/19 58/19 80/19 80/22
**confidentiality [2]** 59/18 72/16
**confirmation [2]** 14/23 15/1
**conformance [1]** 97/10
**confronted [1]** 60/22
**connected [1]** 75/16
**connection [5]** 28/5 28/22 31/3 45/13 73/17
**considerable [1]** 42/7
**consult [1]** 82/21
**contact [16]** 17/12 17/15 18/2 18/3 18/19 18/23 19/17 23/13 26/4 48/7 56/24 59/24 75/15 88/2 88/9 93/6
**contacted [8]** 23/15 25/7 28/5 28/21 29/5 33/4 45/12 46/3
**contacts [2]** 48/5 61/16
**content [1]** 62/6
**context [2]** 37/16 45/6
**Contingency [1]** 71/18
**contingent [2]** 74/11 74/13
**continual [1]** 61/21
**continually [1]** 60/22
**continuances [1]** 43/16
**continue [1]** 88/2
**Continued [2]** 3/6 14/12
**continues [2]** 93/8 94/5
**contract [6]** 71/18 72/21 72/24 72/24 74/6 80/5
**contrary [1]** 18/19
**conveniently [1]** 6/1
**conversation [8]** 18/14 18/17 19/1 24/2 34/10 60/11 60/14 79/24
**conversations [9]** 17/2 17/7 19/10 27/18 47/4 48/2 49/6 49/6 54/18
**conversed [1]** 41/18
**coordinate [1]** 31/8
**copied [1]** 32/23
**copies [2]** 38/22 89/21
**copy [11]** 15/1 15/4 32/20 38/16 38/17 39/1 56/17 59/22 71/6 78/10 83/12
**corner [2]** 15/6 49/25
**correct [33]** 7/6 9/11 15/8 18/6 20/4 20/7 20/10 21/5 22/21 23/3 23/4 28/11 33/23 35/6 37/10 37/21 39/3 39/4 39/8 43/6 48/10 54/9 62/13 62/15 65/4 66/15 73/11 86/10 90/12 90/15 92/16 94/17 97/8
**corrected [1]** 65/1
**correctly [1]** 17/20
**correspondence [8]** 11/17 57/16 89/16 89/18 89/22 91/22 91/24 93/22
**costs [1]** 74/9
**could [30]** 5/13 7/5 8/5 8/6 10/5 14/8 15/21 19/13 20/12 20/15 20/17 28/2 67/14 67/19 69/22 70/16 70/22 71/14 72/4 79/15 81/5 81/8 84/24 84/25 87/4 88/10 89/11 89/12 93/20 96/5
**couldn't [5]** 6/10 80/22 80/25
**counsel [14]** 2/1 2/15 4/7 4/10 4/16 5/16 6/15 13/21 48/20 82/17 82/21 83/1 91/25 93/25
**couple [6]** 21/24 48/9 70/6 76/11 76/23 84/16
**course [1]** 10/22
**court [17]** 1/4 4/15 4/19 7/4 10/9 10/16 11/23 12/1 35/11 57/20 59/25 60/5 60/21 62/24 63/15 64/3 97/16
**Court's [1]** 4/13
**Courthouse [1]** 1/19 2/7
**courtroom [3]** 8/17 33/11 75/21
**covered [1]** 37/14
**credit [1]** 16/1
**criminal [4]** 2/5 4/18 10/22 20/3
**cross [12]** 3/4 3/11 9/21 12/2 12/18 12/22 12/24 19/23 56/24 57/1 57/2 62/18
**cross-examination [7]** 9/21 12/2 12/24 19/23 56/24 57/1 62/18
**cross-examine [3]** 12/18 12/22 57/2
**Cummings [3]** 4/11 13/5 13/24
**cure [1]** 7/8
**currently [3]** 68/2 68/5 68/17

**D**

date [33]  4/20 8/10 15/25 16/1 16/1 16/3 16/9 16/18 19/15 20/24 21/6 21/12 21/15 21/22 21/23 27/15 27/16 28/14 32/4 36/17 36/24 37/4 37/4 41/23 42/6 46/2 53/24 74/12 76/21 83/19 90/11 95/21 97/13
dated [6]  20/25 21/1 41/24 41/25 73/9 81/18
day [22]  1/12 4/14 5/18 5/19 9/9 46/12 46/24 63/6 70/2 71/7 71/20 71/21 71/25 72/2 73/4 75/5 77/20 77/22 77/23 77/25 81/18 81/19
days [7]  34/1 34/2 40/3 76/23 93/7 93/18 94/3
deadline [5]  40/4 40/10 40/15 40/22 41/3
deal [2]  12/7 12/16
dealings [3]  42/8 54/10 54/13
DEAN [2]  2/15 2/15 4/10
debate [2]  7/7 7/11
debit [1]  15/25
debt [1]  79/16
December [26]  21/1 21/2 21/4 21/15 21/18 23/21 27/16 28/8 28/20 29/4 30/23 30/25 31/10 31/15 31/20 31/25 32/5 53/21 54/11 54/14 68/21 68/24 69/7 69/14 73/10 75/21
December 12 [1]  27/16
December 12th [1]  28/20
December 14th [1]  30/23
December 16 [1]  31/10
December 16th [2]  31/15 31/20
December 2016 [4]  23/21 68/21 69/7 69/14
December 20th [2]  31/25 32/5
December 21st [1]  21/1
December 22 [2]  21/15 21/18
December 22nd [6]  21/2 21/4 30/25 53/21 54/11 54/14
December of [1]  68/24
decide [1]  61/18
deciding [1]  82/2
decline [1]  10/2
defendant [73]  1/12 2/13 8/8 8/25 11/15 16/6 17/3 17/7 18/15 18/17 18/22 19/1 19/5 19/10 19/14 19/16 57/9 58/21 59/4 60/1 69/18 70/13 70/25 71/20 71/24 74/1 74/6 74/16 74/22 74/25 75/5 76/4 76/6 76/9 76/21 77/7 77/12 77/15 78/15 81/1 81/12 82/8 82/12 83/1 83/19 83/24 85/6 85/19 86/4 86/7 86/12 86/21 87/14 87/18 88/2 88/4 88/13 88/15 89/19 89/22 91/7 91/10 91/13 92/18 92/21 93/9 94/6 94/8 94/10 95/2 95/6 95/22 95/23
defendant's [6]  60/4 71/1 75/18 92/4 93/2 94/1
defense [3]  3/11 3/13 8/5
deferred [1]  80/7
defined [1]  74/11
definition [4]  8/21 8/23 9/17 62/5
demanded [1]  55/2
Denied [1]  55/5
Department [2]  68/6 68/10
depends [1]  62/6
deposit [13]  87/2 87/11 88/12 91/16 91/17 91/19 92/14 92/23 92/24 92/25 93/11 94/22 95/19
deposited [2]  79/7 84/7
deposits [12]  84/9 88/8 88/14 88/17 88/20 88/23 94/16 94/19 95/4 95/7 95/11 95/14
Depot [1]  69/3
deputy [1]  8/17
describe [2]  54/23 79/10
describing [1]  86/7
description [3]  5/25 6/8 6/13
details [1]  46/7
determination [1]  61/20
determine [2]  63/1 75/13
determined [1]  82/5
dialogue [2]  23/18 24/1
did [112]
didn't [26]  8/3 13/1 21/17 26/20 40/23 42/10 47/24 50/17 50/18 51/16 54/6 58/24 62/3 69/10 72/5 75/20 82/14 83/7 83/18 84/8 84/10 85/15 90/16 92/23 93/11 93/21
different [5]  39/5 68/19 71/23 84/15 94/25
difficulty [1]  64/4

dinner [1]  92/22
diplomacy [1]  65/1
direct [16]  3/4 3/11 14/12 20/12 20/14 28/2 36/14 37/3 45/4 50/8 55/7 64/14 64/17 67/23 79/7 87/2
directed [1]  29/16
disagreement [1]  36/13
disclosed [1]  81/2
discuss [4]  45/21 56/3 74/16 96/10
discussed [2]  15/2 87/24
discusses [1]  10/19
discussing [1]  46/6
discussion [6]  30/23 31/1 31/4 47/2 53/5 58/17
discussions [5]  25/8 31/23 42/20 83/24 85/9
disparaged [1]  60/17
displaced [1]  69/10
dispute [7]  25/13 31/19 46/19 46/22 46/25 52/14 53/6
disputes [1]  81/25
DISTRICT [2]  1/4 1/5
divided [1]  33/21
DIVISION [2]  1/6 2/5
docket [6]  5/4 6/3 6/3 6/8 6/9 6/13
document [40]  7/24 7/25 8/7 8/11 9/12 11/1 11/1 15/4 20/13 20/22 26/1 27/3 27/20 27/24 29/1 44/2 45/18 45/20 49/19 49/21 51/12 51/19 51/20 52/6 52/21 52/25 53/13 60/5 70/21 70/23 70/25 71/6 71/17 72/20 73/3 73/13 78/15 81/13 81/15
documents [13]  5/24 6/11 9/8 10/3 10/23 11/15 50/7 51/24 52/1 58/18 58/21 59/17 59/22
does [18]  4/23 11/10 16/15 26/3 26/8 26/10 27/5 28/4 43/3 45/20 46/10 49/21 50/1 51/14 52/9 65/9 65/13 65/24
doesn't [6]  7/8 25/20 37/15 52/13 53/4 58/7
doing [1]  8/8
don't [88]  5/1 7/7 7/11 8/11 8/16 9/5 10/9 12/1 12/23 22/14 23/10 23/11 24/4 24/24 25/2 25/16 25/18 26/15 26/21 27/17 27/19 31/7 31/17 32/10 32/12 36/7 37/22 37/22 37/23 38/13 38/15 38/20 39/1 39/11 39/19 43/10 43/16 43/18 44/14 44/23 44/25 45/2 45/5 45/11 46/2 46/7 46/25 47/4 47/8 47/13 47/17 47/22 48/2 48/4 48/25 50/10 51/3 51/8 51/17 51/18 51/23 52/5 52/16 52/24 54/5 54/5 54/6 54/7 57/23 59/16 59/25 60/15 60/17 61/1 61/12 62/21 63/15 65/11 65/14 65/18 66/11 72/13 72/17 76/16 90/20 93/11
done [3]  10/11 34/1 34/3
door [1]  8/13
doubt [2]  32/7 32/9
Dourec [2]  87/5 88/1
down [7]  34/5 60/24 64/8 67/11 81/16 92/15 96/15
Drew [1]  4/18
due [2]  42/8 57/4
during [19]  12/2 12/15 17/22 19/1 28/13 34/23 49/9 49/10 50/4 50/7 51/1 51/2 58/3 71/1 73/4 74/24 76/24 77/3 84/2
duties [1]  4/15

**E**

e-mail [24]  20/17 20/24 28/3 28/8 28/18 28/20 28/24 29/4 29/8 29/10 30/3 31/17 32/23 33/1 39/22 40/12 41/25 56/19 57/15 62/1 62/3 62/7 62/18 63/25
e-mails [6]  20/25 41/24 49/7 61/4 62/20 63/14
each [5]  17/13 17/15 17/21 82/18 82/20
Eagan [3]  16/11 16/13 73/1
earlier [3]  41/7 47/19 64/18
early [4]  23/21 44/13 57/8 58/14
easier [2]  32/20 70/22
easiest [1]  85/16
Ed [1]  9/15
education [1]  68/20
educational [1]  68/16

