1          **UNITED STATES DISTRICT COURT**

2     **CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

3        **HONORABLE JAMES V. SELNA, U.S. DISTRICT JUDGE**

4

5   UNITED STATES OF AMERICA,          )
                                       )
6                   Plaintiff,         )   <u>**CERTIFIED TRANSCRIPT**</u>
                                       )
7         vs.                          )   Case No.
                                       )   SACR-19-00061-JVS
8   MICHAEL JOHN AVENATTI,             )
                                       )   **TRIAL DAY 9**
9                   Defendant.         )   **VOLUME 2**
    _____)

10

11

12

13

14

15              REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                 TUESDAY, JULY 27, 2021

17                      1:34 P.M.

18                 SANTA ANA, CALIFORNIA

19

20

21

22

23   _____

24              **DEBBIE HINO-SPAAN, CSR 7953, CRR**
                 FEDERAL OFFICIAL COURT REPORTER
25              411 WEST 4TH STREET, ROOM 1-053
                    SANTA ANA, CA 92701
                    dhinospaan@yahoo.com

**UNITED STATES DISTRICT COURT**

1                    **APPEARANCES OF COUNSEL:**

2

3     **FOR THE PLAINTIFF:**

4            NICOLA T. HANNA
             United States Attorney
5            BY:  BRETT SAGEL
                  Assistant United States Attorney
6            411 West 4th Street
             Suite 8000
7            Santa Ana, California 92701
             714-338-3598
8            brett.sagel@usdoj.gov

9            NICOLA T. HANNA
             United States Attorney
10           BY:  ALEXANDER WYMAN
                  Assistant United States Attorney
11           312 North Spring Street
             Suite 1100
12           Los Angeles, California 90012
             213-894-2435
13           alex.wyman@usdoj.gov

14    **FOR THE DEFENDANT IN PRO SE:**

15           MICHAEL JOHN AVENATTI, ESQ.

16

17    **STANDBY COUNSEL FOR MR. AVENATTI:**

18           H. DEAN STEWARD LAW OFFICES
             BY:  H. DEAN STEWARD, ESQ.
18           17 Corporate Plaza
             Suite 254
19           Newport Beach, California 92660
             949-481-4900
20           deansteward7777@gmail.com

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

**I N D E X**

**WITNESSES**                                                                            **PAGE**

**JUDY REGNIER, CALLED BY THE GOVERNMENT**
   Direct Examination by Mr. Sagel (resumed)                          6

**EXHIBITS**

| EXHIBIT | IN EVIDENCE | WITHDRAWN OR REJECTED |
|---|---|---|
| 262 | 10 | |
| 137 | 13 | |
| 136 | 15 | |
| 140 | 18 | |
| 142 | 22 | |
| 146 | 24 | |
| 147 | 27 | |
| 148 | 28 | |
| 138 | 30 | |
| 154 | 33 | |
| 155 | 33 | |
| 156 | 36 | |

# I N D E X
## (Continued:)

### EXHIBITS

| EXHIBIT | IN EVIDENCE | WITHDRAWN OR REJECTED |
|---------|-------------|------------------------|
| 349 | 37 | |
| 157 | 39 | |
| 159 | 44 | |
| 158 | 45 | |
| 163 | 47 | |
| 263 | 52 | |
| 174 | 62 | |
| 190 | 64 | |
| 370 | 66 | |
| 202 | 70 | |
| 193 | 71 | |
| 194 | 76 | |
| 372 | 78 | |
| 195 | 82 | |
| 196 | 84 | |
| 172 | 86 | |
| 198 | 88 | |
| 200 | 90 | |

**I N D E X**
(Continued:)

**EXHIBITS**

| EXHIBIT | IN EVIDENCE | WITHDRAWN OR REJECTED |
|---------|-------------|----------------------|
| 213 | 95 | |
| 219 | 98 | |
| 224 | 100 | |

**UNITED STATES DISTRICT COURT**

SANTA ANA, CALIFORNIA; TUESDAY, JULY 27, 2021

1:34 P.M.

- - -

01:34PM  (In the presence of the jury.)

THE COURT:  Good afternoon, ladies and gentlemen.

Mr. Sagel?

MR. SAGEL:  Thank you, Your Honor.

**JUDY REGNIER, WITNESS, RESUMED THE STAND**

01:34PM  **DIRECT EXAMINATION  (resumed)**

BY MR. SAGEL:

Q    Ms. Regnier, I'm going to turn your attention to late

2018 as it relates to Mr. Johnson's rent.  Did you ever have a

conversation with the defendant about Mr. Johnson receiving an

01:35PM  eviction notice?

A    No, I don't believe I did.

Q    Did you ever -- did you ever have -- did you ever receive

any information from Geoff Johnson about his rent not being

paid?

01:35PM  A    I received, I believe, an e-mail from him saying that the

rent was late.

Q    Did you have a conversation about that with Mr. Avenatti?

A    I would have -- I don't know if I had a conversation or if

I sent an e-mail or what.  I would have advised him, yes.

01:35PM  MR. AVENATTI:  Your Honor, move to strike as

```
 1   speculation.
 2          THE COURT:  Overruled.  Denied.
 3          MR. SAGEL:  One second, Your Honor.
 4          (Pause in proceedings.)
 5   Q   BY MR. SAGEL:  Ms. Regnier, have you met with the
 6   Government on previous occasions?
 7   A   Yes, I have.
 8   Q   If you were to see notes of the interview you gave with
 9   the Government on November 19th, 2019, would that refresh your
10   memory on a conversation you had with Mr. Avenatti regarding
11   rent payments in late 2018?
12          MR. AVENATTI:  Your Honor, objection.  Speculation.
13   If he wants to have her refresh her recollection, he can show
14   her the document.  But how can she know if it will without
15   seeing the document?
16          THE COURT:  If you wish to show the document to
17   refresh recollection, you may.
18          MR. SAGEL:  Thank you, Your Honor.
19          May I approach, Your Honor?
20          THE COURT:  You may.
21   Q   BY MR. SAGEL:  Ms. Regnier, if I could have you focus on
22   paragraph 20 of that report.  After you've read paragraph 20,
23   please look up.
24   A   Yes, I remember this now.
25   Q   Can you please close the report.
```

01:36PM  5
01:36PM 10
01:36PM 15
01:37PM 20
01:38PM 25

1          In late 2018, did you have a conversation with

2    defendant about Mr. Johnson getting an eviction notice?

3          MR. AVENATTI:  Asked and answered.

4          THE COURT:  Overruled.

01:38PM 5          THE WITNESS:  Yes, I would have -- I don't know that

6    Johnson ever sent me the eviction notice, but I would have had

7    a conversation because he told -- Geoff told me he was going to

8    be evicted because his rent had not been paid.

9    Q    BY MR. SAGEL:  And did you tell Mr. Avenatti?

01:38PM 10          MR. AVENATTI:  Same objection.  Asked and answered.

11          THE COURT:  The witness is now testifying after

12   she's had her recollection refreshed.  The objection is not

13   appropriate.  Overruled.

14          THE WITNESS:  Yes.

01:39PM 15   Q    BY MR. SAGEL:  What did defendant say?

16   A    He said that he can't be fucking bothered with this right

17   now.

18   Q    And what did you understand him to mean?

19   A    That I wasn't going to get an answer from him one way or

01:39PM 20   another as to authorization to pay the rent or if -- what he

21   was going to do about it.

22   Q    Turning your attention to March 22nd, 2019, did you

23   receive a call from the defendant on that date?

24   A    Yes.

01:39PM 25   Q    Do you remember what defendant asked you on March 22nd,

```
 1   2019?

 2   A    He called requesting Mr. Johnson's home address and I

 3   believe his phone number also.

 4   Q    Did he tell you why he wanted Mr. Johnson's home address

 5   and phone number?

 6   A    No.

 7   Q    If I could have you look at Exhibit 262.

 8   A    Okay.

 9   Q    Does this appear to be a text message that you sent to

10   Mr. Avenatti?

11   A    Yes, it does.

12   Q    And with an attachment or like a picture attachment text

13   with it?

14   A    Yes.

15   Q    And if you were to look at the time of it at the right,

16   it says "UTC"; is that correct?

17   A    Yes, it does.

18   Q    Is this the text message you sent to Mr. Avenatti in

19   response to his phone call?

20   A    Yes.

21        MR. SAGEL:  At this time, Your Honor, the Government

22   moves to admit Exhibit 262.

23        MR. AVENATTI:  Objection, Your Honor.  Hearsay.

24   Foundation.  Authentication.

25        THE COURT:  Overruled.  262 will be received.
```

    1              **(Exhibit Number 262 received.)**

    2  Q    BY MR. SAGEL:  First page is the text; is that correct?

    3  A    Yes, it is.

    4  Q    And the second page, if we could just pull up the second

01:41PM  5  page, it's been redacted for purposes here.  But what was the

    6  second page?

    7  A    It's like the contact from my contacts.  The contact for

    8  Geoff Johnson from my contacts on my phone.

    9  Q    And that included his home address and his telephone

01:41PM 10  number?

   11  A    And his telephone number, yes.

   12  Q    Did you ever have discussions with the defendant about

   13  who would make financial decisions for Geoff Johnson?

   14  A    I mean, Michael handled most everything, the decisions

01:42PM 15  having to do with Geoff.  He authorized the money and that type

   16  of thing, and he -- he spoke to Geoff about those things, not

   17  in my presence most of the time.

   18  Q    Did he ever say who would make those ultimate decisions

   19  for Mr. Johnson?

01:42PM 20  A    Michael said he would handle things for Geoff Johnson.

   21  Q    Is that something -- how often did he say that?

   22  A    Probably every other time that something came up about

   23  Geoff.

   24  Q    Do you remember who Alexis Gardner is?

01:43PM 25  A    She was a client of Eagan Avenatti.

1    Q    How did you know that she was a client of Eagan Avenatti?

2    A    Because Michael did work for her, and we had a

3    relationship with The X-Law office up in L.A., and they said

4    that there was a new client coming in and this is who it was.

01:43PM 5    And --

6    Q    So let me stop you there.  You said "we had a

7    relationship" with a law firm in L.A.; is that what you said?

8    A    Yes.

9    Q    What was the name of that law firm?

01:43PM 10   A    The X-Law Group.

11   Q    And did you have any dealings with The X-Law Group?

12   A    Yeah.

13   Q    What was your understanding of what The X-Law Group was?

14   A    Well, it was basically Filippo Marchino's firm.  For a

01:43PM 15   while, some of the staff and attorneys worked for Eagan

16   Avenatti, and Filippo did work with Eagan Avenatti for a while.

17   And they would collaborate on cases, that type of thing.

18   Q    And as part of your responsibilities for Eagan Avenatti,

19   did you know who was on payroll for Eagan Avenatti?

01:44PM 20   A    For Eagan Avenatti, yes.

21   Q    And during some periods of time, were you -- was the

22   payroll for Eagan Avenatti, did it include some of the lawyers

23   and the staff from The X-Law Group?

24   A    Yes, it did.

01:44PM 25   Q    And you started saying something about The X-Law Group

1   had something to do with bringing in Ms. Gardner; is that

2   correct?

3   A     I believe they did, yes.

4   Q     What was your understanding of that?  Where did that come

01:44PM  5   from?

6   A     I'm trying to remember the name of the gentleman that

7   called me.  I forget.  He was one of the assistants in the law

8   firm.  He was one of the assistants at X-Law Group, and he

9   called and told me that Filippo and Michael were working on a

01:45PM 10   new client and we were going to need to have a check cut.

11   Q     I'm going to have you look at -- I believe it's going to

12   be in Volume II.  If you can look at Exhibit 137.  Do you have

13   Exhibit 137 in front of you?

14   A     Yes.

01:46PM 15   Q     Is this an e-mail -- sorry, is this an e-mail from the

16   defendant to you?

17   A     Yes, it is.

18   Q     With a document attached?

19   A     Yes.

01:46PM 20   Q     Did it bear an accurate copy of the e-mail and document

21   that defendant sent to you?

22   A     Yes, it is.

23           MR. SAGEL:  At this time, Your Honor, the Government

24   would move to admit Exhibit 137.

01:46PM 25           MR. AVENATTI:  Objection.  Hearsay.  And it has an

| | |
|---|---|
| 1 | attachment, Your Honor. |
| 2 | MR. SAGEL:  Adopted by the e-mail, Your Honor. |
| 3 | THE COURT:  Mr. Avenatti is the author of the |
| 4 | e-mail.  Party admission.  It will be received. |
| 01:46PM 5 | **(Exhibit Number 137 received.)** |
| 6 | Q    BY MR. SAGEL:  At the top, what's the date of this e-mail |
| 7 | from the defendant to you? |
| 8 | A    December 22nd, 2016. |
| 9 | Q    And what is the subject? |
| 01:46PM 10 | A    "Draft Agreement." |
| 11 | Q    And the title of the attachment? |
| 12 | A    "Draft Settlement Agreement.Doc." |
| 13 | Q    Can you please read the e-mail that the defendant writes |
| 14 | to you. |
| 01:47PM 15 | A    "Please see attached.  Can you please fill in our trust |
| 16 | account info and send back to me." |
| 17 | Q    If you were to look at page 2, which is the first page of |
| 18 | the attachment.  Do you see that? |
| 19 | A    Yes. |
| 01:47PM 20 | Q    What's the title at the top? |
| 21 | A    "Settlement Agreement." |
| 22 | Q    If you could read the first paragraph, just under |
| 23 | "Settlement Agreement."  What does it say? |
| 24 | A    "This agreement is dated as of the 7th day of |
| 01:47PM 25 | January 2017, by and between Alexis Gardner |

```
 1              (Gardener) on the one hand and Hassan Whiteside

 2              (Whiteside) on the other hand.  Gardner and

 3              Whiteside are each a party and are collectively the

 4              parties to this agreement."

 5   Q    So this first paragraph talks about January 7, 2017; is

 6   that correct?

 7   A    Yes, it does.

 8   Q    And the e-mail is dated 12/22/2016?

 9   A    Yes.

10   Q    And, I'm sorry, I just said the date, but what's the time

11   this e-mail is sent to you by the defendant?

12   A    2:55 p.m.

13   Q    If I could have you look at Exhibit 136.  Do you have 136

14   in front of you?

15   A    Yes, I do.

16   Q    Is this an e-mail that you sent?

17   A    Yes.

18   Q    And is the defendant cc'd on this e-mail?

19   A    Yes, he is.

20   Q    And at whose direction did you send this e-mail?

21   A    At Michael's direction.

22   Q    And there's an attachment to this e-mail?

23   A    Yes, there is.

24   Q    Is this a true and correct copy of the e-mail and

25   attachment that you sent on Mr. Avenatti's -- at Mr. Avenatti's
```

```
 1   direction?

 2   A     Yes, it is.

 3            MR. SAGEL:  At this time, Your Honor, the Government

 4   would move to admit Exhibit 136.

 5            MR. AVENATTI:  Objection, Your Honor.  Hearsay and

 6   the Court's pretrial motion in limine ruling.

 7            THE COURT:  Overruled.  136 will be received.

 8            (Exhibit Number 136 received.)

 9   Q    BY MR. SAGEL:  What's the date on this e-mail,

10   Ms. Regnier?

11   A     December 22nd, 2016.

12   Q    And what's the time?

13   A     8:04 p.m.

14   Q    So approximately five hours after the e-mail we saw on

15   137?

16   A     Yes.

17   Q    And who are you sending this to?

18   A     Simon Roads.

19   Q    And after the "at" sign, what does it say?

20   A     Haci.honda.com.

21   Q    And what is it that you write in the body of the e-mail?

22   A     "Mr. Roads, please see attached from Mr. Avenatti."

23   Q    Turning to the second page, the very top of this

24   document, what's the letterhead that this is on?

25   A     Honda Aircraft Company.
```

01:49PM (line 5)
01:50PM (line 10)
01:50PM (line 15)
01:50PM (line 20)
01:51PM (line 25)

1    Q    The -- it's written to Mr. Avenatti; is that correct?

2    A    Yes, it is.

3    Q    After "Dear, Mr. Avenatti," can you read that first

4    paragraph.

01:51PM  5    A    "This letter is in connection with aircraft

6         Purchase Agreement Number 40000316, dated

7         October 11, 2006 (agreement) for the purchase of a

8         HondaJet HA-420 aircraft, Serial Number 42000029

9         (aircraft) by Passport 420, LLC, (customer)."

01:51PM 10    Q    Do you know what Passport 420 is, Passport 420, LLC?

11    A    Yeah, it's an LLC that Michael has that was the purchaser

12    of an aircraft.

13    Q    And who had an ownership interest in Passport 420, LLC,

14    that you know of?

01:52PM 15    A    Michael Avenatti and William Parrish.

16    Q    If I could have you look at the second paragraph.

17    There's a sentence that starts, towards the end of the third

18    line, "Honda Aircraft has."

19    A    Yes.

01:52PM 20    Q    Can you read the rest of the paragraph, starting with

21    "Honda Aircraft has."

22    A    "Honda Aircraft has requested further assurances

23         from customer that customer remains committed to

24         accept delivery of the aircraft.  Accordingly,

01:52PM 25         customer and Honda Aircraft hereby agree that

|   |   |
|---|---|
| 1 | customer will arrive on site at Honda Aircraft's |
| 2 | facilities no later than January 31, 2017, to begin |
| 3 | the acceptance of the aircraft." |
| 4 | Q    On the bottom right corner of this letter, do you see a |
| 5 | signature block? |
| 6 | A    Yes. |
| 7 | Q    Whose signature is that? |
| 8 | A    Michael's. |
| 9 | Q    And is that under Passport 420, LLC? |
| 10 | A    Yes, it is. |
| 11 | Q    And what is listed under the signature? |
| 12 | A    "Name, Michael Avenatti; title, manager." |
| 13 | Q    If I could have you look at Exhibit -- strike that. |
| 14 |      We looked at the draft settlement agreement that |
| 15 | Mr. Avenatti sent to you on the Alexis Gardner matter? |
| 16 | A    Yes. |
| 17 | Q    At any point did you learn that the Alexis Gardner matter |
| 18 | was settled? |
| 19 | A    At some point, yes. |
| 20 | Q    Did defendant tell you that it settled? |
| 21 | A    Michael would have told me that it settled. |
| 22 | Q    Do you recall any part of the conversation of him telling |
| 23 | you that the case settled? |
| 24 | A    Not anything particular, no. |
| 25 | Q    Do you remember how much he said he was going to get or |

```
  1   how much the settlement was for?

  2   A     I think it was around 2.75 -- I'm not sure -- million.

  3   Q     I'm going to have you look at Exhibit 140.  Do you have

  4   Exhibit 140 in front of you?

01:54PM  5   A     Yes, I do.

  6   Q     Is that an e-mail that you sent?

  7   A     Yes.

  8   Q     And Mr. Avenatti is cc'd?

  9   A     Yes, he is.

01:55PM 10   Q     And at whose direction did you send this e-mail?

 11   A     At Michael's direction.

 12   Q     And the attachment to this -- and there's an attachment

 13   to this e-mail as well; is that correct?

 14   A     Yes, there is.

01:55PM 15   Q     Is this a true and accurate copy of the e-mail that you

 16   sent at defendant's direction with a true and correct copy of

 17   the attachment?

 18   A     Yes.

 19             MR. SAGEL:  Government moves to admit Exhibit 140,

01:55PM 20   Your Honor.

 21             MR. AVENATTI:  Your Honor, objection.  Hearsay,

 22   including as to the multiple attachments.

 23             THE COURT:  140 will be received.  Objection is

 24   overruled.

01:55PM 25             **(Exhibit Number 140 received.)**
```

Q    BY MR. SAGEL:  Who are you sending this e-mail to?

A    To William Parrish.

Q    And that's the other individual you mentioned having an ownership interest in the plane?

01:56PM A    Yes.

Q    And what's the subject line?

A    "Wire instructions for HondaJet."

Q    Why were you sending this e-mail to William Parrish?

A    Michael had requested I send him the e-mail.

01:56PM Q    And Mr. Avenatti is receiving this e-mail as well?

A    Yes, he is.  He's copied on the e-mail.

Q    Going down to the paragraph that starts "attached," can you read that paragraph for me.

A    "Attached are two invoices for the HondaJet totaling

01:56PM $3,922,405.  One-half of this amount is $1,961,202.50.  Note that this includes the amount remaining on purchase price plus the work you and Michael had done to add the option on the plane."

Q    How did you know what to write to Mr. Parrish there?

01:56PM A    Michael told me.

Q    The first two sentences of the next paragraph, can you read that?

A    "Can you please wire into Passport 420, LLC's, account the amount of 1,985,000, and Michael will do

01:57PM the same.  The wire instructions are below."

| | | |
|---|---|---|
| | 1 | Q     How did you know to ask Mr. Parrish to do that? |
| | 2 | A     Michael instructed me, basically dictated the letter. |
| | 3 | Q     And the wire instructions below, is that for an account? |
| | 4 | A     That's for an account in the name of Passport 420, LLC. |
| 01:57PM | 5 | Q     And the beneficiary names Passport 420, LLC, and then |
| | 6 | there's an address under that, 520 Newport Center Drive, |
| | 7 | Suite 1400, Newport Beach, California.  Do you see that? |
| | 8 | A     Yes. |
| | 9 | Q     Was there anything else at that same address? |
| 01:57PM | 10 | A     That was where Eagan Avenatti was located. |
| | 11 | Q     When you asked Mr. Parrish to wire that amount and then |
| | 12 | you said "and Michael will do the same," who told you that -- |
| | 13 | strike that. |
| | 14 |         Did Mr. Parrish send that money into the account? |
| 01:58PM | 15 | A     Yes, he did. |
| | 16 | Q     And who told you to write "Michael will do the same"? |
| | 17 | A     Michael. |
| | 18 | Q     Did defendant do the same? |
| | 19 | A     No. |
| 01:58PM | 20 | Q     At the time -- at the time of this e-mail, in and around |
| | 21 | January 10th, 2017, were you still sending bank balance updates |
| | 22 | to the defendant? |
| | 23 | A     Yes.  I've always done that. |
| | 24 | Q     And based on the bank balances you were sending to the |
| 01:59PM | 25 | defendant in and around January of 2017, did he have money to |

```
 1   send $1.9 million into this account for the plane?
 2              MR. AVENATTI:  Objection.  Foundation, Your Honor.
 3              THE COURT:  Lay the foundation.
 4   Q    BY MR. SAGEL:  In addition to sending him the daily
 5   updates of what his bank balances were, were you aware of what
 6   were in these bank balances?
 7   A    I was aware of what was in the bank accounts that I knew
 8   about, yes.
 9   Q    Okay.  And those included the Eagan Avenatti accounts?
10   A    Yes.
11   Q    And those included the Passport 420 account?
12   A    Yes.
13   Q    And based on your review and your providing of these
14   balances to defendant in the accounts that you knew of, did
15   defendant have $1.9 million in any of those accounts to be
16   sending to the Passport 420 account?
17   A    No.
18   Q    Did the defendant ever tell you where he was going to get
19   the money to buy this plane from?
20   A    No.
21   Q    Could I have you look at Exhibit 142, please.  Do you
22   have 142 in front of you?
23   A    Yes, I do.
24   Q    Is this an e-mail from the defendant to you?
25   A    Yes, it is.
```

01:59PM (lines 5, 10, 15)
02:00PM (lines 20, 25)

1   Q    Is it a -- is it a fair and accurate copy of the e-mail

2   from defendant to you?

3   A    Yes, it is.

4        MR. SAGEL:  At this point, Your Honor, the

02:00PM 5   Government would move to admit Exhibit 142.

6        MR. AVENATTI:  No objection.

7        THE COURT:  142 will be received.

8        **(Exhibit Number 142 received.)**

9   Q    BY MR. SAGEL:  What's the subject line of the e-mail

02:01PM 10  defendant sent you?

11  A    "Draft Letter."

12  Q    And what's the date of this e-mail?

13  A    January 19, 2017.

14  Q    And if you were to look, let's just highlight -- there

02:01PM 15  are brackets that kind of say "insert" throughout this e-mail;

16  is that correct?

17  A    Yes, there are.

18  Q    Did you understand what defendant is sending you when he

19  sends you this draft letter e-mail?

02:01PM 20  A    Yes, I do.  It's something that he wants put onto

21  letterhead and then cleaned up, and then he'll revise it.  This

22  was generally preceded by a phone call.

23  Q    If you could read the first paragraph that starts "This

24  letter."

02:01PM 25  A    "This letter is to confirm the following agreement

23

```
         1         as it relates to the 12-month lease to be entered

         2         into between [insert] and Ms. Alexis Gardner

         3         (Ms. Gardner) relating to that certain apartment

         4         located at [insert] (the lease)."

02:02PM  5    Q    And then in the second paragraph after the -- whatever

         6    the kind of bracketed parts are, the part that starts "Eagan

         7    Avenatti," can you read the second paragraph starting "Eagan

         8    Avenatti, LLP"?

         9    A    "Eagan Avenatti, LLP, serves as counsel for

02:02PM 10         Ms. Gardner in connection with a litigation matter

        11         that has been resolved by settlement to her

        12         satisfaction.  This settlement provides for

        13         substantial monies to be paid to Ms. Gardner for an

        14         extended period of time well in excess of the term

02:02PM 15         of the lease."

        16    Q    Now, when Mr. Avenatti asked you to type up this letter

        17    with this information, do you have any independent knowledge

        18    whether the information in this letter is accurate?

        19    A    I don't believe I did.

02:03PM 20    Q    When you would receive something like this to put on

        21    letterhead?

        22    A    Sometimes I would know what it was regarding; other times

        23    Michael would be working on something that I was not aware of,

        24    and he would send it to me and have me put it on a letterhead

02:03PM 25    and I'd send it back to him.
```

24

```
        1    Q    And then if you were to look at Exhibit 146, is 146 an
        2    e-mail that you sent to defendant with an attachment?
        3    A    I have to get a different book.
        4    Q    Oh, I'm sorry.  You are correct.  It's Volume III.
02:04PM  5    A    Okay.
        6    Q    Is 146 an e-mail that you sent to defendant with an
        7    attachment?
        8    A    Yes, it is.
        9    Q    And is it a fair and accurate copy of the e-mail you sent
02:04PM 10    to defendant and forwarded to defendant and a fair and accurate
       11    copy of the attachment that you sent?
       12    A    Yes, it is.
       13              MR. SAGEL:  Government moves to admit Exhibit 146,
       14    Your Honor.
02:05PM 15              MR. AVENATTI:  No objection.
       16              THE COURT:  146 will be received.
       17              (Exhibit Number 146 received.)
       18    Q    BY MR. SAGEL:  And if you were to look halfway down the
       19    page, there is an e-mail that you sent to Rachel Dourec.  Do
02:05PM 20    you see that?
       21    A    Yes, I do.
       22    Q    And that's at 3:15 p.m. on January 23rd?
       23    A    Yes, it is.
       24    Q    And the e-mail says:
02:05PM 25              "Rachel, attached please find the executed
```

```
  1              letter.  Please verify that you have received this
  2              document"; is that correct?
  3   A     Yes, it is.
  4   Q     Is Mr. Avenatti on that e-mail?
02:05PM  5   A     Not on the one to Rachel, no.
  6   Q     And then you then forward that e-mail to the defendant;
  7   is that accurate?
  8   A     Yes, it is.
  9   Q     And what did you say in your e-mail to defendant?
02:05PM 10   A     "Sorry.  Hit 'send' before I cc'd you."
 11   Q     And the time on your e-mail at the top appears to be
 12   almost exactly eight hours later; is that correct?
 13   A     Yes.
 14   Q     You don't know if this is UTC time, do you?
02:06PM 15   A     No, I don't.
 16   Q     If you were to look at page 2 of this exhibit, does this
 17   appear to be the letter that Mr. Avenatti asked you to type up
 18   in Exhibit 142?
 19   A     Yes, it does.
02:06PM 20   Q     And it's on Eagan Avenatti letterhead?
 21   A     Yes, it is.
 22   Q     And if you could read the first paragraph in this
 23   document that's sent to Ms. Dourec.
 24   A     "This letter is to confirm" --
02:06PM 25   Q     I'm sorry, the numbered 1 paragraph.
```

```
 1   A     Oh, I'm sorry.  (Reading:)

 2              "Eagan Avenatti, LLP, serves as counsel for

 3   Ms. Gardner in connection with a litigation matter that has

 4   been resolved by settlement to her satisfaction.  This

02:06PM 5   settlement provides for substantial monies to be paid to

 6   Ms. Gardner for an extended period of time well in excess of

 7   the term of the lease."

 8   Q    If you could turn to page 2 of the attachment, page 3 of

 9   the exhibit.  Do you recognize the signature on the left side?

02:07PM 10   A    Yes.

11   Q    Whose signature is that?

12   A    Michael's.

13   Q    Paragraph -- sorry.  Going back to page 2, the first page

14   of the attachment, how much is the cashier's check for the

02:07PM 15   lease?

16   A    $51,935.

17   Q    If I could have you look at Exhibit 147.

18              And, Your Honor, the Government would move

19   Exhibit 147 in pursuant to the custodian declaration at 394,

02:08PM 20   page 2.

21              MR. AVENATTI:  Your Honor, hearsay.  And I'll raise

22   the same objections that we did in Docket 596, page 10 of 12.

23              THE COURT:  I previously indicated that the

24   custodian declaration at 394 is sufficient.  Exhibit 147 will

02:08PM 25   be received.
```

**(Exhibit Number 147 received.)**

Q    BY MR. SAGEL:  And if you could look at, for example, the top of page 1.  Is that basically the purchasing of a cashier's check?

02:08PM  A    That's actually a copy of the cashier's check, yes.

Q    I stand corrected.  Copy of a cashier's check.

And do you recognize the signature on the purchaser's signature?

A    Yes.  That's Michael's.

02:09PM  Q    And how much is this cashier's check purchased for?

A    $51,935.

Q    And who is listed as the remitter on this purchase of the cashier's check?

A    Eagan Avenatti, LLP.

02:09PM  Q    Do you know why Eagan Avenatti, LLP, was listed as the remitter?

A    Probably purchased off of an Eagan Avenatti account.

Q    And is this -- and then page 3 is the actual cashier's check; is that correct?

02:09PM  A    Yes.  That's the actual check.  That's the -- yes.

Q    And what's the date on that?

A    January 24th, 2017.

Q    And that's paid to the order of Rachel Dourec?

A    Yes.

02:10PM  Q    That's the same name as the lease letter we looked at in

1    Exhibit 146?

2    A    Yes.

3    Q    If I could have you look at Exhibit 148.

4         MR. SAGEL:  And, Your Honor, the Government moves

02:10PM 5    into evidence Exhibit 148, which is also part of the custodian

6    declaration at 394, page 2.

7         MR. AVENATTI:  Your Honor, same objections.

8         THE COURT:  148 will be received.

9         **(Exhibit Number 148 received.)**

02:10PM 10   Q    BY MR. SAGEL:  Starting at the top left, what bank

11   account is this -- are these bank records for?

12   A    State Bar of California, Eagan Avenatti, LLP,

13   attorney-client trust account.

14   Q    And the address is the office address; is that correct?

02:11PM 15   A    Yes, it is.

16   Q    If you were to look in the top right corner, which you

17   might have to look on your page, this is a statement from what

18   date to what date?

19   A    December 30th, 2016, to January 31st, 2017.

02:11PM 20   Q    And can you see how much is in the account according to

21   the previous balance?

22   A    23 cents.

23   Q    Then if you were to look at the deposits and credit

24   section, do you see a deposit on January 25th of 2017?

02:11PM 25   A    Yes, I do.

```
 1   Q     How much is that deposit for?
 2   A     2,750,000.
 3   Q     Do you know what this $2.75 million deposit into the
 4   account was for?
 5   A     That would be the settlement that we were just talking
 6   about.
 7   Q     For Ms. Gardner?
 8   A     For Ms. Gardner, yes.
 9         THE REPORTER:  Ms. Regnier, can you get closer to
10   the mic.
11         THE WITNESS:  I'm sorry.
12         THE COURT:  The mic will also move if you just want
13   to pull it.  Thank you.
14   Q     BY MR. SAGEL:  If I could have you look at -- while it's
15   still there, in the description of the deposit, can you read
16   what it says as the description.
17   A     "Wire in" --
18   Q     You don't need to read all the numbers, but "wire in" and
19   then skip past --
20   A     It says:  "ORG, Hassan Whiteside, OBI Whiteside," and then
21   another number.
22   Q     If I could have you look at Exhibit 138.  And I
23   apologize, I may go back a binder.
24   A     Okay.
25   Q     Is Exhibit 138 an e-mail that the defendant sent to you?
```

02:12PM (lines 5, 10, 15, 20)
02:13PM (line 25)

1    A    Yes, it is.

2    Q    And the e-mail has an attachment?

3    A    Yes, it does.

4    Q    Is this e-mail from defendant to you a fair and accurate

02:14PM 5    copy of the e-mail and attachment that he sent to you?

6    A    Yes.

7         MR. SAGEL:  Government moves into evidence

8    Exhibit 138, Your Honor.

9         MR. AVENATTI:  Objection.  Hearsay.

02:14PM 10        THE COURT:  Overruled.  138 will be received.

11        **(Exhibit Number 138 received.)**

12   Q    BY MR. SAGEL:  Start with the e-mail part on the top,

13   first page.  This is an e-mail from defendant to you.  What's

14   the date of his e-mail?

02:14PM 15   A    January 26, 2017.

16   Q    And what's the subject?

17   A    "Wire instructions pdf."

18   Q    What's the name of the attachment?

19   A    "Chase client wire instructions."

02:15PM 20   Q    And if you were to look at page 2, the attachment, what

21   is this attachment that he's sending you?

