1    **UNITED STATES DISTRICT COURT**

2    **CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

3    **HONORABLE JAMES V. SELNA, U.S. DISTRICT JUDGE**

4

5    UNITED STATES OF AMERICA,              )
                                            )
6                    Plaintiff,             )    <u>**CERTIFIED TRANSCRIPT**</u>
                                            )
7          vs.                              )    Case No.
                                            )    SACR-19-00061-JVS
8    MICHAEL JOHN AVENATTI,                 )
                                            )    **TRIAL DAY 10**
9                    Defendant.             )    **VOLUME 2**
                                            )

10

11

12

13

14

15                   REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                     WEDNESDAY, JULY 28, 2021

17                            1:32 P.M.

18                      SANTA ANA, CALIFORNIA

19

20

21

22

23   ────────────────────────────────────────────────────────

24               **DEBBIE HINO-SPAAN, CSR 7953, CRR**
                  FEDERAL OFFICIAL COURT REPORTER
25               411 WEST 4TH STREET, ROOM 1-053
                     SANTA ANA, CA 92701
                     dhinospaan@yahoo.com

**UNITED STATES DISTRICT COURT**

1                        **APPEARANCES OF COUNSEL:**

2

3      **FOR THE PLAINTIFF:**

4              NICOLA T. HANNA
               United States Attorney
5              BY:  BRETT SAGEL
                   Assistant United States Attorney
6              411 West 4th Street
               Suite 8000
7              Santa Ana, California 92701
               714-338-3598
8              brett.sagel@usdoj.gov

9              NICOLA T. HANNA
               United States Attorney
10             BY:  ALEXANDER WYMAN
                   Assistant United States Attorney
11             312 North Spring Street
               Suite 1100
12             Los Angeles, California 90012
               213-894-2435
13             alex.wyman@usdoj.gov

14     **FOR THE DEFENDANT IN PRO SE:**

15             MICHAEL JOHN AVENATTI, ESQ.

16

       **STANDBY COUNSEL FOR MR. AVENATTI:**
17
               H. DEAN STEWARD LAW OFFICES
18             BY:  H. DEAN STEWARD, ESQ.
               17 Corporate Plaza
19             Suite 254
               Newport Beach, California 92660
20             949-481-4900
               deansteward7777@gmail.com
21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1        **I N D E X**

2    **WITNESSES**                                                    **PAGE**

3    **JUDY REGNIER, CALLED BY THE GOVERNMENT**
         Cross-Examination by Mr. Avenatti (resumed)              4

4

5

6

7

8

9

10

11

12

13                              **EXHIBITS**

14                          (None offered.)

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

|    |    |
|----|----|
|    | 1 |

```
 1              SANTA ANA, CALIFORNIA; WEDNESDAY, JULY 28, 2021

 2                            1:32 P.M.

 3                             - - -

 4

 5              (In the presence of the jury.)

 6              THE COURT:  Good afternoon, ladies and gentlemen.

 7              Mr. Avenatti.

 8              MR. AVENATTI:  Thank you, Your Honor.

 9         JUDY REGNIER, WITNESS, RESUMED THE STAND

10                       CROSS-EXAMINATION

11   BY MR. AVENATTI:

12   Q    Ms. Regnier, during the break Mr. Steward reminded me I

13   neglected to ask a question.  When the raid was conducted on

14   your home, what time was it?

15   A    It was in the morning, I'd say around 9:00 a.m.  I'm not

16   exactly sure.

17   Q    Can you see this on the flip chart, I've written "JR plus

18   gov."  Do you see that?

19   A    Yes.

20   Q    Okay.  And I think we established that the first time you

21   met with the Government was on March 25 of '19; right?

22   A    Yes.

23   Q    And then you had contact with the Government on March 26

24   of 2019; right?

25   A    Yes.
```

1    Q    And then on April 9th, 2019, you got your devices back;

2    right?

3              MR. SAGEL:  Objection, Your Honor.  All of these

4    have been asked and answered already.

01:33PM 5          THE COURT:  Sustained.

6              MR. SAGEL:  These could have been done during the

7    break, Your Honor.  I would ask that he ask a question of the

8    witness.

9              THE COURT:  Mr. Avenatti, ask a question, please.

01:33PM 10          MR. AVENATTI:  Sure, Your Honor.

11             THE COURT:  Now.

12   Q    BY MR. AVENATTI:  On November 19, 2019, Ms. Regnier,

13   isn't it true that you told the Government that you knew the

14   Johnson case had settled because I told the employees of the

01:34PM 15  law firm?

16   A    Yes.

17   Q    And you also told the Government that I may have done a

18   press release at that time; right?

19   A    Yes, I believe I said so.

01:34PM 20  Q    Did you also tell the Government on that date that I

21   occasionally worked on cases where no one else at EA knew what

22   the details of the case was?

23   A    Yes, I did.

24   Q    And that was because it was my law firm; right?

01:34PM 25  A    It's because that's what you did, yes.

          1   Q    Did you also tell the Government that the cost incurred

          2   by Eagan Avenatti for the Johnson case were extensive because

          3   Eagan Avenatti covered Mr. Johnson's living expenses?

          4   A    Yes.

01:35PM   5   Q    Did you also tell the Government in that meeting that I

          6   had visited Mr. Johnson quite often?

          7             MR. SAGEL:  Objection.  Calls for hearsay.  He's not

          8   asking her these questions now, he's asking from previous

          9   interviews, which is improper, Your Honor.

01:35PM  10             THE COURT:  Overruled.

         11             THE WITNESS:  Yes, I believe I did.

         12   Q    BY MR. AVENATTI:  Did you also inform Mr. Sagel on that

         13   date, November 19th, 2019, that you did not know what agreement

         14   I, Mr. Johnson, and Mr. Johnson's family had with each other?

01:35PM  15   A    Yes, I did.

         16   Q    Did you inform the Government on that date that I did not

         17   have you create any false documents in any matter relating to

         18   Mr. Johnson?

         19   A    If it's -- unless I'm sure I did, I don't actually recall

01:36PM  20   what I said at that matter.

         21   Q    Well, I'll refresh your recollection, if you don't mind,

         22   or we'll try to refresh your recollection.  I think you have

         23   the notes for November 19th, 2019, in front of you, and I

         24   direct your attention to paragraph 21.

01:36PM  25   A    Okay.  That refreshes my recollection.

```
 1  Q    So isn't it true that on that date, you told the
 2  Government that I did not have you create false documents in
 3  any matter related to Mr. Johnson?
 4  A    I believe I told him I did not have you -- have me make
 5  any false documents as it related to what happened to the
 6  events of that day.
 7  Q    Ms. Regnier, isn't it true that on November 19, 2019, you
 8  informed Mr. Sagel and his colleagues that I did not have you
 9  create false documents in any matter related to Johnson?
10  A    I don't doubt that I said something like that, if that's
11  what the notes say.
12  Q    You also told the Government on that day that Mr. Johnson
13  never asked you for a copy of the settlement agreement; isn't
14  that true?
15  A    That's correct.
16  Q    And you also told the Government that as far as you knew,
17  there was no reason for Johnson not to get a copy of the
18  settlement agreement?
19  A    Correct.
20  Q    You were also asked during that meeting about Mr. Barela.
21  Do you recall that generally?
22  A    Generally.
23  Q    And you told the Government that Eagan Avenatti was
24  supposed to get the entire amount of their attorneys' fees from
25  the initial settlement payment; isn't that true?
```

1    A    I probably did.  I don't recall.

2    Q    Take a look at paragraph 42 and see if that refreshes

3    your recollection, please.

4    A    Okay.

01:39PM 5    Q    Does that refresh your recollection that in November of

6    2019, you told Mr. Sagel and his colleagues that Eagan Avenatti

7    was supposed to get the entire amount of the attorneys' fees

8    from the initial settlement payment?

9    A    Yes.  I told him I believed we were -- or Eagan Avenatti

01:39PM 10   was supposed to get the entire amount.

11   Q    And yet you also tell the Government on that day that the

12   firm had helped Mr. Barela with a civil lawsuit in San Diego.

13   A    Yes.

14   Q    And that was separate from the Brock case that you

01:40PM 15   testified to on direct; correct?

16   A    Yes.

17   Q    Those are two different matters?

18   A    Two different matters.

19   Q    Did you also inform the Government at that time that me

01:40PM 20   and Mr. Barela were in touch weekly and that I assisted

21   Mr. Barela quite often?

22   A    I said that you guys were in touch a lot and that, yes,

23   you were working on things together.

24   Q    And that I assisted Mr. Barela quite often?

01:40PM 25   A    That may have been my exact words.  I'm not sure at this

1    point.

2    Q    Take a look at paragraph 55 and see if that refreshes --

3    A    I don't doubt that I may have said those words.  I can

4    tell you I don't recall at this point.

01:40PM 5    Q    Did you also tell the Government on that date that you

6    did not know what me and Mr. Barela were working on?

7    A    Yes, I said that you had projects going that I did not

8    know what they were.  Yes.

9    Q    And, Ms. Regnier, didn't you also tell Mr. Sagel, Special

01:41PM 10   Agent Carlos, and Special Agent Roberson on November 19, 2019,

11   that I never instructed you or anyone else, as far as you knew,

12   to ignore Mr. Barela?

13   A    Yes.

14   Q    Didn't you also inform the Government on that same day

01:41PM 15   that you did not recall me asking you to fabricate financial

16   documents for any bank loans?

17   A    Yes.

18   Q    Your next meeting with the Government took place on or

19   about November 26, 2019.  Do you recall that?

01:42PM 20   A    I recall meeting with them.  Don't recall the exact date.

21          MR. SAGEL:  Your Honor, this was briefed in the

22   Government's trial brief.  If he wants to pursue it, he can,

23   but he knows he's opening the door.

24          MR. AVENATTI:  I respectfully disagree, Your Honor.

01:42PM 25          THE COURT:  You may proceed.

|   |   |
|---|---|
| 1 | MR. AVENATTI:  May I approach, Your Honor? |
| 2 | THE COURT:  For what purpose? |
| 3 | MR. AVENATTI:  Well, let me ask this foundational |
| 4 | question. |
| 01:43PM 5 | Q    You don't remember the exact date that you met with the |
| 6 | Government late November of 2019; is that right? |
| 7 | A    Correct. |
| 8 | MR. AVENATTI:  Can I approach, Your Honor? |
| 9 | THE COURT:  You may. |
| 01:43PM 10 | Q    BY MR. AVENATTI:  Ms. Regnier, my question is very |
| 11 | simple.  Taking a look at the top of this document in the first |
| 12 | paragraph -- |
| 13 | THE COURT:  Well, first of all, the next question |
| 14 | ought to be is her recollection refreshed, and then you |
| 01:44PM 15 | proceed. |
| 16 | MR. AVENATTI:  Thank you, Your Honor. |
| 17 | Q    Ms. Regnier, is your recollection refreshed? |
| 18 | A    I admit that I -- |
| 19 | THE COURT:  No.  No.  No.  Answer that question, |
| 01:44PM 20 | please. |
| 21 | THE WITNESS:  It does not refresh my memory as to |
| 22 | the date. |
| 23 | Q    BY MR. AVENATTI:  Do you dispute that you met with |
| 24 | Mr. Sagel and Mr. Carlos, among others, on November 26, 2019? |
| 01:44PM 25 | A    No, I do not. |

```
 1   Q    Do you recall leaving a voicemail for Mr. Sagel on or
 2   about December 16, 2019?
 3              MR. SAGEL:  Objection.  Relevance, Your Honor.
 4              THE COURT:  Overruled.
01:45PM  5     MR. SAGEL:  And it -- Fifth Amendment rights,
 6   Your Honor.  It goes to her Fifth Amendment rights, Your Honor.
 7              MR. AVENATTI:  It's just a yes-or-no question,
 8   Your Honor.  I'm not getting into content yet.
 9              THE WITNESS:  I don't recall the date.  I could have
01:45PM 10   very well left one.
11   Q    BY MR. AVENATTI:  Do you have a general recollection of
12   leaving a voicemail for Mr. Sagel in late 2019?  That's just a
13   yes-or-no question.
14   A    I'm not sure if I did or not.  I don't know the content.
01:46PM 15     MR. AVENATTI:  Your Honor, may I approach?
16              THE COURT:  You may.
17   Q    BY MR. AVENATTI:  Ms. Regnier, I've shown you a document
18   that's Bates-stamped USAO01141811.  Does that refresh your
19   recollection?
01:47PM 20   A    Like I said, I very well could have left one.  I don't
21   recall the --
22              THE COURT:  No.  No.  Please answer the question.
23   Does it refresh your recollection?
24              THE WITNESS:  Not really, no.
01:47PM 25   Q    BY MR. AVENATTI:  Do you have any reason to dispute that
```

1    you left a voicemail on or about that date?

2    A      No.

3    Q      Ms. Regnier, do you have a recollection of having a

4    meeting with Mr. Sagel on the phone on or about January 9th of

01:48PM 5    2020?

6    A      I'm sure I did.  I don't have a calendar in front of me to

7    see the dates.  But I met with him several times.  So yes.

8    Q      Do you have a recollection of having another meeting with

9    a phone call with Mr. Sagel on or about February 4 of 2020?

01:48PM 10   A      I'm sure I did.  I don't have an independent recollection

11   of the dates.

12             MR. AVENATTI:  Can I approach, Your Honor?

13             THE COURT:  You may.

14   Q      BY MR. AVENATTI:  Do you have the document, Ms. Regnier?

01:49PM 15   A      Yes.

16   Q      Does this refresh your recollection that on or about

17   February 4, 2020, you had a meeting and a call where Mr. Sagel

18   was present?

19   A      Like I said, yes, I recall having a meeting with

01:49PM 20   Mr. Sagel.  I don't recall the date.

21   Q      Does this refresh your recollection?

22   A      Not as to the date, no.

23   Q      Okay.  Do you dispute that you had a call with Mr. Sagel

24   and a meeting with others on that day?

01:50PM 25   A      No.

1    Q    Do you have a recollection that you then had a meeting

2    with individuals from the Government, including Mr. Sagel's

3    former colleague, Mr. Andre, on February 5th, 2020?

4    A    I don't recall the date, but I don't dispute the date.

01:50PM  5         MR. AVENATTI:  Can I approach, Your Honor?

6              THE COURT:  You may.

7              MR. SAGEL:  We'll, speed it up.  Maybe he can

8    provide her with each of the copies he's going to and then we

9    can stipulate to the dates, Your Honor.

01:51PM 10   Q    BY MR. AVENATTI:  Ms. Regnier, does this document refresh

11   your recollection that on February 5th, 2020, you had a meeting

12   with individuals from the Government, including Mr. Julian

13   Andre from Mr. Sagel's office?

14   A    As I said, I don't recall the date.  I don't dispute the

01:51PM 15   date.  I do recall meeting with him.

16   Q    And then on or about March 15th, 2021, you received a

17   letter from Mr. Dean Steward; correct?

18   A    2021 -- oh, yes.  I believe so.

19   Q    And he stated that he'd like to speak with you and that

01:52PM 20   he represented me; isn't that true?

21   A    Yes.

22   Q    Did you respond to Mr. Steward?

23   A    No.  I had counsel, and he was aware of that.

24   Q    So you did not respond to Mr. Steward?

01:52PM 25   A    No.

```
 1   Q    But you did promptly send the letter to Mr. Sagel;
 2   correct?
 3   A    Yes, I did.
 4   Q    And you sent an e-mail to Mr. Sagel, Mr. Andre, and
 5   Mr. Carlos, and you stated that you had received the attached
 6   correspondence --
 7            THE COURT:  Mr. Avenatti, we're not going to get
 8   into the content of an exhibit until it's received, or a
 9   document.
10   Q    BY MR. AVENATTI:  Ms. Regnier, did you inform the
11   U.S. Attorney's Office in March of 2021 that you would not be
12   contacting Mr. Steward and you had no intention of doing so?
13   A    Correct.  Because I was represented by counsel.
14   Q    When did you start being represented by counsel?
15   A    I've been being represented by counsel since 2019, I
16   believe, when the lawsuit started being filed.
17   Q    I'm sorry, how long have you been represented by
18   counsel -- strike that.
19            Your lawyer is here today, Mr. Barton; correct?
20   A    Yes.
21   Q    Okay.
22            MR. SAGEL:  403, Your Honor.
23   Q    BY MR. AVENATTI:  How long have you -- how long have you
24   been represented by Mr. Barton in this case?
25            MR. SAGEL:  Objection.  403, Your Honor.
```

```
 1              THE COURT:  Sustained.

 2    Q    BY MR. AVENATTI:  Then you met with the Government for

 3    about five hours on June 14, 2021; is that correct?

 4    A    Yes.

 5    Q    And that was via Webex videoconference.  Do you remember

 6    that?

 7    A    Yes.

 8    Q    And you were present, your attorney was present, Special

 9    Agent Carlos was present, Special Agent Roberson was present.

10    And Mr. Sagel and Mr. Wyman, they were all present; is that

11    right?

12    A    Yes, I believe so.

13    Q    And at the beginning of that meeting the Government

14    reminded you that it was important for you to tell the truth

15    when communicating with them; right?

16    A    I believe so, yes.

17              MR. AVENATTI:  Your Honor, one moment.

18              (Pause in proceedings.)

19              MR. AVENATTI:  Thank you, Your Honor.

20    Q    And during this meeting on June 14, 2021, you were asked

21    about Exhibit 281.  Go ahead and turn to 281.

22              And, Joe, maybe we can put it up for the jury,

23    please.

24    A    Okay.

25    Q    Do you have 281, Ms. Regnier?
```

01:54PM  5
01:55PM 10
01:56PM 15
01:57PM 20
01:58PM 25

```
  1   A     Yes, I do.
  2   Q     And do you recall that this is one of the documents that
  3   Mr. Sagel was asking you about earlier today, this morning?  Do
  4   you recall that?
01:58PM  5   A     Yes.
  6               MR. AVENATTI:  And why don't we blow up the bottom
  7   portion, please.
  8   Q     Do you see that, Ms. Regnier?
  9   A     Yes.
01:59PM 10   Q     And that's an e-mail that you sent to Mr. Long Tran on
 11   what date?
 12   A     May 1st, 2018.
 13   Q     And you were asked about this e-mail on this date,
 14   June 14, 2021, weren't you?
01:59PM 15   A     Okay.  I don't dispute that.
 16   Q     And you told the Government that I had used your computer
 17   to send this e-mail, didn't you?
 18   A     I told the Government that I --
 19   Q     Yes or no, did you tell the Government that I had used
02:00PM 20   your computer to send this e-mail?  Yes or no?
 21   A     I can't answer that.
 22   Q     Isn't it true that you told the Government on this date
 23   that occasionally I would use your computer to type up an
 24   e-mail and then say, "Send this"?
02:00PM 25   A     Yes.
```

**UNITED STATES DISTRICT COURT**

```
         1   Q    Do you dispute that you told the Government on that date
         2   that I may have used your computer to send this e-mail?
         3   A    I told the Government --
         4   Q    Do you dispute that, Ms. Regnier?
02:00PM  5   A    That is not the exact statement I made.
         6   Q    So if it's in the Government's notes, the notes are
         7   wrong?
         8   A    No.
         9   Q    Well, let me show you a document.  We'll see if it
02:01PM 10   refreshes your recollection.
        11        MR. AVENATTI:  May I approach, Your Honor?
        12        THE COURT:  You may.
        13   Q    BY MR. AVENATTI:  Ms. Regnier, I'd like to direct your
        14   attention to paragraph 77 of the document.  And then I'm going
02:01PM 15   to ask you a question.
        16        THE COURT:  First you need to ask whether it
        17   refreshes her recollection.
        18        MR. AVENATTI:  That's going to be the first
        19   question, Your Honor.
02:02PM 20   Q    Page 11 of 13, Ms. Regnier, paragraph 77.
        21   A    Yes.
        22   Q    Does that refresh your recollection that you told the
        23   Government on this date that I may have used your computer and
        24   e-mail to send this e-mail?
02:02PM 25   A    Yes.  I said you may have.
```

```
 1    Q    And you told the Government that you were not comfortable
 2    with me doing this, but once the e-mail was sent, it was too
 3    late for you to do anything.  That's what you told the
 4    Government; right?
 5    A    Yes.  I was referring to all --
 6    Q    Ms. Regnier, is that what you told the Government?
 7    A    Yes.
 8    Q    Just answer my question, please.
 9    A    Yes.
10    Q    Okay.  And you also told the Government that you never
11    told the person who was sent the e-mail that the e-mail was
12    prepared and sent by me, not you.  That's what you told the
13    Government; right?
14    A    Yes, I did.
15    Q    You next communicated with the Government about this case
16    on July 6, 2021; correct?
17    A    Yes.
18    Q    And that was for about three hours; am I right?
19    A    Yes.
20    Q    Then two days later, on July 8, 2021, you had another
21    meeting with the Government that lasted over three hours with
22    Mr. -- Special Agent Roberson, Special Agent Carlos --
23            MR. SAGEL:  Objection.  403.  She met with the
24    Government, Your Honor.  I don't know why we need to name
25    everybody.
```

```
 1              THE COURT:  Overruled.
 2    Q    BY MR. AVENATTI:  Special Agent Carlos, Special
 3    Agent Kim, Special Agent Sagel -- I'm sorry, AUSA Sagel and
 4    AUSA Wyman; right?
 5    A    Yes.
 6    Q    And that was another meeting that was over three hours on
 7    July 8th; am I right?
 8    A    Yes.
 9    Q    And during that meeting you informed the Government that
10    because of your unfortunate medical condition and what you had
11    been through that your memory may be affected; is that right?
12    A    I don't know if it was during that meeting or a prior
13    meeting.  But, yes, I did inform them of that.
14    Q    And then on July 19, 2021, you had another meeting with
15    the Government, with Special Agent Roberson, Special
16    Agent Carlos, and both Assistant U.S. Attorneys Sagel and
17    Wyman, on the 19th of July; is that right?
18    A    Yes.
19    Q    Meeting lasted about 40 minutes?
20    A    Probably, yes.
21    Q    And then on July 22nd, 2021, you had a call with Special
22    Agent Roberson, Special Agent Carlos and AUSA Brett Sagel that
23    lasted 13 minutes.  Do you recall that?
24    A    Yes.
25    Q    Was that the last call or meeting you had with the
```

1    Government before you testified here today?

2    A    Yes, I believe so.

3    Q    And during that call, Assistant U.S. Attorney Sagel

4    informed you that I was going to represent myself at trial;

02:07PM 5    right?

6    A    Yes.

7    Q    He informed you that you may have to testify; right?

8    A    Yes.

9    Q    And you didn't have any questions for him during that

02:07PM 10   call; is that right?

11   A    Correct.

12   Q    What happened during the other 12 minutes of the call?

13   A    That was it.  I mean, I think there were maybe some

14   statistical type -- like when I was supposed to be here or

02:07PM 15   something.  But other than that, there was nothing on that

16   call.

17   Q    Well, the call lasted about 13 minutes.  We established

18   that; right?

19   A    Yes.

02:08PM 20   Q    "Ms. Regnier, Mr. Avenatti is going to represent himself.

