1    **UNITED STATES DISTRICT COURT**

2    **CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

3    **HONORABLE JAMES V. SELNA, U.S. DISTRICT JUDGE**

4

5    UNITED STATES OF AMERICA,                    )
                                                  )
6                      Plaintiff,                 )   <u>**CERTIFIED TRANSCRIPT**</u>
                                                  )
7         vs.                                     )   Case No.
                                                  )   SACR-19-00061-JVS
8    MICHAEL JOHN AVENATTI,                       )
                                                  )   **TRIAL DAY 11**
9                      Defendant.                 )   **VOLUME 2**
                                                  )

10

11

12

13

14

                REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                  THURSDAY, JULY 29, 2021

16                         1:00 P.M.

17                   SANTA ANA, CALIFORNIA

18

19

20

21

22

23

24    **DEBBIE HINO-SPAAN, CSR 7953, CRR**
       FEDERAL OFFICIAL COURT REPORTER
       411 WEST 4TH STREET, ROOM 1-053
25           SANTA ANA, CA 92701
             dhinospaan@yahoo.com

**UNITED STATES DISTRICT COURT**

1                       **APPEARANCES OF COUNSEL:**

2

3    **FOR THE PLAINTIFF:**

4              NICOLA T. HANNA
               United States Attorney
5              BY:  BRETT SAGEL
                   Assistant United States Attorney
6              411 West 4th Street
               Suite 8000
7              Santa Ana, California 92701
               714-338-3598
8              brett.sagel@usdoj.gov

9              NICOLA T. HANNA
               United States Attorney
10             BY:  ALEXANDER WYMAN
                   Assistant United States Attorney
11             312 North Spring Street
               Suite 1100
12             Los Angeles, California 90012
               213-894-2435
13             alex.wyman@usdoj.gov

14   **FOR THE DEFENDANT IN PRO SE:**

15             MICHAEL JOHN AVENATTI, ESQ.

16

     **STANDBY COUNSEL FOR MR. AVENATTI:**
17
               H. DEAN STEWARD LAW OFFICES
18             BY:  H. DEAN STEWARD, ESQ.
               17 Corporate Plaza
19             Suite 254
               Newport Beach, California 92660
20             949-481-4900
               deansteward7777@gmail.com

21

22

23

24

25

                      **UNITED STATES DISTRICT COURT**

1                        **I N D E X**

2     **WITNESSES**                                    **PAGE**

3     **JUDY REGNIER, CALLED BY THE GOVERNMENT**
          Cross-Examination by Mr. Avenatti (resumed)      7
4         Redirect Examiantion by Mr. Sagel              25
          Recross-Examination by Mr. Avenatti            57
5
      **JOEL WEINER, CALLED BY THE GOVERNMENT**
6         Direct Examination by Mr. Sagel               68

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                   **UNITED STATES DISTRICT COURT**

**I N D E X**
(Continued:)


**EXHIBITS**

| EXHIBIT | | IN EVIDENCE | WITHDRAWN OR REJECTED |
|---|---|---|---|
| 61 | 5/14/2015 e-mail from Regnier to Avenatti re Geoff Johnson with attachment | 8 | |
| 1013 | Document USAO565508 | | 15 |
| 373 | Signature Card - CNB 8611 | 20 | |
| 385 | Signature Card - EA 8671, EA 3714, EA 4613 | 21 | |
| 135 | 12/22/2016 e-mail from Avenatti to Weiner and Hon. Meisinger | 72 | |
| 139 | 1/7/2017 Settlement Agreement Between Gardner and Whiteside | 76 | |
| 141 | 1/16/2017 e-mail from Avenatti to Weiner re call | 81 | |
| 144 | 1/20/2017 e-mail from Avenatti to Weiner re call | 83 | |
| 145 | 1/20/2017 Voicemail from Avenatti to Weiner | 85 | |
| 151 | 1/25/2017 Voicemail from Avenatti to Weiner | 86 | |
| 150 | 1/25/2017 e-mail from Avenatti to Weiner re call | 89 | |

**SANTA ANA, CALIFORNIA; THURSDAY, JULY 29, 2021**

**1:00 P.M.**

**- - -**

01:00PM    **(Out of the presence of the jury.)**

THE COURT:  Mr. Sagel, are you prepared to address the request that I made before we adjourned?

MR. SAGEL:  Yes, Your Honor.  Any and all text messages that we've received from Ms. Regnier or any other witness that would apply under *Jencks*, that we're aware of, have been disclosed.  The only -- I'll start with two parts. One answer was "I may."  Second, what I would say is the way we've kept and done in every text message and e-mail, and so forth, in this case, we've disclosed them.  We don't have any other.

The only ones we have are text messages that are with an agent this week saying, "I'm here, I'm parking, I'm coming up," stuff like that.  Nothing having to do with her testimony.  Based on everything that's in the Government's possession, we've turned them over to the defendant.  There's nothing more.

THE COURT:  Okay.

MR. AVENATTI:  Your Honor, Ms. Regnier testified --

THE COURT:  Sir, I know what she testified to.  I have the Government's response.  The record is full.

1          MR. AVENATTI:  I have not received any text messages

2    from the Government that Ms. Regnier sent to any government

3    agent or AUSA.  If I am incorrect, I would like -- I would

4    invite Mr. Sagel to correct me.

01:01PM  5          Your Honor, it's not sufficient under the law for us

6    to raise a legitimate *Jencks* issue based on the testimony of

7    the witness and for the Government to just simply say, "They

8    have everything."  That --

9          THE COURT:  Sir, I have the Government's response.

01:01PM 10   It is sufficient.  If you wish to make a motion on the basis of

11   present record, please proceed to do so.  You indicated you

12   were going to do that in writing.  I will look for it.

13         MR. AVENATTI:  And, Your Honor, I appreciate that,

14   but --

01:02PM 15         THE COURT:  Sir, I closed out this issue at this

16   moment.  We need to convene the jury.

17         MR. AVENATTI:  This is highly --

18         THE COURT:  Sir, we need to convene the jury.

19         MR. AVENATTI:  I understand, Your Honor.  This is

01:02PM 20   highly prejudicial.  I have no text messages.

21         THE COURT:  I indicated tomorrow morning we would

22   discuss the documents or portions of documents that were being

23   admissible.  I invite the Government at that time to express

24   its view whether Mr. Avenatti would qualify as an adverse party

01:02PM 25   under 612(b) for purposes of introducing portions of documents

```
 1   into evidence.
 2            Let's bring the jury in, please.
 3            (In the presence of the jury.)
 4            THE COURT:  Good afternoon, ladies and gentlemen.
 5            (The jury collectively responded "Good afternoon.")
 6            THE COURT:  Mr. Avenatti.
 7            MR. AVENATTI:  Thank you, Your Honor.
 8            JUDY REGNIER, WITNESS, RESUMED THE STAND
 9                    CROSS-EXAMINATION
10   BY MR. AVENATTI:
11   Q    Good afternoon, Ms. Regnier.
12   A    Good afternoon.
13            MR. SAGEL:  Your Honor, the defendant is not wearing
14   a mask or a shield at this point.
15            THE COURT:  People sometimes forget, as I did first
16   thing this morning.
17            Proceed.
18            MR. AVENATTI:  Apologies, Your Honor.
19   Q    Good afternoon, Ms. Regnier.
20   A    Good afternoon.
21   Q    Could I direct your attention to Exhibit 61.
22            And, Your Honor, I don't believe 61 is in evidence
23   yet.
24            THE COURTROOM DEPUTY:  It is not.
25   Q    BY MR. AVENATTI:  Do you have 61, Ms. Regnier?
```

The timestamps in left margin: 01:04PM (line 5), 01:04PM (line 10), 01:04PM (line 15), 01:04PM (line 20), 01:05PM (line 25).

```
 1   A     Yes, I do.

 2   Q     Do you recognize the bottom portion of this e-mail and

 3   the attachment as a document that Mr. Sagel asked you about on

 4   direct; correct?

 5   A     Yes.  Yes.

 6   Q     Included within that document, though, was not the top

 7   half of 61; correct?

 8   A     I don't believe so.

 9   Q     Is the top half of Exhibit 61 a continuation of the

10   e-mail that Mr. Sagel asked you about on direct?

11   A     Yes.  It appears to be so, yes.

12   Q     And is this an e-mail that you sent on or about May 14th,

13   2015, to me regarding Mr. Johnson?

14   A     Yes, it is.

15              MR. AVENATTI:  Your Honor, at this time, I'd offer

16   Government Exhibit 61.

17              MR. SAGEL:  No objections, Your Honor.

18              THE COURT:  61 will be received.

19              (Exhibit Number 61 received.)

20              MR. AVENATTI:  Can we publish the top half of 61,

21   please.

22   Q     Let's start with the date, please, May 14, 2015.

23   A     Correct.

24   Q     And then you wrote:

25              "Michael, Geoff Johnson sent me the below and
```

The timestamps in the left margin: 01:05PM (line 5), 01:05PM (line 10), 01:06PM (line 15), 01:06PM (line 20), 01:07PM (line 25).

```
          1            attached.  He received it from the individual he

          2            met with regarding housing."

          3                 Correct?

          4   A    Yes.

01:07PM   5                 MR. AVENATTI:  And then let's blow up separately,

          6   Joe, please, beginning with "Also Phillip Johnson called and

          7   had three questions," down to the name Judy.

          8                 I'm just going to do it the old fashion way,

          9   Your Honor.

01:08PM  10   Q    Can you see that, Ms. Regnier?

         11   A    Yes.

         12   Q    Now, am I correct that Mr. Sagel didn't ask any questions

         13   about this portion of the e-mail?

         14   A    I don't believe he did, no.

01:09PM  15   Q    Can you please read the introductory statements, starting

         16   with "Also."

         17   A    "Also, Phillip Johnson called and had three

         18            questions.  One, is there a provision in the

         19            judgment for he and his wife to be reimbursement for

01:09PM  20            monies they expended on Geoff's behalf for

         21            attorneys' fees, housing, et cetera."

         22   Q    Stop there.  Does this refresh your recollection that you

         23   had a call with Mr. Johnson's father on or about this date and

         24   he asked three questions?

01:09PM  25   A    Yes.
```

```
 1   Q    And the first question he asked was whether there was a

 2   provision in the judgment for he and his wife to receive

 3   reimbursement; correct?

 4   A    Yes.

 5   Q    During that same call, he expressed a concern as to how

 6   the money would be handled; right?

 7   A    Yes.

 8   Q    Please read Number 3.

 9   A    "Due to Geoff's bipolar situation, he wants to

10        know if there is something that can be put into

11        place so that Geoff does not have full control of

12        the monies and not use them for his living

13        expenses."

14   Q    Does that refresh your recollection that that's what

15   Mr. Johnson's father told you on or about that date, which you

16   then informed me of via e-mail?

17             MR. SAGEL:  Objection.  She never said her

18   recollection needed to be refreshed, Your Honor.

19             THE COURT:  Rephrase the question.

20   Q    BY MR. AVENATTI:  Ms. Regnier, do you have any reason to

21   dispute what you wrote to me on or about that date?

22   A    No.

23   Q    Did you send this e-mail to me shortly after your

24   conversation with Mr. Johnson's father?

25   A    Yes.
```

01:10PM 5
01:10PM 10
01:10PM 15
01:11PM 20
01:11PM 25

```
        1   Q    To the best of your recollection, is this what

        2   Mr. Johnson's father told you his concerns were as it related

        3   to Mr. Johnson having access to all the money?

        4   A    Yes.

01:11PM 5   Q    Did Mr. Sagel or Mr. Wyman ask you any questions about

        6   this portion of the e-mail when you met with them on more than

        7   ten occasions?

        8   A    I don't know if we went over this portion or not.  I don't

        9   recall.

01:12PM 10  Q    When Mr. Johnson said to you on the phone that he was

       11   concerned about Mr. Johnson -- strike that.

       12            When Mr. Phillip Johnson said to you on the phone

       13   that he was concerned about Mr. Geoff Johnson having access to

       14   all the money due to his bipolar situation, what did you

01:12PM 15  understand him to be telling you?

       16   A    Just exactly what he said there.

       17   Q    When you spoke with Mr. Phillip Johnson, did he ever

       18   mention to you Mr. Geoff Johnson's gambling problem?

       19   A    I don't recall that.

01:12PM 20  Q    Do you have a recollection of being copied on an e-mail

       21   that was sent on or about February 17, 2012, from me to Ruth

       22   Johnson?

       23   A    No, I don't have a recollection of that.

       24            MR. AVENATTI:  Your Honor, may I approach?

01:13PM 25            THE COURT:  You may.
```

**UNITED STATES DISTRICT COURT**

```
 1              MR. SAGEL:  We would just say it calls for
 2   inadmissible hearsay.  It's a statement of defendant, Your
 3   Honor.
 4              THE COURT:  This party is simply asking the witness
01:13PM  5   to review to refresh her recollection.
 6              MR. SAGEL:  As long as he's not reading from the
 7   document.
 8   Q    BY MR. AVENATTI:  Ms. Regnier, do you have what's been
 9   marked as Defense Exhibit 1013, beginning with USAO565508 in
01:14PM 10   front of you?
11   A    Yes, I do.
12   Q    Does this refresh your recollection that you were copied
13   on an e-mail that was sent on or about February 17, 2012, to
14   Mr. [sic] Ruth Johnson?
01:14PM 15   A    No.
16   Q    Do you have a recollection of learning in February 2012
17   that Ms. Johnson was very appreciative of our work at the firm
18   relating to her brother?
19              MR. SAGEL:  Objection, Your Honor.  Asked and
01:14PM 20   answered as well as improper refreshing.
21              THE COURT:  Overruled.
22              THE WITNESS:  No, I don't really recall.
23   Q    BY MR. AVENATTI:  Take a look at the bottom of 1013.  And
24   my question is, does this refresh your recollection that that
01:15PM 25   was true?
```

1    A    Not really.  But I don't doubt that it was true.  I don't

2    dispute it.

3    Q    Is 1013 an e-mail that you received or were copied on, on

4    or about February 17, 2012?

01:15PM 5    A    Yes.  It shows I was cc'd on it.

6    Q    Was this e-mail, to the best of your knowledge, kept in

7    the ordinary course of business of Eagan Avenatti, LLP?

8    A    Yes.  I'm sure it was.

9    Q    One of your roles at Eagan Avenatti, LLP, during the year

01:16PM 10   2012, was to ensure that the electronic files of the firm were

11   properly maintained; am I right about that?

12   A    Yes.  I mean, we had IT help.

13         MR. AVENATTI:  Your Honor, at this time I'd offer

14   Defense Exhibit 1013 into evidence.

01:16PM 15        MR. SAGEL:  Objection, Your Honor.  Hearsay and

16   Rule 16, Your Honor.

17         THE COURT:  Any other basis for receiving it?

18         MR. AVENATTI:  I'm sorry, Your Honor?

19         THE COURT:  Is there any other basis for receiving

01:16PM 20   it?

21   Q    BY MR. AVENATTI:  Ms. Regnier, as you moved forward on

22   the Johnson matter --

23         THE COURT:  Well, why don't you answer that question

24   so I can rule on your offer and the objections.

01:17PM 25        MR. AVENATTI:  I was trying to establish the

        1   foundation, Your Honor, for the additional offer.  But --
        2            THE COURT:  Okay.  Go ahead.
        3            MR. AVENATTI:  Thank you, Your Honor.
        4   Q    Ms. Regnier, it's fair to say that as of the date of this
01:17PM 5   e-mail, February 17, 2012, it was fairly early on in the
        6   Johnson matter.  Is that fair to say?
        7   A    Yes, it is.
        8   Q    And during that time period, do you have a general
        9   recollection that we were communicating with Ms. Ruth Johnson
01:17PM 10  in connection with the care for her brother?
       11   A    I know the firm was communicating with her.
       12   Q    And that was in connection with ensuring that he was
       13   properly cared for; correct?
       14   A    I'm -- yes.  I don't believe I had any direct
01:17PM 15  communication with her.
       16            MR. AVENATTI:  Your Honor, we would offer 1013 as a
       17   statement of an agent, a business record, and recollection
       18   refreshed.
       19            MR. SAGEL:  Same objections.  It's defendant's
01:18PM 20  statement, Your Honor.
       21            MR. AVENATTI:  Your Honor, at a minimum we'd ask
       22   that the bottom portion be admitted.
       23            THE COURT:  Well, it appears the document -- one,
       24   she didn't testify that it refreshed her recollection as to any
01:18PM 25  portion; two, the Rule 16 obligation.  1013 is refused.

|  |  |
|---|---|
| 1 | **(Exhibit Number 1013 denied.)** |
| 2 | Q    BY MR. AVENATTI:  Ms. Regnier, do you have a recollection |
| 3 | that Mr. Johnson's family was incredibly appreciative in |
| 4 | February 2012 relating to our efforts on behalf of Mr. Johnson? |
| 01:18PM 5 | MR. SAGEL:  Asked and answered and 403, Your Honor. |
| 6 | THE COURT:  Sustained. |
| 7 | Q    BY MR. AVENATTI:  Ms. Regnier, do you have a recollection |
| 8 | that members of Mr. Johnson's family expressed to individuals |
| 9 | at the firm that we had worked tirelessly on his behalf? |
| 01:19PM 10 | MR. SAGEL:  Same objections, Your Honor. |
| 11 | THE COURT:  Sustained. |
| 12 | Q    BY MR. AVENATTI:  Ms. Regnier, do you have a recollection |
| 13 | of saving what has been marked as Exhibit 1013 in the files of |
| 14 | the law firm? |
| 01:19PM 15 | A    I -- no, I don't recall.  But it would have been something |
| 16 | I would have normally done. |
| 17 | Q    And why would you have normally saved 1013? |
| 18 | A    If it's something that -- it was in the file where people |
| 19 | said nice things. |
| 01:20PM 20 | MR. AVENATTI:  Your Honor, I offer 1013. |
| 21 | THE COURT:  Refused.  Same reasons. |
| 22 | Q    BY MR. AVENATTI:  Before you took the stand, Ms. Regnier, |
| 23 | did Mr. Sagel or any other government agent or attorney ask you |
| 24 | about the content of 1013? |
| 01:20PM 25 | A    No, I don't believe they did. |

```
 1   Q    Please take a look at Exhibit 157, which I do not believe

 2   is admitted yet.

 3            THE COURT:  I have 157 as being admitted on 7/27.

 4            MR. AVENATTI:  Your Honor, I think you're right.  I

 5   think it's the next one that's not admitted.  My mistake.

 6            MR. SAGEL:  158 is also in.

 7            THE COURT:  Correct.

 8            MR. AVENATTI:  I'm not asking about 158.  I'm just

 9   asking about 157.

10            THE COURT:  Proceed.  It's in evidence.

11            MR. AVENATTI:  Thank you.

12   Q    Ms. Regnier, take a look at 157.  Do you have that in

13   front of you?

14   A    Yes, I do.

15   Q    You don't know if 157 is accurate or not; correct?

16   A    Correct.

17   Q    And you're aware that payments were made in connection

18   with Ms. Gardner after the date here at the bottom, March 9,

19   2017; correct?

20   A    Yes, I believe they were.

21   Q    And in the upper left-hand corner is that famous date of

22   July 26, 2019.  As of that date you didn't have any QuickBooks

23   files in your possession; correct?

24   A    Correct.

25   Q    Let's go to 174.  Go to page 3, please .
```

1  A    Yes.

2  Q    The last entry is December 22nd, 2017.  Do you see that?

3  A    Yes, I do.

4  Q    And on the preceding page, the last entry is December 15,

01:22PM 5  2017.  Do you see that?

6  A    Yes, I do.

7  Q    Were there any payments made in connection with the

8  Barela matter after that date?

9  A    I --

01:23PM 10  Q    Strike that question.  Let me ask a better question.

11        After December 15, 2017, isn't it true that there

12  were payments made in connection with Greg Barela; true or

13  false?

14  A    I believe there were.

01:23PM 15  Q    In order to be certain, you'd have to check the

16  electronic records; right?

17  A    Yes, I would.

18  Q    Please go to Exhibit 221.

19        By the way, before we get to 221, in any of the

01:24PM 20  ten-plus meetings that you had with the Government, did they

21  ever ask you to review any electronic files with any of the

22  agents or assistant U.S. attorneys?

23  A    No, they did not.

24  Q    So they didn't ask you to review any electronic

01:24PM 25  QuickBooks data; right?

```
 1    A    Correct.
 2    Q    And they didn't ask you to review any electronic Tabs
 3  data either, did they?
 4    A    Correct.
 5    Q    Do you have 221?
 6         I don't believe 221 is in evidence, so please don't
 7  publish it to the jury yet.
 8             THE COURT:  That's correct.
 9    Q    BY MR. AVENATTI:  Ms. Regnier, do you have 221?
10    A    Yes, I do.
11    Q    Do you see at the top of the first page, it says
12  "Barela"?
13    A    Yes, I do.
14    Q    Do you have a recollection that there were payments made
15  to Mr. Barela in 2018 that are not reflected on this document?
16    A    You mean payments directly to Mr. Barela?
17    Q    Let me ask a better question.
18         As you sit here today, you can't tell us whether all
19  the payments relating to Mr. Barela are reflected on 221; is
20  that true?
21    A    That's true.
22    Q    Please go to 329.  329 is another printout regarding
23  another matter; is that right?
24    A    Yes, it is.
25    Q    It's got that infamous date of July 26, 2019, in the
```

The timestamps shown in the left margin are: 01:24PM (line 5), 01:25PM (line 10), 01:25PM (line 15), 01:25PM (line 20), 01:26PM (line 25).

```
 1   left-hand corner; right?
 2   A     Yes.
 3   Q     And it relates to some of the costs from the NFL matter;
 4   is that right?
01:26PM  5         MR. SAGEL:  Your Honor, asked and answered.  He went
 6   over this and asked these same questions before lunch.
 7             THE COURT:  I don't think he did with respect to
 8   229.
 9             MR. AVENATTI:  No, I did not.
01:27PM 10             THE COURT:  Overruled.
11             MR. AVENATTI:  Thank you, Your Honor.
12   Q     Ms. Regnier, let me ask the question.  We probably lost
13   it.  So I'll strike the last question.
14             Here's the question:  329 can include some costs
01:27PM 15   related to the NFL matter?
16   A     Correct.
17   Q     Do you have any idea if this is all of the cost or not?
18   A     No, I do not.
19   Q     In order to figure that out, you have to have access to
01:27PM 20   the electronic data; is that correct?
21   A     That's correct.
22   Q     Please go to Exhibit 373.
23   A     Okay.
24   Q     Is 373 a signature card that you signed on or about --
01:28PM 25   well, in or about December of 2018?  And I'll direct your
```

 1    attention to the second and third pages.

 2    A    Yes, I signed it.

 3    Q    Please take a moment.  And my question is, yes or no,

 4    there's no limitation on your authority on this account listed

01:29PM 5    on this document?

 6    A    I do not see any.

 7    Q    Please go to Exhibit 385.

 8         MR. AVENATTI:  Actually, Your Honor, at this point

 9    we'd offer 373.

01:29PM 10        MR. SAGEL:  No objection, Your Honor.

 11        THE COURT:  373 will be received.

 12        **(Exhibit Number 373 received.)**

 13        MR. AVENATTI:  Can we publish that for the jury

 14   briefly, please, Joe.  Can we go to the third page.

01:30PM 15   Q    That's your signature that appears immediately below

 16   mine; is that right?

 17   A    Yes.

 18   Q    And if we go to the bottom of the preceding page, the

 19   heading, at the bottom where it says "authorized signers, sign

01:30PM 20   in box below," do you see that, Ms. Regnier?

 21   A    Yes.

 22   Q    And then your name appears below mine on the next page;

 23   right?

