1          **UNITED STATES DISTRICT COURT**

2      **CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

3         **HONORABLE JAMES V. SELNA, U.S. DISTRICT JUDGE**

4

5   UNITED STATES OF AMERICA,            )
                                         )
6                   Plaintiff,           )   <u>**CERTIFIED TRANSCRIPT**</u>
                                         )
7          vs.                           )   Case No.
                                         )   SACR-19-00061-JVS
8   MICHAEL JOHN AVENATTI,               )
                                         )   **TRIAL DAY 12**
9                   Defendant.           )   **VOLUME 2**
                                         )

10

11

12

13

14

15              REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                  FRIDAY, JULY 30, 2021

17                       1:32 P.M.

18                 SANTA ANA, CALIFORNIA

19

20

21

22

23

24            **DEBBIE HINO-SPAAN, CSR 7953, CRR**
              FEDERAL OFFICIAL COURT REPORTER
25            411 WEST 4TH STREET, ROOM 1-053
                 SANTA ANA, CA 92701
                 dhinospaan@yahoo.com

**UNITED STATES DISTRICT COURT**

1                        **APPEARANCES OF COUNSEL:**

2

3    **FOR THE PLAINTIFF:**

4            NICOLA T. HANNA
             United States Attorney
5            BY:  BRETT SAGEL
                 Assistant United States Attorney
6            411 West 4th Street
             Suite 8000
7            Santa Ana, California 92701
             714-338-3598
8            brett.sagel@usdoj.gov

9            NICOLA T. HANNA
             United States Attorney
10           BY:  ALEXANDER WYMAN
                 Assistant United States Attorney
11           312 North Spring Street
             Suite 1100
12           Los Angeles, California 90012
             213-894-2435
13           alex.wyman@usdoj.gov

14   **FOR THE DEFENDANT IN PRO SE:**

15           MICHAEL JOHN AVENATTI, ESQ.

16

     **STANDBY COUNSEL FOR MR. AVENATTI:**
17

18           H. DEAN STEWARD LAW OFFICES
             BY:  H. DEAN STEWARD, ESQ.
             17 Corporate Plaza
19           Suite 254
             Newport Beach, California 92660
20           949-481-4900
             deansteward7777@gmail.com

21

22

23

24

25

                        **UNITED STATES DISTRICT COURT**

```
1                           I N D E X

2    WITNESSES                                            PAGE

3    ALEXIS GARDNER, CALLED BY THE GOVERNMENT
         Direct Examination by Mr. Sagel (resumed)          4
4        Cross-Examination by Mr. Avenatti                  42

5

6

7

8

9

10

11

12                          EXHIBITS

13                                          IN      WITHDRAWN
                                                      OR
     EXHIBIT                              EVIDENCE   REJECTED
14
     162      Cassaro Text Messages with     14
15            Gardner

16   164      2/24/2019 e-mail from Gardner   29
              to Avenatti re Alexis Gardner
17            Meeting Overview

18

19

20

21

22

23

24

25
```

```
 1              SANTA ANA, CALIFORNIA; FRIDAY, JULY 30, 2021

 2                          1:32 P.M.

 3                            - - -

 4

 5              (In the presence of the jury.)

 6              THE COURT:  Good afternoon, ladies and gentlemen.

 7              (The jurors collectively responded "Good

 8              afternoon.")

 9              THE COURT:  Mr. Sagel.

10              MR. SAGEL:  Thank you, Your Honor.

11          ALEXIS GARDNER, WITNESS, RESUMED THE STAND

12                     DIRECT EXAMINATION

13  BY MR. SAGEL:

14  Q    Ms. Gardner, when we left off, we were looking at the

15  April 17, 2018, text that says, "Hey, Michael, they sent me

16  34K"; is that correct?

17  A    Yes.  May I ask, could you remind me of what exhibit it

18  was.

19  Q    Yes, ma'am.  I apologize.  Exhibit 160.  And it's page 5.

20  160.

21  A    Yes.

22  Q    Do you know why you're saying to the defendant "They sent

23  me 34K"?

24  A    Yes.  I received a direct deposit for 34K.

25  Q    And if you look at several of these in a row, there are
```

01:32PM (lines 5, 10, 15)
01:33PM (lines 20, 25)

```
 1    texts but there are no responses.  Do you see that?
 2    A    Yes.
 3    Q    Bad question.  Text from you to the defendant but no
 4    responses to you from the defendant; is that correct?
 5    A    Yes.
 6    Q    Was that typical?
 7    A    Yes.
 8    Q    And -- but would he respond to you?
 9    A    Yes.  He would call me.
10    Q    So you would text him and he would call you back?
11    A    Yes.
12    Q    And now if I could have you look at Exhibit 158, which is
13    already an exhibit.  And if I could have you look at page 23.
14              The check at the top, is that a check on April 17,
15    2018?
16    A    Yes.
17    Q    And for that same 34K you referenced?
18    A    Yes.  The same amount.  Yes.
19    Q    And in -- if I didn't ask, the K stood for thousand.  So
20    $34,000?
21    A    Yes.
22    Q    Do you know who Judy Regnier is?
23    A    Personally, no.  I've never met her.  But yes, I'm
24    familiar with who she is.
25    Q    How are you familiar with who she is?
```

| | |
|---|---|
| 1 | A     She worked for Michael. |
| 2 | Q     How did you know that she worked for the defendant? |
| 3 | A     I don't really remember much of conversation in regards to |
| 4 | Judy.  I've never spoken to her, per se, but I do know now just |
| 01:35PM 5 | from things I've learned from this case. |
| 6 | Q     Okay.  So I only want to ask you what you knew at the |
| 7 | time.  Did you ever have any communications with Judy Regnier? |
| 8 | A     No, not to my recollection. |
| 9 | Q     You never met with or talked with her? |
| 01:36PM 10 | MR. AVENATTI:  Asked and answered. |
| 11 | THE COURT:  Sustained. |
| 12 | Q     BY MR. SAGEL:  Have you ever met her in person? |
| 13 | MR. AVENATTI:  Asked and answered. |
| 14 | THE COURT:  Overruled. |
| 01:36PM 15 | THE WITNESS:  No. |
| 16 | Q     BY MR. SAGEL:  When you said to the defendant, "Hey, |
| 17 | Michael, they sent me 34K," did he ever say to you it was |
| 18 | Ms. Regnier who put $34,000 into your account? |
| 19 | A     No. |
| 01:36PM 20 | Q     That text message, and you can look at it if you need to, |
| 21 | was after you had sent defendant your bank account information. |
| 22 | If you look at page 24 of Exhibit 158, next page, |
| 23 | there's a cashier's check.  Go to the bottom half, please.  If |
| 24 | you see the last five numbers, that's 5185.  Do you see that? |
| 01:37PM 25 | A     Yes. |

1    Q    Those are the same last four numbers of your bank

2    account; is that correct?

3    A    Yes.

4    Q    When you told defendant, "They sent me 34K," did he say

01:37PM 5    Ms. Regnier deposited $34,000 into your account?

6    A    No.

7    Q    If you could turn back to Exhibit 160.  And again, page 5

8    of 160.  Is this another text that you sent to defendant, this

9    one on June 15, 2018?

01:38PM 10   A    Yes.

11   Q    What do you say to the defendant in this text message?

12   A    "Hey, Michael, hope all is well.  It's almost

13        8:00 p.m. Pacific Standard Time, PST, and I have not

14        received my deposit, so I wanted to touch bases."

01:38PM 15   Q    And what are you referring to as the "deposit" here?

16   A    The direct deposit of 16,000 that I receive on the 15th of

17   each month or supposed to receive.

18   Q    And then on the top of the next page defendant replies,

19   saying, "Hi, there.  Please give me a call.  Best, Michael"?

01:38PM 20   A    (No audible response.)

21   Q    You need to give an audible reply.

22   A    Yes.

23   Q    At this time, when you're sending defendant these text

24   messages saying you're not receiving your text -- I'm sorry,

01:39PM 25   you're not receiving your deposits, did you have conversations

```
          1   with him about what he was doing?
          2          MR. AVENATTI:  Asked and answered, Your Honor.
          3   Cumulative.
          4          THE COURT:  Overruled.
01:39PM   5          THE WITNESS:  Yes.
          6   Q    BY MR. SEGAL:  What was defendant telling you he was
          7   doing?
          8   A    That he was reaching out to them and they either weren't
          9   getting back or they were being difficult.
01:39PM  10   Q    Did defendant ever tell you anything that he claimed they
         11   were saying?  Let me ask it in a different way.
         12          Did defendant ever say anything to you about why
         13   they were not depositing the money?
         14   A    Yeah.  Pretty much that these guys are assholes.  These
01:40PM  15   guys are assholes.  My ex is an asshole.  He doesn't -- he
         16   really doesn't want to see me succeed, you know.
         17   Q    And who did he blame the lack of deposits in your account
         18   on?
         19   A    My ex and his counsel.
01:40PM  20   Q    Who, if anybody, did he tell you was fighting on your
         21   behalf?
         22   A    Him.  Michael.
         23   Q    Did you believe he was fighting on your behalf?
         24   A    Wholeheartedly, yes.
01:41PM  25   Q    Why?
```

UNITED STATES DISTRICT COURT

```
 1   A    Nobody else was really.  He called me all the time and
 2   that's what he told me.  He reassured me constantly all the
 3   time.
 4   Q    During this time when you weren't getting your deposits
 5   or weren't getting them on time, did you have discussions with
 6   the defendant about taking further actions against your
 7   ex-boyfriend?
 8   A    Yes.
 9   Q    What did defendant talk to you about whether or not you
10   could take further actions against your ex-boyfriend?
11   A    They weren't actions that I could take, but he talked
12   about -- he talked about public filing and there was also --
13   there was something else that I just don't remember.
14        But he talked about public filing and he -- I'm
15   sorry.  I'm trying to -- it was something else that he would
16   send them.  Something that he would send them to motivate them
17   to make the payments on time.
18   Q    And who did you learn that from or who told you that?
19   A    Michael did.
20   Q    I'm going to have you look at page 7 of Exhibit 160.  Do
21   you see a text message at the top you sent to the defendant on
22   July 19th?
23   A    Yes.
24   Q    And there you say, "Hi, Michael.  Hope all is well.
25        I just checked my account.  I haven't received my
```

01:41PM 5
01:42PM 10
01:42PM 15
01:43PM 20
01:43PM 25

**UNITED STATES DISTRICT COURT**

```
 1          deposit."
 2               Is that correct?
 3    A    Yes, that's correct.
 4    Q    And this is the same reference to not getting your --
 5    what you believe was a direct deposit from your ex-boyfriend?
 6    A    Yes.
 7    Q    And then almost a couple weeks later, on July 31st, you
 8    send defendant another text message; is that correct?
 9    A    Yes.
10    Q    Can you read what you sent to defendant on July 31st,
11    2018.
12    A    "Hey, Michael, I just got back in from Atlanta.
13         Sorry to catch up so late, but I have not received
14         my deposit." -- excuse me -- "Is there anything we
15         can do about the time?  It's become a pattern of
16         them not sending it unless you reach out."
17    Q    When you say "not received my deposit," this is the same
18    we've been talking about; is that correct?
19    A    Yes.
20    Q    And then you ask the defendant:
21               "Is there anything we can do about the time?
22         It's become a pattern of them not sending it unless
23         you reach out."
24               What's becoming a pattern of that?  What are you
25    saying when you say "becoming a pattern of them"?
```

UNITED STATES DISTRICT COURT

1   A     My -- what I was told was I would receive it on the 15th

2   of each month, and it had become a pattern of the 15th coming

3   and going and I did not receive the deposit.

4   Q     And then you said, "Unless you reach out."  What do you

01:45PM 5   mean when you say, "Unless you reach out"?

6   A     It was -- to my knowledge, when I reached out to Michael,

7   he was reaching out to my ex and his counsel to get them to

8   send the deposit.  And so each month I'm having to reach out to

9   Michael to get him, to my knowledge, reach out to them to send

01:45PM 10  a deposit, and that became the pattern.

11  Q     What did defendant say in response to your text message

12  on July 31st?

13  A     "Still?  Let me see, as this is not right.  I'm on it."

14  Q     In response to you saying "it's become a pattern of them

01:46PM 15  not sending it unless you reach out," did he ever say to you in

16  response to that, "I don't reach out to the other side"?

17  A     No.

18          MR. AVENATTI:  Objection.  Argumentative,

19  Your Honor.

01:46PM 20          THE COURT:  Overruled.

21          THE WITNESS:  No.

22  Q     BY MR. SAGEL:  When he said, "Still?  Let me see, as this

23  is not right.  I'm on it," what did you understand that to

24  mean?

01:46PM 25  A     You still haven't received your deposit?  "Let me see, as

```
 1    this is not right," let me see why they haven't sent it.  "This
 2    is not right" being it's not right that they keep doing this,
 3    and that he's on it.  He's going to make sure that they do.
 4    Q    And did you believe he would be on it and make sure that
 5    the other side would do what he was saying he was doing?
 6    A    Yes.
 7    Q    Throughout these -- let me ask you a different question
 8    first.
 9              In 2018, were you still -- were you pursuing a music
10    and acting career?
11    A    Yes.
12    Q    I'm not just saying only, but during -- in that year you
13    were pursuing music and acting?
14    A    Yes.
15    Q    Did you have conversations with defendant about that?
16    A    Yes.
17    Q    Did he try and help you -- or did you ask him for help?
18    A    Yes.  There were times that I asked for help for certain
19    things.  Or just even advice with things to -- before I signed
20    something.  You know, just to make sure that it was okay.
21    Q    Looking at the bottom of page 7, and it continues on to
22    the top of page 8, do you text defendant saying:
23              "Okay.  Can we talk Friday if you have some
24         time?  The people I've been working with on music
25         finally feel like we have a hit record, and they
```

01:47PM 5
01:47PM 10
01:47PM 15
01:47PM 20
01:48PM 25

**UNITED STATES DISTRICT COURT**

```
 1          want me to get an entertainment lawyer so that we
 2          can go forward with paperwork."
 3               Did you send that to the defendant?
 4    A    Yes.
 5    Q    And then defendant replies to you, "Perfect, yes.  Happy
 6    to chat and help you.  Exciting."
 7    A    I would say that I -- to my recollection, I can't remember
 8    whether -- I know that I sent it.  But I can't remember whether
 9    this was something I discussed specifically with Michael or
10    with Tom.
11    Q    And I'm not asking about the contents of the documents or
12    anything like that, but that you reached out to defendant to
13    tell him about your music.
14    A    Yes.
15    Q    And defendant wrote back to you:  "Perfect, yes.  Happy
16    to chat and help you."
17               Did he ever say to you, "This will come out of your
18    settlement agreement from Mr. Whiteside"?
19    A    No.
20    Q    Did he ever say to you, "I'm going to need to charge you
21    for this separately as separate legal work"?
22    A    No.
23    Q    When he said, "Happy to chat and help with you," did he
24    show you how he was going to deduct that from your original
25    settlement agreement?
```

01:48PM 5
01:49PM 10
01:49PM 15
01:49PM 20
01:50PM 25

**UNITED STATES DISTRICT COURT**

```
 1   A     No.

 2   Q     You mentioned Tom again right there.  That's Tom Cassaro;

 3   correct?

 4   A     Yes.

 5   Q     If you could look at Exhibit 162.  Does 162 contain text

 6   messages you had with Tom Cassaro?

 7         And, actually, let me just focus you on page 3 and 4

 8   as well.

 9   A     Yes.

10   Q     When you were texting with Tom Cassaro on the dates -- in

11   August 14th of 2018, were you doing so because you believed he

12   worked with Michael Avenatti?

13   A     Yes.

14   Q     And are these, on page 3 and 4 of Exhibit 162, fair and

15   accurate copies of the text messages you had with Tom Cassaro

16   on August 14, 2018?

17   A     Yes.

18         MR. SAGEL:  Your Honor, at this time, the Government

19   moves to admit Exhibit 162, just pages 3 and 4.

20         MR. AVENATTI:  Objection, Your Honor.  Hearsay.

21   Foundation.  Authentication.

22         THE COURT:  It will be received but not for the

23   truth of the content.

24         (Exhibit Number 162 received.)

25         MR. SAGEL:  If necessary, I believe it's agency
```

The timestamps in the left margin read: 01:50PM (line 5), 01:50PM (line 10), 01:51PM (line 15), 01:51PM (line 20), 01:52PM (line 25).

 1    admission because he's working for defendant at this point.

 2              MR. AVENATTI:  No foundation to that, Your Honor.

 3    Same objections.

 4              THE COURT:  Okay.  Entries from Tom will be received

01:52PM  5    for the truth.  The rest just for notice.

 6    Q    BY MR. SAGEL:  If you can look at the top of page 3, I

 7    know it's a long text, but do you mind reading the text that

 8    you sent to Tom Cassaro?

 9    A    "Hey, Tom.  Hope all is well.  It's Alexis.  I

01:52PM 10        wanted to reach out.  I know that Michael has been

11        really busy on his road to presidency, and I was

12        wondering if you could help me in regards to my

13        deposits.  I haven't received it for the month of

14        July, and I'm supposed to receive it August,

01:52PM 15        tomorrow.

16              "I was wondering if someone could reach out.

17        Also, it was supposed to increase in February by

18        4,000.  If I'm not mistaken, because Michael had

19        paid the first year of my rent and it was deducted

01:53PM 20        but after that the" -- excuse me -- "but after the

21        lease, it was supposed to go up.  And they sent me

22        2,000 one month, and other than that, they haven't

23        sent the accurate amount.

24              I was hoping we could take a look at

01:53PM 25        things and see what we can do to get on track, but

UNITED STATES DISTRICT COURT

```
 1              primarily, I just wanted to see if we can get two
 2              months deposits first."
 3     Q    Now, with regards to these -- the deposits, are these
 4     still the deposits you're referring to from your ex-boyfriend?
 5     A    Yes.
 6     Q    And were you having more difficulty reaching the
 7     defendant at this time?
 8                  MR. AVENATTI:  Objection.  Leading.
 9                  THE COURT:  Overruled.
10                  THE WITNESS:  Will you repeat the question.
11     Q    BY MR. SAGEL:  Why did you reach out to -- I'll ask a
12     different question.  Why were you reaching out to Tom Cassaro
13     at this point instead of the defendant?
14     A    I'll say for multiple reasons.  I feel like I -- yes, it
15     could have been more time with hearing back from Michael, but
16     also just the desire for results.
17     Q    At this point you weren't getting your deposits?
18     A    Yes.
19     Q    And when you mentioned in this text message it was
20     supposed to increase by $4,000, is that after your first rental
21     place had expired?
22     A    Yes.
23     Q    And then Mr. Cassaro replied to you:
24              "Okay, Alexis, let me look into this.  Sorry,
25              it's not an excuse, but with Michael's schedule,
```

01:53PM   5
01:54PM  10
01:54PM  15
01:54PM  20
01:55PM  25

1    things have been a bit chaotic in Newport Beach.

2    I'll find out ASAP what's going on."

3        Do you see that?

4  A    Yes.

01:55PM 5  Q    And then if you turn to page 4, right below that message,

6  what does Mr. Cassaro then text you next?

7  A    "Michael says this is 'handled.'  Let me know if it's not

8  and I'll push further."

9  Q    And then you wrote back to Mr. Cassaro next.  What did

01:55PM 10  you write back at 2:39 p.m.?

11  A    "Hey, Tom, I got a call from Michael this

12    afternoon.  Thanks for reaching out for me.  How

13    are you?"

14  Q    After you had reached out to Tom Cassaro and he told you

01:55PM 15  he talked to the defendant and you then said you talked to the

16  defendant, do you remember that phone call with the defendant?

17  A    Yes.

18  Q    Can you describe the phone call that you had with

19  defendant on August 14, 2018.

