Michael John Avenatti (Pro Se)

H. Dean Steward, SBN 85317
17 Corporate Plaza, Suite 254
Newport Beach, California 92660
Tel (949) 481-4900
Fax (949) 497-6753

Advisory Counsel for Defendant
MICHAEL JOHN AVENATTI

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL JOHN AVENATTI,<br><br>Defendant. | SA CR No. 19-061-JVS<br><br>DEFENDANT'S SUBMISSION REGARDING THE COURT'S RESTRICTIONS ON CROSS-EXAMINATION IN VIOLATION OF DEFENDANT'S SIXTH AMENDMENT RIGHTS |

Defendant MICHAEL JOHN AVENATTI ("Mr. Avenatti") by and through his counsel of record, H. Dean Steward, hereby files this submission regarding the Court's restrictions on Mr. Avenatti's cross-examinations of government witnesses Mr. Joel Weiner and Ms. Alexis Gardner in violation of defendant's Sixth Amendment rights.

Dated:  August 2, 2021

Respectfully submitted,

/s/ Michael J. Avenatti

Defendant
MICHAEL JOHN AVENATTI

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

The Sixth Amendment provides that a person accused of a crime has the right to confront each witness against him in a criminal action.  The Confrontation Clause found in the Sixth Amendment provides that "in all criminal prosecutions, the accused shall enjoy the right…to be confronted with the witnesses against him." The purpose of the Clause is straightforward – it is intended to prevent the conviction of a defendant without that defendant having an opportunity to face his or her accusers and to put their honesty and truthfulness to test before the jury.  This right expressly includes the right to cross-examine each of the prosecution's witnesses as to the topics raised on direct by the prosecution.

Despite this right, on repeated occasions thus far during the trial, the Court has restricted defendant from inquiring into subjects first raised by the government on direct examination.  Most recently, this occurred during the cross-examination of Mr. Joel Weiner and Ms. Alexis Gardner on Friday, July 30, 2021.  The restrictions imposed on Mr. Avenatti lacked a reasonable basis, were unduly prejudicial and violated Mr. Avenatti's rights as guaranteed under the Sixth Amendment.

## II.   LEGAL STANDARD

In *Pointer v. Texas*, 380 U.S. 400 (1965), the Supreme Court held, in an unanimous decision, that it "cannot seriously be doubted at this late date that the right of cross-examination is included in the right of an accused in a criminal case to confront the witnesses against him." *Id.*, at 404. Citing and quoting from such cases as *Kirby v. United States*, 174 U.S. 47 (1899), *Alford v. United States*, 282 U.S. 687 (1931), *Greene v. McElroy*, 360 U.S. 474 (1959), *In re Oliver*, 333 U.S. 257 (1948), and *Turner v. Louisiana*, 379 U.S. 466 (1965), the Court observed that "[there] are few subjects,

perhaps, upon which this Court and other courts have been more nearly unanimous than in the expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." *Pointer*, 380 U.S. at 405.

The Supreme Court reaffirmed the importance of cross-examination twenty years later in the case of *Lee v. Illinois*, 476 U.S. 530, 540 (1986), stating as follows:

> On one level, the right to confront and cross-examine adverse witnesses contributes to the establishment of a system of criminal justice in which the perception as well as the reality of fairness prevails. To foster such a system, the Constitution provides certain safeguards to promote to the greatest possible degree society's interest **in having the accused and accuser engage in an open and even contest in a public trial**. The Confrontation Clause advances these goals by ensuring that convictions will not be based on the charges of unseen and unknown -- and hence unchallengeable -- individuals.
>
> **But the confrontation guarantee serves not only symbolic goals. The right to confront and to cross-examine witnesses is primarily a functional right that promotes reliability in criminal trials.** In *California v. Green*, 399 U.S. 149, 158 (1970), we identified how the mechanisms of confrontation and cross-examination advance the pursuit of truth in criminal trials. Confrontation, we noted, "(1) insures that the witness will give his statements under oath -- thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) **forces the witness to submit to cross-examination, the 'greatest legal engine ever invented for the discovery of truth'**; (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness making his statement, thus aiding the jury in assessing his credibility' (footnote omitted). *Ibid.*

(emphasis added).

Moreover, the Court and the Ninth Circuit have made clear that a defendant is to be given wide latitude when cross-examining a witness. *See, e.g., Smith v. Illinois*, 390 U.S. 129 (1968); *United States v. Uramoto*, 638 F.2d 84 (9th Cir. 1980). The Ninth Circuit's decision in *Uramoto* is instructive. There, the Court held as follows:

2

We have repeatedly insisted that wide latitude be given to defendants in their cross-examination of key prosecution witnesses, *see United States v. Bleckner*, 601 F.2d 382, 385 (9th Cir. 1979); *United States v. Stanfield*, 521 F.2d 1122, 1128 (9th Cir. 1975) . . . We have found cross-examination impermissibly limited both when the defendant was not given adequate scope to impeach a witness's credibility, *see, e.g., Burr v. Sullivan*, 618 F.2d 583, 587-88 (9th Cir. 1980) (arson defendant has right to cross-examine juvenile witnesses concerning their admission of 100 burglaries to show their bias), and when matters clearly relevant to crucial issues were excluded, *see, e.g., United States v. McLister*, 608 F.2d 785, 788 (9th Cir. 1979) (cross-examination of detective needed to counter possible misapprehension by jury); *United States v. Miranda*, 510 F.2d 385, 387 (9th Cir. 1975) (cross-examination inappropriately limited when defense not allowed to ask if others besides defendant had access to cabinet in which missing money was kept).

