Michael John Avenatti (Pro Se)

H. Dean Steward, SBN 85317
17 Corporate Plaza, Suite 254
Newport Beach, California 92660
Tel (949) 481-4900
Fax (949) 497-6753

Advisory Counsel for Defendant
MICHAEL JOHN AVENATTI

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

      Plaintiff,

      v.

MICHAEL JOHN AVENATTI,

      Defendant.

SA CR No. 19-061-JVS

REPLY TO THE GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR MISTRIAL OR, IN THE ALTERNATIVE, TO STRIKE THE TESTIMONY OF NINE GOVERNMENT WITNESSES DUE TO VIOLATIONS OF THE JENCKS ACT AND RULE 26.2

## I.    INTRODUCTION

On August 2, 2021, the defendant filed a Motion for Mistrial, or, in the Alternative, to Strike the Testimony of Nine Government Witnesses due to Violations of the Jencks Act and Rule 26.2. [Dkt. 629]. This motion was made in connection with the government's failure to produce *statements* of the following government witnesses: Joseph Varani, Nashan Taschyan, Judy Regnier, Patrick McNicholas, Thomas Hurrell, Geoffrey Johnson, Thomas Goeders, Carlos Colorado, and Joel Weiner.

On August 4, 2021, the government filed its "Opposition to Defendant's Motion for Mistrial, or, in the Alternative, to Strike the Testimony of Nine Government Witnesses due to Violations of the Jencks Act and Rule 26.2 (CR 629)" [Dkt. 644].

**Within its Opposition, the government did not respond to any of the specific claims made in connection with Joseph Varani, Nashan Taschyan, Patrick McNicholas, Thomas Hurrell, Thomas Goeders, or Carlos Colorado.** As for Mr. Johnson, the government only addressed Mr. Avenatti's *Brady* claims relating to handwritten notes from a single interview – March 31, 2019.[1]  They failed to address the specific *Jencks* issues relating to Mr. Johnson's interview where the government listed "no new information was provided."  As for Mr. Weiner, the government made an in camera submission to the Court after which the court determined that there was Jencks violation.

Mr. Avenatti respectfully requests that this Court declare a mistrial.  In the alternative, Mr. Avenatti requests that the Court strike the testimony of the nine witnesses for the reasons set forth in the motion and below.  Mr. Avenatti further requests that the Court hold an evidentiary hearing, complete with testimony from the government, relating to the missing text messages, email correspondence, and handwritten notes that the government has failed to produce to the defendant despite Mr. Avenatti's consistent requests.

## II.   ARGUMENT

### A. Mr. Avenatti Has Made an Initial Showing that the Government has withheld Discovery in Connection with Nine Government Witnesses

On August 2, 2021, the defendant submitted to the Court a thoughtful and detailed summary and analysis of the testimony elicited thus far at trial as well as the statements that have not been provided to the defendant as required by *United States v. Jencks*, the Jencks Act and Rule 26.2. It is opposition, the government denies these allegations and summarily divides the defendant's claims into two categories: (1) handwritten notes, and (2) text and email messages sent by government witnesses to government officials.

---

[1] These *Brady* claims were raised at sidebar on July 22, 2022.  *See e.g.,* Trial Tr. (7/22/21, Vol. 2) pp. 4-8.

2

### i.     Request for Handwritten Notes

First, the government claims that the defendant has failed to make a "threshold showing" that any agent's rough notes constitute a statement under the Jencks Act. [Dkt. 644, p. 5]. The government cites *United States v. Roberson*, 895 F.3d 1206 (9th Cir. 2018) for the proposition that the defendant is required to make a threshold showing that any agent's rough notes constitute a statement under Jencks. However, the Ninth Circuit in *Robertson* indicates "our case law in this area has not been entirely clear…" and the court then proceeds to cite to a number of cases where the defendant made *no showing* in seeking the relevant statements. *Id.* at 1216; *citing United States v. Henke*, 222 F.3d 633, 642-43 (9th Cir. 2000)(finding that the defendant did not trigger an in camera inquiry where there was no showing that that the notes were used or adopted by the witness); *United States v. Michaels*, 796 F.2d 112 (9th Cir. 1986)(defendant was refused an in-camera hearing where defendant "made no attempt to show" that the notes qualified as statements).

Handwritten notes taken by government agents "in interviews with prospective government witnesses may contain such statements." *United States v. Pisello*, 877 F2d 762 (9th Cir. 1989); *citing United States v. Harris*, 543 F.2d 1247, 1252 (9th Cir. 1976). It is sometimes the case that "because the typed memorandum contain Jencks statements, the handwritten notes from which the memoranda derive also must contain Jencks statements… the district court could determine, based on an *in camera* inspection of the handwritten notes, whether the handwritten notes are Jencks Act materials." *United States v. Pisello*, 877 F2d 762, 769 (9th Cir. 1989)(H. Pregerson, dissenting).

Mr. Avenatti has made a threshold showing to justify the in-camera review of the handwritten notes in connection with the following interview notes: (1) July 22, 2021 notes from interview with Judy Regnier; (2) July 12, 2021 notes from interview with Patrick McNicholas; (3) July 14, 2021 notes from interview with Thomas Hurrell; (4)

July 22, 2021 notes from interview with Geoffrey Johnson; and, (5) July 1, 2021 notes from interview with Carlos Colorado.

The request for the handwritten notes for each of these interviews is based on the premise that the government conducted these interviews, which in several instances lasted over an hour, and the only *substantive* information transcribed to the report reads, "no new information was provided." [Dkt. 629, Exhibits A-E]. Any handwritten notes in connection with these interviews are, by their very nature, not captured by the language of the report unless the handwritten notes in total indicate that no new information was provided. If the handwritten notes are not limited to that language alone, the notes likely contain variations in statements, inconsistencies, and other information that by their very nature were not captured by the conclusory reports.

### ii.    Request for Text Messages and Email Messages from Government Witnesses

Second, the government argues, "[w]ith respect to emails and text messages, defendant offers no reason to believe that an unproduced email or text from a witness to the government 'relates to' the 'subject matter' of the witness's testimony." [Dkt. 644, p. 5]. The government claims that Mr. Avenatti has failed to make a threshold finding of a *Jencks* violation. [Dkt. 644, p. 6]. Mr. Avenatti has affirmatively established, by way of cross-examination and through his initial filing, that the following government witnesses had substantive communications with the government that have not been provided to the defendant: (1) Joseph Varani; (2) Nshan Taschyan; (3) Judy Regnier; (4) Patrick McNicholas; (5) Thomas Hurrell; (6) Thomas Goeders; and, (7) Joel Weiner.[2]

Mr. Varani testified that he had been working on the investigation since 2019 and had "written communications with other individuals and the government" regarding Mr. Varani's "work in this case…" *See e.g.,* Trial Tr. (7/23/21, Vol. 1) p. 22. Mr. Varani

---

[2]   As described above, the Court previously granted the defendant's request to review the e-mails exchanged between Mr. Weiner and the government agents to determine whether any emails were improperly withheld. The Court found that the government satisfied its discovery obligations in connection with Mr. Weiner.

indicated that he sent and received emails with other government agents in this case but was never asked to gather his written communications in preparation for this case. *See e.g.,* Trial Tr. (7/23/21, Vol. 1) p. 22-24; *See e.g.,* Exhibit A. No such e-mail correspondence has been produced to the defense.

Special Agent Taschyan similarly testified that he most likely generated both emails and text messages with other members of the prosecution team in connection with this case and issues related to his testimony. *See e.g.,* Trial Tr. (7/22/21, Vol. 2) p. 91; *See e.g.,* Exhibit B.

Judy Regnier also testified that she exchanged text messages with government agents or Assistant United States Attorneys, including Special Agent Remoun Karlous. *See e.g.,* Trial Tr. (7/29/21, Vol. 1) p. 66-67; *See e.g.,* Exhibit C. Ms. Regnier testified specifically that she no longer had access to the text messages but she believed that she "texted with Ramon [Karlous], and I don't remember the names of other people." *See e.g.,* Trial Tr. (7/29/21, Vol. 1) p. 66-67. The time frame for these texts was 2019 according to Ms. Regnier. Because the defendant had been unable to obtain these text messages through the government, Mr. Avenatti subpoenaed Ms. Regnier's text messages. The text messages produced pursuant to the subpoena do not include messages between Ms. Regnier and Mr. Karlous, which is not surprising seeing as Ms. Regnier testified that she had not retained them. But these has no bearing on where the government's copy of the text messages is.  And the only way to get to the bottom of the issue is for Agent Karlous to provide testimony to the Court about whether he ever texted with Ms. Regnier and, if so, what happened to the text messages she sent him.

Mr. Avenatti has made these threshold showings for Mr. Varani, Special Agent Taschyan, Ms. Regnier, Mr. McNicholas, Mr. Hurrell, Mr. Goeders, and Mr. Weiner.

## B. Striking the Testimony or Declaring a Mistrial are the Only Proper Remedies

The government argues that "to the extent that the Court determines any particular notes or texts contain a Jencks statement and must be produced to defendant, the remedy would be to allow a 'reasonabl[e]' 'recess' to review the statement and then recall the witness for further cross-examination." [Dkt. 644, p. 6]. Pursuant to 18 U.S.C. 3500(c), "[w]henever any statement is delivered to a defendant pursuant to this section, the court in its discretion, upon application of said defendant, may recess proceedings in the trial for such time as it may determine to be reasonably required for the examination of such statement by said defendant and his preparation for its use in the trial." This request for recess refers to the scenario where the government has completed its direct and chose to wait to provide the relevant Jencks statements until after its direct examination concludes. *See United States v. Buckland*, 1996 U.S. App. 28237, at *2 (9th Cir. 1996)("The statute requires production of a Jencks Act statement 'after a witness called by the United States has testified on direct examination,' 18 U.S.C. 3500(b), and gives the district court discretion to recess trial proceedings 'for such time as it may determine reasonably required for the examination of such statement by said defendant and his preparation for its use in the trial.' 18 U.S.C. 3500(c)."). It has no application where the government withholds the information entirely as in this case.

