1              **UNITED STATES DISTRICT COURT**

2        **CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

3          **HONORABLE JAMES V. SELNA, U.S. DISTRICT JUDGE**

4

5    UNITED STATES OF AMERICA,            )
                                          )
6                   Plaintiff,            )   <u>**CERTIFIED TRANSCRIPT**</u>
                                          )
7          vs.                            )   Case No.
                                          )   SACR-19-00061-JVS
8    MICHAEL JOHN AVENATTI,               )
                                          )   **TRIAL DAY 13**
9                   Defendant.            )   **VOLUME 2**
     _____)

10

11

12

13

14

15                 REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                    TUESDAY, AUGUST 3, 2021

17                          1:31 P.M.

18                    SANTA ANA, CALIFORNIA

19

20

21

22

23   _____

24            **DEBBIE HINO-SPAAN, CSR 7953, CRR**
                FEDERAL OFFICIAL COURT REPORTER
25              411 WEST 4TH STREET, ROOM 1-053
                    SANTA ANA, CA 92701
                    dhinospaan@yahoo.com

                     **UNITED STATES DISTRICT COURT**

1      **APPEARANCES OF COUNSEL:**

2

3   **FOR THE PLAINTIFF:**

4          NICOLA T. HANNA
           United States Attorney
5          BY:  BRETT SAGEL
                Assistant United States Attorney
6          411 West 4th Street
           Suite 8000
7          Santa Ana, California 92701
           714-338-3598
8          brett.sagel@usdoj.gov

9          NICOLA T. HANNA
           United States Attorney
10         BY:  ALEXANDER WYMAN
                Assistant United States Attorney
11         312 North Spring Street
           Suite 1100
12         Los Angeles, California 90012
           213-894-2435
13         alex.wyman@usdoj.gov

14  **FOR THE DEFENDANT IN PRO SE:**

15         MICHAEL JOHN AVENATTI, ESQ.

16

17  **STANDBY COUNSEL FOR MR. AVENATTI:**

           H. DEAN STEWARD LAW OFFICES
18         BY:  H. DEAN STEWARD, ESQ.
           17 Corporate Plaza
19         Suite 254
           Newport Beach, California 92660
20         949-481-4900
           deansteward7777@gmail.com

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

```
 1                        I N D E X

 2     WITNESSES                                           PAGE

 3     ALEXIS GARDNER, CALLED BY THE GOVERNMENT
           Cross-Examination by Mr. Avenatti (resumed)      11
 4         Redirect Examination by Mr. Sagel                22
           Recross-Examination by Mr. Avenatti              35
 5
       FILIPPO MARCHINO, CALLED BY THE GOVERNMENT
 6         Direct Examination by Mr. Wyman                  44

 7

 8                        EXHIBITS

 9                                                    WITHDRAWN
                                              IN         OR
10     EXHIBIT                             EVIDENCE    REJECTED

11     130      8/1/2016 e-mail from M.       56
                Avenatti to F. Marchino with
12              Attachment

13     152      Chase Statement for X Law     63
                Group Account 7608 - 1/31/2017
14
       153      1/26/2017 e-mail from Marchino 66
15              to Avenatti re info with
                Attachment
16
       167      E-mails                       72
17
       168      E-mails                       72
18
       265      3/1/2017 e-mail from Avenatti 79
19              to Tran re IPSY

20     266      8/15/2017 e-mail from Tran to 81
                Avenatti and Marchino re
21              Executed Fee Agreement

22     267      8/16/2017 e-mail from Avenatti 87
                to Tran and Marchino re
23              Signature Page with Attachment

24
       274      Tran Text Messages with       96
25              Marchino
```

UNITED STATES DISTRICT COURT

**SANTA ANA, CALIFORNIA; TUESDAY, AUGUST 3, 2021**

**1:31 P.M.**

**- - -**

01:28PM  **(Out of the presence of the jury.)**

THE COURT:  Before we took the lunch break, Mr. Avenatti raised the issue as to whether there had been a violation of Rule 615 of the Federal Rules of Evidence.  In that regard, he cited me to *United States vs. Robertson*, 01:31PM  895 F.3d 1206, Ninth Circuit, 2018.

Number 1, the Court holds there that the ambit of 615 is not limited to literal presence in the courtroom in violation of the exclusion order.  The rule can also be violated by the witness reviewing transcripts.  In the case of 01:31PM  *Robertson*, it was pretrial transcripts of evidentiary rulings.

I find that reviewing tweets is not the equivalent of reviewing transcripts and that there is, in fact, no Rule 615 violation here.  Second, there's no indication that the witness, Ms. Gardner, did so at the request of the 01:32PM  Government or even with the knowledge of the Government.

Assuming there was a Rule 615 violation, the Court in *Robertson* very clearly says that the remedy is cross-examination.  At page 1216, the Court says:

"We have long recognized cross-examination as 01:32PM  a suit- remedy" -- "as a suitable remedy for a

1        Rule 615 violation at least whereas here the

2        violation of the rule was not deliberate."

3            I've already found that it didn't occur at the

4   instance of the Government.  And I find that, at best, any

01:32PM 5   review of Ms. Cuniff's tweets were not deliberate.

6            I'm going to -- I'm not going to conduct an

7   evidentiary hearing out of the presence of the jury.

8   Disqualification of the witness is an usual circumstance and

9   certainly not warranted here given the limited exposure via

01:33PM 10  Ms. Cuniff's tweets.  I will allow cross-examination of --

11  further cross-examination of Ms. Gardner.

12           Mr. Avenatti raised the question of a Hobson's

13  choice.  If he gets into the negative material, is he

14  prejudicing himself by exposing that negative material to the

01:33PM 15  jury?

16           Sir, I'll allow you to cross-examine, but before the

17  witness, any tweets that you believe are negative and ask her,

18  A, whether she regarded that as a negative comment with respect

19  to you and, B, did it have any effect upon her.

01:33PM 20           It's your choice if at that point you want to go

21  further and expose the substantive content of the particular

22  tweet.  But in the first instance, unless you choose otherwise,

23  I would limit you to expose -- or to explain to the witness

24  only the negative tweet or tweets that you have in mind and ask

01:34PM 25  her, one, whether she's seen them and, two, whether she regards

1    them as negative and, three, what effect that's had upon her.

2                MR. AVENATTI:  Can I respond, Your Honor?

3                THE COURT:  Please.

4                MR. AVENATTI:  Your Honor, I'd like to make a few

01:34PM  5    points.  One, it appears that, in fact, it was deliberate in

6    that Ms. Gardner deliberately read the tweets of the reporter

7    and she appears to have done so extensively.  So --

8                THE COURT:  I don't regard that deliberate in terms

9    of deliberate violation of Rule 615.  She may have been

01:34PM 10    deliberate in carrying out the acts and review those tweets,

11    but I don't believe that's deliberate conduct for the purposes

12    of 615.

13                MR. AVENATTI:  Well, and that's one of the things

14    I'd like to examine or have the Court examine outside the

01:35PM 15    presence of the jury.

16                THE COURT:  Sir, it's not warranted and I'm not

17    going to do that.  Clearly, the appropriate remedy is

18    cross-examination.  The question is how far you wish to go in

19    terms of the substance of some of those tweets.

01:35PM 20                MR. AVENATTI:  My second point, Your Honor, is that

21    I don't believe that the Court has before it an adequate record

22    relating to what these tweets really are, because they're not

23    just generalized tweets, Your Honor, these tweets include

24    questions and answers for every day of the trial as well as

01:35PM 25    filings that have been made before Your Honor outside the

         1    presence of the jury.

         2             The amount of tweeting that has gone on by this

         3    particular reporter has been extensive, Your Honor, and it is

         4    worse than a verbatim transcript.  And I think it is

01:36PM  5    appropriate that we get to the bottom of it and determine --

         6             THE COURT:  Sir, you'll have the opportunity to do

         7    that via cross-examination.  If you wish to put a full record

         8    of the tweets before the Court, you're invited to make that

         9    filing.  But that's my ruling and we're going to go forward

01:36PM 10    with the cross-examination of the witness at this time.

        11             MR. AVENATTI:  Well, then, what I would like to do

        12    is I'd like to at least have a 30-minute recess so I can gather

        13    the tweets and look at them in order to prepare my

        14    cross-examination.  I don't have all the tweets at my disposal

01:36PM 15    right now, Your Honor.  I don't know how -- how am I supposed

        16    to cross-examine the witness --

        17             THE COURT:  Sir, supposedly you had a factual basis

        18    to make the motion or to bring to the Court's attention the

        19    potential Rule 615 violation prior to the time we took the

01:36PM 20    recess this morning.  Sir, we're proceeding.

        21             MR. AVENATTI:  Well, Your Honor, I don't have the --

        22             THE COURT:  Sir, we're proceeding.

        23             MR. AVENATTI:  Well, how am I supposed to

        24    cross-examine the witness without the benefit of the tweets,

01:37PM 25    Your Honor?

<pre>
 1            THE COURT:  Sir, you, obviously, had the benefit of

 2   the tweets to make the comments that you made.  You said they

 3   had been extensive and over a long period, and you said that

 4   before lunch.  I assume in order to have a factual basis to

01:37PM  5   make those statements in good faith, you had in mind and had,

 6   in fact, reviewed the tweets and had them with you.

 7            MR. AVENATTI:  Your Honor, there's a difference

 8   between conversing with people on my team and them showing me

 9   tweets and me having a hard copy of the actual tweets.

01:37PM 10            THE COURT:  Sir, we're going forward.

11            Bring the jury in, please.

12            MR. SAGEL:  Your Honor, if I can just raise one

13   quick thing that we just received at 1:30.

14            THE COURT:  Okay.

01:37PM 15            MR. SAGEL:  Defendant just handed us an unredacted

16   copy of what is our Government 164.  The very reason why some

17   of these exhibits are redacted -- and he was provided with

18   these now a month ago -- is because there are third party and

19   privacy interests.  At no point between July 6 and today did he

01:37PM 20   say anything -- and Ms. Gardner's been on the stand since last

21   week -- say anything about his issues with the redactions or

22   anything.

23            And I point that out that now he's trying to get

24   this in front -- I probably say it's irrelevant anyway, but

01:38PM 25   this is the exact same issue that we've been raising in the
</pre>

01:38PM

01:38PM

01:39PM

01:39PM

01:40PM

```
  1    opposite direction.  He wants things redacted when they're not
  2    at the last second, and now he's trying to get unredacted
  3    things without any issue at the last second for no real reason
  4    that we can see.  And he never -- not before 1:30, before he
  5    walked in here did he ever provide this to us or say anything
  6    to us about this.  And I don't -- you know, I truly can't see a
  7    reason why we need third parties' names in this anyway.
  8             MR. AVENATTI:  Your Honor, I handed up a copy of the
  9    unredacted version for the benefit of the Court before
 10    Your Honor took the bench.  I don't know if you have it.  I can
 11    approach with another copy.
 12             THE COURT:  Wait a minute.  Nope.
 13             MR. AVENATTI:  Can I approach, Your Honor?
 14             THE COURT:  You may.
 15             MR. AVENATTI:  Your Honor, I may be able to shortcut
 16    this with the witness by simply asking her about one of the
 17    names that's redacted.
 18             THE COURT:  Which one and why?
 19             THE WITNESS:  Kendu Isaacs.
 20             THE COURT:  Is that the same Mr. Isaacs that we were
 21    talking about this morning?
 22             MR. AVENATTI:  Yep.
 23             THE COURT:  Make a proffer.  Well, I guess
 24    Mr. Issacs' name is in the record anyway at this point.
 25             MR. AVENATTI:  Correct.
```

|     |                                                                  |
| --- | ---------------------------------------------------------------- |
| 1   | THE COURT:  Okay.                                                 |
| 2   | MR. AVENATTI:  So I don't see any reason for it to               |
| 3   | remain redacted within 164.                                      |
| 4   | THE COURT:  Where specifically are you talking                   |

THE COURT:  Okay.

MR. AVENATTI:  So I don't see any reason for it to remain redacted within 164.

THE COURT:  Where specifically are you talking about?

MR. AVENATTI:  If you look under "moving forward."

THE COURT:  Yeah.

MR. AVENATTI:  "I would like to move forward with would be," and then his name is listed.  And then down below, "I am interested in working with Kendu," and his name is listed.

THE COURT:  Where is the second reference?

MR. AVENATTI:  Right before "was entertainment" and "artist management" under "moving forward."

THE COURT:  I see his name in the second paragraph.

MR. AVENATTI:  If you look at the second paragraph under "moving forward," Your Honor.

THE COURT:  Yeah, I'm there.

MR. AVENATTI:  If you go to the fourth paragraph --

THE COURT:  Okay.

MR. AVENATTI:  -- his name appears once, his full name, and then once, his first name.

MR. SAGEL:  403, Your Honor.  I'm not so concerned that his name is now in the record, which whether or not it should be or not.  It's just, again, this portion, if he wants

```
 1    to say that that's the name there, it's still 403.  It's still
 2    irrelevant to --
 3              THE COURT:  Well, let's hear what the specific
 4    question is.
 5              Okay.  Bring the jury in, please.
 6              MR. AVENATTI:  I'm sorry, Your Honor?
 7              THE COURT:  I asked Ms. Bredahl to bring the jury
 8    in.
 9              (In the presence of the jury.)
10              THE COURT:  Good afternoon, ladies and gentlemen.
11              (The jury collectively responded "Good afternoon.")
12              THE COURT:  Mr. Avenatti.
13              MR. AVENATTI:  Thank you.
14              ALEXIS GARDNER, WITNESS, RESUMED THE STAND
15                    CROSS-EXAMINATION (resumed)
16    BY MR. AVENATTI:
17    Q    Good afternoon, Ms. Gardner.
18    A    Good afternoon.
19    Q    Now, before you testified on Friday, you were aware that
20    you were not supposed to be communicating with any other
21    witnesses in the case, were you not?
22    A    No, I wasn't aware that I cannot talk to my attorney.
23    Q    I'm not asking you about your attorney, Mr. Gammill, I'm
24    talking about -- well, let me ask the question again.
25              Prior to Friday when you took the stand, had anyone
```

```
 1    informed you that you were not supposed to be communicating

 2    with other witnesses in the case, including Mr. Marchino?

 3    A    I don't recall.

 4    Q    You don't recall anyone ever telling you that?

 5    A    I don't recall.

 6    Q    And prior to Friday, did anyone inform you that you were

 7    not supposed to be reading any trial testimony from the case,

 8    whether it be on Twitter or some other form?

 9    A    I just know I couldn't come.

10         MR. AVENATTI:  Move to strike, Your Honor.

11         THE COURT:  It will be stricken.

12    Q    BY MR. AVENATTI:  Ms. Gardner, here's my question:  Prior

13    to taking the stand on Friday, had anyone informed you that you

14    were not supposed to be reading trial testimony or about events

15    that happened during the trial?  Meaning this trial.

16    A    I don't recall.

17    Q    You don't recall anyone ever advising you of that?

18    A    I don't recall.

19    Q    Did you speak with Mr. Marchino about what you read on

20    Twitter, relating to what has been going on in this trial?

21    A    I can't remember.

22    Q    Well, it's been pretty recent; right?  It's just been

23    over the last two weeks; right?

24    A    Yes.

25    Q    Okay.  Well, when Mr. Sagel was asking you questions
```

```
        1    about things happening three, four years ago, you seemed to

        2    have near perfect recall.  Do you remember that?

        3            MR. SAGEL:  Objection.  Argumentative, Your Honor.

        4            THE COURT:  Sustained.

01:47PM  5    Q    BY MR. AVENATTI:  Ms. Gardner, I'm just talking about the

        6    last two weeks --

        7    A    I know.

        8    Q    -- during the trial.

        9    A    I slept a lot.  I was -- I slept a lot.  Yeah.

01:47PM 10            MR. AVENATTI:  Move to strike, Your Honor.

       11            THE COURT:  Denied.

       12    Q    BY MR. AVENATTI:  Ms. Gardner, over the last two weeks,

       13    isn't it true that you've spoken to Mr. Marchino about what

       14    you've read on Twitter as it relates to this trial?

01:47PM 15    A    I don't remember.

       16    Q    So you may have?

       17            MR. SAGEL:  Objection.  Asked and answered,

       18    Your Honor.

       19            THE COURT:  Overruled.

01:47PM 20            THE WITNESS:  I don't recall.

       21    Q    BY MR. AVENATTI:  Have you texted with anyone, other than

       22    Mr. Gammill, about what you've read on Twitter during the trial

       23    of this case?

       24            MR. SAGEL:  Objection.  Vague as to "anyone."

01:48PM 25            THE COURT:  Overruled.
```

```
 1                    THE WITNESS:  Yes.
 2   Q    BY MR. AVENATTI:  Who have you texted with?
 3   A    My mother.
 4   Q    Anyone else?
 5   A    Not that I recall.
 6   Q    Has your mother been following what's been going on in
 7   this case over the last two years -- or strike that.
 8            Has your mother been following what's been going on
 9   in this case over the last two weeks, to the best of your
10   knowledge?
11            MR. SAGEL:  Objection.  Foundation.  Calls for
12   speculation.
13            THE COURT:  Lay the foundation.
14   Q    BY MR. AVENATTI:  You said that you have been
15   communicating via text message with your mother about what has
16   been going on during this trial; is that right?  Yes or no?
17   A    She's my mom.  Yes.
18   Q    Okay.  And she's been texting you as to what various
19   people had been testifying about; right?
20   A    No.
21   Q    Has she been referring you to press reports about the
22   case?
23   A    No.
24   Q    How was it that you found the press reports that you
25   mentioned earlier today?  How did you find out about them?
```

01:48PM (line 5)
01:48PM (line 10)
01:49PM (line 15)
01:49PM (line 20)
01:49PM (line 25)

**UNITED STATES DISTRICT COURT**

|  |  |
|---|---|
| 1 | A    I looked up my name in a Twitter search. |
| 2 | Q    What about the "L.A. Times" article, how did you find |
| 3 | that? |
| 4 | A    Via looking up my name in a Twitter search. |
| 01:50PM 5 | Q    Let me direct your attention, if I could, to a document |
| 6 | that Mr. Sagel asked you about, Exhibit 164. |
| 7 |          Before we get to 164, Ms. Gardner, you're an |
| 8 | actress; is that right? |
| 9 | A    I've taken jobs as an actress playing characters, yes. |
| 01:51PM 10 | Q    Isn't that generally what people call an actress? |
| 11 | A    It doesn't pay my bills as of today. |
| 12 |          MR. AVENATTI:  Move to strike as non- -- |
| 13 |          THE COURT:  It will be stricken. |
| 14 | Q    BY MR. AVENATTI:  Ms. Gardner, isn't it true that you |
| 01:51PM 15 | have regularly held yourself out on social media and otherwise |
| 16 | as an actress? |
| 17 | A    Yes. |
| 18 | Q    And you've taken acting jobs in the past; right? |
| 19 | A    Yes. |
| 01:51PM 20 | Q    And some of the parts that you've auditioned for have |
| 21 | been involved in playing roles for people in trial; right? |
| 22 | A    As the attorney but not on the other side.  Yes. |
| 23 | Q    Who is Alexis, and the last name is D-e-v-i-y-a-n?  Who |
| 24 | is that?  How do you pronounce that name, do you know? |
| 01:52PM 25 | A    Deviyan. |

```
        1    Q    I'm sorry?

        2    A    Deviyan.

        3    Q    Deviyan?

        4    A    Yes.

01:52PM  5    Q    Who is Alexis Deviyan?

        6    A    Alexis Deviyan was the first stage name that I adopted.

        7    Q    What do you mean "stage name"?

        8    A    One of my mentors said that people -- I guess when you

        9    receive hard critics as an artist, that you should take on a

01:53PM 10    stage name so that when people are talking about you, they're

       11    not talking about you specifically, they're talking about the

       12    work that you did.

       13         And so I've had a couple, but that was the first one

       14    that I tried.  But it just didn't seem to fit after a while.

01:53PM 15    Q    How many stage names have you had?

       16         MR. SAGEL:  Objection.  403, Your Honor.

       17         THE COURT:  Sustained.

       18    Q    BY MR. AVENATTI:  Ms. Gardner, in 2018 and early 2019,

       19    you were aware, were you not, that I was assisting your mother

01:53PM 20    with a number of things?

       21    A    I'm not familiar with the date, but the only thing that --

       22    Q    Just --

       23    A    -- that she did say was you were her lawyer at some point.

       24    Q    I'm sorry?

01:54PM 25    A    At some point she said that you became her lawyer, but she
```

```
 1   didn't tell me the number or anything in further relation to
 2   it.
 3   Q    I want to direct your attention to Exhibit 164.  I think
 4   it's on the screen.  Mr. Sagel asked you some questions about
 5   this document.  Do you remember that?
 6   A    Yes.
 7   Q    Now, a number of the entries in this e-mail have nothing
 8   to do with your settlement with Mr. Whiteside; would you agree
 9   with that?
10   A    Yes.
11   Q    And you had asked me to assist you with a number of
12   things that had nothing to do with Mr. Whiteside during 2018
13   and 2019; isn't that true?  Yes or no?
14   A    Yes.
15   Q    And if I can direct your attention to the middle of the
16   page, I want to ask you about some of the -- a couple of the
17   redactions by Mr. Sagel.  Do you have 164?
18   A    I do.
19         MR. AVENATTI:  Ms. Hernandez, if we can have the
20   first two paragraphs and under the heading "moving forward."
21   Q    Do you see that, Ms. Gardner?
22   A    Yes, I'm familiar.
23   Q    You're familiar with this document because you reviewed
24   it before you testified; right?
25   A    I wrote it.
```

01:54PM  5
01:54PM 10
01:55PM 15
01:55PM 20
01:56PM 25

UNITED STATES DISTRICT COURT

```
 1   Q    You wrote it.  And you stand behind it; right?
 2   A    Yes.
 3   Q    Now, in the second paragraph, you write:
 4             "One of my questions for you would be, if I
 5        sign with an established management company, can I
 6        bring pieces of my own team?  Because, personally,
 7        the only people I would like to move forward with
 8        would be --" and then there's two names that are
 9   redacted there; right?
10   A    Yes.
11   Q    One of those names was Kendu Isaacs; right?
12   A    Yes.
13   Q    And the date of this document is February 23, 2019;
14   right?
15   A    Yes.
16   Q    About 18 or 19 days after that text message that we were
17   talking about before the break; right?
18   A    Yes.
19   Q    And then later in the -- not the next paragraph but the
20   following paragraph --
21             No.  Yep.  Thank you.
22             Can you see that?
23   A    I do.
24   Q    There's a redacted name, and it reads:
25             "Was entertainment and artist management for
```

**UNITED STATES DISTRICT COURT**

```
 1              Grammy award-winning artist 'blank' for 16 years,
 2              winning six Grammys as a team and two Oscar
 3              nominations.  I am interested in working with
 4              'blank' as an A & R and producer, not manager."
01:58PM 5              Did I read that correctly?
 6    A    Yes.
 7    Q    And the first name that is blacked out, that's another
 8    instance of Kendu Isaacs, isn't it?
 9    A    Yes.
01:58PM 10   Q    And then when you say, "I am interested in working with,"
11   and there's a redacted box there, that's another instance of
12   Kendu Isaacs; right?
13   A    Yes.
14   Q    And you said "as an A & R."  What's an A & R?
01:58PM 15             MR. SAGEL:  Objection.  403 at this point,
16   Your Honor.
17             THE COURT:  Overruled.
18             THE WITNESS:  That's basically the person who helps
19   you put together the elements that create your song, sonically.
01:59PM 20   The -- well, it's the person that makes the beat, the
21   musicians, the vocal producers.  Yeah.  They help you
22   coordinate your vision.
23   Q    BY MR. AVENATTI:  And you already established that you
24   wrote 164 around the same date that you sent it, February 23,
01:59PM 25   2019; is that correct?
```

```
         1    A     Yes.

         2    Q     And you stand behind your words; right?

         3    A     Yes.

         4    Q     You don't want to change anything; right?

02:00PM  5               MR. SAGEL:  Objection.  Argumentative, Your Honor.

         6               THE COURT:  Overruled.

         7               MR. AVENATTI:  I'll strike the question.

         8    Q     And, in fact, you sent this e-mail not once but twice,

         9    didn't you?

02:00PM 10    A     I don't recall.

        11    Q     Do you recall telling the Government that you sent it

        12    twice?

        13    A     I don't remember.

        14    Q     Do you have the notes from your April 2nd, 2019

02:00PM 15    interview?

        16    A     Yes.

        17    Q     Let me direct your attention to paragraph 82.

        18    A     I'm sorry, I was yawning.  Could you repeat the paragraph

        19    again.

02:01PM 20    Q     Sure.  Directing your attention to paragraph 82, my

        21    question is, does that refresh your recollection that you sent

        22    this document, 164, not once, but twice?

        23    A     Per the document, yes.  But I'm saying --

        24    Q     Thank you.

02:01PM 25    A     -- I don't remember.
```

**UNITED STATES DISTRICT COURT**

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | MR. AVENATTI:  Everything after "yes," please move                 |
|       | 2  | to strike, Your Honor, as nonresponsive.                           |
|       | 3  | THE COURT:  It will be stricken.                                   |
|       | 4  | MR. AVENATTI:  Your Honor, one moment, please.                     |
| 02:01PM | 5  | **(Counsel conferred off the record.)**                         |
|       | 6  | Q    BY MR. AVENATTI:  I just have one question, Ms. Gardner,       |
|       | 7  | and then I'm going to sit down.                                    |
|       | 8  | During the break, did anybody from the Government                  |
|       | 9  | ask you to look for any bank records?                              |
| 02:02PM | 10 | A    No.                                                         |
|       | 11 | MR. SAGEL:  Your Honor, I'd ask --                                 |
|       | 12 | MR. AVENATTI:  No.  Nothing further.                              |
|       | 13 | MR. SAGEL:  I'd ask for an instruction that the                   |
|       | 14 | Government is not allowed to talk to a witness while they're       |
| 02:02PM | 15 | testifying based on that question, Your Honor.                    |
|       | 16 | THE COURT:  With respect to all witnesses, ladies                 |
|       | 17 | and gentlemen, I've instructed the parties that they're to have   |
|       | 18 | no substantive discussion with the witness about the witness's    |
|       | 19 | testimony from the time they take the stand until they're         |
| 02:03PM | 20 | released from the stand.  That applies to all parties and all     |
|       | 21 | witnesses.                                                        |
|       | 22 | MR. AVENATTI:  Your Honor, I'd like to ask one last               |
|       | 23 | question, then, in light of the instruction.                     |
|       | 24 | MR. SAGEL:  He tendered the witness, Your Honor.                 |
| 02:03PM | 25 | THE COURT:  Mr. Avenatti, proceed.                               |

```
 1   Q    BY MR. AVENATTI:  Ms. Gardner, did you or anyone on your
 2   behalf during the break try to locate any bank records?
 3   A    I called my bank and asked them to send me hard copies of
 4   all of my records, for my records.
 5   Q    And that was the first time you've done that since --
 6   well, ever; right?
 7   A    Yes.
 8        MR. AVENATTI:  Nothing further.
 9        THE COURT:  Mr. Sagel.
10                      REDIRECT EXAMINATION
11   BY MR. SAGEL:
12   Q    Good afternoon, Ms. Gardner.
13   A    Good afternoon.
14   Q    Friday the defendant went over with you the amount of
15   money you told the Government during your first meeting and
16   went over the calculations with you.  Do you remember that from
17   Friday?
18   A    Yes.
19   Q    Let me start with, the $3.6 million that you told the
20   Government in your first meeting, why did you tell the
21   Government that number?
22   A    That's what Michael had told me.
23   Q    At that time when you told the Government that you
24   thought it was $3.6 million, had you ever even seen the
25   settlement agreement?
```

```
 1   A    No.
 2   Q    When the defendant asked you to do this calculation, to
 3   multiply seven years at $20,000 and one year at $16,000 and all
 4   the different math here, had you ever tried to do that math
 5   yourself before?
 6   A    Yes.  Yes.
 7   Q    Did you think it was your job to figure out how much you
 8   were due?
 9   A    At some point, yes.
10   Q    Why did you think at some point it became your job to do
11   that?
12   A    Because per the terms of this -- per the terms of what I
13   was told the settlement would be, that it would come every
14   month.  And once it stopped and it wasn't consistent, I tried
15   to calculate and understand what was there, what was left, and
16   what was missing.  But also just trying to understand -- yeah.
17   I'm sorry.  It's a lot.
18   Q    When you met with the defendant in December of 2016 to
19   hire him as your lawyer --
20   A    Uh-huh.
21   Q    -- did you expect him to tell you how much you would get
22   from your settlement agreement?
23   A    Yes.
24   Q    Did you expect him to do the math of how much you were
25   owed?
```

**UNITED STATES DISTRICT COURT**

```
 1              MR. AVENATTI:  Leading.  Leading, Your Honor.
 2              THE COURT:  Overruled.
 3              THE WITNESS:  Yes.
 4    Q    BY MR. SAGEL:  He went over the math with you and told
 5    you the numbers didn't add up to the numbers.  Do you remember
 6    that, that your numbers didn't add up to 33 percent?  Do you
 7    remember him asking you that question?
 8    A    Yes.
 9    Q    Did you think it was your job to check to see if the math
10    that the defendant gave you was accurate?
11              MR. AVENATTI:  Asked and answered, Your Honor.
12              THE COURT:  Sustained.
13    Q    BY MR. SAGEL:  Did you think you needed to check the
14    defendant's work of what he was telling you?
15    A    No.
16              MR. AVENATTI:  Asked and answered, Your Honor.
17              THE COURT:  Sustained.
18              MR. AVENATTI:  Move to strike.
19              THE COURT:  Stricken.
20    Q    BY MR. SAGEL:  All these numbers from this chart about
21    monthly payments, that wasn't part of your terms of your
22    settlement agreement.  Why did you need to do that math?
23    A    To justify what I was told.
24    Q    And who were you told that by?
25    A    My attorney.
```

```
 1   Q    Is that the defendant?

 2   A    Yes.  Sorry.  That really struck me.

 3   Q    Had the defendant told you that there would be one

 4   payment of $2.75 million due later that month, would you have

 5   been required to do any math?

 6   A    No.

 7             MR. AVENATTI:  Objection, Your Honor.  403.

 8             THE COURT:  Overruled.

 9             MR. AVENATTI:  Outside the scope.

10             THE COURT:  Denied.

11             THE WITNESS:  No.

12   Q    BY MR. SAGEL:  When defendant went over the math with you

13   both on Friday and today, he asked you if you accounted for the

14   cost and the expenses.  Do you remember those questions?

15   A    Yes.

16   Q    Did the defendant ever provide you with the cost and

17   expenses on your case?

18   A    No.

19   Q    Who did you expect to provide you with the accounting of

20   the cost and expenses if they were to be deducted from your

21   settlement?

22   A    My attorney.

23   Q    The defendant?

24   A    Yes.

25   Q    Defendant asked you on Friday and, again, this morning
```

02:08PM (lines 5, 10, 15)
02:09PM (lines 20, 25)

```
          1   whether or not you knew there were considerable expenses and

          2   costs on your case.  Do you even know that as you sit here?

          3              MR. AVENATTI:  Objection, Your Honor.  Asked and

          4   answered.

02:09PM   5              THE COURT:  Overruled.

          6              MR. AVENATTI:  Seeks to ignore the witness's prior

          7   testimony.

          8              THE COURT:  Overruled.

          9              THE WITNESS:  Could you repeat the question.

02:09PM  10   Q    BY MR. SAGEL:  Do you even know whether or not

         11   considerable costs were -- cost and expenses were expended on

         12   your case?

         13   A    No.

         14   Q    As you sit here, do you even know if it was the defendant

02:09PM  15   or his firm who spent any money on the cost and expenses of

         16   your case?

         17   A    I do not know.

         18              MR. SAGEL:  Where is your exhibit, the handwritten

         19   exhibit?  Can I get that, please, when you have an opportunity?

02:10PM  20   Q    You were asked questions today about doing a calculation

         21   with 33.3 percent.  Do you remember that?

         22   A    Yes.

         23   Q    At one point you said you're confused because you don't

         24   remember where 33.3 percent came from.

02:11PM  25   A    Yes.
```

```
 1              MR. SAGEL:  If we could pull up Exhibit 132,
 2   paragraph 4.
 3   Q    Your fee agreement, Exhibit 132, doesn't say
 4   33.3 percent, does it?
 5   A    No.
 6   Q    Do you know why defendant was asking you to calculate
 7   with 33.3 percent?
 8   A    Probably to continue to confuse me.
 9              MR. AVENATTI:  Objection, Your Honor.  Move to
10   strike.
11              THE COURT:  Overruled.  Denied.
12   Q    BY MR. SAGEL:  Defendant also went over in the same
13   paragraph how it mentions 40 percent, and you started to give
14   an answer.  What was your understanding of when it would be 40
15   percent?
16   A    If we filed a lawsuit.
17   Q    Did you?
18   A    No.  Not to my knowledge.
19   Q    Defendant went over your calculations that he marked as
20   Defendant's Exhibit 1051, which were, if I'm saying it
21   correctly, your calculations of what you believed you were
22   owed; is that correct?
23   A    Yes.  I calculated the 33 percent and the 33.3 percent.
24   Q    So there's the 33 percent calculation and the 33.3
25   percent calculation; is that correct?
```

02:11PM (line 5)
02:11PM (line 10)
02:12PM (line 15)
02:12PM (line 20)
02:13PM (line 25)

|   | |
|---|---|
| 1 | A    Yes. |
| 2 | Q    And they're both in and around 1.76- or $1.75 million; is |
| 3 | that correct? |
| 4 | A    Yes. |
| 02:13PM 5 | Q    Were you ever paid that money? |
| 6 | A    No. |
| 7 | Q    Defendant asked you earlier this morning about the |
| 8 | additional $250,000 you got and Mr. Marchino assisting you in |
| 9 | getting that money.  Do you recall that? |
| 02:13PM 10 | A    Yes. |
| 11 | Q    When did you learn that there would be a $250,000 |
| 12 | additional payment due in November of 2020? |
| 13 | A    The first time that I met with the AUSAs and they told me |
| 14 | about the terms of the agreement. |
| 02:14PM 15 | Q    When, if ever, did the defendant tell you there was a |
| 16 | $250,000 payment due in November of 2020? |
| 17 | A    He may have told me at the -- at the -- at the -- when he |
| 18 | was breaking it down or giving me the amount.  Because that was |
| 19 | the -- I guess like a timeline within it.  But I can't -- yes. |
| 02:14PM 20 | He told me this at the mediation.  At the end of the mediation |
| 21 | he told me about the $250,000.  But I had forgotten.  I had |
| 22 | long forgotten. |
| 23 | Q    If I could have you look at -- I believe it's |
| 24 | Exhibit 139 -- page 2 of Exhibit 139, when he went over -- when |
| 02:15PM 25 | you're talking about he was going over it with you at -- the |

```
         1    terms.  Did he show it to you in this document?

         2    A      No.

         3    Q      Do you have the April 2nd, 2019, memorandum of interview

         4    report there?

02:16PM   5    A      Yes.

         6    Q      Defendant asked you about paragraph 26.

         7              One second.

         8              (Counsel conferred off the record.)

         9    Q      BY MR. SAGEL:  Defendant asked you if this report -- or

02:16PM  10    you had told the Government if you asked for the copy of this

        11    settlement agreement over and over again in writing.  Do you

        12    remember him asking you that question?

        13    A      Yes.

        14    Q      Does the report actually say you were asking for it over

02:16PM  15    and over again -- or asking in writing over and over again as

        16    he asked you?

        17              MR. AVENATTI:  Objection, Your Honor.  Improper use

        18    of the document.  It's hearsay.  It's not being used to

        19    refresh.  If he'd like to ask her a question, he can do so.

02:17PM  20              THE COURT:  Overruled.

        21              MR. SAGEL:  612 as the adverse party, Your Honor.

        22    Q      Does that report say that you asked in writing over and

        23    over again for the settlement agreement?

        24    A      In writing and over the phone, yes.  It says that.

02:17PM  25    Q      Do you have any doubt that you asked defendant for it
```

1   over and over again?

