1          **UNITED STATES DISTRICT COURT**

2      **CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

3         **HONORABLE JAMES V. SELNA, U.S. DISTRICT JUDGE**

4

5    UNITED STATES OF AMERICA,           )
                                          )
6                    Plaintiff,           )   <u>**CERTIFIED TRANSCRIPT**</u>
                                          )
7          vs.                            )   Case No.
                                          )   SACR-19-00061-JVS
8    MICHAEL JOHN AVENATTI,               )
                                          )   **TRIAL DAY 14**
9                    Defendant.           )   **VOLUME 2**
     _____)

10

11

12

13

14

15              REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                 WEDNESDAY, AUGUST 4, 2021

17                        1:30 P.M.

18                  SANTA ANA, CALIFORNIA

19

20

21

22

23    _____

24            **DEBBIE HINO-SPAAN, CSR 7953, CRR**
               FEDERAL OFFICIAL COURT REPORTER
25             411 WEST 4TH STREET, ROOM 1-053
                    SANTA ANA, CA 92701
                   dhinospaan@yahoo.com

1                    **APPEARANCES OF COUNSEL:**

2

3     **FOR THE PLAINTIFF:**

4              NICOLA T. HANNA
               United States Attorney
5              BY:  BRETT SAGEL
                    Assistant United States Attorney
6              411 West 4th Street
               Suite 8000
7              Santa Ana, California 92701
               714-338-3598
8              brett.sagel@usdoj.gov

9              NICOLA T. HANNA
               United States Attorney
10             BY:  ALEXANDER WYMAN
                    Assistant United States Attorney
11             312 North Spring Street
               Suite 1100
12             Los Angeles, California 90012
               213-894-2435
13             alex.wyman@usdoj.gov

14    **FOR THE DEFENDANT IN PRO SE:**

15             MICHAEL JOHN AVENATTI, ESQ.

16

17    **STANDBY COUNSEL FOR MR. AVENATTI:**

18             H. DEAN STEWARD LAW OFFICES
               BY:  H. DEAN STEWARD, ESQ.
19             17 Corporate Plaza
               Suite 254
20             Newport Beach, California 92660
               949-481-4900
               deansteward7777@gmail.com
21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1                        **I N D E X**

2

3     **WITNESSES**                                          **PAGE**

4     **FILLIPO MARCHINO, CALLED BY THE GOVERNMENT**
          Cross-Examination by Mr. Avenatti (resumed)        9
5         Redirect Examination by Mr. Wyman                 13
          Recross-Examination by Mr. Avenatti               16
6
      **MARILYN SORENSEN, CALLED BY THE GOVERNMENT**
7         Direct Examination by Mr. Sagel                   19
          Cross-Examination by Mr. Avenatti                 25
8
      **GREGORY A. BARELA JR., CALLED BY THE GOVERNMENT**
9         Direct Examination by Mr. Sagel                   33

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    **UNITED STATES DISTRICT COURT**

**I N D E X**
(Continued:)

**EXHIBITS**

| EXHIBIT | | IN EVIDENCE | WITHDRAWN OR REJECTED |
|---|---|---|---|
| 400A through 400G | Audio recordings. | 23 | |
| 171 | 9/16/2014 e-mail from Regnier to Barela re Barela IP Rights | 36 | |
| 176 | Barela Text Messages - Forensic Report | 47 | |
| 184 | Barela Settlement Agreement with March Dates | 53 | |
| 201 | 3/14/2018 e-mail from Barela to Avenatti re Nda | 70 | |
| 203 | 4/2/2018 e-mail from Barela to Avenatti re Thanks! | 80 | |
| 204 | 4/5/2018 e-mail from Barela to Avenatti re Wire and Brock | 85 | |
| 235 | Payments to Barela | 87 | |
| 206 | 4/22/2018 e-mail from Barela to Avenatti re Sunday call | 93 | |
| 207 | 5/7/2017 e-mail from Barela to Avenatti re action list | 99 | |
| 208 | 5/15/2018 e-mail from Barela to Avenatti | 101 | |
| 210 | 5/25/2018 e-mail from Barela to Avenatti and J. Regnier re Wire | 104 | |
| 214 | 5/25/2018 (8:29) e-mail from Barela to Avenatti and Regnier re Wire | 107 | |

|  |  |
|---|---|
| 1 | **SANTA ANA, CALIFORNIA; WEDNESDAY, AUGUST 4, 2021** |
| 2 | **1:30 P.M.** |
| 3 | **- - -** |
| 4 |  |
| 01:30PM 5 | **(Out of the presence of the jury.)** |
| 6 | MR. AVENATTI:  Your Honor, there was one issue I |
| 7 | wanted to address, if I could, quickly. |
| 8 | THE COURT:  Quickly.  Witness is in the box. |
| 9 | MR. AVENATTI:  Can we excuse him quickly? |
| 01:30PM 10 | THE COURT:  You're excused quickly.  And come back |
| 11 | quickly. |
| 12 | Okay, Mr. Avenatti. |
| 13 | MR. AVENATTI:  Your Honor, do you have a copy of the |
| 14 | October 10, 2019, memorandum of interview of Mr. Marchino? |
| 01:30PM 15 | THE COURT:  I don't believe so. |
| 16 | MR. AVENATTI:  Can I approach? |
| 17 | THE COURT:  Sure. |
| 18 | MR. AVENATTI:  Your Honor, before I began the |
| 19 | cross-examination this morning, I raised some *Jencks* and *Brady* |
| 01:31PM 20 | issues.  During the break, I raised a specific *Jencks and Brady* |
| 21 | issue relating to Exhibit 4 referred to in the interview |
| 22 | memorandum that I've handed to the Court. |
| 23 | You'll see that Exhibit 4, Your Honor, the |
| 24 | Government utilized Exhibit 4 to ask Mr. Marchino about the |
| 01:31PM 25 | million dollar payment that he received in approximately June |

of 2018 and what that related to.  It's highly relevant.  When

this memorandum was produced, Your Honor, in the production,

the exhibits did not immediately follow the memorandum.

So I'd like Exhibit 4.  I asked Mr. Sagel.  I'm not

going to get into the details of his response, Your Honor, but

suffice it to say, it was lacking.

So I would like Exhibit 4, because this is testimony

or an area where the Government elicited direct testimony.  In

my view, it's *Brady* and *Jencks*.  It should have been asked

without any -- or provided without any specific request.  It's

a spreadsheet.

THE COURT:  That's fine.

Have you had a chance to check this out?

MR. SAGEL:  Yes and no.  He has it.  My response to

him was he has it.  He's had this report for over two years.

Most of our reports have the exhibits behind it.  If this one

did not, he's had two years to ask for it.

There's also a Filippo Marchino production.  It's

almost certainly, obviously, with it, with the Filippo Marchino

production, because the exhibit numbers are the exhibits that

Filippo Marchino provided to us most likely.  He asked for the

first time at lunchtime.  He told us his paralegal was going to

ask us for it.  Supposedly she did.  Now he's bringing it up

for the first time now.

So I haven't looked at anything because he was going

1    to have his paralegal ask our paralegal.

2         THE COURT:  Check the Filippo Marchino production.

3         MR. AVENATTI:  Your Honor, we have.  We did that

4    during the lunch break and it's not there.  And the issue,

01:33PM 5    Your Honor, is this --

6         THE COURT:  I know what the issue is.  Government

7    should go look for it, either verify if it's in the Marchino

8    production if it is, in fact, there or if it's somewhere else.

9    I think you're obligated to produce it.

01:33PM 10        MR. SAGEL:  I understand and I -- I feel confident

11   it's there.

12        THE COURT:  That's fine.

13        MR. SAGEL:  You want that done now?

14        THE COURT:  We're going to bring the jury in so I

01:33PM 15   think we're going to have testimony, but, you know, if you can

16   e-mail your colleagues to go look for it or excuse Mr. Wyman.

17        MR. WYMAN:  Your Honor, at the lunch break, my

18   understanding was that Ms. Hernandez was going to e-mail our

19   paralegal, Ms. Gomez.  That's what I asked her to do.  I wasn't

01:34PM 20   copied on that e-mail.  I don't know -- she's nodding, so it

21   sounds like she did.  Ms. Gomez, presumably is looking for it

22   as we speak.  If she hasn't --

23        I assume she has not sent it you?

24        MS. HERNANDEZ:  Not yet.

01:34PM 25        MR. WYMAN:  I don't know.  We can take a break and

```
 1   go look ourselves, but Ms. Gomez is going to be faster than we
 2   are.
 3              THE COURT:  Oh, fine.  Let her do that and let her
 4   report to you.
 5              MR. AVENATTI:  Your Honor, I have about maybe 20 or
 6   30 minutes left of my cross.  I'd like to get the spreadsheet
 7   before I conclude my cross.
 8              THE COURT:  Sure.  If we can, we will.  But it's a
 9   little late in the day.  Not that you're not entitled to it if
10   it is there, but it's a little late in the day to be asking for
11   it and raising the issue that you believe it's not produced.
12              MR. AVENATTI:  Your Honor, I think the record is
13   replete --
14              THE COURT:  Sir, we're going to move on right now.
15              MR. AVENATTI:  My request for *Brady* and *Jencks* have
16   been legion in this case.
17              THE COURT:  Well, sir, you don't have to repeat it
18   again.
19              We can bring the jury in, please.
20              MR. SAGEL:  If she wants to look, they have a very
21   detailed index --
22              MR. AVENATTI:  We looked.
23              MR. SAGEL:  -- witness number.
24              MR. AVENATTI:  It's not there.
25              THE COURT:  Sir, you will not interrupt.  Rudeness
```

01:34PM (line 5)
01:34PM (line 10)
01:35PM (line 15)
01:35PM (line 20)
01:35PM (line 25)

1  doesn't work in my courtroom.  One person speaks and then the

2  other person speaks.

3          MR. AVENATTI:  Understood, Your Honor.

4          MR. SAGEL:  If they look, which I am certain it will

01:35PM 5  be there, it will be a box that will say "Filippo Marchino

6  production" with the Bates range.  I understand we'll get it.

7  I'm not arguing that.  If he wants his paralegal to look, it

8  will be in the index as "Filippo Marchino production" so

9  they'll know the exact Bates range in the production.

01:35PM 10          THE COURT:  Okay.  Fine.

11          **(In the presence of the jury.)**

12          THE COURT:  Good afternoon, ladies and gentlemen.

13          **(The jury collectively responded "Good afternoon.")**

14          THE COURT:  Mr. Avenatti.

01:36PM 15          MR. AVENATTI:  Thank you, Your Honor.

16          **FILIPPO MARCHINO, WITNESS, RESUMED THE STAND**

17              **CROSS-EXAMINATION (resumed)**

18  BY MR. AVENATTI:

19  Q    Mr. Marchino, before the break we were talking about

01:37PM 20  Exhibit 274, these text messages.  Do you recall that?

21  A    I do, yes.

22  Q    And did you ever have any communications with anyone from

23  Boston Private and Trust Bank [sic]?

24  A    No.

01:37PM 25  Q    Did you ever have any direct communications with any of

```
 1   the bankers associated with Eagan Avenatti bank accounts as it

 2   related to transfers to Mr. Tran or Ms. Phan?

 3   A    No.

 4   Q    Please turn to Exhibit 284.

 5   A    Yes.

 6             MR. AVENATTI:  May I have the next page.

 7             THE WITNESS:  Okay.

 8   Q    BY MR. AVENATTI:  Mr. Marchino, you were asked a number

 9   of questions on direct by Mr. Wyman relating to this page.  Do

10   you recall that?

11   A    I do.

12   Q    And I believe you testified that this page came from me;

13   is that right?

14   A    Yes.  That's correct.

15   Q    You understood at the time that I did not create this

16   page; is that right?

17   A    Yes.  That's not what I meant.

18   Q    You understood that I got it from somewhere else; right?

19   A    Yes.

20   Q    Do you know where I got it from before I sent it to you?

21   A    I do not.  No.

22   Q    Please go to Exhibit 285.

23             Can we please pull up the top half of the first

24   page, please.

25             You were asked about this document on direct
```

         1   examination.  Do you recall that?

         2   A     I do, yes.

         3   Q     This -- neither one of these e-mails came to me or were

         4   sent by me; is that right?  Yes or no?

01:40PM  5   A     Yes.  I believe yes.

         6   Q     Meaning, "yes," I'm correct; right?

         7   A     Yes.

         8   Q     Do you know, as you sit there today, whether you

         9   forwarded this e-mail to anyone?

01:40PM 10   A     I don't.

        11   Q     Since late March 2019, have you deleted any text messages

        12   where Mr. Tran was a party?

        13   A     No.

        14   Q     Have you deleted any text messages that I was a party on

01:42PM 15   the text message?

        16   A     No.

        17   Q     I believe you said that your offices were searched.  Was

        18   it on March 25th, 2019?

        19   A     Yes.

01:42PM 20   Q     You were there -- you were not there at the time; is that

        21   correct?

        22   A     That's correct.

        23   Q     You got a phone call alerting you to that fact; is that

        24   right?

01:42PM 25   A     Yeah.  It was either a text message or a phone call.

```
 1   Q    Was that from Mr. Cassaro?

 2   A    I can't remember.  I think so.  Yeah.

 3   Q    As of the moment you got the phone call, did you take any

 4   steps to preserve your communications with me via Signal?

 5   A    There were none.  So no.

 6   Q    Did you take steps to preserve any other communications

 7   with me as soon as you got that text message or phone call

 8   about the search?

 9   A    I -- no.  I didn't take any affirmative steps.

10   Q    Did anyone ever ask you to take any affirmative steps?

11   A    Yes.  The agent at the office asked to image the

12   computers, and we provided them with the passwords and they did

13   that.

14   Q    But they never asked to image your phones; right?

15   A    That's correct.

16   Q    As of that time, did you have multiple phones or just one

17   phone?

18   A    Just one phone.

19   Q    Did you have prior phones that you had used before

20   upgrading to the phone that you had been using at the time?

21   A    Yes.  I mean, I've been using phones for a while.

22   Q    And my question is a little different.  Meaning, did you

23   have any of your old phones anywhere?

24   A    No.  I typically give them to family members, kind of

25   thing.
```

```
 1   Q    Mr. Marchino, have all of your answers during your
 2   testimony before this jury been as truthful as what you told
 3   the Government on September 4th, 2019?
 4   A    Yes.
 5        MR. AVENATTI:  Your Honor, I'll pass the witness but
 6   reserve for the reason discussed on the break.
 7        THE COURT:  That's fine.
 8        Mr. Wyman.
 9        MR. WYMAN:  Thank you, Your Honor.
10                      REDIRECT EXAMINATION
11   BY MR. WYMAN:
12   Q    Good afternoon, Mr. Marchino.
13   A    Good afternoon.
14   Q    The defendant asked you on cross-examination about
15   allegations made against you in connection with the Jim Carrey
16   case.  Do you recall that?
17   A    I do.
18   Q    Were there ever any findings made against you in
19   connection with that case?
20   A    No.
21   Q    After those allegations were made against you in
22   September of 2017, did the defendant continue working with you
23   after that?
24   A    Yes.
25   Q    Now, the defendant also asked you about the role that you
```

1  played in the negotiation with IPSY, and I believe you

2  testified that your involvement was less than the defendant's

3  but not de minimis; is that right?

4  A    That's correct.

01:46PM 5  Q    How much involvement did you have in receiving the funds

6  from IPSY?

7  A    Zero.

8  Q    How much of the IPSY money was wired into your

9  attorney-client trust account?

01:46PM 10  A    None of it.

11  Q    To your knowledge, who was in charge of that aspect of

12  the matter?

13  A    Mr. Avenatti.

14  Q    Now, the defendant also asked you about how Ms. Phan and

01:47PM 15  Mr. Tran received, collectively, tens of millions of dollars

16  from that matter.  Do you recall that?

17  A    I do, yes.

18  Q    In those tens of millions of dollars that they received,

19  did that include the second $4 million wire transfer that the

01:47PM 20  defendant told you he had sent Michelle Phan?

21  A    No.  To my understanding, no.

22  Q    Were you ever able to locate that wire transfer?

23  A    I was not.

24  Q    All of that back-and-forth that you testified about, both

01:47PM 25  on direct and cross, with Mr. Tran about trying to find that

```
 1   second wire transfer, would any of that have been necessary if

 2   the defendant had actually sent the second $4 million wire

 3   transfer?

 4              MR. AVENATTI:  Speculation.  Conjecture.

 5              THE COURT:  Overruled.

 6              THE WITNESS:  Probably not.

 7   Q    BY MR. WYMAN:  The defendant asked you about Exhibit 130,

 8   the e-mail he sent you with a picture of a private plane.  Do

 9   you remember that?

10   A    Yes.

11   Q    And I think he asked you about how, to your knowledge, he

12   didn't purchase that specific plane shown in the e-mail; is

13   that right?

14              MR. AVENATTI:  Objection.  Misstates the testimony.

15              THE COURT:  Overruled.

16              THE WITNESS:  I think the question was whether I had

17   sent any payment for that plane.

18   Q    BY MR. WYMAN:  Fair enough.  Did he ask you any questions

19   about the payment that you did send to purchase a different

20   plane for him?

21   A    No.

22   Q    Did he ask you any questions about the wire payment that

23   he sent you for $2.5 million on January 26, 2017?

24   A    No.

25              MR. WYMAN:  Nothing further.  Thank you,
```

**UNITED STATES DISTRICT COURT**

```
 1   Mr. Marchino.
 2              THE COURT:  Mr. Avenatti.
 3                    RECROSS-EXAMINATION
 4   BY MR. AVENATTI:
 5   Q    Mr. Marchino, I want to ask you about the question that
 6   Mr. Wyman just raised with you about after the allegations
 7   against you in the Carrey case.  Do you recall that question?
 8   It was only asked maybe three minutes ago.
 9   A    Yes.
10   Q    Now, after you were sued for fraud and extortion in
11   connection with the Jim Carrey case, you told me that the
12   evidence establishing that the client had been harmed by
13   Mr. Carrey was legit, didn't you?
14              MR. WYMAN:  Objection.  Beyond the scope.  403 and
15   the Court's prior ruling.
16              THE COURT:  Beyond the scope.  Sustained.
17              MR. AVENATTI:  Your Honor, I'm trying to establish
18   why I continued --
19              THE COURT:  Sir, it's beyond the scope.  The only
20   question asked is whether there were any findings in that case.
21              MR. AVENATTI:  Your Honor, he asked whether I
22   continued to work with Mr. Marchino, and I'm trying to
23   establish why.
24              THE COURT:  Restate the question.
25              MR. AVENATTI:  Thank you.
```

1  Q    Mr. Marchino, do you recall on redirect Mr. Wyman asked

2  you if after those allegations were made, whether I continued

3  to work with you from that point forward?  Do you recall that?

4  A    Yes.

01:50PM 5  Q    And you answered that I did continue to work with you.

6  Do you recall that?

7  A    Yes.

8  Q    And do you recall that after those allegations were made,

9  I inquired of you as to whether the allegations were true?

01:51PM 10  A    Yes.

11  Q    And you denied the allegations; correct?

12  A    Correct.

13  Q    And later it was found that the primary piece of evidence

14  that you were using was fraudulent and had been doctored and

01:51PM 15  submitted in an effort to get millions of dollars for

16  Mr. Carrey.  Isn't that true?

17            MR. WYMAN:  Beyond the scope.

18            THE COURT:  Sustained.

19  Q    BY MR. AVENATTI:  Mr. Marchino, isn't it true that when

01:51PM 20  the truth came out --

21            THE COURT:  Sir, you're not going to pursue this

22  line of questioning any further.  Move on.

23            MR. AVENATTI:  Your Honor, just to be clear, you're

24  not letting me get into why I continued to work with him?

01:52PM 25            THE COURT:  That wasn't your question, sir.

```
 1   Q    BY MR. AVENATTI:  Sir, isn't it true that one of the

 2   reasons why I continued to work with you was because you denied

 3   the allegations made by Mr. Carrey and Mr. Boucher?

 4            MR. WYMAN:  Calls for speculation.

 5            THE COURT:  Sustained.

 6   Q    BY MR. AVENATTI:  Mr. Marchino, isn't it true that you

 7   knew at the time that one of the reasons why I continued to

 8   work with you was because you denied the allegations made

 9   against you by Mr. Carrey and Mr. Boucher.

10            MR. WYMAN:  Same objection, Your Honor.

11            THE COURT:  Sustained.

12            Move on to another line of questioning.

13            MR. AVENATTI:  Nothing further, Your Honor.  Reserve

14   the right to call -- recall Mr. Marchino.

15            THE COURT:  Sir, you're excused, but you're subject

16   to recall.

17            THE WITNESS:  Thank you, Your Honor.

18            THE COURT:  Thank you.

19            MR. SAGEL:  The Government calls Marilyn Sorensen.

20       **MARILYN SORENSEN, GOVERNMENT WITNESS, WAS SWORN**

21            THE COURTROOM DEPUTY:  If you'll be seated, please.

22            THE COURT:  Can you see okay?

23            THE WITNESS:  I can.

24            THE COURTROOM DEPUTY:  If you'll please state and

25   spell your first and last name.
```

Timestamps in left margin: 01:52PM (line 5), 01:52PM (line 10), 01:52PM (line 15), 01:54PM (line 20), 01:54PM (line 25)

1          THE WITNESS:  Marilyn Sorensen, S-o-r-e-n-s-e-n.

2          THE COURTROOM DEPUTY:  And M-a-r-i-l-y-n?

3          THE WITNESS:  That's correct.

4          THE COURTROOM DEPUTY:  Thank you.

01:54PM 5          THE COURT:  Mr. Sagel.

6          MR. SAGEL:  Thank you, Your Honor.

7                        **DIRECT EXAMINATION**

8    BY MR. SAGEL:

9    Q    Good afternoon, Ms. Sorensen.

01:54PM 10   A    Good afternoon.

11   Q    Where do you work?

12   A    I work for the Department of Justice in an agency called

13   the U.S. Trustee.

14   Q    And what is your job at the United States Trustee's

01:55PM 15   office?

16   A    I -- my title is bankruptcy analyst and I work

17   predominantly on Chapter 11 cases.

18   Q    How long have you been with the United States Trustee's

19   office -- let's start with the job you just mentioned.  How

01:55PM 20   long have you been doing that job for?

21   A    34 years.

22   Q    And how long in total have you been with the

23   United States Trustee's office?

24   A    36.

01:55PM 25   Q    And you said you predominantly do Chapter 11

bankruptcies.  What is that?

A     There's different chapters in the federal bankruptcy code.
One of the chapters is Chapter 11.  A lot of people refer to
that as a reorganization chapter, where people are trying to
reorganize their debts and repay their creditors.

Q     Do you know what a Section 341 hearing is?

A     I do.

Q     And what is a Section 341 hearing?

A     It is an oral examination under oath that any party who
files bankruptcy has to undergo.

Q     And who is it that gives the oral examination under oath?

A     It depends on the chapter.  If it's a Chapter 11, it is
the U.S. Trustee staff attorney typically.

Q     That's who asks the questions?

A     That's correct.

Q     And who answers the questions?

A     The -- it depends on -- if it's a corporation, it would be
a corporate officer.  If it's a partnership, it might be a
partner.  So officer or...

Q     And you mentioned that it's an oral testimony under oath.
How is that preserved?

A     In an audio recording format.

Q     And who keeps a copy of the audio format of the hearings?

A     Our office has possession of the original audio
recordings.

Q     And are you familiar with the Chapter 11 case of In Re

Eagan Avenatti, LLP, Case Number 8:17-bk-11961-CB?

A     I am.

Q     And in your role as a bankruptcy analyst in the

01:57PM  United States Trustee's office, did you look to see if the

original recordings of the Section 341 hearings were maintained

by your office?

A     I did.

Q     And were there Section 341 hearings, the recordings of

01:57PM  them, maintained by your office?

A     Yes.  There were two.

Q     And when you say "There were two," what do you mean by

"There were two"?

A     There were two different dates:  One in June of 2017, the

01:57PM  other in July of 2017.  I think the first one was maybe four

hours, and the second one was maybe three hours.

Q     And you mentioned the first one in June.  Is that

June 12, 2017?

A     Yes.

01:58PM  Q     And the one in July was July 14th, 2017?

A     Yes.

Q     And do you know who was the individual who testified as

the principal of Eagan Avenatti in those Section 341 hearings?

A     I do.

01:58PM  Q     And who was that?

```
 1   A      Michael Avenatti.

 2   Q      And after retrieving or finding the original recordings

 3   of the Section 341 hearings, did you receive segments or clips

 4   from those hearings from the Government, and particularly

 5   myself?

 6   A      Yes.

 7   Q      And did you review those segments of -- from the 341

 8   hearings and compare them to the original 341 hearings?

 9   A      I did.

10   Q      And were the segments from the 341 hearings that you were

11   provided true and accurate copies of the same time and place in

12   the original 341 hearings?

13   A      They were.

14   Q      And do you maintain these recordings as part of your

15   responsibilities with the United States Trustees's office, the

16   original?

17   A      Yes.

18   Q      And they're maintained -- and they're created at the time

19   of those hearings?

20   A      Yes.  The audio recordings are made at the time of the

21   examination.

22   Q      And of these segments the Government provided to you, did

23   they include Exhibits 400A, 400B, 400C, 400D, 400E, 400F, and

24   400G?

25   A      They did.
```

01:58PM (line 5)
01:58PM (line 10)
01:59PM (line 15)
01:59PM (line 20)
02:00PM (line 25)

**UNITED STATES DISTRICT COURT**

1        MR. SAGEL:  At this time --

2   Q    And these were true and correct segments of the

3   originals; is that correct?

4   A    That is correct.

02:00PM 5        MR. SAGEL:  At this time, Your Honor, the Government

6   moves to admit Exhibits 400A, 400B, 400C, 400D, 400E, 400F, and

7   400G.

8        THE COURT:  Any objection?

9        MR. AVENATTI:  Objection, Your Honor.

02:00PM 10  Authentication and completeness and hearsay.

11       THE COURT:  Objections are overruled.  To the extent

12  you have a 106 offering, you need to make it.  It will be

13  received.

14       MR. SAGEL:  Thank you.  At this time, Your Honor,

02:00PM 15  may the Government play the seven exhibits at this time?

16       THE COURT:  Government may.

17       **(Exhibit Numbers 400A-400G received.)**

18       MR. SAGEL:  First we will play Exhibit 400A.

19       **(Audio recording was played, not reported.)**

02:01PM 20       THE COURT:  Pause it.

21       Ladies and gentlemen, the evidence is the recording.

22  The transcript is simply provided to you as an aid.  What you

23  hear controls.  If you hear something different from what's in

24  the transcript, what you hear controls.  The evidence is the

02:01PM 25  recording.  Thank you.

```
 1              (Audio recording was played, not reported.)

 2              MR. SAGEL:  And Exhibit 400B.

 3              (Audio recording was played, not reported.)

 4              MR. SAGEL:  Exhibit 400C, Your Honor.

02:03PM 5       (Audio recording was played, not reported.)

 6              MR. SAGEL:  Exhibit 400D.

 7              (Audio recording was played, not reported.)

 8              MR. SAGEL:  400E.

 9              (Audio recording was played, not reported.)

02:06PM 10      MR. SAGEL:  400F.

11              MR. AVENATTI:  Your Honor, I would object as it

12      relates to 400E.  There was no preceding question.  The same

13      thing, evidently, what we're going to see on 400F.  So the

14      question should be provided for context for the benefit of the

02:06PM 15      jury, Your Honor.

16              THE COURT:  Sir, you can make your 106 offering but

17      you haven't done that.

18              Proceed.

19              MR. SAGEL:  400F.

02:07PM 20      (Audio recording was played, not reported.)

21              MR. SAGEL:  400G.

22              (Audio recording was played, not reported.)

23              MR. SAGEL:  No further questions, Your Honor.

24              THE COURT:  Mr. Avenatti.

02:08PM 25      ///
```

**CROSS-EXAMINATION**

BY MR. AVENATTI:

Q    Ms. Sorensen, good afternoon.

A    Good afternoon.

Q    Now, when the Government sent you the -- I think the term that Mr. Sagel used was "segments."  Do you recall when he sent you the segments?

A    The date?

Q    No.  I mean just generally the act of him sending you the segments.

A    Yes, I do.

Q    And what did you do to verify the accuracy of the segments that we just listened to?

A    It was a lengthy process.  I pulled the original audio recordings, which are a CD, and I put those in an external drive.  First I listened to the entire recording, the original recording.  Then I listened to the entire audio recording that they made.  And then I went back and pulled the clips that they had, and I started before the clip they gave me and compared it to the original and I went to just after the clip so that I could make sure that it matched the original recording.

Q    So let me make sure that we understand what happened. First you listened to all six hours plus across the two days; right?

A    In June and July of 2017, yes, that's correct.

1  Q    So you listened to the entirety of the six-plus hours?

2  A    I did.

3  Q    Okay.  And then I think you said that you listened to the

4  recording that they had made.  What --

02:10PM 5  A    I'm sorry.  Go ahead.

6  Q    What recording do you mean when you say "the recording

7  they had made"?

8  A    That's a misstatement on my part.  We do provide copies.

9  Our office produces copies for parties who request them.  So at

02:11PM 10  some point we had provided a copy of the original CD audio

11  recording of that examination to them.  So it was that copy of

12  the original.

13  Q    I'm sorry.  Were you done?

14  A    I was.

02:11PM 15  Q    Okay.  Now, you said that you provided a copy of the

16  entirety of the recording to them.  Who is "them"?  Is that the

17  prosecutors?

18  A    The U.S. Attorney's Office.

19  Q    So to Mr. Sagel and his colleagues?

02:11PM 20  A    Yes.

21  Q    Okay.  And again, that was over six hours of testimony;

22  right?

23  A    It was.

24  Q    And then what you got back to verify, out of the six-plus

02:11PM 25  hours of testimony were the clips that we just listened to

1    moments ago; right?

2    A    Not just the clips.  They had the full six-plus hours, as

3    you're describing it, in addition to the clips.

4    Q    Did they ask you to verify any other clips from the over

02:12PM 5    six hours of sworn testimony?

6    A    No.

7    Q    So they just asked you to verify seven clips, if my count

8    is correct, 400A through G, out of six-plus hours of testimony;

9    right?

02:12PM 10   A    I don't have it in front of me.  If you want me to look at

11   it, I can.

12   Q    Please.  Please take a look.

13   A    So right now the book is on the exhibit in the 200s.

14   Q    Behind you, Ms. Sorensen, there should be a book with the

02:13PM 15   400 --

16   A    So this one ends at 310.  Can I close it?

17   Q    Yes.

18   A    Okay.

19   Q    Right behind you there should be --

02:13PM 20   A    I won't close it.  I'll let someone else do it.

