1              **UNITED STATES DISTRICT COURT**

2        **CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

3          **HONORABLE JAMES V. SELNA, U.S. DISTRICT JUDGE**

4

5    UNITED STATES OF AMERICA,           )
                                         )
6                    Plaintiff,          )   <u>**CERTIFIED TRANSCRIPT**</u>
                                         )
7          vs.                           )   Case No.
                                         )   SACR-19-00061-JVS
8    MICHAEL JOHN AVENATTI,              )
                                         )   **TRIAL DAY 16**
9                    Defendant.          )   **VOLUME 2**
     _____)

10

11

12

13

14

                  REPORTER'S TRANSCRIPT OF PROCEEDINGS

15

                     FRIDAY, AUGUST 6, 2021

16

                          1:32 P.M.

17

                     SANTA ANA, CALIFORNIA

18

19

20

21

22

23   _____

                  **DEBBIE HINO-SPAAN, CSR 7953, CRR**
24                FEDERAL OFFICIAL COURT REPORTER
                  411 WEST 4TH STREET, ROOM 1-053
25                     SANTA ANA, CA 92701
                       dhinospaan@yahoo.com


              **UNITED STATES DISTRICT COURT**

1              APPEARANCES OF COUNSEL:

2

3     FOR THE PLAINTIFF:

4              NICOLA T. HANNA
               United States Attorney
5              BY:  BRETT SAGEL
                    Assistant United States Attorney
6              411 West 4th Street
               Suite 8000
7              Santa Ana, California 92701
               714-338-3598
8              brett.sagel@usdoj.gov

9              NICOLA T. HANNA
               United States Attorney
10             BY:  ALEXANDER WYMAN
                    Assistant United States Attorney
11             312 North Spring Street
               Suite 1100
12             Los Angeles, California 90012
               213-894-2435
13             alex.wyman@usdoj.gov

14    FOR THE DEFENDANT IN PRO SE:

15             MICHAEL JOHN AVENATTI, ESQ.

16

      STANDBY COUNSEL FOR MR. AVENATTI:
17
               H. DEAN STEWARD LAW OFFICES
18             BY:  H. DEAN STEWARD, ESQ.
               17 Corporate Plaza
19             Suite 254
               Newport Beach, California 92660
20             949-481-4900
               deansteward7777@gmail.com
21

22

23

24

25

1                              **I N D E X**

2   **WITNESSES**                                            **PAGE**

3   **GREGORY A. BARELA JR., CALLED BY THE GOVERNMENT**
        Redirect Examination by Mr. Sagel (resumed)          6
4       Recross-Examination by Mr. Avenatti                  18

5   **LONG TRAN, CALLED BY THE GOVERNMENT**
        Direct Examination by Mr. Wyman                      50

6

7
                             **EXHIBITS**

8
                                                     **WITHDRAWN**
9                                        **IN**            **OR**
    **EXHIBIT**                       **EVIDENCE**   **REJECTED**
10
    187      12/29/2017 e-mail from Sheikh      10
11           to Avenatti re Barela
             signature pages
12
    297      Contingency Fee Agreement         58
13
    268      Phan Personalized Beauty          67
14           Discovery, Inc., common stock
             repurchase agreement 9/17/2017
15
    296      Common stock repurchase           69
16           agreement between
             Personalized Beauty Discovery,
17           Inc., and Long Tran

18  271      9/21/2017 e-mail from Avenatti    79
             to Tran re wire received
19
    273      3/8/2018 e-mail from Tong to      81
20           Tran re IPSY common stock
             repurchase agreement
21
    272      3/8/2018 e-mail from Tong to      87
22           Phan re IPSY common stock
             repurchase agreement
23
    278      Tran text messages with          94
24           Avenatti

25


                    **UNITED STATES DISTRICT COURT**

|       |                                                              |
|-------|--------------------------------------------------------------|
| 1     | **SANTA ANA, CALIFORNIA; FRIDAY, AUGUST 6, 2021**            |
| 2     | **1:32 P.M.**                                                |
| 3     | **- - -**                                                    |
| 4     |                                                              |
| 01:32PM 5 | **(Out of the presence of the jury.)**                   |
| 6     | MR. SAGEL:  Your Honor, we're obviously ready to            |
| 7     | proceed, but I know that before we get to the next break, we're |
| 8     | going to have a witness, most likely, if defendant wants to  |
| 9     | raise an issue.                                              |
| 01:32PM 10 | And then we'll also probably be reading a transcript    |
| 11    | that may have an excerpt that we think is okay, but we just  |
| 12    | want to clear it with the Court.  I don't know if you want to |
| 13    | take two minutes to do it now.                               |
| 14    | THE COURT:  With regard to the transcripts, they're         |
| 01:32PM 15 | the same ones I previously reviewed, I've ruled.        |
| 16    | MR. WYMAN:  Your Honor, the only reason we bring it          |
| 17    | up now is the -- there was an earlier exhibit in this trial  |
| 18    | where there was a reference to GB Auto, the defendant's car  |
| 19    | racing company, and specifically a wire out of the 1.6 million |
| 01:33PM 20 | that came from Geoffrey Johnson.  And Your Honor ordered us to |
| 21    | redact that.                                                 |
| 22    | THE COURT:  Right.                                           |
| 23    | MR. WYMAN:  And our under- -- we didn't redact it           |
| 24    | prior to that because our understanding was that it's a direct |
| 01:33PM 25 | use of a victim's funds, and so it came in.  One of the  |

```
 1    transcripts asked the defendant about whether GB Auto does
 2    anything else besides car racing.
 3                THE COURT:  Well, don't read that.
 4                MR. WYMAN:  Okay.  And just to be clear, the reason
 5    we included both of those is because it is a direct use of the
 6    defendant's --
 7                THE COURT:  Right.
 8                MR. WYMAN:  -- or the victim's funds.
 9                Okay.  We will not read that portion.
10                THE COURT:  Don't read the questions about what
11    GB Auto does.
12                MR. WYMAN:  We will not.
13                MR. AVENATTI:  Your Honor, the issue that I wanted
14    to raise relating to this exhibit relates to the next witness,
15    Mr. Tran, who's going to be called.  On July 30th, Mr. Tran
16    provided a document to the Government which has been marked as
17    297.  I believe you have a copy of it.
18                THE COURT:  I think so.
19                MR. AVENATTI:  It's a redline document.
20                THE COURT:  Well -- we'll get to this.
21                MR. AVENATTI:  Can I approach, Your Honor, if you
22    need a copy?
23                THE COURT:  It's right here.  I've got it.
24                MR. AVENATTI:  Okay.  So Mr. Tran --
25                THE COURT:  We'll come back to this.  Do you need it
```

01:33PM (line 5)
01:33PM (line 10)
01:34PM (line 15)
01:34PM (line 20)
01:34PM (line 25)

1    for Mr. Barela?  Do you need 297 for Mr. Barela?

2              MR. AVENATTI:  No.  297 is for Mr. Tran.

3              THE COURT:  We'll get to it afterward.

4              Bring the jury in.

01:35PM 5              MR. AVENATTI:  Okay.

6              **(In the presence of the jury.)**

7              THE COURT:  Good afternoon, ladies and gentlemen.

8              Mr. Sagel.

9              MR. SAGEL:  Thank you, Your Honor.

01:36PM 10          **GREGORY A. BARELA JR., WITNESS, RESUMED THE STAND**

11                         **REDIRECT EXAMINATION**

12    BY MR. SAGEL:

13    Q    Mr. Barela, I'm going to ask you questions about some of

14    the text messages that defendant went over with you.  So it's

01:36PM 15    Exhibit 176.  I don't know that we're going to need to see them

16    each time unless you need to look at it to refresh your memory

17    of which one I'm talking about.

18              On line 2 of page 3, defendant asked you a question

19    about a door knocker that came to your house, and you told

01:36PM 20    him -- and you sent him, I guess, a selfie of yourself with the

21    door knocker, something like that?

22    A    That's correct.

23    Q    And defendant said that had nothing to do with the Brock

24    settlement; is that correct?

01:37PM 25    A    That's correct.

1   Q    Defendant also went over a text message on page 20 about

2   guy named Tucker being rude?

3   A    Yes.

4   Q    And he said that had nothing to do with the Brock

01:37PM 5   settlement; is that correct?

6   A    That's correct.

7   Q    Then on page 22, he went over a text message where you

8   told him you were proud of him, and he asked you whether or not

9   that had anything to do with the Brock settlement; is that

01:37PM 10   correct?

11   A    That's correct.

12   Q    Page 41, he went over a text message where you talked

13   about a *60 Minute* watch party, and he asked you whether or not

14   that had anything to do with the Brock settlement; is that

01:37PM 15   correct?

16   A    That's correct.

17   Q    And then this morning he went over, on page 12, a few

18   text messages where you told defendant to keep pushing forward

19   and you're praying for him; is that correct?

01:37PM 20   A    That's correct.

21   Q    And he also said that that's -- and he wrote back to you

22   "Thanks, Greg," and "appreciate it."  And that showed that he

23   responded to you and was responsive to you.  Do you remember

24   those questions?

01:38PM 25   A    Yes.

**UNITED STATES DISTRICT COURT**

1   Q    In response to you saying you were praying for him and

2   saying nice things to him, would you say he was responsive?

3   A    He was responsive when I would say things like that, but

4   not to the questions that I would ask about the Brock matter.

01:38PM 5   Q    When you were asking about where the settlement money was

6   and what he was going to do to try and collect the settlement

7   money, how would you describe his responsiveness?  Let's start

8   with November of 2018.

9   A    Little to none.

01:38PM 10   Q    And with regards to those same e-mails I just -- the text

11   messages at the end, the one about pushing forward and you're

12   praying for him, he also said that those text messages had

13   nothing to do with the Brock settlement; is that correct?

14   A    That's correct.

01:39PM 15   Q    In Exhibit 176, there are almost 700 messages in there

16   between SMS and MMS messages; is that correct?

17   A    That's correct.

18   Q    Of the nearly 700 messages in Exhibit 176, how many

19   questions did defendant ask you about the Brock settlement in

01:39PM 20   text messages?

21   A    Zero.

22   Q    Luckily, we already had a zero written on this board, so

23   we'll use that.

24        How many text messages in the nearly 700 there did

01:40PM 25   defendant go over in which you were asking about what he was

```
  1    going to do on further actions with Brock?

  2    A    Zero.

  3    Q    He went over some e-mails with you, read you some e-mails

  4    that the Government moved into evidence.  We went over a lot of

01:40PM  5    e-mails where you were talking about your financial struggles

  6    without the $1.6 million, your portion of the $1.6 million.

  7    How many of those e-mails did defendant ask you questions

  8    about?

  9             MR. AVENATTI:  Outside the scope, Your Honor.

01:40PM 10    Objection.

 11             THE COURT:  Overruled.

 12             THE WITNESS:  Zero.

 13    Q    BY MR. SAGEL:  Defendant talked to you about how you --

 14    your custom and practice was to initial the bottom right corner

01:41PM 15    of documents.

 16    A    Yes.

 17    Q    If I could have you look at Exhibit 228, which is in

 18    evidence, which is what you want to look through, was what you

 19    said was the fully executed agreement defendant provided you in

01:41PM 20    his office.  Do you see those nine pages?

 21    A    Yes.

 22    Q    Are there any initials on any of those nine pages?

 23    A    No.

 24    Q    That's the one with the March dates; is that correct?

01:41PM 25    A    Yes.
```

```
 1   Q    I'll have you look at Exhibit 187.
 2              MR. SAGEL:  And, Your Honor, I'd ask to --
 3   permission to publish this.  This will be for conditional
 4   admittance.  It will be admitted through a later witness.
 5              THE COURT:  187?
 6              MR. SAGEL:  Yes, Your Honor.
 7              THE COURT:  Okay.
 8              MR. AVENATTI:  Your Honor, objection.  Hearsay.  And
 9   lacks foundation.
10              THE COURT:  It will be received conditionally
11   subject to proving up authenticity in the foundation.
12              MR. SAGEL:  Thank you, Your Honor.
13              (Exhibit Number 187 received.)
14   Q    BY MR. SAGEL:  Mr. Barela, if you look at pages after --
15   go to the second page, please.
16              Have you looked through the pages, pages 2 through
17   going forward -- have you at any point seen the actual fully
18   executed settlement agreement --
19   A    No.
20   Q    -- from the defendant?
21   A    No.
22   Q    And in that fully executed settlement agreement, it has
23   January dates.  Are there any initials on any of the pages?
24   A    No.
25   Q    Defendant asked you whether or not you were wrong about
```

several of your answers, including who signed that letter from

Mr. Arden and Ibrahim and whether or not the law firm had

discretion to hire outside attorneys, and asked you were you

wrong in your answers.  Do you remember those questions and

01:44PM answers?

A    I do.

Q    Were your answers wrong when you stated you never

received your portion of the settlement money from the

defendant?

01:44PM A    No.

Q    Were your answers wrong when you stated that defendant

never gave you an accounting for the cost and expenses on your

settlement?

A    No.

01:44PM Q    Were your answers wrong when you stated that the

defendant told you Brock did not pay their $1.6 million

pursuant to the settlement agreement?

A    No.

Q    Were any of your answers wrong when you talked about the

01:44PM serious financial troubles you were in when you did not receive

your portion of the $1.6 million?

A    No.

Q    And I forgot to do it during the break.  Is the

exhibit -- the handwritten calculation up there?

01:45PM A    Yes.

| | |
|---|---|
| 1 | MR. SAGEL:  May I approach, Your Honor? |
| 2 | THE COURT:  You may. |
| 3 | Q    BY MR. SAGEL:  When defendant asked you to calculate -- I |
| 4 | might have said the wrong number.  I guess it's 1076. |
| 01:45PM 5 | When defendant asked you to do these calculations, |
| 6 | this is your writing of your calculations of what I think he |
| 7 | asked you to put what you believed you were owed under the |
| 8 | settlement agreement? |
| 9 | A    Yes. |
| 01:46PM 10 | Q    When you hired the defendant to represent you in your |
| 11 | matter against Brock, whose responsibility did you believe it |
| 12 | was to calculate how much you would be entitled to? |
| 13 | A    Mr. Avenatti. |
| 14 | Q    At the top you have $1.6 million rather than |
| 01:46PM 15 | $1.9 million.  Defendant asked you, "Did you receive the |
| 16 | additional $300,000 pursuant to the agreement?"  Do you |
| 17 | remember those questions? |
| 18 | A    Yes. |
| 19 | Q    What role, if any, did defendant have in you collecting |
| 01:46PM 20 | the $300,000 after you obtained new counsel? |
| 21 | A    None. |
| 22 | Q    When you got -- from the settlement agreement, from the |
| 23 | $1.9 million, how much of the settlement agreement have you |
| 24 | received? |
| 01:47PM 25 | A    60 percent of the 300,000. |

**UNITED STATES DISTRICT COURT**

```
 1  Q    And the portion that you did not get was what you had to
 2  pay your new attorneys?
 3  A    Correct.
 4  Q    You listed $120,000 for actual costs, or I think there
 5  was questions about -- actually, let me take it back.
 6        You listed $120,000 for costs, and defendant said,
 7  "Do you even know what the actual costs were?"  Do you remember
 8  those questions?
 9  A    Yes.
10  Q    Why don't you know what the actual costs were in the
11  case?
12  A    Because I've never received an accounting.
13  Q    Defendant's never provided that to you?
14  A    No.
15  Q    If I could have you look at Exhibit 174.
16        Which is in evidence, Your Honor.
17        Did defendant ever tell you in December of 2017 that
18  Judy Regnier sent him what the costs were while you were in
19  Colorado for the mediation?
20        MR. AVENATTI:  Objection.  Misstates the testimony.
21  Lacks foundation, Your Honor.
22        THE COURT:  Overruled.
23        THE WITNESS:  No.
24  Q    BY MR. SAGEL:  If you were to look at the second page,
25  did defendant ever provide you with the draft cost of your case
```

**UNITED STATES DISTRICT COURT**

```
 1   at the time of the settlement?
 2   A     No.
 3   Q     If the cost of your case at the time of the settlement
 4   was about $109,000, did you expect defendant to tell you that?
 5             MR. AVENATTI:  Objection, Your Honor.  Misstates the
 6   evidence, and it lacks foundation.
 7             THE COURT:  Overruled.
 8             THE WITNESS:  One more time, please.
 9   Q     BY MR. SAGEL:  At the time of your mediation and the
10   settlement, if defendant knew what the costs were in your case,
11   would you have expected him to tell you that?
12   A     Of course.
13   Q     Now, if I could have you look at Exhibit 193.  On
14   January 11, Judy Regnier was directed to take $111,000 out of
15   your settlement money for the actual costs of your case.  Would
16   you have expected defendant to tell you that?
17             MR. AVENATTI:  Objection.  Lacks foundation,
18   Your Honor.
19             THE COURT:  Overruled.
20             THE WITNESS:  Of course.
21   Q     BY MR. SAGEL:  And if defendant knew what your actual
22   costs of your case were in January of 2018, would you have
23   wanted him to tell you that?
24   A     Yes.
25   Q     You included what you said was an approximation, you'd
```

01:49PM 5
01:49PM 10
01:49PM 15
01:50PM 20
01:50PM 25

UNITED STATES DISTRICT COURT

1    have to look back at your records, but an approximation of

2    $130,000 under the term "advance" on this; is that correct?

3    A    Yes.

4    Q    If you had received your portion of the $1.6 million,

01:51PM 5    would you have needed any of these advances?

6    A    No.

7    Q    When defendant provided you these advances, did that keep

8    you from learning that the $1.6 million had actually already

9    been paid?

01:51PM 10           MR. AVENATTI:  Objection, Your Honor.  Speculation.

11           THE COURT:  Overruled.

12           THE WITNESS:  Yes.

13   Q    BY MR. SAGEL:  Why did you give defendant credit for

14   $130,000 on this calculation?

01:51PM 15   A    I couldn't remember the exact amount.

16   Q    Of the advances that you have listed here, do you know

17   whether any of them actually came from your settlement amount?

18   A    No.

19   Q    Of the number you estimated, that you were asked to

01:52PM 20   estimate of what you were due under the $1.6 million or under

21   the settlement agreement -- let me change that.

22           Of the number you listed here that you were asked to

23   calculate what you were due, how much of that money has

24   defendant paid you?

01:52PM 25   A    Zero.

```
 1   Q      Same number right behind me?

 2   A      Yes.

 3   Q      Did defendant tell you, according to the defendant, under

 4   California law, the client is entitled to their monies

 5   immediately, their portion of the monies?

 6          MR. AVENATTI:  Objection, Your Honor.  Misstates the

 7   testimony.

 8          THE COURT:  Overruled.

 9          THE WITNESS:  One more time, please.

10   Q      BY MR. SAGEL:  Did defendant tell you that, according to

11   the defendant, under California law, the client is entitled to

12   their monies immediately?

13   A      No.

14   Q      Their portion of the monies?

15   A      No.

16   Q      Throughout the cross-examination of you, defendant said

17   numerous times that we have to be clear and concise.  Do you

18   remember those questions?

19   A      Yes.

20   Q      What clear and concise statement did defendant provide

21   you on how much Brock had paid of the $1.6 million?

22   A      None.

23   Q      What clear and concise statement did defendant provide

24   you on how much you were entitled to based on an accounting

25   under the settlement agreement?
```

01:52PM   5
01:53PM  10
01:53PM  15
01:53PM  20
01:53PM  25

```
 1   A    None.
 2   Q    What clear and concise statement did defendant provide
 3   you on why you were not getting any money under the settlement
 4   agreement?
 5   A    He did not.
 6   Q    Did he tell you why you weren't getting that money?
 7   A    No.
 8   Q    Did it have anything to do with Brock not paying?
 9        MR. AVENATTI:  Objection, Your Honor.  Asked and
10   answered.
11        THE COURT:  Overruled.
12        THE WITNESS:  One more time, please.
13   Q    BY MR. SAGEL:  What clear and concise reason did
14   defendant tell you is the reason you didn't get money from the
15   $1.6 million from Brock?
16   A    He did not.
17   Q    What was the reason he told you you were not getting --
18        MR. AVENATTI:  Asked and answered, Your Honor, now
19   twice or three times.
20        THE COURT:  Sustained.
21        MR. AVENATTI:  Thank you.  I'm sorry, Your Honor.
22   Q    BY MR. SAGEL:  When you say "he did not," he did not
23   provide you that money?
24   A    No.
25   Q    Defendant asked you whether you believed the $1.6 million
```

01:54PM  (lines 5, 10, 15, 20, 25)

```
 1    was entirely yours and you said "No."  Was the $1.6 million
 2    entirely defendant's?
 3    A     Absolutely not.
 4    Q     The defendant asked you whether or not the Government has
 5    all of your bank records.  If anybody looked at your bank
 6    records, how much of the $1.6 million settlement money will be
 7    found in your bank records?
 8              MR. AVENATTI:  Objection, Your Honor.  Speculation.
 9    Conjecture.
10              THE COURT:  Overruled.
11              THE WITNESS:  Zero.
12    Q     BY MR. SAGEL:  Same number?
13    A     Same number.
14              MR. SAGEL:  No further questions, Your Honor.
15              THE COURT:  Mr. Avenatti.
16                   RECROSS-EXAMINATION
17    BY MR. AVENATTI:
18    Q     Mr. Barela, on redirect by Mr. Sagel, just before the
19    lunch break, you testified that Exhibit 184 was the settlement
20    agreement that you received in December in my office and
21    signed; right?
22    A     Did you say "and signed"?
23    Q     Yes.  184.
24    A     Yes.
25    Q     That's your testimony; right?
```

The time annotations in the left margin read: 01:55PM (line 5), 01:55PM (line 10), 01:55PM (line 15), 01:56PM (line 20), 01:56PM (line 25).

```
 1    A    Yes.

 2              MR. AVENATTI:  Can we have 184, please.

 3    Q    Do you see this?

 4    A    Yes.

 5    Q    Okay.  Sir, how many initials appear in the lower

 6    right-hand corner?

 7    A    None.

 8    Q    Zero?

 9    A    Zero.

10    Q    Go to the next page.  How many initials appear in the

11    lower right-hand corner?

12    A    Zero.

13    Q    Go to the next page.  How many initials appear in the

14    lower right-hand corner?

15    A    Zero.

16    Q    What are we at, page 4?

17    A    Yes.

18    Q    How many initials appear in the lower right-hand corner?

19    A    None.

20    Q    Zero?

21    A    Zero.

22    Q    Page 5, zero; page 6, zero; page 7, zero.  They're all

23    zero; right?

24    A    Correct.

25    Q    Mr. Sagel asked you about the Exhibit 2 attached to your
```

01:57PM (5)
01:57PM (10)
01:57PM (15)
01:58PM (20)
01:58PM (25)

```
 1    May 2019 declaration.  Do you remember that?

 2    A    Yes.

 3    Q    This is the version that you swore under penalty of

 4    perjury in May was the version you had been provided in

01:59PM  5    December.  Do you remember that?

 6    A    Yes.

 7    Q    Page 1, how many initials appear in the right-hand corner

 8    of this document?

 9    A    Zero.

01:59PM 10    Q    Page 2, how many?

11    A    None.

12    Q    Zero; right?

13    A    Yep.

14    Q    3, zero; right?

02:00PM 15    A    Yes.

16    Q    And I'm not going to go through every page, unless you

17    want me to, but isn't it true that the number of initials that

18    appear on any of these pages that you claimed you signed are

19    zero?

02:00PM 20    A    Yes.

21    Q    When we went to the mediation in Denver, did you

22    understand that that was for free?

23    A    No.

24    Q    And what I'm speaking about specifically is the fee that

02:01PM 25    had to be paid for the mediation, for the retired federal
```

**UNITED STATES DISTRICT COURT**

```
 1    magistrate.  Did you have understanding that that was just

 2    gratis, that was free?

 3    A    No.

 4    Q    Do you have any idea how much that cost?

 5    A    I think you said 10,000.

 6    Q    Do you have any idea, sir?

 7    A    I believe that's what you said, 10,000.

 8    Q    You now have a specific recollection of how much I told

 9    you the mediation was four years later.  Is that your

10    testimony, sir?

11    A    Yes.

12    Q    Okay.  How about for the work after the first day, do you

13    have any idea how much that cost?

14    A    No.

15    Q    Take a look at Exhibit 174.

16    A    Okay.

17    Q    By the way, do you have a recollection that there were

18    two mediations in your case?

19    A    Yes.

20    Q    Take as much time as you'd like, sir, relating to --

21    strike that.

22         Do you see on 174 where it says "Draft" across the

23    page?

24    A    Oh, on the next page.  Yes, I see it says "Draft."

25    Q    You don't know whether these are the final costs or not,
```

02:01PM  5
02:01PM 10
02:01PM 15
02:02PM 20
02:02PM 25

|   | |
|---|---|
| 1 | do you, sir? |
| 2 | A    I do not. |
| 3 | Q    Take as much time as you'd like and please direct the |
| 4 | attention of the jury to the line item for the mediation fee in |
| 02:03PM 5 | Denver. |
| 6 | A    I see GAB [sic] group, which I would assume would be |
| 7 | Denver.  Was the JAG arbitration, multiple. |
| 8 | Q    Sir, the Judicial Arbiter Group was the arbiter in your |
| 9 | case.  You knew that; right? |
| 02:03PM 10 | A    No, I don't recall. |
| 11 | Q    Okay.  Well, you don't see all the references to arbiter |
| 12 | and Judicial Arbiter Group?  Do you understand the arbitration |
| 13 | is different than a mediation; right? |
| 14 | MR. SAGEL:  Objection at this time.  Foundation. |
| 02:03PM 15 | 403. |
| 16 | THE COURT:  Overruled. |
| 17 | THE WITNESS:  One more time, please. |
| 18 | Q    BY MR. AVENATTI:  You understood that your case was an |
| 19 | arbitration and fees had to be paid to an arbitrator; right? |
| 02:04PM 20 | A    Yes. |
| 21 | Q    That was different from the mediation; right? |
| 22 | A    Yes. |
| 23 | Q    Okay.  Take as much time as you'd like and point me to |
| 24 | the line item for the December 2017 mediation fee. |
| 02:04PM 25 | A    I don't see it. |

```
 1   Q    I'm sorry.  I didn't hear that.

 2   A    I don't see it.

 3   Q    Let's take a look at page 3 of 3.

 4   A    Okay.

 5   Q    Between June and December of 2017, you see there's only

 6   four line items for costs listed there?

 7   A    Yes.

 8   Q    Now, your case was getting ready for arbitration, right,

 9   at that time, in late 2017?  Do you remember that?

10   A    Yes.

11   Q    We were all pretty busy working on your case.  Do you

12   remember that?

13   A    Yes.

14   Q    Do you honestly believe that there were only four costs

15   during that six-month time period, sir?

16              MR. SAGEL:  Objection.  Foundation.

17              THE COURT:  Overruled.

18              THE WITNESS:  I wouldn't know.  But I would assume

19   not.

20   Q    BY MR. AVENATTI:  You would assume not?

21   A    No.

22   Q    That's probably why it says "Draft"; right?

23   A    I wouldn't know.  It's not my accounting.

24              MR. AVENATTI:  Move to strike after "no" as

25   nonresponsive.
```

02:04PM 5
02:05PM 10
02:05PM 15
02:05PM 20
02:06PM 25

**UNITED STATES DISTRICT COURT**

|  |  |
|---|---|
| 1 | THE COURT:  It will be stricken. |
| 2 | Q   BY MR. AVENATTI:  You were asked about 193.  Let's take a |
| 3 | look at that. |
| 4 | Oh, before we get to that, do you recall the |
| 02:06PM 5 | arbitration was venued in Denver, the same place where the |
| 6 | mediation took place? |
| 7 | A   I don't recall. |
| 8 | Q   You don't remember traveling to Denver for your |
| 9 | deposition? |
| 02:07PM 10 | A   Oh, yes, I do.  Thank you. |
| 11 | Q   And when you were deposed, you were deposed in an |
| 12 | attorney's office; right? |
| 13 | A   Yes. |
| 14 | MR. SAGEL:  Objection.  Outside the scope, |
| 02:07PM 15 | Your Honor. |
| 16 | THE COURT:  Sustained. |
| 17 | Q   BY MR. AVENATTI:  Mr. Barela, isn't it true that we had |
| 18 | local counsel in your case located in Denver, and, in fact, |
| 19 | that was required for your arbitration? |
| 02:07PM 20 | A   Yes. |
| 21 | Q   So when Mr. Sagel just asked you, and you said the only |
| 22 | attorneys that worked on your Brock case were me and |
| 23 | Mr. Ibrahim and Mr. Arden, that was not accurate, was it?  Yes |
| 24 | or no? |
| 02:07PM 25 | A   No. |

```
 1   Q     193, please.

 2   A     I'm here.

 3         MR. AVENATTI:  If we can blow up the top, please.

 4   Q     Mr. Barela you have no idea whether this was an interim

 5   withdrawal or total withdrawal for the entirety of your case

 6   cost, do you?

 7   A     No.

 8   Q     And then here's the last thing I want to talk to you --

 9   ask you about.

10         Mr. Sagel asked you what role I had in your receipt

11   of $300,000 under the settlement agreement from Brock.  Do you

12   recall that?

13   A     Yes.

14   Q     And he asked you how much of that money you got, and you

15   said you got 60 percent; right?

16   A     Yes.

17   Q     And you said you had to pay another lawyer 40 percent to

18   get your $300,000 from Brock.  Did I hear that correctly?

19   A     Yes.

20   Q     Now, that $300,000 was already required under your

21   settlement agreement; right?

22   A     Yes.

23   Q     And yet, despite that, you were charged by some lawyer

24   $120,000 in order to get those payments; is that correct?

25   A     Yes.
```

```
 1   Q    Did Brock fight you on paying you that?

 2   A    No.

 3   Q    That was pursuant to the settlement agreement that I

 4   negotiated; right?

 5   A    Correct.

 6   Q    Has that guy been charged criminally?

 7   A    Of course not.

 8   Q    Exactly.

 9             MR. AVENATTI:  Nothing further.

10             THE COURT:  May the witness be excused?

11             MR. AVENATTI:  We reserve the right to recall him,

12   Your Honor.

13             THE COURT:  Sir, you may step down but you're

14   subject to recall.  Thank you.

15             MR. SAGEL:  Your Honor, at this time we'd ask that

16   you read the redacted 258.

17             THE COURT:  Ladies and gentlemen, you'll recall in

18   the initial instructions I gave you I listed a number of things

19   that were evidence.  One of the things that is evidence are any

20   facts to which the lawyers have agreed.  The lawyers have

21   agreed to the following facts I'm going to read to you, and

22   you're to accept those facts as proven and true.  (Reading:)

23             "It is hereby stipulated by Michael John

24         Avenatti, respondent, respondent was admitted to

25         the practice of law in the state of California on
```

1       June 1, 2000, and since that time has been a member

2       of the State Bar of California.

3           "The parties stipulate to the -- the parties

4       stipulate that the following facts are true:

02:12PM 5       "1, on July 8, 2014, Gregory Barela employed

6       Michael Avenatti, respondent, and his law firm,

7       Eagan Avenatti, LLP, to represent him in an

8       intellectual property dispute with the settling

9       party.

02:12PM 10          "2, respondent filed two lawsuits in federal

11      court on behalf of Mr. Barela against the settling

12      party alleging multiple causes of action.

13      Thereafter, the settling party and Mr. Barela

14      entered in arbitration.

02:12PM 15          "3, that the relevant times in these

16      stipulated facts David Sheikh, S-h-e-i-k-h, a

17      member of the Illinois Bar, State Bar, and a

18      founding partner in the law firm of Lee Sheikh

19      Megley, M-e-g-l-e-y, & Haan, H-a-a-n, LLC,

02:13PM 20      represented the settling party.

21          "4, on December 20, 2017, Mr. Barela and the

22      settling party agreed to a final compromise and

23      settlement of the arbitration, with the settling

24      party agreeing to pay a total of $1,900,000 to

02:13PM 25      Mr. Barela over four yearly payments, the first

1       payment in the amount of 1,600,000 with three

2       subsequent annual payments of $100,000 each.

