1

2

3

4              UNITED STATES DISTRICT COURT

5             CENTRAL DISTRICT OF CALIFORNIA

6                   SOUTHERN DIVISION

7                        - - -

8      THE HONORABLE JAMES V. SELNA, JUDGE PRESIDING

9

       UNITED STATES OF AMERICA,      )CERTIFIED TRANSCRIPT
10                        Plaintiff,  )
            vs.                       )
11                                    )  SACR-19-00061-JVS
       MICHAEL JOHN AVENATTI,         )
12                        Defendant.  )TRIAL DAY 20, VOL. 1
       ------------------------------)
13

14

15        REPORTER'S TRANSCRIPT OF PROCEEDINGS

16               Santa Ana, California

17                August 13, 2021

18

19                    SHARON A. SEFFENS, RPR
                      United States Courthouse
20                    411 West 4th Street, Suite 1-1053
                      Santa Ana, CA  92701
21                    (714) 543-0870

22

23

24

25

1   APPEARANCES OF COUNSEL:

2   For the Plaintiff:

3   NICOLA T. HANNA
    United States Attorney
4   BRANDON D. FOX
    Assistant United States Attorney
5   Chief, Criminal Division
    ALEXANDER WYMAN
6   Assistant United States Attorney
    Major Frauds Section
7   1100 United States Courthouse
    312 North Spring Street
8   Los Angeles, CA  90012
    (213) 894-6683
9
    BRETT A. SAGEL
10  Assistant United States Attorney
    Ronald Reagan Federal Building
11  411 West Fourth Street, Suite 8000
    Santa Ana, CA  92701
12  (714) 338-3598

13  For the Defendant:

14  MICHAEL JOHN AVENATTI, PRO SE

15  H. DEAN STEWARD, ADVISORY COUNSEL
    H. DEAN STEWARD LAW OFFICES
16  107 Avenida Miramar, Suite C
    San Clemente, CA  92672
17  (949) 481-4900

18

19

20

21

22

23

24

25

```
1

2                            I-N-D-E-X

3

4    PLAINTIFF'S
     WITNESSES:              DIRECT   CROSS   REDIRECT   RECROSS
5
     JOHN DRUM
6      (Continued)            23       84

7    PLAINTIFF'S
     EXHIBITS:                               MARKED     RECEIVED
8
     Exhibit 359                                          46
9    Exhibit 382                                          46
     Exhibit 371                                          54
10
     DEFENSE
11   WITNESSES:      DIRECT   CROSS   REDIRECT   RECROSS

12    (None)

13   DEFENSE
     EXHIBITS:                               MARKED     RECEIVED
14
     Exhibit 1080                             85
15

16

17

18

19

20

21

22

23

24

25
```

|       |    |                                                                        |
|-------|----|------------------------------------------------------------------------|
|       | 1  | SANTA ANA, CALIFORNIA; FRIDAY, AUGUST 13, 2021; 8:31 A.M.               |
| 08:22 | 2  | (Jury present)                                                         |
| 08:31 | 3  | THE CLERK:  Item 1, SACR-19-00061-JVS, United                         |
| 08:31 | 4  | States of America versus Michael John Avenatti.                        |
| 08:31 | 5  | MR. SAGEL:  Good morning, Your Honor.  Brett Sagel                     |
| 08:31 | 6  | and Alexander Wyman on behalf of the United States.  And at            |
| 08:31 | 7  | counsel table is Special Agent Remoun Karlous.                         |
| 08:31 | 8  | THE COURT:  Good morning.                                             |
| 08:31 | 9  | MR. AVENATTI:  Good morning, Your Honor.  Michael                     |
| 08:31 | 10 | Avenatti, present with Mr. Dean Steward and                            |
| 08:31 | 11 | Ms. Cummings-Cefali.                                                   |
| 08:31 | 12 | THE COURT:  Good morning.                                             |
| 08:31 | 13 | I received several filings overnight, two relating                     |
| 08:32 | 14 | to witness one.  It would appear to me if she doesn't have a            |
| 08:32 | 15 | fever, under the ground rules laid out by the CDC, she                  |
| 08:32 | 16 | should be free to testify and is safe to testify.                      |
| 08:32 | 17 | Thoughts?                                                              |
| 08:32 | 18 | MR. SAGEL:  Currently we don't disagree.  What we                     |
| 08:32 | 19 | figured, especially in light of the defense case not                   |
| 08:32 | 20 | starting until next week, is we would reach out to her                 |
| 08:32 | 21 | probably on Sunday or Monday and find out if she has any                |
| 08:32 | 22 | symptoms.                                                              |
| 08:32 | 23 | If not, then we would proceed.  If she does, we                       |
| 08:32 | 24 | can file on Monday anything in response to the confrontation           |
| 08:32 | 25 | clause that Your Honor had asked if it becomes necessary               |

08:32   1   that she could not testify in person.

08:32   2           THE COURT:  Mr. Avenatti.

08:32   3           MR. AVENATTI:  Your Honor, I want to note

08:32   4   something for the record because I think it's important.  We

08:32   5   subpoenaed the witness.  Instead of responding to us, the

08:32   6   witness reaches out to the government, is now in regular

08:33   7   communication with the government about whether she is going

08:33   8   to respond to the subpoena that we served her with.

08:33   9           The government, from what I can tell, is not

08:33   10  representing her but is in regular contact with her and is

08:33   11  almost acting -- almost, if not acting, you know, as an

08:33   12  advocate for the witness.  So this is rather bizarre to me.

08:33   13  I don't understand it.

08:33   14          So I don't know why we are proceeding through

08:33   15  Mr. Sagel and the government relating --

08:33   16          THE COURT:  Sir, the issue before the Court is the

08:33   17  conditions in bringing witness number one.  Do you have any

08:33   18  further comments on that?

08:33   19          MR. AVENATTI:  Other than what I filed, no, sir.

08:33   20          THE COURT:  Okay.  Well, let's see what her

08:33   21  situation is on Monday and proceed accordingly.

08:34   22          The government filed its response to

08:34   23  Mr. Avenatti's motion for a mistrial based on alleged

08:34   24  failure to comply with Federal Rule of Evidence 615.  The

08:34   25  government filed its opposition last night.

| | | |
|---|---|---|
| 08:34 | 1 | Do you want to address that, Mr. Avenatti? |
| 08:34 | 2 | MR. AVENATTI:  Yes, sir. |
| 08:34 | 3 | The government has conflated and confused the |
| 08:34 | 4 | timeline of what happened in connection with this case.  The |
| 08:34 | 5 | government raised no other objections other than Touhy prior |
| 08:34 | 6 | to those subpoenas being quashed by the Court, and then the |
| 08:34 | 7 | government proceeded to purposely have the agents in the |
| 08:34 | 8 | courtroom. |
| 08:34 | 9 | There is no finding by the Court that they were |
| 08:34 | 10 | necessary to the government's case.  The government did not |
| 08:34 | 11 | seek that finding or anything of that nature. |
| 08:34 | 12 | And, Your Honor, I also, as we pointed out in our |
| 08:35 | 13 | papers -- and I think this is very important -- two weeks |
| 08:35 | 14 | before the government told Your Honor that Touhy precluded |
| 08:35 | 15 | me from subpoenaing the agents, Mr. Steward provided the |
| 08:35 | 16 | Bahamonde case to the government.  He asked for any contrary |
| 08:35 | 17 | authority.  No contrary authority was presented because |
| 08:35 | 18 | there is no contrary authority because Touhy does not apply |
| 08:35 | 19 | in the Ninth Circuit.  That is clear. |
| 08:35 | 20 | Despite that knowledge, the government then -- |
| 08:35 | 21 | Mr. Sagel represented to Your Honor that Touhy precluded the |
| 08:35 | 22 | subpoenas without informing Your Honor of Bahamonde, which |
| 08:35 | 23 | led Your Honor to commit reversible error.  Then we file a |
| 08:35 | 24 | motion for reconsideration pointing out that the government |
| 08:35 | 25 | had led the Court astray. |

08:35  1          THE COURT:  Having presented to the Court for the

08:35  2   first time Bahamonde, evidence -- authority that would

08:35  3   support the proposition that Touhy doesn't apply in criminal

08:36  4   cases.

08:36  5          MR. AVENATTI:  That's correct, Your Honor.

08:36  6   Although, if you go back and you look at the transcript of

08:36  7   that morning when you quashed the subpoena, I attempted to

08:36  8   explain Bahamonde or the existence of Bahamonde.  I was cut

08:36  9   off by Your Honor.  I was told just answer the question.

08:36  10  Did you comply with Touhy?  It was something along those

08:36  11  lines.

08:36  12         THE COURT:  Right.

08:36  13         MR. AVENATTI:  And I answered Your Honor's

08:36  14  question because I know that Your Honor is not happy when

08:36  15  lawyers doesn't answer Your Honor's question.

08:36  16         THE COURT:  And it doesn't matter who the lawyer

08:36  17  is either.

08:36  18         MR. AVENATTI:  Understood, Your Honor.  I'm not

08:36  19  saying that it does.  Had I been provided an opportunity, I

08:36  20  would have informed the Court about Bahamonde.  But the

08:36  21  point is this, Your Honor --

08:36  22         THE COURT:  Sir, you could have always filed it

08:36  23  and brought it to the Court's attention that way.

08:36  24         MR. AVENATTI:  Well, Your Honor, I did file it.  I

08:36  25  filed a motion for reconsideration.  But let's be clear

08:36  1    about something.  Two weeks prior, both U.S. attorneys were

08:37  2    informed about Bahamonde, and the authority could not be

08:37  3    more clear.  There is no subsequent authority that even

08:37  4    calls it into question.

08:37  5              Knowing that, full knowledge, Mr. Sagel stood up

08:37  6    before Your Honor and said you have to quash the subpoenas

08:37  7    because of Touhy.  That's not proper, Your Honor.  He knew

08:37  8    about Bahamonde.  He led the Court astray purposely.

08:37  9              THE COURT:  Sir, I appreciate your point.

08:37  10             MR. AVENATTI:  All right.  And then lastly, Your

08:37  11   Honor, he compounded it by having the agents remain in the

08:37  12   courtroom.  That was not an accident.  It was not good-faith

08:37  13   reliance on an order from the Court.  He knew he had gotten

08:37  14   away with one.

08:38  15             And then he took advantage of it, and that is not

08:38  16   proper, Your Honor.  He knew about 615.  He knew exactly

08:38  17   what we were doing, and he knew that we were right.  And for

08:38  18   that reason, Your Honor, the motion should be granted.

08:38  19             THE COURT:  Well, I agree with you that if the

08:38  20   government was aware of contra authority it certainly would

08:38  21   have been a better course to have brought that to my

08:38  22   attention.

08:38  23             Nevertheless, I'm going to deny the motion.

08:38  24   Clearly under Robertson, the rule is to cross-examine the

08:38  25   witnesses.  Moreover, in its opposition, the government

08:38   1   raises potential technical defects in the subpoenas

08:38   2   themselves in that they are not sealed and signed, so query

08:38   3   whether those subpoenas which the government attaches to its

08:38   4   opposition at Docket 691 were valid.

08:38   5           MR. AVENATTI:  Your Honor, my understanding is

08:39   6   that when they were served on the agents they had the seal

08:39   7   and the signature.  That's my understanding.

08:39   8           THE COURT:  Okay.

08:39   9           MR. AVENATTI:  But that is a technical issue that

08:39   10  was not raised until well after the fact.  That was not the

08:39   11  reason for the -- and there's no question about this.

08:39   12  That's not the reason why the subpoenas were quashed.  They

08:39   13  were quashed because of the belief that Touhy applied.

08:39   14          THE COURT:  Correct.

08:39   15          MR. AVENATTI:  And, Your Honor, let me just say

08:39   16  this about the cross-examination issue.  I don't believe

08:39   17  that's the rule, and here is why.  It doesn't make any

08:39   18  sense, Your Honor.  If that was the case --

08:39   19          THE COURT:  Is Robertson incorrectly decided?

08:39   20          MR. AVENATTI:  Your Honor, I think Robertson was

08:39   21  inartfully worded -- let me put it that way -- for this

08:39   22  reason --

08:39   23          THE COURT:  I don't agree with that.

08:39   24          MR. AVENATTI:  Well, for this reason, Your

08:39   25  Honor --

08:39    1          THE COURT:  I read the relevant passage into the
08:39    2   record twice.  I don't think Robertson could be clearer as
08:39    3   to what the remedy is absent extraordinary circumstances.
08:40    4          MR. AVENATTI:  Your Honor, I think at best for the
08:40    5   government it is fact specific as to what happened in that
08:40    6   case.  But let me just make this point.  It cannot be the
08:40    7   law that a witness can purposely violate 615 and then the
08:40    8   entire remedy is, well, you can just cross-examine the
08:40    9   witness about the fact that they listened to the prior
08:40   10   testimony.
08:40   11          It renders 615 basically a nullity.  It renders
08:40   12   615 useless, and it undercuts the long line of cases and
08:40   13   jurisprudence about the existence of 615, which is -- the
08:40   14   concept has been around since biblical times.
08:40   15          I mean, it is well established in the law.  It
08:40   16   would be render 615 a nullity.  Everybody could just sit in
08:40   17   the courtroom, and you could call them to the stand, and you
08:40   18   get to cross-examine them, and that's it.  It doesn't make
08:40   19   any sense, Your Honor.
08:40   20          THE COURT:  Sir, I have your position.
08:40   21          MR. AVENATTI:  Thank you.
08:40   22          THE COURT:  I'm denying the motion.  I'm following
08:40   23   Robertson, which I believe is directly on point.
08:41   24          MR. AVENATTI:  Thank you.
08:41   25          THE COURT:  The government made a filing at Docket

08:41   1   690 with regard to communications between the government and

08:41   2   Mr. Armenta.  Three documents were produced, and both appear

08:41   3   to summarize the substance of their testimony.  The

08:41   4   government identified two additional documents which it

08:41   5   attaches to the filing at 691.

08:41   6          I don't believe they have anything, certainly the

08:41   7   last one.  Exhibit 5 doesn't have anything, and Exhibit 4

08:41   8   notes that certain prefixes to the transfer numbers were

08:41   9   missing and incomplete.  To me, that's of very little

08:42   10  substance.

08:42   11         Mr. Avenatti.

08:42   12         MR. AVENATTI:  Well, I respectfully disagree, Your

08:42   13  Honor.  We will file something over the weekend relating to

08:42   14  the seriousness of this issue, because it is a very serious

08:42   15  issue, and it brings --

08:42   16         THE COURT:  Sir, am I incorrect that the only

08:42   17  thing of substance is the correction of the wire number in

08:42   18  Exhibit No. 4?

08:42   19         MR. AVENATTI:  Yes, sir.

08:42   20         THE COURT:  Okay.

08:42   21         MR. AVENATTI:  And I'll put it in writing and

08:42   22  explain why.

08:42   23         THE COURT:  Okay.

08:42   24         MR. AVENATTI:  Thank you.

08:42   25         I will also note, Your Honor, but for my question

08:42    1    we would have never received any of the e-mails.

08:42    2            THE COURT:  Sir, you received them; didn't you?

08:42    3            MR. AVENATTI:  I'm talking about the e-mails, Your

08:42    4    Honor, not the interview memorandum.

08:43    5            THE COURT:  All right.

08:43    6            MR. AVENATTI:  Okay.  And it's not my job to ask

08:43    7    witnesses on the stand as to whether Jencks materials exist

08:43    8    so that I can then bring it the attention of Your Honor.

08:43    9            THE COURT:  It may not be your job, but it's

08:43   10    certainly your prerogative if you have an ongoing suspicion

08:43   11    that the government has not complied with its Jencks

08:43   12    obligation with respect to virtually every single witness's

08:43   13    testimony.  So it's not your obligation, but it's certainly

08:43   14    your prerogative, and you're exercising it.

08:43   15            MR. AVENATTI:  Understood, Your Honor.  But,

08:43   16    again, it's not something that I should be required to do.

08:43   17    It is not my job to prove that the government is not

08:43   18    complying with their obligation.  I will submit the filing

08:43   19    and explain why this raises a whole host of issues because

08:43   20    it demonstrates, Your Honor, that they are not doing what

08:43   21    they are supposed to do relating to looking for Jencks.  I

08:43   22    will explain it in my brief.

08:43   23            THE COURT:  Very good.

08:43   24            I think we are waiting for the government's

08:43   25    opposition on Bahamonde.  I think we agree with regard to

08:44    1    Ms. Gardner's reviewing of the tweets.  I think that's the

08:44    2    only outstanding matter we have to address.

08:44    3            MR. AVENATTI:  Your Honor, do you need any further

08:44    4    submission relating to the tweets from us?

08:44    5            THE COURT:  No, I don't think so.

08:44    6            MR. AVENATTI:  Okay.

08:44    7            THE COURT:  I mean, the major thing that you put

08:44    8    before the Court with that filing is Exhibit B, which may be

08:44    9    a more wholesome record of what was out there.  I think

08:44   10    there is still a question in my mind of how many of those

08:44   11    did Ms. Gardner actually see.  But I appreciate the

08:44   12    expansion of the record as to what was out there.

08:44   13            MR. AVENATTI:  Fair enough.

08:44   14            THE COURT:  Okay.

08:44   15            MR. SAGEL:  For clarity's sake on a couple of

08:44   16    matters from I believe it was yesterday morning, I think

08:45   17    Your Honor had asked for a proffer from the defendant

08:45   18    relating to three individuals, the two SDNY agents and

08:45   19    Mr. Varani.

08:45   20            THE COURT:  He made the proffer for Mr. Varani

08:45   21    before we resumed after lunch yesterday.

08:45   22            MR. SAGEL:  And I didn't think if it was just

08:45   23    Mr. Varani.

08:45   24            THE COURT:  I thought I indicated that.

08:45   25            MR. SAGEL:  So where do we stand on the other two

| | | |
|---|---|---|
| 08:45 | 1 | individuals?  Obviously they're putting their jobs on hold |
| 08:45 | 2 | pending being called and traveling cross country.  What's |
| 08:45 | 3 | the time frame for him to submit the proffer on the other |
| 08:45 | 4 | two?  Obviously our request would be as soon as possible. |
| 08:45 | 5 | MR. AVENATTI:  Your Honor, what I would like to do |
| 08:45 | 6 | in the interest of time is come back at 1:15 today and |
| 08:45 | 7 | provide an oral proffer. |
| 08:45 | 8 | THE COURT:  I can't do that.  I need the full |
| 08:45 | 9 | lunch hour today. |
| 08:46 | 10 | MR. AVENATTI:  I'm sorry? |
| 08:46 | 11 | THE COURT:  I need the full lunch hour today.  How |
| 08:46 | 12 | about the end of the day? |
| 08:46 | 13 | MR. AVENATTI:  Can I do the proffer at the end of |
| 08:46 | 14 | the day? |
| 08:46 | 15 | THE COURT:  Sure. |
| 08:46 | 16 | MR. AVENATTI:  Okay.  Thank you. |
| 08:46 | 17 | MR. SAGEL:  Not to put a further burden on the |
| 08:46 | 18 | Court, but is there a possibility or an opportunity for us |
| 08:46 | 19 | to know subsequent to that some kind of a decision so that |
| 08:46 | 20 | we can let the agents know prior to the weekend whether or |
| 08:46 | 21 | not they are potentially flying out here on Monday? |
| 08:46 | 22 | THE COURT:  I will have Ms. Bredahl contact you. |
| 08:46 | 23 | MR. SAGEL:  Thank you, Your Honor. |
| 08:46 | 24 | Generally speaking, all we need to know is to tell |
| 08:46 | 25 | them to be here or not to be here. |

08:46  1          THE COURT:  Right.

08:46  2          MR. SAGEL:  With regards to Special Agent Galicia,

08:46  3  she is in a slightly different category, what would be

08:46  4  closer to the Harper category and Penland, just whether or

08:46  5  not there is admissible evidence, because we understand Your

08:47  6  Honor's ruling from the other day.

08:47  7          THE COURT:  Okay.

08:47  8          MR. SAGEL:  Thank you, Your Honor.

08:47  9          THE COURT:  Mr. Avenatti.

08:47  10         MR. AVENATTI:  Your Honor, I had two issues.

08:47  11  Number one is, is Mr. Drum the government's last witness?

08:47  12         MR. WYMAN:  Yes, Your Honor.

08:47  13         MR. AVENATTI:  Number two, where is the Tabs data?

08:47  14  I just need a Bates stamp number.  I don't need to argue

08:47  15  this point.  I just want the government to provide the Bates

08:47  16  stamp number for the Tabs data which they have had for

08:47  17  two-and-a-half years.

08:47  18         MR. SAGEL:  Would you like me to respond to that,

08:47  19  Your Honor?

08:47  20         THE COURT:  Please.

08:47  21         MR. SAGEL:  Defendant, as he wants to do, starts

08:47  22  talking about how critical items are and how important they

08:47  23  are and what the government does and doesn't have.

08:48  24         THE COURT:  Well, the question is has the

08:48  25  government produced that data, or, more importantly, does

08:48    1    the government have that data?

08:48    2                MR. SAGEL:  I will start with the obvious.

08:48    3    Everything that is in the prosecution team's possession he

08:48    4    has.

08:48    5                THE COURT:  Does the government have the Tabs

08:48    6    data?

08:48    7                MR. SAGEL:  Other than what's attached to e-mails

08:48    8    and, for example, has come into evidence -- there are places

08:48    9    where we see it where it's attached to things.  I'm not

08:48   10    seeing anything where it's the database by itself.

08:48   11                So the answer is that what we have of it and what

08:48   12    Judy Regnier testified to like that e-mail for Johnson, the

08:48   13    e-mail for Barela, those are from their Tabs database.  We

08:48   14    don't have anything separate.  So anything that we have, we

08:48   15    have provided to him.

08:48   16                The one thing that I went back to look for between

08:48   17    the last time and --

08:48   18                THE COURT:  So you don't have a parallel to the --

08:48   19                MR. SAGEL:  QuickBooks?

08:48   20                THE COURT:  Right.

08:48   21                MR. SAGEL:  Correct.  And what I could say with

08:49   22    regards to the QuickBooks, there was a separate thing that

08:49   23    Judy Regnier at her house when they were doing the search

08:49   24    warrant showed them where on her computer the QuickBooks was

08:49   25    kept.  So that was taken off of her computer.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

08:49 | 1    I don't believe that -- I don't know this because
08:49 | 2  I'm not the one doing any of it, and it's all on the taint
08:49 | 3  side, but I'm not sure the QuickBooks ever came off of the
08:49 | 4  server.  It came off of Judy Regnier's computer at her
08:49 | 5  house.  I at least know that's one place where it came from.
08:49 | 6    With regard to the Tabs, I don't know where -- if
08:49 | 7  it even exists and so forth.  So I don't know about the
08:49 | 8  extractions.  We don't have anything in our database
08:49 | 9  separate of Tabs and so forth.
08:49 | 10    What I did go back and look at is -- as Your Honor
08:49 | 11  will recall -- and I can give some of the docket numbers.
08:49 | 12  Starting at Docket 50 was the first time defendant asked for
08:49 | 13  access to the Eagan Avenatti servers and what he wanted.  At
08:49 | 14  no point did he mention Tabs, his need for Tabs, or anything
08:50 | 15  like that.
08:50 | 16    He had access as Your Honor knows.  He went
08:50 | 17  physically to the IRS CI offices where the servers were
08:50 | 18  re-set up for him and got upwards of 40,000 to 60,000 files
08:50 | 19  from the servers.  If they were critical, he, who knows of
08:50 | 20  his servers, could have gotten them at that point and had
08:50 | 21  access to his servers, which we did not.
08:50 | 22    Then after having multiple opportunities to get to
08:50 | 23  the servers, get files from the servers and get reports from
08:50 | 24  the servers, he doesn't contact us or the IRS or anybody for
08:50 | 25  any other files for I think it was about eight more months.

08:50   1           At that point, he asked for after he had already

08:50   2   had everything we had produced in February, which is both

08:50   3   the taint and the non-taint material, we provided everything

08:50   4   that we received I think it was in May.  And in July, maybe

08:50   5   June, June of 2020, he files his next motion of how he wants

08:51   6   to have access to the Eagan Avenatti servers after we had

08:51   7   already produced everything that we got through discovery.

08:51   8           Not only does he not mention Tabs at all, but in

08:51   9   our response, which was at 195, we attached the documents

08:51   10  saying here are the financials that we have and the costs

08:51   11  and expenses we have.  And we even attached the very e-mails

08:51   12  and documents, the Tabs related to Mr. Barela, related to

08:51   13  Mr. Johnson, QuickBooks files that related to them as well,

08:51   14  showing there are financial records in our production.

08:51   15  These are them.  What we have has been produced.

08:51   16          At no point did he say, no, there's Tabs.  There

08:51   17  is something else.  We even said in our filing if there is

08:51   18  something specific that he thinks he doesn't have, we can

08:51   19  address that.  He also has other options.  He could have

08:51   20  done other things himself.

08:52   21          THE COURT:  He could have subpoenaed the trustee,

08:52   22  the records of the trustee.

08:52   23          MR. SAGEL:  He could even do that right now under

08:52   24  a 17(c) subpoena that's not a fishing expedition, which is a

08:52   25  specific subpoena for specific documents if they're

08:52    1    critical.  There are many things he can do.  And while he

08:52    2    can say time and time the government hasn't done it, at no

08:52    3    point can he show why we have this Tabs data.

08:52    4              I'd also point out that it doesn't even make

08:52    5    sense, because according to him, he took out his costs and

08:52    6    fees and expenses from Mr. Johnson based on exactly the Tabs

08:52    7    data that was there even if they weren't correct.  And then

08:52    8    he tells Mr. Johnson three years later, four years later, he

08:52    9    still owes him 1.9.  So it's not like there's 2 million less

08:52   10    of costs and expenses coming out of that.  It's the same

08:52   11    thing with Barela.  For two of the clients, there aren't

08:52   12    even any costs or expenses that he has.

08:53   13              Anything and everything we have, we have produced.

08:53   14    If there was something else, he has had more than sufficient

08:53   15    opportunities to get them.

08:53   16              MR. AVENATTI:  Your Honor, there has been a number

08:53   17    of representations just made to this Court that are not

08:53   18    accurate, and I'm going to explain why.

08:53   19              The government executed a search warrant relating

08:53   20    to the law firm servers.  They obtained images of the law

08:53   21    firm servers.  I believe included within those law firm

08:53   22    servers is the Tabs database.  There was never any privilege

08:53   23    issue relating to the Tabs database.  The government had an

08:54   24    obligation under Rule 16, Brady and Giglio, to produce the

08:54   25    Tabs database.  It was never produced.

08:54  1      We have consistently in this case filed motions

08:54  2  requesting all of the cost and expense data for each of the

08:54  3  clients.  The government had an obligation to produce it.

08:54  4  They didn't do so.

08:54  5      Ms. Regnier testified, Your Honor, under oath that

08:54  6  she made the government aware of the Tabs data on multiple

08:54  7  occasions.  For whatever reason, they still didn't produce

08:54  8  it to us even though they were aware of the Tabs data.  They

08:54  9  had an obligation to produce it.

08:54  10      Now, let's talk about my access to the servers,

08:54  11  because what has just been represented to Your Honor is just

08:54  12  not accurate.  The government did not make the entirety of

08:54  13  the servers available and say, Mr. Avenatti and Mr. Steward,

08:54  14  whatever you want from the servers you can just come in and

08:55  15  get.  That's not what happened, and the record is clear in

08:55  16  that regard.

08:55  17      Here is what happened.  The IRS made the e-mails

08:55  18  available to me and Mr. Steward, the e-mails from the

08:55  19  servers and documents from client files like pleadings and

08:55  20  correspondence and things of that nature.  That's the only

08:55  21  thing that the government made available to me and

08:55  22  Mr. Steward.

08:55  23      The government then fought our ability to have

08:55  24  additional access to other files on the servers.  And, Your

08:55  25  Honor, I'm going to make a filing on this just so we have a

08:55  1  clear record.  Mr. Sagel represented to Your Honor

08:55  2  repeatedly in connection with the server issue -- you asked

08:55  3  actually I think it was on June 6th -- I may be wrong --

08:55  4  June 6th of 2020 or thereabouts -- I looked at the

08:55  5  transcript last night.  You specifically asked Mr. Sagel or

08:55  6  it may have been Mr. Andre:  Has all of the Brady and Giglio

08:56  7  information from the servers been produced?  That's what you

08:56  8  asked.  You were told yes.

08:56  9          THE COURT:  I was told yes on multiple occasions.

08:56  10         MR. AVENATTI:  Correct.  And, Your Honor, that was

08:56  11 not true.  They knew about the Tabs data.  The database is

08:56  12 on the servers.  They didn't produce the database of the

08:56  13 costs.  It's been a consistent defense in this case that I

08:56  14 was entitled to deduct fees and costs and that the wire

08:56  15 counts -- I can't be convicted criminally if I am accused of

08:56  16 taking money that I was otherwise entitled to because it

08:56  17 constituted fees and costs.  That has been a consistent

08:56  18 defense, Your Honor.

08:56  19         We have repeatedly in filings before this Court,

08:56  20 repeatedly we have said we don't have all the cost and fee

08:56  21 information.

08:56  22         THE COURT:  Sir, I have your position.  It's about

08:56  23 time to bring the jury in.

08:56  24         MR. AVENATTI:  I would like to have the

08:57  25 opportunity, because this is an important issue, to file

08:57    1    something over the weekend with the Court.

08:57    2         THE COURT:  You are welcome to do that.

08:57    3         MR. AVENATTI:  Thank you.  So I would like the

08:57    4    Court to reserve judgment at this point on this issue, but I

08:57    5    think it is now established that there is no Bates stamp

08:57    6    number for the Tabs database because we were never provided

08:57    7    the Tabs database.

08:57    8         THE COURT:  And the government represents that it

08:57    9    does not have it in its inventory of documents that the

08:57   10    prosecution team has.

08:57   11         MR. AVENATTI:  Well, Your Honor, we can have a

08:57   12    debate as to when they say we don't have it.  I don't know

08:57   13    what "we" is.  I don't know if we're talking --

08:57   14         THE COURT:  "We" is the prosecution team as I

08:57   15    understand Mr. Sagel's statement.

08:57   16         MR. AVENATTI:  But that's not the standard under

08:57   17    Brady and Giglio.  It's not.  It's not limited to the three

08:57   18    gentlemen sitting at the table.  We know that.  It's not

08:57   19    limited to those individuals.  It's just not.

08:57   20         THE COURT:  Very good, sir.

08:57   21         MR. AVENATTI:  Thank you.

08:57   22         THE COURT:  Okay.  We will be in recess briefly.

08:58   23              (Recess taken at 8:58 a.m.;

08:58   24               proceedings resumed at 9:05 a.m.)

08:58   25              (Jury present)

09:05   1           THE CLERK:  Item 1, SACR-19-00061-JVS, United

09:05   2  States of America versus Michael John Avenatti.

09:05   3           MR. WYMAN:  Good morning, Your Honor.  Alex Wyman

09:05   4  and Brett Sagel on behalf of the United States.  And with us

09:05   5  at counsel table is Special Remoun Karlous.

09:05   6           THE COURT:  Good morning.

09:06   7           MR. AVENATTI:  Good morning, Your Honor.  Michael

09:06   8  Avenatti, present with Mr. Dean Steward and

09:06   9  Ms. Cummings-Cefali.  Ms. Hernandez will be joining us

09:06  10  probably after the morning break.

09:06  11           THE COURT:  Very good.

09:06  12           Good morning, ladies and gentlemen.

09:06  13           THE JURY:  Good morning.

09:06  14           THE COURT:  Mr. Wyman.

09:06  15      JOHN DRUM, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

09:06  16           DIRECT EXAMINATION (Continued)

09:06  17  BY MR. WYMAN:

09:06  18  Q    Good morning, Mr. Drum.

09:06  19  A    Good morning.

09:06  20  Q    If you could please pull up Exhibit 48.

09:06  21        Do you recall yesterday afternoon, Mr. Drum, we

09:06  22  were discussing Exhibit 48, the spreadsheet that Judy

09:06  23  Regnier e-mailed to defendant?

09:06  24  A    Yes.

09:06  25  Q    And at the end of the calculations there, there was

09:06  1   that total amount for costs and expenses related to

09:06  2   Mr. Johnson's case, which is now on the screen, for about

09:06  3   $736,000.  Do you remember that?

09:06  4   A    Yes.

09:06  5   Q    And I believe your testimony was that this number was

09:06  6   higher than your figure because this included some double

09:06  7   counting?

09:07  8   A    Correct.

09:07  9   Q    Generally speaking, what records did you rely on in

09:07 10   determining whether the payments reflected in this

09:07 11   spreadsheet were actually paid?

09:07 12   A    I relied on the case-related spreadsheet, the

09:07 13   QuickBooks records, as well as the settlement agreement with

09:07 14   the County of L.A.

09:07 15   Q    Did you also review the underlying bank records?

09:07 16   A    Yes.

09:07 17        MR. AVENATTI:  Leading.

09:07 18        THE COURT:  Overruled.

09:07 19   BY MR. WYMAN:

09:07 20   Q    If we could please go back to Exhibit 420 now.  Once

09:07 21   you did your calculation using QuickBooks, that spreadsheet,

09:07 22   and the banks records, what was the total amount that you

09:07 23   calculated for case-related expenses for Mr. Johnson's case?

09:07 24   A    $543,062.

09:07 25   Q    Does that include just Eagan Avenatti's costs and

09:08   1   expenses?

09:08   2   A    Yes.

09:08   3   Q    So if there was a co-counsel on the matter who incurred

09:08   4   approximately $2,776 in expenses, what would the total

09:08   5   amount of Johnson-related expenses be approximately?

09:08   6   A    Approximately 545,700.

09:08   7   Q    The row right below that, what does that say?

09:08   8   A    Total due to client as of January 29th, 2015.

09:08   9   Q    And what is the number listed there?

09:08   10   A    $1,856,938.

09:08   11   Q    How did you calculate that figure?

09:08   12   A    That is the $4 million total settlement amount paid on

09:08   13   1/29/15, minus the $1.6 million in legal fees, minus the

09:08   14   $543,000 for case-related expenses.

09:08   15   Q    And so if you factor in an additional $2,776 in

09:08   16   co-counsel expenses, would that reduce the amount in this

09:09   17   row by a corresponding amount?

09:09   18   A    Yes, it would.

09:09   19   Q    And then lastly, what does the last line on this chart

09:09   20   reflect?

09:09   21   A    It reflects that none of the amounts that were

09:09   22   deposited into the client trust account were paid to

09:09   23   Geoffrey Johnson.

09:09   24   Q    Could you please go now to Exhibit 421.  What is the

09:09   25   title of this chart?

09:09   1   A     Tracing of Geoffrey Johnson's Settlement Funds.

09:09   2   Q     Now, in the upper left it looks like there is a legend

09:09   3   explaining some sort of color-coding system; is that right?

09:09   4   A     That's right.  The blue bubbles represent independent

09:09   5   accounts.  The yellow bubbles are client trust accounts.

09:09   6   The orange bubbles are other accounts that are associated

09:10   7   with Mr. Avenatti, and the green bubbles represent the

09:10   8   clients.

09:10   9   Q     And it looks like some of the orange and yellow bubbles

09:10   10  have abbreviations -- EA, A&A, and GB.  What do those

09:10   11  abbreviations stand for?

09:10   12  A     Those stand for Eagan Avenatti, Avenatti & Associates,

09:10   13  and Global Baristas.

09:10   14  Q     For all of the bubbles that are either orange or

09:10   15  yellow, was the defendant a signatory to those accounts?

09:10   16  A     Yes.

09:10   17  Q     Starting with the bubble on the left-hand side, the

09:10   18  blue one that says County of Los Angeles, what does that

09:10   19  first arrow going to the right show?

09:10   20  A     That represents the payment that was deposited into EA

09:10   21  8541, the client trust account.

09:10   22  Q     It looks like there is then three arrows going from the

09:11   23  EA 8541 bubble -- well, let me ask this first.  The EA 8541

09:11   24  bubble there, does that reflect the account that the

09:11   25  $4 million settlement check was deposited into?

09:11   1    A      Yes.

09:11   2    Q      Okay.  Now let's go to the three arrows going away from

09:11   3    that bubble, starting with the one at the bottom.  What does

09:11   4    that show?

09:11   5    A      At the bottom it shows a gray box that were

09:11   6    miscellaneous transfers, and that represents that on -- that

09:11   7    after a certain time the amount in EA 8541 were commingled

09:11   8    with another large deposit that cannot be directly

09:11   9    attributable to the Johnson settlement payment.

09:11   10   Q      Okay.  And then going -- next, the arrow going to the

09:11   11   right, what does that show?

09:11   12   A      That shows $3.1 million was withdrawn from EA 8541 and

09:12   13   deposited into EA 2851 in approximately two months between

09:12   14   January 30th and March 30th, 2015.

09:12   15   Q      And then lastly what does the arrow going up to the

09:12   16   green bubbles show?

09:12   17   A      That shows that no withdrawals were made from EA 8541

09:12   18   to Geoffrey Johnson that can be associated with the

09:12   19   settlement payment.

09:12   20   Q      So next to the bubble after the $3.1 million to EA

09:12   21   2851, it looks like there are more miscellaneous transfers

09:12   22   going down; is that correct?

09:12   23   A      That's correct.

09:12   24   Q      And then to the right, what does that arrow show?

09:12   25   A      That shows that 1.7 million was withdrawn from EA 2851

09:12    1   and deposited into A&A 0661 in approximately the same two

09:12    2   months.

09:12    3   Q    And you said A&A stands for that?

09:12    4   A    Avenatti & Associates.

09:12    5   Q    Have you reviewed the bank records associated with the

09:13    6   Avenatti & Associates account ending in 0661?

09:13    7   A    Yes.

09:13    8   Q    Generally speaking, what kind of expenses did you see

09:13    9   charged to that account?

09:13   10   A    Mixed, business-related and personal expenses.

09:13   11   Q    Then it looks like about $50,000 -- if you go to the

09:13   12   right, the very last arrow to the right -- it looks like

09:13   13   $50,000 was transferred to the Avenatti personal account; is

09:13   14   that right?

09:13   15   A    Yes.

09:13   16   Q    And then what does the last transfer going up show?

09:13   17   A    $250,000 being deposited into a Global Baristas

09:13   18   account, GB 9962.

09:13   19   Q    If you could please go to Exhibit 422 now.  What is the

09:13   20   title of this charge?

09:13   21   A    Activities of EA Trust Account 8541 after receiving

09:13   22   Geoffrey Johnson's Settlement Payment.

09:14   23   Q    And generally speaking, what does this chart show?

09:14   24        MR. AVENATTI:  Objection, Your Honor, 401, 403.

09:14   25        THE COURT:  Overruled.

09:14   1           THE WITNESS:  Generally speaking, this shows that

09:14   2   this account had a beginning balance of zero and then

09:14   3   received a deposit of $4 million on January 29th, 2015.  And

09:14   4   then there is a series of withdraws.  All of those can be

09:14   5   associated with that $4 million deposit.  And then on

09:14   6   March 31st, 2015, this account received another deposit of

09:14   7   approximately $3 million, and then there are more withdraws.

09:14   8   BY MR. WYMAN:

09:14   9   Q    Let me stop you there.  If you could turn briefly to

09:14   10  the end of the exhibit, page 3, the very last row.

09:14   11          MR. WYMAN:  If you could pull up the bottom

09:14   12  portion.  It looks like there is a dash mark at the end

09:14   13  there.

09:14   14  BY MR. WYMAN:

09:14   15  Q    What does that mean?

09:14   16  A    That means --

09:14   17          MR. AVENATTI:  Same objection, Your Honor.  Could

09:14   18  I have a standing?

09:14   19          THE COURT:  No.

09:14   20          MR. AVENATTI:  Okay.

09:14   21          THE COURT:  Overruled.

09:15   22          THE WITNESS:  The dash mark indicates that as of

09:15   23  July 6th, 2015, this account had a balance of zero.

09:15   24  BY MR. WYMAN:

09:15   25  Q    Okay.

09:15  1              MR. WYMAN:  Now if we could please go back to
09:15  2    page 1, and if we could blow up the first handful of rows
09:15  3    going to -- that's fine.
09:15  4    BY MR. WYMAN:
09:15  5    Q    On January 29th -- well, let me ask first.  It looks
09:15  6    like there is black text in the second column under amount
09:15  7    paid and then some red text in parentheses.  What does the
09:15  8    red text mean?
09:15  9    A    The red text represents withdraws.
09:15 10    Q    And what is the black text?
09:15 11    A    Deposits.
09:15 12    Q    Deposits you said?
09:15 13    A    Yes.
09:15 14    Q    Okay.  So on January 29th, at the top I see, I guess,
09:15 15    the deposit for $4 million.  Then it looks like there are
09:15 16    several withdrawals in red.  Do you see that?
09:15 17    A    Yes.
09:16 18    Q    In the row right below the $4 million deposit, what is
09:16 19    the amount of the withdrawal?
09:16 20    A    1.6 million.
09:16 21    Q    And where did that amount go?
09:16 22    A    To account EA 2851.
09:16 23    Q    Based on your review of the banks reports, is the EA
09:16 24    2851 account an attorney/client trust account?
09:16 25    A    No, it's not.

09:16   1   Q     And $1.6 million, is that the same amount that you

09:16   2   calculated Eagan Avenatti would be entitled to in attorney

09:16   3   fees under the settlement agreement with Mr. Johnson?

09:16   4   A     Under the fee agreement, yes.

09:16   5   Q     Thank you.  That's what I meant to say.

09:16   6         All right.  Right below the 1.6 million, it looks

09:16   7   like there is another withdrawal to that same account for

09:16   8   approximately $736,000.  Do you see that?

09:16   9   A     Yes.

09:16   10  Q     And without going back to Exhibit 48, is this the same

09:16   11  amount rounded to the nearest dollar as the total amount of

09:17   12  costs and expenses in that spreadsheet in Exhibit 48?

09:17   13  A     Yes.

09:17   14  Q     And then right below that, what is the amount of the

09:17   15  next withdrawal?

09:17   16  A     $2,776.

09:17   17  Q     And the date?

09:17   18  A     February 4th, 2015.

09:17   19  Q     Okay.  Would you please pull up what is already in

09:17   20  evidence as Exhibit 50 -- at the top, please.

09:17   21  A     (Witness complies.)

09:17   22  Q     Do you see that this is an e-mail from Judy Regnier on

09:17   23  that same date, February 4th, to the defendant?

09:17   24  A     Yes.

09:17   25  Q     And what is the subject of this e-mail?

09:17　1　A　　Forward Johnson.

09:17　2　Q　　And the name of the attachment?

09:17　3　A　　Johnson costs advanced.

09:17　4　Q　　And what is the content of the message right there?

09:17　5　A　　It just says, "FYI, total is $2,776."

09:18　6　　　　　　MR. WYMAN:  And if we could scroll down a little

09:18　7　bit.

09:18　8　BY MR. WYMAN:

09:18　9　Q　　Do you see that this is an e-mail that Ms. Regnier

09:18　10　received from someone named Mary Welsh with a copy to

09:18　11　Patrick McNicholas?

09:18　12　A　　Yes.  I see that.

09:18　13　　　　　　MR. WYMAN:  Turning now, please, to Exhibit 422,

09:18　14　page 1.  Can we blow up the top few lines again.

09:18　15　BY MR. WYMAN:

09:18　16　Q　　The transfer below the $736,000, $2,776, is that the

09:18　17　same amount rounded to the nearest dollar that we saw in

09:18　18　that previous e-mail?

09:18　19　A　　Yes.

09:18　20　　　　　　MR. WYMAN:  Okay.  If we could please blow up the

09:18　21　following rows now.

09:18　22　BY MR. WYMAN:

09:18　23　Q　　After these transfers for 1.6 million, the amount of

09:19　24　attorneys' fees, and then the two amounts of costs from

09:19　25　those dates, it looks like there is a break of about a month

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:19   1   in activity; is that right?

09:19   2   A     That's right.

09:19   3   Q     And on the right-hand side, what is the balance in the

09:19   4   account during that month?

09:19   5   A     Approximately 1.66 million.

09:19   6   Q     So that amount just sits in the account for about a

09:19   7   month?

09:19   8   A     Yes.

09:19   9   Q     Then below that, starting on March 2nd, 2015, what does

09:19  10   the account show?

09:19  11   A     It shows a series of withdraws that are going to

09:19  12   EA 2851.

09:19  13   Q     Now, I'm not going to go through the entire chart, but

09:19  14   between January 29th when this chart begins and July 6th

09:19  15   when the account is zeroed out at the end, are there any

09:20  16   transfers to Mr. Johnson in this chart?

09:20  17   A     No, there are not.

09:20  18          MR. WYMAN:  If we could go to Exhibit 423.

09:20  19   BY MR. WYMAN:

09:20  20   Q     What is the title of this chart?

09:20  21   A     Activities of EA account 2851 after receiving portions

09:20  22   of Geoffrey Johnson's settlement payment from EA trust

09:20  23   account 8541.

09:20  24   Q     And what is the date that this chart begins on?

09:20  25   A     January 30th, 2015.

09:20   1   Q    And it looks like the beginning balance there on the

09:20   2   screen is a little over 25,000?

09:20   3   A    That's right.

09:20   4   Q    And then right below that, what is reflected?

09:20   5        MR. AVENATTI:  Objection, Your Honor, 401, 403.

09:20   6        THE COURT:  Overruled.

09:20   7        THE WITNESS:  The second line reflects a deposit

09:20   8   of 1.6 million coming from EA 8541.

09:20   9   BY MR. WYMAN:

09:20   10  Q    And it looks like this chart spans seven pages?

09:21   11  A    Yes.

09:21   12  Q    And then at the end, if we can go to page 7 at the end,

09:21   13  what is the date of the last entry on this chart?

09:21   14       MR. AVENATTI:  Same objections, Your Honor.

09:21   15       THE COURT:  Overruled.

09:21   16       THE WITNESS:  March 30th, 2015.

09:21   17  BY MR. WYMAN:

09:21   18  Q    And what is the balance of the account on that date?

09:21   19       MR. AVENATTI:  Same objection, Your Honor.

09:21   20       THE COURT:  Overruled.

09:21   21       THE WITNESS:  Just over $1,000.

09:21   22  BY MR. WYMAN:

09:21   23  Q    Now, again, I'm not going to go through all of the

09:21   24  transfers in this chart, but it looks like -- if we could

09:21   25  pull up page 3, maybe the bottom third of the page -- it

09:21   1   looks like there are some payments in here to Sunrise of

09:22   2   West Hills; is that right?

09:22   3   A     Yes.

09:22   4   Q     And for one of the ones on the screen, generally how

09:22   5   much are those payments for?

09:22   6   A     About $5,500.

09:22   7   Q     In this seven-page chart of account activities, are

09:22   8   there any payments to Geoffrey Johnson directly?

09:22   9   A     No.

09:22   10         MR. WYMAN:  If we could please go to Exhibit 424

09:22   11  now.

09:22   12  BY MR. WYMAN:

09:22   13  Q     What is the title of this chart?

09:22   14  A     Activities of A&A account 0661 after receiving portions

09:22   15  of Geoffrey Johnson's settlement payment from EA account

09:22   16  2851.

09:22   17  Q     This chart also appears to span from January 30th to

09:22   18  March 30th, 2015; is that right?

09:23   19  A     That's right.

09:23   20         MR. WYMAN:  If we could go to the last row on

09:23   21  page 3.

09:23   22  BY MR. WYMAN:

09:23   23  Q     What is the amount -- what is the account balance as of

09:23   24  March 30th, 2015?

09:23   25         MR. AVENATTI:  Objection, Your Honor, 401, 403.

09:23  1          THE COURT:  Overruled.

09:23  2          THE WITNESS:  The balance as of March 30th, 2015,

09:23  3   is $958.

09:23  4   BY MR. WYMAN:

09:23  5   Q    Are there any payments to Geoffrey Johnson reflected in

09:23  6   this chart?

09:23  7   A    No.

09:23  8   Q    Based on your review of the bank records associated

09:23  9   with the defendant, are you aware that the defendant sent

09:23  10  periodic payments to Geoffrey Johnson beginning in

09:23  11  approximately July 2015?

09:23  12  A    Yes.

09:23  13  Q    Would you please take a look at Exhibit 425.

09:23  14          MR. WYMAN:  If we could blow up the content of the

09:23  15  chart, please.

09:24  16  BY MR. WYMAN:

09:24  17  Q    The top left, is that that same legend with the color

09:24  18  coding?

09:24  19  A    That's correct.

09:24  20  Q    And what does this chart show?

09:24  21  A    This chart shows a graphic depiction of the payments

09:24  22  that were made to Geoffrey Johnson.  On the right-hand side

09:24  23  you have a green bubble showing Geoffrey Johnson, and there

09:24  24  are six arrows that point at that green bubble.  That

09:24  25  represents that Geoffrey Johnson received payments from six

09:24   1   different accounts.

09:24   2           For some of those payments I was able to trace the

09:24   3   source of funds back further, and I've depicted some of

09:24   4   those on the bubbles in the middle portion.  On the

09:24   5   left-hand side we have a blue bubble for the County of Los

09:24   6   Angeles and an arrow going to EA 8541.  That depicts the

09:24   7   $4 million deposit that we discussed earlier.  And the

09:24   8   vertical line represents that none of the money that was

09:25   9   deposited into EA 8541 was paid to Geoffrey Johnson.

09:25   10  Q    So does this chart purport to reflect all of the

09:25   11  individual payments sent to Mr. Johnson by the defendant?

09:25   12  A    No.  It only reflects the accounts from which Geoffrey

09:25   13  Johnson received payments.

09:25   14  Q    And you talked about the bubble on the left of that

09:25   15  dotted line there.  What is the fact that there is no arrow

09:25   16  going from the right, going to the right from the EA 8541

09:25   17  bubble signify?

09:25   18  A    That signifies that no payments made to Geoffrey

09:25   19  Johnson can be traced to the deposit for the Johnson

09:25   20  settlement, the $4 million deposit.

09:25   21  Q    Right below that there is a blue bubble titled

09:25   22  Personalized Beauty Discovery.  What does that represent?

09:26   23  A    That represents the Michelle Phan repurchase payment.

09:26   24  Q    And why is that included on this chart?

09:26   25  A    Because payment to Geoffrey Johnson can be traced to

09:26   1   the Michelle Phan repurchase amount.

09:26   2   Q    Apart from determining that these accounts listed on

09:26   3   this chart was the source of payments to Mr. Johnson, did

09:26   4   you conduct further analysis into the source of the payments

09:26   5   to Mr. Johnson?

09:26   6   A    Yes.

09:26   7   Q    Let's look at a few short examples.  Can you please

09:26   8   turn to Exhibit 426.  What is the title of this chart?

09:26   9   A    GB account funds used to make a payment to Geoffrey

09:26   10  Johnson on 4/7/16.

09:26   11  Q    And what does this chart depict, starting from the

09:26   12  left?

09:26   13  A    So this depicts one payment that was made to Geoffrey

09:27   14  Johnson on that date, April 7, 2016.  That payment came from

09:27   15  accounts EA 2851, and I can trace the source of that payment

09:27   16  to a GB source.  So on the left you see that the account

09:27   17  2851 had a beginning balance on the day before the payment

09:27   18  to Geoffrey Johnson of negative $5,000.  On that same day it

09:27   19  received a transfer from GB 2240 of $6,000, and then the

09:27   20  next day it withdrew $1,900 to pay Geoffrey Johnson.

09:27   21  Q    So based on this analysis, where did at least part of

09:27   22  the $1,900 to Mr. Johnson come from?

09:27   23  A    From GB 2240.

09:27   24       MR. WYMAN:  Let's look at Exhibit 427 now, please.

        25

09:28    1    BY MR. WYMAN:

09:28    2    Q    What is the title of this chart?

09:28    3    A    GB account funds use to make a payment to Geoffrey

09:28    4    Johnson on January 5th, 2018.

09:28    5    Q    And what does this chart show?

09:28    6    A    This shows another payment made to Geoffrey Johnson for

09:28    7    $1,900, and I'm able to trace the source of that payment to

09:28    8    GB account.  So then starting on the left, this account had

09:28    9    a beginning balance of approximately $1,400 on January 5th,

09:28   10    2018.

09:28   11         On that same day it received two deposits from GB

09:28   12    accounts that totaled $17,600.  And then on that same day

09:28   13    $1,900 was withdrawn to pay Geoffrey Johnson.

09:28   14    Q    So same as the last one, where were you able to trace

09:28   15    that $1,900 back to?

09:29   16    A    At least a portion of the $1,900 was traceable to

09:29   17    Global Baristas accounts.

09:29   18         MR. WYMAN:  If we could go to Exhibit 428 now.

09:29   19    BY MR. WYMAN:

09:29   20    Q    What is the title of this chart?

09:29   21    A    GB account funds used to make a payment to Geoffrey

09:29   22    Johnson on February 15th, 2018.

09:29   23    Q    And what does this chart reflect?

09:29   24    A    This reflects the payment to Geoffrey Johnson for

09:29   25    $1,900 on February 15th, 2018.  And the source of that fund

09:29   1    is traceable to GB accounts.

09:29   2    Q    And if you wouldn't mind walking from the left to the

09:29   3    right.

09:29   4    A    So the account from which Geoffrey Johnson received the

09:29   5    payment, EA 4613, had a beginning balance of $1,761.  And

09:29   6    then over the next two days it received two transfers from

09:30   7    Global Baristas accounts that total approximately $26,000.

09:30   8    And then on February 15th, 2018, it withdrew $1,900 to pay

09:30   9    Geoffrey Johnson.

09:30   10   Q    And you said earlier that at least one of the payments

09:30   11   to Mr. Johnson was traceable to Ms. Phan's repurchase

09:30   12   amount; is that correct?

09:30   13   A    That's correct.

09:30   14   Q    Did you prepare a chart to reflect that tracing

09:30   15   analysis?

09:30   16   A    Yes.

09:30   17   Q    Would you please turn to Exhibit 429.  What is the

09:30   18   title of 429?

09:30   19   A    A portion of Michelle Phan's stock repurchase payment

09:30   20   transferred to EA 0313, and then this is a three-page

09:30   21   exhibit.

09:30   22   Q    Okay.  So starting with page 1, what does this chart

09:30   23   show?

09:30   24   A    So this shows that a $150,000 transfer to EA 0313 was

09:30   25   traceable to the Michelle Phan client trust account.  On the

09:31    1    left we have the balance of $8.3 million in CNB 4705, and

09:31    2    then on April 9th, 2018, a $150,000 deposit was made into

09:31    3    EA 0313.

09:31    4    Q    Then going to page 2, please?

09:31    5    A    So page 2 continues from page 1.  This shows that

09:31    6    account EA 0313 had a beginning balance of $2,000 and

09:31    7    received a transfer from CNB 4705 -- that's the Michelle

09:31    8    Phan client trust account -- of $150,000.  And then on that

09:31    9    same day, that account made a transfer to EA 4613 of

09:31    10    $32,000.

09:31    11    Q    And then the last page, please?

09:32    12    A    The last page continues from the prior page.  It shows

09:32    13    that account EA 4613 had a beginning balance of $224 before

09:32    14    receiving the transfers from EA 0313.  And then on that same

09:32    15    day it received a transfer and made a payment to Geoffrey

09:32    16    Johnson for $1,900.

09:32    17    Q    And so based on this analysis, that last payment for

09:32    18    $1,900, what is that traceable to?

09:32    19    A    To Michelle Phan's client trust account.

09:32    20    Q    Based on your analysis of these bank records in

09:32    21    connection with Mr. Johnson's settlement money, how much of

09:32    22    that $4 million settlement payment is traceable to

09:32    23    Mr. Johnson?

09:32    24    A    None of the $4 million settlement was transferred to

09:32    25    Mr. Johnson.

09:32   1   Q    Okay.  Let's turn now to Exhibits 430 through 438.  If
09:33   2   you could please let us know, which clients do those charts
09:33   3   relate to?
09:33   4   A    These relate to Alexis Gardner.
09:33   5   Q    Okay.  Let's start with Exhibit 430.  What is the title
09:33   6   of this chart?
09:33   7   A    Total amount due to Alexis Gardner as of January 25th,
09:33   8   2017, and November 2020.
09:33   9   Q    Starting with the first row, what does that row
09:33   10  reflect?
09:33   11  A    That reflects a similar amount paid on January 25th,
09:33   12  2017, for $2.75 million.
09:33   13  Q    Did you review bank records showing that the defendant
09:33   14  received the settlement amount on that date?
09:33   15  A    Yes.
09:33   16  Q    If you could please pull up what is already in evidence
09:33   17  as Exhibit 148, page 1.
09:33   18  A    (Witness complies.)
09:33   19  Q    And in the top left-hand corner, can you please let us
09:33   20  know what the name on the account is.
09:34   21  A    Eagan Avenatti, LLP, Attorney/Client Trust Account.
09:34   22  Q    And in the top right what are the last four digits of
09:34   23  the account number?
09:34   24  A    8671.
09:34   25  Q    If you could please go to the middle of the page now

09:34  1  under deposits and credits.  What is reflected there?

09:34  2  A    That reflects a $2.75 million deposit from Hassan

09:34  3  Whiteside on January 25th, 2017.

09:34  4  Q    Okay.  Please go back to Exhibit 430 now.  The second

09:34  5  row below the settlement amount paid, what does that say?

09:34  6  A    That's your legal fees of $990,000.

09:34  7  Q    And where did that figure come from?

09:34  8  A    That came from the fee agreement, which was 33 percent

09:35  9  of the settlement amount, the total settlement amount of the

09:35  10  2.75 plus the amount due in November 2020 of $250,000.

09:35  11  Q    So that's 33 percent of the total of 3 million?

09:35  12  A    Yes.

09:35  13  Q    Then the next row says less case-related expenses.

09:35  14  What figure is reflected there?

09:35  15  A    $65,615.

09:35  16  Q    And how did you calculate that figure?

09:35  17  A    That figure was based on the amount identified in

09:35  18  QuickBooks related to Alexis Gardner.

09:35  19  Q    Right below that, what does the next row show?

09:35  20  A    Total due to client as of January 25th, 2017.

09:35  21  Q    How much is listed there?

09:35  22  A    Approximately $1.7 million.

09:35  23  Q    So based on your calculations and your review of the

09:35  24  fee agreement, is that how much your understanding was that

09:36  25  was owed to Ms. Gardner as of that date?

09:36    1                MR. AVENATTI:  Objection, leading.

09:36    2                THE COURT:  Overruled.

09:36    3                THE WITNESS:  Yes, that's correct.

09:36    4    BY MR. WYMAN:

09:36    5    Q    Below that, what do the next two rows show?

09:36    6    A    The next row is plus settlement amount due

09:36    7    November 2020, $250,000.  And then the following row is the

09:36    8    total due to Alexis Gardner as of November 2020, the amount

09:36    9    due in January 2017, and $250,000, and that totals to

09:36    10   $1.9 million.

09:36    11   Q    And the last row in red, what does that represent?

09:36    12   A    That says total client received from settlement of zero

09:36    13   dollars.  That represents that none of the amount that was

09:36    14   deposited into Alex Gardner's client trust account was paid

09:36    15   to Alexis Gardner.

09:36    16               MR. WYMAN:  Could you please go to Exhibit 431

09:37    17   now.  And if we could blow up the whole contents, please.

09:37    18   BY MR. WYMAN:

09:37    19   Q    What is the title of this chart?

09:37    20   A    Tracing of Alexis Gardner's first settlement payment.

09:37    21   Q    And in the top left-hand corner, is that the same

09:37    22   legend for color coding?

09:37    23   A    That's correct.

09:37    24   Q    Starting from the left, what does the first arrow going

09:37    25   to the right show?

09:37  1   A    That shows the first settlement payment on

09:37  2   January 25th, 2017.  It was deposited into EA 8671.

09:37  3   Q    Then if we could please go to the right, it looks like

09:37  4   there are three arrows going from that bubble; is that

09:37  5   right?

09:37  6   A    That's correct.

09:37  7   Q    So starting from the one on the bottom, the one going

09:37  8   down, what does that show?

09:37  9   A    That shows $2.5 million was withdrawn from the client

09:37  10  trust accounts 8671 and sent to X-Law Group.

09:38  11  Q    Then if we could please go to the right, what happens

09:38  12  after that 2.5 million was sent to the X-Law Group?

09:38  13  A    On the same day $2.5 million was sent to Honda Aircraft

09:38  14  Company.

09:38  15  Q    If we can go back to the middle, please, what does the

09:38  16  arrow in the middle going to the right show?

09:38  17  A    $250,000 withdrawal from the client trust account into

09:38  18  EA 2851.

09:38  19  Q    And then to the right of that, what happened to that

09:38  20  money?

09:38  21  A    On that same day $250,000 was withdrawn and deposited

09:38  22  into A&A 0661.

09:38  23       MR. WYMAN:  At this time, Your Honor, the

09:38  24  government would move two bank records into evidence,

09:38  25  Exhibits 359 and 382, for which the custodian declarations

09:38   1   for both is Exhibit 394, page 2.

09:39   2            MR. AVENATTI:  Objection, Your Honor.  Hearsay,

09:39   3   401, 403.

09:39   4            THE COURT:  The numbers again?

09:39   5            MR. WYMAN:  The exhibits are 359 and 382.

09:39   6            THE COURT:  359 and 382 will be received.  The

09:39   7   objection is overruled.

09:39   8            (Exhibits 359 and 382 received in evidence)

09:39   9            MR. WYMAN:  If we could please pull up

09:39   10  Exhibit 382, page 1.

09:39   11  BY MR. WYMAN:

09:39   12  Q    What is the name of this account?

09:39   13  A    Eagan Avenatti, LLP.

09:39   14  Q    And the last four in the top right-hand corner of the

09:39   15  account number?

09:39   16  A    2851.

09:39   17  Q    And then if you go down to the deposits and credits, is

09:39   18  there -- on January 26th, 2017, do you see a deposit for

09:40   19  $250,000 on that day?

09:40   20  A    Yes.

09:40   21            MR. WYMAN:  Then if we could please go to

09:40   22  Exhibit 359, page 1.

09:40   23  BY MR. WYMAN:

09:40   24  Q    What is the name of this account?

09:40   25  A    Avenatti & Associates, A Professional Corp.

09:40   1   Q    And in the top right what are the last four numbers of

09:40   2   this account number?

09:40   3   A    0661.

09:40   4   Q    And then down on this page do you see a deposit or

09:40   5   credit for $250,000?

09:40   6   A    Yes.

09:40   7   Q    On what date?

09:40   8   A    January 26th.

09:40   9        MR. WYMAN:  If we could please go back to

09:40  10   Exhibit 431 now.

09:40  11   BY MR. WYMAN:

09:40  12   Q    Are those the transfers reflected in the middle there

09:41  13   going to the right?

09:41  14   A    Yes.

09:41  15   Q    And then lastly, in the middle the arrow going up to

09:41  16   the green bubble, what does that show?

09:41  17   A    That shows that no money was withdrawn from the 8671

09:41  18   and sent to Alexis Gardner.

09:41  19        MR. WYMAN:  If we could please go to Exhibit 432

09:41  20   now.

09:41  21   BY MR. WYMAN:

09:41  22   Q    What is the title of this chart?

09:41  23   A    Activities of EA trust account 8671 after receiving

09:41  24   Alexis Gardner's first settlement payment.

09:41  25   Q    The first row in light blue looks like there is a

09:41  1    balance of zero.  Is that what that hash mark means?

09:41  2    A    Yes.  That's right.

09:41  3    Q    And then the first row below that, January 25th, 2017,

09:41  4    is that the day that the settlement amount came in?

09:41  5    A    Yes.

09:41  6    Q    And what do the three rows below that show?

09:41  7    A    The two rows below that show there are two withdraws,

09:42  8    one for $2.5 million sent to the X-Law Group, and one for

09:42  9    $250,000 sent to EA 2851.

09:42  10   Q    And as of January 26th, 2017, at the end of this chart,

09:42  11   how much is left of Ms. Gardner's settlement money in this

09:42  12   trust account?

09:42  13   A    Zero.

09:42  14   Q    Did any of the money in this chart go to Ms. Gardner?

09:42  15   A    No, it did not.

09:42  16   Q    Based on your e-mail review of the defendant's bank

09:42  17   records, are you aware that certain payments were made from

09:42  18   those accounts to Ms. Gardner?

09:42  19   A    Yes, I'm aware that payments were made to Ms. Gardner.

09:42  20            MR. WYMAN:  If we could please look at

09:42  21   Exhibit 433.

09:42  22   BY MR. WYMAN:

09:42  23   Q    What is the title of this chart?

09:42  24   A    Payments to Alexis Gardner.

09:42  25   Q    On the left-hand side at the top, it looks like there's

09:42   1    that same legend; is that right?

09:42   2    A    Yes.

09:43   3    Q    And if we could start here on the left, what does the

09:43   4    left portion of this chart show to the left of the dashed

09:43   5    line?

09:43   6    A    The left portion shows settlement payments.  So the top

09:43   7    one represents the payment from Hassan Whiteside to the

09:43   8    client trust account EA 8671, and the bottom set of bubbles

09:43   9    represents the Michelle Phan repurchase agreement payment

09:43   10   deposited into CNB 4705.

09:43   11   Q    And then to the right of the dashed line, what do these

09:43   12   bubbles and arrows reflect?

09:43   13   A    So the orange and yellow bubbles are either client

09:43   14   trust account or other Avenatti & Associates accounts, and

09:43   15   the arrows represent flows of money.  On the right-hand side

09:43   16   we have a green bubble for Alexis Gardner, and it shows that

09:44   17   she received payments from four different accounts.

09:44   18           MR. WYMAN:  If we could please zoom back out so we

09:44   19   can see the full chart.

09:44   20   BY MR. WYMAN:

09:44   21   Q    It looks like there are no arrows from the EA 8671

09:44   22   account that received the Hassan Whiteside payment to

09:44   23   Ms. Gardner.  What does that mean?

09:44   24   A    That means none of the amount that was deposited into

09:44   25   EA 8671 for settlement were paid to Ms. Gardner.

09:44   1   Q    As with Mr. Johnson, did you conduct additional

09:44   2   analysis for the source of certain payments to Ms. Gardner?

09:44   3   A    Yes.

09:44   4   Q    Take a look at Exhibit 434.

09:44   5   A    (Witness complies.)

09:44   6   Q    What is the title of this chart?

09:44   7   A    GB account funds used to make a payment to Alexis

09:44   8   Gardner on April 14th, 2017.

09:44   9   Q    And can you please explain what this chart reflects.

09:44   10  A    So this chart reflects that Alexis Gardner received a

09:44   11  payment of $16,000 on April 14th, 2017.  She received that

09:45   12  payment from account A&A 0661, and I am able to trace the

09:45   13  source of that payment to a GB account.

09:45   14  Q    So starting from the left, what do these bars mean?

09:45   15  A    So starting with the left, the account from which

09:45   16  Ms. Gardner received her payments, A&A 0661 had a beginning

09:45   17  balance of $3,300.  And then on April 7th that account

09:45   18  received a deposit from GB 2240 of $185,000.  And then

09:45   19  approximately a week later that same account made a transfer

09:45   20  to Alexis Gardner of $16,000.

09:45   21          MR. WYMAN:  If we could go to Exhibit 435 now.

09:45   22  BY MR. WYMAN:

09:45   23  Q    What is the title of this chart?

09:45   24  A    GB account funds used to make a payment to Alexis

09:46   25  Gardner on May 15th, 2017.

09:46  1    Q     And what does this chart reflect?

09:46  2    A     So this chart reflects another $16,000 payment made to

09:46  3    Alexis Gardner, this time approximately a month after the

09:46  4    previous one, also from A&A 0661.  And I am able to trace

09:46  5    the source of that payment to a GB account.

09:46  6              So starting on the left, this account had a

09:46  7    balance of $5,300 on May 15th.  And then on that same day it

09:46  8    received a transfer from GB 2240 of $30,000 and then made a

09:46  9    payment to Alexis Gardner for $16,000.

09:46  10   Q     And at Exhibit 436, please, what is the title of this

09:46  11   chart?

09:46  12   A     GB account funds used to make a payment to Alexis

09:47  13   Gardner on January 16th, 2018.

09:47  14   Q     What does this chart reflect?

09:47  15   A     This chart reflects another $16,000 payment received by

09:47  16   Alexis Gardner on January 16th, 2018, this time from account

09:47  17   EA 3174.  And I am able to trace the source of that payment

09:47  18   to a GB account.  So starting on the left, on January 16th,

09:47  19   2018, the account from which Alexis Gardner received her

09:47  20   payment had a beginning balance of $155.  It received a

09:47  21   transfer from GB 3730 of 25,000 on that same day, and then

09:47  22   also on that same day that account made a transfer to Alexis

09:47  23   Gardner of $16,000.

09:47  24              MR. WYMAN:  Exhibit 437, please.

       25

09:47   1   BY MR. WYMAN:

09:47   2   Q     What is the title of Exhibit 437?

09:48   3   A     GB account funds used to make a payment to Alexis

09:48   4   Gardner on February 20th, 2018.

09:48   5   Q     And is this the same analysis showing the source of a

09:48   6   payment to Alexis Gardner?

09:48   7   A     Yes.

09:48   8   Q     What was the amount of that payment?

09:48   9   A     $16,000.

09:48   10  Q     And based on this tracing analysis, what was the source

09:48   11  of that money?

09:48   12  A     From Global Baristas account.

09:48   13         MR. WYMAN:  Let's go lastly to Exhibit 438 on

09:48   14  Ms. Gardner.

09:48   15  BY MR. WYMAN:

09:48   16  Q     It looks like this is a two-page exhibit?

09:48   17  A     Yes.

09:48   18  Q     What is the title of the exhibit?

09:48   19  A     A portion of Michelle Phan's stock repurchase payment

09:48   20  was transferred to EA 4613.

09:48   21  Q     And would you please explain what is reflected on

09:48   22  page 1.

09:48   23  A     On page 1, that reflects starting with the left-hand

09:48   24  blue bar the balance in CNB 4705 that reflects the Michelle

09:48   25  Phan repurchase payments.  And then $200,000 of that money

09:49   1   was withdrawn and transferred to account EA 4613.

09:49   2   Q    And on page 2, is this a continuation of page 1?

09:49   3   A    Yes, it's a continuation of page 1.  So on the

09:49   4   left-hand side we see that account EA 4613 had a beginning

09:49   5   balance of $1,500 before receiving the $200,000 deposit from

09:49   6   CNB 4705 on April 17th, 2018.  And then on that same day a

09:49   7   $34,000 withdraw was made and paid to Alexis Gardner.

09:49   8   Q    So based on this analysis, that $34,000 payment to

09:49   9   Alexis Gardner on April 17th, 2018, what was the source of

09:49   10  that money?

09:50   11  A    Michelle Phan's repurchase.

09:50   12  Q    Based on your analysis of the bank records associated

09:50   13  with Ms. Gardner, how much of the settlement money from

09:50   14  Hassan Whiteside went to Ms. Gardner?

09:50   15  A    None.  Zero.

09:50   16  Q    Turning now to Exhibits 439 through 443, which client

09:50   17  do these charts relate to?

09:50   18  A    Greg Barela.

09:50   19  Q    Starting with Exhibit 439, what is the title of this

09:50   20  chart?

09:50   21  A    Total amount due to Greg Barela as of January 5th,

09:50   22  2018, and January 2021.

09:50   23  Q    Focusing on the top, what does the first line reflect?

09:50   24  A    Settlement amount paid on January 5th, 2018, for

09:50   25  $1.6 million.

09:51    1    Q    Did you review bank records showing that the defendant

09:51    2    received a settlement amount in that amount on that day?

09:51    3    A    Yes.  I reviewed bank records that showed a deposit of

09:51    4    that amount into the client trust account.

09:51    5              MR. WYMAN:  Could I have one moment, Your Honor.

09:51    6              (Government counsel conferring)

09:51    7              MR. WYMAN:  At this time, Your Honor, the

09:51    8    government moves Exhibit 371 into evidence, for which the

09:51    9    custodian declaration is at Exhibit 397, pages 3 and 4.

09:51   10              MR. AVENATTI:  Objection, Your Honor.  Hearsay as

09:51   11    well as 401 and 403.

09:51   12              THE COURT:  Overruled.  371 will be received.

09:51   13              (Exhibit 371 received in evidence)

09:51   14              MR. WYMAN:  Could we please pull up Exhibit 371

09:51   15    and blow up the first half of the page.

09:51   16    BY MR. WYMAN:

09:51   17    Q    What is the title of this?  And if you would like, it

09:52   18    should be in the binder, too, if it's easier to see.

09:52   19              What is the title of this document?

09:52   20    A    "Transaction Detail Report."

09:52   21    Q    And what is the amount of the transaction?

09:52   22    A    $1.6 million.

09:52   23    Q    What is reflected there at the bottom right-hand

09:52   24    corner?

09:52   25    A    That reflects information about this transfer.  It says

09:52    1    "Brock USA 2018 Settlement Payment."

09:52    2    Q     And who is the originator of the wire?

09:52    3    A     Brock USA, LLC.

09:52    4    Q     And then if we could pull up the right side.  Who is

09:52    5    the beneficiary?

09:53    6    A     Michael J. Avenatti, Attorney/Client Trust Account.

09:53    7    Q     And what is the send date listed here for the wire?

09:53    8    A     January 5th, 2018.

09:53    9              MR. WYMAN:  If we could go back to Exhibit 439

09:53   10    now, please.

09:53   11    BY MR. WYMAN:

09:53   12    Q     Below that settlement amount paid January 5th, 2018, of

09:53   13    1.6 million, what does the next row say?

09:53   14    A     Less legal fees for $760,000.

09:53   15    Q     Where did that number come from?

09:53   16    A     That came from the fee agreement between Barela and

09:53   17    Avenatti.

09:53   18    Q     And then right below that, what does the next line

09:53   19    reflect?

09:53   20    A     Case-related expenses, approximately $181,000.

09:53   21    Q     How did you calculate that number?

09:54   22    A     That number reflects a combination of the amounts

09:54   23    identified in QuickBooks as related to Greg Barela's case

09:54   24    and a spreadsheet sent by Judy Regnier.

09:54   25    Q     And the spreadsheet sent by Judy Regnier, was that

09:54  1   similar to the spreadsheet you reviewed related to

09:54  2   Mr. Johnson?

09:54  3   A    Yes.

09:54  4   Q    It then says total due to client as of January 5th,

09:54  5   2018.  And how much is listed there?

09:54  6   A    $659,000.

09:54  7   Q    So as of that date, January 5th, 2018, is that how much

09:54  8   you calculated was due to Mr. Barela?

09:54  9   A    That's right.

09:54  10  Q    And how did you calculate that figure?

09:54  11  A    That is the $1.6 million settlement amount paid minus

09:54  12  the legal fees of $760,000, minus the case-related expenses

09:54  13  of $180,000.

09:54  14  Q    It then looks like there are three rows that start with

09:55  15  Brock settlement amount.  What does that mean?

09:55  16  A    Those are additional settlement amounts that were due

09:55  17  with their dates.

09:55  18  Q    And then at the end it says total due to client,

09:55  19  approximately $959,000.

09:55  20  A    Yes.

09:55  21  Q    And what does the very last row in red show?

09:55  22  A    That shows that the total client received from the

09:55  23  settlement of zero dollars.  That reflects none of the

09:55  24  amounts deposited into Greg Barela's trust account were paid

09:55  25  to Greg Barela.

09:55  1    Q    In this chart when you calculated the legal fees of

09:55  2    $760,000, what was that percentage based on?

09:55  3    A    That's based on the total settlement amount, which is

09:55  4    the 1.6 million plus the three $100,000 amounts, to a total

09:56  5    of 1.9 million.

09:56  6    Q    So that's 1.9 million times 40 percent?

09:56  7    A    Yes.

09:56  8         MR. WYMAN:  If we could go to Exhibit 440 now,

09:56  9    please, and if we could blow up the content of the whole

09:56 10    side, please.

09:56 11    BY MR. WYMAN:

09:56 12    Q    What is the title of this chart?

09:56 13    A    "Tracing Greg Barela's First Settlement Payment."

09:56 14    Q    In the top left-hand corner, it looks like it's the

09:56 15    same color-coded legend.

09:56 16    A    Yes.

09:56 17    Q    Starting from the left and going to the right, what

09:56 18    does that first arrow reflect?

09:56 19    A    That arrow reflects the $1.6 million settlement payment

09:56 20    deposited into CNB 5566.

09:56 21    Q    What is CNB 5566?

09:56 22    A    That's the client trust account.

09:56 23         MR. WYMAN:  Then if we could blow up the second

09:57 24    top of the right side of the page.

      25

09:57  1    BY MR. WYMAN:

09:57  2    Q    It looks like there are three arrows going from that

09:57  3    bubble; is that right?

09:57  4    A    That's right.

09:57  5    Q    So starting with the arrow going down to the bottom,

09:57  6    what does that show?

09:57  7    A    That shows that between January 10th and March 14th,

09:57  8    almost $500,000 was withdrawn from the client trust accounts

09:57  9    into GB and EA accounts.

09:57  10   Q    And when it says GB and EA, what does that mean?

09:57  11   A    Those are Global Baristas and Eagan Avenatti accounts.

09:57  12   Q    Next, the arrow going to the right in the middle, what

09:57  13   does that show?

09:57  14   A    That shows that between January 5th and March 14th,

09:57  15   approximately $1.1 million was withdrawn and sent to various

09:57  16   independent accounts.

09:57  17   Q    And can you please read what the independent accounts

09:57  18   listed in that bubble are.

09:57  19   A    GB expenses, X-Law Group, Edward Ricci, and other

09:57  20   miscellaneous transfers.

09:58  21   Q    And then lastly the arrow in red going up to the green

09:58  22   bubble, what does that show?

09:58  23   A    That shows that none of the amount that was deposited

09:58  24   into CNB 5566 was paid to Greg Barela.

09:58  25   Q    If we could go now to Exhibit 441, what is the title of

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:58   1    this chart?

09:58   2    A    "Activities of CNB Trust Account 5566 After Receiving

09:58   3    Greg Barela's First Settlement Payment."

09:58   4    Q    And the top row in light blue, what does that line

09:58   5    show?

09:58   6    A    That shows that the beginning balance on January 5th,

09:58   7    2018, was zero before receiving the $1.6 million deposit

09:58   8    from Brock USA.

09:58   9    Q    And is that the deposit reflected on the line right

09:59  10    below?

09:59  11    A    Yes.

09:59  12    Q    Again, like the previous charts like this, the red

09:59  13    numbers within parentheticals, does that reflect

09:59  14    withdrawals?

09:59  15    A    Yes.

09:59  16    Q    I want to ask you about just a few of these payments.

09:59  17    A few rows down from the top, I see a payment for 41 --

09:59  18    actually a withdrawal for $41,885.  Do you see that?

09:59  19    A    Yes.

09:59  20    Q    Who is that withdrawal to?

09:59  21          MR. AVENATTI:  Objection, Your Honor, 401, 403.

09:59  22          THE COURT:  Overruled.

09:59  23          THE WITNESS:  That was paid to Dillanos Coffee

09:59  24    Roasters.

       25

| | | |
|---|---|---|
| 09:59 | 1 | BY MR. WYMAN: |
| 09:59 | 2 | Q    And then a few down from that, there is a payment or |
| 09:59 | 3 | withdrawal for $617,000 approximately? |
| 09:59 | 4 | A    Yes. |
| 09:59 | 5 | MR. AVENATTI:  Same objection. |
| 09:59 | 6 | THE COURT:  Overruled. |
| 09:59 | 7 | BY MR. WYMAN: |
| 09:59 | 8 | Q    Who was that for? |
| 09:59 | 9 | A    That was paid to Edward Ricci. |
| 09:59 | 10 | Q    And the date? |
| 09:59 | 11 | A    January 8th, 2018. |
| 09:59 | 12 | Q    And scrolling down through, it looks like there are a |
| 10:00 | 13 | number of payments or withdrawals to Global Baristas, LLC? |
| 10:00 | 14 | MR. AVENATTI:  Same objection, Your Honor. |
| 10:00 | 15 | THE COURT:  Overruled. |
| 10:00 | 16 | THE WITNESS:  Yes.  That's correct. |
| 10:00 | 17 | BY MR. WYMAN: |
| 10:00 | 18 | Q    And additional payment to Dillanos Coffee Roasters and |
| 10:00 | 19 | Alki Bakery? |
| 10:00 | 20 | MR. AVENATTI:  Same objection. |
| 10:00 | 21 | THE COURT:  Overruled. |
| 10:00 | 22 | THE WITNESS:  Yes. |
| 10:00 | 23 | BY MR. WYMAN: |
| 10:00 | 24 | Q    If you could please go to page 3, the end of this |
| 10:00 | 25 | chart, it looks like this chart ends on March 14, 2018; is |

| | | |
|---|---|---|
| 10:00 | 1 | that right? |
| 10:00 | 2 | A    That's right. |
| 10:00 | 3 | Q    And as of March 14th, 2018, how much is left in this |
| 10:00 | 4 | trust account? |
| 10:00 | 5 |        MR. AVENATTI:  Same objection. |
| 10:00 | 6 |        THE COURT:  Overruled. |
| 10:00 | 7 |        THE WITNESS:  $610. |
| 10:00 | 8 | BY MR. WYMAN: |
| 10:00 | 9 | Q    In this chart are there any payments reflected to |
| 10:00 | 10 | Gregory Barela? |
| 10:00 | 11 | A    No, there are not. |
| 10:00 | 12 | Q    Based on your review of the defendant's banks records |
| 10:00 | 13 | associated with Mr. Barela, are you aware that the defendant |
| 10:00 | 14 | sent a few payments to Mr. Barela? |
| 10:00 | 15 | A    Yes. |
| 10:01 | 16 | Q    If we can look at Exhibit 442, what is the title of |
| 10:01 | 17 | this chart? |
| 10:01 | 18 | A    "Payments to Greg Barela." |
| 10:01 | 19 | Q    Starting on the left-hand side, what do these bubbles |
| 10:01 | 20 | to the left of the dashed line show? |
| 10:01 | 21 | A    Again, these show settlement payment deposits with the |
| 10:01 | 22 | top set of bubbles shows a deposit from Brock USA to |
| 10:01 | 23 | CNB 5566.  That's the $1.6 million payment that we showed on |
| 10:01 | 24 | earlier exhibits.  Below that represents Michelle Phan's |
| 10:01 | 25 | repurchase payments. |

| | | |
|---|---|---|
| 10:01 | 1 | Q    And then to the right of the dashed line, what do these |
| 10:01 | 2 | bubbles show? |
| 10:01 | 3 | A    Those show two other client trust accounts, and the |
| 10:01 | 4 | arrows represent payments to Greg Barela. |
| 10:02 | 5 | Q    Are these the accounts from which Greg Barela received |
| 10:02 | 6 | payments? |
| 10:02 | 7 | A    Yes. |
| 10:02 | 8 | Q    As with Mr. Johnson and Ms. Gardner for the similar |
| 10:02 | 9 | charts you created, does this chart purport to reflect all |
| 10:02 | 10 | of the payments? |
| 10:02 | 11 | A    No.  It only reflects the accounts from which they |
| 10:02 | 12 | received the payment. |
| 10:02 | 13 | MR. WYMAN:  If we could zoom back out, please. |
| 10:02 | 14 | BY MR. WYMAN: |
| 10:02 | 15 | Q    The bottom left-hand bubble there from Personalized |
| 10:02 | 16 | Beauty Discovery, why is that reflected in this chart? |
| 10:02 | 17 | A    That's reflected in this chart because payments to Greg |
| 10:02 | 18 | Barela can be traced to the Michelle Phan repurchase |
| 10:02 | 19 | agreement settlement amount. |
| 10:02 | 20 | Q    And then right above that we see the bubble from Brock |
| 10:02 | 21 | USA with an arrow to CNB 5566, and then there is no arrow |
| 10:02 | 22 | going to the right of the dashed line.  Why is that? |
| 10:02 | 23 | A    That reflects that none of the amounts that were paid |
| 10:02 | 24 | into the client trust account 5566 were ultimately paid to |
| 10:02 | 25 | Greg Barela. |

10:03   1   Q    As with Mr. Johnson and Ms. Gardner, did you conduct a

10:03   2   more detailed analysis to trace at least one of the payments

10:03   3   to Mr. Barela?

10:03   4   A    Yes.

10:03   5   Q    Would you please take a look at Exhibit 443.

10:03   6   A    (Witness complies.)

10:03   7   Q    What is the title of this chart?

10:03   8   A    A portion of Michelle Phan's stock repurchase payment

10:03   9   was transferred to EA 4613.

10:03   10  Q    And is this a two-page exhibit?

10:03   11  A    Yes.

10:03   12  Q    Starting with the first page, can you please explain

10:03   13  what this chart reflects.

10:03   14  A    Sure.  This reflects on the left-hand side the balance

10:03   15  of CNB 4705, which reflects Michelle Phan's stock repurchase

10:03   16  payment.  And on April 4th, 2018, this account CNB 4705 made

10:03   17  a transfer to account EA 4613 in the amount of approximately

10:04   18  $190,000.

10:04   19  Q    And then going to page 2, is this a continuation of

10:04   20  page 1?

10:04   21  A    That's correct.

10:04   22  Q    And what is shown on this page?

10:04   23  A    So the left-hand side shows that account EA 4613 which

10:04   24  received the $190,000 deposit on April 4th.  Prior to

10:04   25  receiving that deposit, that account had a balance of $60.

10:04   1   And the next day that account EA 4613 made a payment to

10:04   2   Waypoint PPG of $60,000.

10:04   3   Q    And what is your understanding of what Waypoint PPG is?

10:04   4   A    I understand that to be associated with Mr. Barela.

10:04   5   Q    And based on your analysis here, that $60,000 payment

10:05   6   to Waypoint PPG, what is the source of that money?

10:05   7   A    Michelle Phan's repurchase payment.

10:05   8   Q    Based on your review of the bank records associated

10:05   9   with Mr. Barela's settlement money, how much of that

10:05   10  settlement money did Mr. Barela receive?

10:05   11  A    Zero dollars.

10:05   12  Q    Turning now to Exhibits 444 through 450, which client

10:05   13  do these exhibits relate to?

10:05   14  A    Michelle Phan, Pratigya Phan, and Long Tran.

10:05   15  Q    Starting with Exhibit 444, what is the title of this

10:05   16  chart?

10:05   17  A    Total amount due to Michelle Phan, Pratigya Phan, and

10:05   18  Long Tran as of March 14th, 2018.

10:05   19  Q    What does the first row say?

10:06   20  A    First repurchase amount paid on September 18th, 2017,

10:06   21  for $28.9 million.

10:06   22  Q    And the second line?

10:06   23  A    Second repurchase amount paid on March 14th, 2018, for

10:06   24  approximately $8.3 million.

10:06   25  Q    Are these the amounts -- are these the amount of

10:06  1  payments to those clients that you saw reflected in the bank

10:06  2  records?

10:06  3  A    Yes.   Those are the amounts of deposits that I saw into

10:06  4  the client trust account.

10:06  5  Q    Thank you.   Good clarification.   Right below that, the

10:06  6  total repurchase amount, what is reflected there?

10:06  7  A    That's the sum of the two amounts above, for

10:06  8  approximately $37.2 million.

10:06  9  Q    Right below that, what does the next row reflect?

10:06  10  A    Less legal fees of $2.79 million.

10:07  11  Q    How did you calculate that figure?

10:07  12  A    That represents 7.5 percent of the total repurchase

10:07  13  account.

10:07  14  Q    And when you're saying the total repurchase amount, are

10:07  15  you referring to the approximately $37.168 million figure

10:07  16  right above?

10:07  17  A    Yes.

10:07  18  Q    Right below that, what is listed for case-related

10:07  19  expenses?

10:07  20  A    Zero.

10:07  21  Q    Then below that, it says total due to clients as of

10:07  22  March 14th, 2018, and what amount is listed there?

10:07  23  A    34.38 million.

10:07  24  Q    Lastly, the row at the bottom in red, what is shown

10:07  25  there?

| | | |
|---|---|---|
| 10:07 | 1 | A    Total clients received from repurchase of approximately |
| 10:07 | 2 | $30.4 million. |
| 10:08 | 3 | Q    What is the approximate different between the last two |
| 10:08 | 4 | rows? |
| 10:08 | 5 | A    Approximately $4 million. |
| 10:08 | 6 | Q    For the amount of legal fees listed here, $2,787,651, |
| 10:08 | 7 | did you review bank records showing that the defendant |
| 10:08 | 8 | received that amount? |
| 10:08 | 9 | A    Yes. |
| 10:08 | 10 | MR. WYMAN:  If you could please pull up what is |
| 10:08 | 11 | already in evidence as Exhibit 367, page 1, focusing on the |
| 10:08 | 12 | check at the top there. |
| 10:08 | 13 | BY MR. WYMAN: |
| 10:08 | 14 | Q    Who is the check made out to? |
| 10:08 | 15 | A    To operating. |
| 10:08 | 16 | Q    And what is the amount of this check? |
| 10:08 | 17 | A    $2,787,650.87. |
| 10:09 | 18 | Q    Is that the total amount of legal fees that you |
| 10:09 | 19 | calculated in your chart? |
| 10:09 | 20 | A    That's right. |
| 10:09 | 21 | Q    Let's go to Exhibit 445 now, please.  What is the title |
| 10:09 | 22 | of this chart? |
| 10:09 | 23 | A    "Tracing of Michelle Phan, Pratigya Phan, and Long |
| 10:09 | 24 | Tran's First Repurchase Payment." |
| 10:09 | 25 | Q    And starting from the left, it looks like there is that |

| | | |
|---|---|---|
| 10:09 | 1 | same color-coded legend; is that right? |
| 10:09 | 2 | A    That's correct. |
| 10:09 | 3 | Q    And what does the bubble on the left and the three |
| 10:09 | 4 | arrows going to the right show? |
| 10:09 | 5 | A    The bubble on the left and the three arrows show the |
| 10:09 | 6 | deposit into CNB 4705, the client trust account, of the |
| 10:09 | 7 | first repurchase payment, which was 28 million and change. |
| 10:09 | 8 | Q    And what were the amounts of those three payments, |
| 10:09 | 9 | please? |
| 10:10 | 10 | A    475,000, 984,750, and approximately 27.4 million. |
| 10:10 | 11 | Q    And I see a date listed above those three.  Was that |
| 10:10 | 12 | the date of all three of these wires? |
| 10:10 | 13 | A    That's correct. |
| 10:10 | 14 | Q    And then if we could go to the right now, it looks like |
| 10:10 | 15 | there are two arrows from the CNB 4705 bubble? |
| 10:10 | 16 | A    That's correct. |
| 10:10 | 17 | Q    Starting with the ones in the bottom, what is reflected |
| 10:10 | 18 | there? |
| 10:10 | 19 | A    That shows a transfer of $2.787 million to CNB 3504. |
| 10:10 | 20 | Q    And then the arrow going to the top? |
| 10:10 | 21 | A    That shows $26.1 million being transferred out of the |
| 10:10 | 22 | client trust account to Michelle Phan and Pratigya Phan and |
| 10:10 | 23 | Long Tran. |
| 10:10 | 24 | Q    And between what dates were those payments to those |
| 10:11 | 25 | three individuals? |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 10:11 | 1 | A    Between September 18th, 2017, and October 3rd, 2017. |
| 10:11 | 2 | Q    If we could go to Exhibit 446, what is the title of |
| 10:11 | 3 | this chart? |
| 10:11 | 4 | A    Activities of CNB trust account 4705 after receiving |
| 10:11 | 5 | the first repurchase payment. |
| 10:11 | 6 | Q    And at the top three rows here, are those the payments |
| 10:11 | 7 | that you just described from Personalized Beauty Discovery? |
| 10:11 | 8 | A    That's correct. |
| 10:11 | 9 | Q    And at the end on October 3rd at the bottom of the |
| 10:11 | 10 | chart, what is the amount of the account balance? |
| 10:11 | 11 | A    Zero dollars and then a negative $12. |
| 10:12 | 12 | Q    Please go to Exhibit 447 now.  Mr. Drum, there should |
| 10:12 | 13 | be a version on the cart right behind you. |
| 10:12 | 14 | MR. WYMAN:  Your Honor, we made a redacted |
| 10:12 | 15 | version. |
| 10:12 | 16 | THE COURT:  That's fine. |
| 10:12 | 17 | THE WITNESS:  I don't think I have the redacted |
| 10:13 | 18 | version. |
| 10:13 | 19 | MR. WYMAN:  Your Honor, if it's okay, I'd like to |
| 10:13 | 20 | come back to this chart.  It's possible we could get to the |
| 10:13 | 21 | morning break after we bring a redacted version. |
| 10:13 | 22 | THE COURT:  That's fine. |
| 10:13 | 23 | MR. WYMAN:  Your Honor, actually now might be a |
| 10:13 | 24 | good time for a break if that's acceptable to Your Honor. |
| 10:13 | 25 | THE COURT:  That's fine. |

| | | |
|---|---|---|
| 10:13 | 1 | Ladies and gentlemen, we will take our mid-morning |
| 10:13 | 2 | break here.  We will be in recess for 15 minutes.  Please |
| 10:13 | 3 | remember the admonition not to discuss the case with anyone |
| 10:13 | 4 | and not to form any opinions on the issues in the case until |
| 10:13 | 5 | it is submitted to you.  And please do not do any research. |
| 10:14 | 6 | We will be in recess for 15 minutes. |
| 10:14 | 7 | (Recess taken at 10:14 a.m.; |
| 10:14 | 8 | proceedings resumed at 10:34 a.m.) |
| 10:14 | 9 | (Jury present) |
| 10:34 | 10 | BY MR. WYMAN: |
| 10:34 | 11 | Q    Mr. Drum, right before the break we were about to |
| 10:34 | 12 | discuss Exhibit 448.  Do you have the new version right in |
| 10:34 | 13 | front of you? |
| 10:34 | 14 | A    447? |
| 10:34 | 15 | Q    Yes.  I'm sorry, 447. |
| 10:34 | 16 | A    Yes. |
| 10:34 | 17 | Q    What is the -- I put it here on the elmo.  What is the |
| 10:34 | 18 | title of this chart? |
| 10:34 | 19 | A    Tracing of Michelle Phan and Long Tran's second |
| 10:34 | 20 | repurchase payment. |
| 10:34 | 21 | Q    At the top left it looks like there's that same |
| 10:34 | 22 | color-coded legend? |
| 10:34 | 23 | A    Yes. |
| 10:34 | 24 | Q    And then on the left side that I've put on the screen |
| 10:34 | 25 | here, what information is reflected? |

| 10:35 | 1 | A    That shows the second repurchase payments made by |
| 10:35 | 2 | Personalized Beauty Discovery deposited into CNB 4705. |
| 10:35 | 3 | Q    What is the date of those wire transfers? |
| 10:35 | 4 | A    March 14th, 2018. |
| 10:35 | 5 | Q    Focusing in the middle to these arrows, what does this |
| 10:35 | 6 | portion of the chart show? |
| 10:35 | 7 | A    This portion of the chart shows withdraws from |
| 10:35 | 8 | CNB 4705.  Starting at the bottom, approximately 4.3 million |
| 10:35 | 9 | was sent to Michelle Phan and Long Tran.  In the middle, |
| 10:35 | 10 | 260,000 was sent to EA 0313, and at the top approximately |
| 10:36 | 11 | 3.8 million was sent to EA 4613. |
| 10:36 | 12 | Q    Focusing on the bottom, the portion you said that was |
| 10:36 | 13 | sent to Michelle Phan and Long Tran, what are the dates of |
| 10:36 | 14 | the transfers making up that approximately 4.3 million |
| 10:36 | 15 | amount? |
| 10:36 | 16 | A    April 23rd, 2018, to May 4th, 2018. |
| 10:36 | 17 | Q    And you said the range there.  Are those the only two |
| 10:36 | 18 | dates on which there were wire transfers? |
| 10:36 | 19 | A    I believe that's right. |
| 10:36 | 20 | Q    Going back to the left, there is a bubble labeled |
| 10:36 | 21 | EA 4613 showing a $46,350 wire, it looks like, back into the |
| 10:36 | 22 | trust account; is that right? |
| 10:36 | 23 | A    That's right. |
| 10:36 | 24 | Q    And what is the date of that transfer? |
| 10:37 | 25 | A    May 4th, 2018. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

10:37  1   Q    And did that transfer immediately predate the May 4th

10:37  2   transfer to Michelle Phan?

10:37  3   A    Yes, it did.

10:37  4   Q    Going to the right now.  After those two middle

10:37  5   transfers that you described to the EA 4613 account and

10:37  6   EA 0313 account, what information is reflected here on the

10:37  7   right?

10:37  8   A    This shows that $32,000 was sent from EA 0313 into

10:37  9   EA 4613, and then from 4613 we have various payments to

10:37  10  three other clients and a payment to EA bankruptcy account.

10:37  11  Q    Let's start with that.  So it looks like EA 4613

10:38  12  received approximately 3.8 million or a little bit less from

10:38  13  the trust account, and then received 32,000 from EA 0313,

10:38  14  and then there are these various transfers.  What is the

10:38  15  first transfer at the top arrow?

10:38  16           MR. AVENATTI:  Objection, Your Honor, 401, 403.

10:38  17           THE COURT:  Overruled.

10:38  18           THE WITNESS:  The first transfer at the top is

10:38  19  $2.8 million to EA bankruptcy counsel on March 15th, 2018.

10:38  20  BY MR. WYMAN:

10:38  21  Q    And then to the right of that, there is another blue

10:38  22  bubble.  What is that arrow?

10:38  23           MR. AVENATTI:  Same objection, Your Honor.

10:38  24           THE COURT:  Overruled.

10:38  25           THE WITNESS:  That reflects a payment that EA

10:38   1   bankruptcy counsel made to the IRS for approximately

10:38   2   $1.5 million.

10:38   3   BY MR. WYMAN:

10:39   4   Q    And then below that, the three green bubbles, what do

10:39   5   those arrows reflect?

10:39   6           MR. AVENATTI:  Objection, Your Honor, 401, 403.

10:39   7           THE COURT:  Overruled.

10:39   8           THE WITNESS:  Those reflect the clients -- Greg

10:39   9   Barela, Geoffrey Johnson, Alexis Gardner -- receiving

10:39   10  payments from EA 4613.

10:39   11  BY MR. WYMAN:

10:39   12  Q    And the payments on this chart to Mr. Johnson,

10:39   13  Mr. Barela, and Ms. Gardner, are those the same payments

10:39   14  that are traceable to Ms. Phan's money that we discussed in

10:39   15  an earlier exhibit?

10:39   16          MR. AVENATTI:  Same objections, Your Honor.

10:39   17          THE COURT:  Overruled.

10:39   18          THE WITNESS:  That's right.

10:39   19  BY MR. WYMAN:

10:39   20  Q    And this payment at the top sent to the IRS of

10:39   21  $1,508,422, what did you say the date was on that?

10:39   22  A    March 26th, 2018.

10:40   23          MR. WYMAN:  Would you please pull up what's

10:40   24  already in evidence as Exhibit 392.  If you could blow up

10:40   25  the top of the check, please.

| | | |
|---|---|---|
| 10:40 | 1 | BY MR. WYMAN: |
| 10:40 | 2 | Q    What is the amount on this check, if you can see it? |
| 10:40 | 3 | A    $1,508,422. |
| 10:40 | 4 | Q    Is that the same amount on the exhibit we were just |
| 10:40 | 5 | referring to? |
| 10:40 | 6 | A    Yes. |
| 10:40 | 7 | Q    And who is the remitter of the check? |
| 10:40 | 8 | A    Sulmeyer Kupetz. |
| 10:40 | 9 | Q    And the date? |
| 10:40 | 10 | A    March 26th, 2018. |
| 10:41 | 11 | MR. WYMAN:  If you could please go now to |
| 10:41 | 12 | Exhibit 448. |
| 10:41 | 13 | BY MR. WYMAN: |
| 10:41 | 14 | Q    What is the title of this chart? |
| 10:41 | 15 | A    Activities of CNB trust account 4705 after receiving |
| 10:41 | 16 | the second repurchase payment. |
| 10:41 | 17 | Q    At the top there in that light blue line, what is |
| 10:41 | 18 | reflected in that row? |
| 10:41 | 19 | A    That reflects that the balance before receiving the |
| 10:41 | 20 | second repurchase payment was zero. |
| 10:41 | 21 | Q    Then below that it looks like there were two deposits |
| 10:41 | 22 | in the amount of the Personalized Beauty Discovery payment? |
| 10:41 | 23 | A    That's correct. |
| 10:41 | 24 | Q    And then the next day on March 15th, 2018, what is |
| 10:41 | 25 | shown there after the two bank fees? |

| | | |
|---|---|---|
| 10:41 | 1 | A    A $3 million withdraw that was paid into EA 4613. |
| 10:42 | 2 | MR. WYMAN:  And if we could zoom out. |
| 10:42 | 3 | BY MR. WYMAN: |
| 10:42 | 4 | Q    Between March 15th and April 23rd, what kind of |
| 10:42 | 5 | activity occurs in this chart? |
| 10:42 | 6 | MR. AVENATTI:  Objection, Your Honor, 401, 403. |
| 10:42 | 7 | THE COURT:  Overruled. |
| 10:42 | 8 | THE WITNESS:  It looks like withdraws to other EA |
| 10:42 | 9 | accounts and bank fees. |
| 10:42 | 10 | BY MR. WYMAN: |
| 10:42 | 11 | Q    As of April 23rd, immediately prior to the last row, |
| 10:42 | 12 | how much is left in the account? |
| 10:42 | 13 | A    As of the end of April 23rd? |
| 10:42 | 14 | Q    Let's start at the beginning of April 23rd prior to the |
| 10:42 | 15 | transfers shown in this chart. |
| 10:42 | 16 | A    Approximately 4.3 million. |
| 10:42 | 17 | Q    And then do you see a payment there to Long Tran of |
| 10:42 | 18 | approximately 147,000? |
| 10:43 | 19 | A    Yes. |
| 10:43 | 20 | Q    Then on May 4th, at the bottom of the page, do you see |
| 10:43 | 21 | two wires there at the bottom of page 1? |
| 10:43 | 22 | A    Yes, I do. |
| 10:43 | 23 | Q    What is the first wire? |
| 10:43 | 24 | A    The first wire is a deposit from EA 4613 for this |
| 10:43 | 25 | $46,350. |

10:43    1    Q    And after that deposit how much is in the account?

10:43    2    A    4,146,350.

10:43    3    Q    And right below that what is the last transfer

10:43    4    reflected on this page?

10:43    5    A    That's a withdrawal paid to IM&T Operations of 146,288.

10:44    6    Q    At the top of page 2, what is the first transfer

10:44    7    reflected on the chart on page 2?

10:44    8    A    That's a withdraw on that same day of $4 million paid

10:44    9    to IM&T Operations.

10:44   10    Q    After that $4 million withdrawal, how much is left in

10:44   11    the account?

10:44   12    A    Sixty-two dollars.

10:44   13    Q    So we just talked about three transfers on May 4th.

10:44   14    One was a deposit for approximately 46,000, and then one was

10:44   15    a withdrawal for 146,000 approximately, and then one was a

10:44   16    withdrawal of 4 million; is that right?

10:44   17    A    That's right.

10:44   18    Q    If that $46,000 approximate amount had not been

10:44   19    transferred in on May 4th, would there have been enough

10:44   20    money in the account to make the next two withdrawals?

10:44   21    A    No, there would not.

10:45   22    Q    As of May 4th, at the end of this chart, what is the

10:45   23    account balance?

10:45   24         MR. AVENATTI:  Objection.  Asked and answered.

10:45   25         THE COURT:  Overruled.

| | | |
|---|---|---|
| 10:45 | 1 | THE WITNESS:  At the end of May 4th after the bank |
| 10:45 | 2 | fee is taken out, the balance is $23. |
| 10:45 | 3 | MR. WYMAN:  If we could go to Exhibit 449. |
| 10:45 | 4 | BY MR. WYMAN: |
| 10:45 | 5 | Q    What is the title of this chart? |
| 10:45 | 6 | A    Activities of EA trust account 4613 after receiving a |
| 10:45 | 7 | portion of the second repurchase payment from CNB trust |
| 10:45 | 8 | account 4705. |
| 10:45 | 9 | Q    Starting at the top in that light blue line in the |
| 10:45 | 10 | first row, what is the account balance? |
| 10:45 | 11 | MR. AVENATTI:  Objection, Your Honor, 401, 403. |
| 10:45 | 12 | THE COURT:  Overruled. |
| 10:45 | 13 | THE WITNESS:  $1,217. |
| 10:45 | 14 | BY MR. WYMAN: |
| 10:45 | 15 | Q    And that's prior to the transfer reflected in the next |
| 10:45 | 16 | row; is that right? |
| 10:45 | 17 | A    That's correct. |
| 10:45 | 18 | Q    How much is that transfer for? |
| 10:46 | 19 | MR. AVENATTI:  Same objection, Your Honor. |
| 10:46 | 20 | THE COURT:  Overruled. |
| 10:46 | 21 | THE WITNESS:  $3 million. |
| 10:46 | 22 | BY MR. WYMAN: |
| 10:46 | 23 | Q    And then in the row right below that, it looks like |
| 10:46 | 24 | there is a sizable withdrawal.  What is that for? |
| 10:46 | 25 | MR. AVENATTI:  Same objection. |

10:46   1          THE COURT:  Overruled.

10:46   2          THE WITNESS:  That's on the same day as the

10:46   3   $3 million deposit, a withdrawal of $2.8 million paid to

10:46   4   Sulmeyer Kupetz.

10:46   5   BY MR. WYMAN:

10:46   6   Q    Then scrolling down a little bit, what other activity

10:46   7   occurred on March 15th?

10:46   8          MR. AVENATTI:  Same objections, Your Honor.  Can I

10:46   9   have a standing objection?

10:46   10          THE COURT:  No, sir.  Overruled.

10:46   11          THE WITNESS:  The remaining transfers on

10:46   12   March 15th of $1,200 payment to Global Baristas and a

10:46   13   $171,000 payment to EA 0313.

10:46   14   BY MR. WYMAN:

10:46   15   Q    And if we could scroll down a little bit, on March 20th

10:46   16   it looks like there is a payment of $1,900 to Geoffrey

10:47   17   Johnson; is that right?

10:47   18          MR. AVENATTI:  Same objections, Your Honor.

10:47   19          THE COURT:  Overruled.

10:47   20          THE WITNESS:  That's correct.

10:47   21          MR. WYMAN:  If could blow up just the payee

10:47   22   portion of the second half of the page.

10:47   23   BY MR. WYMAN:

10:47   24   Q    Later in March it appears that there are a number of

10:47   25   transfers to Global Baristas and Passport 420 and the

| | | |
|---|---|---|
| 10:47 | 1 | A&A 0661 account; is that right? |
| 10:47 | 2 | MR. AVENATTI:  Same objections, Your Honor. |
| 10:47 | 3 | THE COURT:  Overruled. |
| 10:47 | 4 | THE WITNESS:  That's correct.  I see one for |
| 10:47 | 5 | EA 0313 in there as well. |
| 10:47 | 6 | BY MR. WYMAN: |
| 10:47 | 7 | Q    I'm now going to page 2.  Without going through all of |
| 10:47 | 8 | these, it looks like there are a number of additional |
| 10:47 | 9 | payments to Global Baristas and Passport 420; is that right? |
| 10:47 | 10 | MR. AVENATTI:  Same objections, Your Honor. |
| 10:47 | 11 | THE COURT:  Overruled. |
| 10:47 | 12 | THE WITNESS:  That's correct. |
| 10:47 | 13 | BY MR. WYMAN: |
| 10:48 | 14 | Q    Then at the very last row on page 2, what is the wire |
| 10:48 | 15 | transfer reflected there? |
| 10:48 | 16 | MR. AVENATTI:  Same objections. |
| 10:48 | 17 | THE COURT:  Overruled. |
| 10:48 | 18 | THE WITNESS:  That's a $60,000 payment paid to |
| 10:48 | 19 | Waypoint PPG. |
| 10:48 | 20 | BY MR. WYMAN: |
| 10:48 | 21 | Q    And you testified earlier that that was the entity you |
| 10:48 | 22 | understood was associated with Mr. Barela? |
| 10:48 | 23 | A    That's correct. |
| 10:48 | 24 | Q    Then lastly, on page 3 it looks like there are more |
| 10:48 | 25 | payments to Passport 420, Global Baristas, and the A&A 0661 |

| | | |
|---|---|---|
| 10:48 | 1 | account? |
| 10:48 | 2 | MR. AVENATTI:  Same objections, Your Honor. |
| 10:48 | 3 | THE COURT:  Overruled. |
| 10:48 | 4 | THE WITNESS:  Yes.  I see that. |
| 10:48 | 5 | BY MR. WYMAN: |
| 10:48 | 6 | Q    And then what does the very last row reflect? |
| 10:48 | 7 | MR. AVENATTI:  Same objections. |
| 10:48 | 8 | THE COURT:  Overruled. |
| 10:48 | 9 | THE WITNESS:  That's a $34,000 payment to Alexis |
| 10:48 | 10 | Gardner. |
| 10:48 | 11 | BY MR. WYMAN: |
| 10:48 | 12 | Q    After that payment how much is left in the account as |
| 10:48 | 13 | of April 17th, 2018? |
| 10:48 | 14 | MR. AVENATTI:  Same objections. |
| 10:48 | 15 | THE COURT:  Overruled. |
| 10:48 | 16 | THE WITNESS:  $90,501. |
| 10:48 | 17 | MR. WYMAN:  Would you please go to Exhibit 450, |
| 10:49 | 18 | please. |
| 10:49 | 19 | BY MR. WYMAN: |
| 10:49 | 20 | Q    What is the title of this chart? |
| 10:49 | 21 | A    "A Portion Of Michelle Phan's Stock Repurchase Payment |
| 10:49 | 22 | Was Transferred To EA 4613." |
| 10:49 | 23 | Q    And it looks like it's a two-page exhibit? |
| 10:49 | 24 | A    That's correct. |
| 10:49 | 25 | Q    So if we could go to the second page and finish the |

| | | |
|---|---|---|
| 10:49 | 1 | name, the title of the chart, please. |
| 10:49 | 2 | A    So the full title of the chart would be:  "A Portion Of |
| 10:49 | 3 | Michelle Phan's Stock Repurchase Payment Was Transferred To |
| 10:49 | 4 | EA 4613 And Was Used To Pay EA's Bankruptcy Counsel Which |
| 10:49 | 5 | Paid The IRS." |
| 10:49 | 6 | Q    Starting on page 1, could you please describe what this |
| 10:49 | 7 | chart reflects. |
| 10:49 | 8 | MR. AVENATTI:  Objection, Your Honor, 401, 403. |
| 10:49 | 9 | THE COURT:  Overruled. |
| 10:49 | 10 | THE WITNESS:  Starting on the left, we have the |
| 10:49 | 11 | balance of the client trust account associated with Michelle |
| 10:49 | 12 | Phan's stock repurchase; and on March 15th, 2018, that |
| 10:50 | 13 | account made a $3 million transfer to EA 4613. |
| 10:50 | 14 | BY MR. WYMAN: |
| 10:50 | 15 | Q    Then going to page 2, what does this page reflect? |
| 10:50 | 16 | MR. AVENATTI:  Same objections, Your Honor. |
| 10:50 | 17 | THE COURT:  Overruled. |
| 10:50 | 18 | THE WITNESS:  On page 2 we start with that same |
| 10:50 | 19 | account 4613, and we see the beginning balance prior to |
| 10:50 | 20 | receiving the $3 million deposit was $1,200.  It then |
| 10:50 | 21 | received $3 million and on that same day transferred $2.8 |
| 10:50 | 22 | million to Sulmeyer Kupetz.  And then approximately 11 days |
| 10:50 | 23 | later, Sulmeyer Kupetz made a payment of $1.5 million to the |
| 10:50 | 24 | IRS. |
| | 25 | |

| | | |
|---|---|---|
| 10:50 | 1 | BY MR. WYMAN: |
| 10:50 | 2 | Q    Now, we have been discussing the second set of payments |
| 10:50 | 3 | that the defendant received in his trust account in |
| 10:51 | 4 | March 2018 for approximately 8.3 million; is that right? |
| 10:51 | 5 | A    That's correct. |
| 10:51 | 6 | Q    And you described in one of the charts how Mr. Tran |
| 10:51 | 7 | received his approximately $147,000; is that right? |
| 10:51 | 8 | A    That's correct. |
| 10:51 | 9 | Q    And Ms. Phan or her entity received a total of two wire |
| 10:51 | 10 | transfers? |
| 10:51 | 11 | A    Yes. |
| 10:51 | 12 | Q    And one of those was for 4 million? |
| 10:51 | 13 | A    Yes, I believe so. |
| 10:51 | 14 | Q    And how much was the other one for approximately? |
| 10:51 | 15 | A    146,000. |
| 10:51 | 16 | Q    Based on your review of the fee agreement and the |
| 10:51 | 17 | settlement agreement and the calculations you performed that |
| 10:51 | 18 | we discussed earlier, how much more was she entitled to |
| 10:51 | 19 | under those agreements? |
| 10:51 | 20 | A    Approximately $4 million. |
| 10:51 | 21 | Q    Based on your review of the bank records associated |
| 10:52 | 22 | with the defendant, did Ms. Phan ever receive that |
| 10:52 | 23 | approximately $4 million that she was owed? |
| 10:52 | 24 | A    No. |
| 10:52 | 25 | Q    Let's look at one more chart that you prepared.  Would |

| | | |
|---|---|---|
| 10:52 | 1 | you please go to Exhibit 456. |
| 10:52 | 2 | A     (Witness complies.) |
| 10:52 | 3 | Q     What is the title of this chart? |
| 10:52 | 4 | A     Most payments made to clients were not directly from |
| 10:52 | 5 | their settlements. |
| 10:52 | 6 | Q     Okay.  Let's start on the left side.  It looks like we |
| 10:52 | 7 | have that same color-coded legend at the top; is that right? |
| 10:52 | 8 | A     That's correct. |
| 10:52 | 9 | Q     And what are these bubbles in blue and yellow on the |
| 10:52 | 10 | left? |
| 10:52 | 11 | A     Those reflect the settlement payments and the deposits |
| 10:52 | 12 | into the client trust accounts. |
| 10:52 | 13 | Q     When you say the settlement payments, whose settlement |
| 10:52 | 14 | payments are you referring to? |
| 10:52 | 15 | A     Those are the settlement payments for the defendants |
| 10:53 | 16 | [sic]. |
| 10:53 | 17 | Q     So does this chart relate to all four of the clients we |
| 10:53 | 18 | have been discussing? |
| 10:53 | 19 | A     Yes. |
| 10:53 | 20 | MR. WYMAN:  Then if we could please zoom out. |
| 10:53 | 21 | BY MR. WYMAN: |
| 10:53 | 22 | Q     What are the bubbles and arrows that kind of look like |
| 10:53 | 23 | a spider web on the right?  What does that reflect? |
| 10:53 | 24 | A     The spider web reflects various accounts from which the |
| 10:53 | 25 | defendants received the payments. |

10:53   1    Q    When you say defendants, do you mean clients?

10:53   2    A    I meant clients, yes.

10:53   3    Q    The bubbles on the right, the green bubbles, what names

10:53   4    are listed there?

10:53   5    A    Geoffrey Johnson, Alexis Gardner, Greg Barela, Michelle

10:53   6    Phan, Pratigya Phan, and Long Tran.

10:53   7    Q    We looked at a handful of -- or four charts that look

10:53   8    similar to this, one for each client.  Is this sort of like

10:53   9    a combination of those charts?

10:53   10   A    That's exactly right.

10:53   11   Q    Going back to the left side, the only bubbles I see,

10:54   12   arrows going to the right of the dashed line, are the ones

10:54   13   from CNB 4705 which received the payments from Personalized

10:54   14   Beauty Discovery.  What does that mean?

10:54   15   A    That means that payments associated with the

10:54   16   Personalized Beauty Discovery/Michelle Phan settlement were

10:54   17   paid to the client.

10:54   18   Q    Other than Ms. Phan who you testified a minute ago

10:54   19   received all but 4 million of her settlement money, did any

10:54   20   of these other clients receive a penny of their settlement

10:54   21   funds?

10:54   22   A    I believe Long Tran did.

10:54   23   Q    Thank you.  That's a good clarification.  I'm referring

10:54   24   to other than Michelle Phan, Long Tran, and Pratigya Phan,

10:55   25   who received money associated with their settlement with

| | |
|---|---|
| 10:55 | 1 |
| 10:55 | 2 |
| 10:55 | 3 |
| 10:55 | 4 |
| 10:55 | 5 |
| 10:55 | 6 |
| 10:55 | 7 |
| 10:55 | 8 |
| 10:55 | 9 |
| 10:55 | 10 |
| 10:56 | 11 |
| 10:56 | 12 |
| 10:56 | 13 |
| 10:57 | 14 |
| 10:57 | 15 |
| 10:57 | 16 |
| 10:57 | 17 |
| 10:57 | 18 |
| 10:57 | 19 |
| 10:57 | 20 |
| 10:57 | 21 |
| 10:57 | 22 |
| 10:57 | 23 |
| 10:57 | 24 |
| 10:57 | 25 |

Personalized Beauty Discovery, did any of the other
clients -- Mr. Johnson, Mr. Barela, Ms. Gardner -- receive a
penny of their settlement funds?

A     No.   That's why there are no arrows from those trust
accounts across the dotted line.

          MR. WYMAN:   Thank you, Mr. Drum.   No further
questions.

          THE COURT:   Mr. Avenatti.

                    CROSS-EXAMINATION

BY MR. AVENATTI:

Q     Mr. Drum, good morning.

A     Good morning.

Q     You and I have never communicated before, correct?

A     That's correct.

Q     What does CPA stand for?

A     Certified public accountant.

Q     And you're licensed in Illinois as a CPA; am I correct?

A     That's correct.

Q     And to get that license, you had to pass an exam that
had four parts; am I correct?

A     That's correct.

Q     Isn't it true that you barely passed that exam?

A     I don't believe that's true.

          MR. AVENATTI:   Your Honor, can I approach?

          THE COURT:   You may.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 10:57 | 1 | (Document handed to the witness) |
| 10:58 | 2 | BY MR. AVENATTI: |
| 10:58 | 3 | Q    Mr. Drum, in order to pass the CPA exam, you have to |
| 10:58 | 4 | pass all four parts, correct? |
| 10:58 | 5 | A    That's correct. |
| 10:58 | 6 | Q    And you have to have a score of at least 75 on all four |
| 10:58 | 7 | parts; don't you? |
| 10:58 | 8 | A    That's my recollection. |
| 10:58 | 9 | MR. AVENATTI:  Your Honor, I would offer 1080 as |
| 10:58 | 10 | impeachment. |
| 10:58 | 11 | MR. WYMAN:  Your Honor, objection.  Foundation, |
| 10:58 | 12 | hearsay. |
| 10:58 | 13 | THE COURT:  Lay the foundation. |
| 10:58 | 14 | BY MR. AVENATTI: |
| 10:58 | 15 | Q    Mr. Drum, isn't it true that on one of the parts of the |
| 10:58 | 16 | CPA exam, namely, the part entitled regulation that you took |
| 10:58 | 17 | on January 28th, 2008, you got a score of 77? |
| 10:59 | 18 | A    That's correct. |
| 10:59 | 19 | MR. AVENATTI:  Your Honor, I offer 1080 as |
| 10:59 | 20 | impeachment. |
| 10:59 | 21 | MR. WYMAN:  Same objections, Your Honor. |
| 10:59 | 22 | THE COURT:  Lay the foundation. |
| 10:59 | 23 | BY MR. AVENATTI: |
| 10:59 | 24 | Q    Sir, isn't it true that if you got less than 75, you |
| 10:59 | 25 | failed? |

| | | |
|---|---|---|
| 10:59 | 1 | MR. WYMAN:  Objection.  Asked and answered. |
| 10:59 | 2 | THE COURT:  Sustained. |
| 10:59 | 3 | BY MR. AVENATTI: |
| 10:59 | 4 | Q    Mr. Drum, the minimal score that you could get on that |
| 10:59 | 5 | portion of the exam was 75 in order to pass; isn't that |
| 10:59 | 6 | true? |
| 10:59 | 7 | MR. WYMAN:  Same objection. |
| 10:59 | 8 | THE COURT:  Sustained. |
| 10:59 | 9 | BY MR. AVENATTI: |
| 10:59 | 10 | Q    Sir, you barely passed one of the four portions of the |
| 10:59 | 11 | exam when you took it; isn't that true? |
| 10:59 | 12 | MR. WYMAN:  Same objection. |
| 10:59 | 13 | THE COURT:  Sustained. |
| 10:59 | 14 | BY MR. AVENATTI: |
| 10:59 | 15 | Q    Sir, when you took the exam, what did you understand |
| 10:59 | 16 | you had to get in order to become a CPA? |
| 10:59 | 17 | MR. WYMAN:  Same objection and relevance, 403. |
| 11:00 | 18 | THE COURT:  Sustained. |
| 11:00 | 19 | BY MR. AVENATTI: |
| 11:00 | 20 | Q    Sir, when you became licensed as a CPA and you took the |
| 11:00 | 21 | regulatory portion of the exam, what did that deal with? |
| 11:00 | 22 | MR. WYMAN:  Objection.  Relevance, 403. |
| 11:00 | 23 | THE COURT:  Overruled. |
| 11:00 | 24 | THE WITNESS:  I believe the regulatory section is |
| 11:00 | 25 | primarily tax-related accounting issues. |

|       |    |                                                          |
|-------|----|----------------------------------------------------------|
| 11:00 | 1  | BY MR. AVENATTI:                                          |
| 11:00 | 2  | Q    The regulatory section of the CPA exam, sir, isn't it |
| 11:00 | 3  | true that that deals with the regulation of accountants  |
| 11:00 | 4  | including legal and ethical requirements?                |
| 11:00 | 5  | A    There is also an ethics portion of the exam and --  |
| 11:00 | 6  | MR. AVENATTI:  Move to strike.                            |
| 11:00 | 7  | Can I have the question read back?                        |
| 11:00 | 8  | THE COURT:  You may.                                      |
| 11:00 | 9  | (Record read)                                            |
| 11:00 | 10 | THE WITNESS:  I don't know that that's true.             |
| 11:01 | 11 | BY MR. AVENATTI:                                          |
| 11:01 | 12 | Q    Well, sir, you took the portion of the exam, right? |
| 11:01 | 13 | A    I did.                                               |
| 11:01 | 14 | Q    Okay.  And as you sit here today, you don't recall that |
| 11:01 | 15 | that portion dealt with regulations of accountants and legal |
| 11:01 | 16 | and ethical issues?  Is that your testimony?             |
| 11:01 | 17 | A    I don't recall the specificity of what that portion of |
| 11:01 | 18 | the exam related to.                                      |
| 11:01 | 19 | Q    Do you dispute that?                                 |
| 11:01 | 20 | A    I have no basis to dispute that.                     |
| 11:01 | 21 | Q    Switching topics, how long have you been providing CPA |
| 11:02 | 22 | services on this matter that is pending in this court?   |
| 11:02 | 23 | A    I believe I started work on this sometime in late 2018. |
| 11:02 | 24 | Q    So over two-and-a-half years?                        |
| 11:02 | 25 | A    Yes.                                                 |

11:02   1    Q    And have you met with the government in connection with

11:02   2    your work?

11:02   3    A    Not in person.

11:02   4    Q    So the first time you met anyone from the government in

11:02   5    connection with this case was today or yesterday?

11:02   6    A    No.  The first time was on Monday.

11:02   7    Q    Everything else was done by phone and e-mail?

11:02   8    A    That's correct.

11:02   9    Q    And you were aware beginning in 2018 that this was a

11:02   10   matter pending here in the state of California, correct?

11:02   11   A    Yes.

11:03   12   Q    How did you know that?

11:03   13        MR. WYMAN:  Objection.  Relevance.

11:03   14        THE COURT:  Overruled.

11:03   15        THE WITNESS:  That was my understanding from my

11:03   16   discussions with counsel.

11:03   17   BY MR. AVENATTI:

11:03   18   Q    When you say counsel, who are you referring to?

11:03   19   A    The government.

11:03   20   Q    Mr. Sagel?

11:03   21   A    Yes.  I spoke with Mr. Sagel.

11:03   22   Q    Well, I agree you spoke with Mr. Sagel.  I'm talking

11:03   23   about this particular issue, sir.  Who informed you that the

11:03   24   matter was taken in California?  Was that Mr. Sagel?

11:03   25   A    I don't recall who it was.

| | | |
|---|---|---|
| 11:03 | 1 | Q   Was it Mr. Andre? |
| 11:03 | 2 | A   I don't recall. |
| 11:03 | 3 | Q   Are you licensed in the state of California as an |
| 11:03 | 4 | accountant, sir? |
| 11:03 | 5 | A   No, I'm not. |
| 11:03 | 6 | Q   What is the California Board of Accountancy? |
| 11:04 | 7 | A   I don't know. |
| 11:04 | 8 | Q   Have you ever heard of that? |
| 11:04 | 9 | A   I'm aware that each state has a board of accountancy or |
| 11:04 | 10 | similarly titled organization. |
| 11:04 | 11 | Q   And the California Board of Accountancy sets rules and |
| 11:04 | 12 | regulations relating to who can come into the state of |
| 11:04 | 13 | California and practice accountancy; don't they? |
| 11:04 | 14 | MR. WYMAN:  Objection.  Foundation. |
| 11:04 | 15 | THE COURT:  Overruled. |
| 11:04 | 16 | THE WITNESS:  That's what I would expect the Board |
| 11:04 | 17 | Of Accountancy of California to do. |
| 11:04 | 18 | BY MR. AVENATTI: |
| 11:04 | 19 | Q   And you are aware, are you not, sir, that if you come |
| 11:04 | 20 | into the state of California and you practice accountancy |
| 11:04 | 21 | without being licensed in the state, that's a criminal |
| 11:04 | 22 | misdemeanor.  You're aware of that, right? |
| 11:04 | 23 | MR. WYMAN:  Calls for a legal conclusion. |
| 11:04 | 24 | THE COURT:  Sustained. |
| | 25 | |

| | | |
|--|--|--|
| 11:04 | 1 | BY MR. AVENATTI: |
| 11:04 | 2 | Q    Sir, did you ever have any communications with the |
| 11:05 | 3 | government wherein they informed you that you had to be |
| 11:05 | 4 | licensed in the state of California in order to practice |
| 11:05 | 5 | accountancy within the borders of the state? |
| 11:05 | 6 | A    No.  They were aware of my credentials. |
| 11:05 | 7 | Q    And they never told you that? |
| 11:05 | 8 | A    We did not have that discussion. |
| 11:05 | 9 | Q    Did you ever ask anybody? |
| 11:05 | 10 | A    I don't believe I did. |
| 11:05 | 11 | Q    Have you made any effort over the last two-and-a-half |
| 11:05 | 12 | years while you have been working on this matter pending in |
| 11:05 | 13 | the state of California to become licensed as an accountant |
| 11:06 | 14 | in California? |
| 11:06 | 15 | A    No, I have not. |
| 11:06 | 16 | Q    Now, prior to testifying in this case, you have never |
| 11:06 | 17 | testified in a court of law in connection with any other |
| 11:06 | 18 | accounting matter; isn't that true? |
| 11:06 | 19 | A    That's correct. |
| 11:06 | 20 | Q    Have you ever testified in any criminal matter? |
| 11:06 | 21 | A    No. |
| 11:06 | 22 | Q    Have you ever done any accounting work for any criminal |
| 11:06 | 23 | matter, a pending criminal case? |
| 11:07 | 24 | A    I don't believe so. |
| 11:07 | 25 | Q    How was it that you became retained by the government |

| | | |
|---|---|---|
| 11:07 | 1 | to work on this case? |
| 11:07 | 2 | A    The government first contacted my colleague and |
| 11:07 | 3 | described the matter, and the government decided to hire |
| 11:07 | 4 | Analysis Group.  My colleague reached out to me and thought |
| 11:07 | 5 | it would be a good fit for my area of expertise. |
| 11:07 | 6 | Q    Who is your colleague? |
| 11:07 | 7 | A    Chris Borek. |
| 11:07 | 8 | Q    Please spell it for the court reporter. |
| 11:07 | 9 | A    C-h-r-i-s, B-o-r-e-k. |
| 11:08 | 10 | Q    Did Chris Borek do any work in connection with this |
| 11:08 | 11 | matter? |
| 11:08 | 12 | A    Yes. |
| 11:08 | 13 | Q    For how long? |
| 11:08 | 14 | A    Chris was involved tangentially I would say throughout |
| 11:08 | 15 | the matter. |
| 11:08 | 16 | Q    Is he still at Analysis Group? |
| 11:08 | 17 | A    Yes, he is. |
| 11:08 | 18 | Q    So he has been working on this matter as well for |
| 11:08 | 19 | two-and-a-half years, right? |
| 11:08 | 20 | A    Yes. |
| 11:08 | 21 | Q    Is there an engagement letter relating to the services |
| 11:08 | 22 | that you provided the government? |
| 11:08 | 23 | A    Yes. |
| 11:08 | 24 | Q    Have you reviewed it? |
| 11:08 | 25 | A    I believe so. |

11:08   1   Q   When did you do that?

11:08   2   A   I can't remember.

11:08   3   Q   Was it this week or two years ago?

11:08   4   A   I would say both.

11:08   5   Q   So you've reviewed it on multiple times?

11:09   6   A   Yes.

11:09   7   Q   Throughout the engagement?

11:09   8   A   I've referred to it, yes.

11:09   9   Q   And did you review it when it was sent to the

11:09  10   government?

11:09  11   A   I would imagine so.  There is an engagement between us

11:09  12   and the government.  I don't know whether it was sent to the

11:09  13   government or we sent it to the government.

11:09  14   Q   Well, strike that.  Have you approved the engagement

11:09  15   letter?

11:09  16   A   I don't believe I'm a signatory to the agreement

11:09  17   between the government and the office group.

11:09  18   Q   Well, that's not exactly what I asked.  Have you

11:09  19   approved the engagement letter?

11:09  20   A   I'm not quite sure what you mean.

11:09  21   Q   Is there anything in the engagement letter that you

11:09  22   disagree with?

11:09  23   A   I don't think so.

11:10  24   Q   What does the engagement letter provide?

11:10  25   A   The agreement between the government and Analysis Group

| | | |
|---|---|---|
| 11:10 | 1 | would outline the general nature of Analysis Group's work |
| 11:10 | 2 | and the fees that the government agreed to. |
| 11:10 | 3 | Q    Including the hourly fees, correct? |
| 11:10 | 4 | A    Yes. |
| 11:10 | 5 | Q    And do you approve of the hourly fee associated with |
| 11:10 | 6 | you that's in that engagement letter? |
| 11:10 | 7 | A    I'm not sure what you mean by whether I approved of it. |
| 11:10 | 8 | Q    Do you agree with it? |
| 11:10 | 9 | A    It's what it is. |
| 11:10 | 10 | Q    I understand that.  What is the hourly fee for you in |
| 11:10 | 11 | the engagement letter? |
| 11:10 | 12 | A    I believe it's $495. |
| 11:10 | 13 | Q    Per hour, correct? |
| 11:10 | 14 | A    Correct. |
| 11:10 | 15 | Q    And that's been true for two-and-a-half years, right? |
| 11:11 | 16 | A    That's correct. |
| 11:11 | 17 | Q    Did you ever tell anyone that you thought that was too |
| 11:11 | 18 | little or too much? |
| 11:11 | 19 | A    No.  I don't have any control over my hourly rate. |
| 11:11 | 20 | Q    Is Chris junior or senior to you? |
| 11:11 | 21 | A    Chris is senior to me. |
| 11:11 | 22 | Q    How have you communicated with the Assistant U.S. |
| 11:11 | 23 | Attorneys and agents during the last two-and-a-half years? |
| 11:11 | 24 | A    Via e-mail and phone calls. |
| 11:12 | 25 | Q    Including e-mails from you, correct? |

| | | |
|---|---|---|
| 11:12 | 1 | A    Correct. |
| 11:12 | 2 | Q    And have you over the last two-and-a-half years been in |
| 11:12 | 3 | fairly regular communication with the Assistant U.S. |
| 11:12 | 4 | Attorneys and the agents in connection with this matter? |
| 11:12 | 5 | A    Yes. |
| 11:12 | 6 | Q    Including by e-mail? |
| 11:12 | 7 | A    Yes. |
| 11:12 | 8 | Q    Who have you communicated with by e-mail? |
| 11:12 | 9 | A    Alex Wyman, Brett Sagel, and prior to that Julian |
| 11:12 | 10 | Andre. |
| 11:12 | 11 | Q    Anyone else from the prosecution or investigative |
| 11:12 | 12 | teams? |
| 11:12 | 13 | A    Yes, but I can't recall their name. |
| 11:12 | 14 | Q    Was it an agent or an attorney? |
| 11:12 | 15 | A    No.  There are agents on the e-mails as well. |
| 11:13 | 16 | Q    No.  I'm speaking about the name you can't recall. |
| 11:13 | 17 | What do you recall about that person? |
| 11:13 | 18 | A    Well, I listed attorneys, and I know there were agents |
| 11:13 | 19 | on the e-mails, and I can't recall the agents' names. |
| 11:13 | 20 | Q    Before testifying in this case, beginning yesterday, |
| 11:13 | 21 | did anybody ask you to compile those communications that you |
| 11:13 | 22 | had sent to the AUSAs and the agents? |
| 11:13 | 23 | A    No. |
| 11:13 | 24 | Q    Have you had any other written communications with the |
| 11:13 | 25 | government -- and by government, I mean the prosecutors and |

| 11:13 | 1 | the agents -- other than e-mails? |
| 11:13 | 2 | A   I don't believe so. |
| 11:13 | 3 | Q   Have you ever sent any text messages to any of them? |
| 11:13 | 4 | A   No. |
| 11:14 | 5 | Q   How about letters? |
| 11:14 | 6 | A   No. |
| 11:14 | 7 | Q   Did you ever have any communication with any prosecutor |
| 11:14 | 8 | or any agent where it was discussed that something would not |
| 11:14 | 9 | be put in writing? |
| 11:14 | 10 | A   I don't believe so. |
| 11:14 | 11 | Q   Did you ever provide drafts of the charts that we were |
| 11:14 | 12 | looking at -- and we're going to get to them in a minute. |
| 11:14 | 13 | Did you ever provide any drafts of those charts by e-mail? |
| 11:14 | 14 | A   Yes. |
| 11:14 | 15 | Q   Was that a fairly regular occurrence as you were |
| 11:14 | 16 | working on the charts? |
| 11:14 | 17 | A   There were a handful in the duration, yes. |
| 11:14 | 18 | Q   And was that over the last two-and-a-half years? |
| 11:14 | 19 | A   Yes. |
| 11:14 | 20 | Q   During the last two-and-a-half years, did you make |
| 11:14 | 21 | requests for information, for documents that you wanted to |
| 11:14 | 22 | review, by e-mail? |
| 11:14 | 23 | A   Yes. |
| 11:15 | 24 | Q   Did you pose questions to the agents and the |
| 11:15 | 25 | prosecutors by e-mail that you had along the way? |

```
11:15    1    A    To clarify, I know I made requests for documents.  And
11:15    2    to answer your question, yes, I had questions.  I don't
11:15    3    think I can say whether those were conveyed via phone calls
11:15    4    or via e-mail.
11:15    5    Q    You're not certain without looking at the e-mails?
11:15    6    A    That's correct.
11:15    7    Q    Generally while you were compiling these charts, these
11:15    8    exhibits that you were asked about, there were times over
11:15    9    the last two-and-a-half years where you would consult with
11:15   10    the government about what the charts showed, correct?
11:15   11    A    That's correct.
11:15   12    Q    And how would you consult with them if you were not
11:15   13    doing it in person?
11:15   14    A    We would consult with them on phone calls.
11:16   15    Q    And would you send a draft of the charts ahead of time
11:16   16    so that they would know what to look at?
11:16   17    A    Yes.
11:16   18    Q    And that would be by e-mail?
11:16   19    A    Correct.
11:16   20    Q    Do you have any estimate as to the number of the
11:16   21    e-mails and phone calls that you had with the prosecutors
11:16   22    and the agents over the last two-and-a-half years?
11:16   23    A    Not a reliable estimate.
11:16   24    Q    It's safe to say there were many, though, correct?
11:16   25    A    Yes.
```

11:16    1    Q    And then how often did you bill for the time that you

11:16    2    spent on this matter?

11:16    3    A    Ideally once a month.

11:16    4    Q    And how would those bills be generated and sent to the

11:17    5    government?

11:17    6    A    They were generated by Analysis Group, and then our

11:17    7    billing department would send them to the government.

11:17    8    Q    Does anyone review the bills before they're sent to the

11:17    9    government to make sure they're accurate?

11:17    10    A    Yes.

11:17    11    Q    Who reviewed the bills over the last two-and-a-half

11:17    12    years to make sure they were accurate?

11:17    13    A    I did.

11:17    14    Q    So you would get draft bills and then you would approve

11:17    15    them, and then they would be sent to the government,

11:17    16    correct?

11:17    17    A    That's correct.

11:17    18    Q    And is that generally what happened for the last

11:17    19    two-and-a-half years?

11:17    20    A    Yes.

11:17    21    Q    And would those bills detail how much time was spent on

11:17    22    each individual task?

11:17    23    A    It would detail how much time was spent and a general

11:17    24    description of the tasks that were accomplished.

11:17    25    Q    And in connection with you approving the bills before

11:17  1   they were sent, you would make sure that that information

11:17  2   was accurate; am I correct?

11:18  3   A    That's correct.

11:18  4   Q    And you would correct any inaccuracies before they were

11:18  5   sent; is that right?  Was that your custom and practice?

11:18  6   A    Yes.

11:18  7   Q    So is it safe to say if you were billing on a monthly

11:18  8   basis, there's approximately 30 bills that were sent to the

11:18  9   government in connection with the subject matter of your

11:18  10  testimony in this case?

11:18  11  A    I would expect the number to be lower because there

11:18  12  were months in which Analysis Group did not perform those

11:18  13  services.

11:18  14  Q    At least 20 bills relating to the subject matter of

11:18  15  your testimony, correct?

11:18  16  A    That may be a reasonable estimate.

11:18  17  Q    And when I was asking about the e-mails, you understood

11:18  18  me to be asking about e-mails relating to the subject matter

11:18  19  of your testimony, correct?

11:18  20  A    Yes.

11:19  21  Q    Before taking the stand, did anybody ask you to gather

11:19  22  the bills?

11:19  23  A    No.

11:19  24  Q    What were you asked to do in connection with this case,

11:19  25  and who asked you to do it?

11:19   1           MR. WYMAN:  Objection.  Vague.

11:19   2           THE COURT:  Overruled.

11:19   3           THE WITNESS:  I was asked to trace what happened

11:19   4   to the money that was deposited into client trust accounts,

11:19   5   and I was asked to trace the source of payments that were

11:19   6   made to the four clients.

11:19   7   BY MR. AVENATTI:

11:19   8   Q    The four clients or the five clients?

11:19   9   A    The clients associated with the four matters.

11:20   10          MR. AVENATTI:  Your Honor, could I have a sidebar?

11:20   11          THE COURT:  No.

11:20   12          MR. AVENATTI:  The request relates to Jencks, but

11:20   13   I'll ask my next question.

11:20   14   BY MR. AVENATTI:

11:20   15   Q    Who determined, sir, what you reviewed in connection

11:20   16   with your work in this case?

11:20   17   A    Could you clarify what you mean by who determines.

11:20   18   Q    Well, what I'm trying to figure out is did you ask for

11:20   19   information, or were you just given information?  So here is

11:20   20   my question:  Who determined what documents you reviewed in

11:20   21   connection with the work you did in connection with this

11:20   22   case?

11:21   23   A    Both were true.  I was provided with information and

11:21   24   performed analyses and asked for additional information and

11:21   25   received additional information.

| | | |
|---|---|---|
| 11:21 | 1 | Q    So it did not start off with you asking for |
| 11:21 | 2 | information.  It started off with the government giving you |
| 11:21 | 3 | information, correct? |
| 11:21 | 4 | A    The very first step I suppose is a conversation with |
| 11:21 | 5 | the government.  Obviously I wanted what they wanted me to |
| 11:21 | 6 | do. |
| 11:21 | 7 | Q    And what was the next step? |
| 11:21 | 8 | A    I can't recall if the next step was me asking, |
| 11:21 | 9 | requesting the information or the government providing or |
| 11:21 | 10 | telling me what they were going to provide.  I don't recall. |
| 11:21 | 11 | Q    What do you recall receiving from the government |
| 11:21 | 12 | initially? |
| 11:22 | 13 | A    I believe my earliest recollection of what we received |
| 11:22 | 14 | was a database of bank information, bank records. |
| 11:22 | 15 | Q    What do you mean when you say a database? |
| 11:22 | 16 | A    A large spreadsheet that contains banking transactions. |
| 11:22 | 17 | Q    You didn't create that spreadsheet; did you? |
| 11:22 | 18 | A    I did not.  I did verify the accuracy, though. |
| 11:22 | 19 |          MR. AVENATTI:  Move is to strike after I did not |
| 11:22 | 20 | as nonresponsive, Your Honor. |
| 11:22 | 21 |          THE COURT:  It will be stricken. |
| 11:22 | 22 |          MR. AVENATTI:  Thank you. |
| 11:22 | 23 | BY MR. AVENATTI: |
| 11:22 | 24 | Q    Now, so one of the first things you received, if not |
| 11:22 | 25 | the first thing, was a database of banking transactions that |

| | | |
|---|---|---|
| 11:22 | 1 | the government provided to you, right? |
| 11:22 | 2 | A    That's my recollection. |
| 11:22 | 3 | Q    And you later came to learn that that database was not |
| 11:23 | 4 | prepared by a bank; was it? |
| 11:23 | 5 | A    I understood that database was prepared by the |
| 11:23 | 6 | government. |
| 11:23 | 7 | Q    So when I asked you it was not prepared by a bank, that |
| 11:23 | 8 | was correct, right? |
| 11:23 | 9 | A    It was based on the information that I was provided by |
| 11:23 | 10 | the government. |
| 11:23 | 11 | MR. AVENATTI:  Move to strike as nonresponsive. |
| 11:23 | 12 | THE COURT:  It will be stricken. |
| 11:23 | 13 | BY MR. AVENATTI: |
| 11:23 | 14 | Q    Mr. Drum, please just listen to my question.  And if |
| 11:23 | 15 | you need me to rephrase it or explain it because sometimes I |
| 11:23 | 16 | ask a bad question, just ask me.  Okay? |
| 11:23 | 17 | A    Okay. |
| 11:23 | 18 | Q    All right.  When you received the database, you |
| 11:23 | 19 | understood that no bank had prepared that database, right? |
| 11:23 | 20 | A    Yes. |
| 11:23 | 21 | Q    And the government informed you at the time that the |
| 11:23 | 22 | government had prepared this database, correct? |
| 11:23 | 23 | A    That's correct. |
| 11:24 | 24 | Q    Do you know who at the government prepared this |
| 11:24 | 25 | database and how they prepared it? |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 11:24 | 1 | A    I don't know who prepared the database. |
| 11:24 | 2 | Q    Do you know how they prepared it? |
| 11:24 | 3 | A    I know that it was based on the bank records. |
| 11:24 | 4 | Q    Well, because that's what they told you, right?  Yes? |
| 11:24 | 5 | A    Yes. |
| 11:24 | 6 | Q    Did you ever talk to anybody who prepared the database? |
| 11:24 | 7 | A    I don't know. |
| 11:24 | 8 | Q    Did you ever ask to speak with anyone that actually |
| 11:24 | 9 | prepared the database? |
| 11:24 | 10 | A    I don't believe so. |
| 11:24 | 11 | Q    All right.  So the database was one of the very first |
| 11:24 | 12 | things you were provided.  What else do you remember being |
| 11:24 | 13 | provided? |
| 11:24 | 14 | A    I was provided access to EA's QuickBooks records.  I |
| 11:24 | 15 | was provided with the settlement agreements and the |
| 11:25 | 16 | retention agreements, and I was provided with thousands of |
| 11:25 | 17 | pages of pdf bank records. |
| 11:25 | 18 | Q    Were you ever provided with anything else? |
| 11:25 | 19 | A    I believe so. |
| 11:25 | 20 | Q    What else? |
| 11:25 | 21 | A    We were provided -- I was provided with information |
| 11:25 | 22 | that relates to the other matter.  I don't want to confuse |
| 11:25 | 23 | the two, but -- |
| 11:25 | 24 | Q    What other information were you provided relating to |
| 11:25 | 25 | the subject matter of your testimony? |

11:25   1   A    I don't recall anything else.

11:26   2   Q    Do you recall asking for anything else over the last

11:26   3   two-and-a-half years other than what you have just

11:26   4   described?

11:26   5   A    No, I don't recall.

11:26   6   Q    Have you now told the jury everything that you reviewed

11:26   7   in connection with this case?

11:26   8   A    Everything that I recall.

11:26   9   Q    What is Tabs?

11:26   10  A    I understand Tabs is a term used to describe the

11:26   11  spreadsheets that Judy Regnier e-mailed that contained

11:26   12  client-related expenses.

11:27   13          MR. AVENATTI:  One moment, Your Honor.

11:27   14          (Pause in proceedings)

11:27   15  BY MR. AVENATTI:

11:27   16  Q    Do you see what I have written there, the big word

11:27   17  "Tabs" with a circle around it?

11:27   18  A    I see that.

11:27   19  Q    You understand that Tabs is not just a couple of

11:27   20  printouts that Judy Regnier provided.  You understand that

11:27   21  Tabs is an accounting program; do you not?

11:28   22  A    I don't know that.

11:28   23  Q    No one from the government ever told you about Tabs?

11:28   24  A    Only in connection to the spreadsheets that Judy

11:28   25  Regnier e-mailed.

11:28  1  Q    No one from the government ever told you that there was

11:28  2  an accounting program that tracked the costs for the client

11:28  3  matters and that the program was called Tabs?  Yes or no?

11:28  4  A    I understood that Tabs was a system that tracked

11:28  5  client-related expenses which is contained in the

11:28  6  spreadsheets Judy Regnier e-mailed.

11:28  7          MR. AVENATTI:  Move to strike, Your Honor.

11:28  8          THE COURT:  Denied.

11:28  9  BY MR. AVENATTI:

11:28  10  Q    Sir, please listen to my question.  Did anyone from the

11:29  11  government ever tell you that there was a software program

11:29  12  called Tabs where the firm tracked client costs?

11:29  13          MR. WYMAN:  Asked and answered.

11:29  14          THE COURT:  Overruled.

11:29  15          THE WITNESS:  I believe that is how the government

11:29  16  described it to me.

11:29  17  BY MR. AVENATTI:

11:29  18  Q    Did you ever say, "I want to see the software database

11:29  19  Tabs"?

11:29  20  A    No, I did not.

11:29  21  Q    Did you ever have any other communications with the

11:29  22  government about the data in the Tabs database?

11:29  23  A    No.

11:29  24  Q    Is it your understanding -- well, strike that.  Do you

11:30  25  have any understanding beyond the two draft documents that

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

11:30    1    you referred to that Ms. Regnier sent, do you have any

11:30    2    understanding of what was tracked in Tabs for the clients?

11:30    3    Do you know?

11:30    4    A    Other than those two spreadsheets, no.

11:30    5    Q    Before testifying in the case and in connection with

11:30    6    the over $600,000 that your firm was paid, did you ever make

11:30    7    any effort to find out what was in Tabs?

11:30    8    A    I did not.

11:30    9    Q    You understood that in connection with your testimony,

11:30   10    you had to figure out what the actual out-of-pocket costs

11:30   11    expended for the clients was, right?  You knew you had to

11:30   12    figure that out, correct?

11:30   13    A    Yes.

11:31   14    Q    Now, you understood, sir, did you not, before taking

11:31   15    the stand that you, unlike other witnesses who have

11:31   16    testified, you had the ability to actually review witness

11:31   17    trial testimony before you testified?  You understood that,

11:31   18    correct?

11:31   19    A    I don't think I understood that.

11:31   20    Q    Did you ever ask to review any of the trial testimony

11:31   21    thus far in the case that has been provided to the jury?

11:31   22    A    No, I don't believe I did.

11:31   23    Q    Before taking the stand, did you ever ask anybody, hey,

11:32   24    what did Judy Regnier testify to as it relates to the

11:32   25    accounting of Eagan Avenatti?

| | | |
|---|---|---|
| 11:32 | 1 | A    I did not ask that. |
| 11:32 | 2 | Q    Sir, did you understand that in order for you to |
| 11:32 | 3 | competently testify in front of the jury, that you had to |
| 11:32 | 4 | understand how the accounting and the management of the law |
| 11:32 | 5 | firm worked first? |
| 11:32 | 6 | MR. WYMAN:  Objection.  Argumentative. |
| 11:32 | 7 | THE COURT:  Overruled. |
| 11:32 | 8 | THE WITNESS:  Can you ask your question again? |
| 11:32 | 9 | MR. AVENATTI:  Can I have it read back, please? |
| 11:32 | 10 | THE COURT:  Yes. |
| 11:32 | 11 | (Record read) |
| 11:33 | 12 | THE WITNESS:  The information that I was |
| 11:33 | 13 | provided -- |
| 11:33 | 14 | BY MR. AVENATTI: |
| 11:33 | 15 | Q    Yes or no, sir?  Just answer my question. |
| 11:33 | 16 | A    I'm sorry.  Can I have it -- it's a long question.  Can |
| 11:33 | 17 | I have it read again? |
| 11:33 | 18 | THE COURT:  Yes. |
| 11:33 | 19 | (Record read) |
| 11:33 | 20 | THE WITNESS:  Of a law firm or of the law firm? |
| 11:33 | 21 | BY MR. AVENATTI: |
| 11:33 | 22 | Q    Of the law firm.  Yes or no? |
| 11:33 | 23 | A    No, I don't think I actually did. |
| 11:33 | 24 | Q    Who knows more about how expenses and costs were |
| 11:34 | 25 | tracked at the law firm in your estimation?  You or Judy |

| | | |
|---|---|---|
| 11:34 | 1 | Regnier? |
| 11:34 | 2 | MR. AVENATTI:  Calls for speculation. |
| 11:34 | 3 | THE COURT:  Overruled. |
| 11:34 | 4 | THE WITNESS:  I would suspect Judy knows more than |
| 11:34 | 5 | I do. |
| 11:34 | 6 | BY MR. AVENATTI: |
| 11:34 | 7 | Q    Are you aware that Ms. Regnier testified repeatedly in |
| 11:34 | 8 | response to questions by me before this jury that in order |
| 11:34 | 9 | to figure out the costs for a client, you had to look at |
| 11:34 | 10 | QuickBooks and Tabs and specifically the electronic data? |
| 11:34 | 11 | Are you aware of that? |
| 11:34 | 12 | A    No. |
| 11:34 | 13 | Q    The government never told you that before you took the |
| 11:35 | 14 | stand; did they? |
| 11:35 | 15 | A    No. |
| 11:35 | 16 | Q    And despite your firm being paid over $600,000, you |
| 11:35 | 17 | never asked; did you? |
| 11:35 | 18 | A    I never asked what? |
| 11:35 | 19 | Q    You never asked what data would have to be reviewed in |
| 11:35 | 20 | order to properly figure out what a client was owed; did |
| 11:35 | 21 | you? |
| 11:35 | 22 | A    I asked for information about client-related expenses, |
| 11:35 | 23 | yes, I did. |
| 11:35 | 24 | Q    You asked the government for that? |
| 11:35 | 25 | A    Yes. |

```
11:35   1    Q    But they didn't give you the Tabs data other than the
11:35   2    two draft spreadsheets; isn't that true?
11:36   3    A    They did not give me Tabs data other than the two
11:36   4    spreadsheets.  That's correct.
11:36   5    Q    Did the government inform you in connection with your
11:36   6    work that in fact on at least two occasions over the last
11:36   7    two-and-a-half years before the trial, Ms. Regnier told the
11:36   8    government about Tabs?
11:36   9    A    I'm sorry.  What was the first part of the question?
11:36   10           MR. AVENATTI:  May I have it read back, Your
11:36   11   Honor?
11:36   12           THE COURT:  Yes.
11:36   13            (Record read)
11:36   14           THE WITNESS:  No, I don't believe the government
11:36   15   conveyed that to me.
11:36   16   BY MR. AVENATTI:
11:36   17   Q    Now, in connection with your work, did you ever ask to
11:37   18   speak with Ms. Regnier?
11:37   19   A    I did not.
11:37   20   Q    Did you ever ask to speak with Mr. Johnson?
11:37   21   A    No.
11:37   22   Q    Ms. Gardner?
11:37   23   A    No.
11:37   24   Q    Ms. Phan?
11:37   25   A    Nope.
```

```
11:37    1   Q    Mr. Tran?
11:37    2   A    Nope.
11:37    3   Q    How about Mr. Barela, the government's star witness?
11:37    4   A    No.
11:37    5           MR. WYMAN:  Objection.  Argumentative.
11:37    6           THE COURT:  Sustained.  Reask the question.
11:37    7           The answer is stricken.
11:37    8   BY MR. AVENATTI:
11:37    9   Q    How about Mr. Barela?
11:37   10   A    No.
11:37   11   Q    And you never asked to speak with me or communicate
11:37   12   with me; did you?
11:37   13   A    No.
11:37   14   Q    Or Mr. Steward?
11:37   15   A    No.
11:37   16   Q    Or Ms. Cummings-Cefali, correct?
11:38   17   A    Correct.  I did not ask to speak with her.
11:38   18   Q    Did you review any transcripts or interview reports or
11:38   19   notes from the government relating to any of the clients
11:38   20   before you testified, starting yesterday?
11:38   21   A    I'm sorry.  Starting yesterday?
11:38   22   Q    Maybe I asked a bad question.  I'll strike the
11:38   23   question.
11:38   24           Before testifying for the first time yesterday in
11:38   25   this case, did you review any transcripts or interview notes
```

| | | |
|---|---|---|
| 11:38 | 1 | from any interviews of any of the clients? |
| 11:38 | 2 | A    I don't recall reviewing the interview notes. |
| 11:38 | 3 | Q    Did you review any interview notes or transcripts from |
| 11:39 | 4 | any meetings that Ms. Regnier had with the government? |
| 11:39 | 5 | A    I don't believe so. |
| 11:39 | 6 | Q    So am I correct that as you sit here today, you have no |
| 11:39 | 7 | idea what Ms. Regnier has said in the last three years about |
| 11:39 | 8 | the accounting at Eagan Avenatti?  Am I correct about that? |
| 11:39 | 9 | A    That's correct. |
| 11:40 | 10 | Q    And am I correct that as you sit here today, you have |
| 11:40 | 11 | no idea what any client, any of the clients that you |
| 11:40 | 12 | testified about, you have no idea what any of them have told |
| 11:40 | 13 | the government or the jury?  Am I correct about that? |
| 11:40 | 14 | A    That is correct. |
| 11:40 | 15 | Q    So you have no idea what they have actually testified |
| 11:40 | 16 | to relating to what they were owed or not owed; is that |
| 11:40 | 17 | right? |
| 11:40 | 18 |           MR. WYMAN:  Objection.  Asked and answered. |
| 11:40 | 19 |           THE COURT:  Sustained. |
| 11:40 | 20 | BY MR. AVENATTI: |
| 11:40 | 21 | Q    Are you aware of any representations that have been |
| 11:40 | 22 | made by any client as to monies they were allegedly due? |
| 11:40 | 23 |           MR. WYMAN:  Same objection. |
| 11:40 | 24 |           THE COURT:  Overruled. |
| 11:40 | 25 |           THE WITNESS:  Could I have the question read back |

| | | |
|---|---|---|
| 11:40 | 1 | to me? |
| 11:40 | 2 | (Record read) |
| 11:41 | 3 | THE WITNESS:  I have seen press that relates to |
| 11:41 | 4 | the clients who testified. |
| 11:41 | 5 | BY MR. AVENATTI: |
| 11:41 | 6 | Q    During the trial? |
| 11:41 | 7 | A    I believe there's -- |
| 11:41 | 8 | Q    I just want you to answer my question.  You have read |
| 11:41 | 9 | this press during the trial; is that right? |
| 11:41 | 10 | A    Yes, that's correct. |
| 11:41 | 11 | Q    Is that on social media? |
| 11:41 | 12 | A    No.  It was on regular media. |
| 11:41 | 13 | Q    And within what you reviewed within the press were |
| 11:41 | 14 | quotes of actual witness testimony, right? |
| 11:41 | 15 | A    I don't recall if they were direct quotes or not. |
| 11:41 | 16 | Q    Well, I asked you about what people have said, and you |
| 11:41 | 17 | referred to the press.  So did they describe what witnesses |
| 11:41 | 18 | have testified to? |
| 11:42 | 19 | A    The press described it, yes. |
| 11:42 | 20 | Q    And that was during the trial, correct? |
| 11:42 | 21 | A    Correct. |
| 11:42 | 22 | Q    But other than that, you don't have any idea what |
| 11:42 | 23 | clients have claimed I allegedly did, right? |
| 11:42 | 24 | A    Other than -- |
| 11:42 | 25 | Q    I'm talking about what clients have stated, sir. |

| | | |
|---|---|---|
| 11:42 | 1 | That's what I -- I want you to focus, please, on my |
| 11:42 | 2 | question. |
| 11:42 | 3 | A    Other than what I have seen in the media, I don't have |
| 11:42 | 4 | any information about what they have stated in court. |
| 11:42 | 5 | Q    Did you ever ask for any information that you were not |
| 11:42 | 6 | provided? |
| 11:42 | 7 | A    I don't believe so. |
| 11:43 | 8 | Q    Now, other people have worked on this case along with |
| 11:43 | 9 | you; am I correct? |
| 11:43 | 10 | A    Yes. |
| 11:43 | 11 | Q    Okay.  Who else has worked on the case? |
| 11:43 | 12 | A    I worked with Evan Carter. |
| 11:43 | 13 | Q    Who else? |
| 11:43 | 14 | A    Ryan Keithahn. |
| 11:43 | 15 | Q    Anyone else? |
| 11:43 | 16 | A    Another analyst in the Analysis Group, My Khe Nguyen. |
| 11:44 | 17 | Q    Anyone else? |
| 11:44 | 18 | A    No. |
| 11:44 | 19 | Q    So the four of you plus Chris, correct? |
| 11:44 | 20 | A    Yes. |
| 11:44 | 21 | Q    Those have been the four billers on the matter since it |
| 11:44 | 22 | came in? |
| 11:44 | 23 | A    That's what I would expect.  There may be others that I |
| 11:44 | 24 | am not recalling. |
| 11:44 | 25 | Q    And have you been the most senior person other than |

| 11:44 | 1 | Chris working on the matter? |
| 11:44 | 2 | A    Yes. |
| 11:44 | 3 | Q    Whose has billed the most time on the matter? |
| 11:44 | 4 | A    I don't know. |
| 11:44 | 5 | Q    What are the rates of the other individuals' billing |
| 11:44 | 6 | time on the matters? |
| 11:44 | 7 | MR. WYMAN:  Objection, 401, 403. |
| 11:44 | 8 | THE COURT:  Overruled. |
| 11:44 | 9 | THE WITNESS:  I don't recall. |
| 11:44 | 10 | BY MR. AVENATTI: |
| 11:44 | 11 | Q    Well, can you estimate for the jury?  I mean, is it $50 |
| 11:44 | 12 | an hour or a thousand dollars an hour? |
| 11:44 | 13 | A    I would guess between 300 and 500. |
| 11:45 | 14 | Q    Per hour? |
| 11:45 | 15 | A    Correct. |
| 11:45 | 16 | Q    If we had the bills, that would tell us, right? |
| 11:45 | 17 | A    Yes. |
| 11:45 | 18 | Q    How much time has Evan Carter spent on the matter? |
| 11:45 | 19 | A    I don't know. |
| 11:45 | 20 | Q    Is it a little bit?  A lot? |
| 11:45 | 21 | A    It varies over time.  Recently a lot. |
| 11:45 | 22 | Q    I mean, Mr. Drum, Ms. Carter has been heavily involved |
| 11:45 | 23 | in preparing you for your testimony in this case; isn't that |
| 11:45 | 24 | true? |
| 11:45 | 25 | A    Yes. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 11:45 | 1 | Q    And she has been heavily involved in preparing the |
| 11:45 | 2 | exhibits that you were asked about by the government; isn't |
| 11:45 | 3 | that true? |
| 11:45 | 4 | A    Yes. |
| 11:46 | 5 | Q    And she has been working on this matter for some time |
| 11:46 | 6 | now, correct? |
| 11:46 | 7 | A    For some time. |
| 11:46 | 8 | Q    A couple years? |
| 11:46 | 9 | A    No. |
| 11:46 | 10 | Q    A year? |
| 11:46 | 11 | A    No. |
| 11:46 | 12 | Q    How long? |
| 11:46 | 13 | A    Several months. |
| 11:46 | 14 | Q    Other than yourself, who is the most knowledgeable |
| 11:46 | 15 | relating to this matter at your firm? |
| 11:46 | 16 | A    I would guess Evan Carter. |
| 11:46 | 17 | Q    Evan Carter is kind of the one that got her hands dirty |
| 11:46 | 18 | relating to really looking at things, right? |
| 11:46 | 19 | A    Evan Carter was heavily involved in assisting me to |
| 11:46 | 20 | prepare for this testimony. |
| 11:46 | 21 | Q    Including getting down in the nitty-gritty, right? |
| 11:46 | 22 | A    Perhaps. |
| 11:46 | 23 | Q    I mean, Evan Carter filled the John Drum role which is |
| 11:47 | 24 | what John Drum usually does in connection with other |
| 11:47 | 25 | matters.  He prepares other people to testify, right, in |

11:47    1    your experience?

11:47    2                    MR. WYMAN:  Objection.  Vague, compound.

11:47    3                    THE COURT:  Sustained.

11:47    4    BY MR. AVENATTI:

11:47    5    Q    Sir, generally up until this case, we've already

11:47    6    established you don't testify.  You assist other people in

11:47    7    getting ready to testify, right?

11:47    8    A    That is a part of my job, yes.

11:47    9    Q    That's been a big part of your job for ten years,

11:47   10    right?

11:47   11    A    Yes.

11:47   12    Q    And that's what Evan Carter did in this case.  She

11:47   13    helped get you ready to testify?

11:47   14    A    Yes.

11:47   15    Q    Is Evan Carter -- well, strike that.  Evan Carter works

11:47   16    out of Denver, right?

11:47   17    A    That's correct.

11:47   18    Q    Is Evan Carter in Southern California right now?

11:47   19                    MR. WYMAN:  401, 403, Your Honor.

11:47   20                    MR. AVENATTI:  Sustained.

11:47   21    BY MR. AVENATTI:

11:47   22    Q    What is the last time you spoke with Evan Carter about

11:47   23    this case?

11:48   24                    MR. WYMAN:  Same objection.

11:48   25                    THE COURT:  Overruled.

11:48   1          THE WITNESS:  Yesterday morning.

11:48   2   BY MR. AVENATTI:

11:48   3   Q     In person or on the phone?

11:48   4          MR. WYMAN:  Same objection.

11:48   5          THE COURT:  Overruled.

11:48   6          THE WITNESS:  Via Chat.

11:48   7   BY MR. AVENATTI:

11:48   8   Q     Via Chat, meaning on your phone, on your cell phone?

11:48   9   A     Yeah, the Chat program with Microsoft Teams.

11:48  10   Q     When is the last time you met in person with Evan

11:48  11   Carter about this case?

11:48  12   A     On Wednesday.

11:48  13   Q     Two days ago?

11:48  14   A     Correct.

11:48  15   Q     Where did you meet Evan Carter about this case?

11:48  16   A     We met in the lobby of the hotel in California.

11:48  17   Q     Close to the courthouse here?

11:48  18   A     Yes.  The Residence Inn.

11:49  19   Q     Is Evan Carter here in Southern California to help you

11:49  20   with your testimony?

11:49  21          MR. WYMAN:  401, 403, Your Honor.

11:49  22          THE COURT:  Overruled.

11:49  23          THE WITNESS:  She is no longer in Southern

11:49  24   California.

       25

11:49  1    BY MR. AVENATTI:

11:49  2    Q    Are you aware that we have been trying to serve her

11:49  3    with a subpoena?

11:49  4         MR. WYMAN:  Same objection.

11:49  5         THE COURT:  Sustained.

11:49  6    BY MR. AVENATTI:

11:49  7    Q    You went over a number of exhibits with Mr. Wyman.  Who

11:49  8    prepared those?

11:49  9    A    I prepared them.

11:50  10   Q    Every one of them?

11:50  11   A    Yes.

11:50  12   Q    Did Ms. Carter have anything to do with preparing

11:50  13   those?

11:50  14   A    Yes.  She assisted me in preparing them.

11:50  15   Q    Okay.  So it wasn't just you?

11:50  16   A    That's correct.

11:50  17   Q    All right.  Well, who else prepared them other than you

11:50  18   and Ms. Carter?

11:50  19   A    I prepared them with a team working at my direction.

11:50  20   Q    And those are the people you mentioned earlier?

11:50  21   A    Yes.

11:50  22   Q    Prior to taking the stand, did you engage in any mock

11:50  23   cross-examination?

11:50  24   A    Yes.

11:50  25   Q    Who played me?

| | | |
|---|---|---|
| 11:50 | 1 | A     Evan Carter. |
| 11:50 | 2 | Q     So far did she do a good job? |
| 11:50 | 3 | MR. WYMAN:  Objection.  Relevance. |
| 11:50 | 4 | MR. AVENATTI:  I will ask another question. |
| 11:50 | 5 | BY MR. AVENATTI: |
| 11:50 | 6 | Q     When did you do your mock cross-examinations where Evan |
| 11:50 | 7 | Carter played me? |
| 11:51 | 8 | MR. WYMAN:  Same objection. |
| 11:51 | 9 | THE COURT:  Overruled. |
| 11:51 | 10 | THE WITNESS:  This week and last week and probably |
| 11:51 | 11 | before. |
| 11:51 | 12 | BY MR. AVENATTI: |
| 11:51 | 13 | Q     So for the last two-and-a-half weeks before you took |
| 11:51 | 14 | the stand, you have been engaged in mock cross-examinations |
| 11:51 | 15 | where Evan Carter played me and you played yourself, the |
| 11:51 | 16 | witness, right? |
| 11:51 | 17 | A     That's correct. |
| 11:51 | 18 | MR. AVENATTI:  Now is a good time for a break if |
| 11:51 | 19 | that's okay with Your Honor. |
| 11:51 | 20 | THE COURT:  That's fine. |
| 11:51 | 21 | We'll take the lunch recess here.  We'll resume at |
| 11:51 | 22 | 1:30, ladies and gentlemen.  Please remember the admonition |
| 11:51 | 23 | not to discuss the case with anyone and not to form any |
| 11:51 | 24 | opinions on the issues in the case until it is submitted to |
| 11:51 | 25 | you.  And no research, please. |

| | | |
|---|---|---|
| 11:51 | 1 | See you all at 1:30. |
| 11:51 | 2 | (Jury not present) |
| 11:52 | 3 | THE COURT:  Sir, you may step down. |
| 11:52 | 4 | Mr. Avenatti. |
| 11:53 | 5 | MR. AVENATTI:  Your Honor, I would ask that the |
| 11:53 | 6 | government be directed to immediately provide the Jencks |
| 11:53 | 7 | materials that were clearly withheld from me.  They should |
| 11:53 | 8 | have been provided before I began my cross-examination, and |
| 11:53 | 9 | it is highly prejudicial that they were not.  And I reserve |
| 11:53 | 10 | all other rights associated with this. |
| 11:53 | 11 | This is a very serious matter and it continues to |
| 11:53 | 12 | arise, and there is no question based on this testimony that |
| 11:53 | 13 | we don't have it.  And in light of what happened last night |
| 11:53 | 14 | with Mr. Armenta, I think it's pretty clear that this was in |
| 11:53 | 15 | absolute bad faith.  And I want the materials, and I want |
| 11:53 | 16 | them now. |
| 11:53 | 17 | MR. WYMAN:  Your Honor, Mr. Drum is an expert |
| 11:53 | 18 | witness working at the government's prosecution team's |
| 11:54 | 19 | direction.  To the extent he had substantive conversations |
| 11:54 | 20 | relating to his testimony, it's covered by the work product |
| 11:54 | 21 | privilege. |
| 11:54 | 22 | For an expert witness we're required to give |
| 11:54 | 23 | disclosure about opinions that he will testify to, which we |
| 11:54 | 24 | did on several occasions, including providing a memorandum |
| 11:54 | 25 | of interview covering exactly what the testimony would be a |

11:54  1    couple of weeks ago, which we weren't required to do.

11:54  2         We also produced draft versions of these charts

11:54  3    which are, as we discussed previously, substantially

11:54  4    identical and within our case about a year and a half ago.

11:54  5    We've complied with our discovery obligations for Mr. Drum.

11:54  6         THE COURT:  Mr. Avenatti.

11:54  7         MR. AVENATTI:  Your Honor, I know of no rule or

11:54  8    case that holds that if the government calls an expert, that

11:54  9    Jencks and 26.2 do not apply.  I know of no such case.  I

11:54  10   don't believe that's the law.  Number one.

11:54  11        Number two, there is clearly a number of e-mails.

11:55  12   There is multiple drafts of these exhibits, multiple drafts,

11:55  13   not just one draft.  We got one draft, to be clear.

11:55  14   Actually -- I want to be clear -- we have two drafts.  We

11:55  15   have the draft in May, and then we have the final draft

11:55  16   that's in the exhibit book.

11:55  17        We don't have the e-mails.  We don't have all the

11:55  18   drafts.  We don't have all the communications from him.  We

11:55  19   don't have the billing records, Your Honor, which he

11:55  20   testified he approved.  I elicited that testimony.

11:55  21        Once he approves the bills and they're sent to the

11:55  22   government, that's a statement of a witness under 26.2 and

11:55  23   Jencks.  So those should have been produced.

11:55  24        They're also Brady.  They're also Giglio, and they

11:55  25   weren't produced.  I mean, I'm speechless.  And as you know,

```
11:55    1    that's rare.   That's rare that I'm speechless.
11:55    2              THE COURT:   We will be in recess.
11:55    3                   (Recess taken at 11:55 a.m.)
11:55    4                        *    *    *
11:55    5
11:55    6
11:55    7
11:55    8
11:55    9
11:55   10
11:55   11
11:55   12
11:55   13
11:55   14
11:55   15
11:55   16
11:55   17
11:55   18
11:55   19
11:55   20
11:55   21
11:55   22
11:55   23
11:55   24
11:55   25
```

**CERTIFICATE**


I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.


Date:  August 14, 2021


/s/   Sharon A. Seffens  8/14/21
_____
SHARON A. SEFFENS, U.S. COURT REPORTER

**MR. AVENATTI: [95]** 4/9 5/3 5/19 6/2 7/5 7/13 7/18 7/24 8/10 9/5 9/9 9/15 9/20 9/24 10/4 10/21 10/24 11/12 11/19 11/21 11/24 12/3 12/6 12/15 13/3 13/6 13/13 14/5 14/10 14/13 14/16 15/10 15/13 19/16 21/10 21/24 22/3 22/11 22/16 22/21 23/7 24/17 28/24 29/17 29/20 34/5 34/14 34/19 35/25 44/1 46/2 54/10 59/21 60/5 60/14 60/20 61/5 71/16 71/23 72/6 72/16 74/6 75/24 76/11 76/19 76/25 77/8 77/18 78/2 78/10 78/16 79/2 79/7 79/14 80/8 80/16 84/24 85/9 85/19 87/6 99/10 99/12 100/19 100/22 101/11 103/13 104/7 106/9 107/2 108/10 115/20 118/4 118/18 119/5 120/7

**MR. SAGEL: [16]** 4/5 4/18 13/15 13/22 13/25 14/17 14/23 15/2 15/8 15/18 15/21 16/2 16/7 16/19 16/21 18/23

**MR. WYMAN: [70]** 15/12 23/3 29/11 30/1 32/6 32/13 32/20 33/18 35/10 35/20 36/14 38/24 39/18 44/16 45/23 46/5 46/9 46/21 47/9 47/19 48/20 49/18 50/21 51/24 52/13 54/5 54/7 54/14 55/9 57/8 57/23 62/13 66/10 68/14 68/19 68/23 72/23 73/11 74/2 76/3 77/21 79/17 82/20 84/6 85/11 85/21 86/1 86/7 86/12 86/17 86/22 88/13 89/14 89/23 99/1 104/13 106/6 109/5 110/18 110/23 113/7 115/2 115/19 115/24 116/4 116/21 117/4 118/3 118/8 119/17

**THE CLERK: [2]** 4/3 23/1

**THE COURT: [131]**

**THE WITNESS: [49]** 29/1 29/22 34/7 34/16 34/21 36/2 44/3 59/23 60/16 60/22 61/7 68/17 71/18 71/25 72/8 72/18 74/8 76/1 76/13 76/21 77/2 77/11 77/20 78/4 78/12 78/18 79/4 79/9 79/16 80/10 80/18 86/24 87/10 88/15 89/16 99/3 104/15 106/8 106/12 106/20 107/4 108/14 110/25 111/3 113/9 116/1 116/6 116/23 118/10

**$**

**$1,000 [1]** 34/21
**$1,200 [2]** 77/12 80/20
**$1,217 [1]** 76/13
**$1,400 [1]** 39/9
**$1,500 [1]** 53/9
**$1,508,422 [2]** 72/21 73/3
**$1,761 [1]** 40/5
**$1,856,938 [1]** 25/10
**$1,900 [11]** 38/20 38/22 39/7 39/13 39/15 39/16 39/25 40/8 41/16 41/18 77/16
**$1.1 [1]** 58/15
**$1.1 million [1]** 58/15
**$1.5 [2]** 72/2 80/23
**$1.5 million [2]** 72/2 80/23
**$1.6 [8]** 25/13 31/1 53/25 54/22 56/11 57/19 59/7 61/23
**$1.6 million [6]** 31/1 53/25 54/22 56/11 57/19 59/7
**$1.7 [1]** 43/22
**$1.7 million [1]** 43/22
**$1.9 [1]** 44/10
**$1.9 million [1]** 44/10
**$100,000 [1]** 57/4
**$12 [1]** 68/11
**$147,000 [1]** 81/7
**$150,000 [3]** 40/24 41/2 41/8
**$155 [1]** 51/20
**$16,000 [7]** 50/11 50/20 51/2 51/9 51/15 51/23 52/9
**$17,600 [1]** 39/12
**$171,000 [1]** 77/13
**$180,000 [1]** 56/13
**$181,000 [1]** 55/20
**$185,000 [1]** 50/18
**$190,000 [2]** 63/18 63/24
**$2,000 [1]** 41/6
**$2,776 [5]** 25/4 25/15 31/16 32/5 32/16
**$2,787,650.87 [1]** 66/17

**$2,787,651 [1]** 66/6
**$2.5 [2]** 45/9 45/13 48/8
**$2.5 million [3]** 45/9 45/13 48/8
**$2.75 [2]** 42/12 43/2
**$2.75 million [2]** 42/12 43/2
**$2.787 [1]** 67/19
**$2.787 million [1]** 67/19
**$2.79 [1]** 65/10
**$2.79 million [1]** 65/10
**$2.8 [3]** 71/19 77/3 80/21
**$2.8 million [2]** 71/19 77/3
**$200,000 [2]** 52/25 53/5
**$224 [1]** 41/13
**$23 [1]** 76/2
**$250,000 [9]** 28/17 43/10 44/7 44/9 45/17 45/21 46/19 47/5 48/9
**$26,000 [1]** 40/7
**$26.1 [1]** 67/21
**$26.1 million [1]** 67/21
**$28.9 [1]** 64/21
**$28.9 million [1]** 64/21
**$3 [7]** 29/7 74/1 76/21 77/3 80/13 80/20 80/21
**$3 million [7]** 29/7 74/1 76/21 77/3 80/13 80/20 80/21
**$3,300 [1]** 50/17
**$3.1 [2]** 27/12 27/20
**$3.1 million [1]** 27/20
**$30,000 [1]** 51/8
**$30.4 [1]** 66/2
**$30.4 million [1]** 66/2
**$32,000 [2]** 41/10 71/8
**$34,000 [3]** 53/7 53/8 79/9
**$37.168 [1]** 65/15
**$37.168 million [1]** 65/15
**$37.2 [1]** 65/8
**$37.2 million [1]** 65/8
**$4 [15]** 25/12 26/25 29/3 29/5 30/15 30/18 37/7 37/20 41/22 41/24 66/5 75/8 75/10 81/20 81/23
**$4 million [15]** 25/12 26/25 29/3 29/5 30/15 30/18 37/7 37/20 41/22 41/24 66/5 75/8 75/10 81/20 81/23
**$41,885 [1]** 59/18
**$46,000 [1]** 75/18
**$46,350 [2]** 70/21 74/25
**$495 [1]** 93/12
**$5,000 [1]** 38/18
**$5,300 [1]** 51/7
**$5,500 [1]** 35/6
**$50 [1]** 113/11
**$50,000 [2]** 28/11 28/13
**$500,000 [1]** 58/8
**$543,000 [1]** 25/14
**$543,062 [1]** 24/24
**$6,000 [1]** 38/19
**$60 [1]** 63/25
**$60,000 [3]** 64/2 64/5 78/18
**$600,000 [2]** 105/6 107/16
**$610 [1]** 61/7
**$617,000 [1]** 60/3
**$65,615 [1]** 43/15
**$659,000 [1]** 56/6
**$736,000 [3]** 24/3 31/8 32/16
**$760,000 [3]** 55/14 56/12 57/2
**$8.3 [2]** 41/1 64/24
**$8.3 million [2]** 41/1 64/24
**$90,501 [1]** 79/16
**$958 [1]** 36/3
**$959,000 [1]** 56/19
**$990,000 [1]** 43/6

**/**

**/s [1]** 122/15

**0**

**0313 [11]** 40/20 40/24 41/3 41/6 41/14 70/10 71/6 71/8 71/13 77/13 78/5
**0661 [10]** 28/1 28/6 35/14 45/22 47/3 50/12 50/16 51/4 78/1 78/25

**0870 [1]** 1/21

**1**

**1-1053 [1]** 1/20
**1.6 [1]** 34/8
**1.6 million [5]** 30/20 31/6 32/23 55/13 57/4
**1.66 million [1]** 33/5
**1.7 million [1]** 27/25
**1.9 [1]** 19/9
**1.9 million [2]** 57/5 57/6
**1/29/15 [1]** 25/13
**1053 [1]** 1/20
**107 [1]** 2/16
**1080 [3]** 3/14 85/9 85/19
**10:14 [1]** 69/7
**10:34 [1]** 69/8
**10th [1]** 58/7
**11 [1]** 80/22
**1100 [1]** 2/7
**11:55 [1]** 121/3
**13 [2]** 1/17 4/1
**14 [2]** 60/25 122/13
**146,000 [2]** 75/15 81/15
**146,288 [1]** 75/5
**147,000 [1]** 74/18
**148 [1]** 42/17
**14th [9]** 50/8 50/11 58/7 58/14 61/3 64/18 64/23 65/22 70/4
**15 [3]** 25/13 69/2 69/6
**15th [11]** 39/22 39/25 40/8 50/25 51/7 71/19 73/24 74/4 77/7 77/12 80/12
**16 [2]** 19/24 38/10
**16th [3]** 51/13 51/16 51/18
**17 [1]** 18/24
**17th [3]** 53/6 53/9 79/13
**18th [2]** 64/20 68/1
**195 [1]** 18/9
**1:15 [1]** 14/6
**1:30 [2]** 118/22 119/1

**2**

**2 million [1]** 19/9
**2.5 million [1]** 45/12
**2.75 [1]** 43/10
**20 [2]** 1/12 98/14
**2008 [1]** 85/17
**2015 [13]** 25/8 27/14 29/3 29/6 29/23 31/18 33/9 33/25 34/16 35/18 35/24 36/2 36/11
**2016 [1]** 38/14
**2017 [15]** 42/8 42/12 42/3 43/20 44/9 45/2 46/18 48/3 48/10 50/8 50/11 50/25 64/20 68/1 68/1
**2018 [40]** 39/4 39/10 39/22 39/25 40/8 41/2 51/13 51/16 51/19 52/4 53/6 53/9 53/22 53/24 55/1 55/8 55/12 56/5 56/7 59/7 60/11 60/25 61/3 63/16 64/18 64/23 65/22 70/4 70/16 70/16 70/25 71/19 72/22 73/10 73/24 79/13 80/12 81/4 87/23 88/9
**2020 [6]** 18/5 21/4 42/8 43/10 44/7 44/8
**2021 [4]** 1/17 4/1 53/22 122/13
**20th [2]** 52/4 77/15
**21 [1]** 122/15
**213 [1]** 2/8
**2240 [4]** 38/19 38/23 50/18 51/8
**23 [1]** 3/6
**23rd [5]** 70/16 74/4 74/11 74/13 74/14
**25,000 [2]** 34/2 51/21
**25th [6]** 42/7 42/11 43/3 43/20 45/2 48/3
**26.2 [2]** 120/9 120/22
**260,000 [1]** 70/10
**26th [5]** 46/18 47/8 48/10 72/22 73/10
**27.4 million [1]** 67/10
**28 [1]** 122/7
**28 million [1]** 67/7
**2851 [13]** 27/13 27/21 27/25 30/22 30/24 33/12 33/21 35/16 38/15 38/17 45/18 46/16 48/9
**28th [1]** 85/17
**29th [5]** 25/8 29/3 30/5 30/14 33/14

**2**
**2nd** [1] 33/9

**3**
**3 million** [1] 43/11
**3.8** [1] 71/12
**3.8 million** [1] 70/11
**30** [1] 98/8
**300** [1] 113/13
**30th** [8] 27/14 27/14 33/25 34/16 35/17 35/18 35/24 36/2
**312** [1] 2/7
**3174** [1] 51/17
**31st** [1] 29/6
**32,000** [1] 71/13
**33 percent** [2] 43/8 43/11
**338-3598** [1] 2/12
**34.38 million** [1] 65/23
**3504** [1] 67/19
**359** [6] 3/8 45/25 46/5 46/6 46/8 46/22
**3598** [1] 2/12
**367** [1] 66/11
**371** [5] 3/9 54/8 54/12 54/13 54/14
**3730** [1] 51/21
**382** [6] 3/9 45/25 46/5 46/6 46/8 46/10
**392** [1] 72/24
**394** [1] 46/1
**397** [1] 54/9
**3rd** [2] 68/1 68/9

**4**
**4 million** [3] 75/16 81/12 83/19
**4,146,350** [1] 75/2
**4.3 million** [3] 70/8 70/14 74/16
**4/7/16** [1] 38/10
**40 percent** [1] 57/6
**40,000** [1] 17/18
**401** [14] 28/24 34/5 35/25 46/3 54/11 59/21 71/16 72/6 74/6 76/11 80/8 113/7 115/19 116/21
**403** [16] 28/24 34/5 35/25 46/3 54/11 59/21 71/16 72/6 74/6 76/11 80/8 86/17 86/22 113/7 115/19 116/21
**41** [1] 59/17
**411** [2] 1/20 2/11
**420** [4] 24/20 77/25 78/9 78/25
**421** [1] 25/24
**422** [2] 28/19 32/13
**423** [1] 33/18
**424** [1] 35/10
**425** [1] 36/13
**426** [1] 38/8
**427** [1] 38/24
**428** [1] 39/18
**429** [2] 40/17 40/18
**430** [3] 42/1 42/5 43/4
**431** [2] 44/16 47/10
**432** [1] 47/19
**433** [1] 48/21
**434** [1] 50/4
**435** [1] 50/21
**436** [1] 51/10
**437** [2] 51/24 52/2
**438** [2] 42/1 52/13
**439** [3] 53/16 53/19 55/9
**440** [1] 57/8
**441** [1] 58/25
**442** [1] 61/16
**443** [2] 53/16 63/5
**444** [2] 64/12 64/15
**445** [1] 66/21
**446** [1] 68/2
**447** [3] 68/12 69/14 69/15
**448** [2] 69/12 73/12
**449** [1] 76/3
**450** [2] 64/12 79/17
**456** [1] 82/1
**46** [2] 3/8 3/9
**46,000** [1] 75/14

**4613** [24] 40/5 41/9 41/13 52/20 53/1 53/4 56/6 59/17 63/3 64/9 70/4 70/21 71/8 71/9 71/9 71/11 72/10 74/1 74/24 76/6 79/22 80/4 80/13 80/19
**4705** [15] 41/1 41/7 49/10 52/24 53/6 63/15 63/16 67/6 67/15 68/4 70/2 70/8 73/15 76/8 83/13
**475,000** [1] 67/10
**48** [4] 23/20 23/22 31/10 31/12
**481-4900** [1] 2/17
**4900** [1] 2/17
**4th** [13] 1/20 31/18 31/23 63/16 63/24 70/16 70/25 71/1 74/20 75/13 75/19 75/22 76/1

**5**
**50** [2] 17/12 31/20
**500** [1] 113/13
**54** [1] 3/9
**543-0870** [1] 1/21
**545,700** [1] 25/6
**5566** [7] 57/20 57/21 58/24 59/2 61/23 62/21 62/24
**5th** [10] 39/4 39/9 53/21 53/24 55/8 55/12 56/4 56/7 58/14 59/6

**6**
**60,000** [1] 17/18
**615** [7] 5/24 8/16 10/7 10/11 10/12 10/13 10/16
**6683** [1] 2/8
**690** [1] 11/1
**691** [2] 9/4 11/5
**6th** [4] 21/3 21/4 29/23 33/14

**7**
**7.5 percent** [1] 65/12
**714** [2] 1/21 2/12
**75** [3] 85/6 85/24 86/5
**753** [1] 122/6
**77** [1] 85/17
**7th** [1] 50/17

**8**
**8.3** [1] 81/4
**8/14/21** [1] 122/15
**8000** [1] 2/11
**84** [1] 3/6
**85** [1] 3/14
**8541** [12] 26/21 26/23 26/23 27/7 27/12 27/17 28/21 33/23 34/8 37/6 37/9 37/16
**8671** [8] 42/24 45/2 45/10 47/17 47/23 49/8 49/21 49/25
**894-6683** [1] 2/8
**8:31** [1] 4/1
**8:58** [1] 22/23
**8th** [1] 60/11

**9**
**90012** [1] 2/8
**92672** [1] 2/16
**92701** [2] 1/20 2/11
**949** [1] 2/17
**984,750** [1] 67/10
**9962** [1] 28/18
**9:05** [1] 22/24
**9th** [1] 41/2

**A**
**a.m** [6] 4/1 22/23 22/24 69/7 69/8 121/3
**abbreviations** [2] 26/10 26/11
**ability** [2] 20/23 105/16
**able** [6] 37/2 39/7 39/14 50/12 51/4 51/17
**about** [56] 5/7 7/20 8/1 8/2 8/8 8/16 9/11 9/16 10/9 10/13 12/3 14/12 15/22 17/7 17/25 20/10 21/11 21/22 24/2 24/2 24/5 32/25 33/6 35/6 37/14 54/25 59/16 69/11 75/13 88/23 94/16 94/17 95/5 96/8 96/10 98/17 98/18 102/3 104/22 106/24 107/22 108/8 109/3 109/9 110/7 110/8 110/12 110/13 111/16 111/25 112/4 114/2

**115/22 116/11 116/15 119/23 120/4**
**above** [5] 32/20 35/25 106/7 114/22/5
**above-entitled** [1] 122/9
**absent** [1] 10/3
**absolute** [1] 119/15
**acceptable** [1] 68/24
**access** [7] 17/13 17/16 17/21 18/6 20/10 20/24 102/14
**accident** [1] 8/12
**accomplished** [1] 97/24
**according** [1] 19/5
**accordingly** [1] 5/21
**account** [110] 25/22 26/21 26/24 28/6 28/9 28/13 28/18 28/21 29/2 29/6 29/23 30/22 30/24 30/24 31/7 33/4 33/6 33/10 33/15 33/21 33/23 34/18 35/7 35/14 35/15 35/23 38/9 38/16 39/3 39/8 39/8 39/21 40/4 40/25 41/6 41/8 41/9 41/13 41/19 42/20 42/21 42/23 44/17 45/17 46/12 46/15 46/24 47/2 47/23 48/12 49/8 49/14 49/22 50/7 50/12 50/13 50/15 50/17 50/19 50/24 51/5 51/6 51/12 51/16 51/18 51/19 51/22 52/3 52/12 53/1 53/4 54/4 55/6 56/24 57/22 59/2 61/4 62/24 63/16 63/17 63/23 63/25 64/1 65/4 65/13 67/6 67/22 68/4 68/10 70/22 71/5 71/6 71/10 71/13 73/15 74/12 75/1 75/11 75/20 75/23 76/6 76/8 76/10 78/1 79/1 79/12 80/11 80/13 80/19 81/3
**accountancy** [7] 89/6 89/9 89/11 89/13 89/17 89/20 90/5
**accountant** [3] 84/16 89/4 90/13
**accountants** [2] 87/3 87/15
**accounting** [8] 86/25 90/18 90/22 103/21 104/2 105/25 106/4 110/8
**accounts** [29] 26/5 26/25 26/6 26/15 37/1 37/12 38/2 38/15 39/12 39/17 40/1 40/7 45/10 48/18 49/14 49/17 58/8 58/9 58/11 58/16 58/17 62/3 62/5 62/11 74/9 82/12 82/24 84/5 99/4
**accuracy** [1] 100/18
**accurate** [5] 19/18 20/12 97/9 97/12 98/2
**accused** [1] 21/15
**across** [1] 84/5
**acting** [2] 5/11 5/11
**activities** [9] 28/21 33/21 35/7 35/14 47/23 59/2 68/4 73/15 76/6
**activity** [3] 33/1 74/5 77/6
**actual** [1] 105/10 111/14
**actually** [10] 13/11 21/3 24/11 59/18 68/23 102/8 105/16 106/23 110/15 120/14
**additional** [9] 11/4 20/24 25/15 50/1 56/16 60/18 78/8 99/24 99/25
**address** [3] 6/1 13/2 18/19
**admissible** [1] 15/5
**admonition** [2] 69/3 118/22
**advanced** [1] 32/3
**advantage** [1] 8/15
**ADVISORY** [1] 2/15
**advocate** [1] 5/12
**after** [27] 9/10 13/21 17/22 18/1 18/6 23/10 27/7 27/20 28/21 32/23 33/21 35/14 45/12 47/23 51/3 59/2 68/4 68/21 71/4 73/15 73/25 75/1 75/10 76/1 76/6 79/12 100/19
**afternoon** [1] 23/21
**again** [8] 12/16 32/14 34/23 46/4 59/12 61/21 106/8 106/17
**agent** [4] 4/7 15/2 94/14 95/8
**agents** [14] 6/7 6/15 8/11 9/6 13/18 14/20 93/23 94/4 94/15 94/18 94/22 95/1 95/24 96/22
**agents'** [1] 94/19
**ago** [5] 83/18 92/3 116/13 120/1 120/4
**agree** [5] 8/19 9/23 12/25 88/22 93/8
**agreed** [1] 93/2
**agreement** [12] 24/13 31/3 31/4 43/8 43/24 49/9 55/16 62/19 81/16 81/17 92/16 92/25
**agreements** [3] 81/19 102/15 102/16
**ahead** [1] 96/15
**Aircraft** [1] 45/13
**Alex** [3] 23/3 44/14 94/9

**A**

**ALEXANDER [2]** 2/5 4/6
**Alexis [27]** 42/4 42/7 43/18 44/8 44/15 44/20
47/18 47/24 48/24 49/16 50/7 50/10 50/20
50/24 51/3 51/9 51/12 51/16 51/19 51/22 52/3
52/6 53/7 53/9 72/9 79/9 83/5
**Alki [1]** 60/19
**all [27]** 8/10 12/5 14/24 17/2 18/8 20/2 21/6
21/20 26/14 29/4 31/6 34/23 37/10 62/9 67/12
78/7 82/17 83/19 85/4 85/6 101/18 102/11
117/17 119/1 119/10 120/17 120/18
**alleged [1]** 5/23
**allegedly [2]** 110/22 111/23
**almost [3]** 5/11 5/11 58/8
**along [3]** 7/10 95/25 112/8
**already [7]** 18/1 18/7 31/19 42/16 66/11 72/24
115/5
**also [12]** 6/12 11/25 18/19 19/4 24/15 35/17
51/4 51/22 87/5 120/2 120/24 120/24
**Although [1]** 7/6
**always [1]** 7/22
**am [14]** 11/16 21/15 50/12 51/4 51/17 84/17
84/20 98/2 110/6 110/18 110/10 110/13 112/9
112/24
**AMERICA [3]** 1/9 4/4 23/2
**amount [64]** 24/1 24/22 25/5 25/12 25/16
25/17 27/7 30/6 30/19 30/21 31/1 31/11 31/11
31/14 32/17 32/23 33/6 35/23 38/1 40/12 42/7
42/11 42/14 43/5 43/9 43/9 43/10 43/17 44/6
44/8 44/13 48/4 49/24 52/8 53/21 53/24 54/2
54/2 54/4 54/21 55/12 56/11 56/15 57/3 58/23
62/19 63/17 64/17 64/20 64/23 64/25 65/6
65/14 65/22 66/6 66/8 66/16 66/18 68/10
70/15 73/2 73/4 73/22 75/18
**amounts [11]** 25/21 32/24 55/22 56/16 56/24
57/4 62/23 64/25 65/3 65/7 67/8
**Ana [4]** 1/16 1/20 2/11 4/1
**analyses [1]** 99/24
**analysis [19]** 38/4 38/21 40/15 41/17 41/20
50/2 52/5 52/10 53/8 53/12 63/2 64/5 91/4
91/16 92/25 93/1 97/6 98/12 112/16
**analyst [1]** 112/16
**Andre [3]** 21/6 89/1 94/10
**Angeles [2]** 2/8 26/18 37/6
**another [9]** 27/8 29/6 31/7 39/6 51/2 51/15
71/21 112/16 118/4
**answer [7]** 9/7 7/15 16/11 96/2 106/15 109/7
111/8
**answered [5]** 7/13 75/24 86/1 104/13 110/18
**any [59]** 4/21 5/17 6/16 9/17 10/19 12/1 13/3
17/2 17/25 19/12 19/22 33/15 35/8 36/5 48/14
61/9 69/4 69/5 83/19 84/1 90/17 90/11 90/17
90/20 90/22 90/22 91/10 93/19 94/24 95/3
95/3 95/7 95/7 95/8 95/13 96/20 98/4 104/21
104/25 105/1 105/7 105/20 109/18 109/19
109/25 110/1 110/1 110/3 110/4 110/11
110/11 110/12 110/21 110/22 111/22 112/4
112/5 117/22 118/23
**anybody [6]** 17/24 90/9 94/21 98/21 102/6
105/23
**anyone [10]** 69/3 88/4 93/17 94/11 97/8 102/8
104/10 112/15 112/17 118/23
**anything [15]** 4/24 6/11 11/6 17/7 16/10 16/14
16/14 17/8 17/14 19/13 92/21 102/18 103/1
103/2 117/12
**Apart [1]** 38/2
**appear [2]** 4/14 11/2
**APPEARANCES [1]** 2/1
**appears [2]** 35/17 77/24
**applied [1]** 9/13
**apply [3]** 6/18 7/3 120/9
**appreciate [2]** 8/9 13/11
**approach [1]** 84/24
**approve [2]** 93/5 97/14
**approved [4]** 92/14 92/19 93/7 120/20
**approves [1]** 120/21
**approving [1]** 97/25
**approximate [2]** 66/3 75/18
**approximately [41]** 25/4 25/5 25/6 27/13 28/1

29/7 31/8 33/5 36/11 39/9 40/7 43/22 50/19
50/19 50/20 51/8 53/6 55/6 63/4 63/24 64/22
65/15 66/1 66/5 67/10 70/8 70/10 70/14 71/12
72/1 74/16 74/18 75/14 75/15 80/22 81/4 81/7
81/14 81/20 81/23 98/8
**April [15]** 38/14 41/2 50/8 50/11 50/17 53/6
53/9 63/16 63/24 70/16 74/4 74/11 74/13
74/14 79/13
**April 14th [2]** 50/8 50/11
**April 17th [1]** 79/13
**April 23rd [4]** 70/16 74/4 74/11 74/14
**April 4th [2]** 63/16 63/24
**April 7 [1]** 38/14
**April 7th [1]** 50/17
**are [84]** 5/14 9/2 12/20 12/21 12/24 14/21
15/22 15/23 16/8 16/13 18/10 18/14 18/19
19/1 19/17 22/2 26/5 26/6 26/6 26/14 27/21
29/7 30/15 33/11 33/15 33/17 35/1 35/5 35/7
36/5 36/9 36/24 42/22 45/4 46/5 47/1 47/12
48/7 48/17 49/13 49/21 56/14 56/16 58/2
58/11 58/18 60/12 61/9 61/11 61/13 62/5
64/25 64/25 65/3 65/14 67/15 68/6 70/13
70/17 71/14 72/13 72/14 77/24 78/5 79/6
82/9 82/14 82/15 82/22 83/4 83/12 84/4 88/18
89/3 89/19 89/19 94/15 107/7 107/11 110/21
113/5 117/2 117/20 120/3
**area [1]** 91/5
**aren't [1]** 19/11
**argue [1]** 15/14
**Argumentative [2]** 106/6 109/5
**arise [1]** 119/12
**Armenta [2]** 11/2 119/14
**around [2]** 10/14 103/7
**arrow [20]** 26/19 27/10 27/15 27/24 28/12
37/6 37/15 44/24 45/16 47/15 57/18 57/19
58/5 58/12 58/21 62/21 62/21 67/20 71/15
71/22
**arrows [17]** 26/22 27/2 36/24 45/4 49/12
49/15 49/21 58/2 62/4 67/4 67/5 67/15 70/5
72/5 82/22 83/12 84/4
**as [68]** 5/11 6/12 10/2 10/5 12/7 13/12 14/4
14/4 15/21 17/10 17/16 18/13 22/12 22/14
24/13 24/13 25/8 29/2 37/1 31/20 35/23
36/2 39/14 42/7 43/20 43/25 44/8 48/10
50/1 53/21 54/10 54/11 55/23 56/4 56/7 61/3
62/8 63/1 64/18 65/21 66/1 72/24 74/11
74/13 75/22 77/2 78/5 79/12 84/17 85/9 85/19
86/20 87/14 89/3 90/13 91/18 94/15 95/15
96/20 100/20 101/11 105/24 110/6 110/10
110/22 120/3 120/25
**ask [22]** 12/6 26/23 30/5 59/16 90/9 94/21
98/21 99/13 99/18 101/16 101/16 102/8
105/20 105/23 106/1 106/8 108/17 108/20
109/17 112/15 118/4 119/5
**asked [29]** 4/25 6/16 13/17 17/12 18/1 21/2
21/5 21/8 75/24 86/1 92/18 96/8 98/24 98/25
99/3 99/5 99/24 101/7 104/13 107/17 107/18
107/19 107/22 107/24 109/11 109/22 110/18
111/16 114/2
**asking [5]** 98/17 98/18 100/1 100/8 103/2
**assist [1]** 115/6
**Assistant [5]** 2/4 2/6 2/10 93/22 94/3
**assisted [1]** 117/14
**assisting [1]** 114/19
**associated [17]** 26/6 27/18 28/5 29/5 36/8
53/12 61/13 64/4 64/8 78/22 80/11 81/21
83/15 83/25 93/5 99/9 119/10
**Associates [5]** 26/12 28/4 28/6 46/25 49/14
**astray [1]** 6/25 8/8
**attached [4]** 16/7 16/9 18/9 18/11
**attaches [2]** 91/3 11/5
**attachment [1]** 32/2
**attempted [1]** 7/7
**attention [3]** 7/23 8/22 12/8
**attorney [2]** 2/3 2/4 2/6 2/10 30/24 31/2 42/21
55/6 94/14
**attorney/client [1]** 30/24 42/21 55/6
**attorneys [4]** 8/1 93/23 94/4 94/18
**attorneys' [1]** 32/24

**attributable [1]** 27/9
**AUSAs [1]** 94/22
**authority [7]** 6/17 6/17 6/18 7/2 8/2 8/3 8/20
**available [3]** 20/13 20/18 20/21
**AVENATTI [32]** 1/11 2/14 4/4 4/10 5/2 6/1
11/11 15/9 17/13 18/6 20/13 23/2 23/8 26/7
26/12 26/12 28/4 28/6 28/13 31/2 42/21 46/13
46/25 49/14 55/6 55/17 58/11 84/8 105/25
110/8 119/4 120/6
**Avenatti's [2]** 5/23 24/25
**Avenida [1]** 2/16
**aware [16]** 8/20 20/6 20/8 36/9 48/17 48/19
61/13 88/9 89/9 89/19 89/22 90/6 107/7
107/11 110/21 117/2
**away [2]** 8/14 27/2

**B**

**B-o-r-e-k [1]** 91/9
**back [23]** 7/6 14/6 16/16 17/10 24/20 30/1
31/10 37/3 39/15 43/4 45/15 47/9 49/18 55/9
62/13 68/20 70/20 73/1 83/11 87/7 106/9
108/10 110/25
**bad [3]** 101/16 109/22 119/15
**Bahamonde [9]** 6/16 6/22 7/2 7/8 7/8 7/20 8/2
8/8 12/25
**Bakery [1]** 60/19
**balance [29]** 29/2 29/23 33/3 34/1 34/18
35/23 36/2 38/17 39/9 40/5 41/1 41/6 41/13
48/1 50/17 51/7 51/20 52/24 53/5 59/6 63/14
63/25 68/10 73/19 75/23 76/2 76/10 80/11
80/19
**bank [24]** 24/15 28/5 36/8 41/20 42/13 45/24
48/16 53/12 54/1 54/3 64/8 65/1 66/7 73/25
74/9 76/1 81/21 100/4 100/14 101/4 101/7
101/19 102/3 102/17
**banking [2]** 100/16 100/25
**bankruptcy [4]** 71/10 71/19 72/1 80/4
**banks [3]** 24/22 30/23 61/12
**bar [1]** 52/24
**Barela [27]** 16/13 18/12 19/11 53/18 53/21
55/16 56/6 56/25 58/24 61/10 61/13 61/14
61/18 62/4 62/5 62/18 62/25 63/3 64/4 64/10
72/9 72/13 78/22 83/9 109/3 109/9
**Barela's [5]** 55/23 56/24 57/13 59/3 64/9
**barely [2]** 84/22 86/10
**Baristas [11]** 26/13 28/17 39/17 40/7 52/12
58/11 60/13 77/12 77/25 78/9 78/25
**bars [1]** 50/14
**based [23]** 5/23 19/6 30/23 36/8 38/21 41/17
41/20 43/17 43/20 50/12 53/8 53/12
57/2 57/3 61/12 64/5 64/8 81/16 81/21 101/9
102/3 119/12
**basically [1]** 10/11
**basis [2]** 87/20 98/8
**Bates [3]** 15/14 15/15 22/5
**be [53]** 4/16 7/25 8/2 8/18 10/2 10/6 10/16
12/9 12/16 13/8 14/4 14/25 14/25 15/3 21/3
21/15 22/22 23/9 25/5 27/8 27/18 29/4 31/2
37/19 37/25 46/5 54/12 54/18 62/18 64/4
68/13 68/23 69/2 69/6 80/2 90/3 91/5 95/9
96/18 97/4 97/15 98/11 98/16 98/18 100/21
101/12 107/19 112/23 119/6 119/25 120/13
120/14 121/2
**Beauty [8]** 37/22 62/16 68/7 70/2 73/22 83/14
83/16 84/1
**became [2]** 86/20 90/25
**because [21]** 5/4 6/17 6/18 7/14 8/7 9/13
11/14 12/19 15/17 19/5 20/11 21/16 21/25
22/6 24/6 37/25 62/17 98/11 101/15 102/4
**become [2]** 86/16 90/13
**becomes [1]** 4/25
**been [31]** 7/19 8/21 10/14 18/15 19/16 20/11
21/6 21/7 21/13 21/17 75/18 75/19 81/2 82/18
87/21 90/12 91/18 93/15 94/2 105/21 110/21
112/21 112/25 113/22 114/1 114/5 115/9
117/2 118/14 119/8 120/23
**before [30]** 5/16 6/14 8/6 13/8 13/21 21/19
38/17 41/13 53/5 59/7 69/11 73/19 84/13

**B**

before... **[17]** 94/20 97/8 97/25 98/4 98/21
105/5 105/14 105/17 105/23 107/8 107/13
108/7 109/20 109/24 118/11 118/13 119/8
began **[1]** 119/8
beginning **[16]** 29/2 34/1 36/10 38/17 39/9
40/5 41/6 41/13 50/16 51/20 53/4 59/6 74/14
80/19 88/9 94/20
begins **[2]** 33/14 33/24
behalf **[2]** 4/6 23/4
behind **[1]** 68/13
being **[7]** 6/6 14/2 28/17 67/21 89/21 102/12
107/16
belief **[1]** 9/13
believe **[30]** 9/16 10/23 11/6 13/16 17/1 19/21
24/5 70/19 81/13 83/22 84/23 86/24 87/23
90/10 90/24 91/25 92/16 93/12 95/2 95/10
100/13 102/10 102/19 104/15 105/22 108/14
110/5 111/7 112/7 120/10
believe there's **[1]** 111/7
below **[26]** 25/7 30/18 31/6 31/14 32/16 33/9
34/4 37/21 43/5 43/19 44/5 48/3 48/6 48/7
55/12 55/18 59/10 61/24 65/5 65/9 65/18
65/21 72/4 73/21 75/3 76/23
beneficiary **[1]** 55/5
best **[1]** 10/4
better **[1]** 8/21
between **[15]** 11/1 16/16 27/13 33/14 55/16
58/7 58/14 66/3 67/24 68/1 74/4 92/11 92/17
92/25 113/13
beyond **[1]** 104/25
biblical **[1]** 10/14
big **[2]** 103/16 115/9
bill **[1]** 97/1
billed **[1]** 113/3
billers **[1]** 112/21
billing **[4]** 97/7 98/7 113/5 120/19
bills **[11]** 97/4 97/8 97/11 97/14 97/21 97/25
98/8 98/14 98/22 113/16 120/21
binder **[1]** 54/18
bit **[5]** 32/7 71/12 77/6 77/15 113/20
bizarre **[1]** 5/12
black **[2]** 30/6 30/10
blow **[10]** 30/2 32/14 32/20 36/14 44/17 54/15
57/9 57/23 72/24 77/21
blue **[1]** 26/4 26/18 37/5 37/12 47/25 52/24
59/4 71/21 73/17 76/9 82/9
board **[4]** 89/6 89/9 89/11 89/16
book **[1]** 120/16
borders **[1]** 90/5
Borek **[2]** 91/7 91/10
both **[6]** 8/1 11/2 18/2 46/1 92/4 99/23
bottom **[16]** 27/3 27/5 29/11 34/25 45/7 49/8
54/23 58/5 62/15 65/24 67/17 68/9 70/8 70/12
74/20 74/21
box **[1]** 27/5
Brady **[4]** 19/24 21/6 22/17 120/24
BRANDON **[1]** 2/4
break **[7]** 23/10 32/25 68/21 68/24 69/2 69/11
118/18
Bredahl **[1]** 14/22
BRETT **[4]** 2/9 4/5 23/4 94/9
brief **[1]** 12/22
briefly **[2]** 22/22 29/9
bring **[3]** 12/8 21/23 68/21
bringing **[1]** 5/17
brings **[1]** 11/15
Brock **[6]** 55/1 55/3 56/15 59/8 61/22 62/20
brought **[2]** 7/23 8/21
bubble **[24]** 26/17 26/23 26/24 27/3 27/20
36/23 36/24 37/5 37/14 37/17 37/21 45/4
47/16 49/16 58/3 58/18 58/22 62/15 62/20
67/3 67/5 67/15 70/20 71/22
bubbles **[20]** 26/4 26/5 26/6 26/7 26/9 26/14
27/16 37/4 49/8 49/12 49/13 61/19 61/22 62/2
72/4 82/9 82/22 83/3 83/3 83/11
Building **[1]** 2/10
burden **[1]** 14/17
business **[1]** 28/10

business-related **[1]** 28/10

**C**

C-h-r-i-s **[1]** 91/9
CA **[4]** 1/20 2/8 2/11 2/16
calculate **[5]** 25/11 43/16 55/21 56/10 65/11
calculated **[5]** 24/23 31/2 56/8 57/1 66/19
calculation **[1]** 24/21
calculations **[3]** 23/25 43/23 81/17
CALIFORNIA **[18]** 1/5 1/16 4/1 88/10 88/24
89/3 89/6 89/13 89/17 89/20 90/4 90/13
90/14 115/18 116/16 116/19 116/24
call **[1]** 10/17
called **[3]** 14/2 104/3 104/12
calls **[8]** 8/4 89/23 93/24 96/3 96/14 96/21
107/2 120/8
came **[9]** 17/3 17/4 17/5 38/14 43/8 48/4
55/16 101/3 112/22
can **[41]** 4/24 5/9 10/7 10/8 12/8 14/13 14/20
17/11 18/18 19/1 19/2 19/3 20/14 22/11 27/18
29/4 32/14 34/7 37/19 37/25 38/7 38/15
42/19 45/15 49/19 50/9 58/17 61/16 62/18
63/12 73/2 77/8 84/24 87/7 89/12 96/3 106/8
106/9 106/16 106/16 113/11
can't **[7]** 14/8 21/15 92/2 94/13 94/16 94/19
100/8
cannot **[2]** 10/6 27/8
cart **[1]** 68/13
Carter **[20]** 112/12 113/18 113/22 114/16
114/17 114/19 114/23 115/12 115/15 115/15
115/18 115/22 116/11 116/15 116/19 117/12
117/18 118/1 118/7 118/15
case **[46]** 4/19 6/4 6/10 6/19 10/8 10/6 20/1
21/13 24/2 24/12 24/23 24/23 25/14 43/13
55/20 55/23 56/14 65/18 69/3 69/4 88/5 90/16
90/23 91/1 94/20 98/10 98/24 99/16 99/22
103/7 105/5 105/21 109/25 112/8 112/11
113/23 115/5 115/12 115/23 116/11 116/15
118/23 118/24 120/4 120/8 120/9
case-related **[7]** 24/12 24/23 25/14 43/13
55/20 56/12 65/18
cases **[2]** 7/4 10/12
category **[2]** 15/3 15/4
CDC **[1]** 4/15
Cefali **[3]** 4/11 23/9 109/16
cell **[1]** 116/8
CENTRAL **[1]** 1/5
certain **[4]** 11/8 27/7 48/17 50/2 96/5
certainly **[4]** 8/20 11/6 12/10 12/13
CERTIFICATE **[1]** 122/4
CERTIFIED **[2]** 1/9 84/16
certify **[1]** 122/6
change **[1]** 67/7
charge **[1]** 28/20
charged **[1]** 28/9
chart **[82]** 25/19 25/25 28/23 33/13 33/14
33/16 33/20 33/24 34/10 34/13 34/24 35/7
35/13 35/17 36/6 36/15 36/20 36/21 37/10
37/24 38/3 38/8 38/11 39/2 39/5 39/20 39/23
40/14 40/22 42/6 44/19 47/22 48/18 48/14
48/23 49/4 49/19 50/6 50/9 50/10 50/23 51/1
51/2 51/11 51/14 51/15 53/20 57/1 57/12 59/1
60/25 60/25 61/9 61/17 62/9 62/16 62/17 63/7
63/13 64/16 66/19 66/22 68/3 68/10 68/20
69/18 70/6 70/7 72/12 73/14 74/5 74/15 75/7
75/22 76/5 79/20 80/1 80/2 80/7 81/25 82/3
82/17
charts **[14]** 42/2 53/17 59/12 62/9 81/6 83/7
83/9 95/11 95/13 95/16 96/7 96/10 96/15
120/2
Chat **[1]** 116/8 116/8 116/9
check **[7]** 26/25 66/12 66/14 66/16 72/25 73/2
73/7
Chief **[1]** 2/5
Chris **[7]** 91/7 91/10 91/14 93/20 93/21
112/19 113/1
CI **[1]** 17/17
circle **[1]** 103/17
Circuit **[1]** 6/19

circumstances **[1]** 10/3
claimed **[1]** 112/22
clarification **[2]** 65/5 83/23
clarify **[2]** 96/1 99/17
clarity's **[1]** 13/15
clause **[1]** 4/25
clear **[8]** 6/19 7/25 8/3 20/15 21/1 119/14
120/13 120/14
clearer **[1]** 10/2
clearly **[3]** 8/24 119/7 120/11
Clemente **[1]** 2/16
client **[45]** 20/19 25/8 25/22 26/5 26/21 30/24
40/25 41/8 41/19 42/21 43/20 44/12 44/14
45/9 45/17 49/8 49/13 53/16 54/4 55/6 56/4
56/18 56/22 57/22 58/8 62/3 62/24 64/12 65/4
67/6 67/22 80/11 82/12 83/8 83/17 99/4
103/12 104/2 104/5 104/12 107/9 107/20
107/22 110/11 110/22
client-related **[3]** 103/12 104/5 107/22
clients **[27]** 19/11 20/3 26/8 42/2 65/1 65/21
66/1 71/10 72/8 82/4 82/17 83/1 83/2 83/20
84/2 99/6 99/8 99/8 99/9 105/2 105/11 109/19
110/1 110/11 111/4 111/23 111/25
Close **[1]** 116/17
closer **[1]** 15/4
CNB **[22]** 41/1 41/7 49/10 52/24 53/6 57/20
57/21 58/24 59/2 61/23 62/21 63/15 63/16
67/6 67/15 67/19 68/4 70/2 70/8 73/15 76/7
83/13
CNB 4705 **[1]** 70/8
CNB 5566 **[1]** 61/23
co **[2]** 25/3 25/16
co-counsel **[2]** 25/3 25/16
Code **[1]** 122/7
coded **[4]** 57/15 67/1 69/22 82/7
coding **[2]** 26/3 36/18 44/22
Coffee **[2]** 59/23 60/18
colleague **[3]** 91/2 91/4 91/6
color **[7]** 26/3 36/17 44/22 57/15 67/1 69/22
82/7
color-coded **[4]** 57/15 67/1 69/22 82/7
color-coding **[1]** 26/3
column **[1]** 30/6
combination **[2]** 55/22 83/9
come **[9]** 14/6 16/8 20/14 38/22 43/7 55/15
68/20 89/12 89/19
coming **[2]** 19/10 34/8
comments **[1]** 5/18
commingled **[1]** 27/7
commit **[1]** 6/23
communicate **[1]** 109/11
communicated **[3]** 84/13 93/22 94/8
communication **[3]** 5/7 94/3 95/7
communications **[6]** 11/1 90/2 94/21 94/24
104/21 120/18
Company **[1]** 45/14
competently **[1]** 106/3
compile **[1]** 94/21
compiling **[1]** 96/7
complied **[2]** 12/11 120/5
complies **[5]** 31/21 42/18 50/5 63/6 82/2
comply **[2]** 5/24 7/10
complying **[1]** 12/18
compound **[1]** 115/2
compounded **[1]** 8/11
computer **[3]** 16/24 16/25 17/4
concept **[1]** 10/14
conclusion **[1]** 89/23
conditions **[1]** 5/17
conduct **[3]** 38/4 50/1 63/1
Conference **[1]** 122/11
conferring **[1]** 54/6
conflated **[1]** 6/3
conformance **[1]** 122/10
confrontation **[1]** 4/24
confuse **[1]** 102/22
confused **[1]** 6/3
connection **[21]** 6/4 21/2 41/21 88/1 88/5
90/17 91/10 94/4 97/25 98/9 98/24 99/15

**C**

connection... **[9]**  99/21 99/21 103/7 103/24
105/5 105/9 108/5 108/17 114/24
consistent **[2]**  21/13 21/17
consistently **[1]**  20/1
constituted **[1]**  21/17
consult **[3]**  96/9 96/12 96/14
contact **[3]**  5/10 14/22 17/24
contacted **[1]**  91/2
contained **[2]**  103/11 104/5
contains **[1]**  100/16
content **[3]**  32/4 36/14 57/9
contents **[1]**  44/17
continuation **[1]**  53/2 53/3 63/19
Continued **[1]**  3/6 23/16
continues **[3]**  41/5 41/12 119/11
contra **[1]**  8/20
contrary **[3]**  6/16 6/17 6/18
control **[1]**  93/19
conversation **[1]**  100/4
conversations **[1]**  119/19
conveyed **[2]**  96/3 108/15
convicted **[1]**  21/15
copy **[1]**  32/10
corner **[5]**  42/19 44/21 46/14 54/24 57/14
Corp **[1]**  46/25
correct **[87]**  7/5 9/14 16/21 19/7 21/10 24/8
27/22 27/23 36/19 40/12 40/13 44/3 44/23
45/6 60/16 63/21 67/2 67/13 67/16 68/8 73/23
76/17 77/20 78/4 78/12 78/23 79/24 81/5 81/8
82/8 84/13 84/14 84/17 84/18 84/20 84/21
85/4 85/5 85/18 88/8 88/10 90/19 93/3 93/13
93/14 93/16 93/25 94/1 96/6 96/10 96/11
96/19 96/24 97/16 97/17 98/2 98/3 98/4 98/15
98/19 100/3 101/8 101/22 101/23 105/12
105/18 108/4 109/16 109/17 110/6 110/8
110/9 110/10 110/13 110/14 111/10 111/20
111/21 112/9 112/19 113/15 114/6 115/17
116/14 117/16 118/17 122/8
correction **[1]**  11/17
correspondence **[1]**  20/20
corresponding **[1]**  25/17
cost **[2]**  20/2 21/20
costs **[17]**  18/10 19/5 19/10 19/12 21/13
21/14 21/17 24/1 24/25 31/12 32/3 32/24
104/2 104/12 105/10 106/24 107/9
could **[70]**  5/1 7/22 8/2 10/2 10/16 10/17
16/21 17/20 18/19 18/21 18/23 23/20 24/20
25/24 28/19 29/9 29/11 29/17 30/1 30/2 32/6
32/20 33/18 34/24 35/10 35/20 36/2 39/18
42/2 42/16 42/25 44/16 44/17 45/3 45/11 46/9
46/21 47/9 47/19 48/20 49/3 49/18 50/21 54/5
54/14 55/4 55/9 57/8 57/9 57/23 58/25 60/24
62/13 66/10 67/14 68/2 68/20 72/24 73/11
74/2 76/3 77/15 77/21 79/25 80/6 82/20 86/4
99/10 99/17 110/25
counsel **[12]**  2/1 2/15 4/7 23/5 25/3 25/16
54/6 71/19 72/1 80/4 88/16 88/18
counting **[1]**  47/2
country **[1]**  14/2
counts **[1]**  21/15
County **[3]**  24/14 26/18 37/5
couple **[4]**  13/15 103/19 114/8 120/1
course **[1]**  8/21
court **[20]**  1/4 5/16 6/6 6/9 6/25 7/1 7/20 8/8
8/13 13/8 14/18 19/17 21/19 22/1 22/4 87/22
90/17 91/8 112/4 122/16
Court's **[1]**  7/23
courthouse **[3]**  1/19 2/7 116/17
courtroom **[3]**  6/8 8/12 10/17
covered **[1]**  119/20
covering **[1]**  119/25
CPA **[8]**  84/15 84/17 85/3 85/16 86/16 86/20
87/2 87/21
create **[1]**  100/17
created **[1]**  62/9
credentials **[1]**  90/6
credit **[1]**  47/5
credits **[2]**  43/1 46/17

criminal **[6]**  2/5 7/3 89/21 90/20 90/22 90/23
criminally **[1]**  89/24
critical **[3]**  15/22 17/19 19/1
cross **[12]**  3/4 3/11 8/24 9/16 10/18 10/18 14/2
84/9 117/23 118/6 118/14 119/8
cross-examination **[4]**  9/16 84/9 117/23
119/8
cross-examinations **[2]**  118/6 118/14
cross-examine **[8]**  8/24 10/8 10/18
Cummings **[3]**  4/11 23/9 109/16
Currently **[1]**  4/18
custodian **[2]**  45/25 54/9
custom **[1]**  98/5
cut **[1]**  7/8

**D**

dash **[2]**  29/12 29/22
dashed **[6]**  49/4 49/11 61/20 62/1 62/22 83/12
data **[16]**  15/13 15/16 15/25 16/1 16/6 19/3
19/7 20/2 20/6 20/8 21/11 104/22 107/10
107/19 108/1 108/3
database **[25]**  16/10 16/13 17/8 19/22 19/23
19/25 21/11 21/12 22/6 22/7 100/14 100/15
100/25 101/3 101/5 101/18 101/19 101/22
101/25 102/1 102/6 102/9 102/11 104/18
104/22
date **[19]**  31/17 31/23 33/24 34/13 34/18
38/14 42/14 43/25 47/7 55/7 56/7 60/10 67/11
67/12 70/3 70/24 72/7 73/9 122/13
dates **[5]**  32/25 56/17 67/24 70/13 70/18
day **[25]**  1/12 14/12 14/14 15/6 38/17 38/18
38/20 39/11 39/12 41/9 41/15 45/13 45/21
46/19 48/4 51/7 51/21 51/22 53/6 54/2 64/1
73/24 75/8 77/2 80/21
days **[3]**  40/6 80/22 116/13
deal **[1]**  86/21
deals **[1]**  87/3
dealt **[1]**  87/15
DEAN **[4]**  2/15 2/15 4/10 23/8
debate **[1]**  22/12
decided **[1]**  9/19 91/3
decision **[1]**  14/19
declaration **[1]**  54/9
declarations **[1]**  45/25
deduct **[1]**  21/14
defects **[1]**  9/1
defendant **[17]**  1/12 2/13 13/17 15/21 17/12
23/23 26/15 31/23 36/9 36/9 37/11 42/13 54/1
61/13 66/7 81/3 81/22
defendant's **[2]**  48/16 61/12
defendants **[2]**  82/15 82/25 83/1
defense **[5]**  3/10 3/13 4/19 21/13 21/18
demonstrates **[1]**  12/20
Denied **[1]**  104/8
Denver **[1]**  115/16
deny **[1]**  8/23
denying **[1]**  10/22
department **[1]**  97/7
depict **[1]**  38/11
depicted **[1]**  37/3
depiction **[1]**  36/21
depicts **[2]**  37/6 38/13
deposit **[28]**  27/8 29/3 29/5 29/6 30/15 30/18
34/7 37/7 37/19 37/20 41/2 43/2 46/18 47/4
50/18 53/5 54/3 59/7 59/9 61/22 63/24 63/25
67/6 74/24 75/1 75/4 79/7 79/13 80/20
deposited **[17]**  25/22 26/20 26/25 27/13 28/1
28/17 37/9 44/14 45/2 45/21 49/10 49/24
56/24 57/20 58/23 73/21 82/11
deposits **[9]**  30/11 30/12 39/11 43/1 46/17
61/21 65/3 73/21 82/11
describe **[3]**  80/6 103/10 111/17
described **[7]**  68/7 71/5 81/6 91/3 103/4
104/16 111/19
description **[1]**  97/24
despite **[2]**  6/20 107/16
detail **[3]**  54/20 97/21 97/23
detailed **[1]**  63/2
determined **[2]**  99/15 99/20

determines **[1]**  99/17
determining **[2]**  21/21 92/8
did **[108]**  6/10 7/10 7/24 13/11 17/10 17/14
17/21 18/16 20/12 24/9 24/15 24/21 25/11
28/8 30/21 38/3 38/21 40/14 42/13 43/7 43/16
48/14 48/15 50/1 54/1 55/15 55/21 56/10 63/1
64/10 65/11 66/7 71/1 71/3 72/21 81/22 83/19
83/22 84/1 86/15 86/21 87/13 88/12 90/2 90/8
90/9 90/10 91/10 92/1 92/9 93/17 94/21 95/7
95/11 95/13 95/20 95/24 97/1 97/13 98/12
98/21 99/18 99/21 100/1 100/17 100/18
100/18 100/19 102/6 102/8 104/10 104/18
104/20 104/21 105/6 105/8 105/14 105/20
105/22 105/23 105/24 106/1 106/2 106/23
107/14 107/17 107/20 107/23 108/3 108/5
108/17 108/19 108/20 109/12 109/17 109/18
109/25 110/3 111/17 111/23 112/5 115/12
116/15 117/12 117/22 118/2 118/6 119/24
didn't **[7]**  12/2 13/22 20/4 20/7 21/12 100/17
108/1
different **[4]**  15/3 37/1 49/17 66/3
digits **[1]**  42/22
Dillanos **[2]**  59/23 60/18
direct **[4]**  3/4 3/11 23/16 111/15
directed **[1]**  119/6
direction **[2]**  117/19 119/19
directly **[4]**  10/23 27/8 35/8 82/4
dirty **[1]**  114/17
disagree **[3]**  4/18 11/12 92/22
disclosure **[1]**  119/23
discovery **[10]**  18/7 37/22 62/16 68/7 70/2
73/22 83/14 83/16 84/1 120/5
Discovery/Michelle **[1]**  83/16
discuss **[3]**  69/3 69/12 118/23
discussed **[5]**  37/7 72/14 81/18 95/8 120/3
discussing **[3]**  23/22 81/2 82/18
discussion **[1]**  90/8
discussions **[1]**  88/16
dispute **[2]**  87/19 87/20
DISTRICT **[1]**  1/4 1/5
DIVISION **[1]**  1/6 2/5
do **[69]**  5/17 6/1 12/16 12/21 13/3 13/25 14/5
14/8 14/13 15/21 18/23 19/1 20/4 22/2 23/21
24/3 26/10 30/16 31/8 31/22 32/9 42/22 44/5
46/18 47/4 48/6 49/11 50/14 53/17 59/18
61/19 62/1 64/13 69/5 69/5 69/12 72/4 74/17
74/20 74/22 83/1 87/19 89/17 91/10 92/1 93/5
93/8 94/17 96/20 98/24 98/25 100/6 100/11
100/15 101/24 102/2 102/12 103/2 103/16
103/21 104/24 105/1 105/3 107/5 117/12
118/2 118/6 120/1 120/9
docket **[4]**  9/4 10/25 17/11 17/12
document **[2]**  54/19 85/1
documents **[11]**  11/2 11/4 18/9 18/12 18/25
20/19 22/9 95/21 96/1 99/20 104/25
does **[67]**  4/23 6/18 7/19 15/23 15/25 16/5
18/8 22/9 24/25 25/7 25/19 26/18 26/24 27/3
27/11 27/15 27/24 28/16 28/23 29/15 30/7
33/9 36/20 37/10 37/22 38/11 39/5 39/23
40/22 42/9 43/5 43/19 44/11 44/24 45/8 45/15
47/16 49/3 49/23 51/1 51/14 53/23 55/13
55/18 56/15 56/21 57/18 58/6 58/10 58/13
58/22 59/4 59/13 62/9 64/19 65/9 67/3 70/5
79/6 80/15 82/17 82/23 83/14 84/15 92/24
97/8 114/24
doesn't **[11]**  4/14 7/3 7/15 7/16 9/17 10/18
11/7 15/23 17/24 18/18 19/4
doing **[5]**  8/17 12/20 16/23 17/2 96/13
dollar **[2]**  31/11 32/17
dollars **[6]**  44/13 56/23 64/11 68/11 75/12
113/12
don't **[67]**  4/18 5/13 5/14 9/16 9/23 10/2 11/6
13/5 15/14 16/14 16/18 17/1 17/1 17/16 17/7
17/8 21/20 22/12 22/12 23/13 68/17 84/23
85/7 87/10 87/14 87/17 88/25 89/2 89/7 89/13
90/10 90/24 92/12 92/16 92/23 93/19 95/2
95/10 96/2 100/10 102/1 102/7 102/10 102/22
103/1 103/5 103/22 105/19 105/22 106/23
108/14 110/2 110/5 111/15 111/22 112/3

## D

**don't...** [11] 112/7 113/4 113/9 113/19 115/6 119/13 120/10 120/17 120/17 120/18 120/19
**done** [4] 18/20 19/2 88/7 90/22
**dotted** [2] 37/15 84/5
**double** [1] 24/6
**down** [13] 27/22 32/6 45/8 46/17 47/4 58/5 59/17 60/2 60/12 77/6 77/15 114/21 119/3
**draft** [9] 96/15 97/14 104/25 108/2 120/2 120/13 120/13 120/15 120/15
**drafts** [5] 95/11 95/13 120/12 120/12 120/14 120/18
**DRUM** [18] 3/5 15/11 23/15 23/18 23/21 68/12 69/11 84/6 84/11 85/3 85/15 86/4 101/14 113/22 114/23 114/24 119/17 120/5
**due** [15] 25/8 42/7 43/10 43/20 44/6 44/8 44/9 53/21 56/4 56/8 56/16 56/18 64/17 65/21 110/22
**duration** [1] 95/17
**during** [6] 33/4 93/23 95/20 111/6 111/9 111/20

## E

**e-mail** [16] 16/12 16/13 31/22 31/25 32/9 32/18 48/16 88/7 93/24 94/6 94/8 95/13 95/22 95/25 96/4 96/18
**e-mailed** [4] 23/23 103/11 103/25 104/6
**e-mails** [16] 12/1 12/3 16/7 18/11 17/20 18/93/25 94/15 94/19 95/1 96/5 96/21 98/17 98/18 120/11 120/17
**EA** [69] 26/10 26/20 26/23 26/23 27/7 27/12 27/13 27/17 27/20 27/25 28/21 30/22 30/23 33/12 33/21 33/22 34/8 35/15 37/6 37/9 37/16 38/15 40/5 40/20 40/24 41/3 41/6 41/9 41/13 41/14 45/2 45/18 47/23 48/9 49/8 49/21 49/25 51/17 52/20 53/1 53/4 58/9 58/10 63/9 63/17 63/23 64/1 70/10 70/11 70/21 71/5 71/6 71/8 71/9 71/10 71/11 71/13 71/19 71/25 72/10 74/1 74/8 74/24 76/6 77/13 78/5 79/22 80/4 80/13
**EA 0313** [3] 41/3 71/6 78/5
**EA 2851** [1] 33/12
**EA 4613** [2] 70/21 71/9
**EA's** [2] 80/4 102/14
**each** [4] 20/2 83/8 89/9 97/22
**Eagan** [10] 17/13 18/6 24/25 26/12 31/2 42/21 46/13 58/11 105/25 110/8
**earlier** [7] 37/7 40/10 61/24 72/15 78/21 81/18 117/20
**earliest** [1] 100/13
**easier** [1] 54/18
**Edward** [2] 58/19 60/9
**effort** [2] 90/11 105/7
**eight** [1] 17/25
**either** [3] 7/17 26/14 49/13
**electronic** [1] 107/10
**elicited** [1] 120/20
**elmo** [1] 69/17
**else** [14] 18/17 19/14 88/7 94/11 102/12 102/18 102/20 103/1 103/2 112/11 112/13 112/15 112/17 117/17
**end** [15] 14/12 14/13 23/25 29/10 29/12 33/15 34/12 34/12 48/10 56/18 60/24 68/9 74/13 75/22 76/1
**ending** [1] 28/6
**ends** [1] 60/25
**engage** [1] 117/22
**engaged** [1] 118/14
**engagement** [9] 91/21 92/7 92/11 92/14 92/19 92/22 92/24 93/6 93/11
**enough** [2] 13/13 75/19
**entire** [2] 10/8 33/13
**entirety** [1] 20/12
**entitled** [6] 21/14 21/16 31/2 81/18 85/16 122/9
**entity** [2] 78/21 81/9
**entry** [1] 34/13
**error** [1] 6/23
**especially** [1] 4/19

## E (second column)

**established** [3] 10/15 22/5 115/6
**estimate** [4] 35/20 98/25 99/14 113/7
**estimation** [1] 106/25
**ethical** [2] 87/4 87/16
**ethics** [1] 87/5
**Evan** [17] 112/12 113/18 114/16 114/17 114/19 114/23 115/12 115/15 115/15 115/18 115/22 116/10 116/15 116/19 118/1 118/6 118/15
**even** [8] 8/3 17/7 18/11 18/17 18/23 19/4 19/7 19/12 20/8
**ever** [26] 17/3 81/22 89/8 90/2 90/9 90/20 90/22 93/17 95/3 95/7 95/11 95/13 102/6 102/8 102/18 103/23 104/1 104/11 104/18 104/21 105/6 105/20 105/23 108/17 108/20 112/5
**every** [2] 12/12 117/10
**Everybody** [1] 10/16
**everything** [8] 16/3 18/2 18/3 18/7 19/13 88/7 103/6 103/8
**evidence** [12] 5/24 7/2 15/5 16/8 31/20 42/16 45/24 46/8 54/8 54/13 66/11 72/24
**exactly** [5] 8/16 19/6 83/10 92/18 119/5
**exam** [12] 84/19 84/22 85/3 85/16 86/5 86/11 86/15 86/21 87/2 87/5 87/12 87/18
**examination** [5] 9/16 23/16 84/9 117/23 119/8
**examinations** [2] 118/6 118/14
**examine** [3] 8/24 10/8 10/18
**example** [1] 16/8
**examples** [1] 38/7
**executed** [1] 19/19
**exercising** [1] 12/14
**exhibit** [70] 3/8 3/9 3/9 3/14 11/7 11/7 11/18 13/8 23/20 23/22 24/20 25/24 28/19 31/9 31/10 31/12 31/20 32/13 33/18 35/10 36/13 38/8 38/24 39/18 40/17 40/21 42/5 42/17 43/4 44/16 46/1 46/10 46/22 47/10 47/19 48/21 50/4 50/21 51/5 52/24 52/2 52/13 52/16 52/18 53/19 54/8 54/9 54/13 54/14 55/9 57/8 58/25 61/16 63/5 63/10 64/15 66/11 66/21 68/2 68/12 69/12 72/15 72/24 73/4 73/12 76/3 79/17 79/23 82/1 120/16
**Exhibit 148** [1] 42/17
**Exhibit 359** [1] 46/22
**Exhibit 367** [1] 66/11
**Exhibit 371** [2] 54/8 54/14
**Exhibit 382** [1] 46/10
**Exhibit 392** [1] 72/24
**Exhibit 4** [1] 11/7
**Exhibit 420** [1] 24/20
**Exhibit 421** [1] 25/24
**Exhibit 422** [2] 28/19 32/13
**Exhibit 423** [1] 33/18
**Exhibit 424** [1] 35/10
**Exhibit 425** [1] 36/13
**Exhibit 426** [1] 38/8
**Exhibit 427** [1] 38/24
**Exhibit 428** [1] 39/18
**Exhibit 429** [1] 40/17
**Exhibit 430** [1] 42/5
**Exhibit 431** [2] 44/16 47/10
**Exhibit 432** [1] 47/19
**Exhibit 433** [1] 48/21
**Exhibit 434** [1] 50/4
**Exhibit 435** [1] 50/21
**Exhibit 436** [1] 51/10
**Exhibit 437** [2] 51/24 52/2
**Exhibit 438** [1] 52/13
**Exhibit 439** [2] 53/19 55/9
**Exhibit 440** [1] 57/8
**Exhibit 441** [1] 58/25
**Exhibit 442** [1] 61/16
**Exhibit 443** [1] 63/5
**Exhibit 445** [1] 66/21
**Exhibit 446** [1] 68/2
**Exhibit 447** [1] 68/12
**Exhibit 448** [2] 69/12 73/12
**Exhibit 449** [1] 76/3

## F (third column)

**Exhibit 450** [1] 79/17
**Exhibit 456** [1] 82/1
**Exhibit 48** [4] 23/20 23/22 31/10 31/12
**Exhibit 5** [1] 11/7
**Exhibit 50** [1] 31/20
**exhibits** [14] 3/7 3/13 42/1 45/25 46/5 46/8 53/16 61/24 64/12 64/13 96/8 114/2 117/7 120/12
**Exhibits 359** [1] 45/25
**Exhibits 439** [1] 53/16
**Exhibits 444** [1] 64/12
**exist** [1] 12/7
**existence** [2] 7/8 10/13
**exists** [1] 17/7
**expansion** [1] 13/12
**expect** [3] 89/16 98/11 112/23
**expedition** [1] 18/24
**expended** [1] 105/11
**expense** [1] 20/2
**expenses** [23] 18/11 19/6 19/10 19/12 24/1 24/23 25/1 25/4 25/5 25/14 25/16 28/8 28/10 31/12 43/13 55/20 56/12 58/9 65/19 103/12 104/5 106/24 107/22
**experience** [1] 115/1
**expert** [3] 119/17 119/22 120/8
**expertise** [1] 91/5
**explain** [9] 7/8 11/22 12/19 12/22 19/18 50/9 52/21 63/12 101/15
**explaining** [1] 26/3
**extent** [1] 119/19
**extractions** [1] 17/8
**extraordinary** [1] 10/3

## F

**fact** [5] 9/10 10/5 10/9 37/15 108/6
**factor** [1] 25/15
**failed** [1] 85/25
**failure** [1] 5/24
**Fair** [1] 13/13
**fairly** [2] 94/3 95/15
**faith** [2] 8/12 119/15
**far** [2] 105/21 118/2
**February** [7] 18/2 31/18 31/23 39/22 39/25 40/8 52/4
**February 15th** [3] 39/22 39/25 40/8
**February 20th** [1] 52/4
**February 4th** [2] 31/18 31/23
**Federal** [2] 2/10 5/24
**fee** [9] 21/20 31/4 43/8 43/24 55/16 76/2 81/16 93/5 93/10
**fees** [17] 19/6 21/14 21/17 25/13 31/3 32/24 43/6 55/14 56/12 57/1 65/10 66/6 66/18 73/25 74/9 93/2 93/3
**fever** [1] 4/15
**few** [6] 32/14 38/7 59/16 59/17 60/2 61/14
**figure** [14] 24/6 25/11 43/7 43/14 43/16 43/17 56/10 65/11 65/15 99/18 105/10 105/12 107/9 107/20
**figured** [1] 4/19
**file** [5] 4/24 6/23 7/24 11/13 21/25
**filed** [6] 5/19 5/22 5/25 7/22 7/25 20/1
**files** [17] 17/18 17/23 17/25 18/5 18/13 20/19 20/24
**filing** [6] 10/25 11/5 12/18 13/8 18/17 20/25
**filings** [2] 4/13 21/19
**filled** [1] 114/23
**final** [1] 120/15
**financial** [1] 18/14
**financials** [1] 18/10
**find** [2] 4/21 105/7
**finding** [2] 6/9 6/11
**fine** [5] 30/3 68/16 68/22 68/25 118/20
**finish** [1] 79/25
**firm** [12] 19/20 19/21 19/21 104/12 105/6 106/5 106/20 106/20 106/22 107/16 114/15
**first** [40] 7/2 17/12 26/19 26/23 30/2 30/5 42/9 44/20 44/24 45/1 47/24 47/25 48/3 53/23 54/15 57/13 57/18 59/3 63/12 64/19 64/20

**F**

**first... [19]** 15/21 67/7 68/5 71/15 71/18 74/23 74/24 75/6 76/10 88/4 88/6 91/2 100/4 100/24 100/25 102/11 106/5 108/9 109/24
**fishing [1]** 18/24
**fit [1]** 91/5
**five [1]** 90/8
**flows [1]** 49/15
**flying [1]** 12/1
**focus [1]** 112/1
**focusing [4]** 53/23 66/11 70/5 70/12
**following [3]** 10/22 32/21 44/7
**foregoing [1]** 122/7
**form [2]** 69/4 118/23
**format [1]** 122/10
**forth [2]** 17/7 17/9
**Forward [1]** 32/1
**fought [1]** 20/23
**foundation [4]** 85/11 85/13 85/22 89/14
**four [16]** 19/8 42/22 46/14 47/1 49/17 82/17 83/7 84/20 85/4 85/6 86/10 99/6 99/8 99/9 112/19 112/21
**Fourth [1]** 2/11
**FOX [1]** 2/4
**frame [1]** 14/3
**Frauds [1]** 2/6
**free [1]** 4/16
**FRIDAY [1]** 4/1
**front [2]** 69/13 106/3
**full [5]** 8/5 14/8 14/11 49/19 80/2
**fund [1]** 39/25
**funds [1]** 26/1 37/3 38/9 39/3 39/21 50/7 50/24 51/12 52/3 83/21 84/3
**further [6]** 5/18 13/3 14/17 37/3 38/4 84/6
**FYI [1]** 32/5

**G**

**Galicia [1]** 15/2
**Gardner [42]** 13/11 42/4 42/7 43/18 43/25 44/8 44/15 47/18 48/14 48/18 48/19 48/24 49/16 49/23 49/25 50/2 50/8 50/10 50/16 50/20 50/25 51/3 51/9 51/13 51/16 51/19 51/23 52/4 52/6 52/14 53/7 53/9 53/13 53/14 62/8 63/1 72/9 72/13 79/10 83/5 84/2 108/22
**Gardner's [5]** 13/1 44/14 44/20 47/24 48/11
**gather [1]** 98/21
**GB [24]** 26/10 28/18 38/9 38/16 38/19 38/23 39/3 39/8 39/11 39/21 40/1 50/7 50/13 50/18 50/24 51/5 51/8 51/12 51/18 51/21 52/3 58/9 58/10 58/19
**general [2]** 93/1 97/23
**generally [9]** 14/24 24/9 28/8 28/23 29/1 35/4 96/7 97/18 115/5
**generated [2]** 97/4 97/6
**gentlemen [4]** 22/18 23/12 69/1 118/22
**Geoffrey [31]** 25/23 26/1 27/18 28/22 33/22 35/8 35/15 36/5 36/10 36/22 36/23 36/25 37/9 37/12 37/18 37/25 38/9 38/13 38/18 38/20 39/3 39/6 39/13 39/22 40/4 40/9 41/15 72/9 77/16 83/5
**get [13]** 10/18 17/22 17/23 17/23 19/15 20/15 68/20 84/6 84/6 86/16 95/12 97/14 115/13
**getting [2]** 114/21 115/7
**Giglio [4]** 19/24 21/6 22/17 120/24
**give [4]** 17/11 108/1 108/3 119/22
**given [1]** 99/19
**giving [1]** 100/2
**Global [11]** 26/13 28/17 39/17 40/7 52/12 58/11 60/13 77/12 77/20 78/9 78/25
**go [42]** 7/6 17/10 24/20 25/24 27/2 28/11 28/19 30/1 30/21 33/13 34/18 34/12 34/23 35/10 35/20 39/18 42/25 43/4 44/16 45/3 45/11 45/15 46/17 46/21 47/9 47/19 48/14 50/21 52/13 55/9 57/8 58/25 60/24 66/21 67/14 68/2 68/12 73/11 76/3 79/17 79/18 79/25 going [45] 5/7 8/23 19/18 20/25 26/19 26/22 27/2 27/10 27/10 27/15 27/22 28/16 30/3 31/10 33/11 33/13 34/23 37/6 37/16 37/16 41/4 44/24 45/4 45/7 45/16 47/13 47/15 57/17
**going to [1]** 30/3
**good [23]** 4/5 4/8 4/9 4/12 8/12 12/23 22/20 23/3 23/6 23/7 23/11 23/12 23/13 23/18 23/19 65/5 68/24 83/23 84/11 84/12 91/5 118/2 118/18
**good-faith [1]** 8/12
**got [6]** 17/18 18/7 85/17 85/24 114/17 120/13
**gotten [2]** 8/13 17/20
**government [90]** 5/6 5/7 5/9 5/15 5/22 5/25 6/3 6/5 6/7 6/10 6/14 6/16 6/20 6/24 8/20 8/25 9/3 10/5 10/25 11/1 11/4 12/11 12/17 15/15 15/23 15/25 16/1 16/5 19/2 19/19 19/23 20/3 20/6 20/12 20/20 21/1 20/23 22/8 45/24 54/6 54/8 88/1 88/4 88/19 90/3 90/25 91/2 91/3 91/22 92/10 92/12 92/13 92/13 92/17 92/25 93/2 94/25 94/25 96/10 97/5 97/7 97/9 97/15 98/9 100/2 100/5 100/9 100/11 101/1 101/6 101/10 101/21 101/22 101/24 103/23 104/1 104/11 104/15 104/22 107/13 107/24 108/5 108/8 108/14 109/19 110/4 110/13 114/2 119/6 120/8 120/22
**government's [6]** 6/10 12/24 15/11 23/15 109/3 119/18
**granted [1]** 8/18
**graphic [1]** 36/21
**gray [1]** 27/5
**green [9]** 26/7 27/16 36/23 36/24 47/16 49/16 58/21 72/4 83/3
**Greg [15]** 53/18 53/21 55/23 56/24 56/25 57/13 58/24 59/3 61/18 62/4 62/5 62/17 62/25 72/8 83/5
**Gregory [1]** 61/10
**gritty [1]** 114/21
**ground [1]** 4/15
**group [11]** 45/10 45/12 48/8 58/19 91/4 91/16 92/17 92/25 97/6 98/12 112/16
**Group's [1]** 93/1
**guess [1]** 30/14 113/13 114/16

**H**

**had [50]** 4/25 6/25 7/19 8/13 9/6 13/17 15/10 15/16 17/16 17/20 18/1 18/2 18/2 18/6 19/14 19/23 20/3 20/9 29/2 29/23 38/17 39/8 40/5 41/6 41/13 50/16 51/6 51/20 53/4 63/25 75/18 84/19 84/20 86/16 90/3 94/22 94/24 95/25 96/2 96/21 101/19 101/22 105/10 105/1 110/4 110/5 106/9 110/4 113/14 115/11
**half [19]** 15/17 54/15 77/22 87/24 90/11 91/19 93/15 93/23 94/2 95/18 95/20 96/9 96/22 97/11 97/19 103/3 108/7 118/13 120/4
**hand [17]** 26/17 33/3 36/22 37/5 42/19 44/21 46/14 48/25 49/15 52/23 53/4 54/23 57/14 61/19 62/15 63/14 63/23
**handed [1]** 85/1
**handful [3]** 30/2 83/7 95/17
**hands [1]** 114/17
**HANNA [1]** 2/3
**happened [8]** 6/4 10/5 20/15 20/17 45/19 97/18 99/3 119/13
**happens [1]** 45/11
**happy [1]** 7/14
**Harper [1]** 15/4
**has [26]** 4/21 6/3 10/14 12/11 15/24 16/4 16/8 18/15 18/19 19/12 19/14 19/16 20/11 21/6 21/17 22/10 89/9 91/18 105/21 110/7 112/11 113/3 113/18 113/22 114/1 114/5
**hash [1]** 48/1
**hasn't [1]** 19/2
**Hassan [4]** 43/2 49/7 49/22 53/14
**have [140]**
**having [3]** 7/1 8/11 17/22
**he [48]** 6/16 8/7 8/8 8/11 8/13 8/13 8/15 8/16 8/16 8/17 13/20 15/21 16/3 17/13 17/14 17/16 17/16 17/19 17/24 18/1 18/5 18/5 18/23 18/16 18/18 18/18 18/19 18/19 18/21 18/23 19/1 19/1 19/3 19/5 19/8 19/8 19/12 19/14
**he [48]** (cont.)

**I**

**I'd [2]** 19/4 68/19
**I'll [3]** 11/21 99/13 109/22
**I'm [32]** 7/18 8/23 10/22 10/22 12/3 14/10 16/9 17/2 17/3 19/18 20/25 33/13 34/23 38/7 48/19 69/15 78/7 83/23 88/22 89/5 89/9 92/16 92/20 93/7 94/16 94/16 98/18 106/16 108/9 109/21 111/25 120/25 121/1
**I've [3]** 37/3 69/24 92/8
**I-N-D-E-X [1]** 3/2
**idea [5]** 110/7 110/11 110/12 110/15 111/22
**Ideally [1]** 97/3
**identical [1]** 120/4
**identified [3]** 11/4 43/17 55/23
**Illinois [1]** 84/17
**IM [2]** 75/5 75/9
**images [1]** 19/20
**imagine [1]** 17/25
**immediately [3]** 71/1 74/11 119/6
**impeachment [2]** 85/10 85/20

**91/16 91/17 91/18 114/25 119/19 119/23**
**heard [1]** 89/8
**hearsay [3]** 46/2 54/10 85/12
**heavily [3]** 113/22 114/1 114/19
**held [1]** 122/9
**help [1]** 116/19
**helped [1]** 115/13
**her [16]** 4/20 5/8 5/10 5/10 5/20 16/23 16/24 16/25 17/4 50/16 51/19 81/9 83/19 109/17 114/17 117/2
**here [24]** 9/17 14/21 14/25 15/24 15/25 18/10 20/17 35/1 49/3 55/7 64/5 66/6 68/6 69/2 69/17 69/25 71/6 87/14 88/10 99/19 110/6 110/10 116/17 116/19 118/21
**hereby [1]** 122/6
**Hernandez [1]** 23/9
**hey [1]** 105/23
**higher [1]** 24/6
**highly [1]** 119/9
**Hills [1]** 35/2
**him [6]** 14/3 16/15 17/18 19/5 19/9 120/18
**himself [1]** 18/20
**hire [1]** 91/3
**his [8]** 17/14 17/20 17/21 18/5 19/5 81/3 81/7 119/20
**hold [1]** 14/1
**holds [1]** 120/8
**Honda [1]** 45/13
**Honor [101]** 4/5 4/9 4/25 5/3 6/12 6/14 6/21 6/22 6/23 7/5 7/9 7/14 7/18 7/21 7/24 8/6 8/7 8/11 8/16 8/18 9/5 9/15 9/18 9/20 9/25 10/4 10/19 11/13 11/25 12/4 12/8 12/15 12/20 13/3 13/17 14/5 14/23 15/8 15/10 15/12 15/19 17/10 17/16 19/16 20/8 21/20 21/10 21/18 22/11 23/3 23/7 28/24 29/17 34/5 34/14 34/19 35/25 45/23 46/2 54/7 54/10 59/21 60/14 68/14 68/19 68/23 68/24 71/16 71/23 72/6 72/16 74/6 76/11 76/19 77/8 77/18 78/2 78/10 79/2 80/8 80/16 84/24 85/9 85/11 85/19 85/21 99/10 100/20 103/13 104/7 108/11 115/19 116/21 118/19 119/5 119/17 120/7 120/19
**Honor's [3]** 7/13 7/15 15/6
**HONORABLE [1]** 1/8
**host [1]** 12/19
**hotel [1]** 116/16
**hour [6]** 14/9 14/11 93/13 113/12 113/12 113/14
**hourly [4]** 93/3 93/5 93/10 93/19
**house [2]** 16/23 17/5
**how [48]** 13/10 14/11 15/22 15/22 18/5 25/11 35/4 41/21 43/16 43/21 43/24 48/11 53/13 55/21 56/5 56/7 56/10 61/3 64/9 65/11 74/12 75/1 75/10 76/18 79/12 81/6 81/14 81/18 87/21 88/12 90/25 91/13 93/22 95/5 96/12 97/1 97/4 97/21 97/23 101/25 102/24 104/15 106/4 106/24 109/3 109/9 113/18 114/12

**J**

important [4] 5/4 6/13 15/22 21/25
importantly [1] 15/25
inaccuracies [1] 98/4
inartfully [1] 9/21
include [1] 24/25
included [3] 19/21 24/6 37/24
including [6] 87/4 93/3 93/25 94/6 114/21 119/24
incomplete [1] 11/9
incorrect [1] 11/16
incorrectly [1] 9/19
incurred [1] 23/9
independent [3] 26/4 58/16 58/17
indicated [1] 13/24
indicates [1] 29/22
individual [2] 37/11 97/22
individuals [4] 13/18 14/1 22/19 67/25
individuals' [1] 113/5
inform [1] 108/5
information [23] 21/7 21/21 54/25 69/25 71/6 95/21 98/1 99/19 99/19 99/23 99/24 99/25 100/2 100/3 100/9 100/14 101/9 102/21 102/24 106/12 107/22 112/4 112/5
informed [5] 7/20 8/2 88/23 90/3 101/21
informing [1] 6/22
initially [1] 100/12
Inn [1] 116/18
Instead [1] 5/5
interest [1] 14/6
interview [6] 12/4 109/18 109/25 110/2 110/3 119/25
interviews [1] 110/1
inventory [1] 22/9
investigative [1] 94/11
involved [4] 91/14 113/22 114/1 114/19
IRS [7] 17/17 17/24 20/17 72/1 72/20 80/5 80/24
is [307]
isn't [10] 84/22 85/15 85/24 86/5 86/11 87/2 90/18 108/2 113/23 114/2
issue [10] 5/16 9/9 9/16 11/14 11/15 19/23 21/2 21/25 22/4 88/23
issues [6] 12/19 15/10 69/4 86/25 87/16 118/24
it [184]
it's [30] 5/4 12/6 12/9 12/13 12/13 12/16 16/9 16/10 17/2 19/9 19/10 21/2 21/22 22/17 22/17 22/18 22/19 30/25 53/3 54/18 57/14 68/19 68/20 79/23 93/9 93/12 96/24 106/16 119/14 119/20
Item [2] 4/3 23/1
items [1] 15/22
its [6] 5/22 5/25 8/25 9/3 12/11 22/9
itself [1] 16/10

**J**

JAMES [1] 1/8
January [35] 25/8 27/14 29/3 30/5 30/14 33/14 33/25 35/17 39/4 39/9 42/7 42/11 43/3 43/20 44/9 45/2 46/18 47/8 48/3 50/10 51/13 51/16 51/18 53/21 53/22 53/24 55/8 55/12 56/4 56/7 58/7 58/14 59/6 60/11 85/17
January 10th [1] 58/7
January 16th [2] 51/16 51/18
January 2017 [1] 44/9
January 2021 [1] 53/22
January 25th [5] 42/7 42/11 43/20 45/2 48/3
January 26th [3] 46/18 47/8 48/10
January 28th [1] 85/17
January 29th [4] 29/3 30/5 30/14 33/14
January 30th [3] 27/14 33/25 35/17
January 5th [3] 39/9 53/21 53/24 55/8 55/12 56/7 58/14 59/6
January 8th [1] 60/11
Jencks [7] 12/7 12/11 12/21 99/12 119/6 120/9 120/23
job [6] 12/6 12/9 12/17 115/8 115/9 118/2
jobs [1] 14/1

**J**

JOHN [8] 1/11 2/14 3/5 4/4 23/2 23/15 114/23 116/25
Johnson [52] 16/12 18/13 19/6 19/8 25/5 25/23 27/9 27/18 31/3 32/1 32/3 33/16 35/8 36/5 36/10 36/22 36/23 36/25 37/9 37/11 37/13 37/19 37/19 37/25 38/3 38/5 38/10 38/14 38/18 38/20 38/22 39/4 39/6 39/13 39/22 39/24 40/4 40/9 40/11 41/16 41/23 41/25 50/1 56/2 62/8 63/1 72/9 72/12 77/17 83/5 84/2 108/20
Johnson's [7] 24/2 24/23 26/1 28/22 33/22 35/15 41/21
Johnson-related [1] 25/5
joining [1] 23/9
JUDGE [1] 1/8
judgment [1] 22/4
Judicial [1] 122/11
Judy [14] 16/12 16/23 17/4 23/22 31/22 55/24 55/25 103/11 103/20 103/24 104/6 105/24 106/25 107/4
Julian [1] 94/9
July [4] 18/4 29/23 33/14 36/11
July 2015 [1] 36/11
July 6th [2] 29/23 33/14
June [4] 18/5 18/5 21/3 21/4
June 6th [2] 21/3 21/4
junior [1] 93/20
jurisprudence [1] 10/13
jury [12] 4/2 21/23 22/25 23/13 69/9 103/6 105/21 106/3 107/8 110/13 113/11 119/2
just [32] 7/9 9/15 10/6 10/8 10/16 13/22 15/4 15/14 15/15 19/17 20/11 20/11 20/14 20/25 22/19 24/25 32/5 33/6 34/21 59/16 68/7 73/4 75/13 77/21 99/19 101/14 101/16 103/3 103/19 106/15 111/8 117/15 120/13
JVS [3] 1/11 4/3 23/1

**K**

Karlous [2] 4/7 23/5
Keithahn [1] 112/14
kept [1] 16/25
Khe [1] 112/16
kind [5] 14/19 28/8 74/4 82/22 114/17
knew [7] 8/7 8/13 8/16 8/16 8/17 21/11 105/11
know [34] 5/11 5/14 7/14 14/19 14/20 14/24 17/1 17/5 17/6 17/7 22/12 22/13 22/18 42/2 42/20 87/10 88/12 89/7 92/12 94/18 96/1 96/16 101/24 102/1 102/2 102/3 102/7 103/22 105/3 113/4 113/19 120/7 120/9 120/25
Knowing [1] 8/5
knowledge [2] 6/20 8/5
knowledgeable [1] 114/14
knows [4] 17/16 17/19 106/24 107/4
Kupetz [4] 73/8 77/4 80/22 80/23

**L**

L.A [1] 24/14
labeled [1] 70/20
ladies [3] 23/12 69/1 118/22
laid [1] 4/15
large [2] 27/8 100/16
last [42] 5/25 11/7 15/16 16/17 21/5 25/19 28/12 28/16 29/10 34/13 35/20 39/14 41/11 41/12 41/17 42/22 44/11 46/14 47/1 56/21 66/3 74/11 75/3 78/14 79/6 90/11 93/23 94/2 95/18 95/20 96/9 96/22 97/11 97/18 103/2 108/6 110/7 115/22 116/10 118/10 118/13 119/13
lastly [8] 8/10 25/19 27/15 47/15 52/13 58/21 65/24 78/24
late [1] 87/23
later [6] 19/8 19/8 50/19 77/24 80/23 101/3
law [17] 2/15 10/7 10/15 19/20 19/20 19/21 45/10 45/12 48/8 58/19 90/7 106/4 106/20 106/20 106/22 106/25 120/10
lawyer [1] 7/16
lawyers [1] 7/15
Lay [2] 85/13 85/22

**L**

leading [2] 24/17 44/1
learn [1] 46/3
least [8] 17/5 38/21 39/16 40/10 63/2 85/6 98/14 108/6
led [3] 6/23 6/25 8/8
left [46] 26/2 26/17 36/17 37/5 37/14 38/12 38/16 39/8 40/2 41/1 42/19 44/21 44/24 48/11 48/25 49/3 49/4 49/4 49/6 50/14 50/15 51/6 51/18 52/23 53/4 57/14 57/17 61/3 61/19 61/20 62/15 63/14 63/23 66/25 67/3 67/5 69/21 69/24 70/20 74/12 75/10 79/12 80/10 82/6 82/10 83/11
left-hand [12] 26/17 37/5 42/19 44/21 48/25 52/23 53/4 57/14 61/19 62/15 63/14 63/23
legal [11] 25/13 43/6 55/14 56/12 57/1 65/10 66/6 66/18 87/4 87/15 89/23
legend [8] 26/2 36/17 44/22 49/1 57/15 67/1 69/22 82/7
less [6] 19/9 43/13 55/14 65/10 71/12 85/24
let [9] 9/15 9/21 10/6 14/20 26/23 29/9 30/5 42/2 42/19
let's [14] 5/20 7/25 20/10 27/2 38/7 38/24 42/1 42/5 52/13 66/21 71/11 74/14 81/25 82/6
letter [7] 91/21 92/15 92/19 92/21 92/24 93/6 93/11
letters [1] 95/5
license [1] 84/19
licensed [6] 84/17 86/20 89/3 89/21 90/4 90/13
light [6] 4/19 47/25 59/4 73/17 76/9 119/13
like [52] 14/5 15/18 16/12 17/15 19/9 20/19 21/24 22/3 26/2 26/9 26/22 27/21 28/11 28/12 29/12 30/6 30/15 31/7 32/23 34/1 34/10 34/24 35/1 45/3 47/25 48/25 49/21 52/16 54/17 56/14 57/14 58/2 59/12 59/12 60/12 60/25 66/25 67/14 68/19 69/21 70/21 71/11 73/21 74/8 76/23 77/16 78/8 78/24 79/23 82/6 82/22 83/8
limited [2] 22/17 22/19
line [19] 10/12 25/19 34/7 37/8 37/15 49/5 49/11 53/23 55/18 59/4 59/9 61/20 62/1 62/22 64/22 73/17 76/9 83/12 84/5
lines [2] 7/11 32/14
listed [12] 25/9 38/2 43/21 55/7 56/5 58/18 65/18 65/22 66/6 67/11 83/4 94/18
listen [2] 101/14 104/10
listened [1] 10/9
little [8] 11/9 32/6 34/2 71/12 77/6 77/15 93/18 113/20
LLC [2] 55/3 60/13
LLP [2] 42/21 46/13
lobby [1] 116/16
long [16] 10/12 64/14 64/18 66/23 67/23 69/19 70/9 70/13 74/17 83/6 83/22 83/24 87/21 91/13 106/16 114/12
longer [1] 116/23
look [15] 7/6 16/16 17/10 36/13 38/7 38/24 48/20 50/4 61/16 63/5 81/25 82/22 83/7 96/16 107/9
looked [2] 21/4 83/7
looking [4] 12/21 95/12 96/5 114/18
looks [38] 25/9 26/9 26/22 27/21 28/11 28/12 29/12 30/5 30/15 31/6 32/25 34/1 34/10 34/24 35/1 45/3 47/25 48/25 49/21 52/16 56/14 57/14 58/2 60/12 60/25 66/25 67/14 69/21 70/21 71/11 73/21 74/8 76/23 77/16 78/8 78/24 79/23 82/6
Los [3] 2/8 26/18 37/5
lot [2] 113/20 113/21
lower [1] 98/11
lunch [4] 13/21 14/9 14/11 118/21

**M**

made [34] 10/25 13/20 19/17 20/6 20/17 20/21 27/17 36/22 37/18 38/13 39/4 41/9 41/15 48/17 48/19 50/19 51/2 51/8 51/22 53/7 63/16 64/1 64/16 68/14 70/1 72/1 80/13 80/23 82/4 90/11 96/1 99/6 110/22
mail [16] 16/12 16/13 31/22 31/25 32/9 32/18

**M**

**mail... [10]** 48/16 88/7 93/24 94/6 94/8 95/13 95/22 95/25 96/4 96/18
**mailed [4]** 23/23 103/11 103/25 104/6
**mails [16]** 12/1 12/3 16/7 18/11 20/17 20/18 93/25 94/15 94/19 95/1 96/5 96/21 98/17 98/18 120/11 120/17
**major [2]** 2/6 13/7
**make [19]** 9/17 10/6 10/18 19/4 20/12 20/25 38/9 39/3 39/21 50/7 50/24 51/12 52/3 75/20 95/20 97/9 97/12 98/1 105/6
**making [1]** 70/14
**management [1]** 106/4
**many [3]** 13/10 19/1 96/24
**March [26]** 27/14 29/6 33/9 34/16 35/18 35/24 36/2 58/7 58/14 60/25 61/3 64/18 64/23 65/22 70/4 71/19 72/22 73/10 73/24 74/4 77/7 77/12 77/15 77/24 80/12 81/4
**March 14 [1]** 60/25
**March 14th [7]** 58/7 58/14 61/3 64/18 64/23 65/22 70/4
**March 15th [6]** 71/19 73/24 74/4 77/7 77/12 80/12
**March 2018 [1]** 81/4
**March 20th [1]** 77/15
**March 26th [2]** 72/22 73/10
**March 2nd [1]** 33/9
**March 30th [4]** 27/14 34/16 35/24 36/2
**March 31st [1]** 29/6
**mark [3]** 29/12 29/22 48/1
**MARKED [2]** 3/7 3/13
**Mary [1]** 32/10
**material [1]** 18/3
**materials [1]** 12/7 119/7 119/15
**matter [29]** 7/16 13/2 25/3 87/22 88/10 88/24 90/12 90/18 90/20 90/23 91/3 91/11 91/15 91/18 94/4 97/2 98/9 98/14 98/18 102/22 102/25 112/21 113/1 113/3 113/18 114/5 114/15 119/11 122/9
**matters [5]** 13/16 99/9 104/3 113/6 114/25
**may [22]** 12/9 13/8 18/4 21/3 21/6 50/25 51/7 70/16 70/25 71/1 74/20 75/13 75/19 75/22 76/1 84/25 87/8 98/16 108/10 112/23 119/3 120/15
**May 15th [1]** 51/7
**May 4th [8]** 70/16 70/25 71/1 74/20 75/13 75/19 75/22 76/1
**maybe [3]** 18/4 34/25 109/22
**McNicholas [1]** 32/11
**me [34]** 4/14 5/12 6/15 9/15 9/21 10/6 11/9 15/18 20/18 20/21 26/23 29/9 30/5 91/4 93/21 98/18 100/5 100/8 100/10 101/15 101/16 104/16 107/8 108/3 108/15 109/11 109/12 111/1 114/19 117/14 117/25 118/7 118/15 119/7
**mean [19]** 10/15 13/7 29/15 30/8 49/23 50/14 56/15 58/10 83/1 83/14 92/20 93/7 94/25 99/17 100/15 113/11 113/22 114/23 120/25
**meaning [1]** 116/8
**means [4]** 29/16 48/1 49/24 83/15
**meant [2]** 31/5 83/2
**media [3]** 111/11 111/12 112/3
**meet [1]** 116/15
**meetings [1]** 110/4
**memorandum [2]** 12/4 119/24
**mention [2]** 17/14 18/8
**mentioned [1]** 117/20
**message [1]** 32/4
**messages [1]** 95/3
**met [4]** 88/1 88/4 116/10 116/16
**MICHAEL [7]** 1/11 2/14 4/4 9/23 23/7 73/5
**Michelle [29]** 37/23 38/1 40/19 40/25 41/7 41/19 49/9 52/19 52/24 53/11 61/24 62/18 63/8 63/15 64/7 64/14 66/17 66/23 67/22 69/19 70/9 70/13 71/2 79/21 80/3 80/11 83/5 83/16 83/24
**Microsoft [1]** 116/9
**mid [1]** 69/1
**mid-morning [1]** 69/1

**middle [10]** 37/4 42/25 45/15 45/16 47/12 47/23 47/24 72/16 73/3 74/12
**might [1]** 68/23
**million [79]** 19/9 25/12 25/13 26/25 27/12 27/20 27/25 29/3 29/5 29/7 30/15 30/18 30/20 31/1 31/6 32/23 33/5 34/8 37/7 37/20 41/1 41/22 41/24 42/12 43/2 43/11 43/22 44/10 45/9 45/12 45/13 48/8 52/5 54/22 55/13 56/11 57/4 57/5 57/6 57/19 58/15 59/7 61/23 64/21 64/24 65/8 65/10 65/15 65/23 66/2 66/5 67/7 67/10 67/19 67/21 70/8 70/11 70/14 71/12 71/19 72/2 75/8 75/10 75/16 76/21 77/3 77/3 80/13 80/20 80/21 80/22 80/23 81/4 81/12 81/20 81/23 83/19
**mind [2]** 13/10 40/2
**minimal [1]** 86/4
**minus [4]** 25/13 25/13 56/11 56/12
**minute [2]** 83/18 95/12
**minutes [2]** 69/2 69/6
**Miramar [1]** 2/16
**miscellaneous [3]** 27/6 27/21 58/20
**misdemeanor [1]** 89/22
**missing [1]** 11/9
**mistrial [1]** 5/23
**Mixed [1]** 28/10
**mock [3]** 117/22 118/6 118/14
**moment [2]** 54/5 103/13
**Monday [5]** 4/21 4/24 5/21 14/21 88/6
**money [20]** 21/16 37/8 41/21 45/20 47/17 48/11 48/14 49/15 52/11 52/25 53/10 53/13 64/6 64/9 64/10 72/14 75/20 83/19 83/25 99/4
**monies [1]** 110/22
**month [5]** 32/25 33/4 33/7 51/3 97/3
**monthly [1]** 98/7
**months [5]** 17/25 27/13 28/2 98/12 114/13
**more [13]** 8/3 13/9 15/25 17/25 19/14 27/21 29/7 63/2 78/24 81/8 81/18 81/25 106/24 107/4
**Moreover [1]** 8/25
**morning [14]** 4/5 4/8 4/9 4/12 7/7 13/16 23/3 23/6 23/7 23/10 23/12 23/13 23/18 23/19 68/21 69/1 84/11 84/12 116/1
**most [4]** 82/4 112/25 113/3 114/14
**motion [7]** 5/23 6/24 7/25 8/18 8/23 10/22 18/5
**motions [1]** 20/1
**move [5]** 45/24 87/6 100/19 101/11 104/7
**moves [1]** 54/8
**Mr [3]** 21/9 23/14 86/4
**Mr. [84]** 4/10 5/2 5/15 5/23 6/1 6/15 6/21 8/5 11/2 11/11 13/19 13/20 13/23 15/9 15/11 18/12 18/13 19/6 19/8 20/13 20/13 20/18 20/22 21/1 21/5 22/15 23/8 23/18 23/22 24/2 24/23 26/7 31/3 33/16 37/11 38/3 38/5 38/22 40/11 41/21 41/23 41/25 50/1 56/2 56/8 61/3 61/12 62/8 63/1 63/3 64/4 64/9 64/10 68/12 69/11 72/12 72/13 78/22 81/6 84/2 84/2 84/6 84/8 84/11 85/3 85/15 88/20 88/21 88/22 88/24 89/1 101/14 108/20 109/1 109/3 109/9 109/14 113/22 117/7 119/4 119/17 120/5 120/6
**Mr. Andre [1]** 89/1
**Mr. Armenta [2]** 1/12 119/14
**Mr. Avenatti [9]** 5/2 6/1 11/11 15/9 20/13 26/7 84/8 119/4 120/6
**Mr. Avenatti's [1]** 5/23
**Mr. Barela [12]** 18/12 56/8 61/13 61/14 63/3 64/4 64/10 72/13 78/22 84/2 109/3 109/9
**Mr. Barela's [1]** 64/9
**Mr. Dean [2]** 4/10 23/8
**Mr. Drum [13]** 15/11 23/18 23/21 68/12 69/11 84/6 84/11 85/3 85/15 101/14 113/22 119/17 120/5
**Mr. Johnson [19]** 18/13 19/6 19/8 31/3 33/16 37/11 38/3 38/5 38/22 40/11 41/23 41/25 50/1 56/2 62/8 63/1 72/12 84/2 108/20
**Mr. Johnson's [3]** 24/2 24/23 41/21
**Mr. Sagel [9]** 5/15 6/21 8/5 21/1 21/5 88/20 88/21 88/22 88/24
**Mr. Sagel's [1]** 22/15

**Mr. Steward [5]** 6/15 20/13 20/18 20/22 109/1
**Mr. Tran [2]** 81/6 109/1
**Mr. Varani [3]** 1/13 13/20 13/23
**Mr. Wyman [1]** 117/7
**Ms [12]** 20/5 23/9 32/9 48/18 72/13 84/2 105/1 107/7 108/7 108/18 110/4 110/7
**Ms. [29]** 4/11 13/1 13/11 14/24 23/9 40/1 43/25 48/11 48/14 48/19 49/23 49/25 50/2 50/16 52/14 53/13 53/14 62/8 63/1 72/14 81/9 81/22 83/18 108/22 108/24 109/16 113/22 117/12 117/18
**Ms. Bredahl [1]** 14/22
**Ms. Carter [3]** 113/22 117/12 117/18
**Ms. Cummings-Cefali [2]** 4/11 23/9 109/16
**Ms. Gardner [14]** 13/11 43/25 48/14 48/19 49/23 49/25 50/2 50/16 52/14 53/13 53/14 62/8 63/1 108/22
**Ms. Gardner's [2]** 13/1 48/11
**Ms. Phan [4]** 81/9 81/22 83/18 108/24
**Ms. Phan's [2]** 40/11 72/14
**much [21]** 35/5 41/21 43/21 43/24 48/11 53/13 56/5 56/7 61/3 64/9 74/12 75/1 75/10 76/18 79/12 81/14 81/18 93/18 97/21 97/23 113/18
**multiple [6]** 17/22 20/6 21/9 92/5 120/12 120/14
**my [30]** 8/21 9/5 9/7 11/25 12/6 12/17 12/22 13/10 20/10 85/8 88/15 88/15 90/6 91/2 91/4 91/5 93/19 99/13 99/20 100/13 101/2 101/14 104/10 106/15 111/8 112/1 112/16 115/8 117/19 119/8

**N**

**name [7]** 32/2 42/20 46/12 46/24 80/1 94/13 94/16
**named [1]** 32/10
**namely [1]** 85/16
**names [2]** 83/3 94/19
**nature [3]** 6/11 20/20 93/1
**nearest [2]** 31/11 32/17
**necessary [2]** 4/25 6/10
**need [8]** 13/3 14/8 14/11 14/24 15/14 15/14 17/14 101/15
**negative [2]** 38/18 68/11
**never [12]** 12/1 19/22 19/25 22/6 84/13 90/7 90/16 107/13 107/17 107/18 107/19 109/11
**Nevertheless [1]** 8/23
**new [1]** 69/12
**next [22]** 4/20 18/5 27/10 27/20 31/15 38/20 40/6 43/13 43/19 44/5 44/6 55/13 55/18 58/12 64/1 65/9 73/24 75/20 76/15 99/13 100/7 100/8
**Nguyen [1]** 112/16
**NICOLA [2]** 2/3
**night [3]** 5/25 21/5 119/13
**Ninth [1]** 6/19
**nitty [1]** 114/21
**nitty-gritty [1]** 114/21
**no [82]** 5/19 6/5 6/9 6/17 6/18 8/3 9/11 13/5 17/14 18/16 18/16 19/2 22/5 27/17 29/19 30/25 33/17 35/9 36/7 37/12 37/15 37/18 47/17 48/15 49/21 61/11 62/1 62/21 75/21 77/10 81/24 84/4 84/4 84/6 87/20 88/6 89/5 90/6 90/15 90/21 93/19 94/15 94/16 94/23 95/4 95/6 98/23 99/11 101/19 103/5 103/23 104/1 104/3 104/20 104/23 105/4 105/22 106/15 106/22 106/23 107/12 107/15 108/14 108/21 108/23 109/4 109/13 109/15 110/6 110/11 110/12 110/15 111/12 112/18 114/9 114/11 116/23 118/25 119/12 120/7 120/9
**No. [1]** 11/18
**No. 4 [1]** 11/18
**non [1]** 18/3
**non-taint [1]** 18/3
**none [20]** 3/12 25/21 37/8 41/24 44/13 49/24 53/15 56/23 58/2 62/23
**nonresponsive [2]** 100/20 101/11

**N**

**Nope [2]** 108/25 109/2
**North [1]** 2/7
**not [100]** 4/19 4/23 5/1 5/9 5/11 6/10 6/18
7/14 7/18 8/2 8/7 8/12 8/12 8/15 9/2 9/10 9/10
9/12 12/4 12/6 12/9 12/11 12/13 12/16 12/17
12/17 12/20 14/17 14/21 14/25 15/5 16/9 17/2
17/3 17/21 18/8 18/8 18/24 19/9 19/17 20/12
20/12 20/15 21/11 22/9 22/16 22/17 22/17
22/18 22/19 30/25 33/13 33/17 34/23 48/15
61/11 69/3 69/4 69/5 75/18 75/21 82/4 88/3
89/5 89/19 90/8 90/15 92/18 92/20 93/7 95/8
96/5 96/12 96/23 98/12 100/1 100/18 100/19
100/24 101/3 101/7 103/19 103/21 104/20
105/8 105/14 106/1 108/3 108/19 109/17
110/16 111/15 112/5 112/24 118/23 118/23
119/2 119/9 120/9 120/13
**note [2]** 5/3 11/25
**notes [5]** 11/8 109/19 109/25 110/2 110/3
**November [4]** 42/8 43/10 44/7 44/8
**November 2020 [4]** 42/8 43/10 44/7 44/8
**now [48]** 5/6 18/23 20/10 22/5 24/2 24/20
25/24 26/2 27/2 28/19 30/1 32/13 32/21 33/13
34/23 35/11 38/24 39/18 42/1 42/25 43/4
44/17 47/10 47/20 50/21 53/16 55/10 57/8
58/25 64/12 66/21 67/14 68/12 68/23 71/4
73/11 78/7 81/2 90/16 100/24 103/6 105/14
108/17 112/8 114/6 115/18 118/18 119/16
**nullity [2]** 10/11 10/16
**number [25]** 5/17 11/17 15/11 15/13 15/14
15/16 19/16 22/6 24/5 25/9 42/23 46/15 47/2
55/15 55/21 55/22 60/13 77/24 78/8 96/20
98/1 117/7 120/10 120/11 120/11
**numbers [5]** 11/8 17/11 46/4 47/1 59/13

**O**

**oath [1]** 20/5
**objection [44]** 28/24 29/17 34/5 34/19 35/25
44/1 46/2 46/7 54/10 59/21 60/5 60/14 60/20
61/5 71/16 71/23 72/6 74/6 75/24 76/11 76/19
76/25 77/9 80/8 85/11 86/4 86/7 86/12 86/17
86/22 88/13 89/14 99/1 106/6 109/5 110/18
110/23 113/7 115/2 115/24 116/4 117/4 118/3
118/8
**objections [13]** 6/5 34/14 72/16 77/8 77/18
78/2 78/10 78/16 79/2 79/7 79/14 80/16 85/21
**obligation [6]** 12/12 12/13 12/18 19/24 20/3
20/9
**obligations [1]** 120/5
**obtained [1]** 19/20
**obvious [1]** 16/2
**Obviously [3]** 14/1 14/4 100/5
**occasions [4]** 20/7 21/9 108/6 119/24
**occurred [1]** 77/7
**occurrence [1]** 95/15
**occurs [1]** 74/5
**October [2]** 68/1 68/9
**October 3rd [2]** 68/1 68/9
**off [6]** 7/9 16/25 17/3 17/4 100/1 100/2
**offer [2]** 85/9 85/19
**office [1]** 92/17
**offices [2]** 2/15 17/17
**often [1]** 97/1
**okay [29]** 5/20 9/8 11/20 11/23 12/6 13/6
13/14 14/16 15/7 22/22 27/2 27/10 29/20
29/25 30/14 31/19 32/20 40/22 42/1 42/5 43/4
68/19 82/6 87/14 101/16 101/17 112/11
117/15 118/19
**once [3]** 24/20 97/3 120/21
**one [43]** 4/14 5/17 8/14 11/7 15/11 16/16 17/2
17/5 26/18 27/3 28/3 34/13 39/14 40/10 45/7
45/7 48/8 48/8 49/7 51/4 54/5 63/2 75/14
75/14 75/15 78/4 81/6 81/12 81/14 81/25 83/8
85/15 86/10 100/24 102/11 103/13 103/23
104/1 114/17 117/10 120/10 120/13 120/13
**ones [3]** 35/4 67/17 83/12
**ongoing [1]** 
**only [9]** 11/16 13/2 18/8 20/20 37/12 62/11
70/17 83/11 103/24

**operating [1]** 66/15
**Operations [2]** 69/9 119/9
**opinions [3]** 69/4 118/24 119/23
**opportunities [2]** 17/22 19/15
**opportunity [3]** 7/19 14/18 21/25
**opposition [4]** 5/25 8/25 9/4 12/25
**options [1]** 18/19
**oral [1]** 14/7
**orange [4]** 26/6 26/9 26/14 49/13
**order [8]** 8/13 85/3 86/5 86/16 90/4 106/2
107/8 107/20
**organization [1]** 89/10
**originator [1]** 89/24
**other [46]** 5/19 6/5 6/5 13/25 14/3 15/6 16/7
17/25 18/19 18/20 20/24 26/6 49/14 58/19
62/3 71/10 74/8 77/6 81/14 83/18 83/20 83/24
84/1 90/17 94/24 95/1 102/22 102/24 103/3
104/21 105/4 105/15 108/1 108/3 111/22
111/24 112/3 112/8 112/25 113/5 114/14
114/24 114/25 115/6 117/17 119/10
**others [1]** 112/23
**otherwise [1]** 21/16
**our [11]** 6/12 14/4 17/8 18/9 18/14 18/17
20/23 69/1 97/6 120/4 120/5
**out [29]** 4/15 4/20 4/21 5/6 6/12 6/24 13/9
13/12 14/21 19/4 19/5 19/10 33/15 49/18
62/13 66/14 67/21 74/2 76/2 82/20 91/4 99/18
105/7 105/10 105/10 105/12 107/9 107/20
115/16
**outline [1]** 93/1
**outstanding [1]** 13/2
**over [19]** 11/13 22/1 34/2 34/21 40/6 87/24
90/11 93/19 94/2 95/18 96/8 96/22 97/11
103/2 105/6 107/16 108/6 113/21 117/7
**overnight [1]** 4/13
**overruled [47]** 24/18 28/25 29/21 34/6 34/15
34/20 36/1 44/2 46/7 54/12 59/22 60/6 60/15
60/21 61/6 71/17 71/24 72/7 72/17 74/7 75/25
76/12 76/20 77/1 77/10 77/19 78/3 78/11
78/17 79/3 79/8 79/15 80/9 80/17 86/23 88/14
89/15 99/2 104/14 106/7 107/3 110/24 113/8
115/25 116/5 116/22 118/9
**owed [4]** 43/25 81/23 107/20 110/16 110/16
**owes [1]** 19/9

**P**

**page [53]** 29/10 30/2 32/14 34/12 34/25 34/25
35/7 35/21 40/20 40/24 41/5 41/5 41/11
41/12 41/12 42/17 42/25 46/1 46/10 46/22
47/4 52/16 52/22 53/2 53/22 53/2 53/2 53/14
57/24 60/24 63/10 63/12 63/19 63/20 63/22
66/11 74/20 74/21 75/4 75/6 75/7 77/22 78/7
78/14 78/24 79/23 79/25 80/6 80/15 80/15
80/18 122/10
**page 1 [13]** 30/2 32/14 40/22 41/5 42/17
46/10 46/22 52/22 53/2 63/20 66/11 74/21
80/6
**page 3 [5]** 29/10 34/25 35/21 60/24 78/24
**page 7 [1]** 34/12
**pages [3]** 34/10 54/9 102/17
**pages 3 [1]** 54/9
**paid [30]** 24/11 25/12 25/22 30/7 37/9 42/11
43/5 44/14 49/25 53/7 53/24 55/12 56/11
56/24 58/24 59/23 60/9 62/23 62/24 64/20
64/23 74/1 75/5 75/8 77/3 78/18 80/5 83/17
105/6 107/16
**papers [1]** 6/13
**parallel [1]** 16/18
**parentheses [1]** 30/7
**parentheticals [1]** 59/13
**part [5]** 38/21 85/16 108/9 115/8 115/9
**particular [1]** 88/23
**parts [4]** 84/20 85/4 85/7 85/15
**pass [4]** 84/19 85/3 85/4 86/5
**passage [1]** 10/1
**passed [2]** 84/22 86/10
**Passport [2]** 77/25 78/9 78/25
**Patrick [1]** 32/11
**Pause [1]** 103/14

**pay [4]** 38/20 39/13 40/8 80/4
**payed [1]** 39/21
**payment [82]** 26/20 27/9 27/19 28/22 33/22
35/15 37/23 37/25 38/19 38/13 38/14 38/15
38/17 39/3 39/6 39/7 39/21 39/24 40/5 40/19
41/15 41/17 41/22 44/20 45/1 47/24 49/7 49/9
49/22 50/7 50/11 50/12 50/13 50/24 51/2 51/5
51/9 51/12 51/15 51/17 51/20 52/3 52/6 52/8
52/19 53/8 55/1 57/13 57/19 59/3 59/17 60/2
60/18 61/21 61/22 63/8 63/16 64/1 64/5
64/7 66/24 67/7 68/5 69/20 71/10 71/25 72/20
73/16 73/20 73/22 74/17 76/7 77/12 77/13
77/16 78/18 79/9 79/12 79/21 80/3 80/23
**payments [55]** 24/10 35/1 35/5 35/8 36/5
36/10 36/21 36/25 37/2 37/11 37/13 37/18
38/3 38/4 40/10 48/17 48/19 48/24 49/6 49/17
50/2 50/16 52/25 59/16 60/13 61/9 61/14
61/18 61/25 62/4 62/6 62/10 62/17 63/2 65/1
67/8 67/24 68/6 70/1 71/9 72/10 72/12 72/13
78/9 78/25 81/2 82/4 82/11 82/13 82/14 82/15
82/25 83/13 83/15 99/5
**pdf [1]** 102/17
**pending [5]** 14/2 87/22 88/10 90/12 90/23
**Penland [1]** 15/4
**penny [2]** 83/20 84/3
**people [5]** 111/16 112/8 114/25 115/6 117/20
**Per [2]** 93/13 113/14
**percent [4]** 43/8 43/11 57/6 65/12
**percentage [1]** 57/2
**perform [1]** 98/12
**performed [2]** 81/17 99/24
**Perhaps [1]** 114/22
**periodic [1]** 36/10
**person [7]** 5/1 88/3 94/17 96/13 112/25 116/3
116/10
**personal [2]** 28/10 28/13
**Personalized [8]** 37/22 62/15 68/7 70/2 73/22
83/13 83/16 84/1
**Phan [28]** 37/23 38/1 40/25 41/8 49/9 52/25
62/18 64/14 64/14 64/17 64/17 66/23 66/23
67/22 67/22 69/19 70/9 70/13 71/2 81/9 81/22
83/6 83/6 83/16 83/18 83/24 83/24 108/24
**Phan's [13]** 40/11 40/19 41/19 52/19 53/11
61/24 63/8 63/15 64/7 72/14 79/21 80/3 80/12
**phone [8]** 88/7 93/24 96/3 96/14 96/21 116/3
116/8 116/8
**physically [1]** 17/17
**place [1]** 17/5
**places [1]** 16/8
**Plaintiff [2]** 1/10 2/2
**PLAINTIFF'S [2]** 3/4 3/7
**played [4]** 117/25 118/7 118/15 118/15
**pleadings [1]** 20/19
**please [69]** 15/20 23/20 24/20 25/24 28/19
30/1 31/19 31/20 32/13 32/20 35/10 36/13
36/15 38/7 38/24 40/17 41/4 41/11 42/2 42/16
42/19 42/25 43/4 44/16 44/17 45/3 45/11
45/15 46/9 46/21 47/9 47/19 48/20 49/18 50/9
51/10 51/24 52/21 54/14 55/10 57/9 57/10
58/17 60/24 62/13 65/3 63/12 66/10 66/21
67/9 68/12 69/2 69/5 72/23 72/25 73/11 79/17
79/18 80/1 80/6 82/1 82/20 91/8 101/14
104/10 106/9 112/1 118/22 118/25
**plus [4]** 43/10 44/6 57/4 112/19
**pocket [1]** 105/10
**point [13]** 7/21 8/9 10/6 10/23 15/15 17/14
17/20 18/1 18/16 19/3 19/4 22/4 36/24
**pointed [1]** 6/12
**pointing [1]** 6/24
**portion [21]** 29/12 37/4 39/16 40/19 49/4 49/6
52/19 63/8 70/6 70/7 70/12 76/7 77/22 79/21
80/2 86/5 86/21 87/5 87/12 87/15 87/17
**portions [3]** 33/21 35/14 86/10
**pose [1]** 95/24
**position [2]** 10/20 21/22
**possession [1]** 16/3
**possibility [1]** 14/18
**possible [2]** 14/4 68/20
**potential [1]** 9/1

## P

**potentially [1]** 14/21
**PPG [4]** 64/2 64/3 64/6 78/19
**practice [4]** 89/13 89/20 90/4 98/5
**Pratigya [6]** 64/14 64/17 66/23 67/22 83/6 83/24
**precluded [2]** 6/14 6/21
**predate [1]** 71/1
**prefixes [1]** 11/8
**prejudicial [1]** 119/9
**prepare [2]** 40/14 114/20
**prepared [16]** 81/25 101/4 101/5 101/7 101/19 101/22 101/24 102/5 102/1 102/2 102/6 102/9 117/8 117/9 117/17 117/19
**prepares [1]** 114/25
**preparing [4]** 113/23 114/1 117/12 117/14
**prerogative [2]** 12/10 12/14
**present [6]** 4/2 4/10 22/25 23/8 69/9 119/2
**presented [2]** 6/17 7/1
**PRESIDING [1]** 1/8
**press [5]** 111/3 111/9 111/13 111/17 111/19
**pretty [1]** 119/14
**previous [3]** 32/18 51/4 59/12
**previously [2]** 23/15 120/3
**primarily [1]** 86/25
**printouts [1]** 103/20
**prior [13]** 6/5 8/1 10/9 14/20 41/12 63/24 74/11 74/14 76/15 80/19 90/16 94/9 117/22
**privilege [2]** 19/22 119/21
**PRO [1]** 2/14
**probably [3]** 4/21 23/10 118/10
**proceed [2]** 4/23 5/21
**proceeded [1]** 6/7
**proceeding [1]** 5/14
**proceedings [5]** 1/15 22/24 69/8 103/14 122/9
**produce [5]** 19/24 20/3 20/7 20/9 21/12
**produced [11]** 11/2 15/25 18/2 18/7 18/15 19/13 19/25 21/7 120/2 120/23 120/25
**product [1]** 119/20
**production [1]** 18/14
**Professional [1]** 46/25
**proffer [5]** 13/17 13/20 14/3 14/7 14/13
**program [5]** 103/21 104/2 104/3 104/11 116/9
**proper [2]** 8/7 8/16
**properly [1]** 107/20
**proposition [1]** 7/3
**prosecution [5]** 16/3 22/10 22/14 94/11 119/18
**prosecutor [1]** 95/7
**prosecutors [3]** 94/25 95/25 96/21
**prove [1]** 12/17
**provide [7]** 14/7 15/15 92/24 95/11 95/13 100/10 119/6
**provided [23]** 6/15 7/19 16/15 18/3 22/6 91/22 99/23 101/1 101/9 102/12 102/13 102/14 102/15 102/16 102/18 102/21 102/21 102/24 103/20 105/21 106/13 112/6 119/8
**providing [3]** 87/21 100/9 119/24
**public [1]** 84/16
**pull [10]** 23/20 29/11 31/19 34/25 42/16 46/9 54/14 55/4 66/10 72/23
**purport [2]** 37/10 62/9
**purposely [3]** 6/7 8/8 10/7
**pursuant [1]** 122/6
**put [7]** 9/21 11/21 13/7 14/17 69/17 69/24 95/9
**putting [1]** 14/1

## Q

**quash [1]** 8/6
**quashed [4]** 6/6 7/9 9/12 9/13
**query [1]** 9/2
**question [27]** 7/9 7/14 7/15 8/4 9/11 11/25 13/10 15/24 87/7 96/2 99/13 99/20 101/14 101/16 104/10 106/8 106/15 106/16 108/9 109/6 109/22 109/23 110/25 111/8 112/2 118/4 119/12
**questions [4]** 84/7 95/24 96/2 107/8

## R

**QuickBooks [11]** 16/19 16/22 16/24 17/3 16/19 17/13 24/20 49/16 49/23 102/1 102/4
**quite [1]** 92/20
**quotes [2]** 111/14 111/15

## R

**raised [2]** 6/5 9/10
**raises [2]** 9/1 12/19
**range [1]** 70/17
**rare [2]** 121/1 121/1
**rate [1]** 93/19
**rates [1]** 113/5
**rather [1]** 5/12
**re [1]** 17/18
**re-set [1]** 17/18
**reach [1]** 4/20
**reached [1]** 91/4
**reaches [1]** 5/6
**read [13]** 10/1 58/17 87/7 87/9 106/9 106/11 106/17 106/19 108/10 108/13 110/25 111/2 111/8
**ready [2]** 115/7 115/13
**Reagan [1]** 2/10
**really [1]** 114/18
**Reask [1]** 109/6
**reason [6]** 8/18 9/11 9/12 9/22 9/24 20/7
**reasonable [1]** 98/16
**recall [20]** 17/11 23/21 87/14 87/17 88/25 89/2 94/13 94/16 94/17 94/19 100/8 100/10 100/11 103/1 103/2 103/5 103/8 110/2 111/15 113/9
**recalling [1]** 112/24
**receive [4]** 64/10 81/22 83/20 84/2
**received [54]** 3/7 3/13 4/13 12/1 12/2 18/4 29/3 29/6 32/10 36/25 37/13 38/19 39/11 40/4 40/6 41/7 41/15 42/14 44/12 46/6 46/8 49/17 49/22 50/10 50/11 50/16 50/18 51/8 51/15 51/19 51/20 54/2 54/12 54/13 56/22 62/5 62/12 63/24 66/1 66/8 71/12 71/13 80/21 81/3 81/7 81/9 82/25 83/13 83/19 83/25 99/25 100/13 100/24 101/18
**receiving [16]** 28/21 33/21 35/14 41/14 47/23 53/5 59/2 59/7 63/25 68/4 72/9 73/15 73/19 76/6 80/20 100/11
**Recently [1]** 113/21
**recess [8]** 22/22 22/23 69/2 69/6 69/7 118/21 121/2 121/3
**recollection [3]** 85/8 100/13 101/2
**reconsideration [2]** 6/24 7/25
**record [11]** 5/4 10/2 13/9 13/12 20/15 21/1 87/9 106/11 106/19 108/13 111/2
**records [25]** 18/14 18/22 24/9 24/13 24/15 24/22 28/5 36/8 41/20 42/13 45/24 48/17 53/12 54/1 54/3 61/12 64/8 65/22 66/7 81/21 100/14 102/3 102/14 102/17 120/19
**RECROSS [2]** 3/4 3/11
**red [9]** 30/7 30/8 30/9 30/16 44/11 56/21 58/21 59/12 65/24
**redacted [2]** 68/14 68/17 68/21
**REDIRECT [2]** 3/4 3/11
**reduce [1]** 25/16
**referred [3]** 92/8 105/1 111/17
**referring [5]** 65/15 73/5 82/14 83/23 88/18
**reflect [21]** 25/20 26/24 37/10 39/23 40/14 42/10 49/12 51/1 51/14 53/23 55/19 57/18 59/13 62/9 65/9 72/5 72/8 79/6 80/15 82/11 82/23
**reflected [22]** 24/10 34/4 36/5 43/1 43/14 47/12 52/21 54/23 59/9 61/9 62/16 62/17 65/11 65/6 67/17 69/25 71/6 73/18 75/4 75/7 76/15 78/15
**reflects [25]** 25/21 34/7 37/12 39/24 42/11 43/2 50/9 50/10 51/2 51/15 52/23 52/24 55/22 56/23 57/19 62/11 62/23 63/13 63/14 63/15 71/25 73/19 80/7 82/24
**regard [4]** 11/1 12/25 17/6 20/16
**regards [2]** 15/2 16/22
**Regnier [20]** 16/12 16/23 20/5 23/23 31/22 32/9 55/24 55/25 103/11 103/20 103/25 104/6

**Regnier's [1]** 17/4
**regular [5]** 5/6 5/10 94/3 95/15 111/12
**regulation [2]** 85/16 87/3
**regulations [3]** 87/15 89/12 122/11
**regulatory [3]** 86/21 86/24 87/2
**relate [5]** 42/3 42/4 53/17 64/13 82/17
**related [21]** 18/12 18/12 18/13 24/1 24/12 24/23 25/5 25/14 28/10 43/13 43/18 55/20 55/23 56/1 56/12 65/18 86/25 87/18 103/12 104/5 107/22
**relates [4]** 99/12 102/22 105/24 111/3
**relating [18]** 4/13 5/15 11/13 12/21 13/4 13/18 19/19 19/23 89/12 91/21 98/14 98/18 102/24 109/19 110/16 114/15 114/18 119/20
**relevance [4]** 86/17 86/22 88/13 118/3
**relevant [1]** 10/1
**reliable [1]** 96/23
**reliance [1]** 8/13
**relied [2]** 24/12
**rely [1]** 24/9
**remain [1]** 8/11
**remaining [1]** 77/11
**remedy [2]** 10/3 10/8
**remember [5]** 24/3 69/3 92/2 102/12 118/22
**remitter [1]** 73/7
**Remoun [2]** 4/7 23/5
**render [1]** 10/16
**renders [2]** 10/11 10/11
**repeatedly [4]** 21/2 21/19 21/20 107/7
**rephrase [1]** 101/15
**Report [1]** 54/20
**reported [1]** 122/8
**reporter [2]** 91/8 122/16
**REPORTER'S [1]** 1/15
**reports [3]** 17/23 30/23 109/18
**represent [6]** 26/4 26/7 37/22 44/11 49/15 62/4
**representations [2]** 19/17 110/21
**represented [1]** 6/21 20/11 21/1
**representing [1]** 5/10
**represents [12]** 22/8 26/20 27/6 30/9 36/25 37/8 37/23 44/13 49/7 49/9 61/24 65/12
**repurchase [30]** 37/23 38/1 40/11 40/19 49/9 52/19 52/25 53/11 61/25 62/18 63/8 63/15 64/7 64/20 64/23 65/6 65/12 65/14 66/1 66/24 67/7 68/5 69/20 70/1 73/16 73/20 76/7 79/21 80/3 80/12
**request [2]** 14/4 99/12
**requesting [2]** 20/2 100/9
**requests [2]** 95/21 96/1
**required [3]** 12/16 119/22 120/1
**requirements [1]** 87/4
**research [2]** 69/5 118/25
**reserve [2]** 22/4 119/9
**Residence [1]** 116/18
**respect [1]** 12/12
**respectfully [1]** 11/12
**respond [2]** 5/8 15/18
**responding [1]** 5/5
**response [4]** 4/24 5/22 18/9 107/8
**resume [1]** 118/21
**resumed [3]** 13/21 22/24 69/8
**retained [1]** 90/25
**retention [1]** 102/16
**reversible [1]** 6/23
**review [20]** 24/15 30/23 36/8 42/13 43/23 48/16 54/1 61/12 64/8 66/7 81/16 81/21 92/9 95/22 97/8 105/16 105/20 109/18 109/25 110/3
**reviewed [11]** 28/5 54/3 56/1 91/24 92/5 97/11 99/15 99/20 103/6 107/19 111/13
**reviewing [2]** 13/1 110/2
**Ricci [2]** 58/19 60/9
**right [123]**
**right-hand [2]** 33/3 36/22 46/14 49/15 54/23
**rights [1]** 119/10
**Roasters [2]** 59/24 60/18

**R**

Robertson [5] 8/24 9/19 9/20 10/2 10/23
role [1] 114/23
Ronald [1] 2/10
rounded [2] 31/11 32/17
row [28] 25/7 25/17 29/10 30/18 35/20 42/9
 42/9 43/5 43/13 43/19 44/6 44/7 44/11 47/25
 48/3 55/13 56/21 59/4 64/19 65/9 65/24 73/18
 74/11 76/10 76/16 76/23 78/14 79/6
rows [9] 30/2 32/21 44/5 48/6 48/7 56/14
 59/17 66/4 68/6
RPR [1] 1/19
rule [5] 5/24 8/24 9/17 19/24 120/7
rules [4] 4/15 89/11
ruling [1] 15/6
Ryan [1] 112/14

**S**

SACR [3] 1/11 4/3 23/1
SACR-19-00061-JVS [1] 1/11 4/3 23/1
safe [4] 4/16 96/24 98/7
SAGEL [13] 2/9 4/5 5/15 6/21 8/5 21/1 21/5
 23/4 88/20 88/21 88/22 88/24 94/9
Sagel's [1] 22/15
said [10] 8/6 18/17 21/20 28/3 30/12 40/10
 70/12 70/17 110/7 111/16
sake [1] 13/15
same [63] 19/10 28/1 29/17 31/1 31/7 31/10
 31/23 32/17 34/14 34/19 36/9 38/18 39/11
 39/12 39/14 41/9 41/14 44/21 45/13 45/21
 49/1 50/19 51/7 51/21 51/22 52/5 53/6 57/15
 60/5 60/14 60/20 61/5 67/1 69/21 71/23 72/13
 72/16 73/4 75/8 76/19 76/25 77/2 77/8 77/18
 78/2 78/10 78/16 79/2 79/7 79/14 80/16 80/18
 80/21 82/7 85/21 86/7 86/12 86/17 110/23
 115/24 116/4 117/4 118/8
San [1] 2/16
Santa [1] 1/16 1/20 2/11 4/1
saw [3] 32/17 65/1 65/3
say [22] 9/15 16/21 18/16 19/2 20/13 22/12
 25/7 31/5 43/5 55/13 64/19 72/21 82/13 83/1
 88/18 91/14 92/4 96/3 96/24 98/7 100/15
 104/18
saying [5] 7/19 18/10 65/14
says [9] 26/18 32/5 43/13 44/12 54/25 56/4
 56/18 58/10 65/21
score [3] 85/6 85/17 86/4
screen [4] 24/2 34/2 35/4 69/24
scroll [2] 32/6 77/15
scrolling [2] 60/12 77/6
SDNY [1] 13/18
SE [1] 2/14
seal [1] 9/6
sealed [1] 9/2
search [2] 16/23 19/19
second [14] 30/6 34/7 43/4 57/23 64/22 64/23
 69/19 70/1 73/16 73/20 76/7 77/22 79/25 81/2
section [4] 2/6 86/24 87/2 122/6
see [31] 5/20 13/11 16/9 28/8 30/14 30/16
 31/8 31/22 32/9 32/12 38/16 46/18 47/4 49/19
 53/4 54/18 59/17 59/18 62/20 67/11 73/2
 74/17 74/20 78/4 79/4 80/19 103/16
 103/18 104/18 119/1
seeing [1] 16/10
seek [1] 6/11
seen [2] 111/3 112/3
SEFFENS [3] 1/19 122/15 122/16
SELNA [1] 1/8
send [3] 55/7 96/15 97/7
senior [3] 93/20 93/21 112/25
sense [3] 9/18 10/19 19/5
sent [31] 36/9 37/11 45/10 45/12 45/13 47/18
 48/8 48/9 55/24 55/25 58/15 61/14 70/9 70/10
 70/11 70/13 71/8 72/20 92/9 92/12 92/13
 94/22 95/3 97/4 97/8 97/15 98/1 98/5 98/8
 105/1 120/21
separate [3] 14/16 16/22 17/9
September [2] 64/20 68/1
September 18th [2] 64/20 68/1

series [2] 29/4 33/11
serious [2] 11/14
seriousness [1] 11/14
serve [1] 117/2
served [2] 5/8 9/6
server [2] 17/4 21/2
servers [19] 17/13 17/17 17/19 17/20 17/21
 17/23 17/23 17/24 18/6 19/20 19/21 19/22
 20/10 20/13 20/14 20/19 20/24 21/7 21/12
services [3] 87/22 91/21 98/13
set [4] 17/18 49/8 61/22 81/2
sets [1] 89/11
settlement [55] 24/13 25/12 26/1 26/25 27/9
 27/19 28/22 31/3 35/13 37/20 41/21
 41/22 41/24 42/14 43/5 43/9 43/9 44/6 44/12
 44/20 45/1 47/24 48/4 48/11 49/6 49/25 53/13
 53/24 54/2 55/1 55/12 56/11 56/15 56/16
 56/23 57/3 57/13 57/19 59/3 61/21 62/19 64/9
 64/10 81/17 82/11 82/13 82/13 82/15 83/16
 83/19 83/20 83/25 84/3 102/15
settlements [1] 82/5
seven [2] 34/10 35/7
seven-page [1] 35/7
several [4] 4/13 30/16 114/13 119/24
SHARON [3] 1/19 122/15 122/16
she [18] 4/14 4/15 4/21 4/23 5/1 5/7 15/3 20/6
 49/17 50/11 81/18 81/23 114/1 114/5 115/12
 116/23 117/14 118/2
short [1] 38/7
should [7] 4/16 8/18 12/16 54/18 68/12 119/7
 120/23
show [33] 19/3 26/19 27/4 27/11 27/16 27/24
 28/16 28/23 33/10 36/20 39/5 40/23 43/19
 44/5 44/25 45/8 45/16 47/16 48/6 48/7 49/4
 56/21 58/6 58/13 58/22 59/5 61/20 61/21 62/2
 62/3 67/4 67/5 70/6
showed [4] 16/24 54/3 61/23 96/10
showing [7] 18/14 36/23 42/13 52/5 54/1 66/7
 70/21
shown [4] 63/22 65/24 73/25 74/15
shows [28] 27/5 27/12 27/17 27/25 29/1
 33/11 36/21 39/6 40/24 41/5 41/12 45/1 45/9
 47/17 49/16 49/16 56/22 58/7 58/14 58/23 59/6
 61/22 63/23 67/19 67/21 70/1 70/7 71/8
sic [1] 82/16
side [17] 17/3 26/17 33/3 36/22 37/5 48/25
 49/15 53/4 55/4 57/10 57/24 61/19 63/14
 63/23 69/24 82/6 83/11
sidebar [1] 99/10
signatory [2] 26/15 92/16
signature [1] 9/7
signed [1] 9/2
signifies [1] 37/18
signify [1] 37/17
similar [4] 42/11 56/1 62/8 83/8
similarly [1] 89/10
since [2] 10/14 112/21
single [1] 12/12
sir [30] 5/16 5/19 6/2 7/22 8/9 10/20 11/16
 11/19 12/2 21/22 22/20 77/10 85/24 86/10
 86/15 86/20 87/2 87/12 88/23 89/4 89/19 90/2
 99/15 104/10 105/14 106/2 106/15 111/25
 115/5 119/3
sit [4] 10/16 87/14 110/6 110/10
sits [1] 33/6
sitting [1] 22/18
situation [1] 5/21
six [2] 36/24 36/25
Sixty [1] 75/12
Sixty-two [1] 75/12
sizable [1] 76/24
slightly [1] 15/3
so [89] 5/12 5/14 9/2 12/8 12/13 13/5 13/25
 14/19 16/11 16/14 16/18 16/25 17/7 17/7 17/9
 19/9 20/4 20/25 22/3 25/3 25/15 27/20 30/14
 33/6 37/10 38/13 38/16 38/21 39/8 39/24 40/4
 40/22 40/24 41/5 41/17 43/11 43/23 45/7 49/6
 49/13 49/18 50/10 50/14 50/15 51/2 51/6
 51/18 53/3 53/8 56/7 57/6 58/5 63/23 71/11

75/13 79/25 80/2 81/13 82/17 87/24 88/4
 89/10 91/24 91/25 94/17 95/1 95/2
 95/10 96/16 97/14 98/7 99/19 100/1 100/24
 101/7 102/10 102/11 102/19 110/5 110/6
 110/15 111/17 112/7 112/19 117/15 118/2
 118/13 120/23
social [1] 111/11
software [2] 104/11 104/18
some [11] 14/19 17/11 24/6 26/3 26/9 30/7
 35/1 37/2 37/3 37/3 114/5 114/7
someone [1] 32/10
something [10] 5/4 7/10 8/1 11/13 12/16
 18/17 18/18 19/14 22/1 95/8
sometime [1] 87/23
sometimes [1] 101/15
soon [1] 14/4
sorry [5] 14/10 69/15 106/16 108/9 109/21
sort [2] 26/3 83/8
source [16] 37/3 38/3 38/4 38/15 38/16 39/7
 39/25 50/2 50/13 51/5 51/17 52/5 52/10 53/9
 64/6 99/5
SOUTHERN [4] 1/6 115/18 116/19 116/23
span [1] 35/17
spans [1] 34/10
speak [5] 102/8 108/18 108/20 109/11 109/17
speaking [4] 14/24 24/9 28/8 28/23 29/1
 94/16
Special [3] 4/7 15/2 23/5
specific [4] 10/5 18/18 18/25 18/25
specifically [2] 21/5 107/10
specificity [1] 87/17
speculation [1] 107/2
speechless [2] 120/25 121/1
spell [1] 91/8
spent [5] 97/2 97/21 97/23 113/18
spider [2] 82/23 82/24
spoke [3] 88/21 88/22 115/22
spreadsheet [10] 23/22 24/11 24/12 24/21
 31/12 55/24 55/25 96/16 100/16 100/17
spreadsheets [6] 103/11 103/24 104/6 105/4
 108/2 108/4
Spring [1] 2/7
stamp [3] 15/14 15/16 22/5
stand [12] 10/17 12/7 13/25 26/11 26/12
 84/15 98/21 105/15 105/23 107/14 117/22
 118/14
standard [1] 22/16
standing [2] 29/18 77/9
stands [1] 28/3
star [1] 109/3
start [9] 16/2 42/5 49/3 56/14 71/11 74/14
 80/18 82/6 100/1
started [1] 87/23 100/2
starting [40] 4/20 17/12 26/17 27/3 33/9
 38/11 39/8 40/22 42/9 44/24 45/7 50/14 50/15
 51/6 51/18 52/23 53/19 57/17 58/5 61/9
 63/12 64/15 66/25 67/17 70/8 76/9 80/6 80/10
 109/20 109/21
starts [1] 15/21
state [9] 88/10 89/3 89/9 89/12 89/20 89/21
 90/4 90/5 90/13
stated [2] 111/25 112/4
statement [2] 22/15 120/22
STATES [14] 1/4 1/9 1/19 2/3 2/4 2/6 2/7 2/10
 4/4 4/6 23/2 23/4 122/7 122/11
stenographically [1] 122/8
step [4] 100/4 100/7 100/8 119/3
STEWARD [9] 2/15 2/15 4/10 6/15 20/13
 20/18 20/22 23/8 109/14
still [4] 13/10 19/9 20/7 91/16
stock [7] 40/19 52/19 63/8 63/15 79/21 80/3
 80/12
stood [1] 8/5
stop [1] 29/9
Street [3] 1/20 2/7 2/11
stricken [2] 100/21 101/12 109/7
strike [8] 87/6 92/14 100/19 101/11 104/7
 104/24 109/22 115/15
subject [5] 31/25 98/9 98/14 98/18 102/25

**S**

**submission** [1] 13/4
**submit** [2] 12/18 14/3
**submitted** [2] 69/5 118/24
**subpoena** [5] 5/8 7/7 18/24 18/25 117/3
**subpoenaed** [2] 5/15 18/21
**subpoenaing** [1] 6/15
**subpoenas** [6] 6/6 6/22 8/6 9/1 9/3 9/12
**subsequent** [2] 8/3 14/19
**substance** [3] 11/3 11/10 11/17
**substantially** [1] 120/3
**substantive** [1] 119/19
**such** [1] 120/9
**sufficient** [1] 19/14
**Suite** [3] 1/20 2/11 2/16
**Sulmeyer** [4] 73/8 77/4 80/22 80/23
**sum** [1] 65/7
**summarize** [1] 11/3
**Sunday** [1] 4/21
**Sunrise** [1] 35/1
**support** [1] 7/3
**suppose** [1] 100/4
**supposed** [1] 12/21
**sure** [8] 14/15 17/3 63/14 92/20 93/7 97/9
97/12 98/1
**suspect** [1] 107/4
**suspicion** [1] 12/10
**Sustained** [10] 86/2 86/8 86/13 86/18 89/24
109/6 110/19 115/3 115/20 117/5
**Switching** [1] 87/21
**SWORN** [1] 23/15
**symptoms** [1] 4/22
**system** [2] 26/3 104/4

**T**

**table** [3] 4/7 22/18 23/5
**Tabs** [38] 15/13 15/16 16/5 16/13 17/6 17/9
17/14 17/14 18/8 18/12 18/16 19/6 19/23 19/24
19/23 19/25 20/6 20/8 21/11 22/6 22/7 103/9
103/10 103/17 103/19 103/21 103/23 104/3
104/4 104/12 104/19 104/22 105/2 105/7
107/10 108/1 108/3 108/8
**taint** [3] 17/2 18/3 18/3
**take** [5] 36/13 50/4 63/5 69/1 118/21
**taken** [6] 16/25 22/23 69/7 76/2 88/24 121/3
**taking** [5] 21/16 98/21 105/14 105/23 117/22
**talk** [2] 20/10 102/6
**talked** [2] 37/14 75/13
**talking** [5] 12/3 15/22 22/13 88/22 111/25
**tangentially** [1] 91/14
**task** [1] 97/22
**tasks** [1] 97/24
**tax** [1] 86/25
**tax-related** [1] 86/25
**team** [3] 22/10 22/14 117/19
**team's** [2] 16/3 119/18
**teams** [2] 94/12 116/9
**technical** [2] 9/1 9/9
**tell** [5] 5/9 14/24 93/17 104/11 113/16
**telling** [1] 100/10
**tells** [1] 19/8
**ten** [1] 115/9
**term** [1] 103/10
**testified** [15] 16/12 20/5 78/21 83/18 90/17
90/20 105/16 105/17 107/7 109/20 110/12
110/15 111/4 111/18 120/20
**testify** [10] 4/16 4/16 5/1 105/24 106/3 114/25
115/6 115/17 115/13 119/23
**testifying** [4] 90/16 94/20 105/5 109/24
**testimony** [20] 10/10 11/3 12/13 24/5 87/16
98/10 98/15 98/19 102/25 105/9 105/17
105/20 111/14 113/23 114/20 116/20 119/12
119/20 119/25 120/24
**text** [6] 30/6 30/7 30/8 30/9 30/10 95/3
**than** [20] 5/19 6/5 16/7 19/4 24/6 83/18
83/24 85/24 95/1 103/3 105/4 107/4 108/1
108/3 111/22 111/24 112/3 112/25 114/14
117/17
**Thank** [13] 10/21 10/24 11/24 14/16 14/23

15/8 22/3 22/21 31/5 65/5 83/23 84/6 100/22
119/1
**that's** [113] 7/6 8/7 9/7 9/12 17/10 18 11/9
13/1 17/5 18/24 20/15 20/20 21/7 22/16 26/4
27/23 30/3 31/5 33/2 34/3 35/19 36/19 40/13
41/7 43/6 43/11 44/3 45/6 48/2 56/9
57/3 57/6 57/22 58/4 60/16 61/2 61/23 62/17
63/21 65/7 66/20 67/2 67/13 67/16 68/8 68/16
68/22 68/24 68/25 70/19 70/23 72/18 73/23
75/5 75/8 75/17 76/16 77/17 77/2 77/20 78/4
78/12 78/18 78/23 79/9 79/24 81/5 81/8 82/8
83/10 83/23 84/4 84/14 84/18 84/21 84/23
85/5 85/8 85/18 87/10 88/8 89/16 89/21 90/19
92/18 93/6 93/15 93/16 96/6 96/11 97/17 98/3
101/2 101/23 102/4 108/4 110/9 111/10 112/1
112/23 115/9 115/12 115/17 117/16 118/17
118/19 118/20 120/10 120/16 120/22 121/1
121/1
**their** [10] 11/3 12/18 14/1 16/13 56/17 82/5
83/20 83/25 84/3 94/13
**them** [22] 10/17 10/18 12/2 14/25 16/24 17/20
18/13 18/15 19/15 95/3 95/12 96/12 96/14
97/7 97/15 110/12 117/9 117/10 117/14
117/17 117/19 119/16
**themselves** [1] 9/2
**then** [100] 4/23 6/6 6/20 6/23 8/10 8/15 10/7
12/8 17/22 19/7 20/23 25/19 26/22 27/10
27/15 27/24 28/11 28/16 29/2 29/4 29/5 29/7
29/30 30/15 31/14 32/24 33/9 34/4 34/12 38/19
39/8 39/12 40/6 40/8 40/20 41/2 41/4 41/8
41/11 41/14 43/13 44/7 45/3 45/11 45/19
46/17 46/21 47/4 47/15 48/3 49/11 50/17
50/18 51/7 51/8 51/21 52/25 53/6 55/4 55/18
56/4 56/14 56/18 57/23 58/21 60/2 62/1 62/20
62/21 63/19 65/21 67/14 67/20 68/11 69/24
71/9 71/13 71/14 71/21 72/4 73/21 73/24
74/17 74/20 75/14 75/15 76/23 77/6 78/14
78/24 79/6 80/15 80/20 80/22 82/20 97/1 97/6
97/14 97/15 120/15
**there** [113] 6/9 6/18 8/3 13/9 13/10 13/12
14/18 15/5 16/8 16/22 18/14 18/16 18/17 19/1
19/7 19/11 19/14 19/16 19/22 22/5 23/25
23/25 25/3 25/9 26/2 26/22 26/24 27/21 29/4
29/7 29/9 29/12 29/13 30/6 30/15 31/7 32/4
32/25 33/15 33/17 34/1 35/1 35/8 36/5 36/23
37/15 37/15 37/21 43/1 43/14 43/21 45/4
46/18 47/12 47/25 48/7 49/21 54/23 56/5
56/14 58/2 60/2 60/12 61/9 61/11 62/15 62/21
65/6 65/22 65/25 66/12 66/25 67/15 67/18
68/12 70/17 70/18 70/20 71/14 71/21 73/17
73/21 73/25 74/17 74/21 75/19 75/21 76/24
77/16 77/24 78/5 78/8 78/15 78/24 83/4 84/4
87/5 91/21 92/11 92/21 94/15 94/18 95/17
96/8 96/24 98/11 103/16 104/1 104/11 112/23
119/12 120/11 120/12
**there's** [9] 9/11 18/16 19/9 48/25 69/21 98/8
111/7
**thereabouts** [1] 21/4
**these** [26] 18/15 32/23 38/2 41/20 42/4 49/11
50/14 53/17 59/16 61/19 61/21 62/1 62/5
64/13 64/25 64/25 67/12 70/5 71/14 78/8 82/9
83/20 96/7 96/7 120/22 120/12
**they** [51] 6/9 9/2 9/6 9/6 9/12 10/9 11/6 12/20
12/21 14/21 15/16 15/22 16/23 17/19 19/7
19/20 20/4 20/7 20/8 20/8 21/11 21/12 22/12
62/11 89/13 90/3 90/6 90/7 96/16 97/6 97/12
97/15 98/1 98/4 100/5 100/10 101/25 102/2
102/4 107/14 108/1 108/3 110/15 110/16
110/22 111/15 111/17 112/14 119/7 119/9
120/24
**they're** [7] 14/1 18/25 97/8 97/9 120/21
120/24 120/4
**thing** [7] 11/17 13/7 16/16 16/22 19/11 20/21
100/25
**things** [7] 16/9 18/20 19/1 20/20 100/24
102/12 114/18
**think** [22] 5/4 6/13 9/20 10/2 10/4 12/24 12/25
13/1 13/5 13/9 13/16 13/22 17/25 18/4 21/3
22/5 68/17 92/23 96/3 105/19 106/23 119/14

**thinks** [1] 18/18
**third** [1] 13/6
**this** [191]
**those** [52] 6/6 7/10 9/3 13/10 16/13 19/21
22/19 26/10 26/12 26/15 29/4 32/25 35/5 37/2
37/4 42/2 47/12 48/18 56/16 58/11 62/3 65/1
65/3 67/8 67/11 67/24 67/24 68/6 70/3 70/17
71/4 72/5 72/8 72/13 81/12 81/9 82/11 82/15
83/9 84/4 94/21 95/13 96/3 97/4 97/21 98/12
105/4 112/21 117/8 117/13 117/20 120/23
**though** [3] 20/8 96/24 100/18
**thought** [3] 13/24 91/4 93/17
**Thoughts** [1] 4/17
**thousand** [1] 113/12
**thousands** [1] 102/16
**three** [23] 11/2 13/18 19/8 22/17 26/22 27/2
40/20 45/4 48/6 56/14 57/4 58/2 67/3 67/5
67/8 67/11 67/12 67/25 68/6 71/10 72/4 75/13
110/7
**three-page** [1] 40/20
**through** [9] 5/14 18/7 33/13 34/23 42/1 53/16
60/12 64/12 78/7
**throughout** [2] 91/14 92/7
**thus** [1] 105/21
**time** [31] 7/2 14/3 14/6 16/17 17/12 19/2 19/2
21/23 27/7 45/23 51/3 51/16 54/7 68/24 88/4
88/6 96/15 97/1 97/21 97/23 101/21 109/24
113/3 113/6 113/18 113/21 114/5 114/7
115/22 116/10 118/18
**timeline** [1] 6/4
**times** [4] 10/14 57/6 92/5 96/8
**title** [35] 25/25 28/20 33/20 35/13 38/8 39/2
39/20 40/18 42/5 44/19 47/22 48/23 50/6
50/23 51/10 52/2 52/18 53/19 54/17 54/19
57/12 58/25 61/16 63/7 64/15 66/21 68/2
69/18 73/14 76/5 79/20 80/1 80/2 82/3 122/7
**titled** [2] 37/21 89/10
**today** [7] 14/6 14/9 14/11 87/14 88/5 110/6
110/10
**told** [12] 6/14 7/9 21/8 21/9 90/7 102/4 103/6
103/23 104/1 107/13 108/7 110/12
**too** [3] 54/18 93/17 93/18
**took** [9] 8/15 19/5 85/16 86/11 86/15 86/20
87/12 107/13 118/13
**top** [30] 30/14 31/20 32/14 36/17 42/19 42/22
44/21 46/14 47/1 48/25 49/6 53/23 57/14
57/24 59/4 59/17 61/22 66/12 67/20 68/6
69/21 70/10 71/15 71/18 72/20 72/25 73/17
75/6 76/9 82/7
**topics** [1] 87/21
**total** [28] 24/1 24/22 25/4 25/8 25/12 31/11
32/5 40/7 42/7 43/9 43/11 43/20 44/8 44/12
53/21 56/4 56/18 56/22 57/3 57/4 64/17 65/6
65/12 65/14 65/21 66/1 66/18 81/9
**totaled** [1] 39/12
**totals** [1] 44/9
**Touhy** [8] 6/5 6/14 6/18 6/21 7/3 7/10 8/7 9/13
**trace** [10] 37/2 38/15 39/7 39/14 50/12 51/4
51/17 63/2 99/3 99/5
**traceable** [7] 39/16 40/1 40/11 40/25 41/18
41/22 72/14
**traced** [5] 37/19 37/25 62/18
**tracing** [7] 26/1 40/14 44/20 52/10 57/13
66/23 69/19
**tracked** [5] 104/2 104/4 104/12 105/2 106/25
**Tran** [11] 64/14 64/18 67/23 70/9 70/13 74/17
81/6 83/6 83/22 83/24 109/1
**Tran's** [2] 66/24 69/19
**transaction** [1] 54/20 54/21
**transactions** [2] 100/16 100/25
**transcript** [6] 1/9 1/15 7/6 21/5 122/8 122/10
**transcripts** [3] 109/18 109/25 110/3
**transfer** [26] 11/8 28/16 32/16 38/19 40/24
41/7 41/9 41/15 50/19 51/8 51/21 51/22 54/25
63/17 67/19 70/24 71/1 71/2 71/15 71/18 75/3
75/6 76/15 76/18 78/15 80/13
**transferred** [11] 28/13 40/20 41/24 52/20
53/1 63/9 67/21 75/19 79/22 80/3 80/21
**transfers** [19] 27/6 27/21 32/23 33/16 34/24

## T

**transfers...** **[14]** 40/6 41/14 47/12 58/20 70/3 71/14 70/18 71/5 71/14 74/15 75/13 77/11 77/25 81/10
**traveling** **[1]** 14/2
**trial** **[7]** 1/12 105/17 105/20 108/7 111/6 111/9 111/20
**true** **[16]** 21/11 84/22 84/23 85/15 85/24 86/6 86/11 87/3 87/10 90/18 93/15 99/23 108/2 113/24 114/3 122/7
**trust** **[40]** 55/22 26/5 26/21 28/21 30/24 33/22 40/25 41/8 41/19 42/21 44/14 45/10 45/17 47/23 48/12 49/8 49/14 54/4 55/6 56/24 57/22 58/8 59/2 61/4 62/3 62/24 65/4 67/6 67/22 68/4 70/22 71/13 73/15 76/6 76/7 80/11 81/3 82/12 84/4 99/4
**trustee** **[2]** 18/21 18/22
**trying** **[2]** 99/18 117/2
**turn** **[4]** 29/9 38/8 40/17 42/1
**Turning** **[3]** 32/13 53/16 64/12
**tweets** **[2]** 13/1 13/4
**twice** **[1]** 10/2
**two** **[61]** 4/13 6/13 8/1 11/4 13/18 13/25 14/4 15/10 15/13 15/17 19/11 27/13 28/1 32/24 39/11 40/6 40/6 44/5 45/24 48/7 48/7 52/16 62/3 63/10 65/7 66/3 67/15 70/17 71/4 73/21 73/25 74/21 75/12 75/20 79/23 81/9 87/24 90/11 91/19 92/3 93/15 93/23 94/2 95/18 95/20 96/9 96/22 97/11 97/19 102/23 103/3 104/25 105/4 108/2 108/3 108/6 108/7 116/13 118/13 120/11 120/14
**two-page** **[3]** 52/16 63/10 79/23

## U

**U.S** **[4]** 8/1 93/22 94/3 122/16
**ultimately** **[1]** 62/24
**under** **[12]** 4/15 8/24 18/23 19/24 20/5 22/16 30/6 31/3 31/4 43/1 81/19 120/22
**undercuts** **[1]** 10/12
**underlying** **[1]** 24/15
**understand** **[11]** 5/13 15/5 22/15 64/4 86/15 93/10 103/10 103/19 103/20 106/2 106/4
**understanding** **[8]** 9/5 9/7 43/24 64/3 88/15 104/24 104/25 105/2
**understood** **[7]** 7/18 12/15 78/22 98/17 101/5 101/19 104/4 105/9 105/14 105/17 105/19
**UNITED** **[14]** 1/4 1/9 1/19 2/3 2/4 2/6 2/7 2/10 4/3 4/6 23/1 23/4 122/7 122/11
**unlike** **[1]** 105/15
**until** **[5]** 4/20 9/10 69/4 115/5 118/24
**up** **[28]** 8/5 17/18 23/20 27/15 28/16 29/11 30/2 31/19 32/14 32/20 34/25 36/14 42/16 44/17 46/9 47/15 54/14 54/15 55/4 57/9 57/23 58/17 60/16 70/14 72/23 72/24 77/21 115/5
**upper** **[1]** 26/2
**upwards** **[1]** 17/18
**us** **[11]** 5/5 13/4 14/18 17/24 20/8 23/4 23/9 42/2 42/19 92/11 113/16
**USA** **[2]** 55/1 55/3 59/8 61/22 62/21
**use** **[1]** 39/3
**used** **[8]** 38/9 39/21 50/7 50/24 51/12 52/3 80/4 103/10
**useless** **[1]** 10/12
**using** **[1]** 24/21
**usually** **[1]** 114/24

## V

**Vague** **[2]** 99/1 115/2
**valid** **[1]** 9/4
**Varani** **[3]** 13/19 13/20 13/23
**varies** **[1]** 113/21
**various** **[4]** 58/15 71/9 71/14 82/24
**verify** **[1]** 100/18
**version** **[5]** 68/13 68/15 68/18 68/21 69/12
**versions** **[1]** 120/2
**versus** **[2]** 4/4 23/2
**vertical** **[1]** 37/8
**very** **[15]** 6/13 11/9 11/14 12/23 18/11 22/20

23/11 28/12 29/10 56/21 78/14 79/6 100/4 120/19
**via** **[5]** 93/24 96/3 96/4 116/6 116/8
**violate** **[1]** 10/7
**virtually** **[1]** 12/12
**VOL** **[1]** 10/7
**vs** **[1]** 1/10

## W

**waiting** **[1]** 12/24
**walking** **[1]** 40/2
**want** **[5]** 5/3 6/1 15/15 20/14 59/16 102/22 104/18 111/8 112/1 119/15 119/15 120/14
**wanted** **[2]** 115/21 100/5 100/5
**wants** **[2]** 15/21 18/5
**warrant** **[2]** 16/24 19/19
**was** **[168]**
**wasn't** **[1]** 117/15
**way** **[3]** 7/23 9/21 95/25
**Waypoint** **[4]** 64/2 64/3 64/6 78/19
**we** **[149]**
**We'll** **[2]** 118/21 118/21
**we're** **[3]** 22/13 95/12 119/22
**we've** **[2]** 115/5 120/5
**web** **[2]** 82/23 82/24
**Wednesday** **[1]** 116/12
**week** **[5]** 4/20 50/19 92/3 118/10 118/10
**weekend** **[3]** 11/13 14/20 22/1
**weeks** **[4]** 6/13 8/1 118/13 120/1
**welcome** **[1]** 22/2
**well** **[5]** 5/20 7/24 8/19 9/24 10/8 10/15 11/12 15/24 18/13 22/11 24/13 26/23 30/5 54/11 78/5 87/12 88/22 91/18 92/14 92/18 94/15 94/18 99/18 102/4 104/24 111/16 113/11 115/15 117/17
**Welsh** **[1]** 32/10
**went** **[4]** 16/16 17/16 53/14 117/7
**were** **[78]** 6/9 8/1 8/17 8/17 9/4 9/6 9/12 9/13 11/2 11/8 16/23 17/17 17/19 20/8 21/8 22/25 23/22 24/11 25/21 25/22 27/5 27/7 27/17 36/22 39/14 48/17 48/19 49/25 56/16 56/24 62/23 62/24 67/8 67/24 69/11 70/18 73/4 73/21 82/4 83/16 88/9 90/6 94/18 95/11 95/15 95/17 96/3 96/7 96/8 96/8 96/12 96/24 96/25 97/12 97/24 98/1 98/4 98/7 98/8 98/12 98/24 99/5 99/19 99/23 100/10 102/12 102/18 102/21 102/24 106/24 110/16 110/22 111/13 111/15 112/5 114/22 117/17 117/9 119/9
**weren't** **[3]** 19/7 120/1 120/25
**West** **[1]** 1/20 2/11 35/2
**what** **[262]**
**what's** **[3]** 14/2 16/7 72/23
**whatever** **[2]** 20/7 20/14
**when** **[24]** 7/7 7/14 9/6 16/23 22/12 33/14 33/15 57/1 58/10 65/14 82/13 83/1 86/11 86/15 86/20 88/18 92/1 92/9 98/17 100/15 101/7 101/18 116/10 118/6
**where** **[20]** 13/25 15/13 16/9 16/9 16/10 16/24 17/5 17/6 17/17 30/21 38/21 39/14 43/7 55/15 95/8 96/9 104/12 116/15 118/6 118/15
**wherein** **[1]** 90/3
**whether** **[9]** 5/7 9/3 12/7 14/20 15/4 24/10 92/12 93/7 96/3
**which** **[39]** 6/22 9/3 10/13 10/23 11/4 13/8 15/16 17/21 18/2 18/9 18/24 24/2 37/12 40/4 42/2 43/8 45/25 50/15 51/19 53/16 54/8 57/3 62/5 62/11 63/15 63/23 64/12 67/7 70/18 80/4 82/24 83/13 98/12 104/5 114/23 119/23 120/1 120/3 120/19
**while** **[3]** 19/1 90/12 96/7
**Whiteside** **[4]** 43/3 49/7 49/22 53/14
**who** **[34]** 7/16 17/19 25/3 55/2 55/4 59/20 60/8 66/14 73/7 83/18 83/25 88/18 88/23 88/25 89/12 91/6 94/8 97/11 98/25 99/15 99/17 99/20 101/24 102/1 102/6 105/15 106/24 111/4 112/11 112/13 114/14 117/7 117/17 117/25
**whole** **[2]** 12/19 44/17 57/9
**wholesome** **[1]** 13/9

**whose** **[2]** 82/13 113/3
**why** **[11]** 9/4 9/7 20/15 21/24 21/24 66/6 18/19 37/24 62/16 62/22 84/4
**will** **[19]** 11/13 11/25 12/18 12/22 14/22 16/2 17/11 22/22 23/9 46/6 54/12 69/1 69/2 69/6 100/21 101/12 118/4 119/23 121/2
**wire** **[11]** 11/17 21/14 55/2 55/7 70/3 70/18 70/21 74/23 74/24 78/14 81/9
**wires** **[2]** 67/12 74/21
**withdraw** **[3]** 53/7 74/1 75/8
**withdrawal** **[13]** 30/19 31/7 31/15 45/17 59/18 59/20 60/3 75/5 75/10 75/15 75/16 76/24 77/3
**withdrawals** **[5]** 27/17 30/16 59/14 60/13 75/20
**withdrawn** **[9]** 27/12 27/25 39/13 45/9 45/21 47/17 53/1 58/8 58/15
**withdraws** **[7]** 29/4 29/7 30/9 33/11 48/7 70/7 74/8
**withdrew** **[2]** 38/20 40/8
**withheld** **[1]** 119/7
**within** **[6]** 19/21 59/13 90/5 111/13 111/13 120/4
**without** **[5]** 6/22 31/10 78/7 89/21 96/5
**witness** **[22]** 4/14 5/5 5/6 5/12 5/17 10/7 10/9 15/11 23/15 31/21 42/18 50/5 63/6 82/2 85/1 105/16 109/3 111/14 118/16 119/18 119/22 120/22
**witness's** **[1]** 12/12
**witnesses** **[6]** 3/4 3/11 8/25 12/7 105/15 111/17
**word** **[1]** 103/16
**worded** **[1]** 9/21
**work** **[11]** 87/23 88/2 90/22 91/1 91/10 93/1 99/16 99/21 108/6 108/17 119/20
**worked** **[4]** 106/5 112/8 112/11 112/12
**working** **[7]** 90/12 91/18 95/16 113/1 114/5 117/19 119/18
**works** **[1]** 115/15
**would** **[63]** 4/14 4/20 4/23 7/2 7/20 8/20 10/16 12/1 14/4 14/5 15/3 15/18 21/24 22/3 25/4 25/16 25/18 31/2 31/19 36/13 40/17 45/24 52/21 54/17 63/5 72/23 75/19 75/21 79/17 80/2 81/25 85/9 89/16 91/5 91/14 92/4 92/11 93/1 95/8 96/9 96/12 96/14 96/15 96/16 96/18 97/4 97/7 97/14 97/14 97/15 97/21 97/23 98/1 98/4 98/11 107/4 107/19 112/23 113/13 113/16 114/16 119/5 119/25
**wouldn't** **[1]** 40/2
**writing** **[1]** 11/21 95/9
**written** **[2]** 94/24 103/16
**wrong** **[1]** 21/3
**WYMAN** **[6]** 2/5 4/6 23/3 23/14 94/9 117/7

## X

**X-Law** **[4]** 45/10 45/12 48/8 58/19

## Y

**Yeah** **[1]** 116/9
**year** **[2]** 114/10 120/4
**years** **[21]** 15/17 19/8 19/8 87/24 90/12 91/19 92/3 93/15 93/23 94/2 95/18 95/20 96/9 96/22 97/12 97/19 110/3 110/7 114/8 115/9
**yellow** **[5]** 26/5 26/9 26/15 49/13 82/9
**yes** **[124]**
**yesterday** **[9]** 13/16 13/21 23/21 88/5 94/20 109/20 109/21 109/24 116/1
**you** **[376]**
**you're** **[5]** 12/14 65/14 84/17 89/22 96/5
**you've** **[1]** 92/5
**your** **[156]**
**yourself** **[2]** 114/14 118/15

## Z

**zero** **[12]** 29/2 29/23 44/12 48/1 48/13 53/15 56/23 59/7 64/11 65/20 68/11 73/20
**zeroed** **[1]** 33/15
**zoom** **[4]** 49/18 62/13 74/2 82/20