1        **UNITED STATES DISTRICT COURT**

2     **CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

3        **HONORABLE JAMES V. SELNA, U.S. DISTRICT JUDGE**

4

5   UNITED STATES OF AMERICA,              )
                                            )
6                    Plaintiff,            )   **CERTIFIED TRANSCRIPT**
                                            )
7         vs.                              )   Case No.
                                            )   SACR-19-00061-JVS
8   MICHAEL JOHN AVENATTI,                 )
                                            )   **TRIAL DAY 17**
9                    Defendant.            )   **VOLUME 2**
                                            )

10

11

12

13

14

                    REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                     TUESDAY, AUGUST 10, 2021

16                          1:15 P.M.

17                    SANTA ANA, CALIFORNIA

18

19

20

21

22

23   _____

24          **DEBBIE HINO-SPAAN, CSR 7953, CRR**
           FEDERAL OFFICIAL COURT REPORTER
           411 WEST 4TH STREET, ROOM 1-053
25              SANTA ANA, CA 92701
                dhinospaan@yahoo.com

**UNITED STATES DISTRICT COURT**

1                          **APPEARANCES OF COUNSEL:**

2

3       **FOR THE PLAINTIFF:**

4                  NICOLA T. HANNA
                   United States Attorney
5                  BY:  BRETT SAGEL
                        Assistant United States Attorney
6                  411 West 4th Street
                   Suite 8000
7                  Santa Ana, California 92701
                   714-338-3598
8                  brett.sagel@usdoj.gov

9                  NICOLA T. HANNA
                   United States Attorney
10                 BY:  ALEXANDER WYMAN
                        Assistant United States Attorney
11                 312 North Spring Street
                   Suite 1100
12                 Los Angeles, California 90012
                   213-894-2435
13                 alex.wyman@usdoj.gov

14      **FOR THE DEFENDANT IN PRO SE:**

15                 MICHAEL JOHN AVENATTI, ESQ.

16

17      **STANDBY COUNSEL FOR MR. AVENATTI:**

18                 H. DEAN STEWARD LAW OFFICES
                   BY:  H. DEAN STEWARD, ESQ.
19                 17 Corporate Plaza
                   Suite 254
20                 Newport Beach, California 92660
                   949-481-4900
21                 deansteward7777@gmail.com

22

23

24

25

**UNITED STATES DISTRICT COURT**

1        **I N D E X**

2

3    **WITNESSES**                                                **PAGE**

4    **MARK HOROUPIAN, CALLED BY THE GOVERNMENT**
          Cross-Examination by Mr. Avenatti                         12
5
     **DAVID SHEIKH, CALLED BY THE GOVERNMENT**
6         Direct Examination by Mr. Sagel                           19
          Cross-Examination by Mr. Avenatti                         57
7         Redirect Examination by Mr. Sagel                         99
          Recross-Examination by Mr. Avenatti                      101
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          I N D E X
                           (Continued:)
 2

 3

 4                          EXHIBITS

 5                                                    WITHDRAWN
                                          IN              OR
 6        EXHIBIT                      EVIDENCE       REJECTED

 7        175     12/20/2017 e-mail from        26
                  Avenatti to Sheikh re
 8                Barela-Brock settlement

 9        178     12/22/2017 e-mail to Avenatti  33
                  re Barela-Brock settlement
10
          179     12/23/2017 e-mail from        37
11                Avenatti re Barela-Brock
                  settlement (attaching MJA
12                revised draft redline)

13        181     12/27/2017 e-mail from        40
                  Avenatti re Barela-Brock
14                settlement with attachment

15        183     12/28/2017 e-mail to Avenatti  43
                  re Barela-Brock settlement
16
          186     12/28/2017 e-mail from        46
17                Avenatti to Sheikh re Barela
                  signature pages (with
18                attachments)

19        187     12/29/2017 e-mail from Sheikh  48
                  to Avenatti re
20                Barela signature pages (with
                  attachments)
21
          191     1/2/2018 e-mail from Avenatti  53
22                to Sheikh re Barela-Brock
                  settlement
23

24

25
```

UNITED STATES DISTRICT COURT

**SANTA ANA, CALIFORNIA; TUESDAY, AUGUST 10, 2021**

**1:15 P.M.**

**- - -**

01:15PM   **(Out of the presence of the jury.)**

THE COURT:  The Government's indicated it intends to offer Exhibits 450 through -7 and 460 through -68, which are charts that have been prepared and constitute 106 summaries.  I want to make sure I have the chronology down.  The Government

01:16PM indicated it was going to offer those exhibits or identify them in -- I believe, in June or July.

MR. WYMAN:  Your Honor, just to shortcut this, I would note one thing.  We discussed this over the lunch break, and while all of the exhibits we believe are admissible and

01:17PM should come in, at this point we're only intending to offer 457, which is the wire count chart.  And I believe that one, with regard to the chronology, I don't recall the first time we disclosed that there would be a wire count summary chart, but I believe even the defendant acknowledges this version was sent

01:17PM to him, the final version was sent on July 14th.

I would like to say that it was part of our July 6th initial trial disclosure, but I would have to confirm that.  I just don't recall.

THE COURT:  So at this time you don't intend to

01:17PM offer 460, 461, and 462 through 468?

```
 1              MR. WYMAN:  Correct, Your Honor.

 2              THE COURT:  You want to be heard with regard to 457,

 3    Mr. Avenatti?

 4              MR. AVENATTI:  Can I have one moment to confer with

01:17PM 5    Ms. Cummings-Cefali, Your Honor?

 6              THE COURT:  Sure.

 7              (Counsel conferred off the record.)

 8              MR. AVENATTI:  Your Honor, my understanding of the

 9    chronology relating to 457 is that the version of it was first

01:19PM 10   provided on July 6th, an updated version was provided on

11    July 14th, and then the disclosure relating to the docs

12    supporting it, pursuant to 1006, was first provided on

13    August 2nd.

14              And so for each of those reasons and for the reasons

01:19PM 15   stated in the submission, Your Honor, I would object to the use

16    of Exhibit 457 and Mr. Bellis serving as a summary witness

17    regarding 457.

18              I will also say that if the Government calls Bellis

19    and utilizes 457, I'm going to use the other exhibits as

01:19PM 20   impeachment of Mr. Bellis and his alleged work in the case.

21    So -- and I think that would be within my right to do it.

22              So that's my position.

23              THE COURT:  Well, you pose the questions and we'll

24    hear if there are objections, if any, to your use of the other

01:20PM 25   ones.
```

```
 1              MR. AVENATTI:  I'm sorry?

 2              THE COURT:  You ask your questions.

 3              MR. AVENATTI:  Yep.

 4              THE COURT:  We'll see if there are objections to the

 5    questions you ask and rule accordingly.

 6              MR. AVENATTI:  Okay.

 7              THE COURT:  Objection to 457 is overruled.

 8              At the latest, with the Government's August 2, 2021

 9    letter, which is attached as Exhibit A at Docket 640, the

10    specific exhibit -- specific underlying documents were

11    identified.  There are only 12 documents.

12              And in Exhibit C to that same filing, a disk was

13    provided with copies of each of the documents not only

14    referenced in 457, but in all the other exhibits which the

15    Government identified in its notice.

16              I believe that given the limited number of

17    supporting documents, the Government provided reasonable notice

18    in sufficient time for Mr. Avenatti to review the documents

19    underlying the summary.

20              I have cited a case law that says 106 summaries need

21    to be presented before trial.  That case law is out there.

22    It's not what the statute says.  The statute simply says they

23    must be provided to the other parties within a reasonable time

24    and place.  I find providing the Exhibit C on August 2 was

25    sufficient notice in a reasonable time.
```

01:20PM (line 5)
01:20PM (line 10)
01:20PM (line 15)
01:21PM (line 20)
01:21PM (line 25)

```
 1            So that's my ruling on 457.  I won't get to the

 2  others because they've been withdrawn by the Government.  But

 3  should anyone get to those, I'm prepared to rule.

 4            Anything further on this topic?

 5            MR. WYMAN:  Not from the Government, Your Honor.

 6            THE COURT:  Mr. Avenatti?

 7            MR. AVENATTI:  Nothing further.  We'll take it

 8  question by -- my apologies, Your Honor.  Nothing further.  As

 9  Your Honor indicated, we'll take it question by question.

10            THE COURT:  Anything else we should discuss at this

11  time?

12            MR. SAGEL:  We have one matter that -- seeing that

13  we have five minutes -- if Your Honor wants to take it up.  And

14  I bring this to the Court's attention so you can decide

15  accordingly with defendant, depending on his position.

16            We got an e-mail and a phone call yesterday from --

17  and I'm not going to use the name now.  If the Court needs it

18  for privacy reasons, I can.  We got a call and an e-mail

19  yesterday from a woman who used to work at defendant's firm

20  saying she was served with a subpoena to testify, and I believe

21  she was told they want her to be a witness on Thursday for

22  them.

23            She provided us her -- and what she told

24  defendant's, I believe, paralegal at the time is she has COVID.

25  She tested positive for COVID.  Her positive test was on
```

01:21PM 5
01:22PM 10
01:22PM 15
01:22PM 20
01:22PM 25

1    August 5th, which I believe is last Thursday.  I have a copy of

2    her test.  And she provided to show proof that she did test

3    positive for COVID.

4         We have interviewed this individual.  The defendant

01:23PM 5    has the memorandum of interviews of her.  Obviously, he does

6    not need to tell us why he wants to call her, and nor have we

7    asked.

8         THE COURT:  Well, she's not going to come into this

9    courtroom having tested positive.  If you want to explore

01:23PM 10   alternate arrangements, I'm happy to hear you.

11        MR. SAGEL:  That's the only reason I bring that to

12   the Court's attention.

13        THE COURT:  Okay.

14        MR. AVENATTI:  Your Honor, I obviously wasn't there

01:23PM 15   when she was served.  My understanding is as follows:  One of

16   the paralegals served her and was at a distance of

17   approximately four feet.  She said that she had just "gotten

18   over COVID."  The paralegal asked her, "Do you have COVID?"

19        She said, "No."

01:24PM 20        Again, I wasn't there.  We can submit a declaration

21   if need be.  She was served with a subpoena.  Then we got an

22   e-mail from Mr. Sagel that she had reached out to the

23   Government.  I haven't seen the test result.  She's an

24   important witness to the defense.  Obviously, when we sought to

01:24PM 25   subpoena her, we had no idea what her medical condition was.

**UNITED STATES DISTRICT COURT**

1          But in any event, I require the testimony for the

2    defense.  She's an important witness.  The Government did

3    interview her in connection with the case.  Her name has been

4    used in connection with other witnesses who have testified in

01:24PM 5    the case.

6          And so we're happy to explore alternative

7    arrangements, but it came as news to us that she had recently

8    tested positive because what we were told is she had gotten

9    over it.  That's what I know, Your Honor.  And if the Court --

01:25PM 10   if the Court desires a declaration from the paralegal, we can

11   provide it.

12         Furthermore, Your Honor, out of an abundance of

13   caution, when we received the e-mail from Mr. Sagel about the

14   claim from the witness that she had COVID, meaning in the

01:25PM 15   present tense, we had the paralegal immediately tested, and she

16   tested negative.

17              THE COURT:  Good.

18              MR. AVENATTI:  So we didn't want to potentially

19   infect other people or other members of the defense team, so

01:25PM 20   that's what we did.

21              THE COURT:  Very good.

22         Well, I will want a declaration from her as to her

23   present condition.  And the Government should submit whatever

24   it has that will shed light on that question.

01:25PM 25              MR. SAGEL:  And do I have the Court's permission --

```
 1   and I can do it under seal and provide the defense a copy, for
 2   privacy reasons.
 3              THE COURT:  Yes.  Yes.
 4              MR. AVENATTI:  That raises one other quick issue,
 5   Your Honor, but if --
 6              THE COURT:  How quick?
 7              MR. AVENATTI:  I think it's very quick.  On Friday,
 8   Your Honor asked for a declaration from Special Agent Carlos.
 9   I don't know if that's been filed or not.  If it has been filed
10   in camera, I would object to the declaration being filed in
11   camera.  I think I'm entitled to see the declaration.  If it
12   hasn't been filed yet, when it is filed, I'd like to see a copy
13   of it contemporaneously.
14              THE COURT:  It's part of in camera submission.  The
15   Government should provide it to Mr. Avenatti.
16              MR. SAGEL:  The declaration?
17              THE COURT:  Right.
18              MR. SAGEL:  No problem, Your Honor.
19              THE COURT:  That's what I contemplated from the
20   beginning, that if you were going to put a declaration in,
21   obviously, defense would see it.  It wouldn't simply be held in
22   camera.
23              MR. SAGEL:  No problem.  That was just a
24   misunderstanding based on the discussion on Friday.
25              THE COURT:  Okay.  Looks like we're ready for the
```

```
 1   jury.
 2                (In the presence of the jury.)
 3                THE COURT:  Good afternoon, ladies and gentlemen.
 4                (The jury collectively responded "Good afternoon.")
 5                THE COURT:  Mr. Avenatti.
 6                MR. AVENATTI:  Thank you, Your Honor.
 7                MARK HOROUPIAN, WITNESS, RESUMED THE STAND
 8                            CROSS-EXAMINATION
 9   BY MR. AVENATTI:
10   Q    Mr. Horoupian, good afternoon.
11   A    Good afternoon.
12   Q    Now, prior to you taking the stand, the Government
13   interviewed you in connection with this case; is that right?
14   A    That's correct.
15   Q    You and I have not spoken in some time.  Is that fair to
16   say?
17   A    That's fair to say.
18   Q    All right.  About at least 18 months?
19   A    Sounds right.
20   Q    Okay.  Now in connection with your representation of me
21   and Avenatti & Associates in the Eagan Avenatti bankruptcy, you
22   understood that that was not a Michael Avenatti bankruptcy;
23   correct?
24   A    Correct.
25   Q    Nor was it an Avenatti & Associates bankruptcy; correct?
```

01:30PM (lines 5, 10, 15, 20)
01:31PM (line 25)

```
 1    A     Correct.
 2    Q     Nor was it a Eagan Avenatti Chapter 7 bankruptcy; is that
 3    right?
 4    A     That's correct.
 5    Q     It was a Chapter 11 bankruptcy; is that right?
 6    A     Correct.
 7    Q     Can you please explain to the jury generally what that
 8    means?
 9    A     A Chapter 11 bankruptcy as -- I'll do that in the reverse.
10          A Chapter 7 is a liquidation where all the assets of
11    a company are surrendered to a trustee and liquidated with the
12    proceeds paid to creditors.
13          A Chapter 11 bankruptcy is a reorganization in which
14    the debtor is given an opportunity to essentially pose --
15    propose a payment plan to restructure its debts.
16    Q     And do you have a recollection that in connection with
17    the Eagan Avenatti bankruptcy, the firm was not seeking to
18    discharge its debts or get out from paying, it was seeking to
19    reorganize those debts.  Do you remember that?
20    A     Correct.
21    Q     And you were asked about Exhibit 343.  Do you recall you
22    were asked a number of questions about that?
23    A     Was that the motion?
24    Q     342.  I'm sorry.
25    A     Which volume?
```

01:31PM (5)
01:31PM (10)
01:31PM (15)
01:32PM (20)
01:32PM (25)

```
 1   Q     It would be in Volume V.  It may be in front of you.

 2   A     This is Volume VII.

 3              I have it in front of me.

 4   Q     And if you could turn to page 38 of 67.  And I want to

 5   ask you about paragraph 5.

 6              Do you have paragraph 5, sir?

 7   A     I do.

 8   Q     Do you have a recollection that in connection with this

 9   filing, there was reference made to three attorneys who used to

10   work at Eagan Avenatti:  Scott Sims, Jason Frank and Andrew

11   Stolper?

12   A     I do recall.

13   Q     And do you recall that those three attorneys had been

14   caught trying to steal business from the firm and had been

15   terminated, and subsequent litigation had ensued?

16              MR. SAGEL:  Objection.  Foundation, 403, and outside

17   the scope.

18              THE COURT:  Sustained.

19   Q     BY MR. AVENATTI:  Directing your attention to paragraph 5

20   of page 38 of 67, which Mr. Sagel put in evidence, I want to

21   ask you some questions about this, paragraph 5.

22              Do you recall that one of the issues that led to the

23   EA Chapter 11 filing was the fact that those three attorneys

24   had stolen various clients from the firm?

25              MR. SAGEL:  Same objections, Your Honor.
```

**UNITED STATES DISTRICT COURT**

|   | | |
|---|---|---|
| | 1 | THE COURT:  Sustained. |
| | 2 | MR. AVENATTI:  Your Honor, he put it in evidence. |
| | 3 | Just trying to ask about it. |
| | 4 | THE COURT:  Move on. |
| 01:35PM | 5 | Q    BY MR. AVENATTI:  Mr. Horoupian, who is Andrew Stolper? |
| | 6 | MR. SAGEL:  Same objections, Your Honor. |
| | 7 | THE COURT:  Sustained. |
| | 8 | Q    BY MR. AVENATTI:  Mr. Horoupian, directing your attention |
| | 9 | to page 57 of 67 -- well, we'll start at 56 of 67 and 57 of 67. |
| 01:36PM | 10 | Do you have those two signature pages there, sir? |
| | 11 | A    I do. |
| | 12 | Q    And my signature appears there; is that right? |
| | 13 | A    It does. |
| | 14 | Q    Mr. Eagan's signature appears there; is that right? |
| 01:36PM | 15 | A    It does. |
| | 16 | Q    And then on the next page there's a signature of Jason |
| | 17 | Frank; is that correct? |
| | 18 | A    Yes. |
| | 19 | Q    Scott Sims; right? |
| 01:36PM | 20 | A    Yes. |
| | 21 | Q    And Andrew Stolper; right? |
| | 22 | A    Yes. |
| | 23 | Q    Okay.  Why did Andrew Stolper sign this document? |
| | 24 | MR. SAGEL:  Objection, Your Honor.  403.  Outside |
| 01:37PM | 25 | the scope, and relevance. |

```
 1              THE COURT:  Sustained.
 2   Q    BY MR. AVENATTI:  Mr. Horoupian, at the time that you
 3   filed this document -- well, strike that.
 4              You actually did not file this document; is that
 5   true?
 6   A    That's correct.
 7   Q    That -- lawyers for the law firm filed the document;
 8   right?
 9   A    That's correct.
10   Q    Did you review it at the time it was filed?
11   A    I believe I would have provided comments to it.
12   Q    Before it was filed?
13   A    Most likely.  I don't recall specifically.
14   Q    But you were aware generally of what it contained before
15   it was filed; right?
16   A    Yes.
17   Q    And at the time that you reviewed it, you knew that
18   Mr. Stolper was somebody who had been booted out of the
19   U.S. Attorney's Office for prosecutorial misconduct and that he
20   was a friend of Mr. Sagel's, didn't you?
21              MR. SAGEL:  Objection, and was hired by defendant.
22   Objection to the entire question, and ask that the defendant
23   move on.
24              THE COURT:  Sustained.
25              I believe this is the second, perhaps the third time
```

```
    1    you put that question to the witness.  I direct you to not put

    2    that same question to any other witness.

    3              MR. AVENATTI:  They put the document in evidence,

    4    Your Honor.

01:38PM 5              THE COURT:  Sir, ask a question.

    6              MR. AVENATTI:  I'm going to ask another question.

    7    Q    Now, Mr. Horoupian, you were asked about the receipt of

    8    certain monies.  Do you recall that?

    9    A    Yes.

01:39PM 10    Q    And you don't know where those monies came from, other

   11    than the account of Eagan Avenatti.  Is that fair?

   12    A    That's correct.

   13    Q    And you don't have any knowledge as to whether those

   14    monies were legitimately owed to the firm or not; is that

01:39PM 15    right?

   16    A    To the Eagan Avenatti firm?

   17    Q    Yes.

   18    A    That -- your question, yes.

   19    Q    I am correct that you have no evidence that you can

01:39PM 20    provide to this jury as to whether those monies were

   21    legitimately owed to the law firm or not; am I correct?

   22    A    That's correct.

   23    Q    The only thing that you know in that regard is that you

   24    received a wire from the law firm and then subsequently made

01:39PM 25    various payments; is that right?
```

```
 1   A     That's correct.
 2   Q     Do you have any knowledge as to any of the fee agreements
 3   that existed with any of the clients of Eagan Avenatti at the
 4   time that you received the money?
 5   A     No.
 6   Q     And as you sit there today, you're not able to tell the
 7   jury what would have happened if the payment would not have
 8   been made on the exact date that it was due.  You can't
 9   speculate to that, can you?
10   A     I don't recall the terms of the agreement in that regard.
11   Q     And you don't know what the position of the Internal
12   Revenue Service might have been; right?
13   A     No.
14   Q     I'm sorry?
15   A     No.
16   Q     And you don't know what the position of any creditors
17   would have been; correct?
18   A     That's correct.
19   Q     And you don't know what the position of Mr. Stolper,
20   Mr. Frank, and Mr. Sims would have been; correct?
21   A     Correct.
22   Q     So, as you sit there today, you can't tell the jury one
23   way or the other as to whether the case would have ultimately
24   been dismissed had this payment not been made on that exact
25   date, can you?
```

01:40PM (line 5)
01:40PM (line 10)
01:40PM (line 15)
01:41PM (line 20)
01:41PM (line 25)

```
 1   A      No.

 2   Q      You cannot tell them one way or the other?

 3   A      I cannot.

 4          MR. AVENATTI:  Nothing further.

 5          MR. SAGEL:  No further questions, Your Honor.

 6          THE COURT:  May the witness be excused?

 7          MR. AVENATTI:  Yes, Your Honor.

 8          THE COURT:  Sir, you're excused.  Thank you.

 9          MR. SAGEL:  The Government calls David Sheikh.

10          THE COURTROOM DEPUTY:  Please stand behind the court

11   reporter and raise your right hand.

12              DAVID SHEIKH, GOVERNMENT WITNESS, WAS SWORN

13          THE COURTROOM DEPUTY:  Sir, if you'll please state

14   and spell your first and last name.

15          THE WITNESS:  David Sheikh.  That's D-a-v-i-d,

16   S-h-e-i-k-h.

17          THE COURT:  Mr. Sagel.

18          MR. SAGEL:  Thank you, Your Honor.

19                          DIRECT EXAMINATION

20   BY MR. SAGEL:

21   Q      Good afternoon, Mr. Sheikh.

22   A      Good afternoon.

23   Q      How are you employed?

24   A      I'm an attorney.

25   Q      How long have you been an attorney for?
```

(01:41PM at line 5; 01:42PM at line 10; 01:43PM at lines 15, 20, 25)

```
        1   A    Since 1992.  So that many years.

        2   Q    You weren't called to be doing math, so...

        3            Where do you practice law currently?

        4   A    Chicago.

01:43PM  5   Q    And do you work for a firm?

        6   A    Yes.  It's my firm with some colleagues of mine.

        7   Q    What's the name of your firm?

        8   A    Lee Sheikh Megley & Haan.

        9   Q    And how long have you worked for Lee Sheikh Megley &

01:43PM 10   Haan?

       11   A    We founded the firm six years -- about six years -- a

       12   little over six years ago.

       13   Q    Do you know a company called Brock USA, LLC?

       14   A    Yes, I do.

01:44PM 15   Q    I'm going to refer to them as "Brock" now, after

       16   Brock USA, LLC.

       17            How are you familiar with the company Brock?

       18   A    I've represented Brock in intellectual property matters

       19   for quite a while.

01:44PM 20   Q    Do you know an individual by the name of Gregory Barela?

       21   A    Yes, I do.  I know of him.

       22   Q    What interactions or what dealings, if any, have you had

       23   with Gregory Barela?

       24   A    Mr. Barela brought -- had a legal dispute with Brock in --

01:44PM 25   from maybe 2014 to 2017 involving some intellectual property
```

1    that I represented Brock in.

2    Q    Do you know an individual by the name of Michael

3    Avenatti?

4    A    Yes, I do.

01:45PM 5    Q    How do you know who Mr. Avenatti is?

6    A    Mr. Avenatti was Mr. Barela's attorney in the intellectual

7    property dispute that I just referred to.

8    Q    And in the intellectual property dispute between

9    Mr. Barela and Mr. Brock, what was your role in that matter or

01:45PM 10   what was your firm and your role?

11   A    We represented Brock.  Mr. Barela had made some claims

12   involving intellectual property against Brock, and I and my

13   firm represented Brock to defend itself against those claims.

14   Q    And you mentioned claims brought by Mr. Barela.  How were

01:45PM 15   those claims brought?  And that's probably a horrible question.

16   Were there -- was there a public filing or how were claims

17   made?

18   A    So it's -- it's a kind of a complicated answer, but

19   initially, as I recall, the claims were brought in an effort --

01:46PM 20   in a motion to intervene in a preexisting lawsuit that Brock

21   had with another party.  Mr. Barela filed a motion, as I

22   recall, to intervene, become a party in that lawsuit to pursue

23   his claims.

24         That was not successful, so then the claims were

01:46PM 25   brought -- and that was a public matter.  Then the claims were

         1    brought by Mr. Barela in a lawsuit filed in federal court, in

         2    fact, in this courtroom, which was ultimately dismissed.  And

         3    then ultimately the matter went to an arbitration proceeding,

         4    an arbitration.

01:46PM  5    Q    And what do you mean by "arbitration"?

         6    A    An arbitration is a -- it's kind of a private court

         7    proceeding where the parties can decide that they would rather

         8    pursue their -- have their claims resolved by a private entity,

         9    like a retired judge or an attorney who's practiced for a long

01:47PM 10    time, who would typically oversee a proceeding like that

        11    instead of going into a court like this.

        12    Q    And after the matter was brought to an arbitration, did

        13    it eventually reach something called mediation?

        14    A    Yes.  As part of the arbitration proceeding, there was a

01:47PM 15    requirement or agreement by the parties that they would be for

        16    having the arbitrator, like a judge, decide the matter.  They

        17    would try to settle it through a mediator, through the use of a

        18    mediator.

        19    Q    And in December of 2017, did the Brock/Barela matter go

01:48PM 20    to mediation?

        21    A    Yes.  A mediation was held, the proceeding -- there were

        22    some papers given to the mediator, and then we actually met

        23    with the mediator who facilitated a settlement.

        24    Q    Where did the mediation take place?

01:48PM 25    A    Denver, Colorado.

23

```
        1    Q    And how long did that mediation last?

        2    A    So if you're referring to the part where we met in person

        3    with the mediator, where the parties were there, that was a

        4    one-day event, a long day, but a one-day event.  And then there

01:48PM  5    was some other collateral things that went with it.

        6    Q    So let me -- let me start there.  After the one-day

        7    mediation in person that you mentioned, did the parties,

        8    Mr. Barela on one hand and Brock on the other hand, did they

        9    reach a resolution on that day?

01:49PM 10    A    Did they reach a resolution during the in-person meeting?

       11    Q    Correct.

       12    A    No.  Not a final resolution, no.

       13    Q    And after the parties were unable to reach a final

       14    resolution during the in-party mediation, did the parties agree

01:49PM 15    to continue with the mediation process?

       16    A    Yes.

       17    Q    And describe what that continuation of the process

       18    entailed.

       19    A    So the parties went their separate ways after the

01:49PM 20    in-person meeting, but prior to that, the mediator got each

       21    side to agree to keep talking through him, primarily to see if

       22    they could resolve the issues that remained.

       23              And so what happened was, there were some

       24    communications, kind of a shuttle diplomacy kind of thing,

01:49PM 25    where each side communicated with the mediator, and the
```

**UNITED STATES DISTRICT COURT**

```
 1   mediator would pass along to the other side and shuttle back
 2   and forth by telephone.  I think there may have been some
 3   e-mails involved.
 4   Q    And on behalf of Brock, who was handling the negotiations
 5   for the mediation?
 6   A    I was.
 7   Q    And on behalf of Mr. Barela, who was handling the
 8   negotiations at the mediation?
 9   A    Mr. Avenatti.
10   Q    And at that time, were you also having interactions
11   directly with Mr. Avenatti?
12   A    I had a few, yes.  Correct.
13   Q    If you could look at -- and I apologize.  I think the
14   binder is going to be Volume III, which may be behind you and
15   not a big stack of binders piled in front of you.  And I'm
16   going to have you look for Exhibit 175.
17   A    You said Volume III?
18   Q    Volume III, I believe.
19   A    Okay.  I have Volume III.
20   Q    Exhibit 175.
21   A    Okay.  I'm there.
22   Q    Is Exhibit 175 e-mails between you and the defendant?
23   A    Yes, it is.
24   Q    And there are a couple other individuals, but each of
25   the -- each of the e-mails in this string were written by
```

01:50PM (line 5)
01:50PM (line 10)
01:50PM (line 15)
01:51PM (line 20)
01:51PM (line 25)

1      either you or the defendant; is that correct?

2      A      Yes.  These are e-mails between me and Mr. Avenatti, and

3      each of us authored the e-mails back and forth.

4      Q      And is this a fair and accurate copy of e-mails between

01:52PM  5   you and the defendant?

6      A      It appears so.  There are some grayed-out area in one of

7      the addresses, I think, on several pages, which I would imagine

8      is not in the original.  But besides that, this appears to be a

9      true and correct copy.

01:52PM  10  Q      Other than the redactions of personal identifying

11     e-mails, it's a true and correct copy of the e-mails?

12     A      Correct.

13            MR. SAGEL:  At this time, Your Honor, the Government

14     moves to admit Exhibit -- actually, let me clarify one

01:52PM  15  additional point.

16     Q      On the last e-mail by page number, on 175, while it looks

17     to be an e-mail from you to defendant, there is insertions in

18     that e-mail; is that correct?

19     A      Are you referring to the bracket in capital letters?

01:53PM  20  Q      Correct.

21     A      Correct.  That -- what you're referring to is an e-mail

22     that I authored and Mr. Avenatti put some commentary in as

23     bracketed and in capitals.

24            MR. SAGEL:  At this time, Your Honor, the Government

01:53PM  25  moves into evidence Exhibit 175.  The e-mails that are solely

```
       1    written by Mr. Sheikh is for notice, and the e-mails from the
       2    defendant for all purposes.
       3              MR. AVENATTI:  Objection, Your Honor.  Hearsay and
       4    408.
01:53PM 5              THE COURT:  Overruled.  275 -- 175 will be received
       6    for the stated purposes.
       7              (Exhibit Number 175 received.)
       8              MR. SAGEL:  Thank you, Your Honor.
       9    Q    And if we can just start at the top of page 1.  And we'll
01:54PM 10   kind of go through this, but these e-mails are basically
      11    December 19th and December 20th, 2017; is that correct?
      12    A    That's correct.
      13    Q    And let's just start at the top.  Defendant's name and
      14    your name are in the "From" and the "To" line, and then there
01:54PM 15   are two other names on the "cc" line.  Do you see that?
      16    A    Yes, I do.
      17    Q    Who is W.F. Downes?
      18    A    That was the mediator.
      19    Q    And who is Joe Culig?
01:54PM 20   A    That's Joe Culig, and he was a lawyer -- one of my
      21    associates who was also involved in this case for Brock.
      22    Q    And I'm going to turn your attention to page 5 of 6.
      23    There's an e-mail that you send on December 19th, 2017.  Do you
      24    see that?
01:55PM 25   A    I do.
```

```
 1    Q    And it starts "Michael."

 2    A    Yes.

 3    Q    Who are you writing this e-mail to?

 4    A    Mr. Avenatti.

 5    Q    And if you could read the first sentence and then the

 6    number 1 paragraph.

 7    A    Yes.

 8              "Michael, Judge Downes informed me that you

 9         wanted me to e-mail the settlement terms.  The

10         settlement terms are as follows:  1, Brock will pay

11         the sum of $1,900,000 to Barela.  1,500,000 of the

12         sum will be paid by January 10, 2018, and the

13         remaining $400,000 will be paid in three

14         installments over a period of three years.  The

15         first installment in the amount of 1,333 --

16         $133,333 will be paid on January 10, 2019.  The

17         second installment in the amount of $133,333 will

18         be paid on January 10, 2020.  And the third

19         installment in the amount of 1,000 -- 1,300 --

20         $1,033 -- 133,334 will be paid on January 10, 2021.

21         The payments are subject to Barela's ongoing

22         compliance with the agreement."

