1            **UNITED STATES DISTRICT COURT**

2       **CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

3         **HONORABLE JAMES V. SELNA, U.S. DISTRICT JUDGE**

4

5   UNITED STATES OF AMERICA,           )
                                        )    **CERTIFIED TRANSCRIPT**
6                   Plaintiff,          )
                                        )    Case No.
7         vs.                           )    SACR-19-00061-JVS
                                        )
8   MICHAEL JOHN AVENATTI,              )
                                        )    **TRIAL DAY 20**
9                   Defendant.          )    **VOLUME 2**
                                        )

10

11

12

13

14

                 REPORTER'S PARTIAL TRANSCRIPT OF PROCEEDINGS
15
                      FRIDAY, AUGUST 13, 2021
16
                           1:27 P.M.
17
                      SANTA ANA, CALIFORNIA
18

19

20

21

22

23
                 **DEBBIE HINO-SPAAN, CSR 7953, CRR**
24                FEDERAL OFFICIAL COURT REPORTER
                  411 WEST 4TH STREET, ROOM 1-053
25                    SANTA ANA, CA 92701
                      dhinospaan@yahoo.com

                    **UNITED STATES DISTRICT COURT**

```
 1                    APPEARANCES OF COUNSEL:

 2

 3    FOR THE PLAINTIFF:

 4            NICOLA T. HANNA
              United States Attorney
 5            BY:  BRETT SAGEL
                   Assistant United States Attorney
 6            411 West 4th Street
              Suite 8000
 7            Santa Ana, California 92701
              714-338-3598
 8            brett.sagel@usdoj.gov

 9            NICOLA T. HANNA
              United States Attorney
10            BY:  ALEXANDER WYMAN
                   Assistant United States Attorney
11            312 North Spring Street
              Suite 1100
12            Los Angeles, California 90012
              213-894-2435
13            alex.wyman@usdoj.gov

14    FOR THE DEFENDANT IN PRO SE:

15            MICHAEL JOHN AVENATTI, ESQ.

16

      STANDBY COUNSEL FOR MR. AVENATTI:
17
              H. DEAN STEWARD LAW OFFICES
18            BY:  H. DEAN STEWARD, ESQ.
              17 Corporate Plaza
19            Suite 254
              Newport Beach, California 92660
20            949-481-4900
              deansteward7777@gmail.com
21

22

23

24

25
```

UNITED STATES DISTRICT COURT

1               **I N D E X**

2     **WITNESSES**                                        **PAGE**

3     **JOHN DRUM, CALLED BY THE GOVERNMENT**

       Cross-Examination by Mr. Avenatti (resumed)      7
4      Redirect-Examination by Mr. Wyman                68
       Recross-Examination by Mr. Avenatti              77

5

6     In-camera hearing transcribed in a separate volume      87

7

8

9

10

11

12

13

14

15                     **EXHIBITS**

16                  (None offered.)

17

18

19

20

21

22

23

24

25

**UNITED  STATES  DISTRICT  COURT**

```
 1                 SANTA ANA, CALIFORNIA; FRIDAY, AUGUST 13, 2021

 2                                1:27 P.M.

 3                                  - - -

 4

 5                 (Out of the presence of the jury.)

 6                 MR. AVENATTI:  I have an issue to raise before he

 7       takes the stand, please.

 8                 THE COURT:  Mr. Avenatti.

 9                 MR. AVENATTI:  Yes, Your Honor.  Following up on

10       what I raised before the break, I'm entitled to these e-mails

11       and these statements from Mr. Drum.  I was entitled to them

12       before I started my cross-examination.  I'd like them produced

13       immediately, and I would like an adjournment so that I can

14       review them before I continue my cross-examination of Mr. Drum.

15                 During the break we had occasion to look for any

16       case law that provides that an expert called by the Government,

17       that somehow that exempts the Government from complying with

18       26.2 and Jencks.  We can find no such case and no such statute.

19                 I also -- and I'll represent I placed calls to three

20       attorneys with a collective of about 100 years criminal law

21       experience who never heard such a thing.

22                 There's no question that the materials exist.  The

23       witness's testimony could not be more clear.  And none of the

24       information was produced, Your Honor.  I was entitled to that

25       information before I began my cross-examination so I could
```

01:27PM 5
01:27PM 10
01:27PM 15
01:28PM 20
01:28PM 25

```
  1    tailor my cross-examination accordingly.
  2             THE COURT:  No, sir.  You were entitled to it by
  3    statute after he finishes his direct.
  4             MR. AVENATTI:  Yes.  If I misspoke, I apologize,
01:28PM 5    Your Honor.  I thought I said before I started my
  6    cross-examination.
  7             THE COURT:  All right.
  8             Mr. Wyman.
  9             MR. WYMAN:  Your Honor, over the lunch break we
01:28PM 10   looked for any e-mails of substance relating to his testimony
  11   for Mr. Drum.
  12            And, again, I haven't had a chance research the
  13   issue.  My understanding with an expert is that substantive
  14   work product like the exchange of drafts, for example, falls
01:28PM 15   within the work product exception.  But with regard to
  16   substantive e-mails, what we were able to find was virtually
  17   nothing, and the stuff that we had found was like -- you know,
  18   I was asking for the extent of their payment and the breakdown
  19   of what that payment was for, and we had copied and pasted that
01:29PM 20   and put that into a disclosure letter to the defense.
  21            We're happy to provide in camera what we were able
  22   to find, which was, as I said, virtually nothing that I don't
  23   think has already been disclosed.  We're happy to provide that
  24   in camera to the Court.
01:29PM 25            THE COURT:  Why don't you do that.  We're not going
```

1    to take an adjournment.  If Mr. Drum needs to stay over the

2    weekend, so be it.

3              MR. AVENATTI:  Your Honor, I would ask that the

4    Court direct the witness, Mr. Drum, to provide to the Court all

01:29PM 5    written communications with the Government, whether it be the

6    prosecutors or the agents, relating to his testimony in this

7    case.  Because, Your Honor, the witness could not have been

8    more clear, for two-and-a-half years he has been communicating

9    by e-mail with the Government relating to this case.  Any of

01:30PM 10   those written communications we're entitled to.  Those are

11   statements of a witness.

12             There is no -- there is no work product exception to

13   the *Jencks* Act and Rule 26.2.  And if counsel has any authority

14   for this proposition, I would ask for it.  And, again, you

01:30PM 15   know, I'm repeating myself, but this morning I made this --

16             THE COURT:  Please don't repeat yourself because the

17   jury is waiting.

18             MR. AVENATTI:  Well, I made this point this morning,

19   Your Honor.  It's not my job to elicit testimony from witnesses

01:30PM 20   on cross-examination that show that the Government hasn't

21   given --

22             THE COURT:  Sir, we had this discussion.  We had it

23   in detail before we took the recess.  Thank you.

24             Bring the jury in, please.

01:31PM 25             **(In the presence of the jury.)**

```
 1          THE COURT:  Good afternoon, ladies and gentlemen.

 2          Mr. Avenatti.

 3              JOHN DRUM, WITNESS, RESUMED THE STAND

 4                  CROSS-EXAMINATION (resumed)

 5  BY MR. AVENATTI:

 6  Q    Mr. Drum, before the break, we were talking about the

 7  mock cross-examinations that you and Ms. Carter had conducted

 8  over the last two-and-a-half weeks.  Do you recall that?

 9  A    Yes, I do.

10  Q    Who else was present when these mock cross-examinations

11  were occurring?

12  A    Nobody.

13  Q    So for every mock cross-examination that occurred in

14  connection with this case, the only two people present were you

15  and Ms. Carter.  Is that your testimony?

16  A    I believe that's right.

17  Q    Do you have any doubt as to that?

18              MR. WYMAN:  Objection.  Asked and answered.

19              THE COURT:  Sustained.

20  Q    BY MR. AVENATTI:  Were any of the government agents or

21  prosecutors ever privy to any of those cross-examinations?

22  A    No.

23  Q    Did you ever have any communications with any of the

24  government agents or prosecutors about some of the questions

25  you might be asked?
```

```
 1    A    Yes.
 2    Q    Did those communications include them telling you
 3    questions you might be asked on cross-examination?
 4    A    Certainly they covered topics that might be covered in
 5    cross-examination, but I don't think we had any specific
 6    questions.
 7    Q    Well, when you say they covered topics that might be
 8    asked on cross-examination, what do you mean?
 9    A    For example, a topic that might be covered in cross might
10    be Analysis Group's fees.
11    Q    What other topics did they mention to you that they
12    thought might be covered on cross?
13              MR. WYMAN:  Objection.  Relevance.
14              THE COURT:  Overruled.
15              THE WITNESS:  I don't recall.
16    Q    BY MR. AVENATTI:  So there were none other -- no other
17    topics other than your fees that were discussed as possible
18    cross topics, sir?
19              MR. WYMAN:  Asked and answered.  403.  Calls for
20    hearsay.
21              THE COURT:  Sustained.
22    Q    BY MR. AVENATTI:  Sir, do you have a recollection of you
23    conversing with the Government before you took the stand about
24    any topics that might be covered in cross?  You conversing.
25              MR. WYMAN:  Same objections.
```

01:33PM (line 5)
01:33PM (line 10)
01:33PM (line 15)
01:34PM (line 20)
01:34PM (line 25)

```
1              THE COURT:  Overruled.
2              THE WITNESS:  Yes.
3  Q   BY MR. AVENATTI:  Okay.  What topics were those?
4  A   I recall discussing Analysis Group's fees being covered in
5  cross.
6  Q   What else?
7  A   I don't recall the other topics.
8  Q   But there were other topics?
9  A   I believe so.
10 Q   Okay.  Well, when did you discuss these other topics that
11 you now can't recall?
12 A   When we met on Monday, and we had a call a few weeks
13 earlier.
14 Q   So you can't recall what you discussed four days ago with
15 the Government when you had the call on Monday?
16              MR. WYMAN:  Asked and answered.  Argumentative.
17              THE COURT:  Sustained.
18 Q   BY MR. AVENATTI:  Sir, are you unable to recall the
19 details of the conversation that you had Monday?
20              MR. WYMAN:  Same objections.
21              THE COURT:  Overruled.
22              THE WITNESS:  I recall some details of that
23 conversation.
24 Q   BY MR. AVENATTI:  Okay.  Do you recall the details about
25 the cross topics?
```

01:34PM 5
01:34PM 10
01:34PM 15
01:35PM 20
01:35PM 25

```
 1   A    Only covering the fees, is the only topic I recall
 2   specifically.
 3   Q    How long was the call?
 4   A    I think we met for an hour or so.
 5   Q    Who was on the call?
 6   A    This was a -- are you talking about our meeting on Monday?
 7   Q    Yep.
 8   A    Okay.  Alex Wyman, Brett Sagel, I believe James Kim was
 9   there.
10   Q    Ms. Carter?
11   A    Yes.
12   Q    Has Ms. Carter had e-mail communications with the
13   government prosecutors and the agents, to the best of your
14   knowledge, in connection with your testimony?
15            MR. WYMAN:  Calls for speculation.  403.
16            THE COURT:  Overruled.
17            THE WITNESS:  Yes.
18   Q    BY MR. AVENATTI:  Has that been a fairly regular
19   occurrence over the last six months?
20   A    Fairly regular, I guess is a way you can describe it,
21   yeah.
22   Q    And that generally has been at your direction as part of
23   your work in the case; correct?
24   A    Yes.  It's been at my direction.
25   Q    And have you been copied on those communications?
```

01:35PM  5
01:35PM 10
01:36PM 15
01:36PM 20
01:36PM 25

**UNITED STATES DISTRICT COURT**

```
 1   A     Yes, I believe so.
 2   Q     And have those communications, done at your direction,
 3   been by e-mail?
 4   A     Yes.
 5   Q     And those have been directed at both the AUSAs and the
 6   government agents?
 7   A     I believe so.
 8   Q     Have you maintained all of -- copies of all of the
 9   e-mails that you and Ms. Carter have sent to the AUSAs or the
10   agents in connection with your -- with the subject matter of
11   your testimony?
12   A     No.  I don't believe I have.
13   Q     You deleted some?
14   A     There's an automatic system that deletes e-mails.
15   Q     After how long?
16   A     After 30 days.
17   Q     You don't have the ability -- well, strike that.
18         In your software program, you don't have the ability
19   to suspend that deletion function?
20   A     I do have that ability.
21   Q     But you didn't exercise it in connection with your work
22   in this case; is that right?
23   A     I don't know if I saved every e-mail to prevent it from
24   being deleted.
25   Q     My question is a little different.
```

01:36PM 5
01:37PM 10
01:37PM 15
01:37PM 20
01:37PM 25

**UNITED STATES DISTRICT COURT**

1            In connection with your work in this case, do you

2    have a recollection of going into the software program and

3    disabling the deletion function as it relates to your written

4    communications with the Government?

01:38PM 5    A    No, I did not disable it.

6    Q    So for the last two-and-a-half years, every 30 days your

7    communications with the Government relating to the subject

8    matter of your testimony have been deleted by the software

9    program.  Do I have that right?

01:38PM 10   A    Not exactly.

11   Q    Okay.  Well, what part of it is not right?

12   A    I have the ability to save e-mails so that they won't be

13   deleted by the system.  And I have saved e-mails associated

14   with this matter.  I don't know whether I saved all of them.

01:38PM 15   Q    How would you determine which e-mails to save as it

16   relates to your communications with the Government?

17   A    I would save e-mails that I think I might want to refer

18   back to at a later time.

19   Q    But you didn't save all the e-mails?

01:39PM 20   A    Correct.  For example, I would not have a reason to

21   refer --

22            MR. AVENATTI:  Move to strike everything after

23   "correct" as nonresponsive.

24            THE COURT:  Be stricken.

01:39PM 25   Q    BY MR. AVENATTI:  Did anyone ever ask you, "You know,

```
 1  you're involved in a serious federal criminal matter.  Please
 2  don't delete any e-mails"?
 3  A    Nobody asked me that.
 4  Q    Did anybody ever ask you -- and by "anybody," I am
 5  including Mr. Sagel, Mr. Wyman, and Special Agent Carlos.  Did
 6  any of these three gentlemen ever advise you that you shouldn't
 7  be deleting the e-mails during the pendency of a federal
 8  criminal matter?
 9  A    I don't believe so.
10  Q    Do you know of any way to recover those e-mails?
11  A    That's not my area of expertise.
12  Q    So that would be a "no"?
13  A    Correct.
14  Q    Correct?
15  A    Yes.
16  Q    Do you know if Ms. Carter has saved her e-mails?
17  A    I don't know.
18  Q    Is she subject generally to the same deletion policy that
19  you mentioned earlier?
20  A    Yes.
21  Q    Did you ever instruct Ms. Carter to preserve e-mails?
22  A    I don't believe I did.
23  Q    Did you ever instruct anyone on your team, any of the
24  four people that you mentioned earlier, did you ever instruct
25  any of them to preserve your communications relating to your
```

**UNITED STATES DISTRICT COURT**

1    work in this matter?

2    A    I don't believe I did.

3    Q    Prior to taking the stand, did anybody ask you to gather

4    the written communications from your firm to the Government in

01:41PM 5    connection with this case?

6    A    No.

7    Q    To the best of your knowledge, did Ms. Evan Carter ever

8    review any trial testimony in connection with this case?

9    A    To the best of my knowledge, no.

01:42PM 10    Q    Did you ever converse with Ms. Evan Carter relating to

11    Tabs?

12    A    I conversed with Ms. Carter about the case-related

13    expenses that I analyzed.

14    Q    You mean the hard copy documents?

01:42PM 15    A    The PDFs, yes.

16    Q    The ones that said "Draft" across the page in big

17    letters, those?

18    A    I don't recall if it said "Draft" or not.

19    Q    All right.  Well, we're going to get to them in a minute.

01:42PM 20         But you never conversed with her about the software

21    program or the electronic data; am I right?

22    A    I did not converse with her about Tabs, no.

23    Q    What are work papers?

24    A    Work papers are a written record of an analysis typically

01:42PM 25    associated with an audit function.

| | |
|---|---|
| 1 | Q    They're not only typically used in connection with |
| 2 | audits, though, are they? |
| 3 | A    No.  That term can be used in other settings. |
| 4 | Q    Other accounting engagements; right? |
| 01:43PM 5 | A    Yes. |
| 6 | Q    Do you have any work papers -- well, strike that. |
| 7 | Does your firm have any work papers that were |
| 8 | prepared in connection with your work that was done in this |
| 9 | case? |
| 01:43PM 10 | A    Yes. |
| 11 | Q    Where are those maintained? |
| 12 | A    On Analysis Group's servers. |
| 13 | Q    And what was the purpose of those work papers? |
| 14 | A    To document the procedures and analyses that I performed. |
| 01:43PM 15 | Q    So they reflect statements by you, effectively; right? |
| 16 | A    I'm not sure I understand that. |
| 17 | Q    Well, they're documents that you prepared; am I correct? |
| 18 | A    Yes. |
| 19 | Q    Did you bring any of those work papers with you today? |
| 01:44PM 20 | A    No, I did not. |
| 21 | Q    How about yesterday? |
| 22 | A    No, I did not. |
| 23 | Q    Did you bring any of them to California in connection |
| 24 | with your testimony? |
| 01:44PM 25 | A    No. |

```
 1    Q     Is there a reason why you didn't bring them?
 2    A     I --
 3    Q     Well, strike that.
 4          I think we established earlier that you prepare
 5    witnesses to testify in cases; right?
 6    A     Yes.  That's part of my job.
 7    Q     All right.  And how many times have you done that over
 8    the last ten years?
 9    A     I'd estimate a dozen.
10    Q     And have those other individuals who have been prepared
11    to testify, has that been in a deposition or at a trial?
12    A     Both.
13    Q     And have you been present for those depositions and
14    trials?
15    A     Some of them, yes.
16    Q     Has there ever been an instance where you prepared
17    another expert to testify and that expert has brought with him
18    or her notebooks full of their work papers?
19    A     No, I don't think I've seen that.
20    Q     You've never done that, sir?
21    A     No.
22    Q     You've never seen an expert that you prepared on the
23    stand demonstrate for the jury where the actual work came from?
24    Am I correct about that?
25          MR. WYMAN:  Asked and answered and 403.
```

01:44PM  5
01:44PM 10
01:45PM 15
01:45PM 20
01:45PM 25

```
 1              THE COURT:  Overruled.
 2              THE WITNESS:  Witnesses that I've helped prepare
 3       demonstrate how they perform their analyses.
 4       Q    BY MR AVENATTI:  And they do that through the work
 5       papers, don't they?
 6       A    No.
 7       Q    They don't refer to any of the actual work that they did
 8       on the stand, in your experience?
 9       A    They refer to their work product.
10       Q    How voluminous are your work papers for your engagement
11       in connection with this case?
12       A    That's tough to estimate.
13       Q    Five pages?  A thousand pages?
14       A    Closer to a few hundred.
15       Q    Okay.  Do they have tick marks on them, these work
16       papers, like little notes on them?
17       A    No.
18       Q    What form are the work papers that you put together in
19       connection with your analysis in this case?
20       A    There would be Microsoft Excel files, PDFs, and Microsoft
21       Word documents.
22       Q    And they contain your notes that you built over the last
23       two-and-a-half years supporting these summaries that you were
24       asked about; is that right?
25       A    They contain details and calculations that underlie the
```

1    analyses that I performed, yes.

2    Q    Now, before you took the stand yesterday, what did you do

3    to prepare to testify before this jury?

4    A    I reviewed the exhibits that we discussed earlier.  And I

01:47PM 5    spoke with counsel, the Government, and I spoke with Evan

6    Carter.

7    Q    And you've been preparing to testify in this case for

8    about the last month.  Is that fair?

9    A    That's a good estimate.

01:47PM 10   Q    And during that month, I take it you also referred back

11   to your work papers from time to time; is that true?

12   A    Yes.

13   Q    And when you referred back to those work papers over the

14   last month to prepare to testify, did that help you refresh

01:48PM 15   your recollection as to certain calculations and certain work

16   that you did?

17   A    It did.

18   Q    That helped you refresh your recollection so that you

19   could come to court and testify as you did on direct; right?

01:48PM 20   A    Yes.

21         MR. AVENATTI:  Your Honor, one moment, please.

22         **(Pause in proceedings.)**

23         BY MR. AVENATTI:  Sir, have you ever heard the

24   phrase "garbage in, garbage out"?

01:49PM 25   A    I've heard that phrase.

```
 1   Q    What do you understand the phrase "garbage in, garbage
 2   out" to mean?
 3   A    It means that if you were performing an analysis or
 4   building a financial model, if the inputs to that model are
 5   unreliable, the outputs would also be unreliable.
 6   Q    That's a widely understood principle, to the best of your
 7   knowledge, in public accounting; is it not?
 8   A    Yes.
 9   Q    If the inputs are not reliable, you can't rely on the
10   output.  Fair?
11   A    That's fair.
12   Q    And you've understood at all times over the last two and
13   a half years that this case was a very serious matter; right?
14   A    Yes.
15   Q    And you understood at all times that your work had to be
16   spot-on, 100 percent correct; right?
17   A    I always aim for my work to be spot-on, 100 percent
18   correct.
19   Q    Well, and you especially understood it in connection with
20   this serious criminal matter; right?
21   A    I understood it in connection with this matter and all my
22   other cases, yes.
23   Q    You understood over the last two years that close was not
24   good enough; is that fair?
25        MR. WYMAN:  Objection.  Argumentative.  Irrelevant.
```

1          THE COURT:  Overruled.

2          THE WITNESS:  I always aim to be as accurate as

3    possible.

4    Q    BY MR. AVENATTI:  Yeah, my question is a little

01:51PM 5    different.

6          You understood that in connection with this very

7    serious criminal matter, close was not good enough; right?

8    A    I think that -- that would be a legal interpretation.  I

9    don't know if I'm --

01:51PM 10   Q    Sir, I'm not asking you for a legal interpretation.  I'm

11   asking you what you've understood over the last two and a half

12   years while you've been -- you and your colleagues have been

13   billing upwards of $600,000.

14         Here's my question, very simple:  You understood in

01:51PM 15   connection with this serious criminal matter that close was not

16   good enough, your work had to be 100 percent?

17         MR. WYMAN:  Objection.  Vague as to "good enough."

18         THE COURT:  Overruled.

19         THE WITNESS:  I'm sorry, I'm not sure how to answer

01:52PM 20   the question, because I don't know what -- "good enough" seems

21   like a standard, potentially a legal interpretation.

22   Q    BY MR. AVENATTI:  Mr. Drum, I'm not asking for a legal

23   interpretation.  My question is this:  In connection with your

24   work over the last two and a half years and the work that you

01:52PM 25   did on these charts, you understood that they had to be

100 percent accurate, especially because of how serious this

matter is; right?

A    All of my work, in every setting, I am to be 100 percent

accurate, yes.

01:52PM 5    Q    Including this one?

A    Including this one, yes.

Q    And you also understood that before you could perform any

analysis or reach any conclusions, you had to understand how

the financial accounting worked at the law firm, Eagan

01:53PM 10    Avenatti; right?

A    I think I was provided the information that I needed to

do -- needed in order to perform the analyses that I was asked

to perform.

MR. AVENATTI:  Move to strike as nonresponsive.

01:53PM 15    THE COURT:  Denied.

Q    BY MR. AVENATTI:  Sir, my question is, did you have the

understanding that in order to reach your conclusions and

provide your opinions to the jury, that you had to understand

how the financial accounting software at the law firm worked?

01:53PM 20    MR. WYMAN:  Asked and answered.

THE COURT:  Sustained.

Q    BY MR. AVENATTI:  Sir, isn't it true that if you don't

know how the law firm tracked expenses for clients, you can't

determine how much a client was owed?

01:54PM 25    MR. WYMAN:  Asked and answered.  Argumentative.

**UNITED STATES DISTRICT COURT**

```
 1              THE COURT:  Sustained.
 2    Q    BY MR. AVENATTI:  Sir, how important was it for you to
 3    understand what the expenses were for any particular client?
 4    A    It was one of the inputs that is part of my exhibits.
 5    Q    It was critically important, was it not?
 6    A    The exhibit would be incomplete without that information,
 7    yes.
 8    Q    So you would agree it's critically important?
 9    A    Yes.
10    Q    Sir, I want to show you some testimony that the jury has
11    already heard in the case, and I'm going to ask you a couple
12    questions about it.  I'm waiting for the Elmo.
13              Do you see this transcript, sir?
14    A    Yes, I can see it.
15    Q    And I'll represent to you that this is some of the
16    testimony from Ms. Judy Regnier.  You know who that is; right?
17    A    Yes.
18    Q    Page 93:
19              "Well, do you remember yesterday you were
20         asked about -- you were asked a question, and you
21         said that there was another program that was used
22         but you couldn't remember the name of it and you
23         thought it might be Timeslips.
24              "ANSWER:  Yes, I remember that.
25              "QUESTION:  Now, is your recollection
```

01:54PM (line 5)
01:54PM (line 10)
01:56PM (line 15)
01:56PM (line 20)
01:56PM (line 25)

1        refreshed that, in fact, it was Tabs?

