Michael John Avenatti (Pro Se)

H. Dean Steward, SBN 85317
17 Corporate Plaza, Suite 254
Newport Beach, California 92660
Tel (949) 481-4900
Fax (949) 497-6753

Advisory Counsel for Defendant
MICHAEL JOHN AVENATTI

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>     v.<br><br>MICHAEL JOHN AVENATTI,<br><br>    Defendant. | SA CR No. 19-061-JVS<br><br>DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, MOTION FOR MISTRIAL, DUE TO THE GOVERNMENT'S (1) FAILURE TO PRODUCE INFORMATION AS REQUIRED BY RULE 16, *BRADY*, AND *GIGLIO*, AND (2) CONTEMPT OF THIS COURT'S JANUARY 25, 2021 ORDER |

Defendant MICHAEL JOHN AVENATTI ("Mr. Avenatti") by and through his counsel of record, H. Dean Steward, hereby moves and files his Motion to Dismiss or, in the Alternative, Motion for Mistrial due to the Government's (1) Failure to Produce Information as Required by Rule 16, *Brady, Giglio*, and (2) Contempt of this Court's January 25, 2021 Order. Defendant's motion is based on the attached memorandum of points and authorities; the evidence referenced in the attached; the files, records and transcripts in this case and the other cases cited herein; and such further evidence and argument as the Court may permit at a hearing on this matter.

//

//

Dated:  August 15, 2021

Respectfully submitted,

/s/ Michael J. Avenatti

Defendant
MICHAEL JOHN AVENATTI

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES………………………………………..……………ii

MEMORANDUM OF POINTS AND AUTHORITIES…………………………1

   I.     INTRODUCTION……………………………………………..…..2

   II.    FACTUAL BACKGROUND…………………………………………3

      A. Calculation of Costs – The Need for both QuickBooks & Tabs……………3

      B. Diligent & Consistent Requests for this Material…………………………...5

   III.   LEGAL STANDARD………………...……………………………………11

   IV.   ARGUMENT…………………………………………………….....18

   V.    CONCLUSION…………………………………………………….20

# TABLE OF AUTHORITIES

**CASES:**                                                                    **Page**

*Banks v. Dretke,*
540 U.S. 668 (2004) …………………………………………………..13

*Benn v. Lambert,*
283 F.3d 1040 (9th Cir. 2002)………………………………………..13

*Brady v. Maryland,*
373 U.S. 83 (1963)…...……………………………………………*passim*

*Comstock v. Humphries,*
786 F.3d 701 (9th Cir. 2015)…..……………………………………13

*DiSabatino v. State Bar,*
27 Cal. 3d 159 (1980)………………………………………………..15

*Giglio v. United States,*
405 U.S. 150 (1972)……………………………………………...12,14

*McNabb v. United States,*
318 U.S. 332 (1943) …………………………………………………17

*Milke v. Ryan,*
711 F.3d 998 (9th Cir. 2013) …………………………………….....13

*N. Mariana Islands v. Bowie,*
243 F.3d 1109 (9th Cir. Haw. 2001)………………………………..15

*People v. Centino,*
60 Cal. 4th 659 (2014)………………………………………………15

*Reis-Campos v. Biter,*
832 F.3d 968 (9th Cir. 2016)…..……………………………………13

*Strickler v. Greene,*
527 U.S. 263 (1999)…………………………………………………13

*United States v. Barrera-Moreno*,
951 F.2d 1089 (9th Cir. 1991)……………………………………………………..17

*United States v. Blanco*,
392 F.3d 382 (9th Cir. 2004)…..………………………………………………….12

*United States v. Brumel-Alvarez*,
991 F.2d 1452 (9th Cir. 1992)……………………………………………………12

*United States v. Bruce*,
984 F.3d 884 (9th Cir. 2021)…..…………………………………………………16

*United States v. Bundy*,
968 F.3d 1019 (9th Cir. 2020)………………………………………...……………*passim*

*United States v. Hastings*,
461 U.S. 499 (1983)…………………………………………………………..17

*United States v. Hernandez-Meza*,
720 F.3d 760 (9th Cir. 2013)…………..…………………………………………14

*United States v. Layton*,
90 F.R.D. 514 (N.D. Cal. 1981)…………..………………………………………16

*United States v. Nixon*,
418 U.S. 683 (1974) ……………………………………………………………16

*United States v. Olsen*,
704 F.3d 1172 (9th Cir. 2013)…………………………………………………12,16

*United States v. Paxson*,
861 F.2d 730 (D.C. Cir. 1988)……………………………………………………15

*United States v. Price*,
566 F.3d 900 (9th Cir. 2009)…………..…………………………………………12,13

*United States v. Sanders*,
2010 U.S. Dist. LEXIS 99550 (D. Mont. 2010) ………………………………16

*United States v. Struckman*,
611 F.3d 560 (9th Cir. 2010)……………………………………………….…..17

*United States v. Zuno-Acre*,
44 F.3d 1420 (9th Cir. 1997) …………………………………………..13,20

**RULES:**

Cal. R. Prof. Cond. 3.4……………………………………………………..15

Cal. R. Prof. Cond. 3.8……………………………………………………12,15

Fed. R. Crim. P. 16………………………………………………………...14

**FEDERAL STATUTORY AUTHORITY:**

28 U.S.C. § 530B……………………………………………………...…12,15

**OTHER AUTHORITES:**

Justice Manual 9-5.001(B)(1) …………………………………………….12

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   <u>INTRODUCTION</u>

Throughout the trial and even before trial, a central theme of the defense has been that Mr. Avenatti was entitled at all times to his attorney's fees earned in connection with his legal services for his clients, as well as all expenses, costs and advances, and that it is the obligation of the government to show beyond a reasonable doubt that Mr. Avenatti was never entitled to any of the monies referenced in the first ten counts of the Indictment. Indeed, this theme was introduced to the jury during the defendant's opening statement, including when Mr. Avenatti wrote on the top of his flip chart "Calculation" and explained how to calculate net client settlement amounts.  *See, e.g.,* Trial Tr. (7/21/21, Vol. 1) p. 68. Mr. Avenatti has continued to focus on this theme with many of the government witnesses during trial, including his former clients.  The government has likewise elicited testimony on the topic from numerous witnesses, including the government's expert witness Mr. John Drum, who the government used to (1) allegedly calculate the applicable fees and costs to be deducted from each client settlement and (2) admit exhibits allegedly showing these same calculations. *See, e.g.,* government exhibits 420, 430, 439, 444.  <u>Put bluntly, this is the sine qua non of this case.</u>

Mr. Avenatti's former Office Manager, Judy Regnier, testifying as a government witness, stated that to properly calculate the costs associated with any given client matter, Eagan Avenatti, LLP ("EA, LLP") utilized two separate accounting software programs - QuickBooks and Tabs. Both were maintained on the EA, LLP servers and both are required to properly determine whether a client is owed any money and, if so, how much. Before trial, the government produced one version of the QuickBooks data file in discovery, although it is unclear where it came from[1] or whether it was even the

---

[1] There has been a suggestion that the copy was located at Ms. Regnier's home although this is unclear.  This is but one of the myriad authentication and foundation problems associated with the data.

most-recent version kept by the law firm.  The file also suffers from a myriad of authentication and foundational problems, which probably explains why it has not been entered into evidence or even found to have been admissible.  As for Tabs, the government has never produced the data nor has Mr. Avenatti ever been given access to the electronic Tabs data despite his requests and its clear relevance and importance to the defense.

On August 12, 2021, Mr. Avenatti raised the issue relating to his access to the Tabs data with the Court, "Your Honor, in preparing for Mr. Drum's testimony today, it became apparent to me that the government has not produced the Tabs data relating to the costs to various clients. That is a serious Brady and Giglio violation." *See, e.g.,* Trial Tr. (8/12/21, Vol. 1) p. 18. Mr. Avenatti asked, "If I am wrong and it has been produced, I would like to know where on the index it is or what the production is." *See, e.g.,* Trial Tr. (8/12/21, Vol. 1) p. 18.  The government did not provide any substantive response.

On August 13, 2021, Mr. Avenatti again requested that the government provide him with information regarding where he could find the Tabs data in the discovery, "Where is the Tabs data? I just need a Bates stamp number. I don't need to argue this point. I just want the government to provide the Bates stamp number for the Tabs data which they have had for two-and-a-half years." *See, e.g.,* Trial Tr. (8/13/21, Vol. 1) p. 15. AUSA Sagel stated, "I will start with the obvious. Everything that is in the prosecution team's possession he has." The Court asked again, "Does the government have the Tabs data?" *See, e.g.,* Trial Tr. (8/13/21, Vol. 1) p. 16. Rather than provide a simple "yes" or "no" answer, AUSA Sagel instead stated, "With regard to the Tabs, I don't know where – if it even exists and so forth. So I don't know about the extractions. We don't have anything in our database separate of Tabs and so forth." *See, e.g.,* Trial Tr. (8/13/21, Vol. 1) p. 17.

