Michael John Avenatti (Pro Se)

H. Dean Steward, SBN 85317
17 Corporate Plaza, Suite 254
Newport Beach, California 92660
Tel (949) 481-4900
Fax (949) 497-6753

Advisory Counsel for Defendant
MICHAEL JOHN AVENATTI

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | SA CR No. 19-061-JVS |
| Plaintiff, | |
| v. | DEFENDANT'S OPPOSITION TO THE *EX PARTE* APPLICATION OF JACQUELINE ROSE FOR AN ORDER TO QUASH DEFENDANT'S SUBPOENA |
| MICHAEL JOHN AVENATTI, | |
| Defendant. | |

Defendant MICHAEL JOHN AVENATTI ("Mr. Avenatti") by and through his advisory counsel of record, H. Dean Steward, hereby files this opposition to the *ex parte* application of Jacqueline Rose for an order to quash Defendant's subpoena.

Dated:  August 16, 2021

Respectfully submitted,

/s/ Michael J. Avenatti

Defendant
MICHAEL JOHN AVENATTI

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION AND FACTUAL BACKGROUND

### A. The Rejected Proposed Stipulation

As counsel for Ms. Rose was informed prior to filing her *ex parte* application, Mr. Avenatti has requested that the government agree to the following stipulation so as to avoid the need for Ms. Rose or any other CNN witness to testify:  "Mr. Avenatti was in Washington, D.C. on April 28, 2018 and April 29, 2018.  On April 29, 2018, he was also in New York City.  He remained in New York City for a number of days, including April 29, 2018, April 30, 2018, May 1, 2018 and May 2, 2018.  Video evidence supports these facts."[1]  The government, however, refuses to stipulate as requested.  As a result, Mr. Avenatti is unfortunately required to prove these facts through witness testimony.

Ms. Jacqueline Rose[2] is one witness who can easily substantiate these facts because she communicated with Mr. Avenatti during this time period in order to book his in-person appearances for CNN on multiple shows in Washington, D.C. and New York City, N.Y. and also arranged his ground transportation while he was in those cities. *See*, *e.g.*, Exhibit A (sample text messages).  In addition, video evidence from CNN substantiates that Mr. Avenatti was in Washington, D.C. and New York and was not in California during this time period.

### B. The Fabricated Story About the May 1, 2018 E-mail

Ms. Judy Regnier is a key government witness who previously served as Mr. Avenatti's Office Manager.  She testified during the government's case-in-chief beginning on July 27, 2021 (the fourth day of trial).  Her testimony lasted over six hours

---

[1] *See* e-mail attached as Exhibit E. Counsel for Ms. Rose neglected to inform the Court of this significant fact in any of her filings.

[2] During the relevant time period, Ms. Rose was a "booker" at CNN, meaning she was responsible for booking guests for various CNN shows and ensuring they arrived in-studio or at their remote locations on time.

on direct, more than any other witness.  The government has attempted to convince the jury that Ms. Regnier was an employee of the defendant who was simply following the orders of Mr. Avenatti at all times and who never knowingly deceived anyone or led Mr. Avenatti astray as it related to financial information.  **Her credibility is a critical issue in this trial.**

On June 14, 2021, Ms. Regnier and her counsel met with the government in preparation for her trial testimony.  Attending from the government were AUSAs Brett Sagel (who would later handle her direct examination) and Alex Wyman, together with Special Agent Ryan Roberson and Remoun Karlous.  According to Ms. Regnier, at the beginning of the meeting, the government explained to Ms. Regnier the importance of telling them the truth.  *See* Trial Tr. (7/28/21, Vol. 2) p. 15.

During the interview, which lasted over four hours, Ms. Regnier was asked about the exhibit attached hereto as Exhibit B (later marked during trial as government exhibit 281).  In particular, the government inquired about Ms. Regnier's email to Long Tran of May 1, 2018 that reads "Long – I asked the bank to put a trace on it.  As soon as I get the results I will let you know ASAP.  Judy."  The government's interest in this email is obvious because it is the government's theory in this case that, in reality, no wire had been sent and Mr. Avenatti had unilaterally fabricated the existence of the $4,000,000 wire in order to deceive Mr. Long and Ms. Phan.  The problem for the government as they approached trial, however, was the existence of this email from **Ms. Regnier**, which completely undercut their theory.  If Ms. Regnier was just following orders and knew that no funds had ever been sent, as she had previously told the government and as they wanted the jury to believe, then how could they explain her email to the client stating that she "had asked the bank to put a trace on it" and that "as soon as [she got] the results," she would let the client know ASAP?  And the problem for Ms. Regnier was that either (1) the tale she had told the government about there being no wire was false, (2) she had lied to Mr. Avenatti about actually sending the $4,000,000 wire from the

account to Ms. Phan, or (3) she had knowingly sent a bogus email to Mr. Tran telling him there was a $4,000,000 wire when she knew there was none.  Under any of these scenarios, Ms. Regnier would face potential criminal exposure and the government's case, together with Ms. Regnier's credibility, would suffer a significant blow.

