Michael John Avenatti (Pro Se)

H. Dean Steward, SBN 85317
17 Corporate Plaza, Suite 254
Newport Beach, California 92660
Tel (949) 481-4900
Fax (949) 497-6753

Advisory Counsel for Defendant
MICHAEL JOHN AVENATTI

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | SA CR No. 19-061-JVS |
|---|---|
| Plaintiff, | DEFENDANT'S REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL PURSUANT TO FEDERAL RULE OF CRIMINAL 29 |
| v. | |
| MICHAEL JOHN AVENATTI, | |
| Defendant. | |

    Defendant MICHAEL JOHN AVENATTI ("Mr. Avenatti") by and through his advisory counsel of record, H. Dean Steward, hereby this Reply to the Government's Opposition to Defendant's Motion for Acquittal pursuant to Federal Rule of Criminal Procedure 29.

Dated: August 18, 2021

    Respectfully submitted,

    /s/ Michael J. Avenatti

    Defendant
    MICHAEL JOHN AVENATTI

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION AND FACTUAL BACKGROUND

On August 16, 2021, Mr. Avenatti filed a "Motion for a Judgment of Acquittal Pursuant to Federal Rule of Criminal Procedure 29." *See, e.g.,* Dkt. 717. On August 17, 2021, the Court Ordered the government to submit a response by the end of the day. *See, e.g.,* Trial Tr. (8/17/21, Vol. 1) p. 34-35. The Court indicated that it sought to focus the inquiry as to Counts 1, 2, 4 and 5 and address "one question in each of those counts raised is: need a particular wire transfer itself be unlawful, or is it sufficient that the wire transfer is part of the overall scheme?" *See, e.g.,* Trial Tr. (8/17/21, Vol.1) p. 86.

Later on August 17, 2021, Mr. Avenatti filed a supplement in support of his original filing pursuant to Federal Rule of Criminal Procedure 29. [Dkt. 726]. On the night of August 17, 2021, after the defendant's filing, the government filed its "Opposition to Defendant's Motion for a Judgment of Acquittal Pursuant to Federal Rule of Criminal Procedure 29." [Dkt. 726]. On August 18, 2021, the Court granted Mr. Avenatti the ability to submit a Reply to the government's opposition by 6:00 p.m.

## II.    ARGUMENT

### A. A Judgment of Acquittal Must be Entered for the Wire Fraud Counts

In the government's brief and in response to the Court's inquiry, the government represented, "[t]he wire itself need not be illegal; indeed, <u>the Supreme Court has specifically rejected that argument</u>" and "any mailing 'incident to an essential part of the scheme' satisfies the mailing element' even if the mailing 'contains no false information.'" *See, e.g.,* Dkt. 726, p. 5 (emphasis added); *citing Bridge v. Phoenix Bond & Indem. Co.,* 553 U.S. 639, 647 (2008); *quoting Scmuck v. United States*, 489 U.S. 705, 712 (1989). Contrary to the government's assertions, the Supreme Court in *Bridge* or *Schmuck* <u>did not</u> specifically address the question before this Court.

In *Bridge v. Phoenix Bond & Indem. Co.,* 553 U.S. 639, the Supreme Court addressed a civil RICO claim involving mail fraud. The parties involved were engaged in buying tax liens on delinquent properties. Obligations were imposed on these parties and prevented a single entity from obtaining excessive tax liens. Respondent alleged that Petitioners improperly obtained tax liens by submitting false declarations to the County through the U.S. mail. The question at issue in *Bridge* was whether the facts supported a showing of mail fraud because the fraudulent misrepresentation was made to the County rather than directly to the Respondent. The Court in *Bridge* determined that the filing party need not establish first-party reliance on the material misrepresentation and determined "a person can be injured 'by reason of' a pattern of mail fraud even if he has not relied on any misrepresentations." *Id.* at 649. The Supreme Court in this case did not specifically reject defendant's argument as the government claims. *See, e.g.,* Dkt. 726, p. 5

*Schmuck v. United States*, 489 U.S. 705 (1989) similarly does not support the government's position. In *Schmuck*, the defendant purchased used cars, rolled back the odometers, and sold these vehicles to retail dealers at improperly inflated values. Relying on the odometer readings, the retailers would resell the vehicles to their customers for prices exceeding their true value. In doing so, the car retailers would use the mail to submit a title-application form to the Wisconsin Department of Transportation. *Id.* at 707. In *Schmuck*, the Court indicated, "the federal mail fraud statute does not purport to reach <u>all frauds</u>, but only those limited to those instances in which the use of the mails <u>is a part of the execution of the fraud</u>, leaving all other cases to be dealt with by appropriate state law." *Id.* at 710; *citing Kann v. United States*, 323 U.S. 88, 95 (1944)(emphasis added). The Supreme Court determined that the "mailing of the title-registration forms was an essential step in the successful passage of title to the retail purchasers." *Id.* at 714. The Court determined that this mailing was sufficient to justify the conviction because absent the mailing, the scheme described in *Schmuck*

2

would not have come to fruition. Neither of these cases answer the question of whether a particular wire transfer need to be unlawful to in order to support the offense of wire fraud.

