Michael John Avenatti (Pro Se)

H. Dean Steward, SBN 85317
17 Corporate Plaza, Suite 254
Newport Beach, California 92660
Tel (949) 481-4900
Fax (949) 497-6753

Advisory Counsel for Defendant
MICHAEL JOHN AVENATTI

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | SA CR No. 19-061-JVS |
| Plaintiff, | DEFENDANT'S REPLY TO THE |
| v. | GOVERNMENT'S OPPOSITION TO MOTION FOR MISTRIAL OR, IN THE ALTERNATIVE, TO STRIKE THE |
| MICHAEL JOHN AVENATTI, | TESTIMONY OF ROBERT AMENTA |
| Defendant. | AND JOHN DRUM DUE TO VIOLATIONS OF THE JENCKS ACT, RULE 26.2, *BRADY* AND *GIGLIO* |

Defendant MICHAEL JOHN AVENATTI ("Mr. Avenatti") by and through his advisory counsel of record, H. Dean Steward, hereby files this reply to the government's opposition to defendant's motion for mistrial or, in the alternative, to strike the testimony of John Drum and Robert Amenta due to violations of the Jencks Act, Rule 26.2, *Brady* and *Giglio*.

Dated:  August 19, 2021

Respectfully submitted,

/s/ Michael J. Avenatti

Defendant
MICHAEL JOHN AVENATTI

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

On August 14, 2021, the defendant filed a Motion for Mistrial or, In the Alternative, to Strike the Testimony of Robert Amenta and John Drum due to Violations of the Jencks Act, Rule 26.2, *Brady* and *Giglio*. This motion was based upon the confirmed and admitted failures of the government to meet their discovery obligations with both Robert Amenta and John Drum. These failures are serious and strike at the heart of defendant's fundamental right.

If the law is not enforced in this case, it erodes the value of the government's discovery obligations and sets egregious precedent for prosecutors in the future. The United States is distinct from other nations in that laws have been established to protect its citizens from government tyranny by providing constitutional protections. Justice is not effectuated when individuals, acting within their capacities as government agents covered by the veil of righteousness, bastardize the Federal Rules of Evidence, the case law of both the Ninth Circuit and the Supreme Court, and the United States Constitution, all in an effort to get a conviction at all costs.

The government should not be permitted to make repeated misrepresentations to the Court, mock the defendant for claiming the prosecution has failed to fulfill its obligations (when they know he is right), and rely on unsupported privileges to prevent disclosure and then, once caught, receive no sanctions. Most days when the Court enters, a statement is read by the Court's clerk: "all rise and face the flag. In the presence of the flag emblematic of our Constitution and remembering the principles for which it stands, this United States District Court is now in session." One of those fundamental principles is that all are equal under the law, both criminal defendants and government agents/prosecutors alike.  Another is the concept of due process.  Both should be enforced by the Court.

<u>John Drum:</u> On August 12, 2021, the government called the final witness in their case-in-chief, Mr. John Drum, to testify as an expert. *See, e.g.,* Trial Tr. (8/12/2021, Vol. 2) p. 49. John Drum was an essential witness. Acting within his capacity as a forensic. Accountant, Mr. Drum was the only government expert to testify this case. During the cross-examination of Mr. Drum, it became apparent that the government failed to abide by its discovery obligations under *Jencks*, *Brady, Giglio* and Rule 26.2. Relying on the work-product privilege, the government indicated, "To the extent he had substantive conversations relating to his testimony, it's covered by the work product privilege." *See, e.g.,* Trial Tr. (8/13/21, Vol. 1) p. 119-120.

Mr. Avenatti asked that "the Court direct the witness, Mr. Drum, to provide to the Court all written communications with the Government, whether it be the prosecutors or the agents, relating to his testimony in this case. Because, Your Honor, the witness could not have been more clear, for two-and-a-half years he has been communicating by e-mail with the Government relating to this case." *See, e.g.,* Trial Tr. (8/13/21, Vol. 2) p. 6.

AUSA Wyman responded, "I haven't had a chance [sic] research the issue. My understanding with an expert is that substantive work product like the exchange of drafts, for example, falls within the work product exception. <u>But with regard to substantive e-mails, what we were able to find was **virtually nothing**[1]</u>, and the stuff that we had found was like -- you know, I was asking for the extent of their payment and the breakdown of what that payment was for, and we had copied and pasted that and put that into a disclosure letter to the defense." *See*, *e.g.,* Trial Tr. (8/13/21, Vol. 2) p. 5.The

---

[1] This statement proved to be a **complete lie and a blatant misrepresentation to the Court.** As discussed herein, the communications ultimately provided to Mr. Avenatti establish that on August 13, 2021, during the lunch break between 12:53-12:54 p.m. and with Mr. Drum on the stand, AUSA Sagel forwarded AUSA Wyman three e-mail strings and an attachment consisting of 26 pages of documents highly relevant to and related to the subject matter of government expert John Drum's testimony. These emails contained both Jencks and Brady/Giglio materials. **Thirty-six (36) minutes after forwarding this e-mail**, AUSA Wyman came before the Court and told the Court and all parties that he was able to find **"virtually nothing."**

government was ordered to provide the undisclosed materials in-camera. On August 15, 2021, the government filed an in-camera filing in connection with the undisclosed Drum materials. This filing consisted of 389 pages.

Unbeknownst to Mr. Avenatti and without any notice to the defendant or his advisory counsel, the Court held an in-person in-camera hearing with AUSA Sagel and AUSA Wyman on August 16, 2021 at 2:03 p.m. Mr. Avenatti was down the hall, in the 10th floor Attorney Room, and working with his paralegals while this private hearing occurred. On August 16, 2021, at 2:21 p.m., AUSA Wyman e-mailed advisory counsel alerting the defendant, "Per the Court's order this afternoon, please see attached our in camera filing from this weekend. The Court has directed us to file this under seal, which we will be doing shortly, and provide a copy to defendant." This filing consisted of 389 pages.[2] Based on the content of the 389 pages and Mr. Drum's testimony, it is clear that Mr. Avenatti has still not been provided all the materials that are required to be produced pursuant to the government's discovery obligations under *Jencks*, the Jencks Act, *Brady*, *Giglio*, *Bundy*, *Price,* Rule 16 and this Court's January 2021 discovery order. The specifics of what Mr. Avenatti knows are missing are addressed below.

