UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

THE HONORABLE JAMES V. SELNA, JUDGE PRESIDING

UNITED STATES OF AMERICA,     )CERTIFIED TRANSCRIPT
                    Plaintiff, )
        vs.                    )
                               )  SACR-19-00061-JVS
MICHAEL JOHN AVENATTI,         )
                    Defendant. )TRIAL DAY 23, VOL. 1
------------------------------)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

August 19, 2021

SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(714) 543-0870

1     APPEARANCES OF COUNSEL:

2     For the Plaintiff:

3     NICOLA T. HANNA
      United States Attorney
4     BRANDON D. FOX
      Assistant United States Attorney
5     Chief, Criminal Division
      ALEXANDER WYMAN
6     Assistant United States Attorney
      Major Frauds Section
7     1100 United States Courthouse
      312 North Spring Street
8     Los Angeles, CA  90012
      (213) 894-6683
9
      BRETT A. SAGEL
10    Assistant United States Attorney
      Ronald Reagan Federal Building
11    411 West Fourth Street, Suite 8000
      Santa Ana, CA  92701
12    (714) 338-3598

13    For the Defendant:

14    MICHAEL JOHN AVENATTI, PRO SE

15    H. DEAN STEWARD, ADVISORY COUNSEL
      H. DEAN STEWARD LAW OFFICES
16    107 Avenida Miramar, Suite C
      San Clemente, CA  92672
17    (949) 481-4900

18

19

20

21

22

23

24

25

```
1

2                              I-N-D-E-X

3

4    PLAINTIFF'S
     WITNESSES:               DIRECT   CROSS   REDIRECT   RECROSS
5
     (None)
6
     PLAINTIFF'S
7    EXHIBITS:                                 MARKED     RECEIVED

8    (None)

9    DEFENSE
     WITNESSES:               DIRECT   CROSS   REDIRECT   RECROSS
10
     KATHERINE MOSBY
11     (Continued)           33       48      59
     JAMES KIM               61       86      88
12   NSHAN TASHCHYAN         92

13   DEFENSE
     EXHIBITS:                                 MARKED     RECEIVED
14
     Exhibit 1098                               46
15

16

17

18

19

20

21

22

23

24

25
```

| | | |
|---|---|---|
| | 1 | SANTA ANA, CALIFORNIA; THURSDAY, AUGUST 19, 2021; 8:27 A.M. |
| | 2 | (Jury not present) |
| 08:27 | 3 | THE CLERK:  Item 1, SACR-19-00061-JVS, United |
| 08:27 | 4 | States of America versus Michael John Avenatti. |
| 08:27 | 5 | MR. SAGEL:  Good morning, Your Honor.  Brett Sagel |
| 08:27 | 6 | and Alexander Wyman on behalf of the United States.  And at |
| 08:27 | 7 | counsel table is Special Agent Remoun Karlous. |
| 08:28 | 8 | THE COURT:  Good morning. |
| 08:28 | 9 | MR. AVENATTI:  Good morning, Your Honor.  Michael |
| 08:28 | 10 | Avenatti, present with Mr. Dean Steward, |
| 08:28 | 11 | Ms. Cummings-Cefali, and Ms. Hernandez. |
| 08:28 | 12 | THE COURT:  Good morning. |
| 08:28 | 13 | Let's take up the defendant's Rule 29 motion at |
| 08:28 | 14 | this time.  I previously indicated that I was going to |
| 08:28 | 15 | reserve on all aspects of the motion other than as it |
| 08:28 | 16 | related to Counts 1, 2, 4, and 5.  So let's address those |
| 08:28 | 17 | counts. |
| 08:28 | 18 | Mr. Avenatti. |
| 08:28 | 19 | MR. AVENATTI:  Thank you, Your Honor.  Obviously |
| 08:28 | 20 | we have submitted an opening motion as well as a reply.  I'm |
| 08:28 | 21 | sure the Court has had the benefit of both. |
| 08:28 | 22 | THE COURT:  Yes. |
| 08:28 | 23 | MR. AVENATTI:  The government then submitted an |
| 08:28 | 24 | opposition.  There's a few points I would like to highlight |
| 08:28 | 25 | if I could. |

08:28   1           THE COURT:  Please.

08:28   2           MR. AVENATTI:  First of all, Your Honor, this is

08:28   3   not a general fraud case.  There is no federal general fraud

08:28   4   statute.  And despite what the government is attempting to

08:29   5   do in this case and during this trial, it is not a general

08:29   6   fraud case.  It is about ten specific wires that the

08:29   7   government alleges were in furtherance of a scheme to

08:29   8   defraud.

08:29   9           If any of those wires are found to have not been

08:29   10  in furtherance of a scheme to defraud, those counts

08:29   11  associated with those wires are required to be -- or a

08:29   12  judgment of acquittal is required to be made.  It is a

08:29   13  count-by-count basis.

08:29   14          Now, the furtherance-of-the-crime requirement is a

08:29   15  substantive requirement, not just a jurisdictional

08:29   16  requirement for federal jurisdiction.  It is a substantive

08:29   17  portion of the crime charged that must be met.  The Ninth

08:29   18  Circuit's model instruction makes that clear.

08:30   19          I cannot be convicted under the law of using wires

08:30   20  to transmit money legitimately due me or the law firm.

08:30   21          THE COURT:  Sir, I'm not sure that's an accurate

08:30   22  statement of the law.  The law is fairly clear that an

08:30   23  entirely lawful and non-fraudulent transfer can stand as the

08:30   24  necessary predicate under the statute if it is undertaken in

08:30   25  furtherance of the scheme.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

08:30   1          The inquiry doesn't end by telling it's a lawful

08:30   2   transfer.  The inquiry must go on to whether that transfer

08:30   3   was in furtherance of the scheme, which is the first point

08:30   4   you made.

08:30   5          MR. AVENATTI:  Your Honor, I don't believe a

08:30   6   lawful transfer can be in furtherance of a scheme generally.

08:30   7   And I think if you look at the case law, the case law holds

08:31   8   that if you have a lawful transfer, it cannot constitute

08:31   9   part of the scheme or in furtherance of the scheme.

08:31   10          I think that the problem for the government is

08:31   11   that they have charged wires relating to monies that were

08:31   12   legitimately due me and the firm.  If I could use this to

08:31   13   illustrate, this demonstrative, we have a trust account at

08:31   14   the top.  We have other EA, standing for Eagan Avenatti

08:31   15   account.  And then we have MA personal accounts or other

08:31   16   MA-related accounts, payees.

08:31   17          The government in this case has two significant

08:31   18   substantial problems with the way they have charged these

08:31   19   counts.  The first problem is the problem that I mentioned

08:31   20   earlier relating to they have charged counts where either me

08:32   21   or my firm were legitimately due the monies, and they have

08:32   22   not shown that those wire transfers were in furtherance of

08:32   23   any scheme as required.  That's the first problem.

08:32   24          The second problem, Your Honor, is they have

08:32   25   charged wire transfers or they have charged as counts wire

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

08:32   1   communications below this line.  What I mean by that is

08:32   2   money move from the trust account to other EA account which

08:32   3   they claim the firm or me were entitled to.

08:32   4           Then those monies moved to other payees, whether

08:32   5   it's my personal account, whether it's Dillanos Coffee or

08:32   6   other vendors that they claim, and they've charged these

08:32   7   wires down here.  They charged the wires after the money

08:32   8   moved into another EA-related account.

08:33   9           The problem for the government is under the case

08:33   10  law that cannot constitute wire fraud.  If the government

08:33   11  wanted to claim that somehow the transfer from this trust

08:33   12  account to the EA account was in furtherance of the scheme,

08:33   13  that would be one thing, but the case law is clear that

08:33   14  under the government's theory the crime would be completed

08:33   15  here.

08:33   16          The crime would be completed when the money moved

08:33   17  from the trust account to the other EA account.  Anything

08:33   18  after that, wherever the money went, whether it was Dillanos

08:33   19  Coffee, a trip to Las Vegas, gambling, whatever, you name

08:33   20  it, that cannot constitute the basis for a wire fraud

08:33   21  conviction on any count.

08:33   22          That is a fundamental problem, Your Honor, for the

08:33   23  government.  We have detailed in our papers why, for

08:34   24  instance, the four counts that Your Honor asked us to draw

08:34   25  attention to or focus on, I should say, why those four

08:34  1  counts cannot constitute conduct substantiating a conviction

08:34  2  and why those wire transfers are not in furtherance of a

08:34  3  scheme.

08:34  4         Your Honor, if you think about it, this makes

08:34  5  sense because otherwise what would happen is anytime you had

08:34  6  a case where someone was entitled to a portion of the money

08:34  7  and they took that portion that they're entitled to,

08:34  8  pursuant to the government's theory, and then they later

08:34  9  took money that they were not entitled to and utilized the

08:34  10  wires, it would not be appropriate or allowed for the

08:34  11  government to go back in time and charge the conduct

08:35  12  relating to payments or wires that were based in legitimacy.

08:35  13         I will also note as follows, Your Honor.  I have

08:35  14  not found a single case -- maybe it's out there.  But we

08:35  15  have looked wide and far.  I have not found a single case

08:35  16  where the wire fraud statutes have been used to charge

08:35  17  conduct against someone when there's no dispute that the

08:35  18  defendant was entitled to a portion of the money.

08:35  19         All of these cases that the government cites,

08:35  20  these are cases where the person had absolutely no

08:35  21  legitimate right to any portion of the money.  In this case

08:35  22  there is no dispute that either me or my law firm had a

08:35  23  legitimate right to a portion of these monies.

08:36  24         The dispute centers on what was that portion and

08:36  25  whether the wires were used in furtherance of the scheme to

08:36  1    defraud.  Those are the two fundamental questions in this
08:36  2    case.  And before I can be convicted of anything, anything,
08:36  3    the government has to meet their burden of proof to find
08:36  4    that these wire transfers were in furtherance of a scheme to
08:36  5    defraud -- and more fundamentally than that, Your Honor,
08:36  6    that I had no entitlement to the money.
08:36  7            And they haven't done that for any of these
08:36  8    clients, and they have to do it, Your Honor, for each wire.
08:36  9    For each wire they have to show that at the time that wire
08:36 10    was made, I had no legitimate right to those monies and nor
08:36 11    did my law firm, because if I did, it is a fundamental error
08:36 12    or a fundamental problem for the government in the case and
08:36 13    it requires a judgment of acquittal.  I cannot be convicted
08:37 14    under that scenario.
08:37 15            I'm happy to answer any questions that the Court
08:37 16    has.
08:37 17            THE COURT:  No.  Thank you.
08:37 18            Mr. Sagel.
08:37 19            MR. SAGEL:  Your Honor, I can be as brief as Your
08:37 20    Honor wants me to be and I can address anything that Your
08:37 21    Honor wants me to address.
08:37 22            THE COURT:  Address the arguments that
08:37 23    Mr. Avenatti just made, please.
08:37 24            MR. SAGEL:  I will start with the law on the
08:37 25    wires, and Your Honor has it both from our jury

08:37  1    instructions.  We cited it in our papers with regards to

08:37  2    what needs to be in furtherance of.

08:37  3           What he's claiming are legitimate monies or he is

08:37  4    entitled to.  (A) that's his spin, which is inappropriate

08:37  5    for a Rule 29 motion; and second of all, it's just false.

08:37  6           He is not entitled to the money.  He is not

08:37  7    entitled to claim that it's legitimate money when he stole

08:37  8    it and lied to his clients about what there is.

08:37  9           According to the testimony -- I'll start with what

08:37  10   is wire fraud, 1 and 2, which is Geoffrey Johnson related.

08:38  11          THE COURT:  As I understand it, your position is

08:38  12   that the scheme had commenced prior to the two transfers in

08:38  13   counts 1 and 2.

08:38  14          MR. SAGEL:  That's correct, Your Honor.  The

08:38  15   scheme had already commenced when he lies to his clients

08:38  16   about what is or is not the settlement, that there isn't a

08:38  17   settlement yet.  It has yet to be finalized.  We're working

08:38  18   on a special-needs trust.  We're working on things so the

08:38  19   money can come in.  And there isn't going to be money coming

08:38  20   in.

08:38  21          So the minute the money comes in, he has already

08:38  22   lied.  And once he starts disbursing it -- he can claim that

08:38  23   it's his legitimately earned money -- he takes the full

08:38  24   $4 million.  So it doesn't matter when he wires, the amount

08:38  25   he wires.  He's not entitled to any money when he has lied

08:38   1    to his clients to obtain money and property, and every wire

08:38   2    he makes thereafter is in furtherance of it.  So that deals

08:38   3    with 1 and 2.

08:38   4           As it relates to the legitimately earned, there is

08:39   5    no proof that he legitimately earned anything when he lied

08:39   6    to his clients, and even his own under-oath testimony says

08:39   7    that.  The client is entitled to their money right away.  He

08:39   8    never provides his client any of their money.

08:39   9           Moving to Counts 4 and 5 very briefly -- and

08:39   10   actually I'm going to back up for a second.  With regards to

08:39   11   where he thinks you draw the line, when you are

08:39   12   misappropriating the money, when you're taking the money as

08:39   13   part of your scheme to defraud, obtaining money and property

08:39   14   for yourself, it doesn't matter how many down-the-line

08:39   15   transfers it is.  It's in furtherance of the scheme to

08:39   16   misappropriate money that doesn't belong to him that came

08:39   17   from his scheme to defraud.

08:39   18          Moving to counts 4 and 5 -- and I'll back up with

08:39   19   any questions Your Honor has -- the $1.6 million wire

08:39   20   transfer into the account is a wire he caused to be wired

08:40   21   there.

08:40   22          THE COURT:  I think he cited to the fact that he

08:40   23   provided wire transfer information so a transfer could be

08:40   24   made.

08:40   25          MR. SAGEL:  Correct.  So there is that part of it,

08:40   1    the causing for sure.  And then in furtherance of the

08:40   2    scheme, he had already three, four days earlier lied to his

08:40   3    client about the terms of the settlement agreement, the

08:40   4    actual settlement agreement itself, and that the money

08:40   5    wasn't coming in until March.  He has already lied.  The

08:40   6    wire in is in furtherance of his scheme to keep his client

08:40   7    from that money at all.

08:40   8          And then to claim a distribution from the money as

08:40   9    part of his legitimate money, same thing.  He is not

08:40 10    entitled to anything when he is lying and he's involved in a

08:40 11    scheme to defraud.  And then to claim, which he did with

08:40 12    either Count 1 or Count 2, as well as Count 5, it is -- oh,

08:40 13    well, that's part of what I would have been entitled to.

08:41 14    There was money to pay the client.  Well, he pays the client

08:41 15    zero.

08:41 16          So the timing of the wire at the front end or the

08:41 17    back end doesn't matter because it's all his

08:41 18    misappropriation in his scheme to defraud, to steal all of

08:41 19    the money from his client, all of the money that they're

08:41 20    entitled to.  Whichever portion, he doesn't get to decide

08:41 21    how he covers that up.

08:41 22          So each of those wires are in furtherance of his

08:41 23    scheme to defraud.  I would point out, which Your Honor

08:41 24    obviously knows and it's in our papers, it's a standard

08:41 25    under Rule 29, which, he can say what he wants about it's

08:41 1  legitimate, but all inferences are not towards his side of

08:41 2  the equation.  It's towards the evidence, which, I don't

08:41 3  even think you'd need the inferences.  However, at this

08:41 4  stage that's where we're at.

08:41 5      I will answer any questions Your Honor has either

08:41 6  on a specific wire or on the scheme itself.

08:41 7      THE COURT:  No.

08:41 8      Mr. Avenatti.

08:42 9      MR. AVENATTI:  Your Honor, what the government

08:42 10  just represented to the Court relating to the evidence in

08:42 11  the case concerning Mr. Johnson and his settlement is not

08:42 12  accurate.

08:42 13      There is no evidence in the case relating to when

08:42 14  Mr. Johnson was told about his settlement in connection with

08:42 15  the first two counts.  They have no evidence that what

08:42 16  Mr. Johnson was told occurred before the first two counts.

08:42 17  That is a fundamental problem for the government, and it

08:42 18  cannot form the basis for this argument that the scheme was

08:42 19  already under way.  That's number one.

08:42 20      Number two, Mr. Johnson signed the settlement

08:42 21  agreement which specifically contains the $4 million payment

08:42 22  in the settlement agreement.  They claim that there is

08:43 23  testimony that his signature was forged.  There is no such

08:43 24  testimony.  He said, I think it was, the "g" and the "e"

08:43 25  looked funny or something of that nature.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

08:43   1          The testimony is that he may have signed it.

08:43   2   That's the testimony.  So he was aware of the terms of the

08:43   3   settlement agreement.  Under the law, he is presumed to know

08:43   4   the terms of the settlement agreement because the terms of

08:43   5   the settlement agreement, including the $4 million payment,

08:43   6   including when it's going to be paid, are set forth in the

08:43   7   written document.  Number two.

08:43   8          Mr. Sagel just stated that it doesn't matter how

08:43   9   far down the line the transfer occurs when you're

08:43  10   misappropriating money, that it's all in furtherance of the

08:43  11   scheme.  Your Honor, the case law that we cite is directly

08:43  12   contrary to that point.

08:43  13          Case after case after case holds that that is not

08:44  14   true, including Supreme Court precedent.  It does matter how

08:44  15   far down the line it was or is.  It does matter whether it

08:44  16   was actually in furtherance of the scheme.

08:44  17          We have I think the case relating to the use of

08:44  18   the monies at the motel and the credit cards and things of

08:44  19   that nature.  We cite those cases in our reply.  It does

08:44  20   matter.  And for each of those reasons, Your Honor, I'm

08:44  21   entitled to a judgment of acquittal on all counts but most

08:44  22   certainly the four counts previously identified.

08:44  23          Thank you.

08:44  24          MR. SAGEL:  Do you want a brief --

08:44  25          THE COURT:  No.  He gets the last word.  It's his

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

08:44  1   motion.

08:44  2        MR. SAGEL:  Okay.

08:44  3        THE COURT:  I'm going to deny the Rule 29 motion

08:44  4   as to Counts 1, 2, 4, and 5.  I find that the government has

08:44  5   presented sufficient evidence, including the inferences that

08:44  6   could be drawn from the evidence, that would permit a

08:45  7   reasonable jury to find beyond a reasonable doubt that each

08:45  8   of the crimes was committed.

08:45  9        With respect to Counts 1 and 2, the fact that

08:45  10  those transfers may have been in themselves permitted under

08:45  11  the fee agreement is not conclusive.  For that, I rely upon

08:45  12  Bridge v. Phoenix Bond & Indemnity Company, 553 US 639, 647

08:45  13  (2008).

08:45  14       And among others, because I think it's

08:45  15  illustrative, although it's only a District Court case,

08:45  16  United States versus Harris, 805 F. Supp. 166 (Southern

08:45  17  District of New York 1992).  That Court says in part at

08:46  18  Headnote 5:  "The wire fraud counts also sufficiently allege

08:46  19  that these transfers of monies representing loan proceeds

08:46  20  from accounts of the borrowing companies to Limited's

08:46  21  accounts in Switzerland were acts in furtherance of the

08:46  22  scheme to defraud.  Defendant argues in the final reply

08:46  23  brief at 5 that the counts do not allege that the transfer

08:46  24  of funds was accomplished by means of any fraud.  That makes

08:46  25  no difference.  The wire fraud statute does not require that

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

08:46  1    the particular communication be fraudulent in and of itself.
08:47  2    Once a scheme to defraud is proven, any writings
08:47  3    communicated by wire for the purpose of executing such
08:47  4    scheme violate the statute."
08:47  5         That addresses Mr. Avenatti's argument that as a
08:47  6    matter of law that a lawful transfer immunizes him from the
08:47  7    wire fraud statute.  However, that doesn't answer the
08:47  8    question as to whether the particular transfers were in
08:47  9    furtherance of the scheme.
08:47  10         I find that the scheme commenced with
08:47  11   misrepresentations to Mr. Johnson prior to those transfers
08:47  12   and that those transfers were in furtherance of the scheme
08:47  13   within the meaning of 1343.
08:47  14         With respect to 4 and 5, I find that there is
08:47  15   sufficient evidence to find beyond a reasonable doubt by a
08:47  16   reasonable jury that Mr. Avenatti induced the transfer by
08:48  17   requesting wire transfer information.  The jury could easily
08:48  18   infer that he provided wire transfer information, that he
08:48  19   understood that as a likely consequence he would receive a
08:48  20   wire transfer predicated on that information.  Thus, he
08:48  21   induced that transfer, and a reasonable jury could easily so
08:48  22   find.
08:48  23         With respect to the transfers of 4 and 5, they
08:48  24   each come after the scheme was commenced.  I believe for
08:48  25   that reason they are in furtherance.  For those reasons, I

08:48  1    deny the Rule 29 motion.

08:48  2           Now let's turn to -- Ms. Carter put in a reply

08:49  3    brief yesterday.  It has not been docketed yet because it

08:49  4    was e-mailed to the Court and not filed through the CM/ECF.

08:49  5    Ms. Carter moved at Docket 712.  Mr. Avenatti replied at

08:49  6    724.  As I indicated, a reply was filed yesterday.  It may

08:49  7    be docketed now.  I'm not sure.

08:49  8           THE CLERK:  It is.

08:49  9           THE COURT:  Okay.

08:49  10          My tentative thinking is that the subpoena ought

08:49  11   to be enforced to compel her testimony, but it ought to be

08:49  12   stricken as to the document requests, given that they are

08:49  13   not sufficiently specific and create a very substantial and

08:49  14   I believe undue burden on Ms. Carter to make that document

08:49  15   production.  So with those thoughts, I'd be happy to hear

08:50  16   you.

08:50  17          Mr. Avenatti.

08:50  18          MR. AVENATTI:  Your Honor, obviously I agree with

08:50  19   the first part.  As it relates to the second portion

08:50  20   relating to the documents, I don't believe it would be

08:50  21   burdensome to require her to produce these documents.  She

08:50  22   could do a simple word search within her e-mails for these

08:50  23   e-mails with the government.

08:50  24          They're highly relevant.  They're for a fairly

08:50  25   finite period of time.  She can just simply search the

08:50 1  attorneys' names -- Mr. Andre, Mr -- I don't even know if
08:50 2  she worked on the matter when Mr. Andre was involved.  But
08:50 3  she can just search for Mr. Sagel's name or Mr. Wyman's name
08:50 4  and produce the e-mails.
08:50 5          Your Honor, to illustrate how simple this is,
08:50 6  within the Drum materials that were provided to us -- and
08:50 7  we'll get to this in connection with Drum -- but I noted
08:51 8  that during the lunch break, after I raised the issues
08:51 9  relating to Mr. Drum, that Mr. Sagel evidently searched his
08:51 10  e-mail and forwarded e-mails to Mr. Wyman from Mr. Drum over
08:51 11  the lunch break.  That's how easy it was to locate those
08:51 12  e-mails.
08:51 13         The point is that I don't think it is burdensomto
08:51 14  require Ms. Carter to do something similar.  There would be
08:51 15  no required redactions.  I'm puzzled by the redaction issue.
08:51 16  But in any event, Your Honor, we think that she should be
08:51 17  compelled to testify and produce the documents requested.
08:51 18         THE COURT:  I want to give Ms. Marino an
08:51 19  opportunity to be heard.  Why don't we set up a telephone
08:51 20  conference with her some time this morning and see if she
08:51 21  has further argument.
08:51 22         I also find to some extent Ms. Carter's testimony
08:51 23  would be cumulative.  Nevertheless, I believe there's enough
08:52 24  there to compel her to come.  I believe that the documents
08:52 25  similarly would be cumulative at least in connection with

08:52   1   Mr. Drum.  Well, we'll see what time we can get Ms. Marino
08:52   2   on the line.  I want to hear her before finalizing my
08:52   3   ruling.
08:52   4          I received last night a supplemental filing from
08:52   5   Mr. Avenatti about pulling together the Tabs testimony at
08:52   6   Docket 733 pulling together the Tabs testimony and Agent
08:52   7   Karlous's testimony.  I assume that that wasn't intended to
08:52   8   be in response to the Court's request, or maybe it is, the
08:52   9   Court's request for a further supplemental memorandum
08:52  10   focusing simply on the Tabs issue.  Is something more
08:53  11   coming?
08:53  12          MR. AVENATTI:  Your Honor, I wasn't planning on
08:53  13   it, but we can certainly submit something.
08:53  14          THE COURT:  Well, let me be clear.  I asked the
08:53  15   parties to put in one place their argument focusing
08:53  16   specifically on the Tabs data.  If you're satisfied with the
08:53  17   showing you made at 733, that's fine.  I'm not compelling
08:53  18   you to put in another brief.  If you're happy with the
08:53  19   record from your perspective, fine.
08:53  20          MR. AVENATTI:  Your Honor, I think I'm satisfied
08:53  21   with the record between two filings, which are 733, as you
08:53  22   mentioned, and then -- I'm sorry, Your Honor.  One moment.
08:53  23          (Pause in proceedings)
08:53  24          MR. AVENATTI:  There are two filings focused on
08:53  25   the Tabs data.  This is separate from Mr. Drum.  That's a

08:53　1　different issue.  The two filings by the defendant relating

08:54　2　to the Tabs data are 706, filed on August 15th, 2021, and

08:54　3　then 733, the supplement, last night.

08:54　4　　　　　　THE COURT:  Okay.  Well, I'll go back to 706 and

08:54　5　focus specifically on the portions dealing with Tabs.  Okay?

08:54　6　　　　　　MR. AVENATTI:  Yes.  706 -- the entirety of 706

08:54　7　relates to Tabs and QuickBooks.  That's the only thing 706

08:54　8　relates to.

08:54　9　　　　　　THE COURT:  That's fine.  If you're satisfied with

08:54　10　your record, that's fine.

08:54　11　　　　　　I requested those supplemental briefs by noon

08:54　12　today, so I'm still looking for your brief, Mr. Sagel.

08:54　13　　　　　　MR. SAGEL:  The government's reply is basically

08:54　14　ready.  I realized the exhibit we would attach has

08:54　15　third-party information, so it would have to be under seal.

08:54　16　　　　　　So I'm hoping while we're here, my legal assistant

08:55　17　can compile the exhibit so it's ready to go I'm hoping in

08:55　18　the 15-minute morning break, but I might need to ask for

08:55　19　about a 15-minute cushion on the noon deadline if I need to

08:55　20　work with my assistant on the one exhibit that would need to

08:55　21　be filed under seal.

08:55　22　　　　　　MR. AVENATTI:  What I would ask for, Your Honor,

08:55　23　then is as follows.  We filed an opening brief at 706.  You

08:55　24　asked for supplemental briefing.  We provided one at 733.

08:55　25　They are now going to file something.  I would like the

08:55    1    opportunity to have the last word on the briefing --

08:55    2            THE COURT:  Sir, the last word on the briefing on

08:55    3    706 is already done.  I requested supplemental information.

08:55    4    I'm going to receive it, and I'm not inviting any further

08:55    5    response to the government's position.

08:55    6            MR. AVENATTI:  They never responded to 706.  Today

08:55    7    would be the first time.  That's the issue, Your Honor.

08:55    8            MR. SAGEL:  My understanding was that's what Your

08:55    9    Honor asked both parties to do, was to respond to it by noon

08:56   10    today.

08:56   11            THE COURT:  Well, all right, 8:00 p.m.

08:56   12            MR. AVENATTI:  The government's opposition by noon

08:56   13    and us by 8:00 p.m.?

08:56   14            THE COURT:  Right.

08:56   15            Now, as I indicated, we will take up the Drum

08:56   16    motion generally and the issues with regard to Tabs tomorrow

08:56   17    morning.  I would like to start at 8:00.  I think we'll have

08:56   18    a great deal to discuss tomorrow, and I think it would be

08:56   19    kinder inviting the jury to come back at 10:00 or invite

08:56   20    them to come back next Tuesday.  I think if we do that, I

08:56   21    think we could spend time on jury instructions and do a

08:56   22    number of other things that will be productive.  But at a

08:56   23    minimum, I'm going to bring them back at 10:00 tomorrow.

08:56   24            Thoughts?

08:56   25            MR. AVENATTI:  Your Honor, I think it makes sense

08:57 1    to bring them back at 10:00 on Tuesday, and here's why.

08:57 2              THE COURT:  No, no, no.  9:00 if it's Tuesday.

08:57 3              MR. AVENATTI:  I'm sorry.  I misspoke on the

08:57 4    timing.

08:57 5              THE COURT:  Okay.

08:57 6              MR. AVENATTI:  I think it makes sense to bring

08:57 7    them back after today at 9:00 on Tuesday.  Clearly, there's

08:57 8    a number of issues that are going to affect the closing

08:57 9    witnesses on my case or in my case, including Mr. Drum.

08:57 10   This Mr. Drum issue is going to have to be resolved.  I have

08:57 11   him subject to recall.

08:57 12             Obviously we have jury instruction issues, et

08:57 13   cetera.  I think it makes more sense to bring them back on

08:57 14   Tuesday morning.

08:57 15             As it relates to Mr. Drum, you gave us until noon

08:57 16   to submit our reply today to the government's 300-page

08:57 17   submission.  I would ask if I could have until 1:30 today.

08:57 18             THE COURT:  That's fine.

08:57 19             MR. AVENATTI:  Thank you, Your Honor.  We will

08:57 20   file that by 1:30.

08:58 21             MR. SAGEL:  Are we saying no jury trial tomorrow?

08:58 22             THE COURT:  Right, possibly.  Your thoughts?

08:58 23             MR. SAGEL:  I think based on the jury already

08:58 24   being told that what we did out of an abundance of caution

08:58 25   would take them to August 20th, which is tomorrow, we should

08:58   1   be utilizing the time to its fullest.  It doesn't mean we

08:58   2   need to start -- you know, obviously 10:00 is sufficient if

08:58   3   we need to do it later.

08:58   4          But, like, Mr. Drum is only one of the witnesses.

08:58   5   If what Mr. Avenatti is claiming, that that's the only

08:58   6   witness left at that point, then maybe it makes sense.  But

08:58   7   if he has other witnesses, that shouldn't be put off until

08:58   8   Tuesday.  We should utilize the time with the jury to the

08:58   9   fullest, which might be whether it's late morning or

08:58   10  afternoon or what have you, but I think we should have trial

08:59   11  tomorrow and keep the train moving.

08:59   12         THE COURT:  I will come back to you by the end of

08:59   13  the day.  My present thought is to invite them back on

08:59   14  Tuesday.

08:59   15         Obviously the Tabs issue is an important one, and

08:59   16  I would like Mr. Patrick Fitzgerald here or his designee or

08:59   17  whoever is heading up the taint team.  I want to know

08:59   18  whether the Tabs data is in the materials that the taint

08:59   19  team holds.

08:59   20         The present record would seem to indicate that no

08:59   21  inquiry has been made of the taint team with respect to the

08:59   22  Tabs data.  That was Mr. Karlous's testimony.  I would like

08:59   23  to know the facts.

08:59   24         Do you want to raise that request of

09:00   25  Mr. Fitzgerald?

09:00  1          MR. SAGEL:  We can.  For tomorrow morning?

09:00  2          THE COURT:  Tomorrow morning.

09:00  3          MR. SAGEL:  I will also -- I'll reach out to him.

09:00  4          THE COURT:  If there is a problem, come back and

09:00  5    tell me, but I would like him or a representative here to be

09:00  6    able to answer that question as to whether the Tabs data is

09:00  7    in the materials in the possession of the taint team.

09:00  8          MR. SAGEL:  I am probably the least versed in

09:00  9    computers, so I probably should be the last one to speak,

09:00  10   but I think what would be required -- I think Nshan

09:00  11   Tashchyan, the special agent, will be here today to testify.

09:00  12   They may need to set the virtual server back up to even

09:00  13   look.  So I don't know how quickly that answer could be

09:00  14   done.  I don't know if it's still set up from two years ago

09:01  15   when he set it up for the defendant.

09:01  16         THE COURT:  Well, I think we'll just wait a little

09:01  17   bit for you to contact Mr. Fitzgerald's office.

09:01  18         MR. SAGEL:  Understood, Your Honor.

09:01  19         MR. AVENATTI:  Your Honor, just to refresh the

09:01  20   Court's recollection, Mr. Varani, when I called him back in

09:01  21   my case-in-chief, I asked him about the process and how it

09:01  22   worked.  He testified he got the images from Mr. Tashchyan

09:01  23   off the servers.  He then did an output of the different

09:01  24   types of files that were available.

09:01  25         Presumably that report of the files that were

09:01  1   reflected on the server -- that information presumably is

09:01  2   still available and easily available for the government.  So

09:01  3   the idea that somehow we have to reboot servers or

09:01  4   re-conduct forensic imaging, I don't think that's accurate.

09:01  5        THE COURT:  Well, let's find out what the facts

09:01  6   are.

09:01  7        MR. AVENATTI:  I agree a hundred percent with

09:02  8   that, Your Honor, 100 percent.  Let's find out what the

09:02  9   facts are and let's find out if the Tabs data is within

09:02  10  those images.  I agree.

09:02  11       THE COURT:  Okay.  I want to take up the situation

09:02  12  of Ms. Witos, W-i-t-o-s.  It's a somewhat unusual situation

09:02  13  where I have a letter from a lawyer not admitted here and

09:02  14  doesn't report to directly represent Ms. Witos, but it

09:02  15  brings to the Court certain facts that I think the Court

09:02  16  needs to consider in whether to enforce the Witos subpoena.

09:02  17       Do you want to address that, Mr. Avenatti?

09:02  18       MR. AVENATTI:  Yes, Your Honor.  I don't think

09:03  19  it's appropriate --

09:03  20       THE COURT:  Let me say procedurally she doesn't

09:03  21  show you asked for a warrant, whatever.  We get to this

09:03  22  question one way or the other.  I would like to

09:03  23  short-circuit it and see if we can't answer this question

09:03  24  now.

09:03  25       MR. AVENATTI:  I understand that, but procedurally

09:03  1   I don't think it's appropriate for the Court to consider

09:03  2   this letter frankly at this point at all.  It's not a proper

09:03  3   filing before the Court.  It's not a motion to quash.  She

09:03  4   could have obtained counsel here to file it.  She was

09:03  5   actually supposed to be here days ago, Your Honor.

09:03  6          THE COURT:  The representation in her letter is

09:03  7   that she cannot afford to retain counsel.

09:03  8          MR. AVENATTI:  Well, Your Honor, let me -- I want

09:03  9   to provide the Court with some --

09:03  10         THE COURT:  Moreover, I'm going to mark this as

09:03  11  the Court's exhibit next in order.  It's an e-mail from

09:03  12  Christopher Adams to Ms. Bredahl with copies to Dean Steward

09:03  13  and Brett Sagel and Alex Wyman transmitted August 17, 2021,

09:03  14  at 7:46 a.m.

09:04  15         MR. AVENATTI:  Your Honor, let me provide some

09:04  16  more background for the Court because I think it's

09:04  17  important.  Ms. Witos was a CPA at the law firm.  She input

09:04  18  information into Tabs data during an approximate five-year

09:04  19  time period, including in connection with at least

09:04  20  Mr. Johnson and Mr. Barela.

09:04  21         Her testimony is critical to my defense case.

09:04  22  That is why we have been attempting to serve her for some

09:04  23  time.  Just so Your Honor is aware, I have a personal

09:04  24  relationship with her father.  He is a friend.  He is a

09:04  25  retired Superior Court judge in the state of New Jersey.  I

09:04   1   have maintained a good relationship with him.

09:04   2           I contacted him in advance of subpoenaing

09:04   3   Ms. Witos.  I was not aware that she had left the

09:04   4   jurisdiction of California.  I called him on the phone as a

09:04   5   courtesy as a friend.  I said unfortunately it will be

09:05   6   necessary for me to subpoena Ms. Witos to testify, your

09:05   7   daughter, in the trial.

09:05   8           He voiced no opposition to that.  He was very

09:05   9   cooperative.  We had a very friendly conversation as we have

09:05  10   for many years.  I have known him since about 2009, Your

09:05  11   Honor.

09:05  12           He then contacted Ms. Witos.  He called me back.

09:05  13   He told me that she really didn't want to come and testify,

09:05  14   that she was very anxious about it, that she had a lot going

09:05  15   on, et cetera.  I informed him that I would make efforts to

09:05  16   try to avoid calling her to testify, but I explained to him

09:05  17   the seriousness of this case which he was aware of due to

09:05  18   his tenure on the bench for many, many years.

09:05  19           We were then forced to try to subpoena her.  We

09:05  20   were unable to subpoena her, but we went to great effort and

09:05  21   expense to have individuals attempt to subpoena her after

09:05  22   locating her address in the state of Texas.

09:05  23           We then finally after, I want to say, a week, it

09:06  24   may have been upwards of two weeks.  I don't recall exactly

09:06  25   without the documents in front of me.  We were then able to

09:06   1    finally effectuate service on her in the state of Texas.  We

09:06   2    then had a conversation with Mr. Adams by phone.  I

09:06   3    explained to Mr. Adams that the last thing in the world I

09:06   4    wanted to do was inconvenience Ms. Witos, especially because

09:06   5    of the fact that she is a mother.

09:06   6            I explained the importance of her coming to

09:06   7    testify.  Subsequent to that, Your Honor, we sent multiple

09:06   8    e-mails to Mr. Adams informing him that we're happy to

09:06   9    arrange her travel.  We're happy to accommodate her from a

09:06   10   convenience standpoint, but unfortunately it will be

09:06   11   necessary for her to testify.

09:06   12           Now, again, she was supposed to be here a number

09:06   13   of days ago.  She did not show.  We have not pushed the

09:06   14   issue because we haven't needed to because we've had other

09:06   15   witnesses.  In any event, this is no small matter.  It's not

09:07   16   a civil matter.  It's a very serious, as you know better

09:07   17   than anybody, criminal felony trial.

09:07   18           This is a critical witness.  I need her here to

09:07   19   testify.  I don't want to inconvenience this young lady.  I

09:07   20   like her.  I've had a good relationship with her and her

09:07   21   father.  But in any event, I need her here to testify.  And

09:07   22   I'm happy to brief the issue.  I have been waiting for

09:07   23   Mr. Adams.  Mr. Steward and I have been waiting for

09:07   24   Mr. Adams to get back to us so we can try to make this as

09:07   25   convenient as possible for this young lady.  And we're going

09:07  1   to continue to try to do that.

09:07  2          But in any event, I need her here to testify.  As

09:07  3   it relates to her financial situation, Your Honor, I will

09:07  4   note this.  She lives in a nice house in Dallas.  Her

09:07  5   husband works.

09:07  6          THE COURT:  Well, the representation here is she's

09:07  7   a single mother and works full time.  Have I misread this?

09:07  8          MR. AVENATTI:  I don't think that is --

09:07  9          THE COURT:  Oh, her husband is employed full time,

09:07 10   and she has no one in the family to serve as a caretaker, no

09:08 11   family in the area.  So he is employed.

09:08 12          MR. AVENATTI:  He is employed.  He has a very good

09:08 13   job.  They live in a nice house in Dallas.  To the extent

09:08 14   that she doesn't have the ability -- again, we said that we

09:08 15   would cover the travel to bring her here.  She's not going

09:08 16   to have to incur any costs associated with that.

09:08 17          But as it relates to the expense associated with

09:08 18   having counsel here file a motion, I mean, were that really

09:08 19   an issue, my understanding is that she could apply through

09:08 20   CJA and get appointed counsel to file a motion to quash if

09:08 21   necessary.  And that has not been done.

09:08 22          Again, she is a very important witness for me,

09:08 23   Your Honor, and she can explain -- you will recall that when

09:08 24   I called Ms. Wolett to the stand, she touched on Tabs but

09:08 25   not as it relates to the expense input.  And Mr. Wyman got

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:08    1    up and asked a single question on cross-examination:  Well,

09:08    2    you didn't have anything to do with the financial aspects of

09:08    3    the firm, right?  Right.  And then he sat down.  So I need

09:09    4    to be able to counter that and explain to the jury how Tabs

09:09    5    from a financial aspect works.

09:09    6              Thank you.

09:09    7              THE COURT:  At the appropriate procedural time, we

09:09    8    can take this up again.

09:09    9              I would like a report back this morning or at the

09:09   10    latest 1:30 about the situation with Mr. Fitzgerald.

09:09   11              MR. SAGEL:  Yes, Your Honor.  With adding that on

09:09   12    to what I will be doing at the morning break, can I have

09:09   13    until 12:30 to file what was due at noon?

09:09   14              THE COURT:  Sure.

09:09   15              MR. SAGEL:  Thank you, Your Honor.

09:09   16              THE COURT:  Anything else we need to take up?

09:09   17              MR. SAGEL:  I will do it briefly.  And if you want

09:09   18    to do it later, we can.  We were asked to have Ms. Phan

09:09   19    available tomorrow.  The proffer that was done yesterday was

09:10   20    to call her back to ask her about the Newport Beach P.D.

09:10   21    issue, which, Your Honor had sustained every one of those

09:10   22    objections I think properly then.

09:10   23              I think the combination of whether or not we are

09:10   24    having trial tomorrow, first of all, and whether or not

09:10   25    there's any reason to inconvenience her to bring her back on

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:10    1    an issue that Your Honor has already ruled is inadmissible.

09:10    2    I just want to know -- our agents are attempting to contact

09:10    3    her to have her available tomorrow.  I just want to have

09:10    4    some guidance on what I should tell the agents to do,

09:10    5    whether to have her available or not.

09:10    6               THE COURT:  Have her on standby.

09:10    7               MR. SAGEL:  Thank you, Your Honor.

09:10    8               THE COURT:  If I decide we will excuse the jury

09:10    9    until Tuesday, that will be sufficient time to let her know

09:10   10    when we'll need her.

09:10   11               Who do you have today, Mr. Avenatti?

09:11   12               MR. AVENATTI:  The continuation of Ms. Mosby, and

09:11   13    then Mr. Tashchyan, then Special Agent Kim, Special Agent

09:11   14    Roberson.  I had hoped to call Evan Carter, but I think it's

09:11   15    pretty apparent she's not going to be here.

09:11   16               I had hoped to call Ms. Witos, but I think it's

09:11   17    pretty apparent that she's not going to be here.  But the

09:11   18    four witnesses that I mentioned should take us through the

09:11   19    day.

09:11   20               THE COURT:  Do you have more potential witnesses

09:11   21    to call?

09:11   22               MR. AVENATTI:  I do.  Right now -- and this is

09:11   23    subject to change --

09:11   24               THE COURT:  I understand.

09:11   25               MR. AVENATTI:  -- other than the individuals that

09:11  1   I just mentioned, including Ms. Carter and Ms. Witos, I have

09:11  2   Ms. Phan, who has been mentioned; Mr. Drum, depending on

09:11  3   what happens on the Drum issue.  And we may have one

09:11  4   additional witness off our witness list, but I haven't

09:12  5   determined who that might be, for a particular issue.

09:12  6           THE COURT:  Okay.

09:12  7           Let's recess briefly and then we'll bring the jury

09:12  8   in.

09:12  9           MR. SAGEL:  Just so Your Honor knows, Special

09:12  10  Agent Tashchyan -- we were alerted last night they wanted to

09:12  11  call Special Agent Tashchyan this morning.  We alerted them

09:12  12  after we contacted Special Agent Tashchyan that because of

09:12  13  an earlier commitment he couldn't change, the earliest he

09:12  14  could be here is 10:30 to 11:00.

09:12  15          Obviously Special Agent Kim and Roberson are here.

09:12  16  He is aware of that.  We told him that last night.  So I

09:12  17  don't know how long Ms. Mosby will be on the stand.

09:12  18          THE COURT:  We shall see.

09:12  19                  (Recess taken at 9:12 a.m.;

09:12  20                  proceedings resumed at 9:20 a.m.)

09:12  21              (Jury present)

09:20  22          THE CLERK:  Item 1, SACR-19-00061-JVS, United

09:20  23  States of America versus Michael John Avenatti.

09:21  24          MR. SAGEL:  Good morning, Your Honor.  Brett Sagel

09:21  25  and Alexander Wyman on behalf of the United States.  And at

```
09:21   1    counsel table is Special Agent Remoun Karlous.
09:21   2              THE COURT:  Good morning.
09:21   3              MR. AVENATTI:  Good morning, Your Honor.  Michael
09:21   4    Avenatti with Mr. Dean Steward, Ms. Cummings-Cefali, and
09:21   5    Ms. Hernandez.
09:21   6              THE COURT:  Good morning.
09:21   7              And good morning, ladies and gentlemen.
09:21   8              THE JURY:  Good morning.
09:21   9              THE COURT:  Mr. Avenatti.
09:21   10             KATHERINE MOSBY, DEFENSE WITNESS, PREVIOUSLY SWORN
09:21   11                  DIRECT EXAMINATION (Continued)
09:21   12   BY MR. AVENATTI:
09:21   13   Q    Good morning, Ms. Mosby.
09:21   14   A    Good morning.
09:21   15   Q    Ms. Mosby, Mosby is your maiden name, and that is
09:21   16   always what I have referred to you as, right?
09:21   17   A    Yes.  I apologize for the confusion yesterday.  That's
09:21   18   the name I go by, yes.
09:21   19   Q    Okay.
09:21   20   A    Most people in the legal field know me by Mosby.
09:21   21   Q    And I used to refer to you as Mose?
09:21   22   A    Yes.
09:21   23   Q    Okay.  Is it acceptable to you if I call you
09:21   24   Ms.  Mosby?
09:21   25   A    Yes.
```

09:21  1  Q    Okay.  Now, in connection with this case, was there a

09:22  2  time in 2020, not 2019 but 2020, that you were contacted by

09:22  3  the government?

09:22  4  A    Yes.

09:22  5  Q    And do you recall that that was in approximately

09:22  6  March of 2020?

09:22  7  A    Correct.

09:22  8  Q    And how were you contacted?

09:22  9  A    I was contacted by Remoun Karlous.

09:22  10  Q    The gentleman seated to my left?

09:22  11  A    Yes.

09:22  12  Q    And how were you contacted by Mr. Karlous in March of

09:22  13  2020?

09:22  14  A    He called me on my cell phone.

09:22  15  Q    Had you ever communicated with Mr. Karlous before?

09:22  16  A    No.

09:22  17  Q    Had you ever communicated with the government before

09:22  18  March 2020 in connection with this case?

09:22  19  A    No.

09:22  20  Q    And did Mr. Karlous ask you to come in and meet with

09:22  21  the government?

09:22  22  A    Yes.

09:23  23  Q    And how long after Mr. Karlous contacted you did you

09:23  24  come in to meet with the government?

09:23  25  A    It was within a couple weeks.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:23   1    Q    I think you met with the government on March 2nd, 2020.
09:23   2    So do you recall that perhaps you were first contacted in
09:23   3    February?
09:23   4    A    Probably, yes.
09:23   5    Q    And had you ever met with any federal agents or
09:23   6    prosecutors in your life before you had that meeting with
09:23   7    the government?
09:23   8    A    No.
09:23   9    Q    Was that a pretty intimidating process?
09:23   10   A    It was intense, yes.
09:23   11   Q    Was it scary?
09:23   12   A    It wasn't scary.  It was intense.
09:23   13   Q    So it wasn't as scary as testifying in this court
09:23   14   proceeding, but it was scary.  Would you agree with that?
09:24   15   A    I don't know if scary would be the word.  It was
09:24   16   definitely intense.
09:24   17   Q    Was it unnerving?
09:24   18   A    No.
09:24   19   Q    And when you met with the government, did they have you
09:24   20   read the indictment in this case?
09:24   21   A    No, not that I recall.
09:24   22   Q    And one of the things when you met with the government
09:24   23   that you did was you mentioned Hillary Wolett; is that
09:24   24   right?
09:24   25   A    Yes.

09:24   1   Q     And I think you gave them Hillary Wolett's cell phone

09:24   2   number.  Do you recall that?

09:24   3   A     I don't recall if I did.

09:25   4   Q     And Ms. Wolett previously worked at the firm, right?

09:25   5   A     Yes.

09:25   6   Q     And you're aware that she testified in this case

09:25   7   yesterday because you saw her out in the hallway; is that

09:25   8   right?

09:25   9   A     Yes.

09:25   10  Q     And when you saw her, did you two catch up about what

09:25   11  had been going on?

09:25   12              MR. SAGEL:  Objection, 403.

09:25   13              THE COURT:  Sustained.

09:25   14  BY MR. AVENATTI:

09:25   15  Q     You had a moment to visit with Ms. Wolett yesterday,

09:25   16  right?

09:25   17  A     Yes.

09:25   18  Q     Now, even though you had -- well, strike that.  When

09:25   19  was your last day at the law firm?

09:25   20  A     I don't recall the exact day.  I know what day I gave

09:25   21  notice, but I don't recall what day I never came back to the

09:25   22  office.

09:25   23  Q     But like we established yesterday, there was a period

09:25   24  of time where you continued to be paid throughout

09:25   25  approximately a year; is that right?

09:25  1   A     Correct.

09:25  2   Q     And in December 2017 you attended the firm's Christmas

09:26  3   party, right?

09:26  4   A     Correct.

09:26  5   Q     And you and I remained on good terms throughout 2018;

09:26  6   is that right?

09:26  7   A     Yes.

09:26  8   Q     And when you met with the government, you told the

09:26  9   government that Ms. Regnier had never expressed to you any

09:26  10  concerns about the law firm; is that right?

09:26  11  A     Right.

09:26  12  Q     And that's true, right?

09:26  13  A     Yes.

09:26  14  Q     And you also told the government that you had quit the

09:26  15  law firm because of Ms. Regnier; is that right?

09:26  16             MR. SAGEL:  Objection, Your Honor.  Calls for

09:26  17  hearsay.

09:26  18             THE COURT:  Sustained.

09:26  19  BY MR. AVENATTI:

09:26  20  Q     You had quit the law firm because of Ms. Regnier, true?

09:27  21             MR. SAGEL:  Asked and answered.

09:27  22             THE COURT:  Overruled.

09:27  23             THE WITNESS:  Yes.

09:27  24  BY MR. AVENATTI:

09:27  25  Q     Now, while you were at the law firm, one of the things

09:27  1   that you would do is that you would help fill out

09:27  2   attorney/client fee agreements and then provide those from

09:27  3   time to time to Ms. Regnier and myself; is that right?

09:27  4   A    Yes.

09:27  5   Q    And generally what would happen to those

09:27  6   attorney/client fee agreements after they were signed?

09:27  7   A    We had them in a folder or we had them -- they are out

09:27  8   of my hands.

09:27  9   Q    Do you recall telling the government that they would be

09:27  10  scanned and put in the client's file?

09:27  11           MR. SAGEL:  Objection.  Calls for hearsay.

09:28  12           THE COURT:  Sustained.

09:28  13  BY MR. AVENATTI:

09:28  14  Q    Ms. Mosby, would Ms. Regnier from time to time scan the

09:28  15  agreements and file them?

09:28  16  A    (No response)

09:28  17  Q    That's a terrible question.  Let me ask a better

09:28  18  question.

09:28  19  A    All right.

09:28  20  Q    While you were at the firm for about ten years, did you

09:28  21  witness Ms. Regnier scanning attorney/client fee contracts

09:28  22  and putting them in the client file?

09:28  23  A    I don't recall seeing her specifically doing it.

09:28  24  Q    What was your understanding as to where the

09:28  25  attorney/client fee contracts would be stored after they

09:28    1    were signed?

09:28    2    A     In her drawers in her office.

09:29    3              MR. AVENATTI:  Your Honor, can I approach to

09:29    4    attempt to refresh?

09:29    5              THE COURT:  You may.

09:29    6              (Document handed to the witness)

09:29    7              THE WITNESS:  I don't have my glasses, so I can't

09:29    8    really read this.

09:29    9              MR. AVENATTI:  I don't know if these are going to

09:29   10    work, but can you try these?

09:29   11              THE WITNESS:  I will just do my best.

09:29   12    BY MR. AVENATTI:

09:30   13    Q     Ms. Mosby, are your glasses in your bag?

09:30   14    A     I can read it.

09:30   15    Q     We can get your glasses.

09:30   16    A     No.  This is big enough.  (Witness reading)

09:30   17    Q     Paragraphs 16 and 17, please, Ms. Mosby.  If you could

09:31   18    read that and see if that refreshes your recollection that

09:31   19    once a fee agreement was signed, it was scanned and put into

09:31   20    the client's file.

09:31   21    A     (Witness reading document aloud)

09:31   22    Q     Please don't read the document, Ms. Mosby.  His Honor

09:31   23    and the government won't be happy about that.

09:31   24              So my question is this:  Does the document refresh

09:31   25    your recollection that once an agreement was signed, it

09:31  1   would be put into the client's file?

09:31  2   A   Yes, to the best of my recollection.

09:31  3   Q   And the hard copies would be kept and the document

09:31  4   would be scanned into the computer system at the firm; is

09:31  5   that right?

09:31  6   A   Yes.

09:32  7   Q   And do you recall when you were at the firm, you dealt

09:32  8   with some financial matters?

09:32  9   A   I probably wrote check a couple times.

09:32  10  Q   When you met with the government, you informed them

09:32  11  that you dealt with some financial matters at the firm; is

09:32  12  that right?

09:32  13  A   I don't recall.

09:32  14  Q   Okay.  If you could take a look at paragraph seven.

09:32  15  A   (Witness complies.)

09:32  16  Q   Does that refresh your recollection that when you met

09:32  17  with the government, you told the government that you dealt

09:32  18  with some financial matters, general financial matters?

09:33  19  A   Like I said, I wrote some checks.  So if that's

09:33  20  financial matters, yes.

09:33  21  Q   And you did not have access to the QuickBooks files at

09:33  22  the law firm; is that right?

09:33  23  A   Correct.

09:33  24  Q   Do you recall a program by the name of Tabs?

09:33  25  A   I never dealt with Tabs.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:33   1    Q    But were you aware that Tabs was a program that was

09:33   2    used at the law firm?

09:33   3    A    I don't even know if I knew that.  I don't recall.

09:33   4    Q    Okay.  That wasn't within your duties and

09:33   5    responsibilities?

09:33   6    A    Correct.

09:33   7    Q    You did understand that certain attorney time and

09:33   8    expenses were being tracked in a program; did you not?

09:34   9    A    Correct.

09:34   10   Q    You just didn't know the name of it or how it worked?

09:34   11   A    Correct.

09:34   12   Q    The tracking of the attorney time and the expenses in

09:34   13   the program that you didn't know the name of, that was being

09:34   14   handled by Ms. Regnier, Ms. Wolett, and Ms. Witos; is that

09:34   15   right?

09:34   16             MR. SAGEL:  Objection, Your Honor.  Leading.

09:34   17             THE COURT:  Overruled.

09:34   18             MR. SAGEL:  And foundation.

09:34   19             THE WITNESS:  I know that Hillary entered time in

09:34   20   cases.  I don't know if Morgan did.  So those would be the

09:34   21   three that would be involved, yes.

09:34   22   BY MR. AVENATTI:

09:34   23   Q    Morgan Witos, Hillary Wolett, and Judy Regnier?

09:34   24   A    Correct.

09:34   25   Q    Okay.  And Morgan Witos, do you recall her from your

09:35  1    years at the firm?

09:35  2    A    Absolutely, yes.

09:35  3    Q    She was at the firm about five years?

09:35  4    A    I don't recall how long.

09:35  5    Q    And do you recall that she assisted with the accounting

09:35  6    at the law firm?

09:35  7    A    Yes.

09:35  8    Q    And as best you knew, was that her primary job, was to

09:35  9    assist with the various accounting and bookkeeping issues at

09:35  10   Eagan Avenatti?

09:35  11   A    Yes.

09:35  12   Q    And while you were at the firm for about ten years, did

09:35  13   you communicate with clients from time to time by phone and

09:35  14   e-mail?

09:35  15   A    Yes.

09:35  16   Q    And you also worked on the Johnson matter; is that

09:35  17   right?

09:35  18   A    Yes.

09:36  19   Q    And you assisted with some of the filings in the

09:36  20   Johnson case; is that right?

09:36  21   A    Yes.

09:36  22   Q    Did you communicate with Mr. Johnson at any point in

09:36  23   time?

09:36  24   A    I don't believe I ever spoke to Mr. Johnson.

09:36  25   Q    Did you ever communicate with his parents?

09:36   1    A     Yes.

09:36   2    Q     And when do you recall communicating with Mr. Johnson's

09:36   3    parents?

09:36   4                MR. SAGEL:  Objection.  403, and calls for

09:36   5    hearsay.

09:36   6                THE COURT:  Overruled.

09:36   7                THE WITNESS:  I do not recall an exact date but

09:36   8    the beginning of the case.

09:36   9    BY MR. AVENATTI:

09:36   10   Q     When you say the beginning of the case, you mean at the

09:36   11   beginning of us beginning to represent Mr. Johnson?

09:36   12   A     Correct.

09:37   13   Q     Do you recall what that was in connection with?

09:37   14   A     I do not.

09:37   15   Q     Did you speak with any of his siblings or just his

09:37   16   parents?

09:37   17   A     I don't recall.

09:37   18   Q     And you can't tell us anything about what those

09:37   19   communications were generally about; is that right?

09:37   20   A     Just his parents worried about him.  That's what I

09:37   21   know.

09:37   22   Q     Do you have a recollection that his parents wanted to

09:37   23   make sure that he was established in an adequate living

09:37   24   situation but that they didn't have the money to pay for it

09:37   25   and they needed the firm to do so?

44

09:37  1              MR. SAGEL:  Objection.  Calls for speculation.

09:37  2  Asks for hearsay.  And it's leading.

09:37  3              THE COURT:  Sustained.

09:37  4  BY MR. AVENATTI:

09:38  5  Q    Do you recall at some point receiving an e-mail

09:38  6  communication from Mr. Johnson's sister relating to his

09:38  7  situation?

09:38  8  A    I don't recall that.

09:38  9  Q    You also worked on the Barela matter, correct?

09:38  10 A    Yes.

09:38  11 Q    And did you assist in filing things in connection with

09:38  12 Mr. Barela?

09:38  13 A    Yes.

09:38  14 Q    Did you communicate with Mr. Barela?

09:38  15 A    I don't recall that I did.

09:38  16             MR. AVENATTI:  Your Honor, can I approach?

09:39  17             THE COURT:  You may.

09:39  18             (Document handed to the witness)

09:39  19             MR. AVENATTI:  I'm going to get a copy for Your

09:39  20 Honor.

09:39  21             THE COURT:  That's okay.

09:39  22 BY MR. AVENATTI:

09:39  23 Q    Ms. Mosby, I have handed you a stack of cards there to

09:39  24 your right.  Do you see those?

09:39  25 A    Yes.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:39   1   Q     And how many are there in that stack?

09:40   2   A     Four.

09:40   3   Q     And these are four of the cards that you gave to me

09:40   4   over your tenure at the law firm; is that right?  Take a

09:40   5   look and confirm.

09:40   6   A     Yes.

09:40   7   Q     And you provided these to me while you were working at

09:40   8   the law firm, right?

09:40   9   A     Yes.

09:40   10  Q     And do you recall that there were others beyond these

09:40   11  four?

09:40   12  A     There sure might have been.

09:41   13  Q     I would like you to read the first one, please.

09:41   14            MR. SAGEL:  Objection.  It's not in evidence, Your

09:41   15  Honor.  And Rule 16, and 403.

09:41   16            MR. AVENATTI:  It goes to bias.

09:41   17            MR. SAGEL:  It's his own witness, Your Honor.

09:41   18            MR. AVENATTI:  We heard the same bias point

09:41   19  yesterday when Mr. Karlous was on the stand.

09:41   20            THE COURT:  Overruled.

09:41   21            THE WITNESS:  I don't know if they are in the same

09:41   22  order.

09:41   23  BY MR. AVENATTI:

09:41   24  Q     Well, you can pick any order you'd like.

09:41   25            MR. SAGEL:  Is he moving them into evidence, Your

09:41   1   Honor?

09:41   2            MR. AVENATTI:  No, not yet.

09:41   3            Your Honor, they have a collective exhibit number

09:41   4   of 1098.

09:42   5            (Exhibit 1098 marked for identification)

09:42   6            THE WITNESS:  Do you want me to read the card and

09:42   7   what I said or just what I said?

09:42   8   BY MR. AVENATTI:

09:42   9   Q    You can just read what you said.  That's fine.

09:42   10  A    "Dear Michael, I could go on forever and let you know

09:42   11  how much you've changed my life, lifting the burdens I have

09:42   12  had for so very long.  Thank you from my heart for all you

09:42   13  do.  Love, Mose."

09:42   14  Q    Please read the next one.

09:42   15  A    "Dear Michael, as I said before, there are no words.

09:42   16  Thank you for being you and changing my life.  I appreciate

09:42   17  you and what you have done for me more than you can ever

09:42   18  know.  I'm so blessed to be part of this team.  Love, Mose."

09:43   19  Q    Can you please read the next one.

09:43   20  A    "Dear Michael, no words could ever convey to you how

09:43   21  much you mean to me and how much I appreciate you.  You have

09:43   22  changed my life.  From the depths of my heart I thank you

09:43   23  from both personal and professional points of view.  I love

09:43   24  you and thank the universe for you.  I know.  Put this card

09:43   25  somewhere for no one else to see.  Love you, Mose."

09:43  1  Q    I guess I didn't do that good a job on that direction;

09:43  2  did I?  Let me ask this question.  I'm not going to have you

09:43  3  read the fourth one unless you want to.

09:43  4  A    I don't care.

09:43  5  Q    Go ahead and read it.

09:43  6  A    "Dear Michael, there are no words, truly no words.  The

09:44  7  only thing I can say is thank you from my heart.  I know you

09:44  8  know, but I would do, have done, and will do whatever I can

09:44  9  to make sure EOA is the shits, a/k/a, the best, most

09:44  10  successful law firm ever.  Your EOA guys' thank you to me

09:44  11  was life altering, and that does not happen very often or

09:44  12  ever.  I will always have your back.  Mose."  I didn't says

09:44  13  love, just Mose.

09:44  14  Q    And these are samples of cards that you sent me during

09:44  15  the ten years you were at the firm, right?

09:44  16  A    Yes.

09:45  17  Q    And you never stopped giving me cards during the ten

09:45  18  years; did you?

09:45  19  A    I'm sure I did not.

09:45  20  Q    While you were at the firm, did I ever ask you to forge

09:45  21  a signature?

09:45  22  A    No.

09:45  23  Q    Did I ever ask you to destroy a document?

09:45  24  A    No.

09:45  25  Q    Did I ever ask you to manipulate a document?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 09:45 | 1 | A      No. |
| 09:45 | 2 | Q      Did I ever ask you to cheat a client? |
| 09:45 | 3 | A      No. |
| 09:45 | 4 |        MR. AVENATTI:  Nothing further. |
| 09:45 | 5 |        THE COURT:  Mr. Sagel. |
| 09:45 | 6 |                    CROSS-EXAMINATION |
| 09:45 | 7 | BY MR. SAGEL: |
| 09:46 | 8 | Q      Good morning, Ms. Sneddon. |
| 09:46 | 9 | A      Good morning. |
| 09:46 | 10 | Q      The last card defendant just had you read talks about |
| 09:46 | 11 | EOA was is the shits.  EOA was Eagan O'Malley Avenatti; is |
| 09:46 | 12 | that correct? |
| 09:46 | 13 | A      Correct. |
| 09:46 | 14 | Q      That firm ceased existing in 2011? |
| 09:46 | 15 |        MR. AVENATTI:  Objection.  They seek a legal |
| 09:46 | 16 | conclusion.  The name changed, Your Honor. |
| 09:46 | 17 |        THE COURT:  Overruled. |
| 09:46 | 18 |        THE WITNESS:  I don't recall the exact year. |
| 09:46 | 19 | BY MR. SAGEL: |
| 09:46 | 20 | Q      Was it about ten years ago? |
| 09:46 | 21 | A      I don't recall.  Probably, yes. |
| 09:46 | 22 | Q      Do you have cards from the defendant from ten years |
| 09:46 | 23 | ago? |
| 09:46 | 24 | A      No. |
| 09:46 | 25 | Q      Do you have any cards from the defendant? |

09:47  1    A    I don't know.

09:47  2    Q    Do you know where these cards were kept for over ten

09:47  3    years?

09:47  4    A    No.

09:47  5    Q    The defendant asked you questions about whether or not

09:47  6    meeting with the government -- let me get the right words --

09:47  7    was intimidating or unnerving?

09:47  8    A    No.

09:47  9    Q    You didn't think it was?

09:47  10   A    No.

09:47  11   Q    And when the defendant subpoenaed you in this case, the

09:47  12   first thing you did was call the government; wasn't that

09:47  13   correct?

09:47  14   A    Yes.

09:48  15   Q    The defendant brought up both yesterday and today that

09:48  16   he paid you for a year after you stopped working at the

09:48  17   firm.  What year was that?

09:48  18   A    2017.

09:48  19   Q    Did he tell you when he was paying you for not working

09:48  20   at the firm that there were clients who had not received

09:48  21   their settlement money?

09:48  22        MR. AVENATTI:  Objection.  Misstates the evidence.

09:48  23   Lacks foundation, Your Honor.

09:48  24        THE COURT:  Overruled.

09:48  25        THE WITNESS:  Would you ask the question again?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:48    1    BY MR. SAGEL:

09:48    2    Q    When defendant was paying you for not working at the

09:48    3    firm in 2017, did he tell you that there were any clients

09:48    4    who had not received their portion of their settlement

09:48    5    money?

09:48    6    A    No.

09:48    7              MR. AVENATTI:  Same objection.

09:48    8              THE COURT:  Overruled.

09:48    9              THE WITNESS:  No.

09:48   10    BY MR. SAGEL:

09:49   11    Q    Defendant asked you questions about Morgan Witos

09:49   12    helping with the accounting.  Morgan Witos stopped working

09:49   13    at Eagan Avenatti in October of 2014; is that correct?

09:49   14    A    I don't recall the exact date.

09:49   15    Q    Do you remember approximately how long ago it was?

09:49   16    A    That sounds correct.

09:49   17    Q    So any accountings that took place after October of

09:49   18    2014 Morgan Witos wouldn't have had anything to do with?

09:49   19              MR. AVENATTI:  Calls for speculation.  Conjecture.

09:49   20              THE COURT:  Overruled.

09:49   21              THE WITNESS:  Correct.

09:49   22    BY MR. SAGEL:

09:49   23    Q    Defendant asked you about filling out attorney fee

09:49   24    agreements.  Let me just ask a couple initial questions.

09:49   25    When you would do an attorney fee agreement or fill one out

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

51

09:49  1  or get it ready, at whose direction would you do that?

09:50  2  A    Michael's.

09:50  3  Q    When it came to everything at the law firm, it was the

09:50  4  defendant who gave the directions; isn't that true?

09:50  5            MR. AVENATTI:  Objection.  Lacks foundation.

09:50  6            THE COURT:  Overruled.

09:50  7            THE WITNESS:  Absolutely.

09:50  8  BY MR. SAGEL:

09:50  9  Q    When it came to any financial decisions at the law

09:50  10  firm, it was defendant's choice, correct?

09:50  11            MR. AVENATTI:  Same objection.

09:50  12            THE COURT:  Overruled.

09:50  13            THE WITNESS:  Yes.

09:50  14  BY MR. SAGEL:

09:50  15  Q    When it came to filling out a fee agreement or choosing

09:50  16  a client or obtaining a client, that was defendant's choice?

09:50  17            MR. AVENATTI:  Same objection.

09:50  18            THE COURT:  Overruled.

09:50  19            THE WITNESS:  Yes.

09:50  20  BY MR. SAGEL:

09:50  21  Q    When you -- let me understand the process.  When

09:50  22  defendant asked you about filling out the fee agreement

09:50  23  contracts for clients, what was it that you were doing on

09:51  24  those contracts?

09:51  25  A    Typing up what he wanted in the agreement.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:51  1    Q    He would provide you the information and then have you

09:51  2    fill it out?

09:51  3    A    Yes.

09:51  4    Q    So, for example, you mentioned that you helped work on

09:51  5    the Geoffrey Johnson case.  He would provide you with the

09:51  6    information to fill out a fee agreement for Mr. Johnson

09:51  7    saying what the scope of the work would be; is that correct?

09:51  8    A    Yes.

09:51  9    Q    If defendant was actually doing other legal work that

09:51  10   he wanted to get paid for, he could ask you to fill out a

09:51  11   new fee agreement?

09:51  12             MR. AVENATTI:  Lacks foundation.  Speculation,

09:51  13   Your Honor.

09:51  14             THE COURT:  Overruled.

09:51  15             THE WITNESS:  Yes.

09:51  16   BY MR. SAGEL:

09:52  17   Q    The defendant asked you a question about how you were

09:52  18   involved in the finances of the firm, and I think your

09:52  19   answer was you might have filled out a check or two.  With

09:52  20   regards to paying clients their portion of a settlement

09:52  21   agreement, what role if any did you have in that?

09:52  22   A    None.

09:52  23   Q    With regards to the bank accounts at the firm, did you

09:52  24   have any signatory authority over the firm bank accounts?

09:52  25   A    No.

09:53  1   Q    The defendant asked you whether he ever asked you to

09:53  2   destroy, forge, manipulate a document.  He asked several

09:53  3   questions about that.  Do you know whether or not defendant

09:53  4   ever did any of those things?

09:53  5   A    No, I don't know if he did.

09:53  6   Q    The defendant asked you both yesterday and then today

09:53  7   whether Ms. Regnier was one of the reasons you left the

09:54  8   firm, and you said yes?

09:54  9   A    Correct.

09:54  10  Q    That was one of the reasons you left the firm; am I

09:54  11  right?

09:54  12  A    Correct.

09:54  13  Q    The other reason you left the firm was the defendant?

09:54  14  A    Just specifically just the negative energy at the firm.

09:54  15  Q    And that negative energy that you're referring to is

09:54  16  that you felt that the defendant and Ms. Regnier were doing

09:54  17  secret stuff behind closed doors that you didn't feel

09:54  18  comfortable with?

09:54  19  A    I knew they were doing stuff behind closed doors.  I

09:54  20  can't say I didn't feel comfortable.  I just -- I can't go

09:54  21  that far to say that.

09:54  22  Q    But you didn't want to work there anymore?

09:54  23  A    Correct.

09:54  24       MR. SAGEL:  No further questions, Your Honor.

09:54  25                  REDIRECT EXAMINATION

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:54  1   BY MR. AVENATTI:

09:55  2   Q    Ms. Mosby, when you left, you voiced to me concerns

09:55  3   about Ms. Regnier's conduct; isn't that true?

09:55  4   A    Yes.

09:55  5   Q    And what you told me was that you didn't like the fact

09:55  6   that she was sharing or that she was not sharing things with

09:55  7   you like she used to?

09:55  8           MR. SAGEL:  Objection.  Calls for hearsay.

09:55  9           THE COURT:  Sustained.

09:55  10  BY MR. AVENATTI:

09:55  11  Q    Do you have a recollection believing when you left that

09:55  12  you were upset that Ms. Regnier was not sharing things with

09:55  13  you like she used to?

09:55  14  A    I'm sure that was part of it.

09:55  15  Q    And Mr. Sagel tried to get you to say that you had left

09:55  16  because you were uncomfortable with things that were going

09:56  17  on behind closed doors.  Do you recall that question?

09:56  18  A    Yes.

09:56  19  Q    All right.  And I think you said that you can't go

09:56  20  there.  Is that what you said?

09:56  21  A    Yes.

09:56  22  Q    All right.  Because that's not the truth; is it?

09:56  23  A    I didn't know what was going on behind closed doors,

09:56  24  and I just didn't like the negative energy at the firm.

09:56  25  Q    And you didn't know what may have been going on behind

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:56  1    closed doors, whether it had anything to do with the

09:56  2    finances or personnel decisions or anything else; is that

09:56  3    right?

09:56  4    A    Correct.

09:56  5    Q    All right.  You had no idea what any of the meetings

09:56  6    that took place behind closed doors were about; did you?

09:56  7    A    Correct.

09:56  8    Q    Now, you were asked a general question about the fact

09:56  9    that I made all the decisions at the law firm.  I wrote it

09:56  10   down, "everything at the law firm."  Do you recall that

09:57  11   question?

09:57  12   A    Yes.

09:57  13   Q    Okay.  Just so the jury is clear, I didn't make every

09:57  14   single decision every day about everything that happened at

09:57  15   the law firm; did I -- every single decision?

09:57  16   A    Correct.

09:57  17   Q    Okay.  That would be a gross overstatement, right?

09:57  18   Move to strike.  Let me ask this question.

09:57  19          THE COURT:  Did we get an answer to that question?

09:57  20          MR. AVENATTI:  I'm going to strike it and then I'm

09:57  21   going to ask --

09:57  22          THE COURT:  No, no.  Did we get an answer to that

09:57  23   question?

09:57  24          MR. AVENATTI:  Can I have it read back, the

09:57  25   question?

09:57  1            (Record read)

09:57  2            THE COURT:  Did you answer that question?  I

09:57  3  didn't hear it.

09:57  4            THE WITNESS:  I probably said uhm.

09:57  5  BY MR. AVENATTI:

09:57  6  Q    Well, let me ask this question.  There were times where

09:58  7  I was traveling and in trial and not in the office while you

09:58  8  were at the firm; is that right?

09:58  9  A    Correct.

09:58  10  Q    And the firm still ran; is that true?

09:58  11  A    Yes.

09:58  12  Q    Okay.  It is true that the major decisions were made by

09:58  13  me at the law firm, right?

09:58  14  A    Yes.

09:58  15  Q    But there were many day-to-day decisions that were made

09:58  16  by other people, right?

09:58  17  A    I'm sure there were.

09:58  18  Q    Okay.  And do you know what financial decisions

09:58  19  Ms. Regnier made?

09:58  20  A    No, I do not.

09:58  21  Q    Do you know what role Ms. Regnier had relating to

09:58  22  paying clients?

09:58  23            MR. SAGEL:  Objection, Your Honor.  Outside the

09:58  24  scope.

09:58  25            THE COURT:  Sustained.

57

09:58   1    BY MR. AVENATTI:

09:59   2    Q    Now, you were asked about the Johnson fee agreement by

09:59   3    Mr. Sagel.  Do you have a recollection of being involved

09:59   4    with the Johnson fee agreement specifically?

09:59   5    A    No, I do not.

09:59   6    Q    So you can't tell us anything about the details of how

09:59   7    that agreement came to be; can you?

09:59   8    A    Correct.

09:59   9    Q    And then you were asked a question by Mr. Sagel about

09:59   10   if I wanted to do additional work, I could have had you fill

09:59   11   out another fee agreement.  Do you recall that question?

09:59   12   A    Yes, I do.

09:59   13   Q    You weren't the only person at the firm who filled out

09:59   14   fee agreements; were you?

09:59   15   A    No.

09:59   16   Q    I did that from time to time, right?

09:59   17   A    Yes.

09:59   18   Q    And Ms. Regnier?

09:59   19   A    Correct.

09:59   20   Q    And other attorneys, right, as far as inputting it into

09:59   21   the agreement?

09:59   22   A    I don't know.

09:59   23   Q    Okay.  And you don't know what the agreements were

10:00   24   between the firm and Mr. Johnson or Mr. Barela?

10:00   25   A    Correct.

| | | |
|---|---|---|
| 10:00 | 1 | Q    Because that wasn't what you did, right? |
| 10:00 | 2 | A    Correct. |
| 10:00 | 3 | Q    And then Mr. Sagel asked you if you knew where I had |
| 10:00 | 4 | kept these cards.  Do you remember that? |
| 10:00 | 5 | A    Yes. |
| 10:00 | 6 | Q    Okay.  And then he asked you whether you had any cards |
| 10:00 | 7 | from me, and I think you said you don't recall or you don't |
| 10:00 | 8 | know? |
| 10:00 | 9 | A    He asked if I had any that I kept, any cards.  I said I |
| 10:00 | 10 | don't know. |
| 10:00 | 11 | Q    Okay.  Do you recall, though, that you and I would |
| 10:00 | 12 | communicate by text message fairly regularly both while you |
| 10:00 | 13 | were at the firm and afterwards? |
| 10:00 | 14 | MR. SAGEL:  Objection, Your Honor.  Outside the |
| 10:01 | 15 | scope and relevance. |
| 10:01 | 16 | THE COURT:  Sustained. |
| 10:01 | 17 | BY MR. AVENATTI: |
| 10:01 | 18 | Q    Ms. Mosby, any suggestion by Mr. Sagel to this jury |
| 10:01 | 19 | that I did not reciprocate your feelings as expressed in |
| 10:01 | 20 | those cards to me, any suggestion by Mr. Sagel to this jury |
| 10:01 | 21 | of that fact would be completely false; wouldn't it? |
| 10:01 | 22 | A    Yes. |
| 10:01 | 23 | MR. AVENATTI:  Nothing further. |
| 10:01 | 24 | THE COURT:  Mr. Sagel. |
| 10:01 | 25 | RECROSS-EXAMINATION |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

10:01  1  BY MR. SAGEL:

10:01  2  Q    Defendant just asked you questions about whether or not

10:01  3  Ms. Regnier was not sharing things with you like she used

10:01  4  to.  I think your answer was you didn't know what was going

10:01  5  on behind closed doors.

10:02  6         When you met with the government, you told the

10:02  7  government that you didn't even ask defendant questions

10:02  8  anymore because he would just lie and make excuses?

10:02  9         MR. AVENATTI:  Objection, Your Honor.  Outside the

10:02  10  scope.  Argumentative.

10:02  11         THE COURT:  Overruled.

10:02  12         THE WITNESS:  I don't remember saying that to you

10:02  13  guys, but --

10:02  14  BY MR. SAGEL:

10:02  15  Q    You don't remember saying it about that or saying it at

10:02  16  all?

10:02  17  A    I don't remember saying what you just repeated to me.

10:02  18  Q    Do you still have the report that the defendant had you

10:02  19  look at?

10:02  20  A    Yes.

10:02  21  Q    Do you want to look at paragraph 36 on page 5 of 6?

10:03  22  A    (Witness complies.)  For this specific thing, yes.

10:03  23  Q    As it related to something having to do with your

10:03  24  payroll, you didn't feel comfortable asking the defendant

10:03  25  about it because he would just lie and make excuses?

| | | |
|---|---|---|
| 10:03 | 1 | MR. AVENATTI:  Outside the scope, Your Honor. |
| 10:03 | 2 | THE COURT:  Sustained. |
| 10:03 | 3 | MR. AVENATTI:  Move to strike. |
| 10:03 | 4 | THE COURT:  It will be stricken. |
| 10:03 | 5 | BY MR. SAGEL: |
| 10:03 | 6 | Q   And with regards to why Ms. Regnier wasn't sharing |
| 10:03 | 7 | things with you anymore at the end of your tenure, you also |
| 10:03 | 8 | don't know if that was at the defendant's direction; do you? |
| 10:03 | 9 | MR. AVENATTI:  Lacks foundation.  Argumentative, |
| 10:03 | 10 | Your Honor. |
| 10:03 | 11 | THE COURT:  Overruled. |
| 10:03 | 12 | THE WITNESS:  Correct. |
| 10:03 | 13 | MR. SAGEL:  No further questions, Your Honor. |
| 10:03 | 14 | THE COURT:  May the witness be excused? |
| 10:04 | 15 | MR. AVENATTI:  Yes. |
| 10:04 | 16 | MR. SAGEL:  Yes. |
| 10:04 | 17 | THE COURT:  You may be excused.  Thank you. |
| 10:04 | 18 | THE WITNESS:  Thank you, Your Honor. |
| 10:04 | 19 | THE COURT:  Would you call your next witness, |
| 10:04 | 20 | please. |
| 10:04 | 21 | MR. AVENATTI:  The defense calls Mr. Tashchyan, |
| 10:04 | 22 | but I think we're trying to see if he is here yet.  If not, |
| 10:04 | 23 | it will be Mr. Kim. |
| 10:04 | 24 | Mr. Tashchyan is not here, so we will call |
| 10:04 | 25 | Mr. James Kim. |

| | | |
|---|---|---|
| 10:04 | 1 | JAMES KIM, DEFENSE WITNESS, SWORN |
| 10:05 | 2 | THE CLERK:  If you will please state and spell |
| 10:06 | 3 | your first and last name. |
| 10:06 | 4 | THE WITNESS:  James Kim, J-a-m-e-s, K-i-m. |
| 10:06 | 5 | THE CLERK:  Thank you. |
| 10:06 | 6 | DIRECT EXAMINATION |
| 10:06 | 7 | BY MR. AVENATTI: |
| 10:06 | 8 | Q    Mr. Kim, good morning. |
| 10:06 | 9 | A    Good morning. |
| 10:06 | 10 | Q    Where are you employed? |
| 10:06 | 11 | A    Internal Revenue Service, Criminal Investigations. |
| 10:06 | 12 | Q    You're a colleague of Special Agent Karlous's, correct? |
| 10:06 | 13 | A    Correct. |
| 10:06 | 14 | Q    And how long have you been in that role? |
| 10:06 | 15 | A    Three years on the civil side and 12 years on the |
| 10:06 | 16 | criminal side, a total of 15 years. |
| 10:06 | 17 | Q    And when did you move to the criminal side from the |
| 10:06 | 18 | civil side? |
| 10:06 | 19 | A    2009. |
| 10:07 | 20 | Q    And what has your role been in connection with the |
| 10:07 | 21 | investigation into the allegations in this case? |
| 10:07 | 22 | A    I was the co-lead investigator. |
| 10:07 | 23 | Q    Co-lead with Special Agent Karlous, correct? |
| 10:07 | 24 | A    Correct. |
| 10:07 | 25 | Q    And how many hours would you estimate that you have |

```
10:07    1    spent working on this case before testifying here today?
10:07    2    A    I don't recall.
10:07    3    Q    A thousand?
10:07    4    A    I wouldn't able to give an estimate.
10:07    5    Q    Well, let's just focus our attention on late March 2019
10:07    6    to the present.  So that's about two-and-a-half months.
10:07    7    Would you agree to that?
10:07    8    A    Correct.
10:07    9    Q    Okay.  And have you been working on this matter during
10:08   10    that two-and-a-half-year time period?
10:08   11    A    Yes.
10:08   12    Q    And what's your best estimate as to the number of hours
10:08   13    during that two-and-a-half-year time period you spent?
10:08   14    A    I wouldn't be able to do the math other than that.
10:08   15    Q    Well, I mean, is it more than a hundred hours?
10:08   16    A    Yes.
10:08   17    Q    Is it more than 500 hours?
10:08   18    A    Possibly, yes.
10:08   19    Q    Is it more than a thousand hours?
10:08   20         MR. SAGEL:  Objection, Your Honor.  403.
10:08   21         THE COURT:  Overruled.
10:08   22         THE WITNESS:  I wouldn't know.
10:08   23    BY MR. AVENATTI:
10:08   24    Q    You work with numbers all the time, right?
10:08   25    A    Correct.
```

| | | |
|---|---|---|
| 10:09 | 1 | Q    Do you have an accounting background? |
| 10:09 | 2 | A    Yes, I do. |
| 10:09 | 3 | Q    What's your education? |
| 10:09 | 4 | A    I have a bachelor of science in accounting. |
| 10:09 | 5 | Q    From where? |
| 10:09 | 6 | A    Cal State Long Beach. |
| 10:09 | 7 | Q    Have you ever sat for the CPA exam? |
| 10:09 | 8 | A    No, I haven't. |
| 10:09 | 9 | Q    Do you have any other accounting training beyond your |
| 10:09 | 10 | bachelor of science in college? |
| 10:09 | 11 | A    No, I don't. |
| 10:09 | 12 | Q    Is this the most high-profile case that you have ever |
| 10:09 | 13 | been associated with? |
| 10:09 | 14 | MR. SAGEL:  Objection, Your Honor.  403. |
| 10:09 | 15 | THE COURT:  Sustained. |
| 10:09 | 16 | MR. AVENATTI:  It goes to adequacy of the |
| 10:09 | 17 | investigation.  I'll ask my next question. |
| 10:10 | 18 | BY MR. AVENATTI: |
| 10:10 | 19 | Q    Mr. Kim, you knew at the time that you got involved in |
| 10:10 | 20 | this case that it was going to be high profile; did you not? |
| 10:10 | 21 | MR. SAGEL:  Objection.  Argumentative and 403, |
| 10:10 | 22 | Your Honor. |
| 10:10 | 23 | THE COURT:  Overruled. |
| 10:10 | 24 | THE WITNESS:  I wouldn't say high profile but |
| 10:10 | 25 | sensitive. |

| | | |
|---|---|---|
| 10:10 | 1 | BY MR. AVENATTI: |
| 10:10 | 2 | Q    At any point in time did you determine that the case |
| 10:10 | 3 | was likely to be high profile?  Yes or no? |
| 10:10 | 4 | A    At any time, you said? |
| 10:10 | 5 | Q    Yes. |
| 10:10 | 6 | A    Yes. |
| 10:10 | 7 | Q    By the spring of 2019, you were aware that this was |
| 10:10 | 8 | likely to be, if not already, high profile, correct? |
| 10:10 | 9 | A    Correct. |
| 10:10 | 10 | Q    And up until that point in time, was this the most |
| 10:11 | 11 | high-profile case you had ever been associated with? |
| 10:11 | 12 | MR. SAGEL:  Objection, Your Honor.  Same objection |
| 10:11 | 13 | that was already sustained. |
| 10:11 | 14 | THE COURT:  Sustained. |
| 10:11 | 15 | BY MR. AVENATTI: |
| 10:11 | 16 | Q    Now, you've communicated with multiple witnesses during |
| 10:11 | 17 | this investigation; is that right? |
| 10:11 | 18 | A    Yes. |
| 10:11 | 19 | Q    And included among the witnesses that you have |
| 10:11 | 20 | communicated with is Judy Regnier, right? |
| 10:11 | 21 | A    Yes. |
| 10:11 | 22 | Q    And another witness that you have communicated with is |
| 10:11 | 23 | Andrew Stolper, right? |
| 10:11 | 24 | A    Correct. |
| 10:11 | 25 | Q    And you've had multiple communications with Mr. Stolper |

| | | |
|---|---|---|
| 10:11 | 1 | since March 2019, correct? |
| 10:11 | 2 | A    I can't say multiple.  Maybe once. |
| 10:11 | 3 |         MR. AVENATTI:  Your Honor, can I approach? |
| 10:12 | 4 |         THE COURT:  You may. |
| 10:12 | 5 |         (Document handed to the witness) |
| 10:12 | 6 | BY MR. AVENATTI: |
| 10:12 | 7 | Q    Sir, I have handed you two documents.  My question is: |
| 10:13 | 8 | Do these two documents refresh your recollection that you |
| 10:13 | 9 | communicated with Mr. Stolper in connection with this case? |
| 10:13 | 10 | A    Yes. |
| 10:13 | 11 | Q    And does it refresh your recollection that you |
| 10:13 | 12 | communicated with Mr. Stolper as a witness on March 26 and |
| 10:13 | 13 | March 27, 2019? |
| 10:13 | 14 | A    Yes. |
| 10:13 | 15 | Q    And when you communicated with Mr. Stolper as a witness |
| 10:13 | 16 | in this case on those two days, you filled out a memorandum |
| 10:13 | 17 | on each day; is that right? |
| 10:13 | 18 | A    That's correct. |
| 10:13 | 19 | Q    And did you do your best when you filled that out to |
| 10:13 | 20 | make sure that it was truthful and accurate? |
| 10:13 | 21 | A    Yes. |
| 10:13 | 22 | Q    And on each occasion you included the names of the |
| 10:13 | 23 | participants; is that right? |
| 10:13 | 24 | A    That's correct. |
| 10:13 | 25 | Q    And what was the purpose of doing that on March 26 and |

10:13  1    March 27 of 2019?

10:14  2    A    It's just policy, our IRS policy.

10:14  3    Q    And it's the policy in order to make sure that when the

10:14  4    memorandum is reviewed, you know who was present; is that

10:14  5    right?

10:14  6    A    That's correct.

10:14  7    Q    And it's also the policy that when you meet with a

10:14  8    witness like Mr. Stolper, that you list the name of the

10:14  9    witness, right?

10:14  10   A    That's correct.

10:14  11   Q    And on both occasions you listed Mr. Stolper as a

10:14  12   witness, right?

10:14  13   A    Yes.

10:14  14   Q    And that was as truthful and accurate as the remaining

10:14  15   portions of your memorandum, correct?

10:14  16   A    Yes.

10:14  17   Q    And on both of those occasions you communicated with

10:14  18   Mr. Stolper as a witness together with Mr. Andre in

10:15  19   connection with this case, right?

10:15  20   A    Correct.

10:15  21   Q    So if anyone were to tell this jury that Mr. Stolper

10:15  22   was never a witness in this case, that would be untrue,

10:15  23   right?

10:15  24   A    At the time --

10:15  25   Q    Sir, just answer my question yes or no.  Would that be

10:15  1   untrue?

10:15  2   A    Yes.

10:16  3   Q    Now, do you recall over the course of your

10:16  4   investigation that you understood that steps -- well, strike

10:16  5   that.  Let me ask a more foundational question.  Are you

10:16  6   still the co-lead agent on the case with Special Agent

10:16  7   Karlous?

10:16  8   A    Yes.

10:16  9   Q    And have you been co-lead since at least the spring of

10:16  10  2019?

10:16  11  A    Yes.

10:16  12  Q    And during the course of the last two and a half years,

10:16  13  did you understand that steps were being taken in connection

10:16  14  with the investigation to determine what monies were due,

10:16  15  legitimately due Eagan Avenatti and me for fees and expenses

10:16  16  from the five client matters?

10:16  17  A    My role wasn't really -- wasn't involved in the

10:17  18  financial aspect of the case.

10:17  19          MR. AVENATTI:  Move to strike, Your Honor.

10:17  20          THE COURT:  Denied.

10:17  21  BY MR. AVENATTI:

10:17  22  Q    Sir, my question is a little different.  Did you

10:17  23  understand over the last two and a half years as your role

10:17  24  as the co-lead investigator that steps were being taken to

10:17  25  determine what monies were legitimately due the law firm and

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

10:17   1   me for fees and expenses?

10:17   2   A     Yes.

10:17   3   Q     And who did you understand was principally looking into

10:17   4   that issue?

10:17   5   A     Special Agent Remoun Karlous.

10:17   6   Q     Anyone else?

10:17   7   A     And AUSAs.

10:17   8   Q     AUSA Andre?

10:17   9   A     Andre and Brett Sagel.

10:17  10   Q     Anyone else that you understood during the last two and

10:18  11   a half years to be looking into that issue, the issue of

10:18  12   what fees and expenses were due the firm or me?

10:18  13   A     I wouldn't know because I deferred to them.

10:18  14   Q     I'm just getting to your knowledge.  To the best of

10:18  15   your knowledge, it was just those three individuals, right?

10:18  16   A     Correct.

10:18  17   Q     And do you recall that at some point in time a search

10:18  18   warrant was obtained in order to get the information from

10:18  19   the Eagan Avenatti servers?

10:18  20   A     Yes.

10:18  21   Q     And did you have the understanding that one of the

10:18  22   reasons for that was to get the financial information?

10:18  23   A     Correct.

10:18  24   Q     And you understood over the last two and a half years

10:19  25   that in connection with this criminal proceeding, the burden

10:19  1    of proof would rest on the government.  You knew that when

10:19  2    you were investigating, right?

10:19  3                MR. SAGEL:  Objection, Your Honor.  Calls for a

10:19  4    legal conclusion.

10:19  5                THE COURT:  Overruled.

10:19  6                THE WITNESS:  Yes.

10:19  7    BY MR. AVENATTI:

10:19  8    Q    And you knew during the last two and a half years that

10:19  9    in connection with this case, the defendant, which in this

10:19  10   case is me, would not have to prove anything?

10:19  11   A    That's correct.

10:19  12   Q    You understood that the burden was on the government to

10:19  13   prove the finances relating to the clients; didn't you?

10:19  14   A    Yes.

10:19  15   Q    And that was one of the reasons why you understood the

10:20  16   servers were being imaged?

10:20  17   A    Yes.

10:20  18   Q    And the investigative team wanted to make sure that

10:20  19   they got all the financial information that could relate to

10:20  20   the clients off the servers, right?

10:20  21   A    Correct.

10:20  22   Q    That was important?

10:20  23   A    Yes, it was.

10:20  24   Q    It was important as it related to this burden of proof

10:20  25   issue that you knew about, right?

| | | |
|---|---|---|
| 10:20 | 1 | A    Correct. |
| 10:20 | 2 | Q    What is Tabs? |
| 10:20 | 3 | A    I don't know. |
| 10:20 | 4 | Q    You're laughing.  Why are you laughing? |
| 10:21 | 5 | A    I don't know what Tab is. |
| 10:21 | 6 | Q    How about -- I know you don't know what Tab is, but how |
| 10:21 | 7 | about Tabs, T-a-b-s? |
| 10:21 | 8 | A    From what I recall, it keeps attorney times on cases |
| 10:21 | 9 | that they work on and expenses on the cases that they worked |
| 10:21 | 10 | on. |
| 10:21 | 11 | Q    Okay.  So a moment ago you laughed and you said you |
| 10:21 | 12 | didn't know what it is, but now you remember what you think |
| 10:21 | 13 | it is? |
| 10:21 | 14 | A    Well, just from -- |
| 10:21 | 15 | Q    Just answer my question.  Now you think you remember |
| 10:21 | 16 | what it is? |
| 10:21 | 17 | A    I really don't know what it is, but that's my best |
| 10:21 | 18 | guess. |
| 10:21 | 19 | Q    When is the first time that you heard about a computer |
| 10:21 | 20 | program called Tabs? |
| 10:22 | 21 | A    I don't recall. |
| 10:22 | 22 | Q    Was it in connection with this case? |
| 10:22 | 23 | A    Yes. |
| 10:22 | 24 | Q    Do you remember who first told you about it or how you |
| 10:22 | 25 | learned about it? |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

```
10:22    1    A    I don't recall.
10:22    2    Q    Did you ever have any communications with Special Agent
10:22    3    Karlous about Tabs?
10:22    4    A    Yes.
10:22    5    Q    When did those occur?
10:22    6    A    In preparation of this trial.
10:22    7    Q    In preparation for your testimony or the trial?
10:22    8    A    For the trial.
10:22    9    Q    And what were your communications with Special Agent
10:22   10    Karlous in preparation for this trial relating to Tabs?
10:22   11    A    Just briefly mentioned it once or twice.
10:22   12    Q    He mentioned it or you mentioned it?
10:23   13    A    He did.
10:23   14    Q    And when did he mention it?
10:23   15    A    I don't recall.
10:23   16    Q    What did he say about it?
10:23   17             MR. SAGEL:  Objection, Your Honor.  Calls for
10:23   18    hearsay.
10:23   19             MR. AVENATTI:  Sustained.
10:23   20    BY MR. AVENATTI:
10:23   21    Q    What do you recall learning about Tabs before the
10:23   22    trial?
10:23   23    A    Basically what I just described what Tab is.
10:23   24    Q    And was that within about a month before the trial?
10:23   25    A    I don't recall.
```

72

| | | |
|---|---|---|
| 10:23 | 1 | Q   Was it within a couple months before the trial? |
| 10:23 | 2 | A   I believe so. |
| 10:23 | 3 | Q   So it was recent? |
| 10:23 | 4 | A   Yes. |
| 10:23 | 5 | Q   Before that, you had not heard of Tabs? |
| 10:23 | 6 | A   I don't recall. |
| 10:23 | 7 | Q   As you sit here today, you don't recall hearing of Tabs |
| 10:23 | 8 | before then, right? |
| 10:23 | 9 | A   I may have.  Just, it didn't -- |
| 10:23 | 10 | Q   Or you may not have, right? |
| 10:23 | 11 | A   Yes. |
| 10:23 | 12 | Q   Okay.  Did you ever google Tabs?  Did you ever go onto |
| 10:24 | 13 | Google and just type in Tabs? |
| 10:24 | 14 | A   No, I didn't. |
| 10:24 | 15 | Q   Did you ever do any research about it? |
| 10:24 | 16 | A   No, I didn't. |
| 10:24 | 17 | Q   Did you want to learn about it?  Did you want to learn |
| 10:24 | 18 | any information about Tabs? |
| 10:24 | 19 | A   Well, it wasn't my responsibility to look at the |
| 10:24 | 20 | financial aspect of the case.  So, no, I didn't. |
| 10:24 | 21 | Q   Whose responsibility was that as far as you understood? |
| 10:24 | 22 | A   I believe Remoun Karlous. |
| 10:24 | 23 | Q   Did you ever discuss Tabs with anyone else other than |
| 10:24 | 24 | Mr. Karlous? |
| 10:24 | 25 | A   Briefly with the AUSAs during this trial. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 10:24 | 1 | Q    During the trial? |
| 10:24 | 2 | A    Correct. |
| 10:24 | 3 | Q    When you say the AUSAs, you're talking about Mr. Sagel |
| 10:24 | 4 | and Mr. Andre? |
| 10:24 | 5 | A    AUSA Wyman. |
| 10:24 | 6 | Q    I'm sorry, Mr. Sagel and Mr. Wyman.  You did not speak |
| 10:25 | 7 | with Mr. Andre about Tabs; is that right? |
| 10:25 | 8 | A    No, I didn't speak to former AUSA Andre. |
| 10:25 | 9 | Q    When is the last time you spoke with Mr. Sagel and |
| 10:25 | 10 | Mr. Wyman about Tabs? |
| 10:25 | 11 | MR. SAGEL:  Objection, Your Honor.  Multiple -- |
| 10:25 | 12 | MR. AVENATTI:  I just asked when. |
| 10:25 | 13 | THE COURT:  Just a minute. |
| 10:25 | 14 | MR. SAGEL:  There is also a work product issue, |
| 10:25 | 15 | too.  But also hearsay.  Calls for hearsay. |
| 10:25 | 16 | THE COURT:  Sustained. |
| 10:25 | 17 | BY MR. AVENATTI: |
| 10:25 | 18 | Q    Mr. Kim, I'm not asking about the content.  I'm just |
| 10:25 | 19 | asking about the date or the time, the last time you |
| 10:25 | 20 | communicated about Tabs with anyone in this case. |
| 10:25 | 21 | A    Yesterday. |
| 10:25 | 22 | Q    Was that before or after Special Agent Karlous |
| 10:25 | 23 | testified? |
| 10:25 | 24 | A    Before. |
| 10:25 | 25 | Q    So it was in the morning before he took the stand, or |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 10:26 | 1 | was it on a break? |
| 10:26 | 2 | A    It was mentioned throughout the day, I guess. |
| 10:26 | 3 | Q    So you spoke with Mr. Wyman and Mr. Sagel throughout |
| 10:26 | 4 | the day yesterday about Tabs, right? |
| 10:26 | 5 | A    Yes. |
| 10:26 | 6 | Q    How about any e-mail or text messages?  Did you have |
| 10:26 | 7 | any e-mail or text messages with anyone about Tabs? |
| 10:26 | 8 | A    No, I don't believe so. |
| 10:26 | 9 | Q    Have you ever undertaken any efforts whatsoever to get |
| 10:27 | 10 | the Tabs data? |
| 10:27 | 11 | A    No, because it wasn't my responsibility. |
| 10:27 | 12 | Q    No, because it wasn't your job, right?  That's your |
| 10:27 | 13 | testimony, correct? |
| 10:27 | 14 | A    That's correct. |
| 10:27 | 15 | Q    That job was Mr. Karlous's job, right?  I think that's |
| 10:27 | 16 | what you testified to earlier. |
| 10:27 | 17 | MR. SAGEL:  Based on that, asked and answered, |
| 10:27 | 18 | then, Your Honor. |
| 10:27 | 19 | THE COURT:  Overruled. |
| 10:27 | 20 | THE WITNESS:  Yes, if we did have Tabs. |
| 10:27 | 21 | MR. AVENATTI:  Move to strike everything after yes |
| 10:27 | 22 | as nonresponsive. |
| 10:27 | 23 | THE COURT:  It will be stricken. |
| 10:27 | 24 | BY MR. AVENATTI: |
| 10:27 | 25 | Q    When you talked to Mr. Wyman and Mr. Sagel, was that in |

75

10:27　1　connection with this idea of if we ever had Tabs?

10:27　2　　　　　　MR. SAGEL:  Objection, Your Honor.  Calls for

10:28　3　hearsay and work product.

10:28　4　　　　　　THE COURT:  Sustained.

10:28　5　　　　　　MR. AVENATTI:  Your Honor, do you want me to keep

10:28　6　going?

10:28　7　　　　　　THE COURT:  Yes.  We didn't get going this morning

10:28　8　with the jury until 9:15.

10:28　9　　　　　　MR. AVENATTI:  No problem.

10:28　10　BY MR. AVENATTI:

10:28　11　Q　　Mr. Kim, do you recall participating on a phone call on

10:28　12　July 25th, 2019, with Judy Regnier, Remoun Karlous, AUSA

10:28　13　Andre, and AUSA Sagel?

10:28　14　A　　I do remember a phone call, but I don't remember a

10:28　15　specific date.

10:29　16　Q　　Do you recall participating in a phone call at some

10:29　17　point in the summer of 2019 for the purpose of learning

10:29　18　about the Eagan Avenatti, LLP, server and how client files

10:29　19　are maintained?

10:29　20　A　　I don't recall.

10:29　21　Q　　Sir, do you have Exhibit -- what's been marked as 1084?

10:29　22　It's not in a notebook.  It will be loose up there on the

10:29　23　stand.

10:30　24　A　　I don't see it.

10:30　25　　　　　　MR. AVENATTI:  Your Honor, can I approach?

| | | |
|---|---|---|
| 10:30 | 1 | THE COURT:  You may. |
| 10:30 | 2 | (Document handed to the witness) |
| 10:30 | 3 | THE WITNESS:  Yeah, I do have it now. |
| 10:30 | 4 | MR. AVENATTI:  Your Honor, would you like a copy? |
| 10:30 | 5 | THE COURT:  Please. |
| 10:30 | 6 | BY MR. AVENATTI: |
| 10:30 | 7 | Q    Mr. Kim, does this refresh your recollection that in |
| 10:30 | 8 | July of 2019 you participated on a phone call with Special |
| 10:30 | 9 | Agent Karlous, AUSA Andre, AUSA Sagel, and Ms. Regnier for |
| 10:31 | 10 | the purpose of learning what was on the EA servers? |
| 10:31 | 11 | A    It refreshes my memory that I was on the phone call, |
| 10:31 | 12 | but I didn't review the context of the notes that was taken |
| 10:31 | 13 | during the call. |
| 10:31 | 14 | Q    You do recall that notes were taken, though, by Special |
| 10:31 | 15 | Agent Karlous, correct? |
| 10:31 | 16 | A    Correct. |
| 10:31 | 17 | Q    And were you physically in the same place as Special |
| 10:31 | 18 | Agent Karlous when this call occurred? |
| 10:31 | 19 | A    Yes. |
| 10:31 | 20 | Q    And were you also physically in the same place as AUSA |
| 10:31 | 21 | Sagel and AUSA Andre? |
| 10:31 | 22 | A    Yes, I was. |
| 10:31 | 23 | Q    So this was on a speakerphone, right? |
| 10:31 | 24 | A    I'm not sure if it was on a speakerphone or one of |
| 10:31 | 25 | those, like, conference call devices. |

| | | |
|---|---|---|
| 10:31 | 1 | Q    But in any event the four of you gentlemen got on the |
| 10:32 | 2 | phone with Ms. Regnier, right? |
| 10:32 | 3 | A    Right. |
| 10:32 | 4 | Q    And during that call in July of 2019, she informed you |
| 10:32 | 5 | about Tabs; didn't she? |
| 10:32 | 6 | A    That's what the note says, yes. |
| 10:32 | 7 | Q    Well, do you have any reason to dispute that the |
| 10:32 | 8 | note -- strike that.  Do you believe that there is any |
| 10:32 | 9 | reason to dispute the fact that she told you four gentlemen |
| 10:32 | 10 | about Tabs back in July of 2019? |
| 10:32 | 11 | A    No, I don't dispute that. |
| 10:32 | 12 | Q    And she specifically told you that the client |
| 10:32 | 13 | accounting and expenses were tracked at the law firm in |
| 10:32 | 14 | Tabs; didn't she? |
| 10:32 | 15 | A    I would have to read the notes again. |
| 10:33 | 16 | Q    Well, take a look at page 3 of 3 at the top of the |
| 10:33 | 17 | page. |
| 10:33 | 18 | A    (Witness complies.)  Yes. |
| 10:33 | 19 | Q    After you got off this call over two years ago, did you |
| 10:33 | 20 | do anything to get the Tabs data? |
| 10:33 | 21 | A    I didn't. |
| 10:33 | 22 | Q    Did anyone? |
| 10:33 | 23 | A    I don't know. |
| 10:33 | 24 | Q    Did you ever suggest to anyone, hey, you know, maybe we |
| 10:34 | 25 | should get that Tabs data and see what the expenses were? |

| | | |
|---|---|---|
| 10:34 | 1 | A    No, I didn't. |
| 10:34 | 2 | Q    Do you recall anyone else on the prosecution or |
| 10:34 | 3 | investigative team saying that or anything like it? |
| 10:34 | 4 | A    I don't remember if they did or not. |
| 10:34 | 5 | Q    Did you ever make any other requests for information |
| 10:34 | 6 | off the Eagan Avenatti servers? |
| 10:34 | 7 | A    No, because that wasn't my role. |
| 10:34 | 8 | Q    Did you ever deal with Mr. Tashchyan, who has testified |
| 10:34 | 9 | in the trial, in connection with this case? |
| 10:34 | 10 | A    Just for logistical purposes. |
| 10:34 | 11 | Q    Logistical purposes for obtaining the servers? |
| 10:35 | 12 | A    I believe that was Remoun Karlous's responsibility. |
| 10:35 | 13 | Q    Well, let's talk about that for a moment.  What was |
| 10:35 | 14 | Mr. Karlous's responsibility relating to Mr. Tashchyan and |
| 10:35 | 15 | the servers? |
| 10:35 | 16 | A    I would say he was more like the quarterback, just -- I |
| 10:35 | 17 | guess just contacting whoever, things that needed to be |
| 10:35 | 18 | done, I guess, and just making sure the case is going |
| 10:35 | 19 | correctly. |
| 10:35 | 20 | Q    So you were facilitating the process whereby the |
| 10:35 | 21 | servers would be given to the government, right? |
| 10:35 | 22 | A    Say that question again. |
| 10:35 | 23 | Q    You were facilitating the process -- quarterbacking, to |
| 10:36 | 24 | use your word, the process whereby the government would |
| 10:36 | 25 | acquire the servers? |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 10:36 | 1 | A    I wasn't. |
| 10:36 | 2 | Q    Well, I thought you said that you were quarterbacking. |
| 10:36 | 3 | A    No.  I said Special Agent Remoun Karlous, that was his |
| 10:36 | 4 | responsibility. |
| 10:36 | 5 | Q    It was his responsibility to get the servers, right? |
| 10:36 | 6 | A    Or to coordinate with someone to get the server. |
| 10:36 | 7 | Q    And were you made aware of the fact contemporaneously |
| 10:36 | 8 | that the government was getting their hands on the servers? |
| 10:36 | 9 | A    Yes. |
| 10:36 | 10 | Q    And that was back in 2019, right? |
| 10:36 | 11 | A    Yes. |
| 10:36 | 12 | Q    And once the government got physical possession of the |
| 10:36 | 13 | servers, what happened to those servers next? |
| 10:36 | 14 | MR. SAGEL:  Objection, Your Honor.  Foundation. |
| 10:36 | 15 | THE COURT:  Overruled. |
| 10:36 | 16 | THE WITNESS:  I don't recall. |
| 10:36 | 17 | BY MR. AVENATTI: |
| 10:36 | 18 | Q    Do you recall learning at some point that the servers |
| 10:36 | 19 | were taken to the IRS offices? |
| 10:37 | 20 | A    I don't recall. |
| 10:37 | 21 | Q    By the way, where is your office? |
| 10:37 | 22 | A    It used to be in Laguna Niguel. |
| 10:37 | 23 | Q    And when did you move out of Laguna Niguel? |
| 10:37 | 24 | A    Late 2019, 2020. |
| 10:37 | 25 | Q    And were you officed with Special Agent Karlous back in |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 10:37 | 1 | 2019?  And when I say officed, I mean in the same building, |
| 10:37 | 2 | not the same office. |
| 10:37 | 3 | A    Yes. |
| 10:37 | 4 | Q    And how about Mr. Tashchyan?  Were you in the same |
| 10:37 | 5 | office as Mr. Tashchyan? |
| 10:37 | 6 | A    No. |
| 10:37 | 7 | Q    He was located in Los Angeles? |
| 10:37 | 8 | A    I'm not sure where he was located at. |
| 10:37 | 9 | Q    Do you recall later learning that these servers were |
| 10:37 | 10 | brought to Laguna Niguel? |
| 10:37 | 11 | A    No, I don't recall. |
| 10:37 | 12 | Q    Do you know where they were taken? |
| 10:37 | 13 | A    No.  I'm not sure. |
| 10:37 | 14 | Q    Did you learn ultimately that they were imaged? |
| 10:38 | 15 | A    Yes. |
| 10:38 | 16 | Q    And who did you learn that from? |
| 10:38 | 17 | A    The investigative team. |
| 10:38 | 18 | Q    And when you say investigative team, who do you mean? |
| 10:38 | 19 | A    Special Agent Remoun Karlous, AUSA Brett Sagel, and |
| 10:38 | 20 | AUSA Julian Andre. |
| 10:38 | 21 | Q    And did you learn how they were imaged? |
| 10:38 | 22 | A    No. |
| 10:38 | 23 | Q    Did you learn where they were imaged? |
| 10:38 | 24 | A    No. |
| 10:38 | 25 | Q    Did you learn what happened to the images once they |

| | | |
|---|---|---|
| 10:38 | 1 | were made? |
| 10:38 | 2 | A    What I recall, they were taken to the taint team. |
| 10:38 | 3 | Q    Anything else? |
| 10:38 | 4 | A    No. |
| 10:38 | 5 | Q    What happened to the servers after they were imaged; do |
| 10:38 | 6 | you know? |
| 10:38 | 7 | A    The taint team reviewed them. |
| 10:38 | 8 | Q    No, I'm sorry. |
| 10:38 | 9 |         MR. AVENATTI:  Move to strike. |
| 10:38 | 10 | BY MR. AVENATTI: |
| 10:38 | 11 | Q    I'm asking not about the images but the servers |
| 10:39 | 12 | themselves. |
| 10:39 | 13 |         MR. SAGEL:  He answered the question that was |
| 10:39 | 14 | asked, Your Honor.  Objection. |
| 10:39 | 15 |         THE COURT:  Overruled. |
| 10:39 | 16 |         THE WITNESS:  No.  I don't know what happened to |
| 10:39 | 17 | the server after that. |
| 10:39 | 18 | BY MR. AVENATTI: |
| 10:39 | 19 | Q    Okay.  So after the server was imaged, you're not aware |
| 10:39 | 20 | of what happened to the actual server, right? |
| 10:39 | 21 | A    Correct. |
| 10:39 | 22 | Q    I would have to ask Mr. Tashchyan about that? |
| 10:39 | 23 | A    That's correct. |
| 10:39 | 24 | Q    Did you and Special Agent Karlous have any discussions |
| 10:39 | 25 | about the need to get information off those servers? |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

82

| | | |
|---|---|---|
| 10:39 | 1 | A    I don't recall. |
| 10:39 | 2 | Q    Did you ever have a discussion with anybody about the |
| 10:39 | 3 | need to get particular information off those servers? |
| 10:39 | 4 | A    Well, I don't recall because my main focus was -- |
| 10:40 | 5 | MR. AVENATTI:  I don't recall.  Move to strike |
| 10:40 | 6 | after that, Your Honor. |
| 10:40 | 7 | THE COURT:  It will be stricken. |
| 10:40 | 8 | BY MR. AVENATTI: |
| 10:40 | 9 | Q    Have you ever met with a gentleman by the name of Greg |
| 10:40 | 10 | Barela? |
| 10:40 | 11 | A    Yes. |
| 10:40 | 12 | Q    How many times have you met with Greg Barela? |
| 10:40 | 13 | A    At least once. |
| 10:40 | 14 | Q    Where was that and when was that? |
| 10:40 | 15 | A    Are you asking before the trial? |
| 10:40 | 16 | Q    Yes, sir. |
| 10:40 | 17 | A    I don't recall. |
| 10:40 | 18 | Q    But the time that you met with him was before trial, |
| 10:40 | 19 | the one time that you recounted? |
| 10:40 | 20 | A    That's correct. |
| 10:40 | 21 | Q    Was that in connection with an interview? |
| 10:40 | 22 | A    Yes. |
| 10:41 | 23 | Q    During that interview did Mr. Barela inform you that he |
| 10:41 | 24 | had signed a declaration under penalty of perjury attaching |
| 10:41 | 25 | a version of the settlement agreement? |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

10:41  1    A    I don't recall.

10:41  2    Q    During that interview did Mr. Barela mention a phone

10:41  3    call with Evan Jenness?

10:41  4    A    I don't recall.

10:41  5    Q    During that interview did Mr. Barela mention an

10:41  6    incident involving Mr. Ibrahim and Mr. Arden attempting to

10:41  7    hide things from him relating to the settlement according to

10:41  8    him?

10:41  9    A    I don't recall.

10:41  10   Q    Did you physically take notes in connection with any

10:42  11   witness interviews you did in connection with this case?

10:42  12   A    Yes.

10:42  13   Q    And what did you do with those notes after you took

10:42  14   them?

10:42  15   A    Put them in the file and stored them in my office.

10:42  16   Q    Are they handwritten or typed?

10:42  17   A    Handwritten.

10:42  18   Q    And was that in connection with interviews?

10:42  19   A    Correct.

10:42  20   Q    And in connection with interviews, you would never meet

10:42  21   with a witness by yourself; would you?

10:42  22   A    No.

10:42  23   Q    There would always be multiple people there, right?

10:42  24   A    That's correct.

10:42  25   Q    But there would be an agreement that only one person

84

| | | |
|---|---|---|
| 10:42 | 1 | would take notes, right? |
| 10:42 | 2 | A     That's correct. |
| 10:42 | 3 | Q     Because that's the policy? |
| 10:42 | 4 | A     Yes, IRS policy. |
| 10:42 | 5 | Q     And the reason for that policy is so that if ultimately |
| 10:42 | 6 | a case proceeds to trial, there is only one set of notes, |
| 10:43 | 7 | right? |
| 10:43 | 8 | A     True. |
| 10:43 | 9 | Q     Because when you have multiple sets of notes, they can |
| 10:43 | 10 | be used to potentially contradict one another, right? |
| 10:43 | 11 | A     That could happen. |
| 10:43 | 12 | Q     Did you take notes in connection with this call that |
| 10:43 | 13 | you had with Ms. Regnier where she mentioned Tabs. |
| 10:43 | 14 | A     On July 25th?  No, I didn't take notes. |
| 10:43 | 15 | Q     Mr. Karlous took the notes? |
| 10:43 | 16 | A     That's correct. |
| 10:43 | 17 | Q     Has anyone ever asked you to go back and look at your |
| 10:43 | 18 | notes to see if there is any mention of Tabs? |
| 10:44 | 19 | A     I don't recall. |
| 10:44 | 20 |           MR. AVENATTI:  Your Honor, now is a good time. |
| 10:44 | 21 |           THE COURT:  We'll take the mid-morning break here, |
| 10:44 | 22 | ladies and gentlemen.  Please remember the admonition not to |
| 10:44 | 23 | discuss the case with anyone and not to form any opinions on |
| 10:44 | 24 | the issues in the case until it is submitted to you.  And |
| 10:44 | 25 | please do no research. |

85

| | | |
|---|---|---|
| 10:44 | 1 | We will be in recess for 15 minutes. |
| 10:44 | 2 | (Jury not present) |
| 10:44 | 3 | THE COURT:  With regard to Evan Carter, we are |
| 10:45 | 4 | going to do a telephone conference with Ms. Marino's |
| 10:45 | 5 | associate at noon. |
| 10:45 | 6 | MR. AVENATTI:  At noon? |
| 10:45 | 7 | THE COURT:  Noon. |
| 10:45 | 8 | MR. AVENATTI:  Understood. |
| 10:45 | 9 | THE COURT:  Okay. |
| 10:45 | 10 | (Recess taken at 10:45 a.m.; |
| 10:45 | 11 | proceedings resumed at 11:02 a.m.) |
| 10:45 | 12 | (Jury not present) |
| 11:02 | 13 | MR. SAGEL:  Just for Your Honor's edification, we |
| 11:02 | 14 | just got off the phone with Patrick Fitzgerald.  He will be |
| 11:02 | 15 | available to be here tomorrow morning.  We obviously didn't |
| 11:02 | 16 | have a long time to talk to him, but we told him to the |
| 11:02 | 17 | extent he can, just start finding out what he can and then |
| 11:02 | 18 | we'll talk at the lunch hour. |
| 11:02 | 19 | THE COURT:  Well, why don't we start at |
| 11:02 | 20 | 9:00 rather than 8:00. |
| 11:02 | 21 | MR. SAGEL:  That's fine.  I guess -- you still |
| 11:02 | 22 | haven't decided with regards to the jury? |
| 11:02 | 23 | THE COURT:  I have decided that we'll get them |
| 11:02 | 24 | back Tuesday. |
| 11:02 | 25 | MR. SAGEL:  Tuesday? |

| 11:02 | 1 | THE COURT: Yes. |

11:02  1          THE COURT:  Yes.

11:02  2          MR. SAGEL:  I don't really want to put my next

11:02  3  comment publicly, but if the jury is not coming tomorrow, is

11:02  4  it possible we could start at 10:30, then?  I have a family

11:02  5  obligation.

11:02  6          MR. AVENATTI:  I have no objection to the Court

11:03  7  accommodating Mr. Sagel for his family.

11:03  8          THE COURT:  That's fine.

11:03  9          MR. SAGEL:  Thank you, Your Honor.  I appreciate

11:03  10  that.

11:03  11          (Jury present)

11:06  12          THE COURT:  Mr. Avenatti.

11:06  13  BY MR. AVENATTI:

11:06  14  Q    During the break did you have occasion to speak with

11:06  15  AUSA Wyman or AUSA Sagel?

11:06  16  A    Yes.

11:06  17  Q    Did anyone mention Tabs?

11:06  18  A    Just overhearing their conversations, yes.

11:06  19          MR. AVENATTI:  Nothing further.

11:06  20          THE COURT:  Mr. Sagel.

11:06  21                    CROSS-EXAMINATION

11:06  22  BY MR. SAGEL:

11:06  23  Q    I might have been confused by the question, or maybe it

11:06  24  was you.

11:06  25          AUSA Wyman and myself did not speak to you at all

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

11:06   1   during this break for your testimony; is that correct?

11:07   2   A     That's correct.

11:07   3   Q     The defendant asked you various questions about your

11:07   4   meetings with Andrew Stolper on March 26 and March 27 of

11:07   5   2019; is that correct?

11:07   6   A     That's correct.

11:07   7   Q     And the first was a phone call to obtain documents the

11:07   8   next day; is that correct?

11:07   9   A     That's correct.

11:07   10  Q     And the second was a meeting basically to pick up

11:08   11  documents; is that correct?

11:08   12  A     That's correct.

11:08   13  Q     And that was after the defendant was charged in this

11:08   14  case; is that correct?

11:08   15  A     That's correct.

11:08   16  Q     Defendant asked you numerous times whether defendant

11:08   17  [sic], based on these reports, was a witness, and he kept

11:08   18  saying "in this case."  As it relates to Geoffrey Johnson,

11:08   19  Alexis Gardner, Gregory Barela, Long Tran, and Michelle

11:08   20  Phan, is Andrew Stolper a witness in this case?

11:08   21  A     No, he is not.

11:08   22  Q     And you as an investigator on this matter and one of

11:08   23  the co-lead agents for the last two-and-a-half years, you

11:08   24  are investigating other matters other than this case; is

11:08   25  that correct?

```
11:08   1              MR. AVENATTI:  Objection, Your Honor.  401, 403.
11:08   2              THE COURT:  Overruled.
11:09   3              THE WITNESS:  That's correct.
11:09   4   BY MR. SAGEL:
11:09   5   Q    And the documents that defendant -- the meetings that
11:09   6   the defendant asked you about and the documents you got from
11:09   7   Andrew Stolper related to the Eagan Avenatti bankruptcy; is
11:09   8   that correct?
11:09   9              MR. AVENATTI:  Objection, leading.
11:09  10              MR. SAGEL:  It's cross-examination.
11:09  11              THE COURT:  Overruled.
11:09  12              THE WITNESS:  That's correct.
11:09  13   BY MR. SAGEL:
11:09  14   Q    So the "in this case" that defendant kept referencing
11:09  15   about Mr. Stolper was actually about the Eagan Avenatti
11:09  16   bankruptcy?
11:09  17   A    That's correct.
11:09  18              MR. SAGEL:  I have no further questions, Your
11:09  19   Honor.
11:09  20              THE COURT:  Mr. Avenatti.
11:09  21                    REDIRECT EXAMINATION
11:09  22   BY MR. AVENATTI:
11:09  23   Q    Mr. Kim, you were repeatedly asked under oath on direct
11:09  24   examination whether you had contacted Mr. Stolper as a
11:09  25   witness in connection with this case.  Do you recall those
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 11:09 | 1 | questions, sir? |
| 11:09 | 2 | A    I do recall. |
| 11:10 | 3 | Q    And you provided answers repeatedly stating that in |
| 11:10 | 4 | fact you had met with Mr. Stolper in connection with this |
| 11:10 | 5 | case.  Do you remember those answers? |
| 11:10 | 6 | A    Yes.  I have met with him. |
| 11:10 | 7 | Q    And you were asked in connection with this case, and |
| 11:10 | 8 | you answered yes repeatedly; did you not, on direct? |
| 11:10 | 9 | A    I did answer yes. |
| 11:10 | 10 | Q    And then after the break, Mr. Sagel now has asked you |
| 11:10 | 11 | whether it had to do with this case, and now all of a sudden |
| 11:10 | 12 | you have changed your story and now you're testifying that |
| 11:10 | 13 | in fact it didn't have anything to do with this case.  Is |
| 11:10 | 14 | that your testimony, sir? |
| 11:10 | 15 | MR. SAGEL:  Objection.  Argumentative. |
| 11:10 | 16 | THE COURT:  Overruled.  We're going to have a |
| 11:10 | 17 | sidebar. |
| 11:10 | 18 | (Sidebar conference) |
| 11:14 | 19 | THE COURT:  It's pretty clear from the record that |
| 11:14 | 20 | Mr. Stolper's involvement as a witness is not related to the |
| 11:14 | 21 | proceeding before us.  I think you opened a door to allow |
| 11:14 | 22 | him to ask what it was about. |
| 11:14 | 23 | MR. AVENATTI:  Well, first of all, I couldn't have |
| 11:14 | 24 | opened the door because he hasn't answered any questions |
| 11:14 | 25 | relating to the topic. |

11:14   1          THE COURT:  Well, no, sir.

11:14   2          MR. AVENATTI:  He hasn't.  He hasn't answered any

11:14   3   questions, and all I did was point out that he changed his

11:15   4   answer.  There was an objection, and you mentioned a

11:15   5   sidebar.  So there has been no door opening.

11:15   6          THE COURT:  Here's how we're going to deal with

11:15   7   this problem.  I think the government is entitled to

11:15   8   establish that it's a fact that Mr. Stolper is not a witness

11:15   9   in this part of the case.

11:15   10          MR. AVENATTI:  Well, I disagree with that for the

11:15   11   following reasons.  The documents that they got were not

11:15   12   solely related to the bankruptcy proceeding, and Mr. Sagel

11:15   13   knows that.  In fact, Your Honor knows that.  And how do we

11:15   14   know that?  Because the questions from the transcript that

11:15   15   Mr. Stolper posed -- those questions were not related to the

11:15   16   bankruptcy.  They were related to Mr. Johnson.  They were

11:15   17   related to other clients in the law firm.

11:15   18          They basically had Mr. Stolper conduct a

11:15   19   cross-examination in a debtor exam knowing I was on the

11:15   20   verge of an arrest, and they wanted to use it.  And this guy

11:15   21   sat in the audience.  It was a scam, and that's exactly what

11:15   22   happened, Your Honor.  If you look at the transcripts, the

11:15   23   questions that Mr. Stolper posed related to the client

11:15   24   accounts.  Now, that's no accident.

11:15   25          And the documents that he provided were not just

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 11:15 | 1 | related to the bankruptcy proceeding because, among other |
| 11:15 | 2 | things, the bankruptcy proceeding was a public proceeding. |
| 11:15 | 3 | THE COURT:  Let's go forward.  I just want to tell |
| 11:15 | 4 | you I'm troubled by the manner in which you attempt to |
| 11:15 | 5 | impeach his testimony in front -- |
| 11:15 | 6 | MR. AVENATTI:  I will leave it alone.  I haven't |
| 11:15 | 7 | attempted to impeach anything. |
| 11:15 | 8 | THE COURT:  Sir, you have already done that in the |
| 11:15 | 9 | initial questions. |
| 11:15 | 10 | MR. AVENATTI:  Your Honor, I have not -- |
| 11:15 | 11 | THE COURT:  What are you doing now? |
| 11:15 | 12 | MR. AVENATTI:  I'm not going to ask any more |
| 11:15 | 13 | questions about Mr. Stolper. |
| 11:15 | 14 | THE COURT:  Okay. |
| 11:15 | 15 | MR. AVENATTI:  Your Honor, Your Honor has ruled |
| 11:15 | 16 | the door is open? |
| 11:15 | 17 | THE COURT:  That's the end of Mr. Stolper with |
| 11:15 | 18 | this witness. |
| 11:15 | 19 | MR. AVENATTI:  Thank you. |
| 11:15 | 20 | (End of sidebar conference) |
| 11:15 | 21 | THE COURT:  Proceed. |
| 11:15 | 22 | MR. AVENATTI:  Nothing further. |
| 11:15 | 23 | Thank you, Mr. Kim. |
| 11:15 | 24 | MR. SAGEL:  No further questions, Your Honor. |
| 11:15 | 25 | THE COURT:  Okay.  May the witness be excused? |

| | | |
|---|---|---|
| 11:15 | 1 | MR. AVENATTI:  Not yet, Your Honor. |
| 11:15 | 2 | THE COURT:  Sir, you are subject to recall.  You |
| 11:15 | 3 | are excused for now. |
| 11:15 | 4 | NSHAN TASHCHYAN, DEFENSE WITNESS, SWORN |
| 11:16 | 5 | THE CLERK:  If you will please state and spell |
| 11:17 | 6 | your first and last name. |
| 11:17 | 7 | THE WITNESS:  Nshan Tashchyan, N-s-h-a-n.  And the |
| 11:17 | 8 | last name is T-a-s-h-c-h-y-a-n. |
| 11:17 | 9 | THE CLERK:  Thank you. |
| 11:17 | 10 | THE COURT:  Mr. Avenatti. |
| 11:17 | 11 | DIRECT EXAMINATION |
| 11:17 | 12 | BY MR. AVENATTI: |
| 11:17 | 13 | Q    Good morning, sir. |
| 11:17 | 14 | A    Good morning. |
| 11:17 | 15 | Q    You testified early on in this case previously, right? |
| 11:17 | 16 | A    I did. |
| 11:17 | 17 | Q    And you work for the Internal Revenue Service, Criminal |
| 11:17 | 18 | Investigation Division? |
| 11:17 | 19 | A    Yes. |
| 11:17 | 20 | Q    And how long have you been in that role? |
| 11:17 | 21 | A    Roughly sixteen years. |
| 11:17 | 22 | Q    And in connection with this case, you have worked with |
| 11:17 | 23 | Special Agent Karlous, Special Agent Kim, and Special Agent |
| 11:17 | 24 | Roberson, correct? |
| 11:17 | 25 | A    Yes. |

| | | |
|---|---|---|
| 11:17 | 1 | Q    As well as Assistant U.S. Attorney Sagel, Assistant |
| 11:17 | 2 | U.S. Attorney Wyman, as well as former AUSA Andre; is that |
| 11:17 | 3 | right? |
| 11:17 | 4 | A    Yes. |
| 11:17 | 5 | Q    And have you been working with them since early 2019 in |
| 11:18 | 6 | connection with this case? |
| 11:18 | 7 | A    Yes. |
| 11:18 | 8 | Q    And where do you physically work?  Where are your |
| 11:18 | 9 | offices? |
| 11:18 | 10 | A    Downtown Los Angeles. |
| 11:18 | 11 | Q    And I believe you testified earlier in the trial that |
| 11:18 | 12 | you are the computer investigative specialist assisting the |
| 11:18 | 13 | agents.  Do I have that correct? |
| 11:18 | 14 | A    Yes. |
| 11:18 | 15 | Q    And when we say assisting the agents, are those agents |
| 11:18 | 16 | Karlous, Kim, and Roberson? |
| 11:18 | 17 | A    Yes. |
| 11:18 | 18 | Q    As well as the two AUSAs seated to my left, Mr. Sagel |
| 11:18 | 19 | and Mr. Wyman, correct? |
| 11:18 | 20 | A    Yes. |
| 11:18 | 21 | Q    Now, I want to focus your attention if I could as it |
| 11:18 | 22 | relates to the seizure and imaging of the Eagan Avenatti |
| 11:18 | 23 | servers.  Do you have that in mind? |
| 11:18 | 24 | A    Yes. |
| 11:18 | 25 | Q    Okay.  And you testified on direct as to what a server |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 11:18 | 1 | is, so we're not going to review that.  My question is at |
| 11:19 | 2 | some point you came in possession of the Eagan Avenatti |
| 11:19 | 3 | servers in connection with this case; is that right? |
| 11:19 | 4 | A    Yes. |
| 11:19 | 5 | Q    And you seized those servers with Mr. John Weeks, I |
| 11:19 | 6 | believe; is that right? |
| 11:19 | 7 | A    Yes. |
| 11:19 | 8 | Q    And where did you acquire them from physically? |
| 11:19 | 9 | A    They were at the data farm not that far from here. |
| 11:19 | 10 | Santa Ana, that's where they were located. |
| 11:19 | 11 | Q    A data center? |
| 11:19 | 12 | A    The data center. |
| 11:19 | 13 | Q    Just so the jury knows, a data center is usually a |
| 11:19 | 14 | center that is climate controlled and can store servers for |
| 11:19 | 15 | a lot of different companies at one time; is that right? |
| 11:19 | 16 | A    Yes. |
| 11:19 | 17 | Q    And did you physically travel to the data farm to pick |
| 11:19 | 18 | up the Eagan Avenatti servers? |
| 11:19 | 19 | A    I did. |
| 11:19 | 20 | Q    Was anyone with you? |
| 11:19 | 21 | A    John Weeks and also the IT person.  I can't recall his |
| 11:20 | 22 | name now. |
| 11:20 | 23 | Q    The IT person from the firm? |
| 11:20 | 24 | A    I believe he was working for -- he was the one that was |
| 11:20 | 25 | managing the servers.  I can't recall his name, though. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

95

11:20  1    Q    So the three of you gentlemen traveled to the data

11:20  2    center.  And do you recall when that was?

11:20  3    A    Not the exact date.

11:20  4    Q    But do you recall that it was generally in the spring

11:20  5    of 2019?

11:20  6    A    Yes.

11:20  7    Q    And when you got to the data center, what happened

11:20  8    next?

11:20  9    A    The person that was managing the servers, he helped us

11:20  10   to power down the servers, to turn them off.  Afterwards we

11:20  11   unplugged everything, and then we took the servers down to

11:20  12   our computer lab in Laguna Niguel.

11:21  13   Q    Okay.  So I just want to break this down quickly if I

11:21  14   can.  That is, we got to the data center.  You were shown

11:21  15   the location of the Eagan Avenatti servers, right?

11:21  16   A    Yes.

11:21  17   Q    And at the time you saw the servers, they were powered

11:21  18   on, meaning the servers were on; they had power?

11:21  19   A    Yes.

11:21  20   Q    And then the data center turned the power off the

11:21  21   servers?

11:21  22   A    Not the data center.  The person that was managing the

11:21  23   servers, the IT person, he had all the passwords and

11:21  24   everything.  So he connected to them and he powered them

11:21  25   down properly, because they're computers and you can't just

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

11:21   1    pull the plug on them. You have to power them down

11:21   2    properly.

11:21   3          So he powered them down properly. Then once

11:21   4    everything was powered down, we unplugged everything and we

11:21   5    took the physical servers down to Laguna.

11:21   6    Q    Now, when you were first shown the servers at the data

11:21   7    center, I'm assuming they were in a rack; am I correct?

11:21   8    A    Yes.

11:21   9    Q    And they were stored in a server rack with a bunch of

11:21   10    other servers from other companies, right? Was that your

11:22   11    assumption?

11:22   12    A    Yes, but each one had their own rack, so those servers

11:22   13    were not mixed with other servers.

11:22   14    Q    So all of the Eagan Avenatti servers were stored at the

11:22   15    data center by themselves in their own rack?

11:22   16    A    Yes. And it was locked and secured so nobody else had

11:22   17    access to it.

11:22   18    Q    Was it in a cage?

11:22   19    A    Yes.

11:22   20    Q    With a lock?

11:22   21    A    Yes.

11:22   22    Q    And did you view the data center unlock the cage when

11:22   23    you were first taking the servers?

11:22   24    A    I believe the IT person had the key for it.

11:22   25    Q    And then after the servers were properly powered down,

| | | |
|---|---|---|
| 11:22 | 1 | did you have to physically remove the servers from the rack? |
| 11:22 | 2 | A    Yes. |
| 11:22 | 3 | Q    And how did you go about doing that? |
| 11:22 | 4 | A    We unplugged all the cables.  I don't recall if they |
| 11:22 | 5 | were screwed in.  They might have been.  If they were |
| 11:22 | 6 | screwed in, we removed all the screws and removed the |
| 11:22 | 7 | servers and put them in our cars and took them down to |
| 11:23 | 8 | Laguna. |
| 11:23 | 9 | Q    When you say you removed the screws, you're talking |
| 11:23 | 10 | about the mounting brackets? |
| 11:23 | 11 | A    Yes. |
| 11:23 | 12 | Q    And then you carried them out to your vehicle? |
| 11:23 | 13 | A    Yes. |
| 11:23 | 14 | Q    How many servers were there? |
| 11:23 | 15 | A    I believe it was six. |
| 11:23 | 16 | Q    Did you leave any Eagan Avenatti servers behind at the |
| 11:23 | 17 | data center? |
| 11:23 | 18 | A    No. |
| 11:23 | 19 | Q    So you took all of the servers that were on the rack |
| 11:23 | 20 | that you understood to be designated for Eagan Avenatti? |
| 11:23 | 21 | A    Yes. |
| 11:23 | 22 | Q    And then you and Mr. Weeks drove the servers |
| 11:23 | 23 | immediately to your offices in Laguna Niguel? |
| 11:23 | 24 | A    Yes. |
| 11:23 | 25 | Q    Was the IT manager who you can't remember his name, was |

11:23  1   that gentleman with you when you drove them to Laguna

11:23  2   Niguel?

11:23  3   A    No.

11:24  4   Q    Why did you immediately drive them to Laguna Niguel?

11:24  5   A    Because they're evidence.  I mean, evidence is going to

11:24  6   go back to our office, and we can't just leave them in the

11:24  7   car.

11:24  8   Q    Evidence has to be handled carefully?

11:24  9   A    Yes.

11:24  10  Q    And when you say your office in Laguna Niguel, that was

11:24  11  the office of the IRS Criminal Investigation Division,

11:24  12  right?

11:24  13  A    Both the IRS Criminal Investigation Division and also

11:24  14  we also have a separate office there just for the computer

11:24  15  investigative specialist.

11:24  16  Q    So the computer investigative specialist in Laguna for

11:24  17  the IRS CID division has an office within the larger office

11:24  18  of the IRS CID in Laguna?

11:24  19  A    It's not within but it's in the same building.

11:24  20  Q    Now, when you picked up these servers, did you do

11:24  21  anything to document the chain of custody on the evidence?

11:25  22  A    I believe so.  It should have been done, yes.

11:25  23  Q    You say it should have been done.  Why should it have

11:25  24  been done?

11:25  25  A    Right now I don't recall, but that's the normal

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

11:25    1    procedure.  We always do it.  So I'm assuming it was done in
11:25    2    this case also.
11:25    3    Q    Whenever you take possession of something like a
11:25    4    computer server in connection with a criminal investigation,
11:25    5    there is a chain of custody that is generally kept so that
11:25    6    there is no question as to the chain of custody relating to
11:25    7    the evidence, meaning who had access to it and how it was
11:25    8    handled; is that right?
11:25    9    A    Yes.  And we provide a receipt to the individual from
11:25   10    whom we take the evidence from.
11:25   11    Q    And did you provide a receipt to the data center or to
11:25   12    the IT gentleman?
11:25   13    A    I believe it was given to the IT person, but I don't
11:25   14    recall at this point.
11:25   15    Q    Do you recall if you filled out the -- well, strike
11:25   16    that.  What is the document called relating to the chain of
11:25   17    custody?
11:25   18    A    We call it a receipt.
11:26   19    Q    Did you fill out the receipt relating to the EA
11:26   20    computer servers?
11:26   21    A    It was either me or John Weeks.
11:26   22    Q    Now, the IRS CID offices are in a building in Laguna
11:26   23    Niguel, right?
11:26   24    A    Yes, in the federal building.
11:26   25    Q    And you understand that that building at least at the

11:26    1    time was the same place where Special Agent Karlous had his

11:26    2    offices, right, or his office?

11:26    3    A    Yes.

11:26    4    Q    And when you got to that building with these six

11:26    5    servers, what did you do next?

11:26    6    A    We took them down to our office which only computer

11:26    7    investigative specialists have access to.  Nobody else has.

11:26    8    Then we started the imaging process.

11:26    9    Q    Why is it that your office has restricted access?

11:26   10    A    Because of all the evidence that's stored in there and

11:27   11    also the expensive equipment that we have.

11:27   12    Q    One of the reasons why your office has restricted

11:27   13    access is to ensure that nobody tampers with the evidence

11:27   14    and that it is kept in as pristine condition as possible,

11:27   15    right?

11:27   16    A    Yes.

11:27   17    Q    Because generally speaking, the evidence that is

11:27   18    contained within that office is of an important critical

11:27   19    nature, right?

11:27   20    A    Yes.  And it's also my responsibility.  That's the only

11:27   21    way I can keep control if certain people have access to our

11:27   22    room.

11:27   23    Q    Now, once you got the servers to your office in Laguna

11:27   24    Niguel, in the special office with restricted access, did

11:27   25    you mount the servers back in a rack there, or how did you

11:27  1   -- what did you do with the servers?

11:27  2   A    No.  Each server was imaged individually.  There was no

11:27  3   need to put them in a rack because we were not going to

11:27  4   power them up the same way they were before.  We had to

11:27  5   forensically image each server on its own.

11:28  6   Q    You had to take a forensic image of each server

11:28  7   individually?

11:28  8   A    Yes.

11:28  9   Q    And it would have its own file?

11:28  10  A    Yes.

11:28  11  Q    Okay.  We're going to get to that in a minute.  When

11:28  12  you got to the office and you put the servers in the room

11:28  13  with the restricted access, do you note the date or time as

11:28  14  to when that evidence comes in your office?

11:28  15  A    No.

11:28  16  Q    So is there any chain of custody for these servers

11:28  17  after you gave the receipt?

11:28  18  A    As far as chain of custody, I mean, at that point it's

11:28  19  in our chain of custody.  So for each digital device that

11:28  20  I'm imaging, it has a separate form that we fill out that

11:28  21  has all the details, the tools I used with the serial number

11:28  22  of that device, anything that has to do with that device.

11:28  23  Q    All right.  Well, that's what I'm getting at.  So I

11:28  24  want to make sure that the jury understands this and I want

11:29  25  to make sure I understand it.

11:29  1          When you brought in the six servers, at that point

11:29  2   in time you didn't fill out anything.  But as you began to

11:29  3   image the servers, each time you would image a server, you

11:29  4   would fill out a form?

11:29  5   A    Yes, and that form would list when I seized the device

11:29  6   and anything specific to that device, whether it's passwords

11:29  7   or any issues that I had while I'm imaging, anything that's

11:29  8   specific to that so I can go back to it and understand what

11:29  9   I have done to that device.

11:29  10  Q    What's that form called?

11:29  11  A    We call it -- there is no specific name for it.  We

11:29  12  just call it a digital device evidence form.

11:29  13  Q    And to the best of your recollection, did you fill out

11:29  14  one of those for each of the six servers?

11:29  15  A    Yes.

11:29  16  Q    Now, when you got these servers back to your office,

11:29  17  this special room, did you immediately begin imaging the

11:30  18  servers?

11:30  19  A    We did.

11:30  20  Q    And when you say we, who other than yourself was

11:30  21  involved in that?

11:30  22  A    John Weeks.

11:30  23  Q    If you could just explain to the jury how it was that

11:30  24  you imaged each of the servers.

11:30  25  A    Sure.  Some of the servers are virtual servers, so the

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 11:30 | 1 | imaging process is different.  For those we have to use a |
| 11:30 | 2 | laptop with a network cable, power up the server, connect it |
| 11:30 | 3 | with a monitor and everything, connect to it with a laptop |
| 11:30 | 4 | with a network cable. |
| 11:30 | 5 | They're ESXI servers, so there's another |
| 11:30 | 6 | application that's called ESXI.  So using that, connect to |
| 11:30 | 7 | it and we're able to see the virtual machines that are on |
| 11:31 | 8 | the servers and then copy those virtual machines down to the |
| 11:31 | 9 | laptop. |
| 11:31 | 10 | Q    Okay.  So let's break that down.  There were six |
| 11:31 | 11 | servers, right? |
| 11:31 | 12 | A    Yes. |
| 11:31 | 13 | Q    And you said some of them were virtual? |
| 11:31 | 14 | A    Yes. |
| 11:31 | 15 | Q    Please explain to the jury as slowly as you can what |
| 11:31 | 16 | that is. |
| 11:31 | 17 | A    A virtual machine is basically a computer on a |
| 11:31 | 18 | different computer.  So the benefit of having the virtual |
| 11:31 | 19 | machine is you can run multiple computers on one computer, |
| 11:31 | 20 | so that server itself is one computer and you can have three |
| 11:31 | 21 | different virtual machines running on it.  So when you power |
| 11:31 | 22 | them on, you're basically powering on three different |
| 11:31 | 23 | computers.  So, I mean, there's a benefit to it because |
| 11:31 | 24 | instead of having three different servers, you have one |
| 11:31 | 25 | server that has three computers on it. |

11:31  1   Q    This is otherwise known as partitioning a server,

11:31  2   right?

11:31  3   A    They're not partitions because you're running three

11:31  4   different devices off it.  So it's not a partition.

11:32  5   Q    So for some of the servers you had to hook up a laptop

11:32  6   and follow the protocol that you mentioned earlier?

11:32  7   A    Yes.

11:32  8   Q    For other servers you did not have to use a laptop?

11:32  9   A    No, because they were physical servers, so that server

11:32  10  was acting as one computer.  So the imaging process for that

11:32  11  is different.  What I have to do for those is I have to --

11:32  12  Q    Please just try to slow down a little bit.

11:32  13  A    Sure.  So they were physical servers, which means that

11:32  14  server is acting as a computer on its own.  So for those I

11:32  15  had to put them up with what we call a booter.  So basically

11:32  16  it's like a computer running on a thumb drive, so that

11:32  17  Windows operating software is on the thumb drive.

11:32  18         So instead of booting it up to the operating

11:32  19  system that's on that server, I'm booting it up to a thumb

11:32  20  drive.  And that thumb drive has forensic software on it and

11:32  21  it allows me to see the hard drive of the computer and

11:32  22  download a forensic image of the hard drives.  So in this

11:33  23  case, since there were servers, there were multiple hard

11:33  24  drives in there that are RAIDed together.  So the forensic

11:33  25  software allows me to see the whole RAID as one drive and

```
11:33    1    just image the whole drive by itself.
11:33    2    Q    All right.  So for the non-virtual servers, you plugged
11:33    3    in the thumb drive that has an operating system on it,
11:33    4    right?
11:33    5    A    Yes.
11:33    6    Q    And then you were able to, utilizing that operating
11:33    7    system off the thumb drive, physically see the hard drives
11:33    8    of the server that you were working on?
11:33    9    A    Yes.
11:33   10    Q    And then you could forensically image those hard
11:33   11    drives?  Do I have that right?
11:33   12    A    Yes.
11:33   13    Q    Okay.  And how long did it take you to image,
11:33   14    forensically image all six of these servers?
11:33   15    A    I believe about a week.  It was a slow process.
11:33   16    Q    One week?
11:33   17    A    Roughly.
11:34   18    Q    Now, obviously you were not there physically for a week
11:34   19    straight.
11:34   20    A    Actually I was.  I would go down there every morning.
11:34   21    And some of the process, you just let it run overnight, lock
11:34   22    the door, because it's a slow process.  Then come back the
11:34   23    next morning and check on it and start the next one.
11:34   24    Q    So you baby-sat this process for about a week?
11:34   25    A    Yes.
```

11:34  1    Q    Was Mr. Weeks involved during that week?

11:34  2    A    No.  He only assisted me on that first day.

11:34  3    Q    Did anyone else assist you during that week?

11:34  4    A    No.

11:34  5    Q    Did you have any issues in imaging the servers?

11:34  6    A    No.

11:34  7    Q    Were there any error messages or any challenges that

11:34  8    you encountered during this week of imaging the servers?

11:34  9    A    Not that I recall.

11:35  10   Q    When you were imaging the servers, you're making an

11:35  11   identical forensic copy of the server onto another piece of

11:35  12   computer equipment, right?

11:35  13   A    Yes.

11:35  14   Q    And at that time did you make one copy of each server,

11:35  15   meaning directly from the server?

11:35  16   A    Yes.  That's the normal process.  When you're imaging

11:35  17   the computer, you make one copy, and that copy would be the

11:35  18   original copy.  Then afterwards you would duplicate that

11:35  19   copy onto other hard drives just to have a backup.

11:35  20   Q    Now, in connection with these forms that we were

11:35  21   talking about for each server --

11:35  22   A    Yes.

11:35  23   Q    -- do those forms contain entries for when you started

11:35  24   imaging that server and when you ended?

11:35  25   A    The time, no.  Just the date.

| | | |
|---|---|---|
| 11:35 | 1 | Q    So if you started on one day and you had to come back |
| 11:36 | 2 | the next day, it would have the day that it started and the |
| 11:36 | 3 | day that it ended? |
| 11:36 | 4 | A    The time and the date is usually -- if I'm using a |
| 11:36 | 5 | forensic software, the forensic software creates a log, and |
| 11:36 | 6 | the time and the date would be in that log, when I started |
| 11:36 | 7 | the process, when the process ended.  If there was any |
| 11:36 | 8 | errors, it would mark where the errors are located. |
| 11:36 | 9 | And also it creates a hash value for the image, so |
| 11:36 | 10 | basically you calculate the hash value of the hard drive |
| 11:36 | 11 | that I'm imaging, and then you calculate the hash value of |
| 11:36 | 12 | the image, verify it together to make sure I have the exact |
| 11:36 | 13 | copy. |
| 11:36 | 14 | Q    And did you use forensic software to image each of the |
| 11:36 | 15 | six servers? |
| 11:36 | 16 | A    No, not for the virtual machines because the process |
| 11:36 | 17 | for the virtual machines is different. |
| 11:36 | 18 | Q    For the non-virtual machines? |
| 11:36 | 19 | A    Yes. |
| 11:36 | 20 | Q    All right.  What door tool did you use to image those |
| 11:36 | 21 | servers, the non-virtual machines? |
| 11:37 | 22 | A    Both the X/Ways imager and the FTK imager. |
| 11:37 | 23 | Q    And for those servers that you used that software on to |
| 11:37 | 24 | create the forensic image, you mentioned a hash value.  Do |
| 11:37 | 25 | you recall that? |

| | | |
|---|---|---|
| 11:37 | 1 | A    Yes. |
| 11:37 | 2 | Q    And just so the jury understands, a hash value is a |
| 11:37 | 3 | long code -- I'm going to try to explain this in layman's |
| 11:37 | 4 | terms -- a long code that is specific just to that |
| 11:37 | 5 | particular image and device; is that right? |
| 11:37 | 6 | A    At that specific time. |
| 11:37 | 7 | Q    At that specific time. |
| 11:37 | 8 | A    Yes. |
| 11:37 | 9 | Q    And what that enables you to do after the fact is if |
| 11:37 | 10 | somebody all of a sudden shows up with a copy of a |
| 11:37 | 11 | particular server or they claim it's a copy, you can check |
| 11:37 | 12 | the hash value to see if it matches the original copy to see |
| 11:38 | 13 | if it's been tampered with? |
| 11:38 | 14 | A    Yes. |
| 11:38 | 15 | Q    So for the servers that you used the forensic software |
| 11:38 | 16 | on, you had one hash value or tag for each server? |
| 11:38 | 17 | A    For each image. |
| 11:38 | 18 | Q    For each image? |
| 11:38 | 19 | A    For each image.  I want to say one of the servers |
| 11:38 | 20 | contained two RAIDed hard drives.  I mean, I have to go back |
| 11:38 | 21 | and look them up. |
| 11:38 | 22 | Q    If you had to look at your paperwork, what would you |
| 11:38 | 23 | look at?  These forms? |
| 11:38 | 24 | A    The forms, yeah, because the forms, I noted everything. |
| 11:38 | 25 | As I recall, one of the servers might have had two separate |

| | | |
|---|---|---|
| 11:38 | 1 | RAIDed hard drives, so I would have created two separate |
| 11:38 | 2 | images for that server. |
| 11:38 | 3 | Q    I was trying to avoid getting into this and I don't |
| 11:38 | 4 | want to spend a lot of time on it, but you keep mentioning |
| 11:38 | 5 | RAIDed.  Can you explain to the jury quickly what RAIDed |
| 11:38 | 6 | means. |
| 11:38 | 7 | A    Sure.  It's basically using multiple hard drives to |
| 11:38 | 8 | work together, and it either increases the capacity or the |
| 11:39 | 9 | size of the hard drive.  So let's say if you have four |
| 11:39 | 10 | one-terabyte drives, it can work together and now you will |
| 11:39 | 11 | have a four-terabyte drive space instead of one. |
| 11:39 | 12 | Or depending what type of a RAID it is, you can |
| 11:39 | 13 | have -- they can create, like, backup copies onto another |
| 11:39 | 14 | hard drive.  So let's say one hard drive fails, you can just |
| 11:39 | 15 | replace that hard drive and the whole RAID will rebuild |
| 11:39 | 16 | again and you will not lose your data. |
| 11:39 | 17 | Q    Do you see that, sir? |
| 11:40 | 18 | A    Yes. |
| 11:40 | 19 | Q    This is a terribly drawn crude picture of a server, |
| 11:40 | 20 | this rectangle here.  Do you see that? |
| 11:40 | 21 | A    Yes. |
| 11:40 | 22 | Q    All right.  And I have drawn four hard drives within |
| 11:40 | 23 | the server, right?  Do you see that? |
| 11:40 | 24 | A    Yes. |
| 11:40 | 25 | Q    What you're talking about is that sometimes you will |

| | | |
|---|---|---|
| 11:40 | 1 | have a server with multiple hard drives, and that's called a |
| 11:40 | 2 | RAID configuration? |
| 11:40 | 3 | A    Yes. |
| 11:40 | 4 | Q    And there were certain of these servers that had that |
| 11:40 | 5 | configuration, correct? |
| 11:40 | 6 | A    Yes. |
| 11:40 | 7 | Q    And for those servers, was there a hash value for each |
| 11:40 | 8 | drive or just for the server? |
| 11:40 | 9 | A    The whole thing, because the software recognizes that |
| 11:40 | 10 | is a RAID, so it is created as one drive instead of four |
| 11:40 | 11 | separate drives. |
| 11:40 | 12 | Q    So after about a week when these servers were |
| 11:40 | 13 | completed, meaning the imaging was completed of all of the |
| 11:40 | 14 | servers, what happened next? |
| 11:40 | 15 | A    As far as to the physical servers or the forensic |
| 11:41 | 16 | images? |
| 11:41 | 17 | Q    Well, I'm going to ask you about both, so let's start |
| 11:41 | 18 | with the physical servers. |
| 11:41 | 19 | A    The physical servers were returned back to the |
| 11:41 | 20 | receiver. |
| 11:41 | 21 | Q    Okay.  And when the physical -- how long after you got |
| 11:41 | 22 | done with the physical servers, how long did they sit in |
| 11:41 | 23 | your office? |
| 11:41 | 24 | A    I don't recall, but I know they were returned back |
| 11:41 | 25 | soon.  So if it was a week or two weeks, I don't recall |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

11:41    1    exactly.

11:41    2    Q    And were the servers kept in your office that entire

11:41    3    time?

11:41    4    A    Yes.

11:41    5    Q    And that was because it was important that they be kept

11:42    6    safe?

11:42    7    A    That's the way we always do it, regardless of the case.

11:42    8    Q    That's the protocol?

11:42    9    A    Yes.

11:42   10    Q    And then when you got done imaging each of the servers,

11:42   11    now you have one forensic copy for each server generally,

11:42   12    right?

11:42   13    A    Yes.

11:42   14    Q    And did you then make copies of the copy?

11:42   15    A    I did.

11:42   16    Q    How many copies of the copy did you make?

11:42   17    A    Just one copy, which will be the working copy.  And

11:42   18    when I'm working on the images, I will work off of that and

11:42   19    keep the original separate.

11:42   20    Q    What did you do with the original copy with the hash

11:42   21    value that you had created over the course of the week?

11:42   22    A    They were locked in my cabinet with the rest of my work

11:42   23    product.

11:42   24    Q    And was that cabinet located within the IRS CID

11:42   25    offices?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

```
11:42   1    A    Yes.
11:43   2    Q    And how long did those images stay within that cabinet?
11:43   3    A    As long as it needs to be.
11:43   4    Q    They're still there?
11:43   5    A    Yes.
11:43   6    Q    So the original forensic copies of every Eagan Avenatti
11:43   7    server that you obtained are still sitting in your cabinet
11:43   8    in Laguna Niguel?
11:43   9    A    Not in Laguna Niguel.  They are actually in the
11:43  10    downtown office, the downtown L.A. office.
11:43  11    Q    Okay.  So at some point you transported the copies to
11:43  12    your office in downtown L.A.?
11:43  13    A    Yes.
11:43  14    Q    And you locked them in your cabinet there?
11:43  15    A    Yes.
11:43  16    Q    And that was basically a day or two after the copies
11:43  17    were complete?
11:43  18    A    Yes.
11:43  19    Q    And they stayed in that cabinet this entire time
11:43  20    period?
11:43  21    A    Yes.
11:43  22    Q    Has anyone ever asked you to get those copies out for
11:43  23    any reason?
11:43  24    A    Not the original.  Whatever they ask me, I work off of
11:44  25    the working copy.
```

11:44   1    Q    Now, the working copy that you obtained, at some point
11:44   2    in time did you send that working copy anywhere?
11:44   3    A    Not the working copy, but I made copies of that and I
11:44   4    sent them over to the DOJ side of the lab.
11:44   5    Q    Okay.  So I want to make sure we have got our copies
11:44   6    straight.  One copy was stored in your cabinet in your
11:44   7    office, right?
11:44   8    A    Yes.
11:44   9    Q    Then there was your working copy?
11:44   10   A    Yes.
11:44   11   Q    And then how many copies of the working copy did you
11:44   12   create?
11:44   13   A    I created one for the DOJ.
11:45   14   Q    And the DOJ copy -- by DOJ copy, I'm talking about the
11:45   15   one you created for DOJ.  That was also around the same time
11:45   16   period, spring of 2019?
11:45   17   A    It was several months after, so I don't recall the
11:45   18   exact date.
11:45   19   Q    Okay.  The copy that you created for DOJ, did you send
11:45   20   that to Mr. Varani in Washington, D.C.?
11:45   21   A    I did.
11:45   22   Q    To the Department of Justice lab in D.C.?
11:45   23   A    Yes.
11:45   24   Q    Did you create any other copies?
11:45   25   A    Of those images, no.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

11:45   1   Q    Do you still have your working copy?

11:45   2   A    Yes.

11:45   3   Q    Does the Department of Justice in Washington, D.C.,

11:45   4   still have the copy that you sent them to the best of your

11:45   5   knowledge?

11:46   6   A    I can't answer that question.  I don't know.

11:46   7   Q    Based on your experience, is it standard protocol for

11:46   8   that to be retained during a pending case?

11:46   9   A    The DOJ has different protocols.  I can't honestly say

11:46   10  what their protocols are.

11:46   11  Q    How did you send a copy to the Department of Justice in

11:46   12  D.C.?

11:46   13  A    Their archive was encrypted with a password, and then

11:46   14  using the UPS I shipped it to them.

11:46   15  Q    So you put all of the forensic images on one hard drive

11:46   16  and sent it to D.C.?

11:46   17  A    Yes.  They were put on a six-terabyte hard drive.

11:46   18  Q    Why was the hard drive so large?  Did you need that

11:46   19  space for the servers?

11:46   20  A    Yes.

11:46   21  Q    And I take it that the reason it took a week to image

11:46   22  the servers was because of the amount of data and

11:47   23  information on the servers?

11:47   24  A    That, and some of the servers were old, so the physical

11:47   25  technology that was on it was really old.  So just the

11:47  1    imaging process was really slow because of that old

11:47  2    technology.

11:47  3    Q    Now, when you went out to the data center to look at

11:47  4    the servers initially, did you determine how these servers

11:47  5    had been backed up over the years?

11:47  6    A    There were backup tapes, but I wouldn't use the backup

11:47  7    tapes.

11:47  8    Q    I'm sorry?

11:47  9    A    They build backup tapes, but I did not image the backup

11:47  10   tapes.

11:47  11   Q    I want to ask you about these backup tapes.  You say

11:47  12   there were backup tapes.  Where did you see backup tapes?

11:47  13   A    I believe backup tapes were seized in this case, but I

11:47  14   can't recall if they were taken from the data center or they

11:47  15   were seized from Judy's residence.  I can't recall her last

11:48  16   name.

11:48  17   Q    Do you recall that in connection with the search

11:48  18   warrant of Ms. Regnier's home, a number of backup tapes of

11:48  19   the servers were taken?

11:48  20   A    Yes.

11:48  21   Q    What happened to the backup tapes of the servers that

11:48  22   were taken from Ms. Regnier's home?

11:48  23   A    They are still locked as evidence.

11:48  24   Q    I'm sorry?

11:48  25   A    They're locked away as evidence.

11:48  1  Q     Where are the backup tapes of the servers that have
11:48  2  been locked away as evidence?  Where are they located?
11:48  3  A     In downtown, at our office in downtown.
11:48  4  Q     Are those within your cabinet?
11:48  5  A     Not within the cabinet.  We have a separate room where
11:48  6  we keep the locked evidence.
11:48  7  Q     So that's in an evidence preservation room, those
11:48  8  backup tapes?
11:48  9  A     Yes.
11:48  10  Q     And have they been there since they were seized?
11:48  11  A     Yes.
11:48  12  Q     And you understand that those backup tapes are backups
11:49  13  of the servers, right?
11:49  14  A     Yes.
11:49  15  Q     Has anyone ever asked you to look at those backup tapes
11:49  16  or attempt to restore the information or data on them?
11:49  17  A     No.
11:49  18  Q     How many backup tapes are there roughly?
11:49  19  A     I don't know the exact number.  I believe it was, like,
11:49  20  a box or two, but I don't know the exact number.
11:49  21  Q     I'm sorry.  Did you say 60?
11:49  22  A     I don't know the exact number.  I think they were
11:49  23  within a box or two boxes, but I don't know the exact
11:49  24  number.  I haven't looked at them in three years.
11:49  25  Q     You haven't looked at them since they were initially

11:49    1    delivered to you, right?

11:49    2    A    Yes.

11:49    3    Q    By the way, who delivered those backup tapes to you?

11:49    4    A    John Weeks.

11:49    5    Q    And did you log the backup tapes as evidence?

11:49    6    A    Yes.

11:49    7    Q    Why?

11:49    8    A    Because they are evidence.

11:50    9    Q    And when you put them in the room, did you make sure

11:50   10    they were secure?

11:50   11    A    Yes.

11:50   12    Q    And did you fill out a chain of custody form -- well,

11:50   13    strike that.  When you received the backup tapes, was there

11:50   14    any chain of custody form or associated documentation with

11:50   15    them?

11:50   16    A    I believe so.

11:50   17    Q    And did you sign for them when Mr. Weeks delivered them

11:50   18    to you?

11:50   19    A    I don't recall exactly now, but it should have been

11:50   20    done.  That's the normal protocol.

11:50   21    Q    And when you put them in the evidence room, did you log

11:50   22    the fact that they had been placed in the evidence room?

11:50   23    A    We don't have a separate log for that since there is

11:50   24    only a handful of us that have access to that room.  So we

11:50   25    have separate locations.  So once we seize it, they're kept

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 11:50 | 1 | by case in separate locations so we know what evidence |
| 11:50 | 2 | belongs to what case.  But we don't have a separate log that |
| 11:51 | 3 | we fill out each time we bring in new evidence into that |
| 11:51 | 4 | room. |
| 11:51 | 5 | Q    So within the room in your office, there's a location |
| 11:51 | 6 | for all of the evidence relating to this case? |
| 11:51 | 7 | A    Yes. |
| 11:51 | 8 | Q    And these backup tapes are included within that area? |
| 11:51 | 9 | A    Yes. |
| 11:51 | 10 | Q    Is any other information relating to the servers |
| 11:51 | 11 | included within that area? |
| 11:51 | 12 | A    No. |
| 11:51 | 13 | Q    Has anyone ever asked you to look for any data from a |
| 11:51 | 14 | program called Tabs?  And when I say look for, I mean on the |
| 11:51 | 15 | servers or the backup tapes of the servers. |
| 11:51 | 16 | A    No. |
| 11:52 | 17 | Q    Now, this working copy of the forensic images, this one |
| 11:52 | 18 | right here -- |
| 11:52 | 19 | A    Okay. |
| 11:52 | 20 | Q    -- by working copy, what you mean is that's your copy |
| 11:52 | 21 | to be able to -- I don't want to use the word manipulate |
| 11:52 | 22 | because that sounds bad, but it's your copy that enables you |
| 11:52 | 23 | to examine, look for things, et cetera; is that fair? |
| 11:52 | 24 | A    You can't really manipulate it because the way that the |
| 11:52 | 25 | images are, they're like a compressed file, like a zip file. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

11:53  1    Until you unzip it, it's going to stay in that same format.

11:53  2    You can't change anything within it.

11:53  3            So the way you process it, you process it in the

11:53  4    forensic software or you restore it in, like, a virtual

11:53  5    environment and haul it out to see what's on it.

11:53  6    Q    Did you do any of those things relating to your working

11:53  7    copy?  Meaning, did you unzip it?  Did you examine it?  Did

11:53  8    you analyze it?

11:53  9    A    Yes.  I had to restore the servers to set it up for you

11:53 10    to --

11:53 11            MR. AVENATTI:  Move to strike the last part as

11:53 12    nonresponsive.

11:53 13            THE COURT:  It will be stricken.

11:53 14    BY MR. AVENATTI:

11:53 15    Q    Now, sir, when you unzip one of these files, like the

11:53 16    working copy --

11:53 17    A    You can't just unzip it.  You have to use the forensic

11:54 18    software to process it.  The forensic software is the one

11:54 19    that unzips it and processes it.

11:54 20    Q    And then what you have is you have a bunch of files off

11:54 21    the server, right?

11:54 22    A    Not really.  The forensic software organizes it nicely.

11:54 23    It will show me the file structure, the way it is on the

11:54 24    computer so I can identify where each file is located on the

11:54 25    computer.  And it would put it in different categories,

11:54  1    whether the file is deleted, give me the metadata for files.
11:54  2    There's different things that the forensic software does.
11:54  3    Q    But you then have to have the actual software program
11:54  4    if you want to open the data, right?
11:54  5    A    Yes.  Without the forensic software, you won't be able
11:54  6    to locate it.
11:54  7    Q    Well, separate and apart from that, let's assume that
11:54  8    this extraction yields a bunch of Microsoft Word documents.
11:54  9    A    Okay.
11:54  10   Q    All right.  Unless you have the Microsoft Word program,
11:54  11   you can't open the Word documents, right?
11:54  12   A    You can within the forensic software.  You can view
11:55  13   them.  But once you export them out from the software, then
11:55  14   you will need the Word software to open up the Word
11:55  15   document.
11:55  16   Q    The forensic software supports some file types but not
11:55  17   others, right?
11:55  18   A    Yes.
11:55  19   Q    So it supports more commonly used file types like Word,
11:55  20   Excel, things of that nature?
11:55  21   A    Yes.
11:55  22   Q    There's other files that require the actual native
11:55  23   software to view, right?
11:55  24   A    Yes.
11:55  25   Q    Did you ever make a listing of the types of files from

11:55  1   the servers or from this working copy?

11:55  2   A    I didn't analyze any of the devices, so the answer is

11:55  3   no, because the analysis was done at the DOJ lab.

11:56  4   Q    So you understood that Mr. Varani was doing an analysis

11:56  5   as to what type of data was on the servers for what program?

11:56  6   A    Yes.

11:56  7   Q    And did you communicate with Mr. Varani as it relates

11:56  8   to his work to do that?

11:56  9   A    Not that much specific to the analysis because they did

11:56  10  their part, and I understand they provided all that evidence

11:56  11  to the Privilege Review Team to review all that evidence.

11:56  12  So it was their job to analyze it and export it out and

11:56  13  provide it to them.

11:57  14  Q    Did you ever obtain a list of the types of data that

11:57  15  were taken from the servers?

11:57  16  A    No.

11:57  17  Q    Did you ever get a list of the database files that were

11:57  18  taken?

11:57  19  A    No.

11:57  20  Q    How about the programs that were found on the servers?

11:57  21  A    No.

11:57  22  Q    So as far as searching for particular data or programs,

11:57  23  that was not something -- well, that was something that

11:57  24  Mr. Varani was doing in connection with the investigation,

11:57  25  right?

| | | |
|---|---|---|
| 11:57 | 1 | A    I believe so. |
| 11:58 | 2 | Q    And you still have your working copy? |
| 11:58 | 3 | A    I do. |
| 11:58 | 4 | Q    So would it be possible for you to utilize that working |
| 11:58 | 5 | copy to search for data in connection with the case? |
| 11:58 | 6 | A    Yes. |
| 11:58 | 7 | Q    How would you go about doing that generally? |
| 11:58 | 8 | A    Depending what we're talking about.  If it's a specific |
| 11:58 | 9 | software, then I have to virtualize those images and power |
| 11:58 | 10 | them on in order to be able to see that software.  Once the |
| 11:58 | 11 | software is accessed, I then get the data out or whatever |
| 11:58 | 12 | data is needed. |
| 11:58 | 13 |      If it's -- if they're documents, then I can just |
| 11:58 | 14 | process them in the forensic software and look for the |
| 11:58 | 15 | specific -- search for the specific documents and get them |
| 11:58 | 16 | out. |
| 11:58 | 17 | Q    I understand the second part of what you said, but as |
| 11:59 | 18 | it relates to the first part and the data, can you explain |
| 11:59 | 19 | that further? |
| 11:59 | 20 | A    Are you talking about the virtualizing it? |
| 11:59 | 21 | Q    Well, strike that.  Let me ask a question.  You said |
| 11:59 | 22 | that if it was particular software, you would have to |
| 11:59 | 23 | virtualize it? |
| 11:59 | 24 | A    I have to virtualize that whole computer.  But in this |
| 11:59 | 25 | case the servers were already virtualized, so all I have to |

11:59  1   do is power them on, look for that specific software, run

11:59  2   it, and depending on what the data is, because I'm not sure

11:59  3   which data we're talking about.

11:59  4   Q    Did anyone ever ask you to look for any QuickBooks data

11:59  5   on the servers?

11:59  6   A    I don't recall exactly, but I do remember QuickBooks

11:59  7   files were exported out.  There were QuickBooks files on the

12:00  8   servers.

12:00  9   Q    Did you export them out?

12:00  10  A    I don't recall.  I don't recall exactly.

12:00  11  Q    Well, so far the only people that have access to this

12:00  12  are you and Mr. Varani, right?

12:00  13  A    Yes.

12:00  14  Q    So what is your recollection as to how it was that

12:00  15  QuickBooks files were exported out?

12:00  16  A    I remember seeing the QuickBooks files on there.  I

12:00  17  don't remember exactly if they asked me to provide them a

12:00  18  copy of the QuickBooks files or if that was done by

12:00  19  Mr. Varani, but I do remember seeing QuickBooks files on

12:00  20  it.

12:00  21  Q    When you say QuickBooks files on it, you mean within

12:00  22  your working copy?

12:00  23  A    Yes, when I powered down, because I had to virtualize

12:00  24  the servers and power them on and make sure everything

12:00  25  worked.

| | | |
|---|---|---|
| 12:00 | 1 | THE COURT:  We'll take the lunch break |
| 12:00 | 2 | here. |
| 12:00 | 3 | Ladies and gentlemen, we will resume at 1:30. |
| 12:00 | 4 | Please remember the admonition not to discuss the case with |
| 12:01 | 5 | anyone and not to form any opinions on the issues in the |
| 12:01 | 6 | case until it is submitted to you.  And please do not do any |
| 12:01 | 7 | research. |
| 12:01 | 8 | So we will see you at 1:30. |
| 12:01 | 9 | (Jury not present) |
| 12:01 | 10 | THE COURT:  Sir, you may step down. |
| 12:01 | 11 | MR. SAGEL:  If it's acceptable to Your Honor, I'm |
| 12:01 | 12 | going to go finish our filing. |
| 12:01 | 13 | THE COURT:  That's fine. |
| 12:01 | 14 | MR. SAGEL:  Thank you. |
| 12:01 | 15 | MR. AVENATTI:  What time do you want to have the |
| 12:01 | 16 | call again? |
| 12:01 | 17 | THE COURT:  Right now. |
| 12:01 | 18 | MR. AVENATTI:  Oh, okay.  Your Honor, while |
| 12:02 | 19 | we're doing that, I'm going to make a demand for a copy of |
| 12:02 | 20 | the backup tapes that were seized in connection with the |
| 12:02 | 21 | search warrant.  I don't have those either.  I think he said |
| 12:02 | 22 | that there were approximately 60, but he wasn't sure as to |
| 12:02 | 23 | the count.  If those were seized in connection with the |
| 12:02 | 24 | search warrant, I should have received them a long time |
| 12:02 | 25 | ago. |

```
12:02   1            THE COURT:  It doesn't fall that everything that
12:02   2    was seized ought to be available to you.
12:02   3            MR. AVENATTI:  But the backup tapes contain
12:02   4    financial information of the law firm responsive to the
12:02   5    search warrant.  So there's no question I was entitled to
12:02   6    that.  That's what this case is about.  So I was not given
12:02   7    copies of the backup tapes, and I should have been given
12:03   8    copies of the backup tapes.
12:03   9            THE COURT:  We'll take it up later.
12:03  10            (Telephone conference call)
12:03  11            THE COURT:  Ms. Marino, we're in session.  The
12:03  12    court reporter is taking down everything that's said as
12:03  13    usual.
12:03  14            I reviewed the memorandum that you put in
12:03  15    yesterday, and I have concluded that I'm going to quash the
12:04  16    subpoena as to the documents because it's overbroad and an
12:04  17    undue burden.  But I'm going to compel Ms. Carter's
12:04  18    appearance.
12:04  19            MS. MARINO:  If I may briefly be heard on that,
12:04  20    Your Honor.
12:04  21            THE COURT:  Yes, please.
12:04  22            MS. MARINO:  With regard to the appearance, do
12:04  23    you mind if I briefly address the testimony of Ms.
12:04  24    Carter?
12:04  25            THE COURT:  Please do.  Go ahead.
```

12:04    1           MS. MARINO:  Oh, I'm sorry.  I think we're having

12:04    2    a little bit of a hard time hearing you.

12:04    3           I just want to briefly address a couple points

12:04    4    that may not have been clear in our filing as to

12:05    5    Ms. Carter's position and analysis, especially with regard

12:05    6    to the analyses that Ms. Carter performed.  I just want to

12:05    7    make sure it's clear for the Court.

12:05    8           These financial analyses that Ms. Carter

12:05    9    performed did not form the basis of any of the evidence

12:05   10    that has been submitted in this matter, did not form the

12:05   11    basis of the exhibits that were shown during Mr. Drum's

12:05   12    testimony.

12:05   13           These analyses were performed after the exhibits

12:05   14    were already prepared.  They were merely done to

12:05   15    substantiate what Mr. Drum already knew, to just make sure

12:05   16    that he had a hundred percent confidence in his mind as to

12:05   17    what he would be testifying to.  So I think that that's a

12:05   18    really important point that may not have come across in our

12:05   19    filing.

12:05   20           I think with regard to the manner and method of

12:06   21    the summary chart preparation, again these were prepared

12:06   22    prior to Ms. Carter's involvement or analysis.  The work

12:06   23    that she performed on the summary charts was very

12:06   24    rudimentary.  It was removing of citations, very general

12:06   25    matters.

12:06  1          The mock cross-exam that Mr. Avenatti highlights,

12:06  2    he has already addressed this issue with Mr. Drum.  Any

12:06  3    further testimony on this issue would merely be cumulative

12:06  4    evidence.

12:06  5          As to the source of the financials used with

12:06  6    regard to Mr. Avenatti's law firm, again Mr. Avenatti has

12:06  7    already extensively questioned Mr. Drum on it, so this would

12:06  8    just be cumulative evidence.

12:06  9          As to the scope and manner that Mr. Avenatti

12:06  10   addresses of the government investigation, again Mr. Drum

12:07  11   has already been questioned by Mr. Avenatti on this matter,

12:07  12   and it's beyond Ms. Carter's personal knowledge as to the

12:07  13   scope of this investigation since she started later on

12:07  14   something that Mr. Drum would be much more suited to testify

12:07  15   to.

12:07  16          I believe that's it, Your Honor.  Those are

12:07  17   the main points we wanted to make sure were clear to the

12:07  18   Court.

12:07  19          THE COURT:  Okay.  Well, thank you.  I appreciated

12:07  20   that.  I am not going to quash as to her personal

12:07  21   appearance.  However, we are dark tomorrow, and I would

12:07  22   expect Mr. Avenatti to coordinate with you with regard to

12:07  23   her appearance on Tuesday.

12:07  24          MR. AVENATTI:  Will do, Your Honor.  Thank you.

12:07  25          MS. MARINO:  Okay.  Thank you, Your Honor.

| | | |
|---|---|---|
| 12:07 | 1 | THE COURT:  Okay.  Thanks for making yourself |
| 12:07 | 2 | available. |
| 12:07 | 3 | MS. MARINO:  All right.  Thank you so much. |
| 12:07 | 4 | THE COURT:  Thank you. |
| 12:07 | 5 | (Recess taken at 12:07 p.m.) |
| 12:07 | 6 | *   *   * |
| 12:07 | 7 | |
| 12:07 | 8 | |
| 12:07 | 9 | |
| 12:07 | 10 | |
| 12:07 | 11 | |
| 12:07 | 12 | |
| 12:07 | 13 | |
| 12:07 | 14 | |
| 12:07 | 15 | |
| 12:07 | 16 | |
| 12:07 | 17 | |
| 12:07 | 18 | |
| 12:07 | 19 | |
| 12:07 | 20 | |
| 12:07 | 21 | |
| 12:07 | 22 | |
| 12:07 | 23 | |
| 12:07 | 24 | |
| 12:07 | 25 | |

CERTIFICATE


        I hereby certify that pursuant to Section 753,
Title 28, United States Code, the foregoing is a true and
correct transcript of the stenographically reported
proceedings held in the above-entitled matter and that the
transcript page format is in conformance with the
regulations of the Judicial Conference of the United States.


Date:  August 19, 2021


                    /s/   Sharon A. Seffens  8/19/21
                    _____
                    SHARON A. SEFFENS, U.S. COURT REPORTER

**MR. AVENATTI: [89]** 4/9 4/19 4/23 5/2 6/5
13/9 17/18 19/12 19/20 19/24 20/6 20/22 21/6
21/12 21/25 22/3 22/6 22/19 24/19 25/7 25/18
25/25 26/8 26/15 29/8 29/12 31/12 31/22
31/25 33/3 39/3 39/9 44/16 44/19 45/16 45/18
46/2 48/4 48/15 49/22 50/7 50/19 51/5 51/11
51/17 52/12 55/20 55/24 58/23 59/9 60/1 60/3
60/9 60/15 60/21 63/16 65/3 67/19 71/19
73/12 74/21 75/5 75/9 75/25 76/4 81/9 82/5
84/20 85/6 85/8 86/6 86/19 88/1 88/9 89/23
90/2 90/10 91/6 91/10 91/12 91/15 91/19
91/22 92/1 119/11 124/15 124/18 125/3
127/24

**MR. SAGEL: [61]** 4/5 9/19 9/24 10/14 11/25
14/24 15/2 20/13 21/8 22/21 22/23 24/1 24/3
24/8 24/18 30/11 30/15 30/17 31/7 32/9 32/24
36/12 37/16 37/21 38/11 41/16 41/18 43/4
44/1 45/14 45/17 45/25 53/24 54/8 56/23
58/14 60/13 60/16 62/20 63/14 63/21 64/12
69/3 71/17 73/11 73/14 77/14 77/19 78/14
81/13 85/13 85/21 85/25 86/2 86/9 88/10
88/18 89/15 91/24 124/11 124/14 125/3

**MS. MARINO: [4]** 125/22 126/1 127/25 128/3
**THE CLERK: [7]** 4/3 17/8 32/22 61/2 61/5
92/5 92/9
**THE COURT: [138]**
**THE WITNESS: [30]** 37/23 39/7 39/11 41/19
43/7 45/21 46/6 48/18 49/25 50/9 50/21 51/7
51/13 51/19 52/15 56/4 59/12 60/12 60/18
61/4 62/22 63/24 69/6 74/20 76/3 79/16 81/16
88/3 88/12 92/7

## $

**$1.6 [1]** 11/19
**$1.6 million [1]** 11/19
**$4 [1]** 10/24 13/21 14/5
**$4 million [3]** 10/24 13/21 14/5

## /

**/s [1]** 129/15

## 0

**0870 [1]** 1/21

## 1

**1-1053 [1]** 1/20
**100 [1]** 25/8
**1053 [1]** 1/20
**107 [1]** 2/16
**1084 [1]** 75/21
**1098 [3]** 3/14 46/4 46/5
**10:00 [1]** 21/23
**10:00 is [1]** 23/2
**10:00 on [1]** 22/1
**10:00 or [1]** 21/19
**10:30 [2]** 32/14 86/4
**10:45 [1]** 85/10
**1100 [1]** 2/7
**11:00 [1]** 32/14
**11:02 [1]** 85/11
**12 [1]** 61/15
**12:07 [1]** 128/5
**12:30 [1]** 30/13
**1343 [1]** 16/13
**15 [2]** 61/16 85/1
**15-minute [2]** 20/18 20/19
**15th [1]** 20/2
**16 [2]** 39/17 45/15
**166 [1]** 15/16
**17 [2]** 26/13 39/17
**19 [3]** 1/17 4/1 129/13
**1992 [1]** 15/17
**1:30 [5]** 22/17 22/20 30/10 124/3 124/8

## 2

**2008 [1]** 15/13
**2009 [2]** 27/10 61/19
**2011 [3]** 48/14

**2014 [2]** 50/13 50/18
**2017 [3]** 37/21 96/8 96/8
**2018 [1]** 37/5
**2019 [19]** 34/2 62/5 64/7 65/1 65/13 66/1
67/10 75/12 75/17 76/8 77/4 77/10 79/10
79/24 80/1 87/5 93/5 95/5 113/16
**2020 [7]** 34/2 34/2 34/6 34/13 34/18 35/1
79/24
**2021 [5]** 1/17 4/1 20/2 26/13 129/13
**20th [1]** 22/25
**21 [1]** 129/15
**215 [1]** 2/8
**23 [1]** 1/12
**25th [2]** 75/12 84/14
**26 [3]** 65/12 65/25 87/4
**27 [3]** 65/13 66/1 87/4
**28 [1]** 129/7
**29 [5]** 4/13 10/5 12/25 15/3 17/1
**2nd [1]** 35/1

## 3

**300-page [1]** 22/16
**312 [1]** 2/7
**32 [1]** 3/11
**338-3598 [1]** 2/12
**3598 [1]** 2/12
**36 [1]** 59/21

## 4

**401 [1]** 88/1
**403 [7]** 36/12 43/4 45/15 62/20 63/14 63/21
88/1
**411 [2]** 1/20 2/11
**46 [1]** 3/14
**48 [1]** 3/11
**481-4900 [1]** 2/17
**4900 [1]** 2/17
**4th [1]** 1/20

## 5

**500 [1]** 62/17
**543-0870 [1]** 1/21
**553 [1]** 15/12
**59 [1]** 3/11

## 6

**60 [2]** 116/21 124/22
**61 [1]** 3/11
**639 [1]** 15/12
**647 [1]** 15/12
**6683 [1]** 2/8

## 7

**706 [8]** 20/2 20/4 20/6 20/6 20/7 20/23 21/3
21/6
**712 [1]** 17/5
**714 [2]** 1/21 2/12
**724 [1]** 17/6
**733 [5]** 19/6 19/17 19/21 20/3 20/24
**753 [1]** 129/6
**7:46 [1]** 26/14

## 8

**8/19/21 [1]** 129/15
**8000 [1]** 2/11
**805 [1]** 15/16
**86 [1]** 3/11
**88 [1]** 3/11
**894-6683 [1]** 2/8
**8:00 [2]** 21/17 85/20
**8:00 p.m [2]** 21/11 21/13
**8:27 [1]** 4/1

## 9

**90012 [1]** 2/8
**92 [1]** 3/12
**92672 [1]** 2/16
**92701 [2]** 1/20 2/11
**949 [1]** 2/17

**9:00 if [1]** 22/2
**9:00 on [1]** 22/7
**9:00 rather [1]** 85/20
**9:12 [1]** 32/19
**9:15 [1]** 75/8
**9:20 [1]** 32/20

## A

**a.m [4]** 4/1 26/14 32/19 32/20 85/10 85/11
**ability [1]** 29/14
**able [10]** 24/6 27/25 30/4 62/4 62/14 103/7
105/6 118/21 120/5 122/10
**able to [1]** 118/21
**about [95]** 5/6 8/4 10/8 10/16 12/3 12/25
13/14 19/5 20/19 24/21 27/10 27/14 30/10
30/20 36/10 37/10 38/20 39/23 42/3 42/12
43/18 43/19 43/20 48/10 48/20 49/5 50/11
50/23 51/22 52/17 53/3 54/3 55/6 55/8 55/14
57/2 57/6 57/9 59/2 59/15 59/25 65/8 55/14
70/6 70/7 70/19 70/24 70/25 71/3 71/16 71/21
71/24 72/15 72/17 72/18 73/3 73/7 73/10
73/18 73/19 73/20 74/4 74/6 74/7 75/18 77/5
77/10 78/13 80/4 81/1 81/22 81/25 82/2 87/3
88/6 88/15 88/15 89/22 91/13 97/3 97/10
105/15 105/24 106/21 109/25 110/12 110/17
113/14 115/11 121/20 122/7 122/8 122/20
123/3 125/6
**above [1]** 129/9
**above-entitled [1]** 129/9
**absolutely [3]** 8/20 42/2 51/7
**abundance [1]** 22/24
**acceptable [2]** 33/23 124/11
**access [11]** 40/21 96/17 99/7 100/7 100/9
100/13 100/21 100/24 101/13 117/24 123/11
**accessed [1]** 122/11
**accident [1]** 90/24
**accommodate [1]** 28/9
**accommodating [1]** 86/7
**accomplished [1]** 15/24
**according [2]** 10/9 83/7
**account [11]** 6/13 6/15 7/2 7/2 7/5 7/8 7/12
7/12 7/17 7/17 11/20
**accounting [7]** 42/5 42/9 50/12 63/1 63/4
63/9 77/13
**accountings [1]** 50/17
**accounts [7]** 6/15 6/16 15/20 15/21 52/23
52/24 90/24
**accurate [5]** 5/21 13/12 25/4 65/20 66/14
**acquire [2]** 78/25 94/8
**acquittal [5]** 5/12 9/13 14/21
**across [1]** 126/18
**acting [2]** 104/10 104/14
**acts [1]** 15/21
**actual [4]** 12/4 81/20 120/3 120/22
**actually [7]** 11/10 14/16 26/5 52/9 88/15
105/20 112/9
**Adams [6]** 26/12 28/2 28/3 28/8 28/23 28/24
**adding [1]** 30/11
**additional [2]** 32/4 57/10
**address [8]** 4/16 9/20 9/21 9/22 25/17 27/22
125/23 126/3
**addressed [1]** 127/2
**addresses [2]** 16/5 127/10
**adequacy [1]** 63/16
**adequate [1]** 43/23
**admitted [1]** 25/13
**admonition [2]** 84/22 124/4
**advance [1]** 27/2
**ADVISORY [1]** 2/15
**affect [1]** 22/8
**afford [1]** 26/7
**after [33]** 7/7 7/18 14/13 14/13 16/24 18/8
22/7 27/21 27/23 32/12 34/23 38/6 38/25
49/16 50/17 73/22 74/21 77/19 81/5 81/17
81/19 82/6 83/13 87/13 89/10 96/25 101/17
108/9 110/12 110/21 112/16 113/17 126/13
**afternoon [1]** 23/10
**afterwards [3]** 58/13 95/10 106/18
**again [12]** 28/12 29/14 29/22 30/8 49/25

## A

**again...** [7] 77/15 78/22 109/16 124/16 126/21 127/6 127/10
**against** [1] 8/17
**agent** [29] 4/7 19/6 24/11 31/13 31/13 32/10 32/11 32/12 32/15 33/1 61/12 61/23 67/6 67/6 68/5 71/2 71/9 73/22 76/9 76/15 76/18 79/3 79/25 80/19 81/24 92/23 92/23 92/23 100/1
**agents** [7] 31/2 31/4 35/5 87/23 93/13 93/15 93/15
**ago** [9] 24/14 26/5 28/13 48/20 48/23 50/15 70/11 77/19 124/25
**agree** [5] 17/18 25/7 25/10 35/14 62/7
**agreement** [24] 12/3 12/4 13/21 13/22 14/3 14/4 14/5 15/11 39/19 39/25 50/25 51/15 51/22 51/25 52/6 52/11 52/21 57/4 57/7 57/11 57/21 82/25 83/25
**agreements** [6] 38/2 38/6 38/15 50/24 57/14 57/23
**ahead** [2] 47/5 125/25
**alerted** [2] 32/10 32/11
**Alex** [1] 26/13
**ALEXANDER** [2] 2/5 4/6 32/25
**Alexis** [1] 87/19
**all** [48] 4/15 5/2 8/19 10/5 12/7 12/17 12/18 12/19 13/1 14/10 14/21 21/11 26/2 30/24 38/19 46/12 54/19 54/22 55/5 55/9 59/16 62/24 69/19 86/25 89/11 89/23 90/3 95/23 96/14 97/4 97/6 97/19 100/10 101/21 101/23 105/2 105/14 107/20 108/10 109/22 110/13 114/15 118/6 120/10 121/10 121/11 122/25 128/3
**allegations** [1] 61/21
**allege** [2] 15/18 15/23
**alleges** [1] 5/7
**allow** [1] 89/21
**allowed** [1] 8/10
**allows** [2] 104/21 104/25
**alone** [1] 91/6
**aloud** [1] 39/21
**already** [17] 10/15 10/21 12/2 12/5 13/19 21/3 22/23 31/1 64/8 64/13 91/8 122/25 126/14 126/15 127/2 127/7 127/11
**also** [20] 8/13 15/18 18/22 24/3 37/14 42/16 44/9 60/7 66/7 73/14 73/15 76/20 94/21 98/13 98/14 99/2 100/11 100/20 107/9 113/15
**altering** [1] 47/11
**although** [1] 15/15
**always** [5] 33/16 47/12 83/23 99/1 111/7
**am** [4] 24/8 53/10 96/7 127/20
**AMERICA** [3] 1/9 4/4 32/23
**among** [3] 15/14 64/19 91/1
**amount** [2] 10/24 114/22
**Ana** [5] 1/16 1/20 2/11 4/1 94/10
**analyses** [3] 126/6 126/8 126/13
**analysis** [5] 121/3 121/4 121/19 126/5 126/22
**analyze** [3] 119/8 121/2 121/12
**Andre** [13] 18/1 18/2 66/18 68/8 68/9 73/4 73/7 73/8 75/13 76/9 76/21 80/20 93/2
**Andrew** [4] 64/23 87/4 87/20 88/7
**Angeles** [2] 2/8 80/7 93/10
**another** [8] 7/8 19/18 57/11 64/22 84/10 103/5 106/11 109/13
**answer** [17] 9/15 13/5 16/7 24/6 24/13 25/23 52/19 55/19 55/22 56/2 59/4 66/25 70/15 89/9 90/4 114/6 121/2
**answered** [6] 37/21 74/17 81/13 89/8 89/24 90/2
**answers** [2] 89/3 89/5
**anxious** [1] 27/14
**any** [56] 5/9 6/23 7/21 8/21 9/7 9/15 10/25 11/8 11/19 13/5 15/24 16/2 18/16 21/4 28/15 28/21 29/2 29/16 30/25 39/5 39/17 42/22 43/15 45/24 48/25 50/3 50/17 51/9 52/21 52/24 53/4 55/5 58/6 58/9 58/9 58/18 58/20 63/9 64/2 64/4 71/2 72/15 72/18 74/6 74/7 74/9 77/1 77/7 77/8 78/5 81/24 83/10 84/18 84/23 89/24 90/2 91/12 97/16 101/16 102/7 106/5 106/7 106/7 107/7 112/23 113/24 117/14 118/10

## 

**118/13 119/6 121/2 123/4 124/5 124/6 126/9 127/5**
**anybody** [1] 28/17 82/2
**anymore** [3] 53/22 59/8 60/7
**anyone** [19] 66/21 68/6 68/10 72/23 73/20 74/7 77/22 77/24 78/2 84/17 84/23 86/17 94/20 106/3 112/22 116/15 118/13 123/4 124/5
**anything** [25] 7/17 9/2 9/2 9/20 11/5 12/10 30/2 30/16 43/18 50/18 55/1 55/2 57/6 69/10 77/20 78/3 81/3 89/13 91/7 98/21 101/22 102/2 102/6 102/7 119/2
**anytime** [1] 8/5
**anywhere** [1] 113/2
**apart** [1] 120/7
**apologize** [1] 33/17
**apparent** [2] 31/15 31/17
**appearance** [4] 125/18 125/22 127/21 127/23
**APPEARANCES** [2] 2/1
**application** [1] 103/6
**apply** [1] 29/19
**appointed** [1] 29/20
**appreciate** [3] 46/16 46/21 86/9
**appreciated** [1] 127/19
**approach** [4] 39/3 44/16 65/3 75/25
**appropriate** [4] 8/10 25/19 26/1 30/7
**approximate** [1] 26/18
**approximately** [4] 34/5 36/25 50/15 124/22
**archive** [1] 114/13
**Arden** [1] 83/6
**are** [67] 5/9 5/11 8/2 8/20 9/1 10/3 11/11 12/22 13/1 14/6 16/25 17/12 19/21 19/24 20/2 20/25 22/8 22/21 25/6 25/9 30/23 31/2 32/15 38/7 39/9 39/13 45/1 45/3 45/21 46/15 47/6 47/14 61/10 67/5 70/4 75/19 82/15 83/16 85/3 87/24 91/11 92/2 92/3 93/8 93/12 93/15 99/22 102/25 103/7 104/24 107/8 112/7 112/9 114/10 115/23 116/1 116/2 116/4 116/12 116/18 117/8 117/8 118/25 122/20 123/12 127/16 127/21
**area** [3] 29/11 118/8 118/11
**argues** [1] 15/22
**argument** [4] 13/18 16/5 18/21 19/15
**Argumentative** [4] 59/10 60/9 63/21 89/15
**arguments** [1] 9/22
**around** [1] 113/15
**arrange** [1] 28/9
**arrest** [1] 90/20
**as** [118] 4/15 4/20 4/20 5/23 6/23 6/25 8/13 9/19 9/19 10/11 11/4 11/12 12/8 12/12 12/12 15/4 16/5 16/8 16/19 17/6 17/12 17/19 19/21 20/23 21/15 22/15 24/6 26/10 27/4 27/5 27/9 28/16 28/24 28/25 29/2 29/10 29/17 29/25 33/16 33/21 35/13 35/13 38/24 42/8 46/15 57/20 57/20 58/19 59/23 62/12 65/12 65/15 66/11 66/14 66/14 66/18 67/23 67/24 69/24 72/7 72/21 72/21 74/22 75/21 76/17 76/20 80/5 87/18 87/22 88/24 89/20 93/1 93/1 93/2 93/2 93/18 93/18 93/21 93/25 99/6 100/14 100/14 101/13 101/18 101/18 102/2 103/15 103/15 104/1 104/10 104/14 104/25 108/25 110/10 110/15 110/15 112/23 112/3 115/23 115/25 116/2 117/5 119/11 121/5 121/7 121/21 121/22 122/17 123/14 124/22 125/12 125/16 126/4 126/16 127/5 127/9 127/12 127/20
**ask** [28] 20/18 20/22 22/17 30/20 34/20 38/17 47/2 47/20 47/23 47/25 48/2 49/25 50/24 52/10 55/18 55/21 56/6 59/7 63/17 67/5 81/22 89/22 91/12 110/17 112/24 115/11 122/21 123/4
**asked** [39] 7/24 19/14 20/24 21/9 24/21 25/21 30/1 30/18 37/21 44/2 44/11 50/23 51/22 52/17 53/1 53/1 53/2 53/6 55/8 57/2 57/9 58/3 58/6 58/9 59/2 73/12 74/17 81/14 84/17 87/3 87/16 88/6 88/23 89/7 89/10 112/22 116/15 118/13 123/17
**asking** [5] 59/24 73/18 73/19 81/11 82/15
**Asks** [1] 44/2

## 

**aspect** [3] 30/5 67/18 72/20
**aspects** [2] 44/15 38/20
**assist** [3] 42/9 44/11 106/3
**assistant** [7] 2/4 2/6 2/10 20/16 20/20 93/1 93/1
**assisted** [3] 42/5 42/19 106/2
**assisting** [2] 93/12 93/15
**associate** [1] 85/5
**associated** [6] 5/11 29/16 29/17 63/13 64/11 117/14
**assume** [2] 19/7 120/7
**assuming** [2] 96/7 99/1
**assumption** [1] 96/11
**attach** [1] 20/14
**attaching** [1] 82/24
**attempt** [4] 27/21 39/4 91/4 116/16
**attempted** [1] 91/7
**attempting** [4] 5/4 26/22 31/2 83/6
**attended** [1] 37/2
**attention** [3] 7/25 62/5 93/21
**attorney** [15] 2/3 2/4 2/6 2/10 38/2 38/6 38/21 38/25 41/7 41/12 50/23 50/25 70/8 93/1 93/2
**attorney/client** [3] 38/2 38/6 38/21 38/25
**attorneys** [1] 57/20
**attorneys'** [1] 18/1
**audience** [1] 90/21
**August** [6] 1/17 4/1 20/2 22/25 26/13 129/13
**August 15th** [1] 20/2
**August 20th** [1] 22/25
**AUSA** [15] 68/8 73/5 73/8 75/12 75/13 76/9 76/9 76/20 76/21 80/19 80/20 86/15 86/15 86/25 93/2
**AUSAs** [4] 68/7 72/25 73/3 93/18
**authority** [1] 52/24
**available** [9] 24/24 25/2 25/4 30/19 31/3 31/5 85/15 125/2 128/2
**AVENATTI** [43] 1/11 2/14 4/4 4/10 4/18 6/14 9/23 13/8 16/16 17/5 17/17 19/5 23/5 25/17 31/11 32/23 33/4 33/9 42/10 48/11 50/13 67/15 68/19 75/18 78/6 86/12 88/7 88/15 88/20 92/10 93/22 94/2 94/18 95/15 96/14 97/16 97/20 112/6 127/1 127/9 127/11 127/22
**Avenatti's** [2] 16/5 127/6
**Avenida** [1] 2/16
**avoid** [2] 27/16 109/3
**aware** [10] 14/2 26/23 27/3 27/17 32/16 36/6 41/1 64/7 79/7 81/19
**away** [3] 11/7 115/25 116/2

## B

**baby** [1] 105/24
**baby-sat** [1] 105/24
**bachelor** [2] 63/4 63/10
**back** [38] 8/11 11/10 11/18 12/17 20/4 21/19 21/20 21/23 22/1 22/7 22/13 23/12 23/13 23/24 24/12 24/20 27/12 28/24 30/9 30/20 30/25 36/21 47/12 55/24 77/10 79/10 79/25 84/17 85/24 98/6 100/25 102/8 102/16 105/22 107/1 108/20 110/19 110/24
**backed** [1] 115/5
**background** [2] 26/16 63/1
**backup** [26] 106/19 109/13 115/6 115/6 115/9 115/11 115/12 115/12 115/13 115/18 115/21 116/1 116/8 116/12 116/15 116/18 117/3 117/5 117/13 118/8 118/15 124/20 125/3 125/7 125/8
**backups** [1] 116/12
**bad** [1] 118/22
**bag** [1] 39/13
**bank** [2] 52/23 52/24
**bankruptcy** [6] 88/7 88/16 90/12 90/16 91/1 91/2
**Barela** [11] 26/20 44/9 44/12 44/14 57/24 82/10 82/12 82/23 82/23 83/2 83/5 87/19
**based** [8] 8/12 22/23 74/17 87/17 114/7
**basically** [10] 20/13 71/23 87/10 90/18 103/17 103/22 104/15 107/10 109/7 112/16
**basis** [5] 5/13 7/20 13/18 126/9 126/11

**B**

**be [117]** 5/11 5/12 5/17 5/19 6/6 7/13 7/14 7/16 8/10 9/2 9/13 9/19 9/20 10/2 10/17 10/19 11/20 11/23 14/6 15/6 16/1 17/7 17/11 17/11 17/15 17/20 18/14 18/16 18/19 18/23 18/25 19/8 19/14 20/15 20/21 21/7 21/18 21/22 22/10 23/1 23/7 23/9 24/5 24/9 24/10 24/11 24/13 26/5 27/5 28/10 28/12 30/4 30/12 31/9 31/15 31/17 32/5 32/18 34/16 36/24 38/9 38/25 39/23 40/1 40/3 40/4 41/20 41/21 46/18 52/7 55/17 57/7 58/21 60/4 60/14 60/17 60/23 62/14 63/20 64/3 64/8 66/22 66/25 68/11 74/23 75/22 78/17 78/21 79/14 82/7 83/23 83/25 84/10 85/1 85/14 85/15 91/25 97/20 98/8 106/17 107/6 111/5 111/17 112/3 114/8 118/21 119/13 120/5 122/4 122/10 125/2 125/19 126/17 127/3 127/8 127/14
**Beach [2]** 30/20 63/6
**because [52]** 8/5 9/11 12/17 14/4 15/14 17/3 26/16 28/4 28/14 28/14 32/12 36/7 37/15 37/20 54/16 54/22 58/1 59/8 59/25 68/13 74/11 74/12 78/7 82/4 84/3 84/9 89/24 90/14 91/1 95/25 98/5 100/10 100/17 101/3 103/23 104/3 104/9 105/22 107/16 108/24 110/9 111/5 114/22 115/1 117/8 118/22 118/24 121/3 121/9 123/2 123/23 125/16
**been [40]** 5/9 8/16 12/13 15/10 17/3 23/21 26/22 27/24 28/22 28/23 29/21 32/2 36/11 45/12 54/25 61/14 61/20 62/9 65/6 65/14 67/9 75/21 86/23 90/5 92/20 93/5 97/5 98/22 98/23 98/24 108/13 115/5 116/2 116/10 117/19 117/22 125/7 126/4 126/10 127/11
**before [21]** 9/2 13/16 19/2 26/3 34/15 34/17 35/6 46/15 62/1 71/21 71/24 72/4 72/5 72/8 73/22 73/24 73/25 82/15 82/18 89/21 101/4
**began [1]** 102/2
**begin [1]** 102/17
**beginning [4]** 43/8 43/10 43/11 43/11
**behalf [2]** 4/6 32/25
**behind [8]** 53/17 53/19 54/17 54/23 54/25 55/6 59/5 97/16
**being [8]** 22/24 41/8 41/13 46/16 57/3 67/13 67/24 69/16
**believe [25]** 6/5 16/24 17/14 17/20 18/23 18/24 42/24 72/2 72/22 74/8 77/8 78/12 93/11 94/6 94/24 96/24 97/15 98/22 99/13 105/15 115/13 116/19 117/16 122/1 127/16
**believing [1]** 54/11
**belong [1]** 11/16
**belongs [1]** 118/2
**below [1]** 7/1
**bench [1]** 27/18
**benefit [3]** 4/21 103/18 103/23
**best [10]** 39/11 40/2 42/8 47/9 62/12 65/19 68/14 70/17 102/13 114/4
**better [2]** 28/16 38/17
**between [2]** 19/21 57/24
**beyond [5]** 15/7 16/15 45/10 63/9 127/12
**bias [2]** 45/16 45/18
**big [1]** 39/16
**bit [3]** 24/17 104/12 126/2
**blessed [1]** 46/18
**Bond [1]** 15/12
**bookkeeping [1]** 42/9
**booter [1]** 104/15
**booting [2]** 104/18 104/19
**borrowing [1]** 15/20
**both [12]** 4/21 9/25 21/9 46/23 49/15 53/6 58/12 66/11 66/17 98/13 107/22 110/17
**box [2]** 116/20 116/23
**boxes [1]** 116/23
**brackets [1]** 97/10
**BRANDON [1]** 2/4
**break [12]** 18/8 18/11 20/18 30/12 74/1 84/21 86/14 87/1 89/10 95/13 103/10 124/1
**Bredahl [1]** 26/12
**BRETT [6]** 2/4 4/5 26/13 32/24 68/9 80/19
**Bridge [1]** 15/12
**brief [8]** 9/19 14/24 15/23 17/3 19/18 20/12
20/23 28/22
**briefing [3]** 26/24 28/22 44/2
**briefly [8]** 11/9 30/17 32/7 71/11 72/25 125/19 125/23 126/3
**briefs [1]** 20/11
**bring [8]** 21/23 22/1 22/6 22/13 29/15 30/25 32/7 118/3
**brings [1]** 25/15
**brought [3]** 49/15 80/10 102/1
**build [1]** 115/9
**building [7]** 2/10 80/1 98/19 99/22 99/24 99/25 100/4
**bunch [3]** 96/9 119/20 120/8
**burden [9]** 9/3 17/14 68/25 69/12 69/24 125/17
**burdens [1]** 46/11
**burdensome [1]** 17/21
**burdensomto [1]** 18/13

**C**

**CA [4]** 1/20 2/8 2/11 2/16
**cabinet [9]** 111/22 111/24 112/2 112/7 112/14 112/19 113/6 116/4 116/5
**cable [2]** 103/2 103/4
**cables [1]** 97/4
**cage [2]** 96/18 96/22
**Cal [1]** 63/6
**calculate [2]** 107/10 107/11
**CALIFORNIA [4]** 1/5 1/16 4/1 27/4
**call [28]** 30/20 31/14 31/16 31/21 32/11 33/23 49/12 60/19 60/24 75/11 75/14 75/16 76/8 76/11 76/13 76/18 76/25 77/4 77/19 83/3 84/12 87/7 99/18 102/11 102/12 104/15 124/16 125/10
**called [11]** 24/20 27/4 27/12 29/24 34/14 70/20 99/16 102/10 103/6 110/1 118/14
**calling [1]** 97/13
**calls [11]** 37/16 38/11 43/4 44/1 50/19 54/8 60/21 69/3 71/17 73/15 75/2
**came [7]** 11/16 36/21 51/3 51/9 51/15 57/7 94/2
**can [55]** 5/23 6/6 9/2 9/19 9/20 10/19 10/22 12/25 17/25 18/3 19/1 19/13 20/17 24/1 28/24 29/23 30/8 30/12 30/18 39/3 39/10 39/14 39/15 44/16 45/24 46/9 46/17 46/19 47/7 47/8 55/24 57/7 65/3 75/25 84/9 85/17 85/17 94/14 95/14 100/21 102/8 103/15 103/19 103/20 108/11 109/5 109/10 109/12 109/13 109/14 119/24 120/12 120/12 122/13 122/18
**can't [21]** 25/23 39/7 43/18 53/20 53/20 54/19 57/6 65/2 94/21 94/25 95/25 97/25 98/6 114/6 114/9 115/14 115/15 118/24 119/2 119/17 120/11
**cannot [8]** 5/19 6/8 7/10 7/20 8/1 9/13 13/18 26/7
**capacity [1]** 109/8
**car [1]** 98/7
**card [3]** 46/6 46/24 48/10
**cards [12]** 14/18 44/23 45/3 47/14 47/17 48/22 48/25 49/2 58/4 58/6 58/9 58/20
**care [1]** 47/4
**carefully [1]** 98/8
**caretaker [1]** 29/10
**carried [1]** 97/12
**cars [1]** 97/7
**Carter [10]** 17/2 17/5 17/14 18/14 31/14 32/1 85/3 125/24 126/6 126/8
**Carter's [5]** 18/22 125/17 126/5 126/22 127/12
**case [87]** 5/3 5/5 5/6 6/7 6/7 6/17 7/9 7/13 8/6 8/14 8/15 8/21 9/2 9/12 13/11 13/13 14/11 14/13 14/13 14/13 14/17 15/15 22/9 22/9 24/21 26/21 27/17 34/1 34/18 35/20 36/6 42/20 43/8 43/10 49/11 52/5 61/21 62/1 63/12 63/20 64/2 64/11 65/9 65/16 66/19 66/22 67/6 67/18 69/9 69/10 70/22 72/20 73/20 78/9 78/18 83/11 84/6 84/24 87/14 87/18 87/20 87/24 88/14 88/25 89/5 89/7 89/11 89/13 90/9 92/15 92/22 93/6 94/3 99/2 104/23
**cases [6]** 8/19 8/20 14/19 41/20 70/8 70/9
**catch [1]** 36/10
**categories [1]** 119/25
**caused [1]** 11/20
**causing [1]** 12/1
**caution [1]** 22/24
**ceased [1]** 48/14
**Cefali [2]** 4/11 33/4
**cell [2]** 34/14 36/1
**center [16]** 94/11 94/12 94/13 94/14 95/2 95/7 95/14 95/20 95/22 96/7 96/15 96/22 97/17 99/11 115/3 115/14
**centers [1]** 8/24
**CENTRAL [1]** 1/5
**certain [4]** 25/15 41/7 100/21 110/4
**certainly [2]** 14/22 19/13
**CERTIFICATE [1]** 129/4
**CERTIFIED [1]** 1/9
**certify [1]** 129/6
**cetera [3]** 22/13 27/15 118/23
**chain [9]** 98/21 99/5 99/6 99/16 101/16 101/18 101/19 117/12 117/14
**challenges [1]** 106/7
**change [3]** 31/23 32/13 119/2
**changed [5]** 46/11 46/22 48/16 89/12 90/3
**changing [1]** 46/16
**charge [2]** 8/11 8/16
**charged [9]** 5/17 6/11 6/18 6/20 6/25 6/25 7/6 7/7 87/13
**chart [1]** 126/21
**charts [1]** 126/23
**cheat [1]** 48/2
**check [4]** 40/9 52/19 105/23 108/11
**checks [1]** 40/9
**chief [2]** 2/5 24/21
**choice [2]** 51/10 51/16
**choosing [1]** 51/15
**Christmas [1]** 37/2
**Christopher [1]** 26/12
**CID [4]** 98/17 98/18 99/22 111/24
**circuit [1]** 25/23
**Circuit's [1]** 5/18
**citations [1]** 126/24
**cite [2]** 14/11 14/19
**cited [2]** 10/1 11/22
**cites [1]** 8/19
**civil [3]** 28/16 61/15 61/18
**CJA [1]** 29/20
**claim [9]** 7/3 7/6 7/11 10/7 10/22 12/8 12/11 13/22 108/11
**claiming [2]** 10/3 23/5
**clear [9]** 5/18 5/22 7/13 19/14 55/13 89/19 126/4 126/7 127/17
**Clearly [1]** 22/7
**Clemente [1]** 2/16
**client [19]** 11/7 11/8 12/3 12/6 12/14 12/14 12/19 38/2 38/6 38/21 38/22 38/25 48/2 51/16 51/16 67/16 75/18 77/12 90/23
**client's [3]** 38/10 39/20 40/1
**clients [9]** 9/8 10/8 10/15 11/1 11/6 42/13 49/20 50/3 51/23 52/20 56/22 69/13 69/20 90/17
**climate [1]** 94/14
**closed [7]** 53/17 53/19 54/17 54/23 55/1 55/6 59/5
**closing [1]** 22/8
**CM [1]** 17/4
**CM/ECF [1]** 17/4
**co [6]** 61/22 61/23 67/6 67/9 67/24 87/23
**co-lead [6]** 61/22 61/23 67/6 67/9 67/24 87/23
**code [3]** 108/3 108/4 129/7
**Coffee [2]** 7/5 7/19
**colleague [1]** 61/12
**collective [1]** 46/3
**college [1]** 63/10
**combination [1]** 30/23
**come [13]** 10/19 16/24 18/24 21/19 21/20

**C**

**come... [8]** 23/12 24/4 27/13 34/20 34/24 105/22 107/1 126/18
**comes [2]** 10/21 101/14
**comfortable [3]** 53/18 53/20 59/24
**coming [5]** 10/19 12/5 19/11 28/6 86/3
**commenced [4]** 10/12 10/15 16/10 16/24
**comment [1]** 86/3
**commitment [1]** 32/13
**committed [1]** 15/8
**commonly [1]** 120/19
**communicate [6]** 42/13 42/22 42/25 44/14 58/12 121/7
**communicated [11]** 16/3 34/15 34/17 64/16 64/20 64/22 65/9 65/12 65/15 66/17 73/20
**communicating [1]** 43/2
**communication [2]** 16/1 44/6
**communications [5]** 7/1 43/19 64/25 71/2 71/9
**companies [3]** 15/20 94/15 96/10
**Company [1]** 15/12
**compel [2]** 17/11 18/24 125/17
**compelled [1]** 18/17
**compelling [1]** 19/17
**compile [1]** 20/17
**complete [1]** 112/17
**completed [4]** 7/14 7/16 110/13 110/13
**completely [1]** 58/21
**complies [3]** 40/15 59/22 77/18
**compressed [1]** 118/25
**computer [22]** 40/4 70/19 93/12 95/12 98/14 98/16 99/4 99/20 100/6 103/17 103/18 103/19 103/20 104/10 104/14 104/16 104/21 106/12 106/17 119/24 119/25 122/24
**computers [5]** 24/9 95/25 103/19 103/23 103/25
**concerning [1]** 13/11
**concerns [2]** 37/10 54/2
**concluded [1]** 125/15
**conclusion [2]** 48/16 69/4
**conclusive [1]** 15/11
**condition [1]** 100/14
**conduct [6]** 8/1 8/11 8/17 25/4 54/3 90/18
**conference [7]** 18/20 76/25 85/4 89/18 91/20 125/10 129/11
**confidence [1]** 126/16
**configuration [2]** 110/2 110/5
**confirm [1]** 45/5
**conformance [1]** 129/10
**confused [1]** 86/23
**confusion [1]** 33/17
**Conjecture [1]** 50/19
**connect [3]** 103/2 103/3 103/6
**connected [1]** 95/24
**connection [36]** 13/14 18/7 18/25 26/19 34/1 34/18 43/13 44/11 61/20 65/9 66/19 67/13 68/25 69/9 70/22 75/1 78/9 82/21 83/10 83/11 83/18 83/20 84/12 88/25 89/4 89/7 92/22 93/6 94/3 99/4 106/20 115/17 121/24 122/5 124/20 124/23
**consequence [1]** 16/19
**consider [2]** 25/16 26/1
**constitute [4]** 6/8 7/10 7/20 8/1
**contact [2]** 24/17 31/2
**contacted [10]** 27/2 27/12 32/12 34/2 34/8 34/9 34/12 34/23 35/2 88/24
**contacting [1]** 78/17
**contain [2]** 106/23 125/3
**contained [2]** 100/18 108/20
**contains [1]** 13/21
**contemporaneously [1]** 79/7
**content [1]** 73/18
**context [1]** 76/12
**continuation [1]** 31/12
**continue [1]** 29/1
**continued [3]** 3/11 33/11 36/24
**contracts [4]** 38/21 38/25 51/23 51/24
**contradict [1]** 84/10
**contrary [1]** 14/12

**control [1]** 100/21
**controlled [1]** 100/4
**convenience [1]** 28/10
**convenient [1]** 28/25
**conversation [2]** 27/9 28/2
**conversations [1]** 86/18
**convey [1]** 46/20
**convicted [3]** 5/19 9/2 9/13
**conviction [2]** 7/21 8/1
**cooperative [1]** 27/9
**coordinate [2]** 79/6 127/22
**copies [5]** 26/12 40/3 109/13 111/14 111/16 112/6 112/11 112/16 112/22 113/3 113/5 113/11 113/24 125/7 125/8
**copy [44]** 44/19 76/4 103/8 106/11 106/14 106/17 106/17 106/18 106/19 107/13 108/10 108/11 108/12 111/11 111/14 111/16 111/17 111/17 111/20 112/25 113/1 113/2 113/3 113/6 113/9 113/11 113/14 113/14 113/19 114/1 114/4 114/11 118/17 118/20 118/20 118/22 119/7 119/16 121/1 122/2 122/5 123/18 123/22 124/19
**correct [86]** 10/14 11/25 34/7 37/1 37/4 40/23 41/6 41/9 41/11 41/24 43/12 44/9 48/12 48/13 49/13 50/13 50/16 50/21 51/10 52/7 53/9 53/12 53/23 55/4 55/7 55/16 56/9 57/8 57/19 57/25 58/2 60/12 61/12 61/13 61/23 61/24 62/8 62/25 64/8 64/9 64/24 65/1 65/18 65/24 66/6 66/10 66/15 66/20 68/16 68/23 69/11 69/21 70/1 73/2 74/13 74/14 76/15 76/16 81/21 81/23 82/20 83/19 83/24 84/2 84/16 87/1 87/2 87/5 87/6 87/8 87/9 87/11 87/12 87/14 87/15 87/25 88/3 88/8 88/12 88/17 92/24 93/13 93/19 96/7 110/5 129/8
**correctly [1]** 78/19
**costs [1]** 29/16
**could [25]** 4/25 6/12 11/23 15/6 16/17 16/21 17/22 21/21 22/17 24/13 26/4 29/19 32/14 39/17 40/14 46/10 46/20 52/10 57/10 69/19 84/11 86/4 93/21 102/23 105/10
**couldn't [2]** 32/13 89/23
**counsel [8]** 2/1 2/15 4/7 26/4 26/7 29/18 29/20 33/1
**count [7]** 5/13 5/13 7/21 12/12 12/12 12/12 124/23
**counter [1]** 30/4
**counts [19]** 4/16 4/17 5/10 6/19 6/20 6/25 7/24 8/1 10/13 11/9 11/18 13/15 13/16 14/21 14/22 15/4 15/9 15/18 15/23
**couple [5]** 34/25 40/9 50/24 72/1 126/3
**course [7]** 67/3 67/12 111/21
**court [21]** 1/4 4/21 9/15 13/10 14/14 15/15 15/17 17/4 25/15 25/15 26/1 26/3 26/9 26/16 26/25 35/13 86/6 125/12 126/7 127/18 129/16
**Court's [4]** 19/8 19/9 24/20 26/11
**courtesy [1]** 27/5
**Courthouse [2]** 1/19 2/7
**cover [1]** 29/15
**covers [1]** 12/21
**CPA [2]** 26/17 63/7
**create [5]** 17/13 107/24 109/13 113/12 113/24
**created [6]** 109/1 110/10 111/21 113/13 113/15 113/19
**creates [2]** 107/5 107/9
**credit [1]** 14/18
**crime [4]** 5/14 5/17 7/14 7/16
**crimes [1]** 15/8
**criminal [10]** 2/5 28/17 61/11 61/16 61/17 68/25 92/17 98/11 98/13 99/4
**critical [3]** 26/21 28/18 100/18
**cross [3]** 3/4 3/9 30/1 48/6 86/21 88/10 90/19 127/1
**cross-exam [1]** 127/1
**cross-examination [5]** 30/1 48/6 86/21 88/10 90/19
**crude [1]** 109/19
**Cummings [1]** 4/11 33/4
**Cummings-Cefali [1]** 33/4

**cumulative [4]** 18/23 18/25 127/3 127/8
**cushion [1]** 20/16
**custody [9]** 98/21 99/5 99/6 99/17 101/16 101/18 101/19 117/12 117/14

**D**

**D.C [5]** 113/20 113/22 114/3 114/12 114/16
**Dallas [2]** 29/4 29/13
**dark [1]** 127/21
**data [43]** 19/16 19/25 20/2 23/18 23/22 24/6 25/9 26/18 74/10 77/20 77/25 94/9 94/11 94/12 94/13 94/17 95/1 95/7 95/15 95/20 95/22 96/6 96/15 96/22 97/17 99/11 109/16 114/22 115/3 115/14 116/16 118/13 120/4 121/5 121/14 121/22 122/5 122/11 122/12 122/18 123/2 123/3 123/4
**database [1]** 121/17
**date [11]** 43/7 50/14 73/19 75/16 95/3 101/13 106/25 107/4 107/6 113/18 129/13
**daughter [1]** 27/7
**day [20]** 1/12 23/13 31/19 36/19 36/20 36/20 36/21 55/14 56/15 56/15 65/17 74/2 74/4 87/8 106/2 107/1 107/2 107/7 107/3 112/16
**days [4]** 12/2 26/5 28/13 65/16
**deadline [1]** 20/19
**deal [3]** 21/18 78/8 90/6
**dealing [1]** 20/5
**deals [1]** 11/2
**dealt [4]** 40/7 40/11 40/17 40/25
**DEAN [5]** 2/15 2/15 4/10 26/12 33/4
**Dear [4]** 46/10 46/15 46/20 47/6
**debtor [1]** 90/19
**December [1]** 37/2
**December 2017 [1]** 37/2
**decide [2]** 12/20 31/8
**decided [2]** 85/22 85/23
**decision [2]** 55/14 55/15
**decisions [6]** 51/9 55/2 55/9 56/12 56/15 56/18
**declaration [1]** 82/24
**defendant [36]** 1/12 2/13 8/18 15/22 20/1 24/15 48/10 48/22 48/25 49/5 49/11 49/15 50/2 50/11 50/23 51/4 51/22 52/9 52/17 53/1 53/3 53/6 53/13 53/16 59/2 59/7 59/18 59/24 69/9 87/3 87/13 87/16 87/16 88/5 88/6 88/14
**defendant's [4]** 4/13 51/10 51/16 60/8
**defense [7]** 3/9 3/13 26/21 33/10 60/21 61/1 92/4
**deferred [1]** 68/13
**definitely [1]** 35/16
**defraud [11]** 5/8 5/10 9/1 9/5 11/13 11/17 12/11 12/18 12/23 15/22 16/2
**deleted [1]** 120/1
**delivered [3]** 117/1 117/3 117/17
**demand [1]** 124/19
**demonstrative [1]** 6/13
**Denied [1]** 67/20
**deny [2]** 15/3 17/1
**Department [3]** 113/22 114/3 114/11
**depending [4]** 32/2 109/12 122/8 123/2
**depths [1]** 46/22
**described [1]** 71/23
**designated [1]** 97/20
**designee [1]** 23/16
**despite [1]** 5/4
**destroy [2]** 47/23 53/2
**detailed [1]** 7/23
**details [2]** 57/6 101/21
**determine [4]** 64/2 67/14 67/25 115/4
**determined [1]** 32/5
**device [8]** 101/19 101/22 101/22 102/5 102/6 102/9 102/12 108/5
**devices [3]** 76/25 104/4 121/2
**did [156]**
**didn't [38]** 27/13 30/2 41/10 41/13 43/24 47/1 47/12 49/9 53/17 53/20 53/22 54/5 54/23 54/24 54/25 55/13 56/3 59/4 59/7 59/24 69/13 70/12 72/9 72/14 72/16 72/20 73/8 75/7 76/12 77/5 77/14 77/21 78/1 84/14 85/15 89/13

**D**

**didn't...** [2] 102/2 121/2
**difference** [1] 15/25
**different** [15] 20/1 24/23 67/22 94/15 103/1
103/18 103/21 103/22 103/24 104/4 104/11
107/17 114/9 119/25 120/2
**digital** [2] 101/19 102/12
**Dillanos** [2] 7/5 7/18
**direct** [8] 3/4 3/9 33/11 61/6 88/23 89/8 92/11
93/25
**direction** [3] 47/1 51/1 60/8
**directions** [1] 51/4
**directly** [3] 14/11 25/14 106/15
**disagree** [1] 90/10
**disbursing** [1] 10/22
**discuss** [4] 21/18 72/23 84/23 124/4
**discussion** [1] 82/2
**discussions** [1] 81/24
**dispute** [6] 8/17 8/22 8/24 77/7 77/9 77/11
**distribution** [1] 12/8
**DISTRICT** [1] 1/4 1/5 15/15 15/17
**division** [6] 1/6 2/5 92/18 98/11 98/13 98/17
**do** [143]

**Docket** [2] 17/5 19/6
**docketed** [2] 17/3 17/7
**document** [17] 14/7 17/12 17/14 39/6 39/21
39/22 39/24 40/3 44/18 47/23 47/25 53/2 65/5
76/2 98/21 99/16 120/15
**documentation** [1] 117/14
**documents** [18] 17/20 17/21 18/17 18/24
27/25 65/7 65/8 87/7 87/11 88/5 88/6 90/11
90/25 120/8 120/11 122/13 122/15 125/16
**does** [11] 14/14 14/15 14/19 15/25 39/24
40/16 47/11 65/11 76/7 114/3 120/2
**doesn't** [13] 6/1 10/24 11/4 11/16 12/17
12/20 14/8 16/7 23/1 25/14 25/20 29/14 125/1
**doing** [13] 30/12 38/23 51/23 52/9 53/16
53/19 65/25 91/11 97/3 121/4 121/24 122/7
124/19
**DOJ** [8] 113/4 113/13 113/14 113/14 113/15
113/19 114/9 121/3
**don't** [102] 6/5 13/2 17/20 18/1 18/13 18/19
24/13 24/14 25/4 25/18 26/1 27/24 28/19 29/8
32/17 35/15 36/3 36/20 36/21 38/23 39/7 39/9
39/22 40/13 41/3 41/3 41/20 42/4 42/24 43/17
44/8 44/15 45/21 47/4 48/18 48/21 49/1 50/14
53/5 57/22 57/23 58/7 58/7 58/10 59/12 59/15
59/17 60/8 62/2 63/11 70/3 70/5 70/6 70/17
70/21 71/1 71/15 71/25 72/6 72/7 74/8 75/14
75/20 75/24 77/11 77/23 78/4 79/16 79/20
80/11 81/16 82/1 82/4 82/5 82/17 83/1 83/4
83/9 84/19 85/19 86/2 97/4 98/25 99/13 109/3
110/24 110/25 113/17 114/6 116/19 116/20
116/22 116/23 117/19 117/23 118/2 118/21
123/6 123/10 123/10 123/17 124/21
**done** [20] 9/7 21/3 24/14 29/21 30/19 46/17
47/8 78/18 91/8 98/22 98/23 98/24 99/1 102/9
110/22 111/10 117/20 121/3 123/18 126/14
**door** [3] 89/21 89/24 90/5 91/16 105/22
107/20
**doors** [3] 15/12 53/19 54/17 54/23 55/1 55/6
59/5
**doubt** [2] 15/7 16/15
**down** [24] 7/7 11/14 14/9 14/15 30/3 55/10
95/10 95/11 95/13 95/25 96/1 96/3 96/4 96/5
96/25 97/7 100/6 103/8 103/10 104/12 105/20
123/23 124/10 126/7
**download** [1] 104/22
**downtown** [6] 93/10 112/10 112/10 112/12
116/3 116/3
**draw** [2] 7/24 11/11
**drawers** [1] 39/2
**drawn** [5] 15/6 109/19 109/22
**drive** [21] 98/4 104/16 104/17 104/20 104/20
104/21 104/25 105/1 105/3 105/7 107/10
109/9 109/11 109/14 109/14 109/15 110/8
110/10 114/15 114/17 114/18
**drives** [12] 104/22 104/24 105/7 105/11
106/19 108/20 109/1 109/7 109/10 109/22

110/1 110/11
**drove** [9] 97/25 98/7
**Drum** [18] 18/6 18/7 18/9 18/10 19/1 19/25
21/15 22/9 22/10 22/15 23/4 32/2 32/3 126/15
127/2 127/7 127/10 127/14
**Drum's** [1] 126/11
**due** [9] 5/20 6/12 6/21 27/17 30/13 67/14
67/15 67/25 68/12
**duplicate** [1] 106/18
**during** [25] 5/5 18/8 26/18 47/14 47/17 62/9
62/13 64/16 67/12 68/10 69/8 72/25 73/1
76/13 77/4 82/23 83/2 83/5 86/14 87/1 106/1
106/3 106/8 114/8 126/11
**duties** [1] 41/4

**E**

**e-mail** [6] 18/10 26/11 42/14 44/5 74/6 74/7
**e-mailed** [1] 17/4
**e-mails** [6] 17/22 17/23 18/4 18/10 18/12 28/8
**EA** [7] 6/14 7/2 7/8 7/12 7/17 76/10 99/19
**EA-related** [1] 7/8
**each** [28] 9/8 9/9 12/22 14/20 15/7 16/24
65/17 65/22 96/12 101/2 101/5 101/6 101/19
102/3 102/14 102/24 106/14 106/21 107/14
108/16 108/17 108/18 109/19 110/7 111/10
111/11 118/3 119/24
**Eagan** [16] 6/14 42/10 48/11 50/13 67/15
68/19 75/18 78/6 88/7 88/15 93/22 94/2 94/18
95/15 96/14 97/19 97/20 112/6
**earlier** [6] 6/20 12/2 32/13 74/16 93/11 104/6
**earliest** [1] 32/13
**early** [2] 92/15 93/5
**earned** [3] 14/11 14/11 11/5
**easily** [3] 16/17 16/21 25/2
**easy** [1] 18/11
**ECF** [1] 17/4
**edification** [1] 85/13
**education** [1] 63/3
**effectuate** [1] 28/1
**effort** [1] 27/20
**efforts** [2] 27/15 74/9
**either** [11] 6/20 8/22 12/12 13/5 99/21 109/8
124/21
**else** [11] 30/16 46/25 55/2 68/6 68/10 72/23
78/2 81/3 96/16 100/7 106/3
**employed** [4] 29/9 29/11 29/12 61/10
**enables** [1] 108/9 118/22
**encountered** [1] 106/8
**encrypted** [1] 114/13
**end** [7] 6/1 12/16 12/17 23/12 60/7 91/17
91/20
**ended** [3] 106/24 107/3 107/7
**energy** [3] 53/14 53/15 54/24
**enforce** [1] 25/16
**enforced** [1] 17/11
**enough** [2] 18/23 39/16
**ensure** [1] 100/13
**entered** [1] 41/19
**entire** [2] 111/2 112/19
**entirely** [1] 5/23
**entirety** [1] 20/6
**entitled** [17] 7/3 8/6 8/7 8/9 8/18 10/4 10/6
10/7 10/25 11/7 12/10 12/13 12/20 14/21 90/7
125/5 129/9
**entitlement** [1] 9/6
**entries** [1] 106/23
**environment** [1] 119/5
**EOA** [4] 47/9 47/10 48/11 48/11
**equation** [1] 13/2
**equipment** [2] 100/11 106/12
**error** [2] 9/11 106/7
**errors** [2] 107/8 107/8
**especially** [2] 28/4 126/5
**establish** [1] 90/8
**established** [2] 36/23 43/23
**estimate** [3] 61/25 62/4 62/12
**ESXi** [2] 103/5 103/6
**et** [3] 22/12 27/15 118/23
**Evan** [3] 31/14 83/3 85/3

**even** [7] 11/6 13/3 18/1 24/12 36/18 41/3 59/7
**event** [5] 44/16 69/6 88/17 126/2
**ever** [38] 34/15 34/17 35/5 42/24 42/25 46/17
46/20 47/10 47/12 47/20 47/23 47/25 48/2
53/1 53/4 63/7 63/12 64/11 71/2 72/12 72/12
72/15 72/23 74/9 75/17 77/24 78/5 78/8 82/2
82/9 84/17 112/22 116/15 118/13 120/25
121/14 121/17 123/4
**every** [7] 11/1 30/21 55/13 55/14 55/15
105/20 112/6
**everything** [13] 51/3 55/10 55/14 74/21 95/11
95/24 96/4 96/4 103/3 108/24 123/24 125/1
125/12
**evidence** [38] 13/2 13/10 13/13 13/15 15/5
15/6 16/15 45/14 45/25 49/22 98/5 98/5 98/8
98/21 99/7 99/10 100/10 100/13 100/17
101/14 102/12 115/23 115/25 116/2 116/6
116/7 117/5 117/8 117/21 117/22 118/1 118/3
118/6 121/10 121/11 126/9 127/4 127/8
**evidently** [1] 18/9
**exact** [11] 36/20 43/7 48/18 50/14 95/3
107/12 113/18 116/19 116/20 116/22 116/23
**exactly** [7] 27/24 90/21 111/1 117/19 123/6
123/10 123/17
**exam** [1] 63/7 90/19 127/1
**examination** [2] 30/1 33/11 48/6 53/25
58/25 61/6 86/21 88/10 88/21 88/24 90/19
92/11
**examine** [2] 118/23 119/7
**example** [1] 52/4
**Excel** [1] 120/20
**excuse** [1] 31/8
**excused** [4] 60/14 60/17 91/25 92/3
**excuses** [2] 59/8 59/25
**executing** [1] 16/3
**exhibit** [8] 3/14 20/14 20/17 20/20 26/11 46/3
46/5 75/21
**exhibits** [4] 3/7 3/13 126/11 126/13
**existing** [1] 48/14
**expect** [1] 127/22
**expense** [3] 27/21 29/17 29/25
**expenses** [6] 41/8 41/12 67/15 68/1 68/12
70/9 77/13 77/25
**expensive** [1] 100/11
**experience** [1] 114/7
**explain** [7] 29/23 30/4 102/23 103/15 108/3
109/5 122/18
**explained** [3] 27/16 28/3 28/6
**export** [3] 120/13 121/12 123/9
**exported** [2] 123/7 123/15
**expressed** [2] 37/9 58/19
**extensively** [1] 127/7
**extent** [3] 18/22 29/13 85/17
**extraction** [1] 120/8

**F**

**facilitating** [2] 78/20 78/23
**fact** [14] 11/22 15/9 28/5 54/5 55/8 58/21 77/9
79/7 89/4 89/13 90/8 90/13 108/9 117/22
**facts** [4] 23/23 25/5 25/9 25/15
**fails** [1] 109/14
**fair** [1] 118/23
**fairly** [3] 5/22 17/24 58/12
**fall** [1] 125/1
**false** [2] 10/5 58/21
**family** [4] 29/10 29/11 86/4 86/7
**far** [12] 8/15 14/9 14/15 53/21 57/20 72/21
94/9 101/18 110/15 121/22 123/11
**farm** [2] 94/9 94/17
**father** [2] 26/24 28/21
**February** [1] 35/3
**federal** [5] 2/10 5/3 5/16 35/5 99/24
**fee** [16] 15/11 38/2 38/6 38/21 38/25 39/19
50/23 50/25 51/15 51/22 52/6 52/11 57/2 57/4
57/11 57/14
**feel** [3] 53/17 53/20 59/24
**feelings** [1] 58/19
**fees** [7] 67/15 68/1 68/12
**felony** [1] 28/17

**F**

**felt** [1] 53/16
**few** [1] 4/24
**field** [1] 33/20
**file** [20] 20/25 22/20 26/4 29/18 29/20 30/13 38/10 38/15 38/22 39/20 40/1 83/15 101/9 118/25 118/25 119/23 119/24 120/1 120/16 120/19
**filed** [5] 17/4 17/6 20/2 20/21 20/23
**files** [17] 24/24 24/25 40/21 75/18 119/15 119/20 120/1 120/22 120/25 121/17 123/7 123/7 123/15 123/16 123/18 123/19 123/21
**filing** [6] 19/4 26/3 44/11 124/12 126/4 126/19
**filings** [4] 19/21 19/24 20/1 42/19
**fill** [13] 38/1 50/25 52/2 52/6 52/10 57/10 99/19 101/20 102/2 102/4 102/13 117/12 118/3
**filled** [5] 52/19 57/13 65/16 65/19 99/15
**filling** [3] 50/23 51/15 51/22
**final** [1] 15/22
**finalized** [1] 10/17
**finalizing** [1] 19/2
**finally** [2] 27/23 28/1
**finances** [2] 52/18 55/2 69/13
**financial** [16] 29/3 30/2 30/9 40/18 40/11 40/18 40/18 40/20 51/9 56/18 67/18 68/22 69/19 72/20 125/4 126/8
**financials** [1] 127/5
**find** [11] 9/3 15/14 15/7 16/10 16/14 16/15 16/22 18/22 25/5 25/8 25/9
**finding** [1] 85/17
**fine** [9] 19/17 19/19 20/9 20/10 22/18 46/9 85/21 86/8 124/13
**finish** [1] 124/12
**finite** [1] 17/25
**firm** [60] 5/20 6/12 6/21 7/3 8/22 9/11 26/17 30/3 36/4 36/19 37/10 37/15 37/20 37/25 38/20 40/4 40/7 40/11 40/22 41/2 42/1 42/3 42/6 42/12 42/25 45/4 45/8 47/10 47/15 47/20 48/14 49/17 49/20 50/3 51/10 52/18 52/23 52/24 53/8 53/10 53/13 53/14 54/24 55/9 55/10 55/15 56/8 56/10 56/13 57/13 57/24 58/13 67/25 68/12 77/13 90/17 94/23 125/4 127/6
**firm's** [1] 37/2
**first** [22] 5/2 6/3 6/19 6/23 13/15 13/16 17/19 21/7 30/24 35/2 45/13 49/12 61/3 70/19 70/24 87/7 89/23 92/6 96/9 96/23 106/2 122/18
**Fitzgerald** [4] 23/16 23/25 30/10 85/14
**Fitzgerald's** [1] 24/17
**five** [3] 26/18 42/3 67/16
**five-year** [1] 26/18
**focus** [5] 7/25 20/5 62/5 82/4 93/21
**focus was** [1] 82/4
**focused** [1] 19/24
**focusing** [2] 19/10 19/15
**folder** [1] 38/7
**follow** [1] 104/6
**following** [1] 90/11
**follows** [2] 8/13 20/23
**forced** [1] 27/19
**foregoing** [1] 129/7
**forensic** [25] 25/4 101/6 104/20 104/22 104/24 106/11 107/5 107/5 107/14 107/24 108/15 110/15 111/11 112/6 114/15 118/17 119/4 119/17 119/18 119/22 120/2 120/5 120/12 120/16 122/14
**forensically** [3] 101/5 105/10 105/14
**forever** [1] 46/10
**forged** [1] 13/23
**forge** [2] 47/20 53/2
**form** [12] 13/18 84/23 101/20 102/4 102/5 102/10 102/12 117/12 117/14 124/5 126/9 126/10
**format** [2] 119/1 129/10
**former** [2] 73/8 93/2
**forms** [5] 106/20 106/23 108/23 108/24 108/24
**forth** [1] 14/6

**forward** [1] 91/3
**forwarded** [1] 89/9
**found** [4] 5/9 8/14 8/15 121/20
**foundation** [6] 41/18 49/23 51/5 52/12 60/9 79/14
**foundational** [1] 67/5
**four** [7] 7/24 7/25 12/2 14/22 31/18 45/2 45/3 45/11 77/1 77/9 109/9 109/11 109/22 110/10
**four-terabyte** [1] 109/11
**fourth** [2] 2/11 47/3
**FOX** [1] 2/4
**frankly** [1] 26/2
**fraud** [11] 5/3 5/3 5/6 7/10 7/20 8/16 10/10 15/18 15/24 15/25 16/7
**Frauds** [1] 2/6
**fraudulent** [2] 5/23 16/1
**friend** [2] 26/24 27/5
**friendly** [1] 27/9
**front** [3] 12/16 27/25 91/5
**FTK** [1] 107/22
**full** [3] 10/23 29/7 29/9
**fullest** [2] 23/1 23/9
**fundamental** [5] 7/22 9/1 9/11 9/12 13/17
**fundamentally** [1] 9/5
**funds** [1] 15/24
**funny** [1] 13/25
**further** [13] 18/21 19/9 21/4 48/4 53/24 58/23 60/13 86/19 88/18 91/22 91/24 122/10 123/11
**furtherance** [24] 5/7 5/10 5/14 5/25 6/3 6/6 6/9 6/22 7/12 8/2 8/25 9/14 10/2 11/2 11/15 12/1 12/6 12/22 14/10 14/16 15/21 16/9 16/12 16/25

**G**

**gambling** [1] 7/19
**Gardner** [1] 87/19
**gave** [6] 22/15 36/1 36/20 45/3 51/4 101/17
**general** [6] 5/3 5/3 5/5 40/18 55/8 126/24
**generally** [9] 6/6 21/16 38/5 43/19 95/4 99/5 100/17 111/11 122/7
**gentleman** [4] 34/10 82/9 98/1 99/12
**gentlemen** [6] 33/7 77/1 77/9 84/22 95/1 124/3
**Geoffrey** [3] 10/10 52/5 87/18
**get** [30] 12/20 18/7 19/1 25/21 28/24 29/20 39/15 44/19 49/6 51/1 52/10 54/15 55/19 55/22 68/18 68/22 74/9 75/7 77/20 77/25 79/6 81/25 82/3 85/23 101/11 112/22 121/17 122/11 122/15
**gets** [1] 14/25
**getting** [4] 68/14 79/8 101/23 109/3
**give** [3] 18/18 62/4 120/1
**given** [5] 17/12 78/21 99/13 125/6 125/7
**giving** [1] 47/17
**glasses** [3] 39/7 39/13 39/15
**go** [20] 6/2 8/11 20/4 20/17 33/18 46/10 47/5 53/20 54/19 72/12 84/17 91/3 98/6 102/8 105/20 108/20 122/7 124/12 125/25
**goes** [2] 45/16 63/16
**going** [46] 4/14 10/19 11/10 14/6 15/3 20/25 21/4 21/23 22/8 22/10 26/10 27/14 28/25 29/15 31/15 31/17 36/11 39/9 44/19 47/2 54/16 54/23 54/25 55/20 55/21 75/6 75/7 78/18 85/4 89/16 90/6 91/12 94/1 98/5 101/3 101/11 108/3 110/17 119/1 124/12 124/19 125/15 125/17 127/20
**good** [24] 4/5 4/8 4/9 4/12 27/1 28/20 29/12 32/24 33/2 33/3 33/6 33/7 33/8 33/13 33/14 37/5 47/1 48/8 48/9 61/8 61/9 89/24 92/13 92/14
**google** [2] 72/12 72/13
**got** [19] 24/22 29/25 63/19 69/19 77/1 77/19 79/12 85/14 88/6 90/11 95/7 95/14 100/4 100/23 101/12 102/16 110/21 111/10 111/13 119/1 124/12 124/24 125/15 125/17 127/20
**government** [45] 4/23 5/4 5/7 6/10 6/17 7/9 7/10 7/23 8/1 9/14 9/22 13/9 13/17 15/4 17/23 25/2 34/3 34/17 34/21 34/24 35/1 35/7 35/19 35/22 37/8 37/9 37/14 38/9 39/23 40/10

**40/17 40/17 49/6 49/12 59/6 59/7 69/1 69/12 73/21 74/24 79/13 90/7 127/6**
**government's** [6] 7/14 8/8 20/13 21/5 21/12 22/16
**great** [2] 21/18 27/20
**Greg** [2] 82/9 82/12
**Gregory** [1] 87/19
**gross** [1] 55/17
**guess** [6] 47/1 70/18 74/2 78/17 78/18 85/21
**guidance** [1] 31/4
**guy** [1] 90/20
**guys** [1] 59/13
**guys'** [1] 47/10

**H**

**had** [77] 4/21 8/5 8/20 8/22 9/6 9/10 10/12 10/15 12/2 27/3 27/9 27/14 28/2 28/14 28/20 30/21 31/14 31/16 34/15 34/17 35/5 35/6 36/11 36/15 36/18 37/9 37/14 37/20 38/7 38/7 46/12 48/10 49/20 50/4 50/18 54/15 55/1 55/5 56/21 57/10 58/3 58/6 58/9 59/18 64/11 64/25 72/5 75/1 82/24 84/13 88/24 89/4 89/11 90/18 95/18 95/23 96/12 96/16 96/24 99/7 100/1 101/4 101/6 102/7 104/5 104/15 107/1 108/16 108/22 108/25 110/4 111/21 115/5 117/22 119/9 123/23 126/16
**half** [9] 62/6 62/10 62/13 67/12 67/23 68/11 68/24 69/8 87/23
**hallway** [1] 36/7
**handed** [6] 39/6 44/18 44/23 65/5 65/7 76/2
**handful** [1] 117/24
**handled** [3] 41/14 98/8 99/8
**hands** [2] 38/8 79/8
**handwritten** [2] 83/16 83/17
**HANNA** [1] 2/3
**happen** [4] 8/5 38/5 47/11 84/11
**happened** [10] 55/14 79/13 80/25 81/5 81/16 81/20 90/22 95/7 110/14 115/21
**happens** [1] 32/3
**happy** [7] 9/15 17/15 19/18 28/8 28/9 28/22 39/23
**hard** [21] 40/3 104/21 104/22 104/23 105/7 105/10 106/19 107/10 108/20 109/1 109/7 109/9 109/14 109/14 109/15 109/22 110/1 114/15 114/17 114/18 126/2
**Harris** [1] 15/16
**has** [47] 4/21 6/17 9/3 9/16 9/25 10/17 10/21 10/25 11/19 12/5 13/5 15/4 17/3 18/21 20/14 23/7 23/21 29/10 29/12 29/21 31/1 32/2 61/20 78/8 84/17 89/10 90/5 91/15 98/8 98/17 100/7 100/9 100/12 101/20 101/21 101/22 103/25 104/20 105/3 112/22 114/9 116/15 118/13 126/10 127/2 127/6 127/11
**hash** [9] 107/12 107/10 107/11 107/24 108/2 108/12 108/16 110/7 111/20
**hasn't** [3] 89/24 90/2 90/2
**haul** [1] 119/5
**have** [199]
**have not** [1] 91/10
**haven't** [8] 9/7 28/14 32/4 63/8 85/22 91/6 116/24 116/25
**having** [6] 29/18 30/24 59/23 103/18 103/24 126/1
**he** [112] 10/3 10/6 10/6 10/7 10/15 10/21 10/22 10/22 10/23 10/24 10/24 10/24 11/2 11/5 11/5 11/7 11/11 11/20 11/22 11/22 12/2 12/5 12/9 12/10 12/11 12/14 12/20 12/21 12/25 12/25 13/24 14/1 14/2 14/3 14/25 16/18 16/18 16/19 16/20 16/23 16/24 17/17 19/9 17/24 17/24 17/24 19/12 19/21 19/22 24/23 26/24 26/24 27/8 27/8 27/12 27/12 27/13 27/17 27/19 29/12 29/12 30/3 32/13 32/13 32/16 34/14 43/23 45/25 49/16 49/19 49/19 50/3 51/5 51/25 52/1 52/10 52/10 53/1 53/2 53/5 58/6 58/9 59/8 60/22 71/12 71/11 71/11 71/16 73/25 79/6 80/8 80/8 81/13 82/23 85/14 85/17 85/17 87/17 87/21 89/24 90/2 90/3 90/25 94/24 94/24 95/9 95/23 95/24 95/24 96/3 106/2 124/21 124/22 126/16 126/17 127/2

**H**

**he's [3]** 10/3 10/25 12/10
**heading [1]** 23/17
**Headnote [1]** 15/18
**hear [3]** 17/15 19/2 56/3
**heard [5]** 18/19 45/18 70/19 72/5 125/19
**hearing [2]** 72/7 126/2
**hearsay [9]** 37/17 38/11 43/5 44/2 54/8 71/18 73/15 73/15 75/3
**heart [3]** 46/12 46/22 47/7
**held [1]** 129/9
**help [1]** 38/1
**helped [2]** 52/4 95/9
**helping [1]** 50/12
**her [50]** 17/11 17/21 17/22 18/20 18/24 19/2 26/6 26/21 26/22 26/24 27/16 27/19 27/20 27/21 27/22 28/1 28/6 28/9 28/9 28/11 28/18 28/20 28/20 28/20 28/21 29/2 29/3 29/4 29/9 29/15 30/20 30/20 30/25 30/25 31/3 31/5 31/6 31/9 31/10 36/7 36/10 38/23 39/2 39/2 41/25 42/8 115/15 127/20 127/23
**here [30]** 7/7 7/15 20/16 23/16 24/5 24/11 25/13 26/4 26/5 28/12 28/18 28/21 29/2 29/9 29/15 29/18 31/15 31/17 32/14 32/15 60/22 60/24 62/1 72/7 84/21 85/15 94/9 109/20 118/18 124/2
**here's [2]** 22/1 90/6
**hereby [1]** 129/6
**Hernandez [2]** 4/11 33/5
**hey [1]** 77/24
**hide [1]** 83/7
**high [6]** 63/12 63/20 63/24 64/3 64/8 64/11
**high-profile [2]** 63/12 64/11
**highlight [1]** 4/24
**highlights [1]** 127/1
**highly [1]** 17/24
**Hillary [4]** 35/23 36/1 41/19 41/23
**him [23]** 11/16 16/6 22/11 24/3 24/5 24/20 24/21 27/1 27/2 27/4 27/10 27/15 27/16 28/8 32/16 43/20 82/18 83/7 83/9 85/16 85/16 89/6 89/22
**his [45]** 10/4 10/8 10/15 10/23 11/1 11/6 11/6 11/8 11/17 12/2 12/6 12/6 12/7 12/17 12/18 12/19 12/22 13/1 13/11 13/14 13/24 16/25 18/9 23/16 27/18 39/22 42/25 43/15 43/15 43/20 43/22 44/6 45/17 79/3 79/5 86/7 90/3 91/5 94/21 94/25 97/25 100/1 100/2 121/8 126/16
**holds [3]** 6/7 14/13 23/19
**home [2]** 115/18 115/22
**honestly [1]** 114/9
**Honor [109]** 4/5 4/9 4/19 5/2 6/5 6/24 7/22 7/24 8/4 8/13 9/5 9/8 9/19 9/20 9/21 9/25 10/14 11/19 12/23 13/5 13/9 14/11 14/20 17/18 18/5 18/16 19/12 19/20 19/22 20/22 21/7 21/9 21/25 22/19 24/18 24/19 25/8 25/18 26/5 26/8 26/15 26/23 27/11 28/7 29/3 29/23 30/11 30/15 30/21 31/1 31/7 32/9 32/24 33/3 37/16 39/3 39/22 41/16 44/16 44/20 45/15 45/17 46/1 46/3 48/16 49/23 52/13 53/24 56/23 58/14 59/9 60/1 60/10 60/13 60/18 62/20 63/14 63/22 64/12 65/3 67/19 69/3 71/17 73/11 74/18 75/2 75/5 75/25 76/4 79/14 81/14 82/6 84/20 86/9 88/1 88/19 90/13 90/22 90/10 91/15 91/15 91/24 92/1 124/11 124/18 125/20 127/16 127/24 127/25
**Honor's [1]** 85/13
**HONORABLE [1]** 1/8
**hook [1]** 104/5
**hoped [2]** 31/14 31/16
**hoping [2]** 20/16 20/17
**hour [1]** 85/18
**hours [5]** 61/25 62/12 62/15 62/17 62/19
**house [2]** 29/4 29/13
**how [50]** 11/14 12/21 14/8 14/14 18/5 18/11 24/13 24/21 30/4 32/17 34/8 34/12 34/23 41/10 42/4 45/1 46/11 46/20 46/21 50/15 52/17 57/6 61/14 61/25 70/6 70/6 70/24 74/6 75/18 80/4 80/21 82/12 90/6 90/13 92/20 97/3

97/14 99/7 100/25 102/23 105/13 110/21 116/18 121/20 122/7 123/14
**However [3]** 13/3 16/7 127/21
**hundred [3]** 25/7 62/15 126/16
**husband [2]** 29/5 29/9

**I**

**I'd [1]** 17/15
**I'll [5]** 10/9 11/18 20/4 24/3 63/17
**I'm [60]** 4/20 5/21 9/15 11/10 14/20 15/3 17/7 18/15 19/17 19/20 19/22 20/2 20/20 20/10 21/7 21/4 21/4 21/23 22/3 26/10 28/22 44/19 46/18 47/2 47/19 54/14 55/20 55/20 56/17 68/14 73/6 73/18 73/18 76/24 80/8 80/13 81/8 91/1 91/4 91/12 96/7 99/1 101/20 101/23 102/7 104/19 107/4 107/11 108/3 110/17 111/18 113/14 115/8 115/24 116/21 123/2 124/11 124/19 125/15 125/17 126/1
**I've [1]** 28/20
**I-N-D-E-X [1]** 3/2
**Ibrahim [1]** 83/6
**idea [3]** 25/3 55/5 75/1
**identical [1]** 106/11
**identification [1]** 46/5
**identified [1]** 14/22
**identify [1]** 119/24
**illustrate [2]** 6/13 18/5
**illustrative [1]** 15/15
**image [20]** 101/5 101/6 102/3 102/3 104/22 105/1 105/10 105/13 105/14 107/9 107/12 107/14 107/20 107/24 108/5 108/17 108/18 108/19 114/21 115/9
**imaged [8]** 69/16 80/14 80/21 80/23 81/5 81/19 101/2 102/24
**imager [2]** 107/22 107/22
**images [13]** 24/22 25/10 80/25 81/11 109/2 110/16 111/18 112/2 113/25 114/15 118/17 118/25 122/9
**imaging [17]** 25/4 93/22 100/8 101/20 102/7 102/17 103/1 104/10 106/5 106/8 106/10 106/16 106/24 107/11 110/13 111/10 115/1
**immediately [3]** 97/23 98/4 102/17
**immunizes [1]** 28/6
**impeach [2]** 91/5 91/7
**importance [1]** 28/6
**important [8]** 23/15 26/17 29/22 69/22 69/24 100/18 111/5 121/23 122/24
**inadmissible [1]** 31/1
**inappropriate [1]** 10/4
**incident [1]** 83/6
**included [4]** 14/9 65/22 118/8 118/11
**including [7]** 14/5 14/6 14/14 15/5 22/9 26/19 32/1
**inconvenience [3]** 28/4 28/19 30/25
**increases [1]** 109/8
**incur [1]** 29/16
**Indemnity [1]** 15/12
**indicate [1]** 23/20
**indicated [3]** 4/14 17/6 21/15
**indictment [1]** 35/20
**individual [1]** 99/9
**individually [2]** 101/2 101/7
**individuals [3]** 27/21 31/25 68/15
**induced [2]** 16/16 16/21
**infer [1]** 16/18
**inferences [3]** 13/1 13/3 15/5
**inform [1]** 82/23
**information [11]** 11/23 16/17 16/18 16/20 20/15 21/3 25/1 26/18 52/1 52/6 68/18 68/22 69/19 72/18 78/5 81/25 82/3 114/23 116/16 118/10 124/4
**informed [3]** 27/15 40/10 77/4
**informing [1]** 28/5
**initial [2]** 50/24 91/9
**initially [2]** 115/4 116/25
**input [2]** 26/17 29/25
**inputting [1]** 57/20
**inquiry [3]** 6/1 6/2 23/21

**instance [1]** 7/24
**instead [4]** 103/24 106/11 109/14 109/24
**instruction [2]** 5/18 22/12
**instructions [2]** 10/1 21/21
**intended [1]** 19/7
**intense [3]** 35/10 35/12 35/16
**Internal [2]** 61/11 92/17
**interview [4]** 82/21 82/23 83/2 83/5
**interviews [3]** 83/11 83/18 83/20
**intimidating [1]** 35/9 49/7
**investigating [2]** 69/2 87/24
**investigation [12]** 61/21 63/17 64/17 67/4 67/14 92/18 98/11 98/13 99/4 121/24 127/10 127/13
**Investigations [1]** 61/11
**investigative [8]** 69/18 78/3 80/17 80/18 93/12 98/15 98/16 100/7
**investigator [3]** 61/22 67/24 87/22
**invite [2]** 21/19 23/13
**inviting [2]** 21/4 21/19
**involved [9]** 12/10 18/2 41/21 52/18 57/3 63/19 67/17 102/21 106/1
**involvement [2]** 89/20 126/22
**involving [1]** 83/6
**IRS [9]** 66/2 79/19 84/4 98/11 98/13 98/17 98/18 99/22 111/24
**is [254]**
**isn't [4]** 10/16 10/19 51/4 54/3
**issue [20]** 18/15 19/10 21/7 22/10 23/15 28/14 28/22 29/19 30/21 31/1 32/3 32/5 68/4 68/11 68/11 69/25 73/14 127/2 127/3
**issues [9]** 18/8 21/16 22/8 22/12 42/9 84/24 102/7 106/5 124/5
**it [293]**
**it's [62]** 6/1 7/5 7/5 8/14 10/5 10/7 10/23 11/15 12/17 12/24 12/24 12/25 13/2 14/6 14/10 14/25 15/14 15/15 20/17 22/2 23/9 24/14 25/12 25/19 26/1 26/2 26/3 26/11 26/16 28/15 28/16 31/14 31/16 44/2 45/14 45/17 66/2 66/3 66/7 75/22 88/10 89/19 90/4 98/19 98/19 100/20 101/18 102/6 104/4 104/16 105/22 108/11 108/13 109/7 118/22 119/1 122/8 122/13 124/11 125/16 126/7 127/12
**Item [2]** 4/3 32/22
**its [4]** 23/1 101/5 101/9 104/14
**itself [5]** 12/4 13/6 16/1 103/20 105/1

**J**

**J-a-m-e-s [1]** 61/4
**JAMES [5]** 1/8 3/11 60/25 61/1 61/4
**Jenness [1]** 83/3
**Jersey [1]** 26/25
**job [7]** 29/13 42/8 47/1 74/12 74/15 74/15 121/12
**JOHN [9]** 1/11 2/14 4/4 32/23 94/5 94/21 99/21 102/22 117/4
**Johnson [19]** 10/10 13/11 13/14 13/16 13/20 16/11 26/20 42/16 42/20 42/22 42/24 43/11 52/5 52/6 57/2 57/4 57/24 87/18 90/16
**Johnson's [2]** 43/2 44/6
**judge [1]** 1/8 26/25
**judgment [3]** 5/12 9/13 14/21
**Judicial [1]** 129/11
**Judy [3]** 41/23 64/20 75/12
**Judy's [1]** 115/15
**Julian [1]** 80/20
**July [5]** 75/12 76/8 77/4 77/10 84/14
**July 25th [2]** 75/12 84/14
**July of [1]** 77/10
**jurisdiction [2]** 5/16 27/4
**jurisdictional [1]** 5/15
**jury [34]** 4/2 9/25 15/7 16/16 16/17 16/21 21/19 21/21 22/12 22/21 22/23 23/8 30/4 31/8 32/7 32/21 33/8 55/13 58/18 58/20 66/21 75/8 85/2 85/12 85/22 86/3 86/11 94/13 102/14 102/23 103/15 108/2 109/5 124/9
**just [80]** 5/15 9/23 10/5 13/10 14/8 17/25 18/3 17/26 24/19 26/23 31/2 31/3 32/1 32/9 39/11 41/10 43/15 43/20 46/7 46/9 47/13 48/10

## J

**just... [58]** 50/24 53/14 53/14 53/20 54/24
55/13 59/2 59/8 59/17 59/25 62/5 66/2 66/25
68/14 68/15 70/9 71/17 71/11 71/23 72/9
72/13 73/12 73/13 73/18 78/10 78/16 78/17
78/18 85/13 85/14 85/17 86/18 90/25 91/3
94/13 95/13 95/25 98/6 98/14 102/12 102/23
104/12 105/1 105/21 106/19 106/25 108/2
108/4 109/14 110/8 111/17 118/25 119/17
122/13 126/3 126/6 126/15 127/8
**Justice [3]** 113/22 114/3 114/11
**JVS [3]** 1/11 4/3 32/22

## K

**K-i-m [1]** 61/4
**Karlous [28]** 4/7 33/1 34/9 34/12 34/15 34/20
34/23 45/19 61/23 67/7 68/5 71/3 71/10 72/22
72/24 73/22 75/12 76/9 76/15 76/18 79/3
79/25 80/19 81/24 84/15 92/23 93/16 100/1
**Karlous's [6]** 19/7 23/22 61/12 74/15 78/12
78/14
**KATHERINE [2]** 3/10 33/10
**keep [7]** 12/6 23/11 75/5 100/21 109/4 111/19
116/6
**keeps [1]** 70/8
**kept [11]** 4/3 49/2 58/4 58/9 87/17 88/14
99/5 100/14 111/2 111/5 117/25
**key [1]** 96/24
**KIM [16]** 3/11 31/13 32/15 60/23 60/25 61/1
61/4 61/8 63/19 73/18 75/11 76/7 88/23 91/23
92/23 93/16
**kinder [1]** 21/19
**knew [9]** 41/3 42/8 53/19 58/3 63/19 69/1
69/8 69/25 126/15
**know [63]** 14/3 18/1 23/2 23/17 23/23 24/13
24/14 28/16 31/2 31/9 32/17 33/20 35/15
36/20 39/9 41/3 41/10 41/13 41/19 41/20
43/21 45/21 46/10 46/18 46/24 47/7 47/8 49/1
49/2 53/3 53/5 54/23 54/25 56/18 56/21 57/22
57/23 58/8 58/10 59/4 60/8 62/22 66/4 68/13
70/3 70/5 70/6 70/6 70/12 70/17 77/23 77/24
80/12 81/6 81/16 90/14 100/24 114/6 116/19
116/20 116/22 116/23 118/1
**knowing [1]** 90/19
**knowledge [4]** 68/14 68/15 114/5 127/12
**known [2]** 27/10 100/1
**knows [5]** 12/24 32/9 90/13 90/13 94/13

## L

**L.A [2]** 112/10 112/12
**lab [4]** 95/12 113/4 113/22 121/3
**Lacks [3]** 49/23 51/5 52/12 60/9
**ladies [3]** 33/7 84/22 124/3
**lady [2]** 28/19 28/25
**Laguna [16]** 79/22 79/23 80/10 95/12 96/5
97/8 97/23 98/1 98/4 98/10 98/16 98/18 99/22
100/23 112/8 112/9
**laptop [5]** 103/2 103/3 103/9 104/5 104/8
**large [1]** 112/4
**larger [1]** 98/17
**Las [1]** 7/19
**last [24]** 14/25 19/4 20/3 21/1 21/2 24/9 28/3
32/10 32/16 36/19 48/10 61/3 67/12 67/23
68/10 68/24 69/8 73/9 73/19 87/23 92/6 92/8
115/15 119/11
**late [3]** 23/9 62/5 79/24
**later [6]** 8/8 23/3 30/18 80/9 125/9 127/13
**latest [1]** 30/10
**laughed [1]** 70/11
**laughing [2]** 70/4 70/4
**law [38]** 2/15 5/19 5/20 5/22 5/22 6/7 6/7 7/10
7/13 8/22 9/11 9/24 14/3 14/11 16/6 26/17
36/19 37/10 37/15 37/20 37/25 40/22 41/2
42/6 45/4 45/8 47/10 51/3 51/9 55/9 55/10
55/15 56/13 67/25 77/13 90/4 90/17 125/4 127/6
**lawful [5]** 5/23 6/1 6/6 6/8 16/6
**lawyer [1]** 25/13
**layman's [1]** 108/3
**lead [6]** 61/22 61/23 67/6 67/9 67/24 87/23

**leading [3]** 41/16 44/2 88/9
**learn [9]** 72/11 72/16 91/22 92/12 92/13 92/23
92/24 100/9 100/16 100/17 108/23 122/9 127/12
80/25
**learned [1]** 70/25
**learning [5]** 71/21 75/17 76/10 79/18 80/9
**least [6]** 18/25 24/8 26/19 67/9 82/13 99/25
**leave [1]** 91/6 97/16 98/6
**left [10]** 23/6 27/3 54/3 53/7 53/10 53/13
54/2 54/11 54/15 93/18
**legal [5]** 20/16 33/20 48/15 52/9 69/4
**legitimacy [1]** 8/12
**legitimate [7]** 8/21 8/23 9/10 10/3 10/7 12/9
13/1
**legitimately [8]** 5/20 6/12 6/21 10/23 11/4
11/5 67/15 67/25
**let [16]** 19/14 25/20 26/8 26/15 31/9 38/17
46/10 47/2 49/6 50/24 51/21 55/18 56/6 67/5
105/21 122/21
**let's [16]** 4/13 4/16 17/2 25/5 25/8 25/9 32/7
62/5 78/13 91/3 103/10 109/9 109/14 110/12
120/7
**letter [3]** 25/13 26/2 26/6
**lie [2]** 59/8 59/25
**lied [6]** 10/8 10/22 10/25 11/5 12/2 12/5
**lies [1]** 10/15
**life [5]** 35/6 46/11 46/16 46/22 47/11
**lifting [1]** 46/11
**like [33]** 4/24 20/25 21/17 23/4 23/16 23/22
24/5 25/22 28/20 30/9 36/23 40/19 45/5 45/13
45/24 54/5 54/7 54/13 54/24 59/3 66/8 76/4
76/25 78/3 78/16 99/3 104/16 109/13 116/19
118/25 118/25 119/4 119/15 120/19
**likely [4]** 16/19 64/3 64/8
**Limited's [1]** 15/20
**line [6]** 7/1 11/11 11/14 14/9 14/15 19/2
**list [5]** 32/4 66/8 102/5 121/14 121/17
**listed [1]** 66/11
**listing [1]** 120/25
**little [4]** 24/16 67/22 104/12 126/2
**live [1]** 29/13
**lives [1]** 29/4
**living [1]** 43/23
**LLP [1]** 75/18
**loan [1]** 15/19
**locate [2]** 18/11 120/6
**located [2]** 80/7 80/8 94/10 107/8 111/24
116/2 119/24
**locating [1]** 27/22
**location [2]** 95/15 118/5
**locations [2]** 117/25 118/1
**lock [2]** 96/20 105/21
**locked [7]** 96/16 111/22 112/14 115/23
115/25 116/2 116/6
**log [6]** 107/5 107/6 117/5 117/21 117/23
118/2
**logistical [2]** 78/10 78/11
**long [18]** 32/17 34/23 42/4 46/12 50/15 61/14
63/6 85/16 87/19 92/20 105/13 108/3 108/4
110/21 110/22 112/2 112/3 124/24
**look [21]** 6/7 24/13 40/14 45/5 59/9 59/21
72/19 77/16 84/17 90/22 108/21 108/22
108/23 115/3 116/15 118/13 118/14 118/23
122/14 123/1 123/4
**looked [4]** 8/15 13/25 116/24 116/25
**looking [3]** 20/12 68/3 68/11
**loose [1]** 75/22
**Los [3]** 2/8 80/7 93/10
**lose [1]** 109/16
**lot [3]** 27/14 94/15 109/4
**love [5]** 46/13 46/18 46/23 46/25 47/13
**lunch [1]** 18/18 111 85/18 124/1
**lying [1]** 12/10

## M

**MA [2]** 6/15 6/16
**MA-related [1]** 6/16
**machine [1]** 103/17 103/19
**machines [7]** 103/7 103/8 103/21 107/16
107/17 107/18 107/21

**made [14]** 5/12 6/4 9/10 9/23 11/24 19/17
26/2 154/9 96/12 98/6 98/9 79/9 99/13/3
**maiden [1]** 33/15
**mail [6]** 18/10 26/11 42/14 44/5 74/6 74/7
**mailed [1]** 17/4
**mails [6]** 17/22 17/23 18/4 18/10 18/12 28/8
**main [2]** 82/4 127/17
**maintained [2]** 27/1 75/19
**major [2]** 2/6 56/12
**make [27]** 17/14 27/15 28/24 43/23 47/9
55/13 59/8 59/25 65/20 66/3 69/18 78/5
101/24 101/25 106/14 106/17 107/12 111/14
111/16 113/5 117/9 120/25 123/24 124/19
126/7 126/15 127/17
**makes [8]** 5/18 8/4 11/2 15/24 21/25 22/6
22/13 23/6
**making [3]** 78/18 106/10 128/1
**manager [1]** 97/25
**managing [3]** 94/25 95/9 95/22
**manipulate [4]** 47/25 53/2 118/21 118/24
**manner [3]** 91/4 126/20 127/9
**many [12]** 11/14 27/10 27/18 27/18 45/1
56/15 61/25 82/12 97/14 111/16 113/1
116/18
**March [13]** 12/5 34/6 34/12 34/18 35/1 62/5
65/1 65/12 65/13 65/25 66/1 87/4 87/4
**March 2019 [2]** 62/5 65/1
**March 2020 [1]** 34/18
**March 26 [3]** 65/12 65/25 87/4
**March 27 [3]** 65/13 66/1 87/4
**March 2nd [1]** 35/1
**March of [1]** 34/6
**Marino [4]** 18/18 19/1 125/11 125/19
**Marino's [1]** 85/4
**mark [2]** 26/10 107/8
**marked [4]** 3/7 3/13 46/5 75/21
**matches [1]** 108/12
**materials [3]** 18/6 23/18 24/7
**math [1]** 62/14
**matter [18]** 10/24 11/14 12/17 14/8 14/14
14/15 14/20 16/16 18/2 28/15 28/16 42/16 44/9
62/9 87/22 126/10 127/11 129/9
**matters [8]** 40/8 40/11 40/18 40/18 40/20
67/16 87/24 126/25
**may [20]** 14/1 15/10 17/6 24/12 27/24 32/3
39/5 44/17 54/25 60/14 60/17 65/4 72/9 72/10
76/1 91/25 124/10 125/19 126/4 126/18
**maybe [6]** 8/14 19/8 23/6 65/2 77/24 86/23
**me [55]** 5/20 6/12 6/20 7/3 8/22 9/20 9/21
19/14 24/5 25/20 26/8 26/15 27/9 27/12 27/13
27/25 29/22 33/20 34/14 38/17 45/3 45/7 46/6
46/17 46/21 47/2 47/10 47/14 47/17 49/6
50/24 51/21 54/2 54/5 55/18 56/6 56/13 58/7
58/20 59/17 67/5 67/15 68/1 68/12 69/10 75/5
99/21 104/21 104/25 106/2 112/24 119/23
120/1 122/21 123/1
**mean [15]** 7/1 23/1 29/18 43/10 46/21 62/15
80/1 80/18 98/5 101/18 103/23 108/20 118/14
118/20 123/21
**meaning [6]** 16/13 95/18 99/7 106/15 110/13
119/7
**means [3]** 15/24 104/13 109/8
**meet [5]** 9/3 34/20 34/24 66/7 83/20
**meeting [3]** 35/6 49/6 87/17
**meetings [3]** 55/5 87/4 88/5
**memorandum [1]** 19/9 65/16 66/4 66/15
125/14
**memory [1]** 76/11
**mention [5]** 71/14 83/2 83/5 84/18 86/17
**mentioned [15]** 6/19 19/22 31/18 32/1 32/2
35/23 52/4 71/11 71/12 71/12 74/2 84/13 90/4
104/6 107/24
**mentioning [1]** 109/4
**merely [2]** 126/14 127/3
**message [1]** 58/12
**messages [3]** 74/6 74/7 106/7
**met [15]** 5/17 35/1 35/5 35/19 35/22 37/8
40/10 40/16 59/6 82/9 82/12 82/18 89/4 89/6
**metadata [1]** 120/1

**M**

method [1] 126/20
MICHAEL [10] 1/11 2/14 4/4 4/9 32/23 33/3
46/10 46/15 46/20 47/6
Michael's [1] 51/2
Michelle [1] 87/19
Microsoft [2] 120/8 120/10
mid [1] 84/21
mid-morning [1] 84/21
might [8] 20/18 23/9 32/5 45/12 52/19 86/23
97/5 108/25
million [4] 10/24 11/19 13/21 14/5
mind [3] 93/23 125/23 126/16
minimum [1] 21/23
minute [5] 10/21 20/18 20/19 73/13 101/11
minutes [1] 85/1
Miramar [1] 2/16
misappropriate [1] 11/16
misappropriating [2] 11/12 14/10
misappropriation [1] 12/18
misread [1] 29/7
misrepresentations [1] 16/11
misspoke [1] 23/9
Misstates [1] 49/22
mixed [1] 96/13
mock [1] 127/1
model [1] 5/18
moment [4] 19/22 36/15 70/11 78/13
money [35] 5/20 7/2 7/7 7/16 7/18 8/6 8/9
8/18 8/21 9/6 10/6 10/7 10/19 10/19 10/21
10/23 10/25 11/1 11/7 11/8 11/12 11/12 11/13
11/16 12/4 12/7 12/8 12/9 12/14 12/19 12/19
14/10 43/24 49/21 50/5
monies [6] 11/6 11/21 7/4 8/23 9/10 10/3
14/18 15/19 67/14 67/25
monitor [1] 103/3
month [1] 71/24
months [3] 62/6 72/1 113/17
more [14] 9/5 19/10 22/13 26/16 31/20 46/17
62/15 62/17 62/19 67/5 78/16 91/12 120/19
127/14
Moreover [1] 26/10
Morgan [6] 41/20 41/23 41/25 50/11 50/12
50/18
morning [34] 4/5 4/8 4/9 4/12 18/20 20/18
21/17 22/14 23/9 24/1 24/2 30/9 30/12 32/11
32/24 33/2 33/3 33/6 33/7 33/8 33/13 33/14
48/8 48/9 61/8 61/9 73/25 75/7 84/21 85/15
92/13 92/14 105/20 105/23
MOSBY [16] 3/10 31/12 32/17 33/10 33/13
33/15 33/15 33/20 33/24 38/14 39/13 39/17
39/22 44/23 54/2 58/18
Mose [6] 33/21 46/13 46/18 46/25 47/12
47/13
most [5] 14/21 33/20 47/9 63/12 64/10
motel [1] 14/18
mother [2] 28/5 29/7
motion [11] 4/13 4/15 4/20 10/5 15/1 15/3
17/1 21/16 26/3 29/18 29/20
mount [1] 100/25
mounting [1] 97/10
move [10] 7/2 55/18 60/3 61/17 67/19 74/21
79/23 81/9 82/5 119/11
moved [4] 7/4 7/8 7/16 17/5
moving [4] 11/9 11/18 23/11 45/25
Mr [10] 9/18 18/1 20/12 24/17 30/10 33/9
58/24 75/11 86/20 88/20
Mr. [155]
Mr. Adams [3] 28/2 28/3 28/8 28/23 28/24
Mr. Andre [5] 18/1 18/2 66/18 73/4 73/7
Mr. Arden [1] 83/6
Mr. Avenatti [17] 4/18 9/23 13/8 16/16 17/5
17/17 19/5 23/5 25/17 31/11 86/12 92/10
127/1 127/6 127/9 127/11 127/22
Mr. Avenatti's [2] 16/5 127/6
Mr. Barela [7] 26/20 44/12 44/14 57/24 82/23
83/2 83/5
Mr. Dean [2] 4/10 33/4
Mr. Drum [14] 18/9 18/10 19/1 19/25 22/9

22/10 22/15 23/4 32/2 126/15 127/2 127/7
127/13
Mr. Drum's [1] 126/11
Mr. Fitzgerald [1] 23/25
Mr. Ibrahim [1] 83/6
Mr. James [1] 60/25
Mr. John [1] 94/5
Mr. Johnson [12] 13/11 13/14 13/16 13/20
16/11 26/20 42/22 42/24 43/11 52/6 57/24
90/16
Mr. Johnson's [2] 43/2 44/6
Mr. Karlous [7] 34/12 34/15 34/20 34/23
45/19 72/24 84/15
Mr. Karlous's [3] 22/4 74/15 78/14
Mr. Kim [7] 60/23 61/8 63/19 73/18 76/7
88/23 91/23
Mr. Patrick [1] 23/16
Mr. Sagel [18] 14/8 18/9 48/5 54/15 57/3 57/9
58/3 58/18 58/20 73/3 73/6 73/9 74/3 74/25
86/7 89/10 90/12 93/18
Mr. Sagel's [1] 18/3
Mr. Steward [1] 28/23
Mr. Stolper [17] 64/25 65/9 65/12 65/15 66/8
66/11 66/18 66/21 88/15 88/24 89/4 90/8
90/15 90/18 90/23 91/13 91/17
Mr. Stolper's [1] 89/20
Mr. Tashchyan [9] 24/22 31/13 60/21 60/24
78/8 78/14 80/4 80/5 81/22
Mr. Varani [7] 24/20 113/20 121/4 121/7
121/24 123/12 123/19
Mr. Weeks [3] 97/22 106/1 117/17
Mr. Wyman [7] 18/10 29/25 73/6 73/10 74/3
74/25 93/19
Mr. Wyman's [1] 18/3
Ms [28] 17/5 17/14 19/1 29/24 33/4 33/15
37/9 37/15 37/20 38/3 38/14 39/22 41/14 53/7
53/16 54/3 54/12 56/21 57/18 59/3 60/6 76/9
77/2 84/13 115/18 115/22 125/19 125/23
Ms. [45] 4/11 4/11 17/2 18/14 18/18 18/22
25/12 25/14 26/12 26/17 27/3 27/6 27/12 28/4
30/18 31/12 31/16 32/1 32/1 32/2 32/17 33/5
33/13 33/24 36/4 36/15 38/14 38/21 39/13
39/17 41/14 41/14 44/23 48/8 54/2 56/19
58/18 85/4 125/11 125/17 126/5 126/6 126/8
126/22 127/12
Ms. Mosby [1] 33/24
Ms. Bredahl [1] 26/12
Ms. Carter [5] 17/2 18/14 32/1 126/6 126/8
Ms. Carter's [5] 18/22 125/17 126/5 126/22
127/12
Ms. Cummings-Cefali [1] 4/11
Ms. Hernandez [2] 4/11 33/5
Ms. Marino [2] 18/18 125/11
Ms. Marino's [1] 85/4
Ms. Mosby [9] 31/12 32/17 33/13 38/14 39/13
39/17 44/23 54/2 58/18
Ms. Phan [2] 30/18 32/2
Ms. Regnier [2] 38/21 56/19
Ms. Sneddon [1] 48/8
Ms. Witos [5] 25/12 25/14 26/17 27/3 27/6
27/12 28/4 31/16 32/1 41/14
Ms. Wolett [3] 36/4 36/15 41/14
much [6] 46/11 46/21 46/21 121/9 127/14
128/3
multiple [11] 28/7 64/16 64/25 65/2 73/11
83/23 84/9 103/19 104/23 109/7 110/1
must [2] 5/17 6/2
my [47] 6/21 7/5 8/22 9/11 17/10 19/2 20/16
20/20 21/8 22/9 22/9 23/13 24/21 26/21 29/19
34/10 34/14 38/8 39/7 39/11 39/24 40/2 46/11
46/12 46/16 46/22 65/17 66/2 66/5 67/3 67/5
66/25 67/17 67/22 70/15 70/17 72/19 74/11
71/17 78/7 82/4 83/15 86/2 93/18 94/1 100/20
111/22 111/22
myself [2] 38/3 86/25

**N**

name [19] 7/19 18/3 18/3 33/15 33/18 40/24
41/10 41/13 48/16 61/3 66/8 82/9 92/6 92/8

94/22 94/25 97/25 102/11 115/16
names [4] 46/1 65/2
native [1] 120/22
nature [4] 13/25 14/19 100/19 120/20
necessary [4] 5/24 27/6 28/11 29/21
need [18] 13/3 20/18 20/19 20/20 23/2 23/3
24/12 28/18 28/21 29/2 30/3 30/16 31/10
81/25 82/3 101/3 114/18 120/14
needed [4] 28/14 43/25 78/17 122/12
needs [4] 10/2 10/18 25/16 112/3
negative [3] 53/14 53/15 54/24
network [2] 103/2 103/4
never [8] 11/8 21/6 36/21 37/9 40/25 47/17
66/22 83/20
Nevertheless [1] 18/23
new [14] 15/17 26/25 52/11 118/3
Newport [1] 30/20
next [15] 21/20 26/11 46/14 46/19 60/19
63/17 79/13 86/2 87/8 95/8 100/5 105/23
105/23 107/2 110/14
nice [2] 29/4 29/13
nicely [1] 119/22
NICOLA [1] 2/3
night [4] 19/4 20/3 32/10 32/16
Niguel [12] 79/22 79/23 80/10 95/12 97/23
98/2 98/4 98/10 99/23 100/24 112/8 112/9
Ninth [1] 5/17
no [113] 5/3 8/17 8/20 8/22 9/6 9/10 9/17 11/5
13/7 13/13 13/15 13/23 14/25 15/25 18/15
22/2 22/2 22/2 22/21 23/20 27/8 28/15 29/10
29/10 34/16 34/19 35/8 35/18 35/21 38/16
39/16 46/2 46/15 46/20 46/25 47/6 47/6 47/22
47/24 48/1 48/3 48/24 49/4 49/8 49/10 50/6
50/9 52/25 53/5 53/24 55/5 55/22 55/22 56/20
57/5 57/15 60/13 63/8 63/11 64/3 66/25 72/14
72/16 72/20 73/8 74/8 74/11 74/12 75/9 77/11
78/1 78/7 79/3 80/6 80/11 80/13 80/22 80/24
81/4 81/8 81/16 83/22 84/14 84/25 86/6 87/21
88/18 90/1 90/5 90/24 91/24 97/18 98/3 99/6
101/2 101/2 101/15 102/11 104/9 106/2 106/4
106/6 106/25 107/16 113/25 116/17 118/12
118/16 121/3 121/16 121/19 121/21 121/25
nobody [3] 96/16 100/7 100/13
non [4] 5/23 105/2 107/18 107/21
non-fraudulent [1] 5/23
non-virtual [3] 105/2 107/18 107/21
None [3] 3/5 3/8 52/22
nonresponsive [2] 74/22 119/12
noon [9] 20/11 20/19 21/9 21/12 22/15 30/13
85/5 85/6 85/7
normal [3] 98/25 106/16 117/20
North [1] 2/7
not [137]
note [5] 8/13 29/4 77/6 77/8 101/13
notebook [1] 75/22
noted [2] 18/7 108/24
notes [12] 76/12 76/14 77/15 83/10 83/13
84/1 84/6 84/9 84/12 84/14 84/15 84/18
Nothing [4] 48/4 58/23 86/19 91/22
notice [1] 36/21
now [43] 5/14 17/2 17/7 20/25 21/15 25/24
28/12 31/22 34/1 36/18 37/25 55/8 57/2 64/16
67/3 70/12 70/15 76/3 84/20 89/10 89/11
89/12 90/24 91/11 92/3 93/21 94/22 96/6
98/20 98/25 99/22 100/23 102/16 105/18
106/20 109/10 111/11 113/1 115/3 117/19
118/17 119/15 124/17
NSHAN [4] 3/12 24/10 92/4 92/7
number [15] 13/19 13/20 14/7 21/22 22/8
28/12 36/2 46/3 62/12 101/21 115/18 116/19
116/20 116/22 116/24
numbers [1] 62/24
numerous [1] 87/16

**O**

O'Malley [1] 48/11
oath [2] 11/6 88/23
objection [33] 36/12 37/16 38/11 41/16 43/4
44/1 45/14 48/15 49/22 50/7 51/5 51/11 51/17

**objection... [20]** 54/8 56/23 58/14 59/9 62/20 63/14 63/21 64/12 64/12 69/3 71/17 73/11 75/2 79/14 81/14 86/6 88/1 88/9 89/15 90/4
**objections [1]** 30/22
**obligation [1]** 86/5
**obtain [3]** 11/1 87/7 121/14
**obtained [4]** 26/4 68/18 112/7 113/1
**obtaining [3]** 11/13 51/16 78/11
**obviously [9]** 4/19 12/24 17/18 22/12 23/2 23/15 32/15 85/15 105/18
**occasion [2]** 65/22 86/14
**occasions [2]** 66/11 66/17
**occur [1]** 71/5
**occurred [2]** 13/16 76/18
**occurs [1]** 14/9
**October [2]** 50/13 50/17
**off [16]** 23/7 24/23 32/4 69/20 77/19 78/6 81/25 82/3 85/14 95/10 95/20 104/4 105/7 111/18 112/24 119/20
**office [32]** 24/17 36/22 39/2 56/7 79/21 80/2 80/5 83/15 98/6 98/10 98/11 98/14 98/17 98/17 100/2 100/6 100/9 100/12 100/18 100/23 100/24 101/12 101/14 102/16 110/23 111/2 112/10 112/10 112/12 113/7 116/3 118/5
**officed [2]** 79/25 80/1
**offices [7]** 2/15 79/19 93/9 97/23 99/22 100/2 111/25
**often [1]** 47/11
**oh [4]** 12/12 29/9 124/18 126/1
**okay [43]** 15/2 17/9 20/4 20/5 22/5 25/11 32/6 33/19 33/23 34/1 40/14 41/4 41/25 44/21 55/13 55/17 56/12 56/18 57/23 58/6 58/11 62/9 70/1 72/12 81/19 85/9 91/14 91/25 93/25 95/13 101/11 103/10 105/13 112/01 112/11 113/5 113/19 118/19 120/9 124/18 127/19 127/25 128/1
**old [3]** 114/24 114/25 115/1
**once [14]** 10/22 16/2 39/19 39/25 65/2 71/11 79/12 80/25 82/13 96/3 100/23 117/25 120/13 122/10
**one [62]** 7/13 13/19 19/15 19/22 20/20 20/24 23/4 23/15 24/9 25/22 29/10 30/21 32/3 35/22 37/25 45/13 46/14 46/19 46/25 47/3 50/25 53/7 53/10 68/21 69/15 76/24 82/19 83/25 84/6 84/10 87/22 94/15 94/24 96/12 100/12 102/14 103/19 103/20 103/24 104/19 104/25 105/16 105/23 106/14 106/17 107/1 108/16 108/19 108/25 109/10 109/11 109/14 110/10 111/11 111/17 113/6 113/13 113/15 114/15 118/17 119/15 119/18
**one-terabyte [1]** 109/10
**only [13]** 15/15 20/7 23/4 23/5 47/7 57/13 83/25 84/6 100/6 100/20 106/2 117/24 123/11
**open [4]** 91/16 120/4 120/11 120/14
**opened [2]** 89/21 89/24
**opening [3]** 4/20 20/23 90/5
**operating [4]** 104/17 104/18 105/3 105/6
**opinions [2]** 84/23 124/5
**opportunity [2]** 18/19 21/1
**opportunity to [1]** 21/1
**opposition [3]** 4/24 21/12 27/8
**order [6]** 26/11 45/22 45/24 66/3 68/18 122/10
**organizes [1]** 119/22
**original [6]** 106/18 108/12 111/19 111/20 112/6 112/24
**other [33]** 4/15 6/14 6/15 7/2 7/4 7/6 7/17 21/22 23/7 25/22 28/14 31/25 52/9 53/13 56/16 57/20 62/14 63/9 72/23 78/5 87/24 87/24 90/17 91/1 96/10 96/10 96/13 102/20 104/8 106/19 113/24 118/10 120/22
**others [3]** 15/14 45/10 120/17
**otherwise [2]** 8/5 104/1
**ought [3]** 17/10 17/11 125/2
**our [21]** 7/23 9/25 10/1 12/24 14/19 22/16 31/2 32/4 62/5 66/2 95/12 97/7 98/6 100/6 100/21 101/19 113/5 116/3 124/12 126/4

---

126/18
**out [42]** 8/18 12/25 22/4 24/8 25/5 25/8 36/7 38/1 38/7 50/23 50/25 51/15 51/22 52/2 52/6 52/10 52/19 57/11 57/13 65/16 66/5 79/23 85/17 90/3 97/12 99/15 99/19 101/20 102/12 102/4 102/13 112/22 115/3 117/12 118/3 119/5 120/13 121/12 122/11 122/16 123/7 123/9 123/15
**output [2]** 24/23
**Outside [4]** 56/23 58/14 59/9 60/1
**over [11]** 18/10 45/4 49/2 52/24 67/3 67/23 68/24 77/19 111/21 113/4 115/5
**overbroad [1]** 125/16
**overhearing [1]** 86/18
**overnight [1]** 105/21
**Overruled [23]** 37/22 41/17 43/6 45/20 48/17 49/24 50/8 50/20 51/6 51/12 51/18 52/14 59/11 60/11 62/21 63/23 69/5 74/19 79/15 81/15 88/2 88/11 89/16
**overstatement [1]** 55/17
**own [7]** 11/6 45/17 96/12 96/15 101/5 101/9 104/14

---

## P

**P.D [1]** 30/20
**p.m [3]** 21/11 21/13 128/5
**page [5]** 22/16 59/21 77/16 77/17 129/10
**page 3 [1]** 77/16
**page 5 [1]** 59/21
**paid [4]** 14/6 36/24 49/16 52/10
**papers [1]** 7/23 10/1 12/24
**paperwork [1]** 108/22
**paragraph [2]** 40/14 59/21
**Paragraphs [1]** 39/17
**parents [5]** 42/25 43/3 43/16 43/20 43/22
**part [14]** 6/9 11/13 11/25 12/9 12/13 15/17 17/19 46/18 54/14 90/9 119/11 121/10 122/17 122/18
**participants [1]** 65/23
**participated [1]** 76/8
**participating [2]** 75/11 75/16
**particular [8]** 16/1 16/8 32/5 82/3 108/5 108/11 121/22 122/22
**parties [2]** 19/15 21/9
**partition [1]** 104/4
**partitioning [1]** 104/1
**partitions [1]** 104/3
**party [2]** 20/15 37/3
**password [1]** 114/13
**passwords [2]** 95/23 102/6
**Patrick [2]** 23/16 85/14
**Pause [1]** 19/23
**pay [2]** 12/14 43/24
**payees [2]** 6/16 7/4
**paying [4]** 49/19 50/2 52/20 56/22
**payment [2]** 13/21 14/5
**payments [1]** 8/12
**payroll [1]** 59/24
**pays [1]** 12/14
**penalty [1]** 82/24
**pending [1]** 114/8
**people [5]** 33/20 56/16 83/23 100/21 123/11
**percent [3]** 25/7 25/8 126/16
**performed [4]** 126/6 126/9 126/13 126/23
**perhaps [1]** 35/2
**period [7]** 17/25 26/19 36/23 62/10 62/13 112/20 113/16
**perjury [1]** 82/24
**permit [1]** 15/6
**permitted [1]** 15/10
**person [10]** 8/22 57/13 83/25 94/21 94/23 95/9 95/22 95/23 96/24 99/13
**personal [6]** 6/15 7/5 26/23 46/23 127/12 127/20
**personnel [1]** 55/2
**perspective [1]** 19/19
**Phan [3]** 30/18 32/2 87/20
**Phoenix [1]** 15/12
**phone [14]** 27/4 28/2 34/14 36/1 42/13 75/11

---

75/14 75/16 76/8 76/11 77/2 83/2 85/14 87/7
**physical [10]** 79/12 85/11 84/8 100/23 110/15 110/18 110/19 110/21 110/22 114/24
**physically [9]** 76/17 76/20 83/10 93/8 94/8 94/17 97/1 105/7 105/18
**pick [3]** 45/24 87/10 94/17
**picked [1]** 98/20
**picture [1]** 109/19
**piece [1]** 106/11
**place [6]** 19/15 50/17 55/6 76/17 76/20 100/1
**placed [1]** 117/22
**Plaintiff [2]** 1/10 2/2
**PLAINTIFF'S [2]** 3/4 3/6
**planning [1]** 19/12
**please [19]** 5/1 9/23 39/17 39/22 45/13 46/14 46/19 60/20 61/2 76/5 84/22 84/25 92/5 103/15 104/12 124/4 124/6 125/21 125/25
**plug [1]** 96/1
**plugged [1]** 105/2
**point [22]** 6/3 12/23 14/12 18/13 23/6 26/2 42/22 44/5 45/18 64/2 64/10 68/17 75/17 79/18 90/3 94/2 99/14 101/18 102/1 112/11 113/1 126/18
**points [4]** 4/24 46/23 126/3 127/17
**policy [5]** 66/2 66/2 66/3 66/7 84/3 84/4 84/5
**portion [11]** 5/17 8/6 8/7 8/18 8/21 8/23 8/24 12/20 17/19 50/4 52/20
**portions [2]** 20/5 66/15
**posed [2]** 90/15 90/23
**position [3]** 10/11 21/5 126/5
**possession [2]** 24/7 79/12 94/2 99/3
**possible [4]** 28/25 86/4 100/14 122/4
**possibly [2]** 22/22 62/18
**potential [1]** 31/20
**potentially [1]** 84/10
**power [10]** 95/10 95/18 95/20 96/1 101/4 103/2 103/21 122/9 123/1 123/24
**powered [6]** 95/17 95/24 96/3 96/4 96/25 123/23
**powering [1]** 103/22
**precedent [1]** 14/14
**predicate [1]** 5/24
**predicated [1]** 16/20
**preparation [4]** 71/6 71/7 71/10 126/21
**prepared [2]** 126/14 126/21
**present [11]** 4/2 4/10 23/13 23/20 32/21 62/6 66/4 85/2 85/12 86/11 124/9
**presented [1]** 15/5
**preservation [1]** 116/7
**PRESIDING [1]** 1/8
**presumably [2]** 24/25 25/1
**presumed [1]** 15/3
**pretty [4]** 31/15 31/17 35/9 89/19
**previously [5]** 4/14 14/22 33/10 36/4 92/15
**primary [1]** 42/8
**principally [1]** 68/3
**prior [3]** 10/12 16/11 126/22
**pristine [1]** 100/14
**Privilege [1]** 121/11
**PRO [1]** 2/14
**probably [6]** 24/8 24/9 35/4 40/9 48/21 56/4
**problem [12]** 6/10 6/19 6/19 6/23 6/24 7/9 7/22 9/12 13/17 24/4 75/9 90/7
**problems [1]** 6/18
**procedural [1]** 30/7
**procedurally [2]** 25/20 25/25
**procedure [1]** 99/1
**Proceed [1]** 91/21
**proceeding [7]** 35/14 68/25 89/21 90/12 91/1 91/2 91/2
**proceedings [5]** 1/15 19/23 32/20 85/11 129/9
**proceeds [2]** 15/19 84/6
**process [22]** 24/21 35/9 51/21 78/20 78/23 78/24 100/8 103/1 104/10 105/15 105/21 105/22 105/24 106/16 107/7 107/17 107/16 115/1 119/3 119/3 119/18 122/14
**processes [1]** 119/19
**produce [3]** 17/21 18/4 18/17

**P**

product [3] 73/14 75/3 111/23
production [1] 17/15
productive [1] 21/22
professional [1] 46/23
proffer [1] 30/19
profile [6] 63/12 63/20 63/24 64/3 64/8 64/11
program [9] 40/24 41/1 41/8 41/13 70/20
118/14 120/3 120/10 121/5
programs [2] 121/20 121/22
proof [4] 9/3 11/5 69/1 69/24
proper [1] 26/2
properly [5] 30/22 95/25 96/2 96/3 96/25
property [1] 11/1 11/13
prosecution [1] 78/2
prosecutors [1] 35/6
protocol [2] 104/6 111/8 114/7 117/20
protocols [2] 114/9 114/10
prove [2] 69/10 69/13
proven [1] 16/2
provide [9] 26/9 26/15 38/2 52/1 52/5 99/9
99/11 121/13 123/17
provided [8] 11/23 16/18 18/6 20/24 45/7
89/3 90/25 121/10
provides [1] 11/8
public [1] 91/2
publicly [1] 86/3
pull [1] 96/1
pulling [2] 19/5 19/6
purpose [4] 16/3 65/25 75/17 76/10
purposes [2] 78/10 78/11
pursuant [2] 8/8 129/6
pushed [1] 28/13
put [20] 17/2 19/15 19/18 29/3 37/8 10/3 9/19
40/1 46/24 83/15 86/2 97/7 101/3 101/12
104/15 114/15 114/17 117/9 117/21 119/25
125/14
putting [1] 38/22
puzzled [1] 18/15

**Q**

quarterback [1] 78/16
quarterbacking [2] 78/23 79/2
quash [4] 26/3 29/20 125/15 127/20
question [36] 16/8 24/6 25/22 25/23 30/1
38/17 38/18 39/24 47/2 47/14 54/17 54/17
55/8 55/11 55/18 55/19 55/23 55/25 56/2 56/6
57/9 57/11 63/17 65/7 66/25 67/5 67/22 70/15
78/22 81/13 86/23 94/1 99/6 114/6 122/21
125/5
questioned [2] 127/7 127/11
questions [23] 9/1 9/15 11/19 13/5 49/5
50/11 50/24 53/3 53/24 59/2 59/7 60/13 87/3
88/18 89/1 89/24 90/3 90/14 90/15 90/23 91/9
91/13 91/24
QuickBooks [10] 20/7 40/21 123/4 123/6
123/7 123/15 123/16 123/18 123/19 123/21
quickly [3] 24/13 95/13 109/5
quit [2] 37/14 37/20

**R**

rack [8] 96/7 96/9 96/12 96/15 97/1 97/19
100/25 101/3
RAID [5] 104/25 109/12 109/15 110/2 110/10
RAIDed [5] 104/24 108/20 109/1 109/5 109/5
raise [1] 23/24
raised [1] 18/8
ran [1] 56/10
rather [1] 85/20
re [1] 25/4
re-conduct [1] 25/4
reach [1] 24/3
read [16] 35/20 39/8 39/14 39/18 39/22 45/13
46/6 46/9 46/14 46/19 47/3 47/5 48/10 55/24
56/1 77/15
reading [2] 39/16 39/21
ready [3] 20/14 20/17 51/1
Reagan [1] 2/10
realized [1] 20/14

really [11] 27/13 29/18 39/8 67/17 70/17 86/2
88/10 88/15 11/16 103/22/22 11/18
reason [8] 16/25 30/25 53/13 77/7 77/9 84/5
112/23 114/21
reasonable [5] 15/7 15/7 16/15 16/16 16/21
reasons [8] 14/20 16/25 53/7 53/10 68/22
69/15 90/11 100/12
reboot [1] 25/3
rebuild [1] 109/15
recall [89] 22/11 27/24 29/23 34/5 35/2 35/21
36/2 36/3 36/20 36/21 38/9 38/23 40/7 40/13
40/24 41/3 41/25 42/4 42/5 43/2 43/7 43/13
43/17 44/5 44/8 44/15 45/10 48/18 48/21
50/14 54/17 55/10 57/11 58/7 58/11 62/2 67/3
68/17 70/8 70/21 71/1 71/15 71/21 71/25 72/6
72/7 75/11 75/16 75/20 76/14 78/2 79/16
79/18 79/20 80/9 80/11 81/2 82/1 82/4 82/5
82/17 83/1 83/4 83/9 84/19 88/25 89/2 92/2
94/21 94/25 95/2 95/4 97/4 98/25 99/14 99/15
106/9 107/25 108/25 110/24 110/25 113/17
115/14 115/15 115/17 117/19 123/6 123/10
123/10
receipt [1] 99/9 99/11 99/18 99/19 101/17
receive [2] 16/19 21/4
received [7] 3/7 3/13 19/4 49/20 50/4 117/13
124/24
receiver [1] 110/20
receiving [1] 44/5
recent [1] 72/3
recess [5] 32/7 32/19 85/1 85/10 128/5
reciprocate [1] 58/20
recognizes [1] 110/9
recollection [13] 24/20 39/18 39/25 40/2
40/16 43/22 54/11 57/3 65/8 65/11 76/7
102/13 123/14
record [6] 19/19 19/21 20/10 23/20 56/1
89/19
recounted [1] 82/19
RECROSS [3] 3/4 3/9 58/25
RECROSS-EXAMINATION [1] 58/25
rectangle [1] 109/20
redaction [1] 18/15
redactions [1] 18/15
REDIRECT [3] 3/4 3/9 53/25 88/21
refer [1] 33/21
referencing [1] 88/14
referred [1] 33/16
referring [1] 53/1
reflected [1] 25/1
refresh [7] 24/19 39/4 39/24 40/16 65/8 65/11
76/7
refreshes [2] 39/18 76/11
regard [7] 21/16 85/3 125/22 126/5 126/20
127/6 127/22
regardless [1] 111/7
regards [6] 10/1 11/10 52/20 52/23 60/6
85/22
Regnier [21] 37/9 37/15 37/20 38/3 38/14
38/21 41/14 41/23 53/7 53/16 54/12 56/19
56/21 57/18 59/3 60/6 64/20 75/12 76/9 77/2
84/13
Regnier's [3] 54/3 115/18 115/22
regularly [1] 58/12
regulations [1] 129/11
relate [1] 69/19
related [14] 4/16 6/16 7/8 10/10 59/23 69/24
88/7 89/20 90/12 90/15 90/16 90/17 90/23
91/1
relates [12] 11/4 17/19 20/7 20/8 22/15 29/3
29/17 29/25 87/18 93/22 121/7 122/18
relating [22] 6/11 6/20 8/12 13/10 13/23
14/17 17/20 18/9 20/1 44/6 56/21 69/13 71/10
78/14 83/7 89/25 99/6 99/16 99/19 118/6
118/10 119/6
relationship [3] 26/24 27/1 28/20
relevance [1] 58/15
relevant [1] 17/24
rely [1] 15/11
remained [1] 37/5

remaining [1] 66/14
remember [19] 50/9 58/1 59/1 59/14 69/17
70/12 70/15 70/24 75/14 75/14 78/4 84/22
89/5 97/25 123/6 123/16 123/17 123/19 124/4
Remoun [9] 4/7 33/1 34/9 68/5 72/22 75/12
78/12 79/3 80/19
remove [1] 97/1
removed [3] 97/6 97/6 97/9
removing [1] 126/24
repeated [1] 59/17
repeatedly [3] 88/23 89/3 89/8
replace [1] 109/15
replied [1] 17/5
reply [7] 4/20 14/19 15/22 17/2 17/6 20/13
22/16
report [4] 24/25 25/14 30/9 59/18
reported [1] 129/8
reporter [2] 125/12 129/16
REPORTER'S [1] 1/5
reports [1] 87/17
represent [2] 25/14 43/11
representation [2] 26/6 29/6
representative [1] 24/5
represented [1] 13/10
representing [1] 15/19
request [3] 19/8 19/9 23/24
requested [3] 18/17 20/11 21/3
requesting [1] 16/17
requests [2] 17/12 78/5
require [4] 15/25 17/21 18/14 120/22
required [5] 5/11 5/12 6/23 18/15 24/10
requirement [3] 5/14 5/15 5/16
requires [1] 9/13
research [3] 72/15 84/25 124/7
reserve [1] 4/15
residence [1] 115/15
resolved [1] 22/10
respect [4] 15/9 16/14 16/23 23/21
respond [1] 21/9
responded [1] 21/6
response [3] 19/8 21/5 38/16
responsibilities [1] 41/5
responsibility [8] 72/19 72/21 74/11 78/12
78/14 79/4 79/5 100/20
responsive [1] 125/4
rest [2] 69/1 111/22
restore [1] 116/16 119/4 119/9
restricted [4] 100/9 100/12 100/24 101/13
resume [1] 124/3
resumed [2] 32/20 85/11
retain [1] 26/7
retained [1] 114/8
retired [1] 26/25
returned [1] 110/19 110/24
Revenue [2] 61/11 92/17
review [4] 76/12 94/1 121/11 121/11
reviewed [1] 66/4 81/7 125/14
right [120] 8/21 8/23 9/10 11/7 21/11 21/14
22/22 30/3 30/3 31/22 33/16 35/24 36/4 36/8
36/16 36/25 37/3 37/6 37/10 37/11 37/22
37/15 38/3 38/19 40/5 40/12 40/22 41/15
42/17 42/20 43/19 44/24 45/5 45/8 47/15 49/6
53/11 54/19 54/22 55/3 55/5 55/17 56/8 56/13
56/16 57/16 57/20 58/1 62/24 64/17 64/20
64/23 65/17 65/23 66/5 66/9 66/12 66/19
66/23 68/15 69/2 69/20 69/25 72/8 72/10 73/7
74/4 74/12 74/15 76/23 77/2 77/3 78/21 79/5
79/10 81/20 83/23 84/1 84/7 84/10 92/15 93/3
94/3 94/6 94/15 95/15 96/10 98/12 98/25 99/8
99/23 100/2 100/15 100/19 101/23 103/11
104/2 105/2 105/4 105/11 106/12 107/20
108/5 109/22 109/23 111/12 113/7 116/13
117/1 118/18 119/21 120/4 120/10 120/11
120/17 120/23 121/25 123/12 124/17 128/3
Roberson [3] 31/14 32/15 92/24 93/16
role [8] 52/21 56/21 61/14 61/20 67/17 67/23
78/7 92/20
Ronald [1] 2/10
room [11] 100/22 101/12 102/17 116/5 116/7

**R**

room... [6] 117/9 117/21 117/22 117/24 118/4 118/5
roughly [3] 92/21 105/17 116/18
RPR [1] 1/19
rudimentary [1] 126/24
Rule [6] 4/13 10/5 12/25 15/3 17/1 45/15
ruled [2] 31/1 91/15
ruling [1] 19/3
run [3] 103/19 105/21 123/1
running [3] 103/21 104/3 104/16

**S**

SACR [3] 1/11 4/3 32/22
SACR-19-00061-JVS [3] 1/11 4/3 32/22
safe [1] 111/6
SAGEL [33] 2/9 4/5 9/18 14/8 18/9 20/12 26/13 32/24 48/5 54/15 57/3 57/9 58/3 58/18 58/20 58/24 68/9 73/3 73/6 73/9 74/3 74/25 75/13 76/9 76/21 80/19 86/7 86/15 86/20 89/10 90/12 93/1 93/18
Sagel's [1] 18/3
said [23] 13/24 27/5 29/14 40/19 46/7 46/7 46/9 46/15 53/8 54/19 54/20 56/4 58/7 58/9 64/4 70/11 79/2 79/3 103/13 122/17 122/21 124/21 125/12
same [17] 12/9 45/18 45/21 50/7 51/11 51/17 64/12 76/17 76/20 80/1 80/2 80/4 98/19 100/1 101/4 113/15 119/1
samples [1] 47/14
San [1] 2/16
Santa [5] 1/16 1/20 2/11 4/1 94/10
sat [4] 30/3 63/7 90/21 105/24
satisfied [3] 19/16 19/20 20/9
saw [3] 36/7 36/10 95/17
say [30] 7/25 12/25 25/20 27/23 43/10 47/7 53/20 53/21 54/15 63/24 65/2 71/16 73/3 78/16 78/22 80/1 80/18 93/15 97/9 98/10 98/23 102/20 108/19 109/9 109/14 114/9 115/11 116/21 118/14 123/21
saying [8] 22/21 52/7 59/12 59/15 59/15 59/17 78/3 87/18
says [4] 11/6 15/17 47/12 77/6
scam [1] 90/21
scan [1] 38/14
scanned [3] 38/10 39/19 40/4
scanning [1] 38/21
scary [5] 35/11 35/12 35/13 35/14 35/15
scenario [1] 9/14
scheme [33] 5/7 5/10 5/25 6/6 6/9 6/9 6/23 7/12 8/3 8/25 9/4 10/12 10/15 11/13 11/15 11/17 12/2 12/6 12/11 12/18 12/23 13/6 13/18 14/11 14/16 15/22 16/2 16/4 16/9 16/10 16/12 16/24
science [2] 63/4 63/10
scope [7] 52/7 56/24 58/15 59/10 60/1 127/9 127/13
screwed [2] 97/5 97/6
screws [2] 97/6 97/9
SE [1] 2/14
seal [2] 20/15 20/21
search [10] 17/22 17/25 18/3 68/17 115/17 122/5 122/15 124/21 124/24 125/5
searched [1] 18/9
searching [1] 121/22
seated [2] 34/10 93/18
second [6] 6/24 10/5 11/10 17/19 87/10 122/17
secret [1] 53/17
Section [2] 2/6 129/6
secure [1] 117/10
secured [1] 96/16
see [24] 18/20 19/1 25/23 32/18 39/18 44/24 46/25 60/22 75/24 77/25 84/18 103/7 104/21 104/25 105/7 108/12 108/12 109/17 109/20 109/23 115/12 119/5 122/10 124/8
seeing [3] 38/23 123/16 123/19
seek [1] 48/15
seem [1] 23/20

SEFFENS [3] 1/19 129/15 129/16
seize [3] 117/6
seized [8] 94/5 102/5 115/13 115/15 116/10 124/20 124/23 125/2
seizure [1] 93/22
SELNA [1] 1/8
send [3] 113/2 113/19 114/11
sense [5] 8/5 21/25 22/6 22/13 23/6
sensitive [1] 63/25
sent [5] 37/7 47/14 113/4 114/4 114/16
separate [13] 19/25 98/14 101/20 108/25 109/1 110/11 111/19 116/5 117/23 117/25 118/1 118/2 120/7
serial [1] 101/21
serious [1] 28/16
seriousness [1] 27/17
serve [2] 26/22 29/10
server [37] 24/12 25/1 75/18 79/6 81/17 81/19 81/20 93/25 96/9 99/4 101/2 101/5 101/6 102/3 103/2 103/20 103/25 104/1 104/9 104/14 104/19 105/8 106/11 106/14 106/15 106/21 106/24 108/11 108/16 109/2 109/19 109/23 110/1 110/18 111/9 111/17 119/21
servers [117] 24/23 25/3 68/19 69/16 69/20 76/10 78/6 78/11 78/15 78/21 78/25 79/5 79/8 79/13 79/13 79/18 80/9 81/5 81/11 81/25 82/3 93/23 94/3 94/5 94/14 94/18 94/25 95/9 95/10 95/11 95/15 95/17 95/18 95/21 95/23 96/5 96/7 96/7 96/10 96/12 96/13 96/14 96/23 96/25 97/1 97/7 97/14 97/16 97/19 97/22 98/20 99/20 100/5 100/23 100/25 101/1 101/12 101/16 102/1 102/3 102/14 102/16 102/18 102/24 102/25 102/25 103/5 103/8 103/11 103/24 104/5 104/8 104/9 104/13 104/23 105/2 105/14 106/5 106/8 106/10 107/15 107/21 107/23 108/15 108/19 108/25 110/4 110/7 110/12 110/14 110/15 110/18 110/19 110/22 111/2 111/10 114/19 114/22 114/23 114/24 115/4 115/4 115/19 115/21 116/1 116/13 118/10 118/15 118/15 119/9 121/1 121/5 121/15 121/20 122/25 123/5 123/8 123/24
service [3] 28/1 61/11 92/17
session [1] 125/11
set [7] 14/6 18/19 24/12 24/14 24/15 84/6 119/9
sets [1] 84/9
settlement [16] 10/16 10/17 12/3 12/4 13/11 13/14 13/20 13/22 14/3 14/4 14/5 49/21 50/4 52/20 82/25 83/7
seven [1] 40/14
several [2] 53/2 113/17
shall [1] 32/18
sharing [5] 54/6 54/6 54/12 59/3 60/6
SHARON [3] 1/19 129/15 129/16
she [41] 17/21 17/25 18/2 18/3 18/16 18/20 25/20 26/3 26/4 26/7 26/17 27/3 27/13 27/14 27/14 28/5 28/12 28/13 29/4 29/10 29/14 29/19 29/22 29/23 29/24 36/6 42/3 42/5 54/6 54/6 54/7 54/13 59/3 77/4 77/5 77/9 77/12 77/14 84/13 126/23 127/13
she's [4] 29/6 29/15 31/15 31/17
shipped [1] 114/14
shits [2] 47/9 48/11
short [2] 55/23
short-circuit [1] 25/23
should [15] 7/25 18/16 22/25 23/8 23/10 24/9 31/4 31/18 77/25 98/22 98/23 98/23 117/19 124/24 125/7
shouldn't [1] 23/7
show [4] 9/9 25/21 28/13 119/23
showing [1] 19/17
shown [4] 62/22 95/14 96/6 126/11
shows [1] 108/10
siblings [1] 43/15
sic [1] 87/17
side [6] 13/1 61/15 61/16 61/17 61/18 113/4
sidebar [4] 89/17 89/18 90/5 91/20
sign [1] 117/17

signatory [1] 52/24
signature [2] 13/22 90/21
signed [7] 13/20 14/1 38/6 39/1 39/19 39/25 82/24
significant [1] 6/17
similar [1] 18/14
similarly [1] 18/25
simple [2] 17/22 18/5
simply [2] 17/25 19/10
since [9] 27/10 65/1 67/9 93/5 104/23 116/10 116/25 117/23 127/13
single [6] 8/14 8/15 29/7 30/1 55/14 55/15
sir [16] 5/21 21/2 65/7 66/25 67/22 75/21 82/16 89/1 89/14 90/1 91/8 92/2 92/13 109/17 119/15 124/10
sister [1] 44/6
sit [2] 72/7 110/22
sitting [1] 112/7
situation [8] 25/11 25/12 29/3 30/10 43/24 44/7
six [8] 97/15 100/4 102/1 102/14 103/10 105/14 107/15 114/17
six-terabyte [1] 114/17
sixteen [1] 92/21
size [1] 109/9
slow [4] 104/12 105/15 105/22 115/1
slowly [1] 103/15
small [2] 28/15
Sneddon [1] 48/8
so [136]
software [27] 104/17 104/20 104/25 107/5 107/5 107/14 107/23 108/15 110/9 119/4 119/18 119/18 119/22 120/2 120/3 120/5 120/12 120/13 120/14 120/16 120/23 122/9 122/10 122/11 122/14 122/22 123/1
solely [1] 90/12
some [18] 20 18/22 26/9 26/15 26/22 31/4 40/8 40/11 40/18 40/19 42/19 44/5 68/17 75/16 79/18 94/2 102/25 103/13 104/5 105/21 112/11 113/1 114/24 120/16
somebody [1] 108/10
somehow [2] 7/11 25/3
someone [3] 8/6 8/17 79/6
something [10] 13/25 18/14 19/10 19/13 20/25 59/23 99/3 121/23 121/23 127/14
sometimes [1] 109/25
somewhat [1] 25/12
somewhere [1] 46/25
soon [1] 110/25
sorry [8] 19/22 22/3 73/6 81/8 115/8 115/24 116/21 126/1
sounds [2] 50/16 118/22
source [1] 127/5
SOUTHERN [1] 1/6 15/16
space [2] 109/11 114/19
speak [6] 24/9 43/15 73/6 73/8 86/14 86/25
speakerphone [2] 76/23 76/24
speaking [1] 100/17
special [30] 4/7 10/18 24/11 31/13 31/13 32/9 32/11 32/12 32/13 33/1 61/12 61/23 67/6 68/5 71/2 71/9 73/22 76/8 76/14 76/17 79/3 79/25 80/19 81/24 92/23 92/23 92/23 100/1 100/24 102/17
special-needs [1] 10/18
specialist [3] 93/12 98/15 98/16
specialists [1] 100/7
specific [16] 5/6 13/6 17/13 59/22 75/15 102/6 102/8 102/11 108/4 108/6 108/7 121/9 122/8 122/15 122/15 123/1
specifically [7] 13/21 19/16 20/5 38/23 53/14 57/4 77/12
speculation [3] 44/1 50/19 52/12
spell [2] 61/2 92/5
spend [2] 21/21 109/4
spent [2] 62/1 62/13
spin [1] 10/4
spoke [2] 42/24 73/9 74/3
spring [5] 2/7 64/7 67/9 95/4 113/16
stack [2] 44/23 45/1

**S**
**stage [1]** 13/4
**stand [6]** 5/23 29/24 32/17 45/19 73/25 75/23
**standard [2]** 12/24 114/7
**standby [1]** 31/6
**standing [1]** 6/14
**standpoint [1]** 28/10
**start [9]** 9/24 10/9 21/17 23/2 85/17 85/19 86/4 105/23 110/17
**started [6]** 100/8 106/23 107/1 107/2 107/6 127/13
**starts [1]** 10/22
**state [6]** 26/25 27/22 28/1 61/2 63/6 92/5
**stated [1]** 14/8
**statement [1]** 5/22
**STATES [15]** 1/4 1/9 1/19 2/3 2/4 2/6 2/7 2/10 4/4 4/6 15/16 32/23 32/25 129/7 129/11
**stating [1]** 89/3
**statute [5]** 5/4 5/24 15/25 16/4 16/7
**statutes [1]** 8/16
**stay [2]** 112/2 119/1
**stayed [1]** 112/19
**steal [1]** 12/18
**stenographically [1]** 129/8
**step [1]** 124/10
**steps [3]** 67/4 67/13 67/24
**STEWARD [6]** 2/15 2/15 4/10 26/12 28/23 33/4
**still [13]** 20/12 24/14 25/2 56/10 59/18 67/6 85/21 112/4 112/7 114/1 114/4 115/23 122/2
**stole [1]** 10/7
**Stolper [21]** 64/23 64/25 65/9 65/12 65/15 66/8 66/11 66/18 66/21 87/4 87/20 88/7 88/15 88/24 89/4 90/5 90/18 90/23 91/13 91/17
**Stolper's [1]** 89/20
**stopped [3]** 47/17 49/16 50/12
**store [1]** 94/14
**stored [6]** 38/25 83/15 96/9 96/14 100/10 113/6
**story [1]** 89/12
**straight [2]** 105/19 113/6
**Street [3]** 1/20 2/7 2/11
**stricken [1]** 17/12 60/4 74/23 82/7 119/13
**strike [14]** 36/18 55/18 55/20 60/3 67/4 67/19 74/21 77/8 81/9 82/5 99/15 117/13 119/11 122/21
**structure [1]** 119/23
**stuff [2]** 53/17 53/19
**subject [3]** 22/11 31/23 92/2
**submission [2]** 22/17
**submit [2]** 9/13 22/16
**submitted [5]** 4/20 4/23 84/24 124/6 126/10
**subpoena [7]** 17/10 25/16 27/6 27/19 27/20 27/21 125/16
**subpoenaed [1]** 49/11
**subpoenaing [1]** 27/2
**Subsequent [1]** 28/7
**substantial [2]** 6/18 17/13
**substantiate [1]** 126/15
**substantiating [1]** 8/1
**substantive [2]** 5/15 5/16
**successful [1]** 47/10
**such [2]** 13/23 16/3
**sudden [2]** 89/11 108/10
**sufficient [4]** 15/5 16/15 23/2 31/9
**sufficiently [2]** 15/18 17/13
**suggest [1]** 77/24
**suggestion [2]** 58/18 58/20
**Suite [3]** 1/20 2/11 2/16
**suited [1]** 127/14
**summary [2]** 126/21 126/23
**summer [1]** 75/17
**Superior [1]** 26/25
**Supp [1]** 15/16
**supplement [1]** 20/3
**supplemental [5]** 19/4 19/9 20/11 20/24 21/3
**supports [2]** 120/16 120/19
**supposed [2]** 26/5 28/12

**Supreme [1]** 14/14
**sure [35]** 4/21 5/8 12/5 27/23 44/5 45/12 47/9 47/19 54/14 56/17 65/20 66/3 69/18 76/24 78/18 80/8 80/13 101/24 101/25 102/25 104/13 107/12 109/7 113/5 117/9 123/2 123/24 124/22 126/7 126/15 127/16 128/5 128/12
**sustained [15]** 30/21 36/13 37/18 38/12 44/3 54/9 56/25 58/16 60/2 63/15 64/13 64/14 71/19 73/16 75/4
**Switzerland [1]** 15/21
**SWORN [3]** 33/10 61/1 92/4
**system [4]** 40/4 104/19 105/3 105/7

**T**
**T-a-b-s [1]** 70/7
**Tab [3]** 70/5 70/6 71/23
**table [2]** 4/7 33/1
**Tabs [49]** 19/5 19/6 19/10 19/16 19/25 20/2 20/5 20/7 21/16 23/15 23/18 23/22 24/6 25/9 26/18 29/24 30/4 40/24 40/25 41/1 70/2 70/7 70/20 71/3 71/10 71/21 72/5 72/7 72/12 72/13 72/18 72/23 73/7 73/10 73/20 74/4 74/7 74/10 74/20 75/1 77/5 77/10 77/14 77/20 77/25 84/13 84/18 86/17 118/14
**tag [1]** 108/16
**taint [6]** 23/17 23/18 23/21 24/7 81/2 81/7
**take [22]** 4/13 21/15 22/25 25/11 30/8 30/16 31/18 40/14 45/4 77/16 83/10 84/1 84/12 84/14 84/21 99/3 99/10 101/6 105/13 114/21 124/1 125/9
**taken [15]** 32/19 67/13 67/24 76/12 76/14 79/19 80/12 81/2 85/10 115/14 115/19 115/22 121/15 121/18 128/5
**takes [1]** 10/23
**taking [3]** 11/12 96/23 125/12
**talk [3]** 78/13 85/16 85/18
**talked [1]** 74/25
**talking [8]** 73/3 97/9 106/21 109/25 113/14 122/8 122/20 123/3
**talks [1]** 48/10
**tampered [1]** 108/13
**tampers [1]** 100/13
**tapes [24]** 115/6 115/7 115/9 115/10 115/11 115/12 115/12 115/13 115/18 115/21 116/1 116/8 116/12 116/15 116/18 117/3 117/5 117/13 118/8 118/15 124/20 125/3 125/7 125/8
**TASHCHYAN [16]** 3/12 24/11 24/22 31/13 32/10 32/11 32/12 60/21 60/24 78/8 78/14 80/4 80/5 81/22 92/4 92/7
**team [12]** 23/17 23/19 23/21 24/7 46/18 69/18 78/3 80/17 80/18 81/2 81/7 121/11
**technology [1]** 114/25 115/2
**telephone [3]** 18/19 85/4 125/10
**tell [8]** 24/5 31/4 43/18 49/19 50/3 57/6 66/21 91/3
**telling [2]** 6/1 38/9
**ten [8]** 5/6 38/20 42/12 47/15 47/17 48/20 48/22 49/2
**tentative [1]** 17/10
**tenure [3]** 27/18 45/4 60/7
**terabyte [3]** 109/10 109/11 114/17
**terms [6]** 12/3 14/2 14/4 14/4 37/5 108/4
**terrible [1]** 38/17
**terribly [1]** 109/19
**testified [8]** 24/22 36/6 73/23 74/16 78/8 92/15 93/11 93/25
**testify [11]** 18/17 24/11 27/6 27/13 27/16 28/7 28/11 28/19 28/21 29/2 127/14
**testifying [4]** 35/13 62/1 89/12 126/17
**testimony [21]** 10/9 11/6 13/23 14/3 14/1 14/2 17/11 18/22 19/5 19/6 19/7 23/22 26/21 71/7 74/13 87/1 89/14 91/5 125/23 126/12 127/3
**Texas [2]** 27/22 28/1
**text [3]** 58/12 74/6 74/7
**than [13]** 4/15 9/5 28/17 31/25 46/17 62/14 62/15 62/17 62/19 72/23 85/20 87/24 102/20
**thank [26]** 4/19 9/17 14/23 22/19 30/6 30/15

31/7 46/12 46/16 46/22 46/24 47/7 47/10 60/10 64/16 85/3 88/6 91/23 118/24 124/14 127/19 127/24 127/25 128/3 128/4
**Thanks [1]** 128/1
**that [631]**
**that money [1]** 12/7
**that's [77]** 5/21 6/23 10/4 10/14 12/13 13/4 13/19 14/2 18/11 19/17 19/25 20/7 20/9 20/10 21/7 21/8 22/18 23/5 25/4 33/17 37/12 38/17 40/19 43/20 44/21 46/9 54/22 62/6 65/18 65/24 66/6 66/10 69/11 70/17 74/12 74/14 74/15 77/6 81/23 82/20 83/24 84/2 84/3 84/16 85/21 86/8 87/2 87/6 87/9 87/12 87/15 88/3 88/12 88/17 90/21 90/24 91/17 94/10 98/25 100/10 100/20 101/23 102/7 103/6 104/19 106/16 110/1 111/7 111/8 116/7 117/20 118/20 124/13 125/6 125/12 126/17 127/16
**their [16]** 9/3 11/7 11/8 19/15 49/21 50/4 50/4 52/20 79/8 86/18 96/12 96/15 114/10 114/13 121/10 121/12
**them [65]** 21/20 21/23 22/17 22/13 22/25 22/13 32/11 36/1 38/7 38/7 38/15 38/22 40/10 45/25 68/13 81/3 82/13 83/15 83/15 85/23 93/5 94/8 95/10 95/24 95/24 96/1 96/1 96/3 97/7 97/7 97/12 98/1 98/4 98/6 100/6 101/3 101/4 103/13 103/22 104/15 108/21 112/14 113/4 114/4 114/14 116/16 116/24 116/25 117/9 117/15 117/17 117/17 117/21 120/13 120/13 121/13 122/10 122/14 122/15 123/1 123/9 123/17 123/24 124/24
**themselves [3]** 15/10 81/12 96/15
**then [58]** 4/23 6/15 7/4 8/8 12/1 12/8 12/11 19/22 20/3 20/23 23/6 24/23 27/12 27/19 27/23 27/25 28/2 30/3 30/22 31/13 31/13 32/7 38/2 52/1 53/6 55/20 57/9 58/3 58/6 72/8 74/18 85/17 86/4 89/10 95/11 95/20 96/3 96/25 97/12 97/22 100/8 103/8 105/6 105/10 105/22 106/18 107/11 111/10 111/14 113/9 113/11 114/13 119/20 120/3 120/13 122/9 122/11 122/13
**theory [2]** 7/14 8/8
**there [74]** 5/3 8/14 8/22 10/8 10/16 10/19 11/4 11/21 11/25 12/14 13/13 13/22 13/23 16/14 18/14 18/24 19/24 24/4 34/1 36/23 44/23 45/1 45/10 45/12 46/15 47/6 49/20 50/3 53/22 54/20 56/6 56/11 56/17 73/14 75/22 77/8 83/23 83/23 83/25 84/6 84/18 90/4 90/5 97/14 98/14 99/5 99/6 100/10 100/25 101/2 101/16 102/11 103/10 104/23 104/24 105/18 105/20 106/7 107/7 110/4 110/7 112/4 112/14 113/9 115/6 115/12 116/10 116/18 117/13 117/23 123/7 123/16 124/22
**there's [11]** 4/24 8/17 18/23 22/7 30/25 103/5 103/23 118/5 120/22 120/22 125/5
**thereafter [1]** 11/2
**these [37]** 6/18 7/6 8/19 8/20 8/23 9/4 9/7 15/19 17/21 17/22 39/9 39/10 45/3 45/7 45/10 47/14 49/2 58/4 65/8 80/9 87/17 98/20 100/4 101/16 102/16 105/14 106/20 108/23 110/4 110/12 115/4 115/11 118/8 119/15 126/8 126/13 126/21
**they [62]** 6/11 6/18 6/20 6/21 6/24 6/25 7/3 7/6 7/7 8/7 8/8 8/9 9/7 9/8 9/9 13/15 13/22 16/23 16/25 17/12 20/25 21/6 24/12 29/13 32/10 35/19 38/6 38/7 38/9 38/25 43/24 43/25 45/21 46/3 48/15 53/19 69/19 70/9 70/9 78/4 80/12 80/14 80/20 80/23 80/25 81/2 81/5 83/16 84/9 90/11 90/16 90/18 90/20 94/9 94/10 95/17 95/18 96/7 96/9 97/4 97/5 97/5 101/4 104/9 104/13 108/11 109/13 110/22 110/24 111/5 112/12 112/19 112/24 114/17 115/9 115/14 115/14 115/23 116/2 116/10 116/20 116/25 117/8 117/10 117/22 121/9 121/10 123/17 126/14 124/14
**they're [13]** 8/7 12/19 17/24 95/25 98/5 103/5 104/3 114/21 115/25 117/25 118/25 122/13
**they've [1]** 7/6
**thing [8]** 7/13 12/9 20/7 28/3 47/7 49/12 59/22

## T

**thing...** [1] 110/9

**things** [19] 10/18 14/18 21/22 35/22 37/25 44/11 53/4 54/6 54/12 54/16 59/3 60/7 78/17 83/7 91/2 118/23 119/6 120/2 120/20

**think** [51] 6/7 6/10 8/4 11/22 13/3 13/24 14/17 15/14 18/13 18/16 19/20 21/16 21/18 21/20 21/21 21/25 22/6 22/13 22/23 23/10 24/10 24/10 24/16 25/4 25/15 25/18 26/1 26/16 29/8 30/22 30/23 31/14 31/16 35/1 36/1 49/9 52/18 54/19 58/7 59/4 60/22 70/12 70/15 74/15 89/21 90/7 116/22 124/21 126/1 126/17 126/20

**thinking** [1] 17/10

**thinks** [1] 11/11

**third** [1] 20/15

**third-party** [1] 20/15

**this** [133] 4/16 5/9 5/10 5/11 6/22 7/4 7/25 8/2 9/1 9/10 12/22 14/19 14/20 15/10 16/11 16/12 16/25 17/15 18/11 20/11 20/13 20/21 38/2 38/5 41/20 43/18 44/24 51/24 53/4 58/20 65/16 66/17 68/15 71/6 75/25 79/13 81/25 82/3 83/13 88/25 89/5 90/15 93/15 94/5 96/12 102/14 103/1 103/8 104/11 104/14 105/10 106/23 107/20 107/23 110/7 112/2 112/22 113/25 116/4 116/7 116/12 116/15 117/3 119/6 122/9 124/21 124/23 127/16

**though** [4] 36/18 58/11 76/14 94/25

**thought** [2] 23/13 79/2

**thoughts** [3] 17/15 21/24 22/22

**thousand** [2] 62/3 62/19

**three** [11] 12/2 41/21 61/15 68/15 95/1 103/20 103/22 103/24 103/25 104/3 116/24

**through** [3] 17/4 29/19 31/18

**throughout** [4] 36/24 37/5 74/2 74/3

**thumb** [6] 104/16 104/17 104/19 104/20 105/3 105/7

**THURSDAY** [1] 4/1

**Thus** [1] 16/20

**time** [68] 4/14 8/11 9/9 17/25 18/20 19/1 21/7 21/21 23/1 23/8 26/19 26/23 29/7 29/9 30/7 31/9 34/2 36/24 38/3 38/3 38/14 38/14 41/7 41/12 41/19 42/13 42/13 42/23 57/16 57/16 62/10 62/13 62/24 63/19 64/2 64/4 64/10 66/24 68/17 70/19 73/9 73/19 73/19 82/18 82/19 84/20 85/16 94/15 95/17 100/1 101/13 102/2 102/3 106/14 106/25 107/4 107/6 108/6 108/7 109/4 111/3 112/19 113/2 113/15 118/3 124/15 124/24 126/2

**times** [5] 40/9 56/6 70/8 82/12 87/16

**timing** [2] 12/16 22/4

**Title** [1] 129/7

**today** [12] 20/12 21/6 21/10 22/7 22/16 22/17 24/11 31/11 49/15 53/6 62/1 72/7

**together** [7] 19/5 19/6 66/18 104/24 107/12 109/8 109/10

**told** [14] 13/14 13/16 22/24 27/13 32/16 37/8 37/14 40/17 54/5 59/6 70/24 77/9 77/12 85/16

**tomorrow** [14] 21/16 21/18 21/23 22/21 22/25 23/11 24/1 24/2 30/19 30/24 31/3 85/15 86/3 127/21

**too** [1] 73/15

**took** [13] 8/7 8/9 50/17 55/6 73/25 83/13 84/15 95/11 96/5 97/7 97/19 100/6 114/21

**tool** [1] 107/20

**tools** [1] 101/21

**top** [2] 6/14 77/16

**topic** [1] 89/25

**total** [1] 61/16

**touched** [1] 29/24

**towards** [2] 13/1 13/2

**tracked** [2] 41/8 77/13

**tracking** [1] 41/12

**train** [1] 23/11

**training** [1] 63/9

**Tran** [1] 87/19

**transcript** [5] 1/9 1/15 90/14 129/8 129/10

**transcripts** [1] 90/22

**transfer** [17] 5/23 6/2 6/2 6/6 6/8 7/11 11/20 12/23 17/23 17/25 22/10 23/19 16/4 16/9 16/16 16/18 16/20 16/21

**transfers** [12] 6/22 6/25 8/2 9/4 10/12 11/15 15/10 15/19 16/8 16/11 16/12 16/23

**transmit** [1] 5/20

**transmitted** [1] 26/13

**transported** [1] 112/11

**travel** [3] 28/9 29/15 94/17

**traveled** [1] 95/1

**traveling** [1] 56/7

**trial** [22] 1/12 5/5 22/21 23/10 27/7 28/17 30/24 56/7 71/6 71/7 71/8 71/10 71/22 71/24 72/1 72/5 73/1 78/9 82/15 82/18 84/6 93/11

**tried** [1] 54/15

**trip** [1] 7/19

**troubled** [1] 91/4

**true** [9] 14/14 37/12 37/20 51/4 54/3 56/10 56/12 84/8 129/7

**truly** [1] 47/6

**trust** [5] 6/13 7/2 7/11 7/17 10/18

**truth** [1] 54/22

**truthful** [2] 65/20 66/14

**try** [7] 27/16 27/19 28/24 29/1 39/10 104/12 108/3

**trying** [1] 60/22 109/3

**Tuesday** [11] 21/20 22/1 22/2 22/7 22/14 23/8 23/14 31/9 85/24 85/25 127/23

**turn** [2] 17/2 95/10

**turned** [1] 95/20

**twice** [1] 71/11

**two** [35] 6/17 9/1 10/12 13/15 13/16 13/20 14/7 19/21 19/24 20/1 24/14 27/24 36/10 52/19 62/6 62/10 62/13 65/7 65/8 65/16 67/12 67/23 68/10 68/24 69/8 77/19 87/23 93/18 108/20 108/25 109/1 110/25 112/16 116/20 116/23

**two-and-a-half-year** [2] 62/10 62/13

**type** [3] 72/13 109/12 121/5

**typed** [1] 83/16

**types** [5] 24/24 120/16 120/19 120/25 121/14

**Typing** [1] 51/25

## U

**U.S** [3] 93/1 93/2 129/16

**uhm** [1] 56/4

**ultimately** [2] 80/14 84/5

**unable** [1] 27/20

**uncomfortable** [1] 54/16

**under** [14] 5/19 5/24 7/9 7/14 9/14 11/6 12/25 13/19 14/3 15/10 20/15 20/21 82/24 88/23

**under-oath** [1] 11/6

**understand** [14] 10/11 25/25 31/24 41/7 51/21 67/13 67/23 68/3 99/25 101/25 102/8 116/12 121/10 122/17

**understanding** [4] 21/8 29/19 38/24 68/21

**understands** [1] 101/24 108/2

**understood** [11] 16/19 24/18 67/4 68/10 68/24 69/12 69/15 72/21 85/8 97/20 121/4

**undertaken** [2] 5/24 74/9

**undue** [2] 17/14 125/17

**unfortunately** [2] 27/5 28/10

**UNITED** [15] 1/4 1/9 1/19 2/3 2/4 2/6 2/7 2/10 4/3 4/6 15/16 32/22 32/25 129/7 129/11

**universe** [1] 46/24

**unless** [2] 47/3 120/10

**unlock** [1] 96/22

**unnerving** [2] 35/17 49/7

**unplugged** [3] 95/11 96/4 97/4

**until** [11] 12/5 22/15 22/17 23/7 30/13 31/9 64/10 75/8 84/24 119/1 124/6

**untrue** [2] 66/22 67/1

**unusual** [1] 125/12

**unzip** [4] 119/1 119/7 119/15 119/17

**unzips** [1] 119/19

**up** [34] 4/13 11/10 11/18 12/21 18/19 21/15 23/17 24/12 24/14 24/25 25/11 30/1 30/8 30/16 36/10 49/15 51/25 64/10 75/22 87/10 94/18 98/20 101/4 103/2 104/5 104/15 104/18

**up...** [1] 110/9

**upon** [1] 15/11

**UPS** [1] 114/14

**upset** [1] 54/12

**upwards** [1] 27/24

**us** [13] 7/24 15/12 18/6 21/13 22/15 28/24 31/18 43/11 43/18 57/6 89/21 95/9 117/24

**use** [11] 6/12 14/17 78/24 90/20 103/1 104/8 107/14 107/20 115/6 118/21 119/17

**used** [14] 8/16 8/25 33/21 41/2 54/7 54/13 59/3 79/22 84/10 101/21 107/23 108/15 120/19 127/5

**using** [5] 5/19 103/6 107/4 109/7 114/14

**usual** [1] 125/13

**usually** [2] 94/13 107/4

**utilize** [2] 23/8 122/4

**utilized** [1] 8/9

**utilizing** [2] 23/1 105/6

## V

**value** [9] 107/9 107/10 107/11 107/24 108/2 108/12 108/16 110/7 111/21

**Varani** [7] 24/20 113/20 121/4 121/7 121/24 123/12 123/19

**various** [2] 42/9 87/3

**Vegas** [1] 7/19

**vehicle** [1] 97/12

**vendors** [1] 7/6

**verge** [1] 90/20

**verify** [1] 107/12

**versed** [1] 24/8

**version** [1] 82/25

**versus** [3] 4/4 15/16 32/23

**very** [12] 11/9 17/13 27/8 27/9 27/14 28/16 29/12 29/22 46/12 47/11 126/23 126/24

**very often** [1] 47/11

**view** [4] 46/23 96/22 120/12 120/23

**violate** [1] 16/4

**virtual** [14] 24/12 102/25 103/7 103/8 103/13 103/17 103/18 103/21 105/2 107/16 107/17 107/18 107/21 119/4

**virtualize** [4] 122/9 122/23 122/24 123/23

**virtualized** [1] 122/25

**virtualizing** [1] 122/20

**visit** [1] 36/15

**voiced** [2] 27/8 54/2

**VOL** [1] 1/12

**vs** [1] 1/10

## W

**W-i-t-o-s** [1] 25/12

**wait** [2] 24/16

**waiting** [2] 28/22 28/23

**want** [36] 14/24 18/18 19/2 23/17 23/24 25/11 25/17 26/8 27/13 27/23 28/19 30/17 31/2 31/3 46/6 47/3 53/22 59/21 72/17 72/17 75/5 86/2 91/3 93/21 95/13 101/24 101/24 108/19 109/4 113/5 115/11 118/21 120/4 124/15 126/3 126/6

**wanted** [10] 7/11 28/4 32/10 43/22 51/25 52/10 57/10 69/18 90/20 127/17

**wants** [3] 9/20 9/21 12/25

**warrant** [6] 25/21 68/18 115/18 124/21 124/24 125/5

**was** [228]

**Washington** [2] 113/20 114/3

**wasn't** [17] 12/5 19/7 19/12 35/12 35/13 41/4 49/12 58/1 60/6 67/17 67/17 72/19 74/11 74/12 78/7 79/1 124/22

**way** [11] 6/18 13/19 25/22 79/21 100/21 101/4 111/7 117/3 118/24 119/3 119/23

**Ways** [1] 107/22

**we** [122] 4/20 6/13 6/14 6/15 7/23 8/14 10/1 14/11 14/17 14/19 18/16 18/19 19/10 20/14 20/23 20/24 21/15 21/20 21/21 22/12 22/19 22/21 22/24 22/25 23/1 23/3 23/8 23/10 24/1 25/3 25/21 25/23 26/22 27/9 27/9 27/19 27/19 27/20 27/23 27/25 28/1 28/7 28/13

**W**

**we...** **[78]** 28/14 28/24 29/14 29/14 30/7 30/16 30/18 30/18 30/23 31/8 32/3 32/10 32/11 32/12 32/16 32/18 36/23 38/7 38/7 39/15 45/18 55/19 55/22 60/24 74/20 75/1 75/7 77/24 85/1 85/3 85/13 85/15 85/16 85/19 86/4 90/13 93/5 95/10 95/11 95/14 96/4 96/4 97/4 97/6 98/6 98/14 99/1 99/9 99/10 100/6 100/8 100/11 101/3 101/4 101/20 102/11 102/11 102/19 102/20 103/1 104/15 106/20 111/7 113/5 116/5 116/6 117/23 117/24 117/25 118/1 118/2 118/3 118/3 124/3 124/8 127/17 127/21

**we'll** **[11]** 18/7 19/1 21/17 24/16 31/10 32/7 84/21 85/18 85/23 124/1 125/9

**we're** **[18]** 10/17 10/18 13/4 20/16 28/8 28/9 28/25 60/22 89/16 90/6 94/1 101/11 103/7 122/8 123/3 124/19 125/11 126/1

**we've** **[1]** 28/14

**week** **[12]** 27/23 105/15 105/16 105/18 105/24 106/1 106/3 106/8 110/12 110/25 111/21 114/21

**weeks** **[11]** 27/24 34/25 94/5 94/21 97/22 99/21 102/22 106/1 110/25 117/4 117/17

**well** **[42]** 4/20 12/12 12/13 12/14 19/1 19/14 20/4 21/11 24/16 25/5 26/8 29/6 30/1 36/18 45/24 56/6 62/5 62/15 67/4 70/14 72/19 77/7 77/16 78/13 79/2 82/4 85/19 89/23 90/1 90/10 93/1 93/2 93/18 99/15 101/23 110/17 117/12 120/7 121/23 122/21 123/11 127/19

**went** **[3]** 7/18 27/20 115/3

**were** **[164]**

**weren't** **[1]** 57/13

**West** **[2]** 1/20 2/11

**what** **[123]** 5/4 7/1 8/5 8/24 10/2 10/3 10/8 10/9 10/16 12/13 12/25 13/9 13/15 19/1 20/22 21/8 22/24 23/5 23/10 24/10 25/5 25/8 30/12 30/13 31/4 32/3 33/16 36/10 36/20 38/5 38/24 43/13 43/18 43/20 46/7 46/7 46/9 46/17 49/17 51/23 51/25 52/7 54/5 54/20 54/23 54/25 55/5 56/18 56/21 57/23 58/1 59/4 59/17 61/20 65/25 67/14 67/25 68/12 70/2 70/5 70/6 70/8 70/12 70/12 70/16 70/17 71/9 71/16 71/21 71/23 71/23 74/16 76/10 77/6 77/25 78/13 79/13 80/25 81/2 81/5 81/16 81/20 83/13 85/17 89/22 90/21 91/11 93/25 95/7 99/16 100/5 101/1 101/23 102/8 103/15 104/11 104/15 107/20 108/9 108/22 109/5 109/12 109/25 110/14 111/20 114/10 115/21 118/1 118/2 118/20 119/20 121/5 121/5 122/8 122/17 123/2 123/14 124/15 125/6 126/15 126/17

**what's** **[5]** 62/12 63/3 75/21 102/10 119/5

**whatever** **[5]** 7/19 25/21 47/8 112/24 122/11

**whatsoever** **[1]** 74/9

**when** **[96]** 7/16 8/17 10/7 10/15 10/24 10/25 11/5 11/11 11/12 12/10 13/13 14/6 14/9 18/2 24/15 24/20 29/23 31/10 35/19 35/22 36/10 36/18 37/8 40/7 40/10 40/16 42/3 43/10 45/19 49/11 49/19 50/2 50/25 51/3 51/9 51/15 51/21 51/21 54/2 54/11 59/6 61/17 65/15 65/19 66/3 66/7 69/1 70/19 71/5 71/14 73/3 73/9 73/12 74/25 76/18 79/23 80/1 80/18 82/14 84/9 93/15 95/2 95/7 96/6 96/22 97/9 98/1 98/10 98/20 100/4 101/11 101/14 102/1 102/5 102/16 102/20 103/21 106/10 106/16 106/23 106/24 107/6 107/7 110/12 110/21 111/10 111/18 115/3 117/9 117/13 117/17 117/21 118/14 119/15 123/21 123/23

**Whenever** **[1]** 99/3

**where** **[31]** 6/20 8/16 8/16 8/20 11/11 13/4 25/13 36/24 38/24 49/2 56/6 58/3 61/10 63/5 79/21 80/8 80/12 80/23 82/14 84/13 93/8 93/8 94/8 94/10 100/1 107/8 115/12 116/1 116/2 116/5 119/24

**whereby** **[2]** 78/20 78/24

**wherever** **[1]** 7/18

**whether** **[26]** 6/2 7/4 7/5 7/18 8/25 14/15 16/8 23/9 23/18 24/6 25/16 30/23 30/24 31/5 49/5

53/1 53/3 53/7 55/1 58/6 59/2 87/16 88/24 90/1 90/2/6 118/1

**whether Ms** **[1]** 53/7

**which** **[20]** 6/3 7/2 10/4 10/10 12/11 12/23 12/25 13/2 13/21 19/21 22/25 23/9 27/17 30/21 69/9 91/4 100/6 104/13 111/17 123/3

**Whichever** **[1]** 12/20

**while** **[10]** 20/16 37/25 38/20 42/12 45/7 47/20 56/7 58/12 102/7 124/18

**who** **[17]** 31/11 32/2 32/5 49/20 50/4 51/4 57/13 66/4 68/3 70/24 78/8 80/16 80/18 97/25 99/7 102/20 117/3

**whoever** **[2]** 23/17 78/17

**whole** **[5]** 104/25 105/1 109/15 110/9 122/24

**whom** **[1]** 99/10

**whose** **[2]** 51/1 72/21

**why** **[16]** 7/23 7/25 8/2 18/19 22/1 26/22 60/6 69/15 70/4 85/19 98/4 98/23 100/9 100/12 114/18 117/7

**wide** **[1]** 8/15

**will** **[44]** 8/13 9/24 13/5 21/15 21/22 22/19 23/12 24/3 24/11 27/5 28/10 29/3 29/23 30/12 30/17 31/8 31/9 32/17 39/11 47/8 47/12 60/4 60/23 60/24 61/2 74/23 75/22 82/7 85/1 85/14 91/6 92/5 109/10 109/15 109/16 109/25 111/17 111/18 119/13 119/23 120/14 124/3 124/8 127/24

**Windows** **[1]** 104/17

**wire** **[26]** 6/22 6/25 6/25 7/10 7/20 8/2 8/16 9/4 9/8 9/9 9/9 10/10 11/1 11/19 11/20 11/23 12/6 12/16 13/6 15/18 15/25 16/3 16/7 16/17 16/18 16/20

**wired** **[1]** 11/20

**wires** **[14]** 5/6 5/9 5/11 5/19 6/11 7/7 7/7 8/10 8/12 8/25 9/25 10/24 10/25 12/22

**within** **[23]** 16/13 17/22 18/6 25/9 34/25 41/4 71/24 72/1 98/7 98/19 100/18 109/22 111/24 112/2 116/4 116/5 116/23 118/5 118/8 118/11 119/2 120/12 123/21

**without** **[2]** 27/25 120/5

**witness** **[38]** 23/6 28/18 29/22 32/4 32/4 33/10 38/21 39/6 39/16 39/21 40/15 44/18 45/17 59/22 60/14 60/19 61/1 64/22 65/5 65/12 65/15 66/8 66/9 66/12 66/18 66/22 76/2 77/18 83/11 83/21 87/17 87/20 88/25 89/20 90/8 91/18 91/25 92/4

**witnesses** **[10]** 3/4 3/9 22/9 23/4 23/7 28/15 31/18 31/20 64/16 64/19

**Witos** **[16]** 25/12 25/14 25/16 26/17 27/3 27/6 27/12 28/4 31/16 32/1 41/14 41/23 41/25 50/11 50/12 50/18

**Wolett** **[6]** 29/24 35/23 36/4 36/15 41/14 41/23

**Wolett's** **[1]** 36/1

**won't** **[2]** 39/23 120/5

**word** **[13]** 14/25 17/22 21/1 21/2 35/15 78/24 118/21 120/8 120/10 120/11 120/14 120/14 120/19

**words** **[5]** 46/15 46/20 47/6 47/6 49/6

**work** **[20]** 20/20 39/10 52/4 52/7 52/9 53/22 57/10 62/24 70/9 73/14 75/3 92/17 93/8 109/8 109/10 111/18 111/22 112/24 121/8 126/22

**worked** **[9]** 18/2 24/22 36/4 41/10 42/16 44/9 70/9 92/22 123/25

**working** **[29]** 10/17 10/18 45/7 49/16 49/19 50/2 50/12 62/1 62/9 93/5 94/24 105/8 111/17 111/18 112/25 113/1 113/2 113/3 113/9 113/11 114/1 118/17 118/20 119/6 119/16 121/1 122/2 123/4 123/22

**works** **[3]** 29/5 29/7 30/5

**world** **[1]** 28/3

**worried** **[1]** 43/20

**would** **[98]** 4/24 7/13 7/14 7/16 8/5 8/10 12/13 12/23 15/6 16/19 17/20 18/14 18/23 18/25 20/20 20/20 20/20 20/25 21/7 21/17 21/18 22/17 22/25 23/16 23/20 23/22 24/5 24/10 25/22 27/15 29/15 30/9 35/14 35/15 38/1 38/1 38/5 38/9 38/14 38/25 40/1 40/3 40/4 41/20 41/21 45/13 47/8 49/25 50/25 51/1

52/1 52/5 52/7 52/17 58/11 58/21 59/8 59/25 60/3 61/23 62/7 62/8 66/25 67/9 67/12 76/4 77/15 78/16 78/21 78/24 81/22 83/20 83/21 83/23 83/25 84/1 101/9 102/3 102/4 102/5 105/20 106/17 106/18 107/2 107/6 107/8 108/22 109/1 119/25 122/4 122/7 122/22 126/17 127/3 127/7 127/14 127/21

**wouldn't** **[8]** 50/18 58/21 62/4 62/14 62/22 63/24 68/13 115/6

**writings** **[1]** 16/2

**written** **[1]** 14/7

**wrote** **[3]** 40/9 40/19 55/9

**WYMAN** **[15]** 2/5 4/6 18/10 26/13 29/25 32/25 73/5 73/6 73/10 74/3 74/25 86/15 86/25 93/2 93/19

**Wyman's** **[1]** 18/3

**X**

**X/Ways** **[1]** 107/22

**Y**

**yeah** **[2]** 76/3 108/24

**year** **[7]** 26/18 36/25 48/18 49/16 49/17 62/10 62/13

**years** **[25]** 24/14 27/10 27/18 38/20 42/1 42/3 42/12 47/15 47/18 48/20 48/22 49/3 61/15 61/15 61/16 67/12 67/23 68/11 68/24 69/8 77/19 87/23 92/21 115/5 116/24

**yes** **[199]**

**yesterday** **[13]** 17/3 17/6 30/19 33/17 36/7 36/15 36/23 45/19 49/15 53/6 73/21 74/4 125/15

**yet** **[6]** 10/17 10/17 17/3 46/2 60/22 92/1

**yields** **[1]** 120/8

**York** **[1]** 15/17

**you** **[693]**

**you'd** **[2]** 13/3 45/24

**you're** **[18]** 11/12 14/9 19/16 19/18 20/9 36/6 53/15 61/12 70/4 73/3 81/19 89/12 97/9 103/22 104/3 106/10 106/16 109/25

**you've** **[3]** 46/11 64/16 64/25

**young** **[2]** 28/19 28/25

**your** **[197]**

**yourself** **[4]** 11/14 83/21 102/20 128/1

**Z**

**zero** **[1]** 12/15

**zip** **[1]** 118/25