affect [1]  82/22
afford [1]  29/5
efforts [7]  37/9 40/3 40/9 40/15 40/21 41/3 82/2
eight [2]  79/8 86/10
either [2]  7/10 63/8
electronic [1]  6/15
elicited [1]  12/3
else [7]  11/13 34/17 57/14 66/17 69/11 82/14 95/18
end [6]  9/9 41/2 41/3 56/18 78/4 82/12
ended [1]  72/7
enough [5]  4/23 12/20 21/9 33/16 62/22
ensure [2]  17/21 93/20
enter [1]  82/25
entire [1]  45/9
entirely [1]  69/20
entitled [6]  7/10 11/1 30/20 57/3 57/24 97/9
essentially [1]  64/5
established [4]  56/12 56/23 62/16 62/17
estimate [1]  47/5
evaluate [2]  8/1 8/6
even [4]  51/18 59/16 70/22 83/4
evening [3]  11/21 77/21 77/22
event [2]  36/9 82/3
events [6]  36/1 39/14 64/14 65/3 65/6 65/17
ever [26]  5/25 19/5 19/10 19/14 19/16 47/13 53/20 54/10 54/13 54/17 74/5 77/3 77/7 77/12 77/15 79/18 81/13 82/8 83/19 83/23 84/2 84/6 86/4 86/21 86/22 95/10
every [6]  50/10 57/7 57/11 58/24 59/4 87/2
everybody [2]  35/6 78/8 83/9
everything [5]  57/22 78/19 82/14
evidence [15]  7/14 7/22 8/14 9/1 9/15 11/1 11/3 11/4 15/14 15/19 71/13 81/6 84/25 87/4 90/9
evidentiary [2]  6/6 59/14
ex [14]  76/7 80/23 86/24 86/25 88/18 88/19 88/24 89/5 89/6 91/25 93/6 93/25 94/21 96/4
ex-boyfriend [5]  76/7 86/25 88/19 88/24 89/5
exact [2]  22/14 26/21 36/7
exactly [4]  27/19 44/14 50/10 54/25
examination [12]  9/21 12/2 12/24 14/12 19/23 36/1 50/8 56/24 57/1 62/18 64/17 67/23
examine [1]  12/18 12/22 57/2
example [2]  6/3 8/2 8/25
except [1]  65/18
exclamation [2]  92/10 92/12
excused [2]  67/3 67/6
executive [1]  23/1
exhibit [34]  3/9 3/9 3/10 14/17 14/19 14/21 15/14 15/17 15/19 20/12 36/25 39/20 39/20 40/6 41/6 41/10 41/13 42/25 51/25 52/2 52/11 52/15 53/9 70/16 70/19 70/22 71/10 71/13 81/5 84/24 87/4 89/11 89/25 90/9
Exhibit 132 [4]  70/16 70/19 70/22 71/10
Exhibit 135 [4]  20/12 51/25 52/11 52/15
Exhibit 139 [4]  36/25 40/6 53/9 81/5
Exhibit 141 [1]  39/20
Exhibit 144 [3]  41/6 41/10 41/13
Exhibit 146 [1]  84/24
Exhibit 147 [1]  87/4
Exhibit 149 [5]  14/17 14/19 14/21 15/14 42/25
Exhibit 160 [2]  89/11 89/25
exhibits [9]  3/8 3/14 11/19 11/20 14/16 49/7 50/15 50/17 50/20
exist [1]  58/1
expect [1]  83/19
expected [5]  35/21 52/2 87/18 95/13 95/20
expecting [8]  40/14 40/21 40/23 91/21 91/23 95/17 95/17 95/18
expenditure [1]  36/21
experience [3]  38/12 65/9 65/13
explaining [1]  50/20
explanation [1]  65/15
express [1]  7/15
extent [2]  90/4 90/5

**F**

**fact [1]** 10/3 12/4 23/24 31/19 52/10 52/14 61/10 62/9
**factual [1]** 25/2
**factually [1]** 25/3
**failing [1]** 19/18
**failure [2]** 6/5 19/12
**fair [14]** 12/20 15/1 15/4 21/9 24/21 28/17 33/16 33/18 35/1 50/5 66/2 66/3 66/11 71/6
**fall [3]** 12/7 12/17 63/15
**falling [1]** 83/25
**falls [2]** 26/6 27/12
**far [1]** 70/15
**fear [1]** 81/3
**federal [3]** 2/10 7/14 65/23
**fee [8]** 71/18 72/21 72/23 72/24 74/5 74/11 74/14 80/5
**feel [2]** 72/5 77/22
**fees [4]** 74/9 79/19 80/10 80/14
**feet [1]** 79/15
**few [2]** 43/14 89/23
**figure [1]** 93/13
**file [6]** 5/17 5/23 24/14 30/16 61/20 61/22
**filed [4]** 4/18 5/1 5/2 6/20
**filing [6]** 5/1 6/3 6/11 32/2 74/13 74/14
**filings [1]** 6/15
**final [1]** 81/24
**financial [5]** 22/6 41/16 41/17 43/4 89/6
**find [8]** 6/1 6/9 35/22 36/19 57/12 92/10 92/12 92/13
**fine [5]** 4/17 5/15 5/19 13/3 52/18
**firm [3]** 15/10 48/21 75/18
**first [37]** 10/7 11/17 11/24 15/10 20/13 20/25 21/21 22/1 25/7 27/7 27/17 28/5 28/7 28/13 28/17 29/8 33/10 41/25 43/20 44/6 49/25 51/13 52/18 67/15 72/20 73/20 77/10 77/24 81/15 81/17 82/7 82/19 86/13 86/15 90/11 90/12 91/3
**firsthand [4]** 66/12 66/14 66/16 66/23
**five [4]** 40/3 81/12 82/17 93/18
**focus [2]** 33/17 54/2
**follow [2]** 57/12 69/5
**follow-up [1]** 69/5
**following [1]** 42/16
**follows [1]** 82/1
**foregoing [1]** 97/7
**form [3]** 38/23 56/4 96/11
**format [2]** 50/19 97/10
**forth [2]** 34/25 37/23
**forward [2]** 29/16 88/5
**found [2]** 8/20 8/21
**foundation [3]** 15/16 24/9 90/2
**four [5]** 56/14 65/3 74/8 92/10 93/7
**four-page [1]** 56/14
**Fourth [1]** 2/11
**FOX [1]** 2/4
**frame [4]** 31/1 44/1 46/3 47/11
**frankly [1]** 25/16
**Frauds [1]** 2/6
**free [3]** 11/6 12/18 12/22
**FRIDAY [1]** 4/1
**friendly [1]** 69/21
**front [3]** 14/16 41/11 70/19
**fuck [1]** 24/8
**full [5]** 32/11 68/5 68/11 81/15 81/24
**full-time [2]** 68/5 68/11
**fully [2]** 82/22 90/16
**fundamental [1]** 57/4
**furnish [1]** 79/16
**further [8]** 5/25 6/8 17/2 19/11 19/17 19/21 29/15 67/1

**G**

**G-a-r-d-n-e-r [1]** 67/17
**Gallegos [2]** 9/25 11/10
**game [2]** 18/13 18/13
**GARDNER [29]** 3/6 15/2 16/16 17/12 18/1 18/9 19/7 23/3 17/24 34/3 35/19 39/2 45/14 45/22 55/17 55/21 57/18 66/6 66/13 66/13

**H**

67/8 67/11 67/13 67/16 67/25 73/2 81/25 82/5 84/21
**Gardner's [2]** 22/2 23/14 45/8
**Gardner/Whiteside [3]** 15/2 66/6 66/13
**gave [1]** 79/11
**general [1]** 81/3
**generally [11]** 30/3 31/12 33/13 33/22 35/11 45/3 48/4 50/12 50/15 55/9 64/15
**gentleman [1]** 48/17
**gentlemen [4]** 14/2 56/2 64/2 96/8
**genuinely [1]** 88/6
**get [35]** 12/5 12/14 21/25 23/8 30/9 31/5 41/6 41/10 41/13 46/3 57/10 58/2 58/16 61/19 62/3 63/7 63/9 65/10 65/13 77/8 77/8 77/13 78/9 79/15 80/14 80/15 83/12 85/6 85/17 88/12 89/2 92/5 92/7 92/23 93/11
**gets [2]** 7/10 51/11 65/14
**getting [8]** 26/19 30/16 59/8 64/4 77/16 84/8 84/12 85/9
**Giglio [2]** 59/14 59/20
**give [6]** 4/23 12/23 63/5 78/10 81/13
**given [7]** 6/1 8/1 51/13 57/9 62/20 62/23 63/5
**glasses [1]** 21/8
**go [21]** 11/20 16/10 24/8 32/12 32/17 34/25 38/9 39/20 40/5 42/25 52/17 53/10 63/12 64/10 69/11 71/23 78/15 83/1 86/18 87/13 93/21
**going [47]** 5/25 7/12 11/19 12/8 13/1 17/17 19/17 20/22 21/25 22/8 24/1 29/19 30/24 31/4 31/21 32/2 32/12 37/23 40/9 41/17 42/8 50/13 50/15 50/18 57/13 58/25 59/1 61/20 61/22 63/19 63/23 63/24 63/25 64/8 69/19 75/6 77/6 79/23 82/7 84/7 85/7 85/12 85/13 86/10 88/5 89/2 90/17
**Gold [1]** 75/11
**gone [1]** 24/21
**good [20]** 4/5 4/8 4/9 6/19 13/19 13/22 13/23 14/1 14/2 14/14 14/15 19/25 20/1 40/25 42/2 51/7 51/9 62/22 67/25 68/1
**got [4]** 40/24 63/21 63/23 93/20
**gotten [2]** 24/21 57/13
**government [30]** 6/22 7/15 9/1 10/23 11/19 11/21 13/10 15/11 15/14 20/8 43/8 43/12 44/6 47/3 48/23 52/15 53/22 56/14 56/24 61/22 61/25 62/15 62/16 62/22 63/4 63/11 63/14 67/8 71/10 89/25
**Government's [3]** 6/5 14/4 67/13
**governs [1]** 7/19
**grand [1]** 58/16
**granted [1]** 9/23
**guess [5]** 47/9 64/20 70/8 88/11 95/18
**guy [2]** 34/13 41/18

**H**

**had [86]** 6/22 10/18 11/12 12/15 18/12 20/5 23/16 24/2 24/7 24/13 24/20 24/21 25/8 25/8 25/14 26/4 26/12 26/18 27/10 28/14 28/15 28/17 28/21 29/5 29/21 29/23 30/23 31/1 31/14 31/19 33/3 34/10 34/10 35/25 40/10 41/14 41/18 42/12 42/17 42/20 44/6 45/12 47/2 48/4 48/5 48/7 53/20 54/18 55/16 55/20 56/24 57/9 58/14 58/22 58/24 59/6 60/10 60/14 61/24 62/1 62/18 66/5 66/12 66/17 66/24 69/19 69/22 71/1 72/5 73/6 78/9 78/25 79/24 79/24 81/3 82/21 84/9 87/19 88/16 91/22 91/24 93/17 93/18 94/16 94/25
**hadn't [2]** 42/20 89/3
**half [5]** 15/21 44/24 45/1 49/11 52/19
**hall [2]** 34/5 67/11
**hand [3]** 49/25 65/19 65/21
**handed [11]** 8/4 10/8 10/16 26/1 27/3 27/24 45/18 49/19 49/21 52/8 53/1
**handled [1]** 35/9
**handling [1]** 41/17
**HANNA [1]** 2/5
**happen [5]** 65/24 81/2 86/12 93/19 94/2
**happened [12]** 16/17 18/14 21/18 26/9 32/7 38/25 53/21 53/23 64/19 75/3 77/24 93/5
**happening [1]** 54/8

**happens [2]** 6/17 93/3
**happy [1]** 90/11
**Harbur [1]** 4/18
**Harbur's [1]** 5/16
**hard [1]** 32/20
**has [18]** 6/22 8/8 9/6 10/25 15/25 16/1 16/20 22/15 25/20 56/17 59/19 59/25 60/19 76/4 82/5 82/20 82/21 82/23
**hasn't [2]** 5/4 19/2
**Hassan [6]** 16/25 28/21 72/8 73/22 87/16 87/20
**have [124]**
**haven't [1]** 92/13
**having [4]** 53/5 64/3 74/4 85/19
**he [119]**
**he's [5]** 28/25 29/9 32/12 57/13 60/16
**head [1]** 77/10
**hear [6]** 4/19 4/20 4/21 5/9 60/25 68/8
**heard [3]** 10/5 12/8 42/13
**hearing [3]** 6/6 6/7 64/4
**hearsay [3]** 15/16 29/1 90/1
**Heat [8]** 23/3 23/5 26/13 26/18 27/6 28/11 29/20 54/14
**held [2]** 33/13 97/9
**help [3]** 44/2 69/23 87/23
**helped [1]** 84/22
**her [9]** 7/5 7/8 7/9 18/24 23/18 39/13 73/17 73/18 85/17
**here [12]** 6/12 20/6 20/25 21/7 43/13 47/7 54/7 56/1 59/16 63/21 63/23 64/6
**Here's [1]** 33/10
**hereby [1]** 97/6
**hesitant [1]** 72/11
**hey [5]** 91/15 92/22 93/11 95/24 96/2
**high [1]** 22/19
**highlight [1]** 71/14
**highlighted [1]** 8/18
**him [21]** 18/12 18/20 23/17 28/23 42/8 46/23 51/17 51/18 52/22 53/16 54/19 58/15 67/4 70/15 71/21 75/23 85/9 88/10 91/23 94/12 95/13
**hired [1]** 76/21
**hiring [4]** 73/16 74/1 74/25 76/6
**his [43]** 4/14 4/14 17/3 18/18 18/20 19/2 19/6 19/12 22/14 22/17 25/22 27/9 31/5 33/4 37/8 37/24 42/21 53/7 57/10 59/1 59/4 59/5 59/7 59/19 65/5 73/19 75/16 75/17 79/18 79/21 80/14 87/15 87/19 89/6 89/6 89/6 91/25 92/6 93/25 95/6 95/10 95/14 96/4
**his paralegal [1]** 75/16
**history [3]** 12/14 12/15 85/16
**hit [1]** 5/4
**hold [2]** 60/24 69/21
**holdback [1]** 54/23
**Home [1]** 69/3
**honest [1]** 87/24
**Honor [87]** 4/5 4/9 4/12 4/25 5/7 5/13 5/17 6/10 6/18 7/3 7/6 7/7 7/11 7/18 7/19 8/16 9/5 10/5 10/7 10/15 10/17 11/3 11/16 11/25 12/13 12/20 12/25 13/11 13/19 13/23 15/13 15/15 19/21 22/22 24/10 24/22 25/18 25/23 27/1 27/22 28/25 30/10 34/14 34/20 35/24 37/17 38/4 42/3 42/16 45/16 46/14 49/17 53/24 55/4 56/10 56/11 56/17 57/2 57/14 57/15 57/23 59/21 60/3 60/18 61/2 61/3 61/10 61/15 61/18 61/18 61/24 62/21 62/23 63/4 63/6 63/17 64/24 67/2 67/5 67/9 67/10 67/22 71/9 81/6 89/24 90/1 90/25
**Honor's [2]** 8/15 24/16
**HONORABLE [2]** 1/8 32/22
**Hope [1]** 91/15
**hopefully [1]** 11/23 62/25
**Hotel [4]** 68/25 69/6 75/11 84/15
**hour [4]** 44/24 45/1 49/11 77/23
**hours [1]** 77/21
**how [39]** 15/21 17/16 21/23 23/8 24/1 24/25 33/6 34/3 35/16 36/4 40/12 43/8 43/11 43/18 44/22 47/14 48/1 51/8 65/11 65/12 69/17 71/22 74/16 76/9 76/15 76/22 77/12 77/15