22   A    It's Chase client trust account wire instructions for

23   Chase Bank for The X-Law Group.

24   Q    And that's the law firm that you were referring to

02:15PM 25   before?

```
       1   A     Yes.
       2   Q     This e-mail is to you the day after the $2.75 million was
       3   deposited; is that correct?
       4   A     Yes, it is.
02:15PM 5  Q     If I could have -- well, while we're there, do you know
       6   why defendant is sending you this e-mail with wire instructions
       7   to The X-Law Group?
       8   A     Not necessarily from this e-mail, but because -- if he's
       9   sending me wire instructions, it's because he wants me to send
02:16PM 10 money.
      11   Q     And this e-mail and the wire instructions do not even
      12   have a dollar amount on them; is that correct?
      13   A     No, they don't have a name or a dollar amount on them.
      14   Q     So how do you know how much to send to The X-Law Group?
02:16PM 15 A     I would have talked to Michael to tell me how much money
      16   to be wired.  And then they -- these wires would be approved.
      17   Q     If I could have you look back at Exhibit 148.  Pulling up
      18   the -- the following day after the $2.75 million is deposited
      19   into the account, are there any transactions, charges or
02:16PM 20 credits coming out of the account?
      21   A     Yes.
      22   Q     Let's start with the first one.  What is the -- on
      23   January 26, what is the first charge on January 26?
      24   A     2,500,000 wire out to X-Law Group.
02:17PM 25 Q     And what is the second?
```

```
 1    A    250,000 online transfer to an Eagan Avenatti account.
 2    Q    And would you have been responsible for this wire and
 3    this online transfer to another Eagan Avenatti account?
 4    A    For initiating them, yes.
 5    Q    And at whose direction?
 6    A    At Michael's direction.
 7    Q    If you were to turn to page 3 of Exhibit 48.
 8    A    Exhibit 48 or 148?
 9    Q    I'm sorry, 148, the same one.  Page 3 of it.  Do you see
10    a section titled "Daily Balances"?
11    A    Yes.
12    Q    On January 25th, when the $2.75 million wire was
13    deposited, what was the daily balance of this trust account?
14    A    It was zero.  And then the deposit came in so it was
15    2,750,000.
16    Q    And by the next day how much was in the client trust
17    account?
18    A    Zero.
19    Q    How much of the money from the $2.75 million that was
20    deposited did defendant ask you to send to Ms. Gardner from the
21    trust account?
22    A    He did not request any money to be sent to Ms. Gardner.
23    Q    If I could have you look at Exhibit 154.
24    A    Okay.
25    Q    Is this an e-mail that you received along with defendant?
```

```
 1   A    Yes.

 2   Q    And while we're here, look at Exhibit 155.  Is 155

 3   defendant's reply to that e-mail to you?  One e-mail down.

 4   A    Yes, it is.

 5   Q    Is 154 and 155 a fair and accurate copy of the e-mails

 6   you received and were on with defendant and the attachments

 7   that go with them?

 8   A    Yes.

 9        MR. SAGEL:  At this time, Your Honor, the Government

10   would move to admit Exhibit 154 and 155.

11        MR. AVENATTI:  Objection.  Hearsay, Your Honor.

12   Multiple levels of hearsay in both documents.  There's also a

13   confrontation issue, Your Honor.

14        THE COURT:  154 and 155 will be received but not for

15   the truth of the matter, simply that these were sent and these

16   things were said, but not that they're true.  Including the

17   invoice, not that the invoice is true.

18        (Exhibit Numbers 154 and 155 received.)

19        MR. AVENATTI:  Thank you.

20   Q    BY MR. SAGEL:  Let's start with the e-mail at the top of

21   154 all the way down through.  Who's Christopher Ohman?

22   A    Christopher Ohman was the pilot for the HondaJet.

23   Q    He was the pilot for?

24   A    The HondaJet that was owned by Passport 420.

25   Q    Okay.  And Mr. Ohman writes to you and Mr. Avenatti; is
```

02:19PM  5
02:19PM 10
02:20PM 15
02:21PM 20
02:21PM 25

```
 1   that correct?
 2   A    Yes, he did.
 3   Q    And what did Mr. Ohman say to you and Mr. Avenatti?
 4   A    "Michael and Judy, FYI, I just received this
 5        from Honda regarding a balance discrepancy after the
 6        two wire transfers today for the closing of the
 7        plane.  See e-mail thread below.  Judy, possibly
 8        there was a mistake on behalf of the bank that could
 9        be checked against the ACH records."
10   Q    If you were to look at -- let's go to 155 now.  Pulling
11   up the first page.  And let's -- Exhibit 155.  Starting at the
12   bottom of the page, is that the same e-mail that we just read
13   from 154 that Christopher Ohman sent to you?
14   A    Yes.
15   Q    And right above that did Mr. Avenatti send you an e-mail?
16   A    Yes, he did.
17   Q    What did Mr. Avenatti tell to you to do?
18   A    "Ignore this."
19   Q    And what did you say?
20   A    "Got it."
21   Q    When Mr. Avenatti told you to ignore the prior e-mail in
22   154 from Mr. Ohman, what did you do?
23   A    I didn't do anything.  I just ignored it.
24   Q    If you were to look at Exhibit 154, page 2 -- and,
25   actually, before I get there, Mr. Ohman's e-mail to you on
```

02:21PM (line 5)
02:22PM (line 10)
02:22PM (line 15)
02:22PM (line 20)
02:23PM (line 25)

```
 1  January 26 mentioned the balance discrepancy after the two wire
 2  transfers today closing the plane.  So that would have been
 3  January 26, 2017?
 4  A    Yes.
 5  Q    If you were to turn to page 2, where it has a little
 6  almost Excel spreadsheet-looking addition, where does the "wire
 7  2 today" say?
 8  A    "Wire 2 today from X-Law Group IOLTA account."
 9  Q    And how much?
10  A    2,500,000.
11  Q    And that's the same amount and the same day that you
12  transferred money out of Eagan Avenatti to X-Law Group?
13  A    Yes.
14  Q    What was your understanding of why you were sending
15  $2.5 million to The X-Law Group?
16  A    I did say I thought that Alexis Gardner was a partner --
17  or partner, I'm sorry -- was a client of both firms and that
18  that was -- we were working with The X-Law group on that.  So I
19  didn't think anything about it.
20  Q    And you had sent the prior e-mail to Mr. Parrish about
21  depositing money; is that correct?
22  A    Yes, I have.
23  Q    Based on what Mr. Avenatti had told you about how the
24  plane was going to be purchased, where did you believe the
25  money was going to be coming from to purchase the plane?
```

02:23PM 5
02:23PM 10
02:24PM 15
02:24PM 20
02:24PM 25

**UNITED STATES DISTRICT COURT**

A     Well, I believed that the money would be coming from

Passport 420.

Q     After Mr. Avenatti told you to ignore this e-mail, did

you even know at this time what happened to that $2.5 million

02:25PM 5    that you transferred to The X-Law Group?

A     No, I did not.

Q     And then if you could look at Exhibit 156.  Is

Exhibit 156 an e-mail from the defendant in response to the

e-mails we just spoke of?

02:25PM 10   A     Yes.

Q     Is it a fair and accurate copy of the e-mail defendant

sent on January 26, 2017?

A     Yes.

            MR. SAGEL:  At this time, Your Honor, the Government

02:25PM 15   moves to admit Exhibit 156.

            MR. AVENATTI:  Objection, Your Honor.  Hearsay,

multiple levels.

            THE COURT:  The first e-mail from Mr. Avenatti will

be received for the truth.  The balance will be received for

02:26PM 20   notice and not for the truth.  So 156 is received.

            **(Exhibit Number 156 received.)**

            MR. SAGEL:  Thank you, Your Honor.

Q     And let's -- just real quickly, if we just look at that

section, about two-thirds of the way down, is that the e-mail

02:26PM 25   we spoke of that Christopher Ohman sent to you and

1    Mr. Avenatti?

2    A    Yes.

3    Q    And at the top, is that Mr. Avenatti's response to

4    Mr. Ohman on January 26, 2017?

02:27PM 5    A    Yes.

6    Q    And what did Mr. Avenatti say?

7    A    "Chris, there is no mistake on our end.  I will

8         handle this -- I will handle this Honda, as it is

9         incorrect.  Thanks, Michael."

02:27PM 10   Q    Did you learn that Mr. Avenatti did buy this Honda

11   aircraft?

12   A    Yes.

13   Q    If you could look at Exhibit 349, which is in Volume V, I

14   believe.

02:27PM 15        MR. SAGEL:  And for the Court's edification, I'm

16   going to have her identify part of the document, but we would

17   also move to admit it under the custodian declaration at 396,

18   page 1 and 2 for Exhibit 349.

19        MR. AVENATTI:  Your Honor, objection.  Hearsay, as

02:28PM 20   well as the additional objections lodged on page 10 of 12 of

21   Docket Entry 596.

22        THE WITNESS:  Okay.

23        THE COURT:  Just a minute.  349 will be received.  I

24   find that the supporting custodian declaration is sufficient.

02:28PM 25        **(Exhibit Number 349 received.)**

|      |   |                                                        |
|------|---|--------------------------------------------------------|
| 1    |   | MR. SAGEL:  If we could publish 349.                   |
| 2    | Q | And what's the title on the top center say?            |
| 3    | A | "Delivery Receipt."                                     |
| 4    | Q | And can you read that first paragraph?                  |
| 5    | A | "The undersigned purchaser hereby accepts              |
| 6    |   | delivery of one Honda Aircraft Company, LLC, model     |
| 7    |   | HA-420 aircraft, bearing United States Registration    |
| 8    |   | Number N227WP (the aircraft), manufactured in          |
| 9    |   | accordance with the HondaJet Retail Purchase           |
| 10   |   | Agreement Number 40000316 between purchaser and        |
| 11   |   | seller, and seller's specification and description     |
| 12   |   | dated January 2016 (the specification)."               |
| 13   | Q | And do you see a part that says "delivery information"? |
| 14   | A | Yes.                                                   |
| 15   | Q | What's the date of the delivery?                       |
| 16   | A | January 27, 2017.                                      |
| 17   | Q | And there's a signature on the kind of right side right |
| 18   |   | under that, under "Passport 420, LLC, purchaser."  Do you see |
| 19   |   | that?                                                  |
| 20   | A | Yes, I do.                                             |
| 21   | Q | Whose signature is that?                               |
| 22   | A | Michael Avenatti.                                      |
| 23   | Q | We talked before about the QuickBooks records.         |
| 24   |   | We can turn away from that exhibit, Ms. Regnier.       |
| 25   |   | We talked about the QuickBooks records for             |

02:29PM (lines 5, 10)
02:30PM (lines 15, 20, 25)

Mr. Johnson.  Did you keep those for other clients of the firm
as well?

A     Yes.

Q     If I could have you look at -- I apologize in advance,
I'm going to be sending you to a different binder again -- 157,
which I believe will be Volume III, Exhibit 157.

A     Okay.

Q     Do you have 157 in front of you?

A     Yes.

Q     Do you recognize what Exhibit 157 is?

A     Yes.

Q     And what is Exhibit 157?

A     That's a QuickBooks -- sorry, QuickBooks report for Alexis
Gardner's case.

Q     And how do you know that it's for Alexis Gardner's case?

A     It says "Gardner.001."  It's the only Gardner case we had.

Q     And is this something that was kept in the ordinary
course of the recordkeeping of Eagan Avenatti while you worked
there?

A     Yes.  Putting -- entering the amounts, yes.

        MR. SAGEL:  At this point, Your Honor, the
Government would move to admit Exhibit 157.

        MR. AVENATTI:  Objection, Your Honor.  Hearsay.

        THE COURT:  Overruled.  157 will be received.

        **(Exhibit Number 157 received.)**

```
 1   Q    BY MR. SAGEL:  Now, with the Johnson QuickBooks record,
 2   that was -- I think it was maybe nine or more pages long; is
 3   that correct?
 4   A    Yes.
02:32PM  5   Q    How long is this QuickBooks records for Alexis Gardner?
 6   How many entries approximately?
 7   A    Eight.
 8   Q    And what's the first date of an entry in Ms. Gardner's
 9   account?
02:32PM 10   A    December 14th, 2016.
11   Q    And you see the entry on January 24th, 2017.  Do you see
12   that?
13   A    Yes.
14   Q    And that says for $51,935; correct?
02:33PM 15   A    Yes, it does.
16   Q    Do you know what that entry is for?
17   A    That's the year's rent that was paid.
18   Q    And not related to the letter and the cashier's check we
19   looked at?
02:33PM 20   A    Yes, it did.
21   Q    And the only other large number on this -- in the
22   negative amount is a $13,000 figure on February 22nd, 2017.  Do
23   you see that?
24   A    Yes.
02:33PM 25   Q    Do you remember what that $13,095 payment was for?
```

```
 1   A    Not off the top of my head, no.
 2   Q    If you were to see an invoice that you received along
 3   with defendant, would that refresh your memory?
 4   A    Yes.
 5            MR. SAGEL:  Your Honor, may I approach?
 6            THE COURT:  You may.
 7            MR. AVENATTI:  Your Honor, there's no Bates stamp
 8   number on this document.
 9            MR. SAGEL:  I can produce the Bates version,
10   Your Honor.  It's produced in discovery.  It's from his server.
11            THE COURT:  Proceed.
12   Q    BY MR. SAGEL:  Does this refresh your memory of what the
13   $13,095 was in the QuickBooks account?
14   A    Yes.
15   Q    What was the $13,000 figure for?
16   A    It was for the -- that mediation that was held in the
17   Gardner/Whiteside matter.
18   Q    So in addition to the 51,000 and the 13,000 we talked
19   about, there's about five other costs associated with that
20   case?
21   A    Yes.
22   Q    And the entire cost of the Gardner case from Eagan
23   Avenatti -- or strike that.  Let me just ask it this way:  Why
24   were you keeping this QuickBooks for the Gardner case?
25   A    For the same reason we keep it on every case, to record
```

02:33PM  (line 5)
02:34PM  (line 10)
02:34PM  (line 15)
02:35PM  (line 20)
02:35PM  (line 25)

```
  1    the cost.

  2    Q    And on January 25th, 2017, is there a deposit?

  3    A    Yes.  For 2,750,000.

  4    Q    Do you know whether or not Alexis Gardner received a copy

02:36PM  5    of her settlement agreement?

  6    A    I do not.

  7    Q    If you needed to provide Ms. Gardner with a copy of her

  8    settlement agreement, would it have been difficult for you to

  9    do so?

02:36PM 10           MR. AVENATTI:  Speculation, Your Honor.

 11           THE COURT:  Overruled.

 12           THE WITNESS:  I don't know if I had a copy of it.

 13    If I did, no, it would not be difficult to do so.

 14    Q    BY MR. SAGEL:  If defendant asked you to provide

02:36PM 15    Ms. Gardner a copy of the settlement agreement, would that have

 16    been difficult to do?

 17    A    No.  I would have just verified with Michael that I could

 18    send a copy to her, and I would e-mail it to her.

 19    Q    Did you know what the terms of this settlement agreement

02:36PM 20    were between -- Ms. Gardner's settlement agreement, did you

 21    know what the terms of the agreement were?

 22    A    I don't know if I did at the time.  I don't believe so.

 23    Q    Do you know any agreements defendant had with Ms. Gardner

 24    about the arrangements or what he was entitled to?

02:37PM 25    A    No.
```

```
 1   Q    After Ms. Gardner's case settled or after -- let me use a

 2   different term.

 3            After the $2.75 million payment was made or

 4   deposited into this account, were you responsible for making

 5   any payments to Ms. Gardner?

 6   A    There was some additional payments that were made to her,

 7   yes.

 8   Q    Do you know why there were payments made to Ms. Gardner?

 9   A    No.  I assumed it was part of the settlement agreement.  I

10   don't know.

11   Q    Were you responsible for making any payments to

12   Ms. Gardner?

13   A    I don't know if physically got the check or if Michael

14   did, but he had me request some checks.

15   Q    So let's look at that, then.  Do you have Exhibit 159 in

16   front of you?

17   A    Yes.

18   Q    Is 159 an e-mail that you sent?

19   A    Yes.

20   Q    Did you send Exhibit 159 at defendant's direction?

21   A    Yes, I did.

22   Q    Is Exhibit 159 a fair and accurate copy of the e-mail you

23   sent at defendant's direction?

24   A    Yes.

25            MR. SAGEL:  Government moves to admit Exhibit 159.
```

02:37PM (lines 5, 10)
02:38PM (lines 15, 20, 25)

44

```
           1                    MR. AVENATTI:  Hearsay.

           2                    THE COURT:  What's the exception?

           3                    MR. SAGEL:  Agency -- I mean, adopted admission.

           4          She did it at defendant's direction.

02:39PM     5                    THE COURT:  159 will be received.

           6                    (Exhibit Number 159 received.)

           7          Q    BY MR. SAGEL:  Ms. Regnier, what's the date of the e-mail

           8          you're sending?

           9          A    February 20th, 2018.

02:39PM    10          Q    And you're sending it to Susan McClaran and Cynthia

          11          Lobato; is that correct?

          12          A    Yes, it is.

          13          Q    Do you know who Ms. McClaran and Ms. Lobato are?

          14          A    They worked at California Bank & Trust and they were

02:39PM    15          basically our contact bankers.

          16          Q    And the subject line is "Cashier's Check EA4613"; is that

          17          correct?

          18          A    Yes, it is.

          19          Q    Can you read the e-mail that you send to Ms. McClaran and

02:40PM    20          Ms. Lobato?

          21          A    Yes.

          22                    "Good afternoon.  Michael will be there

          23              shortly to obtain a cashier's check drawn on the

          24              trust (4613) as follows:  Payee, Alexis Gardner.

02:40PM    25              Amount, 16,000.  Remitter, Whiteside.  Thank you."
```

UNITED STATES DISTRICT COURT

```
 1   Q     How did you know to put this information in this e-mail
 2   to send to these two individuals?
 3   A     Michael requested -- this is what he requested.
 4   Q     It says "Remitter, Whiteside."
 5           Previously when I asked you why Eagan Avenatti, LLP,
 6   was the remitter, you said that's the account it came from; is
 7   that correct?
 8   A     Yes.
 9   Q     Why are you asking for a different remitter than the
10   account it's coming from here?
11   A     I don't -- the remitter -- a lot of times we asked for
12   something different because it would identify what case or
13   something like that.
14   Q     When you say "We would ask for that," how did you know to
15   ask for Whiteside to be the remitter?
16   A     Michael would tell me who he wanted the remitter to be.
17   Q     If I could have you look at Exhibit 158.
18           And, Your Honor, the Government would move
19   Exhibit 158, which is part of the same custodian declaration at
20   394, page 2.
21           MR. AVENATTI:  Your Honor, hearsay.  Same objections
22   outlined in Docket 596 on page 10 of 12.
23           THE COURT:  158 will be received.
24           (Exhibit Number 158 received.)
25   Q     BY MR. SAGEL:  If I could have you look at page 19 of
```

02:40PM  5

02:41PM 10

02:41PM 15

02:42PM 20

02:42PM 25

| | | |
|---|---|---|
| | 1 | 158. |
| | 2 | A    Okay. |
| | 3 | Q    And I'm going to be looking at page 19, 20 and 21. |
| | 4 | What's the date on page 19, 20 and 21? |
| 02:43PM | 5 | A    February 20th, 2018. |
| | 6 | Q    The same date that you requested the cashier's check in |
| | 7 | Exhibit 159? |
| | 8 | A    Yes. |
| | 9 | Q    If we could pull up the top part of page 19, which I |
| 02:43PM | 10 | think you already have.  What does it say for the remitter? |
| | 11 | A    Whiteside. |
| | 12 | Q    Whose signature under the purchaser do you recognize? |
| | 13 | A    That's Michael's signature. |
| | 14 | Q    And this is the $16,000 amount requested in the e-mail? |
| 02:43PM | 15 | A    Yes. |
| | 16 | Q    Page 20, there's a signature on the check written to cash |
| | 17 | for this $16,000 amount.  Do you recognize the signature on |
| | 18 | that check? |
| | 19 | A    Yes.  That's Michael's signature. |
| 02:43PM | 20 | Q    And page 21, is that the actual cashier's check that was |
| | 21 | purchased for $16,000? |
| | 22 | A    Yes, it is. |
| | 23 | Q    And that's to Alexis Gardner? |
| | 24 | A    Yes. |
| 02:44PM | 25 | Q    And who's the remitter? |

| | |
|---|---|
| 1 | A      Whiteside. |
| 2 | Q      On this bottom half, and I -- |
| 3 |         Can you exit out of that. |
| 4 |         Do you see the "for deposit only" written on the |
| 02:44PM 5 | check, the cashier's check for Ms. Gardner? |
| 6 | A      Yes, I do. |
| 7 | Q      Do you recognize whose handwriting says "for deposit |
| 8 | only"? |
| 9 | A      It appears to be Michael's handwriting. |
| 02:44PM 10 | Q      If I could have you look at Exhibit 163. |
| 11 | A      Yes. |
| 12 | Q      Is 163 the e-mail thread that you sent to California |
| 13 | Bank & Trust? |
| 14 | A      Yes. |
| 02:45PM 15 | Q      And at whose direction did you send these e-mails? |
| 16 | A      At Michael's direction. |
| 17 | Q      And is it a fair and accurate copy of the e-mail you sent |
| 18 | at defendant's direction? |
| 19 | A      Yes, it is. |
| 02:45PM 20 |         MR. SAGEL:  Government moves to admit Exhibit 163, |
| 21 | Your Honor. |
| 22 |         MR. AVENATTI:  Objection.  Hearsay. |
| 23 |         THE COURT:  Overruled.  163 will be received. |
| 24 |         **(Exhibit Number 163 received.)** |
| 02:45PM 25 | Q      BY MR. SAGEL:  And if I could have you look at the bottom |

1   half of page 1.  Is that another e-mail that you sent to Susan

2   McClaran and Cynthia Lobato?

3   A     Yeah.

4   Q     And what's the date of this e-mail?

02:45PM 5   A     May 23rd, 2018.

6   Q     And the subject line is "Cashier's check from trust

7   4613"?

8   A     Yes.

9   Q     Can you please read the e-mail that you sent at the

02:46PM 10  bottom of page 1 to Ms. McClaran and Ms. Lobato.

11  A     "Good afternoon.  I'm going to be heading over

12        there to pick up a cashier's check for $16,000 drawn

13        on a trust ending in 4613 payable to Alexis Gardner.

14        The remitter is Whiteside.  Thank you."

02:46PM 15  Q     How did you know what information to send to them on

16  May 23rd, 2018?

17  A     Michael provided it.

18  Q     If I could have you look at -- back at Exhibit 158, if I

19  could have you look at page 25.  And that's going to be 25, 26

02:46PM 20  and 27.  It's over on the top check on page 25.

21        Do you recognize this signature under the purchaser

22  there?

23  A     Yes.  That's my signature.

24  Q     And is this the -- let me do it generally first.

02:47PM 25        Page 25, 26, and 27, is this the cashier's check

1    that you referenced in the e-mail we just looked at in

2    Exhibit 163?

3    A    Yes.

4    Q    This is the purchase of the $16,000 cashier's check to

02:47PM 5    Alexis Gardner on May 23rd?

6    A    Yes.

7    Q    And who's the remitter?

8    A    It is Whiteside.

9    Q    If you could look at the bottom half of page 27,

02:47PM 10   underneath the cashier's check, do you see that?

11   A    Yes.

12   Q    There is handwriting "for deposit only" and an account

13   number.

14   A    Yes.

02:47PM 15   Q    Whose handwriting is that?

16   A    That's my handwriting.

17   Q    Did you ever deposit any checks into Ms. Gardner's

18   account?

19   A    Yes.

02:47PM 20   Q    How did you know to deposit checks into Ms. Gardner's

21   account?

22   A    Michael directed me to do a deposit into her account and

23   she provided the account number.

24   Q    And when you say "she provided the account number" --

02:48PM 25   A    Oh.  Michael gave me an account number.  I mean, I'm sure

|      | 1  | he got it from her. |
|      | 2  | Q    Did you ever have any communications with Ms. Gardner? |
|      | 3  | A    I don't believe I did. |
|      | 4  | Q    So if you had the account number, how did you get that? |
| 02:48PM | 5  | A    Michael gave it to me. |
|      | 6  | Q    How did you know what bank to deposit it at? |
|      | 7  | A    He gave me that information also. |
|      | 8  | Q    And did you go to that bank and deposit it? |
|      | 9  | A    Yes. |
| 02:48PM | 10 | Q    Do you know if Ms. Gardner knew you were depositing the |
|      | 11 | check? |
|      | 12 | A    I don't know. |
|      | 13 | Q    Exhibit 158 is 27 pages with numerous cashier's checks, |
|      | 14 | and I'm not going to go through each of them but I'm going to |
| 02:49PM | 15 | have you look at page 3.  This is the deposit, the cashier's |
|      | 16 | check on March 15th, 2017.  Do you see that? |
|      | 17 | A    Yes. |
|      | 18 | Q    And that has a remitter of Whiteside.  Do you see that? |
|      | 19 | A    Yes. |
| 02:49PM | 20 | Q    Do you recognize the handwriting "for deposit only" on |
|      | 21 | the bottom part? |
|      | 22 | A    Yeah.  That's Michael's writing. |
|      | 23 | Q    Page 6 is a cashier's check to Alexis Gardner for |
|      | 24 | $16,000.  Do you see that? |
| 02:49PM | 25 | A    Yes. |

|  |  |
|---|---|
| 1 | Q    That's April 14th, 2017.  Do you see that? |
| 2 | A    Yes. |
| 3 | Q    Who's the remitter on this cashier's check? |
| 4 | A    Whiteside. |
| 02:49PM 5 | Q    And on the bottom half of that check there's writing "for |
| 6 | deposit only" with the bank account.  Do you recognize whose |
| 7 | handwriting that is? |
| 8 | A    Yes.  That's Michael's handwriting. |
| 9 | Q    Do you know who Tom Cassaro is? |
| 02:50PM 10 | A    Yes. |
| 11 | Q    Who is Tom Cassaro? |
| 12 | A    He worked for X-Law Group and he also worked for Eagan |
| 13 | Avenatti. |
| 14 | Q    When you described the relationship where some of the |
| 02:50PM 15 | X-Law Group people worked for Eagan Avenatti, was Tom Cassaro |
| 16 | one of those individuals? |
| 17 | A    Yes, he was. |
| 18 | Q    Did you have any -- did you ever have any communications |
| 19 | with Tom Cassaro as it related to Alexis Gardner? |
| 02:50PM 20 | A    I may have, yes. |
| 21 | Q    Could you look at Exhibit 263. |
| 22 |      And, Your Honor, let me know whenever you want to |
| 23 | take a break.  I can keep going on with questioning or I can |
| 24 | take a break at any time that's good for you. |
| 02:51PM 25 |      THE COURT:  Let's go for a little longer. |

1          THE WITNESS:  Okay.

2     Q     BY MR. SAGEL:  Do you see Exhibit 263?

3     A     Yes.

4     Q     Are these text messages between you and Mr. Cassaro?

02:51PM 5    A     Yes.

6     Q     Are they a fair and accurate copy of text messages

7     between you and Mr. Cassaro?

8     A     Yes.

9          MR. SAGEL:  Your Honor, I'm not offering them for

02:51PM 10   the truth of the matter, but at this time -- but for the

11    actions she took thereafter -- the Government moves to admit

12    Exhibit 263.

13         MR. AVENATTI:  Objection, Your Honor.  Hearsay.

14    Also foundation, authentication, Your Honor.

02:52PM 15        THE COURT:  Again, the basis for offering 263?

16         MR. SAGEL:  For what she did after receiving this,

17    which is -- comes in on the second text message, Your Honor.

18         THE COURT:  Be received for -- not for the facts in

19    it, just for the exchange.

02:52PM 20        **(Exhibit Number 263 received.)**

21         MR. SAGEL:  Can we publish Exhibit 263 and highlight

22    the first text message.

23    Q     Is this text message that Mr. Cassaro sent to you on

24    August 14, 2018?

02:53PM 25   A     Yes.

| | |
|---|---|
| 1 | Q    And it says:  "Hey, Judy, Alexis Gardner sent me |
| 2 | a text that she hasn't received her July money, and |
| 3 | August is supposed to come tomorrow.  She says the |
| 4 | amount was supposed to increase because her rent had |
| 02:53PM 5 | been subtracted for the first year, but that was to |
| 6 | end in February.  I told her I'd find out what I |
| 7 | could do -- find out what I could.  She said she |
| 8 | doesn't want to bother Michael because he's on his |
| 9 | way to the White House but hopes we can figure this |
| 02:53PM 10 | out soon." |
| 11 | After you received this message from Tom Cassaro, |
| 12 | what did you do? |
| 13 | A    I'm not sure if I forwarded that to Michael or sent a |
| 14 | message to Michael or called Michael. |
| 02:53PM 15 | Q    And regardless of which manner you did, did you wind up |
| 16 | talking or getting some information from Mr. Avenatti about it? |
| 17 | A    Michael told me he had it handled. |
| 18 | Q    And did you pass that along to Mr. Cassaro? |
| 19 | A    Yes. |
| 02:54PM 20 | Q    And that's the second e-mail -- sorry, text message, |
| 21 | where you say "Michael had this handled"? |
| 22 | A    Yeah. |
| 23 | MR. SAGEL:  Your Honor, if this is a good breaking |
| 24 | point. |
| 02:54PM 25 | THE COURT:  That's fine.  We'll take the |

1    midafternoon break here, ladies and gentlemen.  We'll be in

2    recess for 15 minutes.

3         Please remember the admonition not to discuss the

4    case with anyone, not to form any opinions on the issues in the

02:54PM  5    case until it's submitted to you, and please don't do any

6    research.

7         So 15 minutes, please.

8         THE COURTROOM DEPUTY:  All rise.

9         **(Out of the presence of the jury.)**

02:55PM 10    MR. AVENATTI:  Your Honor, I have one issue I'd like

11   to raise before we come back, right before we start back.  It

12   won't take long.

13        THE COURT:  Why don't you take it up now.

14        MR. AVENATTI:  Okay.  Your Honor, I've lodged a

02:55PM 15   number of objections basically based on speculation.  I want to

16   explain those objections.

17        THE COURT:  Sir, I appreciate the purport of the

18   speculation objection.  I don't need any further elaboration.

19        MR. AVENATTI:  Just to make a record, Your Honor,

02:55PM 20   the witness continually says "I would have," "He would have,"

21   things of that nature.  That is not a recollection of the

22   specific event, Your Honor.  And there's no clarity from the

23   Government on this.  The witness does not appear to have a

24   recollection of the specific event she's being asked about.

02:56PM 25   She is speculating as to what would have happened.

1          Now, I'm going to get into this on cross,

2    Your Honor --

3              THE COURT:  That's fine.

4              MR. AVENATTI:  -- but I would just ask that the

02:56PM  5    Court -- well, when I make the objection based on speculation,

6    Your Honor, that's what it is.  It's not suggesting that

7    somehow in 90 percent of the instances that she wouldn't

8    otherwise know, Your Honor.  It's that she doesn't have an

9    actual recall of the event.  So I appreciate the time.

02:56PM 10              THE COURT:  I take those statements to be the

11    equivalent of "I don't remember but that would have been my

12    practice."  I think the jury can so interpret the statement "I

13    would have" in that fashion.

14              We'll be in recess.

02:57PM 15              **(Recess from 2:57 p.m. to 3:14 p.m.)**

16              **(In the presence of the jury.)**

17              THE COURT:  Mr. Sagel.

18              MR. SAGEL:  Thank you, Your Honor.

19    Q    You mentioned before that you basically gave defendant

03:14PM 20    updates on the account balances of the law firm while you

21    worked there; is that correct?

22    A    Yes, it is.

23    Q    And you also mentioned that you paid bills for Eagan

24    Avenatti while you were at work there; is that correct?

03:14PM 25    A    Yes, it is.

```
 1   Q    Between these functions of giving him the account
 2   balances and paying bills, were you aware of the financial
 3   condition of Eagan Avenatti while you were working there?
 4   A    Yes, I was.
 5   Q    Between 2015 and 2019, how would you describe the
 6   financial condition of the firm?
 7              MR. AVENATTI:  Objection, Your Honor.  Relevance and
 8   a pretrial ruling, 403.
 9              THE COURT:  Overruled.
10              THE WITNESS:  The firm was not doing well
11   financially.  It -- I mean, sometimes there would be a lot of
12   money; other times there was no money.
13   Q    BY MR. SAGEL:  And you said it wasn't doing well and
14   sometimes it did.  Was there times where it was worse than
15   other times?
16   A    Definitely.
17   Q    And when did the financial condition of the firm become
18   even worse?
19              MR. AVENATTI:  Same objection, Your Honor.
20              THE COURT:  Overruled.
21              THE WITNESS:  In about August of 2018.
22   Q    BY MR. SAGEL:  And why do you say August of 2018 it
23   became worse?
24   A    At that point in time the firm started becoming unable to
25   meet their normal business expenses.
```

03:15PM (5)
03:15PM (10)
03:15PM (15)
03:15PM (20)
03:16PM (25)

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
|       | 1  | Q     And going back -- I'm going to go back to early 2017.           |
|       | 2  | A     Okay.                                                           |
|       | 3  | Q     Was the firm having financial problems in early 2017?          |
|       | 4  | A     I believe so.  Yes.                                            |
| 03:16PM | 5 | Q     Do you know whether or not -- let me ask it in a               |
|       | 6  | different way first.                                                  |
|       | 7  |        In your role and your responsibilities at Eagan              |
|       | 8  | Avenatti, did you learn that Eagan Avenatti, the firm, filed         |
|       | 9  | for bankruptcy?                                                      |
| 03:16PM | 10 | MR. AVENATTI:  Same objection, Your Honor.                    |
|       | 11 |             THE COURT:  Overruled.                                   |
|       | 12 |             THE WITNESS:  Yes, I did.                               |
|       | 13 | Q     BY MR. SAGEL:  And approximately when did Eagan Avenatti      |
|       | 14 | file for bankruptcy?                                                 |
| 03:16PM | 15 | A     I'm not 100 percent sure.  I believe early 2017.          |
|       | 16 | Q     During the times when you -- did you have any discussions     |
|       | 17 | with the defendant about the financial condition of the firm,       |
|       | 18 | about its ability to make payments?                                  |
|       | 19 | A     We had daily conversations regarding finances.               |
| 03:17PM | 20 | Q     Why did you have daily conversations about finances with  |
|       | 21 | the defendant?                                                       |
|       | 22 | A     Because the firm wasn't doing well and we were trying to     |
|       | 23 | make the bills, and that's why.                                      |
|       | 24 | Q     Did you ever discuss the firm's financial situation with     |
| 03:18PM | 25 | anybody other than the defendant?                              |

1    A    No.

2    Q    Why not?

3    A    Just -- I just didn't.  I mean, I didn't -- it's not

4    something that we -- that I discussed with any of the staff or

03:18PM  5    anybody in the office.

6    Q    Did defendant ever give you any directions regarding

7    that?

8    A    Yes.  I mean, Michael did not want anybody to know the

9    finances of the business.

03:18PM 10    Q    Did he tell that to you?

11    A    Yes.

12              MR. AVENATTI:  Objection.  Leading.

13              THE COURT:  Overruled.

14    Q    BY MR. SAGEL:  Your answer was "yes"?

03:18PM 15    A    Yes.

16    Q    Ms. Regnier, are you currently taking any medications?

17    A    Yes, I am.

18    Q    What are you taking medications for?

19    A    Anxiety and depression.  I've recently gone through

03:19PM 20    Stage III breast cancer, so -- and I have PTSD.

21    Q    And the medications you take for anxiety and stress --

22    A    Uh-huh.

23    Q    -- what impact do you believe it has on your memory?

24    A    I don't know how much of an impact it actually has on my

03:19PM 25    memory.  It's more of what I've been through in the last year

1    that has an impact on my memory, I believe, than the

2    medications I'm taking.  My only real problem is place things

3    in the timeline.  And so being refreshed by documents is very

4    helpful.

03:19PM 5    Q    When you say what you've been through the last year, is

6    that the cancer treatment?

7    A    The cancer treatment and the -- and everything that

8    happened the year before with the raid on my house.

9    Q    And you mentioned the financial condition of the firm

03:20PM 10   Eagan Avenatti got even worse in August of 2018.  Is that what

11   you said?

12   A    Yes, it did.

13   Q    At some point was the law firm no longer located in

14   Newport Beach?

03:20PM 15   A    Yes.  The firm was evicted from their offices in November

16   of '18.