21   You may have to testify at trial."

22            MR. SAGEL:  These are asked and answered now,

23   Your Honor.

24            THE COURT:  Sustained.

02:08PM 25   Q    BY MR. AVENATTI:  That takes about --

**UNITED STATES DISTRICT COURT**

```
 1                    THE COURT:  Sustained.
 2   Q    BY MR. AVENATTI:  -- 30 seconds; right?
 3                    MR. SAGEL:  I think the question -- the objection
 4   was sustained, Your Honor?
02:08PM 5              THE COURT:  Sustained.
 6   Q    BY MR. AVENATTI:  You don't recall -- well, strike that.
 7                    This call just took place on the 22nd of July;
 8   right?
 9   A    Yes.
02:08PM 10  Q    You don't recall anything else that was said beyond what
11   we just covered?
12                    MR. SAGEL:  Asked and answered.
13                    THE COURT:  Sustained.
14   Q    BY MR. AVENATTI:  Before you took the stand yesterday,
02:08PM 15  you had a pretty good idea what questions Mr. Sagel was going
16   to ask you, didn't you?
17   A    Fairly decent, yes.
18   Q    And is that because you had reviewed the questions with
19   him before you took the stand?
02:09PM 20  A    Yes.  We reviewed the -- yeah.  The content of my
21   testimony, yes.
22   Q    You never did that with me or Mr. Steward, did you?
23   A    No.
24   Q    I want to go over a number of the exhibits that you were
02:09PM 25  asked about by Mr. Sagel.  Let's start with Exhibit 21, please.
```

UNITED STATES DISTRICT COURT

1          Joe, maybe you can bring that up for the jury.  Joe,

2     if we could please blow that up.

3          And, Ms. Regnier, I'm going to do my best to go in

4     the same order that you were asked about the exhibits yesterday

02:10PM 5     by Mr. Sagel.  If at some point in time I get it wrong or --

6     please let me know.  It's not meant to confuse you, okay?

7     A    Okay.

8     Q    All right.  You recall that you were asked about

9     Exhibit 21 by Mr. Sagel?

02:11PM 10    A    Yes.

11    Q    And you were asked about this statement in the e-mail at

12    the bottom:

13         "That call contact with Geoff or the family

14         regarding mediation, settlement, et cetera, will be

02:11PM 15         handled by Judy or me"; is that right?

16    A    Yes.

17    Q    Okay.  It doesn't say it's going to be only handled by

18    me, does it?

19    A    No.

02:11PM 20    Q    And do you have a recollection that at around the time of

21    this date, that Mr. Johnson's father was trying to get his

22    hands on about $70,000 of Mr. Johnson's money?  Do you have a

23    recollection of that?

24    A    No.  I don't recall that.

02:11PM 25    Q    Do you have a recollection of Mr. Johnson or other family

```
         1   members attempting to get money from Mr. Johnson's settlement?

         2   A    No.  I don't recall that.

         3   Q    Are you claiming it never happened?

         4   A    No, I'm not --

02:12PM  5               MR. SAGEL:  Objection.  Asked and answered.

         6               THE COURT:  Overruled.

         7   Q    BY MR. AVENATTI:  Please take a look at Exhibit 41.

         8   A    Okay.

         9   Q    The check from Los Angeles County, do you see that?

02:12PM 10   A    Yes, I do.

        11   Q    Now, Mr. Sagel asked you a number of questions about this

        12   check, didn't he?

        13   A    Yes.  A few, yeah.

        14   Q    And do you have a recollection that he asked you about

02:13PM 15   the $1.6 million that was withdrawn from the account that this

        16   check was deposited into almost immediately?

        17   A    Yes, I do.

        18   Q    Ms. Regnier, isn't it true that when there is a fixed

        19   attorney fee in connection with a particular settlement check,

02:13PM 20   that that fee is required to be deducted immediately from the

        21   trust account?

        22               MR. SAGEL:  Objection.  Foundation and misstates the

        23   law, and calls for a legal conclusion.

        24               THE COURT:  Sustained.

02:13PM 25   Q    BY MR. AVENATTI:  Ms. Regnier, are you aware of anything
```

```
 1   improper about having $1.6 million deducted from this amount
 2   almost immediately after it was received?
 3   A    I don't know.
 4   Q    My question is a little different.  As you sit there
 5   today, are you aware of anything improper with what was done
 6   relating to the deduction of the $1.6 million?
 7           MR. SAGEL:  Asked and answered, Your Honor.
 8           THE COURT:  Sustained.
 9   Q    BY MR. AVENATTI:  Please go to Exhibit 391.
10   A    Okay.
11           MR. AVENATTI:  And why don't we blow up the portion
12   of this document that says "previous balance, zero."
13   Q    Do you remember Mr. Sagel asked you about this exhibit
14   and about the previous balance being zero?
15   A    Yes.
16   Q    This is a statement from a trust account; correct?
17   A    Yes, it is.
18   Q    Was the firm holding any funds in trust for any other
19   clients as of this date, that you're aware of?
20   A    Not in this account they weren't.
21   Q    And that is why the balance is zero; correct?
22   A    Yes.
23   Q    You were also asked --
24           MR. AVENATTI:  Joe, if we can get the portion
25   immediately below that, the "charges/debits."
```

1    Q    You were asked about this payment of $1,600,000.  Do you

2    see that?

3    A    Yes, I do.

4    Q    And you testified that that was your -- it was your

02:16PM 5    understanding that that was the fee from this particular

6    settlement; right?

7    A    Correct.

8    Q    Not the costs, the fee; right?

9    A    Correct.

02:16PM 10   Q    You were then asked about some payments that occurred on

11   Exhibit 44.  Go ahead and take a look at that.

12          And, Joe, maybe we can just show the amounts without

13   the payees.  Exhibit 44.  Sorry.  Second page, Joe.  Maybe the

14   payment type and the status and the amount.

02:18PM 15          Do you remember that Mr. Sagel asked you a number of

16   questions about these payments?

17   A    Yes.

18   Q    These payments came out of the $1.6 million attorney fee,

19   didn't they?

02:18PM 20          MR. SAGEL:  Calls for speculation.  Foundation,

21   Your Honor.

22          THE COURT:  Overruled.

23          THE WITNESS:  I'm not sure -- I don't see an account

24   number on here to --

02:19PM 25   Q    BY MR. AVENATTI:  Well, do you see the date of the

```
 1   payments, each one of these payments?  The first one's on

 2   January 30th; correct?

 3   A    Correct.

 4   Q    The second one's on January 30th; correct?

 5   A    Correct.

 6   Q    The third, the fourth, the fifth, the sixth are all on

 7   January 30th; right?

 8   A    Yes.  But they're not all drawn from the same accounts.

 9   Q    I understand that, Ms. Regnier.  Mr. Sagel asked you some

10   very specific questions about these payments and where they had

11   come from, the funds that they had originated from.

12           THE COURT:  Sir, let's have a question.

13   Q    BY MR. AVENATTI:  My question is this, Ms. Regnier:  Do

14   you have any evidence whatsoever at all that a single one of

15   these payments came from stolen monies from Geoff Johnson's

16   settlement?

17   A    I'm sorry.  I don't -- I can't answer that.  I don't

18   understand the question.

19   Q    Are you aware of any evidence that suggests to you that

20   any one of these payments came from monies that were stolen

21   from Geoff Johnson's settlement?

22   A    I can't answer that.  I'm sorry.  I don't know.

23   Q    As you sit there today, you're aware of no such evidence;

24   right?

25           MR. SAGEL:  Objection.  Asked and answered.
```

02:19PM 5
02:19PM 10
02:19PM 15
02:20PM 20
02:20PM 25

**UNITED STATES DISTRICT COURT**

1        THE COURT:  Sustained.

2    Q    BY MR. AVENATTI:  Take a look at 391.

3    A    Okay.

4        MR. AVENATTI:  Joe, if we could blow up the summary

02:20PM  5    of account balance down to "charges/debits."

6    Q    Can you see that, Ms. Regnier?

7    A    Yes.

8    Q    On direct examination, you testified that the $4 million

9    was the check from the County of Los Angeles.  Do you remember

02:21PM 10    that?

11   A    Yes.

12   Q    And then you testified that the $1.6 million was the

13   attorney fee from that check; am I correct?

14   A    Yes.

02:21PM 15   Q    As of January 30th, what was the balance in the account,

16   in the trust account, on the right-hand side?

17   A    I have to move the tag over.  Just a sec.  2,400,000.

18   Q    So the 4 million minus $1.6 million; correct?

19   A    Yes.

02:21PM 20   Q    Let's go back to 44.  Second page --

21        Joe, can you blow up just the value date, the second

22   column.  It's the second column.

23        MR. SAGEL:  Maybe he can ask the question without it

24   on the screen, Your Honor.

02:23PM 25        MR. AVENATTI:  There we go.  Thank you, Joe.

```
           1    Q     As of the date of every one of those payments, there was
           2    still $2.4 million in the trust account, wasn't there?
           3    A     Yes, there was.
           4    Q     Take a look at Exhibit 43, another document that
02:23PM    5    Mr. Sagel asked you about on direct.
           6    A     Yes.
           7    Q     You were asked about this $250,000 payment on
           8    January 30th, 2015.  Do you remember that?
           9    A     Yes.
02:24PM   10    Q     As of the date of that payment, how much money was still
          11    in the trust account?
          12    A     What was it, 2.6?
          13    Q     2.4 million?
          14    A     Or 2.4 million.  I'm sorry.  Yes.
02:24PM   15    Q     You can refer back to Exhibit 391 if you need to check.
          16    A     It's 2.4.
          17    Q     This payment didn't come from any money taken from
          18    Mr. Geoff Johnson illegally, did it?
          19          MR. SAGEL:  Calls for a legal conclusion,
02:24PM   20    Your Honor.
          21          THE COURT:  Sustained.
          22    Q     BY MR. AVENATTI:  Ms. Regnier, are you aware of any
          23    evidence that this money -- this $250,000 came from any money
          24    embezzled from Geoff Johnson?
02:24PM   25          MR. SAGEL:  Foundation.  Calls for a legal
```

```
  1    conclusion, Your Honor.

  2              THE COURT:  Overruled.

  3              THE WITNESS:  I don't -- I don't know of any

  4    evidence.

02:25PM 5        MR. AVENATTI:  Let's bring up Exhibit 48.

  6    Q    Ms. Regnier, if I can direct your attention to

  7    Exhibit 48.  Go to the second page, please.

  8              Now, Ms. Regnier, why does it say "Draft" on it?

  9    A    Because it's a draft bill.

02:26PM 10   Q    And is this from QuickBooks, pages 2 through 9?

 11    A    No.  This is from Tabs.

 12    Q    And Tabs is one of the programs where the costs

 13    associated with client matters was kept at the firm; right?

 14    A    Yes.

02:26PM 15   Q    So if you wanted to get an accurate picture of what the

 16    costs were at a given time, you would look at QuickBooks and

 17    Tabs; right?

 18    A    Correct.

 19    Q    And after you looked at QuickBooks and Tabs, you can then

02:26PM 20   figure out what the costs were that needed to be deducted from

 21    the settlement; fair?

 22    A    Fair.

 23    Q    That's how you did it?

 24    A    Yes.

02:27PM 25   Q    And if you only looked at one, then you might miss
```

1    something?

2    A    Or it might be a duplicate or something.  That's the

3    reason it's a draft bill, yes.

4    Q    In order to be accurate, you've got to look at both?

02:27PM 5    A    Correct.

6    Q    And I think you said that you had someone that was

7    helping you for a while input data into QuickBooks and Tabs?

8    A    Mainly Tabs.

9    Q    Was that Morgan Winters (phonetic)?

02:27PM 10   A    Yes, it was.

11   Q    And she was a CPA at the time; right?

12   A    I believe so, yes.

13   Q    Do you recall what years she worked at Eagan Avenatti?

14   A    No, I don't.

02:27PM 15   Q    But it was a while?

16   A    Yes.  She worked there for probably four years or so.

17   Yeah.

18   Q    Now, as you sit here today, you don't have any

19   independent recollection as to the data and the costs contained

02:28PM 20   within Exhibit 48; is that true?

21   A    I'm -- I don't understand what you mean.

22   Q    Meaning, do you have an independent recollection, as you

23   sit here, as to the exact amount of costs from the Johnson

24   matter from the beginning until the end?

02:28PM 25   A    No, I do not.

```
 1   Q     And you don't know if Exhibit 48 is 100 percent accurate
 2   or not, do you?
 3   A     No, I do not.
 4   Q     Sitting there today, if you wanted to figure out what the
02:28PM 5   exact costs on the Johnson case were, is it true that you would
 6   go to the electronic file of QuickBooks, the most recent file,
 7   and the electronic file of Tabs and look at the data?
 8   A     Yes.
 9         MR. AVENATTI:  Your Honor, I have too much paper up
02:29PM 10  here.  I'm sorry.
11   Q     By the way, are you aware of any evidence that supports a
12   claim before this jury that I stole the entire $4 million of
13   Mr. Johnson's settlement?
14         MR. SAGEL:  Objection.  Foundation.  She hasn't been
02:30PM 15  here for anybody else's testimony, Your Honor.
16         THE COURT:  Overruled.
17         THE WITNESS:  Can you repeat the question?
18   Q     BY MR. AVENATTI:  Sure.
19         Are you aware of any evidence that would support a
02:30PM 20  claim by anyone before this jury that I stole the entire
21   $4 million of Geoff Johnson's settlement?
22   A     The entire 4 million, no.
23   Q     Take a look at Exhibit 50.
24   A     Okay.
02:31PM 25  Q     I think Mr. Sagel asked you some questions, and in
```

```
 1   particular about the costs associated with this document or

 2   attached to it.  Do you recall that?

 3   A    Yes.

 4   Q    Was there anything improper, in your mind, when you

 5   deducted these costs from the settlement amount and caused the

 6   check to be sent to Mr. McNicholas?

 7   A    No.

 8   Q    Were you bothered by the fact that Mr. McNicholas was

 9   charging Mr. Johnson for things like copies and Ubers?

10            MR. SAGEL:  Objection.  Relevance, Your Honor.

11            THE COURT:  Sustained.

12   Q    BY MR. AVENATTI:  Please turn to Exhibit 9.

13   A    Okay.

14            MR. AVENATTI:  Joe, if we can get that, please.

15            MR. SAGEL:  It's not in evidence, Your Honor.

16            MR. AVENATTI:  Oh, I had it in evidence, Your Honor.

17   I apologize.

18   Q    Let me just ask you a foundational question, Ms. Regnier.

19            Do you have a recollection that at some point in

20   mid-March Mr. Geoff Johnson's father called you and stated that

21   the next month they would be attempting to send in $500 a month

22   to help with Mr. Johnson's living arrangements?

23   A    Yes.  After reading this, yes, I recall that.

24   Q    Was that enough to cover Mr. Johnson's monthly expenses?

25   A    No.
```

02:31PM  5
02:32PM 10
02:33PM 15
02:33PM 20
02:34PM 25

**UNITED STATES DISTRICT COURT**

1    Q    Was it even close?

2    A    No.

3    Q    Who was covering those expenses at the time?

4    A    The firm was.

02:34PM 5    Q    Do you recall that Mr. Sagel asked you some questions

6    about the retainer agreement with Mr. Johnson?

7    A    Yes.

8    Q    Was there anything in that retainer agreement that

9    obligated the law firm, as far as you knew, to support

02:34PM 10   Mr. Johnson's living arrangements and pay his monthly expenses?

11   A    No.

12   Q    You were asked some questions about a dispute with

13   CareMeridian.  Do you recall that?

14   A    Yes.

02:35PM 15   Q    Was that dispute ultimately resolved?

16   A    Yes, it was.

17   Q    Who paid the settlement amount?

18   A    The firm paid the settlement amount.

19   Q    Please turn to Exhibit 25.

02:36PM 20   A    Okay.

21   Q    Mr. Sagel asked you some questions about Exhibit 25;

22   right?

23   A    Yes.

24   Q    And he asked you a number of questions on direct about

02:36PM 25   the financial condition of the law firm during the time period

```
 1  up through early 2019.  Do you recall that?
 2  A     Yes.
 3  Q     Where were you and I in late March and early April 2017?
 4  A     I believe that was -- we were in L.A. at the
 5  Kimberly-Clark trial.
 6  Q     In federal court; right?
 7  A     Yes, in federal court in L.A.
 8  Q     Did we get a verdict in that case?
 9  A     Yes.
10  Q     We got a verdict for our clients for $454 million, didn't
11  we, Ms. Regnier?
12  A     Yes, we did.
13  Q     And at the time of that verdict, the firm was entitled to
14  anywhere from 20 to 25 percent of $454 million because of our
15  work; right?
16  A     Yes.
17  Q     And that was on April -- I think it was -- 7th, 2017.
18  Does that sound about right?
19  A     I believe -- yes, it is.
20  Q     Now I want to go back to Exhibit 25.
21  A     Okay.
22  Q     You may recall that Mr. Sagel asked you about one of the
23  line items on this exhibit.  Do you remember that?  He asked
24  you about the Johnson line item.
25  A     Yes.
```

```
 1   Q     And did you understand that this document was an estimate
 2   of potential fees and costs from various cases in 2015?
 3   A     Yes, I did.
 4              MR. AVENATTI:  Joe, maybe we can just blow up it
 5   bigger.
 6   Q     Now, Ms. Regnier, in your experience -- well, strike
 7   that.
 8              What's the bottom number there in bold?
 9   A     47,615,000.
10   Q     Now, in your experience, Ms. Regnier, working at the
11   firm, is it fair to say that it was difficult to estimate what
12   exactly the fee income would be at the firm for any given time
13   period?
14   A     Yes.
15   Q     And that's because of the nature of the cases that we
16   handle; is that right?
17   A     Correct.
18   Q     Sometimes cases would settle earlier and sometimes they
19   would settle later; right?
20   A     Correct.
21   Q     Sometimes they would settle for a lot more money than we
22   anticipated and sometimes they would settle for a lot less
23   money; right?
24   A     Correct.
25   Q     So let's go through these cases on this exhibit, please.
```

1    The *Barela* case, that case ultimately settled, did
2    it not?

3    A    Yes, it did.

4    Q    In favor of our client; right?

02:40PM 5    A    Yes, it did.

6    Q    The *Calvert v. Commerce Bank* case, those two cases, they
7    ultimately settled for the benefit of our client; correct?

8         MR. SAGEL:  Objection.  403, Your Honor.

9         THE COURT:  Overruled.

02:40PM 10        THE WITNESS:  Yes.

11   Q    BY MR. AVENATTI:  *Calvert v. Moss Adams*, that case
12   ultimately settled for the benefit of our clients; right?

13   A    Yes.

14   Q    *Francis v. BDO Seidman*, we ultimately withdrew from that
02:41PM 15   case and stopped representing the client at our choice; right?

16   A    Correct.

17   Q    *Heritage Manor v. DFG* group, that case went to trial and
18   we got a verdict in 2014; right?

19   A    Correct.

02:41PM 20   Q    *Johnson vs. Los Angeles County*, we discussed.

21        *Koss vs. American Express*, that was a case that we
22   brought in Phoenix, and we ultimately settled it for the
23   benefit of our client; right?

24   A    Yes.

02:41PM 25   Q    *Koss vs. Park Bank*, that case was pending as of that time

```
 1    period; right?
 2    A    Yes, it was pending.
 3    Q    Loftin vs. KPMG, there was a partial settlement in that
 4    case, was there not?
02:42PM 5  A    Yes, there was.
 6    Q    And it was in favor of our client; right?
 7    A    Yes.
 8    Q    Manpower vs. McGuire Woods, that was another case that we
 9    successfully litigated on behalf of our client; right?
02:42PM 10 A    Yes.
11    Q    McCaw vs. Morgan Stanley, that's a case we decided to
12    withdraw from; correct?
13    A    Yes.
14    Q    Simms vs. National Football League was a case that we
02:42PM 15 went to trial on in Dallas, Texas; right?
16    A    Yes, it is.
17    Q    You and me and Mr. Chris Ayres; is that right?
18    A    Yes.
19    Q    And we ultimately obtained a plaintiff's verdict in that
02:42PM 20 case, didn't we?
21    A    Yes, we did.
22         MR. AVENATTI:  Joe, if we can go back to the first
23    page.  Can you blow up the top.
24    Q    Do you remember Mr. Sagel asked you about whether this
02:43PM 25 was submitted in connection with getting a loan from a bank in
```

```
 1   Mississippi, the Peoples Bank?
 2   A    Yes.
 3   Q    The Peoples Bank was repaid 100 percent of any loans;
 4   isn't that true?
 5   A    Yes.
 6   Q    Do you recall receiving a letter from the Peoples Bank
 7   telling us what a pleasure it was to deal with us, and if we
 8   ever wanted to borrow any money, that that wouldn't be a
 9   problem.  Do you recall that?
10            MR. SAGEL:  Objection.  403.
11            THE COURT:  Sustained.
12   Q    BY MR. AVENATTI:  Please turn to Exhibit 57.
13   A    Okay.
14   Q    Mr. Sagel asked you some questions about setting up a
15   special needs trust.  Do you recall that?
16   A    Yes.
17   Q    As you sit there today, you don't know what steps I took,
18   if any, in connection with setting up a special needs trust, do
19   you?
20   A    Correct.
21   Q    You don't know who I called or did not call, do you?
22   A    No, I don't.
23   Q    Is it fair to say that when you were working with me, we
24   communicated a lot, but I didn't tell you everything that I was
25   working on at all times, did I?
```

02:43PM 5
02:44PM 10
02:44PM 15
02:44PM 20
02:45PM 25

**UNITED STATES DISTRICT COURT**

A     No, you did not.

Q     Please go to Exhibit 58.  Do you have Exhibit 58,
Ms. Regnier?

A     Yes, I do.

02:45PM  Q     Mr. Sagel asked you about this response from me, where I
said, "Let me check into this.  Don't do anything for now."  Do
you see that?

A     Yes, I do.

Q     You have no idea why I sent that e-mail back to you, do
02:46PM  you?

A     Because you were going to check into something.

Q     Right.  But you don't know, other than that, if I had any
other ulterior motive associated with sending this e-mail, do
you?

02:46PM  A     No, I do not.

Q     Did Mr. Johnson make it a point to instruct you only to
send him $1900 or less because he was concerned about his
account going above $2,000?

A     Yes, he did.

02:47PM  Q     Were there times where he had you send him multiple
checks so that he could hold one check and not deposit it;
otherwise, he would violate the account balance rule?

A     Yes.