 24   A    Yes, it does.

01:30PM 25   Q    Okay.  If we can then go to 385.

```
 1              MR. AVENATTI:  It's not in evidence yet, so please

 2      don't publish it to the jury yet.

 3              MR. SAGEL:  Government would stipulate to its

 4      admission, Your Honor.

01:31PM  5              MR. AVENATTI:  Great.  We'll move 385 into evidence.

 6              THE COURT:  385 will be received.

 7              (Exhibit Number 385 received.)

 8              MR. AVENATTI:  Please publish 385 for the jury.

 9      Q    Ms. Regnier, this is a signature card for the Eagan

01:31PM 10      Avenatti, LLP, attorney-client trust account; correct?

11      A    Yes.

12              MR. AVENATTI:  Joe, can you -- there you go.  Thank

13      you.

14      Q    And your signature appears as an authorized signer

01:31PM 15      immediately below mine; right?

16      A    Correct.

17      Q    Please take a moment and tell me if there's any

18      limitation in this document on your signing authority or

19      ability to move funds.

01:32PM 20      A    No.  But --

21      Q    Thank you.

22              Now, Ms. Regnier, you were asked about whether at

23      the end of 2018 or 2019 mail was being sent to a P.O. Box or a

24      mailbox near your house in Yorba Linda.  Do you remember that?

01:32PM 25      A    Yes, I do.
```

```
 1   Q    Mail was also being sent to an office in Los Angeles
 2   where the leasor was The X-Law Group.  Do you remember that?
 3   A    Yes.
 4   Q    Now, you've described what transpired when the search
01:33PM 5  warrant was executed by Mr. Sagel and the others on March 25th,
 6   2019 yesterday; correct?  Do you recall that generally?  Yes?
 7   A    Yes.  Sorry.
 8   Q    Isn't it true that you informed the Government last year
 9   that you had been diagnosed with post-traumatic stress disorder
01:33PM 10 as a result of that search warrant and the way that it was
11   conducted?
12   A    Yes.
13   Q    Now, you were not here for opening statements in this
14   case; am I correct?
01:34PM 15 A    Correct.
16   Q    Okay.  Can you see this sheet?
17   A    Yes, I can.
18   Q    Do you recognize my handwriting?
19   A    Yes, I do.
01:34PM 20 Q    And at the top it says "calculation."  Do you see that?
21   A    Yes, I do.
22   Q    And the first item identified is the settlement amount;
23   is that right?
24   A    Yes, it is.
01:34PM 25 Q    And if you wanted to figure out how much a client was
```

```
 1    actually owed, the first thing, based on your experience at the
 2    firm, you would need to know would be how much was the
 3    settlement amount; am I right?
 4  A    Correct.
 5  Q    And then the second thing you would need to know, or
 6    among the things you would need to know next, would be how much
 7    are the attorneys' fees for that particular case; right?
 8  A    Correct.
 9  Q    And then the next thing you would want to know -- you
10    would have to know would be the total out-of-pocket
11    expenditures or expenses for the client; right?
12  A    Yes.
13  Q    And at our firm, in order to figure that out, you've got
14    to consult QuickBooks and Tabs; right?
15  A    Correct.
16  Q    And then the next thing you would need to know is if --
17    whether there was any money advanced for the benefit of the
18    client that was not listed as an expense; right?
19  A    Yes.
20  Q    And then you would also need to know if any interest was
21    being charged by the firm relating to those expenses; right?
22  A    We never discussed interest.
23  Q    Well, that you know of; right?
24  A    That I know of, correct.
25  Q    Okay.  But if interest was due, that would be something
```

01:35PM (line 5)
01:35PM (line 10)
01:35PM (line 15)
01:35PM (line 20)
01:36PM (line 25)

```
 1  that would be deducted from the settlement amount; right?
 2  A    I don't know.
 3  Q    Okay.  And then if there were fees due for other work or
 4  other matters that were done for the client, that would also
 5  need to be known and deducted; right?
 6  A    I -- not necessarily.  If it's another matter, there may
 7  be another settlement.  So I can't really comment on that.
 8  Q    But if there wasn't another matter -- I'm sorry.  If
 9  there wasn't another settlement, it's possible that could be
10  deducted from that settlement amount, is it not?
11  A    It's possible.
12  Q    And then that would result in a net amount due client;
13  right?
14  A    Yes.
15  Q    That's generally how you would determine how much money
16  was due a client at the end of the case; right?
17  A    Correct.
18  Q    Did you ever explain that to Mr. Sagel or any of the
19  other government agents or attorneys?
20  A    Yes.  Not about the interest or the other work, but the
21  remainder of it, yes.
22  Q    Do you have any idea why they never bothered to look at
23  the actual data?
24            MR. SAGEL:  Objection.  Argumentative, Your Honor.
25            THE COURT:  Sustained.
```

01:36PM 5
01:36PM 10
01:36PM 15
01:37PM 20
01:37PM 25

**UNITED STATES DISTRICT COURT**

|   |   |
|---|---|
| 1 | MR. AVENATTI:  Nothing further. |
| 2 | **REDIRECT EXAMINATION** |
| 3 | BY MR. SAGEL: |
| 4 | Q    Ms. Regnier, yesterday when defendant was asking you on |
| 01:38PM 5 | cross-examination, he started with, "And Mr. Sagel asked you |
| 6 | about the financial conditions of the firm from 2015 to 2019." |
| 7 | Do you remember that? |
| 8 | A    Yes, I do. |
| 9 | Q    And then he turned to a $454 million verdict that he |
| 01:39PM 10 | obtained in the *Kimberly-Clark* case.  Do you remember that |
| 11 | question? |
| 12 | A    Yes, I do. |
| 13 | Q    And then he went to the 20 to 25 percent contingency fee |
| 14 | that he and the firm were entitled to from that judgment; is |
| 01:39PM 15 | that correct? |
| 16 | A    Yes, he did. |
| 17 | Q    Now, when he mentioned Mr. Ricci, he again mentioned the |
| 18 | $454 million verdict the defendant obtained in the |
| 19 | *Kimberly-Clark* case; is that correct? |
| 01:39PM 20 | A    Yes, it is. |
| 21 | Q    So I can write it on this board, how much money did the |
| 22 | firm get from the *Kimberly-Clark* case? |
| 23 | MR. AVENATTI:  Objection, Your Honor.  Relevance. |
| 24 | THE COURT:  Overruled. |
| 01:39PM 25 | THE WITNESS:  None. |

```
 1   Q    BY MR. SAGEL:  Zero?

 2   A    Zero.

 3   Q    Were there fees and expenses in the Kimberly-Clark case?

 4   A    Yes, there were.

 5   Q    Substantial fees?

 6   A    Yes.

 7   Q    Substantial fees and costs with no money returned.  How

 8   did that help the financial condition of the firm?

 9        MR. AVENATTI:  Objection.  Argumentative.

10        THE COURT:  Restate the question.  Restate the

11   question.

12   Q    BY MR. SAGEL:  If the firm recovered zero and had

13   substantial fees and costs, how did the Kimberly-Clark case

14   help the financial condition of the firm?

15        MR. AVENATTI:  Same objection, Your Honor.

16        THE COURT:  Overruled.

17        THE WITNESS:  It didn't.

18   Q    BY MR. SAGEL:  Yesterday when the defendant was referring

19   to your meetings with the Government, he even said to you, "In

20   your 18 meetings with the Government, did you say this to the

21   Government"; is that correct?

22   A    Yes, he did.

23   Q    Do you still have the notes for the meeting that he had

24   given you yesterday up there?

25   A    Yes.
```

01:40PM (line 5)
01:40PM (line 10)
01:40PM (line 15)
01:40PM (line 20)
01:41PM (line 25)

```
 1    Q    When he asked you about the November 16, 2019, meeting,
 2    he mentioned that Special Agent Carlos and myself were present
 3    along with others.  Do you recall that?
 4    A    Yes.
 5    Q    Do you have the November 26, 2019, meeting in front of
 6    you?
 7    A    No, I don't.  I don't have those notes here.
 8              MR. SAGEL:  May I approach, Your Honor?
 9              THE COURT:  You may.
10              MR. SAGEL:  Do you have this?
11              MR. AVENATTI:  No.  I need it.
12    Q    BY MR. SAGEL:  Do you see the November 26 statements
13    there, Ms. Regnier?
14    A    Yes, I do.
15    Q    Now, while Special Agent Carlos and I were present, that
16    was not an interview conducted by either of us, was it?
17    A    No, it wasn't.
18    Q    And it wasn't about this case, was it?
19              MR. AVENATTI:  Objection, Your Honor.
20              THE COURT:  Yes?
21              MR. AVENATTI:  Court's prior ruling, Your Honor.
22              MR. SAGEL:  It wasn't about this case.
23              MR. AVENATTI:  That wasn't the ruling, Your Honor.
24              THE COURT:  Overruled.
25              THE WITNESS:  No, it wasn't about this case.
```

**UNITED STATES DISTRICT COURT**

```
 1    Q    BY MR. SAGEL:  Was it about another matter?

 2    A    Yes, it was.

 3    Q    He asked you about a January 9th, 2020 meeting.  And he

 4    asked if I was part of it.  Do you have the January 9th meeting

 5    there?

 6    A    No, I don't.

 7    Q    Let me try and short-circuit it.  Of the 18 meetings he

 8    provided you documents to get the dates on yesterday, were

 9    approximately five of them on another matter?

10    A    Yes, they were.

11    Q    And neither myself, AUSA Andre or Special Agent Carlos

12    were asking you questions in those matters -- in those

13    interviews; correct?

14    A    Correct.

15    Q    Those weren't meetings about this case?

16    A    No, they weren't.

17              MR. AVENATTI:  Objection, Your Honor.

18              THE COURT:  Overruled.

19    Q    BY MR. SAGEL:  And one of the meetings, and I can pull

20    the sheet over, but one of the meetings was where you signed a

21    piece of paper to get your digital devices back; is that

22    correct?

23    A    Yes, I believe it was.

24    Q    Was that a meeting with the Government to discuss this

25    case?
```

01:43PM  5
01:44PM 10
01:44PM 15
01:44PM 20
01:44PM 25

|       |    |                                                                          |
|-------|----|--------------------------------------------------------------------------|
|       | 1  | A    No, they just brought the devices and had me sign that I             |
|       | 2  | received them.                                                           |
|       | 3  | Q    One of the meetings he discussed was to pick up a box at             |
|       | 4  | your house; is that correct?                                             |
| 01:44PM | 5 | A    Yes.                                                                 |
|       | 6  | Q    Is that a meeting to discuss this case?                             |
|       | 7  | A    No.  They came and picked up the box.                              |
|       | 8  | Q    If I could have you pull up Exhibit 391.  If you could              |
|       | 9  | look at page 1 of Exhibit 391.                                          |
| 01:46PM | 10 | A    Okay.                                                               |
|       | 11 | Q    Do you see where it says "previous balance, zero"?                 |
|       | 12 | A    Yes, I do.                                                          |
|       | 13 | Q    And do you remember defendant asking you yesterday if the          |
|       | 14 | reason that the beginning balance was zero was because there            |
| 01:46PM | 15 | was no money to be held in trust for a client; is that correct?         |
|       | 16 | A    That's correct.                                                     |
|       | 17 | Q    Was it your understanding that an attorney-client trust             |
|       | 18 | account is to hold a client's money in trust?                           |
|       | 19 |       MR. AVENATTI:  Your Honor, lacks foundation.  Seeks                |
| 01:46PM | 20 | improper opinion testimony.                                              |
|       | 21 |       THE COURT:  Overruled.                                             |
|       | 22 |       THE WITNESS:  Yes.                                                 |
|       | 23 | Q    BY MR. SAGEL:  And based on your understanding of working          |
|       | 24 | at defendant's firm for 11 years, what monies were being               |
| 01:46PM | 25 | held -- let me rephrase that -- what monies were supposed to be         |

|   |   |
|---|---|
| 1 | held in an attorney-client trust account? |
| 2 | MR. AVENATTI:  Same objections, Your Honor. |
| 3 | THE COURT:  Overruled. |
| 4 | THE WITNESS:  Client monies. |
| 01:46PM 5 | Q   BY MR. SAGEL:  Based on your review of the bank records |
| 6 | and you working there, were Geoffrey Johnson's portion of his |
| 7 | $4 million settlement held in trust for him? |
| 8 | MR. AVENATTI:  Lacks foundation, Your Honor. |
| 9 | THE COURT:  Overruled. |
| 01:47PM 10 | THE WITNESS:  No. |
| 11 | Q   BY MR. SAGEL:  Defendant asked you many questions about |
| 12 | payments that were made to Geoffrey Johnson, whether it was his |
| 13 | rent, his living expenses, and what came after February 4th, |
| 14 | 2015. |
| 01:47PM 15 | Did defendant ever ask you to pay Geoffrey Johnson |
| 16 | his portion of the settlement? |
| 17 | A   No. |
| 18 | Q   Defendant asked you numerous questions yesterday, and I |
| 19 | believe even today, about the need to review both Tabs and |
| 01:48PM 20 | QuickBooks to see if costs were correct.  Is that -- |
| 21 | A   Yes. |
| 22 | Q   I'm going to have you look at Exhibit 102 again, page 7 |
| 23 | of 102.  Do you have 102 in front of you? |
| 24 | A   Yes, I do. |
| 01:48PM 25 | Q   So before the $4 million is deposited in this -- and just |

1    for the record, this is the Geoffrey Johnson QuickBooks

2    records; is that right?

3              MR. AVENATTI:  Objection.  Asked and answered.

4              THE COURT:  Overruled.

01:48PM 5              THE WITNESS:  Yes.

6    Q    BY MR. SAGEL:  And so if you were to look right before

7    the $4 million is deposited, at that point what are the

8    expenses at that time?

9              MR. AVENATTI:  Your Honor, speculation.  Conjecture.

01:49PM 10              THE COURT:  Overruled.

11              THE WITNESS:  $467,863.06.

12    Q    BY MR. SAGEL:  And if you were to look right below the

13    deposit, there are a handful of other expenses that are

14    included up to and including February 4th; is that correct?

01:49PM 15    Just below the $4 million.

16    A    Yes.

17    Q    And in a quick review, that's about $10,000 more in

18    expenses?

19    A    Yes.  Approximately.

01:49PM 20    Q    So according to the QuickBooks, as of about February 4th,

21    there's about $477,000 in expenses; is that correct?

22              MR. AVENATTI:  Objection, Your Honor.  Lacks

23    foundation.  Which QuickBooks?

24              THE COURT:  Overruled.

01:50PM 25              THE WITNESS:  Yes.

UNITED STATES DISTRICT COURT

```
          1    Q    BY MR. SAGEL:  These are the QuickBooks records you kept
          2    on behalf of the defendant?
          3              MR. AVENATTI:  Asked and answered, Your Honor.
          4              THE COURT:  Overruled.
01:50PM   5              THE WITNESS:  I believe they are, yes.
          6    Q    BY MR. SAGEL:  Now if I can have you look at Exhibit 48.
          7    Specifically page 8 of Exhibit 48.
          8    A    Okay.
          9    Q    At the bottom of page 8 -- and this is the Tabs for
01:51PM  10    Mr. Johnson; is that correct?
         11    A    Yes, it is.
         12    Q    At the bottom of page 8, what is the total amount here of
         13    expenses and costs and advances for Mr. Johnson?
         14    A    $736,883.89.
01:51PM  15    Q    And defendant asked you again yesterday if the firm paid
         16    for CareMeridian; is that correct?
         17    A    Yes, they did.
         18    Q    And based on your review of these records both in your
         19    direct and prior to your direct, do these records accurately
01:51PM  20    reflect the actual payments to CareMeridian?
         21              MR. AVENATTI:  Objection, Your Honor.  Calls for
         22    speculation.  Seeks to ignore the witness's prior testimony as
         23    to what she requires to answer these questions.
         24              THE COURT:  Overruled.
01:51PM  25              THE WITNESS:  No, it doesn't accurately reflect what
```

```
 1  was paid to CareMeridian.
 2  Q    BY MR. SAGEL:  Is that because on page 1 it has numerous
 3  expenses that weren't actually paid?
 4            MR. AVENATTI:  Leading.
 5            THE COURT:  Sustained.
 6            THE WITNESS:  Yes.
 7  Q    BY MR. SAGEL:  Let me ask it in a --
 8            THE COURT:  Next question.
 9            MR. AVENATTI:  Strike the answer, please.  Leading.
10            THE COURT:  Fine.
11  Q    BY MR. SAGEL:  If you were to look at page 1, are there
12  payments -- were the payments on page 1 all paid to
13  CareMeridian?
14  A    No.  In Tabs, these aren't payments.  These are just a
15  recording of the invoices that have been received.
16  Q    And then we also saw on page 6 the payment to
17  CareMeridian to settle the nonpayment issues, is that correct,
18  for 175?
19  A    Yes.
20  Q    Now, if we could look at Exhibit 391 again, on page 7.
21  And if it's easier, we might be able to put it on the screen
22  for you.
23  A    Okay.
24  Q    On February 4th of 2015, defendant withdrew $736,883.89;
25  is that correct?
```

**UNITED STATES DISTRICT COURT**

```
 1              MR. AVENATTI:  Your Honor, outside the scope.

 2              THE COURT:  Overruled.

 3              THE WITNESS:  Yes.

 4    Q    BY MR. SAGEL:  And that's the number from the larger of

 5    the two numbers we just talked about from the Tabs report?

 6    A    Yes.

 7    Q    From what you're looking at, does it appear that

 8    defendant looked at both Tabs and QuickBooks to ensure the

 9    accuracy of the costs and expenses?

10              MR. AVENATTI:  Objection, Your Honor.  Speculation.

11    Conjecture.  Argumentative.

12              THE COURT:  Sustained.

13    Q    BY MR. SAGEL:  Does this reflect what was in the

14    QuickBooks account?

15              MR. AVENATTI:  Objection.  Lacks foundation.  She

16    doesn't know what was in the QuickBooks account because she

17    doesn't have the data.

18              MR. SAGEL:  These are talking objections,

19    Your Honor.

20              THE COURT:  Sustained -- I'm sorry.  Overruled.

21    Q    BY MR. SAGEL:  Is this number accurate -- let me say it

22    again.

23              Is this number the number that was in the QuickBooks

24    record you just looked at?

25    A    No.
```

01:53PM (line 5)
01:53PM (line 10)
01:54PM (line 15)
01:54PM (line 20)
01:54PM (line 25)

```
 1   Q    This number is the number from the Tabs report you just

 2   looked at?

 3   A    Yes.

 4   Q    A Tabs report that had double counting in it?

 5   A    Yes, it did.

 6        MR. SAGEL:  If I could pull up Exhibit 25.  And if

 7   you can go to page 3.

 8   Q    This was the report created as of November 12th, 2014.

 9   Do you see that?

10   A    Yes, I do.

11   Q    And when defendant showed this to you, he asked you

12   questions about sometimes it's hard to predict the amounts that

13   a firm is going to make; is that correct?

14   A    Yes, it is.

15   Q    Now, if this is created on November 12th, 2014, five days

16   after defendant told a federal judge that all material terms in

17   the Geoffrey Johnson matter were already resolved, would it be

18   hard to predict how much the firm would be making?

19        MR. AVENATTI:  Objection, Your Honor.  Speculation.

20   Argumentative.

21        THE COURT:  Speculation sustained.

22   Q    BY MR. SAGEL:  On this sheet, on the Johnson matter, as

23   of November 12th, 2014, how much is listed there for the

24   estimated settlement?

25   A    One -- oh, for the estimated settlement?  4 million.
```

01:54PM 5

01:55PM 10

01:55PM 15

01:55PM 20

01:55PM 25

1    Q    When does it say it's going to be paid?

2    A    The 1st quarter of 2015.

3    Q    Are both of those inputs there as of November 12th, 2014,

4    accurate?

01:56PM 5           MR. AVENATTI:  Objection, Your Honor.  Speculation.

6    Accurate as to when?

7           THE COURT:  Overruled.

8           THE WITNESS:  I believe they are.

9    Q    BY MR. SAGEL:  Did Mr. Johnson get a $4 million

01:56PM 10   settlement in Quarter 1 of 2015?

11   A    I believe it was in Quarter 1 of 2015.  But, yes, he got a

12   $4 million settlement.

13   Q    Defendant had you go over possibly every single one of

14   these cases on this list and how much the firm either did or

01:56PM 15   didn't do on those cases and what they did or didn't get in

16   those cases; is that correct?

17          MR. AVENATTI:  Objection.  Misstates the testimony.

18   It is what it is.

19          THE COURT:  Overruled.

01:56PM 20   Q    BY MR. SAGEL:  He went over those cases with you

21   yesterday?

22   A    Yeah, he went over the cases with me.

23   Q    What, if anything, do any of those cases have to do with

24   whether or not Geoffrey Johnson got paid a settlement money?

01:57PM 25          MR. AVENATTI:  Objection, Your Honor.

1  Argumentative.

2          THE COURT:  Sustained.

3  Q    BY MR. SAGEL:  Did Mr. Johnson have anything to do with

4  any of those other cases?

01:57PM 5          MR. AVENATTI:  Objection, Your Honor.

6  Argumentative.

7          THE COURT:  Overruled.

8          THE WITNESS:  No.

9  Q    BY MR. SAGEL:  When talking about Alexis Gardner

01:57PM 10  yesterday and her rental property, defendant asked you numerous

11  questions about the, quote/unquote, "broken screen incident."

12  Do you remember that?

13  A    Yes, I do.

14  Q    The broken screen incident took place in September of

01:57PM 15  2017; is that correct?

16  A    I believe that's correct, yes.

17  Q    About eight or nine months after Ms. Gardner's settlement

18  money was deposited into her account; is that correct?

19          MR. AVENATTI:  Leading.

01:57PM 20          THE COURT:  Sustained.

21          MR. SAGEL:  Let me --

22          THE WITNESS:  Yes.

23          MR. AVENATTI:  Strike the answer, Your Honor.

24          THE COURT:  It will be stricken.

01:58PM 25  Q    BY MR. SAGEL:  Let me ask it a different way.  How many

UNITED STATES DISTRICT COURT

```
 1   months is September 2017 after January 2017?

 2   A     Nine months.

 3   Q     As it relates to Ms. Gardner's settlement monies due to

 4   her in January 2015, what does the broken screen have to do

 5   with her settlement?

 6              MR. AVENATTI:  Your Honor, argumentative, and it

 7   lacks foundation as to the predicate.

 8              THE COURT:  Overruled.

 9              THE WITNESS:  Nothing.

10   Q     BY MR. SAGEL:  If I could have you look at Exhibit 155.

11   This is an e-mail that had to do with -- tell me when you have

12   a chance to look at 155.

13   A     Okay.

14   Q     To move this along, this was the e-mail dealing

15   originally from Mr. Ohman where defendant told you to "ignore

16   this."  Do you see that?

17   A     Yes, I do.

18   Q     And defendant asked you if the reason he told you to

19   ignore it was maybe because it had already been taken care of?

20   A     Yes.

21   Q     He told you maybe he told you to ignore it because maybe

22   there wasn't a mistake?

23   A     Yes.

24   Q     If you could look at page 2.

25   A     Yes.
```

01:58PM (line 5)
01:58PM (line 10)
01:59PM (line 15)
01:59PM (line 20)
01:59PM (line 25)

**UNITED STATES DISTRICT COURT**

```
 1   Q    Is it possible he told you to ignore it because he didn't
 2   want you to see that on the same day you wired $2.5 million to
 3   The X-Law Group from the Alexis Gardner settlement?
 4              MR. AVENATTI:  Objection.  Argumentative,
 5   Your Honor.
 6              THE COURT:  Sir, let him finish the questions,
 7   please.
 8              MR. AVENATTI:  Understood, Your Honor.
 9   Argumentative and it's leading.
10              THE COURT:  Sustained.
11   Q    BY MR. SAGEL:  Did he want -- do you know whether or not
12   he wanted you to see where the $2.5 million to the Honda
13   Aircraft Company came from?
14              MR. AVENATTI:  Lacks foundation, Your Honor.
15   Argumentative.
16              THE COURT:  Overruled.
17              THE WITNESS:  Can you repeat?
18   Q    BY MR. SAGEL:  Do you know if the reason he asked you to
19   ignore this was so that you wouldn't see how Honda Aircraft
20   received $2.5 million?
21   A    I don't know if that's the case, but it could very well
22   be.
23   Q    We looked at an e-mail and you talked about how defendant
24   instructed you to send the $2.5 million to The X-Law Group
25   yesterday.  Do you recall that?
```

01:59PM  5
02:00PM 10
02:00PM 15
02:00PM 20
02:00PM 25

```
 1   A     Yes, I do.
 2   Q     Do you know why defendant didn't ask you to wire the
 3   $2.5 million directly to Honda Aircraft?
 4              MR. AVENATTI:  Objection, Your Honor.  Outside the
 5   scope.
 6              THE COURT:  Overruled.
 7              THE WITNESS:  No, I don't.
 8   Q     BY MR. SAGEL:  If I could have you look at Exhibit 387,
 9   page 15.
10              MR. AVENATTI:  Your Honor, this is a document that's
11   subject to redaction; so I'd ask that it be taken off the
12   screen until we figure that out.  If there's a particular line
13   item that he wants to ask about, perhaps he can identify that
14   for me.
15              MR. SAGEL:  There's not a single client on this --
16              MR. AVENATTI:  Objection.  That's not true,
17   Your Honor, and that's not appropriate.
18              THE COURT:  Sir, you will not tell people what's
19   appropriate.  I will decide what's appropriate.
20              MR. AVENATTI:  I agree, Your Honor.
21              THE COURT:  You can make objections.
22              MR. AVENATTI:  My objection is that we agreed that
23   this would be redacted, and they're blowing it up and it's
24   entirely inappropriate, Your Honor.
25              MR. SAGEL:  There has not been a single request for
```

02:00PM 5
02:01PM 10
02:01PM 15
02:02PM 20
02:02PM 25

```
 1   a redaction on this page.

 2            MR. AVENATTI:  That's not true, Your Honor.

 3            THE COURT:  Just a minute.

 4            MR. SAGEL:  This is the document he went over this

 5   morning.

 6            MR. AVENATTI:  Until this is resolved, I'd ask that

 7   it be taken down, Your Honor.

 8            THE COURT:  Take it down for the moment,

 9   Exhibit 387.

10            MR. SAGEL:  It's page 15, Your Honor.

11            THE COURT:  Which volume?

12            THE COURTROOM DEPUTY:  Which volume, Mr. Sagel?

13            MR. SAGEL:  Volume VI, 387, page 15.

14            MR. AVENATTI:  And it's also covered by the Court's

15   in limine order, Your Honor.

16            THE COURT:  Sir, give me a moment to find the

17   passage, please.  Is it morning or afternoon?

18            MR. SAGEL:  I'm sorry, Your Honor, I didn't hear

19   you.

20            THE COURT:  Point me to the volume.

21            THE COURTROOM DEPUTY:  He's talking about in the

22   transcript.

23            MR. SAGEL:  Oh, it would have been this morning.

24            The Government admitted it yesterday.  He showed

25   this page this morning, if that clarifies it.
```

02:02PM (line 5)
02:02PM (line 10)
02:03PM (line 15)
02:03PM (line 20)
02:03PM (line 25)

**UNITED STATES DISTRICT COURT**

```
 1              MR. AVENATTI:  Your Honor, this is covered by the
 2    Court's --
 3              THE COURT:  Sir, just a minute.
 4              MR. AVENATTI:  Okay.  I'll wait for your prompt,
 5    Your Honor.
 6              THE COURTROOM DEPUTY:  Judge, Volume I, page 41.
 7              (The Court and clerk conferred off the record.)
 8              THE COURT:  I don't see any request for redaction.
 9              MR. AVENATTI:  Your Honor, by way of the Court's in
10    limine ruling.
11              THE COURT:  Sir, there's no request for redaction in
12    yesterday's transcript.  Restate your question.
13              MR. SAGEL:  Can we publish page 15 of 387,
14    Your Honor?
15              THE COURT:  You may.
16              MR. SAGEL:  Thank you.
17    Q    The defendant asked you to look at this page and asked
18    you about the $120,000 payment to the -- I don't know if I'm
19    going to mispronounce their names, but the Huettners or
20    Huettners on that page; is that correct?
21    A    Yes, he did.
22    Q    Now, this is an attorney-client trust account; is that
23    correct?
24    A    Yes, it is.
25    Q    If you were to look at the first two payments on that
```

02:04PM  5
02:05PM 10
02:05PM 15
02:06PM 20
02:06PM 25

```
 1  page, those are to Passport 420; is that correct?
 2  A    Yes, it is.
 3  Q    The third payment is to Global Baristas?
 4  A    Yes, it is.
 5  Q    Fourth payment is the one we went over yesterday to
 6  Sulmeyer Kupetz?
 7  A    Yes.
 8  Q    The next one is to Global Baristas?
 9  A    Yes.
10  Q    Then Eagan Avenatti?
11  A    Yes.
12  Q    And if you look throughout this page, there is at least
13  10 or 15 more to Global Baristas; is that correct?
14  A    Yes, it is.
15  Q    And numerous ones to Avenatti & Associates?
16  A    Yes.
17  Q    And Passport 420?
18  A    Yes.
19  Q    Defendant asked you if there was anything unusual about
20  paying Patricia and Glenn Huettners' settlement money out of
21  this account by focusing on that one payment; is that correct?
22  A    Yes.
23  Q    Is there anything unusual using the attorney-client trust
24  account to pay for all of the defendant's other businesses?
25          MR. AVENATTI:  Objection, Your Honor.  Misstates the
```

```
         1   testimony.  Outside the scope.

         2              THE COURT:  Overruled.

         3              THE WITNESS:  Michael would instruct me to pay

         4   expenses out of various accounts, whichever the account

02:07PM  5   happened to be.

         6   Q    BY MR. SAGEL:  And then with regards to Glenn and

         7   Patricia Huettner --

         8              MR. AVENATTI:  Huettner.

         9              MR. SAGEL:  Huettner.  I apologize.

02:07PM 10   Q    -- you don't know if their settlement money came in six

        11   months earlier, do you?

        12   A    Not as I sit here, no.

        13   Q    And you don't know that their money went into a totally

        14   different account, do you?

02:08PM 15              MR. AVENATTI:  Objection.  Lacks foundation,

        16   Your Honor.

        17              THE COURT:  Overruled.

        18              THE WITNESS:  Not as I sit here, no, I don't know.

        19   Q    BY MR. SAGEL:  And if their money was handled properly,

02:08PM 20   you would see the deposits of their settlement money into this

        21   trust account, wouldn't you?

        22              MR. AVENATTI:  Objection.  Speculation.  Conjecture,

        23   Your Honor.

        24              THE COURT:  Overruled.

02:08PM 25              THE WITNESS:  Yes.
```

45

Q    BY MR. SAGEL:  Defendant went over his chart with you to

kind of -- how you calculate things?

A    Uh-huh.

Q    Talked about you need to know the settlement agreement?

A    Yes.

Q    The amount of the settlement?

A    Yes.

Q    He asked you if you need to know the attorneys' fees?

A    Yes.

Q    Cost and the advancements?

A    Yes.

Q    And as part of your responsibilities at Eagan Avenatti,

did you do that for the defendant and the firm to calculate

what attorneys' fees and what the clients were due?

A    Yes.

Q    And as part of those responsibilities, would you just

decide what the contingency fee was, or would you actually look

to the fee agreement?

A    I would look to the fee agreement.

Q    Defendant asked you to calculate 20 percent of

$28.5 million.  Do you remember that?

A    Yes.