01:56PM 20  A    Michael called me, very high energy, and he was upset that

21  I had called Tom.  He told me that I can always call him.  He

22  kind of reminded me that he does always call me.  And if ever

23  anything is wrong, like, to call him, don't call Tom.  Like, he

24  made it clear that I've always had a direct line of

01:56PM 25  communication with him, and just kind of reassured me that I

```
 1   should still continue to call him.

 2   Q    And at the beginning you said, if I heard you correctly,

 3   "high energy" and "upset."  Is that what you said?

 4   A    Yes.

 5   Q    What do you mean by he was high energy and upset?

 6              MR. AVENATTI:  Objection, Your Honor.  Asked and

 7   answered.  Seeks to ignore the witness's prior testimony.

 8              THE COURT:  Overruled.

 9              THE WITNESS:  It was -- to me, it just felt like I

10   didn't -- like I had done something wrong.  Like I -- like I

11   betrayed him.  Like, "You know, you could have called me.  Why

12   did you call someone else?"  And that was the -- but it was --

13   he just seemed flustered by it.  Very flustered.

14   Q    BY MR. SAGEL:  Did you talk about your deposits during

15   that phone call?

16   A    Yes.

17   Q    At any time during that phone call, did he tell you --

18   during that phone call when you talked about the deposits, did

19   he make you -- who did he say was not making the deposits on

20   time?

21   A    That wasn't the specific -- I mean, that wasn't -- the

22   context of the conversation was more so that he would handle it

23   based on who he knew -- who I knew to be making the deposits.

24   But it was more so making sure that I understood that I should

25   call him.
```

**UNITED STATES DISTRICT COURT**

```
 1   Q    Okay.  If I could have you turn back to Exhibit 160,
 2   page 8.  Two days after your -- I'm sorry.  I'll let you get
 3   there.
 4   A    Do you mind if I have a moment to put my jacket on?
 5            MR. SAGEL:  No problem.
 6            (Pause in proceedings.)
 7            THE WITNESS:  Thank you.
 8   Q    BY MR. SAGEL:  Are you on page 8 of Exhibit 160?
 9   A    Yes.
10   Q    Two days after you had the phone call with the defendant
11   we just discussed, did you send defendant another text message?
12   A    Yes.
13   Q    And in that text message you say:  "Hi, Michael,
14        just checking in.  I still haven't received my
15        deposit."
16            Is that correct?
17   A    Yes.
18   Q    What was defendant's reply to you?
19   A    "That's a problem.  Let me find out what is happening."
20   Q    Who did you understand he would find out what is
21   happening from?
22   A    My ex and his counsel.
23   Q    If you could turn to page 10 of the same exhibit.  On
24   September 25th of 2018, did you send a text message to the
25   defendant?
```

01:59PM 5

02:00PM 10

02:00PM 15

02:00PM 20

02:01PM 25

```
 1    A    Yes.
 2    Q    And in that you wrote him:
 3              "Hey, Michael, I wanted to follow up on the
 4         deposits and let you know I haven't received
 5         anything from them."
 6              Is that what you texted him?
 7    A    Yes.
 8    Q    And this is, again, the same deposits and the "them"
 9    being your ex-boyfriend and his team?
10    A    Yes.
11    Q    What did defendant say back to you?
12    A    "????  I will find out what the hell is going on."
13    Q    Who did you understand he would find out what the hell is
14    going on from?
15    A    My ex and his counsel.
16              Might I say something else?
17    Q    Unfortunately, I have to ask questions and you have to
18    answer them.  If there's a question you think you didn't answer
19    correctly, you can correct that.  Otherwise, I have to ask you
20    questions.
21    A    Okay.
22    Q    During this time in September and October of 2018, a year
23    and a half after the settlement agreement, even slightly more
24    than that, are you asking questions or having discussions with
25    the defendant about trying to figure out a solution to your
```

02:01PM  5
02:01PM 10
02:01PM 15
02:02PM 20
02:02PM 25

| | | |
|---|---|---|
| | 1 | deposits? |
| | 2 | MR. AVENATTI:  Leading. |
| | 3 | THE COURT:  Overruled. |
| | 4 | THE WITNESS:  Yes. |
| 02:02PM | 5 | Q    BY MR. SAGEL:  What is he telling you are some of the |
| | 6 | options you have at this time? |
| | 7 | A    For the most part, that he was going to get it.  That he |
| | 8 | was going to get my deposits, and that was it.  He just kept |
| | 9 | reassuring me that he was working on it. |
| 02:03PM | 10 | Q    Did he tell you who he was working on it with? |
| | 11 | A    Not particularly with, but I presumed that he was doing |
| | 12 | the work and he was calling my ex and his counsel. |
| | 13 | MR. AVENATTI:  Your Honor, move to strike the |
| | 14 | portion after "with."  Non-responsive. |
| 02:04PM | 15 | THE COURT:  It will be stricken. |
| | 16 | Q    BY MR. SAGEL:  If you'll look at page 12 of Exhibit 160. |
| | 17 | At the top there's a text message on October 12, 2018, to |
| | 18 | the -- from you to the defendant.  Do you see that? |
| | 19 | A    Yes. |
| 02:04PM | 20 | Q    You say, "Hi, Michael, do you have a follow-up from the |
| | 21 | attorney?" |
| | 22 | Who are you referring to as "from the attorney"? |
| | 23 | A    My ex's attorney. |
| | 24 | Q    And why were you asking the defendant if he has a |
| 02:04PM | 25 | follow-up from the attorney? |

```
 1    A    Because he told me that he was going to call them in

 2    regards to why I haven't received my deposits.

 3    Q    And defendant wrote back:  "Hi, just tried you."

 4              What do you understand that to mean?

 5    A    He picked up the phone and called me.  And I didn't --

 6    didn't answer.

 7    Q    And now the next text covers almost three pages.  But

 8    starting at the bottom half of Exhibit 160, on page 12, did you

 9    send a screenshot of your bank statement to the defendant?

10    A    Yes.

11    Q    And what's the avail- -- I'm sorry -- the available

12    balance of your bank statement you're sending to the defendant?

13    A    Negative $1,239.81.

14    Q    Why are you sending the defendant the negative balance in

15    your account?

16    A    Probably out of frustration.  But to show him that I don't

17    have any money.  Don't have any money.  I haven't received my

18    deposits and this is my current financial standpoint based on

19    that.

20    Q    And then after the screenshot of your bank balance,

21    starting on page 13, and it's going to continue, but can you

22    please read what you sent to the defendant on page 13.

23    A    "Hey, Michael.  So my bank account has been like

24         this since September 29.  I've been stressed out and

25         feeling stuck because I can't pay for class, and I
```

02:05PM (line 5)
02:05PM (line 10)
02:05PM (line 15)
02:06PM (line 20)
02:06PM (line 25)

can't get my own apartment.  I haven't gotten one
since my lease was up because I was worried about
the money, being behind, and getting an eviction,
and it makes me feel justified for not doing so
02:06PM 5    because it hasn't been consistent.

"My goal is to finish my album and owning a
majority in it because I've been funding, but I
haven't been able to keep up with that since for
the past four months I've had to pay bills rather
02:07PM 10   than invest in myself, instead of being able to do
both.

"And I don't ever want to bother you because
I hate feeling like my problems are your problems
so I don't itemize it.  But I'm stressed out,
02:07PM 15   Michael.  I'm trying to make it to the Grammys and
I can't if I can't make the music.  And if I can't
go to class and pay for my lessons and my vocal
producer and my" -- excuse me -- "and my -- get
things done.  And I know you have been telling me
02:07PM 20   to hold tight, but it's been four months and this
is when -- and this is when I'm dealing with."

Q    I'm going to ask you a few questions.  On page 13, when
you said you didn't want to get a new lease because you were
worried about an eviction and it makes you feel justified for
02:08PM 25   not doing so because it hasn't been consistent, what has not

```
 1   been consistent?
 2   A     My monthly payments.
 3   Q     Where were you living at this time?  And I'm not asking
 4   for an address, but just generally speaking.
 5   A     With a friend.
 6   Q     Did you have your own place to live?
 7   A     No.
 8   Q     On page 14, when you say "I don't ever want to bother you
 9   because I hate feeling like my problems are your problems,"
10   what do you mean by that?
11   A     Michael's all over the news.  I felt like based off of the
12   things that he was dealing with in the public eye, that my
13   problems were miniscule or small.
14   Q     And what were your problems at this time?
15   A     Not having any -- having a negative bank account.  At that
16   time I -- I no longer have my car, so I didn't really have
17   transportation.  I didn't have a place to live, and I'm
18   depending on someone that I honestly just kind of met.  And I
19   can't go to school, which is what I came out here for.  I
20   can't -- I can't invest in my music.  I can't get studio time.
21   I can't -- I can't mix things.  I can't work with the vocal
22   producer.  I can't do anything.  I'm a sitting duck.
23   Q     At that time did you know that any of your financial
24   problems were related to the defendant?
25   A     No.
```

02:08PM (line 5)
02:08PM (line 10)
02:09PM (line 15)
02:09PM (line 20)
02:10PM (line 25)

```
 1   Q    When you said your problems or your financial problems,
 2   you don't want to make them his problem -- I'm sorry, that your
 3   financial problems shouldn't be his problems, did he ever say
 4   to you, "Your problems are because of me"?
 5   A    No.
 6   Q    And at the end you say:
 7            "And I know you have been telling me to hold
 8         tight, but it's been four months.  And this is when
 9         I'm dealing with."
10            What do you mean when you are saying to the
11   defendant that he told you to hold tight?
12   A    He just kept telling me that he was working on it and to
13   just kind of be patient and to wait.
14   Q    When you say "it's been four months," what has been four
15   months?
16   A    It was four months since I had received a deposit.
17   Q    And if you look at the bottom of the page, it has
18   October 29th.  And if you continue to the next page, on
19   October 15 -- I'm sorry -- you continue to the next page,
20   page 15, continuing on October 9th, you sent him another
21   deposit [sic] saying, "Oh, and by the way, the deposit didn't
22   hit this weekend"?
23   A    Uh-huh.
24   Q    Had defendant told you you would be receiving a deposit?
25   A    Based on the date, I'd say "yes."
```

02:10PM 5
02:10PM 10
02:11PM 15
02:11PM 20
02:11PM 25

**UNITED STATES DISTRICT COURT**

```
 1   Q    I'm going to move to page 16 and page 17, the text
 2   message on November 22nd.  Do you see the text message that
 3   starts on page 16 and continues on page 17?
 4   A    Yes.
 5   Q    You'll probably get to it on 17, but this is a text
 6   message you sent on Thanksgiving to the defendant.  Do you mind
 7   reading what you wrote to the defendant on Thanksgiving Day of
 8   2018.
 9   A    "Hello, my phenomenal lawyer, confidant and
10        future president.  Happy Thanksgiving.  I'm so
11        thankful for you and how you came into my life and
12        changed it for the better.  Thank you for being not
13        only a fighter for those in need, but a true
14        champion.  God bless you and your family.  I cannot
15        wait to see many more holidays of success, joy and
16        happiness."
17   Q    Let's start at the beginning.  When you said your
18   "lawyer" and your "confidant," why are you referring to him as
19   your confidant?
20   A    Because I thought he was fighting for me all the time.  I
21   thought he was working for me all the time.  I was very
22   confident that the person calling me was doing the things he
23   said and was in my corner.
24   Q    And you said, "How you came into my life and changed it
25   for the better."
```

```
 1              At this time did you believe he had changed your
 2     life for the better?
 3     A    Yes.
 4     Q    When you told him that he changed your life for the
02:14PM 5     better, did he tell you at that time that Hassan Whiteside had
 6     already paid the $2.75 million in January of 2017?
 7              MR. AVENATTI:  Objection.  Argumentative.
 8              THE COURT:  Overruled.
 9              THE WITNESS:  No.
02:14PM 10     Q    BY MR. SAGEL:  When you told him and you thanked him for
11     being a fighter for those in need but a true champion for you,
12     did he tell you that $2.75 million had been deposited into his
13     account a year and a half earlier?
14     A    No.
02:14PM 15     Q    I'm going to fast-forward.
16              And, Ms. Gardner, is it correct I'm not going over
17     every text in this packet; is that correct?
18     A    Yes.
19     Q    I'm going to fast-forward to page 19 of Exhibit 160, the
02:15PM 20     second half of that text message on February 5th.  And this is
21     now February 5th of 2019; is that correct?
22     A    Yes.
23     Q    The bottom part says:
24              "My plan is to move in with a friend and
02:15PM 25          fellow music artist, Ana, in Hollywood until things
```

 1              are figured out with Hassan because it's literally

 2              been seven months."

 3                   What's literally been seven months?

 4     A    It had been seven months since I had received a deposit.

02:16PM  5     Q    When you said your plan was to move in with a friend in

 6     Hollywood, did you have a place to live on your own?

 7     A    No.  This was the second friend that I lived with -- that

 8     I was moving to live with.

 9     Q    And if you look at the very bottom of page 24 -- and I

02:16PM 10     skipped a handful of texts again, but if you go to the bottom

11     of page 24 for the date, do you see that you sent a text

12     message that starts on 24 on February 23rd, 2019?

13     A    Yes.

14     Q    And then the text message you sent him is on the next

02:17PM 15     page, on page 25 at the top?

16     A    Yes.

17     Q    Can you read what you wrote to the defendant?

18     A    "Hey, Michael.  I sent over an e-mail of things

19              I wanted to go over with you.  Let me know that you

02:17PM 20              got it when you get a chance.  Have a great day."

21     Q    And did defendant reply?

22     A    Yes.  He said, "Got it."

23     Q    Can you please look at Exhibit 164.  Do you see 164?

24     A    Yes.

02:18PM 25     Q    Is this the e-mail that you sent to defendant on

|       |                                                                          |
|-------|--------------------------------------------------------------------------|
| 1     | February 23rd, 2019?                                                      |
| 2     | A    Yes.                                                                 |
| 3     | Q    Is this a true and accurate copy of the e-mail that you             |
| 4     | sent to defendant on February 23rd, 2019?                                |
| 02:18PM 5 | A    Yes.                                                             |
| 6     | MR. SAGEL:  At this time, Your Honor, the Government               |
| 7     | moves to admit Exhibit 164.                                               |
| 8     | MR. AVENATTI:  Objection, Your Honor.  Hearsay.                    |
| 9     | Authentication.  Foundation.                                              |
| 02:18PM 10 | THE COURT:  164 will be received for notice, that                |
| 11    | is, that this was sent to Mr. Avenatti, not for the truth of             |
| 12    | the content in the e-mail.                                                |
| 13    | **(Exhibit Number 164 received.)**                                        |
| 14    | Q    BY MR. SAGEL:  This, Ms. Gardner, was the e-mail you were           |
| 02:19PM 15 | referencing that defendant said he got it?                          |
| 16    | A    Yes.                                                                 |
| 17    | Q    Let's start at the very top of page 1, the first                    |
| 18    | paragraph, where you say -- it starts with "I wanted."  Can you          |
| 19    | read the first, I think, two sentences from "I wanted."                  |
| 02:19PM 20 | A    "I wanted to run through a few things with you.                |
| 21    | It's a bit lengthy, but I wanted you to have the                         |
| 22    | details so that when we speak you're well informed,                      |
| 23    | and at best, when we speak, we can just check off                        |
| 24    | the list."                                                               |
| 02:19PM 25 | Q    And then this is a two-page e-mail; is that correct?           |

| | | |
|---|---|---|
| | 1 | A     Yes. |
| | 2 | Q     And there are various sections.  There's a record label |
| | 3 | section; is that correct? |
| | 4 | A     Yes. |
| 02:19PM | 5 | Q     There's your vision for your music? |
| | 6 | A     Yes. |
| | 7 | Q     There's what you want to do moving forward with your |
| | 8 | music career? |
| | 9 | A     Yes. |
| 02:20PM | 10 | Q     There's a section on how you want to protect your music, |
| | 11 | your interest in your music; is that correct? |
| | 12 | A     Yes. |
| | 13 | Q     I'm not going to go over it in detail, but why are you |
| | 14 | sharing this with the defendant? |
| 02:20PM | 15 | A     Well, at this point it's -- I'm ready to move forward with |
| | 16 | my life, and we had just discussed different people and |
| | 17 | different options since I wasn't getting the deposits on time |
| | 18 | that could help me facilitate the things that I've been working |
| | 19 | on for the past few years. |
| 02:20PM | 20 | Q     And was defendant willing to work with you and meet with |
| | 21 | you to discuss these things about how to go forward with your |
| | 22 | musical career? |
| | 23 | A     Yes. |
| | 24 | Q     At any time when you met with the defendant and discussed |
| 02:20PM | 25 | how you'd go forward with your musical career, did he say he |

UNITED STATES DISTRICT COURT

```
 1    would need to deduct these as fees from your settlement with
 2    Hassan Whiteside?
 3    A    No.
 4    Q    What did you -- why do you think he was doing this work
 5    for you?
 6    A    He always seemed to genuinely care and take an interest in
 7    my well-being and what I was doing with my life.
 8    Q    If I could have you turn to page 2, the top of page 2.
 9    Is there a section called "Finances"?
10    A    Yes.
11    Q    Let's start with the part in "Finances."  Can you read
12    the first paragraph, if you want to call it that, "In a perfect
13    world."
14    A    "In a perfect world, I would want to push to
15         get management, put the finishing touches on my
16         package as a whole, and pitch to a label to get my
17         deal, live off of my advance and transition into
18         working in the field."
19    Q    That's about your musical career?
20    A    Yes.
21    Q    And then can you read the next paragraph, "In my world."
22    A    "In my world, in regards to Hassan, at best,
23         you and I have had conversations regarding filing
24         publicly, and I've been concerned about my image and
25         dealing with the world that is not" -- excuse me --
```

02:21PM  5
02:21PM 10
02:21PM 15
02:22PM 20
02:22PM 25

UNITED STATES DISTRICT COURT

1        "in dealing with a world that is not very kind to

2        women in my position, especially since I have been

3        pushing to at some point become a public figure."

4   Q    You say here, "You and I have had conversations regarding

02:22PM 5   filing publicly."

6            What do you mean when you say we've had

7   conversations about filing publicly?

8   A    Filing publicly would have been more so, I guess, a threat

9   to the other side.  Our mediation was very private.  And so

02:22PM 10  this was the opposite of that.

11  Q    And who told you that there was an option of filing

12  publicly?

13  A    My mother and Michael.

14  Q    And I'm not going to ask about your mother, so let's just

02:23PM 15  talk about the defendant.

16           What was the defendant telling you you would be

17  filing publicly?

18  A    That was just the term.  That was just the term.  I don't

19  know what the "file" would have been.

02:23PM 20  Q    Did it relate to what you believe were the unpaid

21  deposits?

22  A    Yes.

23           MR. AVENATTI:  Leading.

24           THE COURT:  Overruled.

02:23PM 25           THE WITNESS:  Yes.

         1   Q     BY MR. SAGEL:  The next paragraph that starts "maybe,"
         2   can you read that paragraph for us.
         3   A     "Maybe we can settle the agreement for a lump
         4         sum rather than the monthly.  From my understanding,
02:24PM  5         the original lump sum from the agreement was
         6         33 percent, which covered legal fees.  The
         7         additional to be paid to me stretched over eight
         8         years, two of which have passed.  They are currently
         9         eight months behind on payments, totaling $160,000.
02:24PM  10        With the rest of this year and the additional five
        11         years, we are looking at 1.4 million, for a total of
        12         1,560,000.  Maybe we can find a median to settle for
        13         a lump sum payout."
        14   Q     Why are you writing this to the defendant?
02:24PM 15   A     I'm looking for other options to recover my funds that I
        16   hadn't received in over eight months.
        17   Q     When you say the funds you haven't received in eight
        18   months, you're talking about what you believed to be the
        19   monthly deposits?
02:25PM 20   A     Yes.
        21   Q     And this is February of 2019, over two years after the
        22   settlement agreement; is that correct?
        23   A     Yes.
        24   Q     And when you wrote this here to the defendant in February
02:25PM 25   2019, is this your understanding at the time of what the

```
          1    settlement agreement was?

          2            MR. AVENATTI:  Objection, Your Honor.  403.

          3    Cumulative.

          4            THE COURT:  Overruled.

02:25PM   5            THE WITNESS:  Yes.

          6    Q    BY MR. SAGEL:  And then at the bottom of the page there's

          7    a section called "Closing."  Do you see that?

          8    A    Yes.

          9    Q    Can you read the first paragraph under "Closing."

02:26PM  10    A    "I want to apologize because I've had to really

         11         learn how to be a professional, and I can't say

         12         that's a quality I have had my entire time knowing

         13         you.  When I met you, I was very much still figuring

         14         myself out and fearful that I wasn't who I hoped to

02:26PM  15         be.  But I'm in a place mentally where I very well

         16         know exactly who I am.

         17             "I can be insecure about calling you because

         18         I want to be able to afford you, Michael, for what

         19         you're worth, and there's many times I wouldn't

02:26PM  20         call you because I feel bad that I can't bring to

         21         the table what other clients potentially can in the

         22         financial department.  But I do believe I'm very

         23         well on my way, and I'm ready for the next chapter

         24         in my life to take flight."

02:27PM  25    Q    Let me start with when you started with "I want to
```

apologize."  Why are you apologizing to the defendant?

A     I am apologizing because I just didn't feel competent as a person.  I feel like as far as our communication and just being young and in a very strange place, I just didn't feel that I could have -- I could have called more.  Like, there were many phone calls that I didn't answer that I felt bad about.  And I apologized because I felt bad about the way that I handled my relationship with Michael.

Q     You say there, "I want to be able to afford you, Michael, for what you're worth."

Did defendant ever tell you he wanted to charge you for services other than your original fee agreement?

A     No.

Q     Why are you telling him that you want to be able to afford him for what he's worth?

A     Because I felt like the fact that I didn't receive the things that I was supposed to receive and that it was taking so much time, that it was based off of the fact that I couldn't afford the time for Michael to work on my -- to work on my issues.

Q     And the time to work on your issues was to obtain these monthly deposits?

MR. AVENATTI:  Leading.

THE COURT:  Sustained.

Q     BY MR. SAGEL:  What did you think the time that he needed

1   to do on your behalf was for?

2   A    Michael hadn't told me he was charging me anything.  But

3   at that time I felt like if I could pay him, that he would work

4   to solve my issues.  That if I paid for that -- because to my

02:29PM  5   understanding, lawyers have an hourly cost or there are fees

6   that are associated -- there are fees that are associated.  And

7   at that time I hadn't paid him anything since whatever he got

8   from the agreement.  So I felt like if I had the money, my

9   issues would have been solved sooner.

02:29PM 10   Q    And what issues are those that you're referring to?

11   A    Not getting my deposits on time and just things being

12   handled in a more timely manner.

13   Q    If I can have you read the very last sentence of the next

14   paragraph that starts with "Hassan."  Can you read the last

02:30PM 15   sentence that starts "Hassan hasn't."

16   A    "Hassan hasn't been compliant, but at best, I have

17        a million times more than I started with when we met

18        at Starbucks, and that's more than enough to be

19        excited about."

02:30PM 20   Q    Why are you saying this to the defendant?