*Uramoto*, 638 F.2d at 86-87.

## III.   ARGUMENT

During the cross-examinations of Mr. Joel Weiner and Ms. Alexis Gardner last Friday, July 30, 2021, the Court incorrectly limited defendant's right to cross-examine both government witnesses as guaranteed under the Sixth Amendment and the case law cited above.

### A.   Joel Weiner

During the direct examination of Mr. Weiner, the government repeatedly elicited testimony from Mr. Weiner that there was no legitimate reason for defendant to be anxious about the settlement falling apart or for the defendant to believe that the money would not be paid. For instance, AUSA Sagel asked Mr. Weiner, "And defendant says he wants to make sure there is no issues with the settlement. What is your understanding -- let me ask you, were there any issues with the settlement at that point?" *See e.g.*, Trial Tr. (7/29/21, Vol. 2) 85. Mr. Weiner answered, "Not that I was aware of. He was just anxious to get the payment." *See e.g.*, Trial Tr. (7/29/21, Vol. 2) 85. AUSA Sagel again asked, "And when he says 'we are growing increasingly anxious and nervous that this

3

thing is going to fall apart' or 'if it's going to fall apart,' was there any reason to believe this settlement was falling apart at that time?" *See e.g.*, Trial Tr. (7/29/21, Vol. 2) 87. Mr. Weiner replied, "No." *See e.g.*, Trial Tr. (7/29/21, Vol. 2) 87. AUSA Sagel continued, "When the defendant says 'I don't know what's going on with your client and his advisors,' to your understanding was there anything that your client and your advisors were doing wrong at that -- and his advisors were doing anything wrong at that point?" *See e.g.*, Trial Tr. (7/29/21, Vol. 2) 88-89. Mr. Weiner testified, "I don't know why he said that." *See e.g.*, Trial Tr. (7/29/21, Vol. 2) 89. The government then asked Mr. Weiner about an email from Mr. Avenatti that they admitted it into evidence as government exhibit 150 and which reads: "Joel, still have yet to receive any money. Where are we on this, as we are growing increasingly concerned? Michael." *See e.g.*, Trial Tr. (7/29/21, Vol. 2) 89-90. The government placed this testimony before the jury so that the jury would conclude that the only reason defendant was anxious the deal was going to fall apart and concerned the money would not be paid was because he was concerned that he would not have the money to immediately to purchase a private jet.

On cross-examination, defendant repeatedly asked questions designed to show that there was another reason that defendant may have been "anxious" or believed the deal would never be consummated – namely the history of Mr. Avenatti's dealings with Mr. Whiteside's team of advisors as it related to potential resolution and the history of Ms. Gardner's dealings with Mr. Whiteside and that same team of advisors across over one year as it related to potential resolution. *See e.g.*, Trial Tr. (7/30/21, Vol. 1) 21-32. The Court precluded Mr. Avenatti from developing these facts to counter the testimony elicited by the government on direct.

Further, on direct examination of Mr. Weiner, the government was permitted to repeatedly elicit testimony as to the January 28, 2017 date for the payment, as opposed to the earlier "best efforts" date of January 21, 2017. After presenting evidence of a voicemail Mr. Avenatti left on January 25, 2017, AUSA Sagel elicited testimony that

1   there was no need for Mr. Avenatti be anxious because the deadline had not yet passed.
2   AUSA Sagel asked, "And pursuant to the settlement agreement, the money still was not
3   due until January 28, 2017?" *See e.g.*, Trial Tr. (7/29/21, Vol. 2) 87. Mr. Weiner
4   responded, "The answer is 'Yes.'" *See e.g.*, Trial Tr. (7/29/21, Vol. 2 ) 87. After
5   presenting evidence that the initial settlement was sent by wire, AUSA Sagel reinforced
6   the January 28, 2017 date. AUSA Sagel asked Mr. Weiner, "And that was no later than
7   January 28, 2017. So that payment was made on time; is that correct?" *See e.g.*, Trial Tr.
8   (7/29/21, Vol. 2 ) 91. Mr. Weiner responded, "Yes." *See e.g.*, Trial Tr. (7/29/21, Vol. 2 )
9   91. The government pursued this testimony in order to leave the jury with the impression
10  that no money was due before January 28, 2017 and therefore there was no reason for
11  defendant to be inquiring as to where the money was other than the impending deadline
12  to purchase the jet.
13      On cross-examination, defendant attempted to elicit testimony from Mr. Weiner
14  showing the importance of the earlier "best efforts" date, how it came about (it was
15  specifically proposed by the mediator), and the fact that the parties understood its
16  importance. *See e.g.*, Trial Tr. (7/30/21, Vol. 1) 37. The Court again precluded defendant
17  from attempting to elicit testimony about facts different than those the government had
18  just placed before the jury on direct. For example, Mr. Avenatti asked Mr. Weiner about
19  the "best efforts" date stating, "Do you have a recollection of you and I actually
20  physically together with Judge Meisinger when he suggested this term?" *See e.g.*, Trial
21  Tr. (7/30/21, Vol. 1 ) 38 (403 objection sustained). Mr. Avenatti then attempted to elicit
22  testimony regarding his prior dealing with Mr. Joe McClean, Mr. Whiteside's financial
23  manager, and his concerns about whether Mr. McClean would actually send the
24  settlement funds, "You had not hear[d] about my communications with Mr. McClean?"
25  and "You hadn't had any discussion with Mr. McClean about his run-in with me?" *See*
26  *e.g.*, Trial Tr. (7/30/21, Vol. 1 ) 42. (403 objection sustained as to each question).
27
28