The government ignores the succeeding passage of 18 U.S.C. 3500 which reads in part, "If the United States elects not to comply with an order of the court under subsection (b) or (c) hereof to deliver to the defendant any such statement, or such portion thereof as the court may direct, the court shall strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared." 18 U.S.C. 3500(d)(emphasis added).

The government also fails to address the evidentiary hearing required by *Campbell v. United States*, 365 U.S. 85, 95 (1961). In *Campbell*, the Supreme Court found that the

lower court had committed error in failing to conduct an adequate inquiry after the defendant's cross examination of a government witness, as in this case, had "shown a *prima facie* case of their entitlement to a statement . . ." Instead, in response to the showing on cross-examination that a statement may not have been properly supplied to the defendant, the "trial judge conducted an inquiry without the jury present to take testimony and hear argument of counsel. Plainly enough <u>this was a proper, even a required, proceeding in the circumstances</u>." *Id.* at 93. (emphasis added).  The Court noted that the government agent was the "obvious witness to call" and that the inquiry was a "proceeding necessary to aid the judge to discharge the responsibility laid upon him to enforce the statute."  As a result, the case was remanded to the district court for additional proceedings as to whether a *Jencks* violation supported the defendant's motion to strike.

The Supreme Court's holding could not be more clear - *Campbell* mandates that the Court hold an evidentiary hearing to determine whether statements have been withheld.  It is not enough to simply take the government's word for the fact that they have not, especially when the government has failed to submit a single sworn declaration attesting to the fact that no text messages or emails have been withheld.

## III.   <u>CONCLUSION</u>

For each of these reasons, Mr. Avenatti respectfully requests that this Court declare a mistrial.  In the alternative, Mr. Avenatti requests that the Court strike the testimony of the nine witnesses for the reasons set forth in the motion and above.  Mr. Avenatti further requests that the Court hold an evidentiary hearing, complete with testimony from the government, relating to the missing text messages, email correspondence, and handwritten notes that the government has failed to produce to the defendant despite his repeated requests.

Dated:  August 5, 2021    Respectfully submitted,

          /s/ Michael J. Avenatti

          Defendant
          MICHAEL JOHN AVENATTI

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

09:04  1  witness, please.

09:04  2          MR. WYMAN:  Yes.  The United States calls Joe

09:04  3  Varani.

09:04  4          JOSEPH VARANI, GOVERNMENT'S WITNESS, SWORN

09:04  5          THE CLERK:  Please speak right into the microphone

09:04  6  and state and spell your first and last name.

09:04  7          THE WITNESS:  Joseph Varani, J-o-s-e-p-h,

09:04  8  V-a-r-a-n-i.

09:05  9          THE COURT:  Mr. Wyman.

09:05  10          MR. WYMAN:  Thank you, Your Honor.

09:05  11                  DIRECT EXAMINATION

09:05  12  BY MR. WYMAN:

09:05  13  Q     Good morning, Mr. Varani.

09:05  14  A     Good morning.

09:05  15  Q     Where do you work?

09:05  16  A     I work in Washington, D.C., for the Cyber Crime Lab,

09:05  17  which is part of the computer crime and intellectual

09:05  18  property section of the Department of Justice.

09:05  19  Q     And what is your title at the DOJ Cyber Crime Lab?

09:05  20  A     I am a senior digital investigative analyst.

09:05  21  Q     And how long have you been a senior digital

09:05  22  investigative analyst?

09:05  23  A     For 11 years now.

09:05  24  Q     And what are your primary duties and responsibilities

09:05  25  in that role?

09:05  1   A    I perform digital forensic examinations as well as
09:05  2   forensic consultations for prosecutors for criminal
09:05  3   investigations.
09:05  4   Q    Did you receive any training prior to assuming those
09:05  5   responsibilities?
09:05  6   A    Yes.  I received over 500 hours of training from
09:06  7   computer forensic tool manufacturers or other independent
09:06  8   organizations that focus on digital forensics training or
09:06  9   cyber security training.
09:06  10  Q    And did much of that training cover forensic
09:06  11  examinations?
09:06  12  A    Yes, it did.
09:06  13  Q    Are you familiar with the government's investigation
09:06  14  into the defendant Michael Avenatti?
09:06  15  A    Yes.
09:06  16  Q    How are you familiar with that investigation?
09:06  17  A    Only in that it exists and in the small part that I
09:06  18  have been asked to participate in.
09:06  19  Q    Did you extract data from various forensic images of
09:06  20  digital devices that have been provided to you as part of
09:06  21  this investigation?
09:06  22  A    Yes, I did.
09:06  23  Q    Who provided those forensic images to you?
09:06  24  A    They were provided by IRS Special Agent Nshan
09:06  25  Tashchyan.

09:07  1    Q     Were the forensic images that were provided to you

09:07  2    labeled so that you could identify which digital devices you

09:07  3    had been provided with?

09:07  4    A     Yes, they were.

09:07  5    Q     Based on the information provided to you by Special

09:07  6    Agent Tashchyan, what kind of devices were these images of?

09:07  7    A     These were images of computer servers and a laptop.

09:07  8    Q     And based on that information, what is your

09:07  9    understanding of where those devices came from?

09:07  10   A     My understanding is that the computer servers came from

09:07  11   a digital data center, and the laptop was seized from

09:07  12   Mr. Avenatti in New York.

09:07  13   Q     Did you understand from that information that the

09:07  14   servers were affiliated with the law firm Eagan Avenatti?

09:07  15   A     Yes.

09:07  16   Q     Once you received the forensic images from the IRS CI,

09:07  17   can you please describe the process that you undertook to

09:08  18   extract data from those images.

09:08  19   A     I first used our forensic tools to import all of the

09:08  20   data and process that data.  And what it does is it locates

09:08  21   all of the files that are inside the alchemies of the images

09:08  22   that we received.  It also indexes the contents of those

09:08  23   files as well so that I am able to perform keyword searches

09:08  24   on the contents of the files.

09:08  25   Q     And did you conduct those keyword searches?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

```
09:08   1   A    Yes.  I received a list of keywords from the
09:08   2   investigation team.  I conducted those searches, and then I
09:08   3   exported the matching files to a hard drive and provided
09:08   4   those to others on the team for review.
09:08   5   Q    The tools you mentioned that you used to extract this
09:09   6   data, were you trained on those extraction tools?
09:09   7   A    Yes.
09:09   8   Q    And had you used those tools before?
09:09   9   A    Yes.  The tool that I used for this I use in most of
09:09  10   the cases over the 11 years that I have done this.
09:09  11   Q    And based on those 11 years of experience and all the
09:09  12   training you have received, is that a commonly accepted and
09:09  13   reliable tool for extracting data?
09:09  14   A    Yes.  The tool is FTK, the forensic tool kit, which is
09:09  15   widely used for digital forensics.
09:09  16   Q    Using that tool, are you able to review the contents of
09:09  17   the digital device images that you receive?
09:09  18   A    Yes.
09:09  19   Q    Could you please take a look at what is Exhibit 11.  It
09:09  20   should be in Volume 1 of the binder right behind you.
09:09  21   A    (Witness complies.)  Yes.
09:09  22   Q    Do you recognize this document?
09:10  23   A    I do, yes.
09:10  24   Q    How do you recognize it?
09:10  25   A    This was a document that I saw on one of the devices
```

09:10   1    that I reviewed.

09:10   2    Q    Which one of the devices was this document found on?

09:10   3    A    (No response)

09:10   4    Q    Well, let me ask a more specific question.  Was this on

09:10   5    one of the law firm's servers?

09:10   6              MR. AVENATTI:  Objection, Your Honor.  Leading.

09:10   7              THE COURT:  Overruled.

09:10   8              THE WITNESS:  I don't recall specifically which

09:10   9    device.

09:10   10   BY MR. WYMAN:

09:10   11   Q    But you recall it was on one of the digital devices

09:10   12   provided to you by the IRS that was part of this

09:10   13   investigation?

09:10   14   A    Yes.

09:10   15   Q    And is the document in front of you a fair and accurate

09:11   16   copy of that document that you found?

09:11   17   A    Yes, this does look like an accurate copy.

09:11   18              MR. WYMAN:  Your Honor, the government moves to

09:11   19   admit Exhibit 11.

09:11   20              MR. AVENATTI:  Objection, Your Honor.  Hearsay and

09:11   21   lack of authentication, foundation.

09:11   22              THE COURT:  Are you offering it for the truth of

09:11   23   the document?

09:11   24              MR. WYMAN:  I'm not offering it for the truth,

09:11   25   Your Honor.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:11    1          THE COURT:  It will be received for the limited

09:11    2    purpose that it was found on the server or the computer.

09:11    3    It's not for the truth of the content, just that it was

09:11    4    there.

09:11    5          MR. WYMAN:  Thank you, Your Honor.

09:11    6          (Exhibit 11 received in evidence

09:11    7           for limited purpose)

09:11    8          MR. WYMAN:  If we could please publish the first

09:11    9    page.  Now, if we could focus on the second paragraph at the

09:11   10    beginning.

09:11   11          THE COURT:  I don't think it's appropriate to have

09:11   12    a substantive discussion on this document until it's been

09:11   13    authenticated and received in full.  If you have got general

09:11   14    questions about the document, fine.

09:11   15          MR. WYMAN:  Very well.  We will come back to it

09:12   16    with another witness, Your Honor.

09:12   17    BY MR. WYMAN:

09:12   18    Q    Would you please turn now to Exhibits 115 and 116 which

09:12   19    should be in the other binder, Volume 2.

09:12   20    A    (Witness complies.)  Okay.

09:12   21    Q    Do you recognize these two documents?

09:12   22    A    Yes, I do.

09:12   23    Q    How do you recognize them?