2   A     No.

3   Q     Did defendant ever provide it to you?

4   A     No.

02:17PM 5   Q     Do you remember any of the excuses defendant provided you

6   as to why he was not providing it to you?

7              MR. AVENATTI:  Objection, Your Honor.  Outside the

8   scope.

9              THE COURT:  Overruled.

02:17PM 10             THE WITNESS:  He said that it was -- I'd never been

11   to the Newport office.  I'd always taken meetings at the office

12   on Sunset.  And he said -- he would say that it was in the

13   Newport or the beach office, and he'd just kind of deflect.

14   "Oh, yeah.  I'll get it to you.  Don't worry about it.  I'll

02:18PM 15   get it to you.  Just kind of be patient.  Give me some time.

16   Have a lot of things going on," but he'll get it to me.  But it

17   was never within arm's length.

18             Oh, and when I originally signed it, he said that he

19   had to get a copy from them.  After I signed it, he told me

02:19PM 20   that he had to get it back to them and that he would get it to

21   me.

22   Q     BY MR. SAGEL:  I believe it was this morning the

23   defendant asked you questions about reaching out to your

24   ex-boyfriend and then a conversation you had with the

02:19PM 25   defendant.  Do you recall that?

UNITED STATES DISTRICT COURT

```
 1   A     Yes.
 2   Q     Let me go backwards before I ask you about that
 3   particularly.
 4         When you were not receiving your monthly deposits or
 5   they were late, who did the defendant tell you he was talking
 6   to to find your missing deposits?
 7         MR. AVENATTI:  Outside the scope, Your Honor.
 8         THE COURT:  Overruled.
 9         THE WITNESS:  My ex.  Well -- yes, my ex and his
10   counsel.
11   Q     BY MR. SAGEL:  And when the defendant contacted you to
12   tell you that he learned you had tried to contact your
13   ex-boyfriend in violation of the agreement, how did that make
14   you feel?
15   A     It hurt.
16   Q     What, if anything, about him telling you he was in
17   contact with the attorneys to find out you spoke to your ex did
18   that make you feel about what he had been telling you about him
19   contacting the lawyers on the other side?
20   A     It validated that there was communication.
21   Q     When you say "validated," was that in your mind?
22   A     Yeah.
23   Q     If you could look at Exhibit 132, which I believe is your
24   fee contract.  Defendant went over paragraph 5 with you, on
25   page 2, about the negotiability of fees.  Do you see that
```

1    paragraph?

2    A    Yes.

3    Q    What negotiations did you have with defendant over your

4    fee structure?

02:22PM 5    A    There was -- it wasn't really a negotiation.  I told him

6    what I had been going through.  He told me that he could help

7    me and that the fee would be 33 percent of what we recovered.

8    Q    And he had this document with him when he met with you?

9    A    Yes.

02:22PM 10   Q    And then paragraph 6 -- paragraph 9, defendant went over

11   the related unknown matters with you.  And he asked you where

12   in that paragraph does it say "written" or "signed anywhere";

13   is that correct?

14   A    Yes.

02:23PM 15   Q    Do you know what the laws are for attorney-client fee

16   contracts?

17            MR. AVENATTI:  Objection, Your Honor.  Seeks an

18   improper opinion, conclusion.

19            MR. SAGEL:  Foundational question, Your Honor.

02:23PM 20            THE COURT:  Overruled.

21   Q    BY MR. SAGEL:  Do you know what the law is on

22   attorney-client fee contracts?

23   A    No.

24   Q    Do you know whether or not if you had a fee contract?

02:24PM 25            MR. AVENATTI:  Objection, Your Honor.

```
 1              THE COURT:  Let him finish the question, please.
 2    Q    BY MR. SAGEL:  Do you know whether or not you had a fee
 3    contract with the defendant that would require you to pay more
 4    than a thousand dollars, it would need to be a written fee
 5    contract?
 6              MR. AVENATTI:  Objection, Your Honor.  Misstates the
 7    law, seeks an improper opinion, and lacks foundation.
 8              THE COURT:  Sustained.
 9    Q    BY MR. SAGEL:  The first paragraph of your fee contract
10    says, "This is a fee contract based on California law."  Did
11    you know that on your own?
12    A    No.
13    Q    Who did you rely on to know that you were being given a
14    legal fee contract?
15    A    My attorney.
16    Q    The defendant?
17    A    Yes.
18    Q    Defendant asked you questions about whether or not the
19    words "written" or "signed" were anywhere in this document
20    about another agreement.  Based on those questions, did you
21    ever have any other agreements with him to do legal work for
22    you for money?
23    A    No.
24    Q    If you could look at Exhibit 158.  Those were some checks
25    that defendant was going over with you.  Do you have
```

02:24PM (line 5)
02:24PM (line 10)
02:24PM (line 15)
02:25PM (line 20)
02:25PM (line 25)

**UNITED STATES DISTRICT COURT**

```
 1  Exhibit 158 in front of you?
 2  A    One sec.  Yes.
 3  Q    I didn't have it in front of me, so I apologize.  If I
 4  understood -- if I heard you correctly, when you were asked to
02:26PM 5  look at these before, was it that you said you were not
 6  comfortably familiar with these checks?
 7  A    Yes.
 8  Q    What did you mean by that?
 9  A    All of the remitters' names are fairly different.  But
02:26PM 10  also, I don't remember all the dates that I got deposits.  And
11  so -- and I didn't look it up before I came.  So I can't be
12  sure that this is the day that I got any of these certain
13  amounts.
14  Q    Who did you believe was depositing money into your
02:27PM 15  accounts?
16  A    My ex and his counsel.  My ex or his financial advisor.
17  Q    And who told you that?
18  A    Michael Avenatti.
19  Q    Had you ever seen these cashier's checks prior to meeting
02:27PM 20  with the Government?
21  A    No.
22  Q    When, during the course of the defendant representing you
23  as his lawyer, did he tell you he was making the monthly
24  deposits into your account?
02:27PM 25  A    Never.
```

```
 1  Q    Do you remember defendant asking you questions about how
 2  you would need to review your bank account to see whether or
 3  not these were deposited into your account?
 4  A    Yes.
 5  Q    Would you need to review your bank records to know if
 6  your portion of a $2.75 million settlement account was
 7  deposited into it?
 8  A    No.
 9  Q    If I could have you look at Exhibit 139, page 2,
10  paragraph 2.  We were looking at it a second ago.  Do you see
11  the paragraph regarding payment?
12  A    Yes.
13  Q    Do you see anywhere in that paragraph where it mentions
14  monthly payments of $16,000?
15  A    No.
16              MR. SAGEL:  No further questions, Your Honor.
17              THE COURT:  Mr. Avenatti.
18              MR. SAGEL:  May I approach to return the exhibit?
19              MR. AVENATTI:  I'm going to use it, actually.
20                      RECROSS-EXAMINATION
21  BY MR. AVENATTI:
22  Q    Ms. Gardner, I want to ask you about 139, which is the
23  document that Mr. Sagel was just talking to you about, the
24  settlement agreement.
25              Ms. Hernandez, can I have 139.. the last page,
```

02:28PM (line 5)
02:28PM (line 10)
02:29PM (line 15)
02:29PM (line 20)
02:30PM (line 25)

```
 1   please.  Can we blow up the signature block.  Actually, can we

 2   blow up the entire page.

 3            Ms. Gardner, do you see above your signature on this

 4   page there's some bolded words "in witness wherefore"?

02:31PM 5        MR. SAGEL:  Objection.  Misstates the document.

 6            THE COURT:  Was it misread?

 7            MR. SAGEL:  Yes.

 8            MR. AVENATTI:  Well, let's put it on the screen.

 9            MR. SAGEL:  He said "wherefore."  It's "whereof."

02:32PM 10           MR. AVENATTI:  Can we blow up the -- Ms. Gardner's

11   signature and the language, please.  Thank you.

12   Q    That reads:  "In witness whereof intending to be

13        legally bound hereby, the parties have executed this

14        agreement as of the day and year written above."

02:32PM 15           Did I read that correctly?

16   A    Yes.

17   Q    And that's your signature; correct?

18   A    Yes.

19   Q    I didn't sign your name, did I?

02:32PM 20   A    I didn't buy a jet.

21            MR. AVENATTI:  Move to strike, Your Honor.

22            THE COURT:  It will be stricken.

23            Disregard, ladies and gentlemen.

24            Please listen to the question and just answer the

02:32PM 25   question.
```

|     |     |
| --- | --- |
| 1 | THE WITNESS:  I apologize. |
| 2 | Q   BY MR. AVENATTI:  Ms. Gardner, did I sign your name?  Yes |
| 3 | or no? |
| 4 | A   No. |
| 02:33PM 5 | Q   Did Judge Meisinger sign your name? |
| 6 | A   I signed my name. |
| 7 | Q   How about Hassan Whiteside, did he sign your name? |
| 8 | A   No.  I signed my name. |
| 9 | Q   And those words were on the page above your signature |
| 02:33PM 10 | before you signed your name, weren't they? |
| 11 | THE WITNESS:  That I can even read.  "Just sign |
| 12 | right here." |
| 13 | MR. AVENATTI:  Move to strike, Your Honor. |
| 14 | THE COURT:  It will be stricken. |
| 02:33PM 15 | Q   BY MR. AVENATTI:  Ms. Gardner, those words that I just |
| 16 | read were on that page before you signed the agreement on that |
| 17 | date -- |
| 18 | MR. SAGEL:  Objection -- |
| 19 | Q   BY MR. AVENATTI:  -- weren't they? |
| 02:33PM 20 | MR. SAGEL:  Objection.  Foundation.  She doesn't |
| 21 | know what's on the page. |
| 22 | THE COURT:  Overruled. |
| 23 | THE WITNESS:  Repeat your question. |
| 24 | MR. AVENATTI:  Can I have it read back, Your Honor? |
| 02:34PM 25 | THE COURT:  Yes. |

1     **(The record was read as follows:**

2     **"Ms. Gardner, those words that I just read were**

3     **on that page before you signed the agreement**

4     **on that date?")**

02:34PM 5 Q BY MR. AVENATTI:  Yes or no?

6    THE WITNESS:  Could you read it one more time?

7     **(The record was read as follows:**

8     **"Ms. Gardner, those words that I just read were on**

9     **that page before you signed the agreement on that**

02:33PM 10     **date?")**

11    THE WITNESS:  I don't know because I don't remember

12 seeing it when I signed it.  So I don't know.

13 Q BY MR. AVENATTI:  Ms. Gardner, is it your testimony

14 before this jury that when you signed this page there was

02:34PM 15 nothing on the page other than the place for you to sign.  Is

16 that your testimony?  Yes or no?

17 A There was --

18 Q Yes or no?

19 A There was something on the page, yes.

02:35PM 20 Q Mr. Sagel asked you about this calculation moments ago.

21 Do you remember that?

22 A Yes.

23 Q And he made a big deal out of the .3 percent.  Do you

24 remember that?  33 versus 33.3 percent?

02:36PM 25 A Wasn't a big deal, but yes.

```
         1    Q    I agree it wasn't a big deal.
         2             Here's my question:  You calculated it both ways, 33
         3    and 33.3; right?
         4    A    To the best of my ability, yes.
02:36PM  5    Q    The calculation with the 33 percent is $1,766,000; right?
         6             MR. SAGEL:  Asked and answered, Your Honor.
         7             THE COURT:  Overruled.
         8    Q    BY MR. AVENATTI:  Right?
         9    A    Say it again.
02:36PM 10    Q    Your calculation using 33 percent versus 33.3 percent was
        11    $1,766,000, right here; correct?
        12    A    Yes.
        13    Q    No inclusion for the money relating to the $250,000;
        14    correct?
02:37PM 15             MR. SAGEL:  Asked and answered, Your Honor.
        16             THE COURT:  Overruled.
        17    Q    BY MR. AVENATTI:  Yes or no?
        18    A    Yes.
        19    Q    No inclusion of the money that was delivered to you at
02:37PM 20    the Airbnb; correct?
        21    A    Yes.
        22    Q    And it's all contingent upon how much you list for the
        23    money you received, which is $192,000; right?
        24    A    Not including the rent.
02:38PM 25    Q    Do you recall that Mr. Sagel just asked you about your
```

```
 1   efforts to get a copy of the settlement agreement?  Do you
 2   recall those questions moments ago?
 3   A    Yes.
 4   Q    Isn't it true that you told the Government that you had
 5   requested the settlement from Mr. Cassaro and Mr. Marchino as
 6   well?
 7   A    Yes.
 8   Q    And you told the Government that Mr. Cassaro and
 9   Mr. Marchino told you that the settlement was in the Long Beach
10   office that was shut down and no one could get to it.  Isn't
11   that what you told the Government?  Yes or no?
12   A    I don't know what beach it was, but at that time, once I
13   found out about the settlement, yes --
14             MR. AVENATTI:  Move to strike, Your Honor.
15             THE WITNESS:  -- the office was shut down and it was
16   not available for me to get it.
17             MR. AVENATTI:  Move to strike.
18             THE COURT:  Stop.  Stop.  The answer will be
19   stricken.
20             MR. AVENATTI:  Thank you.
21   Q    Take a look at paragraph 26 from your April 2nd, 2019
22   memorandum.
23   A    Okay.
24   Q    Isn't it true, Ms. Gardner, that you told the Government
25   that you asked for a copy of the agreement from Mr. Cassaro and
```

02:39PM  5
02:39PM 10
02:40PM 15
02:40PM 20
02:40PM 25

```
 1   Mr. Marchino and you were told that it was in the Long Beach
 2   office that was shut down?
 3   A    Yes.
 4   Q    And that same Mr. Marchino who told you that, he still
02:41PM  5   represents you; right?  Yes or no?
 6             MR. SAGEL:  Objection.  Outside the scope.
 7             THE COURT:  Overruled.
 8   Q    BY MR. AVENATTI:  He still represents you as an attorney;
 9   right?
02:41PM 10   A    In other matters, yes.
11   Q    Well, and as of late 2020, he's still representing you in
12   connection with your settlement with Mr. Whiteside; right?  Yes
13   or no?
14   A    You represented me.
02:41PM 15   Q    Yes or no, as of late 2020, Ms. Gardner?  I just want you
16   to please answer my question.
17   A    He was not my attorney; you were.
18             MR. AVENATTI:  Move to strike, Your Honor.
19             THE COURT:  It will be stricken.
02:42PM 20             Please listen to the question and do your best to
21   answer that question.  Okay?
22             THE WITNESS:  Okay.
23   Q    BY MR. AVENATTI:  Ms. Gardner, did I ever represent you
24   in the year 2020?  Yes or no?
02:42PM 25   A    No.
```

```
 1    Q    Did Mr. Marchino represent you in the year 2020?  Yes or
 2    no?
 3    A    Yes.
 4    Q    Did Mr. Marchino, after you gave this date -- this
 5    interview on April 2nd, 2019, and you told the Government what
 6    Mr. Marchino had told you about the settlement agreement, he
 7    continued to represent you after that as it related to
 8    Mr. Whiteside, didn't he?
 9    A    Yes.  Yes, he did.
10    Q    Mr. Sagel asked you about the provision in Exhibit 132
11    relating to agreements for other legal work.  Do you recall
12    that?
13    A    Yes.
14    Q    Ms. Gardner, yes or no, you believed that the other work
15    that I was doing for you, separate and apart from the Whiteside
16    case, was for free?  Yes or no?
17    A    Yes.  Yes.  Yes.
18    Q    You were asked about the checks at 158 by Mr. Sagel, the
19    deposits made to your account.  Do you remember that?
20    A    Yes.
21    Q    And you gave an answer I want to ask you about.  You
22    started your answer -- I wrote it down.  You tell me if I wrote
23    it down wrong -- "I didn't look it up before I came here."
24         Do you recall saying that?
25    A    Yes.
```

**UNITED STATES DISTRICT COURT**

Q    And what you meant was, you hadn't looked it up online or
by way of the app on your phone; right?  Yes or no?

A    Prior to coming to court, no.

Q    That's what you meant, though, when you said, "I didn't
look it up before I came here."  You were talking about looking
it up on the Web or on your phone; right?

        MR. SAGEL:  Asked and answered.

        THE COURT:  Overruled.

        THE WITNESS:  It's honestly a little confusing.  So
I'm just going to say I just don't recall.  I'm so confused.

Q    I don't want you to be confused, Ms. Gardner.

        So here's my question:  You said in response to
Mr. Sagel's question, that "I didn't look it up before I came
here."  And my question is, what you meant was you had not
looked it up online or via your phone, meaning your bank
records; correct?

A    In the history of having my bank account, yes, I had
looked it up.  But prior to coming to court, to do research or
to see -- or to stack the dates in my mind, no.  But, yes, I
had seen my deposits on my statements within the history of
having my bank accounts.

        MR. AVENATTI:  Nothing further, Your Honor.

        We'd ask that -- we reserve the right to recall her
in my case in chief.

        THE COURT:  Very good.

                    UNITED STATES DISTRICT COURT

1            Ms. Gardner, you'll be excused at this time, but

2    you're subject to recall.

3            THE WITNESS:  Okay.

4            THE COURT:  Thank you.  You may step down.

02:48PM 5            THE COURTROOM DEPUTY:  Please stand behind the court

6    reporter and raise your right hand.

7        **FILIPPO MARCHINO, GOVERNMENT WITNESS, WAS SWORN**

8            MR. WYMAN:  For the record, Your Honor, the

9    United States will call Filippo Marchino as a witness.

02:49PM 10            THE COURTROOM DEPUTY:  Sir, if you could please

11   state and spell your first and last name.

12            THE WITNESS:  My first name is Filippo.  It's

13   F-i-l-i-p-p-o.  And my last name is Marchino, M-a-r-c-h-i-n-o.

14            THE COURTROOM DEPUTY:  Thank you.

02:49PM 15                     **DIRECT EXAMINATION**

16   BY MR. WYMAN:

17   Q    Good afternoon, Mr. Marchino.

18   A    Good afternoon.

19   Q    Where do you live?

02:49PM 20   A    Los Angeles.

21   Q    And what do you do for work?

22   A    I'm an attorney.

23   Q    What is the name of your law firm?

24   A    It's called The X-Law Group, PC, which stands for

02:49PM 25   "professional corporation."

**UNITED STATES DISTRICT COURT**

```
      1    Q    What kind of law do you practice at The X-Law Group?

      2    A    Primarily, personal injury, catastrophic personal injury,

      3    and a little bit of class action work.

      4    Q    Is that all civil litigation?

02:49PM 5    A    Yes.  All plaintiff, civil.

      6    Q    And you said all on the plaintiff's side?

      7    A    Yes.

      8    Q    Do you ever partner with other law firms?

      9    A    Occasionally, yes.

02:50PM 10   Q    Have you ever partnered with the law firm Eagan Avenatti?

      11   A    I have, yes.

      12   Q    Who is your primary point of contact at Eagan Avenatti?

      13   A    Michael Avenatti.

      14   Q    Do you see Michael Avenatti in the courtroom here today?

02:50PM 15   A    I do.

      16   Q    Can you please identify him for the record by where he is

      17   standing and an article of clothing he's wearing?

      18   A    Yes.  He just stood up and he's wearing a suit and tie

      19   that's light blue.

02:50PM 20        THE COURT:  The record will indicate that the

      21   witness has identified the defendant.

      22        MR. WYMAN:  Thank you, Your Honor.

      23   Q    Did you understand the defendant to be the owner of Eagan

      24   Avenatti?

02:50PM 25   A    One of the principals, yes.
```

| | |
|---|---|
| 1 | Q    When did you first work on a case with the defendant and |
| 2 | his law firm? |
| 3 | A    The first time I worked with them was against them in a |
| 4 | class action in 2011, I believe. |
| 02:50PM 5 | Q    And when is the first time that you partnered with the |
| 6 | law firm together? |
| 7 | A    I think the beginning of 2013, end of 2012.  Beginning of |
| 8 | 2013 in a class action matter. |
| 9 | Q    What was your general arrangement with the firm when you |
| 02:51PM 10 | partnered with them that first time? |
| 11 | A    It was a series of class actions.  They were deriving from |
| 12 | basically a fraudulent advertising.  And I had brought the |
| 13 | clients and the class actions and we were going to split the |
| 14 | fees and work.  They were going to take the lead but I was |
| 02:51PM 15 | sourcing the case. |
| 16 | Q    At some point after that first time when you partnered |
| 17 | with them, did your firm reach a more formal arrangement with |
| 18 | Eagan Avenatti? |
| 19 | A    You mean on -- like, an ongoing arrangement? |
| 02:51PM 20 | Q    Yes. |
| 21 | A    Yes.  In 2015 -- sorry, in 2016. |
| 22 | Q    And, generally speaking, what was that arrangement? |
| 23 | A    The short of it is that we were going to transfer over the |
| 24 | people that were working with us to work with Eagan Avenatti. |
| 02:52PM 25 | And we were going to transfer over some of our personal injury |

cases.  And I was basically going to turn into a rainmaker for
Eagan Avenatti.

Q    When you say "transfer over people," are you referring to
both attorneys and staff at The X-Law Group?

A    Correct.  Yes.  We had a couple of attorneys and a couple
of staff that went to work for Eagan Avenatti.

Q    As part of this arrangement, did you share office space
with Eagan Avenatti?

A    So I -- I got an office in their main place in Newport.
We had an office in Los Angeles that we allowed them to use in
exchange for me retaining my personal office in L.A.

Q    In your office in Los Angeles, did the defendant have an
office in that office space?

A    So aside from my personal suite, there were some cubicle
spaces, like -- it was an open office, if you will, like a
modern space.  So there wasn't really an office for him.  But
every time he would come, he'd either use my office or the
conference room.

Q    Okay.  As part of that arrangement, it sounds like you
worked cases together more frequently at that point?

A    Sort of, yes.

Q    What do you mean by "sort of"?

A    So I transferred the cases to Eagan Avenatti.  So I would
still be involved in the ones that were technical, but I
started, you know, just working to source other cases.  At the

```
 1   same time, I would work -- well, I worked a couple of cases
 2   they already had, including the Kimberly-Clark class action.
 3   Q    Okay.  Once you reached that arrangement with the
 4   defendant and his law firm, who was paying the payroll expenses
 5   for the combined firms' employees?
 6   A    So the former employees of The X-Law Group had completely
 7   transferred over as Eagan Avenatti employees.  So they were on
 8   the payroll of Eagan Avenatti.  The office in L.A.'s rent was
 9   also being paid for by Eagan Avenatti.
10   Q    And the attorneys from X-Law Group who went over to Eagan
11   Avenatti, did they receive Eagan Avenatti e-mail addresses?
12   A    Yes.
13   Q    Did you also have an Eagan Avenatti e-mail address?
14   A    I did.
15   Q    And did the defendant and Eagan Avenatti also pay you a
16   salary?
17   A    For a few months they did.
18   Q    You said a few months?
19   A    Yeah.  I think it was about eight or ten months.
20   Q    And you mentioned that in your -- The X-Law Group office
21   in Los Angeles where you had conference rooms, that the
22   defendant would occasionally work there; is that right?
23   A    Yes.
24   Q    And was that prior to March of 2019?
25   A    Yes.
```

02:54PM (5)
02:54PM (10)
02:54PM (15)
02:54PM (20)
02:55PM (25)

**UNITED STATES DISTRICT COURT**

|   |   |
|---|---|
| 1 | Q    To your knowledge, did the defendant also occasionally |
| 2 | use that X-Law Group office in court filings? |
| 3 | A    I believe so, yes. |
| 4 | Q    In approximately March of 2019, did federal agents |
| 02:55PM 5 | execute a search warrant at that office space of The X-Law |
| 6 | Group? |
| 7 | A    Yes.  It was, I think, March 25th. |
| 8 | Q    I want to ask you about a few of the cases that you |
| 9 | worked together with the defendant and Eagan Avenatti. |
| 02:55PM 10 | A    Sure. |
| 11 | Q    Did you ever work on a case involving a client named |
| 12 | Geoffrey Johnson? |
| 13 | A    No. |
| 14 | Q    Did you ever work on a case with an individual named |
| 02:55PM 15 | Alexis Gardner? |
| 16 | A    Yes. |
| 17 | Q    How about a client named Gregory Barela? |
| 18 | A    Can you say that again? |
| 19 | Q    Gregory Barela. |
| 02:56PM 20 | A    No. |
| 21 | Q    And lastly, did you work with the defendant on a matter |
| 22 | involving clients named Michelle Phan and Long Tran? |
| 23 | A    Yes. |
| 24 | Q    So you never did any legal work for Geoffrey Johnson or |
| 02:56PM 25 | Gregory Barela; is that right? |

```
 1  A    That's correct.
 2  Q    Okay.  But you did work on Ms. Gardner's matter and then
 3  the Phan and Tran matter; is that right?
 4  A    That's also correct.
 5  Q    I want to talk about those two matters.  Let's start with
 6  Ms. Gardner.
 7           Approximately when did you work with Eagan Avenatti
 8  on Ms. Gardner's matter?
 9  A    From the -- I think the beginning of December of 2016
10  through January of 2017, give or take.
11  Q    Did Ms. Gardner hire Eagan Avenatti and you to negotiate
12  a settlement to resolve potential litigation with her
13  ex-boyfriend, Hassan Whiteside?
14  A    Yes.
15  Q    Was this case taken on a contingency basis?
16  A    As far as -- well, as far as I understand, yes.
17  Q    And what do you understand a contingency basis to mean?
18  A    A contingency -- typically a contingency contract in
19  personal injury involves an attorney fronting costs, an
20  attorney fronting labor, and only recovering both the costs and
21  the labor from a recovery, if any, in the case.
22  Q    And then as part of a contingency case, is there a
23  percentage fee that the attorney can receive?
24  A    There is.  So there's a distinction between the legal
25  costs and the legal fees.  The fees are normally fixed in a
```

02:56PM — lines 5, 10, 15
02:57PM — lines 20, 25

1    percentage.  So it would be 30 percent, a third, 40 percent.

2    It truly depends.  The costs are whatever they are, and they

3    come out of the side of the plaintiff, or the client.

4    Q    And the amount of the contingency fee, is that usually

02:58PM 5    spelled out in the fee agreement?

6              MR. AVENATTI:  Objection, Your Honor.  Lacks

7    foundation.

8              THE COURT:  Overruled.

9              THE WITNESS:  It is.  It has to be, pursuant to

02:58PM 10   California State Bar rules.

11             MR. AVENATTI:  Move to strike, Your Honor.  Lacks

12   foundation.

13             THE COURT:  Denied.

14   Q    BY MR. WYMAN:  What was your understanding of what the

02:58PM 15   contingency fee percentage was in Ms. Gardner's case?

16   A    At the beginning, I was under the understanding it was

17   40 percent, because cases like that are typically signed up at

18   40 percent.  I later learned that it was actually a third.

19   Q    Did you have an agreement with the defendant about how

02:58PM 20   that contingency fee would be split between you and Eagan

21   Avenatti?

22   A    Yes.

23   Q    What was that agreement?

24   A    So for cases that were sourced by The X-Law Group -- and

02:58PM 25   there's a bit of a technical term, in a sense, of "source" --

```
  1    they were going to be split 50/50.
  2    Q    And if you could explain briefly, what do you mean by
  3    "sourced"?
  4    A    So you can source a case directly, meaning I meet you at a
02:59PM  5    bar.  You tell me you were in a car accident.  I sign you up.
  6    Or I can source it indirectly, which means I tell you that I
  7    work with a firm.  You tell your buddy that was in the car
  8    accident; he calls the firm directly.  So I indirectly sourced
  9    it because it came through me, but the contact was direct with
02:59PM 10    the firm.
 11    Q    I see.  Was Ms. Gardner's case one of the cases that was
 12    sourced through you?
 13    A    Indirectly so, yes.
 14    Q    So for her case, you expected to receive half of the
02:59PM 15    contingency fee?
 16    A    That's correct.
 17    Q    When you were first hired by Ms. Gardner, I think you
 18    said late 2016, where did you understand her to be living at
 19    that time?
02:59PM 20    A    Well, nowhere.  She was living in a car.
 21    Q    What, if anything, did you do to help her find a place to
 22    stay?
 23    A    I think my first contact with her was after she was -- she
 24    retained the firm of Eagan Avenatti.  I was asked to find her a
03:00PM 25    place to stay, and we put her up at the Sofitel in L.A.
```

```
 1   Q     The Sofitel hotel?

 2   A     Yeah.

 3   Q     Did you also conduct an investigation in this matter?

 4   A     I did, yeah.

 5   Q     Did that investigation involve international travel?

 6   A     It did.

 7   Q     To what country?

 8   A     Italy.

 9   Q     Did you incur expenses as part of the work that you did

10   on that case?

11   A     Yes.  I mean, I was -- I personally had fronted -- the

12   X-Law Group had fronted the hotel, the trip to Italy, all that.

13              MR. WYMAN:  Your Honor, this is a good breaking

14   point.

15              THE COURT:  That's fine.

16              Ladies and gentlemen, we'll take the afternoon break

17   here.  15 minutes.  Please remember the admonition not to

18   discuss the case with anyone, not to form any opinions on the

19   issues in the case until it's submitted to you, and please

20   don't do any research.

21              So 15 minutes, please.

22              THE COURTROOM DEPUTY:  All rise.

23              (Out of the presence of the jury.)

24              THE COURT:  We'll be in recess.

25              Sir, you may step down.
```

**UNITED STATES DISTRICT COURT**

```
 1              (Recess from 3:01 p.m. to 3:18 p.m.)

 2              THE COURT:  Mr. Wyman.

 3              MR. WYMAN:  Thank you, Your Honor.

 4    Q    Mr. Marchino, I asked you before the break about whether

 5    you ever worked on legal matters involving clients named

 6    Geoffrey Johnson and Gregory Barela, and I believe you said

 7    "no"; is that right?

 8    A    Yeah.  That's correct.

 9    Q    Just to clarify, are you familiar with the cases that The

10    X-Law Group works on, generally?

11    A    Yes.

12    Q    And, to your knowledge, did anyone at The X-Law Group

13    ever work on legal matters for Geoffrey Johnson or Gregory

14    Barela?

15    A    Not that I know of.

16    Q    Okay.  Thank you for that clarification.

17              Returning to Ms. Gardner's matter, in the time

18    leading up to when you began to represent her in 2016, did the

19    defendant ever talk to you about purchasing a private plane?

20    A    Yes.

21    Q    Can you please take a look at what has been marked as

22    Government's Exhibit 130.  It should be in Volume II of the

23    binder there.

24    A    Yes.

25    Q    Do you recognize this as an e-mail you received from the
```

```
 1    defendant with an attachment?

 2    A     Yes.

 3    Q     Is it a fair and accurate copy of that e-mail and

 4    attachment?

 5    A     It is.

 6              MR. WYMAN:  Your Honor, the Government moves to

 7    admit Exhibit 130.

 8              THE COURT:  Mr. Avenatti?

 9              MR. AVENATTI:  Objection, Your Honor.  Hearsay.

10    Both the e-mail and the attachment.

11              THE COURT:  I'll receive page 1 of Exhibit 130 for

12    the fact that Mr. Avenatti received it, not for the truth of

13    the content.

14              MR. WYMAN:  Your Honor, is page 2 not coming into

15    evidence?

16              THE COURT:  Correct.

17              MR. AVENATTI:  Your Honor, in that instance, I'd ask

18    that the bottom part of page 1 also not come in.

19              THE COURT:  Redact the bottom part of page 1,

20    please.  I think you can show the e-mail.  Well --

21              MR. WYMAN:  I can use the Elmo, Your Honor, and fold

22    the page in half, if that's the Court's ruling.

23              THE COURT:  I believe I was previously presented

24    with this issue.

25              MR. WYMAN:  You were, Your Honor, prior to openings,
```

03:19PM   5

03:20PM  10

03:20PM  15

03:20PM  20

03:21PM  25

**UNITED STATES DISTRICT COURT**

1    and I believe Your Honor stated that we could bring it into

2    evidence.