21        Okay.  So here we go.  So I want 391 to 468?

22   Q    I believe so, yes.

23   A    Okay.

24        MR. SAGEL:  Your Honor, the exhibit books are just

02:13PM 25   going to have the transcripts.  They don't have the audio

```
 1   clips.
 2              MR. AVENATTI:  Let me see if I can clean this up,
 3   Your Honor.
 4   Q    Ms. Sorensen, when you got these segments to confirm,
 5   there were only seven segments.  Is that your best
 6   recollection?
 7   A    Somewhere in that neighborhood, 7 to 10.  I don't have
 8   them in front of me so I don't know exactly, but it was less
 9   than 15 and more than 5.
10   Q    Now, when you got the segments -- well, strike that.
11              You were, obviously, here when we just listened to
12   the segments; right?
13   A    Yes.
14   Q    Okay.  And could you hear them clearly when they were
15   played?
16   A    I could.
17   Q    Now, did you notice that on a number of the segments the
18   question was not included?
19              MR. SAGEL:  Objection, Your Honor.  Your ruling on
20   the defendant's prior motion.
21              THE COURT:  Overruled.
22              THE WITNESS:  Can you restate the question for me.
23              MR. AVENATTI:  Yes, ma'am.
24   Q    Did you notice that the question that I was asked was not
25   included in what you reviewed?
```

02:13PM  5

02:14PM 10

02:14PM 15

02:14PM 20

02:14PM 25

```
 1   A    I didn't pay particular attention to that, probably
 2   because I listened to more of the audios, but I heard the
 3   objection you just raised, so...
 4   Q    Well, my question is a little different.  I want to make
 5   sure that the segments that were just played here in court was
 6   exactly what Mr. Sagel sent you to review for accuracy.  Were
 7   they?
 8   A    Yes.
 9   Q    Okay.  So on a number of the segments, when Mr. Sagel
10   sent them to you to review, they did not include the question
11   that was asked; right?
12   A    Apparently.
13   Q    Apparently not; correct?
14   A    Yes.
15   Q    Did you ever ask Mr. Sagel why?
16   A    I did not.
17   Q    Now, let's talk a moment about bankruptcy.
18             MR. SAGEL:  At this point, Your Honor, I'll raise a
19   scope objection.  She's just a foundational witness.
20             THE COURT:  Let's hear what the question is, please.
21             MR. AVENATTI:  Thank you, Your Honor.
22   Q    You said you have quite a lot of experience in the
23   bankruptcy realm; correct?
24   A    I think he asked me how many years I had been there, and
25   so I think, if you consider 36 years a lot of experience.
```

The timestamps in the left margin read: 02:14PM at line 5, 02:15PM at line 10, 02:15PM at line 15, 02:15PM at line 20, 02:16PM at line 25.

```
  1    Q    I would consider that an enormous amount of experience.
  2    Is that fair?
  3    A    Yes.
  4    Q    Okay.  Now, what's the difference between a chapter --
02:16PM  5    well, strike that.
  6              You mentioned Chapter 11 versus 7.  What's the
  7    difference between a Chapter 11 versus a Chapter 7?
  8              MR. SAGEL:  Objection.  Relevance and scope,
  9    Your Honor.
02:16PM 10              THE COURT:  Sustained.
 11    Q    BY MR. AVENATTI:  You mentioned that a Chapter 11 case is
 12    a reorganization.  What did you mean by that?
 13              THE WITNESS:  You want me to answer that one?
 14              THE COURT:  Yes, please.
02:16PM 15              THE WITNESS:  Generally speaking, when a person, a
 16    company, a partnership files a Chapter 11, the intent behind
 17    that is to reorganize their debts, their income, the business,
 18    the expenses, and to, in the future, propose a plan that repays
 19    creditors over time.
02:17PM 20    Q    BY MR. AVENATTI:  That's versus Chapter 7 where debts are
 21    wiped out; is that right?
 22              MR. SAGEL:  Objection.  Scope and relevance, Your
 23    Honor.
 24              THE COURT:  Sustained.
02:17PM 25    Q    BY MR. AVENATTI:  Now, this bankruptcy matter was not a
```

```
 1   personal bankruptcy matter, correct, that you reviewed the

 2   clips for?

 3            MR. SAGEL:  Objection, scope and relevancy,

 4   Your Honor.

 5            THE COURT:  Overruled.

 6            THE WITNESS:  I'm answering?

 7            THE COURT:  Yes, please.  Unless I sustain the

 8   objection, you get to answer.

 9            THE WITNESS:  Okay.  Thank you.

10            That's correct.  I believe Eagan Avenatti was an

11   LLP, a limited liability partnership.

12   Q    BY MR. AVENATTI:  This was a business reorganization

13   bankruptcy; right?

14   A    That's correct.

15   Q    And the business ultimately voluntarily dismissed the

16   bankruptcy; isn't that true?

17            MR. SAGEL:  Objection, scope and relevance,

18   Your Honor.

19            THE COURT:  Sustained.

20   Q    BY MR. AVENATTI:  In the course of your job, did you come

21   to learn what had happened to the bankruptcy case that

22   Mr. Sagel asked you about?

23            MR. SAGEL:  Objection.  Scope and relevance, and

24   this is the same question as the last one.

25            THE COURT:  Sustained.
```

02:17PM (line 5)
02:17PM (line 10)
02:17PM (line 15)
02:18PM (line 20)
02:18PM (line 25)

```
 1  Q    BY MR. AVENATTI:  After July 14, 2017, Ms. Sorensen, was

 2  there any other sworn testimony provided in connection with the

 3  case that you learned of in connection with your review of the

 4  segments?

 5            MR. SAGEL:  Objection.  Scope.

 6            THE COURT:  Overruled.

 7            THE WITNESS:  I would have to actually look at the

 8  bankruptcy court docket to see if there were any other

 9  examinations.  There's other types that can occur in a

10  bankruptcy.  These were just the ones under Section 341(a).

11  Q    BY MR. AVENATTI:  As you sit there today, you're not

12  aware of any such other examinations; is that right?

13  A    I would not know without reviewing the docket.

14  Q    So you're not aware of any; right?

15  A    I'm not.

16  Q    Thank you.

17            Nothing further.

18            THE COURT:  Anything further?

19            MR. SAGEL:  No, Your Honor.

20            THE COURT:  May the witness be excused?

21            MR. AVENATTI:  Yes.

22            THE COURT:  You may be excused.  Thank you.

23            MR. SAGEL:  Government calls Gregory Barela.

24            THE COURTROOM DEPUTY:  Please stand behind the court

25  reporter and raise your right hand.
```

02:18PM 5

02:19PM 10

02:19PM 15

02:19PM 20

02:20PM 25

<u>**GREGORY A. BARELA JR., GOVERNMENT WITNESS, WAS SWORN**</u>

THE COURTROOM DEPUTY:  If you'll please state and spell your first and last name.

THE WITNESS:  My name is Gregory A. Barela, Jr., G-r-e-g-o-r-y, middle initial A, last name B-a-r-e-l-a, J-r.

THE COURT:  Mr. Sagel.

MR. SAGEL:  Thank you, Your Honor.

**DIRECT EXAMINATION**

BY MR. SAGEL:

Q    Good afternoon, Mr. Barela.

A    Good afternoon.

Q    Are you employed?

A    What's that?

Q    Are you employed?

A    No.

Q    What do you do for a living?

A    I'm trying to start over and start another business.

Q    What kind of businesses do you work in or are you trying to work in?

A    Technology that deals with construction-related products and patents, intellectual property.

Q    And how long have you been working in the construction-related fields?

A    Since 1990.

Q    What's your educational background?

34

```
         1   A     11th grade.

         2   Q     Do you know who Michael Avenatti is?

         3   A     I do.

         4   Q     How do you know who Michael Avenatti is?

02:22PM  5   A     He was my lawyer.

         6   Q     When did you first meet Michael Avenatti -- or when did

         7   you first hire Michael Avenatti as your lawyer?

         8              MR. AVENATTI:  Compound.

         9              THE COURT:  Overruled.

02:22PM 10              THE WITNESS:  It was -- I don't know now.  It's been

        11   2000 -- six years ago, I think, now.  Is that right?

        12   Q     BY MR. SAGEL:  What were the circumstances of you hiring

        13   him?

        14   A     My corporate lawyer introduced me to Michael because we

02:22PM 15   were looking for somebody to represent us in the Colorado

        16   matter for the intellectual property on a product that I had

        17   stolen from.

        18   Q     And did you end up hiring the defendant?

        19   A     I did.

02:22PM 20   Q     If you could look at -- I think it's going to be

        21   Volume III.  There's a binder behind you, Volume III.  I'm

        22   going to ask you to look at Exhibit 171.

        23   A     I got it.

        24   Q     You've got Exhibit 171 in front of you?

02:23PM 25   A     I do.
```

```
 1   Q    Let's start with -- is this an e-mail that you received
 2   with an attachment?
 3   A    Yes, it is.
 4   Q    And the e-mail address there is an e-mail address you
 5   were using in September of 2014?
 6   A    Yes, it was.
 7   Q    Do you know who Judy Regnier is?
 8   A    Yes.  It's offices -- Michael's -- Mr. Avenatti's office
 9   manager and paralegal.
10   Q    And this e-mail that you received with the attachment,
11   did you receive it from Ms. Regnier with the defendant cc'd on
12   it?
13   A    I did.
14   Q    And is it a fair and accurate copy of the e-mail and
15   attachment that you received from Ms. Regnier?
16   A    Yes, it is.
17             MR. SAGEL:  At this time, Your Honor, the Government
18   moves to admit Exhibit 171.
19             MR. AVENATTI:  Objection, Your Honor.  Hearsay.
20             THE COURT:  What's the exception?
21             MR. SAGEL:  This is a business record of Eagan
22   Avenatti that was sent to -- that was sent to Mr. Barela as a
23   fully executed copy of their agreement and a statement of the
24   defendant basically as his agreement.  And, also, an agency
25   statement, Ms. Regnier, sending it.
```

02:24PM (5)
02:24PM 10
02:24PM 15
02:24PM 20
02:25PM 25

| | |
|---|---|
| 1 | THE COURT:  Overruled. |
| 2 | Say number again.  Exhibit number again, please. |
| 3 | MR. SAGEL:  171. |
| 4 | THE COURT:  171 will be received. |
| 02:25PM 5 | **(Exhibit Number 171 received.)** |
| 6 | Q   BY MR. SAGEL:  If we can start on the top of page 1. |
| 7 | What's the date that Ms. Regnier sent you this e-mail? |
| 8 | A   The date of the e-mail was 9/16/2014 at 7:54 p.m. |
| 9 | Q   What's the subject line? |
| 02:25PM 10 | A   "Subject:  Barela IP Rights." |
| 11 | Q   Then the attachment is a fully executed retainer |
| 12 | agreement; is that correct? |
| 13 | A   That's correct. |
| 14 | Q   And the e-mail to you says: |
| 02:26PM 15 | "Attached please find a fully executed copy |
| 16 | of the retainer agreement for your records.  Judy." |
| 17 | Is that correct? |
| 18 | A   That is correct. |
| 19 | Q   Let's turn to page 2.  At the top, even though the e-mail |
| 02:26PM 20 | was September 2014, what's the date on the retainer agreement? |
| 21 | A   July 2nd, 2014. |
| 22 | Q   And can you read the first paragraph under |
| 23 | "attorney-client fee contract contingency." |
| 24 | A   "This attorney-client fee contract, this agreement, |
| 02:26PM 25 | is the written fee contract that the California law |

requires lawyers to have with their clients.  It is
between Eagan Avenatti, LLP, the attorney, on the
one hand and Greg Barela of Eco Alliance, LLC, the
client, on the other hand."

02:26PM 5  Q   And if you can look at paragraph 2, "Scope of Services,"
can you read the part next to "Scope of Services."

A   "Client is hiring attorney to represent client in
the matter of the client's affirmation claims
relating to client's intellectual property rights in

02:27PM 10  the hardscape underlayment process/technologies.
Attorney will provide those legal services,
responsibly required to represent client, and may at
any time and at its discretion retain outside
counsel, whose legal fees will be deducted from fees

02:27PM 15  received by attorney."

Q   Now, when you talk before about hiring defendant for an
intellectual property case out of Colorado, is this the fee
agreement for that matter?

A   It is.

02:27PM 20  Q   Do you know who Brock USA is?

A   I do.

Q   And who or what was Brock USA?

A   Brock was my partner in the original patent that we were
pursuing for stealing the trade secrets in the intellectual

02:28PM 25  property.

```
 1   Q    Is this the fee contract you had with defendant in suing
 2   Brock USA?
 3   A    It is.
 4   Q    And do you know what -- I don't know -- I'm just going to
02:28PM  5   say the first word, Oldcastle.  I don't know if it was
 6   Oldcastle, LLC, or what it was.  But do you know what Oldcastle
 7   was?
 8   A    I do.
 9   Q    How is Oldcastle related to Brock?
02:28PM 10   A    Oldcastle and Brock were in litigation over my product
11   that Oldcastle decided to bring to market and steal from Brock.
12   Q    And if there are references to Oldcastle litigation or
13   Brock litigation as it relates to you, is that one and the
14   same?
02:28PM 15   A    No, it is not.
16   Q    Is that part of this fee agreement?
17   A    It is not.
18   Q    Did you have a separate fee agreement related to
19   Oldcastle in any way?
02:28PM 20   A    No.
21   Q    Did you ever sue Oldcastle?
22   A    I did not.
23   Q    If I could have you look at paragraph 3, "Client's
24   Duties."  Do you see that paragraph?
02:29PM 25   A    I do.
```

39

```
         1   Q    It says:

         2            "Client agrees to be truthful with attorney,

         3        to cooperate, to keep attorney informed of

         4        developments, to abide by this agreement."

02:29PM  5            And then the last part is crossed off.  Do you see

         6   that?

         7   A    I do.

         8   Q    And then there is two initials next to the cross-off.  Do

         9   you see that?

02:29PM 10   A    I do.

        11   Q    Whose initials are those?

        12   A    Those are mine.

        13   Q    Who crossed that part out?

        14   A    I did.

02:29PM 15   Q    Why is it crossed out?

        16   A    Because I didn't understand why I was going to have to pay

        17   for bills and costs on time when it's a contingency agreement.

        18   Q    So then let's look at the very next sentence under

        19   paragraph 4, "Legal Fees, Costs, Billings and Practices."  Can

02:29PM 20   you read that sentence after "billing and Practices."

        21   A    Sure.

        22            "Attorney will receive a contingency fee of

        23        40 percent of the recovery defined below."

        24   Q    And did you have a discussion with the defendant about

02:30PM 25   how your case would be handled on a contingency fee?
```

```
 1   A     Yes.

 2   Q     And did you agree to that?

 3   A     I did.

 4   Q     And at any point did you have any discussions with him

 5   about changing this agreement in relation to your hiring him

 6   for the Brock matter?

 7   A     I did not.

 8   Q     And then in the paragraph -- two down from that, it says:

 9         "If payment of all or any part of the amount

10         to be received will be deferred, such as in the

11         case of an annuity, a structured settlement or

12         periodic payments, the 'recovery' for purposes of

13         calculating the attorney's fees will be the initial

14         lump-sum payment plus the present value as of the

15         time of the binding resolution of the payments to

16         be received thereafter.  The attorney's fees will

17         be paid out of the initial lump-sum payment.  If

18         the payment is insufficient to pay the attorney's

19         fees in full, the balance will be paid from the

20         subsequent payments of the recovery before any

21         distribution to the client."

22         Did you go over this portion with defendant when you

23   signed this fee agreement?

24   A     I did.

25   Q     And what did you understand that to mean?
```

02:30PM (line 5)
02:30PM (line 10)
02:31PM (line 15)
02:31PM (line 20)
02:31PM (line 25)

**UNITED STATES DISTRICT COURT**

```
 1   A    I understood that to mean that I would be paying direct

 2   costs, not the attorney's fees.  The attorney's fees were come

 3   out of the 40 percent, and that's what the contingency was for.

 4   Q    Okay.  And did you know when that would be taken out,

 5   when the attorney's fees would be taken out?

 6   A    Yeah.  When we received the payment, first payment.  Well,

 7   let me correct that.  When we got the first payment, we didn't

 8   know what it was going to be when I signed the agreement.  So

 9   that's what my opinion is.

10   Q    If there was -- if there was a settlement and it was paid

11   out on multiple payments, when did you understand the

12   attorney's fees to be deducted?

13   A    I assumed that it would be -- whenever we got paid, he

14   would get 40 percent of the payment.

15   Q    And there's a paragraph, paragraph 6, about the costs and

16   expenses on page 3 of the exhibit, page 2 of the fee agreement.

17   Do you see that?

18   A    I do.

19   Q    I'm not going to go over all the things that you're

20   authorizing as costs and expenses, but did you go over this

21   with the defendant when you signed the agreement?

22   A    I did.

23   Q    Is there anywhere in there where you paid defendant for

24   the hours he works on your case?

25   A    There is not.
```

02:31PM  5
02:32PM 10
02:32PM 15
02:32PM 20
02:32PM 25

```
 1   Q    And did you have an understanding of why you were not
 2   paying for the hours that he worked on your case?
 3   A    That's what the 40 percent was to cover, was attorney's
 4   time.
 5   Q    Then if I could have you look at paragraph 9, titled
 6   "Related Unknown Matters," it says:
 7            "Client represents that client does not know
 8        of any related legal matters that would require
 9        legal services to be provided under this agreement.
10        If such a matter arises later, client agrees that
11        this agreement does not apply to any such related
12        legal matters, and a separate agreement for
13        provision of services and payment for those
14        services will be required if client desires
15        attorney to perform that additional legal work."
16            Did you know this paragraph was there when you
17   agreed to this?
18   A    I did.
19   Q    Other than this fee contract, this fee agreement, did you
20   have any other fee agreement contracts with the defendant or
21   his law firms?
22   A    I do not.
23   Q    Paragraph 12, "Conclusion of Services."  It's on page 4.
24   Do you see that?
25   A    I do.
```

**UNITED STATES DISTRICT COURT**

43

```
         1    Q    It says:
         2              "Conclusion of Services.  When attorney's
         3         services conclude, other than by discharge or
         4         withdrawal, all unpaid charges will immediately
02:34PM  5         become due and payable.  After attorney's services
         6         conclude, attorney will, upon client's request,
         7         deliver client's file to client, along with any
         8         client's funds or property in attorney's
         9         possession."
02:34PM 10              Was that part of this agreement you signed with the
        11    defendant?
        12    A    Yes.
        13    Q    And I didn't ask you, but at the bottom -- or middle of
        14    the page 4, the bottom of the written part, is that you who
02:34PM 15    signed this settlement agreement?
        16    A    It is.
        17    Q    I'm sorry.  I said "settlement agreement."  I meant fee
        18    agreement.
        19    A    Yes.
02:34PM 20    Q    This fee agreement is from 2014.  I'm going to
        21    fast-forward -- well, let me ask you, did defendant pursue
        22    litigation on your behalf against Brock USA?
        23    A    Yes, he did.
        24    Q    Now I'm going to fast-forward.  In December of 2017, did
02:35PM 25    the matter with Brock USA go to a mediation?
```

UNITED STATES DISTRICT COURT

```
 1   A    It did.

 2   Q    Were you present?

 3   A    I was.

 4   Q    Where were you -- where were you from this mediation?

 5   A    Colorado.

 6   Q    And how long were you in Colorado for this mediation?

 7   A    It was Friday through Sunday.

 8   Q    And while you were there, did the matter resolve?

 9   A    It did not.

10   Q    While you were there, were you -- who were you there

11   with?

12   A    Michael -- Mr. Avenatti.

13   Q    And was he keeping you updated on the progress of the

14   mediation?

15   A    He was.

16   Q    After the time you were there concluded and it didn't get

17   resolved, do you know whether or not the parties were still

18   trying to resolve the matter?

19   A    They were.

20   Q    And how do you know that?

21   A    Because we were texting back and forth and I was asking

22   where we were and where they were.  And they were at a certain

23   amount and we were at a certain amount, and we hadn't finalized

24   the agreement yet.

25   Q    When you say "we," who's the "we" you're referring to?
```

**UNITED STATES DISTRICT COURT**

1    A     Me and Mr. Avenatti.

2    Q     And were you aware that he was continuing to work on

3    resolving your case with the other side even when those

4    original days of the mediation concluded?

02:36PM 5    A     Yes.

6    Q     Did the defendant ever tell you that your mediation or

7    your case resolved?

8    A     Yes.

9    Q     What were the circumstances of him telling you that the

02:37PM 10   case resolved?

11   A     Him and I discussed it, and he informed me that they were

12   at 1.9 million and that he believed it was a fair settlement

13   and we should accept it.

14   Q     And at the time when he was telling you how much the

02:37PM 15   settlement was going to be and for you to -- and that you

16   should accept it, did he tell you how much approximately you

17   would get if you took that settlement agreement?

18   A     60 percent less fees.  And that was direct cost, witness

19   fees and experts, stuff like that.

02:37PM 20   Q     When he told you the settlement amount, did you express

21   any disappointment to him?

22   A     I was a little disappointed because I definitely thought

23   it was going to be more, yes.

24   Q     And what after that phone call or -- I don't know if you

02:38PM 25   said this so let me know.  Was this over the phone?

```
      1    A     Yes.

      2    Q     After this phone call with the defendant about the

      3    settlement, did you talk to him about what to do next?

      4    A     Yes.

02:38PM 5    Q     And what was that?

      6    A     I spoke with him about when we were going to sign the

      7    agreements -- settlement agreement.

      8    Q     So you did agree to accept that settlement?

      9    A     I did.

02:38PM 10   Q     And what did he tell you you would need to do to sign

      11   that settlement agreement or to finalize it?

      12   A     I had to come inside to the office, meet him, and sign the

      13   original documents.

      14   Q     I'm going to have you look at Exhibit 176.  Do you have

02:39PM 15   176 in front of you?

      16   A     I do.

      17   Q     And it is approximately 47 pages or -- 47 pages.

      18   A     47.  Okay.  Yeah, 47 pages.

      19   Q     And have you seen this document before?

02:39PM 20   A     I have.

      21   Q     And let me just back up.  At any point did you provide

      22   your phone to federal agents for them to download the contents

      23   of your phone?

      24   A     I did.

02:39PM 25   Q     Portions of your phone?
```

```
 1  A    Yes, I did.

 2  Q    Among what you agreed to allow agents to extract from

 3  your phone were all of your text messages between you and the

 4  defendant; is that correct?

 5  A    That is correct.

 6  Q    And you have reviewed this report prior to today?

 7  A    I have.

 8  Q    Does this report contain a true and accurate copy of the

 9  text messages from your phone at the time the agents extracted

10  it between you and the defendant?

11  A    It does.  It is.

12  Q    And in addition to the text messages with defendant,

13  there is a couple text messages that also include John Arden;

14  is that correct?

15  A    That's correct.

16  Q    Who is John Arden?

17  A    John Arden was an attorney working with Michael on my

18  case.

19       MR. SAGEL:  At this time, Your Honor, the Government

20  moves to admit Exhibit 176 into evidence.

21       MR. AVENATTI:  Objection, Your Honor.  Hearsay --

22  sorry.  Objection, Your Honor.  Hearsay.  Authentication.

23       THE COURT:  Overruled.

24       176 will be received.

25            (Exhibit Number 176 received.)
```

48

```
         1    Q      BY MR. SAGEL:  If I could have you look at page 11.  At

         2    the very top do you see the text message on December 18, 2017,

         3    at the top?

         4    A      What did you say?  What date?

02:41PM  5    Q      It's line number 59 at the top of page 11.

         6    A      It's not lining up.  Hold on.  This one starts over at

         7    number 1 for some reason.  So let me see if it's --

         8    Q      Look above the one.  Is there a 59 above that?

         9    A      No, there's not.

02:41PM 10    Q      Do you see in the bottom right corner of page number 11?

        11    A      Says page 11 of 47.

        12    Q      Okay.  And now look at the very top.  Is there a

        13    section --

        14    A      Oh, I'm sorry.  You're right.  It's at the very, very top.

02:42PM 15    Got it.

        16    Q      On December 18, 2017, did you send a message to Michael

        17    Avenatti and John Arden?

        18    A      Yeah.  4:01 p.m.

        19    Q      And then it says "UTC time."  Do you see that next to the

02:42PM 20    "4:01 p.m."?

        21    A      I do.

        22    Q      And then can you read the message that you sent to

        23    Mr. Avenatti and John Arden on that day.

        24    A      It says:

02:42PM 25             "Good morning, gentlemen, Greg Barela here.
```

1          I wanted to make sure you have my correct cell

2          phone number.  I do not have the 565 number

3          anymore.  Thanks.  Let me know if you need

4          anything.  Thanks."

02:42PM 5  Q    And then if you were to look at page 10, if you look at,

6  for example, line 58, is that a message you got back -- a text

7  message you got back from the defendant?

8  A    It is.

9  Q    And what did the defendant say back to you?

02:42PM 10 A    158?  "Got it.  We will keep you posted."

11 Q    And then did defendant send you a message on

12 December 18th, on line 56?

13 A    Yes.

14 Q    And what did defendant say to you on December 18th, on

02:43PM 15 line 56?

16 A    He said, "They are at 1.65 million and we are at

17 2.1 million.  It's their move."

18         MR. AVENATTI:  Objection, Your Honor.  Misstates the

19 document.

02:43PM 20         THE COURT:  Did he misread it?

21         MR. AVENATTI:  He did.

22         MR. SAGEL:  He said "It's" instead of "It is," Your

23 Honor.

24         MR. AVENATTI:  No.  He added the word "million"

02:43PM 25 twice.

Q    BY MR. SAGEL:  What did you understand when defendant
said "1.65" and "2.1" to mean?

A    Million.

Q    At this time, do you know where -- do you know why he's
sending you this message?

A    Yeah, because I'm asking where we are with what -- what we
were and where they are at for their offer.

Q    And at about this time, how much longer until you had a
settlement?

A    I've never got a settlement.

Q    Good point.  Let me ask it in a different way.

     When were you told by defendant a settlement
agreement had been reached?

A    It was -- I think it was the end of the day on Monday.

Q    If you were to look up on line 54.

A    Yes.

Q    You sent a message to the defendant and John Arden again;
is that correct?

A    That is correct.

Q    What did you send on December 22nd to the defendant and
Mr. Arden?

A    Said:  "Happy Friday.  Any question on paperwork?  Merry
Christmas in advance."

Q    After asking about -- why were you asking about
paperwork?

```
        1    A    So I could sign it, because we had come to an agreement of

        2    1.9 million.

        3    Q    And the paperwork you're referring to is what?

        4    A    The settlement agreement.

02:45PM  5    Q    And did there come a time where you went over the --

        6    where you met with the defendant to go over the settlement

        7    agreement?

        8    A    Yes.

        9    Q    And when was that?

02:45PM 10    A    I don't remember the exact day, but it was shortly after

       11    we reached the agreement, within days.

       12    Q    Where did you meet the defendant to go over the

       13    paperwork?

       14    A    At the Eagan Avenatti corporate office in Newport Beach,

02:45PM 15    Fashion Island.

       16    Q    If you could look back at Exhibit 176.  If you could turn

       17    to the actual last page, page 47 of the exhibit.

       18    A    Page 9 of -- page 47?

       19    Q    Correct.

02:46PM 20    A    I'm on it.

       21    Q    Do you see the text messages between you and the

       22    defendant on December 28th, at the bottom of that page?

       23    A    I see a -- starting at --

       24    Q    Line 631 through 629.

02:46PM 25    A    Yes.
```

```
 1   Q    Do you know -- defendant sends you a text message on line
 2   631, "Greg, my meeting was delayed starting.  Can we make it 5?
 3   Apologies."
 4        Do you know what defendant is texting you there?
 5   A    Yes.  That's about meeting at his office.
 6   Q    And what was that meeting at his office for?
 7   A    To sign the settlement agreement.
 8   Q    And then if you were to look up to line 628, what did you
 9   text the defendant?
10   A    "I'm at the front door but it's locked on the 14th floor."
11   Q    When you met with the defendant to go over the settlement
12   agreement, who else was there?
13   A    No one.
14   Q    Did the defendant unlock the door for you?
15   A    He did.
16   Q    When you met with him, did he go over the settlement
17   agreement with you?
18   A    Yes.
19   Q    Go over the documents he provided you that day?
20   A    Yes.
21   Q    What did he tell you about the settlement agreement when
22   he met with you that day?
23   A    That it was, you know, a good deal, and I should sign it,
24   and it's a lot of money.
25   Q    I'll have you look at Exhibit 184.  Do you have
```

02:47PM 5
02:47PM 10
02:47PM 15
02:48PM 20
02:48PM 25

         1   Exhibit 184?

         2   A     Yes.

         3   Q     If you could look at Exhibit 184, it's about seven pages.

         4   Do you recognize what Exhibit 184 is?

02:48PM   5   A     I do.

         6   Q     What is Exhibit 184?

         7   A     It's the confidential settlement agreement I signed.

         8   Q     And are there any signatures at the back of this?

         9   A     There is not.

02:48PM  10   Q     Do you know when you received this document?

        11   A     On that day that I met with Michael at his office.

        12   Q     Is this a fair and correct copy or fair and accurate copy

        13   of the document that defendant provided you at his office that

        14   day?

02:49PM  15   A     Let me make sure.  Yeah, this is it.

        16         MR. SAGEL:  At this time, Your Honor, the Government

        17   moves to admit Exhibit 184.

        18         MR. AVENATTI:  Objection, Your Honor.  Hearsay.

        19         THE COURT:  Overruled.  184 will be received.

02:49PM  20         **(Exhibit Number 184 received.)**

        21   Q     BY MR. SAGEL:  Now, let's start at the top of page 1.

        22   What's the bolded and underlined part at the top?

        23   A     "Confidential Settlement Agreement."

        24   Q     And can you read the unredacted part of the first

02:49PM  25   paragraph.

```
 1    A    "The confidential settlement agreement is entered
 2         into as of December 20th, 2017, by and between Greg
 3         Barela, an individual, who resides at" so-and-so.
 4         Redacted.
 5    Q    "And Brock" -- can you continue?
 6    A    Yep.
 7              "And Brock USA, LLC, d/b/a Brock
 8         International, a Colorado limited liability
 9         company, with its principal place of business at
10         3090 Sterling Circle, Boulder, Colorado, 80301,
11         Brock.  Barela and Brock are collectively referred
12         to as the parties."
13    Q    Prior to -- let me skip ahead.  Page 7 is the last page
14    of this; is that correct?
15    A    That's correct.
16    Q    Are there any signature pages with this document?
17    A    There is not.
18    Q    When the defendant went over this agreement with you,
19    were there signature pages?
20    A    There was.
21    Q    Did you sign them?
22    A    I did.
23    Q    And what did you do -- what happened to the signature
24    pages?
25    A    Michael hung on to it because the copy machine wasn't
```

02:50PM (line 5)
02:50PM (line 10)
02:50PM (line 15)
02:51PM (line 20)
02:51PM (line 25)

```
 1   working.
 2   Q     And what did he tell you about when you would get a copy
 3   of the full settlement agreement?
 4   A     He said I could ask for it and I could pick it up.
 5   Q     And if we can turn to page 3 of this document,
 6   Exhibit 184, do you see paragraph 12?
 7   A     I do.
 8   Q     Paragraph 12 says:  "Brock will pay the total sum of
 9   1,900,000 U.S. dollars, USD 1,900,000, to Barela as follows."
10          Is that your understanding of what your settlement
11   agreement would pay?
12   A     It was, yes.  It is.
13   Q     The next paragraph says:
14          "The sum of 1,600,000 U.S. dollars, USD 1.6
15          million" -- "1,600,000, will be paid by Brock to
16          Barela on March 10, 2018."
17          When defendant provided you with this agreement to
18   sign on -- in late December 2017, did he tell you when you
19   would get your payments?
20   A     Yeah.  He said March 10.
21   Q     And did he go over these dates with you?
22   A     He did.
23   Q     And the next three paragraphs talk about three additional
24   payments of $100,000.  Do you see that?
25   A     I do.
```

```
        1   Q    Did he go over with you at that time when you would
        2   receive those three additional $100,000 payments?
        3   A    Yeah.
        4   Q    And what dates did he tell you you would receive those?
02:52PM 5   A    March 10th of '19, '20 and '21.
        6   Q    2019, 2020 and 2021?
        7   A    That's correct.
        8   Q    Did you ever have a discussion with him at that point
        9   about why you needed to wait till March to get your payment?
02:53PM 10  A    Yeah.  I asked, but he just said that's -- that's our
        11  agreement.
        12  Q    The first line -- or the heading that we talked about on
        13  the first page, the first line says it's a confidential
        14  settlement agreement.  Did defendant talk to you about the
02:53PM 15  confidentiality of the agreement?
        16  A    He did.
        17  Q    And what did he tell you about that?
        18  A    He told me the reason that they spread out the last three
        19  payments was because if any -- either party on either side
02:53PM 20  leaked any information or if there was an incident, there was
        21  $100,000 penalty per incident.
        22  Q    After you provided your signatures to the defendant, did
        23  he tell you what was going to happen with the settlement
        24  agreement?
02:54PM 25  A    Well, he was returning our executed copy and receiving
```

their executed copy.  And then we would get a wire on the date

in March -- March whatever it is now -- the 10th.

Q    At the time you met with him, did he say whether or not

the other side had signed the agreement?

02:54PM 5   A    I believe we were still waiting for the signature at that

point in time.

Q    Within days of signing the settlement agreement, did you

get a fully executed settlement agreement back?

A    I did not.

02:55PM 10   Q    At the time you met with the defendant to go over the

settlement agreement then, did he tell you how much you were

going to get from the settlement agreement?

A    He had an approximate amount.  He said somewhere between

one and 1.1 million, less costs, which he was estimating

02:55PM 15   between 100- and 130,000.

Q    So that would put how much you -- how much did -- based

on what defendant was telling you at that time, how much did

you think you were going to get from the overall settlement

agreement?

02:55PM 20   A    About $1.1 million.

Q    And at that point, did he tell you -- let me take that

back.

You said something about the 60 percent minus the

$100- to 130-ish thousand dollars?

02:56PM 25          MR. AVENATTI:  Misstates the testimony.