3            "5, between December 22, 2017, and

4       December 28, 2017, respondent and Mr. Sheikh

02:14PM 5    negotiated a written settlement agreement on behalf

6       of their respective clients.  The final written

7       settlement agreement required the settling party to

8       make an initial payment of $1,600,000 by

9       January 10, 2018, and three additional payments of

02:14PM 10   $100,000 by January 10, 2019, 2020, 2021,

11      respectively, for a total of $1,900,000.

12           "6, on December 28, 2017, respondent e-mailed

13      Mr. Sheikh the signature page from the settlement

14      agreement bearing Mr. Barela's signature.

02:14PM 15           "7, on December 29, 2017, Mr. Sheikh e-mailed

16      respondent a fully executed settlement agreement

17      with Mr. Barela and the settling party's

18      signatures, which included the payment schedule

19      that the respondent and Mr. Sheikh had negotiated

02:15PM 20   on behalf of their respective clients.

21           "8, on January 2, 2018, respondent sent an

22      e-mail to Mr. Sheikh specifying the client trust

23      account and providing wiring instructions for the

24      settling party to make the settlement payments

02:15PM 25   according to the settlement agreement.

1      "9, on January 5, 2018, the settling party

2      made the initial payment -- the initial settlement

3      payment by wire transfer to the client trust

4      account specified by respondent on January 2, 2018,

02:15PM   5      City National Bank account number XXXX556.

6      "10, on April 5, 2018, Mr. Barela received a

7      wire transfer of $60,000 from respondent.

8      "11, on May 25, 2018, Mr. Barela received a

9      wire transfer of $30,000 from respondent.

02:16PM  10      "12, on June 27, 2018, Mr. Barela received a

11      wire transfer of $30,000 from respondent.

12      "13, on September 11, 2018, Mr. Barela

13      received a wire transfer of $6,000 from respondent.

14      "14, on November 5, 2018, respondent provided

02:16PM  15      Mr. Barela with a cashier's check in the amount of

16      $4,000.  Respectfully submitted, dated November 15,

17      2019."

18          Signature block, Michael John Avenatti, respondent,

19   with a signature above that.

02:16PM  20          As I indicated, ladies and gentlemen, the parties

21   have agreed to these facts and you're to accept them as having

22   been proved.

23          MR. SAGEL:  Your Honor, at this time, the Government

24   would like to read into evidence several transcripts, and we

02:17PM  25   have AUSA Faraz Mohammadi to read the other portions of the

transcripts.

THE COURT:  And these are from various hearings?

MR. SAGEL:  Various hearings.  And I'll announce each one.

02:17PM  THE COURT:  Okay.  Ladies and gentlemen, you're going to hear testimony taken in various hearings which will be indicated.  That testimony was taken under oath and you're to treat it just as if it had been given here in this courtroom under the same oath that each witness in this courtroom takes. You're not to give any special significance to any intonation or how the words are read.

MR. SAGEL:  The first transcript we'll be reading is Exhibit 402.

Let me know when you're at 402.

02:18PM  MR. MOHAMMADI:  I'm there.

MR. SAGEL:  Your Honor, this is the examination of Michael Avenatti on July 25th, 2018, at 11:00 a.m. in the matter of In Re: Eagan Avenatti, LLP, Case Number 817-bk-11961-CB:

02:19PM  "Michael Avenatti, having been first duly sworn, testified as follows:

"Q    Mr. Avenatti, at the meeting of creditors in the bankruptcy case there was testimony that EA had transferred money at some

02:19PM  time to Global Barista.  Is that an entity

```
 1          controlled by you?
 2               "A     The question is:  Is Global Barista an
 3          entity controlled by me?
 4               "Q     Yes.
02:19PM  5          "A     Yes.
 6               "Q     I'm going to ask you some questions
 7          about the Eden Memorial Park class action case.
 8          Are you familiar with that case?
 9               "A     Yes.
02:19PM 10          "Q     What were EA's total fees received
11          from that case?
12               "A     I don't remember.
13               "Q     Can you please give me your best estimate?
14               "A     Net fees?
02:19PM 15          "Q     What is net fees as compared to -- okay
16          why don't you explain what you mean by 'net fees' as
17          compared to gross fees.
18               "A     Correct.
19               "Q     So since I don't do class action work, can
02:20PM 20          you -- can you explain what net fees are.
21               "A     I'm asking you for clarification.
22               "Q     What are net fees?
23               "A     The net amount of attorney fees that Eagan
24          Avenatti received.
02:20PM 25          "Q     Yes.
```

 1          "A    It was -- I don't remember exactly what the

 2     number was.  It was in the teens.

 3          "Q    I'm sorry?

 4          "A    It was in the teens.

02:20PM 5          "Q    The teen millions?

 6          "A    Teen millions.

 7          "Q    What fees were" -- I'm sorry.  "What

 8     fees were awarded by the Court?

 9          "A    I think it was 21- or 23 million total, but

02:20PM 10    Eagan Avenatti did not receive all that.

 11         "Q    Who did you have to share the fees with?

 12         "A    It had to share the fees with Ed Ricci.

 13    It had to share the fees with me personally.  It had

 14    to share the fees with -- I think there was an

02:20PM 15    objector or two, as I recall.  I think that's it.

 16         "Q    Why did -- why did it have to share with --

 17         fees with you personally?

 18         "A    Because there was an agreement for me to

 19    receive a portion of the fees.

02:21PM 20         "Q    Origination fee?

 21         "A    Yes.

 22         "Q    Agreement between EA and you?

 23         "A    Yeah.

 24         "Q    Is Ed Ricci an attorney?"

02:21PM 25         MR. SAGEL:  I'm sorry.  Let me start over.

```
 1              "Q    Is Ed Ricci an attorney?  Was he acting as
 2         co-counsel in the case.
 3              "A    yes.
 4              "Q    Is he here in California?
02:21PM  5      "A    No."
 6         MR. SAGEL:  Now if I could have you look at
 7    Exhibit 403.  Do you have 403 in front of you?
 8              MR. MOHAMMADI:  I do.
 9              MR. SAGEL:  It's in the matter of Michael Avenatti
02:21PM 10   versus Lisa Storie-Avenatti, a judgment debtor examination of
11    Michael Avenatti on January 30th, 2019:
12              "Michael Avenatti was called by and on behalf
13         of the judgment creditor, and having been first
14         duly sworn by the court clerk, was examined and
02:22PM 15        testified as follows:
16              "Q    You've been previously sworn at court
17         on January 23rd, 2019, for your judgment debtor
18         exam.  Do you recall that?
19              "A    Yes.
02:22PM 20        "Q    Okay.  You understand that you
21         are still under oath?
22              "A    Yes.
23              "Q    Please state your full name for
24         the record.
02:22PM 25        "A    Michael John Avenatti.
```

```
 1              "Q     Do you hold trust accounts at
 2         any other institution other than City National Bank?
 3              "A     I'm not going to answer questions about
 4         where I hold my trust accounts because those funds
 5         don't belong to me.  So that's privileged.  I'm not
 6         going to answer that question."
 7              MR. SAGEL:  An attorney says:  "I believe he's
 8    right."
 9              Then the other attorney, the one I'm asking
10    questions on behalf of --
11              "Q     I'm entitled to know the location
12         of accounts, not entitled to know the client.
13              "A     Not if they don't belong to me.  They
14         don't belong to me.  I don't even know if there are
15         any, as I sit here, to be honest with you."
16              MR. SAGEL:  Exhibit 404.  Do you have 404 in front
17    of you?
18              MR. MOHAMMADI:  Yes.
19              MR. SAGEL:  The judgment debtor examination of
20    Michael J. Avenatti on Friday, March 15th, 2019.
21              Your Honor, do you want me to read the matter or...
22              THE COURT:  Why don't you skip it.
23              MR. SAGEL:  Okay.  (Reading:)
24              "Q     Mr. Avenatti, do you understand
25         you're under oath?
```

```
 1                  "A      I'm sorry, sir?
 2                  "Q      Do you understand you're under
 3          oath?
 4                  "A      yes.
 5                  "Q      Can you please state your full name,
 6          please.
 7                  "A      Michael John Avenatti.
 8                  "Q      We are going to go through
 9          some transactions that I want to ask you about, the
10          nature of the transactions.  Let's start.
11          What is Alki Bay Group?
12                  "A      A vendor for Global Baristas.
13                  "Q      What kind of vendor?
14                  "A      A bakery vendor.
15                  "Q      So Global Baristas was buying baked
16          goods from Alki?
17                  "A      As I -- as I recall.
18                  "Q      who is Dillanos Coffee Roasters?
19                  "A      A coffee roaster.
20                  "Q      Is it a coffee roaster for
21          Eagan Avenatti?
22                  "A      No.
23                  "Q      Who is Dillanos a coffee roaster
24          for?
25                  "Objection.  Foundation.
```

36

```
 1              "A     I have no idea who they are

 2         a coffee roaster for.

 3              "Q     Have you ever done business with

 4         Dillanos Coffee Roasters?

02:25PM 5      "A     Me personally, no.

 6              "Q     You on behalf of any entity

 7         you controlled?

 8              "A     Yes.

 9              "Q     What business did you do?

02:25PM 10     "A     They were a coffee roaster.

11              "Q     For who?

12              "A     For Global Baristas US, LLC.

13              "Q     Let's talk for a couple minutes

14         about Geoffrey Johnson.  Who is Mr. Johnson?

02:25PM 15     "A     Client of the firm.

16              "Q     Is the firm making a structured

17         payout to Mr. Johnson?

18              "A     No.

19              "Q     Did the firm settle a case on

02:26PM 20     behalf of Mr. Johnson?

21              "A     Yes.

22              "Q     So there's no reason for you to be

23         paying Mr. Johnson on an ongoing basis?

24              "A     I'm not answering --

02:26PM 25              "Sure.  So I asked Mr. Avenatti a question
```

1      about whether or not a client had been fully paid

2      the amount of money he was due at the law firm.  I'm

3      exploring, obviously, whether there are other" --

4           The Court says:

02:26PM 5      "Whether a client had paid the law firm?"

6           "The opposite, whether the law firm had paid

7      money the client is due."

8           The Court interjects:

9           "From the client trust?"

02:26PM 10      Lawyer responds:

11           "For a settlement, yes.  And Mr. Avenatti

12      asserted an objection to that and somehow

13      attorney-client privilege.  I'm not seeking

14      communications.  I didn't even ask how much it was.

02:27PM 15      I simply asked -- I'm trying to figure out if there

16      is another creditor out there we are going to have

17      to deal with.  And so part of the question is does

18      the -- is Mr. Avenatti going to have, essentially,

19      a problem with this particular client.

02:27PM 20           "So my question is, has that person been

21      given the money they were due."

22           Defendant's lawyer says:

23           "It's attorney-client privilege.  He is

24      specifically asking Mr. Avenatti for communications

02:27PM 25      and the substance of communications between him and

```
 1          his clients, number one.
 2               "Number two" --
 3               The Court says:
 4               "Okay, I overruled that.  It is a 'yes' or
 5          'no' question as to whether or not he has been paid
 6          all the money he was owed.  It's overruled.
 7               "So go ahead and answer it.
 8               "A     To the best of my knowledge, yes.
 9               "Q     Mr. Avenatti, do you or your law firms
10          have any current obligations to make payments to
11          Mr. Johnson?
12               "A     To the best of my knowledge, no.
13               "Q     Mr. Avenatti, has your law
14          firm been making periodic payments to Geoffrey
15          Johnson through at least 2018?
16               "A     I think so.  Yes.
17               "Q     When did your obligation to make
18          payments to Mr. Johnson cease, if they have ceased?
19               "A     I don't recall.
20               "Q     Okay.  Do you recall what the nature
21          of the -- what the nature of the settlement was
22          whereby you were making payments?
23               "A     I don't."
24               MR. SAGEL:  Skip to page 16:
25               "Q     Mr. Avenatti, were you the manager
```

1      of Passport 420?

2              "A     Yes."

3              MR. SAGEL:  And then, finally, Exhibit 406.

4              MR. MOHAMMADI:  I have it in front of me.

02:29PM 5      MR. SAGEL:  In Re:  Eagan Avenatti, LLP, debtor

6      examination of Michael Avenatti, dated Friday, March 22nd,

7      2019:

8              "Q     "Do you recall getting a $1.6 million

9              wire in the *Barela vs. Brock* matter as part of the

02:29PM 10             settlement?

11             "A     I think at one time that happened, yes.

12             "Q     Was the $1.6 million that we saw wired

13             into the Michael J. Avenatti trust account part of

14             the settlement that you obtained on behalf of

02:30PM 15     Mr. Barela?

16             "A     Sir, when you say 'that we

17             saw,' you refer to a document that I did not agree

18             with the predicate to, and I did not agree with your

19             assertions relating to the document.  What I can

02:30PM 20             recall is that $1.6 million was received and, yes,

21             it related to a matter for Mr. Barela.

22             "Q     How much of the $1.6 million that came

23             in related to a matter for Mr. Barela did you remit

24             to Mr. Barela?

02:30PM 25             "A     I don't recall.

1              "Q     Was it any money?

2              "A     I don't recall as I sit here right now,

3        because I don't have the accounting records in front

4        of me.  What I can recall is he still owes us money.

02:30PM  5              "Q     How much money does Mr. Barela owe --

6        when you say 'us,' do you mean Michael J. Avenatti,

7        Avenatti & Associates, or Eagan Avenatti?

8              "A     One or more of those firms or

9        individuals.  I don't know, as I sit here right now.

02:31PM 10              "Q     How much money does Mr. Barela owe each

11        of those firms?

12              "A     I -- I can't answer that question

13        without looking at the documents.

14              "Q     What is the basis for your claim that

02:31PM 15        Mr. Barela owes money to Eagan Avenatti?

16              "A     Because we did a bunch of work for him

17        and we weren't paid for it, and we also advanced a

18        bunch of costs.

19              "Q     Was Mr. Barela an hourly client?

02:31PM 20              "A     In some instances, yes.

21              "Q     What was the hourly rate Mr. Barela

22        was supposed to pay?

23              "A     I don't recall, as I sit here.

24              "Q     Do you recall receiving money from

02:31PM 25        Mr. Brock on behalf of Mr. Barela in any trust

```
 1    account?
 2          "Objection.  Asked and answered.
 3          "THE WITNESS:  Your Honor, I've answered this
 4    question."
 5          MR. SAGEL:  The Court says:
 6          "This is a yes-or-no question.
 7          "THE WITNESS:  Sir, I have a recollection of
 8    receiving settlement monies at some point in time
 9    relating to Mr. Barela.
10          "Q    And I believe you've already testified
11    that was approximately $1.6 million; correct?
12          "Did Mr. Barela ever authorize you to take
13    any of his money or any of the money that was
14    obtained as part of the settlement and send it to
15    Ed Ricci?
16          "A    Sir, all transfers of these monies
17    were legitimate, ethical, and legal under California
18    law at all times.  I don't have a recollection if he
19    did or he didn't, but I disagree with your
20    predicate, which is that somehow these were his
21    monies.  They weren't his monies.
22          "Q    The money that came in for the Barela
23    settlement wasn't Mr. Barela's money?
24          "A    Sir, you have my testimony.
25          "Q    All right.  Did Mr." -- I'm sorry.
```

1           "All right.  Did Mr. Barela ever authorize

2      you to send money obtained as part of his settlement

3      to Global Baristas on or about January 12th, 2018?

4           "A     Same answer, sir.

02:33PM 5           "Q     Mr. Avenatti, did you inform

6      Mr. Barela promptly when the money for his

7      settlement came in?

8           "A     I don't recall, as I sit here.

9           "Q     Did you provide Mr. Barela a

02:33PM 10     statement after his settlement came in showing how

11     money was used?

12          "A     I don't recall, as I sit here, without

13     looking at the documents.

14          "Q     Did Ed Ricci provide legal services

02:33PM 15     to Mr. Barela?

16          "A     I don't recall.  I don't think he did.

17          "Q     Looking at the money that

18     came in to this Michael J. Avenatti attorney-client

19     trust account for $1.6 million, I just want to ask

02:33PM 20     you -- I'll ask you generally -- did Mr. Barela

21     approve any disbursements of that money to any of

22     the entities that are listed here?  You can look at

23     it.  It is Dillanos Coffee, Burt Contracting, a

24     bakery, Global Baristas, any of the money that went

02:34PM 25     into the attorney-client trust account, was any of

UNITED STATES DISTRICT COURT

1        that money disbursed at Mr. Barela's direction?

2                "A     Sir, it may have been.  I don't know

3        without looking at other documents and further

4        considering the matter.  I don't know.

02:34PM 5                "Q     Okay.  Let's look more specifically.

6                "A     But it wasn't -- it wasn't his

7        money.

8                "Q     It was all your money?

9                "A     No.  I didn't say that.

02:34PM 10               "Q     Whose money was it?

11               "A     I said it --

12               "Q     Whose money was it?

13               "A     It was --

14               "Q     Sorry.  Whose money was it?

02:34PM 15               "A     Mr. Stolper, the money was handled

16        pursuant to California law and ethical requirements

17        legitimately at all times, okay.  We represented

18        Mr. Barela on a number of matters.

19               "Q     Whose money was it, Mr. Avenatti?

02:34PM 20               "A     Which money?

21               "Q     The 1.6 million that came in in the

22        *Barela vs. Brock* settlement.  Whose money was that

23        once it came in?

24               "A     I believe it was the money of the

02:35PM 25        various firms that had operated or worked on his

UNITED STATES DISTRICT COURT

```
 1          behalf.
 2                  "Q    None of that money belonged to Mr. Barela?
 3                  "A    I -- I don't know.  I'd have to look
 4          at other documents.  I don't believe so.
 5                  "Q    Did you send Mr. Barela a statement
 6          after the $1.6 million was obtained showing him how
 7          the money was accounted for?
 8                  "A    Sir, you asked me that.  I said I didn't
 9          recall.  I'd have to look at other documents."
10                  MR. SAGEL:  Thank you.
11                  MR. WYMAN:  Your Honor, our next witness is Long
12          Tran.  I believe the defendant wished to discuss an issue about
13          that witness before we begin.
14                  THE COURT:  Is that going to be a fairly short
15          discussion?
16                  MR. WYMAN:  I believe so.
17                  THE COURT:  Let's do it at sidebar.
18                  (Sidebar out of the presence of the jury:)
19                  THE COURT:  Okay.  You have handed up this morning
20          297.
21                  MR. AVENATTI:  Yes, sir.
22                  THE COURT:  This would appear to be a contingency
23          fee agreement between you and Michelle Phan and Long Tran.
24                  MR. AVENATTI:  Yes, Your Honor.  This is a redlined
25          version.  The Government received this document on July 30th,
```

evidently, from Mr. Tran, July 30th of this year.  They had

previously communicated with Mr. Tran, interviewed him in

connection with this case on at least two occasions, April 4th,

2019, and June 18, 2021.  We had made a Rule 16 request back

02:44PM  in, as I recall, May of 2019.

Government received this document on July 30th.  It

was not on their exhibit list.  Five days later they disclosed

it to us, on Tuesday of this week, August 3rd, at 5:26 p.m.,

and they labeled it Exhibit 297.  There's no transmittal e-mail

02:44PM  showing that this document was transmitted to me

contemporaneously or, frankly, at any point in time, and,

Your Honor, we object to the Government's use of it.

This is dissimilar to the instance that Your Honor

ruled on prior in the trial after the Government had done

02:44PM  direct and then I cross-examined the witness and the Government

wanted to use it on redirect.

We object -- I object to the use of the document,

Your Honor.  It wasn't disclosed.  You know, before -- well, it

wasn't disclosed on the exhibit list, it wasn't disclosed in

02:44PM  trial.  It's not in response to cross-examination.  I believe

it's a Rule 16 violation.  And to the extent the Government

wanted to use this document, it should have been obtained from

Mr. Tran well prior to trial and disclosed, and therefore, I

object to the use of 297.  It's also hearsay.

02:44PM  MR. WYMAN:  Your Honor, may I make --

1          THE COURT:  Please.

2          MR. WYMAN:  First of all, we did receive it on

3    July 30th.  I have the e-mail right here.  We received it last

4    Friday while we were in trial.  During the lunch break, I

02:44PM  5    forwarded it to Dean Steward and informed him that we would be

6    producing it with Bates numbers at a later date but wanted him

7    to have it the same date we had it, so they had a couple hours.

8          THE COURT:  You sent him the e-mail and the

9    document?

02:44PM 10          MR. WYMAN:  Yes.  I forwarded him the e-mail from

11   Mr. Tran so that they would have it.  And then we reviewed it

12   over the weekend, and I believe it was Tuesday we disclosed it

13   as a trial exhibit and informed them that we intended to

14   introduce it through Mr. Tran.  It's a redline that Mr. Tran

02:44PM 15   created.  We intend to lay the foundation and it's clearly

16   relevant.

17          THE COURT:  I'll allow you to use it.  Had you had

18   any -- prior to Mr. Tran sending it to you on the 30th, did

19   you -- did you have in your production materials any version of

02:44PM 20   the fee agreement between Michelle Phan and Long Tran?

21          MR. WYMAN:  Yes, Your Honor.  That's a good

22   clarification.  We already disclosed the final fee agreement as

23   the trial exhibit and we intend to introduce both.  This shows

24   the negotiation period prior to the final fee agreement being

02:44PM 25   reached.  So the final fee agreement is already a trial

```
 1    exhibit.  This was just the added on one.
 2              MR. AVENATTI:  Your Honor, I'll just add -- I'm
 3    sorry.
 4              THE COURT:  Did the Government have any knowledge of
 5    297 prior to Mr. Tran sending it to you on the 30th?
 6              MR. WYMAN:  No, Your Honor.  As defendant knows,
 7    since we showed him the e-mail, the e-mail that came from
 8    Mr. Tran came out of the blue.  We were unaware of its
 9    existence.  Had we been, it would have been asked for a long
10    time ago.
11              THE COURT:  Mr. Avenatti.
12              MR. AVENATTI:  Your Honor, the exhibit is classic
13    hearsay.  There's not going to be any testimony that I created
14    this document, that the redline markup is mine.  There's not
15    going to be any testimony of that.
16              This can't go to notice, Your Honor, because if the
17    claim is that somehow he sent this to me, where is the
18    accompanying e-mail with it as to when it was sent?
19              That hasn't been produced, Your Honor, and I don't
20    think it's appropriate that the Government is interviewing
21    witnesses on multiple occasions and all of a sudden a witness
22    just comes up with a document out of the blue and the
23    Government gets to use the document even though it wasn't
24    previously produced and it wasn't on the exhibit list.
25              I mean, if we're going to adhere to strict deadlines
```

```
 1  and Rule 16 issues as the Court has done as it relates to my

 2  ability to use documents even in the Government's production, I

 3  think it's highly prejudicial and inequitable to allow the

 4  Government to use 297, Your Honor.  And for all of those

 5  reasons I would object.

 6            THE COURT:  Your objections are overruled.  Before

 7  this is displayed, lay the foundation, including what the

 8  redline's all about.

 9            MR. WYMAN:  Yes, Your Honor.

10            THE COURT:  It seems to me the Government produced

11  it as early as possible opportunity on the same day.  A copy

12  was sent to Mr. Avenatti's advisory counsel, and the hard copy

13  with the Bates numbers were delivered on the 3rd.  I think the

14  Government acted very expeditiously upon receipt of the

15  document.

16            With regard to whether it was ever sent to

17  Mr. Avenatti, what the foundation is, we'll find out about all

18  that.  But I'm not going to exclude it at this point.

19            MR. AVENATTI:  All right.  I would also, just for

20  the record, lodge a 403 objection, I think, as well as,

21  Your Honor -- I think --

22            THE COURT:  What 403 portion are you --

23            MR. AVENATTI:  I'm sorry?

24            THE COURT:  What portion of 403 are you invoking?

25            MR. AVENATTI:  I think it's highly prejudicial and
```

**UNITED STATES DISTRICT COURT**

1    more prejudicial than probative, especially because of its late

2    production.

3                THE COURT:  Sir, that's not the type of prejudice

4    that 403 addresses.  403 addresses substantive prejudice.

02:44PM  5          MR. AVENATTI:  I also think it's a Due Process

6    Clause violation to spring this document on me in the middle of

7    the trial.  I didn't have the benefit of the document before

8    trial, before I gave my opening statement, before I figured out

9    my defense in the case.

02:44PM 10          And to drop a redline document on me in the middle

11   of trial that just comes out of nowhere when it's not for

12   impeachment or in response to cross-examination, I don't think

13   it's appropriate.  I think it's a violation of my Due Process

14   Clause rights, Your Honor.  And, you know, again, this came out

02:44PM 15   of nowhere.  And to allow the Government to use it I think is

16   highly prejudicial.  And for those reasons, I would object.

17                THE COURT:  You can ignore the contents and events

18   leading up to the document and the transmission to you.  I find

19   no prejudice, particularly given the representation that the

02:44PM 20   actual final fee agreement is in evidence, which suggests that

21   you probably knew about it when it was created and signed, and

22   the fee agreement certainly comes as no surprise to you.

23                So let's proceed.

24                MR. WYMAN:  Just to be clear, it's not yet in

02:44PM 25   evidence.  It's a trial exhibit.

1          THE COURT:  Right.  I assume at some point you will

2  offer it into evidence.

3          MR. WYMAN:  Shortly.

4          **(Open court in the presence of the jury.)**

02:45PM 5          THE COURT:  Government call its next witness,

6  please.

7          MR. WYMAN:  United States calls Long Tran.

8          THE COURTROOM DEPUTY:  Please raise your right hand.

9          **LONG TRAN, GOVERNMENT WITNESS, WAS SWORN**

02:45PM 10          THE COURTROOM DEPUTY:  If you'll please state and

11  spell your first and last name.

12          THE WITNESS:  Long Tran.  L-o-n-g, T-r-a-n.

13          THE COURTROOM DEPUTY:  Thank you.

14          THE COURT:  Mr. Wyman.

02:46PM 15          MR. WYMAN:  Thank you, Your Honor.

16                    **DIRECT EXAMINATION**

17  BY MR. WYMAN:

18  Q    Good afternoon, Mr. Tran.  Where do you live?

19  A    Los Angeles.

02:46PM 20  Q    And what do you do for work?

21  A    I am the COO of Divinium Labs.

22          THE REPORTER:  Sorry.  COO of?

23          THE WITNESS:  Divinium Labs.

24          THE COURT:  Sir, would you try and pull the

02:46PM 25  microphone a little bit closer.  Maybe put it under the shield.

|        |   |                                                              |
|--------|---|--------------------------------------------------------------|
| 1      | Q | BY MR. WYMAN:  Who runs the company at Divinium Labs?         |
| 2      | A | Michelle Phan.                                               |
| 3      | Q | What line of business is Michelle Phan in?                   |
| 4      | A | Cosmetics and beauty.                                        |
| 02:46PM 5 | Q | How long have you been working directly for her?          |
| 6      | A | Approximately five, six years.                               |
| 7      | Q | Prior to working directly for Ms. Phan, did you work with    |
| 8      |   | her at another company?                                      |
| 9      | A | Indirectly I worked for IPSY.                                |
| 02:46PM 10 | Q | And what is IPSY?                                          |
| 11     | A | It's a beauty/cosmetics subscription service.                |
| 12     | Q | What was your role at IPSY?                                   |
| 13     | A | I was a creative director.                                   |
| 14     | Q | And what was Ms. Phan's role?                                 |
| 02:47PM 15 | A | She was a cofounder.                                       |
| 16     | Q | From your work at IPSY, did you own any common stock or       |
| 17     |   | shares in the company?                                       |
| 18     | A | Yes.                                                         |
| 19     | Q | And did Ms. Phan also own common stock in the company?       |
| 02:47PM 20 | A | Yes.                                                       |
| 21     | Q | Now, you said you currently work at Divinium Labs for        |
| 22     |   | Ms. Phan; is that correct?                                   |
| 23     | A | Yes.                                                         |
| 24     | Q | What is your title?  I think you said COO?                   |
| 02:47PM 25 | A | Yes.                                                       |

**UNITED STATES DISTRICT COURT**

1   Q     And what is that?

2   A     Chief operations officer.

3   Q     And what are your general responsibilities as a chief

4   operations officer?

02:47PM 5   A     I oversee the running of the company.  All the business

6   affairs, hiring executives.

7   Q     As part of your responsibility, do you handle Ms. Phan's

8   financial affairs as well?

9   A     I work with her financial team.

02:48PM 10   Q     Are you involved in the companies that she works with?

11   A     Yes.

12   Q     And are you involved in selecting the law firms that she

13   hires?

14   A     Yes.

02:48PM 15   Q     And are you generally familiar with the law firms and

16   businesses and individuals she works with?

17   A     Familiar in what way?

18   Q     Well, familiar in the sense that, if Ms. Phan works with

19   a law firm or another business or individual, are you likely to

02:48PM 20   be aware of that?

21   A     Yes.

22   Q     At some point in time did you and Ms. Phan decide to sell

23   your respective shares in IPSY?