23              And then there's in brackets, in caps, "AGREED."

24    Q    Okay.  And so since it's there, we'll say it now.  What

25    is the bracket, all caps, "AGREED" -- what is your
```

01:55PM (line 5)
01:55PM (line 10)
01:56PM (line 15)
01:56PM (line 20)
01:57PM (line 25)

```
 1  understanding of what that is?
 2  A    That was put in by Mr. Avenatti, and my understanding is
 3  that Mr. Barela, who he was representing, agreed to that.
 4  Q    And if you were to look at page 3 of these e-mails, at
 5  the very bottom, there's an e-mail from Michael Avenatti to you
 6  on December 19th, where he says, "Please see my
 7  comments/revisions below in brackets.  Please let me know your
 8  response"; is that correct?
 9  A    Yes.
10  Q    The bracket revisions or what you're talking about now is
11  in this first e-mail?
12  A    I believe that's correct.
13  Q    Now, turning back to this first paragraph, the total sum
14  that Brock would pay to Mr. Barela, the 1.9 million here, at
15  this point had it been agreed to, the dollar amounts, that
16  would be as part of the settlement?
17  A    I believe at the time of this e-mail, when I sent the
18  e-mail, that that total amount had been agreed to.  I believe
19  so.
20  Q    And then each of the payment dates that are listed was
21  January 10th, 2018, through January 10th, 2021; is that
22  correct?
23  A    Correct.
24  Q    And then this e-mail has some back-and-forth e-mails that
25  we just referenced.  And if you were to look at page --
```

29

```
         1    actually, all the way to page 1, you then sent another e-mail
         2    to the defendant on December 20th at 12:39 p.m.; is that
         3    correct?
         4    A    That's correct.
01:58PM  5    Q    And you start again by saying, "Michael, Judge Downes
         6    asked me to send you this e-mail."
         7              And then can you read paragraph 1 underneath that.
         8    A    Yes.
         9              "Brock will pay the sum of $1,900,000 to
01:59PM 10         Barela.  $1,600,000 of this sum will be paid by
        11         January 10, 2018, and the remaining $300,000 will
        12         be paid in three installments over a period of
        13         three years.  The first installment in the amount
        14         of $100,000 will be paid on January 10, 2019; the
01:59PM 15         second installment in the amount of $100,000 will
        16         be paid on January 10, 2020; and the third
        17         installment in the amount of $100,000 will be paid
        18         on January 10, 2021.  The payments are subject to
        19         Barela's ongoing compliance with the agreement."
01:59PM 20    Q    And this following day, December 20th, the settlement
        21    amount is still $1.9 million; is that correct?
        22    A    Correct.
        23    Q    But the amounts in which they would be paid changed
        24    slightly from the day before; is that correct?
02:00PM 25              MR. AVENATTI:  Objection.  Leading.
```

```
 1              THE COURT:  Sustained.
 2  Q    BY MR. SAGEL:  What's different between paragraph 1 of
 3  this December 20th e-mail and paragraph 1 from the
 4  December 19th e-mail that we looked at on page 5?
02:00PM  5  A    Yeah.  One difference is that on the previous e-mail, on
 6  December 19th, 2017, the -- there was $1.5 million paid and
 7  $400,000 paid over time in installments, and each installment
 8  was 133,333, except the last one was 133,334.
 9              Whereas, on December 20th, 1.6 million would be paid
02:01PM 10  on January 10, 2018, and $300,000 will be paid over three
11  installments.
12  Q    And do you recall why it changed from December 19th to
13  December 20th?
14  A    I don't recall specifically why, but I -- my recollection
02:01PM 15  is that was -- there was still some open issues between
16  December 17th and December 20th where each side was giving and
17  taking.  And in exchange for some compromise on another term,
18  the -- those terms, those dollar amounts, slightly changed.
19  Q    Who wanted -- based on the negotiation, who wanted more
02:01PM 20  money paid up front?
21              MR. AVENATTI:  Objection.  Calls for speculation.
22  Seeks to ignore the witness's testimony.
23              THE COURT:  Overruled.
24              THE WITNESS:  Mr. Barela.
02:01PM 25  Q    BY MR. SAGEL:  And were you discussing directly with
```

         1    Mr. Barela?
         2    A    Oh, no.  I'm sorry.  I was not discussing directly with
         3    Mr. Barela.  I was discussing this with Mr. Avenatti.
         4    Q    And if you could turn to page 2, paragraph 7, can you
02:02PM  5    read what paragraph 7 says on page 2.
         6    A    Yeah.  At page 2 of 6?
         7    Q    2 of 6, the numbered paragraph 7.
         8    A    "Assuming the parties agree on the terms herein
         9         by the close of business on December 20th, 2017,
02:02PM 10         Brock's counsel will provide a first draft of a
        11         formal settlement agreement by the close of business
        12         on December 22nd, 2017, and the parties will execute
        13         all the settlement documents by the close of
        14         business on December 29th, 2017."
02:03PM 15    Q    And then turning back to page 1, did defendant reply to
        16    your e-mail that we were just going over on December 20th,
        17    2017, at the top?
        18    A    Yes.  At the very top, yes.
        19    Q    And what did defendant say?
02:03PM 20    A    "Agreed.  Thanks, Dave."
        21    Q    Based on this e-mail communication we just went over,
        22    including defendant's statement that he agreed at the top, was
        23    there an agreement between the parties on December 20th, 2017?
        24    A    Yes.  I think as a result of this last exchange or e-mail,
02:04PM 25    there was an agreement on material terms of a resolution on

December 20th, 2017.

Q    Now if I can have you look at Exhibit 178.  Do you have

Exhibit 178 in front of you?

A    I do.

Q    And is -- let me start that one over.

     Is Exhibit 178 an e-mail with an attachment that you

sent to defendant?

A    Yes, it is.

Q    And is it a fair and accurate copy of the e-mail and

attachment that you sent to defendant?

A    I believe it is, except I'll just note for -- just like

the previous exhibit, there are grayed-out areas that identify

some personal information.

Q    Other than the redactions, is it a fair and accurate copy

of the e-mail and attachment?

A    Yes, it is.

          MR. SAGEL:  At this time, Your Honor, the Government

moves to admit Exhibit 178.

          MR. AVENATTI:  Objection, Your Honor.  Hearsay and

408.

          THE COURT:  408 is not applicable.  It's not offered

for any of the prescribed purposes in 408.

          It will be received but not for the truth, simply

that it was sent to Mr. Avenatti, notice to him, not for the

truth.

```
 1              (Exhibit Number 178 received.)
 2    Q    BY MR. SAGEL:  Let's start at the top.  What's the date
 3    that you sent this e-mail to the defendant?
 4    A    Friday, December 22nd, 2017.
02:06PM 5  Q    And can you see the title of the attachment underneath
 6    the date?
 7    A    Yes.  "Barela-Brock confidential settlement agreement,
 8    December 22nd, 2017.docx."
 9    Q    And what is your understanding of when the attachment is
02:06PM 10  a .docx?
11    A    That it's a Microsoft Word document.
12    Q    And if you can read the first sentence under "Michael."
13    Can you read what you wrote to the defendant?
14    A    Yes.
02:06PM 15         "In accordance with paragraph 7 of the
16         settlement terms, the parties agreed to on
17         December 20th, here is a first draft of a formal
18         settlement agreement.  Please review the draft and
19         get back to me with your comments."
02:06PM 20  Q    I'm going to stop you there.  Is this referencing the
21    e-mail chain that we just went over, including the
22    December 20th e-mail we were just talking about in Exhibit 175?
23    A    Yes.  Should I continue?
24    Q    I'm sorry, what did you say?
02:07PM 25  A    Did you want me to continue reading?
```

```
           1    Q     Oh, no.  If I could have you turn to page 2.  Does page 2
           2    of 9 start the draft settlement agreement that you attached?
           3    A     Correct.
           4    Q     And can you read --
02:07PM    5              MR. SAGEL:  If we can put the first paragraph on the
           6    screen.
           7    Q     Maybe I'll read it to you.  It will go quicker:
           8              "The confidential settlement agreement is
           9         entered into as of December 20th, 2017, by and
02:07PM   10         between Greg Barela, an individual, and Brock USA,
          11         a Colorado limited liability company."
          12              Is this the draft of the settlement agreement
          13    between those two parties?
          14              MR. AVENATTI:  Objection, Your Honor.  Misread.
02:08PM   15    Lacks foundation.
          16              THE COURT:  Overruled.
          17              THE WITNESS:  Yes, it is.
          18    Q     BY MR. SAGEL:  And if you were to look about three
          19    paragraphs down, it says:
02:08PM   20              "On December 20th, 2017, Barela and Brock
          21         agreed to a final compromise and settlement of the
          22         arbitration and all disputes between them."
          23              Is that based on the e-mails back and forth and the
          24    agreement to the terms in that e-mail?
02:08PM   25              MR. AVENATTI:  Objection.  Leading.
```

```
 1              THE COURT:  Overruled.
 2              THE WITNESS:  That's correct.
 3   Q    BY MR. SAGEL:  And then if you were to look at page 4 of
 4   9, is there a section in this draft settlement agreement with
02:09PM 5   the payment schedule to Mr. Barela?
 6   A    Yes.  In Exhibit 178 on page 4 of 9 and paragraph 12.
 7   Q    What's the total sum of money in paragraph 12 at the top
 8   that's going to be paid to Mr. Barela?
 9   A    $1.9 million.
02:09PM 10   Q    And then in subparagraphs (a) through (d), does it
11   provide the manner in which those -- the settlement payments
12   would be made?
13   A    That's correct.
14   Q    And what are the dates of those four payments to
02:09PM 15   Mr. Barela in paragraphs (a) through (d)?
16   A    January 10th, 2018; January 10th, 2019; January 10th,
17   2020; and January 10th, 2021.
18   Q    And if you look at paragraph 14 just below it, it says:
19              "Each of the payments specified in paragraph
02:10PM 20        12 shall be made by wire transfer to the following
21        account."
22              And then it says:  "Insert wire transfer info
23   there."
24              Do you see that?
02:10PM 25   A    Yes, I do.
```

Q    And why is that in this draft settlement agreement?

A    That's information that the recipient of the settlement

proceeds would provide.  We didn't have information on -- for

wiring the funds.  That would come from Mr. Avenatti.

02:10PM   Q    Now if I could have you look at Exhibit 179.

A    Okay.  I'm there.

Q    And before I get there, let me ask you a follow-up

question from 178.  You mentioned that the attachment was a

WordPerfect document; is that correct?

02:11PM   A    No.  Actually, Microsoft Word.  Yeah.

Q    Okay.  If anyone knows why I said WordPerfect, because

we're in the last place that uses WordPerfect.

        Microsoft Word document; is that correct?

A    That's correct.

02:11PM   Q    Why were you sending a Microsoft Word document as a draft

settlement agreement to the defendant at that point?

A    It was a draft settlement agreement, and there was a

possibility that Mr. Avenatti would have -- want to propose

some changes.

02:11PM         So it was sent in a way that it was modifiable by

Mr. Avenatti so that if he had changes, if he didn't agree with

something in a draft or wanted to make a comment, he could put

it right in the document.

Q    Now if I can have you look at Exhibit 179.

02:12PM   A    Yes.

```
 1   Q    Is Exhibit 179 an e-mail you received from the defendant?
 2   A    Yes.
 3   Q    With an attachment?
 4   A    Correct.
 5   Q    Is this a fair and accurate copy of an e-mail you
 6   received from the defendant with the attachment?
 7   A    With the exception of the redacted material, yes.
 8             MR. SAGEL:  Government moves to admit Exhibit 179,
 9   Your Honor.
10             MR. AVENATTI:  Objection, Your Honor.  Hearsay and
11   408.
12             THE COURT:  Mr. Avenatti's e-mails will be received
13   for the truth, the others just for notice.
14             (Exhibit Number 179 received.)
15   Q    BY MR. SAGEL:  If we can look at the top of the page.
16   What's the date of defendant's reply e-mail to you or
17   defendant's e-mail at the top to you?
18   A    Saturday, December 23rd, 2017.
19   Q    And if you were to look at page 2, this e-mail is in
20   response to your initial e-mail that we looked at in
21   Exhibit 178; is that correct?
22   A    That's correct.
23   Q    And in this e-mail that defendant sent you on Saturday,
24   December 23rd, 2017, is there an attachment?
25   A    Yes, there is.
```

1    Q    And on the top, what's the name of the attachment?

2    A    "MJA revised draft.docx."

3    Q    And then if you could read what the defendant wrote to

4    you right below that, under "Dave."

02:14PM 5    A    Yes.

6              "Attached please find a revised draft of the

7         settlement agreement.  I am available to discuss

8         anytime this weekend, if need be, at 949-887-4118.

9         Note that we will provide the wire instructions

02:14PM 10        immediately prior to execution.  Thanks.  Michael."

11    Q    And are you familiar with, in Microsoft Word, redline or

12    track changes?

13    A    Yes.

14    Q    And is the revised draft that defendant sent you in

02:15PM 15    redline or track changes?

16    A    Yes.  There are redline changes and track changes in the

17    document.

18    Q    If I could have you look at page 5 of 10 in the section

19    called "Payments to Barela."

02:15PM 20    A    Yes.

21    Q    In paragraphs -- in the part where -- paragraph 12 and

22    the dollar amounts and dates, are there any changes in this

23    draft agreement to the dates and the amounts?

24    A    No.

02:15PM 25    Q    They're all still January 10th?

```
 1   A     Correct.
 2   Q     If I could have you look at Exhibit 181.
 3         Actually, let me ask you a real quick question on
 4   179 before we move on.
 5   A     Okay.
 6   Q     At this time, when he sent you the MJA revised draft and
 7   his e-mail said "Note that we will provide the wire
 8   instructions immediately prior to execution," did defendant, at
 9   that time, provide you with the wire instructions?
10   A     At the time he sent this e-mail?
11   Q     Correct.
12   A     No, he did not.
13   Q     And he didn't fill in that box where it asked for it to
14   be inserted?
15   A     No, he did not.
16   Q     Now looking at Exhibit 181, is this another -- is this an
17   e-mail chain later in time from the same e-mail chain we've
18   been talking about from the defendant?
19   A     Yes.
20   Q     And is -- and this e-mail chain and the most recent
21   e-mail has an attachment; is that correct?
22   A     Yes, it does.
23   Q     And the most recent e-mail is from the defendant to you;
24   is that accurate?
25   A     That's correct.
```

02:16PM (lines 5,10,15)  02:17PM (lines 20,25)

**UNITED STATES DISTRICT COURT**

```
 1   Q    And other than any redactions throughout this, is it a

 2   fair and accurate copy of the e-mails between you and the

 3   defendant and the attachment to the most recent e-mail that was

 4   attached to defendant's e-mail to you?

 5   A    Yes.  Appears so.

 6             MR. SAGEL:  The Government moves to admit

 7   Exhibit 181, Your Honor.

 8             MR. AVENATTI:  Objection, Your Honor.  Hearsay.

 9   408.

10             THE COURT:  408 [sic] will be received.  Again,

11   Mr. Avenatti's e-mail's for the truth.  The other e-mails are

12   not for the truth, just for notice that they were sent to

13   Mr. Avenatti.

14             (Exhibit Number 181 received.)

15   Q    BY MR. SAGEL:  At the top of Exhibit 181, what's the date

16   of the e-mail from defendant to you?

17   A    Wednesday, December 27th, 2017.

18   Q    And what's the name of the attachment there?

19   A    "Further revised.docx."

20   Q    And what did defendant write in his e-mail?

21   A    "Please see attached."

22   Q    If you were to turn to page -- starting on page 181 --

23   I'm sorry, page 6 of Exhibit 181, is that the further revised

24   draft settlement agreement between Mr. Barela and Brock?

25   A    Yes.
```

02:17PM 5
02:18PM 10
02:18PM 15
02:19PM 20
02:19PM 25

```
 1   Q    And is this also a redline or track-change version of the

 2   draft settlement agreement?

 3   A    Yes.  This document has redline and track changes in it.

 4   Q    And based on your understanding, defendant is inserting

02:19PM 5   or being able to change the document as he sends it to you?

 6              MR. AVENATTI:  Objection.  Leading.

 7              THE COURT:  Overruled.

 8              THE WITNESS:  Yes.  That's correct.

 9   Q    BY MR. SAGEL:  And if we can turn to page 8 of this

02:20PM 10  exhibit.  In paragraph 12, as well as the (a) through (d)

11   subparagraphs, are the payment amounts and the dates still the

12   same on this document?

13   A    As the previous draft?

14   Q    Correct.

02:20PM 15  A    Yes, they are.

16   Q    And there is a change in what appears to be the new

17   paragraph 13.  Do you see that?

18   A    I do.

19   Q    What is the changed language that's inserted by the

02:20PM 20  defendant in this draft?

21   A    The wording -- the following wording is added:

22              "A trust account specified in an e-mail from

23         Barela's counsel (Michael Avenatti) to Brock's

24         counsel (David Sheikh) on or before January 3rd,

02:21PM 25         2018."
```

And "the following account" is stricken out, as is
the "insert wire transfer info."

Q    After receiving this e-mail from the defendant, did you
have a conversation with him about the -- did you have a
02:21PM conversation with him?

A    I believe I did.

Q    As it relates to the paragraph we just read and the wire
transfer or the information about the money, did you have any
discussion about that when you talked to the defendant?

02:21PM A    I believe I did have a brief conversation, yes.

Q    And what, if anything, did defendant say about the
account that he was going to have you wire it into?

A    As I recall, he said that it hadn't been set up yet.  That
needed to be set up and he would be doing that.  And he, I
02:22PM think, reiterated or in sum and substance said the same thing
that the track changes did.

Q    Now if I can have you look at Exhibit 183.

A    Okay.

Q    Is Exhibit 183 an e-mail chain -- part of the same e-mail
02:22PM chain we've been discussing with the various draft settlement
agreements?

A    Yes.

Q    And is it a -- other than any redactions in there, is it
a fair and accurate copy of the e-mail chain as well as the
02:23PM attachments to the last e-mail or the most recent e-mail in

```
      1    this chain?

      2    A     Yes, I believe so.

      3          MR. SAGEL:  At this time, Your Honor, the Government

      4    moves to admit Exhibit 183 and its attachments, the e-mails

02:23PM 5    from defendant for the truth and the e-mails to defendant for

      6    notice.

      7          MR. AVENATTI:  Objection, Your Honor.  Hearsay.

      8    408.

      9          THE COURT:  Overruled.  Exhibit will be received for

02:23PM 10   the stated purposes.

      11         (Exhibit Number 183 received.)

      12   Q     BY MR. SAGEL:  What's the date of your e-mail at the top

      13   of page 1 to the defendant?

      14   A     Thursday, December 28th, 2017.

02:24PM 15   Q     And can you say the name of the attachments that you've

      16   attached to this e-mail?

      17   A     Yes.

      18         "Barela-Brock confidential settlement

      19         agreement (execution copy).pdf" and

02:24PM 20        "stipulated.dismissal.docx."

      21   Q     And then your e-mail to defendant, you say:

      22         "As we discussed, here are:  1, a clean

      23         execution copy of the agreement and; 2, a clean

      24         execution copy of the stipulated dismissal.  Please

02:24PM 25        let me know when you have executed versions from
```

**UNITED STATES DISTRICT COURT**

1          your side and we can exchange signature pages by

2          e-mail."

3              At this point, what are these documents that you are

4      sending to the defendant?

02:25PM 5   A    Well, the Brock -- or the Barela-Brock confidential

6      settlement agreement (execution copy).pdf document is the

7      agreed-on final copy of the settlement agreement that the

8      parties would execute, sign, and date.

9              The stipulated.dismissal.docx is also a --

02:25PM 10  considered a final agreement that would be entered by the

11     arbitrator as memorialized when the case was done, settled.

12     Q    And when you say:

13          "Please let me know when you have executed

14          versions from your side and we can exchange

02:25PM 15          signature pages by e-mail," what did you mean by

16     that?

17     A    That Mr. Avenatti would coordinate with Mr. Barela to have

18     him sign and date for him, and I would be doing the same for my

19     client, Brock.  And then once that was done, we could e-mail to

02:26PM 20  each other our respective clients' signatures, and together

21     that would be a fully executed settlement agreement.

22     Q    And if you look at page 9 of this final but unsigned

23     settlement agreement, page 9 of the exhibit.

24     A    Yes.

02:26PM 25  Q    Is that the section about the payments to Barela?

```
 1    A    So paragraph 12, on page 9 of 16, is the section about
 2    payments by Brock to Barela.
 3    Q    And what's the payment date for the $1.6 million in
 4    paragraph A?
 5    A    January 10th, 2018.
 6    Q    And then the next three payments of $100,000, what's the
 7    date -- the dates of those next three payments?
 8    A    Yes.  January 10th, 2019; January 10th, 2020; and
 9    January 10th, 2021.
10    Q    And then if you were to look at paragraph 14 right below
11    it, paragraph 14 includes the language we looked at in the
12    prior draft that defendant inserted?
13    A    Correct.
14    Q    And if you were to look at page 12 of the exhibit, which
15    is page 6 of the agreement but page 12 of 16 --
16    A    Yes.
17    Q    -- of Exhibit 183, there's a section called "Notices"?
18    A    Yes.
19    Q    It says:
20            "Any notice required by this agreement shall
21         be made by e-mail, an express mail delivery, or
22         courier, signature required, postage prepaid as
23         follows."
24            And for Brock, who is listed there?
25    A    Richard Runkles, who is the president, and a copy goes to
```

02:26PM  5
02:27PM 10
02:27PM 15
02:28PM 20
02:28PM 25

1  me.

2  Q    And for Mr. Barela, where were the notices to go?

3  A    To care of Michael Avenatti at the Newport -- 520 Newport

4  Center Drive address.

02:28PM 5  Q    And you just mentioned Richard Runkles' name.  If you

6  were to look at page 14, who was to be signing this settlement

7  agreement for the two different parties?

8  A    Mr. Runkles was signing for Brock, and Mr. Barela was

9  signing for Mr. Barela.

02:29PM 10  Q    Now if I could have you look at Exhibit 186.  Do you see

11  Exhibit 186?

12  A    I do.

13  Q    Is that an e-mail you received from the defendant with

14  attachments?

02:29PM 15  A    Yes.

16  Q    Is it a fair and accurate copy of an e-mail you received

17  from the defendant with attachments?

18  A    Yes, I believe so.

19       MR. SAGEL:  Government moves to admit Exhibit 186,

02:29PM 20  which is an e-mail from the defendant.

21       MR. AVENATTI:  Objection.  Hearsay.  408,

22  Your Honor.

23       THE COURT:  Overruled.  186 will be received.

24       **(Exhibit Number 186 received.)**

02:29PM 25  Q    BY MR. SAGEL:  What's the date of defendant's e-mail to

47

```
         1   you with these attachments?
         2   A    Thursday, December 28th, 2017.
         3   Q    And can you read what defendant wrote to you in the
         4   e-mail.
02:30PM   5   A    Yes.
         6            "David, attached please find the signature
         7        pages per our agreement.  Please provide yours no
         8        later than the morning.  Thank you in advance.
         9        Best, Michael."
02:30PM  10   Q    And if you were to look at page 2, what is page 2?
        11   A    It's a -- it's a copy of the signature page on the
        12   Barela-Brock settlement agreement, with a signature under
        13   Greg -- and a date under Greg Barela.
        14   Q    And if you were to look at page 3 of this exhibit, what
02:30PM  15   is page 3 of this exhibit?
        16   A    That is the signature page on the stipulated dismissal,
        17   with a signature and a date.  The signature is on the line,
        18   Michael J. Avenatti, and the date of 12/28/17 is under that.
        19   Q    Do you know why the defendant only sent you the signature
02:31PM  20   pages?
        21   A    Do I know why?
        22   Q    Yes.
        23   A    No, I don't know why.
        24   Q    It's not unusual to just receive signature pages, is it?
02:31PM  25   A    No, it's not unusual.
```

**UNITED STATES DISTRICT COURT**

1    Q    And if I could have you look at Exhibit 187.

2    A    Yes.

3    Q    Do you have Exhibit 187 in front of you?

4    A    I do.

02:31PM 5    Q    Is that an e-mail that you sent in response to the e-mail

6    we just looked at, at 186, back to the defendant with

7    attachments?

8    A    Yes.

9    Q    And is this a fair and accurate copy of the e-mail and

02:32PM 10   the attachments you sent to defendant?

11   A    With the exception of the redacted information on the

12   attachment, yes.

13        MR. SAGEL:  Government moves into evidence,

14   Your Honor, Exhibit 187.

02:32PM 15        MR. AVENATTI:  Objection.  Hearsay.

16        THE COURT:  It will be received, but just for

17   notice.  Objection is overruled.

18        **(Exhibit Number 187 received.)**

19   Q    BY MR. SAGEL:  If I could have you look at -- what's the

02:32PM 20   date of your e-mail to defendant, at the top?

21   A    Friday, December 29th, 2017.

22   Q    And the first attachment is called "Brock-Barela

23   settlement agreement fully executed."  Do you see that?

24   A    I do.

02:33PM 25   Q    What is the fully executed Brock-Barela settlement

```
  1   agreement?

  2   A    It's the copy of the agreed-on final agreement that was

  3   sent by pdf earlier that now has both the signatures of both

  4   sides and dates with it.

02:33PM  5   Q    And then you also have the Brock-Barela stipulated

  6   dismissal attached.  Do you see that?

  7   A    I do.

  8   Q    And what generally is that that you're sending?

  9   A    That's a document that memorializes the fact that the

02:33PM 10   parties have settled and agreed to a complete settlement of

 11   their dispute.  So each party has stipulated or agreed to that.

 12   And that is to go to the arbitrator so the arbitrator can have

 13   it and sign.

 14   Q    And then your e-mail to the defendant says:

02:34PM 15        "Michael, thanks.  Here are fully executed

 16        copies of the settlement and the stipulated

 17        dismissal.  I will get the stipulated dismissal on

 18        file today."

 19        And then you say:  "When you have the wire transfer

02:34PM 20   details, please e-mail them."

 21        Why do you say, "When you have the wire transfer

 22   details, please e-mail them"?

 23   A    Well, at this point I did not have the information I

 24   needed from Mr. Avenatti to have Brock use to make the initial

02:34PM 25   $1.6 million payment.  I needed that information from
```

```
            1   Mr. Avenatti in order for the payment to be made.
            2   Q     And then if you look at pages 2 through 10 of the
            3   exhibit, is this the final fully executed settlement agreement
            4   between Brock and Barela?
02:35PM     5   A     Yes.
            6   Q     And now if you were to look at page 10, it has
            7   Mr. Barela's signature.  The signature page that you received
            8   from the defendant has been inserted to this agreement; is that
            9   correct?
02:35PM    10   A     That's correct.
           11   Q     And now if you look on page 9, Mr. Runkles' signature is
           12   now there as well?
           13   A     Correct.
           14   Q     And then turning you to page 4 of the exhibits.  In the
02:35PM    15   final fully executed settlement agreement, are the payments to
           16   Barela the same as what we've been looking at in the previous
           17   versions?
           18   A     Yes.  The -- this document has the January 10th dates in
           19   it.
02:36PM    20   Q     In the various versions that we've seen, they all said,
           21   "January 10th, 2018; January 10th, 2019; January 10th, 2020;
           22   and January 10th, 2021."  Was March 10th ever part of the
           23   settlement agreement between Brock and Barela?
           24   A     No.
02:36PM    25   Q     There is a section -- I'm not going to go through the
```

```
 1  whole part, but there's a section on page 5 about
 2  confidentiality.  Do you see that?
 3  A    I do.
 4  Q    Was this a term of the deal between the parties, to keep
 5  this agreement confidential?
 6  A    Yes.
 7  Q    This e-mail where you attach a fully executed final
 8  settlement agreement, was there anything that would have
 9  prevented the defendant from forwarding this to his client?
10           MR. AVENATTI:  Objection, Your Honor.  Speculation.
11  Argumentative.
12           THE COURT:  Overruled.
13           THE WITNESS:  Your question is, was there anything
14  that would have prevented Mr. Avenatti from forwarding
15  Exhibit 187 to Mr. Barela?
16  Q    BY MR. SAGEL:  Correct.
17  A    No.
18  Q    Did you provide a copy of the fully executed settlement
19  agreement to your client?
20  A    Absolutely.
21  Q    And Exhibit -- well, I'll just ask you generally, and if
22  we need to look at it...
23           You mentioned the stipulated dismissal, that you
24  were getting signatures and you were going to file.
25  A    Yes.
```

UNITED STATES DISTRICT COURT

```
 1   Q    What's the purpose of filing and getting the judge to
 2   sign a stipulated dismissal?
 3   A    That puts an end to the case.  That -- you know, the
 4   arbitrator is overseeing the case.  And until there is a
 5   document memorializing that the parties have, in fact, resolved
 6   their differences in a way that there's nothing left to be
 7   decided, there's still at least ambiguity about whether there's
 8   a dispute.  Once that document is signed by the arbitrator or
 9   the judge and filed, that puts an end to the matter.
10   Q    And if I could have you look at Exhibit 191.  Is 191, at
11   the top, an e-mail that you received from the defendant?
12   A    Yes.
13   Q    And this is part of a longer e-mail chain, some e-mails
14   from you and some e-mails from the defendant.  But is it a fair
15   and accurate copy, other than any redactions throughout, of the
16   e-mails sent between you and the defendant?
17   A    Yes, but page 2 of 4 does include an e-mail from W.F.D. to
18   Michael Avenatti, with a copy of it to me, but that is part of
19   an e-mail that I did send to Mr. Avenatti.
20              MR. SAGEL:  With that clarification, Your Honor, the
21   Government moves to admit Exhibit 191, the e-mails from
22   defendant, for the truth of the matter and the remaining
23   e-mails for notice to the defendant.
24              MR. AVENATTI:  Objection, Your Honor.  408.
25   Hearsay.
```

1          THE COURT:  191 will be received for the stated

2  purposes.

3          **(Exhibit Number 191 received.)**

4  Q    BY MR. SAGEL:  What's the date of defendant's e-mail to

02:40PM 5  you at the top of page 1?

6  A    Tuesday, January 2nd, 2018.

7  Q    And what's the subject of this e-mail?

8  A    "Brock" -- I'm sorry -- "Barela-Brock settlement."

9  Q    And then if you were to look at the e-mail he sent you,

02:41PM 10 can you read just the first part before you get to the banking

11 information.

12 A    Yes.

13          "David, below please find the wire

14          instructions.  Please conform receipt and that we

02:41PM 15         are on track.  Thanks, Michael."

16 Q    And why was he sending you these wire -- what was your

17 understanding of why he's sending you these wire instructions?

18 A    That was something that was not in the agreement that I

19 had asked for, and then ultimately the agreement included a

02:41PM 20 provision saying that he would eventually, I think, by

21 January 3rd was the date, provide that information to me so I

22 could coordinate with Brock in having the settlement monies

23 paid.

24 Q    And then the part of his e-mail that says -- I think it's

02:42PM 25 supposed to say confirm -- "Please confirm receipt and that we

        1    are on track," what did you understand "we are on track" to

        2    mean?

        3    A    That Brock would pay the initial -- make the initial

        4    payment, which was due on January 10th, 2018, of $1.6 million.

02:42PM  5    Q    What involvement, if any, did you have with Brock paying

        6    the $1.6 million to be wired into defendant's trust account?

        7    A    Without going into any privileged communications, I can

        8    tell you that I made sure --

        9    Q    Let me ask a different question, because my question was

02:43PM 10    poorly worded, which may have called for that.  So let me ask

       11    it in a different way.

       12         Did you confirm that Brock paid the $1.6 million

       13    wire transfer into the defendant's trust account?

       14    A    Yes, I did.

02:43PM 15    Q    And was that wire made on January 5th, 2018?

       16    A    Yes.

       17    Q    After the $1.6 million was wired into defendant's

       18    attorney-client trust account on January 5th, 2018, did you

       19    have any further dealings with Michael Avenatti?

02:43PM 20    A    I did not.

       21    Q    Between -- once the payment was made, and I'm leaving off

       22    the three subsequent payments that were in the three separate

       23    years, but between January of 2018, when the first payment was

       24    made, through November or December of 2018, was there any

02:44PM 25    reason for you to have any discussions with the defendant?

```
 1              MR. AVENATTI:  Objection.  Calls for speculation,
 2       Your Honor.
 3              THE COURT:  Overruled.
 4              THE WITNESS:  No.
02:44PM  5   Q    BY MR. SAGEL:  And during that period of time, from
 6       January through November of 2018, did you have any
 7       communications with the defendant?
 8   A    No.
 9   Q    At any time from January through November of 2018, did
02:44PM 10   defendant reach out to you in any manner, e-mail, telephone
11       call, text message, anything, to inquire why Brock had not paid
12       the $1.6 million?
13   A    No.
14   Q    Would there have been any reason for defendant to reach
02:45PM 15   out to you between January and November of 2018, to inquire why
16       Brock had not paid the $1.6 million?
17   A    No, because Brock had fully paid plaintiff.
18   Q    Between January and October -- I'm going to move it back
19       one month -- January and October of 2018, did you know that
02:45PM 20   there were any issues with the Brock payment of the
21       $1.6 million?
22   A    You mean any issues with respect to Brock making the
23       payment?
24   Q    Correct.
02:45PM 25   A    No.  Brock had made the payment.
```

UNITED STATES DISTRICT COURT

```
          1   Q     In November of 2018, were you contacted by anybody to

          2   inquire whether or not Brock made that payment?

          3   A     What date was that?

          4   Q     November of 2018.

02:46PM   5   A     No.

          6   Q     Did you ever get contacted by a representative of Gregory

          7   Barela other than the defendant?

          8               MR. AVENATTI:  Objection.  Leading.

          9               THE COURT:  Overruled.

02:46PM  10               THE WITNESS:  Yes.

         11   Q     BY MR. SAGEL:  And what was the purpose of being

         12   contacted by Gregory Barela's new representative?

         13               MR. AVENATTI:  Objection.  Lacks foundation.  Seeks

         14   hearsay, Your Honor.

02:46PM  15               THE COURT:  Overruled.

         16               THE WITNESS:  My understanding of the purpose was

         17   that he was investigating into whether Brock had made a

         18   payment, as required by the settlement agreement, to

         19   Mr. Barela.

02:46PM  20   Q     BY MR. SAGEL:  And were you requested to provide any

         21   documents at that time to Mr. Barela's new counsel?

         22               MR. AVENATTI:  Objection.  Calls for hearsay,

         23   Your Honor.

         24               THE COURT:  Overruled.

02:47PM  25               THE WITNESS:  Yes.
```

```
 1   Q    BY MR. SAGEL:  What documentation were you requested to
 2   provide to Mr. Barela's new counsel?
 3              MR. AVENATTI:  Same objection, Your Honor.
 4              THE COURT:  Overruled.
02:47PM 5              THE WITNESS:  A copy of the fully executed
 6   Barela-Brock settlement agreement.
 7   Q    BY MR. SAGEL:  And did you provide it to them?
 8   A    After I was assured that he was, in fact, representing
 9   Mr. Barela and that he would abide by the confidentiality
02:47PM 10   provisions, yes, I did provide a copy of the fully executed
11   agreement.
12              MR. SAGEL:  No further questions, Your Honor.
13              THE COURT:  Mr. Avenatti.
14                      CROSS-EXAMINATION
02:47PM 15   BY MR. AVENATTI:
16   Q    Good afternoon.
17   A    Good afternoon.
18   Q    Please turn to 187.
19   A    Okay.  I'm there.
02:49PM 20   Q    I think you testified to the jury that 187 is the fully
21   executed final settlement agreement between your client, Brock,
22   and Mr. Barela.  Do I have that correct?
23   A    I believe I testified it's a fully executed copy of the
24   settlement agreement and the stipulated dismissal.
02:49PM 25   Q    Sir, Exhibit 187, to the best of your knowledge, is the
```

```
        1   fully executed settlement agreement that settled the matter

        2   between your client, Brock, and Mr. Barela; isn't that true?

        3   A    Exhibit 187 includes what I believe to be the fully

        4   executed Brock-Barela settlement agreement.

02:49PM  5   Q    So what I said is accurate, to the best of your

        6   knowledge; correct?

        7   A    Well, your question was, is that exhibit the fully

        8   executed -- it includes it.  It's got other things.  Subject to

        9   that, you're correct.

02:50PM 10   Q    Okay.  And you -- strike that.

       11        Your client has continued to adhere to this document

       12   as the fully executed settlement agreement -- right? -- since

       13   the date that it was signed?

       14   A    I believe so, yes.

02:50PM 15   Q    Okay.  I mean, to the best of your knowledge; right?

       16   A    Yes.

       17   Q    And pursuant to this document, 187, your client made

       18   $100,000 payment to Mr. Barela on January 10th, 2019; right?