2           "ANSWER:  Yes.

3           "QUESTION:  When you had to figure out costs

4        for a case, you would look at Tabs, would you not?

01:57PM  5          "ANSWER:  No.  I would look at both Tabs and

6        QuickBooks.

7           "QUESTION:  Why would you look at both

8        QuickBooks and Tabs?

9           "ANSWER:  To make sure that we had

01:57PM 10       encompassed all of the costs.

11          "QUESTION:  You couldn't rely on just one.

12       You had to look at both; right?

13          "ANSWER:  Yes.

14          "QUESTION:  Otherwise, the calculation could

01:57PM 15     be off?

16          "ANSWER:  Correct."

17           Did I read that correctly?

18  A    Yes.

19  Q   Did you, sir, in connection with your $600,000-plus

01:57PM 20 analysis, ever make any efforts to look at both QuickBooks and

21  Tabs, meaning the electronic data?

22        MR. WYMAN:  Asked and answered several times,

23  Your Honor.

24        THE COURT:  Overruled.

01:58PM 25      THE WITNESS:  My estimate of case-related expenses

24

```
  1    reflects both QuickBooks and the spreadsheets from Judy

  2    Regnier, which I understand are an output from Tabs.

  3    Q    BY MR. AVENATTI:  Sir, that's not what I asked you.

  4    We're going to get to what Ms. Regnier said about these

01:58PM  5    spreadsheets momentarily.  I'm asking you about the data --

  6    strike that.

  7          You looked at the data from QuickBooks; am I right?

  8    A    Yes, I looked at data in QuickBooks.

  9    Q    But you never looked at the electronic data from Tabs,

01:58PM 10    did you?

 11    A    That's correct.

 12    Q    The only information that Tabs -- from Tabs you ever

 13    looked at was the hard copy draft printouts that you were

 14    provided by the Government; am I right?

01:58PM 15    A    That's correct.

 16    Q    You understand that the costs for a case --

 17          THE COURT:  Mr. Avenatti, hold your voice down a

 18    little, please.

 19          MR. AVENATTI:  I'm sorry, Your Honor.

01:59PM 20    Q    Sir, you understand that the cost for any particular

 21    case, what's reflected in QuickBooks, is not identical to

 22    what's reflected in Tabs; right?  You understand that?

 23    A    Yes.  My review --

 24    Q    Thank you.

01:59PM 25    A    -- when I compared the two, I saw they were different.
```

1          MR. AVENATTI:  Move to strike everything after "yes"

2     as nonresponsive.

3          THE COURT:  Be stricken.

4     Q     BY MR. AVENATTI:  Sir, the reason why you never looked --

02:00PM 5     you never asked to look at the Tabs electronic data was because

6     nobody ever told you it existed; isn't that true?

7     A     I knew of the outputs -- the spreadsheets that were

8     e-mailed by Judy Regnier, but other than that, no.

9     Q     Every time I ask you about the electronic data, you want

02:00PM 10    to mention the spreadsheets.  Please just listen to my

11    question.

12          MR. WYMAN:  Objection.  Argumentative.

13          THE COURT:  Sir, just ask questions.

14          MR. AVENATTI:  I will.

02:00PM 15    Q     Mr. Drum, I'm asking about the electronic data of Tabs.

16    Here's my question:  The reason why you never asked to look at

17    the electronic data of Tabs was because you didn't even know it

18    existed; isn't that true?

19    A     That's correct.

02:00PM 20    Q     And you never did anything to find out, even though your

21    firm billed over $600,000; isn't that true?

22    A     I never did anything to find out what?

23    Q     To find out whether there was electronic data from Tabs.

24    A     That's correct.

02:01PM 25    Q     Now, let's talk about the data that you reviewed from

1    QuickBooks.  Where did you get that from?

2    A    That data came from the Government.  Was provided to me

3    from the Government.

4    Q    Did you look at any of the identifying information on

02:02PM 5    that electronic -- well, strike that.  Let me lay some

6    foundation.

7         When you got it from the Government, was it an

8    electronic file?

9    A    Yes, it was.

02:02PM 10   Q    Did you look at any of the identifying information on the

11   electronic file to try to figure out where it came from?

12   A    I'm not sure what you mean by "identifying information."

13   Q    When you received the electronic file, it was a

14   QuickBooks database; am I right?

02:02PM 15   A    Yes.

16   Q    And you loaded it in QuickBooks; right?

17   A    Yes.

18   Q    Did you try to find out any information about what

19   electronic information was in the file showing where it came

02:03PM 20   from or the last time it had been updated?

21   A    No, I did not.

22   Q    So when you -- and that's the QuickBooks data that you

23   used; right?

24   A    Yes.

02:03PM 25   Q    So you made no effort to see how current it was, did you?

**UNITED STATES DISTRICT COURT**

```
  1   A     No.  I relied on it as given to me.

  2   Q     So when you used that -- well, strike that.

  3             You used that because that's what the Government

  4   told you to use; right?

  5   A     I used that because that's the data the Government
02:03PM
  6   provided me, yes.

  7   Q     But you have no idea how complete or incomplete that data

  8   is; right?

  9   A     I had no way to verify how complete or incomplete the data
02:04PM
 10   was.

 11   Q     And you undertook no effort to do so; right?

 12   A     I had no information that would allow me to do that.

 13   Q     And, therefore, you didn't take any steps to do it;

 14   right?

 15   A     That's right.
02:04PM
 16   Q     Did you ever ask to see any of the cost invoices for any

 17   particular client?  By "cost invoice" -- let me ask a better

 18   question.  Strike that.

 19             Did you ever ask to see the actual invoices from

 20   vendors in connection with any particular client?
02:05PM
 21   A     No, I did not.

 22   Q     And just to be clear, what I mean by that is, did you

 23   ever ask the Government, just as an example, "I'd like to see

 24   all of the invoices from the law firm that may relate to an

 25   expense associated with Mr. Johnson's case."  And by "invoices"
02:05PM
```

```
       1   I'm talking about third-party invoices.
       2          Did you ever do that?
       3   A    No.  I didn't review any third-party invoices.
       4   Q    And you never asked for any?
02:05PM 5   A    I don't believe I did.
       6   Q    And that was true for Mr. Johnson, Mr. Barela, Ms. Phan,
       7   Mr. Tran, and Ms. Gardner; right?
       8   A    Yes.
       9   Q    So you assumed the QuickBooks file was accurate, and you
02:06PM 10  assumed that all of the expenses were in QuickBooks; right?
      11          MR. WYMAN:  Objection.  Compound.
      12          THE COURT:  Sustained.
      13  Q    BY MR. AVENATTI:  Okay.  We already established that you
      14  assumed QuickBooks was accurate; true?
02:06PM 15  A    I relied on QuickBooks as it was provided to me.
      16  Q    And you assumed it was accurate; right?
      17  A    I had no reason to believe otherwise.
      18          MR. AVENATTI:  Move to strike, Your Honor.
      19          THE COURT:  Be stricken.
02:06PM 20  Q    BY MR. AVENATTI:  Sir, you assumed the QuickBooks file
      21  was accurate.  That's why you used it; correct?
      22  A    I summarized the information in QuickBooks, yes.
      23  Q    Because you assumed it was accurate?
      24  A    Yes.
02:06PM 25  Q    You generally don't use information that you don't
```

```
 1   believe is accurate; is that right?
 2   A     That's a good practice.
 3   Q     Okay.  Now, and you also assumed as part of your analysis
 4   that every expense the firm had incurred for a client was put
02:07PM  5   in QuickBooks; correct?
 6   A     No.  That's why I relied on the Judy Regnier spreadsheets
 7   that were available and QuickBooks.
 8   Q     Sir, what if an expense was incurred but was not input in
 9   QuickBooks or on the spreadsheet, would your analysis reflect
02:07PM 10   that?
11   A     It would not.
12   Q     Do you know what the practice of the law firm was
13   relating to when invoices would come in and how much time would
14   pass before they were actually put into QuickBooks or Tabs?
02:07PM 15   A     No, I do not.
16   Q     Did you make any effort in connection with your analysis
17   to discover what that protocol was and whether there was any
18   lag time?
19   A     No.  I relied on the information that was inputted in
02:08PM 20   QuickBooks and provided to me.
21   Q     So, for instance, since you're here in an expert
22   capacity, I can ask you to assume various things.  I want you
23   to assume that there was $100,000 expert invoice on one of the
24   client's -- client matters that you have testified about.
02:08PM 25             Do you have that assumption in mind?
```

A     Okay.

Q     And I want you to assume that it was not input into QuickBooks, or at least the version that you had, or on one of the spreadsheets.

02:08PM              Do you have that assumption in mind?

A     I'm sorry, can you repeat that?

              MR. AVENATTI:  Can I have it read back?

              THE COURT:  Fine.

              **(The record was read as follows:**

02:08PM              **"And I want you to assume that it was not**

              **input into  QuickBooks, or at least the version**

              **that you had, or on one of the spreadsheets.**

              **"Do you have that assumption in mind?")**

              THE WITNESS:  Okay.

02:09PM Q     BY MR. AVENATTI:  Your analysis, then, would be wrong, because it would not account for the $100,000 invoice that you made no effort to find out about in connection with your analysis; right?

A     My analysis would omit that expense that was omitted from

02:09PM the data that was provided to me.

Q     Is that a long way of saying, "Yes, it would be wrong"?

A     My analysis is an accurate summary of the information that was provided to me.

Q     It would be wrong, correct, sir?

02:09PM A     What would be wrong?  Can you be specific?

```
 1   Q    I want you to assume there's $100,000 invoice.  I thought
 2   we just went through this.  Let me go through it again.
 3             I want you to assume there's $100,000 invoice.  It's
 4   not in the version of QuickBooks that you have.  It was also
 5   not included in the spreadsheets that the Government provided
 6   you.
 7             Your analysis would be wrong because it would not
 8   account for the $100,000 invoice, cost for a client; true?
 9   A    Under that hypothetical, yes.
10   Q    And you don't know if there's any examples of that for
11   any of the clients, do you?
12   A    I would have no way of knowing that.
13   Q    And the reason is because you never made any effort to
14   find out.  That's why you don't know that; isn't that true?
15   A    I would have no way of knowing that.
16   Q    Sir, did you make any effort to find out about any other
17   legal work that was done for any of the clients beyond the work
18   on the particular settlement amounts?
19   A    No.  That was not in the scope of my assignment.
20   Q    It was not in the scope?
21   A    That's correct.
22   Q    And who determined the scope, the Government?
23   A    Yes.  The Government provided me my assignment.
24   Q    So you understood that you couldn't -- you couldn't even
25   make inquiry about that topic -- was that it? -- because it was
```

02:10PM  5
02:10PM  10
02:10PM  15
02:11PM  20
02:11PM  25

```
  1    outside the scope?

  2    A    No, I don't think so.

  3    Q    "No," you don't think so what?

  4    A    I could have asked about that, yeah.

02:11PM 5    Q    But you did not?

  6    A    No, I didn't.

  7    Q    All right.  I want to ask you some questions about the

  8    charts.  Let's go to Exhibit 420.

  9              Can we please blow up 420?

02:12PM 10             Can you see that, sir?

 11    A    Yes.

 12    Q    Now, if you're wrong about either the legal fees or the

 13    case-related expenses, then the total due to the client is

 14    wrong; correct?

02:13PM 15    A    That's how the math works, yes.

 16    Q    Pretty simple; right?

 17    A    Yes.

 18    Q    And as it relates to the case-related expenses, we were

 19    just talking about that, you did nothing to verify that other

02:13PM 20    than look at QuickBooks and the spreadsheets; right?

 21    A    Correct.  Those were the two sources of information I

 22    used.

 23              MR. AVENATTI:  Your Honor, one moment.  I'm sorry.

 24              **(Counsel conferred off the record.)**

02:14PM 25    Q    BY MR. AVENATTI:  Now, Mr. Drum, you understand in this
```

```
            1    criminal case, this case is about what's called counts; right?

            2    A    Did you say "counts"?

            3    Q    Counts.

            4    A    Yes.

02:14PM     5    Q    Okay.  And you understand that there's ten counts or

            6    criminal charges in connection with this case; right?

            7    A    I don't think I had that number in mind.

            8    Q    Okay.  Well, the Government can correct me if I'm wrong,

            9    but I'll represent to you that there's ten counts.  All right?

02:14PM    10            Now, I want to show you 457, and we're going to take

           11    a look at Count One.  This is a Government exhibit.  Can you

           12    see that?

           13    A    Yes, I see that.

           14    Q    Okay.  And you see that this is a transfer of $250,000;

02:15PM    15    right?

           16    A    Yes.

           17    Q    What's the date?

           18    A    January 30th, 2015.

           19    Q    And you understand that this is one of the charges by the

02:15PM    20    Government; namely, that they allege that this money was

           21    improperly taken from Mr. --

           22            I didn't even finish the question.  Strike that.

           23            You understand that the Government alleges that this

           24    was improper?

02:15PM    25            MR. WYMAN:  Objection.  Foundation.  Argumentative
```

```
 1    and calls for a legal conclusion.
 2              THE COURT:  Sustained.
 3    Q    BY MR. AVENATTI:  Sir, I want to ask you about this
 4    $250,000 transfer.
 5    A    Okay.
 6    Q    Did you see this $250,000 transfer over the course of
 7    your analysis?
 8    A    I saw a transfer of $250,000 from A&A 0061 to GB 9962 on
 9    that same day.
10    Q    Where did the money come from before AA transferred the
11    $250,000?
12    A    It came from EA 2851.
13    Q    Where is that reflected so we can show the jury?
14    A    I'm looking at Exhibit 424.
15              MR. AVENATTI:  Why don't -- Ms. Hernandez, I'll just
16    switch it over.  Keep that up there, please, if you don't mind.
17    I'm just going to use this.
18    Q    There's the $250,000 deposit into the EA account; right?
19    A    Yes.  And on the same day a $200,000 deposit was made.
20              MR. AVENATTI:  Move to strike the second part as
21    nonresponsive.
22              THE COURT:  Be stricken.
23    Q    BY MR. AVENATTI:  Sir, please just answer my question.
24              This is the $250,000 deposit into the AA account;
25    right?
```

```
 1    A    Yes.

 2    Q    And it came from EA 2851; right?

 3    A    Yes.

 4    Q    Okay.  Where did EA 2851 get the money to send it to AA?

 5    A    From EA 8541.

 6    Q    What exhibit?

 7    A    423.

 8    Q    That's it right there; correct?

 9    A    Yes.  That's the transfer to AA O661.

10    Q    And this $250,000 payment came out of this $1.6 million

11    that had been deposited into EA's account; right?

12    A    Yes.

13    Q    And where did the $1.6 million come from?

14    A    From EA 8541.

15    Q    What exhibit?

16    A    423 and 422.

17    Q    That's it right there; right?

18    A    Yes.

19    Q    Well, look at 422.  The $1.6 million; right?

20    A    Yes.

21    Q    That was the legal fee associated with the Geoff Johnson

22    matter, wasn't it?

23    A    Yes.

24    Q    So Count One charges me with a $250,000 transfer that

25    came directly out of the $1.6 million legal fee that the firm
```

02:18PM (line 5)
02:19PM (line 10)
02:20PM (line 15)
02:21PM (line 20)
02:21PM (line 25)

```
 1    was entitled to in connection with the Johnson matter; isn't
 2    that true?
 3              MR. WYMAN:  Objection.  Foundation.  Argumentative.
 4    Lacks personal knowledge.
 5              THE COURT:  Overruled.
 6              THE WITNESS:  The $250,000 withdraw on January 30th,
 7    2015, that we pointed to on 424 came from the $1.6 million
 8    legal fees.
 9              MR. AVENATTI:  Ms. Hernandez, can we have row 2.
10    Q    We're looking at row 2 of Exhibit 457.
11    A    Okay.
12    Q    Do you see that?
13    A    Yes.
14    Q    What's the date?
15    A    February 10th, 2015.
16    Q    What's the amount?
17    A    $50,000.
18    Q    From which account to which account?
19    A    From CB&T 0661 to Bank of America account in the name of
20    Michael John Avenatti.
21    Q    What exhibits reflect where that money came from?
22    A    I believe it would be the same exhibits we were just
23    looking at.
24    Q    Let's show the jury.  Can you direct me, please.
25    A    424.
```

02:21PM 5
02:22PM 10
02:22PM 15
02:23PM 20
02:23PM 25

| | | |
|---|---|---|
| 1 | Q | What's the date again? |
| 2 | A | February 10th, 2015. |
| 3 | Q | Which one? |
| 4 | A | The one just above your fingernail.  Yeah. |
| 02:24PM 5 | Q | That one; right? |
| 6 | A | The one that your finger is covering.  Yeah. |
| 7 | Q | This one? |
| 8 | A | Yes. |
| 9 | Q | Okay.  And where did the money come from this pay -- for |

10   this payment?

11   A    Looks like it came from the $100,000 deposit from 2851.

12   Q    Okay.  Where is that reflected?

13   A    That would be in Exhibit 423.  Yes.

14   Q    That's it right there; right?

02:26PM 15   A    Yes.

16   Q    And where did that money come from?

17   A    So prior to that withdrawal, there were three deposits

18   from EA 8541 and one deposit that's not identified.

19   Q    And the three deposits from 8541 were the $1.6 million

02:27PM 20   that we've already established was the legal fee; correct?

21   A    Yes.

22   Q    The $2,776 that related to Mr. McNicholas's cost; right?

23   A    Yes.

24   Q    This cost amount, which you claim was not accurate,

02:27PM 25   although you don't have the Tabs data; right?

**UNITED STATES DISTRICT COURT**

```
         1   A     I have the output in the Judy Regnier e-mail.

         2   Q     Sir, do you know anything about that output as to its

         3   accuracy or what Judy Regnier testified to about it?  Do you

         4   have any idea?

02:27PM  5   A     I don't know what Judy Regnier testified.

         6   Q     Okay.  And you don't have any idea as to how accurate it

         7   is either, do you?

         8   A     I believe it double-counted certain expenses, so it was

         9   not accurate.

02:28PM  10  Q     Sir, you're not understanding my question.

         11           You don't know whether that was a final cost amount

         12  or not, do you?

         13  A     I don't know whether that was a final cost or not.

         14  Q     Okay.  And we're going to come back to this number

02:28PM  15  momentarily.

         16           And there's this number of $15,637; right?

         17  A     Yes.

         18  Q     And after this $100,000 payment was made, what was the

         19  balance in the account?

02:28PM  20  A     708,031.

         21  Q     So are you able to tell the jury that any of that $50,000

         22  came from money stolen from Geoffrey Johnson?

         23  A     The $100,000?  No, I can't say one way or another.

         24  Q     But we know the $250,000 was not; right?

02:29PM  25  A     The source of the $250,000 withdrawal was the 1.6 million.
```

UNITED STATES DISTRICT COURT

```
  1    Yes.
  2    Q    So do you have any idea why they charged me with a
  3    federal crime over that payment?
  4              MR. WYMAN:  Objection.  Argumentative.
02:29PM 5         THE COURT:  Sustained.
  6    Q    BY MR. AVENATTI:  By the way, in connection with the over
  7    $600,000 worth of work that your firm did and you did, did the
  8    Government ever ask you to engage in this type of analysis,
  9    where they took the charges and actually traced them through to
02:30PM 10   see if an actual crime had been committed?  Did they ever ask
  11   you to do that?
  12   A    That was not part of my assignment.
  13   Q    So I'll take that as a "No."  Is that fair?
  14   A    Yes.
02:30PM 15   Q    Now, you were also asked about -- and we're going to come
  16   back to that count chart here momentarily, but you were also
  17   asked about Exhibit 48.
  18              Can you please pull that up.
  19              You recall that Mr. Wyman asked you about
02:31PM 20   Exhibit 48?
  21   A    Yes.
  22   Q    And you understand that this is a draft printout from
  23   Tabs; right?
  24   A    Yes.
02:31PM 25   Q    And I wrote this down, but I may have written it down
```

wrong.  You correct me if I'm wrong.  But I believe that during

your direct, Mr. Wyman asked you if you had confirmed that

these expenses had actually been incurred, and you said that

you had.  And the way that you had confirmed it was you had

02:32PM 5  looked at the underlying bank records to see if the payments

had been made.  Do you recall that testimony?

A     I think so.  Yes.

Q     And was that truthful when you told the jury that that's

how you confirmed that these payments had been made?

02:32PM 10  A     That was my recollection.

Q     Sir, do you know why some costs were kept in QuickBooks

versus Tabs?

A     No, I don't.

Q     Isn't it true that sometimes the law firm would get an

02:33PM 15  invoice that would have a lot of different cases billed on the

same invoice, and the total amount would go into QuickBooks,

but then it had to be broken down in Tabs.  Isn't that true?

           MR. WYMAN:  Objection.  Foundation.

           THE COURT:  Overruled.

02:33PM 20            THE WITNESS:  That could be.

Q     BY MR. AVENATTI:  So I want to ask you about page 4 of 9

on this Exhibit 48.  This is the one that you said you went to

the banking records and you confirmed the payments, page 4 of

9.

02:34PM 25            We can just blow up the bottom half, please.

1            Sir, do you see all these entries to Nationwide?

2    A    Yes, I do.

3    Q    And many of them are fairly small numbers there.  Do you

4    see that?  For instance, there's one, "Delivery of envelope,

02:34PM 5    $18."

6    A    I see that.

7    Q    There's another one, "Delivery of envelope, $72."

8            Do you see that?

9    A    Yes.

02:35PM 10   Q    So, sir, is it your testimony that if you went into the

11   bank records of Eagan Avenatti, that you would see a check for

12   each one of these small amounts made payable to Nationwide and

13   that -- I mean, I think you testified that's how you confirmed

14   that the expenses were paid; right?

02:35PM 15   A    I should clarify that.  I confirmed the CareMeridian

16   amounts in here.  They were actually paid.

17   Q    Well, sir, that wasn't the question.  I wrote it down.

18           Mr. Wyman asked you if you had confirmed all of the

19   expenses on 48 by checking the bank records, and you testified

02:35PM 20   to the jury that you had.

21           Do you wish to now change that testimony?

22   A    I confirmed the amounts that were paid to CareMeridian.

23   Q    Because there would be no way to confirm the other

24   expenses merely by going to the bank records, because very

02:36PM 25   often the payment made in the bank records would account for a

1    number of different cases, i.e., for Nationwide; right?

2    A    That could be a reason, yes.

3    Q    So other than CareMeridian, you made no confirmation of

4    any of these expenses on 48; right?

02:36PM 5    A    I don't recall making a confirmation of the others.

6    Q    And you don't recall asking Ms. Carter or any of the

7    other people working with you to do so; right?

8    A    I don't recall one way or the other.

9    Q    You were asked about this line item in red, "Total client

02:37PM 10   received from settlement," and you have nothing listed there.

11   Right?

12   A    That's correct.

13   Q    Did Mr. Johnson receive any monies before -- strike that.

14        Did Mr. Johnson receive any monies from Eagan

02:38PM 15   Avenatti before January 29, 2015, as an advance on his

16   settlement, yes or no?

17   A    I don't recall.

18   Q    Well, you would agree that if he did receive such

19   advances, this number would be wrong; right?

02:38PM 20   A    Yes, if he received advances, I would expect that to be in

21   the case-related expenses.

22        MR. AVENATTI:  Move to strike as nonresponsive.

23        THE COURT:  Be stricken.

24   Q    BY MR. AVENATTI:  Sir, if he received advances before his

02:39PM 25   settlement, this statement that he received no monies would be

1    wrong, wouldn't it?

2    A    No, I don't think that's right.

3    Q    Well, did he receive any money after January 29th, 2015,

4    from Eagan Avenatti?

02:39PM 5    A    Yes.

6    Q    None of those monies are shown on this page; correct?

7    A    That's correct.

8    Q    Sir, you were asked a question about what kinds of

9    expenses that you noticed out of the Avenatti & Associates

02:40PM 10   account.  Do you recall that?  You were asked this general

11   question by Mr. Wyman?

12   A    Yes, I recall that.

13   Q    And you said that it was a mix of personal and business

14   expenses.  Do you recall that?