As demonstrated below, the government has been in possession of the Tabs data, and likely other versions of the QuickBooks data, including more current versions, since

seizing the law firm servers in early 2019 – approximately two and a half years ago. And yet, inexplicably, they failed to produce this critical, highly relevant information to the defendant despite the requirements of Rule 16, *Brady, Giglio*, and this Court's January 25, 2021 Order directing the government to comply with certain discovery obligations.  To compound matters, for over two years, the government represented to the Court and the defense that no financial information relating to the clients had been withheld and that the government had fully complied with its *Brady* and other discovery obligations.  Even worse, despite the recent trial testimony and the clear importance of the data to the defense, the government continues to refuse to produce the data to the defendant in a deliberate effort to interfere with his ability to mount a proper defense.

The government suppressed this material information and failed to produce it for years despite its obvious importance and their clear obligation to do so.  As of this filing, their failures continue.  The government's misconduct is inexcusable and outrageous and evidences a deliberate attempt to violate Mr. Avenatti's right to due process and interfere with his ability to properly defend himself at trial.  And the resulting prejudice has been substantial.  Accordingly, for each of these reasons, as well as those set forth below, the Court should dismiss the Indictment.  In the alternative, the Court should declare a mistrial.

## II.   FACTUAL BACKGROUND

### A.   Calculation of Costs – The Need for both QuickBooks & Tabs

The government has called multiple witnesses who have testified that the financial records of Mr. Avenatti's former law firm were maintained on two separate and independently operated accounting systems, QuickBooks, and Tabs. *See, e.g.,* Trial Tr. (7/28/2021, Vol. 1) p. 92. In order to properly calculate the costs for a particular case, it was necessary to review both QuickBooks and Tabs; relying exclusively on one accounting system would result in inaccurate calculations. *See, e.g.,* Trial Tr. (7/28/2021, Vol. 1) p. 93; Trial Tr. (7/28/2021, Vol. 2) p. 29. This is true because the systems

generally tracked different expenses. Former Office Manager and key government witness Judy Regnier testified that on March 25, 2019, the day the search warrant was executed on her home, she probably told the government about Tabs because the law firm's financial records were kept on both QuickBooks and Tabs. *See, e.g.*, Trial Tr. (7/28/2021, Vol. 1) p. 91-93. Ms. Regnier also testified that on November 19, 2019, she informed AUSA Sagel, Special Agent Karlous and Special Agent Roberson that the firm used Tabs and QuickBooks to track expenses for clients. *See, e.g.*, Trial Tr. (7/29/2021, Vol. 1) p. 68. Ms. Regnier answered affirmatively to the question, "without looking at the data from QuickBooks and Tabs, you don't know what the costs were for the Barela matter; correct?" *See, e.g.*, Trial Tr. (7/29/2021, Vol. 2) p. 65.

Ms. Regnier was asked to review government exhibits 48[2] and 174[3] during the government's investigation and the prosecution's direct examination. In connection with government exhibit 48, Ms. Regnier testified that it was "a draft bill," that she did not know whether the costs listed were 100 percent accurate, and she agreed that "if you wanted to figure out what the exact costs on the Johnson case were … you would go to the electronic file of QuickBooks, the most recent file, and the electronic file of Tabs and look at the data." *See, e.g.*, Trial Tr. (7/28/2021, Vol. 2) p. 31. Although the last entry of exhibit 48 revealed a date of December 15, 2014, Ms. Regnier testified that payments were made to Mr. Johnson after this date. *See, e.g.*, Trial Tr. (7/29/2021, Vol. 1) p. 98-99. Ms. Regnier similarly testified that exhibit 174 was only a draft and she could not verify whether it was complete or not. *See, e.g.*, Trial Tr. (7/28/2021, Vol. 2) p. 61. Despite the last entry of the Tabs cost sheet being December 22, 2017, Ms. Regnier testified that she believed payments were made to Mr. Barela after that date. *See, e.g.*, Trial Tr. (7/29/2021, Vol. 2) p. 17. Further, Ms. Regnier also indicated that Tabs was also used to track hourly time and fees for matters that were non-contingency. *See, e.g.*,

---

[2] Draft Tabs printout for costs associated with the Johnson matter.
[3] Draft Tabs printout for costs associated with the Barela matter.

Trial Tr. (7/29/2021, Vol. 2) p. 64-65.  In other words, if the firm performed work for a contingency client on another legal matter that was being billed hourly (i.e. the other Barela and Gardner matters), that time and that fee would be tracked in Tabs, not QuickBooks.

On August 12, 2021, the government called its final witness in its case-in-chief, Mr. John Drum, to testify as an expert. *See, e.g.,* Trial Tr. (8/12/2021, Vol. 2) p. 49. Mr. Drum testified that in order to perform his financial analysis, he was provided access to QuickBooks records, settlement agreements, retention agreements and bank records. *See, e.g.,* Trial Tr. (8/13/2021, Vol. 1) p. 102. Other than the two spreadsheets (marked as government exhibits 48 and 174), Mr. Drum was never provided access to, and did not request access to, the Tabs software database. *See, e.g.,* Trial Tr. (8/13/2021, Vol. 1) p. 104. Mr. Drum was asked, "Do you have any understanding beyond the two draft documents that you referred to that Ms. Regnier sent, do you have any understanding of what was tracked in Tabs for clients?" to which he answered "Other than those two spreadsheets, no." *See, e.g.,* Trial Tr. (8/13/2021, Vol. 1) p. 105. He stated to the jury that the government "did not give me Tabs data other than the two spreadsheets." *See, e.g.,* Trial Tr. (8/13/2021, Vol. 1) p. 108.  He also testified that he never made any effort to learn how Tabs worked and likewise never "googled it." He also testified that the government provided Mr. Drum with the QuickBooks electronic file, but he made no effort before using it for his analysis to see how current the data was or when the last time it had been updated. *See, e.g.,* Trial Tr. (8/13/2021, Vol. 2) p. 26-27. Mr. Drum stated that he "had no way to verify how complete or incomplete the data was." *See, e.g.,* Trial Tr. (8/13/2021, Vol. 2) p. 27.

### B.   Defendant's Diligent & Consistent Requests for this Material

Early on during the course of the government's investigation, the government obtained warrants to search several digital devices, including a forensic copy of EA LLP's servers, which the government obtained from the law firm's Receiver, Brian

Weiss. In the search warrant application, the government requested the ability to search for, among other things, "records, documents, programs, applications or materials from January 2011 through March 25, 2019, relating to the accounting records for AVENATTI and/or any of the subject entities[4] including any Microsoft Dynamics NAV, QuickBooks, or other electronic accounting data, files or records." *See, e.g.,* Case No. 8:18-MJ-00419, Dkt. 4-1, p. 7 (emphasis added).

In May 2019, the defendant sent the government his Rule 16 demand and requested that the government comply with Rule 16, as well as *Brady* and *Giglio*.  In a further effort to obtain the exculpatory financial data contained on the servers, the defendant filed a "Motion to Compel Discovery" relating to the servers on July 28, 2019. [Dkt. 50]. The motion requested "immediate and unfettered access to the Eagan Avenatti, LLP ('EA') servers, and digital devices seized from an Eagan Avenatti employee, so that Mr. Avenatti may properly defend himself in this matter." [Dkt. 50, p. 3]. Mr. Avenatti specifically requested access to the following materials: "(1) correspondence with clients and others; (2) client files; **(3) time records**; (4) settlement communications and documentation of settlements; (5) correspondence and files in relation to the other charges in the indictment; (6) defendant's emails with his tax professionals and others relating to his taxes; and **(7) accounting information relating to the clients at issue, including documents showing client costs and expenses, and associated fees.**" [Dkt. 50, p. 3](emphasis added).

On August 12, 2019, the government filed its "Opposition to Defendant Michael John Avenatti's Motion to Compel Discovery." [Dkt. 55]. In response, the government indicated "the USAO's Privilege Review Team has already located on one of the EA Devices copies of EA LLP's QuickBooks accounting records, which are being processed and should be produced to defendant shortly. In fact, the only category of records that defendant identified in his motion that have not already been produced are defendant's

---

[4] The "subject entities" included Eagan Avenatti, LLP.

'time records.' " [Dkt. 55, p. 15].  On August 12, 2019, Receiver Brian Weiss also filed an Opposition to Motion to Compel Discovery seeking to preclude Mr. Avenatti from accessing the EA, LLP servers. [Dkt. 59].