The solution, which was a win, win for the government and Ms. Regnier, but not so much for the defendant, was this:  Ms. Regnier, and later the government if need be, would explain away the email to Mr. Tran by claiming that it was actually **Mr. Avenatti** that sent the May 1, 2018 email from Ms. Regnier's computer.  Thus, according to the notes from the June 14, 2021 interview,[3] Ms. Regnier told the two AUSAs and two government agents this lie, which they documented:  "MA may have used JR's computer and email to send this email.  Occasionally, MA would use computer to type up an email and then say, 'send this.'  JR was not comfortable with MA doing this, but once the email was sent it was too late for her to do anything.  JR never told the person who was sent the email that the email was prepared and sent by MA, not JR."

## C. The Government Calls Ms. Regnier as a Trial Witness

Thirteen days after this interview, despite the obvious dubious nature of what Ms. Regnier had just allegedly told both AUSAs and both agents about an important piece of evidence in a major criminal case, the government called Ms. Regnier to testify before the jury.  During the direct examination, led by AUSA Sagel, the government used Ms. Regnier to lay the foundation for, and admit, Exhibit B (marked as government exhibit 281) and then proceeded to ask her a number of questions about the exhibit and the wire transfer.  This testimony is attached as Exhibit D.  Included within the questions from Mr. Sagel were "Is this an e-mail chain that you were on with the defendant?" followed

---

[3] The handwritten notes have not been produced to the defense but are clearly *Brady* for the reasons explained *infra*.  The relevant portion of typewritten summary is attached hereto as Exhibit C.

by "Including <u>at least two</u>[4] of those e-mails being written by the defendant?" (emphasis added). *See, e.g.,* Trial Tr. (7/28/21, Vol. 1) p. 52-53. Ms. Regnier answered "Yes" to both questions.  Mr. Sagel then proceeded to illicit from Ms. Regnier that the reason the email said what it said was "That's what Michael wanted to send to the client."  Mr. Sagel followed up, "Was there any wire to put a trace on?"  Ms. Regnier responded, "Not at that time, no."  *See, e.g.,* Trial Tr. (7/28/21, Vol. 1) p. 56.

On cross-examination, Mr. Avenatti confronted Ms. Regnier with what she had told the government on June 14, 2021, namely that Mr. Avenatti may have used her computer to send the email. *See, e.g.,* Trial Tr. (7/28/21, Vol. 2) p. 15-17. Mr. Avenatti, however, chose at that time not to cross examine Ms. Regnier about her other related false statements to the government about the exhibit and likewise purposely chose not to complete the impeachment of Ms. Regnier, choosing instead to wait until his case-in-chief (as is his right).  **That time has now arrived.**

### D. Exposing the Lie and the Government's Knowledge

<u>It was literally impossible for Mr. Avenatti to have typed the email on Ms. Regnier's computer in Newport Beach on May 1, 2018 because he was on the other side of the country on that date, and had been, for days.</u>  Further, the evidence will show that the government knew <u>before</u> they called Ms. Regnier to the stand that she had lied in the interview about Mr. Avenatti possibly typing the key May 1, 2018 email (Exhibit 281) to Mr. Tran on her computer and yet they still called her as a critical witness in their case-in-chief and proceeded to ask her questions for six hours, including about Exhibit 281 (after admitting it through her) and countless other trial exhibits.

### E. The Service of Ms. Rose

Ms. Rose was contacted by phone on August 9, 2021 at approximately 5:32 p.m. by defense paralegal Ms. Emma Hernandez. She was told that Ms. Hernandez worked

---

[4] The email string shows only two emails sent from Mr. Avenatti.  The only way to account for another is to credit what Ms. Regnier told the government in the interview.

with the defendant and that she had a subpoena to serve on Ms. Rose.  Ms. Hernandez inquired whether she would accept service.  The call was then placed on speakerphone, with Ms. Rose, Mr. Avenatti, Ms. Hernandez and Ms. Barberena, another defense paralegal, present.  During the call, Ms. Rose agreed to accept service by email, expressed no hesitations or concerns, and then provided her email address because the defense did not have it.  The subpoena, which required her attendance four days later, was then immediately emailed to her at 5:44 p.m.  She responded via text at 5:46.[5]  No witness fees were paid because defendant was informed by his advisory counsel that witness fees were not required at the time of service due to defendant's CJA status.  If, however, witness fees are required, they will be paid promptly.

## II.   **LEGAL STANDARD AND ARGUMENT**

A criminal defendant has the power to issue a subpoena pursuant to Federal Rule of Criminal Procedure 17. A subpoena may "order the witness to produce any books, papers, documents, data, or other objects the subpoena designates." Fed. R. Crim. Proc. 17(c)(1). Both the government and the defendant "have the right to call witnesses, and the power to compel witness testimony is essential to our system of justice." *Barnett v. Norman*, 782 F.3d 417, 422 (9th Cir. 2015); *citing Blair v. United States*, 250 U.S. 273, 281-82 (1919). The "interest in full disclosure and the fair administration of justice overrides concerns that testimony might be inconvenient, burdensome, or harmful to a witness's social or economic status." *Id.; citing United States v. Calandra*, 414 U.S. 338, 345 (1974). The Ninth Circuit has made it clear, "[f]ew witnesses want to testify, and if given the choice, almost never would … But much like jury service, witness testimony is not optional in our justice system – it is essential." *Barnett v. Norman*, 782 F.3d 417, 424-25 (9th Cir. 2015).

---

[5] Ms. Hernandez and Ms. Barberena will both be in the courtroom and prepared to testify under oath as to these facts at the hearing on this matter.