The government ignores the Ninth Circuit case of *United States v. Narum*, 577 Fed. Appx. 689, 691 (9th Cir. 2014) cited by Mr. Avenatti. In that case, the Ninth "reject[ed] the government's contention that a wire fraud conviction may be based on any wire transfer taking place during a time period encompassed by the scheme to defraud. <u>Wire fraud requires a use of the wires **in furtherance** of a scheme to defraud, not merely a use of the wires **during** a scheme to defraud.</u>" *Id.* at 691 (emphasis added). *See also Kann v. United States*, 323 U.S. 88 (1944)(holding that although the defendants cashed checks obtained as part of a fraudulent scheme and knew that the bank would send the checks by mail, there was no violation of the mail fraud statute because the scheme reached fruition and the mailing was "immaterial … to any consummation of the scheme"); *United States v. Maze*, 414 U.S. 395, 400-402 (1974)(reversing convictions for mail fraud where defendant stole roommates credit card, obtained lodging from a motel and it was foreseeable that the merchant would mail an invoice to the bank and the card owner because the mailing was not "for the purpose of executing such scheme or artifice").

The regulated conduct at issue in wire fraud is not merely a 'scheme to defraud,' but more precisely <u>*the use of the … wires in furtherance of a scheme to defraud*</u>." *United States v. Hussain*, 972 F.3d 1138, 1143 (9th Cir. 2020)(emphasis added); citing *Bascunan v. Elsaca*, 927 F.3d 108 (2d Cir. 2019)(italics in original). A wire transmission must be "part of the execution of the scheme as conceived by the perpetrator at the time." *United States v. Redcorn*, 528 F.3d 727, 738 (10th Cir. 2008); *quoting Schmuck v. United States*, 489 U.S. 705, 715 (1989). Once the initial, criminalized wire transfer is complete, the subsequent use of the wires is not in furtherance of the scheme to defraud, "but instead was meant to allow him to enjoy the fruits of his crime." *Narum*, *supra,* 577

Fed. Appx. at 691. Accordingly, except in very limited circumstances, subsequent wires cannot form the basis for a wire fraud conviction.

Mr. Avenatti asks that the Court find that the government has failed to establish that Counts 1, 2, 4 and 5 (and all other counts) were in furtherance of any scheme to defraud. Moreover, in connection with Counts 1, 2, 4 and 5, the government has failed to establish that the relevant funds were not legally owed to Mr. Avenatti or effectuated the alleged scheme to defraud his former clients in any way.

### B. The Government Misstates the Evidence Presented at Trial

Within the government's opposition, the government makes many statements of alleged fact that are not based on the actual evidence presented during trial. Additionally, the government fails to deny or refute many of the facts set forth by the defendant.

Counts 1-2: Without any citations to the record, the government has claimed that prior to Mr. Avenatti depositing legitimately earned attorney's fees, the defendant lied to Geoffrey Johnson that a settlement with the County had yet to be finalized, caused Mr. Johnson's signature to be forged, and failed to disclose the settlement agreement. *See, e.g.,* Dkt. 726, p. 6. This argument by the government misstates the testimony of Mr. Johnson.

Mr. Johnson agreed that when he met with the government on March 31, 2019, he informed the government that Mr. Avenatti brought the settlement agreement to him while he was living at Sunrise of West Hills. *See, e.g.,* Trial Tr. (7/22/21, Vol. 2) p. 12. Consistent with his statement to the government, the evidence established that the settlement agreement was signed on January 2, 2015, during the time in which Mr. Johnson was living at Sunrise of West Hills. *See, e.g.,* Trial Tr. (7/22/21, Vol. 2) p. 12. During his meeting with the government, Mr. Johnson indicated that "he may have signed the document but his signature looks funny." *See, e.g.,* Trial Tr. (7/22/21, Vol. 2) p. 5. Mr. Johnson testified that he relayed to the government that the "G" and the "E" looked "funny." *See, e.g.,* Trial Tr. (7/22/21, Vol. 2) p. 56-57. Immediately prior to Mr.

4

Johnson's signature on the settlement agreement, the document reads "CAUTION: READ BEFORE SIGNING" *See, e.g.,* Trial Tr. (7/22/21, Vol. 2) p. 30-31. On the first page of the settlement agreement, the settlement amount of $4,000,000 is clearly listed. The government has failed to cite to any evidence in the trial record establishing that Mr. Avenatti did not deliver the settlement agreement, did not explain its terms, and forged Mr. Johnson's signature.