Robert Amenta: Mr. Avenatti elicited testimony from Investigator Amenta that revealed he communicated with the government regarding the substance of his testimony. In response to Mr. Avenatti's objections to the prosecution's lack of discovery, the government filed its "Government's Filing Regarding Email

---

[2] The timing of the government's forced disclosure makes it nearly impossible for Mr. Avenatti to perform a meaningful review of the 389 pages of undisclosed materials. As all parties are aware, the defendant began his case-in-chief on Tuesday, August 17, 2021, only hours after this lengthy disclosure. In addition to preparing for his direct examinations, coordinating witness testimony, and drafting extensive briefing in this case, the defendant is now forced to review nearly 400 documents to determine what he would have done differently during his cross-examination. The timing obligations imposed by the Jencks Act, Rule 26.2, *Brady, Giglio, Bundy, Price* and *Olsen* are created to allow for the defendant to adequately prepare for trial and mount a defense. A post hoc document dump is exactly the type of situation these rules were created to avoid.

Communications with Robert Amenta." [Dkt. 690]. In its filing, the government stated that it had failed to provide the defendant two e-mail correspondence between the government and Investigator Amenta regarding the subject matter of the testimony. The government attached two e-mails to its pleadings but failed to include, and still has yet to provide to the defendant, the attachments referenced in these emails.  Further, based on his testimony, it is obvious that this is not all of the written statements by Investigator Amenta.

In addition to the August 14, 2021 motion for mistrial or, in the alternative, to strike the testimony of John Drum and Robert Amenta due to violations of the Jencks Act, Rule 26.2, *Brady* and *Giglio*, the defendant provided the Court with additional information as to the materiality of the undisclosed materials in a Supplement to Motion for Mistrial or, In the Alternative, to Strike the Testimony of Robert Amenta and John Drum due to Violations of the Jencks Act, Rule 26.2, *Brady* and *Giglio*. *See, e.g.,* Dkt. 720. On August 18, 2021, the Court stated, "[w]ith regard to Mr. Amenta … I'm going to deny the motion to strike Mr. Amenta's testimony or to grant a mistrial. I believe the document on which Mr. Avenatti focuses is – would have been appropriate ground for cross-examination, but I don't believe it's material to the government's overall showing with that witness." *See, e.g.,* Trial Tr. (8/18/21, Vol. 1) p. 9. Based on the following, Mr. Avenatti asks that the Court reconsider its ruling and strike the testimony of Investigator Amenta or declare a mistrial.

On August 18, 2021, the government filed its Opposition. [Dkt. 732]. It its opposition, the government acknowledges that it failed to provide statements made by Investigator Amenta regarding the subject matter of his testimony. The government falsely claims that all the materials contained within e-mails were memorialized into the three memoranda of interview previously provided to the defendant. In connection with Mr. Drum, the government admits that the defendant was correct that the work product privilege does not apply to disclosures required under the Jencks Act despite the

4

prosecution's constant mockery of Mr. Avenatti's lack of *Jencks*-related knowledge. The government admits that these materials were based on a misunderstanding of the law and should have been provided. The government argues, however, that the only remedies prescribed under the law (either a mistrial or striking of the witness's testimony) should not be provided to Mr. Avenatti.

Based upon the government's flagrant, deliberate and calculated failures to produce discovery in this case, serious sanctions must result. The Court has been assured time and time again that the government has produced all discovery owed to the defendant. <u>As established below, one of two remedies is required under the law as a result of the governments conduct: a mistrial or the striking of the witness' testimony.</u> Further, even though the prejudice is obvious, under Ninth Circuit precedent, no prejudice need be shown.

## II.    LEGAL STANDARD

### A.    What is a "Statement" Under the Jencks Act and Rule 26.2?

The Jencks Act requires the government to produce all statements "which relate to the subject matter as to which the witness [will] testif[y]."  18 U.S.C. § 3500(b). Importantly, "the statement need relate only *generally* to the events and activities testified to by the witness to come within [the] sweep" of 18 U.S.C. § 3500.  *United States v. Bibbero*, 749 F.2d 581, 585 (9th Cir. 1984)(emphasis added).  "The act requires the government, upon the defendant's motion, to produce statements made by any of its witnesses which the particular witness *signed, adopted or approved*, and which pertain to their testimony at trial.  The hope is that these statements will afford the defense a basis for effective cross-examination of government witnesses and the possible impeachment of their testimony . . ."  *United States v. Kimoto*, 588 F.3d 464, 475 (7th Cir. 2009)(emphasis added)(citing *United States v. Johnson*, 200 F.3d 529, 534 (7th Cir. 2000)(internal citations omitted))."  *See also*, Fed.R.Crim.P. 26.2(f) (defining "statement" to include any "written statement that the witness makes and signs, *or otherwise adopts*

5

*or approves*," as well as any substantially verbatim, contemporaneously recorded recital of the witness's oral statement)(emphasis added); *United States v. Ogbuehi*, 18 F.3d 807, 811 (9th Cir. 1994)("where it is shown that a witness adopted notes that were not provided to the defendant, court is required to remand so that district court can conduct an in camera review to determine if the notes are 'statements'").

Rather than limiting the *Jencks* case, the Jencks Act "reaffirms the Jencks case in its holding that provides that a defendant on trial in a criminal prosecution is entitled to relevant and competent reports and statements in possession of the government *touching the events and activities* as to which a government witness has testified at the trial." *Goldberg v. United States*, 425 U.S. 94, 96 (1976)(emphasis added); *See also, United States v. Bobadilla-Lopez*, 954 F.2d 519, 524 (9th Cir. 1992)("the Court has noted explicitly that the legislative history of the Jencks Act indicates clearly that the statute 'was not intended to limit the *Jencks* decision'"); *Palermo v. United States*, 360 U.S. 343, 353 n.10 (1959)**("the statute does not provide that inconsistency between the statement and the witness' testimony is to be a relevant consideration" in determining which statements are to be produced).**