## H

how... **[1]** 77/18 77/18 77/21 78/3 79/1 79/2 79/4 80/23 85/12 86/25 89/10
hundred **[1]** 70/6

## I

I'd **[1]** 11/11
I'll **[3]** 6/11 19/14 54/22
I'm **[40]** 5/7 10/15 11/1 11/19 13/2 19/13 21/3 24/25 26/8 27/15 35/5 41/9 42/16 44/21 44/25 46/21 49/2 49/9 50/15 51/9 57/3 57/3 57/24 58/8 58/13 61/1 61/8 63/19 63/20 63/22 63/24 63/25 64/2 64/25 68/5 68/17 71/22 82/7 90/17 92/22
I've **[2]** 8/17 51/13
I-N-D-E-X **[1]** 3/2
identified **[1]** 76/4
identify **[1]** 75/23
immediately **[1]** 30/6
important **[1]** 50/23
improper **[1]** 8/12
improperly **[1]** 29/1
inadmissible **[2]** 7/22 8/14
includes **[1]** 61/4
including **[1]** 12/9 22/20 85/19
incomplete **[1]** 52/23
independent **[2]** 10/12 11/12
independently **[1]** 82/21
indicate **[1]** 76/3
indicated **[1]** 7/5
indicates **[1]** 31/17
individual **[3]** 72/8 75/20 76/1
individuals **[1]** 35/3
inducement **[1]** 82/23
inform **[1]** 73/24
information **[7]** 4/13 9/3 94/11 94/14 94/23 95/4 95/22
informed **[3]** 32/1 32/9 82/22
informing **[3]** 10/16 23/17 31/9
initial **[1]** 80/10
inquiries **[1]** 73/25
inquiry **[1]** 57/20
Instagram **[1]** 18/12
instance **[2]** 9/2 64/23
intended **[2]** 9/20 18/13
interactions **[1]** 58/3
interests **[1]** 9/18
interim **[1]** 17/23
interpretation **[1]** 11/9
Intersect **[6]** 16/25 22/8 22/13 22/14 22/15 43/3
interview **[11]** 20/5 51/1 51/2 56/13 56/15 56/20 56/21 57/6 57/7 61/11 61/25
interviewed **[1]** 20/8
introduce **[1]** 8/5
investigation **[1]** 61/16
involved **[1]** 23/8
involvement **[1]** 45/7
involving **[1]** 76/7
is **[156]**
isn't **[9]** 8/9 22/12 41/14 42/6 45/24 46/11 52/21 55/19 63/7
issue **[1]** 11/3 11/11 11/19 11/24 11/25 13/6 59/8
issues **[5]** 4/12 11/15 11/22 56/4 96/11
it **[207]**
it's **[26]** 14/17 15/4 25/18 25/24 32/19 33/11 33/13 34/1 36/18 40/3 40/6 52/22 55/22 56/14 57/1 57/4 61/2 62/4 62/9 62/21 73/9 73/10 81/6 93/11 93/15 95/16
Item **[2]** 4/3 13/17
its **[2]** 7/15 11/4
itself **[1]** 17/24

## J

JAMES **[1]** 1/8
January **[18]** 16/4 16/5 19/16 37/3 37/4 37/7 37/9 39/24 40/4 41/24 41/25 81/18 82/3 82/4 82/9 83/22 83/23 87/14
January 16th **[2]** 39/24 41/25
January 20th **[2]** 24/19 42/3
January 21st **[4]** 37/4 37/9 40/4 82/3
January 25 **[1]** 16/5
January 25th **[4]** 16/4 19/16 83/23 87/14
January 28 **[1]** 82/4
January 28th **[3]** 37/3 37/7 82/9
January 7 **[1]** 83/22
January of **[1]** 81/18
Jencks **[23]** 7/9 56/11 57/1 57/13 57/24 58/7 58/10 58/11 59/9 59/20 60/17 60/18 60/21 61/4 61/4 61/8 61/19 61/24 62/4 62/4 62/6 62/9 63/10
Joe **[5]** 20/15 22/5 41/14 41/16 52/18
JOEL **[3]** 3/5 14/4 14/10
JOHN **[4]** 1/11 2/14 4/4 13/18
joined **[1]** 13/24
joint **[1]** 35/6
judge **[12]** 1/8 33/1 34/23 35/9 35/16 37/12 37/20 38/2 39/9 39/12 66/5 77/1
Judicial **[1]** 97/11
July **[16]** 1/17 4/1 47/18 48/10 49/3 49/11 49/13 50/2 52/15 56/15 56/20 57/6 58/4 59/7 61/12 97/13
July 11 **[1]** 56/20
July 1st **[1]** 47/18
July 6 **[6]** 48/10 49/11 49/13 57/6 58/4 61/12
July 6th **[5]** 49/3 50/2 52/15 56/15 59/7
juror **[1]** 13/7
jury **[17]** 4/2 8/1 8/6 12/2 13/13 13/16 20/16 20/17 33/10 47/5 56/8 58/16 63/21 63/23 64/1 91/13 96/14
just **[49]** 6/2 6/3 7/2 10/8 10/24 13/1 15/24 20/16 22/7 26/8 27/15 34/7 37/22 43/18 46/5 49/14 50/4 50/14 51/7 51/16 52/12 52/12 53/2 53/4 55/21 57/20 60/2 62/10 62/17 62/23 65/6 65/12 68/2 69/10 69/19 70/15 70/15 72/15 74/20 79/12 80/16 82/11 87/25 88/9 88/10 89/12 92/13 93/23
JVS **[3]** 1/11 4/3 13/17

## K

keep **[3]** 59/17 64/6 88/9
keeping **[1]** 58/19
keeps **[1]** 57/11
kept **[1]** 80/15
key **[1]** 64/6
Kim **[2]** 44/20 48/13
kind **[4]** 52/6 69/19 69/21 78/8
knew **[3]** 28/10 42/6 80/23
know **[55]** 5/1 8/9 8/16 10/9 19/5 22/14 27/19 31/7 32/25 33/5 37/22 37/22 37/23 39/1 39/9 39/11 39/12 39/17 39/19 40/23 41/1 42/10 43/16 47/8 47/17 50/10 51/8 51/16 58/7 59/16 59/25 60/17 64/7 64/9 64/20 65/14 65/16 65/19 66/2 66/4 69/12 71/24 79/21 79/22 82/15 83/4 83/18 84/8 84/10 87/8 90/19 90/20 94/10 94/22 95/2
knowledge **[5]** 23/2 66/12 66/14 66/16 66/23

## L

La **[2]** 68/25 75/11
label **[1]** 6/2
ladies **[4]** 14/2 56/1 64/2 96/8
landlord **[1]** 88/1
last **[13]** 4/14 11/18 16/14 28/3 44/22 48/1 48/22 60/19 60/19 67/15 67/17 93/12 93/16
lasted **[2]** 47/14 49/11
late **[5]** 83/9 88/8 88/23 88/24 89/3
later **[9]** 11/21 17/17 18/11 29/24 37/7 82/3 82/9 93/7 94/3
latter **[1]** 86/14
lavalier **[1]** 64/3
law **[7]** 2/15 8/12 8/21 60/20 61/3 61/8 72/25
lawsuit **[7]** 24/14 30/15 32/2 74/3 74/15
lawyer **[6]** 48/21 71/25 72/2 83/11 83/13 89/6
lawyers **[2]** 35/12 72/25
Leading **[3]** 71/2 86/1 90/22
learn **[8]** 18/9 24/5 24/6 24/13 26/12 76/6 76/9 78/3
learned **[2]** 24/19 45/6
learning **[2]** 76/12 76/17
least **[4]** 6/1 33/15 50/8 58/10
leave **[1]** 83/9
left **[2]** 75/4 83/15
legal **[4]** 66/18 73/23 74/9 79/19
less **[2]** 44/24 45/1
let **[20]** 18/1 21/8 23/12 26/24 27/20 36/24 41/13 45/15 59/6 64/9 64/9 69/5 70/21 71/23 75/4 77/6 77/24 84/14 87/13 94/25
let's **[19]** 32/17 33/17 36/2 36/10 38/9 39/14 39/20 42/25 51/12 53/10 61/17 62/23 63/3 63/7 63/9 78/1 90/11 92/22 93/15
letter **[12]** 15/10 23/16 23/25 26/12 26/16 26/18 26/22 27/6 27/16 28/10 29/20 85/5
life **[1]** 69/10
light **[1]** 8/6
likes **[1]** 83/10
like **[16]** 8/9 15/25 15/25 22/20 28/7 33/11 33/11 33/11 44/1 56/25 64/5 72/5 77/22 77/23 79/21 84/17
likely **[1]** 12/16
likewise **[1]** 10/13
limine **[3]** 24/16 26/7 27/13
limit **[1]** 63/24
limiting **[1]** 49/2
line **[3]** 8/22 16/14 65/24
litany **[1]** 61/8
litigation **[2]** 57/17 57/18
little **[2]** 8/20 67/19
live **[5]** 68/2 84/12 85/7 85/10 85/17
lives **[1]** 7/3
living **[7]** 68/4 68/24 69/7 69/9 75/6 75/13 88/7
LLC **[1]** 16/11
LLP **[2]** 16/13 73/1
local **[3]** 6/23 6/24 7/3
long **[15]** 12/14 21/23 36/4 41/18 44/22 47/14 48/1 72/7 76/15 76/22 77/18 77/18 77/20 77/22 78/9
long-term **[1]** 72/7
longer **[1]** 7/3
look **[32]** 10/18 15/6 15/24 16/9 16/19 40/5 46/8 49/25 51/12 51/13 52/7 52/25 53/9 59/21 70/16 72/20 73/13 74/4 74/8 81/5 81/8 81/21 82/16 82/18 84/24 84/25 85/5 87/4 89/11 91/9 92/15 96/5
looked **[1]** 9/14
looking **[5]** 6/8 16/15 40/25 77/8 77/13
looks **[1]** 15/25 28/7
Los **[4]** 2/8 68/3 68/5 68/21
losing **[1]** 81/4
lot **[3]** 12/4 12/9 68/20
Louis **[1]** 32/22
lump **[10]** 79/6 79/9 79/10 79/11 79/12 79/13 80/10 80/15 85/15 85/23
lump-sum **[1]** 80/10
lunch **[3]** 64/7 64/10 96/8

## M

made **[9]** 17/1 37/7 39/1 40/9 41/2 47/24 53/17 80/24 82/9
mail **[24]** 20/17 20/24 28/3 28/8 28/18 28/20 28/24 29/4 29/8 29/10 30/3 31/17 32/23 33/1 39/22 40/12 41/25 56/19 57/15 62/1 62/3 62/7 62/18 63/25
mails **[6]** 20/25 41/24 49/7 61/4 62/20 63/14
Major **[1]** 2/2
make **[17]** 6/12 6/17 18/24 19/12 19/18 35/5 37/8 37/9 57/20 58/18 61/19 68/7 70/21 93/3 93/5 94/2 95/19
makes **[1]** 6/15
making **[15]** 9/21 17/3 17/8 19/2 19/6 31/10 86/23 87/1 88/17 88/19 93/19 94/19 95/7 95/11 95/14
manager **[3]** 95/7 95/10 95/14
manages **[1]** 22/19
managing **[1]** 22/12