17   Q    And why was the law firm evicted in November of 2018?

18            MR. AVENATTI:  Objection.  Relevance.  403.

19            THE COURT:  Overruled.

03:20PM 20            THE WITNESS:  Nonpayment of rent.

21   Q    BY MR. SAGEL:  And after the law firm was evicted, where

22   were you working?

23   A    I was working from my home.

24   Q    And at your house did you have files and records from the

03:20PM 25   law firm?

```
         1   A     Yes.

         2   Q     Do you have digital devices from the law firm?

         3   A     Yes.

         4   Q     Where was the mail being sent for the law firm?

03:20PM  5   A     The mail was being sent to a private P.O. Box.

         6   Q     And was that near where you lived?

         7   A     Yes.

         8   Q     And did you set up that Post Office Box?

         9   A     Yes, I did.

03:21PM 10   Q     At whose direction?

        11   A     At Michael's direction.

        12   Q     So you had said earlier that the last time you had a job

        13   was March 25th, 2019; is that correct?

        14   A     Yes, it is.

03:21PM 15   Q     Was that the day that law enforcement executed a search

        16   warrant at your house?

        17   A     Yes, it is.

        18   Q     And at your house that day, were there records of the law

        19   firm?

03:21PM 20   A     Yes.

        21   Q     Do you know who Gregory Barela is?

        22   A     Yes.  He was a client of Eagan Avenatti.

        23   Q     How did you know he was a client of Eagan Avenatti?

        24   A     We had a case in the office for him.  We had, you know, a

03:21PM 25   retainer with him and...
```

```
        1   Q    Do you know what the name of the other party was in his
        2   matter?
        3   A    No.  I don't remember it off the top of my head.
        4   Q    Fair enough.
03:22PM  5        Do you remember approximately when -- did you learn
        6   while you were working at Eagan Avenatti that the case was
        7   going towards mediation or a settlement?
        8   A    Yes.
        9   Q    Do you remember when it was going towards mediation or
03:22PM 10   settlement?
       11   A    Not really, as I sit here.
       12   Q    Okay.  Well, let's go through some of the exhibits and
       13   we'll do it that way.
       14        If you could look at Exhibit 174.  That's
03:23PM 15   Volume III.
       16   A    Okay.
       17   Q    Is Exhibit 174 an e-mail and attachment you sent to the
       18   defendant?
       19   A    Yes, it is.
03:23PM 20   Q    Is it a fair and accurate copy of an e-mail and
       21   attachment you sent to defendant?
       22   A    Yes.
       23        MR. SAGEL:  At this time, Your Honor, the Government
       24   would move to admit Exhibit 174.
03:23PM 25        MR. AVENATTI:  Objection.  Hearsay.
```

```
 1              THE COURT:  Overruled.
 2              (Exhibit Number 174 received.)
 3              MR. SAGEL:  If we could publish the first page, the
 4    top part.
03:23PM 5    Q    Ms. Regnier, is this an e-mail that you're sending to the
 6    defendant?
 7    A    Yes, it is.
 8    Q    What's the date of this e-mail?
 9    A    December 19, 2017.
03:23PM 10   Q    What's the subject?
11    A    "Barela cost bill."
12    Q    And the attachment?
13    A    "Barela costs."
14    Q    And what's the e-mail that you write to defendant?
03:24PM 15   A    "Michael, total Barela costs, $109,200.72."
16    Q    And do you know why you were sending this e-mail to
17    defendant on December 19th, 2017?
18    A    Michael had requested it.  This was probably around the
19    time of the mediation.
03:24PM 20   Q    Give me one second.
21              If you look at Exhibit 175.
22    A    Okay.
23    Q    Just review Exhibit 175.  Does that refresh your
24    recollection on when the Barela matter was approaching
03:25PM 25   settlement?
```

```
  1    A      Yeah -- yes.  I'm sorry.

  2    Q      And then turning back to Exhibit 174 that we were looking

  3    at, this December 19, 2017 e-mail, did you send this to

  4    defendant at the time he was involved in mediation in the

03:25PM  5    Barela matter?

  6    A      Yes, I would have.

  7    Q      And you say on the first page the costs are $109,272, and

  8    then there's an attachment; is that correct?

  9    A      Yes, there's an attachment.

03:25PM 10    Q      And the attachment is two pages long?

 11    A      Yes.

 12    Q      And if you get to the end of the attachment, what's the

 13    number for the total expenses and advances?

 14    A      $109,200.72.

03:26PM 15    Q      And the first page of this also has the big word "draft"

 16    across it?

 17    A      Yes, it does.

 18    Q      Did defendant at times of settlement typically ask you to

 19    send the cost related to cases?

03:26PM 20    A      Yes.

 21    Q      And what was your understanding of why he would ask you

 22    for the cost related to the cases?

 23            MR. AVENATTI:  Calls for speculation.

 24            THE COURT:  Overruled.

03:26PM 25            THE WITNESS:  Because, especially when they were in
```

mediation, trying to figure out, you know, what the firm

was owed, what the client would ultimately get so the client

could agree to the settlement or not agree to the settlement.

Q    BY MR. SAGEL:  At some point soon after this, did you

learn that the Barela matter settled?

A    Yes, I did.

Q    And who did you learn that from?

A    I believe from Michael.

Q    At the time that you learned that this case settled, did

you know the terms of the settlement agreement?

A    Not when it immediately settled, but -- no, not really.

Q    If I could have you look at Exhibit 190.  Is Exhibit 190

an e-mail that you sent to defendant?

A    Yes, it is.

Q    With an attachment?

A    Yes.

Q    Is it a fair and accurate copy of the e-mail you sent

with a fair and accurate copy of the attachment you sent to

defendant?

A    Yes, it is.

          MR. SAGEL:  At this time, Your Honor, the Government

moves to admit Exhibit 190.

          MR. AVENATTI:  Objection.  Hearsay.

          THE COURT:  Overruled.  190 will be received.

          **(Exhibit Number 190 received.)**

```
 1    Q    BY MR. SAGEL:  What's the date of this e-mail that you

 2    sent to Michael Avenatti?

 3    A    January 2nd, 2018.

 4    Q    What's the subject line?

 5    A    "Wire instructions from Dianna at CNB."

 6    Q    Who's Dianna at CNB?

 7    A    Dianna Appell at City National Bank.  She was, like, our

 8    rep there.

 9    Q    And at some point did you switch from California Bank &

10    Trust to CNB, City National Bank?

11    A    Yes.

12    Q    On the second page are the wire instructions?

13    A    Yes.

14    Q    And what's the -- if you look at the bottom, it gives an

15    account number.  What are the last four numbers of the account

16    number?

17    A    5566.

18    Q    And in parentheses what does it refer to?

19    A    "BAR Settlement."

20    Q    Do you know what the account called "BAR settlement,"

21    what that relates to?

22    A    To the Barela settlement.

23    Q    And how do you know that the account is the Barela

24    settlement account?

25    A    The B-A-R is for Barela.
```

```
 1    Q    Were you involved in helping set up that bank account?

 2    A    I believe so, yes.

 3    Q    Do you know who directed that an account be set up for

 4    the Barela settlement?

 5    A    Michael.

 6    Q    If I could have you look at Exhibit 370.

 7              MR. SAGEL:  And, Your Honor, the Government would

 8    move Exhibit 370 into evidence based on the custodian

 9    declaration at 397, pages 3 and 4.

10              MR. AVENATTI:  Your Honor, objection on hearsay as

11    well as the objections lodged on Docket 596, page 10 of 12,

12    relating to the business records rule.

13              THE COURT:  Volume VII seems to be eluding me for a

14    moment.

15              MR. SAGEL:  There's an extra copy over there if you

16    want.  I was offering.  I wasn't going to make your staff do it

17    for you.

18              It's Exhibit 370, and the declaration is at 397.

19    I'm being told 370 is in Volume VI, and 397 is in Volume VII.

20              THE COURT:  370 will be received.  I find the

21    declaration of 397 to be sufficient --

22              MR. SAGEL:  Thank you, Your Honor.

23              THE COURT:  -- under 902 and 803.

24              (Exhibit Number 370 received.)

25              MR. SAGEL:  If we could pull the top half of page 1
```

```
 1  of 370.
 2  Q    Let's start with, what's the title of this account?
 3  A    "Michael J. Avenatti, attorney-client trust account, BAR
 4  settlement."
 5  Q    What's the address?
 6  A    520 Newport Center Drive, Suite 1400, Newport Beach, CA,
 7  92660.
 8  Q    Same location as Eagan Avenatti?
 9  A    Yes.
10  Q    Have you look in the upper right corner with the account
11  number.  Is that the same 5566 number?
12  A    Yes, it is.
13  Q    And do you recognize this as the Gregory Barela
14  settlement trust account?
15  A    Yes.
16  Q    And if we look at the bottom half, there's a beginning
17  balance and ending balance for this first page.  Do you see
18  that?
19  A    Yes.
20  Q    It's December 28th and December 29th of 2017?
21  A    Yes.
22  Q    Do you understand that to mean that this account was
23  opened on December 28th?
24  A    Yes, it was opened on the 28th.
25  Q    If I could have you turn to page 2 of this settlement
```

```
        1   account.  In the middle section, what's the beginning balance
        2   as of December 29th, 2017?
        3   A     Zero.
        4   Q     And if I could have you look at the kind of bottom third,
03:34PM  5   where there's electronic credits, do you see an incoming wire?
        6   A     Yes.
        7   Q     What's the date of the incoming wire?
        8   A     January 5th.
        9   Q     And if you were to look above to see the year, would that
03:34PM 10   be January 5th of 2018?
       11   A     Yes.
       12   Q     How much is the incoming wire on January 5th, 2018?
       13   A     1.6 million.
       14   Q     Do you know what this $1.6 million incoming wire
03:34PM 15   represents?
       16   A     That would be part of the Barela settlement.
       17   Q     You say part of the settlement?
       18   A     Well, it would be the Barela settlement that had been
       19   received.
03:35PM 20   Q     Do you know who Ed Ricci is or Edward Ricci?
       21   A     Yes, I do.
       22   Q     Who's Edward Ricci?
       23   A     He's an attorney in Florida that we worked on some cases
       24   with.
03:35PM 25   Q     When you say "we," do you mean --
```

```
 1   A     That Eagan Avenatti worked with his office on cases in
 2   Florida.
 3   Q     Were you familiar with what attorneys worked on Gregory
 4   Barela's matter?
 5   A     Our firm worked on Gregory Barela's matter.
 6   Q     Was Edward Ricci one of the attorneys that worked on
 7   Gregory Barela's matter?
 8   A     I don't believe Ed Ricci did any work on Barela's matter.
 9   Q     If I could have you look at Exhibit 202.  I believe it's
10   Volume III.
11           Do you have Exhibit 202 in front of you?
12   A     Yes, I do.
13   Q     Is this an e-mail that you sent to Ms. Appell at City
14   National Bank?
15   A     Yes, it is.
16   Q     At whose direction did you send this to Ms. Appell at
17   City National Bank?
18   A     Michael's.
19   Q     Is this a fair and accurate copy of the e-mail that you
20   sent to Ms. Appell at City National Bank?
21   A     Yes.
22           MR. SAGEL:  At this time, Your Honor, the Government
23   would move to admit Exhibit 202.
24           MR. AVENATTI:  Objection.  Hearsay.
25           THE COURT:  202 will be received.
```

1          **(Exhibit Number 202 received.)**

2    Q    BY MR. SAGEL:  The subject line of this e-mail is

3    "Cashier's Check"; is that correct?

4    A    Yes, it is.

03:37PM 5    Q    And what's the date of this e-mail?

6    A    January 8th, 2018.

7    Q    And you start with "Dianna, good morning."  Can you

8    please read what it says after "good morning."

9    A    "We need to issue a cashier's check today from

03:37PM 10         the account ending 5566 as follows:  Remitter,

11         Avenatti Trust; payee, Edward Ricci; amount,

12         $617,840.44.  Just let me know when I can come pick

13         it up.  Thank you."

14   Q    And it says "from the account ending 5566."  What was the

03:37PM 15   account ending 5566?

16   A    The Barela settlement account.

17   Q    And why were you asking for a cashier's check made out to

18   Edward Ricci from the Barela trust account?

19   A    Because Michael instructed me to get a check for Ed from

03:38PM 20   that account.

21              MR. SAGEL:  And if we could turn back to

22   Exhibit 370, it might be easier if we just put it on the

23   screen, page 3.

24   Q    If we were to look at the debits on the bottom page of

03:38PM 25   page 3 of Exhibit 70 [sic], on January 8th, is there a debit

| | |
|---|---|
| 1 | memo? |
| 2 | A     Yes. |
| 3 | Q     And how much is the debit memo on January 8 from the |
| 4 | Barela account or the Barela settlement account? |
| 03:38PM 5 | A     $617,840.44. |
| 6 | Q     The same amount as in the e-mail that you sent to |
| 7 | Ms. Appell in Exhibit 202? |
| 8 | A     Yes. |
| 9 | Q     If I could have you look at Exhibit 193. |
| 03:39PM 10 | A     Yes. |
| 11 | Q     Is Exhibit 193 an e-mail that you were sending to a |
| 12 | different individual at City National Bank? |
| 13 | A     Yes, it is. |
| 14 | Q     And at whose direction were you sending this e-mail? |
| 03:39PM 15 | A     Michael's. |
| 16 | Q     Is it a true and accurate copy of an e-mail you sent at |
| 17 | defendant's direction? |
| 18 | A     Yes, it is. |
| 19 | MR. SAGEL:  Government moves to admit Exhibit 193, |
| 03:39PM 20 | Your Honor. |
| 21 | MR. AVENATTI:  Hearsay, Your Honor. |
| 22 | THE COURT:  Overruled.  193 will be received. |
| 23 | **(Exhibit Number 193 received.)** |
| 24 | Q     BY MR. SAGEL:  The subject line is "Michael Avenatti |
| 03:40PM 25 | Account"; is that correct? |

```
          1    A     Yes, it is.

          2    Q     And it's being sent to Stephen Reagan or Reagan.  Do you

          3    see that?

          4    A     Yes, I do.

03:40PM    5    Q     And is it because you got an out-of-office message from

          6    Dianna Appell?

          7    A     Yes, it is.

          8    Q     Can you read the e-mail after "good morning."

          9    A     "I will be coming in to pick up a cashier's check

03:40PM   10          this morning as follows:  Remitter, case costs;

          11          payee, Eagan Avenatti, LLP; amount, $111,113.22

          12          drawn on account ending 5566.  Thank you."

          13   Q     Where did the information come from to ask for this

          14   cashier's check?

03:40PM   15   A     From Michael.

          16   Q     And do you know what -- when it says "Case costs for

          17   $111,000 approximately," do you know what that related to?

          18   A     That was related to the Barela settlement.

          19   Q     And what do you mean by it "was related to the Barela

03:41PM   20   settlement"?

          21   A     That would have been the case costs that were due from

          22   Barela.

          23   Q     So, for example, we looked at Exhibit 174 --

          24   A     Uh-huh.

03:41PM   25   Q     -- that had the costs as of December.
```

UNITED STATES DISTRICT COURT

```
 1   A      Right.
 2   Q      So this relates to the final cost?
 3   A      The final cost.
 4   Q      And the date on this is January 11; is that correct?
 5   A      Yes, it is.
 6   Q      So approximately six days after the settlement, the check
 7   came in?
 8   A      Yes.
 9   Q      And if you were to look at Exhibit 370, page 3 -- and we
10   can put it on the screen -- is there a debit memo of money
11   coming out of Mr. Barela's settlement account on January 11th?
12   A      Yes.
13   Q      And what's the amount that's coming out of Mr. Barela's
14   account on January 11th?
15   A      $111,113.22.
16   Q      The same amount as in Exhibit 193?
17   A      Yes.
18   Q      Did defendant ever ask you to prepare an accounting for
19   Mr. Barela?
20   A      I'm not sure.  I believe a partial one may have been
21   started, but I'm not sure.
22   Q      When you say "a partial one might have been started," who
23   would it have been started for?
24   A      Started for or started by?
25   Q      Let's start with started by.
```

```
       1   A      Okay.  I would have -- I may have started one just because
       2   a lot of times I'd have him start it before we settle a case.
       3   Q      Did you ever provide that to Mr. Barela?
       4   A      I don't believe so, no.
03:42PM 5   Q      Did you ever -- while you worked at Eagan Avenatti, did
       6   you ever provide an accounting directly to a client?
       7   A      I believe I may have, at Michael's direction, sent an
       8   e-mail with an accounting in it, then copying Michael, sent it
       9   to them for their review and approval.
03:43PM 10  Q      If you said one was started, who would you have been
      11   sending the draft or started version to?
      12              MR. AVENATTI:  Speculation, Your Honor.  Foundation.
      13              THE COURT:  Rephrase the question, please.
      14   Q      BY MR. SAGEL:  You said you believe one might have been
03:43PM 15  started.  Let's start with, who asked you to start an
      16   accounting?
      17              MR. AVENATTI:  Same objections, Your Honor.
      18              THE COURT:  Overruled.
      19              THE WITNESS:  A lot of times when they were in a
03:43PM 20  mediation, we would just start because it was a basic form, and
      21   just start filling in the basic information, which would be the
      22   client's name, address, things like that, what the -- by the
      23   time -- on a contingency matter, by the time it went to a
      24   mediation, you knew how much the contingency percentage would
03:44PM 25  be.  So you fill in the percentage.  I mean, you don't know the
```

**UNITED STATES DISTRICT COURT**

```
 1  amounts, but...
 2  Q    Did you ever prepare a final accounting for Gregory
 3  Barela?
 4  A    No, I did not.
 5  Q    Why not?
 6  A    Michael never had me prepare a final one for him.
 7  Q    If I could have you look at Exhibit 194.  Is Exhibit 194
 8  an e-mail you received?
 9  A    I was cc'd on this, yes.
10  Q    And was this an e-mail that -- you said you were cc'd.
11  It was sent to?
12  A    To Michael.
13  Q    And is this a fair and accurate e-mail that you would
14  have received as the -- on the cc that was sent to
15  Mr. Avenatti?
16  A    Yes, it is.
17  Q    And there is attachments to this e-mail; is that correct?
18  A    Yes, there are.
19  Q    This is -- are these true and correct copies of the
20  attachment sent to Mr. Avenatti -- or sent to Mr. Avenatti that
21  you're cc'd on this e-mail?
22  A    Yes.
23       MR. SAGEL:  At this time, Your Honor, the Government
24  moves to admit Exhibit 194.  And we are not offering the
25  attachment for the truth of the matter, just that it was
```

1    received.

2             MR. AVENATTI:  Objection.  Hearsay.  Relevance.

3    403, Your Honor.

4             THE COURT:  194 will be received except for the

03:46PM  5    attachment.  It will be received for the fact that it was

6    transmitted.

7             **(Exhibit Number 194 received.)**

8             MR. SAGEL:  If we could publish the top part, just

9    the to and from and all that.  Yeah.

03:46PM 10    Q    Who is Vitaliy Shved?

11    A    He worked for Global Baristas.

12    Q    What was Global Baristas?

13    A    Global Baristas was the -- on the coffee shops up in

14    Washington.

03:46PM 15    Q    And who owned Global Baristas?

16             MR. AVENATTI:  Asked and answered.

17             THE COURT:  Overruled.

18             THE WITNESS:  Michael.

19    Q    And do you know why Vitaliy Shved is sending an e-mail to

03:46PM 20    Michael Avenatti and cc'ing you on that e-mail?  Let me ask it

21    in a different way.  We'll go step by step.

22             Why are you on an e-mail relating to Global

23    Baristas?

24    A    People tend to cc me on a lot of e-mails that go to

03:47PM 25    Michael, and Michael would call and ask if I had things or he

would tell people to make sure and cc me on things.

Q     And did you have any responsibilities -- you mentioned
paying bills for Eagan Avenatti.  Did you have any
responsibilities for paying the bills of Global Baristas?

03:47PM A     No, I didn't have any responsibilities, per se, unless
Michael instructed me to send a wire or a payment for them.

Q     And if we could look at the e-mail that starts with
"Michael" all the way down to the fourth bullet point.  Can you
read what the e-mail says after "Michael."

03:47PM A     "Payables due today/this week.  Liberty, 6.2 thousand.
Need to deliver check today for deliveries to continue
uninterrupted.  Dillanos, 29,942.52 due.  Alki, 10,588.74 due.
Finales, 3.3 thousand.  Need to give a check Wednesday per
agreed-on terms."

03:48PM Q     I'm going to stop you there.  What is your understanding
on these amounts that are due today/this week that lists
Liberty, Dillanos, Alki and Finales?  What is your
understanding of what those relate to?

A     Those were suppliers of Global Baristas.

03:48PM Q     What's the date of this e-mail?

A     January 16th, 2018.

Q     After you and the defendant received this e-mail, did you
have any discussions with the defendant of what you were to do
next?

03:49PM A     Yes, I would have.

|     |     |
| --- | --- |
| 1 | Q    Did defendant give you any directions? |
| 2 |      MR. AVENATTI:  Speculation.  Objection. |
| 3 |      THE COURT:  Follow up on the question. |
| 4 | Q    BY MR. SAGEL:  After you received this e-mail along with |
| 03:49PM 5 | the defendant, did he direct you to do anything in relationship |
| 6 | to this e-mail? |
| 7 | A    Yes, he did. |
| 8 | Q    And what did he tell you to do? |
| 9 | A    He told me what he wanted paid and where he wanted it paid |
| 03:49PM 10 | from. |
| 11 |      MR. SAGEL:  Your Honor, at this time, the Government |
| 12 | moves to admit Exhibit 372, which is part of the same custodian |
| 13 | declaration at 397, pages 3 and 4, the City National Bank |
| 14 | custodian. |
| 03:50PM 15 |      MR. AVENATTI:  Hearsay objection, Your Honor.  Same |
| 16 | objections at 596, page 10 of 12. |
| 17 |      THE COURT:  Overruled.  It will be received. |
| 18 |      **(Exhibit Number 372 received.)** |
| 19 | Q    BY MR. SAGEL:  At the top of this -- are you looking at |
| 03:50PM 20 | 392 in your book? |
| 21 | A    Yes, I am. |
| 22 | Q    Are these the outgoing wires from the Barela settlement |
| 23 | account ending in 5566? |
| 24 | A    Yes, they are. |
| 03:50PM 25 | Q    And if you were to look on the left side of the page, |

```
 1  you'll see CNB and debit account; is that correct?
 2  A     Yes.
 3  Q     And all of the debit accounts are the same, ending in
 4  5566?
 5  A     Yes, they are.
 6  Q     And that's the BAR settlement account?
 7              MR. AVENATTI:  Leading.
 8              THE COURT:  Overruled.
 9              THE WITNESS:  Yes, it is.
10  Q     BY MR. SAGEL:  And the next column is "Debit Party Name."
11  Who is the name for the debit party name?
12  A     Michael Avenatti.  Michael J. Avenatti.
13  Q     And if you were to look about seven columns over, there's
14  a column called "Beneficiary."  Do you see that?
15  A     Yes.
16  Q     And what's the column right to the right of
17  "Beneficiary"?
18  A     The Tran date.
19  Q     Do you understand that to be transaction date?
20  A     Yes.
21  Q     And then the last column is amount?
22  A     Yes.
23  Q     If you were to look down about 9 -- the 10th through
24  12th, do you see Alki Bakery?
25  A     Yes, I do.
```

| | | |
|---|---|---|
| 1 | Q | What's the transaction date right next to Alki Bakery? |
| 2 | A | January 16, 2018. |
| 3 | Q | Same date as the e-mail Vitaliy Shved sent to you on |
| 4 | | Exhibit 194? |
| 03:52PM 5 | A | Yes. |
| 6 | Q | And how much is the wire to Alki Bakery? |
| 7 | A | $10,588.74. |
| 8 | Q | The same amount that Vitaliy Shved asked for in |
| 9 | | Exhibit 194; is that correct? |
| 03:52PM 10 | A | Yes, it is. |
| 11 | Q | The wire immediately below that is Global Baristas, LLC. |
| 12 | | Do you see that? |
| 13 | A | Yes, I do. |
| 14 | Q | Previously I asked you what Global Baristas US, LLC, was. |
| 03:52PM 15 | | This one says Global Baristas, LLC.  Do you see that? |
| 16 | A | Yes, I do.  They were all related.  I'm not sure of the |
| 17 | | exact structure. |
| 18 | Q | And who owned -- to your knowledge, who owned this Global |
| 19 | | Baristas, LLC? |
| 03:52PM 20 | A | Michael Avenatti. |
| 21 | Q | And how much was the wire to Global Baristas, LLC? |
| 22 | A | 10,000. |
| 23 | Q | And what date was that? |
| 24 | A | January 17th, 2018. |
| 03:53PM 25 | Q | And then one below that, there's a wire on January 18th, |

1    2018.  Do you see that?

2    A    Yes.

3    Q    And who is that made payable to?

4    A    Dillanos Coffee Roasters.

03:53PM 5    Q    And how much is paid to Dillanos Coffee Roasters?

6    A    $24,959.

7    Q    Why were payments on January 16th to 18th being paid to

8    vendors of defendant's coffee company out of the Barela

9    settlement account?

03:53PM 10   A    Michael instructed me to make the payments.

11   Q    If I could have you look at Exhibit 195.

12   A    Okay.

13   Q    Is this an e-mail chain that you were on?

14   A    Yes, I am.

03:54PM 15   Q    And the middle e-mail, which is at the bottom of page 1,

16   is an e-mail that defendant wrote in this chain; is that

17   correct?

18   A    Yes, it is.

19   Q    And is this a fair and accurate copy of an e-mail chain

03:54PM 20   that defendant was on and wrote one of the e-mails?

21   A    Yes, it is.

22            MR. SAGEL:  Government moves Exhibit 195 in.

23            MR. AVENATTI:  Objection, Your Honor.  Hearsay.

24            THE COURT:  Mr. Avenatti's e-mail will be received

03:54PM 25   for the truth.  The e-mail to him from Melissa Grice will be

```
 1   received for the fact that he received it, not that the content
 2   is true.
 3                    (Exhibit Number 195 received.)
 4   Q     BY MR. SAGEL:  If I could have you look at page 2.
 5   There's an e-mail from Krystal Tonning that starts "hi all."
 6   Do you know who Krystal Tonning is?
 7   A     No, I don't.
 8   Q     Do you see her e-mail address?
 9   A     Yes.  It's @globalbaristas.com.
10   Q     What did Krystal Tonning write to "all" in this e-mail?
11   A     "Just wanted to make sure everyone was aware
12         of the current status of Dillanos.  I was just
13         informed that no deliveries will be made tomorrow
14         because they have not yet received a wire.  There
15         has been no communication about will call, but I
16         would assume no orders will be released without
17         either until payment has been made."
18   Q     And if you were to look at the bottom of page 1 -- I'm
19   sorry, the e-mail that Ms. Tonning sent was on January 29th,
20   2018; is that correct?
21   A     Yes.
22   Q     And if you were to look at the bottom of page 1, does the
23   defendant reply to Ms. Tonning's e-mail?
24   A     Yes.
25   Q     And what date does he reply?
```

```
 1    A     On January 29th, 2018.

 2    Q     The same day?

 3    A     Uh-huh.

 4    Q     Is that the same day?

 5    A     Yes, it is.

 6    Q     What does Mr. Avenatti say in response?

 7    A     "I want to be really clear about something.  Why

 8          are the stores not ordering enough supplies so they

 9          are not depending on daily orders all the time?  I

10          want this changed immediately."

11    Q     What was your understanding of why defendant was telling

12    the people in this e-mail how he wanted things changed?

13                MR. AVENATTI:  Speculation, Your Honor.

14                THE COURT:  Overruled.

15                THE WITNESS:  It was his company.  So that's what he

16    wanted.

17    Q     BY MR. SAGEL:  And the subject line of this e-mail chain

18    is "Dillanos Wire"?

19    A     Yes.

20    Q     And the last e-mail at the top, Melissa Grice's e-mail,

21    do you know who Melissa Grice is?

22    A     I believe I've spoken with her, yes.

23    Q     And where did she work?

24    A     She worked at Global Baristas.

25    Q     And her e-mail, what's the date on her e-mail?
```

03:56PM (lines 5, 10, 15, 20)
03:57PM (line 25)

|  |  |
|---|---|
| 1 | A    January 30th, 2018. |
| 2 | Q    If you could look at Exhibit 196.  Is Exhibit 196 an |
| 3 | e-mail you received? |
| 4 | A    Yes, it is. |
| 03:57PM 5 | Q    Did you receive this as an agent of defendant? |
| 6 | A    Yes. |
| 7 | Q    Is it a fair and accurate copy of the e-mail you received |
| 8 | on January 30th, 2018? |
| 9 | A    Yes. |
| 03:57PM 10 | MR. SAGEL:  Government moves to admit Exhibit 196, |
| 11 | Your Honor. |
| 12 | MR. AVENATTI:  Objection, Your Honor.  Hearsay. |
| 13 | THE COURT:  It will be received but not for the |
| 14 | truth.  196. |
| 03:58PM 15 | **(Exhibit Number 196 received.)** |
| 16 | Q    BY MR. SAGEL:  The subject line to you is what? |
| 17 | A    "Dillanos wire due today, $11,343.81." |
| 18 | Q    And the date of this? |
| 19 | A    January 30th, 2018. |
| 03:58PM 20 | Q    If we could turn back to Exhibit 372.  On January 30th, |
| 21 | 2018, which is about slightly under halfway down the wires, was |
| 22 | there a wire to Dillanos Coffee Roasters on January 30th, 2018? |
| 23 | A    Yes, there was. |
| 24 | Q    For how much? |
| 03:58PM 25 | A    $11,343.81. |

```
 1   Q    And if you were to look up and down these outgoing wires

 2   from the Greg Barela settlement account, are there numerous

 3   wires to Dillanos Coffee Roasters?

 4   A    Yes.

 5   Q    And are there multiple outgoing wires to the Alki Bakery?

 6   A    Yes.

 7   Q    And each and every one of those wires were related to the

 8   Global Baristas' coffee business?

 9   A    Yes.

10   Q    And were you responsible for making these wires to these

11   vendors of Global Baristas?

12   A    Michael authorized me -- told me to make them.  So I made

13   them.

14   Q    And at any point did you understand why it was coming out

15   of the Gregory Barela settlement account?

16   A    That's just the account that he requested I send them out

17   of.

18   Q    Can I have you look at Exhibit 172, please.  Actually,

19   let me ask you the question.  If you know the answer, we don't

20   have to look at the exhibit.

21        Do you know who Coblentz Law is?

22   A    They're a law firm.

23   Q    Do you know in what relationship Coblentz Law had to

24   defendant?

25   A    I know Michael has some personal work done for he and his
```

**UNITED STATES DISTRICT COURT**

| | |
|---|---|
| 1 | wife, I believe. |
| 2 | Q    And was the work that the defendant had with Coblentz |
| 3 | Law -- actually, look at Exhibit 172.  Is this an e-mail you |
| 4 | received from the defendant? |
| 04:00PM  5 | A    I was cc'd on this, yes. |
| 6 | Q    And was the message -- you were cc'd, you are correct. |
| 7 | The message in that e-mail is addressed to you, though; is that |
| 8 | correct? |
| 9 | A    Yes.  The -- yes. |
| 04:01PM 10 | Q    Is this a true and accurate e-mail that Mr. Avenatti sent |
| 11 | that you received with a direction to you? |
| 12 | A    Yes. |
| 13 | MR. SAGEL:  At this time, Your Honor, the Government |
| 14 | moves to admit Exhibit 172. |
| 04:01PM 15 | MR. AVENATTI:  Objection, Your Honor.  Hearsay. |
| 16 | Privileged. |
| 17 | MR. SAGEL:  Sent to a third party. |
| 18 | THE COURT:  Just a minute. |
| 19 | MR. AVENATTI:  Communication with my counsel, |
| 04:01PM 20 | Your Honor.  It's privileged. |
| 21 | THE COURT:  The document would not appear to contain |
| 22 | any confidential information.  It would simply be a billing |
| 23 | record or a billing demand.  Overruled.  172 will be received. |
| 24 | **(Exhibit Number 172 received.)** |
| 04:02PM 25 | Q    BY MR. SAGEL:  What's the subject line of this e-mail |

```
 1   chain, Ms. Regnier?

 2   A    "16628, Michael J. Avenatti and Lisa Storie Avenatti

 3   status update."

 4   Q    And what is the e-mail that Mr. Avenatti says at the top?

 5   What does he say?

 6   A    "Judy, please get this resolved ASAP.  Thanks."

 7   Q    And what did you understand when defendant told you to

 8   get something resolved ASAP to mean?

 9   A    He would generally call me and let me know what he meant.

10   Q    And the middle paragraph is from a J. Mitchell at

11   Coblentz Law?

12   A    Yes.

13   Q    Can you read that first paragraph under "Michael"?

14   A    "I'm forwarding an e-mail that I received from

15        my accounting department.  We've received no payment

16        for either the estate planning or the litigation

17        work over the last year."

18   Q    And now if I could have you look at Exhibit 198.  This is

19   an e-mail that Mr. Avenatti sent to you, forwarding an e-mail.

20   A    Yes.

21   Q    Is it a fair and accurate copy of the e-mail and -- and

22   there's an attachment.  Fair and accurate copy of the e-mail

23   and attachment that defendant sent to you?

24   A    Yes.

25            MR. SAGEL:  At this time, Your Honor, the Government
```

04:02PM 5
04:03PM 10
04:03PM 15
04:04PM 20
04:04PM 25

```
  1    moves to admit Exhibit 198.

  2              MR. AVENATTI:  Hearsay.  Privileged, Your Honor.

  3              THE COURT:  Overruled.  It's simply dealing with

  4    business matters.  198 will be received.

04:05PM  5         (Exhibit Number 198 received.)

  6    Q    BY MR. SAGEL:  Ms. Regnier, what's the date of the e-mail

  7    Mr. Avenatti sent you?

  8    A    January 31st, 2018.

  9    Q    And the subject line is?

04:05PM 10    A    "Unpaid AR."

 11    Q    Do you understand what "unpaid AR" means?

 12    A    An unpaid account receivable.

 13    Q    Who is this e-mail coming from that is being sent to you?

 14    A    Michael sent it to me.  It, I believe, was sent to Michael

04:05PM 15    by Clifford Yin at Coblentz Law.

 16    Q    At the bottom, under Mr. Yin's e-mail, it's Coblentz

 17    Patch Duffy & Bass, LLP?

 18    A    Yes.

 19    Q    And the attachment is Coblentz Patch Duffy & Bass's wire

04:06PM 20    information?

 21    A    Yes, it is.

 22    Q    If I could have you look at Exhibit 372.  Two-thirds of

 23    the way down, is there a wire transfer on January 31st, 2018,

 24    from the Gregory Barela settlement account?

04:06PM 25    A    Yes.
```