Q     That's not something I told you to do, that's something
02:47PM  Mr. Johnson requested; right?

```
 1  A    Mr. Johnson requested and you authorized it.  Yes.

 2  Q    Please take a look at Exhibit 37 -- I'm sorry.  73.

 3  A    Yes.

 4         MR. AVENATTI:  Joe, perhaps we can blow up the body,

 5  please.

 6  Q    "Hi, Judy, can you FedEx me two checks each for 1900?

 7  Thanks, Geoff."

 8         Did I read that correctly?

 9  A    Yes.

10  Q    August 30th, 2016; correct?

11  A    Yes.

12  Q    Is this an example of what we were just speaking about?

13  A    Yes, it is.

14  Q    Take a look at Exhibit 260, please.

15  A    Okay.

16         MR. AVENATTI:  Actually, Joe, can we get all three,

17  please.

18  Q    By the way, Ms. Regnier, you see at the top where it says

19  "Extraction Report"?

20  A    Yes, I do.

21  Q    Is it your understanding that these are text messages

22  that were extracted by the Government from your cell phone?

23  A    Either my cell phone or your -- somebody's cell phone,

24  yes.

25  Q    You did not produce the text messages to the Government
```

02:47PM (line 5)
02:48PM (line 10)
02:49PM (line 15)
02:49PM (line 20)
02:49PM (line 25)

```
 1   in this way; is that fair?
 2   A    No -- yes, it's fair.
 3   Q    Okay.  Going back to the content of Exhibit 260,
 4   Mr. Sagel asked you about these text messages.  Do you remember
 5   that?
 6   A    Yes.
 7   Q    And you see the text message at the bottom, Mr. Johnson
 8   asked you for a deposit.  Do you see that?
 9   A    Yes.
10   Q    And that was at about 5:40 p.m.; right?
11   A    I guess, yes.
12   Q    And then about five hours later you sent me a text
13   message; right?
14   A    Yes.
15   Q    "Geoff pinged me about money.  Do you want me to tell him
16   I will make deposit tomorrow?"
17             Do you see that?
18   A    Yes.
19   Q    And if these times are right, I mean, that's after
20   10:00 o'clock at night; correct?
21   A    Yes.
22   Q    And he had reached out to you after 5:00 o'clock at
23   night, or in the evening; right?
24   A    Yes.
25   Q    And I responded about 30 minutes later; right?
```

**UNITED STATES DISTRICT COURT**

```
 1   A     Yes.
 2   Q     And I said, "Yes"; correct?
 3   A     Correct.
 4   Q     And you understood that to mean, yes, you can make the
 5   deposit tomorrow?
 6   A     Correct.
 7   Q     If you take a look at 378, please.  Mr. Sagel asked you
 8   about your signature on a number of these checks, the Freedom
 9   to Live.  Do you recall that?
10   A     One second.
11   Q     Take your time.
12   A     Yes.
13   Q     Ms. Regnier, generally, you signed most checks at the law
14   firm; correct?
15   A     Correct.
16   Q     And that was true for the better part of ten years;
17   correct?
18   A     Probably nine years, yeah.
19   Q     That wasn't only true as it relates to anything
20   concerning Mr. Johnson; right?
21   A     No.
22   Q     Or Mr. Barela?
23   A     No.
24   Q     Or any other particular client, was it?
25   A     No.
```

02:51PM (line 5)
02:52PM (line 10)
02:52PM (line 15)
02:53PM (line 20)
02:53PM (line 25)

```
 1    Q    That was just generally how we operated at the firm;
 2    correct?
 3    A    Correct.
 4    Q    By the way, who is Kathy Mosby?
 5    A    Kathy was -- Kathy started the firm with us, and she was
 6    your personal secretary for eight or nine years.
 7    Q    Ms. Mosby was one of the first employees at the firm
 8    along with me and you; right?
 9    A    Yes.
10    Q    And when do you recall Ms. Mosby leaving?
11    A    2017, I believe.  January of 2017.
12    Q    Did you ever witness Ms. Mosby being appreciative for her
13    role at the firm?
14              MR. SAGEL:  Objection.  Relevance, Your Honor.
15              THE COURT:  Sustained.
16    Q    BY MR. AVENATTI:  Ms. Mosby, from time to time, would
17    assist with the recordkeeping at the law firm; correct?
18    A    Yes.
19    Q    Therefore, sometimes she was as active as you were; is
20    that fair?
21    A    Yes.
22    Q    Take a look at 379, please.
23              Do you recall Mr. Sagel asked you about these checks
24    that are part of 379?
25    A    Yes.
```

```
          1   Q    And I think, if I'm not mistaken, every one of these
          2   checks has your signature on it; right?
          3   A    It appears so, yes.
          4   Q    Again, nothing unusual about that in your 11 years of
02:55PM   5   experience, is there?
          6   A    No.
          7   Q    Take a look at Exhibit 380, please.
          8   A    Okay.
          9   Q    Mr. Sagel asked you about these checks?
02:55PM  10   A    Yes.
         11   Q    And every one of these checks but one has your signature
         12   on it; is that right?
         13   A    Yes, it is.
         14   Q    One of the checks has my signature, the second page;
02:56PM  15   right?
         16   A    Correct.
         17   Q    Now, occasionally when you were not -- well, strike that.
         18        Occasionally there would be a check run and you
         19   would walk into my office and present a stack of checks and I
02:56PM  20   would sign the checks; right?
         21   A    Yeah.  We would have gone over what was to be paid prior
         22   to me running the checks.
         23   Q    And you would prepare the checks and come in and I would
         24   sign them?
02:56PM  25   A    Yes.
```

**UNITED STATES DISTRICT COURT**

```
 1   Q    Sometimes I was not there to sign them, which is one of
 2   the reasons why you signed the majority of the checks?
 3   A    Yes.
 4   Q    Please go to Exhibit 356.
 5   A    Okay.
 6   Q    Exhibit 356 you were asked --
 7             Go to the second page, Joe, please.
 8             THE COURT:  You sure 356 is in?
 9             MR. AVENATTI:  Am I sure it's in?
10             THE COURT:  Is it?
11             THE COURTROOM DEPUTY:  I have it in yesterday,
12   Judge.
13             THE COURT:  Okay.
14   Q    BY MR. AVENATTI:  Mr. Sagel asked you about a number of
15   these checks, Exhibit 356.  Do you recall that?
16   A    Yes.
17   Q    And he asked if you had signed my name; right?
18   A    Yes.
19   Q    From time to time you would sign my name to checks;
20   correct?
21   A    Yes.
22   Q    Was that generally true because I was out of the office
23   or otherwise unavailable?
24   A    Yes.  It was usually because you were out of the office.
25             THE COURT:  I think we'll take the midafternoon
```
02:57PM  5
02:58PM 10
02:58PM 15
02:58PM 20
02:59PM 25

```
 1   break, ladies and gentlemen.  We'll be in recess for 15
 2   minutes.  Please remember the admonition not to discuss the
 3   case with anyone and not to form any opinions on the issues in
 4   the case until it's submitted to you.  And please don't do any
 5   research.
 6                  THE COURTROOM DEPUTY:  All rise.
 7                  (Out of the presence of the jury.)
 8                  THE COURT:  We'll be in recess.
 9                  (Recess from 2:59 p.m. to 3:16 p.m.)
10                  (In the presence of the jury.)
11                  THE COURT:  Mr. Avenatti.
12                  MR. AVENATTI:  Thank you, Your Honor.
13   Q    Ms. Regnier, if you could please turn to Exhibit 75.
14   A    Okay.
15   Q    Do you have it there?
16   A    Yes, I do.
17   Q    Mr. Sagel asked you about this e-mail relating to a list
18   of potential homes for Mr. Johnson.  Do you recall that?
19   A    Yes, I do.
20   Q    Did the original retainer agreement obligate me or the
21   firm to assist Mr. Johnson in finding a home to purchase?
22   A    No, it did not.
23   Q    Do you know what my agreement was with Mr. Johnson
24   relating to finding him a home to purchase?
25   A    No, I do not.
```

02:59PM — line 5
03:16PM — line 10
03:17PM — line 15
03:17PM — line 20
03:17PM — line 25

**UNITED STATES DISTRICT COURT**

```
 1   Q    Was I ever a real estate attorney when you were working
 2   with me?
 3   A    I don't believe we handled any real estate matters.  No.
 4   Q    Please turn to 102.
 5   A    Okay.
 6   Q    Is 102 from Tabs or QuickBooks?
 7   A    102 is from QuickBooks.
 8   Q    And do you see in the upper left-hand corner there's a
 9   date?
10   A    Yes.
11   Q    Now, you didn't print out this document, did you?
12   A    No, I did not.
13   Q    You're certain of that?
14   A    Yes, I'm certain.
15   Q    And you're certain of that because the date in the
16   left-hand corner is July 26, 2019; correct?
17   A    Correct.
18   Q    And you didn't have access to any of the QuickBooks files
19   as of that date; right?
20   A    Correct.
21   Q    Do you have any idea, as you sit here today, where this
22   Exhibit 102, this printout, came from?
23   A    The Government showed it to me.
24   Q    Okay.  Where did the Government get it from?  Do you have
25   any idea?
```

03:19PM (line 5)
03:19PM (line 10)
03:20PM (line 15)
03:20PM (line 20)
03:20PM (line 25)

| | |
|---|---|
| 1 | A     They -- I was told it was printed from our QuickBooks |
| 2 | program. |
| 3 | Q     Who told you that? |
| 4 | A     I believe it was Mr. Sagel. |
| 03:20PM 5 | Q     Do you know what QuickBooks file -- well, strike that. |
| 6 | You don't have any personal knowledge of where this |
| 7 | document came from; correct?  You did not print it out? |
| 8 | A     I did not print it, no. |
| 9 | Q     You didn't watch it get printed out? |
| 03:21PM 10 | A     No. |
| 11 | Q     Do you know if this document came from -- well, strike |
| 12 | that. |
| 13 | Which QuickBooks electronic file do you know -- or |
| 14 | do you know where this came from?  Do you have any idea? |
| 03:21PM 15 | MR. SAGEL:  Asked and answered, Your Honor. |
| 16 | THE COURT:  Sustained. |
| 17 | Q     BY MR. AVENATTI:  Ms. Regnier, do you know if this |
| 18 | document came from any electronic files that were taken from |
| 19 | you? |
| 03:21PM 20 | A     The QuickBooks was on one of the computers that was taken |
| 21 | from my home. |
| 22 | MR. AVENATTI:  Move to strike, Your Honor. |
| 23 | THE COURT:  Denied. |
| 24 | Q     BY MR. AVENATTI:  My question is this, Ms. Regnier: |
| 03:21PM 25 | Looking at this document, can you tell where this document came |

```
 1   from, what electronic file?

 2   A    I don't think I understand.

 3   Q    Okay.  QuickBooks files were provided to Ms. Hendricks

 4   from time to time; correct?

 5   A    Yes.

 6   Q    Marjorie Hendricks served as an accounting advisor to the

 7   firm.  Is that fair to say?

 8   A    Yes.

 9   Q    Do you know, as you sit here today, whether this printout

10   came from that QuickBooks file?

11   A    No, I do not.

12   Q    Do you know if this file came from a QuickBooks file

13   taken from the law firm servers?

14   A    No, I do not.

15   Q    Do you know if this QuickBooks file or printout came from

16   a file taken from a computer at the law firm?

17   A    No, I do not.

18   Q    Do you know if this printout came from a QuickBooks file

19   taken from your residence?

20   A    No, I do not.

21   Q    And I think we established earlier, you don't know if 102

22   is complete or not, do you?

23   A    No, I do not.

24   Q    Please take a look at 262.

25   A    Okay.
```

The timestamps in the left margin are: 03:22PM (line 5), 03:22PM (line 10), 03:22PM (line 15), 03:22PM (line 20), 03:24PM (line 25).

```
 1    Q    You were asked about sending me Mr. Johnson's contact
 2    information.  Do you recall that?
 3    A    Yes.
 4    Q    You were aware that prior to this date, I would text with
 5    Mr. Johnson from time to time; correct?
 6    A    Yes.
 7    Q    You don't have any idea why I asked you for this contact
 8    information, do you?
 9    A    No, I don't.
10    Q    Please go to Exhibit 137.
11    A    Okay.
12         MR. AVENATTI:  If we can go to the next page, Joe,
13    please, for the benefit of the jury, at the top.
14    Q    Do you recall that Mr. Sagel asked you a number of
15    questions about Alexis Gardner?  Do you recall that?
16    A    Yes.
17    Q    Did you ever communicate with Ms. Gardner?
18    A    No, I don't believe I ever did.
19    Q    Do you know how Ms. Gardner came to be represented by me?
20    A    No.
21    Q    Do you recall me telling you that Ms. Gardner's mother
22    had reached out to me and asked me to represent her?
23         MR. SAGEL:  Objection.  She just said she doesn't
24    know, Your Honor.  Foundation.
25         THE COURT:  Sustained.
```

Q    BY MR. AVENATTI:  Ms. Regnier, I believe you testified

in -- under direct from Mr. Sagel that you understood that

Mr. Filippo Marchino had referred Ms. Gardner to the law firm.

Did I get that correctly?

03:27PM 5    A    That I -- I believe that Filippo had somehow brought the

client in, because all the information came from his office

originally.

Q    But you don't know that, do you?

A    No.

03:27PM 10    Q    Do you have a recollection that after Ms. Gardner became

a client of the firm, that I arranged for Mr. Marchino and

Mr. Cassaro to make sure that she had a place to stay that

night, that she had a hotel to stay in?  Do you recall that?

A    I recall receiving a call, I believe, from Tom saying that

03:27PM 15    they were doing that.

Q    But you don't know, as you sit there today, whether that

was at my request; right?

A    No, I do not.

Q    And do you recall that it was after that, that I took

03:28PM 20    steps to make sure that she had a rental apartment?

A    I know someone took steps.  I don't know if it was you or

someone at the L.A. office.  But yes.

Q    Do you know if I physically went with her to make sure

that she was settled into that location?

03:28PM 25    A    I do not know.

```
 1   Q    You do know that at one point in time I arranged for us
 2   to have a mediation with a retired judge by the name of Louis
 3   Meisinger; right?
 4   A    Yes.
 5   Q    Yes?
 6   A    Yes.
 7   Q    Did Mr. Marchino go to that mediation?
 8   A    I don't know if he did or not.  I was not there.
 9   Q    Who is Mr. Meisinger?
10        MR. SAGEL:  Objection.  Relevance, Your Honor.
11        THE COURT:  Overruled.
12        THE WITNESS:  He's a retired judge we had appeared
13   in front of several times on various mediations.
14   Q    BY MR. AVENATTI:  We had successfully mediated a lot of
15   cases for plaintiffs in front of him at the time of
16   Ms. Gardner's settlement; is that fair?
17        MR. SAGEL:  Objection.  401, 403, Your Honor.
18        THE COURT:  Overruled.
19        THE WITNESS:  Yes.
20   Q    BY MR. AVENATTI:  Including a high-profile case involving
21   a cemetery that we settled for $85 million -- an $85 million
22   settlement value; right?
23   A    Yes.  Excuse me, yes.
24   Q    That was in 2014?
25   A    I believe so, yes.
```

03:28PM — line 5
03:29PM — line 10
03:29PM — line 15
03:29PM — line 20
03:29PM — line 25

UNITED STATES DISTRICT COURT

```
 1   Q     Were you privy to any of my communications with

 2   Ms. Gardner or her mother in connection with her case?

 3   A     No, I was not.

 4   Q     Did you attend the mediation?

 5   A     No, I did not.

 6   Q     Did Ms. Gardner ever voice to you unhappiness with the

 7   settlement?

 8   A     I never spoke with Ms. Gardner.

 9   Q     So I'll take that as a "no"?

10   A     No.

11   Q     Do you recall that a dispute arose between Ms. Gardner

12   and her landlord?

13   A     Yes, I do.

14   Q     Do you recall that there was quite a lot of drama around

15   that?

16   A     Yes.

17   Q     Okay.  Why do you laugh?

18   A     Because it was over a screen.

19   Q     What do you mean, "a screen"?

20         MR. SAGEL:  Objection.  403, Your Honor.

21         THE COURT:  Overruled.

22         THE WITNESS:  A screen on the house that supposedly

23   got broken while Ms. Gardner was living there.

24   Q     BY MR. AVENATTI:  Do you recall that we both got involved

25   in the screen dispute?
```

1    A    Yes.

2    Q    Do you recall that I had to mediate the screen dispute

3    between Ms. Gardner and her landlord?

4    A    Yes.

03:32PM 5    Q    You were asked about the purchase of the plane.  I want

6    to talk to you about the purchase of the plane.

7         By the way, you and your husband had occasion to fly

8    on the plane; is that right?

9    A    Yes, we did fly on the plane once.

03:32PM 10   Q    And you had occasion to vacation down in Mexico on a few

11   occasions at my expense; correct?

12   A    Yes.

13   Q    And I think on at least one or two occasions you brought

14   some friends with you; right?

03:33PM 15   A    Yes.

16   Q    And from time to time you were also provided sporting

17   event tickets, including for events internationally, like in

18   France; right?

19   A    Yes.

03:33PM 20   Q    And that was at my expense?

21   A    Yes.

22         MR. AVENATTI:  Now, if we can have Exhibit 136, at

23   the top.  I'm sorry, the second page, first paragraph.

24   Q    Now, Mr. Sagel didn't ask you about this first paragraph,

03:33PM 25   did he?

UNITED STATES DISTRICT COURT

55

```
 1   A    I thought I read it yesterday.  But I don't know that he
 2   asked me about it.
 3   Q    Well, if I'm mistaken, then I'll apologize.  But let me
 4   ask you a question in particular.
 5                This refers to an aircraft purchase agreement dated
 6   October 11, 2006.
 7   A    Yes.
 8   Q    Is that a typo?
 9   A    No.
10   Q    Ten years before this document; right?
11   A    Yes.
12   Q    Was it your understanding that I had contracted to buy
13   this plane in October of 2006, over ten years prior?
14   A    Yes.
15   Q    So any suggestion that we settled Ms. Gardner's case and
16   I ran out and contracted to buy a new jet would be false,
17   wouldn't it?
18            MR. SAGEL:  Objection.  Foundation.  Argumentative.
19            THE COURT:  Sustained.
20   Q    BY MR. AVENATTI:  Ms. Regnier, as you sit there today,
21   you're not aware of what agreement, if any, I had with William
22   Parrish as it related to the purchase of the plane; is that
23   right?
24   A    Correct.
25   Q    You're not aware of what the agreement was relating to
```

03:34PM  5
03:34PM 10
03:34PM 15
03:35PM 20
03:35PM 25

|     |     |
| --- | --- |
| 1 | the operation of the plane, the deposit to the plane, or any of |
| 2 | those details, are you? |
| 3 | A    Not entirely.  It's just whatever you asked me to send to |
| 4 | Mr. Parrish. |
| 03:36PM 5 | Q    Do you have a recollection that at the time the -- at the |
| 6 | time of the delivery of the plane, that the price of the plane, |
| 7 | the value of the plane had actually gone up over a million |
| 8 | dollars beyond what the purchase price was? |
| 9 | MR. SAGEL:  Objection.  401, 403, Your Honor. |
| 03:36PM 10 | THE COURT:  Sustained. |
| 11 | Q    BY MR. AVENATTI:  Do you have any knowledge as to whether |
| 12 | there was any equity in the plane immediately upon delivery? |
| 13 | MR. SAGEL:  Same objection, Your Honor. |
| 14 | THE COURT:  Sustained. |
| 03:37PM 15 | Q    BY MR. AVENATTI:  Take a look at 142, a document that |
| 16 | Mr. Sagel asked you about, please.  Exhibit 142. |
| 17 | A    Okay. |
| 18 | Q    This document relates to that apartment that later |
| 19 | developed the screen issue; right? |
| 03:38PM 20 | A    Correct. |
| 21 | Q    And do you recall that the landlord had legal counsel |
| 22 | involved in connection with this matter? |
| 23 | A    Yes, I do. |
| 24 | Q    And do you recall that there was a threat of litigation? |
| 03:38PM 25 | MR. SAGEL:  Objection.  Relevance, Your Honor. |

```
 1              THE COURT:  Sustained.
 2              MR. AVENATTI:  Your Honor, the Court's indulgence.
 3      Just one moment, please.
 4              (Pause in proceedings.)
03:40PM  5      Q    BY MR. AVENATTI:  Please go to Exhibit 148.  You were
 6      asked about this $2.5 million wire transfer to The X-Law Group?
 7      A    Yes.
 8      Q    As you sit there today, you don't have any independent
 9      knowledge as to what the purpose of this wire was for, do you?
03:40PM 10      A    Correct.
11      Q    I'm sorry?
12      A    Correct.
13      Q    Please go to 138.  Actually, let me see if I can shortcut
14      this.  Let's just go to 154.
03:41PM 15              Mr. Sagel asked you a number of questions about this
16      e-mail about the deposits for the plane.  Do you recall that?
17      A    Yes, I do.
18      Q    Do you have any independent knowledge as to what this
19      situation was relating to the deposits on the plane?
03:42PM 20      A    No.
21      Q    Do you know what the issue was Or what it was caused by?
22      A    No, I do not.
23      Q    You weren't at all involved with the purchase of the
24      plane; is that true?
03:42PM 25      A    That's correct.
```

```
 1   Q    Let's go to 155.

 2   A    I'm there.

 3   Q    Let's look at the bottom briefly.  Mr. Sagel asked you

 4   about this e-mail about the balance discrepancy for the plane.

 5   That's what we were just talking about; right?

 6   A    Yes.

 7        MR. AVENATTI:  And then let's blow up the top two

 8   e-mails.

 9   Q    Do you see that?

10   A    Yes.

11   Q    I instructed you, "Ignore this"; right?

12   A    Correct.

13   Q    And you said, "Got it"?

14   A    Correct.

15   Q    Do you have any idea whatsoever as to why I instructed

16   you "Ignore this"?

17   A    No.

18   Q    Do you have any idea as to whether it was part of some

19   grand nefarious plot to defraud a client of the firm?  Do you

20   have any idea --

21        MR. SAGEL:  Asked and answered, Your Honor.

22   Argumentative.

23        THE COURT:  Overruled.

24        THE WITNESS:  I don't have any idea why you said,

25   "Ignore this," no.
```

```
 1    Q    BY MR. AVENATTI:  For all you knew, it was resolved by
 2    then; right?
 3    A    Yes.
 4    Q    And if you look at 156, at the top, what did I write?
03:45PM 5    A    "Chris, there is no mistake on our end.  I
 6         will handle this Honda, as it is incorrect.
 7         Thanks, Michael."
 8    Q    Did you ever learn that that statement was false in any
 9    way, shape, or form?
03:45PM 10    A    No.
11    Q    Please go to 157.  This is a printout from QuickBooks,
12    not Tabs; right?
13    A    Correct.
14    Q    I mean, you can tell that almost immediately just from
03:47PM 15    the format of the document; right?
16    A    Correct.
17    Q    Do you see the date in the upper left-hand corner?
18    A    Yes, I do.
19    Q    7/25/2019 [sic]; right?
03:47PM 20    A    7/26/2019.
21    Q    I stand corrected, Ms. Regnier.  7/26/2019.  You are
22    correct.
23         At that time, you didn't have any QuickBooks files
24    in your possession; right?
03:47PM 25    A    Correct.
```

60

```
 1    Q    You don't know where this printout came from, do you,
 2    which QuickBooks version?
 3    A    No, I don't.
 4    Q    You don't know whether it's accurate or not, do you?
03:48PM 5    A    No, I don't.
 6    Q    Let's go to 159, please.  You were asked about this
 7    e-mail that you sent to Ms. McClaran at California Bank &
 8    Trust.  Do you remember that?
 9    A    Yes, I do.
03:49PM 10   Q    Other than this e-mail, do you have any independent
11    knowledge as to the purpose of this $16,000 payment to
12    Ms. Gardner?
13    A    No, I don't.
14    Q    Let's go to Exhibit 158.  158 is a number of $16,000
03:49PM 15   checks to Ms. Gardner.  Do you see that?
16    A    Yes, I do.
17    Q    Do you have any independent knowledge whatsoever as to
18    what these checks were for?
19    A    No, I do not.
03:49PM 20   Q    Exhibit 163, this is another document that Mr. Sagel
21    asked you about relating to a $16,000 check to Ms. Gardner.  Do
22    you recall that?
23    A    Yes.
24    Q    Other than what's in this document, do you have any
03:50PM 25   knowledge whatsoever as to the purpose of that payment ?
```

**UNITED STATES DISTRICT COURT**

```
 1   A      No, I do not.

 2   Q      Let's go to 174.

 3   A      Okay.

 4   Q      Last two pages.  This isn't from QuickBooks, it's from

03:51PM 5   Tabs; right?

 6   A      Correct.

 7   Q      And you're certain about that just from the format;

 8   correct?

 9   A      Correct.

03:51PM 10   Q      And this is a draft printout from Tabs; right?

11   A      Correct.

12   Q      And looking at this, you can't tell if this is complete

13   or not, can you?

14   A      No, I can't.

03:51PM 15   Q      You would need the actual program to do that, the data?

16   A      Well --

17   Q      Strike that.  Let me ask a different question.

18          You don't know what the QuickBooks printout for

19   Barela would show, do you?

03:52PM 20   A      No, I do not.

21   Q      And now we come to Mr. Barela.  Do you have a

22   recollection that there was a mediation with Mr. Barela in

23   Denver, Colorado?

24   A      Yes.

03:53PM 25   Q      Did I attend?
```

```
 1    A    Yes.
 2    Q    Did you attend?
 3    A    No.
 4    Q    Did Mr. John Arden attend?
 5    A    Yes.
 6    Q    Did Mr. Greg Barela attend?
 7    A    Yes.
 8    Q    Do you recall that that mediation took place in front of
 9    a retired federal magistrate judge?
10    A    Yes.
11    Q    Yes?
12    A    Yes.
13    Q    Do you recall that that mediation was prolonged, it was
14    drug out?
15    A    I believe you had to go back a second time.  I'm not sure
16    though.
17    Q    Do you recall that it took place around Hanukkah or
18    Christmas, late December?
19    A    Yes, I do.
20    Q    And do you have a general recollection that there was
21    quite a lot of back-and-forth between the parties and the
22    federal magistrate judge in attempting to facilitate a
23    resolution of the case?
24    A    Yes, I do.
25    Q    It was not an easy settlement; is that a fair statement?
```

The timestamps in the left margin are: 03:53PM (line 5), 03:53PM (line 10), 03:53PM (line 15), 03:54PM (line 20), 03:54PM (line 25).