Q    Do you know why he chose the number 20 percent?

A    No, I don't.

Q    If you were to figure out the cost and the fees due in

         1   the Michelle Phan and Long Tran matter, would you just take

         2   20 percent or would you look to the fee agreement?

         3   A    You would --

         4            MR. AVENATTI:  Objection.  Speculation and

02:09PM  5   conjecture, Your Honor.

         6            THE COURT:  Overruled.

         7            THE WITNESS:  You would look to the fee agreement.

         8   Q    BY MR. SAGEL:  And if the fee agreement was 7.5 percent,

         9   you wouldn't use 20 percent, would you?

02:09PM 10   A    No.

        11   Q    When the defendant asked you about the Barela mediation,

        12   he talked about all the time it took to finally resolve and all

        13   the back-and-forth; is that correct?

        14   A    Yes, he did.

02:10PM 15   Q    Now, when you look at -- we'll do it one by one.

        16            Can you look through the firm's QuickBooks records

        17   to keep track of costs and fees.  Is there any hourly rates in

        18   those?

        19            MR. AVENATTI:  Objection, Your Honor.  Lacks

02:10PM 20   foundation.  Which QuickBooks records are we talking about?

        21            THE COURT:  Overruled.

        22            THE WITNESS:  There's no hourly time kept in

        23   QuickBooks.

        24   Q    BY MR. SAGEL:  What about Tabs?

02:10PM 25   A    Yes.

47

```
         1   Q    Now, in contingency fee cases, did you keep track of the
         2   hourly fees for any costs or expenses?
         3   A    I'm sorry.  I don't understand.
         4   Q    Okay.  In the -- based on your understanding, were the
02:11PM  5   lawyers keeping track of their hours to charge the clients in
         6   contingency fee cases?
         7   A    No.
         8   Q    Why were lawyers not charging for their hours in
         9   contingency fee cases?
02:11PM 10   A    Because it was a contingency fee.  It's not an hourly fee.
        11   Q    So all of the back-and-forth and all the time it took to
        12   resolve Greg Barela's matter in mediation, that wouldn't change
        13   the cost in fees at all, would it?
        14   A    It wouldn't change for an hourly rate or a billable, no.
02:11PM 15   Q    I think it's Exhibit 372, but give me one second.
        16         Do you have Exhibit 372?
        17   A    Yes, I do.
        18   Q    Do you remember defendant asked you to look at these
        19   outgoing wires from the Barela settlement account?
02:12PM 20   A    Yes, I do.
        21   Q    He asked you if you'd do some quick math, your ballpark
        22   figure.  And I think your ballpark figure was approximately
        23   $730,000?
        24   A    Yes.
02:12PM 25   Q    Then he asked you what a 40 percent contingency of
```

         1    $1.9 million would be.  Do you remember that?

         2    A    Yes, I do.

         3    Q    And then he said was $760,000 slightly more or less than

         4    $730,000; is that right?

02:13PM   5    A    Correct.

         6    Q    Can you look at Exhibit 370, page 3.  Specifically

         7    January 8.  Do you see that?

         8    A    Yes, I do.

         9    Q    That was the cashier's check that you testified that

02:13PM  10    defendant directed you to send to Edward Ricci; is that

        11    correct?

        12    A    Yes, it is.

        13    Q    He didn't ask you to add that to the outgoing wires from

        14    the Gregory Barela settlement account, did he?

02:13PM  15    A    No, he did not.

        16    Q    If you were to add the $617,000 along with the $730,000,

        17    that would put you at about $1.34 million; is that correct?

        18    A    Yes, it is.

        19    Q    That's far in excess of a 40 percent contingency fee?

02:14PM  20    A    Yes, it is.

        21    Q    Looking at Exhibit 372, this is the attorney-client trust

        22    account for Gregory Barela settlement money; is that correct?

        23    The 5566 account?

        24    A    Yes, it is.

02:14PM  25    Q    And you've testified what the purpose of an attorney --

49

```
 1    your understanding of the purpose of an attorney-client trust

 2    account.  Does it appear that Gregory Barela's money --

 3    settlement money is being held in trust?

 4                MR. AVENATTI:  Objection, Your Honor.  Seeks an

 5    improper conclusion and a legal conclusion.  She's not an

 6    expert on attorney-client trust accounts.

 7                THE COURT:  Overruled.

 8                THE WITNESS:  I'm sorry.  Can you repeat?

 9    Q    BY MR. SAGEL:  Based on what -- your review of this

10    account and the monies going out of this account from the

11    Gregory Barela settlement attorney-client trust account, does

12    it look like Gregory Barela settlement money is being held in

13    trust?

14                MR. AVENATTI:  Objection.  Speculation.

15                THE COURT:  Overruled.

16                THE WITNESS:  No.

17    Q    BY MR. SAGEL:  Do you remember defendant asking you

18    questions about when you brought Gregory Barela his settlement

19    agreement in the conference room?

20    A    Yes.

21    Q    He asked you maybe three or four questions about what he

22    did or did not say while he brought it to you or asked you to

23    get it; is that correct?

24    A    Yes.

25    Q    Who told you to get the settlement agreement?
```

02:14PM  5
02:14PM 10
02:15PM 15
02:15PM 20
02:15PM 25

```
 1   A      Michael.
 2   Q      Who told you where to get it?
 3              MR. AVENATTI:  Objection.  Speculation.
 4              THE WITNESS:  I --
 5              THE COURT:  Just a minute.
 6              Overruled.
 7              THE WITNESS:  I believe it was on -- either on the
 8   system as a PDF or I had a hard copy.  I honestly don't
 9   remember.
10   Q   BY MR. SAGEL:  And when defendant asked you the
11   questions, he said after you got it he leafed through it; is
12   that correct?
13   A      That's correct.
14   Q      You don't know if the reason he was leafing through it
15   was to check the dates in the document you were providing him,
16   do you?
17              MR. AVENATTI:  Objection, Your Honor.  Speculation.
18   Argumentative.  And it lacks foundation.
19              THE COURT:  Overruled.
20              THE WITNESS:  No, I don't.
21   Q   BY MR. SAGEL:  My days are running together, so if it
22   wasn't this morning, I apologize, but I believe it was this
23   morning.
24              The defendant showed you numerous documents of
25   communications with Geoffrey Johnson and other members of the
```

02:15PM (line 5)
02:16PM (line 10)
02:16PM (line 15)
02:16PM (line 20)
02:17PM (line 25)

```
 1   firm -- is that correct? -- or e-mails?
 2   A    Yes.
 3   Q    Let me just ask you the first question.  Do you know if
 4   defendant knew about any of those communications on his own?
 5   A    No, I don't.
 6   Q    Do you know whether he authorized those communications
 7   separately?
 8   A    No, I don't.
 9   Q    All of the e-mail communications he had you look at were
10   from 2012 and 2013; is that correct?  Or maybe even '14, but
11   2012 to 2014?
12              MR. AVENATTI:  Misstates the evidence.
13              THE COURT:  Overruled.
14              THE WITNESS:  Yes, I believe so.
15   Q    BY MR. SAGEL:  None of them were at the time of the
16   settlement, were they?
17   A    No, I believe they weren't.
18   Q    None of them --
19   A    Or I don't believe they were.
20   Q    None of them were from after the settlement money was
21   received, were they?
22   A    No, I don't believe so.
23   Q    The defendant also showed you a few communications with
24   Mr. Barela with other members of the firm; is that correct?
25   A    Yes, he did.
```

02:17PM (lines 5, 10, 15, 20)
02:18PM (line 25)

1    Q    And all the communications with Mr. Barela were from 2016

2    and 2017; is that correct?

3    A    I believe so, yes.

4    Q    And they were all before the settlement in Mr. Barela's

02:18PM 5    case; isn't that correct?

6    A    Yes, that is.

7    Q    He didn't show you a single communication with another

8    member of the firm relating to the settlement, did he?

9         MR. AVENATTI:  Objection.  Misstates the evidence,

02:18PM 10   Your Honor.

11        THE COURT:  Overruled.

12        THE WITNESS:  I don't believe he did.

13   Q    BY MR. SAGEL:  Didn't show you any communications with

14   Mr. Barela from another member of the firm relating to the

02:18PM 15   receipt of the settlement money, did he?

16   A    No, I don't believe so.

17   Q    You mentioned a helicopter during the search warrant

18   yesterday; is that correct?

19   A    Yes.

02:19PM 20   Q    You don't know that it was actually a government

21   helicopter, do you?

22   A    It was Sheriff's Department, I believe.

23   Q    Sheriff's Department.  It was not Internal Revenue

24   Service, was it?

02:19PM 25   A    I don't know if they have a helicopter.

```
 1    Q     They only have cars, but we'll move past that.
 2               MR. AVENATTI:  Objection, Your Honor.
 3               THE COURT:  Remark will be stricken.
 4    Q     BY MR. SAGEL:  Were the agents -- you mentioned they were
 5    wearing, like, polos and khakis; is that correct?
 6    A     And jeans, yeah.
 7    Q     Were they respectful to you?
 8    A     The -- most of the agents were.  They weren't respectful
 9    to my property though.
10    Q     They let you put your dogs away, as you mentioned?
11    A     Yes, they did.
12    Q     And you chose on your own freely to meet with agents and
13    myself to give an interview that day?
14    A     Yes.  I was told I could leave if I wanted to.
15    Q     And each and every time you've met with the Government,
16    whether it be myself or special agents or anybody, you've done
17    so voluntarily?
18    A     Yes, I have.
19    Q     You've never asked for any protection whatsoever, have
20    you?
21    A     No, I have not.
22    Q     Government's never even offered you any protection, and
23    you've never asked?
24    A     Correct.
25    Q     Defendant asked you yesterday questions about what was
```

**UNITED STATES DISTRICT COURT**

1    said to you about attorney-client privileges at that first

2    meeting on March 25th, 2019; is that correct?

3    A    Yes.

4    Q    Was it description of what was said to you about -- what

02:21PM 5    was said to you about the attorney client privilege correct?

6         MR. AVENATTI:  Objection, Your Honor.

7         COURT REPORTER:  I'm sorry.  Can I get the question

8    again.

9         THE COURT:  Repeat the question.

02:21PM 10   Q    BY MR. SAGEL:  When defendant asked you questions about

11   what was stated on March 25th, 2019, about the attorney-

12   client privilege, was it description of what was said to you correct?

13        MR. AVENATTI:  Objection, Your Honor.  Foundation.

14   I mean, we ask questions; the witnesses provide answers.

02:21PM 15        THE COURT:  Overruled.

16        THE WITNESS:  I don't believe it was quite correct.

17   I really don't remember exactly what was said to me.  But I

18   believe I had been told that the Government had spoken with the

19   clients that they asked me questions about.

02:22PM 20   Q    BY MR. SAGEL:  Would reviewing the report of March 25th,

21   2019, help refresh your recollection of what was said to you

22   about the attorney-client privilege?

23   A    Yes.

24        MR. SAGEL:  One second, Your Honor.

02:22PM 25        THE WITNESS:  I think I have that one up here.  I

```
 1   do.
 2   Q    BY MR. SAGEL:  If you could look at paragraph 7.
 3   A    Yes.
 4   Q    Does that refresh your recollection of what was told to
 5   you on March 25th, 2019, about the attorney-client privilege?
 6   A    Yes, it does.
 7   Q    What were you so advised?
 8   A    That --
 9             MR. AVENATTI:  Asked and answered.
10             THE COURT:  Sorry?
11             MR. AVENATTI:  Asked and answered.
12             THE COURT:  Overruled.
13             THE WITNESS:  That they weren't going to ask me to
14   divulge any attorney-client information, although some clients
15   had waived their privilege, and that I was to let them know if
16   I was concerned about privilege while talking to them.
17   Q    BY MR. SAGEL:  Mr. -- I'm sorry.  The defendant, in
18   cross-examination over two days, approximately seven hours --
19             MR. AVENATTI:  Objection, Your Honor.
20   Argumentative.
21             THE COURT:  Just ask the question, please.
22   Q    BY MR. SAGEL:  During the course of the
23   cross-examination, how many questions or documents -- let's
24   start with questions.  How many questions did he ask you about
25   paying Mr. Johnson his portion of the settlement fees?
```

02:22PM  5
02:23PM 10
02:23PM 15
02:24PM 20
02:24PM 25

1          MR. AVENATTI:  Objection, Your Honor.  It's

2    improper.  Foundation.  Speculation.  It's not a proper

3    question.

4          THE COURT:  Overruled.

02:24PM 5          THE WITNESS:  None.

6    Q    BY MR. SAGEL:  How many documents did Mr. -- did the

7    defendant show you in which you paid Mr. Johnson his portion of

8    his settlement fees?

9    A    None.

02:25PM 10   Q    How many questions did the defendant ask you about your

11   payment -- about a payment to Alexis Gardner, her portion of

12   her settlement fee?

13   A    None.

14   Q    How many documents were you shown showing that Alexis

02:25PM 15   Gardner received her portion of her settlement fee?

16   A    None.

17   Q    How many questions were asked of you relating to

18   Mr. Barela receiving his portion of the settlement fee?

19   A    None.

02:25PM 20   Q    How many documents were shown to you where Mr. Barela

21   received his portion of the settlement fee from his settlement

22   trust account?

23   A    None.

24   Q    And how many documents did defendant show you that showed

02:26PM 25   you that he was entitled to the $4 million for Michelle Phan's

```
 1  second payment from her settlement agreement?
 2  A     None.
 3            MR. SAGEL:  No further questions, Your Honor.
 4            THE COURT:  We'll take the midafternoon break here,
 5  ladies and gentlemen.  We'll be in recess for 15 minutes.
 6  Please remember the admonition not to discuss the case with
 7  anyone or form any opinions on the issues in the case until
 8  it's submitted to you.  No research, please.
 9            THE COURTROOM DEPUTY:  All rise.
10            (Recess from 2:26 p.m. to 2:45 p.m.)
11            THE COURT:  Mr. Avenatti.
12                      RECROSS-EXAMINATION
13  BY MR. AVENATTI:
14  Q     Ms. Regnier, on redirect, how many questions did
15  Mr. Sagel ask you about the data for QuickBooks?
16  A     You mean electronic data?  None.
17  Q     Yes.  I'm sorry?
18  A     None.
19  Q     How many questions did Mr. Sagel ask you about the data
20  from Tabs?
21  A     Nothing on the electronic data.
22  Q     Mr. Sagel still hasn't asked you to look at any of the
23  electronic data from QuickBooks or Tabs, has he?
24  A     No, he has not.
25  Q     In order to figure out whether any money is owed to a
```

```
 1    client, you've got to know that out-of-pocket expenses and the
 2    advances, don't you?
 3              MR. SAGEL:  Asked and answered, Your Honor.
 4              THE COURT:  Sustained.
02:46PM  5              MR. AVENATTI:  Your Honor, it's recross on the
 6    redirect.
 7              THE COURT:  Sir, you asked that question on cross.
 8    You walked through that complete chart previously.
 9    Q    BY MR. AVENATTI:  Mr. Sagel didn't ask you any questions
02:46PM 10    about the chart, did he?
11    A    I don't think so.  No, not on the chart itself.
12    Q    Mr. Sagel, again, showed you Exhibit 102.  Let's go back
13    to 102.  It's on the screen if that's quicker.
14    A    Thank you.
02:47PM 15    Q    Ms. Regnier, are you changing any of your testimony from
16    earlier in the trial when you said that you didn't know whether
17    this document was accurate?
18    A    I don't know if this document is complete.
19    Q    Thank you.
02:47PM 20              You have no way of knowing whether this document is
21    accurate unless you look at the data; isn't that true?
22              MR. SAGEL:  Asked and answered, Your Honor.
23              THE COURT:  Sustained.
24              MR. AVENATTI:  Let's go to Exhibit 48.  Next page.
02:47PM 25    Q    Ms. Regnier, did Mr. Sagel ask you any questions about
```

```
 1    the accuracy of this document, yes or no?
 2    A     No.  But I ran the document.
 3    Q     Thank you.  The answer is "No."
 4          Move to strike the balance of the testimony,
 5    Your Honor.
 6          THE COURT:  It will be stricken.
 7          MR. AVENATTI:  Thank you.
 8          Exhibit 25, please.  Next page.  Next page.  Can we
 9    blow that up, please.
10    Q     Mr. Sagel didn't ask you about any other case on this
11    chart and the likely fee income or received fee income other
12    than the Johnson matter, did he?
13    A     No, he did not.
14    Q     As of the date of this document, was the settlement
15    agreement finalized and approved by the County of Los Angeles?
16    A     I'm not sure if it was or not.
17    Q     Okay.  Thank you.
18          Ms. Regnier, have you ever heard the phrase "many a
19    slip between the cup and the lip"?
20    A     No.
21    Q     Ms. Regnier, you know from your experience that until the
22    money comes in, no settlement is complete, do you not?
23    A     Yes.
24    Q     Let's go to Exhibit 25.  We were just there.  We were
25    talking about the attachment; correct?
```

02:48PM  5
02:49PM 10
02:49PM 15
02:50PM 20
02:51PM 25

```
 1   A     Yes.

 2   Q     What's the date at the top?

 3   A     November 12, 2014.

 4   Q     Let's take a look at the settlement agreement,

 5   Exhibit 11.

 6              I'm sorry.  Joe, it's a different exhibit.

 7              Your Honor, one moment.

 8              (Pause in proceedings.)

 9   Q     BY MR. AVENATTI:  As of November 14, had the money from

10   the Johnson case been received, Ms. Regnier?

11   A     No, it had not.

12   Q     Had the cost been calculated?

13   A     No.  I don't believe they had.

14   Q     You are not an expert on attorney-client trust account

15   issues, are you?

16   A     No, I'm not.

17   Q     Do you have any legal training as to the proper

18   accounting associated with settlements of cases?

19   A     No, I do not.

20   Q     Have you ever taken a single course on that topic?

21   A     No, I have not.

22   Q     Do you know what the rules and regulations are relating

23   to trust accounts and clients?

24   A     No.

25              MR. AVENATTI:  Turn to Exhibit 37, the settlement
```

```
  1    agreement with Mr. Johnson.  Last page, please.

  2    Q     Ms. Regnier, what's the date shown?

  3    A     January 21st, 2015.

  4    Q     Is January 21st before or after November 14, 2014, the

02:54PM  5    date of the chart that Mr. Sagel asked you about?

  6    A     After.

  7    Q     Who is Ellen Pansky?

  8    A     She's an attorney.

  9    Q     She's an ethics attorney that the firm would consult in

02:55PM 10    connection with trust account issues, isn't she?

 11           MR. SAGEL:  Objection.  Your Honor's ruling and

 12    outside the scope.

 13           THE COURT:  Outside the scope.  Sustained.

 14    Q     BY MR. AVENATTI:  Ms. Regnier, do you believe that

02:55PM 15    Ms. Pansky knew more about trust account issues than you did

 16    when you answered the questions for Mr. Sagel?

 17           MR. SAGEL:  Objection.  Same objection, Your Honor.

 18           THE COURT:  Outside the scope.  Sustained.

 19    Q     BY MR. AVENATTI:  Are you familiar with the regulations

02:56PM 20    relating to when cost and fees have to be deducted from a trust

 21    account?

 22           MR. SAGEL:  Asked and answered on cross-examination,

 23    Your Honor.

 24           THE COURT:  Overruled.

02:56PM 25           THE WITNESS:  No, I'm not.
```

```
 1   Q    BY MR. AVENATTI:  I'm sorry, what was that?

 2   A    No.

 3   Q    You were asked about the Kimberly-Clark case.  Do you

 4   remember that?

 5   A    Yes.

 6   Q    Okay.  I will represent to you that the charges in this

 7   case came about in about April of 2019.  Here's my question --

 8           MR. SAGEL:  Objection.  Strike his testimony,

 9   Your Honor.  No factual predicate.

10           MR. AVENATTI:  Your Honor, I don't think this is in

11   dispute.

12           MR. SAGEL:  Still not in evidence.

13           THE COURT:  Rephrase the question.

14   Q    BY MR. AVENATTI:  When Mr. Sagel showed up at your home

15   on March 25th, he told you that I had been arrested; correct?

16   A    I was told.  I'm not sure if it was Mr. Sagel or Mr. --

17   or --

18   Q    Carlos?

19   A    -- Carlos.  Sorry.

20   Q    All right.  One of the two told you I had been arrested

21   earlier on March 25; correct?

22   A    Yes.

23   Q    As of the date of my arrest, had the Kimberly-Clark

24   verdict been reduced to zero, yes or no?

25   A    No.
```

63

```
        1   Q    The Kimberly-Clark verdict was not overturned by the
        2   Court of Appeal until well into 2020; isn't that true?
        3   A    Yes.
        4   Q    So do you have any idea how the Court of Appeal
02:58PM 5   overturning the verdict could have an impact on the financial
        6   condition of the law firm before 2019?  Do you have any idea?
        7   A    I mean, it was up on appeal, so we received no money.
        8   Q    We had not received any money, but in your experience, we
        9   could borrow money on results from cases, couldn't we?
02:58PM 10  A    Yes.
        11  Q    In fact, that's what we did with The Peoples Bank, didn't
        12  we?
        13  A    Yes.
        14  Q    On multiple occasions, did we not?
02:58PM 15  A    I believe two occasions, yes.
        16  Q    And at the time of 2018, 2019, the firm had an
        17  expectation of a large fee in the *Kimberly-Clark* case; right?
        18  A    Yes.
        19  Q    And there were other cases during the years that had been
02:58PM 20  won at trial and then lost on appeal; right?
        21  A    Yes.
        22  Q    Other large cases; correct?  Yes?
        23  A    Yes.
        24  Q    And there were other cases that we didn't expect were
02:59PM 25  going to generate a lot of money, and they ultimately did
```

```
 1   generate a lot of money; is that right?
 2               MR. SAGEL:  Objection.  Outside the scope.
 3               THE COURT:  Sustained.
 4   Q    BY MR. AVENATTI:  And then you were asked about the
 5   meetings with the Government by Mr. Sagel on redirect.  Do you
 6   remember that?
 7   A    Yes.
 8   Q    And he made it a big point to point out, through you,
 9   that five or six of those meetings were either not meetings or
10   were not related, in his view, to this case; right?
11   A    Yes.
12   Q    Okay.  So let's take 18, and we'll deduct 5 or 6.
13   A    Okay.
14   Q    What's that number?
15   A    12 or 13.
16   Q    And that's 12 or 13 more times than you ever met with me
17   or Mr. Steward; right?
18   A    Yes.
19   Q    We didn't have the opportunity to do a dress rehearsal
20   relating to your answers to our questions, did we?  Yes or no?
21   A    No.
22   Q    You were also asked about Tabs by Mr. Sagel.  Namely, you
23   were asked if hourly fees were ever kept track of in Tabs.  Do
24   you recall that?
25   A    I was asked if hourly fees were kept track of in
```

02:59PM 5
02:59PM 10
03:00PM 15
03:00PM 20
03:01PM 25

```
 1    QuickBooks, I believe.
 2    Q    And you said, "No, they're not kept in QuickBooks," and
 3    then Mr. Sagel asked a follow-up question as to whether they
 4    were kept in Tabs.  Do you remember that?
 5    A    Yes.
 6    Q    Yes?
 7    A    Yes.
 8    Q    There were occasions, were there not, where hourly fees
 9    were kept track of in Tabs for contingency cases?
10    A    They were kept track of for class actions and for hourly
11    cases.
12    Q    Do you have any idea whether there was an agreement
13    between me and Mr. Barela relating to hourly work spent on
14    matters for him outside the intellectual property matter?
15              MR. SAGEL:  Objection.  Asked and answered several
16    times in cross.
17              MR. AVENATTI:  Following up on direct.
18              THE COURT:  Sustained.
19              MR. AVENATTI:  I'm sorry?
20              THE COURT:  Sustained.
21    Q    BY MR. AVENATTI:  You were asked about this payment to
22    Mr. Ricci and adding it to the $730,000; do you remember that?
23    A    Yes, I do.
24    Q    As you sit here today, without looking at the data from
25    QuickBooks and Tabs, you don't know what the costs were from
```

```
 1    the Barela matter; correct?

 2    A    Right.  Without --

 3    Q    Thank you.

 4         MR. AVENATTI:  Move to strike everything after

 5    "right."

 6         THE COURT:  It's stricken.

 7    Q    BY MR. AVENATTI:  Mr. Sagel asked you about bringing in

 8    the document to me in the conference room.  Do you recall that?

 9    A    Yes.

10    Q    And he asked you if -- various reasons that I may have

11    leafed through the document.  Do you remember that?

12    A    Yes.

13    Q    It's equally possible that I leafed through the document

14    to make sure that it was complete; right?

15    A    Yes.

16    Q    Mr. Sagel asked you about the helicopter above your home

17    when the search warrant was executed by Mr. Sagel and

18    approximately 11 other federal agents and individuals.  Do you

19    recall that?

20    A    Yes.

21    Q    And you said it was a Sheriff's Department helicopter;

22    right?

23    A    Yes.

24    Q    Do you think it was just a coincidence that a Sheriff's

25    Department helicopter happened to be there that day while
```

```
 1    Mr. Sagel and his federal agents went into your

 2    2,000-square-foot home?

 3              MR. SAGEL:  Objection.  Relevance.  Outside the

 4    scope.

 5              THE COURT:  Relevance sustained.

 6    Q    BY MR. AVENATTI:  Ms. Regnier, do you know how the

 7    Sheriff's Department helicopter that Mr. Sagel asked you about

 8    got there?

 9              MR. SAGEL:  Same objection.

10              THE COURT:  Sustained.

11    Q    BY MR. AVENATTI:  Ms. Regnier, are you an expert on the

12    attorney-client privilege and what it protects and does not

13    protect?

14    A    No, I'm not.

15    Q    So when Mr. Sagel told you when he interviewed you that

16    he wasn't going to be asking you any questions covered by the

17    attorney-client privilege, you relied on him to act in good

18    faith and not ask those questions; is that right?

19    A    Yes, I did.

20    Q    On redirect, Ms. Regnier, how many questions did

21    Mr. Sagel ask you relating to where he or Mr. Carlos or Mr. Kim

22    or Mr. Roberson, or any other federal agent, might be able to

23    find the QuickBooks or Tabs data?

24    A    He didn't.

25    Q    To the best of your knowledge, is it sitting on the
```

03:04PM (line 5)
03:04PM (line 10)
03:04PM (line 15)
03:04PM (line 20)
03:05PM (line 25)

```
 1  servers of Eagan Avenatti?
 2  A    It's on the computers or the servers of Eagan Avenatti,
 3  yes.
 4  Q    Do you know of any steps that Mr. Sagel or any other
 5  federal agent has taken to try to look at it?
 6  A    No.  I would not have that knowledge.
 7            MR. AVENATTI:  Nothing further.
 8            THE COURT:  May the witness be excused?
 9            MR. AVENATTI:  Your Honor, we reserve the right to
10  call her in our case in chief.
11            THE COURT:  Ms. Regnier, you're excused for now but
12  you're on recall.  Thank you.
13            Government call its next witness, please.
14            MR. SAGEL:  The Government calls Joel Weiner.
15       JOEL WEINER, GOVERNMENT WITNESS, WAS SWORN
16            THE COURTROOM DEPUTY:  If you'll state and spell
17  your first and last name.
18            THE WITNESS:  Joel, J-o-e-l, Weiner, W-e-i-n-e-r.
19            THE COURTROOM DEPUTY:  Thank you.  If you'll be
20  seated, please.
21            THE COURT:  Mr. Sagel.
22            MR. SAGEL:  Thank you, Your Honor.
23                    DIRECT EXAMINATION
24  BY MR. SAGEL:
25  Q    Good afternoon, Mr. Weiner.
```

03:06PM (line 5)
03:06PM (line 10)
03:08PM (line 15)
03:09PM (line 20)
03:09PM (line 25)

**UNITED STATES DISTRICT COURT**

```
         1    A     Good afternoon.

         2    Q     What do you do for a living?

         3    A     I'm a lawyer.

         4    Q     Where do you practice law?

03:09PM  5    A     I'm at a firm called Katten Muchin Rosenman in Century

         6    City.

         7    Q     And how long have you been a lawyer for?

         8    A     Graduated and passed the Bar in 1988.  A long while.

         9    Q     Over 30 years?

03:09PM 10    A     Yes.

        11    Q     Do you know an individual by the name of Hassan

        12    Whiteside?

        13    A     Yes.

        14    Q     How do you know who Hassan Whiteside is?

03:10PM 15    A     He's my client and a professional basketball player.

        16    Q     Do you know an individual by the name of Michael

        17    Avenatti?

        18    A     Yes.

        19    Q     And how do you know who Mr. Avenatti --

03:10PM 20          Can you please sit down.

        21          MR. AVENATTI:  Sure.  I thought you wanted to point

        22    me out.  Sorry about that.

        23    Q     BY MR. SAGEL:  Do you know who Mr. Avenatti is?

        24    A     He was opposing counsel in a matter I handled a number of

03:10PM 25    years ago when I was representing Mr. Whiteside.
```

Q    And what was the matter that you were representing

Mr. Whiteside in which the defendant was representing the other

side?