21   A    I've -- I hadn't received my deposits in eight months, but

22   at this point, I've been to school and studied fairly well and

23   made good music.  And so I had a million times more than I

24   started with.  I was accumulating things for myself, just as

02:31PM 25   far as my music and the things that I was doing.  And it was a

```
           1    lot more than the girl -- the little, dirty girl at Starbucks
           2    who was living out of her car.
           3    Q    When you referenced millions, it's not about money?
           4    A    No.
02:31PM    5              MR. AVENATTI:  Leading.
           6              THE COURT:  Sustained.
           7              MR. AVENATTI:  Move to strike, Your Honor.
           8              THE COURT:  Be stricken.
           9    Q    BY MR. SAGEL:  What, if anything, does the "million" have
02:31PM   10    to do with money?
          11    A    Nothing.
          12    Q    After you sent this e-mail to defendant, did you meet
          13    with him to go over this letter?
          14    A    Yes.
02:31PM   15    Q    When you met with the defendant to go over this letter,
          16    did you go over it -- I'm sorry, this e-mail -- when you met
          17    with the defendant to go over this e-mail, and at the start of
          18    the e-mail you said you wanted to put this together so you
          19    could check everything off --
02:32PM   20    A    Yes.
          21    Q    -- did you do that at the meeting?
          22    A    Yes.
          23    Q    You went over all these things on this e-mail in person
          24    with the defendant?
02:32PM   25    A    Not in the reference that we just did, but he had read it
```

UNITED STATES DISTRICT COURT

```
         1   and he was ready to discuss the things that were within it.
         2   Q    When you met with him, did you talk about the section
         3   entitled "Finances"?
         4   A    Yes.
02:32PM   5   Q    And in that section, did you talk about what you had
         6   listed about the monthly payments for an eight-year period and
         7   maybe looking to get a lump-sum payout?
         8   A    Yes.
         9   Q    At any point during that meeting, did the defendant tell
02:33PM  10   you that what you wrote was wrong?
        11   A    To use the words specifically to say what I wrote was
        12   wrong, no, but he did tell me a different number than what was
        13   on the page.
        14   Q    What did he tell you?
02:33PM  15   A    The 1.5 -- excuse me, 1,560,000, he told me it was -- he
        16   told me it was 2 million and something.  I don't remember
        17   specifically, but I just remember that it did kind of trigger
        18   me when he said a larger amount than what I had anticipated.
        19   Q    And did he say that you weren't due monthly payments?
02:33PM  20   A    No.
        21   Q    With regards to the part where you said "they are
        22   currently eight months behind on payment," did he ever correct
        23   you, saying, "They're not behind on any payments"?
        24   A    No.
02:34PM  25   Q    During this meeting when you went over this section on
```

```
 1    finances, at that meeting did he ever tell you that Hassan

 2    Whiteside paid $2.75 million in January of 2017?

 3    A    No.

 4    Q    You had explained earlier and we had spoken earlier about

02:35PM  5    how you believed your monthly payments would go up after the

 6    lease was over.  Do you know what I'm referencing?

 7    A    Yes.

 8    Q    Was there any discussion with defendant at that meeting

 9    about how your monthly -- your monthly deposit was supposed to

02:35PM 10    increase based on your understanding?

11    A    Yes.

12    Q    And what did defendant say about that?

13    A    He said no, that it wasn't.

14    Q    Okay.  And how did you feel when he told you it was not

02:35PM 15    going to increase because of that?

16    A    Confused.

17    Q    And why were you confused?

18    A    Because that -- he told me that was what I had known the

19    terms of the agreement -- well, that was what he had told me

02:35PM 20    based off after the first year of my rent.  And that was

21    confusing for me to hear something different.

22    Q    When you first met with the Government before you had

23    even seen the settlement agreement, had you told the Government

24    different numbers of what you expected?

02:36PM 25    A    Yes.
```

```
 1   Q      Why was that?
 2   A      I was confused.  I didn't know at that point.
 3   Q      During the two years, from January 2017 to March of 2019,
 4   did defendant ever give you a copy of your settlement
 5   agreement?
 6   A      No.
 7   Q      Did you ask him for a copy of your settlement agreement?
 8   A      Yes.
 9   Q      More than once?
10   A      Yes.
11   Q      Why did he tell you -- why didn't he give it to you?
12   A      He didn't tell me a reason.  He told me that he would get
13   it to me.
14   Q      And you didn't get it?
15   A      Oh, I'm sorry.  There was more.  He -- it was also --
16   there was -- in that first year, my mother also had come to
17   live with me, and also just based on the terms of the
18   agreement, I wasn't supposed to share it with my mother.  So
19   that was a reason why I didn't get it further.
20          MR. AVENATTI:  Objection, Your Honor.  Move to
21   strike as nonresponsive.
22          MR. SAGEL:  She was asked the reasons defendant gave
23   her for why she didn't get it.
24          THE COURT:  Overruled.
25   Q   BY MR. SAGEL:  Who told you he couldn't give it to you
```

41

```
 1  because your mother was living with you?
 2  A    He did.
 3  Q    Did you expect your attorney to provide you with a copy
 4  of your settlement agreement?
 5  A    Yes.
 6  Q    Did you expect your attorney to tell you the true terms
 7  of the settlement agreement?
 8            MR. AVENATTI:  Asked and answered, Your Honor.
 9            THE WITNESS:  Yes.
10            THE COURT:  Overruled.
11            THE WITNESS:  Yes.
12  Q    BY MR. SAGEL:  Why did you expect that from your
13  attorney?
14  A    That's what he's supposed to do.  And he also told me that
15  he would.
16  Q    At any point did defendant tell you that he used
17  $2.5 million of your settlement money to buy a private plane?
18  A    No.
19  Q    Would you have expected him to tell you that's what
20  happened to your money?
21  A    I'm a little confused by the question.
22  Q    What did you expect -- if the defendant received
23  settlement money on your behalf, what did you expect him to do
24  with it?
25  A    Tell me and send it to me.
```

02:38PM (line 5)
02:38PM (line 10)
02:38PM (line 15)
02:38PM (line 20)
02:39PM (line 25)

1    Q    Did you ever authorize the defendant to use your

2    settlement money to buy a private plane?

3    A    No.

4           MR. SAGEL:  No further questions, Your Honor.

02:39PM 5           THE COURT:  Mr. Avenatti.

6                    **CROSS-EXAMINATION**

7    BY MR. AVENATTI:

8    Q    Ms. Gardner, good afternoon.

9    A    Hello.

02:40PM 10   Q    Could you please turn to Exhibit 160.  Exhibit 160 are

11   the text messages that Mr. Sagel just spent quite a lot of time

12   chatting with you about; right?

13   A    Yes.

14   Q    And do you know how Mr. Sagel got the text messages that

02:40PM 15   are part of 160?

16   A    Yes.

17   Q    How was that?

18   A    I provided them.

19   Q    And how did you go about providing Mr. Sagel the text

02:41PM 20   messages that are part of 160?

21   A    I turned on my phone.  I went to the earliest text

22   messages and I screenshot them one by one.

23   Q    Were you careful when you did that?

24   A    Very.

02:41PM 25   Q    Because you understood how important it was; right?

```
         1    A    Yes.
         2    Q    Are there any text messages between me and you that are
         3    missing from Exhibit 160?  And please take as much time as
         4    you'd like.
02:42PM  5    A    Actually, to my recollection, no.  I sent 28 pages.
         6    Q    Well, my question is a little different.  My question is,
         7    is Exhibit 160 all of the text messages that you and I had
         8    between December of 2017 and the end of March of 2019?
         9    A    To my recollection, yes.
02:43PM 10    Q    You didn't delete any text messages before you provided
        11    the text messages to the Government, did you?
        12    A    I can't remember.  It was a couple years ago.
        13    Q    Well, Ms. Gardner, I think you just testified that you
        14    were very careful because you understood how serious this was;
02:44PM 15    right?
        16    A    Yes.
        17    Q    Do you have a recollection of deleting any text messages
        18    between me and you before you provided the group of texts that
        19    has been marked and used by the Government as Exhibit 160?
02:45PM 20    A    That's a lot of time over the span of a couple years,
        21    so -- but prior to sending it to them, no.  When they asked, I
        22    sent them exactly what I had.
        23    Q    So is your testimony that you may have deleted text
        24    messages between me and you before you gave this group of text
02:45PM 25    messages to the Government?
```

```
 1   A    I don't recall.

 2   Q    I just want to clarify.  You don't recall doing that or

 3   you don't recall one way or the other?

 4   A    Sorry.  I'm having a hard time.  My heart is beating out

 5   of my chest.  Can I take a moment?

 6   Q    You can take as much time as you'd like, Ms. Gardner.  As

 7   long as His Honor says it's okay, because it's his courtroom.

 8            THE COURT:  Would you like to take a break at this

 9   point?

10            THE WITNESS:  Yeah, my heart is racing.

11            THE COURT:  Okay.  We'll take our midafternoon

12   break, ladies and gentlemen.  We'll be in recess 15 minutes.

13            Please remember the admonition not to discuss the

14   case with anyone and not to form any opinions on issues in the

15   case until it's submitted to you, and no research, please.

16            THE COURTROOM DEPUTY:  All rise.

17            **(Out of the presence of the jury.)**

18            THE COURT:  If possible, I wanted to give the jury

19   an update on where we are in the Government's case in chief.

20            MR. AVENATTI:  Your Honor, while they're

21   conferring --

22            THE COURT:  No.  I'm waiting for an answer.

23            MR. SAGEL:  Based on the cross-examinations that

24   have taken place to date and what we would project the times

25   they would be, I think we probably have about six more court
```

1   days after today, maybe seven more court days in the

2   Government's case in chief.  Again, an estimate.  But the

3   projected dates we have for our witnesses, I think, go to

4   August 10th or 11th, which is four days next week and two days

02:48PM  5   the following week.

6            THE COURT:  Okay.  I don't think it will be helpful

7   for the jury at this point.  It's not firm enough.  But thank

8   you for the estimate.

9            Mr. Avenatti.

02:48PM 10            MR. AVENATTI:  Your Honor, I intend on taking the

11   balance of the day with Ms. Gardner, so it probably makes sense

12   to dismiss the next witness.  I'm just providing that

13   information as a courtesy.

14            THE COURT:  Very good.

02:49PM 15            I had one other matter.  Having listened to the

16   testimony thus far, I want to revisit the issue as to whether

17   we really need an expert on special needs trusts.  The -- and I

18   want to take this up Tuesday morning, give you a chance to

19   think about it.

02:49PM 20            MR. SAGEL:  If it short-circuits it, as of right now

21   I don't think the Government's planning on calling a special

22   needs expert.

23            THE COURT:  Okay.  Okay.  If you come to a different

24   conclusion --

02:49PM 25            MR. SAGEL:  We will let the Court know.

|    |    |
|----|----|
| 1  | THE COURT:  Okay.  Thank you. |
| 2  | **(Recess from 2:49 p.m. to 3:05 p.m.)** |
| 3  | **(In the presence of the jury.)** |
| 4  | THE COURT:  Mr. Avenatti. |
| 03:05PM 5 | Q   BY MR. AVENATTI:  Ms. Gardner, if at any point in time |
| 6  | you'd like to take a break, just let us know.  Okay? |
| 7  | A   Okay. |
| 8  | Q   Ms. Gardner, did anyone from the Government ever ask you |
| 9  | to image your phone? |
| 03:06PM 10 | A   What do you mean by "image" my phone? |
| 11 | Q   Did anyone from the Government ever ask you to consent or |
| 12 | allow someone from the Government to take an electronic copy of |
| 13 | either your phone or portions of your phone, like text |
| 14 | messages? |
| 03:06PM 15 | A   I volunteered it. |
| 16 | Q   Let me ask a better question.  Did anyone from the |
| 17 | Government, Mr. Sagel, or Special Agent Carlos, or anyone else, |
| 18 | ever ask you to allow them to physically take your phone and |
| 19 | make a copy of it, an electronic forensic copy? |
| 03:07PM 20 | A   No. |
| 21 | Q   Did anyone from the Government ever ask you to allow them |
| 22 | to physically take your phone and make copies of text messages, |
| 23 | mainly the text messages that you and I engaged in? |
| 24 | A   No. |
| 03:07PM 25 | Q   Directing your attention to Exhibit 160 -- do you have it |

```
 1    there?
 2    A     (No audible response.)
 3    Q     Yes?  You have to answer audibly because the court
 4    report- --
 5    A     Yes.
 6    Q     Can you -- and take as much time as you'd like.  Can you
 7    direct the jury's attention to the text message where you asked
 8    for a copy of the settlement agreement.
 9    A     I asked you verbally.
10            MR. AVENATTI:  Move to strike, Your Honor.
11            THE COURT:  Answer will be stricken.
12    Q     BY MR. AVENATTI:  Ms. Gardner, here's my question:  Could
13    you please take a look at Exhibit 160 -- and again, take as
14    much time as you'd like -- and please direct the jury's
15    attention to the text message or text messages wherein you
16    asked for a copy of the settlement agreement.
17            And the record will reflect that the witness is
18    paging through Exhibit 160?
19    A     I did not send you a text in regards to the agreement.
20    Q     I'm sorry.  I just could not hear you.
21    A     I did not send you a text in regards to the agreement.
22    Q     Do you recall ever sending me an e-mail in regards to the
23    agreement?  Strike that question.
24    A     Yes.
25    Q     Let me ask a better question.
```

03:07PM (line 5)
03:08PM (line 10)
03:08PM (line 15)
03:10PM (line 20)
03:11PM (line 25)

              1                    MR. SAGEL:  Your Honor, she -- let her answer the

              2      question.

              3                    THE COURT:  She answered the question.

              4                    MR. AVENATTI:  Let me clarify.

03:11PM     5      Q    Ms. Gardner, do you have a recollection of sending me an

              6      e-mail wherein you requested a copy of the agreement?

              7      A    No.

              8      Q    Do you recall during the time period that I was

              9      representing you that your mother would contact me on a fairly

03:11PM    10      regular basis to communicate with me about your situation?

             11      A    No.  My mother doesn't tell me what she does.

             12      Q    You were not aware at the time that your mother and I

             13      were having fairly regular communications about your case?  Is

             14      that your testimony?

03:12PM    15      A    Yes.  Some, but not regularly.

             16      Q    Do you recall if you and your mother and I ever had any

             17      group text communications?

             18      A    No.  Not to my recollection.

             19      Q    When you provided the text messages as part of 160, did

03:13PM    20      you look for any text messages between me and you and your

             21      mother?

             22      A    No, but -- because my mother wasn't to know about the

             23      terms of my agreement.  So no.

             24                    MR. AVENATTI:  Your Honor, move to strike after the

03:13PM    25      first "no" as nonresponsive.

```
 1              THE COURT:  It will be stricken.
 2    Q    BY MR. AVENATTI:  Now, I think you testified on direct
 3    that you understood that your mother was the first person to
 4    reach out to me in connection with potentially representing
03:13PM  5    you; is that right?
 6    A    Yes.
 7    Q    And do you recall that you had a conversation with her
 8    about the fact that she wanted you to meet with me?
 9    A    Yes.
03:14PM 10    Q    And then you and I met at that Starbucks in
11    West Hollywood.  We sat at an outside table; right?
12    A    No.  We sat inside.
13    Q    We didn't sit at a round table immediately outside the
14    front door of the Starbucks in West Hollywood?
03:14PM 15    A    No.  We sat inside, to the right.
16    Q    And during that meeting I asked you questions about the
17    situation that you were in as it related to Mr. Whiteside;
18    right?
19    A    Yes.
03:15PM 20    Q    And you confided in me at the time that you had been
21    living in your car, parked immediately behind the Starbucks; is
22    that right?
23    A    Not immediately behind the Starbucks, but in a close
24    proximity.
03:15PM 25    Q    And what was my reaction?
```

**UNITED STATES DISTRICT COURT**

1    A      You were shocked.  Appalled.

2    Q      And what, if anything, did I tell you?

3           MR. SAGEL:  Objection.  Calls for hearsay,

4    Your Honor.

03:15PM  5           THE COURT:  Sustained.

6    Q      BY MR. AVENATTI:  Did you inform me at the time that you

7    did not want me to share your situation with your mother?

8    Meaning your living situation.

9    A      Yes.

03:16PM 10   Q      And you subsequently ended up that night at the Sofitel

11   hotel; is that right?

12   A      Yes.

13   Q      And I think your testimony was that Mr. Tom Cassaro

14   assisted you in getting settled at the Sofitel hotel; is that

03:16PM 15   right?

16   A      I don't recall.

17   Q      And how long did you stay at the Sofitel hotel?

18   A      Until an apartment Airbnb was arranged for me.

19   Q      After about a week you expressed the desire to move into

03:17PM 20   an Airbnb in West Hollywood; right?

21   A      No.  I was told that I would be moved to a more, I guess,

22   realistic situation until we figure something out.

23   Q      Did you move to the Airbnb?

24   A      Yes.

03:17PM 25   Q      And how long did you stay at the Airbnb and where was it?

```
        1   A    I stayed at the Airbnb for roughly two and a half weeks.
        2   More specifically -- well, it was -- it was longer than that.
        3   I apologize.  I don't recall.  I know it took me -- it was
        4   roughly two and a half weeks before we had the mediation.
03:18PM  5            But it was on Sunset Boulevard across from the
        6   California Donuts.
        7   Q    And then subsequent to that you moved to the apartment;
        8   is that right?
        9   A    Yes.
03:18PM 10   Q    Now, as of the time that we met the first time, that
       11   particular moment in time, were you attending school?
       12   A    Yes.
       13   Q    Where were you attending school?
       14   A    Speiser and Sturges -- excuse me -- Speiser Sturges Studio
03:19PM 15   on La Cienega Boulevard.
       16   Q    Were you working?
       17   A    No.
       18   Q    How were you paying for school?
       19   A    It had already been paid for.
03:19PM 20   Q    By Mr. Whiteside?
       21   A    Yes.
       22   Q    And you were also an aspiring actress at that time.  Am I
       23   right about that?
       24   A    Yes.
03:19PM 25   Q    And what you hired me to do was to attempt to resolve a
```

**UNITED STATES DISTRICT COURT**

```
 1   dispute that you had been having with Mr. Whiteside for the
 2   better part of a year; is that right?
 3   A    Yes.
 4   Q    And Mr. Whiteside and his -- I think you used a term to
 5   describe them -- "financial people," had been attempting to
 6   have you sign an NDA; is that right?
 7            MR. SAGEL:  Objection, Your Honor.  Your motion in
 8   limine ruling and 403.
 9            THE COURT:  Overruled.
10   Q    BY MR. AVENATTI:  You can answer.
11   A    Yes.
12   Q    And they had been attempting to get you to settle any
13   claims that you might have against Mr. Whiteside; is that
14   right?
15   A    No.  I'm actually confused by the question.  Could you ask
16   it in a different way?
17   Q    Sure.  During the approximate year before you and I first
18   met at that Starbucks, Mr. Whiteside's advisors had been trying
19   to get you to sign an NDA and settle any claims that you might
20   have against Mr. Whiteside; is that right?
21            MR. SAGEL:  Objection.  Compound.
22            THE COURT:  Overruled.
23            THE WITNESS:  When speaking in regards to his
24   financial people, no, it wasn't them that was trying to get me
25   to sign the NDA.  It was actually someone else within his
```

03:20PM   5
03:20PM  10
03:21PM  15
03:21PM  20
03:22PM  25

UNITED STATES DISTRICT COURT

| | | |
|---|---|---|
| | 1 | circle. |
| | 2 | Q    BY MR. AVENATTI:  And who was that? |
| | 3 | A    His cousin. |
| | 4 | Q    His cousin? |
| 03:22PM | 5 | A    Yes. |
| | 6 | Q    Did you know who Joe McLean was? |
| | 7 | A    Yes. |
| | 8 | Q    And when we met, do you recall telling me who Joe McLean |
| | 9 | was? |
| 03:22PM | 10 | A    Yes. |
| | 11 | Q    Who was Joe McLean? |
| | 12 | A    My ex's financial advisor. |
| | 13 | Q    And do you recall telling me that Joe McLean was the guy |
| | 14 | that made all the decisions -- financial decisions for Hassan |
| 03:22PM | 15 | Whiteside? |
| | 16 | A    Not those specific words. |
| | 17 | Q    Well, what do you recall telling me? |
| | 18 | A    He handled the bills, per se.  He handled the finances. |
| | 19 | Q    And at that meeting, did we discuss the fact that I was |
| 03:23PM | 20 | going to reach out to Joe McLean? |
| | 21 | A    Yes. |
| | 22 | Q    And you wanted me to do that, did you not? |
| | 23 | A    Yes. |
| | 24 | Q    And when we met, you had to explain to me kind of the |
| 03:23PM | 25 | cast of characters, if you will, around Mr. Whiteside because |

```
  1   you were familiar with them and I was not; is that fair?

  2   A    Yes.

  3   Q    As of the date that we met, Ms. Gardner, did you feel

  4   like you had been jerked around, for lack of a better term, by

03:24PM  5   Hassan Whiteside and his advisors for the better part of the

  6   year?

  7              MR. SAGEL:  Objection.  403, Your Honor.

  8              THE COURT:  Sustained.

  9   Q    BY MR. AVENATTI:  Ms. Gardner, is it fair to say that as

03:25PM 10   of the time that we met, you felt like you had not yet gotten

 11   adequate traction towards a resolution that was acceptable to

 12   you over the preceding year?

 13              MR. SAGEL:  Same objection, Your Honor.

 14              THE COURT:  Sustained.

03:25PM 15   Q    BY MR. AVENATTI:  Can you take a look at Exhibit 132,

 16   please.

 17   A    Okay.  Okay.

 18              MR. AVENATTI:  And, Joe, if we can bring that up for

 19   the jury.

03:26PM 20   Q    And is that your signature on the last page?

 21   A    Yes.  My signature is on page 3.

 22   Q    Is that your handwriting, "12-5-16"?

 23   A    Yes.

 24   Q    And did you read this document before you signed it?

03:26PM 25   A    Yes.
```

```
  1    Q    Was that at the Starbucks?

  2    A    Yes.

  3    Q    And when you signed this document, was it your custom and

  4    practice to review documents before you signed them?

03:27PM 5  A    Yes.

  6    Q    Was there anything in this agreement that you did not

  7    understand at the time that you signed it?

  8    A    No.

  9    Q    And if we take a look at paragraph 5, it reads:

03:28PM 10          "The rates set forth above are not set by

 11          law, but were negotiated between attorney and

 12          client."

 13          Did I read that correctly?

 14    A    Yes.

03:28PM 15  Q    And then the preceding paragraph, paragraph 4, under the

 16    heading "Legal Fees, Cost, and Billing Practices," it has a

 17    provision in the last paragraph relating to what happened in

 18    the event of discharge or withdrawal.  Do you see that?

 19    A    Yes.

03:29PM 20  Q    And it talks about that in the event that happens,

 21    basically you owe a reasonable fee for the legal services

 22    provided; right?

 23    A    Yes.

 24    Q    And then paragraph 6 --

03:29PM 25          If we can have that, please, Joe.
```

1          Ms. Gardner, would you mind reading paragraph 6 of

2     Exhibit 132 into the record.

3     A     "Cost disbursements and expenses.  Client will

4           reimburse attorney for all out-of-pocket litigation

03:30PM 5          and trial cost and expenses from the proceeds

6           received by client, if any, at the conclusion of

7           litigation.  Cost and expenses include filing and

8           court fees, investigation expenses, process fees,

9           deposition costs, photocopying charges, mock trials

03:30PM 10          or focus groups, jury fees, computerized research,

11          jury trial consultant fees, telephone toll charges,

12          travel costs, mail messenger and other delivery

13          charges, postage and any other necessary expenses in

14          this matter.  Client authorizes attorney to incur

03:30PM 15          all reasonable costs and to hire any investigators,

16          consultants, or expert witnesses reasonably

17          necessary in attorney's judgment."