**B.    Alexis Gardner**

The Court's restrictions continued when defendant attempted to cross-examine Ms. Gardner.  Once again, Mr. Avenatti attempted to establish that Ms. Gardner had been "jerked around" by Mr. Whiteside's advisors for the better part of a year before meeting Mr. Avenatti and that she had shared that information with Mr. Avenatti early on (i.e. well before the mediation). *See e.g.*, Trial Tr. (7/30/21, Vol. 2) 54. The Court did not permit Mr. Avenatti to explore this line of questioning despite the prior testimony elicited by the government from Mr. Weiner suggesting that Mr. Avenatti had no basis for believing Mr. Whiteside and his advisors would not make good on the settlement. Mr. Avenatti asked Ms. Gardner, "As of the date that we met, Ms. Gardner, did you feel like you had been jerked around, for lack of a better term, by Hassan Whiteside and his advisors for the better part of the year?" *See e.g.*, Trial Tr. (7/30/21, Vol. 2) 54. (403 objection sustained). Mr. Avenatti also asked, "Ms. Gardner, is it fair to say that as of the time that we met, you felt like you had not yet gotten adequate traction towards a resolution that was acceptable to you over the preceding year?" *See e.g.*, Trial Tr. (7/30/21, Vol. 2) 54. (403 objection sustained).

Next, the defendant attempted to question Ms. Gardner about the fact that she was alone with the mediator outside of Mr. Avenatti's presence immediately after the mediation and therefore could have asked him anything she wanted about the settlement or what had just happened during the all-day mediation. *See e.g.*, Trial Tr. (7/30/21, Vol. 2) 58-59. The defendant asked Mr. Gardner whether she was alone with Judge Meisinger during a car ride, "Was I in the car?" and "Ms. Gardner, after the mediation ended, there was a period of time, was there not, that you were alone with Judge Mesinger? That's a yes-or no question." (401 and 403 objections sustained as to each question). *See e.g.*, Trial Tr. (7/30/21, Vol. 2) 58-59.

The defendant attempted to explore this area in an effort to counter testimony elicited by the government from both Mr. Weiner and Ms. Gardner on direct suggesting

6

that Ms. Gardner never had access to the mediator, was isolated at the mediation and was purposely precluded by defendant from learning what the true terms of the settlement were and what had happened during the mediation. *See e.g.*, Trial Tr. (7/30/21, Vol. 1) 77-80. Despite the prior testimony elicited by the government, the Court prevented defendant from exploring this area and attempting to place before the jury evidence contrary to the government's version of events.

The Court's restrictions imposed on Mr. Avenatti during his cross-examination of both Mr. Weiner and Ms. Gardner were highly prejudicial and violative of Mr. Avenatti's rights under the Sixth Amendment, including his right to confront the witnesses against him, as well as the decisions of the Supreme Court and the Ninth Circuit cited above.

Mr. Avenatti respectfully requests that he be given the wide latitude required under the law as it relates to his cross-examination of his witnesses, including in connection with his continued examination of Ms. Gardner.

Dated:  August 2, 2021

Respectfully submitted,

/s/ Michael J. Avenatti

Defendant
MICHAEL JOHN AVENATTI

## CERTIFICATE OF SERVICE

I, H. Dean Steward, am a citizen of the United States, and am at least 18 years of age. My business address is 17 Corporate Plaza, Suite 254 in Newport Beach, California. I am not a party to the above-entitled action.  I have caused, on August 2, 2021, service of the:

DEFENDANT'S SUBMISSION REGARDING THE COURT'S RESTRICTIONS ON CROSS-EXAMINATION IN VIOLATION OF DEFENDANT'S SIXTH AMENDMENT RIGHTS

on the following party, using the Court's ECF system:

AUSA BRETT SAGEL AND AUSA ALEXANDER WYMAN

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 2, 2021

/s/ H. Dean Steward
H. Dean Steward