09:13   24    A    These were documents that I saw on the MacBook Pro

09:13   25    laptop.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:13   1    Q    And based on the information provided to you by the
09:13   2    IRS, where was that MacBook found?
09:13   3    A    That was found in New York, I believe.
09:13   4    Q    Let me ask this.  I think you said earlier that one of
09:13   5    the computers was found in the defendant's apartment.  Is
09:13   6    that the computer you're referring to?
09:13   7    A    As far as I know, the search warrants that I reviewed
09:13   8    said that it was seized from Mr. Avenatti.  That's all that
09:13   9    I know at this point.
09:13   10   Q    Okay.  But you remember that this document was found on
09:13   11   a digital device seized from the defendant?
09:13   12   A    Yes.
09:13   13   Q    And are these fair and accurate copies of documents
09:13   14   found on the digital device from the defendant?
09:13   15   A    Yes.
09:13   16        MR. WYMAN:  Your Honor, the government moves to
09:13   17   admit Exhibits 115 and 116.
09:13   18        MR. AVENATTI:  Objection, Your Honor.  Hearsay,
09:13   19   authentication, and foundation.
09:14   20        MR. WYMAN:  They're not offered for the truth,
09:14   21   Your Honor.
09:14   22        THE COURT:  Again, these two documents will be
09:14   23   received for the fact that they were found on the particular
09:14   24   computer, not for the truth of the documents.
09:14   25        (Exhibits 115 and 116 received in evidence

09:14  1                    for limited purpose)
09:14  2              MR. WYMAN:  Your Honor, may I publish these
09:14  3    documents?
09:14  4              MR. AVENATTI:  Your Honor, I have the same
09:14  5    objection in light of the Court's prior comment.
09:14  6              THE COURT:  You may not at this time.
09:14  7              MR. WYMAN:  May I ask about the title of these
09:14  8    documents so they're identifiable?
09:14  9              THE COURT:  You may.
09:14  10   BY MR. WYMAN:
09:14  11   Q    Starting with Exhibit 115, what is the title of this
09:14  12   document?
09:14  13   A    General release settlement agreement and acknowledgment
09:14  14   of accounting.
09:14  15   Q    What type of file was this on the computer?
09:14  16   A    This was a Microsoft Word document.
09:15  17   Q    Mr. Varani, from your training and experience in
09:15  18   forensic examination of digital evidence, do you know what
09:15  19   metadata is?
09:15  20   A    Yes.
09:15  21   Q    What is metadata?
09:15  22   A    Metadata is data that describes other data.
09:15  23   Q    And more specifically with Word documents, for example,
09:15  24   what kind of information did it provide about a particular
09:15  25   document?

| | | |
|---|---|---|
| 09:15 | 1 | A    Sure.  A metadata for a Word document would be when it |
| 09:15 | 2 | was created or the author or how many words might be in that |
| 09:15 | 3 | document or the file size of the file name. |
| 09:15 | 4 | Q    Were you able to review the metadata associated with |
| 09:15 | 5 | Exhibit 115? |
| 09:15 | 6 | A    Yes, I was. |
| 09:15 | 7 | Q    Did the metadata provided indicate when this document |
| 09:15 | 8 | was created? |
| 09:15 | 9 | A    Yes. |
| 09:15 | 10 | Q    When was it created? |
| 09:15 | 11 | A    The document was created on March 29th of 2019, a |
| 09:15 | 12 | little after 9:00 a.m. |
| 09:15 | 13 | Q    You said March 29.  Is that -- |
| 09:16 | 14 | MR. AVENATTI:  Objection, Your Honor.  He answered |
| 09:16 | 15 | the question. |
| 09:16 | 16 | THE COURT:  I'm sorry? |
| 09:16 | 17 | MR. AVENATTI:  He was asked about the date, and he |
| 09:16 | 18 | provided an answer to the date.  Counsel is now trying to |
| 09:16 | 19 | coach the witness. |
| 09:16 | 20 | THE COURT:  Overruled. |
| 09:16 | 21 | THE WITNESS:  It may have been March 23rd or |
| 09:16 | 22 | March 29th. |
| 09:16 | 23 | BY MR. WYMAN: |
| 09:16 | 24 | Q    You don't recall sitting here today? |
| 09:16 | 25 | A    Not specifically. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

19

09:16   1   Q    Would it refresh your recollection to look at a report

09:16   2   in the interview you provided to the government?

09:16   3   A    Yes.

09:16   4              MR. WYMAN:  Your Honor, may I approach?

09:16   5              THE COURT:  You may.  Does Mr. Avenatti have a

09:16   6   copy?

09:16   7   BY MR. WYMAN:

09:16   8   Q    Mr. Varani, once you're finished reviewing it, if you

09:17   9   would please turn the document over.

09:17   10  A    (Witness reviewing document)

09:17   11  Q    Did that refresh your recollection?

09:17   12  A    It did, yes.

09:17   13  Q    When was Exhibit 115 created?

09:17   14             MR. AVENATTI:  Objection.  Asked and answered.

09:17   15             THE COURT:  Overruled.

09:17   16             THE WITNESS:  It was created on March 23rd, 2019,

09:17   17  at 9:05 a.m.

09:17   18  BY MR. WYMAN:

09:17   19  Q    Who is listed as the author of this document?

09:17   20  A    The original author was a user named C. Darnell.

09:18   21  Q    Did the metadata also indicate when it was last

09:18   22  modified or saved?

09:18   23  A    Yes.  It indicated that it was last saved on the same

09:18   24  day, March 23rd, 2019, at 12:07 p.m.

09:18   25  Q    Did it say who was the last person to edit that

| | | |
|---|---|---|
| 09:18 | 1 | document? |
| 09:18 | 2 | A    It reported the last user name was Michael Avenatti. |
| 09:18 | 3 | Q    Would you please look at Exhibit 116 now. |
| 09:18 | 4 | A    (Witness complies.) |
| 09:18 | 5 | Q    What is the title of this document? |
| 09:18 | 6 | A    Client testimonial approval. |
| 09:18 | 7 | Q    Was this also a Word document? |
| 09:18 | 8 | A    Yes, it was. |
| 09:18 | 9 | Q    Did you review the metadata for Exhibit 116? |
| 09:18 | 10 | A    Yes. |
| 09:18 | 11 | Q    Based on your review of that metadata, when was this |
| 09:18 | 12 | document created? |
| 09:18 | 13 | A    This document was created on March 23rd, 2019, at |
| 09:19 | 14 | 11:16 a.m. |
| 09:19 | 15 | Q    And who is listed as the author? |
| 09:19 | 16 | A    User name was Michael Avenatti. |
| 09:19 | 17 | Q    And when was it last modified? |
| 09:19 | 18 | A    It was last modified on March 23rd, 2019, at 12:07 p.m. |
| 09:19 | 19 | Q    And who did it say was the last person to edit it? |
| 09:19 | 20 | A    The user name was Michael Avenatti. |
| 09:19 | 21 |         MR. WYMAN:  One moment, Your Honor. |
| 09:19 | 22 |         Nothing further, Mr. Varani.  Thank you. |
| 09:19 | 23 |         THE COURT:  Mr. Avenatti. |
| 09:19 | 24 |         MR. AVENATTI:  Thank you, Your Honor. |
| 09:19 | 25 |                 CROSS-EXAMINATION |

| | | |
|---|---|---|
| 09:19 | 1 | BY MR. AVENATTI: |
| 09:19 | 2 | Q    Mr. Varani, good morning. |
| 09:19 | 3 | A    Good morning. |
| 09:19 | 4 | Q    Welcome to California. |
| 09:19 | 5 | A    Thank you. |
| 09:20 | 6 | Q    You work out of Washington, D.C.; is that right? |
| 09:20 | 7 | A    Yes. |
| 09:20 | 8 | Q    And you work for the Department of Justice; is that |
| 09:20 | 9 | right? |
| 09:20 | 10 | A    Yes. |
| 09:20 | 11 | Q    And you traveled all the way from Washington, D.C., to |
| 09:20 | 12 | California at the request of the prosecutors to testify in |
| 09:20 | 13 | this case; is that right? |
| 09:20 | 14 | A    Yes, I did. |
| 09:20 | 15 | Q    And you have been -- unfortunately you've had to be |
| 09:20 | 16 | cooling your heels out in the hallway waiting for your |
| 09:20 | 17 | testimony, right? |
| 09:20 | 18 | A    Yes. |
| 09:20 | 19 | MR. WYMAN:  Objection.  Relevance. |
| 09:20 | 20 | THE COURT:  Sustained. |
| 09:20 | 21 | BY MR. AVENATTI: |
| 09:20 | 22 | Q    Sir, how many days have you been here waiting to |
| 09:20 | 23 | testify? |
| 09:20 | 24 | MR. WYMAN:  Objection. |
| 09:20 | 25 | THE COURT:  Let's get down to the essence of your |

09:20   1   testimony, sir.

09:20   2   BY MR. AVENATTI:

09:20   3   Q    Sir, how many times have you spoken to the government

09:20   4   in the last 48 hours about your testimony here today?

09:20   5   A    Not many.  Maybe once or twice.

09:20   6   Q    And how long have you been working on the investigation

09:20   7   into me?

09:20   8   A    I initially received a request in 2019 sometime.  My

09:21   9   participation has not been constant throughout, though.

09:21  10   Q    So you have been working on the investigation and

09:21  11   criminal prosecution off and on since 2019 up through today;

09:21  12   is that fair?

09:21  13   A    Yes.

09:21  14   Q    And during that two-year time period, did you have

09:21  15   written communications with other individuals and the

09:21  16   government about your work in this case?

09:21  17   A    Yes.

09:21  18   Q    And in what form did those communications take place?

09:21  19   A    There were -- you said written communications?

09:21  20   Q    Yes, sir.

09:21  21   A    Those were e-mails.

09:21  22   Q    Any text messages?

09:21  23   A    No.