3              THE COURT:  Okay.  It will be received but not for

4    the truth.  The entire exhibit but not the truth, the fact that

03:21PM 5  it was sent to Mr. Avenatti.

6              MR. WYMAN:  It is an e-mail from Mr. Avenatti, Your

7    Honor.

8              THE COURT:  Oh, I'm sorry.  Then it will be

9    received --

03:21PM 10             MR. WYMAN:  And the attachment as well?

11             THE COURT:  -- for all purposes.

12             **(Exhibit Number 130 received.)**

13   Q    BY MR. WYMAN:  If we could focus on the top part.  What

14   is the date of this e-mail?

03:21PM 15 A    August 1st, 2016.

16   Q    And the subject?

17   A    It's a "Forward:  HondaJet 026."

18             MR. WYMAN:  And if we could please go now to page 2.

19   If we can zoom in on just page 2.

03:22PM 20 Q    What is the attachment to this e-mail?

21   A    It was a picture.

22   Q    What's it a picture of?

23   A    It's a picture of an aircraft, one of the Honda jets that

24   you were discussing.

03:22PM 25 Q    Okay.  You said "one of the Honda jets."  Were you

|   | |
|---|---|
| 1 | discussing multiple ones? |
| 2 | A     My understanding was that Mr. Avenatti had ordered two. |
| 3 | Q     And when you say he ordered two, did you understand him |
| 4 | to be under contract to purchase two planes? |
| 03:22PM 5 | A     Yes.  That's what was my understanding of the term |
| 6 | "order." |
| 7 | Q     And with which company? |
| 8 | A     Meaning? |
| 9 | Q     Which company did he order the aircrafts from? |
| 03:22PM 10 | A     Honda.  They were identical. |
| 11 | Q     Were you ever part of the defendant's conversations with |
| 12 | Honda about his purchase of planes? |
| 13 | A     I was not. |
| 14 | Q     Apart from this e-mail, did you have other conversations |
| 03:23PM 15 | with the defendant about purchasing an aircraft? |
| 16 | A     Yes. |
| 17 | Q     Would you say it was a frequent topic of conversation? |
| 18 | MR. AVENATTI:  Objection.  Leading. |
| 19 | THE COURT:  Sustained. |
| 03:23PM 20 | Q     BY MR. WYMAN:  Did you have -- were some of these |
| 21 | additional conversations in late 2016? |
| 22 | A     I think by the time of this e-mail, they had lightened up. |
| 23 | It was more before this e-mail.  It was a frequent topic of |
| 24 | conversation. |
| 03:23PM 25 | Q     At some point did you learn that Ms. Gardner's case had |

```
 1   reached a settlement?
 2   A    Yes.
 3   Q    Who did you learn that from?
 4   A    Mr. Avenatti.
 5   Q    What did he say to you?
 6   A    Well, I was in Italy for the mediation, basically.  My
 7   purpose was to be in Italy during the mediation.  So the
 8   morning after I learned that the case had settled.
 9   Q    And what did he tell you when he told you that the case
10   had settled?
11   A    It was late night in L.A., was early morning in Italy, and
12   he just said the case had settled and we would talk about it
13   later.
14   Q    Did he tell you how much the case had settled for?
15   A    Yes.  It was about 3 million.  But I can't remember an
16   exact number.
17   Q    Did he say how that money would be paid out under the
18   settlement?
19   A    No.
20   Q    Approximately when was that conversation?
21   A    It would have been the morning after the mediation itself.
22   So I think, like, January 6, 7, 8 of 2017, I think it is.
23   Q    You mentioned earlier the fee arrangement that you had on
24   this case with Eagan Avenatti.  When you spoke to him and
25   learned that the case had settled, did he say anything about
```

03:23PM  5
03:24PM 10
03:24PM 15
03:24PM 20
03:25PM 25

```
 1    when your firms would be receiving your attorneys' fees?
 2    A    No, not in that conversation.
 3    Q    Did he subsequently tell you about that?
 4    A    At a subsequent point he did, yes.
 5    Q    What did he say?
 6    A    That there was going to be a structure of the settlement,
 7    and part of the settlement was going to be a lump sum for the
 8    attorneys' fees to be paid at sometime in the near future.
 9    Q    What do you mean when you say "there was going to be a
10    structure of the settlement"?
11    A    So at the beginning, I understood that there was a
12    settlement with a little carve out that was going to be paid
13    later on for compliance.  Meaning, if the client observes all
14    the terms, at the end he or she receives the last part of the
15    settlement.
16         So I understood that the first part -- well, I
17    assumed the first part was going to be just a lump sum.  And
18    then, instead, I was told that it was going to be a set of
19    periodic payments.  The only lump sum was going to be the
20    attorneys' fees.
21    Q    When was your understanding, based on that conversation,
22    of when you and the defendant would receive that lump sum for
23    attorneys' fees?
24    A    It was never really clear.  At some point in the near
25    future.  I understood it to be within the next three to six
```

UNITED STATES DISTRICT COURT

```
  1    months kind of thing.
  2    Q    And this conversation you're describing, when did that
  3    take place?
  4    A    Sometime in January after we got back from Italy.
03:26PM 5    Q    January 2017?
  6    A    2017, yes.
  7    Q    Did you ever see a written settlement agreement for
  8    Ms. Gardner's matter?
  9    A    I saw it once, but significantly after.
03:26PM 10    Q    Significantly after January 2017?
 11    A    Yeah.  I mean, like, 2020 I saw it.
 12    Q    Prior to March of 2019, had you ever seen it?
 13    A    No.
 14    Q    Prior to March of 2019, had you asked the defendant to
03:26PM 15    see it?
 16    A    I don't think so, no.
 17    Q    Do you know whether the defendant ever provided a
 18    written -- a written settlement agreement to Ms. Gardner?
 19    A    I understand he didn't.
03:27PM 20    Q    What's that understanding based on?
 21    A    Ms. Gardner.
 22    Q    Did she --
 23              MR. AVENATTI:  Move to strike as lacking foundation
 24    and based on hearsay, Your Honor.
03:27PM 25              THE COURT:  Sustained.  It will be stricken.
```

```
 1    Q    BY MR. WYMAN:  Prior to March of 2019, did Ms. Gardner
 2   ever ask you for a copy of her settlement agreement?
 3    A    Prior to when?  Sorry.
 4    Q    March of 2019.
 5    A    Not that I can recall.
 6    Q    The understanding you were describing a minute ago of
 7   what the settlement agreement provided, was that based on the
 8   conversation you had with the defendant?
 9    A    Yes.
10    Q    And you described the structure, as you called it.  At
11   the end of January of 2017, were you aware that Mr. Whiteside
12   had wired a total of $2.75 million of Ms. Gardner's settlement
13   funds into an Eagan Avenatti trust account?
14    A    I was not.
15    Q    Does The X-Law Group maintain bank records with Chase
16   Bank?
17    A    You mean bank accounts?  Yes.
18    Q    Yes.  Does that include attorney-client trust accounts?
19    A    Yes.
20    Q    Who has signatory authority over those bank accounts?
21    A    Only I do.
22    Q    Are you generally familiar with your firm's bank records
23   and finances?
24    A    Yes.  I handle them.  Nobody else.
25    Q    Can you please take a look at Government's Exhibit 152.
```

03:27PM (line 5)
03:27PM (line 10)
03:28PM (line 15)
03:28PM (line 20)
03:28PM (line 25)

**UNITED STATES DISTRICT COURT**

```
         1    A     Okay.

         2    Q     Do you recognize this document?

         3    A     Yes.

         4    Q     What is it?

03:29PM   5    A     It's a December 31st through -- sorry, December 31st,

         6    2016, through January 31st, 2017, statement from our IOLTA

         7    trust account.

         8    Q     When you say "our," who are you referring to?

         9    A     The X-Law Group.

03:29PM  10    Q     Is this an account that you control?

        11    A     Yes.

        12           COURT REPORTER:  I'm sorry.  Can you repeat the

        13    question.

        14           MR. WYMAN:  Sorry.

03:29PM  15    Q     Is this an account that you control?

        16    A     Yes.

        17    Q     Do you see that the statement has redactions throughout?

        18    A     Yes.

        19    Q     Other than these redactions, is this a fair and accurate

03:30PM  20    copy of a bank statement from one of the Chase Bank accounts

        21    you control in the name of X-Law Group?

        22    A     Yes.  Just one clarification.  It's an IOLTA trust

        23    account; so it's not technically an account of The X-Law Group.

        24    But yes.

03:30PM  25    Q     Thank you for the clarification.
```

```
 1            Is IOLTA a type of attorney-client trust account?
 2   A    It is.  I think it stands for interest only lawyer trust
 3   account or something along those lines.  But it basically means
 4   that it's not the firm's money, it's the client's money.
 5            MR. WYMAN:  Your Honor, at this time the Government
 6   moves to admit 152.
 7            MR. AVENATTI:  Your Honor, I move to strike the last
 8   portion as nonresponsive to the question.
 9            THE COURT:  Denied.
10            MR. AVENATTI:  And the objection, Your Honor, to 152
11   is hearsay.  There's no custodial declaration in connection
12   with this document.  Lack of foundation, authentication.
13            THE COURT:  I believe it's relevant.  The law firm
14   controlling the firm's finances is sufficient foundation and
15   sufficient basis for him to authenticate it.  152 will be
16   received.
17            MR. WYMAN:  Thank you.  If we can please publish
18   page 1.
19            (Exhibit Number 152 received.)
20   Q    BY MR. WYMAN:  On the top left there, what is the name of
21   this account?
22   A    It's The X-Law Group, PC, IOLTA trust account.
23   Q    I believe you said it when you were identifying the
24   document, but at the top right, what month does this statement
25   refer to?
```

03:30PM (line 5)
03:30PM (line 10)
03:31PM (line 15)
03:31PM (line 20)
03:31PM (line 25)

```
 1   A    December 31st, 2016, through January 31st, 2017.  So
 2   basically all of January 2017.
 3   Q    Please go to page 2 of the exhibit.  I'd like to direct
 4   your attention to the only unredacted line, under "Deposits and
 5   Additions."  Do you see that?
 6   A    I do.
 7   Q    Do you see a January 26 wire there?
 8   A    I do.
 9   Q    How much is that wire for -- I'm sorry -- deposit for?
10   A    It's $2 and a half million.
11   Q    Do you recall receiving that transfer?
12   A    I do.
13   Q    Who sent you that $2.5 million?
14   A    Well, I understood Mr. Avenatti, from the trust account to
15   Eagan Avenatti.
16   Q    Did the defendant tell you why he was wiring $2.5 million
17   into your IOLTA trust account?
18   A    Yes.
19   Q    What did he tell you?
20   A    That it was for the purchase of part of the -- part of one
21   of the Honda jets.
22   Q    What, if anything, did he tell you to do with that money?
23   A    Wire it to Honda.
24   Q    A little bit further down on the same page, do you see
25   the heading "Electronic Withdrawals"?
```

03:31PM  5
03:31PM 10
03:32PM 15
03:32PM 20
03:32PM 25

**UNITED STATES DISTRICT COURT**

```
 1    A    I do.

 2    Q    And I see, it looks like there's a January 26th wire

 3    transfer there.  Do you see that?

 4    A    Yes.

 5    Q    And what is the amount of that transfer?

 6    A    It's 2 and a half million.

 7    Q    Did you make this wire transfer?

 8    A    I did.  I went to the bank and did it.

 9    Q    And what was it for?

10    A    For the payment of -- well, I understood it to be for the

11    payment of the Honda jet or part of the Honda jet.

12    Q    And that understanding was based on what the defendant

13    told you?

14    A    Yes.

15    Q    The transfer information there -- I apologize, the screen

16    is a little bit small so I'm going to ask you to read it for

17    the jury.

18         Can you please read what the transfer information

19    says.

20    A    Yes.  It says, "Wells Fargo NA" --

21    Q    You can skip the numbers.

22    A    Okay.

23         "Account holder, Honda Aircraft Company, LLC.

24    Reference Passport 420, LLC; contract Number

25    4000316; serial Number 42000029."
```

**UNITED STATES DISTRICT COURT**

```
 1   Q     Is that information that you provided when you initiated

 2   this wire transfer?

 3   A     I did.

 4   Q     Where did that information come from?

 5   A     It was e-mailed to me from Mr. Avenatti.

 6   Q     Can you please take a look at Government's Exhibit 153

 7   now.  Do you recognize this as an e-mail exchange between you

 8   and the defendant?

 9   A     Yes.

10   Q     Is it a fair and accurate copy of that e-mail exchange

11   with an attachment?

12   A     Yes.

13              MR. WYMAN:  The Government moves to admit

14   Exhibit 153.

15              MR. AVENATTI:  Objection, Your Honor.  Hearsay as to

16   the e-mail and the attachment.

17              THE COURT:  Mr. Avenatti's e-mail will be received

18   for the truth; Mr. Marchino's e-mail will be received just for

19   notice that Mr. Avenatti received it.

20              (Exhibit Number 153 received.)

21   Q     BY MR. WYMAN:  Focus on the first e-mail from the

22   defendant at the bottom.

23              MR. AVENATTI:  I'm sorry, Your Honor.  And the

24   attachment?

25              THE COURT:  The attachment appears to be part of
```

**UNITED STATES DISTRICT COURT**

```
 1    Mr. Marchino's e-mail.  So it will be received for notice, not

 2    the truth.

 3              MR. WYMAN:  Thank you, Your Honor.

 4    Q    What is the date of the defendant's e-mail to you?

 5    A    January 25th, 2017.

 6    Q    And the subject?

 7    A    "Info."

 8    Q    Can you please read the e-mail for the jury.

 9    A    Yeah.  It says:

10              "I have to list following Passport 420, LLC,

11         Contract Number 4000316; Serial Number 42000029."

12    Q    Is that the same information we saw in the bank statement

13    just a minute ago?

14    A    I believe it to be, yes.

15    Q    What did you write back in your response above this

16    e-mail?

17    A    "Good?" question mark.

18    Q    Is there an attachment to your e-mail?

19    A    There is.

20              MR. WYMAN:  If you go to the top half of page 2.

21    Just the top half, please.

22    Q    What is this information in the top half?

23    A    It's the recipient of the wire transfer.  It's a

24    screenshot of my end of the sort of setting it up.

25    Q    And who is listed as the recipient name?
```

03:35PM (line 5)
03:35PM (line 10)
03:36PM (line 15)
03:36PM (line 20)
03:36PM (line 25)

**UNITED STATES DISTRICT COURT**

```
 1   A     Honda Aircraft Company, LLC.

 2   Q     And then at the bottom of the top half, where it says

 3   "message to recipient," is that that same information there

 4   again?

 5   A     Yes.  It's the same one from the prior e-mail.

 6   Q     And on the bottom half, what is that information?

 7   A     It's the bank information of where the funds were sent to.

 8   Q     Based on what the defendant told you about this

 9   $2.5 million that he wired into your account, whose money did

10   you believe it was?

11   A     I believed it to belong to Mr. Bill Parrish, or William

12   Parrish.

13   Q     And who did you understand that to be?

14   A     Mr. Parrish is a longstanding client or was a longstanding

15   client of Eagan Avenatti.  They had done a case for him prior

16   to my time with Eagan Avenatti.

17   Q     And why did you understand that you were wiring

18   Mr. Parrish's money to Honda Aircraft?

19   A     Because that was the half of the plane that Mr. Parrish

20   was buying.  Mr. Avenatti and Mr. Parrish were buying it

21   together.  And I understood there could be a problem for

22   Mr. Avenatti to send the money directly, because he had already

23   paid his side, so Mr. Parrish's side had to come from a

24   different firm.

25   Q     And all of this understanding that you just described,
```

```
 1  where did that come from?
 2  A    From Mr. Avenatti.
 3  Q    At the time that you received this wire from the
 4  defendant on January 26, were you aware that he had received a
 5  wire payment from Hassan Whiteside of $2.75 million the day
 6  before?
 7  A    I was not.
 8  Q    Were you aware that prior to that transfer, the
 9  defendant's account had only 23 cents in it?
10  A    I did not know that.
11  Q    Had you known those things, would you have sent the wire
12  of $2.5 million to Honda?
13            MR. AVENATTI:  Speculation, Your Honor.  Conjecture.
14            THE COURT:  Sustained.
15  Q    BY MR. WYMAN:  Mr. Marchino, did you ever receive the
16  portion of the settlement funds that was owed to The X-Law
17  Group under your agreement with the defendant on Ms. Gardner's
18  settlement?
19  A    No.  The costs and the fees were never paid.
20  Q    Let's start with the fees.  You said the fees were never
21  paid --
22  A    Correct.
23  Q    -- to The X-Law Group?
24  A    Correct.
25  Q    Did you ever ask the defendant about that?
```

1    A    I did.

2    Q    What did he say?

3    A    I mean, it was varying.  Throughout 2017 and 2018 I asked

4    for -- multiple times for the payments.

03:39PM 5    Q    And did he ever give you an explanation as to why?

6    A    There was always some delay.  There was a partial payment

7    in June of 2018, but that was it.

8    Q    And how much was that partial payment?

9    A    It was 1 million.

03:39PM 10   Q    Now, you mentioned costs or expenses as well?

11   A    Yes.

12   Q    And I think you said earlier that you fronted some

13   expenses as part of your work for Ms. Gardner's case; right?

14   A    That's correct.

03:39PM 15   Q    I think you said the Sofitel hotel?

16   A    Yes.

17   Q    And the trip to Italy?

18   A    Yes.  There's also -- was that a question?

19   Q    No.  You answered my question.

03:40PM 20   A    Okay.

21   Q    Thank you.

22        Did you provide those expenses to the defendant's

23   paralegal, Judy Regnier?

24   A    I think I did, yeah.  I'm pretty sure I did.

03:40PM 25   Q    Can you please take a look at what's been marked as

Government's Exhibit 167 and 168.  And it will actually be on
the cart behind you.

       Before I ask you about these documents -- and, I'm
sorry, were you able to locate them?

03:40PM  A    Yeah.  I have it here.

Q    Okay.  Before I ask you about them, a couple of follow-up
questions on the partial payment you described.

A    Sure.

Q    The partial payment from Eagan Avenatti, was that only
03:41PM for your work on Ms. Gardner's case?

A    No.  No.  No.  No.  There was a multitude of cases.

Q    Okay.  So the $1 million you received wasn't just
attorneys' fees for The X-Law Group from Ms. Gardner's
settlement?

03:41PM  A    You're correct.  No.

Q    Do you have 167 and 168 in front of you?

A    I do.

Q    Do you recognize these documents?

A    I do.

03:41PM  Q    Are these e-mails with attachments that you sent to Judy
Regnier?

A    Yes.

Q    Are they fair and accurate copies of those e-mails and
attachments?

03:41PM  A    Yes, I believe them to be.

```
 1              MR. WYMAN:  Your Honor, the Government moves to
 2    admit Exhibits 167 and 168.
 3              MR. AVENATTI:  Objection, Your Honor.  Hearsay.
 4              THE COURT:  They will be received but not for the
 5    truth, simply for the fact that these e-mails were sent by
 6    Mr. Marchino to Judy Regnier.  Not for the truth of the content
 7    or any attachments.
 8              MR. WYMAN:  Thank you.
 9              MR. AVENATTI:  All right, Your Honor, in light of
10    that, I object to the attachments.  Same basis, hearsay.
11              THE COURT:  Same ruling.
12              (Exhibit Numbers 167 and 168 received.)
13    Q    BY MR. WYMAN:  Mr. Marchino, focusing first on
14    Exhibit 167, can you please read the date of that e-mail.
15    A    Sure.  It's January 23rd, 2017.
16    Q    And the subject line?
17    A    "Gardner."
18    Q    Are there attachments to this e-mail?
19    A    Two of them.
20    Q    What are the names of the attachment?
21    A    "Gardner expenses.pdf" and "Italy trip detail.pdf."
22    Q    Can you please read the message to Ms. Regnier.
23    A    Yes.  It's, "Judy, here are the expenses on Gardner."
24    Q    And if we can go to page 2, bearing in mind we're going
25    to get to 168.
```

The timestamps in the left margin are: 03:42PM (line 5), 03:42PM (line 10), 03:42PM (line 15), 03:42PM (line 20), 03:43PM (line 25).

```
 1              At the time that you sent this e-mail, was this a
 2   fair summary of the expenses that you and your firm had
 3   incurred on the Gardner matter?
 4   A    Yes.
 5   Q    I want to ask you about a few of them.  I see in the
 6   middle there, about five lines down, the Sofitel.
 7   A    Yes.
 8   Q    What is the Sofitel?
 9   A    It's the hotel I mentioned earlier.
10   Q    And what is the amount listed for that?
11   A    $3,354.62.
12   Q    What is that expense related to?
13   A    It was the stay of Ms. Gardner at the Sofitel for X amount
14   of days, including, you know, food and that kind of stuff.
15   Q    Is that a cost that you personally incurred?
16   A    The X-Law Group did, yes.
17   Q    I also see charges for Airbnb and Gofer It!
18   A    Yes.
19   Q    What are those?
20   A    Gofer It! is a messenger service.  I can't remember what
21   was being messengered or -- well, sent.  And the Airbnb was
22   because Ms. Gardner moved from being in a hotel to being in an
23   apartment that we had rented for her.
24   Q    And the Airbnb, was that also an expense that The X-Law
25   Group paid?
```

**UNITED STATES DISTRICT COURT**

1   A    Yes.  All of these were expenses that The X-Law Group

2   fronted and were supposed to go to accounting, basically.

3   Q    The last line says, "Trip, Italy."  How much did The

4   X-Law Group expend on that trip?

03:44PM 5   A    About $7,572.56.

6   Q    Can you please turn now to Exhibit 168.

7   A    Yes.

8   Q    What is the date of this e-mail?

9   A    January 28th, 2017.

03:45PM 10   Q    And the subject line?

11   A    "2nd reimbursement."

12   Q    And can you please read your message in this e-mail.

13   A    "Judy, not sure which ones of these you already

14        have from Alfredo, but here they are.  These are not

03:45PM 15        included in that first e-mail with Alexis's

16        reimbursements.  Altogether it's $34,267.87.  Yours,

17        Filippo."

18   Q    So that amount there of a little over $34,000, was that

19   the total amount of expenses that your firm, The X-Law Group,

03:46PM 20   incurred in the Gardner matter?

21   A    No.  So the -- this second tranche of stuff was not

22   related to Ms. Gardner.  So the second set of 15,423.17 was not

23   tied to Ms. Gardner.

24   Q    And at the bottom of 167, if I could ask you to go back

03:46PM 25   to that attachment.  There's a slightly smaller number at the

```
 1   bottom of page 2, about $18,844.  Is that the amount The X-Law
 2   Group incurred?
 3   A    Yes.  That's correct.
 4   Q    On the Gardner matter?
 5   A    Yes.
 6   Q    For all these expenses, at the Sofitel, the trip to
 7   Italy, the Airbnb, did the defendant ever pay you back for
 8   those expenses?
 9   A    No.
10   Q    Were you ever reimbursed for your expenses on this case
11   in full?
12   A    No.  But it wasn't Mr. Avenatti that was supposed to
13   reimburse them.  They were supposed to come from Eagan
14   Avenatti.  But, no, I never received it.
15   Q    Okay.  That's a good clarification.
16             So you never received your expenses from the
17   settlement funds; is that right?
18   A    That's correct.
19   Q    And I think you said earlier you never received your
20   attorneys' fees either?
21   A    That's correct.
22   Q    To your knowledge, did Ms. Gardner ever receive the
23   settlement funds that she was owed?
24             MR. AVENATTI:  Objection, Your Honor.  Calls for
25   speculation.  Conjecture.
```

UNITED STATES DISTRICT COURT

1           THE COURT:  Overruled.

2           THE WITNESS:  To my understanding, no.

3           THE COURT:  I want to go back to 167 and 168.  The

4    witness's testimony has now established that it's a list of

03:47PM 5    expenses that his firm incurred.  He prepared the list.  At

6    this point, with that foundation, I'm prepared to receive the

7    exhibits in full for the truth of the exhibits.

8           Mr. Avenatti?

9           MR. AVENATTI:  Your Honor, I'd lodge the objection

03:47PM 10   based on hearsay yet again.

11          THE COURT:  Okay.  It will be received in full.

12   Q    BY MR. WYMAN:  I'm going to shift gears now and ask you

13   about the other matter you described earlier involving Michelle

14   Phan and Long Tran.  Do you know who they are?

03:48PM 15   A    Yes.

16   Q    Let's start with Mr. Tran.  How long have you known Long

17   Tran?

18   A    Since, I think it was, 2000 or 2001.

19   Q    And how did you meet Michelle Phan?

03:48PM 20   A    Through Long -- or through Mr. Tran, I guess.

21   Q    What line of business did you understand Ms. Phan to be

22   in?

23   A    When I first met her, she was an influencer.  At the time,

24   I don't know if the term was actually "influencer," but that's

03:48PM 25   what she was.

```
 1   Q      What do you mean by that?

 2   A      What?

 3   Q      What do you mean by that?

 4   A      She was doing make-up tutorial on YouTube, and she was

 5   monetizing the views that she was getting.  So that's why I

 6   called her influencer, if you will.

 7   Q      And what about Mr. Tran, what line of work did you

 8   understand him to be in?

 9   A      He was a graphic designer, mostly for, like, online

10   websites and that kind of stuff.  He was very well-versed on

11   technology and just the web.

12   Q      And fast-forwarding to the mid-2010, what line of work

13   were they each in at that point?

14   A      So Michelle graduated from sort of being an influencer to

15   having a makeup company, or a makeup delivery company called

16   IPSY.

17   Q      And where did Mr. Tran work at that time?

18   A      I understood that he had his own company, but also he was

19   working with Michelle -- or Ms. Phan on IPSY.

20   Q      At some point in 2017, did Mr. Tran contact you about

21   finding legal representation for himself and Ms. Phan?

22   A      Yes.  I'm not sure of the date.  I think it may have been

23   2016.  But 2016, 2017, yes.

24   Q      Okay.  And why was Mr. Tran looking for an attorney?

25   A      There was some discord, if you will, at IPSY, and Michelle
```

03:48PM (line 5)
03:49PM (line 10)
03:49PM (line 15)
03:49PM (line 20)
03:50PM (line 25)

UNITED STATES DISTRICT COURT

 1   and Long wanted out.

 2   Q    When you say they "wanted out," what specifically were

 3   they looking to do?

 4   A    They were looking to transact the shares that Michelle and

03:50PM  5   Long held, plus some other associates of theirs had shares as

 6   well.  But functionally, they wanted to sell their shares and

 7   be able to cash in and be done.

 8   Q    So they were looking for an attorney to help them with

 9   that?

03:50PM 10   A    Yes, for negotiation and an exit strategy.

11   Q    Did you refer Mr. Tran to an attorney?

12   A    I did.

13   Q    Who?

14   A    Mr. Avenatti.

03:50PM 15   Q    Would you please take a look at Exhibit 265.

16   A    I don't know if I have that.

17   Q    It should be in a different binder right behind you,

18   Volume IV.

19   A    Which number again?

03:51PM 20   Q    265.

21        Do you recognize this as an e-mail that you were on

22   with the defendant and Long Tran?

23   A    Yeah, I do.

24   Q    And is it a fair and accurate copy of the e-mail

03:51PM 25   exchange?

```
 1   A    Yes.  Aside from the redactions, yes.

 2   Q    Thank you.

 3             MR. WYMAN:  Your Honor, the Government moves to

 4   admit Exhibit 265.

 5             MR. AVENATTI:  Objection, Your Honor.  Hearsay.

 6   Multiple levels of hearsay.

 7             MR. WYMAN:  Your Honor, I believe the defendant is

 8   on every e-mail in the chain.

 9             THE COURT:  The e-mail from Mr. Avenatti will be

10   received for the truth; the others will be received for the

11   fact that they were sent and received, but not for the truth of

12   the content.

13             (Exhibit Number 265 received.)

14   Q    BY MR. WYMAN:  Starting with the e-mail at the top of the

15   page.  And it appears that the oldest e-mail is the top one and

16   it goes down.  Do you see that?

17   A    Yeah.

18   Q    What is the date of the oldest e-mail at the top?

19   A    February 9th, 2017.

20   Q    Is that approximately when Mr. Tran reached out to you

21   about finding a lawyer?

22   A    Yeah.  I think it may have been within three or four weeks

23   of that, yes.

24   Q    What is the subject of this e-mail chain?

25   A    "IPSY."
```

03:51PM    5

03:52PM 10

03:52PM 15

03:52PM 20

03:53PM 25

1    Q    If we can pull up Mr. Tran's e-mail there and

2    specifically the three numbers under "For context."  Can you

3    please read these three numbered items under "For context."

4    A    Sure:

03:53PM 5            "Number 1, Michelle is a co-founder.  Number

6            2, Michelle has no board seats.  Number 3, Michelle

7            is supposedly second largest shareholder behind the

8            CEO and board majority, Marcelo Camberos.  Have not

9            seen the cap table to verify."

03:53PM 10   Q    And then under "Complexity," it looks like there are two

11   more points.  Can you please read those.

12   A    Uh-huh.  So point Number 1 is:

13           "IPSY bought back her cosmetics brand EM

14           Cosmetics from L'Oreal, about 5 million, and has

03:54PM 15          full ownership.  Point Number 2, would be looking

16          to purchase EM Cosmetics from IPSY in parallel with

17          selling her shares of the company.  Options to

18          purchase it back could be with shares or with

19          fundraising.  If there are any missing" -- sorry --

03:54PM 20         "if there are missing pieces to the documentation

21          that you identify, please let me know and I will

22          dig them up.  Thanks."

23   Q    And this is an e-mail that Mr. Tran sent you and the

24   defendant?