UNITED STATES DISTRICT COURT

```
 1              THE COURT:  Overruled.
 2    Q    BY MR. SAGEL:  What were you referring to between the
 3    100- to $130,000 amount?
 4    A    As we discussed in the original part of the first
 5    agreement, it was only going to be costs, not attorney's fees.
 6    So the costs would have been whatever the travel was and things
 7    like that, which he said was approximately 100- to $130,000,
 8    and I would get 60 percent less that.
 9    Q    "Less that," meaning from the overall amount?
10    A    Correct.
11    Q    At any point when you met with the defendant to go over
12    the settlement agreement, did he say that the cost and expenses
13    were so high that you would not get any money?
14    A    No.
15    Q    When you learned that your settlement money would not
16    come until March -- and we're in late December at this point --
17    did you have any discussion with defendant about what you
18    should do while you wait until the money comes in March?
19    A    I did.
20    Q    What did defendant tell you?
21    A    It was in the first meeting when we were signing the
22    agreement, he said it's a lot money, and, you know, he says,
23    "Take your family on a vacation.  You're going to have enough
24    money to do it.  Finance your new businesses.  Get things
25    moving."
```

```
 1   Q    At any point did you feel like you would not be getting

 2   your money -- in anything defendant was telling you, that you

 3   would not be getting your money?

 4   A    Never.

 5   Q    If you look at Exhibit 176 -- I don't know if it's still

 6   in front of you.  If you could look at line 627, January 3rd.

 7   A    What page again?  I'm sorry.

 8   Q    47.  The last page.

 9   A    Last page.  Okay.  47.

10   Q    And line 627.

11   A    Okay.

12   Q    Is that a text message you sent to the defendant on

13   January 3rd, 2018?

14   A    It is.

15   Q    Can you read what you sent to defendant on January 3rd,

16   2018.

17   A    "Hi Michael, I hope all is well.  I just wanted

18        to follow up and see if you had any progress on the

19        accounting.  Thanks, and I will talk to you soon."

20   Q    What did you mean by "the accounting"?

21   A    What the final costs were associated with the case so I'd

22   understand what my percentage was.

23   Q    Did defendant tell you that he would be providing you

24   with an accounting?

25   A    Yes.
```

Times: 02:57PM (line 5), 02:58PM (lines 10, 15, 20, 25)

**UNITED STATES DISTRICT COURT**

```
 1   Q     When you sent this text message, had you received that
 2   accounting from the defendant?
 3   A     I had not.
 4   Q     In response to your text message to the defendant, did he
 5   send you an accounting of the cost in your case?
 6   A     He did not.
 7   Q     Has the defendant ever sent you an accounting on your
 8   case?
 9   A     He has not.
10          THE COURT:  I think we'll take the midafternoon
11   break here.
12          Ladies and gentlemen, we'll be in recess for 15
13   minutes.  Please remember the admonition not to discuss the
14   case with anyone and not to form any opinions on the issues in
15   the case until it's submitted to you, and no research, please.
16          THE COURTROOM DEPUTY:  All rise.
17          (Recess from 2:59 p.m. to 3:17 p.m.)
18          (Out of the presence of the jury.)
19          THE COURT:  Mr. Avenatti, on the tape from the
20   bankruptcy hearing, you introduced yourself as "Mr. Avenatti."
21   I'd be happy to pronounce your name correctly.  You just tell
22   me how to pronounce it correctly.
23          MR. AVENATTI:  Sure.  "Avenatti" is fine.
24          THE COURT:  That's your preferred pronunciation?
25          MR. AVENATTI:  Yes, sir.  You've been pronouncing it
```

```
 1    correctly.
 2              THE COURT:  Okay.
 3              MR. SAGEL:  Your Honor, what we were going to ask
 4    for you to do, if it's possible, is to read -- you had
 5    mentioned that were you going to be reading Exhibit 258.
 6              THE COURT:  Right.  I should have done that.
 7              MR. SAGEL:  And I can't remember if the new 258
 8    would be in your books or not.
 9              THE COURT:  Do you have a copy of that handy?
10              I have it.
11              MR. SAGEL:  Okay.  Thank you, Your Honor.
12              THE COURT:  Would you like me to read it at this
13    time?
14              MR. SAGEL:  Yes, Your Honor.
15              MR. AVENATTI:  Your Honor, I object to the reading
16    of it in the middle of the examination.  If they wanted it read
17    before or after, I think that would be appropriate.  But
18    reading it in the middle of the examination, in my view, gives
19    it undue an unwarranted weight, Your Honor.  So I would object.
20              THE COURT:  I agree.  I'll read it at the end of
21    this witness's testimony.
22              MR. SAGEL:  Okay.  I'm going to ask him -- the
23    difference is, now I'm going to ask him a lot of what he wasn't
24    told.  So it's six of one, half a dozen of the other.  But
25    that's fine, Your Honor.
```

03:17PM (line 5)
03:19PM (line 10)
03:19PM (line 15)
03:19PM (line 20)
03:19PM (line 25)

1    I would point out, Your Honor, it's a stipulation of

2  fact of a government exhibit that we don't need a witness for

3  it.  So we could introduce it at any point.

4    THE COURT:  You could, but it's evidence like

03:20PM 5  everything else and I think --

6    MR. SAGEL:  With your discretion, Your Honor.  I

7  understand.

8    **(In the presence of the jury.)**

9    THE COURT:  Mr. Sagel.

03:21PM 10    MR. SAGEL:  Thank you, Your Honor.

11  Q    Mr. Barela, at the time you met with the defendant to go

12  over the settlement agreement and to sign it in late December

13  2017, did defendant ever tell you that there was a settlement

14  agreement with January 10th dates instead of March 10th dates?

03:21PM 15  A    No.

16    MR. AVENATTI:  Objection.  Lacks foundation.

17    THE COURT:  Overruled.

18  Q    BY MR. SAGEL:  What was your answer?

19  A    "No."

03:21PM 20  Q    At the time you met with the defendant, did he tell you

21  that he had been sending drafts back and forth with the counsel

22  for Brock USA, and all the drafts had January 10th dates on

23  them?

24    MR. AVENATTI:  Objection.  Lacks foundation.

03:22PM 25  Assumes facts, Your Honor.

```
           1              THE COURT:  Overruled.

           2              THE WITNESS:  No.

           3   Q    BY MR. SAGEL:  At the time you signed the settlement

           4   agreement that the defendant provided you that had March 10th

03:22PM    5   on it, if the actual settlement agreement was for the payments

           6   to be made on January 10th of the four years, would you have

           7   expected the defendant to tell you that?

           8   A    Yes, of course.

           9   Q    In January of 2018, shortly after you signed the

03:22PM   10   settlement agreement and -- the settlement agreement that was

          11   provided to you at defendant's office, did defendant tell you

          12   that Brock USA paid $1.6 million into his attorney-client trust

          13   account?

          14   A    No, he did not.

03:23PM   15   Q    If Brock USA paid $1.6 million pursuant to the settlement

          16   agreement in your case into the defendant's attorney-client

          17   trust account, would you have wanted to know that?

          18              MR. AVENATTI:  Leading.

          19              THE COURT:  Overruled.

03:23PM   20              THE WITNESS:  Absolutely.

          21   Q    BY MR. SAGEL:  Why?

          22   A    Because it's my money.

          23   Q    Would you have expected your attorney to tell you that

          24   that money was deposited into his account?

03:23PM   25              MR. AVENATTI:  Objection.  403, Your Honor.
```

```
 1    Leading.
 2              THE COURT:  Sustained.
 3    Q    BY MR. SAGEL:  Can I have you look at Exhibit 176 again.
 4    I'm just going to kind of have you look generally, and I'll
 5    tell you, start on page 47, line 626.  Do you see that?  It's
 6    dated January 11.
 7    A    I do.
 8    Q    Okay.  And if you look all the way until approximately
 9    line 549 on page 43, there are about 80 text messages between
10    you and the defendant between January and early March of 2018;
11    is that correct?
12    A    That is correct.
13    Q    At any time between January and early March 2018, in
14    these 80 text messages, do you ever ask defendant if Brock paid
15    your settlement money?
16    A    I did not.
17    Q    Why in those two months did you never ask about your
18    settlement money?
19    A    Because my agreement was for March.
20    Q    Your agreement that the defendant provided you?
21              MR. AVENATTI:  Leading.
22              THE COURT:  Overruled.
23              THE WITNESS:  Correct.
24    Q    BY MR. SAGEL:  Now if I could have you look at line 4 --
25    I'm sorry, 546.  And it's on page 42.
```

03:23PM  5
03:24PM 10
03:24PM 15
03:25PM 20
03:25PM 25

```
 1    A    546, you said?
 2    Q    Line 546, page 42.
 3    A    Okay.  I'm there.
 4    Q    Is that a text message you sent to defendant on
 5    March 10th, 2018?
 6    A    Yes.  5:17.
 7    Q    And can you read what you texted to defendant on
 8    March 10th, 2018.
 9    A    "Good morning.  I was just thinking, it's a big
10         day from our -- from our friends at Brock" question
11         mark.
12    Q    What did you mean when you said this is a "big day from
13    our friends at Brock"?
14    A    It's the date they're supposed to pay us for the
15    settlement.
16    Q    And why did you think March 10 was the big day for Brock
17    to pay for the settlement?
18    A    Because that's what the agreement stated.
19    Q    If you could look up a few lines to Exhibit 540 --
20    actually, before I have you do that, on March 10th, 2018, when
21    you believed it was the big day for Brock to make the payment,
22    did you get any of your settlement money that day?
23    A    I did not.
24    Q    Did defendant tell you whether or not Brock paid the
25    settlement at that time?
```

1    A    No.  I don't recall if he said.  But they hadn't, I think

2    that's what he told me.

3    Q    Did you receive any money?

4    A    No, I did not.

03:27PM 5    Q    If you could look at line 542, text message that you sent

6    to defendant on March 13, 2018.

7    A    Yep.

8    Q    Did you send defendant a text message that says:

9         "Just checking in to see how your week's

03:27PM 10        looking.  I'm going to do a call and wanted to see

11        if you could get on it with us in the team just to

12        get caught up.  I'm going to put together the

13        agenda.  Is there any time you could squeeze us in

14        before Friday?  Also, any word on that wire from

03:27PM 15        Brock?  Let me know.  Good luck with all going on."

16        Let me start it towards the end.  When you say

17   "also, any word on that wire from Brock," what do you mean by

18   that?

19   A    I'm asking where the $1.6 million is.

03:27PM 20   Q    And at that point had defendant told you whether or not

21   Brock had paid the money?

22   A    No.  He said they had not.

23   Q    And you also, in that text message, talk about whether or

24   not defendant could have time to get on a call with the team.

03:28PM 25   What is that referring to?

UNITED STATES DISTRICT COURT

A    That's for my other business that we were starting called

Quix Supply.

Q    Had you had any discussions with the defendant about him

being part of your new business?

03:28PM A    Yes.

Q    And what were those discussions?

A    The discussion was Michael was going to help us with the

legal work and the setting up of the entity.  And he was going

to get a percentage of the business.

03:28PM Q    At any time when you discussed your new business entity

with the defendant, did he ever say, "I'm not going to pay you

your Brock settlement money because I'm going to take my piece

out of that"?

A    Of course not.

03:28PM Q    Did you ever have any such agreement with the defendant?

A    I did not.

Q    If you look up one line to line 541, the next day,

March 14, 2018.

A    Yes.

03:29PM Q    What do you text defendant on March 14, 2018?

A    "Hi Michael.  Just checking in on the Brock

issue.  I've been going pretty deep in credit cards

and a little loan to keep both businesses going.

Any updates?"

03:29PM Q    What was the Brock issue you were checking in on?

```
 1   A    Checking in to see if they sent us the $1.6 million and
 2   where it was.
 3   Q    When you say "I've been going pretty deep in credit cards
 4   and a little loan to keep both businesses going," what are you
 5   telling the defendant at that point?
 6   A    It refers back to our discussion when I signed the
 7   original settlement agreement, to where Michael said the money
 8   would be coming; so if I had any resources, to go ahead and use
 9   them to keep the businesses going, things like that.
10   Q    And the resources to keep the businesses going, did that
11   involve credit cards and loans?
12   A    It did.
13   Q    And had you told defendant you did this?
14        MR. AVENATTI:  Leading.
15        THE COURT:  Overruled.
16        THE WITNESS:  Yes, I did.
17   Q    BY MR. SAGEL:  If you could look at Exhibit 201.
18   A    I'm on it.
19   Q    Before you get to 201, is 186 in that same binder?
20   A    Yes, it is.
21   Q    I'm sorry.  Can you look at Exhibit 186.
22   A    Okay.  I'm on it.
23   Q    And if you look at page 2 of Exhibit 186, is that your
24   signature?
25   A    It is.
```

**UNITED STATES DISTRICT COURT**

|  |  |
|---|---|
| 1 | Q     Is that your handwriting of the date? |
| 2 | A     It is. |
| 3 | Q     And what's the date that you -- your signature? |
| 4 | A     12/28/2017. |
| 03:31PM 5 | Q     And do you recognize what you're signing on page 2 there? |
| 6 | A     Yeah.  It's the original settlement agreement I signed in |
| 7 | December. |
| 8 | Q     Is this your signature that you provided to defendant |
| 9 | during that meeting? |
| 03:31PM 10 | A     It is. |
| 11 | Q     Now if you could look at Exhibit 201.  Is Exhibit 201 an |
| 12 | e-mail chain that you forwarded to the defendant? |
| 13 | A     Yes, it is. |
| 14 | Q     Is it a fair and accurate copy of the e-mail chain that |
| 03:32PM 15 | you forwarded to the defendant? |
| 16 | A     Yes, it is. |
| 17 | Q     And most of the e-mail relates to your other business |
| 18 | venture; is that correct? |
| 19 |          MR. AVENATTI:  Leading. |
| 03:32PM 20 |          THE COURT:  Sustained. |
| 21 |          MR. SAGEL:  At this time the Government moves to |
| 22 | admit Exhibit 201, Your Honor. |
| 23 |          MR. AVENATTI:  Objection.  Hearsay. |
| 24 |          THE COURT:  It will be received but not for the |
| 03:33PM 25 | truth, simply for notice that Mr. Avenatti received the e-mail |

```
 1    directly to him and the ones that were forwarded.
 2              (Exhibit Number 201 received.)
 3    Q    BY MR. SAGEL:  The e-mails below yours at the top that
 4    you forwarded to defendant, do these all relate to Quix Supply?
 5    A    Yes.  But I ask a question.  I said, "PS, any word on
 6    Brock?"
 7    Q    I haven't asked that question.
 8    A    Oh, sorry.
 9    Q    And the part that says "PS," it says, "PS, any word on
10    Brock?"  Do you see that?
11    A    I do.
12    Q    What are you referring to on March 14, 2018, when you say
13    "PS, any word on Brock"?
14    A    I'm asking where the settlement payment is.
15    Q    And at this time had defendant told you he had received
16    the money in January?
17    A    No.
18    Q    Turning back to Exhibit 276.  The following day, on
19    March 15, line 538.
20    A    276?
21    Q    I'm sorry.  176.
22    A    Okay.  I didn't see 276.
23    Q    Page 42 of 176.
24    A    176.  What was the page again?  I'm sorry.
25    Q    42.
```

```
 1  A     Page 42, yes.
 2  Q     If you were to look at line 541 -- I'm sorry.  538,
 3  that's a text you sent to the defendant on March 15, 2018,
 4  according to this, at the UTC time.  Do you see that?
```
03:35PM 5  A     I do.
```
 6  Q     And you send defendant a text that says:
 7            "Nothing pressing.  Give me a call when you
 8         get a chance.  Really good meetings today with
 9         major players.  Looking forward to Friday's call
```
03:35PM 10        with you.  My only concern is with Brock.  I just
```
11         want to make sure that it closes.  If not, I'm in a
12         bit of trouble without the cash after the
13         investments I've made the last four months.  I have
14         to put a few more bucks in the next few days and
```
03:35PM 15        I'm getting worried.  Thanks."
```
16            When you say, "My only concern is with Brock.  I
17  want to make sure that it closes," what did you mean by that?
18  A     I wanted to know where the $1.6 million was.
19  Q     When you say:
```
03:36PM 20        "If not, I'm in a bit of trouble without the
```
21         cash after the investments I've made for the --
22         made the last four months," what did you mean by
23  that?
24  A     It meant that I had been investing into the companies on
```
03:36PM 25  Michael's advice that the money was coming and I was getting in

```
  1    cash trouble, was having trouble paying the bills.
  2    Q    And then if you look at the line right above 537, the
  3    defendant texted you back.  Do you see that?
  4    A    I do.
03:36PM 5    Q    What did defendant text you back?
  6    A    He said, "Let's chat today.  I'm sure it will be
  7    resolved."
  8    Q    And what did you understand defendant to mean when he
  9    says "it will be resolved"?
03:36PM 10   A    I was assuming the collection of the $1.6 million from
  11   Brock.
  12   Q    Did you talk to him at that point?  He said, "Let's
  13   chat."  Would you have talked to him?
  14   A    No, I don't recall.  I recall a lot, so I couldn't tell
03:37PM 15   you if I did or didn't at this point.
  16   Q    In or around that time?
  17   A    Oh, I'm sure.  I would call daily.
  18   Q    And if you look two lines up, on March 19th, line 535.
  19   A    Yes.
03:37PM 20   Q    You say:
  21            "Good morning, Michael.  I'm going to be
  22        sending you an e-mail in a moment with a couple
  23        meetings we need to set up.  We need to talk about
  24        the entity and a few other things as well.  I want
03:37PM 25        to talk to you about the intellectual property and
```

```
 1            review the possibilities.  I've got some input on

 2            that from a few people."

 3                I'm going to stop there for a second.  Does that

 4       relate to your new business entity?

03:37PM  5   A    It does.

 6   Q    The rest of the text message says:

 7                "Also want to make sure we're aggressive with

 8            Brock this week.  Let me know if you hear anything.

 9            Thanks."

03:38PM 10                What do you mean when you say you want to make sure

11       "we're aggressive with Brock"?

12   A    In collecting the $1.6 million.  So we need to be

13       aggressive.

14   Q    At this time when you're talking to the defendant, you're

03:38PM 15   sending these text messages, and I think you said you called

16       him a lot.  Did you talk to him on occasion?

17   A    I did.

18   Q    What did he tell you he was doing to try and find out

19       what was going on with Brock?

03:38PM 20                MR. AVENATTI:  Objection.  Foundation, Your Honor,

21       as to time.

22                THE COURT:  Overruled.

23                THE WITNESS:  I was calling and I would speak to

24       him, and he said, you know -- and I don't know which time was

03:39PM 25   which, but basically that he was going to work on collecting
```

```
         1   the money one way or another and we possibly might have to go

         2   back to federal court or state court or arbitration or the

         3   mediator.  I wasn't sure which one or which direction he was

         4   going to go.  But he led me to believe at that point in time we

03:39PM   5   had to take action.

         6   Q    BY MR. SAGEL:  Did he ever tell you who he was talking to

         7   to try and find out what was going on with Brock?

         8                MR. AVENATTI:  Objection.  Leading.

         9                THE COURT:  Overruled.

03:39PM  10                THE WITNESS:  Well, he said -- at one point he said

        11   Ahmed was going to be working on -- Ahmed, one of the attorneys

        12   at Eagan Avenatti, was going to be working on it.

        13   Q    BY MR. SAGEL:  Did the defendant say if he, the

        14   defendant, spoke to anybody about enforcing the Brock matter?

03:39PM  15                MR. AVENATTI:  Leading.

        16                THE COURT:  Overruled.

        17                THE WITNESS:  Yes, he did.  He said that he had

        18   spoken with David Schack (phonetic), who was the counsel for

        19   Brock that handled the settlement agreement on their side, and

03:40PM  20   said he's not sure why they haven't made their payment.  He

        21   didn't understand it.

        22   Q    Who said he didn't understand it?

        23   A    David Schack, according to Michael, Mr. Avenatti.

        24   Q    And if we were to look at these text messages -- we can

03:40PM  25   look at these text messages in March -- and we're going to go
```

```
        1    through a lot, but there's a lot more text messages from you to

        2    the defendant than back to you; is that correct?

        3              MR. AVENATTI:  Objection.  Lacks foundation,

        4    Your Honor.

03:40PM 5              THE COURT:  Overruled.

        6              THE WITNESS:  Yes, there's a ton.

        7    Q    BY MR. SAGEL:  Did defendant just ignore you?

        8    A    No.

        9    Q    Did you talk to the defendant?

03:40PM 10   A    Yes.

        11   Q    And after you would send him these text messages, how

        12   would you communicate with him?

        13   A    I would call, text, e-mail.

        14   Q    And then how would he get back to you?

03:41PM 15   A    Usually would take him some time, and I would primarily

        16   only get small little responses.  "Got to look into it," those

        17   types of things.

        18   Q    And did you talk to him over the phone?

        19   A    Then I would talk to him over the phone more than

03:41PM 20   anything -- you kind of called him a lot.

        21   Q    When you talked to the defendant about what you were

        22   going to be doing to be aggressive with Brock, for example, did

        23   you suggest any ideas to the defendant on what you should do?

        24   A    No.  I asked what our options were, and I was waiting for

03:41PM 25   them to make a recommendation on how we could collect.
```

Q    And at any point when you were asking for these options,
did defendant tell you, "There's no options to take because
we've already gotten the money"?

MR. AVENATTI:  Objection, Your Honor.  403.

03:42PM    THE COURT:  Overruled.

THE WITNESS:  No.

Q    BY MR. SAGEL:  If I could have you look at line 530,
which is on page 41.  On March 22nd, do you see that?

A    Yes, I do.  1:19.

03:42PM    Q    Correct.  March 22nd, 2018, you sent defendant a text
message, and it says, "Good evening, Michael.  Any word on
Brock?"

What is the "word on Brock" that you're asking for?

A    The collection of the $1.6 million.

03:42PM    Q    And if you look up to line 525, the following day, on
March 23rd, what did you text the defendant the following day?

A    I said:

"I know you're busy, but checking in on

Brock.  Did they step up with the transfer?  If

03:42PM    not, what are we doing next?  Hope all is well.

Thanks, Michael."

Q    Does this relate to the 1.6 million still?

A    Yes.

Q    When you say "what we're going to do next," is that about

03:43PM    the options you were going to have to take, potential options?

```
          1    A    That is correct.
          2    Q    And then if you can look up on page 41 to the top of the
          3    page, there's a series of text messages on March 24th that you
          4    sent to the defendant and then he replies.  Do you see those?
03:43PM   5    It starts on line 521 and goes -- let's start from 521 to 518.
          6    A    Yes.
          7    Q    You send three texts in a row, starting at 521 and the
          8    two above that.  Can you read what you sent to the defendant.
          9    A    521, it says, "We need to talk.  Let me know what works."
03:44PM  10    Q    And then the one above it?
         11    A    The next one --
         12    Q    520.
         13    A    Oh 520, yeah.  "Need help."
         14    Q    The one above it, 519, the next one you sent to the
03:44PM  15    defendant?
         16    A    "I'm going to be in big shit in the next ten days."
         17    Q    When you say you need help and you're going to have these
         18    issues in the next ten days, what are you referring to?
         19    A    I'm referring to all the debt I incurred trying to build
03:44PM  20    the business waiting for the 1.6 million.
         21    Q    And what did the defendant reply to you on line 518?
         22    A    He said "Okay."
         23    Q    And then you sent him another text message right above
         24    that, "Can I call you tomorrow?  I am so worried."
03:44PM  25    A    Yes.
```

```
 1   Q    And then if you look at the bottom of page 40, right
 2   after that on line 516, you sent another message to defendant,
 3   saying, "Meaning, I'm going to be in big shit.  I am very
 4   worried."  Do you see that?
 5   A    I do.
 6   Q    And then on line 515, defendant texted you back.  Do you
 7   see that?
 8   A    I do.
 9   Q    What did defendant text you back after you told him how
10   worried you were?
11   A    "Greg, don't worry.  Let's chat tomorrow" -- T-m-r-w
12        which I believe stands for "tomorrow" -- "we will
13        figure this out.  Michael."
14   Q    Did you talk to the defendant?
15   A    I'm sure I did.
16   Q    Was the figuring it out to tell you that Brock had paid
17   two months earlier?
18             MR. AVENATTI:  Objection.  403.  Leading,
19   Your Honor.
20             THE COURT:  Sustained.
21   Q    BY MR. SAGEL:  What was the defendant's figuring it out
22   that he talked to you about?
23             MR. AVENATTI:  Speculation.  Conjecture, Your Honor.
24             THE COURT:  Overruled.
25             THE WITNESS:  Figure out how we're going to collect
```

```
         1    the money from Brock.
         2    Q    BY MR. SAGEL:  These messages are in late March 2018 --
         3    these messages were March 24, 2018.  At this time when you're
         4    talking to the defendant, did he tell you that he had spent all
03:46PM   5    but $600 of the $1.6 million he received from Brock?
         6    A    He did not.
         7    Q    Would you have wanted to know that?
         8    A    Absolutely.
         9    Q    Why?
03:46PM  10    A    Because I needed my money.  It was my money.
        11    Q    If you could look at Exhibit 203, please.  Do you have
        12    Exhibit 203 in front of you?
        13    A    I do.
        14    Q    Is this an e-mail that you sent to the defendant?
03:47PM  15    A    It is.
        16    Q    Is it a true and accurate copy of an e-mail you sent to
        17    defendant?
        18    A    It is.
        19          MR. SAGEL:  Government moves to admit Exhibit 203,
03:47PM  20    Your Honor.
        21          MR. AVENATTI:  Objection.  Hearsay, Your Honor.
        22          THE COURT:  What's the exception?
        23          MR. SAGEL:  It's a notice to the defendant and --
        24    notice to the defendant.
03:48PM  25          THE COURT:  Okay.  It will be received for notice.
```

```
 1              (Exhibit Number 203 received.)

 2    Q    BY MR. SAGEL:  Mr. Barela, did you send this to defendant

 3    on April 2nd, 2018?

 4    A    I did.

 5    Q    After "Hi, Michael," can you read the first two sentences

 6    to the defendant.

 7    A    "Thanks again for taking the time to meet.  I

 8         talked with Tallie, my wife, and if we could get

 9         112,000, that would be best, if possible, in the

10         next 60 days."

11    Q    Read that next short sentence.

12    A    "But whatever you can do is great.  I am putting another

13    8,000" --

14    Q    I'm going to have you stop right there and ask you a

15    question.

16    A    Yes.

17    Q    When you said, "Thanks again for taking the time to meet"

18    and then you talk about this money over the next 60 days, did

19    you have a meeting with the defendant about needing money?

20    A    I did.

21    Q    And what did he tell you during that meeting?

22    A    Told me to find out what I needed and he could advance me

23    some funds.

24    Q    When you say he told you he could advance you some funds,

25    what did he tell you he did -- how did he explain that as
```

81

```
        1    advancing you funds?

        2    A     He said he would give me money out of his pocket for what

        3    I needed at that time.

        4    Q     Was it a loan?

03:49PM  5    A     An advance.

        6    Q     And what did you understand him to mean when he said it

        7    was an advance?

        8    A     An advance towards future collections of the 1.6 million

        9    from Brock.

03:49PM 10    Q     And if you look down under the "to dos" -- I'm skipping

       11    past some of the e-mail, but you list wire information for

       12    Waypoint PPG, LLC.  Do you see that?

       13    A     I do.

       14    Q     What is Waypoint PPG, LLC?

03:49PM 15    A     It was one of my consulting businesses at the time.

       16    Q     And why are you providing wire information to defendant

       17    for Waypoint PPG?

       18    A     He told me to provide the wire information for my account

       19    so he could get me an advance.

03:50PM 20    Q     When he told you it was an advance for future collection

       21    of the $1.6 million, did you know at that time he had received

       22    the $1.6 million?

       23              MR. AVENATTI:  Objection.  Misstates the evidence.

       24    Leading.

03:50PM 25              THE COURT:  Overruled.
```

**UNITED STATES DISTRICT COURT**

```
 1              THE WITNESS:  No.
 2              THE COURT:  Mr. Avenatti, it may be repetitive, but
 3     it's the custom in federal court to rise when you make an
 4     objection.
 5              MR. AVENATTI:  Your Honor, I apologize.  I was just
 6     trying to not delay things.  No problem.  I'm aware of the
 7     custom, Your Honor.  I'll follow it.
 8     Q    BY MR. SAGEL:  If you could look at Exhibit -- let me ask
 9     you one final question on this.
10              When you provided the defendant with your wire
11     instructions, had he already agreed to send you money?
12     A    Yes.
13     Q    If I could have you look back now at Exhibit 176.  And I
14     apologize, it's much easier for me because I have it loose.  So
15     I understand you have to keep going back and forth in the
16     binder.  And if you could look at page 39.
17              If you were to look at lines 490 to 487 -- well, let
18     me start with 490 and 489.  Do you see those?
19     A    Yes.  Yes.
20     Q    Those are both on April 3rd, 2018, the same -- both
21     April 3rd, 2018?
22     A    Yes.
23     Q    And their UTC time -- I'm not asking you to know that,
24     but -- so what are you saying in these two e-mails at line
25     490 -- I'm sorry, text messages -- 490 and 489?
```

```
 1   A    490 says, "Good evening.  Sent you an e-mail.  Things are
 2   progressing quickly.  Are" -- I said are -- "word from Brock?"
 3   Q    Did you mean "Any word from Brock?"
 4   A    Yes.
 5   Q    What do you mean when -- "Any word from Brock?"
 6   A    If they had paid the settlement yet.
 7   Q    And then your next text message a couple hours later, you
 8   say,?
 9          "Thanks again for the call.  Whatever you can
10          do is so appreciated.  It is going back into the
11          business and I am so happy to have you as part of
12          us.  G."
13          What did you mean when you said, "Whatever you can
14   do is so appreciated"?
15   A    I was thanking him for the offer of the advance.
16   Q    And when you told him "It is going back into the business
17   and I am so happy to have you as part of us," what did you mean
18   by that?
19   A    The money that we were receiving was going to go back to
20   pay credit cards, which was going to go back into the Quix
21   Supply business.  That was for Michael being part of the team,
22   for his percentage of the equity.
23   Q    And after you thanked defendant and told him how
24   appreciative you are, did defendant reply by text message in
25   488?
```

84

```
         1    A    Yes, he did.

         2    Q    And what did defendant say?

         3    A    "All good.  No worries."

         4    Q    If you were to look at line 481, which is on page 38 --
03:54PM   5    I'm sorry, let's start with 483 to 481.  These are April 4th

         6    text messages.

         7    A    What page?  I'm sorry.

         8    Q    Page 38.

         9    A    Page 38.  Which one?
03:54PM  10    Q    Start at the very bottom.  483.

        11    A    Yep.

        12    Q    You sent a text message to defendant on April 4th; is

        13    that correct?

        14    A    Yes.  4/4.
03:54PM  15    Q    I'll read yours.  It says:

        16              "Last note for the day.  Are you able to wire

        17         me any amount, if at all?  I am trying to keep

        18         things moving best as as possible.  I will have a

        19         update e-mail to you in two days and will try only
03:54PM  20         to hit you up every three days as needed in e-mail.

        21         I feel bad to bother you with as busy as you are.

        22         Thanks, Michael."

        23              When you're asking about the "wire any amount, if at

        24    all," is that regarding the advance you discussed?
03:55PM  25    A    Yes.
```

**UNITED STATES DISTRICT COURT**

1    Q    And what did defendant reply to you in line 482?

2    A    Line 482 says, "I can probably send a wire tomorrow."

3    T-m-r-w.

4    Q    And then what did you say in reply to the defendant?

03:55PM 5    A    I said, "Thank you, and sorry to trouble you."

6    Q    And why are you apologizing to the defendant?

7    A    Because he's advancing me money on -- money/funds that I

8    believe we didn't receive.

9    Q    If I could have you look at Exhibit 204.  204, an e-mail

03:55PM 10   that you sent to the defendant on April 5th, 2018.

11   A    I see it.

12   Q    And is it an e-mail that you sent to defendant on

13   April 5th, 2018?

14   A    It is.

03:56PM 15   Q    Is it a true and accurate copy of the e-mail you sent to

16   the defendant?

17   A    It is.

18        MR. SAGEL:  At this time, Your Honor, the Government

19   moves to admit Exhibit 204.

03:56PM 20        MR. AVENATTI:  Objection, Your Honor.  Hearsay.