24   A     Yes.

02:48PM 25   Q     Did you hire a lawyer to help you and Ms. Phan in

|   | |
|---|---|
| 1 | negotiating a sale of your shares? |
| 2 | A    Yes. |
| 3 | Q    Whom did you first contact to find a lawyer? |
| 4 | A    Contact to find a lawyer? |
| 02:49PM 5 | Q    Well, when you decided that you wanted to hire a lawyer |
| 6 | for yourself and Ms. Phan, who did you reach out to? |
| 7 | A    I reached out to two people.  One was Filippo Marchino. |
| 8 | Q    Okay.  Who is Filippo Marchino? |
| 9 | A    Actually, I reached out to -- I reached out to Filippo |
| 02:49PM 10 | Marchino and Gunderson Dettmer as two firms to review. |
| 11 | Q    And let's go to -- which one of those people helped you |
| 12 | find a lawyer you ultimately hired? |
| 13 | A    Filippo. |
| 14 | Q    And what is your relationship with Filippo Marchino? |
| 02:49PM 15 | A    Filippo has been a long-time friend.  He used to be a |
| 16 | client at an old job that I had when I lived in Texas. |
| 17 | Q    Whom did you ultimately hire as your attorney? |
| 18 | A    Eagan Avenatti. |
| 19 | Q    And which attorney was the lead attorney on your matter |
| 02:50PM 20 | at Eagan Avenatti? |
| 21 | A    Michael Avenatti. |
| 22 | Q    Do you see Michael Avenatti in the courtroom here today? |
| 23 | A    Yes. |
| 24 | Q    Can you please identify him for the record by where he is |
| 02:50PM 25 | standing and an item of clothing he is wearing. |

```
 1    A     Suit, blue tie.

 2          THE COURT:  The record will indicate that the

 3    witness has identified the defendant.

 4          MR. WYMAN:  Thank you.

 5    Q     When did you first meet the defendant, Michael Avenatti?

 6    A     I'm not sure of the exact date.  Filippo introduced me to

 7    Michael, I think, shortly after they had a merge of their

 8    companies, the law firms.

 9    Q     Do you recall approximately what year that would have

10    been?

11    A     I don't.  It was casual.

12    Q     And do you recall the circumstances of that meeting?

13    Where did you meet him?

14    A     I met him at his Newport office.

15    Q     Based on your meeting with him and the conversation you

16    had with the defendant, what kind of law did you understand him

17    to practice?

18    A     Mergers and acquisitions.

19    Q     And that was based on your conversation with the

20    defendant?

21    A     Yes.

22          MR. AVENATTI:  Objection.  Leading.

23          THE COURT:  Sustained.

24    Q     BY MR. WYMAN:  Approximately when did you first discuss

25    with the defendant the prospect of him representing you and
```

02:50PM (line 5)
02:50PM (line 10)
02:51PM (line 15)
02:51PM (line 20)
02:51PM (line 25)

```
        1   Ms. Phan?

        2   A     Early 2017, I believe.

        3              MR. WYMAN:  Can you please pull up what is already

        4   in evidence as Exhibit 265.

02:51PM  5   Q     Mr. Tran, there are some binders behind you.  If you

        6   wouldn't mind looking for Volume IV, that way you can review

        7   the entire exhibit.

        8              Are we missing Volume IV?

        9   A     I don't see a Volume IV.

02:52PM 10              MR. WYMAN:  Ms. Bredahl, I know there's another copy

       11   over there.  I'm not sure what happened to the first one.

       12              (Pause in proceedings.)

       13   Q     BY MR. WYMAN:  Now if you could please turn to 265.

       14   A     Okay.

02:53PM 15   Q     Do you recognize this as an e-mail chain between you and

       16   the defendant and Filippo Marchino?

       17   A     Yes.

       18   Q     Starting with the first e-mail chronologically, the one

       19   at the top there on page 1, what is the date of that e-mail?

02:53PM 20   A     February 9th, 2017.

       21   Q     And what is the subject of the e-mail?

       22   A     IPSY.

       23   Q     I'm sorry, you said IPSY?

       24   A     Yes.

02:53PM 25   Q     February 9th of 2017, is this approximately the time that
```

```
 1    you first hired the defendant?
 2    A     This is when I engaged them, yes.
 3    Q     And focusing on your e-mail, there are three numbered
 4    points there below the heading "For Context."  Do you see that?
 5    A     Yes.
 6    Q     Can you please read those aloud.
 7    A     "Michelle is co-founder."  That's Number 1.
 8               "Number 2, Michelle has no board seats.
 9               "Number 3, Michelle is supposedly second
10          largest shareholder behind the CEO and board
11          majority, Marcelo Camberos.  Have not seen the cap
12          table to verify."
13    Q     And then right below that there are a couple more points
14    under the heading "Complexities."  Would you please read those
15    as well.
16    A     "Number 1:  IPSY bought back her cosmetics
17          brand, EM Cosmetics, from L'Oreal, approximately
18          $5 million, and has full ownership.
19               "Number 2, would be looking to purchase
20          EM Cosmetics from IPSY in parallel with selling her
21          shares of the company.  Options to purchase it back
22          would be the shares" --
23    Q     Why were you sending this information to the defendant
24    and Mr. Marchino?
25    A     For them to work with us on this case.
```

```
  1   Q    When you say "this case," are you referring to the issues
  2   regarding IPSY that you're detailing there?
  3   A    Yes.
  4   Q    Now, after these initial e-mails in this e-mail chain,
02:55PM 5  did you and Ms. Phan ultimately sign a fee agreement with the
  6   defendant and his law firm?
  7   A    Yes.
  8   Q    Prior to signing the agreement, did either you or
  9   Ms. Phan negotiate the terms of that fee agreement?
02:55PM 10 A    Yes.
 11   Q    And was that negotiation with the defendant?
 12   A    Yes.
 13   Q    Between you and Ms. Phan, who handled that negotiation?
 14   A    I did.
02:55PM 15 Q    Did the defendant provide you with an initial draft of
 16   the fee agreement?
 17   A    Yes.
 18   Q    And did you propose any changes to it?
 19   A    Yes.
02:56PM 20 Q    When you proposed changes, how did you reflect or mark
 21   those changes?
 22   A    In a Word document.  I did the usual redlines.
 23   Q    Can you please turn to Exhibit 297.  If it's not in the
 24   binder, it might be on the cart right behind you in a loose
02:56PM 25 paper.  Got it?
```

| | | |
|---|---|---|
| | 1 | Do you recognize this document? |
| | 2 | A    Yes. |
| | 3 | Q    What is it? |
| | 4 | A    This was my redline and markup back to Michael. |
| 02:56PM | 5 | Q    And when you say "redline," what do you mean by that? |
| | 6 | A    Proposed changes. |
| | 7 | Q    I'm sorry? |
| | 8 | A    Proposed changes. |
| | 9 | Q    Okay.  And are those proposed changes a feature that you |
| 02:57PM | 10 | can input in Word, as you said? |
| | 11 | A    Yes. |
| | 12 | Q    Is this a fair and accurate copy of the redline that you |
| | 13 | created on Word? |
| | 14 | A    Yes. |
| 02:57PM | 15 | Q    And once you created that, what did you do with it? |
| | 16 | A    I sent it back. |
| | 17 | Q    Back to whom? |
| | 18 | A    To Mr. Avenatti. |
| | 19 | MR. WYMAN:  Your Honor, at this time the Government |
| 02:57PM | 20 | moves to admit Exhibit 297. |
| | 21 | MR. AVENATTI:  Objection, Your Honor.  Lacks |
| | 22 | foundation.  Hearsay. |
| | 23 | THE COURT:  297 will be received.  Objection is |
| | 24 | overruled. |
| 02:57PM | 25 | **(Exhibit Number 297 received.)** |

Q    BY MR. WYMAN:  If you could please pull paragraph 4 on

page 1.  Can you please read the first sentence of that

paragraph?

A    "Legal fees, costs, and billing practices.  Attorney

     will receive a contingent fee for services rendered

     of 7.5 percent of the recovery defined below."

Q    How did you arrive at 7.5 percent for that fee with the

defendant?

A    Mr. Avenatti proposed 10 percent; I came back with

5 percent, and we met in the middle.

Q    It then appears, right below that in the remainder of

paragraph 4, that there are -- there's some stricken language

in red.  What does that mean?

A    I didn't agree to those terms.

Q    The language that's been stricken in red, are those the

changes that you proposed?

A    Yes.

Q    And what did you propose striking from this paragraph?

A    "The fair market value of any benefit, refund,

     property, stock, note, partnership interest, carried

     interest, stock option, business accommodation,

     intellectual property, loan and funding, and all

     other consideration."

Q    And the language you just read appears to be in the

definition of the term "recovery"; is that right?

```
 1   A      Yes.

 2   Q      And we don't need to go back to it, but the beginning of

 3   paragraph 4, recovery is what the defendant's attorneys' fees

 4   would come out of?

 5   A      Yes.

 6   Q      And then at the bottom of page 1 and top of page 2, it

 7   looks like you struck out paragraph 6 in its entirety; is that

 8   right?

 9   A      Correct.

10   Q      Can you please read what paragraph 6 said before you

11   deleted it.

12   A      "Cost disbursements and expenses.  Clients agree

13          to reimburse attorney for all out-of-pocket costs

14          and expenses within 30 days.  Clients receiving a

15          request for such reimbursement from attorney.  Cost

16          and expenses include filing and court fees,

17          investigation expenses, process fees, investigation

18          fees, graphic art and filming fees, PowerPoint fees,

19          computer animation fees, expert fees, deposition

20          costs, photocopying charges, mock trials or focus

21          groups, jury fees, computerized research, jury trial

22          consultant fees, telephone toll charges, travel

23          costs, mail messenger and other delivery charges,

24          postage and any other necessary expenses in this

25          matter.  Clients authorize attorney to incur all
```

```
 1          reasonable costs and to hire any investigators" --
 2              THE COURT:  Slow down a little bit.  Slow down.
 3              THE WITNESS:  -- "consultants or expert
 4          witnesses reasonably necessary in attorney's
03:00PM 5   judgment."
 6    Q    BY MR. WYMAN:  Why did you propose striking this entire
 7    paragraph?
 8    A    Because the fee structure was meant to be a contingency.
 9    Q    And what do you mean by that?
03:01PM 10  A    The recovery would just be a percentage if it was
11    recovered.
12    Q    And so by striking the costs, you believe that they
13    weren't necessary because of the contingency fee provision?
14              Well, let me ask a different question.
03:01PM 15              How does your belief that it's a contingency fee
16    relate to the paragraph 6 about costs, disbursements and
17    expenses?
18    A    Well, I think they should be all-inclusive in the
19    contingency agreement.
03:01PM 20  Q    Did you discuss that and specifically the striking of
21    paragraph 6 with the defendant?
22    A    Yes.
23    Q    Did he agree to a revised version with that change?
24    A    Yes.
03:01PM 25              MR. WYMAN:  Your Honor, I'm about to move on to a
```

```
 1    new exhibit if you want to take a break.
 2              THE COURT:  We'll take the midafternoon break here,
 3    ladies and gentlemen.  We'll be in recess for 15 minutes.
 4    Please remember the admonition not to discuss the case with
 5    anyone, not to form any opinion regarding the issues in the
 6    case, and please don't do any research.
 7              So 15 minutes, please.
 8              THE COURTROOM DEPUTY:  All rise.
 9              (Recess from 3:02 p.m. to 3:22 p.m.)
10              MR. WYMAN:  Thank you, Your Honor.
11    Q    Mr. Tran, if you could please pull up now Exhibit 266.
12              Which is already in evidence, Your Honor.
13              Do you recognize -- I'll wait until you get there.
14    A    Okay.
15    Q    Do you recognize this e-mail exchange?
16    A    Yes.
17    Q    If you could start with the first e-mail on page 2.  What
18    is the date of that e-mail?
19    A    August 15th, 2017.
20    Q    And the subject line?
21    A    "Draft fee agreement."
22    Q    Can you please read the defendant's message to you there.
23    A    "Long, attached please find the draft agreement
24         we discussed.  Please review, and if acceptable,
25         please return the signed copy.  As always, if you
```

03:02PM  5
03:21PM 10
03:22PM 15
03:23PM 20
03:23PM 25

```
 1            have any questions, please do not hesitate to
 2            contact me."
 3     Q      And then if we can go to page 1, it looks like there are
 4     a couple of e-mails, first from the defendant and then from you
03:23PM 5  with no content.  And then the middle there at 6:14 p.m., do
 6     you see an e-mail from the defendant to you?
 7     A      Yes.
 8     Q      And what does he say there?
 9     A      "Please see the attached per our discussion."
03:23PM 10  Q      And then at the top, what did you respond?
11     A      "Executed copy attached."
12     Q      Turning to page 3 of this exhibit, do you see that there
13     is an attachment to this e-mail exchange?
14     A      Yes.
03:24PM 15  Q      We were speaking a few minutes ago right before the break
16     about the redline of the fee agreement.  Do you remember that?
17     A      Yes.
18     Q      This attachment here to Exhibit 266 appears to be a
19     different version of the fee contract; is that right?
03:24PM 20  A      Correct.
21     Q      Is this the final version of the fee contract?
22     A      I believe so.
23     Q      Going to page 5 of the exhibit, the very end, are
24     those -- is that your signature and Ms. Phan's signature?
03:25PM 25  A      Yes.
```

64

```
 1   Q    Did you and Ms. Phan ever sign any other agreement on

 2   attorneys' fees with the defendant or his law firm?

 3   A    No.

 4   Q    If we could focus now on page 3 of the exhibit,

 5   paragraph 2, "Scope of Services."  Can you please read the

 6   first sentence of that paragraph.

 7   A    "Scope of Services.  Clients are hiring attorney

 8        to represent clients in connection with client's

 9        affirmative claims, divestiture, and exit from

10        Personalized Beauty Discovery, Inc."

11   Q    Is that a fair description of what you and Ms. Phan were

12   hiring the defendant to do?

13   A    Yes.

14   Q    Looking at paragraph 4, the legal fees, costs, and

15   billing practices, it appears that the final settlement -- I'm

16   sorry -- the final fee agreement here still has that 7.5

17   percent contingency fee; is that right?

18   A    I'm sorry, could you repeat that.

19   Q    Of course.

20        It looks like the attorney's fee percentage there of

21   7.5 percent that we discussed in the redline version, that it

22   made it to the final agreement; is that right?

23   A    Correct.

24   Q    And we looked in Exhibit 297, the redline, at how you

25   deleted paragraph 6 on costs and expenses.  Do you remember
```

03:25PM (line 5)
03:25PM (line 10)
03:25PM (line 15)
03:26PM (line 20)
03:26PM (line 25)

```
          1   that?

          2   A     Yes.

          3   Q     Does that paragraph appear anywhere in the final fee

          4   agreement with the defendant?

03:26PM    5   A     Don't believe so.

          6   Q     Well, if you could please take a look to confirm.  Is

          7   there any paragraph in Exhibit 266, pages 3 through 5, on

          8   expenses and costs?

          9   A     No.

03:26PM   10   Q     So under this agreement that you and Ms. Phan signed, was

         11   the defendant entitled to recoup costs in this matter?

         12   A     No.

         13   Q     Will you please turn now to Exhibit 267.

         14          This is already in evidence, Your Honor.

03:27PM   15          Do you see that this is an e-mail dated August 16th,

         16   2017, so the day after the previous e-mail?

         17   A     Yes.

         18   Q     Can you please read the defendant's message to you in

         19   this e-mail.

03:27PM   20   A     "Attached is the fully executed signature page

         21          to the agreement.  Thanks again, and I look forward

         22          to great success together.  See you later this

         23          morning."

         24   Q     And on page 2, the attachment, what is this?

03:27PM   25   A     The signature page.
```

```
 1   Q    And so you received the signature page now with the

 2   defendant's signature; is that right?

 3   A    Yes.

 4   Q    After you signed this fee agreement with the defendant,

03:28PM  5   did the defendant begin negotiating on your behalf with IPSY?

 6   A    Yes.

 7   Q    And that was to sell your shares and Ms. Phan's shares in

 8   IPSY; is that right?

 9   A    Yes.

03:28PM 10   Q    As part of his representation of you and Ms. Phan, did

11   the defendant also negotiate a sale of IPSY shares belonging to

12   someone named Pratigya Phan?

13   A    Yes.

14   Q    And who is Pratigya Phan?

03:28PM 15   A    Michelle Phan's sister-in-law.

16   Q    Did I pronounce that correctly, Pratigya?

17   A    Close enough.

18   Q    Was the defendant ultimately able to reach settlements on

19   behalf of you, Ms. Phan, and Pratigya Phan with IPSY?

03:28PM 20   A    Yes.

21   Q    Approximately when did he reach those agreements?

22   A    I would say third quarter of 2017.

23   Q    Were those agreements memorialized in writing?

24   A    Yes.

03:29PM 25   Q    Can you please take a look at Exhibit 268 now.  Do you
```

```
 1    recognize this document?

 2    A    Yes.

 3    Q    What is it?

 4    A    Common stock repurchase agreement from Michelle Phan.

 5    Q    As Ms. Phan's business manager, did you review this

 6    agreement before she signed it?

 7    A    Yes.

 8    Q    Is it a fair and accurate copy of Michelle Phan's common

 9    stock repurchase agreement?

10    A    Yes.

11         MR. WYMAN:  Your Honor, the Government moves to

12    admit Exhibit 268.

13         MR. AVENATTI:  Objection.  Hearsay.

14         THE COURT:  Overruled.  268 will be received.

15         (Exhibit Number 268 received.)

16    Q    BY MR. WYMAN:  Now, starting on page 1 at the top, what

17    is the date of this agreement?

18    A    September 17, 2017.

19    Q    And it looks like it's entered into between Personalized

20    Beauty Discovery, Inc., and Michelle Phan.  What is

21    Personalized Beauty Discovery, Inc.?

22    A    That is the -- that is the company name that IPSY is

23    under.

24    Q    Would you please look at the bottom of page 1, Section 1

25    of the agreement.  I see a reference in this paragraph to an
```

03:29PM (line 5)
03:29PM (line 10)
03:30PM (line 15)
03:30PM (line 20)
03:30PM (line 25)

```
 1    initial closing and then a subsequent closing.  Do you see
 2    that?
 3    A    Yes.
 4    Q    What does that mean?
 5    A    That the closing involved -- well, there were two closings
 6    to the deal.
 7    Q    And in this context, what do you mean by "closing"?
 8    A    That there would be two payments made.
 9    Q    Two payments made from IPSY?
10    A    Correct.
11    Q    To Michelle Phan?
12    A    Yes.
13    Q    When were those payments scheduled to occur under this
14    agreement?
15    A    September 18th, 2017, the initial closing; September 18th,
16    2018, for the subsequent closing.
17    Q    Now, was there a separate agreement with IPSY to purchase
18    your shares in the company?
19    A    Yes.
20    Q    Can you please take a look at Exhibit 296.  Do you
21    recognize this document?
22    A    Yes.
23    Q    And what is Exhibit 296?
24    A    Common stock repurchase agreement for myself.
25    Q    Is this the agreement that you entered into with IPSY?
```

**UNITED STATES DISTRICT COURT**

```
       1   A     Yes.

       2   Q     Is it a fair and accurate copy of the agreement that you

       3   entered into with IPSY?

       4   A     Yes.

03:32PM 5         MR. WYMAN:  Your Honor, at this time the Government

       6   moves to admit Exhibit 296.

       7         MR. AVENATTI:  Objection, Your Honor.  Hearsay.

       8         THE COURT:  Overruled.  The document is an operative

       9   agreement.  It's not hearsay.  296 will be received.

03:33PM 10        (Exhibit Number 296 received.)

      11          MR. WYMAN:  If you could please pull up the top.

      12   Thank you.

      13   Q     What is the date of this agreement?

      14   A     September 17th, 2017.

03:33PM 15  Q     Is that the same date as Michelle Phan's agreement?

      16   A     Yes.

      17   Q     And focusing at the bottom of this page, in Section 1, as

      18   we did with the other agreement, like Ms. Phan's agreement,

      19   does this one also provide for two separate closings or two

03:33PM 20  separate payments?

      21   A     Yes.

      22   Q     And what are the dates of those payments?

      23   A     September 18th, 2017, for the initial closing;

      24   September 18th, 2018, for the subsequent closing.

03:33PM 25  Q     Are those the same dates as Michelle Phan's payments?
```

```
      1    A     Yes.

      2    Q     Now, you mentioned earlier that the defendant also

      3    negotiated a sale of stock for Pratigya Phan; is that right?

      4    A     Yes.

03:34PM  5    Q     How many payments were due for her?

      6    A     I believe just one.

      7    Q     So between the two payments to Michelle Phan, two

      8    payments to you, and then one to Pratigya Phan, you were

      9    expecting a total of five payments from IPSY; is that right?

03:34PM 10    A     Yes.

     11    Q     Based on your understanding, did IPSY make those five

     12    payments?

     13    A     Yes.

     14    Q     Did you direct IPSY's payments to be made in any

03:34PM 15    particular account?

     16    A     Yes.

     17    Q     Where did you have those payments sent?

     18    A     Eagan Avenatti client trust account.

     19    Q     And why did you have the payment sent to the defendant's

03:34PM 20    law firm attorney-client trust account rather than directly to

     21    you and Ms. Phan and Pratigya Phan?

     22    A     During the initial closing it was used to be held in

     23    escrow.

     24    Q     Well, let me back up.  I'm actually referring at the

03:35PM 25    outset to the initial closing, the initial set of payments.
```

           1           Well, let me ask a threshold question.

           2           The initial closing, those first payments, were they

           3    made on time pursuant to the agreement on September 18, 2017?

           4    A    From IPSY?

03:35PM    5    Q    Yes.

           6    A    Yes.

           7    Q    And at that time, did you direct them to be made into the

           8    defendant's attorney-client trust account?

           9    A    Yes.

03:35PM   10    Q    And why did you do that?

          11    A    We were still -- for the divestment of EM Cosmetics, we

          12    were still working the LLC that would hold it and, also, bank

          13    accounts.  So that was for the 20 million from Michelle's bank.

          14    Q    So why would those circumstances lead you to want to have

03:35PM   15    them deposited into an attorney-client trust account?

          16    A    It was -- well, I was told that that's just how it would

          17    be.  I mean, Michael suggested it and gave reasoning for it.

          18    Q    You said were you told.  Who were you told that by?

          19    A    Michael Avenatti.

03:36PM   20    Q    All right.  I want to ask you about the amount of the

          21    IPSY payments.  So the bank records for that would be helpful.

          22    Let's pull up what's already in evidence as Exhibit 369,

          23    page 1.  If we could pull up the right portion.

          24           This is a series of incoming wire payments.  Do you

03:36PM   25    see that?

A     I'm sorry, which exhibit is this?

Q     369, page 1.  It's likely going to be in a different volume, different binder.

        MR. SAGEL:  Volume VI.

Q     BY MR. WYMAN:  Volume VI.

A     That's 369?

Q     369, yes.  Page 1.  Do you have it up?

A     Yes.

Q     This is a series of incoming wire transfers.  Do you see that?  Do you see the heading that says "Incoming Wires"?

A     Yes.

Q     And in the column that says "Credit Account," what are the last four numbers of that account?

A     4705.

Q     In the column that says "Originator," which is on the left-hand side of the screen there, do you see that there are a total of five incoming wires from Personalized Beauty Discovery, Inc.?

A     Yes.

Q     And I think you said earlier, that's the parent company or the company that IPSY is under?

A     Yes.

Q     What did you understand these five payments to represent?

A     These were the payments made based on the agreements that we had with IPSY.

```
 1   Q    Okay.  I want to ask you about each of them.  Do you see
 2   the column that says "Transaction Date"?
 3   A    Yes.
 4   Q    Do you see in that column that three of the payments were
 5   made on September 18, 2017?
 6   A    Yes.
 7   Q    And, again, I'm referring just to the payments from
 8   Personalized Beauty Discovery, Inc.  Do you see that three of
 9   those wires were on September 18, 2017?
10   A    Yes.
11   Q    All right.  The payment in the first row there, who did
12   you understand that payment to be for?
13   A    That was for Michelle Phan.
14   Q    And what is the amount of that payment?
15   A    $27,414,668.32.
16   Q    How about the second wire, who did you understand that to
17   be a payment for?
18   A    That looks -- excuse me.  That looks to be mine.
19   Q    And what is the amount of that payment?
20   A    $984,750.
21   Q    Okay.  The third wire payment, who did you understand
22   that to be a payment for?
23   A    For Pratigya Phan.
24   Q    And the amount?
25   A    $475,000.
```

03:38PM 5
03:39PM 10
03:39PM 15
03:40PM 20
03:40PM 25

```
        1   Q    And then if we can go below that, do you see that there

        2   are two more payments from Personalized Beauty Discovery,

        3   Inc. --

        4   A    Yes.

03:41PM  5   Q    -- on March 14th of 2018?

        6   A    Yes.

        7   Q    Starting with the first one, who did you understand that

        8   to be a payment for?

        9   A    Michelle Phan.

03:41PM 10   Q    And the amount?

       11   A    $8,146,288.

       12   Q    And then the last payment from IPSY, who did you

       13   understand that to be a payment for?

       14   A    That was for me.

03:41PM 15   Q    And what is the amount of that one?

       16   A    $147,972.

       17   Q    I've written down the payments on the easel here that you

       18   just read aloud, and I'm going to ask you to add them up.  Do

       19   you see there's a calculator there to your right?

03:42PM 20   A    Yes.

       21   Q    Can you please turn it on.

       22        So for the five wire payments reflected on

       23   Exhibit 369, page 1, from Personalized Beauty Discovery, Inc.,

       24   can you please add those on the calculator and let me know what

03:42PM 25   the total is.
```

```
 1  A      My total comes out to $37,168,678.32.

 2  Q      Okay.  It's $37,168,678.32.  Is that correct?

 3  A      Correct.

 4  Q      Based on your understanding of the fee agreement that you

 5  and Ms. Phan entered into with the defendant, did you

 6  understand that he was entitled to 7.5 percent of that figure?

 7  A      Yes.

 8  Q      Did you believe he was entitled to anything more than

 9  that?

10  A      No.

11  Q      Given that there were two sets of payments that you said

12  originally was September 2017 and then the second was

13  scheduled, at least, for September of 2018, when did you

14  understand the defendant would be taking his 7.5 percent of

15  that figure?

16  A      We paid the full fee from the first closing.

17  Q      Okay.  Now I'm going to ask you to do one more

18  calculation.  Do you still have that number up?

19  A      Yes.

20  Q      Can you please take that figure and multiply it by

21  $7.5 percent.

22  A      It's $2,787,650.87.

23  Q      Go a little more slowly.  2 million how much?

24  A      $2,787,650.87.

25  Q      $2,787,650.87?
```

```
        1   A      Correct.
        2   Q      I'm going to ask you now to pull up in a binder, if we
        3   can show it on the screen, what is already in evidence as
        4   Exhibit 367.
03:46PM 5          Now, you testified a few minutes ago that your
        6   understanding was that the defendant took his attorney's fee,
        7   the 7.5 percent, with the first set of payments; is that right?
        8   A      Yes.
        9   Q      Can we please pull up the first check on this page.  What
03:46PM 10  is the name on this check?
       11   A      MLP Settlement Trust.
       12   Q      And under the name there, it lists an account number.
       13   What are the last four digits of that account number?
       14   A      4705.
03:47PM 15  Q      Is that the same last four digits of the incoming wires
       16   he was looking at on the credit account?
       17   A      I believe so.
       18   Q      Who is this check made out to?
       19   A      Can't quite make out the writing.
03:47PM 20  Q      Okay.  Potentially "operating"?
       21   A      "To operating."
       22   Q      Okay.  And what is the date of the check?
       23   A      9/18/17.
       24   Q      The same date that -- first three wire payments from IPSY
03:47PM 25  that we just looked at?
```

A     Yes.

Q     And the same date in your and Ms. Phan's common stock repurchase agreements for the first set of payments?

A     Yes.

Q     And then what is the amount on this check?

A     $2,787,650.87.

Q     Is that the same -- is that the same amount, to the penny, that we just calculated here?

A     Yes.

Q     All right.  After the defendant took his full 7.5 percent attorney's fee, did you, Michelle Phan, and Pratigya Phan receive your portions of the first set of payments in September of -- in September/October of 2017?

A     Yes.

Q     If you can go back now to Exhibit 369, please.  And now look at page 2.  Do you see that this page is labeled "Outgoing Wires"?

A     Yes.

Q     And if you look at the column to the left under "Debit Account," do you see that it's the same account ending in 4705?

A     Yes.

Q     Now, on the right in the column transaction date, do you see five outgoing wires at the top between September 18, 2017, and then October 3rd, 2017?

A     Yes.

| | |
|---|---|
| 1 | Q    It looks at the top there's a wire to you; is that right? |
| 2 | A    Yes. |
| 3 | Q    And what did you understand that payment to represent? |
| 4 | A    The first payment. |
| 03:49PM 5 | Q    And right below that, I see a wire to Pratigya Phan with |
| 6 | an amount on the right.  What did you understand that to be? |
| 7 | A    That was her full payment. |
| 8 | Q    And right below that, there's one for Michelle Phan for a |
| 9 | little more than 4.7 million.  And then two below that for |
| 03:50PM 10 | 10 million to Divinium Labs, LLC.  What did you understand |
| 11 | those last three payments to be? |
| 12 | A    The first payment is for Michelle's personal accounts, and |
| 13 | the second and third payments were to go to her company. |
| 14 | Q    So at this time, in October of 2017, did you and Michelle |
| 03:50PM 15 | Phan and Pratigya Phan receive everything you believed you were |
| 16 | owed under the terms of your common stock repurchase |
| 17 | agreements? |
| 18 | A    Yes. |
| 19 | Q    Can you please turn to Exhibit 271.  Do you recognize |
| 03:51PM 20 | this document? |
| 21 | A    Yes. |
| 22 | Q    Is this a fair and accurate copy of an e-mail that you |
| 23 | received from the defendant? |
| 24 | A    Yes. |
| 03:51PM 25 | MR. WYMAN:  Your Honor, the Government moves to |

```
 1    admit Exhibit 271.

 2            MR. AVENATTI:  Objection, Your Honor.  Hearsay as to

 3    the bottom e-mail.

 4            MR. WYMAN:  Your Honor, to the extent there's a

 5    statement in the bottom e-mail, it's an agency statement.  It's

 6    from Judy Regnier.

 7            THE COURT:  271 will be received.

 8            (Exhibit Number 271 received.)

 9            MR. WYMAN:  If we could please pull up the bottom

10    half of the page.

11    Q    Focusing on the first e-mail here on the bottom half of

12    the page sent from Judy Regnier, do you know who Judy Regnier

13    is?

14    A    Yes.

15    Q    Who is she?

16    A    My understanding is that she was the office manager of

17    Eagan Avenatti.

18    Q    And who do you believe she worked for?

19    A    Michael Avenatti.

20    Q    What is the subject line of this e-mail?

21    A    "Wire received."

22    Q    And the date?

23    A    September 21st, 2017.

24    Q    Now, it looks like Ms. Regnier sent this e-mail to the

25    defendant and then he forwarded it to you; is that right?
```

03:51PM (line 5)
03:52PM (line 10)
03:52PM (line 15)
03:52PM (line 20)
03:52PM (line 25)

| | | |
|---|---|---|
| | 1 | A      Correct. |
| | 2 | Q      And what did he say in his e-mail to you? |
| | 3 | A      "See below.  Judy confirmed the wire hit Michelle's |
| | 4 | account." |
| 03:53PM | 5 | Q      Okay.  Now, I want to turn to the second set of payments |
| | 6 | that we discussed earlier now.  At some point did IPSY reach |
| | 7 | out to you about making those second payments early? |
| | 8 | A      Yes. |
| | 9 | Q      Approximately when did that occur? |
| 03:53PM | 10 | A      Believe it was February 2018. |
| | 11 | Q      When you heard from IPSY, did you contact the defendant? |
| | 12 | A      Yes. |
| | 13 | Q      Can you please take a look at Exhibit 273 now.  Do you |
| | 14 | recognize this document? |
| 03:53PM | 15 | A      Yes. |
| | 16 | Q      Is this an e-mail chain that you were on with the |
| | 17 | defendant and Judy Regnier? |
| | 18 | A      Yes. |
| | 19 | Q      And is it a fair and accurate copy of that e-mail chain? |
| 03:54PM | 20 | A      Yes. |
| | 21 | MR. WYMAN:  Your Honor, the Government moves to |
| | 22 | admit Exhibit 273. |
| | 23 | MR. AVENATTI:  Objection, Your Honor.  Hearsay. |
| | 24 | MR. WYMAN:  Your Honor, the e-mails from Mr. Tran |
| 03:54PM | 25 | are just being offered for notice, and the original e-mail from |

**UNITED STATES DISTRICT COURT**

1    Valen Tong.

2            THE COURT:  The e-mails by Mr. Avenatti will be

3    received for the truth.  The rest of the e-mails will be

4    received for notice only.  So objection's overruled.

03:54PM 5            **(Exhibit Number 273 received.)**

6    Q    BY MR. WYMAN:  If you can please pull up the very bottom

7    of page 1.

8            Mr. Tran, it looks like the earliest e-mail is from

9    someone named Valen Tong.  Do you see that?

03:54PM 10   A    Yes.

11   Q    Who is Valen Tong?

12   A    CFO of IPSY.

13   Q    Okay.  What is the date of this e-mail?

14   A    March 8th, 2018.

03:55PM 15   Q    Go to page 2, please.

16           Well, first, let me ask you, what's the subject

17   line?

18   A    IPSY Common Stock Repurchase Agreement.

19   Q    Thank you.  And then if we can go to page 2.  Can you

03:55PM 20   please read the first three paragraphs of Valen Tong's e-mail

21   to you.

22   A    "Dear Long, hope the e-mail finds you well.  I am

23        the CFO of IPSY.  We have not met.  Nice meeting you

24        here, plus some good news to share.  As Jen has

03:55PM 25        discussed with you this morning, we are planning to

```
  1            effect an early subsequent closing of your common

  2            stock repurchase agreement.  As a result, we will be

  3            repurchasing 1,947 shares for an aggregate purchase

  4            price of $147,972 per the common stock repurchase

03:55PM  5    agreement.  The funds will be wired to you next

  6            week.  Can you please confirm your bank account

  7            information below."

  8    Q    Now, you testified a minute ago that you believe they

  9    reached out to you in February.  Seeing this e-mail dated

03:56PM 10    March 8th of 2018, does that refresh your recollection as to

 11    the timing?

 12    A    Yes.

 13    Q    So was this the first contact about a second payment?

 14    A    Yes.

03:56PM 15    Q    Okay.  Now, below the three paragraphs you just read, it

 16    looks like there is some account information.  Do you see that?

 17    A    Yes.

 18    Q    It says, "City National Bank, Los Angeles, California,"

 19    and then there's an account and routing number.  What are the

03:56PM 20    last four numbers of the account number listed?

 21    A    4705.

 22    Q    And are those the same four digits of the defendant's

 23    attorney-client trust account that we've been discussing?

 24    A    Yes.

03:56PM 25    Q    Going back to page 1 now, toward the bottom, who did you
```

```
 1   send this e-mail to once you received it?
 2   A    I sent it to Michael Avenatti.
 3   Q    Can you please read your e-mail that you sent to the
 4   defendant.
 5   A    "Hi, Michael.  Is the below your escrow account?
 6        We would prefer to pass through it like before in
 7        order to keep consistent with tax treatment of the
 8        first traunch.  Let me know, thanks."
 9   Q    When you said "consistent with tax treatment with the
10   first traunch," what did you mean by that?
11   A    I wanted it to be treated the same way as the first
12   traunch.
13   Q    And what tax treatment are you referring to, based on
14   your understanding?
15   A    I don't really have a good understanding of taxes in
16   general, but my understanding was that as a divestiture, if we
17   were to -- well, the 20 million was for the divestiture, and
18   the remaining would be for Michelle's personal account.  And so
19   this was to be treated like her personal.
20   Q    So did you have some understanding that there was a tax
21   benefit to doing it this way?
22   A    That was my broad understanding, but not specifically.
23   Q    And that broad understanding, where did it come from?
24   A    Michael Avenatti.
25   Q    Right above this e-mail and -- sorry, it looks like your
```

1    e-mail is also dated March 8, the same day?