       19   A    I believe that's correct.

02:51PM 20   Q    Okay.  And did Mr. Barela accept that payment of $100,000

       21   pursuant to this agreement?

       22   A    I believe he did; although, I recall in my discussions --

       23        MR. AVENATTI:  Move to strike after "I believe he

       24   did" as nonresponsive, Your Honor.

02:51PM 25        THE COURT:  Be stricken.
```

UNITED STATES DISTRICT COURT

Q    BY MR. AVENATTI:  Sir, your client Brock then made

another $100,000 payment on January 10th, 2020, to Mr. Barela

pursuant to this agreement, 187; correct?

A    I believe it was pursuant to this agreement --

02:51PM  Q    Thank you.

A    -- as amended.

Q    And your client then paid another $100,000 on

January 10th, 2021, to Mr. Barela; correct?

A    Under amendment, yes.

02:52PM  Q    Sir, just answer my questions.  Okay?  This will go a lot

easier if you just answer my questions.  Fair?

A    Sure.

Q    If at any point in time you don't understand a question

that I ask you, just ask me to explain it.  Okay?

02:52PM  A    I will.

Q    All right.  So since January 1st, of 2019, your client

has paid $300,000 to Mr. Barela in three $100,000 payments,

each dated January 10th of the respective year; is that true?

A    Yes.

02:52PM  Q    Now, sir, you don't know, as you sit there today, whether

187 was the document that Mr. Barela originally signed or not,

do you?  Meaning, you don't have any firsthand knowledge of

that, do you?

A    Firsthand knowledge, no, I do not.

02:53PM  Q    Okay.  Because you weren't there when Mr. Barela signed

```
  1    whatever he signed; correct?
  2    A     That's correct.
  3    Q     Are you aware that Mr. Barela swore under oath in a
  4    declaration that, in fact, he had signed this agreement?
02:54PM 5            MR. SAGEL:  Objection, Your Honor.  Calls for
  6    speculation and improper impeachment.
  7              THE COURT:  Overruled.
  8              THE WITNESS:  I'm not aware of anything like that.
  9    Q     BY MR. AVENATTI:  The Government never told you that; is
02:54PM 10   that right?
 11    A     Correct.
 12    Q     Mr. Barela never told you that; right?
 13    A     That's correct.
 14    Q     And Mr. Barela's new lawyers, they never told you that
02:54PM 15   either, did they?
 16    A     Not that I recall.
 17    Q     Did Mr. Barela or his lawyers ever inform you, "Hey, you
 18    know, I didn't sign that agreement where Brock sent
 19    $1.6 million to Avenatti's trust account.  So I'm not
02:55PM 20   interested in enforcing the rest of the agreement, in getting
 21    the $300,000"?  Did they ever informed you of that exactly,
 22    sir, yes or no?
 23    A     I'm not sure I follow your question.  It's kind of
 24    convoluted.  Can you repeat it?
02:55PM 25   Q     Yeah.  I have a tendency to do that sometimes.  I'm
```

```
 1   sorry.  Let me try to clean it up.

 2           At any point in time, did Mr. Barela or his lawyers

 3   contact you and say, "You know, I never signed that agreement

 4   that settled our case, so I want to proceed with the case or I

 5   don't want the remaining $300,000."  Did they ever contact you

 6   and say those words?  Yes or no?

 7   A    No.

 8   Q    And, sir, you don't know whether Mr. Barela ever received

 9   a copy of 187, do you?

10   A    I do not know that.

11   Q    Now, let's take a look at 187, the signature -- or the

12   header there, if we could, please.

13   A    Okay.

14   Q    Now, this is an e-mail from you attaching the fully

15   executed settlement agreement; is that right?

16   A    Yes.

17   Q    This e-mail doesn't have any clients on it, does it?

18   A    No.  This is between you and me.

19   Q    Well, it's not just between me and you.  You sent it to

20   me, and you copied Mr. Culig and Ms. Gonzalez, two other

21   attorneys from your firm; correct?

22   A    No, that's not correct.  Mr. Culig was an attorney

23   associate involved in the case and Ms. Gonzalez is my

24   assistant.

25   Q    Okay.  Two other employees at your firm; right?
```

02:56PM (line 5)
02:56PM (line 10)
02:57PM (line 15)
02:57PM (line 20)
02:57PM (line 25)

```
          1    A    Yes.

          2    Q    Okay.  There's no clients listed on this e-mail.  Brock

          3    is not listed, Mr. Runkles is not listed, Mr. Barela is not

          4    listed; isn't that true?

02:58PM    5    A    Yes.

          6    Q    As you sit here today, do you believe that you did

          7    anything unethical or illegal by not copying your client on

          8    this e-mail?  Yes or no?

          9    A    On this particular e-mail?

02:58PM   10    Q    Correct.

         11    A    No.

         12    Q    Now, moments ago you were asked a question by

         13    Mr. Sagel -- and, by the way, you've met with Mr. Sagel before;

         14    right?

02:58PM   15    A    Yes.

         16    Q    You've never met with me regarding this matter; is that

         17    true?

         18    A    I was never asked to.  No.

         19    Q    You've never met with me before relating to this

02:59PM   20    matter -- isn't that true, sir? -- the case we're here today

         21    on?

         22    A    I never have, no.

         23    Q    Okay.  So you were asked moments ago by -- about 186,

         24    Exhibit 186.

02:59PM   25    A    Okay.  I'm there.
```

63

```
            1   Q    By the way, during the case that we had against one
            2   another, is it fair to say that you and I didn't always see eye
            3   to eye?  Is that fair?
            4             MR. SAGEL:  Objection.  Relevance.
02:59PM     5             THE COURT:  Overruled.
            6   Q    BY MR. AVENATTI:  I see you smiling.  Is that fair?
            7   A    That's fair.
            8   Q    You and I would go round and round on various issues and
            9   it would be fairly contentious; is that right?
02:59PM    10   A    Sure.  I think that's fair to say.
           11   Q    You would agree with that; right?
           12   A    Sure.
           13   Q    Okay.  Now, let's go back to 186.  You were asked about
           14   the signature pages that had been sent to you from me --
03:00PM    15   A    Yes.
           16   Q    -- do you recall that?
           17   A    Yes.
           18   Q    And Mr. Sagel asked you a question along the lines of "Do
           19   you know why Mr. Avenatti would only have sent you the
03:00PM    20   signature pages?"  Do you recall that question generally?
           21   A    Generally, yeah.
           22   Q    And you said, "I don't know why."  Do you remember that?
           23   A    Yeah.
           24   Q    Okay.  Let's take a look at Exhibit 183.
03:00PM    25             By the way, before we move from that, this is dated
```

```
       1   December 28th, 2017, the signature page --

       2           Ms. Hernandez, maybe we can have the first page of

       3   186.

       4           Do you see December 28th, 2017?  Do you see that?

03:01PM 5   A    Yes.

       6   Q    All right.  Now, let's see if we can figure out why I

       7   might have only sent you the signature pages.  Let's go to 183.

       8   A    Okay.  I'm there.

       9   Q    By the way, 186 -- it was in the evening that these

03:01PM 10  signature pages were sent.  Do you see that?  You can just flip

      11   back in your booklet to -- your notebook to 186.  Do you see

      12   that?

      13   A    So the -- you have a date and 17:29:12.  I'm assuming

      14   that's the time.

03:01PM 15  Q    Military time.  5:29 p.m.; right?

      16   A    Yes.

      17   Q    Okay.  Now let's go to 183.

      18   A    Okay.

      19           MR. AVENATTI:  And if we can blow up the top,

03:02PM 20  please.  I'm sorry, including the paragraph underneath.

      21   Q    You sent me 183 before I sent you 186; is that right?

      22   A    So 183 has a time of 5:21:15.  And 186 has 17:29:12.  So

      23   assuming that's the time it's sent, I think that's correct.

      24   Q    Yeah.  About 12 hours before I sent you the signature

03:02PM 25  pages you sent me this e-mail; right?
```

```
         1    A     That's what it appears.

         2    Q     Well, you don't have any reason to doubt the times now,

         3    do you?

         4    A     Well, assuming the times are when the e-mails are sent.

03:03PM  5    Q     Well, sir, you see the time format is the same?  They're

         6    both e-mails from you.  Do you see that?

         7    A     Wait.  Which ones are you asking me to look at?

         8    Q     183 and 186.  Those are the only two things we're talking

         9    about.  We're just comparing times.

03:03PM 10    A     Yeah.  So the time on the 186 is military time, 17:29:12.

        11    The one on 183 is 5:21:15, not military time.

        12    Q     Well, it is military time.  If you look at it, it's

        13    05:21:15.  Do you see that?

        14    A     Oh, I do see it says that.

03:03PM 15    Q     You see it now; right?

        16    A     I do.

        17    Q     Okay.  So about 12 hours before I sent you the signature

        18    pages you sent me this e-mail, according to the time; right?

        19    A     Yes.

03:03PM 20    Q     Okay.  And could you please read the second sentence to

        21    the jury.

        22    A     Under "Michael"?  Under the body?

        23    Q     Yeah.  What you wrote.

        24    A     The second sentence:

03:04PM 25               "Please let me know when you have executed
```

1          versions from your side and we can exchange

2          signature pages by e-mail."

3     Q    Sir, does that refresh your recollection as to why

4     Michael would have sent you the signature pages, namely,

03:04PM 5   because that's exactly what you asked for 12 hours earlier?

6     A    Yes, it does.

7               MR. AVENATTI:  Now is a good time for a break, if

8     that's acceptable with Your Honor.

9               THE COURT:  We'll take the afternoon break here,

03:04PM 10  ladies and gentlemen.  We'll be in recess for 15 minutes.

11              Please remember the admonition not to discuss the

12    case with anyone, not to form any opinions on the issues of the

13    case until it's submitted to you, and no research, please.

14              15 minutes.  Thank you.

03:04PM 15          THE COURTROOM DEPUTY:  All rise.

16              THE COURT:  We'll be in recess.

17              **(Recess from 3:05 p.m. to 3:23 p.m.)**

18              THE COURT:  Mr. Avenatti.

19    Q    BY MR. AVENATTI:  Sir, on direct examination by

03:23PM 20  Mr. Sagel, you were asked if the parties had a mediation, and

21    you gave an answer relating to the fact that there was a

22    requirement for mediation.  Do you recall that?

23    A    Yes, I do.

24    Q    Brock and Mr. Barela did not have one mediation, they had

03:23PM 25  two mediations; isn't that true?

UNITED STATES DISTRICT COURT

67

```
        1   A     I don't recall that.  I don't recall.  I don't know one
        2   way or another.  I know they had the one that I remember, but
        3   there could have been another one.  I just don't recall.
        4   Q     Well, do you have a recollection -- well, strike that.
03:24PM  5         On direct examination you gave an answer or part of
        6   an answer relating to that there was a requirement of mediation
        7   before the parties could pursue claims or something of that
        8   nature.  Do you recall that?
        9   A     I recall testifying that it's my understanding that there
03:24PM 10   was a mediation built into the agreement between the parties.
       11   If they were going to arbitrate, there would be a mediation.
       12   Q     And when you talk about the agreement between the
       13   parties, we're not talking about the settlement agreement,
       14   we're talking about an agreement before the settlement
03:24PM 15   agreement?
       16   A     Correct.
       17   Q     And did you represent Brock in connection with that
       18   clause, that other mediation?
       19   A     I don't understand your question.
03:24PM 20   Q     Here's my question:  There's testimony in this case that
       21   there was more than one mediation.  Do you dispute that?
       22         MR. SAGEL:  Assumes facts not in evidence,
       23   Your Honor.
       24         THE COURT:  Overruled.
03:25PM 25         THE WITNESS:  I recall -- as I sit here today, I
```

```
       1    recall the mediation took place in Colorado.  That's the one I
       2    recall.  If there was another one, I may not recall, but that's
       3    all I recall at this point.
       4    Q    BY MR. AVENATTI:  The mediation that you recall was
03:25PM  5    before retired Federal Magistrate Judge Downes?
       6    A    Correct.
       7    Q    And do you recall that the matter was being arbitrated in
       8    Denver, Colorado?
       9    A    Yes.  I think -- actually, I think it might have been
03:25PM 10    Boulder where the thing was, but yeah.
      11    Q    Before a Judge Boland of JAG, J-A-G; right?
      12    A    Yes, he was the arbitrator.
      13    Q    And do you recall a name by the name of Frank Azar?
      14    A    No.  I want to say that name strikes some familiarity with
03:26PM 15    me, but I don't know -- I can't say more than that.
      16    Q    You don't recall that Mr. Barela had another lawyer
      17    involved in Denver, Colorado, by the name of Frank Azar?
      18    A    Okay.  With that explanation, I do recall that there was a
      19    lawyer retained for Mr. -- that Mr. Barela had that was where
03:26PM 20    the -- that was where the arbitration was.  I do recall that,
      21    yeah.
      22    Q    Well, it wasn't where the arbitration was, it was where
      23    Mr. Barela's deposition occurred.  Do you remember his office,
      24    Mr. Azar's office in Denver?  You were there.  I was there.
03:26PM 25    Mr. Barela was there.  Mr. Culig was there.
```

1  A    I do recall -- I don't recall the location.  I'm sorry.

2  But I do recall there were depositions.

3  Q    Well, what's important for our purposes, is you do recall

4  that there was an attorney by the name of Frank Azar who was

03:27PM 5  representing Mr. Barela, together with me and others; right?

6  A    I believe that there was a lawyer -- I recall another

7  lawyer involved and it -- I don't know if it was Azar or not,

8  but I do recall that now that you mention it.

9  Q    And you have no idea how much money Mr. Azar was paid or

03:27PM 10  not paid in connection with Mr. Barela's matter, do you?

11  A    I have no idea.

12  Q    And you have no idea what cost he may or may not have

13  incurred in connection with Mr. Barela's matter, do you?

14  A    I don't.

03:27PM 15  Q    Now, you mentioned the name Joe Culig.  He was an

16  associate at the time with your firm?

17  A    Yes.

18  Q    And he was handling much of the day-to-day on the case.

19  Is that fair to say?

03:28PM 20  A    Yeah.  I'd say he handled -- yes.  I think that's fair.

21  Q    You were not handling the day-to-day; although, you were

22  keeping tabs on what was going on; right?

23  A    I did handle the day-to-day stuff, but he was definitely

24  in charge of doing more of that.

03:28PM 25  Q    And do you have a recollection that a gentleman by the

**UNITED STATES DISTRICT COURT**

```
 1    name of John Arden from my office was handling a lot of the

 2    day-to-day as Joe Culig was for your office?

 3    A     I recall there was an attorney named John Arden.  I

 4    believe he was with your office.  I don't know how much he was

03:28PM  5    doing or what he was doing.

 6    Q     Do you recall that he was at the mediation?

 7    A     No.  I don't -- actually, I don't recall specifically if

 8    he was there or not.

 9    Q     Is it fair to say that at the mediation we didn't have a

03:29PM 10    lot of joint sessions; is that right?

11    A     I think that's fair.  Yeah.

12    Q     Now, when we left the mediation, there was no agreement;

13    correct?

14    A     I think that's correct.

03:29PM 15    Q     And a number of days later you e-mailed me draft

16    settlement terms at the direction of the retired Federal

17    Magistrate Judge Downes; correct?

18    A     I recall that happening.  I believe there might be one of

19    these exhibits that is that --

03:29PM 20    Q     Go to 175.

21    A     Okay.

22    Q     See if that refreshes your recollection, the first e-mail

23    in the string, which is on the last page.

24    A     Yes.

03:30PM 25          MR. AVENATTI:  And, Ms. Hernandez, if we can have
```

**UNITED STATES DISTRICT COURT**

```
 1   that, for the benefit of the jury, please, that page 5 of 6.
 2   If we can blow up everything beginning with, at the top, on
 3   December 19th, 2017, at 1:35 p.m.  Perfect.
 4   Q    Can you see that, sir?
 5   A    I see on the screen what's been blown up.  I'm looking for
 6   it in the exhibits.  I don't have the exhibit tab.
 7   Q    It's Exhibit 175, page 5 of 6.
 8   A    Okay.  I'm there, yeah.
 9   Q    And you write, "Michael" -- well, first of all, you
10   write, "Confidential, subject to FRE 408"; right?
11   A    Yes.
12   Q    And just so the jury knows, FRE 408 is a rule of evidence
13   relating to confidentiality concerning settlement negotiations
14   generally; right?
15             MR. SAGEL:  Objection.  403, Your Honor.
16             THE COURT:  Overruled.
17             THE WITNESS:  Are you asking me that?
18   Q    BY MR. AVENATTI:  Yeah.  That's what that is; right?
19   A    Yes.  Federal Rule of Evidence 408.
20   Q    Right.  Then you write:
21             "Michael, Judge Downes informed me that you
22        wanted me to e-mail the settlement terms.  The
23        settlement terms are as follows."
24             And then you listed the settlement terms; right?
25   A    Yes.
```

03:30PM (line 5)
03:31PM (line 10)
03:31PM (line 15)
03:31PM (line 20)
03:31PM (line 25)

**UNITED STATES DISTRICT COURT**

```
 1    Q     And do you have a recollection that at the end of the
 2    mediation the parties had not reached agreement.  You left with
 3    your client and I left with Mr. Barela.  And subsequent to
 4    that, both sides communicated with Judge Downes in an effort to
03:32PM  5    bridge the gap.  Do you recall that?
 6    A     Generally, I do.  I don't know what conversations he had
 7    with you, but generally I do believe that's what happened.
 8    Q     At that time you understood that he was conversing with
 9    me confidentially; correct?
03:32PM 10    A     Yes.
11    Q     And you believed that I understood that he was conversing
12    with you confidentially about your side; right?
13              MR. SAGEL:  Objection.  Calls for speculation.
14              THE COURT:  Sustained.
03:32PM 15    Q     BY MR. AVENATTI:  Your understanding at this time period,
16    your understanding, was that Judge Downes was having
17    communications with both sides without the other side present?
18    A     Yes.
19    Q     And there's nothing unusual about that in your experience
03:32PM 20    going to mediations; true?
21    A     Correct.
22    Q     Very often mediations don't settle on the day of the
23    mediation and there is a prolonged process; right?
24    A     Yeah.  A fair amount of time, yes.
03:33PM 25    Q     Okay.  So in response to one of your communications with
```

```
          1   retired Federal Magistrate Judge Downes, during that
          2   communication he suggested that you send to me some proposed
          3   settlement terms; correct?
          4   A    Well, what I recall is -- the best I can recall is what I
03:33PM   5   say here, that Judge Downes informed me that you, Michael,
          6   wanted me to e-mail the settlement terms.  That's what I -- the
          7   best I can remember.
          8   Q    But you have a recollection that at that point no
          9   settlement terms had been agreed to when you sent this e-mail;
03:33PM  10   correct?
         11   A    I can't recall.  At the time I sent this e-mail, I can't
         12   recall if I had an understanding that you had -- that these
         13   were the agreed terms and I was supposed to memorialize them or
         14   if there were any open issues.  I -- all I can recall is what I
03:34PM  15   said here.
         16   Q    All right.  Well, let's see how I responded.
         17        By the way, you sent this at 1:35 p.m., at the top.
         18   Do you see that?
         19   A    Yes.
03:34PM  20   Q    On December 19?
         21   A    Yes.
         22   Q    All right.  Can we go to page 4 of 6.
         23   A    Yes.
         24        MR. AVENATTI:  Can we blow that up.  Great.
03:34PM  25   Q    And I responded:  "Dave" -- and this is five minutes
```

```
         1   after you sent me that e-mail --
         2           "Thank you for the e-mail but I think there
         3       may be some confusion.  We merely wanted the most
         4       recent offer in writing so we could consider it and
03:34PM  5       not misunderstand the scope of the proposed terms.
         6       We never accepted this nor did we convey that we
         7       would not counter it.  We will converse with the
         8       client and be back with you.  Thank you, Michael."
         9           That's what I wrote; correct?
03:35PM 10   A    Yes.
        11   Q    And when you got that, you understood that what I was
        12   informing you was that I wanted to see the terms in writing in
        13   an e-mail so that we could converse with Mr. Barela about them
        14   and then get back to you.  That was your understanding when you
03:35PM 15   got that e-mail from me; correct?
        16   A    That's what you say here, yes.
        17   Q    Okay.  And then if we go to the bottom of page 3 of 6.
        18   So that's at 1:40 p.m.  A little less than three hours later
        19   you received this e-mail, right, which says:
03:36PM 20           "Dave, please see my comments/revisions below
        21       in brackets.  Please let me know your response.
        22       Thanks.  Michael."
        23   A    Yes.
        24   Q    Okay.  So does that refresh your recollection, that after
03:36PM 25   you sent me the proposed terms on page 5 of 6 -- let's go back
```

UNITED STATES DISTRICT COURT

```
 1    to 5 of 6 -- and after I sent that interim e-mail I sent you
 2    another e-mail that said:  "Here is our response to the
 3    proposed terms," in brackets.
 4    A     I mean, that's what's here.  I didn't have any
 5    recollection that needed to be refreshed.  That's what it says,
 6    yeah.
 7    Q     You don't dispute that?
 8    A     That's what it says.
 9    Q     Okay.  And the first term was a term relating to the
10    payment of $1.9 million and a payment schedule that Mr. Sagel
11    asked you about, and I put "agreed" in brackets; right?
12    A     Yes.
13    Q     Now, you have no idea what happened during that
14    three-hour time period relating to my communications with
15    Mr. Barela, do you?
16    A     What happened with you or me?
17    Q     No.  No, what happened with me and Mr. Barela.  You have
18    no idea what, if any, communications occurred?
19    A     No, I don't know what was going on.  No.
20    Q     Okay.  And then we provided additional bracketed language
21    in connection with your proposed terms; correct?
22    A     Well, you put in brackets comments about the numbered
23    paragraphs.
24    Q     Right.  Each numbered paragraph has brackets relating to
25    what you understood at the time to be our position on the other
```

03:36PM (line 5)
03:37PM (line 10)
03:37PM (line 15)
03:37PM (line 20)
03:38PM (line 25)

```
 1   side of the transaction; correct?
 2   A    Yes.
 3   Q    And do you see at the bottom you wrote --
 4        And this is actually, Ms. Hernandez, below
 5   paragraph 9.
 6        Now, what you wrote was, in your e-mail:
 7        "Please confirm acceptance of the above
 8        settlement terms by replying to this e-mail, and we
 9        can prepare a formal document that incorporates
10        them."
11        That's what you wrote; correct?
12   A    Yes.
13   Q    And I wrote, "Deal subject to formal documents being
14   signed."
15        Those were my words; right?
16   A    Yes.
17   Q    And when you got this back, you understood that my
18   position was there was no deal until an agreement was actually
19   signed; right?
20   A    Until formal documents were signed, yes.
21   Q    And by "formal documents," you understood that to mean a
22   formal settlement agreement; right?
23   A    Yes.
24   Q    Like the one at 187 that we were just talking about.
25   A    Let me make sure 187 is what I'm thinking it is.  Yes.
```

```
 1    Q    All right.  And then going back to 175, page 3 of 6, the
 2    top two-thirds.
 3    A    Okay.
 4              MR. AVENATTI:  Please drop down a little more,
 5    Ms. Hernandez, all the way down to "best regards, Dave."
 6    Q    Now, in response to my brackets on the prior draft, you
 7    responded with you and your client's position in an e-mail back
 8    to me; right?
 9    A    Yes.
10    Q    And this dance that we were doing at the time, this
11    wasn't unusual in your experience, was it?
12    A    No.  Not at all.
13    Q    This is what lawyers do trying to negotiate a deal
14    generally; right?
15    A    Sure.  Yeah.
16    Q    Okay.  And you gave your position relating to various
17    points in this e-mail; right?
18    A    Yeah.  I think my -- mine is intended to correspond with
19    your points.  Yes.
20    Q    We still don't have a deal at this point, do we, when you
21    sent this e-mail?
22    A    "A deal," meaning?
23    Q    Meaning signed, sealed, and delivered.
24    A    No, we did not.  We did not.
25    Q    All right.  All right.
```

**UNITED STATES DISTRICT COURT**

78

|  |  |
|--|--|
| 1 | And then you say, at the bottom: |
| 2 | "Please get back to me regarding the above. |
| 3 | I'd like to have a confirmation of agreement on |
| 4 | material terms and start working on a draft |
| 03:41PM 5 | agreement." |
| 6 | Do you see that? |
| 7 | A   Yes. |
| 8 | Q   And by "draft agreement," you're talking about a final |
| 9 | written, signed settlement agreement? |
| 03:41PM 10 | A   Yes. |
| 11 | Q   All right.  And then later that night, if we go to page 2 |
| 12 | of 6, I responded by saying: |
| 13 | "Dave, please see below.  Please do not |
| 14 | respond until you speak with Judge Downes.  Thanks, |
| 03:42PM 15 | Michael." |
| 16 | Do you see that? |
| 17 | A   Yep. |
| 18 | Q   And if we go back to page 3 of 6, we'll see statements in |
| 19 | brackets again.  Do you see that? |
| 03:42PM 20 | A   I do. |
| 21 | Q   And those, again, were my statements in response to your |
| 22 | most recent proposed settlement terms; right? |
| 23 | A   Yes. |
| 24 | Q   And in my e-mail, I said to you, "Do not respond until |
| 03:42PM 25 | you speak with Judge Downes." |

**UNITED STATES DISTRICT COURT**

1          Do you recall seeing that in the e-mail?

2   A    I do.

3   Q    And when you got that, you understood what I was

4   signaling to you was don't jump to conclusions or react to what

03:43PM 5   I am putting in the brackets.  Talk to the mediator first.

6   That was generally what you understood me to be telling you;

7   correct?

8   A    I don't recall what I did or did not understand at the

9   time.  I -- it says:  "Please do not respond until you speak

03:43PM 10  with Judge Downes," and that's what I understood your request

11  to be.

12  Q    Did you speak with Judge Downes after you got my markup

13  of your proposed terms?

14  A    I believe I did.  I can't think -- I don't recall

03:43PM 15  specifically, but I know I spoke with him.  And I can't think

16  of a reason why I wouldn't have, given your e-mail.  So I

17  believe I did.

18  Q    All right.  Let's go to page 1 of 6.  This is an e-mail

19  that you sent in response to my e-mail.

03:43PM 20  A    Okay.

21          MR. AVENATTI:  And, actually, if we can include,

22  Ms. Hernandez, the date, please.

23          No, I'm sorry.  It starts on December 20th, 2017.

24  Yep.

03:44PM 25  Q    This is the e-mail that you sent back after that e-mail

```
 1   that I had sent to you; right?
 2   A    That's correct.
 3   Q    And you write, "Confidential, subject to FRE 408."  You
 4   included that again; right?
 5   A    Yes.
 6   Q    And you included that because you expected these
 7   communications to be confidential; right?
 8              MR. SAGEL:  Objection.  403, Your Honor.
 9              THE COURT:  Sustained.
10   Q    BY MR. AVENATTI:  And you write:
11              "Judge Downes asked me to send you this
12         e-mail.  Please confirm by return e-mail that the
13         terms are acceptable and we can begin work on the
14         formal agreement.  As stated in paragraph 7 below,
15         I am prepared to do that."
16              Did I read that correctly?
17   A    Yes.
18   Q    And were these the terms that you understood constituted
19   the agreement between Mr. Barela and Brock?
20   A    Yes.  At this time I think I understood that the parties
21   had resolved whatever remaining issues existed and these terms
22   represented the material terms of a settlement.
23   Q    So, sir, isn't it true that when you sent this document,
24   you understood that if I responded "agreed," we had a binding
25   settlement agreement regardless of whether the clients signed
```

```
          1    it or not?

          2    A    My understanding was we had --

          3    Q    Just answer my question.  Yes or no?

          4    A    No.

03:46PM    5    Q    Okay.  Let's take a look at page 2 of 6, paragraph 7

          6    through 9, on 2 of 6.

          7              Now, first of all, these are your words that you

          8    sent to me at the direction of Judge Downes on December 20th,

          9    2017, at approximately 12:39 p.m.; is that true?

03:47PM   10    A    Yes.

         11    Q    Okay.  Paragraph 7, "Assuming the parties agree on the

         12    terms herein" -- I'm going to stop right there.  When you wrote

         13    "herein," you were talking about within this e-mail; correct?

         14    A    Yes.

03:47PM   15    Q    "Assuming the parties agree on the terms herein by the

         16    close of business on December 20th, 2017" --

         17              So that's the same day; correct?

         18    A    Yes.

         19    Q    -- "Brock's counsel" --

03:47PM   20              That was you; correct?

         21    A    Yes.

         22    Q    -- "will provide a first draft of a formal settlement

         23    agreement by the close of business on December 22, 2017" --

         24              Two days later; correct?

03:48PM   25    A    Yes.
```

UNITED STATES DISTRICT COURT

82

```
        1    Q    -- "and the parties will execute all the settlement
        2    documents by the close of business on December 29th, 2017."
        3            Did I read that correctly?
        4    A    Yes.
03:48PM  5    Q    Then you wrote as the next term, paragraph 8:
        6            "If a formal settlement agreement is not
        7         fully executed by the close of business on
        8         December 29, 2017, this document shall constitute
        9         the full final settlement agreement."
03:48PM 10            Did I read that correctly?
       11    A    Yes.
       12    Q    And by "this document," you were referring to this
       13    e-mail; correct?
       14    A    Yes.
03:48PM 15    Q    Then you wrote, paragraph 9:
       16            "The parties understand that this document
       17         constitutes a binding, enforceable agreement and
       18         may be submitted to a court or arbitrator to prove
       19         the existence of the agreement or for enforcement."
03:49PM 20            Did I read that correctly?
       21    A    Yes.
       22    Q    Your client's not copied on your e-mail to me; isn't that
       23    true?
       24    A    On this particular e-mail?
03:49PM 25    Q    Correct.
```

**UNITED STATES DISTRICT COURT**

```
 1   A    That's correct.
 2   Q    Was that illegal or unethical in your view?
 3   A    I'm not an expert on those matters.
 4   Q    Well, in your view.  I'm going to guess the answer is
 5   "No."  Am I correct?  The answer is "No"?
 6   A    I would agree with that.  I didn't -- not copying,
 7   including the client on this particular e-mail, I don't think
 8   is a problem.
 9   Q    And then I responded at the top, on the first page,
10   "Agreed.  Thanks, Dave."
11   A    Yes.  That's your e-mail.
12   Q    And I sent that to you and to retired Federal Magistrate
13   Judge Downes with a copy to Mr. Culig; right?
14   A    Correct.
15   Q    All right.  And when you got that, you understood that I,
16   on behalf of Mr. Barela, was agreeing to the terms in the
17   e-mail that you had sent; correct?
18   A    At that point, yes.
19   Q    So pursuant to the terms in your e-mail, a binding
20   settlement agreement had been reached as of that moment,
21   pursuant to the terms of your e-mail?
22   A    As stated -- as I stated in my e-mail?
23   Q    Yes.
24   A    Yes.
25   Q    All right.  So if something would have happened and
```

03:49PM (line 5)
03:50PM (line 10)
03:50PM (line 15)
03:51PM (line 20)
03:51PM (line 25)

**UNITED STATES DISTRICT COURT**

84

```
          1    nobody signed anything, it was your position, as you stated,

          2    that the settlement was done, it was binding, and the parties

          3    had to adhere to the agreement as set forth in this e-mail;

          4    correct?

03:51PM   5    A    Correct.

          6    Q    The settlement agreement was not contingent on any

          7    signature as of that moment, was it?  That was your

          8    understanding.

          9    A    Well...

03:52PM  10    Q    Just answer --

         11    A    Not necessarily --

         12              MR. AVENATTI:  Move to strike.  Move to strike.

         13    Q    Here's my question, sir:  Yes or no, your understanding,

         14    when you got my e-mail back, was the settlement agreement, as

03:52PM  15    you put in your e-mail, was binding on Brock and Mr. Barela

         16    without the need for signatures?  Yes or no?

         17    A    If the settlement agreement is not fully executed by the

         18    close of business on December 29th, 2017, as stated in

         19    paragraph 8, at that point, yes.

03:52PM  20    Q    So if signatures were not exchanged by that time, we

         21    still had a binding agreement; right?

         22    A    Correct.

         23    Q    By you agreeing to that term on behalf of Brock, your

         24    client, did you understand at the time that you were doing

03:53PM  25    anything illegal or wrong?
```

**UNITED STATES DISTRICT COURT**

```
 1   A    I don't understand the question, because Brock --
 2   that's --
 3             MR. AVENATTI:  Move to --
 4   A    -- what Brock instructed --
 5             MR. AVENATTI:  Move to strike as nonresponsive.
 6             THE COURT:  Everything after "I don't understand"
 7   will be stricken.
 8             THE WITNESS:  Could you rephrase your question?  I
 9   just didn't quite understand what you're asking me.
10             MR. AVENATTI:  Let me -- can I have it read back,
11   Your Honor?
12             THE COURT:  Yes.
13             MR. AVENATTI:  Thank you.
14             (The record was read as follows:
15             "By you agreeing to that term on behalf of
16        Brock, your client, did you understand at the time
17        that you were doing anything illegal or wrong.")
18   Q    BY MR. AVENATTI:  Yes or no?
19   A    No.
20   Q    Please turn to 178.
21   A    Okay.  I'm there.
22             MR. AVENATTI:  If we can take a look at the top of
23   this document with the date and the first two paragraphs of the
24   e-mail.  Perfect.
25   Q    Now, after that e-mail exchange, you sent me this e-mail
```

1  that Mr. Sagel asked you about at Exhibit 178; correct?

2  A    Yes.  That's correct.

3  Q    And do you recall that the actual arbitration hearing was

4  set for this case to occur about 30 days later, in late

03:55PM 5  January, around the time of the mediation?

6  A    I don't recall specifically that.  I knew that there were

7  deadlines and maybe even an actual arbitration in the near

8  future.

9  Q    Do you have a recollection that if the arbitrator was

03:55PM 10  informed that the case was settled within 30 days, the parties

11  could not get the arbitration fees back, which were thousands

12  of dollars?

13  A    I recall -- again, not specifically.  I recall there was a

14  rule of that type that made it important -- the timing of any

03:56PM 15  settlement to be important to that -- for that point -- to that

16  point.

17  Q    Well, let's see if my recollection was correct.  Let's

18  look at that -- the paragraph you wrote that begins with

19  "Relatedly."  Can you read that to the jury.

03:56PM 20  A    "Relatedly, we should consider contacting Magistrate

21       Judge Boland to make him aware of the settlement.

22       This may facilitate the parties' ability to get

23       their deposits back.  I believe that under JAG's

24       rules, applications to get the deposits back must be

03:56PM 25       made more than 30 days before the hearing date.