02:40PM 15   A    Yes, I recall that.

16   Q    Who owned Avenatti & Associates?

17   A    I believe it was -- I believe it was you, and I don't

18   recall if there was another interest in it.

19   Q    You understood, sir, that Avenatti & Associates was a

02:40PM 20   company that I owned 100 percent of, did you not?  You

21   understood that when you were doing your analysis; right?

22   A    I don't recall that offhand, but I can accept that.

23   Q    It wasn't a publicly traded company?

24   A    No.

02:41PM 25   Q    Okay.  Did you understand that I owed any money in

```
           1    Avenatti & Associates to other people who were my partners in
           2    Avenatti & Associates?
           3    A    I don't know whether Avenatti & Associates had any debt,
           4    no.
02:41PM    5    Q    I'm sorry, any debt?
           6    A    Yes.
           7    Q    I wasn't asking about debt.  I was just asking about
           8    partners.
           9         Are you aware of any other partners or people that
02:41PM   10    owned equity interest in Avenatti & Associates?
          11    A    No, I'm not aware.
          12    Q    So are you aware of anything improper in -- when you have
          13    a wholly owned personal corporation, having the company pay
          14    personal expenses from time to time as long as it's accounted
02:41PM   15    for?  Are you aware something improper in that?
          16    A    As long as it's accounted for properly.  That's up to the
          17    sole proprietor to do.
          18    Q    Happens all the time, doesn't it?
          19    A    It does.
02:42PM   20    Q    Now, when you were asked about 422, Mr. Wyman didn't ask
          21    you about a particular line item, and I want to ask you about
          22    it.
          23         This is the EA trust account exhibit.  Do you see
          24    that?
02:42PM   25    A    Yes, I see that.
```

```
 1   Q    And there's the $1.6 million fee.  We already talked
 2   about that; right?
 3   A    Yes.
 4   Q    And then there's a $3 million deposit on March 31st, and
 5   the payor is Mark Calvert.  Do you see that?
 6   A    I see that.
 7   Q    Do you know what that relates to?
 8   A    No.  I don't know who Mark Calvert is.
 9   Q    Did you ever ask anybody?
10   A    I don't believe so.
11   Q    And then out of that amount of money there was an amount
12   paid to Eagan Avenatti of over $2 million; is that right?
13   A    I see that withdrawal to Eagan Avenatti.
14   Q    And that largely came from the amount of money deposited
15   from Mr. Mark Calvert.  Do you see that?
16   A    Yes.  Before the deposit from Mark Calvert, the account
17   did not have sufficient funds to make that transfer.
18   Q    And then there was a $350,000 payment made to
19   McNicholas & McNicholas.  Do you see that?
20   A    Yes, I see that.
21   Q    And that was the same firm that was working on the Geoff
22   Johnson matter, wasn't it?
23   A    That's my understanding.
24   Q    Now, we're back to Exhibit 423 and we're talking about
25   this $1.6 million that was deposited into the account.  Do you
```

```
 1   remember that?
 2   A     Yes.
 3   Q     We already talked about the $250,000 payment that the
 4   federal government is charging me with; right?
 5   A     We talked about that payment.
 6   Q     And what's this payment right here?
 7   A     That's a $5,000 payment to Sunrise of West Hills.
 8   Q     And the firm actually deducted this amount from the
 9   amount of the $1.6 million legal fee that the firm got.  Do I
10   have that correct?
11   A     The -- yes, the source of the $5,000 payment was the
12   balance which reflects the $25,000 balance and the $1.6 million
13   deposit.
14   Q     And you understood that that related to Mr. Johnson;
15   right?
16   A     Yes, I understand that.
17   Q     By the way, in connection with your analysis, did you
18   ever ask to see any of the client banking records to see what
19   money they may have received?
20   A     No.  I never saw the client records.
21   Q     And you never asked to do so; right?
22   A     I don't believe so.
23   Q     And how do you know that these are -- that the accounts
24   that Mr. Wyman asked you about, how do you know that those are
25   all of the Eagan Avenatti or Michael Avenatti bank accounts?
```

02:45PM (line 5)
02:46PM (line 10)
02:46PM (line 15)
02:47PM (line 20)
02:47PM (line 25)

```
 1   Or do you know?
 2   A    It's possible there are other accounts that I don't know
 3   about.
 4   Q    You only used what the Government gave you?
 5   A    I used the information that was provided me by the
 6   Government, yes.
 7   Q    Let's take a look at Exhibit 430, please.  Do you see
 8   Exhibit 430?
 9   A    Yes.
10   Q    You have case-related expenses, $65,615; right?
11   A    That's correct.
12   Q    Do you know whether that number is accurate?
13   A    That's an accurate depiction of the case-related expenses
14   that are recorded in QuickBooks for Alexis Gardner.
15   Q    What about Tabs?
16   A    I asked if there was a similar spreadsheet, as I reviewed
17   for Geoffrey Johnson and Greg Barela, and I understand there
18   was not.
19   Q    Did you ask if there was any electronic data from Tabs
20   for this matter?
21   A    I don't believe so.
22   Q    If the cost amount is different, the calculation would be
23   wrong; isn't that true?
24   A    If the cost amount was different, the calculation would be
25   different, yep.
```

02:47PM (line 5)
02:49PM (line 10)
02:49PM (line 15)
02:49PM (line 20)
02:50PM (line 25)

```
 1   Q    It would be different than the calculation that you
 2   produced in connection with your $600,000 worth of work; right?
 3   A    Yes.
 4   Q    And then I notice that you have plus settlement amount
 5   due November 2020, $250,000; right?
 6   A    Yes.
 7   Q    And then you have total due to client as of November
 8   2020, $1,944,385.  Do I have that correct?
 9   A    Yes.
10   Q    And then you have total client received from settlement,
11   nothing; right?
12   A    Yes.
13   Q    Did Ms. Gardner receive any advances before her
14   settlement was received?
15   A    I don't recall.
16   Q    You don't know, do you?
17   A    I know there were expenses paid for.
18   Q    Sir, I didn't ask you about expenses.
19        Did Ms. Gardner receive any advances before
20   settlement was paid?
21   A    I don't know.
22   Q    Did Ms. Gardner receive any monies after her settlement
23   was paid?
24   A    Yes, she did.
25   Q    Those are not reflected on your sheet, are they?
```

02:50PM, 02:50PM, 02:51PM, 02:51PM, 02:51PM timestamps appear at lines 5, 10, 15, 20, 25.

```
 1   A      That's correct.  Those --

 2   Q      Thank you.

 3   A      -- came from other accounts.

 4              MR. AVENATTI:  Move to strike after "correct" as

 5   nonresponsive, Your Honor.

 6              THE COURT:  It will be stricken.

 7   Q   BY MR. AVENATTI:  Now, let's talk about the $250,000 that

 8   you listed -- well, strike that.

 9              Whose idea was it to put this $250,000 amount on

10   your chart?  Was that the Government's idea or your idea?

11   A   I would say that was my idea.

12   Q   So after you put the $250,000 on your chart as an amount

13   that was due, what did you do to figure out if Ms. Gardner ever

14   got any part of the money?  Did you do anything?

15   A   I didn't have records for that time period that would

16   allow me to analyze that.

17   Q   So you put that the amount would be due her, but you then

18   did nothing to figure out whether she ever got any of the

19   money; is that true?

20   A   I was not provided any information that would allow me to

21   do that.

22   Q   Nor did you ever ask for any information about whether

23   she had actually been paid any of the money; isn't that true,

24   sir?

25   A   I did not ask for any information about the 250,000 on
```

02:51PM (line 5)
02:51PM (line 10)
02:52PM (line 15)
02:52PM (line 20)
02:52PM (line 25)

1    November 2020.

2    Q    If she did receive some of that money, your calculation

3    would be wrong; isn't that true?

4    A    If she received some of the $250,000 payment in November

02:53PM 5    2020, yes, the value in the red should reflect that.

6    Q    And your calculation would be wrong; isn't that true?

7    A    Yes.

8              MR. AVENATTI:  Now is a good time.

9              THE COURT:  Okay.  We'll take the midafternoon break

02:53PM 10   here, ladies and gentlemen.  We'll be in recess for 15 minutes.

11             Please remember the admonition not to discuss the

12   case with anyone, not to form any opinions on the issues in the

13   case until it's submitted to you, and, as always, no research,

14   please.

02:53PM 15             THE COURTROOM DEPUTY:  All rise.

16             **(Recess from 2:54 p.m. to 3:14 p.m.)**

17             MR. AVENATTI:  Your Honor, for the Court's

18   information, plus or minus 30 minutes on cross.  I'm going to

19   try to eliminate some.  Obviously reserving my rights on the

03:12PM 20   other issues.

21             **(In the presence of the jury.)**

22             THE COURT:  Ladies and gentlemen, this is the

23   toughest hour of the week, so if any of you feel the need to

24   stretch, please go ahead.

03:14PM 25             THE COURTROOM DEPUTY:  I told them the same thing,

1    ironically.

2              THE COURT:  Now you know where I get all my good

3    ideas.

4              Mr. Avenatti.

03:14PM  5         MR. AVENATTI:  Thank you, Your Honor.

6    Q    Before the break, sir, we were talking about Exhibit 430,

7    this chart you prepared.  Do you recall that?

8    A    Yes, sir, I recall that.

9    Q    Did Ms. Gardner ever agree to accept monthly payments in

03:15PM 10   connection with the Whiteside settlement?

11             MR. WYMAN:  Objection.  Calls for speculation.

12             THE COURT:  Overruled.

13             THE WITNESS:  I don't know.

14   Q    BY MR. AVENATTI:  Did you ever ask anybody if Ms. Gardner

03:15PM 15   had agreed to accept monthly payments in connection with the

16   settlement amount that you put on 430?

17   A    I don't believe I did.

18   Q    And nobody ever told you one way or the other, did they?

19   A    No.

03:15PM 20   Q    Let's take a look at 439.  439 relates to Mr. Barela.  Do

21   you see that?

22   A    Yes, it does.

23   Q    And you have a case-related expense amount here of

24   $180,797.  Do you see that?

03:16PM 25   A    Yes.

```
 1   Q     And you got that off of the QuickBooks file, which you

 2   don't know where it came from or how current it was, and the

 3   draft spreadsheet.  Do I have that correctly?

 4   A     Yes.  The two sources of information are the QuickBooks

 5   files and the spreadsheet from Judy Regnier.

 6   Q     And you don't know if either one of those two sources of

 7   information are accurate, do you?

 8   A     I wasn't able to -- no.  I wasn't able to do anything to

 9   verify the accuracy.

10   Q     So the answer is, "No," you do not?

11   A     That's correct.  I accepted them as they were provided to

12   me.

13   Q     By the Government?

14   A     By the Government, yes.

15   Q     And you would agree that if the case-related expense

16   amount is wrong, then this calculation would not be accurate;

17   right?

18   A     That's how the math works, yes.

19   Q     Again, pretty simple; right?

20   A     Yes.

21   Q     Can you see this?

22   A     Yes, I can see that.

23   Q     At the top it says "calculation," and then it has,

24   "Settlement amount, minus attorney's fees, minus out-of-pocket

25   expenses, minus advances, minus interest, minus fees for other
```

03:16PM (line 5)
03:17PM (line 10)
03:17PM (line 15)
03:18PM (line 20)
03:18PM (line 25)

```
     1   work -- for other work, equals net amount due client."
     2           Do you see that?
     3   A    I see that in there.
     4   Q    This, too, is pretty simple math; right?
03:18PM 5   A    Yes.
     6   Q    And this is essentially what you have attempted to do;
     7   right?
     8   A    Yes.
     9   Q    But you haven't accounted for all of the advances, if
03:19PM 10  any, paid to any of the clients or any interest or any legal
     11  fees for other work.  Is that fair?
     12  A    I believe advances were included in the spreadsheet from
     13  Judy Regnier.
     14  Q    Sir, do you understand that those spreadsheets, when they
03:19PM 15  say "advances," that they're referring to advances to clients?
     16  A    There's a line that says "advances" in those spreadsheets.
     17  Q    All right.  Well, let's take a look at it.  Let's go back
     18  to 48.
     19          When I wrote "advances" on here, I referred to --
03:20PM 20  what I meant was advances to clients.
     21  A    Payments directly to the clients?
     22  Q    Yes.  Or someone that the client directed the money to go
     23  to.  Does that clarify your answer?
     24  A    I don't think so.
03:20PM 25  Q    Okay.  Let's take a look at 48.  Here's the first page
```

1    with that big-old "Draft" across the page.  Do you see that?

2    A    Yes.

3    Q    And this says "expenses"; right?

4    A    Yes.

03:20PM  5    Q    And this is a Tabs printout, we already established that;

6    right?

7    A    Yes.

8    Q    And then there's another category here called "advances";

9    right?

03:21PM 10    A    Yes.

11    Q    But you don't see any payments to client -- to a client

12    under "advances," do you?

13    A    No, I don't see that.

14    Q    Do you know the differences in Tabs between an advance

03:21PM 15    and an expense?

16    A    That distinction didn't affect my analysis.

17              MR. AVENATTI:  Move to strike as nonresponsive.

18              THE COURT:  Be stricken.

19    Q    BY MR. AVENATTI:  Sir, I'm just asking you if you know

03:21PM 20    why Tabs lists some items under "expense" and some under

21    "advances"

22    A    No, I don't know that.

23    Q    And the reason is because you don't know anything about

24    Tabs, do you?

03:22PM 25    A    No.

Q     And before this case, you'd never even heard of Tabs?

A     Before this case I had not heard of Tabs.  That's correct.

Q     Did you ever Google it?

A     I don't believe I did.

03:22PM  Q     And you never attempted to buy the software either, did

you?

A     No, I did not buy the software.

Q     So going back to the question that led us down this path,

we were talking about simple math and I was asking you about

03:23PM  this sheet on the flip chart.  Do you recall that?

A     Yes.

Q     Okay.  And going back to what I asked, this is

essentially what you have attempted to do, although you have

not accounted for some of the categories that I listed on my

03:23PM  flip chart.  Is that fair?

A     That's fair.

Q     Do you know if any other legal work was done for

Mr. Barela for which the firm was entitled to be paid, other

than this amount that you've listed of $760,000?

03:24PM  A     No, I don't know one way or the other.

Q     And you never asked anyone if any other legal work had

been paid; is that correct -- I'm sorry.

      You never asked anyone if any other legal work had

been done for Mr. Barela for which the firm was entitled to

03:24PM  money; is that true?

```
          1    A      That's correct.

          2    Q      And you then have the settlement amounts listed, three of

          3    them, $100,000.  Do you see that?

          4    A      Yes.

03:24PM    5    Q      And then you calculated a total amount due to Mr. Barela

          6    of $959,203, including these three $100,000 amounts; is that

          7    right?

          8    A      That's correct.

          9    Q      And then you have in red, "Total client received from

03:24PM   10    settlement," and you have nothing listed there; is that right?

         11    A      That's correct.

         12    Q      By the way, whose idea was it to put this in red on the

         13    bottom of these charts?  Was that your ideas or the

         14    Government's idea?

03:25PM   15    A      I don't recall where that idea originated.

         16    Q      Sir, did Mr. Barela receive any portion of this $300,000

         17    that you put on the chart?

         18    A      I don't know.

         19    Q      Did you ever ask anybody?

03:25PM   20    A      I don't believe I did.

         21    Q      If Mr. Barela received any portion of that $300,000, then

         22    your calculation would be wrong; is that correct?

         23    A      My calculation would have to be updated, yes.

         24    Q      And the calculation that you provided to the jury would

03:25PM   25    be wrong if that was true; is that accurate?
```

```
 1   A     Under that hypothetical, it would have to be updated, yes.
 2   Q     Not only would it have to be updated, but the one that
 3   you put before this jury would be wrong; correct?
 4   A     Under that hypothetical, yes.
```
03:25PM  5   Q     Now, Mr. Drum, I want to ask you about some of the -- I
```
 6   want to ask you some questions, and we're going to use your
 7   Exhibit 439 as if it's accurate.  Okay?
 8   A     Okay.
 9   Q     All right.  Now, according to you and your analysis, the
```
03:27PM 10   total amount of money from the $1.6 million that the law firm
```
11   was entitled to was 760,000 plus 180,797; right?
12   A     Yes.
13   Q     Putting aside the other issues that we already talked
14   about relating to the cost and other things, the Tabs software
```
03:28PM 15   and, again, other issues, 760,000 plus $180,797 is how much,
```
16   about $940,797?  Is that about right?
17   A     Yes.
18   Q     Okay.  I want to ask you about Dillanos Coffee because
19   we've heard a lot about Dillanos Coffee.  Okay?
```
03:29PM 20   A     All right.
```
21   Q     All right.  So let's talk about Dillanos Coffee.
22         Here is the $1,600,000 that came in in connection
23   with the Brock settlement.  Do you see that?
24   A     Yes.
```
03:29PM 25   Q     Now, it's not on this page, but what was the number that,

58

```
        1    according to you, even though you never looked at Tabs,

        2    according to you that the firm, Eagan Avenatti, was entitled to

        3    from the Brock settlement?  What's the amount?

        4    A    940,747, I believe.

03:30PM  5    Q    Did I write that amount correctly?

        6    A    Yes.

        7    Q    After the Dillanos Coffee payment --

        8    A    Sorry, -797.

        9    Q    Does that look good (indicating)?

03:30PM 10    A    Yes.

       11    Q    Okay.  So a million-six came into the account.  There was

       12    a bank fee.  You understand that was for receipt of the wire;

       13    right?

       14    A    That seems reasonable.

03:30PM 15    Q    And then there's this $41,885 payment to Dillanos Coffee;

       16    right?

       17    A    I see that.

       18    Q    Mr. Wyman asked you about that, didn't he?

       19    A    He did.

03:31PM 20    Q    Okay.  And how much money was in -- left in the account

       21    after the payment to Dillanos Coffee?

       22    A    1,558,100.

       23    Q    Is that amount of money more or less than the balance

       24    that would be in the account after the deduction of Eagan

03:31PM 25    Avenatti's fees and expenses?
```

UNITED STATES DISTRICT COURT

```
 1   A    That amount is more than what would be in the account had
 2   940,797 been deducted.
 3   Q    So this Dillanos Coffee came in -- this didn't come out
 4   of Mr. Barela's share of the settlement, did it, sir?
 5              MR. WYMAN:  Objection.  Calls for a legal
 6   conclusion.
 7              THE COURT:  Overruled.
 8              THE WITNESS:  It came from the $1.6 million.
 9   Q    BY MR. AVENATTI:  Of which Eagan Avenatti was entitled to
10   $940,797, even according to your calculation; right?
11   A    Yes.  That's correct.
12   Q    So are you aware of any evidence that this Dillanos
13   Coffee payment came from any money owed to Greg Barela?
14   A    At this point, the -- before the Dillanos Coffee
15   deduction, the only amounts in this account were the
16   $1.6 million.
17              MR. AVENATTI:  Can I have the question read back,
18   please?
19              THE COURT:  You may.
20              (The record was read as follows:
21              "So are you aware of any evidence that this
22         Dillanos Coffee payment came from any money owed to
23         Greg Barela?")
24   Q    BY MR. AVENATTI:  Do you know, sir?
25   A    It came from the $1.6 million balance in the account.
```

03:32PM (lines 5, 10, 15, 20)
03:33PM (line 25)

```
 1   Q    Sir, you understand Greg Barela wasn't entitled, even
 2   under your calculation, to the entire 1.6 million; right?
 3   A    Yes.  Of course.
 4   Q    Okay.  So are you aware of any evidence that this
 5   Dillanos Coffee payment came from money that was due to Greg
 6   Barela net of the fees and the costs, even under your
 7   calculation?
 8   A    I'm sorry, can you repeat the question.
 9   Q    Are you aware of any evidence that Mr. Barela was
10   entitled to monies net of the fees and costs and that this
11   Dillanos Coffee payment came from those monies?
12   A    At this point, that distinction can't be made because it's
13   just the 1.6 million in the account.
14   Q    So you don't know?
15   A    That's correct.  It can't be determined.
16   Q    And again, you don't know what the costs were for
17   Mr. Barela's matter, you just looked at the QuickBooks account
18   and the spreadsheet; right?
19            MR. WYMAN:  Asked and answered.
20            THE COURT:  Sustained.
21   Q    BY MR. AVENATTI:  What is 1,600,000 minus $940,797?
22            I'll shortcut it for you.  It's on your chart.
23   A    Thank you.  Yeah, 659,203.  Thank you.
24   Q    Okay.  659,203; right?
25   A    That's correct.
```

```
 1    Q    We've heard a lot about this guy, too, Edward Ricci.  Do

 2    you see that?

 3    A    I see that.

 4    Q    $617,840 payment; right?

 5    A    I see that.

 6    Q    After the payment to Mr. Ricci, was the amount in this

 7    account greater than the amount that you claim Mr. Barela was

 8    due, $659,203, or less?

 9    A    That amount is greater than 659,000.

10    Q    So are you aware of any evidence that this $617,000

11    payment to Mr. Ricci came from the money that was due Greg

12    Barela?

13    A    Again, that came from the $1.6 million balance or slightly

14    less than that.

15    Q    So you don't know, do you?

16    A    I don't believe that's a meaningful distinction to make to

17    balance -- before making that it was 1.5 million.

18         MR. AVENATTI:  Your Honor, move to strike as

19    nonresponsive.

20         THE COURT:  Be stricken.

21    Q    BY MR. AVENATTI:  Sir, we already established that even

22    under your calculation the firm was entitled to the first

23    $940,797.

24         MR. WYMAN:  Objection.  Misstates the testimony.

25         THE COURT:  Overruled.
```

03:36PM (line 5)
03:36PM (line 10)
03:36PM (line 15)
03:37PM (line 20)
03:37PM (line 25)

**UNITED STATES DISTRICT COURT**

```
 1   Q    BY MR. AVENATTI:  Right?
 2   A    They were entitled to 940,797.  Whether that comes out
 3   first or last, I don't have an opinion.
 4   Q    You don't know if the firm's money was supposed to come
 5   out first or last or in between?  You don't know?
 6   A    No, I don't know that.
 7   Q    Did you ever ask anybody that?
 8   A    I don't think I did.
 9   Q    Let's talk about Exhibit 444.  Now, before we get into
10   the nitty-gritty on Exhibit 444 relating to Ms. Phan and
11   Mr. Tran and Promise Phan, I think I saw somewhere that you
12   used to do valuation work.  Is this valuation work?
13   A    Yes.
14   Q    Can you explain generally to the jury what business
15   valuation work is.
16              MR. WYMAN:  Objection.  Relevance.
17              THE COURT:  Sustained.
18   Q    BY MR. AVENATTI:  Sir, were you ever asked --
19              MR. AVENATTI:  Just two-question leeway, please,
20   Your Honor.
21              THE COURT:  Okay.
22   Q    BY MR. AVENATTI:  Were you ever asked to do any valuation
23   in connection with your work in this case relating to any
24   business associated with Michelle Phan?
25   A    No, I was not.
```

```
 1    Q    That was not in the scope of work that you were engaged
 2    to do; correct?
 3              MR. WYMAN:  Relevance.
 4              THE COURT:  Overruled.
 5              THE WITNESS:  No, that was not in the scope of my
 6    work.
 7    Q    BY MR. AVENATTI:  Now, when you were determining the
 8    legal costs that were due, the legal fees in connection with
 9    Michelle Phan and Long Tran and Promise Phan's matter, what did
10    you rely on in connection with that?
11    A    The fee agreement and the total repurchase amount.
12    Q    And so when you were determining what the legal fees due
13    the law firm for that transaction, what the amount would be,
14    you read the fee agreement, you interpreted the agreement, and
15    then you calculated the amount based on your interpretation of
16    the fee agreement; right?
17    A    I pulled the 7 and a half percent from the legal agreement
18    and applied that to the total repurchase amount.
19    Q    Sir, you read the fee agreement; correct?  Let's go step
20    by step.  You read the fee agreement?
21    A    I did.
22    Q    You interpreted the fee agreement?
23    A    I saw that included a 7 and a half percent fee.
24    Q    You interpreted the fee agreement; right?  Part of your
25    interpretation was this application of 7 and a half percent;
```