On August 29, 2019, the Court denied Mr. Avenatti's Motion to Compel and addressed the categories of information sought by Mr. Avenatti. Relevant to this discussion, the Court referred to Mr. Avenatti's request for access for client files, time records, and "accounting information" relating to the clients at issue. [Dkt. 63, p. 3]. <u>Relying on representations made to the Court by the government and the government's presumed good faith, the Court found that "[t]o the extent that these categories relate [sic] the specifics in the Indictment, the Government has or is in the process of producing the materials."  [Dkt. 63, p. 3](emphasis added). The Court added, "the Government has acknowledged its obligation to produce all documents within the scope of the search warrants as well as its *Brady* and *Giglio* obligations." [Dkt. 63, p. 3](footnote citations omitted).</u>

Mr. Avenatti and his counsel were subsequently permitted access to certain emails and client pleadings stored on the servers by visiting the IRS-CI's Los Angeles office on two occasions in September and October of 2019 but were not permitted any access to any other files, data or software programs on the servers.

In May, June and July of 2020, defendant again raised the issue of his need to have full access to the servers in order to obtain critical financial information relating to the client matters. For instance, on May 27, 2020, defendant filed a status report where he requested access to the EA, LLP servers arguing that they contained "critical records detailing costs and expenses on cases involving the alleged victims, as well as hours spent on the matters…" [Dkt. 164, p. 10]. On May 30, 2020, the government filed a response to Mr. Avenatti's status report wherein the government stated, "Defendant's claim that he still has not received 'critical records detailing costs and expenses on cases involving the alleged victims' is demonstrably false." [Dkt. 168, p.  12](citations

omitted). On June 1, 2020, a status conference was held where the Court requested additional briefing in preparation for an additional status conference. *See* Dkt. 181.

On June 5, 2020, the government filed another status report wherein the prosecution again told the Court that Mr. Avenatti's May 27, 2020 claim that he had not received "critical records detailing costs and expenses on cases involving the alleged victims" was "demonstrably false." [Dkt. 176, p. 13]. Mr. Avenatti then supplemented his prior status report and informed the Court, "contrary to the government's claims … the critical cost documentation for each of the alleged victim clients … was not generally kept by the firms and organized by client-matter in QuickBooks." [Dkt. 178, p. 3]. He further explained, "other systems [were] used to track and organize client costs and expenses and the time spent on individual client matters. Much of this critical information is included on the EA servers and is part of the IRS database. This is a central issue in the case and goes to the heart of the allegations against Mr. Avenatti." [Dkt. 178, p. 4].

On June 8, 2020, another status conference was held with the Court. During this hearing, AUSA Sagel represented to the Court that "anything that would have been relevant in our case and within the scope of the warrant should have been and likely was found and produced to the defendant." *See e.g.,* Dkt. 182, p. 6. During this hearing, the Court ordered that Mr. Avenatti provide additional briefing as to what legal obligation exists to access the IRS database. [Dkt. 184].

On June 15, 2020, Mr. Avenatti responded to the Court's inquiry and alerted the Court that he needed access to the materials held within the EA LLP servers so that he could access "cost and fee information and documentation for the cases involving the alleged victims – i.e. what costs for experts, staff personnel and other reasonable expenses were recorded and net settlements." [Dkt. 193, p. 2]. Mr. Avenatti argued that "the above material is, for the most part, not contained in the Eagan/Avenatti QuickBooks system that was acquired by the government … the material listed above

would demonstrate a clearer picture, is potentially exculpatory and the defense therefore needs access under *Brady*." [Dkt. 193, p. 3]. The government submitted its reply brief on June 22, 2020 and argued to the Court that the cost and fee information for the cases involving defendant's alleged victims "have been produced in multiple ways." [Dkt. 195, p. 22]. On July 6, 2020, another status conference was held to address the issue and the Court ultimately determined that "further access to the Eagan Avenatti digital devices, VME, IRS's materials is DENIED." [Dkt. 199].

On August 31, 2020, an additional status conference was held where the Court specifically alerted the parties it wished to discuss the status of outstanding discovery. During this status conference, former AUSA Andre represented to the Court: "The defendant [] has all the discovery as to all the charges at this point." [Dkt. 289, p. 3-4]. The government knew this representation was false because it knew it had not provided Mr. Avenatti with the critical Tabs data.

Due to the importance of the information to his defense, Mr. Avenatti continued to seek access to the financial information relating to the clients as well as the other discovery to which he was entitled.  For instance, on January 18, 2021, the defendant filed a Motion for an Order Requiring the Government's Prompt Compliance with the Due Process Protections Act and Advising the Government of the Consequences for Failing to Comply. [Dkt. 398]. On January 25, 2021, the Court granted the defendant's motion and ordered the government "to produce to the defendant in a timely manner all information or evidence known to the government that is either: (1) relevant to the defendant's guilt or punishment; or (2) favorable to the defendant on the issue of guilt or punishment." *See e.g.,* Dkt. 408, p. 1.

Weeks later, after having not received the financial information and other important discovery, the defendant filed a Motion for an Order to Show Cause re Civil Contempt and a Finding of Contempt on March 8, 2021. [Dkt. 415]. In this motion, Mr. Avenatti argued that the government failed to provide him with "exculpatory financial

information relating to fees and expenses due Mr. Avenatti and his law firm from the alleged victim clients (including but not limited to all invoices and expense information)." [Dkt. 415, p. 8]. In response, the government stated, "the government has produced the fee and expense information related to defendant's victims and his law firm, as well as any information in its possession regarding work defendant performed for his victims that entitled him to attorney's fees and costs." [Dkt. 418, p. 18]. Again, the government knew this to be inaccurate because the government had yet to produce the Tabs data, which Ms. Regnier had informed them about nearly two years prior. The Court subsequently denied the defendant's motion on March 30, 2021 without a hearing [Dkt. 431].

Defendant, however, continued to press for the information.  By way of a letter on April 8, 2021, counsel Dean Steward sent AUSAs Sagel and Wyman a letter requesting compliance with *Brady*, *Bundy*, *Price*, *Olsen*, Rule 16 and the Court's January 25, 2021 Order. *See, e.g.,* Exhibit A – Correspondence.  The letter demanded compliance and included the following under the heading "Information and Materials the Government Has Failed to Produce:"

> The government has not complied with its obligations under Brady, Bundy, Price, Olsen, Rule 16, the Court's Order, the RPC, and the Justice Manual. These failures are significant and must be rectified immediately. By way of example only:
>
> ***
>
> 10.  Financial Information Relating to the Clients Identified in the Indictment and the Government's 404(b) Notice. Despite repeated representations to the Court and the defense, the government has failed to produce all of the accounting and financial information relating to the clients identified in the Indictment and the clients identified in the government's 404(b) notice, including those relating to the NFL case. **The information withheld includes information concerning fees, costs and expenses, as well as time records.** The defense is entitled to all of this information and it was required to be produced long ago pursuant to Brady, Bundy, Price, Olsen, Rule 16, and the Court's Order at a minimum. **Indeed,**

**it is difficult to imagine information more fundamental to the defense than this information.**

Exhibit A, pp. 4-10 (emphasis added).

The government ultimately responded, "[a]s we have repeatedly represented to you, the government is aware of its discovery obligations, has complied with them, and will continue to do so." *See* Exhibit A.  Once again, the government made this representation knowing the Tabs data and all of the QuickBooks data had not been produced.

The defendant yet again raised concerns relating to the failure of the government to produce Brady information in his final pretrial status report filed on June 25, 2021. [Dkt. 511].  Therein, defendant stated, "The government has not produced information and documents to the defense that constitute *Brady* material. Included among the materials the government has not produced are … <u>financial information relating to the accounting applicable to the client matters at issue in counts 1-10</u>." [Dkt. 511,  p. 8].

As demonstrated above, beginning in early 2019, defendant has repeatedly demanded that the government produce all financial records relating to the clients identified in the indictment, including all information relating to the calculation of fees and expenses. These efforts have included filing multiple motions with the Court. Time and time again the government represented to the Court and the defense that all financial information had been produced, including all *Brady* information.  **This has now been shown to be demonstrably false, as the government finally admitted on Thursday, after years, that the Tabs data was never produced.  The prejudice resulting from this misconduct cannot be overstated.**

III.   **LEGAL STANDARD**

The law is clear that the government is required to promptly produce to the defense all information favorable to the defense, regardless of materiality.  *See, e.g., United States v. Bundy*, 968 F.3d 1019, 1033 (9th Cir. 2020)(requiring all favorable evidence to be disclosed by prosecutors pretrial, without regard to materiality:  "[T]rial

11

prosecutors must disclose favorable information without attempting to predict whether its disclosure might affect the outcome of the trial. . . . The retrospective definition of materiality is appropriate only in the context of appellate review" and not at the trial level.)(citation omitted); *United States v. Price*, 566 F.3d 900 (9th Cir. 2009)(requiring prosecutors to produce all potentially exculpatory or otherwise favorable evidence without regard to how the withholding of such evidence might be viewed as affecting the outcome of the trial); *United States v. Olsen*, 704 F.3d 1172, 1183 n.3 (9th Cir. 2013)(explaining that a prosecutor should not produce only what he considers "material" because it is "just too difficult to analyze before trial" what may be material).  *See also* California RPC 3.8 (applicable to federal prosecutors pursuant to 28 U.S.C. § 530B(a) and requiring disclosure to the defense without regard to materiality); Justice Manual 9-5.001(B)(1) (requiring AUSAs to "err on the side of disclosing exculpatory and impeaching evidence.").