Upon the motion of a subpoenaed party, "the Court may quash or modify the subpoena if 'compliance would be unreasonable or oppressive.'" *United States v. Cota*, 2009 U.S. Dist. LEXIS 18736, at *4 (N.D. Cal. 2009). A decision to enforce or quash criminal subpoena rests within the discretion of the district court. *United States v. Bentacount*, 277 Fed. Appx. 708, 711 (9th Cir. 2008). The Supreme Court has previously determined that the proponent of the subpoena must "clear three hurdles: (1) relevance, (2) admissibility; and (3) specificity." *United States v. Reyes*, 239 F.R.D. 591, 598 (N.D. Cal. 2006); *quoting United States v. Nixon*, 418 U.S. 683 (1974). The subpoena must be brought in good faith and cannot be intended as a general fishing expedition. *United States v. Scovis*, 743 Fed. Appx. 795, 800 (9th Cir. 2018).

The subpoena at issue directed to Ms. Rose seeks relevant, admissible, and specific testimony and documents.  The government called a witness to the stand who they knew had fabricated a tale about a key piece of evidence only two weeks earlier. Mr. Avenatti is entitled, as part of his defense, to show that what Ms. Regnier told the government was categorically false because it was literally impossible and that Ms. Regnier created the possibility that Mr. Avenatti had typed the email out of whole cloth. There are few things more critical in a criminal trial than the credibility of the government's witnesses and the right of the accused to challenge the veracity of such witnesses. And there are few, if any, witnesses in this case more important than Ms. Regnier.

Further, Ms. Rose seeks to quash the subpoena by arguing that it is seeking to force a CNN editorial producer to testify about information she would have gathered in the course and scope of her newsgathering responsibilities at CNN. As Exhibit A demonstrates, this argument is devoid of merit.

The critical question for deciding whether a person may invoke the journalist's privilege is "whether she is gathering news for dissemination to the public. The test is whether the person seeking to invoke the privilege has the intent to use material sought,

6

gathered or received to disseminate information to the public and whether such intent existed at the inception of the newsgathering process. If both conditions are met, then the privilege may be invoked." *Shoen v. Shoen*, F. 3d. 1289, 1293-94 (9th Cir. 1993).

The journalist's privilege against compelled disclosure is a First Amendment shield … but it is not absolute." *Wright v. Fred Hutchinson Cancer Research Ct.,* 206 F.R.D. 679, 680 (W.D. Wash. 2002)(emphasis added). If the circumstances of the case "show that the privilege applies, the Court must then determine whether, in light of the competing needs and interests of society and the opposing parties, the privilege has been overcome." *Id. citing Shoen v. Shoen*, F. 3d. 1289, 1292 (9th Cir. 1993). To determine whether the qualified privilege is overcome requires "that the claimed privilege under U.S. Const. amend I and the opposing need for disclosure be judicially weighed in light of the surrounding facts, and a balance be struck to determine where lies the paramount interest." *Mark v. Shoen*, 48 F.3d 412, 415 (9th Cir. 1995). The United States Supreme Court has made it clear that "the public interest in a press unburdened by subpoenas did not outweigh the public interest in assuring that criminal proceedings are based on the fullest record possible." *United States v. Schneider*, 2003 U.S. Dist. LEXIS 27324, at *8 (N.D. Cal. 2003); *citing Branzburg v. Hayes*, 408 U.S. 665, 690-691 (1972). While reporters enjoy a qualified shield in both the civil and criminal setting, "the shield in a criminal setting is exceptionally thin." *Id.* at *10.

There has not been any sufficient showing that Ms. Rose's logistical coordination of Mr. Avenatti's appearances constitute materials that she later intended to use to "disseminate information to the public" within the newsgathering process. Accordingly, Ms. Rose has failed to make a sufficient showing that she is protected by the qualified privilege. However, even if this Court find that the privilege applies, Mr. Avenatti's due process rights and his right to a fair and complete jury trial far outweigh Ms. Rose's limited and qualified privilege, especially as to the matters at issue.

Contrary to Ms. Rose's assertions, Mr. Avenatti does not seek access to any news gathering materials. Instead, Mr. Avenatti solely seeks to establish that Mr. Avenatti was in New York and Washington D.C. at the same time when government witness Judy Regnier stated that the defendant used her computer located in California. Ms. Jacqueline Rose is one witness who can easily substantiate these facts because she communicated with Mr. Avenatti during this time period in order to book his in-person appearances for CNN on multiple shows in Washington, D.C. and New York City, N.Y. and also arranged his ground transportation while he was in those cities. Under these facts, Ms. Rose's First Amendment rights, if any, must yield to Mr. Avenatti's constitutionally protected rights to a fair jury trial and due process.

## III.   CONCLUSION

Based upon the foregoing, Mr. Avenatti respectfully requests that this Court deny the request to quash and order Ms. Rose to comply with the subpoena as served.

Dated:  August 16, 2021                    Respectfully submitted,

/s/ Michael J. Avenatti

Defendant
MICHAEL JOHN AVENATTI

8

# Exhibit A

Messages · Jane · Sarah Jones

4/28/18, 10:27 AM

Hey polson told me he ran into you so you want to do jake tomorrow? And is that a no to the shows today and tomorrow then or would you want to do something with Dana Bash tomorrow night?