Nowhere in the government's brief does the prosecution deny, nor can they based on the evidence presented, that Mr. Avenatti was entitled to attorney's fees of $1,600,000.00 (40% of $4,000,000). Instead, the government claims that "a jury could easily infer that defendant's attempt to withdraw 40% as his fees, and then the 'costs' immediately after … were to conceal his theft of Mr. Johnson's funds." Mr. Avenatti's collection of funds legally due to him in no way advances any scheme to defraud Mr. Johnson. The government claims that the $250,000 sent from the EA account to Global Baristas US LLC account and the $50,000 sent from the EA account to Mr. Avenatti's personal account furthered his scheme to defraud Mr. Johnson because these funds originated from the proceeds of a settlement executed between Mr. Johnson and Los Angeles County. So what? The transmission of these two wires cannot be said to conceivably be <u>in furtherance of, essential to, or any step in a scheme to defraud Mr. Johnson.</u> Instead, these wire transfers would have occurred independent of any scheme to defraud Mr. Johnson. Further, both wires are subsequent to the prior transfers from the EA trust account relating to Mr. Johnson's settlement. Even if the $1,600,000 was related to the scheme as the government. claims, any scheme to defraud relating to this money would have been complete when the money was first transferred from the EA trust account and, thus, any later transfer of $300,000 ($250,000 plus $50,000) cannot form the basis for wire fraud convictions. *Narum, supra,* 577 Fed. Appx. at 691.

<u>Counts 4-5:</u> First, the government claims that it has sufficiently proven that Mr. Avenatti caused the wire alleged in Count 4 to be sent. The government points

5

exclusively to Government Exhibit 191 where Mr. Avenatti e-mailed opposing counsel Mr. Sheikh with the wire instructions. *See, e.g.,* Dkt. 726, p. 8. However, the government has failed to establish who actually transmitted the wire. There is no evidence that Mr. Shiekh personally transmitted the wire himself. AUSA Sagel asked Mr. Shiekh the question, "What involvement, if any, did you have with Brock paying the $1.6 million to be wired into defendant's trust account?" *See, e.g.,* Trial Tr. (8/10/21, Vol. 2) p. 54. Before being cut off by AUSA Sagel, Mr. Shiekh responded, "Without going into any privileged communications, I can tell you that I made sure –" *See, e.g.,* Trial Tr. (8/10/21, Vol. 2) p. 54. The government does not dispute this fact or point to evidence to establish that Mr. Sheikh personally transmitted the wire at Mr. Avenatti's direction and it remains unknown who transmitted the relevant wire and at what direction.

     Next, the government argues that the initial payment from Brock US, LLC to Mr. Barela (Count 4) was obtained "based on false statements and false representations to his client, and the wire that the defendant caused to be made into CNB 5566 carried out an essential part of his scheme." *See, e.g.,* Dkt. 726, p. 8. This wire transfer in no way advanced Mr. Avenatti's alleged scheme. Taking the government's version of facts as true and accepting the prosecution's alleged theory as correct, this wire would have been transferred on the same date, for the same amount regardless of whether Mr. Avenatti represented the initial payment date was on January 10, 2018 or March 10, 2018, as a result of both the email agreement, which was binding, and the settlement agreement. The wire transmitted from a third-party opposing counsel in no way advances Mr. Avenatti's alleged scheme to defraud Mr. Barela.

     Similarly, as it relates to Count 5, the government makes no objection to Mr. Avenatti's claims that the legal fees owed to Mr. Avenatti were at least $760,000 in addition to case-related expenses of at least $180,797. *See, e.g.,* Government Exhibit 439. By the government expert witness' calculation, Mr. Barela was due $659,203 as of January 5, 2018. Mr. Drum's analysis, as summarized in Government Exhibit 441,

established that on January 10, 2018, a wire transfer was made in the amount of $60,000 from the EA Trust account to EA account number 3714 with sufficient funds in the trust account remaining to pay Mr. Barela the total amount due to him as calculated by the government. This wire transmission of $60,000 acts as the basis for Count 5.

<u>The transmission of these two wires was not in furtherance of any scheme to defraud Mr. Barela.</u>

### III. CONCLUSION

For each of the reasons stated above, defendant respectfully requests that the Court grant the motion and enter a judgment of acquittal for Counts 1 through 10.

Dated: August 18, 2021

Respectfully submitted,

/s/ Michael J. Avenatti

Defendant
MICHAEL JOHN AVENATTI

# CERTIFICATE OF SERVICE

I, H. Dean Steward, am a citizen of the United States, and am at least 18 years of age. My business address is 17 Corporate Plaza, Suite 254 in Newport Beach, California. I am not a party to the above-entitled action. I have caused, on August 18, 2021, service of the:

DEFENDANT'S REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL PURSUANT TO FEDERAL RULE OF CRIMINAL 29

on the following party, using the Court's ECF system:

AUSA BRETT SAGEL AND AUSA ALEXANDER WYMAN

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 18, 2021

/s/ H. Dean Steward
H. Dean Steward