Accordingly, "statements" often include, but are not limited to, notes of witness interviews (handwritten and typed), audio and video recordings of the witness, and letters, text messages, emails, and similar files from the witness, adopted by the witness, or approved by the witness. **Emails generally are written statements that the witness makes and signs, or otherwise adopts or approves**. *See United States v. Hamilton*, 2012 U.S. Dist. LEXIS 167591, at *18 (W.D. Wash. 2012); *citing* Fed. R. Crim. P. 26.2(f)(1); 18 U.S.C. 3500(e)(1); *United States v. Toilolo*, 2015 U.S. Dist. LEXIS 85100, *30-31 (D. Haw. 2015)(e-mail communications should have been provided to the defendant as *Jencks* and *Giglio* material as the e-mails were the witness' statements). A text message similarly often meets the definition of a "statement" as defined by the Jencks Act. *United States v. Losch*, 2019 U.S. Dist. LEXIS 208926, at *6 (D. Az. 2019)("the Court agrees that a text message may meet the definition of 'statement' as outlined in the Jencks Act."). Even statements regarding "meeting times, meeting

locations, and other logistical arrangements may potentially relate to the subject matter of a witness' testimony." *Id.* The government's obligations under the Jencks Act extends to statements possessed by the prosecutorial arm of the federal government. *United States v. Merlino*, 349 F.3d 144, 146 (3d Cir. 2003); *see also, United States v. Waters*, 2006 U.S. Dist. LEXIS 102198, at *4 (W.D. Wash. 2006).

In concert with these principles, the United States Department of Justice has directed their prosecutors that "members of the prosecution team should err on the side of preservation when deciding which e-communications to preserve for review." James M. Cole, DOJ *Guidance on the Use, Preservation, and Disclosure of Electronic Communications in Federal Criminal Cases* (March 30, 2011). This includes substantive e-communications created or received in the course of an investigation and prosecution and those communications sent to or received from potential witnesses who are not law enforcement personnel. *Id.* Even logistical communications may be discoverable when their content includes *Brady, Giglio, Jencks* or Rule 16 content. *Id.* at p. 8.

**B.     What are the consequences for non-compliance with the *Jencks* Act and Rule 26.2?**

The Supreme Court's holding in *Jencks v. United States*, 353 U.S. 657 (1957), 18 U.S.C. § 3500 (the "Jencks Act"), and Fed. R. Crim. P. 26.2 are all clear as to the requirement of production of statements immediately after a government witness testifies.  Equally clear are the consequences for non-compliance – striking a witness's testimony and/or ordering a mistrial.  Indeed, under the clear language of the Act and the Rule, once a violation is discovered, the Court is <u>required</u> to either strike the testimony or declare a mistrial.  *See, e.g.*, *United States v. Cardenas-Mendoza*, 579 F.3d 1024, 1029 (9th Cir. 2009) ("Jencks Act sanctions are triggered when the government does not provide a witness's statement properly requested under the act. *United States v. Well*, 572 F.2d 1383, 1384 (9th Cir. 1978). Ordinarily, **sanctions are mandatory**, and the district court must either strike the testimony of a witness whose statement is not produced or, alternatively, declare a mistrial.")(emphasis added).

Forty-three years-ago in *United States v. Well*, the Ninth Circuit made its position

clear as to *Jencks* violations and their serious consequences:

> **The Jencks Act does not require the defendant to show prejudice.** The Act provides that after a government witness testifies at trial the government must produce, on request, any previously made statements by that witness which relate to the witness's testimony on direct examination. 18 U.S.C. § 3500(b). If the government fails to produce such statements, **the court is required to strike the testimony of the witness**. 18 U.S.C. § 3500(d). As the Supreme Court noted in its comprehensive discussion of the Jencks Act in Palermo v. United States, 360 U.S. 343, 353 n.10, 79 S. Ct. 1217, 1225, 3 L. Ed. 2d 1287 (1959), "the statute does not provide that inconsistency between the statement and the witness' testimony is to be a relevant consideration" in determining which statements must be produced.

*Well*, 572 F.2d at 1384. This is entirely consistent with the plain language of the Act and the Rule. *See*, *e.g.*, Rule 26.2(e) ("Sanction for Failure to Produce or Deliver a Statement. If the party who called the witness disobeys an order to produce or deliver a statement, the court **must** strike the witness's testimony from the record. If an attorney for the government disobeys the order, the court **must** declare a mistrial if justice so requires.")(emphasis added); 18 U.S.C. § 3500(d) ("If the United States elects not to comply with an order of the court under subsection (b) or (c) hereof to deliver to the defendant any such statement, or such portion thereof as the court may direct, the court **shall** strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared.")(emphasis added).

## C.    The Government's Case Law is Unpersuasive and Inapplicable

The cases cited by the government are not persuasive and the facts underlying each of those cases is widely dissimilar and not nearly as egregious as the case before this Court. The government cites the *United States v. Finnegan*, 568 F.2d 637, 642 (9th Cir. 1977) case for the proposition that the district court has broad discretion in determining whether Jencks Act sanctions ought to be imposed. In *Finnegan*, the government failed to produce certain interview notes that "may have been" a Jencks

statement based on a finding that the loss of the notes was "not intentional and perhaps not even negligent. The government's bad faith was not an issue." *Id.* at 642. The government also relies heavily on *United States v. Echeverry*, 759. F.2d 1451 (9th Cir. 1985) for the proposition that trial court should not impose sanctions on the government. In *Echeverry*, the government failed to disclose (one of two) prior grand jury transcripts of the DEA Agent's prior testimony. The district court declined to impose sanctions on the prosecution based on a finding that there was no bad faith, the transcript was substantially similar to the one previously produced, and the defendant alleged no concrete injury. *Id.* at 1456. In deciding whether to impose these sanctions, the court weighed two factors: (1) the culpability of the government, and (2) the injury resulting to the defendants. *Id.*

The government argues that *United States v. Sterling*, 742 F.2d 521, 524 (9th Cir. 984) establishes that a district court does not abuse its discretion when it declines to impose a sanction where other materials available enabled vigorous cross-examination. In *Sterling*, the government witness was called to testify against the defendant seven days into a nine day trial. While testifying in trial, the witness alerted the prosecution for the first time that the witness testified earlier in an out-of-state grand jury proceeding related to the defendant. *Id.* at 524. The district decided not to impose sanctions because it made a specific finding that the failure "was totally inadvertent and not due to any willful attempt to conceal statements from the defense [and] all other Jencks Act statements of the remaining government witnesses…" *Id.* at 525.