**M**

**manner** [1] 58/19
**many** [6] 22/20 43/8 43/11 43/18 65/20 77/21
**March** [10] 19/16 45/24 59/24 60/7 90/12 91/3 91/10 91/14 91/20 93/18
**March 15th** [1] 91/20
**March 24th** [2] 90/12 91/3
**March 28** [2] 91/10 91/14
**March 29** [2] 45/24 59/24
**March 29th** [1] 60/7
**March's** [1] 93/21
**MARKED** [2] 3/8 3/14
**Marshall** [1] 68/18
**mask** [2] 61/2 64/4
**material** [1] 63/11
**materials** [1] 57/3
**matter** [26] 6/21 15/2 20/3 23/9 24/1 28/15 28/23 29/24 33/2 45/22 46/1 46/4 46/13 46/14 46/24 57/18 58/23 60/9 60/15 61/10 62/9 66/6 66/13 74/2 77/25 97/9
**matters** [2] 4/21 13/4
**may** [15] 6/25 7/20 27/1 27/2 27/22 27/23 45/17 49/5 49/18 50/20 60/2 66/4 67/3 67/6 96/15
**maybe** [3] 21/24 49/6 71/23
**McLean** [24] 22/5 22/12 23/17 23/25 24/2 24/7 24/13 24/20 25/8 26/5 34/10 34/12 34/13 34/17 35/17 41/7 41/15 42/2 42/7 42/14 42/20 54/11 54/18 66/24
**McLean's** [1] 43/6
**me** [101]
**meals** [1] 77/11
**mean** [13] 10/10 12/8 21/20 21/21 27/16 40/12 45/9 47/5 51/1 51/14 54/1 61/1 83/11
**meaning** [4] 7/16 9/10 9/20 39/3
**meant** [1] 10/19
**mediate** [2] 23/8 31/22
**mediation** [51] 12/15 24/20 25/9 25/14 26/12 26/19 26/19 26/23 28/6 30/14 30/24 31/2 31/6 31/12 31/16 31/24 32/1 32/13 33/4 33/7 33/10 34/3 34/12 34/23 35/3 35/11 35/16 36/4 37/14 37/15 38/24 39/5 52/23 64/22 76/7 76/10 76/12 76/13 76/18 76/19 76/22 76/24 77/4 77/7 77/9 77/16 77/18 78/4 81/19 83/15 83/22
**mediations** [2] 33/20 35/9
**mediator** [1] 35/13
**meet** [5] 43/8 47/24 48/3 69/23 70/1
**meeting** [18] 49/9 50/23 52/4 57/11 57/19 59/6 59/11 70/10 70/15 71/1 71/21 71/24 72/2 72/7 73/4 74/24 75/3 75/10
**meetings** [2] 43/10 53/22
**Meisinger** [12] 32/22 33/1 34/23 35/9 35/17 35/22 37/13 37/20 38/2 39/9 39/12 66/5
**memo** [2] 56/14 56/15
**memorandum** [3] 56/13 56/20 61/11
**memory** [6] 9/20 51/7 51/10 65/9 65/13 65/16
**mentioned** [5] 73/6 84/15 84/16 86/7 89/4
**merely** [1] 57/20
**merits** [1] 13/2
**message** [8] 89/15 89/21 91/6 91/10 92/18 94/1 94/4 95/23
**messages** [8] 61/4 61/23 63/5 90/4 90/14 90/20 91/3 92/15
**met** [9] 28/17 47/13 48/12 52/15 69/14 70/10 71/20 75/20 76/9
**Miami** [8] 23/3 23/5 26/13 26/18 27/6 28/11 29/20 54/14
**mic** [4] 64/3 64/6 64/9 67/19
**MICHAEL** [30] 1/11 2/14 4/4 4/9 8/4 13/18 13/23 48/17 69/12 69/15 69/25 75/15 75/16 76/25 77/2 78/5 83/14 84/23 86/20 88/21 89/1 89/9 89/16 90/14 91/15 91/22 92/22 92/22 93/11 96/2
**microphone** [2] 64/5 68/7
**mid** [1] 56/1
**mid-morning** [1] 56/1
**midst** [1] 65/20
**might** [2] 90/20 44/15
**million** [11] 16/7 16/23 17/1 18/8 19/15 78/25
82/1 82/14 84/6 87/15 87/19
**mind** [4] 21/16 23/11 23/19 23/20
**minimal** [2] 11/24 36/20
**minute** [2] 20/22 21/25
**minutes** [3] 10/8 10/17 56/2
**Miramar** [1] 2/16
**missed** [1] 93/18
**mistrial** [1] 7/11
**moment** [2] 20/11 76/1
**Monday** [2] 93/3 93/5
**money** [17] 12/5 16/10 22/10 22/19 34/13 36/13 41/14 42/8 42/25 78/20 79/2 79/5 83/17 83/20 85/14 85/15 85/24
**Monica** [2] 70/4 70/8
**month** [10] 47/19 76/23 79/7 86/16 86/17 86/18 87/3 91/16 93/16 93/16
**month's** [2] 93/12 93/13
**monthly** [13] 17/8 19/2 19/6 19/9 19/12 19/18 84/9 86/10 86/13 88/17 88/20 88/23 91/19
**months** [3] 18/11 87/10 88/9
**more** [7] 6/10 33/9 44/24 60/18 70/8 84/14 84/20
**Moreover** [2] 6/25 9/24
**morning** [17] 4/5 4/8 4/9 5/5 6/21 13/19 13/22 13/23 14/1 14/2 14/14 14/15 19/25 20/1 56/1 67/25 68/1
**most** [2] 76/25 77/1
**mostly** [1] 58/25
**mother** [4] 69/19 69/20 80/23 80/25
**motion** [4] 4/18 24/16 26/6 27/13
**motions** [1] 61/20
**move** [10] 36/2 36/8 36/10 36/14 36/19 36/22 39/14 55/24 84/19 90/24
**moved** [1] 87/25
**moves** [1] 51/1 51/10 89/25
**Mr** [25] 13/25 14/3 22/12 23/25 24/2 24/7 24/13 24/20 25/8 26/8 26/5 26/12 34/13 34/17 35/17 41/7 42/2 42/7 42/20 43/6 54/11 57/12 60/16 66/24
**Mr.** [128]
**Mr. Andre** [2] 43/12 44/17
**Mr. Avenatti** [15] 4/23 5/23 9/4 13/4 19/22 30/19 36/8 39/14 56/9 58/7 64/11 70/1 70/11 90/5 90/7
**Mr. Cassaro** [1] 75/18
**Mr. Dean** [1] 4/10
**Mr. Harbur's** [1] 5/16
**Mr. McLean** [2] 23/17 42/14
**Mr. Meisinger** [1] 35/22
**Mr. Pat** [2] 27/6 54/14
**Mr. Repking** [2] 4/11 4/13
**Mr. Sagel** [41] 12/3 20/13 21/3 21/17 22/7 23/6 37/2 39/20 43/12 44/14 45/4 45/24 46/3 46/12 46/23 47/2 48/14 50/8 50/12 50/22 51/14 51/21 51/24 52/10 52/14 52/21 53/2 53/6 53/13 53/20 55/7 57/5 57/16 57/21 58/5 59/24 60/8 60/19 64/15 64/18 67/21
**Mr. Steward** [2] 11/18 13/24
**Mr. Weiner** [21] 12/4 14/14 19/25 25/7 26/3 45/20 49/21 56/21 57/7 57/10 57/16 58/25 59/2 59/17 60/8 60/9 61/13 61/17 63/12 63/19 64/13
**Mr. Weiner's** [2] 12/2 58/8
**Mr. Whiteside** [28] 17/1 17/3 17/7 17/12 18/2 18/4 18/9 18/10 19/2 22/2 22/3 22/21 25/15 30/8 31/5 32/3 34/4 34/7 34/18 35/18 45/9 45/22 55/12 55/16 55/20 57/18 77/25 85/24
**Mr. Whiteside's** [1] 29/6
**Mr. Wyman** [6] 17/1 9/11 9/13 10/14 43/12 48/14
**Ms** [3] 6/23 84/24 88/1
**Ms.** [23] 4/11 6/6 13/5 13/24 17/12 18/1 18/9 19/7 22/2 23/14 23/17 26/14 34/3 35/19 39/2 45/8 45/14 45/22 55/17 55/21 57/18 67/11 67/25
**Ms. Cummings-Cefali** [3] 4/11 13/5 13/24
**Ms. Gardner** [16] 17/12 18/1 18/9 19/7 23/17 26/14 34/3 35/19 39/2 45/14 45/22 55/17 55/21 57/18 67/11 67/25

**Ms. Gardner's** [3] 22/2 23/14 45/8
**Ms. Regnier** [1] 6/6
**much** [8] 15/21 44/25 65/16 76/25 77/12 77/15 83/10 85/16
**multiple** [1] 33/14
**music** [2] 68/12 68/13
**my** [84] 7/23 8/22 9/14 10/11 11/24 17/25 18/11 18/19 21/8 21/24 22/6 22/16 22/18 23/1 24/14 24/20 27/17 28/4 28/7 28/10 30/16 33/10 38/24 39/10 39/13 39/17 42/3 43/7 43/4 45/13 48/21 51/13 52/8 52/13 53/4 54/10 54/13 55/22 56/11 56/25 57/4 65/9 67/16 68/17 68/20 69/8 69/19 69/20 75/8 75/15 77/10 77/11 79/8 79/15 79/16 79/25 80/23 80/23 80/25 81/3 83/11 84/5 85/14 86/15 86/24 87/9 87/9 88/7 88/8 88/18 89/6 89/15 91/16 91/17 91/25 92/14 92/23 93/6 93/17 93/25 94/9 94/21 96/4
**myself** [2] 24/8 76/25

**N**

**name** [9] 14/9 22/8 48/17 67/15 67/16 67/17 69/1 72/8 73/19
**namely** [1] 40/20
**NBA** [2] 22/20 23/1
**necessary** [4] 7/25 30/8 62/25 62/25
**need** [9] 9/22 12/23 17/10 19/17 31/8 51/16 72/13 72/17 94/22
**needed** [6] 27/9 51/15 57/10 58/17 87/23 94/13
**needs** [2] 6/24 58/10
**never** [7] 20/2 28/14 35/3 51/20 57/9 79/11 84/9
**nevertheless** [1] 7/4
**new** [1] 84/12
**next** [24] 5/11 25/5 25/21 30/13 46/12 46/24 47/1 47/6 47/8 47/16 48/7 52/17 53/10 72/18 73/9 75/6 75/9 79/8 83/16 92/9 93/9 93/14 93/16 93/22
**NICOLA** [1] 2/3
**night** [3] 11/18 80/18 82/13
**Ninth** [4] 9/24 10/1 11/10 60/21
**no** [71] 5/25 7/2 11/21 17/5 17/9 19/4 19/8 19/20 19/21 22/4 24/10 32/8 33/3 33/12 34/9 35/6 37/7 37/21 42/9 42/11 45/23 46/16 47/15 49/24 50/3 51/2 51/21 52/16 53/8 55/10 56/5 56/20 57/19 58/3 61/24 66/1 66/21 66/25 67/2 71/11 72/10 74/3 74/7 74/23 77/5 77/14 77/17 78/16 79/20 81/14 82/3 82/9 82/10 82/14 83/3 83/6 83/21 84/1 84/5 84/9 86/6 87/17 90/16 90/17 92/8 92/9 94/24 95/1 95/5 95/9 95/12
**None** [2] 3/12 3/15
**nonresponsive** [1] 55/24
**North** [1] 2/7
**not** [89] 4/2 6/11 7/21 8/13 8/15 9/7 9/12 9/19 10/18 13/2 13/8 17/3 17/7 17/14 18/3 19/5 19/6 20/5 22/1 23/13 24/5 24/25 26/10 28/16 29/10 30/13 30/20 30/24 31/22 32/1 32/12 33/3 33/11 33/21 35/22 38/20 39/2 39/4 39/6 41/9 42/13 44/4 44/21 46/10 49/2 49/6 54/12 54/16 54/20 56/3 56/4 56/8 57/19 58/8 58/8 58/9 58/9 58/13 58/25 59/4 59/4 62/5 62/17 62/22 63/20 63/24 64/7 64/16 66/2 66/4 66/8 69/20 71/22 72/11 75/11 78/19 80/16 81/3 82/5 82/23 84/5 84/6 90/7 92/5 92/7 96/10 96/11 96/12 96/14
**note** [1] 13/6
**notes** [17] 56/20 56/25 57/19 58/3 58/7 58/9 58/13 59/8 59/10 59/13 59/15 59/17 60/15 61/6 61/7 61/12 61/15
**nothing** [7] 13/10 55/16 55/20 57/14 58/23 59/19 67/1
**notice** [2] 6/25 90/6
**November** [3] 17/20 69/6 82/4
**November 1st** [2] 17/20 82/4
**now** [27] 5/7 6/20 7/8 7/11 21/6 21/17 23/8 32/17 32/22 33/6 33/10 34/23 37/2 38/7 38/12 39/24 41/6 47/1 50/4 54/21 60/16 66/2 71/15 74/5 90/11 96/6 96/7

**N**

nowhere [1]  24/21
number [10]  15/7 15/7 50/9 63/9 64/13 79/11
81/22 82/17 94/9 94/9
numbers [3]  62/24 63/4 63/6