**UNITED STATES DISTRICT COURT**

```
 1    Q    And the first -- there are actually two wires on that
 2    date.  The first wire on that day, on January 31st, 2018, who
 3    is that wire?
 4    A    Coblentz Patch Duffy & Bass, LLP.
 5    Q    And how much is that for?
 6    A    37,000.
 7    Q    Which is slightly different from the $43,000 that's
 8    requested in the e-mail.  Why did you send 37,000 instead of
 9    the $43,000?
10    A    Michael instructed me to send 37,000.
11    Q    And right under that, on the same day there is a wire
12    transfer to you for about $3800.  Do you see that?
13    A    Yes.
14    Q    Why was there a wire transfer to you for $3800?
15    A    It was reimbursement of expenses I had been putting on my
16    credit cards for the firm.
17    Q    And why did it come out of this account?
18    A    That's the account that Michael instructed me to send the
19    wires out of.
20    Q    Finally, if you could look at Exhibit 200.  I shouldn't
21    use the word "finally."  Finally as it relates to these wires.
22    A    Yes.
23    Q    Is Exhibit 200 an e-mail that defendant sent to you?
24    A    Yes.
25    Q    And he forwarded an attachment in an e-mail to you?
```

```
 1   A     Yes, he did.

 2   Q     And is it a fair and accurate copy of the e-mail and

 3   attachment he forwarded to you?

 4   A     Yes, it is.

 5         MR. SAGEL:  At this time, Your Honor, the Government

 6   moves to admit Exhibit 200.

 7         MR. AVENATTI:  Hearsay.

 8         THE COURT:  Overruled.  200 will be received.

 9         (Exhibit Number 200 received.)

10   Q     BY MR. SAGEL:  What's the date of the e-mail that

11   Mr. Avenatti sent to you?

12   A     February 16th, 2018.

13   Q     And the attachment is the Chase client wire instructions

14   copy; is that correct?

15   A     Yes, it is.

16   Q     Do you see the date of the e-mail that was sent to him

17   that he's forwarding to you?

18   A     Yes.

19   Q     What's that date?

20   A     December 27th, 2017.

21   Q     And if you were to look at -- actually, who is that

22   e-mail that he's forwarding to you from?

23   A     Filippo Marchino.

24   Q     And is Mr. -- I don't know if it's Marchino or Marchino.

25   Mr. Marchino, is that the individual you referred to from
```

04:08PM (line 5)
04:08PM (line 10)
04:08PM (line 15)
04:08PM (line 20)
04:09PM (line 25)

```
 1          The X-Law Group?
 2      A    Yes, it is.
 3      Q    And if you look at page 3.
 4               What is page 3?
 5      A    It's Chase client trust account wire instructions.
 6      Q    For what account name?
 7      A    For The X-Law Group.
 8      Q    Nowhere on this e-mail does it say how much to wire to
 9          The X-Law Group; is that correct?
10      A    Yes.
11      Q    If you were to look back at Exhibit 372, on February 16,
12          the same date as this e-mail to you, is there a wire transfer
13          to The X-Law Group?
14      A    Yes.
15      Q    For how much money?
16      A    $46,146.81.
17      Q    How did you know the amount to send to The X-Law Group?
18      A    I would have had a conversation with Michael and he would
19          have given me the amount to send.
20      Q    And now you mentioned earlier in relation to Ms. Gardner
21          that The X-Law Group worked on Ms. Gardner's case; is that
22          correct?
23      A    Yes.
24      Q    As related to Gregory Barela, to your understanding, did
25          Filippo Marchino or The X-Law Group have anything to do with
```

```
 1   Mr. Barela's matter?

 2   A     Not to my understanding.

 3   Q     If you were to look up and down the outgoing wires from

 4   the 5566 account, the Gregory Barela settlement account --

 5   A     Yes.

 6   Q     -- are there any wires to Gregory Barela?

 7   A     No.

 8   Q     Earlier today I asked you what your understanding of what

 9   an attorney-client trust account was.  Did it cause you any

10   concern, based on your understanding of an attorney-client

11   trust account, that all these payments were coming out of an

12   attorney-client trust account?

13   A     It did cause some concern, yes.

14   Q     And why did you do it?

15   A     I was instructed to do it.  It was part of my job.  That's

16   why.

17   Q     If I could have you look at Exhibit 370, page 8.  Do you

18   see that this is still the bank statements for the 5566 Barela

19   settlement account?

20   A     Yes.

21   Q     Do you see the daily balances section on the bottom -- or

22   the bottom of what's written but the middle of the page?

23   A     Yes.

24   Q     As of March 14th, 2018, slightly over two months after

25   the $1.6 million was deposited into this account, how much
```

```
 1    money is left in the Barela settlement account?
 2    A    I don't see that.
 3    Q    There's a 3-14, 03-14, under "daily balances."
 4    A    Oh, there it is.  I'm sorry.  $609.73.
 5    Q    As of March 14th, 2018, of the nearly $1.599 million that
 6    was spent out of the Gregory Barela settlement account, how
 7    much money did the defendant ask you to send to Gregory Barela?
 8    A    He did not request I send any money to Mr. Barela.
 9    Q    After you -- after Mr. Barela's case was settled, did
10    Mr. Barela still come to the office?
11    A    Yes.
12    Q    Why was Mr. Barela still at the office?
13    A    Mr. Barela --
14    Q    To your understanding.
15    A    My understanding from Mr. Barela -- and he and Michael had
16    other business dealings, and Mr. Barela would also use our
17    office for some meetings that he had.  And so he would be
18    around probably every couple weeks for a meeting or so.
19    Q    And did you communicate with Mr. Barela to set up the
20    conference room, for example?
21    A    Yes.
22    Q    And did you ever talk to the defendant about Mr. Barela
23    being able to come and use the conference room?
24    A    Yes.
25    Q    And did you get permission to allow Mr. Barela to do
```

94

```
       1  that?
       2  A    Yes.
       3  Q    Now, moving past March of 2018 -- we just looked at the
       4  account -- moving past that, at any point did you send any
04:14PM 5  money to Mr. Barela?
       6  A    Yes.
       7  Q    Do you know the reason why you were sending money to
       8  Mr. Barela later?
       9  A    I'm not sure.  Michael would direct me to send money to
04:15PM 10 Greg.  Greg would call or send me an e-mail, saying, "Michael
      11  was supposed to send me some stuff.  Can you follow up with
      12  Michael."  Or Michael would call and say, "Can you send this to
      13  Greg."
      14  Q    And if you were instructed to do so, you would wire the
04:15PM 15 money?
      16  A    Yes.
      17  Q    Were you privy to the reasons that -- let me just ask,
      18  did you know why the monies were being sent to Mr. Barela?
      19  A    No, I didn't.
04:15PM 20 Q    If I could have you look at Exhibit 213.  Is this an
      21  e-mail chain that you were on, with the most recent e-mail
      22  coming from Mr. Avenatti to you?
      23  A    Okay.
      24  Q    Was that a "yes" or --
04:16PM 25 A    Oh, I have it, yes.
```

**UNITED STATES DISTRICT COURT**

95

```
      1   Q     Oh, you have it.

      2              Is this -- let's start with the top e-mail.  Is this

      3   an e-mail Mr. Avenatti sent to you?

      4   A     Yes, it is.

04:16PM 5   Q     And this is the last e-mail of the chain between you,

      6   Mr. Avenatti and Gregory Barela; is that correct?

      7   A     Yes.

      8   Q     Is it a fair and accurate copy of this e-mail chain?

      9   A     Yes.

04:16PM 10             MR. SAGEL:  At this time, Your Honor, the Government

     11   moves to admit Exhibit 213.

     12             MR. AVENATTI:  Objection.  Hearsay.

     13             THE COURT:  Mr. Avenatti's e-mails will be received

     14   for the truth.  Mr. Barela's will be received for just notice,

04:16PM 15   not for the truth, just that that message was sent.

     16             (Exhibit Number 213 received.)

     17   Q     BY MR. SAGEL:  Turning to the bottom of page 2, on

     18   May 22nd, 2018, Mr. Barela sends an e-mail that starts with

     19   "Hi, Michael."  Do you see that?

04:17PM 20   A     Yes.

     21   Q     What did Mr. Barela say after "Hi, Michael"?

     22   A     "Hi, Michael.  I will be putting an e-mail together

     23         on our meeting to follow up on, but I wanted to give

     24         you new wire instructions for the 60K."

04:17PM 25   Q     If you were to just look quickly at page 3, which is
```

```
 1   below that e-mail, are those the wire instructions?
 2   A    Yes.
 3   Q    And in response to Mr. Barela's e-mail, on page 2 at the
 4   bottom that you just read, did Mr. Avenatti reply?
 5   A    Yes.  He said, "Got it.  Thanks."
 6   Q    And if you were to turn to page 1, the bottom half,
 7   Mr. Barela then sends an e-mail to the defendant with you cc'd
 8   on it; is that correct?
 9   A    Yes, it is.
10   Q    And what does Mr. Barela say?
11   A    "Thanks for the call.  The wire is not in either account.
12   Can you confirm the information."
13   Q    And then did you forward that e-mail to anybody?
14   A    I forwarded it to Michael Avenatti.
15   Q    And why did you do that?
16   A    I forwarded it to him and I -- because I'm sure he called
17   me and asked about it or something, but I was copied on it and
18   I sent the report showing that the wire went, asking if he
19   wanted me to send a report to Greg.
20   Q    Okay.  So the e-mail says, "here's the report showing the
21   wire went.  Do you want me to send it to Greg?"
22         Why did you ask Mr. Avenatti's permission to send
23   the report to Greg Barela?
24             MR. AVENATTI:  Asked and answered, Your Honor.
25             THE COURT:  Overruled.
```

**UNITED STATES DISTRICT COURT**

```
 1              THE WITNESS:  Any communications with clients,

 2   Michael wanted to be approved by him before they went out of

 3   the office.

 4   Q    BY MR. SAGEL:  And what was Mr. Avenatti's response?

 5   A    "Yes."

 6   Q    Now, did Mr. Avenatti say in this response, "You don't

 7   need to ask me these kind of questions"?

 8   A    No.

 9   Q    Because he wanted you to do this?

10   A    Yes.

11   Q    If you would look at Exhibit 219.  Is that an e-mail that

12   you sent to Mr. Barela and the defendant that's in response to

13   the e-mails we just looked at in Exhibit 213?

14   A    I believe so, yes.

15   Q    And I didn't ask you, but the dates of the last couple

16   e-mails where you -- and 213 was May 25th, 2018; is that

17   correct?

18   A    Yes.  I believe so.  Yes.

19   Q    And on 219, these are also e-mails on May 25th?

20   A    Yes.

21              MR. SAGEL:  At this time, Your Honor, the Government

22   moves to admit Exhibit 219.

23              MR. AVENATTI:  Objection.  Hearsay.

24              THE COURT:  Mr. Avenatti's e-mail will be received

25   for the truth.  The other e-mails will be received just for
```

1    notice but not for the truth.

2         **(Exhibit Number 219 received.)**

3    Q    BY MR. SAGEL:  If I can have you look at quickly on

4    page 3 at the top, is that the e-mail we looked at before where

04:20PM 5   Mr. Barela is saying he's putting an e-mail together with the

6    wire instructions for the 60,000?

7    A    Yes.

8    Q    And then turning to page 1 at the top, this is the e-mail

9    you were sending to Mr. Barela and Mr. Avenatti with the wire

04:21PM 10  report; is that correct?

11   A    Yes.

12   Q    And you write, "Greg, the wire was sent to this account.

13   Attached is a bank confirm."

14           Is that the bank confirmation?

04:21PM 15  A    Yes, it is.

16   Q    If you were to look at page 4 of this exhibit, that's the

17   wire transaction detail; is that correct?

18   A    Yes, it is.

19   Q    How much was wired to Mr. Barela's account?

04:21PM 20  A    30,000.

21   Q    Mr. Barela had asked for 60,000.  Why did you wire only

22   30-?

23   A    Michael instructed me to send 30,000.

24   Q    The account number in the middle section, debit account

04:21PM 25  number, what's the last four numbers of that account number?

```
 1    A     3512.

 2    Q     That's not the Barela settlement account?

 3    A     No, it's not.

 4    Q     I'm not going to go through each, but you sent several

 5    wires to Mr. Barela?

 6    A     Yes.

 7    Q     Each time you sent wires to Mr. Barela, were there

 8    similar e-mails as what we just went through?

 9    A     Yes.

10    Q     And who directed you on the amount to send to Mr. Barela?

11          MR. AVENATTI:  Foundation, Your Honor.

12          THE COURT:  Overruled.

13          THE WITNESS:  Michael.

14    Q     BY MR. SAGEL:  And who authorized the account from which

15    to send the money?

16    A     Michael.

17          MR. AVENATTI:  Same objection.

18          THE COURT:  Overruled.

19    Q     BY MR. SAGEL:  Who did you say?

20    A     Michael.

21    Q     Do you know if there was ever a time where Mr. Barela was

22    trying to get a copy of his settlement agreement?

23    A     Yes.

24    Q     Did he ask you for a copy of his settlement agreement?

25    A     Yes, he did.
```

```
 1   Q     Did you just send it to him?

 2   A     No.

 3   Q     Why not?

 4   A     I asked Michael if I could send a copy to him.  That was

 5   the rule in the office.

 6   Q     Why don't we look at Exhibit 224.  Is 224 an e-mail chain

 7   or thread in which you forwarded an e-mail to Mr. Avenatti and

 8   he replied to you?

 9   A     Yes.  I have it now.

10   Q     I apologize.  Just let me repeat the question.

11                Is this an e-mail that you forwarded to Mr. Avenatti

12   and he replied to you?

13   A     Yes, it is.

14   Q     Is it a fair and accurate copy of the e-mails that you

15   forwarded and received from Mr. Avenatti?

16   A     Yes.

17                MR. SAGEL:  At this time, Your Honor, the Government

18   moves to admit Exhibit 224.

19                MR. AVENATTI:  Objection.  Hearsay.

20                THE COURT:  Mr. Avenatti's e-mail, again, for the

21   truth.  The rest of it not for the truth.  224 is received.

22                (Exhibit Number 224 received.)

23   Q     BY MR. SAGEL:  Let's start with the bottom e-mail from

24   Mr. Barela to you.  Do you see that?

25   A     Yes, I do.
```

04:23PM   5
04:24PM  10
04:24PM  15
04:24PM  20
04:24PM  25

| | | |
|---|---|---|
| | 1 | Q     What's the date of that e-mail? |
| | 2 | A     June 29th, 2018. |
| | 3 | Q     So this is about six months after the deposit we looked |
| | 4 | at in the account; is that correct? |
| 04:25PM | 5 | A     Yes. |
| | 6 | Q     What does Mr. Barela say to you? |
| | 7 | A     "Good morning, Judy.  Could you forward me the |
| | 8 | signed agreement from Brock, with Richard Runkles' |
| | 9 | signature." |
| 04:25PM | 10 | Q     And seeing the word "Brock" -- |
| | 11 | A     That was the other party in the case. |
| | 12 | Q     Do you know why Mr. Barela, six months after the |
| | 13 | settlement money was deposited, is asking you for a copy of his |
| | 14 | settlement agreement? |
| 04:25PM | 15 | A     No, I didn't know. |
| | 16 | Q     And what did you do after you got this e-mail from |
| | 17 | Mr. Barela? |
| | 18 | A     I forwarded it to Michael and said, "Okay to send?" |
| | 19 | Q     Why are you asking Mr. Avenatti if it's okay to send the |
| 04:25PM | 20 | settlement agreement? |
| | 21 | A     Because that was the rule in the office, nothing went out |
| | 22 | of the office to the client unless Michael had approved it. |
| | 23 | Q     And if we can look at the top part, Mr. Avenatti replies |
| | 24 | to your request of "Okay to send?"  Does Mr. Avenatti send a |
| 04:26PM | 25 | reply? |

**UNITED STATES DISTRICT COURT**

```
 1    A      Yes, he did.

 2    Q      What did he say?

 3    A      "No."

 4    Q      Do you know why Mr. Avenatti said "No" to sending his

 5    client his settlement agreement?

 6    A      No, I do not.

 7    Q      Can you look at Exhibit 225, please.

 8                 THE COURT:  Why don't we stop here for the day.

 9                 MR. SAGEL:  Can I get two more -- it's one document.

10                 THE COURT:  Let's stop here for the day.

11                 MR. SAGEL:  Thank you, Your Honor.

12                 THE COURT:  You've heard me say a lot today "This

13    will be received not for the truth."  I heard this example

14    illustrated a long time ago and I thought it was a pretty good

15    one.  Suppose your neighbor knocks on the door at 2:00 in the

16    morning, says, "My house is on fire.  You've got to get out."

17    So you, your wife, the three dogs, your six kids and the

18    parakeets all go out the back door.

19                 You're called to testify and you're asked, "What did

20    your neighbor say?"  It couldn't be received for the truth

21    because it's hearsay -- you can't cross-examine the neighbor --

22    but it could be received to explain why you and the family took

23    off.

24                 So one is for notice, for another purpose; one is

25    for the truth.  So I hope that example can clarify things.
```

|  |  |
|---|---|
| 1 | Ladies and gentlemen, we'll adjourn here for the |
| 2 | day.  Regular day tomorrow, 9:00 a.m. |
| 3 | Please remember the admonition not to discuss the |
| 4 | case with anyone, not to form any opinions on the issues of the |
| 04:27PM 5 | case until it's submitted to you, and, again, please don't do |
| 6 | any research. |
| 7 | So we'll see you bright and early.  Thank you.  Have |
| 8 | a good evening. |
| 9 | THE COURTROOM DEPUTY:  All rise. |
| 04:28PM 10 | **(Out of the presence of the jury.)** |
| 11 | THE COURT:  Mr. Avenatti, before lunch you indicated |
| 12 | that you wanted to move for a mistrial based on the Court's |
| 13 | decision to receive Exhibits 43 and 44.  I'll be happy to hear |
| 14 | you at this time. |
| 04:28PM 15 | MR. AVENATTI:  Thank you, Your Honor.  I have a few |
| 16 | other issues I'd like to raise as well, but we'll start with |
| 17 | that one, if that's okay. |
| 18 | Your Honor, we filed a motion in limine that was |
| 19 | extensively briefed prior to trial beginning.  Your Honor |
| 04:29PM 20 | issued a ruling relating to wealth and financial condition |
| 21 | evidence.  There had been numerous instances today where the |
| 22 | Government has elicited testimony and placed before this jury |
| 23 | information relating to the financial condition of the law |
| 24 | firm, my financial condition, the financial condition of other |
| 04:29PM 25 | companies that I owned, and I think it's highly prejudicial and |

```
 1    improper, Your Honor.
 2            And frankly, it's extended this trial now for
 3    numerous days.  It's going to extend it numerous days because
 4    now we're going to have a trial within the trial of what the
 5    financial condition of me and my companies were at the time,
 6    Your Honor.  They've opened the door and now it's going to
 7    require that.  And it's one of the exact things that we were
 8    attempting -- I was attempting to avoid, Your Honor.
 9            In particular, Exhibits 43 and 44 should have never
10    come into evidence.  They should have never been placed before
11    the jury.  In particular, I think it's Exhibit -- I don't want
12    to misspeak.  I think it's Exhibit --
13            THE COURT:  Let's take 43 first.
14            MR. AVENATTI:  All right.  We'll take 43 first.
15    Give me one moment, Your Honor.
16            Your Honor, if you take a look at the date of this
17    wire, January 30th, 2015, from Avenatti & Associates -- and
18    this is going to become an issue at the close of the
19    Government's case -- the only money that had been taken from
20    Mr. Johnson's $4 million was $1.6 million at that time,
21    Your Honor.  No other money had left that account, that trust
22    account.  This $250,000 came out of that $1.6 million.  Came
23    out of the legitimate fee amount according to the Government's
24    evidence that they just elicited.  There's no reason why this
25    $250,000 payment should have been put before the jury,
```

04:29PM   5
04:30PM  10
04:30PM  15
04:30PM  20
04:31PM  25

1    Your Honor.

2         THE COURT:  Sir, you're free to make that argument.

3    It's a substantial transfer of funds.  You put one gloss on it,

4    the Government might another.  So 43 was properly admitted.

04:31PM 5         44?

6         MR. SAGEL:  I'd also mention real quickly, 43 is

7    actually a wire count, Your Honor.  It might even be Count I.

8         MR. AVENATTI:  I agree, Your Honor.  And that's why

9    it's going to be the subject of a Rule 29 at the end of the

04:32PM 10   Government's case.

11        THE COURT:  Well, sir, we'll get to Rule 29.

12        MR. AVENATTI:  I understand.  I hope we do.

13        And now moving to 44, Your Honor.

14        THE COURT:  We'll get to the end of the Government's

04:32PM 15   case in chief and it will be your decision to make a Rule 29

16   motion.

17        MR. AVENATTI:  I'm sorry, Your Honor?

18        THE COURT:  We'll get to the end of the Government's

19   case and it will be your decision to make a Rule 29 motion.

04:32PM 20        MR. AVENATTI:  I understand that, Your Honor, and I

21   will be making one.

22        THE COURT:  Okay.

23        MR. AVENATTI:  But moving to 44, Your Honor, it's

24   the same issue.  Look at these payments in 44 that they put

04:32PM 25   before the jury.  Not only did they ask about them, but they

```
 1    also put them up on the screen.  A payment to my first wife of
 2    $26,000.  A payment to a building company, $100,000.  A payment
 3    to fine arts services for $21,000.  Mr. Sagel elicited the
 4    testimony about the racing team for $60,000.
 5              THE COURT:  He didn't elicit testimony --
 6              MR. AVENATTI:  He tried to.
 7              THE COURT:  -- about a racing team, per se.  He
 8    might have been going down that track, but I stopped him.
 9              MR. AVENATTI:  It was on the screen, Your Honor.
10              THE COURT:  Sir, it's not self-evident that the
11    entry for GB Auto Sport is a racing team.  It's a $60,000
12    transfer.
13              MR. AVENATTI:  Well, I think -- I don't have the
14    transcript, Your Honor.  I think that he elicited at least one
15    answer before Your Honor stepped in.  If I'm wrong, I'm wrong,
16    but that's my recollection.
17              THE COURT:  He didn't call it a racing team.  I know
18    that.
19              MR. AVENATTI:  I'm sorry?
20              THE COURT:  He didn't call it a racing team.  I know
21    that.
22              MR. AVENATTI:  And the last entry, Your Honor,
23    $60,000 for villas and apartments.  That was on the screen
24    before the jury, Your Honor.
25              THE COURT:  I don't see that.
```

                    MR. AVENATTI:  The last entry, villas and

 2    apartments.  $60,000.

 3              THE COURT:  I'm going to direct that that be

 4    redacted, that the entry for -- I guess it's "Jule Klein Fine

 5    Art" be redacted.

 6              MR. AVENATTI:  Your Honor, I would ask that all of

 7    this be redacted.  And, frankly, I'm moving for a mistrial.

 8    It's highly prejudicial.  They knew exactly what they were

 9    doing.  Your Honor ruled on it.  And here's the problem --

10              THE COURT:  Well, sir, let me read what I ruled and

11    see if that squares with the arguments you're making.

12              At Docket 512, page 11, the Court said:

13              "To the extent that the Government offers

14         evidence of Avenatti's, quote, 'lifestyle, luxury,

15         flash, and glamor' (opposition P13), the Court

16         excludes such evidence as more prejudicial than

17         probative.  This specifically includes cars and

18         apartment rent.  While such evidence may support a

19         finding of motive, it wreaks of classes.  The

20         Government's effort to show that, quote, 'He was

21         jet-setting around the world, dining at fancy

22         restaurants, making expensive purchases and

23         otherwise projecting a lifestyle of wealth,' close

24         quote, falls within the same category."

25              I said nothing there about the finances of the Eagan

```
 1    Avenatti firm or the Avenatti firm.  That came up today, but it

 2    wasn't covered by the Court's ruling.

 3             I think they're entitled to show where the money

 4    went.  If a particular entry is inflammatory, I will, as I

 5    have, direct it to be redacted.  But with movements of large

 6    amounts of money, for example, $250,000, the Government's

 7    entitled to offer that evidence and put what gloss on it it

 8    thinks what the evidence will bear, and you're entitled to

 9    address it.

10             MR. AVENATTI:  Your Honor, what they're not entitled

11    to do is attempt to mislead this jury and prejudice the jury

12    against me by way of payments made from a $1.6 million amount

13    that they claim was the fee, Your Honor.  That's the issue.  If

14    you look at the dates of these payments, how can they be

15    fraudulent if they came out of the legitimate fee, even under

16    the argument of the Government?

17             THE COURT:  Sir, that's what cross-examination is

18    about.

19             MR. AVENATTI:  Your Honor, no other money -- if you

20    look at the trust account, Your Honor, the document that they

21    admitted into evidence, at the time of these payments, no other

22    money had come from Mr. Johnson's -- or from the trust account.

23             THE COURT:  Sir, that's what cross-examination is

24    about.

25             MR. AVENATTI:  I'm struggling to understand how I
```

The timestamps in the left margin read: 04:35PM at line 5, 04:35PM at line 10, 04:36PM at line 15, 04:36PM at line 20, 04:36PM at line 25.

can be charged in Counts One and Two with stealing money from a

client that came from a legitimate fee that was due me and my

law firm.  But I guess we're going to get there.

But the point is, it's even exasperated, Your Honor,

by the fact that they take these payments, right, of $250,000,

the payment for the fine art, et cetera, they splash it on the

screen in front of the jury.  It's highly --

THE COURT:  They didn't splash anything, sir.

MR. AVENATTI:  He displayed it.

THE COURT:  That's not called splashing.

MR. AVENATTI:  Okay.  I'm sorry.  He displayed it.

He displayed it.  And he specifically started to go down the

road of asking about the payments.  That was deliberate,

Your Honor.  That wasn't accidental.

THE COURT:  Sir, anything further on your motion

predicated on these two exhibits?

MR. AVENATTI:  Nothing further on these two

exhibits.

THE COURT:  Your motion for mistrial is denied.

MR. AVENATTI:  Which items are going to be redacted

from Exhibit 44, Your Honor?

THE COURT:  The rent and the art payment.

MR. AVENATTI:  What about the payment to Ms. Carlin,

the building payment, the payment to my then current wife?  I

mean, what is the relevance of this?

1          THE COURT:  I already ruled that payments to --

2    spousal payments and that sort of thing could come in, that the

3    balance of that type of evidence was such that the evidentiary

4    value predominated over prejudice, as opposed to restaurant

04:38PM 5    bills and actually flying around in a jet, as opposed to buying

6    one.

7          MR. AVENATTI:  I don't understand what the --

8    Your Honor, I'm struggling to understand the relevance of where

9    this money was spent.  I'm talking about this money,

04:38PM 10   Your Honor.

11         THE COURT:  Sir, I've ruled.  If you'd like to go on

12   to something else, that's fine.  You'll certainly have an

13   opportunity to cross-examine.

14         MR. AVENATTI:  My understanding, Your Honor, moving

04:39PM 15   on, was that we were not to make speaking objections and

16   responses in front of Your Honor.  That's what I understood

17   Your Honor's rule was.

18         THE COURT:  Sir, nobody has gone beyond the bounds

19   today.  If they do, I will call them on it.

04:39PM 20         MR. AVENATTI:  Well, I know of one --

21         THE COURT:  Sir.

22         MR. AVENATTI:  Yes, sir.

23         THE COURT:  I don't believe anyone went beyond the

24   bounds today.  When I think they do, I will call them on it,

04:39PM 25   including yourself advancing factual assertions as part of your

questions, responding to objections.

MR. AVENATTI:  Your Honor, I know of one occasion when Mr. Sagel mentioned the document came from my own server.

THE COURT:  Sir, do you have any other grounds you'd like to advance at this time?

MR. AVENATTI:  Court's indulgence, one moment, Your Honor.  Thank you.

The other concern I have, Your Honor, is when you had made it clear that certain items are not supposed to be highlighted for the jury because they're not coming in for the truth of the matter, that they are still being displayed for the jury during the process.  And so I would just ask that that be curtailed, Your Honor.

THE COURT:  It won't be curtailed because they set the context for admissible parts of those documents.  For example, if a question is put to Mr. Avenatti in an e-mail and he responds to it, you can't know what the answer means very well without looking at the question.

MR. AVENATTI:  The last point, Your Honor, before -- well, before I'm done, is as follows:  You may recall that a few weeks ago we sought a continuance in this case because of the need to try to obtain an expert to -- as it related to Ms. Regnier.  We represented to the Court that she was a key witness.  I think we called her the linchpin.  The Government represented to Your Honor that she really wasn't that

```
 1    important.
 2           By my count or our count -- I'm probably wrong, I've
 3    been wrong a lot -- they used or introduced over 58 exhibits
 4    with this witness.  She's been on the stand now, I guess, about
 5    four hours on direct.
 6           THE COURT:  No, approximately five.
 7           MR. AVENATTI:  Okay.
 8           THE COURT:  Plus or minus.
 9           MR. AVENATTI:  Five hours.  The record speaks for
10    itself, Your Honor.  And with that, I'll sit down.
11           THE COURT:  I addressed in my order ruling on your
12    most recent motion for a continuance why I rejected
13    Ms. Regnier's health condition as a basis; therefore, I don't
14    need to repeat that today.
15           Mr. Sagel, your representation or estimate provided
16    to Mr. Avenatti was five hours for direct testimony of Mr. --
17    Ms. Regnier.  Where are you?
18           MR. SAGEL:  It was actually four to six, Your Honor.
19    I believe I have about an hour left.
20           THE COURT:  Okay.
21           MR. SAGEL:  And if I could just be heard on a couple
22    things real quickly.
23           To move things along today, at that point, we moved
24    in -- or we said at that point only pages 1 through 7 is what I
25    was going to cover with Ms. Regnier.  But the whole 391 should
```

04:41PM on lines 5, 10
04:42PM on lines 15, 20, 25

1    come in, and it is fully relevant because that, along with

2    other things which we can get into, shows that the money isn't

3    going to Mr. Johnson.  So at that point I said we're only using

4    1 through 7, but the Government would be moving in all of 391.

04:42PM  5           THE COURT:  391 is the banking records for the

6    Avenatti trust account?

7           MR. SAGEL:  Eagan Avenatti trust account, correct.

8           THE COURT:  Okay.

9           MR. SAGEL:  And then --

04:43PM 10           THE COURT:  You're moving in the entire document at

11    this time?

12           MR. SAGEL:  Yes, Your Honor.

13           THE COURT:  Objections?

14           MR. AVENATTI:  Your Honor, can I look at it briefly?

04:43PM 15           THE COURT:  Sure.  It's about 27 pages of banking

16    records from the trust account.

17           MR. AVENATTI:  Your Honor, I object.  This contains

18    information from a whole host of other clients.  It's entirely

19    irrelevant, has nothing to do with this case.  403 -- what is

04:44PM 20    the probative value, if any, of having information before this

21    jury relating to other client accounting and financial matters?

22           THE COURT:  If you want to propose redactions based

23    on privacy and other clients, so be it.  But I think

24    ipso facto, the banking records of the trust account are

04:44PM 25    relevant.  It may be a basis for redaction and you're welcome

1   to discuss that with the Government.

2          But before anything other than 1 and 7 are shown to

3   the jury again, the Government needs to have that discussion

4   with you about what should be redacted.

04:44PM  5          MR. SAGEL:  We will do that, Your Honor.  I think we

6   said this multiple times, and to use someone else's phrase, so

7   it's clear for the record, July 6 was the first of multiple

8   times we asked defendant if he had any issues with any of the

9   exhibits which we provided him in full along with the exhibit

04:45PM 10   list, did they want to redact anything from the exhibits.  To

11   this date, we've still yet to hear a single word about a single

12   exhibit that he wants redacted until we're in court and the

13   exhibit is being shown.

14          It might behoove him to bring these up not while

04:45PM 15   we're in trial and things can move quicker that way if he

16   believes things need to be redacted in the exhibits.

17          MR. AVENATTI:  Your Honor, there's a host of

18   exhibits they're not even moving into evidence in this case.

19   They just sought to admit 391.  I will take a look at it.  I

04:45PM 20   will propose redactions and we'll go from there.  I think it's

21   only reasonable, Your Honor.

22          THE COURT:  That's fine.

23          MR. SAGEL:  And I don't want to take too much of the

24   Court's time.  I would suggest or ask, the very reason we put

04:46PM 25   all of the custodian records in a chart in a manner that we did

for the pages and the exhibits is to try and expedite things

for something that is just quintessential records that come in,

such as bank records.  The custodian records speak for

themselves.  Your Honor has ruled on several of them.

04:46PM    I don't know how many more times we're going to do

this.  I can think of a few more exhibits.  I don't know if

Your Honor wants us to continue doing it the way that kind of

is wasting time, but --

THE COURT:  I think Mr. Avenatti has a right to put

04:46PM you to your proof with each document.

MR. SAGEL:  Understood.  And we'll proceed that way.

THE COURT:  Okay.

MR. SAGEL:  And I'm not saying that he doesn't.  I'm

saying some of those objections, if he were to say to the

04:46PM Court -- or he has now.  It's up to the Court how you want to

rule, but I think 394, for example, you've already stated --

and I can look at the list, but you've already --

THE COURT:  That covers the majority of the

documents --

04:47PM MR. SAGEL:  That's correct.

THE COURT:  -- as to which there's an objection.

I've read each of the declarations, and I think it's 393, 394,

397 and 396.  I've read them all.  I think they're all

adequate.

04:47PM MR. SAGEL:  We'll continue in the manner that we

have.  But that was -- that was my point.  But I appreciate
that, Your Honor.

THE COURT:  Okay.  Anything further for today?

MR. SAGEL:  One thing that I'll just bring up now.
04:47PM  It will save us tomorrow morning.  There will be a point,
probably very soon, when we start tomorrow morning when I
will -- I'm just reminding Your Honor of this -- that regarding
November 18th -- I think it's either November 14th, 15th,
somewhere around there.  That's when defendant was arrested on
04:48PM  his domestic violence charge.  I am going to be leading the
witness, with Your Honor's discretion, under 611 so that
there's no explanation of why the phone call happened other
than to lead her to get her to the conversation as opposed to
what caused the conversation.

04:48PM  MR. AVENATTI:  Your Honor, I don't have an objection
to that.  This is the second or third time I've heard this.  I
just want to correct the record.  I was never charged in that
case, period.  So --

MR. SAGEL:  You say that.

04:48PM  THE COURT:  Well, sir, we're not going to get into
it.  I think it's entirely permissible and appropriate for the
Government to request to lead its own witness so that we don't
get into an area that's prejudicial.  So fine.  You weren't
charged in a manner that we're not going to get into because
04:48PM  the Government appropriately, with the Court's permission, is

1  going to lead.

2              MR. AVENATTI:  I understand that.  I don't want the

3  Court left with a misunderstanding.  Mr. Sagel has said that I

4  was arrested on a domestic violence charge.  I was never

04:49PM 5  charged.  That's all I'm saying.

6              THE COURT:  Were you arrested?

7              MR. AVENATTI:  I was arrested, sir.

8              THE COURT:  Well, sir, that's what the Government

9  said.  But it's really of no moment to me and no moment to this

04:49PM 10  case because we're taking steps to ensure that neither an

11  arrest nor a conviction with regard to that conduct or anything

12  else is going to come in.

13              MR. AVENATTI:  And I appreciate that, Your Honor.

14  Thank you.

04:49PM 15              THE COURT:  Okay.