1    A    That would be correct, yes.

2    Q    And around this time period of the settlement, the

3    mediation in late 2017, early 2018, Mr. Barela was in the

4    office sometimes two or three days a week, wasn't he?

03:55PM 5    A    Yes, he was.

6    Q    He was operating a start-up business basically out of our

7    conference room; right?

8    A    Yeah.  I wasn't sure what he was doing, but, yes, he was

9    in our conference room two to three days a week.

03:55PM 10   Q    He was in regular contact with you and others at our

11   firm, like Emily and other people that worked there, relating

12   to coming in to use the conference room and being present in

13   the office; right?

14   A    Yes.

03:55PM 15   Q    Did Mr. Barela ever confront you and say, "Judy, where

16   the hell is my settlement agreement?"

17   A    He sent me a couple e-mails asking for it.

18   Q    My question is, on the two or three times in the office

19   when he was physically there every week, did he ever approach

03:56PM 20   you and say, "Where the hell is my settlement agreement?"

21   A    I don't recall him doing so, no.

22   Q    And do you recall around the same time that Mr. Barela

23   was a defendant in a case called *Pirch*, P-i-r-c-h, the

24   appliance company, was suing Mr. Barela and others?

03:56PM 25   A    Yes.

```
 1              MR. SAGEL:  Objection.  Relevance.  608 and 403,
 2    Your Honor.
 3              THE COURT:  Relevance sustained.
 4    Q    BY MR. AVENATTI:  Do you recall that I and Mr. Arden and
 5    others were doing work on that case?
 6    A    Yes.
 7    Q    Do you have any idea what the agreement was between me
 8    and our firm and Mr. Barela relating to how we were going to be
 9    compensated for the work in that case?
10    A    No, I do not.
11    Q    You also understood, did you not, that I was assisting
12    Mr. Barela in connection with his new venture called Quix,
13    Q-u-i-x, Supply?  Do you remember that?
14    A    I remember you were working with him on something.  I
15    don't recall the name.
16    Q    Do you have any idea what the agreement with Mr. Barela
17    was relating to how I was going to be compensated in connection
18    with my work associated with Quix Supply?
19    A    No, I do not.
20    Q    You were asked about a gentleman by the name of Edward
21    Ricci.  Do you recall that?
22    A    Yes.
23    Q    You came to know Mr. Ricci over the years because we had
24    worked closely with him in connection with a number of cases;
25    right?
```

```
 1    A      Correct.

 2    Q      We had a case down in Florida with Mr. Ricci; right?

 3    A      Yes.

 4    Q      Mr. Ricci played a role in the $454 million jury verdict

03:59PM 5    that we secured in April of 2017; right?

 6    A      Yes.

 7    Q      Were you privy to all of my communications with

 8    Mr. Ricci?

 9    A      No, I was not.

03:59PM 10   Q      Did you have knowledge of everything that I was working

11    with Mr. Ricci on?

12    A      No, I did not.

13    Q      Do you know every case that I sought assistance from

14    Mr. Ricci on?

03:59PM 15   A      No, I do not.

16    Q      Mr. Ricci was quite a bit older than me; right?

17    A      Yes.

18    Q      When you observed our interactions, did you come to the

19    conclusion that Mr. Ricci was kind of like a mentor to me?

04:00PM 20          MR. SAGEL:  Objection.  Relevance.  401, 403.

21          THE COURT:  Sustained.

22    Q      BY MR. AVENATTI:  You were asked questions about Global

23    Baristas.  Do you recall that?

24    A      Yes.

04:00PM 25   Q      Do you have a recollection that in 2018 we began to wind
```

```
  1   down the operations of Global Baristas?

  2   A     I believe that's what you were doing, yes.

  3   Q     And do you have a recollection that a few years prior to

  4   that, I had put together a group of individuals to buy the

  5   company in order to save it from bankruptcy and save the loss

  6   of over 500 jobs in the Seattle area?  Do you recall that?

  7   A     I recall that you had a partner or more to purchase the

  8   company, yes.

  9   Q     And do you recall that we bought it out of bankruptcy in

 10   order to avoid the loss of over 500 jobs in the greater Seattle

 11   area?

 12   A     Yeah, I do recall you bought it out of bankruptcy.

 13   Q     Let's go to 372, please.

 14         MR. AVENATTI:  Maybe we can blow up the last four

 15   columns.

 16   Q     Do you remember Mr. Sagel asked you about --

 17         THE COURT:  Is 372 in?

 18         MR. SAGEL:  Yes, Your Honor.

 19         MR. AVENATTI:  I have it in, Your Honor.

 20         THE COURTROOM DEPUTY:  Yes, Judge.

 21         THE COURT:  Okay.

 22   Q     BY MR. AVENATTI:  Ms. Regnier, you may recall that

 23   Mr. Sagel asked you about a number of these payments on this

 24   chart; right?

 25   A     Yes, he did.
```

```
 1   Q    Can you take a moment and see if you can do a rough
 2   calculation as to the total of these payments.  Just ballpark.
 3   A    Probably around 730,000.
 4   Q    How much?
 5   A    About 730.
 6   Q    Now, generally -- and there were exceptions, but the
 7   contingency percentage that we would receive at the firm would
 8   be anywhere from 25 to 45 percent; is that fair?
 9   A    Yes.
10   Q    Do you remember what the contingency fee percentage just
11   for the work we did for Greg Barela on the Brock matter was?
12   A    Not off the top of my head, no.
13   Q    Rather than get out the document and spend more time, I
14   want you to just assume for me that the settlement amount was
15   $1,900,000 and the contingency fee percentage just for the work
16   we did in that case was 40 percent.
17              MR. SAGEL:  Objection.  Foundation.  Calls for
18   speculation.
19              THE COURT:  Overruled.
20   Q    BY MR. AVENATTI:  $1.9 million times 40 percent.  Is it
21   fair to say that that is $760,000?
22   A    Approximately, yes.
23   Q    Is that more or less than the rough figure of $730,000
24   you just gave the jury?
25   A    It's more.
```

UNITED STATES DISTRICT COURT

1    Q    And I think that you were asked about this payment that

2    you received for $3867?

3    A    Yes.

4    Q    Have you offered to return that?

04:08PM 5    A    Have I offered to return that?

6    Q    Yeah.

7    A    Who would I -- no.  I don't understand.

8    Q    You haven't offered to return it because you don't think

9    there's anything wrong with you receiving it; right?

04:08PM 10   A    It was reimbursement for expenses for airline tickets and

11   things like that for people in the firm.  Yes, I was entitled

12   to my expense reimbursement.

13   Q    And as far as you're concerned, as you sit there today,

14   despite your 18 meetings with the Government and your

04:08PM 15   six-and-a-half hours of examination by Mr. Sagel and your

16   review of all of these documents, as far as you're concerned,

17   you're entitled to keep that money; right?

18   A    I'm entitled to keep my expense reimbursement, yes.

19   Q    Yes.  The $3800 payment?

04:09PM 20   A    Yes.

21   Q    Let's take a look at 196.  You were asked about a wire

22   for $11,000 that was due to Dillanos.  Do you recall that?

23   A    Just a moment.  Yes.

24   Q    Now, there wasn't anything especially unusual during this

04:10PM 25   time period with payments being made to Global Baristas or

```
  1  their vendors from the law firm, was there?
  2  A    I mean, it was happening on a fairly regular basis, yes.
  3  Q    And the law firm was also receiving deposits and
  4  reimbursements back from the coffee company from time to time;
04:10PM  5  right?
  6  A    Yes.
  7  Q    That, too, was fairly regular; right?
  8  A    Yes.
  9  Q    You were asked about Exhibit 172.  Let's go to 172.
04:12PM 10  A    Okay.
 11  Q    This was an e-mail concerning a delayed payment to
 12  Coblentz Patch Duffy & Bass, a law firm in San Francisco;
 13  correct?
 14  A    Correct.
04:12PM 15  Q    Were you aware at the time that I had had a relationship
 16  with the partners at the firm, a professional relationship for
 17  24 years, the partners at Coblentz Patch Duffy & Bass?
 18  A    No.
 19  Q    After this e-mail, did the firm continue to represent me?
04:12PM 20  A    I'm -- I don't know.
 21  Q    Are you aware of anything that suggests to you that they
 22  did not continue to represent me?
 23          MR. SAGEL:  Objection.  Asked and answered.
 24  Foundation.
04:13PM 25          MR. AVENATTI:  Well, let me --
```

70

```
 1              THE COURT:  Hold.  Hold.

 2              MR. AVENATTI:  Go ahead, Your Honor.  I'm sorry.

 3              THE COURT:  Overruled.

 4     Q    BY MR. AVENATTI:  Are you aware of anything that suggests

04:13PM 5  to you that they stopped representing me?

 6     A    No.

 7     Q    The total listed in this e-mail on the second page is

 8     $81,000; is that right?

 9              There at the bottom, Joe.

04:13PM 10    A    Yes.

11     Q    All right.  And let's go back to the first page.  The

12     date is August 10, 2017; right?

13     A    Your e-mail to me, yes.

14     Q    Let's turn to 198.  Down at the bottom.  Mr. Clifford

04:14PM 15    Yin.

16     A    Yes.

17     Q    Do you recall that Mr. Yin was one of the attorneys from

18     Coblentz that was representing me?

19     A    Yes, I do.

04:14PM 20    Q    And the date of this e-mail is after the e-mail we were

21     just looking at that talked about the $81,000 balance; right?

22     A    Yes, it is.

23     Q    And Mr. Yin mentions that the total account receivable

24     now is about 43,000.  Do you see that?

04:14PM 25    A    Yes.
```

```
 1   Q    Now, you don't know whether he did any work or the firm
 2   did any work between the last e-mail and this e-mail, do you?
 3   A    No, I don't.
 4   Q    All right.  If you see here at the bottom of the e-mail,
 5   though, it says:  "Also, please send to me by e-mail the
 6   executed engagement letter for Desert Harvest."
 7        Did I read that correctly?
 8   A    Yes, you did.
 9   Q    Do you have a recollection that after this e-mail,
10   Coblentz Patch was retained in connection another project that
11   I was working on?
12        MR. SAGEL:  Objection.  401, 403.
13        THE COURT:  Sustained.
14   Q    BY MR. AVENATTI:  Did you ever come to learn that
15   Coblentz Patch refused to continue to work with me because they
16   were upset about the payment schedule relating to their fees?
17   A    No, I did not hear that.
18   Q    In your experience, law firms often carry receivable
19   balances for clients for hourly fees for quite a long time, do
20   they not?
21   A    Sometimes yes.
22   Q    Let's go back to 372, that list of payments that I
23   believe you said totaled approximately $730,000.  I want to ask
24   you about if there was a payment to Coblentz Patch Duffy & Bass
25   for $37,000.
```

```
 1    A     Yes, there is.

 2    Q     That's included in the 730,000; right?

 3    A     Yes, it is.

 4    Q     Let's go to Exhibit 200, another exhibit you were asked

 5    about by Mr. Sagel.

 6    A     Okay.

 7    Q     Do you have any idea what the purpose of this e-mail was?

 8    A     No, I don't.

 9    Q     During the time period, the year 2018, when you were

10    dealing with Mr. Barela relating to various payment issues,

11    were you aware at that time that he had recently been convicted

12    of a felony involving dishonesty and was on probation?

13          MR. SAGEL:  Objection.  608, 609, Your Honor, of

14    this witness, to ask this witness.

15          MR. AVENATTI:  Your Honor, I don't think there's any

16    doubt it's coming in.

17          THE COURT:  It may come in but not through this

18    witness.  Sustained.

19    Q     BY MR. AVENATTI:  You were asked by Mr. Sagel about

20    bringing the settlement agreement into the conference room when

21    I was meeting with Mr. Barela and others.  Do you recall that?

22    A     Yes.

23    Q     And you said that it was common -- or protocol for you,

24    and it was true whether it was me or some other attorney at the

25    firm, that if you brought a document into a conference room,
```

1    you would hand it to the attorney to hand to the client; right?

2    A    Correct.

3    Q    That wasn't something special that happened that day only

4    relating to Mr. Barela, was it?

04:21PM 5    A    No.

6    Q    And I had asked you to get a copy of Mr. Barela's

7    settlement agreement for him; right?

8    A    Yes.

9    Q    When I asked you to bring in the settlement agreement for

04:21PM 10   Mr. Barela, did I say to you, "Hey, Judy, don't bring in the

11   real one, bring in the bogus one with the fake dates"?  Did I

12   say anything like that?

13   A    No.

14   Q    Did I say anything, like, "Hey, remember how we talked

04:21PM 15   about there's two settlement agreements on the system?  I don't

16   want you to bring in the real one"?

17   A    No.

18   Q    Did I say to you, "Remember, we're trying to screw Greg

19   Barela out of his settlement funds.  We don't want to show him

04:22PM 20   the real document"?

21   A    No.

22   Q    I just said, "Could you please bring in a copy of the

23   settlement agreement for Greg Barela"; right?

24   A    Correct.

04:22PM 25   Q    And that's what you did?

A     Yes.

Q     You walked into the conference room with the settlement agreement.  I leafed through it, made sure it was complete, and handed it to Greg Barela; right?

04:22PM  A     Yeah.  I believe that's what you did.  I dropped it off and walked out.

Q     Did you later come to learn, when you found out that Mr. Barela had filed an arbitration proceeding against the firm, as well as me and Mr. Ibrahim and Mr. Arden -- you later came to learn that; right?  I think you testified to that on direct.

A     Yes.

Q     Mr. Sagel said, I think, it was a lawsuit.  Really, it was an arbitration first, was it not?

04:23PM  A     The arbitration was first, correct.

Q     And when that arbitration was filed, did you read it when we got it at the firm?

A     Yes, I did.

Q     And do you recall that going back to this conference room meeting, that Mr. Barela alleged that he was in the office meeting with Mr. Ibrahim in the conference room and he saw Mr. Arden through the glass, a reflection of the glass, giving the hand across the throat gesture, like "Whatever you do, don't tell Mr. Barela about the settlement agreement."  Do you recall those allegations?

1          MR. SAGEL:  Objection.  Calls for hearsay.  Improper

2   impeachment.

3          THE COURT:  Sustained.

4   Q    BY MR. AVENATTI:  Did you ever witness me or Mr. Ibrahim

04:24PM 5   or Mr. Arden in the conference room with Mr. Barela while

6   another member of the firm was outside the conference room

7   giving the gesture of the hand across the throat?

8   A    No.

9          MR. AVENATTI:  Your Honor, this is actually a good

04:24PM 10   place to stop.

11          THE COURT:  That's fine.

12          We'll stop here for the day, ladies and gentlemen.

13   Please remember the admonition not to discuss the case with

14   anyone, not to form any opinions on the issues in the case

04:25PM 15   until it's submitted to you, and please don't do any research.

16          Tomorrow our day will be slightly different.  We'll

17   need to stop at 3:15.  So that we can make up for lost time, or

18   part of it, we're only going to take an hour for lunch

19   tomorrow.  So it will be 9:00 to 12:00, 1:00 to 3:15.

04:25PM 20          Very good, then.  And if I didn't say it, please

21   don't do any research.  See you in the morning.

22          THE COURTROOM DEPUTY:  All rise.

23          **(Out of the presence of the jury.)**

24          THE COURT:  Anything for the record before we

04:26PM 25   adjourn?

1          MR. AVENATTI:  Nothing from the defendant,

2    Your Honor.

3          THE COURT:  Mr. Sagel?

4          MR. SAGEL:  Two things real briefly, Your Honor.  If

04:26PM 5    you were to look at the Government's trial memo at 528, which

6    we discussed at I think one of our pretrial conferences, one of

7    the comments the Government made specifically about defendant's

8    other fraud charges, "For example" -- this is on page 15:

9          "For example, if defendant cross-examines

04:26PM 10         Ms. Regnier, his paralegal, about all the times she

11         met with the Government or the amount of time she

12         spent being interviewed by the Government, possibly

13         including the interviews related to the charges in

14         the Southern District of New York, the Government

04:27PM 15         should be able to elicit on redirect that much of

16         her time spent in the interview concerning matters

17         other than the clients whose settlement funds

18         defendant is alleged to have stolen in these

19         counts."

04:27PM 20         Defendant, in addition to asking about several of

21    the interviews, and actually upwards of, I think, five, having

22    only to do with the Southern District of New York cases and

23    then went back to it and said with his 18 meetings with the

24    Government.  That doesn't even take into account what he was

04:27PM 25    going over with the meetings in our case relating to other

things.

I think at this point it's -- he's clearly opened the door to us being able to elicit from her that many of those meetings were with AUSAs and agents on other cases in which defendant defrauded other clients of his.

THE COURT:  Mr. Avenatti?

MR. AVENATTI:  Your Honor, I did not ask about the content of a single one of the meetings, and that was by design, number one, not a single one of the meetings that Mr. Sagel is referencing.  I did not ask about the content.

THE COURT:  That's not the point, sir.

MR. AVENATTI:  Well, let me finish number two and then I'll stop.

There were a number of meetings that occurred outside the presence of the assistant U.S. attorneys in this case.  I did not ask about a single meeting where Mr. Sagel or Mr. Andre was not present.  It begs the question, Your Honor, if it had nothing to do with this case, why were they present?

I think there were about five meetings, Your Honor -- I may be wrong, there may be four -- that took place only with prosecutors or agents in New York, without Mr. Sagel or Mr. Andre present.  I didn't ask about any of those.  Not one.

The only time I asked, and I was very particular in the question, Your Honor, whether she had met with Mr. Sagel

1    and others, that's what I asked.  So if it didn't have anything

2    to do with this case, why was Mr. Sagel or Mr. Andre present on

3    the call or the meeting?

4            And this is why Judge Gardephe in the *Nike* case

04:29PM 5    recently found that, in fact, it was a joint prosecution, that

6    the offices coordinated each other.  It's in his written

7    decision.  I think it was 90-plus pages.  It was issued on, I

8    think it was, June 6th.  We can get it for Your Honor if you'd

9    like it.  But he specifically found that it was a joint

04:29PM 10   prosecution and investigation, Your Honor.

11           So I don't think --

12           THE COURT:  In the *Nike* case?

13           MR. AVENATTI:  I'm sorry?

14           THE COURT:  The *Nike* case was a joint prosecution.

04:30PM 15   MR. AVENATTI:  The *Nike* case and this case.

16           THE COURT:  Would you present the Court a copy of

17   that, please?

18           MR. AVENATTI:  Most certainly, Your Honor.  And

19   we'll have it to you within 30 minutes.

04:30PM 20   THE COURT:  Tomorrow morning is good enough.