A    There was a mediation between his client and my client to

03:10PM    resolve some of their differences.

Q    And what's the name of his client?

A    Alexis Gardner.

Q    And you mentioned a mediation.  For those of us who don't

do that, what -- in a general term, what is a mediation?

03:11PM    A    In general, a mediation is where two parties hire a

mediator to help them resolve their differences, to settle a

claim or dispute, and it's usually outside the court system,

it's voluntary.  And typically, in my practice, the mediator

would be a retired judge or a lawyer who specializes in

03:11PM    mediations, and the parties would be represented by counsel at

the mediation.

Q    And let's talk about this specific case.  Prior to this

mediation, had any formal lawsuit been filed in the matter?

A    No.

03:11PM    Q    Do you know what an arbitration is?

A    Yes.

Q    Generally speaking, what is an arbitration?

A    An arbitration is a binding legal proceeding that's done

outside the court system.

03:12PM    Q    Was any formal arbitration demand or arbitration

UNITED STATES DISTRICT COURT

|  | proceeding filed in this matter? |
|---|---|
| 1 | |
| 2 | A     No. |
| 3 | Q     How did you know that defendant was representing a client |
| 4 | against your client? |
| 03:12PM 5 | A     I was contacted to represent Mr. Whiteside in connection |
| 6 | with communication by Mr. Avenatti on behalf of Ms. Gardner. |
| 7 | Q     And I clearly asked a bad question, which is what the |
| 8 | difficulty is. |
| 9 |         So did defendant reach out to you letting you know |
| 03:13PM 10 | that he was representing Ms. Gardner? |
| 11 | A     I don't remember if I reached out to him first or he |
| 12 | reached out to me first, but we had a conversation. |
| 13 | Q     And did you, in your communication with defendant, set up |
| 14 | the mediation you spoke of? |
| 03:13PM 15 | A     He and I agreed to arrange a mediation. |
| 16 | Q     Do you remember how long -- approximately how long |
| 17 | between the time you were first communicating with the |
| 18 | defendant on this matter and it took until you had a mediation? |
| 19 | A     A few weeks. |
| 03:13PM 20 | Q     If I could have you look at Exhibit 135.  And I can let |
| 21 | you know the volume number.  I believe it's Volume II. |
| 22 |         Do you have Exhibit 135 in front of you? |
| 23 | A     I do. |
| 24 | Q     And is this an e-mail chain between you and the defendant |
| 03:15PM 25 | along with an attachment? |

UNITED STATES DISTRICT COURT

```
 1   A     Yes.

 2   Q     Is it a fair and accurate copy of the e-mail chain

 3   between you and the defendant and the attachment that went with

 4   the e-mail?

 5   A     Yes, it appears to be.

 6   Q     And the most recent e-mail at the top of page 1, is that

 7   an e-mail that the defendant sent to you?

 8   A     Yes.

 9         MR. SAGEL:  At this time, Your Honor, the Government

10   moves to admit Exhibit 135.

11         MR. AVENATTI:  Objection, Your Honor.  Hearsay and

12   also the mediation privilege issue we briefed pretrial.  I'd

13   just like a standing objection as to that.

14         THE COURT:  Sir, make your objections as we go.

15   Overruled.

16         MR. AVENATTI:  Okay.

17         THE COURT:  135 will be received.  Mr. Avenatti's

18   e-mails will be received for the truth; the others for notice,

19   not for the truth.

20         (Exhibit Number 135 received.)

21   Q     BY MR. SAGEL:  Let's start at the top.  Actually, give me

22   one second.

23         Let's start with the top.  What's the date of this

24   e-mail in the top of page 1?

25   A     I need to change glasses.  Hang on.
```

03:15PM (line 5)
03:15PM (line 10)
03:15PM (line 15)
03:16PM (line 20)
03:16PM (line 25)

```
         1              Sorry.  Just to clarify, I'm looking at -- on the
         2    screen here is the same exhibit that I have in the hard copy;
         3    right?
         4    Q     It should be.  And it --
03:16PM  5    A     Does it matter which one I look at?
         6    Q     As long as it appears to be the same to you as well, it
         7    does not.  Whatever is easiest for you.
         8    A     Okay.  I'm sorry.  What was the question?
         9    Q     What's the date of the e-mail defendant sent to you?
03:16PM 10    A     December 22nd, 2016.
        11    Q     And do you see there is a cc or a carbon copy in this
        12    e-mail?
        13    A     Yes.
        14    Q     Who is receiving this e-mail along with you?
03:17PM 15    A     The cc is to the Honorable Lou Meisinger, a retired judge
        16    who was our mediator in the matter we discussed.
        17    Q     Okay.  And what's the subject line?
        18    A     The subject line says, "Re Judge Meisinger-Confidential
        19    Mediation on January 7, at 9:30 a.m."
03:17PM 20    Q     And could you read the e-mail that defendant wrote to you
        21    after it says "Joel."
        22    A     "In an effort to avoid any protracted discussions
        23          or negotiations regarding nonmonetary terms at
        24          mediation, attached please find a draft settlement
03:17PM 25          agreement for your review.  Please provide your
```

|   |   |
|---|---|
| 1 | comments and any edits well in advance of the |
| 2 | mediation so that we can hopefully resolve any |
| 3 | differences beforehand or at least focus our efforts |
| 4 | for January 7.  Happy holidays and I hope you are |
| 03:18PM 5 | feeling better.  Regards, Michael." |
| 6 | Q    Thank you.  And then what is your understanding of what |
| 7 | was going to happen on January 7th? |
| 8 | A    We were going to have a mediation before Judge |
| 9 | Meisinger -- retired Judge Meisinger as our mediator. |
| 03:18PM 10 | Q    And when defendant says: |
| 11 | "...to avoid any protracted discussions or |
| 12 | negotiations regarding nonmonetary terms at the |
| 13 | mediation," what was your understanding of what |
| 14 | he's asking you there or telling you there?  Actually, let me |
| 03:18PM 15 | ask a different question. |
| 16 | Was this an effort to focus the mediation just on a |
| 17 | monetary negotiation? |
| 18 | A    It was an effort to have a -- to try to come to an |
| 19 | agreement on the overall form of the settlement agreement so |
| 03:19PM 20 | that we could more quickly document it if we reached a |
| 21 | settlement at the mediation. |
| 22 | Q    Thank you. |
| 23 | Could I have you look at Exhibit -- or, actually, |
| 24 | before I do that, did you guys have a mediation on January 7th? |
| 03:19PM 25 | A    Yes. |

UNITED STATES DISTRICT COURT

```
 1   Q    And this e-mail is December 22nd, 2016.  Was the
 2   mediation on January 7th, 2017?
 3   A    Yes.
 4   Q    Could I have you look -- let me ask you a few more
 5   questions.  Sorry.  I apologize.
 6        Where did the mediation take place?
 7   A    Sorry.  Go ahead.
 8   Q    Where did the mediation take place?
 9   A    Where?
10   Q    Yes.
11   A    It took place at an office building in Century City area
12   of Los Angeles, I believe 1900 Avenue of the Stars, in the
13   offices of a company called ADR Services, Inc., which is where
14   Retired Judge Meisinger did his mediations at that time.
15   Q    And do you remember approximately how long the mediation
16   took place on that day?
17   A    We started in the morning.  I can't recall the exact time.
18   Could have been 9:00, 10:00.  And we went very late.  I can't
19   recall the exact time.  Could have been 10:00, 11:00, 12:00
20   midnight, late.
21   Q    Now can I have you look at Exhibit 139.
22   A    Yes.
23   Q    Do you recognize Exhibit 139?
24   A    Yes.
25   Q    What is Exhibit 139?
```

```
 1    A     It's a settlement agreement between Ms. Gardner and

 2    Mr. Whiteside dated January 7th, 2017, which was an agreement

 3    reached at the mediation.

 4    Q     Is this a true and accurate copy of the settlement

03:21PM 5    agreement between Alexis Gardner and Hassan Whiteside?

 6    A     Yes.

 7           MR. SAGEL:  At this time, Your Honor, the Government

 8    moves to admit Exhibit 139.

 9           MR. AVENATTI:  Objection.  Hearsay.

03:21PM 10           THE COURT:  Overruled.  239 [sic] will be received.

11           MR. SAGEL:  Thank you.

12    Q     Let's start at the top of page 1 --

13           THE COURT:  Sorry.  139 will be received.

14           (Exhibit Number 139 received.)

03:22PM 15    Q     BY MR. SAGEL:  Let's start at the top, Exhibit 139 at the

16    top.  The bold letters at the top say "Settlement Agreement";

17    is that correct?

18    A     Yes.

19    Q     Can you read the first sentence up to "other hand"?

03:22PM 20    A     "This agreement is dated as of the 7th day of

21          January, 2017, (the effective date) by and between

22          Alexis Gardner --"

23           And that has Gardner in quotes.

24    Q     "On the one hand"?

03:22PM 25    A     "-- on the one hand and Hassan Whiteside" -- and
```

```
 1          Whiteside in quotes -- "on the other hand."
 2  Q    And the date of this agreement is the same date as the
 3  mediation; is that correct?
 4  A    Yes.
 5  Q    Do you know when this settlement agreement was signed?
 6  A    Yes.  It was signed at the mediation on January 7, 2017.
 7  Q    Is it fair to say at the end?
 8  A    Yes.
 9  Q    If I could have you look at page 2, at the top.  Is
10  paragraph 2 titled "Payment"; is that correct?
11  A    Yes.
12  Q    Could you read the first -- can you read the first
13  sentence or up through the word "agreement."  Can you read
14  number 2?
15  A    "Payment.  As full and final settlement of any
16       and all claims and disputes, Whiteside will pay
17       Gardner the total sum of $3 million defined as the
18       payment amount as follows:  $2,750,000 using best
19       efforts to pay on or before January 21st, 2017, but
20       in no event any later than January 28, 2017, and
21       $250,000 on November 1st, 2020, assuming Gardner has
22       not been previously determined by the arbitrator to
23       have violated the terms of this agreement."
24  Q    So let me start with that.  Is this the full and final
25  settlement agreement?  Is this the only settlement agreement?
```

03:22PM  5
03:23PM 10
03:23PM 15
03:24PM 20
03:24PM 25

A     Yes.

Q     Were there any other agreements at this time -- or were there any other agreements at this time between Mr. Whiteside and Ms. Gardner?

03:25PM  A     Not that I'm aware of.

Q     And this requires the total sum of $3 million to be paid. Was that the ultimate settlement between the parties on that day, on January 7, 2017?

A     Yes.

03:25PM  Q     And it breaks it down into two payments.  When was the $2.75 million due pursuant to this settlement agreement?

A     It was due no later than January 28th, 2017.  But we had agreed to use best efforts to pay on or before January 21, 2017.

03:25PM  Q     And then the last part of that paragraph says:  "All payments shall be made by wire transfer according to the following instructions."

        What's the name on the account that the payments should be made to?

03:26PM  A     Eagan Avenatti, LLP, client trust.

Q     And let me have you look at paragraph 8.  Probably should have done that before I asked my previous question.

        But what is the title of paragraph 8?

A     "Entire Agreement."

03:26PM  Q     And can you read what paragraph 8 says.

```
 1   A     "This agreement constitutes the entire understanding
 2         between the parties with respect to settlement of
 3         the disputes and any and all claims and supersedes
 4         any prior written and/or verbal agreements between
 5         the parties.  This agreement may not be amended
 6         except by a writing signed by all of the parties."
 7   Q     And paragraph 10, I'm not going to have you read it, it's
 8   very long, but what's the title of the paragraph 10?
 9   A     "Confidentiality and Nondisparagement."
10   Q     And there is a signature under Hassan Whiteside.  Did
11   your client sign that in your presence -- I'm sorry -- on
12   page 5?
13   A     Yes.
14   Q     Did you go over -- I don't want any communications
15   between you and your client, but did you at least review this
16   settlement agreement with your client?
17               MR. AVENATTI:  Objection.  Privilege, Your Honor.
18   What he did or did not do with his client is irrelevant.  Also
19   privilege.
20               THE COURT:  Sir, you're not following the privilege
21   rule.  Overruled.
22               THE WITNESS:  I'm sorry, the objection was
23   overruled?
24               THE COURT:  Yes.
25               THE WITNESS:  Yes.
```

| | |
|---|---|
| 1 | Q    BY MR. SAGEL:  Did you provide a copy of the settlement |
| 2 | agreement to your client? |
| 3 | A    I believe so. |
| 4 | Q    Would that have been your custom and practice to do so? |
| 03:28PM 5 | A    Yes. |
| 6 | Q    If you could look at Exhibit 141, please. |
| 7 | A    Yes. |
| 8 | Q    Is Exhibit 141 an e-mail chain between you and the |
| 9 | defendant? |
| 03:28PM 10 | A    Yes. |
| 11 | Q    And is the top e-mail an e-mail from the defendant to |
| 12 | you? |
| 13 | A    Yes. |
| 14 | Q    Is it a fair and accurate copy of the e-mail |
| 03:29PM 15 | communication between you and the defendant? |
| 16 | A    Yes. |
| 17 |         MR. SAGEL:  At this time, Your Honor, the Government |
| 18 | moves to admit Exhibit 141. |
| 19 |         MR. AVENATTI:  Objection.  Hearsay. |
| 03:29PM 20 |         THE COURT:  Mr. Avenatti's e-mails will be received |
| 21 | for the truth, the others just for notice; that is, that he got |
| 22 | them not for the truth of the content. |
| 23 |         144 [sic] is received -- wait a minute. |
| 24 |         MR. SAGEL:  141. |
| 03:29PM 25 |         THE COURT:  141 is received. |

                    **(Exhibit Number 141 received.)**

1

2    Q    BY MR. SAGEL:  On the top of the page is the e-mail from

3    the defendant to you; is that correct?

4    A    I'm sorry.  What's the question?

03:29PM 5    Q    The e-mail at the top of page 1 is the e-mail from the

6    defendant to you?

7    A    Yes.

8    Q    And what's the date of that e-mail?

9    A    January 16, 2017.

03:29PM 10   Q    And after the defendant says "Thanks, Joel," what does he

11   say next?

12   A    "Just touching base so I can set expectations on our side.

13   Are we looking good for this week?"

14   Q    What was your understanding of what he meant when he said

03:30PM 15   "on our side"?

16   A    Ms. Gardner and himself.

17   Q    And he says, "Are we looking good for this week?"  What

18   was your understanding of what he's asking you in that

19   question, "Are we looking good for this week?"

03:30PM 20   A    He wanted to know if the payment of the 2.75 million would

21   be made at some point during that week.

22   Q    And according to the agreement that you went over in

23   Exhibit 139, the first payment wasn't due until January 28,

24   2017; is that correct?

03:30PM 25   A    That's correct.  We had agreed that I'd make best efforts

```
 1    to get the payment by the 21st, but that the actual deadline
 2    was no later than January 28th.
 3    Q    Do you see -- I'm sorry.  Can you please look at
 4    Exhibit 144, please.
03:31PM  5    A    Yes.
 6    Q    Is 144 an e-mail exchange between you and the defendant?
 7    A    Yes.
 8    Q    And is the first e-mail at the bottom of page 1 and the
 9    top e-mail at the top of page 1 e-mails that the defendant sent
03:31PM 10    to you?
11    A    Sorry.  To clarify, you're just on page 1?
12    Q    Correct.  There's an e-mail at the very bottom.  Is that
13    from the defendant to you?
14    A    Yes.
03:32PM 15    Q    And at the very top of the page there's another e-mail
16    from the defendant to you?
17    A    Yes.
18    Q    Is this a fair and accurate copy of the e-mail exchange
19    between you and the defendant?
03:32PM 20    A    Yes.
21         MR. SAGEL:  At this time, Your Honor, the Government
22    moves to admit Exhibit 144.
23         MR. AVENATTI:  Objection.  Hearsay.
24         THE COURT:  Again, Mr. Avenatti's e-mails will be
03:32PM 25    received for the truth; others from the witness for notice or
```

```
 1   the fact that Mr. Avenatti got those e-mails but not for the
 2   truth of the content.
 3                (Exhibit Number 144 received.)
 4   Q    BY MR. SAGEL:  If we can start at the bottom of page 1.
 5   Mr. Avenatti sends you an e-mail on January 20th at 9:18 a.m.
 6   Do you see that?
 7   A    Yes.
 8   Q    And what does defendant say to you in the 9:18 a.m.
 9   e-mail?
10   A    "Joel, good morning.  Please confirm we are receiving a
11   wire transfer today.  Thank you, Michael."
12   Q    What is your understanding of who he's referring to when
13   he says "we"?
14                MR. AVENATTI:  Your Honor, I'll note there's no
15   redactions on this document pursuant to the Local Rule.
16                MR. SAGEL:  These are public -- these are public
17   e-mail addresses of lawyers and a law firm that does not exist
18   anymore of defendant's, Your Honor.  They're not following the
19   Local Rule.
20                THE COURT:  Overruled.
21                THE WITNESS:  Sorry.  What was the question?
22   Q    BY MR. SAGEL:  What is your understanding of who he's
23   referring to when he says "we," "Please confirm we"?
24   A    His client, Ms. Gardner, and himself.
25   Q    And when he says "receiving a wire transfer today," what
```

Timestamps in left margin: 03:32PM (line 5), 03:32PM (line 10), 03:33PM (line 15), 03:33PM (line 20), 03:33PM (line 25)

```
 1   is your understanding of what he's referring to there?
 2   A    The wire transfer of $2.75 million settlement payment.
 3   Q    This e-mail is on January 20th.  It's still eight days
 4   before it's due; is that correct?
 5   A    Correct.
 6   Q    And then you replied:
 7        "Finally getting off a conference call on
 8        another matter.  Let me check on the status and get
 9        back to you shortly.  If I want to talk to you,
10        should I call your office or cell."
11        Is that correct?
12   A    Yes.
13   Q    And he says:  "Thanks."  And then he provides you a cell
14   number at that time?
15   A    Yes.
16   Q    Did you receive voicemails from the defendant during this
17   time?
18   A    Yes.
19   Q    And were you able to obtain and provide to the Government
20   the actual digital voicemails that you received from the
21   defendant?
22   A    Yes.  I had two of them.
23   Q    And did you provide the Government with the voicemails
24   that you received from the defendant?
25   A    Yes.
```

**UNITED STATES DISTRICT COURT**

1   Q    And prior to today, have you listened to Exhibit 145, the

2   voicemail defendant sent you on January 20th, 2017?

3   A    Yes.

4   Q    And is it a fair and accurate voicemail that defendant

03:35PM 5   left you on January 20th, 2017?

6   A    Yes.

7         MR. SAGEL:  At this time, Your Honor, the Government

8   moves to admit defendant's voicemail on January 20th, 2017, and

9   ask to play it.

03:35PM 10         MR. AVENATTI:  No objection to either.

11         MR. SAGEL:  And it's Exhibit 145.

12         THE COURT:  145 will be received.

13         **(Exhibit Number 145 received.)**

14         MR. SAGEL:  And we haven't tested out the audio

03:35PM 15   today so I'm hoping it's working.

16         **(Audio recording was played, not reported.)**

17   Q    BY MR. SAGEL:  Now, this voicemail was also on Friday,

18   January 20th, 2017; is that correct?

19   A    Yes.

03:36PM 20   Q    And defendant says he wants to make sure there is no

21   issues with the settlement.  What is your understanding -- let

22   me ask you, were there any issues with the settlement at that

23   point?

24   A    Not that I was aware of.  He was just anxious to get the

03:37PM 25   payment.

```
 1              MR. AVENATTI:  Your Honor, move to strike as
 2    nonresponsive.
 3              THE COURT:  Denied.
 4    Q    BY MR. SAGEL:  And then did defendant leave you another
 5    voicemail on January 20 -- Wednesday, January 25th, 2017?
 6    A    Yes.
 7    Q    And prior to today, did you provide that voicemail to the
 8    Government?
 9    A    Yes.
10    Q    And in Exhibit 151, have you listened to that voicemail,
11    and is it a true and accurate voicemail that defendant left you
12    on January 25th, 2017?
13              Most likely there's going to be nothing in that
14    binder because it's the audio, but it's 151.
15    A    The answer is "Yes."
16              MR. SAGEL:  At this time, Your Honor, the Government
17    moves to admit Exhibit 151 and asks to play Exhibit 151.
18              MR. AVENATTI:  No objection to either.
19              THE COURT:  151 will be received.
20              (Exhibit Number 151 received.)
21              (Audio recording was played, not reported.)
22    Q    BY MR. SAGEL:  So let's start with, this voicemail was
23    left for you on January 25th, 2017; is that correct?
24    A    Yes.
25    Q    And pursuant to the settlement agreement, the money still
```

```
        1   was not due until January 28th, 2017?
        2           MR. AVENATTI:  Objection.  Misstates the document.
        3           THE COURT:  Overruled.
        4           THE WITNESS:  The answer is "Yes."
03:39PM  5   Q   BY MR. SAGEL:  Now, in the defendant's voicemail to you,
        6   he uses the word "we" several times.  Who did you understand
        7   was "we"?
        8   A   His client, Ms. Gardner, and himself.
        9   Q   And when he says "we are growing increasingly anxious and
03:40PM 10   nervous that this thing is going to fall apart" or "if it's
       11   going to fall apart," was there any reason to believe this
       12   settlement was falling apart at that time?
       13           MR. AVENATTI:  Objection, Your Honor.  Speculation
       14   and conjecture as to what my belief was or what it was based
03:40PM 15   on.
       16           THE COURT:  Overruled.
       17           THE WITNESS:  No.
       18   Q   BY MR. SAGEL:  At this time was your client, pursuant to
       19   the settlement agreement, doing what he needed to do to pay on
03:40PM 20   the settlement agreement?
       21   A   The payment was due by the 28th and we were in the process
       22   of complying with that.
       23           MR. AVENATTI:  Move to strike as nonresponsive to
       24   the question asked, Your Honor.
03:41PM 25           THE COURT:  It's stricken.
```

```
 1              MR. AVENATTI:  Can we have the question reread,

 2      please.

 3              THE COURT:  Yes.

 4              (The record was read as follows:

 5              "At this time was your client, pursuant to

 6          the settlement agreement, doing what he needed to

 7          do to pay on the settlement agreement.")

 8              THE WITNESS:  Yes.

 9      Q   BY MR. SAGEL:  And that was -- he was attempting to get

10      the money together to pay his wire; is that correct?

11              MR. AVENATTI:  Calls for privileged information,

12      Your Honor.

13              THE COURT:  Overruled.  You're not the holder of the

14      privilege.

15              MR. AVENATTI:  I'm going to deem it a waiver.

16              THE WITNESS:  Your Honor, I don't want to waive

17      privilege, so...

18              THE COURT:  That's fine.

19              MR. SAGEL:  I'll ask a different question.

20      Q   On January 25th, 2017, the money wasn't due; is that

21      correct?

22              MR. AVENATTI:  Asked and answered, Your Honor.

23              THE COURT:  Sustained.

24      Q   BY MR. SAGEL:  When defendant says "I don't know what's

25      going on with your client and his advisors," to your
```

03:40PM  5
03:41PM 10
03:41PM 15
03:41PM 20
03:42PM 25

1    understanding, was there anything that your client and your

2    advisors were doing wrong at that -- and his advisors were

3    doing anything wrong at that point?

4    A    I don't know why he said that.

03:42PM 5    Q    When he said "they're not taking this seriously," did you

6    provide him any basis to believe that they were not taking it

7    seriously?

8    A    I didn't know why he said that.

9    Q    If you could look at Exhibit 150, please.  Exhibit 150 is

03:43PM 10   an e-mail chain between you and the defendant?

11   A    Yes.

12   Q    Including at least two e-mails on the first page that

13   defendant wrote to you; is that correct?

14   A    Yes.

03:43PM 15   Q    Is it a fair and accurate copy of an e-mail chain between

16   you and the defendant?

17   A    Yes.

18         MR. SAGEL:  At this time, Your Honor, the Government

19   moves to admit Exhibit 150.

03:43PM 20        MR. AVENATTI:  Objection, Your Honor.  Hearsay.

21         THE COURT:  Again, Mr. Avenatti's e-mails will be

22   received for the truth.  The other from Mr. Weiner will be

23   received for notice; that is, that that was sent, not for the

24   truth of what Mr. Weiner said.

03:44PM 25         **(Exhibit Number 150 received.)**

```
 1    Q    BY MR. SAGEL:  If you look, this is a continuation of

 2    part of the e-mails that we looked at from January 20th.

 3    That's on page 2 of this document; is that correct?

 4    A    Yes.

 5    Q    And then if you look at the bottom of page 1, that's an

 6    e-mail defendant sent to you on Wednesday, January 25th; is

 7    that correct?

 8    A    Yes.

 9    Q    He says:

10         "Joel, still have yet to receive any money.

11         Where are we on this, as we are growing

12         increasingly concerned?  Michael."

13         Who is your understanding of "we are"?

14    A    I understood it to mean his client, Ms. Gardner, and

15    himself.

16    Q    And you replied to defendant right above that; is that

17    correct?

18    A    Yes.

19    Q    And what did you say to defendant?

20    A    "I was told today or tomorrow.  Probably today.

21         Let me know later today if you have not heard and I

22         will follow up."

23    Q    Did you learn later that day that your client did make

24    the wire payment?

25    A    Yes.  The client's financial advisor arranged for the wire
```

03:44PM (line 5)
03:44PM (line 10)
03:44PM (line 15)
03:45PM (line 20)
03:45PM (line 25)

1    payment that day.

2    Q    And after you learned that the wire was paid, did you

3    have a communication with the defendant regarding that wire?

4    A    Yes.  We had a phone call.  I asked him if he had

03:46PM 5    received -- I told him that the wire had been done.  I think I

6    gave him the confirmation number and asked if he had received

7    it, and he told me that he had received the money.

8    Q    Now, when we looked at the settlement agreement, the

9    settlement agreement called for two payments, the first payment

03:46PM 10   for $2.75 million; is that correct?

11   A    Yes.

12   Q    And that was by no later than January 28, 2017.  So that

13   payment was made on time; is that correct?

14   A    Yes.

03:46PM 15   Q    And the next payment on 139, if I'm reading it correct,

16   was a $250,000 payment on November 1st, 2020; is that correct?