18     Q     And that paragraph was in the agreement when you signed

19     it; correct?

03:31PM 20     A     Yes.

21     Q     And then let's take a look at paragraph 9, please.  This

22     paragraph reads:

23          "Related unknown matters.  Client represents

24           that client does not know of any related legal

03:31PM 25           matters that would require legal services to be

```
 1              provided under this agreement.  If a matter arises

 2              later, client agrees that this agreement does not

 3              apply to any such related legal matters, and a

 4              separate agreement for provision of services and

03:31PM  5      payment for those services will be required if

 6              client desires attorney to perform that additional

 7              work."

 8                   Did I read that correctly?

 9      A    Yes.

03:32PM 10      Q    Does the word "written" or "signed" appear anywhere in

11      paragraph 9?

12      A    No.

13      Q    How about with the word "agreement"?  Do the words

14      "written agreement" or "signed agreement" appear together

03:32PM 15      anywhere in paragraph 9?

16      A    No.

17      Q    Now, you were asked some questions about the mediation by

18      Mr. Sagel.  Do you remember that?

19      A    Yes.

03:33PM 20      Q    And at the beginning of the mediation, did you meet

21      Judge Meisinger?

22      A    Yes.

23      Q    And did you speak with him during the mediation?

24      A    Alone?  Can you rephrase the question?

03:34PM 25      Q    Sure.  During the 12 or 15 hours that we were there, did
```

UNITED STATES DISTRICT COURT

```
 1   you speak with Judge Meisinger and did he speak with you?
 2   A    Yes.  He asked me questions.  Yes.
 3   Q    You'll recall that he would come into the room and he
 4   would be present with both you and I, and you would converse
 5   with him; right?
 6   A    Yes.
 7   Q    Did you find him to be approachable?
 8             MR. SAGEL:  At this point, Your Honor, 403.
 9             THE COURT:  Sustained.
10   Q    BY MR. AVENATTI:  After the mediation was over -- we'll
11   come back to the mediation in a minute.  After the mediation
12   was over, what happened when we left the mediation offices?
13   A    When specifically?
14   Q    It was late at night.  Do you remember that?
15   A    Yes.
16   Q    We left the mediation offices.  Do you remember that?
17   A    Yes.
18   Q    What happened immediately after that?
19   A    I went back to the Airbnb.
20   Q    But you first went back to the Peninsula hotel where your
21   car was parked; right?
22   A    Yes.
23   Q    Did I drive you from the mediation to where your car was
24   parked?
25   A    No.
```

03:34PM (line 5)
03:35PM (line 10)
03:35PM (line 15)
03:36PM (line 20)
03:36PM (line 25)

```
 1    Q      Who did?

 2    A      Judge Meisinger.

 3    Q      Was I in the car?

 4           MR. SAGEL:  Objection.  401 and 403.

 5           THE COURT:  Sustained.

 6    Q      BY MR. AVENATTI:  Ms. Gardner, after the mediation ended,

 7    there was a period of time, was there not, that you were alone

 8    with Judge Meisinger?  That's a yes-or-no question.

 9           MR. SAGEL:  401 and 403, Your Honor.

10           THE COURT:  Sustained.

11    Q      BY MR. AVENATTI:  Do you recall meeting with the

12    Government in this case for the first time on or about

13    April 2nd, 2019?

14    A      Yes.

15    Q      And you were there and you were represented by a lawyer;

16    right?

17    A      Yes.

18    Q      And Mr. Sagel was there, Special Agent Carlos, another

19    assistant U.S. attorney by the name of Mr. Andre, and another

20    special agent by the last name of Bellis; am I correct?

21    A      To my recollection, yes.

22    Q      And during that meeting -- well, strike that.

23           Who asked most of the questions during that meeting?

24           MR. SAGEL:  Objection.  403, Your Honor.

25           THE COURT:  Sustained.
```

03:36PM  5
03:37PM 10
03:37PM 15
03:38PM 20
03:38PM 25

60

```
 1   Q    BY MR. AVENATTI:  Ms. Gardner, you were -- strike that.
 2            The meeting with the Government lasted about four
 3   hours; is that right?
 4   A    I can't recall.
 5            MR. AVENATTI:  Your Honor, can I approach?
 6            THE COURT:  You may.
 7   Q    BY MR. AVENATTI:  Ms. Gardner, I've handed you a
 8   document.  I just want you to look at the first page of the
 9   document and tell me if that refreshes your recollection that
10   the meeting lasted almost four hours.
11   A    If the time on the document stands, then yes.
12   Q    And do you recall that you told the Government -- well,
13   strike that.
14            Do you remember at the beginning of the meeting that
15   the Government informed you that it was important that you be
16   honest with them?
17   A    Yes.
18   Q    And that was your understanding, right, when you met with
19   them?
20   A    Yes.
21   Q    And you understood that it was just as important then to
22   be honest with the Government as it was and is when you took
23   the oath before the jury to be honest with them; right?
24   A    Yes.
25   Q    And isn't it true that one of the things that you told
```

03:38PM 5
03:39PM 10
03:40PM 15
03:41PM 20
03:41PM 25

Mr. Sagel, Andre, Carlos, and Ms. Bellis was that you had asked

for a copy of your settlement agreement -- you had asked for a

copy of it in writing?

A    Is it within this document?

Q    Do you recall telling the Government that?

A    Is there something that can refresh my memory?

Q    Well, I want to ask you a question before we show you the

document.

        So do you have a recollection when the Government

told you it was important to be honest, that you stated that

you had requested -- you made a request for your settlement

agreement in writing over and over again?

A    The words "in writing," I don't recall.  It's been a few

years.

Q    Take a look at paragraph 26.  And I'm going to ask you a

question.  Isn't it true that in the very first meeting you had

with the Government, you told the individuals present that you

had asked for a copy of the settlement agreement in writing?

A    Yes.

Q    Yes or no?

A    Yes.  Per the document, yes.

Q    Do you have a recollection that at this same meeting,

this issue of the text messages, and whether they were all the

messages, came up?

        MR. SAGEL:  Is he asking her to look at the document

```
 1    or is he asking her --
 2              MR. AVENATTI:  Your Honor, I'm just asking
 3    questions.
 4              MR. SAGEL:  Then he should ask her to close the
 5    document.  That's the proper way to do it.
 6              MR. AVENATTI:  I'm just asking questions.
 7              THE COURT:  Let's do it the right way, though.
 8              MR. AVENATTI:  I wasn't aware she was still looking
 9    at the document.
10              Ms. Gardner you can take the document and turn it
11    over, if you'd like, please.
12              THE COURT:  If you're not looking at the document to
13    refresh your recollection, would you turn it over, please.
14              THE WITNESS:  Okay.
15    Q    BY MR. AVENATTI:  Have you turned over the document?
16    A    Do you mean turn it facedown?
17    Q    I guess.  All right.
18              MR. AVENATTI:  Can I have the last question read
19    back, please.
20              THE COURT:  Yes.
21              **(The record was read as follows:**
22              **"Do you have a recollection that at this**
23         **same meeting, this issue of the text messages, and**
24         **whether they were all the messages, came up.")**
25              MR. AVENATTI:  Let me strike that question because I
```

```
  1    don't think that was a good question.
  2    Q    Do you have a recollection that at this first meeting the
  3    issue came up as to whether you had given the Government all of
  4    the text messages between you and me?
03:46PM 5    A    I don't specifically recall, but yes, the text messages
  6    were discussed.
  7    Q    Do you recall that you told the federal agents that you
  8    were agreeing to turn over all the text messages from your
  9    phone?
03:47PM 10   A    That I had, yes.
 11    Q    Did you do that at that meeting or later?
 12    A    I don't recall.  It was a little scary finding out
 13    everything.  So I don't really remember.
 14         MR. AVENATTI:  Your Honor, move to strike everything
03:48PM 15   after "I don't recall."
 16         THE COURT:  It will be stricken.
 17    Q    BY MR. AVENATTI:  Do you recall during that first meeting
 18    with the Government that you informed Mr. Sagel and his
 19    colleagues that when Mr. Whiteside had attempted to discredit
03:48PM 20   you, I had your back?
 21    A    I'm unfamiliar with the discredit statement, but I am
 22    familiar that I told them that you have my back.
 23    Q    Take a look at the last two sentences in paragraph 69 and
 24    tell me if that refreshes your recollection, that that is what
03:49PM 25   you told Mr. Sagel and his colleagues.  It's just a yes-or-no
```

|  |  |
|---|---|
| 1 | question. |
| 2 | A     Yes. |
| 3 | Q     And at one point the Government asked you if you had any |
| 4 | voicemails from me; is that correct? |
| 03:50PM  5 | A     Yes. |
| 6 | Q     I'm sorry? |
| 7 | A     Yes. |
| 8 | Q     And did you search for any voicemails that I may have |
| 9 | left you? |
| 03:50PM 10 | A     I'm sure I did. |
| 11 | Q     Did you give any voicemails to the Government? |
| 12 | A     Not that I can remember. |
| 13 | Q     I'm sorry? |
| 14 | A     Not that I can remember. |
| 03:50PM 15 | Q     Do you recall finding voicemails that I had left for you? |
| 16 | A     Not that I can remember. |
| 17 | Q     Take a look at paragraph 76 and tell me if that refreshes |
| 18 | your recollection that, in fact, you did find some voicemails |
| 19 | that I had left for you, from the year 2018. |
| 03:51PM 20 | A     I'm going to need a second.  Number 69 kind of disturbed |
| 21 | me. |
| 22 | Q     Would you like a break? |
| 23 | A     No. |
| 24 | Q     You sure? |
| 03:51PM 25 | A     No. |

**UNITED STATES DISTRICT COURT**

         1   Q    I mean, we can take a break.  This whole thing -- we're

         2   waiting on you -- well, we can take a break provided that His

         3   Honor says we can take a break.  I don't decide when we take

         4   breaks.

03:52PM   5            Are you okay or do you need some time?

         6   A    I'm okay.  Do you want to repeat?

         7   Q    Yeah.  Let me strike the last question.  I'll ask a new

         8   question.

         9            Taking a look at paragraph 76, does that refresh

03:52PM  10   your recollection that when you met with the Government, you

        11   checked for voicemails on two phones and you found some

        12   voicemails that I had left for you in 2018?

        13   A    Yes.

        14   Q    And did you give those voicemails to the Government?

03:52PM  15   A    To my recollection, yes.

        16   Q    Now, Mr. Sagel did not ask you about any voicemails

        17   earlier today; is that correct?

        18   A    That's correct.

        19   Q    Now, we just established that when it came to looking for

03:53PM  20   voicemails, you looked on not one, but two phones; right?

        21   A    Yes.

        22   Q    The text messages that are marked as Exhibit 160 came

        23   from one phone; right?

        24   A    Yes.

03:53PM  25   Q    Did you look on your other phone for text messages

                        UNITED STATES DISTRICT COURT

1  between me and you?  Yes or no?

2  A     Yes.

3  Q     Did you produce those to the Government -- well, strike

4  that.

03:54PM 5          Did you find any?

6  A    I can't recall.  I know that I had lost that device and

7  gotten a new one.  So I do feel like I can't recall.  It's been

8  some time.

9  Q     So as you sit there today, you're not sure if you

03:55PM 10 produced any text messages from that phone to the Government;

11 is that right?

12 A     Is there something to refresh my memory?

13 Q     I don't believe so in this document, other than the fact

14 that you looked for voicemails on the other phone.

03:55PM 15 A     I don't recall.

16 Q     And when you met with the Government, they asked you what

17 you understood the terms of the settlement agreement to be at

18 the end of the mediation.  Do you remember that?

19 A     Yes.

03:56PM 20 Q     And on April 2nd, 2019, you told Mr. Sagel and his

21 colleagues that at the end of the mediation, you believed that

22 the total settlement amount was $3,600,000; right?  That's what

23 you told the Government.  Yes or no?

24 A     Yes.

03:57PM 25 Q     And you also told the Government that you understood that

1    33 percent of this amount would be a lump-sum payment made to

2    me for legal fees; right?

3    A    Yes.

4    Q    Now, would you agree with me that 33 percent of

03:58PM    5    3.6 million is $1.2 million, the number that I've written down

6    here on the board?

7    A    I'm not great with numbers.  If you want to give me a

8    pencil, I'll do some math.

9    Q    I'm sure that Mr. Sagel will correct me if I'm wrong.

03:59PM   10    Does 33 percent of 3.6 million sound about $1.2 million?

11              MR. SAGEL:  Asked and answered, Your Honor.

12              THE COURT:  Overruled.

13              THE WITNESS:  Yes.

14    Q    BY MR. AVENATTI:  And then you also told the Government

03:59PM   15    that you understood that the remaining portion of $2.4 million

16    was going to be paid to you in monthly payments over eight

17    years; right?

18    A    Yes.

19    Q    And that these payments would be in $20,000 increments

04:00PM   20    each month for eight years, but the first year would only be

21    15,000 a month.  That's what you told the Government your

22    understanding was; right?

23    A    16,000 a month.

24    Q    I'm sorry, $16,000 a month.  You're right.

04:00PM   25              That's what you told the Government?

```
          1   A    Yes.

          2   Q    So there's 12 months in a year; right?

          3   A    (No audible response.)

          4   Q    Yes?  You have to answer audibly.

04:01PM   5   A    Yes.

          6   Q    Okay.  And seven years would be -- seven times 12 is 84

          7   months.  Would you agree with that?

          8   A    Yes.

          9   Q    I don't know if you can see that, but I've written --

04:01PM  10   A    I can't see that.

         11   Q    -- 84 times 20,000.

         12   A    Okay.

         13   Q    Do you see that?

         14   A    Yes.  Kind of.

04:01PM  15   Q    Right here.  My handwriting is not the best.  I

         16   apologize.

         17   A    My vision is not the best from here.

         18   Q    Okay.  That's what I've written here.  84 times 20,000.

         19   A    Okay.

04:01PM  20   Q    84 times 20,000 is $1,680.000.  Does that sound about

         21   right?

         22   A    Sure.  I can't see it from here, but sure.  Okay.

         23   Q    Do you need me to approach or --

         24   A    You can.  Sure.

04:02PM  25             MR. SAGEL:  Your Honor, he can just tell her what
```

          1  he's written on the board.  I'm not sure what use of this time
          2  is.
          3          MR. AVENATTI:  Your Honor, I'd just like to do my
          4  cross-examination.
04:03PM   5          MR. SAGEL:  Under the confines of 403, Your Honor.
          6          THE COURT:  If you want to show it to her, you may.
          7          MR. AVENATTI:  (Indicating).
          8          THE WITNESS:  Thank you.
          9  Q    BY MR. AVENATTI:  But we haven't accounted for that
04:04PM  10  $16,000 a month for the first year at 12 months.  We haven't
         11  accounted for that yet; right?
         12  A    Correct.
         13  Q    And that first year, 12 payments at $16,000 a month comes
         14  out to $192,000.  Does that sound about right?
04:04PM  15  A    Yes.
         16  Q    Now, how much is 1,680,000 plus $192,000?
         17  A    Numbers kind of consume me.  Can I do it myself?  Do you
         18  want to bring me a -- I asked for a pencil.
         19  Q    If you'd like to, sure.  No problem.
04:05PM  20          Can I approach, Your Honor?
         21          THE COURT:  Let's expedite this.  Why don't you just
         22  use a calculator.
         23          THE WITNESS:  That would be nice.  I didn't know it
         24  was a math lesson.
04:05PM  25          MR. AVENATTI:  Well, it's not a math test.

1          Your Honor, if we had a calculator, I'd be happy to

2     get her one.  I think it's pretty straightforward.

3               THE COURT:  I do too.

4               **(The courtroom deputy handed the witness**

04:06PM 5          **a calculator.)**

6               THE WITNESS:  What are the numbers again?

7     Q    BY MR. AVENATTI:  Sure.  84 times 20,000.

8     A    Okay.

9     Q    That's 1,680,000; right?

04:06PM 10    A    Yes.

11    Q    And then 12 times 16,000.

12    A    Okay.

13    Q    That's 192,000; correct?

14    A    (No audible response.)

04:06PM 15    Q    You have to answer audibly.

16    A    Oh, I'm sorry.  Repeat it.

17    Q    12 times 16,000 is 192,000; correct?

18    A    That's correct.

19    Q    And then 1,680,000 plus 192,000 equals 1,872,000; right?

04:07PM 20    A    Yes.

21    Q    Now, these two numbers are not the same, 2.4 million and

22    $1,872,000, are they?

23    A    No.

24    Q    And after you told the Government that this was what you

04:07PM 25    thought the settlement agreement provided for, they explained

```
 1  to you that that couldn't be your recollection because those
 2  numbers don't work, didn't they?
 3  A    Yes.  I hadn't seen the agreement.
 4          MR. AVENATTI:  Move to strike everything after "yes"
 5  as nonresponsive.
 6          THE COURT:  It will be stricken.
 7          MR. SAGEL:  I think she said, "I guess, yes" Your
 8  Honor.  It wasn't "yes."
 9          MR. AVENATTI:  No, she said, "Yes."  Whatever the --
10          THE COURT:  Just a minute.
11          MR. AVENATTI:  -- court reporter says.
12          I'm sorry, Your Honor?
13          THE COURT:  Everything after "yes" is stricken.
14  Q    BY MR. AVENATTI:  And at that point, after the Government
15  told you that, your attorney asked to take a break with you so
16  he could consult with you; correct?
17  A    Yes.
18  Q    And then you came back on the conference with the
19  Government, you and your attorney.  Do you remember that?
20  A    To my recollection, yes.
21  Q    Yes?  I'm sorry, you have to answer audibly.
22  A    To my recollection, yes.
23          THE COURTROOM DEPUTY:  Are we done with the
24  calculator?
25          MR. AVENATTI:  We are.  Thankfully.
```

04:08PM 5
04:08PM 10
04:08PM 15
04:08PM 20
04:09PM 25

Q    And after this incident and after the break, you spoke
with your attorney and you came back into the conference.  The
Government didn't ask you again in that meeting what your
understanding was of the total settlement amount, did they?

04:10PM A    Not to my recollection.

MR. AVENATTI:  Your Honor, may I have one moment,
please.

**(Counsel conferred off the record.)**

Q    BY MR. AVENATTI:  Please take a look at 139.  It's the
04:12PM settlement agreement that Mr. Sagel asked you about.

Before we get to 139, I want to come back to the
calculation you provided the Government.  I forgot to ask a
question.

When you gave the calculation to the Government, did
04:12PM you account for any cost or expenses that were going to have to
be deducted from the settlement?

A    The question was the agreement amount.

MR. AVENATTI:  Move to strike as nonresponsive,
Your Honor.

04:13PM THE COURT:  Will be stricken.