09:21  24   Q    So those were e-mails that you would draft and then

09:21  25   send to other government agents and prosecutors, right, in

| | | |
|---|---|---|
| 09:22 | 1 | some instances? |
| 09:22 | 2 | A     Yes -- or receive, yes. |
| 09:22 | 3 | Q     It was both sending and receiving, right? |
| 09:22 | 4 | A     Yes. |
| 09:22 | 5 | Q     And when you sent the e-mails, you would be the one |
| 09:22 | 6 | that would type out the e-mail and send it, right? |
| 09:22 | 7 | A     Yes.  If I sent an e-mail, yes. |
| 09:22 | 8 | Q     And because you wanted to make sure that you were doing |
| 09:22 | 9 | a good job over the last two years, you had fairly |
| 09:22 | 10 | consistent communications in that regard; did you not? |
| 09:22 | 11 | A     Consistent in what way? |
| 09:22 | 12 | Q     Well, you did your job? |
| 09:22 | 13 | A     Yes, I did. |
| 09:22 | 14 | Q     Has anyone ever asked you to gather those |
| 09:22 | 15 | communications for any reason? |
| 09:22 | 16 | A     No. |
| 09:22 | 17 | Q     You weren't asked to do that before you testified here |
| 09:22 | 18 | today, correct? |
| 09:22 | 19 | A     No. |
| 09:23 | 20 |             THE COURT:  Wait a minute. |
| 09:23 | 21 |             MR. AVENATTI:  Yes.  Let me clarify. |
| 09:23 | 22 | BY MR. AVENATTI: |
| 09:23 | 23 | Q     Before you took the stand here today, no one asked you |
| 09:23 | 24 | to gather your written communications that you drafted in |
| 09:23 | 25 | connection with this case, correct? |

24

09:23  1    A    Correct.

09:23  2    Q    And you are a senior digital investigative analyst; is

09:23  3    that right?

09:23  4    A    Yes.

09:23  5    Q    How long have you held that position?

09:23  6    A    I began in 2010, so 11 years.

09:23  7    Q    You have had the same title for that entire time

09:23  8    period?

09:23  9    A    I believe I was promoted to senior digital

09:23  10   investigative analyst in 2013 or 2014.

09:23  11   Q    And how did you get this assignment?

09:23  12   A    This assignment came in via an e-mail request from one

09:24  13   of the attorneys on the case.

09:24  14   Q    One of the Assistant U.S. Attorneys?

09:24  15   A    Yes.

09:24  16   Q    And did you respond to that e-mail request when you got

09:24  17   it?

09:24  18   A    Yes.

09:24  19   Q    And that was back in 2019?

09:24  20   A    I believe so, yes.

09:24  21   Q    Who has been your primary source of contact in

09:24  22   connection with your work on this case?

09:24  23   A    That contact has changed over time.  I had primarily

09:24  24   dealt with attorneys who were responsible for the privilege

09:24  25   review, and that person has changed over time.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:24 1    Q    And you have also communicated with Mr. Wyman and

09:24 2    Mr. Sagel; am I right?

09:24 3    A    Yes.

09:24 4    Q    Including in writing, right?

09:24 5    A    Yes.

09:25 6         MR. WYMAN:  Objection.  Relevance, Your Honor.

09:25 7         THE COURT:  Overruled.

09:25 8    BY MR. AVENATTI:

09:25 9    Q    Now, if I understand your testimony correctly -- and

09:25 10   please tell me if I am wrong -- you did not actually extract

09:25 11   the data from any device.  Am I right about that?

09:25 12   A    No.  I did extract the data from the -- well, from

09:25 13   original devices or from copies of data from the devices?

09:25 14   Q    You never extracted any data from any original device?

09:25 15   A    Correct.

09:25 16   Q    And what I mean by that is you never had an actual

09:25 17   cellphone or laptop or computer server physically in your

09:25 18   possession that you then got the data from?

09:25 19   A    Correct.

09:25 20   Q    You only received images from the gentleman that you

09:25 21   mentioned, Mr. Tashchyan; is that correct?

09:25 22   A    That's correct.

09:26 23   Q    So you personally do not know whether the data came

09:26 24   from the device, right?

09:26 25   A    I only know based on information that was provided to

09:26    1    me in reports and other documents.

09:26    2    Q    By Mr. Tashchyan?

09:26    3    A    Yes.

09:26    4    Q    Because you were not physically there when any data was

09:26    5    taken from any device?

09:26    6    A    Correct.

09:26    7    Q    You are relying on what others have told you?

09:26    8         MR. WYMAN:  Objection.  Asked and answered.

09:26    9         THE COURT:  Sustained.

09:26   10    BY MR. AVENATTI:

09:26   11    Q    And how many forensic images were given to you by

09:26   12    Mr. Tashchyan or anyone else in connection with the

09:26   13    investigation and prosecution of this case?

09:26   14    A    There were dozens all together.

09:27   15    Q    And can you describe for the jury -- strike that.  I

09:27   16    think you mentioned on direct that you were given keyword

09:27   17    search terms to look for in the data from the images you

09:27   18    were given; is that right?

09:27   19    A    Yes.

09:27   20    Q    And who gave you those keyword search terms?

09:27   21    A    The Assistant U.S. Attorney that was working on the

09:27   22    case at the time.

09:27   23    Q    Was that Mr. Andre?

09:27   24    A    Yes.

09:27   25    Q    And did you have correspondence back and forth with him

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:27   1   about that process?

09:27   2   A     Yes.

09:27   3   Q     By e-mail?

09:27   4   A     Yes, by e-mail.

09:27   5   Q     And then you would conduct the keyword searches and get

09:28   6   the results, and then you would send that information to

09:28   7   others, correct.

09:28   8   A     Correct.

09:28   9   Q     And would that be by e-mail?

09:28   10   A     No.   Due to the volume of data, the data that was

09:28   11   provided was exported to hard drives and provided directly

09:28   12   by hand.

09:28   13   Q     Did you make sure those searches were conducted

09:28   14   properly before you forwarded that data?

09:28   15   A     Yes, in terms of spot-checking the results to make sure

09:28   16   they contained the keywords.

09:28   17   Q     You were confident that the data -- well, strike that.

09:28   18   You affirmed in your mind that the work you had done was

09:28   19   competent before you sent that information; is that fair?

09:28   20           MR. WYMAN:   Objection.   Asked and answered.

09:28   21           THE COURT:   Overruled.

09:28   22           THE WITNESS:   Yes.

09:28   23   BY MR. AVENATTI:

09:29   24   Q     Now, Mr. Wyman asked you about metadata.   Do you

09:29   25   remember that?

09:29   1    A     I do.

09:29   2    Q     And is there a document that you printed out that

09:29   3    showed the metadata on these documents?

09:29   4    A     No.

09:29   5    Q     How did you access the metadata on the documents?  How

09:29   6    did you discover it?

09:29   7    A     I used my forensic tool called FTK to view the

09:29   8    document.  When I do that, I can also view the metadata

09:29   9    associated with that document.

09:29   10   Q     And when you say you can view the metadata, that's on

09:29   11   your computer screen, right?

09:29   12   A     Yes.

09:29   13   Q     Did you take a screenshot of it?

09:29   14   A     For my own recordkeeping, yes.

09:29   15   Q     You took a screenshot of the metadata?

09:29   16   A     Yes.

09:29   17   Q     Did you print it out?

09:29   18   A     No.

09:29   19   Q     Where did you store the screenshot?

09:29   20   A     On my computer, on my analysis computer.

09:30   21   Q     Did you bring that metadata screenshot with you?

09:30   22   A     Today, no.

09:30   23   Q     You took a screenshot of each piece of metadata that

09:30   24   you viewed relating to these documents that Mr. Wyman asked

09:30   25   you about, right?

09:30   1   A    Yes.

09:30   2   Q    You brought none of them with you here today?

09:30   3   A    I did not.

09:30   4   Q    Because nobody asked you to?

09:30   5   A    Yes.

09:30   6   Q    Now, metadata as it relates to dates and times is

09:30   7   contingent on what?

09:30   8   A    On the time of the device, time that the device is

09:31   9   set to.

09:31   10   Q    So there is no independent time and date that

09:31   11   establishes metadata separate and apart from the date and

09:31   12   time that a particular device is set to.  Am I right about

09:31   13   that?

09:31   14   A    Could you repeat that question.

09:31   15   Q    Sure.  The metadata of a particular document, the date

09:31   16   and the time, there is no independent date and time out

09:31   17   there in the ether that determines what appears on a

09:31   18   document.  It's wholly dependent on what the date and time

09:31   19   is on the device, fair?

09:31   20   A    Yes.

09:31   21   Q    So if I set my laptop to a date of January 1st, 1900,

09:31   22   and a document is created in Microsoft Word, and then

09:32   23   Mr. Tashchyan images that device and he sends the image to

09:32   24   you and you observe the metadata for that document, you will

09:32   25   determine that it was created on January 1st, 1900,

09:32  1    according to the metadata; is that fair?

09:32  2              MR. WYMAN:  Objection.  Calls for speculation.

09:32  3              THE COURT:  Overruled.

09:32  4              THE WITNESS:  That's what I would -- that's what I

09:32  5    would see.  I would know that that date wouldn't be

09:32  6    accurate.

09:32  7    BY MR. AVENATTI:

09:32  8    Q    Because Microsoft Word didn't exist in 1900?

09:32  9    A    Right.

09:32  10   Q    Okay.  But as you sit here today, you have no way of

09:32  11   knowing whether the date and time on the metadata that you

09:32  12   extracted from the documents was actually the date and time

09:32  13   that the documents were created; do you?

09:32  14   A    With a thorough forensic analysis of an entire

09:33  15   computer, that may be able to be more fully determined.

09:33  16   Q    But you didn't do that; did you?

09:33  17   A    No.

09:33  18   Q    You just looked at the metadata and assumed that that

09:33  19   was the correct date and time, right?