03:54PM 25   A    Yes.

```
 1   Q    After this e-mail exchange, did Mr. Tran and Ms. Phan

 2   sign an attorney's fees agreement with the defendant?

 3   A    I believe so, yes.

 4   Q    Can you please take a look at Exhibit 266.

03:55PM  5        Do you recognize this as another e-mail exchange

 6   that you were on with the defendant and Mr. Tran?

 7   A    Yes.

 8   Q    And is it a fair and accurate copy of that e-mail

 9   exchange, Except for the redactions?

03:55PM 10   A    I believe so.

11        MR. WYMAN:  Your Honor, the Government moves to

12   admit Exhibit 266.

13        MR. AVENATTI:  Objection, Your Honor.  Hearsay.

14        THE COURT:  The e-mails from Mr. Avenatti will be

03:55PM 15   received for the truth; the others, just for notice.  Including

16   the attachment, the attorney fee agreement, will just be

17   received for notice.

18        (Exhibit Number 266 received.)

19   Q    BY MR. WYMAN:  If you could just start on page 2 there

03:55PM 20   with the defendant's e-mail in the middle.

21        What is the date of this e-mail?

22   A    August 15, 2017.

23   Q    And the subject?

24   A    "Draft fee agreement."

03:56PM 25   Q    And can you please read the defendant's e-mail for the
```

```
 1   jury.
 2   A     Sure.  It's:
 3             "Long, attached please find the draft
 4         agreement we discussed.  Please review, and if
 5         acceptable, please return a signed copy.  As
 6         always, if you have any questions, please do not
 7         hesitate to contact me."
 8   Q     And then if we can go to page 1.  The second e-mail from
 9   the top, on August 15, 2017, do you see another e-mail there
10   from the defendant?
11   A     Yes.
12   Q     What does he say there?
13   A     "Please see the attached per our discussion."
14   Q     And then, lastly, the e-mail at the top, who is that
15   from?
16   A     Long.  Mr. Tran.
17   Q     And what does he say?
18   A     "Executed copy attached."
19   Q     Is there an attachment to Mr. Tran's e-mail?
20   A     I mean, I see it as in the exhibit.  I don't know if there
21   was on the original e-mail because it doesn't show it.  But I
22   believe so, yes.
23   Q     Fair enough.  Let's take a look at page 3 of the exhibit.
24   A     Yep.
25   Q     What is page 3 through 5?
```

**UNITED STATES DISTRICT COURT**

```
 1  A    It's the -- Mr. Avenatti's retainer agreement for this
 2  matter.
 3  Q    When you say "for this matter," you're referring to
 4  Mr. Tran and Ms. Phan?
 5  A    Yes.
 6  Q    Now, if we can focus at the top where there's a date.  It
 7  looks like this agreement has a date at the top of February 9,
 8  2017.  Is that the same date as the e-mail we looked at a few
 9  minutes ago?
10  A    It's not.
11  Q    I'm sorry, I was referring to the e-mail -- bear with me.
12  Exhibit 265, the first e-mail exchange we looked at.
13  A    Yes.
14  Q    That's also February 9?
15  A    It is.  It matches that date.
16  Q    And if you go to the last page of the agreement, page 5
17  of Exhibit 266.  Do you see that it is signed by Long Tran and
18  Michelle Phan?
19  A    Yes.
20  Q    Now, this e-mail attaching the agreement is dated
21  August 15 of 2017.  Do you know why this is being signed in
22  August 2017 but it's dated February 2017?
23  A    There was a bunch of stuff happening between March and May
24  of 2017, meaning there was a huge trial that was going on in
25  downtown.  So a bunch of time had been sucked up by that.  This
```

03:57PM  (line 5)
03:57PM  (line 10)
03:58PM  (line 15)
03:58PM  (line 20)
03:59PM  (line 25)

UNITED STATES DISTRICT COURT

```
 1   had been placed a little bit on the back burner, but the
 2   conversations were going on.  So I just think that it was just
 3   a formality, if you will, to get this inked and finalized.
 4   Q    Okay.  Other than this document, are you aware of any
 5   other contract between the defendant and Long Tran?
 6   A    Not that I know of.
 7   Q    Are you aware of any other fee agreement between the
 8   defendant and Michelle Phan?
 9   A    Not that I know of.
10   Q    If you could take a look at a couple of the provisions.
11   If you could pull up paragraph 4, which is on page 3 of
12   Exhibit 266.  Do you see paragraph 4, titled "Legal Fees, Costs
13   and Billing Practices"?
14   A    Yes.
15   Q    Can you please read that paragraph.
16   A    Sure.
17            "Attorney will receive a contingent fee for
18        services rendered of 7 and a half percent of the
19        recovery as defined below.  Recovery will include
20        any cash and the fair market value of any benefit,
21        refund, carried interest, business accommodation,
22        loan and/or funding received in connection with the
23        settlement, judgment, or any other resolution of
24        any clients' claims, divestiture, and/or exits as
25        referenced above."
```

```
 1   Q     You can stop there.
 2              Do you see anything about expenses in this
 3   paragraph?
 4   A     No.
 5   Q     Focusing on paragraph 2, just titled "Scope of Services."
 6   Can you please read that paragraph for the jury.
 7   A     Sure.
 8              "Clients are hiring attorney to represent
 9         clients in connection with client's affirmative
10         claims, divestiture, and exit from Personalized
11         Beauty Discovery, Inc., d/b/a IPSY, or company.
12         Attorney will provide those legal services
13         reasonably required to represent clients and take
14         reasonable steps to inform clients of progress and
15         to timely respond to client's inquiries.  In
16         addition, attorney may at any time and at its
17         discretion retain outside and/or local counsel,
18         including but not limited to Filippo Marchino,
19         Esquire, whose legal fees will be deducted from the
20         fees received by attorney and will be the sole and
21         exclusive responsibility of attorney.  Attorney
22         will represent the clients until a settlement,
23         resolution, or a judgment is reached, and in
24         connection with any appropriate posttrial motions."
25   Q     Did you perform work on this matter?
```

```
      1   A      I did.
      2   Q      And based on this paragraph, how did you understand you
      3   would be paid for your work on this matter?
      4   A      From the fees.
04:01PM 5   Q      And who would receive those fees?
      6   A      I mean, the fees would be deducted from any settlement
      7   coming in, but Mr. Avenatti's --
      8   Q      Let me ask a clearer question.
      9   A      Sure.
04:02PM 10  Q      Who did you understand would be paying you your portion
     11   of the fees?
     12   A      Mr. Avenatti.  Or, rather, I think this was an Avenatti &
     13   Associates case.  So one of his entities.
     14   Q      Did you understand that the fees you received would come
04:02PM 15  out of that 7.5 percent you read a minute ago?
     16                 MR. AVENATTI:  Leading.
     17                 THE COURT:  Overruled.
     18                 THE WITNESS:  Yes.
     19   Q      BY MR. WYMAN:  And did you have an agreement with the
04:02PM 20  defendant about how much of that you would receive?
     21   A      Yes.  This fell back to that original understanding that
     22   cases sourced by us would receive 50 percent.
     23   Q      So you expected to receive 50 percent of the fee?
     24   A      That's correct.
04:02PM 25  Q      Can you please take a look at Exhibit 267 now.  Do you
```

```
 1   recognize this as an e-mail that you and Mr. Tran received from
 2   the defendant?
 3   A    I don't know if I received this one because it doesn't
 4   have -- oh, yes.  Sorry.  Yes.  Sorry.  I see my name now.
04:03PM 5   Q    Is it a fair and accurate copy of that e-mail?
 6   A    As far as I can tell, yes.
 7            MR. WYMAN:  Your Honor, the Government moves to
 8   admit Exhibit 267.
 9            MR. AVENATTI:  Objection, Your Honor.  Hearsay.
04:03PM 10            THE COURT:  It's an e-mail from Mr. Avenatti.  It
11   will be received.  Objection is overruled.
12            **(Exhibit Number 267 received.)**
13   Q    BY MR. WYMAN:  If you could pull up the first page.  It
14   appears that this is an e-mail sent August 16th, 2017; is that
04:03PM 15   right?
16   A    That's correct, yes.
17   Q    What does the defendant write in this e-mail?
18   A    (Reading:)
19            "Long, attached is a fully executed signature page
04:03PM 20   to the agreement.  Thanks again, and I look forward to great
21   success together.  See you later this morning."
22   Q    And then on page 2, what is the attachment?
23   A    It's a signature page of the previous one, but with the
24   addition of Mr. Avenatti's signature.
04:04PM 25   Q    A signature page to the previous agreement we looked at?
```

A     Yes.

Q     Now, at some point did the defendant reach agreements

with IPSY on behalf of Ms. Phan and Mr. Tran?

A     Yes.

04:04PM  Q     Approximately when were those agreements reached?

A     I think sometime in the end of 2017, but I'm not sure.

Q     Okay.  Did those agreements provide for certain amounts

of money that IPSY would pay Mr. Tran and Ms. Phan for their

respective shares in the company?

04:04PM  A     So, yes, in the sense that it quantified, it gave a value

to each share, as far as I can recall.  I haven't seen the

documents in a while.  But it quantified the amount of money

per share.  And then there was an accounting of the shares and

how they were going to be used.

04:05PM  Q     And did IPSY agree to make payments to them for those

shares?

A     Yes.  So as I understood it, there were two sets of

payments because there was two groups of shares, basically.

And that EM Cosmetics transaction was also part of the deal.

04:05PM  Q     When you say the EM Cosmetics transaction, what do you

mean?

A     So I don't know if you recall this, but earlier when I was

going through the e-mail that Mr. Long had sent -- or Mr. Tran

had sent, one of the things that Ms. Phan wanted was to

04:05PM  repurchase this brand called EM Cosmetics back from IPSY.  It

```
 1   had been previously sold to a different company called L'Oreal

 2   and bought back by IPSY, and Ms. Phan wanted to take it with

 3   her.  So that was part of the deal.

 4   Q    Okay.  So you said there were two different sets of

 5   payments.  Did I get that right?

 6   A    So two different sets of payments in time.  And then these

 7   subsets were for Ms. Phan, Mr. Tran, and I believe there was a

 8   subentity of Ms. Phan's family.

 9   Q    Okay.  And that was for the first payment?

10   A    Yes.  And then I understood it to be the same thing for

11   the second payment.

12   Q    Okay.

13   A    It was just a question of when they could sell back the

14   shares.

15   Q    And relative to when the agreement was reached, when was

16   the first payment or first set of payments to be made

17   approximately?

18   A    I can't remember off the top of my head.

19   Q    Well, was it supposed to be soon thereafter or sometime

20   after?

21   A    Soon.

22   Q    And, to your knowledge, did IPSY make those first -- that

23   first set of payments?

24   A    Yes.  Later on, yes.

25   Q    How did you learn that?
```

```
 1  A    I received a text message from Mr. Tran with a picture of

 2  a car that he had purchased.  And he thanked me for helping him

 3  find Mr. Avenatti and getting this done.

 4  Q    And that was the first time you learned that the first

 5  payment from IPSY had been made?

 6  A    That's correct.

 7  Q    When you learned that, did you speak to the defendant

 8  about the fees that you and his law firm were to receive?

 9  A    I did.

10  Q    What did he say?

11  A    That the fees were coming out of the second set of

12  transactions, the second payment.

13  Q    Did he tell you during this conversation that on

14  September 18, 2017, he had deposited almost $2.8 million from

15  the settlement with IPSY into one of his operating accounts?

16            MR. AVENATTI:  Lacks foundation, Your Honor.

17            THE COURT:  Lay the foundation.

18  Q    BY MR. WYMAN:  Well, during the process of reaching this

19  agreement for Mr. Tran and Ms. Phan, you understood that you

20  and the defendant would each receive attorneys' fees from your

21  representation.  Do I have that right?

22  A    Yes.

23  Q    And that you would receive a portion of the total fee

24  that would go to the defendant's firm first?

25  A    Yes.
```

The timestamps in the left margin are: 04:07PM (line 5), 04:07PM (line 10), 04:07PM (line 15), 04:07PM (line 20), 04:08PM (line 25).

Q     And in September of 2017, did he ever tell you that his firm had received the attorneys' fees?

A     No.

MR. AVENATTI:  Objection, Your Honor.  Lacks foundation.

THE COURT:  Overruled.

Q     BY MR. WYMAN:  Did you ever receive your portion of the fees for your work in this matter?

A     I don't believe so.

Q     After this first set of payments from IPSY, did Mr. Tran later contact you about IPSY making its second set of payments?

A     Yes.  Meaning there was a shortened schedule, and he reached out.

Q     What do you mean by "a shortened schedule"?

A     The -- there was a timeline for the second buyback of shares from Mr. Tran and Ms. Phan.  And it had been accelerated by IPSY, because they were anticipating a public offering and they wanted to get rid of the issue, if you will.

Q     Do you recall approximately when Mr. Tran reached out to you about that second payment?

A     It would have been between April and May of 2018 at this point.

Q     So earlier I think you said that the -- you believe the agreement was reached in late 2017; is that right?

A     Yes.  At some point between August and, I think,

```
 1   September, October of 2017.
 2   Q    Okay.  And the second set of payments happened presumably
 3   sometime after that; is that right?
 4   A    Correct.  I think it was April or May, is when the ball
 5   started.
 6   Q    Okay.  Is that your recollection of when the first time
 7   Mr. Tran reached out to you about the payment?
 8   A    Give or take.  It's -- I had a bunch of other stuff going
 9   on at that time.  And it's just not crystal clear in my head,
10   but it was around March, April, May of 2018.
11   Q    Would it refresh your recollection to review your text
12   messages with Mr. Tran?
13             MR. AVENATTI:  Calls for speculation.
14             MR. WYMAN:  I'm asking for --
15             THE COURT:  Overruled.
16             THE WITNESS:  Yes.
17             MR. WYMAN:  Okay.  One moment.
18             (Counsel conferred off the record.)
19   Q    BY MR. WYMAN:  Could you please take a look at
20   Exhibit 274, page 1.
21   A    Okay.
22   Q    Does that refresh your recollection of when Mr. Tran
23   first reached out to you?
24   A    Yeah.  It does, yes.
25   Q    Okay.  If you could please close that exhibit now.
```

1       When was the first time that Mr. Tran -- when did

2   Mr. Tran reach out to you about the second set of payments?

3   A    March of 2018.

4   Q    Did you talk to Mr. Tran about where to have IPSY deposit

04:11PM 5   those second payments?

6   A    I think so.  Yes.

7   Q    Well, let me ask you a different question, then.

8       What was your understanding of where IPSY would be

9   making those second payments?

04:11PM 10  A    To Mr. Avenatti, same place where the first ones went.

11  Q    Okay.  And the first ones went to the defendant.  What

12  kind of account, to your knowledge, did they go to?

13  A    I don't know.  I was not involved in that.  So I don't

14  know.

04:12PM 15  Q    So beginning from this time in March 2018 until about May

16  of 2018, did you communicate regularly with Mr. Tran about

17  these payments from IPSY?

18  A    I did.

19  Q    Did you also communicate with the defendant during that

04:12PM 20  time period about the money from IPSY?

21  A    I did.

22  Q    Would you ever convey information from the defendant to

23  Mr. Tran about the payments from IPSY?

24  A    Yes.

04:12PM 25  Q    And would you also convey information back from Mr. Tran

| | |
|---|---|
| 1 | to the defendant? |
| 2 | A    Yes. |
| 3 | Q    How would you communicate with the defendant during this |
| 4 | time? |
| 04:12PM 5 | A    Through messaging typically. |
| 6 | Q    What kind of messaging? |
| 7 | A    Phone messaging.  Like, there's an app that he'd use with |
| 8 | me called Signal. |
| 9 | Q    And how would you communicate with Mr. Tran at this time? |
| 04:13PM 10 | A    90 percent of the time through text messaging. |
| 11 | Q    Based on your communications with the defendant during |
| 12 | this time, did he know that you would be conveying certain |
| 13 | messages from him to Mr. Tran? |
| 14 |         MR. AVENATTI:  Calls for speculation and conjecture, |
| 04:13PM 15 | Your Honor.  Objection. |
| 16 |         THE COURT:  Overruled. |
| 17 |         THE WITNESS:  Yes. |
| 18 | Q    BY MR. WYMAN:  And based on your conversations with him, |
| 19 | were you authorized to be conveying these messages from the |
| 04:13PM 20 | defendant to Mr. Tran? |
| 21 |         MR. AVENATTI:  Same objection, Your Honor. |
| 22 |         THE COURT:  Overruled. |
| 23 |         THE WITNESS:  Sorry.  I didn't hear what you said. |
| 24 | Q    BY MR. WYMAN:  Sure.  I'll repeat it. |
| 04:13PM 25 |         Based on your conversations with the defendant, did |

```
 1   you understand that you were authorized by him to send the
 2   messages he sent you to Mr. Tran?
 3   A    Yes.  I mean, I was being asked to do that.
 4   Q    And you were being asked to do that by the defendant?
 5   A    Yes.
 6   Q    Was he asking you to communicate with Mr. Tran on his
 7   behalf on these matters?
 8              MR. AVENATTI:  Leading.
 9              THE COURT:  Overruled.
10              THE WITNESS:  So not necessarily on his behalf, but
11   I would more, like, go between.
12   Q    BY MR. WYMAN:  Do you have Exhibit 274 there in front of
13   you?
14   A    I do.
15   Q    Do you recognize this document?
16   A    Like, all of it?
17   Q    Well, I guess, is this exhibit a collection of text
18   messages between you and Mr. Tran?
19   A    Yes.
20   Q    And do they generally span from March 2018 to May of
21   2018?
22   A    Yes.
23   Q    And do they include messages that you got from the
24   defendant and were asked to send to Mr. Tran?
25   A    Yes.
```

```
 1   Q    And is it a fair and accurate copy of your text messages
 2   with Mr. Tran?
 3   A    This would be the inverse of what I would have had.  But
 4   yes.
 5   Q    Understood.
 6             THE COURT:  What do you mean by that?  What do you
 7   mean by "the inverse"?
 8             THE WITNESS:  So these would be screenshots of
 9   Mr. Tran.  So the -- they would be juxtaposed.
10   Q    BY MR. WYMAN:  But the content is accurate?
11   A    Yes.
12             MR. AVENATTI:  Calls for speculation and conjecture,
13   Your Honor.
14             THE COURT:  Overruled.
15             MR. WYMAN:  Your Honor, the Government moves to
16   admit Exhibit 274.
17             MR. AVENATTI:  Objection, Your Honor.  Hearsay,
18   authentication, and foundation.
19             THE COURT:  Okay.  274 will be received for the
20   truth as to Mr. Marchino's communications as authorized
21   communications.  Mr. Tran's communications will be received
22   for notice only; that is, this is what he said and he sent it.
23             **(Exhibit Number 274 received.)**
24             MR. WYMAN:  If you can pull up page 1.
25   Q    What is the date here on this top text message?
```

```
 1   A     March 12.  And that would have been 2018.
 2              MR. WYMAN:  If we can pull up the whole page, just
 3   to orient the jury.
 4   Q     The messages that appear to be aligned to the right, who
 5   are those from?
 6   A     So the ones on the right side, those would be Mr. Tran,
 7   and the ones on the left side would be mine.
 8   Q     So that first message, "You got a minute to chat," that's
 9   from Mr. Tran?
10   A     Correct.  Yes.
11   Q     And he -- he reaches out to you on March 12th.  And is
12   this -- I think you said earlier 2018?
13   A     Yes.
14   Q     And after his text, can you please read the next three
15   texts that are on the screen.
16   A     So, "Yes," my text.  And then the next day I asked:  "Hi,
17   did Michael call you yet?"
18              And Long responded "Not yet."
19   Q     What are these texts referring to?
20   A     So Mr. Tran had reached out to explain that IPSY wanted to
21   go public and wanted to accelerate the stock buyback.  So I
22   reached out to Mr. Avenatti and tried to put him in touch.
23   Q     And is this --
24              MR. AVENATTI:  Objection, Your Honor, to that
25   portion relating to what Mr. Tran conveyed as hearsay, outside
```

1   of the text message.  Move to strike.

2           THE COURT:  What Mr. Tran conveyed will not be

3   received for the truth.

4   Q    BY MR. WYMAN:  Is this the beginning of the time when you

04:17PM 5   referred acting as a go-between, to use your words?

6   A    Yes, sort of.

7   Q    Can you please turn to page 3.  Looks like it's now

8   March 14th; is that right?

9   A    Yes.

04:17PM 10  Q    And what do you say there at the top to Mr. Tran?

11  A    "Hi - let me know when wires have been sent by IPSY.  That

12  way we can turn around quickly."

13  Q    And what is his response?

14  A    "They said they just sent."

04:17PM 15  Q    And then you write, "Okay.  We'll check shortly."

16          What did you mean by that?

17  A    That I was going to check with Mr. Avenatti to see if they

18  had been received.

19  Q    On page 4, which is a continuation of the last page, it

04:18PM 20  looks like -- there is your text, "We'll check shortly."  And

21  it looks like Mr. Tran responds that he will send you the wire

22  info.  Do you see that?

23  A    Yes.

24          MR. WYMAN:  If you can pull up, please, what is

04:18PM 25  already in evidence as Exhibit 275.

```
         1   Q    Is this an e-mail that you received from Mr. Tran?

         2   A    It was, yes.  Or it is.

         3   Q    And is this also dated March 14, 2018?

         4   A    It is, yes.

04:18PM   5   Q    Can you please read Mr. Tran's e-mail.

         6   A    Sorry.  I couldn't hear you.

         7   Q    Can you please read, I guess, just the first line of

         8   Mr. Tran's message.

         9   A    Sure.

04:19PM  10        "Hi guys.  Here is the wire info for myself and

        11   Michelle.  Payment was sent from IPSY today."

        12   Q    And when you said "payment was sent from IPSY today,"

        13   what was your understanding of where it was sent?

        14   A    To Mr. Avenatti.

04:19PM  15   Q    And then I'm not going to ask you to read all the bank

        16   info, but how much was he instructing you and the defendant to

        17   send him from the IPSY payments?

        18   A    Well, it wasn't instructing me, but it was $8,146,288 for

        19   Ms. Phan and $147,972 for Mr. Tran.

04:19PM  20   Q    Okay.  Let's go back now to Exhibit 274, your text

        21   messages.  And if you could please go to page 5.

        22   A    Yes.

        23   Q    What is the date at the top of this page?

        24   A    March 20th.

04:20PM  25   Q    And it looks like Mr. -- is that the top there a message
```

```
 1   from Mr. Tran, the "Morning sunshine"?

 2   A    I think so, but I'm not sure.

 3   Q    And then right below that, those are messages from you?

 4   A    Yes.

 5   Q    So at the top there, there's a message, "Morning

 6   sunshine.  Get the wire?"

 7   A    Yes.

 8   Q    So March 20th, about a little less than a week after the

 9   last e-mail on March 14th, Mr. Tran and Ms. Phan had not

10   received their wire payments?

11        MR. AVENATTI:  Objection.  Calls for speculation,

12   Your Honor.

13        THE COURT:  Overruled.

14        THE WITNESS:  I don't know if that was referring to

15   that or whether Mr. Avenatti had received the wires from IPSY.

16   I can't remember the chronology of it.

17   Q    BY MR. WYMAN:  Okay.  So when this says "Morning

18   sunshine.  Get the wire?" what did you understand "the wire" to

19   be?

20   A    As I see it in this context, it was the wire from IPSY to

21   Mr. Avenatti.

22   Q    Okay.  And then you write, "No idea.  Need to ask

23   Michael."  And then you say, "I'll ping him shortly."  Do you

24   see that?

25   A    Yes.
```

```
  1    Q    Did you speak to the defendant after receiving this text

  2    from Mr. Tran?

  3    A    I can't remember when, but, yes, shortly thereafter.

  4    Q    And what did he say?

04:21PM 5   A    I can't remember directly.  As I sit here today, I have no

  6    recollection of it.

  7    Q    Well, setting aside that specific conversation, do you

  8    recall having conversations with the defendant around this time

  9    about the wire payments from IPSY?

04:21PM 10  A    Yes.

  11   Q    And during those conversations, did he ever tell you that

  12   he had wired $3 million of the payments on March 15, 2018 --

  13             MR. AVENATTI:  Objection.  Lacks foundation,

  14   Your Honor.

04:21PM 15            THE COURT:  Overruled.

  16   Q    BY MR. WYMAN:  I'm sorry.  I didn't quite finish my

  17   question.

  18             -- that he had wired $3 million to other accounts he

  19   controlled?

04:22PM 20            MR. AVENATTI:  Objection.  That lacks foundation.

  21             THE COURT:  Overruled.

  22             THE WITNESS:  No.

  23   Q    BY MR. WYMAN:  Top of page 6 now.  What's the date of the

  24   second text from the top, where Mr. Tran writes, "Please call

04:22PM 25  me back"?
```

**UNITED STATES DISTRICT COURT**

```
 1  A     I believe that to be April 22nd, 2018.

 2  Q     It looks like you ask if it's urgent?

 3  A     Yes.

 4  Q     And what is his response?

04:22PM  5  A     "Same conversation as last time so, yes, I'm concerned and

 6  losing patience."

 7  Q     What did you understand him to mean when he said that?

 8  A     He had called me a few days before this indicating that

 9  the payment from Mr. Avenatti to them had not been made yet and

04:22PM 10  asking for my assistance, if you will.

11  Q     Would you have communicated that to the defendant after

12  receiving it?

13             MR. AVENATTI:  Objection.  Calls for speculation as

14  phrased.

04:23PM 15             THE COURT:  Overruled.

16             THE WITNESS:  Yes, I did.

17  Q     BY MR. WYMAN:  And during this time period when you're

18  acting as a go-between, when you would receive messages from

19  Mr. Tran, would you then communicate them to the defendant?

04:23PM 20             MR. AVENATTI:  Lacks foundation.

21             THE COURT:  Overruled.

22             THE WITNESS:  Yes.

23  Q     BY MR. WYMAN:  If you can please go to page 7 now.  It

24  looks like we're now at May 3rd of 2018; is that right?

04:23PM 25  A     Yes.
```

```
 1   Q    And Mr. Tran says, "Please call me back ASAP"?

 2   A    Yes.

 3   Q    Do you recall what this was about?

 4   A    Yes.

 5   Q    And what was it?

 6   A    Same issue.

 7   Q    And what was that issue?

 8   A    That they haven't -- they hadn't received the -- the

 9   complete amount of money.

10   Q    And you write back:

11            "I put a call in.  Will have news shortly.

12        Hang tight until tomorrow and I'll get this sorted

13        for you."

14            Do you recall what you were referring to when you

15   said that?

16   A    Yes.  I was trying to help him sort out where the second

17   wire was at.

18   Q    And then he says, "Thank you."

19            And you say, "I've got you.  Don't worry."

20            Did you know that by this time the defendant had

21   spent almost $4 million of Michelle Phan's money?

22            MR. AVENATTI:  Objection, Your Honor.  Lacks

23   foundation.

24            THE COURT:  Overruled.

25            THE WITNESS:  No, I did not know.
```

04:23PM (line 5)
04:23PM (line 10)
04:24PM (line 15)
04:24PM (line 20)
04:24PM (line 25)

```
 1   Q    BY MR. WYMAN:  Had you known that, would you have sent
 2   this message to Mr. Tran telling him not to worry?
 3              MR. AVENATTI:  Objection.  Calls for speculation.
 4              THE COURT:  Overruled.
 5              THE WITNESS:  Absolutely not.
 6   Q    BY MR. WYMAN:  If you go to page 8, please, now May 4th;
 7   is that right?
 8   A    Yes.
 9   Q    And it looks like you write, "Hi.  Did the other 4
10   arrive?"
11   A    Yes.
12   Q    What did you mean by that?
13   A    So the -- earlier we talked about there was $8 million
14   that were due to Ms. Phan.  My understanding at the time was
15   that they had been broken down into three separate wires:  Two
16   wires of $4 million each and then one smaller wire of a hundred
17   and whatever the difference was.
18              And they had received the hundred-something-thousand
19   dollar one.  They had received one of the $4 million wires.
20   But there was $4 million that was missing, and that was the --
21   "Did the other 4 arrive?"  Meaning, did the second $4 million
22   wire hit the account.
23   Q    When you say your understanding was that there were two
24   $4 million wires and one for the difference, what was that
25   understanding based on?
```

04:24PM 5
04:24PM 10
04:25PM 15
04:25PM 20
04:25PM 25

```
 1    A    My conversations with Mr. Avenatti.

 2    Q    Did he tell you there were two different wire payments

 3    for $4 million?

 4    A    Yes.

 5    Q    Now, returning to page 8, what is his response when you

 6    ask if the other 4 arrived?

 7    A    That he will check.

 8    Q    And then a little bit down that page, it looks like he

 9    writes, "Banks are closed now.  We'll know first thing Monday."

10         Do you see that?

11    A    No.  I actually said, "Okay."

12         And then he responded with "The banks are closed

13    now.  We'll know first thing Monday."

14    Q    Thank you.  Yes.

15         And now if we could go to page 11, which is three

16    days later on May 7.  Do you see that?

17    A    Yes.

18    Q    And what do you write there on May 7?

19    A    "Hi.  Any updates?"

20    Q    And what is his -- well, let me ask first, what are you

21    asking for updates on?

22    A    Well, based on the conversation of Friday -- yeah, I think

23    it was Friday -- if he had checked in and figured out whether

24    or not the money had hit.

25    Q    So this is still about the wire payments?
```

```
 1   A     Yes.  So everything here is about that second tranche of

 2   $4 million, the second set -- the second wire of 4 million.

 3   Q     Okay.  And what is his response?

 4   A     That he -- that he's waiting for a call back.

 5   Q     If you could go to page 12 now.  Looks like it's still

 6   the same day.  There's a text message from you where you say,

 7   "Okay."  And then what does Mr. Tran write right below that?

 8   A     He tells me that there is no sign of it and if I have a

 9   federal reference number for tracking.

10   Q     When he said "fed ref number for tracking," what did you

11   understand him to mean?

12   A     Well, at the time I understood that each wire would have a

13   tracking number, almost like a UPS or FedEx package, that you

14   could trace and figure out where it's at.  So that's what I was

15   understanding him to be asking for.

16   Q     And then right below that, it looks like it's the

17   following day and he's asking for an update on your end,

18   May 8th; is that right?

19   A     That's correct.

20   Q     If we can go to page 13 now, now May 9th.  And focusing

21   on the text messages at the bottom, what did you write there?

22   A     "I just got a text from bank.  We should have fed number

23   shortly."

24   Q     Did you write this text?

25   A     I did not.
```

```
     1   Q     Who wrote this text?
     2   A     Well, I copied and pasted, from one app to the other, a
     3   message that I had received, and I just -- for ease, I just
     4   copied it and sent it to Mr. Tran.
04:28PM  5   Q     And who did you receive this message from?
     6   A     From Mr. Avenatti.
     7   Q     So during this time, were you in communication with the
     8   defendant about that missing $4 million wire payment?
     9   A     I was, yes.
04:29PM 10   Q     And what did he say about it?
    11   A     That he was trying to find it -- or rather, getting the
    12   bank on it to try and find it.
    13   Q     If we can go to page 14 now.  Looks like it's still
    14   May 9th.
04:29PM 15   A     Yes.
    16   Q     And if we could look at the bottom, it looks like there's
    17   a several-lined text from you on the bottom half of the page.
    18   Can you please read that for the jury.
    19   A     Sure.  It says, "Please" -- or the shorthand for
04:29PM 20   "please" -- "give this to Long, 0504L2LFCK1C000933."
    21            Then I said, "This is what I received."
    22   Q     And is this another message that you copied from another
    23   messaging app?
    24   A     Yes.
04:30PM 25   Q     And who sent that you message?
```

**UNITED STATES DISTRICT COURT**

A      Mr. Avenatti.

THE COURT:  We'll stop here for the day.

MR. WYMAN:  Thank you, Your Honor.

THE COURT:  Ladies and gentlemen, regular day

04:30PM  tomorrow.  9:00 to 12:00, 1:30 to 4:30.  Please remember the

admonition not to discuss the case with anyone, not to form any

opinions on the issues in the case until it's submitted to you,

and do not research the case.

Hope you enjoy the evening.  See you tomorrow.

04:30PM  THE COURTROOM DEPUTY:  All rise.

**(Out of the presence of the jury.)**

THE COURT:  Tomorrow morning at 8:30 we'll take up

Mr. Harbur's motion to quash.  At 8:15 why don't we take up the

in camera matters, the Johnson notes and the additional notes

04:31PM  from --

MR. SAGEL:  Yes, Your Honor.  Can the witness step

down?

THE COURT:  You may step down, sir.  Thank you.

THE WITNESS:  Thank you, Your Honor.

04:31PM  MR. SAGEL:  And just for clarification, Your Honor,

I asked your courtroom deputy -- Ms. Regnier's attorney had

sent to both the defendant and us responses of all texts and

e-mails.  I had ask that Mr. Barton provide it to the Court.

I'm not sure he has.  So if -- I'm seeing a head nod "no."  I'd

04:31PM  ask that I can just forward what we received to the Court so

```
 1    the Court can see that in reference as well.
 2              THE COURT:  That's fine.
 3              MR. SAGEL:  Thank you.
 4              MR. AVENATTI:  Your Honor, that submission relating
 5    to what was received from Ms. Regnier, I don't believe that
 6    should be in camera, because it was provided to both sides.
 7    And before any decisions are made --
 8              MR. SAGEL:  I'm not asking for it to be in camera.
 9    I'm just asking to provide it to the Court.
10              MR. AVENATTI:  Before any decisions are made,
11    Your Honor, relating to these Jencks issues, I want -- I would
12    like to be heard beyond just our initial filing with the Court.
13              THE COURT:  Well, sir, I indicated we'd have a
14    hearing on Friday.
15              MR. AVENATTI:  Okay.  And I understand that to be on
16    all the Jencks issues?
17              THE COURT:  The Jencks issues you raised in your
18    initial memorandum, yes.
19              MR. AVENATTI:  The initial memorandum relating to
20    Ms. Regnier as well as the memorandum that we filed over the
21    last couple days?
22              THE COURT:  Right.  It relates to, I believe, seven
23    witnesses.
24              MR. AVENATTI:  I believe it's nine.
25              THE COURT:  You asked either for a mistrial or that
```

         1    their testimony be stricken.