21        THE COURT:  It will be received for notice.

22   Overruled.

23        **(Exhibit Number 204 received.)**

24   Q    BY MR. SAGEL:  Can you read the body of the e-mail after

03:56PM 25   "Michael."

```
 1   A      "I made commitments after our meeting on Saturday
 2          and committing 50K that Monday or Tuesday.  I am
 3          going to be in trouble by Friday.  Please make this
 4          happen today.  I also would like to discuss my
03:56PM 5   options for the collection on Brock."
 6   Q      And when you say, "Please make this happen today," what
 7   are you referring to?
 8   A      The advance.
 9   Q      And when you say to the defendant "I would also like to
03:56PM 10  discuss my options for collections on Brock," what did you mean
11   there?
12   A      Collecting the $1.6 million, what we were going to do
13   next.
14   Q      And then you provide your wire information for Waypoint
03:57PM 15  again; is that correct?
16   A      That is correct.
17   Q      Can you look at Exhibit 235, please.
18   A      Must be in a different book.
19   Q      It's probably in the next volume.
03:57PM 20  A      What was it again?
21   Q      235.
22   A      Okay.  235.
23   Q      And there are five pages here.  Can you look through the
24   five pages.  And are these various bank records of yours that
03:58PM 25  you provided to the Government?
```

UNITED STATES DISTRICT COURT

```
  1   A    They are.

  2   Q    Are they true and accurate copies of your bank records

  3   for your various accounts that you provided to the Government?

  4   A    They are.

  5   Q    And do they reflect the advances that defendant provided

  6   to you to your bank accounts?

  7   A    Yes.

  8             MR. SAGEL:  At this time, Your Honor, the Government

  9   moves to admit 235.

 10             MR. AVENATTI:  Objection, Your Honor.  Hearsay.  No

 11   custodial declaration.

 12             MR. SAGEL:  They're his bank records.

 13             THE COURT:  There's testimony sufficient to

 14   authenticate.  It will be received.  Objection is overruled.

 15             (Exhibit Number 235 received.)

 16   Q    BY MR. SAGEL:  Let's start with page 1.  Do you see on

 17   the right side there's -- we can start on the top left.  Is

 18   this the Waypoint PPG account at Bank of America?

 19   A    Yes, it is.

 20   Q    And this is the account that you had provided to

 21   defendant to send the April wire?

 22             MR. AVENATTI:  Leading.  Objection, Your Honor.

 23   Leading.

 24             THE COURT:  Overruled.

 25             THE WITNESS:  Yes.
```

03:58PM (line 5)
03:58PM (line 10)
03:59PM (line 15)
03:59PM (line 20)
03:59PM (line 25)

```
   1   Q    BY MR. SAGEL:  And then if you were to look on the right

   2   side, there's a date.  What's the date of this wire?

   3   A    4/5/18.

   4   Q    And if you were to look slightly down in the middle

03:59PM 5   section, it says the amount of the wire.  How much did the

   6   defendant -- how much was this wire for?

   7   A    $60,000.

   8   Q    Who sent you the $60,000 wire into the Waypoint PPG, LLC,

   9   account?

04:00PM 10   A    It was directed by Michael Avenatti.  I'm not sure who

  11   pushed the...

  12        MR. AVENATTI:  Objection, Your Honor.  Lacks

  13   foundation as to the answer.

  14        THE COURT:  Overruled.

04:00PM 15   Q    BY MR. SAGEL:  Who told you they would be wiring this

  16   money into your account?

  17   A    Mr. Avenatti.

  18   Q    And what was the purpose for this wire into your

  19   Waypoint PPG account?

04:00PM 20   A    It was an advance towards the $1.6 million.

  21   Q    When defendant told you he would wire $60,000 on

  22   April 5th, 2018, into your Waypoint PPG account, did he tell

  23   you that this money was coming from Michelle Phan's settlement

  24   money?

04:00PM 25        MR. AVENATTI:  Objection, Your Honor.  Lacks
```

```
 1    foundation.

 2              THE COURT:  Overruled.

 3              THE WITNESS:  He did not.

 4    Q    BY MR. SAGEL:  When the defendant sent you this money in

 5    April 2018, did he tell you that it would come from another

 6    client's settlement amount?

 7              MR. AVENATTI:  Same objection, Your Honor.  403.

 8              THE COURT:  Overruled.

 9              THE WITNESS:  He did not.

10    Q    BY MR. SAGEL:  Now I'm going to send you back to

11    Exhibit 176, which is a different binder, in the text messages.

12    A    176.

13    Q    Back to page 38, line 479.  Do you see that?

14    A    I do.

15    Q    And that text message from you to the defendant is on

16    April 5th, 2018, the same date as that wire; is that correct?

17    A    That is correct.

18    Q    And what did you say to the defendant in that text?

19    A    "Thanks so much.  Wire received."

20    Q    And then if you go up to line 477, do you text defendant

21    again?

22    A    I did.

23    Q    You said:

24              "What you did today was a big deal for me.

25         Just wanted to say thank you again.  Good luck with
```

04:00PM (line 5)
04:01PM (line 10)
04:01PM (line 15)
04:02PM (line 20)
04:02PM (line 25)

1      your current project.  I can keep moving and it is

2      for the whole team.  Thanks for coming through,

3      Michael.  I look forward to getting you up to speed

4      this weekend if you have time.  G."

04:02PM  5          Why are you thanking the defendant for what he did

6  for you?

7  A    Because he was advancing me money out of pocket towards

8  the settlement that we -- I believed we had received of

9  $1.6 million.

04:03PM 10  Q    Why did you tell him it was a big deal to you?

11  A    Because it was a big deal, because it kept my businesses

12  floating and paid my personal bills.

13  Q    At this time when he's advancing you this money, are you

14  still having discussions with him about taking actions against

04:03PM 15  Brock?

16  A    Yes.

17  Q    Did defendant say he was doing anything to reach out to

18  Brock or to enforce the settlement?

19  A    Yes.

04:03PM 20  Q    What was he telling you he was doing?

21  A    It was different things at different times.  Sometimes it

22  was Ahmed was working on it.  Sometimes we're still looking

23  into options.

24  Q    At this time or soon thereafter, did you ever have a

04:04PM 25  discussion with defendant about possibly selling your interest

|     |     |
| --- | --- |
| 1 | in your settlement agreement? |
| 2 | MR. AVENATTI:  Objection.  Leading. |
| 3 | THE COURT:  Overruled. |
| 4 | THE WITNESS:  Yes, I did. |
| 04:04PM 5 | Q    BY MR. SAGEL:  What -- let's start with, what did you say |
| 6 | to the defendant? |
| 7 | MR. AVENATTI:  Objection.  Hearsay, Your Honor. |
| 8 | Calls for hearsay. |
| 9 | THE COURT:  It will be received for notice. |
| 04:04PM 10 | Q    BY MR. SAGEL:  You can answer.  What did you tell the |
| 11 | defendant about your idea to sell your interest in the |
| 12 | settlement agreement? |
| 13 | A    I found a party that was willing to buy my settlement |
| 14 | agreement for a reduced amount, which I was willing to do at |
| 04:04PM 15 | the time because I was becoming desperate for the funds. |
| 16 | Q    What did defendant tell you when you told him you were |
| 17 | interested in selling your interest in it? |
| 18 | A    He told me, no, it's a bad idea.  It's going to hurt the |
| 19 | opportunities -- you know, future opportunities for Quix |
| 04:04PM 20 | Supply, and it's not a good deal, and he could help me out and |
| 21 | find the money for me. |
| 22 | Q    What, if anything, did he tell you about the |
| 23 | confidentiality of the agreement? |
| 24 | MR. AVENATTI:  Objection.  Leading. |
| 04:05PM 25 | THE COURT:  Overruled. |

UNITED STATES DISTRICT COURT

```
 1              THE WITNESS:  I don't understand the question.
 2   Q    BY MR. SAGEL:  As it relates to you selling your
 3   settlement agreement, what, if anything, did he say to you
 4   about the confidentiality of the agreement?
 5   A    We had confidential clauses in there, that if I shared the
 6   data, it could jeopardize $100,000 each occurrence.
 7   Q    And how did that relate to your attempt to sell the
 8   settlement agreement or the discussions you had?
 9   A    The other party wanted to see the agreements.
10   Q    And did the defendant tell you whether or not that would
11   be permissible?
12   A    It's not permissible.
13   Q    And who told you that?
14   A    Mr. Avenatti.
15   Q    If I could have you look at Exhibit 206.  Do you see
16   Exhibit 206?
17   A    Yes, I do.
18   Q    Is this an e-mail chain between you and the defendant?
19   A    Yes.
20   Q    And it looks like approximately four total e-mails, three
21   of which you sent to the defendant and one of which defendant
22   sent to you; is that correct?
23   A    Yes.
24   Q    Is it a true and accurate copy of the e-mail chain
25   between you and the defendant?
```

04:05PM 5
04:05PM 10
04:05PM 15
04:06PM 20
04:06PM 25

```
 1   A    Yes.

 2          MR. SAGEL:  At this time, Your Honor, the Government

 3   moves to admit Exhibit 206.

 4          MR. AVENATTI:  Objection.  Hearsay, Your Honor.

 5          THE COURT:  Mr. Avenatti's e-mails will be received

 6   for the truth.  The others will simply be received for notice;

 7   that is, that Mr. Avenatti received them but not for the truth

 8   of the content.

 9          (Exhibit Number 206 received.)

10          MR. SAGEL:  Thank you, Your Honor.

11   Q    If we could start on page 2.  Do you see page 2?

12   A    Yes.

13   Q    What's the date of the e-mail you sent to the defendant?

14   A    April 15, 2018.

15   Q    What's the subject?

16   A    Subject is "Sunday call."

17   Q    And then there's a long, like, itemization or an outline

18   of things.  Is that fair?

19   A    Correct.

20   Q    Why are you sending this outline of different topics and

21   names, and so forth, to the defendant?

22   A    It's things that we needed to discuss.

23   Q    And at the top part there's a section "Michael Avenatti,

24   old business."  Do you see that?

25   A    I do.
```

```
  1  Q    Can you read the two things that you list under "Michael
  2  Avenatti, old business"?
  3  A    Yeah:
  4            "Number 1, status of Brock?  Number 2, next
04:08PM 5      actions if not collected.  Need a plan as fast as
  6            possible.  250K out of pocket based on settlement.
  7            I am good for 60 days from time of advance on cash
  8            flow now."
  9  Q    So let's start with 1, "status on Brock."  What did you
04:08PM 10 mean when you said to the defendant "status on Brock"?
 11  A    The collection of the 1.6 million.
 12  Q    And Number 2, you said, "next actions if not collected."
 13  What did you mean when you said to the defendant "next actions
 14  if not collected"?
04:08PM 15 A    What steps we were taking to collect the money.
 16  Q    When you said "250K out of pocket based on settlement,"
 17  why are you saying that to the defendant?
 18  A    Because he encouraged me to use my resources that I had to
 19  build the business, and we were just -- I was spending money to
04:08PM 20 get things going and nothing was happening on the collection.
 21  Q    And then when you said, "I am good for 60 days," it says
 22  "form" time.  Is that "from time"?
 23  A    Correct.
 24  Q    "From time of advance on cash flow now."
04:09PM 25           Are you saying you're good -- why are you saying
```

1    you're good for 60 days from time of advance on April 15th?

2    A    Because that's how long I could make on what I have.

3    Q    And what you have, is that based on the advance that

4    defendant gave you?

04:09PM 5    A    That's correct.

6    Q    Now, if you look at page 1, at the very bottom, it

7    appears the next day you reply to the same e-mail and you ask

8    defendant, "When is a good time to call tomorrow?"  Is that

9    correct?

04:09PM 10   A    Yes.

11   Q    And defendant replies to you -- what does defendant reply

12   right above it, in the middle of page 1?

13   A    It says, "Morning, Greg.  I can chat this a.m. around 8:00

14   your time.  Good?"

04:09PM 15   Q    Now, you provided this list to the defendant, and I only

16   went over one portion of the list.  Did you have a phone call

17   with defendant after these e-mails to go over this list?

18   A    I believe so, yes.

19   Q    And do you see the e-mail at the top that's about six

04:10PM 20   days later?  Do you see that?

21   A    Yes.

22   Q    Now, when you sent these lists to the defendant and you

23   had phone calls, would you go through these lists?

24   A    Yes.

04:10PM 25   Q    And at any time -- well, let me ask specifically.

**UNITED STATES DISTRICT COURT**

```
            1            Some of the things on the list included what we just

            2   went over, the "status on Brock" and "next actions if not

            3   collected."  Did you discuss that with the defendant when you

            4   talked to him?

04:10PM     5   A     Yes.

            6   Q     And in any of those phone calls, when you're going over

            7   these items with him, did he ever tell you that Brock had paid

            8   in January of 2018?

            9            MR. AVENATTI:  Objection.  Lacks foundation,

04:10PM    10   Your Honor.  403.

           11            THE COURT:  Overruled.

           12            THE WITNESS:  No.

           13   Q     BY MR. SAGEL:  And then looking at the top e-mail on

           14   page 1, that's -- what's the date of that e-mail to defendant?

04:11PM    15   A     Sunday, April 22nd, 2018, 3:15 p.m.

           16   Q     And you said:

           17            "Hi, Michael.  I know how busy you were last

           18            week and figured I would wait till the weekend to

           19            check in.  I have four things to check in on."

04:11PM    20            Did I read that right?

           21   A     Yes, you did.

           22   Q     Can you read the first two things that you wrote to the

           23   defendant.

           24   A     Yes.  "Number 1, did Brock respond?  Number 2, next action

04:11PM    25   if not."
```

UNITED STATES DISTRICT COURT

```
 1   Q    Prior to you asking the defendant "did Brock respond,"

 2   did defendant tell you he would be doing anything?

 3   A    Yes.

 4   Q    What did he tell you he was going to do?

 5   A    He was going to go after them and collect the money, and

 6   we were going to go -- again, it was always either state court

 7   or federal court or an arbitrator.

 8   Q    And why are you asking if Brock responded?

 9   A    Because supposedly we had sent something out to collect

10   money.  I can't tell you what it was.

11   Q    And who told you that you were sending something out to

12   collect the money?

13   A    Michael.  Mr. Avenatti, excuse me.

14   Q    That last e-mail, I think you said, was April 22nd?

15   A    Yes.

16   Q    If you could turn back to Exhibit 176, page 37, and

17   line 461 and 460.  Do you see those two text messages you sent

18   to the defendant?

19   A    What number again?  I'm sorry.

20   Q    461 and 460.

21   A    Okay.  461 and 460.  Yes.

22   Q    Do you see those two text messages you sent to defendant

23   on April 25th and April 26th?

24   A    I do.

25   Q    You sent defendant the first one:  "Any word from Brock
```

**UNITED STATES DISTRICT COURT**

1   today?  G."

2       And then the next text you sent to defendant is, "I

3   know you're so busy, but wanted to check in and see if Brock

4   responded."

04:13PM 5       Are these the same questions you were asking him

6   over the phone and in the e-mail we just discussed?

7       MR. AVENATTI:  Objection.  Leading.

8       THE COURT:  Overruled.

9       THE WITNESS:  Yes, they are.

04:14PM 10  Q   BY MR. SAGEL:  At any point when you're asking about the

11  next actions to take, did he ever tell you there are no actions

12  to take?

13  A   No.

14  Q   In both -- the e-mail we just read, you started off:  "I

04:14PM 15  know how busy you were last week."

16       And then in your text message you said:  "I know

17  you're so busy."  And we see that in several of your e-mails

18  and texts.

19       Why are you starting off your messages to the

04:14PM 20  defendant about how busy he is?

21  A   It's because when he was on TV a lot and he was very busy

22  going around, and every time I called I was starting to

23  irritate him.

24  Q   How did you know you were starting to irritate him?

04:15PM 25  A   Because he would tell me so.

```
 1   Q    If I could have you look at Exhibit 207.  Do you see
 2   Exhibit 207?
 3   A    Yes, I do.
 4   Q    Is this an e-mail that you sent to the defendant on
 5   May 7th, 2018?
 6   A    Yes, it is.
 7   Q    Is it a fair and accurate copy of an e-mail you sent to
 8   defendant on May 7, 2018?
 9   A    It is.
10         MR. SAGEL:  At this time, Your Honor, the Government
11   moves to admit Exhibit 207.
12         MR. AVENATTI:  Objection, Your Honor.  Hearsay.
13         THE COURT:  207 will be received for notice only.
14         (Exhibit Number 207 received.)
15   Q    BY MR. SAGEL:  At the top of the e-mail, what's the
16   subject line?
17   A    "Action list."
18   Q    And then you say:  "Hi Michael, here is the short list."
19         Why are you providing this list to defendant in this
20   e-mail?
21   A    Because my list never changes, but I try and put the stuff
22   on the top in case he's busy so he could get it quickly.
23   Q    And the first thing on the top of your list is what?
24   A    "Brock next action."
25   Q    And then if I skip you all the way down to basically the
```

04:15PM (line 5)
04:15PM (line 10)
04:16PM (line 15)
04:16PM (line 20)
04:16PM (line 25)

bottom of the e-mail, what's the last sentence of that kind of

paragraph?

A    "If Brock does not pay soon, I may need a little help in

the next two weeks."

04:16PM 5  Q    What did you mean when you said, "If Brock does not pay

soon, I may need a little help in the next two weeks"?

A    I was asking for another advance because we hadn't

collected the $1.6 million, I believe.

Q    And at the top, when you say "Brock next action," this is

04:17PM 10  May of 2018.  Why are you asking about Brock next action in May

of 2018?

MR. AVENATTI:  Objection, Your Honor.  403.

THE COURT:  Overruled.

THE WITNESS:  Because supposedly we had not

04:17PM 15  collected the money.

Q    BY MR. SAGEL:  And who told you that?

A    Mr. Avenatti.

Q    Now, if I could have you look at Exhibit 208.

A    Yes.

04:17PM 20  Q    Is that an e-mail you sent to the defendant approximately

eight days later, on May 15, 2018?

A    Yes.

Q    Is it a true and accurate copy of an e-mail you sent to

defendant on May 15, 2018?

04:17PM 25  A    It is.

1          MR. SAGEL:  At this time, Your Honor, the Government

2   moves to admit Exhibit 208.

3          MR. AVENATTI:  Objection, Your Honor.  Hearsay.

4          THE COURT:  It will be received for notice only,

04:18PM  5   ladies and gentlemen.

6          **(Exhibit Number 208 received.)**

7   Q    BY MR. SAGEL:  What's the subject line of this e-mail

8   that you sent to defendant?

9   A    "Let's talk as soon as you can."

04:18PM 10          THE COURT:  Wait a minute.

11          Excuse me.  Go ahead.

12   Q    BY MR. SAGEL:  You then say:

13          "Michael" -- and I'm going to break this into

14          parts, so I'll read it part by part -- "I will be

04:18PM 15          quick with my message because I know you are on a

16          crazy schedule.  I do need to figure out how to

17          proceed on many fronts, and I am losing credibility

18          with my team and wife."

19          What did you mean when you said you needed to figure

04:19PM 20   out how to proceed on many fronts?

21   A    There didn't seem to be any work being done on anything

22   that I needed help with.  So my team was telling me and my wife

23   that something was going on, but I continued to ask Michael for

24   help.

04:19PM 25   Q    And when you wanted to figure out things on many fronts,

**UNITED STATES DISTRICT COURT**

```
 1    did that also include the Brock settlement money?

 2              MR. AVENATTI:  Objection.  Leading.

 3              THE COURT:  Overruled.

 4              THE WITNESS:  Yes.

 5    Q    BY MR. SAGEL:  "As discussed, I thought and planned on us

 6    having collected the Brock settlement in May."

 7              I'll start with when you say "as discussed," who

 8    were you discussing it with?

 9    A    Mr. Avenatti.

10    Q    And when you said you thought you'd have the Brock

11    settlement collected in May, why did you say "in May"?

12    A    Because that was what my settlement agreement said, that I

13    had in my possession.

14    Q    And this says "May," not March.

15              MR. AVENATTI:  Objection.  Leading.

16              THE COURT:  Overruled.

17    Q    BY MR. SAGEL:  Why did you say May there?

18              MR. AVENATTI:  Asked and answered.

19              THE COURT:  Overruled.

20              THE WITNESS:  Because that's when he said we would

21    probably get it collected.

22    Q    BY MR. SAGEL:  Is that from the settlement agreement or

23    your discussions with the defendant?

24              MR. AVENATTI:  Objection.  Leading.

25              THE COURT:  Overruled.
```

04:19PM (lines 5)
04:19PM (line 10)
04:20PM (line 15)
04:20PM (line 20)
04:20PM (line 25)

```
 1              THE WITNESS:  From my discussions with the client --
 2     I mean with Mr. Avenatti.
 3     Q     BY MR. SAGEL:  Then it says:
 4              "So I am in a bad position now.  I do
04:20PM  5          appreciate the advance, but I'm going to be in
 6          trouble on the 1st of June."
 7              When you say "I appreciate the advance," are you
 8     referring to the April wire we talked about?
 9     A     Yes.
04:20PM 10     Q     And when you talk about the trouble on the 1st of June,
11     what are you referring to there?
12     A     I actually wasn't going to be able to pay rent.
13     Q     And then you said, "I made commitments based on the
14     settlement date."
04:21PM 15              What did you mean by that?
16     A     I made commitments for my business and paying back some of
17     the loans that I took, plus I had personal debt I needed to
18     manage.
19     Q     And then there's a section below -- actually, before we
04:21PM 20     get there, it says:
21              "I am funding both business and holding on by
22          a shoestring.  Please let me know where we are with
23          the following."
24              And then there's a category called "Brock."  Do you
04:21PM 25     see that?
```

```
          1    A     Yes.

          2    Q     What did you say, the two things under "Brock"?

          3    A     "Number 1, did Brock respond or pay?  Number 2, if no,

          4    what are we filing this week?"

04:22PM   5    Q     If I could have you look at Exhibit 210, please.  Do you

          6    have Exhibit 210 in front of you?

          7    A     I do.

          8    Q     Is this a e-mail chain between you and the defendant?

          9    A     It is.

04:22PM  10    Q     And with Judy Regnier on at least two of the e-mails as

         11    well?

         12    A     Yes.

         13    Q     And two of the e-mails you sent and one of the e-mails

         14    you received from the defendant; is that correct?

04:22PM  15    A     That is correct.

         16    Q     Is this a fair and accurate copy of the e-mail chain

         17    including you and the defendant?

         18    A     It is.

         19            MR. SAGEL:  Government moves to admit Exhibit 210.

04:22PM  20            MR. AVENATTI:  Your Honor, hearsay.  Objection.

         21            THE COURT:  Overruled.  Mr. Avenatti's e-mails will

         22    be received for the truth, the others simply for notice that

         23    Mr. Avenatti received them, not for the truth of the content.

         24            (Exhibit Number 210 received.)

04:23PM  25    Q     BY MR. SAGEL:  Go to the bottom of page 1.  Is that an
```

```
      1    e-mail that you sent to defendant on May 22nd, 2018?

      2    A     It is.

      3    Q     And you say:

      4          "Hi Michael.  I will be putting an e-mail

04:23PM 5          together on our meeting to follow up.  But I wanted

      6          to give you new wire instructions for 60K."

      7          Do you see that?

      8    A     I do.

      9    Q     Did you have a discussion with defendant about receiving

04:23PM 10   a further advance?

     11    A     Yes.

     12    Q     What did defendant tell you?

     13    A     Said for me to figure out what I needed and he would

     14    provide me an advance.

04:23PM 15   Q     And when he told you he would provide you an advance,

     16    what did you understand the advance was?

     17    A     An advance on the $1.6 million that we hadn't collected

     18    from Brock.

     19    Q     And in reply to the e-mail that you sent to defendant,

04:24PM 20   the wire instructions for the 60K, did defendant reply to you

     21    on that same day of May 22nd?

     22    A     Yes.

     23    Q     What did he say?

     24    A     "Got it.  Thanks."

04:24PM 25   Q     And then if you look at the top of the page, three days
```

```
     1   later, on May 25th, did you send another e-mail to defendant?

     2   A    Yes.

     3   Q    And what did you say to the defendant on May 25th?

     4   A    "Hi Michael, wanted to confirm we are good for a wire?

04:24PM 5   Need to issue payments tomorrow.  Thanks."

     6   Q    And to try and save you from going to a different binder,

     7   I'll see if I can do it on the screen.

     8               MR. SAGEL:  If we can pull up Exhibit 235, page 2.

     9   Q    Did you receive a wire on May 25th, 2018?

04:25PM 10  A    Yes.  Yes.

    11   Q    And how much is the wire you received on May 25th, 2018?

    12   A    30,000.

    13   Q    Now, in the e-mail we just looked at in 210, you said:

    14   "I wanted to give you new wire instructions for the 60K."

04:25PM 15               Why did you say "60"K?

    16   A    Because that's what we agreed upon.

    17   Q    And did defendant tell you he would provide you with that

    18   amount?

    19   A    Yes.

04:25PM 20  Q    Why did you only receive 30,000 in this wire transfer on

    21   May 25th, according to Exhibit 235?

    22   A    I'm not sure.

    23   Q    Did you ever ask defendant why it's not the amount that

    24   he told you?

04:25PM 25  A    Yes.
```

**UNITED STATES DISTRICT COURT**

```
 1   Q    And what did he say?

 2   A    He said he's working on the rest.

 3   Q    If I could have you look at Exhibit 214.

 4   A    Okay.

 5   Q    214 is an e-mail chain that is a continuation from the

 6   e-mails we were just looking at; is that correct?

 7   A    That's correct.

 8   Q    It's a true and accurate copy of additional e-mails to

 9   that chain that we -- is this a true and correct copy of the

10   e-mail chain between you, the defendant, and Ms. Regnier?

11   A    It is.

12        MR. SAGEL:  At this time, Your Honor, the Government

13   moves to admit Exhibit 214.

14        MR. AVENATTI:  Objection, Your Honor.  Hearsay.

15        THE COURT:  It will be received for notice only.

16        MR. SAGEL:  And I'd ask, Your Honor, the second

17   e-mail from the top from Ms. Regnier would be an authorized

18   admission of the defendant.  May 25th e-mail at 1:00 p.m.

19        MR. AVENATTI:  Same objection.  Lack of foundation

20   as to that issue, Your Honor.  Hearsay.

21        THE COURT:  It will be received for the truth as an

22   authorized e-mail that is authorized by the defendant.

23        (Exhibit Number 214 received.)

24   Q    BY MR. SAGEL:  Let's start with the e-mail from

25   Ms. Regnier, the second one down.  What's the date of the
```

04:26PM (line 5)
04:27PM (line 10)
04:27PM (line 15)
04:27PM (line 20)
04:28PM (line 25)

```
 1    e-mail from Ms. Regnier to you?

 2    A     Friday, May 25th, 2018.

 3    Q     What does Ms. Regnier say to you?

 4    A     "Greg, the wire was sent to this account.  Attached is the

 5    bank confirmation.  Best, Judy."

 6    Q     And then at the top you reply.  Can you read the first

 7    line in your reply.

 8    A     "Thanks.  Bank said by 6:30.  This is a big help to keep

 9    everything rolling and greatly appreciated."

10    Q     What did you mean when you said, "This is a big help to

11    keep everything rolling and greatly appreciated"?

12    A     Because I believed he was advancing me money out of his

13    pocket to help me keep things rolling on the $1.6 million

14    future payment.

15    Q     Would you have needed these advances to help keep

16    everything rolling if you had received your portion of the

17    settlement money in January 2018 when it came in?

18          MR. AVENATTI:  Objection.  Calls for speculation.

19    403, Your Honor.

20          THE COURT:  Overruled.

21          THE WITNESS:  No.  Of course not.

22          THE COURT:  I think we ought to stop here for the

23    day.

24          You may step down.

25          Tomorrow, ladies and gentlemen, we're going to have
```

**UNITED STATES DISTRICT COURT**

```
 1    to stop at 3:00 o'clock.  So it will be 9:00 to 12:00, 1:30 to

 2    3:00 o'clock.

 3              Please remember the admonition not to discuss the

 4    case with anyone.  You're not to form any opinions on the

 5    issues in the case until it's submitted to you.  And please no

 6    overnight research.

 7              Trust you have a good evening.  We'll see you in the

 8    morning.

 9              THE COURTROOM DEPUTY:  All rise.

10              (Out of the presence of the jury.)

11              THE COURT:  Where it's obvious that the Court is

12    only going to receive an exhibit for limited purpose such as

13    notice, it might be helpful if you make that offer in -- when

14    you move it in.  I think it might necessitate fewer objections.

15    Just a suggestion.

16              MR. SAGEL:  I absolutely will do that.  I'm not sure

17    I agree with the second half, but we'll find that out together.

18              MR. AVENATTI:  Your Honor, I have something I'd like

19    to put on the record as it relates to that exact issue, if I

20    could.

21              THE COURT:  Go ahead.

22              MR. AVENATTI:  Thank you.

23              Does Your Honor have 207 and 208?

24              THE COURT:  Yes.

25              MR. AVENATTI:  I only use these as examples,
```

Your Honor.

THE COURT:  Tell you what.  Why don't you make a written submission.  You'll have a better record.

MR. AVENATTI:  I'm happy to do that, Your Honor. Just as it relates to 207 and 208, I just wanted to point this out.  There's been a number of documents that have come in for notice, for purposes of notice following a hearsay objection. If you look at 207 and 208, these didn't come from the files of Eagan Avenatti or my files.  There's no evidence or foundation that they were ever received by me.  These documents came from the files of Mr. Barela.  That's why his name is in the upper left-hand corner.

So I don't understand what the foundation is as it relates to notice to me.  If they didn't come from my files, how can they be notice, documents under hearsay?  I'm happy to submit something in writing.

THE COURT:  Sir, if that's your point, you've made it.

MR. AVENATTI:  So I would just ask that in the future if there's a hearsay objection, if something's going to come in for notice, there needs to be a showing by the Government that I actually received notice.

THE COURT:  I think the record establishes that they were actually sent to you.  The jury, if it wishes to, can infer that e-mails sent in the normal course are generally

1    received.  Same as lawyers put it in the mailbox are generally

2    assumed received by the designated recipient.

3              MR. AVENATTI:  I understand the Court's response.

4              THE COURT:  Okay.

04:33PM 5            Anything further?

6              MR. SAGEL:  One second, Your Honor.

7              **(Counsel conferred off the record.)**

8              MR. SAGEL:  I am about, I think, 40 percent of the

9    way through my direct, maybe 50.  I'll err on the side of 40.

04:33PM 10   So I think that means I probably have about two hours left.  I

11   just want to get confirmation of the length of the cross so

12   that we know if we need to have a witness here tomorrow.

13              THE COURT:  Okay.

14              MR. AVENATTI:  Your Honor, I'm happy to provide that

04:33PM 15   within the next 10 or 15 minutes after I check -- discuss with

16   Mr. Steward and Ms. Cummings.  So probably, certainly, by

17   5:00 o'clock, if that's okay.

18              THE COURT:  You asked for the next five or ten

19   minutes.  Confer with your advisory counsel and your team and

04:34PM 20   advise Mr. Sagel whether he needs to have a witness here

21   tomorrow.

22              MR. AVENATTI:  Fair enough, Your Honor.

23              I had one other issue I wanted to raise, but I'll

24   wait for Mr. Sagel to finish.

04:34PM 25              MR. SAGEL:  I'm done.

**UNITED STATES DISTRICT COURT**

                    MR. AVENATTI:  All right.  Your Honor, there was a

moment during the examination where Your Honor noted my lack of

standing during the objections.  I apologize to the Court.  I

did not mean any disrespect by that or any lack of decorum.

04:34PM  I'll be sure to stand from here on out.  And so I apologize to

the Court for that.  That was number one.

                    Number two, Your Honor, I raised the issue of

Exhibit 4 for Mr. Marchino's interview prior to the completion

of my cross-examination.  My understanding -- well, I did not

04:34PM  receive the document prior to the end of the cross-examination.

My understanding is, while this examination was going on

relating to Mr. Barela, Ms. Hernandez communicated with the

Government's paralegal, and we were provided a Bates range of

the Marchino documents that the Government referenced.

04:35PM              Can I approach for one minute, Your Honor?

                    THE COURT:  I don't need it.  That's okay.

                    MR. AVENATTI:  Your Honor, the point is, is that we

were referred to an exhibit within this stack of documents that

has Exhibit 4 on it.  This is not the spreadsheet, Your Honor,

04:35PM  that is referenced in the interview.

                    If you look at the interview, the interview notes

are very clear that Mr. Marchino had a spreadsheet relating to

the payment of this million dollars.  And we haven't been

provided that document.  And if we have been provided the

04:35PM  document and I'm wrong -- and it's certainly possible I am

```
 1    wrong, but I don't think I'm wrong --
 2              MR. SAGEL:  He is.
 3              MR. AVENATTI:  -- I'd like -- okay.  Your Honor, I'd
 4    like to speak, if I could, without being interrupted.  I'd like
 5    to be able to --
 6              THE COURT:  Mr. Sagel hasn't interrupted you.
 7              MR. AVENATTI:  Well, he just did.  And I'd also like
 8    to speak without snickering and laughter by the Government
 9    because I don't think it's appropriate, frankly.
10              So as it relates to Exhibit 4, Your Honor, I don't
11    have the spreadsheet.  If I have the spreadsheet, I would just
12    simply like a Bates range for the spreadsheet and we will look
13    it up.  But the paralegals have been looking for this for
14    hours.  We can't find it.
15              THE COURT:  Mr. Sagel, I'd ask you to go through the
16    Marchino production --
17              MR. SAGEL:  We will, and --
18              THE COURT:  -- and if you can identify the exact --
19    exact Bates number range, would you promptly provide it to
20    Mr. Avenatti.
21              MR. SAGEL:  I will, Your Honor.  And it will
22    actually not take probably too much time once I get to my
23    computer and be able to do it.
24              I will point out that time and time again throughout
25    this whole case -- and Mr. Steward can say if I'm saying this
```

wrong -- any time Mr. Steward or his paralegal or anybody has

asked for a document or production, anything of where it would

be, and even many times a reproduction of things that we

provided years and months ago, we do it.  And the first time it

04:37PM 5  was ever asked for this document, the exhibit attached to this

MOI, was at 1:30 today when he was about to start his

examination.  If he had just asked for it and -- when I wasn't

in court, I would have been able to do it.