2    A    Yes.

3    Q    And then right above that it looks like you sent a

4    follow-up e-mail on March 12 of 2018; is that right?

03:58PM 5    A    Yes.

6    Q    And what did you say there?

7    A    "Hi, Michael.  Just wanted to follow up here.  They will

8    be sending early this week.  Thanks."

9    Q    And above that, it looks like the defendant responded on

03:58PM 10   March 13th and said, "What time can we chat this a.m.?"; is

11   that right?

12   A    Yes.

13   Q    And then you say, "Please give me a call any time."

14        And those last four digits, is that a phone that you

03:58PM 15   used?

16   A    Yes, that's my phone number.

17   Q    Did you end up speaking to the defendant about IPSY's

18   second set of payments to you and Ms. Phan?

19   A    Yes.

03:59PM 20   Q    What did he say?

21   A    He said he confirmed that the money should go to the

22   client trust account or that account.

23   Q    And when you say "the money," are you referring to the

24   IPSY payments that you were expecting?

03:59PM 25   A    Correct.

```
  1   Q    When you had this conversation, did the defendant say

  2   anything to you about charging you or Ms. Phan additional

  3   attorney's fees for receiving the second set of payments?

  4   A    No.

03:59PM  5   Q    Based on your fee agreement with the defendant, did you

  6   believe that he was entitled to charge any fees for this second

  7   set of payments?

  8   A    No.

  9   Q    And if he was going to charge you any additional fees for

03:59PM 10   doing so, would you have expected him to tell you?

 11            MR. AVENATTI:  Speculation and conjecture,

 12   Your Honor.

 13            THE COURT:  Overruled.

 14            THE WITNESS:  Yes.

04:00PM 15   Q    BY MR. WYMAN:  Why?

 16   A    He had already paid the full fee during first traunch

 17   payment.

 18   Q    Around the same time that you received this e-mail from

 19   Valen Tong on March 8th, 2018, to your knowledge, did Michelle

04:00PM 20   Phan receive a similar e-mail?

 21   A    Yes.

 22   Q    And did Ms. Phan end up forwarding that e-mail to you?

 23   A    Yes.

 24   Q    Was that e-mail also about IPSY making its second payment

04:00PM 25   early, only instead of you, to Ms. Phan?
```

| | | |
|---|---|---|
| | 1 | MR. AVENATTI:  Objection, Your Honor.  Hearsay. |
| | 2 | Seeks hearsay. |
| | 3 | MR. WYMAN:  Not offered for the truth, Your Honor. |
| | 4 | THE COURT:  Be received but not for the truth. |
| 04:00PM | 5 | MR. WYMAN:  I'm not actually offering any exhibit |
| | 6 | yet.  It's just a question. |
| | 7 | THE COURT:  Well, the answer will be received not |
| | 8 | for the truth. |
| | 9 | MR. WYMAN:  Okay.  I apologize.  Thank you. |
| 04:01PM | 10 | Q    I'm sorry, did you answer the question? |
| | 11 | A    Yes. |
| | 12 | Q    Okay.  Thanks. |
| | 13 | Now, did you also communicate with the defendant |
| | 14 | about receiving Ms. Phan's second payment from IPSY? |
| 04:01PM | 15 | MR. AVENATTI:  Objection.  Leading. |
| | 16 | THE COURT:  Overruled. |
| | 17 | THE WITNESS:  Yes. |
| | 18 | Q    BY MR. WYMAN:  Can you please take a look at Exhibit 272. |
| | 19 | Do you recognize this document? |
| 04:01PM | 20 | A    Yes. |
| | 21 | Q    Is this an e-mail that you received from Ms. Phan? |
| | 22 | A    Yes. |
| | 23 | Q    And is it a fair and accurate copy of that e-mail? |
| | 24 | A    Yes. |
| 04:01PM | 25 | MR. WYMAN:  Your Honor, the Government moves to |

```
 1   admit Exhibit 272, not for the truth but to show the actions of
 2   what the parties did next.
 3                MR. AVENATTI:  Objection, Your Honor.  Hearsay.
 4                THE COURT:  272 will be received, but not for the
 5   truth.
 6                (Exhibit Number 272 received.)
 7   Q    BY MR. WYMAN:  Focusing on the first e-mail that Ms. Phan
 8   forwarded you -- and let me back up.
 9                It looks like in the way that this chain is
10   organized, the oldest e-mail is at the top; is that right?
11   A    Yes.
12   Q    So the first e-mail that Ms. Phan forwarded you at the
13   top half of page 1, it appears to be pretty similar to the
14   e-mail from Valen Tong that we just looked at in Exhibit 273;
15   is that right?
16                MR. AVENATTI:  Objection.  Leading.
17                THE COURT:  Overruled.
18                THE WITNESS:  Yes.
19   Q    BY MR. WYMAN:  Can you please read the third paragraph,
20   starting with "as Jen."
21   A    "As Jen has discussed with Long this morning, we
22        are planning to effect an early subsequent closing
23        of your common stock repurchase agreement.  As a
24        result, we will be repurchasing 107,188 shares for
25        an aggregate purchase price of $8,146,288 per the
```

|       |    |                                                                        |
|-------|----|------------------------------------------------------------------------|
|       | 1  | common stock repurchase agreement.  Funds will be                      |
|       | 2  | wired to you next week.  Can you please confirm your                   |
|       | 3  | bank account information below."                                       |
|       | 4  | Q     And then below that, is that the same bank account               |
| 04:03PM | 5 | information?                                                           |
|       | 6  | A     Yes.                                                             |
|       | 7  | Q     At the bottom of page 1, it looks like Michelle Phan             |
|       | 8  | forwarded you another subsequent part of that e-mail chain on          |
|       | 9  | March 14; is that right?                                               |
| 04:04PM | 10 | A     Yes.                                                            |
|       | 11 | Q     At the top of page 2, it looks like she responded to             |
|       | 12 | Valen Tong on March 13?                                                |
|       | 13 |           MR. AVENATTI:  Leading.  Objection.                          |
|       | 14 |           THE COURT:  Overruled.                                       |
| 04:04PM | 15 | Q     BY MR. WYMAN:  Do you see that?                                 |
|       | 16 | A     I'm sorry, could you repeat that.                                |
|       | 17 | Q     Of course.                                                       |
|       | 18 |           At the top of page 2, it looks like Michelle Phan's          |
|       | 19 | response is dated March 13 of 2018.  Do you see that e-mail?           |
| 04:04PM | 20 | A     Yes.                                                            |
|       | 21 | Q     Can you please read what her response is.                        |
|       | 22 | A     "Hi everyone.  Yes, the wire info is correct.  Thank you."       |
|       | 23 | Q     And March 13, is that the same date in the previous              |
|       | 24 | e-mail where the defendant and you talked about chatting on the        |
| 04:04PM | 25 | phone?                                                                |

```
         1   A     Yes.
         2   Q     Prior to Ms. Phan sending this e-mail, had you discussed
         3   with the defendant having Michelle Phan's payment sent to his
         4   attorney-client trust account?
04:05PM  5   A     Yes.
         6   Q     Looking at the bottom of page 1 and top of page 2 in
         7   response to Michelle Phan's e-mail, there's an e-mail from
         8   Darryl Chang.  Who is Darryl Chang?
         9   A     I believe Darryl worked on Valen's team.
04:05PM 10   Q     And what did Mr. Chang write in his e-mail to Michelle
        11   Phan?
        12   A     "Hi Michelle.  Just wanted to let you know that
        13         the payment was processed today.  If you have any
        14         questions, please let us know."
04:05PM 15   Q     What is the date of Mr. Chang's e-mail?
        16   A     March 14th, 2018.
        17   Q     At this time, in addition to the defendant, did you also
        18   communicate about the IPSY payments with Filippo Marchino?
        19   A     I don't recall.
04:06PM 20   Q     Well, during this time, in spring of 2018, were you in
        21   communication with Mr. Marchino?
        22                MR. AVENATTI:  Objection.  Leading.
        23                THE COURT:  Overruled.
        24                THE WITNESS:  In the spring, yes.
04:06PM 25   Q     BY MR. WYMAN:  And how would you communicate with him
```

```
         1    typically?

         2    A     Text message.

         3    Q     Can you please take a look at Exhibit 274.

         4          And, Your Honor, this is already in evidence.

04:06PM  5          Do you recognize Exhibit 274?

         6    A     Yes.

         7    Q     Is this a collection of text messages that you provided

         8    to the Government?

         9    A     Yes.

04:07PM  10   Q     And who are they with?

         11   A     Filippo Marchino.

         12         MR. WYMAN:  Can we please pull up page 3.

         13   Q     That last e-mail we looked at from Darryl Chang was

         14   March 14, 2018; is that right?

04:07PM  15   A     Yes.

         16   Q     On page 3 here, does that appear to be the same date as

         17   the text message at the top?

         18   A     March 14th?

         19   Q     Yes.

04:07PM  20   A     Yes.

         21   Q     What does Mr. Marchino say to you in that text message on

         22   March 14th?

         23   A     Says, "Okay, will check shortly."

         24   Q     I'm sorry, at the top.

04:07PM  25   A     Oh, I'm sorry.  At the top, "Hi, let me know when wires
```

```
         1   have been sent by IPSY.  That way we can turn around quickly."

         2   Q    Who did you understand him to be referring to when he

         3   said "we can turn around quickly"?

         4   A    Eagan Avenatti.

04:08PM  5   Q    And what is your response?

         6   A    "They said they just sent."

         7   Q    On the top of page 4, it looks like Mr. Marchino says,

         8   "Will check shortly."  And then what did you write to him?

         9   A    "I'll send you wire info."

04:08PM 10   Q    And did you send him wire information?

        11   A    Yes.

        12   Q    If you can please turn to what is already in evidence as

        13   Exhibit 275.  Do you recognize this as an e-mail that you sent?

        14   A    Yes.

04:08PM 15   Q    Who did you send it to?

        16   A    Sent it to Michael Avenatti, Judy Regnier, Filippo

        17   Marchino.

        18   Q    Why did you send it to those three people?

        19   A    Those were the people that I had interactions with at the

04:09PM 20   firm.

        21   Q    By "the firm," you're referring to Eagan Avenatti?

        22   A    Yes.

        23   Q    Now, it looks like the subject is "Wire Info."  Can you

        24   please read your message.

04:09PM 25   A    "Hi, guys.  Here is the wire info for myself and Michelle.
```

Payment was sent from IPSY today."

Q    And then below that, below Michelle Phan's name and then Long Tran, what is the information you're providing in those areas?

A    Our account information at our banks.

Q    What amount are you directing to be deposited into Michelle Phan's account?

A    $8,146,288.

Q    And what amount for you?

A    $147,972.

Q    And are those the amounts you understood that IPSY was wiring?

A    Yes.

Q    This e-mail is March 14th of 2018.  Did you and Ms. Phan receive your second payments from IPSY that day?

A    No.  Wait.  Are you saying from IPSY?

Q    Yes.  Did you personally receive your payments from the defendant from IPSY that day.

A    No.

Q    How about that week?

A    Don't believe so.

Q    Can you please go back to Exhibit 274, page 5.  It looks like six days -- and I'm focusing at the top here -- six days after that e-mail we just looked at, March 20th, you reached out to Mr. Marchino; is that right?

```
 1   A     Yes.

 2   Q     And what did you say?

 3   A     "Morning sunshine.  Get the wire?"

 4   Q     What did you mean by "the wire"?

 5   A     The wire for the -- the wires that were supposed to go to

 6   our bank accounts.

 7   Q     And it looks like he responds, "Hi, no idea.  Need to ask

 8   Michael."

 9         And he says he will ping him.  Do you see that?

10   A     Yes.

11   Q     In addition to Mr. Marchino, were you also text-messaging

12   occasionally with the defendant during this time?

13   A     Yes.

14   Q     Can you please take a look at Exhibit 278 now.  Do you

15   recognize this document?

16   A     Yes.

17   Q     What is it?

18   A     It's a text message with Michael Avenatti and myself.

19   Q     And if you page through, it's an eight-page exhibit.  Are

20   these all text messages that you exchanged with the defendant?

21   A     Yes.

22   Q     Are they fair and accurate copies of text messages?

23   A     Yes.

24         MR. WYMAN:  Your Honor, the Government moves to

25   admit Exhibit 278.
```

04:11PM (line 5)
04:11PM (line 10)
04:12PM (line 15)
04:12PM (line 20)
04:12PM (line 25)

```
 1              MR. AVENATTI:  Objection, Your Honor.  Best
 2     evidence.  Authentication.  Foundation.  Hearsay.
 3              THE COURT:  Overruled.  Mr. Avenatti's e-mails will
 4     be received for the truth.  The others will just be received
 5     for purposes of notice; that is, that Mr. Avenatti received
 6     those, not for the truth of the content.
 7              (Exhibit Number 278 received.)
 8     Q    BY MR. WYMAN:  Now, before I ask you any questions about
 9     this exhibit, is this the entirety of text messages that you
10     had with the defendant?
11     A    No.
12     Q    So you had more communications with him than what is
13     reflected here; is that right?
14     A    Yes.
15     Q    All right.  Let's take a look at the top of page 1, which
16     appears to be dated March 23rd.  What did you write to the
17     defendant there?
18     A    "Hi, Michael.  Checking in on the wire.  Let me
19          know when we should expect it to come our way.
20          Thanks."
21     Q    So this is about three days after that text to
22     Mr. Marchino we just reviewed?
23     A    Yes.
24     Q    Now, it doesn't look like the defendant responded by text
25     until March 28th.  Do you recall having a phone conversation
```

```
 1  with him?
 2  A    I don't recall.
 3  Q    Based on your correspondence with the defendant, do you
 4  believe that you likely would have had a phone conversation?
 5  MR. AVENATTI:  Objection, Your Honor.  Asked and
 6  answered.  Calls for speculation.
 7  THE COURT:  Overruled.
 8  THE WITNESS:  Yes.
 9  Q    BY MR. WYMAN:  Page 2, it looks like there's a text from
10  you on April 5th.  What did you write there?
11  A    "Good morning, Michael.  Just wanted to follow up on the
12  wire and plane availability.  Thanks."
13  Q    What did you mean, "follow up on the wire"?
14  A    The wire had still not been sent.
15  Q    Did he tell you where the wires were?
16  A    No.
17  Q    So as of April 5th, had you and Ms. Phan still not
18  received your wire payments?
19  A    No.
20  Q    Well, let me ask that -- let me clarify that.
21  As of April 5th, had you received -- had you and
22  Ms. Phan received your wire payments?
23  A    Definitely not Michelle's.  I'm not -- I don't recall when
24  I received mine.
25  Q    Okay.  So you eventually received your wire payment in
```

|   | |
|---|---|
| 1 | April, but you don't remember the date? |
| 2 | A    Yes. |
| 3 | Q    Okay.  In this text message, you refer to "plane |
| 4 | availability."  What did you mean by that? |
| 04:15PM 5 | A    I asked Michael -- for Michelle's birthday, she had an |
| 6 | event in San Francisco, and so I asked to use his plane. |
| 7 | Q    And did he say yes? |
| 8 | A    Yes. |
| 9 | Q    When he told you you could use his plane, did he tell you |
| 04:15PM 10 | he was going to charge you for it? |
| 11 | A    No. |
| 12 | Q    Did he tell you he would be deducting any money out of |
| 13 | Michelle Phan's payment from IPSY? |
| 14 | A    No. |
| 04:15PM 15 | Q    How about from your payment from IPSY? |
| 16 | A    No. |
| 17 | Q    What is the defendant's response to you in his text |
| 18 | message? |
| 19 | A    "Hi, Long.  Plane is confirmed.  Just need details |
| 04:16PM 20 | from you on when and where you want to depart from. |
| 21 | In NYC, back tomorrow, and then we should be able to |
| 22 | clear wire.  Thanks." |
| 23 | Q    What did you understand him to mean when he said "back |
| 24 | tomorrow, and then we should be able to clear wire"? |
| 04:16PM 25 | A    That the next day he would be able to send the wire. |

**UNITED STATES DISTRICT COURT**

```
        1   Q     And based on your understanding from this text message,

        2   why would it matter if he's back tomorrow for the wire payment?

        3   A     He told me that he had to be there in person to sign or

        4   approve it.

04:16PM  5   Q     Sign or approve what?

        6   A     The wire transfer.

        7   Q     And when you say "there," what do you mean?  Where did he

        8   have to be to sign and approve the wire?

        9   A     At the bank.

04:17PM 10   Q     At the top of page 3 now, it looks like it's April 9th;

       11   is that right?

       12   A     Yes.

       13   Q     And what do you write in your message there?

       14   A     "Hi, Michael.  Can you initiate the wire today?"

04:17PM 15   Q     And when you refer to "the wire," are you still referring

       16   to the IPSY payments for you and Ms. Phan?

       17   A     Yes.

       18   Q     And then it looks like there are a couple of logistical

       19   messages below about the plane?

04:17PM 20   A     Yes.

       21   Q     All right.  I want to go back now to Exhibit 274, your

       22   text messages with Mr. Marchino.  And if you could please turn

       23   to page 6.

       24         Do you see a message on page 6 from you on

04:18PM 25   April 22nd?
```

```
 1    A    Yes.

 2    Q    What did you write to Mr. Marchino?

 3    A    "Please call me back."

 4    Q    And it looks like he writes back, "Hey.  Urgent?"

04:18PM 5   A    Yes.

 6    Q    And what did you write back?

 7    A    "Same conversation as last time.  So, yes, I'm concerned

 8    and losing patience."

 9    Q    What did you mean by "same conversation as last time"?

04:18PM 10  A    That we had not received the wire yet.

11    Q    And when you said "I'm concerned and losing patience,"

12    what did you mean?

13    A    That it's been a long time, there really shouldn't -- it

14    shouldn't have taken this long to initiate these wires.

04:18PM 15  Q    Now, I think you alluded to this a minute ago, but at

16    some point did you receive the wire payment of approximately

17    $147,000 that you were owed?

18    A    Yes.

19    Q    This text message with Mr. Marchino that we were just

04:19PM 20  looking at is April 22nd, 2018; is that right?

21    A    Yes.

22              MR. WYMAN:  Can we please pull up, again,

23    Exhibit 369, and page 2.

24    Q    We looked at this earlier.  These are the outgoing wires

04:19PM 25  from the defendant's trust account.  Do you see that?
```

```
 1   A    Yes.
 2   Q    A few rows from the bottom, do you see the wire payment
 3   that you received?
 4   A    Yes.
 5   Q    What is the date of that wire transfer?
 6   A    April 23rd, 2018.
 7   Q    So the day after the text message to Mr. Marchino we were
 8   just looking at?
 9   A    Yes.
10   Q    Do you remember the circumstances in which you received
11   your wire payment on April 23rd, 2018?
12   A    Circumstances?
13   Q    Let me ask you a more specific question.
14              Prior to you receiving your wire payment, did you
15   have a conversation with the defendant on the phone?
16              MR. AVENATTI:  Objection.  Leading.
17              THE COURT:  Overruled.
18              THE WITNESS:  I don't recall.
19   Q    BY MR. WYMAN:  Do you recall having a conversation with
20   the defendant at any time while you were in New York City or
21   while Michelle Phan was in New York City?
22              MR. AVENATTI:  Objection.  Leading and vague as to
23   time.
24              THE COURT:  Overruled.
25              THE WITNESS:  I'm sorry, could you repeat that?
```

**UNITED STATES DISTRICT COURT**

1    Q     BY MR. WYMAN:  Yes.

2          Do you recall having a conversation with the

3    defendant on the phone while Michelle Phan was in New York

4    City?

04:21PM 5    A     I don't recall.

6    Q     Okay.  Let's take a look at Exhibit 278.  And if you

7    could please turn to page 4.

8    A     You said 278?

9    Q     I'm sorry, 278, page 4.  Do you see at the top -- I'll

04:21PM 10   wait until you get there.  I'm sorry.

11   A     I'm good.  I have it.

12   Q     Do you see at the top there, a message from you to the

13   defendant on page 4?

14   A     Yes.

04:22PM 15   Q     And what did you write in your message?

16   A     "Good morning, Michael.  Please confirm after the wire is

17   sent today.  Thanks."

18   Q     And when you're referring to "the wire," what do you

19   mean?

04:22PM 20   A     The wire to Michelle.

21   Q     Did you understand that on this day, April 23rd, that the

22   defendant would be wiring payment not only to you, but to

23   Ms. Phan as well?

24   A     Yes.

04:22PM 25   Q     Between March 13th, 2018, and this day when you received

UNITED STATES DISTRICT COURT

```
 1  your wire payment, were you having conversations with the
 2  defendant?
 3  A    Yes.
 4  Q    During any of these conversations, did he ever tell you
 5  that he was entitled to any of Michelle Phan's money from that
 6  second wire payment?
 7  A    No.
 8         MR. AVENATTI:  Objection.  Asked and answered,
 9  Your Honor.
10         THE COURT:  Overruled.
11  Q    BY MR. WYMAN:  Is that a "No"?
12  A    No.
13  Q    After the wire payment for your money that you received,
14  did you reach out to the defendant again?
15  A    Yes.
16  Q    What does your text message right below this on page 4
17  say, also on April 23rd?
18  A    "Can your office provide Fed Ref number for
19        Michelle's wire?  It is neither posted nor pending
20        status on our end.  Thanks."
21  Q    What did you mean by that?
22  A    That the wire had not been received yet.
23  Q    And what is a Fed Ref number?
24  A    Tracking number for the wire.
25  Q    And when you said "it is neither posted nor pending
```

**UNITED STATES DISTRICT COURT**

```
 1   status on our end," what did you mean?
 2   A     That it was not in the system as far as her bank was
 3   concerned.
 4   Q     On April 23rd, did Michelle Phan receive a wire payment
 5   from the defendant?
 6   A     No.
 7   Q     If we can go to page 6 now.  And focusing at the top, is
 8   this now April 24th?
 9   A     Yes.
10   Q     What did you write to the defendant in your message
11   there?
12   A     "Good morning, Michael.  Just following up on the
13         Fed Ref number.  We haven't been able to track down
14         Michelle's wire yet.  Thanks."
15   Q     When you said "we haven't been able to track down
16   Michelle's wire yet," what did you mean by that?
17   A     That it was still neither pending nor posted to her
18   accounts.
19   Q     Were you expecting that there had been a Michelle -- a
20   wire to Michelle Phan's account?
21   A     Yes.
22   Q     Why were you expecting that?
23   A     I was told it was wired.
24   Q     By whom?
25   A     By Michael.
```

**UNITED STATES DISTRICT COURT**

| | | |
|---|---|---|
| 1 | Q | By the defendant? |
| 2 | A | Yes. |
| 3 | Q | Did he respond to your text message? |
| 4 | A | Yes. |

04:25PM 5    Q    What did he say?

6    A    "Morning.  I've asked Judy to get you what you need."

7    Q    And by "Judy," who did you understand who they were

8    referring to?

9    A    Judy Regnier.

04:25PM 10    Q    Now, you've asked a couple times now, looks like, for the

11    Fed Ref number.  Did you receive that information on

12    April 24th, when you asked for it?

13              Why don't we move to an exhibit.

14              MR. AVENATTI:  Objection.  Is he striking the

04:26PM 15    question?  If he's not striking the question, I'd like the

16    witness to be provided an opportunity to answer the question.

17              MR. WYMAN:  Sure.

18              MR. AVENATTI:  Can we have it read back, please?

19              THE WITNESS:  Could you ask it again?

04:26PM 20              MR. WYMAN:  The court reporter is going to read back

21    my question for you.

22              **(The record was read as follows:**

23              **"Now, you've asked a couple times now, looks**

24         **like, for the Fed Ref number.  Did you receive that**

04:25PM 25         **information on April 24th, when you asked for it?")**

```
 1              THE WITNESS:  No.
 2   Q    BY MR. WYMAN:  Thank you.
 3              If you can go now to Exhibit 280.
 4              And, Your Honor, this is already in evidence.
 5              Is this an e-mail that you sent to the defendant and
 6   Judy Regnier?
 7   A    Yes.
 8   Q    What is the subject of this e-mail?
 9   A    Wire Fed Ref number.
10   Q    And what is the date?
11   A    April 25th, 2018.
12   Q    So the day after those text messages we were just
13   reading?
14   A    Yes.
15   Q    What does your message there say?
16   A    "Can you please provide me with the Fed Ref number for
17   Michelle's wire from Monday?  Thanks."
18   Q    And in the date, you see it says "Wednesday, April 25th,
19   2018"?
20   A    Yes.
21   Q    So when you say "Monday," are you referring to Monday,
22   April 23rd?
23   A    Yes.
24   Q    Moving to the second e-mail in the chain below yours,
25   what did the defendant respond?
```

```
 1   A      "Please handle."
 2   Q      Did you understand him to be saying that to you?
 3   A      No.
 4   Q      Who did you understand him to be directing that message
 5   to?
 6   A      Judy Regnier.
 7   Q      Did you receive the information that you were requesting
 8   on that day, April 25th?
 9   A      No.
10   Q      Finally, looks like you replied "all" on April 26th the
11   following day.  What did you write in that message?
12   A      "Hi, Judy and Michael.  We've been in contact with
13          the bank all week and they have not been able to
14          track the wire.  Please provide the Fed Ref number
15          with immediacy.  This is becoming very urgent.
16          There is $8 million of Michelle's money in the ether
17          somewhere, and we have been given the runaround for
18          over six weeks.  I'm becoming extremely concerned.
19          Please advise ASAP."
20   Q      The first sentence, when you said that you've been in
21   contact with the bank all week and they haven't been able to
22   track the wire, what wire are you referring to?
23   A      The $4 million -- the $8 million.
24   Q      And to whom?
25   A      To Michelle.
```

04:28PM (lines 5, 10, 15, 20)
04:29PM (line 25)

UNITED STATES DISTRICT COURT

```
 1   Q    And who did you expect had made -- who did you believe at
 2   this time had made a wire to Michelle Phan of $8 million?
 3   A    I'm sorry, ask again.
 4   Q    Of course.
 5        At this time when you wrote this e-mail, who did you
 6   believe had sent a wire payment to Michelle Phan for over
 7   $8 million?
 8   A    Eagan Avenatti.
 9        THE COURT:  I think we're going to conclude here for
10   the day.
11        Ladies and gentlemen, we'll take the weekend break.
12   We'll come back on Tuesday, regular day.  Please remember the
13   admonition not to discuss the case with anyone and not to form
14   any opinions on the issues in the case until it's submitted to
15   you, and please don't do any research.
16        So I trust you'll have a good weekend.  We'll see
17   you on Tuesday.
18        THE COURTROOM DEPUTY:  All rise.
19        (Out of the presence of the jury.)
20        MR. AVENATTI:  Your Honor, does the Government have
21   something to raise?
22        THE COURT:  Yeah, that's why Mr. Sagel wanted to
23   just take a very short break.
24        MR. AVENATTI:  Oh, I thought he said if we're going
25   to take up something.  I didn't know if they had anything.  I
```

04:29PM 5
04:29PM 10
04:29PM 15
04:32PM 20
04:32PM 25

```
  1    was confused.
  2              THE COURT:  I thought he did.
  3              Mr. Wyman, how much more do you have on direct?
  4              MR. WYMAN:  One second.  I'll just check.
04:33PM  5       About a half hour, Your Honor.
  6              THE COURT:  Estimated cross?
  7              MR. AVENATTI:  Less than 90 minutes.
  8              THE COURT:  Then I assume Ms. Phan is next?
  9              MR. WYMAN:  Potentially.  The only reason I'm
04:33PM 10    hesitating is we've had to reschedule witnesses because of --
 11    it's taken longer than we expected.  And so some people are not
 12    available.
 13              THE COURT:  We won't get to Mr. Drum on Tuesday?
 14              MR. WYMAN:  No, we will not.
04:33PM 15              THE COURT:  Okay.  I propose that we take up those
 16    issues Tuesday morning.
 17              MR. WYMAN:  That's fine.
 18              We have one issue.  I took notes earlier when
 19    Your Honor was discussing the *Jencks* motion, and I believe
04:34PM 20    Your Honor said something about us filing a declaration for
 21    Ramon Carlos if appropriate.
 22              THE COURT:  Right.
 23              MR. WYMAN:  I guess we were hoping for more guidance
 24    on that.  We weren't sure what that meant, if Your Honor was
04:34PM 25    directing us to file one or -- if necessary, or what Your Honor
```

```
 1   meant by that.
 2            THE COURT:  I expect you to have a discussion.  And
 3   if there's something that should be sent, you'll put it in a
 4   declaration.
 5            MR. WYMAN:  Very well, Your Honor.
 6            THE COURT:  And if there are no text messages or
 7   there are, they are and they're not statements in terms of
 8   Jencks.
 9            MR. WYMAN:  And just to be clear, either way, if
10   there is nothing or if there is something or -- is Your Honor
11   expecting an answer?
12            THE COURT:  Let's put it this way.  Just put in a
13   declaration, please.
14            MR. WYMAN:  Thank you.  I appreciate it.
15            THE COURT:  Government have anything else?
16            MR. WYMAN:  Yes, Your Honor.  In connection with the
17   same issue, Your Honor asked us to make inquiries about
18   Mr. Varani and Special Agent Tashchyan.  We're going to do
19   that.  Do we have permission to submit something in camera,
20   depending on what --
21            THE COURT:  Yes.
22            MR. WYMAN:  Thank you.
23            I don't think we had any other issues.
24            THE COURT:  What's the current estimate for
25   concluding your case in chief?
```

```
 1              MR. WYMAN:  I would expect either Wednesday or
 2    Thursday, Your Honor.
 3              THE COURT:  Okay.
 4              Mr. Avenatti?
 5              MR. AVENATTI:  Are you asking me if I have any other
 6    issues, Your Honor?
 7              THE COURT:  Yes.  You have the floor.
 8              MR. AVENATTI:  I think I'd like a little more
 9    clarity, if possible, as to when they anticipate calling
10    Mr. Drum, because I believe there's going to be -- have to be
11    significant issues resolved before Mr. Drum is permitted to
12    testify, especially, Your Honor, in light of some of the
13    testimony that's already occurred during the trial.
14              Because I think that even furthers my position
15    relating to Mr. Drum and *Daubert*, 702, 703, 704, especially in
16    light of what we heard from Ms. Regnier.
17              THE COURT:  I'll tell you, sir, my preliminary
18    thought is that I've heard nothing during the course of the
19    trial that would cause me to conduct a *Daubert* hearing.
20              I've also observed that to the extent Mr. Drum
21    relies on bank records that are covered by the declarations,
22    and I believe it's 394 through 397, or 98, I believe that that
23    is legitimate base -- that is proper to rely on, because having
24    accepted the declarations, those documents -- the bank records
25    would be admissible.
```

04:36PM (line 5)
04:36PM (line 10)
04:36PM (line 15)
04:36PM (line 20)
04:37PM (line 25)

1          There may be other issues, but I'll share those two

2   thoughts with you.

3          MR. AVENATTI:  I understand the thoughts of the

4   Court.  And there are other issues.  To the extent that we want

04:37PM 5   to raise something, it would probably be best if we filed

6   something.

7          THE COURT:  It would certainly be helpful.

8          MR. AVENATTI:  Understood, Your Honor.

9          Oh, Your Honor, one other point.  During the

04:37PM 10   sidebar, Mr. Wyman stated that the e-mail had actually been

11   forwarded on the 30th of July and not on -- I think it was the

12   3rd.  After the sidebar I had an opportunity to check.