```
 1              Given the holidays, we may we might want to start
 2              the process.  Please give that some thought and get
 3              back to me."
 4   Q    Does that refresh your recollection that, in fact, you
03:57PM 5   were concerned that the arbitrator be informed promptly that
 6   the case had settled so that the parties could get their fees
 7   back from the arbitrator?
 8   A    Yeah, I hadn't remembered a 30-day trigger date, but here,
 9   looking at this, I refer to 30 days.
03:57PM 10   Q    And the first sentence says "consider contacting
11   Magistrate Judge Boland" --
12              That was the arbitrator, not Judge Downes,
13   obviously; right?
14   A    Correct.
03:57PM 15   Q    -- "to make him aware of the settlement."
16              Those are your words; correct?
17   A    Yes.
18   Q    Now, as of this date, December 22, no one had signed
19   anything?
03:57PM 20   A    That's correct.
21   Q    But we had that e-mail exchange we were just talking
22   about?
23   A    That's correct.
24   Q    All right.  And take a look at Exhibit 180, which I do
03:58PM 25   not believe is in evidence, so just take a look at it in your
```

**UNITED STATES DISTRICT COURT**

```
 1   notebook.
 2          And my question is, do you recall that on
 3   December 26th, the day after Christmas, the parties informed
 4   the arbitrator that, in fact, the case had settled?
 5   A    Yes.  You sent this e-mail to that effect and included me
 6   on that.
 7   Q    And you agreed with it; right?
 8   A    Yes.
 9   Q    Okay.  And that's December 26th; right?
10   A    Yes.
11   Q    No one has signed anything yet as of December 26 either;
12   isn't that true?
13   A    That's correct.
14   Q    But we had the e-mail exchange we were talking about
15   earlier?
16   A    Yes.
17   Q    And, sir, in your experience in settling matters
18   generally, sometimes there's a delay for wire instructions;
19   true?
20   A    Not typically, but sometimes.
21   Q    Sometimes there are; correct?  Because accounts have to
22   be set up and things of that nature?
23   A    Actually, I would -- I don't agree with that.
24   Q    Okay.  Well, let me ask you this question:  If you have
25   wire instructions two weeks before a wire is sent, can you send
```

03:58PM (line 5)
03:59PM (line 10)
03:59PM (line 15)
04:00PM (line 20)
04:00PM (line 25)

```
          1   the wire two weeks earlier?  If the agreement -- if the

          2   agreement provides for a specific date and your client wants to

          3   send the money on that date, if you have the wire instructions

          4   two weeks earlier, do you generally send the wire earlier?

04:00PM   5   A    I don't understand the question.  It's kind of all over

          6   the place again.

          7   Q    All right.  Well, let me ask a better question.

          8        There was a date on which the first payment had to

          9   be made; correct?

04:00PM  10   A    In the formal settlement agreement?  You're saying the

         11   final settlement agreement?

         12   Q    Well, in the e-mail.

         13   A    What e-mail are you referring to?

         14   Q    The e-mail settlement agreement, the one that was

04:00PM  15   binding, according to you.

         16   A    What exhibit is that?

         17   Q    Sure.  That is 175, I believe.  Yes, 175.

         18   A    Okay.  What's your question?

         19   Q    The question is, 175 had the first payment date of

04:01PM  20   January 10th, 2018; right?

         21   A    Yes.

         22   Q    Okay.  So if you were to have the wire instructions two

         23   weeks before that, is it your testimony that Brock would have

         24   sent the money two weeks earlier?

04:01PM  25   A    Wait.  Two weeks before what?
```

**UNITED STATES DISTRICT COURT**

Q     January 10th, 2018.

A     I don't know what Brock would have done, because we were

going to have a formal -- we were working at the time on a

formal settlement agreement that would have had wire

04:01PM 5  instructions in there.  So I don't think I had an understanding

of any type like that.  Because why would I?

Q     Sir, do you believe if I called Mr. Runkles to the stand

and asked him "Would you have paid the money early if you had

earlier wire instructions," do you think he would tell

04:02PM 10  the jury, "Yeah, I would have parted with $1.6 million" --

            MR. SAGEL:  Calls for speculation and is irrelevant.

            THE COURT:  Sustained.

Q     BY MR. AVENATTI:  Sir, was any payment delayed because of

when you received wire instructions?  Strike that.  That's a

04:02PM 15  bad question.

            Was the $1.6 million payment delayed because of when

you received the wire instructions?

A     I have to refresh my memory on the timing, but I believe

the wire instructions were provided several days after the

04:02PM 20  agreement was entered into.

Q     That's not what I asked you.

            Move to strike as nonresponsive, Your Honor.

            THE COURT:  It will be stricken.

Q     BY MR. AVENATTI:  Sir, my question is very simple.  The

04:03PM 25  first payment had to be made on January 10th.  Did you get the

```
     1    wire instructions before January 10th?

     2    A    Yes.

     3    Q    Was the wire made on or before January 10th?

     4    A    It was made before January 10th.

04:03PM 5    Q    So the date that you received the wire instructions did

     6    not cause the payment to be late; correct?

     7    A    I don't know if I agree with that, because Brock was

     8    either to pay to get this done with --

     9              MR. AVENATTI:  Move to strike after "I don't know if

04:03PM 10   I agree with that," everything after.

     11             THE COURT:  Everything after that will be stricken.

     12             MR. AVENATTI:  Thank you.

     13   Q    Sir, if Brock was so anxious to make this payment, why

     14   didn't they send the payment after you sent the binding e-mail?

04:03PM 15   A    They didn't have wire instructions.

     16   Q    So is it your testimony that had they had the wire

     17   instructions, they would have made the payment immediately?

     18   A    No.  That's --

     19   Q    No.  No.  Sir, just answer -- this is going to go a lot

04:04PM 20   easier if you just answer my question.  Okay?

     21             So here's my question:  As you sit here today, is it

     22   your testimony that had Brock had the wire instructions

     23   immediately after you sent the e-mail, they would have

     24   immediately made the payment?

04:04PM 25   A    No.
```

**UNITED STATES DISTRICT COURT**

```
 1   Q    We were talking about Mr. Culig's role in the case and
 2   your role.  Do you recall that?
 3   A    Yeah.  Uh-huh.
 4   Q    And I think you said that you were keeping fairly close
04:05PM 5 tabs on what was going on; right?
 6   A    I don't know that I said that.  But both Mr. Culig and I
 7   were representing Brock in this case.
 8   Q    Did you review pleadings that were made before His Honor
 9   in the case?
04:05PM 10      MR. SAGEL:  Objection.  Relevance.  403.  And your
11   Court's prior ruling.
12           THE COURT:  Sustained.
13   Q    BY MR. AVENATTI:  Sir, isn't it true that you and
14   Mr. Culig, in filings before this very Court, called
04:06PM 15 Mr. Barela, effectively, a liar?
16           MR. SAGEL:  Objection, Your Honor.  He's asking the
17   same questions again --
18           THE COURT:  Sustained.
19           MR. SAGEL:  -- Your Honor sustained.
04:06PM 20 Q    BY MR. AVENATTI:  Sir, prior to the execution of the
21   settlement agreement, did you ever claim that Mr. Barela had
22   fabricated facts in connection with a legal claim?
23           MR. SAGEL:  Same objection, Your Honor.
24           THE COURT:  Sustained.
04:06PM 25 Q    BY MR. AVENATTI:  Sir, did you ever represent to any
```

```
          1    court of law that, quote, "Something fishy was going on," close
          2    quote, relating to Mr. Barela?
          3               MR. SAGEL:  Objection.  Same objection that I asked
          4    for a directive that he move on --
04:07PM    5               THE COURT:  Sustained.
          6               MR. SAGEL:  -- from the other questions.
          7               THE COURT:  Next topic, please.
          8    Q    BY MR. AVENATTI:  Please go to Exhibit 179 that Mr. Sagel
          9    asked you about.
04:08PM   10    A    Okay.  I'm there.
         11    Q    Mr. Sagel asked you about some redline changes in this
         12    version of the settlement agreement.  Do you recall that
         13    generally?
         14    A    Yes.
04:08PM   15               MR. AVENATTI:  And if we could bring up Exhibit 179,
         16    page 5 of 10, please.
         17    Q    Do you have that, sir?
         18    A    I do.
         19               MR. AVENATTI:  And if we could please blow up the
04:09PM   20    middle of the page, please.
         21    Q    Now just so the jury is aware, there's words here that
         22    are struck through.  There's a line through them.  They're in
         23    blue.  Do you see that?
         24    A    I do, yeah.
04:09PM   25    Q    Now, when you sent this agreement over, those words were
```

```
 1   black.  They were in black, like the rest of the text; correct?
 2   A    Yes.
 3   Q    And then when I sent the agreement back, I drew a line
 4   through that portion of the agreement that reads, "No further
 5   payments are required under this agreement"; right?
 6   A    Yes.
 7   Q    So when you received the agreement back, those words had
 8   been struck; right?
 9   A    Yes.
10   Q    And those words did not appear in the final version of
11   the agreement, Exhibit 187, did they?  Go ahead and take a
12   look.
13   A    You're asking if your change, your striking those was
14   implemented in the final agreement?  That's correct, that did
15   not appear in the final agreement.
16   Q    The words "No further payments are required under this
17   agreement" did not appear in the final agreement?
18   A    That's correct.
19   Q    And the reason is because I had struck them; correct?
20   Yes or no?
21   A    Yes.
22   Q    If you go to 181, please, page 8 of 13.  This is another
23   exhibit that Mr. Sagel asked you about.
24   A    What page did you say, again?
25   Q    Yes.  8 of 13.
```

A       Okay.  I'm there.

Q       You were asked about this change in paragraph 14.

A       Yes, I was asked about that.

Q       Yes.  And on direct examination, Mr. Sagel asked if you
recall the conversation that we had relating to this change.
Do you remember that?

A       Yes.

Q       And I believe your testimony was that you and I spoke
about this change, and I explained that an account was going to
have to be set up in order to receive the funds; right?

A       That was my recollection -- my best recollection of what
was discussed, yes.

Q       Do you have any evidence to suggest to you that that was
inaccurate at the time when I told you that?

A       That what was inaccurate?

Q       That an account was going to be set up to receive the
funds.

A       No.

Q       And, again, I'll note in 181 -- and you can leaf through
the pages.  I don't want to spend a lot of time on it, but none
of our clients are copied on any of these e-mail
communications, are they?  Not your client, not my client.

A       I think that's correct, yeah.

Q       And by the way, this phrase, this language here, this
made its way into the final agreement, didn't it?

96

```
            1    A     What phrase and language are you talking about?

            2    Q     The language about the fact that a trust account

            3    information would be e-mailed to you in connection with the

            4    first payment.  That was in the final agreement.

04:14PM     5    A     That's correct, yeah.

            6    Q     And you were also asked about this notice provision.

            7    Let's go to page 11 of 13.

            8    A     Okay.

            9    Q     Do you have that?

04:14PM    10    A     11 of 13, Exhibit 181?

           11    Q     Yes, sir.

           12    A     Yes.

           13    Q     This notice provision was also in the final agreement,

           14    wasn't it?

04:14PM    15    A     Yes.

           16    Q     You can take a look at 187 if you have any doubts about

           17    that.

           18    A     Yeah, I just wanted to make sure that there wasn't a

           19    change to the address or anything like that, but I believe the

04:15PM    20    answer is "Yes" to that question.  Yes.

           21    Q     And when this agreement was signed, do you have any

           22    reason to believe that that notice provision was not in the

           23    agreement?

           24    A     Well, it's in Exhibit 187.  It has the signatures with it,

04:16PM    25    and it's in there.
```

**UNITED STATES DISTRICT COURT**

```
 1   Q     So that would be, "No," you don't have any reason to

 2   believe it wasn't in there; right?  It's in 187.

 3   A     It is, yeah.  You asked me that, and I said it was, yes.

 4   Q     Sir, do you know if Mr. Runkles read the agreement before

 5   it was signed?

 6   A     I believe he did, yes.  Mr. Runkles attended the -- you

 7   might remember he was present at the mediation as well.

 8   Q     The agreement wasn't signed at the mediation; correct?

 9   A     That's correct.  The agreement wasn't signed at the --

10   Q     Mediation.

11   A     -- at the mediation, right.

12   Q     Were you physically with Mr. Runkles when he signed the

13   agreement?

14   A     No.

15   Q     You provided it to him for his review, right, and

16   signature?

17   A     I provided all the drafts, I believe, to him for review

18   and a final version for signature.

19           MR. AVENATTI:  Move to strike.  I'm asking about the

20   final agreement.

21           THE WITNESS:  Uh-huh.

22           MR. AVENATTI:  Move to strike, Your Honor.

23           THE COURT:  Be stricken.

24           MR. AVENATTI:  Thank you.

25   Q     Sir, were you physically with -- strike that.
```

**UNITED STATES DISTRICT COURT**

```
  1              Did Mr. Runkles tell you he read the agreement

  2    before he signed it, the final -- strike that.  That calls for

  3    privilege.

  4              Do you know, as you sit here today, whether

04:18PM  5    Mr. Runkles, in fact, read the final agreement before it was

  6    signed?

  7              MR. SAGEL:  Asked and answered, Your Honor.

  8              THE COURT:  Sustained.

  9    Q    BY MR. AVENATTI:  Did you receive the signature page back

04:18PM 10    from Mr. Runkles or the entirety of the agreement before you

 11    provided the signature pages to my office?

 12    A    That, I don't recall.

 13    Q    Let's take a look at 187, the final agreement.  I just

 14    have a few more questions for you.

04:19PM 15    A    Okay.  I'm there.

 16    Q    Now, the initial draft of this agreement was provided by

 17    you; correct?  You drafted it?

 18    A    Yes.

 19    Q    I want to ask you about the first sentence in

04:19PM 20    paragraph 23.

 21    A    So you're talking about on page 8 of 12?

 22    Q    Page 8 of 12.

 23    A    And you want --

 24    Q    Paragraph 23, the first sentence.

04:20PM 25    A    Okay.  I see that.
```

```
 1   Q      "The parties acknowledge that they were represented
 2          by their respective counsel in connection with their
 3          settlement and this agreement."
 4          Did I read that correctly?
 5   A      Yes.
 6   Q      And your understanding, when you wrote that, was -- what
 7   you attempted to convey was that each party, by signing this
 8   agreement, acknowledged that they had their own lawyer in
 9   connection with the settlement and the terms of the agreement;
10   correct?
11   A      Yes.
12   Q      And, sir, after the payment, the first payment of
13   $1.6 million, you have no idea what communications took place
14   between me and Mr. Barela; true?
15   A      That's correct.
16   Q      Thank you.
17              MR. AVENATTI:  Pass the witness, Your Honor.
18              THE COURT:  Mr. Sagel.
19              MR. SAGEL:  Thank you, Your Honor.
20                        REDIRECT EXAMINATION
21   BY MR. SAGEL:
22   Q      The defendant asked you two questions earlier, or
23   actually, a series of questions, but one was about your client
24   not being copied on an e-mail, that you didn't think there was
25   anything unethical or illegal about that.  And he asked you a
```

04:20PM (line 5)
04:20PM (line 10)
04:21PM (line 15)
04:21PM (line 20)
04:21PM (line 25)

```
         1   question about your agreeing to terms on behalf of a client,
         2   there's nothing illegal or wrong about that.  Do you remember
         3   those questions?
         4   A    Yes, I do.  He did ask me that.
04:21PM  5   Q    If you were to lie to your client about the terms of a
         6   settlement agreement, do you think there's something illegal or
         7   unethical about that?
         8            MR. AVENATTI:  Objection, Your Honor.
         9   Argumentative.
04:22PM 10            THE COURT:  Overruled.
        11            THE WITNESS:  Absolutely.
        12   Q    BY MR. SAGEL:  If you were to fail to tell your client
        13   that you received $1.6 million of settlement money on behalf of
        14   the client, do you think there's something illegal or unethical
04:22PM 15   about that?
        16            MR. AVENATTI:  Same objection, Your Honor.
        17            THE COURT:  Sustained.
        18            THE WITNESS:  Absolutely.
        19            THE COURT:  Just a minute.
04:22PM 20            Answer is stricken.
        21            MR. AVENATTI:  Move to strike.
        22            THE COURT:  Answer is stricken.
        23            MR. SAGEL:  No further questions, Your Honor.
        24            THE COURT:  Mr. Avenatti.
04:22PM 25   ///
```

|    |                                                                |
|----|----------------------------------------------------------------|
| 1  | **RECROSS-EXAMINATION**                                        |
| 2  | BY MR. AVENATTI:                                               |
| 3  | Q    Sir, as you sit there, do you have any firsthand          |
| 4  | knowledge of me lying to any client, ever?                     |
| 5  | A    No firsthand knowledge of that, no.                       |
| 6  | Q    Thank you.                                                |
| 7  | THE COURT:  May the witness be excused?                        |
| 8  | MR. AVENATTI:  Yes, Your Honor.                                |
| 9  | THE COURT:  Sir, you may be excused.  Thank you.               |
| 10 | THE WITNESS:  Thank you, Your Honor.                           |
| 11 | THE COURT:  I think we'll stop here for today,                 |
| 12 | ladies and gentlemen.                                          |
| 13 | Please remember the admonition not to discuss the              |
| 14 | case with anyone, not to form any opinions on the issues in the|
| 15 | case until it's submitted to you and, please, no research.     |
| 16 | Regular day tomorrow.  We'll see you at 9:00 in the            |
| 17 | morning.  Have a good weekend -- or good week -- evening.  Have |
| 18 | a good evening.  All of the above.                             |
| 19 | THE COURTROOM DEPUTY:  All rise.                               |
| 20 | **(Out of the presence of the jury.)**                        |
| 21 | THE COURT:  Anything for the record before we                  |
| 22 | conclude?                                                       |
| 23 | MR. AVENATTI:  The defense has a couple issues,                |
| 24 | Your Honor.                                                     |
| 25 | THE COURT:  Mr. Avenatti.                                      |

04:22PM (line 5)
04:23PM (line 10)
04:23PM (line 15)
04:24PM (line 20)
04:24PM (line 25)

UNITED STATES DISTRICT COURT

1          MR. AVENATTI:  Thank you, Your Honor.

2          I have some considerable concerns relating to

3    timing, and I want to express those to the Court.  We are

4    attempting to make sure that as soon as the Government rests we

04:24PM  5    can begin the defense case, which, at this point, and this is a

6    rough estimate, I estimate it's going to be four days or so.

7          There's a number of issues relating to witnesses

8    avoiding service of subpoenas.  We have the issue that the

9    Government raised earlier relating to, we'll call her

04:24PM 10    Witness 1, if that's acceptable to Your Honor.

11          THE COURT:  That's fine.

12          MR. AVENATTI:  I'm sorry?

13          THE COURT:  That's fine.

14          MR. AVENATTI:  Okay.  We have the paralegal here,

04:25PM 15    actually, that served Witness 1.  She's prepared to provide any

16    testimony under oath to Your Honor about what happened with

17    that.  She has no objection to taking the stand if Your Honor

18    would like to hear from her in connection with that.  We can do

19    it today, tomorrow, or any other day Your Honor wants.  I'm

04:25PM 20    going to have to --

21          MR. SAGEL:  I don't think there was anything

22    objected to.  We were going to discuss possibilities going

23    forward.

24          THE COURT:  Right.

04:25PM 25          MR. AVENATTI:  There's an issue, Your Honor,

relating to what she told the Government versus what she told

the paralegal, and maybe it's just a misunderstanding, I don't

know.  The point is, Your Honor, I want to be really clear

about this.

04:25PM   THE COURT:  If you want to be really clear, just put

it in a declaration.

MR. AVENATTI:  Okay.  We're happy to do that,

Your Honor.  I just wanted to give Your Honor an opportunity to

ask her any questions Your Honor wanted to about the service of

04:25PM this.

THE COURT:  I can still do that after I read the

declaration.

MR. AVENATTI:  Yes, sir.  Understood.

I'd like to make sure that we don't have any hiccups

04:26PM relating to the order of witnesses or delay for the defense

case, et cetera.  So I'd like to get, as best I can, an

estimate as to how much longer the Government has so that we

can make sure that we have witnesses here.

I anticipate making a Rule 29 after the Government

04:26PM rests.  I don't know if -- if Your Honor -- if it is

Your Honor's custom and practice to reserve on that or if you

are going to want to hear argument at the time.  We'll probably

file something.

THE COURT:  Why don't you file something.  I'm going

04:26PM to reserve at the end of the Government's case.

1          MR. AVENATTI:  Okay.

2          THE COURT:  We can revisit at the close of evidence.

3          MR. AVENATTI:  Understood, Your Honor.  So we'll

4     file that upon the conclusion of the Government's case.

04:26PM 5          THE COURT:  That's fine.

6          MR. AVENATTI:  But if I could get a representation

7     as to who they have left and, you know, what their estimates

8     are.

9          I mean, as I mentioned earlier relating to

04:27PM 10    Mr. Drum -- you know, obviously, Mr. Bellis's testimony is

11    going to be more limited than we thought it was.  But as it

12    relates to Mr. Drum, that's going to be, in my view, a very

13    lengthy examination, cross-examination.  I consider him to be

14    an important witness.

04:27PM 15         And, initially, they said that they anticipated

16    resting tomorrow morning.  I don't think that's realistic.

17         THE COURT:  Well, let's get the Government's current

18    view.

19         Mr. Wyman.

04:27PM 20         MR. WYMAN:  Thank you, Your Honor.

21         Timing in this case has been a bit of a moving

22    target because the cross-examination continues to be much

23    lengthier than we expected.  We did anticipate resting tomorrow

24    morning.  Even today, for example, David Sheikh's estimated

04:27PM 25    cross-examination from the defense, I think, was somewhat like

half an hour, and it ended up being much longer than that.

THE COURT:  An hour and 13 minutes.

MR. WYMAN:  Yes, Your Honor.

At this point we have four remaining witnesses.  Two are extremely short, probably ten minutes.  There is Special Agent Steve Bellis who's just going to introduce that chart, the wire fraud -- the wire count chart, and then Michelle Phan, who is probably about an hour from us.  Then we have Rob Amenta from the Federal Reserve, that's five to ten minute.  That's just the interstate wire nexus portion.  And then John Drum.  John Drum's direct testimony is probably 90 minutes to two hours.  I understand from the defense that he intends to cross-examine him for over four hours.

So, again, our remaining directs are probably a few hours, but I understand the crosses may be significantly longer, and that's out of our control.

THE COURT:  Sounds like we won't get to your case-in-chief until Thursday afternoon or maybe even Friday.

MR. AVENATTI:  That's what it sounds like to me as well, Your Honor.

I would ask for the courtesy of allowing us to start first thing Friday morning, assuming that -- I mean, we know Drum's going to testify; so that's going to take probably at least six hours in total.

THE COURT:  Have a witness here on Thursday.

1          MR. AVENATTI:  Okay.  Understood.  That's why I

2     asked.

3          THE COURT:  Well --

4          MR. AVENATTI:  That's why I asked.

04:29PM 5          THE COURT:  Especially in a trial of this length, I

6     like to use up every single day.  I don't like to send the

7     jurors home early unless there's some good reason.  Five

8     minutes, ten minutes, so be it, but if we have an hour or two,

9     I want to use it up.

04:29PM 10          MR. AVENATTI:  Understood.  This is why I'm

11     previewing it now so that we don't have any issues, Your Honor.

12          THE COURT:  And so that we run smoothly, I'm going

13     to direct when the Government rests, you provide the Government

14     with a witness list and you provide each day at the end of the

04:29PM 15     day who's in the batting order for the next day with your

16     estimate, and the Government will provide you an estimate.  I

17     want to make sure we use up the days and nobody on either side

18     gets held up short.

19          MR. AVENATTI:  Understood.  We'll follow the Court's

04:29PM 20     directive.

21          MR. SAGEL:  Just to clarify what Your Honor just

22     said about when the Government rests from the witness list,

23     considering we're probably going to be resting on Thursday and

24     he needs to have witnesses here, will the Court direct him

04:30PM 25     tomorrow, when we adjourn for the day, to tell us who he would

1    have here on Thursday?

2              THE COURT:  If he has to put a witness on, yes.

3              MR. AVENATTI:  If what?

4              THE COURT:  If you have to put a witness on

04:30PM  5    Thursday, better safe than sorry to disclose who your lead-off

6    witness is at the end of the day Wednesday, tomorrow.

7              MR. AVENATTI:  Understood, Your Honor.

8              One other issue I wanted to raise.  Mr. John

9    Arden -- we've heard his name during the trial -- I intend on

04:30PM 10    calling Mr. Arden.  He's under subpoena.  We received a request

11    from his counsel two days ago asking if he could be called out

12    of order on Wednesday, meaning tomorrow, because his counsel

13    has a conflict, he has a prepaid trip planned on Friday.  We

14    sent an e-mail to the Government asking if he could be called

04:30PM 15    out of order.

16              The Government objects to him being called in their

17    case, meaning tomorrow.  My preference would be to accommodate

18    Mr. Arden and his counsel.  I'll leave it to the discretion of

19    the Court, but I would ask that we attempt to accommodate

04:31PM 20    Mr. Arden and his counsel by calling him tomorrow.

21              MR. SAGEL:  Mr. Avenatti did not accommodate

22    Mr. Sheikh's schedule, with 48 hours' notice to make him travel

23    out here a second time.  So to ask --

24              THE COURT:  So be it.  I don't believe in tit for

04:31PM 25    tat.  However, I believe the Government's entitled to put its

        1    case on without interruption.  If you want to interrupt one of

        2    your witnesses to take somebody out of order, fine.

        3               MR. AVENATTI:  Your Honor, I don't have a dog in the

        4    fight.  I'm just --

04:31PM  5               THE COURT:  Oh, I'm not sure that's true.

        6               MR. AVENATTI:  Okay.  Well, I have a dog in most

        7    fights.  I don't think I have one in this -- this may be one of

        8    the few ones I don't have a dog in.

        9               The issue, Your Honor, is, if the government objects

04:31PM 10    and the Court does not wish or does not order us to allow us to

       11    call Mr. Arden during the Government's case, understood.  We'll

       12    act accordingly and we'll inform Mr. Arden and his counsel.

       13               THE COURT:  That's fine.

       14               MR. AVENATTI:  I wanted to make the request.

04:32PM 15               THE COURT:  Fine.  Not an unreasonable request.  But

       16    I just think you're free virtually any time to interrupt your

       17    own witnesses.  I don't think you're entitled to interrupt the

       18    Government's case.

       19               MR. AVENATTI:  Understood.  Understood.

04:32PM 20               THE COURT:  Mr. Wyman.

       21               MR. WYMAN:  Your Honor, I had a couple issues.  One

       22    relates to the defense case.  We've been informed by an

       23    employee of Analysis Group, the company that John Drum works

       24    for, the expert consulting group, that the defendant has been

04:32PM 25    trying to subpoena her.  She is basically an associate at the

company.  I believe, you know, she's on the team that's helped

prepare Mr. Drum's summary exhibits.

I don't understand how she could possibly be a

witness in the defense case.  She's not a fact witness.  She's

04:32PM  not an expert that's been disclosed by the defendant, and

there's no basis for impeachment.  And I am concerned that if

he subpoenas her, he will seek to exclude her or prevent her

from speaking with Mr. Drum, given that she is an associate of

his.

04:33PM  THE COURT:  I'll allow her to discharge her regular

duties as part of Mr. Drum's engagement; notwithstanding, she

may be subject to subpoena.

MR. WYMAN:  Very well, Your Honor.

MR. AVENATTI:  Your Honor --

04:33PM  THE COURT:  To put it another way around, I

don't feel by putting somebody on your witness list, you can

co-op them from their regular duties.  I've already mentioned

that with respect to the agents.  I don't know why it should

apply to this lady.

04:33PM  MR. AVENATTI:  Your Honor, let me speak to this

briefly.  Her name is Evan --

THE COURT:  I'm not going to -- fine.  You have her

under subpoena.  I'm not -- I don't require you to make an

offer of proof.  I don't know that I have the power to make a

04:34PM  criminal defendant make an offer of proof, but I'm not going to

```
 1  make it -- at least for present purposes, I'm not going to
 2  require any offers of proof.
 3           MR. AVENATTI:  Well, and I appreciate that,
 4  Your Honor.  Thank you.
 5           We've been attempting to serve her for days.  She's
 6  been avoiding service.  Clearly she's in communication with the
 7  Government.  She's actually been present for a number of
 8  interviews with Mr. Drum.  I think I have a good-faith basis to
 9  call her.  And, you know, look --
10           THE COURT:  Sir, you don't -- I'm telling you, you
11  don't have to make an offer of proof.
12           MR. AVENATTI:  I understand that, Your Honor.
13           Here's what I will say, okay?  This young lady has
14  been very active in connection with the work that's been done
15  in this case.  And the idea -- the idea, Your Honor, that for
16  days she would be avoiding service of a trial subpoena in a
17  federal criminal matter should not sit well with anybody.
18           THE COURT:  Sir, if you think there's misconduct,
19  document it and bring it to me.
20           MR. AVENATTI:  Thank you.  Understood.  Appreciate
21  it.
22           THE COURT:  Anything else, Mr. Avenatti?
23           MR. AVENATTI:  No, sir.  Thank you.
24           MR. WYMAN:  In anticipation of Mr. Drum testifying
25  likely tomorrow, Your Honor, I wanted to raise one issue.
```

```
 1            As Your Honor knows, we have previously informed the

 2   defense of all the bank record exhibits that we intend to

 3   admit.  We've admitted some but not all.  My intention during

 4   the testimony of Mr. Drum is to batch admit the remaining ones

 5   that we've informed them we would admit.  And so I wanted to

 6   flag that for Your Honor in case the defendant intends to

 7   object to individual ones.

 8            As Your Honor knows, they all fall under the

 9   custodian declarations that Your Honor has already ruled on,

10   and we have long since provided them or asked for any

11   redactions that are necessary without getting any meaningful

12   response.

13            THE COURT:  I think the case law is pretty clear.

14   106 presentation has to consist of admissible evidence.  You

15   don't have to have them admitted.

16            MR. WYMAN:  I understand that, Your Honor.  We're

17   not seeking to admit all of the underlying bank records.  What

18   I was referring to was the actual trial exhibits that are bank

19   statements that we haven't gone over with certain witnesses.

20   We intend to admit additional ones into evidence without

21   necessarily going over them all with Mr. Drum, but so that we

22   do have them in evidence.

23            THE COURT:  See if you can work it out.  Identify

24   them.