03:39PM (line 5)
03:40PM (line 10)
03:40PM (line 15)
03:41PM (line 20)
03:41PM (line 25)

```
 1  right?
 2  A     The fee agreement indicated that the law firm was entitled
 3  to 7 and a half percent of the settlement.
 4  Q     The fee agreement indicated a lot of things, did it not,
 5  sir?  I mean, it's, like, three pages.
 6  A     Yeah, there are other content.
 7  Q     And there's other terms; right?
 8  A     Yes, there are other terms.
 9  Q     Okay.  So you read the fee agreement, you interpreted it,
10  and your takeaway was that the fees due the firm were 7 and a
11  half percent.  Do I have that correct?
12            MR. WYMAN:  Objection.  Vague as to "interpret."
13            THE COURT:  Overruled.
14            THE WITNESS:  I used the 7 and a half percent that
15  was indicated in the fee agreement and applied it, yes.
16  Q     BY MR. AVENATTI:  Sir, there were other numbers in the
17  agreement.  You applied 7 and a half percent; am I right?
18  A     I applied 7 and a half percent, yes.
19  Q     Okay.  And then you took the 7 and a half percent times
20  the amount, and that's how you came to this number; right?
21  A     Yes.
22  Q     Now, do you have any legal training?
23  A     I do not.
24  Q     Would you agree with me that if your interpretation of
25  the fee agreement was wrong, that your calculation as it
```

```
 1   relates to the legal fees would also be wrong?
 2   A    Yes.  If an interpretation of the fee agreement suggested
 3   a different amount, my amount would be wrong.
 4   Q    And the total due to client amount would also be wrong;
 5   correct?
 6   A    That's how the math works.
 7   Q    And the total -- well, the total clients receive number
 8   would remain the same, even if your interpretation was wrong;
 9   correct?
10   A    That number would remain the same on the timetable.  Yes.
11   Q    Did you ever ask any lawyer to interpret the fee
12   agreement for you in connection with your analysis?
13   A    I discussed my analysis with the Government, and part of
14   that would have been the application of 7 and a half percent.
15   Q    So the Government told you to apply 7 and a half percent?
16   A    I pulled the 7 and a half percent from the fee agreement
17   and discussed it with the Government.
18   Q    And they said, "Yes, John, use the 7 and a half percent"?
19   A    They agreed with that application.  Yes.
20   Q    I just have a few more questions.  I just want to ask you
21   some general questions.
22        We've been talking about Exhibits 420 through 450
23   and 456; right?
24   A    Yes.
25   Q    Are all of these charts in these exhibits that you and
```

```
        1   your colleagues prepared, do they all have the same degree of
        2   accuracy, to the best of your knowledge?
        3   A    To the best of my knowledge, yes.
        4   Q    They are all, to the best of your knowledge, 100 percent
03:45PM  5   accurate; is that right?
        6   A    They are -- yes, to the best I could do with the
        7   information that was provided me.
        8   Q    They're all, according to you, 100 percent accurate;
        9   right?  I mean, we're not talking about the best you can do.
03:45PM 10   We're talking about a federal criminal case.
       11             THE COURT:  We're talking about asking a question.
       12   Please give your question to the witness without further
       13   comment.
       14   Q    BY MR. AVENATTI:  Mr. Drum, are they 100 percent
03:46PM 15   accurate, to the best of your knowledge?
       16   A    To the best of my knowledge, they're 100 percent accurate.
       17   Q    And did you take the same degree of carefulness and
       18   thoroughness when you were preparing each of the exhibits?
       19   A    Yes.
03:46PM 20   Q    Sir, you were asked a question about whether any of the
       21   clients had received any amount of money from any of their
       22   settlements.  Do you remember that?
       23   A    Yes, I remember that.
       24   Q    You would agree, would you not, that if the clients were
03:46PM 25   advanced money before the settlement was paid or received money
```

UNITED STATES DISTRICT COURT

```
 1   after the settlement was paid, it would be inaccurate to say
 2   that they had not received any money from any of their
 3   settlements, if that were true.  You would agree with that,
 4   would you not?
 5   A    No, I would not agree with that.
 6   Q    Sir, do you know if any of the clients received any of
 7   the advances before their settlement was paid?  Yes or no?
 8   A    No, I don't know.
 9   Q    Do you know if any of the clients received any of the
10   money from their settlements after the initial settlement
11   payment was made?
12   A    For Geoffrey Johnson, Alexis Gardner, Greg Barela, none of
13   the money that was deposited into the trust accounts.
14        MR. AVENATTI:  Move to strike.  That's not my
15   question.
16        THE COURT:  Be stricken.
17        MR. AVENATTI:  Can I have it read back please.
18        THE COURT:  Yes.
19        MR. AVENATTI:  Please listen to my question, sir.
20        (The record was read as follows:
21        "Do you know if any of the clients received
22        any of the money from their settlements after the
23        initial settlement payment was made?")
24   Q    BY MR. AVENATTI:  Yes or no?  I'm talking about receiving
25   money.  I'm not talking about what account it came from.  I'm
```

```
 1   talking about receiving money.  That's my question.

 2   A    The clients received money after the initial settlement

 3   was paid, yes.

 4              MR. AVENATTI:  One moment, please.

 5              Nothing further, Your Honor.

 6              THE COURT:  Mr. Wyman.

 7              MR. WYMAN:  Thank you, Your Honor.

 8                      REDIRECT EXAMINATION

 9   BY MR. WYMAN:

10   Q    Good afternoon, Mr. Drum.

11              During cross-examination, the defendant asked you to

12   assume a cost of about $100,000 for an expert.  Do you recall

13   that?

14   A    I recall that.

15   Q    And I believe it was in the context of asking you, if

16   that amount wasn't reflected on Tabs or QuickBooks, would that

17   make your calculation wrong.  Is that generally right?

18   A    Yes, I recall that.

19   Q    And I think you then said something to the effect of you

20   don't know if there are examples of that.  Do you remember

21   that?

22   A    Yes.

23   Q    Did he provide you with any examples of that?

24   A    No, he did not.

25   Q    He just provided you with a hypothetical?
```

```
 1   A    That was a hypothetical, yes.
 2            MR. WYMAN:  Can we please pull up Exhibit 439.
 3   Q    What is the amount of costs and the case-related expenses
 4   that you listed for Mr. Barela's matter?
 5   A    180,797.
 6            MR. WYMAN:  Can we please pull up what is already in
 7   evidence as Exhibit 193.
 8   Q    Do you see an amount listed here?
 9   A    I do.
10   Q    What is the amount?
11   A    111,113.
12   Q    And what does it say for the remitter at the top?
13   A    "Case costs."
14   Q    And what is the account -- the last four digits of the
15   account listed at the bottom?
16   A    5566.
17   Q    Is that the trust account that the Greg Barela settlement
18   money was deposited into?
19   A    Yes.
20   Q    The amount listed here, 111,000 and some change, is that
21   more or less than the amount you gave the defendant credit for
22   in your chart?
23   A    That is less.
24            MR. WYMAN:  Can we please pull up Exhibit 48 and
25   page 2 of the exhibit.
```

03:50PM — line 5
03:51PM — line 10
03:51PM — line 15
03:52PM — line 20
03:52PM — line 25

**UNITED STATES DISTRICT COURT**

```
 1   Q    Do you recall a number of questions from the defendant
 2   about this exhibit?
 3   A    Yes.
 4   Q    And I think he asked you a bunch of questions about how
 5   you don't know whether this Tabs printout was accurate; is that
 6   right?
 7   A    Yes.
 8   Q    I think he pointed out that it had it and said the
 9   big-old "Draft" mark on it; is that right?
10   A    That's correct.
11           MR. WYMAN:  If we could go to page 8.
12   Q    What is the total listed there of expenses and advances?
13   A    736,884, rounded.
14           MR. WYMAN:  And then if we could go to page 1 of
15   this exhibit, please.  If we could pull up the date.
16   Q    What is the date that this e-mail with this spreadsheet
17   was sent?
18   A    February 4th, 2015.
19   Q    Now, if we could please pull up Exhibit 420, the chart
20   that you prepared -- I'm sorry.  I got my charts mixed up.
21   422, please.
22           What is the amount withdrawn there on February 4th
23   of 2015?
24   A    736,884.
25   Q    Is that the same amount on the spreadsheet with the
```

03:52PM (line 5)
03:52PM (line 10)
03:53PM (line 15)
03:53PM (line 20)
03:54PM (line 25)

1   big-old "Draft" on it?

2   A    Yes, it is.

3   Q    Now, the defendant also asked you about that spreadsheet,

4   about the other costs listed.  I think he had Nationwide as an

03:54PM 5   example.  And I think you said that you weren't able to verify

6   whether or not those costs were paid; is that right?

7   A    That's right.

8   Q    In reaching your calculation on Exhibit 420, which I

9   think you calculated case-related expenses of about 543,000,

03:54PM 10  did you give him credit for those costs that you weren't able

11  to verify?

12  A    Yes.

13       MR. WYMAN:  Can we please pull up Exhibit 457.

14  Q    Do you remember the defendant asking you about this

03:55PM 15  chart?

16  A    Yes, I do.

17  Q    And specifically the first two rows only?

18  A    Yes.

19  Q    Did he ask you about any of rows 3 through 10?

03:55PM 20  A    No, he did not.

21       MR. WYMAN:  Can we blow up row 3, please.

22  Q    What is the wire payment listed in this row?

23  A    It's a $2.5 million payment sent from account 8671 to The

24  X-Law Group.

03:55PM 25  Q    Do you recognize that wire transfer?

```
      1   A     I do.
      2             MR. AVENATTI:  Objection, Your Honor.  Asked and
      3   answered.  Outside the scope.
      4             THE COURT:  Overruled.
03:55PM 5             THE WITNESS:  I recognize that.
      6   Q     BY MR WYMAN:  Where did that money come from?
      7   A     That came from the Alexis Gardner settlement.
      8   Q     Let's take a look at row 4.  What wire payment is
      9   described in that row?
03:56PM 10  A     $1.6 million sent from Brock USA to Account 5566.
     11   Q     And do you recognize that payment?
     12   A     Yes.
     13   Q     What does that payment represent?
     14   A     That represents the Greg Barela settlement.
03:56PM 15            MR. WYMAN:  Can we please pull up Exhibit 441.
     16   Actually, before we move on, I'm sorry, can we please pull up
     17   Exhibit 457 again.
     18   Q     The first two rows there, do you recall the defendant
     19   asked you about how the payments listed there came from the
03:57PM 20  1.6 million that was withdrawn from the Geoffrey Johnson
     21   settlement?
     22   A     Yes, I remember that.
     23   Q     Of the remaining 2.4 million that was not withdrawn, at
     24   that $1.6 million payment time, how much of the 2.4 million
03:57PM 25  went to Geoffrey Johnson?
```

```
 1   A     None.
 2               MR. WYMAN:  Now can we please pull up Exhibit 441.
 3   Q     Do you remember being asked questions about Dillanos
 4   Coffee Roasters?
 5   A     I do.
 6   Q     And at each point he would ask you about a payment and
 7   then ask you to confirm whether the balance was still more than
 8   the amount he was owed in attorney's fees.  Do you remember
 9   that?
10   A     Yes.
11   Q     Now, you testified on direct that these red entries in
12   parentheticals, those are withdrawals?
13   A     That's correct.
14   Q     I'm going to scroll through, and let me know if you see
15   any deposits.
16   A     There are no deposits on this page.
17   Q     Page 1.
18   A     There's one interest deposit.
19   Q     Interest deposit, $13.  Any others on page 2?
20   A     No.
21   Q     On page 3?
22   A     One interest deposit of $2.
23   Q     Now, the defendant asked you about this first payment to
24   Dillanos Coffee Roasters; right?
25   A     Yes.
```

```
 1    Q    And the balance after that was still a sizable amount,
 2    $1.5 million and change?
 3    A    Yes.
 4    Q    Page 2, do you see -- well, there are a bunch of them,
 5    but do you see a Dillanos Coffee Roasters transfer there for
 6    27,000 and change at the bottom of page 2?
 7    A    Yes, I see that.
 8    Q    That's on February 12, 2018?
 9    A    Yes.
10    Q    What is the balance after that transfer?
11    A    123,412.
12    Q    And at the end of the chart, how much is left?
13    A    $610.
14    Q    Are there any payments to Gregory Barela in this chart?
15    A    No.
16    Q    He also asked you about Ed Ricci in this chart.  Do you
17    remember that?
18    A    Yes.
19    Q    Do you know whether the defendant testified in public
20    court that Ed Ricci was co-counsel on one of his cases?
21    A    I don't know what the defendant has testified.
22    Q    Exhibit 441 that we've been looking at with all the
23    withdrawals and the payments to Dillanos and Alki Bakery and
24    Global Baristas, is that an attorney-client trust account?
25    A    Yes.
```

1            MR. WYMAN:  Can you please pull up Exhibit 444.  Can

2    you blow up the content.  Thank you.

3    Q    During the end of your cross-examination, the defendant

4    asked you if -- a hypothetical, which is, if you were

04:01PM 5    interpreting the fee contract incorrectly, would the amount due

6    to the client be incorrect.  Do you remember that?

7    A    Yes, I remember that.

8    Q    If the -- if your interpretation of the fee contract was

9    incorrect, would the number that you list on this chart for

04:01PM 10   legal fees be incorrect?

11   A    Yes.

12   Q    Are you aware that the defendant withdrew that precise

13   amount on or about September 18, 2017?

14   A    I think I recall that.  Yes, I see that in Exhibit 446.

04:02PM 15   Q    If we can please pull up Exhibit 430 now, your similar

16   chart for Alexis Gardner.

17            Now, the defendant asked you about your inclusion of

18   the $250,000 payment from November of 2020 in this chart.  Do

19   you recall that?

04:02PM 20   A    I recall that.

21   Q    There are two payments reflected on this chart.  One

22   January 25th, 2017, and one November 2020; is that right?

23   A    That's right.

24   Q    When you calculated the legal fee owed to the defendant,

04:02PM 25   did you use the total of both of those two payments?

1  A    I did.

2  Q    I have the same question for you on Exhibit 439.

3        Can we please pull that up?

4        He asked you about the three $100,000 payments in

04:03PM  5  later years on that chart; is that right?

6  A    Yes.  The three amounts in later years.

7  Q    And when you calculated the legal fees owed to the

8  defendant for Mr. Barela's matter, did you include that

9  $300,000 in the amount?

04:03PM 10  A    I did.

11  Q    The last row in this chart and the related charts for the

12  other clients, it says, "Total client received from

13  settlement."  And with the exception of Michelle Phan and Long

14  Tran, the other three charts all have that dash mark for zero;

04:03PM 15  is that right?

16  A    That's correct.

17  Q    Now, does that mean that they got zero dollars from the

18  defendant?

19  A    No, it does not.

04:04PM 20  Q    What does it mean?

21  A    It means that none of the amounts that were deposited into

22  the client trust account were transferred to the clients.

23  Q    That's the settlement money?

24  A    That's correct.

04:04PM 25  Q    Thank you, Mr. Drum.

```
1              No further questions.

2              THE COURT:  Mr. Avenatti.

3                      RECROSS-EXAMINATION

4    BY MR. AVENATTI:

04:04PM 5   Q    Mr. Drum, is it your position that the law firm was not

6    entitled to deduct its legal fees and costs from the settlement

7    amounts?  Is that your position, yes or no?

8    A    That is not my position.

9    Q    And the only way that you would have been able to

04:04PM 10   determine what legal fees and costs were owed was based on the

11   information the Government provided you; right?

12   A    That's correct.  They provided me the fee agreements, and

13   they discussed it.

14   Q    But your analysis was confined, as it related to

04:05PM 15   determining the fees and costs, to whatever the Government

16   provided you; right?

17   A    Correct.  I have no other source of information.

18   Q    And you didn't ask for any?

19              MR. WYMAN:  Objection.  Asked and answered.  Beyond

04:05PM 20   the scope.

21              THE COURT:  Sustained.

22   Q    BY MR. AVENATTI:  Now, you were just asked about 193.  Do

23   you remember that?

24   A    Yes, I remember that.

04:06PM 25   Q    Sir, you have no idea whether this was an interim draw on
```

```
 1    costs or a final deduction for cost, do you?

 2    A    I only know what's depicted on this sheet.

 3    Q    Sir, please answer my question.

 4          Can I have it read back, Your Honor?

 5          THE COURT:  You may.

 6          (The record was read as follows:

 7          "Sir, you have no idea whether this was an

 8          interim draw on costs or a final deduction for

 9          cost, do you?")

10          THE WITNESS:  I don't know whether it was interim or

11    final.

12    Q    BY MR AVENATTI:  And who would be more knowledgeable

13    about whether this was an initial withdraw of cost or a final

14    withdraw of cost, you or Judy Regnier?

15    A    Judy Regnier.

16    Q    You were asked about Exhibit 48.

17    A    Yes.

18    Q    Do you know if this was an interim amount or a final

19    amount for cost in the Barela matter?  I'm sorry, it's on the

20    Johnson matter.

21    A    Can I see the top of this in the e-mail?

22    Q    (Indicating.)

23    A    Nothing indicates whether it's interim or final.

24    Q    Who would be more knowledgeable if it was interim or

25    final, you or Judy Regnier?
```

```
  1   A     Judy Regnier.

  2   Q     Now, you're certain that you read the -- well, strike

  3   that.

  4              Mr. Wyman asked you about the Michelle Phan fee

04:09PM  5   agreement.  Do you remember that?

  6   A     Yes, I remember that.

  7   Q     And you're certain you read that before you did your

  8   analysis; right?

  9   A     Yes.

04:09PM 10   Q     And you're certain that the firm was only entitled to

 11   7.5 percent of the money from IPSY; right?

 12   A     I'm sorry, what is IPSY?

 13   Q     I'm sorry, did you just ask me "what is IPSY"?

 14   A     Yes.

04:10PM 15              MR. AVENATTI:  No further questions.  Ask that he

 16   remain on recall.

 17              THE COURT:  Sir, you may be excused but you're

 18   subject to recall.  Thank you.

 19              MR. SAGEL:  Subject to verifying the exhibits that

04:10PM 20   have come into evidence, Your Honor, the Government rests.

 21              THE COURT:  Okay.

 22              Ladies and gentlemen, we're going to stop here for

 23   the day.  We'll resume Tuesday, 9:00 o'clock, regular day.

 24              Please remember the admonition not to discuss the

04:10PM 25   case with anyone, not to form any opinions on the issues in the
```

1    case until it's submitted to you, and please don't do any

2    research.

3              Thanks very much.  Have a good weekend.

4              THE COURTROOM DEPUTY:  All rise.

04:11PM  5         **(Out of the presence of the jury.)**

6              THE COURT:  Anything for the record before we

7    adjourn?

8              MR. SAGEL:  I don't believe from the Government,

9    Your Honor.

04:11PM 10             THE COURT:  Mr. Avenatti.

11             MR. AVENATTI:  Your Honor, the defense would move

12   pursuant to Rule 29.  What I would propose is that I -- if it's

13   acceptable, obviously, to the Court, that I be permitted to

14   argue it either on Monday sometime that's convenient to the

04:12PM 15   Court or on Tuesday morning.  I know I still need to provide a

16   proffer to Your Honor for the two agents as well.

17             THE COURT:  Well, we're going to do that today.

18             MR. AVENATTI:  Understood.

19             THE COURT:  That's fine.  8:00 o'clock Tuesday.  If

04:12PM 20   you want to make a written submission as well, that's fine.

21             MR. AVENATTI:  We probably will file something in

22   advance, Your Honor.

23             THE COURT:  Okay.

24             If there's nothing else, let's adjourn to an

04:12PM 25   in-camera session.

1          MR. AVENATTI:  Well, I have a couple things, but go

2     ahead if the Government has something.

3          THE COURT:  Go ahead.

4          MR. AVENATTI:  Your Honor, the other request that I

04:13PM 5     would make is, right now the terms of my temporary release

6     expire on Tuesday, the 17th.  Judge Gardephe has ordered me to

7     self-surrender on September 15th.  I'm waiting for my

8     designation.  I expect to have it probably within the next

9     week.  So I would ask that the temporary release be extended to

04:13PM 10    September 15th.

11         THE COURT:  Any -- well, I know the Government's

12    position.

13         MR. AVENATTI:  On the same terms and conditions,

14    Your Honor, obviously.

04:13PM 15         MR. SAGEL:  I mean, I think our position is --

16    subject to all of our prior objections, Your Honor, our

17    position would be until the end of this trial.  The last

18    request he made for temporary release was for preparation of

19    trial.  There's nothing between the end of this trial and

04:13PM 20    September 15th that would require any further temporary

21    release.

22         MR. AVENATTI:  Well, actually, Your Honor, we don't

23    know what's going to happen with the other counts yet.  So

24    there would be a preparation issue.

04:14PM 25         THE COURT:  Well, let's address that.  I think our

```
 1   trial date for the second phase is October 12.
 2              MR. AVENATTI:  But, in any event, Your Honor, I'm
 3   not --
 4              THE COURT:  Let's deal with the immediate question
 5   you posed.  I'll continue you on the same terms and conditions
 6   until Friday, September 3.
 7              MR. AVENATTI:  September?
 8              THE COURT:  3.
 9              MR. AVENATTI:  3?
10              THE COURT:  3.
11              MR. AVENATTI:  Thank you, Your Honor.
12              THE COURT:  Okay.  If there's nothing further, let's
13   adjourn to the in-camera session.
14              MR. SAGEL:  Your Honor, one quick question, just for
15   timing or practicalitywise.
16              With regards to what we said we would submit in
17   camera related to Mr. Drum, I can send that via e-mail to your
18   CRD probably over the weekend or after.
19              THE COURT:  That's fine.
20              MR. SAGEL:  I didn't know if it would get to you
21   over the weekend.
22              THE COURT:  It will.
23              MR. SAGEL:  Thank you.  We'll do that then.
24              THE COURT:  Okay.
25              MR. AVENATTI:  And then, Your Honor, we have five
```

        1   witnesses that we intend on calling on Tuesday.  I'll provide

        2   that list to the Government now.

        3           THE COURT:  Okay.

        4           MR. AVENATTI:  Along with the time estimates.

04:15PM  5           THE COURT:  Okay.  I think they're listening.

        6           MR. AVENATTI:  Well, I'm not going to do it orally.

        7   I'll hand it to them once Your Honor is done.

        8           THE COURT:  Okay.  Why don't you hand it to them.

        9           MR. AVENATTI:  I'm just going to write the time

04:15PM 10   estimates.  It will be two minutes, Your Honor.  Thank you.

       11           **(Pause in proceedings.)**

       12           MR. AVENATTI:  Your Honor, one other issue, in

       13   looking through the list and providing the time estimates.  I

       14   anticipate that Attorney Evan Jenness will testify on Tuesday.

04:16PM 15   Ms. Jenness previously represented me in connection with the --

       16   with the arrest on the domestic violence allegation for which

       17   there were never any charges.

       18           We're going to have to figure out some fencing or

       19   parameters relating to the cross-examination.  Obviously, I

04:17PM 20   don't believe that that should go before the jury.  I'm happy

       21   to deal with it on Tuesday morning, but I want --

       22           THE COURT:  Well, you structure your direct such

       23   that that topic is not opened.