Moreover, *Brady* encompasses impeachment evidence, and evidence that would impeach a central prosecution witness is indisputably favorable to the accused. *See Giglio v. United States*, 405 U.S. 150, 154 (1972); *see also, e.g., United States v. Blanco*, 392 F.3d 382, 387 (9th Cir. 2004) ("*Brady/Giglio* information includes 'material . . . that bears on the credibility of a significant witness in the case.'") (omission in original) (quoting *United States v. Brumel-Alvarez*, 991 F.2d 1452, 1461 (9th Cir. 1992)).

The suppression of evidence favorable to an accused is itself sufficient to amount to a denial of due process. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The prosecution's suppression of evidence that is favorable to the accused "violates due process where the evidence is material either to guilt or to punishment, irrespective of good faith or bad faith of the prosecution." *Id.* at 88. Under *Brady*, the prosecution is "trusted to turn over evidence to the defense because its interest is not that it shall win a case, but that justice shall be done." *United States v. Bundy*, 968 F.3d 1019, 1023 (9th Cir. 2020)(affirming the district court's dismissal of a twenty-one defendant obstruction case because the

government disregarded its *Brady* obligations by failing to disclose materials until several days into trial).

There are three *elements* to a *Brady* violation: (1) the evidence at issue must be favorable to the accused; (2) the evidence must have been suppressed by the state willfully or inadvertently; and (3) prejudice must have ensued. *Reis-Campos v. Biter*, 832 F.3d 968, 975 (9th Cir. 2016); *citing Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Evidence is favorable to the accused for *Brady* purposes if it is either "exculpatory or impeaching," "advantageous to the defendant" or "would tend to call the government's case into doubt." *Comstock v. Humphries*, 786 F.3d 701, 708 (9th Cir. 2015); *citing Strickler, supra,* 527 U.S. at 281-82 (1999); *Banks v. Dretke*, 540 U.S. 668, 691 (2004); *Milke v. Ryan*, 711 F.3d 998, 1012 (9th Cir. 2013). The term "suppression" does not describe merely "overt or purposeful acts on the part of the prosecutor; sins of omission are equally within the Brady's scope." *United States v. Price*, 566 F.3d 900, 907 (9th Cir. 2009); *citing Benn v. Lambert*, 283 F.3d 1040, 1053 (9th Cir. 2002)(the terms "suppression," "withholding" and "failure to disclose" have the same meaning for *Brady* purposes). The prosecution has "a duty to learn of any exculpatory evidence known to others acting on the government's behalf. Because the prosecution is in a unique position to obtain information known to other agents of the government, it may not be excused from disclosing what it does not know but could have learned." *Id.* at 909; *quoting United States v. Zuno-Acre*, 44 F.3d 1420, 1427 (9th Cir. 1997). As the *Price* court made clear:

> At the outset, we note that the district court's ruling is predicated on a clear misconception of the governing law. In its ruling from the bench, the court held that no *Brady* violation occurred in this case because the prosecutor did not personally have in his possession the evidence of Phillips' prior arrests, conduct, and convictions. In ruling on Price's new trial motion, the district court stated that "the core of [a Brady violation] is the Government has to either intentionally . . . or through some kind of misunderstanding or negligence fail to disclose what it has. Here most, if not all of what is alleged

13

> to have not been disclosed wasn't known [to t]he Government — the prosecutor at least didn't have it. So we don't have [a Brady violation]." The district court misunderstood the law. The Supreme Court has clearly held that "Brady suppression occurs when the government fails to turn over even evidence that is 'known only to police investigators and not to the prosecutor.'" *Youngblood v. West Virginia*, 547 U.S. 867, 869-70, 126 S.Ct. 2188, 165 L.Ed.2d 269 (2006) (per curiam) (quoting *Kyles*, 514 U.S. at 438, 115 S.Ct. 1555). Accordingly, the district court's reliance on the prosecutor's lack of personal knowledge of the *Brady* material demonstrated a clearly erroneous understanding of the law as it has existed at least since *Kyles v. Whitley*, 514 U.S. 419, 438, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). See also Giglio, 405 U.S. at 154, 92 S.Ct. 763; Jackson v. Brown, 513 F.3d 1057, 1073(9th Cir. 2008).

*Id.* (emphasis added).

In addition, on January 25, 2021, the Court issued an Order in this case directing the government to produce to the defense "<u>all</u> information or evidence known to the government that is <u>either</u>: (1) <u>relevant</u> to the defendant's guilt or punishment; **or** (2) favorable to the defendant on the issue of guilt or punishment." [Dkt. 408, the "Order" (emphasis added)].  The Court reaffirmed this Order at the status conference held on April 7, 2021.  Within days of the Order being issued in January, the U.S. Attorney's Office for the Central District acknowledged to the Chief Judge of the Ninth Circuit that the language of the Order requires, among other things, (1) "the production of material far beyond what is required under *Brady* and its progeny;" (2) the production of "all information *relevant* to the crime, regardless whether the material is exculpatory or helpful to the defense, even if the material is wholly inculpatory;" (3) the production of "every witness statement, regardless of whether that witness testifies against the defendant;" and (4) "the production of information regardless of its materiality."

Further, Rule 16 requires prosecutors to disclose any information to the defense that may assist the defense in preparing a defense.  *See*, *e.g.*, *U.S. v. Hernandez-Meza*, 720 F.3d 760, 768 (9th Cir. 2013)(Rule 16(a)(1)(E) requires disclosure of any relevant information that "would have helped [defendant] prepare a defense . . . even if it simply

14

causes a defendant to 'completely abandon' a planned defense and take an entirely different path"). <u>Even where doubt exists as to the usefulness of the evidence to the defendant, the government must resolve all such doubts in favor of full disclosure.</u> *See United States v. Paxson*, 861 F.2d 730, 737 (D.C. Cir. 1988).

Additionally, the California Rules of Professional Conduct ("RPC"), which are applicable to federal prosecutors pursuant to 28 U.S.C. § 530B(a), are clear that prosecutors have a duty to provide evidence helpful to an accused. Rule 3.4(a) provides that a lawyer shall not "unlawfully obstruct another party's access to evidence . . . or unlawfully alter, destroy or conceal a document or other material having potential evidentiary value. A lawyer shall not counsel or *assist another person* to do any such act." (emphasis added). Rule 3.4(b) prohibits a lawyer from suppressing "*any evidence* that the lawyer or the lawyer's client has a legal obligation to reveal or to produce." (emphasis added) Rule 3.8(d) specifically requires that a prosecutor "make timely disclosure to the defense of all evidence *or information* known to the prosecutor that the prosecutor knows or reasonably should know tends to negate the guilt of the accused, mitigate the offense, or mitigate the sentence . . ." (emphasis added). Critically, state and federal courts have repeatedly held prosecutors to account when they fail to adhere to these requirements. *See*, *e.g.*, *N. Mariana Islands v. Bowie*, 243 F.3d 1109, 1117-18 (9th Cir. Haw. 2001); *People v. Centino*, 60 Cal. 4th 659, 666-67 (2014); *DiSabatino v. State Bar*, 27 Cal. 3d 159 (1980); *United States v. Scruggs*, Case No. 3:07-cr-192-B-A, Dkt. 368 (Order granting motion to disqualify prosecutor due to misstatements) (N.D. Miss. May 2011).

Moreover, to the extent the government attempts to excuse away their suppression by arguing that Mr. Avenatti should have issued a Rule 17 subpoena to the law firm trustee in order to obtain the information, this is directly contrary to the law. The government is not permitted to escape its discovery obligations by imposing on the defendant a duty to investigate exculpatory materials to which the defendant is already

15

entitled under *Brady* and which the government already has in their possession. Indeed, the "obligations imposed by *Brady* are not limited to evidence prosecutors are aware of, or have in their possession." *United States v. Bruce*, 984 F.3d 884, 895 (9th Cir. 2021). "Prosecutors cannot turn a blind eye to their discovery obligations." *Id.* at 897 (rejecting the government's argument that because there were references to unproduced materials in the documents the prosecution did produce, it was incumbent upon the defense to investigate and uncover potentially favorable evidence itself). Further, the Supreme Court has made it clear that Rule 17 "was not intended to provide a means of discovery for criminal cases." *United States v. Nixon*, 418 U.S. 683, 698 (1974); *See also, United States v. Sanders*, 2010 U.S. Dist. LEXIS 99550, at *5 (D. Mont. 2010)(holding that a Rule 17 subpoena is not a vehicle for discovery); *United States v. Layton*, 90 F.R.D. 514 (N.D. Cal. 1981)("Rule 17(c) is not a discovery device."). Moreover, Mr. Avenatti previously sought the necessary access to the EA LLP servers through the government, the Receiver and the Court. But those requests were denied.