4/28/18, 12:39 PM

It will be a substantive intv with jake Polson promised. He's asking if you have any news to break and if so let me know! Regardless they want you but anything that would add color etc

Also Dana would love you tomorrow around 7:30 pm I know you're in nyc at that time but she would love a remote intv so we can circle about car arrangements for that hit tomorrow. Polson is arranging your car for jake tomorrow morning for an 8:15 am pickup

Okay

Are you doing the red carpet tonight? If so please stop by the CNN camera look for monica :)

If you're able to

Yes - I will

4/28/18, 4:26 PM

Thanks for heading to the camera. Have fun tonight but don't forget about your early am car! 8:15 am from the watergate. Make sure no ones slips you a Mickey keep an eye on your drink!

Lol.

4/29/18, 9:33 AM

Hey! I'm about to head into a class but let me know where you need the car later for your 7:30 hit with Dana tonight. I can chat around 2. Hope everything went well with jake this morning!

4/29/18, 12:11 PM



Hey here ▮▮▮▮ cell please never give this to anyone and it's for you only. He has an assistant I can send your her email if anyone ever need to get in touch with him they have to go through her

And ▮▮▮▮ never really answers his phone lol and he doesn't text normally so do you have wickr? He talks to everyone on there

Got it

4/29/18, 4:00 PM

Hey your hit time is 7:34 you're in a flash on the 4th floor a greeter will take you to makeup and then down to the flash let me know your eta

10 min

4/30/18, 7:17 AM

Hey Michael! Both erin Burnett and don lemon would like you this evening are you able to do both or one of those shows? Let me know and if you have time restrictions let me know that erin is on at 7 pm and don is on from 10-12

4/30/18, 11:40 AM

Would you be able to pretape with jake at 3 or 3:30 potentially? Just wondering and then we would have to work it out internally. Let me know & thank you!

4/30/18, 1:35 PM

Hi! So car is set from the park Hyatt at 7:15 pm this evening it will stay with you through Don's hit just make sure you are back for don by about 10:40ish since you're on at the top of 11. Anderson is 8 pm hour will get back to you asap on exact hit time. Also new day tomorrow with Alisyn is 8:30 am is that ok?

4/30/18, 3:23 PM

Hit time with AC is 8:13 tonight just FYI :)

Okay

4/30/18, 5:05 PM

Hey you ok? Are you in the car?

Never mind! lol I thought someone might have kidnapped you

4/30/18, 6:29 PM

Hey! Don's producers just texted me they have to cancel tonight due to breaking news on russia investigation. Just keep the car til 11:30 as originally planned. Also for tomorrow new day hit again is 8:30 so I've arranged the car for 7:30 am from the park Hyatt that works right? Thank you so much!

5/1/18, 6:04 AM

How did this morning go?

Great. Thanks!

5/1/18, 8:22 AM

Hey quick random question do you know anyone st CMG worldwide? I was in texas last week working on the Southwest Airlines hero pilot for AC and apparently she's being repped by someone at CMG

Nope. Sorry.

No probs! I want this pilot I'm stalking

5/2/18, 7:00 PM

Hey! I know it's late any chance you might be able to join don to discuss Giuliani's comments? Thanks!

Car is coming in 15-20 and will take you right up to CNN they will take you as soon as you get there they say so I will tell them to plan for about 10:45 ish just let me know your eta when you can

Thanks again! I know it's a scramble

Hey! So just to pass along the requests for tomorrow so far are

New day (6-9) they are flexible on timing whatever works for you
Sit Room with Wolf (5-7 pm)
Erin Burnett (7 pm in nyc)

I expect more to come in. Let me know if you're able to do new day and we can figure it out from there

Thank you so so much for coming up last minute! Just wanted to see if new day tomorrow was possible they will be flexible on timing

Ok I hear that new day stalked you outside the studio sorry about that. Anyway thanks for doing them tomorrow

Lol your response to ▮▮▮▮ tweet is pretty good

Lol

Messages                                Now

Let me know what time works for new day they said 7:45 and 8:15 were ok on their end so just keep me posted

8:15

Ok thank you! Car from where?

Hyatt?

Ok so I'm going to bed but we will have a car at the Hyatt at 7:30 if you need it somewhere else I will be up around 7:15 and can change it I need my beauty sleep :) night

Thansk

Exhibit B

5/31/2018      RiceBunny Inc. Mail - Michelle Wire



**Long Tran**

## Michelle Wire

5 messages

**Michael J. Avenatti** <mavenatti@eaganavenatti.com>     Mon, Apr 30, 2018 at 11:55 AM
To: "Judy K. Regnier" <jregnier@eaganavenatti.com>, "long

Judy - I know you are trying to dig out from last week, but please get with Long and figure out what the issue is on the CNB wire. This needs to be a priority. If I need to do something or find a branch on the East coast let me know but I want this resolved. Thanks.

Michael J. Avenatti, Esq.
Eagan Avenatti, LLP
520 Newport Center Drive, Ste. 1400
Newport Beach, CA 92660
Tel: (949) 706-7000
Fax: (949) 706-7050

mavenatti@eaganavenatti.com

The preceding email message (including any attachments) contains information that may be confidential, protected by the attorney-client or other applicable privileges, or constitutes non-public information. It is intended to be conveyed only to the designated recipient(s). If you are not an intended recipient of this message, please notify the sender by replying to this message and then delete it from your system. Use, dissemination, or reproduction of this message by unintended recipients is not authorized and may be unlawful.