Finally, the government argues that the appropriate remedy would be to allow a 'reasonabl[e]' 'recess' to review the statement and then recall the witness for further cross-examination." *See, e.g.,* Dkt. 732, p. 4.  Pursuant to 18 U.S.C. 3500(c), "[w]henever any statement is delivered to a defendant pursuant to this section, the court in its discretion, upon application of said defendant, may recess proceedings in the trial for such time as it may determine to be reasonably required for the examination of such

9

statement by said defendant and his preparation for its use in the trial." This request for recess refers to the scenario where the government has completed its direct and chose to wait to provide the relevant Jencks statements until after its direct examination concludes. *See United States v. Buckland*, 1996 U.S. App. 28237, at *2 (9th Cir. 1996)("The statute requires production of a Jencks Act statement 'after a witness called by the United States has testified on direct examination,' 18 U.S.C. 3500(b), and gives the district court discretion to recess trial proceedings 'for such time as it may determine reasonably required for the examination of such statement by said defendant and his preparation for its use in the trial.' 18 U.S.C. 3500(c)."). The government ignores the next passage of 18 U.S.C. 3500 which reads in part, "If the United States elects not to comply with an order of the court under subsection (b) or (c) hereof to deliver to the defendant any such statement, or such portion thereof as the court may direct, <u>the court</u> **<u>shall</u>** <u>strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared</u>." 18 U.S.C. 3500(d)(emphasis added).

Finally, the government claims that the undisclosed materials are not *Brady* or *Giglio.* Without citing any case law, the government claims that "none of the information in any emails with either Mr. Amenta or Mr. Drum could be considered 'favorable to the defense.'" *See, e.g.,* Dkt. 4, n. 1. The government is wrong. The suppression of evidence favorable to an accused is itself sufficient to amount to a denial of due process. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The prosecution's suppression of evidence that is favorable to the accused "violates due process where the evidence is material either to guilt or to punishment, irrespective of good faith or bad faith of the prosecution." *Id.* at 88. The law is clear that the government is required to promptly produce to the defense all information favorable to the defense, regardless of materiality. *See, e.g., United States v. Bundy*, 968 F.3d 1019, 1033 (9th Cir. 2020)(requiring all favorable evidence to be disclosed by prosecutors pretrial, without regard to materiality: "[T]rial prosecutors

10

must disclose favorable information without attempting to predict whether its disclosure might affect the outcome of the trial. . . . The retrospective definition of materiality is appropriate only in the context of appellate review" and not at the trial level.)(citation omitted); *United States v. Price*, 566 F.3d 900 (9th Cir. 2009)(requiring prosecutors to produce all potentially exculpatory or otherwise favorable evidence without regard to how the withholding of such evidence might be viewed as affecting the outcome of the trial); *United States v. Olsen*, 704 F.3d 1172, 1183 n.3 (9th Cir. 2013)(explaining that a prosecutor should not produce only what he considers "material" because it is "just too difficult to analyze before trial" what may be material).  Further, pursuant to *Giglio*, any information that can be used to impeach a witness or call the witnesses credibility into question must be produced.  *Giglio* is *Brady*.

In addition, on January 25, 2021, the Court issued an Order in this case directing the government to produce to the defense "<u>all</u> information or evidence known to the government that is <u>either</u>: (1) <u>relevant</u> to the defendant's guilt or punishment; **<u>or</u>** (2) favorable to the defendant on the issue of guilt or punishment." [Dkt. 408, the "Order" (emphasis added)].

## III.   ARGUMENT

### A.   The Testimony of John Drum Must be Stricken <u>or</u> a Mistrial Declared

During the cross examination of government expert John Drum, it was revealed that Mr. Drum had extensive communication with the government, over the last two-and-a-half years regarding the subject matter of his testimony. Under cross-examination, Mr. Drum testified that he has been working on this case since "sometime in late 2018." *See, e.g.,* Trial Tr. (8/13/21, Vol. 1) p. 87. Mr. Drum testified that the first time he met with the government in person was the Monday prior to his testimony and all other communications during the approximate two-and-a-half years prior were done by phone and e-mail. *See, e.g.,* Trial Tr. (8/13/21, Vol. 1) p. 88. Mr. Drum also answered "yes" to

the question, "[a]nd have you over the last two-and-a-half years been in fairly regular communication with the Assistant U.S. Attorneys and the agents in connection with this matter?" *See, e.g.,* Trial Tr. (8/13/21, Vol. 1) p. 94. He indicated that these communications were via e-mail with "Alex Wyman, Brett Sagel, and prior to that Julian Andre [another AUSA previously assigned to the case]." *See, e.g.,* Trial Tr. (8/13/21, Vol. 1) p. 94. He stated, "[t]here are agents on the e-mails as well." *See, e.g.,* Trial Tr. (8/13/21, Vol. 1) p. 94. He indicated that no one ever asked him to compile those communications that he had sent to the AUSAs and the agents. *See, e.g.,* Trial Tr. (8/13/21, Vol. 1) p. 94.  Shockingly, he also testified that his copy of some of the emails with the government about the subject matter of his testimony may have been destroyed <u>during the pendency of the case</u> (i.e. after indictment). *See, e.g.,* Trial Tr. (8/13/21, Vol. 2) p. 11. <u>These materials were not provided to the defendant and the government makes no real effort to claim that these are not governed by Jencks, Rule 26.2, *Brady or Giglio* and nor could they.</u>

*First*, the prosecution's misunderstanding of its discovery obligations does not excuse its misconduct. In open court, on two occasions, the government represented to the Court and the defendant that it did not provide these materials to the defense because of the "issue of the work product privilege, which government counsel believed would apply." *See, e.g.,* Dkt. 732, p. 9. The government now "agrees that the work product privilege does not shield statements that would otherwise be producible under the Jencks Act." *See, e.g.,* Dkt. 732, p. 9. Two experienced federal prosecutors' mutual post-conduct misunderstanding, or blatant disregard for the law, is no excuse. *See, e.g. Deleon v. Denny's Inc.*, 2020 U.S. Dist. LEXIS 152638, at * (C.D. Cal. 2020); *Kyle v. Campbell Soup Co.,* 28 F.3d 928,  930 (9th Cir. 1994)(counsel's mistake in interpreting and applying local rules and federal rules is <u>not excusable neglect</u>); *Roberson v. Fedex Nat'l LTL, Inc.,* 2010 U.S. Dist. LEXIS 145959, at *14-15 (holding a "lawyer's mistake in interpreting and apply the relevant rules or mistake of fact is not a compelling excuse.");

*United States. v. Chapman*, 524 F.3d 1073, 1088 (9th Cir. 2008)(upholding the dismissal of the Indictment where the Court determined that the government "egregiously failed to meet its constitutional obligations under *Brady* and *Giglio*" by failing to produce documents and determining "[t]he prosecutor has a 'sworn duty to assure that the defendant has a fair and impartial trial' and his 'interest in a particular. Case is not necessarily to win, but to do justice").