**O**

oath [1]  14/6
objection [22]  15/15 22/22 24/9 24/15 27/8
28/25 30/10 30/17 30/19 32/14 34/14 34/19
40/16 42/3 42/15 42/22 44/8 55/4 66/7 66/19
71/11 90/1
objections [1]  24/22
obligation [1]  19/3
obligations [4]  19/6 19/9 19/12 19/19
obtain [1]  57/8
obtained [2]  74/12 74/14
occurred [1]  49/23
occurs [1]  26/6
off [3]  70/8 79/15 83/10
offer [1]  9/8
offered [1]  10/3
office [5]  33/3 33/4 95/7 95/10 95/14
OFFICES [1]  2/15
often [1]  38/13
Okay [20]  5/3 5/6 5/8 5/21 5/22 6/14 7/4 10/7
11/13 12/12 13/12 51/7 51/12 60/6 62/14
67/12 68/9 70/10 70/18 93/3
once [1]  89/13
one [36]  5/25 9/17 9/22 20/25 21/1 21/3 33/20
33/24 33/24 34/4 38/16 38/16 38/24 38/24
39/1 39/17 42/10 49/5 50/11 51/24 52/1 56/12
59/3 59/22 60/10 61/24 61/25 65/19 68/18
70/4 70/7 82/19 86/4 88/6 88/10 92/16
ones [3]  57/8 90/17 90/19
only [11]  7/23 48/9 49/2 51/4 52/4 57/7 58/14
59/6 77/10 85/18 86/15
open [1]  23/25
opening [1]  23/18
opinions [1]  56/4 96/11
opportunity [4]  6/22 11/12 20/5 82/21
opposite [1]  40/19
opposition [1]  5/18
options [1]  7/9
order [2]  31/5 58/20
original [2]  38/23 85/15
Originally [1]  75/15
originator [3]  16/20 16/23 22/9
other [27]  17/13 17/15 25/14 28/15 31/5
33/24 34/17 35/13 37/8 39/17 42/10 57/11
59/14 61/23 63/6 65/20 65/20 66/18 67/10
70/13 74/2 74/4 74/5 77/3 82/24 84/3 88/11
others [2]  6/8 10/13
otherwise [1]  7/21
ought [1]  6/7
our [3]  30/13 33/17 34/24
out [38]  6/12 7/3 18/9 18/12 19/14 24/5 24/6
24/19 25/13 26/4 26/11 27/7 29/7 35/23 40/8
45/25 54/18 57/12 58/12 59/9 60/8 64/2 73/17
77/8 77/8 78/9 79/19 84/4 88/10 88/11 88/13
88/14 89/8 89/9 92/10 92/12 92/13 93/13
outweighs [1]  36/21
over [9]  4/14 47/8 59/15 69/2 77/10 78/15
83/1 86/10 95/2
Overruled [9]  15/17 24/23 27/11 44/9 46/15
53/25 66/20 71/3 86/2
own [1]  11/12

**P**

p.m [3]  28/8 31/21 92/15
page [42]  16/20 28/3 38/8 38/10 38/10 38/14
38/17 38/18 38/21 49/25 51/13 52/17 52/18
53/11 56/14 70/22 73/10 73/14 80/3 80/6
81/8 81/10 81/17 81/21 82/16 82/19 83/8
84/25 85/3 85/5 90/11 90/12 90/17 90/17 91/3
91/9 92/6 93/8 94/4 94/5 97/10
page 1 [2]  73/14 80/3
page 139 [1]  81/17
page 3 [4]  70/22 73/6 82/16 85/3

page 4 [1]  94/4
page 6 [6]  33/10 81/10 81/10 83/8 94/5
pages [5]  12/10 38/18 81/12 89/12 89/14
pages 85 [1]  12/10
paid [11]  12/8 16/6 17/17 17/19 18/8 36/13
74/17 83/16 85/12 85/23 86/10
pandemic [3]  33/15 33/17 43/17
paper [3]  8/4 8/5 21/7
paragraph [21]  36/25 37/11 52/7 52/9 52/25
72/20 72/23 73/13 74/8 74/10 80/3 80/5 81/17
81/21 81/22 81/24 82/11 82/16 82/17 83/2
83/5
paralegal [3]  4/14 75/16 75/17
parameter [2]  19/15
part [8]  17/21 54/25 55/2 69/6 78/24 80/7
80/24 82/7
particular [1]  53/10
parties [15]  17/22 33/21 35/10 35/12 35/13
37/6 38/12 38/22 55/1 55/9 55/11 55/13 55/22
60/10 82/19
partner [1]  22/12
party [22]  7/16 7/20 8/16 8/21 8/23 9/2 9/3
9/10 9/13 9/18 9/18 9/18 9/22 9/23 10/19 10/20
10/21 11/9 38/16 38/17 82/18 82/20 82/24
party' [1]  9/18
passage [1]  11/8
passed [1]  13/8
Pat [5]  22/25 26/12 27/6 28/10 54/14
Patrons [1]  70/14
pavilion [1]  70/5
pay [6]  74/22 79/15 81/25 82/2 85/13 88/16
paying [1]  86/5
payment [21]  17/3 17/16 17/21 36/16 36/24
37/7 37/9 40/9 40/15 40/21 41/1 54/2 54/23
55/8 79/13 79/20 80/10 81/22 82/1 82/9
payments [9]  17/8 53/17 80/9 80/12 86/13
86/15 86/23 87/1 88/25
penalties [1]  18/5
people [1]  70/14
per [1]  93/17
percent [5]  74/11 74/14 74/21 79/22 79/23
perhaps [1]  44/2
period [5]  21/14 33/17 42/1 52/12 84/2
periodic [1]  17/22
permanent [2]  84/14 84/20
person [7]  8/24 22/1 41/17 43/10 43/23 47/13
69/24
personal [1]  73/18
pertained [1]  65/5
phone [14]  16/6 24/10 48/15 48/25 49/2 49/16
65/19 65/20 65/22 69/19 89/17
phones [1]  89/18
physical [1]  38/13
physically [2]  6/11 38/2
picks [1]  68/7
piece [3]  8/4 8/5 21/7
place [13]  32/25 48/6 49/9 49/10 56/15 56/21
57/8 64/14 65/7 72/5 84/12 84/20 85/10
places [1]  68/25
Plaintiff [1]  1/10 2/2
PLAINTIFF'S [2]  3/4 3/7
played [2]  23/5 49/4
players [1]  22/20
pleading [2]  6/4 6/20
please [13]  14/8 20/16 20/18 52/17 55/21
56/2 56/5 60/4 60/24 67/14 67/20 89/11 96/9
plus [2]  64/8 80/11
point [11]  8/15 29/16 31/1 45/12 56/12 61/9
80/16 92/19 94/16 94/20 94/23
pointing [1]  75/25
points [2]  92/10 92/12
poor [2]  75/3 75/8
portion [5]  7/24 7/25 20/16 71/14 73/15
portions [1]  78/17
posed [2]  9/9 10/12
position [3]  11/7 22/14 31/11
possible [1]  31/15
potential [1]  31/15
potentially [1]  23/18

potentials [1]  18/5
practice [1]  53/16
practices [1]  74/9
preferred [1]  35/10
preparation [1]  53/14
prepared [2]  7/15 85/6
prerogative [1]  25/24
present [5]  4/2 4/10 13/16 35/14 39/2 39/6
44/12 48/18 56/8 63/15 64/1 80/11 96/14
PRESIDING [1]  1/8
pretty [4]  45/1 51/7 76/25 83/10
preview [2]  11/25 12/23
previously [4]  14/4 20/9 66/8 82/5
primarily [1]  79/6
prior [21]  9/1 24/5 24/6 24/16 24/19 25/13
26/4 26/11 28/14 33/1 36/1 36/10 36/18 42/8
59/9 61/13 69/5 72/7 74/12 77/16 93/18
privilege [7]  23/11 25/5 25/11 25/12 25/16
37/14 37/15
privileged [1]  25/19
privileges [3]  23/10 24/25 25/3
PRO [1]  2/14
probably [7]  11/23 31/7 44/10 44/14 47/8
70/6 75/8
probative [2]  36/20 36/21
problem [4]  7/8 58/6 61/21 64/10
problems [2]  12/1 60/23
proceed [1]  35/10
proceeding [3]  65/21 74/13 74/15
proceedings [4]  1/15 13/15 56/7 97/9
process [7]  7/20 26/5 30/9 57/4 77/16 77/18
84/22
Produce [1]  6/5
produced [4]  63/2 63/8 63/9 63/13
professional [1]  22/19
profile [1]  22/19
progress [2]  31/10 73/24
proponent [1]  9/13
propose [1]  11/20
proposing [2]  4/19 5/9
prosecution [1]  61/16
protect [5]  55/9 55/11 55/12 55/15 55/20
protecting [1]  55/16 55/20
protective [1]  58/20
proved [1]  69/4
provide [2]  5/24 73/22
provided [9]  5/7 8/7 17/3 13/5 15/11 56/13
57/3 60/1 73/3
provides [2]  17/14 18/3
provision [4]  7/23 37/2 54/21 55/11
pull [2]  67/19 80/3
purported [1]  9/8
purpose [3]  45/9 45/21 46/9
purposes [1]  80/9
pursuant [4]  58/20 59/18 79/21 97/6
put [1]  11/1 21/8 69/17 80/2

**Q**

qualification [1]  62/11
quash [1]  4/18
question [39]  9/7 9/9 10/12 18/1 20/24 23/12
23/12 25/4 25/5 25/21 28/4 30/20 30/20 33/10
35/5 36/7 37/16 37/18 40/17 41/9 50/19 51/13
52/9 55/7 55/21 65/9 69/4 69/5 71/22 72/14
72/18 72/18 75/9 76/16 77/24 91/15
94/25 95/16
questions [23]  8/9 12/9 19/21 21/17 33/6
33/9 45/5 50/12 50/21 50/24 51/15 51/24 52/3
52/5 52/10 53/20 54/10 54/13 54/17 64/13
64/15 64/21 65/5
quick [2]  49/6 91/15
quickly [1]  60/2
quite [4]  12/4 12/9 24/25 71/22
quote [3]  24/8 24/13 63/6

**R**

Rachel [1]  87/5
Ramon [2]  4/7 13/21
rate [1]  86/16

**R**

**reach [7]** 18/12 19/14 38/12 88/10 88/11 89/8 89/9
**reached [10]** 18/9 27/7 36/19 45/24 54/18 60/8 78/1 78/3 78/6 88/13
**reaches [1]** 9/24
**reaching [11]** 24/5 24/6 24/19 25/13 26/4 26/11 29/7 36/1 36/10 40/8 88/14
**read [12]** 8/12 11/8 60/18 61/7 73/14 74/20 78/17 81/12 82/11 89/12 90/16 93/9
**reading [2]** 52/9 89/15
**ready [1]** 30/16
**Reagan [1]** 2/10
**really [11]** 12/7 12/8 32/12 44/4 44/25 45/2 46/7 50/14 54/16 46/16 69/11
**reason [8]** 6/24 12/6 12/13 19/8 31/19 42/11 88/15 94/13
**reasonable [1]** 73/24
**reasonably [1]** 73/23
**reasons [3]** 55/18 55/23 88/6
**recall [62]** 8/3 17/18 26/15 26/21 26/23 27/17 28/16 28/23 29/4 29/11 29/13 29/15 29/19 30/2 30/6 30/23 31/3 31/12 31/14 31/18 32/6 32/10 36/5 36/6 37/4 38/22 38/25 41/7 43/10 43/18 43/20 44/12 44/14 44/23 45/2 46/2 47/4 47/14 47/22 48/2 48/4 48/25 49/5 49/15 50/22 51/3 51/23 52/3 52/5 52/24 54/1 54/7 54/12 54/16 54/20 54/23 55/9 60/12 64/15 64/17 67/4 67/7
**recalled [2]** 6/25 7/5
**recalling [1]** 7/8
**receive [13]** 74/10 74/21 79/1 79/2 79/4 79/6 79/7 79/9 79/18 79/23 80/1 83/17 91/19
**received [19]** 3/8 3/14 10/9 11/17 15/18 15/19 56/19 59/3 71/12 71/13 80/7 80/12 87/14 87/19 90/3 90/6 90/9 90/9 90/19 94/16
**receiving [2]** 78/23 80/16
**recess [7]** 13/12 13/14 56/2 56/6 96/9 96/16 96/17
**recognize [6]** 14/21 70/21 70/23 70/25 89/13 94/5
**recollection [47]** 7/13 7/21 8/7 8/24 9/9 9/12 10/4 10/24 10/25 17/25 21/24 25/17 25/21 25/23 26/3 26/9 26/24 27/5 27/9 27/21 28/5 29/10 31/9 31/25 32/11 36/12 38/1 44/3 44/25 45/15 45/21 46/9 46/16 49/22 50/1 51/14 51/21 52/8 52/10 52/13 53/1 53/4 56/18 59/23 81/3 81/19 84/5
**record [5]** 10/16 14/9 24/10 36/9 76/3
**records [2]** 57/8 58/16
**recovered [1]** 74/21
**recovery [3]** 74/11 74/14 80/9
**RECROSS [2]** 3/4 3/11
**redaction [1]** 11/18
**redactions [1]** 11/21
**redirect [3]** 3/4 3/11 67/2
**reduction [1]** 86/16
**refer [1]** 92/24
**reference [1]** 16/13
**referenced [1]** 28/23
**referred [2]** 79/22 89/10
**referring [6]** 21/3 57/11 89/4 91/18 93/24 96/3
**refers [2]** 41/24 56/19
**refresh [26]** 7/20 8/7 8/24 9/9 9/12 10/4 10/23 25/22 26/3 26/8 26/24 27/5 27/21 28/4 44/3 45/15 45/20 49/22 50/1 51/14 52/8 52/9 52/13 53/4 56/18 59/23
**refreshed [3]** 9/21 10/25 27/9
**refreshes [2]** 46/8 53/1
**refreshing [1]** 7/13
**regard [2]** 6/20 36/1
**regarding [9]** 6/5 12/4 15/2 20/2 26/13 30/24 47/3 48/5 49/3
**Regnier [2]** 6/6 6/23 63/5
**regular [2]** 64/5 65/24
**regularly [1]** 65/22
**regulations [1]** 97/11
**rejects [1]** 11/8
**related [7]** 14/23 22/2 22/3 26/18 29/24 33/2