16              MR. AVENATTI:  I do have one last issue.  If

17  Mr. Sagel has one, he can go ahead.

18              MR. SAGEL:  The only other issue that I raise is

19  based on the estimate we received, eight hours or more, that

04:49PM 20  would cover obviously -- of cross-examination of Ms. Regnier,

21  that would cover all day tomorrow.  I'm just seeking the

22  Court's permission that we don't need to have any witnesses

23  here tomorrow.

24              THE COURT:  You don't.

04:49PM 25              MR. SAGEL:  Thank you, Your Honor.

1        THE COURT:  If you change your mind this evening,

2   you're to give notice.  I don't want anybody pulled up short.

3   We're going to use the court days as fully as possible.

4        MR. AVENATTI:  Understood, Your Honor.

04:50PM 5        THE COURT:  Okay.

6        MR. AVENATTI:  The last thing I'd like to raise is

7   this:  There were a number of questions by Mr. Sagel drawing

8   the jury's attention to the balance in the trust account being

9   de minimis, zero, 23 cents, things of that nature.

04:50PM 10        THE COURT:  $600.

11        MR. AVENATTI:  Yeah, something of that nature,

12   Your Honor.  I'm talking about before the money came in.  There

13   were a number of questions about what the balance was before

14   the money came in.

04:50PM 15        THE COURT:  Right.

16        MR. AVENATTI:  Okay.  My understanding, unless

17   there's another understanding, is that -- and there was also --

18   let me back up.

19        There was also questions about how quickly, for

04:51PM 20   instance, on the Johnson settlement, the $1.6 million was

21   withdrawn from the trust account.  My understanding presently

22   of the bar rule is that there's nothing wrong with that.  And,

23   in fact, that's what's required.  That's my understanding

24   presently of the bar rule.

04:51PM 25        So the idea that somehow the jury is going to be

left with a misperception or misunderstanding that somehow that

was improper by taking that amount immediately or somehow it

was improper to have a zero dollar trust account balance prior

to the money coming in, I think that's prejudicial, Your Honor,

04:51PM  and I don't know how we deal with that, if it's by way of an

instruction or otherwise.

THE COURT:  We're not going to deal with it, sir.

That's what cross-examination is for.  If you wish to establish

through Ms. Regnier or some other person in the Government's

04:51PM  case in chief that the lawyer is supposed to make payment once

he received settlement, is supposed to make prompt payment to

the client of the client's portion, and is permitted just as

promptly to take out the agreed fees, so be it.

MR. AVENATTI:  Understood, Your Honor.

04:52PM  THE COURT:  I don't think there's anything improper,

per se, in the Government pointing out the timing of transfers

out of the trust account.

MR. AVENATTI:  Your Honor, as it relates to the

portion that the Government concedes is the fee, there is

04:52PM  something improper about it, because it suggests that somehow

there's something wrong with an attorney immediately taking his

fee.  And I actually believe that the bar rule requires it.

THE COURT:  Permits it.  I don't think it requires

it.

04:52PM  MR. AVENATTI:  No.  No.  Your Honor, I actually

1    think it requires it.  I think it requires it.  Look, if I'm

2    wrong, I'm wrong.  But I think it requires it.  That's my

3    understanding now.

4            THE COURT:  Well, it's a debate I don't think any of

04:53PM 5    us needs to get into.  We're adjourned.

6            THE COURTROOM DEPUTY:  All rise.  This Court is now

7    in recess.

8            **(Proceedings concluded at 4:53 p.m.)**

9                         **--oOo--**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  CERTIFICATE OF OFFICIAL REPORTER

 2

 3   COUNTY OF LOS ANGELES    )
                              )
 4   STATE OF CALIFORNIA      )

 5              I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME

 6   COURT REPORTER, in and for the United States District Court for

 7   the Central District of California, do hereby certify that

 8   pursuant to Section 753, Title 28, United States Code that the

 9   foregoing is a true and correct transcript of the

10   stenographically reported proceedings held in the

11   above-entitled matter and that the transcript page format is in

12   conformance with the regulations of the Judicial Conference of

13   the United States.

14

15   Date:  July 27, 2021

16

17

18

19                            /S/ DEBBIE HINO-SPAAN
                            _____

20                            Debbie Hino-Spaan, CSR No. 7953
                              Federal Official Court Reporter
21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**

**$**

**$1,961,202.50** [1] - 19:15
**$1.599** [1] - 93:5
**$10,588.74** [1] - 80:7
**$100,000** [1] - 106:2
**$109,200.72** [2] - 62:15, 63:14
**$109,272** [1] - 63:7
**$11,343.81** [2] - 84:17, 84:25
**$111,000** [1] - 72:17
**$111,113.22** [2] - 72:11, 73:15
**$13,000** [2] - 40:22, 41:15
**$13,095** [2] - 40:25, 41:13
**$16,000** [6] - 46:14, 46:17, 46:21, 48:12, 49:4, 50:24
**$2.75** [6] - 29:3, 31:2, 31:18, 32:12, 32:19, 43:3
**$21,000** [1] - 106:3
**$24,959** [1] - 81:6
**$250,000** [4] - 104:22, 104:25, 108:6, 109:5
**$26,000** [1] - 106:2
**$3,922,405** [1] - 19:15
**$3800** [2] - 89:12, 89:14
**$43,000** [2] - 89:7, 89:9
**$46,146.81** [1] - 91:16
**$51,935** [3] - 26:16, 27:11, 40:14
**$60,000** [4] - 106:4, 106:11, 106:23, 107:2
**$600** [1] - 118:10
**$609.73** [1] - 93:4
**$617,840.44** [2] - 70:12, 71:5

**'**

**'18** [1] - 59:16
**'He** [1] - 107:20
**'lifestyle** [1] - 107:14
**'send'** [1] - 25:10

**/**

**/S** [1] - 121:19

**0**

**03-14** [1] - 93:3

**1**

**1** [14] - 25:25, 27:3, 37:18, 48:1, 48:10, 66:25, 81:15, 82:18, 82:22, 96:6, 98:8, 112:24, 113:4, 114:2
**1,985,000** [1] - 19:24
**1-053** [1] - 1:24
**1.6** [7] - 68:13, 68:14, 92:25, 104:20, 104:22, 108:12, 118:20
**1.9** [2] - 21:1, 21:15
**10** [6] - 3:11, 26:22, 37:20, 45:22, 66:11, 78:16
**10000** [1] - 80:22
**10,588.74** [1] - 77:12
**100** [2] - 5:7, 57:15
**10th** [2] - 20:21, 79:23
**11** [3] - 16:7, 73:4, 107:12
**1100** [1] - 2:11
**11th** [2] - 73:11, 73:14
**12** [5] - 26:22, 37:20, 45:22, 66:11, 78:16
**12-month** [1] - 23:1
**12/22/2016** [1] - 14:8
**12th** [1] - 79:24
**13** [1] - 3:12
**13,000** [1] - 41:18
**136** [6] - 3:13, 14:13, 15:4, 15:7, 15:8
**137** [6] - 3:12, 12:12, 12:13, 12:24, 13:5, 15:15
**138** [6] - 3:19, 29:22, 29:25, 30:8, 30:10, 30:11
**14** [1] - 52:24
**140** [6] - 3:14, 18:3, 18:4, 18:19, 18:23, 18:25
**1400** [2] - 20:7, 67:6
**142** [7] - 3:15, 21:21, 21:22, 22:5, 22:7, 22:8, 25:18
**146** [8] - 3:16, 24:1, 24:6, 24:13, 24:16, 24:17, 28:1
**147** [5] - 3:17, 26:17, 26:19, 26:24, 27:1
**148** [8] - 3:18, 28:3, 28:5, 28:8, 28:9, 31:17, 32:8, 32:9
**14th** [5] - 40:10, 51:1, 92:24, 93:5, 116:8
**15** [3] - 3:13, 54:2, 54:7

**154** [10] - 3:20, 32:23, 33:5, 33:10, 33:14, 33:18, 33:21, 34:13, 34:22, 34:24
**155** [9] - 3:21, 33:2, 33:5, 33:10, 33:14, 33:18, 34:10, 34:11
**156** [6] - 3:22, 36:7, 36:8, 36:15, 36:20, 36:21
**157** [9] - 4:6, 39:5, 39:6, 39:8, 39:10, 39:12, 39:22, 39:24, 39:25
**158** [8] - 4:8, 45:17, 45:19, 45:23, 45:24, 46:1, 48:18, 50:13
**159** [9] - 4:7, 43:15, 43:18, 43:20, 43:22, 43:25, 44:5, 44:6, 46:7
**15th** [2] - 50:16, 116:8
**16** [2] - 80:2, 91:15
**16,000** [1] - 44:25
**163** [7] - 4:9, 47:10, 47:12, 47:20, 47:23, 47:24, 49:2
**16628** [1] - 87:2
**16th** [3] - 77:21, 81:7, 90:12
**17** [1] - 2:18
**172** [6] - 4:20, 85:18, 86:3, 86:14, 86:23, 86:24
**174** [7] - 4:11, 61:14, 61:17, 61:24, 62:2, 63:2, 72:23
**175** [2] - 62:21, 62:23
**17th** [1] - 80:24
**18** [1] - 3:14
**18th** [3] - 80:25, 81:7, 116:8
**19** [7] - 22:13, 45:25, 46:3, 46:4, 46:9, 62:9, 63:3
**190** [6] - 4:12, 64:12, 64:22, 64:24, 64:25
**193** [7] - 4:15, 71:9, 71:11, 71:19, 71:22, 71:23, 73:16
**194** [8] - 4:16, 75:7, 75:24, 76:4, 76:7, 80:4, 80:9
**195** [4] - 4:18, 81:11, 81:22, 82:3
**196** [6] - 4:19, 84:2, 84:10, 84:14, 84:15
**198** [5] - 4:21, 87:18, 88:1, 88:4, 88:5
**19th** [2] - 7:9, 62:17

**1:34** [2] - 1:16, 6:2

**2**

**2** [18] - 1:9, 13:17, 25:16, 26:8, 26:13, 26:20, 28:6, 30:20, 34:24, 35:5, 35:7, 35:8, 37:18, 45:20, 67:25, 82:4, 95:17, 96:3
**2,500,000** [2] - 31:24, 35:10
**2,750,000** [3] - 29:2, 32:15, 42:3
**2.5** [2] - 35:15, 36:4
**2.75** [1] - 18:2
**20** [5] - 7:22, 46:3, 46:4, 46:16
**200** [6] - 4:22, 89:20, 89:23, 90:6, 90:8, 90:9
**2006** [1] - 16:7
**2015** [2] - 56:5, 104:17
**2016** [5] - 13:8, 15:11, 28:19, 38:12, 40:10
**2017** [28] - 13:25, 14:5, 17:2, 20:21, 20:25, 22:13, 27:22, 28:19, 28:24, 30:15, 35:3, 36:12, 37:4, 38:16, 40:11, 40:22, 42:2, 50:16, 51:1, 57:1, 57:3, 57:15, 62:9, 62:17, 63:3, 67:20, 68:2, 90:20
**2018** [37] - 6:13, 7:11, 8:1, 44:9, 46:5, 48:5, 48:16, 52:24, 56:21, 56:22, 59:10, 59:17, 65:3, 68:10, 68:12, 70:6, 77:21, 80:2, 80:24, 81:1, 82:20, 83:1, 84:1, 84:8, 84:19, 84:21, 84:22, 88:8, 88:23, 89:2, 90:12, 92:24, 93:5, 94:3, 95:18, 97:16, 101:2
**2019** [5] - 7:9, 8:22, 9:1, 56:5, 60:13
**202** [7] - 4:14, 69:9, 69:11, 69:23, 69:25, 70:1, 71:7
**2021** [3] - 1:15, 6:1, 121:15
**20th** [2] - 44:9, 46:5
**21** [3] - 46:3, 46:4, 46:20
**213** [6] - 5:5, 94:20,

**95:11, 95:16, 97:13, 97:16**
**213-894-2435** [1] - 2:12
**219** [5] - 5:6, 97:11, 97:19, 97:22, 98:2
**22** [1] - 3:15
**224** [6] - 5:7, 100:6, 100:18, 100:21, 100:22
**225** [1] - 102:7
**22nd** [6] - 8:22, 8:25, 13:8, 15:11, 40:22, 95:18
**23** [2] - 28:22, 118:9
**23rd** [4] - 24:22, 48:5, 48:16, 49:5
**24** [1] - 3:16
**24th** [2] - 27:22, 40:11
**25** [4] - 48:19, 48:20, 48:25
**250,000** [1] - 32:1
**254** [1] - 2:19
**25th** [6] - 28:24, 32:12, 42:2, 60:13, 97:16, 97:19
**26** [9] - 30:15, 31:23, 35:1, 35:3, 36:12, 37:4, 48:19, 48:25
**262** [5] - 3:11, 9:7, 9:22, 9:25, 10:1
**263** [7] - 4:10, 51:21, 52:2, 52:12, 52:15, 52:20, 52:21
**27** [10] - 1:15, 3:17, 6:1, 38:16, 48:20, 48:25, 49:9, 50:13, 113:15, 121:15
**27th** [1] - 90:20
**28** [2] - 3:18, 121:8
**28th** [3] - 67:20, 67:23, 67:24
**29** [4] - 105:9, 105:11, 105:15, 105:19
**29,942.52** [1] - 77:12
**29th** [5] - 67:20, 68:2, 82:19, 83:1, 101:2
**2:00** [1] - 102:15
**2:55** [1] - 14:12
**2:57** [1] - 55:15
**2nd** [1] - 65:3

**3**

**3** [14] - 26:8, 27:18, 32:7, 32:9, 50:15, 66:9, 70:23, 70:25, 73:9, 78:13, 91:3, 91:4, 95:25, 98:4
**3-14** [1] - 93:3

**3.3** [1] - 77:13
**30** [2] - 3:19, 98:22
**30,000** [2] - 98:20, 98:23
**30th** [7] - 28:19, 84:1, 84:8, 84:19, 84:20, 84:22, 104:17
**31** [1] - 17:2
**312** [1] - 2:11
**31st** [4] - 28:19, 88:8, 88:23, 89:2
**33** [2] - 3:20, 3:21
**349** [6] - 4:5, 37:13, 37:18, 37:23, 37:25, 38:1
**3512** [1] - 99:1
**36** [1] - 3:22
**37** [1] - 4:5
**37,000** [3] - 89:6, 89:8, 89:10
**370** [11] - 4:13, 66:6, 66:8, 66:18, 66:19, 66:20, 66:24, 67:1, 70:22, 73:9, 92:17
**372** [6] - 4:17, 78:12, 78:18, 84:20, 88:22, 91:11
**39** [1] - 4:6
**391** [4] - 112:25, 113:4, 113:5, 114:19
**392** [1] - 78:20
**393** [1] - 115:22
**394** [6] - 26:19, 26:24, 28:6, 45:20, 115:16, 115:22
**396** [2] - 37:17, 115:23
**397** [6] - 66:9, 66:18, 66:19, 66:21, 78:13, 115:23
**3:14** [1] - 55:15
**3:15** [1] - 24:22

## 4

**4** [4] - 66:9, 78:13, 98:16, 104:20
**40000316** [2] - 16:6, 38:10
**403** [4] - 56:8, 59:18, 76:3, 113:19
**411** [2] - 1:24, 2:6
**420** [13] - 16:9, 16:10, 16:13, 17:9, 19:23, 20:4, 20:5, 21:11, 21:16, 33:24, 36:2, 38:18
**42000029** [1] - 16:8
**43** [6] - 103:13, 104:9, 104:13, 104:14, 105:4, 105:6

**44** [8] - 4:7, 103:13, 104:9, 105:5, 105:13, 105:23, 105:24, 109:21
**45** [1] - 4:8
**4613** [3] - 44:24, 48:7, 48:13
**47** [1] - 4:9
**48** [2] - 32:7, 32:8
**4:53** [1] - 120:8
**4th** [1] - 2:6
**4TH** [1] - 1:24

## 5

**51,000** [1] - 41:18
**512** [1] - 107:12
**52** [1] - 4:10
**520** [2] - 20:6, 67:6
**5566** [10] - 65:17, 67:11, 70:10, 70:14, 70:15, 72:12, 78:23, 79:4, 92:4, 92:18
**58** [1] - 112:3
**596** [5] - 26:22, 37:21, 45:22, 66:11, 78:16
**5th** [3] - 68:8, 68:10, 68:12

## 6

**6** [3] - 3:3, 50:23, 114:7
**6.2** [1] - 77:10
**60,000** [2] - 98:6, 98:21
**60K** [1] - 95:24
**611** [1] - 116:11
**62** [1] - 4:11
**64** [1] - 4:12
**66** [1] - 4:13

## 7

**7** [4] - 14:5, 112:24, 113:4, 114:2
**70** [2] - 4:14, 70:25
**71** [1] - 4:15
**714-338-3598** [1] - 2:7
**753** [1] - 121:8
**76** [1] - 4:16
**78** [1] - 4:17
**7953** [2] - 1:23, 121:20
**7th** [1] - 13:24

## 8

**8** [2] - 71:3, 92:17
**8000** [1] - 2:6
**803** [1] - 66:23

**82** [1] - 4:18
**84** [1] - 4:19
**86** [1] - 4:20
**88** [1] - 4:21
**8:04** [1] - 15:13
**8th** [2] - 70:6, 70:25

## 9

**9** [2] - 1:8, 79:23
**90** [2] - 4:22, 55:7
**90012** [1] - 2:12
**902** [1] - 66:23
**92660** [2] - 2:19, 67:7
**92701** [2] - 1:25, 2:7
**949-481-4900** [1] - 2:20
**95** [1] - 5:5
**98** [1] - 5:6
**9:00** [1] - 103:2

## A

**a.m** [1] - 103:2
**ability** [1] - 57:18
**able** [1] - 93:23
**above-entitled** [1] - 121:11
**accept** [1] - 16:24
**acceptance** [1] - 17:3
**accepts** [1] - 38:5
**accidental** [1] - 109:14
**accordance** [1] - 38:9
**according** [2] - 28:20, 104:23
**accordingly** [1] - 16:24
**account** [106] - 13:16, 19:24, 20:3, 20:4, 20:14, 21:1, 21:11, 21:16, 27:17, 28:11, 28:13, 28:20, 29:4, 30:22, 31:19, 31:20, 32:1, 32:3, 32:13, 32:17, 32:21, 35:8, 40:9, 41:13, 43:4, 45:6, 45:10, 49:12, 49:18, 49:21, 49:22, 49:23, 49:24, 49:25, 50:4, 51:6, 55:20, 56:1, 65:15, 65:20, 65:23, 65:24, 66:1, 66:3, 67:2, 67:3, 67:10, 67:14, 67:22, 68:1, 70:10, 70:14, 70:15, 70:16, 70:18, 70:20, 71:4, 72:12, 73:11, 73:14, 78:23, 79:1, 79:6, 81:9,

85:2, 85:15, 85:16, 88:12, 88:24, 89:17, 89:18, 91:5, 91:6, 92:4, 92:9, 92:11, 92:12, 92:19, 92:25, 93:1, 93:6, 94:4, 96:11, 98:12, 98:19, 98:24, 98:25, 99:2, 99:14, 101:4, 104:21, 104:22, 108:20, 108:22, 113:6, 113:7, 113:16, 113:24, 118:8, 118:21, 119:3, 119:17
**Account** [1] - 71:25
**accounting** [7] - 73:18, 74:6, 74:8, 74:16, 75:2, 87:15, 113:21
**accounts** [5] - 21:7, 21:9, 21:14, 21:15, 79:3
**accurate** [27] - 12:20, 18:15, 22:1, 23:18, 24:9, 24:10, 25:7, 30:4, 33:5, 36:11, 43:22, 47:17, 52:6, 61:20, 64:17, 64:18, 69:19, 71:16, 75:13, 81:19, 84:7, 86:10, 87:21, 87:22, 90:2, 95:8, 100:14
**ACH** [1] - 34:9
**actions** [1] - 52:11
**actual** [4] - 27:18, 27:20, 46:20, 55:9
**add** [1] - 19:17
**addition** [3] - 21:4, 35:6, 41:18
**additional** [2] - 37:20, 43:6
**address** [11] - 9:2, 9:4, 10:9, 20:6, 20:9, 28:14, 67:5, 74:22, 82:8, 108:9
**addressed** [2] - 86:7, 112:11
**adequate** [1] - 115:24
**adjourn** [1] - 103:1
**adjourned** [1] - 120:5
**admissible** [1] - 111:15
**admission** [2] - 13:4, 44:3
**admit** [27] - 9:22, 12:24, 15:4, 18:19, 22:5, 24:13, 33:10, 36:15, 37:17, 39:22, 43:25, 47:20, 52:11,

61:24, 64:22, 69:23, 71:19, 75:24, 78:12, 84:10, 86:14, 88:1, 90:6, 95:11, 97:22, 100:18, 114:19
**admitted** [2] - 105:4, 108:21
**admonition** [2] - 54:3, 103:3
**adopted** [2] - 13:2, 44:3
**advance** [2] - 39:4, 111:5
**advances** [1] - 63:13
**advancing** [1] - 110:25
**advised** [1] - 6:24
**afternoon** [3] - 6:6, 44:22, 48:11
**agency** [1] - 44:3
**agent** [1] - 84:5
**ago** [2] - 102:14, 111:21
**agree** [4] - 16:25, 64:3, 105:8
**agreed** [2] - 77:14, 119:13
**agreed-on** [1] - 77:14
**Agreement** [5] - 13:10, 13:21, 13:23, 16:6, 38:10
**agreement** [19] - 13:24, 14:4, 16:7, 17:14, 22:25, 42:5, 42:8, 42:15, 42:19, 42:20, 42:21, 43:9, 64:10, 99:22, 99:24, 101:8, 101:14, 101:20, 102:5
**Agreement.Doc** [1] - 13:12
**agreements** [1] - 42:23
**ahead** [1] - 117:17
**Aircraft** [6] - 15:25, 16:18, 16:21, 16:22, 16:25, 38:6
**aircraft** [9] - 16:5, 16:8, 16:9, 16:12, 16:24, 17:3, 37:11, 38:7, 38:8
**Aircraft's** [1] - 17:1
**alex.wyman@usdoj.gov** [1] - 2:13
**ALEXANDER** [1] - 2:10
**Alexis** [17] - 10:24, 13:25, 17:15, 17:17, 23:2, 35:16, 39:13, 39:15, 40:5, 42:4,

44:24, 46:23, 48:13, 49:5, 50:23, 51:19, 53:1

**Alki** [6] - 77:12, 77:17, 79:24, 80:1, 80:6, 85:5

**allow** [1] - 93:25

**almost** [2] - 25:12, 35:6

**AMERICA** [1] - 1:5

**amount** [25] - 19:15, 19:16, 19:24, 20:11, 31:12, 31:13, 35:11, 40:22, 44:25, 46:14, 46:17, 53:4, 70:11, 71:6, 72:11, 73:13, 73:16, 79:21, 80:8, 91:17, 91:19, 99:10, 104:23, 108:12, 119:2

**amounts** [4] - 39:20, 75:1, 77:16, 108:6

**ANA** [3] - 1:17, 1:25, 6:1

**Ana** [1] - 2:7

**and..** [1] - 60:25

**Angeles** [1] - 2:12

**ANGELES** [1] - 121:3

**answer** [5] - 8:19, 58:14, 85:19, 106:15, 111:17

**answered** [4] - 8:3, 8:10, 76:16, 96:24

**anxiety** [2] - 58:19, 58:21

**apartment** [2] - 23:3, 107:18

**apartments** [2] - 106:23, 107:2

**apologize** [3] - 29:23, 39:4, 100:10

**appear** [4] - 9:9, 25:17, 54:23, 86:21

**APPEARANCES** [1] - 2:1

**Appell** [6] - 65:7, 69:13, 69:16, 69:20, 71:7, 72:6

**appreciate** [4] - 54:17, 55:9, 116:1, 117:13

**approach** [2] - 7:19, 41:5

**approaching** [1] - 62:24

**appropriate** [2] - 8:13, 116:21

**appropriately** [1] - 116:25

**approval** [1] - 74:9

**approved** [3] - 31:16,

97:2, 101:22

**April** [1] - 51:1

**AR** [2] - 88:10, 88:11

**area** [1] - 116:23

**argument** [2] - 105:2, 108:16

**arguments** [1] - 107:11

**arrangements** [1] - 42:24

**arrest** [1] - 117:11

**arrested** [4] - 116:9, 117:4, 117:6, 117:7

**arrive** [1] - 17:1

**Art** [1] - 107:5

**art** [2] - 109:6, 109:22

**arts** [1] - 106:3

**ASAP** [2] - 87:6, 87:8

**assertions** [1] - 110:25

**Assistant** [2] - 2:5, 2:10

**assistants** [2] - 12:7, 12:8

**associated** [1] - 41:19

**Associates** [1] - 104:17

**assume** [1] - 82:16

**assumed** [1] - 43:9

**assurances** [1] - 16:22

**attached** [7] - 12:18, 13:15, 15:22, 19:12, 19:14, 24:25, 98:13

**attachment** [38] - 9:12, 13:1, 13:11, 13:18, 14:22, 14:25, 18:12, 18:17, 24:2, 24:7, 24:11, 26:8, 26:14, 30:2, 30:5, 30:18, 30:20, 30:21, 61:17, 61:21, 62:12, 63:8, 63:9, 63:10, 63:12, 64:15, 64:18, 75:20, 75:25, 76:5, 87:22, 87:23, 88:19, 89:25, 90:3, 90:13

**attachments** [3] - 18:22, 33:6, 75:17

**attempt** [1] - 108:11

**attempting** [2] - 104:8

**attention** [3] - 6:12, 8:22, 118:8

**attorney** [7] - 28:13, 67:3, 68:23, 92:9, 92:10, 92:12, 119:21

**Attorney** [2] - 2:4, 2:5, 2:9, 2:10

**attorney-client** [5] - 28:13, 67:3, 92:9,

92:10, 92:12

**attorneys** [3] - 11:15, 69:3, 69:6

**August** [5] - 52:24, 53:3, 56:21, 56:22, 59:10

**authentication** [2] - 9:24, 52:14

**author** [1] - 13:3

**authorization** [1] - 8:20

**authorized** [3] - 10:15, 85:12, 99:14

**Auto** [1] - 106:11

**AVENATTI** [109] - 1:8, 2:15, 2:16, 6:25, 7:12, 8:3, 8:10, 9:23, 12:25, 15:5, 18:21, 21:2, 22:6, 24:15, 26:21, 28:7, 30:9, 33:11, 33:19, 36:16, 37:19, 39:23, 41:7, 42:10, 44:1, 45:21, 47:22, 52:13, 54:10, 54:14, 54:19, 55:4, 56:7, 56:19, 57:10, 58:12, 59:18, 61:25, 63:23, 64:23, 66:10, 69:24, 71:21, 74:12, 74:17, 76:2, 76:16, 78:2, 78:15, 79:7, 81:23, 83:13, 84:12, 86:15, 86:19, 88:2, 90:7, 95:12, 96:24, 97:23, 99:11, 99:17, 100:19, 103:15, 104:14, 105:8, 105:12, 105:17, 105:20, 105:23, 106:6, 106:9, 106:13, 106:19, 106:22, 107:1, 107:6, 108:10, 108:19, 108:25, 109:9, 109:11, 109:17, 109:20, 109:23, 110:7, 110:14, 110:20, 110:22, 111:2, 111:6, 111:19, 112:7, 112:9, 113:14, 113:17, 114:17, 116:15, 117:2, 117:7, 117:13, 117:16, 118:4, 118:6, 118:11, 118:16, 119:14, 119:18, 119:25

**Avenatti** [113] - 6:22,

7:10, 8:9, 9:10, 9:18, 10:25, 11:1, 11:16, 11:18, 11:19, 11:20, 11:22, 13:3, 15:22, 16:1, 16:3, 16:15, 17:12, 17:15, 18:8, 19:10, 20:10, 21:9, 23:7, 23:8, 23:9, 23:16, 25:4, 25:17, 25:20, 26:2, 27:14, 27:15, 27:17, 28:12, 32:1, 32:3, 33:25, 34:3, 34:15, 34:17, 34:21, 35:12, 35:23, 36:3, 36:18, 37:1, 37:6, 37:10, 38:22, 39:18, 41:23, 45:5, 51:13, 51:15, 53:16, 55:24, 56:3, 57:8, 57:13, 59:10, 60:22, 60:23, 61:6, 65:2, 67:3, 67:8, 69:1, 70:11, 71:24, 72:11, 74:5, 75:15, 75:20, 76:20, 77:3, 79:12, 80:20, 83:6, 86:10, 87:2, 87:4, 87:19, 88:7, 90:11, 94:22, 95:3, 95:6, 96:4, 96:14, 97:6, 98:9, 100:7, 100:11, 100:15, 101:19, 101:23, 101:24, 102:4, 103:11, 104:17, 108:1, 111:16, 112:16, 113:6, 113:7, 115:9

**Avenatti's** [10] - 14:25, 37:3, 81:24, 95:13, 96:22, 97:4, 97:24, 100:20, 107:14

**avoid** [1] - 104:8

**aware** [5] - 21:5, 21:7, 23:23, 56:2, 82:11

---

## B

**Bakery** [4] - 79:24, 80:1, 80:6, 85:5

**balance** [13] - 20:21, 28:21, 32:13, 34:5, 35:1, 36:19, 67:17, 68:1, 110:3, 118:8, 118:13, 119:3

**Balances** [1] - 32:10

**balances** [8] - 20:24, 21:5, 21:6, 21:14, 55:20, 56:2, 92:21, 93:3

**Bank** [11] - 30:23, 44:14, 47:13, 65:7,

65:9, 65:10, 69:14, 69:17, 69:20, 71:12, 78:13

**bank** [16] - 20:21, 20:24, 21:5, 21:6, 21:7, 28:10, 28:11, 34:8, 50:6, 50:8, 51:6, 66:1, 92:18, 98:13, 98:14, 115:3

**bankers** [1] - 44:15

**banking** [3] - 113:5, 113:15, 113:24

**bankruptcy** [2] - 57:9, 57:14

**BAR** [5] - 65:19, 65:20, 65:25, 67:3, 79:6

**bar** [3] - 118:22, 118:24, 119:22

**Bar** [1] - 28:12

**Barela** [67] - 60:21, 62:11, 62:13, 62:15, 62:24, 63:5, 64:5, 65:22, 65:23, 65:25, 66:4, 67:13, 68:16, 68:18, 70:16, 70:18, 71:4, 72:18, 72:19, 72:22, 73:19, 74:3, 75:3, 78:22, 81:8, 85:2, 85:15, 88:24, 91:24, 92:4, 92:6, 92:18, 93:1, 93:6, 93:7, 93:8, 93:10, 93:12, 93:13, 93:15, 93:16, 93:19, 93:22, 93:25, 94:5, 94:8, 94:18, 95:6, 95:18, 95:21, 96:7, 96:10, 96:23, 97:12, 98:5, 98:9, 98:21, 99:2, 99:5, 99:7, 99:10, 99:21, 100:24, 101:6, 101:12, 101:17

**Barela's** [11] - 69:4, 69:5, 69:7, 69:8, 73:11, 73:13, 92:1, 93:9, 95:14, 96:3, 98:19

**Baristas** [14] - 76:11, 76:12, 76:13, 76:15, 76:23, 77:4, 77:19, 80:11, 80:14, 80:15, 80:19, 80:21, 83:24, 85:11

**Baristas'** [1] - 85:8

**based** [10] - 20:24, 21:13, 35:23, 54:15, 55:5, 66:8, 92:10, 103:12, 113:22,

117:19
**basic** [2] - 74:20, 74:21
**basis** [3] - 52:15, 112:13, 113:25
**Bass** [2] - 88:17, 89:4
**Bass's** [1] - 88:19
**Bates** [2] - 41:7, 41:9
**Beach** [4] - 2:19, 20:7, 59:14, 67:6
**bear** [2] - 12:20, 108:8
**bearing** [1] - 38:7
**became** [1] - 56:23
**become** [2] - 56:17, 104:18
**becoming** [1] - 56:24
**begin** [1] - 17:2
**beginning** [3] - 67:16, 68:1, 103:19
**behalf** [1] - 34:8
**behoove** [1] - 114:14
**believes** [1] - 114:16
**below** [6] - 19:25, 20:3, 34:7, 80:11, 80:25, 96:1
**Beneficiary** [2] - 79:14, 79:17
**beneficiary** [1] - 20:5
**between** [9] - 13:25, 23:2, 38:10, 42:20, 52:4, 52:7, 56:1, 56:5, 95:5
**beyond** [2] - 110:18, 110:23
**big** [1] - 63:15
**bill** [1] - 62:11
**billing** [2] - 86:22, 86:23
**bills** [6] - 55:23, 56:2, 57:23, 77:3, 77:4, 110:5
**binder** [2] - 29:23, 39:5
**block** [1] - 17:5
**body** [1] - 15:21
**book** [2] - 24:3, 78:20
**bother** [1] - 53:8
**bothered** [1] - 8:16
**bottom** [22] - 17:4, 34:12, 47:2, 47:25, 48:10, 49:9, 50:21, 51:5, 65:14, 67:16, 68:4, 70:24, 81:15, 82:18, 82:22, 88:16, 92:21, 92:22, 95:17, 96:4, 96:6, 100:23
**bounds** [2] - 110:18, 110:24
**Box** [2] - 60:5, 60:8
**bracketed** [1] - 23:6

brackets [1] - 22:15
**break** [3] - 51:23, 51:24, 54:1
**breaking** [1] - 53:23
**breast** [1] - 58:20
**BRETT** [1] - 2:5
**brett.sagel@usdoj.gov** [1] - 2:8
**briefed** [1] - 103:19
**briefly** [1] - 113:14
**bright** [1] - 103:7
**bring** [2] - 114:14, 116:4
**bringing** [1] - 12:1
**Brock** [2] - 101:8, 101:10
**building** [2] - 106:2, 109:24
**bullet** [1] - 77:8
**business** [6] - 56:25, 58:9, 66:12, 85:8, 88:4, 93:16
**but..** [1] - 75:1
**buy** [2] - 21:19, 37:10
**buying** [1] - 110:5
**BY** [52] - 2:5, 2:18, 3:3, 6:11, 7:5, 7:21, 8:9, 8:15, 10:2, 13:6, 15:9, 19:1, 21:4, 22:9, 24:18, 27:2, 28:10, 29:14, 30:12, 33:20, 40:1, 41:12, 42:14, 44:7, 45:25, 47:25, 52:2, 56:13, 56:22, 57:13, 58:14, 59:21, 64:4, 65:1, 70:2, 71:24, 74:14, 78:4, 78:19, 79:10, 82:4, 83:17, 84:16, 86:25, 88:6, 90:10, 95:17, 97:4, 98:3, 99:14, 99:19, 100:23