21           MR. AVENATTI:  Okay.

22           So I was very careful, Your Honor.  I was very, very

23   careful.  And, you know, again, not to repeat myself, and I

24   apologize to the Court, if the interviews didn't have anything

04:30PM 25   to do with this case, then why would Mr. Sagel or Mr. Andre be

```
 1   present for the interviews?
 2            THE COURT:  Are you representing that your list of
 3   meetings, your telephone conferences do not include any
 4   situation where the only attorney representatives were from the
 5   Southern District of New York?
 6            MR. AVENATTI:  100 percent correct.  That is my
 7   representation, Your Honor.
 8            THE COURT:  Okay.
 9            MR. SAGEL:  Is Mr. Avenatti done?
10            THE COURT:  I think so.
11            MR. SAGEL:  What Mr. Avenatti is very careful to
12   state, Your Honor, is, one, he hasn't said why he brought them
13   up.  In his direct quote, when he then asked Ms. Regnier --
14   when he asked Ms. Regnier about being questioned about the
15   percentage fees, about Edward Ricci and Greg Barela settlement,
16   is:
17            "Despite your 18 meetings with the
18        Government, at least three of them" -- and it's
19        really five -- "at least three of them were witness
20        prep sessions in New York for the Nike case."
21            Absolutely nothing to do with this.
22            THE COURT:  Were you and Mr. Andre involved in those
23   sessions?
24            MR. SAGEL:  We sat in and listened.
25            THE COURT:  Okay.  That's good enough.
```

|       | 1  | MR. AVENATTI:  Thank you, Your Honor. |
|-------|----|---------------------------------------|

```
          1            MR. AVENATTI:  Thank you, Your Honor.

          2            THE COURT:  If you want to go in to establish that

          3    those specific sessions were prep sessions in the Nike case, so

          4    be it.

04:32PM   5            MR. SAGEL:  Thank you, Your Honor.

          6            THE COURT:  I think that the Government is entitled

          7    to present the full context.  If the thrust of the meeting was

          8    the Nike case and they were there, yes, you had a meeting with

          9    them, but I think it opens the door for the Government to

04:32PM  10    establish what the purpose of the meeting was.

         11            MR. AVENATTI:  Well, then I would ask that it be --

         12    that it be established -- that they not mention the case by

         13    name, Your Honor.  That's not necessary.  They can say it was

         14    predominantly for another case.

04:32PM  15            THE COURT:  That's fine.

         16            MR. AVENATTI:  That's what it should be.  It should

         17    be --

         18            THE COURT:  Well, that's fine.

         19            MR. AVENATTI:  It should be predominantly for

04:32PM  20    another case.

         21            THE COURT:  That's fine.

         22            MR. AVENATTI:  Okay.

         23            MR. SAGEL:  Another criminal investigation.

         24            THE COURT:  That's fine.

04:32PM  25            MR. SAGEL:  Thank you.
```

```
 1              THE COURT:  Anything else?
 2              MR. SAGEL:  We'd ask, I guess, timing of what's
 3     left, because we need to know what witnesses we would need to
 4     have here tomorrow.
 5              MR. AVENATTI:  I think probably about two and a half
 6     to three hours, Your Honor.  But I'm going to try to circle
 7     back with the team and figure out if we can narrow that down a
 8     little bit.
 9              THE COURT:  Does the Government need to have a
10     witness here tomorrow?
11              MR. AVENATTI:  I don't know how long their redirect
12     is going to be.  I think better safe than sorry, Your Honor,
13     they should have a witness.  So if they could tell me who that
14     is.
15              THE COURT:  Mr. Sagel?
16              MR. SAGEL:  Our next two witnesses will be Joel
17     Weiner and Alexis Gardner, Your Honor.
18              THE COURT:  Are they people who we can get here on
19     fairly short notice?
20              MR. SAGEL:  That's why they're next, because they
21     are both local, Your Honor.
22              THE COURT:  Okay.  I have one thing for the record,
23     just so the record is clear.
24              I have afforded Mr. Avenatti the opportunity to use
25     a plexiglass shield.  He has not chosen to use the plexiglass
```

**UNITED STATES DISTRICT COURT**

```
 1    shield at any point today.

 2              Anything else?

 3              MR. AVENATTI:  I will note for the record,

 4    Your Honor, that every juror today and alternate chose not to

 5    use a plexiglass shield.  They all chose masks.

 6              THE COURT:  That's fair.  That's accurate.  And I

 7    afforded them the same opportunity.  That's fair.

 8              MR. AVENATTI:  Understood, Your Honor.

 9              THE COURT:  Okay.  We'll be in recess.

10              Mr. Avenatti, I'll give you the exact number

11    tomorrow, but you used about three hours and 30 minutes, plus

12    or minus.

13              MR. SAGEL:  One other clarification, Your Honor.  I

14    don't know if it's necessary.  Actually, I think it is

15    necessary.

16              Mr. Avenatti also mentioned the hours of the

17    meetings that Ms. Regnier had, especially on March 25th,

18    November 19th.  What he knows from those interview reports is

19    that 80 percent of those interviews, especially -- and maybe on

20    March 25th it was close to 90-plus percent, dealt with taxes,

21    bank fraud, bankruptcy fraud, and not the charges here.  So he

22    left them with the impression that eight hours was spent on

23    this case.  That was also in our memo.  That was also given to

24    him as notice.  And he opened the door on that as well.

25              THE COURT:  I think you're entitled to ask the
```

```
 1   question "Were other matters discussed?"  Not to mention how

 2   much time was spent on the other matters or how much time was

 3   spent on this case.

 4               MR. SAGEL:  Understood, Your Honor.

 5               THE COURT:  But you're not to mention the other

 6   matters which I said.

 7               MR. AVENATTI:  Nor the charges in the other matter,

 8   Your Honor.  That's highly prejudicial.

 9               THE COURT:  "Other matters."  That's the label we

10   use.  "Other matters."

11               MR. AVENATTI:  Thank you, Your Honor.  Thank you.

12               THE COURT:  Okay.  Thank you.

13               THE COURTROOM DEPUTY:  All rise.  This Court is now

14   in recess.

15               (Proceedings concluded at 4:36 p.m.)

16                             --oOo--

17

18

19

20

21

22

23

24

25
```

1          *CERTIFICATE OF OFFICIAL REPORTER*

2

3    COUNTY OF LOS ANGELES   )
                             )
4    STATE OF CALIFORNIA     )

5              I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME

6    COURT REPORTER, in and for the United States District Court for

7    the Central District of California, do hereby certify that

8    pursuant to Section 753, Title 28, United States Code that the

9    foregoing is a true and correct transcript of the

10   stenographically reported proceedings held in the

11   above-entitled matter and that the transcript page format is in

12   conformance with the regulations of the Judicial Conference of

13   the United States.

14

15   *Date:  July 28, 2021*

16

17

18

19                          */S/ DEBBIE HINO-SPAAN*
                            _____

20                          *Debbie Hino-Spaan, CSR No. 7953*
                            *Federal Official Court Reporter*
21

22

23

24

25

**UNITED STATES DISTRICT COURT**

## $

**$1,600,000** [1] - 25:1
**$1,900,000** [1] - 67:15
**$11,000** - 68:22
**$16,000** [3] - 60:11, 60:14, 60:21
**$1900** [1] - 39:17
**$2,000** [1] - 39:18
**$250,000** [2] - 28:7, 28:23
**$37,000** [1] - 71:25
**$3800** [1] - 68:19
**$3867** [1] - 68:2
**$454** [3] - 34:10, 34:14, 65:4
**$500** [1] - 32:21
**$70,000** - 22:22
**$730,000** [2] - 67:23, 71:23
**$760,000** [1] - 67:21
**$81,000** [2] - 70:8, 70:21
**$85** [2] - 52:21

## '

**'19** [1] - 4:21

## /

**/S** [1] - 84:19

## 1

**1-053** [1] - 1:24
**1.6** [6] - 23:15, 24:1, 24:6, 25:18, 27:12, 27:18
**1.9** [1] - 67:20
**10** [2] - 1:8, 70:12
**100** [3] - 31:1, 38:3, 79:6
**102** [5] - 47:4, 47:6, 47:7, 47:22, 49:21
**10:00** [1] - 41:20
**11** [3] - 17:20, 44:4, 55:6
**1100** [1] - 2:11
**12** [1] - 20:12
**12:00** [1] - 75:19
**13** [3] - 17:20, 19:23, 20:17
**136** [1] - 54:22
**137** [1] - 50:10
**138** [1] - 57:13
**14** [3] - 15:3, 15:20, 16:14
**142** [2] - 56:15, 56:16
**148** [1] - 57:5

**15** [2] - 46:1, 76:8
**154** [1] - 57:14
**155** [1] - 58:1
**156** [1] - 59:4
**157** [1] - 59:11
**158** [2] - 60:14
**159** [1] - 60:6
**15th** [1] - 13:16
**16** [1] - 11:2
**163** [1] - 60:20
**17** [1] - 2:18
**172** [1] - 69:9
**174** [1] - 61:2
**18** [3] - 68:14, 76:23, 79:17
**19** [4] - 5:12, 7:7, 9:10, 19:14
**1900** [1] - 40:6
**196** [1] - 68:21
**198** [1] - 70:14
**19th** [4] - 6:13, 6:23, 19:17, 82:18
**1:00** [1] - 75:19
**1:32** [2] - 1:16, 4:2
**1st** [1] - 16:12

## 2

**2** [2] - 1:9, 29:10
**2,400,000** [1] - 27:17
**2.4** [4] - 28:2, 28:13, 28:14, 28:16
**2.5** [1] - 57:6
**2.6** [1] - 28:12
**20** [1] - 34:14
**200** [1] - 72:4
**2006** [2] - 55:6, 55:13
**2014** [2] - 36:18, 52:24
**2015** [2] - 28:8, 35:2
**2016** [1] - 40:10
**2017** [7] - 34:3, 34:17, 43:11, 63:3, 65:5, 70:12
**2018** [4] - 16:12, 63:3, 65:25, 72:9
**2019** [16] - 4:24, 5:1, 5:12, 6:13, 6:23, 7:7, 8:6, 9:10, 9:19, 10:6, 10:24, 11:2, 11:12, 14:15, 34:1, 47:16
**2020** [5] - 12:5, 12:9, 12:17, 13:3, 13:11
**2021** [10] - 1:15, 4:1, 13:16, 13:18, 14:11, 15:3, 15:20, 16:14, 18:16, 18:20, 19:14, 19:21, 84:15
**21** [3] - 6:24, 21:25, 22:9
**213-894-2435** [1] -

2:12
**22nd** [2] - 19:21, 21:7
**24** [1] - 69:17
**25** [6] - 4:21, 33:19, 33:21, 34:14, 34:20, 67:8
**254** [1] - 2:19
**25th** [2] - 82:17, 82:20
**26** [4] - 4:23, 9:19, 10:24, 47:16
**260** [2] - 40:14, 41:3
**262** [1] - 49:24
**28** [4] - 1:15, 4:1, 84:8, 84:15
**281** [3] - 15:21, 15:25
**2:59** [1] - 46:9

## 3

**30** [4] - 21:2, 41:25, 78:19, 82:11
**30th** [6] - 26:2, 26:4, 26:7, 27:15, 28:8, 40:10
**312** [1] - 2:11
**356** [4] - 45:4, 45:6, 45:8, 45:15
**37** [1] - 40:2
**372** [3] - 66:13, 66:17, 71:22
**378** [1] - 42:7
**379** [2] - 43:22, 43:24
**380** [1] - 44:7
**391** [3] - 24:9, 27:2, 28:15
**3:15** [2] - 75:17, 75:19
**3:16** [1] - 46:9

## 4

**4** [8] - 3:3, 12:9, 12:17, 27:8, 27:18, 31:12, 31:21, 31:22
**40** [3] - 19:19, 67:16, 67:20
**401** [4] - 52:17, 56:9, 65:20, 71:12
**403** [11] - 14:22, 14:25, 18:23, 36:8, 38:10, 52:17, 53:20, 56:9, 64:1, 65:20, 71:12
**41** [1] - 23:7
**411** [2] - 1:24, 2:6
**42** [1] - 8:2
**43** [1] - 28:4
**43,000** [1] - 70:24
**44** [3] - 25:11, 25:13, 27:20
**45** [1] - 67:8
**47,615,000** [1] - 35:9

**48** [4] - 29:5, 29:7, 30:20, 31:1
**4:36** [1] - 83:15
**4th** [1] - 2:6
**4TH** [1] - 1:24

## 5

**50** [1] - 31:23
**500** [2] - 66:6, 66:10
**528** [1] - 76:5
**55** [1] - 9:2
**57** [1] - 38:12
**58** [2] - 39:2
**5:00** [1] - 41:22
**5:40** [1] - 41:10
**5th** [2] - 13:3, 13:11

## 6

**6** [1] - 18:16
**608** [2] - 64:1, 72:13
**609** [1] - 72:13
**6th** [1] - 78:8

## 7

**7/25/2019** [1] - 59:19
**7/26/2019** [1] - 59:20, 59:21
**714-338-3598** [1] - 2:7
**73** [1] - 40:2
**730** [1] - 67:5
**730,000** [1] - 67:3, 72:2
**75** [1] - 46:13
**753** [1] - 84:8
**77** [2] - 17:14, 17:20
**7953** [2] - 1:23, 84:20
**7th** [1] - 34:17

## 8

**8** [1] - 18:20
**80** [1] - 82:19
**8000** [1] - 2:6
**8th** [1] - 19:7

## 9

**9** [2] - 29:10, 32:12
**90-plus** [2] - 78:7, 82:20
**90012** [1] - 2:12
**92660** [1] - 2:19
**92701** [2] - 1:25, 2:7
**949-481-4900** [1] - 2:20
**9:00** [2] - 4:15, 75:19
**9th** [2] - 5:1, 12:4

## A

**a.m** [1] - 4:15
**able** [2] - 76:15, 77:3
**above-entitled** [1] - 84:11
**absolutely** [1] - 79:21
**access** [1] - 47:18
**account** [14] - 23:15, 23:21, 24:16, 24:20, 25:23, 27:5, 27:15, 27:16, 28:2, 28:11, 39:18, 39:22, 70:23, 76:24
**accounting** [1] - 49:6
**accounts** [1] - 26:8
**accurate** [5] - 29:15, 30:4, 31:1, 60:4, 82:6
**active** [1] - 43:19
**actual** [1] - 61:15
**Adams** [1] - 36:11
**addition** [1] - 76:20
**adjourn** [1] - 75:25
**admit** [1] - 10:18
**admonition** [2] - 46:2, 75:13
**advisor** [1] - 49:6
**affected** [1] - 19:11
**afforded** [2] - 81:24, 82:7
**afternoon** [1] - 4:6
**Agent** [13] - 9:10, 15:9, 18:22, 19:2, 19:3, 19:15, 19:16, 19:22
**agents** [2] - 77:4, 77:21
**agreement** [20] - 6:13, 7:13, 7:18, 33:6, 33:8, 46:20, 46:23, 55:5, 55:21, 55:25, 63:16, 63:20, 64:7, 64:16, 72:20, 73:7, 73:9, 73:23, 74:3, 74:24
**agreements** [1] - 73:15
**ahead** [3] - 15:21, 25:11, 70:2
**aircraft** [1] - 55:5
**airline** [1] - 68:10
**alex.wyman@usdoj.gov** [1] - 2:13
**ALEXANDER** [1] - 2:10
**Alexis** [2] - 50:15, 81:17
**allegations** [1] - 74:25
**alleged** [2] - 74:20,

76:18
**almost** [3] - 23:16, 24:2, 59:14
**alternate** [1] - 82:4
**Amendment** [2] - 11:5, 11:6
**AMERICA** [1] - 1:5
**American** [1] - 36:21
**amount** [11] - 7:24, 8:7, 8:10, 24:1, 25:14, 30:23, 32:5, 33:17, 33:18, 67:14, 76:11
**amounts** [1] - 25:12
**ANA** [3] - 1:17, 1:25, 4:1
**Ana** [1] - 2:7
**Andre** [8] - 13:3, 13:13, 14:4, 77:17, 77:22, 78:2, 78:25, 79:22
**ANGELES** [1] - 84:3
**Angeles** [4] - 2:12, 23:9, 27:9, 36:20
**answer** [6] - 10:19, 11:22, 16:21, 18:8, 26:17, 26:22
**answered** [9] - 5:4, 20:22, 21:12, 23:5, 24:7, 26:25, 48:15, 58:21, 69:23
**anticipated** [1] - 35:22
**apartment** [2] - 51:20, 56:18
**apologize** [3] - 32:17, 55:3, 78:24
**APPEARANCES** [1] - 2:1
**appeared** [1] - 52:12
**appliance** [1] - 63:24
**appreciative** [1] - 43:12
**approach** [7] - 10:1, 10:8, 11:15, 12:12, 13:5, 17:11, 63:19
**April** [4] - 5:1, 34:3, 34:17, 65:5
**arbitration** [4] - 74:8, 74:14, 74:15, 74:16
**Arden** [5] - 62:4, 64:4, 74:9, 74:22, 75:5
**area** [2] - 66:6, 66:11
**argumentative** [2] - 55:18, 58:22
**arose** [1] - 53:11
**arranged** [2] - 51:11, 52:1
**arrangements** [2] - 32:22, 33:10
**assist** [2] - 43:17,

46:21
**assistance** [1] - 65:13
**assistant** [1] - 77:15
**Assistant** [4] - 2:5, 2:10, 19:16, 20:3
**assisted** [2] - 8:20, 8:24
**assisting** [1] - 64:11
**associated** [4] - 29:13, 32:1, 39:13, 64:18
**assume** [1] - 67:14
**attached** [2] - 14:5, 32:2
**attempting** [1] - 23:1, 32:21, 62:22
**attend** [5] - 53:4, 61:25, 62:2, 62:4, 62:6
**attention** [3] - 6:24, 17:14, 29:6
**Attorney** [5] - 2:4, 2:5, 2:9, 2:10, 20:3
**attorney** [4] - 15:8, 23:19, 25:18, 27:13, 47:1, 72:24, 73:1, 79:4
**Attorney's** [1] - 14:11
**Attorneys** [1] - 19:16
**attorneys** [2] - 70:17, 77:15
**attorneys'** [2] - 7:24, 8:7
**August** [2] - 40:10, 70:12
**AUSA** [3] - 19:3, 19:4, 19:22
**AUSAs** [1] - 77:4
**authorized** [1] - 40:1
**Avenatti** [18] - 3:3, 4:7, 5:9, 6:2, 6:3, 7:23, 8:6, 8:9, 14:7, 20:20, 30:13, 46:11, 77:6, 79:9, 79:11, 81:24, 82:10, 82:16
**AVENATTI** [114] - 1:8, 2:15, 2:16, 4:8, 4:11, 5:10, 5:12, 6:12, 9:24, 10:1, 10:3, 10:8, 10:10, 10:16, 10:23, 11:7, 11:11, 11:15, 11:17, 11:25, 12:12, 12:14, 13:5, 13:10, 14:10, 14:23, 15:2, 15:17, 15:19, 16:6, 17:11, 17:13, 17:18, 19:2, 20:25, 21:2, 21:6, 21:14, 23:7, 23:25, 24:9, 24:11, 24:24, 25:25,

26:13, 27:2, 27:4, 27:25, 28:22, 29:5, 31:9, 31:18, 32:12, 32:14, 32:16, 35:4, 36:11, 37:22, 38:12, 40:4, 40:16, 43:16, 45:9, 45:14, 46:12, 48:17, 48:22, 48:24, 50:12, 51:1, 52:14, 52:20, 53:24, 54:22, 55:20, 56:11, 56:15, 57:2, 57:5, 58:7, 59:1, 64:4, 65:22, 66:14, 66:19, 66:22, 67:20, 69:25, 70:2, 70:4, 71:14, 72:15, 72:19, 75:4, 75:9, 76:1, 77:7, 77:12, 78:13, 78:15, 78:18, 78:21, 79:6, 80:1, 80:11, 80:16, 80:19, 80:22, 81:5, 81:11, 82:3, 82:8, 83:7, 83:11
**avoid** [1] - 66:10
**aware** [16] - 13:23, 23:25, 24:5, 24:19, 26:19, 26:23, 28:22, 31:11, 31:19, 50:4, 55:21, 55:25, 69:15, 69:21, 70:4, 72:11
**Ayres** [1] - 37:17

**B**

**back-and-forth** [1] - 62:21
**balance** [8] - 24:12, 24:14, 24:21, 27:5, 27:15, 39:22, 58:4, 70:21
**balances** [1] - 71:19
**ballpark** [1] - 67:2
**bank** [3] - 9:16, 37:25, 82:21
**Bank** [6] - 36:6, 36:25, 38:1, 38:3, 38:6, 60:7
**bankruptcy** [4] - 66:5, 66:9, 66:12, 82:21
**Barela** [33] - 7:20, 8:12, 8:20, 8:21, 8:24, 9:6, 9:12, 36:1, 42:22, 61:19, 61:21, 61:22, 62:6, 63:3, 63:15, 63:22, 63:24, 64:8, 64:12, 64:16, 67:11, 72:10, 72:21, 73:4, 73:10, 73:19, 73:23, 74:4, 74:8,

74:20, 74:24, 75:5, 79:15
**Barela's** [1] - 73:6
**Baristas** [3] - 65:23, 66:1, 68:25
**Barton** [2] - 14:19, 14:24
**basis** [1] - 69:2
**Bass** [3] - 69:12, 69:17, 71:24
**Bates** [1] - 11:18
**Bates-stamped** [1] - 11:18
**BDO** [1] - 36:14
**Beach** [1] - 2:19
**became** [1] - 51:10
**began** [1] - 65:25
**beginning** [2] - 15:13, 30:24
**begs** [1] - 77:17
**behalf** [1] - 37:9
**below** [1] - 24:25
**benefit** [4] - 36:7, 36:12, 36:23, 50:13
**best** [1] - 22:3
**better** [2] - 42:16, 81:12
**between** [5] - 53:11, 54:3, 62:21, 64:7, 71:2
**beyond** [2] - 21:10, 56:8
**bigger** [1] - 35:5
**bill** [2] - 29:9, 30:3
**bit** [2] - 65:16, 81:8
**blow** [10] - 16:6, 22:2, 24:11, 27:4, 27:21, 35:4, 37:23, 40:4, 58:7, 66:14
**body** [1] - 40:4
**bogus** [1] - 73:11
**bold** [1] - 35:8
**borrow** [1] - 38:8
**bothered** [1] - 32:8
**bottom** [8] - 16:6, 22:12, 35:8, 41:7, 58:3, 70:9, 70:14, 71:4
**bought** [2] - 66:9, 66:12
**break** [3] - 4:12, 5:7, 46:1
**BRETT** [1] - 2:5
**Brett** [1] - 19:22
**brett.sagel@usdoj. gov** [1] - 2:8
**brief** [1] - 9:22
**briefed** [1] - 9:21
**briefly** [2] - 58:3, 76:4
**bring** [7] - 22:1, 29:5,

73:9, 73:10, 73:11, 73:16, 73:22
**bringing** [1] - 72:20
**Brock** [2] - 8:14, 67:11
**broken** [1] - 53:23
**brought** [5] - 36:22, 51:5, 54:13, 72:25, 79:12
**business** [1] - 63:6
**buy** [3] - 55:12, 55:16, 66:4
**BY** [54] - 2:5, 2:18, 3:3, 4:11, 5:12, 6:12, 10:10, 10:23, 11:11, 11:17, 11:25, 12:14, 13:10, 14:10, 14:23, 15:2, 17:13, 19:2, 20:25, 21:2, 21:6, 21:14, 23:7, 23:25, 24:9, 25:25, 26:13, 27:2, 28:22, 31:18, 32:12, 36:11, 38:12, 43:16, 45:14, 48:17, 48:24, 51:1, 52:14, 52:20, 53:24, 55:20, 56:11, 56:15, 57:5, 59:1, 64:4, 65:22, 66:22, 67:20, 70:4, 71:14, 72:19, 75:4

**C**

**CA** [1] - 1:25
**calculation** [1] - 67:2
**calendar** [1] - 12:6
**California** [5] - 2:7, 2:12, 2:19, 60:7, 84:7
**CALIFORNIA** [4] - 1:2, 1:17, 4:1, 84:4
**CALLED** [1] - 3:3
**Calvert** [2] - 36:6, 36:11
**careful** [3] - 78:22, 78:23, 79:11
**CareMeridian** [1] - 33:13
**Carlos** [8] - 9:10, 10:24, 14:5, 15:9, 18:22, 19:2, 19:16, 19:22
**carry** [1] - 71:18
**case** [53] - 5:14, 5:22, 6:2, 8:14, 14:24, 18:15, 31:5, 34:8, 36:1, 36:6, 36:11, 36:15, 36:17, 36:21, 36:25, 37:4, 37:8, 37:11, 37:14, 37:20, 46:3, 46:4, 52:20,

53:2, 55:15, 62:23, 63:23, 64:5, 64:9, 65:2, 65:13, 67:16, 75:13, 75:14, 76:25, 77:16, 77:18, 78:2, 78:4, 78:12, 78:14, 78:15, 78:25, 79:20, 80:3, 80:8, 80:12, 80:14, 80:20, 82:23, 83:3
**Case** [1] - 1:7
**cases** [10] - 5:21, 35:2, 35:15, 35:18, 35:25, 36:6, 52:15, 64:24, 76:22, 77:4
**Cassaro** [1] - 51:12
**caused** [2] - 32:5, 57:21
**cell** [3] - 40:22, 40:23
**cemetery** [1] - 52:21
**CENTRAL** [1] - 1:2
**Central** [1] - 84:7
**certain** [4] - 47:13, 47:14, 47:15, 61:7
**certainly** [1] - 78:18
**CERTIFICATE** [1] - 84:1
**CERTIFIED** [1] - 1:6
**certify** [1] - 84:7
**cetera** [1] - 22:14
**charges** [4] - 76:8, 76:13, 82:21, 83:7
**charges/debits** [2] - 24:25, 27:5
**charging** [1] - 32:9
**chart** [2] - 4:17, 66:24
**check** [13] - 23:9, 23:12, 23:16, 23:19, 27:9, 27:13, 28:15, 32:6, 39:6, 39:11, 39:21, 44:18, 60:21
**checks** [18] - 39:21, 40:6, 42:8, 42:13, 43:23, 44:2, 44:9, 44:11, 44:14, 44:19, 44:20, 44:22, 44:23, 45:2, 45:15, 45:19, 60:15, 60:18
**choice** [1] - 36:15
**chose** [2] - 82:4, 82:5
**chosen** [1] - 81:25
**Chris** [2] - 37:17, 59:5
**Christmas** [1] - 62:18
**circle** [1] - 81:6
**civil** [1] - 8:12
**claim** [2] - 31:12, 31:20
**claiming** [1] - 23:3
**clarification** [1] - 82:13