17   A    Yes.  That's what the agreement says.

18   Q    So as of January 25th, 2017, when Mr. Whiteside paid the

19   $2.75 million, had he completed his obligations under the

03:47PM 20   agreement at that time?

21   A    Yes.

22   Q    Did Mr. Whiteside ever have any monthly obligations under

23   the agreement to Ms. Gardner?

24   A    Not under the settlement agreement, no.

03:47PM 25             THE COURT:  I think we ought to stop here for the

1    day.

2           Ladies and gentlemen, a regular day tomorrow, 9:00

3    to 12:00, 1:30 to 4:30.  Please remember the admonition not to

4    discuss the case with anyone and not to form any opinions on

03:47PM 5    the issues in the case until it's submitted to you, and please

6    do not do any research.

7           Trust you have a good evening.  We'll see you in the

8    morning.

9           THE COURTROOM DEPUTY:  All rise.

03:48PM 10           **(Out of the presence of the jury.)**

11           THE COURT:  It's indicated I need to adjourn at this

12    point.  So any matters that you want to take up, we'll take up

13    first thing tomorrow 8:30.

14           MR. SAGEL:  Thank you, Your Honor.

03:48PM 15           MR. AVENATTI:  Thank you, Your Honor.

16           **(Proceedings concluded at 3:48 p.m.)**

17                          --oOo--

18

19

20

21

22

23

24

25

1          *CERTIFICATE OF OFFICIAL REPORTER*

2

3    COUNTY OF LOS ANGELES   )
                             )
4    STATE OF CALIFORNIA     )

5              I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME

6    COURT REPORTER, in and for the United States District Court for

7    the Central District of California, do hereby certify that

8    pursuant to Section 753, Title 28, United States Code that the

9    foregoing is a true and correct transcript of the

10   stenographically reported proceedings held in the

11   above-entitled matter and that the transcript page format is in

12   conformance with the regulations of the Judicial Conference of

13   the United States.

14

15   *Date:  July 29, 2021*

16

17

18

19                           */S/ DEBBIE HINO-SPAAN*
                             _____
20                           *Debbie Hino-Spaan, CSR No. 7953*
                             *Federal Official Court Reporter*
21

22

23

24

25

**UNITED STATES DISTRICT COURT**

## $

**$1.34** [1] - 48:17
**$10,000** [1] - 31:17
**$120,000** [1] - 42:18
**$2,750,000** [1] - 77:18
**$2.75** [4] - 78:11, 84:2, 91:10, 91:19
**$250,000** [2] - 77:21, 91:16
**$454** [2] - 25:9, 25:18
**$467,863.06** [1] - 31:11
**$477,000** [1] - 31:21
**$617,000** [1] - 48:16
**$730,000** [4] - 47:23, 48:4, 48:16, 65:22
**$736,883.89** [2] - 32:14, 33:24
**$760,000** [1] - 48:3

## '

**'14** [1] - 51:10

## /

**/S** [1] - 93:19

## 1

**1** [15] - 29:9, 33:2, 33:11, 33:12, 36:10, 36:11, 72:6, 72:24, 76:12, 81:5, 82:8, 82:9, 82:11, 83:4, 90:5
**1-053** [1] - 1:24
**1.9** [1] - 48:1
**1/16/2017** [1] - 4:16
**1/20/2017** [2] - 4:17, 4:19
**1/25/2017** [2] - 4:20, 4:22
**1/7/2017** [1] - 4:14
**10** [3] - 43:13, 79:7, 79:8
**1013** [12] - 4:9, 12:9, 12:23, 13:3, 13:14, 14:16, 14:25, 15:1, 15:13, 15:17, 15:20, 15:24
**102** [5] - 30:22, 30:23, 58:12, 58:13
**10:00** [2] - 75:18, 75:19
**11** [4] - 1:8, 29:24, 60:5, 66:18
**1100** [1] - 2:11
**11:00** [1] - 75:19

**12** [3] - 60:3, 64:15, 64:16
**12/22/2016** [1] - 4:12
**12:00** [2] - 75:19, 92:3
**12th** [4] - 35:8, 35:15, 35:23, 36:3
**13** [2] - 64:15, 64:16
**135** [6] - 4:12, 71:20, 71:22, 72:10, 72:17, 72:20
**139** [10] - 4:14, 75:21, 75:23, 75:25, 76:8, 76:13, 76:14, 76:15, 81:23, 91:15
**14** [3] - 8:22, 60:9, 61:4
**141** [7] - 4:16, 80:6, 80:8, 80:18, 80:24, 80:25, 81:1
**144** [6] - 4:17, 80:23, 82:4, 82:6, 82:22, 83:3
**145** [5] - 4:19, 85:1, 85:11, 85:12, 85:13
**14th** [1] - 8:12
**15** [9] - 4:9, 17:4, 17:11, 40:9, 41:10, 41:13, 42:13, 43:13, 57:5
**150** [5] - 4:22, 89:9, 89:19, 89:25
**151** [7] - 4:20, 86:10, 86:14, 86:17, 86:19, 86:20
**155** [2] - 38:10, 38:12
**157** [5] - 16:1, 16:3, 16:9, 16:12, 16:15
**158** [2] - 16:6, 16:8
**16** [4] - 13:16, 14:25, 27:1, 81:9
**17** [5] - 2:18, 11:21, 12:13, 13:4, 14:5
**174** [1] - 16:25
**175** [1] - 33:18
**18** [3] - 26:20, 28:7, 64:12
**1900** [1] - 75:12
**1988** [1] - 69:8
**1:00** [2] - 1:16, 5:2
**1:30** [1] - 92:3
**1st** [3] - 36:2, 77:21, 91:16

## 2

**2** [6] - 1:9, 38:24, 77:9, 77:10, 77:14, 90:3
**2,000-square-foot** [1] - 67:2
**2.5** [5] - 39:2, 39:12,

39:20, 39:24, 40:3
**2.75** [1] - 81:20
**20** [7] - 4:10, 25:13, 45:20, 45:23, 46:2, 46:9, 86:5
**2012** [9] - 11:21, 12:13, 12:16, 13:4, 13:10, 14:5, 15:4, 51:10, 51:11
**2013** [1] - 51:10
**2014** [7] - 35:8, 35:15, 35:23, 36:3, 51:11, 60:3, 61:4
**2015** [10] - 8:13, 8:22, 25:6, 30:14, 33:24, 36:2, 36:10, 36:11, 38:4, 61:3
**2016** [3] - 52:1, 73:10, 75:1
**2017** [30] - 16:19, 17:2, 17:5, 17:11, 37:15, 38:1, 52:2, 75:2, 76:2, 76:21, 77:6, 77:19, 77:20, 78:8, 78:12, 78:14, 81:9, 81:24, 85:2, 85:5, 85:8, 85:18, 86:5, 86:12, 86:23, 87:1, 88:20, 91:12, 91:18
**2018** [4] - 18:15, 19:25, 21:23, 63:16
**2019** [14] - 16:22, 18:25, 21:23, 22:6, 25:6, 27:1, 27:5, 54:2, 54:11, 54:21, 55:5, 62:7, 63:6, 63:16
**2020** [4] - 28:3, 63:2, 77:21, 91:16
**2021** [3] - 1:15, 5:1, 93:15
**20th** [7] - 83:5, 84:3, 85:2, 85:5, 85:8, 85:18, 90:2
**21** [2] - 4:11, 78:13
**213-894-2435** [1] - 2:12
**21st** [4] - 61:3, 61:4, 77:19, 82:1
**221** [6] - 17:18, 17:19, 18:5, 18:6, 18:9, 18:19
**229** [1] - 19:8
**22nd** [3] - 17:2, 73:10, 75:1
**239** [1] - 76:10
**25** [6] - 3:4, 25:13, 35:6, 59:8, 59:24, 62:21
**254** [1] - 2:19

**25th** [12] - 22:5, 54:2, 54:11, 54:20, 55:5, 62:15, 86:5, 86:12, 86:23, 88:20, 90:6, 91:18
**26** [4] - 16:22, 18:25, 27:5, 27:12
**28** [4] - 77:20, 81:23, 91:12, 93:8
**28.5** [1] - 45:21
**28th** [4] - 78:12, 82:2, 87:1, 87:21
**29** [3] - 1:15, 5:1, 93:15
**2:26** [1] - 57:10
**2:45** [1] - 57:10

## 3

**3** [6] - 10:8, 16:25, 35:7, 48:6, 77:17, 78:6
**30** [1] - 69:9
**312** [1] - 2:11
**329** [3] - 18:22, 19:14
**37** [1] - 60:25
**370** [1] - 48:6
**3714** [1] - 4:11
**372** [3] - 47:15, 47:16, 48:21
**373** [6] - 4:10, 19:22, 19:24, 20:9, 20:11, 20:12
**385** [7] - 4:11, 20:7, 20:25, 21:5, 21:6, 21:7, 21:8
**387** [4] - 40:8, 41:9, 41:13, 42:13
**391** [3] - 29:8, 29:9, 33:20
**3:48** [1] - 92:16

## 4

**4** [8] - 30:7, 30:25, 31:7, 31:15, 35:25, 36:9, 36:12, 56:25
**40** [2] - 47:25, 48:19
**403** [1] - 15:5
**41** [1] - 42:6
**411** [2] - 1:24, 2:6
**420** [2] - 43:1, 43:17
**4613** [1] - 4:11
**48** [3] - 32:6, 32:7, 58:24
**4:30** [1] - 92:3
**4TH** [1] - 1:24
**4th** [5] - 2:6, 30:13, 31:14, 31:20, 33:24

## 5

**5** [2] - 64:12, 79:12
**5/14/2015** [1] - 4:7
**5566** [1] - 48:23
**57** [1] - 3:4

## 6

**6** [2] - 33:16, 64:12
**61** [10] - 4:7, 7:21, 7:22, 7:25, 8:7, 8:9, 8:16, 8:18, 8:19, 8:20
**612(b** [1] - 6:25
**68** [1] - 3:6

## 7

**7** [8] - 3:3, 30:22, 33:20, 55:2, 73:19, 74:4, 77:6, 78:8
**7.5** [1] - 46:8
**7/27** [1] - 16:3
**714-338-3598** [1] - 2:7
**72** [1] - 4:12
**753** [1] - 93:8
**76** [1] - 4:14
**7953** [2] - 1:23, 93:20
**7th** [5] - 74:7, 74:24, 75:2, 76:2, 76:20

## 8

**8** [4] - 4:7, 32:7, 32:9, 32:12, 48:7, 78:21, 78:23, 78:25
**8000** [1] - 2:6
**81** [1] - 4:16
**83** [1] - 4:17
**85** [1] - 4:19
**86** [1] - 4:20
**8611** [1] - 4:10
**8671** [1] - 4:11
**89** [1] - 4:22
**8:30** [1] - 92:13

## 9

**9** [1] - 16:18
**90012** [1] - 2:12
**92660** [1] - 2:19
**92701** [2] - 1:25, 2:7
**949-481-4900** [1] - 2:20
**9:00** [2] - 75:18, 92:2
**9:18** [2] - 83:5, 83:8
**9:30** [1] - 73:19
**9th** [2] - 28:3, 28:4

# A

**a.m** [3] - 73:19, 83:5, 83:8
**ability** [1] - 21:19
**able** [3] - 33:21, 67:22, 84:19
**above-entitled** [1] - 93:11
**access** [3] - 11:3, 11:13, 19:19
**according** [3] - 31:20, 78:16, 81:22
**account** [27] - 20:4, 21:10, 29:18, 30:1, 34:14, 34:16, 37:18, 42:22, 43:21, 43:24, 44:4, 44:14, 44:21, 47:19, 48:14, 48:22, 48:23, 49:2, 49:10, 49:11, 56:22, 60:14, 61:10, 61:15, 61:21, 78:18
**accounting** [1] - 60:18
**accounts** [3] - 44:4, 49:6, 60:23
**accuracy** [2] - 34:9, 59:1
**accurate** [13] - 16:15, 34:21, 36:4, 36:6, 58:17, 58:21, 72:2, 76:4, 80:14, 82:18, 85:4, 86:11, 89:15
**accurately** [2] - 32:19, 32:25
**act** [1] - 67:17
**actions** [1] - 65:10
**actual** [4] - 24:23, 32:20, 82:1, 84:20
**add** [2] - 48:13, 48:16
**adding** [1] - 65:22
**additional** [1] - 14:1
**address** [1] - 5:6
**addresses** [1] - 83:17
**adjourn** [1] - 92:11
**adjourned** [1] - 75:11
**admissible** [1] - 6:23
**admission** [1] - 21:4
**admit** [7] - 72:10, 76:8, 80:18, 82:22, 85:8, 86:17, 89:19
**admitted** [5] - 14:22, 16:2, 16:3, 16:5, 41:24
**admonition** [2] - 57:6, 92:3
**ADR** [1] - 75:13
**advance** [1] - 74:1
**advanced** [1] - 23:17
**advancements** [1] -

45:10
**advances** [2] - 32:13, 58:2
**adverse** [1] - 6:24
**advised** [1] - 55:7
**advisor** [1] - 90:25
**advisors** [3] - 88:25, 89:2
**afternoon** [9] - 7:4, 7:5, 7:11, 7:12, 7:19, 7:20, 41:17, 68:25, 69:1
**agent** [6] - 5:17, 6:3, 14:17, 15:23, 67:22, 68:5
**Agent** [3] - 27:2, 27:15, 28:11
**agents** [8] - 17:22, 24:19, 53:4, 53:8, 53:12, 53:16, 66:18, 67:1
**ago** [1] - 69:25
**agree** [1] - 40:20
**agreed** [4] - 40:22, 71:15, 78:13, 81:25
**agreement** [43] - 45:4, 45:18, 45:19, 46:2, 46:7, 46:8, 49:19, 49:25, 57:1, 59:15, 60:4, 61:1, 65:12, 73:25, 74:19, 76:1, 76:2, 76:5, 76:20, 77:2, 77:5, 77:13, 77:23, 77:25, 78:11, 79:1, 79:5, 79:16, 80:2, 81:22, 86:25, 87:19, 87:20, 88:6, 88:7, 91:8, 91:9, 91:17, 91:20, 91:23, 91:24
**Agreement** [3] - 4:14, 76:16, 78:24
**agreements** [3] - 78:2, 78:3, 79:4
**ahead** [2] - 14:2, 75:7
**Aircraft** [3] - 39:13, 39:19, 40:3
**alex.wyman@usdoj. gov** [1] - 2:13
**ALEXANDER** [1] - 2:10
**Alexis** [7] - 37:9, 39:3, 56:11, 56:14, 70:7, 76:5, 76:22
**amended** [1] - 79:5
**AMERICA** [1] - 1:5
**amount** [8] - 22:22, 23:3, 24:1, 24:10, 24:12, 32:12, 45:6, 77:18

**amounts** [1] - 35:12
**Ana** [1] - 2:7
**ANA** [3] - 1:17, 1:25, 93:3
**Andre** [1] - 28:11
**ANGELES** [1] - 93:3
**Angeles** [4] - 2:12, 22:1, 59:15, 75:12
**answer** [8] - 5:12, 13:23, 32:23, 33:9, 37:23, 59:3, 86:15, 87:4
**answered** [12] - 12:20, 15:5, 19:5, 31:3, 32:3, 55:9, 55:11, 58:3, 58:22, 61:16, 61:22, 65:15, 88:22
**answers** [2] - 54:14, 64:20
**anxious** [2] - 85:24, 87:9
**apart** [3] - 87:10, 87:11, 87:12
**apologies** [1] - 7:18
**apologize** [3] - 44:9, 50:22, 75:5
**Appeal** [2] - 63:2, 63:4
**appeal** [2] - 63:7, 63:20
**appear** [2] - 34:7, 49:2
**APPEARANCES** [1] - 2:1
**apply** [1] - 5:10
**appreciate** [1] - 6:13
**appreciative** [2] - 12:17, 15:3
**approach** [2] - 11:24, 27:8
**appropriate** [3] - 40:17, 40:19
**approved** [1] - 59:15
**April** [1] - 62:7
**arbitration** [5] - 70:20, 70:22, 70:23, 70:25
**arbitrator** [1] - 77:22
**area** [1] - 62:23
**argumentative** [9] - 34:11, 35:20, 37:1, 37:6, 38:6, 39:9, 39:15, 50:18, 55:20
**Argumentative** [3] - 24:24, 26:9, 39:4
**arrange** [1] - 71:15
**arranged** [1] - 90:25
**arrest** [1] - 62:23
**arrested** [2] - 62:15, 62:20
**Assistant** [2] - 2:5, 2:10
**assistant** [1] - 17:22

**associated** [1] - 60:18
**Associates** [1] - 43:15
**assuming** [1] - 77:21
**attached** [2] - 9:1, 73:24
**attachment** [5] - 4:8, 8:3, 59:25, 71:25, 72:3
**attempting** [1] - 88:9
**attention** [2] - 7:21, 20:1
**attorney** [22] - 15:23, 21:10, 29:17, 30:1, 42:22, 43:23, 48:21, 48:25, 49:1, 49:6, 49:11, 54:1, 54:5, 54:11, 54:22, 55:5, 55:14, 60:14, 61:8, 61:9, 67:12, 67:17
**Attorney** [4] - 2:4, 2:5, 2:9, 2:10
**attorney-client** [17] - 21:10, 29:17, 30:1, 42:22, 43:23, 48:21, 49:1, 49:6, 49:11, 54:1, 54:11, 54:22, 55:5, 55:14, 54:22, 60:14, 67:12, 67:17
**attorneys** [1] - 17:22, 24:19
**attorneys'** [4] - 9:21, 23:7, 45:8, 45:14
**audio** [2] - 85:14, 86:14
**Audio** [2] - 85:16, 86:21
**AUSA** [2] - 6:3, 28:11
**authority** [2] - 20:4, 21:18
**authorized** [2] - 20:19, 21:14, 51:6
**AVENATTI** [148] - 1:8, 2:15, 2:16, 5:23, 6:1, 6:13, 6:17, 6:19, 7:7, 7:10, 7:18, 7:25, 8:15, 8:20, 9:5, 10:20, 11:24, 12:8, 12:23, 13:13, 13:18, 13:21, 13:25, 14:3, 14:16, 14:21, 15:2, 15:7, 15:12, 15:20, 15:22, 16:4, 16:8, 16:11, 18:9, 19:9, 19:11, 20:8, 20:13, 21:1, 21:5, 21:8, 21:12, 25:1, 25:23, 26:9, 26:15, 27:11, 27:19, 27:21, 27:23, 28:17, 29:19, 30:2, 30:8, 31:3, 31:9,

31:22, 32:3, 32:21, 33:4, 33:9, 34:1, 34:10, 34:15, 35:19, 36:5, 36:17, 36:25, 37:5, 37:19, 37:23, 38:6, 39:4, 39:8, 39:14, 40:4, 40:10, 40:16, 40:20, 40:22, 41:2, 41:6, 41:14, 42:1, 42:4, 42:9, 43:25, 44:8, 44:15, 44:22, 46:4, 46:19, 49:4, 49:14, 50:3, 50:17, 51:12, 52:9, 53:2, 54:6, 54:13, 55:9, 55:11, 55:19, 56:1, 57:13, 58:5, 58:9, 58:24, 59:7, 60:9, 60:25, 61:14, 61:19, 62:1, 62:10, 62:14, 64:4, 65:17, 65:19, 65:21, 66:4, 66:7, 67:6, 67:11, 68:7, 68:9, 69:21, 72:11, 72:16, 76:9, 79:17, 80:19, 82:23, 83:14, 85:10, 86:1, 86:18, 87:2, 87:13, 87:23, 88:1, 88:11, 88:15, 88:22, 89:20, 92:15
**Avenatti** [27] - 3:3, 3:4, 4:7, 4:13, 4:16, 4:17, 4:19, 4:21, 4:22, 6:24, 7:6, 13:7, 13:9, 21:10, 43:10, 43:15, 45:12, 57:11, 68:1, 68:2, 69:17, 69:19, 69:23, 71:6, 78:20, 83:1, 83:6
**Avenatti's** [4] - 72:17, 80:20, 82:24, 89:21
**Avenue** [1] - 75:12
**avoid** [2] - 73:22, 74:11
**aware** [4] - 5:10, 16:17, 78:5, 85:24

# B

**back-and-forth** [2] - 46:13, 47:11
**bad** [1] - 71:7
**balance** [3] - 29:11, 29:14, 59:4
**ballpark** [2] - 47:21, 47:22
**bank** [1] - 30:5
**Bank** [1] - 63:11
**Bar** [1] - 69:8

**Barela** [20] - 17:8,
17:12, 18:12, 18:15,
18:16, 18:19, 46:11,
47:19, 48:14, 48:22,
49:11, 49:12, 49:18,
51:24, 52:1, 52:14,
56:18, 56:20, 65:13,
66:1
**Barela's** [3] - 47:12,
49:2, 52:4
**Baristas** [3] - 43:3,
43:8, 43:13
**base** [1] - 81:12
**based** [9] - 5:19, 6:6,
23:1, 29:23, 30:5,
32:18, 47:4, 49:9,
87:14
**basis** [4] - 6:10, 13:17,
13:19, 89:6
**basketball** [1] - 69:15
**Beach** [1] - 2:19
**beforehand** [1] - 74:3
**beginning** [3] - 9:6,
12:9, 29:14
**behalf** [5] - 9:20, 15:4,
15:9, 32:2, 71:6
**belief** [1] - 87:14
**below** [8] - 8:25,
20:15, 20:20, 20:22,
21:15, 31:12, 31:15
**benefit** [1] - 23:17
**best** [6] - 11:1, 13:6,
67:25, 77:18, 78:13,
81:25
**better** [3] - 17:10,
18:17, 74:5
**Between** [1] - 4:15
**between** [20] - 59:19,
65:13, 70:4, 71:17,
71:24, 72:3, 76:1,
76:5, 76:21, 78:3,
78:7, 79:2, 79:4,
79:15, 80:8, 80:15,
82:6, 82:19, 89:10,
89:15
**big** [1] - 64:8
**billable** [1] - 47:14
**binder** [1] - 86:14
**binding** [1] - 70:23
**bipolar** [2] - 10:9,
11:14
**blow** [2] - 9:5, 59:9
**blowing** [1] - 40:23
**board** [1] - 25:21
**bold** [1] - 76:16
**borrow** [1] - 63:9
**bothered** [1] - 24:22
**bottom** [12] - 8:2,
12:23, 14:22, 16:18,
20:18, 20:19, 32:9,

32:12, 82:8, 82:12,
83:4, 90:5
**box** [3] - 20:20, 29:3,
29:7
**Box** [1] - 21:23
**break** [1] - 57:4
**breaks** [1] - 78:10
**BRETT** [1] - 2:5
**brett.sagel@usdoj.
gov** [1] - 2:8
**briefed** [1] - 72:12
**briefly** [1] - 20:14
**bring** [1] - 7:2
**bringing** [1] - 66:7
**broken** [3] - 37:11,
37:14, 38:4
**brother** [2] - 12:18,
14:10
**brought** [3] - 29:1,
49:18, 49:22
**building** [1] - 75:11
**business** [2] - 13:7,
14:17
**businesses** [1] -
43:24
**BY** [91] - 2:5, 2:18, 3:3,
3:5, 7:10, 7:25,
10:20, 12:8, 12:23,
13:21, 15:2, 15:7,
15:12, 15:22, 18:9,
25:3, 26:1, 26:12,
26:18, 27:12, 28:1,
28:19, 29:23, 30:5,
30:11, 31:6, 31:12,
32:1, 32:6, 33:2,
33:7, 33:11, 34:4,
34:13, 34:21, 35:22,
36:9, 36:20, 37:3,
37:9, 37:25, 38:10,
39:11, 39:18, 40:8,
44:6, 44:19, 45:1,
46:8, 46:24, 49:9,
49:17, 50:10, 50:21,
51:15, 52:13, 53:4,
54:10, 54:20, 55:2,
55:17, 55:22, 56:6,
57:13, 58:9, 60:9,
61:14, 61:19, 62:1,
62:14, 64:4, 65:21,
66:7, 67:6, 67:11,
68:24, 69:23, 72:21,
76:15, 80:1, 81:2,
83:4, 83:22, 85:17,
86:4, 86:22, 87:5,
87:18, 88:9, 88:24,
90:1

**C**

**CA** [1] - 1:25

**calculate** [3] - 45:2,
45:13, 45:20
**calculated** [1] - 60:12
**calculation** [1] - 22:20
**CALIFORNIA** [4] - 1:2,
1:17, 5:1, 93:4
**California** [4] - 2:7,
2:12, 2:19, 93:7
**CALLED** [2] - 3:3, 3:5
**carbon** [1] - 73:11
**card** [2] - 19:24, 21:9
**Card** [2] - 4:10, 4:11
**care** [2] - 14:10, 38:19
**cared** [1] - 14:13
**CareMeridian** [5] -
32:16, 32:20, 33:1,
33:13, 33:17
**Carlos** [6] - 27:2,
27:15, 28:11, 62:18,
62:19, 67:21
**cars** [1] - 53:1
**case** [29] - 5:14, 22:14,
23:7, 24:16, 25:10,
25:19, 25:22, 26:3,
26:13, 27:18, 27:22,
27:25, 28:15, 28:25,
29:6, 39:21, 52:5,
57:6, 57:7, 59:10,
60:10, 62:3, 62:7,
63:17, 64:10, 68:10,
70:17, 92:4, 92:5
**Case** [1] - 1:7
**cases** [17] - 36:14,
36:15, 36:16, 36:20,
36:22, 36:23, 37:4,
47:1, 47:6, 47:9,
60:18, 63:9, 63:19,
63:22, 63:24, 65:9,
65:11
**cashier's** [1] - 48:9
**cc** [2] - 13:11, 73:15
**cc'd** [1] - 13:5
**cell** [2] - 84:10, 84:13
**CENTRAL** [1] - 1:2
**Central** [1] - 93:7
**Century** [2] - 69:5,
75:11
**certain** [1] - 17:15
**CERTIFICATE** [1] -
93:1
**CERTIFIED** [1] - 1:6
**certify** [1] - 93:7
**cetera** [1] - 9:21
**chain** [5] - 71:24, 72:2,
80:8, 89:10, 89:15
**chance** [1] - 38:12
**change** [3] - 47:12,
47:14, 72:25
**changing** [1] - 58:15
**charge** [1] - 47:5

**charged** [1] - 23:21
**charges** [1] - 62:6
**charging** [1] - 47:8
**chart** [6] - 45:1, 58:8,
58:10, 58:11, 59:11,
61:5
**check** [4] - 17:15,
48:9, 50:15, 84:8
**chief** [1] - 68:10
**chose** [2] - 45:23,
53:12
**circuit** [1] - 28:7
**City** [2] - 69:6, 75:11
**claim** [1] - 70:12
**claims** [2] - 77:16,
79:3
**clarifies** [1] - 41:25
**clarify** [2] - 73:1, 82:11
**Clark** [9] - 25:10,
25:19, 25:22, 26:3,
26:13, 62:3, 62:23,
63:1, 63:17
**class** [1] - 65:10
**clearly** [1] - 71:7
**clerk** [1] - 42:7
**client** [48] - 21:10,
22:25, 23:11, 23:18,
24:4, 24:12, 24:16,
29:15, 29:17, 30:1,
30:4, 40:15, 42:22,
43:23, 48:21, 49:1,
49:6, 49:11, 54:1,
54:5, 54:11, 54:22,
55:5, 55:14, 58:1,
60:14, 67:12, 67:17,
69:15, 70:4, 70:6,
71:3, 71:4, 78:20,
79:11, 79:15, 79:16,
79:18, 80:2, 83:24,
87:8, 87:18, 88:5,
88:25, 89:1, 90:14,
90:23
**client's** [2] - 29:18,
90:25
**clients** [5] - 45:14,
47:5, 54:19, 55:14,
60:23
**closed** [1] - 6:15
**CNB** [1] - 4:10
**Code** [1] - 93:8
**coincidence** [1] -
66:24
**collectively** [1] - 7:5
**coming** [1] - 5:18
**comment** [1] - 24:7
**comments** [1] - 74:1
**communicating** [3] -
14:9, 14:11, 71:17
**communication** [6] -
14:15, 52:7, 71:6,