Q    BY MR. AVENATTI:  Ms. Gardner, here's my question:  When
you provided the $3.6 million amount to the Government and the
calculation that we just went over painfully, did you provide
any amount to the Government at that time relating to what cost
04:13PM and expenses were going to have to be deducted?

```
 1   A    It was not a question outside of the percentage of

 2   33 percent.

 3              MR. AVENATTI:  Move to strike, Your Honor.

 4              THE COURT:  Denied.

 5   Q    BY MR. AVENATTI:  You did not provide them with a

 6   monetary figure, am I correct, at that time?

 7   A    The percentage.

 8   Q    No.  The amount for costs and expenses.

 9   A    A dollar amount, no.

10   Q    Now, do you recall that before the mediation considerable

11   costs and expenses were incurred on your behalf?

12   A    I was told that they would be taken care of with what was

13   recovered.

14              MR. AVENATTI:  Move to strike, Your Honor.

15              THE COURT:  It will be stricken.

16   Q    BY MR. AVENATTI:  Ms. Gardner, if you could just please

17   concentrate on my question.

18              Here's my next question:  Before the mediation, you

19   were aware that cost and expenses were being expended in

20   connection with your case; correct?

21   A    Yes.

22   Q    You understood that there was a fee associated with

23   having Mr. -- or Judge Meisinger hold a mediation; correct?

24   A    No.

25   Q    You thought -- you thought that was free?
```

04:13PM  5
04:14PM 10
04:14PM 15
04:14PM 20
04:15PM 25

```
 1   A     I thought that everything was within what was to be
 2   recovered.
 3   Q     You thought everything was included within the
 4   33 percent?  Yes or no?
04:15PM  5   A     Yes.  I was told I didn't have to worry about it.
 6   Q     Did you understand that other expenses were being
 7   incurred for your living situation?
 8   A     Yes.
 9   Q     Did you understand that one attorney had to take a trip
04:15PM 10   to Italy in order to investigate your allegations against
11   Mr. Whiteside?
12         MR. SAGEL:  Objection, Your Honor.  Your Honor's
13   motion in limine ruling.
14         THE COURT:  Overruled.
04:16PM 15   Q     BY MR. AVENATTI:  Do you recall that?
16   A     I'm thinking.  Is this not within my attorney-client
17   privilege?
18   Q     I don't believe it is, Ms. Gardner.  Would you like --
19         Your Honor, however you want to handle it.
04:16PM 20         THE COURT:  Attorney-client privilege with
21   Mr. Avenatti?
22         THE WITNESS:  (No audible response.)
23         THE COURT:  I thought the Government represented
24   that this would be waived.
04:17PM 25         MR. SAGEL:  She did sign a limited waiver for this
```

1   case, Your Honor, that is correct.

2           THE COURT:  Well, does it cover this question?

3           MR. SAGEL:  I don't know what the basis of what

4   she's thinking of or what the question is, but I don't have a

04:17PM 5   reason to say that there's a privilege.  I don't know one way

6   or the other.

7           MR. AVENATTI:  Your Honor, let me ask a foundational

8   question.

9   Q    Ms. Gardner, do you have an attorney here representing

04:17PM 10  you here today?

11  A    Yes.

12  Q    Yes?

13          Your Honor, should we give her a chance to confer?

14  Break for the day?  I'll do whatever you'd like.

04:17PM 15          THE COURT:  Why don't we conclude here for the day.

16          Okay, ladies and gentlemen, We're going to conclude

17  for the week and we'll resume tomorrow -- Tuesday.  I didn't

18  want to come back tomorrow.  We'll resume on Tuesday.  Regular

19  day, 9:00 to 12:00, 1:30 to 4:30.

04:18PM 20          Please remember the admonition not to discuss the

21  case with anyone, not to form any opinions on the issues of the

22  case until it's submitted to you, and please don't do any

23  research.

24          After all those thoughts, I hope you have a great

04:18PM 25  weekend.

1     THE COURTROOM DEPUTY:  All rise.

2     **(Out of the presence of the jury.)**

3     THE COURT:  Anything for the record before we break?

4     MR. STEWARD:  We can't hear you, Your Honor.

04:19PM 5     THE COURT:  Anything for the record before we break?

6     MR. SAGEL:  I don't think it's on.

7     THE COURT:  Now anything?

8     MR. SAGEL:  Now we can.  Nothing from the

9     Government, your Honor.

04:19PM 10     MR. AVENATTI:  No, sir.

11     THE COURT:  We're good.  Enjoy the weekend.

12     **(Proceedings concluded at 4:19 p.m.)**

13                    **--oOo--**

14

15

16

17

18

19

20

21

22

23

24

25

1          *CERTIFICATE OF OFFICIAL REPORTER*

2

3     COUNTY OF LOS ANGELES   )
                             )
4     STATE OF CALIFORNIA     )

5               I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME

6     COURT REPORTER, in and for the United States District Court for

7     the Central District of California, do hereby certify that

8     pursuant to Section 753, Title 28, United States Code that the

9     foregoing is a true and correct transcript of the

10    stenographically reported proceedings held in the

11    above-entitled matter and that the transcript page format is in

12    conformance with the regulations of the Judicial Conference of

13    the United States.

14

15    *Date:  July 30, 2021*

16

17

18

19                              */S/ DEBBIE HINO-SPAAN*
                              _____
20                            *Debbie Hino-Spaan, CSR No. 7953*
                              *Federal Official Court Reporter*
21

22

23

24

25

**UNITED STATES DISTRICT COURT**

## $

**$1,239.81** [1] - 22:13
**$1,680.000** [1] - 68:20
**$1,872,000** [1] - 70:22
**$16,000** [3] - 67:24, 69:10, 69:13
**$160,000** [1] - 33:9
**$192,000** [2] - 69:14, 69:16
**$2.75** [3] - 27:6, 27:12, 39:2
**$20,000** [1] - 67:19
**$3,600,000** [1] - 66:22
**$34,000** [3] - 5:20, 6:18, 7:5
**$4,000** [1] - 16:20

## '

**'handled** [1] - 17:7

## /

**/S** [1] - 77:19

## 1

**1** [1] - 29:17
**1,560,000** [2] - 33:12, 38:15
**1,680,000** [3] - 69:16, 70:9, 70:19
**1,872,000** [1] - 70:19
**1-053** [1] - 1:24
**1.2** [2] - 67:5, 67:10
**1.4** [1] - 33:11
**1.5** [1] - 38:15
**10** [1] - 19:23
**10th** [1] - 45:4
**1100** [1] - 2:11
**11th** [1] - 45:4
**12** [11] - 1:8, 21:16, 21:17, 22:8, 57:25, 68:2, 68:6, 69:10, 69:13, 70:11, 70:17
**12-5-16** [1] - 54:22
**12:00** [1] - 75:19
**13** [3] - 22:21, 22:22, 23:22
**132** [2] - 54:15, 56:2
**139** [2] - 72:9, 72:11
**14** [4] - 3:14, 14:16, 17:19, 24:8
**14th** [1] - 14:11
**15** [5] - 7:9, 25:19, 25:20, 44:12, 57:25
**15,000** [1] - 67:21
**158** [2] - 5:12, 6:22
**15th** [3] - 7:16, 11:1,

11:2
**16** [2] - 26:1, 26:3
**16,000** [4] - 7:16, 67:23, 70:11, 70:17
**160** [22] - 4:19, 4:20, 7:7, 7:8, 9:20, 19:1, 19:8, 21:16, 22:8, 27:19, 42:10, 42:15, 42:20, 43:3, 43:7, 43:19, 46:25, 47:13, 47:18, 48:19, 65:22
**162** [6] - 3:14, 14:5, 14:14, 14:19, 14:24
**164** [6] - 3:16, 28:23, 29:7, 29:10, 29:13
**17** [6] - 2:18, 4:15, 5:14, 26:1, 26:3, 26:5
**19** [1] - 27:19
**192,000** [3] - 70:13, 70:17, 70:19
**19th** [1] - 9:22
**1:30** [1] - 75:19
**1:32** [2] - 1:16, 4:2

## 2

**2** [4] - 1:9, 31:8, 38:16
**2,000** [1] - 15:22
**2.4** [2] - 67:15, 70:21
**2.5** [1] - 41:17
**2/24/2019** [1] - 3:16
**20,000** [4] - 68:11, 68:18, 68:20, 70:7
**2017** [4] - 27:6, 39:2, 40:3, 43:8
**2018** [14] - 4:15, 5:15, 7:9, 10:11, 12:9, 14:11, 14:16, 17:19, 19:24, 20:22, 21:17, 26:8, 64:19, 65:12
**2019** [10] - 27:21, 28:12, 29:1, 29:4, 33:21, 33:25, 40:3, 43:8, 59:13, 66:20
**2021** [3] - 1:15, 4:1, 77:15
**213-894-2435** [1] - 2:12
**22nd** [1] - 26:2
**23** [1] - 5:13
**23rd** [3] - 28:12, 29:1, 29:4
**24** [4] - 6:22, 28:9, 28:11, 28:12
**25** [1] - 28:15
**254** [1] - 2:19
**25th** [1] - 19:24
**26** [1] - 61:15
**28** [2] - 43:5, 77:8

**29** [2] - 3:16, 22:24
**29th** [1] - 25:18
**2:39** [1] - 17:10
**2:49** [1] - 46:2
**2nd** [2] - 59:13, 66:20

## 3

**3** [5] - 14:7, 14:14, 14:19, 15:6, 54:21
**3.6** [3] - 67:5, 67:10, 72:22
**30** [3] - 1:15, 4:1, 77:15
**312** [1] - 2:11
**31st** [3] - 10:7, 10:10, 11:12
**33** [6] - 33:6, 67:11, 67:4, 67:10, 73:2, 74:4
**34K** [6] - 4:16, 4:23, 4:24, 5:17, 6:17, 7:4
**3:05** [1] - 46:2

## 4

**4** [6] - 3:3, 14:7, 14:14, 14:19, 17:5, 55:15
**4,000** [1] - 15:18
**401** [2] - 59:4, 59:9
**403** [8] - 34:2, 52:8, 54:7, 58:8, 59:4, 59:9, 59:24, 69:5
**411** [2] - 1:24, 2:6
**42** [1] - 3:4
**4:19** [1] - 76:12
**4:30** [1] - 75:19
**4TH** [1] - 1:24
**4th** [1] - 2:6

## 5

**5** [3] - 4:19, 7:7, 55:9
**5185** [1] - 6:24
**5th** [2] - 27:20, 27:21

## 6

**6** [2] - 55:24, 56:1
**69** [2] - 63:23, 64:20

## 7

**7** [2] - 9:20, 12:21
**714-338-3598** [1] - 2:7
**753** [1] - 77:8
**76** [2] - 64:17, 65:9
**7953** [2] - 1:23, 77:20

## 8

**8** [3] - 12:22, 19:2, 19:8
**8000** [1] - 2:6
**84** [5] - 68:6, 68:11, 68:18, 68:20, 70:7
**8:00** [1] - 7:13

## 9

**9** [3] - 56:21, 57:11, 57:15
**90012** [1] - 2:12
**92660** [1] - 2:19
**92701** [2] - 1:25, 2:7
**949-481-4900** [1] - 2:20
**9:00** [1] - 75:19
**9th** [1] - 25:20

## A

**able** [5] - 23:8, 23:10, 34:18, 35:9, 35:14
**above-entitled** [1] - 77:11
**acceptable** [1] - 54:11
**account** [11] - 6:18, 6:21, 7:2, 7:5, 8:17, 9:25, 22:15, 22:23, 24:15, 27:13, 72:15
**accounted** [2] - 69:9, 69:11
**accumulating** [1] - 36:24
**accurate** [3] - 14:15, 15:23, 29:3
**acting** [2] - 12:10, 12:13
**actions** [3] - 9:6, 9:10, 9:11
**actress** [1] - 51:22
**additional** [3] - 33:7, 33:10, 57:6
**address** [1] - 24:4
**adequate** [1] - 54:11
**admission** [1] - 15:1
**admit** [2] - 14:19, 29:7
**admonition** [2] - 44:13, 75:20
**advance** [1] - 31:17
**advice** [1] - 12:19
**advisor** [1] - 53:12
**advisors** [2] - 52:18, 54:5
**afford** [4] - 34:18, 35:9, 35:15, 35:19
**afternoon** [4] - 4:6, 4:8, 17:12, 42:8

**agency** [1] - 14:25
**agent** [1] - 59:20
**Agent** [2] - 46:17, 59:18
**agents** [1] - 63:7
**ago** [1] - 43:12
**agree** [2] - 67:4, 68:7
**agreeing** [1] - 63:8
**agreement** [39] - 13:18, 13:25, 20:23, 33:3, 33:5, 33:22, 34:1, 35:12, 36:8, 39:19, 39:23, 40:5, 40:7, 40:18, 41:4, 41:7, 47:8, 47:16, 47:19, 47:21, 47:23, 48:6, 48:23, 55:6, 56:18, 57:1, 57:2, 57:4, 57:13, 57:14, 61:2, 61:12, 61:18, 66:17, 70:25, 71:3, 72:10, 72:17
**agrees** [1] - 57:2
**Airbnb** [6] - 50:18, 50:20, 50:23, 50:25, 51:1, 58:19
**album** [1] - 23:6
**alex.wyman@usdoj. gov** [1] - 2:13
**ALEXANDER** [1] - 2:10
**Alexis** [3] - 3:16, 15:9, 16:24
**ALEXIS** [2] - 3:3, 4:11
**allegations** [1] - 74:10
**allow** [3] - 46:12, 46:18, 46:21
**almost** [4] - 7:12, 10:7, 22:7, 60:10
**alone** [2] - 57:24, 59:7
**AMERICA** [1] - 1:5
**amount** [11] - 5:18, 15:23, 38:18, 66:22, 67:1, 72:4, 72:17, 72:22, 72:24, 73:8, 73:9
**Ana** [2] - 2:7, 27:25
**ANA** [3] - 1:17, 1:25, 4:1
**Andre** [2] - 59:19, 61:1
**ANGELES** [1] - 77:3
**Angeles** [1] - 2:12
**answer** [12] - 20:18, 22:6, 35:6, 44:22, 47:3, 47:11, 48:1, 52:10, 68:4, 70:15, 71:21
**answered** [7] - 6:10, 6:13, 8:2, 18:7, 41:8, 48:3, 67:11

anticipated [1] - 38:18
apartment [3] - 23:1, 50:18, 51:7
apologize [5] - 4:19, 34:10, 35:1, 51:3, 68:16
apologized [1] - 35:7
apologizing [2] - 35:1, 35:2
appalled [1] - 50:1
appear [2] - 57:10, 57:14
APPEARANCES [1] - 2:1
apply [1] - 57:3
approach [3] - 60:5, 68:23, 69:20
approachable [1] - 58:7
approximate [1] - 52:17
April [4] - 4:15, 5:14, 59:13, 66:20
Argumentative [2] - 11:18, 27:7
arises [1] - 57:1
arranged [1] - 50:18
artist [1] - 27:25
ASAP [1] - 17:2
aspiring [1] - 51:22
asshole [1] - 8:15
assholes [2] - 8:14, 8:15
Assistant [2] - 2:5, 2:10
assistant [1] - 59:19
assisted [1] - 50:14
associated [3] - 36:6, 73:22
Atlanta [1] - 10:12
attempt [1] - 51:25
attempted [1] - 63:19
attempting [2] - 52:5, 52:12
attending [2] - 51:11, 51:13
attention [3] - 46:25, 47:7, 47:15
attorney [19] - 21:21, 21:22, 21:23, 21:25, 41:3, 41:6, 41:13, 55:11, 56:4, 56:14, 57:6, 59:19, 71:15, 71:19, 72:2, 74:9, 74:16, 74:20, 75:9
Attorney [4] - 2:4, 2:5, 2:9, 2:10
attorney's [1] - 56:17
attorney-client [2] - 74:16, 74:20

audible [6] - 7:20, 7:21, 47:2, 68:3, 70:14, 74:22
audibly [4] - 47:3, 68:4, 70:15, 71:21
August [5] - 14:11, 14:16, 15:14, 17:19, 45:4
authentication [2] - 14:21, 29:9
authorize [1] - 42:1
authorizes [1] - 56:14
avail [1] - 22:11
available [1] - 22:11
Avenatti [8] - 3:4, 3:16, 14:12, 29:11, 42:5, 45:9, 46:4, 74:21
AVENATTI [73] - 1:8, 2:15, 2:16, 6:10, 6:13, 8:2, 11:18, 14:20, 15:2, 16:8, 18:6, 21:2, 21:13, 27:7, 29:8, 32:23, 34:2, 35:23, 37:5, 37:7, 40:20, 41:8, 42:7, 44:20, 45:10, 46:5, 47:10, 47:12, 48:4, 48:24, 49:2, 50:6, 52:10, 53:2, 54:9, 54:15, 54:18, 58:10, 59:6, 59:11, 60:1, 60:5, 60:7, 62:2, 62:6, 62:8, 62:15, 62:18, 62:25, 63:14, 63:17, 67:14, 69:3, 69:7, 69:9, 69:25, 70:7, 71:4, 71:9, 71:11, 71:14, 71:25, 72:6, 72:9, 72:18, 72:21, 73:3, 73:5, 73:14, 73:16, 74:15, 75:7, 76:10
aware [3] - 48:12, 62:8, 73:19

**B**

bad [4] - 5:3, 34:20, 35:6, 35:7
balance [4] - 22:12, 22:14, 22:20, 45:11
bank [7] - 6:21, 7:1, 22:9, 22:12, 22:20, 22:23, 24:15
based [9] - 18:23, 22:18, 24:11, 25:25, 35:18, 39:10, 39:20, 40:17, 44:23
bases [1] - 7:14

basis [2] - 48:10, 75:3
Beach [2] - 2:19, 17:1
beating [1] - 44:4
became [1] - 11:10
become [5] - 10:15, 10:22, 11:2, 11:14, 32:3
becoming [2] - 10:24, 10:25
beginning [4] - 18:2, 26:17, 57:20, 60:14
behalf [5] - 8:21, 8:23, 36:1, 41:23, 73:11
behind [4] - 23:3, 33:9, 38:22, 38:23, 49:21, 49:23
Bellis [2] - 59:20, 61:1
below [1] - 17:5
best [6] - 7:19, 29:23, 31:22, 36:16, 68:15, 68:17
betrayed [1] - 18:11
better [9] - 26:12, 26:25, 27:2, 27:5, 46:16, 47:25, 52:2, 54:4, 54:5
between [8] - 43:2, 43:8, 43:18, 43:24, 48:20, 55:11, 63:4, 66:1
Billing [1] - 55:16
bills [2] - 23:9, 53:18
bit [2] - 17:1, 29:21
blame [1] - 8:17
bless [1] - 26:14
board [2] - 67:6, 69:1
bother [2] - 23:12, 24:8
bottom [8] - 6:23, 12:21, 22:8, 25:17, 27:23, 28:9, 28:10, 34:6
Boulevard [2] - 51:5, 51:15
boyfriend [5] - 9:7, 9:10, 10:5, 16:4, 20:9
break [12] - 44:8, 44:12, 46:6, 64:22, 65:1, 65:2, 65:3, 71:15, 72:1, 75:14, 76:3, 76:5
breaks [1] - 65:4
BRETT [1] - 2:5
brett.sagel@usdoj. gov [1] - 2:8
bring [3] - 34:20, 54:18, 69:18
busy [1] - 15:11
buy [2] - 41:17, 42:2

BY [47] - 2:5, 2:18, 3:3, 4:13, 6:12, 6:16, 8:6, 11:22, 15:6, 16:11, 18:14, 19:8, 21:5, 21:16, 27:10, 29:14, 33:1, 34:6, 35:25, 37:9, 40:25, 41:12, 42:7, 46:5, 47:12, 49:2, 50:6, 52:10, 53:2, 54:9, 54:15, 58:10, 59:6, 59:11, 60:1, 60:7, 62:15, 63:17, 67:14, 69:9, 70:7, 71:14, 72:9, 72:21, 73:5, 73:16, 74:15

**C**

CA [1] - 1:25
calculation [2] - 72:12, 72:14, 72:23
calculator [4] - 69:22, 70:1, 70:5, 71:24
CALIFORNIA [4] - 1:2, 1:17, 4:1, 77:4
California [5] - 2:7, 2:12, 2:19, 51:6, 77:7
CALLED [1] - 3:3
cannot [1] - 26:14
car [6] - 24:16, 37:2, 49:21, 58:21, 58:23, 59:3
care [2] - 31:6, 73:12
career [5] - 12:10, 30:8, 30:22, 30:25, 31:19
careful [2] - 42:23, 43:14
Carlos [3] - 46:17, 59:18, 61:1
case [11] - 6:5, 44:14, 44:15, 44:19, 45:2, 48:13, 59:12, 73:20, 75:1, 75:21, 75:22
Case [1] - 1:7
cashier's [1] - 6:23
Cassaro [12] - 3:14, 14:2, 14:6, 14:10, 14:15, 15:8, 16:12, 16:23, 17:6, 17:9, 17:14, 50:13
cast [1] - 53:25
catch [1] - 10:13
Central [1] - 77:7
CENTRAL [1] - 1:2
certain [1] - 12:18
CERTIFICATE [1] - 77:1

CERTIFIED [1] - 1:6
certify [1] - 77:7
champion [2] - 26:14, 27:11
chance [3] - 28:20, 45:18, 75:13
changed [4] - 26:12, 26:24, 27:1, 27:4
chaotic [1] - 17:1
chapter [1] - 34:23
characters [1] - 53:25
charge [2] - 13:20, 35:11
charges [3] - 56:9, 56:11, 56:13
charging [1] - 36:2
chat [3] - 13:6, 13:16, 13:23
chatting [1] - 42:12
check [5] - 5:14, 6:23, 29:23, 37:19
checked [2] - 9:25, 65:11
checking [1] - 19:14
chest [1] - 44:5
chief [2] - 44:19, 45:2
Cienega [1] - 51:15
circle [1] - 53:1
circuits [1] - 45:20
claimed [1] - 8:10
claims [2] - 52:13, 52:19
clarify [2] - 44:2, 48:4
class [2] - 22:25, 23:17
clear [1] - 17:24
client [10] - 55:12, 56:3, 56:6, 56:14, 56:23, 56:24, 57:2, 57:6, 74:16, 74:20
clients [1] - 34:21
close [2] - 49:23, 62:4
Closing [1] - 34:7, 34:9
Code [1] - 77:8
colleagues [3] - 63:19, 63:25, 66:21
collectively [1] - 4:7
coming [1] - 11:2
communicate [1] - 48:10
communication [2] - 17:25, 35:3
communications [3] - 6:7, 48:13, 48:17
competent [1] - 35:2
compliant [1] - 36:16
Compound [1] - 52:21
computerized [1] -