09:33  20   A    Yes.

09:33  21   Q    And then as it relates to who creates a document and

09:33  22   edits the document, you looked at the user name, right?

09:33  23   A    Yes.  There's a field for author and last user.

09:33  24   Q    But there is no way for you to know whether that actual

09:33  25   person created that document or edited the document, right?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:34    1    A    Right.

09:34    2    Q    So, for instance, if I registered a user name of Donald

09:34    3    Duck on a device, when you pulled up the metadata, you would

09:34    4    see that Donald Duck created the document, right?

09:34    5    A    Yes.

09:34    6    Q    You would have no way of knowing whether the fictional

09:34    7    character Donald Duck or somebody else created or edited the

09:34    8    document, fair?

09:34    9    A    Correct.

09:34   10    Q    Do you have a laptop?

09:34   11    A    I do, yes.

09:34   12    Q    If you loaned your laptop to someone and they created a

09:34   13    Microsoft Word document, it would show that you created the

09:34   14    document if you access the metadata; is that fair?

09:35   15         MR. WYMAN:  Objection.  Relevance.

09:35   16         THE COURT:  Overruled.

09:35   17         THE WITNESS:  Yes, that's correct.

09:35   18   BY MR. AVENATTI:

09:35   19    Q    So if I was doing the analysis, I would pull up the

09:35   20    metadata and it would say that you created the document when

09:35   21    in essence someone else was using your computer, right?

09:35   22    A    Yes.

09:35   23    Q    Because you have no way of knowing based on your

09:35   24    analysis whether the date and time was the real date and

09:35   25    time a document was created and edited or whether I actually

| | | |
|---|---|---|
| 09:35 | 1 | created or edited any document, correct? |
| 09:35 | 2 | A    Correct.  I don't know whether you specifically were at |
| 09:35 | 3 | the computer at the time. |
| 09:35 | 4 | Q    Sir, thank you for your candor. |
| 09:35 | 5 | THE COURT:  Redirect. |
| 09:35 | 6 | MR. WYMAN:  No, Your Honor.  Thank you. |
| 09:35 | 7 | THE COURT:  May the witness be excused? |
| 09:35 | 8 | MR. AVENATTI:  We would like to reserve the |
| 09:35 | 9 | opportunity to potentially recall him, Your Honor. |
| 09:36 | 10 | THE COURT:  Sir, you are excused for now but |
| 09:36 | 11 | you're on recall.  Thank you. |
| 09:36 | 12 | Would the government call its next witness, |
| 09:36 | 13 | please. |
| 09:36 | 14 | MR. WYMAN:  Thank you, Your Honor. |
| 09:36 | 15 | The United States calls Carlos Colorado. |
| 09:36 | 16 | CARLOS COLORADO, GOVERNMENT'S WITNESS, SWORN |
| 09:36 | 17 | THE CLERK:  If you will pull the microphone |
| 09:36 | 18 | towards you and state and spell your first and last name. |
| 09:37 | 19 | THE WITNESS:  Carlos Colorado, C-a-r-l-o-s, |
| 09:37 | 20 | C-o-l-o-r-a-d-o. |
| 09:37 | 21 | THE COURT:  Mr. Wyman. |
| 09:37 | 22 | MR. WYMAN:  Thank you, Your Honor. |
| 09:37 | 23 | DIRECT EXAMINATION |
| 09:37 | 24 | BY MR. WYMAN: |
| 09:37 | 25 | Q    Good morning, Mr. Colorado. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**EXHIBIT B**

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | THE COURT:  Let's proceed.  Let's proceed. |
|       | 2  | Presumably, if you had the three witnesses yesterday, you |
|       | 3  | conducted overnight your preparation, or your preparation for |
|       | 4  | those witnesses during the lunchtime. |
| 03:46PM | 5 | MR. WYMAN:  Thank you, Your Honor.  The |
|       | 6  | United States calls Special Agent Nshan Tashchyan. |
|       | 7  | **NSHAN TASHCHYAN, GOVERNMENT WITNESS, WAS SWORN** |
|       | 8  | THE COURTROOM DEPUTY:  If you'll please state and |
|       | 9  | spell your first and last name. |
| 03:47PM | 10 | THE WITNESS:  Nshan Tashchyan.  The first name is |
|       | 11 | spelled N-s-h-a-n, and the last name, T-a-s-h-c-h-y-a-n. |
|       | 12 | THE COURTROOM DEPUTY:  Thank you. |
|       | 13 | **DIRECT EXAMINATION** |
|       | 14 | BY MR. WYMAN: |
| 03:47PM | 15 | Q    Good afternoon, Special Agent Tashchyan. |
|       | 16 | A    Good afternoon. |
|       | 17 | Q    Where do you work? |
|       | 18 | A    I work for the IRS Criminal Investigation division. |
|       | 19 | Q    What is your title at the IRS Criminal Investigation |
| 03:47PM | 20 | division? |
|       | 21 | A    A special agent, computer investigative specialist. |
|       | 22 | Q    How long have you been a computer investigative |
|       | 23 | specialist? |
|       | 24 | A    Since 2016, about five years. |
| 03:47PM | 25 | Q    What are your primary responsibilities as a computer |

**UNITED STATES DISTRICT COURT**

```
 1    investigative specialist?
 2    A    To preserve the electronic evidence in a
 3    forensically-sound manner, basically to assist the agents that
 4    are conducting the investigation with seizing and analyzing the
03:48PM  5    electronic evidence that comes off computers, cell phones,
 6    et cetera.
 7    Q    What kind of training did you receive to become a
 8    computer investigative specialist?
 9    A    It's several trainings, and it's a continuous training
03:48PM 10    every year.  I started with a six-week basic training.  And
11    almost every year there's additional several trainings, with
12    the exception of last year.
13    Q    Are you familiar with the Government's investigation into
14    the defendant, Michael Avenatti?
03:48PM 15    A    Yes, I am.
16    Q    Were you one of the primary investigative agents on that
17    investigation?
18    A    No.  I was the computer investigative specialist assisting
19    the primary agents.
03:48PM 20    Q    And as the computer investigative specialist assisting
21    the agents, what was your involvement in this investigation?
22    A    I was involved with several of the search warrants, where
23    I seized electronic devices, imaged them.
24    Q    And when you say "imaged," does that mean you made a
03:49PM 25    forensic image of a digital device?
```

UNITED STATES DISTRICT COURT

```
 1   A     Yes.
 2   Q     What is a forensic image?
 3   A     It is the exact, unaltered, beat-to-beat copy of the
 4   electronic media.  If it's hard drive, it's basically a copy of
 5   the whole hard drive.  It copies all hard drive without
 6   altering the data that's on it.
 7   Q     Did you make forensic images of servers from the law firm
 8   Eagan Avenatti?
 9   A     I did.
10   Q     Were those servers seized pursuant to a federal search
11   warrant?
12   A     Yes.
13   Q     Who conducted the seizure of those servers?
14   A     It was me and another agent, John Weeks, who assisted me
15   to seize those devices.
16   Q     Where did you seize them?
17   A     We seized them from a data center that was located in
18   Santa Ana.
19   Q     Now, we're talking about servers.  At a high level, can
20   you please describe what a server is?
21   A     Sure.  It's basically a computer on the network of
22   computers that provides services of software or data to the
23   other computers on the network.
24         So basically, for example, if you have an e-mail
25   server in the organization, that's where all the e-mails will
```

**UNITED STATES DISTRICT COURT**

```
 1    be located, and the users -- all the organization will connect

 2    to that server with their own computers and access those

 3    e-mails.

 4    Q    So can a server contain quite a bit of information?

 5    A    Yes.

 6    Q    E-mails?

 7    A    E-mails, data, sometimes software.  And people have to

 8    connect to that server to have access to that software.

 9    Q    And after you seized the servers, did you make forensic

10    images?

11    A    I did.

12    Q    Where did you do that?

13    A    The imaging process was done at our office located in

14    Laguna Niguel.

15    Q    At the IRS?

16    A    Yes.

17    Q    What tool or method did you use to make forensic images

18    of those servers?

19    A    Several tools were used.  Three of the servers were

20    virtual servers, and for those, I had to use my laptop.  I

21    connected a server with the network cable.  I was able to

22    access those virtual machines and images.

23          The other three servers were physical servers.  I

24    had to boot them up with the hard drive that I have that has

25    its own operating system.  It has forensic tools on it.  And
```

03:50PM (lines 5, 10, 15)
03:51PM (lines 20, 25)

```
  1  using those tools, I was able to image them.
  2  Q    Had you previously received training on those tools that
  3  you used --
  4  A    Yes.
03:51PM  5  Q    -- for the servers?
  6       Based on your training and experience, are those
  7  tools commonly accepted tools for forensic imaging?
  8  A    Yes, they are.
  9  Q    Did you also image an iMac computer?
03:51PM 10  A    I did.
 11  Q    Where was that computer seized from?
 12  A    That was seized from Mr. Avenatti's apartment.
 13  Q    Did you personally seize the computer?
 14  A    No.  I was -- on that date I was at a different location,
03:52PM 15  and the agents that seized it, they were the ones that provided
 16  me with all the electronic -- along with all the other
 17  electronic devices that were seized from the apartment.
 18  Q    And how are you able to identify where it was seized
 19  from?
03:52PM 20  A    By looking at the chain of custody paperwork.  And, also,
 21  I compared it with the inventory of all the items that were
 22  seized from the apartment to make sure that I wasn't missing
 23  anything.
 24  Q    When you say "chain of custody paperwork," what does that
03:52PM 25  mean?
```