         2              MR. AVENATTI:  Right.  It's nine witnesses and it

         3    includes Ms. Regnier.

         4              THE COURT:  Okay.  Yes.

04:33PM   5              MR. AVENATTI:  Because as it relates to Mr. Barton's

         6    communications, Your Honor, there is substantial reason to

         7    believe that is not all the text messages, and --

         8              THE COURT:  Well, sir, let's take it up on Friday.

         9              MR. AVENATTI:  But -- understood, Your Honor --

04:33PM  10              THE COURT:  I understand you have substantial

        11    reasons, and I'll expect you to tell me what they are.

        12              MR. AVENATTI:  Fair enough, Your Honor.

        13              My position -- I just want the record to be clear.

        14    At some point a proper *Jencks* inquiry needs to be conducted,

04:33PM  15    and that includes taking sworn testimony from Special Agent

        16    Carlos and others.  I believe that's required under *Campbell*

        17    *vs. United States.*  I'll be happy to take it up on Friday.

        18              THE COURT:  I'm not sure the case law validates your

        19    position in any event.

04:33PM  20              Anything else for today?

        21              MR. SAGEL:  Nothing from the Government, Your Honor.

        22              THE COURT:  Heads-up on Thursday, I need to stop at

        23    3:00 p.m. on Thursday.

        24              MR. SAGEL:  Okay.  Thank you for the heads-up.

04:34PM  25              THE COURT:  We'll be in recess.

1          THE COURTROOM DEPUTY:  All rise.  This Court is now

2  in recess.

3               **(Proceedings concluded at 4:34 p.m.)**

4                          --oOo--

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        *CERTIFICATE OF OFFICIAL REPORTER*

2

3    COUNTY OF LOS ANGELES   )
                             )
4    STATE OF CALIFORNIA     )

5              I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME

6    COURT REPORTER, in and for the United States District Court for

7    the Central District of California, do hereby certify that

8    pursuant to Section 753, Title 28, United States Code that the

9    foregoing is a true and correct transcript of the

10   stenographically reported proceedings held in the

11   above-entitled matter and that the transcript page format is in

12   conformance with the regulations of the Judicial Conference of

13   the United States.

14

15   *Date:  August 3, 2021*

16

17

18

19                          */S/ DEBBIE HINO-SPAAN*

20                          *Debbie Hino-Spaan, CSR No. 7953*
                            *Federal Official Court Reporter*
21

22

23

24

25

**UNITED STATES DISTRICT COURT**

## $

**$1,766,000** [2] - 39:5, 39:11
**$1.75** [1] - 28:2
**$147,872** [1] - 99:19
**$16,000** [2] - 23:3, 35:14
**$18,844** [1] - 75:1
**$192,000** [1] - 39:23
**$2.75** [4] - 25:4, 35:6, 61:12, 69:5
**$20,000** [1] - 23:3
**$250,000** [5] - 28:8, 28:11, 28:16, 28:21, 39:13
**$3,354.62** [1] - 73:11
**$34,000** [1] - 74:18
**$34,267.87** [1] - 74:16
**$7,572.56** [1] - 74:5
**$8,146,288** [1] - 99:18

## '

**'blank'** [2] - 19:1, 19:4

## /

**/S** [1] - 112:19

## 0

**026** [1] - 56:17
**0504L2LFCK1C**
   **000933** [1] - 107:20

## 1

**1** [12] - 4:11, 55:11, 55:18, 55:19, 63:18, 70:9, 71:12, 80:5, 80:12, 82:8, 92:20, 96:24
**1-053** [1] - 1:24
**1.76** [1] - 28:2
**1/26/2017** [1] - 3:14
**1/31/2017** [1] - 3:13
**1051** [1] - 27:20
**11** [2] - 3:3, 105:15
**1100** [1] - 2:11
**12** [2] - 97:1, 106:5
**1206** [1] - 4:10
**1216** [1] - 4:23
**12:00** [1] - 108:5
**12th** [1] - 97:11
**13** [2] - 1:8, 106:20
**130** [5] - 3:11, 54:22, 55:7, 55:11, 56:12
**132** [4] - 27:1, 27:3, 31:23, 42:10

**139** [4] - 28:24, 35:9, 35:22
**139.** [1] - 35:25
**14** [2] - 99:3, 107:13
**14th** [2] - 98:8, 100:9
**15** [6] - 53:17, 53:21, 81:22, 82:9, 83:21, 101:12
**15,423.17** [1] - 74:22
**152** [6] - 3:13, 61:25, 63:6, 63:10, 63:15, 63:19
**153** [4] - 3:14, 66:6, 66:14, 66:20
**158** [3] - 33:24, 34:1, 42:18
**16** [1] - 19:1
**164** [8] - 8:16, 10:3, 15:6, 15:7, 17:3, 17:17, 19:24, 20:22
**167** [8] - 3:16, 71:1, 71:16, 72:2, 72:12, 72:14, 74:24, 76:3
**168** [8] - 3:17, 71:1, 71:16, 72:2, 72:12, 72:25, 74:6, 76:3
**16th** [1] - 87:14
**17** [1] - 2:18
**18** [2] - 18:16, 90:14
**19** [1] - 18:16
**1:30** [3] - 8:13, 9:4, 108:5
**1:31** [2] - 1:16, 4:2
**1st** [1] - 56:15

## 2

**2** [19] - 1:9, 28:24, 31:25, 35:9, 35:10, 55:14, 56:18, 56:19, 64:3, 64:10, 65:6, 67:20, 72:24, 75:1, 80:6, 80:15, 81:19, 85:5, 87:22
**2.5** [4] - 64:13, 64:16, 68:9, 69:12
**2.8** [1] - 90:14
**2000** [1] - 76:18
**2001** [1] - 76:18
**2011** [1] - 46:4
**2012** [1] - 46:7
**2013** [2] - 46:7, 46:8
**2015** [1] - 46:21
**2016** [3] - 23:18, 46:21, 50:9, 52:18, 54:18, 56:15, 57:21, 62:6, 64:1, 77:23
**2017** [29] - 50:10, 58:22, 60:5, 60:6, 60:10, 61:11, 62:6,

64:1, 64:2, 67:5, 70:3, 72:15, 74:9, 77:20, 77:23, 79:19, 81:22, 82:9, 83:8, 83:21, 83:22, 83:24, 87:14, 88:6, 90:14, 91:1, 91:24, 92:1
**2018** [18] - 4:10, 16:18, 17:12, 70:3, 70:7, 91:21, 92:10, 93:3, 93:15, 93:16, 95:20, 95:21, 97:1, 97:12, 99:3, 101:12, 102:1, 102:24
**2019** [14] - 16:18, 17:13, 18:13, 19:25, 20:14, 29:3, 40:21, 42:5, 48:24, 49:4, 60:12, 60:14, 61:1, 61:4
**2020** [7] - 28:12, 28:16, 41:11, 41:15, 41:24, 42:1, 60:11
**2021** [3] - 1:15, 4:1, 112:15
**20th** [2] - 99:24, 100:8
**213-894-2435** [1] - 2:12
**22** [1] - 3:4
**22nd** [1] - 102:1
**23** [3] - 18:13, 19:24, 69:9
**23rd** [1] - 72:15
**254** [1] - 2:19
**25th** [2] - 49:7, 67:5
**26** [4] - 29:6, 40:21, 64:7, 69:4
**265** [6] - 3:18, 78:15, 78:20, 79:4, 79:13, 83:12
**266** [6] - 3:20, 81:4, 81:12, 81:18, 83:17, 84:12
**267** [4] - 3:22, 86:25, 87:8, 87:12
**26th** [1] - 65:2
**274** [7] - 3:24, 92:20, 95:12, 96:16, 96:19, 96:23, 99:20
**275** [1] - 98:25
**28** [1] - 112:8
**28th** [1] - 74:9
**2nd** [5] - 20:14, 29:3, 40:21, 42:5, 74:11

## 3

**3** [12] - 1:15, 4:1, 38:23, 58:15, 80:6, 82:23, 82:25, 84:11,

64:1, 64:2, 67:5, 70:3, 72:15, 74:9, 77:20, 77:23, 79:19, 81:22, 82:9, 83:8,

98:7, 101:12, 101:18, 112:15
**3.6** [2] - 22:19, 22:24
**3/1/2017** [1] - 3:18
**30** [1] - 51:1
**30-minute** [1] - 7:12
**312** [1] - 2:11
**31st** [5] - 62:5, 62:6, 64:1
**33** [8] - 24:6, 27:23, 27:24, 32:7, 38:24, 39:2, 39:5, 39:10
**33.3** [9] - 26:21, 26:24, 27:4, 27:7, 27:23, 27:24, 38:24, 39:3, 39:10
**35** [1] - 3:4
**3:00** [1] - 110:23
**3:01** [1] - 54:1
**3:18** [1] - 54:1
**3rd** [1] - 102:24

## 4

**4** [17] - 27:2, 84:11, 84:12, 98:19, 103:21, 104:9, 104:16, 104:19, 104:20, 104:21, 104:24, 105:3, 105:6, 106:2, 107:8
**40** [5] - 27:13, 27:14, 51:1, 51:17, 51:18
**4000316** [2] - 65:25, 67:11
**403** [5] - 10:23, 11:1, 16:16, 19:15, 25:7
**411** [2] - 1:24, 2:6
**420** [2] - 65:24, 67:10
**42000029** [2] - 65:25, 67:11
**44** [1] - 3:6
**4:30** [1] - 108:5
**4:34** [1] - 111:3
**4th** [2] - 2:6, 104:6
**4TH** [1] - 1:24

## 5

**5** [5] - 31:24, 80:14, 82:25, 83:16, 99:21
**50** [2] - 86:22, 86:23
**50/50** [1] - 52:1
**56** [1] - 3:11

## 6

**6** [4] - 8:19, 32:10, 58:22, 101:23
**612** [1] - 29:21

**615** [8] - 4:8, 4:12, 4:18, 4:21, 5:1, 6:9, 6:12, 7:19
**63** [1] - 3:13
**66** [1] - 3:14

## 7

**7** [5] - 58:22, 84:18, 102:23, 105:16, 105:18
**7.5** [1] - 86:15
**714-338-3598** [1] - 2:7
**72** [2] - 3:16, 3:17
**753** [1] - 112:8
**7608** [1] - 3:13
**79** [1] - 3:18
**7953** [2] - 1:23, 112:20

## 8

**8** [4] - 58:22, 104:6, 104:13, 105:5
**8/1/2016** [1] - 3:11
**8/15/2017** [1] - 3:20
**8/16/2017** [1] - 3:22
**8000** [1] - 2:6
**81** [1] - 3:20
**82** [2] - 20:17, 20:20
**87** [1] - 3:22
**895** [1] - 4:10
**8:15** [1] - 108:13
**8:30** [1] - 108:12
**8th** [1] - 106:18

## 9

**9** [3] - 32:10, 83:7, 83:14
**90** [1] - 94:10
**90012** [1] - 2:12
**92660** [1] - 2:19
**92701** [2] - 1:25, 2:7
**949-481-4900** [1] - 2:20
**96** [1] - 3:24
**9:00** [1] - 108:5
**9th** [3] - 79:19, 106:20, 107:14

## A

**ability** [1] - 39:4
**able** [3] - 9:15, 71:4, 78:7
**above-entitled** [1] - 112:11
**absolutely** [1] - 104:5
**accelerate** [1] - 97:21
**accelerated** [1] -

91:16

**acceptable** [1] - 82:5

**accident** [2] - 52:5, 52:8

**accommodation** [1] - 84:21

**Account** [1] - 3:13

**account** [23] - 34:24, 35:2, 35:3, 35:6, 42:19, 43:17, 61:13, 62:7, 62:10, 62:15, 62:23, 63:1, 63:3, 63:21, 63:22, 64:14, 64:17, 65:23, 68:9, 69:9, 93:12, 104:22

**accounted** [1] - 25:13

**accounting** [3] - 25:19, 74:2, 88:13

**accounts** [8] - 34:15, 43:21, 61:17, 61:18, 61:20, 62:20, 90:15, 101:18

**accurate** [10] - 24:10, 55:3, 62:19, 66:10, 71:23, 78:24, 81:8, 87:5, 96:1, 96:10

**acting** [3] - 15:18, 98:5, 102:18

**action** [4] - 45:3, 46:4, 46:8, 48:2

**actions** [2] - 46:11, 46:13

**actress** [4] - 15:8, 15:9, 15:10, 15:16

**acts** [1] - 6:10

**actual** [1] - 8:9

**add** [2] - 24:5, 24:6

**addition** [2] - 85:16, 87:24

**additional** [4] - 28:8, 28:12, 57:21, 108:14

**Additions** [1] - 64:5

**address** [1] - 48:13

**addresses** [1] - 48:11

**adequate** [1] - 6:21

**admit** [8] - 55:7, 63:6, 66:13, 72:2, 79:4, 81:12, 87:8, 96:16

**admonition** [2] - 53:17, 108:6

**adopted** [1] - 16:6

**adverse** [1] - 29:21

**advertising** [1] - 46:12

**advising** [1] - 12:17

**advisor** [1] - 34:16

**afternoon** [9] - 11:10, 11:11, 11:17, 11:18, 22:12, 22:13, 44:17, 44:18, 53:16

**Agent** [1] - 110:15

**agents** [1] - 49:4

**ago** [9] - 8:18, 13:1, 35:10, 38:20, 40:2, 61:6, 67:13, 83:9, 86:15

**agree** [3] - 17:8, 39:1, 88:15

**agreement** [40] - 22:25, 23:22, 24:22, 27:3, 28:14, 29:11, 29:23, 31:13, 33:20, 35:24, 36:14, 37:16, 38:3, 38:9, 40:1, 40:25, 42:6, 51:5, 51:19, 51:23, 60:7, 60:18, 61:2, 61:7, 69:17, 81:2, 81:16, 81:24, 82:4, 83:1, 83:7, 83:16, 83:20, 84:7, 86:19, 87:20, 87:25, 89:15, 90:19, 91:24

**Agreement** [1] - 3:21

**agreements** [5] - 33:21, 42:11, 88:2, 88:5, 88:7

**Airbnb** [5] - 39:20, 73:17, 73:21, 73:24, 75:7

**aircraft** [2] - 56:23, 57:15

**Aircraft** [3] - 65:23, 68:1, 68:18

**aircrafts** [1] - 57:9

**alex.wyman@usdoj. gov** [1] - 2:13

**ALEXANDER** [1] - 2:10

**Alexis** [4] - 15:23, 16:5, 16:6, 49:15

**ALEXIS** [2] - 3:3, 11:14

**Alexis's** [1] - 74:15

**Alfredo** [1] - 74:14

**aligned** [1] - 97:4

**allow** [2] - 5:10, 5:16

**allowed** [2] - 21:14, 47:10

**almost** [3] - 90:14, 103:21, 106:13

**altogether** [1] - 74:16

**ambit** [1] - 4:11

**AMERICA** [1] - 1:5

**amount** [12] - 7:2, 22:14, 28:18, 51:4, 65:5, 73:10, 73:13, 74:18, 74:19, 75:1, 88:12, 103:9

**amounts** [2] - 34:13, 88:7

**Ana** [1] - 2:7

**ANA** [3] - 1:17, 1:25, 4:1

**ANGELES** [1] - 112:3

**Angeles** [5] - 2:12, 44:20, 47:10, 47:12, 48:21

**answer** [7] - 27:14, 36:24, 40:18, 41:16, 41:21, 42:21, 42:22

**answered** [8] - 13:17, 24:11, 24:16, 26:4, 39:6, 39:15, 43:7, 70:19

**answers** [1] - 6:24

**anticipating** [1] - 91:17

**anyway** [3] - 8:24, 9:7, 9:24

**apart** [2] - 42:15, 57:14

**apartment** [1] - 73:23

**apologize** [3] - 34:3, 37:1, 65:15

**app** [4] - 43:2, 94:7, 107:2, 107:23

**appear** [1] - 97:4

**APPEARANCES** [1] - 2:1

**applies** [1] - 21:20

**approach** [3] - 9:11, 9:13, 35:18

**appropriate** [6] - 6:17, 7:5, 85:24

**April** [8] - 20:14, 29:3, 40:21, 42:5, 91:21, 92:4, 92:10, 102:1

**Argumentative** [2] - 13:3, 20:5

**arm's** [1] - 30:17

**arrangement** [8] - 46:9, 46:17, 46:19, 46:22, 47:7, 47:19, 48:3, 58:23

**arrive** [2] - 104:10, 104:21

**arrived** [1] - 105:6

**article** [2] - 15:2, 45:17

**artist** [4] - 10:14, 16:9, 18:25, 19:1

**ASAP** [1] - 103:1

**aside** [3] - 47:14, 79:1, 101:7

**assist** [1] - 17:11

**assistance** [1] - 102:10

**Assistant** [2] - 2:5, 2:10

**assisting** [2] - 16:19,

28:8

**associates** [1] - 78:5

**Associates** [1] - 86:13

**assume** [1] - 8:4

**assumed** [1] - 59:17

**assuming** [1] - 4:21

**attached** [4] - 82:3, 82:13, 82:18, 87:19

**attaching** [1] - 83:20

**Attachment** [3] - 3:12, 3:15, 3:23

**attachment** [15] - 55:1, 55:4, 55:10, 56:10, 56:20, 66:11, 66:16, 66:24, 66:25, 67:18, 72:20, 74:25, 81:16, 82:19, 87:22

**attachments** [5] - 71:20, 71:24, 72:7, 72:10, 72:18

**attention** [7] - 7:18, 15:5, 17:3, 17:15, 20:17, 20:20, 64:4

**Attorney** [4] - 2:4, 2:5, 2:9, 2:10

**attorney** [28] - 11:22, 11:23, 15:22, 24:25, 25:22, 32:15, 32:22, 33:15, 41:8, 41:17, 44:22, 50:19, 50:20, 50:23, 61:18, 63:1, 77:24, 78:8, 78:11, 81:16, 84:17, 85:8, 85:12, 85:16, 85:20, 85:21, 108:21

**attorney's** [1] - 81:2

**attorney-client** [4] - 32:15, 32:22, 61:18, 63:1

**attorneys** [4] - 31:17, 47:4, 47:5, 48:10

**attorneys'** [8] - 59:1, 59:8, 59:20, 59:23, 71:13, 75:20, 90:20, 91:2

**auditioned** [1] - 15:20

**August** [8] - 56:15, 81:22, 82:9, 83:21, 83:22, 87:14, 91:25, 112:15

**AUGUST** [2] - 1:15, 4:1

**AUSAs** [1] - 28:13

**authenticate** [1] - 63:15

**authentication** [2] - 63:12, 96:18

**authority** [1] - 61:20

**authorized** [3] - 94:19, 95:1, 96:20

**available** [1] - 40:16

**AVENATTI** [127] - 1:8, 2:15, 2:16, 6:2, 6:4, 6:13, 6:20, 7:11, 7:21, 7:23, 8:7, 9:8, 9:13, 9:15, 9:22, 9:25, 10:2, 10:6, 10:8, 10:13, 10:16, 10:19, 10:21, 11:6, 11:13, 11:16, 12:10, 12:12, 13:5, 13:10, 13:12, 13:21, 14:2, 14:14, 15:12, 15:14, 16:18, 17:19, 19:23, 20:7, 21:1, 21:4, 21:6, 21:12, 21:22, 22:1, 22:8, 24:1, 24:11, 24:16, 24:18, 25:7, 25:9, 26:3, 26:6, 27:9, 29:17, 30:7, 31:7, 32:17, 32:25, 33:6, 35:19, 35:21, 36:8, 36:10, 36:21, 37:2, 37:13, 37:15, 37:19, 37:24, 38:5, 38:13, 39:8, 39:17, 40:14, 40:17, 40:20, 41:8, 41:18, 41:23, 43:22, 51:6, 51:11, 55:9, 55:17, 57:18, 60:23, 63:7, 63:10, 66:15, 66:23, 69:13, 72:3, 72:9, 75:24, 76:9, 79:5, 81:13, 86:16, 87:9, 90:16, 91:4, 92:13, 94:14, 94:21, 95:8, 96:12, 96:17, 97:24, 100:11, 101:13, 101:20, 102:13, 102:20, 103:22, 104:3, 109:4, 109:10, 109:15, 109:19, 109:24, 110:2, 110:5, 110:9, 110:12

**Avenatti** [74] - 3:3, 3:4, 3:11, 3:15, 3:18, 3:20, 3:22, 4:7, 5:12, 11:12, 21:25, 34:18, 35:17, 45:10, 45:12, 45:13, 45:14, 45:24, 46:18, 46:24, 47:2, 47:6, 47:8, 47:23, 48:7, 48:8, 48:9, 48:11, 48:13, 48:15, 49:9, 50:7, 50:11, 51:21, 52:24, 55:8, 55:12, 56:5, 56:6, 57:2, 58:4, 58:24, 61:13, 64:14, 64:15,

66:5, 66:19, 68:15, 68:16, 68:20, 68:22, 69:2, 71:9, 75:12, 75:14, 76:8, 78:14, 79:9, 81:14, 86:12, 87:10, 90:3, 93:10, 97:22, 98:17, 99:14, 100:15, 100:21, 102:9, 105:1, 107:6, 108:1

**Avenatti's** [4] - 66:17, 83:1, 86:7, 87:24

**award** [1] - 19:1

**award-winning** [1] - 19:1

**aware** [8] - 11:19, 11:22, 16:19, 61:11, 69:4, 69:8, 84:4, 84:7

**B**

**backwards** [1] - 31:2

**ball** [1] - 92:4

**Bank** [2] - 61:16, 62:20

**bank** [19] - 21:9, 22:2, 22:3, 35:2, 35:5, 43:15, 43:17, 43:21, 61:15, 61:17, 61:20, 61:22, 62:20, 65:8, 67:12, 68:7, 99:15, 106:22, 107:12

**Banks** [1] - 105:9

**banks** [1] - 105:12

**Bar** [1] - 51:10

**bar** [1] - 52:5

**Barela** [2] - 49:17, 49:19, 49:25, 54:6, 54:14

**Barton** [1] - 108:23

**Barton's** [1] - 110:5

**based** [16] - 21:15, 33:10, 33:20, 59:21, 60:20, 60:24, 61:7, 65:12, 68:8, 76:10, 86:2, 94:11, 94:18, 94:25, 104:25, 105:22

**basis** [6] - 7:17, 8:4, 50:15, 50:17, 63:15, 72:10

**beach** [2] - 30:13, 40:12

**Beach** [3] - 2:19, 40:9, 41:1

**bear** [1] - 83:11

**bearing** [1] - 72:24

**beat** [1] - 19:20

**Beauty** [1] - 85:11

**became** [2] - 16:25, 23:10

**began** [1] - 54:18

**beginning** [7] - 46:7, 50:9, 51:16, 59:11, 93:15, 98:4

**behalf** [4] - 22:2, 88:3, 95:7, 95:10

**behind** [6] - 18:1, 20:2, 44:5, 71:2, 78:17, 80:7

**belong** [1] - 68:11

**below** [5] - 10:9, 84:19, 100:3, 106:7, 106:16

**bench** [1] - 9:10

**benefit** [4] - 7:24, 8:1, 9:9, 84:20

**best** [4] - 5:4, 14:9, 39:4, 41:20

**between** [14] - 8:8, 8:19, 50:24, 51:20, 66:7, 83:23, 84:5, 84:7, 91:21, 91:25, 95:11, 95:18, 98:5, 102:18

**beyond** [1] - 109:12

**big** [3] - 38:23, 38:25, 39:1

**bill** [1] - 68:11

**Billing** [1] - 84:13

**bills** [1] - 15:11

**binder** [2] - 54:23, 78:17

**bit** [6] - 45:3, 51:25, 64:24, 65:16, 84:1, 105:8

**blacked** [1] - 19:7

**block** [1] - 36:1

**blow** [3] - 36:1, 36:2, 36:10

**blue** [1] - 45:19

**board** [2] - 80:6, 80:8

**bolded** [1] - 36:4

**bottom** [11] - 7:5, 55:18, 55:19, 66:22, 68:2, 68:6, 74:24, 75:1, 106:21, 107:16, 107:17

**bought** [2] - 80:13, 89:2

**bound** [1] - 36:13

**box** [1] - 17:1

**boyfriend** [2] - 30:24, 31:13, 50:13

**brand** [2] - 80:13, 88:25

**break** [6] - 4:6, 18:17, 21:8, 22:2, 53:16, 54:4

**breaking** [2] - 28:18, 53:13

**Bredahl** [1] - 11:7

**BRETT** [1] - 2:5

**brett.sagel@usdoj. gov** [1] - 2:8

**briefly** [1] - 52:2

**bring** [6] - 7:18, 8:11, 11:5, 11:7, 18:6, 56:1

**broken** [1] - 104:15

**brought** [1] - 46:12

**buddy** [1] - 52:7

**bunch** [3] - 83:23, 83:25, 92:8

**burner** [1] - 84:1

**business** [2] - 76:21, 84:21

**buy** [1] - 36:20

**buyback** [2] - 91:15, 97:21

**buying** [2] - 68:20

**BY** [68] - 2:5, 2:18, 3:3, 3:5, 11:16, 12:12, 13:5, 13:12, 13:21, 14:2, 14:14, 15:14, 16:18, 19:23, 21:6, 22:1, 22:11, 24:4, 24:13, 24:20, 25:12, 26:10, 27:12, 29:9, 30:22, 31:11, 32:21, 33:2, 33:9, 35:21, 37:2, 37:15, 37:19, 38:5, 38:13, 39:8, 39:17, 41:8, 41:23, 44:16, 51:14, 56:13, 57:20, 61:1, 63:20, 66:21, 69:15, 72:13, 76:12, 79:14, 81:19, 86:19, 87:13, 90:18, 91:7, 92:19, 94:18, 94:24, 95:12, 96:10, 98:4, 100:17, 101:16, 101:23, 102:17, 102:23, 104:1, 104:6

**C**

**CA** [1] - 1:25

**calculate** [2] - 23:15, 27:6

**calculated** [2] - 27:23, 39:2

**calculation** [7] - 23:2, 26:20, 27:24, 27:25, 38:20, 39:5, 39:10

**calculations** [3] - 22:16, 27:19, 27:21

**CALIFORNIA** [4] - 1:2,

1:17, 4:1, 112:4

**California** [6] - 2:7, 2:12, 2:19, 33:10, 51:10, 112:7

**CALLED** [2] - 3:3, 3:5

**Camberos** [1] - 80:8

**camera** [3] - 108:14, 109:6, 109:8

**Campbell** [1] - 110:16

**cannot** [1] - 11:22

**cap** [1] - 80:9

**car** [4] - 52:5, 52:7, 52:20, 90:2

**Carlos** [1] - 110:16

**carried** [1] - 84:21

**carrying** [1] - 6:10

**cart** [1] - 71:2

**carve** [1] - 59:12

**case** [44] - 4:14, 11:21, 12:2, 12:7, 13:23, 14:7, 14:9, 14:22, 25:17, 26:2, 26:12, 26:16, 42:16, 43:24, 46:1, 46:15, 49:11, 49:14, 50:15, 50:21, 50:22, 51:15, 52:4, 52:11, 52:14, 53:10, 53:18, 53:19, 57:25, 58:8, 58:9, 58:12, 58:14, 58:24, 58:25, 68:15, 70:13, 71:10, 75:10, 86:13, 108:6, 108:7, 108:8, 110:18

**Case** [1] - 1:7

**cases** [12] - 47:1, 47:20, 47:23, 47:25, 48:1, 49:8, 51:17, 51:24, 52:11, 54:9, 71:11, 86:22

**cash** [2] - 78:7, 84:20

**cashier's** [1] - 34:19

**Cassaro** [3] - 40:5, 40:8, 40:25

**catastrophic** [1] - 45:2

**CENTRAL** [1] - 1:2

**Central** [1] - 112:7

**cents** [1] - 69:9

**CEO** [1] - 80:8

**certain** [3] - 34:12, 88:7, 94:12

**certainly** [1] - 5:9

**CERTIFICATE** [1] - 112:1

**CERTIFIED** [1] - 1:6

**certify** [1] - 112:7

**chain** [2] - 79:8, 79:24

**change** [1] - 20:4

**characters** [1] - 15:9

**charges** [1] - 73:17

**chart** [1] - 24:20

**Chase** [3] - 3:13, 61:15, 62:20

**chat** [1] - 97:8

**check** [6] - 24:9, 24:13, 98:15, 98:17, 98:20, 105:7

**checked** [1] - 105:23

**checks** [4] - 33:24, 34:6, 34:19, 42:18

**chief** [1] - 43:24

**choice** [2] - 5:13, 5:20

**choose** [1] - 5:22

**chronology** [1] - 100:16

**Circuit** [1] - 4:10

**circumstance** [1] - 5:8

**cited** [1] - 4:9

**civil** [2] - 45:4, 45:5

**claims** [2] - 84:24, 85:10

**clarification** [5] - 54:16, 62:22, 62:25, 75:15, 108:20

**clarify** [1] - 54:9

**Clark** [1] - 48:2

**class** [6] - 45:3, 46:4, 46:8, 46:11, 46:13, 48:2

**clear** [3] - 59:24, 92:9, 110:13

**clearer** [1] - 86:8

**clearly** [2] - 4:22, 6:17

**client** [10] - 32:15, 32:22, 49:11, 49:17, 51:3, 59:13, 61:18, 63:1, 68:14, 68:15

**client's** [3] - 63:4, 85:9, 85:15

**clients** [8] - 46:13, 49:22, 54:5, 85:8, 85:9, 85:13, 85:14, 85:22

**clients'** [1] - 84:24

**close** [1] - 92:25

**closed** [2] - 105:9, 105:12

**clothing** [1] - 45:17

**co** [1] - 80:5

**co-founder** [1] - 80:5

**Code** [1] - 112:8

**collection** [1] - 95:17

**collectively** [1] - 11:11

**combined** [1] - 48:5

**comfortably** [1] - 34:6

**coming** [5] - 43:3, 43:18, 55:14, 86:7, 90:11

**comment** [1] - 5:18

**comments** [1] - 8:2

**communicate** [6] -

93:16, 93:19, 94:3, 94:9, 95:6, 102:19
**communicated** [1] - 102:11
**communicating** [3] - 11:20, 12:1, 14:15
**communication** [2] - 31:20, 107:7
**communications** [5] - 94:11, 96:20, 96:21, 110:6
**company** [10] - 18:5, 57:7, 57:9, 77:15, 77:18, 80:17, 85:11, 88:9, 89:1
**Company** [2] - 65:23, 68:1
**complete** [1] - 103:9
**completely** [1] - 48:6
**Complexity** [1] - 80:10
**compliance** [1] - 59:13
**concerned** [2] - 10:23, 102:5
**concluded** [1] - 111:3
**conclusion** [1] - 32:18
**conduct** [3] - 5:6, 6:11, 53:3
**conducted** [1] - 110:14
**conference** [2] - 47:18, 48:21
**Conference** [1] - 112:12
**conferred** [3] - 21:5, 29:8, 92:18
**conformance** [1] - 112:12
**confuse** [1] - 27:8
**confused** [3] - 26:23, 43:10, 43:11
**confusing** [1] - 43:9
**conjecture** [4] - 69:13, 75:25, 94:14, 96:12
**connection** [5] - 41:12, 63:11, 84:22, 85:9, 85:24
**considerable** [2] - 26:1, 26:11
**consistent** [1] - 23:14
**contact** [8] - 31:12, 31:17, 45:12, 52:9, 52:23, 77:20, 82:7, 91:11
**contacted** [1] - 31:11
**contacting** [1] - 31:19
**content** [5] - 5:21, 55:13, 72:6, 79:12, 96:10
**context** [3] - 80:2,