THE COURT:  When were you given notice that

04:37PM 10  Mr. Marchino -- when did you give notice that Mr. Marchino

would appear as a witness today?

MR. SAGEL:  Thursday.  Mr. Marchino was here all day

Friday waiting to testify.  The first time we provided

Mr. Marchino would be a witness here was for Friday's

04:37PM 15  testimony.  Mr. Marchino -- he's had Marchino on his list since

Thursday evening.

MR. AVENATTI:  Your Honor, I had no way of

predicting that Mr. Marchino would take the stand and actually

testify that the million dollars that he got on June 18 had

04:38PM 20  nothing to do with Gardner or the Phan case.  That's the issue.

That's why I need the spreadsheet.

THE COURT:  Sir, presumably you had the -- if you

were on notice that Mr. Marchino might be called on Friday, one

has to presume that you would have gone to the agent's report

04:38PM 25  and identified any shortcomings or required production that was

1   evident, from your view, from the face of the report.

2          It's really quite troubling to spring this on the

3   Government at the last moment.  The Government has an

4   obligation, but they have -- also have a right, I think, to

04:38PM 5   reasonable notice that you think there is something missing.

6   The Government can't be expected to spring in action while

7   we're in court because you, at the last moment, have identified

8   what you believe to be a shortcoming and have made a request.

9          MR. AVENATTI:  Your Honor, let's see if it's been

04:39PM 10  produced, because if it hasn't been produced, it's a clear

11  *Brady* violation and a *Jencks* violation.  So let's see if it's

12  been produced.

13         THE COURT:  Well, let's see if it's been produced

14  and let's see whether the Government has it.

04:39PM 15         MR. AVENATTI:  Well, it's referred to in the

16  interview report that they asked Mr. Marchino about it, so they

17  had it at some point.

18         THE COURT:  Let's see what further investigation

19  produces.

04:39PM 20         Okay.  We're adjourned for today.

21         THE COURTROOM DEPUTY:  All rise.  This court is now

22  in recess.

23         **(Proceedings concluded at 4:40 p.m.)**

24                    **--oOo--**

25

1                    *CERTIFICATE OF OFFICIAL REPORTER*

2

3    COUNTY OF LOS ANGELES    )
                             )
4    STATE OF CALIFORNIA      )

5                I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME

6    COURT REPORTER, in and for the United States District Court for

7    the Central District of California, do hereby certify that

8    pursuant to Section 753, Title 28, United States Code that the

9    foregoing is a true and correct transcript of the

10   stenographically reported proceedings held in the

11   above-entitled matter and that the transcript page format is in

12   conformance with the regulations of the Judicial Conference of

13   the United States.

14

15   *Date:  August 4, 2021*

16

17

18

19                              */S/ DEBBIE HINO-SPAAN*

20                              *Debbie Hino-Spaan, CSR No. 7953*
                              *Federal Official Court Reporter*
21

22

23

24

25

**UNITED STATES DISTRICT COURT**

## $

**$100** [1] - 57:24
**$100,000** [4] - 55:24, 56:2, 56:21, 92:6
**$130,000** [2] - 58:3, 58:7
**$60,000** [3] - 88:7, 88:8, 88:21
**$600** [1] - 79:5

## '

**'19** [1] - 56:5
**'20** [1] - 56:5
**'21** [1] - 56:5
**'recovery'** [1] - 40:12

## /

**/S** [1] - 116:19

## 1

**1** [12] - 36:6, 48:7, 53:21, 87:16, 94:4, 94:9, 95:6, 95:12, 96:14, 96:24, 104:3, 104:25
**1,600,000** [2] - 55:14, 55:15
**1,900,000** [2] - 55:9
**1-053** [1] - 1:24
**1.1** [2] - 57:14, 57:20
**1.6** [22] - 55:14, 63:12, 63:15, 66:19, 68:1, 71:18, 72:10, 73:12, 76:14, 76:22, 77:20, 79:5, 81:8, 81:21, 81:22, 86:12, 88:20, 90:9, 94:11, 100:8, 105:17, 108:13
**1.65** [2] - 49:16, 50:2
**1.9** [2] - 45:12, 51:2
**10** [7] - 5:14, 28:7, 49:5, 55:16, 55:20, 65:16, 111:15
**100** [3] - 57:15, 58:3, 58:7
**101** [1] - 4:20
**104** [1] - 4:22
**106** [2] - 23:12, 24:16
**107** [1] - 4:24
**10th** [10] - 56:5, 57:2, 62:14, 62:22, 63:4, 63:6, 65:5, 65:8, 65:20
**11** [14] - 19:17, 19:25, 20:3, 20:12, 21:1, 30:6, 30:7, 30:11,

30:16, 48:1, 48:5, 48:10, 48:11, 64:6
**1100** [1] - 2:11
**112,000** [1] - 80:9
**11th** [1] - 34:1
**12** [4] - 21:18, 42:23, 55:6, 55:8
**12/28/2017** [1] - 69:4
**12:00** [1] - 109:1
**13** [2] - 3:5, 66:6
**130** [1] - 15:7
**130,000** [1] - 57:15
**130-ish** [1] - 57:24
**14** [5] - 1:8, 32:1, 67:18, 67:20, 70:12
**14th** [2] - 21:20, 52:10
**15** [8] - 28:9, 60:12, 70:19, 71:3, 93:14, 100:21, 100:24, 111:15
**158** [1] - 49:10
**15th** [1] - 95:1
**16** [1] - 3:5
**17** [1] - 2:18
**171** [7] - 4:7, 34:22, 34:24, 35:18, 36:3, 36:4, 36:5
**176** [16] - 4:9, 46:14, 46:15, 47:20, 47:24, 47:25, 51:16, 59:5, 64:3, 70:21, 70:23, 70:24, 82:13, 89:11, 89:12, 97:16
**18** [3] - 48:2, 48:16, 114:19
**184** [10] - 4:10, 52:25, 53:1, 53:3, 53:4, 53:6, 53:17, 53:19, 53:20, 55:6
**186** [3] - 68:19, 68:21, 68:23
**18th** [2] - 49:12, 49:14
**19** [1] - 3:7
**1990** [1] - 33:24
**19th** [1] - 72:18
**1:00** [1] - 107:18
**1:19** [1] - 76:9
**1:30** [4] - 1:16, 5:2, 109:1, 114:6
**1st** [2] - 103:6, 103:10

## 2

**2** [13] - 1:9, 36:19, 37:5, 41:16, 68:23, 69:5, 93:19, 94:4, 94:12, 96:24, 104:3, 106:8
**2.1** [2] - 49:17, 50:2
**2.5** [1] - 15:23

**20** [1] - 8:5
**2000** [1] - 34:11
**200s** [1] - 27:13
**201** [7] - 4:12, 68:17, 68:19, 69:11, 69:22, 70:2
**2014** [4] - 35:5, 36:20, 36:21, 43:20
**2017** [14] - 13:22, 15:23, 21:14, 21:15, 21:18, 21:20, 25:25, 32:1, 43:24, 48:2, 48:16, 54:2, 55:18, 62:13
**2018** [40] - 6:1, 55:16, 59:13, 59:16, 63:9, 64:10, 64:13, 65:5, 65:8, 65:20, 66:6, 67:18, 67:20, 70:12, 71:3, 76:10, 79:2, 79:3, 80:3, 82:20, 82:21, 85:10, 85:13, 88:22, 89:5, 89:16, 93:14, 96:8, 96:15, 99:5, 99:8, 100:10, 100:11, 100:21, 100:24, 105:1, 106:9, 106:11, 108:2, 108:17
**2019** [5] - 5:14, 11:11, 11:18, 13:3, 56:6
**2020** [1] - 56:6
**2021** [4] - 1:15, 5:1, 56:6, 116:15
**203** [5] - 4:13, 79:11, 79:12, 79:19, 80:1
**204** [5] - 4:15, 85:9, 85:19, 85:23
**206** [5] - 4:17, 92:15, 92:16, 93:3, 93:9
**207** [9] - 4:19, 99:1, 99:2, 99:11, 99:13, 99:14, 109:23, 110:5, 110:8
**208** [7] - 4:20, 100:18, 101:2, 101:6, 109:23, 110:5, 110:8
**20th** [1] - 54:2
**210** [6] - 4:22, 104:5, 104:6, 104:19, 104:24, 106:13
**213-894-2435** [1] - 2:12
**214** [5] - 4:24, 107:3, 107:5, 107:13, 107:23
**22nd** [7] - 50:20, 76:8, 76:10, 96:15, 97:14, 105:1, 105:21
**23** [1] - 4:5

**235** [8] - 4:16, 86:17, 86:21, 86:22, 87:9, 87:15, 106:8, 106:21
**23rd** [1] - 76:16
**24** [1] - 79:3
**24th** [1] - 77:3
**25** [1] - 3:7
**250K** [2] - 94:6, 94:16
**254** [1] - 2:19
**258** [2] - 61:5, 61:7
**25th** [9] - 11:18, 97:23, 106:1, 106:3, 106:9, 106:11, 106:21, 107:18, 108:2
**26** [1] - 15:23
**26th** [1] - 97:23
**274** [1] - 9:20
**276** [3] - 70:18, 70:20, 70:22
**28** [1] - 116:8
**284** [1] - 10:4
**285** [1] - 10:22
**28th** [1] - 51:22
**2:59** [1] - 60:17
**2nd** [2] - 36:21, 80:3

## 3

**3** [3] - 38:23, 41:16, 55:5
**3/14/2018** [1] - 4:12
**30** [1] - 8:6
**30,000** [2] - 106:12, 106:20
**3090** [1] - 54:10
**310** [1] - 27:16
**312** [1] - 2:11
**33** [1] - 3:9
**34** [1] - 19:21
**341** [10] - 20:6, 20:8, 21:6, 21:9, 21:23, 22:3, 22:7, 22:8, 22:10, 22:12
**341(a)** [1] - 32:10
**36** [3] - 4:7, 19:24, 29:25
**37** [1] - 97:16
**38** [4] - 84:4, 84:8, 84:9, 89:13
**39** [1] - 82:16
**391** [1] - 27:21
**3:00** [2] - 109:1, 109:2
**3:15** [1] - 96:15
**3:17** [1] - 60:17
**3rd** [5] - 59:6, 59:13, 59:15, 82:20, 82:21

## 4

**4** [17] - 1:15, 5:1, 5:21,

5:23, 5:24, 6:4, 6:7, 14:19, 15:2, 39:19, 42:23, 43:14, 64:24, 112:8, 112:19, 113:10, 116:15
**4/2/2018** [1] - 4:13
**4/22/2018** [1] - 4:17
**4/4** [1] - 84:14
**4/5/18** [1] - 88:3
**4/5/2018** [1] - 4:15
**40** [7] - 39:23, 41:3, 41:14, 42:3, 78:1, 111:8, 111:9
**400** [1] - 27:15
**400A** [5] - 4:5, 22:23, 23:6, 23:18, 23:19
**400A-400G** [1] - 23:17
**400B** [3] - 22:23, 23:6, 24:2
**400C** [3] - 22:23, 23:6, 24:4
**400D** [3] - 22:23, 23:6, 24:6
**400E** [4] - 22:23, 23:6, 24:8, 24:12
**400F** [5] - 22:23, 23:6, 24:10, 24:13, 24:19
**400G** [4] - 4:6, 22:24, 23:7, 24:21
**403** [8] - 16:14, 63:25, 76:4, 78:18, 89:7, 96:10, 100:12, 108:19
**41** [2] - 76:8, 77:2
**411** [2] - 1:24, 2:6
**42** [5] - 64:25, 65:2, 70:23, 70:25, 71:1
**43** [1] - 64:9
**460** [3] - 97:17, 97:20, 97:21
**461** [3] - 97:17, 97:20, 97:21
**468** [1] - 27:21
**47** [11] - 4:9, 46:17, 46:18, 48:11, 51:17, 51:18, 59:8, 59:9, 64:5
**477** [1] - 89:20
**479** [1] - 89:13
**481** [2] - 84:4, 84:5
**482** [2] - 85:1, 85:2
**483** [2] - 84:5, 84:10
**487** [1] - 82:17
**488** [1] - 83:25
**489** [2] - 82:18, 82:25
**490** [5] - 82:17, 82:18, 82:25, 83:1
**4:01** [2] - 48:18, 48:20
**4:40** [1] - 115:23
**4th** [4] - 2:6, 13:3,

84:5, 84:12
**4TH** [1] - 1:24

## 5

**5** [2] - 28:9, 52:2
**5/15/2018** [1] - 4:20
**5/25/2018** [2] - 4:22, 4:24
**5/7/2017** [1] - 4:19
**50** [1] - 111:9
**50K** [1] - 86:2
**515** [1] - 78:6
**516** [1] - 78:2
**518** [2] - 77:5, 77:21
**519** [1] - 77:14
**520** [2] - 77:12, 77:13
**521** [4] - 77:5, 77:7, 77:9
**525** [1] - 76:15
**53** [1] - 4:10
**530** [1] - 76:7
**535** [1] - 72:18
**537** [1] - 72:2
**538** [2] - 70:19, 71:2
**54** [1] - 50:15
**540** [1] - 65:19
**541** [2] - 67:17, 71:2
**542** [1] - 66:5
**546** [3] - 64:25, 65:1, 65:2
**549** [1] - 64:9
**56** [2] - 49:12, 49:15
**565** [1] - 49:2
**58** [1] - 49:6
**59** [2] - 48:5, 48:8
**5:00** [1] - 111:17
**5:17** [1] - 65:6
**5th** [4] - 85:10, 85:13, 88:22, 89:16

## 6

**6** [1] - 41:15
**60** [8] - 45:18, 57:23, 58:8, 80:10, 80:18, 94:7, 94:21, 95:1
**60"K** [1] - 106:15
**60K** [3] - 105:6, 105:20, 106:14
**626** [1] - 64:5
**627** [2] - 59:6, 59:10
**628** [1] - 52:8
**629** [1] - 51:24
**631** [2] - 51:24, 52:2
**6:30** [1] - 108:8

## 7

**7** [6] - 28:7, 30:6, 30:7,

30:20, 54:13, 99:8
**70** [1] - 4:12
**714-338-3598** [1] - 2:7
**753** [1] - 116:8
**7953** [2] - 1:23, 116:20
**7:54** [1] - 36:8
**7th** [1] - 99:5

## 8

**8,000** [1] - 80:13
**80** [3] - 4:13, 64:9, 64:14
**8000** [1] - 2:6
**80301** [1] - 54:10
**85** [1] - 4:15
**87** [1] - 4:16
**8:00** [1] - 95:13
**8:17-bk-11961-CB** [1] - 21:2
**8:29** [1] - 4:24

## 9

**9** [3] - 3:4, 42:5, 51:18
**9/16/2014** [2] - 4:7, 36:8
**90012** [1] - 2:12
**92660** [1] - 2:19
**92701** [2] - 1:25, 2:7
**93** [1] - 4:17
**949-481-4900** [1] - 2:20
**99** [1] - 4:19
**9:00** [1] - 109:1

## A

**a.m** [1] - 95:13
**abide** [1] - 39:4
**able** [6] - 14:22, 84:16, 103:12, 113:5, 113:23, 114:8
**above-entitled** [1] - 116:11
**absolutely** [3] - 63:20, 79:8, 109:16
**accept** [3] - 45:13, 45:16, 46:8
**according** [3] - 71:4, 74:23, 106:21
**account** [12] - 14:9, 63:13, 63:17, 63:24, 81:18, 87:18, 87:20, 88:9, 88:16, 88:19, 88:22, 108:4
**accounting** [6] - 59:19, 59:20, 59:24, 60:2, 60:5, 60:7
**accounts** [3] - 10:1,

87:3, 87:6
**accuracy** [2] - 25:12, 29:6
**accurate** [13] - 22:11, 35:14, 47:8, 53:12, 69:14, 79:16, 85:15, 87:2, 92:24, 99:7, 100:23, 104:16, 107:8
**act** [1] - 25:9
**action** [8] - 4:19, 74:5, 96:24, 99:17, 99:24, 100:9, 100:10, 115:20
**actions** [7] - 90:14, 94:5, 94:12, 94:13, 96:2, 98:11
**actual** [2] - 51:17, 63:5
**added** [1] - 49:24
**addition** [2] - 27:3, 47:12
**additional** [4] - 42:15, 55:23, 56:2, 107:8
**address** [3] - 5:7, 35:4
**adjourned** [1] - 115:20
**admission** [1] - 107:18
**admit** [13] - 23:6, 35:18, 47:20, 53:17, 69:22, 79:19, 85:19, 87:9, 93:3, 99:11, 101:2, 104:19, 107:13
**admonition** [2] - 60:13, 109:3
**advance** [24] - 50:23, 80:22, 80:24, 81:5, 81:7, 81:8, 81:19, 81:20, 83:15, 84:24, 86:8, 88:20, 94:7, 94:24, 95:1, 95:3, 100:7, 103:5, 103:7, 105:10, 105:14, 105:15, 105:16, 105:17
**advances** [2] - 87:5, 108:15
**advancing** [5] - 81:1, 85:7, 90:7, 90:13, 108:12
**advice** [1] - 71:25
**advise** [1] - 111:20
**advisory** [1] - 111:19
**affirmation** [1] - 37:8
**afternoon** [10] - 9:12, 9:13, 13:12, 13:13, 19:9, 19:10, 25:3, 25:4, 33:10, 33:11
**agency** [2] - 19:12, 35:24
**agenda** [1] - 66:13

**agent** [1] - 12:11
**agent's** [1] - 114:24
**agents** [3] - 46:22, 47:2, 47:9
**aggressive** [4] - 73:7, 73:11, 73:13, 75:22
**ago** [4] - 16:8, 27:1, 34:11, 114:4
**agree** [4] - 40:2, 46:8, 61:20, 109:17
**agreed** [4] - 42:17, 47:2, 82:11, 106:16
**Agreement** [2] - 4:10, 53:23
**agreement** [81] - 35:23, 35:24, 36:12, 36:16, 36:20, 36:24, 37:18, 38:16, 38:18, 39:4, 39:17, 40:5, 40:23, 41:8, 41:16, 41:21, 42:9, 42:11, 42:12, 42:19, 42:20, 43:10, 43:15, 43:17, 43:18, 43:20, 44:24, 45:17, 46:7, 46:11, 50:13, 51:1, 51:4, 51:7, 51:11, 52:7, 52:12, 52:17, 52:21, 53:7, 54:1, 54:18, 55:3, 55:11, 55:17, 56:11, 56:14, 56:15, 56:24, 57:4, 57:7, 57:8, 57:11, 57:12, 57:19, 58:5, 58:12, 58:22, 62:12, 62:14, 63:4, 63:5, 63:10, 63:16, 64:19, 64:20, 65:18, 67:15, 68:7, 69:6, 74:19, 91:1, 91:12, 91:14, 91:23, 92:3, 92:4, 92:8, 102:12, 102:22
**agreements** [2] - 46:7, 92:9
**agrees** [2] - 39:2, 42:10
**ahead** [5] - 26:5, 54:13, 68:8, 101:11, 109:21
**Ahmed** [2] - 74:11, 90:22
**aid** [1] - 23:22
**alerting** [1] - 11:23
**alex.wyman@usdoj. gov** [1] - 2:13
**ALEXANDER** [1] - 2:10
**allegations** [9] - 13:15, 13:21, 16:6, 17:2, 17:8, 17:9,

17:11, 18:3, 18:8
**Alliance** [1] - 37:3
**allow** [1] - 47:2
**almost** [1] - 6:19
**AMERICA** [1] - 1:5
**America** [1] - 87:18
**amount** [15] - 30:1, 40:9, 44:23, 45:20, 57:13, 58:3, 58:9, 84:17, 84:23, 88:5, 89:6, 91:14, 106:18, 106:23
**Ana** [1] - 2:7
**ANA** [3] - 1:17, 1:25, 5:1
**analyst** [2] - 19:16, 21:4
**ANGELES** [1] - 116:3
**Angeles** [1] - 2:12
**annuity** [1] - 40:11
**answer** [5] - 30:13, 31:8, 62:18, 88:13, 91:10
**answered** [2] - 17:5, 102:18
**answering** [1] - 31:6
**answers** [2] - 13:1, 20:16
**apologies** [1] - 52:3
**apologize** [4] - 82:5, 82:14, 112:3, 112:5
**apologizing** [1] - 85:6
**appear** [1] - 114:11
**APPEARANCES** [1] - 2:1
**apply** [1] - 42:11
**appreciate** [2] - 103:5, 103:7
**appreciated** [4] - 83:10, 83:14, 108:9, 108:11
**appreciative** [1] - 83:24
**approach** [2] - 5:16, 112:15
**appropriate** [2] - 61:17, 113:9
**approximate** [1] - 57:13
**April** [18] - 80:3, 82:20, 82:21, 84:5, 84:12, 85:10, 85:13, 87:21, 88:22, 89:5, 89:16, 93:14, 95:1, 96:15, 97:14, 97:23, 103:8
**arbitration** [1] - 74:2
**arbitrator** [1] - 97:7
**Arden** [7] - 47:13, 47:16, 47:17, 48:17,

48:23, 50:17, 50:21
**area** [1] - 6:8
**arguing** [1] - 9:7
**arises** [1] - 42:10
**aspect** [1] - 14:11
**Assistant** [2] - 2:5, 2:10
**associated** [2] - 10:1, 59:21
**assume** [1] - 7:23
**assumed** [2] - 41:13, 111:2
**assumes** [1] - 62:25
**assuming** [1] - 72:10
**attached** [3] - 36:15, 108:4, 114:5
**attachment** [4] - 35:2, 35:10, 35:15, 36:11
**attempt** [1] - 92:7
**attention** [1] - 29:1
**Attorney** [4] - 2:4, 2:5, 2:9, 2:10
**attorney** [17] - 14:9, 20:13, 36:23, 36:24, 37:2, 37:7, 37:11, 37:15, 39:2, 39:3, 39:22, 42:15, 43:6, 47:17, 63:12, 63:16, 63:23
**Attorney's** [1] - 26:18
**attorney's** [12] - 40:13, 40:16, 40:18, 41:2, 41:5, 41:12, 42:3, 43:2, 43:5, 43:8, 58:5
**attorney-client** [5] - 14:9, 36:23, 36:24, 63:12, 63:16
**attorneys** [1] - 74:11
**Audio** [9] - 4:5, 23:19, 24:1, 24:3, 24:5, 24:7, 24:9, 24:20, 24:22
**audio** [8] - 20:22, 20:23, 20:24, 22:20, 25:14, 25:17, 26:10, 27:25
**audios** [1] - 29:2
**AUGUST** [2] - 1:15, 5:1
**August** [1] - 116:15
**authenticate** [1] - 87:14
**authentication** [2] - 23:10, 47:22
**authorized** [3] - 107:17, 107:22
**authorizing** [1] - 41:20
**Avenatti** [52] - 3:4, 3:5, 3:7, 4:12, 4:14,

4:15, 4:18, 4:19, 4:21, 4:22, 4:24, 5:12, 9:14, 10:1, 14:13, 16:2, 21:2, 21:23, 22:1, 24:24, 31:10, 34:2, 34:4, 34:6, 34:7, 35:22, 37:2, 44:12, 45:1, 48:17, 48:23, 51:14, 60:19, 60:20, 60:23, 69:25, 74:12, 74:23, 82:2, 88:10, 88:17, 92:14, 93:7, 93:23, 94:2, 97:13, 100:17, 102:9, 103:2, 104:23, 110:9, 113:20
**AVENATTI** [112] - 1:8, 2:15, 2:16, 5:6, 5:9, 5:13, 5:16, 5:18, 7:3, 8:5, 8:12, 8:15, 8:22, 8:24, 9:3, 9:15, 9:18, 10:6, 10:8, 13:5, 15:4, 15:14, 16:4, 16:17, 16:21, 16:25, 17:19, 17:23, 18:1, 18:6, 18:13, 23:9, 24:11, 25:2, 28:2, 28:23, 29:21, 30:11, 30:20, 30:25, 31:12, 31:20, 32:1, 32:11, 32:21, 34:8, 35:19, 47:21, 49:18, 49:21, 49:24, 53:18, 57:25, 60:23, 60:25, 61:15, 62:16, 62:24, 63:18, 63:25, 64:21, 68:14, 69:19, 69:23, 73:20, 74:8, 74:15, 75:3, 76:4, 78:18, 78:23, 79:21, 81:23, 82:5, 85:20, 87:10, 87:22, 88:12, 88:25, 89:7, 91:2, 91:7, 91:24, 93:4, 96:9, 98:7, 99:12, 100:12, 101:3, 102:2, 102:15, 102:18, 102:24, 104:20, 107:14, 107:19, 108:18, 109:18, 109:22, 109:25, 110:4, 110:19, 111:3, 111:14, 111:22, 112:1, 112:17, 113:3, 113:7, 114:17, 115:9, 115:15
**Avenatti's** [3] - 35:8, 93:5, 104:21
**aware** [4] - 32:12,

32:14, 45:2, 82:6

# B

**back-and-forth** [1] - 14:24
**background** [1] - 33:25
**bad** [3] - 84:21, 91:18, 103:4
**balance** [1] - 40:19
**Bank** [2] - 9:23, 87:18
**bank** [7] - 10:1, 86:24, 87:2, 87:6, 87:12, 108:5, 108:8
**bankers** [1] - 10:1
**bankruptcies** [1] - 20:1
**bankruptcy** [14] - 19:16, 20:2, 20:10, 21:4, 29:17, 29:23, 30:25, 31:1, 31:13, 31:16, 31:21, 32:8, 32:10, 60:20
**BARELA** [3] - 3:8, 33:1, 33:5
**Barela** [28] - 4:8, 4:9, 4:10, 4:12, 4:13, 4:15, 4:16, 4:17, 4:19, 4:20, 4:22, 4:24, 32:23, 33:4, 33:10, 35:22, 36:10, 37:3, 48:25, 54:3, 54:11, 55:9, 55:16, 62:11, 80:2, 110:11, 112:12
**based** [5] - 57:16, 94:6, 94:16, 95:3, 103:13
**Bates** [5] - 9:6, 9:9, 112:13, 113:12, 113:19
**Beach** [2] - 2:19, 51:14
**become** [1] - 43:5
**becoming** [1] - 91:15
**began** [1] - 5:18
**behalf** [1] - 43:22
**behind** [6] - 6:16, 27:14, 27:19, 30:16, 32:24, 34:21
**below** [3] - 39:23, 70:3, 103:19
**benefit** [1] - 24:14
**best** [3] - 28:5, 80:9, 84:18
**Best** [1] - 108:5
**better** [1] - 77:16
**between** [17] - 30:4, 30:7, 37:2, 47:3,

47:10, 51:21, 54:2, 57:13, 57:15, 58:2, 64:9, 64:10, 64:13, 92:18, 92:25, 104:8, 107:10
**Beyond** [1] - 16:14
**beyond** [3] - 16:16, 16:19, 17:17
**big** [11] - 65:9, 65:12, 65:16, 65:21, 77:16, 78:3, 89:24, 90:10, 90:11, 108:8, 108:10
**billing** [1] - 39:20
**Billings** [1] - 39:19
**bills** [3] - 39:17, 72:1, 90:12
**binder** [5] - 34:21, 68:19, 82:16, 89:11, 106:6
**binding** [1] - 40:15
**bit** [2] - 71:12, 71:20
**body** [1] - 85:24
**bolded** [1] - 53:22
**book** [3] - 27:13, 27:14, 86:18
**books** [2] - 27:24, 61:8
**Boston** [1] - 9:23
**bother** [1] - 84:21
**bottom** [9] - 43:13, 43:14, 48:10, 51:22, 78:1, 84:10, 95:6, 100:1, 104:25
**Boucher** [2] - 18:3, 18:9
**Boulder** [1] - 54:10
**box** [2] - 5:8, 9:5
**Brady** [5] - 5:19, 5:20, 6:9, 8:15, 115:11
**break** [8] - 5:20, 7:4, 7:17, 7:25, 9:19, 13:6, 60:11, 101:13
**BRETT** [1] - 2:5
**brett.sagel@usdoj.gov** [1] - 2:8
**bring** [3] - 7:14, 8:19, 38:11
**bringing** [1] - 6:23
**Brock** [83] - 4:15, 37:20, 37:22, 37:23, 38:2, 38:9, 38:10, 38:11, 38:13, 40:6, 43:22, 43:25, 54:5, 54:7, 54:11, 55:8, 55:15, 62:22, 63:12, 63:15, 64:14, 65:10, 65:13, 65:16, 65:21, 65:24, 66:15, 66:17, 66:21, 67:12, 67:21, 67:25, 70:6, 70:10,

70:13, 71:10, 71:16, 72:11, 73:8, 73:11, 73:19, 74:7, 74:14, 74:19, 75:22, 76:12, 76:13, 76:19, 78:16, 79:1, 79:5, 81:9, 83:2, 83:3, 83:5, 86:5, 86:10, 90:15, 90:18, 94:4, 94:9, 94:10, 96:2, 96:7, 96:24, 97:1, 97:8, 97:25, 98:3, 99:24, 100:3, 100:5, 100:9, 100:10, 102:1, 102:6, 102:10, 103:24, 104:2, 104:3, 105:18
**bucks** [1] - 71:14
**build** [2] - 77:19, 94:19
**business** [21] - 30:17, 31:12, 31:15, 33:17, 35:21, 54:9, 67:1, 67:4, 67:9, 67:10, 69:17, 73:4, 77:20, 83:11, 83:16, 83:21, 93:24, 94:2, 94:19, 103:16, 103:21
**businesses** [8] - 33:18, 58:24, 67:23, 68:4, 68:9, 68:10, 81:15, 90:11
**busy** [9] - 76:18, 84:21, 96:17, 98:3, 98:15, 98:17, 98:20, 98:21, 99:22
**buy** [1] - 91:13
**BY** [66] - 2:5, 2:18, 3:4, 3:6, 3:8, 9:18, 10:8, 13:11, 15:7, 15:18, 16:4, 17:19, 18:1, 18:6, 19:8, 25:2, 30:11, 30:20, 30:25, 31:12, 31:20, 32:1, 32:11, 33:9, 34:12, 36:6, 48:1, 50:1, 53:21, 58:2, 62:18, 63:3, 63:21, 64:3, 64:24, 68:17, 70:3, 74:6, 74:13, 75:7, 76:7, 78:21, 79:2, 80:2, 82:8, 85:24, 87:16, 88:1, 88:15, 89:4, 89:10, 91:5, 91:10, 92:2, 96:13, 98:10, 99:15, 100:16, 101:7, 101:12, 102:5, 102:17, 102:22, 103:3, 104:25,

107:24

# C

**CA** [1] - 1:25
**calculating** [1] - 40:13
**California** [5] - 2:7, 2:12, 2:19, 36:25, 116:7
**CALIFORNIA** [4] - 1:2, 1:17, 5:1, 116:4
**CALLED** [3] - 3:4, 3:6, 3:8
**cards** [4] - 67:22, 68:3, 68:11, 83:20
**carrey** [4] - 16:13, 17:16, 18:3, 18:9
**Carrey** [3] - 13:15, 16:7, 16:11
**Case** [2] - 1:7, 21:2
**case** [30] - 8:16, 13:16, 13:19, 16:7, 16:11, 16:20, 21:1, 30:11, 31:21, 32:3, 37:17, 39:25, 40:11, 41:24, 42:2, 45:3, 45:7, 45:10, 47:18, 59:21, 60:5, 60:8, 60:14, 60:15, 63:16, 99:22, 109:4, 109:5, 113:25, 114:20
**cases** [1] - 19:17
**cash** [5] - 71:12, 71:21, 72:1, 94:7, 94:24
**Cassaro** [1] - 12:1
**category** [1] - 103:24
**caught** [1] - 66:12
**cc'd** [1] - 35:11
**CD** [2] - 25:15, 26:10
**cell** [1] - 49:1
**CENTRAL** [1] - 1:2
**Central** [1] - 116:7
**certain** [3] - 9:4, 44:22, 44:23
**certainly** [3] - 6:19, 111:16, 112:25
**CERTIFICATE** [1] - 116:1
**CERTIFIED** [1] - 1:6
**certify** [1] - 116:7
**chain** [9] - 69:12, 69:14, 92:18, 92:24, 104:8, 104:16, 107:5, 107:9, 107:10
**chance** [2] - 6:13, 71:8
**changes** [1] - 99:21
**changing** [1] - 40:5
**Chapter** [11] - 19:17, 19:25, 20:3, 20:12,