13   Mr. Wyman was right.  They forwarded that, I think, evening,

14   but then listed it as an exhibit and Bates-stamped it a few

04:38PM 15   days later.

16          So I wanted to acknowledge that Mr. Wyman was right

17   and that I was wrong.

18          THE COURT:  Okay.  Thank you.

19          MR. AVENATTI:  I didn't want the Court to think that

04:38PM 20   I was trying to pull a fast one or something, because I wasn't.

21          THE COURT:  I didn't hear you objecting during the

22   sidebar to the representation that it was sent to you on the

23   30th.

24          MR. AVENATTI:  I was not aware of that until after

04:38PM 25   the sidebar, Your Honor.  That's why I made --

1          THE COURT:  Thank you for the clarification.

2          MR. AVENATTI:  Thank you, Your Honor.

3          THE COURT:  Anything else?

4          MR. AVENATTI:  No, sir.  Thank you.  Have a nice

04:38PM  5  weekend.

6          THE COURT:  Thank you.

7          THE COURTROOM DEPUTY:  All rise.  This court is now

8  in recess.

9          **(Proceedings concluded at 4:38 p.m.)**

10                      **--oOo--**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1          *CERTIFICATE OF OFFICIAL REPORTER*

2

3     COUNTY OF LOS ANGELES   )
                             )
4     STATE OF CALIFORNIA     )

5              I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME

6     COURT REPORTER, in and for the United States District Court for

7     the Central District of California, do hereby certify that

8     pursuant to Section 753, Title 28, United States Code that the

9     foregoing is a true and correct transcript of the

10    stenographically reported proceedings held in the

11    above-entitled matter and that the transcript page format is in

12    conformance with the regulations of the Judicial Conference of

13    the United States.

14

15    *Date:  August 7, 2021*

16

17

18

19                              */S/ DEBBIE HINO-SPAAN*
                              _____

20                              *Debbie Hino-Spaan, CSR No. 7953*
                              *Federal Official Court Reporter*
21

22

23

24

25

**UNITED STATES DISTRICT COURT**

## $

**$1,600,000** [1] - 28:7
**$1,900,000** [2] - 27:23, 28:10
**$100,000** [2] - 28:1, 28:9
**$109,000** [1] - 14:3
**$111,000** [1] - 14:13
**$120,000** [3] - 13:3, 13:5, 25:23
**$130,000** [2] - 15:1, 15:13
**$147,000** [1] - 98:16
**$147,972** [3] - 74:15, 82:3, 92:9
**$2,787,650.87** [4] - 75:21, 75:23, 75:24, 77:5
**$27,414,668.32** [1] - 73:14
**$30,000** [2] - 29:8, 29:10
**$300,000** [5] - 12:15, 12:19, 25:10, 25:17, 25:19
**$37,168,678.32** [2] - 74:25, 75:1
**$4,000** [1] - 29:15
**$475,000** [1] - 73:24
**$6,000** [1] - 29:12
**$60,000** [1] - 29:6
**$8,146,288** [3] - 74:10, 87:24, 92:7
**$984,750** [1] - 73:19

## '

**'net** [1] - 31:15
**'no** [1] - 38:4
**'that** [1] - 39:15
**'us** [1] - 40:5
**'yes'** [1] - 38:3

## /

**/S** [1] - 112:19

## 1

**1** [23] - 20:6, 26:25, 27:4, 55:18, 56:6, 56:15, 59:1, 60:5, 63:2, 67:15, 67:23, 69:16, 71:22, 72:1, 72:6, 74:22, 81:6, 82:24, 87:12, 88:6, 89:5, 94:14
**1,600,000** [1] - 27:25
**1,947** [1] - 82:2

**1-053** [1] - 1:24
**1.6** [22] - 4:19, 9:5, 11:15, 11:20, 12:13, 15:3, 15:7, 15:19, 16:20, 17:14, 17:24, 17:25, 18:5, 39:7, 39:11, 39:19, 39:21, 41:10, 42:18, 43:20, 44:5
**1.9** [2] - 12:14, 12:22
**10** [6] - 3:10, 28:8, 28:9, 29:5, 59:8, 78:9
**10,000** [2] - 21:4, 21:6
**107,188** [1] - 87:23
**1076** [1] - 12:3
**11** [3] - 14:13, 29:7, 29:11
**1100** [1] - 2:11
**11:00** [1] - 30:16
**12** [3] - 7:16, 29:9, 84:3
**12/29/2017** [1] - 3:10
**12th** [1] - 42:2
**13** [4] - 29:11, 88:11, 88:18, 88:22
**13th** [2] - 84:9, 100:24
**14** [3] - 29:13, 88:8, 90:13
**14th** [5] - 74:4, 89:15, 90:17, 90:21, 92:13
**15** [3] - 29:15, 62:2, 62:6
**15th** [2] - 34:19, 62:18
**16** [5] - 1:8, 38:23, 45:3, 45:20, 47:25
**16th** [1] - 65:14
**17** [2] - 2:18, 67:17
**174** [3] - 13:14, 21:14, 21:21
**176** [3] - 6:14, 8:14, 8:17
**17th** [1] - 69:13
**18** [6] - 3:4, 45:3, 71:2, 73:4, 73:8, 77:22
**184** [3] - 18:18, 18:22, 19:1
**187** [4] - 3:10, 9:25, 10:4, 10:12
**18th** [4] - 68:14, 69:22, 69:23
**193** [3] - 14:12, 24:1, 24:25
**1:32** [2] - 1:16, 4:2

## 2

**2** [23] - 1:9, 6:17, 10:15, 19:24, 20:9, 27:9, 28:20, 29:3,
56:7, 56:18, 60:5, 62:16, 64:4, 65:23, 75:22, 77:15, 81:14, 81:18, 88:10, 88:17, 89:5, 95:8, 98:22
**20** [4] - 6:25, 27:20, 71:12, 83:16
**2000** [1] - 26:25
**2014** [1] - 27:4
**2017** [28] - 13:16, 22:23, 23:4, 23:8, 27:20, 28:2, 28:3, 28:11, 28:14, 55:1, 55:19, 55:24, 62:18, 65:15, 66:21, 67:17, 68:14, 69:13, 69:22, 71:2, 73:4, 73:8, 75:11, 77:12, 77:22, 77:23, 78:13, 79:22
**2018** [34] - 8:7, 14:21, 28:8, 28:20, 28:25, 29:3, 29:5, 29:7, 29:9, 29:11, 29:13, 30:16, 38:14, 42:2, 68:15, 69:23, 74:4, 75:12, 80:9, 81:13, 82:9, 84:3, 85:18, 88:18, 89:15, 89:19, 90:13, 92:13, 98:19, 99:5, 99:10, 100:24, 104:10, 104:18
**2019** [9] - 19:25, 28:9, 29:16, 33:10, 33:16, 34:19, 39:6, 45:3, 45:4
**2020** [1] - 28:9
**2021** [5] - 1:15, 4:1, 28:9, 45:3, 112:15
**20th** [1] - 92:23
**21** [1] - 32:8
**213-894-2435** [1] - 2:12
**21st** [1] - 79:22
**22** [2] - 7:6, 28:2
**228** [1] - 9:16
**22nd** [3] - 39:5, 97:24, 98:19
**23** [1] - 32:8
**23rd** [8] - 33:16, 94:15, 99:5, 99:10, 100:20, 101:16, 102:3, 104:21
**24th** [3] - 102:7, 103:11, 103:24
**25** [1] - 29:7
**254** [1] - 2:19
**258** [1] - 26:15
**25th** [4] - 30:16, 104:10, 104:17, 105:7

## 3

**3** [12] - 6:17, 20:13, 23:2, 27:14, 56:8, 63:11, 64:3, 65:6, 90:11, 90:15, 97:9
**3/8/2018** [2] - 3:19, 3:21
**30** [1] - 60:13
**300,000** [1] - 12:24
**30th** [10] - 5:15, 33:10, 44:24, 44:25, 45:5, 46:2, 46:17, 47:4, 110:10, 110:22
**312** [1] - 2:11
**367** [1] - 76:3
**369** [7] - 71:21, 72:1, 72:5, 72:6, 74:22, 77:14, 98:22
**394** [1] - 109:21
**397** [1] - 109:21
**3:02** [1] - 62:8
**3:22** [1] - 62:8
**3rd** [4] - 45:7, 48:12, 77:23, 110:11

## 4

**4** [12] - 19:15, 27:20, 58:25, 59:11, 60:2, 64:13, 91:6, 100:6, 100:8, 100:12, 101:15, 105:22
**4.7** [1] - 78:8
**40** [1] - 25:16
**402** [2] - 30:12, 30:13
**403** [8] - 22:14, 33:6, 48:19, 48:21, 48:23, 49:3
**404** [2] - 34:15
**406** [1] - 39:2
**41** [1] - 7:11
**411** [2] - 1:24, 2:6
**420** [1] - 38:25
**4705** [4] - 72:13, 76:13, 77:19, 82:20
**4:38** [1] - 111:8
**4th** [2] - 2:6, 45:2
**4TH** [1] - 1:24

## 5

**5** [10] - 19:21, 28:2, 28:25, 29:5, 29:13, 56:17, 59:9, 63:22, 65:6, 92:21
**50** [1] - 3:5
**58** [1] - 3:12
**5:26** [1] - 45:7
**5th** [3] - 95:9, 95:16, 95:20

## 6

**6** [13] - 1:15, 3:3, 4:1, 19:21, 28:11, 60:6, 60:9, 61:15, 61:20, 64:24, 97:22, 97:23, 102:6
**60** [3] - 7:12, 12:24, 25:14
**67** [1] - 3:13
**69** [1] - 3:15
**6:14** [1] - 63:4

## 7

**7** [3] - 19:21, 28:14, 112:15
**7.5** [9] - 59:5, 59:6, 64:15, 64:20, 75:5, 75:13, 75:20, 76:6, 77:9
**700** [3] - 8:14, 8:17, 8:23
**702** [1] - 109:14

---

**265** [2] - 55:3, 55:12
**266** [3] - 62:10, 63:17, 65:6
**267** [1] - 65:12
**268** [5] - 3:13, 66:24, 67:11, 67:13, 67:14
**26th** [1] - 105:9
**27** [1] - 29:9
**271** [5] - 3:18, 78:18, 78:25, 79:6, 79:7
**272** [5] - 3:21, 86:17, 86:25, 87:3, 87:5
**273** [5] - 3:19, 80:12, 80:21, 81:4, 87:13
**274** [4] - 90:2, 90:4, 92:21, 97:20
**275** [1] - 91:12
**278** [7] - 3:23, 93:13, 93:24, 94:6, 100:5, 100:7, 100:8
**28** [3] - 28:3, 28:11, 112:8
**280** [1] - 104:2
**28th** [1] - 94:24
**29** [1] - 28:14
**296** [6] - 3:15, 68:19, 68:22, 69:5, 69:8, 69:9
**297** [14] - 3:12, 5:17, 6:1, 6:2, 44:19, 45:8, 45:23, 47:4, 48:3, 57:22, 58:19, 58:22, 58:24, 64:23

**703** [1] - 109:14
**704** [1] - 109:14
**714-338-3598** [1] - 2:7
**753** [1] - 112:8
**79** [1] - 3:18
**7953** [2] - 1:23, 112:20

**8**

**8** [7] - 27:4, 28:20, 83:25, 105:15, 105:22, 106:1, 106:6
**8000** [1] - 2:6
**81** [1] - 3:19
**817-bk-11961-CB** [1] - 30:18
**87** [1] - 3:21
**8th** [3] - 81:13, 82:9, 85:18

**9**

**9** [1] - 28:25
**9/17/2017** [1] - 3:14
**9/18/17** [1] - 76:22
**9/21/2017** [1] - 3:14
**90** [1] - 107:6
**90012** [1] - 2:12
**92660** [1] - 2:19
**92701** [2] - 1:25, 2:7
**94** [1] - 3:23
**949-481-4900** [1] - 2:20
**98** [1] - 109:21
**9th** [3] - 55:19, 55:24, 97:9

**A**

**a.m** [2] - 30:16, 84:9
**ability** [1] - 48:1
**able** [8] - 66:17, 96:20, 96:23, 96:24, 102:12, 102:14, 105:12, 105:20
**above-entitled** [1] - 112:11
**absolutely** [1] - 18:2
**accept** [2] - 26:21, 29:20
**acceptable** [1] - 62:23
**accepted** [1] - 109:23
**accommodation** [1] - 59:20
**accompanying** [1] - 47:17
**according** [3] - 16:2, 16:9, 28:24
**Account** [2] - 72:11, 77:19

**account** [34] - 28:22, 29:3, 29:4, 39:12, 40:25, 42:18, 42:24, 70:14, 70:17, 70:19, 71:7, 71:14, 72:12, 76:11, 76:12, 76:15, 77:19, 80:3, 82:5, 82:15, 82:18, 82:19, 82:22, 83:4, 83:17, 84:21, 88:2, 88:3, 89:3, 92:4, 92:6, 98:24, 102:19
**accounted** [1] - 44:6
**accounting** [5] - 11:11, 13:11, 16:23, 23:22, 40:2
**accounts** [7] - 33:25, 34:3, 34:11, 71:12, 78:11, 93:5, 102:17
**accurate** [8] - 24:22, 58:11, 67:7, 69:1, 78:21, 80:18, 86:22, 93:21
**acknowledge** [1] - 110:15
**acquisitions** [1] - 54:17
**acted** [1] - 48:13
**acting** [1] - 32:25
**action** [3] - 27:11, 31:6, 31:18
**actions** [2] - 8:25, 86:25
**actual** [7] - 10:16, 13:3, 13:6, 13:9, 14:14, 14:20, 49:19
**add** [3] - 47:1, 74:17, 74:23
**added** [1] - 46:25
**addition** [2] - 89:16, 93:10
**additional** [4] - 12:15, 28:8, 85:1, 85:8
**addresses** [2] - 49:3
**adhere** [1] - 47:24
**admissible** [1] - 109:24
**admit** [7] - 58:19, 67:11, 69:5, 78:25, 80:21, 86:25, 93:24
**admittance** [1] - 10:3
**admitted** [2] - 10:3, 26:23
**admonition** [2] - 62:3, 106:12
**advance** [1] - 15:1
**advanced** [1] - 40:16
**advances** [3] - 15:4, 15:6, 15:15
**advise** [1] - 105:18

**advisory** [1] - 48:11
**affairs** [2] - 52:5, 52:7
**afternoon** [2] - 6:7, 50:17
**agency** [1] - 79:4
**Agent** [1] - 108:17
**aggregate** [2] - 82:2, 87:24
**ago** [5] - 47:9, 63:14, 76:4, 82:7, 98:14
**agree** [5] - 39:16, 39:17, 59:13, 60:11, 61:22
**agreed** [4] - 26:19, 26:20, 27:21, 29:20
**agreeing** [1] - 27:23
**Agreement** [2] - 3:12, 81:17
**agreement** [70] - 3:14, 3:16, 3:20, 3:22, 9:18, 10:17, 10:21, 11:16, 12:7, 12:15, 12:21, 12:22, 15:20, 16:24, 17:3, 18:19, 25:10, 25:20, 26:2, 28:4, 28:6, 28:13, 28:15, 28:24, 32:17, 32:21, 44:22, 46:19, 46:21, 46:23, 46:24, 49:19, 49:21, 57:4, 57:7, 57:8, 57:15, 61:18, 62:20, 62:22, 63:15, 63:25, 64:15, 64:21, 65:3, 65:9, 65:20, 66:3, 67:3, 67:5, 67:8, 67:16, 67:24, 68:13, 68:16, 68:23, 68:24, 69:1, 69:8, 69:12, 69:14, 69:17, 71:2, 75:3, 82:1, 82:4, 85:4, 87:22, 87:25
**agreements** [5] - 66:20, 66:22, 72:23, 77:2, 78:16
**ahead** [1] - 38:6
**alex.wyman@usdoj.gov** [1] - 2:13
**ALEXANDER** [1] - 2:10
**Alki** [2] - 35:10, 35:15
**all-inclusive** [1] - 61:17
**alleging** [1] - 27:11
**allow** [3] - 46:16, 48:2, 49:14
**alluded** [1] - 98:14
**almost** [1] - 8:14
**aloud** [2] - 56:5, 74:17
**AMERICA** [1] - 1:5

**amount** [17] - 15:14, 15:16, 27:25, 29:14, 31:22, 37:1, 71:19, 73:13, 73:18, 73:23, 74:9, 74:14, 77:4, 77:6, 78:5, 92:5, 92:8
**amounts** [1] - 92:10
**ANA** [3] - 1:17, 1:25, 4:1
**Ana** [1] - 2:7
**ANGELES** [1] - 112:3
**Angeles** [3] - 2:12, 50:18, 82:17
**animation** [1] - 60:18
**announce** [1] - 30:2
**annual** [1] - 28:1
**answer** [9] - 34:2, 34:5, 38:6, 40:11, 42:3, 86:6, 86:9, 103:15, 108:10
**answered** [6] - 17:9, 17:17, 41:1, 41:2, 95:5, 101:7
**answering** [1] - 36:23
**answers** [7] - 10:25, 11:3, 11:4, 11:6, 11:10, 11:14, 11:18
**anticipate** [1] - 109:8
**apologize** [1] - 86:8
**appear** [9] - 19:4, 19:9, 19:12, 19:17, 20:6, 20:17, 44:21, 65:2, 90:15
**APPEARANCES** [1] - 2:1
**appreciate** [2] - 7:21, 108:13
**approach** [2] - 5:21, 11:25
**appropriate** [3] - 47:19, 49:12, 107:20
**approve** [4] - 42:20, 97:3, 97:4, 97:7
**approximation** [2] - 14:24, 14:25
**April** [22] - 29:5, 45:2, 95:9, 95:16, 95:20, 95:25, 97:9, 97:24, 98:19, 99:5, 99:10, 100:20, 101:16, 102:3, 102:7, 103:11, 103:24, 104:10, 104:17, 104:21, 105:7, 105:9
**Arbiter** [2] - 22:7, 22:11
**arbiter** [2] - 22:7, 22:10
**arbitration** [8] - 22:6,

22:11, 22:18, 23:7, 24:4, 24:18, 27:13, 27:22
**arbitrator** [1] - 22:18
**Arden** [2] - 11:1, 24:22
**areas** [1] - 92:3
**arrive** [1] - 59:6
**art** [1] - 60:17
**ASAP** [1] - 105:18
**asserted** [1] - 37:11
**assertions** [1] - 39:18
**Assistant** [2] - 2:5, 2:10
**Associates** [1] - 40:6
**assume** [5] - 22:5, 23:17, 23:19, 49:25, 107:7
**attached** [5] - 19:24, 62:22, 63:8, 63:10, 65:19
**attachment** [3] - 63:12, 63:17, 65:23
**attention** [1] - 22:3
**attorney** [22] - 31:22, 32:23, 32:25, 34:6, 34:8, 37:12, 37:22, 42:17, 42:24, 53:16, 53:18, 59:3, 60:12, 60:14, 60:24, 64:6, 70:19, 71:7, 71:14, 82:22, 89:3
**Attorney** [4] - 2:4, 2:5, 2:9, 2:10
**attorney's** [6] - 24:11, 61:3, 64:19, 76:5, 77:10, 85:2
**attorney-client** [9] - 37:12, 37:22, 42:17, 42:24, 70:19, 71:7, 71:14, 82:22, 89:3
**attorneys** [3] - 11:2, 13:1, 24:21
**attorneys'** [2] - 60:2, 64:1
**AUGUST** [2] - 1:15, 4:1
**August** [4] - 45:7, 62:18, 65:14, 112:15
**AUSA** [1] - 29:24
**authentication** [1] - 94:1
**authenticity** [1] - 10:10
**authorize** [3] - 41:11, 41:25, 60:24
**Auto** [3] - 4:18, 5:1, 5:11
**availability** [2] - 95:11, 96:3
**available** [1] - 107:11

**Avenatti** [65] - 3:4, 3:11, 3:18, 3:24, 12:12, 18:14, 26:23, 27:5, 27:6, 29:17, 30:16, 30:17, 30:19, 30:21, 31:23, 32:9, 33:8, 33:9, 33:10, 33:11, 33:24, 34:19, 34:23, 35:6, 35:20, 36:24, 37:10, 37:17, 37:23, 38:8, 38:12, 38:24, 39:4, 39:5, 39:12, 40:5, 40:6, 40:14, 42:4, 42:17, 43:18, 47:10, 48:16, 53:17, 53:19, 53:20, 53:21, 54:4, 58:17, 59:8, 70:17, 71:18, 79:16, 79:18, 81:1, 83:1, 83:23, 91:3, 91:15, 91:20, 93:17, 94:4, 106:7, 109:3
**AVENATTI** [69] - 1:8, 2:15, 2:16, 5:13, 5:19, 5:21, 5:24, 6:2, 6:5, 9:8, 10:7, 13:19, 14:4, 14:16, 15:9, 16:5, 17:8, 17:17, 17:20, 18:7, 18:16, 19:1, 22:17, 23:19, 23:23, 24:1, 24:16, 25:2, 26:8, 26:10, 44:20, 44:23, 47:1, 47:11, 48:18, 48:22, 48:24, 49:4, 54:21, 58:20, 67:12, 69:6, 79:1, 80:22, 85:10, 85:25, 86:14, 87:2, 87:15, 88:12, 89:21, 93:25, 95:4, 99:15, 99:21, 101:7, 103:13, 103:17, 106:19, 106:23, 107:6, 109:4, 109:7, 110:2, 110:7, 110:18, 110:23, 111:1, 111:3
**Avenatti's** [2] - 48:11, 94:2
**awarded** [1] - 32:7
**aware** [2] - 52:19, 110:23

**B**

**baked** [1] - 35:14
**bakery** [2] - 35:13, 42:23
**bank** [16] - 18:4, 18:6, 71:11, 71:12, 71:20, 82:5, 88:2, 88:3,

93:5, 97:8, 102:1, 105:12, 105:20, 109:20, 109:23
**Bank** [3] - 29:4, 34:1, 82:17
**bankruptcy** [1] - 30:22
**banks** [1] - 92:4
**Bar** [3] - 27:1, 27:16
**Barela** [42] - 3:11, 6:1, 6:12, 10:13, 18:17, 24:16, 25:3, 27:4, 27:10, 27:12, 27:20, 27:24, 28:16, 29:5, 29:7, 29:9, 29:11, 29:14, 39:8, 39:14, 39:20, 39:22, 39:23, 40:4, 40:9, 40:14, 40:18, 40:20, 40:24, 41:8, 41:11, 41:21, 41:25, 42:5, 42:8, 42:14, 42:19, 43:17, 43:21, 44:1, 44:4
**BARELA** [1] - 3:3
**Barela's** [3] - 28:13, 41:22, 42:25
**Barista** [2] - 30:24, 31:1
**Baristas** [5] - 35:11, 35:14, 36:11, 42:2, 42:23
**base** [1] - 109:22
**based** [10] - 16:23, 54:14, 54:18, 70:10, 72:23, 75:3, 83:12, 85:4, 95:2, 96:25
**basis** [2] - 36:22, 40:13
**Bates** [3] - 46:5, 48:12, 110:13
**Bates-stamped** [1] - 110:13
**Bay** [1] - 35:10
**Beach** [1] - 2:19
**bearing** [1] - 28:13
**beauty** [1] - 51:3
**Beauty** [9] - 3:13, 3:16, 64:9, 67:19, 67:20, 72:16, 73:7, 74:1, 74:22
**beauty/cosmetics** [1] - 51:10
**becoming** [2] - 105:14, 105:17
**begin** [2] - 44:12, 66:4
**beginning** [1] - 60:1
**behalf** [12] - 27:10, 28:4, 28:19, 33:11, 34:9, 36:5, 36:19, 39:13, 40:24, 43:25, 66:4, 66:18

**behind** [4] - 15:25, 55:4, 56:9, 57:23
**belief** [1] - 61:14
**belong** [3] - 34:4, 34:12, 34:13
**belonged** [1] - 44:1
**belonging** [1] - 66:10
**below** [19] - 56:3, 56:12, 59:5, 59:10, 73:25, 78:4, 78:7, 78:8, 80:2, 82:6, 82:14, 83:4, 88:2, 88:3, 92:1, 97:18, 101:15, 104:23
**benefit** [3] - 49:6, 59:18, 83:20
**best** [5] - 31:12, 38:7, 38:11, 93:25, 110:4
**between** [14] - 3:16, 8:15, 23:4, 28:2, 32:21, 37:24, 44:22, 46:19, 55:14, 57:12, 67:18, 70:6, 77:22, 100:24
**billing** [2] - 59:3, 64:14
**binder** [3] - 57:23, 72:2, 76:1
**binders** [1] - 55:4
**birthday** [1] - 96:4
**bit** [2] - 50:24, 61:1
**block** [1] - 29:17
**blow** [1] - 25:2
**blue** [3] - 47:7, 47:21, 53:25
**board** [3] - 8:21, 56:7, 56:9
**bottom** [13] - 9:13, 60:5, 67:23, 69:16, 79:2, 79:4, 79:8, 79:10, 81:5, 82:24, 88:6, 89:5, 99:1
**bought** [1] - 56:15
**brand** [1] - 56:16
**break** [9] - 4:7, 11:22, 18:18, 46:3, 61:25, 62:1, 63:14, 106:10, 106:22
**Bredahl** [1] - 55:9
**BRETT** [1] - 2:5
**brett.sagel@usdoj. gov** [1] - 2:8
**bring** [2] - 4:16, 6:4
**broad** [2] - 83:21, 83:22
**Brock** [20] - 6:22, 7:3, 7:8, 7:13, 8:3, 8:12, 8:18, 8:25, 11:15, 12:10, 16:20, 17:7, 17:14, 24:21, 25:10,

25:17, 25:25, 39:8, 40:24, 43:21
**bunch** [2] - 40:15, 40:17
**Burt** [1] - 42:22
**business** [7] - 36:2, 36:8, 51:2, 52:4, 52:18, 59:20, 67:4
**businesses** [1] - 52:15
**busy** [1] - 23:10
**buying** [1] - 35:14
**BY** [42] - 2:5, 2:18, 3:3, 3:5, 6:11, 9:12, 10:13, 12:2, 13:23, 14:8, 14:20, 15:12, 16:9, 17:12, 17:21, 18:11, 18:16, 22:17, 23:19, 24:1, 24:16, 50:16, 50:25, 54:23, 55:12, 58:25, 61:5, 67:15, 72:4, 81:5, 85:14, 86:17, 87:6, 87:18, 88:14, 89:24, 94:7, 95:8, 99:18, 99:25, 101:10, 104:1

**C**

**CA** [1] - 1:25
**calculate** [3] - 12:2, 12:11, 15:22
**calculated** [1] - 77:7
**calculation** [3] - 11:23, 15:13, 75:17
**calculations** [2] - 12:4, 12:5
**calculator** [2] - 74:18, 74:23
**CALIFORNIA** [4] - 1:2, 1:17, 4:1, 112:4
**California** [12] - 2:7, 2:12, 2:19, 16:3, 16:10, 26:24, 27:1, 33:3, 41:16, 43:15, 82:17, 112:7
**CALLED** [2] - 3:3, 3:5
**Camberos** [1] - 56:10
**camera** [1] - 108:18
**cap** [1] - 56:10
**car** [2] - 4:18, 5:2
**Carlos** [1] - 107:20
**carried** [1] - 59:19
**cart** [1] - 57:23
**case** [29] - 13:10, 13:24, 14:2, 14:9, 14:14, 14:21, 21:17, 22:8, 22:17, 23:7, 23:10, 24:17, 24:21, 25:4, 30:22, 31:6,

31:7, 31:10, 33:1, 36:18, 45:2, 49:8, 56:24, 56:25, 62:3, 62:5, 106:12, 106:13, 108:24
**Case** [2] - 1:7, 30:17
**cashier's** [1] - 29:14
**casual** [1] - 54:10
**causes** [1] - 27:11
**cease** [1] - 38:17
**ceased** [1] - 38:17
**Central** [1] - 112:7
**CENTRAL** [1] - 1:2
**CEO** [1] - 56:9
**certainly** [2] - 49:21, 110:6
**CERTIFICATE** [1] - 112:1
**CERTIFIED** [1] - 1:6
**certify** [1] - 112:7
**CFO** [2] - 81:11, 81:22
**chain** [7] - 55:14, 57:3, 80:15, 80:18, 87:8, 88:7, 104:23
**Chang** [4] - 89:7, 89:9, 90:12
**Chang's** [1] - 89:14
**change** [2] - 15:20, 61:22
**changes** [7] - 57:17, 57:19, 57:20, 58:5, 58:7, 58:8, 59:15
**charge** [3] - 85:5, 85:8, 96:9
**charged** [2] - 25:22, 26:5
**charges** [3] - 60:19, 60:21, 60:22
**charging** [1] - 85:1
**chat** [1] - 84:9
**chatting** [1] - 88:23
**check** [10] - 29:14, 76:8, 76:9, 76:17, 76:21, 77:4, 90:22, 91:7, 107:3, 110:11
**checking** [1] - 94:17
**chief** [3] - 52:1, 52:2, 108:24
**chronologically** [1] - 55:17
**circumstances** [4] - 54:11, 71:13, 99:9, 99:11
**City** [6] - 29:4, 34:1, 82:17, 99:19, 99:20, 100:3
**claim** [2] - 40:13, 47:16
**claimed** [1] - 20:17
**claims** [1] - 64:8

**clarification** [3] - 31:20, 46:21, 110:25
**clarify** [1] - 95:19
**clarity** [1] - 109:8
**class** [2] - 31:6, 31:18
**classic** [1] - 47:11
**Clause** [2] - 49:5, 49:13
**clear** [11] - 4:12, 5:4, 16:16, 16:19, 16:22, 17:1, 17:12, 49:23, 96:21, 96:23, 108:8
**clearly** [1] - 46:14
**clerk** [1] - 33:13
**client** [23] - 16:3, 16:10, 28:21, 29:2, 34:11, 36:25, 37:4, 37:6, 37:8, 37:12, 37:18, 37:22, 40:18, 42:17, 42:24, 53:15, 70:17, 70:19, 71:7, 71:14, 82:22, 84:21, 89:3
**Client** [1] - 36:14
**client's** [1] - 64:7
**clients** [8] - 28:5, 28:19, 37:25, 60:11, 60:13, 60:24, 64:6, 64:7
**close** [1] - 66:16
**closer** [1] - 50:24
**closing** [14] - 67:25, 68:4, 68:6, 68:14, 68:15, 69:22, 69:23, 70:21, 70:24, 71:1, 75:15, 81:25, 87:21
**closings** [2] - 68:4, 69:18
**clothing** [1] - 53:24
**co** [2] - 33:1, 56:6
**co-counsel** [1] - 33:1
**co-founder** [1] - 56:6
**Code** [1] - 112:8
**Coffee** [3] - 35:17, 36:3, 42:22
**coffee** [3] - 35:18, 35:19, 35:22, 36:1, 36:9
**cofounder** [1] - 51:14
**collect** [1] - 8:5
**collecting** [1] - 12:18
**collection** [1] - 90:6
**Colorado** [1] - 13:18
**column** [6] - 72:11, 72:14, 73:1, 73:3, 77:18, 77:21
**common** [14] - 3:14, 3:20, 3:22, 51:15, 51:18, 67:3, 67:7, 68:23, 77:1, 78:15,

81:25, 82:3, 87:22, 87:25
**Common** [2] - 3:15, 81:17
**communicate** [3] - 86:12, 89:17, 89:24
**communicated** [1] - 45:1
**communication** [1] - 89:20
**communications** [4] - 37:13, 37:23, 37:24, 94:11
**companies** [2] - 52:9, 54:7
**company** [12] - 4:19, 50:25, 51:7, 51:16, 51:18, 52:4, 56:20, 67:21, 68:17, 72:19, 72:20, 78:12
**compared** [2] - 31:14, 31:16
**Complexities** [1] - 56:13
**compromise** [1] - 27:21
**computer** [1] - 60:18
**computerized** [1] - 60:20
**concerned** [4] - 98:6, 98:10, 102:2, 105:17
**concise** [5] - 16:16, 16:19, 16:22, 17:1, 17:12
**conclude** [1] - 106:8
**concluded** [1] - 111:8
**concluding** [1] - 108:24
**conditional** [1] - 10:2
**conditionally** [1] - 10:9
**conduct** [1] - 109:18
**Conference** [1] - 112:12
**confirm** [4] - 65:5, 82:5, 88:1, 100:15
**confirmed** [1] - 80:2, 84:20, 96:18
**conformance** [1] - 112:12
**confused** [1] - 106:25
**conjecture** [2] - 18:8, 85:10
**connection** [3] - 45:2, 64:7, 108:15
**consideration** [1] - 59:22
**considering** [1] - 43:3
**consistent** [2] - 83:6, 83:8