25            MR. WYMAN:  We have identified them previously,
```

Your Honor.

THE COURT:  Specifically -- what you're going to use with Mr. Drum, identify specifically if you've not already done so.  Make your offer.  I've already ruled that the custodian declarations in the record are sufficient.  And having reviewed the additional custodian of records with your summaries in 457, 60 to 68, I found those to be sufficient.  So you ought to be able to do this fairly quickly.

MR. WYMAN:  Fair enough, Your Honor.

And then on a related topic, with regard to the summary exhibits that we intend to offer through Mr. Drum, just to shortcut, rather than lay a foundation for each one, we intend to try to batch admit them once we've laid the foundation 4006.  I just wanted to flag that for Your Honor in case Your Honor has any concerns about that.

THE COURT:  Proceed as you wish.

MR. WYMAN:  Thank you, Your Honor.

THE COURT:  Mr. Sagel.

MR. SAGEL:  One more thing, and I don't have my phone here so I have no idea if I've gotten an e-mail back, nor would I have expected because they're sitting here, but at the lunch break is when I reached out to the Southern District of New York regarding Special Agent Penland.  What I was informed was that she's on leave this week and she's out of town, and the request was would she be able to testify at next week's

1    trial.

2            Based on the proffer that he expects a four-day

3    defense case, which wouldn't start until at least Thursday or

4    Friday, I'd ask that she be permitted to travel here for

04:38PM 5    Tuesday's testimony upon a request or see if there's an

6    objection to that, to accommodate her schedule.

7            MR. AVENATTI:  Your Honor, I don't mind calling her

8    on Tuesday to accommodate the agent's schedule.  No problem.

9    What I will say is this:  We reached out this weekend to

04:38PM 10   Mr. Sagel and we asked if the Government could facilitate this

11   agent coming from New York, which, obviously, would have been

12   contingent on Your Honor's ruling, obviously, okay?  We were

13   basically told to pound sand, that it's not their

14   responsibility to bring an agent from New York, and told that

04:39PM 15   basically we have to go deal with the people in New York.

16           So, again, I'm happy to accommodate Ms. Penland on

17   Tuesday, but I don't necessarily think that that is good faith

18   when I've subpoenaed an agent from the FBI -- or, actually,

19   she's not with the FBI, she's a special agent with SDNY.

04:39PM 20           So I would ask that the Government work with us

21   relating to having some of these folks that we've already

22   placed under subpoena available to us, and I'm happy to attempt

23   to accommodate their schedule, Your Honor.

24           MR. SAGEL:  I think it's irrelevant.  But I don't

04:39PM 25   think I would agree with his interpretation of an e-mail that

would speak for itself.  But we will do what is required of us.

And as I've told them, we put in a request with SDNY to see how

they want the travel coordinated, whether they want to work

with the defendant or they want to handle it themselves.

04:39PM    THE COURT:  Okay.

MR. AVENATTI:  Your Honor, there's one other agent

that was subpoenaed, a Ms. Galicia, an agent based in SDNY.  I

don't know of any motion to --

THE COURT:  Well, she wasn't in your list of five

04:40PM people previously.

MR. AVENATTI:  She was subpoenaed after that,

Your Honor.  And there's been no motion to quash that subpoena.

So until there's a motion to quash, then I'm going to assume

the subpoena is valid.  It's been validly served.  There's no

04:40PM *Touhy* regulation that's appropriate.  If the Government wants

to make a motion to quash, we'll deal with it.  But I do want

to raise it because I don't want it to come as a surprise.

MR. SAGEL:  His filing only mentioned

Special Agent Harper and Special Agent Penland.  And his

04:40PM attachments that he filed under seal only referred to those

two.  If he wants us to address the other ones, he should have

mentioned it.  Without having it in front of me, I cannot think

of a single thing that Special Agent Galicia, if I'm saying the

name right, wouldn't also fall under Your Honor's 403 ruling,

04:41PM among other reasons, for her not to be present.  And it's just,

again, bad faith to say she should be present.

THE COURT:  As documented by the defendant in
Docket 641 on page 5 is a chart.  With respect to Penland and
Harper, Ms. Galicia is only on two of those memos.  And, you
know, it's clear to me that Ms. Penland has the most to say, if
anything relevant, about those meetings.  And I would likely --
if presented to me, I would likely quash the subpoena directed
to her based on balancing and the fact that it would appear
that her testimony would be cumulative.

MR. SAGEL:  And without seeing it in front of me,
when you say "two," I believe one out of those two is a consent
to search a digital device that she's a witness to.  So it's
not even --

THE COURT:  The first one, right, is consent.

MR. SAGEL:  So it is even less.  So it's only one
interview.

So I guess I'll ask Your Honor's direction.  Do you
want us to be filing something or defendant to file something
to show why it wouldn't fall under the Special Agent Harper
ruling of today?  Because I don't think there's anything
further we can say about Ms. Galicia.

THE COURT:  If you wish to, why don't you put it in
something brief as to why I shouldn't apply the ruling I
applied to Harper to Galicia.

MR. AVENATTI:  You're directing me to do that,