       24           MR. AVENATTI:  Understood, Your Honor.  I just

04:17PM 25   wanted to raise it for the Court, alert the Government.  We can

```
 1   talk about it on Tuesday morning.
 2                THE COURT:  Fine.
 3                MR. AVENATTI:  I anticipate her testimony is going
 4   to be very brief.  She's going to address this claim by
 5   Mr. Barela, the phone call in which she was never on.
 6                THE COURT:  Okay.  What's your current estimate for
 7   your case-in-chief?  I'd like to be able to tell the jurors
 8   something Tuesday.
 9                MR. AVENATTI:  I will most likely be done with the
10   case-in-chief, Your Honor, by the close of court on Thursday.
11   So two to three days.
12                THE COURT:  Okay.
13                MR. SAGEL:  Your Honor, obviously, seeing this for
14   the first time, our only comment would be, is there's a very
15   good chance that two hours of what he just provided us is
16   inappropriate.  That witness wouldn't be able to testify are
17   not a basis for him to call for two hours.  He would need to
18   have -- and that being someone who worked at the expert's firm,
19   which he hasn't noticed up as an expert, there's no basis for a
20   two-hour calling of someone who worked for the firm who has no
21   percipient fact knowledge in this case.
22                So if he's planning on filling up two of his hours
23   on Tuesday with a witness that probably couldn't be called --
24                THE COURT:  Well, has she been served?  Ms. Carter?
25                MR. AVENATTI:  Yeah.  She dodged service for a week,
```

```
 1  but we finally got her served because we got ahold of an
 2  attorney who agreed to accept service.  So she's served.
 3              MR. SAGEL:  That's only part one of the equation,
 4  but I...
 5              THE COURT:  You'd better have enough witnesses to
 6  fill up the day, Mr. Avenatti.
 7              MR. AVENATTI:  Understood, Your Honor.
 8              THE COURT:  Okay.
 9              MR. AVENATTI:  I've already indicated to the Court
10  that I'm sensitive to that issue, because I understand the
11  Court's sensitive to the issue.
12              THE COURT:  Okay.  I think you committed by noon
13  Monday to provide your additional comments on the jury
14  instructions.
15              MR. AVENATTI:  If I didn't, I have now.
16              THE COURT:  Okay.  I mean, I think that's what you
17  meant.
18              MR. AVENATTI:  I think you're right, Your Honor.  No
19  problem.
20              THE COURT:  Okay.  Then probably at the end of the
21  day on Tuesday we'll spend some time on the jury instructions.
22  If you conclude your case on Thursday, I'll instruct, and
23  you'll argue on Friday.
24              MR. AVENATTI:  Understood.
25              THE COURT:  Okay.  Estimate for closing?  Just
```

```
 1   preliminary.

 2              MR. WYMAN:  About an hour half to hour 45.

 3              MR. SAGEL:  And that's just for opening-close.

 4              MR. WYMAN:  Yeah.  I'm sorry.

 5              MR. SAGEL:  Not including rebuttal.

 6              THE COURT:  Say, again, your estimate.

 7              MR. WYMAN:  Estimate for the opening-close is about

 8   an hour 30 to an hour 40.

 9              THE COURT:  What's rebuttal?

10              MR. SAGEL:  Very hypothetical, but I'm assuming 30

11   minutes or less.

12              THE COURT:  Okay.  Mr. Avenatti.

13              MR. AVENATTI:  Your Honor, is the Government

14   planning on splitting the closing and the rebuttal?

15              MR. WYMAN:  Yes, Your Honor.

16              MR. AVENATTI:  I'll contemplate how I feel about

17   that, whether I have any objection.

18              But, in any event, in answer to your question,

19   Your Honor, my estimate for the close is two and a half to

20   three hours.

21              THE COURT:  Okay.

22              MR. SAGEL:  Unless we're needed, we will leave.

23              THE COURT:  You're excused.

24              MR. SAGEL:  Thank you, Your Honor.

25              MR. WYMAN:  Thank you, Your Honor.
```

04:20PM (line 5)
04:20PM (line 10)
04:20PM (line 15)
04:21PM (line 20)
04:21PM (line 25)

**UNITED STATES DISTRICT COURT**

1          THE COURT:  As is everyone else.

2          **(The following proceedings were sealed by**

3          **the Court and transcribed under separate cover.)**

4             **(Proceedings concluded at 4:21 p.m.)**

5                       --oOo--

88

1                    *CERTIFICATE OF OFFICIAL REPORTER*

2

3    COUNTY OF LOS ANGELES   )
                             )
4    STATE OF CALIFORNIA     )

5              I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME

6    COURT REPORTER, in and for the United States District Court for

7    the Central District of California, do hereby certify that

8    pursuant to Section 753, Title 28, United States Code that the

9    foregoing is a true and correct transcript of the

10   stenographically reported proceedings held in the

11   above-entitled matter and that the transcript page format is in

12   conformance with the regulations of the Judicial Conference of

13   the United States.

14

15   *Date:  August 13, 2021*

16

17

18

19                              */S/ DEBBIE HINO-SPAAN*
                              _____

20                              *Debbie Hino-Spaan, CSR No. 7953*
                              *Federal Official Court Reporter*
21

22

23

24

25

## $

**$1,600,000** [1] - 57:22
**$1,944,385** [1] - 48:8
**$100,000** [12] - 29:23, 30:16, 31:1, 31:3, 31:8, 37:11, 38:18, 38:23, 56:3, 56:6, 68:12, 76:4
**$13** [1] - 73:19
**$15,637** [1] - 38:16
**$18** [1] - 41:5
**$180,797** [2] - 51:24, 57:15
**$2** [1] - 73:22
**$2,776** [1] - 37:22
**$200,000** [1] - 34:19
**$25,000** [1] - 46:12
**$250,000** [19] - 33:14, 34:4, 34:6, 34:8, 34:11, 34:18, 34:24, 35:10, 35:24, 36:6, 38:24, 38:25, 46:3, 48:5, 49:7, 49:9, 49:12, 50:4, 75:18
**$300,000** [3] - 56:16, 56:21, 76:9
**$350,000** [1] - 45:18
**$41,885** [1] - 58:15
**$5,000** [2] - 46:7, 46:11
**$50,000** [2] - 36:17, 38:21
**$600,000** [4] - 20:13, 25:21, 39:7, 48:2
**$610** [1] - 74:13
**$617,000** [1] - 61:10
**$617,840** [1] - 61:4
**$65,615** [1] - 47:10
**$659,203** [1] - 61:8
**$72** [1] - 41:7
**$760,000** [1] - 55:19
**$940,797** [4] - 57:16, 59:10, 60:21, 61:23
**$959,203** [1] - 56:6

## /

**/S** [1] - 88:19

## 0

**0061** [1] - 34:8
**0661** [1] - 36:19

## 1

**1** [2] - 70:14, 73:17
**1,558,100** [1] - 58:22
**1,600,000** [1] - 60:21

**1-053** [1] - 1:24
**1.5** [2] - 61:17, 74:2
**1.6** [21] - 35:10, 35:13, 35:19, 35:25, 36:7, 37:19, 38:25, 45:1, 45:25, 46:9, 46:12, 57:10, 59:8, 59:16, 59:25, 60:2, 60:13, 61:13, 72:10, 72:20, 72:24
**10** [1] - 71:19
**100** [11] - 4:20, 19:16, 19:17, 20:16, 21:1, 21:3, 43:20, 66:4, 66:8, 66:14, 66:16
**10th** [2] - 36:15, 37:2
**1100** [1] - 2:11
**111,000** [1] - 69:20
**111,113** [1] - 69:11
**12** [2] - 74:8, 82:1
**123,412** [1] - 74:11
**13** [3] - 1:15, 4:1, 88:15
**15** [1] - 50:10
**15th** [3] - 81:7, 81:10, 81:20
**17** [1] - 2:18
**17th** [1] - 81:6
**18** [1] - 75:13
**180,797** [2] - 57:11, 69:5
**193** [2] - 69:7, 77:22
**1:27** [2] - 1:16, 4:2

## 2

**2** [8] - 1:9, 36:9, 36:10, 45:12, 69:25, 73:19, 74:4, 74:6
**2.4** [2] - 72:23, 72:24
**2.5** [1] - 71:23
**20** [1] - 1:8
**2015** [8] - 33:18, 36:7, 36:15, 37:2, 42:15, 43:3, 70:18, 70:23
**2017** [2] - 75:13, 75:22
**2018** [1] - 74:8
**2020** [6] - 48:5, 48:8, 50:1, 50:5, 75:18, 75:22
**2021** [3] - 1:15, 4:1, 88:15
**213-894-2435** [1] - 2:12
**250,000** [1] - 49:25
**254** [1] - 2:19
**25th** [1] - 75:22
**26.2** [2] - 4:18, 6:13
**27,000** [1] - 74:6
**28** [1] - 88:8

**2851** [4] - 34:12, 35:2, 35:4, 37:11
**29** [2] - 42:15, 80:12
**29th** [1] - 43:3
**2:54** [1] - 50:16

## 3

**3** [8] - 45:4, 71:19, 71:21, 73:21, 82:6, 82:8, 82:9, 82:10
**30** [5] - 11:16, 12:6, 50:18, 86:8, 86:10
**30th** [2] - 33:18, 36:6
**312** [1] - 2:11
**31st** [1] - 45:4
**3:14** [1] - 50:16

## 4

**4** [3] - 40:21, 40:23, 72:8
**40** [1] - 86:8
**403** [3] - 8:19, 10:15, 16:25
**411** [2] - 1:24, 2:6
**420** [5] - 32:8, 32:9, 65:22, 70:19, 71:8
**422** [4] - 35:16, 35:19, 44:20, 70:21
**423** [4] - 35:7, 35:16, 37:13, 45:24
**424** [3] - 34:14, 36:7, 36:25
**430** [5] - 47:7, 47:8, 51:6, 51:16, 75:15
**439** [5] - 51:20, 57:7, 69:2, 76:2
**441** [3] - 72:15, 73:2, 74:22
**444** [3] - 62:9, 62:10, 75:1
**446** [1] - 75:14
**45** [1] - 86:2
**450** [1] - 65:22
**456** [1] - 65:23
**457** [4] - 33:10, 36:10, 71:13, 72:17
**48** [9] - 39:17, 39:20, 40:22, 41:19, 42:4, 53:18, 53:25, 69:24, 78:16
**4:21** [1] - 87:4
**4th** [3] - 2:6, 70:18, 70:22
**4TH** [1] - 1:24

## 5

**543,000** [1] - 71:9

**5566** [2] - 69:16, 72:10

## 6

**600,000-plus** [1] - 23:19
**659,000** [1] - 61:9
**659,203** [2] - 60:23, 60:24

## 7

**7** [13] - 63:17, 63:23, 63:25, 64:3, 64:10, 64:14, 64:17, 64:18, 64:19, 65:14, 65:15, 65:16, 65:18
**7.5** [1] - 79:11
**708,031** [1] - 38:20
**714-338-3598** [1] - 2:7
**736,884** [2] - 70:13, 70:24
**753** [1] - 88:8
**760,000** [2] - 57:11, 57:15
**7953** [2] - 1:23, 88:20
**797** [1] - 58:8

## 8

**8** [1] - 70:11
**8000** [1] - 2:6
**8541** [4] - 35:5, 35:14, 37:18, 37:19
**8671** [1] - 71:23
**8:00** [1] - 80:19

## 9

**9** [2] - 40:21, 40:24
**90012** [1] - 2:12
**92660** [1] - 2:19
**92701** [2] - 1:25, 2:7
**93** [1] - 22:18
**940,747** [1] - 58:4
**940,797** [2] - 59:2, 62:2
**949-481-4900** [1] - 2:20
**9962** [1] - 34:8
**9:00** [1] - 79:23

## A

**A&A** [1] - 34:8
**AA** [4] - 34:10, 34:24, 35:4, 35:9
**ability** [4] - 11:17, 11:18, 11:20, 12:12
**able** [10] - 5:16, 5:21,

**38:21, 52:8, 71:5,** 71:10, 77:9, 84:7, 84:16
**above-entitled** [1] - 88:11
**accept** [4] - 43:22, 51:9, 51:15, 85:2
**acceptable** [1] - 80:13
**accepted** [1] - 52:11
**according** [5] - 57:9, 58:1, 58:2, 59:10, 66:8
**accordingly** [1] - 5:1
**account** [30] - 30:16, 31:8, 34:18, 34:24, 35:11, 36:18, 36:19, 38:19, 41:25, 43:10, 44:23, 45:16, 45:25, 58:11, 58:20, 58:24, 59:1, 59:15, 59:25, 60:13, 60:17, 61:7, 67:25, 69:14, 69:15, 69:17, 71:23, 74:24, 76:22
**Account** [1] - 72:10
**accounted** [4] - 44:14, 44:16, 53:9, 55:14
**accounting** [4] - 15:4, 19:7, 21:9, 21:19
**accounts** [5] - 46:23, 46:25, 47:2, 49:3, 67:13
**accuracy** [3] - 38:3, 52:9, 66:2
**accurate** [24] - 20:2, 21:1, 21:4, 28:9, 28:14, 28:16, 28:21, 28:23, 29:1, 30:22, 37:24, 38:6, 38:9, 47:12, 47:13, 52:7, 52:16, 56:25, 57:7, 66:5, 66:8, 66:15, 66:16, 70:5
**Act** [1] - 6:13
**actual** [4] - 16:23, 17:7, 27:19, 39:10
**additional** [1] - 85:13
**address** [2] - 81:25, 84:4
**adjourn** [3] - 80:7, 80:24, 82:13
**adjournment** [2] - 4:13, 6:1
**admonition** [2] - 50:11, 79:24
**advance** [3] - 42:15, 54:14, 80:22
**advanced** [1] - 66:25
**advances** [18] - 42:19, 42:20, 42:24, 48:13,

48:19, 52:25, 53:9, 53:12, 53:15, 53:16, 53:19, 53:20, 54:8, 54:12, 54:21, 67:7, 70:12

**advise** [1] - 13:6

**affect** [1] - 54:16

**afternoon** [2] - 7:1, 68:10

**Agent** [1] - 13:5

**agents** [7] - 6:6, 7:20, 7:24, 10:13, 11:6, 11:10, 80:16

**ago** [1] - 9:14

**agree** [8] - 22:8, 42:18, 51:9, 52:15, 64:24, 66:24, 67:3, 67:5

**agreed** [3] - 51:15, 65:19, 85:2

**agreement** [19] - 63:11, 63:14, 63:16, 63:17, 63:19, 63:20, 63:22, 63:24, 64:2, 64:4, 64:9, 64:15, 64:17, 64:25, 65:2, 65:12, 65:16, 79:5

**agreements** [1] - 77:12

**ahead** [3] - 50:24, 81:2, 81:3

**ahold** [1] - 85:1

**aim** [2] - 19:17, 20:2

**alert** [1] - 83:25

**Alex** [1] - 10:8

**alex.wyman@usdoj. gov** [1] - 2:13

**ALEXANDER** [1] - 2:10

**Alexis** [4] - 47:14, 67:12, 72:7, 75:16

**Alki** [1] - 74:23

**allegation** [1] - 83:16

**allege** [1] - 33:20

**alleges** [1] - 33:23

**allow** [3] - 27:12, 49:16, 49:20

**America** [1] - 36:19

**AMERICA** [1] - 1:5

**amount** [54] - 36:16, 37:24, 38:11, 40:16, 45:11, 45:14, 46:8, 46:9, 47:22, 47:24, 48:4, 49:9, 49:12, 49:17, 51:16, 51:23, 52:16, 52:24, 53:1, 55:19, 56:5, 57:10, 58:3, 58:5, 58:23, 59:1, 61:6, 61:7, 61:9, 63:11, 63:13,

63:15, 63:18, 64:20, 65:3, 65:4, 66:21, 68:16, 69:3, 69:8, 69:10, 69:20, 69:21, 70:22, 70:25, 73:8, 74:1, 75:5, 75:13, 76:9, 78:18, 78:19

**amounts** [10] - 31:18, 41:12, 41:16, 41:22, 56:2, 56:6, 59:15, 76:6, 76:21, 77:7

**Ana** [1] - 2:7

**ANA** [3] - 1:17, 1:25, 4:1

**analyses** [4] - 15:14, 17:3, 18:1, 21:12

**Analysis** [3] - 8:10, 9:4, 15:12

**analysis** [23] - 14:24, 17:19, 19:3, 21:8, 23:20, 29:3, 29:9, 29:16, 30:15, 30:18, 30:19, 30:22, 31:7, 34:7, 39:8, 43:21, 46:17, 54:16, 57:9, 65:12, 65:13, 77:14, 79:8

**analyze** [1] - 49:16

**analyzed** [1] - 14:13

**ANGELES** [1] - 88:3

**Angeles** [1] - 2:12

**answer** [6] - 20:19, 34:23, 52:10, 53:23, 78:3, 86:18

**ANSWER** [6] - 22:24, 23:2, 23:5, 23:9, 23:13, 23:16

**answered** [7] - 7:18, 8:19, 9:16, 16:25, 21:20, 21:25, 23:22, 60:19, 72:3, 77:19

**anticipate** [2] - 83:14, 84:3

**apologize** [1] - 5:4

**APPEARANCES** [1] - 2:1

**application** [3] - 63:25, 65:14, 65:19

**applied** [4] - 63:18, 64:15, 64:17, 64:18

**apply** [1] - 65:15

**area** [1] - 13:11

**argue** [2] - 80:14, 85:23

**Argumentative** [2] - 19:25, 39:4

**argumentative** [5] - 9:16, 21:25, 25:12, 33:25, 36:3

**arrest** [1] - 83:16

**aside** [1] - 57:13

**assignment** [3] - 31:19, 31:23, 39:12

**Assistant** [2] - 2:5, 2:10

**associated** [5] - 12:13, 14:25, 27:25, 35:21, 62:24

**Associates** [7] - 43:9, 43:16, 43:19, 44:1, 44:2, 44:3, 44:10

**assume** [7] - 29:22, 29:23, 30:2, 30:10, 31:1, 31:3, 68:12

**assumed** [7] - 28:9, 28:10, 28:14, 28:16, 28:20, 28:23, 29:3

**assuming** [1] - 86:10

**assumption** [1] - 29:25, 30:5, 30:13

**attempted** [3] - 53:6, 55:5, 55:13

**attorney** [2] - 74:24, 85:2

**Attorney** [5] - 2:4, 2:5, 2:9, 2:10, 83:14

**attorney's** [2] - 52:24, 73:8

**attorney-client** [1] - 74:24

**attorneys** [1] - 4:20

**audit** [1] - 14:25

**audits** [1] - 15:2

**August** [1] - 88:15

**AUGUST** [2] - 1:15, 4:1

**AUSAs** [2] - 11:5, 11:9

**authority** [1] - 6:13

**automatic** [1] - 11:14

**available** [1] - 29:7

**Avenatti** [28] - 3:3, 3:4, 4:8, 7:2, 21:10, 24:17, 36:20, 41:11, 42:15, 43:4, 43:9, 43:16, 43:19, 44:1, 44:2, 44:3, 44:10, 45:12, 45:13, 46:25, 51:4, 58:2, 59:9, 77:2, 80:10, 85:6, 86:12

**AVENATTI** [106] - 1:8, 2:15, 2:16, 4:6, 4:9, 5:4, 6:3, 6:18, 7:5, 7:20, 8:16, 8:22, 9:3, 9:18, 9:24, 10:18, 12:22, 12:25, 17:4, 18:21, 18:23, 20:4, 20:22, 21:14, 21:16, 21:22, 22:2, 24:3, 24:19, 25:1, 25:4,

25:14, 28:13, 28:18, 28:20, 30:7, 30:15, 32:23, 32:25, 34:3, 34:15, 34:20, 34:23, 36:9, 39:6, 40:21, 42:22, 42:24, 49:4, 49:7, 50:8, 50:17, 51:5, 51:14, 54:17, 54:19, 59:9, 59:17, 59:24, 60:21, 61:18, 61:21, 62:1, 62:18, 62:19, 62:22, 63:7, 64:16, 66:14, 67:14, 67:17, 67:19, 67:24, 68:4, 72:2, 77:4, 77:22, 78:12, 79:15, 80:11, 80:18, 80:21, 81:1, 81:4, 81:13, 81:22, 82:2, 82:7, 82:9, 82:11, 82:25, 83:4, 83:6, 83:9, 83:12, 83:24, 84:3, 84:9, 84:25, 85:7, 85:9, 85:15, 85:18, 85:24, 86:13, 86:16

**Avenatti's** [1] - 58:25

**aware** [10] - 44:9, 44:11, 44:12, 44:15, 59:12, 59:21, 60:4, 60:9, 61:10, 75:12

# B

**Bakery** [1] - 74:23

**balance** [10] - 38:19, 46:12, 58:23, 59:25, 61:13, 61:17, 73:7, 74:1, 74:10

**Bank** [1] - 36:19

**bank** [7] - 40:5, 41:11, 41:19, 41:24, 41:25, 46:25, 58:12

**banking** [2] - 40:23, 46:18

**Barela** [21] - 28:6, 47:17, 51:20, 55:18, 55:24, 56:5, 56:16, 56:21, 59:13, 59:23, 60:1, 60:6, 60:9, 61:7, 61:12, 67:12, 69:17, 72:14, 74:14, 78:19, 84:5

**Barela's** [4] - 59:4, 60:17, 69:4, 76:8

**Baristas** [1] - 74:24

**based** [2] - 63:15, 77:10

**basis** [2] - 84:17, 84:19

**Beach** [1] - 2:19

**began** [1] - 4:25

**best** [11] - 10:13, 14:7, 14:9, 19:6, 66:2, 66:3, 66:4, 66:6, 66:9, 66:15, 66:16

**better** [2] - 27:17, 85:5

**between** [3] - 54:14, 62:5, 81:19

**beyond** [2] - 31:17, 77:19

**big** [4] - 14:16, 54:1, 70:9, 71:1

**big-old** [2] - 54:1, 70:9, 71:1

**billed** [2] - 25:21, 40:15

**billing** [1] - 20:13

**blow** [4] - 32:9, 40:25, 71:21, 75:2

**bottom** [4] - 40:25, 56:13, 69:15, 74:6

**break** [6] - 4:10, 4:15, 5:9, 7:6, 50:9, 51:6

**breakdown** [1] - 5:18

**BRETT** [1] - 2:5

**Brett** [1] - 10:8

**brett.sagel@usdoj. gov** [2] - 2:8

**brief** [1] - 84:4

**bring** [4] - 6:24, 15:19, 15:23, 16:1

**Brock** [3] - 57:23, 58:3, 72:10

**broken** [1] - 40:17

**brought** [1] - 16:17

**building** [1] - 19:4

**built** [1] - 17:22

**bunch** [2] - 70:4, 74:4

**business** [3] - 43:13, 62:14, 62:24

**buy** [2] - 55:5, 55:7

**BY** [49] - 2:5, 2:18, 3:3, 7:5, 7:20, 8:16, 8:22, 9:3, 9:18, 9:24, 10:18, 12:25, 17:4, 18:23, 20:4, 20:22, 21:16, 21:22, 22:2, 24:3, 25:4, 28:13, 28:20, 30:15, 32:25, 34:3, 34:23, 39:6, 40:21, 42:24, 49:7, 51:14, 54:19, 59:9, 59:24, 60:21, 61:21, 62:1, 62:18, 62:22, 63:7, 64:16, 66:14, 67:24, 68:9, 72:6, 77:4, 77:22, 78:12

# C

**CA** [1] - 1:25
**calculated** [5] - 56:5, 63:15, 71:9, 75:24, 76:7
**calculation** [18] - 23:14, 47:22, 47:24, 48:1, 50:2, 50:6, 52:16, 52:23, 56:22, 56:23, 56:24, 59:10, 60:2, 60:7, 61:22, 64:25, 68:17, 71:8
**calculations** [2] - 17:25, 18:15
**CALIFORNIA** [4] - 1:2, 1:17, 4:1, 88:4
**California** [5] - 2:7, 2:12, 2:19, 15:23, 88:7
**CALLED** [1] - 3:3
**Calvert** [4] - 45:5, 45:8, 45:15, 45:16
**camera** [5] - 5:21, 5:24, 80:25, 82:13, 82:17
**capacity** [1] - 29:22
**carefulness** [1] - 66:17
**CareMeridian** [3] - 41:15, 41:22, 42:3
**Carlos** [1] - 13:5
**Carter** [13] - 7:7, 7:15, 10:10, 10:12, 11:9, 13:16, 13:21, 14:7, 14:10, 14:12, 18:6, 42:6, 84:24
**case** [47] - 4:16, 4:18, 6:7, 6:9, 7:14, 10:23, 11:22, 12:1, 14:5, 14:8, 14:12, 15:9, 17:11, 17:19, 18:7, 19:13, 22:11, 23:4, 23:25, 24:16, 24:21, 27:25, 32:13, 32:18, 33:1, 33:6, 42:21, 47:10, 47:13, 50:12, 50:13, 51:23, 52:15, 55:1, 55:2, 62:23, 66:10, 69:3, 69:13, 71:9, 79:25, 80:1, 84:7, 84:10, 84:21, 85:22
**Case** [1] - 1:7
**case-in-chief** [2] - 84:7, 84:10
**case-related** [11] - 14:12, 23:25, 32:13, 32:18, 42:21, 47:10, 47:13, 51:23, 52:15,

69:3, 71:9
**cases** [5] - 16:5, 19:22, 40:15, 42:1, 74:20
**categories** [1] - 55:14
**category** [1] - 54:8
**CB&T** [1] - 36:19
**CENTRAL** [1] - 1:2
**Central** [1] - 88:7
**certain** [6] - 18:15, 38:8, 79:2, 79:7, 79:10
**certainly** [1] - 8:4
**CERTIFICATE** [1] - 88:1
**CERTIFIED** [1] - 1:6
**certify** [1] - 88:7
**chance** [2] - 5:12, 84:15
**change** [4] - 41:21, 69:20, 74:2, 74:6
**charged** [1] - 39:2
**charges** [5] - 33:6, 33:19, 35:24, 39:9, 83:17
**charging** [1] - 46:4
**chart** [20] - 39:16, 49:10, 49:12, 51:7, 55:10, 55:15, 56:17, 60:22, 69:22, 70:19, 71:15, 74:12, 74:14, 74:16, 75:9, 75:16, 75:18, 75:21, 76:5, 76:11
**charts** [7] - 20:25, 32:8, 56:13, 65:25, 70:20, 76:11, 76:14
**check** [1] - 41:11
**checking** [1] - 41:19
**chief** [2] - 84:7, 84:10
**claim** [3] - 37:24, 61:7, 84:4
**clarify** [2] - 41:15, 53:23
**clear** [3] - 4:23, 6:8, 27:22
**client** [23] - 21:24, 22:3, 27:17, 27:20, 29:4, 29:24, 31:8, 32:13, 42:9, 46:18, 46:20, 48:7, 48:10, 53:1, 53:22, 54:11, 56:9, 65:4, 74:24, 75:6, 76:12, 76:22
**client's** [1] - 29:24
**clients** [16] - 21:23, 31:11, 31:17, 53:10, 53:15, 53:20, 53:21, 65:7, 66:21, 66:24, 67:6, 67:9, 67:21,