Finally, the Ninth Circuit's decision in *Bundy* is especially instructive. In *Bundy*, the Court determined that in connection with a *Brady* violation that occurs prior to a conviction, "whether a jury would ultimately find the evidence convincing and lead to an acquittal is not the measuring rod here." *United States v. Bundy*, 968 F.3d 1019, 1033 (9th Cir. 2020). Because there has been no verdict, the "retrospective test, evaluating the strength of the evidence after trial has concluded" is not applicable. *Id.* citing *United States v. Olsen*, 704 F.3d 1172, 1183 (9th Cir. 2013). The Ninth Circuit in *Bundy* determined that "[s]ince the new evidence emerged mid-trial, neither the district court (in the first instance) nor we (as a reviewing court) can measure prejudice against all the evidence produced during the trial." *Id.*

A court may "dismiss an indictment under its supervisor powers "(1) to implement a remedy for the violation of a recognized statutory or constitutional right; (2) to preserve judicial integrity by ensuring that conviction rests on appropriate considerations

validly before a jury; and (3) deter future illegal conduct." *Id. citing United States v. Struckman*, 611 F.3d 560, 574 (9th Cir. 2010); *quoting United States v. Hastings*, 461 U.S. 499, 505 (1983). The court's power to dismiss an indictment "protects the integrity of the federal courts and prevents the courts from making themselves "accomplices in willful disobedience of law." *Id.* at 1030; *citing McNabb v. United States*, 318 U.S. 332, 345 (1943). And a district court has the authority to dismiss an indictment even if the conduct does not rise to the level of a due process violation. *Id. citing United States v. Barrera-Moreno*, 951 F.2d 1089, 1091 (9th Cir. 1991).

Indeed, the misconduct by the government need not be intentional or malicious to justify such a remedy. *Id.* at 1038. In *Bundy*, the Ninth Circuit upheld the district court's granting of a motion for a mistrial and ultimately the dismissal of the indictment with prejudice when the government may not have made a conscious choice to withhold the exculpatory material but, "[a]t best, the government failed to appreciate the relevance of the evidence. At worst, it sought to handicap the defendants by withholding evidence directly relevant to mens rea. In either circumstance, the government fell well short of its obligations to work toward fairly and faithfully dispensing justice rather than simply notching another win." *Id.* at 1041. Reckless disregard or flagrant misconduct is sufficient to justify this remedy. *Id.*

The Bundy court also acknowledged the need to impose a stiff sanction to deter future government misconduct. In *Bundy*, the district court described how, like in this case, "the government blamed the defense for not requesting more specific information … the government continued to maintain that it never had an obligation to turn these documents over and that any omission on the government's part was the fault of the defendants…" *Id.* at 1044. In upholding the decision, the Ninth Circuit stated, "given the government's efforts to minimize the defendants' discovery requests and its misrepresentations to the district court in such a high-profile case, the district court understandably sought a remedy that would reinforce the seriousness of the violations

here." *Id.* at 1045. The *Bundy* matter has many parallels to the case before the Court, and the same remedy should be granted to Mr. Avenatti.

## IV.   **ARGUMENT**

Mr. Avenatti has consistently sought access to the financial records of the firm, specifically as they related to the costs and expenses incurred on behalf of the alleged victims in this case. Based upon the representations made to the Court that the government had provided all *Brady* and *Giglio* materials, representations that have now been shown to be categorically false, the Court repeatedly denied Mr. Avenatti's repeated requests for access to the EA LLP servers. Further, although AUSA Sagel claims that the "prosecution team" does not personally have the Tabs data in its possession, this is not the standard. The Tabs and QuickBooks data contained on the EA LLP servers was imaged by the government in 2019, over two years ago, and remains in the government's possession. Further, the government has been on notice of the importance of Tabs data since 2019 because government witness Ms. Regnier informed the government of its existence and importance likely during the execution of the search warrant at her home on March 25, 2019, and most certainly during a later interview of her in November of 2019 (as she testified). And at the same time they were consistently telling the Court that all *Brady* and *Giglio* materials had been produced, the government was ignoring the repeated requests by the defense for the additional accounting and costs information contained on the EA LLP servers.

The Tabs and QuickBooks data are essential to the defendant's presentation of his defense and without this material he cannot adequately defend himself against the crimes charged. Ms. Regnier was very clear that the calculation of the costs and expenses incurred on behalf of each client cannot be computed without the relevant QuickBooks **and** Tabs **data** (i.e. electronic files). The government has provided the defendant with a QuickBooks database of questionable origin and vintage and has failed to provide any Tabs data, instead attempting to sell the jury on using two draft printouts from only two

of the alleged victims. The Tabs database, held in the government's possession, unquestionably holds additional information related to these two clients as well as others. The data is highly material and strikes at the core of the case: what amount of money were the clients entitled to, if any, and was it misappropriated by way of some scheme? **Without the Tabs data and relevant QuickBooks data, this question is impossible to answer.**

Mr. Avenatti has now been forced to defend himself during this action without access to these exculpatory materials and has been severely prejudiced as a result. Without knowing the precise calculations contained in both the Tabs and the QuickBooks data, it is impossible to know the costs, fees, expenses and other hourly work performed in connection with each of the alleged victims. The only way for Mr. Avenatti to prove that he was entitled to the funds is by way of access to the two accounting software suites and databases that were consistently used by EA, LLP in the operation of the law firm.

As described in detail above, the government has been on notice of the importance of this financial information for years. The government has been aware of Tabs since early 2019 and yet ignored it, instead choosing to blindly accept two draft printouts in lieu of an entire electronic database of more current Tabs data within the government's possession. When asked by the Court whether the <u>government</u> has the Tabs data, AUSA Sagel instead stated, "Everything that is in the prosecution team's possession he has." The Court asked again, "Does the government have the Tabs data?" *See e.g.,* Trial Tr. (8/13/21, Vol. 1) p. 16. AUSA Sagel represented to the Court, "with regard to the Tabs, I don't know where – if it even exists and so forth. So I don't know about the extractions. We don't have anything in our database separate of Tabs and so forth." *See e.g.,* Trial Tr. (8/13/21, Vol. 1) p. 17. **This response speaks volumes.** <u>At best,</u> the government has buried its head in the sand and purposely failed to fulfill its "duty to learn of any exculpatory evidence known to others acting on the government's behalf." *United States*

*v. Zuno-Acre*, 44 F.3d 1420, 1427 (9th Cir. 1997).  And they have done so despite their constant representations to the Court that the government has complied with all of their discovery obligations and the defendant's repeated demands for the information.  In fact, even to this day, the government still has not produced the Tabs data and all of the QuickBooks data.

## V.   **CONCLUSION**

For each of the reasons set forth above, Mr. Avenatti respectfully requests that the Court dismiss Counts 1 through 10 as a result of the government's misconduct, blatant discovery failures, interference with Mr. Avenatti's right to due process and the resulting severe prejudice.  In the alternative, Mr. Avenatti requests that the Court declare a mistrial.

Dated:  August 15, 2021                    Respectfully submitted,

                                           /s/ Michael J. Avenatti

                                           Defendant
                                           MICHAEL JOHN AVENATTI

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

**EXHIBIT A**

28

# H. Dean Steward

ATTORNEY AT LAW

107 Avenida Miramar
Suite "C"
San Clemente, CA 92672
949-481-4900

April 8, 2021

Via E-Mail

Mr. Alexander Wyman
Assistant United States Attorney
(alex.wyman@usdoj.gov)

Mr. Brett Sagel
Assistant United States Attorney
(brett.sagel@usdoj.gov)

Re: **United States v. Avenatti (SA CR No. 19-061-JVS)**
Request for Immediate and Full Compliance with *Brady,
Bundy, Price, Olsen,* Rule 16, the Court's January 25,
2021 Order [Dkt. 408], and the RPC

Dear Mr. Wyman and Mr. Sagel:

I write to request that the government ensure that the defense
promptly receives all of the information to which it is entitled and
that any prior misrepresentations made to the defense or the Court
in this case by any current or former member of your office,
whether in writing or on the record, be immediately corrected.  As
you know, the government has an obligation at all times to see to it
that my client receives all information required to be produced and

that neither the defense nor the Court is misled as to any issue. Further, the government cannot turn a blind eye, or be indifferent, to conduct or actions that they learn of that are inconsistent with either the government's production obligations or the ethical rules.