**Long Tran**      Tue, May 1, 2018 at 10:38 AM
To: Michael Avenatti <mavenatti@eaganavenatti.com>
Cc: "Judy K. Regnier" <jregnier@eaganavenatti.com>

Thanks Michael.

Hi Judy,

The wire hasn't come through, and we can only trace it via the Fed Ref #. Please provide ASAP so we can see where it got held up. This is very urgent. Thank you.

Best,
Long
[Quoted text hidden]

**Judy K. Regnier** <jregnier@eaganavenatti.com>    Tue, May 1, 2018 at 3:08 PM
To: Long Tran      "Michael J. Avenatti" <mavenatti@eaganavenatti.com>

Long –

I asked the bank to put a trace on it. As soon as I get the results I will let you know ASAP.

Judy

https://mail.google.com/mail/u/0/?ui=2&ik=4f838dc127&jsver=CSjuCmRoJnw.en.&cbl=gmail_fe_180523.13_p6&view=pt&cat=Legal%2Fipsy&search=cat&th=1631e504a7119dda

USAO_00058766
00058872

Exhibit 281
Page 1 of 2

5/31/2018                                    RiceBunny Inc. Mail - Michelle Wire

**From:** Long Tran [mailto: ████████████████ ]
**Sent:** Tuesday, May 01, 2018 10:38 AM
**To:** Michael J. Avenatti
**Cc:** Judy K. Regnier
**Subject:** Re: Michelle Wire

[Quoted text hidden]

---

**Long Tran** ████████████████                                    Tue, May 1, 2018 at 5:15 PM
To: "Judy K. Regnier" <jregnier@eaganavenatti.com>
Cc: Michael Avenatti <mavenatti@eaganavenatti.com>

Judy,

Please provide the tracking number so we can trace on our end as well. If you initiated the wire, you should have that
information readily available.
[Quoted text hidden]

---

**Michael J. Avenatti** <mavenatti@eaganavenatti.com>                                    Tue, May 1, 2018 at 5:46 PM
To: Long Tran ████████████████
Cc: "Judy K. Regnier" <jregnier@eaganavenatti.com>

Pls handle.

Michael J. Avenatti, Esq.
Eagan Avenatti, LLP
520 Newport Center Drive, Ste. 1400
Newport Beach, CA 92660
Tel: (949) 706-7000
Fax: (949) 706-7050
████████████
mavenatti@eaganavenatti.com

The preceding email message (including any attachments) contains information that may be confidential, protected by the
attorney-client or other applicable privileges, or constitutes non-public information. It is intended to be conveyed only to
the designated recipient(s). If you are not an intended recipient of this message, please notify the sender by replying to
this message and then delete it from your system. Use, dissemination, or reproduction of this message by unintended
recipients is not authorized and may be unlawful.
[Quoted text hidden]

https://mail.google.com/mail/u/0/?ui=2&ik=4f838dc127&jsver=CSjuCmRoJnw.en.&cbl=gmail_fe_180523.13_p6&view=pt&cat=Legal%2Fipsy&search=cat&th=1631e504a7119dda

USAO_00058767
00058872

Exhibit 281
Page 2 of 2

Exhibit C



# DEPARTMENT OF THE TREASURY
## Internal Revenue Service
## Criminal Investigation

## Memorandum of Interview

---

**Investigation #:**  ███████           **Location:**   Via WebEx video conference
**Investigation Name:**  Michael Avenatti

**Date:**            June 14, 2021
**Time:**            Approximately 8:31
                     AM – 1:04 PM
**Participant(s):**  Judy Regnier, Witness
                     John Barton, Attorney
                     Ryan Roberson, Special Agent
                     Remoun Karlous, Special Agent
                     Brett Sagel, Assistant United States Attorney
                     Alex Wyman, Assistant United States Attorney



**JR was shown exhibit 56, email exchange dated April 30, 2018 between JR, MA, Tran, and Phan in which MA asks JR to resolve the CNB wire transfer issue, and provided the following information:**

76. MA instructed JR to say she would put a trace on the funds. At the time, JR knew that no funds had ever been sent. For this reason, red flags were being raised because this did not make sense to JR, even though JR did not know the terms of the agreement between MA and Phan.

77. MA may have used JR's computer and email to send this email. Occasionally MA would use JR's computer to type up an email and then say, "send this." JR was not comfortable with MA doing this, but once the email was sent it was too late for her to do anything. JR never told the person who was sent the email that the email was prepared and sent by MA, not JR.



AUSA Sagel thanked JR for her time and the interview was concluded at 1:04 PM.

I prepared this memorandum on June 14, 2021, after refreshing my memory from notes made during and immediately after the interview with JR.