*Second,* it is clear from the nearly 400-page disclosure provided that the government still has yet to produce all of the materials owed to the defense. By way of example only, within Exhibit 5, Mr. Drum sent an e-mail to former AUSA Andre, AUSA Sagel, Special Agent Kim, Special Agent Karlous and Rochelle Tores stating, "please see attached a deck for discussion today." A "deck" is another word for a Powerpoint-type presentation. This presentation prepared by Mr. Drum and presented to the government prosecutors and agents is a "statement" but it has yet to be given to the defense.  It also is likely *Brady* and *Giglio*.

Additionally, during his testimony, Mr. Drum stated that other individuals within Analysis Group regularly communicated with the government at his approval, request and direction. *See, e.g.,* Trial Tr. (8/13/21, Vol. 2) p. 10. Mr. Drum stated that these e-mail communications were at his direction as part of his work on this case. *See, e.g.,* Trial Tr. (8/13/21, Vol. 2) p. 10-11. These statements have yet to be provided.

Mr. Drum also testified about his monthly billing statements, detailing the time he spent on projects and a general description of the tasks that were accomplished, which he personally reviewed and approved before they were sent to the government. *See, e.g.,* Trial Tr. (8/13/21, Vol. 1) p. 97-98. These bills have not been provided despite Mr. Avenatti's repeated requests.  *See, e.g.,* Dkt. 732, p. 10; *See United States v. Alvarez*, 86 F.3d 901, 903 (9th Cir. 1996)("to the extent the prosecutor is uncertain about the materiality of a piece of evidence, the prudent prosecutor will resolve doubtful questions in favor of disclosure.'). These bills should have been provided as they are statements

covered under the Jencks Act and Rule 26.2, not to mention Brady and Giglio.

Further, the defendant still does not have all of the draft summaries that Mr. Drum prepared and sent to the government.  These are statements under the Jencks Act and Rule 26.2.  The government conceded to this in its argumentative in-camera brief to the Court, "the government does not believe that these e-mails or the drafts fall within the scope of its Jencks obligations but will provide these to the Court for review upon request."

*Third,* the government does not argue, nor could they plausibly claim, that the recently produced materials are cumulative to the materials defendant has received in the past. As noted by the Court, "396 pages is a lot of paper." *See, e.g,* Trial Tr. (8/19/21, Vol. 1) p. 15. The length of the untimely disclosure alone severely prejudices the defendant. Near the end of the trial, after the close of the government's case and at the inception of the defense case, the defendant is forced to review hundreds of pages of materials to determine what he would have done differently if he had been provided these materials in a timely manner. Attached hereto as Exhibit A is chart that described the undisclosed documents in detail establishing the materiality of the undisclosed documents, their legal significance and the consistent misrepresentations of the government.

*Finally,* cross-examination is not the proper remedy. A mistrial or the striking of the witness testimony is required. Under the case law cited by the government, which the defendant maintains is inapplicable in this matter, two factors are to be considered when imposing sanctions for a Jencks violation: (1) the culpability of the government, and (2) the injury resulting to the defendants. *United States v. Echeverry*, 759. F.2d 1451, 1456 (9th Cir. 1985). First, the government is highly culpable. The government allegedly relied on principles clearly rejected by case law and statute to justify its failure to disclose hundreds of pages of materials. In reality, this is a post-conduct excuse.  The fact of the matter is they never looked.  It was only after Mr. Avenatti discovered the

failures through cross-examination that the government began to look for required discovery. Even today, the defendant has yet to receive all the materials he is entitled to. This is improper and it is highly prejudicial. Mr. Avenatti should have been provided these material statements prior to trial and certainly before performing his cross-examination of Mr. Drum. The situation before this Court is much more egregious than the cases cited by the government. Unlike those cases, the government has not acted with any degree of good faith.

### B.   The Testimony of Robert Amenta Must be Stricken <u>or</u> a Mistrial Declared

The government claims that it was prompted to seek out additional statements made by Investigator Amenta when "defendant elicited the existence of further email correspondence that may exist on cross-examination…" *See, e.g.,* Dkt. 732, p. 7. The government claims that it immediately filed two emails that "related to the subject matter of Mr. Amenta's testimony…" *See, e.g.,* Dkt. 732, p. 8. The government has indicated that "they did not contain any new information, since all of the information was contained in the memoranda of interviews of Mr. Amenta." *See, e.g.,* Dkt. 732, p. 8. The government argues that Mr. Avenatti "does not request the opportunity for further cross-examination in his instant motion or his supplement to the motion, instead resorting to the most drastic remedy possible – a mistrial or the striking of Mr. Amenta's testimony."

*First*, any argument that the undisclosed statements did not contain "any new information, since all of the information was contained in the memoranda of interviews of Mr. Amenta" is demonstrably false. As specified in detail in Mr. Avenatti's supplement, the statements contained in the undisclosed emails is materially different from what was contained within the government's subsequent memoranda of interviews. *See, e.g.,* Dkt. 720, pp. 5-6.

*Second*, the government fails to even mention its failure to provide these documents as a result of its faulty method of preserving, maintaining and producing

statements required to be given to the defendant. The government previously indicated that AUSAs Wyman and Sagel conducted a search of their emails to determine if there were any discoverable emails related to government Investigator Amenta. Because the government "believed that at least one Assistant United States Attorney (AUSA Wyman) was copied on all correspondence with Mr. Amenta," the government only searched through the e-mail accounts of the Assistant United States Attorneys to identify statements by its witness. [Dkt. 690, 4]. This "explanation" in and of itself raises significant issues. The government's response does not even address this point and raises concerns as to the procedures the government has utilized in connection with other witnesses.