48/8
**relates [5]** 55/16 59/24 60/1 69/17 89/9
**relating [17]** 11/4 11/18 12/14 13/6 24/19 29/20 37/3 44/6 48/24 48/25 54/22 56/11 60/21 61/3 61/16 66/5 66/13
**relation [1]** 27/17
**relationship [2]** 72/8 73/18
**relevance [5]** 22/22 24/15 41/20 42/3 66/19
**relied [1]** 82/23
**remember [27]** 8/11 12/11 17/20 22/9 24/3 31/2 31/23 33/7 36/7 45/5 45/11 46/7 48/9 51/17 51/18 51/25 52/1 52/13 53/4 54/3 54/5 54/6 56/3 69/1 73/3 76/17 96/10
**reminded [1]** 14/5
**rent [1]** 87/9
**rental [1]** 85/16
**rentals [1]** 84/17
**repeat [1]** 19/13
**Rephrase [1]** 40/17
**Repking [3]** 4/11 4/13 13/25
**replied [1]** 92/6
**reply [1]** 92/4
**reported [1]** 97/8
**reporter [2]** 64/3 97/16
**REPORTER'S [1]** 1/15
**represent [4]** 73/16 73/23 74/17 74/25
**representation [4]** 58/2 58/6 63/10 82/24
**representatives [18]** 18/10 22/3 25/15 28/22 29/6 31/5 37/8
**represented [6]** 8/3 23/17 45/13 60/10 87/8 87/9
**representing [2]** 28/22 40/21
**request [3]** 6/6 6/23 56/11
**requesting [1]** 23/25
**required [1]** 73/23
**requires [2]** 59/9 72/25
**research [6]** 10/12 10/13 11/12 56/5 58/10 96/12
**reserve [1]** 67/4
**residence [2]** 87/9 87/25
**resolution [2]** 55/20 80/12
**resolve [1]** 23/13
**resolved [1]** 24/1
**resolving [1]** 23/18
**respect [2]** 63/19 65/18
**respond [3]** 4/24 6/23 73/25
**responded [2]** 30/2 55/8
**response [4]** 72/10 93/2 94/1 94/24
**resumed [2]** 13/15 56/7
**review [3]** 6/22 49/4 63/16
**reviewed [2]** 39/18 82/20
**reviewing [2]** 54/11 60/5
**revisit [2]** 11/7 11/11
**right [62]** 15/6 16/9 16/12 18/24 20/3 20/6 20/9 21/4 21/7 21/25 22/15 23/6 23/19 23/22 29/25 30/16 33/14 33/20 33/25 34/5 34/13 35/4 35/14 35/19 35/23 38/18 39/24 40/5 40/11 40/15 40/22 41/4 41/13 41/19 43/21 44/1 45/9 45/10 46/6 47/1 47/24 48/11 48/14 48/18 49/11 49/25 50/8 50/13 51/5 51/22 52/7 53/9 53/18 54/7 55/12 57/4 65/7 67/4 70/8 74/5 86/9 95/22
**right-hand [1]** 49/25
**rights [1]** 9/22
**Riley [5]** 22/25 26/13 27/6 28/10 54/14
**Roberson [1]** 48/13
**Robertson [1]** 70/9
**role [1]** 22/15
**Ronald [1]** 2/10
**roof [1]** 77/10
**room [16]** 33/22 33/24 33/25 34/4 34/5 34/8 34/11 35/4 39/3 39/4 39/5 39/9 39/13 67/11 77/2 78/5
**rooms [2]** 33/14 37/23
**roughly [5]** 36/7 44/22 76/23 86/17 87/10
**routing [1]** 94/9
**RPR [1]** 1/19
**rule [11]** 7/14 7/16 7/19 7/23 8/13 8/16 8/23 9/6 11/4 36/20 59/14

**Rules [1]** 7/14
**ruling [1]** 87/16
**run [1]** 42/21
**run-in [1]** 42/21

**S**

**SACR [3]** 1/11 4/3 13/17
**SACR-19-00061-JVS [1]** 1/11 4/3 13/17
**SAGEL [46]** 2/9 4/5 12/3 13/19 14/3 20/13 21/3 21/17 22/7 33/6 37/2 39/20 43/12 44/14 45/4 45/24 46/3 46/12 46/23 47/2 48/14 50/8 50/12 50/22 51/14 51/21 51/24 52/10 52/14 52/21 53/2 53/6 53/13 53/20 55/7 57/5 57/16 57/21 58/5 59/24 60/8 60/16 60/19 64/15 64/18 67/21
**said [17]** 8/10 9/16 18/23 27/8 28/21 28/24 29/5 31/8 50/14 51/14 68/10 79/12 86/9 90/7 92/9 92/11 93/23
**same [20]** 9/24 16/14 24/22 27/18 30/17 30/20 33/21 35/4 38/13 38/21 39/3 39/4 41/18 42/22 45/3 70/2 84/2 92/24 93/22 95/21
**San [2]** 2/16
**Santa [1]** 1/16 1/20 2/11 4/1 70/4 70/8
**sat [1]** 81/16
**saw [4]** 26/21 27/17 77/1 81/15
**say [27]** 10/18 10/24 16/15 18/22 19/1 19/8 19/17 24/21 28/18 43/3 49/12 57/21 63/25 66/2 66/3 66/11 75/17 79/9 79/18 80/21 83/13 85/22 90/16 90/17 91/17 92/9 96/1
**saying [4]** 51/17 51/18 51/22 60/17
**says [21]** 6/4 8/4 16/4 16/12 16/16 17/19 17/25 27/16 29/8 29/10 37/11 40/12 40/12 72/23 73/14 73/15 74/10 80/6 81/17 81/24 82/17
**scheduling [2]** 43/18 49/7
**schools [2]** 68/19 68/20
**Scope [2]** 73/14 73/15
**screen [2]** 32/17 32/19
**screenshots [1]** 89/17
**SE [1]** 2/14
**second [5]** 11/25 17/21 21/1 28/2 68/17
**section [5]** 2/6 9/15 16/14 74/8 97/6
**secure [1]** 88/11
**security [1]** 87/11
**see [33]** 14/19 16/21 18/20 21/6 21/11 26/24 27/20 32/19 32/21 32/22 32/23 37/1 38/10 40/8 43/18 45/15 64/8 71/17 74/9 80/1 81/22 83/7 87/6 89/3 90/18 90/19 91/4 91/11 93/7 93/20 94/3 95/24 96/13
**seeking [1]** 23/13
**seeks [1]** 8/11
**seem [1]** 65/15
**seemed [1]** 88/6
**seen [2]** 51/20 89/13
**sees [1]** 8/16
**SEFFENS [3]** 1/19 97/15 97/16
**SELNA [1]** 1/8
**send [10]** 42/8 52/22 89/3 91/10 92/18 93/7 93/12 93/23 94/12 94/15 95/23
**sending [5]** 28/23 29/4 94/6 94/8 94/10
**senior [1]** 22/15
**sensitivity [1]** 64/9
**sent [18]** 16/10 23/16 23/24 26/12 26/16 26/18 27/6 27/7 28/20 29/21 33/1 52/1 58/15 90/7 90/19 92/14 95/21 96/2
**separate [1]** 68/13
**server [1]** 30/9
**service [2]** 30/7 30/15
**services [3]** 73/14 73/15 73/23
**session [1]** 35/6
**set [10]** 12/15 25/9 25/14 26/5 26/11 26/19 26/23 30/14 31/6 46/5
**setting [4]** 28/6 31/15 33/11 35/12
**settled [1]** 78/25
**settlement [46]** 16/18 17/10 17/11 36/2 36/10 36/18 36/25 37/3 38/7 38/9 38/12 38/23 39/15 40/4 40/5 40/10 41/1 45/8 45/13 52/23 53/17 54/2 54/22 54/25 55/2 57/9 58/15 64/23 72/11 78/12 78/14 78/18 78/21 78/24 79/19 80/8

**S**

settlement... **[10]**  80/19 81/2 81/24 82/12
83/25 84/11 84/19 86/8 87/13 95/3
**Several [2]**  88/6 94/3
**SHARON [3]**  1/19 97/15 97/16
**she [21]**  4/16 6/24 6/24 6/25 6/25 7/2 7/3 7/5
18/3 18/5 18/12 18/13 18/24 39/10 39/18
69/21 69/22 69/22 72/15 85/18 90/7
**she's [2]**  6/24 72/15
**short [2]**  6/7 84/17
**short-term [1]**  84/17
**shortly [1]**  76/18
**shot [1]**  24/14
**should [4]**  7/13 11/13 29/16 70/16
**showed [1]**  14/4
**shows [1]**  8/11
**shuttle [1]**  35/1
**side [12]**  16/9 16/12 33/24 33/24 34/18 34/24
34/25 40/19 40/20 77/3 84/3 88/1
**sign [10]**  38/13 38/16 38/17 39/13 71/1 74/5
78/7 78/10 78/11 83/7
**signature [9]**  38/8 38/9 38/18 39/1 70/23 73/7
73/9 81/10 85/3
**signatures [1]**  38/21
**signed [13]**  38/7 38/22 39/2 39/6 39/10 39/18
71/7 74/24 78/14 80/18 83/2 83/4 83/15
**simple [1]**  20/23
**since [3]**  6/24 9/20 59/2
**sing [1]**  68/12
**singing [1]**  68/13
**single [1]**  50/10
**sir [35]**  9/7 11/6 12/18 12/22 14/5 20/20 23/16
24/5 24/19 26/8 27/5 27/15 28/2 29/4 29/9
30/13 36/12 36/14 36/16 36/18 36/24 37/15
38/10 40/19 41/23 42/6 43/3 46/11 51/4 55/19
60/24 63/21 66/11 66/14 67/6
**sit [2]**  54/7 59/16
**sitting [4]**  4/16 63/21 63/23 75/25
**situation [2]**  11/5 75/14
**six [3]**  52/7 52/9 52/25
**slightest [1]**  59/5
**slightly [1]**  84/20
**so [66]**  5/4 5/6 5/16 6/2 6/8 6/23 8/2 8/5 8/10
8/10 8/25 10/2 10/9 11/24 12/1 21/3 23/10
24/25 33/17 37/23 38/16 38/18 43/17 44/18
53/19 54/2 56/25 57/10 58/8 59/8 60/7 62/24
62/25 63/4 64/6 64/9 68/7 68/19 69/4 69/6
72/4 72/4 78/9 78/11 79/15 80/24 83/4 83/11
83/23 84/9 84/19 85/16 85/17 86/15 87/9
88/10 89/6 90/17 91/22 93/12 93/13 93/19
93/19 93/21 93/23 95/18
**Sofitel [4]**  68/25 69/6 75/11 84/15
**solution [1]**  61/15
**some [23]**  6/7 11/17 11/19 31/1 31/10 32/7
33/6 33/9 35/21 45/3 45/12 46/23 48/5 50/20
59/14 62/24 65/5 75/23 78/7 78/19 79/15
80/16 94/16
**somebody [1]**  63/1
**somehow [1]**  12/7
**someone [3]**  69/22 72/4 95/18
**something [5]**  8/10 25/3 59/13 79/24 84/14
**sometimes [4]**  38/15 38/15 38/16 38/19
**somewhat [1]**  52/22
**somewhere [1]**  46/2
**soon [2]**  76/9 84/11
**sorry [5]**  19/13 46/21 49/9 61/1 64/25
**sort [6]**  17/24 21/19 21/20 49/8 50/14 50/19
**sought [1]**  50/18
**sounds [2]**  44/1 48/11
**SOUTHERN [1]**  1/6
**speak [3]**  34/23 34/24 72/5 93/20
**speaking [1]**  49/14
**speaks [1]**  17/24
**Special [7]**  4/7 13/21 44/19 44/20 48/12 48/12
48/13
**specific [9]**  8/9 18/1 46/2 46/16 47/4 48/2
52/5 64/20 70/8
**specifically [7]**  31/18 33/3 45/2 45/11 48/4
51/3 57/17