**C**

**CA** [2] - 1:25, 67:6
**California** [9] - 2:7, 2:12, 2:19, 20:7, 28:12, 44:14, 47:12, 65:9, 121:7
**CALIFORNIA** [4] - 1:2, 1:17, 6:1, 121:4
**CALLED** [1] - 3:3
**cancer** [3] - 58:20, 59:6, 59:7
**cards** [1] - 89:16
**Carlin** [1] - 109:23
**cars** [1] - 107:17
**case** [33] - 17:23, 39:14, 39:15, 39:16,

41:20, 41:22, 41:24, 41:25, 43:1, 45:12, 54:4, 54:5, 60:24, 61:6, 64:9, 72:10, 72:21, 74:2, 91:21, 93:9, 101:11, 103:4, 103:5, 104:19, 105:10, 105:15, 105:19, 111:21, 113:19, 114:18, 116:18, 117:10, 119:10
**Case** [2] - 1:7, 72:16
**cases** [5] - 11:17, 63:19, 63:22, 68:23, 69:1
**cash** [1] - 46:16
**cashier's** [24] - 26:14, 27:3, 27:5, 27:6, 27:10, 27:13, 27:18, 40:18, 44:23, 46:6, 46:20, 47:5, 48:12, 48:25, 49:4, 49:10, 50:13, 50:15, 50:23, 51:3, 51:5, 70:9, 70:17, 70:19, 72:9, 72:14, 73:6, 77:11, 77:13
**Cashier's** [3] - 44:16, 46:8, 70:3
**Cassaro** [9] - 51:9, 51:11, 51:15, 51:19, 52:4, 52:7, 52:23, 53:11, 53:18
**category** [1] - 107:24
**caused** [1] - 116:14
**cc** [3] - 75:14, 76:24, 77:1
**cc'd** [9] - 14:18, 18:8, 25:10, 75:9, 75:10, 75:21, 86:5, 86:6, 96:7
**cc'ing** [1] - 76:20
**center** [1] - 38:2
**Center** [2] - 20:6, 67:6
**Central** [1] - 121:7
**CENTRAL** [1] - 1:2
**cents** [2] - 28:22, 118:9
**certain** [2] - 23:3, 111:9
**certainly** [1] - 110:12
**CERTIFICATE** [1] - 121:1
**CERTIFIED** [1] - 1:6
**certify** [1] - 121:7
**cetera** [1] - 109:6
**chain** [9] - 81:13, 81:16, 81:19, 83:17, 87:1, 94:21, 95:5, 95:8, 100:6
**change** [1] - 118:1

**changed** [2] - 83:10, 83:12
**charge** [3] - 31:23, 116:10, 117:4
**charged** [4] - 109:1, 116:17, 116:24, 117:5
**charges** [1] - 31:19
**chart** [1] - 114:25
**chase** [1] - 30:19
**Chase** [4] - 30:22, 30:23, 90:13, 91:5
**check** [37] - 12:10, 26:14, 27:4, 27:5, 27:6, 27:10, 27:13, 27:19, 27:20, 40:18, 43:13, 44:23, 46:6, 46:16, 46:18, 46:20, 47:5, 48:6, 48:12, 48:20, 48:25, 49:4, 49:10, 50:11, 50:16, 50:23, 51:3, 51:5, 70:9, 70:17, 70:19, 72:9, 72:14, 73:6, 77:11, 77:13
**Check** [2] - 44:16, 70:3
**checked** [1] - 34:9
**checks** [4] - 43:14, 49:17, 49:20, 50:13
**chief** [2] - 105:15, 119:10
**Chris** [1] - 37:7
**Christopher** [4] - 33:21, 33:22, 34:13, 36:25
**City** [7] - 65:7, 65:10, 69:13, 69:17, 69:20, 71:12, 78:13
**claim** [1] - 108:13
**clarify** [1] - 102:25
**clarity** [1] - 54:22
**classes** [1] - 107:19
**clean** [1] - 22:21
**clear** [3] - 83:7, 111:9, 114:7
**client** [25] - 10:25, 11:1, 11:4, 12:10, 28:13, 30:19, 30:22, 32:16, 35:17, 60:22, 60:23, 64:2, 67:3, 74:6, 90:13, 91:5, 92:9, 92:10, 92:12, 101:22, 102:5, 109:2, 113:21, 119:12
**client's** [2] - 74:22, 119:12
**clients** [4] - 39:1, 97:1, 113:18, 113:23

**Clifford** [1] - 88:15
**close** [3] - 7:25, 104:18, 107:23
**closer** [1] - 29:9
**closing** [2] - 34:6, 35:2
**CNB** [4] - 65:5, 65:6, 65:10, 79:1
**Coblentz** [8] - 85:21, 85:23, 86:2, 87:11, 88:15, 88:16, 88:19, 89:4
**Code** [1] - 121:8
**Coffee** [4] - 81:4, 81:5, 84:22, 85:3
**coffee** [3] - 76:13, 81:8, 85:8
**collaborate** [1] - 11:17
**collectively** [1] - 14:3
**column** [4] - 79:10, 79:14, 79:16, 79:21
**columns** [1] - 79:13
**coming** [14] - 11:4, 31:20, 35:25, 36:1, 45:10, 72:9, 73:11, 73:13, 85:14, 88:13, 92:11, 94:22, 111:10, 119:4
**committed** [1] - 16:23
**communicate** [1] - 93:19
**communication** [2] - 82:15, 86:19
**communications** [3] - 50:2, 51:18, 97:1
**companies** [2] - 103:25, 104:5
**company** [2] - 81:8, 83:15, 106:2
**Company** [2] - 15:25, 38:6
**concedes** [1] - 119:19
**concern** [2] - 92:10, 92:13, 111:8
**concluded** [1] - 120:8
**condition** [11] - 56:3, 56:6, 56:17, 57:17, 59:9, 103:20, 103:23, 103:24, 104:5, 112:13
**conduct** [1] - 117:11
**conference** [2] - 93:20, 93:23
**Conference** [1] - 121:12
**confidential** [1] - 86:22
**confirm** [4] - 22:25, 25:24, 96:12, 98:13
**confirmation** [1] -

98:14

**conformance** [1] - 121:12

**confrontation** [1] - 33:13

**connection** [3] - 16:5, 23:10, 26:3

**contact** [3] - 10:7, 44:15

**contacts** [2] - 10:7, 10:8

**contain** [1] - 86:21

**contains** [1] - 113:17

**content** [1] - 82:1

**context** [1] - 111:15

**contingency** [2] - 74:23, 74:24

**continually** [1] - 54:20

**continuance** [2] - 111:21, 112:12

**continue** [3] - 77:11, 115:7, 115:25

**Continued** [2] - 4:1, 5:1

**conversation** [10] - 6:14, 6:22, 6:23, 7:10, 8:1, 8:7, 17:22, 91:18, 116:13, 116:14

**conversations** [2] - 57:19, 57:20

**conviction** [1] - 117:11

**copied** [2] - 19:11, 96:17

**copies** [1] - 75:19

**copy** [38] - 12:20, 14:24, 18:15, 18:16, 22:1, 24:9, 24:11, 27:5, 27:6, 30:5, 33:5, 36:11, 42:4, 42:7, 42:12, 42:15, 42:18, 43:22, 47:17, 52:6, 61:20, 64:17, 64:18, 66:15, 69:19, 71:16, 81:19, 84:7, 87:21, 87:22, 90:2, 90:14, 95:8, 99:22, 99:24, 100:4, 100:14, 101:13

**copying** [1] - 74:8

**corner** [3] - 17:4, 28:16, 67:10

**Corporate** [1] - 2:18

**correct** [51] - 9:16, 10:2, 12:2, 14:6, 14:24, 16:1, 18:13, 18:16, 22:16, 24:4, 25:2, 25:12, 27:19, 28:14, 31:3, 31:12,

34:1, 35:21, 40:3, 40:14, 44:11, 44:17, 45:7, 55:21, 55:24, 60:13, 63:8, 70:3, 71:25, 73:4, 75:17, 75:19, 79:1, 80:9, 81:19, 82:20, 86:6, 86:8, 90:14, 91:9, 91:22, 95:6, 96:8, 97:17, 98:10, 98:17, 101:4, 113:7, 115:20, 116:17, 121:9

**corrected** [1] - 27:6

**cost** [7] - 41:22, 42:1, 62:11, 63:19, 63:22, 73:2, 73:3

**costs** [8] - 41:19, 62:13, 62:15, 63:7, 72:10, 72:16, 72:21, 72:25

**COUNSEL** [2] - 2:1, 2:16

**counsel** [3] - 23:9, 26:2, 86:19

**count** [2] - 105:7, 112:2

**Count** [1] - 105:7

**Counts** [1] - 109:1

**COUNTY** [1] - 121:3

**couple** [3] - 93:18, 97:15, 112:21

**course** [1] - 39:18

**Court** [10] - 55:5, 107:12, 107:15, 111:23, 115:15, 117:3, 120:6, 121:6, 121:20

**COURT** [134] - 1:1, 1:24, 6:6, 7:2, 7:16, 7:20, 8:4, 8:11, 9:25, 13:3, 15:7, 18:23, 21:3, 22:7, 24:16, 26:23, 28:8, 29:12, 30:10, 33:14, 36:18, 37:23, 39:24, 41:6, 41:11, 42:11, 44:2, 44:5, 45:23, 47:23, 51:25, 52:15, 52:18, 53:25, 54:13, 54:17, 55:3, 55:10, 55:17, 56:9, 56:20, 57:11, 58:13, 59:19, 62:1, 63:24, 64:24, 66:13, 66:20, 66:23, 69:25, 71:22, 74:13, 74:18, 76:4, 76:17, 78:3, 78:17, 79:8, 81:24, 83:14, 84:13, 86:18, 86:21, 88:3, 90:8,

95:13, 96:25, 97:24, 99:12, 99:18, 100:20, 102:8, 102:10, 102:12, 103:11, 104:13, 105:2, 105:11, 105:14, 105:18, 105:22, 106:5, 106:7, 106:10, 106:17, 106:20, 106:25, 107:3, 107:10, 108:17, 108:23, 109:8, 109:10, 109:15, 109:19, 109:22, 110:1, 110:11, 110:18, 110:21, 110:23, 111:4, 111:14, 112:6, 112:8, 112:11, 112:20, 113:5, 113:8, 113:10, 113:13, 113:15, 113:22, 114:22, 115:9, 115:12, 115:18, 115:21, 116:3, 116:20, 117:6, 117:8, 117:15, 117:24, 118:1, 118:5, 118:10, 118:15, 119:7, 119:15, 119:23, 120:4, 121:6

**court** [2] - 114:12, 118:3

**court's** [1] - 111:6

**Court's** [7] - 15:6, 37:15, 103:12, 108:2, 114:24, 116:25, 117:22

**COURTROOM** [3] - 54:8, 103:9, 120:6

**cover** [3] - 112:25, 117:20, 117:21

**covered** [1] - 108:2

**covers** [1] - 115:18

**credit** [2] - 28:23, 89:16

**credits** [2] - 31:20, 68:5

**cross** [7] - 55:1, 102:21, 108:17, 108:23, 110:13, 117:20, 119:8

**cross-examination** [1] - 108:17, 108:23, 117:20, 119:8

**cross-examine** [2] - 102:21, 110:13

**CRR** [1] - 1:23

**CSR** [2] - 1:23, 121:20

**current** [2] - 82:12, 109:24

**curtailed** [2] - 111:13, 111:14

**custodian** [11] - 26:19, 26:24, 28:5, 37:17, 37:24, 45:19, 66:8, 78:12, 78:14, 114:25, 115:3

**customer** [4] - 16:23, 16:25, 17:1

**customer)** [1] - 16:9

**cut** [1] - 12:10

**Cynthia** [2] - 44:10, 48:2

## D

**daily** [7] - 21:4, 32:13, 57:19, 57:20, 83:9, 92:21, 93:3

**Daily** [1] - 32:10

**Date** [1] - 121:15

**date** [38] - 8:23, 13:6, 14:10, 15:9, 22:12, 27:21, 28:18, 30:14, 38:15, 40:8, 44:7, 46:4, 46:6, 48:4, 62:8, 65:1, 68:7, 70:5, 73:4, 77:20, 79:18, 79:19, 80:1, 80:3, 80:23, 82:25, 83:25, 84:18, 88:6, 89:2, 90:10, 90:16, 90:19, 91:12, 101:1, 104:16, 114:11

**dated** [4] - 13:24, 14:8, 16:6, 38:12

**dates** [2] - 97:15, 108:14

**DAY** [1] - 1:8

**days** [4] - 73:6, 104:3, 118:3

**de** [1] - 118:9

**deal** [2] - 119:5, 119:7

**dealing** [1] - 88:3

**dealings** [2] - 11:11, 93:16

**DEAN** [2] - 2:17, 2:18

**deansteward7777@ gmail.com** [1] - 2:20

**Dear** [1] - 16:3

**debate** [1] - 120:4

**DEBBIE** [1] - 1:23, 121:5, 121:19

**Debbie** [1] - 121:20

**Debit** [1] - 79:10

**debit** [5] - 70:25, 71:3, 73:10, 79:1, 79:3,

79:11, 98:24

**December** [13] - 13:8, 15:11, 28:19, 40:10, 62:9, 62:17, 63:3, 67:20, 67:23, 68:2, 72:25, 90:20

**decision** [3] - 103:13, 105:15, 105:19

**decisions** [3] - 10:13, 10:14, 10:18

**declaration** [10] - 26:19, 26:24, 28:6, 37:17, 37:24, 45:19, 66:9, 66:18, 66:21, 78:13

**declarations** [1] - 115:22

**defendant** [77] - 6:14, 8:2, 8:15, 8:23, 8:25, 10:12, 12:16, 12:21, 13:7, 13:13, 14:11, 14:18, 17:20, 20:18, 20:22, 20:25, 21:14, 21:15, 21:18, 21:24, 22:2, 22:10, 22:18, 24:2, 24:6, 24:10, 25:6, 25:9, 29:25, 30:4, 30:13, 31:6, 32:20, 32:25, 33:6, 36:8, 36:11, 41:3, 42:14, 42:23, 55:19, 57:17, 57:21, 57:25, 58:6, 61:18, 61:21, 62:6, 62:14, 62:17, 63:4, 63:18, 64:13, 64:19, 73:18, 77:22, 77:23, 78:1, 78:5, 81:16, 81:20, 82:23, 83:11, 84:5, 85:24, 86:2, 86:4, 87:7, 87:23, 89:23, 93:7, 93:22, 96:7, 97:12, 114:8, 116:9

**DEFENDANT** [1] - 2:14

**Defendant** [1] - 1:9

**defendant's** [8] - 18:16, 33:3, 43:20, 43:23, 44:4, 47:18, 71:17, 81:8

**definitely** [1] - 56:16

**deliberate** [1] - 109:13

**deliver** [1] - 77:11

**deliveries** [2] - 77:11, 82:13

**delivery** [5] - 16:24, 38:3, 38:6, 38:13, 38:15

**demand** [1] - 86:23

**denied** [2] - 7:2, 109:19
**department** [1] - 87:15
**deposit** [18] - 28:24, 29:1, 29:3, 29:15, 32:14, 42:2, 47:4, 47:7, 49:12, 49:17, 49:20, 49:22, 50:6, 50:8, 50:15, 50:20, 51:6, 101:3
**deposited** [7] - 31:3, 31:18, 32:13, 32:20, 43:4, 92:25, 101:13
**depositing** [2] - 35:21, 50:10
**deposits** [1] - 28:23
**depression** [1] - 58:19
**DEPUTY** [3] - 54:8, 103:9, 120:6
**describe** [1] - 56:5
**described** [1] - 51:14
**description** [3] - 29:15, 29:16, 38:11
**detail** [1] - 98:17
**devices** [1] - 60:2
**dhinospaan@yahoo. com** [1] - 1:25
**Dianna** [5] - 65:5, 65:6, 65:7, 70:7, 72:6
**dictated** [1] - 20:2
**different** [9] - 24:3, 39:5, 43:2, 45:9, 45:12, 57:6, 71:12, 76:21, 89:7
**difficult** [3] - 42:8, 42:13, 42:16
**digital** [1] - 60:2
**Dillanos** [9] - 77:12, 77:17, 81:4, 81:5, 82:12, 83:18, 84:17, 84:22, 85:3
**dining** [1] - 107:21
**direct** [6] - 78:5, 94:9, 107:3, 108:5, 112:5, 112:16
**DIRECT** [1] - 6:10
**Direct** [1] - 3:3
**directed** [3] - 49:22, 66:3, 99:10
**direction** [21] - 14:20, 14:21, 15:1, 18:10, 18:11, 18:16, 32:5, 32:6, 43:20, 43:23, 44:4, 47:15, 47:16, 47:18, 60:10, 60:11, 69:16, 71:14, 71:17, 74:7, 86:11
**directions** [2] - 58:6, 78:1

**directly** [1] - 74:6
**discovery** [1] - 41:10
**discrepancy** [2] - 34:5, 35:1
**discretion** [1] - 116:11
**discuss** [4] - 54:3, 57:24, 103:3, 114:1
**discussed** [1] - 58:4
**discussion** [1] - 114:3
**discussions** [3] - 10:12, 57:16, 77:23
**displayed** [4] - 109:9, 109:11, 109:12, 111:11
**District** [2] - 121:6, 121:7
**DISTRICT** [3] - 1:1, 1:2, 1:3
**DIVISION** [1] - 1:2
**Docket** [5] - 26:22, 37:21, 45:22, 66:11, 107:12
**document** [16] - 7:14, 7:15, 7:16, 12:18, 12:20, 15:24, 25:2, 25:23, 37:16, 41:8, 86:21, 102:9, 108:20, 111:3, 113:10, 115:10
**documents** [4] - 33:12, 59:3, 111:15, 115:19
**dogs** [1] - 102:17
**dollar** [3] - 31:12, 31:13, 119:3
**domestic** [2] - 116:10, 117:4
**done** [4] - 19:17, 20:23, 85:25, 111:20
**door** [3] - 102:15, 102:18, 104:6
**Dourec** [3] - 24:19, 25:23, 27:23
**down** [14] - 19:12, 24:18, 33:3, 33:21, 36:24, 77:8, 79:23, 84:21, 85:1, 88:23, 92:3, 106:8, 109:12, 112:10
**draft** [7] - 13:10, 13:12, 17:14, 22:11, 22:19, 63:15, 74:11
**drawing** [1] - 118:7
**drawn** [3] - 44:23, 48:12, 72:12
**Drive** [2] - 20:6, 67:6
**due** [7] - 72:21, 77:10, 77:12, 77:16, 84:17, 109:2
**Duffy** [3] - 88:17,

88:19, 89:4
**during** [3] - 11:21, 57:16, 111:12

---

## E

**e-mail** [187] - 6:20, 6:24, 12:15, 12:20, 13:2, 13:4, 13:6, 13:13, 14:8, 14:11, 14:16, 14:18, 14:20, 14:22, 14:24, 15:9, 15:14, 15:21, 18:6, 18:10, 18:13, 18:15, 19:1, 19:8, 19:9, 19:10, 19:11, 20:20, 21:24, 22:1, 22:9, 22:12, 22:15, 22:19, 24:2, 24:6, 24:9, 24:19, 24:24, 25:4, 25:6, 25:9, 25:11, 29:25, 30:2, 30:4, 30:5, 30:12, 30:13, 30:14, 31:2, 31:6, 31:8, 31:11, 32:25, 33:3, 33:20, 34:7, 34:12, 34:15, 34:21, 34:25, 35:20, 36:3, 36:8, 36:11, 36:18, 36:24, 42:18, 43:18, 43:22, 44:7, 44:19, 45:1, 46:14, 47:12, 47:17, 48:1, 48:4, 48:9, 49:1, 53:20, 61:17, 61:20, 62:5, 62:8, 62:14, 62:16, 63:3, 64:13, 64:17, 65:1, 69:13, 69:19, 70:2, 70:5, 71:6, 71:11, 71:14, 71:16, 72:8, 74:8, 75:8, 75:10, 75:13, 75:17, 75:21, 76:19, 76:20, 76:22, 77:7, 77:9, 77:20, 77:22, 78:4, 78:6, 80:3, 81:13, 81:15, 81:16, 81:19, 81:24, 81:25, 82:5, 82:8, 82:10, 82:19, 82:23, 83:12, 83:17, 83:20, 83:25, 84:3, 84:7, 86:3, 86:7, 86:10, 86:25, 87:4, 87:14, 87:19, 87:21, 87:22, 88:6, 88:13, 88:16, 89:8, 89:23, 89:25, 90:2, 90:10, 90:16, 90:22, 91:8, 91:12, 94:10, 94:21, 95:2, 95:3, 95:5, 95:8, 95:18, 95:22,

96:1, 96:3, 96:7, 96:13, 96:20, 97:11, 97:24, 98:4, 98:5, 98:8, 100:6, 100:7, 100:11, 100:20, 100:23, 101:1, 101:16, 111:16
**e-mails** [12] - 33:5, 36:9, 47:15, 76:24, 81:20, 95:13, 97:13, 97:16, 97:19, 97:25, 99:8, 100:14
**EA4613** [1] - 44:16
**Eagan** [43] - 10:25, 11:1, 11:15, 11:16, 11:18, 11:19, 11:20, 11:22, 20:10, 21:9, 23:6, 23:7, 23:9, 25:20, 26:2, 27:14, 27:15, 27:17, 28:12, 32:1, 32:3, 35:12, 39:18, 41:22, 45:5, 51:12, 51:15, 55:23, 56:3, 57:7, 57:8, 57:13, 59:10, 60:22, 60:23, 61:6, 67:8, 69:1, 72:11, 74:5, 77:3, 107:25, 113:7
**early** [4] - 57:1, 57:3, 57:15, 103:7
**easier** [1] - 70:22
**Ed** [3] - 68:20, 69:8, 70:19
**edification** [1] - 37:15
**Edward** [5] - 68:20, 68:22, 69:6, 70:11, 70:18
**effort** [1] - 107:20
**eight** [3] - 25:12, 40:7, 117:19
**either** [4] - 82:17, 87:16, 96:11, 116:8
**elaboration** [1] - 54:18
**electronic** [1] - 68:5
**elicit** [1] - 106:5
**elicited** [4] - 103:22, 104:24, 106:3, 106:14
**eluding** [1] - 66:13
**end** [7] - 16:17, 37:7, 53:6, 63:12, 105:9, 105:14, 105:18
**ending** [8] - 48:13, 67:17, 70:10, 70:14, 70:15, 72:12, 78:23, 79:3
**enforcement** [1] - 60:15
**ensure** [1] - 117:10
**entered** [1] - 23:1

**entering** [1] - 39:20
**entire** [2] - 41:22, 113:10
**entirely** [2] - 113:18, 116:21
**entitled** [6] - 42:24, 108:3, 108:7, 108:8, 108:10, 121:11
**entries** [1] - 40:6
**Entry** [1] - 37:21
**entry** [8] - 40:8, 40:11, 40:16, 106:11, 106:22, 107:1, 107:4, 108:4
**equivalent** [1] - 55:11
**especially** [1] - 63:25
**ESQ** [2] - 2:15, 2:18
**establish** [1] - 119:8
**estate** [1] - 87:16
**estimate** [2] - 112:15, 117:19
**et** [1] - 109:6
**evening** [2] - 103:8, 118:1
**event** [3] - 54:22, 54:24, 55:9
**evicted** [4] - 8:8, 59:15, 59:17, 59:21
**eviction** [3] - 6:15, 8:2, 8:6
**EVIDENCE** [3] - 3:10, 4:4, 5:4
**evidence** [14] - 28:5, 30:7, 66:8, 103:21, 104:10, 104:24, 107:14, 107:16, 107:18, 108:7, 108:8, 108:21, 110:3, 114:18
**evident** [1] - 106:10
**evidentiary** [1] - 110:3
**exact** [2] - 80:17, 104:7
**exactly** [2] - 25:12, 107:8
**EXAMINATION** [1] - 6:10
**Examination** [1] - 3:3
**examination** [4] - 108:17, 108:23, 117:20, 119:8
**examine** [2] - 102:21, 110:13
**example** [8] - 27:2, 72:23, 93:20, 102:13, 102:25, 108:6, 111:16, 115:16
**exasperated** [1] - 109:4

Excel [1] - 35:6
except [1] - 76:4
exception [1] - 44:2
excess [2] - 23:14,
26:6
exchange [1] - 52:19
excludes [1] - 107:16
executed [2] - 24:25,
60:15
Exhibit [148] - 9:7,
9:22, 10:1, 12:12,
12:13, 12:24, 13:5,
14:13, 15:4, 15:8,
17:13, 18:3, 18:4,
18:19, 18:25, 21:21,
22:5, 22:8, 24:1,
24:13, 24:17, 25:18,
26:17, 26:19, 26:24,
27:1, 28:1, 28:3,
28:5, 28:9, 29:22,
29:25, 30:8, 30:11,
31:17, 32:7, 32:8,
32:23, 33:2, 33:10,
33:18, 34:11, 34:24,
36:7, 36:8, 36:15,
36:21, 37:13, 37:18,
37:25, 39:6, 39:10,
39:12, 39:22, 39:25,
43:15, 43:20, 43:22,
43:25, 44:6, 45:17,
45:19, 45:24, 46:7,
47:10, 47:20, 47:24,
48:18, 49:2, 50:13,
51:21, 52:2, 52:12,
52:20, 52:21, 61:14,
61:17, 61:24, 62:2,
62:21, 62:23, 63:2,
64:12, 64:22, 64:25,
66:6, 66:8, 66:18,
66:24, 69:9, 69:11,
69:23, 70:1, 70:22,
70:25, 71:7, 71:9,
71:11, 71:19, 71:23,
72:23, 73:9, 73:16,
75:7, 75:24, 76:7,
78:12, 78:18, 80:4,
80:9, 81:11, 81:22,
82:3, 84:2, 84:10,
84:15, 84:20, 85:18,
86:3, 86:14, 86:24,
87:18, 88:1, 88:5,
88:22, 89:20, 89:23,
90:6, 90:9, 91:11,
92:17, 94:20, 95:11,
95:16, 97:11, 97:13,
97:22, 98:2, 100:6,
100:18, 100:22,
102:7, 104:11,
104:12, 109:21
exhibit [8] - 25:16,

26:9, 38:24, 85:20,
98:16, 114:9,
114:12, 114:13
EXHIBIT [3] - 3:10,
4:4, 5:4
exhibits [10] - 61:12,
109:16, 109:18,
112:3, 114:9,
114:10, 114:16,
114:18, 115:1, 115:6
Exhibits [2] - 103:13,
104:9
EXHIBITS [3] - 3:8,
4:2, 5:2
exit [1] - 47:3
expedite [1] - 115:1
expenses [3] - 56:25,
63:13, 89:15
expensive [1] - 107:22
expert [1] - 111:22
explain [2] - 54:16,
102:22
explanation [1] -
116:12
extend [1] - 104:3
extended [3] - 23:14,
26:6, 104:2
extensively [1] -
103:19
extent [1] - 107:13
extra [1] - 66:15

## F

facilities [1] - 17:2
fact [4] - 76:5, 82:1,
109:5, 118:23
facto [1] - 113:24
facts [1] - 52:18
factual [1] - 110:25
fair [22] - 22:1, 24:9,
24:10, 30:4, 33:5,
36:11, 43:22, 47:17,
52:6, 61:4, 61:20,
64:17, 64:18, 69:19,
75:13, 81:19, 84:7,
87:21, 87:22, 90:2,
95:8, 100:14
falls [1] - 107:24
familiar [1] - 69:3
family [1] - 102:22
fancy [1] - 107:21
fashion [1] - 55:13
February [6] - 40:22,
44:9, 46:5, 53:6,
90:12, 91:11
FEDERAL [2] - 1:24,
121:5
Federal [1] - 121:20
fee [6] - 104:23,

108:13, 108:15,
109:2, 119:19,
119:22
fees [1] - 119:13
few [3] - 103:15,
111:21, 115:6
figure [4] - 40:22,
41:15, 53:9, 64:1
file [1] - 57:14
filed [2] - 57:8, 103:18
files [1] - 59:24
Filippo [5] - 11:14,
11:16, 12:9, 90:23,
91:25
fill [2] - 13:15, 74:25
filling [1] - 74:21
final [4] - 73:2, 73:3,
75:2, 75:6
Finales [1] - 77:13,
77:17
finally [4] - 89:20,
89:21
finances [4] - 57:19,
57:20, 58:9, 107:25
financial [14] - 10:13,
56:2, 56:6, 56:17,
57:3, 57:17, 57:24,
59:9, 103:20,
103:23, 103:24,
104:5, 113:21
financially [1] - 56:11
Fine [1] - 107:4
fine [7] - 53:25, 55:3,
106:3, 109:6,
110:12, 114:22,
116:23
fire [1] - 102:16
firm [32] - 11:7, 11:9,
11:14, 12:8, 30:24,
39:1, 55:20, 56:6,
56:10, 56:17, 56:24,
57:3, 57:8, 57:17,
57:22, 59:9, 59:13,
59:15, 59:17, 59:21,
59:25, 60:2, 60:4,
60:19, 64:1, 69:5,
85:22, 89:16,
103:24, 108:1, 109:3
firm's [1] - 57:24
firms [1] - 35:17
first [31] - 10:2, 13:17,
13:22, 14:5, 16:3,
19:21, 22:23, 25:22,
26:13, 30:13, 31:22,
31:23, 34:11, 36:18,
38:4, 40:8, 48:24,
52:22, 53:5, 57:6,
62:3, 63:7, 63:15,
67:17, 87:13, 89:1,
89:2, 104:13,

104:14, 106:1, 114:7
five [5] - 15:14, 41:19,
112:6, 112:9, 112:16
flash [1] - 107:15
Florida [2] - 68:23,
69:2
flying [1] - 110:5
focus [1] - 7:21
follow [3] - 78:3,
94:11, 95:23
following [2] - 22:25,
31:18
follows [4] - 44:24,
70:10, 72:10, 111:20
FOR [3] - 2:3, 2:14,
2:16
foregoing [1] - 121:9
forget [1] - 12:7
form [3] - 54:4, 74:20,
103:4
format [1] - 121:11
forward [3] - 25:6,
96:13, 101:7
forwarded [10] -
24:10, 53:13, 89:25,
90:3, 96:14, 96:16,
100:7, 100:11,
100:15, 101:18
forwarding [4] -
87:14, 87:19, 90:17,
90:22
Foundation [1] - 21:2
foundation [5] - 9:24,
21:3, 52:14, 74:12,
99:11
four [4] - 65:15, 98:25,
112:5, 112:18
fourth [1] - 15:7
frankly [2] - 104:2,
107:7
fraudulent [1] -
108:15
free [1] - 105:2
front [9] - 12:13,
14:14, 18:4, 21:22,
39:8, 43:16, 69:11,
109:7, 110:16
fucking [1] - 8:16
full [1] - 114:9
fully [2] - 113:1, 118:3
functions [1] - 56:1
funds [1] - 105:3
FYI [1] - 34:4

## G

Gardener [1] - 14:1
Gardner [39] - 10:24,
12:1, 13:25, 14:2,
17:15, 17:17, 23:2,

23:3, 23:10, 23:13,
26:3, 26:6, 29:7,
29:8, 32:20, 32:22,
35:16, 39:16, 40:5,
41:22, 41:24, 42:4,
42:7, 42:15, 42:23,
43:5, 43:8, 43:12,
44:24, 46:23, 47:5,
48:13, 49:5, 50:2,
50:10, 50:23, 51:19,
53:1, 91:20
Gardner's [8] - 39:14,
39:15, 40:8, 42:20,
43:1, 49:17, 49:20,
91:21
Gardner.001 [1] -
39:16
Gardner/Whiteside
[1] - 41:17
GB [1] - 106:11
generally [3] - 22:22,
48:24, 87:9
gentleman [1] - 12:6
gentlemen [3] - 6:6,
54:1, 103:1
Geoff [8] - 6:18, 8:7,
10:8, 10:13, 10:15,
10:16, 10:20, 10:23
given [1] - 91:19
glamor' [1] - 107:15
Global [15] - 76:11,
76:12, 76:13, 76:15,
76:22, 77:4, 77:19,
80:11, 80:14, 80:15,
80:18, 80:21, 83:24,
85:8, 85:11
globalbaristas.com
[1] - 82:9
gloss [2] - 105:3,
108:7
GOVERNMENT [1] -
3:3
government [8] -
18:19, 24:13, 30:7,
43:25, 47:20, 71:19,
81:22, 84:10
Government [39] -
7:6, 7:9, 9:21, 12:23,
15:3, 22:5, 26:18,
28:4, 33:9, 36:14,
39:22, 45:18, 52:11,
54:23, 61:23, 64:21,
66:7, 69:22, 75:23,
78:11, 86:13, 87:25,
90:5, 95:10, 97:21,
100:17, 103:22,
105:4, 107:13,
108:16, 111:24,
113:4, 114:1, 114:3,
116:22, 116:25,

117:8, 119:16, 119:19
**Government's** [8] - 104:19, 104:23, 105:10, 105:14, 105:18, 107:20, 108:6, 119:9
**Greg** [8] - 85:2, 94:10, 94:13, 96:19, 96:21, 96:23, 98:12
**Gregory** [14] - 60:21, 67:13, 69:3, 69:5, 69:7, 75:2, 85:15, 88:24, 91:24, 92:4, 92:6, 93:6, 93:7, 95:6
**Grice** [2] - 81:25, 83:21
**Grice's** [1] - 83:20
**grounds** [1] - 111:4
**group** [1] - 35:18
**Group** [23] - 11:10, 11:11, 11:13, 11:23, 11:25, 12:8, 30:23, 31:7, 31:14, 31:24, 35:8, 35:12, 35:15, 36:5, 51:12, 51:15, 91:1, 91:7, 91:9, 91:13, 91:17, 91:21, 91:25
**guess** [3] - 107:4, 109:3, 112:4

**H**

**HA-420** [2] - 16:8, 38:7
**Haci.honda.com** [1] - 15:20
**half** [8] - 19:15, 47:2, 48:1, 49:9, 51:5, 66:25, 67:16, 96:6
**halfway** [2] - 24:18, 84:21
**hand** [2] - 14:1, 14:2
**handle** [3] - 10:20, 37:8
**handled** [3] - 10:14, 53:17, 53:21
**handwriting** [8] - 47:7, 47:9, 49:12, 49:15, 49:16, 50:20, 51:7, 51:8
**HANNA** [2] - 2:4, 2:9
**happy** [1] - 103:13
**Hassan** [2] - 14:1, 29:20
**head** [2] - 41:1, 61:3
**heading** [1] - 48:11
**health** [1] - 112:13
**hear** [2] - 103:13,