**Clark** [1] - 34:5
**clear** [1] - 81:23
**clearly** [1] - 77:2
**client** [12] - 29:13, 36:4, 36:7, 36:15, 36:23, 37:6, 37:9, 42:24, 51:6, 51:11, 58:19, 73:1
**clients** [6] - 24:19, 34:10, 36:12, 71:19, 76:17, 77:5
**Clifford** [1] - 70:14
**close** [2] - 33:1, 82:20
**closely** [1] - 64:24
**Coblentz** [6] - 69:12, 69:17, 70:18, 71:10, 71:15, 71:24
**Code** [1] - 84:8
**coffee** [1] - 69:4
**colleague** [1] - 13:3
**colleagues** [2] - 7:8, 8:6
**Colorado** [1] - 61:23
**column** [2] - 27:22
**columns** [1] - 66:15
**comfortable** [1] - 18:1
**coming** [2] - 63:12, 72:16
**comments** [1] - 76:7
**Commerce** [1] - 36:6
**common** [1] - 72:23
**communicate** [1] - 50:17
**communicated** [2] - 18:15, 38:24
**communicating** [1] - 15:15
**communications** [2] - 53:1, 65:7
**company** [4] - 63:24, 66:5, 66:8, 69:4
**compensated** [2] - 64:9, 64:17
**complete** [3] - 49:22, 61:12, 74:3
**computer** [6] - 16:16, 16:20, 16:23, 17:2, 17:23, 49:16
**computers** [1] - 48:20
**concerned** [3] - 39:17, 68:13, 68:16
**concerning** [3] - 42:20, 69:11, 76:16
**concluded** [1] - 83:15
**conclusion** [4] - 23:23, 28:19, 29:1, 65:19
**condition** [2] - 19:10, 33:25
**conducted** [1] - 4:13

**conference** [10] - 63:7, 63:9, 63:12, 72:20, 72:25, 74:2, 74:19, 74:21, 75:5, 75:6
**Conference** [1] - 84:12
**conferences** [2] - 76:6, 79:3
**conformance** [1] - 84:12
**confront** [1] - 63:15
**confuse** [1] - 22:6
**connection** [9] - 23:19, 37:25, 38:18, 53:2, 56:22, 64:12, 64:17, 64:24, 71:10
**contact** [5] - 4:23, 22:13, 50:1, 50:7, 63:10
**contacting** [1] - 14:12
**contained** [1] - 30:19
**content** [7] - 11:8, 11:14, 14:8, 21:20, 41:3, 77:8, 77:10
**context** [1] - 80:7
**contingency** [3] - 67:7, 67:10, 67:15
**continue** [3] - 69:19, 69:22, 71:15
**contracted** [2] - 55:12, 55:16
**convicted** [1] - 72:11
**coordinated** [1] - 78:6
**copies** [2] - 13:8, 32:9
**copy** [5] - 7:13, 7:17, 73:6, 73:22, 78:16
**corner** [3] - 47:8, 47:16, 59:17
**Corporate** [1] - 2:18
**correct** [75] - 7:15, 7:19, 8:15, 10:7, 13:17, 14:2, 14:13, 14:19, 15:3, 18:16, 20:11, 24:16, 24:21, 25:7, 25:9, 26:2, 26:3, 26:4, 26:5, 27:13, 27:18, 29:18, 30:5, 35:17, 35:20, 35:24, 36:7, 36:16, 36:19, 37:12, 38:20, 40:10, 41:20, 42:2, 42:3, 42:6, 42:14, 42:15, 42:17, 43:2, 43:3, 43:17, 44:16, 45:20, 47:16, 47:17, 47:20, 48:7, 49:4, 50:5, 54:11, 55:24, 56:20, 57:10, 57:12, 57:25, 58:12, 58:14,

59:13, 59:16, 59:22, 59:25, 61:6, 61:8, 61:9, 61:11, 63:1, 65:1, 69:13, 69:14, 73:2, 73:24, 74:15, 79:6, 84:9
**corrected** [1] - 59:21
**correctly** [3] - 40:8, 51:4, 71:7
**correspondence** [1] - 14:6
**cost** [1] - 6:1
**costs** [10] - 25:8, 29:12, 29:16, 29:20, 30:19, 30:23, 31:5, 32:1, 32:5, 35:2
**COUNSEL** [2] - 2:1, 2:16
**counsel** [6] - 13:23, 14:13, 14:14, 14:15, 14:18, 56:21
**counts** [1] - 76:19
**County** [2] - 23:9, 27:9, 36:20
**COUNTY** [1] - 84:3
**couple** [1] - 63:17
**Court** [5] - 78:16, 78:24, 83:13, 84:6, 84:20
**COURT** [98] - 1:1, 1:24, 4:6, 5:5, 5:9, 5:11, 6:10, 9:25, 10:2, 10:9, 10:13, 10:19, 11:4, 11:16, 11:22, 12:13, 13:6, 14:7, 15:1, 17:12, 17:16, 19:1, 20:24, 21:1, 21:5, 21:13, 23:6, 23:24, 24:8, 25:22, 26:12, 27:1, 28:21, 29:2, 31:16, 32:11, 36:9, 38:11, 43:15, 45:8, 45:10, 45:13, 45:25, 46:8, 46:11, 48:16, 48:23, 50:25, 52:11, 52:18, 53:21, 55:19, 56:10, 56:14, 57:1, 58:23, 64:3, 65:21, 66:17, 66:21, 67:19, 70:1, 70:3, 71:13, 72:17, 75:3, 75:11, 75:24, 76:3, 77:6, 77:11, 78:12, 78:14, 78:16, 78:20, 79:2, 79:8, 79:10, 79:22, 79:25, 80:2, 80:6, 80:15, 80:18, 80:21, 80:24, 81:1, 81:9, 81:15, 81:18, 81:22, 82:6,

82:9, 82:25, 83:5, 83:9, 83:12, 84:6
**court** [2] - 34:6, 34:7
**Court's** [1] - 57:2
**COURTROOM** [5] - 45:11, 46:6, 66:20, 75:22, 83:13
**cover** [1] - 32:24
**covered** [2] - 6:3, 21:11
**covering** [1] - 33:3
**CPA** [1] - 30:11
**create** [3] - 6:17, 7:2, 7:9
**criminal** [1] - 80:23
**CROSS** [1] - 4:10
**cross** [1] - 76:9
**Cross** [1] - 3:3
**CROSS-EXAMINATION** [1] - 4:10
**Cross-Examination** [1] - 3:3
**cross-examines** [1] - 76:9
**CRR** [1] - 1:23
**CSR** [2] - 1:23, 84:20

## D

**Dallas** [1] - 37:15
**data** [4] - 30:7, 30:19, 31:7, 61:15
**date** [34] - 5:20, 6:13, 6:16, 7:1, 9:5, 9:20, 10:5, 10:22, 11:9, 12:1, 12:20, 12:22, 13:4, 13:14, 13:15, 16:11, 16:13, 16:22, 17:1, 17:23, 22:21, 24:19, 25:25, 27:21, 28:1, 28:10, 47:9, 47:15, 47:19, 50:4, 59:17, 70:12, 70:20
**Date** [1] - 84:15
**dated** [1] - 55:5
**dates** [4] - 12:7, 12:11, 13:9, 73:11
**DAY** [1] - 1:8
**days** [3] - 18:20, 63:4, 63:9
**deal** [1] - 38:7
**dealing** [1] - 72:10
**dealt** [1] - 82:20
**dean** [1] - 13:17
**DEAN** [2] - 2:17, 2:18
**deansteward7777@gmail.com** [1] - 2:20
**Debbie** [1] - 84:20
**DEBBIE** [3] - 1:23,

84:5, 84:19
**December** [2] - 11:2, 62:18
**decent** [1] - 21:17
**decided** [1] - 37:11
**decision** [1] - 78:7
**deducted** [4] - 23:20, 24:1, 29:20, 32:5
**deduction** [1] - 24:6
**DEFENDANT** [1] - 2:14
**defendant** [6] - 63:23, 76:1, 76:9, 76:18, 76:20, 77:5
**Defendant** [1] - 1:9
**defendant's** [1] - 76:7
**defraud** [1] - 58:19
**defrauded** [1] - 77:5
**delayed** [1] - 69:11
**delivery** [2] - 56:6, 56:12
**denied** [1] - 48:23
**Denver** [1] - 61:23
**deposit** [5] - 39:21, 41:8, 41:16, 42:5, 56:1
**deposited** [1] - 23:16
**deposits** [3] - 57:16, 57:19, 69:3
**DEPUTY** [5] - 45:11, 46:6, 66:20, 75:22, 83:13
**Desert** [1] - 71:6
**design** [1] - 77:9
**despite** [1] - 68:14
**Despite** [1] - 72:17
**details** [2] - 5:22, 56:2
**developed** [1] - 56:19
**devices** [1] - 5:1
**DFG** [1] - 36:17
**dhinospaan@yahoo. com** [1] - 1:25
**Diego** [1] - 8:12
**different** [3] - 8:17, 8:18, 24:4, 61:17, 75:16
**difficult** [1] - 35:11
**Dillanos** [1] - 68:22
**direct** [10] - 6:24, 8:15, 17:13, 27:8, 28:5, 29:6, 33:24, 51:2, 74:11, 79:13
**disagree** [1] - 9:24
**discrepancy** [1] - 58:4
**discuss** [2] - 46:2, 75:13
**discussed** [3] - 36:20, 76:6, 83:1
**dishonesty** [1] - 72:12

dispute [13] - 10:23, 11:25, 12:23, 13:4, 13:14, 16:15, 17:1, 17:4, 33:12, 33:15, 53:11, 53:25, 54:2
**District** [5] - 76:14, 76:22, 79:5, 84:6, 84:7
**DISTRICT** [3] - 1:1, 1:2, 1:3
**DIVISION** [1] - 1:2
**document** [26] - 10:11, 11:17, 12:14, 13:10, 14:9, 17:9, 17:14, 24:12, 28:4, 32:1, 35:1, 47:11, 48:7, 48:11, 48:18, 48:25, 55:10, 56:15, 56:18, 59:15, 60:20, 60:24, 67:13, 72:25, 73:20
**documents** [7] - 6:17, 7:2, 7:5, 7:9, 9:16, 16:2, 68:16
**dollars** [1] - 56:8
**done** [4] - 5:6, 5:17, 24:5, 79:9
**door** [4] - 9:23, 77:3, 80:9, 82:24
**doubt** [3] - 7:10, 9:3, 72:16
**down** [6] - 27:5, 54:10, 65:2, 66:1, 70:14, 81:7
**Draft** [1] - 29:8
**draft** [3] - 29:9, 30:3, 61:10
**drama** [1] - 53:14
**drawn** [1] - 26:8
**dropped** [1] - 74:5
**drug** [1] - 62:14
**due** [1] - 68:22
**Duffy** [3] - 69:12, 69:17, 71:24
**duplicate** [1] - 30:2
**during** [12] - 4:12, 5:6, 7:20, 15:20, 19:9, 19:12, 20:3, 20:9, 20:12, 33:25, 68:24, 72:9

### E

**e-mail** [32] - 14:4, 16:10, 16:13, 16:17, 16:20, 16:24, 17:2, 17:24, 18:2, 18:11, 22:11, 39:9, 39:13, 46:17, 57:16, 58:4, 60:7, 60:10, 69:11,

69:19, 70:7, 70:13, 70:20, 71:2, 71:4, 71:5, 71:9, 72:7
**e-mails** [2] - 58:8, 63:17
**EA** [1] - 5:21
**Eagan** [6] - 6:2, 6:3, 7:23, 8:6, 8:9, 30:13
**early** [3] - 34:1, 34:3, 63:3
**easy** [1] - 62:25
**Edward** [2] - 64:20, 79:15
**eight** [2] - 43:6, 82:22
**either** [1] - 40:23
**electronic** [5] - 31:6, 31:7, 48:13, 48:18, 49:1
**elicit** [2] - 76:15, 77:3
**embezzled** [1] - 28:24
**Emily** [1] - 63:11
**employees** [2] - 5:14, 43:7
**end** [2] - 30:24, 59:5
**engagement** [1] - 71:6
**entire** [6] - 7:24, 8:7, 8:10, 31:12, 31:20, 31:22
**entirely** [1] - 56:3
**entitled** [7] - 34:13, 68:11, 68:17, 68:18, 80:6, 82:25, 84:11
**equity** [1] - 56:12
**especially** [3] - 68:24, 82:17, 82:19
**ESQ** [2] - 2:15, 2:18
**establish** [2] - 80:2, 80:10
**established** [4] - 4:20, 20:17, 49:21, 80:12
**estate** [2] - 47:1, 47:3
**estimate** [2] - 35:1, 35:11
**et** [1] - 22:14
**evening** [1] - 41:23
**event** [1] - 54:17
**events** [2] - 7:6, 54:17
**evidence** [9] - 26:14, 26:19, 26:23, 28:23, 29:4, 31:11, 31:19, 32:15, 32:16
**exact** [7] - 8:25, 9:20, 10:5, 17:5, 30:23, 31:5, 82:10
**exactly** [2] - 4:16, 35:12
**examination** [2] - 27:8, 68:15
**EXAMINATION** [1] - 4:10

**Examination** [1] - 3:3
**examines** [1] - 76:9
**example** [3] - 40:12, 76:8, 76:9
**exceptions** [1] - 67:6
**excuse** [1] - 52:23
**executed** [1] - 71:6
**Exhibit** [38] - 15:21, 21:25, 22:9, 23:7, 24:9, 25:11, 25:13, 28:4, 28:15, 29:5, 29:7, 30:20, 31:1, 31:23, 32:12, 33:19, 33:21, 34:20, 38:12, 39:2, 40:2, 40:14, 41:3, 44:7, 45:4, 45:6, 45:15, 46:13, 47:22, 50:10, 54:22, 56:16, 57:5, 60:14, 60:20, 69:9, 72:4
**exhibit** [5] - 14:8, 24:13, 34:23, 35:25, 72:4
**EXHIBITS** [1] - 3:13
**exhibits** [2] - 21:24, 22:4
**expense** [4] - 54:11, 54:20, 68:12, 68:18
**expenses** [5] - 6:3, 32:24, 33:3, 33:10, 68:10
**experience** [4] - 35:6, 35:10, 44:5, 71:18
**Express** [1] - 36:21
**extensive** [1] - 6:2
**extracted** [1] - 40:22
**Extraction** [1] - 40:19

### F

**fabricate** [1] - 9:15
**facilitate** [1] - 62:22
**fact** [2] - 32:8, 78:5
**fair** [14] - 29:21, 29:22, 35:11, 38:23, 41:1, 41:2, 43:20, 49:7, 52:16, 62:25, 67:8, 67:21, 82:6, 82:7
**fairly** [4] - 21:17, 69:2, 69:7, 81:19
**fake** [1] - 73:11
**false** [6] - 6:17, 7:2, 7:5, 7:9, 55:16, 59:8
**family** [3] - 6:14, 22:13, 22:25
**far** [5] - 7:16, 9:11, 33:9, 68:13, 68:16
**father** [2] - 22:21, 32:20
**favor** [2] - 36:4, 37:6

**February** [4] - 12:9, 12:17, 13:3, 13:11
**FEDERAL** [2] - 1:24, 84:5
**federal** [4] - 34:6, 34:7, 62:9, 62:22
**Federal** [1] - 84:20
**FedEx** [1] - 40:6
**fee** [9] - 23:19, 23:20, 25:5, 25:8, 25:18, 27:13, 35:12, 67:10, 67:15
**fees** [6] - 7:24, 8:7, 35:2, 71:16, 71:19, 79:15
**felony** [1] - 72:12
**few** [3] - 23:13, 54:10, 66:3
**fifth** [1] - 26:6
**Fifth** [2] - 11:5, 11:6
**figure** [4] - 29:20, 31:4, 67:23, 81:7
**file** [12] - 31:6, 31:7, 48:5, 48:13, 49:1, 49:10, 49:12, 49:15, 49:16, 49:18
**filed** [3] - 14:16, 74:8, 74:16
**files** [4] - 47:18, 48:18, 49:3, 59:23
**Filippo** [2] - 51:3, 51:5
**financial** [2] - 9:15, 33:25
**fine** [5] - 75:11, 80:15, 80:18, 80:21, 80:24
**finish** [1] - 77:12
**firm** [39] - 5:15, 5:24, 8:12, 24:18, 29:13, 33:4, 33:9, 33:18, 33:25, 34:13, 35:11, 35:12, 42:14, 43:1, 43:5, 43:7, 43:13, 43:17, 46:21, 49:7, 49:13, 49:16, 51:3, 51:11, 58:19, 63:11, 64:8, 67:7, 68:11, 69:1, 69:3, 69:12, 69:16, 69:19, 71:1, 72:25, 74:9, 74:17, 75:6
**firms** [1] - 71:18
**first** [13] - 4:20, 10:11, 10:13, 17:16, 17:18, 26:1, 37:22, 43:7, 54:23, 54:24, 70:11, 74:14, 74:15
**five** [5] - 15:3, 41:12, 76:21, 77:19, 79:19
**fixed** [1] - 23:18
**flip** [1] - 4:17

Florida [1] - 65:2
fly [2] - 54:7, 54:9
Football [1] - 37:14
FOR [3] - 2:3, 2:14, 2:16
foregoing [1] - 84:9
form [4] - 46:3, 59:9, 75:14
format [1] - 59:15, 61:7, 84:11
former [1] - 13:3
forth [1] - 62:21
Foundation [3] - 23:22, 55:18, 67:17
foundation [5] - 25:20, 28:25, 31:14, 50:24, 69:24
foundational [2] - 10:3, 32:18
four [3] - 30:16, 66:14, 77:20
fourth [1] - 26:6
France [1] - 54:18
Francis [1] - 36:14
Francisco [1] - 69:12
fraud [2] - 76:8, 82:21
Freedom [1] - 42:8
friends [1] - 54:14
front [5] - 6:23, 12:6, 52:13, 52:15, 62:8
full [1] - 80:7
funds [4] - 24:18, 26:11, 73:19, 76:17

## G

Gardephe [1] - 78:4
Gardner [15] - 50:15, 50:17, 50:19, 51:3, 51:10, 53:2, 53:6, 53:8, 53:11, 53:23, 54:3, 60:12, 60:15, 60:21, 81:17
Gardner's [3] - 50:21, 52:16, 55:15
general [2] - 11:11, 62:20
generally [6] - 7:21, 7:22, 42:13, 43:1, 45:22, 67:6
gentleman [1] - 64:20
gentlemen [3] - 4:6, 46:1, 75:12
Geoff [9] - 22:13, 26:15, 26:21, 28:18, 28:24, 31:21, 32:20, 40:7, 41:15
gesture [2] - 74:23, 75:7
given [3] - 29:16,

35:12, 82:23
glass [2] - 74:22
Global [3] - 65:22, 66:1, 68:25
gov [1] - 4:18
GOVERNMENT [1] - 3:3
Government [54] - 4:21, 4:23, 5:13, 5:17, 5:20, 6:1, 6:5, 6:16, 7:2, 7:12, 7:16, 7:23, 8:11, 8:19, 9:5, 9:14, 9:18, 10:6, 13:2, 13:12, 15:2, 15:13, 16:16, 16:18, 16:19, 16:22, 17:1, 17:3, 17:23, 18:1, 18:4, 18:6, 18:10, 18:13, 18:15, 18:21, 18:24, 19:9, 19:15, 20:1, 40:22, 40:25, 47:23, 47:24, 68:14, 76:7, 76:11, 76:12, 76:14, 76:24, 79:18, 80:6, 80:9, 81:9
Government's [3] - 9:22, 17:6, 76:5
grand [1] - 58:19
greater [1] - 66:10
Greg [6] - 62:6, 67:11, 73:18, 73:23, 74:4, 79:15
group [2] - 36:17, 66:4
Group [1] - 57:6
guess [2] - 41:11, 81:2
guys [1] - 8:22

## H

half [2] - 68:15, 81:5
hand [8] - 27:16, 47:8, 47:16, 59:17, 73:1, 74:23, 75:7
handed [1] - 74:4
handle [2] - 35:16, 59:6
handled [3] - 22:15, 22:17, 47:3
hands [1] - 22:22
HANNA [2] - 2:4, 2:9
Hanukkah [1] - 62:17
Harvest [1] - 71:6
head [1] - 67:12
hear [1] - 71:17
hearsay [2] - 6:7, 75:1
held [1] - 84:10
hell [2] - 63:16, 63:20
help [1] - 32:22
helped [1] - 8:12
helping [1] - 30:7

Hendricks [2] - 49:3, 49:6
hereby [1] - 84:7
Heritage [1] - 36:17
hi [1] - 40:6
high [1] - 52:20
high-profile [1] - 52:20
highly [1] - 83:8
himself [1] - 20:20
Hino [1] - 84:20
HINO [3] - 1:23, 84:5, 84:19
Hino-Spaan [1] - 84:20
HINO-SPAAN [3] - 1:23, 84:5, 84:19
hold [1] - 39:21, 70:1
holding [1] - 24:18
home [4] - 4:14, 46:21, 46:24, 48:21
homes [1] - 46:18
Honda [1] - 59:6
Honor [83] - 4:8, 5:3, 5:7, 5:10, 6:9, 9:21, 9:24, 10:1, 10:8, 10:16, 11:3, 11:6, 11:8, 11:15, 12:12, 13:5, 13:9, 14:22, 14:25, 15:17, 15:19, 17:11, 17:19, 18:24, 20:23, 21:4, 24:7, 25:21, 27:24, 28:20, 29:1, 31:9, 31:15, 32:10, 32:15, 32:16, 36:8, 43:14, 46:12, 48:15, 48:22, 50:24, 52:10, 52:17, 53:20, 56:9, 56:13, 56:25, 57:2, 58:21, 64:2, 66:18, 66:19, 70:2, 72:13, 72:15, 75:9, 76:2, 76:4, 77:7, 77:17, 77:20, 77:25, 78:8, 78:10, 78:18, 78:22, 79:7, 79:12, 80:1, 80:5, 80:13, 81:6, 81:12, 81:17, 81:21, 82:4, 82:8, 82:13, 83:4, 83:8, 83:11
HONORABLE [1] - 1:3
hotel [1] - 51:13
hour [1] - 75:18
hourly [1] - 71:19
hours [10] - 15:3, 18:18, 18:21, 19:6, 41:12, 68:15, 81:6, 82:11, 82:16, 82:22
house [1] - 53:22

husband [1] - 54:7

## I

Ibrahim [3] - 74:9, 74:21, 75:4
idea [13] - 21:15, 39:9, 47:21, 47:25, 48:14, 50:7, 58:15, 58:18, 58:20, 58:24, 64:7, 64:16, 72:7
ignore [1] - 9:12
Ignore [3] - 58:11, 58:16, 58:25
illegally [1] - 28:18
immediately [6] - 23:16, 23:20, 24:2, 24:25, 56:12, 59:14
impeachment [1] - 75:2
important [1] - 15:14
impression [1] - 82:22
improper [6] - 6:9, 24:1, 24:5, 32:4, 75:1
IN [1] - 2:14
include [1] - 79:3
included [1] - 72:2
including [5] - 13:2, 13:12, 52:20, 54:17, 76:13
income [1] - 35:12
incorrect [1] - 59:6
incurred [1] - 6:1
independent [7] - 12:10, 30:19, 30:22, 57:8, 57:18, 60:10, 60:17
individuals [3] - 13:2, 13:12, 66:4
indulgence [1] - 57:2
inform [6] - 6:12, 6:16, 8:19, 9:14, 14:10, 19:13
information [3] - 50:2, 50:8, 51:6
informed [4] - 7:8, 19:9, 20:4, 20:7
initial [2] - 7:25, 8:8
input [1] - 30:7
instruct [1] - 39:16
instructed [3] - 9:11, 58:11, 58:15
intention [1] - 14:12
interactions [1] - 65:18
internationally [1] - 54:17
interview [2] - 76:16, 82:18

interviewed [1] - 76:12
interviews [6] - 6:9, 76:13, 76:21, 78:24, 79:1, 82:19
investigation [2] - 78:10, 80:23
involved [4] - 53:24, 56:22, 57:23, 79:22
involving [2] - 52:20, 72:12
issue [2] - 56:19, 57:21
issued [1] - 78:7
issues [3] - 46:3, 72:10, 75:14
item [1] - 34:24
items [1] - 34:23