71:13, 80:15, 91:3
**communications** [8] -
50:25, 51:4, 51:6,
51:9, 51:23, 52:1,
52:13, 79:14
**Company** [1] - 39:13
**company** [1] - 75:13
**complete** [4] - 58:8,
58:18, 59:22, 66:14
**completed** [1] - 91:19
**complying** [1] - 87:22
**computers** [1] - 68:2
**concern** [1] - 10:5
**concerned** [4] - 11:11,
11:13, 55:16, 90:12
**concerns** [1] - 11:2
**concluded** [1] - 92:16
**conclusion** [2] - 49:5
**condition** [2] - 26:8,
26:14, 63:6
**conditions** [1] - 25:6
**conducted** [2] - 22:11,
27:16
**Conference** [1] -
93:12
**conference** [3] -
49:19, 66:8, 84:7
**conferred** [1] - 42:7
**Confidential** [1] -
73:18
**confidentiality** [1] -
79:9
**confirm** [2] - 83:10,
83:23
**confirmation** [1] -
91:6
**conformance** [1] -
93:12
**conjecture** [5] - 31:9,
34:11, 44:22, 46:5,
87:14
**connection** [7] -
14:10, 14:12, 16:17,
17:7, 17:12, 61:10,
71:5
**constitutes** [1] - 79:1
**consult** [2] - 23:14,
61:9
**contacted** [1] - 71:5
**content** [3] - 15:24,
80:22, 83:2
**contingency** [9] -
25:13, 45:17, 47:1,
47:6, 47:9, 47:10,
47:25, 48:19, 65:9
**continuation** [2] - 8:9,
90:1
**Continued** [1] - 4:1
**control** [1] - 10:11
**convene** [2] - 6:16,

6:18

**conversation** [2] - 10:24, 71:12

**copied** [3] - 11:20, 12:12, 13:3

**copy** [9] - 50:8, 72:2, 73:2, 73:11, 76:4, 80:1, 80:14, 82:18, 89:15

**corner** [2] - 16:21, 19:1

**Corporate** [1] - 2:18

**correct** [104] - 6:4, 8:4, 8:7, 8:23, 9:3, 9:12, 10:3, 14:13, 16:7, 16:15, 16:16, 16:19, 16:23, 16:24, 18:1, 18:4, 18:8, 19:16, 19:20, 19:21, 21:10, 21:16, 22:6, 22:14, 22:15, 23:4, 23:8, 23:15, 23:24, 24:17, 25:15, 25:19, 26:21, 28:13, 28:14, 28:22, 29:4, 29:15, 29:16, 30:20, 31:14, 31:21, 32:10, 32:16, 33:17, 33:25, 35:13, 36:16, 37:15, 37:16, 37:18, 42:20, 42:23, 43:1, 43:13, 43:21, 46:13, 48:5, 48:11, 48:17, 48:22, 49:23, 50:12, 50:13, 51:1, 51:10, 51:24, 52:2, 52:5, 52:18, 53:5, 53:24, 54:2, 54:5, 54:12, 54:16, 59:25, 62:15, 62:21, 63:22, 66:1, 76:17, 77:3, 77:10, 81:3, 81:24, 81:25, 82:12, 84:4, 84:5, 84:11, 85:18, 86:23, 88:10, 88:21, 89:13, 90:3, 90:7, 90:17, 91:10, 91:13, 91:15, 91:16, 93:9

**cost** [6] - 19:17, 45:10, 45:25, 47:13, 60:12, 61:20

**costs** [10] - 19:3, 19:14, 26:7, 26:13, 30:20, 32:13, 34:9, 46:17, 47:2, 65:25

**counsel** [2] - 69:24, 70:15

**COUNSEL** [2] - 2:1, 2:16

**counting** [1] - 35:4

**COUNTY** [1] - 93:3

**County** [1] - 59:15

**course** [3] - 13:7, 55:22, 60:20

**Court** [5] - 42:7, 63:2, 63:4, 93:6, 93:20

**court** [2] - 70:12, 70:24

**COURT** [140] - 1:1, 1:24, 5:6, 5:22, 5:24, 6:9, 6:15, 6:18, 6:21, 7:4, 7:6, 7:15, 8:18, 10:19, 11:25, 12:4, 12:21, 13:17, 13:19, 13:23, 14:2, 14:23, 15:6, 15:11, 15:21, 16:3, 16:7, 16:10, 18:8, 19:7, 19:10, 20:11, 21:6, 24:25, 25:24, 26:10, 26:16, 27:9, 27:20, 27:24, 28:18, 29:21, 30:3, 30:9, 31:4, 31:10, 31:24, 32:4, 32:24, 33:5, 33:8, 33:10, 34:2, 34:12, 34:20, 35:21, 36:7, 36:19, 37:2, 37:7, 37:20, 37:24, 38:8, 39:6, 39:10, 39:16, 40:6, 40:18, 40:21, 41:3, 41:8, 41:11, 41:16, 41:20, 42:3, 42:8, 42:11, 42:15, 44:2, 44:17, 44:24, 46:6, 46:21, 49:7, 49:15, 50:5, 50:19, 51:13, 52:11, 53:3, 54:7, 54:9, 54:15, 55:10, 55:12, 55:21, 56:4, 57:4, 57:11, 58:4, 58:7, 58:23, 59:6, 61:13, 61:18, 61:24, 62:13, 64:3, 65:18, 65:20, 66:6, 67:5, 67:10, 68:8, 68:11, 68:21, 72:14, 72:17, 76:10, 76:13, 79:20, 79:24, 80:20, 80:25, 82:24, 83:20, 85:12, 86:3, 86:19, 87:3, 87:16, 87:25, 88:3, 88:13, 88:18, 88:23, 89:21, 91:25, 92:11, 93:6

**Court's** [3] - 41:14, 42:2, 42:9

**court's** [1] - 27:21

**COURTROOM** [8] - 7:24, 41:12, 41:21, 42:6, 57:9, 68:16,

68:19, 92:9

**covered** [3] - 41:14, 42:1, 67:16

**created** [2] - 35:8, 35:15

**Cross** [1] - 3:3

**cross** [6] - 25:5, 55:18, 55:23, 58:7, 61:22, 65:16

**CROSS** [1] - 7:9

**Cross-Examination** [1] - 3:3

**cross-examination** [4] - 25:5, 55:18, 55:23, 61:22

**CROSS-EXAMINATION** [1] - 7:9

**CRR** [1] - 1:23

**CSR** [2] - 1:23, 93:20

**cup** [1] - 59:19

**custom** [1] - 80:4

# D

**data** [13] - 17:25, 18:3, 19:20, 24:23, 34:17, 57:15, 57:16, 57:19, 57:21, 57:23, 58:21, 65:24, 67:23

**Date** [1] - 93:15

**date** [21] - 8:22, 9:23, 10:15, 10:21, 14:4, 16:18, 16:21, 16:22, 17:8, 18:25, 59:14, 60:2, 61:2, 61:5, 62:23, 72:23, 73:9, 76:21, 77:2, 81:8

**dated** [2] - 76:2, 76:20

**dates** [2] - 28:8, 50:15

**DAY** [1] - 1:8

**days** [4] - 35:15, 50:21, 55:18, 84:3

**deadline** [1] - 82:1

**dealing** [1] - 38:14

**DEAN** [2] - 2:17, 2:18

**deansteward7777@gmail.com** [1] - 2:20

**Debbie** [1] - 93:20

**DEBBIE** [3] - 1:23, 93:5, 93:19

**December** [6] - 17:2, 17:4, 17:11, 19:25, 73:10, 75:1

**decide** [2] - 40:19, 45:17

**deduct** [1] - 64:12

**deducted** [4] - 24:1, 24:5, 24:10, 61:20

**deem** [1] - 88:15

**DEFENDANT** [1] - 2:14

**Defendant** [1] - 1:9

**defendant** [80] - 5:20, 7:13, 12:2, 25:4, 25:18, 26:18, 29:13, 30:11, 30:15, 30:18, 32:2, 32:15, 33:24, 34:8, 35:11, 35:16, 36:13, 37:10, 38:15, 38:18, 39:23, 40:2, 42:17, 43:19, 45:1, 45:13, 45:20, 46:11, 47:18, 48:10, 49:17, 50:10, 50:24, 51:4, 51:23, 53:25, 54:10, 55:17, 56:7, 56:10, 56:24, 70:2, 71:3, 71:9, 71:13, 71:18, 71:24, 72:3, 72:7, 73:9, 73:20, 74:10, 80:9, 80:11, 80:15, 81:3, 81:6, 81:10, 82:6, 82:9, 82:13, 82:16, 82:19, 83:8, 84:16, 84:21, 84:24, 85:2, 85:4, 85:20, 86:4, 86:11, 88:24, 89:10, 89:13, 89:16, 90:6, 90:16, 90:19, 91:3

**defendant's** [6] - 14:19, 29:24, 43:24, 83:18, 85:8, 87:5

**Defense** [2] - 12:9, 13:14

**defined** [1] - 77:17

**demand** [1] - 70:25

**denied** [2] - 15:1, 86:3

**Department** [5] - 52:22, 52:23, 66:21, 66:25, 67:7

**deposit** [1] - 31:13

**deposited** [3] - 30:25, 31:7, 37:18

**deposits** [1] - 44:20

**described** [1] - 22:4

**description** [2] - 54:4, 54:12

**determine** [1] - 24:15

**determined** [1] - 77:22

**devices** [2] - 28:21, 29:1

**dhinospaan@yahoo.com** [1] - 1:25

**diagnosed** [1] - 22:9

**differences** [3] - 70:5, 70:11, 74:3

**different** [5] - 37:25, 44:14, 60:6, 74:15, 88:19

**difficulty** [1] - 71:8

**digital** [2] - 28:21, 84:20

**direct** [8] - 7:21, 8:4, 8:10, 14:14, 19:25, 32:19, 65:17

**Direct** [1] - 3:6

**DIRECT** [1] - 68:23

**directed** [1] - 48:10

**directly** [2] - 18:16, 40:3

**disclosed** [2] - 5:11, 5:14

**discuss** [5] - 6:22, 28:24, 29:6, 57:6, 92:4

**discussed** [3] - 23:22, 29:3, 73:16

**discussions** [2] - 73:22, 74:11

**disorder** [1] - 22:9

**dispute** [4] - 10:21, 13:2, 62:11, 70:12

**disputes** [2] - 77:16, 79:3

**DISTRICT** [3] - 1:1, 1:2, 1:3

**District** [2] - 93:6, 93:7

**DIVISION** [1] - 1:2

**divulge** [1] - 55:14

**document** [23] - 8:3, 8:6, 12:7, 14:23, 18:15, 20:5, 21:18, 40:10, 41:4, 50:15, 58:17, 58:18, 58:20, 59:1, 59:2, 59:14, 66:8, 66:11, 66:13, 74:20, 83:15, 87:2, 90:3

**Document** [1] - 4:9

**documents** [10] - 6:22, 6:25, 28:8, 50:24, 55:23, 56:6, 56:14, 56:20, 56:24

**dogs** [1] - 53:10

**done** [5] - 5:13, 15:16, 24:4, 53:16, 70:23, 78:22, 91:5

**double** [1] - 35:4

**doubt** [1] - 13:1

**down** [5] - 9:7, 41:7, 41:8, 69:20, 78:10

**draft** [1] - 73:24

**dress** [1] - 64:19

**due** [16] - 10:9, 11:14,

**ensuring** [1] - 14:12
**entire** [2] - 78:24, 79:1
**entirely** [1] - 40:24
**entitled** [3] - 25:14, 56:25, 93:11
**entry** [2] - 17:2, 17:4
**equally** [1] - 66:13
**ESQ** [2] - 2:15, 2:18
**establish** [1] - 13:25
**estimated** [2] - 35:24, 35:25
**et** [1] - 9:21
**ethics** [1] - 61:9
**evening** [1] - 92:7
**event** [1] - 77:20
**EVIDENCE** [1] - 4:6
**evidence** [10] - 7:1, 7:22, 13:14, 16:10, 18:6, 21:1, 21:5, 51:12, 52:9, 62:12
**exact** [2] - 75:17, 75:19
**exactly** [2] - 11:16, 54:17
**Examiantion** [1] - 3:4
**EXAMINATION** [4] - 7:9, 25:2, 57:12, 68:23
**Examination** [3] - 3:3, 3:4, 3:6
**examination** [4] - 25:5, 55:18, 55:23, 61:22
**except** [1] - 79:6
**excess** [1] - 48:19
**exchange** [2] - 82:6, 82:18
**excused** [2] - 68:8, 68:11
**executed** [2] - 22:5, 66:17
**Exhibit** [64] - 7:21, 8:9, 8:16, 8:19, 12:9, 13:14, 15:1, 15:13, 16:1, 17:18, 19:22, 20:7, 20:12, 21:7, 29:8, 29:9, 30:22, 32:6, 32:7, 33:20, 35:6, 38:10, 40:8, 41:9, 47:15, 47:16, 48:6, 48:21, 58:12, 58:24, 59:8, 59:24, 60:5, 60:25, 71:20, 71:22, 72:10, 72:20, 74:23, 75:21, 75:23, 75:25, 76:8, 76:14, 76:15, 80:6, 80:8, 80:18, 81:1, 81:23, 82:4, 82:22, 83:3, 85:1, 85:11, 85:13,

86:10, 86:17, 86:20, 89:9, 89:19, 89:25
**exhibit** [2] - 60:6, 73:2
**EXHIBIT** [1] - 4:6
**EXHIBITS** [1] - 4:3
**exist** [1] - 83:17
**expect** [1] - 63:24
**expectation** [1] - 63:17
**expectations** [1] - 81:12
**expended** [1] - 9:20
**expenditures** [1] - 23:11
**expense** [1] - 23:18
**expenses** [15] - 10:13, 23:11, 23:21, 26:3, 30:13, 31:8, 31:13, 31:18, 31:21, 32:13, 33:3, 34:9, 44:4, 47:2, 58:1
**experience** [3] - 23:1, 59:21, 63:8
**expert** [3] - 49:6, 60:14, 67:11
**explain** [1] - 24:18
**express** [1] - 6:23
**expressed** [2] - 10:5, 15:8

**E**

**e-mail** [54] - 4:7, 4:12, 4:16, 4:17, 4:22, 5:13, 8:2, 8:10, 8:12, 9:13, 10:16, 10:23, 11:6, 11:20, 12:13, 13:3, 13:6, 14:5, 38:11, 38:14, 39:23, 51:9, 71:24, 72:2, 72:4, 72:6, 72:7, 72:24, 73:9, 73:12, 73:14, 73:20, 75:1, 80:8, 80:11, 80:14, 81:2, 81:5, 81:8, 82:6, 82:8, 82:9, 82:12, 82:15, 82:18, 83:5, 83:9, 83:17, 84:3, 89:10, 89:15, 90:6
**e-mails** [9] - 51:1, 72:18, 80:20, 82:9, 82:24, 83:1, 89:12, 89:21, 90:2
**EA** [3] - 4:11, 4:11
**Eagan** [3] - 13:7, 13:9, 21:9, 43:10, 45:12, 68:1, 68:2, 78:20
**early** [1] - 14:5
**easier** [1] - 33:21
**easiest** [1] - 73:7
**edits** [1] - 74:1
**Edward** [1] - 48:10
**effective** [1] - 76:21
**effort** [3] - 73:22, 74:16, 74:18
**efforts** [5] - 15:4, 74:3, 77:19, 78:13, 81:25
**eight** [2] - 37:17, 84:3
**either** [7] - 18:3, 27:16, 36:14, 50:7, 64:9, 85:10, 86:18
**electronic** [9] - 13:10, 17:16, 17:21, 17:24, 18:2, 19:20, 57:16, 57:21, 57:23
**Ellen** [1] - 61:7
**end** [3] - 21:23, 24:16, 77:7
**ensure** [2] - 13:10, 34:8

**F**

**fact** [2] - 63:11, 83:1
**factual** [1] - 62:9
**fair** [8] - 14:4, 14:6, 72:2, 77:7, 80:14, 82:18, 85:4, 89:15
**fairly** [1] - 14:5
**faith** [1] - 67:18
**fall** [2] - 87:10, 87:11
**falling** [1] - 87:12
**false** [1] - 17:13
**familiar** [1] - 54:17
**family** [2] - 15:3, 15:8
**famous** [1] - 16:21
**far** [1] - 48:19
**fashion** [1] - 9:8
**father** [4] - 9:23, 10:15, 10:24, 11:2
**February** [10] - 11:21, 12:13, 12:16, 13:4, 14:5, 15:4, 30:13, 31:14, 31:20, 33:24
**federal** [3] - 35:16, 66:18, 67:1, 67:22, 68:5
**Federal** [1] - 93:20
**FEDERAL** [2] - 1:24, 93:5
**fee** [20] - 25:13, 45:17,

45:18, 45:19, 46:2, 46:7, 46:8, 47:1, 47:6, 47:9, 47:10, 48:19, 56:12, 56:15, 56:18, 56:21, 59:11, 63:17
**fees** [19] - 9:21, 23:7, 24:3, 26:3, 26:5, 26:7, 26:13, 45:8, 45:14, 45:25, 46:17, 47:2, 47:13, 55:25, 56:8, 61:20, 64:23, 64:25, 65:8
**few** [5] - 51:23, 71:19, 75:4
**figure** [2] - 19:19, 22:25, 23:13, 40:12, 45:25, 47:22, 57:25
**file** [1] - 15:18
**filed** [2] - 70:18, 71:1
**files** [4] - 13:10, 15:13, 16:23, 17:21
**final** [2] - 77:15, 77:24
**finalized** [1] - 59:15
**finally** [2] - 46:12, 84:7
**financial** [5] - 25:6, 26:8, 26:14, 63:5, 90:25
**fine** [2] - 33:10, 88:18
**finish** [1] - 39:6
**firm** [29] - 12:17, 13:10, 14:11, 15:9, 15:14, 23:2, 23:13, 23:21, 25:6, 25:14, 25:22, 26:8, 26:12, 26:14, 29:24, 32:15, 35:13, 35:18, 36:14, 45:13, 51:1, 51:24, 52:8, 52:14, 61:9, 63:6, 63:16, 69:5, 83:17
**firm's** [1] - 46:16
**first** [20] - 7:15, 10:1, 18:11, 22:22, 23:1, 42:25, 51:3, 54:1, 68:17, 71:11, 71:12, 71:17, 76:19, 77:12, 81:23, 82:8, 89:12, 91:9, 92:13
**five** [3] - 28:9, 35:15, 64:9
**focus** [2] - 74:3, 74:16
**focusing** [1] - 43:21
**follow** [2] - 65:3, 90:22
**follow-up** [1] - 65:3
**following** [4] - 65:17, 78:17, 79:20, 83:18
**follows** [2] - 77:18, 88:4
**FOR** [3] - 2:3, 2:14,

2:16
**foregoing** [1] - 93:9
**forget** [1] - 7:15
**form** [3] - 57:7, 74:19, 92:4
**formal** [2] - 70:18, 70:25
**format** [1] - 93:11
**forth** [5] - 5:14, 46:13, 47:11
**forward** [1] - 13:21
**foundation** [12] - 14:1, 29:19, 30:8, 31:23, 34:15, 38:7, 39:14, 44:15, 46:20, 50:18, 54:13, 56:2
**four** [1] - 49:21
**fourth** [1] - 43:5
**freely** [1] - 53:12
**Friday** [1] - 85:17
**front** [5] - 12:10, 16:13, 27:5, 30:23, 71:22
**full** [4] - 5:25, 10:11, 77:15, 77:24
**funds** [1] - 21:19

**G**

**gambling** [1] - 11:18
**Gardner** [21] - 4:15, 16:18, 37:9, 39:3, 56:11, 56:15, 70:7, 71:6, 71:10, 76:1, 76:5, 76:22, 76:23, 77:17, 77:21, 78:4, 81:16, 83:24, 87:8, 90:14, 91:23
**Gardner's** [2] - 37:17, 38:3
**general** [3] - 14:8, 70:9, 70:10
**generally** [3] - 22:6, 24:15, 70:22
**generate** [2] - 63:25, 64:1
**gentlemen** [3] - 7:4, 57:5, 92:2
**Geoff** [5] - 4:7, 8:25, 10:11, 11:13, 11:18
**Geoff's** [2] - 9:20, 10:9
**Geoffrey** [7] - 30:6, 30:12, 30:15, 31:1, 35:17, 36:24, 50:25
**given** [1] - 26:24
**glasses** [1] - 72:25
**Glenn** [2] - 43:20, 44:6
**Global** [3] - 43:3, 43:8, 43:13
**Government** [26] -

23:25, 24:3, 24:12, 24:16, 38:3, 45:14, 45:25, 78:11, 78:12, 81:23, 84:4, 87:1, 87:21, 88:20
**during** [8] - 10:5, 13:9, 14:8, 52:17, 55:22, 63:19, 81:21, 84:16

6:2, 6:7, 6:23, 8:16, 17:20, 22:8, 26:19, 26:20, 26:21, 28:24, 41:24, 53:15, 54:18, 64:5, 68:13, 68:14, 72:9, 76:7, 80:17, 82:21, 84:19, 84:23, 85:7, 86:8, 86:16, 89:18

**GOVERNMENT** [3] - 3:3, 3:5, 68:15
**government** [5] - 6:2, 15:23, 21:3, 24:19, 52:20
**government's** [1] - 53:22
**Government's** [3] - 5:19, 5:25, 6:9
**graduated** [1] - 69:8
**great** [1] - 21:5
**Greg** [2] - 17:12, 47:12
**Gregory** [6] - 48:14, 48:22, 49:2, 49:11, 49:12, 49:18
**Group** [3] - 22:2, 39:3, 39:24
**growing** [2] - 87:9, 90:11
**guys** [1] - 74:24

## H

**half** [3] - 8:7, 8:9, 8:20
**hand** [6] - 16:21, 19:1, 76:19, 76:24, 76:25, 77:1
**handful** [1] - 31:13
**handled** [2] - 1:6, 44:19, 69:24
**handwriting** [1] - 22:18
**hang** [1] - 72:25
**HANNA** [2] - 2:4, 2:9
**happy** [1] - 74:4
**hard** [4] - 35:12, 35:18, 50:8, 73:2
**Hassan** [5] - 69:11, 69:14, 76:5, 76:25, 79:10
**heading** [1] - 20:19
**hear** [1] - 41:18
**heard** [2] - 59:18, 90:21
**Hearsay** [3] - 76:9, 80:19, 82:23
**hearsay** [4] - 12:2, 13:15, 72:11, 89:20
**held** [7] - 29:15, 29:25, 30:1, 30:7, 49:3, 49:12, 93:10

**helicopter** [7] - 52:17, 52:21, 52:25, 66:16, 66:21, 66:25, 67:7
**help** [5] - 13:12, 26:8, 26:14, 54:21, 70:11
**hereby** [1] - 93:7
**highly** [2] - 6:17, 6:20
**himself** [4] - 81:16, 83:24, 87:8, 90:15
**HINO** [3] - 1:23, 93:5, 93:19
**Hino** [1] - 93:20
**HINO-SPAAN** [1] - 1:23, 93:5, 93:19
**Hino-Spaan** [1] - 93:20
**hire** [1] - 70:10
**hold** [1] - 29:18
**holder** [1] - 88:13
**holidays** [1] - 74:4
**home** [2] - 62:14, 66:16, 67:2
**Hon** [1] - 4:13
**Honda** [3] - 39:12, 39:19, 40:3
**honestly** [1] - 50:8
**Honor** [121] - 5:8, 5:23, 6:5, 6:13, 6:19, 7:7, 7:13, 7:18, 7:22, 8:15, 8:17, 9:9, 10:18, 11:24, 12:3, 12:19, 13:13, 13:15, 13:16, 13:18, 14:1, 14:3, 14:16, 14:20, 14:21, 15:5, 15:10, 15:20, 16:4, 19:5, 19:11, 20:8, 20:10, 21:4, 24:24, 25:23, 26:15, 27:8, 27:19, 27:21, 27:23, 28:17, 29:19, 30:2, 30:8, 31:9, 31:22, 32:3, 32:21, 34:1, 34:10, 34:19, 35:19, 36:5, 36:25, 37:5, 37:23, 38:6, 39:5, 39:8, 39:14, 40:4, 40:10, 40:17, 40:20, 40:24, 41:2, 41:7, 41:10, 41:15, 41:18, 42:1, 42:5, 42:9, 42:14, 43:25, 44:16, 44:23, 46:5, 46:19, 49:4, 50:17, 52:10, 53:2, 54:6, 54:13, 54:24, 55:19, 56:1, 57:3, 58:3, 58:5, 58:22, 59:5, 60:7, 61:17, 61:23, 62:9, 62:10, 68:9, 68:22, 72:9,

72:11, 76:7, 79:17, 80:17, 82:21, 83:14, 83:18, 85:7, 86:1, 86:16, 87:13, 87:24, 88:12, 88:16, 88:22, 89:18, 89:20, 92:14, 92:15
**Honor's** [1] - 61:11
**HONORABLE** [1] - 1:3
**Honorable** [1] - 73:15
**hope** [1] - 74:4
**hopefully** [1] - 74:2
**hoping** [1] - 85:15
**hourly** [10] - 46:17, 46:22, 47:2, 47:10, 47:14, 64:23, 64:25, 65:8, 65:10, 65:13
**hours** [3] - 47:5, 47:8, 55:18
**house** [2] - 21:24, 29:4
**housing** [2] - 9:2, 9:21
**Huettner** [3] - 44:7, 44:8, 44:9
**Huettners** [2] - 42:19, 42:20
**Huettners'** [1] - 43:20

## I

**idea** [5] - 19:17, 24:22, 63:4, 63:6, 65:12
**identified** [1] - 22:22
**identify** [1] - 40:13
**ignore** [6] - 32:22, 38:15, 38:19, 38:21, 39:1, 39:19
**II** [1] - 71:21
**immediately** [2] - 20:15, 21:15
**impact** [1] - 63:5
**improper** [4] - 12:20, 29:20, 49:5, 56:2
**IN** [2] - 2:14, 4:5
**inadmissible** [1] - 12:2
**inappropriate** [1] - 40:24
**Inc** [1] - 75:13
**incident** [2] - 37:11, 37:14
**include** [1] - 19:14
**included** [2] - 8:6, 31:14
**including** [1] - 31:14, 89:12
**income** [2] - 59:11
**incorrect** [1] - 6:3
**increasingly** [1] - 87:9, 90:12

**incredibly** [1] - 15:3
**indicated** [3] - 6:11, 6:21, 92:11
**individual** [3] - 9:1, 69:11, 69:16
**individuals** [2] - 15:8, 66:18
**infamous** [1] - 18:25
**information** [2] - 55:14, 88:11
**informed** [2] - 10:16, 22:8
**inputs** [1] - 36:3
**instruct** [1] - 44:3
**instructed** [1] - 39:24
**instructions** [1] - 78:17
**intellectual** [1] - 65:14
**interest** [4] - 23:20, 23:22, 23:25, 24:20
**Internal** [1] - 52:23
**interview** [2] - 27:16, 53:13
**interviewed** [1] - 67:15
**interviews** [1] - 28:13
**introducing** [1] - 6:25
**introductory** [1] - 9:15
**invite** [2] - 6:4, 6:23
**invoices** [1] - 33:15
**irrelevant** [1] - 79:18
**issue** [3] - 6:6, 6:15, 72:12
**issues** [8] - 33:17, 57:7, 60:15, 61:10, 61:15, 85:21, 85:22, 92:5
**IT** [1] - 13:12
**item** [2] - 22:22, 40:13
**itself** [1] - 58:11