56:10

**concentrate** [1] - 73:17

**concerned** [1] - 31:24

**conclude** [2] - 75:15, 75:16

**concluded** [1] - 76:12

**conclusion** [2] - 45:24, 56:6

**confer** [1] - 75:13

**Conference** [1] - 77:12

**conference** [2] - 71:18, 72:2

**conferred** [1] - 72:8

**conferring** [1] - 44:21

**confidant** [3] - 26:9, 26:18, 26:19

**confided** [1] - 49:20

**confident** [1] - 26:22

**confines** [1] - 69:5

**conformance** [1] - 77:12

**confused** [5] - 39:16, 39:17, 40:2, 41:21, 52:15

**confusing** [1] - 39:21

**connection** [2] - 49:4, 73:20

**consent** [1] - 46:11

**considerable** [1] - 73:10

**consistent** [3] - 23:5, 23:25, 24:1

**constantly** [1] - 9:2

**consult** [1] - 71:16

**consultant** [1] - 56:11

**consultants** [1] - 56:16

**consume** [1] - 69:17

**contact** [1] - 48:9

**contain** [1] - 14:5

**content** [2] - 14:23, 29:12

**contents** [1] - 13:11

**context** [1] - 18:22

**continue** [4] - 18:1, 22:21, 25:18, 25:19

**continues** [2] - 12:21, 26:3

**continuing** [1] - 25:20

**conversation** [3] - 6:3, 18:22, 49:7

**conversations** [5] - 7:25, 12:15, 31:23, 32:4, 32:7

**converse** [1] - 58:4

**copies** [2] - 14:15, 46:22

**copy** [13] - 29:3, 40:4,

40:7, 41:3, 46:12, 46:19, 47:8, 47:16, 48:6, 61:2, 61:3, 61:18

**corner** [1] - 26:23

**Corporate** [1] - 2:18

**correct** [34] - 4:16, 5:4, 7:2, 10:2, 10:3, 10:8, 10:18, 14:3, 19:16, 20:19, 27:16, 27:17, 27:21, 29:25, 30:3, 30:11, 33:22, 38:22, 56:19, 59:20, 64:4, 65:17, 65:18, 67:9, 69:12, 70:13, 70:17, 70:18, 71:16, 73:6, 73:20, 73:23, 75:1, 77:9

**correctly** [4] - 18:2, 20:19, 55:13, 57:8

**cost** [7] - 36:5, 56:3, 56:5, 56:7, 72:15, 72:24, 73:19

**Cost** [1] - 55:16

**costs** [5] - 56:9, 56:12, 56:15, 73:8, 73:11

**counsel** [8] - 8:19, 11:7, 19:22, 20:15, 21:12

**Counsel** [1] - 72:8

**COUNSEL** [2] - 2:1, 2:16

**COUNTY** [1] - 77:3

**couple** [3] - 10:7, 43:12, 43:20

**Court** [3] - 45:25, 77:6, 77:20

**court** [5] - 44:25, 45:1, 47:3, 56:8, 71:11

**COURT** [70] - 1:1, 1:24, 4:6, 4:9, 6:11, 6:14, 8:4, 11:20, 14:22, 15:4, 16:9, 18:8, 21:3, 21:15, 27:8, 29:10, 32:24, 34:4, 35:24, 37:6, 37:8, 40:24, 41:10, 42:5, 44:8, 44:11, 44:18, 44:22, 45:6, 45:14, 45:23, 46:1, 46:4, 47:11, 48:3, 49:1, 50:5, 52:9, 52:22, 54:8, 54:14, 58:9, 59:5, 59:10, 59:25, 60:6, 62:7, 62:12, 62:20, 63:16, 67:12, 69:6, 69:21, 70:3, 71:6, 71:10, 71:13, 72:20, 73:4, 73:15, 74:14, 74:20,

74:23, 75:2, 75:15, 76:3, 76:5, 76:7, 76:11, 77:6

**courtesy** [1] - 45:13

**courtroom** [2] - 44:7, 70:4

**COURTROOM** [3] - 44:16, 71:23, 76:1

**cousin** [2] - 53:3, 53:4

**cover** [1] - 75:2

**covered** [1] - 33:6

**covers** [1] - 22:7

**Cross** [1] - 3:4

**CROSS** [1] - 42:6

**cross** [2] - 44:23, 69:4

**cross-examination** [1] - 69:4

**Cross-Examination** [1] - 3:4

**CROSS-EXAMINATION** [1] - 42:6

**cross-examinations** [1] - 44:23

**CRR** [1] - 1:23

**CSR** [2] - 1:23, 77:20

**cumulative** [2] - 8:3, 34:3

**current** [1] - 22:18

**custom** [1] - 55:3

## D

**Date** [1] - 77:15

**date** [4] - 25:25, 28:11, 44:24, 54:3

**dates** [2] - 14:10, 45:3

**DAY** [1] - 1:8

**days** [6] - 19:2, 19:10, 45:1, 45:4

**deal** [1] - 31:17

**dealing** [5] - 23:21, 24:12, 25:9, 31:25, 32:1

**DEAN** [2] - 2:17, 2:18

**deansteward7777@gmail.com** [1] - 2:20

**DEBBIE** [3] - 1:23, 77:5, 77:19

**Debbie** [1] - 77:20

**December** [1] - 43:8

**decide** [1] - 65:3

**decisions** [2] - 53:14

**deduct** [2] - 13:24, 31:1

**deducted** [3] - 15:19, 72:16, 72:25

**defendant** [78] - 4:22, 5:3, 5:4, 6:2, 6:16, 6:21, 7:4, 7:8, 7:11,

7:18, 7:23, 8:6, 8:10, 8:12, 9:6, 9:9, 9:21, 10:8, 10:10, 10:20, 11:11, 12:15, 12:22, 13:3, 13:5, 13:12, 13:15, 15:1, 16:7, 16:13, 17:15, 17:16, 17:19, 19:10, 19:11, 19:25, 20:11, 20:25, 21:18, 21:24, 22:3, 22:9, 22:12, 22:14, 22:22, 24:24, 25:11, 25:24, 26:6, 26:7, 28:17, 28:21, 28:25, 29:4, 29:15, 30:14, 30:20, 30:24, 32:15, 32:16, 33:14, 33:24, 35:1, 35:11, 36:20, 37:12, 37:15, 37:17, 37:24, 38:9, 39:8, 39:12, 40:4, 40:22, 41:16, 41:22, 42:1

**Defendant** [1] - 1:9

**DEFENDANT** [1] - 2:14

**defendant's** [1] - 19:18

**delete** [1] - 43:10

**deleted** [1] - 43:23

**deleting** [1] - 43:17

**delivery** [1] - 56:12

**denied** [1] - 73:4

**department** [1] - 34:22

**deposit** [19] - 4:24, 7:14, 7:15, 7:16, 10:1, 10:5, 10:14, 10:17, 11:3, 11:8, 11:10, 11:25, 19:15, 25:16, 25:21, 25:24, 28:4, 39:9

**deposited** [2] - 7:5, 27:12

**depositing** [1] - 8:13

**deposition** [1] - 56:9

**deposits** [24] - 7:25, 8:17, 9:4, 15:13, 16:2, 16:3, 16:4, 16:17, 18:14, 18:18, 18:19, 18:23, 20:4, 20:8, 21:1, 21:8, 22:2, 22:18, 30:17, 32:21, 33:19, 35:22, 36:11, 36:21

**deputy** [1] - 70:4

**DEPUTY** [3] - 44:16, 71:23, 76:1

**describe** [2] - 17:18, 52:5

**desire** [2] - 16:16, 50:19

**desires** [1] - 57:6

**detail** [1] - 30:13

**details** [1] - 29:22

**device** [1] - 66:6

**dhinospaan@yahoo.com** [1] - 1:25

**different** [11] - 8:11, 12:7, 16:12, 30:16, 30:17, 38:12, 39:21, 39:24, 43:6, 45:23, 52:16

**difficult** [1] - 8:9

**difficulty** [1] - 16:6

**Direct** [1] - 3:3

**DIRECT** [1] - 4:12

**direct** [7] - 4:24, 7:16, 10:5, 17:24, 47:7, 47:14, 49:2

**directing** [1] - 46:25

**dirty** [1] - 37:1

**disbursements** [1] - 56:3

**discharge** [1] - 55:18

**discredit** [2] - 63:19, 63:21

**discuss** [5] - 30:21, 38:1, 44:13, 53:19, 75:20

**discussed** [5] - 13:9, 19:11, 30:16, 30:24, 63:6

**discussion** [1] - 39:8

**discussions** [2] - 9:5, 20:24

**dismiss** [1] - 45:12

**dispute** [1] - 52:1

**DISTRICT** [3] - 1:1, 1:2, 1:3

**District** [2] - 77:6, 77:7

**disturbed** [1] - 64:20

**DIVISION** [1] - 1:2

**document** [15] - 54:24, 55:4, 60:8, 60:9, 60:11, 61:4, 61:8, 61:21, 61:25, 62:5, 62:9, 62:10, 62:12, 62:15, 66:13

**documents** [2] - 13:11, 55:4

**dollar** [1] - 73:9

**done** [3] - 18:10, 23:19, 71:23

**Donuts** [1] - 51:6

**door** [1] - 49:14

**down** [1] - 67:5

**drive** [1] - 58:23

**duck** [1] - 24:22

**due** [1] - 38:19

**during** [17] - 9:4, 12:12, 18:14, 18:17,

18:18, 20:22, 38:9, 38:25, 40:3, 48:8, 49:16, 52:17, 57:23, 57:25, 59:22, 59:23, 63:17

## E

e-mail [14] - 3:16, 28:18, 28:25, 29:3, 29:12, 29:14, 29:25, 37:12, 37:16, 37:17, 37:18, 37:23, 47:22, 48:6
earliest [1] - 42:21
eight [3] - 33:7, 33:9, 33:16, 33:17, 36:21, 38:6, 38:22, 67:16, 67:20
eight-year [1] - 38:6
either [2] - 8:8, 46:13
electronic [2] - 46:12, 46:19
end [4] - 25:6, 43:8, 66:18, 66:21
ended [2] - 50:10, 59:6
energy [3] - 17:20, 18:3, 18:5
engaged [1] - 46:23
enjoy [1] - 76:11
entertainment [1] - 13:1
entire [1] - 34:12
entitled [2] - 38:3, 77:11
entries [1] - 15:4
equals [1] - 70:19
especially [1] - 32:2
ESQ [2] - 2:15, 2:18
established [1] - 65:19
estimate [2] - 45:2, 45:8
event [2] - 55:18, 55:20
eviction [2] - 23:3, 23:24
EVIDENCE [1] - 3:13
ex [11] - 8:15, 8:19, 9:7, 9:10, 10:5, 11:7, 16:4, 19:22, 20:9, 20:15, 21:12
ex's [2] - 21:23, 53:12
ex-boyfriend [5] - 9:7, 9:10, 10:5, 16:4, 20:9
exactly [2] - 34:16, 43:22
examination [1] - 69:4

EXAMINATION [2] - 4:12, 42:6
Examination [2] - 3:3, 3:4
examinations [1] - 44:23
excited [1] - 36:19
exciting [1] - 13:6
excuse [7] - 10:14, 15:20, 16:25, 23:18, 31:25, 38:15, 51:14
EXHIBIT [1] - 3:13
exhibit [5] - 4:17, 5:13, 19:23
Exhibit [28] - 4:19, 5:12, 6:22, 7:7, 9:20, 14:5, 14:14, 14:19, 14:24, 19:1, 19:8, 21:16, 22:8, 27:19, 28:23, 29:7, 29:13, 42:10, 43:3, 43:7, 43:19, 46:25, 47:13, 47:18, 54:15, 56:2, 65:22
EXHIBITS [1] - 3:11
expect [5] - 41:3, 41:6, 41:12, 41:22, 41:23
expected [2] - 39:24, 41:19
expedite [1] - 69:21
expended [1] - 73:19
expenses [11] - 56:3, 56:5, 56:7, 56:8, 56:13, 72:15, 72:25, 73:8, 73:11, 73:19, 74:6
expert [3] - 45:17, 45:22, 56:16
expired [1] - 16:21
explain [1] - 53:24
explained [2] - 39:4, 70:25
expressed [1] - 50:19
eye [1] - 24:12

## F

facedown [1] - 62:16
facilitate [1] - 30:18
fact [6] - 35:16, 35:18, 49:8, 53:19, 64:18, 66:13
fair [3] - 14:14, 54:1, 54:9
fairly [3] - 36:22, 48:9, 48:13
familiar [4] - 5:24, 5:25, 54:1, 63:22
family [1] - 26:14
far [3] - 35:3, 36:25,

45:16
fast [2] - 27:15, 27:19
fast-forward [2] - 27:15, 27:19
fearful [1] - 34:14
February [8] - 15:17, 27:20, 27:21, 28:12, 29:1, 29:4, 33:21, 33:24
FEDERAL [2] - 1:24, 77:5
federal [1] - 63:7
Federal [1] - 77:20
fee [3] - 35:12, 55:21, 73:22
fees [9] - 31:1, 33:6, 36:5, 36:6, 56:8, 56:10, 56:11, 67:2
Fees [1] - 55:16
fellow [1] - 27:25
felt [8] - 18:9, 24:11, 35:6, 35:7, 35:16, 36:3, 36:8, 54:17
few [4] - 23:22, 29:20, 30:19, 61:13
field [1] - 31:18
fighter [2] - 26:13, 27:11
fighting [3] - 8:20, 8:23, 26:20
figure [4] - 20:25, 32:3, 50:22, 73:6
figured [1] - 28:1
figuring [1] - 34:13
file [1] - 32:19
filing [9] - 9:12, 9:14, 31:23, 32:5, 32:7, 32:8, 32:11, 32:17, 56:7
finally [1] - 12:25
finances [2] - 39:1, 53:18
Finances [3] - 31:9, 31:11, 38:3
financial [9] - 22:18, 24:23, 25:1, 25:3, 34:22, 52:5, 52:24, 53:12, 53:14
finish [1] - 23:6
finishing [1] - 31:15
firm [1] - 45:7
first [24] - 12:8, 15:19, 16:2, 16:20, 29:17, 29:19, 31:12, 34:9, 39:20, 39:22, 40:16, 48:25, 49:3, 51:10, 52:17, 58:20, 59:12, 60:8, 61:16, 63:2, 63:17, 67:20, 69:10, 69:13

five [2] - 6:24, 33:10
flight [1] - 34:24
flustered [2] - 18:13
focus [2] - 14:7, 56:10
follow [3] - 20:3, 21:20, 21:25
follow-up [1] - 21:20, 21:25
following [1] - 45:5
follows [1] - 62:21
FOR [3] - 2:3, 2:14, 2:16
foregoing [1] - 77:9
forensic [1] - 46:19
forgot [1] - 72:12
form [2] - 44:14, 75:21
format [1] - 77:11
forth [1] - 55:10
forward [7] - 13:2, 27:15, 27:19, 30:7, 30:15, 30:21, 30:25
foundation [3] - 14:21, 15:2, 29:9
foundational [1] - 75:7
four [10] - 7:1, 23:9, 23:20, 25:8, 25:14, 25:16, 45:4, 60:2, 60:10
free [1] - 73:25
FRIDAY [2] - 1:15, 4:1
Friday [1] - 12:23
friend [4] - 24:5, 27:24, 28:5, 28:7
front [1] - 49:14
frustration [1] - 22:16
funding [1] - 23:7
funds [2] - 33:15, 33:17
future [1] - 26:10

## G

GARDNER [2] - 3:3, 4:11
Gardner [25] - 3:15, 3:16, 3:16, 4:14, 27:16, 29:14, 42:8, 43:13, 44:6, 45:11, 46:5, 46:8, 47:12, 48:5, 54:3, 54:9, 56:1, 59:6, 60:1, 60:7, 62:10, 72:21, 73:16, 74:18, 75:9
generally [1] - 24:4
gentlemen [3] - 4:6, 44:12, 75:16
genuinely [1] - 31:6
girl [1] - 37:1
given [1] - 63:3

goal [1] - 23:6
God [1] - 26:14
GOVERNMENT [1] - 3:3
Government [44] - 14:18, 29:6, 39:22, 39:23, 43:11, 43:19, 43:25, 46:6, 46:11, 46:12, 46:17, 46:21, 59:12, 60:2, 60:12, 60:15, 60:22, 61:5, 61:9, 61:17, 63:3, 63:18, 64:3, 64:11, 65:10, 65:14, 66:3, 66:10, 66:16, 66:23, 66:25, 67:14, 67:21, 67:25, 70:24, 71:14, 71:19, 72:3, 72:12, 72:14, 72:22, 72:24, 74:23, 76:9
Government's [3] - 44:19, 45:2, 45:21
Grammys [1] - 23:15
great [3] - 28:20, 67:7, 75:24
group [3] - 43:18, 43:24, 48:17
groups [1] - 56:10
guess [4] - 32:8, 50:21, 62:17, 71:7
guy [1] - 53:13
guys [2] - 8:14, 8:15

## H

half [7] - 6:23, 20:23, 22:8, 27:13, 27:20, 51:1, 51:4
handed [2] - 60:7, 70:4
handful [1] - 28:10
handle [2] - 18:22, 74:19
handled [4] - 35:7, 36:12, 53:18
handwriting [2] - 54:22, 68:15
HANNA [2] - 2:4, 2:9
happiness [1] - 26:16
happy [4] - 13:5, 13:15, 26:10, 70:1
Happy [1] - 13:23
hard [1] - 44:4
Hassan [10] - 27:5, 28:1, 31:2, 31:22, 36:14, 36:15, 36:16, 39:1, 53:14, 54:5
hate [2] - 23:13, 24:9
heading [1] - 55:16
hear [3] - 39:21,

47:20, 76:4
**heard** [1] - 18:2
**hearing** [1] - 16:15
**hearsay** [3] - 14:20, 29:8, 50:3
**heart** [2] - 44:4, 44:10
**held** [1] - 77:10
**hell** [2] - 20:12, 20:13
**hello** [2] - 26:9, 42:9
**help** [8] - 12:17, 12:18, 13:6, 13:16, 13:23, 15:12, 30:18
**helpful** [1] - 45:6
**hereby** [1] - 77:7
**Hi** [4] - 7:19, 9:24, 19:13, 21:20
**hi** [1] - 22:3
**high** [3] - 17:20, 18:3, 18:5
**HINO** [3] - 1:23, 77:5, 77:19
**Hino** [1] - 77:20
**HINO-SPAAN** [3] - 1:23, 77:5, 77:19
**Hino-Spaan** [1] - 77:20
**hire** [1] - 56:15
**hired** [1] - 51:25
**hit** [2] - 12:25, 25:22
**hold** [4] - 23:20, 25:7, 25:11, 73:23
**holidays** [1] - 26:15
**Hollywood** [5] - 27:25, 28:6, 49:11, 49:14, 50:20
**honest** [4] - 60:16, 60:22, 60:23, 61:10
**honestly** [1] - 24:18
**Honor** [51] - 4:10, 8:2, 11:19, 14:18, 14:20, 15:2, 18:6, 21:13, 29:6, 29:8, 34:2, 37:7, 40:20, 41:8, 42:4, 44:7, 44:20, 45:10, 47:10, 48:1, 48:24, 50:4, 52:7, 54:7, 54:13, 58:8, 59:9, 59:24, 60:5, 62:2, 63:14, 65:3, 67:11, 68:25, 69:3, 69:5, 69:20, 70:1, 71:8, 71:12, 72:6, 72:19, 73:3, 73:14, 74:12, 74:19, 75:1, 75:7, 75:13, 76:4, 76:9
**Honor's** [1] - 74:12
**HONORABLE** [1] - 1:3
**hope** [4] - 7:12, 9:24, 15:9, 75:24

**hoped** [1] - 34:14
**hoping** [1] - 15:24
**hotel** [4] - 50:11, 50:14, 50:17, 58:20
**hourly** [1] - 36:5
**hours** [5] - 57:25, 60:3, 60:10

**I**

**ignore** [1] - 18:7
**image** [3] - 31:24, 46:9, 46:10
**immediately** [4] - 49:13, 49:21, 49:23, 58:18
**important** [4] - 42:25, 60:15, 60:21, 61:10
**IN** [2] - 2:14, 3:13
**incident** [1] - 72:1
**include** [1] - 56:7
**included** [1] - 74:3
**increase** [4] - 15:17, 16:20, 39:10, 39:15
**increments** [1] - 67:19
**incur** [1] - 56:14
**incurred** [2] - 73:11, 74:7
**indicating)** [1] - 69:7
**individuals** [1] - 61:17
**inform** [1] - 50:6
**information** [2] - 6:21, 45:13
**informed** [3] - 29:22, 60:15, 63:18
**insecure** [1] - 34:17
**inside** [2] - 49:12, 49:15
**instead** [2] - 16:13, 23:10
**intend** [1] - 45:10
**interest** [2] - 30:11, 31:6
**invest** [2] - 23:10, 24:20
**investigate** [1] - 74:10
**investigation** [1] - 56:8
**investigators** [1] - 56:15
**issue** [4] - 45:16, 61:23, 62:23, 63:3
**issues** [7] - 35:20, 35:21, 36:4, 36:9, 36:10, 44:14, 75:21
**Italy** [1] - 74:10
**itemize** [1] - 23:14