UNITED STATES DISTRICT COURT

```
 1   A    Every time we seize a device, there's a chain of custody
 2   paperwork that's prepared during the seizure that identifies
 3   where the device was found, which room, who found it, so later
 4   on we can identify where that device actually came from.
 5   Q    And where did this iMac computer come from?
 6   A    It came from the apartment.  I just don't recall the exact
 7   location, where in the apartment.
 8   Q    When you say "the apartment," you're referring to the
 9   defendant's apartment?
10   A    Yes.
11   Q    What tool did you use -- or tools did you use to make an
12   image of the iMac computer?
13   A    For the iMac, I use a tool that's called MacQuisition.
14   It's a special tool designed for the forensic imaging of Apple
15   products.
16   Q    Had you previously received training on that tool for
17   forensic imaging?
18   A    Yes, I have.
19   Q    And have you made other forensics images using that tool
20   before?
21   A    Yes.
22   Q    Based on your training and experience, is it a commonly
23   accepted method or tool for forensic imaging of Apple
24   computers?
25   A    Yes.
```

**UNITED STATES DISTRICT COURT**

73

```
        1   Q     Once you made forensic images of the digital devices,

        2   such as the servers from the defendant's law firm and computer

        3   from his apartment, did you label the images in a way such that

        4   they would be identifiable?

03:53PM  5   A     Yes, I did.

        6   Q     What did you do with the images at that point?

        7   A     I made several copies of them.  Kept one copy to myself,

        8   and another copy was sent over to DOJ cyber lab.

        9   Q     Is that in D.C.?

03:54PM 10   A     Yes.

       11   Q     Do you know whether the materials from those digital

       12   device images were subjected to a privilege review?

       13   A     I believe they were.

       14   Q     What is a privilege review?

03:54PM 15   A     It's basically a group of agents or attorneys

       16   conducting -- or reviewing the evidence that has been seized to

       17   make sure that it doesn't contain any client-attorney privilege

       18   before that evidence is presented to the agents that are

       19   conducting the investigation.

03:54PM 20   Q     So the agents and attorneys conducting the privilege

       21   review, will they be separate from the prosecution team --

       22   A     Yes.

       23   Q     -- of agents and attorneys?

       24         So the prosecution team of agents and attorneys

03:54PM 25   would not necessarily receive all the documents on those
```

**UNITED STATES DISTRICT COURT**

74

```
        1   digital devices if they went through a privilege review?

        2   A     No.

        3              THE COURT:  Wait a minute.  That's ambiguous.

        4              Is it correct that they wouldn't receive all the

03:54PM 5   documents that were seized because of the privilege review?

        6              THE WITNESS:  Yes.

        7              THE COURT:  Okay.

        8              MR. WYMAN:  Thank you, Your Honor.

        9   Q     Apart from the Eagan Avenatti servers and the iMac

03:55PM 10  computer, did you and other agents also make forensic images of

       11   certain individuals' cell phones?

       12   A     Yes, we did.

       13   Q     In addition to imaging the cell phones, did you extract

       14   data from those cell phones?

03:55PM 15  A     Yes.

       16   Q     What tool did you use to extract that data?

       17   A     It's a software called Cellebrite.

       18   Q     What is Cellebrite, at a high level?

       19   A     It's a forensic software especially designed for

03:55PM 20  extracting data from cell phones and tablets.

       21   Q     And is Cellebrite a commonly-accepted tool for extracting

       22   data, based on your training and experience?

       23   A     Yes.

       24   Q     When you use Cellebrite to extract data from a cell

03:55PM 25  phone, does it create a report?
```

```
 1    A     Yes.  That option is there to create a report of all the
 2    items that you want to appear on that report.
 3    Q     Could you please take a look at what's been marked as
 4    Exhibit 124.  And I apologize, it should be in Volume II.  It
 5    might not be in front of you.
 6    A     This is Volume I.
 7    Q     I think it should be right behind you.
 8    A     I'm sorry, which exhibit was it?
 9    Q     124.
10    A     Okay.
11    Q     Do you recognize this document?
12    A     I do.
13    Q     What is it?
14    A     This is the extraction report of -- this is the extraction
15    report from Tom Goeders's cell phone.
16    Q     So is Tom Goeders or Tom Goeders one of the individuals
17    whose cell phones was imaged?
18    A     Yes.
19    Q     Do you see that this report appears to have certain
20    redactions throughout or areas that have been whited out?
21    A     Yes.
22    Q     Other than those redactions, is this a fair and accurate
23    copy of the extraction report that you created for Tom
24    Goeders's cell phone?
25    A     Yes, it is.
```

```
 1   Q     Would you please --
 2              THE COURT:  Ladies and gentlemen, let me give you a
 3   brief explanation for this term "redaction."  That means that
 4   something has been blacked out either because of privilege,
 5   privacy, or it just simply doesn't have to do -- have anything
 6   to do with this case.  You're not to concern yourself with any
 7   of the redactions.
 8              MR. WYMAN:  Thank you, Your Honor.
 9   Q     Can you please turn now to Exhibit 176.  That's probably
10   Volume III.
11   A     Okay.
12   Q     Do you recognize this document?
13   A     Yes.  This is the extraction report for Greg Barela's cell
14   phone.
15   Q     Is Gregory Barela another one of the individuals whose
16   cell phone was imaged in this case?
17   A     Yes.
18   Q     Other than the redactions in this report, is this a fair
19   and accurate copy of the extraction report for Gregory Barela's
20   cell phone?
21   A     Yes, it is.
22              MR. WYMAN:  Your Honor, I would request to
23   conditionally admit just the first page of Exhibit 176 subject
24   to later testimony by Mr. Barela.
25              MR. AVENATTI:  Your Honor, Objection.  Foundation.
```

```
 1              THE COURT:  Page 1 of 176 will be received
 2   provisionally.
 3              MR. WYMAN:  Thank you, Your Honor.
 4              (Exhibit Number 176-1 received.)
03:58PM 5       MR. WYMAN:  Your Honor, may I publish it, the first
 6   page?
 7              THE COURT:  Any objection publishing this first
 8   page?
 9              MR. AVENATTI:  Your Honor already admitted it
03:59PM 10  provisionally.
11              THE COURT:  Yes.  But any objection?
12              MR. AVENATTI:  I do object to the publication before
13   the foundation is laid.  Actually, yeah, Your Honor, I'm going
14   to stand on the objection.
03:59PM 15      THE COURT:  Okay.  We won't publish it at this time.
16              MR. WYMAN:  Your Honor, I'm not seeking to publish
17   any content, just the extraction report cover page, basically
18   to explain it to the jury.
19              THE COURT:  First page has content.  It will not be
04:00PM 20  published at this time.
21              MR. WYMAN:  Thank you, Your Honor.
22   Q    In these reports, is there a cover page to the extraction
23   reports?
24   A    Yes, there is.
04:00PM 25  Q    And the reports, do they include text messages and other
```

UNITED STATES DISTRICT COURT

```
 1    types of messages and phone calls?
 2    A    It will include whatever you choose to include.  If you
 3    want to extract text messages, then it will include the text
 4    messages.
 5    Q    The text messages in the extraction reports and the phone
 6    calls, for that matter, what time zone are they in?
 7    A    A lot of times they're in UTC.
 8    Q    And for the exhibits we are focusing on, what time zone
 9    are they in?
10    A    They are in UTC.
11    Q    What is UTC?
12    A    UTC is a universally accepted time standard.  Basically,
13    when we compare it with the Pacific Standard Time which we are
14    in currently, it is about seven or eight hours ahead of us,
15    depending on the time of the year.  Because of Daylight
16    Savings, between spring to fall, it's about seven hours ahead.
17    The rest of the year it's about eight hours ahead of us.
18    Q    So the timestamps on the text messages and phone calls in
19    these reports will be either seven or eight hours ahead of the
20    time in California?
21    A    Yes.
22    Q    Was a forensic image of various digital devices
23    belonging -- also made belonging to a woman named Judy Regnier?
24    A    Yes.
25    Q    Did that include cell phones and iPad?
```

04:00PM  5
04:00PM 10
04:01PM 15
04:01PM 20
04:01PM 25

| | |
|---|---|
| 1 | A    Cell phone, iPad, and, I believe, other devices. |
| 2 | Q    And was an extraction report created for the data from |
| 3 | those digital devices belonging to Ms. Regnier? |
| 4 | A    Yes. |
| 04:02PM 5 | Q    Would you please look at Exhibits 260, 261, 262, and 263. |
| 6 | A    Okay. |
| 7 | Q    Do you recognize these documents? |
| 8 | A    Yes.  This looked like pages from the extraction report of |
| 9 | Judy's cell phone. |
| 04:02PM 10 | Q    Have you compared these -- let me ask you another |
| 11 | question. |
| 12 |      Are these fair and accurate pages from an overall |
| 13 | extraction of Ms. Regnier's digital devices? |
| 14 | A    Yes. |
| 04:03PM 15 | Q    Did you personally run the Cellebrite extraction on |
| 16 | Ms. Regnier's devices? |
| 17 | A    I did not.  That was done by another computer investigator |
| 18 | specialist, John Weeks. |
| 19 | Q    How do you know that Mr. Weeks performed that extraction? |
| 04:03PM 20 | A    Because on the day of the search warrant, he was the one |
| 21 | that was assigned to handle the devices from Judy's residence |
| 22 | and he was there personally.  And he was the one who imaged the |
| 23 | devices at the residence and provided the forensic images to |
| 24 | me. |
| 04:03PM 25 |      MR. WYMAN:  One moment, Your Honor. |

```
 1   Q    Have you reviewed the full extraction report from

 2   Ms. Regnier's devices?

 3   A    I have.

 4   Q    Are these exhibits, 260 through 263, fair and accurate

 5   copies of excerpts from that extraction report?

 6   A    Yes.

 7            MR. WYMAN:  Thank you.  No further questions.

 8            THE COURT:  Mr. Avenatti.

 9                        CROSS-EXAMINATION

10   BY MR. AVENATTI:

11   Q    Good afternoon, sir.

12   A    Good afternoon.

13   Q    Can you give me the pronunciation of your last name

14   again, because I want to make sure I get it right.

15   A    Tashchyan.

16   Q    Tashchyan?

17   A    Yes.

18   Q    If at any point in time I don't get it right, please let

19   me know.

20   A    That's fine.  Okay.

21   Q    Thank you.

22            Now, sir, on direct examination, you talked about

23   preserving evidence in a forensically competent manner?

24   A    Uh-huh.

25   Q    Correct?
```