80:3, 100:20
**contingency** [9] - 50:15, 50:17, 50:18, 50:22, 51:4, 51:15, 51:20, 52:15
**contingent** [2] - 39:22, 84:17
**continuation** [1] - 98:19
**continue** [1] - 27:8
**continued** [1] - 42:7
**Contract** [1] - 67:11
**contract** [1] - 31:24, 32:24, 33:3, 33:5, 33:9, 33:10, 33:14, 50:18, 57:4, 65:24, 84:5
**contracts** [2] - 32:16, 32:22
**control** [3] - 62:10, 62:15, 62:21
**controlled** [1] - 101:19
**controlling** [1] - 63:14
**conversation** [12] - 30:24, 57:17, 57:24, 58:20, 59:2, 59:21, 60:2, 61:8, 90:13, 101:7, 102:5, 105:22
**conversations** [9] - 57:11, 57:14, 57:21, 84:2, 94:18, 94:25, 101:8, 101:11, 105:1
**conversing** [1] - 8:8
**convey** [2] - 93:22, 93:25
**conveyed** [2] - 97:25, 98:2
**conveying** [1] - 94:12, 94:19
**coordinate** [1] - 19:22
**copied** [3] - 107:2, 107:4, 107:22
**copies** [2] - 22:3, 71:23
**copy** [18] - 8:9, 8:16, 9:8, 9:11, 29:10, 30:19, 40:1, 40:25, 55:3, 61:2, 62:20, 66:10, 78:24, 81:8, 82:5, 82:18, 87:5, 96:1
**Corporate** [1] - 2:18
**corporation** [1] - 44:25
**correct** [31] - 9:25, 19:25, 27:22, 27:25, 28:3, 32:13, 36:17, 39:11, 39:14, 39:20, 43:16, 47:5, 50:1, 50:4, 52:16, 54:8,

55:16, 69:22, 69:24, 70:14, 71:15, 75:3, 75:18, 75:21, 86:24, 87:16, 90:6, 92:4, 97:10, 106:19, 112:9
**correctly** [4] - 19:5, 27:21, 34:4, 36:15
**cosmetics** [1] - 80:13
**Cosmetics** [5] - 80:14, 80:16, 88:19, 88:20, 88:25
**cost** [6] - 25:14, 25:16, 25:20, 26:11, 26:15, 73:15
**Costs** [1] - 84:12
**costs** [8] - 26:2, 26:11, 50:19, 50:20, 50:25, 51:2, 69:19, 70:10
**Counsel** [3] - 21:5, 29:8, 92:18
**COUNSEL** [2] - 2:1, 2:16
**counsel** [3] - 31:10, 34:16, 85:17
**country** [1] - 53:7
**COUNTY** [1] - 112:3
**couple** [8] - 16:13, 17:16, 47:5, 48:1, 71:6, 84:10, 109:21
**course** [1] - 34:22
**Court** [15] - 4:11, 4:21, 4:23, 6:14, 6:21, 7:8, 9:9, 108:23, 108:25, 109:1, 109:9, 109:12, 111:1, 112:6, 112:20
**COURT** [135] - 1:1, 1:24, 4:6, 6:3, 6:8, 6:16, 7:6, 7:17, 7:22, 8:1, 8:10, 8:14, 9:12, 9:14, 9:18, 9:20, 9:23, 10:1, 10:4, 10:7, 10:12, 10:15, 10:18, 10:20, 11:3, 11:7, 11:10, 11:12, 12:11, 13:4, 13:11, 13:19, 13:25, 14:13, 15:13, 16:17, 19:17, 20:6, 21:3, 21:16, 21:25, 22:9, 24:2, 24:12, 24:17, 24:19, 25:8, 25:10, 26:5, 26:8, 27:11, 29:20, 30:9, 31:8, 32:20, 33:1, 33:8, 35:17, 36:6, 36:22, 37:14, 37:22, 37:25, 39:7, 39:16, 40:18, 41:7, 41:19, 43:8, 43:25, 44:4, 45:20, 51:8,

51:13, 53:15, 53:24, 54:2, 55:8, 55:11, 55:16, 55:19, 55:23, 56:3, 56:8, 56:11, 57:19, 60:25, 62:12, 63:9, 63:13, 66:17, 66:25, 69:14, 72:4, 72:11, 76:1, 76:3, 76:11, 79:9, 81:14, 86:17, 87:10, 90:17, 91:6, 92:15, 94:16, 94:22, 95:9, 96:6, 96:14, 96:19, 98:2, 100:13, 101:15, 101:21, 102:15, 102:21, 103:24, 104:4, 108:2, 108:4, 108:12, 108:18, 109:2, 109:13, 109:17, 109:22, 109:25, 110:4, 110:8, 110:10, 110:18, 110:22, 110:25, 112:6
**court** [4] - 43:3, 43:18, 44:5, 49:2
**Court's** [2] - 7:18, 55:22
**courtroom** [3] - 4:12, 45:14, 108:21
**COURTROOM** [6] - 44:5, 44:10, 44:14, 53:22, 108:10, 111:1
**create** [1] - 19:19
**critics** [1] - 16:9
**CROSS** [1] - 11:15
**cross** [11] - 4:23, 4:24, 5:10, 5:11, 5:16, 6:18, 7:7, 7:10, 7:14, 7:16, 7:24
**Cross** [1] - 3:3
**CROSS-EXAMINATION** [1] - 11:15
**cross-examination** [8] - 4:23, 4:24, 5:10, 5:11, 6:18, 7:7, 7:10, 7:14
**Cross-Examination** [1] - 3:3
**cross-examine** [3] - 5:16, 7:16, 7:24
**CRR** [1] - 1:23
**crystal** [1] - 92:9
**CSR** [2] - 1:23, 112:20
**cubicle** [1] - 47:14
**Cuniff's** [2] - 5:5, 5:10
**custodial** [1] - 63:11

**D**

**d/b/a** [1] - 85:11
**Date** [1] - 112:15
**date** [21] - 16:21, 18:13, 19:24, 37:17, 38:4, 38:10, 42:4, 56:14, 67:4, 72:14, 74:8, 77:22, 79:18, 81:21, 83:6, 83:7, 83:8, 83:15, 96:25, 99:23, 101:23
**dated** [3] - 83:20, 83:22, 99:3
**dates** [2] - 34:10, 43:19
**DAY** [1] - 1:8
**days** [5] - 18:16, 73:14, 102:8, 105:16, 109:21
**deal** [5] - 38:23, 38:25, 39:1, 88:19, 89:3
**DEAN** [2] - 2:17, 2:18
**deansteward7777@ gmail.com** [1] - 2:20
**Debbie** [1] - 112:20
**DEBBIE** [3] - 1:23, 112:5, 112:19
**December** [5] - 23:18, 50:9, 62:5, 64:1
**decisions** [2] - 109:7, 109:10
**declaration** [1] - 63:11
**deducted** [3] - 25:20, 85:19, 86:6
**DEFENDANT** [1] - 2:14
**defendant** [94] - 8:15, 22:14, 23:2, 23:18, 24:10, 25:1, 25:3, 25:12, 25:16, 25:23, 25:25, 26:14, 27:6, 27:12, 27:19, 28:7, 28:15, 29:6, 29:9, 29:25, 30:3, 30:5, 30:23, 30:25, 31:5, 31:11, 31:24, 32:3, 32:10, 33:3, 33:16, 33:18, 33:25, 34:22, 35:1, 45:21, 45:23, 46:1, 47:12, 48:4, 48:15, 48:22, 49:1, 49:9, 49:21, 51:19, 54:19, 55:1, 57:15, 59:22, 60:14, 60:17, 61:8, 64:16, 65:12, 66:8, 66:22, 68:8, 69:4, 69:17, 69:25, 75:7, 78:22, 79:7, 80:24, 81:2, 81:6,

**UNITED STATES DISTRICT COURT**

82:10, 84:5, 84:8, 86:20, 87:2, 87:17, 88:2, 90:7, 90:20, 93:11, 93:19, 93:22, 94:1, 94:3, 94:11, 94:20, 94:25, 95:4, 95:24, 99:16, 101:1, 101:8, 102:11, 102:19, 103:20, 107:8, 108:22

**Defendant** [1] - 1:9

**defendant's** [8] - 24:14, 51:17, 67:4, 69:9, 70:22, 81:20, 81:25, 90:24

**Defendant's** [1] - 27:20

**defined** [1] - 84:19

**deflect** [1] - 30:13

**delay** [1] - 70:6

**deliberate** [7] - 5:2, 5:5, 6:5, 6:8, 6:9, 6:10, 6:11

**deliberately** [1] - 6:6

**delivered** [1] - 39:19

**delivery** [1] - 77:15

**denied** [5] - 13:11, 25:10, 27:11, 51:13, 63:9

**deposit** [2] - 64:9, 93:4

**deposited** [3] - 35:3, 35:7, 90:14

**depositing** [1] - 34:14

**Deposits** [1] - 64:4

**deposits** [6] - 31:4, 31:6, 34:10, 34:24, 42:19, 43:20

**DEPUTY** [6] - 44:5, 44:10, 44:14, 53:22, 108:10, 111:1

**deputy** [1] - 108:21

**deriving** [1] - 46:11

**described** [4] - 61:10, 68:25, 71:7, 76:13

**describing** [2] - 60:2, 61:6

**designer** [1] - 77:9

**detail.pdf** [1] - 72:21

**determine** [1] - 7:5

**DEVIYAN** [1] - 15:23

**Deviyan** [5] - 15:25, 16:2, 16:3, 16:5, 16:6

**dhinospaan@yahoo. com** [1] - 1:25

**difference** [3] - 8:7, 104:17, 104:24

**different** [9] - 23:4, 34:9, 68:24, 78:17,

89:1, 89:4, 89:6, 93:7, 105:2

**dig** [1] - 80:22

**Direct** [1] - 3:6

**direct** [6] - 15:5, 17:3, 17:15, 20:17, 52:9, 64:3

**DIRECT** [1] - 44:15

**directing** [1] - 20:20

**direction** [1] - 9:1

**directly** [4] - 52:4, 52:8, 68:22, 101:5

**discord** [1] - 77:25

**Discovery** [1] - 85:11

**discretion** [1] - 85:17

**discuss** [2] - 53:18, 108:6

**discussed** [1] - 82:4

**discussing** [2] - 56:24, 57:1

**discussion** [2] - 21:18, 82:13

**disposal** [1] - 7:14

**disqualification** [1] - 5:8

**disregard** [1] - 36:23

**distinction** [1] - 50:24

**District** [2] - 112:6, 112:7

**DISTRICT** [3] - 1:1, 1:2, 1:3

**divestiture** [1] - 84:24, 85:10

**DIVISION** [1] - 1:2

**document** [17] - 15:5, 17:5, 17:23, 18:13, 20:22, 20:23, 29:1, 29:18, 32:8, 33:19, 35:23, 36:5, 62:2, 63:12, 63:24, 84:4, 95:15

**documentation** [1] - 80:20

**documents** [3] - 71:3, 71:18, 88:12

**dollar** [1] - 104:19

**dollars** [1] - 33:4

**done** [5] - 6:7, 22:5, 68:15, 78:7, 90:3

**doubt** [1] - 29:25

**down** [17] - 10:9, 21:7, 28:18, 40:10, 40:15, 41:2, 42:22, 42:23, 44:4, 53:25, 64:24, 73:6, 79:16, 104:15, 105:8, 108:17, 108:18

**downtown** [1] - 83:25

**draft** [2] - 81:24, 82:3

**due** [5] - 23:8, 25:4,

28:12, 28:16, 104:14

**during** [18] - 12:15, 13:8, 13:22, 14:16, 17:12, 21:8, 22:2, 22:15, 34:22, 58:7, 90:13, 90:18, 93:19, 94:3, 94:11, 101:11, 102:17, 107:7

## E

**e-mail** [71] - 3:11, 3:14, 3:18, 3:20, 3:22, 17:7, 20:8, 48:11, 48:13, 54:25, 55:3, 55:10, 55:20, 56:6, 56:14, 56:20, 57:14, 57:22, 57:23, 66:7, 66:10, 66:16, 66:17, 66:18, 66:21, 67:1, 67:4, 67:8, 67:16, 67:18, 68:5, 72:14, 72:18, 73:1, 74:8, 74:12, 74:15, 78:21, 78:24, 79:8, 79:9, 79:14, 79:15, 79:18, 79:24, 80:1, 80:23, 81:1, 81:5, 81:8, 81:20, 81:21, 81:25, 82:8, 82:9, 82:14, 82:19, 82:21, 83:8, 83:11, 83:12, 83:20, 87:1, 87:5, 87:10, 87:14, 87:17, 88:23, 99:1, 99:5, 100:9

**e-mailed** [1] - 66:5

**e-mails** [5] - 71:20, 71:23, 72:5, 81:14, 108:23

**E-mails** [2] - 3:16, 3:17

**Eagan** [28] - 45:10, 45:12, 45:23, 46:18, 46:24, 47:2, 47:6, 47:8, 47:23, 48:7, 48:8, 48:9, 48:10, 48:11, 48:13, 48:15, 49:9, 50:7, 50:11, 51:20, 52:24, 58:24, 61:13, 64:15, 68:15, 68:16, 71:9, 75:13

**early** [2] - 16:18, 58:11

**ease** [1] - 107:3

**effect** [2] - 5:19, 6:1

**efforts** [1] - 40:1

**eight** [1] - 48:19

**either** [3] - 47:17, 75:20, 109:25

**Electronic** [1] - 64:25

**elements** [1] - 19:19

**Elmo** [1] - 55:21

**EM** [5] - 80:13, 80:16, 88:19, 88:20, 88:25

**employees** [3] - 48:5, 48:6, 48:7

**end** [7] - 28:20, 46:7, 59:14, 61:11, 67:24, 88:6, 106:17

**enjoy** [1] - 108:9

**entertainment** [2] - 10:13, 18:25

**entire** [2] - 36:2, 56:4

**entities** [1] - 86:13

**entitled** [1] - 112:11

**entries** [1] - 17:7

**equivalent** [1] - 4:16

**ESQ** [2] - 2:15, 2:18

**Esquire** [1] - 85:19

**established** [3] - 18:5, 19:23, 76:4

**evening** [1] - 108:9

**event** [1] - 110:19

**events** [1] - 12:14

**evidence** [3] - 55:15, 56:2, 98:25

**EVIDENCE** [1] - 3:10

**Evidence** [1] - 4:8

**evidentiary** [2] - 4:15, 5:7

**ex** [6] - 30:24, 31:9, 31:13, 31:17, 34:16, 50:13

**ex-boyfriend** [3] - 30:24, 31:13, 50:13

**exact** [2] - 8:25, 58:16

**Examination** [1] - 3:3, 3:4, 3:4, 3:6

**EXAMINATION** [4] - 11:15, 22:10, 35:20, 44:15

**examination** [8] - 4:23, 4:24, 5:10, 5:11, 6:18, 7:7, 7:10, 7:14

**examine** [5] - 5:16, 6:14, 7:16, 7:24

**except** [1] - 81:9

**exchange** [8] - 47:11, 66:7, 66:10, 78:25, 81:1, 81:5, 81:9, 83:12

**exclusion** [1] - 4:13

**exclusive** [1] - 85:21

**excused** [1] - 44:1

**excuses** [1] - 30:5

**execute** [1] - 49:5

**Executed** [1] - 3:21

**executed** [3] - 36:13, 82:18, 87:19

**exhibit** [9] - 26:18, 26:19, 35:18, 56:4, 64:3, 82:20, 82:23, 92:25, 95:17

**Exhibit** [43] - 15:6, 17:3, 27:1, 27:3, 27:20, 28:24, 31:23, 33:24, 34:1, 35:9, 42:10, 54:22, 55:7, 55:11, 56:12, 61:25, 63:19, 66:6, 66:14, 66:20, 71:1, 72:12, 72:14, 74:6, 78:15, 79:4, 79:13, 81:4, 81:12, 81:18, 83:12, 83:17, 84:12, 86:25, 87:8, 87:12, 92:20, 95:12, 96:16, 96:23, 98:25, 99:20

**EXHIBIT** [1] - 3:10

**exhibits** [2] - 8:17, 76:7

**EXHIBITS** [1] - 3:8

**Exhibits** [1] - 72:2

**exit** [2] - 78:10, 85:10

**exits** [1] - 84:24

**expect** [4] - 23:21, 23:24, 25:19, 110:11

**expected** [2] - 52:14, 86:23

**expend** [1] - 74:4

**expended** [1] - 26:11

**expense** [2] - 73:12, 73:24

**expenses** [21] - 25:14, 25:17, 25:20, 26:1, 26:11, 26:15, 48:4, 53:9, 70:10, 70:13, 70:22, 72:23, 73:2, 74:1, 74:19, 75:6, 75:8, 75:10, 75:16, 76:5, 85:2

**expenses.pdf** [1] - 72:21

**explain** [3] - 5:23, 52:2, 97:20

**explanation** [1] - 70:5

**expose** [2] - 5:21, 5:23

**exposing** [1] - 5:14

**exposure** [1] - 5:9

**extensive** [2] - 7:3, 8:3

**extensively** [1] - 6:7

## F

**F-i-l-i-p-p-o-o** [1] - 44:13

**F.3d** [1] - 4:10

**fact** [8] - 4:17, 6:5, 8:6, 20:8, 55:12, 56:4, 72:5, 79:11

**factual** [2] - 7:17, 8:4
**fair** [12] - 55:3, 62:19, 66:10, 71:23, 73:2, 78:24, 81:8, 82:23, 84:20, 87:5, 96:1, 110:12
**fairly** [1] - 34:9
**faith** [1] - 8:5
**familiar** [6] - 16:21, 17:22, 17:23, 34:6, 54:9, 61:22
**family** [1] - 89:8
**far** [5] - 6:18, 50:16, 87:6, 88:11
**Fargo** [1] - 65:20
**fast** [1] - 77:12
**fast-forwarding** [1] - 77:12
**February** [6] - 18:13, 19:24, 79:19, 83:7, 83:14, 83:22
**fed** [2] - 106:10, 106:22
**FEDERAL** [2] - 1:24, 112:5
**federal** [2] - 49:4, 106:9
**Federal** [2] - 4:8, 112:20
**FedEx** [1] - 106:13
**fee** [25] - 27:3, 31:24, 32:4, 32:7, 32:15, 32:22, 32:24, 33:2, 33:4, 33:9, 33:10, 33:14, 50:23, 51:4, 51:5, 51:15, 51:20, 52:15, 58:23, 81:16, 81:24, 84:7, 84:17, 86:23, 90:23
**Fee** [1] - 3:21
**fees** [26] - 31:25, 46:14, 50:25, 59:1, 59:8, 59:20, 59:23, 69:19, 69:20, 71:13, 75:20, 81:2, 85:19, 85:20, 86:4, 86:5, 86:6, 86:11, 86:14, 90:8, 90:11, 90:20, 91:2, 91:8
**Fees** [1] - 84:12
**fell** [1] - 86:21
**few** [7] - 6:4, 48:17, 48:18, 49:8, 73:5, 83:8, 102:8
**figure** [2] - 23:7, 106:14
**figured** [1] - 105:23
**filed** [2] - 27:16, 109:20
**filing** [2] - 7:9, 109:12

**filings** [2] - 6:25, 49:2
**FILIPPO** [2] - 3:5, 44:7
**Filippo** [4] - 44:9, 44:12, 74:17, 85:18
**finalized** [1] - 84:3
**finances** [2] - 61:23, 63:14
**financial** [1] - 34:16
**fine** [2] - 53:15, 109:2
**finish** [2] - 33:1, 101:16
**firm** [20] - 26:15, 44:23, 45:10, 46:2, 46:6, 46:9, 46:17, 48:4, 52:7, 52:8, 52:10, 52:24, 63:13, 68:24, 73:2, 74:19, 76:5, 90:8, 90:24, 91:2
**firm's** [3] - 61:22, 63:4, 63:14
**firms** [2] - 45:8, 59:1
**firms'** [1] - 48:5
**first** [47] - 5:22, 10:22, 16:6, 16:13, 17:20, 19:7, 22:5, 22:15, 22:20, 28:13, 33:9, 44:11, 44:12, 46:1, 46:3, 46:5, 46:10, 46:16, 52:17, 52:23, 59:16, 59:17, 66:21, 72:13, 74:15, 76:23, 83:12, 87:13, 89:9, 89:16, 89:22, 89:23, 90:4, 90:24, 91:10, 92:6, 92:23, 93:1, 93:10, 93:11, 97:8, 99:7, 105:9, 105:13, 105:20
**fit** [1] - 16:14
**five** [1] - 73:6
**fixed** [1] - 50:25
**focus** [3] - 56:13, 66:21, 83:6
**focusing** [3] - 72:13, 85:5, 106:20
**fold** [1] - 55:21
**follow** [1] - 71:6
**follow-up** [1] - 71:6
**following** [5] - 14:6, 14:8, 18:20, 67:10, 106:17
**follows** [2] - 38:1, 38:7
**food** [1] - 73:14
**FOR** [3] - 2:3, 2:14, 2:16
**foregoing** [1] - 112:9
**forgotten** [2] - 28:21, 28:22
**form** [3] - 12:8, 53:18,

108:6
**formal** [1] - 46:17
**formality** [1] - 84:3
**format** [1] - 112:11
**former** [1] - 48:6
**Forward** [1] - 56:17
**forward** [10] - 7:9, 8:10, 10:6, 10:8, 10:14, 10:17, 17:20, 18:7, 87:20, 108:25
**forwarding** [1] - 77:12
**Foundation** [2] - 14:11, 37:20
**foundation** [16] - 14:13, 33:7, 51:7, 51:12, 60:23, 63:12, 63:14, 76:6, 90:16, 90:17, 91:5, 96:18, 101:13, 101:20, 102:20, 103:23
**foundational** [1] - 32:19
**founder** [1] - 80:5
**four** [2] - 13:1, 79:22
**fourth** [1] - 10:19
**fraudulent** [1] - 46:12
**free** [1] - 42:16
**frequent** [2] - 57:17, 57:23
**frequently** [1] - 47:20
**Friday** [13] - 11:19, 11:25, 12:6, 12:13, 22:14, 22:17, 25:13, 25:25, 105:22, 105:23, 109:14, 110:8, 110:17
**front** [5] - 8:24, 34:1, 34:3, 71:16, 95:12
**fronted** [4] - 53:11, 53:12, 70:12, 74:2
**fronting** [2] - 50:19, 50:20
**full** [6] - 7:7, 10:21, 75:11, 76:7, 76:11, 80:15
**fully** [1] - 87:19
**functionally** [1] - 78:6
**funding** [1] - 84:22
**fundraising** [1] - 80:19
**funds** [5] - 61:13, 68:7, 69:16, 75:17, 75:23
**future** [2] - 59:8, 59:25

## G

**Gammill** [2] - 11:23, 13:22
**GARDNER** [2] - 3:3,

11:14
**Gardner** [45] - 4:19, 5:11, 6:6, 11:17, 12:12, 13:5, 13:12, 15:7, 15:14, 16:18, 17:21, 21:6, 22:1, 22:12, 35:22, 36:3, 37:2, 37:15, 38:2, 38:8, 38:13, 40:24, 41:15, 41:23, 42:14, 43:11, 44:1, 49:15, 50:6, 50:11, 52:17, 60:18, 60:21, 61:1, 72:17, 72:21, 72:23, 73:3, 73:13, 73:22, 74:20, 74:22, 74:23, 75:4, 75:22
**Gardner's** [14] - 8:20, 36:10, 50:2, 50:8, 51:15, 52:11, 54:17, 57:25, 60:8, 61:12, 69:17, 70:13, 71:10, 71:13
**gather** [1] - 7:12
**gears** [1] - 76:12
**general** [1] - 46:9
**generalized** [1] - 6:23
**generally** [5] - 15:10, 46:22, 54:10, 61:22, 95:20
**gentlemen** [5] - 11:10, 21:17, 36:23, 53:16, 108:4
**Geoffrey** [4] - 49:12, 49:24, 54:6, 54:13
**given** [2] - 5:9, 33:13
**go-between** [2] - 98:5, 102:18
**Gofer** [2] - 73:17, 73:20
**Government** [27] - 4:20, 5:4, 8:16, 20:11, 21:8, 21:14, 22:15, 22:20, 22:21, 22:23, 29:10, 34:20, 40:4, 40:8, 40:11, 40:24, 42:5, 55:6, 63:5, 66:13, 72:1, 79:3, 81:11, 87:7, 96:15, 110:21
**GOVERNMENT** [3] - 3:3, 3:5, 44:7
**Government's** [4] - 54:22, 61:25, 66:6, 71:1
**graduated** [1] - 77:14
**Grammy** [1] - 19:1
**Grammys** [1] - 19:2
**graphic** [1] - 77:9
**great** [1] - 87:20

**Gregory** [5] - 49:17, 49:19, 49:25, 54:6, 54:13
**Group** [27] - 3:13, 44:24, 45:1, 47:4, 48:6, 48:10, 48:20, 49:2, 49:6, 51:24, 53:12, 54:10, 54:12, 61:15, 62:9, 62:21, 62:23, 63:22, 69:17, 69:23, 71:13, 73:16, 73:25, 74:1, 74:4, 74:19, 75:2
**groups** [1] - 88:18
**guess** [6] - 9:23, 16:8, 28:19, 76:20, 95:17, 99:7
**guys** [1] - 99:10

## H

**half** [12] - 52:14, 55:22, 64:10, 65:6, 67:20, 67:21, 67:22, 68:2, 68:6, 68:19, 84:18, 107:17
**hand** [1] - 44:6
**handed** [2] - 8:15, 9:8
**handle** [1] - 61:24
**handwritten** [1] - 26:18
**hang** [1] - 103:12
**HANNA** [2] - 2:4, 2:9
**happy** [1] - 110:17
**Harbur's** [1] - 108:13
**hard** [3] - 8:9, 16:9, 22:3
**Hassan** [3] - 37:7, 50:13, 69:5
**head** [3] - 89:18, 92:9, 108:24
**heading** [2] - 17:20, 64:25
**heads** [2] - 110:22, 110:24
**heads-up** [2] - 110:22, 110:24
**hear** [3] - 11:3, 94:23, 99:6
**heard** [2] - 34:4, 109:12
**hearing** [2] - 5:7, 109:14
**hearsay** [14] - 29:18, 55:9, 60:24, 63:11, 66:15, 72:3, 72:10, 76:10, 79:5, 79:6, 81:13, 87:9, 96:17, 97:25
**held** [3] - 15:15, 78:5,

112:10
**help** [5] - 19:21, 32:6, 52:21, 78:8, 103:16
**helping** [1] - 90:2
**helps** [1] - 19:18
**hereby** [2] - 36:13, 112:7
**Hernandez** [2] - 17:19, 35:25
**hesitate** [1] - 82:7
**Hi** [1] - 104:9
**hi** [4] - 97:16, 98:11, 99:10, 105:19
**himself** [2] - 5:14, 77:21
**Hino** [1] - 112:20
**HINO** [3] - 1:23, 112:5, 112:19
**Hino-Spaan** [1] - 112:20
**HINO-SPAAN** [3] - 1:23, 112:5, 112:19
**hire** [2] - 23:19, 50:11
**hired** [1] - 52:17
**hiring** [1] - 85:8
**history** [2] - 43:17, 43:20
**hit** [2] - 104:22, 105:24
**Hobson's** [1] - 5:12
**holder** [1] - 65:23
**holds** [1] - 4:11
**Honda** [12] - 56:23, 56:25, 57:10, 57:12, 64:21, 64:23, 65:11, 65:23, 68:1, 68:18, 69:12
**HondaJet** [1] - 56:17
**honestly** [1] - 43:9
**Honor** [109] - 6:2, 6:4, 6:20, 6:23, 6:25, 7:3, 7:15, 7:21, 7:25, 8:7, 8:12, 9:8, 9:10, 9:13, 9:15, 10:17, 10:23, 11:6, 12:10, 13:3, 13:10, 13:18, 16:16, 19:16, 20:5, 21:2, 21:4, 21:11, 21:15, 21:22, 21:24, 24:1, 24:11, 24:16, 25:7, 26:3, 27:9, 29:17, 29:21, 30:7, 31:7, 32:17, 32:19, 32:25, 33:6, 35:16, 36:21, 37:13, 37:24, 39:6, 39:15, 40:14, 41:18, 43:22, 44:8, 45:22, 51:6, 51:11, 53:13, 54:3, 55:6, 55:9, 55:14, 55:17, 55:21, 55:25, 56:1, 56:7,

60:24, 63:5, 63:7, 63:10, 66:15, 66:23, 67:3, 69:13, 72:1, 72:3, 72:9, 75:24, 76:9, 79:3, 79:5, 79:7, 81:11, 81:13, 87:7, 87:9, 90:16, 91:4, 94:15, 94:21, 96:13, 96:15, 96:17, 97:24, 100:12, 101:14, 103:22, 108:3, 108:16, 108:19, 108:20, 109:4, 109:11, 110:6, 110:9, 110:12, 110:21
**HONORABLE** [1] - 1:3
**hope** [1] - 108:9
**hotel** [5] - 53:1, 53:12, 70:15, 73:9, 73:22
**huge** [1] - 83:24
**hundred** [2] - 104:16, 104:18
**hundred-something-thousand** [1] - 104:18
**hurt** [1] - 31:15

**I**

**idea** [1] - 100:22
**identical** [1] - 57:10
**identified** [1] - 45:21
**identify** [2] - 45:16, 80:21
**identifying** [1] - 63:23
**ignore** [1] - 26:6
**II** [1] - 54:22
**improper** [3] - 29:17, 32:18, 33:7
**IN** [2] - 2:14, 3:9
**Inc** [1] - 85:11
**include** [4] - 6:23, 61:18, 84:19, 95:23
**included** [1] - 74:15
**includes** [2] - 110:3, 110:15
**including** [6] - 12:2, 39:24, 48:2, 73:14, 81:15, 85:18
**inclusion** [2] - 39:13, 39:19
**incur** [1] - 53:9
**incurred** [5] - 73:3, 73:15, 74:20, 75:2, 76:5
**indicate** [1] - 45:20
**indicated** [1] - 109:13
**indicating** [1] - 102:8
**indication** [1] - 4:18

**indirectly** [3] - 52:6, 52:8, 52:13
**individual** [1] - 49:14
**influencer** [4] - 76:23, 76:24, 77:6, 77:14
**Info** [1] - 3:15
**info** [4] - 67:7, 98:22, 99:10, 99:16
**inform** [2] - 12:6, 85:14
**information** [11] - 65:15, 65:18, 66:1, 66:4, 67:12, 67:22, 68:3, 68:6, 68:7, 93:22, 93:25
**informed** [2] - 12:1, 12:13
**initial** [3] - 109:12, 109:18, 109:19
**initiated** [1] - 66:1
**injury** [4] - 45:2, 46:25, 50:19
**inked** [1] - 84:3
**inquiries** [1] - 85:15
**inquiry** [1] - 110:14
**instance** [5] - 5:4, 5:22, 19:8, 19:11, 55:17
**instead** [1] - 59:18
**instructed** [1] - 21:17
**instructing** [2] - 99:16, 99:18
**instruction** [2] - 21:13, 21:23
**intending** [1] - 36:12
**interest** [2] - 63:2, 84:21
**interested** [3] - 10:10, 19:3, 19:10
**interests** [1] - 8:19
**international** [1] - 53:5
**interview** [3] - 20:15, 29:3, 42:5
**inverse** [2] - 96:3, 96:7
**investigation** [2] - 53:3, 53:5
**invited** [1] - 7:8
**involve** [1] - 53:5
**involved** [3] - 15:21, 47:24, 93:13
**involves** [1] - 50:19
**involving** [4] - 49:11, 49:22, 54:5, 76:13
**IOLTA** [5] - 62:6, 62:22, 63:1, 63:22, 64:17
**IPSY** [32] - 3:19, 77:16, 77:19, 77:25, 79:25, 80:13, 80:16,

85:11, 88:3, 88:8, 88:15, 88:25, 89:2, 89:22, 90:5, 90:15, 91:10, 91:11, 91:17, 93:4, 93:8, 93:17, 93:20, 93:23, 97:20, 98:11, 99:11, 99:12, 99:17, 100:15, 100:20, 101:9
**irrelevant** [2] - 8:24, 11:2
**Isaacs** [5] - 9:19, 9:20, 18:11, 19:8, 19:12
**Isaacs'** [1] - 9:24
**issue** [7] - 4:7, 8:25, 9:3, 55:24, 91:18, 103:6, 103:7
**issues** [6] - 8:21, 53:19, 108:7, 109:11, 109:16, 109:17
**Italy** [10] - 53:8, 53:12, 58:6, 58:7, 58:11, 60:4, 70:17, 72:21, 74:3, 75:7
**items** [1] - 80:3
**itself** [1] - 58:21
**IV** [1] - 78:18

**J**

**JAMES** [1] - 1:3
**January** [15] - 50:10, 58:22, 60:4, 60:5, 60:10, 61:11, 62:6, 64:1, 64:2, 64:7, 65:2, 67:5, 69:4, 72:15, 74:9
**Jencks** [4] - 109:11, 109:16, 109:17, 110:14
**jet** [3] - 36:20, 65:11
**jets** [3] - 56:23, 56:25, 64:21
**job** [3] - 23:7, 23:10, 24:9
**jobs** [2] - 15:9, 15:18
**JOHN** [2] - 1:8, 2:15
**Johnson** [4] - 49:12, 49:24, 54:6, 54:13, 108:14
**Judge** [1] - 37:5
**JUDGE** [1] - 1:3
**judgment** [2] - 84:23, 85:23
**Judicial** [1] - 112:12
**Judy** [5] - 70:23, 71:20, 72:6, 72:23, 74:13
**July** [1] - 8:19