21:1, 30:6, 30:7, 30:11, 30:16, 30:20
**chapter** [3] - 20:4, 20:12, 30:4
**chapters** [2] - 20:2, 20:3
**charge** [1] - 14:11
**charges** [1] - 43:4
**chat** [4] - 72:6, 72:13, 78:11, 95:13
**check** [6] - 6:13, 7:2, 96:19, 98:3, 111:15
**checking** [5] - 66:9, 67:21, 67:25, 68:1, 76:18
**Christmas** [1] - 50:23
**Circle** [1] - 54:10
**circumstances** [2] - 34:12, 45:9
**claims** [1] - 37:8
**clauses** [1] - 92:5
**clean** [1] - 28:2
**clear** [3] - 17:23, 112:22, 115:10
**clearly** [1] - 28:14
**client** [18] - 14:9, 16:12, 36:23, 36:24, 37:4, 37:7, 37:12, 39:2, 40:21, 42:7, 42:10, 42:14, 43:7, 63:12, 63:16, 103:1
**Client's** [1] - 38:23
**client's** [5] - 37:8, 37:9, 43:6, 43:7, 43:8, 89:6
**clients** [1] - 37:1
**clip** [2] - 25:19, 25:20
**clips** [9] - 22:3, 25:18, 26:25, 27:2, 27:3, 27:4, 27:7, 28:1, 31:2
**close** [2] - 27:16, 27:20
**closes** [2] - 71:11, 71:17
**Code** [1] - 116:8
**code** [1] - 20:2
**colleagues** [2] - 7:16, 26:19
**collect** [6] - 75:25, 78:25, 94:15, 97:5, 97:9, 97:12
**collected** [10] - 94:5, 94:12, 94:14, 96:3, 100:8, 100:15, 102:6, 102:11, 102:21, 105:17
**collecting** [3] - 73:12, 73:25, 86:12
**collection** [6] - 72:10,

76:14, 81:20, 86:5, 94:11, 94:20
**collections** [2] - 81:8, 86:10
**collectively** [3] - 9:13, 14:15, 54:11
**Colorado** [6] - 34:15, 37:17, 44:5, 44:6, 54:8, 54:10
**coming** [4] - 68:8, 71:25, 88:23, 90:2
**commitments** [3] - 86:1, 103:13, 103:16
**committing** [1] - 86:2
**communicate** [1] - 75:12
**communicated** [1] - 112:12
**communications** [4] - 9:22, 9:25, 12:4, 12:6
**companies** [1] - 71:24
**company** [2] - 30:16, 54:9
**compare** [1] - 22:8
**compared** [1] - 25:19
**completeness** [1] - 23:10
**completion** [1] - 112:8
**compound** [1] - 34:8
**computer** [1] - 113:23
**computers** [1] - 12:12
**concern** [2] - 71:10, 71:16
**conclude** [3] - 8:7, 43:3, 43:6
**concluded** [3] - 44:16, 45:4, 115:23
**Conclusion** [1] - 42:23
**conclusion** [1] - 43:2
**confer** [1] - 111:19
**Conference** [1] - 116:12
**conferred** [1] - 111:7
**confident** [1] - 7:10
**confidential** [4] - 53:7, 54:1, 56:13, 92:5
**Confidential** [1] - 53:23
**confidentiality** [3] - 56:15, 91:23, 92:4
**confirm** [1] - 28:4, 106:4
**confirmation** [2] - 108:5, 111:11
**conformance** [1] - 116:12
**conjecture** [2] - 15:4, 78:23

**connection** [5] - 13:15, 13:19, 16:11, 32:2, 32:3
**consider** [2] - 29:25, 30:1
**construction** [2] - 33:20, 33:23
**construction-related** [2] - 33:20, 33:23
**consulting** [1] - 81:15
**contain** [1] - 47:8
**content** [2] - 93:8, 104:23
**contents** [1] - 46:22
**context** [1] - 24:14
**contingency** [5] - 36:23, 39:17, 39:22, 39:25, 41:3
**continuation** [1] - 107:5
**continue** [3] - 13:22, 17:5, 54:5
**Continued** [1] - 4:1
**continued** [7] - 16:18, 16:22, 17:2, 17:24, 18:2, 18:7, 101:23
**continuing** [1] - 45:2
**contract** [5] - 36:23, 36:24, 36:25, 38:1, 42:19
**contracts** [1] - 42:20
**controls** [2] - 23:23, 23:24
**cooperate** [1] - 39:3
**copied** [1] - 7:20
**copies** [4] - 22:11, 26:8, 26:9, 87:2
**copy** [25] - 5:13, 20:23, 26:10, 26:11, 26:15, 35:14, 35:23, 36:15, 47:8, 53:12, 54:25, 55:2, 56:25, 57:1, 61:9, 69:14, 79:16, 85:15, 92:24, 99:7, 100:23, 104:16, 107:8, 107:9
**corner** [2] - 48:10, 110:12
**Corporate** [1] - 2:18
**corporate** [3] - 20:18, 34:14, 51:14
**corporation** [1] - 20:17
**correct** [61] - 10:14, 11:6, 11:21, 11:22, 12:15, 14:4, 17:11, 17:12, 19:3, 20:15, 23:2, 23:3, 23:4, 25:25, 27:8, 29:13, 29:23, 31:1, 31:10,

31:14, 36:12, 36:13, 36:17, 36:18, 41:7, 47:4, 47:5, 47:14, 47:15, 49:1, 50:18, 50:19, 51:19, 53:12, 54:14, 54:15, 56:7, 58:10, 64:11, 64:12, 64:23, 69:18, 75:2, 76:10, 77:1, 84:13, 86:15, 86:16, 89:16, 89:17, 92:22, 93:19, 94:23, 95:5, 95:9, 104:14, 104:15, 107:6, 107:7, 107:9, 116:9
**correctly** [3] - 60:21, 60:22, 61:1
**cost** [3] - 45:18, 58:12, 60:5
**costs** [8] - 39:17, 41:2, 41:15, 41:20, 57:14, 58:5, 58:6, 59:21
**Costs** [1] - 39:19
**Counsel** [1] - 111:7
**COUNSEL** [2] - 2:1, 2:16
**counsel** [4] - 37:14, 62:21, 74:18, 111:19
**count** [1] - 27:7
**COUNTY** [1] - 116:3
**couple** [3] - 47:13, 72:22, 83:7
**course** [5] - 31:20, 63:8, 67:14, 108:21, 110:25
**Court** [6] - 5:22, 109:11, 112:3, 112:6, 116:6, 116:20
**court** [11] - 29:5, 32:8, 32:24, 74:2, 82:3, 97:6, 97:7, 114:8, 115:7, 115:21
**COURT** [135] - 1:1, 1:24, 5:8, 5:10, 5:15, 5:17, 6:12, 7:2, 7:6, 7:12, 7:14, 8:3, 8:8, 8:14, 8:17, 8:25, 9:10, 9:12, 9:14, 13:7, 15:5, 15:15, 16:2, 16:16, 16:19, 16:24, 17:18, 17:21, 17:25, 18:5, 18:11, 18:15, 18:18, 18:22, 19:5, 23:8, 23:11, 23:16, 23:20, 24:16, 24:24, 28:21, 29:20, 30:10, 30:14, 30:24, 31:5, 31:7, 31:19, 31:25, 32:6, 32:18, 32:20, 32:22, 33:6,

34:9, 35:20, 36:1, 36:4, 47:23, 49:20, 53:19, 58:1, 60:10, 60:19, 60:24, 61:2, 61:6, 61:9, 61:12, 61:20, 62:4, 62:9, 62:17, 63:1, 63:19, 64:2, 64:22, 68:15, 69:20, 69:24, 73:22, 74:9, 74:16, 75:5, 76:5, 78:20, 78:24, 79:22, 79:25, 81:25, 82:2, 85:21, 87:13, 87:24, 88:14, 89:2, 89:8, 91:3, 91:9, 91:25, 93:5, 96:11, 98:8, 99:13, 100:13, 101:4, 101:10, 102:3, 102:16, 102:19, 102:25, 104:21, 107:15, 107:21, 108:20, 108:22, 109:11, 109:21, 109:24, 110:2, 110:17, 110:23, 111:4, 111:13, 111:18, 112:16, 113:6, 113:15, 113:18, 114:9, 114:22, 115:13, 115:18, 116:6

**Court's** [2] - 16:15, 111:3
**courtroom** [1] - 9:1
**COURTROOM** [9] - 18:21, 18:24, 19:2, 19:4, 32:24, 33:2, 60:16, 109:9, 115:21
**cover** [1] - 42:3
**crazy** [1] - 101:16
**create** [1] - 10:15
**created** [1] - 22:18
**credibility** [1] - 101:17
**credit** [4] - 67:22, 68:3, 68:11, 83:20
**creditors** [2] - 20:5, 30:19
**CROSS** [2] - 9:17, 25:1
**Cross** [2] - 3:4, 3:7
**cross** [9] - 5:19, 8:6, 8:7, 13:14, 14:25, 39:8, 111:11, 112:9, 112:10
**CROSS-EXAMINATION** [2] - 9:17, 25:1
**Cross-Examination** [2] - 3:4, 3:7

**cross-examination** [4] - 5:19, 13:14, 112:9, 112:10
**cross-off** [1] - 39:8
**crossed** [3] - 39:5, 39:13, 39:15
**CRR** [1] - 1:23
**CSR** [2] - 1:23, 116:20
**Cummings** [1] - 111:16
**current** [1] - 90:1
**custodial** [1] - 87:11
**custom** [2] - 82:3, 82:7

**D**

**d/b/a** [1] - 54:7
**daily** [1] - 72:17
**data** [1] - 92:6
**Date** [1] - 116:15
**date** [16] - 25:8, 36:7, 36:8, 36:20, 48:4, 57:1, 65:14, 69:1, 69:3, 88:2, 89:16, 93:13, 96:14, 103:14, 107:25
**dated** [1] - 64:6
**dates** [6] - 21:14, 55:21, 56:4, 62:14, 62:22
**Dates** [1] - 4:11
**David** [2] - 74:18, 74:23
**DAY** [1] - 1:8
**days** [17] - 25:23, 45:4, 51:11, 57:7, 71:14, 77:16, 77:18, 80:10, 80:18, 84:19, 84:20, 94:7, 94:21, 95:1, 95:20, 100:21, 105:25
**de** [1] - 14:3
**deal** [5] - 52:23, 89:24, 90:10, 90:11, 91:20
**deals** [1] - 33:20
**DEAN** [2] - 2:17, 2:18
**deansteward7777@gmail.com** [1] - 2:20
**DEBBIE** [3] - 1:23, 116:5, 116:19
**Debbie** [1] - 116:20
**debt** [2] - 77:19, 103:17
**debts** [1] - 20:5, 30:17, 30:20
**December** [12] - 43:24, 48:2, 48:16, 49:12, 49:14, 50:20, 51:22, 54:2, 55:18,

58:16, 62:12, 69:7
**decided** [1] - 38:11
**declaration** [1] - 87:11
**decorum** [1] - 112:4
**deducted** [2] - 37:14, 41:12
**deep** [2] - 67:22, 68:3
**defendant** [192] - 13:14, 13:22, 13:25, 14:14, 14:20, 15:2, 15:7, 34:18, 35:11, 35:24, 37:16, 38:1, 39:24, 40:22, 41:21, 41:23, 42:20, 43:11, 43:21, 45:6, 46:2, 47:4, 47:10, 47:12, 49:7, 49:9, 49:11, 49:14, 50:1, 50:12, 50:17, 50:20, 51:6, 51:12, 51:22, 52:1, 52:4, 52:9, 52:11, 52:14, 53:13, 54:18, 55:17, 56:14, 56:22, 57:10, 57:17, 58:11, 58:17, 58:20, 59:2, 59:12, 59:15, 59:23, 60:2, 60:4, 60:7, 62:11, 62:13, 62:20, 63:4, 63:7, 63:11, 64:10, 64:14, 64:20, 65:4, 65:7, 65:24, 66:6, 66:8, 66:20, 66:24, 67:3, 67:11, 67:15, 67:20, 68:5, 68:13, 69:8, 69:12, 69:15, 70:4, 70:15, 71:3, 71:6, 72:3, 72:5, 72:8, 73:14, 74:13, 74:14, 75:2, 75:7, 75:9, 75:21, 75:23, 76:2, 76:10, 76:16, 77:4, 77:8, 77:15, 77:21, 78:2, 78:6, 78:9, 78:14, 79:4, 79:14, 79:17, 79:23, 79:24, 80:2, 80:6, 80:19, 81:16, 82:10, 83:23, 83:24, 84:2, 84:12, 85:1, 85:4, 85:6, 85:10, 85:12, 85:16, 86:9, 87:5, 87:21, 88:6, 88:21, 89:4, 89:15, 89:18, 89:20, 90:5, 90:17, 90:25, 91:6, 91:11, 91:16, 92:10, 92:18, 92:21, 92:25, 93:13, 93:21, 94:10, 94:13, 94:17, 95:4, 95:8, 95:11, 95:15,

95:17, 95:22, 96:3, 96:14, 96:23, 97:1, 97:2, 97:18, 97:22, 97:25, 98:2, 98:20, 99:4, 99:8, 99:19, 100:20, 100:24, 101:8, 102:23, 104:8, 104:14, 104:17, 105:1, 105:9, 105:12, 105:19, 105:20, 106:1, 106:3, 106:17, 106:23, 107:10, 107:18, 107:22
**DEFENDANT** [1] - 2:14
**Defendant** [1] - 1:9
**defendant's** [5] - 14:2, 28:20, 63:11, 63:16, 78:21
**deferred** [1] - 40:10
**defined** [1] - 39:23
**definitely** [1] - 45:22
**delay** [1] - 82:6
**delayed** [1] - 52:2
**deleted** [2] - 11:11, 11:14
**deliver** [1] - 43:7
**denied** [3] - 17:11, 18:2, 18:8
**Department** [1] - 19:12
**deposited** [1] - 63:24
**DEPUTY** [9] - 18:21, 18:24, 19:2, 19:4, 32:24, 33:2, 60:16, 109:9, 115:21
**describing** [1] - 27:3
**designated** [1] - 111:2
**desires** [1] - 42:14
**desperate** [1] - 91:15
**detailed** [1] - 8:21
**details** [1] - 6:5
**developments** [1] - 39:4
**dhinospaan@yahoo.com** [1] - 1:25
**difference** [3] - 30:4, 30:7, 61:23
**different** [13] - 12:22, 15:19, 20:2, 21:14, 23:23, 29:4, 50:11, 86:18, 89:11, 90:21, 93:20, 106:6
**Direct** [2] - 3:7, 3:9
**DIRECT** [2] - 19:7, 33:8
**direct** [8] - 6:8, 9:25, 10:9, 10:25, 14:25,

41:1, 45:18, 111:9
**directed** [1] - 88:10
**direction** [1] - 74:3
**directly** [1] - 70:1
**disappointed** [1] - 45:22
**disappointment** [1] - 45:21
**discharge** [1] - 43:3
**discretion** [2] - 37:13, 62:6
**discuss** [7] - 60:13, 86:4, 86:10, 93:22, 96:3, 109:3, 111:15
**discussed** [8] - 13:6, 45:11, 58:4, 67:10, 84:24, 98:6, 102:5, 102:7
**discussing** [1] - 102:8
**discussion** [7] - 39:24, 56:8, 58:17, 67:7, 68:6, 90:25, 105:9
**discussions** [7] - 40:4, 67:3, 67:6, 90:14, 92:8, 102:23, 103:1
**dismissed** [1] - 31:15
**disrespect** [1] - 112:4
**distribution** [1] - 40:21
**DISTRICT** [3] - 1:1, 1:2, 1:3
**District** [1] - 116:6, 116:7
**DIVISION** [1] - 1:2
**docket** [2] - 32:8, 32:13
**doctored** [1] - 17:14
**document** [12] - 10:25, 46:19, 49:19, 53:10, 53:13, 54:16, 55:5, 112:10, 112:24, 112:25, 114:2, 114:5
**documents** [7] - 46:13, 52:19, 110:6, 110:10, 110:15, 112:14, 112:18
**dollar** [1] - 5:25
**dollars** [8] - 14:15, 14:18, 17:15, 55:9, 55:14, 57:24, 112:23, 114:19
**done** [6] - 7:13, 24:17, 26:13, 61:6, 101:21, 111:25
**door** [2] - 52:10, 52:14
**dos** [1] - 81:10
**down** [6] - 40:8, 81:10,

88:4, 99:25, 107:25, 108:24
**download** [1] - 46:22
**dozen** [1] - 61:24
**drafts** [2] - 62:21, 62:22
**drive** [1] - 25:16
**due** [1] - 43:5
**during** [7] - 5:20, 7:4, 13:1, 69:9, 80:21, 112:2, 112:3
**Duties** [1] - 38:24

## E

**e-mail** [72] - 4:7, 4:12, 4:13, 4:15, 4:17, 4:19, 4:20, 4:22, 4:24, 7:16, 7:18, 7:20, 11:9, 15:8, 15:12, 35:1, 35:4, 35:10, 35:14, 36:7, 36:8, 36:14, 36:19, 69:12, 69:14, 69:17, 69:25, 72:22, 75:13, 79:14, 79:16, 81:11, 83:1, 84:19, 84:20, 85:9, 85:12, 85:15, 85:24, 92:18, 92:24, 93:13, 95:7, 95:19, 96:13, 96:14, 97:14, 98:6, 98:14, 99:4, 99:7, 99:15, 99:20, 100:1, 100:20, 100:23, 101:7, 104:8, 104:16, 105:1, 105:4, 105:19, 106:1, 106:13, 107:5, 107:10, 107:17, 107:18, 107:22, 107:24, 108:1
**e-mails** [14] - 11:3, 70:3, 82:24, 92:20, 93:5, 95:17, 98:17, 104:10, 104:13, 104:21, 107:6, 107:8, 110:25
**Eagan** [9] - 10:1, 21:2, 21:23, 31:10, 35:21, 37:2, 51:14, 74:12, 110:9
**early** [2] - 64:10, 64:13
**easier** [1] - 82:14
**Eco** [1] - 37:3
**educational** [1] - 33:25
**effort** [1] - 17:15
**eight** [1] - 100:21
**either** [5] - 7:7, 11:25,

56:19, 97:6
**elicited** [1] - 6:8
**employed** [2] - 33:12, 33:14
**encouraged** [1] - 94:18
**end** [5] - 34:18, 50:14, 61:20, 66:16, 112:10
**ends** [1] - 27:16
**enforce** [1] - 90:18
**enforcing** [1] - 74:14
**enormous** [1] - 30:1
**entered** [1] - 54:1
**entire** [2] - 25:16, 25:17
**entirety** [2] - 26:1, 26:16
**entitled** [2] - 8:9, 116:11
**entity** [4] - 67:8, 67:10, 72:24, 73:4
**equity** [1] - 83:22
**err** [1] - 111:9
**ESQ** [2] - 2:15, 2:18
**establish** [2] - 16:17, 16:23
**establishes** [1] - 110:23
**establishing** [1] - 16:12
**estimating** [1] - 57:14
**evening** [4] - 76:11, 83:1, 109:7, 114:16
**EVIDENCE** [1] - 4:4
**evidence** [8] - 16:12, 17:13, 23:21, 23:24, 47:20, 62:4, 81:23, 110:9
**evident** [1] - 115:1
**evidently** [1] - 24:13
**exact** [5] - 9:9, 51:10, 109:19, 113:18, 113:19
**exactly** [2] - 28:8, 29:6
**Examination** [6] - 3:4, 3:5, 3:5, 3:7, 3:7, 3:9
**examination** [14] - 5:19, 11:1, 13:14, 20:9, 20:11, 22:21, 26:11, 61:16, 61:18, 112:2, 112:9, 112:10, 112:11, 114:7
**EXAMINATION** [6] - 9:17, 13:10, 16:3, 19:7, 25:1, 33:8
**examinations** [2] - 32:9, 32:12
**example** [2] - 49:6, 75:22

**examples** [1] - 109:25
**exception** [2] - 35:20, 79:22
**excuse** [4] - 5:9, 7:16, 97:13, 101:11
**excused** [4] - 5:10, 18:15, 32:20, 32:22
**executed** [6] - 35:23, 36:11, 36:15, 56:25, 57:1, 57:8
**Exhibit** [78] - 5:21, 5:23, 5:24, 6:4, 6:7, 9:20, 10:4, 10:22, 15:7, 23:17, 23:18, 24:2, 24:4, 24:6, 34:22, 34:24, 35:18, 36:5, 46:14, 47:20, 47:25, 51:16, 52:25, 53:1, 53:3, 53:4, 53:6, 53:17, 53:20, 55:6, 59:5, 61:5, 64:3, 65:19, 68:17, 68:21, 68:23, 69:11, 69:22, 70:2, 70:18, 79:11, 79:12, 79:19, 80:1, 82:8, 82:13, 85:9, 85:19, 85:23, 86:17, 87:15, 89:11, 92:15, 92:16, 93:3, 93:9, 97:16, 99:1, 99:2, 99:11, 99:14, 100:18, 101:2, 101:6, 104:5, 104:6, 104:19, 104:24, 106:8, 106:21, 107:3, 107:13, 107:23, 112:8, 112:19, 113:10
**exhibit** [10] - 6:20, 27:13, 27:24, 36:2, 41:16, 51:17, 62:2, 109:12, 112:18, 114:5
**EXHIBIT** [1] - 4:4
**Exhibits** [2] - 22:23, 23:6
**exhibits** [4] - 6:3, 6:16, 6:20, 23:15
**EXHIBITS** [1] - 4:2
**expected** [3] - 63:7, 63:23, 115:6
**expenses** [4] - 30:18, 41:16, 41:20, 58:12
**experience** [3] - 29:22, 29:25, 30:1
**experts** [1] - 45:19
**explain** [1] - 80:25
**express** [1] - 45:20
**extent** [1] - 23:11
**external** [1] - 25:15

**extortion** [1] - 16:10
**extract** [1] - 47:2
**extracted** [1] - 47:9

## F

**face** [1] - 115:1
**fact** [3] - 7:8, 11:23, 62:2
**facts** [1] - 62:25
**fair** [11] - 15:18, 30:2, 35:14, 45:12, 53:12, 69:14, 93:18, 99:7, 104:16, 111:22
**familiar** [1] - 21:1
**family** [2] - 12:24, 58:23
**Fashion** [1] - 51:15
**fast** [3] - 43:21, 43:24, 94:5
**fast-forward** [2] - 43:21, 43:24
**faster** [1] - 8:1
**FEDERAL** [1] - 1:24, 116:5
**federal** [5] - 20:2, 46:22, 74:2, 82:3, 97:7
**Federal** [1] - 116:20
**fee** [16] - 36:23, 36:24, 36:25, 37:17, 38:1, 38:16, 38:18, 39:22, 39:25, 40:23, 41:16, 42:19, 42:20, 43:17, 43:20
**Fees** [1] - 39:19
**fees** [12] - 37:14, 40:13, 40:16, 40:19, 41:2, 41:5, 41:12, 45:18, 45:19, 58:5
**few** [5] - 65:19, 71:14, 72:24, 73:2
**fewer** [1] - 109:14
**fields** [1] - 33:23
**figure** [6] - 78:13, 78:25, 101:16, 101:19, 101:25, 105:13
**figured** [1] - 96:18
**figuring** [2] - 78:16, 78:21
**file** [1] - 43:7
**files** [6] - 20:10, 30:16, 110:8, 110:9, 110:11, 110:14
**filing** [1] - 104:4
**FILIPPO** [1] - 9:16
**Filippo** [6] - 6:18, 6:19, 6:21, 7:2, 9:5, 9:8

**FILLIPO** [1] - 3:4
**final** [2] - 59:21, 82:9
**finalize** [1] - 46:11
**finalized** [1] - 44:23
**finance** [1] - 58:24
**findings** [2] - 13:18, 16:20
**fine** [7] - 6:12, 7:12, 8:3, 9:10, 13:7, 60:23, 61:25
**finish** [1] - 111:24
**firms** [1] - 42:21
**first** [29] - 6:22, 6:24, 10:23, 18:25, 21:15, 21:17, 23:18, 25:16, 25:23, 33:3, 34:6, 34:7, 36:22, 38:5, 41:6, 41:7, 53:24, 56:12, 56:13, 58:4, 58:21, 80:5, 96:22, 97:25, 99:23, 108:6, 114:4, 114:13
**five** [3] - 86:23, 86:24, 111:18
**floating** [1] - 90:12
**floor** [1] - 52:10
**flow** [2] - 94:8, 94:24
**follow** [4] - 6:3, 59:18, 82:7, 105:5
**following** [5] - 70:18, 76:15, 76:16, 103:23, 110:7
**follows** [1] - 55:9
**FOR** [3] - 2:3, 2:14, 2:16
**foregoing** [1] - 116:9
**Forensic** [1] - 4:9
**form** [4] - 60:14, 94:22, 109:4
**format** [3] - 20:22, 20:23, 116:11
**forth** [5] - 14:24, 44:21, 62:21, 82:15, 93:21
**forward** [5] - 17:3, 43:21, 43:24, 71:9, 90:3
**forwarded** [5] - 11:9, 69:12, 69:15, 70:1, 70:4
**Foundation** [1] - 73:20
**foundation** [9] - 62:16, 62:24, 75:3, 88:13, 89:1, 96:9, 107:19, 110:9, 110:13
**foundational** [1] - 29:19
**four** [6] - 21:15, 63:6,

71:13, 71:22, 92:20, 96:19
**frankly** [1] - 113:9
**fraud** [1] - 16:10
**fraudulent** [1] - 17:14
**Friday** [7] - 44:7, 50:22, 66:14, 86:3, 108:2, 114:13, 114:23
**Friday's** [2] - 71:9, 114:14
**friends** [2] - 65:10, 65:13
**front** [8] - 27:10, 28:8, 34:24, 46:15, 52:10, 59:6, 79:12, 104:6
**fronts** [3] - 101:17, 101:20, 101:25
**full** [3] - 27:2, 40:19, 55:3
**fully** [4] - 35:23, 36:11, 36:15, 57:8
**funding** [1] - 103:21
**funds** [6] - 14:5, 43:8, 80:23, 80:24, 81:1, 91:15
**future** [6] - 30:18, 81:8, 81:20, 91:19, 108:14, 110:20

### G

**Gardner** [1] - 114:20
**generally** [5] - 25:9, 30:15, 64:4, 110:25, 111:1
**gentlemen** [6] - 9:12, 23:21, 48:25, 60:12, 101:5, 108:25
**given** [1] - 114:9
**Gomez** [3] - 7:19, 7:21, 8:1
**Government** [28] - 5:24, 6:8, 13:3, 18:19, 22:4, 22:22, 23:5, 23:15, 25:5, 35:17, 47:19, 53:16, 69:21, 85:18, 86:25, 87:3, 87:8, 93:2, 99:10, 101:1, 107:12, 110:22, 112:14, 113:8, 115:3, 115:6, 115:14
**GOVERNMENT** [5] - 3:4, 3:6, 3:8, 18:20, 33:1
**government** [6] - 7:6, 23:16, 32:23, 62:2, 79:19, 104:19
**Government's** [1] -

112:13
**grade** [1] - 34:1
**great** [1] - 80:12
**greatly** [2] - 108:9, 108:11
**Greg** [7] - 37:3, 48:25, 52:2, 54:2, 78:11, 95:13, 108:4
**Gregory** [2] - 32:23, 33:4
**GREGORY** [3] - 3:8, 33:1, 33:5

### H

**half** [3] - 10:23, 61:24, 109:17
**hand** [4] - 32:25, 37:3, 37:4, 110:12
**handed** [1] - 5:22
**handled** [2] - 39:25, 74:19
**handwriting** [1] - 69:1
**handy** [1] - 61:9
**HANNA** [2] - 2:4, 2:9
**happy** [7] - 50:22, 60:21, 83:11, 83:17, 110:4, 110:15, 111:14
**hardscape** [1] - 37:10
**harmed** [1] - 16:12
**heading** [1] - 56:12
**hear** [6] - 23:23, 23:24, 28:14, 29:20, 73:8
**heard** [1] - 29:2
**hearing** [3] - 20:6, 20:8, 60:20
**hearings** [11] - 20:23, 21:6, 21:9, 21:23, 22:3, 22:4, 22:8, 22:10, 22:12, 22:19
**Hearsay** [4] - 47:22, 69:23, 79:21, 93:4
**hearsay** [16] - 23:10, 35:19, 47:21, 53:18, 85:20, 87:10, 91:7, 91:8, 99:12, 101:3, 104:20, 107:14, 107:20, 110:7, 110:15, 110:20
**held** [1] - 116:10
**help** [12] - 67:7, 77:13, 77:17, 91:20, 100:3, 100:6, 101:22, 101:24, 108:8, 108:10, 108:13, 108:15
**helpful** [1] - 109:13
**hereby** [1] - 116:7

Hernandez [2] - 7:18, 112:12
**HERNANDEZ** [1] - 7:24
**Hi** [1] - 80:5
**hi** [6] - 59:17, 67:21, 96:17, 99:18, 105:4, 106:4
**high** [1] - 58:13
**highly** [1] - 6:1
**HINO** [3] - 1:23, 116:5, 116:19
**Hino** [1] - 116:20
**HINO-SPAAN** [3] - 1:23, 116:5, 116:19
**Hino-Spaan** [1] - 116:20
**hire** [1] - 34:7
**hiring** [5] - 34:12, 34:18, 37:7, 37:16, 40:5
**hit** [1] - 84:20
**hold** [1] - 48:6
**holding** [1] - 103:21
**Honor** [112] - 5:6, 5:13, 5:18, 5:23, 6:2, 6:5, 7:3, 7:5, 7:17, 8:5, 8:12, 9:3, 9:15, 13:5, 13:9, 16:17, 16:21, 17:23, 18:10, 18:13, 18:17, 19:6, 23:5, 23:9, 23:14, 24:4, 24:11, 24:15, 24:23, 27:24, 28:3, 30:9, 30:23, 31:4, 31:18, 32:19, 33:7, 35:17, 35:19, 47:19, 47:21, 47:22, 49:18, 49:23, 53:16, 53:18, 61:3, 61:11, 61:14, 61:15, 61:19, 61:25, 62:1, 62:6, 62:10, 62:25, 63:25, 69:22, 73:20, 75:4, 76:4, 78:19, 78:23, 79:20, 79:21, 82:5, 82:7, 85:18, 85:20, 87:8, 87:10, 87:22, 88:12, 88:25, 89:7, 91:7, 93:2, 93:4, 93:10, 96:10, 99:10, 99:12, 100:12, 101:1, 101:3, 104:20, 107:12, 107:14, 107:16, 107:20, 108:19, 109:18, 109:23, 110:1, 110:4, 111:6, 111:14, 111:22,

112:1, 112:2, 112:7, 112:15, 112:17, 112:19, 113:3, 113:10, 113:21, 114:17, 115:9
**HONORABLE** [1] - 1:3
**hope** [2] - 59:17, 76:20
**hours** [14] - 21:16, 25:23, 26:1, 26:21, 26:25, 27:2, 27:5, 27:8, 41:24, 42:2, 83:7, 111:10, 113:14
**hung** [1] - 54:25
**hurt** [1] - 91:18

### I

**idea** [2] - 91:11, 91:18
**ideas** [1] - 75:23
**identified** [2] - 114:25, 115:7
**identify** [1] - 113:18
**ignore** [1] - 75:7
**III** [2] - 34:21
**image** [2] - 12:11, 12:14
**immediately** [2] - 6:3, 43:4
**IN** [2] - 2:14, 4:4
**incident** [2] - 56:20, 56:21
**include** [5] - 14:19, 22:23, 29:10, 47:13, 102:1
**included** [3] - 28:18, 28:25, 96:1
**including** [1] - 104:17
**income** [1] - 30:17
**incurred** [1] - 77:19
**index** [2] - 8:21, 9:8
**individual** [2] - 21:22, 54:3
**infer** [1] - 110:25
**information** [5] - 56:20, 81:11, 81:16, 81:18, 86:14
**informed** [2] - 39:3, 45:11
**initial** [3] - 33:5, 40:13, 40:17
**initials** [2] - 39:8, 39:11
**input** [1] - 73:1
**inquired** [1] - 17:9
**inside** [1] - 46:12
**instead** [2] - 49:22, 62:14
**instructions** [4] - 82:11, 105:6,

105:20, 106:14
**insufficient** [1] - 40:18
**intellectual** [6] - 33:21, 34:16, 37:9, 37:17, 37:24, 72:25
**intent** [1] - 30:16
**interest** [3] - 90:25, 91:11, 91:17
**interested** [1] - 91:17
**International** [1] - 54:8
**interrupt** [1] - 8:25
**interrupted** [2] - 113:4, 113:6
**interview** [7] - 5:14, 5:21, 112:8, 112:20, 112:21, 115:16
**introduce** [1] - 62:3
**introduced** [2] - 34:14, 60:20
**investigation** [1] - 115:18
**investing** [1] - 71:24
**investments** [2] - 71:13, 71:21
**involve** [1] - 68:11
**involvement** [2] - 14:2, 14:5
**IP** [2] - 4:8, 36:10
**IPSY** [3] - 14:1, 14:6, 14:8
**irritate** [2] - 98:23, 98:24
**Island** [1] - 51:15
**issue** [13] - 5:6, 5:21, 7:4, 7:6, 8:11, 67:22, 67:25, 106:5, 107:20, 109:19, 111:23, 112:7, 114:20
**issues** [4] - 5:20, 60:14, 77:18, 109:5
**itemization** [1] - 93:17
**items** [1] - 96:7