**consultant** [1] - 60:21
**consultants** [1] - 61:2
**contact** [7] - 53:2, 53:3, 63:1, 80:10, 82:12, 105:11, 105:20
**contemporaneously** [1] - 45:10
**content** [2] - 63:4, 94:5
**contents** [1] - 49:16
**Context** [1] - 56:3
**context** [1] - 68:6
**Contingency** [1] - 3:12
**contingency** [6] - 44:21, 61:7, 61:12, 61:14, 61:18, 64:16
**contingent** [1] - 59:4
**contract** [2] - 63:18, 63:20
**Contracting** [1] - 42:22
**controlled** [3] - 30:25, 31:2, 36:6
**conversation** [10] - 54:14, 54:18, 84:25, 94:24, 95:3, 98:6, 98:8, 99:14, 99:18, 100:1
**conversations** [2] - 100:25, 101:3
**COO** [3] - 50:20, 50:21, 51:23
**copies** [1] - 93:21
**copy** [13] - 5:17, 5:22, 48:10, 48:11, 55:9, 58:11, 62:24, 63:10, 67:7, 69:1, 78:21, 80:18, 86:22
**corner** [6] - 9:13, 19:5, 19:10, 19:13, 19:17, 20:6
**Corporate** [1] - 2:18
**correct** [35] - 6:21, 6:23, 6:24, 7:4, 7:5, 7:9, 7:10, 7:14, 7:15, 7:18, 7:19, 8:12, 8:13, 8:15, 8:16, 9:23, 13:2, 15:1, 19:23, 25:23, 26:4, 31:17, 41:10, 51:21, 60:8, 63:19, 64:22, 68:9, 75:1, 75:2, 75:25, 79:25, 84:24, 88:21, 112:9
**correctly** [2] - 25:17, 66:15
**correspondence** [1] - 95:2

**Cosmetics** [3] - 56:16, 56:19, 71:10
**cosmetics** [2] - 51:3, 56:15
**cost** [8] - 11:11, 13:24, 14:2, 21:3, 21:12, 25:5, 60:11, 60:14
**costs** [23] - 13:3, 13:5, 13:6, 13:9, 13:17, 14:9, 14:14, 14:21, 21:24, 23:5, 23:13, 40:17, 59:3, 60:12, 60:19, 60:22, 60:25, 61:11, 61:15, 64:13, 64:24, 65:7, 65:10
**COUNSEL** [2] - 2:1, 2:16
**counsel** [4] - 12:19, 24:17, 33:1, 48:11
**COUNTY** [1] - 112:3
**couple** [7] - 36:12, 46:6, 56:12, 63:3, 97:17, 103:9, 103:22
**course** [7] - 14:11, 14:19, 26:6, 64:18, 88:16, 106:3, 109:17
**court** [7] - 27:10, 33:13, 33:15, 50:3, 60:15, 103:19, 111:6
**Court** [11] - 4:12, 32:7, 37:3, 37:7, 38:2, 41:4, 47:25, 110:3, 110:18, 112:6, 112:20
**COURT** [102] - 1:1, 1:24, 4:14, 4:22, 5:3, 5:7, 5:10, 5:18, 5:20, 5:23, 5:25, 6:3, 6:7, 9:10, 10:4, 10:6, 10:9, 12:1, 13:21, 14:6, 14:18, 15:10, 16:7, 17:10, 17:19, 18:9, 18:14, 22:15, 23:16, 23:25, 24:15, 26:9, 26:12, 26:16, 30:1, 30:4, 34:21, 44:13, 44:16, 44:18, 44:21, 45:25, 46:7, 46:16, 47:3, 47:10, 48:5, 48:9, 48:21, 48:23, 49:2, 49:16, 49:25, 50:4, 50:13, 50:23, 54:1, 54:22, 58:22, 61:1, 62:1, 67:13, 69:7, 79:6, 81:1, 85:12, 86:3, 86:6, 86:15, 87:3, 87:16, 88:13, 89:22, 94:2, 95:6, 99:16, 99:23, 101:9, 106:8,

106:21, 107:1, 107:5, 107:7, 107:12, 107:14, 107:21, 108:1, 108:5, 108:11, 108:14, 108:20, 108:23, 109:2, 109:6, 109:16, 110:6, 110:17, 110:20, 110:25, 111:2, 111:5, 112:6
**COURTROOM** [6] - 50:7, 50:9, 50:12, 62:7, 106:17, 111:6
**courtroom** [3] - 30:7, 30:8, 53:21
**covered** [1] - 109:20
**created** [5] - 46:14, 47:12, 49:20, 58:12, 58:14
**creative** [1] - 51:12
**Credit** [1] - 72:11
**credit** [2] - 15:12, 76:15
**creditor** [2] - 33:12, 37:15
**creditors** [1] - 30:22
**criminally** [1] - 26:5
**cross** [5] - 16:15, 45:14, 45:19, 49:11, 107:5
**cross-examination** [3] - 16:15, 45:19, 49:11
**cross-examined** [1] - 45:14
**CRR** [1] - 1:23
**CSR** [2] - 1:23, 112:20
**current** [2] - 38:9, 108:23
**custom** [1] - 9:13

**D**

**Darryl** [4] - 89:7, 89:8, 90:12
**Date** [2] - 73:1, 112:15
**date** [21] - 46:5, 46:6, 54:5, 55:18, 62:17, 67:16, 69:12, 69:14, 76:21, 76:23, 77:1, 77:21, 79:21, 81:12, 88:22, 89:14, 90:15, 95:25, 99:4, 104:9, 104:17
**dated** [7] - 29:15, 39:5, 65:14, 82:8, 83:25, 88:18, 94:15
**dates** [4] - 9:23, 10:22, 69:21, 69:24
**Daubert** [2] - 109:14,

109:18
David [1] - 27:15
DAY [1] - 1:8
days [6] - 45:6, 60:13, 92:22, 94:20, 110:14
deadlines [1] - 47:24
deal [2] - 37:16, 68:5
DEAN [2] - 2:17, 2:18
Dean [1] - 46:4
deansteward7777@
  gmail.com [1] - 2:20
dear [1] - 81:21
DEBBIE [3] - 1:23, 112:5, 112:19
Debbie [1] - 112:20
Debit [1] - 77:18
debtor [4] - 33:9, 33:16, 34:18, 39:4
December [10] - 13:16, 18:19, 20:4, 22:23, 23:4, 27:20, 28:2, 28:3, 28:11, 28:14
decide [1] - 52:21
decided [1] - 53:4
declaration [4] - 19:25, 107:19, 108:3, 108:12
declarations [2] - 109:20, 109:23
deducting [1] - 96:11
DEFENDANT [1] - 2:14
Defendant [1] - 1:9
defendant [105] - 4:8, 5:1, 6:13, 6:17, 6:22, 6:25, 7:17, 8:18, 8:24, 9:6, 9:12, 9:18, 10:19, 10:24, 11:8, 11:10, 11:15, 12:2, 12:4, 12:9, 12:14, 12:18, 13:5, 13:16, 13:24, 14:3, 14:9, 14:15, 14:20, 15:6, 15:12, 15:23, 16:2, 16:9, 16:10, 16:15, 16:19, 16:22, 17:1, 17:13, 17:24, 18:3, 44:11, 47:5, 54:2, 54:4, 54:15, 54:19, 54:24, 55:15, 55:25, 56:22, 57:5, 57:10, 57:14, 59:7, 61:20, 63:3, 63:5, 64:1, 64:11, 65:3, 65:10, 66:3, 66:4, 66:10, 66:17, 70:1, 75:4, 75:13, 76:5, 77:9, 78:22, 79:24, 80:10, 80:16, 83:3, 84:8,

84:16, 84:25, 85:4, 86:12, 88:23, 89:2, 89:16, 92:17, 93:11, 93:19, 94:9, 94:16, 94:23, 95:2, 99:14, 99:19, 100:2, 100:12, 100:21, 101:1, 101:13, 102:4, 102:9, 102:25, 104:4, 104:24
defendant's [14] - 4:18, 5:6, 13:12, 18:1, 37:21, 60:2, 62:21, 65:17, 66:1, 70:18, 71:7, 82:21, 96:16, 98:24
defense [1] - 49:8
defined [1] - 59:5
definitely [1] - 95:22
definition [1] - 59:24
deleted [2] - 60:10, 64:24
delivered [1] - 48:12
delivery [1] - 60:22
Denver [6] - 20:20, 22:4, 22:6, 24:4, 24:7, 24:17
depart [1] - 96:19
deposed [2] - 24:10
deposited [2] - 71:14, 92:5
deposition [2] - 24:8, 60:18
DEPUTY [6] - 50:7, 50:9, 50:12, 62:7, 106:17, 111:6
describe [1] - 8:6
description [1] - 64:10
despite [1] - 25:22
detailing [1] - 57:1
details [1] - 96:18
Dettmer [1] - 53:19
dhinospaan@yahoo.
  com [1] - 1:25
different [6] - 22:12, 22:20, 61:13, 63:18, 72:1, 72:2
digits [4] - 76:12, 76:14, 82:21, 84:13
Dillanos [4] - 35:17, 35:22, 36:3, 42:22
Direct [1] - 3:5
direct [7] - 4:24, 5:5, 22:2, 45:14, 70:13, 71:6, 107:2
DIRECT [1] - 50:15
directed [1] - 14:13
directing [3] - 92:5, 105:3, 107:24

direction [1] - 42:25
directly [3] - 51:4, 51:6, 70:19
director [1] - 51:12
disagree [1] - 41:18
disbursed [1] - 48:18
disbursements [3] - 42:20, 60:11, 61:15
disclosed [7] - 45:6, 45:17, 45:18, 45:22, 46:11, 46:21
Discovery [9] - 3:14, 3:16, 64:9, 67:19, 67:20, 72:17, 73:7, 74:1, 74:22
discretion [1] - 11:2
discuss [5] - 44:11, 54:23, 61:19, 62:3, 106:12
discussed [6] - 62:23, 64:20, 80:5, 81:24, 87:20, 89:1
discussing [2] - 82:22, 107:18
discussion [3] - 44:14, 63:8, 108:1
displayed [1] - 48:6
dispute [1] - 27:7
dissimilar [1] - 45:12
District [2] - 112:6, 112:7
DISTRICT [3] - 1:1, 1:2, 1:3
divestiture [3] - 64:8, 83:15, 83:16
divestment [1] - 71:10
Divinium [5] - 50:20, 50:22, 50:25, 51:20, 78:9
DIVISION [1] - 1:2
document [28] - 5:16, 5:19, 20:7, 39:16, 39:18, 44:24, 45:5, 45:9, 45:16, 45:21, 46:8, 47:13, 47:21, 47:22, 48:14, 49:5, 49:6, 49:9, 49:17, 57:21, 57:25, 66:25, 68:20, 69:7, 78:19, 80:13, 86:18, 93:14
documents [8] - 9:14, 40:12, 42:12, 43:2, 44:3, 44:8, 48:1, 109:23
done [3] - 36:2, 45:13, 47:25
door [2] - 6:18, 6:20
down [6] - 26:12, 61:1, 74:16, 102:12, 102:14

Draft [3] - 21:21, 21:23, 23:21
draft [4] - 13:24, 57:14, 62:20, 62:22
drop [1] - 49:9
Drum [5] - 107:12, 109:9, 109:10, 109:14, 109:19
due [6] - 15:19, 15:22, 37:1, 37:6, 37:20, 70:4
Due [2] - 49:4, 49:12
duly [2] - 30:19, 33:13
during [12] - 11:22, 23:14, 46:3, 70:21, 85:15, 89:19, 93:11, 101:3, 109:12, 109:17, 110:8, 110:20

## E

e-mail [73] - 3:10, 3:18, 3:19, 3:21, 28:21, 45:8, 46:2, 46:7, 46:9, 47:6, 47:17, 55:14, 55:17, 55:18, 55:20, 56:2, 57:3, 62:14, 62:16, 62:17, 63:5, 63:12, 65:14, 65:15, 65:18, 78:21, 79:2, 79:4, 79:10, 79:19, 79:23, 80:1, 80:15, 80:18, 80:24, 81:7, 81:12, 81:19, 81:21, 82:8, 82:25, 83:2, 83:24, 83:25, 84:3, 85:17, 85:19, 85:21, 85:23, 86:20, 86:22, 87:6, 87:9, 87:11, 87:13, 88:7, 88:18, 88:23, 89:1, 89:6, 89:9, 89:14, 90:12, 91:12, 92:13, 92:23, 104:4, 104:7, 104:23, 106:4, 110:9
e-mailed [2] - 28:11, 28:14
e-mails [11] - 8:9, 9:2, 9:4, 9:6, 57:3, 63:3, 80:23, 81:1, 81:2, 94:2
EA [2] - 30:23, 32:21
EA's [1] - 31:9
Eagan [15] - 27:6, 30:17, 31:22, 32:9, 35:20, 39:4, 40:6, 40:14, 53:17, 53:19, 70:17, 79:16, 91:3,

91:20, 106:7
earliest [1] - 81:7
early [7] - 48:10, 55:1, 80:6, 81:25, 84:7, 85:24, 87:21
easel [1] - 74:16
Ed [5] - 32:11, 32:23, 32:25, 41:14, 42:13
Eden [1] - 31:6
effect [2] - 81:25, 87:21
eight [1] - 93:18
eight-page [1] - 93:18
either [3] - 57:7, 108:8, 108:25
EM [3] - 56:16, 56:19, 71:10
employed [1] - 27:4
end [6] - 8:10, 63:22, 84:16, 85:21, 101:19, 101:25
ending [1] - 77:19
engaged [1] - 56:1
entered [5] - 27:13, 67:18, 68:24, 69:2, 75:4
entire [2] - 55:6, 61:5
entirely [2] - 17:25, 18:1
entirety [3] - 25:4, 60:6, 94:8
entities [1] - 42:21
entitled [12] - 12:11, 16:3, 16:10, 16:23, 34:10, 34:11, 65:10, 75:5, 75:7, 85:5, 101:4, 112:11
entity [3] - 30:24, 31:2, 36:5
escrow [2] - 70:22, 83:4
especially [3] - 48:25, 109:11, 109:14
ESQ [2] - 2:15, 2:18
essentially [1] - 37:17
estimate [3] - 15:19, 31:12, 108:23
estimated [2] - 15:18, 107:5
ether [1] - 105:15
ethical [2] - 41:16, 43:15
evening [1] - 110:12
event [1] - 96:5
events [1] - 49:16
eventually [1] - 95:24
evidence [19] - 9:3, 9:17, 13:15, 14:5, 26:18, 29:23, 49:19, 49:24, 50:1, 55:3,

62:11, 65:13, 71:21,
76:2, 90:3, 91:11,
94:1, 104:3
**EVIDENCE** [1] - 3:9
**evidently** [1] - 44:25
**exact** [2] - 15:14, 54:5
**exactly** [2] - 26:7,
31:25
**exam** [1] - 33:17
**EXAMINATION** [3] -
6:10, 18:15, 50:15
**Examination** [3] - 3:3,
3:4, 3:5
**examination** [7] -
16:15, 30:15, 33:9,
34:18, 39:5, 45:19,
49:11
**examined** [2] - 33:13,
45:14
**excerpt** [1] - 4:11
**exchange** [2] - 62:14,
63:12
**exchanged** [1] - 93:19
**exclude** [1] - 48:17
**excuse** [1] - 73:17
**excused** [1] - 26:9
**executed** [6] - 9:18,
10:17, 10:21, 28:15,
63:10, 65:19
**executives** [1] - 52:5
**exhibit** [22] - 4:17,
5:14, 11:23, 45:6,
45:18, 46:12, 46:22,
46:25, 47:11, 47:23,
49:24, 55:6, 61:25,
63:11, 63:22, 64:3,
71:25, 86:4, 93:18,
94:8, 103:12, 110:13
**EXHIBIT** [1] - 3:9
**Exhibit** [57] - 6:14,
8:14, 8:17, 9:16,
9:25, 10:12, 13:14,
14:12, 18:18, 19:24,
21:14, 30:12, 33:6,
34:15, 39:2, 45:8,
55:3, 57:22, 58:19,
58:24, 62:10, 63:17,
64:23, 65:6, 65:12,
66:24, 67:11, 67:14,
68:19, 68:22, 69:5,
69:9, 71:21, 74:22,
76:3, 77:14, 78:18,
78:25, 79:7, 80:12,
80:21, 81:4, 86:17,
86:25, 87:5, 87:13,
90:2, 90:4, 91:12,
92:21, 93:13, 93:24,
94:6, 97:20, 98:22,
100:5, 104:2
**EXHIBITS** [1] - 3:7

**existence** [1] - 47:8
**exit** [1] - 64:8
**expect** [5] - 14:3,
94:18, 105:25,
108:1, 108:25
**expected** [4] - 14:10,
14:15, 85:9, 107:10
**expecting** [5] - 70:8,
84:23, 102:18,
102:21, 108:10
**expeditiously** [1] -
48:13
**expenses** [9] - 11:11,
60:11, 60:13, 60:15,
60:16, 60:23, 61:16,
64:24, 65:7
**expert** [2] - 60:18,
61:2
**explain** [2] - 31:15,
31:19
**exploring** [1] - 37:2
**extent** [4] - 45:20,
79:3, 109:19, 110:3
**extremely** [1] - 105:17

**F**

**fact** [1] - 24:17
**facts** [6] - 26:19,
26:20, 26:21, 27:3,
27:15, 29:20
**fair** [9] - 58:11, 59:18,
64:10, 67:7, 69:1,
78:21, 80:18, 86:22,
93:21
**fairly** [1] - 44:13
**familiar** [4] - 31:7,
52:14, 52:16, 52:17
**far** [1] - 102:1
**Faraz** [1] - 29:24
**fast** [1] - 110:19
**feature** [1] - 58:8
**February** [4] - 55:19,
55:24, 80:9, 82:8
**Fed** [8] - 101:17,
101:22, 102:12,
103:10, 103:23,
104:8, 104:15,
105:13
**Federal** [1] - 112:20
**federal** [2] - 20:24,
27:9
**FEDERAL** [1] - 1:24,
112:5
**Fee** [1] - 3:12
**fee** [34] - 20:23, 22:3,
22:23, 32:19, 44:22,
46:19, 46:21, 46:23,
46:24, 49:19, 49:21,
57:4, 57:8, 57:15,

59:4, 59:6, 61:7,
61:12, 61:14, 62:20,
63:15, 63:18, 63:20,
64:15, 64:16, 64:19,
65:2, 66:3, 75:3,
75:15, 76:5, 77:10,
85:4, 85:15
**fees** [32] - 22:18, 31:9,
31:13, 31:14, 31:16,
31:19, 31:21, 31:22,
32:6, 32:7, 32:10,
32:11, 32:12, 32:13,
32:16, 32:18, 59:3,
60:2, 60:15, 60:16,
60:17, 60:18, 60:20,
60:21, 64:1, 64:13,
85:2, 85:5, 85:8
**fees'** [1] - 31:15
**few** [7] - 7:16, 63:14,
76:4, 99:1, 110:13
**fight** [1] - 25:25
**figure** [4] - 37:14,
75:5, 75:14, 75:19
**figured** [1] - 49:7
**file** [1] - 107:24
**filed** [2] - 27:9, 110:4
**filing** [2] - 60:15,
107:19
**Filippo** [11] - 53:6,
53:7, 53:8, 53:12,
53:13, 53:14, 54:5,
55:15, 89:17, 90:10,
91:15
**filming** [1] - 60:17
**final** [12] - 21:24,
27:21, 28:5, 46:21,
46:23, 46:24, 49:19,
63:20, 64:14, 64:15,
64:21, 65:2
**finally** [2] - 39:2, 105:9
**financial** [4] - 9:4,
11:19, 52:7, 52:8
**fine** [1] - 107:16
**firm** [16] - 11:1, 27:5,
27:17, 36:14, 36:15,
36:18, 37:1, 37:4,
37:5, 38:13, 52:18,
57:5, 64:1, 70:19,
91:19, 91:20
**firms** [8] - 38:8, 40:7,
40:10, 43:24, 52:11,
52:14, 53:9, 54:7
**first** [39] - 21:11,
27:24, 30:11, 30:19,
33:12, 46:1, 50:10,
53:2, 54:4, 54:23,
55:10, 55:17, 55:25,
59:1, 62:16, 63:3,
64:5, 71:1, 73:10,
74:6, 75:15, 76:6,

76:8, 76:23, 77:2,
77:11, 78:3, 78:11,
79:10, 81:15, 81:19,
82:12, 83:7, 83:9,
83:10, 85:15, 87:6,
87:11, 105:19
**five** [8] - 45:6, 51:5,
70:8, 70:10, 72:16,
72:22, 74:21, 77:22
**floor** [1] - 109:6
**focus** [2] - 60:19, 64:3
**focusing** [4] - 56:2,
69:16, 79:10, 87:6,
92:22, 102:6
**follow** [4] - 84:3, 84:6,
95:10, 95:12
**follow-up** [1] - 84:3
**following** [4] - 26:20,
27:3, 102:11, 105:10
**follows** [3] - 30:20,
33:14, 103:21
**FOR** [3] - 2:3, 2:14,
2:16
**foregoing** [1] - 112:9
**forgot** [1] - 11:22
**form** [2] - 62:4, 106:12
**format** [1] - 112:11
**forward** [4] - 7:17,
8:10, 10:16, 65:20
**forwarded** [8] - 46:4,
46:9, 79:24, 87:7,
87:11, 88:7, 110:10,
110:12
**forwarding** [1] - 85:21
**foundation** [10] - 10:8,
10:10, 13:20, 14:15,
14:16, 22:13, 46:14,
48:6, 48:16, 58:21
**Foundation** [3] -
23:15, 35:24, 94:1
**founder** [1] - 56:6
**founding** [1] - 27:17
**four** [10] - 21:8, 23:5,
23:13, 27:24, 72:12,
76:12, 76:14, 82:19,
82:21, 84:13
**Francisco** [1] - 96:5
**frankly** [1] - 45:10
**free** [2] - 20:21, 21:1
**Friday** [3] - 34:19,
39:5, 46:3
**FRIDAY** [2] - 1:15, 4:1
**friend** [1] - 54:11
**front** [4] - 33:6, 34:15,
39:3, 40:2
**full** [7] - 33:22, 35:4,
56:17, 75:15, 77:9,
78:6, 85:15
**fully** [6] - 9:18, 10:16,
10:21, 28:15, 36:25,

65:19
**funding** [1] - 59:21
**funds** [5] - 4:25, 5:8,
34:3, 82:4, 87:25
**furthers** [1] - 109:13

**G**

**GAB** [1] - 22:5
**GB** [3] - 4:18, 5:1, 5:11
**general** [2] - 52:2,
83:15
**generally** [2] - 42:19,
52:14
**gentlemen** [6] - 6:7,
26:16, 29:19, 30:4,
62:2, 106:10
**Geoffrey** [3] - 4:20,
36:13, 38:13
**given** [5] - 30:7, 37:20,
49:18, 75:10, 105:16
**Global** [7] - 30:24,
31:1, 35:11, 35:14,
36:11, 42:2, 42:23
**goods** [1] - 35:15
**government** [3] - 45:5,
50:4, 108:14
**Government** [24] -
5:16, 9:3, 18:3,
29:22, 44:24, 45:13,
45:14, 45:20, 47:3,
47:19, 47:22, 48:3,
48:9, 48:13, 49:14,
58:18, 67:10, 69:4,
78:24, 80:20, 86:24,
90:7, 93:23, 106:19
**GOVERNMENT** [3] -
3:3, 3:5, 50:8
**Government's** [2] -
45:11, 48:1
**graphic** [1] - 60:17
**gratis** [1] - 21:1
**great** [1] - 65:21
**Greg** [1] - 7:21
**GREGORY** [1] - 3:3
**Gregory** [1] - 27:4
**gross** [1] - 31:16
**group** [1] - 22:5
**Group** [3] - 22:7,
22:11, 35:10
**groups** [1] - 60:20
**guess** [3] - 6:19, 12:3,
107:22
**guidance** [1] - 107:22
**Gunderson** [1] - 53:9
**guy** [2] - 7:1, 26:5
**guys** [1] - 91:24

## H

**Haan** [1] - 27:18
**HAAN** [1] - 27:18
**half** [4] - 79:9, 79:10, 87:12, 107:4
**hand** [7] - 19:5, 19:10, 19:13, 19:17, 20:6, 50:7, 72:15
**handed** [1] - 44:18
**handle** [2] - 52:6, 104:25
**handled** [2] - 43:14, 57:12
**handwritten** [1] - 11:23
**HANNA** [2] - 2:4, 2:9
**hard** [1] - 48:11
**heading** [3] - 56:3, 56:13, 72:9
**hear** [4] - 22:25, 25:17, 30:5, 110:20
**heard** [3] - 80:10, 109:15, 109:17
**hearing** [1] - 109:18
**hearings** [3] - 30:1, 30:2, 30:5
**hearsay** [1] - 10:7, 45:23, 47:12, 58:21, 69:6, 69:8, 79:1, 80:22, 85:25, 86:1, 87:2, 94:1
**Hearsay** [1] - 67:12
**held** [2] - 70:21, 112:10
**help** [1] - 52:24
**helped** [1] - 53:10
**helpful** [2] - 71:20, 110:6
**hereby** [2] - 26:22, 112:7
**hesitate** [1] - 62:25
**hesitating** [1] - 107:9
**hi** [8] - 83:4, 84:6, 88:21, 91:24, 94:17, 96:18, 97:13, 105:11
**Hi** [3] - 89:11, 90:24, 93:6
**highly** [2] - 48:2, 48:24, 49:15
**Hino** [1] - 112:20
**HINO** [3] - 1:23, 112:5, 112:19
**Hino-Spaan** [1] - 112:20
**HINO-SPAAN** [3] - 1:23, 112:5, 112:19
**hire** [5] - 11:2, 52:24, 53:4, 53:16, 60:25
**hired** [3] - 12:9, 53:11,

55:25
**hires** [1] - 52:12
**hiring** [3] - 52:5, 64:6, 64:11
**hit** [1] - 80:2
**hold** [3] - 33:25, 34:3, 71:11
**honest** [1] - 34:14
**honestly** [1] - 23:13
**Honor** [90] - 4:6, 4:16, 4:20, 5:13, 5:21, 6:9, 9:8, 10:1, 10:5, 10:7, 10:11, 11:25, 13:15, 13:20, 14:4, 14:17, 15:9, 16:5, 17:8, 17:17, 17:20, 18:7, 18:13, 24:14, 26:11, 26:14, 29:22, 30:15, 34:20, 41:2, 44:10, 44:23, 45:11, 45:12, 45:17, 45:24, 46:20, 47:1, 47:5, 47:11, 47:15, 47:18, 48:3, 48:8, 48:20, 49:13, 50:14, 58:18, 58:20, 61:24, 62:9, 62:11, 65:13, 67:10, 69:4, 69:6, 78:24, 79:1, 79:3, 80:20, 80:22, 80:23, 85:11, 85:25, 86:2, 86:24, 87:2, 90:3, 93:23, 93:25, 95:4, 101:8, 104:3, 106:19, 107:4, 107:18, 107:19, 107:23, 107:24, 108:4, 108:9, 108:15, 108:16, 109:1, 109:5, 109:11, 110:7, 110:8, 110:24, 111:1
**HONORABLE** [1] - 1:3
**hope** [1] - 81:21
**hoping** [1] - 107:22
**hour** [1] - 107:4
**hourly** [2] - 40:18, 40:20
**hours** [1] - 46:6
**house** [1] - 6:18

## I

**Ibrahim** [2] - 11:1, 24:22
**idea** [6] - 21:3, 21:5, 21:12, 25:3, 35:25, 93:6
**identified** [1] - 54:2
**identify** [1] - 53:23
**ignore** [1] - 49:16

**Illinois** [1] - 27:16
**immediacy** [1] - 105:14
**immediately** [2] - 16:4, 16:11
**impeachment** [1] - 49:11
**IN** [2] - 2:14, 3:9
**Inc** [9] - 3:14, 3:17, 64:9, 67:19, 67:20, 72:17, 73:7, 74:2, 74:22
**include** [1] - 60:15
**included** [3] - 5:5, 14:24, 28:17
**including** [2] - 10:25, 48:6
**inclusive** [1] - 61:17
**incoming** [4] - 71:23, 72:8, 72:16, 76:14
**Incoming** [1] - 72:9
**incur** [1] - 60:24
**indicate** [1] - 54:1
**indicated** [2] - 29:19, 30:6
**indirectly** [1] - 51:8
**individual** [1] - 52:18
**individuals** [2] - 40:8, 52:15
**inequitable** [1] - 48:2
**info** [3] - 88:21, 91:8, 91:24
**Info** [1] - 91:22
**inform** [1] - 42:4
**information** [11] - 56:22, 82:6, 82:15, 88:2, 88:4, 91:9, 92:2, 92:4, 103:10, 103:24, 105:6
**informed** [2] - 46:4, 46:12
**initial** [14] - 9:13, 26:17, 28:7, 29:1, 57:3, 57:14, 67:25, 68:14, 69:22, 70:21, 70:24, 71:1
**initials** [8] - 9:21, 10:22, 19:4, 19:9, 19:12, 19:17, 20:6, 20:16
**initiate** [2] - 97:13, 98:13
**input** [1] - 58:9
**inquiries** [1] - 108:16
**instance** [1] - 45:12
**instances** [1] - 40:19
**instead** [1] - 85:24
**institution** [1] - 34:1
**instructions** [2] - 26:17, 28:22

**intellectual** [2] - 27:7, 59:21
**intend** [2] - 46:14, 46:22
**intended** [1] - 46:12
**interactions** [1] - 91:18
**interest** [2] - 59:19, 59:20
**interim** [1] - 25:3
**interjects** [1] - 37:7
**interviewed** [1] - 45:1
**interviewing** [1] - 47:19
**intonation** [1] - 30:9
**introduce** [2] - 46:13, 46:22
**introduced** [1] - 54:5
**investigation** [2] - 60:16
**investigators** [1] - 60:25
**invoking** [1] - 48:23
**involved** [3] - 52:9, 52:11, 68:4
**IPSY** [47] - 3:20, 3:22, 51:8, 51:9, 51:11, 51:15, 52:22, 55:21, 55:22, 56:15, 56:19, 57:1, 66:4, 66:7, 66:10, 66:18, 67:21, 68:8, 68:16, 68:24, 69:2, 70:8, 70:10, 71:3, 71:20, 72:20, 72:24, 74:11, 76:23, 80:5, 80:10, 81:11, 81:17, 81:22, 84:23, 85:23, 86:13, 89:17, 90:25, 91:25, 92:10, 92:14, 92:15, 92:17, 96:12, 96:14, 97:15
**IPSY's** [2] - 70:13, 84:16
**issue** [5] - 4:9, 5:13, 44:11, 107:17, 108:16
**issues** [10] - 47:25, 56:25, 62:4, 106:13, 107:15, 108:22, 109:5, 109:10, 109:25, 110:3
**item** [3] - 22:3, 22:23, 53:24
**items** [1] - 23:5
**IV** [3] - 55:5, 55:7, 55:8