```
 1   Your Honor?
 2              THE COURT:  I'm suggesting if you'd like to do that,
 3   that would be helpful.
 4              MR. AVENATTI:  I'm happy to do that, Your Honor.
 5   I -- procedurally -- procedurally, this is a little different
 6   than I think the law provides.  My understanding is I have a
 7   right to subpoena witnesses in my defense case.
 8              I have a validly issued subpoena.  If the Government
 9   wants to move to quash it, they really should file something in
10   writing.
11              THE COURT:  File something.  Government should file
12   something.
13              MR. SAGEL:  We will, Your Honor.
14              And, you know, I've mentioned it several times
15   during this trial, defendant makes these statements as if he's
16   acting in good faith, and when you --
17              THE COURT:  I don't want to get into that.
18              MR. SAGEL:  Understood, Your Honor.
19              THE COURT:  Okay.  We'll be in recess.
20              THE COURTROOM DEPUTY:  All rise.
21              (Proceedings concluded at 4:43 p.m.)
22                           --oOo--
23
24
25
```

04:42PM on line 5
04:43PM on line 10
04:43PM on line 15
04:43PM on line 20

1              *CERTIFICATE OF OFFICIAL REPORTER*

2

3    COUNTY OF LOS ANGELES    )
                             )
4    STATE OF CALIFORNIA      )

5              I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME

6    COURT REPORTER, in and for the United States District Court for

7    the Central District of California, do hereby certify that

8    pursuant to Section 753, Title 28, United States Code that the

9    foregoing is a true and correct transcript of the

10   stenographically reported proceedings held in the

11   above-entitled matter and that the transcript page format is in

12   conformance with the regulations of the Judicial Conference of

13   the United States.

14

15   *Date:  August 10, 2021*

16

17

18

19                        *   /S/ DEBBIE HINO-SPAAN*

20                        *Debbie Hino-Spaan, CSR No. 7953*
                         *Federal Official Court Reporter*
21

22

23

24

25

**UNITED STATES DISTRICT COURT**

**$**

**$1,033** [1] - 27:20
**$1,600,000** [1] - 29:10
**$1,900,000** [2] - 27:11, 29:9
**$100,000** [9] - 29:14, 29:15, 29:17, 45:6, 58:18, 58:20, 59:2, 59:7, 59:17
**$133,333** [2] - 27:16, 27:17
**$300,000** [5] - 29:11, 30:10, 59:17, 60:21, 61:5
**$400,000** [2] - 27:13, 30:7

**/**

**/S** [1] - 117:19

**0**

**05:21:15** [1] - 65:13

**1**

**1** [14] - 26:9, 27:6, 27:10, 29:1, 29:7, 30:2, 30:3, 31:15, 43:13, 43:22, 53:5, 79:18, 102:10, 102:15
**1,000** [1] - 27:19
**1,300** [1] - 27:19
**1,333** [1] - 27:15
**1,500,000** [1] - 27:11
**1-053** [1] - 1:24
**1.5** [1] - 30:6
**1.6** [15] - 30:9, 45:3, 49:25, 54:4, 54:6, 54:12, 54:17, 55:12, 55:16, 55:21, 60:19, 90:10, 90:16, 99:13, 100:13
**1.9** [4] - 28:14, 29:21, 35:9, 75:10
**1/2/2018** [1] - 4:21
**10** [16] - 1:15, 5:1, 27:12, 27:16, 27:18, 27:20, 29:11, 29:14, 29:16, 29:18, 30:10, 38:18, 50:2, 50:6, 93:16, 117:15
**1006** [1] - 6:12
**101** [1] - 3:7
**106** [3] - 5:8, 7:20, 111:14
**10th** [28] - 28:21,

35:16, 35:17, 38:25, 45:5, 45:8, 45:9, 50:18, 50:21, 50:22, 54:4, 58:18, 59:2, 59:8, 59:18, 89:20, 90:1, 90:25, 91:1, 91:3, 91:4
**11** [6] - 13:5, 13:9, 13:13, 14:23, 96:7, 96:10
**1100** [1] - 2:11
**12** [15] - 3:4, 7:11, 35:6, 35:7, 35:20, 38:21, 41:10, 45:1, 45:14, 45:15, 64:24, 65:17, 66:5, 98:21, 98:22
**12/20/2017** [1] - 4:7
**12/22/2017** [1] - 4:9
**12/23/2017** [1] - 4:10
**12/27/2017** [1] - 4:13
**12/28/17** [1] - 47:18
**12/28/2017** [2] - 4:15, 4:16
**12/29/2017** [1] - 4:19
**12:39** [2] - 29:2, 81:9
**13** [6] - 41:17, 94:22, 94:25, 96:7, 96:10, 105:2
**133,333** [1] - 30:8
**133,334** [2] - 27:20, 30:8
**14** [5] - 35:18, 45:10, 45:11, 46:6, 95:2
**14th** [2] - 5:20, 6:11
**15** [2] - 66:10, 66:14
**16** [2] - 45:1, 45:15
**17** [2] - 1:8, 2:18
**175** [15] - 4:7, 24:16, 24:20, 24:22, 25:16, 25:25, 26:5, 26:7, 33:22, 70:20, 71:7, 77:1, 89:17, 89:19
**178** [11] - 4:9, 32:2, 32:3, 32:6, 32:18, 33:1, 35:6, 36:8, 37:21, 85:20, 86:1
**179** [9] - 4:10, 36:5, 36:24, 37:1, 37:8, 37:14, 39:4, 93:8, 93:15
**17:29:12** [3] - 64:13, 64:22, 65:10
**17th** [1] - 30:16
**18** [1] - 12:18
**180** [1] - 87:24
**181** [11] - 4:13, 39:2, 39:16, 40:7, 40:14, 40:15, 40:22, 40:23, 94:22, 95:19, 96:10

**183** [13] - 4:15, 42:17, 42:19, 43:4, 43:11, 45:17, 63:24, 64:7, 64:17, 64:21, 64:22, 65:8, 65:11
**186** [17] - 4:16, 46:10, 46:11, 46:19, 46:23, 46:24, 48:6, 62:23, 62:24, 63:13, 64:3, 64:9, 64:11, 64:21, 64:22, 65:8, 65:10
**187** [22] - 4:19, 48:1, 48:3, 48:14, 48:18, 51:15, 57:18, 57:20, 57:25, 58:3, 58:17, 59:3, 59:21, 61:9, 61:11, 76:24, 76:25, 94:11, 96:16, 96:24, 97:2, 98:13
**19** [2] - 3:6, 73:20
**191** [6] - 4:21, 52:10, 52:21, 53:1, 53:3
**1992** [1] - 20:1
**19th** [7] - 26:11, 26:23, 28:6, 30:4, 30:6, 30:12, 71:3
**1:15** [2] - 1:16, 5:2
**1:35** [2] - 71:3, 73:17
**1:40** [1] - 74:18
**1st** [1] - 59:16

**2**

**2** [18] - 1:9, 7:8, 7:24, 31:4, 31:5, 31:6, 31:7, 34:1, 37:19, 43:23, 47:10, 50:2, 52:17, 78:11, 81:5, 81:6
**2014** [1] - 20:25
**2017** [30] - 20:25, 22:19, 26:11, 26:23, 30:6, 31:9, 31:12, 31:14, 31:17, 31:23, 32:1, 33:4, 34:9, 34:20, 37:18, 37:24, 40:17, 43:14, 47:2, 48:21, 64:1, 64:4, 71:3, 79:23, 81:9, 81:16, 81:23, 82:2, 82:8, 84:18
**2017.docx** [1] - 33:8
**2018** [22] - 27:12, 28:21, 29:11, 30:10, 35:16, 41:25, 45:5, 50:21, 53:6, 54:4, 54:15, 54:18, 54:23, 54:24, 55:6, 55:9, 55:15, 55:19, 56:1, 56:4, 89:20, 90:1

**2019** [7] - 27:16, 29:14, 35:16, 45:8, 50:21, 58:18, 59:16
**2020** [6] - 27:18, 29:16, 35:17, 45:8, 50:21, 59:2
**2021** [11] - 1:15, 5:1, 7:8, 27:20, 28:21, 29:18, 35:17, 45:9, 50:22, 59:8, 117:15
**20th** [18] - 26:11, 29:2, 29:20, 30:3, 30:9, 30:13, 30:16, 31:9, 31:16, 31:23, 32:1, 33:17, 33:22, 34:9, 34:20, 79:23, 81:8, 81:16
**213-894-2435** [1] - 2:12
**22** [2] - 81:23, 87:18
**22nd** [3] - 31:12, 33:4, 33:8
**23** [2] - 98:20, 98:24
**23rd** [2] - 37:18, 37:24
**254** [1] - 2:19
**26** [2] - 4:7, 88:11
**26th** [2] - 88:3, 88:9
**275** [1] - 26:5
**27th** [1] - 40:17
**28** [1] - 117:8
**28th** [4] - 43:14, 47:2, 64:1, 64:4
**29** [2] - 82:8, 103:19
**29th** [4] - 31:14, 48:21, 82:2, 84:18
**2nd** [2] - 6:13, 53:6

**3**

**3** [6] - 28:4, 47:14, 47:15, 74:17, 77:1, 78:18
**30** [4] - 86:4, 86:10, 86:25, 87:9
**30-day** [1] - 87:8
**312** [1] - 2:11
**33** [1] - 4:9
**342** [1] - 13:24
**343** [1] - 13:21
**37** [1] - 4:10
**38** [2] - 14:4, 14:20
**3:05** [1] - 66:17
**3:23** [1] - 66:17
**3rd** [2] - 41:24, 53:21

**4**

**4** [5] - 35:3, 35:6, 50:14, 52:17, 73:22
**40** [1] - 4:13

**4006** [1] - 112:14
**403** [6] - 14:16, 15:24, 71:15, 80:8, 92:10, 114:24
**408** [14] - 26:4, 32:20, 32:21, 32:22, 37:11, 40:9, 40:10, 43:8, 46:21, 52:24, 71:10, 71:12, 71:19, 80:3
**411** [2] - 1:24, 2:6
**43** [1] - 4:15
**450** [1] - 5:7
**457** [10] - 5:16, 6:2, 6:9, 6:16, 6:17, 6:19, 7:7, 7:14, 8:1, 112:6
**46** [1] - 4:16
**460** [2] - 5:7, 5:25
**461** [1] - 5:25
**462** [1] - 5:25
**468** [1] - 5:25
**48** [2] - 4:19, 107:22
**4:43** [1] - 116:21
**4th** [1] - 2:6
**4TH** [1] - 1:24

**5**

**5** [14] - 14:5, 14:6, 14:19, 14:21, 26:22, 30:4, 38:18, 51:1, 71:1, 71:7, 74:25, 75:1, 93:16, 115:3
**520** [1] - 46:3
**53** [1] - 4:21
**56** [1] - 15:9
**57** [3] - 3:6, 15:9
**5:21:15** [2] - 64:22, 65:11
**5:29** [1] - 64:15
**5th** [3] - 9:1, 54:15, 54:18

**6**

**6** [17] - 26:22, 31:6, 31:7, 40:23, 45:15, 71:1, 71:7, 73:22, 74:17, 74:25, 75:1, 77:1, 78:12, 78:18, 79:18, 81:5, 81:6
**60** [1] - 112:7
**640** [1] - 7:9
**641** [1] - 115:3
**67** [5] - 14:4, 14:20, 15:9
**68** [2] - 5:7, 112:7
**6th** [2] - 5:21, 6:10

## 7

**7** [10] - 5:7, 13:2, 13:10, 31:4, 31:5, 31:7, 33:15, 80:14, 81:5, 81:11
**714-338-3598** [1] - 2:7
**753** [1] - 117:8
**7953** [2] - 1:23, 117:20

## 8

**8** [7] - 41:9, 82:5, 84:19, 94:22, 94:25, 98:21, 98:22
**8000** [1] - 2:6

## 9

**9** [10] - 34:2, 35:4, 35:6, 44:22, 44:23, 45:1, 50:11, 76:5, 81:6, 82:15
**90** [1] - 105:11
**90012** [1] - 2:12
**92660** [1] - 2:19
**92701** [1] - 1:25, 2:7
**949-481-4900** [1] - 2:20
**949-887-4118** [1] - 38:8
**99** [1] - 3:7
**9:00** [1] - 101:16

## A

**abide** [1] - 57:9
**ability** [1] - 86:22
**able** [4] - 18:6, 41:5, 112:8, 112:25
**above-entitled** [1] - 117:11
**absolutely** [3] - 51:20, 100:11, 100:18
**abundance** [1] - 10:12
**accept** [1] - 58:20
**acceptable** [3] - 66:8, 80:13, 102:10
**acceptance** [1] - 76:7
**accepted** [1] - 74:6
**accommodate** [7] - 107:17, 107:19, 107:21, 113:6, 113:8, 113:16, 113:23
**accordance** [1] - 33:15
**according** [2] - 65:18, 89:15
**accordingly** [3] - 7:5,

8:15, 108:12
**account** [12] - 17:11, 35:21, 41:22, 42:1, 42:12, 54:6, 54:13, 54:18, 60:19, 95:9, 95:16, 96:2
**accounts** [1] - 88:21
**accurate** [11] - 25:4, 32:9, 32:14, 37:5, 39:24, 40:2, 42:24, 46:16, 48:9, 52:15, 58:5
**acknowledge** [1] - 99:1
**acknowledged** [1] - 99:8
**acknowledges** [1] - 5:19
**act** [1] - 108:12
**acting** [1] - 116:16
**active** [1] - 110:14
**actual** [3] - 86:3, 86:7, 111:18
**added** [1] - 41:21
**additional** [4] - 25:15, 75:20, 111:20, 112:6
**address** [3] - 46:4, 96:19, 114:21
**addresses** [1] - 25:7
**adhere** [2] - 58:11, 84:3
**adjourn** [1] - 106:25
**admissible** [2] - 5:14, 111:14
**admit** [13] - 25:14, 32:18, 37:8, 40:6, 43:4, 46:19, 52:21, 111:3, 111:4, 111:5, 111:17, 111:20, 112:13
**admitted** [2] - 111:3, 111:15
**admonition** [2] - 66:11, 101:13
**advance** [1] - 47:8
**afternoon** [10] - 12:3, 12:4, 12:10, 12:11, 19:21, 19:22, 57:16, 57:17, 66:9, 105:18
**agent** [6] - 113:11, 113:14, 113:18, 113:19, 114:6, 114:7
**Agent** [7] - 11:8, 105:6, 112:23, 114:19, 114:23, 115:19
**agent's** [1] - 113:8
**agents** [1] - 109:18
**ago** [4] - 20:12, 62:12, 62:23, 107:11

**agree** [12] - 23:14, 23:21, 31:8, 36:21, 63:11, 81:11, 81:15, 83:6, 88:23, 91:7, 91:10, 113:25
**Agreed** [1] - 83:10
**AGREED** [2] - 27:23, 27:25
**agreed** [16] - 28:3, 28:15, 28:18, 31:20, 31:22, 33:16, 34:21, 44:7, 49:2, 49:10, 49:11, 73:9, 73:13, 75:11, 80:24, 88:7
**agreed-on** [2] - 44:7, 49:2
**agreeing** [4] - 83:16, 84:23, 85:15, 100:1
**agreement** [126] - 18:10, 22:15, 27:22, 29:19, 31:11, 31:23, 31:25, 33:7, 33:18, 34:2, 34:8, 34:12, 34:24, 35:4, 36:1, 36:16, 36:17, 38:7, 38:23, 40:24, 41:2, 43:19, 43:23, 44:6, 44:7, 44:10, 44:21, 44:23, 45:15, 45:20, 46:7, 47:7, 47:12, 48:23, 49:1, 49:2, 50:3, 50:8, 50:15, 50:23, 51:5, 51:8, 51:19, 53:18, 53:19, 56:18, 57:6, 57:11, 57:21, 57:24, 58:1, 58:4, 58:12, 58:21, 59:3, 59:4, 60:4, 60:18, 60:20, 61:3, 61:15, 67:10, 67:12, 67:13, 67:14, 67:15, 70:12, 72:2, 76:18, 76:22, 78:3, 78:5, 78:8, 78:9, 80:14, 80:19, 80:25, 81:23, 82:6, 82:9, 82:17, 82:19, 83:20, 84:3, 84:6, 84:14, 84:17, 84:21, 89:1, 89:2, 89:10, 89:11, 89:14, 90:4, 90:20, 92:21, 93:12, 93:25, 94:3, 94:4, 94:5, 94:7, 94:11, 94:14, 94:15, 94:17, 95:25, 96:4, 96:13, 96:21, 96:23, 97:4, 97:8, 97:9, 97:13, 97:20, 98:1, 98:5, 98:10, 98:13, 98:16, 99:3, 99:8,

99:9, 100:6
**agreements** [2] - 18:2, 42:21
**ahead** [1] - 94:11
**alex.wyman@usdoj. gov** [1] - 2:13
**ALEXANDER** [1] - 2:10
**alleged** [1] - 6:20
**allow** [2] - 108:10, 109:10
**allowing** [1] - 105:21
**alternate** [1] - 9:10
**alternative** [1] - 10:6
**ambiguity** [1] - 52:7
**amended** [1] - 59:6
**amendment** [1] - 59:9
**Amenta** [1] - 105:8
**AMERICA** [1] - 1:5
**amount** [9] - 27:15, 27:17, 27:19, 28:18, 29:13, 29:15, 29:17, 29:21, 72:24
**amounts** [6] - 28:15, 29:23, 30:18, 38:22, 38:23, 41:11
**Ana** [1] - 2:7
**ANA** [3] - 1:17, 1:25, 5:1
**Analysis** [1] - 108:23
**Andrew** [4] - 14:10, 15:5, 15:21, 15:23
**ANGELES** [1] - 117:3
**Angeles** [1] - 2:12
**Answer** [1] - 100:20
**answer** [14] - 21:18, 59:10, 59:11, 66:21, 67:5, 67:6, 81:3, 83:4, 83:5, 84:10, 91:19, 91:20, 96:20, 100:22
**answered** [1] - 98:7
**anticipate** [2] - 103:19, 104:23
**anticipated** [1] - 104:15
**anticipation** [1] - 110:24
**anxious** [1] - 91:13
**anytime** [1] - 38:8
**apologies** [1] - 8:8
**apologize** [1] - 24:13
**appear** [4] - 94:10, 94:15, 94:17, 115:8
**APPEARANCES** [1] - 2:1
**applicable** [1] - 32:21
**applications** [1] - 86:24
**applied** [1] - 115:24

**apply** [2] - 109:19, 115:23
**appreciate** [2] - 110:3, 110:20
**appropriate** [1] - 114:15
**arbitrate** [1] - 67:11
**arbitrated** [1] - 68:7
**arbitration** [12] - 22:3, 22:4, 22:5, 22:6, 22:12, 22:14, 34:22, 68:20, 68:22, 86:3, 86:7, 86:11
**arbitrator** [13] - 22:16, 44:11, 49:12, 52:4, 52:8, 68:12, 82:18, 86:9, 87:5, 87:7, 87:12, 88:4
**Arden** [8] - 70:1, 70:3, 107:9, 107:10, 107:18, 107:20, 108:11, 108:12
**area** [1] - 25:6
**areas** [1] - 32:12
**argument** [1] - 103:22
**argumentative** [2] - 51:11, 100:9
**arrangements** [2] - 9:10, 10:7
**assets** [1] - 13:10
**Assistant** [2] - 2:5, 2:10
**assistant** [1] - 61:24
**associate** [4] - 61:23, 69:16, 108:25, 109:8
**associates** [1] - 26:21
**Associates** [2] - 12:21, 12:25
**assume** [1] - 114:13
**assumes** [1] - 67:22
**Assuming** [1] - 81:11
**assuming** [6] - 31:8, 64:13, 64:23, 65:4, 81:15, 105:22
**assured** [1] - 57:8
**attach** [1] - 51:7
**attached** [8] - 7:9, 34:2, 38:6, 40:4, 40:21, 43:16, 47:6, 49:6
**attaching** [2] - 4:11, 61:14
**attachment** [16] - 4:14, 32:6, 32:10, 32:15, 33:5, 33:9, 36:8, 37:3, 37:6, 37:24, 38:1, 39:21, 40:3, 40:18, 48:12, 48:22
**attachments** [11] -

4:18, 4:20, 42:25, 43:4, 43:15, 46:14, 46:17, 47:1, 48:7, 48:10, 114:20
**attempt** [2] - 107:19, 113:22
**attempted** [1] - 99:7
**attempting** [2] - 102:4, 110:5
**attended** [1] - 97:6
**attention** [5] - 8:14, 9:12, 14:19, 15:8, 26:22
**Attorney** [4] - 2:4, 2:5, 2:9, 2:10
**attorney** [8] - 19:24, 19:25, 21:6, 22:9, 54:18, 61:22, 69:4, 70:3
**Attorney's** [1] - 16:19
**attorney-client** [1] - 54:18
**attorneys** [4] - 14:9, 14:13, 14:23, 61:21
**AUGUST** [2] - 1:15, 5:1
**August** [6] - 6:13, 7:8, 7:24, 9:1, 117:15
**authored** [2] - 25:3, 25:22
**available** [2] - 38:7, 113:22
**Avenatti** [59] - 3:4, 3:6, 3:7, 4:7, 4:9, 4:11, 4:13, 4:15, 4:17, 4:19, 4:21, 6:3, 7:18, 8:6, 11:15, 12:5, 12:21, 12:22, 12:25, 13:2, 13:17, 14:10, 17:11, 17:16, 18:3, 21:3, 21:5, 21:6, 24:9, 24:11, 25:2, 25:22, 27:4, 28:2, 28:5, 31:3, 32:24, 36:4, 36:18, 36:21, 40:13, 41:23, 44:17, 46:3, 47:18, 49:24, 50:1, 51:14, 52:18, 52:19, 54:19, 57:13, 63:19, 66:18, 100:24, 101:25, 107:21, 110:22
**AVENATTI** [118] - 1:8, 2:15, 2:16, 6:4, 6:8, 7:1, 7:3, 7:6, 8:7, 9:14, 10:18, 11:4, 11:7, 12:6, 12:9, 14:19, 15:2, 15:5, 15:8, 16:2, 17:3, 17:6, 19:4, 19:7,

26:3, 29:25, 30:21, 32:19, 34:14, 34:25, 37:10, 40:8, 41:6, 43:7, 46:21, 48:15, 51:10, 52:24, 55:1, 56:8, 56:13, 56:22, 57:3, 57:15, 58:23, 59:1, 60:9, 63:6, 64:19, 66:7, 66:19, 68:4, 70:25, 71:18, 72:15, 73:24, 77:4, 79:21, 80:10, 84:12, 85:3, 85:5, 85:10, 85:13, 85:18, 85:22, 90:13, 90:24, 91:9, 91:12, 92:13, 92:20, 92:25, 93:8, 93:15, 93:19, 97:19, 97:22, 97:24, 98:9, 99:17, 100:8, 100:16, 100:21, 101:2, 101:8, 101:23, 102:1, 102:12, 102:14, 102:25, 103:7, 103:13, 104:1, 104:3, 104:6, 105:19, 106:1, 106:4, 106:10, 106:19, 107:3, 107:7, 108:3, 108:6, 108:14, 108:19, 109:14, 109:20, 110:3, 110:12, 110:20, 110:23, 113:7, 114:6, 114:11, 115:25, 116:4
**Avenatti's** [3] - 37:12, 40:11, 60:19
**avoiding** [3] - 102:8, 110:6, 110:16
**aware** [6] - 16:14, 60:3, 60:8, 86:21, 87:15, 93:21
**Azar** [5] - 68:13, 68:17, 69:4, 69:7, 69:9
**Azar's** [1] - 68:24

# B

**back-and-forth** [1] - 28:24
**bad** [2] - 90:15, 115:1
**balancing** [1] - 115:8
**bank** [3] - 111:2, 111:17, 111:18
**banking** [1] - 53:10
**bankruptcy** [8] - 12:21, 12:22, 12:25,

13:2, 13:5, 13:9, 13:13, 13:17
**Barela** [87] - 4:8, 4:9, 4:11, 4:13, 4:15, 4:17, 4:20, 4:22, 20:20, 20:23, 20:24, 21:9, 21:11, 21:14, 21:21, 22:1, 23:8, 24:7, 27:11, 28:3, 28:14, 29:10, 30:24, 31:1, 31:3, 33:7, 34:10, 34:20, 35:5, 35:8, 35:15, 38:19, 40:24, 43:18, 44:5, 44:17, 44:25, 45:2, 46:2, 46:8, 46:9, 47:12, 47:13, 48:22, 48:25, 49:5, 50:4, 50:16, 50:23, 51:15, 53:8, 56:7, 56:19, 57:6, 57:9, 57:22, 58:2, 58:4, 58:18, 58:20, 59:2, 59:8, 59:17, 59:21, 59:25, 60:3, 60:12, 60:17, 61:2, 61:8, 62:3, 66:24, 68:16, 68:19, 68:25, 69:5, 72:3, 74:13, 75:15, 75:17, 80:19, 83:16, 84:15, 92:15, 92:21, 93:2, 99:14
**Barela's** [12] - 21:6, 27:21, 29:19, 41:23, 50:7, 56:12, 56:21, 57:2, 60:14, 68:23, 69:10, 69:13
**Barela-Brock** [12] - 4:8, 4:9, 4:11, 4:13, 4:15, 4:22, 33:7, 43:18, 44:5, 47:12, 53:8, 57:6
**based** [8] - 11:24, 30:19, 31:21, 34:23, 41:4, 113:2, 114:7, 115:8
**basis** [2] - 109:6, 110:8
**batch** [2] - 111:4, 112:13
**batting** [1] - 106:15
**Beach** [1] - 2:19
**become** [1] - 21:22
**begin** [2] - 80:13, 102:5
**beginning** [2] - 11:20, 71:2
**begins** [1] - 86:18
**behalf** [7] - 24:4, 24:7, 83:16, 84:23, 85:15,

100:1, 100:13
**behind** [2] - 19:10, 24:14
**Bellis** [4] - 6:16, 6:18, 6:20, 105:6
**Bellis's** [1] - 104:10
**below** [9] - 28:7, 35:18, 38:4, 45:10, 53:13, 74:20, 76:4, 78:13, 80:14
**benefit** [1] - 71:1
**best** [9] - 47:9, 57:25, 58:5, 58:15, 73:4, 73:7, 77:5, 95:11, 103:16
**better** [2] - 89:7, 107:5
**between** [28] - 21:8, 24:22, 25:2, 25:4, 30:2, 30:15, 31:23, 34:10, 34:13, 34:22, 40:2, 40:24, 50:4, 50:23, 51:4, 52:16, 54:21, 54:23, 55:15, 55:18, 57:21, 58:2, 61:18, 61:19, 67:10, 67:12, 80:19, 99:14
**big** [1] - 24:15
**binder** [1] - 24:14
**binders** [1] - 24:15
**binding** [8] - 80:24, 82:17, 83:19, 84:2, 84:15, 84:21, 89:15, 91:14
**bit** [1] - 104:21
**black** [2] - 94:1
**blow** [4] - 64:19, 71:2, 73:24, 93:19
**blown** [1] - 71:5
**blue** [1] - 93:23
**body** [1] - 65:22
**Boland** [3] - 68:11, 86:21, 87:11
**booklet** [1] - 64:11
**booted** [1] - 16:18
**bottom** [4] - 28:5, 74:17, 76:3, 78:1
**Boulder** [1] - 68:10
**box** [1] - 39:13
**bracket** [3] - 25:19, 27:25, 28:10
**bracketed** [2] - 25:23, 75:20
**brackets** [10] - 27:23, 28:7, 74:21, 75:3, 75:11, 75:22, 75:24, 77:6, 78:19, 79:5
**break** [4] - 5:13, 66:7, 66:9, 112:22
**BRETT** [1] - 2:5
**brett.sagel@usdoj.**

**gov** [1] - 2:8
**bridge** [1] - 72:5
**brief** [2] - 42:10, 115:23
**briefly** [1] - 109:21
**bring** [5] - 8:14, 9:11, 93:15, 110:19, 113:14
**Brock** [77] - 4:8, 4:9, 4:11, 4:13, 4:15, 4:22, 20:13, 20:15, 20:16, 20:17, 20:18, 20:24, 21:1, 21:9, 21:11, 21:12, 21:13, 21:20, 23:8, 24:4, 26:21, 27:10, 28:14, 29:9, 33:7, 34:10, 34:20, 40:24, 43:18, 44:5, 44:19, 45:2, 45:24, 46:8, 47:12, 48:22, 48:25, 49:5, 49:24, 50:4, 50:23, 53:8, 53:22, 54:3, 54:5, 54:12, 55:11, 55:16, 55:17, 55:20, 55:22, 55:25, 56:2, 56:17, 57:6, 57:21, 58:2, 58:4, 59:1, 60:18, 62:2, 66:24, 67:17, 80:19, 84:15, 84:23, 85:1, 85:4, 85:16, 89:23, 90:2, 91:7, 91:13, 91:22, 92:7
**Brock's** [3] - 31:10, 41:23, 81:19
**Brock-Barela** [4] - 48:22, 48:25, 49:5, 58:4
**Brock/Barela** [1] - 22:19
**brought** [7] - 20:24, 21:14, 21:15, 21:19, 21:25, 22:1, 22:12
**built** [1] - 67:10
**business** [9] - 14:14, 31:9, 31:11, 31:14, 81:16, 81:23, 82:2, 82:7, 84:18
**BY** [48] - 2:5, 2:18, 3:4, 3:5, 12:9, 14:19, 15:5, 15:8, 16:2, 19:20, 30:2, 30:25, 33:2, 34:18, 35:3, 37:15, 40:15, 41:9, 43:12, 46:25, 48:19, 51:16, 53:4, 55:5, 56:11, 56:20, 57:1, 57:7, 57:15, 59:1, 60:9, 63:6, 66:19,

68:4, 71:18, 72:15,
80:10, 85:18, 90:13,
90:24, 92:13, 92:20,
92:25, 93:8, 98:9,
99:21, 100:12, 101:2

## C

**CA** [1] - 1:25
**California** [4] - 2:7,
2:12, 2:19, 117:7
**CALIFORNIA** [4] - 1:2,
1:17, 5:1, 117:4
**CALLED** [2] - 3:4, 3:5
**camera** [4] - 11:10,
11:11, 11:14, 11:12
**cannot** [3] - 19:2,
19:3, 114:22
**capital** [1] - 25:19
**capitals** [1] - 25:23
**caps** [2] - 27:23, 27:25
**care** [1] - 46:3
**Carlos** [1] - 11:8
**Case** [1] - 1:7
**case** [47] - 6:20, 7:20,
7:21, 10:3, 10:5,
12:13, 18:23, 26:21,
44:11, 52:3, 52:4,
61:4, 61:23, 62:20,
63:1, 66:12, 66:13,
67:20, 69:18, 86:4,
86:10, 87:6, 88:4,
92:1, 92:7, 92:9,
101:14, 101:15,
102:5, 103:16,
103:25, 104:4,
104:21, 105:18,
107:17, 108:1,
108:11, 108:18,
108:22, 109:4,
110:15, 111:6,
111:13, 112:15,
113:3, 116:7
**case-in-chief** [1] -
105:18
**caught** [1] - 14:14
**caution** [1] - 10:13
**cc** [1] - 26:15
**Cefali** [1] - 6:5
**Center** [1] - 46:4
**Central** [1] - 117:7
**CENTRAL** [1] - 1:2
**certain** [2] - 17:8,
111:19
**CERTIFICATE** [1] -
117:1
**CERTIFIED** [1] - 1:6
**certify** [1] - 117:7
**cetera** [1] - 103:16
**chain** [9] - 33:21,

39:17, 39:20, 42:19,
42:20, 42:24, 43:1,
52:13
**change** [8] - 41:1,
41:5, 41:16, 94:13,
95:2, 95:5, 95:9,
96:19
**changed** [4] - 29:23,
30:12, 30:18, 41:19
**changes** [10] - 36:19,
36:21, 38:12, 38:15,
38:16, 38:22, 41:3,
42:16, 93:11
**Chapter** [6] - 13:2,
13:5, 13:9, 13:10,
12:13, 14:23
**charge** [1] - 69:24
**chart** [5] - 5:16, 5:18,
105:6, 105:7, 115:3
**charts** [1] - 5:8
**Chicago** [1] - 20:4
**chief** [1] - 105:18
**Christmas** [1] - 88:3
**chronology** [3] - 5:9,
5:17, 6:9
**cited** [1] - 7:20
**claim** [3] - 10:14,
92:21, 92:22
**claims** [11] - 21:11,
21:13, 21:14, 21:15,
21:16, 21:19, 21:23,
21:24, 21:25, 22:8,
67:7
**clarification** [1] -
52:20
**clarify** [2] - 25:14,
106:21
**clause** [1] - 67:18
**clean** [3] - 43:22,
43:23, 61:1
**clear** [4] - 103:3,
103:5, 111:13, 115:5
**clearly** [1] - 110:6
**client** [26] - 44:19,
51:9, 51:19, 54:18,
57:21, 58:2, 58:11,
58:17, 59:1, 59:7,
59:16, 62:7, 72:3,
74:8, 83:7, 84:24,
85:16, 89:2, 95:22,
99:23, 100:1, 100:5,
100:12, 100:14,
101:4
**client's** [2] - 77:7,
82:22
**clients** [6] - 14:24,
18:3, 61:17, 62:2,
80:25, 95:21
**clients'** [1] - 44:20
**close** [11] - 31:9,

31:11, 31:13, 81:16,
81:23, 82:2, 82:7,
84:18, 92:4, 93:1,
104:2
**co** [1] - 109:17
**co-op** [1] - 109:17
**Code** [1] - 117:8
**collateral** [1] - 23:5
**colleagues** [1] - 20:6
**collectively** [1] - 12:4
**Colorado** [5] - 22:25,
34:11, 68:1, 68:8,
68:17
**coming** [1] - 113:11
**comment** [1] - 36:22
**commentary** [1] -
25:22
**comments** [3] - 16:11,
33:19, 75:22
**comments/revisions**
[2] - 28:7, 74:20
**communicated** [2] -
23:25, 72:4
**communication** [3] -
31:21, 73:2, 110:6
**communications**
[10] - 23:24, 54:7, 55:7,
72:17, 72:25, 75:14,
75:18, 80:7, 95:22,
99:13
**company** [6] - 13:11,
20:13, 20:17, 34:11,
108:23, 109:1
**comparing** [1] - 65:9
**complete** [1] - 49:10
**compliance** [2] -
27:22, 29:19
**complicated** [1] -
21:18
**compromise** [2] -
30:17, 34:21
**concerned** [2] - 87:5,
109:6
**concerning** [1] - 71:13
**concerns** [2] - 102:2,
112:15
**conclude** [1] - 101:22
**concluded** [1] -
116:21
**conclusion** [1] - 104:4
**conclusions** [1] - 79:4
**condition** [2] - 9:25,
10:23
**confer** [1] - 6:4
**Conference** [1] -
117:12
**conferred** [1] - 6:7
**Confidential** [2] -
71:10, 80:3
**confidential** [6] - 33:7,

34:8, 43:18, 44:5,
51:5, 80:7
**confidentiality** [3] -
51:2, 57:9, 71:13
**confidentially** [2] -
72:9, 72:12
**confirm** [6] - 5:22,
53:25, 54:12, 76:7,
80:12
**confirmation** [1] -
78:3
**conflict** [1] - 107:13
**conform** [1] - 53:14
**conformance** [1] -
117:12
**confusion** [1] - 74:3
**connection** [16] -
10:3, 10:4, 12:13,
12:20, 13:16, 14:8,
67:17, 69:10, 69:13,
75:21, 92:22, 96:3,
99:2, 99:9, 102:18,
110:14
**consent** [2] - 115:11,
115:14
**consider** [4] - 74:4,
86:20, 87:10, 104:13
**considerable** [1] -
102:2
**considered** [1] - 44:10
**considering** [1] -
106:23
**consist** [1] - 111:14
**constitute** [2] - 5:8,
82:8
**constituted** [1] - 80:18
**constitutes** [1] - 82:17
**consulting** [1] -
108:24
**contact** [2] - 61:3,
61:5
**contacted** [3] - 56:1,
56:6, 56:12
**contacting** [2] - 86:20,
87:10
**contained** [1] - 16:14
**contemplated** [1] -
11:19
**contemporaneously**
[1] - 11:13
**contentious** [1] - 63:9
**contingent** [2] - 84:6,
113:12
**continuation** [1] -
23:17
**continue** [3] - 23:15,
33:23, 33:25
**Continued** [1] - 4:1
**continued** [1] - 58:11
**continues** [1] - 104:22

**control** [1] - 105:16
**conversation** [4] -
42:4, 42:5, 42:10,
95:5
**conversations** [1] -
72:6
**converse** [2] - 74:7,
74:13
**conversing** [2] - 72:8,
72:11
**convey** [2] - 74:6, 99:7
**convoluted** [1] - 60:24
**coordinate** [2] - 44:17,
53:22
**coordinated** [1] -
114:3
**copied** [4] - 61:20,
82:22, 95:21, 99:24
**copies** [2] - 7:13,
49:16
**copy** [27] - 9:1, 11:1,
11:12, 25:4, 25:9,
25:11, 32:9, 32:14,
37:5, 40:2, 42:24,
43:23, 43:24, 44:7,
45:25, 46:16, 47:11,
48:9, 49:2, 51:18,
52:15, 52:18, 57:5,
57:10, 57:23, 61:9,
83:13
**copy).pdf** [2] - 43:19,
44:6
**copying** [2] - 62:7,
83:6
**Corporate** [1] - 2:18
**correct** [128] - 6:1,
12:14, 12:23, 12:24,
12:25, 13:1, 13:4,
13:6, 13:20, 15:17,
16:6, 16:9, 17:12,
17:19, 17:21, 17:22,
18:1, 18:17, 18:18,
18:20, 18:21, 23:11,
24:12, 25:1, 25:9,
25:11, 25:12, 25:18,
25:20, 25:21, 26:11,
26:12, 28:8, 28:12,
28:22, 28:23, 29:3,
29:4, 29:21, 29:22,
29:24, 34:3, 35:2,
35:13, 36:9, 36:13,
36:14, 37:4, 37:21,
37:22, 39:1, 39:11,
39:21, 39:25, 41:8,
41:14, 45:13, 50:9,
50:10, 50:13, 51:16,
55:24, 57:22, 58:6,
58:9, 58:19, 59:3,
59:8, 60:1, 60:2,
60:11, 60:13, 61:21,

61:22, 62:10, 64:23, 67:16, 68:6, 70:13, 70:14, 70:17, 72:9, 72:21, 73:3, 73:10, 74:9, 74:15, 75:21, 76:1, 76:11, 79:7, 80:2, 81:13, 81:17, 81:20, 81:24, 82:13, 82:25, 83:1, 83:5, 83:14, 83:17, 84:4, 84:5, 84:22, 86:1, 86:2, 86:17, 87:14, 87:16, 87:20, 87:23, 88:13, 88:21, 89:9, 91:6, 94:1, 94:14, 94:18, 94:19, 95:23, 96:5, 97:8, 97:9, 98:17, 99:10, 99:15, 117:9
**correctly** [5] - 80:16, 82:3, 82:10, 82:20, 99:4
**correspond** [1] - 77:18
**cost** [1] - 69:12
**COUNSEL** [2] - 2:1, 2:16
**counsel** [12] - 31:10, 41:23, 41:24, 56:21, 57:2, 81:19, 99:2, 107:11, 107:12, 107:18, 107:20, 108:12
**Counsel** [1] - 6:7
**count** [3] - 5:16, 5:18, 105:7
**counter** [1] - 74:7
**COUNTY** [1] - 117:3
**couple** [3] - 24:24, 101:23, 108:21
**courier** [1] - 45:22
**court** [6] - 19:10, 22:1, 22:6, 22:11, 82:18, 93:1
**COURT** [130] - 1:1, 1:24, 5:6, 5:24, 6:2, 6:6, 6:23, 7:2, 7:4, 7:7, 8:6, 8:10, 9:8, 9:13, 10:17, 10:21, 11:3, 11:6, 11:14, 11:17, 11:19, 11:25, 12:3, 12:5, 14:18, 15:1, 15:4, 15:7, 16:1, 16:24, 17:5, 19:6, 19:8, 19:17, 26:5, 30:1, 30:23, 32:21, 34:16, 35:1, 37:12, 40:10, 41:7, 43:9, 46:23, 48:16, 51:12, 53:1, 55:3,

56:9, 56:15, 56:24, 57:4, 57:13, 58:25, 60:7, 63:5, 66:9, 66:16, 66:18, 67:24, 71:16, 72:14, 80:9, 85:6, 85:12, 90:12, 90:23, 91:11, 92:12, 92:18, 92:24, 93:5, 93:7, 97:23, 98:8, 99:18, 100:10, 100:17, 100:19, 100:22, 100:24, 101:7, 101:9, 101:11, 101:21, 101:25, 102:11, 102:13, 102:24, 103:5, 103:11, 103:24, 104:2, 104:5, 104:17, 105:2, 105:17, 105:25, 106:3, 106:5, 106:12, 107:2, 107:4, 107:24, 108:5, 108:13, 108:15, 108:20, 109:10, 109:15, 109:22, 110:10, 110:18, 110:22, 111:13, 111:23, 112:2, 112:16, 112:18, 114:5, 114:9, 115:2, 115:14, 115:22, 116:2, 116:11, 116:17, 116:19, 117:6
**Court** [10] - 8:17, 10:9, 10:10, 92:14, 102:3, 106:24, 107:19, 108:10, 117:6, 117:20
**Court's** [5] - 8:14, 9:12, 10:25, 92:11, 106:19
**courtesy** [1] - 105:21
**COURTROOM** [5] - 19:10, 19:13, 66:15, 101:19, 116:20
**courtroom** [2] - 9:9, 22:2
**COVID** [6] - 8:24, 8:25, 9:3, 9:18, 10:14
**creditors** [2] - 13:12, 18:16
**criminal** [2] - 109:25, 110:17
**Cross** [2] - 3:4, 3:6
**CROSS** [2] - 12:8, 57:14
**cross** [4] - 104:13,

104:22, 104:25, 105:13
**Cross-Examination** [2] - 3:4, 3:6
**cross-examination** [3] - 104:13, 104:22, 104:25
**CROSS-EXAMINATION** [2] - 12:8, 57:14
**cross-examine** [1] - 105:13
**crosses** [1] - 105:15
**CRR** [1] - 1:23
**CSR** [2] - 1:23, 117:20
**Culig** [10] - 26:19, 26:20, 61:20, 61:22, 68:25, 69:15, 70:2, 83:13, 92:6, 92:14
**Culig's** [1] - 92:1
**Cummings** [1] - 6:5
**Cummings-Cefali** [1] - 6:5
**cumulative** [1] - 115:9
**current** [1] - 104:17
**custodian** [3] - 111:9, 112:4, 112:6
**custom** [1] - 103:21

## D

**dance** [1] - 77:10
**Date** [1] - 117:15
**date** [31] - 18:8, 18:25, 33:2, 33:6, 37:16, 40:15, 43:12, 44:8, 44:18, 45:3, 45:7, 46:25, 47:13, 47:17, 47:18, 48:20, 53:4, 53:21, 56:3, 58:13, 64:13, 79:22, 85:23, 86:25, 87:8, 87:18, 89:2, 89:3, 89:8, 89:19, 91:5
**dated** [2] - 59:18, 63:25
**dates** [8] - 28:20, 35:14, 38:22, 38:23, 41:11, 45:7, 49:4, 50:18
**Dave** [7] - 31:20, 38:4, 73:25, 74:20, 77:5, 78:13, 83:10
**DAVID** [3] - 3:5, 19:12, 19:15
**David** [6] - 19:9, 19:15, 41:24, 47:6, 53:13, 104:24
**DAY** [1] - 1:8
**day-to-day** [4] - 69:18,

69:21, 69:23, 70:2