68:2, 76:12, 76:22
**close** [7] - 19:23, 20:7, 20:15, 84:10, 86:3, 86:7, 86:19
**closer** [1] - 17:14
**closing** [2] - 85:25, 86:14
**co** [1] - 74:20
**co-counsel** [1] - 74:20
**Code** [1] - 88:8
**Coffee** [15] - 57:18, 57:19, 57:21, 58:7, 58:15, 58:21, 59:3, 59:13, 59:14, 59:22, 60:5, 60:11, 73:4, 73:24, 74:5
**colleagues** [2] - 20:12, 66:1
**collective** [1] - 4:20
**comment** [2] - 66:13, 84:14
**comments** [1] - 85:13
**committed** [2] - 39:10, 85:12
**communicating** [1] - 6:8
**communications** [12] - 6:5, 6:10, 7:23, 8:2, 10:12, 10:25, 11:2, 12:4, 12:7, 12:16, 13:25, 14:4
**company** [3] - 43:20, 43:23, 44:13
**compared** [1] - 24:25
**complete** [2] - 27:7, 27:9
**complying** [1] - 4:17
**Compound** [1] - 28:11
**conclude** [1] - 85:22
**concluded** [1] - 87:4
**conclusion** [2] - 34:1, 59:6
**conclusions** [2] - 21:8, 21:17
**conditions** [2] - 81:13, 82:5
**conducted** [1] - 7:7
**Conference** [1] - 88:12
**conferred** [1] - 32:24
**confined** [1] - 77:14
**confirm** [2] - 41:23, 73:7
**confirmation** [2] - 42:3, 42:5
**confirmed** [8] - 40:2, 40:4, 40:9, 40:23, 41:13, 41:15, 41:18, 41:22
**conformance** [1] -

88:12
**connection** [34] - 7:14, 10:14, 11:10, 11:21, 12:1, 14:5, 14:8, 15:1, 15:8, 15:23, 17:11, 17:19, 19:19, 19:21, 20:6, 20:15, 20:23, 23:19, 27:20, 29:16, 30:17, 33:6, 36:1, 39:6, 46:17, 48:2, 51:10, 51:15, 57:22, 62:23, 63:8, 63:10, 65:12, 83:15
**contain** [2] - 17:22, 17:25
**contemplate** [1] - 86:16
**content** [2] - 64:6, 75:2
**context** [1] - 68:15
**continue** [2] - 4:14, 82:5
**contract** [2] - 75:5, 75:8
**convenient** [1] - 80:14
**conversation** [2] - 9:19, 9:23
**converse** [2] - 14:10, 14:22
**conversed** [2] - 14:12, 14:20
**conversing** [2] - 8:23, 8:24
**copied** [2] - 5:19, 10:25
**copies** [1] - 11:8
**copy** [2] - 14:14, 24:13
**Corporate** [1] - 2:18
**corporation** [1] - 44:13
**correct** [55] - 10:23, 12:20, 12:23, 13:13, 13:14, 15:17, 16:24, 19:16, 19:18, 23:16, 24:11, 24:15, 25:19, 25:24, 28:21, 29:5, 30:24, 31:21, 32:14, 32:21, 33:8, 35:8, 37:20, 40:1, 42:12, 43:6, 43:7, 46:10, 47:11, 48:8, 49:1, 49:4, 52:11, 55:2, 55:22, 56:1, 56:8, 56:11, 56:22, 57:3, 59:11, 60:15, 60:25, 63:2, 63:19, 64:11, 65:5, 65:9, 70:10, 73:13, 76:16, 76:24, 77:12, 77:17, 88:9

**correctly** [3] - 23:17, 52:3, 58:5
**cost** [17] - 24:20, 27:16, 27:17, 31:8, 37:22, 37:24, 38:11, 38:13, 47:22, 47:24, 57:14, 68:12, 78:1, 78:9, 78:13, 78:14, 78:19
**costs** [18] - 23:3, 23:10, 24:16, 40:11, 60:6, 60:10, 60:16, 63:8, 69:3, 69:13, 71:4, 71:6, 71:10, 77:6, 77:10, 77:15, 78:1, 78:8
**Counsel** [1] - 32:24
**counsel** [3] - 6:13, 18:5, 74:20
**COUNSEL** [2] - 2:1, 2:16
**Count** [2] - 33:11, 35:24
**count** [1] - 39:16
**counted** [1] - 38:8
**counts** [6] - 33:1, 33:2, 33:3, 33:5, 33:9, 81:23
**COUNTY** [1] - 88:3
**couple** [2] - 22:11, 81:1
**course** [2] - 34:6, 60:3
**COURT** [97] - 1:1, 1:24, 4:8, 5:2, 5:7, 5:25, 6:16, 6:22, 7:1, 7:19, 8:14, 8:21, 9:1, 9:17, 9:21, 10:16, 12:24, 17:1, 20:1, 20:18, 21:15, 21:21, 22:1, 23:24, 24:17, 25:3, 25:13, 28:12, 28:19, 30:8, 34:2, 34:22, 36:5, 39:5, 40:19, 42:23, 49:6, 50:9, 50:22, 51:2, 51:12, 54:18, 59:7, 59:19, 60:20, 61:20, 61:25, 62:17, 62:21, 63:4, 64:13, 66:11, 67:16, 67:18, 68:6, 72:4, 77:2, 77:21, 78:5, 79:17, 79:21, 80:6, 80:10, 80:17, 80:19, 80:23, 81:3, 81:11, 81:25, 82:4, 82:8, 82:10, 82:12, 82:19, 82:22, 82:24, 83:3, 83:5, 83:8, 83:22, 84:2, 84:6, 84:12, 84:24, 85:5,

85:8, 85:12, 85:16, 85:20, 85:25, 86:6, 86:9, 86:12, 86:21, 86:23, 87:1, 88:6
**court** [3] - 18:19, 74:20, 84:10
**Court** [10] - 5:24, 6:4, 80:13, 80:15, 83:25, 85:9, 87:3, 88:6, 88:20
**Court's** [2] - 50:17, 85:11
**COURTROOM** [3] - 50:15, 50:25, 80:4
**cover** [1] - 87:3
**covered** [7] - 8:4, 8:7, 8:9, 8:12, 8:24, 9:4
**covering** [2] - 10:1, 37:6
**CRD** [1] - 82:18
**credit** [2] - 69:21, 71:10
**crime** [2] - 39:3, 39:10
**criminal** [9] - 4:20, 13:1, 13:8, 19:20, 20:7, 20:15, 33:1, 33:6, 66:10
**critically** [2] - 22:5, 22:8
**Cross** [1] - 3:3
**CROSS** [1] - 7:4
**cross** [23] - 4:12, 4:14, 4:25, 5:1, 5:6, 6:20, 7:7, 7:10, 7:13, 7:21, 8:3, 8:5, 8:8, 8:9, 8:12, 8:18, 8:24, 9:5, 9:25, 50:18, 68:11, 75:3, 83:19
**Cross-Examination** [1] - 3:3
**CROSS-EXAMINATION** [1] - 7:4
**cross-examination** [13] - 4:12, 4:14, 4:25, 5:1, 5:6, 6:20, 7:13, 8:3, 8:5, 8:8, 68:11, 75:3, 83:19
**cross-examinations** [3] - 7:7, 7:10, 7:21
**CRR** [1] - 1:23
**CSR** [2] - 1:23, 88:20
**current** [3] - 26:25, 52:2, 84:6

## D

**dash** [1] - 76:14
**data** [20] - 14:21, 23:21, 24:5, 24:7,

24:8, 24:9, 25:5, 25:9, 25:15, 25:17, 25:23, 25:25, 26:2, 26:22, 27:5, 27:7, 27:9, 30:20, 37:25, 47:19
**database** [1] - 26:14
**date** [6] - 33:17, 36:14, 37:1, 70:15, 70:16, 82:1
**Date** [1] - 88:15
**DAY** [1] - 1:8
**days** [4] - 9:14, 11:16, 12:6, 84:11
**deal** [2] - 82:4, 83:21
**DEAN** [2] - 2:17, 2:18
**deansteward7777@ gmail.com** [1] - 2:20
**Debbie** [1] - 88:20
**DEBBIE** [3] - 1:23, 88:5, 88:19
**debt** [3] - 44:3, 44:5, 44:7
**deduct** [1] - 77:6
**deducted** [2] - 46:8, 59:2
**deduction** [4] - 58:24, 59:15, 78:1, 78:8
**DEFENDANT** [1] - 2:14
**defendant** [15] - 68:11, 69:21, 70:1, 71:3, 71:14, 72:18, 73:23, 74:19, 74:21, 75:3, 75:12, 75:17, 75:24, 76:8, 76:18
**Defendant** [1] - 1:9
**defense** [2] - 5:20, 80:11
**degree** [2] - 66:1, 66:17
**delete** [1] - 13:2
**deleted** [4] - 11:13, 11:24, 12:8, 12:13
**deletes** [1] - 11:14
**deleting** [1] - 13:7
**deletion** [3] - 11:19, 12:3, 13:18
**Delivery** [2] - 41:4, 41:7
**demonstrate** [2] - 16:23, 17:3
**denied** [1] - 21:15
**depicted** [1] - 78:2
**depiction** [1] - 47:13
**deposit** [11] - 34:18, 34:19, 34:24, 37:11, 37:18, 45:4, 45:16, 46:13, 73:18, 73:19, 73:22

**deposited** [6] - 35:11, 45:14, 45:25, 67:13, 69:18, 76:21
**deposition** [1] - 16:11
**depositions** [1] - 16:13
**deposits** [4] - 37:17, 37:19, 73:15, 73:16
**DEPUTY** [3] - 50:15, 50:25, 80:4
**describe** [1] - 10:20
**described** [1] - 72:9
**designation** [1] - 81:8
**detail** [1] - 6:23
**details** [4] - 9:19, 9:22, 9:24, 17:25
**determine** [3] - 12:15, 21:24, 77:10
**determined** [1] - 31:22, 60:15
**determining** [3] - 63:7, 63:12, 77:15
**dhinospaan@yahoo. com** [1] - 1:25
**differences** [1] - 54:14
**different** [7] - 11:25, 20:5, 24:25, 40:15, 42:1, 47:22, 47:24, 47:25, 48:1, 65:3
**digits** [1] - 69:14
**Dillanos** [16] - 57:18, 57:19, 57:21, 58:7, 58:15, 58:21, 59:3, 59:12, 59:14, 59:22, 60:5, 60:11, 73:3, 73:24, 74:5, 74:23
**direct** [7] - 5:3, 6:4, 18:19, 36:24, 40:2, 73:11, 83:22
**directed** [2] - 11:5, 53:22
**direction** [3] - 10:22, 10:24, 11:2
**directly** [2] - 35:25, 53:21
**disable** [1] - 12:5
**disabling** [1] - 12:3
**disclosed** [1] - 5:23
**disclosure** [1] - 5:20
**discover** [1] - 29:17
**discuss** [3] - 9:10, 50:11, 79:24
**discussed** [6] - 8:17, 9:14, 18:4, 65:13, 65:17, 77:13
**discussing** [1] - 9:4
**discussion** [1] - 6:22
**distinction** [2] - 54:16, 60:12, 61:16
**DISTRICT** [3] - 1:1,

1:2, 1:3
**District** [2] - 88:6, 88:7
**DIVISION** [1] - 1:2
**document** [1] - 15:14
**documents** [3] - 14:14, 15:17, 17:21
**dodged** [1] - 84:25
**dollars** [1] - 76:17
**domestic** [1] - 83:16
**done** [9] - 11:2, 15:8, 16:7, 16:20, 31:17, 55:17, 55:24, 83:7, 84:9
**double** [1] - 38:8
**double-counted** [1] - 38:8
**doubt** [1] - 7:17
**down** [6] - 24:17, 39:25, 40:17, 41:17, 55:8
**dozen** [1] - 16:9
**Draft** [5] - 14:16, 14:18, 54:1, 70:9, 71:1
**draft** [3] - 24:13, 39:22, 52:3
**drafts** [1] - 5:14
**draw** [2] - 77:25, 78:8
**Drum** [15] - 4:11, 4:14, 5:11, 6:1, 6:4, 7:6, 20:22, 25:15, 32:25, 57:5, 66:14, 68:10, 76:25, 77:5, 82:17
**DRUM** [2] - 3:3, 7:3
**due** [15] - 32:13, 48:5, 48:7, 49:13, 49:17, 53:1, 56:5, 60:5, 61:8, 61:11, 63:8, 63:12, 64:10, 65:4, 75:5
**during** [6] - 4:15, 13:7, 18:10, 40:1, 68:11, 75:3

## E

**e-mail** [8] - 6:9, 10:12, 11:3, 11:23, 38:1, 70:16, 78:21, 82:17
**e-mailed** [1] - 25:8
**e-mails** [15] - 4:10, 5:10, 5:16, 11:9, 11:14, 12:12, 12:13, 12:15, 12:17, 12:19, 13:2, 13:7, 13:10, 13:16, 13:21
**EA** [8] - 34:12, 34:18, 35:2, 35:4, 35:5, 35:14, 37:18, 44:23
**EA's** [1] - 35:11

**Eagan** [10] - 21:9, 41:11, 42:14, 43:4, 45:12, 45:13, 46:25, 58:2, 58:24, 59:9
**Ed** [2] - 74:16, 74:20
**Edward** [1] - 61:1
**effect** [1] - 68:19
**effectively** [1] - 15:15
**effort** [6] - 26:25, 27:11, 29:16, 30:17, 31:13, 31:16
**efforts** [1] - 23:20
**either** [5] - 32:12, 38:7, 52:6, 55:5, 80:14
**electronic** [14] - 14:21, 23:21, 24:9, 25:5, 25:9, 25:15, 25:17, 25:23, 26:5, 26:8, 26:11, 26:13, 26:19, 47:19
**elicit** [1] - 6:19
**eliminate** [1] - 50:19
**Elmo** [1] - 22:12
**encompassed** [1] - 23:10
**end** [5] - 74:12, 75:3, 81:17, 81:19, 85:20
**engage** [1] - 39:8
**engaged** [1] - 63:1
**engagement** [1] - 17:10
**engagements** [1] - 15:4
**entire** [1] - 60:2
**entitled** [19] - 4:10, 4:11, 4:24, 5:2, 6:10, 36:1, 55:18, 55:24, 57:11, 58:2, 59:9, 60:1, 60:10, 61:22, 62:2, 64:2, 77:6, 79:10, 88:11
**entries** [2] - 41:1, 73:11
**envelope** [2] - 41:4, 41:7
**equals** [1] - 53:1
**equation** [1] - 85:3
**equity** [1] - 44:10
**especially** [2] - 19:19, 21:1
**ESQ** [2] - 2:15, 2:18
**essentially** [2] - 53:6, 55:13
**established** [5] - 16:4, 28:13, 37:20, 54:5, 61:21
**estimate** [6] - 16:9, 17:12, 18:9, 23:25, 84:6, 85:25, 86:6,

86:7, 86:19
**estimates** [3] - 83:4, 83:10, 83:13
**Evan** [4] - 14:7, 14:10, 18:5, 83:14
**event** [2] - 82:2, 86:18
**evidence** [7] - 59:12, 59:21, 60:4, 60:9, 61:10, 69:7, 79:20
**exactly** [1] - 12:10
**EXAMINATION** [3] - 7:4, 68:8, 77:3
**examination** [13] - 4:12, 4:14, 4:25, 5:1, 5:6, 6:20, 7:13, 8:3, 8:5, 8:8, 68:11, 75:3, 83:19
**Examination** [3] - 3:3, 3:4, 3:4
**examinations** [3] - 7:7, 7:10, 7:21
**example** [5] - 5:14, 8:9, 12:20, 27:23, 71:5
**examples** [3] - 31:10, 68:20, 68:23
**Excel** [1] - 17:20
**exception** [3] - 5:15, 6:12, 76:13
**exchange** [1] - 5:14
**excused** [2] - 79:17, 86:23
**exempts** [1] - 4:17
**exercise** [1] - 11:21
**exhibit** [8] - 22:6, 33:11, 35:6, 35:15, 44:23, 69:25, 70:2, 70:15
**Exhibit** [29] - 32:8, 34:14, 36:10, 37:13, 39:17, 39:20, 40:22, 45:24, 47:7, 47:8, 51:6, 57:7, 62:9, 62:10, 69:2, 69:7, 69:24, 70:19, 71:8, 71:13, 72:15, 72:17, 73:2, 74:22, 75:1, 75:14, 75:15, 76:2, 78:16
**EXHIBITS** [1] - 3:14
**Exhibits** [1] - 65:22
**exhibits** [7] - 18:4, 22:4, 36:21, 36:22, 65:25, 66:18, 79:19
**exist** [1] - 4:22
**existed** [2] - 25:6, 25:18
**expect** [2] - 42:20, 81:8
**expense** [8] - 27:25,

29:4, 29:8, 30:19, 51:23, 52:15, 54:15, 54:20
**expenses** [27] - 14:13, 21:23, 22:3, 23:25, 28:10, 32:13, 32:18, 38:8, 40:3, 41:14, 41:19, 41:24, 42:4, 42:21, 43:9, 43:14, 44:14, 47:10, 47:13, 48:17, 48:18, 52:25, 54:3, 58:25, 69:3, 70:12, 71:9
**experience** [2] - 4:21, 17:8
**expert** [9] - 4:16, 5:13, 16:17, 16:22, 29:21, 29:23, 68:12, 84:19
**expert's** [1] - 84:18
**expertise** [1] - 13:11
**expire** [1] - 81:6
**explain** [1] - 62:14
**extended** [1] - 81:9
**extent** [1] - 5:18

## F

**fact** [2] - 23:1, 84:21
**fair** [8] - 18:8, 19:10, 19:11, 19:24, 39:13, 53:11, 55:15, 55:16
**fairly** [3] - 10:18, 10:20, 41:3
**falls** [1] - 5:14
**February** [5] - 36:15, 37:2, 70:18, 70:22, 74:8
**FEDERAL** [2] - 1:24, 88:5
**Federal** [1] - 88:20
**federal** [5] - 13:1, 13:7, 39:3, 46:4, 66:10
**fee** [27] - 35:21, 35:25, 37:20, 45:1, 46:9, 58:12, 63:11, 63:14, 63:16, 63:19, 63:20, 63:22, 63:23, 63:24, 64:2, 64:4, 64:9, 64:15, 64:25, 65:2, 65:11, 65:16, 75:5, 75:8, 75:24, 77:12, 79:4
**fees** [22] - 8:10, 8:17, 9:4, 10:1, 32:12, 36:8, 52:24, 52:25, 53:11, 58:25, 60:6, 60:10, 63:8, 63:12, 64:10, 65:1, 73:8, 75:10, 76:7, 77:6,

77:10, 77:15
**fencing** [1] - 83:18
**few** [3] - 9:12, 17:14, 65:20
**figure** [5] - 23:3, 26:11, 49:13, 49:18, 83:18
**file** [8] - 26:8, 26:11, 26:13, 26:19, 28:9, 28:20, 52:1, 80:21
**files** [2] - 17:20, 52:5
**fill** [1] - 85:6
**filling** [1] - 84:22
**final** [9] - 38:11, 38:13, 78:1, 78:8, 78:11, 78:13, 78:18, 78:23, 78:25
**finally** [1] - 85:1
**financial** [3] - 19:4, 21:9, 21:19
**fine** [5] - 30:8, 80:19, 80:20, 82:19, 84:2
**finger** [1] - 37:6
**fingernail** [1] - 37:4
**finish** [1] - 33:22
**finishes** [1] - 5:3
**firm** [27] - 14:4, 15:7, 21:9, 21:19, 21:23, 25:21, 27:24, 29:4, 29:12, 35:25, 39:7, 40:14, 45:21, 46:8, 46:9, 55:18, 55:24, 57:10, 58:2, 61:22, 63:13, 64:2, 64:10, 77:5, 79:10, 84:18, 84:20
**firm's** [1] - 62:4
**first** [8] - 53:25, 61:22, 62:3, 62:5, 71:17, 72:18, 73:23, 84:14
**five** [2] - 17:13, 82:25
**flip** [2] - 55:10, 55:15
**following** [2] - 4:9, 87:2
**follows** [4] - 30:9, 59:20, 67:20, 78:6
**FOR** [3] - 2:3, 2:14, 2:16
**foregoing** [1] - 88:9
**form** [3] - 17:18, 50:12, 79:25
**format** [1] - 88:11
**foundation** [2] - 26:6, 33:25
**Foundation** [3] - 36:3, 40:18
**four** [3] - 9:14, 13:24, 69:14
**Friday** [2] - 82:6, 85:23

**FRIDAY** [2] - 1:15, 4:1
**full** [1] - 16:18
**function** [3] - 11:19, 12:3, 14:25
**funds** [1] - 45:17

## G

**garbage** [4] - 18:24, 19:1
**Gardephe** [1] - 81:6
**Gardner** [11] - 28:7, 47:14, 48:13, 48:19, 48:22, 49:13, 51:9, 51:14, 67:12, 72:7, 75:16
**gather** [1] - 14:3
**GB** [1] - 34:8
**general** [2] - 43:10, 65:21
**generally** [5] - 10:22, 13:18, 28:25, 62:14, 68:17
**gentlemen** [5] - 7:1, 13:6, 50:10, 50:22, 79:22
**Geoff** [2] - 35:21, 45:21
**Geoffrey** [5] - 38:22, 47:17, 67:12, 72:20, 72:25
**given** [2] - 6:21, 27:1
**Global** [1] - 74:24
**Google** [1] - 55:3
**GOVERNMENT** [1] - 3:3
**Government** [42] - 4:16, 4:17, 6:5, 6:9, 6:20, 8:23, 9:15, 12:4, 12:7, 12:16, 14:4, 18:5, 24:14, 26:2, 26:3, 26:7, 27:3, 27:5, 27:23, 31:5, 31:22, 31:23, 33:8, 33:11, 33:20, 33:23, 39:8, 47:4, 47:6, 52:13, 52:14, 65:13, 65:15, 65:17, 77:11, 77:15, 79:20, 80:8, 81:2, 83:2, 83:25, 86:13
**government** [5] - 7:20, 7:24, 10:13, 11:6, 46:4
**Government's** [3] - 49:10, 56:14, 81:11
**greater** [2] - 61:7, 61:9
**Greg** [9] - 47:17, 59:13, 59:23, 60:1, 60:5, 61:11, 67:12,

69:17, 72:14
**Gregory** [1] - 74:14
**gritty** [1] - 62:10
**Group** [1] - 71:24
**Group's** [3] - 8:10, 9:4, 15:12
**guess** [1] - 10:20
**guy** [1] - 61:1

## H

**half** [23] - 6:8, 7:8, 12:6, 17:23, 19:13, 20:11, 20:24, 40:25, 63:17, 63:23, 63:25, 64:3, 64:11, 64:14, 64:17, 64:18, 64:19, 65:14, 65:15, 65:16, 65:18, 86:2, 86:19
**hand** [2] - 83:7, 83:8
**HANNA** [2] - 2:4, 2:9
**happy** [3] - 5:21, 5:23, 83:20
**hard** [2] - 14:14, 24:13
**heard** [8] - 4:21, 18:23, 18:25, 22:11, 55:1, 55:2, 57:19, 61:1
**hearsay** [1] - 8:20
**held** [1] - 88:10
**help** [1] - 18:14
**helped** [2] - 17:2, 18:18
**hereby** [1] - 88:7
**Hernandez** [2] - 34:15, 36:9
**Hills** [1] - 46:7
**HINO** [3] - 1:23, 88:5, 88:19
**Hino** [1] - 88:20
**HINO-SPAAN** [3] - 1:23, 88:5, 88:19
**Hino-Spaan** [1] - 88:20
**hold** [1] - 24:17
**Honor** [47] - 4:9, 4:24, 5:5, 5:9, 6:3, 6:7, 6:19, 18:21, 23:23, 24:19, 28:18, 32:23, 49:5, 50:17, 51:5, 61:18, 62:20, 68:5, 68:7, 72:2, 78:4, 79:20, 80:9, 80:11, 80:16, 80:22, 81:4, 81:14, 81:16, 81:22, 82:2, 82:11, 82:14, 82:25, 83:7, 83:10, 83:12, 83:24, 84:10, 84:13, 85:7, 85:18, 86:13, 86:15, 86:19,