Applicable Law

The law is clear that the government is required to promptly produce to the defense all favorable information to the defense, regardless of materiality.  *See, e.g., United States v. Bundy*, 968 F.3d 1019, 1033 (9th Cir. 2020)(requiring all favorable evidence to be disclosed by prosecutors pretrial, without regard to materiality: "[T]rial prosecutors must disclose favorable information without attempting to predict whether its disclosure might affect the outcome of the trial. . . . The retrospective definition of materiality is appropriate only in the context of appellate review" and not at the trial level.)(citation omitted); *United States v. Price*, 566 F.3d 900 (9th Cir. 2009)(requiring prosecutors to produce all potentially exculpatory or otherwise favorable evidence without regard to how the withholding of such evidence might be viewed as affecting the outcome of the trial); *United States v. Olsen*, 704 F.3d 1172, 1183 n.3 (9th Cir. 2013)(explaining that a prosecutor should not produce only what he considers "material" because it is "just too difficult to analyze before trial" what may be material).  *See also* California RPC 3.8 (applicable to federal prosecutors pursuant to 28 U.S.C. § 530B(a) and requiring disclosure to the defense without regard to materiality); Justice Manual 9-5.001(B)(1) (requiring AUSAs to "err on the side of disclosing exculpatory and impeaching evidence.").

The government's *Brady* obligation to promptly provide favorable information to the defense is not diminished by the fact that such information may also be required to be produced later pursuant to 18 U.S.C. § 3500 (the "Jencks Act") or by the fact that such information need not be produced according to Rule 16.  *See, e.g.*, Advisory Committee Note to Fed. R. Crim. P. 16 (1974) ("the rule is designed to prescribe the <u>minimum</u> amount of discovery to which the parties are entitled.").

2

Further, Rule 16 requires prosecutors to disclose any information to the defense that may assist the defense in preparing a defense.  *See, e.g., U.S. v. Hernandez-Meza*, 720 F.3d 760, 768 (9th Cir. 2013)(Rule 16(a)(1)(E) requires disclosure of any relevant information that "would have helped [defendant] prepare a defense . . . even if it simply causes a defendant to 'completely abandon' a planned defense and take an entirely different path").  <u>Even where doubt exists as to the usefulness of the evidence to the defendant, the government must resolve all such doubts in favor of full disclosure.</u>  *See United States v. Paxson*, 861 F.2d 730, 737 (D.C. Cir. 1988).

Moreover, over two months ago on January 25, 2021, the Court issued an Order in this case directing the government to produce to the defense "<u>all</u> information or evidence known to the government that is <u>either</u>: (1) <u>relevant</u> to the defendant's guilt or punishment; **<u>or</u>** (2) favorable to the defendant on the issue of guilt or punishment." [Dkt. 408, the "Order" (emphasis added)].  The Court reaffirmed this Order at the status conference held on April 7, 2021.  Within days of the Order being issued in January, your office acknowledged to the Chief Judge of the Ninth Circuit that the Order requires, among other things, (1) "the production of material far beyond what is required under *Brady* and its progeny;" (2) the production of "all information *relevant* to the crime, regardless whether the material is exculpatory or helpful to the defense, even if the material is wholly inculpatory;" (3) the production of "every witness statement, regardless of whether that witness testifies against the defendant;" and (4) "the production of information regardless of its materiality."  As a result, you cannot now take the position that the Order requires the production of something different or less.  <u>At an absolute minimum, the defense in this case is entitled to all of the information required to be produced under the interpretation of the Order you provided to the Ninth Circuit.</u>

Finally, the California Rules of Professional Conduct ("RPC"), which are applicable to federal prosecutors pursuant to 28 U.S.C. § 530B(a), are clear that prosecutors have a duty to correct any misstatement of fact or law made to a tribunal, as well as to disclose any false evidence previously placed before a tribunal, even

3

if they are not directly responsible.  *See, e.g.,* California RPC 3.3(a).
Further, Rule 3.3(b) requires that any lawyer who becomes aware of
any fraudulent conduct related to a proceeding has a duty to take
remedial measures to rectify such conduct.  Importantly, the duties
of Rules 3.3(a) and (b) "continue to the conclusion of the
proceeding," meaning so long as this case remains open, you have
an obligation to ensure these requirements are met.  Rule 3.4(a)
provides that a lawyer shall not "unlawfully obstruct another party's
access to evidence . . . or unlawfully alter, destroy or conceal a
document or other material having potential evidentiary value.  A
lawyer shall not counsel or *assist another person* to do any such
act." (emphasis added).  Rule 3.4(b) prohibits a lawyer from
suppressing "*any evidence* that the lawyer or the lawyer's client has
a legal obligation to reveal or to produce." (emphasis added) Rule
3.8(d) specifically requires that a prosecutor "make timely
disclosure to the defense of all evidence *or information* known to the
prosecutor that the prosecutor knows or reasonably should know
tends to negate the guilt of the accused, mitigate the offense, or
mitigate the sentence . . ." (emphasis added).  Critically, state and
federal courts have repeatedly held prosecutors to account when
they fail to adhere to these requirements.  *See, e.g., N. Mariana
Islands v. Bowie,* 243 F.3d 1109, 1117-18 (9th Cir. Haw. 2001);
*People v. Centino,* 60 Cal. 4th 659, 666-67 (2014); *DiSabatino v.
State Bar,* 27 Cal. 3d 159 (1980); *United States v. Scruggs,* Case No.
3:07-cr-192-B-A, Dkt. 368 (Order granting motion to disqualify
prosecutor due to misstatements) (N.D. Miss. May 2011).

Information and Materials the Government Has Failed to Produce

The government has not complied with its obligations under
*Brady, Bundy, Price, Olsen,* Rule 16, the Court's Order, the RPC,
and the Justice Manual.  These failures are significant and must be
rectified immediately.  By way of example only:

1.   *Handwritten Notes from the Interview of Client 1.*  On
March 31, 2019, the government interviewed a former client of Mr.
Avenatti's identified as victim Client 1 in the Indictment [Dkt. 16].
Client 1 was shown a settlement agreement that the government
claims in the Indictment Mr. Avenatti hid the terms of and deceived

4

Client 1 about (Indictment, ¶¶ 7.(f) and (g)).  According to a typewritten summary prepared later from "notes made during and immediately after the interview," Client 1 admitted in the interview "he may have signed the document" when his case was settled and that Mr. Avenatti went to Client 1's residence at the time to "deliver this document to [Client 1]"  [*See* USAO_0013358, 62.]  The government has withheld the handwritten notes from the defense. This is improper.  Mr. Avenatti could not have hidden the terms of a settlement agreement from the client and misled the client about those terms when the client admits signing the actual agreement and contemporaneously receiving a copy.  The notes should have been produced two years ago pursuant to *Brady, Bundy, Price* and *Olsen* as they are exculpatory.

    2.    *Notes and Documents from the Meetings with Judy Regnier*.  The government has failed to produce to the defense in this case (a) handwritten notes from a March 25, 2019 interview of government witness Judy Regnier attended by two agents and AUSA Sagel (approximately 5 hours); (b) handwritten notes from a March 26, 2019 meeting between Ms. Regnier and two agents; (c) handwritten notes from a November 19, 2019 interview of Ms. Regnier attended by two agents and AUSA Sagel (approximately 8.5 hours); (d) handwritten notes from interactions with Ms. Regnier on October 24, 2019 and December 5, 2019 and (e) certain documents referenced in other interview memoranda and notes produced to the defense from interviews with Ms. Regnier (*e.g.*, the screenshot sent to Special Agent Penland and referenced during Ms. Regnier's interview in connection with the *Nike-related* case (USAO_460560)). Other typewritten summaries and reports relating to Ms. Regnier likewise appear not to have been produced.  All of this information was required to be turned over to the defense long ago pursuant to the authorities cited above and the Court's Order.

    To compound matters, before Ms. Regnier testified at trial in the Nike-related case (No. 19-cr-373 (PGG), SDNY), <u>all</u> of this information was required to be produced by the government pursuant to (a) 18 U.S.C. § 3500 (the "Jencks Act") and (b) the letter agreement submitted to the court in that matter on October 17, 2019 [Dkt. 68, p. 2 (requiring 3500 material to be produced on or

5

before January 14, 2020 and stating that the obligation is continuing and requires "timely" production, meaning "the same day it is generated, and prior to the witness to whom it applies taking the stand."].  Further, some of this information was also likely required to be turned over to Mr. Avenatti well before trial pursuant to *Brady v. Maryland*, 363 U.S. 83 (1963) and its progeny, as well as pursuant to *Giglio*.  And yet the information was never provided before Ms. Regnier testified on February 6, 2020 (during which AUSAs Sagel and Andre were present in the gallery after assisting in preparing her), before Ms. Regnier's testimony was used by the government in closing argument, or at any time in the fourteen months since.