Ryan Roberson
Special Agent

☑  Double click here to sign
Witness

U.S. Treasury Criminal Investigation

Exhibit D

52

| | | |
|---|---|---|
| 10:13 | 1 | A     No, I do not. |
| 10:13 | 2 | Q     If I could have you look at Exhibit 368, page 12. |
| 10:13 | 3 | A     (Witness complies.) |
| 10:14 | 4 |            MR. SAGEL:  It's already in evidence, Your Honor. |
| 10:14 | 5 | BY MR. SAGEL: |
| 10:14 | 6 | Q     Exhibit 368, page 12, there is a section for daily |
| 10:14 | 7 | balances for the MLP settlement account; is that correct? |
| 10:14 | 8 | A     Yes. |
| 10:14 | 9 | Q     And this is for the April 2018 period; is that correct? |
| 10:14 | 10 | A     Yes, it is. |
| 10:14 | 11 | Q     From April 17th through April 30th, was there ever |
| 10:14 | 12 | 8 million in this account? |
| 10:14 | 13 | A     No, there was not. |
| 10:14 | 14 | Q     As of April 23rd, how much is in this account? |
| 10:14 | 15 | A     $4,152,004. |
| 10:14 | 16 | Q     And that's how much is in the account through the end |
| 10:15 | 17 | of the month? |
| 10:15 | 18 | A     Yes, it is. |
| 10:15 | 19 | Q     If I could have you look at Exhibit 281, please. |
| 10:15 | 20 | A     (Witness complies.) |
| 10:15 | 21 | Q     Do you have that in front of you? |
| 10:15 | 22 | A     Yes. |
| 10:15 | 23 | Q     Is this an e-mail chain that you were on with the |
| 10:15 | 24 | defendant? |
| 10:15 | 25 | A     Yes, it is. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

53

| | | |
|---|---|---|
| 10:15 | 1 | Q    Including at least two of those e-mails being written |
| 10:15 | 2 | by the defendant? |
| 10:16 | 3 | A    Yes. |
| 10:16 | 4 | Q    Is this a fair and accurate e-mail chain that you were |
| 10:16 | 5 | on with the defendant in which he wrote at least two of the |
| 10:16 | 6 | e-mails? |
| 10:16 | 7 | A    Yes. |
| 10:16 | 8 |           MR. SAGEL:  The government moves to admit |
| 10:16 | 9 | Exhibit 281, Your Honor. |
| 10:16 | 10 |           MR. AVENATTI:  Objection.  Hearsay. |
| 10:16 | 11 |           THE COURT:  Overruled.  281 will be received.  The |
| 10:16 | 12 | e-mails by Mr. Avenatti will be received for the truth, the |
| 10:16 | 13 | others just for notice. |
| 10:16 | 14 |           (Exhibit 281 received in evidence) |
| 10:16 | 15 | BY MR. SAGEL: |
| 10:16 | 16 | Q    Let's start with the top.  Who is on this e-mail chain? |
| 10:16 | 17 | A    Michael Avenatti, myself, and Long Tran. |
| 10:16 | 18 | Q    And if you kind of look and the way gmail keeps it, the |
| 10:16 | 19 | subject line is along with the five messages; do you see |
| 10:16 | 20 | that? |
| 10:16 | 21 | A    Yes.  It's Michelle wire. |
| 10:16 | 22 | Q    So the subject of these e-mails are Michelle wire? |
| 10:16 | 23 | A    Yes. |
| 10:16 | 24 | Q    On April 30th, 2018, what does defendant write? |
| 10:17 | 25 | A    "Judy, I know you are trying to dig out from last week, |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

```
10:17    1   but please get with Long and figure out what the issue is on
10:17    2   the CNB wire.  This needs to be a priority.  If I need to do
10:17    3   something or find a branch on the East Coast, let me know,
10:17    4   but I want this resolved.  Thanks."
10:17    5   Q    What did you understand defendant saying when he says
10:17    6   he wants to make this a priority?
10:17    7   A    Michael sent that, and then he would contact me and
10:17    8   tell me through that e-mail when we were going to do the
10:17    9   wire but just to hold off.
10:17   10   Q    So after the defendant sent this e-mail to Long Tran
10:17   11   that you're on, you had a conversation with him?
10:17   12   A    Either after or before.
10:17   13   Q    What did he say at that time to you in relationship to
10:17   14   this e-mail?
10:17   15   A    That we weren't sending the wire right now.  He would
10:18   16   get back with me as to when we would release the wire.
10:18   17   Q    So as of April 30th when he's sending you this e-mail,
10:18   18   to you and Long Tran, had you sent any wires to Michelle
10:18   19   Phan?
10:18   20   A    No.
10:18   21   Q    Then he says:  "If I need to do something or find a
10:18   22   branch on the East Coast, let me know, but I want to get
10:18   23   this resolved."  What would the defendant need to do if he
10:18   24   wanted to send a wire to Michelle Phan?
10:18   25           MR. AVENATTI:  Speculation.  Conjecture, Your
```