*Third*, the government claims that the materials withheld from the defendant are not *Brady*. The materials withheld from Mr. Avenatti are *Brady* and *Giglio* materials and should have been provided to the defendant. The assertions that the e-mails were not *Brady* as they did not contain any information "not already provided to defendant" is completely false. The defendant points the Court's direction to defendant's supplemental filing it made that specifically itemized all of the differences between the documents produced and the e-mails withheld from the government. *See, e.g.,* Dkt. 720. This material should have been provided long ago so that Mr. Avenatti could properly prepare his cross-examination against both Investigator Amenta as well as government witness Mr. Clark who offered to lay the foundation for Government Exhibit 457. In connection with a *Brady* violation that occurs prior to a conviction, "whether a jury would ultimately find the evidence convincing and lead to an acquittal is not the measuring rod here." *United States v. Bundy*, 968 F.3d 1019, 1033 (9th Cir. 2020). Because there has been no verdict, the "retrospective test, evaluating the strength of the evidence after trial has concluded" is not applicable. *Id.* citing *United States v. Olsen*, 704 F.3d 1172, 1183 (9th Cir. 2013). The Ninth Circuit in *Bundy* determined that "[s]ince the new evidence emerged mid-trial, neither the district court (in the first instance) nor we (as a reviewing

court) can measure prejudice against all the evidence produced during the trial." *Id.*

*Finally,* further cross-examination is not the proper remedy. A mistrial or the striking of the witness testimony is required. Here, the blame lies entirely with the government. The prosecution failed to search through their own emails, failed to communicate with members of the prosecution team that they have been in near constant contact with for weeks, and failed to abide by department policies regarding the collection of witness statements. The government does not even attempt to refute these claims or ease concerns that the same procedures have been used for other government witnesses. In fact, the government makes <u>this same excuse in connection with Mr. Drum</u>. Second, the injury is significant. Investigator Amenta's direct and cross examination is now complete. The purpose behind the discovery rules is to allow for the defendant to make strategic decisions about what questions to ask and which questions to eliminate <u>before he begins his cross-examination</u>, not after it ends. The defendant must have the ability to review all the materials at his disposal before he is required to make these strategy decisions. Allowing for the government to, at best, recklessly and carelessly fail to identify discoverable material erodes the purpose of the Jencks Act and Rule 26.2.

## IV.    CONCLUSION

For each of these reasons, Mr. Avenatti respectfully requests that this Court declare a mistrial. In the alternative, Mr. Avenatti requests that the Court strike the testimony of Robert Amenta and John Drum.


Dated:  August 19, 2021                              Respectfully submitted,


                                                     /s/ Michael J. Avenatti

                                                     Defendant
                                                     MICHAEL JOHN AVENATTI

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT A**

| Date | Description of Undisclosed Materials | Violation of Law |
|---|---|---|
| 9/16/20-9/21/20 | <u>Under Seal Exhibit 1:</u> This chain of emails contains a logistical discussion regarding setting up a meeting to discuss Mr. Avenatti's motion to exclude Mr. John Drum. | Jencks Act, *Jencks*, 26.2. |
| *[1]<br>3/06/19-4/17/19 | <u>Under Seal Exhibit 2:</u> This chain of emails contains discussion regarding the need for an NDA and the need for the team to execute a confidentiality agreement. Further, Mr. Drum itemizes a discussion he had with the government. This email indicates that Analysis Group awaits additional information <u>and</u> data. Mr. Drum indicated that he discussed personal account data, American Express data, Payroll data, Global Baristas data from its server,  Payroll data from third parties. | Jencks Act, *Jencks*, 26.2, Rule 16 |
| *<br>3/6/19-3/17/19 | <u>Under Seal Exhibit 3:</u> This exhibit is comprised of a series of emails as well as 16 pages of attachments. These emails contain the following statements that identify issues with the expense calculation and items that were material the defense, exculpatory and should have been provided.<br>• "Almost ½ of the $33m to $21m while the 'expenses' do not decrease proportionally (from $33m to $30m). Almost ½ of the $30m in third party outflows are to payees marked 'unknown' (~$10m) or "missing check" (~$5m)… As a note, these numbers are not including transfers to "unknown" from the GB US Payroll account…"<br><br>• The May 2020 chart referenced by the government <u>contained 168 entries</u>. The chart now provided to the defendant contains <u>2,369</u> payee entries. (See Ex. 11 at 343-47.). | Jencks Act, *Jencks,* 26.2, Rule 16, *Brady, Giglio, Bundy, Price,* and others. |

---

[1] The entries marked with an *(Asterix) represent the communications that AUSA Sagel forwarded to AUSA Wyman during the lunch break on August 13,2021 before AUSA Wyman came before the Court approximately 36 minutes later and indicated the government has discovered "virtually nothing."

| 11/25/19 | <u>Under Seal Exhibit 4:</u> Exhibit 4 consists of a single email with an attachment of 76 pages. This email is from Mr. Drum to AUSA Andre and describes his calculations, and issues he had with the accounting related specifically to this case. These statements are not only regarding the substance of Mr. Drum's testimony, but the statements are also exculpatory, contain impeachment material and should have been provided to the defendant in November of 2019. These material statements include, but are not limited to, the following: | Jencks Act, *Jencks,* 26.2, Rule 16, *Brady, Giglio, Bundy, Price,* and others. |
|---|---|---|

- "We have noticed some discrepancies in the accrual and cash totals, which raises the question of which is applicable here. It seems that an accrual basis is appropriate because this records that the expense was incurred regardless of whether there was a cash transaction yet. <u>However, given the large discrepancy (especially in Client 3), we were concerned about the reliability of the cash and accrual figures</u>." (emphasis added).

- Mr. Drum specifically contacted AUSA Andre seeking clarification, "we're also wondering if you have insight into the following idiosyncrasies that we've observed…" Mr. Drum then provided the following list of issues related to Mr. Drum's calculations.