**specifics [1]**  53/5
**spell [3]**  58/11 69/9 69/10
**spent [1]**  77/1
**spoke [1]**  14/24
**spoken [2]**  20/2 24/7
**Spring [1]**  2/7
**stamp [4]**  62/24 63/4 63/6 63/9
**stand [4]**  47/7 57/21 62/1 64/25
**stands [1]**  15/10
**Starbucks [8]**  74/4 70/6 70/11 70/14 71/20
72/3 75/4 75/21
**start [6]**  5/11 15/21 50/23 82/7 90/11 93/15
**started [2]**  36/6 95/23
**starting [1]**  11/4
**starts [3]**  82/16 93/8 94/4
**state [4]**  7/3 14/8 67/14 73/19
**stated [3]**  55/18 55/23 62/10
**statement [3]**  9/1 58/8 61/25
**statements [6]**  6/5 59/10 59/11 61/4 61/5
62/11
**STATES [15]**  1/4 1/9 1/19 2/3 2/4 2/6 2/7 2/10
4/4 4/6 9/25 13/18 13/20 97/7 97/11
**stay [1]**  75/9
**staying [1]**  69/5
**stenographically [1]**  97/8
**step [1]**  96/15
**steps [1]**  73/24
**STEWARD [5]**  2/15 2/15 4/10 11/18 13/24
**still [7]**  14/6 58/7 58/9 58/10 62/21 64/10
93/11
**stood [1]**  76/1
**stopped [2]**  36/6 88/8
**straightforward [2]**  20/23 65/12
**street [4]**  1/20 2/7 2/11 70/7
**stricken [2]**  7/10 91/1
**strike [10]**  23/9 23/11 24/6 28/13 38/8 44/5
49/10 55/24 66/3 90/24
**structured [1]**  80/8
**student [3]**  68/5 68/11 68/14
**stuff [2]**  63/1 63/8
**styled [1]**  6/4
**subject [2]**  12/19 12/23 67/7
**Submission [1]**  6/4
**submitted [3]**  56/5 61/17 96/12
**subpoena [2]**  4/19 58/16
**subsequent [3]**  39/15 56/19 58/24
**subsequently [2]**  26/17 46/5
**substance [12]**  48/8 48/24 49/1 49/3 59/5
59/9 59/19 61/14 62/8 62/11 63/12 66/4
**substantive [1]**  57/13
**such [3]**  4/21 44/19 80/7
**sue [1]**  32/12
**sufficient [1]**  57/19
**sufficiently [1]**  36/9
**suggested [3]**  37/12 37/20 38/2
**suggestion [4]**  12/7 37/24 37/24 37/25
**Suite [3]**  1/20 2/11 2/16
**sum [11]**  79/6 79/9 79/10 79/11 79/12 79/13
80/10 80/16 82/1 85/15 85/23
**Sunday [1]**  11/21
**Sunset [1]**  69/2
**supplement [1]**  11/6
**supposed [2]**  59/9 91/19
**Supreme [1]**  60/21
**sure [16]**  6/12 6/17 18/24 24/25 35/5 41/9
44/21 45/1 58/8 58/13 58/18 63/22 68/7 71/22
93/3 93/5
**sustain [1]**  30/19
**sustained [19]**  22/23 24/11 24/17 29/2 30/11
30/18 32/15 34/15 34/21 35/25 38/5 41/21
42/4 42/18 42/23 55/5 66/8 66/9 90/23
**SWORN [2]**  14/4 67/13
**system [1]**  43/1

**T**

**tab [1]**  52/17
**tab 135 [1]**  52/17
**table [4]**  4/7 4/16 13/21 75/25
**tacks [1]**  63/3

**take [24]**  5/15 6/21 7/12 11/13 19/11 19/17
21/9 24/4 49/5 49/5 49/15 49/16 49/25 61/12
51/13 52/7 52/25 53/9 56/1 73/24 89/17 90/6
96/7 96/8
**taken [5]**  13/14 56/6 58/3 79/25 96/17
**taking [3]**  4/14 4/21 64/14
**talk [2]**  57/17 92/22
**talked [7]**  17/16 26/22 26/23 41/7 50/15 50/20
61/13 88/1
**talking [6]**  10/22 30/25 33/16 49/23 92/25
93/16
**team [3]**  21/1 61/17 66/18 66/18 66/18 89/6
**tech [1]**  64/8
**technology [1]**  4/11
**telephone [10]**  24/2 31/14 43/23 43/24 47/12
47/14 47/23 48/3 54/17 65/22
**telephones [1]**  43/11
**tell [38]**  19/5 46/8 50/17 51/16 53/1 62/22
64/20 77/7 77/12 77/15 77/20 78/21 78/23
79/1 79/2 79/4 79/13 80/18 80/22 80/25 81/1
82/8 83/19 86/4 86/8 86/12 86/21 86/22 86/25
87/14 87/18 89/1 89/13 91/13 94/13 95/6
95/10 95/13
**telling [5]**  29/15 29/19 30/3 31/3 80/15
**tells [1]**  63/4
**ten [2]**  18/11 60/19
**term [7]**  7/16 37/12 37/20 38/3 55/13 55/22
72/7 84/17
**terms [7]**  42/2 82/6 82/12 82/22 85/18 85/19
86/8
**testified [6]**  20/6 25/20 43/13 50/13 62/1
62/21
**testify [5]**  9/19 43/9 48/23 59/2 62/8
**testifying [1]**  58/23 59/1
**testimony [9]**  7/10 8/1 12/3 12/4 12/9 53/14
59/5 59/7 59/20
**text [17]**  61/4 61/23 63/5 89/15 89/21 90/14
90/20 91/3 91/6 91/10 92/15 92/18 92/21 93/8
94/1 94/4 95/23
**textbook [2]**  62/4 62/5
**than [14]**  11/21 34/17 37/7 44/24 45/1 60/19
65/16 66/18 70/13 74/2 74/4 82/3 82/9 84/14
**Thank [12]**  4/17 5/21 7/18 13/9 14/11 25/25
37/17 56/10 67/7 67/18 67/20 67/22
**thanking [1]**  30/2
**that [528]**
**that's [42]**  4/15 4/17 5/5 5/15 5/19 8/12 9/7
13/3 17/25 22/16 22/18 26/9 29/6 29/8 31/17
32/20 33/5 34/1 34/3 35/6 35/9 35/16 37/11
38/20 40/12 52/1 53/2 55/1 59/8 63/18 63/18
63/25 65/18 66/15 67/16 70/5 73/6 87/23
88/21 89/10 90/5 92/16
**Theater [3]**  68/6 68/10 68/11
**their [3]**  10/25 35/12 72/25
**them [26]**  8/11 10/4 35/23 43/21 47/13 47/24
48/3 48/5 48/7 50/9 58/20 61/17 61/19 62/21
62/23 89/2 89/2 89/4 89/5 89/8 89/9 89/10
92/13 93/19 94/15 95/20
**then [22]**  11/22 13/12 16/14 34/24 35/18 37/4
44/15 59/2 60/10 60/14 62/8 64/18 65/6 75/15
76/12 79/7 84/15 84/19 85/22 86/17 88/9 93/7
**there [66]**  6/7 9/5 9/15 11/3 11/13 12/5 12/6
12/14 13/6 15/7 15/24 17/16 18/5 19/8 19/9
20/25 28/3 28/3 30/24 35/6 36/12 36/20 37/6
38/18 38/25 42/11 43/16 43/18 44/15 44/19
48/17 49/5 57/14 58/9 58/13 58/14 58/17
59/13 59/16 61/7 63/14 69/1 69/14 70/13
70/14 74/8 76/6 76/10 76/12 76/17 77/19 78/1
78/3 78/9 78/9 80/5 82/8 83/5 85/17 89/11
90/8 91/9 94/4 94/6 94/8 94/11
**there's [3]**  7/9 11/22 70/6
**thereafter [2]**  76/18 80/12
**these [15]**  15/11 33/20 34/1 50/14 52/23
58/18 58/21 59/17 82/11 85/18 89/13 89/21
90/4 90/14 90/20
**they [55]**  8/11 10/24 17/12 17/14 25/9 27/10
33/21 33/22 33/23 35/13 38/14 38/15 38/15
45/3 45/5 45/7 45/12 48/15 57/21 58/1 58/9
58/20 58/22 59/18 60/10 60/14 61/13 61/19

**T**

they... [27] 61/23 62/1 62/1 62/5 62/7 62/8 62/18 62/20 64/8 78/6 78/25 80/24 86/17 88/8 88/21 89/2 89/15 90/6 92/13 93/12 93/17 93/17 93/23 93/24 94/22 96/2 96/3
they're [3] 61/18 62/11 90/5
thing [2] 49/8 77/10
things [5] 43/17 61/24 64/19 78/7 78/19
think [35] 6/7 11/22 13/1 15/25 17/19 17/24 23/15 25/2 25/18 27/12 33/3 35/25 36/9 44/18 45/11 47/13 49/15 51/9 53/9 56/14 57/11 56/23 59/22 61/15 61/24 62/2 65/5 65/18 72/13 72/17 88/17 88/19 88/24 93/12 93/23 94/19
thinking [2] 32/11 85/22
third [3] 16/12 60/16 84/25
this [165]
those [28] 10/24 11/22 11/23 13/4 34/2 53/5 56/25 57/24 58/3 58/22 59/11 59/13 59/15 62/3 62/3 62/15 62/20 64/15 73/22 84/2 84/16 85/19 86/23 87/1 88/17 88/19 88/23 88/24
though [2] 20/8 38/20
thought [3] 84/8 85/14 87/23
three [31] 17/17 43/15 51/4 52/4 53/3 53/7 53/13 65/7 65/17 83/23 84/2
three-week [1] 84/2
through [13] 11/18 11/20 18/12 50/12 68/19 69/20 77/16 78/11 81/12 83/23 89/12 90/16 93/21
time [61] 4/21 4/23 11/14 15/13 17/23 18/8 19/9 21/9 21/14 23/5 25/7 27/18 28/10 28/14 28/17 29/23 31/1 33/17 34/19 35/24 36/21 40/14 40/19 42/1 43/20 44/1 45/6 46/3 46/12 46/24 47/6 47/11 47/16 48/7 48/9 48/20 48/22 53/16 59/6 60/16 65/10 65/13 68/5 68/11 68/22 69/14 69/21 71/9 74/1 76/21 77/1 79/1 80/11 81/15 83/22 85/14 88/14 89/24 92/21 95/6 96/9
times [1] 43/8
timing [6] 26/15 26/19 26/21 26/25 31/8 48/5
Title [1] 97/7
titled [2] 5/24 71/17
today [6] 4/13 20/6 47/7 54/7 64/3 64/18
today's [1] 6/3
together [4] 35/4 35/7 38/2 93/13
told [28] 24/7 24/13 46/12 46/23 52/22 53/2 53/6 53/16 69/21 72/15 78/6 78/6 78/7 78/7 78/8 78/10 78/19 78/25 79/6 80/22 80/23 82/12 86/19 88/21 89/8 89/9 92/2 95/20
Tom [3] 75/16 75/17 84/23
tomorrow [1] 92/22
took [13] 10/8 10/17 14/6 32/25 36/4 47/6 49/9 49/10 51/5 56/21 57/7 59/10 65/6
top [12] 15/21 16/9 16/12 20/16 21/3 32/19 39/22 42/25 52/18 53/11 71/14 73/10
topic [5] 6/1 36/2 36/9 36/15 36/19
topics [1] 45/4
total [1] 82/1
touch [2] 29/20 69/18
tough [1] 95/16
transaction [2] 14/23 41/17
transcript [5] 1/9 1/15 12/10 97/8 97/10
transfer [7] 15/22 16/24 17/2 17/6 42/25 87/15 87/19
transpired [1] 12/15
treated [1] 58/18
Treatise [1] 9/15
treatises [2] 8/17 8/22
trial [8] 1/12 5/24 6/2 6/4 48/6 51/1 57/13 58/25
tried [1] 18/12
true [11] 8/10 12/12 41/14 42/6 45/24 46/11 52/22 55/19 89/21 90/8 97/7
trust [5] 16/11 16/13 53/18 58/21 87/15
truth [1] 90/5
truthful [2] 51/15 87/24
truthfully [1] 50/24
trying [9] 8/24 12/14 25/9 55/6 62/4 78/8 83/9 84/3 93/20

Tuesday [2] 4/15 5/11
two [23] 7/9 8/17 8/21 10/8 10/17 11/15 13/4 20/25 36/25 38/18 38/22 47/9 47/10 49/6 57/23 61/12 61/22 62/2 62/5 70/17 73/13 81/22 92/15
typewritten [1] 61/11
typically [1] 34/1