114:11
**heard** [4] - 102:12, 102:13, 112:21, 116:16
**hearsay** [19] - 9:23, 15:5, 26:21, 33:11, 33:12, 36:16, 39:23, 44:1, 45:21, 52:13, 66:10, 71:21, 78:15, 81:23, 84:12, 86:15, 88:2, 90:7, 102:21
**Hearsay** [12] - 12:25, 18:21, 30:9, 37:19, 47:22, 61:25, 64:23, 69:24, 76:2, 95:12, 97:23, 100:19
**held** [2] - 41:16, 121:10
**helpful** [1] - 59:4
**helping** [1] - 66:1
**hereby** [3] - 16:25, 38:5, 121:7
**Hi** [2] - 95:19, 95:21
**hi** [2] - 82:5, 95:22
**highlight** [2] - 22:14, 52:21
**highlighted** [1] - 111:10
**highly** [3] - 103:25, 107:8, 109:7
**Hino** [1] - 121:20
**HINO** [3] - 1:23, 121:5, 121:19
**Hino-Spaan** [1] - 121:20
**HINO-SPAAN** [3] - 1:23, 121:5, 121:19
**hit** [1] - 25:10
**home** [4] - 9:2, 9:4, 10:9, 59:23
**Honda** [10] - 15:25, 16:18, 16:21, 16:22, 16:25, 17:1, 34:5, 37:8, 37:10, 38:6
**HondaJet** [6] - 16:8, 19:7, 19:14, 33:22, 33:24, 38:9
**Honor** [147] - 6:8, 6:25, 7:3, 7:12, 7:18, 7:19, 9:21, 9:23, 12:23, 13:1, 13:2, 15:3, 15:5, 18:20, 18:21, 21:2, 22:4, 24:14, 26:18, 26:21, 28:4, 28:7, 30:8, 33:9, 33:11, 33:13, 36:14, 36:16, 36:22, 37:19, 39:21, 39:23, 41:5, 41:7, 41:10, 42:10, 45:18, 45:21,

47:21, 51:22, 52:9, 52:13, 52:14, 52:17, 53:23, 54:10, 54:14, 54:19, 54:22, 55:2, 55:6, 55:8, 55:18, 56:7, 56:19, 57:10, 61:23, 64:21, 66:7, 66:10, 66:22, 69:22, 71:20, 71:21, 74:12, 74:17, 75:23, 76:3, 78:11, 78:15, 81:23, 83:13, 84:11, 84:12, 86:13, 86:15, 86:20, 87:25, 88:2, 90:5, 95:10, 96:24, 97:21, 99:11, 100:17, 102:11, 103:15, 103:18, 103:19, 104:1, 104:6, 104:8, 104:15, 104:16, 104:21, 105:1, 105:7, 105:8, 105:13, 105:17, 105:20, 105:23, 106:9, 106:14, 106:15, 106:22, 106:24, 107:6, 107:9, 108:10, 108:13, 108:19, 108:20, 109:4, 109:14, 109:21, 110:8, 110:10, 110:14, 110:16, 111:2, 111:7, 111:8, 111:13, 111:19, 111:25, 112:10, 112:18, 113:12, 113:14, 113:17, 114:5, 114:17, 114:21, 115:4, 115:7, 116:2, 116:7, 116:15, 117:13, 117:25, 118:4, 118:12, 119:4, 119:14, 119:18, 119:25
**Honor's** [2] - 110:17, 116:11
**HONORABLE** [1] - 1:3
**hope** [2] - 102:25, 105:12
**hopes** [1] - 53:9
**host** [2] - 113:18, 114:17
**hour** [1] - 112:19
**hours** [6] - 15:14, 25:12, 112:5, 112:9, 112:16, 117:19
**house** [5] - 59:8, 59:24, 60:16, 60:18,

102:16
**House** [1] - 53:9

**I**

**idea** [1] - 118:25
**identify** [2] - 37:16, 45:12
**ignore** [3] - 34:18, 34:21, 36:3
**ignored** [1] - 34:23
**II** [1] - 12:12
**III** [5] - 24:4, 39:6, 58:20, 61:15, 69:10
**illustrated** [1] - 102:14
**immediately** [5] - 64:11, 80:11, 83:10, 119:2, 119:21
**impact** [3] - 58:23, 58:24, 59:1
**important** [1] - 112:1
**improper** [5] - 104:1, 119:2, 119:3, 119:15, 119:20
**IN** [4] - 2:14, 3:9, 4:4, 5:4
**include** [1] - 11:22
**included** [3] - 10:9, 21:9, 21:11
**includes** [2] - 19:16, 107:17
**including** [3] - 18:22, 33:16, 110:25
**incoming** [4] - 68:5, 68:7, 68:12, 68:14
**incorrect** [1] - 37:9
**increase** [1] - 53:4
**independent** [1] - 23:17
**indicated** [2] - 26:23, 103:11
**individual** [3] - 19:3, 71:12, 90:25
**individuals** [2] - 45:2, 51:16
**indulgence** [1] - 111:6
**inflammatory** [1] - 108:4
**info** [1] - 13:16
**information** [16] - 6:18, 23:17, 23:18, 38:13, 45:1, 48:15, 50:7, 53:16, 72:13, 74:21, 86:22, 88:20, 96:12, 103:23, 113:18, 113:20
**informed** [1] - 82:13
**initiating** [1] - 32:4
**insert** [3] - 22:15, 23:2, 23:4

**instance** [1] - 118:20
**instances** [2] - 55:7, 103:21
**instead** [1] - 89:8
**instructed** [9] - 20:2, 70:19, 77:6, 81:10, 89:10, 89:18, 92:15, 94:14, 98:23
**instruction** [1] - 119:6
**instructions** [16] - 19:7, 19:25, 20:3, 30:17, 30:19, 30:22, 31:6, 31:9, 31:11, 65:5, 65:12, 90:13, 91:5, 95:24, 96:1, 98:6
**interest** [2] - 16:13, 19:4
**interpret** [1] - 55:12
**interview** [1] - 7:8
**introduced** [1] - 112:3
**invoice** [2] - 33:17, 41:2
**invoices** [1] - 19:14
**involved** [2] - 63:4, 64:8
**IOLTA** [1] - 35:8
**ipso** [1] - 113:24
**irrelevant** [1] - 113:19
**issue** [8] - 33:13, 54:10, 70:9, 104:18, 105:24, 108:13, 117:16, 117:18
**issued** [1] - 103:20
**issues** [4] - 54:4, 103:4, 103:16, 114:8
**items** [2] - 109:20, 111:9
**itself** [1] - 112:10

**J**

**JAMES** [1] - 1:3
**January** [48] - 13:25, 14:5, 17:2, 20:21, 20:25, 22:13, 24:22, 27:22, 28:19, 28:24, 30:15, 31:23, 32:12, 35:1, 35:3, 36:12, 37:4, 38:12, 38:16, 40:11, 42:2, 65:3, 68:8, 68:10, 68:12, 70:6, 70:25, 71:3, 73:4, 73:11, 73:14, 77:21, 80:2, 80:24, 80:25, 81:7, 82:19, 83:1, 84:1, 84:8, 84:19, 84:20, 84:22, 88:8, 88:23, 89:2, 104:17

**jet** [2] - 107:21, 110:5
**jet-setting** [1] - 107:21
**job** [2] - 60:12, 92:15
**JOHN** [2] - 1:8, 2:15
**Johnson** [12] - 6:14, 6:18, 8:2, 8:6, 10:8, 10:13, 10:19, 10:20, 39:1, 40:1, 113:3, 118:20
**Johnson's** [5] - 6:13, 9:2, 9:4, 104:20, 108:22
**JUDGE** [1] - 1:3
**Judicial** [1] - 121:12
**Judy** [5] - 34:4, 34:7, 53:1, 87:6, 101:7
**JUDY** [2] - 3:3, 6:9
**Jule** [1] - 107:4
**July** [3] - 53:2, 114:7, 121:15
**JULY** [2] - 1:15, 6:1
**June** [1] - 101:2
**jury** [18] - 6:5, 54:9, 55:12, 55:16, 103:10, 103:22, 104:11, 104:25, 105:25, 106:24, 108:11, 109:7, 111:10, 111:12, 113:21, 114:3, 118:25
**jury's** [1] - 118:8

### K

**keep** [3] - 39:1, 41:25, 51:23
**keeping** [1] - 41:24
**kept** [1] - 39:17
**key** [1] - 111:23
**kids** [1] - 102:17
**kind** [6] - 22:15, 23:6, 38:17, 68:4, 97:7, 115:7
**Klein** [1] - 107:4
**knocks** [1] - 102:15
**knowledge** [2] - 23:17, 80:18
**Krystal** [3] - 82:5, 82:6, 82:10

### L

**L.A** [2] - 11:3, 11:7
**ladies** [3] - 6:6, 54:1, 103:1
**large** [2] - 40:21, 108:5
**last** [15] - 58:25, 59:5, 60:12, 65:15, 79:21,

83:20, 87:17, 95:5, 97:15, 98:25, 106:22, 107:1, 111:19, 117:16, 118:6
**late** [4] - 6:12, 6:21, 7:11, 8:1
**Law** [30] - 11:3, 11:10, 11:11, 11:13, 11:23, 11:25, 12:8, 30:23, 31:7, 31:14, 31:24, 35:8, 35:12, 35:15, 35:18, 36:5, 51:12, 51:15, 85:21, 85:23, 86:3, 87:11, 88:15, 91:1, 91:7, 91:9, 91:13, 91:17, 91:21, 91:25
**LAW** [1] - 2:17
**law** [16] - 11:7, 11:9, 12:7, 30:24, 55:20, 59:13, 59:17, 59:21, 59:25, 60:2, 60:4, 60:15, 60:18, 85:22, 103:23, 109:3
**lawyer** [1] - 119:10
**lawyers** [1] - 11:22
**lay** [1] - 21:3
**lead** [3] - 116:13, 116:22, 117:1
**Leading** [1] - 58:12
**leading** [2] - 79:7, 116:10
**learn** [6] - 17:17, 37:10, 57:8, 61:5, 64:5, 64:7
**learned** [1] - 64:9
**lease** [5] - 23:1, 23:15, 26:7, 26:15, 27:25
**lease)** [1] - 23:4
**least** [1] - 106:14
**left** [8] - 26:9, 28:10, 78:25, 93:1, 104:21, 112:19, 117:3, 119:1
**legitimate** [3] - 104:23, 108:15, 109:2
**Letter** [1] - 22:11
**letter** [13] - 16:5, 17:4, 20:2, 22:19, 22:24, 22:25, 23:16, 23:18, 25:1, 25:17, 25:24, 27:25, 40:18
**letterhead** [5] - 15:24, 22:21, 23:21, 23:24, 25:20
**levels** [2] - 33:12, 36:17
**liberty** [1] - 77:10
**Liberty** [1] - 77:17

**lifestyle** [1] - 107:23
**limine** [2] - 15:6, 103:18
**linchpin** [1] - 111:24
**line** [12] - 16:18, 19:6, 22:9, 44:16, 48:6, 65:4, 70:2, 71:24, 83:17, 84:16, 86:25, 88:9
**Lisa** [1] - 87:2
**list** [2] - 114:10, 115:17
**listed** [3] - 17:11, 27:12, 27:15
**lists** [1] - 77:16
**litigation** [3] - 23:10, 26:3, 87:16
**lived** [1] - 60:6
**LLC** [14] - 16:9, 16:10, 16:11, 16:13, 17:9, 20:4, 20:5, 38:6, 38:18, 80:11, 80:14, 80:15, 80:19, 80:21
**LLC's** [1] - 19:23
**LLP** [10] - 23:8, 23:9, 26:2, 27:14, 27:15, 28:12, 45:5, 72:11, 88:17, 89:4
**Lobato** [5] - 44:11, 44:13, 44:20, 48:2, 48:10
**located** [3] - 20:10, 23:4, 59:13
**location** [1] - 67:8
**lodged** [3] - 37:20, 54:14, 66:11
**look** [94] - 7:23, 9:7, 9:15, 12:11, 12:12, 13:17, 14:13, 16:16, 17:13, 18:3, 21:21, 22:14, 24:1, 24:18, 25:16, 26:17, 27:2, 28:3, 28:16, 28:17, 28:23, 29:14, 29:22, 30:20, 31:17, 32:23, 33:2, 34:10, 34:24, 36:7, 36:23, 37:13, 39:4, 43:15, 45:17, 45:25, 47:10, 47:25, 48:18, 48:19, 49:9, 50:15, 51:21, 61:14, 62:21, 64:12, 65:14, 66:6, 67:10, 67:16, 68:4, 68:9, 69:9, 70:24, 71:9, 73:9, 75:7, 77:7, 78:25, 79:13, 79:23, 81:11, 82:4, 82:18, 82:22, 84:2, 85:1, 85:18, 85:20, 86:3, 87:18,

88:22, 89:20, 90:21, 91:3, 91:11, 92:3, 92:17, 94:20, 95:25, 97:11, 98:3, 98:16, 100:6, 101:23, 102:7, 104:16, 105:24, 108:14, 108:20, 113:14, 114:19, 115:17, 120:1
**looked** [9] - 17:14, 27:25, 40:19, 49:1, 72:23, 94:3, 97:13, 98:4, 101:3
**looking** [5] - 35:6, 46:3, 63:2, 78:19, 111:18
**LOS** [1] - 121:3
**Los** [1] - 2:12
**lunch** [1] - 103:11
**luxury** [1] - 107:14

### M

**mail** [189] - 6:20, 6:24, 12:15, 12:20, 13:2, 13:4, 13:6, 13:13, 14:8, 14:11, 14:16, 14:18, 14:20, 14:22, 14:24, 15:9, 15:14, 15:21, 18:6, 18:10, 18:13, 18:15, 19:1, 19:8, 19:9, 19:10, 19:11, 20:20, 21:24, 22:1, 22:9, 22:12, 22:15, 22:19, 24:2, 24:6, 24:9, 24:19, 24:24, 25:4, 25:6, 25:9, 25:11, 29:25, 30:2, 30:4, 30:5, 30:12, 30:13, 30:14, 31:2, 31:6, 31:8, 31:11, 32:25, 33:3, 33:20, 34:7, 34:12, 34:15, 34:21, 34:25, 35:20, 36:3, 36:8, 36:11, 36:18, 36:24, 42:18, 43:18, 43:22, 44:7, 44:19, 45:1, 46:14, 47:12, 47:17, 48:1, 48:4, 48:9, 49:1, 53:20, 60:4, 60:5, 61:17, 61:20, 62:5, 62:8, 62:14, 62:16, 63:3, 64:13, 64:17, 65:1, 69:13, 69:19, 70:2, 70:5, 71:6, 71:11, 71:14, 71:16, 72:8, 74:8, 75:8, 75:10, 75:13, 75:17, 75:21, 76:19,

76:20, 76:22, 77:7, 77:9, 77:20, 77:22, 78:4, 78:6, 80:3, 81:13, 81:15, 81:16, 81:19, 81:24, 81:25, 82:5, 82:8, 82:10, 82:19, 82:23, 83:12, 83:17, 83:20, 83:25, 84:3, 84:7, 86:3, 86:7, 86:10, 86:25, 87:4, 87:14, 87:19, 87:21, 87:22, 88:6, 88:13, 88:16, 89:8, 89:23, 89:25, 90:2, 90:10, 90:16, 90:22, 91:8, 91:12, 94:10, 94:21, 95:2, 95:3, 95:5, 95:8, 95:18, 95:22, 96:1, 96:3, 96:7, 96:13, 96:20, 97:11, 97:24, 98:4, 98:5, 98:8, 100:6, 100:7, 100:11, 100:20, 100:23, 101:1, 101:16, 111:16
**mails** [12] - 33:5, 36:9, 47:15, 76:24, 81:20, 95:13, 97:13, 97:16, 97:19, 97:25, 99:8, 100:14
**majority** [1] - 115:18
**manager** [1] - 17:12
**manner** [4] - 53:15, 114:25, 115:25, 116:24
**manufactured** [1] - 38:8
**March** [7] - 8:22, 8:25, 50:16, 60:13, 92:24, 93:5, 94:3
**Marchino** [5] - 90:23, 90:24, 90:25, 91:25
**Marchino's** [1] - 11:14
**matter** [20] - 17:15, 17:17, 23:10, 26:3, 33:15, 41:17, 52:10, 61:2, 62:24, 63:5, 64:5, 69:4, 69:5, 69:7, 69:8, 74:23, 75:25, 92:1, 111:11, 121:11
**matters** [2] - 88:4, 113:21
**McClaran** [5] - 44:10, 44:13, 44:19, 48:2, 48:10
**mean** [13] - 8:18, 10:14, 44:3, 49:25, 56:11, 58:3, 58:8,

67:22, 68:25, 72:19, 74:25, 87:8, 109:25
**means** [2] - 88:11, 111:17
**meant** [1] - 87:9
**mediation** [8] - 41:16, 61:7, 61:9, 62:19, 63:4, 64:1, 74:20, 74:24
**medications** [4] - 58:16, 58:18, 58:21, 59:2
**meet** [1] - 56:25
**meeting** [2] - 93:18, 95:23
**meetings** [1] - 93:17
**Melissa** [3] - 81:25, 83:20, 83:21
**memo** [3] - 71:1, 71:3, 73:10
**memory** [6] - 7:10, 41:3, 41:12, 58:23, 58:25, 59:17
**mention** [1] - 105:6
**mentioned** [8] - 19:3, 35:1, 55:19, 55:23, 59:9, 77:2, 91:20, 111:3
**message** [12] - 9:9, 9:18, 52:17, 52:22, 52:23, 53:11, 53:14, 53:20, 72:5, 86:6, 86:7, 95:15
**messages** [2] - 52:4, 52:6
**met** [1] - 7:5
**mic** [2] - 29:10, 29:12
**Michael** [86] - 10:14, 10:20, 11:2, 12:9, 16:11, 16:15, 17:12, 17:21, 19:9, 19:17, 19:20, 19:24, 20:2, 20:12, 20:16, 20:17, 23:23, 31:15, 34:4, 37:9, 38:22, 42:17, 43:13, 44:22, 45:3, 45:16, 48:17, 49:22, 49:25, 50:5, 53:8, 53:13, 53:14, 53:17, 53:21, 58:8, 62:15, 62:18, 64:8, 65:2, 66:5, 67:3, 70:19, 71:24, 72:15, 74:8, 75:6, 75:12, 76:18, 76:20, 76:25, 77:6, 77:8, 77:9, 79:12, 80:20, 81:10, 85:12, 85:25, 87:2, 87:13, 88:14, 89:10, 89:18, 91:18, 93:15, 94:9,

94:10, 94:12, 95:19, 95:21, 95:22, 96:14, 97:2, 98:23, 99:13, 99:16, 99:20, 100:4, 101:18, 101:22
**MICHAEL** [2] - 1:8, 2:15
**Michael's** [16] - 14:21, 17:8, 18:11, 26:12, 27:9, 32:6, 46:13, 46:19, 47:9, 47:16, 50:22, 51:8, 60:11, 69:18, 71:15, 74:7
**midafternoon** [1] - 54:1
**middle** [5] - 68:1, 81:15, 87:10, 92:22, 98:24
**might** [8] - 28:17, 70:22, 73:22, 74:14, 105:4, 105:7, 106:8, 114:14
**million** [20] - 18:2, 21:1, 21:15, 29:3, 31:2, 31:18, 32:12, 32:19, 35:15, 36:4, 43:3, 68:13, 68:14, 92:25, 93:5, 104:20, 104:22, 108:12, 118:20
**mind** [1] - 118:1
**minimis** [1] - 118:9
**minus** [1] - 112:8
**minute** [2] - 37:23, 86:18
**minutes** [2] - 54:2, 54:7
**mislead** [1] - 108:11
**misperception** [1] - 119:1
**misspeak** [1] - 104:12
**mistake** [2] - 34:8, 37:7
**mistrial** [3] - 103:12, 107:7, 109:19
**misunderstanding** [2] - 117:3, 119:1
**Mitchell** [1] - 87:10
**model** [1] - 38:6
**moment** [5] - 66:14, 104:15, 111:6, 117:9
**money** [39] - 10:15, 20:14, 20:25, 21:19, 31:10, 31:15, 32:19, 32:22, 35:12, 35:21, 35:25, 36:1, 53:2, 56:12, 73:10, 91:15, 93:1, 93:7, 93:8, 94:5, 94:7, 94:9, 94:15, 99:15,

101:13, 104:19, 104:21, 108:3, 108:6, 108:19, 108:22, 109:1, 110:9, 113:2, 118:12, 118:14, 119:4
**monies** [3] - 23:13, 26:5, 94:18
**months** [3] - 92:24, 101:3, 101:12
**morning** [8] - 70:7, 70:8, 72:8, 72:10, 101:7, 102:16, 116:5, 116:6
**most** [4] - 10:14, 10:17, 94:21, 112:12
**motion** [7] - 15:6, 103:18, 105:16, 105:19, 109:15, 109:19, 112:12
**motive** [1] - 107:19
**move** [16] - 6:25, 12:24, 15:4, 22:5, 26:18, 29:12, 33:10, 37:17, 39:22, 45:18, 61:24, 66:8, 69:23, 103:12, 112:23, 114:15
**moved** [1] - 112:23
**movements** [1] - 108:5
**moves** [21] - 9:22, 18:19, 24:13, 28:4, 30:7, 36:15, 43:25, 47:20, 52:11, 64:22, 71:19, 75:24, 78:12, 81:22, 84:10, 86:14, 88:1, 90:6, 95:11, 97:22, 100:18
**moving** [9] - 94:3, 94:4, 105:13, 105:23, 107:7, 110:14, 113:4, 113:10, 114:18
**MR** [224] - 2:16, 6:8, 6:11, 6:25, 7:3, 7:5, 7:12, 7:18, 7:21, 8:3, 8:9, 8:10, 8:15, 9:21, 9:23, 10:2, 12:23, 12:25, 13:2, 13:6, 15:3, 15:5, 15:9, 18:19, 18:21, 19:1, 21:2, 21:4, 22:4, 22:6, 22:9, 24:13, 24:15, 24:18, 26:21, 27:2, 28:4, 28:7, 28:10, 29:14, 30:7, 30:9, 30:12, 33:9, 33:11, 33:19, 33:20,

36:14, 36:16, 36:22, 37:15, 37:19, 38:1, 39:21, 39:23, 40:1, 41:5, 41:7, 41:9, 41:12, 42:10, 42:14, 43:25, 44:1, 44:3, 44:7, 45:21, 45:25, 47:20, 47:22, 47:25, 52:2, 52:9, 52:13, 52:16, 52:21, 53:23, 54:10, 54:14, 54:19, 55:4, 55:18, 56:7, 56:13, 56:19, 56:22, 57:10, 57:13, 58:12, 58:14, 59:18, 59:21, 61:23, 61:25, 62:3, 63:23, 64:4, 64:21, 64:23, 65:1, 66:7, 66:10, 66:15, 66:22, 66:25, 69:22, 69:24, 70:2, 70:21, 71:19, 71:21, 71:24, 74:12, 74:14, 74:17, 75:23, 76:2, 76:8, 76:16, 78:2, 78:4, 78:11, 78:15, 78:19, 79:7, 79:10, 81:22, 81:23, 82:4, 83:13, 83:17, 84:10, 84:12, 84:16, 86:13, 86:15, 86:17, 86:19, 86:25, 87:25, 88:2, 88:6, 90:5, 90:7, 90:10, 95:10, 95:12, 95:17, 96:24, 97:4, 97:21, 97:23, 98:3, 99:11, 99:14, 99:17, 99:19, 100:17, 100:19, 100:23, 102:9, 102:11, 103:15, 104:14, 105:6, 105:8, 105:12, 105:17, 105:20, 105:23, 106:6, 106:9, 106:13, 106:19, 106:22, 107:1, 107:6, 108:10, 108:19, 108:25, 109:9, 109:11, 109:17, 109:20, 109:23, 110:7, 110:14, 110:20, 110:22, 111:2, 111:6, 111:19, 112:7, 112:9, 112:18, 112:21, 113:7, 113:9, 113:12, 113:14, 113:17, 114:5, 114:17, 114:23, 115:11,

115:13, 115:20, 115:25, 116:4, 116:15, 116:19, 117:2, 117:7, 117:13, 117:16, 117:18, 117:25, 118:4, 118:6, 118:11, 118:16, 119:14, 119:18, 119:25
**multiple** [6] - 18:22, 33:12, 36:17, 85:5, 114:6, 114:7

## N

**N227WP** [1] - 38:8
**Name** [1] - 79:10
**name** [12] - 11:9, 12:6, 17:12, 20:4, 27:25, 30:18, 31:13, 61:1, 74:22, 79:11, 91:6
**names** [1] - 20:5
**National** [7] - 65:7, 65:10, 69:14, 69:17, 69:20, 71:12, 78:13
**nature** [3] - 54:21, 118:9, 118:11
**near** [1] - 60:6
**nearly** [1] - 93:5
**necessarily** [1] - 31:8
**need** [11] - 12:10, 29:18, 54:18, 70:9, 77:11, 77:13, 97:7, 111:22, 112:14, 114:16, 117:22
**needed** [1] - 42:7
**needs** [2] - 114:3, 120:5
**negative** [1] - 40:22
**neighbor** [3] - 102:15, 102:20, 102:21
**never** [5] - 75:6, 104:9, 104:10, 116:17, 117:4
**new** [3] - 11:4, 12:10, 95:24
**Newport** [6] - 2:19, 20:6, 20:7, 59:14, 67:6
**next** [5] - 19:21, 32:16, 77:24, 79:10, 80:1
**NICOLA** [2] - 2:4, 2:9
**nine** [1] - 40:2
**nobody** [1] - 110:18
**nonpayment** [1] - 59:20
**normal** [1] - 56:25
**North** [1] - 2:11
**note** [1] - 19:15

notes [1] - 7:8
nothing [5] - 101:21, 107:25, 109:17, 113:19, 118:22
notice [8] - 6:15, 8:2, 8:6, 36:20, 95:14, 98:1, 102:24, 118:2
November [2] - 7:9, 59:15, 59:17, 116:8
nowhere [1] - 91:8
number [23] - 9:3, 9:5, 10:10, 10:11, 29:21, 40:21, 41:8, 49:13, 49:23, 49:24, 49:25, 50:4, 54:15, 63:13, 65:15, 65:16, 67:11, 98:24, 98:25, 118:7, 118:13
Number [35] - 10:1, 13:5, 15:8, 16:6, 16:8, 18:25, 22:8, 24:17, 27:1, 28:9, 30:11, 36:21, 37:25, 38:8, 38:10, 39:25, 44:6, 45:24, 47:24, 52:20, 62:2, 64:25, 66:24, 70:1, 71:23, 76:7, 78:18, 82:3, 84:15, 86:24, 88:5, 90:9, 95:16, 98:2, 100:22
numbered [1] - 25:25
Numbers [1] - 33:18
numbers [3] - 29:18, 65:15, 98:25
numerous [1] - 50:13, 85:2, 103:21, 104:3

**O**

OBI [1] - 29:20
object [1] - 113:17
Objection [1] - 21:2
objection [40] - 7:12, 8:10, 8:12, 9:23, 12:25, 15:5, 18:21, 18:23, 22:6, 24:15, 30:9, 33:11, 36:16, 37:19, 39:23, 47:22, 52:13, 54:18, 55:5, 56:7, 56:19, 57:10, 58:12, 59:18, 61:25, 64:23, 66:10, 69:24, 76:2, 78:2, 78:15, 81:23, 84:12, 86:15, 95:12, 97:23, 99:17, 100:19, 115:21, 116:15
objections [13] - 26:22, 28:7, 37:20,

45:21, 54:15, 54:16, 66:11, 74:17, 78:16, 110:15, 111:1, 113:13, 115:14
obtain [2] - 44:23, 111:22
obviously [1] - 117:20
occasion [1] - 111:2
occasions [1] - 7:6
October [1] - 16:7
OF [7] - 1:2, 1:5, 1:14, 2:1, 121:1, 121:3, 121:4
offer [1] - 108:7
offering [4] - 52:9, 52:15, 66:16, 75:24
offers [1] - 107:13
Office [1] - 60:8
office [13] - 11:3, 28:14, 58:5, 60:24, 69:1, 72:5, 93:10, 93:12, 93:17, 97:3, 100:5, 101:21, 101:22
OFFICES [1] - 2:17
offices [1] - 59:15
Official [1] - 121:20
OFFICIAL [3] - 1:24, 121:1, 121:5
often [1] - 10:21
Ohman [4] - 33:21, 33:22, 34:13, 36:25
ohman [4] - 33:25, 34:3, 34:22, 37:4
ohman's [1] - 34:25
once [1] - 119:10
one [42] - 7:3, 8:19, 12:7, 12:8, 14:1, 19:15, 25:5, 31:22, 32:9, 33:3, 38:6, 51:16, 54:10, 62:20, 69:6, 73:20, 73:22, 74:1, 74:10, 74:14, 75:6, 80:15, 80:25, 81:20, 85:7, 102:9, 102:15, 102:24, 103:17, 104:7, 104:15, 105:3, 105:21, 106:14, 110:6, 110:20, 111:2, 111:6, 116:4, 117:16, 117:17
One [1] - 109:1
one-half [1] - 19:15
online [2] - 32:1, 32:3
oOo [1] - 120:9
opened [3] - 67:23, 67:24, 104:6
opinions [2] - 54:4, 103:4

opportunity [1] - 110:13
opposed [3] - 110:4, 110:5, 116:13
opposition [1] - 107:15
option [1] - 19:17
OR [3] - 3:9, 4:4, 5:4
order [2] - 27:23, 112:11
ordering [1] - 83:8
orders [2] - 82:16, 83:9
ordinary [1] - 39:17
ORG [1] - 29:20
otherwise [3] - 55:8, 107:23, 119:6
out-of-office [1] - 72:5
outgoing [4] - 78:22, 85:1, 85:5, 92:3
outlined [1] - 45:22
overruled [30] - 7:2, 8:4, 8:13, 9:25, 15:7, 18:24, 30:10, 39:24, 42:11, 47:23, 56:9, 56:20, 57:11, 58:13, 59:19, 62:1, 63:24, 64:24, 71:22, 74:18, 76:17, 78:17, 79:8, 83:14, 86:23, 88:3, 90:8, 96:25, 99:12, 99:18
owed [1] - 64:2
own [2] - 111:3, 116:22
owned [5] - 33:24, 76:15, 80:18, 103:25
ownership [2] - 16:13, 19:4

**P**

p.m [6] - 14:12, 15:13, 24:22, 55:15, 120:8
P.M [2] - 1:16, 6:2
P.O [1] - 60:5
P13 [1] - 107:15
page [76] - 10:2, 10:4, 10:5, 10:6, 13:17, 15:23, 24:19, 25:16, 26:8, 26:13, 26:20, 26:22, 27:3, 27:18, 28:6, 28:17, 30:13, 30:20, 32:7, 32:9, 34:11, 34:12, 34:24, 35:5, 37:18, 37:20, 45:20, 45:22, 45:25, 46:3, 46:4, 46:9, 46:16, 46:20, 48:1, 48:10, 48:19, 48:20,

48:25, 49:9, 50:15, 50:23, 62:3, 63:7, 63:15, 65:12, 66:11, 66:25, 67:17, 67:25, 70:23, 70:24, 70:25, 73:9, 78:16, 78:25, 81:15, 82:4, 82:18, 82:22, 91:3, 91:4, 92:17, 92:22, 95:17, 95:25, 96:3, 96:6, 98:4, 98:8, 98:16, 107:12, 121:11
PAGE [1] - 3:2
pages [8] - 40:2, 50:13, 63:10, 66:9, 78:13, 112:24, 113:15, 115:1
paid [11] - 6:19, 8:8, 23:13, 26:5, 27:23, 40:17, 55:23, 78:9, 81:5, 81:7
paragraph [19] - 7:22, 13:22, 14:5, 16:4, 16:16, 16:20, 19:12, 19:13, 19:21, 22:23, 23:5, 23:7, 25:22, 25:25, 26:13, 38:4, 87:10, 87:13
parakeets [1] - 102:18
parentheses [1] - 65:18
Parrish [8] - 16:15, 19:2, 19:8, 19:19, 20:1, 20:11, 20:14, 35:20
part [19] - 11:18, 17:22, 23:6, 28:5, 30:12, 37:16, 38:13, 43:9, 45:19, 46:9, 50:21, 62:4, 68:16, 68:17, 76:8, 78:12, 92:15, 101:23, 110:25
partial [2] - 73:20, 73:22
particular [4] - 17:24, 104:9, 104:11, 108:4
parties [1] - 14:4
partner [2] - 35:16, 35:17
parts [2] - 23:6, 111:15
Party [1] - 79:10
party [6] - 13:4, 14:3, 61:1, 79:11, 86:17, 101:11
pass [1] - 53:18
Passport [13] - 16:9, 16:10, 16:13, 17:9, 19:23, 20:4, 20:5,

21:11, 21:16, 33:24, 36:2, 38:18
past [2] - 29:19, 94:3, 94:4
Patch [3] - 88:17, 88:19, 89:4
Pause [1] - 7:4
pay [1] - 8:20
payable [2] - 48:13, 81:3
payables [1] - 77:10
payee [3] - 44:24, 70:11, 72:11
paying [3] - 56:2, 77:3, 77:4
payment [16] - 40:25, 43:3, 77:6, 82:17, 87:15, 104:25, 106:1, 106:2, 109:6, 109:22, 109:23, 109:24, 119:10, 119:11
payments [17] - 7:11, 43:5, 43:6, 43:8, 43:11, 57:18, 81:7, 81:10, 92:11, 105:24, 108:12, 108:14, 108:21, 109:5, 109:13, 110:1, 110:2
payroll [2] - 11:19, 11:22
pdf [1] - 30:17
people [4] - 51:15, 76:24, 77:1, 83:12
per [4] - 77:5, 77:13, 106:7, 119:16
percent [2] - 55:7, 57:15
percentage [2] - 74:24, 74:25
period [3] - 23:14, 26:6, 116:18
periods [1] - 11:21
permissible [1] - 116:21
permission [4] - 93:25, 96:22, 116:25, 117:22
permits [1] - 119:23
permitted [1] - 119:12
person [1] - 119:9
personal [1] - 85:25
phone [6] - 9:3, 9:5, 9:19, 10:8, 22:22, 116:12
phrase [1] - 114:6
physically [1] - 43:13
pick [3] - 48:12, 70:12, 72:9

**picture** [1] - 9:12
**pilot** [2] - 33:22, 33:23
**place** [1] - 59:2
**placed** [2] - 103:22, 104:10
**Plaintiff** [1] - 1:6
**PLAINTIFF** [1] - 2:3
**plane** [8] - 19:4, 19:18, 21:1, 21:19, 34:7, 35:2, 35:24, 35:25
**planning** [1] - 87:16
**Plaza** [1] - 2:18
**plus** [2] - 19:16, 112:8
**point** [19] - 17:17, 17:19, 22:4, 39:21, 53:24, 56:24, 59:13, 64:4, 65:9, 77:8, 85:14, 94:4, 109:4, 111:19, 112:23, 112:24, 113:3, 116:1, 116:5
**pointing** [1] - 119:16
**portion** [2] - 119:12, 119:19
**possible** [1] - 118:3
**possibly** [1] - 34:7
**Post** [1] - 60:8
**practice** [1] - 60:8
**preceded** [1] - 22:22
**predicated** [1] - 109:16
**predominated** [1] - 110:4
**prejudice** [2] - 108:11, 110:4
**prejudicial** [5] - 103:25, 107:8, 107:16, 116:23, 119:4
**prepare** [3] - 73:18, 75:2, 75:6
**presence** [5] - 6:5, 10:17, 54:9, 55:16, 103:10
**presently** [2] - 118:21, 118:24
**pretrial** [2] - 15:6, 56:8
**pretty** [1] - 102:14
**previous** [2] - 7:6, 28:21
**previously** [3] - 26:23, 45:5, 80:14
**price** [1] - 19:16
**privacy** [1] - 113:23
**private** [1] - 60:5
**privileged** [3] - 86:16, 86:20, 88:2
**privy** [1] - 94:17
**PRO** [1] - 2:14
**probative** [2] - 107:17,