## J

JAMES [1] - 1:3
January [7] - 12:4, 26:2, 26:4, 26:7, 27:15, 28:8, 43:11
jet [1] - 55:16
jobs [2] - 66:6, 66:10
Joe [17] - 15:22, 22:1, 24:24, 25:12, 25:13, 27:4, 27:21, 27:25, 32:14, 35:4, 37:22, 40:4, 40:16, 45:7, 50:12, 70:9
Joel [1] - 81:16
John [1] - 62:4
JOHN [2] - 1:8, 2:15
Johnson [27] - 5:14, 6:2, 6:6, 6:14, 6:18, 7:3, 7:9, 7:12, 7:17, 22:25, 28:18, 28:24, 30:23, 31:5, 32:9, 33:6, 34:24, 36:20, 39:16, 39:25, 40:1, 41:7, 42:20, 46:18, 46:21, 46:23, 50:5
Johnson's [14] - 6:3, 6:14, 22:21, 22:22, 23:1, 26:15, 26:21, 31:13, 31:21, 32:20, 32:22, 32:24, 33:10, 50:1
joint [3] - 78:5, 78:9, 78:14
JR [1] - 4:17
Judge [3] - 45:12, 66:20, 78:4
JUDGE [1] - 1:3
judge [4] - 52:2, 52:12, 62:9, 62:22
Judicial [1] - 84:12

**Judy** [4] - 22:15, 40:6, 63:15, 73:10
**JUDY** [2] - 3:3, 4:9
**Julian** [1] - 13:12
**July** [9] - 18:16, 18:20, 19:7, 19:14, 19:17, 19:21, 21:7, 47:16, 84:15
**JULY** [2] - 1:15, 4:1
**June** [4] - 15:3, 15:20, 16:14, 78:8
**juror** [1] - 82:4
**jury** [11] - 4:5, 15:22, 22:1, 31:12, 31:20, 46:7, 46:10, 50:13, 65:4, 67:24, 75:23

### K

**Kathy** [3] - 43:4, 43:5
**keep** [2] - 68:17, 68:18
**kept** [1] - 29:13
**Kim** [1] - 19:3
**Kimberly** [1] - 34:5
**Kimberly-Clark** [1] - 34:5
**kind** [1] - 65:19
**knowledge** [8] - 48:6, 56:11, 57:9, 57:18, 60:11, 60:17, 60:25, 65:10
**knows** [2] - 9:23, 82:18
**Koss** [2] - 36:21, 36:25
**KPMG** [1] - 37:3

### L

**L.A** [3] - 34:4, 34:7, 51:22
**label** [1] - 83:9
**ladies** [3] - 4:6, 46:1, 75:12
**landlord** [3] - 53:12, 54:3, 56:21
**last** [4] - 19:25, 61:4, 66:14, 71:2
**lasted** [4] - 18:21, 19:19, 19:23, 20:17
**late** [6] - 10:6, 11:12, 18:3, 34:3, 62:18, 63:3
**laugh** [1] - 53:17
**Law** [1] - 57:6
**LAW** [1] - 2:17
**law** [14] - 5:15, 5:24, 23:23, 33:9, 33:25, 42:13, 43:17, 49:13, 49:16, 51:3, 69:1,

69:3, 69:12, 71:18
**lawsuit** [3] - 8:12, 14:16, 74:13
**lawyer** [1] - 14:19
**leafed** [1] - 74:3
**League** [1] - 37:14
**learn** [4] - 59:8, 71:14, 74:7, 74:10
**least** [3] - 54:13, 79:18, 79:19
**leaving** [3] - 11:1, 11:12, 43:10
**left** [8] - 11:10, 11:20, 12:1, 47:8, 47:16, 59:17, 81:3, 82:22
**left-hand** [3] - 47:8, 47:16, 59:17
**legal** [4] - 23:23, 28:19, 28:25, 56:21
**less** [3] - 35:22, 39:17, 67:23
**letter** [4] - 13:17, 14:1, 38:6, 71:6
**line** [2] - 34:23, 34:24
**list** [3] - 46:17, 71:22, 79:2
**listed** [1] - 70:7
**listened** [1] - 79:24
**litigated** [1] - 37:9
**litigation** [1] - 56:24
**Live** [1] - 42:9
**living** [4] - 6:3, 32:22, 33:10, 53:23
**loan** [1] - 37:25
**loans** [2] - 9:16, 38:3
**local** [1] - 81:21
**location** [1] - 51:24
**Loftin** [1] - 37:3
**look** [22] - 8:2, 9:2, 10:11, 23:7, 25:11, 27:2, 28:4, 29:16, 30:4, 31:7, 31:23, 40:2, 40:14, 42:7, 43:22, 44:7, 49:24, 56:15, 58:3, 59:4, 68:21, 76:5
**looked** [2] - 29:19, 29:25
**looking** [3] - 48:25, 61:12, 70:21
**LOS** [1] - 84:3
**Los** [4] - 2:12, 23:9, 27:9, 36:20
**loss** [2] - 66:5, 66:10
**lost** [1] - 75:17
**Louis** [1] - 52:2
**lunch** [1] - 75:18

### M

**magistrate** [2] - 62:9, 62:22
**mail** [32] - 14:4, 16:10, 16:13, 16:17, 16:20, 16:24, 17:2, 17:24, 18:2, 18:11, 22:11, 39:9, 39:13, 46:17, 57:16, 58:4, 60:7, 60:10, 69:11, 69:19, 70:7, 70:13, 70:20, 71:2, 71:4, 71:5, 71:9, 72:7
**mails** [2] - 58:8, 63:17
**majority** [1] - 45:2
**Manor** [1] - 36:17
**manpower** [1] - 37:8
**March** [8] - 4:21, 4:23, 13:16, 14:11, 32:20, 34:3, 82:17, 82:20
**Marchino** [3] - 51:3, 51:11, 52:7
**Marjorie** [1] - 49:6
**masks** [1] - 82:5
**matter** [9] - 6:17, 6:20, 7:3, 7:9, 30:24, 56:22, 67:11, 83:7, 84:11
**matters** [10] - 8:17, 8:18, 29:13, 47:3, 76:16, 83:1, 83:2, 83:6, 83:9, 83:10
**McCaw** [1] - 37:11
**McClaran** [1] - 60:7
**McGuire** [1] - 37:8
**McNicholas** [2] - 32:6, 32:8
**mean** [7] - 20:13, 30:21, 41:19, 42:4, 53:19, 59:14, 69:2
**meaning** [1] - 30:22
**meant** [1] - 22:6
**mediate** [1] - 54:2
**mediated** [1] - 52:14
**mediation** [8] - 22:14, 52:2, 52:7, 53:4, 61:22, 62:8, 62:13, 63:3
**mediations** [1] - 52:13
**medical** [1] - 19:10
**meeting** [30] - 6:5, 7:20, 9:18, 9:20, 12:4, 12:8, 12:17, 12:19, 12:24, 13:1, 13:11, 13:15, 15:13, 15:20, 18:21, 19:6, 19:9, 19:12, 19:13, 19:14, 19:19, 19:25, 72:21, 74:20, 74:21,

77:16, 78:3, 80:7, 80:8, 80:10
**meetings** [11] - 68:14, 76:23, 76:25, 77:4, 77:8, 77:9, 77:14, 77:19, 79:3, 79:17, 82:17
**Meisinger** [2] - 52:3, 52:9
**member** [1] - 75:6
**members** [1] - 23:1
**memo** [2] - 76:5, 82:23
**memory** [2] - 10:21, 19:11
**mention** [3] - 80:12, 83:1, 83:5
**mentioned** [1] - 82:16
**mentions** [1] - 70:23
**mentor** [1] - 65:19
**message** [2] - 41:7, 41:13
**messages** [4] - 40:21, 40:25, 41:4
**met** [8] - 4:21, 10:5, 10:23, 12:7, 15:2, 18:23, 76:11, 77:25
**Mexico** [1] - 54:10
**Michael** [1] - 59:7
**MICHAEL** [2] - 1:8, 2:15
**mid** [1] - 32:20
**mid-March** [1] - 32:20
**midafternoon** [1] - 45:25
**might** [2] - 29:25, 30:2
**million** [22] - 23:15, 24:1, 24:6, 25:18, 27:8, 27:12, 27:18, 28:2, 28:13, 28:14, 31:12, 31:21, 31:22, 34:10, 34:14, 52:21, 56:7, 57:6, 65:4, 67:20
**mind** [2] - 6:21, 32:4
**minus** [2] - 27:18, 82:12
**minutes** [8] - 19:19, 19:23, 20:12, 20:17, 41:25, 46:2, 78:19, 82:11
**miss** [1] - 29:25
**Mississippi** [1] - 38:1
**misstates** [1] - 23:22
**mistake** [1] - 59:5
**mistaken** [2] - 44:1, 55:3
**moment** [4] - 15:17, 57:3, 67:1, 68:23
**money** [11] - 22:22,

23:1, 28:10, 28:17, 28:23, 35:21, 35:23, 38:8, 41:15, 68:17
**monies** [2] - 26:15, 26:20
**month** [2] - 32:21
**monthly** [2] - 32:24, 33:10
**Morgan** [2] - 30:9, 37:11
**morning** [4] - 4:15, 16:3, 75:21, 78:20
**Mosby** [5] - 43:4, 43:7, 43:10, 43:12, 43:16
**Moss** [1] - 36:11
**most** [3] - 31:6, 42:13, 78:18
**mother** [2] - 50:21, 53:2
**motive** [1] - 39:13
**move** [2] - 27:17, 48:22
**MR** [169] - 2:16, 4:8, 4:11, 5:3, 5:6, 5:10, 5:12, 6:7, 6:12, 9:21, 9:24, 10:1, 10:3, 10:8, 10:10, 10:16, 10:23, 11:3, 11:5, 11:7, 11:11, 11:15, 11:17, 11:25, 12:12, 12:14, 13:5, 13:7, 13:10, 14:10, 14:22, 14:23, 14:25, 15:2, 15:17, 15:19, 16:6, 17:11, 17:13, 17:18, 18:23, 19:2, 20:22, 20:25, 21:2, 21:3, 21:6, 21:12, 21:14, 23:5, 23:7, 23:22, 23:25, 24:7, 24:9, 24:11, 24:24, 25:20, 25:25, 26:13, 26:25, 27:2, 27:4, 27:23, 27:25, 28:19, 28:22, 28:25, 29:5, 31:9, 31:14, 31:18, 32:10, 32:12, 32:14, 32:15, 32:16, 35:4, 36:8, 36:11, 37:22, 38:10, 38:12, 40:4, 40:16, 43:14, 43:16, 45:9, 45:14, 46:12, 48:15, 48:17, 48:22, 48:24, 50:12, 50:23, 51:1, 52:10, 52:14, 52:17, 52:20, 53:20, 53:24, 54:22, 55:18, 55:20, 56:9, 56:11, 56:13, 56:15, 56:25, 57:2, 57:5, 58:7, 58:21,

59:1, 64:1, 64:4, 65:20, 65:22, 66:14, 66:18, 66:19, 66:22, 67:17, 67:20, 69:23, 69:25, 70:2, 70:4, 71:12, 71:14, 72:13, 72:15, 72:19, 75:1, 75:4, 75:9, 76:1, 76:4, 77:7, 77:12, 78:13, 78:15, 78:18, 78:21, 79:6, 79:9, 79:11, 79:24, 80:1, 80:5, 80:11, 80:16, 80:19, 80:22, 80:23, 80:25, 81:2, 81:5, 81:11, 81:16, 81:20, 82:3, 82:8, 82:13, 83:4, 83:7, 83:11
**multiple** [1] - 39:20

**N**

**name** [7] - 18:24, 45:17, 45:19, 52:2, 64:15, 64:20, 80:13
**narrow** [1] - 81:7
**National** [1] - 37:14
**nature** [1] - 35:15
**necessary** [3] - 80:13, 82:14, 82:15
**need** [8] - 17:16, 18:24, 28:15, 61:15, 75:17, 81:3, 81:9
**needed** [1] - 29:20
**needs** [2] - 38:15, 38:18
**nefarious** [1] - 58:19
**neglected** [1] - 4:13
**never** [6] - 7:13, 9:11, 18:10, 21:22, 23:3, 53:8
**new** [2] - 55:16, 64:12
**New** [5] - 76:14, 76:22, 77:21, 79:5, 79:20
**Newport** [1] - 2:19
**next** [7] - 9:18, 10:13, 18:15, 32:21, 50:12, 81:16, 81:20
**NICOLA** [2] - 2:4, 2:9
**night** [3] - 41:20, 41:23, 51:13
**Nike** [7] - 78:4, 78:12, 78:14, 78:15, 79:20, 80:3, 80:8
**nine** [2] - 42:18, 43:6
**None** [1] - 3:14
**North** [1] - 2:11
**note** [1] - 82:3
**notes** [4] - 6:23, 7:11, 17:6

**nothing** [5] - 20:15, 44:4, 76:1, 77:18, 79:21
**notice** [2] - 81:19, 82:24
**November** [10] - 5:12, 6:13, 6:23, 7:7, 8:5, 9:10, 9:19, 10:6, 10:24, 82:18
**number** [17] - 21:24, 23:11, 25:15, 25:24, 33:24, 35:8, 42:8, 45:14, 50:14, 57:15, 60:14, 64:24, 66:23, 77:9, 77:12, 77:14, 82:10

**O**

**o'clock** [2] - 41:20, 41:22
**objection** [26] - 5:3, 6:7, 11:3, 14:25, 18:23, 21:3, 23:5, 26:25, 31:14, 32:10, 36:8, 38:10, 43:14, 50:23, 52:10, 52:17, 53:20, 56:9, 56:13, 56:25, 64:1, 65:20, 69:23, 71:12, 72:13, 75:1
**Objection** [3] - 23:22, 55:18, 67:17
**obligate** [1] - 46:20
**obligated** [1] - 33:9
**observed** [1] - 65:18
**obtained** [1] - 37:19
**occasion** [2] - 54:7, 54:10
**occasionally** [4] - 5:21, 16:23, 44:17, 44:18
**occasions** [2] - 54:11, 54:13
**occurred** [2] - 25:10, 77:14
**October** [2] - 55:6, 55:13
**OF** [7] - 1:2, 1:5, 1:14, 2:1, 84:1, 84:3, 84:4
**offered** [4] - 3:14, 68:4, 68:5, 68:8
**office** [10] - 13:13, 44:19, 45:22, 45:24, 51:6, 51:22, 63:4, 63:13, 63:18, 74:20
**Office** [1] - 14:11
**offices** [1] - 78:6
**OFFICES** [1] - 2:17
**OFFICIAL** [3] - 1:24,

84:1, 84:5
**Official** [1] - 84:20
**often** [4] - 6:6, 8:21, 8:24, 71:18
**older** [1] - 65:16
**once** [2] - 18:2, 54:9
**one** [37] - 5:21, 11:10, 11:20, 15:17, 16:2, 26:1, 26:14, 26:20, 28:1, 29:12, 29:25, 34:22, 39:21, 42:10, 43:7, 44:1, 44:11, 44:14, 45:1, 48:20, 52:1, 54:13, 57:3, 70:17, 73:11, 73:16, 76:6, 77:8, 77:9, 77:23, 79:12, 81:22, 82:13
**one's** [2] - 26:1, 26:4
**oOo** [1] - 83:16
**opened** [2] - 77:2, 82:24
**opening** [1] - 9:23
**opens** [1] - 80:9
**operated** [1] - 43:1
**operating** [1] - 63:6
**operation** [1] - 56:1
**operations** [1] - 66:1
**opinions** [2] - 46:3, 75:14
**opportunity** [2] - 81:24, 82:7
**order** [4] - 22:4, 30:4, 66:5, 66:10
**original** [1] - 46:20
**originally** [1] - 51:7
**originated** [1] - 26:11
**otherwise** [2] - 39:22, 45:23
**ought** [1] - 10:14
**outside** [2] - 75:6, 77:15
**overruled** [6] - 6:10, 11:4, 19:1, 23:6, 25:22, 29:2, 31:16, 36:9, 52:11, 52:18, 53:21, 58:23, 67:19, 70:3

**P**

**p.m** [4] - 41:10, 46:9, 83:15
**P.M** [2] - 1:16, 4:2
**page** [13] - 17:20, 25:13, 27:20, 29:7, 37:23, 44:14, 45:7, 50:12, 54:23, 70:7, 70:11, 76:8, 84:11
**PAGE** [1] - 3:2

**pages** [3] - 29:10, 61:4, 78:7
**paid** [3] - 33:17, 33:18, 44:21
**paper** [1] - 31:9
**paragraph** [8] - 6:24, 8:2, 9:2, 10:12, 17:14, 17:20, 54:23, 54:24
**paralegal** [1] - 76:10
**Park** [1] - 36:25
**Parrish** [2] - 55:22, 56:4
**part** [4] - 42:16, 43:24, 58:18, 75:18
**partial** [1] - 37:3
**particular** [6] - 23:19, 25:5, 32:1, 42:24, 55:4, 77:24
**parties** [1] - 62:21
**partner** [1] - 66:7
**partners** [2] - 69:16, 69:17
**Patch** [5] - 69:12, 69:17, 71:10, 71:15, 71:24
**Pause** [2] - 15:18, 57:4
**pay** [1] - 33:10
**payees** [1] - 25:13
**payment** [15] - 7:25, 8:8, 25:1, 25:14, 28:7, 28:10, 28:17, 60:11, 60:25, 68:1, 68:19, 69:11, 71:16, 71:24, 72:10
**payments** [13] - 25:10, 25:16, 25:18, 26:1, 26:10, 26:15, 26:20, 28:1, 66:23, 67:2, 68:25, 71:22
**pending** [2] - 36:25, 37:2
**people** [3] - 63:11, 68:11, 81:18
**Peoples** [3] - 38:1, 38:3, 38:6
**percent** [9] - 31:1, 34:14, 38:3, 67:8, 67:16, 67:20, 79:6, 82:19, 82:20
**percentage** [4] - 67:7, 67:10, 67:15, 79:15
**perhaps** [1] - 40:4
**period** [6] - 33:25, 35:13, 37:1, 63:2, 68:25, 72:9
**person** [1] - 18:11
**personal** [2] - 43:6, 48:6

**Phoenix** [1] - 36:22
**phone** [5] - 12:4, 12:9, 40:22, 40:23
**phonetic** [1] - 30:9
**physically** [2] - 51:23, 63:19
**picture** [1] - 29:15
**pinged** [1] - 41:15
**Pirch** [1] - 63:23
**PIRCH** [1] - 63:23
**place** [7] - 9:18, 21:7, 51:12, 62:8, 62:17, 75:10, 77:21
**Plaintiff** [1] - 1:6
**PLAINTIFF** [1] - 2:3
**plaintiff's** [1] - 37:19
**plaintiffs** [1] - 52:15
**plane** [16] - 54:5, 54:6, 54:8, 54:9, 55:13, 55:22, 56:1, 56:6, 56:7, 56:12, 57:16, 57:19, 57:24, 58:4
**played** [1] - 65:4
**Plaza** [1] - 2:18
**pleasure** [1] - 38:7
**plexiglass** [3] - 81:25, 82:5
**plot** [1] - 58:19
**plus** [2] - 4:17, 82:11
**point** [9] - 9:1, 9:4, 22:5, 32:19, 39:16, 52:1, 77:2, 77:11, 82:1
**portion** [3] - 16:7, 24:11, 24:24
**possession** [1] - 59:24
**possibly** [1] - 76:12
**potential** [2] - 35:2, 46:18
**predominantly** [2] - 80:14, 80:19
**prejudicial** [1] - 83:8
**prep** [2] - 79:20, 80:3
**prepare** [1] - 44:23
**prepared** [1] - 18:12
**presence** [5] - 4:5, 46:7, 46:10, 75:23, 77:15
**present** [15] - 12:18, 15:8, 15:9, 15:10, 44:19, 63:12, 77:17, 77:18, 77:22, 78:2, 78:16, 79:1, 80:7
**press** [1] - 5:18
**pretrial** [1] - 76:6
**pretty** [1] - 21:15
**previous** [3] - 6:8, 24:12, 24:14
**price** [2] - 56:6, 56:8

**print** [3] - 47:11, 48:7, 48:8
**printed** [2] - 48:1, 48:9
**printout** [8] - 47:22, 49:9, 49:15, 49:18, 59:11, 60:1, 61:10, 61:18
**privy** [2] - 53:1, 65:7
**PRO** [1] - 2:14
**probation** [1] - 72:12
**problem** [1] - 38:9
**proceed** [2] - 9:25, 10:15
**proceeding** [1] - 74:8
**Proceedings** [1] - 83:15
**PROCEEDINGS** [1] - 1:14
**proceedings** [3] - 15:18, 57:4, 84:10
**produce** [1] - 40:25
**professional** [1] - 69:16
**profile** [1] - 52:20
**program** [2] - 48:2, 61:15
**programs** [1] - 29:12
**project** [1] - 71:10
**projects** [1] - 9:7
**prolonged** [1] - 62:13
**promptly** [1] - 14:1
**prosecution** [3] - 78:5, 78:10, 78:14
**prosecutors** [1] - 77:21
**protocol** [1] - 72:23
**provide** [1] - 13:8
**provided** [2] - 49:3, 54:16
**purchase** [9] - 46:21, 46:24, 54:5, 54:6, 55:5, 55:22, 56:8, 57:23, 66:7
**purpose** [6] - 10:2, 57:9, 60:11, 60:25, 72:7, 80:10
**pursuant** [1] - 84:8
**pursue** [1] - 9:22
**put** [2] - 15:22, 66:4

**Q**

**questioned** [1] - 79:14
**questions** [16] - 6:8, 20:9, 21:15, 21:18, 23:11, 25:16, 26:10, 31:25, 33:5, 33:12, 33:21, 33:24, 38:14, 50:15, 57:15, 65:22
**QuickBooks** [22] -