## J

**JAMES** [1] - 1:3
**January** [39] - 28:3, 28:4, 38:1, 38:4, 48:7, 61:3, 61:4, 73:19, 74:4, 74:7, 74:24, 75:2, 76:2, 76:21, 77:6, 77:19, 77:20, 78:8, 78:12, 78:13, 81:9, 81:23, 82:2, 83:5, 84:3, 85:2, 85:5, 85:8, 85:18, 86:5, 86:12, 86:23, 87:1, 88:20, 90:2, 90:6, 91:12, 91:18
**jeans** [1] - 53:6
**Jencks** [2] - 5:10, 6:6

**Joe** [4] - 9:6, 20:14, 21:12, 60:6
**Joel** [6] - 68:14, 68:18, 73:21, 81:10, 83:10, 90:10
**JOEL** [3] - 3:5, 68:15, 68:18
**JOHN** [2] - 1:8, 2:15
**Johnson** [34] - 4:7, 8:13, 8:25, 9:6, 9:17, 11:3, 11:10, 11:11, 11:12, 11:13, 11:17, 11:22, 12:14, 12:17, 13:22, 14:6, 14:9, 15:4, 30:12, 30:15, 31:1, 32:10, 32:13, 35:17, 35:22, 36:9, 36:24, 37:3, 50:25, 55:25, 56:7, 59:12, 60:10, 61:1
**Johnson's** [8] - 9:23, 10:15, 10:24, 11:2, 11:18, 15:3, 15:8, 30:6
**Judge** [4] - 73:18, 74:8, 74:9, 75:14
**JUDGE** [1] - 1:3
**judge** [4] - 35:16, 42:6, 70:14, 73:15
**judgment** [3] - 9:19, 10:2, 25:14
**Judicial** [1] - 93:12
**Judy** [1] - 9:7
**JUDY** [2] - 3:3, 7:8
**July** [3] - 16:22, 18:25, 93:15
**JULY** [2] - 1:15, 5:1
**jury** [11] - 5:5, 6:16, 6:18, 7:2, 7:3, 7:5, 18:7, 20:13, 21:2, 21:8, 92:10

## K

**Katten** [1] - 69:5
**keep** [2] - 46:17, 47:1
**keeping** [1] - 47:5
**kept** [10] - 5:13, 13:6, 32:1, 46:22, 64:23, 64:25, 65:2, 65:4, 65:9, 65:10
**khakis** [1] - 53:5
**Kim** [1] - 67:21
**Kimberly** [9] - 25:10, 25:19, 25:22, 26:3, 26:13, 62:3, 62:23, 63:1, 63:17
**Kimberly-Clark** [9] - 25:10, 25:19, 25:22, 26:3, 26:13, 62:3,

62:23, 63:1, 63:17
**kind** [1] - 45:2
**knowing** [1] - 58:20
**knowledge** [3] - 13:6, 67:25, 68:6
**known** [1] - 24:5
**Kupetz** [1] - 43:6

# L

**lacks** [7] - 29:19, 30:8, 31:22, 38:7, 39:14, 46:19, 50:18
**Lacks** [2] - 34:15, 44:15
**ladies** [3] - 7:4, 57:5, 92:2
**large** [2] - 63:17, 63:22
**larger** [1] - 34:4
**last** [7] - 17:2, 17:4, 19:13, 22:8, 61:1, 68:17, 78:15
**late** [2] - 75:18, 75:20
**law** [5] - 6:5, 15:14, 63:6, 69:4, 83:17
**LAW** [1] - 2:17
**Law** [3] - 22:2, 39:3, 39:24
**lawsuit** [1] - 70:18
**lawyer** [3] - 69:3, 69:7, 70:14
**lawyers** [3] - 47:5, 47:8, 83:17
**leading** [3] - 33:4, 37:19, 39:9
**Leading** [1] - 33:9
**leafed** [3] - 50:11, 66:11, 66:13
**leafing** [1] - 50:14
**learn** [1] - 90:23
**learned** [1] - 91:2
**learning** [1] - 12:16
**leasor** [1] - 22:2
**least** [4] - 43:12, 74:3, 79:15, 89:12
**leave** [2] - 53:14, 86:4
**left** [5] - 16:21, 19:1, 85:5, 86:11, 86:23
**left-hand** [2] - 16:21, 19:1
**legal** [3] - 49:5, 60:17, 70:23
**legitimate** [1] - 6:6
**less** [1] - 48:3
**letters** [1] - 76:16
**letting** [1] - 71:9
**likely** [2] - 59:11, 86:13
**limine** [2] - 41:15,

42:10
**limitation** [2] - 20:4, 21:18
**Linda** [1] - 21:24
**line** [3] - 40:12, 73:17, 73:18
**lip** [1] - 59:19
**list** [1] - 36:14
**listed** [3] - 20:4, 23:18, 35:23
**listened** [2] - 85:1, 86:10
**living** [3] - 10:12, 10:13, 69:2
**LLP** [4] - 13:7, 13:9, 21:10, 78:20
**Local** [2] - 83:15, 83:19
**look** [46] - 6:12, 12:23, 16:1, 16:12, 24:22, 29:9, 30:22, 31:6, 31:12, 32:6, 33:11, 33:20, 38:10, 38:12, 38:24, 40:8, 42:17, 42:25, 43:12, 45:17, 45:19, 46:2, 46:7, 46:15, 46:16, 47:18, 48:6, 49:12, 51:9, 55:2, 57:22, 58:21, 60:4, 68:5, 71:20, 73:5, 74:23, 75:4, 75:21, 77:9, 78:21, 80:6, 82:3, 89:9, 90:1, 90:5
**looked** [6] - 34:8, 34:24, 35:2, 39:23, 90:2, 91:8
**looking** [7] - 34:7, 48:21, 65:24, 73:1, 81:13, 81:17, 81:19
**Los** [4] - 2:12, 22:1, 59:15, 75:12
**LOS** [1] - 93:3
**lost** [2] - 19:12, 63:20
**Lou** [1] - 73:15
**lunch** [1] - 19:6

# M

**mail** [56] - 4:7, 4:12, 4:16, 4:17, 4:22, 5:13, 8:2, 8:10, 8:12, 9:13, 10:16, 10:23, 11:6, 11:20, 12:13, 13:3, 13:6, 14:5, 21:23, 22:1, 38:11, 38:14, 39:23, 51:9, 71:24, 72:2, 72:4, 72:6, 72:7, 72:24, 73:9, 73:12, 73:14,

73:20, 75:1, 80:8, 80:11, 80:14, 81:2, 81:5, 81:8, 82:6, 82:8, 82:9, 82:12, 82:15, 82:18, 83:5, 83:9, 83:17, 84:3, 89:10, 89:15, 90:6
**mailbox** [1] - 21:24
**mails** [9] - 51:1, 72:18, 80:20, 82:9, 82:24, 83:1, 89:12, 89:21, 90:2
**maintained** [1] - 13:11
**March** [8] - 16:18, 22:5, 54:2, 54:11, 54:20, 55:5, 62:15, 62:21
**marked** [2] - 12:9, 15:13
**mask** [1] - 7:14
**material** [1] - 35:16
**math** [1] - 47:21
**matter** [26] - 13:22, 14:6, 17:8, 18:23, 19:3, 19:15, 24:6, 24:8, 28:1, 28:9, 35:17, 35:22, 46:1, 47:12, 59:12, 65:14, 66:1, 69:24, 70:1, 70:18, 71:1, 71:18, 73:5, 73:16, 84:8, 93:11
**matters** [4] - 24:4, 28:12, 65:14, 92:12
**mean** [6] - 13:12, 18:16, 54:14, 57:16, 63:7, 90:14
**meant** [1] - 81:14
**mediation** [26] - 46:11, 47:12, 70:4, 70:8, 70:9, 70:10, 70:16, 70:18, 71:14, 71:15, 71:18, 72:12, 73:24, 74:2, 74:8, 74:13, 74:16, 74:21, 74:24, 75:2, 75:6, 75:8, 75:15, 76:3, 77:3, 77:6
**Mediation** [1] - 73:19
**mediations** [2] - 70:15, 75:14
**mediator** [4] - 70:11, 70:13, 73:16, 74:9
**meet** [1] - 53:12
**meeting** [8] - 26:23, 27:1, 27:5, 28:3, 28:4, 28:24, 29:6, 54:2
**meetings** [11] - 17:20, 26:19, 26:20, 28:7,

28:15, 28:19, 28:20, 29:3, 64:5, 64:9
**Meisinger** [6] - 4:13, 73:15, 73:18, 74:9, 75:14
**Meisinger-Confidential** [1] - 73:18
**member** [2] - 52:8, 52:14
**members** [3] - 15:8, 50:25, 51:24
**mention** [1] - 11:18
**mentioned** [7] - 25:17, 27:2, 52:17, 53:4, 53:10, 70:8
**message** [1] - 5:13
**messages** [4] - 5:9, 5:16, 6:1, 6:20
**met** [4] - 9:2, 11:6, 53:15, 64:16
**MICHAEL** [2] - 1:8, 2:15
**Michael** [7] - 8:25, 44:3, 50:1, 69:16, 74:5, 83:11, 90:12
**Michelle** [2] - 46:1, 56:25
**midafternoon** [1] - 57:4
**midnight** [1] - 75:20
**might** [2] - 33:21, 67:22
**million** [25] - 25:9, 25:18, 30:7, 30:25, 31:7, 31:15, 35:25, 36:9, 36:12, 39:2, 39:12, 39:20, 39:24, 40:3, 45:21, 48:1, 48:17, 56:25, 77:17, 78:6, 78:11, 81:20, 84:2, 91:10, 91:19
**mine** [3] - 20:16, 20:22, 21:15
**minimum** [1] - 14:21
**minute** [4] - 41:3, 42:3, 50:5, 80:23
**minutes** [1] - 57:5
**mispronounce** [1] - 42:19
**misstates** [5] - 36:17, 43:25, 51:12, 52:9, 87:2
**mistake** [2] - 16:5, 38:22
**moment** [6] - 6:16, 20:3, 21:17, 41:8, 41:16, 60:7
**monetary** [1] - 74:17
**money** [35] - 10:6,

11:3, 11:14, 23:17, 24:15, 25:21, 26:7, 29:15, 29:18, 36:24, 37:18, 43:20, 44:10, 44:13, 44:19, 44:20, 48:22, 49:2, 49:3, 49:12, 51:20, 52:15, 57:25, 59:22, 60:9, 63:7, 63:8, 63:9, 63:25, 64:1, 86:25, 88:10, 88:20, 90:10, 91:7
**monies** [9] - 9:20, 10:12, 29:24, 29:25, 30:4, 38:3, 49:10
**monthly** [1] - 91:22
**months** [4] - 37:17, 38:1, 38:2, 44:11
**morning** [11] - 6:21, 7:16, 41:5, 41:17, 41:23, 41:25, 50:22, 50:23, 75:17, 83:10, 92:8
**most** [3] - 53:8, 72:6, 86:13
**motion** [1] - 6:10
**move** [8] - 21:5, 21:19, 38:14, 53:1, 59:4, 66:4, 86:1, 87:23
**moved** [1] - 13:21
**moves** [7] - 72:10, 76:8, 80:18, 82:22, 85:8, 86:17, 89:19
**MR** [271] - 2:16, 5:8, 5:23, 6:1, 6:13, 6:17, 6:19, 7:7, 7:10, 7:13, 7:18, 7:25, 8:15, 8:17, 8:20, 9:5, 10:17, 10:20, 11:24, 12:1, 12:6, 12:8, 12:19, 12:23, 13:13, 13:15, 13:18, 13:21, 13:25, 14:3, 14:16, 14:19, 14:21, 15:2, 15:5, 15:7, 15:10, 15:12, 15:20, 15:22, 16:4, 16:6, 16:8, 16:11, 18:9, 19:5, 19:9, 19:11, 20:8, 20:10, 20:13, 21:1, 21:3, 21:5, 21:8, 21:12, 24:24, 25:1, 25:3, 25:23, 26:1, 26:9, 26:12, 26:15, 26:18, 27:8, 27:10, 27:11, 27:12, 27:19, 27:21, 27:22, 27:23, 28:1, 28:17, 28:19, 29:19, 29:23, 30:2, 30:5, 30:8, 30:11,

31:3, 31:6, 31:9, 31:12, 31:22, 32:1, 32:3, 32:6, 32:21, 33:2, 33:4, 33:7, 33:9, 33:11, 34:1, 34:4, 34:10, 34:13, 34:15, 34:18, 34:21, 35:6, 35:19, 35:22, 36:5, 36:9, 36:17, 36:20, 36:25, 37:3, 37:5, 37:9, 37:19, 37:21, 37:23, 37:25, 38:6, 38:10, 39:4, 39:8, 39:11, 39:14, 39:18, 40:4, 40:8, 40:10, 40:15, 40:16, 40:20, 40:22, 40:25, 41:2, 41:4, 41:6, 41:10, 41:13, 41:14, 41:18, 41:23, 42:1, 42:4, 42:9, 42:13, 42:16, 43:25, 44:6, 44:8, 44:9, 44:15, 44:19, 44:22, 45:1, 46:4, 46:8, 46:19, 46:24, 49:4, 49:9, 49:14, 49:17, 50:3, 50:10, 50:17, 50:21, 51:12, 51:15, 52:9, 52:13, 53:2, 53:4, 54:6, 54:10, 54:13, 54:20, 54:24, 55:2, 55:9, 55:11, 55:17, 55:19, 55:22, 56:1, 56:6, 57:3, 57:13, 58:3, 58:5, 58:9, 58:22, 58:24, 59:7, 60:9, 60:25, 61:11, 61:14, 61:17, 61:19, 61:22, 62:1, 62:8, 62:10, 62:12, 62:14, 64:2, 64:4, 65:15, 65:17, 65:19, 65:21, 66:4, 66:7, 67:3, 67:6, 67:9, 67:11, 68:7, 68:9, 68:14, 68:22, 68:24, 69:21, 69:23, 72:9, 72:11, 72:16, 72:21, 76:7, 76:9, 76:11, 76:15, 79:17, 80:1, 80:17, 80:19, 80:24, 81:2, 82:21, 82:23, 83:4, 83:14, 83:16, 83:22, 85:7, 85:10, 85:11, 85:14, 85:17, 86:1, 86:4, 86:16, 86:18, 86:22, 87:2, 87:5, 87:13, 87:18, 87:23, 88:1, 88:9, 88:11, 88:15, 88:19, 88:22,

**N**

88:24, 89:18, 89:20, 90:1, 92:14, 92:15
**Muchin** [1] - 69:5
**multiple** [1] - 63:14

**name** - 9:7, 20:22, 68:17, 69:11, 69:16, 70:6, 78:18
**namely** [1] - 64:22
**names** [1] - 42:19
**near** [1] - 21:24
**necessarily** [1] - 24:6
**need** [14] - 6:16, 6:18, 23:2, 23:5, 23:6, 23:16, 23:20, 24:5, 27:11, 30:19, 45:4, 45:8, 72:25, 92:11
**needed** [3] - 10:18, 87:19, 88:6
**negotiation** [1] - 74:17
**negotiations** [2] - 73:23, 74:12
**nervous** [1] - 87:10
**net** [1] - 24:12
**never** [6] - 10:17, 23:22, 24:22, 53:19, 53:22, 53:23
**Newport** [1] - 2:19
**next** [13] - 16:5, 20:22, 23:6, 23:9, 23:16, 33:8, 43:8, 58:24, 59:8, 68:13, 81:11, 91:15
**NFL** [2] - 19:3, 19:15
**nice** [1] - 15:19
**NICOLA** [2] - 2:4, 2:9
**nine** [2] - 37:17, 38:2
**Nondisparagement** [1] - 79:9
**none** [12] - 25:25, 51:15, 51:18, 51:20, 56:5, 56:9, 56:13, 56:16, 56:19, 56:23, 57:2, 57:18
**None** [1] - 57:16
**nonmonetary** [2] - 73:23, 74:12
**nonpayment** [1] - 33:17
**nonresponsive** [2] - 86:2, 87:23
**normally** [2] - 15:16, 15:17
**North** [1] - 2:11
**note** [1] - 83:14
**notes** [2] - 26:23, 27:7
**nothing** [7] - 5:18, 5:21, 25:1, 38:9,

57:21, 68:7, 86:13
**notice** [4] - 72:18, 80:21, 82:25, 89:23
**November** [12] - 27:1, 27:5, 27:12, 35:8, 35:15, 35:23, 36:3, 60:3, 60:9, 61:4, 77:21, 91:16
**number** [13] - 34:4, 34:21, 34:23, 35:1, 45:23, 64:14, 69:24, 71:21, 77:14, 84:14, 91:6
**Number** [12] - 8:19, 10:8, 15:1, 20:12, 21:7, 72:20, 76:14, 81:1, 83:3, 85:13, 86:20, 89:25
**numbers** [1] - 34:5
**numerous** [5] - 30:18, 33:2, 37:10, 43:15, 50:24

**O**

**objection** [58] - 10:17, 12:19, 13:15, 20:10, 24:24, 25:23, 26:9, 26:15, 27:19, 28:17, 31:3, 31:22, 32:21, 34:10, 34:15, 35:19, 36:5, 36:17, 36:25, 37:5, 39:4, 40:4, 40:16, 40:22, 43:25, 44:15, 44:22, 46:4, 46:19, 49:4, 49:14, 50:3, 50:17, 52:9, 53:2, 54:13, 55:19, 56:1, 61:11, 61:17, 62:8, 64:2, 65:15, 67:3, 67:9, 72:11, 72:13, 76:9, 79:17, 79:22, 80:19, 82:23, 85:10, 86:18, 87:2, 87:13, 89:20
**Objection** [1] - 54:6
**objections** [8] - 8:17, 13:24, 14:19, 15:10, 30:2, 34:18, 40:21, 72:14
**obligation** [1] - 14:25
**obligations** [2] - 91:19, 91:22
**obtain** [1] - 84:19
**obtained** [2] - 25:10, 25:18
**occasions** [4] - 11:7, 63:14, 63:15, 65:8
**OF** [7] - 1:2, 1:5, 1:14, 2:1, 93:1, 93:3, 93:4

**offer** [7] - 8:15, 13:13, 13:24, 14:1, 14:16, 15:20, 20:9
**offered** [1] - 53:22
**office** [3] - 22:1, 75:11, 84:10
**OFFICES** [1] - 2:17
**offices** [1] - 75:13
**Official** [1] - 93:20
**OFFICIAL** [3] - 1:24, 93:1, 93:5
**Ohman** [1] - 38:15
**old** [1] - 9:8
**one** [23] - 5:12, 9:18, 13:9, 14:23, 16:5, 28:19, 28:20, 29:3, 36:13, 43:5, 43:8, 43:21, 46:15, 47:15, 54:24, 54:25, 60:7, 62:20, 72:22, 73:5, 76:24, 76:25
**One** [1] - 35:25
**ones** [2] - 5:16, 43:15
**oOo** [1] - 92:17
**opening** [1] - 22:13
**opinion** [1] - 29:20
**opinions** [2] - 57:7, 92:4
**opportunity** [1] - 64:19
**opposing** [1] - 69:24
**OR** [1] - 4:5
**order** [5] - 17:15, 19:19, 23:13, 41:15, 57:25
**ordinary** [1] - 13:7
**originally** [1] - 38:15
**ought** [1] - 91:25
**out-of-pocket** [2] - 23:10, 58:1
**outgoing** [2] - 47:19, 48:13
**outside** [11] - 34:1, 40:4, 44:1, 61:12, 61:13, 61:18, 64:2, 65:14, 67:3, 70:12, 70:24
**overall** [1] - 74:19
**overruled** [45] - 12:21, 19:10, 25:24, 26:16, 27:24, 28:18, 29:21, 30:3, 30:9, 31:4, 31:10, 31:24, 32:4, 32:24, 34:2, 34:20, 36:7, 36:19, 37:7, 38:8, 39:16, 40:6, 44:2, 44:17, 44:24, 46:6, 46:21, 49:7, 49:15, 50:6, 50:19, 51:13, 52:11, 54:15,

55:12, 56:4, 61:24, 72:15, 76:10, 79:21, 79:23, 83:20, 87:3, 87:16, 88:13
**overturned** [1] - 63:1
**overturning** [1] - 63:5
**owed** [2] - 23:1, 57:25
**own** [2] - 51:4, 53:12

**P**

**p.m** [3] - 57:10, 92:16
**P.M** [2] - 1:16, 5:2
**P.O** [1] - 21:23
**PAGE** [1] - 3:2
**page** [50] - 16:25, 17:4, 18:11, 20:14, 20:18, 20:22, 29:9, 30:22, 32:7, 32:9, 32:12, 33:2, 33:11, 33:12, 33:16, 33:20, 35:7, 38:24, 40:9, 41:1, 41:10, 41:13, 41:25, 42:6, 42:13, 42:17, 42:20, 43:1, 43:12, 48:6, 58:24, 59:8, 61:1, 72:6, 72:24, 76:12, 77:9, 79:12, 81:2, 81:5, 82:8, 82:9, 82:11, 82:15, 83:4, 89:12, 90:3, 90:5, 93:11
**pages** [1] - 20:1
**paid** [10] - 32:15, 33:1, 33:3, 33:12, 36:1, 36:24, 56:7, 78:6, 91:2, 91:18
**Pansky** [2] - 61:7, 61:15
**paper** [1] - 28:21
**paragraph** [8] - 55:2, 77:10, 78:15, 78:21, 78:23, 78:25, 79:7, 79:8
**parking** [1] - 5:17
**part** [5] - 28:4, 45:12, 45:16, 78:15, 90:2
**particular** [2] - 23:7, 40:12
**parties** [6] - 70:10, 70:15, 78:7, 79:2, 79:5, 79:6
**parts** [1] - 5:11
**party** [2] - 6:24, 12:4
**passage** [1] - 41:17
**passed** [1] - 69:8
**Passport** [2] - 43:1, 43:17
**past** [1] - 53:1
**Patricia** [2] - 43:20,

44:7
**Pause** [1] - 60:8
**pay** [9] - 30:15, 43:24, 44:3, 77:16, 77:19, 78:13, 87:19, 88:7, 88:10
**paying** [1] - 43:20, 55:25
**Payment** [1] - 77:10
**payment** [23] - 33:16, 42:18, 43:3, 43:5, 43:21, 56:11, 57:1, 65:21, 77:15, 77:18, 81:20, 81:23, 82:1, 84:2, 85:25, 87:21, 90:24, 91:1, 91:9, 91:13, 91:15, 91:16
**payments** [16] - 17:7, 17:7, 17:12, 18:14, 18:16, 18:19, 30:12, 32:20, 33:12, 33:14, 42:25, 78:10, 78:16, 78:18, 91:9
**PDF** [1] - 50:8
**people** [3] - 7:15, 15:18, 40:18
**Peoples** [1] - 63:11
**percent** [8] - 25:13, 45:20, 45:23, 46:2, 46:8, 46:9, 47:25, 48:19
**perhaps** [1] - 40:13
**period** [1] - 14:8
**Phan** [1] - 46:1
**Phan's** [1] - 56:25
**Phillip** [4] - 9:6, 9:17, 11:12, 11:17
**phone** [3] - 11:10, 11:12, 91:4
**phrase** [1] - 59:18
**pick** [1] - 29:3
**picked** [1] - 29:7
**piece** [1] - 28:21
**place** [6] - 10:11, 37:14, 75:6, 75:8, 75:11, 75:16
**Plaintiff** [1] - 1:6
**PLAINTIFF** [1] - 2:3
**play** [2] - 85:9, 86:17
**played** [2] - 85:16, 86:21
**player** [1] - 69:15
**Plaza** [1] - 2:18
**plus** [1] - 17:20
**pocket** [2] - 23:10, 58:1
**point** [11] - 7:14, 20:8, 31:7, 41:20, 64:8, 69:21, 81:21, 85:23, 89:3, 92:12

polos [1] - 53:5
**portion** [14] - 8:2, 9:13, 11:6, 11:8, 14:22, 14:25, 30:6, 30:16, 55:25, 56:7, 56:11, 56:15, 56:18, 56:21
**portions** [2] - 6:22, 6:25
**possession** [2] - 5:20, 16:23
**possible** [4] - 24:9, 24:11, 39:1, 66:13
**possibly** [1] - 36:13
**post** [1] - 22:9
**post-traumatic** [1] - 22:9
**practice** [3] - 69:4, 70:13, 80:4
**preceding** [2] - 17:4, 20:18
**predicate** [2] - 38:7, 62:9
**predict** [2] - 35:12, 35:18
**prejudicial** [1] - 6:20
**prepared** [1] - 5:6
**presence** [4] - 5:5, 7:3, 79:11, 92:10
**present** [3] - 6:11, 27:2, 27:15
**pretrial** [1] - 72:12
**previous** [2] - 29:11, 78:22
**previously** [2] - 58:8, 77:22
**printout** [1] - 18:22
**privilege** [14] - 54:5, 54:12, 54:22, 55:5, 55:15, 55:16, 67:12, 67:17, 72:12, 79:17, 79:19, 79:20, 88:14, 88:17
**privileged** [1] - 88:11
**privileges** [1] - 54:1
**PRO** [1] - 2:14
**problem** [1] - 11:18
**proceed** [2] - 6:11, 7:17, 16:10
**proceeding** [2] - 70:23, 71:1
**Proceedings** [1] - 92:16
**PROCEEDINGS** [1] - 1:14
**proceedings** [2] - 60:8, 93:10
**process** [1] - 87:21
**professional** [1] - 69:15

prompt [1] - 42:4
**proper** [2] - 56:2, 60:17
**properly** [3] - 13:11, 14:13, 44:19
**property** [3] - 37:10, 53:9, 65:14
**protect** [1] - 67:13
**protection** [2] - 53:19, 53:22
**protects** [1] - 67:12
**protracted** [2] - 73:22, 74:11
**provide** [7] - 54:14, 73:25, 80:1, 84:19, 84:23, 86:7, 89:6
**provided** [1] - 28:8
**provides** [1] - 84:13
**providing** [1] - 50:15
**provision** [2] - 9:18, 10:2
**public** [1] - 83:16
**publish** [6] - 8:20, 18:7, 20:13, 21:2, 21:8, 42:13
**pull** [3] - 28:19, 29:8, 35:6
**purpose** [2] - 48:25, 49:1
**purposes** [1] - 6:25
**pursuant** [6] - 78:11, 83:15, 86:25, 87:18, 88:5, 93:8
**put** [4] - 10:10, 33:21, 48:17, 53:10

**Q**

**qualify** [1] - 6:24
**quarter** [1] - 36:2
**Quarter** [2] - 36:10, 36:11
**questions** [36] - 9:7, 9:12, 9:18, 9:24, 11:5, 19:6, 28:12, 30:11, 30:18, 32:23, 35:12, 37:11, 39:6, 49:18, 49:21, 50:11, 53:25, 54:10, 54:14, 54:19, 55:23, 55:24, 56:10, 56:17, 57:3, 57:14, 57:19, 58:9, 58:25, 61:16, 64:20, 67:16, 67:18, 67:20, 75:5
**quick** [2] - 31:17, 47:21
**QuickBooks** [21] - 16:22, 17:25, 23:14, 30:20, 31:1, 31:20,