**J**

**jacket** [1] - 19:4
**JAMES** [1] - 1:3
**January** [3] - 27:6, 39:2, 40:3
**jerked** [1] - 54:4
**Joe** [7] - 53:6, 53:8, 53:11, 53:13, 53:20, 54:18, 55:25
**JOHN** [2] - 1:8, 2:15
**joy** [1] - 26:15
**Judge** [4] - 57:21, 59:8, 73:23
**JUDGE** [1] - 1:3
**judge** [1] - 59:2
**judgment** [1] - 56:17
**Judicial** [1] - 77:12
**Judy** [3] - 5:22, 6:4, 6:7
**JULY** [2] - 1:15, 4:1
**July** [6] - 9:22, 10:7, 10:10, 11:12, 15:14, 77:15
**June** [1] - 7:9
**jurors** [1] - 4:7
**jury** [10] - 4:5, 44:17, 44:18, 45:7, 46:3, 54:19, 56:10, 56:11, 60:23, 76:2
**jury's** [2] - 47:7, 47:14
**justified** [2] - 23:4, 23:24

**K**

**keep** [2] - 12:2, 23:8
**kept** [2] - 21:8, 25:12
**kind** [10] - 17:22, 17:25, 24:18, 25:13, 32:1, 38:17, 53:24, 64:20, 68:14, 69:17
**knowing** [1] - 34:12
**knowledge** [2] - 11:6, 11:9
**known** [1] - 39:18

**L**

**label** [2] - 30:2, 31:16
**lack** [2] - 8:17, 54:4
**ladies** [3] - 4:6, 44:12, 75:16
**larger** [1] - 38:18
**last** [10] - 6:24, 7:1, 36:13, 36:14, 54:20, 55:17, 59:20, 62:18, 63:23, 65:7
**lasted** [2] - 60:2, 60:10
**late** [2] - 10:13, 58:14

**LAW** [1] - 2:17
**law** [1] - 55:11
**lawyer** [4] - 13:1, 26:9, 26:18, 59:15
**lawyers** [1] - 36:5
**leading** [5] - 16:8, 21:2, 32:23, 35:23, 37:5
**learn** [2] - 9:18, 34:11
**learned** [1] - 6:5
**lease** [4] - 15:21, 23:2, 23:23, 39:6
**left** [7] - 4:14, 58:12, 58:16, 64:9, 64:15, 64:19, 65:12
**Legal** [1] - 55:16
**legal** [7] - 13:21, 33:6, 55:21, 56:24, 56:25, 57:3, 67:2
**lengthy** [1] - 29:21
**lesson** [1] - 69:24
**lessons** [1] - 23:17
**letter** [2] - 37:13, 37:15
**life** [7] - 26:11, 26:24, 27:2, 27:4, 30:16, 31:7, 34:24
**limine** [2] - 52:8, 74:13
**limited** [1] - 74:25
**line** [1] - 17:24
**list** [1] - 29:24
**listed** [1] - 38:6
**listened** [1] - 45:15
**literally** [2] - 28:1, 28:3
**litigation** [2] - 56:4, 56:7
**live** [6] - 24:6, 24:17, 28:6, 28:8, 31:17, 40:17
**lived** [1] - 28:7
**living** [6] - 24:3, 37:2, 41:1, 49:21, 50:8, 74:7
**look** [27] - 4:25, 5:12, 5:13, 6:20, 6:22, 9:20, 14:5, 15:6, 15:24, 16:24, 21:16, 25:17, 28:9, 28:23, 47:13, 48:20, 54:15, 55:9, 56:21, 60:8, 61:15, 61:25, 63:23, 64:17, 65:9, 65:25, 72:9
**looked** [2] - 65:20, 66:14
**looking** [8] - 4:14, 12:21, 33:11, 33:15, 38:7, 62:8, 62:12, 65:19
**Los** [1] - 2:12

**LOS** [1] - 77:3
**lost** [1] - 66:6
**lump** [5] - 33:3, 33:5, 33:13, 38:7, 67:1
**lump-sum** [2] - 38:7, 67:1

**M**

**ma'am** [1] - 4:19
**mail** [13] - 3:16, 28:18, 28:25, 29:3, 29:12, 29:14, 29:25, 37:12, 37:16, 37:17, 37:18, 37:23, 47:22, 48:6, 56:12
**majority** [1] - 23:7
**management** [1] - 31:15
**manner** [1] - 36:12
**March** [2] - 40:3, 43:8
**marked** [2] - 43:19, 65:22
**math** [3] - 67:8, 69:24, 69:25
**matter** [4] - 45:15, 56:14, 57:1, 77:11
**matters** [3] - 56:23, 56:25, 57:3
**McLean** [5] - 53:6, 53:8, 53:11, 53:13, 53:20
**mean** [11] - 11:5, 11:24, 18:5, 18:21, 22:4, 24:10, 25:10, 32:6, 46:10, 62:16, 65:1
**meaning** [1] - 50:8
**median** [1] - 33:12
**mediation** [17] - 32:9, 51:4, 57:17, 57:20, 57:23, 58:10, 58:11, 58:12, 58:16, 58:23, 59:6, 66:18, 66:21, 73:10, 73:18, 73:23
**meet** [4] - 30:20, 37:12, 49:8, 57:20
**Meeting** [1] - 3:17
**meeting** [20] - 37:21, 38:9, 38:25, 39:1, 39:8, 49:16, 53:19, 59:11, 59:22, 59:23, 60:2, 60:10, 60:14, 61:16, 61:22, 62:23, 63:2, 63:11, 63:17, 72:3
**Meisinger** [5] - 57:21, 58:1, 59:2, 59:8, 73:23
**memory** [2] - 61:6,

66:12
**mentally** [1] - 34:15
**mentioned** [2] - 14:2, 16:19
**message** [19] - 6:20, 7:11, 9:21, 10:8, 11:11, 16:19, 17:5, 19:11, 19:13, 19:24, 21:17, 26:2, 26:6, 27:20, 28:12, 28:14, 47:7, 47:15
**messages** [30] - 7:24, 14:6, 14:15, 42:11, 42:14, 42:20, 42:22, 43:2, 43:7, 43:10, 43:11, 43:17, 43:24, 43:25, 46:14, 46:22, 46:23, 47:15, 48:19, 48:20, 61:23, 61:24, 62:23, 62:24, 63:4, 63:5, 63:8, 65:22, 65:25, 66:10
**Messages** [1] - 3:14
**messenger** [1] - 56:12
**met** [21] - 5:23, 6:9, 6:12, 24:18, 30:24, 34:13, 36:17, 37:15, 37:16, 38:2, 39:22, 49:10, 51:10, 52:18, 53:8, 53:24, 54:3, 54:10, 60:18, 65:10, 66:16
**Michael** [31] - 4:15, 6:1, 6:17, 7:12, 7:19, 8:22, 9:19, 9:24, 10:12, 11:6, 11:9, 13:9, 14:12, 15:10, 15:18, 16:15, 17:7, 17:11, 17:20, 19:13, 20:3, 21:20, 22:23, 23:15, 28:18, 32:13, 34:18, 35:8, 35:9, 35:19, 36:2
**MICHAEL** [2] - 1:8, 2:15
**Michael's** [2] - 16:25, 24:11
**midafternoon** [1] - 44:11
**might** [3] - 20:16, 52:13, 52:19
**million** [16] - 27:6, 27:12, 33:11, 36:17, 36:23, 37:9, 38:16, 39:2, 41:17, 67:5, 67:10, 67:15, 70:21, 72:22
**millions** [1] - 37:3
**mind** [4] - 15:7, 19:4, 26:6, 56:1

**miniscule** [1] - 24:13
**minute** [2] - 58:11, 71:10
**minutes** [1] - 44:12
**missing** [1] - 43:3
**mistaken** [1] - 15:18
**mix** [1] - 24:21
**mock** [1] - 56:9
**moment** [4] - 19:4, 44:5, 51:11, 72:6
**monetary** [1] - 73:6
**money** [11] - 8:13, 22:17, 23:3, 36:8, 37:3, 37:10, 41:17, 41:20, 41:23, 42:2
**month** [11] - 7:17, 11:2, 11:8, 15:13, 15:22, 67:20, 67:21, 67:23, 67:24, 69:10, 69:13
**monthly** [10] - 24:2, 33:4, 33:19, 35:22, 38:6, 38:19, 39:5, 39:9, 67:16
**months** [18] - 16:2, 23:9, 23:20, 25:8, 25:14, 25:15, 25:16, 28:2, 28:3, 28:4, 33:9, 33:16, 33:18, 36:21, 38:22, 68:2, 68:7
**morning** [1] - 45:18
**most** [2] - 21:7, 59:23
**mother** [13] - 32:13, 32:14, 40:16, 40:18, 41:1, 48:9, 48:11, 48:12, 48:16, 48:21, 48:22, 49:3, 50:7
**motion** [2] - 52:7, 74:13
**motivate** [1] - 9:16
**move** [16] - 21:13, 26:1, 27:24, 28:5, 30:15, 37:7, 40:20, 47:10, 48:24, 50:19, 50:23, 63:14, 71:4, 72:18, 73:3, 73:14
**moved** [2] - 50:21, 51:7
**moves** [2] - 14:19, 29:7
**moving** [2] - 28:8, 30:7
**MR** [122] - 2:16, 4:10, 4:13, 6:10, 6:12, 6:13, 6:16, 8:2, 8:6, 11:18, 11:22, 14:18, 14:20, 14:25, 15:2, 15:6, 16:8, 16:11, 18:6, 18:14, 19:5,

19:8, 21:2, 21:5, 21:13, 21:16, 27:7, 27:10, 29:6, 29:8, 29:14, 32:23, 33:1, 34:2, 34:6, 35:23, 35:25, 37:5, 37:7, 37:9, 40:20, 40:22, 40:25, 41:8, 41:12, 42:4, 42:7, 44:20, 44:23, 45:10, 45:20, 45:25, 46:5, 47:10, 47:12, 48:1, 48:4, 48:24, 49:2, 50:3, 50:6, 52:7, 52:10, 52:21, 53:2, 54:7, 54:9, 54:13, 54:15, 54:18, 58:8, 58:10, 59:4, 59:6, 59:9, 59:11, 59:24, 60:1, 60:5, 60:7, 61:25, 62:2, 62:4, 62:6, 62:8, 62:15, 62:18, 62:25, 63:14, 63:17, 67:11, 67:14, 68:25, 69:3, 69:5, 69:7, 69:9, 69:25, 70:7, 71:4, 71:7, 71:9, 71:11, 71:14, 71:25, 72:6, 72:9, 72:18, 72:21, 73:3, 73:5, 73:14, 73:16, 74:12, 74:15, 74:25, 75:3, 75:7, 76:4, 76:6, 76:8, 76:10
**multiple** [1] - 16:14
**music** [13] - 12:9, 12:13, 12:24, 13:13, 23:16, 24:20, 27:25, 30:5, 30:8, 30:10, 30:11, 36:23, 36:25
**musical** [3] - 30:22, 30:25, 31:19

# N

**name** [2] - 59:19, 59:20
**NDA** [3] - 52:6, 52:19, 52:25
**necessary** [3] - 14:25, 56:13, 56:17
**need** [10] - 6:20, 7:21, 13:20, 26:13, 27:11, 31:1, 45:17, 64:20, 65:5, 68:23
**needed** [1] - 35:25
**needs** [2] - 45:17, 45:22
**negative** [3] - 22:13, 22:14, 24:15

**negotiated** [1] - 55:11
**never** [3] - 5:23, 6:4, 6:9
**new** [3] - 23:23, 65:7, 66:7
**Newport** [2] - 2:19, 17:1
**news** [1] - 24:11
**next** [15] - 6:22, 7:18, 17:6, 17:9, 22:7, 25:18, 25:19, 28:14, 31:21, 33:1, 34:23, 36:13, 45:4, 45:12, 73:18
**nice** [1] - 69:23
**NICOLA** [2] - 2:4, 2:9
**night** [2] - 50:10, 58:14
**nobody** [1] - 9:1
**non** [1] - 21:14
**non-responsive** [1] - 21:14
**nonresponsive** [4] - 40:21, 48:25, 71:5, 72:18
**North** [1] - 2:11
**nothing** [2] - 37:11, 76:8
**notice** [2] - 15:5, 29:10
**November** [1] - 26:2
**number** [3] - 38:12, 64:20, 67:5
**Number** [2] - 14:24, 29:13
**numbers** [8] - 6:24, 7:1, 39:24, 67:7, 69:17, 70:6, 70:21, 71:2

# O

**oath** [1] - 60:23
**objection** [16] - 11:18, 14:20, 16:8, 18:6, 27:7, 29:8, 34:2, 40:20, 50:3, 52:7, 52:21, 54:7, 54:13, 59:4, 59:24, 74:12
**objections** [1] - 15:3
**obtain** [1] - 35:21
**October** [5] - 20:22, 21:17, 25:18, 25:19, 25:20
**OF** [7] - 1:2, 1:5, 1:14, 2:1, 77:1, 77:3, 77:4
**offices** [2] - 58:12, 58:16
**OFFICES** [1] - 2:17
**Official** [1] - 77:20

**OFFICIAL** [3] - 1:24, 77:1, 77:5
**once** [1] - 40:9
**one** [16] - 7:9, 15:22, 23:1, 42:22, 44:3, 45:15, 60:25, 64:3, 65:20, 65:23, 66:7, 70:2, 72:6, 74:9, 75:5
**oOo** [1] - 76:13
**opinions** [2] - 44:14, 75:21
**opposite** [2] - 32:10
**option** [1] - 32:11
**options** [3] - 21:6, 30:17, 33:15
**OR** [1] - 3:13
**order** [1] - 74:10
**original** [3] - 13:24, 33:5, 35:12
**otherwise** [1] - 20:19
**out-of-pocket** [1] - 56:4
**outside** [3] - 49:11, 49:13, 73:1
**overruled** [15] - 6:14, 8:4, 11:20, 16:9, 18:8, 21:3, 27:8, 32:24, 34:4, 40:24, 41:10, 52:9, 52:22, 67:12, 74:14
**Overview** [1] - 3:17
**owe** [1] - 55:21
**own** [3] - 23:1, 24:6, 28:6
**owning** [1] - 23:6

# P

**P.M** [2] - 1:16, 4:2
**p.m** [5] - 7:13, 17:10, 46:2, 76:12
**Pacific** [1] - 7:13
**package** [1] - 31:16
**packet** [1] - 27:17
**PAGE** [1] - 3:2
**page** [45] - 4:19, 5:13, 6:22, 7:7, 7:18, 9:20, 12:21, 12:22, 14:7, 14:14, 15:6, 17:5, 19:2, 19:8, 19:3, 21:16, 22:8, 22:21, 22:22, 23:22, 24:8, 25:17, 25:18, 25:19, 25:20, 26:1, 26:3, 27:19, 28:9, 28:11, 28:15, 29:17, 29:25, 31:8, 34:6, 38:13, 54:20, 54:21, 60:8, 77:11

**pages** [3] - 14:19, 22:7, 43:5
**paging** [1] - 47:18
**paid** [8] - 15:19, 27:6, 33:7, 36:4, 36:7, 39:2, 51:19, 67:16
**painfully** [1] - 72:23
**paperwork** [22] - 13:2
**paragraph** [22] - 29:18, 31:12, 31:21, 33:1, 33:2, 34:9, 36:14, 55:9, 55:15, 55:17, 55:24, 56:1, 56:18, 56:21, 56:22, 57:11, 57:15, 61:15, 63:23, 64:17, 65:9
**parked** [3] - 49:21, 58:21, 58:24
**part** [9] - 21:7, 27:23, 31:11, 38:21, 42:15, 42:20, 48:19, 52:2, 54:5
**particular** [1] - 51:11
**particularly** [1] - 21:11
**passed** [1] - 33:8
**past** [2] - 23:9, 30:19
**patient** [1] - 25:13
**pattern** [7] - 10:15, 10:22, 10:24, 10:25, 11:2, 11:10, 11:14
**Pause** [1] - 19:6
**pay** [4] - 22:25, 23:9, 23:17, 36:3
**paying** [1] - 51:18
**payment** [3] - 38:22, 57:5, 67:1
**payments** [10] - 9:17, 24:2, 33:9, 38:6, 38:19, 38:23, 39:5, 67:16, 67:19, 69:13
**payout** [2] - 33:13, 38:7
**pencil** [1] - 67:8, 69:18
**Peninsula** [1] - 58:20
**people** [4] - 12:24, 30:16, 52:5, 52:24
**per** [3] - 6:4, 53:18, 61:21
**percent** [6] - 33:6, 67:1, 67:4, 67:10, 73:2, 74:4
**percentage** [2] - 73:1, 73:7
**Perfect** [1] - 13:5
**perfect** [3] - 13:15, 31:12, 31:14
**perform** [1] - 57:6
**period** [3] - 38:6, 48:8, 59:7
**person** [5] - 6:12,

26:22, 35:3, 37:23, 49:3
**personally** [1] - 5:23
**phenomenal** [1] - 26:9
**phone** [20] - 17:16, 17:18, 18:15, 18:17, 18:18, 19:10, 22:5, 35:6, 42:21, 46:9, 46:10, 46:13, 46:18, 46:22, 63:9, 65:23, 65:25, 66:10, 66:14
**phones** [2] - 65:11, 65:20
**photocopying** [1] - 56:9
**physically** [2] - 46:18, 46:22
**picked** [1] - 22:5
**pitch** [1] - 31:16
**place** [7] - 16:21, 24:6, 24:17, 28:6, 34:15, 35:4, 44:24
**Plaintiff** [1] - 1:6
**PLAINTIFF** [1] - 2:3
**plan** [2] - 27:24, 28:5
**plane** [2] - 41:17, 42:2
**planning** [1] - 45:21
**Plaza** [1] - 2:18
**plus** [2] - 69:16, 70:19
**pocket** [1] - 56:4
**point** [15] - 15:1, 16:13, 16:17, 30:15, 32:3, 36:22, 38:9, 40:2, 41:16, 44:9, 45:7, 46:5, 58:8, 64:3, 71:14
**portion** [2] - 21:14, 67:15
**portions** [1] - 46:13
**position** [1] - 32:2
**possible** [2] - 48:3, 49:4
**postage** [1] - 56:13
**potentially** [2] - 34:21, 49:4
**practice** [1] - 55:4
**Practices** [1] - 55:16
**preceding** [2] - 54:12, 55:15
**presence** [4] - 4:5, 44:17, 46:3, 76:2
**present** [2] - 58:4, 61:17
**presidency** [1] - 15:11
**president** [1] - 26:10
**presumed** [1] - 21:11
**pretty** [2] - 8:14, 70:2
**primarily** [1] - 16:1
**private** [1] - 32:9, 41:17, 42:2
**privilege** [3] - 74:17,

74:20, 75:5
**PRO** [1] - 2:14
**problem** [4] - 19:5, 19:19, 25:2, 69:19
**problems** [12] - 23:13, 24:9, 24:13, 24:14, 24:24, 25:1, 25:3, 25:4
**Proceedings** [1] - 76:12
**proceedings** [2] - 19:6, 77:10
**PROCEEDINGS** [1] - 1:14
**proceeds** [1] - 56:5
**process** [1] - 66:3
**produce** [1] - 66:3
**produced** [1] - 66:10
**producer** [2] - 23:18, 24:22
**professional** [1] - 34:11
**project** [1] - 44:24
**projected** [1] - 45:3
**proper** [1] - 62:5
**protect** [1] - 30:10
**provide** [3] - 41:3, 72:23, 73:5
**provided** [10] - 42:18, 43:10, 43:18, 48:19, 55:22, 57:1, 65:2, 70:25, 72:12, 72:22
**providing** [2] - 42:19, 45:12
**provision** [2] - 55:17, 57:4
**proximity** [1] - 49:24
**PST** [1] - 7:13
**public** [4] - 9:12, 9:14, 24:12, 32:3
**publicly** [6] - 31:24, 32:5, 32:7, 32:8, 32:12, 32:17
**pursuant** [1] - 77:8
**pursuing** [2] - 12:9, 12:13
**push** [2] - 17:8, 31:14
**pushing** [1] - 32:3
**put** [4] - 6:18, 19:4, 31:15, 37:18

**Q**

**quality** [1] - 34:12
**questions** [11] - 20:17, 20:20, 20:24, 23:22, 42:4, 49:16, 57:17, 58:2, 59:23, 62:3, 62:6
**quite** [1] - 42:11

**R**

**racing** [1] - 44:10
**rates** [1] - 55:10
**rather** [2] - 23:9, 33:4
**re** [1] - 3:16
**reach** [13] - 10:16, 10:23, 11:4, 11:5, 11:8, 11:9, 11:15, 11:16, 15:10, 15:16, 16:11, 49:4, 53:20
**reached** [3] - 11:6, 13:12, 17:14
**reaching** [5] - 8:8, 11:7, 16:6, 16:12, 17:12
**reaction** [1] - 49:25
**read** [16] - 10:10, 22:22, 28:17, 29:19, 31:11, 31:21, 33:2, 34:9, 36:13, 36:14, 37:25, 54:24, 55:13, 57:8, 62:18, 62:21
**reading** [3] - 15:7, 26:7, 56:1
**reads** [2] - 55:9, 56:22
**ready** [3] - 30:15, 34:23, 38:1
**realistic** [1] - 50:22
**really** [8] - 6:3, 8:16, 9:1, 15:11, 24:16, 34:10, 45:17, 63:13
**REALTIME** [1] - 77:5
**reason** [3] - 40:12, 40:19, 75:5
**reasonable** [2] - 55:21, 56:15
**reasonably** [1] - 56:16
**reasons** [2] - 16:14, 40:22
**reassured** [2] - 9:2, 17:25
**reassuring** [1] - 21:9
**receive** [7] - 7:16, 7:17, 11:1, 11:3, 15:14, 35:16, 35:17
**received** [23] - 4:24, 7:14, 9:25, 10:13, 10:17, 11:25, 14:22, 14:24, 15:4, 15:13, 19:14, 20:4, 22:2, 22:17, 25:16, 28:4, 29:10, 29:13, 33:16, 33:17, 36:21, 41:22, 56:6
**receiving** [3] - 7:24, 7:25, 25:24
**Recess** [1] - 46:2
**recess** [1] - 44:12
**recollection** [22] - 6:8,