04:04PM 5
04:04PM 10
04:04PM 15
04:04PM 20
04:04PM 25

```
 1              THE COURT:  Sir, you need to say "yes" or "no."
 2              THE WITNESS:  Yes.
 3   Q    BY MR. AVENATTI:  Can you explain to the jury what you
 4   mean when you say "preserving evidence in a forensically
 5   competent manner."
 6   A    Sure.  There's -- there are certain methods that we have
 7   to follow whenever we come across an electronic device.  We
 8   have to make sure it's handled a certain way, depending on
 9   the -- what condition the device is, and we do have certain
10   tools that we have to use to forensically image those devices,
11   to make sure that the evidence is not altered.
12   Q    Why do you have to use the forensic tools?
13   A    Because without the forensic tools, you can't just look at
14   the device and copy the stuff out.  At that point you'll be
15   altering the device.  By using the forensic tools, you're
16   guaranteeing that none of the information that's extracted from
17   those devices is altered.
18   Q    Because if you don't use the forensic tools, you run the
19   risk that the information is altered or not legitimate; right?
20   A    Yes.
21   Q    Yes?
22   A    Yes.
23   Q    So let's just say I have a cell phone, a smartphone --
24   A    Yes.
25   Q    -- with text messages on it.  If you're involved in an
```

1   investigation, why can't you just open my cell phone and start

2   taking pictures of my cell phone, of the text messages?

3   A     You can, but that is not the forensically sound way of

4   doing it, especially if you have special tools designed to

04:06PM 5   extract that evidence.

6   Q     Just taking pictures of a cell phone -- text messages on

7   a cell phone, that's not forensically appropriate, in your

8   experience; right?

9   A     Depends.  There have been some certain times that the tool

04:06PM 10  couldn't be used and that was the only way to preserve the

11  evidence.

12  Q     But absent those instances, those rare instances, the

13  best thing to do is to get the device, hook it up to your

14  computer or software, and get a forensic image of the device;

04:07PM 15  right?

16  A     It is.  But, again, the only way to use that method, the

17  correct method, is to make sure the phone is unlocked and you

18  have the PIN code for the phone.  If you don't have the

19  passcode, you cannot forensically extract the data using the

04:07PM 20  software.  At that point the only option you have, if the phone

21  is open, is to take pictures of those text messages.

22  Q     Well, if the phone is open, then presumably it would be

23  unlocked; right?

24  A     It is, but as soon as you connect it to the computer to

04:07PM 25  use the forensic software, it's going to ask you -- it's like

|      | connecting your phone to any computer.  It wants to trust it. |
|------|---------------------------------------------------------------|
| 1    | connecting your phone to any computer.  It wants to trust it. |
| 2    | The only way to do it is to enter the passcode. |
| 3    | Q    But if you have a witness who is cooperating with the |
| 4    | Government and is willing to give the Government their |
| 04:07PM 5 | cell phone to be imaged, then in your experience, the proper |
| 6    | thing to do to properly preserve the text message would be -- |
| 7    | or text messages would be to image the phone; right? |
| 8    | A    It is.  But if we were just talking about one or two text |
| 9    | messages, a lot of times it's easier just to take a picture of |
| 04:08PM 10 | that text message than to image the whole phone. |

Q    You are familiar, are you not, with apps that are freely
available out on the Internet that allows you to create a
supposed text message to anybody; right?

A    I'm pretty sure, yes.

04:08PM 15   Q    I'm sorry?  Yes?

A    I'm not familiar with those apps, but I'm pretty sure
those apps do exist.

Q    Okay.  I don't know if they're called spoofing.  Have you
ever heard anything called a spoofing app?

04:08PM 20            MR. WYMAN:  Objection.  Relevance.

            THE COURT:  Overruled.

            THE WITNESS:  I've never heard of it.

Q    BY MR. AVENATTI:  Okay.  Are you familiar with the fact
that people can create text messages on their phone that look
04:08PM 25   like they were actually sent or received but they weren't

```
 1   actually sent or received?  Are you familiar with that, sir?
 2   A    I'm not.  But I'm pretty sure it does exist.
 3   Q    And because those apps exist, that's one of the reasons
 4   why you've got to use these, I think you called them common
 5   tools, when it comes to the federal government's investigation
 6   in criminal matters; right?
 7   A    Yes.
 8   Q    That's why you've got to use things like Cellebrite, so
 9   you make sure that the evidence is authentic?
10   A    Yes.
11   Q    Did anyone restrict you in what you could image from the
12   devices?
13   A    No.
14   Q    Did anyone tell you, "Don't image this part of the
15   devices"?
16   A    There is no way to do that.  Once you start imaging,
17   you're imaging the whole device.
18   Q    It's not piecemeal thing?
19   A    No.  After it's imaged, then you can do scope review and
20   extract just the items that are within the scope of that search
21   warrant or whatever that person consented to.  But when you're
22   conducting forensic image, you're imaging the whole thing.
23   Q    So you were asked about a number of extraction reports by
24   Mr. Wyman.  Do you recall that?
25   A    Yes.
```

**UNITED STATES DISTRICT COURT**

```
 1   Q     Those are not the entire images of those devices, are
 2   they?
 3   A     No.  Because the entire image also contains software
 4   files, whole bunch of stuff.  In this situation, this is only
 5   the extraction of the text messages from that cell phone.
 6   Q     But it's not the extraction of all the text messages, is
 7   it?
 8   A     No, it's not.
 9   Q     It's not.  Who told you or instructed you as to which
10   text messages should be extracted?
11   A     Well, in this specific situation, whatever the people
12   consented to or whatever the scope of the warrant was,
13   that's -- based on that, I believe, the text messages were
14   extracted.
15   Q     Well, you had the entirety of the device imaged; right?
16   A     Yes.
17             MR. WYMAN:  Your Honor, I'm not sure which exhibit
18   we're talking about here.  So I would object as vague as to the
19   exhibit.
20             MR. AVENATTI:  Your Honor, let me be specific.  I
21   was trying to shortcut it.
22   Q     If you could turn to 123, which I believe is the
23   extraction report from Mr. Geoff Johnson's phone.
24   A     Okay.
25   Q     Do you have that, sir?
```

```
 1   A      Yes.

 2   Q      These are only text messages between Mr. Johnson and

 3   Mr. Tom Goeders; right?

 4   A      Looks like it.

 5   Q      There's no text messages there between me and

 6   Mr. Johnson, are there?

 7   A      Nope.  Looks like all the communication is between Tom and

 8   Geoff.

 9   Q      No messages there between Mr. Johnson and members of his

10   family, is there?

11   A      No.

12   Q      No messages there between Mr. Johnson and anyone else

13   about me, other than if it's with Mr. Goeders; right?

14   A      I'm not sure.  I haven't read all the text messages.

15   Q      Well, all the text messages in this document are between

16   Mr. Johnson and Mr. Goeders; right?

17   A      In this report, yes.  But you have to understand, once you

18   extract all the data from the cell phone, then within the

19   forensic software you can choose whatever it is you want to

20   create the report based on.  In this situation, looks like it

21   was only for the communication between Geoff and Tom.

22   Q      So that's my question.  Who made that choice?

23   A      I don't recall.  I was either asked or either -- it would

24   have been -- since Geoff was consenting, it would have been --

25   I don't exactly recall.
```

04:12PM   5

04:13PM  10

04:13PM  15

04:13PM  20

04:14PM  25

**UNITED STATES DISTRICT COURT**

```
 1    Q    You don't remember or you don't recall who made that
 2    choice, but somebody did; right?
 3    A    Somebody asked me to create a report based on those two
 4    communications and that's what the report was created on.
04:14PM  5    Q    So as you sit here today, you don't know if there were
 6    other text messages on that phone about me, do you?
 7    A    No.  Because I didn't read every single text message on
 8    there.
 9    Q    And nobody asked you to look for those messages, either
04:14PM 10    did they, as you can recall?
11    A    I don't recall.
12    Q    Let's go to Exhibit 124.  I think you were asked about
13    that.  I believe you testified that this was from Mr. Goeders'
14    cell phone; right?
04:15PM 15    A    Yes.
16    Q    Sir, take your time, but the only text messages I see
17    from this cell phone are the ones between me or Mr. Johnson and
18    Mr. Goeders; am I right about that?
19    A    Yes.
04:15PM 20    Q    There's no other text messages about me or Mr. Johnson
21    that Mr. Goeders may have had with other people; am I correct?
22    A    In this situation, Mr. Goeders only consented to text
23    communication between certain phone numbers, and I believe
24    those are the phone numbers that the report was created for.
04:15PM 25    Q    So you got his phone?
```

```
     1   A      Uh-huh.  Yes.
     2   Q      He consented to allow you to forensically image the
     3   entire phone; am I right?  Because I think you -- strike that.
     4          I think you testified earlier that you can't half
04:15PM 5   forensic a phone.  You either fully forensic image it or you
     6   don't.  Am I right about that?
     7   A      Yes.  But the forensic tool allows you just to -- let's
     8   say -- you can just image just the text messages.  In this
     9   situation he only consented for me to image the text messages.
04:16PM 10  But the problem is, I can't just choose specific text messages
    11   to image.  I have to image all the text messages, then go in
    12   there and just bookmark the phone numbers that he's consenting
    13   to, and then create a separate report based on those.  That's
    14   what happened in this situation.
04:16PM 15  Q      So Mr. Goeders allowed the Government to forensically
    16   image all of the text messages on his phone and then consented
    17   to only allow the Government to extract those messages with
    18   Mr. Johnson and Mr. Avenatti, me; correct?
    19   A      Yes.  He gave me the phone numbers.  He went through the
04:16PM 20  phone -- he gave me the phone numbers that he specifically
    21   consented to, and I create the report based on that.
    22   Q      And he didn't consent to anyone else, any other numbers
    23   other than Mr. Johnson and me.  Am I right about that?  I just
    24   want to make sure the record is clear.
04:17PM 25          MR. WYMAN:  Objection.  Asked and answered.
```

```
 1              THE COURT:  Sustained.
 2     Q    BY MR. AVENATTI:  How about Exhibit 176?  I believe you
 3     said that's the extraction report for Mr. Barela?
 4     A    Yes.
 5     Q    Did Mr. Barela put any restrictions on the Government's
 6     ability to extract messages from his cell phone?
 7     A    I don't recall.  I know he was a consent again, but I
 8     don't recall if he provided me the phone numbers for which he
 9     consented to.  This happened sometime in early 2019.  I don't
10     recall.
11     Q    But you recall that you forensically imaged the entirety
12     of Mr. Barela's cell phone?
13     A    Yes.
14     Q    Other than me and a gentleman by the name of John
15     Arden -- well, strike that.
16              All of the images within this exhibit appear to be
17     text messages relating to communications that Mr. Barela had
18     with either me or Mr. Arden.  Can you take a look and tell me
19     if I'm wrong about that?
20     A    I can see other names and phone numbers here.
21     Q    Agreed, sir.  But I believe that either me and Mr. Arden
22     are party to all of those messages.
23     A    Yes.
24     Q    Am I correct about that?
25     A    Yes.
```