June [1] - 70:7
**jury** [19] - 4:5, 5:7, 5:15, 6:15, 7:1, 8:11, 11:5, 11:7, 11:9, 11:11, 38:14, 53:23, 65:17, 67:8, 82:1, 85:6, 97:3, 107:18, 108:11
**justify** [1] - 24:23
**juxtaposed** [1] - 96:9

**K**

**Kendu** [5] - 9:19, 10:10, 18:11, 19:8, 19:12
**Kimberly** [1] - 48:2
**Kimberly-Clark** [1] - 48:2
**kind** [8] - 30:13, 30:15, 45:1, 60:1, 73:14, 77:10, 93:12, 94:6
**knowledge** [8] - 4:20, 14:10, 27:18, 49:1, 54:12, 75:22, 89:22, 93:12
**known** [3] - 69:11, 76:16, 104:1

**L**

**L'Oreal** [2] - 80:14, 89:1
**L.A** [4] - 15:2, 47:11, 52:25, 58:11
**L.A.'s** [1] - 48:8
**labor** [2] - 50:20, 50:21
**lack** [1] - 63:12
**lacking** [1] - 60:23
**lacks** [8] - 33:7, 51:6, 51:11, 90:16, 91:4, 101:20, 102:20, 103:22
**Lacks** [1] - 101:13
**ladies** [5] - 11:10, 21:16, 36:23, 53:16, 108:4
**language** [1] - 36:11
**largest** [1] - 80:7
**last** [21] - 8:20, 9:2, 9:3, 12:23, 13:6, 13:12, 14:7, 14:9, 15:23, 21:22, 35:25, 44:11, 44:13, 59:14, 63:7, 74:3, 83:16, 98:19, 100:9, 102:5, 109:21
**lastly** [2] - 49:21, 82:14

**late** [7] - 31:5, 41:11, 41:15, 52:18, 57:21, 58:11, 91:24
**Law** [27] - 3:13, 44:24, 45:1, 47:4, 48:6, 48:10, 48:20, 49:2, 49:5, 51:24, 53:12, 54:10, 54:12, 61:15, 62:9, 62:21, 62:23, 63:22, 69:16, 69:23, 71:13, 73:16, 73:24, 74:1, 74:4, 74:19, 75:1
**LAW** [1] - 2:17
**law** [13] - 32:21, 33:7, 33:10, 44:23, 45:1, 45:8, 45:10, 46:2, 46:6, 48:4, 63:13, 90:8, 110:18
**laws** [1] - 32:15
**lawsuit** [1] - 27:16
**lawyer** [6] - 16:23, 16:25, 23:19, 34:23, 63:2, 79:21
**lawyers** [1] - 31:19
**lay** [2] - 14:13, 90:17
**lead** [1] - 46:14
**Leading** [1] - 57:18
**leading** [5] - 24:1, 54:18, 86:16, 95:8
**learn** [4] - 28:11, 57:25, 58:3, 89:25
**learned** [6] - 31:12, 51:18, 58:8, 58:25, 90:4, 90:7
**least** [2] - 5:1, 7:12
**left** [3] - 23:15, 63:20, 97:7
**Legal** [1] - 84:12
**legal** [11] - 33:14, 33:21, 42:11, 49:24, 50:24, 50:25, 54:5, 54:13, 77:21, 85:12, 85:19
**legally** [1] - 36:13
**length** [1] - 30:17
**less** [1] - 100:8
**levels** [1] - 79:6
**light** [3] - 21:23, 45:19, 72:9
**lightened** [1] - 57:22
**limit** [1] - 5:23
**limited** [3] - 4:12, 5:9, 85:18
**line** [8] - 64:4, 72:16, 74:3, 74:10, 76:21, 77:7, 77:12, 99:7
**lined** [1] - 107:17
**lines** [2] - 63:3, 73:6
**list** [4] - 39:22, 67:10,

76:4, 76:5
**listed** [4] - 10:9, 10:11, 67:25, 73:10
**listen** [2] - 36:24, 41:20
**literal** [1] - 4:12
**litigation** [2] - 45:4, 50:12
**live** [1] - 44:19
**living** [2] - 52:18, 52:20
**LLC** [4] - 65:23, 65:24, 67:10, 68:1
**loan** [1] - 84:22
**local** [1] - 85:17
**locate** [2] - 22:2, 71:4
**lodge** [1] - 76:9
**longstanding** [2] - 68:14
**look** [26] - 7:13, 10:6, 10:16, 21:9, 28:23, 31:23, 33:24, 34:5, 34:11, 35:9, 40:21, 42:23, 43:5, 43:13, 54:21, 61:25, 66:6, 70:25, 78:15, 81:4, 82:23, 84:10, 86:25, 87:20, 92:19, 107:16
**looked** [7] - 15:1, 43:1, 43:15, 43:18, 83:8, 83:12, 87:25
**looking** [8] - 15:4, 35:10, 43:5, 77:24, 78:3, 78:4, 78:8, 80:15
**looks** [15] - 65:2, 80:10, 83:7, 98:7, 98:20, 98:21, 99:25, 102:2, 102:24, 104:9, 105:8, 106:5, 106:16, 107:13, 107:16
**LOS** [1] - 112:3
**Los** [5] - 2:12, 44:20, 47:10, 47:12, 48:21
**losing** [1] - 102:6
**lump** [4] - 59:7, 59:17, 59:19, 59:22
**lunch** [2] - 4:6, 8:4

# M

**M-a-r-c-h-i-n-o** [1] - 44:13
**mail** [71] - 3:11, 3:14, 3:18, 3:20, 3:22, 17:7, 20:8, 48:11, 48:13, 54:25, 55:3, 55:10, 55:20, 56:6, 56:14, 56:20, 57:14,

57:22, 57:23, 66:7, 66:10, 66:16, 66:17, 66:18, 66:21, 67:1, 67:4, 67:8, 67:16, 67:18, 68:5, 72:14, 72:18, 73:1, 74:8, 74:12, 74:15, 78:21, 78:24, 79:8, 79:9, 79:14, 79:15, 79:18, 79:24, 80:1, 80:23, 81:1, 81:5, 81:8, 81:20, 81:21, 81:25, 82:8, 82:9, 82:14, 82:19, 82:21, 83:8, 83:11, 83:12, 83:20, 87:1, 87:5, 87:10, 87:14, 87:17, 88:23, 99:1, 99:5, 100:9
**mailed** [1] - 66:5
**mails** [7] - 3:16, 3:17, 71:20, 71:23, 72:5, 81:14, 108:23
**main** [1] - 47:9
**maintain** [1] - 61:15
**majority** [1] - 80:8
**make-up** [1] - 77:4
**makeup** [2] - 77:15
**management** [3] - 10:14, 18:5, 18:25
**manager** [1] - 19:4
**Marcelo** [1] - 80:8
**March** [20] - 48:24, 49:4, 49:7, 60:12, 60:14, 61:1, 61:4, 83:23, 92:10, 93:3, 93:15, 95:20, 97:1, 97:11, 98:8, 99:3, 99:24, 100:8, 100:9, 101:12
**MARCHINO** [2] - 3:5, 44:7
**Marchino** [24] - 3:11, 3:14, 3:20, 3:22, 3:25, 12:2, 12:19, 13:13, 28:8, 40:5, 40:9, 41:1, 41:4, 42:1, 42:4, 42:6, 44:9, 44:13, 44:17, 54:4, 69:15, 72:6, 72:13, 85:18
**Marchino's** [3] - 66:18, 67:1, 96:20
**mark** [1] - 67:17
**marked** [3] - 27:19, 54:21, 70:25
**market** [1] - 84:20
**matches** [1] - 83:15
**material** [2] - 5:13, 5:14
**math** [8] - 23:4, 23:24,

24:4, 24:9, 24:22, 25:5, 25:12
**matter** [18] - 46:8, 49:21, 50:2, 50:3, 50:8, 53:3, 54:17, 60:8, 73:3, 74:20, 75:4, 76:13, 83:2, 83:3, 85:25, 86:3, 91:8, 112:11
**matters** [7] - 32:11, 41:10, 50:5, 54:5, 54:13, 95:7, 108:14
**mean** [24] - 16:7, 34:8, 46:19, 47:22, 50:17, 52:2, 53:11, 59:9, 60:11, 61:17, 70:3, 77:1, 77:3, 82:20, 86:6, 88:21, 91:14, 95:3, 96:6, 96:7, 98:16, 102:7, 104:12, 106:11
**meaning** [8] - 12:15, 43:15, 52:4, 57:8, 59:13, 83:24, 91:12, 104:21
**means** [2] - 52:6, 63:3
**meant** [3] - 43:1, 43:4, 43:14
**media** [1] - 15:15
**mediation** [5] - 28:20, 58:6, 58:7, 58:21
**meet** [2] - 52:4, 76:19
**meeting** [3] - 22:15, 22:20, 34:19
**meetings** [1] - 30:11
**Meisinger** [1] - 37:5
**memorandum** [5] - 29:3, 40:22, 109:18, 109:19, 109:20
**mentioned** [5] - 14:25, 48:20, 58:23, 70:10, 73:9
**mentions** [2] - 27:13, 35:13
**mentors** [1] - 16:8
**message** [18] - 14:15, 18:16, 68:3, 72:22, 74:12, 90:1, 96:25, 97:8, 98:1, 99:8, 99:25, 100:5, 104:2, 106:6, 107:3, 107:5, 107:22, 107:25
**messages** [13] - 92:12, 94:13, 94:19, 95:2, 95:18, 95:23, 96:1, 97:4, 99:21, 100:3, 102:18, 106:21, 110:7
**Messages** [1] - 3:24
**messaging** [5] - 94:5,

94:6, 94:7, 94:10, 107:23
**messenger** [1] - 73:20
**messengered** [1] - 73:21
**met** [4] - 23:18, 28:13, 32:8, 76:23
**MICHAEL** [2] - 1:8, 2:15
**Michael** [6] - 22:22, 34:18, 45:13, 45:14, 97:17, 100:23
**Michelle** [14] - 49:22, 76:13, 76:19, 77:14, 77:19, 77:25, 78:4, 80:5, 80:6, 83:18, 84:8, 99:11, 103:21
**mid-2010** [1] - 77:12
**middle** [3] - 17:15, 73:6, 81:20
**million** [31] - 22:19, 22:24, 25:4, 28:2, 35:6, 58:15, 61:12, 64:10, 64:13, 64:16, 65:6, 68:9, 69:5, 69:12, 70:9, 71:12, 80:14, 90:14, 101:12, 101:18, 103:21, 104:13, 104:16, 104:19, 104:20, 104:21, 104:24, 105:3, 106:2, 107:8
**mind** [5] - 5:24, 8:5, 31:21, 43:19, 72:24
**mine** [1] - 97:7
**minute** [5] - 9:12, 61:6, 67:13, 86:15, 97:8
**minutes** [3] - 53:17, 53:21, 83:9
**misread** [1] - 36:6
**missing** [3] - 23:16, 31:6, 80:19, 80:20, 104:20, 107:8
**misstates** [1] - 33:6, 36:5
**mistrial** [1] - 109:25
**modern** [1] - 47:16
**mom** [1] - 14:17
**moment** [2] - 21:4, 92:17
**moments** [2] - 38:20, 40:2
**Monday** [2] - 105:9, 105:13
**monetizing** [1] - 77:5
**money** [22] - 22:15, 26:15, 28:5, 28:9, 33:22, 34:14, 39:13,

39:19, 39:23, 58:17,
63:4, 64:22, 68:9,
68:18, 68:22, 88:8,
88:12, 93:20, 103:9,
103:21, 105:24
**month** [4] - 8:18,
23:14, 25:4, 63:24
**monthly** [4] - 24:21,
31:4, 34:23, 35:14
**months** [4] - 48:17,
48:18, 48:19, 60:1
**morning** [10] - 7:20,
9:21, 25:25, 28:7,
30:22, 58:8, 58:11,
58:21, 87:21, 108:12
**Morning** [3] - 100:1,
100:5, 100:17
**mostly** [1] - 77:9
**mother** [5] - 14:3,
14:6, 14:8, 14:15,
16:19
**motion** [2] - 7:18,
108:13
**motions** [1] - 85:24
**move** [17] - 10:8,
12:10, 13:10, 15:12,
18:7, 21:1, 24:18,
27:9, 36:21, 37:13,
40:14, 40:17, 41:18,
51:11, 60:23, 63:7,
98:1
**moved** [1] - 73:22
**moves** [8] - 55:6, 63:6,
66:13, 72:1, 79:3,
81:11, 87:7, 96:15
**moving** [4] - 10:6,
10:14, 10:17, 17:20
**MR** [231] - 2:16, 6:2,
6:4, 6:13, 6:20, 7:11,
7:21, 7:23, 8:7, 8:12,
8:15, 9:8, 9:13, 9:15,
9:22, 9:25, 10:2,
10:6, 10:8, 10:13,
10:16, 10:19, 10:21,
10:23, 11:6, 11:13,
11:16, 12:10, 12:12,
13:3, 13:5, 13:10,
13:12, 13:17, 13:21,
13:24, 14:2, 14:11,
14:14, 15:12, 15:14,
16:16, 16:18, 17:19,
19:15, 19:23, 20:5,
20:7, 21:1, 21:4,
21:6, 21:11, 21:12,
21:13, 21:22, 21:24,
22:1, 22:8, 22:11,
24:1, 24:4, 24:11,
24:13, 24:16, 24:18,
24:20, 25:7, 25:9,
25:12, 26:3, 26:6,

26:10, 26:18, 27:1,
27:9, 27:12, 29:9,
29:17, 29:21, 30:7,
30:22, 31:7, 31:11,
32:17, 32:19, 32:21,
32:25, 33:2, 33:6,
33:9, 35:16, 35:18,
35:19, 35:21, 36:5,
36:7, 36:8, 36:9,
36:10, 36:21, 37:2,
37:13, 37:15, 37:18,
37:19, 37:20, 37:24,
38:5, 38:13, 39:6,
39:8, 39:15, 39:17,
40:14, 40:17, 40:20,
41:6, 41:8, 41:18,
41:23, 43:7, 43:22,
44:8, 44:16, 45:22,
51:6, 51:11, 51:14,
53:13, 54:3, 55:6,
55:9, 55:14, 55:17,
55:21, 55:25, 56:6,
56:10, 56:13, 56:18,
57:18, 57:20, 60:23,
61:1, 62:14, 63:5,
63:7, 63:10, 63:17,
63:20, 66:13, 66:15,
66:21, 66:23, 67:3,
67:20, 69:13, 69:15,
72:1, 72:3, 72:8,
72:9, 72:13, 75:24,
76:9, 76:12, 79:3,
79:5, 79:7, 79:14,
81:11, 81:13, 81:19,
86:16, 86:19, 87:7,
87:9, 87:13, 90:16,
90:18, 91:4, 91:7,
92:13, 92:14, 92:17,
92:19, 94:14, 94:18,
94:21, 94:24, 95:8,
95:12, 96:10, 96:12,
96:15, 96:17, 96:24,
97:2, 97:24, 98:4,
98:24, 100:11,
100:17, 101:13,
101:16, 101:20,
101:23, 102:13,
102:17, 102:20,
102:23, 103:22,
104:1, 104:3, 104:6,
108:3, 108:16,
108:20, 109:3,
109:4, 109:8,
109:10, 109:15,
109:19, 109:24,
110:2, 110:5, 110:9,
110:12, 110:21,
110:24
**multiple** [3] - 57:1,
70:4, 79:6
**multiply** [1] - 23:3

**multitude** [1] - 71:11
**musicians** [1] - 19:21

**N**

**NA** [1] - 65:20
**name** [33] - 9:24, 10:9,
10:10, 10:15, 10:21,
10:22, 10:24, 11:1,
15:1, 15:4, 15:23,
15:24, 16:6, 16:7,
16:10, 18:24, 19:7,
36:19, 37:2, 37:5,
37:6, 37:7, 37:8,
37:10, 44:11, 44:12,
44:13, 44:23, 62:21,
63:20, 67:25, 87:4
**named** [5] - 49:11,
49:14, 49:17, 49:22,
54:5
**names** [7] - 9:7, 9:17,
16:15, 18:8, 18:11,
34:9, 72:20
**near** [3] - 13:2, 59:8,
59:24
**necessarily** [1] - 95:10
**need** [7] - 9:7, 24:22,
33:4, 35:2, 35:5,
100:22, 110:22
**needed** [1] - 24:13
**needs** [1] - 110:14
**negative** [6] - 5:13,
5:14, 5:17, 5:18,
5:24, 6:1
**negotiability** [1] -
31:25
**negotiate** [1] - 50:11
**negotiation** [2] - 32:5,
78:10
**negotiations** [1] - 32:3
**never** [11] - 9:4, 30:10,
30:17, 34:25, 49:24,
59:24, 69:19, 69:20,
75:14, 75:16, 75:19
**Newport** [4] - 2:19,
30:11, 30:13, 47:9
**news** [1] - 103:11
**next** [4] - 18:19, 59:25,
97:14, 97:16
**NICOLA** [2] - 2:4, 2:9
**night** [1] - 58:11
**nine** [2] - 109:24,
110:2
**Ninth** [1] - 4:10
**nobody** [1] - 61:24
**nominations** [1] - 19:3
**non** [1] - 15:12
**nonresponsive** [2] -
21:2, 63:8
**normally** [1] - 50:25

**North** [1] - 2:11
**notes** [3] - 20:14,
108:14
**nothing** [7] - 17:7,
17:12, 21:12, 22:8,
38:15, 43:22, 110:21
**notice** [5] - 66:19,
67:1, 81:15, 81:17,
96:22
**November** [2] - 28:12,
28:16
**nowhere** [1] - 52:20
**Number** [13] - 56:12,
63:19, 65:24, 65:25,
66:20, 67:11, 79:13,
80:12, 80:15, 81:18,
87:12, 96:23
**number** [16] - 4:11,
16:20, 17:1, 17:7,
17:11, 22:21, 58:16,
74:25, 78:19, 80:5,
80:6, 106:9, 106:10,
106:13, 106:22
**numbered** [1] - 80:3
**Numbers** [1] - 72:12
**numbers** [6] - 24:5,
24:6, 24:20, 65:21,
80:2

**O**

**object** [1] - 72:10
**objection** [40] - 13:3,
13:17, 13:24, 16:16,
19:15, 20:5, 25:7,
26:3, 27:9, 29:17,
30:7, 32:17, 32:25,
33:6, 36:5, 37:18,
41:6, 51:6, 55:9,
57:18, 63:10, 66:15,
72:3, 75:24, 76:9,
79:5, 81:13, 87:9,
87:11, 91:4, 94:15,
94:21, 96:17, 97:24,
100:11, 101:13,
101:20, 102:13,
103:22, 104:3
**Objection** [2] - 14:11,
37:20
**observes** [1] - 59:13
**obviously** [1] - 8:1
**occasionally** [3] -
45:9, 48:22, 49:1
**occur** [1] - 5:3
**October** [1] - 92:1
**OF** [7] - 1:2, 1:5, 1:14,
2:1, 112:1, 112:3,
112:4
**offering** [1] - 91:17
**office** [20] - 30:11,

30:13, 40:10, 40:15,
41:2, 47:7, 47:9,
47:10, 47:11, 47:12,
47:13, 47:15, 47:16,
47:17, 48:8, 48:20,
49:2, 49:5
**OFFICES** [1] - 2:17
**OFFICIAL** [3] - 1:24,
112:1, 112:5
**Official** [1] - 112:20
**oldest** [2] - 79:15,
79:18
**once** [8] - 10:21,
10:22, 20:8, 20:22,
23:14, 40:12, 48:3,
60:9
**One** [1] - 92:17
**one** [39] - 5:25, 6:5,
6:13, 8:12, 9:16,
9:18, 16:8, 16:13,
18:4, 18:11, 21:4,
21:6, 21:22, 23:3,
25:3, 26:23, 29:7,
34:2, 38:6, 40:10,
45:25, 52:11, 56:23,
56:25, 62:20, 62:22,
64:20, 68:5, 79:15,
86:13, 87:3, 87:23,
88:24, 90:15,
104:16, 104:19,
104:24, 107:2
**ones** [7] - 47:24, 57:1,
74:13, 93:10, 93:11,
97:6, 97:7
**ongoing** [1] - 46:19
**online** [3] - 43:1,
43:15, 77:9
**oOo** [1] - 111:4
**open** [1] - 47:15
**openings** [1] - 55:25
**operating** [1] - 90:15
**opinion** [2] - 32:18,
33:7
**opinions** [2] - 53:18,
108:7
**opportunity** [2] - 7:6,
26:19
**opposite** [1] - 9:1
**options** [1] - 80:17
**OR** [1] - 3:9
**order** [5] - 4:13, 7:13,
8:4, 57:6, 57:9
**ordered** [2] - 57:2,
57:3
**orient** [1] - 97:3
**original** [2] - 82:21,
86:21
**originally** [1] - 30:18
**Oscar** [1] - 19:2
**otherwise** [2] - 5:22,

15:15
**outside** [8] - 6:14, 6:25, 25:9, 30:7, 31:7, 41:6, 85:17, 97:25
**overruled** [35] - 13:19, 13:25, 19:17, 20:6, 24:2, 25:8, 26:5, 26:8, 27:11, 29:20, 30:9, 31:8, 32:20, 37:22, 39:7, 39:16, 41:7, 43:8, 51:8, 76:1, 86:17, 87:11, 91:6, 92:15, 94:16, 94:22, 95:9, 96:14, 100:13, 101:15, 101:21, 102:15, 102:21, 103:24, 104:4
**owed** [4] - 23:25, 27:22, 69:16, 75:23
**own** [3] - 18:6, 33:11, 77:18
**owner** [1] - 45:23
**ownership** [1] - 80:15

## P

**P.M** [2] - 1:16, 4:2
**p.m** [4] - 54:1, 110:23, 111:3
**package** [1] - 106:13
**Page** [1] - 3:23
**PAGE** [1] - 3:2
**page** [61] - 4:23, 17:16, 28:24, 31:25, 35:9, 35:25, 36:2, 36:4, 37:9, 37:16, 37:21, 38:3, 38:9, 38:14, 38:15, 38:19, 55:11, 55:14, 55:18, 55:19, 55:22, 56:18, 56:19, 63:18, 64:3, 64:24, 67:20, 72:24, 75:1, 79:15, 81:19, 82:8, 82:23, 82:25, 83:16, 84:11, 87:13, 87:19, 87:22, 87:23, 87:25, 92:20, 96:24, 97:2, 98:7, 98:19, 99:21, 99:23, 101:23, 102:23, 104:6, 105:5, 105:8, 105:15, 106:5, 106:20, 107:13, 107:17, 112:11
**paid** [10] - 28:5, 48:9, 58:17, 59:8, 59:12, 68:23, 69:19, 69:21, 73:25, 86:3

paragraph [29] - 10:15, 10:16, 10:19, 18:3, 18:19, 18:20, 20:17, 20:18, 20:20, 27:2, 27:13, 29:6, 31:24, 32:1, 32:10, 32:12, 33:9, 35:10, 35:11, 35:13, 40:21, 84:11, 84:12, 84:15, 85:3, 85:5, 85:6, 86:2
**paragraphs** [1] - 17:20
**paralegal** [1] - 70:23
**parallel** [1] - 80:16
**Parrish** [5] - 68:11, 68:12, 68:14, 68:19, 68:20
**Parrish's** [2] - 68:18, 68:23
**part** [20] - 24:21, 47:7, 47:19, 50:22, 53:9, 55:18, 55:19, 56:13, 57:11, 59:7, 59:14, 59:16, 59:17, 64:20, 65:11, 66:25, 70:13, 88:19, 89:3
**partial** [4] - 70:6, 70:8, 71:7, 71:9
**particular** [2] - 5:21, 7:3
**particularly** [1] - 31:3
**parties** [3] - 21:17, 21:20, 36:13
**parties'** [1] - 9:7
**partner** [1] - 45:8
**partnered** [4] - 45:10, 46:5, 46:10, 46:16
**parts** [1] - 15:20
**party** [2] - 8:18, 29:21
**Passport** [2] - 65:24, 67:10
**past** [1] - 15:18
**pasted** [1] - 107:2
**patience** [1] - 102:6
**patient** [1] - 30:15
**pay** [5] - 15:11, 33:3, 48:15, 75:7, 88:8
**paying** [2] - 48:4, 86:10
**payment** [22] - 25:4, 28:12, 28:16, 35:11, 65:10, 65:11, 69:5, 70:6, 70:8, 71:7, 71:9, 89:9, 89:11, 89:16, 90:5, 90:12, 91:20, 92:7, 99:11, 99:12, 102:9, 107:8
**payments** [24] - 24:21, 35:14, 59:19, 70:4, 88:15, 88:18, 89:5,

89:6, 89:16, 89:23, 91:10, 91:11, 92:2, 93:2, 93:5, 93:9, 93:17, 93:23, 99:17, 100:10, 101:9, 101:12, 105:2, 105:25
**payroll** [2] - 48:4, 48:8
**PC** [2] - 44:24, 63:22
**people** [9] - 8:8, 14:19, 15:10, 15:21, 16:8, 16:10, 18:7, 46:24, 47:3
**per** [5] - 20:23, 23:12, 82:13, 88:13
**percent** [26] - 24:6, 26:21, 26:24, 27:4, 27:7, 27:13, 27:15, 27:23, 27:24, 27:25, 32:7, 38:23, 38:24, 39:5, 39:10, 51:1, 51:17, 51:18, 84:18, 86:15, 86:22, 86:23, 94:10
**percentage** [3] - 50:23, 51:1, 51:15
**perfect** [1] - 13:2
**perform** [1] - 85:25
**period** [3] - 8:3, 93:20, 102:17
**periodic** [1] - 59:19
**person** [2] - 19:18, 19:20
**personal** [6] - 45:2, 46:25, 47:11, 47:14, 50:19
**Personalized** [1] - 85:10
**personally** [3] - 18:6, 53:11, 73:15
**Phan** [21] - 49:22, 50:3, 76:14, 76:19, 76:21, 77:19, 77:21, 81:1, 83:4, 83:18, 84:8, 88:3, 88:8, 88:24, 89:2, 89:7, 90:19, 91:16, 99:19, 100:9, 104:14
**Phan's** [2] - 89:8, 103:21
**phone** [5] - 29:24, 43:2, 43:6, 43:15, 94:7
**phrased** [1] - 102:14
**picture** [4] - 56:21, 56:22, 56:23, 90:1
**pieces** [2] - 18:6, 80:20
**ping** [1] - 100:23
**place** [6] - 38:15, 47:9,

52:21, 52:25, 60:3, 93:10
**placed** [1] - 84:1
**plaintiff** [2] - 45:5, 51:3
**Plaintiff** [1] - 1:6
**PLAINTIFF** [1] - 2:3
**plaintiff's** [1] - 45:6
**plane** [2] - 54:19, 68:19
**planes** [2] - 57:4, 57:12
**playing** [2] - 15:9, 15:21
**Plaza** [1] - 2:18
**plus** [1] - 78:5
**point** [27] - 5:20, 6:20, 8:19, 8:23, 9:24, 16:23, 16:25, 19:15, 23:9, 23:10, 26:23, 45:12, 46:16, 47:20, 53:14, 57:25, 59:4, 59:24, 76:6, 77:13, 77:20, 80:12, 80:15, 88:2, 91:22, 91:25, 110:14
**points** [2] - 6:5, 80:11
**portion** [8] - 10:25, 35:6, 63:8, 69:16, 86:10, 90:23, 91:7, 97:25
**position** [2] - 110:13, 110:19
**posttrial** [1] - 85:24
**potential** [2] - 7:19, 50:12
**practice** [1] - 45:1
**Practices** [1] - 84:13
**prejudicing** [1] - 5:14
**prepare** [1] - 7:13
**prepared** [2] - 76:5, 76:6
**presence** [8] - 4:5, 4:12, 5:7, 6:15, 7:1, 11:9, 53:23, 108:11
**presented** [1] - 55:23
**press** [2] - 14:21, 14:24
**presumably** [1] - 92:2
**pretrial** [1] - 4:15
**pretty** [2] - 12:22, 70:24
**previous** [2] - 87:23, 87:25
**previously** [2] - 55:23, 89:1
**primarily** [1] - 45:2
**primary** [1] - 45:12
**principals** [1] - 45:25
**privacy** [1] - 8:19

**private** [1] - 54:19
**PRO** [1] - 2:14
**problem** [1] - 68:21
**proceed** [1] - 21:25
**proceeding** [2] - 7:20, 7:22
**Proceedings** [1] - 111:3
**proceedings** [1] - 112:10
**PROCEEDINGS** [1] - 1:14
**process** [1] - 90:18
**producer** [1] - 19:4
**producers** [1] - 19:21
**professional** [1] - 44:25
**proffer** [1] - 9:23
**progress** [1] - 85:14
**pronounce** [1] - 15:24
**proper** [1] - 110:14
**provide** [9] - 9:5, 25:16, 25:19, 30:3, 70:22, 85:12, 88:7, 108:23, 109:9
**provided** [6] - 8:17, 30:5, 60:17, 61:7, 66:1, 109:6
**providing** [1] - 30:6
**provision** [1] - 42:10
**provisions** [1] - 84:10
**public** [2] - 91:17, 97:21
**publish** [1] - 63:17
**pull** [7] - 27:1, 80:1, 84:11, 87:13, 96:24, 97:2, 98:24
**purchase** [1] - 57:4, 57:12, 64:20, 80:16, 80:18
**purchased** [1] - 90:2
**purchasing** [2] - 54:19, 57:15
**purpose** [1] - 58:7
**purposes** [2] - 6:11, 56:11
**pursuant** [1] - 51:9, 112:8
**put** [6] - 7:7, 19:19, 36:8, 52:25, 97:22, 103:11

## Q

**quantified** [2] - 88:10, 88:12
**quash** [1] - 108:13
**questions** [24] - 6:24, 12:25, 17:4, 18:4, 25:14, 26:20, 30:23,

33:18, 33:20, 35:1,
35:16, 40:2, 71:7,
82:6
**quick** [1] - 8:13
**quickly** [1] - 98:12
**quite** [1] - 101:16

## R

**rainmaker** [1] - 47:1
**raise** [2] - 8:12, 44:6
**raised** [3] - 4:7, 5:12,
109:17
**raising** [1] - 8:25
**rather** [2] - 86:12,
107:11
**re** [4] - 3:15, 3:19,
3:20, 3:22
**reach** [3] - 46:17,
88:2, 93:2
**reached** [13] - 48:3,
58:1, 79:20, 85:23,
88:5, 89:15, 91:13,
91:19, 91:24, 92:7,
92:23, 97:20, 97:22
**reaches** [1] - 97:11
**reaching** [2] - 30:23,
90:18
**read** [31] - 6:6, 12:19,
13:14, 13:22, 19:5,
36:15, 37:11, 37:16,
37:24, 38:1, 38:2,
38:6, 38:7, 38:8,
65:16, 65:18, 67:8,
72:14, 72:22, 74:12,
80:3, 80:11, 81:25,
84:15, 85:6, 86:15,
97:14, 99:5, 99:7,
99:15, 107:18
**reading** [2] - 12:7,
12:14
**Reading** [1] - 87:18
**reads** [2] - 18:24,
36:12
**real** [1] - 9:3
**really** [5] - 6:22, 25:2,
32:5, 47:16, 59:24
**REALTIME** [1] - 112:5
**reason** [5] - 8:16, 9:3,
9:7, 10:2, 110:6
**reasonable** [1] - 85:14
**reasonably** [1] - 85:13
**reasons** [1] - 110:11
**receive** [20] - 16:9,
48:11, 50:23, 52:14,
55:11, 59:22, 69:15,
75:22, 76:6, 84:17,
86:5, 86:20, 86:22,
86:23, 90:8, 90:20,
90:23, 91:7, 102:18,