### J

**J-r** [1] - 33:5
**JAMES** [1] - 1:3
**January** [14] - 15:23, 59:6, 59:13, 59:15, 62:14, 62:22, 63:6, 63:9, 64:6, 64:10, 64:13, 70:16, 96:8, 108:17
**Jencks** [5] - 5:19, 5:20, 6:9, 8:15, 115:11
**jeopardize** [1] - 92:6
**Jim** [2] - 13:15, 16:11

**job** [4] - 19:14, 19:19, 19:20, 31:20
**John** [6] - 47:13, 47:16, 47:17, 48:17, 48:23, 50:17
**JOHN** [2] - 1:8, 2:15
**JR** [2] - 3:8, 33:1
**Jr** [1] - 33:4
**JUDGE** [1] - 1:3
**Judicial** [1] - 116:12
**Judy** [4] - 35:7, 36:16, 104:10, 108:5
**July** [6] - 21:15, 21:20, 25:25, 32:1, 36:21
**June** [8] - 5:25, 21:14, 21:17, 21:18, 25:25, 103:6, 103:10, 114:19
**jury** [11] - 5:5, 7:14, 8:19, 9:11, 9:13, 13:2, 24:15, 60:18, 62:8, 109:10, 110:24
**Justice** [1] - 19:12

**K**

**keep** [13] - 39:3, 49:10, 67:23, 68:4, 68:9, 68:10, 82:15, 84:17, 90:1, 108:8, 108:11, 108:13, 108:15
**keeping** [1] - 44:13
**keeps** [1] - 20:23
**kept** [1] - 90:11
**kind** [5] - 12:24, 33:18, 64:4, 75:20, 100:1
**knowledge** [2] - 14:11, 15:11

**L**

**lack** [2] - 112:2, 112:4
**Lack** [1] - 107:19
**lacking** [1] - 6:6
**Lacks** [4] - 62:16, 62:24, 75:3, 96:9
**lacks** [2] - 88:12, 88:25
**ladies** [5] - 9:12, 23:21, 60:12, 101:5, 108:25
**last** [19] - 18:25, 31:24, 33:3, 33:5, 39:5, 51:17, 54:13, 56:18, 59:8, 59:9, 71:13, 71:22, 84:16, 96:17, 97:14, 98:15, 100:1, 115:3, 115:7
**late** [7] - 8:9, 8:10,

11:11, 55:18, 58:16, 62:12, 79:2
**laughter** [1] - 113:8
**law** [2] - 36:25, 42:21
**LAW** [1] - 2:17
**lawyer** [3] - 34:5, 34:7, 34:14
**lawyers** [2] - 37:1, 111:1
**leading** [13] - 63:18, 64:1, 64:21, 68:14, 69:19, 74:15, 78:18, 81:24, 87:22, 87:23, 98:7, 102:2, 102:24
**Leading** [4] - 74:8, 91:2, 91:24, 102:15
**leaked** [1] - 56:20
**learn** [1] - 31:21
**learned** [2] - 32:3, 58:15
**least** [1] - 104:10
**led** [1] - 74:4
**left** [4] - 8:6, 87:17, 110:12, 111:10
**left-hand** [1] - 110:12
**legal** [7] - 37:11, 37:14, 42:8, 42:9, 42:12, 42:15, 67:8
**Legal** [1] - 39:19
**legion** [1] - 8:16
**legit** [1] - 16:13
**length** [1] - 111:11
**lengthy** [1] - 25:14
**less** [6] - 14:2, 28:8, 45:18, 57:14, 58:8, 58:9
**letting** [1] - 17:24
**liability** [2] - 31:11, 54:8
**likely** [1] - 6:21
**limited** [3] - 31:11, 54:8, 109:12
**Line** [1] - 85:2
**line** [41] - 17:22, 18:12, 36:9, 48:5, 49:6, 49:12, 49:15, 50:15, 51:24, 52:1, 52:8, 56:12, 56:13, 59:6, 59:10, 64:5, 64:9, 64:24, 65:2, 66:5, 67:17, 70:19, 71:2, 72:2, 72:18, 76:7, 76:15, 77:5, 77:21, 78:2, 78:6, 82:24, 84:4, 85:1, 89:13, 89:20, 97:17, 99:16, 101:7, 108:7
**lines** [3] - 65:19, 72:18, 82:17
**lining** [1] - 48:6

**list** [4] - 4:19, 81:11, 94:1, 95:15, 95:16, 95:17, 96:1, 99:17, 99:18, 99:19, 99:21, 99:23, 114:15
**listened** [9] - 25:13, 25:16, 25:17, 25:23, 26:1, 26:3, 26:25, 28:11, 29:2
**lists** [2] - 95:22, 95:23
**litigation** [4] - 38:10, 38:12, 38:13, 43:22
**living** [1] - 33:16
**LLC** [6] - 37:3, 38:6, 54:7, 81:12, 81:14, 88:8
**LLP** [3] - 21:2, 31:11, 37:2
**loan** [3] - 67:23, 68:4, 81:4
**loans** [2] - 68:11, 103:17
**locate** [1] - 14:22
**locked** [1] - 52:10
**look** [73] - 7:7, 7:16, 8:1, 8:20, 9:4, 9:7, 21:5, 27:10, 27:12, 32:7, 34:20, 34:22, 37:5, 38:23, 39:18, 42:5, 46:14, 48:1, 48:8, 48:12, 49:5, 50:15, 51:16, 52:8, 52:25, 53:3, 59:5, 59:6, 64:3, 64:4, 64:8, 64:24, 65:19, 66:5, 67:17, 68:17, 68:21, 68:23, 69:11, 71:2, 72:2, 72:18, 74:24, 74:25, 75:16, 76:7, 76:15, 77:2, 78:1, 79:11, 81:10, 82:8, 82:13, 82:16, 82:17, 84:4, 85:9, 86:17, 86:23, 88:1, 88:4, 90:3, 92:15, 95:6, 99:1, 100:18, 104:5, 105:25, 107:3, 110:8, 112:21, 113:12
**looked** [3] - 6:25, 8:22, 106:13
**looking** [8] - 7:21, 34:15, 66:10, 71:9, 90:22, 96:13, 107:6, 113:13
**looks** [1] - 92:20
**loose** [1] - 82:14
**LOS** [1] - 116:3
**Los** [1] - 2:12
**losing** [1] - 101:17

**luck** [2] - 66:15, 89:25
**lump** [2] - 40:14, 40:17
**lump-sum** [2] - 40:14, 40:17
**lunch** [2] - 7:4, 7:17
**lunchtime** [1] - 6:22

**M**

**ma'am** [1] - 28:23
**machine** [1] - 54:25
**mail** [72] - 4:7, 4:12, 4:13, 4:15, 4:17, 4:19, 4:20, 4:22, 4:24, 7:16, 7:18, 7:20, 11:9, 15:8, 15:12, 35:1, 35:4, 35:10, 35:14, 36:7, 36:8, 36:14, 36:19, 69:12, 69:14, 69:17, 69:25, 72:22, 75:13, 79:14, 79:16, 81:11, 83:1, 84:19, 84:20, 85:9, 85:12, 85:15, 85:24, 92:18, 92:24, 93:13, 95:7, 95:19, 96:13, 96:14, 97:14, 98:6, 98:14, 99:4, 99:7, 99:15, 99:20, 100:1, 100:20, 100:23, 101:7, 104:8, 104:16, 105:1, 105:4, 105:19, 106:1, 106:13, 107:5, 107:10, 107:17, 107:18, 107:22, 107:24, 108:1
**mailbox** [1] - 111:1
**mails** [14] - 11:3, 70:3, 82:24, 92:20, 93:5, 95:17, 98:17, 104:10, 104:13, 104:21, 107:6, 107:8, 110:25
**maintain** [1] - 22:14
**maintained** [3] - 21:6, 21:10, 22:18
**major** [1] - 71:9
**manage** [1] - 103:18
**manager** [1] - 35:9
**March** [35] - 4:11, 11:11, 11:18, 55:16, 55:20, 56:5, 56:9, 57:2, 58:16, 58:18, 62:14, 63:4, 64:10, 64:13, 64:19, 65:5, 65:8, 65:16, 65:20, 66:6, 67:18, 67:20,

70:12, 70:19, 71:3, 72:18, 74:25, 76:8, 76:10, 76:16, 77:3, 79:2, 79:3, 102:14
**MARCHINO** [2] - 3:4, 9:16
**Marchino** [32] - 5:14, 5:24, 6:18, 6:19, 6:21, 7:2, 7:7, 9:5, 9:8, 9:19, 10:8, 13:1, 13:12, 16:1, 16:5, 16:22, 17:1, 17:19, 18:6, 18:14, 112:14, 112:22, 113:16, 114:10, 114:12, 114:14, 114:15, 114:18, 114:23, 115:16
**Marchino's** [1] - 112:8
**Marilyn** [2] - 18:19, 19:1
**MARILYN** [3] - 3:6, 18:20, 19:2
**mark** [1] - 65:11
**market** [1] - 38:11
**matched** [1] - 25:21
**matter** [14] - 14:12, 14:16, 30:25, 31:1, 34:16, 37:8, 37:18, 40:6, 42:10, 43:25, 44:8, 44:18, 74:14, 116:11
**Matters** [1] - 42:6
**matters** [2] - 42:8, 42:12
**mean** [29] - 12:21, 21:12, 25:9, 26:6, 30:12, 40:25, 41:1, 50:2, 59:20, 65:12, 66:17, 71:17, 71:22, 72:8, 73:10, 81:6, 83:3, 83:5, 83:13, 83:17, 86:10, 94:10, 94:13, 100:5, 101:19, 103:2, 103:15, 108:10, 112:4
**Meaning** [1] - 78:3
**meaning** [3] - 11:6, 12:22, 58:9
**means** [1] - 111:10
**meant** [3] - 10:17, 43:17, 71:24
**mediation** [6] - 43:25, 44:4, 44:6, 44:14, 45:4, 45:6
**mediator** [1] - 74:3
**meet** [5] - 34:6, 46:12, 51:12, 80:7, 80:17
**meeting** [9] - 52:2,

52:5, 52:6, 58:21,
69:9, 80:19, 80:21,
86:1, 105:5
**meetings** [2] - 71:8,
72:23
**members** [1] - 12:24
**memorandum** [4] -
5:14, 5:22, 6:2, 6:3
**mentioned** [6] - 19:19,
20:20, 21:17, 30:6,
30:11, 61:5
**merry** [1] - 50:22
**message** [29] - 11:15,
11:25, 12:7, 48:2,
48:16, 48:22, 49:6,
49:7, 49:11, 50:5,
50:17, 52:1, 59:12,
60:1, 60:4, 65:4,
66:5, 66:8, 66:23,
73:6, 76:11, 77:23,
78:2, 83:7, 83:24,
84:12, 89:15, 98:16,
101:15
**Messages** [1] - 4:9
**messages** [24] - 9:20,
11:11, 11:14, 47:3,
47:9, 47:12, 47:13,
51:21, 64:9, 64:14,
73:15, 74:24, 74:25,
75:1, 75:11, 77:3,
79:2, 79:3, 82:25,
84:6, 89:11, 97:17,
97:22, 98:19
**met** [10] - 51:6, 52:11,
52:16, 52:22, 53:11,
57:3, 57:10, 58:11,
62:11, 62:20
**Michael** [35] - 22:1,
34:2, 34:4, 34:6,
34:7, 34:14, 44:12,
47:17, 48:16, 53:11,
54:25, 59:17, 67:7,
67:21, 68:7, 72:21,
74:23, 76:11, 76:21,
78:13, 80:5, 83:21,
84:22, 85:25, 88:10,
90:3, 93:23, 94:1,
96:17, 97:13, 99:18,
101:13, 101:23,
105:4, 106:4
**MICHAEL** [2] - 1:8,
2:15
**Michael's** [2] - 35:8,
71:25
**Michelle** [2] - 14:20,
88:23
**midafternoon** [1] -
60:10
**middle** [6] - 33:5,
43:13, 61:16, 61:18,

88:4, 95:12
**might** [5] - 20:18,
74:1, 109:13,
109:14, 114:23
**million** [36] - 5:25,
14:19, 15:2, 15:23,
45:12, 49:16, 49:17,
49:24, 50:3, 51:2,
55:15, 57:14, 57:20,
63:12, 63:15, 66:19,
68:1, 71:18, 72:10,
73:12, 76:14, 76:22,
77:20, 79:5, 81:8,
81:21, 81:22, 86:12,
88:20, 90:9, 94:11,
100:8, 105:17,
108:13, 112:23,
114:19
**millions** [3] - 14:15,
14:18, 17:15
**mine** [1] - 39:12
**minimis** [1] - 14:3
**minus** [1] - 57:23
**minute** [2] - 101:10,
112:15
**minutes** [5] - 8:6,
16:8, 60:13, 111:15,
111:16, 111:6
**misread** [1] - 49:20
**missing** [1] - 115:5
**misstatement** [1] -
26:8
**misstates** [3] - 49:18,
57:25, 81:23
**Misstates** [1] - 15:14
**MOI** [1] - 114:6
**moment** [6] - 12:3,
29:17, 72:22, 112:2,
115:3, 115:7
**moments** [1] - 27:1
**Monday** [2] - 50:14,
86:2
**money** [47] - 14:8,
52:24, 58:13, 58:15,
58:18, 58:22, 58:24,
59:2, 59:3, 63:22,
63:24, 64:15, 64:18,
65:22, 66:3, 66:21,
67:12, 68:7, 70:16,
71:25, 74:1, 76:3,
79:1, 79:10, 80:18,
80:19, 81:2, 82:11,
83:19, 85:7, 88:16,
88:23, 88:24, 89:4,
90:7, 90:13, 91:21,
94:15, 94:19, 97:5,
97:10, 97:12,
100:15, 102:1,
108:12, 108:17
**money/funds** [1] -

85:7
**months** [5] - 64:17,
71:13, 71:22, 78:17,
114:4
**morning** [5] - 5:19,
48:25, 65:9, 72:21,
109:8
**Morning** [1] - 95:13
**most** [3] - 6:16, 6:21,
69:17
**motion** [1] - 28:20
**move** [5] - 8:14, 17:22,
18:12, 49:17, 109:14
**moves** [13] - 23:6,
35:18, 47:20, 53:17,
69:21, 79:19, 85:19,
87:9, 93:3, 99:11,
101:2, 104:19,
107:13
**moving** [3] - 58:25,
84:18, 90:1
**MR** [231] - 2:16, 5:6,
5:9, 5:13, 5:16, 5:18,
6:14, 7:3, 7:10, 7:13,
7:17, 7:25, 8:5, 8:12,
8:15, 8:20, 8:22,
8:23, 8:24, 9:3, 9:4,
9:15, 9:18, 10:6,
10:8, 13:5, 13:9,
13:11, 15:4, 15:7,
15:14, 15:18, 15:25,
16:4, 16:14, 16:17,
16:21, 16:25, 17:17,
17:19, 17:23, 18:1,
18:4, 18:6, 18:10,
18:13, 18:19, 19:6,
19:8, 23:1, 23:5,
23:9, 23:14, 23:18,
24:2, 24:4, 24:6,
24:8, 24:10, 24:11,
24:19, 24:21, 24:23,
25:2, 27:24, 28:2,
28:19, 28:23, 29:18,
29:21, 30:8, 30:11,
30:20, 30:22, 30:25,
31:3, 31:12, 31:17,
31:20, 31:23, 32:1,
32:5, 32:11, 32:19,
32:21, 32:23, 33:9,
34:8, 34:12, 35:17,
35:19, 35:21, 36:3,
36:6, 47:19, 47:21,
48:1, 49:18, 49:21,
49:22, 49:24, 50:1,
53:16, 53:18, 53:21,
57:25, 58:2, 60:23,
60:25, 61:3, 61:7,
61:11, 61:14, 61:15,
61:22, 62:6, 62:10,
62:16, 62:18, 62:24,

63:3, 63:18, 63:21,
63:25, 64:3, 64:21,
64:24, 68:14, 68:17,
69:19, 69:21, 69:23,
70:3, 73:20, 74:6,
74:8, 74:13, 74:15,
75:3, 75:7, 76:4,
76:7, 78:18, 78:21,
78:23, 79:2, 79:19,
79:21, 79:23, 80:2,
81:23, 82:5, 82:8,
85:18, 85:20, 85:24,
87:8, 87:10, 87:12,
87:16, 87:22, 88:1,
88:12, 88:15, 88:25,
89:4, 89:7, 89:10,
91:2, 91:5, 91:7,
91:10, 91:24, 92:2,
93:2, 93:4, 93:10,
96:9, 96:13, 98:7,
98:10, 99:10, 99:12,
99:15, 100:12,
100:16, 101:1,
101:3, 101:7,
101:12, 102:2,
102:5, 102:15,
102:17, 102:18,
102:22, 102:24,
103:3, 104:19,
104:20, 104:25,
106:8, 107:12,
107:14, 107:16,
107:19, 107:24,
108:18, 109:16,
109:18, 109:22,
109:25, 110:4,
110:19, 111:3,
111:6, 111:8,
111:14, 111:22,
111:25, 112:1,
112:17, 113:2,
113:3, 113:7,
113:17, 113:21,
114:12, 114:17,
115:9, 115:15
**MS** [1] - 7:24
**multiple** [2] - 12:16,
41:11
**must** [1] - 86:18

# N

**name** [6] - 18:25, 33:3,
33:4, 33:5, 60:21,
110:11
**names** [1] - 93:21
**Nda** [1] - 4:12
**necessary** [1] - 15:1
**necessitate** [1] -
109:14

**need** [18] - 23:12,
46:10, 49:3, 62:2,
72:23, 73:12, 77:9,
77:13, 77:17, 94:5,
100:3, 100:6,
101:16, 106:5,
111:12, 112:16,
114:21
**needed** [11] - 56:9,
79:10, 80:22, 81:3,
84:20, 93:22,
101:19, 101:22,
103:17, 105:13,
108:15
**needing** [1] - 80:19
**needs** [2] - 110:21,
111:20
**negotiation** [1] - 14:1
**neighborhood** [1] -
28:7
**never** [5] - 12:14,
50:10, 59:4, 64:17,
99:21
**new** [7] - 58:24, 61:7,
67:4, 67:10, 73:4,
105:6, 106:14
**Newport** [2] - 2:19,
51:14
**next** [37] - 10:6, 37:6,
39:8, 39:18, 46:3,
48:19, 55:13, 55:23,
67:17, 71:14, 76:20,
76:24, 77:11, 77:14,
77:16, 77:18, 80:10,
80:11, 80:18, 83:7,
86:13, 86:19, 94:4,
94:12, 94:13, 95:7,
96:2, 96:24, 98:2,
98:11, 99:24, 100:4,
100:6, 100:9,
100:10, 111:15,
111:18
**NICOLA** [2] - 2:4, 2:9
**none** [2] - 12:5, 14:10
**normal** [1] - 110:25
**North** [1] - 2:11
**note** [1] - 84:16
**noted** [1] - 112:2
**notes** [1] - 112:21
**nothing** [5] - 15:25,
18:13, 32:17, 94:20,
114:20
**Nothing** [1] - 71:7
**notice** [24] - 28:17,
28:24, 69:25, 79:23,
79:24, 79:25, 85:21,
91:9, 93:6, 99:13,
101:4, 104:22,
107:15, 109:13,
110:7, 110:14,

110:15, 110:21, 110:22, 114:9, 114:10, 114:23, 115:5
**Number** [14] - 21:2, 36:5, 47:25, 53:20, 70:2, 80:1, 85:23, 87:15, 93:9, 94:12, 99:14, 101:6, 104:24, 107:23
**number** [22] - 8:23, 10:8, 28:17, 29:9, 36:2, 48:5, 48:7, 48:10, 49:2, 94:4, 96:24, 97:19, 104:3, 110:6, 112:6, 112:7, 113:19
**Numbers** [1] - 23:17
**numbers** [1] - 6:20

## O

**o'clock** [3] - 109:1, 109:2, 111:17
**oath** [3] - 20:9, 20:11, 20:20
**object** [3] - 24:11, 61:15, 61:19
**objection** [56] - 15:14, 16:14, 18:10, 23:8, 23:9, 28:19, 29:3, 29:19, 30:8, 30:22, 31:3, 31:8, 31:17, 31:23, 32:5, 35:19, 47:21, 47:22, 49:18, 53:18, 62:16, 62:24, 63:25, 69:23, 74:8, 75:3, 76:4, 78:18, 79:21, 81:23, 82:4, 85:20, 87:10, 87:14, 87:22, 88:12, 88:25, 89:7, 91:2, 91:7, 91:24, 93:4, 96:9, 98:7, 99:12, 100:12, 101:3, 102:2, 102:15, 102:24, 104:20, 107:14, 107:19, 108:18, 110:7, 110:20
**Objection** [1] - 73:20
**objections** [3] - 23:11, 109:14, 112:3
**obligated** [1] - 7:9
**obligation** [1] - 115:4
**obvious** [1] - 109:11
**obviously** [2] - 6:19, 28:11
**occasion** [1] - 73:16
**occur** [1] - 32:9
**occurrence** [1] - 92:6

**October** [1] - 5:14
**OF** [7] - 1:2, 1:5, 1:14, 2:1, 116:1, 116:3, 116:4
**offer** [3] - 50:7, 83:15, 109:13
**offering** [2] - 23:12, 24:16
**Office** [1] - 26:18
**office** [18] - 12:11, 19:15, 19:19, 19:23, 20:24, 21:5, 21:7, 21:10, 22:15, 26:9, 35:8, 46:12, 51:14, 52:5, 52:6, 53:11, 53:13, 63:11
**officer** [2] - 20:18, 20:19
**OFFICES** [1] - 2:17
**offices** [2] - 11:17, 35:8
**OFFICIAL** [3] - 1:24, 116:1, 116:5
**Official** [1] - 116:20
**old** [3] - 12:23, 93:24, 94:2
**Oldcastle** [9] - 38:5, 38:6, 38:9, 38:10, 38:11, 38:12, 38:19, 38:21
**once** [1] - 113:22
**one** [46] - 5:6, 6:16, 9:1, 11:3, 12:16, 12:18, 18:1, 18:7, 20:3, 21:14, 21:15, 21:16, 21:17, 21:20, 27:16, 30:13, 31:24, 37:3, 38:13, 48:6, 48:8, 52:13, 57:14, 61:24, 67:17, 74:1, 74:3, 74:10, 74:11, 77:10, 77:11, 77:14, 81:15, 82:9, 84:9, 92:21, 95:16, 97:25, 104:13, 107:25, 111:6, 111:23, 112:6, 112:15, 114:23
**ones** [2] - 32:10, 70:1
**oOo** [1] - 115:24
**opinion** [1] - 41:9
**opinions** [2] - 60:14, 109:4
**opportunities** [2] - 91:19
**options** [8] - 75:24, 76:1, 76:2, 76:25, 86:5, 86:10, 90:23
**OR** [1] - 4:4
**or..** [1] - 20:19

**oral** [3] - 20:9, 20:11, 20:20
**original** [18] - 20:24, 21:6, 22:2, 22:8, 22:12, 22:16, 25:14, 25:16, 25:20, 26:10, 26:12, 37:23, 45:4, 46:13, 58:4, 68:7, 69:6
**originals** [1] - 23:3
**ought** [1] - 108:22
**ourselves** [1] - 8:1
**outline** [1] - 93:17, 93:20
**outside** [1] - 37:13
**overall** [2] - 57:18, 58:9
**overnight** [1] - 109:6
**overruled** [40] - 15:5, 15:15, 23:11, 28:21, 31:5, 32:6, 34:9, 36:1, 47:23, 53:19, 58:1, 62:17, 63:1, 63:19, 64:22, 68:15, 73:22, 74:9, 74:16, 75:5, 76:5, 78:24, 81:25, 85:22, 87:14, 87:24, 88:14, 89:2, 89:8, 91:3, 91:25, 96:11, 98:8, 100:13, 102:3, 102:16, 102:19, 102:25, 104:21, 108:20

## P

**p.m** [8] - 36:8, 48:18, 48:20, 60:17, 96:15, 107:18, 115:23
**P.M** [2] - 1:16, 5:2
**PAGE** [1] - 3:3
**page** [59] - 10:6, 10:9, 10:12, 10:16, 10:24, 36:6, 36:19, 41:16, 42:23, 43:14, 48:1, 48:5, 48:10, 48:11, 49:5, 51:17, 51:18, 51:22, 53:21, 54:13, 55:5, 56:13, 59:7, 59:8, 59:9, 64:5, 64:9, 64:25, 65:2, 68:23, 69:5, 70:23, 70:24, 71:1, 76:8, 77:2, 77:3, 78:1, 82:16, 84:4, 84:7, 84:8, 84:9, 87:16, 89:13, 93:11, 95:6, 95:12, 96:14, 97:16, 104:25, 105:25, 106:8, 116:11
**payable** [1] - 43:5
**paying** [4] - 41:1, 42:2, 72:1, 103:16
**payment** [19] - 5:25, 15:17, 15:19, 15:22, 40:9, 40:14, 40:17,

**pages** [9] - 46:17, 46:18, 53:3, 54:16, 54:19, 54:24, 86:23, 86:24
**paid** [15] - 40:17, 40:19, 41:10, 41:13, 41:23, 55:15, 63:12, 63:15, 64:14, 65:24, 66:21, 78:16, 83:6, 90:12, 96:7
**paperwork** [4] - 50:22, 50:25, 51:3, 51:13
**paragraph** [6] - 36:22, 37:5, 38:23, 38:24, 39:19, 40:8, 41:15, 42:5, 42:16, 42:23, 53:25, 55:6, 55:8, 55:13, 100:2
**paragraphs** [1] - 55:23
**paralegal** [8] - 6:22, 7:1, 7:19, 9:7, 35:9, 112:13, 114:1
**paralegals** [1] - 113:13
**part** [20] - 22:14, 26:8, 37:6, 38:16, 39:5, 39:13, 40:9, 43:10, 43:14, 53:22, 53:24, 58:4, 67:4, 70:9, 83:11, 83:17, 83:21, 93:23, 101:14
**particular** [1] - 29:1
**particularly** [1] - 22:4
**parties** [3] - 26:9, 44:17, 54:12
**partner** [2] - 20:19, 37:23
**partnership** [3] - 20:18, 30:16, 31:11
**parts** [1] - 101:14
**party** [6] - 11:12, 11:14, 20:9, 56:19, 91:13, 92:9
**pass** [1] - 13:5
**passwords** [1] - 12:12
**past** [1] - 81:11
**patent** [1] - 37:23
**patents** [1] - 33:21
**pause** [1] - 23:20
**pay** [13] - 29:1, 39:16, 40:18, 55:8, 55:11, 65:14, 65:17, 67:11, 83:20, 100:3, 100:5, 103:12, 104:3

40:18, 41:6, 41:7, 41:14, 42:13, 56:9, 65:21, 70:14, 74:20, 108:14, 112:23
**Payments** [1] - 4:16
**payments** [10] - 40:12, 40:15, 40:20, 41:11, 55:19, 55:24, 56:2, 56:19, 63:5, 106:5
**penalty** [1] - 56:21
**people** [2] - 20:3, 20:4, 73:2
**per** [1] - 56:21
**percent** [8] - 39:23, 41:3, 41:14, 42:3, 45:18, 57:23, 58:8, 111:8
**percentage** [3] - 59:22, 67:9, 83:22
**perform** [1] - 42:15
**periodic** [1] - 40:12
**permissible** [2] - 92:11, 92:12
**person** [3] - 9:1, 9:2, 30:15
**personal** [3] - 31:1, 90:12, 103:17
**Phan** [4] - 10:2, 14:14, 14:20, 114:20
**Phan's** [1] - 88:23
**phone** [22] - 11:23, 11:25, 12:3, 12:7, 12:17, 12:18, 12:20, 45:24, 45:25, 46:2, 46:22, 46:23, 46:25, 47:3, 47:9, 49:2, 75:18, 75:19, 95:16, 95:23, 96:6, 98:6
**phones** [5] - 12:14, 12:16, 12:19, 12:21, 12:23
**phonetic** [1] - 74:18
**pick** [1] - 55:4
**picture** [1] - 15:8
**piece** [2] - 17:13, 67:12
**place** [2] - 22:11, 54:9
**Plaintiff** [1] - 1:6
**PLAINTIFF** [1] - 2:3
**plan** [2] - 30:18, 94:5
**plane** [4] - 15:8, 15:12, 15:17, 15:20
**planned** [1] - 102:5
**play** [2] - 23:15, 23:18
**played** [11] - 14:1, 23:19, 24:1, 24:3, 24:5, 24:7, 24:9, 24:20, 24:22, 28:15, 29:5
**players** [1] - 71:9

**Plaza** [1] - 2:18
**plus** [7] - 25:23, 26:1, 26:24, 27:2, 27:8, 40:14, 103:17
**pocket** [5] - 81:2, 90:7, 94:6, 94:16, 108:13
**point** [27] - 17:3, 26:10, 29:18, 40:4, 46:21, 50:11, 56:8, 57:6, 57:21, 58:11, 58:16, 59:1, 62:1, 62:3, 66:20, 68:5, 72:12, 72:15, 74:4, 74:10, 76:1, 98:10, 110:5, 110:17, 112:17, 113:24, 115:17
**portion** [3] - 40:22, 95:16, 108:16
**portions** [1] - 46:25
**position** [1] - 103:4
**possession** [3] - 20:24, 43:9, 102:13
**possibilities** [1] - 73:1
**possible** [5] - 61:4, 80:9, 84:18, 94:6, 112:25
**possibly** [2] - 74:1, 90:25
**posted** [1] - 49:10
**potential** [1] - 76:25
**PPG** [7] - 81:12, 81:14, 81:17, 87:18, 88:8, 88:19, 88:22
**Practices** [2] - 39:19, 39:20
**preceding** [1] - 24:12
**predicting** [1] - 114:18
**predominantly** [2] - 19:17, 19:25
**preferred** [1] - 60:24
**presence** [5] - 5:5, 9:11, 60:18, 62:8, 109:10
**present** [2] - 40:14, 44:2
**preserve** [2] - 12:4, 12:6
**preserved** [1] - 20:21
**pressing** [1] - 71:7
**presumably** [2] - 7:21, 114:22
**presume** [1] - 114:24
**pretty** [2] - 67:22, 68:3
**primarily** [1] - 75:15
**primary** [1] - 17:13
**principal** [2] - 21:23, 54:9
**private** [1] - 15:8

**Private** [1] - 9:23
**PRO** [1] - 2:14
**problem** [1] - 82:6
**proceed** [3] - 24:18, 101:17, 101:20
**proceedings** [1] - 116:10
**Proceedings** [1] - 115:23
**PROCEEDINGS** [1] - 1:14
**process** [1] - 25:14
**process/ technologies** [1] - 37:10
**produce** [1] - 7:9
**produced** [6] - 6:2, 8:11, 115:10, 115:12, 115:13
**produces** [2] - 26:9, 115:19
**product** [2] - 34:16, 38:10
**production** [11] - 6:2, 6:18, 6:20, 7:2, 7:8, 9:6, 9:8, 9:9, 113:16, 114:2, 114:25
**products** [1] - 33:20
**progress** [2] - 44:13, 59:18
**progressing** [1] - 83:2
**project** [1] - 90:1
**promptly** [1] - 113:19
**pronounce** [2] - 60:21, 60:22
**pronouncing** [1] - 60:25
**pronunciation** [1] - 60:24
**property** [7] - 33:21, 34:16, 37:9, 37:17, 37:25, 43:8, 72:25
**propose** [1] - 30:18
**prosecutors** [1] - 26:17
**provide** [10] - 26:8, 37:11, 46:21, 81:18, 86:14, 105:14, 105:15, 106:17, 111:14, 113:19
**provided** [30] - 6:10, 6:21, 12:12, 22:11, 22:22, 23:22, 24:14, 26:10, 26:15, 32:2, 42:9, 52:19, 53:13, 55:17, 56:22, 63:4, 63:11, 64:20, 69:8, 82:10, 86:25, 87:3, 87:5, 87:20, 95:15, 112:13, 112:24,

114:4, 114:13
**providing** [3] - 59:23, 81:16, 99:19
**provision** [1] - 42:13
**PS** [4] - 70:5, 70:9, 70:13
**pull** [2] - 10:23, 108:8
**pulled** [2] - 25:14, 25:18
**purchase** [2] - 15:12, 15:19
**purpose** [2] - 88:18, 109:12
**purposes** [2] - 40:12, 110:7
**pursuant** [2] - 63:15, 116:8
**pursue** [2] - 17:21, 43:21
**pursuing** [1] - 37:24
**pushed** [1] - 88:11
**put** [7] - 25:15, 57:16, 66:12, 71:14, 99:21, 109:19, 111:1
**putting** [2] - 80:12, 105:4