## J

**JAG** [1] - 22:6
**JAMES** [1] - 1:3

**January** [11] - 10:22, 14:13, 14:21, 28:8, 28:9, 28:20, 28:25, 29:3, 33:10, 33:16, 42:2
**Jen** [2] - 81:23, 87:19, 87:20
**Jencks** [2] - 107:18, 108:7
**job** [1] - 53:15
**JOHN** [2] - 1:8, 2:15
**John** [4] - 26:22, 29:17, 33:24, 35:6
**Johnson** [9] - 4:20, 36:13, 36:16, 36:19, 36:22, 38:10, 38:14, 38:17
**JR** [1] - 3:3
**JUDGE** [1] - 1:3
**judgment** [5] - 33:9, 33:12, 33:16, 34:18, 61:4
**Judicial** [3] - 22:7, 22:11, 112:12
**Judy** [14] - 13:17, 14:13, 79:5, 79:11, 80:2, 80:16, 91:15, 103:5, 103:6, 103:8, 104:5, 105:5, 105:11
**July** [8] - 5:15, 27:4, 30:16, 44:24, 44:25, 45:5, 46:2, 110:10
**June** [4] - 23:4, 26:25, 29:9, 45:3
**jury** [9] - 4:5, 6:4, 6:6, 22:3, 44:17, 50:3, 60:20, 106:18

## K

**keep** [3] - 7:17, 15:6, 83:6
**kind** [2] - 35:12, 54:15
**knocker** [2] - 6:18, 6:20
**knowledge** [4] - 38:7, 38:11, 47:3, 85:18
**knows** [1] - 47:5

## L

**L'Oreal** [1] - 56:16
**labeled** [2] - 45:8, 77:15
**Labs** [5] - 50:20, 50:22, 50:25, 51:20, 78:9
**lacks** [4] - 10:8, 13:20, 14:5, 58:20
**Lacks** [1] - 14:16

**ladies** [6] - 6:7, 26:16, 29:19, 30:4, 62:2, 106:10
**language** [3] - 59:11, 59:14, 59:23
**largest** [1] - 56:9
**last** [13] - 25:7, 46:2, 50:10, 72:12, 74:11, 76:12, 76:14, 78:10, 82:19, 84:13, 90:12, 98:6, 98:8
**late** [2] - 23:8, 48:25
**LAW** [1] - 2:17
**law** [22] - 11:1, 16:3, 16:10, 26:24, 27:5, 27:17, 37:1, 37:4, 37:5, 38:8, 38:12, 41:17, 43:15, 52:11, 52:14, 52:18, 54:7, 54:15, 57:5, 64:1, 66:14, 70:19
**lawsuits** [1] - 27:9
**lawyer** [9] - 25:16, 25:22, 37:9, 37:21, 52:24, 53:2, 53:3, 53:4, 53:11
**lawyers** [2] - 26:19
**lay** [2] - 46:14, 48:6
**lead** [2] - 53:18, 71:13
**leading** [5] - 49:17, 87:15, 88:12, 89:21, 99:15
**Leading** [3] - 54:21, 86:14, 99:21
**learning** [1] - 15:7
**least** [3] - 38:14, 45:2, 75:12
**Lee** [1] - 27:17
**left** [2] - 72:15, 77:18
**left-hand** [1] - 72:15
**legal** [4] - 41:16, 42:13, 59:3, 64:13
**legitimate** [2] - 41:16, 109:22
**legitimately** [1] - 43:16
**less** [1] - 107:6
**letter** [1] - 10:25
**light** [2] - 109:11, 109:15
**likely** [4] - 4:8, 52:18, 72:1, 95:3
**line** [8] - 6:17, 22:3, 22:23, 23:5, 51:2, 62:19, 79:19, 81:16
**Lisa** [1] - 33:9
**list** [3] - 45:6, 45:18, 47:23
**listed** [9] - 13:3, 13:5, 15:15, 15:21, 23:5,

26:17, 42:21, 82:19, 110:13
**lists** [1] - 76:11
**live** [1] - 50:17
**lived** [1] - 53:15
**LLC** [4] - 27:18, 36:11, 71:11, 78:9
**LLP** [3] - 27:6, 30:17, 39:4
**loan** [1] - 59:21
**local** [1] - 24:17
**located** [1] - 24:17
**location** [1] - 34:10
**lodge** [1] - 48:19
**logistical** [1] - 97:17
**LONG** [3] - 3:5, 50:8, 50:11
**long-time** [1] - 53:14
**look** [31] - 6:15, 9:16, 9:17, 9:25, 10:13, 13:14, 13:23, 14:12, 14:25, 21:14, 23:2, 24:2, 33:5, 42:21, 43:4, 44:2, 44:8, 65:5, 65:20, 66:24, 67:23, 68:19, 77:15, 77:18, 80:12, 86:17, 90:2, 93:13, 94:14, 94:23, 100:5
**looked** [8] - 10:15, 18:4, 64:23, 76:24, 87:13, 90:12, 92:23, 98:23
**looking** [10] - 40:12, 42:12, 43:2, 55:5, 56:18, 64:13, 76:15, 89:5, 98:19, 99:7
**Looking** [1] - 42:16
**looks** [28] - 60:6, 63:2, 64:19, 67:18, 73:17, 77:25, 79:23, 81:7, 82:15, 83:24, 84:2, 84:8, 87:8, 88:6, 88:10, 88:17, 91:6, 91:22, 92:21, 93:6, 95:8, 97:9, 97:17, 98:3, 103:9, 103:22, 105:9
**loose** [1] - 57:23
**LOS** [1] - 112:3
**Los** [3] - 2:12, 50:18, 82:17
**losing** [2] - 98:7, 98:10
**lower** [4] - 19:4, 19:10, 19:13, 19:17
**luckily** [1] - 8:21
**lunch** [2] - 18:18, 46:3

**M**

**magistrate** [1] - 20:25
**mail** [74] - 3:10, 3:18, 3:19, 3:21, 28:21, 45:8, 46:2, 46:7, 46:9, 47:6, 47:17, 55:14, 55:17, 55:18, 55:20, 56:2, 57:3, 60:22, 62:14, 62:16, 62:17, 63:5, 63:12, 65:14, 65:15, 65:18, 78:21, 79:2, 79:4, 79:10, 79:19, 79:23, 80:1, 80:15, 80:18, 80:24, 81:7, 81:12, 81:19, 81:21, 82:8, 82:25, 83:2, 83:24, 83:25, 84:3, 85:17, 85:19, 85:21, 85:23, 86:20, 86:22, 87:6, 87:9, 87:11, 87:13, 88:7, 88:18, 88:23, 89:1, 89:6, 89:9, 89:14, 90:12, 91:12, 92:13, 92:23, 104:4, 104:7, 104:23, 106:4, 110:9
**mailed** [2] - 28:11, 28:14
**mails** [11] - 8:9, 9:2, 9:4, 9:6, 57:3, 63:3, 80:23, 81:1, 81:2, 94:2
**majority** [1] - 56:10
**manager** [3] - 38:24, 67:4, 79:15
**Marcelo** [1] - 56:10
**March** [23] - 9:23, 34:19, 39:5, 74:4, 81:13, 82:9, 83:25, 84:3, 84:9, 85:18, 88:8, 88:11, 88:18, 88:22, 89:15, 90:13, 90:17, 90:21, 92:13, 92:23, 94:15, 94:24, 100:24
**Marchino** [19] - 53:6, 53:7, 53:9, 53:13, 55:15, 56:23, 89:17, 89:20, 90:10, 90:20, 91:6, 91:16, 92:24, 93:10, 94:21, 97:21, 98:1, 98:18, 99:6
**mark** [1] - 57:19
**marked** [1] - 5:16
**market** [1] - 59:18
**markup** [2] - 47:13, 58:3
**materials** [1] - 46:18

**matter** [14] - 8:3, 12:10, 30:17, 33:8, 34:20, 39:8, 39:20, 39:22, 43:3, 53:18, 60:24, 65:10, 97:1, 112:11
**matters** [1] - 43:17
**mean** [21] - 31:15, 40:5, 47:24, 58:4, 59:12, 61:8, 68:3, 68:6, 71:16, 83:9, 93:3, 95:12, 96:3, 96:22, 97:6, 98:8, 98:11, 100:18, 101:20, 101:25, 102:15
**meant** [3] - 61:7, 107:23, 107:25
**mediation** [10] - 13:18, 14:8, 20:20, 20:24, 21:8, 22:3, 22:12, 22:20, 22:23, 24:5
**mediations** [1] - 21:17
**meet** [2] - 54:4, 54:12
**meeting** [4] - 30:21, 54:11, 54:14, 81:22
**Megley** [1] - 27:18
**MEGLEY** [1] - 27:18
**member** [2] - 26:25, 27:16
**Memorial** [1] - 31:6
**memorialized** [1] - 66:22
**memory** [1] - 6:15
**mentioned** [1] - 70:1
**merge** [1] - 54:6
**mergers** [1] - 54:17
**message** [25] - 6:25, 7:6, 7:11, 62:21, 65:17, 90:1, 90:16, 90:20, 91:23, 93:17, 96:2, 96:17, 96:25, 97:12, 97:23, 98:18, 99:6, 100:11, 100:14, 101:15, 102:9, 103:2, 104:14, 105:3, 105:10
**messages** [18] - 3:23, 6:13, 7:17, 8:10, 8:11, 8:14, 8:15, 8:17, 8:19, 8:23, 90:6, 93:19, 93:21, 94:8, 97:18, 97:21, 104:11, 108:5
**messaging** [1] - 93:10
**messenger** [1] - 60:22
**met** [3] - 54:13, 59:9, 81:22
**MICHAEL** [2] - 1:8,

2:15
**Michael** [38] - 26:22, 27:5, 29:17, 30:16, 30:19, 33:8, 33:10, 33:11, 33:24, 34:19, 35:6, 39:5, 39:12, 40:5, 42:17, 53:20, 53:21, 54:4, 54:6, 58:3, 71:16, 71:18, 79:18, 83:1, 83:4, 83:23, 84:6, 91:15, 93:7, 93:17, 94:17, 95:10, 96:4, 97:13, 100:15, 102:11, 102:24, 105:11
**Michelle** [41] - 44:22, 46:19, 51:1, 51:2, 56:6, 56:7, 56:8, 66:14, 67:3, 67:7, 67:19, 68:10, 69:14, 69:24, 70:6, 73:12, 74:8, 77:10, 78:7, 78:13, 85:18, 88:6, 88:17, 89:2, 89:6, 89:9, 89:11, 91:24, 92:1, 92:6, 96:12, 99:20, 100:2, 100:19, 101:4, 102:3, 102:18, 102:19, 105:24, 106:1, 106:5
**Michelle's** [11] - 71:12, 78:11, 80:2, 83:17, 95:22, 96:4, 101:18, 102:13, 102:15, 104:16, 105:15
**microphone** [1] - 50:24
**midafternoon** [1] - 62:1
**middle** [4] - 49:5, 49:9, 59:9, 63:4
**might** [2] - 12:3, 57:23
**million** [36] - 4:19, 9:5, 11:15, 11:20, 12:13, 12:14, 12:22, 15:3, 15:7, 15:19, 16:20, 17:14, 17:24, 17:25, 18:5, 32:8, 39:7, 39:11, 39:19, 39:21, 41:10, 42:18, 43:20, 44:5, 56:17, 71:12, 75:22, 78:8, 78:9, 83:16, 105:15, 105:22, 106:1, 106:6
**millions** [2] - 32:4, 32:5
**mind** [1] - 55:5
**mine** [3] - 47:13, 73:17, 95:23

**Minute** [1] - 7:12
**minute** [2] - 82:7, 98:14
**minutes** [7] - 4:13, 36:12, 62:2, 62:6, 63:14, 76:4, 107:6
**missing** [1] - 55:7
**Misstates** [1] - 13:19
**misstates** [2] - 14:4, 16:5
**MLP** [1] - 76:10
**MMS** [1] - 8:15
**mock** [1] - 60:19
**Mohammadi** [1] - 29:24
**MOHAMMADI** [4] - 30:14, 33:7, 34:17, 39:3
**Monday** [3] - 104:16, 104:20
**money** [51] - 8:4, 8:6, 11:7, 14:14, 15:22, 17:2, 17:5, 17:13, 17:22, 18:5, 25:13, 30:23, 37:1, 37:6, 37:20, 38:5, 39:25, 40:3, 40:4, 40:9, 40:14, 40:23, 41:12, 41:21, 41:22, 42:1, 42:5, 42:10, 42:16, 42:20, 42:23, 42:25, 43:6, 43:7, 43:9, 43:11, 43:13, 43:14, 43:18, 43:19, 43:21, 43:23, 44:1, 44:6, 84:20, 84:22, 96:11, 101:4, 101:12, 105:15
**monies** [8] - 16:3, 16:4, 16:11, 16:13, 41:7, 41:15, 41:20
**month** [1] - 23:14
**morning** [11] - 7:16, 44:18, 65:22, 81:24, 87:20, 93:2, 95:10, 100:15, 102:11, 103:5, 107:15
**most** [1] - 4:8
**motion** [1] - 107:18
**move** [3] - 23:23, 61:24, 103:12
**moved** [1] - 9:3
**moves** [7] - 58:19, 67:10, 69:5, 78:24, 80:20, 86:24, 93:23
**moving** [1] - 104:23
**MR** [182] - 2:16, 4:6, 4:16, 4:23, 5:4, 5:8, 5:12, 5:13, 5:19, 5:21, 5:24, 6:2, 6:5,

6:9, 6:11, 9:8, 9:12, 10:1, 10:5, 10:7, 10:11, 10:13, 11:25, 12:2, 13:19, 13:23, 14:4, 14:8, 14:16, 14:20, 15:9, 15:12, 16:5, 16:9, 17:8, 17:12, 17:17, 17:20, 17:21, 18:7, 18:11, 18:13, 18:16, 19:1, 22:13, 22:17, 23:15, 23:19, 23:23, 24:1, 24:13, 24:16, 25:2, 26:8, 26:10, 26:14, 29:22, 30:2, 30:11, 30:15, 32:24, 33:5, 33:7, 33:8, 34:6, 34:15, 34:17, 34:18, 34:22, 38:23, 39:2, 39:3, 39:4, 41:4, 44:9, 44:10, 44:15, 44:20, 44:23, 45:24, 46:1, 46:9, 46:20, 47:1, 47:5, 47:11, 48:8, 48:18, 48:22, 48:24, 49:4, 49:23, 50:2, 50:6, 50:14, 50:16, 50:25, 54:3, 54:21, 54:23, 55:2, 55:9, 55:12, 58:18, 58:20, 58:25, 61:5, 61:24, 62:9, 67:10, 67:12, 67:15, 69:4, 69:6, 69:10, 72:3, 72:4, 78:24, 79:1, 79:3, 79:8, 80:20, 80:22, 80:23, 81:5, 85:10, 85:14, 85:25, 86:2, 86:4, 86:8, 86:14, 86:17, 86:24, 87:2, 87:6, 87:15, 87:18, 88:12, 88:14, 89:21, 89:24, 90:11, 93:23, 93:25, 94:7, 95:4, 95:8, 98:21, 99:15, 99:18, 99:21, 99:25, 101:7, 101:10, 103:13, 103:16, 103:17, 103:19, 104:1, 106:19, 106:23, 107:3, 107:6, 107:8, 107:13, 107:16, 107:22, 108:4, 108:8, 108:13, 108:15, 108:21, 108:25, 109:4, 109:7, 110:2, 110:7, 110:18, 110:23, 111:1, 111:3
**multiple** [3] - 22:6,

27:11, 47:20
**multiply** [1] - 75:19

## N

**name** [7] - 33:22, 35:4, 50:10, 67:21, 76:9, 76:11, 92:1
**named** [3] - 7:1, 66:11, 81:8
**National** [3] - 29:4, 34:1, 82:17
**nature** [3] - 35:9, 38:19, 38:20
**nearly** [2] - 8:17, 8:23
**necessary** [4] - 60:23, 61:3, 61:12, 107:24
**need** [9] - 5:22, 5:25, 6:1, 6:14, 6:15, 60:1, 93:6, 96:18, 103:5
**needed** [1] - 15:4
**negotiate** [2] - 57:8, 66:10
**negotiated** [4] - 26:3, 28:4, 28:18, 70:2
**negotiating** [2] - 52:25, 66:4
**negotiation** [3] - 46:23, 57:10, 57:12
**net** [5] - 31:13, 31:14, 31:19, 31:21, 31:22
**never** [4] - 11:6, 11:11, 13:11, 13:12
**New** [3] - 99:19, 99:20, 100:2
**new** [3] - 12:19, 13:1, 61:25
**Newport** [2] - 2:19, 54:13
**news** [1] - 81:23
**next** [12] - 4:7, 5:14, 19:9, 19:12, 21:23, 44:10, 50:4, 82:4, 87:1, 88:1, 96:24, 107:7
**nice** [3] - 8:1, 81:22, 111:3
**NICOLA** [2] - 2:4, 2:9
**nine** [2] - 9:19, 9:21
**none** [8] - 8:8, 12:20, 16:21, 16:25, 19:6, 19:18, 20:10, 44:1
**nonresponsive** [1] - 23:24
**North** [1] - 2:11
**note** [1] - 59:19
**notes** [1] - 107:17
**nothing** [6] - 6:22, 7:3, 8:12, 26:8, 108:9, 109:17

**notice** [4] - 47:15, 80:24, 81:3, 94:4
**November** [3] - 8:7, 29:13, 29:15
**nowhere** [2] - 49:10, 49:14
**Number** [10] - 10:12, 30:17, 56:6, 58:24, 67:14, 69:9, 79:7, 81:4, 87:5, 94:6
**number** [32] - 12:3, 15:18, 15:21, 15:25, 18:11, 18:12, 20:16, 26:17, 29:4, 32:1, 37:25, 38:1, 43:17, 56:7, 56:8, 56:15, 56:18, 75:17, 76:11, 76:12, 82:18, 82:19, 84:15, 101:17, 101:22, 101:23, 102:12, 103:10, 103:23, 104:8, 104:15, 105:13
**numbered** [1] - 56:2
**numbers** [4] - 46:5, 48:12, 72:12, 82:19
**numerous** [1] - 16:16
**NYC** [1] - 96:20

## O

**oath** [5] - 30:6, 30:8, 33:20, 34:24, 35:2
**object** [6] - 45:11, 45:16, 45:23, 48:4, 49:15
**objecting** [1] - 110:20
**Objection** [2] - 23:15, 35:24
**objection** [33] - 9:9, 10:7, 13:19, 14:4, 14:16, 15:9, 16:5, 17:8, 18:7, 22:13, 24:13, 37:11, 41:1, 48:19, 54:21, 58:20, 58:22, 67:12, 69:6, 79:1, 80:22, 85:25, 86:14, 87:2, 87:15, 88:12, 89:21, 93:25, 95:4, 99:15, 99:21, 101:7, 103:13
**objection's** [1] - 81:3
**objections** [1] - 48:5
**objector** [1] - 32:14
**obligation** [1] - 38:16
**obligations** [1] - 38:9
**observed** [1] - 109:19
**obtained** [6] - 12:19, 39:13, 41:13, 42:1, 44:5, 45:21

**obviously** [2] - 4:6, 37:2
**occasionally** [1] - 93:11
**occasions** [2] - 45:2, 47:20
**occur** [2] - 68:12, 80:8
**occurred** [1] - 109:12
**October** [2] - 77:23, 78:13
**OF** [7] - 1:2, 1:5, 1:14, 2:1, 112:1, 112:3, 112:4
**offer** [1] - 50:1
**offered** [2] - 80:24, 86:2
**offering** [1] - 86:4
**office** [6] - 9:19, 18:19, 24:11, 54:13, 79:15, 101:17
**officer** [2] - 52:1, 52:3
**OFFICES** [1] - 2:17
**OFFICIAL** [3] - 1:24, 112:1, 112:5
**Official** [1] - 112:20
**old** [1] - 53:15
**oldest** [1] - 87:9
**once** [3] - 43:22, 58:14, 82:25
**one** [31] - 4:25, 6:16, 8:10, 9:23, 14:7, 16:8, 17:11, 22:16, 26:18, 30:3, 34:8, 37:25, 39:10, 40:7, 46:25, 53:6, 53:10, 55:10, 55:17, 69:18, 70:5, 70:7, 74:6, 74:14, 75:16, 78:7, 107:3, 107:17, 107:24, 110:8, 110:19
**ones** [1] - 4:15
**ongoing** [1] - 36:22
**oOo** [1] - 111:9
**Open** [1] - 50:3
**opening** [1] - 49:7
**operated** [1] - 43:24
**operating** [2] - 76:19, 76:20
**operations** [2] - 52:1, 52:3
**operative** [1] - 69:7
**opinion** [1] - 62:4
**opinions** [1] - 106:13
**opportunity** [3] - 48:10, 103:15, 110:11
**opposite** [1] - 37:5
**option** [1] - 59:20
**Options** [1] - 56:20

**OR** [1] - 3:9
**or..** [1] - 34:20
**order** [2] - 25:23, 83:6
**ordered** [1] - 4:20
**organized** [1] - 87:9
**original** [1] - 80:24
**originally** [1] - 75:11
**origination** [1] - 32:19
**Originator** [1] - 72:14
**out-of-pocket** [1] - 60:12
**Outgoing** [1] - 77:15
**outgoing** [2] - 77:22, 98:23
**outset** [1] - 70:24
**outside** [3] - 9:8, 11:2, 24:13
**overruled** [27] - 9:10, 13:21, 14:6, 14:18, 15:10, 16:7, 17:10, 18:9, 22:15, 23:16, 38:3, 38:5, 48:5, 58:23, 67:13, 69:7, 81:3, 85:12, 86:15, 87:16, 88:13, 89:22, 94:2, 95:6, 99:16, 99:23, 101:9
**oversee** [1] - 52:4
**owe** [2] - 40:4, 40:9
**owed** [4] - 12:6, 38:5, 78:15, 98:16
**owes** [2] - 40:3, 40:14
**own** [2] - 51:15, 51:18
**ownership** [1] - 56:17

**P**

**P.M** [2] - 1:16, 4:2
**p.m** [5] - 45:7, 62:8, 63:4, 111:8
**PAGE** [1] - 3:2
**page** [74] - 6:17, 6:25, 7:6, 7:11, 7:16, 10:14, 13:23, 19:9, 19:12, 19:15, 19:21, 20:6, 20:9, 20:15, 21:22, 21:23, 23:2, 28:12, 38:23, 55:18, 59:1, 60:5, 62:16, 63:2, 63:11, 63:22, 64:3, 65:19, 65:23, 65:24, 65:25, 67:15, 67:23, 69:16, 71:22, 72:1, 72:6, 74:22, 76:8, 77:15, 79:9, 79:11, 81:6, 81:14, 81:18, 82:24, 87:12, 88:6, 88:10, 88:17, 89:5, 90:11, 90:15, 91:6, 92:21, 93:18,

94:14, 95:8, 97:9, 97:22, 97:23, 98:22, 100:6, 100:8, 100:12, 101:15, 102:6, 112:11
**pages** [9] - 3:11, 9:19, 9:21, 10:13, 10:15, 10:22, 20:17, 65:6
**paid** [12] - 15:8, 15:23, 16:20, 20:24, 22:18, 36:25, 37:4, 37:5, 38:4, 40:16, 75:15, 85:15
**paper** [1] - 57:24
**paragraph** [18] - 58:25, 59:2, 59:11, 59:17, 60:2, 60:6, 60:9, 61:6, 61:15, 61:20, 64:4, 64:5, 64:13, 64:24, 65:2, 65:6, 67:24, 87:18
**paragraphs** [2] - 81:19, 82:14
**parallel** [1] - 56:19
**parent** [1] - 72:19
**Park** [1] - 31:6
**part** [8] - 37:16, 39:8, 39:12, 41:13, 42:1, 52:6, 66:9, 88:7
**particular** [2] - 37:18, 70:14
**particularly** [1] - 49:18
**parties** [4] - 27:2, 29:19, 87:1
**partner** [1] - 27:17
**partnership** [1] - 59:19
**party** [10] - 7:12, 27:8, 27:11, 27:12, 27:19, 27:21, 27:23, 28:6, 28:23, 28:25
**party's** [1] - 28:16
**pass** [1] - 83:5
**Passport** [1] - 38:25
**patience** [2] - 98:7, 98:10
**Pause** [1] - 55:11
**pay** [5] - 11:15, 13:1, 25:16, 27:23, 40:21
**paying** [3] - 17:7, 25:25, 36:22
**payment** [41] - 27:25, 28:7, 28:17, 29:1, 29:2, 70:18, 73:10, 73:11, 73:13, 73:16, 73:18, 73:20, 73:21, 74:7, 74:11, 74:12, 78:2, 78:3, 78:6, 78:11, 82:12, 85:16, 85:23, 86:13, 89:2,

89:12, 91:25, 95:24, 96:12, 96:14, 97:1, 98:15, 99:1, 99:10, 99:13, 100:21, 100:25, 101:5, 101:12, 102:3, 106:5
**payments** [52] - 25:23, 27:24, 28:1, 28:8, 28:23, 38:9, 38:13, 38:17, 38:21, 68:7, 68:8, 68:12, 69:19, 69:21, 69:24, 70:4, 70:6, 70:7, 70:8, 70:11, 70:13, 70:16, 70:24, 71:1, 71:20, 71:23, 72:22, 72:23, 73:3, 73:6, 74:1, 74:16, 74:21, 75:10, 76:6, 76:23, 77:2, 77:11, 78:10, 78:12, 80:4, 80:6, 84:17, 84:23, 85:2, 85:6, 89:17, 92:14, 92:16, 95:17, 95:21, 97:15
**payout** [1] - 36:16
**penalty** [1] - 20:2
**pending** [3] - 101:18, 101:24, 102:16
**penny** [1] - 77:7
**people** [5] - 53:6, 53:10, 91:17, 91:18, 107:10
**per** [3] - 63:8, 82:3, 87:24
**percent** [14] - 12:24, 25:14, 25:16, 59:5, 59:6, 59:8, 59:9, 64:16, 64:20, 75:5, 75:13, 75:20, 76:6, 77:9
**percentage** [2] - 61:9, 64:19
**period** [2] - 23:14, 46:23
**periodic** [1] - 38:13
**perjury** [1] - 20:3
**permission** [2] - 10:2, 108:18
**permitted** [1] - 109:10
**person** [2] - 37:19, 97:2
**personal** [3] - 78:11, 83:17, 83:18
**Personalized** [9] - 3:13, 3:16, 64:9, 67:18, 67:20, 72:16, 73:7, 74:1, 74:22
**personally** [4] - 32:12, 32:16, 36:4, 92:16
**Phan** [65] - 3:13, 3:22,

44:22, 46:19, 51:1, 51:2, 51:6, 51:18, 51:21, 52:17, 52:21, 52:24, 53:5, 54:25, 57:4, 57:8, 57:12, 63:25, 64:10, 65:9, 66:9, 66:11, 66:13, 66:18, 67:3, 67:19, 68:10, 70:2, 70:6, 70:7, 70:20, 73:12, 73:22, 74:8, 75:4, 77:10, 78:4, 78:7, 78:14, 84:17, 85:1, 85:19, 85:21, 85:24, 86:20, 87:6, 87:11, 88:6, 89:1, 89:10, 92:13, 95:16, 95:21, 97:15, 99:20, 100:2, 100:22, 102:3, 106:1, 106:5, 107:7
**Phan's** [20] - 51:13, 52:6, 63:23, 66:6, 66:14, 67:4, 67:7, 69:14, 69:17, 69:24, 77:1, 86:13, 88:17, 89:2, 89:6, 92:1, 92:6, 96:12, 101:4, 102:19
**phone** [7] - 84:13, 84:15, 88:24, 94:24, 95:3, 99:14, 100:2
**photocopying** [1] - 60:19
**ping** [1] - 93:8
**place** [2] - 24:4, 24:5
**Plaintiff** [1] - 1:6
**PLAINTIFF** [1] - 2:3
**plane** [6] - 95:11, 96:2, 96:5, 96:8, 96:18, 97:18
**planning** [2] - 81:24, 87:21
**Plaza** [1] - 2:18
**plus** [1] - 81:23
**pocket** [1] - 60:12
**point** [10] - 10:16, 22:22, 41:7, 45:10, 48:17, 49:25, 52:21, 80:5, 98:15, 110:8
**points** [2] - 56:3, 56:12
**portion** [12] - 5:9, 9:5, 11:7, 11:20, 12:25, 15:3, 16:4, 16:13, 32:18, 48:21, 48:23, 71:22
**portions** [2] - 29:24, 77:11
**position** [1] - 109:13
**possible** [2] - 48:10,

109:8
**postage** [1] - 60:23
**posted** [3] - 101:18, 101:24, 102:16
**potentially** [2] - 76:19, 107:8
**PowerPoint** [1] - 60:17
**practice** [3] - 9:13, 26:24, 54:16
**practices** [2] - 59:3, 64:14
**Pratigya** [11] - 66:11, 66:13, 66:15, 66:18, 70:2, 70:7, 70:20, 73:22, 77:10, 78:4, 78:14
**praying** [3] - 7:18, 7:25, 8:11
**predicate** [2] - 39:17, 41:19
**prefer** [1] - 83:5
**prejudice** [2] - 49:2, 49:3, 49:18
**prejudicial** [4] - 48:2, 48:24, 48:25, 49:15
**preliminary** [1] - 109:16
**presence** [5] - 4:5, 6:6, 44:17, 50:3, 106:18
**pretty** [2] - 23:10, 87:12
**previous** [2] - 65:15, 88:22
**previously** [4] - 4:15, 33:15, 45:1, 47:23
**price** [2] - 82:3, 87:24
**privilege** [2] - 37:12, 37:22
**privileged** [1] - 34:4
**PRO** [1] - 2:14
**probative** [1] - 48:25
**problem** [1] - 37:18
**proceed** [2] - 4:7, 49:22
**Proceedings** [1] - 111:8
**PROCEEDINGS** [1] - 1:14
**proceedings** [2] - 55:11, 112:10
**process** [1] - 60:16
**Process** [2] - 49:4, 49:12
**processed** [1] - 89:12
**produced** [3] - 47:18, 47:23, 48:9
**producing** [1] - 46:5
**production** [3] -

46:18, 48:1, 49:1
**promptly** [1] - 42:5
**pronounce** [1] - 66:15
**proper** [1] - 109:22
**property** [3] - 27:7, 59:19, 59:21
**propose** [4] - 57:17, 59:17, 61:5, 107:14
**proposed** [6] - 57:19, 58:5, 58:7, 58:8, 59:8, 59:15
**prospect** [1] - 54:24
**proud** [1] - 7:7
**proved** [1] - 29:21
**proven** [1] - 26:21
**provide** [12] - 13:24, 16:19, 16:22, 17:1, 17:22, 42:8, 42:13, 57:14, 69:18, 101:17, 104:15, 105:13
**provided** [8] - 5:16, 9:18, 13:12, 15:6, 20:3, 29:13, 90:6, 103:15
**providing** [2] - 28:22, 92:2
**proving** [1] - 10:10
**provision** [1] - 61:12
**publish** [1] - 10:2
**pull** [14] - 50:23, 55:2, 58:25, 62:10, 69:10, 71:21, 71:22, 76:1, 76:8, 79:8, 81:5, 90:11, 98:21, 110:19
**purchase** [5] - 56:18, 56:20, 68:16, 82:2, 87:24
**purposes** [1] - 94:4
**pursuant** [6] - 11:16, 12:15, 26:2, 43:15, 71:2, 112:8
**pushing** [2] - 7:17, 8:10
**put** [5] - 12:6, 50:24, 108:2, 108:11

## Q

**quarter** [1] - 66:21
**questions** [18] - 5:10, 6:12, 7:23, 8:3, 8:18, 9:6, 11:3, 12:16, 13:4, 13:7, 16:17, 18:13, 31:5, 34:2, 34:9, 62:25, 89:13, 94:7
**quickly** [2] - 90:25, 91:2
**quite** [1] - 76:18