**days** [12] - 70:15, 81:24, 86:4, 86:10, 86:25, 87:9, 90:19, 102:6, 106:17, 107:11, 110:5, 110:16
**deadlines** [1] - 86:7
**deal** [7] - 51:4, 76:18, 77:13, 77:20, 77:22, 113:15, 114:16
**Deal** [1] - 76:13
**dealings** [2] - 20:22, 54:19
**DEAN** [2] - 2:17, 2:18
**deansteward7777@ gmail.com** [1] - 2:20
**Debbie** [1] - 117:20
**DEBBIE** [3] - 1:23, 117:5, 117:19
**debtor** [1] - 13:14
**debts** [3] - 13:15, 13:18, 13:19
**December** [49] - 22:19, 26:11, 26:23, 28:6, 29:2, 29:20, 30:3, 30:4, 30:6, 30:9, 30:12, 30:13, 30:16, 31:9, 31:12, 31:14, 31:16, 31:23, 32:1, 33:4, 33:8, 33:17, 33:22, 34:9, 34:20, 37:18, 37:24, 40:17, 43:14, 47:2, 48:21, 54:24, 64:1, 64:4, 71:3, 73:20, 79:23, 81:8, 81:16, 81:23, 82:2, 82:8, 84:18, 87:18, 88:3, 88:9, 88:11
**decide** [3] - 8:14, 22:7, 22:16
**decided** [1] - 52:7
**declaration** [11] - 9:20, 10:10, 10:22, 11:8, 11:10, 11:11, 11:16, 11:20, 60:4, 103:6, 103:12
**declarations** [2] - 111:9, 112:5
**defend** [1] - 21:13
**defendant** [70] - 5:19, 8:15, 9:4, 16:21, 16:22, 24:22, 25:1, 25:5, 25:17, 26:2, 29:2, 31:15, 31:19, 32:7, 32:10, 33:3, 33:13, 36:16, 37:1, 37:6, 37:23, 38:3, 38:14, 39:8, 39:18,

39:23, 40:3, 40:16, 40:20, 41:4, 41:20, 42:3, 42:9, 42:11, 43:5, 43:13, 43:21, 44:4, 45:12, 46:13, 46:17, 46:20, 47:3, 47:19, 48:6, 48:10, 48:20, 49:14, 50:8, 51:9, 52:11, 52:14, 52:16, 52:22, 52:23, 54:25, 55:7, 55:10, 55:14, 56:7, 99:22, 108:24, 109:5, 109:25, 111:6, 114:4, 115:2, 115:18, 116:15
**Defendant** [1] - 1:9
**DEFENDANT** [1] - 2:14
**defendant's** [12] - 8:19, 8:24, 26:13, 31:22, 37:16, 37:17, 40:4, 46:25, 53:4, 54:6, 54:13, 54:17
**defense** [15] - 9:24, 10:2, 10:19, 11:1, 11:21, 101:23, 102:5, 103:15, 104:25, 105:12, 108:22, 109:4, 111:2, 113:3, 116:7
**definitely** [1] - 69:23
**delay** [2] - 88:18, 103:15
**delayed** [2] - 90:13, 90:16
**delivered** [1] - 77:23
**delivery** [1] - 45:21
**Denver** [4] - 22:25, 68:8, 68:17, 68:24
**deposition** [1] - 68:23
**depositions** [1] - 69:2
**deposits** [2] - 86:23, 86:24
**DEPUTY** [5] - 19:10, 19:13, 66:15, 101:19, 116:20
**describe** [1] - 23:17
**desires** [1] - 10:10
**details** [2] - 49:20, 49:22
**device** [1] - 115:12
**dhinospaan@yahoo. com** [1] - 1:25
**difference** [1] - 30:5
**differences** [1] - 52:6
**different** [5] - 30:2, 46:7, 54:9, 54:11, 116:5
**digital** [1] - 115:12

diplomacy [1] - 23:24
Direct [1] - 3:6
direct [7] - 17:1,
66:19, 67:5, 95:4,
105:11, 106:13,
106:24
DIRECT [1] - 19:19
directed [1] - 115:7
directing [3] - 14:19,
15:8, 115:25
direction [3] - 70:16,
81:8, 115:17
directive [2] - 93:4,
106:20
directly [3] - 24:11,
30:25, 31:2
directs [1] - 105:14
discharge [2] - 13:18,
109:10
disclose [1] - 107:5
disclosed [2] - 5:18,
109:5
disclosure [2] - 5:22,
6:11
discretion [1] - 107:18
discuss [5] - 8:10,
38:7, 66:11, 101:13,
102:22
discussed [3] - 5:13,
43:22, 95:12
discussing [4] -
30:25, 31:2, 31:3,
42:20
discussion [2] -
11:24, 42:9
discussions [2] -
54:25, 58:22
disk [1] - 7:12
dismissal [8] - 43:24,
47:16, 49:6, 49:17,
51:23, 52:2, 57:24
dismissed [2] - 18:24,
22:2
dispute [7] - 20:24,
21:7, 21:8, 49:11,
52:8, 67:21, 75:7
disputes [1] - 34:22
distance [1] - 9:16
DISTRICT [3] - 1:1,
1:2, 1:3
District [3] - 112:22,
117:6, 117:7
DIVISION [1] - 1:2
Docket [2] - 7:9, 115:3
docs [1] - 6:11
document [29] -
15:23, 16:3, 16:4,
16:7, 17:3, 33:11,
36:9, 36:13, 36:15,
36:23, 38:17, 41:3,

41:5, 41:12, 44:6,
49:9, 50:18, 52:5,
52:8, 58:11, 58:17,
59:21, 76:9, 80:23,
82:8, 82:12, 82:16,
85:23, 110:19
documentation [1] -
57:1
documented [1] -
115:2
documents [12] -
7:10, 7:11, 7:13,
7:17, 7:18, 31:13,
44:3, 56:21, 76:13,
76:20, 76:21, 82:2
docx [1] - 33:10
dog [3] - 108:3, 108:6,
108:8
dollar [3] - 28:15,
30:18, 38:22
dollars [1] - 86:12
done [7] - 44:11,
44:19, 84:2, 90:2,
91:8, 110:14, 112:3
doubt [1] - 65:2
doubts [1] - 96:16
down [4] - 5:9, 34:19,
77:4, 77:5
Downes [18] - 26:17,
27:8, 29:5, 68:5,
70:17, 71:21, 72:4,
72:16, 73:1, 73:5,
78:14, 78:25, 79:10,
79:12, 80:11, 81:8,
83:13, 87:12
draft [27] - 4:12, 31:10,
33:17, 33:18, 34:2,
34:12, 35:4, 36:1,
36:15, 36:17, 36:22,
38:6, 38:14, 38:23,
39:6, 40:24, 41:2,
41:13, 41:20, 42:20,
45:12, 70:15, 77:6,
78:4, 78:8, 81:22,
98:16
draft.docx [1] - 38:2
drafted [1] - 98:17
drafts [1] - 97:17
drew [1] - 94:3
Drive [1] - 46:4
drop [1] - 77:4
Drum [11] - 104:10,
104:12, 105:10,
108:23, 109:8,
110:8, 110:24,
111:4, 111:21,
112:3, 112:11
Drum's [4] - 105:11,
105:23, 109:2,
109:11

due [2] - 18:8, 54:4
during [10] - 23:10,
23:14, 55:5, 63:1,
73:1, 75:13, 107:9,
108:11, 111:3,
116:15
duties [2] - 109:11,
109:17

E

e-mail [156] - 4:7, 4:9,
4:10, 4:13, 4:15,
4:16, 4:19, 4:21,
8:16, 8:18, 9:22,
10:13, 25:16, 25:17,
25:18, 25:21, 26:23,
27:3, 27:9, 28:5,
28:11, 28:17, 28:18,
28:24, 29:1, 29:6,
30:3, 30:4, 30:5,
31:16, 31:21, 31:24,
32:6, 32:9, 32:15,
33:3, 33:21, 33:22,
34:24, 37:1, 37:5,
37:16, 37:17, 37:19,
37:20, 37:23, 39:7,
39:10, 39:17, 39:20,
39:21, 39:23, 40:3,
40:4, 40:16, 40:20,
41:22, 42:3, 42:19,
42:24, 42:25, 43:12,
43:16, 43:21, 44:2,
44:15, 44:19, 45:21,
46:13, 46:16, 46:20,
46:25, 47:4, 48:5,
48:9, 48:20, 49:14,
49:20, 49:22, 51:7,
52:11, 52:13, 52:17,
52:19, 53:4, 53:7,
53:9, 53:24, 55:10,
61:14, 61:17, 62:2,
62:8, 62:9, 64:25,
65:18, 66:2, 70:22,
71:22, 73:6, 73:9,
73:11, 74:1, 74:2,
74:13, 74:15, 74:19,
75:1, 75:2, 76:6,
76:8, 77:7, 77:17,
77:21, 78:24, 79:1,
79:16, 79:18, 79:19,
79:25, 80:12, 81:13,
82:13, 82:22, 82:24,
83:7, 83:11, 83:17,
83:19, 83:21, 83:22,
84:3, 84:14, 84:15,
85:24, 85:25, 87:21,
88:5, 88:14, 89:12,
89:13, 89:14, 91:14,
91:23, 95:21, 99:24,
107:14, 112:20,

113:25
e-mail's [1] - 40:11
e-mailed [2] - 70:15,
96:3
e-mails [26] - 24:3,
24:22, 24:25, 25:2,
25:3, 25:4, 25:11,
25:25, 26:1, 26:10,
28:4, 28:24, 34:23,
37:12, 40:2, 40:11,
43:4, 43:5, 52:13,
52:14, 52:16, 52:21,
52:23, 65:4, 65:6
EA [1] - 14:23
Eagan [7] - 12:21,
13:2, 13:17, 14:10,
17:11, 17:16, 18:3
Eagan's [1] - 15:14
early [2] - 90:8, 106:7
easier [2] - 59:11,
91:20
effect [1] - 88:5
effectively [1] - 92:15
effort [2] - 21:19, 72:4
either [5] - 25:1,
60:15, 88:11, 91:8,
106:17
employed [1] - 19:23
employee [1] - 108:23
employees [1] - 61:25
end [6] - 52:3, 52:9,
72:1, 103:25,
106:14, 107:6
ended [1] - 105:1
enforceable [1] -
82:17
enforcement [1] -
82:19
enforcing [1] - 60:20
engagement [1] -
109:11
ensued [1] - 14:15
entailed [1] - 23:18
entered [3] - 34:9,
44:10, 90:20
entire [1] - 16:22
entirety [1] - 98:10
entitled [4] - 11:11,
107:25, 108:17,
117:11
entity [1] - 22:8
especially [1] - 106:5
ESQ [2] - 2:15, 2:18
essentially [1] - 13:14
estimate [5] - 102:6,
103:17, 106:16
estimated [1] - 104:24
estimates [1] - 104:7
et [1] - 103:16
Evan [1] - 109:21

evening [3] - 64:9,
101:17, 101:18
event [3] - 10:1, 23:4
eventually [2] - 12:13,
53:20
EVIDENCE [1] - 4:6
evidence [14] - 14:20,
15:2, 17:3, 17:19,
25:25, 48:13, 67:22,
71:12, 87:25, 95:13,
104:2, 111:14,
111:20, 111:22
Evidence [1] - 71:19
exact [2] - 18:8, 18:24
exactly [2] - 60:21,
66:5
examination [7] -
66:19, 67:5, 95:4,
104:13, 104:22,
104:25
Examination [5] - 3:4,
3:6, 3:6, 3:7, 3:7
EXAMINATION [5] -
12:8, 19:19, 57:14,
99:20, 101:1
examine [1] - 105:13
example [1] - 104:24
except [2] - 30:8,
32:11
exception [2] - 37:7,
48:11
exchange [8] - 30:17,
31:24, 44:1, 44:14,
66:1, 85:25, 87:21,
88:14
exchanged [1] - 84:20
exclude [1] - 109:7
excused [4] - 19:6,
19:8, 101:7, 101:9
execute [3] - 31:12,
44:8, 82:1
executed [22] - 43:25,
44:13, 44:21, 48:23,
48:25, 49:15, 50:3,
50:15, 51:7, 51:18,
57:5, 57:10, 57:21,
57:23, 58:1, 58:4,
58:8, 58:12, 61:15,
65:25, 82:7, 84:17
execution [7] - 38:10,
39:8, 43:19, 43:23,
43:24, 44:6, 92:20
Exhibit [61] - 6:16,
7:9, 7:12, 7:24,
13:21, 24:16, 24:20,
24:22, 25:14, 25:25,
26:7, 32:2, 32:3,
32:6, 32:18, 33:1,
33:22, 35:6, 36:5,
36:24, 37:1, 37:8,

37:14, 37:21, 39:2,
39:16, 40:7, 40:14,
40:15, 40:23, 42:17,
42:19, 43:4, 43:9,
43:11, 45:17, 46:10,
46:11, 46:19, 46:24,
48:1, 48:3, 48:14,
48:18, 51:15, 51:21,
52:10, 52:21, 53:3,
57:25, 58:3, 62:24,
63:24, 71:7, 86:1,
87:24, 93:8, 93:15,
94:11, 96:10, 96:24
**EXHIBIT** [1] - 4:6
**exhibit** [12] - 7:10,
32:12, 41:10, 44:23,
45:14, 47:14, 47:15,
50:3, 58:7, 71:6,
89:16, 94:23
**exhibits** [11] - 5:10,
5:14, 6:19, 7:14,
50:14, 70:19, 71:6,
109:2, 111:2,
111:18, 112:11
**EXHIBITS** [1] - 4:4
**Exhibits** [1] - 5:7
**existed** [2] - 18:3,
80:21
**existence** [1] - 82:19
**expected** [2] - 80:6,
104:23, 112:21
**expects** [1] - 113:2
**experience** [3] -
72:19, 77:11, 88:17
**expert** [3] - 83:3,
108:24, 109:5
**explain** [2] - 13:7,
59:14
**explained** [1] - 95:9
**explanation** [1] -
68:18
**explore** [2] - 9:9, 10:6
**express** [2] - 45:21,
102:3
**extremely** [1] - 105:5
**eye** [2] - 63:2, 63:3

## F

**fabricated** [1] - 92:22
**facilitate** [2] - 86:22,
113:10
**facilitated** [1] - 22:23
**fact** [13] - 14:23, 22:2,
49:9, 52:5, 57:8,
60:4, 66:21, 87:4,
88:4, 96:2, 98:5,
109:4, 115:8
**facts** [2] - 67:22, 92:22
**fail** [1] - 100:12

**fair** [24] - 12:15, 12:17,
17:11, 25:4, 32:9,
32:14, 37:5, 40:2,
42:24, 46:16, 48:9,
52:14, 59:11, 63:2,
63:3, 63:6, 63:7,
63:10, 69:19, 69:20,
70:9, 70:11, 72:24,
112:9
**fairly** [3] - 63:9, 92:4,
112:8
**faith** [4] - 110:8,
113:17, 115:1,
116:16
**fall** [3] - 111:8, 114:24,
115:19
**familiar** [2] - 20:17,
38:11
**familiarity** [1] - 68:14
**FBI** [2] - 113:18,
113:19
**FEDERAL** [1] - 1:24,
117:5
**Federal** [7] - 68:5,
70:16, 71:19, 73:1,
83:12, 105:9, 117:20
**federal** [2] - 22:1,
110:17
**fee** [1] - 18:2
**fees** [2] - 86:11, 87:6
**feet** [1] - 9:17
**few** [4] - 24:12, 98:14,
105:14, 108:8
**fight** [1] - 108:4
**fights** [1] - 108:7
**figure** [1] - 64:6
**file** [10] - 16:4, 49:18,
51:24, 103:23,
103:24, 104:4,
115:18, 116:9,
116:11
**filed** [14] - 11:9, 11:10,
11:12, 16:3, 16:7,
16:10, 16:12, 16:15,
21:21, 22:1, 52:9,
114:20
**filing** [7] - 7:12, 14:9,
14:23, 21:16, 52:1,
114:18, 115:18
**filings** [1] - 92:14
**fill** [1] - 39:13
**final** [27] - 5:20, 23:12,
23:13, 34:21, 44:7,
44:10, 44:22, 49:2,
50:3, 50:15, 51:7,
57:21, 78:8, 82:9,
89:11, 94:10, 94:14,
94:15, 94:17, 95:25,
96:4, 96:13, 97:18,
97:20, 98:2, 98:5,

98:13
**fine** [7] - 102:11,
102:13, 104:5,
108:2, 108:13,
108:15, 109:22
**firm** [18] - 8:19, 13:17,
14:14, 14:24, 16:7,
17:14, 17:16, 17:21,
17:24, 20:5, 20:6,
20:7, 20:11, 21:10,
21:13, 61:21, 61:25,
69:16
**first** [35] - 5:17, 6:9,
6:12, 19:14, 27:5,
27:15, 28:11, 28:13,
29:13, 31:10, 33:12,
33:17, 34:5, 48:22,
53:10, 54:23, 64:2,
70:22, 71:9, 75:9,
79:5, 81:7, 81:22,
83:9, 85:23, 87:10,
89:8, 89:19, 90:25,
96:4, 98:19, 98:24,
99:12, 105:22,
115:14
**firsthand** [4] - 59:22,
59:24, 101:3, 101:5
**fishy** [1] - 93:1
**five** [5] - 8:13, 73:25,
105:9, 106:7, 114:9
**flag** [2] - 111:6, 112:14
**flip** [1] - 64:10
**folks** [1] - 113:21
**follow** [3] - 36:7,
60:23, 106:19
**follow-up** [1] - 36:7
**following** [4] - 29:20,
35:20, 41:17, 42:1
**follows** [5] - 9:15,
27:10, 45:23, 71:23,
85:14
**FOR** [3] - 2:3, 2:14,
2:16
**foregoing** [1] - 117:9
**form** [2] - 66:12,
101:14
**formal** [13] - 31:11,
33:17, 76:9, 76:13,
76:20, 76:21, 76:22,
80:14, 81:22, 82:6,
89:10, 90:3, 90:4
**format** [2] - 65:5,
117:11
**forth** [5] - 24:2, 25:3,
28:24, 34:23, 84:3
**forward** [1] - 102:23
**forwarding** [2] - 51:9,
51:14
**foundation** [4] -
34:15, 56:13,

112:12, 112:14
**Foundation** [1] -
14:16
**founded** [1] - 20:11
**four** [6] - 9:17, 35:14,
102:6, 105:4,
105:13, 113:2
**four-day** [1] - 113:2
**Frank** [6] - 14:10,
15:17, 18:20, 68:13,
68:17, 69:4
**fraud** [1] - 105:7
**FRE** [3] - 71:10, 71:12,
80:3
**free** [1] - 108:16
**Friday** [8] - 11:7,
11:24, 33:4, 48:21,
105:18, 105:22,
107:13, 113:4
**friend** [1] - 16:20
**front** [8] - 14:1, 14:3,
24:15, 30:20, 32:3,
48:3, 114:22, 115:10
**full** [1] - 82:9
**fully** [20] - 44:21,
48:23, 48:25, 49:15,
50:3, 50:15, 51:7,
51:18, 55:17, 57:5,
57:10, 57:20, 57:23,
58:1, 58:3, 58:7,
58:12, 61:14, 82:7,
84:17
**funds** [3] - 36:4,
95:10, 95:17
**furthermore** [1] -
10:12
**future** [1] - 86:8

## G

**Galicia** [5] - 114:7,
114:23, 115:4,
115:21, 115:24
**gap** [1] - 72:5
**generally** [14] - 13:7,
16:14, 49:8, 51:21,
63:20, 63:21, 71:14,
72:6, 72:7, 77:14,
79:6, 88:18, 89:4,
93:13
**gentleman** [1] - 69:25
**gentlemen** [3] - 12:3,
66:10, 101:12
**given** [6] - 7:16, 13:14,
22:22, 79:16, 87:1,
109:8
**Gonzalez** [2] - 61:20,
61:23
**good-faith** [1] - 110:8
**Government** [35] -

5:9, 6:18, 7:15, 7:17,
8:2, 8:5, 9:23, 10:2,
10:23, 11:15, 12:12,
19:9, 25:13, 25:24,
32:17, 40:6, 43:3,
52:21, 60:9, 102:4,
102:9, 103:1,
103:17, 103:19,
106:13, 106:16,
106:22, 107:14,
107:16, 110:7,
113:10, 113:20,
114:15, 116:8
**government** [5] - 37:8,
46:19, 48:13, 108:9,
116:11
**GOVERNMENT** [3] -
3:4, 3:5, 19:12
**Government's** [8] -
5:6, 7:8, 103:25,
104:4, 104:17,
107:25, 108:11,
108:18
**grayed** [2] - 25:6,
32:12
**grayed-out** [2] - 25:6,
32:12
**great** [1] - 73:24
**Greg** [3] - 34:10, 47:13
**Gregory** [4] - 20:20,
20:23, 56:6, 56:12
**Group** [1] - 108:23
**group** [1] - 108:24
**guess** [2] - 83:4,
115:17

## H

**Haan** [2] - 20:8, 20:10
**half** [1] - 105:1
**hand** [3] - 19:11, 23:8
114:4
**handled** [1] - 69:20
**handling** [5] - 24:4,
24:7, 69:18, 69:21,
70:1
**HANNA** [2] - 2:4, 2:9
**happy** [6] - 9:10, 10:6,
103:7, 113:16,
113:22, 116:4
**Harper** [4] - 114:19,
115:4, 115:19,
115:24
**header** [1] - 61:12
**hear** [4] - 6:24, 9:10,
102:18, 103:22
**heard** [2] - 6:2, 107:9
**hearing** [2] - 86:3,
86:25

hearsay [8] - 26:3, 32:19, 37:10, 40:8, 43:7, 52:25, 56:14, 56:22
Hearsay [2] - 46:21, 48:15
held [4] - 11:21, 22:21, 106:18, 117:10
helped [1] - 109:1
helpful [1] - 116:3
hereby [1] - 117:7
herein [4] - 31:8, 81:12, 81:13, 81:15
Hernandez [5] - 64:2, 70:25, 76:4, 77:5, 79:22
hiccups [1] - 103:14
Hino [1] - 117:20
HINO [3] - 1:23, 117:5, 117:19
Hino-Spaan [1] - 117:20
HINO-SPAAN [3] - 1:23, 117:5, 117:19
hired [1] - 16:21
holidays [1] - 87:1
home [1] - 106:7
Honor [115] - 5:12, 6:1, 6:5, 6:8, 6:15, 8:5, 8:8, 8:9, 8:13, 9:14, 10:9, 10:12, 11:5, 11:8, 11:18, 12:6, 14:25, 15:2, 15:6, 15:24, 17:4, 19:5, 19:7, 19:18, 25:13, 25:24, 26:3, 26:8, 32:17, 32:19, 34:14, 37:9, 37:10, 40:7, 40:8, 43:3, 51:10, 52:20, 52:24, 55:2, 56:14, 56:23, 57:3, 57:12, 58:24, 60:5, 66:8, 67:23, 71:15, 80:8, 85:11, 90:22, 92:8, 92:16, 92:19, 92:23, 97:22, 98:7, 99:17, 99:19, 100:8, 100:16, 100:23, 101:8, 101:10, 101:24, 102:1, 102:10, 102:16, 102:17, 102:19, 102:25, 103:3, 103:8, 103:9, 103:20, 104:3, 104:20, 105:3, 105:20, 106:11, 106:21, 107:7, 108:3, 108:9,

108:21, 109:13, 109:14, 109:20, 110:4, 110:12, 110:15, 110:25, 111:1, 111:6, 111:8, 111:9, 111:16, 112:1, 112:9, 112:14, 112:15, 112:17, 113:7, 113:23, 114:6, 114:12, 116:1, 116:4, 116:13, 116:18
Honor's [4] - 103:21, 113:12, 114:24, 115:17
HONORABLE [1] - 1:3
HOROUPIAN [2] - 3:4, 12:7
Horoupian [5] - 12:10, 15:5, 15:8, 16:2, 17:7
horrible [1] - 21:15
hour [5] - 75:14, 105:1, 105:2, 105:8, 106:8
hours [8] - 64:24, 65:17, 66:5, 74:18, 105:12, 105:13, 105:15, 105:24
hours' [1] - 107:22

**I**

idea [10] - 9:25, 69:9, 69:11, 69:12, 75:13, 75:18, 99:13, 110:15, 112:20
identified [3] - 7:11, 7:15, 111:25
identify [4] - 5:10, 32:12, 111:23, 112:3
identifying [1] - 25:10
ignore [1] - 30:22
III [4] - 24:14, 24:17, 24:18, 24:19
illegal [8] - 62:7, 83:2, 84:25, 85:17, 99:25, 100:2, 100:6, 100:14
imagine [1] - 25:7
immediately [4] - 10:15, 38:10, 39:8, 91:17, 91:23, 91:24
impeachment [3] - 6:20, 60:6, 109:6
implemented [1] - 94:14
important [6] - 9:24, 10:2, 69:3, 86:14, 86:15, 104:14

improper [1] - 60:6
IN [2] - 2:14, 4:5
in-party [1] - 23:14
in-person [2] - 23:10, 23:20
inaccurate [2] - 95:14, 95:15
include [2] - 52:17, 79:21
included [4] - 53:19, 80:4, 80:6, 88:5
includes [3] - 45:11, 58:3, 58:8
including [4] - 31:22, 33:21, 64:20, 83:7
incorporates [1] - 76:9
incurred [1] - 69:13
indicated [3] - 5:6, 5:10, 8:9
individual [5] - 9:4, 20:20, 21:2, 34:10, 111:7
individuals [1] - 24:24
infect [1] - 10:19
info [2] - 35:22, 42:2
inform [2] - 60:17, 108:12
information [10] - 32:13, 36:2, 36:3, 42:8, 48:11, 49:23, 49:25, 53:11, 53:21, 96:3
informed [11] - 27:8, 60:21, 71:21, 73:5, 86:10, 87:5, 88:3, 108:22, 111:1, 111:5, 112:23
informing [1] - 74:12
initial [6] - 5:22, 37:20, 49:24, 54:3, 98:16
inquire [1] - 55:11, 55:15, 56:2
insert [2] - 35:22, 42:2
inserted [4] - 39:14, 41:19, 45:12, 50:8
inserting [1] - 41:4
insertions [1] - 25:17
installment [7] - 27:15, 27:17, 27:19, 29:13, 29:15, 29:17, 30:7
installments [4] - 27:14, 29:12, 30:7, 30:11
instead [1] - 22:11
instructed [1] - 85:4
instructions [19] - 38:9, 39:8, 39:9, 53:14, 53:17, 88:18,

88:25, 89:3, 89:22, 90:5, 90:9, 90:14, 90:17, 90:19, 91:1, 91:5, 91:15, 91:17, 91:22
intellectual [5] - 20:18, 20:25, 21:6, 21:8, 21:12
intend [6] - 5:24, 107:9, 111:2, 111:20, 112:11, 112:13
intended [1] - 77:18
intending [1] - 5:15
intends [3] - 5:6, 105:12, 111:6
intention [1] - 111:3
interactions [2] - 20:22, 24:10
interested [1] - 60:20
interim [1] - 75:1
Internal [1] - 18:11
interpretation [1] - 113:25
interrupt [3] - 108:1, 108:16, 108:17
interruption [1] - 108:1
interstate [1] - 105:10
intervene [2] - 21:20, 22:22
interview [2] - 10:3, 115:16
interviewed [2] - 9:4, 12:13
interviews [2] - 9:5, 110:8
introduce [1] - 105:6
investigating [1] - 56:17
involved [5] - 24:3, 26:21, 61:23, 68:17, 69:7
involvement [1] - 54:5
involving [2] - 20:25, 21:12
irrelevant [2] - 90:11, 113:24
issue [6] - 11:4, 102:8, 102:25, 107:8, 108:9, 110:25
issued [1] - 116:8
issues [14] - 14:22, 23:22, 30:15, 55:20, 55:22, 63:8, 66:12, 73:14, 80:21, 101:14, 101:23, 102:7, 106:11, 108:21
it.. [1] - 51:22

itself [2] - 21:13, 114:1

**J**

JAG [2] - 68:11
JAG's [1] - 86:23
JAMES [1] - 1:3
January [49] - 27:12, 27:16, 27:18, 27:20, 28:21, 29:11, 29:14, 29:16, 29:18, 30:10, 35:16, 35:17, 38:25, 41:24, 45:5, 45:8, 45:9, 50:18, 50:21, 50:22, 53:6, 53:21, 54:4, 54:15, 54:18, 54:23, 55:6, 55:9, 55:15, 55:18, 55:19, 58:18, 59:2, 59:8, 59:16, 59:18, 86:5, 89:20, 90:1, 90:25, 91:1, 91:3, 91:4
Jason [2] - 14:10, 15:16
Joe [4] - 26:19, 26:20, 69:15, 70:2
JOHN [2] - 1:8, 2:15
John [6] - 70:1, 70:3, 105:10, 105:11, 107:8, 108:23
joint [1] - 70:10
Judge [20] - 27:8, 29:5, 68:5, 68:11, 70:17, 71:21, 72:4, 72:16, 73:1, 73:5, 78:14, 78:25, 79:10, 79:12, 80:11, 81:8, 83:13, 86:21, 87:11, 87:12
judge [4] - 22:9, 22:16, 52:1, 52:9
JUDGE [1] - 1:3
Judicial [1] - 117:12
July [5] - 5:11, 5:20, 5:21, 6:10, 6:11
jump [1] - 79:4
June [1] - 5:11
jurors [1] - 106:7
jury [16] - 5:5, 12:1, 12:2, 12:4, 13:7, 17:20, 18:7, 18:22, 57:20, 65:21, 71:1, 71:12, 86:19, 90:10, 93:21, 101:20

**K**

keep [2] - 23:21, 51:4
keeping [2] - 69:22, 92:4

**kind** [7] - 21:18, 22:6, 23:24, 26:10, 60:23, 89:5
**knowledge** [9] - 17:13, 18:2, 57:25, 58:6, 58:15, 59:22, 59:24, 101:4, 101:5
**knows** [4] - 36:11, 71:12, 111:1, 111:8

**L**

**Lacks** [1] - 56:13
**lacks** [1] - 34:15
**ladies** [3] - 12:3, 66:10, 101:12
**lady** [2] - 109:19, 110:13
**laid** [1] - 112:13
**language** [6] - 41:19, 45:11, 75:20, 95:24, 96:1, 96:2
**last** [9] - 9:1, 19:14, 23:1, 25:16, 30:8, 31:24, 36:12, 42:25, 70:23
**late** [2] - 86:4, 91:6
**latest** [1] - 7:8
**LAW** [1] - 2:17
**law** [9] - 7:20, 7:21, 16:7, 17:21, 17:24, 20:3, 93:1, 111:13, 116:6
**lawsuit** [3] - 21:20, 21:22, 22:1
**lawyer** [4] - 26:20, 68:16, 68:19, 69:6, 69:7, 99:8
**lawyers** [5] - 16:7, 60:14, 60:17, 61:2, 77:13
**lay** [1] - 112:12
**lead** [1] - 107:5
**lead-off** [1] - 107:5
**Leading** [2] - 34:25, 41:6
**leading** [2] - 29:25, 56:8
**leaf** [1] - 95:19
**least** [5] - 12:18, 52:7, 105:24, 110:1, 113:3
**leave** [2] - 107:18, 112:24
**leaving** [1] - 54:21
**led** [1] - 14:22
**Lee** [2] - 20:8, 20:9
**left** [5] - 52:6, 70:12, 72:2, 72:3, 104:7
**legal** [2] - 20:24, 92:22
**legitimately** [2] -

17:14, 17:21
**length** [1] - 106:5
**lengthier** [1] - 104:23
**lengthy** [1] - 104:13
**less** [2] - 74:18, 115:15
**letter** [1] - 7:9
**letters** [1] - 25:19
**liability** [1] - 34:11
**liar** [1] - 92:15
**lie** [1] - 100:5
**light** [1] - 10:24
**likely** [4] - 16:13, 110:25, 115:6, 115:7
**limited** [3] - 7:16, 34:11, 104:11
**line** [5] - 26:14, 26:15, 47:17, 93:22, 94:3
**lines** [1] - 63:18
**liquidated** [1] - 13:11
**liquidation** [1] - 13:10
**list** [4] - 106:14, 106:22, 109:16, 114:9
**listed** [7] - 28:20, 45:24, 62:2, 62:3, 62:4, 71:24
**litigation** [1] - 14:15
**LLC** [2] - 20:13, 20:16
**location** [1] - 69:1
**look** [43] - 24:13, 24:16, 28:4, 28:25, 32:2, 34:18, 35:3, 35:18, 36:5, 36:24, 37:15, 37:19, 38:18, 39:2, 42:17, 44:22, 45:10, 45:14, 46:6, 46:10, 47:10, 47:14, 48:1, 48:19, 50:2, 50:6, 50:11, 51:22, 52:10, 53:9, 61:11, 63:24, 65:7, 65:12, 81:5, 85:22, 86:18, 87:24, 87:25, 94:12, 96:16, 98:13, 110:9
**looked** [4] - 30:4, 37:20, 45:11, 48:6
**looking** [4] - 39:16, 50:16, 71:5, 87:9
**looks** [2] - 11:25, 25:16
**LOS** [1] - 117:3
**Los** [1] - 2:12
**lunch** [2] - 5:13, 112:22
**lying** [1] - 101:4

**M**

**Magistrate** [6] - 68:5,

70:17, 73:1, 83:12, 86:20, 87:11
**mail** [157] - 4:7, 4:9, 4:10, 4:13, 4:15, 4:16, 4:19, 4:21, 8:16, 8:18, 9:22, 10:13, 25:16, 25:17, 25:18, 25:21, 26:23, 27:3, 27:9, 28:5, 28:11, 28:17, 28:18, 28:24, 29:1, 29:6, 30:3, 30:4, 30:5, 31:16, 31:21, 31:24, 32:6, 32:9, 32:15, 33:3, 33:21, 33:22, 34:24, 37:1, 37:5, 37:16, 37:17, 37:19, 37:20, 37:23, 39:7, 39:10, 39:17, 39:20, 39:21, 39:23, 40:3, 40:4, 40:16, 40:20, 41:22, 42:3, 42:19, 42:24, 42:25, 43:12, 43:16, 43:21, 44:2, 44:15, 44:19, 45:21, 46:13, 46:16, 46:20, 46:25, 47:4, 48:5, 48:9, 48:20, 49:14, 49:20, 49:22, 51:7, 52:11, 52:13, 52:17, 52:19, 53:4, 53:7, 53:9, 53:24, 55:10, 61:14, 61:17, 62:2, 62:8, 62:9, 64:25, 65:18, 66:2, 70:22, 71:22, 73:6, 73:9, 73:11, 74:1, 74:2, 74:13, 74:15, 74:19, 75:1, 75:2, 76:6, 76:8, 77:7, 77:17, 77:21, 78:24, 79:1, 79:16, 79:18, 79:19, 79:25, 80:12, 81:13, 82:13, 82:22, 82:24, 83:7, 83:11, 83:17, 83:19, 83:21, 83:22, 84:3, 84:14, 84:15, 85:24, 85:25, 87:21, 88:5, 88:14, 89:12, 89:13, 89:14, 91:14, 91:23, 95:21, 99:24, 107:14, 112:20, 113:25
**mail's** [1] - 40:11
**mailed** [2] - 70:15, 96:3
**mails** [26] - 24:3, 24:22, 24:25, 25:2, 25:3, 25:4, 25:11, 25:25, 26:1, 26:10, 28:4, 28:24, 34:23,

37:12, 40:2, 40:11, 43:4, 43:5, 52:13, 52:14, 52:16, 52:21, 52:23, 65:4, 65:6
**manner** [2] - 35:11, 55:10
**March** [1] - 50:22
**MARK** [2] - 3:4, 12:7
**markup** [1] - 79:12
**material** [4] - 31:25, 37:7, 78:4, 80:22
**math** [1] - 20:2
**matter** [17] - 8:12, 21:9, 21:25, 22:3, 22:12, 22:16, 22:19, 52:9, 52:22, 58:1, 62:16, 62:20, 68:7, 69:10, 69:13, 110:17, 117:11
**matters** [3] - 20:18, 83:3, 88:17
**mean** [9] - 22:5, 44:15, 54:2, 55:22, 58:15, 75:4, 76:21, 104:9, 105:22
**meaning** [6] - 10:14, 59:22, 77:22, 77:23, 107:12, 107:17
**meaningful** [1] - 111:11
**means** [1] - 13:8
**mediation** [30] - 22:13, 22:20, 22:21, 22:24, 23:1, 23:7, 23:14, 23:15, 24:5, 24:8, 66:20, 66:22, 66:24, 67:6, 67:10, 67:11, 67:18, 67:21, 68:1, 68:4, 70:6, 70:9, 70:12, 72:2, 72:23, 86:5, 97:7, 97:8, 97:10, 97:11
**mediations** [3] - 66:25, 72:20, 72:22
**mediator** [10] - 22:17, 22:18, 22:22, 22:23, 23:3, 23:20, 23:25, 24:1, 26:18, 79:5
**medical** [1] - 9:25
**meeting** [2] - 23:10, 23:20
**meetings** [1] - 115:6
**Megley** [2] - 20:8, 20:9
**members** [1] - 10:19
**memorandum** [1] - 9:5
**memorialize** [1] - 73:13
**memorialized** [1] - 44:11

**memorializes** [1] - 49:9
**memorializing** [1] - 52:5
**memory** [1] - 90:18
**memos** [1] - 115:4
**mention** [1] - 69:8
**mentioned** [11] - 21:14, 23:7, 36:8, 46:5, 51:23, 69:15, 104:9, 109:17, 114:18, 114:22, 116:14
**merely** [1] - 74:3
**message** [1] - 55:11
**met** [5] - 22:22, 23:2, 62:13, 62:16, 62:19
**MICHAEL** [2] - 1:8, 2:15
**Michael** [24] - 12:22, 21:2, 27:1, 27:8, 28:5, 29:5, 33:12, 38:10, 41:23, 46:3, 47:9, 47:18, 49:15, 65:22, 66:4, 71:9, 71:21, 73:5, 74:8, 74:22, 78:15
**Michelle** [1] - 105:7
**Microsoft** [5] - 33:11, 36:10, 36:13, 36:15, 38:11
**middle** [1] - 93:20
**might** [6] - 18:12, 64:7, 68:9, 70:18, 87:1, 97:7
**military** [4] - 64:15, 65:10, 65:11, 65:12
**million** [20] - 28:14, 29:21, 30:6, 30:9, 35:9, 45:3, 49:25, 54:4, 54:6, 54:12, 54:17, 55:12, 55:16, 55:21, 60:19, 75:10, 90:10, 90:16, 99:13, 100:13
**mind** [1] - 113:7
**mine** [2] - 20:6, 77:18
**minute** [2] - 100:19, 105:9
**minutes** [9] - 8:13, 66:10, 66:14, 73:25, 105:2, 105:5, 105:11, 106:8
**misconduct** [2] - 16:19, 110:18
**misread** [1] - 34:14
**misunderstand** [1] - 74:5
**misunderstanding** [2]

UNITED STATES DISTRICT COURT

- 11:24, 103:2
**MJA** [3] - 4:11, 38:2, 39:6
**modifiable** [1] - 36:20
**moment** [3] - 6:4, 83:20, 84:7
**moments** [2] - 62:12, 62:23
**money** [9] - 18:4, 30:20, 35:7, 42:8, 69:9, 89:3, 89:24, 90:8, 100:13
**monies** [5] - 17:8, 17:10, 17:14, 17:20, 53:22
**month** [1] - 55:19
**months** [1] - 12:18
**morning** [5] - 47:8, 101:17, 104:16, 104:24, 105:22
**most** [9] - 16:13, 39:20, 39:23, 40:3, 42:25, 74:3, 78:22, 108:6, 115:5
**motion** [7] - 13:23, 21:20, 21:21, 114:8, 114:12, 114:13, 114:16
**move** [17] - 15:4, 16:23, 39:4, 55:18, 58:23, 63:25, 84:12, 85:3, 85:5, 90:22, 91:9, 93:4, 97:19, 97:22, 100:21, 116:9
**moves** [9] - 25:14, 25:25, 32:18, 37:8, 40:6, 43:4, 46:19, 48:13, 52:21
**moving** [1] - 104:21
**MR** [201] - 2:16, 5:12, 6:1, 6:4, 6:8, 7:1, 7:3, 7:6, 8:5, 8:7, 8:12, 9:11, 9:14, 10:18, 10:25, 11:4, 11:7, 11:16, 11:18, 11:23, 12:6, 12:9, 14:16, 14:19, 14:25, 15:2, 15:5, 15:6, 15:8, 15:24, 16:2, 16:21, 17:3, 17:6, 19:4, 19:5, 19:7, 19:9, 19:18, 19:20, 25:13, 25:24, 26:3, 26:8, 29:25, 30:2, 30:21, 30:25, 32:17, 32:19, 33:2, 34:5, 34:14, 34:18, 34:25, 35:3, 37:8, 37:10, 37:15, 40:6, 40:8, 40:15, 41:6, 41:9,

43:3, 43:7, 43:12, 46:19, 46:21, 46:25, 48:13, 48:15, 48:19, 51:10, 51:16, 52:20, 52:24, 53:4, 55:1, 55:5, 56:8, 56:11, 56:13, 56:20, 56:22, 57:1, 57:3, 57:7, 57:12, 57:15, 58:23, 59:1, 60:5, 60:9, 63:4, 63:6, 64:19, 66:7, 66:19, 67:22, 68:4, 70:25, 71:15, 71:18, 72:13, 72:15, 73:24, 77:4, 79:21, 80:8, 80:10, 84:12, 85:3, 85:5, 85:10, 85:13, 85:18, 85:22, 90:11, 90:13, 90:24, 91:9, 91:12, 92:10, 92:13, 92:16, 92:19, 92:20, 92:23, 92:25, 93:3, 93:6, 93:8, 93:15, 93:19, 97:19, 97:22, 97:24, 98:7, 98:9, 99:17, 99:19, 99:21, 100:8, 100:12, 100:16, 100:21, 100:23, 101:2, 101:8, 101:23, 102:1, 102:12, 102:14, 102:21, 102:25, 103:7, 103:13, 104:1, 104:3, 104:6, 104:20, 105:3, 105:19, 106:1, 106:4, 106:10, 106:19, 106:21, 107:3, 107:7, 107:21, 108:3, 108:6, 108:14, 108:19, 108:21, 109:13, 109:14, 109:20, 110:3, 110:12, 110:20, 110:23, 110:24, 111:16, 111:25, 112:9, 112:17, 112:19, 113:7, 113:24, 114:6, 114:11, 114:18, 115:10, 115:15, 115:25, 116:4, 116:13, 116:18
**must** [2] - 7:23, 86:24

---

# N

**name** [22] - 8:17, 10:3, 19:14, 20:7, 20:20,

21:2, 26:13, 26:14, 38:1, 40:18, 43:15, 46:5, 68:13, 68:14, 68:17, 69:4, 69:15, 70:1, 107:9, 109:21, 114:24
**named** [1] - 70:3
**namely** [1] - 66:4
**names** [1] - 26:15
**nature** [2] - 67:8, 88:22
**near** [1] - 86:7
**necessarily** [3] - 84:11, 111:21, 113:17
**necessary** [1] - 111:11
**need** [6] - 7:20, 9:6, 9:21, 38:8, 51:22, 84:16
**needed** [4] - 42:14, 49:24, 49:25, 75:5
**needs** [2] - 8:17, 106:24
**negative** [1] - 10:16
**negotiate** [1] - 77:13
**negotiation** [1] - 30:19
**negotiations** [3] - 24:4, 24:8, 71:13
**never** [9] - 60:9, 60:12, 60:14, 61:3, 62:16, 62:18, 62:19, 62:22, 74:6
**new** [5] - 41:16, 56:12, 56:21, 57:2, 60:14
**New** [4] - 112:23, 113:11, 113:14, 113:15
**Newport** [3] - 2:19, 46:3
**news** [1] - 10:7
**next** [7] - 15:16, 45:6, 45:7, 82:5, 93:7, 106:15, 112:25
**nexus** [1] - 105:10
**NICOLA** [2] - 2:4, 2:9
**night** [1] - 78:11
**nobody** [2] - 84:1, 106:17
**none** [1] - 95:20
**nonresponsive** [3] - 58:24, 85:5, 90:22
**North** [1] - 2:11
**note** [4] - 5:13, 32:11, 38:9, 95:19
**Note** [1] - 39:7
**notebook** [2] - 64:11, 88:1
**nothing** [6] - 8:7, 8:8, 19:4, 52:6, 72:19, 100:2

**notice** [15] - 7:15, 7:17, 7:25, 26:1, 32:24, 37:13, 40:12, 43:6, 45:20, 48:17, 52:23, 96:6, 96:13, 96:22, 107:22
**Notices** [1] - 45:17
**notices** [1] - 46:2
**notwithstanding** [1] - 109:11
**November** [6] - 54:24, 55:6, 55:9, 55:15, 56:1, 56:4
**number** [7] - 7:16, 13:22, 25:16, 27:6, 70:15, 102:7, 110:7
**Number** [8] - 26:7, 33:1, 37:14, 40:14, 43:11, 46:24, 48:18, 53:3
**numbered** [3] - 31:7, 75:22, 75:24

---

# O

**oath** [2] - 60:3, 102:16
**object** [3] - 6:15, 11:10, 111:7
**objected** [1] - 102:22
**objection** [38] - 7:7, 15:24, 16:21, 16:22, 26:3, 29:25, 30:21, 32:19, 34:14, 34:25, 37:10, 40:8, 41:6, 43:7, 46:21, 48:15, 48:17, 51:10, 52:24, 55:1, 56:8, 56:13, 56:22, 57:3, 60:5, 63:4, 71:15, 72:13, 80:8, 92:10, 92:16, 92:23, 93:3, 100:8, 100:16, 102:17, 113:6
**Objection** [1] - 14:16
**objections** [4] - 6:24, 7:4, 14:25, 15:6
**objects** [2] - 107:16, 111:14
**obviously** [8] - 9:5, 9:14, 9:24, 11:21, 87:13, 104:10, 113:11, 113:12
**occur** [1] - 86:4
**occurred** [2] - 68:23, 75:18
**October** [2] - 55:18, 55:19
**OF** [7] - 1:2, 1:5, 1:14, 2:1, 117:1, 117:3, 117:4

**offer** [10] - 5:7, 5:10, 5:15, 5:25, 74:4, 109:24, 109:25, 110:11, 112:4, 112:11
**offered** [1] - 32:21
**offers** [1] - 110:2
**Office** [1] - 16:19
**office** [6] - 68:23, 68:24, 70:1, 70:2, 70:4, 98:11
**OFFICES** [1] - 2:17
**OFFICIAL** [3] - 1:24, 117:1, 117:5
**Official** [1] - 117:20
**often** [1] - 72:22
**once** [4] - 44:19, 52:8, 54:21, 112:13
**one** [48] - 5:13, 5:16, 6:4, 8:12, 9:15, 11:4, 14:22, 18:22, 19:2, 23:4, 23:6, 23:8, 25:6, 25:14, 26:20, 30:5, 30:8, 32:5, 55:19, 63:1, 65:11, 66:24, 67:1, 67:2, 67:3, 67:21, 68:1, 68:2, 70:18, 72:25, 76:24, 87:18, 88:11, 89:14, 99:23, 107:8, 108:1, 108:7, 108:21, 110:25, 112:12, 112:19, 114:6, 115:11, 115:14, 115:15
**one-day** [3] - 23:4, 23:6
**ones** [7] - 6:25, 65:7, 108:8, 111:4, 111:7, 111:20, 114:21
**ongoing** [2] - 27:21, 29:19
**oOo** [1] - 116:22
**op** [1] - 109:17
**open** [3] - 30:15, 73:14
**opinions** [2] - 66:12, 101:14
**opportunity** [2] - 13:14, 103:8
**OR** [1] - 4:5
**order** [8] - 50:1, 95:10, 103:15, 106:15, 107:12, 107:15, 108:2, 108:10
**original** [1] - 25:8
**originally** [1] - 59:21
**ought** [1] - 112:7
**outside** [2] - 14:16, 15:24

---