86:24, 86:25
**HONORABLE** [1] - 1:3
**hour** [7] - 10:4, 50:23, 84:20, 86:2, 86:8
**hours** [4] - 84:15, 84:17, 84:22, 86:20
**hundred** [1] - 17:14
**hypothetical** [7] - 31:9, 57:1, 57:4, 68:25, 69:1, 75:4, 86:10

### I

**I..** [1] - 85:4
**i.e** [1] - 42:1
**idea** [13] - 27:7, 38:4, 38:6, 39:2, 49:9, 49:10, 49:11, 56:12, 56:14, 56:15, 77:25, 78:7
**ideas** [2] - 51:3, 56:13
**identical** [1] - 24:21
**identified** [1] - 37:18
**identifying** [3] - 26:4, 26:10, 26:12
**immediate** [1] - 82:4
**immediately** [1] - 4:13
**important** [3] - 22:2, 22:5, 22:8
**improper** [3] - 33:24, 44:12, 44:15
**improperly** [1] - 33:21
**IN** [1] - 2:14
**in-camera** [2] - 80:25, 82:13
**inaccurate** [1] - 67:1
**inappropriate** [1] - 84:16
**include** [2] - 8:2, 76:8
**included** [3] - 31:5, 53:12, 63:23
**including** [5] - 13:5, 21:5, 21:6, 56:6, 86:5
**inclusion** [1] - 75:17
**incomplete** [3] - 22:6, 27:7, 27:9
**incorrect** [3] - 75:6, 75:9, 75:10
**incorrectly** [1] - 75:5
**incurred** [3] - 29:4, 29:8, 40:3
**indicated** [4] - 64:2, 64:4, 64:15, 85:9
**indicates** [1] - 78:23
**indicating** [2] - 58:9, 78:22
**individuals** [1] - 16:10
**information** [26] -

4:24, 4:25, 21:11, 22:6, 24:12, 26:4, 26:10, 26:12, 26:18, 26:19, 27:12, 28:22, 28:25, 29:19, 30:22, 32:21, 47:5, 49:20, 49:22, 49:25, 50:18, 52:4, 52:7, 66:7, 77:11, 77:17
**initial** [4] - 67:10, 67:23, 68:2, 78:13
**input** [3] - 29:8, 30:2, 30:11
**inputs** [3] - 19:4, 19:9, 22:4
**inputted** [1] - 29:19
**inquiry** [1] - 31:25
**instance** [3] - 16:16, 29:21, 41:4
**instruct** [4] - 13:21, 13:23, 13:24, 85:22
**instructions** [2] - 85:14, 85:21
**intend** [1] - 83:1
**interest** [7] - 43:18, 44:10, 52:25, 53:10, 73:18, 73:19, 73:22
**interim** [6] - 77:25, 78:8, 78:10, 78:18, 78:23, 78:24
**interpret** [2] - 64:12, 65:11
**interpretation** [10] - 20:8, 20:10, 20:21, 20:23, 63:15, 63:25, 64:24, 65:2, 65:8, 75:8
**interpreted** [4] - 63:14, 63:22, 63:24, 64:9
**interpreting** [1] - 75:5
**invoice** [8] - 27:17, 29:23, 30:16, 31:1, 31:3, 31:8, 40:15, 40:16
**invoices** [7] - 27:16, 27:19, 27:24, 27:25, 28:1, 28:3, 29:13
**involved** [1] - 13:1
**IPSY** [3] - 79:11, 79:12, 79:13
**ironically** [1] - 51:1
**irrelevant** [1] - 19:25
**issue** [6] - 4:6, 5:13, 81:24, 83:12, 85:10, 85:11
**issues** [5] - 50:12, 50:20, 57:13, 57:15, 79:25
**item** [2] - 42:9, 44:21

**items** [1] - 54:20

### J

**James** [1] - 10:8
**JAMES** [1] - 1:3
**January** [5] - 33:18, 36:6, 42:15, 43:3, 75:22
**Jencks** [2] - 4:18, 6:13
**Jenness** [2] - 83:14, 83:15
**job** [2] - 6:19, 16:6
**JOHN** [4] - 1:8, 2:15, 3:3, 7:3
**John** [2] - 36:20, 65:18
**Johnson** [13] - 28:6, 35:21, 36:1, 38:22, 42:13, 42:14, 45:22, 46:14, 47:17, 67:12, 72:20, 72:25, 78:20
**Johnson's** [1] - 27:25
**Judge** [1] - 81:6
**JUDGE** [1] - 1:3
**Judicial** [1] - 88:12
**Judy** [13] - 22:16, 24:1, 25:8, 29:6, 38:1, 38:3, 38:5, 52:5, 53:13, 78:14, 78:15, 78:25, 79:1
**jurors** [1] - 84:7
**jury** [21] - 4:5, 6:17, 6:24, 6:25, 16:23, 18:3, 21:18, 22:10, 34:13, 36:24, 38:21, 40:8, 41:20, 50:21, 56:24, 57:3, 62:14, 80:5, 83:20, 85:13, 85:21

### K

**keep** [1] - 34:16
**kept** [1] - 40:11
**Kim** [1] - 10:8
**kinds** [1] - 43:8
**knowing** [2] - 31:12, 31:15
**knowledge** [11] - 10:14, 14:7, 14:9, 19:7, 36:4, 66:2, 66:3, 66:4, 66:15, 66:16, 84:21
**knowledgeable** [2] - 78:12, 78:24

### L

**lacks** [1] - 36:4

**ladies** [4] - 7:1, 50:10, 50:22, 79:22
**lag** [1] - 29:18
**largely** [1] - 45:14
**last** [17] - 7:8, 10:19, 12:6, 16:8, 17:22, 18:8, 18:14, 19:12, 19:23, 20:11, 20:24, 26:20, 62:3, 62:5, 69:14, 76:11, 81:17
**Law** [1] - 71:24
**LAW** [1] - 2:17
**law** [12] - 4:16, 4:20, 21:9, 21:19, 21:23, 27:24, 29:12, 40:14, 57:10, 63:13, 64:2, 77:5
**lawyer** [1] - 65:11
**lay** [1] - 26:5
**least** [2] - 30:3, 30:11
**leave** [1] - 86:22
**led** [1] - 55:8
**leeway** [1] - 62:12
**left** [2] - 58:20, 74:12
**legal** [28] - 20:8, 20:10, 20:21, 20:22, 31:17, 32:12, 34:1, 35:21, 35:25, 36:8, 37:20, 46:9, 53:10, 55:17, 55:21, 55:23, 59:5, 63:8, 63:12, 63:17, 64:22, 65:1, 75:10, 75:24, 76:7, 77:6, 77:10
**less** [6] - 58:23, 61:8, 61:14, 69:21, 69:23, 86:11
**letter** [1] - 5:20
**letters** [1] - 14:17
**likely** [1] - 84:9
**line** [3] - 42:9, 44:21, 53:16
**list** [3] - 75:9, 83:2, 83:13
**listed** [14] - 42:10, 49:8, 55:14, 55:19, 56:2, 56:10, 69:4, 69:8, 69:15, 69:20, 70:12, 71:4, 71:22, 72:19
**listen** [2] - 25:10, 67:19
**listening** [1] - 83:5
**lists** [1] - 54:20
**loaded** [1] - 26:16
**look** [19] - 4:15, 23:4, 23:5, 23:7, 23:12, 23:20, 25:5, 25:16, 26:4, 26:10, 32:20, 33:11, 35:19, 47:7,

51:20, 53:17, 53:25, 58:9, 72:8
**looked** [9] - 5:10, 24:7, 24:8, 24:9, 24:13, 25:4, 40:5, 58:1, 60:17
**looking** [5] - 34:14, 36:10, 36:23, 74:22, 83:13
**looks** [1] - 37:11
**LOS** [1] - 88:3
**Los** [1] - 2:12
**lunch** [1] - 5:9

### M

**mail** [8] - 6:9, 10:12, 11:3, 11:23, 38:1, 70:16, 78:21, 82:17
**mailed** [1] - 25:8
**mails** [15] - 4:10, 5:10, 5:16, 11:9, 11:14, 12:12, 12:13, 12:15, 12:17, 12:19, 13:2, 13:7, 13:10, 13:16, 13:21
**maintained** [2] - 11:8, 15:11
**March** [1] - 45:4
**Mark** [3] - 45:5, 45:8, 45:16
**mark** [3] - 45:15, 70:9, 76:14
**marks** [1] - 17:15
**materials** [1] - 4:22
**math** [5] - 32:15, 52:18, 53:4, 55:9, 65:6
**matter** [23] - 11:10, 12:8, 12:14, 13:1, 13:8, 14:1, 19:13, 19:20, 19:21, 20:7, 20:15, 21:2, 35:22, 36:1, 45:22, 47:20, 60:17, 63:9, 69:4, 76:8, 78:19, 78:20, 88:11
**matters** [1] - 29:24
**McNicholas** [2] - 45:19
**McNicholas's** [1] - 37:22
**mean** [12] - 8:8, 14:14, 19:2, 26:12, 27:22, 41:13, 64:5, 66:9, 76:17, 76:20, 81:15, 85:16
**meaning** [1] - 23:21
**meaningful** [1] - 61:16
**means** [2] - 19:3,

76:21
**meant** [2] - 53:20, 85:17
**meeting** [1] - 10:6
**mention** [2] - 8:11, 25:10
**mentioned** [2] - 13:19, 13:24
**merely** [1] - 41:24
**met** [2] - 9:12, 10:4
**Michael** [2] - 36:20, 46:25
**MICHAEL** [2] - 1:8, 2:15
**Michelle** [4] - 62:24, 63:9, 76:13, 79:4
**Microsoft** [2] - 17:20
**midafternoon** [1] - 50:9
**might** [10] - 7:25, 8:3, 8:4, 8:7, 8:9, 8:12, 8:24, 12:17, 22:23
**million** [29] - 35:10, 35:13, 35:19, 35:25, 36:7, 37:19, 38:25, 45:1, 45:4, 45:12, 45:25, 46:9, 46:12, 57:10, 58:11, 59:8, 59:16, 59:25, 60:2, 60:13, 61:13, 61:17, 71:23, 72:10, 72:20, 72:23, 72:24, 74:2
**million-six** [1] - 58:11
**mind** [5] - 29:25, 30:5, 30:13, 33:7, 34:16
**minus** [7] - 50:18, 52:24, 52:25, 60:21
**minute** [1] - 14:19
**minutes** [4] - 50:10, 50:18, 83:10, 86:11
**misspoke** [1] - 5:4
**misstates** [1] - 61:24
**mix** [1] - 43:13
**mixed** [1] - 70:20
**mock** [3] - 7:7, 7:10, 7:13
**model** [2] - 19:4
**moment** [2] - 18:21, 32:23, 68:4
**momentarily** [3] - 24:5, 38:15, 39:16
**Monday** [6] - 9:12, 9:15, 9:19, 10:6, 80:14, 85:13
**money** [40] - 33:20, 34:10, 35:4, 36:21, 37:9, 37:16, 38:22, 43:3, 43:25, 45:11, 45:14, 46:19, 49:14, 49:19, 49:23, 50:2,

53:22, 55:25, 57:10, 58:20, 58:23, 59:13, 59:22, 60:5, 61:11, 62:4, 66:21, 66:25, 67:2, 67:10, 67:13, 67:22, 67:25, 68:1, 68:2, 69:18, 72:6, 76:23, 79:11
**monies** [7] - 42:13, 42:14, 42:25, 43:6, 48:22, 60:10, 60:11
**month** [3] - 18:8, 18:10, 18:14
**monthly** [2] - 51:9, 51:15
**months** [1] - 10:19
**morning** [5] - 6:15, 6:18, 80:15, 83:21, 84:1
**most** [1] - 84:9
**move** [12] - 12:22, 21:14, 25:1, 28:18, 34:20, 42:22, 49:4, 54:17, 61:18, 67:14, 72:16, 80:11
**MR** [163] - 2:16, 4:6, 4:9, 5:4, 5:9, 6:3, 6:18, 7:5, 7:18, 7:20, 8:13, 8:16, 8:19, 8:22, 8:25, 9:3, 9:16, 9:18, 9:20, 9:24, 10:15, 10:18, 12:22, 12:25, 16:25, 17:4, 18:21, 18:23, 19:25, 20:4, 20:17, 20:22, 21:14, 21:16, 21:20, 21:22, 21:25, 22:2, 23:22, 24:3, 24:19, 25:1, 25:4, 25:12, 25:14, 28:11, 28:13, 28:18, 28:20, 30:7, 30:15, 32:23, 32:25, 33:25, 34:3, 34:15, 34:20, 34:23, 36:3, 36:9, 39:4, 39:6, 40:18, 40:21, 42:22, 42:24, 49:4, 49:7, 50:8, 50:17, 51:5, 51:11, 51:14, 54:17, 54:19, 59:5, 59:9, 59:17, 59:24, 60:19, 60:21, 61:18, 61:21, 61:24, 62:1, 62:16, 62:18, 62:19, 62:22, 63:3, 63:7, 64:12, 64:16, 66:14, 67:14, 67:17, 67:19, 67:24, 68:4, 68:7, 68:9, 69:2, 69:6, 69:24, 70:11, 70:14, 71:13,

71:21, 72:2, 72:6, 72:15, 73:2, 75:1, 77:4, 77:19, 77:22, 78:12, 79:15, 79:19, 80:8, 80:11, 80:18, 80:21, 81:1, 81:4, 81:13, 81:15, 81:22, 82:2, 82:7, 82:9, 82:11, 82:14, 82:20, 82:23, 82:25, 83:4, 83:6, 83:9, 83:12, 83:24, 84:3, 84:9, 84:13, 84:25, 85:3, 85:7, 85:9, 85:15, 85:18, 85:24, 86:2, 86:3, 86:4, 86:5, 86:7, 86:10, 86:13, 86:15, 86:16, 86:22, 86:24, 86:25

### N

**name** [2] - 22:22, 36:19
**namely** [1] - 33:20
**Nationwide** [4] - 41:1, 41:12, 42:1, 71:4
**need** [3] - 50:23, 80:15, 84:17
**needed** [3] - 21:11, 21:12, 86:22
**needs** [1] - 6:1
**net** [3] - 53:1, 60:6, 60:10
**never** [21] - 4:21, 14:20, 16:20, 16:22, 24:9, 25:4, 25:5, 25:16, 25:20, 25:22, 28:4, 31:13, 46:20, 46:21, 55:1, 55:5, 55:21, 55:23, 58:1, 83:17, 84:5
**Newport** [1] - 2:19
**next** [1] - 81:8
**NICOLA** [2] - 2:4, 2:9
**nitty** [1] - 62:10
**nitty-gritty** [1] - 62:10
**nobody** [4] - 7:12, 13:3, 25:6, 51:18
**None** [1] - 3:15
**none** [6] - 4:23, 8:16, 43:6, 67:12, 73:1, 76:21
**nonresponsive** [8] - 12:23, 21:14, 25:2, 34:21, 42:22, 49:5, 54:17, 61:19
**noon** [1] - 85:12
**North** [1] - 2:11
**notebooks** [1] - 16:18

**notes** [2] - 17:16, 17:22
**nothing** [12] - 5:17, 5:22, 32:19, 42:10, 48:11, 49:18, 56:10, 68:5, 78:23, 80:24, 81:19, 82:12
**notice** [1] - 48:4
**noticed** [2] - 43:9, 84:19
**November** [6] - 48:5, 48:7, 50:1, 50:4, 75:18, 75:22
**number** [12] - 33:7, 38:14, 38:16, 42:1, 42:19, 47:12, 57:25, 64:20, 65:7, 65:10, 70:1, 75:9
**numbers** [2] - 41:3, 64:16

### O

**o'clock** [2] - 79:23, 80:19
**O661** [1] - 35:9
**objection** [16] - 7:18, 8:13, 19:25, 20:17, 25:12, 28:11, 33:25, 39:4, 51:11, 59:5, 61:24, 62:16, 64:12, 72:2, 77:19, 86:17
**Objection** [2] - 36:3, 40:18
**objections** [3] - 8:25, 9:20, 81:16
**obviously** [5] - 50:19, 80:13, 81:14, 83:19, 84:13
**occasion** [1] - 4:15
**occurred** [1] - 7:13
**occurrence** [1] - 10:19
**occurring** [1] - 7:11
**October** [1] - 82:1
**OF** [7] - 1:2, 1:5, 1:14, 2:1, 88:1, 88:3, 88:4
**offered** [1] - 3:15
**offhand** [1] - 43:22
**OFFICES** [1] - 2:17
**Official** [1] - 88:20
**OFFICIAL** [3] - 1:24, 88:1, 88:5
**often** [1] - 41:25
**old** [3] - 54:1, 70:9, 71:1
**omit** [1] - 30:19
**omitted** [1] - 30:19
**once** [1] - 83:7
**one** [35] - 18:21, 21:5, 21:6, 22:4, 23:11,

29:23, 30:3, 30:12, 32:23, 33:19, 37:3, 37:4, 37:5, 37:6, 37:7, 37:18, 38:23, 40:22, 41:4, 41:7, 41:12, 42:8, 51:18, 52:6, 55:20, 57:2, 68:4, 73:18, 73:22, 74:20, 75:21, 75:22, 82:14, 83:12, 85:3
**One** [2] - 33:11, 35:24
**ones** [1] - 14:16
**oOo** [1] - 87:5
**opened** [1] - 83:23
**opening** [2] - 86:3, 86:7
**opening-close** [2] - 86:3, 86:7
**opinion** [1] - 62:3
**opinions** [3] - 21:18, 50:12, 79:25
**orally** [1] - 83:6
**order** [2] - 21:12, 21:17
**ordered** [1] - 81:6
**originated** [1] - 56:15
**otherwise** [2] - 23:14, 28:17
**out-of-pocket** [1] - 52:24
**output** [4] - 19:10, 24:2, 38:1, 38:2
**outputs** [2] - 19:5, 25:7
**outside** [2] - 32:1, 72:3
**overruled** [16] - 8:14, 9:1, 9:21, 10:16, 17:1, 20:1, 20:18, 23:24, 36:5, 40:19, 51:12, 59:7, 61:25, 63:4, 64:13, 72:4
**owed** [8] - 21:24, 43:25, 59:13, 59:22, 73:8, 75:24, 76:7, 77:10
**owned** [4] - 43:16, 43:20, 44:10, 44:13

### P

**p.m** [3] - 50:16, 87:4
**P.M** [2] - 1:16, 4:2
**page** [18] - 14:16, 22:18, 40:21, 40:23, 43:6, 53:25, 54:1, 57:25, 69:25, 70:11, 70:14, 73:16, 73:17, 73:19, 73:21, 74:4, 74:6, 88:11

**PAGE** [1] - 3:2
**pages** [3] - 17:13, 64:5
**paid** [16] - 41:14, 41:16, 41:22, 45:12, 48:17, 48:20, 48:23, 49:23, 53:10, 55:18, 55:22, 66:25, 67:1, 67:7, 68:3, 71:6
**papers** [13] - 14:23, 14:24, 15:6, 15:7, 15:13, 15:19, 16:18, 17:5, 17:10, 17:16, 17:18, 18:11, 18:13
**parameters** [1] - 83:19
**parentheticals** [1] - 73:12
**part** [11] - 10:22, 12:11, 16:6, 22:4, 29:3, 34:20, 39:12, 49:14, 63:24, 65:13, 85:3
**particular** [6] - 22:3, 24:20, 27:17, 27:20, 31:18, 44:21
**partners** [3] - 44:1, 44:8, 44:9
**party** [2] - 28:1, 28:3
**pass** [1] - 29:14
**pasted** [1] - 5:19
**path** [1] - 55:8
**Pause** [2] - 18:22, 83:11
**pay** [2] - 37:9, 44:13
**payable** [1] - 41:12
**payment** [35] - 5:18, 5:19, 35:10, 37:10, 38:18, 39:3, 41:25, 45:18, 46:3, 46:5, 46:6, 46:7, 46:11, 50:4, 58:7, 58:15, 58:21, 59:13, 59:22, 60:5, 60:11, 61:4, 61:6, 61:11, 67:11, 67:23, 71:22, 71:23, 72:8, 72:11, 72:13, 72:24, 73:6, 73:23, 75:18
**payments** [13] - 40:5, 40:9, 40:23, 51:9, 51:15, 53:21, 54:11, 72:19, 74:14, 74:23, 75:21, 75:25, 76:4
**payor** [1] - 45:5
**PDFs** [2] - 14:15, 17:20
**pendency** [1] - 13:7
**people** [5] - 7:14, 13:24, 42:7, 44:1, 44:9
**percent** [24] - 19:16,

19:17, 20:16, 21:1, 21:3, 43:20, 63:17, 63:23, 63:25, 64:3, 64:11, 64:14, 64:17, 64:18, 64:19, 65:14, 65:15, 65:16, 65:18, 66:4, 66:8, 66:14, 66:16, 79:11
**percipient** [1] - 84:21
**perform** [4] - 17:3, 21:7, 21:12, 21:13
**performed** [2] - 15:14, 18:1
**performing** [1] - 19:3
**period** [1] - 49:15
**permitted** [1] - 80:13
**personal** [4] - 36:4, 43:13, 44:13, 44:14
**Phan** [7] - 28:6, 62:10, 62:11, 62:24, 63:9, 76:13, 79:4
**Phan's** [1] - 63:9
**phase** [1] - 82:1
**phone** [1] - 84:5
**phrase** [3] - 18:24, 18:25, 19:1
**placed** [1] - 4:19
**Plaintiff** [1] - 1:6
**PLAINTIFF** [1] - 2:3
**planning** [2] - 84:22, 86:14
**Plaza** [1] - 2:18
**plus** [4] - 48:4, 50:18, 57:11, 57:15
**pocket** [1] - 52:24
**point** [4] - 6:18, 59:14, 60:12, 73:6
**pointed** [2] - 36:7, 70:8
**policy** [1] - 13:18
**portion** [2] - 56:16, 56:21
**posed** [1] - 82:5
**position** [6] - 77:5, 77:7, 77:8, 81:12, 81:15, 81:17
**possible** [3] - 8:17, 20:3, 47:2
**potentially** [1] - 20:21
**practicalitywise** [1] - 82:15
**practice** [2] - 29:2, 29:12
**precise** [1] - 75:12
**preliminary** [1] - 86:1
**preparation** [2] - 81:18, 81:24
**prepare** [4] - 16:4, 17:2, 18:3, 18:14
**prepared** [8] - 15:8,

15:17, 16:10, 16:16, 16:22, 51:7, 66:1, 70:20
**preparing** [2] - 18:7, 66:18
**presence** [4] - 4:5, 6:25, 50:21, 80:5
**present** [3] - 7:10, 7:14, 16:13
**preserve** [2] - 13:21, 13:25
**pretty** [3] - 32:16, 52:19, 53:4
**prevent** [1] - 11:23
**previously** [1] - 83:15
**principle** [1] - 19:6
**printout** [3] - 39:22, 54:5, 70:5
**printouts** [1] - 24:13
**privy** [1] - 7:21
**PRO** [1] - 2:14
**problem** [1] - 85:19
**procedures** [1] - 15:14
**proceedings** [4] - 18:22, 83:11, 87:2, 88:10
**PROCEEDINGS** [1] - 1:14
**Proceedings** [1] - 87:4
**produced** [3] - 4:12, 4:24, 48:2
**product** [4] - 5:14, 5:15, 6:12, 17:9
**proffer** [1] - 80:16
**program** [5] - 11:18, 12:2, 12:9, 14:21, 22:21
**Promise** [2] - 62:11, 63:9
**properly** [1] - 44:16
**propose** [1] - 80:12
**proposition** [1] - 6:14
**proprietor** [1] - 44:17
**prosecutors** [4] - 6:6, 7:21, 7:24, 10:13
**protocol** [1] - 29:17
**provide** [5] - 5:21, 5:23, 6:4, 21:18, 68:23, 80:15, 83:1, 85:13
**provided** [20] - 21:11, 24:14, 26:2, 27:6, 28:15, 29:20, 30:20, 30:23, 31:5, 31:23, 47:5, 49:20, 52:11, 56:24, 66:7, 68:25, 77:11, 77:12, 77:16, 84:15
**provides** [1] - 4:16