In addition, the withheld information is responsive to the Nike court's October 2020 Order, which directs the government to produce certain documents and information to the defense, including any that could be used to impeach a government witness at trial.  *See* SDNY Dkt No. 305 (the "Order").  Your office was specifically made aware of the terms of this Order no later than January of this year, when it was referenced in connection with a defense motion in this case and attached as an exhibit.  *See* CDCA Dkt. No. 398, p. 1-2 and Ex. A.  The Order makes clear that the government is required to produce <u>all information</u> that "can be used to impeach the trial testimony of a Government witness . . . ."  It further provides that the government's "<u>obligations are continuing ones and apply to materials that become known to the Government in the future</u>.  Additionally, if information is otherwise subject to disclosure, it must be disclosed regardless of whether the Government credits it."  The obligations apply to all information, regardless of whether it would "constitute admissible evidence."  The Order requires the government to disclose information to Mr. Avenatti that is material either to guilt or to punishment "promptly after its existence becomes known to the Government so that the defense may make effective use of the information in the preparation of its case" and provides for severe consequences for failure to do so.  The Order was issued nearly six months ago but the information has yet to be produced.

6

Further, the government's continued failure to timely produce this information is especially unsettling in light of the opinion recently issued by the Hon. Alison Nathan of the Southern District of New York in the case of Ali Sadr Hashemi Nejad (18-cr-224 (AJN)) (Dkt. 379), which found significant and systemic prosecutorial misconduct surrounding the failure to timely produce information to the defense, including 3500 material, and noted that "the Government's failure to further pursue the question of whether the [] 302s were required to be disclosed under *Brady* is shocking . . . With each document wrongfully withheld, an innocent person faces the chance of wrongful conviction." *Id.* at pp. 11, 33.  Judge Nathan specifically ordered every AUSA and SAUSA in SDNY to read her opinion and the Acting U.S. Attorney to file a declaration within one week affirming this had been done.  Even though this Order was issued in September 2020 and the government was put on notice of the serious consequences of not producing *Brady* and *Giglio* information, the government continued to withhold the Regnier information.

The facts demonstrate that one of three scenarios occurred: (1) For well over a year (in some instances, two years), your office withheld this information not only from the defense teams in this case and the Nike case, but also from the AUSAs from the Southern District of New York; (2) Your office made USAO-SDNY aware of this information prior to the Nike trial and/or since the conclusion of the Nike trial, and they made the decision to withhold the information from the defense and not alert the Nike court; or (3) The information and materials were destroyed despite the fact that the government was aware since at least March 25, 2019 (prior to the original creation of the information and materials) that Ms. Regnier was a key witness likely to testify.  <u>In any event, this constitutes a serious breach of the government's obligations and Mr. Avenatti's rights in at least two cases, and possibly a third (the Daniels related case where Ms. Regnier is also a witness).  These failures must be addressed by the government immediately and all applicable information and materials produced so that a determination may be made as to the degree of prejudice suffered by Mr. Avenatti.</u>

7

3.   *Information and Materials Relating to Immunity Requests,
Leniency and Similar Communications with Judy Regnier.*   The
defense has learned within the last two weeks that Ms. Regnier is
refusing to testify unless she is granted immunity or provided
similar consideration or assurance.   Pursuant to *Brady* and *Giglio*,
the defense is entitled to know about <u>all</u> communications that have
occurred between the government and Ms. Regnier (or any of her
attorneys or representatives) concerning this issue.   This is true
even if such communications have yet to be reduced to writing.
Further, if any of these communications occurred before February
6, 2020, this information was required to be produced to the
defense before Ms. Regnier testified in the Nike related matter.
However, no such information was produced.

4.   *Handwritten Notes from Other Interviews.*   The
government has interviewed approximately 100 witnesses in
connection with this case, sometimes for multiple days.   Most of
these interviews have been attended by multiple agents and
members of the prosecution team.   And yet the government has not
produced the handwritten notes from the interviews.   Further, the
government has not produced all of the 302s and memoranda of
interviews, and the documents referred to in those memoranda.

5.   *Immunity and Proffer Agreements.*   The government
entered into immunity and/or proffer agreements with at least five
government witnesses (Ms. Hendricks, Mr. Cassaro, Mr. Marchino,
Mrs. Carlin, and Mr. Tobin).   These agreements have not been
produced.   All similar agreements and communications concerning
leniency, immunity, etc. are likewise required to be produced.   This
is likewise true if any such agreements or communications exist
relating to Ms. Regnier.

6.   *The Regnier Search Warrant Materials.*   On March 25,
2019, the government executed a search warrant at the residence of
Ms. Regnier, Mr. Avenatti's office manager and lead paralegal.   The
government obtained eleven (11) boxes of hardcopy documents
(comprising thousands of pages) from the residence relating to the
charges in the Indictment.   [*See* Search Warrant Return, Dkt. 6,
Case No. 8:19-mj-00243, filed 05/16/19.].   These documents were

8

required to be produced long ago but have not been produced. Worse yet, the government has repeatedly represented to the defense in writing since 2019 that these materials were produced as part of the government's production No. 5 made on August 26, 2019.  These representations are false.

7.     *Thank You Notes, Emails and Awards.*  The government obtained files containing thank you notes and emails Mr. Avenatti received from countless clients between 2007 and 2019, as well as various awards.  All of this information is favorable to the defense not only in this case, but in the Nike-related case as well, especially as it relates to sentencing and mitigation.  It is believed that these files include communications from clients identified in the Indictment and various government witnesses, including some related to the government's efforts to introduce Rule 404(b) evidence.  This information should have been produced long ago.

8.     *The Notes from the Interview with Lisa Storie.*  The government interviewed Ms. Lisa Storie, Mr. Avenatti's second wife to whom he is still legally married, for 45 minutes on January 6, 2020.  [*See* Memorandum of Contact at USAO_454799.].  The government has failed to produce the notes from this interview.  In addition, this interview and the notes may raise additional issues relating to the government's use of information protected by the marital communications privilege.

9.     *The Information Relating to Mrs. Carlin.*  Mrs. Carlin is referenced in the complaint filed in March 2019 [Dkt. 1].  She was subpoenaed to testify before the grand jury in this case in 2019 and subsequently sat for an interview with AUSAs Sagel and Andre on July 25, 2019.  The government later produced a Memorandum of Interview from the July 25, 2019 interview to the defense on October 5, 2019 (USAO_00173598) but failed to produce any handwritten notes from the interview.  In March 2020, the government provided follow-up questions to Mrs. Carlin, through her counsel, relating to her 2019 interview.  The government has not produced those questions or the emails relating to them.  On or about April 1, 2020, the government conducted a subsequent interview/proffer session with Mrs. Carlin's counsel relating to the

2019 interview.  This lasted approximately 2.5 hours.  The defense
has learned that during this interview, the government was
confronted with the fact that (a) statements they attributed to Mrs.
Carlin in their Memorandum of Mrs. Carlin's July 25, 2019
interview were not accurate (i.e. the memo did not reflect what the
government had actually been told during the interview) and (b) the
government's representations made to the defense and the Court
that Mrs. Carlin had informed them that Mr. Avenatti did not owe
Mrs. Carlin money when he made payments to her, including while
on bond, were demonstrably false.  No notes have been produced
relating to the April 1, 2020 interview/proffer session.  The defense
is entitled to the notes from the July 2019 interview, the questions
the government sent in March 2020 and the related emails, and all
notes and memoranda relating to the April 2020 interview/proffer
session.  Further, the prior representations made to the Court by
the government in connection with Mr. Avenatti's remand to
custody in January 2020, on the eve of the Nike trial, must be
corrected immediately as they are demonstrably false.

   10.   *Financial Information Relating to the Clients Identified in
the Indictment and the Government's 404(b) Notice.*  Despite repeated
representations to the Court and the defense, the government has
failed to produce all of the accounting and financial information
relating to the clients identified in the Indictment and the clients
identified in the government's 404(b) notice, including those relating
to the NFL case.  The information withheld includes information
concerning fees, costs and expenses, as well as time records.  The
defense is entitled to all of this information and it was required to
be produced long ago pursuant to *Brady, Bundy, Price, Olsen,* Rule
16, and the Court's Order at a minimum.  Indeed, it is difficult to
imagine information more fundamental to the defense than this
information.

Defendant's Requests

   In addition to the specific requests made above, we request
that you ensure that we promptly receive all of the requested
information no later than April 22, 2021.  To the extent no such
information exists, we ask that you state that in writing.  We also

request that you ensure that all other information to which the defense is entitled pursuant to *Brady, Bundy, Price, Olsen,* Rule 16, and/or the Court's Order, but which has not been previously produced, likewise be provided to the defense no later than April 22, 2021.  Finally, we ask that you comply with your obligations as set forth above, including those delineated under the California Rules of Professional Conduct, and guarantee that all prior misrepresentations made to the defense or the Court, whether in writing or on the record, are immediately corrected.