55

| | | |
|---|---|---|
| 10:18 | 1 | Honor. |
| 10:18 | 2 | THE COURT:  Overruled. |
| 10:18 | 3 | THE WITNESS:  I would just have to initiate it and |
| 10:18 | 4 | he would approve it. |
| 10:18 | 5 | BY MR. SAGEL: |
| 10:18 | 6 | Q    Did he do that? |
| 10:18 | 7 | A    No. |
| 10:18 | 8 | Q    In response to defendant's e-mail on April 30th, did |
| 10:18 | 9 | Long Tran reply? |
| 10:18 | 10 | A    Yes.  He said, "Thanks, Michael.  Hi, Judy.  The wire |
| 10:18 | 11 | hasn't come through, and we can only trace it via the fed |
| 10:19 | 12 | ref number.  Please provide ASAP so we can see where it got |
| 10:19 | 13 | held up.  This is very urgent.  Thank you." |
| 10:19 | 14 | Q    Was there a fed reference number to provide at that |
| 10:19 | 15 | time? |
| 10:19 | 16 | A    No, there was not. |
| 10:19 | 17 | Q    And in an e-mail subsequent, you replied to Long Tran; |
| 10:19 | 18 | is that correct? |
| 10:19 | 19 | A    Yes, I did. |
| 10:19 | 20 | Q    Let's start with what did you say to Long Tran? |
| 10:19 | 21 | A    What I said was:  "Long, I asked the bank to put a |
| 10:19 | 22 | trace on it.  As soon as I get the result, I will let you |
| 10:19 | 23 | know ASAP." |
| 10:19 | 24 | Q    Why did you tell Long Tran that you asked the bank to |
| 10:19 | 25 | put a trace on it? |

56

| | | | |
|---|---|---|---|
| 10:19 | 1 | A | Because that's what Michael had me write. |
| 10:19 | 2 | Q | So why did you write it? |
| 10:19 | 3 | A | That's what Michael wanted to send to the client. |
| 10:19 | 4 | Q | Was there any wire to put a trace on? |
| 10:19 | 5 | A | Not at that time, no. |
| 10:20 | 6 | Q | On page 2, a couple hours later Long Tran replies to |
| 10:20 | 7 | | you and to the defendant again.  Do you see that? |
| 10:20 | 8 | A | Yes, I do. |
| 10:20 | 9 | Q | At 5:15 p.m.? |
| 10:20 | 10 | A | Yes. |
| 10:20 | 11 | Q | What did Mr. Tran say at that point? |
| 10:20 | 12 | A | "Please provide the tracking number so we can trace on |
| 10:20 | 13 | | our end as well.  If you initiated the wire, you should have |
| 10:20 | 14 | | that information readily available." |
| 10:20 | 15 | Q | Had you initiated the wire, is that correct that you |
| 10:20 | 16 | | would have had it readily available? |
| 10:20 | 17 | A | Yes. |
| 10:20 | 18 | Q | And why did you not have it readily available? |
| 10:20 | 19 | A | The wire had not been initiated as of that time. |
| 10:20 | 20 | Q | And in response to Long Tran's e-mail on May 1st, did |
| 10:20 | 21 | | defendant reply again? |
| 10:20 | 22 | A | Yes. |
| 10:20 | 23 | Q | What did he say? |
| 10:20 | 24 | A | "Please handle." |
| 10:20 | 25 | Q | Did you have a conversation with defendant at this time |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

57

| | | |
|---|---|---|
| 10:20 | 1 | when he said "Please handle"? |
| 10:21 | 2 | A    Yes. |
| 10:21 | 3 | Q    What did he say? |
| 10:21 | 4 | A    Michael said he was taking care of it.  This was his |
| 10:21 | 5 | way of making me be the scapegoat for whatever he was doing. |
| 10:21 | 6 | Q    If I could have you turn back to Exhibit 369, page 2. |
| 10:21 | 7 | A    (Witness complies.) |
| 10:21 | 8 | Q    On May 4th of 2018, the last two lines of this chart, |
| 10:21 | 9 | are there two outgoing wires? |
| 10:21 | 10 | A    Yes, there are. |
| 10:21 | 11 | Q    What are the amounts of the two outgoing wires? |
| 10:21 | 12 | A    $4 million and $146,288. |
| 10:21 | 13 | Q    Do you know if these were the wires to Michelle Phan? |
| 10:22 | 14 | A    Yes.  They were to her account, yes. |
| 10:22 | 15 | Q    And if you were to look at 275, this was the account |
| 10:22 | 16 | information that was provided to you by Long Tran for |
| 10:22 | 17 | Michelle Phan? |
| 10:22 | 18 | A    Yes, it is. |
| 10:22 | 19 | Q    But on March 14th it asks for the amount to be |
| 10:22 | 20 | $8,146,288; is that correct? |
| 10:22 | 21 | A    Yes, it is. |
| 10:22 | 22 | Q    And on May 4th, 2018, there were two wires that totaled |
| 10:22 | 23 | $4,146,288; is that correct? |
| 10:22 | 24 | A    Yes, it is. |
| 10:22 | 25 | Q    Why did you only send $4,146,288? |

58

| | | |
|---|---|---|
| 10:22 | 1 | A    That's the amount Michael instructed me to send. |
| 10:22 | 2 | Q    Why did you send it in two wires, one for 4 million and |
| 10:23 | 3 | one for $146,288? |
| 10:23 | 4 | A    Michael requested I send them in two wires. |
| 10:23 | 5 | Q    Now, if you look back up the chart in the previous |
| 10:23 | 6 | year, for example, in October of 2017, you were able to send |
| 10:23 | 7 | a $10 million wire? |
| 10:23 | 8 | A    Correct. |
| 10:23 | 9 | Q    Is there any reason that you had to split up this |
| 10:23 | 10 | $4 million and $146,288 wire? |
| 10:23 | 11 | A    No. |
| 10:23 | 12 | Q    And why did you split them up? |
| 10:23 | 13 | A    Michael wanted them sent in two separate wires. |
| 10:23 | 14 | Q    Did you tell Long Tran on that day how much was wired |
| 10:23 | 15 | to him -- or, to Michelle Phan? |
| 10:23 | 16 | A    I don't believe I did. |
| 10:23 | 17 | Q    Did you have any communications -- let me ask it a |
| 10:23 | 18 | different way.  Did you ever tell Long Tran that you sent |
| 10:23 | 19 | $8,146,000 on that day? |
| 10:24 | 20 | A    No. |
| 10:24 | 21 | Q    Did you ever tell anybody that you sent two $4 million |
| 10:24 | 22 | wires on that day? |
| 10:24 | 23 | A    No. |
| 10:24 | 24 | Q    How many $4 million wire transfers did you do on that |
| 10:24 | 25 | day? |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