We're also wondering if you have any insight into the following data idiosyncrasies that we've observed:
1. Expense records on an accrual basis do not always match those on a cash basis.
   - Client 3 has approximately $70K of accrued client-related expenses that do not appear to have cash transactions. We are not sure why this is and want to confirm these are valid expenses.
   - Client 3 has an accrued expense of $799.90 where only $300.54 appears to have been transacted in cash.
2. Some client-related expenses are negative, despite being recorded as expenses (i.e., rather than income). More than $60K of these negative expenses for Client 1 do not appear to void other expenses. We are unsure how to treat these expenses, though they are currently included in our calculations of total client-related expenses.
3. We noticed a Paid/Unpaid designation in QuickBooks. Both "paid" and "unpaid" transactions appear in the Access database, so we are uncertain what this designation means or if it is relevant to our calculations.

- The government in its in-camera filing Exhibit 4 is the only email that the government believes could fall within the definition of Jencks material, since the calculation of client expenses was part of Mr. Drum's testimony.

- The government's attempts to excuse its bad faith and failure to disclose materials by claiming that AUSA Wyman and AUSA Sagel were not copied on this email chain. Former AUSA Andre

was copied on the email. This argument again leads the defendant to believe that the manner in which the government seeks out statements pursuant to its discovery obligations is by way of searching only through the email accounts of AUSA Sagel and AUSA Wyman. For every government witness, the prosecution had the obligation to have every member of the prosecution team perform a thorough and diligent search for statements by that witness regarding the subject matter of their testimony, in whatever form, and then produce such statements to the defendant before cross-examination began.

- The government improperly claims that the 76 pages of QuickBooks materials attached to this email are immaterial because the defendant was on notice that Mr. Drum relied on QuickBooks. However, the government fails to reveal that it routinely failed to disclose **which portions of the QuickBooks records Mr. Drum relied on. The defendant raised this specific issue with the Court on multiple occasions**. *See, e.g.,* Dkt. 546 ("Although Mr. Drum's summaries include references to some specific bates numbers, not all bates numbers are listed and other references are extremely ambiguous and general … For example, references to 'QuickBooks' is akin to stating 'filing cabinet'…"); Dkt. 668 ("the old draft summaries contained general references to 'QuickBooks' or 'Ayres' without any explanation or reference as to which exact materials those entries relate to."); Dkt. 600 ("the draft summaries indicated that Mr. Drum relied on 'QuickBooks' or "Ayres' documentation, making it impossible for Mr. Avenatti to understand or investigate the exact source of the specific data or information Mr. Drum's apparently relying on."); Dkt. 511 ("the government merely stating 'QuickBooks' for instance, without identifying specific data or report in QuickBooks (which is a software program), is not sufficient. It is akin to stating 'file cabinet.'") Mr. Avenatti's requests for this specific information is well documented. Yet, these material statements and the documents approved/adopted by Mr. Drum were never produced.

| | | |
|---|---|---|
| *<br>10/22/19-<br>12/09/19 | <u>Under Seal Exhibit 5:</u> Exhibit 5 represents a string of emails.<br><br>• Within the 10/22/19 email, Mr. Drum indicated, "please see attached a deck for discussion today." This *deck* presentation has still not been provided to the defendant.<br><br>• On the 11/4/19 e-mail, the government was provided "confirmation of notes on Exhibits 6-7 (attached) that read 'I understand from Counsel…'" The government also received "<u>our classifications of personal spending and third-party payees…</u>"<br><br>• In the email, Mr. Drum made a statement regarding inconsistent views between Mr. Drum and the prosecution. "<u>On the call, we discussed that they should be treated as EA, but Brett mentioned that might not be correct.</u>" (emphasis added). This is material, exculpatory and should have been produced. AUSA Sagel interjected his opinion into the financial analysis, changing Analysis Group's analysis. This is material and exculpatory. Attachments were again referenced that Mr. Avenatti does not have.<br><br>• Mr. Drum then indicated to the government "confirming proper treatment of CNB Accounts as well as the QuickBooks client-related expenses questions <u>in the attached</u>." These attachments have not been provided. | Jencks Act, *Jencks,* 26.2, Rule 16, *Brady, Giglio, Bundy, Price,* and others. |
| *<br>03/09/20-<br>04/02/20 | <u>Under Seal Exhibit 6:</u> Exhibit 6 represents a string of emails.<br><br>• In one of the emails dated 4/2/2020, Mr. Drum indicated that he was still in the process of performing "quality control checks on all of the exhibits." These quality control checks occurred after the initial draft was produced.<br><br>• Mr. Drum also indicated that he was working on "<u>a technical set of notes for me to study to prep for testimony. Having this written out will make picking it up this Summer easier.</u>" | Jencks Act, *Jencks,* 26.2, Rule 16, *Brady, Giglio, Bundy, Price,* and others. |

| | | |
|---|---|---|
| | (emphasis added) Mr. Avenatti has not been provided any notes. These are statements of Mr. Drum outlining his testimony in this case and should have been produced.<br><br>• Mr. Drum then states, "An analysis of the portion of expenses that I identify as personal that are supported by either QuickBooks or the documents you sent. It might make sense to share that with you <u>to confirm that you're comfortable with. It and no change to the direction on this portion is needed.</u>" (emphasis added).  This analysis was not provided, and the specific QuickBooks records and other documents have not been provided. This statement is material and exculpatory as it could have been used to establish that Mr. Drum's analysis was subject to the direction and criticism of the AUSAs rather than an unbiased interpretation of data.<br><br>• The government argued in its in-camera filing that these personal expenses are unrelated to the client counts. It is unclear how there can be a finding that an analysis of Mr. Avenatti's personal expenses could be unrelated to Counts 1 through 10 which alleges Mr. Avenatti misappropriated client funds for personal expenses. | |
| 7/10/21-<br>6/11/21 | <u>Under Seal Exhibit</u> 7: Exhibit 7 represents a string of emails.<br><br>• In one e-mail, AUSA Wyman contacted Mr. Drum asking for a breakdown of the funds spent by Analysis Group on Counts 1 through 10.  In response, Mr. Drum indicated "It may be possible to prepare an estimate of the various projects, <u>but it would be pretty imprecise. Would an imprecise estimate be helpful</u>?" (emphasis added). A "rough breakdown" of the accounting was then sent by Mr. Drum to AUSA Wyman and AUSA Sagel. Mr. Avenatti was never provided the exculpatory statement that these approximations would be imprecise. The government then went on to argue to the Court that it should be permitted to elicit testimony, and did elicit testimony, that because Mr. Drum's worked on both matters overlapped so significantly, the | Jencks Act, *Jencks*, 26.2, Rule 16, *Brady, Giglio, Bundy, Price,* and others. |