**U**

U.S [3] 48/13 65/23 97/16
under [14] 7/14 7/23 8/16 11/2 11/9 14/6 17/3 17/8 17/10 17/11 36/20 42/25 57/20 57/24
understand [6] 10/15 35/5 41/9 51/21 74/25 76/16
understanding [17] 7/23 8/22 16/5 17/25 22/16 22/18 40/24 42/1 74/19 78/1 80/13 83/16 85/13 92/1 92/11 93/4 93/17
understood [5] 40/8 40/13 40/14 40/19 75/18
UNITED [15] 1/4 1/9 1/19 2/3 2/4 2/6 2/7 2/10 4/3 4/6 9/25 13/17 13/20 97/7 97/11
University [1] 68/18
unless [1] 57/3
unlike [1] 35/11
unsuccessful [1] 25/10
until [7] 5/13 13/12 19/16 56/4 94/19 96/9 96/11
up [43] 4/21 5/11 5/15 6/21 7/12 11/13 11/23 12/13 12/15 17/11 20/17 23/18 23/25 25/9 25/14 26/5 26/11 26/19 26/23 28/6 30/14 31/6 31/15 33/21 37/25 39/22 42/16 46/5 52/18 52/21 53/11 57/12 57/21 68/7 69/5 76/1 77/6 80/2 80/3 84/11 86/18 94/19
update [5] 13/6 91/16 91/17 91/21 91/23
upper [1] 49/25
USAO [2] 15/7 56/14
use [2] 19/14 27/20
used [10] 7/13 8/7 9/8 9/11 10/4 50/8 56/18 59/23 60/12 79/13
using [3] 10/23 28/25 82/2
usual [1] 4/21

**V**

Vague [2] 46/14 53/23
vaguely [3] 29/11 29/13 32/6
val [2] 15/25 16/1
value [3] 36/20 36/22 80/11
various [3] 5/24 43/16 68/25
Verde [1] 48/18
versa [1] 35/23
versed [2] 60/20 61/3 61/9
versus [5] 4/4 9/25 13/18 86/14 95/19
very [17] 6/19 8/12 8/20 16/19 20/23 30/13 35/22 52/12 60/20 61/8 69/4 69/6 69/10 75/3 77/20 80/3
via [3] 16/5 49/23 69/19
vice [1] 35/23
video [5] 49/10 49/12 49/13 49/23 50/1
view [1] 7/15
violated [1] 82/6
violating [1] 72/16
violation [3] 9/6 57/1 57/4
violation of [1] 9/6
voice [2] 60/24 72/6
voicemails [1] 49/4
VOL [1] 1/12
Volume [2] 14/16 70/17
Volume 2 [1] 70/17
Volume 3 [1] 14/16
vs [1] 1/10

**W**

waive [3] 23/10 23/11 24/24
waives [1] 25/3
walk [1] 78/11
want [12] 13/1 20/11 20/23 21/14 23/10 23/11 24/24 28/3 33/9 64/20 90/16 96/6
wanted [7] 12/21 24/14 41/1 58/17 60/8 77/7 77/10

wants [2] 8/25 59/17
wasn't [17] 4/25 5/6 5/7 12/8 18/23 27/8 34/7 34/11 37/13 50/14 50/19 55/11 63/8 79/24 85/16 95/16 95/17
way [14] 7/13 8/13 10/25 34/5 35/9 35/10 38/25 39/17 42/10 64/4 71/23 82/23 84/15
we [90] 5/11 6/12 6/17 6/21 7/7 7/10 7/11 7/12 8/2 9/1 9/2 11/13 12/1 12/8 13/12 14/23 15/2 15/21 17/16 20/11 21/21 23/25 25/2 26/20 26/22 26/23 26/23 28/15 28/17 30/23 31/1 31/14 31/19 31/21 31/23 32/1 32/12 32/17 32/20 35/22 36/6 36/9 40/14 40/16 40/25 41/6 41/7 41/10 41/13 46/5 49/14 49/22 50/20 56/1 56/2 57/10 57/18 57/23 58/2 58/14 58/15 59/2 59/6 59/14 60/22 61/11 61/12 61/19 61/24 62/3 62/20 62/23 63/22 63/22 64/7 64/10 67/4 71/14 72/13 72/17 78/9 79/24 80/2 87/24 92/25 93/13 93/21 96/8 96/9 96/16
we'll [7] 5/15 50/4 61/19 68/7 71/23 96/7 96/11
we're [9] 10/22 20/22 21/25 22/8 30/25 33/16 61/20 61/22 63/23
we've [3] 63/4 63/21 63/22
Webex [2] 49/13 49/15
week [10] 29/24 40/25 41/2 41/3 47/8 47/10 60/19 84/2 93/14 93/22
weekend [1] 11/20
weeks [11] 21/24 48/9 51/4 52/4 53/3 53/7 53/14 65/7 65/17 76/11 83/23
WEINER [25] 3/5 12/4 14/4 14/10 14/14 19/25 25/7 26/3 45/20 49/21 56/21 57/7 57/10 57/12 57/16 58/25 59/2 59/17 60/8 60/9 61/13 61/17 63/12 63/19 64/13
Weiner's [2] 12/2 58/8
well [41] 5/2 7/4 7/12 8/19 10/11 23/9 24/6 25/2 27/20 38/8 40/24 44/5 45/7 45/15 47/5 49/2 50/17 50/22 51/4 51/9 51/12 56/12 57/21 58/2 60/20 61/3 61/8 62/23 64/17 64/22 65/12 65/22 68/5 68/17 77/1 77/21 77/22 80/15 88/7 91/15 93/21
well-being [1] 88/7
went [7] 50/12 68/18 68/19 77/21 77/21 88/8 88/9
were [89] 7/12 9/12 9/13 15/24 16/9 16/19 17/12 17/14 18/5 22/1 22/3 25/8 25/9 29/6 29/19 30/7 31/4 31/10 31/21 31/23 32/1 34/4 34/5 35/3 36/4 38/8 39/2 40/14 40/23 41/6 42/2 43/9 43/16 44/19 45/5 45/7 46/5 48/15 48/23 49/4 49/14 49/22 50/7 54/21 57/8 58/3 58/19 58/22 59/16 59/17 63/12 64/13 68/21 68/24 69/7 69/9 69/17 71/21 71/24 72/22 74/1 74/17 74/25 75/6 76/24 77/8 77/11 77/12 77/18 82/11 83/10 83/19 83/24 84/6 84/16 85/5 85/7 85/18 85/22 86/9 88/14 88/21 88/23 91/21 92/25 95/7 95/10 95/14
weren't [4] 19/9 31/11 62/20 88/14
West [2] 1/20 2/11
what [87] 7/12 8/8 10/19 12/15 12/16 14/21 16/15 16/17 17/25 18/17 18/22 20/24 21/17 21/20 26/9 27/8 29/8 29/10 31/17 32/4 32/25 37/11 40/12 40/23 40/24 46/21 47/1 50/12 50/17 52/6 53/2 53/6 53/20 54/22 55/1 58/7 58/10 59/8 60/17 60/20 61/3 61/20 63/18 63/19 68/4 69/17 74/19 74/20 74/21 75/3 77/7 77/8 77/24 78/23 79/4 79/10 79/11 79/13 80/1 80/21 81/1 83/16 85/13 86/12 87/8 87/23 87/24 89/13 91/13 91/17 92/1 92/4 92/9 92/11 92/21 93/2 93/4 93/4 93/9 93/15 94/1 94/5 94/8 94/13 95/16 95/17 96/1
what's [9] 9/10 15/21 16/3 25/4 37/18 41/23 43/15 68/16 90/8
whatever [1] 24/14
when [67] 5/1 5/11 5/18 5/23 6/21 8/10 9/11 10/9 10/19 15/10 21/21 25/7 26/21 26/22 27/10 27/17 28/5 32/9 33/20 36/6 36/13 38/2 38/12 39/2 39/6 39/10 40/24 40/24 47/5 47/6 47/16 48/6 48/7 51/15 52/15 52/21 57/12 58/24 61/13 63/4 64/7 71/24 74/24 78/14 79/9

**W**

**when... [22]**  79/18 79/21 79/22 80/18 81/15 81/16 83/2 83/4 83/13 83/16 83/17 85/22 86/7 88/13 88/13 88/23 89/1 91/17 92/9 92/11 92/24 93/23
**where [15]**  7/25 16/10 68/2 68/24 69/7 70/3 72/5 75/6 75/9 75/24 77/11 78/5 80/13 88/1 88/21
**whether [14]**  10/20 30/8 30/15 30/24 31/21 32/7 38/25 39/17 42/7 49/15 52/3 63/1 64/7 86/21
**whether it [1]**  38/25
**which [12]**  7/20 16/4 20/12 29/5 47/18 60/1 60/9 69/14 83/22 84/24 86/16 87/4
**while [2]**  32/17 77/20
**white [1]**  21/7
**Whiteside [40]**  15/2 16/16 16/25 17/1 17/3 17/7 17/12 18/2 18/4 18/9 18/10 19/2 22/2 22/3 22/21 25/15 29/24 30/8 31/5 32/3 34/4 34/7 34/18 35/18 45/9 45/22 55/12 55/16 55/20 57/18 66/6 66/13 66/17 72/9 73/22 77/25 81/25 85/24 87/16 87/20
**Whiteside's [2]**  28/22 29/6
**Whiteside/Gardner [1]**  16/16
**who [34]**  6/15 8/2 9/19 16/23 22/5 22/25 34/10 34/17 44/5 44/12 44/15 48/21 55/2 59/3 69/12 69/20 69/24 70/10 70/13 75/13 76/1 76/24 83/13 84/22 86/19 86/22 88/17 88/24 89/5 89/8 91/21 93/23 94/19 96/3
**whole [1]**  61/8
**whom [1]**  91/24
**whose [2]**  9/18 37/24
**why [26]**  5/5 12/13 19/5 29/6 35/8 43/3 54/25 60/21 61/10 65/15 69/9 71/20 72/2 83/7 87/22 88/4 88/14 88/19 88/23 89/3 89/3 92/13 93/15 94/10 94/22 95/2
**will [41]**  4/14 4/14 4/16 4/20 5/5 5/16 6/17 6/21 10/18 11/7 11/20 11/24 13/12 15/17 20/11 38/16 38/17 38/18 56/1 56/2 63/17 63/22 71/12 73/22 74/10 74/20 76/3 80/7 80/10 81/25 90/3 90/6 91/1 92/10 92/11 93/3 94/2 94/3 96/8 96/9 96/16
**wind [1]**  84/11
**wire [9]**  14/23 15/1 15/22 16/10 16/23 17/1 17/6 87/15 87/19
**wired [1]**  19/15
**within [4]**  27/12 47/8 76/11 93/22
**without [1]**  35/13
**witness [37]**  8/1 8/2 8/3 8/4 9/1 9/19 9/22 10/20 10/21 14/4 26/1 27/3 27/24 45/18 49/19 56/18 56/23 56/25 59/10 59/11 59/20 59/23 60/13 61/6 61/7 67/3 67/10 67/11 67/13 70/18 72/22 75/25 76/4 81/9 85/2 89/15 90/6
**witness's [4]**  7/20 8/6 9/12 9/20
**witnesses [9]**  3/4 3/11 8/9 10/23 10/24 57/2 61/5 61/5 61/25
**wobbling [1]**  64/6
**won't [1]**  62/25
**wonder [1]**  77/11
**words [1]**  31/7
**work [6]**  31/4 31/7 65/25 70/14 75/13 75/18
**works [1]**  33/7
**worried [1]**  83/25
**worry [1]**  79/16
**worse [1]**  65/14
**would [94]**  5/23 6/2 6/14 9/2 10/13 12/7 12/16 18/20 18/20 18/23 19/8 19/11 30/8 30/15 34/23 34/24 34/25 35/17 35/18 35/22 35/22 36/13 37/7 37/8 37/14 39/22 41/1 43/18 44/2 45/1 46/12 46/23 48/6 56/25 57/12 58/9 58/18 59/11 59/15 61/10 63/14 69/22 69/23 74/16 74/20 76/7 76/10 76/17 77/15 78/10 78/23 79/1 79/2 79/4 79/6 79/7 79/9 79/13 79/18 79/25 80/1 80/1 80/14 80/15 81/1 83/12 83/16 83/17 85/18 85/22 85/24 86/4 86/12 86/15 86/18 86/22 86/25 87/2 87/18 87/24 88/9 88/10 89/1 89/1 89/8 89/9 92/6 92/13 93/4 94/22 95/13 95/19 95/20 95/20
**wouldn't [1]**  79/16

**Wright [2]**  9/14 11/8
**write [4]**  68/11
**writing [3]**  9/21 11/7 68/13
**written [3]**  21/6 21/11 72/24
**wrote [9]**  46/19 46/21 46/23 91/13 93/9 93/15
**WYMAN [9]**  2/5 4/6 7/17 9/11 9/13 10/14 13/20 43/12 48/14

**Y**

**Yeah [2]**  5/11 50/10
**year [10]**  64/14 64/19 68/17 68/18 86/13 86/15 86/17 87/9 88/7 95/2
**years [9]**  17/17 57/23 60/19 61/12 62/2 65/3 79/8 86/10 86/14
**yelling [1]**  61/2
**yes [138]**
**yesterday [13]**  5/2 9/10 10/12 12/3 14/6 14/24 15/3 20/13 43/9 43/13 48/24 49/5 64/17
**yet [3]**  5/4 13/8 92/23
**you [578]**
**you're [7]**  12/18 16/14 65/19 65/21 68/10 82/19 94/5
**your [207]**
**yourself [2]**  89/18 91/7