113:20
**problem** [2] - 59:2, 107:9
**problems** [1] - 57:3
**proceed** [2] - 41:11, 115:11
**Proceedings** [1] - 120:8
**proceedings** [2] - 7:4, 121:10
**PROCEEDINGS** [1] - 1:14
**process** [1] - 111:12
**produce** [1] - 41:9
**produced** [1] - 41:10
**projecting** [1] - 107:23
**prompt** [1] - 119:11
**promptly** [1] - 119:13
**proof** [1] - 115:10
**properly** [1] - 105:4
**propose** [2] - 113:22, 114:20
**provide** [4] - 42:7, 42:14, 74:3, 74:6
**provided** [5] - 48:17, 49:23, 49:24, 112:15, 114:9
**provides** [2] - 23:12, 26:5
**providing** [1] - 21:13
**PTSD** [1] - 58:20
**publish** [4] - 38:1, 52:21, 62:3, 76:8
**pull** [4] - 10:4, 29:13, 46:9, 66:25
**pulled** [1] - 118:2
**pulling** [2] - 31:17, 34:10
**Purchase** [2] - 16:6, 38:9
**purchase** [5] - 16:7, 19:16, 27:12, 35:25, 49:4
**purchased** [4] - 27:10, 27:17, 35:24, 46:21
**purchaser** [6] - 16:11, 38:5, 38:10, 38:18, 46:12, 48:21
**purchaser's** [1] - 27:8
**purchases** [1] - 107:22
**purchasing** [1] - 27:3
**purport** [1] - 54:17
**purpose** [1] - 102:24
**purposes** [1] - 10:5
**pursuant** [2] - 26:19, 121:8
**put** [14] - 22:20, 23:20, 23:24, 45:1, 70:22, 73:10, 104:25,

105:3, 105:24, 106:1, 108:7, 111:16, 114:24, 115:9
**putting** [4] - 39:20, 89:15, 95:22, 98:5

**Q**

**questioning** [1] - 51:23
**questions** [5] - 97:7, 111:1, 118:7, 118:13, 118:19
**QuickBooks** [8] - 38:23, 38:25, 39:13, 40:1, 40:5, 41:13, 41:24
**quicker** [1] - 114:15
**quickly** [6] - 36:23, 95:25, 98:3, 105:6, 112:22, 118:19
**quintessential** [1] - 115:2
**quote** [3] - 107:14, 107:20, 107:24

**R**

**Rachel** [4] - 24:19, 24:25, 25:5, 27:23
**racing** [5] - 106:4, 106:7, 106:11, 106:17, 106:20
**raid** [1] - 59:8
**raise** [5] - 26:21, 54:11, 103:16, 117:18, 118:6
**read** [24] - 7:22, 13:13, 13:22, 16:3, 16:20, 19:13, 19:22, 22:23, 23:7, 25:22, 29:15, 29:18, 34:12, 38:4, 44:19, 48:9, 70:8, 72:8, 77:9, 87:13, 96:4, 107:10, 115:22, 115:23
**Reading** [1] - 26:1
**Reagan** [2] - 72:2
**real** [4] - 36:23, 59:2, 105:6, 112:22
**really** [5] - 61:11, 64:11, 83:7, 111:25, 117:9
**REALTIME** [1] - 121:5
**reason** [4] - 41:25, 94:7, 104:24, 114:24
**reasonable** [1] - 114:21
**reasons** [1] - 94:17

**Receipt** [1] - 38:3
**receivable** [1] - 88:12
**receive** [5] - 6:17, 8:23, 23:20, 84:5, 103:13
**received** [98] - 6:20, 9:25, 10:1, 13:4, 13:5, 15:7, 15:8, 18:23, 18:25, 22:7, 22:8, 24:16, 24:17, 25:1, 26:25, 27:1, 28:8, 28:9, 30:10, 30:11, 32:25, 33:6, 33:14, 33:18, 34:4, 36:19, 36:20, 36:21, 37:23, 37:25, 39:24, 39:25, 41:2, 42:4, 44:5, 44:6, 45:23, 45:24, 47:23, 47:24, 52:18, 52:20, 53:2, 53:11, 62:2, 64:24, 64:25, 66:20, 66:24, 68:19, 69:25, 70:1, 71:22, 71:23, 75:8, 75:14, 76:1, 76:4, 76:5, 76:7, 77:22, 78:4, 78:17, 78:18, 81:24, 82:1, 82:3, 82:14, 84:3, 84:7, 84:13, 84:15, 86:4, 86:11, 86:23, 86:24, 87:14, 87:15, 88:4, 88:5, 90:8, 90:9, 95:13, 95:14, 95:16, 97:24, 97:25, 98:2, 100:15, 100:21, 100:22, 102:13, 102:20, 102:22, 117:19, 119:11
**receiving** [3] - 6:14, 19:10, 52:16
**recent** [2] - 94:21, 112:12
**recently** [1] - 58:19
**recess** [3] - 54:2, 55:14, 120:7
**Recess** [1] - 55:15
**recognize** [10] - 26:9, 27:7, 39:10, 46:12, 46:17, 47:7, 48:21, 50:20, 51:6, 67:13
**recollection** [7] - 7:13, 7:17, 8:12, 54:21, 54:24, 62:24, 106:16
**record** [7] - 40:1, 41:25, 54:19, 86:23, 112:9, 114:7, 116:17
**recordkeeping** [1] - 39:18
**records** [15] - 28:11,

34:9, 38:23, 38:25, 40:5, 59:24, 60:18, 66:12, 113:5, 113:16, 113:24, 114:25, 115:2, 115:3
**redact** [1] - 114:10
**redacted** [9] - 10:5, 107:4, 107:5, 107:7, 108:5, 109:20, 114:4, 114:12, 114:16
**redaction** [1] - 113:25
**redactions** [2] - 113:22, 114:20
**refer** [1] - 65:18
**referenced** [1] - 49:1
**referred** [1] - 90:25
**referring** [1] - 30:24
**refresh** [6] - 7:9, 7:13, 7:17, 41:3, 41:12, 62:23
**refreshed** [2] - 8:12, 59:3
**regard** [1] - 117:11
**regarding** [6] - 7:10, 23:22, 34:5, 57:19, 58:6, 116:7
**regardless** [1] - 53:15
**Registration** [1] - 38:7
**REGNIER** [2] - 3:3, 6:9
**Regnier** [16] - 6:12, 7:5, 7:21, 15:10, 29:9, 38:24, 44:7, 58:16, 62:5, 87:1, 88:6, 111:23, 112:17, 112:25, 117:20, 119:9
**Regnier's** [1] - 112:13
**regular** [1] - 103:2
**regulations** [1] - 121:12
**reimbursement** [1] - 89:15
**rejected** [1] - 112:12
**REJECTED** [3] - 3:10, 4:4, 5:4
**relate** [1] - 77:18
**related** [11] - 40:18, 51:19, 63:19, 63:22, 72:17, 72:18, 72:19, 80:16, 85:7, 91:24, 111:22
**relates** [6] - 6:13, 23:1, 65:21, 73:2, 89:21, 119:18
**relating** [6] - 23:3, 66:12, 76:22, 103:20, 103:23, 113:21
**relation** [1] - 91:20

**UNITED STATES DISTRICT COURT**

**relationship** [5] - 11:3, 11:7, 51:14, 78:5, 85:23
**released** [1] - 82:16
**relevance** [4] - 56:7, 76:2, 109:25, 110:8
**Relevance** [1] - 59:18
**relevant** [2] - 113:1, 113:25
**remaining** [1] - 19:16
**remains** [1] - 16:23
**remember** [12] - 7:24, 8:25, 10:24, 12:6, 17:25, 40:25, 54:3, 55:11, 61:3, 61:5, 61:9, 103:3
**reminding** [1] - 116:7
**remitter** [1] - 27:12, 27:16, 44:25, 45:6, 45:9, 45:11, 45:15, 45:16, 46:10, 46:25, 48:14, 49:7, 50:18, 51:3, 70:10, 72:10
**Remitter** [1] - 45:4
**rent** [11] - 6:13, 6:18, 6:21, 7:11, 8:8, 8:20, 40:17, 53:4, 59:20, 107:18, 109:22
**rep** [1] - 65:8
**repeat** [2] - 100:10, 112:14
**rephrase** [1] - 74:13
**replied** [2] - 100:8, 100:12
**replies** [1] - 101:23
**reply** [5] - 33:3, 82:23, 82:25, 96:4, 101:25
**report** [8] - 7:22, 7:25, 39:13, 96:18, 96:19, 96:20, 96:23, 98:10
**reported** [1] - 121:10
**REPORTER** [4] - 1:24, 29:9, 121:1, 121:6
**Reporter** [1] - 121:20
**REPORTER'S** [1] - 1:14
**representation** [1] - 112:15
**represented** [2] - 111:23, 111:25
**represents** [1] - 68:15
**request** [5] - 32:22, 43:14, 93:8, 101:24, 116:22
**requested** [9] - 16:22, 19:9, 45:3, 46:6, 46:14, 62:18, 85:16, 89:8
**requesting** [1] - 9:2
**require** [1] - 104:7

**required** [1] - 118:23
**requires** [5] - 119:22, 119:23, 120:1, 120:2
**research** [2] - 54:6, 103:6
**resolved** [4] - 23:11, 26:4, 87:6, 87:8
**responding** [1] - 111:1
**responds** [1] - 111:17
**response** [8] - 9:19, 36:8, 37:3, 83:6, 96:3, 97:4, 97:6, 97:12
**responses** [1] - 110:16
**responsibilities** [5] - 11:18, 57:7, 77:2, 77:4, 77:5
**responsible** [4] - 32:2, 43:4, 43:11, 85:10
**rest** [2] - 16:20, 100:21
**restaurant** [1] - 110:4
**restaurants** [1] - 107:22
**resumed** [2] - 3:3, 6:10
**RESUMED** [1] - 6:9
**Retail** [1] - 38:9
**retainer** [1] - 60:25
**review** [3] - 21:13, 62:23, 74:9
**revise** [1] - 22:21
**Ricci** [7] - 68:20, 68:22, 69:6, 69:8, 70:11, 70:18
**Richard** [1] - 101:8
**rise** [3] - 54:8, 103:9, 120:6
**road** [1] - 109:13
**Roads** [1] - 15:18
**roads** [1] - 15:22
**Roasters** [4] - 81:4, 81:5, 84:22, 85:3
**role** [1] - 57:7
**ROOM** [1] - 1:24
**room** [2] - 93:20, 93:23
**Rule** [4] - 105:9, 105:11, 105:15, 105:19
**rule** [8] - 66:12, 100:5, 101:21, 110:17, 115:16, 118:22, 118:24, 119:22
**ruled** [5] - 107:9, 107:10, 110:1, 110:11, 115:4
**ruling** [5] - 15:6, 56:8, 103:20, 108:2,

112:11
**Runkles'** [1] - 101:8

# S

**SACR-19-00061-JVS** [1] - 1:7
**sAGEL** [1] - 33:9
**SAGEL** [117] - 2:5, 6:8, 6:11, 7:3, 7:5, 7:18, 7:21, 8:9, 8:15, 9:21, 10:2, 12:23, 13:2, 13:6, 15:3, 15:9, 18:19, 19:1, 21:4, 22:4, 22:9, 24:13, 24:18, 27:2, 28:4, 28:10, 29:14, 30:7, 30:12, 33:20, 36:14, 36:22, 37:15, 38:1, 39:21, 40:1, 41:5, 41:9, 41:12, 42:14, 43:25, 44:3, 44:7, 45:25, 47:20, 47:25, 52:2, 52:9, 52:16, 52:21, 53:23, 55:18, 56:13, 56:22, 57:13, 58:14, 59:21, 61:23, 62:3, 64:4, 64:21, 65:1, 66:7, 66:15, 66:22, 66:25, 69:22, 70:2, 70:21, 71:19, 71:24, 74:14, 75:23, 76:8, 78:4, 78:11, 78:19, 79:10, 81:22, 82:4, 83:17, 84:10, 84:16, 86:13, 86:17, 86:25, 87:25, 88:6, 90:5, 90:10, 95:10, 95:17, 97:4, 97:21, 98:3, 99:14, 99:19, 100:17, 100:23, 102:9, 102:11, 105:6, 112:18, 112:21, 113:7, 113:9, 113:12, 114:5, 114:23, 115:11, 115:13, 115:20, 115:25, 116:4, 116:19, 117:18, 117:25
**Sagel** [9] - 3:3, 6:7, 55:17, 106:3, 111:3, 112:15, 117:3, 117:17, 118:7
**SANTA** [3] - 1:17, 1:25, 6:1
**Santa** [1] - 2:7
**satisfaction** [2] - 23:12, 26:4
**save** [1] - 116:5

**saw** [1] - 15:14
**screen** [6] - 70:23, 73:10, 106:1, 106:9, 106:23, 109:7
**SE** [1] - 2:14
**se** [3] - 77:5, 106:7, 119:16
**search** [1] - 60:15
**second** [14] - 7:3, 10:4, 10:6, 15:23, 16:16, 23:5, 23:7, 31:25, 52:17, 53:20, 62:20, 65:12, 116:10
**Section** [1] - 121:8
**section** [6] - 28:24, 32:10, 36:24, 68:1, 92:21, 98:24
**see** [45] - 7:8, 13:15, 13:18, 15:22, 17:4, 20:7, 24:20, 28:20, 28:24, 32:9, 34:7, 38:13, 38:18, 40:11, 40:23, 41:2, 47:4, 49:10, 50:16, 50:18, 50:24, 51:1, 52:2, 67:17, 68:5, 68:9, 72:3, 79:1, 79:14, 79:24, 80:12, 80:15, 81:1, 82:8, 89:12, 90:16, 92:18, 92:21, 93:2, 95:19, 100:24, 103:7, 106:25, 107:11
**seeing** [2] - 7:15, 101:10
**seeking** [1] - 117:21
**self** [1] - 106:10
**self-evident** [1] - 106:10
**seller** [1] - 38:11
**seller's** [1] - 38:11
**SELNA** [1] - 1:3
**send** [47] - 13:16, 14:20, 18:10, 19:9, 20:14, 21:1, 23:24, 23:25, 31:9, 31:14, 32:20, 34:15, 42:18, 43:20, 44:19, 45:2, 47:15, 48:15, 63:3, 63:19, 69:16, 77:6, 85:16, 89:8, 89:10, 89:18, 91:17, 91:19, 93:7, 93:8, 94:4, 94:9, 94:10, 94:11, 94:12, 96:19, 96:21, 96:22, 98:23, 99:10, 99:15, 100:1, 100:4, 101:18, 101:19, 101:24
**sending** [24] - 15:17,

19:1, 19:8, 20:21, 20:24, 21:4, 21:16, 22:18, 30:21, 31:6, 31:9, 35:14, 39:5, 44:8, 44:10, 62:5, 62:16, 71:11, 71:14, 74:11, 76:19, 94:7, 98:9, 102:4
**sends** [3] - 22:19, 95:18, 96:7
**sent** [75] - 6:24, 8:6, 9:9, 9:18, 12:21, 14:11, 14:16, 14:25, 17:15, 18:6, 18:16, 22:10, 24:2, 24:6, 24:9, 24:11, 24:19, 25:23, 29:25, 30:5, 32:22, 33:15, 34:13, 35:20, 36:12, 36:25, 43:18, 43:23, 47:12, 47:17, 48:1, 48:9, 52:23, 53:1, 53:13, 60:4, 60:5, 61:17, 61:21, 64:13, 64:17, 64:18, 65:2, 69:13, 69:20, 71:6, 71:16, 72:2, 74:7, 74:8, 75:11, 75:14, 75:20, 80:3, 82:19, 86:10, 86:17, 87:19, 87:23, 88:7, 88:13, 88:14, 89:23, 90:11, 90:16, 94:18, 95:3, 95:15, 96:18, 97:12, 98:12, 99:4, 99:7
**sentence** [1] - 16:17
**sentences** [1] - 19:21
**Serial** [1] - 16:8
**server** [2] - 41:10, 111:3
**serves** [1] - 23:9, 26:2
**services** [1] - 106:3
**set** [5] - 60:8, 66:1, 66:3, 93:19, 111:14
**setting** [1] - 107:21
**settle** [1] - 74:2
**settled** [9] - 17:18, 17:20, 17:21, 17:23, 43:1, 64:5, 64:9, 64:11, 93:9
**Settlement** [3] - 13:12, 13:23, 65:19
**settlement** [56] - 13:21, 17:14, 18:1, 23:11, 23:12, 26:4, 26:5, 29:5, 42:5, 42:8, 42:15, 42:19, 42:20, 43:9, 61:7, 61:10, 62:25, 63:18, 64:3, 64:10, 65:20,

65:22, 65:24, 66:4, 67:4, 67:14, 67:25, 68:16, 68:17, 68:18, 70:16, 71:4, 72:18, 72:20, 73:6, 73:11, 78:22, 79:6, 81:9, 85:2, 85:15, 88:24, 92:4, 92:19, 93:1, 93:6, 99:2, 99:22, 99:24, 101:13, 101:14, 101:20, 102:5, 118:20, 119:11
**seven** [1] - 79:13
**several** [2] - 99:4, 115:4
**shops** [1] - 76:13
**short** [1] - 118:2
**shortly** [1] - 44:23
**show** [4] - 7:13, 7:16, 107:20, 108:3
**showing** [2] - 96:18, 96:20
**shown** [2] - 114:2, 114:13
**shows** [1] - 113:2
**Shved** [4] - 76:10, 76:19, 80:3, 80:8
**sic** [1] - 70:25
**side** [3] - 26:9, 38:17, 78:25
**sign** [1] - 15:19
**signature** [17] - 17:5, 17:7, 17:11, 26:9, 26:11, 27:7, 27:8, 38:17, 38:21, 46:12, 46:13, 46:16, 46:17, 46:19, 48:21, 48:23, 101:9
**signed** [1] - 101:8
**similar** [1] - 99:8
**Simon** [1] - 15:18
**simply** [3] - 33:15, 86:22, 88:3
**single** [2] - 114:11
**sit** [2] - 61:11, 112:10
**site** [1] - 17:1
**situation** [1] - 57:24
**six** [5] - 73:6, 101:3, 101:12, 102:17, 112:18
**skip** [1] - 29:19
**slightly** [3] - 84:21, 89:7, 92:24
**someone** [1] - 114:6
**sometimes** [3] - 23:22, 56:11, 56:14
**somewhere** [1] - 116:9
**soon** [3] - 53:10, 64:4,

116:6
**sorry** [18] - 12:15, 14:10, 24:4, 25:10, 25:25, 26:1, 26:13, 29:11, 32:9, 35:17, 39:13, 53:20, 63:1, 82:19, 93:4, 105:17, 106:19, 109:11
**sort** [1] - 110:2
**sought** [2] - 111:21, 114:19
**SOUTHERN** [1] - 1:2
**Spaan** [1] - 121:20
**SPAAN** [3] - 1:23, 121:5, 121:19
**speaking** [1] - 110:15
**speaks** [1] - 112:9
**specific** [2] - 54:22, 54:24
**specifically** [2] - 107:17, 109:12
**specification** [1] - 38:11
**specification)** [1] - 38:12
**speculating** [1] - 54:25
**speculation** [10] - 7:1, 7:12, 42:10, 54:15, 54:18, 55:5, 63:23, 74:12, 78:2, 83:13
**spent** [2] - 93:6, 110:9
**splash** [2] - 109:6, 109:8
**splashing** [1] - 109:10
**spoken** [1] - 83:22
**Sport** [1] - 106:11
**spousal** [1] - 110:2
**spreadsheet** [1] - 35:6
**spreadsheet-looking** [1] - 35:6
**Spring** [1] - 2:11
**squares** [1] - 107:11
**staff** [4] - 11:15, 11:23, 58:4, 66:16
**Stage** [1] - 58:20
**stamp** [1] - 41:7
**stand** [2] - 27:6, 112:4
**STAND** [1] - 6:9
**STANDBY** [1] - 2:16
**start** [16] - 30:12, 31:22, 33:20, 54:11, 67:2, 70:7, 73:25, 74:2, 74:15, 74:20, 74:21, 95:2, 100:23, 103:16, 116:6
**started** [13] - 11:25, 56:24, 73:21, 73:22, 73:23, 73:24, 73:25, 74:1, 74:10, 74:11,

74:15, 109:12
**starting** [4] - 16:20, 23:7, 28:10, 34:11
**starts** [7] - 16:17, 19:12, 22:23, 23:6, 77:7, 82:5, 95:18
**State** [1] - 28:12
**STATE** [1] - 121:4
**statement** [2] - 28:17, 55:12
**statements** [2] - 55:10, 92:18
**States** [8] - 2:4, 2:5, 2:9, 2:10, 38:7, 121:6, 121:8, 121:13
**STATES** [2] - 1:1, 1:5
**status** [2] - 82:12, 87:3
**stealing** [1] - 109:1
**stenographically** [1] - 121:10
**step** [1] - 76:21
**Stephen** [1] - 72:2
**stepped** [1] - 106:15
**steps** [1] - 117:10
**STEWARD** [2] - 2:17, 2:18
**still** [7] - 20:21, 29:15, 92:18, 93:10, 93:12, 111:11, 114:11
**stop** [4] - 11:6, 77:15, 102:8, 102:10
**stopped** [1] - 106:8
**stores** [1] - 83:8
**Storie** [1] - 87:2
**STREET** [1] - 1:24
**Street** [2] - 2:6, 2:11
**stress** [1] - 58:21
**strike** [4] - 6:25, 17:13, 20:13, 41:23
**structure** [1] - 80:17
**struggling** [2] - 108:25, 110:8
**stuff** [1] - 94:11
**subject** [15] - 13:9, 19:6, 22:9, 30:16, 44:16, 48:6, 62:10, 65:4, 70:2, 71:24, 83:17, 84:16, 86:25, 88:9, 105:9
**submitted** [2] - 54:5, 103:5
**substantial** [2] - 23:13, 26:5, 105:3
**subtracted** [1] - 53:5
**sufficient** [3] - 26:24, 37:24, 66:21
**suggest** [1] - 114:24
**suggesting** [1] - 55:6
**suggests** [1] - 119:20

**Suite** [5] - 2:6, 2:11, 2:19, 20:7, 67:6
**suppliers** [1] - 77:19
**supplies** [1] - 83:8
**support** [1] - 107:18
**supporting** [1] - 37:24
**suppose** [1] - 102:15
**supposed** [6] - 53:3, 53:4, 94:11, 111:9, 119:10, 119:11
**Susan** [2] - 44:10, 48:1
**switch** [1] - 65:9

## T

**talks** [1] - 14:5
**team** [5] - 106:4, 106:7, 106:11, 106:17, 106:20
**telephone** [2] - 10:9, 10:11
**tend** [1] - 76:24
**term** [3] - 23:14, 26:7, 43:2
**terms** [4] - 42:19, 42:21, 64:10, 77:14
**testify** [1] - 102:19
**testifying** [1] - 8:11
**testimony** [4] - 103:22, 106:4, 106:5, 112:16
**text** [11] - 9:9, 9:12, 9:18, 10:2, 52:4, 52:6, 52:17, 52:22, 52:23, 53:2, 53:20
**THE** [156] - 2:3, 2:14, 3:3, 6:6, 6:9, 7:2, 7:16, 7:20, 8:4, 8:5, 8:11, 8:14, 9:25, 13:3, 15:7, 18:23, 21:3, 22:7, 24:16, 26:23, 28:8, 29:9, 29:11, 29:12, 30:10, 33:14, 36:18, 37:22, 37:23, 39:24, 41:6, 41:11, 42:11, 42:12, 44:2, 44:5, 45:23, 47:23, 51:25, 52:1, 52:15, 52:18, 53:25, 54:8, 54:13, 54:17, 55:3, 55:10, 55:17, 56:9, 56:10, 56:20, 56:21, 57:11, 57:12, 58:13, 59:19, 59:20, 62:1, 63:24, 63:25, 64:24, 66:13, 66:20, 66:23, 69:25, 71:22, 74:13, 74:18, 74:19, 76:4, 76:17, 76:18,

78:3, 78:17, 79:8, 79:9, 81:24, 83:14, 83:15, 84:13, 86:18, 86:21, 88:3, 90:8, 95:13, 96:25, 97:1, 97:24, 99:12, 99:13, 99:18, 100:20, 102:8, 102:10, 102:12, 103:9, 103:11, 104:13, 105:2, 105:11, 105:14, 105:18, 105:22, 106:5, 106:7, 106:10, 106:17, 106:20, 106:25, 107:3, 107:10, 108:17, 108:23, 109:8, 109:10, 109:15, 109:19, 109:22, 110:1, 110:11, 110:18, 110:21, 110:23, 111:4, 111:14, 112:6, 112:8, 112:11, 112:20, 113:5, 113:8, 113:10, 113:13, 113:15, 113:22, 114:22, 115:9, 115:12, 115:18, 115:21, 116:3, 116:20, 117:6, 117:8, 117:15, 117:24, 118:1, 118:5, 118:10, 118:15, 119:7, 119:15, 119:23, 120:4, 120:6
**themselves** [1] - 115:4
**thereafter** [1] - 52:11
**therefore** [1] - 112:13
**they've** [1] - 104:6
**thinks** [1] - 108:8
**third** [4] - 16:17, 68:4, 86:17, 116:16
**thirds** [2] - 36:24, 88:22
**thousand** [2] - 77:10, 77:13
**thread** [3] - 34:7, 47:12, 100:7
**three** [1] - 102:17
**throughout** [1] - 22:15
**timeline** [1] - 59:3
**timing** [1] - 119:16
**Title** [1] - 121:8
**title** [5] - 13:11, 13:20, 17:12, 38:2, 67:2
**titled** [1] - 32:10
**today** [16] - 34:6, 35:2,

35:7, 35:8, 70:9, 77:11, 84:17, 92:8, 102:12, 103:21, 108:1, 110:19, 110:24, 112:14, 112:23, 116:3
**today/this** [2] - 77:10, 77:16
**together** [2] - 95:22, 98:5
**Tom** [5] - 51:9, 51:11, 51:15, 51:19, 53:11
**tomorrow** [7] - 53:3, 82:13, 103:2, 116:5, 116:6, 117:21, 117:23
**Tonning** [4] - 82:5, 82:6, 82:10, 82:19
**Tonning's** [1] - 82:23
**took** [2] - 52:11, 102:22
**top** [25] - 13:6, 13:20, 15:23, 25:11, 27:3, 28:10, 28:16, 30:12, 33:20, 37:3, 38:2, 41:1, 46:9, 48:20, 61:3, 62:4, 66:25, 76:8, 78:19, 83:20, 87:4, 95:2, 98:4, 98:8, 101:23
**total** [2] - 62:15, 63:13
**totaling** [1] - 19:14
**towards** [3] - 16:17, 61:7, 61:9
**track** [1] - 106:8
**Tran** [1] - 79:18
**transaction** [3] - 79:19, 80:1, 98:17
**transactions** [1] - 31:19
**TRANSCRIPT** [2] - 1:6, 1:14
**transcript** [3] - 106:14, 121:9, 121:11
**transfer** [8] - 32:1, 32:3, 88:23, 89:12, 89:14, 91:12, 105:3, 106:12
**transferred** [2] - 35:12, 36:5
**transfers** [3] - 34:6, 35:2, 119:16
**transmitted** [1] - 76:6
**treatment** [2] - 59:6, 59:7
**trial** [5] - 103:19, 104:2, 104:4, 114:15
**TRIAL** [1] - 1:8
**tried** [1] - 106:6
**true** [10] - 14:24,

18:15, 18:16, 33:16, 33:17, 71:16, 75:19, 82:2, 86:10, 121:9
**Trust** [4] - 44:14, 47:13, 65:10, 70:11
**trust** [27] - 13:15, 28:13, 30:22, 32:13, 32:16, 32:21, 44:24, 48:6, 48:13, 67:3, 67:14, 70:18, 91:5, 92:9, 92:11, 92:12, 104:21, 108:20, 108:22, 113:6, 113:7, 113:16, 113:24, 118:8, 118:21, 119:3, 119:17
**truth** [17] - 33:15, 36:19, 36:20, 52:10, 75:25, 81:25, 84:14, 95:14, 95:15, 97:25, 98:1, 100:21, 102:13, 102:20, 102:25, 111:11
**try** [2] - 111:22, 115:1
**trying** [4] - 12:6, 57:22, 64:1, 99:22
**TUESDAY** [2] - 1:15, 6:1
**turn** [9] - 6:12, 26:8, 32:7, 35:5, 38:24, 67:25, 70:21, 84:20, 96:6
**turning** [5] - 8:22, 15:23, 63:2, 95:17, 98:8
**two** [13] - 19:14, 19:21, 34:6, 35:1, 36:24, 45:2, 63:10, 88:22, 89:1, 92:24, 102:9, 109:16, 109:17
**Two** [1] - 109:1
**two-thirds** [2] - 36:24, 88:22
**type** [5] - 10:15, 11:17, 23:16, 25:17, 110:3
**typically** [1] - 63:18

**U**

**U.S** [1] - 1:3
**ultimate** [1] - 10:18
**ultimately** [1] - 64:2
**unable** [1] - 56:24
**under** [17] - 13:22, 17:9, 17:11, 20:6, 37:17, 38:18, 46:12, 48:21, 66:23, 84:21, 87:13, 88:16, 89:11,

93:3, 108:15, 116:11
**underneath** [1] - 49:10
**undersigned** [1] - 38:5
**understood** [4] - 110:16, 115:11, 118:4, 119:14
**uninterrupted** [1] - 77:12
**United** [8] - 2:4, 2:5, 2:9, 2:10, 38:7, 121:6, 121:8, 121:13
**UNITED** [2] - 1:1, 1:5
**unless** [3] - 77:5, 101:22, 118:16
**unpaid** [3] - 88:10, 88:11, 88:12
**up** [32] - 7:23, 10:4, 10:22, 11:3, 22:21, 23:16, 25:17, 31:17, 34:11, 46:9, 48:12, 53:15, 54:13, 60:8, 66:1, 66:3, 70:13, 72:9, 76:13, 78:3, 85:1, 92:3, 93:19, 94:11, 95:23, 106:1, 108:1, 114:14, 115:15, 116:4, 118:2, 118:18
**update** [1] - 87:3
**updates** [3] - 20:21, 21:5, 55:20
**upper** [1] - 67:10
**US** [1] - 80:14
**UTC** [2] - 9:16, 25:14

**V**

**value** [2] - 110:4, 113:20
**vendors** [2] - 81:8, 85:11
**verified** [1] - 42:17
**verify** [1] - 25:1
**version** [2] - 41:9, 74:11
**VI** [1] - 66:19
**VII** [2] - 66:13, 66:19
**villas** [2] - 106:23, 107:1
**violence** [2] - 116:10, 117:4
**Vitaliy** [4] - 76:10, 76:19, 80:3, 80:8
**Volume** [8] - 12:12, 24:4, 37:13, 39:6, 61:15, 66:19, 69:10
**VOLUME** [1] - 1:9
**volume** [1] - 66:13

**vs** [1] - 1:7

**W**

**wants** [5] - 7:13, 22:20, 31:9, 114:12, 115:7
**warrant** [1] - 60:16
**Washington** [1] - 76:14
**wasting** [1] - 115:8
**wealth** [2] - 103:20, 107:23
**Wednesday** [1] - 77:13
**week** [2] - 77:10, 77:16
**weeks** [2] - 93:18, 111:21
**welcome** [1] - 113:25
**West** [1] - 2:6
**WEST** [1] - 1:24
**White** [1] - 53:9
**Whiteside** [14] - 14:1, 14:2, 14:3, 29:20, 44:25, 45:4, 45:15, 46:11, 47:1, 48:14, 49:8, 50:18, 51:4
**whole** [2] - 112:25, 113:18
**wife** [4] - 86:1, 102:17, 106:1, 109:24
**William** [3] - 16:15, 19:2, 19:8
**wind** [1] - 53:15
**wire** [57] - 19:7, 19:23, 19:25, 20:3, 20:11, 29:17, 29:18, 30:17, 30:19, 30:22, 31:6, 31:9, 31:11, 31:24, 32:2, 32:12, 34:6, 35:1, 35:6, 35:8, 65:5, 65:12, 68:5, 68:7, 68:12, 68:14, 77:6, 80:6, 80:11, 80:21, 80:25, 82:14, 84:17, 84:22, 88:19, 88:23, 89:2, 89:3, 89:11, 89:14, 90:13, 91:5, 91:8, 91:12, 94:14, 95:24, 96:1, 96:11, 96:18, 96:21, 98:6, 98:9, 98:12, 98:17, 98:21, 104:17, 105:7
**Wire** [1] - 83:18
**wired** [2] - 31:16, 98:19
**wires** [15] - 31:16, 78:22, 84:21, 85:1,

85:3, 85:5, 85:7, 85:10, 89:1, 89:19, 89:21, 92:3, 92:6, 99:5, 99:7
**wish** [2] - 7:16, 119:8
**WITHDRAWN** [3] - 3:9, 4:3, 5:3
**withdrawn** [1] - 118:21
**WITNESS** [18] - 6:9, 8:5, 8:14, 29:11, 37:22, 42:12, 52:1, 56:10, 56:21, 57:12, 59:20, 63:25, 74:19, 76:18, 79:9, 83:15, 97:1, 99:13
**witness** [7] - 8:11, 54:20, 54:23, 111:24, 112:4, 116:11, 116:22
**witnesses** [1] - 117:22
**WITNESSES** [1] - 3:2
**word** [6] - 63:15, 89:21, 101:10, 114:11
**world** [1] - 107:21
**worse** [4] - 56:14, 56:18, 56:23, 59:10
**wreaks** [1] - 107:19
**write** [6] - 15:21, 19:19, 20:16, 62:14, 82:10, 98:12
**writes** [2] - 13:13, 33:25
**writing** [2] - 50:22, 51:5
**written** [4] - 16:1, 46:16, 47:4, 92:22
**wrote** [2] - 81:16, 81:20
**WYMAN** [1] - 2:10

**X**

**X-Law** [25] - 11:3, 11:10, 11:11, 11:13, 11:23, 11:25, 12:8, 30:23, 31:7, 31:14, 31:24, 35:8, 35:12, 35:15, 35:18, 36:5, 51:12, 51:15, 91:1, 91:7, 91:9, 91:13, 91:17, 91:21, 91:25

**Y**

**year** [6] - 53:5, 58:25, 59:5, 59:8, 68:9, 87:17
**year's** [1] - 40:17

**Yin** [1] - 88:15
**Yin's** [1] - 88:16
**yourself** [1] - 110:25

## Z

**zero** [5] - 32:14, 32:18, 68:3, 118:9, 119:3

UNITED STATES DISTRICT COURT