29:10, 29:16, 29:19, 30:7, 31:6, 47:6, 47:7, 47:18, 48:1, 48:5, 48:13, 48:20, 49:3, 49:10, 49:12, 49:15, 49:18, 59:11, 59:23, 60:2, 61:4, 61:18
**quite** [7] - 6:6, 8:21, 8:24, 53:14, 62:21, 65:16, 71:19
**Quix** [2] - 64:12, 64:18
**QUIX** [1] - 64:13
**quote** [1] - 79:13

**R**

**raid** [1] - 4:13
**ran** [1] - 55:16
**rather** [1] - 67:13
**reached** [2] - 41:22, 50:22
**read** [4] - 40:8, 55:1, 71:7, 74:16
**reading** [1] - 32:23
**real** [6] - 47:1, 47:3, 73:11, 73:16, 73:20, 76:4
**really** [3] - 11:24, 74:13, 79:19
**REALTIME** [1] - 84:5
**reason** [3] - 7:17, 11:25, 30:3
**reasons** [1] - 45:2
**receivable** [2] - 70:23, 71:18
**receive** [1] - 67:7
**received** [5] - 13:16, 14:5, 14:8, 24:2, 68:2
**receiving** [4] - 38:6, 51:14, 68:9, 69:3
**recent** [1] - 31:6
**recently** [2] - 72:11, 78:5
**recess** [4] - 46:1, 46:8, 82:9, 83:14
**Recess** [1] - 46:9
**recollection** [34] - 6:21, 6:22, 6:25, 8:3, 8:5, 10:14, 10:17, 11:11, 11:19, 11:23, 12:3, 12:8, 12:10, 12:16, 12:21, 13:1, 13:11, 17:10, 17:17, 17:22, 22:20, 22:23, 22:25, 23:14, 30:19, 30:22, 32:19, 51:10, 56:5, 61:22, 62:20, 65:25, 66:3, 71:9

**record** [4] - 75:24, 81:22, 81:23, 82:3
**recordkeeping** [1] - 43:17
**redirect** [2] - 76:15, 81:11
**refer** [1] - 28:15
**referencing** [1] - 77:10
**referred** [1] - 51:3
**referring** [1] - 18:5
**refers** [1] - 55:5
**reflection** [1] - 74:22
**refresh** [10] - 6:21, 6:22, 8:5, 10:21, 11:18, 11:23, 12:16, 12:21, 13:10, 17:22
**refreshed** [2] - 10:14, 10:17
**refreshes** [5] - 6:25, 8:2, 9:2, 17:10, 17:17
**refused** [1] - 71:15
**regarding** [1] - 22:14
**REGNIER** [2] - 3:3, 4:9
**Regnier** [45] - 4:12, 5:12, 7:7, 9:9, 10:10, 10:17, 11:17, 12:3, 12:14, 13:10, 14:10, 15:25, 16:8, 17:4, 17:13, 17:20, 18:6, 20:20, 22:3, 23:18, 23:25, 26:9, 26:13, 27:6, 28:22, 29:6, 29:8, 32:18, 34:11, 35:6, 35:10, 39:3, 40:18, 42:13, 46:13, 48:17, 48:24, 51:1, 55:20, 59:21, 66:22, 76:10, 79:13, 79:14, 82:17
**regular** [3] - 63:10, 69:2, 69:7
**regulations** [1] - 84:12
**reimbursement** [3] - 68:10, 68:12, 68:18
**reimbursements** [1] - 69:4
**related** [5] - 7:3, 7:5, 7:9, 55:22, 76:13
**relates** [2] - 42:19, 56:18
**relating** [14] - 6:17, 24:6, 46:17, 46:24, 55:25, 57:19, 60:21, 63:11, 64:8, 64:17, 71:16, 72:10, 73:4, 76:25
**relationship** [2] - 69:15, 69:16
**release** [1] - 5:18

**Relevance** [7] - 11:3, 32:10, 43:14, 52:10, 56:25, 64:1, 65:20
**relevance** [1] - 64:3
**remember** [17] - 10:5, 15:5, 24:13, 25:15, 27:9, 28:8, 34:23, 37:24, 41:4, 46:2, 60:8, 64:13, 64:14, 66:16, 67:10, 73:14, 75:13
**Remember** [1] - 73:18
**reminded** [2] - 4:12, 15:14
**rental** [1] - 51:20
**repaid** [1] - 38:3
**repeat** [2] - 31:17, 78:23
**Report** [1] - 40:19
**reported** [1] - 84:10
**REPORTER** [3] - 1:24, 84:1, 84:6
**Reporter** [1] - 84:20
**REPORTER'S** [1] - 1:14
**reports** [1] - 82:18
**represent** [5] - 20:4, 20:20, 50:22, 69:19, 69:22
**representation** [1] - 79:7
**representatives** [1] - 79:4
**represented** [7] - 13:20, 14:13, 14:14, 14:15, 14:17, 14:24, 50:19
**representing** [4] - 36:15, 70:5, 70:18, 79:2
**request** [1] - 51:17
**requested** [2] - 39:25, 40:1
**required** [1] - 23:20
**research** [3] - 46:5, 75:15, 75:21
**residence** [1] - 49:19
**resolution** [1] - 4:9
**resolved** [2] - 33:15, 59:1
**respectfully** [1] - 9:24
**respond** [2] - 13:22, 13:24
**responded** [1] - 41:25
**response** [1] - 39:5
**RESUMED** [1] - 4:9
**resumed** [1] - 3:3
**retained** [1] - 71:10
**retainer** [3] - 33:6, 33:8, 46:20

**retired** [3] - 52:2, 52:12, 62:9
**return** [3] - 68:4, 68:5, 68:8
**review** [1] - 68:16
**reviewed** [2] - 21:18, 21:20
**Ricci** [10] - 64:21, 64:23, 65:2, 65:4, 65:8, 65:11, 65:14, 65:16, 65:19, 79:15
**right-hand** [1] - 27:16
**rights** [2] - 11:5, 11:6
**rise** [3] - 46:6, 75:22, 83:13
**Roberson** [5] - 9:10, 15:9, 18:22, 19:15, 19:22
**role** [2] - 43:13, 65:4
**room** [10] - 63:7, 63:9, 63:12, 72:20, 72:25, 74:2, 74:19, 74:21, 75:5, 75:6
**ROOM** [1] - 1:24
**rough** [2] - 67:1, 67:23
**rule** [1] - 39:22
**run** [1] - 44:18
**running** [1] - 44:22

**S**

**SACR-19-00061-JVS** [1] - 1:7
**safe** [1] - 81:12
**Sagel** [65] - 6:12, 7:8, 8:6, 9:9, 10:24, 11:1, 11:12, 12:4, 12:9, 12:17, 12:20, 12:23, 14:1, 14:4, 15:10, 16:3, 19:3, 19:16, 19:22, 20:3, 21:15, 21:25, 22:5, 22:9, 23:11, 24:13, 25:15, 26:9, 28:5, 31:25, 33:5, 33:21, 34:22, 37:24, 38:14, 39:5, 41:4, 42:7, 43:23, 44:9, 45:14, 46:17, 48:4, 50:14, 51:2, 54:24, 56:16, 57:15, 58:3, 60:20, 66:16, 66:23, 68:15, 72:5, 72:19, 74:13, 76:3, 77:10, 77:16, 77:22, 77:25, 78:2, 78:25, 81:15
**SAGEL** [58] - 2:5, 5:3, 5:6, 6:7, 9:21, 11:3, 11:5, 13:7, 14:22, 14:25, 18:23, 20:22,

21:3, 21:12, 23:5, 23:22, 24:7, 25:20, 26:25, 27:23, 28:19, 28:25, 31:14, 32:10, 32:15, 36:8, 38:10, 43:14, 48:15, 50:23, 52:10, 52:17, 53:20, 55:18, 56:9, 56:13, 56:25, 58:21, 64:1, 65:20, 66:18, 67:17, 69:23, 71:12, 72:13, 75:1, 76:4, 79:9, 79:11, 79:24, 80:5, 80:23, 80:25, 81:2, 81:16, 81:20, 82:13, 83:4

**Sagel's** [2] - 13:2, 13:13
**San** [2] - 8:12, 69:12
**Santa** [1] - 2:7
**SANTA** [3] - 1:17, 1:25, 4:1
**sat** [1] - 79:24
**save** [2] - 66:5
**saw** [1] - 74:21
**schedule** [1] - 71:16
**screen** [7] - 27:24, 53:18, 53:19, 53:22, 53:25, 54:2, 56:19
**screw** [1] - 73:18
**SE** [1] - 2:14
**Seattle** [2] - 66:6, 66:10
**sec** [1] - 27:17
**second** [11] - 25:13, 26:4, 27:21, 27:22, 29:7, 42:10, 44:14, 45:7, 54:23, 62:15, 70:7
**Second** [1] - 27:20
**seconds** [1] - 21:2
**secretary** [1] - 43:6
**Section** [1] - 84:8
**secured** [1] - 65:5
**see** [26] - 4:17, 4:18, 8:2, 9:2, 12:7, 16:8, 17:9, 23:9, 25:2, 25:23, 25:25, 27:6, 39:7, 40:18, 41:7, 41:8, 41:17, 47:8, 57:13, 58:9, 59:17, 60:15, 67:1, 70:24, 71:4, 75:21
**Seidman** [1] - 36:14
**SELNA** [1] - 1:3
**Send** [1] - 16:24
**send** [10] - 14:1, 16:17, 16:20, 17:2, 17:24, 32:21, 39:17, 39:20, 56:3, 71:5

**sending** [2] - 39:13, 50:1
**sent** [10] - 14:4, 16:10, 18:2, 18:11, 18:12, 32:6, 39:9, 41:12, 60:7, 63:17
**separate** [1] - 8:14
**served** [1] - 49:6
**servers** [1] - 49:13
**sessions** [4] - 79:20, 79:23, 80:3
**setting** [2] - 38:14, 38:18
**settle** [4] - 35:18, 35:19, 35:21, 35:22
**settled** [8] - 5:14, 36:1, 36:7, 36:12, 36:22, 51:24, 52:21, 55:15
**settlement** [35] - 7:13, 7:18, 7:25, 8:8, 22:14, 23:1, 23:19, 25:6, 26:16, 26:21, 29:21, 31:13, 31:21, 32:5, 33:17, 33:18, 37:3, 52:16, 52:22, 53:7, 62:25, 63:2, 63:16, 63:20, 67:14, 72:20, 73:7, 73:9, 73:15, 73:19, 73:23, 74:2, 74:24, 76:17, 79:15
**several** [3] - 12:7, 52:13, 76:20
**shape** [1] - 59:9
**shield** [3] - 81:25, 82:1, 82:5
**short** [1] - 81:19
**shortcut** [1] - 57:13
**show** [4] - 17:9, 25:12, 61:19, 73:19
**showed** [1] - 47:23
**shown** [1] - 11:17
**sic** [1] - 59:19
**side** [1] - 27:16
**sign** [4] - 44:20, 44:24, 45:1, 45:19
**signature** [2] - 42:8, 44:2, 44:11, 44:14
**signed** [3] - 42:13, 45:2, 45:17
**Simms** [1] - 37:14
**simple** [1] - 10:11
**single** [4] - 26:14, 77:8, 77:9, 77:16
**sit** [11] - 24:4, 26:23, 30:18, 30:23, 38:17, 47:21, 49:9, 51:16, 55:20, 57:8, 68:13
**sitting** [1] - 31:4

**situation** [2] - 57:19, 79:4
**six** [1] - 68:15
**six-and-a-half** [1] - 68:15
**sixth** [1] - 26:6
**slightly** [1] - 75:16
**someone** [3] - 30:6, 51:21, 51:22
**sometimes** [8] - 35:18, 35:21, 35:22, 43:19, 45:1, 63:4, 71:21
**sorry** [13] - 14:17, 19:3, 25:13, 26:17, 26:22, 28:14, 31:10, 40:2, 54:23, 57:11, 70:2, 78:13, 81:12
**sought** [1] - 65:13
**sound** [1] - 34:18
**SOUTHERN** [1] - 1:2
**Southern** [2] - 76:14, 76:22, 79:5
**Spaan** [2] - 84:20
**SPAAN** [3] - 1:23, 84:5, 84:19
**speaking** [1] - 40:12
**special** [3] - 38:15, 38:18, 73:3
**Special** [13] - 9:9, 9:10, 15:8, 15:9, 18:22, 19:2, 19:3, 19:15, 19:21, 19:22
**specific** [2] - 26:10, 80:3
**specifically** [2] - 76:7, 78:9
**speculation** [2] - 25:20, 67:18
**speed** [1] - 13:7
**spend** [1] - 67:13
**spent** [5] - 76:12, 76:16, 82:22, 83:2, 83:3
**sporting** [1] - 54:16
**Spring** [1] - 2:11
**stack** [1] - 44:19
**stamped** [1] - 11:18
**STAND** [1] - 4:9
**stand** [3] - 21:14, 21:19, 59:21
**STANDBY** [1] - 2:16
**Stanley** [1] - 37:11
**start** [3] - 14:14, 21:25, 63:6
**start-up** [1] - 63:6
**started** [2] - 14:16, 43:5
**state** [1] - 79:12
**STATE** [1] - 84:4

**statement** [5] - 17:5, 22:11, 24:16, 59:8, 62:25
**STATES** [2] - 1:1, 1:5
**States** [7] - 2:4, 2:5, 2:9, 2:10, 84:6, 84:8, 84:13
**statistical** [1] - 20:14
**status** [1] - 25:14
**stay** [2] - 51:12, 51:13
**stenographically** [1] - 84:10
**steps** [2] - 38:17, 51:20, 51:21
**STEWARD** [2] - 2:17, 2:18
**Steward** [6] - 4:12, 13:17, 13:22, 13:24, 14:12, 21:22
**still** [2] - 28:2, 28:10
**stipulate** [1] - 13:9
**stole** [2] - 31:12, 31:20
**stolen** [3] - 26:15, 26:20, 76:18
**stop** [4] - 75:10, 75:12, 75:17, 77:13
**stopped** [2] - 36:15, 70:5
**STREET** [1] - 1:24
**Street** [2] - 2:6, 2:11
**strike** [9] - 14:18, 21:6, 35:6, 44:17, 48:5, 48:11, 48:22, 61:17
**submitted** [3] - 37:25, 46:4, 75:15
**successfully** [2] - 37:9, 52:14
**suggestion** [1] - 55:15
**suggests** [3] - 26:19, 69:21, 70:4
**suing** [1] - 63:24
**Suite** [3] - 2:6, 2:11, 2:19
**summary** [1] - 27:4
**Supply** [2] - 64:13, 64:18
**support** [2] - 31:19, 33:9
**supports** [1] - 31:11
**supposed** [4] - 7:24, 8:7, 8:10, 20:14
**supposedly** [1] - 53:22
**sustained** [25] - 5:5, 15:1, 20:24, 21:1, 21:4, 21:5, 21:13, 23:24, 24:8, 27:1, 28:21, 32:11, 38:11, 43:15, 48:16, 50:25,

55:19, 56:10, 56:14, 57:1, 64:3, 65:21, 71:13, 72:18, 75:3
**system** [1] - 73:15

**T**

**Tabs** [11] - 29:11, 29:12, 29:17, 29:19, 30:7, 30:8, 31:7, 47:6, 59:12, 61:5, 61:10
**tag** [1] - 27:17
**taxes** [1] - 82:20
**team** [1] - 81:7
**telephone** [1] - 79:3
**ten** [3] - 42:16, 55:10, 55:13
**testified** [7] - 8:15, 20:1, 25:4, 27:8, 27:12, 51:1, 74:10
**testify** [2] - 20:7, 20:21
**testimony** [2] - 21:21, 31:15
**Texas** [1] - 37:15
**text** [6] - 40:21, 40:25, 41:4, 41:7, 41:12, 50:4
**THE** [116] - 2:3, 2:14, 3:3, 4:6, 4:9, 5:5, 5:9, 5:11, 6:10, 6:11, 9:25, 10:2, 10:9, 10:13, 10:19, 10:21, 11:4, 11:9, 11:16, 11:22, 11:24, 12:13, 13:6, 14:7, 15:1, 17:12, 17:16, 19:1, 20:24, 21:1, 21:5, 21:13, 23:6, 23:24, 24:8, 25:22, 25:23, 26:12, 27:1, 28:21, 29:2, 29:3, 31:16, 31:17, 32:11, 36:9, 36:10, 38:11, 43:15, 45:8, 45:10, 45:11, 45:13, 45:25, 46:6, 46:8, 46:11, 48:16, 48:23, 50:25, 52:11, 52:12, 52:18, 52:19, 53:21, 53:22, 55:19, 56:10, 56:14, 57:1, 58:23, 58:24, 64:3, 65:21, 66:17, 66:20, 66:21, 67:19, 70:1, 70:3, 71:13, 72:17, 75:3, 75:11, 75:22, 75:24, 76:3, 77:6, 77:11, 78:12, 78:14, 78:16, 78:20, 79:2, 79:8, 79:10, 79:22,

79:25, 80:2, 80:6,
80:15, 80:18, 80:21,
80:24, 81:1, 81:9,
81:15, 81:18, 81:22,
82:6, 82:9, 82:25,
83:5, 83:9, 83:12,
83:13
**therefore** [1] - 43:19
**third** [1] - 26:6
**threat** [1] - 56:24
**three** [11] - 18:18,
18:21, 19:6, 40:16,
63:4, 63:9, 63:18,
79:18, 79:19, 81:6,
82:11
**throat** [2] - 74:23, 75:7
**thrust** [1] - 80:7
**tickets** [2] - 54:17,
68:10
**timing** [1] - 81:2
**Title** [1] - 84:8
**today** [16] - 14:19,
16:3, 20:1, 24:5,
26:23, 30:18, 31:4,
38:17, 47:21, 49:9,
51:16, 55:20, 57:8,
68:13, 82:1, 82:4
**together** [2] - 8:23,
66:4
**Tom** [1] - 51:14
**tomorrow** [8] - 41:16,
42:5, 75:16, 75:19,
78:20, 81:4, 81:10,
82:11
**took** [10] - 9:18, 21:7,
21:14, 21:19, 38:17,
51:19, 51:21, 62:8,
62:17, 77:20
**top** [8] - 10:11, 37:23,
40:18, 50:13, 54:23,
58:7, 59:4, 67:12
**total** [3] - 67:2, 70:7,
70:23
**totaled** [1] - 71:23
**touch** [2] - 8:20, 8:22
**Tran** [1] - 16:10
**transcript** [2] - 84:9,
84:11
**TRANSCRIPT** [2] -
1:6, 1:14
**transfer** [1] - 57:6
**TRIAL** [1] - 1:8
**trial** [7] - 9:22, 20:4,
20:21, 34:5, 36:17,
37:15, 76:5
**true** [17] - 5:13, 7:1,
7:7, 7:14, 7:25,
13:20, 16:22, 23:18,
30:20, 31:5, 38:4,
42:16, 42:19, 45:22,

57:24, 72:24, 84:9
**Trust** [1] - 60:8
**trust** [8] - 23:21,
24:16, 24:18, 27:16,
28:2, 28:11, 38:15,
38:18
**truth** [1] - 15:14
**try** [2] - 6:22, 81:6
**trying** [2] - 22:21,
73:18
**turn** [7] - 15:21, 32:12,
33:19, 38:12, 46:13,
47:4, 70:14
**two** [16] - 8:17, 8:18,
18:20, 36:6, 40:6,
54:13, 58:7, 61:4,
63:4, 63:9, 63:18,
73:15, 76:4, 77:12,
81:5, 81:16
**type** [3] - 16:23, 20:14,
25:14
**typo** [1] - 55:8

## U

**U.S** [5] - 1:3, 14:11,
19:16, 20:3, 77:15
**Ubers** [1] - 32:9
**ulterior** [1] - 39:13
**ultimately** [7] - 33:15,
36:1, 36:7, 36:12,
36:14, 36:22, 37:19
**unavailable** [1] -
45:23
**under** [1] - 51:2
**understood** [5] - 42:4,
51:2, 64:11, 82:8,
83:4
**unfortunate** [1] -
19:10
**unhappiness** [1] -
53:6
**UNITED** [2] - 1:1, 1:5
**United** [7] - 2:4, 2:5,
2:9, 2:10, 84:6, 84:8,
84:13
**unless** [1] - 6:19
**unusual** [2] - 44:4,
68:24
**up** [23] - 13:7, 15:22,
16:6, 16:23, 22:1,
22:2, 24:11, 27:4,
27:21, 29:5, 31:9,
34:1, 35:4, 37:23,
38:14, 38:18, 40:4,
56:7, 58:7, 63:6,
66:14, 75:17, 79:13
**upper** [2] - 47:8, 59:17
**upset** [1] - 71:16
**upwards** [1] - 76:21

**USAO01141811** [1] -
11:18

## V

**vacation** [1] - 54:10
**value** [3] - 27:21,
52:22, 56:7
**various** [3] - 35:2,
52:13, 72:10
**vendors** [1] - 69:1
**venture** [1] - 64:12
**verdict** [6] - 34:8,
34:10, 34:13, 36:18,
37:19, 65:4
**version** [1] - 60:2
**via** [1] - 15:5
**videoconference** [1] -
15:5
**violate** [1] - 39:22
**visited** [1] - 6:6
**voice** [1] - 53:6
**voicemail** [3] - 11:1,
11:12, 12:1
**VOLUME** [1] - 1:9
**vs** [8] - 1:7, 36:20,
36:21, 36:25, 37:3,
37:8, 37:11, 37:14

## W

**walk** [1] - 44:19
**walked** [2] - 74:2, 74:6
**wants** [1] - 9:22
**watch** [1] - 48:9
**Webex** [1] - 15:5
**WEDNESDAY** [2] -
1:15, 4:1
**week** [3] - 63:4, 63:9,
63:19
**weekly** [1] - 8:20
**Weiner** [1] - 81:17
**West** [1] - 2:6
**WEST** [1] - 1:24
**whatsoever** [4] -
26:14, 58:15, 60:17,
60:25
**William** [1] - 55:21
**wind** [1] - 65:25
**Winters** [1] - 30:9
**wire** [3] - 57:6, 57:9,
68:21
**withdraw** [1] - 37:12
**withdrawn** [1] - 23:15
**withdrew** [1] - 36:14
**WITNESS** [13] - 4:9,
6:11, 10:21, 11:9,
11:24, 25:23, 29:3,
31:17, 36:10, 52:12,
52:19, 53:22, 58:24

**witness** [9] - 5:8,
43:12, 72:14, 72:18,
75:4, 79:19, 81:10,
81:13
**witnesses** [2] - 81:3,
81:16
**WITNESSES** [1] - 3:2
**Woods** [1] - 37:8
**words** [2] - 8:25, 9:3
**write** [1] - 59:4
**written** [4] - 4:17, 78:6
**Wyman** [3] - 15:10,
19:4, 19:17
**WYMAN** [1] - 2:10

## X

**X-Law** [1] - 57:6

## Y

**year** [1] - 72:9
**years** [17] - 30:13,
30:16, 42:16, 42:18,
43:6, 44:4, 55:10,
55:13, 64:23, 66:3,
69:17
**yes-or-no** [2] - 11:7,
11:13
**yesterday** [4] - 21:14,
22:4, 45:11, 55:1
**Yin** [3] - 70:15, 70:17,
70:23
**York** [5] - 76:14,
76:22, 77:21, 79:5,
79:20

## Z

**zero** [3] - 24:12, 24:14,
24:21