31:23, 32:1, 34:8, 34:14, 34:16, 34:23, 46:16, 46:20, 46:23, 57:15, 57:23, 65:1, 65:2, 65:25, 67:23
**quicker** [1] - 58:13
**quickly** [1] - 74:20
**quite** [1] - 54:16
**quote/unquote** [1] - 37:11
**quotes** [2] - 76:23, 77:1

**R**

**raise** [1] - 6:6
**ran** [1] - 59:2
**rate** [1] - 47:14
**rates** [1] - 46:17
**Re** [1] - 73:18
**re** [4] - 4:7, 4:16, 4:18, 4:22
**reach** [1] - 71:9
**reached** [4] - 71:11, 71:12, 74:20, 76:3
**read** [10] - 9:15, 10:8, 73:20, 76:19, 77:12, 77:13, 78:25, 79:7, 88:4
**reading** [2] - 12:6, 91:15
**really** [4] - 12:22, 13:1, 24:7, 54:17
**REALTIME** [1] - 93:5
**reason** [6] - 10:20, 29:14, 38:18, 39:18, 50:14, 87:11
**reasons** [2] - 15:21, 66:10
**receipt** [1] - 52:15
**receive** [3] - 10:2, 84:16, 90:10
**received** [44] - 5:9, 6:1, 8:18, 8:19, 9:1, 13:3, 20:11, 20:12, 21:6, 21:7, 29:2, 33:15, 39:20, 51:21, 56:15, 56:21, 59:11, 60:10, 63:7, 63:8, 72:17, 72:18, 72:20, 76:10, 76:13, 76:14, 80:20, 80:23, 80:25, 81:1, 82:25, 83:3, 84:20, 84:24, 85:12, 85:13, 86:19, 86:20, 89:22, 89:23, 89:25, 91:5, 91:6, 91:7
**receiving** [6] - 13:17, 13:19, 56:18, 73:14, 83:10, 83:25

recent [1] - 72:6
**recess** [1] - 57:5
**Recess** [1] - 57:10
**recognize** [3] - 8:2, 22:18, 75:23
**recollection** [19] - 9:22, 10:14, 10:18, 11:1, 11:20, 11:23, 12:5, 12:12, 12:16, 12:24, 14:9, 14:17, 14:24, 15:2, 15:7, 15:12, 18:14, 54:21, 55:4
**record** [7] - 5:25, 6:11, 14:17, 31:1, 34:24, 42:7, 88:4
**recording** [2] - 33:15, 85:16, 86:21
**records** [8] - 17:16, 30:5, 31:2, 32:1, 32:18, 32:19, 46:16, 46:20
**recovered** [1] - 26:12
**Recross** [1] - 3:4
**RECROSS** [1] - 57:12
**recross** [1] - 58:5
**Recross-Examination** [1] - 3:4
**RECROSS-EXAMINATION** [1] - 57:12
**redacted** [1] - 40:23
**redaction** [4] - 40:11, 41:1, 42:8, 42:11
**redactions** [1] - 83:15
**Redirect** [1] - 3:4
**REDIRECT** [1] - 25:2
**redirect** [4] - 57:14, 58:6, 64:5, 67:20
**reduced** [1] - 62:24
**referring** [4] - 26:18, 83:12, 83:23, 84:1
**reflect** [3] - 32:20, 32:25, 34:13
**reflected** [2] - 18:15, 18:19
**refresh** [7] - 9:22, 10:14, 12:5, 12:12, 12:24, 54:21, 55:4
**refreshed** [3] - 10:18, 14:18, 14:24
**refreshing** [1] - 12:20
**refused** [2] - 14:25, 15:21
**regarding** [6] - 8:13, 9:2, 18:22, 73:23, 74:12, 91:3
**regards** [2] - 44:6, 74:5

**REGNIER** [2] - 3:3, 7:8
**regnier** [1] - 67:11
**Regnier** [35] - 4:7, 5:9, 5:23, 6:2, 7:11, 7:19, 7:25, 9:10, 10:20, 12:8, 13:21, 14:4, 15:2, 15:7, 15:12, 15:22, 16:12, 18:9, 19:12, 20:20, 21:9, 21:22, 25:4, 27:13, 57:14, 58:15, 58:25, 59:18, 59:21, 60:10, 61:2, 61:14, 67:6, 67:20, 68:11
**regular** [1] - 92:2
**regulations** [3] - 60:22, 61:19, 93:12
**rehearsal** [1] - 64:19
**reimbursement** [2] - 9:19, 10:3
**REJECTED** [1] - 4:6
**related** [3] - 11:2, 19:15, 64:10
**relates** [2] - 19:3, 38:3
**relating** [12] - 12:18, 15:4, 18:19, 23:21, 52:8, 52:14, 56:17, 60:22, 61:20, 64:20, 65:13, 67:21
**Relevance** [1] - 67:3
**relevance** [2] - 25:23, 67:5
**relied** [1] - 67:17
**remainder** [1] - 24:21
**remark** [1] - 53:3
**remember** [22] - 21:24, 22:2, 25:7, 25:10, 29:13, 37:12, 45:21, 47:18, 48:1, 49:17, 50:9, 54:17, 57:6, 62:4, 64:6, 65:4, 65:22, 66:11, 71:11, 71:16, 75:15, 92:3
**rent** [1] - 30:13
**rental** [1] - 37:10
**repeat** [2] - 39:17, 49:8
**Repeat** [1] - 54:9
**rephrase** [3] - 10:19, 29:25, 62:13
**replied** [2] - 84:6, 90:16
**report** [5] - 34:5, 35:1, 35:4, 35:8, 54:20
**reported** [3] - 85:16, 86:21, 93:10
**Reporter** [1] - 93:20
**REPORTER** [4] - 1:24, 54:7, 93:1, 93:6

**REPORTER'S** [1] - 1:14
**represent** [2] - 62:6, 71:5
**represented** [1] - 70:15
**representing** [5] - 69:25, 70:1, 70:2, 71:3, 71:10
**request** [4] - 5:7, 40:25, 42:8, 42:11
**requires** [2] - 32:23, 78:6
**reread** [1] - 88:1
**research** [2] - 57:8, 92:6
**reserve** [1] - 68:9
**resolve** [5] - 46:12, 47:12, 70:5, 70:11, 74:2
**resolved** [2] - 35:17, 41:6
**respect** [2] - 19:7, 79:2
**respectful** [2] - 53:7, 53:8
**responded** [1] - 7:5
**response** [2] - 5:25, 6:9
**responsibilities** [2] - 45:12, 45:16
**restate** [3] - 26:10, 42:12
**result** [2] - 22:10, 24:12
**results** [1] - 63:9
**resumed** [1] - 3:3
**RESUMED** [1] - 7:8
**Retired** [1] - 75:14
**retired** [3] - 70:14, 73:15, 74:9
**returned** [1] - 26:7
**Revenue** [1] - 52:23
**review** [11] - 12:5, 17:21, 17:24, 18:2, 30:5, 30:19, 31:17, 32:18, 49:9, 73:25, 79:15
**reviewing** [1] - 54:20
**Ricci** [3] - 25:17, 48:10, 65:22
**rise** [2] - 57:9, 92:9
**Roberson** [1] - 67:22
**roles** [1] - 13:9
**room** [2] - 49:19, 66:8
**ROOM** [1] - 1:24
**Rosenman** [1] - 69:5
**Rule** [4] - 13:16, 14:25, 83:15, 83:19
**rule** [2] - 13:24, 79:21

**rules** [1] - 60:22
**ruling** [4] - 27:21, 27:23, 42:10, 61:11
**running** [1] - 50:21
**Ruth** [3] - 11:21, 12:14, 14:9

---

**S**

**SACR-19-00061-JVS** [1] - 1:7
**Sagel** [35] - 3:4, 3:6, 5:6, 6:4, 8:3, 8:10, 9:12, 11:5, 15:23, 22:5, 24:18, 25:5, 41:12, 57:15, 57:19, 57:22, 58:9, 58:12, 58:25, 61:5, 61:16, 62:14, 62:16, 64:5, 64:22, 65:3, 66:7, 66:16, 66:17, 67:1, 67:7, 67:15, 67:21, 68:4, 68:21
**sagel** [1] - 59:10
**SAGEL** [126] - 2:5, 5:8, 7:13, 8:17, 10:17, 12:1, 12:6, 12:19, 13:15, 14:19, 15:5, 15:10, 16:6, 19:5, 20:10, 21:3, 24:24, 25:3, 26:1, 26:12, 26:18, 27:8, 27:10, 27:12, 27:22, 28:1, 28:19, 29:23, 30:5, 30:11, 31:6, 31:12, 32:1, 32:6, 33:2, 33:7, 33:11, 34:4, 34:13, 34:18, 34:21, 35:6, 35:22, 36:9, 36:20, 37:3, 37:9, 37:21, 37:25, 38:10, 39:11, 39:18, 40:8, 40:15, 40:25, 41:4, 41:10, 41:13, 41:18, 41:23, 42:13, 42:16, 44:6, 44:9, 44:19, 45:1, 46:8, 46:24, 49:9, 49:17, 50:10, 50:21, 51:15, 52:13, 53:4, 54:10, 54:20, 54:24, 55:2, 55:17, 55:22, 56:6, 57:3, 58:3, 58:22, 61:11, 61:17, 61:22, 62:8, 62:12, 64:2, 65:15, 67:3, 67:9, 68:14, 68:22, 68:24, 69:23, 72:9, 72:21, 76:7, 76:11, 76:15, 80:1, 80:17, 80:24, 81:2, 82:21, 83:4, 83:16,

83:22, 85:7, 85:11, 85:14, 85:17, 86:4, 86:16, 86:22, 87:5, 87:18, 88:9, 88:19, 88:24, 89:18, 90:1, 92:14
**SANTA** [3] - 1:17, 1:25, 5:1
**Santa** [1] - 2:7
**saved** [1] - 15:17
**saving** [1] - 15:13
**saw** [1] - 33:16
**scope** [8] - 34:1, 40:5, 44:1, 61:12, 61:13, 61:18, 64:2, 67:4
**screen** [7] - 33:21, 37:11, 37:14, 38:4, 40:12, 58:13, 73:2
**SE** [1] - 2:14
**search** [4] - 22:4, 22:10, 52:17, 66:17
**seated** [1] - 68:20
**second** [7] - 5:12, 20:1, 23:5, 47:15, 54:24, 57:1, 72:22
**Section** [1] - 93:8
**see** [23] - 9:10, 17:2, 17:5, 18:11, 20:6, 20:20, 22:16, 22:20, 27:12, 29:11, 30:20, 35:9, 38:16, 39:2, 39:12, 39:19, 42:8, 44:20, 48:7, 73:11, 82:3, 83:6, 92:7
**seeks** [3] - 29:19, 32:22, 49:4
**SELNA** [1] - 1:3
**send** [3] - 10:23, 39:24, 48:10
**sends** [1] - 83:5
**sent** [13] - 6:2, 8:12, 8:25, 11:21, 12:13, 21:23, 22:1, 72:7, 73:9, 82:9, 85:2, 89:23, 90:6
**sentence** [2] - 76:19, 77:13
**separately** [2] - 9:5, 51:7
**September** [2] - 37:14, 38:1
**seriously** [2] - 89:5, 89:7
**servers** [2] - 68:1, 68:2
**Service** [1] - 52:24
**Services** [1] - 75:13
**set** [2] - 71:13, 81:12
**settle** [2] - 33:17, 70:11

**Settlement** [2] - 4:14, 76:16
**settlement** [73] - 22:22, 23:3, 24:1, 24:7, 24:9, 24:10, 30:7, 30:16, 35:24, 35:25, 36:10, 36:12, 36:24, 37:17, 38:3, 38:5, 39:3, 43:20, 44:10, 44:20, 45:4, 45:6, 47:19, 48:14, 48:22, 49:3, 49:11, 49:12, 49:18, 49:25, 51:16, 51:20, 52:4, 52:8, 52:15, 55:25, 56:8, 56:12, 56:15, 56:18, 56:21, 57:1, 59:14, 59:22, 60:4, 60:25, 73:24, 74:19, 74:21, 76:1, 76:4, 77:5, 77:15, 77:25, 78:7, 78:11, 79:2, 79:16, 80:1, 84:2, 85:21, 85:22, 86:25, 87:12, 87:19, 87:20, 88:6, 88:7, 91:8, 91:9, 91:24
**settlements** [1] - 60:18
**seven** [1] - 55:18
**several** [2] - 65:15, 87:6
**shall** [1] - 78:16
**sheet** [3] - 22:16, 28:20, 35:22
**Sheriff's** [5] - 52:22, 52:23, 66:21, 66:24, 67:7
**shield** [1] - 7:14
**short** [1] - 28:7
**short-circuit** [1] - 28:7
**shortly** [2] - 10:23, 84:9
**show** [4] - 52:7, 52:13, 56:7, 56:24
**showed** [7] - 35:11, 41:24, 50:24, 51:23, 56:24, 58:12, 62:14
**showing** [1] - 56:14
**shown** [3] - 56:14, 56:20, 61:2
**shows** [1] - 13:5
**sic** [3] - 12:14, 76:10, 80:23
**side** [3] - 70:3, 81:12, 81:15
**sign** [3] - 20:19, 29:1, 79:11
**signature** [5] - 19:24, 20:15, 21:9, 21:14,

79:10
**Signature** [2] - 4:10, 4:11
**signed** [6] - 19:24, 20:2, 28:20, 77:5, 77:6, 79:6
**signer** [1] - 21:14
**signers** [1] - 20:19
**signing** [1] - 21:18
**simply** [2] - 6:7, 12:4
**single** [5] - 36:13, 40:15, 40:25, 52:7, 60:20
**sit** [5] - 18:18, 44:12, 44:18, 65:24, 69:20
**sitting** [1] - 67:25
**situation** [2] - 10:9, 11:14
**six** [2] - 44:10, 64:9
**slightly** [1] - 48:3
**slip** [1] - 59:19
**so..** [1] - 88:17
**sometimes** [2] - 7:15, 35:12
**sorry** [26] - 13:18, 22:7, 24:8, 34:20, 41:18, 47:3, 49:8, 54:7, 55:10, 55:17, 57:17, 60:6, 62:1, 62:19, 65:19, 69:22, 73:1, 73:8, 75:5, 75:7, 79:11, 79:22, 81:4, 82:3, 82:11, 83:21
**Sorry** [1] - 76:13
**SOUTHERN** [1] - 1:2
**Spaan** [1] - 93:20
**SPAAN** [3] - 1:23, 93:5, 93:19
**speaking** [1] - 70:22
**special** [1] - 53:16
**Special** [3] - 27:2, 27:15, 28:11
**specializes** [1] - 70:14
**specific** [1] - 70:17
**specifically** [2] - 32:7, 48:6
**Speculation** [3] - 44:22, 46:4, 49:14
**speculation** [10] - 31:9, 32:22, 34:10, 35:19, 35:21, 36:5, 50:3, 50:17, 56:2, 87:13
**spell** [1] - 68:16
**spent** [1] - 65:13
**spoken** [1] - 54:18
**Spring** [1] - 2:11
**STAND** [1] - 7:8
**stand** [1] - 15:22

**STANDBY** [1] - 2:16
**standing** [1] - 72:13
**Stars** [1] - 75:12
**start** [10] - 5:11, 8:22, 55:24, 72:21, 72:23, 76:12, 76:15, 77:24, 83:4, 86:22
**started** [2] - 25:5, 75:17
**starting** [1] - 9:15
**state** [1] - 68:16
**STATE** [1] - 93:4
**statement** [3] - 12:2, 14:17, 14:20
**statements** [3] - 9:15, 22:13, 27:12
**STATES** [2] - 1:1, 1:5
**States** [7] - 2:4, 2:5, 2:9, 2:10, 93:6, 93:8, 93:13
**status** [1] - 84:8
**stenographically** [1] - 93:10
**steps** [1] - 68:4
**Steward** [1] - 64:17
**STEWARD** [2] - 2:17, 2:18
**still** [6] - 26:23, 57:22, 62:12, 84:3, 86:25, 90:10
**stipulate** [1] - 21:3
**stop** [2] - 9:22, 91:25
**STREET** [1] - 1:24
**Street** [2] - 2:6, 2:11
**stress** [1] - 22:9
**stricken** [5] - 37:24, 53:3, 59:6, 66:6, 87:25
**strike** [10] - 11:11, 17:10, 19:13, 33:9, 37:23, 59:4, 62:8, 66:4, 86:1, 87:23
**stuff** [1] - 5:18
**subject** [3] - 40:11, 73:17, 73:18
**submitted** [2] - 57:8, 92:5
**substantial** [3] - 26:5, 26:7, 26:13
**sufficient** [2] - 6:5, 6:10
**Suite** [3] - 2:6, 2:11, 2:19
**Sulmeyer** [1] - 43:6
**sum** [2] - 77:17, 78:6
**supersedes** [1] - 79:3
**supposed** [1] - 29:25
**sustained** [20] - 15:6, 15:11, 24:25, 33:5, 34:12, 34:20, 35:21,

37:2, 37:20, 39:10, 58:4, 58:23, 61:13, 61:18, 64:3, 65:18, 65:20, 67:5, 67:10, 88:23
**SWORN** [1] - 68:15
**system** [3] - 50:8, 70:12, 70:24

**T**

**Tabs** [18] - 18:2, 23:14, 30:19, 32:9, 33:14, 34:5, 34:8, 35:1, 35:4, 46:24, 57:20, 57:23, 64:22, 64:23, 65:4, 65:9, 65:25, 67:23
**ten** [2] - 11:7, 17:20
**ten-plus** [1] - 17:20
**term** [1] - 70:9
**terms** [4] - 35:16, 73:23, 74:12, 77:23
**tested** [1] - 85:14
**testified** [4] - 5:23, 5:24, 48:9, 48:25
**testify** [1] - 14:24
**testimony** [9] - 5:19, 6:6, 29:20, 32:22, 36:17, 44:1, 58:15, 59:4, 62:8
**text** [5] - 5:8, 5:13, 5:16, 6:1, 6:20
**THE** [194] - 2:3, 2:14, 3:3, 3:5, 5:6, 5:22, 5:24, 6:9, 6:15, 6:18, 6:21, 7:4, 7:6, 7:8, 7:15, 7:24, 8:18, 10:19, 11:25, 12:4, 12:21, 12:22, 13:17, 13:19, 13:23, 14:2, 14:23, 15:6, 15:11, 15:21, 16:3, 16:7, 16:10, 18:8, 19:7, 19:10, 20:11, 21:6, 24:25, 25:24, 25:25, 26:10, 26:16, 26:17, 27:9, 27:20, 27:24, 27:25, 28:18, 29:21, 29:22, 30:3, 30:4, 30:9, 30:10, 31:4, 31:5, 31:10, 31:11, 31:24, 31:25, 32:4, 32:5, 32:24, 32:25, 33:5, 33:6, 33:8, 33:10, 34:2, 34:3, 34:12, 34:20, 35:21, 36:7, 36:8, 36:19, 37:2, 37:7, 37:8, 37:20, 37:22, 37:24,

38:8, 38:9, 39:6, 39:10, 39:16, 39:17, 40:6, 40:7, 40:18, 40:21, 41:3, 41:8, 41:11, 41:12, 41:16, 41:20, 41:21, 42:3, 42:6, 42:8, 42:11, 42:15, 44:2, 44:3, 44:17, 44:18, 44:24, 44:25, 46:6, 46:7, 46:21, 46:22, 49:7, 49:8, 49:15, 49:16, 50:4, 50:5, 50:7, 50:19, 50:20, 51:13, 51:14, 52:11, 52:12, 53:3, 54:9, 54:15, 54:16, 54:25, 55:10, 55:12, 55:13, 55:21, 56:4, 56:5, 57:4, 57:9, 57:11, 58:4, 58:7, 58:23, 59:6, 61:13, 61:18, 61:24, 61:25, 62:13, 64:3, 65:18, 65:20, 66:6, 67:5, 67:10, 68:8, 68:11, 68:16, 68:18, 68:19, 68:21, 72:14, 72:17, 76:10, 76:13, 79:20, 79:22, 79:24, 79:25, 80:20, 80:25, 82:24, 83:20, 83:21, 85:12, 86:3, 86:19, 87:3, 87:4, 87:16, 87:17, 87:25, 88:3, 88:8, 88:13, 88:16, 88:18, 88:23, 89:21, 91:25, 92:9, 92:11
**third** [3] - 20:1, 20:14, 43:3
**three** [4] - 9:7, 9:17, 9:24, 49:21
**throughout** [1] - 43:12
**THURSDAY** [2] - 1:15, 5:1
**tirelessly** [1] - 15:9
**title** [2] - 78:23, 79:8
**Title** [1] - 93:8
**titled** [1] - 77:10
**today** [11] - 18:18, 30:19, 65:24, 83:11, 83:25, 85:1, 85:15, 86:7, 90:20, 90:21
**together** [2] - 50:21, 88:10
**tomorrow** [4] - 6:21, 90:20, 92:2, 92:13
**took** [7] - 15:22, 37:14, 46:12, 47:11, 71:18, 75:11, 75:16
**top** [21] - 8:6, 8:9,

8:20, 18:11, 22:20, 60:2, 72:6, 72:21, 72:23, 72:24, 76:12, 76:15, 76:16, 77:9, 80:11, 81:2, 81:5, 82:9, 82:15
**topic** [1] - 60:20
**total** [4] - 23:10, 32:12, 77:17, 78:6
**totally** [1] - 44:13
**touching** [1] - 81:12
**track** [7] - 46:17, 47:1, 47:5, 64:23, 64:25, 65:9, 65:10
**training** [1] - 60:17
**Tran** [1] - 46:1
**TRANSCRIPT** [2] - 1:6, 1:14
**transcript** [4] - 41:22, 42:12, 93:9, 93:11
**transfer** [4] - 78:16, 83:11, 83:25, 84:2
**transpired** [1] - 22:4
**traumatic** [1] - 22:9
**trial** [2] - 58:16, 63:20
**TRIAL** [1] - 1:8
**true** [14] - 12:25, 13:1, 17:11, 17:12, 18:20, 18:21, 22:8, 40:16, 41:2, 58:21, 63:2, 76:4, 86:11, 93:9
**trust** [23] - 21:10, 29:15, 29:17, 29:18, 30:1, 30:7, 42:22, 42:23, 44:21, 48:21, 49:1, 49:3, 49:6, 49:11, 49:13, 56:22, 60:14, 60:23, 61:10, 61:15, 61:20, 78:20, 92:7
**truth** [8] - 72:18, 72:19, 80:21, 80:22, 82:25, 83:2, 89:22, 89:24
**try** [3] - 28:7, 68:5, 74:18
**trying** [1] - 13:25
**turn** [1] - 60:25
**turned** [2] - 5:20, 25:9
**two** [12] - 5:11, 14:25, 34:5, 42:25, 55:18, 62:20, 63:15, 70:10, 78:10, 84:22, 89:12, 91:9
**typically** [1] - 70:13

**U**

**U.S** [2] - 1:3, 17:22
**ultimate** [1] - 78:7

ultimately [1] - 63:25
under [7] - 5:10, 6:5, 6:25, 79:10, 91:19, 91:22, 91:24
understood [1] - 90:14
Understood [1] - 39:8
UNITED [2] - 1:1, 1:5
United [7] - 2:4, 2:5, 2:9, 2:10, 93:6, 93:8, 93:13
unless [1] - 58:21
unusual [2] - 43:19, 43:23
up [21] - 5:18, 9:5, 26:24, 29:3, 29:7, 29:8, 31:14, 35:6, 40:23, 54:25, 59:9, 62:14, 63:7, 65:3, 65:17, 71:13, 76:19, 77:13, 90:22, 92:12
upper [1] - 16:21
USAO565508 [2] - 4:9, 12:9
uses [1] - 87:6

## V

various [2] - 44:4, 66:10
verbal [1] - 79:4
verdict [5] - 25:9, 25:18, 62:24, 63:1, 63:5
VI [1] - 41:13
via [1] - 10:16
view [2] - 6:24, 64:10
violated [1] - 77:23
voicemail [10] - 85:2, 85:4, 85:8, 85:17, 86:5, 86:7, 86:10, 86:11, 86:22, 87:5
Voicemail [2] - 4:19, 4:20
voicemails [3] - 84:16, 84:20, 84:23
VOLUME [1] - 1:9
volume [4] - 41:11, 41:12, 41:20, 71:21
Volume [3] - 41:13, 42:6, 71:21
voluntarily [1] - 53:17
voluntary [1] - 70:13
vs [1] - 1:7

## W

W-e-i-n-e-r [1] - 68:18
wait [2] - 42:4, 80:23
waive [1] - 88:16

waived [1] - 55:15
waiver [1] - 88:15
walked [1] - 58:8
wants [3] - 10:9, 40:13, 85:20
warrant [4] - 22:5, 22:10, 52:17, 66:17
WAS [1] - 68:15
wearing [2] - 7:13, 53:5
Wednesday [2] - 86:5, 90:6
week [5] - 5:17, 81:13, 81:17, 81:19, 81:21
weeks [1] - 71:19
WEINER [2] - 3:5, 68:15
Weiner [11] - 4:13, 4:16, 4:18, 4:19, 4:21, 4:22, 68:14, 68:18, 68:25, 89:22, 89:24
WEST [1] - 1:24
West [1] - 2:6
whatsoever [1] - 53:19
whichever [1] - 44:4
Whiteside [15] - 4:15, 69:12, 69:14, 69:25, 70:2, 71:5, 76:2, 76:5, 76:25, 77:1, 77:16, 78:3, 79:10, 91:18, 91:22
wife [2] - 9:19, 10:2
wire [11] - 40:2, 78:16, 83:11, 83:25, 84:2, 88:10, 90:24, 90:25, 91:2, 91:3, 91:5
wired [1] - 39:2
wires [2] - 47:19, 48:13
wish [1] - 6:10
WITHDRAWN [1] - 4:5
withdrew [1] - 33:24
witness [6] - 5:10, 6:7, 12:4, 68:8, 68:13, 82:25
WITNESS [47] - 7:8, 12:22, 25:25, 26:17, 27:25, 29:22, 30:4, 30:10, 31:5, 31:11, 31:25, 32:5, 32:25, 33:6, 34:3, 36:8, 37:8, 37:22, 38:9, 39:17, 40:7, 44:3, 44:18, 44:25, 46:7, 46:22, 49:8, 49:16, 50:4, 50:7, 50:20, 51:14, 52:12, 54:16, 54:25, 55:13, 56:5,

61:25, 68:15, 68:18, 79:22, 79:25, 83:21, 87:4, 87:17, 88:8, 88:16
witness's [1] - 32:22
witnesses [1] - 54:14
WITNESSES [1] - 3:2
won [1] - 63:20
word [2] - 77:13, 87:6
write [1] - 25:21
writing [2] - 6:12, 79:6
written [1] - 79:4
wrote [4] - 8:24, 10:21, 73:20, 89:13
WYMAN [1] - 2:10
Wyman [1] - 11:5

## X

X-Law [3] - 22:2, 39:3, 39:24

## Y

year [2] - 13:9, 22:8
years [4] - 29:24, 63:19, 69:9, 69:25
yesterday [15] - 22:6, 25:4, 26:18, 26:24, 28:8, 29:13, 30:18, 32:15, 36:21, 37:10, 39:25, 41:24, 43:5, 52:18, 53:25
yesterday's [1] - 42:12
Yorba [1] - 21:24

## Z

zero [6] - 26:1, 26:2, 26:12, 29:11, 29:14, 62:24