13:7, 43:5, 43:9, 43:17, 48:5, 48:18, 59:21, 60:9, 61:9, 61:22, 62:13, 62:22, 63:2, 63:24, 64:18, 65:10, 65:15, 71:1, 71:20, 71:22, 72:5
**record** [8] - 12:25, 30:2, 47:17, 56:2, 62:21, 72:8, 76:3, 76:5
**recover** [1] - 33:15
**recovered** [2] - 73:13, 74:2
**reference** [2] - 10:4, 37:25
**referenced** [2] - 5:17, 37:3
**referencing** [2] - 29:15, 39:6
**referring** [5] - 7:15, 16:4, 21:22, 26:18, 36:10
**reflect** [1] - 47:17
**refresh** [4] - 61:6, 62:13, 65:9, 66:12
**refreshes** [1] - 60:9, 63:24, 64:17
**regarding** [2] - 31:23, 32:4
**regards** [10] - 6:3, 15:12, 16:3, 22:2, 31:22, 38:21, 47:19, 47:21, 47:22, 52:23
**Regnier** [4] - 5:22, 6:7, 6:18, 7:5
**regular** [3] - 48:10, 48:13, 75:18
**regularly** [1] - 48:15
**regulations** [1] - 77:12
**reimburse** [1] - 56:4
**REJECTED** [1] - 3:13
**relate** [1] - 32:20
**related** [5] - 24:24, 49:17, 56:23, 56:24, 57:3
**relating** [2] - 55:17, 72:24
**relationship** [1] - 35:8
**remaining** [1] - 67:15
**remember** [20] - 6:3, 9:13, 13:7, 13:8, 17:16, 38:16, 38:17, 43:12, 44:13, 57:18, 58:14, 58:16, 60:14, 63:13, 64:12, 64:14, 64:16, 66:18, 71:19, 75:20
**remind** [1] - 4:17
**reminded** [1] - 17:22

**rent** [2] - 15:19, 39:20
**rental** [1] - 16:20
**repeat** [3] - 16:10, 65:6, 70:16
**rephrase** [1] - 57:24
**replied** [1] - 16:23
**replies** [2] - 7:18, 13:5
**reply** [3] - 7:21, 19:18, 28:21
**report** [1] - 47:4
**reported** [1] - 77:10
**REPORTER** [3] - 1:24, 77:1, 77:6
**Reporter** [1] - 77:20
**reporter** [1] - 71:11
**REPORTER'S** [1] - 1:14
**represented** [2] - 59:15, 74:23
**representing** [3] - 48:9, 49:4, 75:9
**represents** [1] - 56:23
**request** [1] - 61:11
**requested** [2] - 48:6, 61:11
**require** [1] - 56:25
**required** [1] - 57:5
**research** [3] - 44:15, 56:10, 75:23
**resolution** [1] - 54:11
**resolve** [1] - 51:25
**respond** [1] - 5:8
**responded** [1] - 4:7
**response** [8] - 7:20, 11:11, 11:14, 11:16, 47:2, 68:3, 70:14, 74:22
**responses** [2] - 5:1, 5:4
**responsive** [1] - 21:14
**rest** [2] - 15:5, 33:10
**results** [1] - 16:16
**resume** [2] - 75:17, 75:18
**RESUMED** [1] - 4:11
**review** [1] - 55:4
**revisit** [1] - 45:16
**rise** [2] - 44:16, 76:1
**road** [1] - 15:11
**ROOM** [1] - 1:24
**room** [1] - 58:3
**roughly** [2] - 51:1, 51:4
**round** [1] - 49:13
**row** [1] - 4:25
**ruling** [2] - 52:8, 74:13
**run** [1] - 29:20

**S**

**SACR-19-00061-JVS** [1] - 1:7
**SAGEL** [50] - 2:5, 4:10, 4:13, 6:12, 6:16, 11:22, 14:18, 14:25, 15:6, 16:11, 18:14, 19:5, 19:8, 21:5, 21:16, 27:10, 29:6, 29:14, 33:1, 34:6, 35:25, 37:9, 40:22, 40:25, 41:12, 42:4, 44:23, 45:20, 45:25, 48:1, 50:3, 52:7, 52:21, 54:7, 54:13, 58:8, 59:4, 59:9, 59:24, 61:25, 62:4, 67:11, 68:25, 69:5, 71:7, 74:12, 74:25, 75:3, 76:6, 76:8
**Sagel** [15] - 3:3, 4:9, 42:11, 42:14, 42:19, 46:17, 57:18, 59:18, 61:1, 63:18, 63:25, 65:16, 66:20, 67:9, 72:10
**SANTA** [3] - 1:17, 1:25, 4:1
**Santa** [1] - 2:7
**sat** [3] - 49:11, 49:12, 49:15
**scary** [1] - 63:12
**schedule** [1] - 16:25
**school** [5] - 24:19, 36:22, 51:11, 51:13, 51:18
**screenshot** [3] - 22:9, 22:20, 42:22
**se** [2] - 6:4, 53:18
**SE** [1] - 2:14
**search** [1] - 64:8
**second** [3] - 27:20, 28:7, 64:20
**Section** [1] - 77:8
**section** [7] - 30:3, 30:10, 31:9, 34:7, 38:2, 38:5, 38:25
**sections** [1] - 30:2
**see** [23] - 5:1, 6:24, 8:16, 9:21, 11:13, 11:22, 11:25, 12:1, 15:25, 16:1, 17:3, 21:18, 26:2, 26:15, 28:11, 28:23, 34:7, 55:18, 68:9, 68:10, 68:13, 68:22
**seeks** [1] - 18:7
**SEGAL** [1] - 8:6

**SELNA** [1] - 1:3
**send** [12] - 9:16, 10:8, 11:8, 11:9, 13:3, 19:11, 19:24, 22:9, 41:25, 47:19, 47:21
**sending** [9] - 7:23, 10:16, 10:22, 11:15, 22:12, 22:14, 43:21, 47:22, 48:5
**sense** [1] - 45:11
**sent** [25] - 4:15, 4:22, 6:17, 6:21, 7:4, 7:8, 9:21, 10:10, 12:1, 13:8, 15:8, 15:21, 15:23, 22:22, 25:20, 26:6, 28:11, 28:14, 28:18, 28:25, 29:4, 29:11, 37:12, 43:5, 43:22
**sentence** [2] - 36:13, 36:15
**sentences** [2] - 29:19, 63:23
**separate** [2] - 13:21, 57:4
**separately** [1] - 13:21
**September** [3] - 19:24, 20:22, 22:24
**serious** [1] - 43:14
**services** [5] - 35:12, 55:21, 56:25, 57:4, 57:5
**set** [2] - 55:10
**settle** [4] - 33:3, 33:12, 52:12, 52:19
**settled** [1] - 50:14
**settlement** [25] - 13:18, 13:25, 20:23, 31:1, 33:22, 34:1, 39:23, 40:4, 40:7, 41:4, 41:7, 41:17, 41:23, 42:2, 47:8, 47:16, 61:2, 61:11, 61:18, 66:17, 66:22, 70:25, 72:4, 72:10, 72:16
**seven** [6] - 28:2, 28:3, 28:4, 45:1, 68:6
**several** [1] - 4:25
**share** [2] - 40:18, 50:7
**sharing** [1] - 30:14
**shocked** [1] - 50:1
**short** [1] - 45:20
**short-circuits** [1] - 45:20
**show** [4] - 13:24, 22:16, 61:7, 69:6
**sic** [1] - 25:21
**side** [3] - 11:16, 12:5, 32:9

**sign** [4] - 52:6, 52:19, 52:25, 74:25
**signature** [1] - 54:20, 54:21
**signed** [8] - 12:19, 54:24, 55:3, 55:4, 55:7, 56:18, 57:10, 57:14
**sit** [2] - 49:13, 66:9
**sitting** [1] - 24:22
**situation** [4] - 48:10, 49:17, 50:7, 50:8, 50:22, 74:7
**six** [1] - 44:25
**skipped** [1] - 28:10
**slightly** [1] - 20:23
**small** [1] - 24:13
**Sofitel** [3] - 50:10, 50:14, 50:17
**solution** [1] - 20:25
**solve** [1] - 36:4
**solved** [1] - 36:9
**someone** [5] - 15:16, 18:12, 24:18, 46:12, 52:25
**sooner** [1] - 36:9
**sorry** [18] - 7:24, 9:15, 10:13, 16:24, 19:2, 22:11, 25:2, 25:19, 37:16, 40:15, 44:4, 47:20, 64:6, 64:13, 67:24, 70:16, 71:12, 71:21
**sound** [3] - 67:10, 68:20, 69:14
**SOUTHERN** [1] - 1:2
**Spaan** [1] - 77:20
**SPAAN** [3] - 1:23, 77:5, 77:19
**span** [1] - 43:20
**speaking** [2] - 24:4, 52:23
**special** [3] - 45:17, 45:21, 59:20
**Special** [2] - 46:17, 59:18
**specific** [2] - 18:21, 53:16
**specifically** [6] - 13:9, 38:11, 38:17, 51:2, 58:13, 63:5
**Speiser** [1] - 51:14
**spent** [1] - 42:11
**spoken** [2] - 6:4, 39:4
**Spring** [1] - 2:11
**STAND** [1] - 4:11
**Standard** [1] - 7:13
**STANDBY** [1] - 2:16
**standpoint** [1] - 22:18
**stands** [1] - 60:11

**sign** — (continued)
**Starbucks** [8] - 36:18, 37:1, 49:10, 49:14, 49:21, 49:23, 52:18, 55:1
**start** [5] - 26:17, 29:17, 31:11, 34:25, 37:17
**started** [3] - 34:25, 36:17, 36:24
**starting** [2] - 22:8, 22:21
**starts** [6] - 26:3, 28:12, 29:18, 33:1, 36:14, 36:15
**STATE** [1] - 77:4
**statement** [2] - 22:9, 22:12, 63:21
**States** [7] - 2:4, 2:5, 2:9, 2:10, 77:6, 77:8, 77:13
**STATES** [2] - 1:1, 1:5
**stay** [2] - 50:17, 50:25
**stayed** [1] - 51:1
**stenographically** [1] - 77:10
**STEWARD** [3] - 2:17, 2:18, 76:4
**still** [8] - 11:13, 11:25, 12:9, 16:4, 18:1, 19:14, 34:13, 62:8
**Still** [1] - 11:22
**stood** [1] - 5:19
**straightforward** [1] - 70:2
**strange** [1] - 35:4
**Street** [2] - 2:6, 2:11
**STREET** [1] - 1:24
**stressed** [2] - 22:24, 23:14
**stretched** [1] - 33:7
**stricken** [9] - 21:15, 37:8, 47:11, 49:1, 63:16, 71:6, 71:13, 72:20, 73:15
**strike** [17] - 21:13, 37:7, 40:21, 47:10, 47:23, 48:24, 59:22, 60:1, 60:13, 62:25, 63:14, 65:7, 66:3, 71:4, 72:18, 73:3, 73:14
**stuck** [1] - 22:25
**studied** [1] - 36:22
**studio** [1] - 24:20
**Studio** [1] - 51:14
**Sturges** [1] - 51:14
**submitted** [2] - 44:15, 75:22
**subsequent** [1] - 51:7
**subsequently** [1] -

**UNITED STATES DISTRICT COURT**

50:10
**succeed** [1] - 8:16
**success** [1] - 26:15
**Suite** [3] - 2:6, 2:11, 2:19
**sum** [5] - 33:4, 33:5, 33:13, 38:7, 67:1
**Sunset** [1] - 51:5
**supposed** [9] - 7:17, 15:14, 15:17, 15:21, 16:20, 35:17, 39:9, 40:18, 41:14
**sustained** [10] - 6:11, 35:24, 37:6, 50:5, 54:8, 54:14, 58:9, 59:5, 59:10, 59:25

**T**

**table** [3] - 34:21, 49:11, 49:13
**talks** [1] - 55:20
**team** [1] - 20:9
**telephone** [1] - 56:11
**term** [4] - 32:18, 52:4, 54:4
**terms** [5] - 39:19, 40:17, 41:6, 48:23, 66:17
**test** [1] - 69:25
**testified** [2] - 43:13, 49:2
**testimony** [5] - 18:7, 43:23, 45:16, 48:14, 50:13
**Text** [1] - 3:14
**text** [60] - 4:15, 5:3, 5:10, 6:20, 7:8, 7:11, 7:23, 7:24, 9:21, 10:8, 11:11, 12:22, 14:5, 14:15, 15:7, 16:19, 17:6, 19:11, 19:13, 19:24, 21:17, 22:7, 26:1, 26:2, 26:5, 27:17, 27:20, 28:11, 28:14, 42:11, 42:14, 42:19, 42:21, 43:2, 43:7, 43:10, 43:11, 43:17, 43:23, 43:24, 46:13, 46:22, 46:23, 47:7, 47:15, 47:19, 47:21, 48:17, 48:19, 48:20, 61:23, 62:23, 63:4, 63:5, 63:8, 65:22, 65:25, 66:10
**texted** [1] - 20:6
**texting** [1] - 14:10
**texts** [3] - 5:1, 28:10, 43:18

**thanked** [1] - 27:10
**thankful** [1] - 26:11
**thankfully** [1] - 71:25
**Thanksgiving** [3] - 26:6, 26:7, 26:10
**THE** [94] - 2:3, 2:14, 3:3, 4:6, 4:9, 4:11, 6:11, 6:14, 6:15, 8:4, 8:5, 11:20, 11:21, 14:22, 15:4, 16:9, 16:10, 18:8, 18:9, 19:7, 21:3, 21:4, 21:15, 27:8, 27:9, 29:10, 32:24, 32:25, 34:4, 34:5, 35:24, 37:6, 37:8, 40:24, 41:9, 41:10, 41:11, 42:5, 44:8, 44:10, 44:11, 44:16, 44:18, 44:22, 45:6, 45:14, 45:23, 46:1, 46:4, 47:11, 48:3, 49:1, 50:5, 52:9, 52:22, 52:23, 54:8, 54:14, 58:9, 59:5, 59:10, 59:25, 60:6, 62:7, 62:12, 62:14, 62:20, 63:16, 67:12, 67:13, 69:6, 69:8, 69:21, 69:23, 70:3, 70:6, 71:6, 71:10, 71:13, 71:23, 72:20, 73:4, 73:15, 74:14, 74:20, 74:22, 74:23, 75:2, 75:15, 76:1, 76:3, 76:5, 76:7, 76:11
**thinking** [2] - 74:16, 75:4
**thoughts** [1] - 75:24
**thousand** [1] - 5:19
**threat** [1] - 32:8
**three** [1] - 22:7
**throughout** [1] - 12:7
**tight** [3] - 23:20, 25:8, 25:11
**timely** [1] - 36:12
**Title** [1] - 77:8
**today** [4] - 45:1, 65:17, 66:9, 75:10
**together** [2] - 37:18, 57:14
**toll** [1] - 56:11
**Tom** [15] - 13:10, 14:2, 14:6, 14:10, 14:15, 15:4, 15:8, 15:9, 16:12, 17:11, 17:14, 17:21, 17:23, 50:13
**tomorrow** [3] - 15:15, 75:17, 75:18
**took** [2] - 51:3, 60:22

**top** [9] - 5:14, 7:18, 9:21, 12:22, 15:6, 21:17, 28:15, 29:17, 31:8
**total** [2] - 33:11, 66:22, 72:4
**totaling** [1] - 33:9
**touch** [1] - 7:14
**touches** [1] - 31:15
**towards** [1] - 54:11
**track** [1] - 15:25
**traction** [1] - 54:11
**transcript** [2] - 77:9, 77:11
**TRANSCRIPT** [2] - 1:6, 1:14
**transition** [1] - 31:17
**transportation** [1] - 24:17
**travel** [1] - 56:12
**TRIAL** [1] - 1:8
**trial** [2] - 56:5, 56:11
**trials** [1] - 56:9
**tried** [1] - 22:3
**trigger** [1] - 38:17
**trip** [1] - 74:9
**true** [7] - 26:13, 27:11, 29:3, 41:6, 60:25, 61:16, 77:9
**trusts** [1] - 45:17
**truth** [3] - 14:23, 15:5, 29:11
**try** [1] - 12:17
**trying** [5] - 9:15, 20:25, 23:15, 52:18, 52:24
**Tuesday** [2] - 45:18, 75:17, 75:18
**turn** [10] - 7:7, 17:5, 19:1, 19:23, 31:8, 42:10, 62:10, 62:13, 62:16, 63:8
**turned** [2] - 42:21, 62:15
**two** [15] - 16:1, 19:2, 19:10, 29:19, 29:25, 33:8, 33:21, 40:3, 45:4, 51:1, 51:4, 63:23, 65:11, 65:20, 70:21
**two-page** [1] - 29:25
**typical** [1] - 5:6

**U**

**U.S** [2] - 1:3, 59:19
**under** [4] - 34:9, 55:15, 57:1, 69:5
**understood** [9] - 18:24, 42:25, 43:14,

49:3, 60:21, 66:17, 66:25, 67:15, 73:22
**unfamiliar** [1] - 63:21
**unfortunately** [1] - 20:17
**United** [7] - 2:4, 2:5, 2:9, 2:10, 77:6, 77:8, 77:13
**UNITED** [2] - 1:1, 1:5
**unknown** [1] - 56:23
**unless** [3] - 10:16, 10:22, 11:15
**Unless** [2] - 11:4, 11:5
**unpaid** [1] - 32:20
**up** [15] - 10:13, 15:21, 20:3, 21:20, 21:25, 22:5, 23:2, 23:8, 39:5, 45:18, 50:10, 54:18, 61:24, 62:24, 63:3
**update** [1] - 44:19
**upset** [3] - 17:20, 18:3, 18:5

**V**

**various** [1] - 30:2
**verbally** [1] - 47:9
**vision** [2] - 30:5, 68:17
**vocal** [2] - 23:17, 24:21
**voicemails** [11] - 64:4, 64:8, 64:11, 64:15, 64:18, 65:11, 65:12, 65:14, 65:16, 65:20, 66:14
**VOLUME** [1] - 1:9
**volunteered** [1] - 46:15
**vs** [1] - 1:7

**W**

**wait** [2] - 25:13, 26:15
**waiting** [2] - 44:22, 65:2
**waived** [1] - 74:24
**waiver** [1] - 74:25
**week** [4] - 45:4, 45:5, 50:19, 75:17
**weekend** [3] - 25:22, 75:25, 76:11
**weeks** [3] - 10:7, 51:1, 51:4
**well-being** [1] - 31:7
**West** [4] - 2:6, 49:11, 49:14, 50:20
**WEST** [1] - 1:24
**wherein** [2] - 47:15, 48:6

**Whiteside** [15] - 13:18, 27:5, 31:2, 39:2, 49:17, 51:20, 52:1, 52:4, 52:13, 52:20, 53:15, 53:25, 54:5, 63:19, 74:11
**Whiteside's** [1] - 52:18
**whole** [2] - 31:16, 65:1
**wholeheartedly** [1] - 8:24
**willing** [1] - 30:20
**withdrawal** [1] - 55:18
**WITHDRAWN** [1] - 3:12
**witness** [3] - 45:12, 47:17, 70:4
**WITNESS** [21] - 4:11, 6:15, 8:5, 11:21, 16:10, 18:9, 19:7, 21:4, 27:9, 32:25, 34:5, 41:9, 41:11, 44:10, 52:23, 62:14, 67:13, 69:8, 69:23, 70:6, 74:22
**witness's** [1] - 18:7
**witnesses** [2] - 45:3, 56:16
**WITNESSES** [1] - 3:2
**women** [1] - 32:2
**wondering** [2] - 15:12, 15:16
**word** [2] - 57:10, 57:13
**words** [4] - 38:11, 53:16, 57:13, 61:13
**world** [6] - 31:13, 31:14, 31:21, 31:22, 31:25, 32:1
**worried** [2] - 23:2, 23:24
**worry** [1] - 74:5
**worth** [3] - 34:19, 35:10, 35:15
**write** [1] - 17:10
**writing** [5] - 33:14, 61:3, 61:12, 61:13, 61:18
**written** [6] - 57:10, 57:14, 67:5, 68:9, 68:18, 69:1
**wrote** [9] - 13:15, 17:9, 20:2, 22:3, 26:7, 28:17, 33:24, 38:10, 38:11
**WYMAN** [1] - 2:10

**Y**

**year** [17] - 12:12,

15:19, 20:22, 27:13,
33:10, 38:6, 39:20,
40:16, 52:2, 52:17,
54:6, 54:12, 64:19,
67:20, 68:2, 69:10,
69:13
**years** [11] - 30:19,
33:8, 33:11, 33:21,
40:3, 43:12, 43:20,
61:14, 67:17, 67:20,
68:6
**yes-or-no** [2] - 59:8,
63:25
**young** [1] - 35:4

UNITED STATES DISTRICT COURT