1   Q     So if there was a message about me but I -- neither I or

2   Mr. Arden were a party to it, it would not be included in this

3   report; correct?

4   A     Actually, I don't recall how I was asked to create this

04:19PM 5   report, if it was based on -- if he consented to communication

6   between second phone numbers or if I was asked.  I don't recall

7   exactly.

8   Q     I understand that, sir.  My question is a little more

9   nuanced, which is, based on looking at the document, if

04:19PM 10  Mr. Barela had a message with someone about me but I wasn't a

11  party to it and Mr. Arden was not a party to it, it would not

12  appear within this report, based on your review; am I correct?

13               MR. WYMAN:  Objection.  Asked and answered.

14               THE COURT:  Overruled.

04:20PM 15               THE WITNESS:  Yes.

16  Q     BY MR. AVENATTI:  How long have you been working on this

17  case?

18  A     Since 2019.

19  Q     So over two years?

04:20PM 20  A     Over two years.

21  Q     And during that two-year time period, have you generated

22  various reports and written work product?

23  A     No, because I was -- I'm not the investigative agent.  I

24  was only assisting them with the electronic devices.

04:20PM 25  Q     Have you generated written communications about your work

```
 1    in connection with the case?

 2    A     I have -- believe I did create a report on the meeting

 3    with Greg Barela.

 4    Q     My question, I don't think -- perhaps it's not clear.

 5          Have you generated e-mails and text messages with

 6    others about your work in connection with this case over the

 7    last two-plus years?

 8    A     Most likely.

 9    Q     And why do you say that?  Because that's commonplace when

10    you're working on an investigation?

11    A     Yes.

12    Q     Yes, sir?

13    A     Yes.

14    Q     And before you sent those text messages and those

15    e-mails, they were, obviously, something that you created;

16    right?

17    A     They would have been e-mails.  When it comes out to cases,

18    I don't communicate with text messages.  They might have been

19    e-mails with either prosecutors or agents.

20    Q     In connection with this case and the issues you've been

21    testifying about here today; right?

22    A     In connection to this case, yeah.

23    Q     And your work on this case has been working on these

24    forensic images that we've been talking about here today?

25    A     Part of it.
```

1          MR. AVENATTI:  Your Honor, one moment, please.

2          **(Counsel conferred off the record.)**

3          MR. AVENATTI:  Sir, thank you.

4          Your Honor, nothing further at this time.

04:22PM  5          MR. WYMAN:  Nothing from the Government, Your Honor.

6          THE COURT:  May the witness be excused?

7          MR. AVENATTI:  Your Honor, we may call him in our

8     case.

9          THE COURT:  Sir, you're excused for now but you'll

04:22PM 10    be on call.  Thank you.

11          I think we'll stop here for the day, ladies and

12    gentlemen.  We'll resume tomorrow at 9:00.  Please remember the

13    admonition not to discuss the case with anyone and not to form

14    any opinions on the issues in the case.  Please don't do any

04:22PM 15    research.

16          I'm probably getting a little bit repetitive, but I

17    need to do this so that it's foremost in everyone's mind what

18    the ground rules are.

19          So you're excused at this time.  See you in the

04:22PM 20    morning.  Have a good evening.

21          THE COURTROOM DEPUTY:  All rise.

22          **(Out of the presence of the jury.)**

23          THE COURT:  We have two items:  One, I want to put

24    on the record the explanation for why we took a short break

04:23PM 25    after Mr. Johnson's testimony.  The parties had agreed that the

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT C**

| | | |
|---|---|---|
| 10:49 | 1 | BY MR. AVENATTI: |
| 10:49 | 2 | Q    Let's try 221 instead of 321.  Do you have 221? |
| 10:51 | 3 | A    Yes, I do. |
| 10:51 | 4 | Q    Ms. Regnier, this appears to be another printout from a |
| 10:51 | 5 | QuickBooks record of some sort perhaps, right? |
| 10:51 | 6 | A    Yes. |
| 10:51 | 7 | Q    You have no idea whether this is accurate; do you? |
| 10:51 | 8 | A    No, I don't. |
| 10:51 | 9 | Q    And there is a date in the upper left-hand corner, |
| 10:51 | 10 | again July 26, 2019, same date.  You didn't have any |
| 10:51 | 11 | QuickBooks records in your possession as of that date, |
| 10:51 | 12 | correct? |
| 10:51 | 13 | A    Correct. |
| 10:52 | 14 | Q    Ms. Regnier, in connection with your communications |
| 10:52 | 15 | with the government relating to me, did you have occasion to |
| 10:52 | 16 | send e-mails to any agents or Assistant U.S. Attorneys? |
| 10:52 | 17 | A    I believe I did. |
| 10:52 | 18 | Q    Did you have occasion to send any text messages to any |
| 10:52 | 19 | agents or Assistant U.S. Attorneys? |
| 10:52 | 20 | A    I may have. |
| 10:52 | 21 | Q    You have a recollection of perhaps doing so?  That's |
| 10:52 | 22 | just a yes-or-no question. |
| 10:52 | 23 | A    I believe I did, yes. |
| 10:53 | 24 | Q    Can you estimate how many text messages you sent?  Just |
| 10:53 | 25 | a number. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

10:53    1    A      No.

10:53    2    Q      Between one and five?  Is that a fair estimate?

10:53    3    A      I really don't know.

10:53    4    Q      Less than ten?

10:53    5    A      I really don't know.

10:53    6    Q      If you wanted to find out, do you think you would have

10:53    7    them in your phone?

10:53    8    A      No, I would not.

10:53    9    Q      Why do you think you would no longer have your text

10:53    10   messages to the government in your phone?

10:53    11   A      Because they only save for so long.

10:53    12   Q      So your understanding is your text messages to the

10:53    13   government during the last two years have been destroyed?

10:53    14   A      I have actually changed phones within the last year.

10:53    15   Q      And you didn't save your old phone?

10:54    16   A      No, I didn't.

10:54    17   Q      And you think that those text messages were on that old

10:54    18   phone?

10:54    19   A      I don't know if they were on the old phone.  I don't

10:54    20   know if there is any on the new phone.

10:54    21   Q      The government has never asked you to look for those

10:54    22   text messages; is that correct?

10:54    23   A      No.

10:54    24   Q      Meaning I'm correct?

10:54    25   A      They have never asked me to look for those text

10:54   1   messages, correct.

10:54   2   Q    So do you think that they may be on your current phone?

10:54   3   A    Could be.  I don't know.  I have never looked for them.

10:54   4   There were sent and either replied to or whatever, and I've

10:54   5   never looked for them again.

10:55   6   Q    Ms. Regnier, could you tell the -- strike that.  Could

10:55   7   you please tell the jury the names of the government agents

10:55   8   and Assistant U.S. Attorneys, if there are any, that you

10:56   9   texted with about me.  Just the names, names only.

10:56   10  A    I don't remember all the texts.  I texted with people

10:56   11  having to do with --

10:56   12  Q    I am asking for the names, Ms. Regnier.

10:56   13  A    Okay.  I texted with Ramon Carlos, and I don't remember

10:56   14  the names of the other people.

10:56   15  Q    Mr. Carlos is the only person whose name you remember?

10:56   16  A    Correct.

10:56   17  Q    When do you recall texting with Mr. Carlos?

10:56   18  A    It was back shortly after all of this started.

10:57   19  Q    So in 2019?

10:57   20  A    2019.

10:57   21  Q    It was after you were interviewed by Mr. Carlos and

10:57   22  Mr. Sagel on March 25, right?

10:57   23  A    Yes, it was.

10:58   24  Q    Now, I know we touched on this yesterday as related to

10:58   25  a different date, but do you recall that you met with the

## **CERTIFICATE OF SERVICE**

I, H. Dean Steward, am a citizen of the United States, and am at least 18 years of age. My business address is 17 Corporate Plaza, Suite 254 in Newport Beach, California. I am not a party to the above-entitled action.  I have caused, on August 5, 2021 service of the:

REPLY TO THE GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR MISTRIAL OR, IN THE ALTERNATIVE, TO STRIKE THE TESTIMONY OF NINE GOVERNMENT WITNESSES DUE TO VIOLATIONS OF THE JENCKS ACT AND RULE 26.2

on the following party, using the Court's ECF system:

AUSA BRETT SAGEL AND AUSA ALEXANDER WYMAN

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 5, 2021

/s/ H. Dean Steward

H. Dean Steward

9