107:5
**received** [54] - 8:13,
39:23, 54:25, 55:12,
56:3, 56:9, 56:12,
63:16, 63:19, 66:17,
66:18, 66:19, 66:20,
67:1, 69:3, 69:4,
71:12, 72:4, 72:12,
75:14, 75:16, 75:19,
76:11, 79:10, 79:11,
79:13, 81:15, 81:17,
81:18, 84:22, 85:20,
86:14, 87:1, 87:3,
87:11, 87:12, 90:1,
91:2, 96:19, 96:21,
96:23, 98:3, 98:18,
99:1, 100:10,
100:15, 103:8,
104:18, 104:19,
107:3, 107:21,
108:25, 109:5
**receives** [1] - 59:14
**receiving** [5] - 31:4,
59:1, 64:11, 101:1,
102:12
**recent** [1] - 12:22
**Recess** [1] - 54:1
**recess** [5] - 7:12, 7:20,
53:24, 110:25, 111:2
**recipient** [1] - 67:23,
67:25, 68:3
**recognize** [8] - 54:25,
62:2, 66:7, 71:18,
78:21, 81:5, 87:1,
95:15
**recognized** [1] - 4:24
**recollection** [5] -
20:21, 92:6, 92:11,
92:22, 101:6
**record** [13] - 6:21, 7:7,
9:24, 10:24, 21:5,
29:8, 38:1, 38:7,
44:8, 45:16, 45:20,
92:18, 110:13
**records** [8] - 21:9,
22:2, 22:4, 35:5,
43:16, 61:15, 61:22
**recovered** [1] - 32:7
**recovering** [1] - 50:20
**recovery** [3] - 50:21,
84:19
**RECROSS** [1] - 35:20
**Recross** [1] - 3:4
**RECROSS-
EXAMINATION** [1] -
35:20
**Recross-
Examination** [1] -
3:4
**redact** [1] - 55:19

**redacted** [7] - 8:17,
9:1, 9:17, 10:3, 18:9,
18:24, 19:11
**redactions** [6] - 8:21,
17:17, 62:17, 62:19,
79:1, 81:9
**Redirect** [1] - 3:4
**REDIRECT** [1] - 22:10
**ref** [1] - 106:10
**refer** [2] - 63:25, 78:11
**reference** [4] - 10:12,
65:24, 106:9, 109:1
**referenced** [1] - 84:25
**referred** [1] - 98:5
**referring** [8] - 14:21,
47:3, 62:8, 83:3,
83:11, 97:19,
100:14, 103:14
**refresh** [4] - 20:21,
29:19, 92:11, 92:22
**refund** [1] - 84:21
**regard** [2] - 4:9, 6:8
**regarded** [1] - 5:18
**regarding** [1] - 35:11
**regards** [1] - 5:25
**Regnier** [3] - 70:23,
71:21, 72:6, 72:22,
109:5, 109:20, 110:3
**Regnier's** [1] - 108:21
**regular** [1] - 108:4
**regularly** [2] - 15:15,
93:16
**regulations** [1] -
112:12
**reimburse** [1] - 75:13
**reimbursed** [1] - 75:10
**reimbursement** [1] -
74:11
**reimbursements** [1] -
74:16
**REJECTED** [1] - 3:10
**related** [4] - 32:11,
42:7, 73:12, 74:22
**relates** [3] - 13:14,
109:22, 110:5
**relating** [8] - 6:22,
12:20, 39:13, 42:11,
97:25, 109:4,
109:11, 109:19
**relation** [1] - 17:1
**relative** [1] - 89:15
**released** [1] - 21:20
**relevant** [1] - 63:13
**rely** [1] - 33:13
**remain** [1] - 10:3
**remedy** [4] - 4:22,
4:25, 6:17
**remember** [28] -
12:21, 13:2, 13:15,
17:5, 20:13, 20:25,

22:16, 24:5, 24:7,
25:14, 26:21, 26:24,
29:12, 30:5, 34:10,
35:1, 38:11, 38:21,
38:24, 42:19, 53:17,
58:15, 73:20, 89:18,
100:16, 101:3,
101:5, 108:5
**remitters'** [1] - 34:9
**rendered** [1] - 84:18
**rent** [2] - 39:24, 48:8
**rented** [1] - 73:23
**repeat** [5] - 20:18,
26:9, 37:23, 62:12,
94:24
**report** [4] - 29:4, 29:9,
29:14, 29:22
**reported** [1] - 112:10
**reporter** [3] - 6:6, 7:3,
44:6
**REPORTER** [4] - 1:24,
62:12, 112:1, 112:6
**Reporter** [1] - 112:20
**REPORTER'S** [1] -
1:14
**reports** [2] - 14:21,
14:24
**represent** [7] - 41:23,
42:1, 42:7, 54:18,
85:8, 85:13, 85:22
**representation** [2] -
77:21, 90:21
**represented** [1] -
41:14
**representing** [2] -
34:22, 41:11
**represents** [2] - 41:5,
41:8
**repurchase** [1] - 88:25
**request** [1] - 4:19
**requested** [1] - 40:5
**require** [1] - 33:3
**required** [3] - 25:5,
85:13, 110:16
**research** [3] - 43:18,
53:20, 108:8
**reserve** [1] - 43:23
**resolution** [2] - 84:23,
85:23
**resolve** [1] - 50:12
**respect** [2] - 5:18,
21:16
**respective** [1] - 88:9
**respond** [2] - 6:2,
85:15
**responded** [3] - 11:11,
97:18, 105:12
**responds** [1] - 98:21
**response** [6] - 43:12,
67:15, 98:13, 102:4,

105:5, 106:3
**responses** [1] -
108:22
**responsibility** [1] -
85:21
**RESUMED** [1] - 11:14
**resumed** [2] - 3:3,
11:15
**retain** [1] - 85:17
**retained** [1] - 52:24
**retainer** [1] - 83:1
**retaining** [1] - 47:11
**return** [2] - 35:18, 82:5
**returning** [2] - 54:17,
105:5
**review** [6] - 5:5, 6:10,
35:2, 35:5, 82:4,
92:11
**reviewed** [2] - 8:6,
17:23
**reviewing** [3] - 4:14,
4:16, 4:17
**rid** [1] - 91:18
**rise** [3] - 53:22,
108:10, 111:1
**Robertson** [3] - 4:9,
4:15, 4:22
**roles** [1] - 15:21
**room** [1] - 47:18
**ROOM** [1] - 1:24
**rooms** [1] - 48:21
**Rule** [6] - 4:8, 4:18,
4:21, 5:1, 6:9, 7:19
**rule** [2] - 4:13, 5:2
**rules** [1] - 51:10
**Rules** [1] - 4:8
**ruling** [3] - 7:9, 55:22,
72:11
**rulings** [1] - 4:15

## S

**SACR-19-00061-JVS**
[1] - 1:7
**SAGEL** [48] - 2:5,
8:12, 8:15, 10:23,
13:3, 13:17, 13:24,
14:11, 16:16, 19:15,
20:5, 21:11, 21:13,
21:24, 22:11, 24:4,
24:13, 24:20, 25:12,
26:10, 26:18, 27:1,
27:12, 29:9, 29:21,
30:22, 31:11, 32:19,
32:21, 33:2, 33:9,
35:16, 35:18, 36:5,
36:7, 36:9, 37:18,
37:20, 39:6, 39:15,
41:6, 43:7, 108:16,
108:20, 109:3,

109:8, 110:21, 110:24
**Sagel** [11] - 3:4, 12:25, 15:6, 17:4, 17:17, 22:9, 35:23, 38:20, 39:25, 42:10, 42:18
**Sagel's** [1] - 43:13
**salary** [1] - 48:16
**SANTA** [3] - 1:17, 1:25, 4:1
**Santa** [1] - 2:7
**saw** [3] - 60:9, 60:11, 67:12
**schedule** [2] - 91:12, 91:14
**scope** [4] - 25:9, 30:8, 31:7, 41:6
**Scope** [1] - 85:5
**screen** [4] - 17:4, 36:8, 65:15, 97:15
**screenshot** [1] - 67:24
**screenshots** [1] - 96:8
**SE** [1] - 2:14
**search** [3] - 15:1, 15:4, 49:5
**seats** [1] - 80:6
**sec** [1] - 34:2
**second** [30] - 4:18, 6:20, 9:2, 9:3, 10:12, 10:15, 10:16, 18:3, 29:7, 35:10, 74:21, 74:22, 80:7, 82:8, 89:11, 90:11, 90:12, 91:11, 91:15, 91:20, 92:2, 93:2, 93:5, 93:9, 101:24, 103:16, 104:21, 106:1, 106:2
**Section** [1] - 112:8
**see** [42] - 9:4, 9:6, 10:2, 10:15, 17:21, 18:22, 24:9, 31:25, 35:2, 35:10, 35:13, 36:3, 43:19, 45:14, 52:11, 60:7, 60:15, 62:17, 64:5, 64:7, 64:24, 65:2, 65:3, 73:5, 73:17, 79:16, 82:9, 82:13, 82:20, 83:17, 84:12, 85:2, 87:4, 87:21, 98:17, 98:22, 100:20, 100:24, 105:10, 105:16, 108:9, 109:1
**seeing** [2] - 38:12, 108:24
**seeks** [3] - 26:6, 32:17, 33:7
**seem** [1] - 16:14
**sell** [2] - 78:6, 89:13

**selling** [1] - 80:17
**SELNA** [1] - 1:3
**send** [6] - 22:3, 68:22, 95:1, 95:24, 98:21, 99:17
**sense** [2] - 51:25, 88:10
**sent** [28] - 19:24, 20:8, 20:11, 20:21, 56:5, 64:13, 68:7, 69:11, 71:20, 72:5, 73:1, 73:21, 79:11, 80:23, 87:14, 88:23, 88:24, 95:2, 96:22, 98:11, 98:14, 99:11, 99:12, 99:13, 104:1, 107:4, 107:25, 108:22
**separate** [2] - 42:15, 104:15
**September** [3] - 90:14, 91:1, 92:1
**Serial** [1] - 67:11
**serial** [1] - 65:25
**series** [1] - 46:11
**service** [1] - 73:20
**Services** [1] - 85:5
**services** [2] - 84:18, 85:12
**set** [10] - 59:18, 74:22, 89:16, 89:23, 90:11, 91:10, 91:11, 92:2, 93:2, 106:2
**sets** [3] - 88:17, 89:4, 89:6
**setting** [2] - 67:24, 101:7
**settled** [5] - 58:8, 58:10, 58:12, 58:14, 58:25
**settlement** [38] - 17:8, 22:25, 23:13, 23:22, 24:22, 25:21, 29:11, 29:23, 35:6, 35:24, 40:1, 40:5, 40:9, 40:13, 41:12, 42:6, 50:12, 58:1, 58:18, 59:6, 59:7, 59:10, 59:12, 59:15, 60:7, 60:18, 61:2, 61:7, 61:12, 69:16, 69:18, 71:14, 75:17, 75:23, 84:23, 85:22, 86:6, 90:15
**seven** [2] - 23:3, 109:22
**several** [1] - 107:17
**several-lined** [1] - 107:17
**share** [3] - 47:7, 88:11, 88:13

**shareholder** [1] - 80:7
**shares** [11] - 78:4, 78:5, 78:6, 80:17, 80:18, 88:9, 88:13, 88:16, 88:18, 89:14, 91:16
**shift** [1] - 76:12
**short** [1] - 46:23
**shortcut** [1] - 9:15
**shortened** [2] - 91:12, 91:14
**shorthand** [1] - 107:19
**shortly** [6] - 98:15, 98:20, 100:23, 101:3, 103:11, 106:23
**show** [3] - 29:1, 55:20, 82:21
**showing** [1] - 8:8
**shut** [3] - 40:10, 40:15, 41:2
**side** [8] - 15:22, 31:19, 45:6, 51:3, 68:23, 97:6, 97:7
**sides** [1] - 109:6
**sign** [10] - 18:5, 36:19, 37:2, 37:5, 37:7, 37:11, 38:15, 52:5, 81:2, 106:8
**Signal** [1] - 94:8
**signatory** [1] - 61:20
**Signature** [1] - 3:23
**signature** [9] - 36:1, 36:3, 36:11, 36:17, 37:9, 87:19, 87:23, 87:24, 87:25
**signed** [16] - 30:18, 30:19, 32:12, 33:19, 37:6, 37:8, 37:10, 37:16, 38:3, 38:9, 38:12, 38:14, 51:17, 82:5, 83:17, 83:21
**significantly** [2] - 60:9, 60:10
**simply** [2] - 9:16, 72:5
**sit** [4] - 21:7, 26:2, 26:14, 101:5
**six** [2] - 19:2, 59:25
**skip** [1] - 65:21
**slept** [2] - 13:9
**slightly** [1] - 74:25
**small** [1] - 65:16
**smaller** [2] - 74:25, 104:16
**social** [1] - 15:15
**Sofitel** [7] - 52:25, 53:1, 70:15, 73:6, 73:8, 73:13, 75:6
**sold** [1] - 89:1

**sole** [1] - 85:20
**sometime** [5] - 59:8, 60:4, 88:6, 89:19, 92:3
**song** [1] - 19:19
**sonically** [1] - 19:19
**soon** [2] - 89:19, 89:21
**sorry** [21] - 11:6, 16:1, 16:24, 20:18, 23:17, 25:2, 46:21, 56:8, 61:3, 62:5, 62:12, 64:9, 66:23, 71:4, 80:19, 83:11, 87:4, 94:23, 99:6, 101:16
**Sorry** [1] - 62:14
**sort** [6] - 47:21, 47:22, 67:24, 77:14, 98:6, 103:16
**sorted** [1] - 103:12
**sounds** [1] - 47:19
**source** [4] - 47:25, 51:25, 52:4, 52:6
**sourced** [5] - 51:24, 52:3, 52:8, 52:12, 86:22
**sourcing** [1] - 46:15
**SOUTHERN** [1] - 1:17
**Spaan** [1] - 112:20
**SPAAN** [3] - 1:23, 112:5, 112:19
**space** [4] - 47:7, 47:13, 47:16, 49:5
**spaces** [1] - 47:15
**span** [1] - 95:20
**speaking** [1] - 46:22
**Special** [1] - 110:15
**specific** [2] - 11:3, 101:7
**specifically** [4] - 10:4, 16:11, 78:2, 80:2
**speculation** [9] - 14:12, 69:13, 75:25, 92:13, 94:14, 96:12, 100:11, 102:13, 104:3
**spell** [1] - 44:11
**spelled** [1] - 44:11
**spent** [2] - 26:15, 103:21
**split** [3] - 46:13, 51:20, 52:1
**spoken** [1] - 13:13
**Spring** [1] - 2:11
**stack** [1] - 43:19
**staff** [2] - 47:4, 47:6
**stage** [4] - 16:6, 16:7, 16:10, 16:15
**stand** [8] - 8:20, 11:25, 12:13, 18:1,

20:2, 21:19, 21:20, 44:5
**STAND** [1] - 11:14
**STANDBY** [1] - 2:16
**standing** [1] - 45:17
**stands** [2] - 44:24, 63:2
**start** [5] - 22:19, 50:5, 69:20, 76:16, 81:19
**started** [4] - 27:13, 42:22, 47:25, 92:5
**starting** [1] - 79:14
**state** [1] - 44:11
**State** [1] - 51:10
**STATE** [1] - 112:4
**statement** [5] - 62:6, 62:17, 62:20, 63:24, 67:12
**Statement** [1] - 3:13
**statements** [2] - 8:5, 43:20
**STATES** [2] - 1:1, 1:5
**States** [10] - 2:4, 2:5, 2:9, 2:10, 4:9, 44:9, 110:17, 112:6, 112:8, 112:13
**stay** [3] - 52:22, 52:25, 73:13
**stenographically** [1] - 112:10
**step** [4] - 44:4, 53:25, 108:16, 108:18
**steps** [1] - 85:14
**STEWARD** [2] - 2:17, 2:18
**still** [9] - 11:1, 41:4, 41:8, 41:11, 47:24, 105:25, 106:5, 107:13
**stock** [1] - 97:21
**stood** [1] - 45:18
**stop** [5] - 40:18, 85:1, 108:2, 110:22
**stopped** [1] - 23:14
**strategy** [1] - 78:10
**Street** [2] - 2:6, 2:11
**STREET** [1] - 1:24
**stricken** [10] - 12:11, 15:13, 21:3, 24:19, 36:22, 37:14, 40:19, 41:19, 60:25, 110:1
**strike** [17] - 12:10, 13:10, 14:7, 15:12, 20:7, 21:2, 24:18, 27:10, 36:21, 37:13, 40:14, 40:17, 41:18, 51:11, 60:23, 63:7, 98:1
**struck** [1] - 25:2
**structure** [4] - 32:4,

**UNITED STATES DISTRICT COURT**

59:6, 59:10, 61:10
**stuff** [5] - 73:14, 74:21, 77:10, 83:23, 92:8
**subentity** [1] - 89:8
**subject** [7] - 44:2, 56:16, 67:6, 72:16, 74:10, 79:24, 81:23
**submission** [1] - 109:4
**submitted** [2] - 53:19, 108:7
**subsequent** [1] - 59:4
**subsequently** [1] - 59:3
**subsets** [1] - 89:7
**substance** [1] - 6:19
**substantial** [2] - 110:6, 110:10
**substantive** [2] - 5:21, 21:18
**success** [1] - 87:21
**sucked** [1] - 83:25
**sufficient** [2] - 63:14, 63:15
**suit** [2] - 4:25, 45:18
**suitable** [1] - 4:25
**suite** [1] - 47:14
**Suite** [3] - 2:6, 2:11, 2:19
**sum** [4] - 59:7, 59:17, 59:19, 59:22
**summary** [1] - 73:2
**Sunset** [1] - 30:12
**sunshine** [3] - 100:1, 100:6, 100:18
**supposed** [10] - 7:15, 7:23, 11:20, 12:1, 12:7, 12:14, 74:2, 75:12, 75:13, 89:19
**supposedly** [2] - 7:17, 80:7
**sustained** [8] - 13:4, 16:17, 24:12, 24:17, 33:8, 57:19, 60:25, 69:14
**SWORN** [1] - 44:7
**sworn** [1] - 110:15

## T

**table** [1] - 80:9
**team** [3] - 8:8, 18:6, 19:2
**technical** [2] - 47:24, 51:25
**technically** [1] - 62:23
**technology** [1] - 77:11
**ten** [1] - 48:19
**tendered** [1] - 21:24

**term** [3] - 51:25, 57:5, 76:24
**terms** [8] - 6:8, 6:19, 23:12, 24:21, 28:14, 29:1, 59:14
**testified** [2] - 11:19, 17:24
**testifying** [2] - 14:19, 21:15
**testimony** [9] - 12:7, 12:14, 21:19, 26:7, 38:13, 38:16, 76:4, 110:1, 110:15
**text** [22] - 14:15, 18:16, 90:1, 92:11, 94:10, 95:17, 96:1, 96:25, 97:14, 97:16, 98:1, 98:20, 99:20, 101:1, 101:24, 106:6, 106:21, 106:22, 106:24, 107:1, 107:17, 110:7
**Text** [1] - 3:24
**texted** [2] - 13:21, 14:2
**texting** [1] - 14:18
**texts** [3] - 97:15, 97:19, 108:22
**thanked** [1] - 90:2
**THE** [176] - 2:3, 2:14, 3:3, 3:5, 4:6, 6:3, 6:8, 6:16, 7:6, 7:17, 7:22, 8:1, 8:10, 8:14, 9:12, 9:14, 9:18, 9:19, 9:20, 9:23, 10:1, 10:4, 10:7, 10:12, 10:15, 10:18, 10:20, 11:3, 11:7, 11:10, 11:12, 11:14, 12:11, 13:4, 13:11, 13:19, 13:20, 13:25, 14:1, 14:13, 15:13, 16:17, 19:17, 19:18, 20:6, 21:3, 21:16, 21:25, 22:9, 24:2, 24:3, 24:12, 24:17, 24:19, 25:8, 25:10, 25:11, 26:5, 26:8, 26:9, 27:11, 29:20, 30:9, 30:10, 31:8, 31:9, 32:20, 33:1, 33:8, 35:17, 36:6, 36:22, 37:1, 37:11, 37:14, 37:22, 37:23, 37:25, 38:6, 38:11, 39:7, 39:16, 40:15, 40:18, 41:7, 41:19, 41:22, 43:8, 43:9, 43:25, 44:3, 44:4, 44:5, 44:10, 44:12,

44:14, 45:20, 51:8, 51:9, 51:13, 53:15, 53:22, 53:24, 54:2, 55:8, 55:11, 55:16, 55:19, 55:23, 56:3, 56:8, 56:11, 57:19, 60:25, 63:9, 63:13, 66:17, 66:25, 69:14, 72:4, 72:11, 76:1, 76:2, 76:3, 76:11, 79:9, 81:14, 86:17, 86:18, 87:10, 90:17, 91:6, 92:15, 92:16, 94:16, 94:17, 94:22, 94:23, 95:9, 95:10, 96:6, 96:8, 96:14, 96:19, 98:2, 100:13, 100:14, 101:15, 101:21, 101:22, 102:15, 102:16, 102:21, 102:22, 103:24, 103:25, 104:4, 104:5, 108:2, 108:4, 108:10, 108:12, 108:18, 108:19, 109:2, 109:13, 109:17, 109:22, 109:25, 110:4, 110:8, 110:10, 110:18, 110:22, 110:25, 111:1
**theirs** [1] - 78:5
**thereafter** [2] - 89:19, 101:3
**third** [4] - 8:18, 9:7, 51:1, 51:18
**thousand** [2] - 33:4, 104:18
**three** [9] - 6:1, 13:1, 59:25, 79:22, 80:2, 80:3, 97:14, 104:15, 105:15
**throughout** [2] - 62:17, 70:3
**Thursday** [2] - 110:22, 110:23
**tie** [1] - 45:18
**tied** [1] - 74:23
**tight** [1] - 103:12
**timeline** [2] - 28:19, 91:15
**timely** [1] - 85:15
**Title** [1] - 112:8
**titled** [2] - 84:12, 85:5
**today** [10] - 8:19, 14:25, 15:11, 25:13, 26:20, 45:14, 99:11, 99:12, 101:5, 110:20
**together** [6] - 19:19,

46:6, 47:20, 49:9, 68:21, 87:21
**tomorrow** [4] - 103:12, 108:5, 108:9, 108:12
**took** [4] - 4:6, 7:19, 9:10, 11:25
**top** [22] - 56:13, 63:20, 63:24, 67:20, 67:21, 67:22, 68:2, 79:14, 79:15, 79:18, 82:9, 82:14, 83:6, 83:7, 89:18, 96:25, 98:10, 99:23, 99:25, 100:5, 101:23, 101:24
**topic** [2] - 57:17, 57:23
**total** [3] - 61:12, 74:19, 90:23
**touch** [1] - 97:22
**trace** [1] - 106:14
**tracking** [3] - 106:9, 106:10, 106:13
**tran** [1] - 91:19
**Tran** [69] - 3:19, 3:20, 3:22, 3:24, 49:22, 50:3, 76:14, 76:16, 76:17, 76:20, 77:7, 77:17, 77:20, 77:24, 78:11, 78:22, 79:20, 80:23, 81:1, 81:6, 82:16, 83:4, 83:17, 84:5, 87:1, 88:3, 88:8, 88:23, 89:7, 90:1, 90:19, 91:10, 91:16, 92:7, 92:12, 92:22, 93:1, 93:2, 93:4, 93:16, 93:23, 93:25, 94:9, 94:13, 94:20, 95:2, 95:6, 95:18, 95:24, 96:2, 96:9, 97:6, 97:9, 97:20, 97:25, 98:2, 98:10, 98:21, 99:1, 99:19, 100:1, 100:9, 101:2, 101:24, 102:19, 103:1, 104:2, 106:7, 107:4
**Tran's** [5] - 80:1, 82:19, 96:21, 99:5, 99:8
**tranche** [2] - 74:21, 106:1
**transact** [1] - 78:4
**transaction** [2] - 88:19, 88:20
**transactions** [1] - 90:12
**TRANSCRIPT** [2] - 1:6, 1:14

**transcript** [3] - 7:4, 112:9, 112:11
**transcripts** [3] - 4:14, 4:15, 4:17
**transfer** [12] - 46:23, 46:25, 47:3, 64:11, 65:3, 65:5, 65:7, 65:15, 65:18, 66:2, 67:23, 69:8
**transferred** [2] - 47:23, 48:7
**travel** [1] - 53:5
**TRIAL** [1] - 1:8
**trial** [12] - 6:24, 12:7, 12:14, 12:15, 12:20, 13:8, 13:14, 13:22, 14:16, 15:21, 83:24
**tried** [5] - 16:14, 23:4, 23:14, 31:12, 97:22
**Trip** [1] - 74:3
**trip** [5] - 53:12, 70:17, 72:21, 74:4, 75:6
**true** [6] - 13:13, 15:14, 17:13, 40:4, 40:24, 112:9
**truly** [2] - 9:6, 51:2
**trust** [9] - 61:13, 61:18, 62:7, 62:22, 63:1, 63:2, 63:22, 64:14, 64:17
**truth** [13] - 55:12, 56:4, 66:18, 67:2, 72:5, 72:6, 76:7, 79:10, 79:11, 81:15, 96:20, 98:3
**try** [2] - 22:2, 107:12
**trying** [5] - 8:23, 9:2, 23:16, 103:16, 107:11
**TUESDAY** [2] - 1:15, 4:1
**turn** [4] - 47:1, 74:6, 98:7, 98:12
**tutorial** [1] - 77:4
**tweet** [2] - 5:22, 5:24
**tweeting** [1] - 7:2
**tweets** [19] - 4:16, 5:5, 5:10, 5:17, 5:24, 6:6, 6:10, 6:19, 6:22, 6:23, 7:8, 7:13, 7:14, 7:24, 8:2, 8:6, 8:9
**twice** [3] - 20:8, 20:12, 20:22
**Twitter** [6] - 12:8, 12:20, 13:14, 13:22, 15:1, 15:4
**two** [22] - 5:25, 12:23, 13:6, 13:12, 14:7, 14:9, 17:20, 18:8, 19:2, 50:5, 57:2,

57:3, 57:4, 72:19,
80:10, 88:17, 88:18,
89:4, 89:6, 104:15,
104:23, 105:2
**type** [1] - 63:1
**typically** [3] - 50:18,
51:17, 94:5

## U

**U.S** [1] - 1:3
**under** [13] - 10:6,
10:14, 10:17, 17:20,
51:16, 57:4, 58:17,
64:4, 69:17, 80:2,
80:3, 80:10, 110:16
**understood** [14] -
34:4, 59:11, 59:16,
59:25, 64:14, 65:10,
68:21, 77:18, 88:17,
89:10, 90:19, 96:5,
106:12, 110:9
**United** [10] - 2:4, 2:5,
2:9, 2:10, 4:9, 44:9,
110:17, 112:6,
112:8, 112:13
**UNITED** [2] - 1:1, 1:5
**unknown** [1] - 32:11
**unless** [1] - 5:22
**unredacted** [4] - 8:15,
9:2, 9:9, 64:4
**up** [40] - 9:8, 15:1,
15:4, 24:5, 24:6,
27:1, 34:11, 36:1,
36:2, 36:10, 42:23,
43:1, 43:5, 43:6,
43:13, 43:15, 43:18,
45:18, 51:17, 52:5,
52:25, 54:18, 57:22,
67:24, 71:6, 77:4,
80:1, 80:22, 83:25,
84:11, 87:13, 96:24,
97:2, 98:24, 108:12,
108:13, 110:8,
110:17, 110:22,
110:24
**update** [1] - 106:17
**updates** [2] - 105:19,
105:21
**UPS** [1] - 106:13
**urgent** [1] - 102:2
**usual** [1] - 5:8

## V

**Vague** [1] - 13:24
**validated** [2] - 31:20,
31:21
**validates** [1] - 110:18
**value** [2] - 84:20,

88:10
**various** [1] - 14:18
**varying** [1] - 70:3
**verbatim** [1] - 7:4
**verify** [1] - 80:9
**versed** [1] - 77:10
**version** [1] - 9:9
**versus** [2] - 38:24,
39:10
**via** [5] - 5:9, 7:7,
14:15, 15:4, 43:15
**views** [1] - 77:5
**violated** [1] - 4:14
**violation** [9] - 4:8,
4:13, 4:18, 4:21, 5:1,
5:2, 6:9, 7:19, 31:13
**vision** [1] - 19:22
**vocal** [1] - 19:21
**VOLUME** [1] - 1:9
**Volume** [2] - 54:22,
78:18
**vs** [3] - 1:7, 4:9,
110:17

## W

**wait** [1] - 9:12
**waiting** [1] - 106:4
**walked** [1] - 9:5
**wants** [2] - 9:1, 10:25
**warrant** [1] - 49:5
**warranted** [2] - 5:9,
6:16
**WAS** [1] - 44:7
**ways** [1] - 39:2
**wearing** [2] - 45:17,
45:18
**web** [1] - 77:11
**Web** [1] - 43:6
**websites** [1] - 77:10
**week** [2] - 8:21, 100:8
**weeks** [5] - 12:23,
13:6, 13:12, 14:9,
79:22
**well-versed** [1] - 77:10
**Wells** [1] - 65:20
**West** [1] - 2:6
**WEST** [1] - 1:24
**whereas** [1] - 5:1
**wherefore** [2] - 36:4,
36:9
**whereof** [2] - 36:9,
36:12
**Whiteside** [5] - 17:8,
17:12, 37:7, 41:12,
42:8, 42:15, 50:13,
61:11, 69:5
**whole** [1] - 97:2
**William** [1] - 68:11
**winning** [1] - 19:1,

19:2
**wire** [26] - 64:7, 64:9,
64:23, 65:2, 65:7,
66:2, 67:23, 69:3,
69:5, 69:11, 98:21,
99:10, 100:6,
100:10, 100:18,
100:20, 101:9,
103:17, 104:16,
104:22, 105:2,
105:25, 106:2,
106:12, 107:8
**wired** [4] - 61:12, 68:9,
101:12, 101:18
**wires** [6] - 98:11,
100:15, 104:15,
104:16, 104:19,
104:24
**wiring** [2] - 64:16,
68:17
**wish** [2] - 6:18, 7:7
**Withdrawals** [1] -
64:25
**WITHDRAWN** [1] - 3:9
**witness** [17] - 4:14,
4:19, 5:8, 5:17, 5:23,
7:10, 7:16, 7:24,
9:16, 21:14, 21:18,
21:24, 36:4, 36:12,
44:9, 45:21, 108:16
**WITNESS** [36] - 9:19,
11:14, 13:20, 14:1,
19:18, 24:3, 25:11,
26:9, 30:10, 31:9,
37:1, 37:11, 37:23,
38:6, 38:11, 40:15,
41:22, 43:9, 44:3,
44:7, 44:12, 51:9,
76:2, 86:18, 92:16,
94:17, 94:23, 95:10,
96:8, 100:14,
101:22, 102:16,
102:22, 103:25,
104:5, 108:19
**witness's** [3] - 21:18,
26:6, 76:4
**WITNESSES** [1] - 3:2
**witnesses** [6] - 11:21,
12:2, 21:16, 21:21,
109:23, 110:2
**words** [8] - 20:2,
33:19, 36:4, 37:9,
37:15, 38:2, 38:8,
98:5
**works** [1] - 54:10
**worry** [3] - 30:14,
103:19, 104:2
**worse** [1] - 7:4
**write** [11] - 18:3,
67:15, 87:17, 98:15,

100:22, 103:10,
104:9, 105:18,
106:7, 106:21,
106:24
**writes** [2] - 101:24,
105:9
**writing** [4] - 29:11,
29:15, 29:22, 29:24
**written** [7] - 32:12,
33:4, 33:19, 36:14,
60:7, 60:18
**wrote** [6] - 17:25,
18:1, 19:24, 42:22,
107:1
**Wyman** [2] - 3:6, 54:2
**WYMAN** [60] - 2:10,
44:8, 44:16, 45:22,
51:14, 53:13, 54:3,
55:6, 55:14, 55:21,
55:25, 56:6, 56:10,
56:13, 56:18, 57:20,
61:1, 62:14, 63:5,
63:17, 63:20, 66:13,
66:21, 67:3, 67:20,
69:15, 72:1, 72:8,
72:13, 76:12, 79:3,
79:7, 79:14, 81:11,
81:19, 86:19, 87:7,
87:13, 90:18, 91:7,
92:14, 92:17, 92:19,
94:18, 94:24, 95:12,
96:10, 96:15, 96:24,
97:2, 98:4, 98:24,
100:17, 101:16,
101:23, 102:17,
102:23, 104:1,
104:6, 108:3

## X

**X-Law** [26] - 44:24,
45:1, 47:4, 48:6,
48:10, 48:20, 49:2,
49:5, 51:24, 53:12,
54:10, 54:12, 61:15,
62:9, 62:21, 62:23,
63:22, 69:16, 69:23,
71:13, 73:16, 73:24,
74:1, 74:4, 74:19,
75:1

## Y

**yawning** [1] - 20:18
**year** [4] - 23:3, 36:14,
41:24, 42:1
**years** [4] - 13:1, 14:7,
19:1, 23:3
**yourself** [2] - 15:15,
23:5

**YouTube** [1] - 77:4

## Z

**zoom** [1] - 56:19

## –

**–** [1] - 3:13

**UNITED STATES DISTRICT COURT**