**Q**

**questioning** [2] - 17:22, 18:12
**questions** [7] - 10:9, 15:18, 15:22, 20:14, 20:16, 24:23, 98:5
**quick** [1] - 101:15
**quickly** [7] - 5:7, 5:8, 5:9, 5:10, 5:11, 83:2, 99:22
**quite** [2] - 29:22, 115:2
**Quix** [4] - 67:2, 70:4, 83:20, 91:19

**R**

**raise** [3] - 29:18, 32:25, 111:23
**raised** [5] - 5:19, 5:20, 16:6, 29:3, 112:7
**raising** [1] - 8:11
**range** [5] - 9:6, 9:9, 112:13, 113:12, 113:19
**Re** [1] - 21:1
**re** [8] - 4:8, 4:12, 4:14, 4:15, 4:18, 4:19, 4:22, 4:25
**reach** [1] - 90:17
**reached** [2] - 50:13, 51:11

**read** [22] - 36:22, 37:6, 39:20, 48:22, 53:24, 59:15, 61:4, 61:12, 61:16, 61:20, 65:7, 77:8, 80:5, 80:11, 84:15, 85:24, 94:1, 96:20, 96:22, 98:14, 101:14, 108:6
**reading** [3] - 61:5, 61:15, 61:18
**really** [2] - 11:8, 115:2
**realm** [1] - 29:23
**REALTIME** [1] - 116:5
**reason** [3] - 13:6, 48:7, 56:18
**reasonable** [1] - 115:5
**reasons** [2] - 18:2, 18:7
**receive** [11] - 22:3, 35:11, 39:22, 56:2, 56:4, 66:3, 85:8, 106:9, 106:20, 109:12, 112:10
**received** [56] - 5:25, 14:15, 14:18, 23:13, 23:17, 35:1, 35:10, 35:15, 36:4, 36:5, 37:15, 40:10, 40:16, 41:6, 47:24, 47:25, 53:10, 53:19, 53:20, 60:1, 69:24, 69:25, 70:2, 70:15, 79:5, 79:25, 80:1, 81:21, 85:21, 85:23, 87:14, 87:15, 89:19, 90:8, 91:9, 93:5, 93:6, 93:7, 93:9, 99:13, 99:14, 101:4, 101:6, 104:14, 104:22, 104:23, 104:24, 106:11, 107:15, 107:21, 107:23, 108:16, 110:10, 110:22, 111:1, 111:2
**receiving** [4] - 14:5, 56:25, 83:19, 105:9
**recess** [2] - 60:12, 115:22
**Recess** [1] - 60:17
**recipient** [1] - 111:2
**recognize** [2] - 53:4, 69:5
**recollection** [1] - 28:6
**recommendation** [1] - 75:25
**record** [6] - 8:12, 35:21, 109:19, 110:3, 110:23, 111:7
**recording** [20] - 20:22, 23:19, 23:21, 23:25,

24:1, 24:3, 24:5, 24:7, 24:9, 24:20, 24:22, 25:16, 25:17, 25:21, 26:4, 26:6, 26:11, 26:16
**recordings** [8] - 4:5, 20:25, 21:6, 21:9, 22:2, 22:14, 22:20, 25:15
**records** [2] - 36:16, 86:24, 87:2, 87:12
**recovery** [2] - 39:23, 40:20
**RECROSS** [1] - 16:3
**Recross** [1] - 3:5
**RECROSS-EXAMINATION** [1] - 16:3
**Recross-Examination** [1] - 3:5
**redacted** [1] - 54:4
**REDIRECT** [1] - 13:10
**Redirect** [1] - 3:5
**redirect** [1] - 17:1
**reduced** [1] - 91:14
**refer** [1] - 20:3
**referenced** [2] - 112:14, 112:20
**references** [1] - 38:12
**referred** [4] - 5:21, 54:11, 112:18, 115:15
**referring** [10] - 44:25, 51:3, 58:2, 66:25, 70:12, 77:18, 77:19, 86:7, 103:8, 103:11
**refers** [1] - 68:6
**reflect** [1] - 87:5
**regarding** [1] - 84:24
**Regnier** [14] - 4:7, 4:22, 4:25, 35:7, 35:11, 35:15, 35:25, 36:7, 104:10, 107:10, 107:17, 107:25, 108:1, 108:3
**regulations** [1] - 116:12
**REJECTED** [1] - 4:4
**relate** [4] - 70:4, 73:4, 76:22, 92:7
**related** [8] - 6:1, 10:2, 33:20, 33:23, 38:9, 38:18, 42:8, 42:11
**Related** [1] - 42:6
**relates** [8] - 24:12, 38:13, 69:17, 92:2, 109:19, 110:5, 110:14, 113:10
**relating** [5] - 5:21,

10:9, 37:9, 112:12, 112:22
**relation** [1] - 40:5
**relevance** [3] - 30:22, 31:17, 31:23
**Relevance** [1] - 30:8
**relevancy** [1] - 31:3
**relevant** [1] - 6:1
**remember** [6] - 12:2, 15:9, 51:10, 60:13, 61:7, 109:3
**rent** [1] - 103:12
**reorganization** [1] - 20:4, 30:12, 31:12
**reorganize** [2] - 20:5, 30:17
**repay** [1] - 20:5
**repays** [1] - 30:18
**repeat** [1] - 8:17
**repetitive** [1] - 82:2
**replete** [1] - 8:13
**replies** [2] - 77:4, 95:11
**reply** [10] - 77:21, 83:24, 85:1, 85:4, 95:7, 95:11, 105:19, 105:20, 108:6, 108:7
**report** [7] - 6:15, 8:4, 47:6, 47:8, 114:24, 115:1, 115:16
**Report** [1] - 4:9
**reported** [9] - 23:19, 24:1, 24:3, 24:5, 24:7, 24:9, 24:20, 24:22, 116:10
**Reporter** [1] - 116:20
**REPORTER** [3] - 1:24, 116:1, 116:6
**reporter** [1] - 32:25
**REPORTER'S** [1] - 1:14
**reports** [1] - 6:16
**represent** [3] - 34:15, 37:7, 37:12
**represents** [1] - 42:7
**reproduction** [1] - 114:3
**request** [5] - 6:10, 8:15, 26:9, 43:6, 115:8
**require** [1] - 42:8
**required** [3] - 37:12, 42:14, 114:25
**requires** [1] - 37:1
**research** [2] - 60:15, 109:6
**reserve** [2] - 13:6, 18:13
**resides** [1] - 54:3
**resolution** [1] - 40:15

**resolve** [2] - 44:8, 44:18
**resolved** [5] - 44:17, 45:7, 45:10, 72:7, 72:9
**resolving** [1] - 45:3
**resources** [3] - 68:8, 68:10, 94:18
**respond** [3] - 96:24, 97:1, 104:3
**responded** [3] - 9:13, 97:8, 98:4
**response** [4] - 6:5, 6:14, 60:4, 111:3
**responses** [1] - 75:16
**responsibilities** [1] - 22:15
**responsibly** [1] - 37:12
**rest** [2] - 73:6, 107:2
**restate** [2] - 16:24, 28:22
**resumed** [2] - 3:4, 9:17
**RESUMED** [1] - 9:16
**retain** [1] - 37:13
**retainer** [3] - 36:11, 36:16, 36:20
**retrieving** [1] - 22:2
**returning** [1] - 56:25
**review** [5] - 22:7, 29:6, 29:10, 32:3, 73:1
**reviewed** [3] - 28:25, 31:1, 47:6
**reviewing** [1] - 32:13
**Rights** [2] - 4:8, 36:10
**rights** [1] - 37:9
**rise** [4] - 60:16, 82:3, 109:9, 115:21
**role** [2] - 13:25, 21:4
**rolling** [4] - 108:9, 108:11, 108:13, 108:16
**ROOM** [1] - 1:24
**row** [1] - 77:7
**rudeness** [1] - 8:25
**ruling** [2] - 16:15, 28:19

---

**S**

S-o-r-e-n-s-e-n [1] - 19:1
**SACR-19-00061-JVS** [1] - 1:7
**Sagel** [16] - 3:7, 3:9, 6:4, 19:5, 25:6, 26:19, 29:6, 29:9, 29:15, 31:22, 33:6, 62:9, 111:20,

111:24, 113:6, 113:15
**SAGEL** [112] - 2:5, 6:14, 7:10, 7:13, 8:20, 8:23, 9:4, 18:19, 19:6, 19:8, 23:1, 23:5, 23:14, 23:18, 24:2, 24:4, 24:6, 24:8, 24:10, 24:19, 24:21, 24:23, 27:24, 28:19, 29:18, 30:8, 30:22, 31:3, 31:17, 31:23, 32:5, 32:19, 32:23, 33:7, 33:9, 34:12, 35:17, 35:21, 36:3, 36:6, 47:19, 48:1, 49:22, 50:1, 53:16, 53:21, 58:2, 61:3, 61:7, 61:11, 61:14, 61:22, 62:6, 62:10, 62:18, 63:3, 63:21, 64:3, 64:24, 68:17, 69:21, 70:3, 74:6, 74:13, 75:7, 76:7, 78:21, 79:2, 79:19, 79:23, 80:2, 82:8, 85:18, 85:24, 87:8, 87:12, 87:16, 88:1, 88:15, 89:4, 89:10, 91:5, 91:10, 92:2, 93:2, 93:10, 96:13, 98:10, 99:10, 99:15, 100:16, 101:1, 101:7, 101:12, 102:5, 102:17, 102:22, 103:3, 104:19, 104:25, 106:8, 107:12, 107:16, 107:24, 109:16, 111:6, 111:8, 111:25, 113:2, 113:17, 113:21, 114:12
**SANTA** [1] - 1:17, 1:25, 5:1
**Santa** [1] - 2:7
**Saturday** [1] - 86:1
**save** [1] - 106:6
**Schack** [2] - 74:18, 74:23
**schedule** [1] - 101:16
**Scope** [2] - 37:5, 37:6
**scope** [11] - 16:14, 16:16, 16:19, 17:17, 29:19, 30:8, 30:22, 31:3, 31:17, 31:23, 32:5
**screen** [1] - 106:7
**SE** [1] - 2:14

**search** [1] - 12:8
**searched** [1] - 11:17
**seated** [1] - 18:21
**second** [9] - 14:19, 15:1, 15:2, 21:16, 73:3, 107:16, 107:25, 109:17, 111:6
**secrets** [1] - 37:24
**Section** [8] - 20:6, 20:8, 21:6, 21:9, 21:23, 22:3, 32:10, 116:8
**section** [4] - 48:13, 88:5, 93:23, 103:19
**see** [57] - 5:23, 18:22, 21:5, 24:13, 28:2, 32:8, 38:24, 39:5, 39:9, 41:17, 42:24, 48:2, 48:7, 48:10, 48:19, 51:21, 51:23, 55:6, 55:24, 59:18, 64:5, 66:9, 66:10, 68:1, 70:10, 70:22, 71:4, 72:3, 76:8, 77:4, 78:4, 78:7, 81:12, 82:18, 85:11, 87:16, 89:13, 92:9, 92:15, 93:11, 93:24, 95:19, 95:20, 97:17, 97:22, 98:3, 98:17, 99:1, 103:25, 105:7, 106:7, 109:7, 115:9, 115:11, 115:13, 115:14, 115:18
**seem** [1] - 101:21
**segments** [17] - 22:3, 22:7, 22:10, 22:22, 23:2, 25:6, 25:7, 25:10, 25:13, 28:4, 28:5, 28:10, 28:12, 28:17, 29:5, 29:9, 32:4
**sell** [2] - 91:11, 92:7
**selling** [3] - 90:25, 91:17, 92:2
**SELNA** [1] - 1:3
**send** [15] - 15:19, 48:16, 49:11, 50:20, 60:5, 66:8, 71:6, 75:11, 77:7, 80:2, 82:11, 85:2, 87:21, 89:10, 106:1
**sending** [8] - 25:9, 35:25, 50:5, 62:21, 72:22, 73:15, 93:20, 97:11
**sends** [1] - 52:1
**sent** [60] - 7:23, 10:20, 11:4, 14:20, 15:2,

15:8, 15:17, 15:23, 25:5, 25:6, 29:6, 29:10, 35:22, 36:7, 48:22, 50:17, 59:12, 59:15, 60:1, 60:7, 65:4, 66:5, 68:1, 71:3, 76:10, 77:4, 77:8, 77:14, 77:23, 78:2, 79:14, 79:16, 83:1, 84:12, 85:10, 85:12, 85:15, 88:8, 89:4, 92:21, 92:22, 93:13, 95:22, 97:9, 97:17, 97:22, 97:25, 98:2, 99:4, 99:7, 100:20, 100:23, 101:8, 104:13, 105:1, 105:19, 108:4, 110:24, 110:25
**sentence** [4] - 39:18, 39:20, 80:11, 100:1
**sentences** [1] - 80:5
**separate** [2] - 38:18, 42:12
**September** [4] - 13:3, 13:22, 35:5, 36:20
**series** [1] - 77:3
**Services** [4] - 37:5, 37:6, 42:23, 43:2
**services** [6] - 37:11, 42:9, 42:13, 42:14, 43:3, 43:5
**set** [1] - 72:23
**setting** [1] - 67:8
**settlement** [71] - 40:11, 41:10, 43:15, 43:17, 45:12, 45:15, 45:17, 45:20, 46:3, 46:7, 46:8, 46:11, 50:9, 50:10, 50:12, 51:4, 51:6, 52:7, 52:11, 52:16, 52:21, 53:7, 54:1, 55:3, 55:10, 56:14, 56:23, 57:7, 57:8, 57:11, 57:12, 57:18, 58:12, 58:15, 62:12, 62:13, 63:3, 63:5, 63:10, 63:15, 64:15, 64:18, 65:15, 65:17, 65:22, 65:25, 67:12, 68:7, 69:6, 70:14, 74:19, 83:6, 88:23, 89:6, 90:8, 90:18, 91:1, 91:12, 91:13, 92:3, 92:8, 94:6, 94:16, 102:1, 102:6, 102:11, 102:12, 102:22, 103:14,

108:17
**Settlement** [2] - 4:10, 53:23
**seven** [4] - 23:15, 27:7, 28:5, 53:3
**several** [1] - 98:17
**shared** [1] - 92:5
**shit** [2] - 77:16, 78:3
**shoestring** [1] - 103:22
**short** [2] - 80:11, 99:18
**shortcoming** [1] - 115:8
**shortcomings** [1] - 114:25
**shortly** [2] - 51:10, 63:9
**showing** [1] - 110:21
**shown** [1] - 15:12
**sic** [1] - 9:23
**side** [7] - 45:3, 56:19, 57:4, 74:19, 87:17, 88:2, 111:9
**sign** [9] - 46:6, 46:10, 46:12, 51:1, 52:7, 52:23, 54:21, 55:18, 62:12
**Signal** [1] - 12:4
**signature** [7] - 54:16, 54:19, 54:23, 57:5, 68:24, 69:3, 69:8
**signatures** [2] - 53:8, 56:22
**signed** [11] - 40:23, 41:8, 41:21, 43:10, 43:15, 53:7, 57:4, 63:3, 63:9, 68:6, 69:6
**signing** [3] - 57:7, 58:21, 69:5
**simply** [5] - 23:22, 69:25, 93:6, 104:22, 113:12
**sit** [2] - 11:8, 32:11
**six** [10] - 25:23, 26:1, 26:21, 26:24, 27:2, 27:5, 27:8, 34:11, 61:24, 95:19
**six-plus** [4] - 26:1, 26:24, 27:2, 27:8
**skip** [2] - 54:13, 99:25
**skipping** [1] - 81:10
**slightly** [1] - 88:4
**small** [1] - 75:16
**snickering** [1] - 113:8
**so-and-so** [1] - 54:3
**so..** [1] - 29:3
**someone** [1] - 27:20
**something's** [1] -

110:20
**sometimes** [2] - 90:21, 90:22
**somewhere** [4] - 7:8, 10:18, 28:7, 57:13
**soon** [6] - 12:7, 59:19, 90:24, 100:3, 100:6, 101:9
**SORENSEN** [2] - 3:6, 18:20
**Sorensen** [7] - 18:19, 19:1, 19:9, 25:3, 27:14, 28:4, 32:1
**sorry** [17] - 26:5, 26:13, 43:17, 47:22, 48:14, 59:7, 64:25, 68:21, 70:8, 70:21, 70:24, 71:2, 82:25, 84:5, 84:7, 85:5, 97:19
**sounds** [1] - 7:21
**SOUTHERN** [1] - 1:2
**Spaan** [1] - 116:20
**SPAAN** [3] - 1:23, 116:5, 116:19
**speaking** [1] - 30:15
**speaks** [2] - 9:1, 9:2
**specific** [3] - 5:20, 6:10, 15:12
**specifically** [1] - 95:25
**speculation** [4] - 15:4, 18:4, 78:23, 108:18
**speed** [1] - 90:3
**spell** [2] - 18:25, 33:3
**spending** [1] - 94:19
**spent** [1] - 79:4
**spoken** [1] - 74:18
**spread** [1] - 56:18
**spreadsheet** [8] - 6:11, 8:6, 112:19, 112:22, 113:11, 113:12, 114:21
**Spring** [1] - 2:11
**spring** [2] - 115:2, 115:6
**squeeze** [1] - 66:13
**stack** [1] - 112:18
**staff** [1] - 20:13
**STAND** [1] - 9:16
**stand** [3] - 32:24, 112:5, 114:18
**STANDBY** [1] - 2:16
**standing** [1] - 112:3
**stands** [1] - 78:12
**start** [20] - 19:19, 33:17, 35:1, 36:6, 53:21, 64:5, 66:16, 77:5, 82:18, 84:5, 84:10, 87:16, 87:17, 91:5, 93:11, 94:9,

102:7, 107:24, 114:6
**started** [2] - 25:19, 98:14
**starting** [7] - 51:23, 52:2, 67:1, 77:7, 98:19, 98:22, 98:24
**starts** [2] - 48:6, 77:5
**state** [4] - 18:24, 33:2, 74:2, 97:6
**STATE** [1] - 116:4
**statement** [2] - 35:23, 35:25
**States** [12] - 2:4, 2:5, 2:9, 2:10, 19:14, 19:18, 19:23, 21:5, 22:15, 116:6, 116:8, 116:13
**STATES** [2] - 1:1, 1:5
**status** [4] - 94:4, 94:9, 94:10, 96:2
**steal** [1] - 38:11
**stealing** [1] - 37:24
**stenographically** [1] - 116:10
**step** [2] - 76:19, 108:24
**steps** [5] - 12:4, 12:6, 12:9, 12:10, 94:15
**Sterling** [1] - 54:10
**Steward** [3] - 111:16, 113:25, 114:1
**STEWARD** [2] - 2:17, 2:18
**still** [6] - 44:17, 57:5, 59:5, 76:22, 90:14, 90:22
**stipulation** [1] - 62:1
**stolen** [1] - 34:17
**stop** [4] - 73:3, 80:14, 108:22, 109:1
**Street** [2] - 2:6, 2:11
**STREET** [1] - 1:24
**strike** [2] - 28:10, 30:5
**structured** [1] - 40:11
**stuff** [2] - 45:19, 99:21
**subject** [7] - 18:15, 36:9, 36:10, 93:15, 93:16, 99:16, 101:7
**submission** [1] - 110:3
**submit** [1] - 110:16
**submitted** [3] - 17:15, 60:15, 109:5
**subsequent** [1] - 40:20
**sue** [1] - 38:21
**sued** [1] - 16:10
**suffice** [1] - 6:6
**sufficient** [1] - 87:13
**suggest** [1] - 75:23

**suggestion** [1] - 109:15
**suing** [1] - 38:1
**Suite** [3] - 2:6, 2:11, 2:19
**sum** [4] - 40:14, 40:17, 55:8, 55:14
**Sunday** [4] - 4:18, 44:7, 93:16, 96:15
**Supply** [4] - 67:2, 70:4, 83:21, 91:20
**supposed** [1] - 65:14
**supposedly** [4] - 6:23, 97:9, 100:14
**sustain** [1] - 31:7
**sustained** [11] - 16:16, 17:18, 18:5, 18:11, 30:10, 30:24, 31:19, 31:25, 64:2, 69:20, 78:20
**sworn** [2] - 27:5, 32:2
**SWORN** [2] - 18:20, 33:1

## T

**t-m-r-w** [1] - 85:3
**Tallie** [1] - 80:8
**tape** [1] - 60:19
**team** [7] - 66:11, 66:24, 83:21, 90:2, 101:18, 101:22, 111:19
**technology** [1] - 33:20
**ten** [3] - 77:16, 77:18, 111:18
**tens** [2] - 14:15, 14:18
**term** [1] - 25:5
**testified** [4] - 10:12, 14:2, 14:24, 21:22
**testify** [2] - 114:13, 114:19
**testimony** [15] - 6:7, 6:8, 7:15, 13:2, 15:14, 20:20, 26:21, 26:25, 27:5, 27:8, 32:2, 57:25, 61:21, 87:13, 114:15
**text** [53] - 9:20, 11:11, 11:14, 11:15, 11:25, 12:7, 47:3, 47:9, 47:12, 47:13, 48:2, 49:6, 51:21, 52:1, 52:9, 59:12, 60:1, 60:4, 64:9, 64:14, 65:4, 66:5, 66:8, 66:23, 67:20, 71:3, 71:6, 72:5, 73:6, 73:15, 74:24, 74:25, 75:1, 75:11, 75:13,

76:10, 76:16, 77:3, 77:23, 78:9, 82:25, 83:7, 83:24, 84:6, 84:12, 89:11, 89:15, 89:18, 89:20, 97:17, 97:22, 98:2, 98:16
**Text** [1] - 4:9
**texted** [3] - 65:7, 72:3, 78:6
**texting** [2] - 44:21, 52:4
**texts** [2] - 77:7, 98:18
**thanked** [1] - 83:23
**thanking** [2] - 83:15, 90:5
**THE** [185] - 2:3, 2:14, 3:4, 3:6, 3:8, 5:8, 5:10, 5:15, 5:17, 6:12, 7:2, 7:6, 7:12, 7:14, 8:3, 8:8, 8:14, 8:17, 8:25, 9:10, 9:12, 9:14, 9:16, 10:7, 13:7, 15:5, 15:6, 15:15, 15:16, 16:2, 16:16, 16:19, 16:24, 17:18, 17:21, 17:25, 18:5, 18:11, 18:15, 18:17, 18:18, 18:21, 18:22, 18:23, 18:24, 19:1, 19:2, 19:3, 19:4, 19:5, 23:8, 23:11, 23:16, 23:20, 24:16, 24:24, 28:21, 28:22, 29:20, 30:10, 30:13, 30:14, 30:15, 30:24, 31:5, 31:6, 31:7, 31:9, 31:19, 31:25, 32:6, 32:7, 32:18, 32:20, 32:22, 32:24, 33:2, 33:4, 33:6, 34:9, 34:10, 35:20, 36:1, 36:4, 47:23, 49:20, 53:19, 58:1, 60:10, 60:16, 60:19, 60:24, 61:2, 61:6, 61:9, 61:12, 61:20, 62:4, 62:9, 62:17, 63:1, 63:2, 63:19, 63:20, 64:2, 64:22, 64:23, 68:15, 68:16, 69:20, 69:24, 73:22, 73:23, 74:9, 74:10, 74:16, 74:17, 75:5, 75:6, 76:5, 76:6, 78:20, 78:24, 78:25, 79:22, 79:25, 81:25, 82:1, 82:2, 85:21, 87:13, 87:24, 87:25, 88:14, 89:2, 89:3, 89:8,

89:9, 91:3, 91:4,
91:9; 91:25, 92:1,
93:5, 96:11, 96:12,
98:8, 98:9, 99:13,
100:13, 100:14,
101:4, 101:10,
102:3, 102:4,
102:16, 102:19,
102:20, 102:25,
103:1, 104:21,
107:15, 107:21,
108:20, 108:21,
108:22, 109:9,
109:11, 109:21,
109:24, 110:2,
110:17, 110:23,
111:4, 111:13,
111:18, 112:16,
113:6, 113:15,
113:18, 114:9,
114:22, 115:13,
115:18, 115:21
**the..** [1] - 88:11
**thereafter** [2] - 40:16,
90:24
**thinking** [1] - 65:9
**thousand** [1] - 57:24
**three** [10] - 16:8,
21:16, 55:23, 56:2,
56:18, 77:7, 84:20,
92:20, 105:25
**throughout** [1] -
113:24
**Thursday** [2] - 114:12,
114:16
**title** [1] - 19:16
**Title** [1] - 116:8
**titled** [1] - 42:5
**TMRW** [1] - 78:11
**today** [12] - 11:8,
32:11, 47:6, 71:8,
72:6, 86:4, 86:6,
89:24, 98:1, 114:6,
114:11, 115:20
**together** [3] - 66:12,
105:5, 109:17
**tomorrow** [9] - 77:24,
78:11, 78:12, 85:2,
95:8, 106:5, 108:25,
111:12, 111:21
**ton** [1] - 75:6
**took** [2] - 45:17,
103:17
**top** [23] - 10:23, 36:6,
36:19, 48:2, 48:3,
48:5, 48:12, 48:14,
53:21, 53:22, 70:3,
77:2, 87:17, 93:23,
95:19, 96:13, 99:15,
99:22, 99:23, 100:9,

105:25, 107:17,
108:6
**topics** [1] - 93:20
**total** [3] - 19:22, 55:8,
92:20
**towards** [4] - 66:16,
81:8, 88:20, 90:7
**trade** [1] - 37:24
**Tran** [4] - 10:2, 11:12,
14:15, 14:25
**TRANSCRIPT** [2] -
1:6, 1:14
**transcript** [4] - 23:22,
23:24, 116:9, 116:11
**transcripts** [1] - 27:25
**transfer** [6] - 14:19,
14:22, 15:1, 15:3,
76:19, 106:20
**transfers** [1] - 10:2
**travel** [1] - 58:6
**TRIAL** [1] - 1:8
**trouble** [8] - 71:12,
71:20, 72:1, 85:5,
86:3, 103:6, 103:10
**troubling** [1] - 115:2
**true** [17] - 17:9, 17:16,
17:19, 18:1, 18:6,
22:11, 23:2, 31:16,
47:8, 79:16, 85:15,
87:2, 92:24, 100:23,
107:8, 107:9, 116:9
**trust** [4] - 14:9, 63:12,
63:17, 109:7
**Trust** [1] - 9:23
**Trustee** [2] - 19:13,
20:13
**Trustee's** [4] - 19:14,
19:18, 19:23, 21:5
**Trustees's** [1] - 22:15
**truth** [7] - 17:20,
69:25, 93:6, 93:7,
104:22, 104:23,
107:21
**truthful** [2] - 13:2,
39:2
**try** [5] - 73:18, 74:7,
84:19, 99:21, 106:6
**trying** [10] - 14:25,
16:17, 16:22, 20:4,
33:17, 33:18, 44:18,
77:19, 82:6, 84:17
**Tuesday** [1] - 86:2
**turn** [5] - 10:4, 36:19,
51:16, 55:5, 97:16
**turning** [1] - 70:18
**TV** [1] - 98:21
**twice** [1] - 49:25
**two** [27] - 6:15, 6:17,
21:11, 21:12, 21:13,
21:14, 25:23, 39:8,

40:8, 64:17, 72:18,
77:8, 78:17, 80:5,
82:24, 84:19, 94:1,
96:22, 97:17, 97:22,
100:4, 100:6, 104:2,
104:10, 104:13,
111:10, 112:7
**types** [2] - 32:9, 75:17
**typically** [2] - 12:24,
20:13

## U

**U.S** [6] - 1:3, 19:13,
20:13, 26:18, 55:9,
55:14
**ultimately** [1] - 31:15
**under** [7] - 20:9,
20:11, 20:20, 32:10,
36:22, 39:18, 42:9,
81:10, 94:1, 104:2,
110:15
**undergo** [1] - 20:10
**underlayment** [1] -
37:10
**underlined** [1] - 53:22
**understood** [4] - 9:3,
10:15, 10:18, 41:1
**undue** [1] - 61:19
**UNITED** [2] - 1:1, 1:5
**United** [12] - 2:4, 2:5,
2:9, 2:10, 19:14,
19:18, 19:23, 21:5,
22:15, 116:6, 116:8,
116:13
**Unknown** [1] - 42:6
**unless** [1] - 31:7
**unlock** [1] - 52:14
**unpaid** [1] - 43:4
**unredacted** [1] - 53:24
**unwarranted** [1] -
61:19
**up** [25] - 6:23, 10:23,
28:2, 34:18, 46:21,
48:6, 50:15, 52:8,
55:4, 59:18, 65:19,
66:12, 67:8, 67:17,
72:18, 72:23, 76:15,
76:19, 77:2, 84:20,
89:20, 90:3, 105:5,
106:8, 113:13
**update** [1] - 84:19
**updated** [1] - 44:13
**updates** [1] - 67:24
**upgrading** [1] - 12:20
**upper** [1] - 110:11
**USA** [9] - 37:20, 37:22,
38:2, 43:22, 43:25,
54:7, 62:22, 63:12,
63:15

**USD** [2] - 55:9, 55:14
**UTC** [3] - 48:19, 71:4,
82:23
**utilized** [1] - 5:24

## V

**vacation** [1] - 58:23
**value** [1] - 40:14
**various** [2] - 86:24,
87:3
**venture** [1] - 69:18
**verify** [5] - 7:7, 25:12,
26:24, 27:4, 27:7
**versus** [3] - 30:6, 30:7,
30:20
**via** [1] - 12:4
**view** [3] - 6:9, 61:18,
115:1
**violation** [2] - 115:11
**volume** [1] - 86:19
**Volume** [1] - 34:21
**VOLUME** [1] - 1:9
**voluntarily** [1] - 31:15
**vs** [1] - 1:7

## W

**wait** [5] - 56:9, 58:18,
96:18, 101:10,
111:24
**waiting** [4] - 57:5,
75:24, 77:20, 114:13
**wants** [2] - 8:20, 9:7
**WAS** [2] - 18:20, 33:1
**Waypoint** [8] - 81:12,
81:14, 81:17, 86:14,
87:18, 88:8, 88:19,
88:22
**WEDNESDAY** [2] -
1:15, 5:1
**week** [4] - 73:8, 96:18,
98:15, 104:4
**week's** [1] - 66:9
**weekend** [2] - 90:4,
96:18
**weeks** [2] - 100:4,
100:6
**weight** [1] - 61:19
**WEST** [1] - 1:24
**West** [1] - 2:6
**whole** [2] - 90:2,
113:25
**wife** [3] - 80:8, 101:18,
101:22
**willing** [2] - 91:13,
91:14
**wiped** [1] - 30:21
**wire** [34] - 14:19,
14:22, 15:1, 15:2,

15:22, 57:1, 66:14,
66:17, 81:11, 81:16,
81:18, 82:10, 84:16,
84:23, 85:2, 86:14,
87:21, 88:2, 88:5,
88:6, 88:8, 88:18,
88:21, 89:16, 89:19,
103:8, 105:6,
105:20, 106:4,
106:9, 106:11,
106:14, 106:20,
108:4
**Wire** [4] - 4:15, 4:23,
4:25
**wired** [1] - 14:8
**wiring** [1] - 88:15
**wishes** [1] - 110:24
**withdrawal** [1] - 43:4
**WITHDRAWN** [1] - 4:3
**WITNESS** [41] - 9:16,
10:7, 15:6, 15:16,
18:17, 18:20, 18:23,
19:1, 19:3, 28:22,
30:13, 30:15, 31:6,
31:9, 32:7, 33:1,
33:4, 34:10, 63:2,
63:20, 64:23, 68:16,
73:23, 74:10, 74:17,
75:6, 76:6, 78:25,
82:1, 87:25, 89:3,
89:9, 91:4, 92:1,
96:12, 98:9, 100:14,
102:4, 102:20,
103:1, 108:21
**witness** [11] - 5:8,
8:23, 13:5, 29:19,
32:20, 45:18, 62:2,
111:12, 111:20,
114:11, 114:14
**witness's** [1] - 61:21
**WITNESSES** [1] - 3:3
**word** [13] - 38:5,
49:24, 66:14, 66:17,
70:5, 70:9, 70:13,
76:11, 76:13, 83:2,
83:3, 83:5, 97:25
**works** [2] - 41:24, 77:9
**worried** [4] - 71:15,
77:24, 78:4, 78:10
**worries** [1] - 84:3
**worry** [1] - 78:11
**writing** [1] - 110:16
**written** [3] - 36:25,
43:14, 110:3
**wrote** [1] - 96:22
**WYMAN** [12] - 2:10,
7:17, 7:25, 13:9,
13:11, 15:7, 15:18,
15:25, 16:14, 17:17,
18:4, 18:10

**Wyman** [6] - 3:5, 7:16, 10:9, 13:8, 16:6, 17:1

### Y

**years** [8] - 6:15, 6:17, 19:21, 29:24, 29:25, 34:11, 63:6, 114:4
**yourself** [1] - 60:20

### Z

**zero** [1] - 14:7