## R

**racing** [2] - 4:19, 5:2
**raise** [5] - 4:9, 5:14, 50:7, 106:20, 110:4
**Ramon** [1] - 107:20
**rate** [1] - 40:20
**rather** [2] - 12:13, 70:19
**re** [4] - 3:11, 3:18, 3:20, 3:22
**Re** [2] - 30:17, 39:4
**reach** [5] - 53:5, 66:17, 66:20, 80:5, 101:13
**reached** [6] - 46:24, 53:6, 53:8, 82:8, 92:23
**read** [28] - 5:3, 5:9, 5:10, 9:2, 26:15, 26:20, 29:23, 29:24, 30:10, 34:20, 56:5, 56:13, 59:1, 59:23, 60:9, 62:21, 64:4, 65:17, 74:17, 81:19, 82:14, 83:2, 87:18, 88:20, 91:23, 103:17, 103:19, 103:21
**Reading** [1] - 26:21
**reading** [4] - 4:10, 30:11, 34:22, 104:12
**ready** [2] - 4:6, 23:7
**really** [2] - 83:14, 98:12
**REALTIME** [1] - 112:5
**reason** [7] - 4:16, 5:4, 17:12, 17:13, 17:16, 36:21, 107:8
**reasonable** [1] - 60:25
**reasonably** [1] - 61:3
**reasoning** [1] - 71:16
**reasons** [2] - 48:4, 49:15
**receipt** [2] - 25:9, 48:13
**receive** [16] - 11:19, 12:14, 32:9, 32:18, 46:1, 59:4, 77:11, 78:14, 85:19, 92:14, 92:16, 98:15, 102:3, 103:10, 103:23, 105:6
**received** [54] - 3:18, 10:9, 10:12, 11:7, 12:23, 13:11, 15:3, 18:19, 29:5, 29:7, 29:9, 29:12, 31:9, 31:23, 39:19, 44:24, 45:5, 46:2, 58:22,

58:24, 65:25, 67:13, 67:14, 69:8, 69:9, 78:22, 79:6, 79:7, 79:20, 81:2, 81:3, 81:4, 82:25, 85:17, 86:3, 86:6, 86:20, 87:3, 87:5, 94:3, 94:4, 94:6, 95:17, 95:20, 95:21, 95:23, 95:24, 98:9, 99:2, 99:9, 100:24, 101:12, 101:21
**receiving** [6] - 40:23, 41:7, 60:13, 85:2, 86:13, 99:13
**recess** [2] - 62:2, 111:7
**Recess** [1] - 62:8
**recognize** [12] - 55:14, 57:25, 62:12, 62:14, 66:25, 68:20, 78:18, 80:13, 86:18, 90:4, 91:12, 93:14
**recollection** [5] - 21:7, 21:16, 41:6, 41:17, 82:9
**record** [5] - 33:23, 48:19, 53:23, 54:1, 103:21
**records** [8] - 14:25, 18:4, 18:5, 18:6, 40:2, 71:20, 109:20, 109:23
**recoup** [1] - 65:10
**recovered** [1] - 61:10
**recovery** [4] - 59:5, 59:24, 60:2, 61:9
**Recross** [1] - 3:4
**RECROSS** [1] - 18:15
**Recross-Examination** [1] - 3:4
**RECROSS-EXAMINATION** [1] - 18:15
**red** [1] - 59:12, 59:14
**redact** [2] - 4:21, 4:23
**redacted** [1] - 26:15
**REDIRECT** [1] - 6:10
**Redirect** [1] - 3:3
**redirect** [2] - 18:17, 45:15
**redline** [10] - 5:19, 46:13, 47:13, 49:9, 58:3, 58:4, 58:11, 63:15, 64:20, 64:23
**redline's** [1] - 48:7
**redlined** [1] - 44:23
**redlines** [1] - 57:21
**Ref** [8] - 101:17,

101:22, 102:12, 103:10, 103:23, 104:8, 104:15, 105:13
**refer** [3] - 39:16, 96:2, 97:14
**reference** [2] - 4:18, 67:24
**references** [1] - 22:10
**referring** [12] - 56:25, 70:23, 73:6, 83:12, 84:22, 91:1, 91:20, 97:14, 100:17, 103:7, 104:20, 105:21
**reflect** [1] - 57:19
**reflected** [2] - 74:21, 94:12
**refresh** [2] - 6:15, 82:9
**refund** [1] - 59:18
**regard** [2] - 4:14, 48:15
**regarding** [2] - 57:1, 62:4
**regards** [1] - 8:9
**Regnier** [12] - 13:17, 14:13, 79:5, 79:11, 79:23, 80:16, 91:15, 103:8, 104:5, 105:5, 109:15
**regular** [1] - 106:11
**regulations** [1] - 112:12
**reimburse** [1] - 60:12
**reimbursement** [1] - 60:14
**REJECTED** [1] - 3:9
**relate** [1] - 61:15
**related** [2] - 39:20, 39:22
**relates** [2] - 5:14, 47:25
**relating** [5] - 5:14, 21:19, 39:18, 41:8, 109:14
**relationship** [1] - 53:13
**relevant** [2] - 27:14, 46:15
**relies** [1] - 109:20
**rely** [1] - 109:22
**remainder** [1] - 59:10
**remaining** [1] - 83:17
**remember** [19] - 7:22, 11:3, 12:16, 13:6, 15:14, 16:17, 19:25, 20:4, 23:8, 23:11, 24:7, 31:11, 31:25, 62:3, 63:15, 64:24, 95:25, 99:9, 106:11

**remit** [1] - 39:22
**rendered** [1] - 59:4
**repeat** [3] - 64:17, 88:15, 99:24
**replied** [1] - 105:9
**reported** [1] - 112:10
**reporter** [1] - 103:19
**Reporter** [1] - 112:20
**REPORTER** [4] - 1:24, 50:21, 112:1, 112:6
**REPORTER'S** [1] - 1:14
**represent** [5] - 12:9, 27:6, 64:7, 72:22, 78:2
**representation** [3] - 49:18, 66:9, 110:21
**represented** [2] - 27:19, 43:16
**representing** [1] - 54:24
**repurchase** [13] - 3:14, 3:15, 3:20, 3:22, 67:3, 67:8, 68:23, 77:2, 78:15, 82:1, 82:3, 87:22, 87:25
**Repurchase** [1] - 81:17
**repurchasing** [2] - 82:2, 87:23
**request** [2] - 45:3, 60:14
**requesting** [1] - 105:6
**required** [3] - 24:18, 25:19, 28:6
**requirements** [1] - 43:15
**reschedule** [1] - 107:9
**research** [3] - 60:20, 62:5, 106:14
**reserve** [1] - 26:10
**resolved** [1] - 109:10
**respectfully** [1] - 29:15
**respective** [3] - 28:5, 28:19, 52:22
**respectively** [1] - 28:10
**respond** [3] - 63:9, 103:2, 104:24
**responded** [4] - 7:22, 84:8, 88:10, 94:23
**respondent** [16] - 26:23, 27:5, 27:9, 28:3, 28:11, 28:15, 28:18, 28:20, 29:3, 29:6, 29:8, 29:10, 29:12, 29:13, 29:17
**responds** [2] - 37:9,

93:6
**response** [8] - 7:25, 45:19, 49:11, 88:18, 88:20, 89:6, 91:4, 96:16
**responsibilities** [1] - 52:2
**responsibility** [2] - 12:10, 52:6
**responsive** [3] - 7:22, 8:1, 8:2
**responsiveness** [1] - 8:6
**rest** [1] - 81:2
**result** [2] - 82:1, 87:23
**resumed** [1] - 3:3
**retired** [1] - 20:24
**return** [1] - 62:24
**review** [4] - 53:9, 55:5, 62:23, 67:4
**reviewed** [3] - 4:15, 46:10, 94:21
**revised** [1] - 61:22
**Ricci** [5] - 32:11, 32:23, 32:25, 41:14, 42:13
**right-hand** [5] - 19:5, 19:10, 19:13, 19:17, 20:6
**rights** [1] - 49:13
**rise** [3] - 62:7, 106:17, 111:6
**roaster** [5] - 35:18, 35:19, 35:22, 36:1, 36:9
**Roasters** [2] - 35:17, 36:3
**role** [4] - 12:18, 25:9, 51:11, 51:13
**ROOM** [1] - 1:24
**routing** [1] - 82:18
**row** [1] - 73:10
**rows** [1] - 99:1
**rude** [1] - 7:1
**Rule** [3] - 45:3, 45:20, 47:25
**ruled** [2] - 4:15, 45:13
**runaround** [1] - 105:16
**running** [1] - 52:4
**runs** [1] - 50:25

**S**

**SACR-19-00061-JVS** [1] - 1:7
**SAGEL** [41] - 2:5, 4:6, 6:9, 6:11, 9:12, 10:1, 10:5, 10:11, 10:13, 11:25, 12:2, 13:23,

14:8, 14:20, 15:12, 16:9, 17:12, 17:21, 18:11, 18:13, 22:13, 23:15, 24:13, 26:14, 29:22, 30:2, 30:11, 30:15, 32:24, 33:5, 33:8, 34:6, 34:15, 34:18, 34:22, 38:23, 39:2, 39:4, 41:4, 44:9, 72:3
**Sagel** [7] - 3:3, 6:8, 18:17, 19:24, 24:20, 25:9, 106:21
**sale** [3] - 52:25, 66:10, 70:2
**San** [1] - 96:5
**SANTA** [3] - 1:17, 1:25, 4:1
**Santa** [1] - 2:7
**saw** [2] - 39:11, 39:16
**schedule** [1] - 28:17
**scheduled** [2] - 68:12, 75:12
**scope** [3] - 9:8, 24:13, 64:6
**Scope** [1] - 64:4
**screen** [2] - 72:15, 76:2
**SE** [1] - 2:14
**seats** [1] - 56:7
**second** [18] - 10:14, 13:23, 56:8, 73:15, 75:11, 78:12, 80:4, 80:6, 82:12, 84:17, 85:2, 85:5, 85:23, 86:13, 92:14, 101:5, 104:23, 107:3
**Section** [3] - 67:23, 69:16, 112:8
**see** [46] - 6:14, 9:19, 19:2, 21:21, 21:23, 22:5, 22:10, 22:24, 23:1, 23:4, 53:21, 55:8, 56:3, 63:5, 63:8, 63:11, 65:14, 65:21, 67:24, 67:25, 71:24, 72:8, 72:9, 72:15, 72:25, 73:3, 73:7, 73:25, 74:18, 77:15, 77:19, 77:22, 78:4, 80:2, 81:8, 82:15, 88:14, 88:18, 93:8, 97:23, 98:24, 99:1, 100:8, 100:11, 104:17, 106:15
**seeing** [1] - 82:8
**seeking** [1] - 37:12
**seeks** [1] - 86:1
**selecting** [1] - 52:11
**selfie** [1] - 6:19

**sell** [2] - 52:21, 66:6
**selling** [1] - 56:19
**SELNA** [1] - 1:3
**send** [9] - 41:13, 42:1, 44:4, 82:25, 91:8, 91:9, 91:14, 91:17, 96:24
**sending** [5] - 46:17, 47:4, 56:22, 84:7, 89:1
**sense** [1] - 52:17
**sent** [28] - 6:19, 13:17, 28:20, 46:7, 47:16, 47:17, 48:11, 48:15, 58:15, 70:16, 70:18, 79:11, 79:23, 83:1, 83:2, 84:2, 89:2, 90:25, 91:5, 91:12, 91:15, 91:25, 95:13, 100:16, 104:4, 106:5, 108:2, 110:21
**sentence** [3] - 59:1, 64:5, 105:19
**separate** [3] - 68:16, 69:18, 69:19
**September** [15] - 29:11, 67:17, 68:14, 69:13, 69:22, 69:23, 71:2, 73:4, 73:8, 75:11, 75:12, 77:11, 77:22, 79:22
**September/October** [1] - 77:12
**series** [2] - 71:23, 72:8
**serious** [1] - 11:19
**service** [1] - 51:10
**services** [2] - 42:13, 59:4
**Services** [2] - 64:4, 64:6
**set** [8] - 70:24, 76:6, 77:2, 77:11, 80:4, 84:17, 85:2, 85:6
**sets** [1] - 75:10
**settle** [1] - 36:18
**settlement** [49] - 6:23, 7:4, 7:8, 7:13, 8:4, 8:5, 8:12, 8:18, 10:17, 10:21, 11:7, 11:12, 11:16, 12:7, 12:21, 12:22, 13:25, 14:2, 14:9, 14:14, 15:16, 15:20, 16:24, 17:2, 18:5, 18:18, 25:10, 25:20, 26:2, 27:22, 28:4, 28:6, 28:12, 28:15, 28:23, 28:24, 29:1, 37:10, 38:20, 39:9, 39:13, 41:7, 41:13, 41:22,

42:1, 42:6, 42:9, 43:21, 64:14
**Settlement** [1] - 76:10
**settlements** [1] - 66:17
**settling** [10] - 27:7, 27:10, 27:12, 27:19, 27:21, 27:22, 28:6, 28:16, 28:23, 28:25
**several** [2] - 10:25, 29:23
**share** [7] - 32:10, 32:11, 32:12, 32:13, 32:15, 81:23, 109:25
**shareholder** [1] - 56:9
**shares** [11] - 51:16, 52:22, 52:25, 56:20, 56:21, 66:6, 66:10, 68:17, 82:2, 87:23
**SHEIKH** [1] - 27:15
**Sheikh** [8] - 3:10, 27:15, 27:17, 28:3, 28:12, 28:14, 28:18, 28:21
**shield** [1] - 50:24
**short** [2] - 44:13, 106:22
**shortly** [4] - 50:2, 54:6, 90:22, 91:7
**show** [2] - 76:2, 86:25
**showed** [2] - 7:21, 47:6
**showing** [3] - 42:9, 44:5, 45:9
**shows** [1] - 46:22
**sic** [1] - 22:5
**side** [1] - 72:15
**sidebar** [6] - 44:16, 44:17, 110:9, 110:11, 110:21, 110:24
**sign** [5] - 57:4, 63:25, 97:2, 97:4, 97:7
**signature** [11] - 3:11, 28:12, 28:13, 29:17, 29:18, 63:23, 65:19, 65:24, 65:25, 66:1
**signatures** [1] - 28:17
**signed** [9] - 10:25, 18:20, 18:21, 20:17, 49:20, 62:24, 65:9, 66:3, 67:5
**significance** [1] - 30:9
**significant** [1] - 109:10
**signing** [1] - 57:7
**similar** [2] - 85:19, 87:12
**simply** [1] - 37:14
**sister** [1] - 66:14

**sister-in-law** [1] - 66:14
**sit** [6] - 34:14, 40:1, 40:8, 40:22, 42:7, 42:11
**six** [5] - 23:14, 51:5, 92:22, 105:17
**six-month** [1] - 23:14
**skip** [1] - 34:21, 38:23
**slow** [2] - 61:1
**slowly** [1] - 75:22
**SMS** [1] - 8:15
**someone** [2] - 66:11, 81:8
**somewhere** [1] - 105:16
**sorry** [24] - 17:20, 22:25, 32:2, 32:6, 32:24, 34:25, 41:24, 43:13, 47:2, 48:22, 55:22, 58:6, 64:15, 64:17, 71:25, 83:24, 86:9, 88:15, 90:23, 90:24, 99:24, 100:8, 100:9, 106:2
**Sorry** [1] - 50:21
**SOUTHERN** [1] - 1:2
**Spaan** [1] - 112:20
**SPAAN** [3] - 1:23, 112:5, 112:19
**speaking** [2] - 20:23, 63:14, 84:16
**special** [1] - 30:9
**Special** [1] - 108:17
**specific** [2] - 21:7, 99:12
**specifically** [6] - 4:19, 20:23, 37:23, 43:4, 61:19, 83:21
**specified** [1] - 29:3
**specifying** [1] - 28:21
**speculation** [4] - 15:9, 18:7, 85:10, 95:5
**spell** [1] - 50:10
**Spring** [1] - 2:11
**spring** [3] - 49:5, 89:19, 89:23
**stamped** [1] - 110:13
**STANDBY** [1] - 2:16
**standing** [1] - 53:24
**start** [4] - 8:6, 32:24, 35:9, 62:16
**starting** [5] - 55:17, 67:15, 74:6, 87:19
**STATE** [1] - 112:4
**state** [4] - 26:24, 33:22, 35:4, 50:9
**State** [2] - 27:1, 27:16
**statement** [8] - 16:19, 16:22, 17:1, 42:9,

44:4, 49:7, 79:4
**statements** [1] - 108:6
**STATES** [2] - 1:1, 1:5
**States** [8] - 2:4, 2:5, 2:9, 2:10, 50:6, 112:6, 112:8, 112:13
**status** [2] - 101:19, 101:25
**stenographically** [1] - 112:10
**step** [1] - 26:12
**STEWARD** [2] - 2:17, 2:18
**Steward** [1] - 46:4
**still** [10] - 33:20, 40:3, 64:15, 71:10, 71:11, 75:17, 95:13, 95:16, 97:14, 102:16
**stipulate** [1] - 27:2, 27:3
**stipulated** [2] - 26:22, 27:15
**Stock** [1] - 81:17
**stock** [18] - 3:14, 3:15, 3:20, 3:22, 51:15, 51:18, 59:19, 59:20, 67:3, 67:8, 68:23, 70:2, 77:1, 78:15, 82:1, 82:3, 87:22, 87:25
**Stolper** [1] - 43:14
**Storie** [1] - 33:9
**Storie-Avenatti** [1] - 33:9
**STREET** [1] - 1:24
**Street** [2] - 2:6, 2:11
**stricken** [3] - 23:25, 59:11, 59:14
**strict** [1] - 47:24
**strike** [2] - 21:20, 23:23
**striking** [6] - 59:17, 61:5, 61:11, 61:19, 103:13, 103:14
**struck** [1] - 60:6
**structure** [1] - 61:7
**structured** [1] - 36:15
**struggles** [1] - 9:4
**subject** [8] - 10:10, 26:13, 55:20, 62:19, 79:19, 81:15, 91:22, 104:7
**submit** [1] - 108:18
**submitted** [2] - 29:15, 106:13
**subscription** [1] - 51:10
**subsequent** [7] - 28:1, 67:25, 68:15, 69:23, 81:25, 87:21, 88:7

**substance** [1] - 37:24
**substantive** [1] - 49:3
**success** [1] - 65:21
**sudden** [1] - 47:20
**suggested** [1] - 71:16
**suggests** [1] - 49:19
**suit** [1] - 53:25
**Suite** [3] - 2:6, 2:11, 2:19
**sunshine** [1] - 93:2
**supposed** [2] - 40:21, 93:4
**supposedly** [1] - 56:8
**surprise** [1] - 49:21
**sustained** [3] - 17:19, 24:15, 54:22
**swore** [1] - 20:2
**SWORN** [1] - 50:8
**sworn** [3] - 30:20, 33:13, 33:15
**system** [1] - 102:1

## T

**T-r-a-n** [1] - 50:11
**table** [1] - 56:11
**Tashchyan** [1] - 108:17
**tax** [4] - 83:6, 83:8, 83:12, 83:19
**taxes** [1] - 83:14
**team** [2] - 52:8, 89:8
**teen** [2] - 32:4, 32:5
**teens** [2] - 32:1, 32:3
**telephone** [1] - 60:21
**term** [2] - 15:1, 59:24
**terms** [4] - 57:8, 59:13, 78:15, 108:6
**testified** [6] - 18:18, 30:20, 33:14, 41:9, 76:4, 82:7
**testify** [1] - 109:11
**testimony** [11] - 13:19, 16:6, 18:24, 21:9, 30:5, 30:6, 30:23, 41:23, 47:12, 47:14, 109:12
**Texas** [1] - 53:15
**text** [32] - 3:23, 6:13, 6:25, 7:6, 7:11, 7:17, 8:9, 8:11, 8:19, 8:23, 90:1, 90:6, 90:16, 90:20, 93:10, 93:17, 93:19, 93:21, 94:8, 94:20, 94:23, 95:8, 96:2, 96:16, 96:25, 97:21, 98:18, 99:6, 101:15, 103:2, 104:11, 108:5
**text-messaging** [1] -

93:10
**THE** [134] - 2:3, 2:14, 3:3, 3:5, 4:14, 4:22, 5:3, 5:7, 5:10, 5:18, 5:20, 5:23, 5:25, 6:3, 6:7, 9:10, 9:11, 10:4, 10:6, 10:9, 12:1, 13:21, 13:22, 14:6, 14:7, 14:18, 14:19, 15:10, 15:11, 16:7, 16:8, 17:10, 17:11, 17:19, 18:9, 18:10, 18:14, 22:15, 22:16, 23:16, 23:17, 23:25, 24:15, 26:9, 26:12, 26:16, 30:1, 30:4, 34:21, 41:2, 41:6, 44:13, 44:16, 44:18, 44:21, 45:25, 46:7, 46:16, 47:3, 47:10, 48:5, 48:9, 48:21, 48:23, 49:2, 49:16, 49:25, 50:4, 50:7, 50:9, 50:11, 50:12, 50:13, 50:21, 50:22, 50:23, 54:1, 54:22, 58:22, 61:1, 61:2, 62:1, 62:7, 67:13, 69:7, 79:6, 81:1, 85:12, 85:13, 86:3, 86:6, 86:15, 86:16, 87:3, 87:16, 87:17, 88:13, 89:22, 89:23, 94:2, 95:6, 95:7, 99:16, 99:17, 99:23, 99:24, 101:9, 103:18, 103:25, 106:8, 106:17, 106:21, 107:1, 107:5, 107:7, 107:12, 107:14, 107:21, 108:1, 108:5, 108:11, 108:14, 108:20, 108:23, 109:2, 109:6, 109:16, 110:6, 110:17, 110:20, 110:25, 111:2, 111:5, 111:6
**thereafter** [1] - 27:12
**therefore** [1] - 45:22
**third** [4] - 66:21, 73:20, 78:12, 87:18
**thoughts** [2] - 110:1, 110:2
**three** [12] - 17:18, 27:25, 28:8, 56:2, 73:3, 73:7, 76:23, 78:10, 81:19, 82:14, 91:17, 94:20

**threshold** [1] - 70:25
**throughout** [1] - 16:15
**Thursday** [1] - 109:1
**tie** [1] - 53:25
**timing** [1] - 82:10
**Title** [1] - 112:8
**title** [1] - 51:23
**today** [5] - 53:21, 89:12, 91:25, 97:13, 100:16
**together** [1] - 65:21
**toll** [1] - 60:21
**tomorrow** [3] - 96:20, 96:23, 97:1
**Tong** [8] - 3:19, 3:21, 80:25, 81:8, 81:10, 85:18, 87:13, 88:11
**Tong's** [1] - 81:19
**took** [4] - 24:5, 76:5, 77:9, 107:17
**top** [24] - 12:13, 25:2, 55:18, 60:5, 63:9, 67:15, 69:10, 77:22, 77:25, 87:9, 87:12, 88:10, 88:17, 89:5, 90:16, 90:23, 90:24, 91:6, 92:22, 94:14, 97:9, 100:8, 100:11, 102:6
**total** [9] - 25:4, 27:23, 28:10, 31:9, 32:8, 70:8, 72:16, 74:24, 74:25
**toward** [1] - 82:24
**track** [4] - 102:12, 102:14, 105:13, 105:21
**tracking** [1] - 101:23
**TRAN** [2] - 3:5, 50:8
**Tran** [28] - 3:17, 3:18, 3:20, 3:23, 5:15, 5:24, 6:2, 44:11, 44:22, 44:25, 45:1, 45:22, 46:10, 46:13, 46:17, 46:19, 47:4, 47:7, 50:6, 50:11, 50:17, 55:4, 62:10, 80:23, 81:7, 92:2
**Transaction** [1] - 73:1
**transaction** [1] - 77:21
**transactions** [2] - 35:8, 35:9
**transcript** [4] - 4:10, 30:11, 112:9, 112:11
**TRANSCRIPT** [2] - 1:6, 1:14
**transcripts** [4] - 4:14, 5:1, 29:23, 29:25
**transfer** [7] - 29:2, 29:6, 29:8, 29:10,

29:12, 97:5, 99:4
**transferred** [1] - 30:23
**transfers** [2] - 41:15, 72:8
**transmission** [1] - 49:17
**transmittal** [1] - 45:8
**transmitted** [1] - 45:9
**traunch** [4] - 83:7, 83:9, 83:11, 85:15
**travel** [1] - 60:21
**traveling** [1] - 24:7
**treat** [1] - 30:7
**treated** [2] - 83:10, 83:18
**treatment** [3] - 83:6, 83:8, 83:12
**TRIAL** [1] - 1:8
**trial** [15] - 4:17, 45:13, 45:19, 45:22, 46:3, 46:12, 46:22, 46:24, 49:6, 49:7, 49:10, 49:24, 60:20, 109:12, 109:18
**trials** [1] - 60:19
**troubles** [1] - 11:19
**true** [5] - 20:16, 24:16, 26:21, 27:3, 112:9
**Trust** [1] - 76:10
**trust** [18] - 28:21, 29:2, 33:25, 34:3, 37:8, 39:12, 40:24, 42:18, 42:24, 70:17, 70:19, 71:7, 71:14, 82:22, 84:21, 89:3, 98:24, 106:15
**truth** [8] - 81:2, 86:2, 86:3, 86:7, 86:25, 87:4, 94:3, 94:5
**try** [2] - 8:5, 50:23
**trying** [2] - 37:14, 110:19
**Tucker** [1] - 7:1
**Tuesday** [6] - 45:7, 46:11, 106:11, 106:16, 107:12, 107:15
**turn** [11] - 55:12, 57:22, 65:12, 74:20, 78:18, 80:4, 90:25, 91:2, 91:11, 97:21, 100:6
**turning** [1] - 63:11
**twice** [1] - 17:18
**two** [19] - 4:13, 21:17, 27:9, 32:14, 38:1, 45:2, 53:6, 53:9, 68:4, 68:7, 68:8, 69:18, 70:6, 74:1, 75:10, 78:8, 109:25

**UNITED  STATES  DISTRICT  COURT**

**type** [1] - 49:2
**typically** [1] - 89:25

## U

**U.S** [1] - 1:3
**ultimately** [4] - 53:11, 53:16, 57:4, 66:17
**unaware** [1] - 47:7
**under** [27] - 4:23, 12:6, 15:1, 15:19, 16:2, 16:10, 16:24, 17:2, 20:2, 25:10, 25:19, 30:6, 30:8, 33:20, 34:24, 35:1, 41:16, 50:24, 56:13, 65:9, 67:22, 68:12, 72:20, 76:11, 77:18, 78:15
**understood** [3] - 22:17, 92:10, 110:7
**United** [8] - 2:4, 2:5, 2:9, 2:10, 50:6, 112:6, 112:8, 112:13
**UNITED** [2] - 1:1, 1:5
**unless** [2] - 6:15, 20:15
**up** [32] - 4:17, 10:10, 11:23, 25:2, 44:18, 47:21, 49:17, 55:2, 62:10, 69:10, 70:23, 71:21, 71:22, 72:6, 74:17, 75:17, 76:1, 76:8, 79:8, 81:5, 84:3, 84:6, 84:16, 85:21, 87:7, 90:11, 95:10, 95:12, 98:21, 102:11, 106:24, 107:14
**urgent** [2] - 98:3, 105:14
**US** [1] - 36:11
**usual** [1] - 57:21

## V

**vague** [1] - 99:21
**Valen** [7] - 80:25, 81:8, 81:10, 81:19, 85:18, 87:13, 88:11
**Valen's** [1] - 89:8
**value** [1] - 59:18
**Varani** [1] - 108:17
**various** [4] - 30:1, 30:2, 30:5, 43:24
**vendor** [3] - 35:11, 35:12, 35:13
**venued** [1] - 24:4
**verify** [1] - 56:11
**version** [8] - 20:2, 20:3, 44:24, 46:18,

61:22, 63:18, 63:20, 64:20
**versus** [1] - 33:9
**VI** [2] - 72:3, 72:4
**victim's** [2] - 4:25, 5:8
**violation** [3] - 45:20, 49:5, 49:12
**VOLUME** [1] - 1:9
**Volume** [5] - 55:5, 55:7, 55:8, 72:3, 72:4
**volume** [1] - 72:2
**vs** [3] - 1:7, 39:8, 43:21

## W

**wait** [3] - 62:12, 92:15, 100:9
**wants** [1] - 4:8
**WAS** [1] - 50:8
**watch** [1] - 7:12
**wearing** [1] - 53:24
**Wednesday** [2] - 104:17, 108:25
**week** [7] - 45:7, 82:5, 84:7, 88:1, 92:19, 105:12, 105:20
**weekend** [4] - 46:11, 106:10, 106:15, 111:4
**weeks** [1] - 105:17
**WEST** [1] - 1:24
**West** [1] - 2:6
**whereby** [1] - 38:21
**wire** [66] - 3:18, 4:19, 29:2, 29:6, 29:8, 29:10, 29:12, 39:8, 71:23, 72:8, 73:15, 73:20, 74:21, 76:23, 77:25, 78:4, 79:20, 80:2, 88:21, 91:8, 91:9, 91:24, 93:2, 93:3, 93:4, 94:17, 95:11, 95:12, 95:13, 95:17, 95:21, 95:24, 96:21, 96:23, 96:24, 97:1, 97:5, 97:7, 97:13, 97:14, 98:9, 98:15, 99:1, 99:4, 99:10, 99:13, 100:15, 100:17, 100:19, 100:25, 101:5, 101:12, 101:18, 101:21, 101:23, 102:3, 102:13, 102:15, 102:19, 104:8, 104:16, 105:13, 105:21, 106:1, 106:5

**Wire** [1] - 91:22
**wired** [4] - 39:11, 82:4, 88:1, 102:22
**wires** [9] - 72:16, 73:8, 76:14, 77:22, 90:24, 93:4, 95:14, 98:13, 98:23
**Wires** [2] - 72:9, 77:16
**wiring** [3] - 28:22, 92:11, 100:21
**wished** [1] - 44:11
**withdrawal** [2] - 25:4
**WITHDRAWN** [1] - 3:8
**witness** [12] - 4:8, 5:14, 10:3, 26:9, 30:8, 44:10, 44:12, 45:14, 47:20, 50:4, 54:2, 103:15
**WITNESS** [25] - 9:11, 13:22, 14:7, 14:19, 15:11, 16:8, 17:11, 18:10, 22:16, 23:17, 41:2, 41:6, 50:8, 50:11, 50:22, 61:2, 85:13, 86:16, 87:17, 89:23, 95:7, 99:17, 99:24, 103:18, 103:25
**witnesses** [3] - 47:20, 61:3, 107:9
**WITNESSES** [1] - 3:2
**Word** [3] - 57:21, 58:9, 58:12
**words** [1] - 30:10
**works** [3] - 52:9, 52:15, 52:17
**write** [10] - 89:9, 91:7, 94:15, 95:9, 97:12, 98:1, 98:5, 100:14, 102:9, 105:10
**writes** [1] - 98:3
**writing** [3] - 12:5, 66:22, 76:18
**written** [4] - 8:21, 28:4, 28:5, 74:16
**wrote** [2] - 7:20, 106:4
**WYMAN** [73] - 2:10, 4:16, 4:23, 5:4, 5:8, 5:12, 44:10, 44:15, 45:24, 46:1, 46:9, 46:20, 47:5, 48:8, 49:23, 50:2, 50:6, 50:14, 50:16, 50:25, 54:3, 54:23, 55:2, 55:9, 55:12, 58:18, 58:25, 61:5, 61:24, 62:9, 67:10, 67:15, 69:4, 69:10, 72:4, 78:24, 79:3, 79:8, 80:20, 80:23, 81:5,

85:14, 86:2, 86:4, 86:8, 86:17, 86:24, 87:6, 87:18, 88:14, 89:24, 90:11, 93:23, 94:7, 95:8, 98:21, 99:18, 99:25, 101:10, 103:16, 103:19, 104:1, 107:3, 107:8, 107:13, 107:16, 107:22, 108:4, 108:8, 108:13, 108:15, 108:21, 108:25
**Wyman** [6] - 3:5, 50:13, 107:2, 110:9, 110:12, 110:15

## X

**XXXX556** [1] - 29:4

## Y

**year** [2] - 44:25, 54:8
**yearly** [1] - 27:24
**years** [2] - 21:8, 51:5
**yes-or-no** [1] - 41:5
**York** [3] - 99:19, 99:20, 100:2
**yourself** [2] - 6:19, 53:5

## Z

**zero** [20] - 8:20, 8:21, 9:1, 9:11, 15:24, 18:10, 19:7, 19:8, 19:11, 19:14, 19:19, 19:20, 19:21, 19:22, 20:8, 20:11, 20:13, 20:18

**UNITED STATES DISTRICT COURT**