**overruled** [20] - 7:7, 26:5, 30:23, 34:16, 35:1, 41:7, 43:9, 46:23, 48:17, 51:12, 55:3, 56:9, 56:15, 56:24, 57:4, 60:7, 63:5, 67:24, 71:16, 100:10
**oversee** [1] - 22:10
**overseeing** [1] - 52:4
**owed** [2] - 17:14, 17:21
**own** [2] - 99:8, 108:17

**P**

**p.m** [9] - 29:2, 64:15, 66:17, 71:3, 73:17, 74:18, 81:9, 116:21
**P.M** [2] - 1:16, 5:2
**PAGE** [1] - 3:3
**page** [71] - 14:4, 14:20, 15:9, 15:16, 25:16, 26:9, 26:22, 28:4, 28:25, 29:1, 30:4, 31:4, 31:5, 31:6, 31:15, 34:1, 35:3, 35:6, 37:15, 37:19, 38:18, 40:22, 40:23, 41:9, 43:13, 44:22, 44:23, 45:1, 45:14, 45:15, 46:6, 47:10, 47:11, 47:14, 47:15, 47:16, 50:6, 50:7, 50:11, 50:14, 51:1, 52:17, 53:5, 64:1, 64:2, 70:23, 71:1, 71:7, 73:22, 74:17, 74:25, 77:1, 78:11, 78:18, 79:18, 81:5, 83:9, 93:16, 93:20, 94:22, 94:24, 96:7, 98:9, 98:21, 98:22, 115:3, 117:11
**pages** [20] - 4:17, 4:20, 15:10, 25:7, 44:1, 44:15, 47:7, 47:20, 47:24, 50:2, 63:14, 63:20, 64:7, 64:10, 64:25, 65:18, 66:2, 66:4, 95:20, 98:11
**paid** [28] - 13:12, 27:12, 27:13, 27:16, 27:18, 27:20, 29:10, 29:12, 29:14, 29:16, 29:17, 29:23, 30:6, 30:7, 30:9, 30:10, 30:20, 35:8, 53:23, 54:12, 55:11, 55:16,

55:17, 59:7, 59:17, 69:9, 69:10, 90:8
**papers** [1] - 22:22
**paragraph** [39] - 14:5, 14:6, 14:19, 14:21, 27:6, 28:13, 29:7, 30:2, 30:3, 31:4, 31:5, 31:7, 33:15, 34:5, 35:6, 35:7, 35:18, 35:19, 38:21, 41:10, 41:17, 42:7, 45:1, 45:4, 45:10, 45:11, 64:20, 75:24, 76:5, 80:14, 81:5, 81:11, 82:5, 82:15, 84:19, 86:18, 95:2, 98:20, 98:24
**paragraphs** [5] - 34:19, 35:15, 38:21, 75:23, 85:23
**paralegal** [6] - 8:24, 9:18, 10:10, 10:15, 102:14, 103:2
**paralegals** [1] - 9:16
**part** [15] - 5:21, 11:14, 22:14, 23:2, 28:16, 38:21, 42:19, 50:22, 51:1, 52:13, 52:18, 53:10, 53:24, 67:5, 109:11
**parted** [1] - 90:10
**particular** [3] - 62:9, 82:24, 83:7
**parties** [33] - 7:23, 22:7, 22:15, 23:3, 23:7, 23:13, 23:14, 23:19, 31:8, 31:12, 31:23, 33:16, 34:13, 44:8, 46:7, 49:10, 51:4, 52:5, 66:20, 67:7, 67:10, 67:13, 72:2, 80:20, 81:11, 81:15, 82:1, 82:16, 84:2, 86:10, 87:6, 88:3, 99:1
**parties'** [1] - 86:22
**party** [5] - 21:21, 21:22, 23:14, 49:11, 99:7
**pass** [2] - 24:1, 99:17
**pay** [5] - 27:10, 28:14, 29:9, 54:3, 91:8
**paying** [2] - 13:18, 54:5
**payment** [35] - 13:15, 18:7, 18:24, 28:20, 35:5, 41:11, 45:3, 49:25, 50:1, 54:4, 54:21, 54:23, 55:20, 55:23, 55:25, 56:2,

56:18, 58:18, 58:20, 59:2, 75:10, 89:8, 89:19, 90:13, 90:16, 90:25, 91:6, 91:13, 91:14, 91:17, 91:24, 96:4, 99:12
**Payments** [1] - 38:19
**payments** [15] - 17:25, 27:21, 29:18, 35:11, 35:14, 35:19, 44:25, 45:2, 45:6, 45:7, 50:15, 54:22, 59:17, 94:5, 94:16
**pdf** [1] - 49:3
**Penland** [5] - 112:23, 113:16, 114:19, 115:3, 115:5
**people** [3] - 10:19, 113:15, 114:10
**per** [1] - 47:7
**Perfect** [2] - 71:3, 85:24
**perhaps** [1] - 16:25
**period** [5] - 27:14, 29:12, 55:5, 72:15, 75:14
**permission** [1] - 10:25
**permitted** [1] - 113:4
**person** [4] - 23:2, 23:7, 23:10, 23:20
**personal** [2] - 25:10, 32:13
**Phan** [1] - 105:7
**phone** [2] - 8:16, 112:20
**phrase** [2] - 95:24, 96:1
**physically** [2] - 97:12, 97:25
**piled** [1] - 24:15
**place** [6] - 7:24, 22:24, 36:12, 68:1, 89:6, 99:13
**placed** [1] - 113:22
**plaintiff** [1] - 55:17
**Plaintiff** [1] - 1:6
**PLAINTIFF** [1] - 2:3
**plan** [1] - 13:15
**planned** [1] - 107:13
**Plaza** [1] - 2:18
**pleadings** [1] - 92:8
**point** [18] - 5:15, 25:15, 28:15, 36:16, 44:3, 49:23, 59:13, 61:2, 68:3, 73:8, 77:20, 83:18, 84:19, 86:15, 86:16, 102:5, 103:3, 105:4
**points** [2] - 77:17, 77:19

**poorly** [1] - 54:10
**portion** [2] - 94:4, 105:10
**pose** [2] - 6:23, 13:14
**position** [10] - 6:22, 8:15, 18:11, 18:16, 18:19, 75:25, 76:18, 77:7, 77:16, 84:1
**positive** [5] - 8:25, 9:3, 9:9, 10:8
**possibilities** [1] - 102:22
**possibility** [1] - 36:18
**possibly** [1] - 109:3
**postage** [1] - 45:22
**potentially** [1] - 10:18
**pound** [1] - 113:13
**power** [1] - 109:24
**practice** [2] - 20:3, 103:21
**practiced** [1] - 22:9
**preexisting** [1] - 21:20
**preference** [1] - 107:17
**prepaid** [2] - 45:22, 107:13
**prepare** [2] - 76:9, 109:2
**prepared** [4] - 5:8, 8:3, 80:15, 102:15
**prescribed** [1] - 32:22
**presence** [3] - 5:5, 12:2, 101:20
**present** [8] - 10:15, 10:23, 72:17, 97:7, 110:1, 110:7, 114:25, 115:1
**presentation** [1] - 111:14
**presented** [2] - 7:21, 115:7
**president** [1] - 45:25
**pretty** [1] - 111:13
**prevent** [1] - 109:7
**prevented** [2] - 51:9, 51:14
**previewing** [1] - 106:11
**previous** [4] - 30:5, 32:12, 41:13, 50:16
**previously** [3] - 111:1, 111:25, 114:10
**primarily** [1] - 23:21
**privacy** [2] - 8:18, 11:2
**private** [2] - 22:6, 22:8
**privilege** [1] - 98:3
**privileged** [1] - 54:7
**PRO** [1] - 2:14
**problem** [4] - 11:18, 11:23, 83:8, 113:8

**procedurally** [2] - 116:5
**proceed** [2] - 61:4, 112:16
**proceeding** [5] - 22:3, 22:7, 22:10, 22:14, 22:21
**proceedings** [1] - 117:10
**PROCEEDINGS** [1] - 1:14
**Proceedings** [1] - 116:21
**proceeds** [2] - 13:12, 36:3
**process** [4] - 23:15, 23:17, 72:23, 87:2
**proffer** [1] - 113:2
**prolonged** [1] - 72:23
**promptly** [1] - 87:5
**proof** [5] - 9:2, 109:24, 109:25, 110:2, 110:11
**property** [5] - 20:18, 20:25, 21:7, 21:8, 21:12
**propose** [2] - 13:15, 16:19
**proposed** [7] - 73:2, 74:5, 74:25, 75:3, 75:21, 78:22, 79:13
**prosecutorial** [1] - 16:19
**prove** [1] - 82:18
**provide** [22] - 10:11, 11:1, 11:15, 17:20, 31:10, 35:11, 36:3, 38:9, 39:7, 39:9, 47:7, 51:18, 53:21, 56:20, 57:2, 57:7, 57:10, 81:22, 102:15, 106:13, 106:14, 106:16
**provided** [16] - 6:10, 6:12, 7:13, 7:17, 7:23, 8:23, 9:2, 16:11, 15:20, 90:19, 97:15, 97:17, 98:11, 98:16, 111:10
**provides** [2] - 89:2, 116:6
**providing** [1] - 7:24
**provision** [4] - 53:20, 96:6, 96:13, 96:22
**provisions** [1] - 57:10
**public** [2] - 21:16, 21:25
**purpose** [3] - 52:1, 56:11, 56:16
**purposes** [7] - 26:2,

26:6, 32:22, 43:10, 53:2, 69:3, 110:1
**pursuant** [8] - 6:12, 58:17, 58:21, 59:3, 59:4, 83:19, 83:21, 117:8
**pursue** [3] - 21:22, 22:8, 67:7
**put** [20] - 11:20, 14:20, 15:2, 17:1, 17:3, 25:22, 28:2, 34:5, 36:22, 75:11, 75:22, 84:15, 103:5, 107:2, 107:4, 107:25, 109:15, 114:2, 115:22
**puts** [2] - 52:3, 52:9
**putting** [2] - 79:5, 109:16

## Q

**quash** [5] - 114:12, 114:13, 114:16, 115:7, 116:9
**questions** [17] - 6:23, 7:2, 7:5, 13:22, 14:21, 19:5, 57:12, 59:10, 59:11, 92:17, 93:6, 98:14, 99:22, 99:23, 100:3, 100:23, 103:9
**quick** [4] - 11:4, 11:6, 11:7, 39:3
**quicker** [1] - 34:7
**quickly** [1] - 112:8
**quite** [2] - 20:19, 85:9
**quote** [2] - 93:1, 93:2

## R

**raise** [4] - 19:11, 107:8, 110:25, 114:17
**raised** [1] - 102:9
**raises** [1] - 11:4
**rather** [2] - 22:7, 112:12
**re** [8] - 4:7, 4:9, 4:11, 4:13, 4:15, 4:17, 4:19, 4:22
**reach** [6] - 22:13, 23:9, 23:10, 23:13, 55:10, 55:14
**reached** [5] - 9:22, 72:2, 83:20, 112:22, 113:9
**react** [1] - 79:4
**read** [24] - 27:5, 29:7, 31:5, 33:12, 33:13,

34:4, 34:7, 38:3, 42:7, 47:3, 53:10, 65:20, 80:16, 82:3, 82:10, 82:20, 85:10, 85:14, 86:19, 97:4, 98:1, 98:5, 99:4, 103:11
**reading** [1] - 33:25
**reads** [1] - 94:4
**ready** [1] - 11:25
**real** [1] - 39:3
**realistic** [1] - 104:16
**really** [3] - 103:3, 103:5, 116:9
**REALTIME** [1] - 117:5
**reason** [9] - 9:11, 54:25, 55:14, 65:2, 79:16, 94:19, 96:22, 97:1, 106:7
**reasonable** [3] - 7:17, 7:23, 7:25
**reasons** [5] - 6:14, 8:18, 11:2, 114:25
**receipt** [3] - 17:7, 53:14, 53:25
**receive** [4] - 47:24, 95:10, 95:16, 98:9
**received** [20] - 10:13, 17:24, 18:4, 26:5, 26:7, 32:23, 33:1, 37:1, 37:6, 37:12, 37:14, 40:10, 40:14, 43:9, 43:11, 46:13, 46:16, 46:23, 46:24, 48:16, 48:18, 50:7, 52:11, 53:1, 53:3, 61:8, 74:19, 90:14, 90:17, 91:5, 94:7, 100:13, 107:10
**receiving** [1] - 42:3
**recent** [6] - 39:20, 39:23, 40:3, 42:25, 74:4, 78:22
**recently** [1] - 10:7
**recess** [3] - 66:10, 66:16, 116:19
**Recess** [1] - 66:17
**recipient** [1] - 36:2
**recollection** [16] - 13:16, 14:8, 30:14, 66:3, 67:4, 69:25, 70:22, 72:1, 73:8, 74:24, 75:5, 86:9, 86:17, 87:4, 95:11
**record** [5] - 6:7, 85:14, 101:21, 111:2, 112:5
**records** [2] - 111:17, 112:6
**RECROSS** [1] - 101:1
**Recross** [1] - 3:7

**RECROSS-EXAMINATION** [1] - 101:1
**Recross-Examination** [1] - 3:7
**redacted** [2] - 37:7, 48:11
**redactions** [6] - 25:10, 32:14, 40:1, 42:23, 52:15, 111:11
**REDIRECT** [1] - 99:20
**Redirect** [1] - 3:7
**redline** [7] - 4:12, 38:11, 38:15, 38:16, 41:1, 41:3, 93:11
**refer** [2] - 20:15, 87:9
**reference** [1] - 14:9
**referenced** [2] - 7:14, 28:25
**referencing** [1] - 33:20
**referred** [2] - 21:7, 114:20
**referring** [6] - 23:2, 25:19, 25:21, 82:12, 89:13, 111:18
**refresh** [4] - 66:3, 74:24, 87:4, 90:18
**refreshed** [1] - 75:5
**refreshes** [1] - 70:22
**regard** [5] - 5:17, 6:2, 17:23, 18:10, 112:10
**regarding** [4] - 6:17, 62:16, 78:2, 112:23
**regardless** [1] - 80:25
**regards** [1] - 77:5
**regular** [3] - 101:16, 109:10, 109:17
**regulation** [1] - 114:15
**regulations** [1] - 117:12
**reiterated** [1] - 42:15
**REJECTED** [1] - 4:6
**related** [1] - 112:10
**Relatedly** [1] - 86:19
**relatedly** [1] - 86:20
**relates** [3] - 42:7, 104:12, 108:22
**relating** [19] - 6:9, 6:11, 62:19, 66:21, 67:6, 71:13, 75:9, 75:14, 75:24, 77:16, 93:2, 95:5, 102:2, 102:7, 102:9, 103:1, 103:15, 104:9, 113:21
**Relevance** [2] - 63:4, 92:10
**relevance** [1] - 15:25
**relevant** [1] - 115:6

**remained** [1] - 23:22
**remaining** [8] - 27:13, 29:11, 52:22, 61:5, 80:21, 105:4, 105:14, 111:4
**remember** [10] - 13:19, 63:22, 66:11, 67:2, 68:23, 73:7, 95:6, 97:7, 100:2, 101:13
**remembered** [1] - 87:8
**reorganization** [1] - 13:13
**reorganize** [1] - 13:19
**repeat** [1] - 60:24
**rephrase** [1] - 85:8
**reply** [2] - 31:15, 37:16
**replying** [1] - 76:8
**reported** [1] - 117:10
**REPORTER** [3] - 1:24, 117:1, 117:6
**reporter** [1] - 19:11
**Reporter** [1] - 117:20
**REPORTER'S** [1] - 1:14
**represent** [2] - 67:17, 92:25
**representation** [2] - 12:20, 104:6
**representative** [2] - 56:6, 56:12
**represented** [6] - 20:18, 21:1, 21:11, 21:13, 80:22, 99:1
**representing** [4] - 28:3, 57:8, 69:5, 92:7
**request** [7] - 79:10, 107:10, 108:14, 108:15, 112:25, 113:5, 114:2
**requested** [2] - 56:20, 57:1
**require** [3] - 10:1, 109:23, 110:2
**required** [6] - 45:20, 45:22, 56:18, 94:5, 94:16, 114:1
**requirement** [3] - 22:15, 66:22, 67:6
**research** [2] - 66:13, 101:15
**reserve** [2] - 103:21, 103:25
**Reserve** [1] - 105:9
**resolution** [5] - 23:9, 23:10, 23:12, 23:14, 31:25
**resolve** [1] - 23:22
**resolved** [3] - 22:8,

52:5, 80:21
**respect** [3] - 55:22, 109:18, 115:3
**respective** [3] - 44:20, 59:18, 99:2
**respond** [3] - 78:14, 78:24, 79:9
**responded** [7] - 12:4, 73:16, 73:25, 77:7, 78:12, 80:24, 83:9
**response** [9] - 28:8, 37:20, 48:5, 72:25, 74:21, 75:2, 77:6, 78:21, 79:19, 111:12
**responsibility** [1] - 113:14
**rest** [2] - 60:20, 94:1
**resting** [3] - 104:16, 104:23, 106:23
**restructure** [1] - 13:15
**rests** [4] - 102:4, 103:20, 106:13, 106:22
**result** [2] - 9:23, 31:24
**RESUMED** [1] - 12:7
**retained** [1] - 68:19
**retired** [5] - 22:9, 68:5, 70:16, 73:1, 83:12
**return** [1] - 80:12
**Revenue** [1] - 18:12
**reverse** [1] - 13:9
**review** [6] - 7:18, 16:10, 33:18, 92:8, 97:15, 97:17
**reviewed** [2] - 16:17, 112:5
**revised** [6] - 4:12, 38:2, 38:6, 38:14, 39:6, 40:23
**revised.docx** [1] - 40:19
**revisions** [1] - 28:10
**revisit** [1] - 104:2
**Richard** [2] - 45:25, 46:5
**rise** [3] - 66:15, 101:19, 116:20
**Rob** [1] - 105:8
**role** [4] - 21:9, 21:10, 92:1, 92:2
**ROOM** [1] - 1:24
**rough** [1] - 102:6
**round** [2] - 63:8
**Rule** [2] - 71:19, 103:19
**rule** [4] - 7:5, 8:3, 71:12, 86:14
**ruled** [2] - 111:9, 112:4
**rules** [1] - 86:24

**ruling** [6] - 8:1, 92:11, 113:12, 114:24, 115:20, 115:23
**run** [1] - 106:12
**Runkles** [10] - 45:25, 46:8, 62:3, 90:7, 97:4, 97:6, 97:12, 98:1, 98:5, 98:10
**Runkles'** [2] - 46:5, 50:11

**S**

**S-h-e-i-k-h** [1] - 19:16
**SACR-19-00061-JVS** [1] - 1:7
**safe** [1] - 107:5
**SAGEL** [74] - 2:5, 8:12, 9:11, 10:25, 11:16, 11:18, 11:23, 14:16, 14:25, 15:6, 15:24, 16:21, 19:5, 19:9, 19:18, 19:20, 25:13, 25:24, 26:8, 30:2, 30:25, 32:17, 33:2, 34:5, 34:18, 35:3, 37:8, 37:15, 40:6, 40:15, 41:9, 43:3, 43:12, 46:19, 46:25, 48:13, 48:19, 51:16, 52:20, 53:4, 55:5, 56:11, 56:20, 57:1, 57:7, 57:12, 60:5, 63:4, 67:22, 71:15, 72:13, 80:8, 90:11, 92:10, 92:16, 92:19, 92:23, 93:3, 93:6, 98:7, 99:19, 99:21, 100:12, 100:23, 102:21, 106:21, 107:21, 112:19, 113:24, 114:18, 115:10, 115:15, 116:13, 116:18
**Sagel** [19] - 3:6, 3:7, 9:22, 10:13, 14:20, 19:17, 62:13, 63:18, 66:20, 75:10, 86:1, 93:8, 93:11, 94:23, 95:4, 99:18, 112:18, 113:10
**Sagel's** [1] - 16:20
**sand** [1] - 113:13
**Santa** [1] - 2:7
**SANTA** [3] - 1:17, 1:25, 5:1
**Saturday** [2] - 37:18, 37:23
**schedule** [6] - 35:5,

75:10, 107:22, 113:6, 113:8, 113:23
**scope** [3] - 14:17, 15:25, 74:5
**Scott** [2] - 14:10, 15:19
**screen** [2] - 34:6, 71:5
**SDNY** [3] - 113:19, 114:2, 114:7
**SE** [1] - 2:14
**seal** [2] - 11:1, 114:20
**sealed** [1] - 77:23
**search** [1] - 115:12
**second** [6] - 16:25, 27:17, 29:15, 65:20, 65:24, 107:23
**Section** [1] - 117:8
**section** [7] - 35:4, 38:18, 44:25, 45:1, 45:17, 50:25, 51:1
**see** [48] - 7:4, 11:11, 11:12, 11:21, 23:21, 26:15, 26:24, 28:6, 33:5, 35:24, 40:21, 41:17, 46:10, 48:23, 49:6, 51:2, 63:2, 63:6, 64:4, 64:6, 64:10, 64:11, 65:5, 65:6, 65:13, 65:14, 65:15, 70:22, 71:4, 71:5, 73:16, 73:18, 74:12, 74:20, 76:3, 78:6, 78:13, 78:16, 78:18, 78:19, 86:17, 93:23, 98:25, 101:16, 111:23, 113:5, 114:2
**seeing** [3] - 8:12, 79:1, 115:10
**seek** [1] - 109:7
**seeking** [3] - 13:17, 13:18, 111:17
**seeks** [2] - 30:22, 56:13
**SELNA** [1] - 1:3
**send** [10] - 26:23, 29:6, 52:19, 73:2, 80:11, 88:25, 89:3, 89:4, 91:14, 106:6
**sending** [5] - 36:15, 44:4, 49:8, 53:16, 53:17
**sends** [1] - 41:5
**sent** [59] - 5:19, 5:20, 28:17, 29:1, 32:7, 32:10, 32:24, 33:3, 36:20, 37:23, 38:14, 39:6, 39:10, 40:12, 47:19, 48:5, 48:10, 49:3, 52:16, 53:9,

60:18, 61:19, 63:14, 63:19, 64:7, 64:10, 64:21, 64:23, 64:24, 64:25, 65:4, 65:17, 65:18, 66:4, 73:9, 73:11, 73:17, 74:1, 74:25, 75:1, 77:21, 79:19, 79:25, 80:1, 80:23, 81:8, 83:12, 83:17, 85:25, 88:5, 88:25, 89:24, 91:14, 91:23, 93:25, 94:3, 107:14
**sentence** [7] - 27:5, 33:12, 65:20, 65:24, 87:10, 98:19, 98:24
**separate** [2] - 23:19, 54:22
**series** [1] - 99:23
**serve** [1] - 110:5
**served** [6] - 8:20, 9:15, 9:16, 9:21, 102:15, 114:14
**Service** [1] - 18:12
**service** [4] - 102:8, 103:9, 110:6, 110:16
**serving** [1] - 6:16
**sessions** [1] - 70:10
**set** [7] - 42:13, 42:14, 84:3, 86:4, 88:22, 95:10, 95:16
**settle** [2] - 22:17, 72:22
**settled** [7] - 44:11, 49:10, 58:1, 61:4, 86:10, 87:6, 88:4
**settlement** [94] - 4:8, 4:9, 4:11, 4:14, 4:15, 4:22, 22:23, 27:9, 27:10, 28:16, 29:20, 31:11, 31:13, 33:7, 33:16, 33:18, 34:2, 34:8, 34:12, 34:21, 35:4, 35:11, 36:1, 36:2, 36:16, 36:17, 38:7, 40:24, 41:2, 42:20, 43:18, 44:6, 44:7, 44:21, 44:23, 46:6, 47:12, 48:23, 48:25, 49:10, 49:16, 50:3, 50:15, 50:23, 51:8, 51:18, 53:8, 53:22, 56:18, 57:6, 57:21, 57:24, 58:1, 58:4, 58:12, 61:15, 67:13, 67:14, 70:16, 71:13, 71:22, 71:23, 71:24, 73:3, 73:6, 73:9, 76:8, 76:22, 78:9, 78:22, 80:22,

80:25, 81:22, 82:1, 82:6, 82:9, 83:20, 84:2, 84:6, 84:14, 84:17, 86:15, 86:21, 87:15, 89:10, 89:11, 89:14, 90:4, 92:21, 93:12, 99:3, 99:9, 100:6, 100:13
**settling** [1] - 88:17
**several** [3] - 25:7, 90:19, 116:14
**shall** [3] - 35:20, 45:20, 82:8
**shed** [1] - 10:24
**SHEIKH** [2] - 3:5, 19:12
**Sheikh** [11] - 4:7, 4:17, 4:19, 4:22, 19:9, 19:15, 19:21, 20:8, 20:9, 26:1, 41:24
**Sheikh's** [2] - 104:24, 107:22
**short** [2] - 105:5, 106:18
**shortcut** [2] - 5:12, 112:12
**show** [2] - 9:2, 115:19
**shuttle** [2] - 23:24, 24:1
**sic** [1] - 40:10
**side** [11] - 23:21, 23:25, 24:1, 30:16, 44:1, 44:14, 66:1, 72:12, 72:17, 76:1, 106:17
**sides** [3] - 49:4, 72:4, 72:17
**sign** [6] - 15:23, 44:8, 44:18, 49:13, 52:2, 60:18
**signaling** [1] - 79:4
**signature** [35] - 4:17, 4:20, 15:10, 15:12, 15:14, 15:16, 44:1, 44:15, 45:22, 47:6, 47:11, 47:12, 47:16, 47:17, 47:19, 47:24, 50:7, 50:11, 61:11, 63:14, 63:20, 64:1, 64:7, 64:10, 64:24, 65:17, 66:2, 66:4, 84:7, 97:16, 97:18, 98:9, 98:11
**signatures** [6] - 44:20, 49:3, 51:24, 84:16, 84:20, 96:24
**signed** [23] - 52:8, 58:13, 59:21, 59:25, 60:1, 60:4, 61:3, 76:14, 76:19, 76:20,

77:23, 78:9, 80:25, 84:1, 87:18, 88:11, 96:21, 97:5, 97:8, 97:9, 97:12, 98:2, 98:6
**significantly** [1] - 105:15
**signing** [4] - 46:6, 46:8, 46:9, 99:7
**simple** [1] - 90:24
**simply** [5] - 7:22, 11:21, 32:23
**Sims** [3] - 14:10, 15:19, 18:20
**single** [2] - 106:6, 114:23
**sit** [9] - 18:6, 18:22, 59:20, 62:6, 67:25, 91:21, 98:4, 101:3, 110:17
**sitting** [1] - 112:21
**six** [4] - 20:11, 20:12, 105:24
**slightly** [2] - 29:24, 30:18
**smiling** [1] - 63:6
**smoothly** [1] - 106:12
**so..** [1] - 20:2
**solely** [1] - 25:25
**sometimes** [4] - 60:25, 88:18, 88:20, 88:21
**somewhat** [1] - 104:25
**soon** [1] - 102:4
**sorry** [13] - 7:1, 13:24, 18:14, 31:2, 33:24, 40:23, 53:8, 61:1, 64:20, 69:1, 79:23, 102:12, 107:5
**sought** [1] - 9:24
**sounds** [2] - 12:19, 105:17, 105:19
**SOUTHERN** [1] - 1:2
**Southern** [1] - 112:22
**Spaan** [1] - 117:20
**SPAAN** [3] - 1:23, 117:5, 117:19
**speaking** [1] - 109:8
**Special** [7] - 11:8, 105:5, 112:23, 114:19, 114:23, 115:19
**special** [1] - 113:19
**specific** [3] - 7:10, 89:2
**specifically** [8] - 16:13, 30:14, 70:7, 79:15, 86:6, 86:13, 112:2, 112:3

**specified** [2] - 35:19, 41:22
**speculate** [1] - 18:9
**speculation** [6] - 30:21, 51:10, 55:1, 60:6, 72:13, 90:11
**spell** [1] - 19:14
**spend** [1] - 95:20
**spoken** [1] - 12:15
**Spring** [1] - 2:11
**stack** [1] - 24:15
**STAND** [1] - 12:7
**stand** [4] - 12:12, 19:10, 90:7, 102:17
**STANDBY** [1] - 2:16
**start** [12] - 15:9, 23:6, 26:9, 26:13, 29:5, 32:5, 33:2, 34:2, 78:4, 87:1, 105:21, 113:3
**starting** [1] - 40:22
**starts** [2] - 27:1, 79:23
**state** [1] - 19:13
**STATE** [1] - 117:4
**statement** [1] - 31:22
**statements** [4] - 78:18, 78:21, 111:19, 116:15
**States** [7] - 2:4, 2:5, 2:9, 2:10, 117:6, 117:8, 117:13
**STATES** [2] - 1:1, 1:5
**statute** [1] - 7:22
**steal** [1] - 14:14
**stenographically** [1] - 117:10
**Steve** [1] - 105:6
**STEWARD** [2] - 2:17, 2:18
**still** [8] - 29:21, 30:15, 38:25, 41:11, 52:7, 77:20, 84:21, 103:11
**stipulated** [9] - 43:24, 47:16, 49:5, 49:11, 49:16, 49:17, 51:23, 52:2, 57:24
**stipulated.dismissal. docx** [2] - 43:20, 44:9
**stolen** [1] - 14:24
**Stolper** [6] - 14:11, 15:5, 15:21, 15:23, 16:18, 18:19
**stop** [3] - 33:20, 81:12, 101:11
**Street** [2] - 2:6, 2:11
**STREET** [1] - 1:24
**stricken** [8] - 42:1, 58:25, 85:7, 90:23, 91:11, 97:23,

100:20, 100:22
**strike** [15] - 16:3, 58:10, 58:23, 67:4, 84:12, 85:5, 90:14, 90:22, 91:9, 97:19, 97:22, 97:25, 98:2, 100:21
**strikes** [1] - 68:14
**striking** [1] - 94:13
**string** [2] - 24:25, 70:23
**struck** [3] - 93:22, 94:8, 94:19
**stuff** [1] - 69:23
**subject** [8] - 27:21, 29:18, 53:7, 58:8, 71:10, 76:13, 80:3, 109:12
**submission** [2] - 6:15, 11:14
**submit** [2] - 9:20, 10:23
**submitted** [3] - 66:13, 82:18, 101:15
**subparagraphs** [2] - 35:10, 41:11
**subpoena** [14] - 8:20, 9:21, 9:25, 107:10, 108:25, 109:12, 109:23, 110:16, 113:22, 114:12, 114:14, 115:7, 116:7, 116:8
**subpoenaed** [3] - 113:18, 114:7, 114:11
**subpoenas** [2] - 102:8, 109:7
**subsequent** [3] - 14:15, 54:22, 72:3
**subsequently** [1] - 17:24
**substance** [1] - 42:15
**successful** [1] - 21:24
**sufficient** [4] - 7:18, 7:25, 112:5, 112:7
**suggest** [1] - 95:13
**suggested** [1] - 73:2
**suggesting** [1] - 116:2
**Suite** [3] - 2:6, 2:11, 2:19
**sum** [7] - 27:11, 27:12, 28:13, 29:9, 29:10, 35:7, 42:15
**summaries** [3] - 5:8, 7:20, 112:6
**summary** [5] - 5:18, 6:16, 7:19, 109:2, 112:11
**supporting** [2] - 6:12,

7:17
**supposed** [2] - 53:25, 73:13
**surprise** [1] - 114:17
**surrendered** [1] - 13:11
**sustained** [16] - 14:18, 15:1, 15:7, 16:1, 16:24, 30:1, 72:14, 80:9, 90:12, 92:12, 92:18, 92:19, 92:24, 93:5, 98:8, 100:17
**swore** [1] - 60:3
**SWORN** [1] - 19:12

### T

**tab** [1] - 71:6
**tabs** [2] - 69:22, 92:5
**target** [1] - 104:22
**tat** [1] - 107:25
**team** [2] - 10:19, 109:1
**telephone** [2] - 24:2, 55:10
**ten** [3] - 105:5, 105:9, 106:8
**tendency** [1] - 60:25
**tense** [1] - 10:15
**term** [7] - 30:17, 51:4, 75:9, 82:5, 84:23, 85:15
**terminated** [1] - 14:15
**terms** [37] - 18:10, 27:9, 27:10, 30:18, 31:8, 31:25, 33:16, 34:24, 70:16, 71:22, 71:23, 71:24, 73:3, 73:6, 73:9, 73:13, 74:5, 74:12, 74:25, 75:3, 75:21, 76:8, 78:4, 78:22, 79:13, 80:13, 80:18, 80:21, 80:22, 81:12, 81:15, 83:16, 83:19, 83:21, 99:9, 100:1, 100:5
**test** [4] - 8:25, 9:2, 9:23
**tested** [5] - 8:25, 9:9, 10:8, 10:15, 10:16
**testified** [3] - 10:4, 57:20, 57:23
**testify** [3] - 8:20, 105:23, 112:25
**testifying** [1] - 67:9, 110:24
**testimony** [13] - 10:1, 30:22, 67:20, 89:23, 91:16, 91:22, 95:8, 102:16, 104:10, 105:11, 111:4,

113:5, 115:9
**text** [2] - 55:11, 94:1
**THE** [156] - 2:3, 2:14, 3:4, 3:5, 5:6, 5:24, 6:2, 6:6, 6:23, 7:2, 7:4, 7:7, 8:6, 8:10, 9:8, 9:13, 10:17, 10:21, 11:3, 11:6, 11:14, 11:17, 11:19, 11:25, 12:3, 12:5, 12:7, 14:18, 15:1, 15:4, 15:7, 16:1, 16:24, 17:5, 19:6, 19:8, 19:10, 19:13, 19:15, 19:17, 26:5, 30:1, 30:23, 30:24, 32:21, 34:16, 34:17, 35:1, 35:2, 37:12, 40:10, 41:7, 41:8, 43:9, 46:23, 48:16, 51:12, 51:13, 53:1, 55:3, 55:4, 56:9, 56:10, 56:15, 56:16, 56:24, 56:25, 57:4, 57:5, 57:13, 58:25, 60:7, 60:8, 63:5, 66:9, 66:15, 66:16, 66:18, 67:24, 67:25, 71:16, 71:17, 72:14, 80:9, 85:6, 85:8, 85:12, 90:12, 90:23, 92:24, 93:5, 93:7, 97:21, 97:23, 98:8, 99:18, 100:10, 100:11, 100:17, 100:18, 100:19, 100:22, 100:24, 101:7, 101:9, 101:10, 101:11, 101:19, 101:21, 101:25, 102:11, 102:13, 102:24, 103:5, 103:11, 103:24, 104:2, 104:5, 104:17, 105:2, 105:17, 105:25, 106:3, 106:5, 106:12, 107:2, 107:4, 107:24, 108:5, 108:13, 108:15, 108:20, 109:10, 109:15, 109:22, 110:10, 110:18, 110:22, 111:13, 111:23, 112:2, 112:16, 112:18, 114:5, 114:9, 115:2, 115:14, 115:22, 116:2, 116:11,

116:17, 116:19, 116:20
**themselves** [1] - 114:4
**they've** [1] - 8:2
**thinking** [1] - 76:25
**third** [3] - 16:25, 27:18, 29:16
**thirds** [1] - 77:2
**thousands** [1] - 86:11
**three** [16] - 14:9, 14:13, 14:23, 27:13, 27:14, 29:12, 29:13, 30:10, 34:18, 45:6, 45:7, 54:22, 59:17, 74:18, 75:14
**three-hour** [1] - 75:14
**throughout** [2] - 40:1, 52:15
**Thursday** [10] - 8:21, 9:1, 43:14, 47:2, 105:18, 105:25, 106:23, 107:1, 107:5, 113:3
**timing** [4] - 86:14, 90:18, 102:3, 104:21
**tit** [1] - 107:24
**title** [1] - 33:5
**Title** [1] - 117:8
**today** [13] - 18:6, 18:22, 49:18, 59:20, 62:6, 62:20, 67:25, 91:21, 98:4, 101:11, 102:19, 104:24, 115:20
**together** [2] - 44:20, 69:5
**tomorrow** [10] - 101:16, 102:19, 104:16, 104:23, 106:25, 107:6, 107:12, 107:17, 107:20, 110:25
**took** [2] - 68:1, 99:13
**top** [21] - 26:9, 26:13, 31:17, 31:18, 31:22, 33:2, 35:7, 37:15, 37:17, 38:1, 40:15, 43:12, 48:20, 52:11, 53:5, 64:19, 71:2, 73:17, 77:2, 83:9, 85:22
**topic** [3] - 8:4, 93:7, 112:10
**total** [4] - 28:13, 28:18, 35:7, 105:24
**Touhy** [1] - 114:15
**town** [1] - 112:24
**track** [9] - 38:12, 38:15, 38:16, 41:1, 41:3, 42:16, 53:15,

**UNITED STATES DISTRICT COURT**

54:1
**track-change** [1] - 41:1
**transaction** [1] - 76:1
**transcript** [2] - 117:9, 117:11
**TRANSCRIPT** [2] - 1:6, 1:14
**transfer** [7] - 35:20, 35:22, 42:2, 42:8, 49:19, 49:21, 54:13
**travel** [3] - 107:22, 113:4, 114:3
**trial** [8] - 5:22, 7:21, 106:5, 107:9, 110:16, 111:18, 113:1, 116:15
**TRIAL** [1] - 1:8
**trigger** [1] - 87:8
**trip** [1] - 107:13
**true** [19] - 16:5, 25:9, 25:11, 58:2, 59:18, 62:4, 62:17, 62:20, 66:25, 72:20, 80:23, 81:9, 82:23, 88:12, 88:19, 92:13, 99:14, 108:5, 117:9
**trust** [6] - 41:22, 54:6, 54:13, 54:18, 60:19, 96:2
**trustee** [1] - 13:11
**truth** [7] - 32:23, 32:25, 37:13, 40:11, 40:12, 43:5, 52:22
**try** [3] - 22:17, 61:1, 112:13
**trying** [4] - 14:14, 15:3, 77:13, 108:25
**Tuesday** [3] - 53:6, 113:8, 113:17
**TUESDAY** [2] - 1:15, 5:1
**Tuesday's** [1] - 113:5
**turn** [8] - 14:4, 26:22, 31:4, 34:1, 40:22, 41:9, 57:18, 85:20
**turning** [3] - 28:13, 31:15, 50:14
**two** [26] - 15:10, 26:15, 34:13, 46:7, 61:20, 61:25, 65:8, 66:25, 77:2, 81:24, 85:23, 88:25, 89:1, 89:4, 89:22, 89:24, 89:25, 99:22, 105:4, 105:11, 106:8, 107:11, 114:21, 115:4, 115:11
**two-thirds** [1] - 77:2
**type** [2] - 86:14, 90:6

**typically** [2] - 22:10, 88:20

# U

**U.S** [2] - 1:3, 16:19
**ultimately** [4] - 18:23, 22:2, 22:3, 53:19
**unable** [1] - 23:13
**under** [21] - 11:1, 33:12, 38:4, 47:12, 47:13, 47:18, 59:9, 60:3, 65:22, 86:23, 94:5, 94:16, 102:16, 107:10, 109:23, 111:8, 113:22, 114:20, 114:24, 115:19
**underlying** [3] - 7:10, 7:19, 111:17
**underneath** [3] - 29:7, 33:5, 64:20
**understood** [25] - 12:22, 72:8, 72:11, 74:11, 75:25, 76:17, 76:21, 79:3, 79:6, 79:10, 80:18, 80:20, 80:24, 83:15, 103:13, 104:3, 106:1, 106:10, 106:19, 107:7, 108:11, 108:19, 110:20, 116:18
**unethical** [5] - 62:7, 83:2, 99:25, 100:7, 100:14
**United** [7] - 2:4, 2:5, 2:9, 2:10, 117:6, 117:8, 117:13
**UNITED** [2] - 1:1, 1:5
**unless** [1] - 106:7
**unreasonable** [1] - 108:15
**unsigned** [1] - 44:22
**unusual** [4] - 47:24, 47:25, 72:19, 77:11
**up** [20] - 8:13, 30:20, 36:7, 42:13, 42:14, 61:1, 64:19, 71:2, 71:5, 73:24, 88:22, 93:15, 93:19, 95:10, 95:16, 105:1, 106:6, 106:9, 106:17, 106:18
**updated** [1] - 6:10
**USA** [3] - 20:13, 20:16, 34:10
**uses** [1] - 36:12
**utilizes** [1] - 6:19

# V

**valid** [1] - 114:14
**validly** [2] - 114:14, 116:8
**various** [6] - 14:24, 17:25, 42:20, 50:20, 63:8, 77:16
**version** [8] - 5:19, 5:20, 6:9, 6:10, 41:1, 93:12, 94:10, 97:18
**versions** [5] - 43:25, 44:14, 50:17, 50:20, 66:1
**versus** [1] - 103:1
**view** [4] - 83:2, 83:4, 104:12, 104:18
**VII** [1] - 14:2
**virtually** [1] - 108:16
**VOLUME** [1] - 1:9
**volume** [1] - 13:25
**Volume** [6] - 14:1, 14:2, 24:14, 24:17, 24:18, 24:19
**vs** [1] - 1:7

# W

**W.F** [1] - 26:17
**W.F.D** [1] - 52:17
**wait** [2] - 65:7, 89:25
**wants** [7] - 8:13, 9:6, 89:2, 102:19, 114:15, 114:21, 116:9
**WAS** [1] - 19:12
**ways** [1] - 23:19
**Wednesday** [3] - 40:17, 107:6, 107:12
**week** [2] - 101:17, 112:24
**week's** [1] - 112:25
**weekend** [3] - 38:8, 101:17, 113:9
**weeks** [6] - 88:25, 89:1, 89:4, 89:23, 89:24, 89:25
**Well..** [1] - 84:9
**West** [1] - 2:6
**WEST** [1] - 1:24
**whereas** [1] - 30:9
**whole** [1] - 51:1
**wire** [39] - 5:16, 5:18, 17:24, 35:20, 35:22, 38:9, 39:7, 39:9, 42:2, 42:7, 42:12, 49:19, 49:21, 53:13, 53:16, 53:17, 54:13, 54:15, 88:18, 88:25, 89:1, 89:3, 89:4,

89:22, 90:4, 90:9, 90:14, 90:17, 90:19, 91:1, 91:3, 91:5, 91:15, 91:16, 91:22, 105:7, 105:10
**wired** [2] - 54:6, 54:17
**wiring** [1] - 36:4
**wish** [3] - 108:10, 112:16, 115:22
**WITHDRAWN** [1] - 4:5
**withdrawn** [1] - 8:2
**WITNESS** [21] - 12:7, 19:12, 19:15, 30:24, 34:17, 35:2, 41:8, 51:13, 55:4, 56:10, 56:16, 56:25, 57:5, 60:8, 67:25, 71:17, 85:8, 97:21, 100:11, 100:18, 101:10
**Witness** [2] - 102:10, 102:15
**witness** [21] - 6:16, 8:21, 9:24, 10:2, 10:14, 17:1, 17:2, 19:6, 99:17, 101:7, 104:14, 105:25, 106:14, 106:22, 107:2, 107:4, 107:6, 109:4, 109:16, 115:12
**witness's** [1] - 30:22
**WITNESSES** [1] - 3:3
**witnesses** [10] - 10:4, 102:7, 103:15, 103:18, 105:4, 106:24, 108:2, 108:17, 111:19, 116:7
**woman** [1] - 8:19
**Word** [5] - 33:11, 36:10, 36:13, 36:15, 38:11
**worded** [1] - 54:10
**wording** [2] - 41:21
**WordPerfect** [3] - 36:9, 36:11, 36:12
**words** [9] - 61:6, 76:15, 81:7, 87:16, 93:21, 93:25, 94:7, 94:10, 94:16
**works** [1] - 108:23
**write** [6] - 40:20, 71:9, 71:10, 71:20, 80:3, 80:10
**writing** [4] - 27:3, 74:4, 74:12, 116:10
**written** [3] - 24:25, 26:1, 78:9
**wrote** [14] - 33:13, 38:3, 47:3, 65:23,

74:9, 76:3, 76:6, 76:11, 76:13, 81:12, 82:5, 82:15, 86:18, 99:6
**WYMAN** [13] - 2:10, 5:12, 6:1, 8:5, 104:20, 105:3, 108:21, 109:13, 110:24, 111:16, 111:25, 112:9, 112:17
**Wyman** [2] - 104:19, 108:20

# Y

**year** [1] - 59:18
**years** [7] - 20:1, 20:11, 20:12, 27:14, 29:13, 54:23
**yesterday** [2] - 8:16, 8:19
**York** [4] - 112:23, 113:11, 113:14, 113:15
**young** [1] - 110:13

**UNITED STATES DISTRICT COURT**