**providing** [1] - 83:13
**public** [2] - 19:7, 74:19
**publicly** [1] - 43:23
**pull** [13] - 39:18, 69:2, 69:6, 69:24, 70:15, 70:19, 71:13, 72:15, 72:16, 73:2, 75:1, 75:15, 76:3
**pulled** [2] - 63:17, 65:16
**purpose** [1] - 15:13
**pursuant** [2] - 80:12, 88:8
**put** [11] - 5:20, 17:18, 29:4, 29:14, 49:9, 49:12, 49:17, 51:16, 56:12, 56:17, 57:3
**putting** [1] - 57:13

**Q**

**QUESTION** [5] - 22:25, 23:3, 23:7, 23:11, 23:14
**questions** [14] - 7:24, 8:3, 8:6, 22:12, 25:13, 32:7, 57:6, 65:20, 65:21, 70:1, 70:4, 73:3, 77:1, 79:15
**quick** [1] - 82:14
**QuickBooks** [33] - 23:6, 23:8, 23:20, 24:1, 24:7, 24:8, 24:21, 26:1, 26:14, 26:16, 26:22, 28:9, 28:10, 28:14, 28:15, 28:20, 28:22, 29:5, 29:7, 29:9, 29:14, 29:20, 30:3, 30:11, 31:4, 32:20, 40:11, 40:16, 47:14, 52:1, 52:4, 60:17, 68:16

**R**

**raise** [2] - 4:6, 83:25
**raised** [1] - 4:10
**reach** [2] - 21:8, 21:17
**reaching** [1] - 71:8
**read** [15] - 23:17, 30:7, 30:9, 59:17, 59:20, 63:14, 63:19, 63:20, 64:9, 67:17, 67:20, 78:4, 78:6, 79:2, 79:7
**REALTIME** [1] - 88:5
**reason** [8] - 12:20, 16:1, 25:4, 25:16,

28:17, 31:13, 42:2, 54:23
**reasonable** [1] - 58:14
**rebuttal** [3] - 86:5, 86:9, 86:14
**receipt** [1] - 58:12
**receive** [10] - 42:13, 42:14, 42:18, 43:3, 48:13, 48:19, 48:22, 50:2, 56:16, 65:7
**received** [19] - 26:13, 42:10, 42:20, 42:24, 42:25, 46:19, 48:10, 48:14, 50:4, 56:9, 56:21, 66:21, 66:25, 67:2, 67:6, 67:9, 67:21, 68:2, 76:12
**receiving** [2] - 67:24, 68:1
**recess** [2] - 6:23, 50:10
**Recess** [1] - 50:16
**recognize** [3] - 71:25, 72:5, 72:11
**recollection** [6] - 8:22, 12:2, 18:15, 18:18, 22:25, 40:10
**record** [7] - 14:24, 30:9, 32:24, 59:20, 67:20, 78:6, 80:6
**recorded** [1] - 47:14
**records** [9] - 40:5, 40:23, 41:11, 41:19, 41:24, 41:25, 46:18, 46:20, 49:15
**recover** [1] - 13:10
**Recross** [1] - 3:4
**RECROSS** [1] - 77:3
**Recross-Examination** [1] - 3:4
**RECROSS-EXAMINATION** [1] - 77:3
**red** [5] - 42:9, 50:5, 56:9, 56:12, 73:11
**REDIRECT** [1] - 68:8
**Redirect** [1] - 3:4
**Redirect-Examination** [1] - 3:4
**refer** [4] - 12:17, 12:21, 17:7, 17:9
**referred** [3] - 18:10, 18:13, 53:19
**referring** [1] - 53:15
**reflect** [4] - 15:15, 29:9, 36:21, 50:5
**reflected** [7] - 24:21, 24:22, 34:13, 37:12,

48:25, 68:16, 75:21
**reflects** [2] - 24:1, 46:12
**refresh** [2] - 18:14, 18:18
**refreshed** [1] - 23:1
**regard** [1] - 5:15
**regards** [1] - 82:16
**Regnier** [14] - 22:16, 24:2, 24:4, 25:8, 29:6, 38:1, 38:3, 38:5, 52:5, 53:13, 78:14, 78:15, 78:25, 79:1
**regular** [3] - 10:18, 10:20, 79:23
**regulations** [1] - 88:12
**relate** [1] - 27:24
**related** [16] - 14:12, 23:25, 32:13, 32:18, 37:22, 42:21, 46:14, 47:10, 47:13, 51:23, 52:15, 69:3, 71:9, 76:11, 77:14, 82:17
**relates** [6] - 12:3, 12:16, 32:18, 45:7, 51:20, 65:1
**relating** [11] - 5:10, 6:6, 6:9, 12:7, 13:25, 14:10, 29:13, 57:14, 62:10, 62:23, 83:19
**release** [4] - 81:5, 81:9, 81:18, 81:21
**relevance** [1] - 63:3
**Relevance** [2] - 8:13, 62:16
**reliable** [1] - 19:9
**relied** [4] - 27:1, 28:15, 29:6, 29:19
**rely** [3] - 19:9, 23:11, 63:10
**remain** [3] - 65:8, 65:10, 79:16
**remaining** [1] - 72:23
**remember** [20] - 22:19, 22:22, 22:24, 46:1, 50:11, 66:22, 66:23, 68:20, 71:14, 72:22, 73:3, 73:8, 74:17, 75:6, 75:7, 77:23, 77:24, 79:5, 79:6, 79:24
**remitter** [1] - 69:12
**repeat** [3] - 6:16, 30:6, 60:8
**repeating** [1] - 6:15
**reported** [1] - 88:10
**REPORTER** [3] - 1:24, 88:1, 88:6
**Reporter** [1] - 88:20

**REPORTER'S** [1] - 1:14
**represent** [4] - 4:19, 22:15, 33:9, 72:13
**represented** [1] - 83:15
**represents** [1] - 72:14
**repurchase** [2] - 63:11, 63:18
**request** [2] - 81:4, 81:18
**require** [1] - 81:20
**research** [3] - 5:12, 50:13, 80:2
**reserving** [1] - 50:19
**rests** [1] - 79:20
**resume** [1] - 79:23
**resumed** [2] - 3:3, 7:4
**RESUMED** [1] - 7:3
**review** [4] - 4:14, 14:8, 24:23, 28:3
**reviewed** [3] - 18:4, 25:25, 47:16
**Ricci** [5] - 61:1, 61:6, 61:11, 74:16, 74:20
**rights** [1] - 50:19
**rise** [2] - 50:15, 80:4
**Roasters** [2] - 73:4, 73:24, 74:5
**ROOM** [1] - 1:24
**rounded** [1] - 70:13
**row** [7] - 36:9, 36:10, 71:21, 71:22, 72:8, 72:9, 76:11
**rows** [3] - 71:17, 71:19, 72:18
**Rule** [2] - 6:13, 80:12

# S

**SACR-19-00061-JVS** [1] - 1:7
**Sagel** [2] - 10:8, 13:5
**SAGEL** [14] - 2:5, 79:19, 80:8, 81:15, 82:14, 82:20, 82:23, 84:13, 85:3, 86:3, 86:5, 86:10, 86:22, 86:24
**SANTA** [3] - 1:17, 1:25, 4:1
**Santa** [1] - 2:7
**save** [4] - 12:12, 12:15, 12:17, 12:19
**saved** [4] - 11:23, 12:13, 12:14, 13:16
**saw** [5] - 24:25, 34:8, 46:20, 62:11, 63:23
**scope** [8] - 31:19, 31:20, 31:22, 32:1,

63:1, 63:5, 72:3, 77:20
**scroll** [1] - 73:14
**SE** [1] - 2:14
**sealed** [1] - 87:2
**second** [2] - 34:20, 82:1
**Section** [1] - 88:8
**see** [52] - 22:13, 22:14, 26:25, 27:16, 27:19, 27:23, 32:10, 33:12, 33:13, 33:14, 34:6, 36:12, 39:10, 40:5, 41:1, 41:4, 41:6, 41:8, 41:11, 44:23, 44:25, 45:5, 45:6, 45:13, 45:15, 45:19, 45:20, 46:18, 47:7, 51:21, 51:24, 52:21, 52:22, 53:2, 53:3, 54:1, 54:11, 54:13, 56:3, 57:23, 58:17, 61:2, 61:3, 61:5, 69:8, 73:14, 74:4, 74:5, 74:7, 75:14, 78:21
**seeing** [1] - 84:13
**self** [1] - 81:7
**self-surrender** [1] - 81:7
**SELNA** [1] - 1:3
**send** [2] - 35:4, 82:17
**sensitive** [2] - 85:10, 85:11
**sent** [4] - 11:9, 70:17, 71:23, 72:10
**separate** [1] - 87:3
**September** [6] - 75:13, 81:7, 81:10, 81:20, 82:6, 82:7
**serious** [6] - 13:1, 19:13, 19:20, 20:7, 20:15, 21:1
**served** [3] - 84:24, 85:1, 85:2
**servers** [1] - 15:12
**service** [2] - 84:25, 85:2
**session** [2] - 80:25, 82:13
**setting** [1] - 21:3
**settings** [1] - 15:3
**settlement** [30] - 31:18, 42:10, 42:16, 42:25, 48:4, 48:10, 48:14, 48:20, 48:22, 51:10, 51:16, 56:2, 56:10, 57:23, 58:3, 59:4, 64:3, 66:25, 67:1, 67:7, 67:10,

67:23, 68:2, 69:17, 72:7, 72:14, 72:21, 76:13, 76:23, 77:6
**Settlement** [1] - 52:24
**settlements** [4] - 66:22, 67:3, 67:10, 67:22
**several** [1] - 23:22
**share** [1] - 59:4
**sheet** [3] - 48:25, 55:10, 78:2
**shortcut** [1] - 60:22
**show** [5] - 6:20, 22:10, 33:10, 34:13, 36:24
**showing** [1] - 26:19
**shown** [1] - 43:6
**similar** [2] - 47:16, 75:15
**simple** [5] - 20:14, 32:16, 52:19, 53:4, 55:9
**six** [2] - 10:19, 58:11
**sizable** [1] - 74:7
**slightly** [1] - 61:13
**small** [2] - 41:3, 41:12
**software** [8] - 11:18, 12:2, 12:8, 14:20, 21:19, 55:5, 55:7, 57:14
**sole** [1] - 44:17
**someone** [3] - 53:22, 84:18, 84:20
**sometime** [1] - 80:14
**sometimes** [1] - 40:14
**somewhere** [1] - 62:11
**sorry** [14] - 20:19, 24:19, 30:6, 32:23, 44:5, 55:22, 58:8, 60:8, 70:20, 72:16, 78:19, 79:12, 79:13, 86:4
**source** [3] - 38:25, 46:11, 77:17
**sources** [3] - 32:21, 52:4, 52:6
**SOUTHERN** [1] - 1:2
**Spaan** [1] - 88:20
**SPAAN** [3] - 1:23, 88:5, 88:19
**Special** [1] - 13:5
**specific** [2] - 8:5, 30:25
**specifically** [2] - 10:2, 71:17
**speculation** [2] - 10:15, 51:11
**spend** [1] - 85:21
**splitting** [1] - 86:14
**spot** [2] - 19:16, 19:17

**spot-on** [2] - 19:16, 19:17
**spreadsheet** [9] - 29:9, 47:16, 52:3, 52:5, 53:12, 60:18, 70:16, 70:25, 71:3
**spreadsheets** [11] - 24:1, 24:5, 25:7, 25:10, 29:6, 30:4, 30:12, 31:5, 32:20, 53:14, 53:16
**Spring** [1] - 2:11
**stand** [6] - 4:7, 8:23, 14:3, 16:23, 17:8, 18:2
**STAND** [1] - 7:3
**standard** [1] - 20:21
**STANDBY** [1] - 2:16
**started** [2] - 4:12, 5:5
**STATE** [1] - 88:4
**statement** [1] - 42:25
**statements** [3] - 4:11, 6:11, 15:15
**STATES** [2] - 1:1, 1:5
**States** [7] - 2:4, 2:5, 2:9, 2:10, 88:6, 88:8, 88:13
**statute** [2] - 4:18, 5:3
**stay** [1] - 6:1
**stenographically** [1] - 88:10
**step** [2] - 63:19, 63:20
**steps** [1] - 27:13
**STEWARD** [2] - 2:17, 2:18
**still** [3] - 73:7, 74:1, 80:15
**stolen** [1] - 38:22
**stop** [1] - 79:22
**Street** [2] - 2:6, 2:11
**STREET** [1] - 1:24
**stretch** [1] - 50:24
**stricken** [9] - 12:24, 25:3, 28:19, 34:22, 42:23, 49:6, 54:18, 61:20, 67:16
**strike** [21] - 11:17, 12:22, 15:6, 16:3, 21:14, 24:6, 25:1, 26:5, 27:2, 27:18, 28:18, 33:22, 34:20, 42:13, 42:22, 49:4, 49:8, 54:17, 61:18, 67:14, 79:2
**structure** [1] - 83:22
**stuff** [1] - 5:17
**subject** [6] - 11:10, 12:7, 13:18, 79:18, 79:19, 81:16
**submission** [1] -

80:20
**submit** [1] - 82:16
**submitted** [2] - 50:13, 80:1
**substance** [1] - 5:10
**substantive** [2] - 5:13, 5:16
**sufficient** [1] - 45:17
**suggested** [1] - 65:2
**Suite** [3] - 2:6, 2:11, 2:19
**summaries** [1] - 17:23
**summarized** [1] - 28:22
**summary** [1] - 30:22
**Sunrise** [1] - 46:7
**supporting** [1] - 17:23
**supposed** [1] - 62:4
**surrender** [1] - 81:7
**suspend** [1] - 11:19
**sustained** [11] - 7:19, 8:21, 9:17, 21:21, 22:1, 28:12, 34:2, 39:5, 60:20, 62:17, 77:21
**switch** [1] - 34:16
**system** [2] - 11:14, 12:13

## T

**Tabs** [33] - 14:11, 14:22, 23:1, 23:4, 23:5, 23:8, 23:21, 24:2, 24:9, 24:12, 24:22, 25:5, 25:15, 25:17, 25:23, 29:14, 37:25, 39:23, 40:12, 40:17, 47:15, 47:19, 54:5, 54:14, 54:20, 54:24, 55:1, 55:2, 57:14, 58:1, 68:16, 70:5
**tailor** [1] - 5:1
**takeaway** [1] - 64:10
**team** [1] - 13:23
**temporary** [4] - 81:5, 81:9, 81:18, 81:20
**ten** [3] - 16:8, 33:5, 33:9
**term** [1] - 15:3
**terms** [5] - 64:7, 64:8, 81:5, 81:13, 82:5
**testified** [8] - 29:24, 38:3, 38:5, 41:13, 41:19, 73:11, 74:19, 74:21
**testify** [9] - 16:5, 16:11, 16:17, 18:3, 18:7, 18:14, 18:19,

83:14, 84:16
**testimony** [17] - 4:23, 5:10, 6:6, 6:19, 7:15, 10:14, 11:11, 12:8, 14:8, 15:24, 22:10, 22:16, 40:6, 41:10, 41:21, 61:24, 84:3
**THE** [118] - 2:3, 2:14, 3:3, 4:8, 5:2, 5:7, 5:25, 6:16, 6:22, 7:1, 7:3, 7:19, 8:14, 8:15, 8:21, 9:1, 9:2, 9:17, 9:21, 9:22, 10:16, 10:17, 12:24, 17:1, 17:2, 20:1, 20:2, 20:18, 20:19, 21:15, 21:21, 22:1, 23:24, 23:25, 24:17, 25:3, 25:13, 28:12, 28:19, 30:8, 30:14, 34:2, 34:22, 36:5, 36:6, 39:5, 40:19, 40:20, 42:23, 49:6, 50:9, 50:15, 50:22, 50:25, 51:2, 51:12, 51:13, 54:18, 59:7, 59:8, 59:19, 60:20, 61:20, 61:25, 62:17, 62:21, 63:4, 63:5, 64:13, 64:14, 66:11, 67:16, 67:18, 68:6, 72:4, 72:5, 77:2, 77:21, 78:5, 78:10, 79:17, 79:21, 80:4, 80:6, 80:10, 80:17, 80:19, 80:23, 81:3, 81:11, 81:25, 82:4, 82:8, 82:10, 82:12, 82:19, 82:22, 82:24, 83:3, 83:5, 83:8, 83:22, 84:2, 84:6, 84:12, 84:24, 85:5, 85:8, 85:12, 85:16, 85:20, 85:25, 86:6, 86:9, 86:12, 86:21, 86:23, 87:1
**therefore** [1] - 27:13
**third** [2] - 28:1, 28:3
**third-party** [2] - 28:1, 28:3
**thoroughness** [1] - 66:18
**thousand** [1] - 17:13
**three** [12] - 4:19, 13:6, 37:17, 37:19, 56:2, 56:6, 64:5, 76:4, 76:6, 76:14, 84:11, 86:20
**Thursday** [2] - 84:10, 85:22

**tick** [1] - 17:15
**Timeslips** [1] - 22:23
**timetable** [1] - 65:10
**timing** [1] - 82:15
**Title** [1] - 88:8
**today** [2] - 15:19, 80:17
**together** [1] - 17:18
**took** [5] - 6:23, 8:23, 18:2, 39:9, 64:19
**top** [3] - 52:23, 69:12, 78:21
**topic** [4] - 8:9, 10:1, 31:25, 83:23
**topics** [11] - 8:4, 8:7, 8:11, 8:17, 8:18, 8:24, 9:3, 9:7, 9:8, 9:10, 9:25
**total** [13] - 32:13, 40:16, 48:7, 48:10, 56:5, 57:10, 63:11, 63:18, 65:4, 65:7, 70:12, 75:25
**Total** [3] - 42:9, 56:9, 76:12
**tough** [1] - 17:12
**toughest** [1] - 50:23
**traced** [1] - 39:9
**tracked** [1] - 21:23
**traded** [1] - 43:23
**training** [1] - 64:22
**Tran** [4] - 28:7, 62:11, 63:9, 76:14
**transaction** [1] - 63:13
**transcribed** [1] - 87:3
**TRANSCRIPT** [2] - 1:6, 1:14
**transcript** [3] - 22:13, 88:9, 88:11
**transfer** [10] - 33:14, 34:4, 34:6, 34:8, 35:9, 35:24, 45:17, 71:25, 74:5, 74:10
**transferred** [2] - 34:10, 76:22
**trial** [6] - 14:8, 16:11, 81:17, 81:19, 82:1
**TRIAL** [1] - 1:7
**trials** [1] - 16:14
**true** [21] - 18:11, 21:22, 25:6, 25:18, 25:21, 28:6, 28:14, 31:8, 31:14, 36:2, 40:14, 40:17, 47:23, 49:19, 49:23, 50:3, 50:6, 55:25, 56:25, 67:3, 88:9
**trust** [5] - 44:23, 67:13, 69:17, 74:24, 76:22

**truthful** [1] - 40:8
**try** [3] - 26:11, 26:18, 50:19
**Tuesday** [11] - 79:23, 80:15, 80:19, 81:6, 83:1, 83:14, 83:21, 84:1, 84:8, 84:23, 85:21
**two** [26] - 6:8, 7:8, 7:14, 12:6, 17:23, 19:12, 19:23, 20:11, 20:24, 24:25, 32:21, 52:4, 52:6, 62:19, 71:17, 72:18, 75:21, 75:25, 80:16, 83:10, 84:11, 84:15, 84:17, 84:20, 84:22, 86:19
**two-and-a-half** [4] - 6:8, 7:8, 12:6, 17:23
**two-hour** [1] - 84:20
**two-question** [1] - 62:19
**type** [1] - 39:8
**typically** [2] - 14:24, 15:1

## U

**U.S** [1] - 1:3
**unable** [1] - 9:18
**under** [10] - 31:9, 54:12, 54:20, 57:1, 57:4, 60:2, 60:6, 61:22, 87:3
**underlie** [1] - 17:25
**underlying** [1] - 40:5
**understood** [19] - 19:6, 19:12, 19:15, 19:19, 19:21, 19:23, 20:6, 20:11, 20:14, 20:25, 21:7, 31:24, 43:19, 43:21, 46:14, 80:18, 83:24, 85:7, 85:24
**undertook** [1] - 27:11
**UNITED** [2] - 1:1, 1:5
**United** [7] - 2:4, 2:5, 2:9, 2:10, 88:6, 88:8, 88:13
**unless** [1] - 86:22
**unreliable** [1] - 19:5
**up** [24] - 4:9, 32:9, 34:16, 39:18, 40:25, 44:16, 69:2, 69:6, 69:24, 70:15, 70:19, 70:20, 71:13, 71:21, 72:15, 72:16, 73:2, 75:1, 75:2, 75:15, 76:3, 84:19, 84:22, 85:6

**updated** [4] - 26:20, 56:23, 57:1, 57:2
**upwards** [1] - 20:13
**USA** [1] - 72:10

## V

**Vague** [2] - 20:17, 64:12
**valuation** [4] - 62:12, 62:15, 62:22
**value** [1] - 50:5
**various** [1] - 29:22
**vendors** [1] - 27:20
**verify** [5] - 27:9, 32:19, 52:9, 71:5, 71:11
**verifying** [1] - 79:19
**version** [3] - 30:3, 30:11, 31:4
**versus** [1] - 40:12
**via** [1] - 82:17
**violence** [1] - 83:16
**virtually** [2] - 5:16, 5:22
**voice** [1] - 24:17
**VOLUME** [1] - 1:9
**voluminous** [1] - 17:10
**vs** [1] - 1:7

## W

**waiting** [3] - 6:17, 22:12, 81:7
**week** [3] - 50:23, 81:9, 84:25
**weekend** [4] - 6:2, 80:3, 82:18, 82:21
**weeks** [2] - 7:8, 9:12
**West** [2] - 2:6, 46:7
**WEST** [1] - 1:24
**Whiteside** [1] - 51:10
**wholly** [1] - 44:13
**widely** [1] - 19:6
**wire** [4] - 58:12, 71:22, 71:25, 72:8
**wish** [1] - 41:21
**withdraw** [3] - 36:6, 78:13, 78:14
**withdrawal** [3] - 37:17, 38:25, 45:13
**withdrawals** [2] - 73:12, 74:23
**withdrawn** [3] - 70:22, 72:20, 72:23
**withdrew** [1] - 75:12
**witness** [6] - 6:4, 6:7, 6:11, 66:12, 84:16, 84:23
**WITNESS** [18] - 7:3,

8:15, 9:2, 9:22,
10:17, 17:2, 20:2,
20:19, 23:25, 30:14,
36:6, 40:20, 51:13,
59:8, 63:5, 64:14,
72:5, 78:10
**witness's** [1] - 4:23
**witnesses** [5] - 6:19,
16:5, 17:2, 83:1,
85:5
**WITNESSES** [1] - 3:2
**Word** [1] - 17:21
**works** [3] - 32:15,
52:18, 65:6
**worth** [2] - 39:7, 48:2
**write** [2] - 58:5, 83:9
**written** [7] - 6:5, 6:10,
12:3, 14:4, 14:24,
39:25, 80:20
**wrote** [3] - 39:25,
41:17, 53:19
**WYMAN** [47] - 2:10,
5:9, 7:18, 8:13, 8:19,
8:25, 9:16, 9:20,
10:15, 16:25, 19:25,
20:17, 21:20, 21:25,
23:22, 25:12, 28:11,
33:25, 36:3, 39:4,
40:18, 51:11, 59:5,
60:19, 61:24, 62:16,
63:3, 64:12, 68:7,
68:9, 69:2, 69:6,
69:24, 70:11, 70:14,
71:13, 71:21, 72:6,
72:15, 73:2, 75:1,
77:19, 86:2, 86:4,
86:7, 86:15, 86:25
**Wyman** [13] - 3:4, 5:8,
10:8, 13:5, 39:19,
40:2, 41:18, 43:11,
44:20, 46:24, 58:18,
68:6, 79:4

## X

**X-Law** [1] - 71:24

## Y

**years** [11] - 4:20, 6:8,
12:6, 16:8, 17:23,
19:13, 19:23, 20:12,
20:24, 76:5, 76:6
**yesterday** [3] - 15:21,
18:2, 22:19
**yourself** [1] - 6:16

## Z

**zero** [2] - 76:14, 76:17

UNITED STATES DISTRICT COURT