In the event these requests are not met or ignored, we will have no choice but to bring these failures to the attention of the Court and seek the imposition of significant consequences/sanctions.  We are hopeful that will not be necessary.

Very truly yours,

H. Dean Steward

11

From: **Sagel, Brett (USACAC)** <Brett.Sagel@usdoj.gov>
Date: Wed, Apr 14, 2021, 5:54 PM
Subject: RE: discovery in Avenatti case
To: Dean Steward <deansteward7777@gmail.com>, Wyman, Alex (USACAC)
<Alex.Wyman@usdoj.gov>


Dean-

In reviewing the attached letter, I wanted to follow-up on a couple of the
requests/comments before we respond in full, as we have attempted – and will continue to
attempt -- to get you discoverable material well in advance of any of our deadlines.  First,
on page 5, you state "other typewritten summaries and reports relating to Ms. Regnier
likewise appear not to have been produced." What additional reports do you believe you do
not have? Next, on Page 8, number 4, it says "the government has not produced all of the
302s and memoranda of interviews, and the documents referred to in those memoranda."
Please let us know what 302s/MOIs you believe have not been produced.  Thanks,

Brett

# H. Dean Steward
ATTORNEY AT LAW

107 Avenida Miramar
Suite "C"
San Clemente, CA 92672
949-481-4900

April 15, 2021

Via E-Mail

Mr. Alexander Wyman
Assistant United States Attorney
(alex.wyman@usdoj.gov)

Mr. Brett Sagel
Assistant United States Attorney
(brett.sagel@usdoj.gov)

Re:   **United States v. Avenatti (SA CR No. 19-061-JVS)**
      Letter in Response to April 14 E-Mail Regarding April 8
      Letter

Dear Mr. Wyman and Mr. Sagel:

I write in response to the government's email sent late
yesterday in partial response to my detailed letter of April 8, 2021.
By way of the email, the government seeks to have the defendant
further identify for the government certain information and
materials the government has withheld from the defense.

First, it is not the defendant's duty to tell the government
everything they have failed to produce. This is true because the
information and materials are in the exclusive possession of the

government.  Rather, it is the government's duty at all times to act with the utmost of good faith and identify and ensure that **all** (not some) required information and materials are timely provided to the defense.  Contrary to your repeated representations to the Court and the defense, and as set forth in the letter, this has not occurred.

Second, as explained in the letter, it is the government's obligation to produce to the defense all information and materials required to be produced pursuant to the Court's January 25, 2021 Order (under the government's interpretation provided to the Ninth Circuit), *Brady, Bundy, Price, Olsen,* Rule 16, and the California Rules of Professional Conduct.  "All" means "all."  Further, this obligation includes all information known to the government, regardless of whether it was written down.  Accordingly, we repeat the request made in the letter (and many times before) – that the government immediately comply with its obligations and the legal requirements we have outlined and produce ALL of the information and materials requested.  This should be able to be easily accomplished by a simple review of the government's file.

Third, the government has had a separate obligation in the Nike-related case (No. 19-cr-373 (PGG), SDNY) to produce all information and materials required to be produced pursuant to *Brady, Giglio,* Rule 16, 18 U.S.C. § 3500 (the "Jencks Act"), the letter agreement submitted to the court in that matter on October 17, 2019, and Judge Gardephe's Order issued over six months ago in October 2020 [Dkt No. 305].  The "government" includes your office, the USAO-SDNY, and all other government agencies involved in the investigation of Mr. Avenatti.  *See, e.g., United States v. Martoma*, 990 F. Supp. 2d 458 (SDNY 2014, J. Gardephe).

Despite these requirements, all indications are that your office failed to produce information required to be produced well over a year ago in connection with the Nike case, including in connection with Ms. Regnier's trial testimony.  To make matters worse, the government never voluntarily disclosed this failure to the defense or brought it to the attention of the Nike court.  Moreover, in light of the uncontroverted facts, including your involvement with

2

interviewing Ms. Regnier, preparing Ms. Regnier to testify in that case and your close working relationship with USAO-SDNY as it relates to Mr. Avenatti, beginning with your coordination during the week of March 18, 2019 relating to his March 25, 2019 arrest, it is difficult to see how this failure could be determined by any court to have been "inadvertent." Finally, as you know, if _any_ handwritten notes or other materials relating to Ms. Regnier (or any other alleged victim or witness) have been destroyed, the consequences for the government promise to be significant. *See, e.g., United States v. Bufalino*, 576 F.2d 446 (2d Cir. 1978) (warning the government that the court "will look with an exceedingly jaundiced eye upon future efforts to justify non-production of a Rule 16 or Jencks Act 'statement' by reference to 'department policy' or 'established practice' or anything of the like. There simply is no longer any excuse for official ignorance regarding the mandate of the law.")

Fourth, even a cursory review of the Regnier materials demonstrates that not all reports, summaries, contacts, notes and memoranda relating to Ms. Regnier have been produced in this case or in the Nike-related matter. And we suggest you re-review your file in full before stating otherwise. In addition, in connection with a related issue and by way of example only (there are others), where are (a) the documents relating to *Ms. Regnier contacting the government* when seeking counsel in late 2019; (b) the documents relating to your communications with Ms. Regnier's criminal and civil counsel; and (c) the documents relating to your communications with Ms. Regnier and her counsel concerning her criminal liability and her concerns relating to criminal exposure?

Fifth, presumably the government knows what witnesses it has had contact with as part of its investigation of Mr. Avenatti and has records documenting each of these contacts. Based on the defense investigation to date, the number is approximately 100. And yet all documents relating to every witness contact and interview have not been produced despite the government's obligations, including its recent representation to the Chief Judge of the Ninth Circuit that the language of the Order issued in this case requires (1) "the production of material far beyond what is required under *Brady* and its progeny;" (2) the production of "all information

*relevant* to the crime, regardless whether the material is exculpatory or helpful to the defense, even if the material is wholly inculpatory;" (3) the production of "every witness statement, regardless of whether that witness testifies against the defendant;" and (4) "the production of information regardless of its materiality." Is it the government's position that they have produced all of this information, including all information, materials, summaries and memorandum relating to any witness contact or interview? Further, has the government produced all of its contacts, notes, statements and emails relating to and evidencing communications with counsel for witnesses and proffers? The obvious answer to both of these questions is "No." In fact, a review of the May 2020 witness list against the discovery in this case alone reveals that all information, notes and memoranda concerning these witnesses have not been produced. As explained in the letter, all of the witness information was required to be produced pursuant to the legal authority cited in the letter and the Order.

We look forward to the government's prompt compliance with each of the obligations identified in the April 8, 2021 letter.

Very truly yours,

H. Dean Steward

From: **Sagel, Brett (USACAC)** <Brett.Sagel@usdoj.gov>
Date: Wed, Apr 21, 2021 at 4:06 PM
Subject: Response to Discovery Letter(s)
To: Dean Steward <deansteward7777@gmail.com>
Cc: Wyman, Alex (USACAC) <Alex.Wyman@usdoj.gov>


Dean-

Your April 8, 2021, discovery letter requested a response from the government by April 22, 2021.  As we have repeatedly represented to you, the government is aware of its discovery obligations, has complied with them, and will continue to do so.  In addition to providing defendant with discovery to which he is entitled, we have produced discovery far in advance of our obligations, including much of the material you reference in said letter.  On April 14, 2021, the government attempted to work with you to identify with particularity any discovery you believe was not actually provided.  Rather than engage professionally to identify any real discovery issue, you chose again in your April 15, 2021, letter, to simply make further baseless accusations.  The government will continue to comply with its discovery obligations and the deadlines set by the Court -- not to arbitrary deadlines set by defendant.

Brett

# **CERTIFICATE OF SERVICE**

I, H. Dean Steward, am a citizen of the United States, and am at least 18 years of age. My business address is 17 Corporate Plaza, Suite 254 in Newport Beach, California. I am not a party to the above-entitled action.  I have caused, on August 15, 2021, service of the:

DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, MOTION FOR MISTRIAL, DUE TO THE GOVERNMENT'S (1) FAILURE TO PRODUCE INFORMATION AS REQUIRED BY RULE 16, *BRADY*, AND *GIGLIO*, AND (2) CONTEMPT OF THIS COURT'S JANUARY 25, 2021 ORDER

on the following party, using the Court's ECF system:

AUSA BRETT SAGEL AND AUSA ALEXANDER WYMAN

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 15, 2021

/s/ H. Dean Steward

H. Dean Steward