59

| | | | |
|---|---|---|---|
| 10:24 | 1 | A | One. |
| 10:24 | 2 | Q | If you could look at Exhibit 368, page 14. |
| 10:24 | 3 | A | (Witness complies.) |
| 10:24 | 4 | Q | Do you see the daily balances? |
| 10:24 | 5 | A | Yes. |
| 10:24 | 6 | Q | As of May 1st of 2018, how much is in the account? |
| 10:24 | 7 | A | $4,100,000. |
| 10:25 | 8 | Q | Is there $8 million in the account to send to Michelle |
| 10:25 | 9 | | Phan? |
| 10:25 | 10 | A | No, there is not. |
| 10:25 | 11 | Q | After you sent the two wire transfers on May 4th, 2018, |
| 10:25 | 12 | | how much money is left in the account? |
| 10:25 | 13 | A | $23. |
| 10:25 | 14 | Q | Is there another $4 million to transfer to Michelle |
| 10:25 | 15 | | Phan in her trust account? |
| 10:25 | 16 | A | No, there is not. |
| 10:25 | 17 | Q | I'm going to have you look at Exhibit -- maybe it will |
| 10:25 | 18 | | be quicker to do them together.  If you could look at |
| 10:25 | 19 | | Exhibits 282, 283, and 286. |
| 10:25 | 20 | A | (Witness complies.) |
| 10:25 | 21 | Q | Have you seen all three? |
| 10:26 | 22 | A | Yes, I have. |
| 10:26 | 23 | Q | And are these all e-mails and attachments you sent to |
| 10:26 | 24 | | defendant? |
| 10:26 | 25 | A | Yes, they are. |

Exhibit E

 Gmail



## Re: United States v. Avenatti
1 message

emma hernandez <​███████████████>       Mon, Aug 16, 2021 at 8:38 AM
To: "Sager, Kelli" <​███████████████>
Cc: Dean Steward <​███████████████>, "Sagel, Brett (USACAC)" <​███████████████>,
"Wyman, Alex (USACAC)" <​███████████████>, "Stahl, Eric" <​███████████████>, "Cate-Gumpert,
Sam" <​███████████████>

From Mr. Steward and Mr. Avenatti:

Ms. Sager:  Please be advised that Mr. Avenatti will oppose the application and the relief sought.  As we
have explained, we are doing all we can to avoid any inconvenience to Ms. Rose or any other CNN
employee for that matter.  For instance, over the weekend, we proposed that the government agree to
the following factual stipulation so we could avoid having to call any CNN employee to testify:

"Mr. Avenatti was in Washington, D.C. on April 28, 2018 and April 29, 2018.  On April 29, 2018, he was
also in New York City.  He remained in New York City for a number of days, including April 29, 2018,
April 30, 2018, May 1, 2018 and May 2, 2018.  Video evidence supports these facts."

The government will not agree to this stipulation.  However, our offer still stands as of this email.

Thank you.

On Mon, Aug 16, 2021 at 8:00 AM Sager, Kelli <​███████████████> wrote:
> Counsel:
> This serves as notice that we will be filing an Ex Parte Application today, on behalf of non-party CNN
> Producer Jacqueline Rose, to quash a trial subpoena that was emailed to her on August 9, 2021, by the
> defense.  We also will ask the Court to order Mr. Avenatti and his counsel not to serve any other
> subpoenas on Ms. Rose or any other CNN employee without leave of Court.  The application and related
> documents will be emailed to you all as soon as they are completed this morning.  Per Judge Selna's
> procedures, any opposition will be due no later than 24 hours after email service is complete.  If a hearing
> is scheduled, you will be notified by the Courtroom Deputy Clerk.
> Sincerely,
> Kelli Sager
>
> **Kelli Sager** | Davis Wright Tremaine LLP
> 865 S Figueroa Street, Suite 2400 | Los Angeles, CA 90017
>
> ███████████████████████████
>
> Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

**<u>CERTIFICATE OF SERVICE</u>**

I, H. Dean Steward, am a citizen of the United States, and am at least 18 years of age. My business address is 17 Corporate Plaza, Suite 254 in Newport Beach, California. I am not a party to the above-entitled action.  I have caused, on August 16, 2021, service of the:

DEFENDANT'S OPPOSITION TO THE *EX PARTE* APPLICATION OF JACQUELINE ROSE FOR AN ORDER TO QUASH DEFENDANT'S SUBPOENA

on the following party, using the Court's ECF system:

AUSA BRETT SAGEL AND AUSA ALEXANDER WYMAN

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 16, 2021

<u>/s/ H. Dean Steward</u>
H. Dean Steward