| | | |
|---|---|---|
| | government should be able to (and ultimately did) establish that Mr. Drum's payment was also in connection with "other matters." *See, e.g.,* Dkt.  528, p.  21-22 ("should defendant cross-examine Mr. Drum at trial concerning the full amount of money that Analysis group was paid in this matter, the government should be permitted to elicit on redirect that much – indeed,  most – of the payments were for work on other matters involving defendant.") Instead of waiting for this door to open, the government elicited **<u>on direct examination,</u>** "has Analysis Group been paid approximately $640,000 by the Government? A: Yes. We've been approved for approximately 640,000. Q: Does that payment include work that Analysis Group has done on **other matters as well as this one?** A: yes." *See, e.g.,* Trial Tr. (8/12/21, Vol. 2.) p. 52-53. | |
| 06/10/21-06/16/21 | <u>Under Seal Exhibit 8</u>: Exhibit 8 consists of a string of e-mails as well as 6 pages of attachments.<br><br>• On June 16, 2021, Mr. Drum e-mailed AUSA Wyman and AUSA Sagel writing "please see attached a list of documents that we received in the course of this case." Mr. Drum then indicated, "we also included as a single line item ~$10,000 bank records accessed through the 'Eclipse' which we used to check the Access database. This list has never been provided to the defendant prior to this disclosure.<br><br>• The May 2020 draft and the disclosure letter referenced by the government fail to identify these specific, additional documents that were provided to Mr. Drum for his review. This information was never previously provided to the defendant | Jencks Act, *Jencks,* 26.2, Rule 16, *Brady, Giglio, Bundy, Price,* and others. |

<table>
<tr><td></td><td>

**Data and Related Documents**

_Access Data and Supporting Tables_
   COMBINED ALL ACCOUNTS rev12182018.mdb
   COMBINEDallBankAccountsrev5282019.mdb
   GBUS - Bank Accounts - DRAFT JLA.xlsx

_Eclipse SE Desktop Data_
   Drive sent via mail with 10,578 Records (received by AG in May 2019)

_QuickBooks Data_
   Eagan O'Malley & Avenatti, LLP QuickBooks files
   Restored Eagan O'Malley & Avenatti, LLP QuickBooks files

**Other Documents**
_FY 2015 GB Workbooks_
   2015 Daily Cash Projection.xlsx
   Trending FY15.xlsx

_Client Contracts & Agreements_
   Thomas Cassaro attachment 3.pdf

**Legal Documents**
   Ex Parte Application for Approval of Attorney Minders for Defendant From MCC New York to Home of Third-Party Custodian in Venice, California; Declaration of Counsel; [Proposed] Order, _United States vs. Michael Avenatti,_ United States District Court, Central District Of California, Case No. SA-CR-19-61-JVS, April 23, 2020.
   Motion in Limine to Exclude Expert Testimony; And, Request for Daubert Hearing, _United States vs. Michael Avenatti_, United States District Court, Central District Of California, Case No. SA-CR-19-61-JVS, October 19, 2020.

</td><td></td></tr>
<tr><td>7/9/21</td><td>

<u>Under Seal Exhibit 9:</u> Exhibit 9 represents an email on July 9, 2021 wherein Mr. Drum provided additional information to the government regarding the fees incurred by Analysis Group.

- Mr. Drum relayed the additional/outstanding funds were needed to "prepare and participate in. prep sessions," "team <u>to document and review technical details and assumptions for each client's analysis</u>" "study details of each client and prepare/rehearse testimony" "Drum and one team member to participate in prep session(s) with counsel" This information is valid impeachment material, contained exculpatory information regarding the rehearsals of testimony and division of fees, and were clear statements of Mr. Drum regarding the subject matter of his testimony. Any statements of the team documenting and reviewing the technical details in preparation for trial has still yet to be provided.

</td><td>

Jencks Act, _Jencks,_ 26.2, Rule 16, _Brady, Giglio, Bundy, Price,_ and others.

</td></tr>
</table>

| | | |
|---|---|---|
| | • This email described the calculation of fees, hourly rates, and hours performed on tasks for the following parties: the Managing Principal, Vice President, Manager, Senior Analyst, and Analyst. During cross-examination, Mr. Avenatti specifically asked Mr. Drum what the hourly rates were of his colleagues and how many hours they spent on various projects. Mr. Drum did not know the answer to either question. This e-mail should have been available for cross-examination and would have been used to impeach Mr. Drum. *See, e.g.,* Trial Tr. (8/13/21,  Vol. 1) p. 113:<br><br>"Q: Whose [sic] has billed the most time on the matter?<br> A: I don't know.<br> Q: What are those rates of the other individuals' billing time on the matters?<br>…<br> A: I don't recall. | |
| 7/31/19 | <u>Under Seal Exhibit 17:</u> Exhibit 17 represents an e-mail where Mr. Drum made the statements relating to the subject matter of the testimony. Mr. Drum provided additional information regarding his calculations. Again, Mr. Drum took direction as to how to perform his financial analysis, what materials to incorporate into their calculations, and requests that the government establish the distinctions between what is classified as a personal expense v. business expenses. | Jencks Act, *Jencks,* 26.2, Rule 16, *Brady, Giglio, Bundy, Price,* and others. |

## **CERTIFICATE OF SERVICE**

I, H. Dean Steward, am a citizen of the United States, and am at least 18 years of age. My business address is 17 Corporate Plaza, Suite 254 in Newport Beach, California. I am not a party to the above-entitled action. I have caused, on August 19, 2021 service of the:

DEFENDANT'S REPLY TO THE GOVERNMENT'S OPPOSITION TO MOTION FOR MISTRIAL OR, IN THE ALTERNATIVE, TO STRIKE THE TESTIMONY OF ROBERT AMENTA AND JOHN DRUM DUE TO VIOLATIONS OF THE JENCKS ACT, RULE 26.2, *BRADY* AND *GIGLIO*

on the following party, using the Court's ECF system:

AUSA BRETT SAGEL AND AUSA ALEXANDER WYMAN

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 19, 2021

/s/ H. Dean Steward

H. Dean Steward