1          **UNITED STATES DISTRICT COURT**

2     **CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

3       **HONORABLE JAMES V. SELNA, U.S. DISTRICT JUDGE**

4

5   UNITED STATES OF AMERICA,              )
                                           )
6                   Plaintiff,             )   <u>**CERTIFIED TRANSCRIPT**</u>
                                           )
7        vs.                               )   Case No.
                                           )   SACR-19-00061-JVS
8   MICHAEL JOHN AVENATTI,                 )
                                           )   **TRIAL DAY 21**
9                   Defendant.             )   **VOLUME 2**
                                           )

10

11

12

13

14

                REPORTER'S TRANSCRIPT OF PROCEEDINGS
15
                   TUESDAY, AUGUST 17, 2021
16
                          1:27 P.M.
17
                   SANTA ANA, CALIFORNIA
18

19

20

21

22

23

               **DEBBIE HINO-SPAAN, CSR 7953, CRR**
24              FEDERAL OFFICIAL COURT REPORTER
              411 WEST 4TH STREET, ROOM 1-053
25                 SANTA ANA, CA 92701
                  dhinospaan@yahoo.com

1        **APPEARANCES OF COUNSEL:**

2

3    **FOR THE PLAINTIFF:**

4            NICOLA T. HANNA
             United States Attorney
5            BY:  BRETT SAGEL
                  Assistant United States Attorney
6            411 West 4th Street
             Suite 8000
7            Santa Ana, California 92701
             714-338-3598
8            brett.sagel@usdoj.gov

9            NICOLA T. HANNA
             United States Attorney
10           BY:  ALEXANDER WYMAN
                  Assistant United States Attorney
11           312 North Spring Street
             Suite 1100
12           Los Angeles, California 90012
             213-894-2435
13           alex.wyman@usdoj.gov

14   **FOR THE DEFENDANT IN PRO SE:**

15           MICHAEL JOHN AVENATTI, ESQ.

16

     **STANDBY COUNSEL FOR MR. AVENATTI:**
17
             H. DEAN STEWARD LAW OFFICES
18           BY:  H. DEAN STEWARD, ESQ.
             17 Corporate Plaza
19           Suite 254
             Newport Beach, California 92660
20           949-481-4900
             deansteward7777@gmail.com

21

22

23

24

25

1                    **I N D E X**

2   **WITNESSES**                                          **PAGE**

3   **JOHN ARDEN, CALLED BY THE DEFENSE**
        Direct Examination by Mr. Avenatti (resumed)      10
4       Cross-Examination by Mr. Sagel                    26
        Redirect Examination by Mr. Avenatti              54
5       Recross-Examination by Mr. Sagel                  77

6   **MELISSA GALICIA, CALLED BY THE DEFENSE**
        Direct Examination by Mr. Avenatti                82
7       Cross-Examination by Mr. Sagel                    100
        Redirect Examination by Mr. Avenatti              101

8

9

10

11

12

13

14

15                    **EXHIBITS**

16                  (None offered.)

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

| | |
|---|---|
| 1 | **SANTA ANA, CALIFORNIA; TUESDAY, AUGUST 17, 2021** |
| 2 | **1:27 P.M.** |
| 3 | **- - -** |
| 4 | |
| 01:27PM 5 | **(Out of the presence of the jury.)** |
| 6 | MR. SAGEL:  Your Honor, the Government had one very |
| 7 | brief matter in addition to the juror notice. |
| 8 | THE COURT:  Okay. |
| 9 | MR. SAGEL:  If you want to do it now or after. |
| 01:28PM 10 | THE COURT:  Well, I think Ms. Bredahl is bringing |
| 11 | the juror in right now. |
| 12 | MR. SAGEL:  Okay. |
| 13 | MR. AVENATTI:  Your Honor, for the Court's |
| 14 | information, we filed the -- you're one step ahead. |
| 01:29PM 15 | THE COURT:  With regard to Mr. Amenta? |
| 16 | MR. AVENATTI:  Yes, sir. |
| 17 | THE COURT:  As I read this, this is not your |
| 18 | response to the Government's large filing that you received |
| 19 | yesterday. |
| 01:29PM 20 | MR. AVENATTI:  Relating to Mr. Drum? |
| 21 | THE COURT:  Yes. |
| 22 | MR. AVENATTI:  That's correct. |
| 23 | THE COURT:  Okay. |
| 24 | MR. AVENATTI:  I'm planning on submitting that.  And |
| 01:29PM 25 | then I'd like an opportunity, actually, to argue the Drum |

```
  1    issue.
  2              THE COURT:  You'll have one.
  3              MR. AVENATTI:  Your Honor, when would you like the
  4    submission relating to Mr. Drum?
01:30PM 5          THE COURT:  As soon as you can practically get it
  6    in.
  7              MR. AVENATTI:  Okay.
  8              THE COURT:  Can't have your argument until you
  9    submit your paper.
01:30PM 10         MR. AVENATTI:  Understood.  A lot of paper, a lot
 11    moving pieces right now.  We're doing the best we can.
 12              (Discussion on the record with Juror Number 5
 13              out of the presence of the jury.)
 14              THE COURT:  Good afternoon.
01:30PM 15         JUROR NUMBER 5:  Hi.
 16              THE COURT:  You sent a note to the Court that you
 17    read part of a headline.
 18              JUROR NUMBER 5:  Uh-huh.
 19              THE COURT:  Why don't you tell me a little bit about
01:31PM 20    that.  First, what publication was it?
 21              JUROR NUMBER 5:  I have no clue.  So on my phone, if
 22    I swipe left, I get a bunch of, like, news, based on what I
 23    normally read.  And I've been reading about the My Pillow
 24    Guy --
01:31PM 25         THE COURT:  About the --
```

1          JUROR NUMBER 5:  -- and his cases.  So I thought it

2     was about that.  So I started --

3          THE COURT:  Tell me again what you said.

4          JUROR NUMBER 5:  The My Pillow Guy and the -- his,

01:31PM 5     like, claims about the 2020 election.

6          THE COURT:  Oh, okay.

7          JUROR NUMBER 5:  Yeah.  Yeah.

8          So anyway, we were on -- we were driving to

9     San Diego for the weekend, and I swiped left.  And I started

01:31PM 10     reading, and it just said, "A federal judge dismisses."  So I

11     thought it was about that.  And then once I read "Michael

12     Avenatti," I just stopped reading, and I just hurried up and

13     scrolled up so I didn't read the rest.

14          THE COURT:  Okay.  You didn't get into the text of

01:31PM 15     the story?

16          JUROR NUMBER 5:  No.  I did not open it.  I did not

17     read the rest of the title.

18          THE COURT:  So do you know what the suit was about?

19          JUROR NUMBER 5:  No, because I was just skimming.

01:32PM 20     And, like, I don't even know the whole title.  I don't know the

21     publication or anything.  I just -- once I saw his name, I --

22          THE COURT:  Good.

23          JUROR NUMBER 5:  -- left it alone.  I didn't want to

24     get in trouble.

01:32PM 25          THE COURT:  Have you discussed the fact that you ran

```
 1   across this with any of the other jurors?
 2           JUROR NUMBER 5:  Well, I said it in front of them,
 3   to Lisa, just that I saw a headline.
 4           THE COURT:  Okay.  But did you directly discuss with
 5   any of the jurors --
 6           JUROR NUMBER 5:  No.  No.
 7           THE COURT:  Okay.  Government have any questions?
 8           MR. SAGEL:  No, Your Honor.
 9           THE COURT:  Mr. Avenatti?
10           MR. AVENATTI:  One or two, Your Honor.
11           JUROR NUMBER 5:  Yeah.  No worries.  Hi.
12           MR. AVENATTI:  Is there anything that you read that
13   would cause you not to give me a fair shake when you deliberate
14   in this case?
15           JUROR NUMBER 5:  I don't think so.  Like, I -- I --
16   seriously, once I saw your name, all I know is a judge
17   dismissed something pertaining to you.  That's all I know.
18           MR. AVENATTI:  So, in your mind, I can feel
19   confident that that -- whatever you read, whatever it was, in
20   no way impacted your ability to weigh the evidence fairly and
21   to give me a fair verdict in this criminal case?
22           JUROR NUMBER 5:  I don't think so.  I don't even
23   know what it was about.
24           MR. AVENATTI:  All right.  Thank you.
25           JUROR NUMBER 5:  No.  Sorry.  I just --
```

The time stamps in the left margin read: 01:32PM (line 5), 01:32PM (line 10), 01:33PM (line 15), 01:33PM (line 20), 01:33PM (line 25).

1     MR. AVENATTI:  Don't be sorry.

2     JUROR NUMBER 5:  I feel bad.

3     MR. AVENATTI:  Don't feel bad.  Thank you so much.

4  Thank you.

01:33PM 5     JUROR NUMBER 5:  Yeah, no problem.

6     MR. AVENATTI:  Thank you, Your Honor.

7     THE COURT:  You think some jurors may have overheard

8  your conversation with Ms. Bredahl?

9     JUROR NUMBER 5:  Well, I know I said with her that I

01:33PM 10  started reading a headline, and I came across his name and I

11  stopped.  And she said, "Write it in a letter."  And they were

12  in the room.

13     THE COURT:  Okay.  Thank you.

14     JUROR NUMBER 5:  Uh-huh.

01:34PM 15     **(Juror Number 5 left the courtroom.)**

16     THE COURT:  I don't think there's enough there to

17  pursue it with the other jurors, but I'd be happy to hear your

18  thoughts.

19     MR. AVENATTI:  Your Honor, I don't know the full

01:34PM 20  extent of what other jurors may or may not have heard.  I

21  don't, frankly, think that this juror knows it either.  And so

22  I would ask for an inquiry relating to if any other jurors

23  heard about this or -- just in a very -- I want to be clear

24  about this, in a very generalized sense, whether they've seen

01:34PM 25  any press or read anything relating to the defendant or

1    relating to Mr. Avenatti.  That's the only thing.

2              THE COURT:  I think that the effectiveness of my

3    instruction to them to report to the Court is proven by

4    Ms. K.Lu.

01:35PM 5              What I'm asking is, is there any basis to go further

6    with the jurors as to what they may have overheard in the

7    exchange between Juror Number 5 and Ms. Bredahl?

8              MR. AVENATTI:  I understand, Your Honor.  What I'm

9    asking for is -- I'm asking for that inquiry so that we can

01:35PM 10   find out if there was anything that these jurors may have

11   overheard relating to what she said to Ms. Bredahl.  Because I

12   want to make sure that no other jurors were potentially

13   tainted.

14             THE COURTROOM DEPUTY:  Judge, for what it's worth,

01:35PM 15   exactly what she said happened.  It's exactly --

16             THE COURT:  Did she mention Mr. Avenatti's name?

17             THE COURTROOM DEPUTY:  She said, "I saw a headline,

18   and I read halfway through it and then I quit."

19             And I said, "If it has to do with this, you need to

01:35PM 20   put it in writing."  And that's what she did, as I waited.  So

21   I know she didn't talk about it then.  And then I took the

22   paper from her and --

23             THE COURT:  But she didn't mention Mr. Avenatti's

24   name?

01:36PM 25             THE COURTROOM DEPUTY:  I do not believe so.

1          THE COURT:  We're going to leave it where it is.

2          Let's bring the jurors in, please.

3          **(In the presence of the jury.)**

4          THE COURT:  Good afternoon, ladies and gentlemen.

01:36PM 5          **(The jurors collectively responded "Good**

6           **afternoon.")**

7          THE COURT:  Mr. Avenatti.

8          MR. AVENATTI:  Ms. Hernandez, can we blow up the

9    body of 1061, please.

01:38PM 10          **JOHN ARDEN, WITNESS, RESUMED THE STAND**

11          **DIRECT EXAMINATION (continued)**

12   BY MR. AVENATTI:

13   Q    Immediately before the lunch break, sir, we were talking

14   about this letter that you had signed addressed to Mr. Bledsoe.

01:38PM 15   Do you recall that?

16   A    Yes, I do.

17   Q    And I believe you had just read into the record the

18   sentence beginning with "Rather"; is that right?

19   A    That sounds right.

01:38PM 20   Q    And immediately after that sentence, there's a sentence

21   that begins with "This is because."  Do you see that?

22          Could you please read that into the record.

23   A    Sure.  Sorry.  "This is because neither of us" --

24          THE REPORTER:  I'm sorry.  Can you put the

01:39PM 25   microphone underneath your mask.

```
 1                THE WITNESS:  Right here?

 2                THE REPORTER:  Yes.  Thank you.

 3                THE WITNESS:  "This is because neither of us

 4          had any role in finalizing the settlement agreement

 5          or dealing with Brock or its attorneys after the

 6          mediation relating to settlement."

 7     Q    BY MR. AVENATTI:  And was that a truthful statement when

 8     you put it in the letter?

 9     A    Yes, it was.

10     Q    So following the mediation, you had no role in finalizing

11     the settlement agreement; is that true?

12     A    That's correct.

13     Q    And you had no role in dealing with Mr. Sheikh relating

14     to the settlement agreement; is that right?

15     A    That's correct.

16     Q    And you had no role in dealing with Mr. Barela as it

17     related to the settlement agreement; is that right?

18     A    That's correct.

19     Q    The person that dealt with Mr. Barela relating to the

20     settlement agreement was me; correct?

21     A    Yes.

22     Q    Were you privy to any of my communications with

23     Mr. Barela relating to the settlement?

24     A    No, I don't think so.

25     Q    Were you privy to any of my communications with
```

         1   Mr. Sheikh relating to the settlement after the mediation?

         2   A     No, I don't think so.

         3   Q     Do you know one way or the other if after the -- well,

         4   strike that.

01:41PM   5         Have you ever seen the settlement agreement?

         6   A     I've seen copies of it at this point in time.

         7   Q     Prior to meeting with the Government, had you ever seen a

         8   copy of the settlement agreement?

         9   A     Well, there were copies of the settlement agreement

01:41PM  10   attached to the arbitration reference.

        11   Q     Prior to Mr. Barela filing the arbitration proceeding --

        12   well, strike that.

        13         Do you recall that arbitration proceeding was filed

        14   in late 2018, early 2019?  What's your best recollection?

01:41PM  15   A     January of 2019.

        16   Q     Prior to January 2019, had you ever seen the settlement

        17   agreement?

        18   A     Not the final version.

        19   Q     Prior to January 2019, were you aware of an e-mail

01:41PM  20   exchange that occurred between me and Mr. Sheikh which

        21   constituted a binding settlement agreement?

        22   A     No, I don't -- I don't think so.

        23   Q     Were you a party to any e-mail communications between me

        24   and Mr. Sheikh relating to the settlement after the mediation?

01:42PM  25   A     No.

Q    Did you have an understanding at any point in time that I or other members of the firm were assisting Mr. Barela in a new business venture?

A    I was generally aware that Mr. Barela had some kind of business venture, but I didn't know the details and wasn't sure who was involved.

Q    Were you involved in any way in determining what work was being performed for Mr. Barela by me or others relating to that venture?

A    No.

Q    Did you have any idea what my arrangement was with Mr. Barela relating to that venture?

A    No.

Q    Did you have any understanding as to how the legal fees associated with that venture were being billed to Mr. Barela?

A    No.

Q    Were you a party to any communications between me and Mr. Barela relating to legal fees?

A    No, I don't think so.

Q    How about relating to -- well, strike that.

        Were you a party to any communications between me and Mr. Barela relating to legal fees on any of his matters?

A    I don't think so.

Q    Do you know all of the work that was done on Mr. Barela's behalf by me and other individuals at the law firm other than

1   yourself?

2   A      No.

3   Q      Prior to today, have you ever told Mr. Barela or any of

4   his attorneys that what Mr. Barela said happened in connection

01:44PM 5   with the conference room event never happened?

6   A      What do you mean by "his attorneys"?

7   Q      Any -- well, strike that.

8          Prior to taking the stand here today, did you ever

9   tell anyone that the events that Mr. Barela claimed relating to

01:45PM 10   the conference room, the hand gesture, did you ever tell anyone

11   associated with Mr. Barela that that did not occur?

12              MR. SAGEL:  Calls for hearsay, Your Honor.

13              THE COURT:  Overruled.

14              THE WITNESS:  I don't think so.  I'm a little

01:45PM 15   confused.  I mean, it was discussed when I was interviewed by

16   the Government.  And, you know, I'm not really sure what you

17   mean by "anyone associated."

18          Obviously, there was a civil lawsuit, and I had an

19   attorney involved in that.  I never spoke directly with anyone

01:46PM 20   on Mr. Barela's side myself.  But he may have.

21   Q      BY MR. AVENATTI:  Do you have a recollection of meeting

22   with Mr. Sagel on October 7th, 2019?

23              MR. SAGEL:  Objection.  Calls for hearsay and

24   improper impeachment.  He hasn't asked him a question here.

01:47PM 25              THE COURT:  Overruled .

1          THE WITNESS:  That's -- sounds right.  I don't

2   remember the exact date.  October of 2019 seems correct.

3   Q    BY MR. AVENATTI:  And do you have a recollection that

4   when you met with Mr. Sagel -- well, before we get to that, do

01:47PM 5   you have a recollection that when you met with Mr. Sagel, it

6   was at the U.S. Attorney's Office in Los Angeles?

7   A    Los Angeles?  No, I think it was here.

8          MR. AVENATTI:  Your Honor, can I approach?

9          THE COURT:  You may.

01:48PM 10          **(Counsel conferred off the record.)**

11   Q    BY MR. AVENATTI:  Mr. Arden, please take a look at the

12   first page.  And my question is, does that refresh your

13   recollection that in October 2019, you met with Mr. Sagel in

14   connection with this case?

01:49PM 15   A    I did meet with Mr. Sagel in October of 2019, yes.

16   Q    All right.  And does the first page of that document

17   refresh your recollection that you met with him at the

18   U.S. Attorney's Office in Los Angeles?

19   A    No.  I think it was here.

01:49PM 20   Q    So if that document says "Los Angeles," that would be

21   wrong, to the best of your recollection?

22   A    To the best of my recollection.

23   Q    Okay.  You recall meeting them in this courthouse?

24   A    I think so, yes.

01:50PM 25   Q    Okay.  And do you recall that during that October 2019

```
  1    meeting, Mr. Sagel specifically asked you about this claim by

  2    Mr. Barela about the conference room incident?

  3    A    Yes.  I recall being asked about it, yes.

  4    Q    And do you recall that, in particular, Mr. Sagel asked

01:50PM  5    you about paragraph 36 in the arbitration claim that had been

  6    filed against you?

  7    A    I don't know if he was referencing paragraph 36 or not.  I

  8    wouldn't have known.  I didn't see what was in front of him.

  9    Q    Okay.  Well, take a look at the notes that I provided

01:50PM 10    you.  I think it's paragraph 39 in those notes.

 11           My question is, does that refresh your recollection?

 12    A    I don't remember looking specifically at the arbitration

 13    claim.  I remember discussing the substance.

 14    Q    My question is this:  Looking at those notes, does that

01:51PM 15    refresh your recollection that when you met with Mr. Sagel, he

 16    asked you about paragraph 36 of the arbitration claim?

 17    A    I don't remember looking at the actual arbitration claim

 18    myself during the meeting.  I don't remember that.

 19    Q    Okay.

01:51PM 20    A    The substance -- if that substance has to do with this

 21    window -- conference room window gesture, then I do remember

 22    discussing the substance of that.

 23           MR. AVENATTI:  Your Honor, can I approach?

 24           THE COURT:  You may.

01:52PM 25    Q    BY MR. AVENATTI:  Mr. Arden, does that refresh your
```

```
  1    recollection that, in fact, you were specifically asked about

  2    this claim -- the conference room claim when you met with

  3    Mr. Sagel?

  4    A    I was asked about the conference room claim, yes.

01:53PM 5    Q    And did you tell Mr. Sagel that you don't recall that

  6    happening?

  7    A    Yes, I believe so.  I don't remember my exact words, but

  8    yes.

  9              MR. AVENATTI:  Your Honor, can I retrieve my

01:53PM 10   document?

 11              THE COURT:  You may.

 12    Q    BY MR. AVENATTI:  And Mr. Arden, did you tell Mr. Sagel

 13    back in October of 2019 that you never recall telling Ahmed

 14    Ibrahim not to talk about the Barela case?

01:54PM 15             MR. SAGEL:  Objection.  Improper impeachment and

 16    calls for hearsay.

 17              THE COURT:  Overruled.

 18              THE WITNESS:  Yes.  I mean, I don't -- yeah, I

 19    generally remember discussing it.  I don't remember the exact

01:54PM 20   words I used.  But yes, that's, in substance, correct.

 21    Q    BY MR. AVENATTI:  And, in fact, not only did you tell

 22    Mr. Sagel that you don't recall that happening, but you

 23    explained to Mr. Sagel why it was not possible that it could

 24    have happened, didn't you?

01:54PM 25   A    I explained that I was --
```

```
 1   Q    No.  Didn't you, sir?
 2              MR. SAGEL:  Objection.  Leading.
 3              THE COURT:  Sustained.
 4   Q    BY MR. AVENATTI:  Mr. Arden, when you met with Mr. Sagel,
 5   did you explain to Mr. Sagel whether it would be possible or
 6   not for that to have happened?
 7              MR. SAGEL:  Same objection.
 8              THE COURT:  Overruled.
 9              THE WITNESS:  I explained that I was confused about
10   the nature of the allegation and how it could have taken place.
11   Q    BY MR. AVENATTI:  Did you explain to Mr. Sagel at the
12   time the conference room setup and how the conference room was
13   positioned at the law firm?
14   A    Yes, I believe I discussed that.  It was also, you know,
15   unclear to me whether I was supposed to have been in the
16   conference room or whether I was supposed to have been outside
17   the conference room.
18              MR. AVENATTI:  Move to strike everything after
19   "that" as nonresponsive.
20              THE COURT:  Be stricken.
21   Q    BY MR. AVENATTI:  Did you tell Mr. Sagel that if you were
22   in the conference room, there could not have been a reflection;
23   and that if you were outside of the conference room, you could
24   not have heard what Mr. Barela and Mr. Ibrahim were talking
25   about?
```

01:54PM 5

01:55PM 10

01:55PM 15

01:55PM 20

01:56PM 25

A      The latter -- I remember the former as to there could not

have been a reflection.  I mean, I don't think those -- there's

a window.  So at least, in theory, it's possible for there to

be a reflection.

01:56PM 5          MR. AVENATTI:  May I approach, Your Honor?

6          THE COURT:  You may.

7 Q    BY MR. AVENATTI:  Mr. Arden, take a look at paragraph 40

8 and tell me if that refreshes your recollection as to whether

9 you explained to Mr. Sagel that it would not have been possible

01:57PM 10 to have occurred as Mr. Barela had suggested.

11          MR. SAGEL:  Objection, Your Honor.  He never said he

12 needed his recollection refreshed.  He answered the question

13 that was asked of him.

14          THE COURT:  Rephrase the question.

01:57PM 15 Q    BY MR. AVENATTI:  Sir, isn't it true that when you met

16 with the Government in October of 2019, that you told Mr. Sagel

17 specifically that had you been in the conference room, the

18 reflection theory of Mr. Barela would not work?  Isn't that

19 true, sir?

01:57PM 20 A    I did not -- what I recall saying is that I did not

21 understand why, if I was in that conference room, someone would

22 be looking at my reflection as opposed to just looking at me.

23 Q    Do you dispute that those notes are accurate, sir?

24 A    I don't remember.

01:58PM 25 Q    So you don't dispute it; is that right?

**UNITED STATES DISTRICT COURT**

1    A    I don't remember everything that I said, so I'm not going

2    to say one way or the other.

3    Q    When you left the meeting with Mr. Sagel in October of

4    2019, did you believe that you had made it clear to Mr. Sagel

01:58PM 5    that what Mr. Barela had said happened had not happened?

6    A    What I -- I believe that I had made it clear that whatever

7    happened, I wasn't trying to signal anything to anyone to be

8    silent about the settlement.

9    Q    Did Mr. Sagel ever ask you any questions about Evan

01:59PM 10   Jenness?

11   A    I believe I was asked a question.

12   Q    In the same October 2019 meeting?

13   A    I think so.

14   Q    Do you recall Mr. Sagel asking you if Evan Jenness was on

01:59PM 15   the call?

16   A    I recall being asked if I was on a call with Evan Jenness.

17   Q    And did you tell Mr. Sagel that you were not on a call

18   with Evan Jenness?

19   A    Yes.  I think so.

01:59PM 20        MR. AVENATTI:  Your Honor, can I retrieve my

21   document again?

22        THE COURT:  You may.

23   Q    BY MR. AVENATTI:  Now, Mr. Barela has testified before

24   the jury that he asked you for a copy of his settlement

02:00PM 25   agreement.  Is that true?

1  A    I don't think so.  I don't think I was ever asked for a

2  copy of the settlement agreement by Mr. Barela.

3  Q    Were you ever asked for any accounting information

4  relating to Mr. Barela's case?  Were you ever asked for that

02:00PM  5  information by Mr. Barela?

6  A    No.  I don't think so.

7  Q    Did you ever track any of your time on any of the matters

8  on which you worked?

9  A    Sometimes, yes.

02:01PM 10  Q    Did you ever give that time to anyone to be input into a

11  computer system?

12  A    I believe I would -- I sent it to the office receptionist

13  when I did.

14  Q    And was that Hillary Wollett?

02:01PM 15  A    Yes.

16  Q    And did you understand that that time would be input into

17  a computer program by the name of Tabs?

18  A    I assume so.

19          MR. SAGEL:  Objection.  Speculation, based on the

02:02PM 20  answer.

21          THE COURT:  The answer will be stricken.

22  Q    BY MR. AVENATTI:  Sir, when you provided your time to

23  Ms. Wollett, you had the understanding that it would be input

24  into a computer system; is that right?

02:02PM 25  A    Yes.

```
 1    Q     And what was that understanding based on?
 2    A     Probably some -- a conversation I had with her at some
 3    point in time.
 4    Q     Did you, at any point in time during your ten years at
 5    the firm, have an understanding that a program by the name of
 6    "Tabs" was used at the firm?
 7    A     Yes.
 8    Q     What did you understand -- well, strike that.
 9          How did you have that understanding about Tabs?
10    A     At some point early on when I started, it was shown to me.
11    Q     And that was around 2009?
12    A     I think so.
13    Q     Now, when you say the program was shown to you, what do
14    you mean by that?
15    A     Someone at the firm told me about it and that it was a
16    means by which to keep track of time.
17    Q     Did you have an understanding that expenses were also
18    tracked in Tabs, and costs?
19    A     No, I didn't have that understanding.
20    Q     Did you know one way or the other?
21    A     No.
22    Q     Who was more knowledgeable about those issues when you
23    were at the firm, to the best of your knowledge, you or
24    Ms. Regnier?
25    A     Ms. Regnier.
```

02:02PM 5
02:02PM 10
02:03PM 15
02:03PM 20
02:03PM 25

**UNITED STATES DISTRICT COURT**

```
 1    Q    Did you understand that the Tabs program was part of the

 2    systems of the law firm?

 3              MR. SAGEL:  Objection.  Foundation.

 4              THE COURT:  Lay the foundation.

 5    Q    BY MR. AVENATTI:  Sir, when you were shown the Tabs

 6    program, when you started at the firm, did you see it on the

 7    computer system?

 8    A    Yes.  It was installed on my computer.

 9    Q    Would you ever access Tabs while you were at the firm?

10    A    There was a point in time where I did.  But eventually I

11    stopped.

12    Q    Why would you access Tabs?

13    A    To enter in my time.

14    Q    There was a point in time where you would enter your own

15    time as opposed to giving it to the receptionist; correct?

16    A    Yes.

17    Q    And in order to do that, you would just access the

18    program from your computer; is that right?

19    A    Yes.

20    Q    While you were at the firm for ten years, did you

21    regularly track your time?

22    A    Off and on.

23    Q    What would determine -- strike that.

24              What would cause you to determine whether you needed

25    to track your time?
```

02:03PM (line 5)
02:04PM (line 10)
02:04PM (line 15)
02:04PM (line 20)
02:05PM (line 25)

```
       1  A    It was a little bit random, I think.  It was never my
       2  understanding that I had to track my time.  So sometimes I did
       3  if I -- I think if I felt that it was going to be a case where
       4  attorneys' fees might try to be recovered and other costs, then
02:05PM 5  I would be more conscientious of entering my time.
       6  Q    Did you have any understanding of what happened to your
       7  time after it was entered into the program, Tabs?
       8  A    Not really, no.
       9  Q    I'm sorry?
02:05PM 10 A    Not really, no.
      11  Q    That was not within your responsibilities at the firm; is
      12  that right?
      13  A    Yeah, that's correct.
      14  Q    Now, when you traveled for the mediation for Mr. Barela,
02:06PM 15 did you incur expenses?
      16  A    Yes.
      17  Q    And when you got back from the mediation, what did you do
      18  with those expenses?
      19  A    I don't remember specifically for the mediation.  But as a
02:06PM 20 rule, it might be I would submit for reimbursement.  Sometimes
      21  Ms. Regnier would just make arrangements for me, travel
      22  arrangements, in which case there was no need to reimburse me
      23  because I hadn't paid out of pocket.  But if I had paid out of
      24  pocket, I would request reimbursement.
02:06PM 25 Q    So if you had paid out of pocket in connection with a
```

**UNITED STATES DISTRICT COURT**

```
 1    case, would you fill out an expense report?
 2    A    I don't remember if I filled out expense reports or just
 3    submitted my receipts.  I think I usually gave them to someone
 4    else within the firm who would then process them.
 5    Q    Who do you recall giving your receipts to generally?
 6    A    Probably Judy Regnier.  I think at some point in time,
 7    there might have been some other individuals as well.
 8    Q    Do you remember a woman by the name of Morgan Witos?
 9    A    I do.
10    Q    Who was Morgan Witos?
11    A    She worked at the firm.
12    Q    She was a CPA who worked at the firm; right?
13    A    I'm not certain of her qualifications.
14    Q    Well, you recall Ms. Witos was involved in the accounting
15    at the law firm while you were there?
16    A    That was generally my understanding.
17    Q    And when these expenses would be given to Ms. Regnier or
18    others, would you ultimately get a check?
19    A    Yes.
20    Q    Do you know how those expenses were processed or where
21    they were stored in the computer systems of the law firm?
22    A    No.
23    Q    You mentioned this other matter in San Diego that you had
24    worked on briefly relating to Mr. Barela.  Do you recall that?
25    A    I recall mentioning another matter, yes.
```

**UNITED STATES DISTRICT COURT**

```
 1   Q    Do you recall that it was a matter in San Diego?
 2   A    That sounds right.
 3   Q    Do you know what other work was done on this -- on the
 4   matter other than what you specifically did?
 5   A    Not really, no.
 6   Q    Do you know what the arrangement was with the law firm
 7   with Mr. Barela relating to how the law firm was to be paid in
 8   connection with that?
 9   A    No.
10         MR. AVENATTI:  One moment, Your Honor, please.
11         (Counsel conferred off the record.)
12         MR. AVENATTI:  Nothing further, Your Honor.
13         THE COURT:  Mr. Sagel.
14                    CROSS-EXAMINATION
15   BY MR. SAGEL:
16   Q    Good afternoon, Mr. Arden.
17   A    Good afternoon.
18   Q    At the beginning of your testimony, defendant went over
19   some of the things you did at the firm.  So let me just ask you
20   some of the questions about that.
21         The work that you did at Eagan Avenatti, that was at
22   the direction of the defendant; is that correct?
23   A    Yes.
24   Q    All work and responsibilities you had there were at
25   defendant's direction?
```

02:09PM (line 5)
02:09PM (line 10)
02:10PM (line 15)
02:11PM (line 20)
02:11PM (line 25)

1    A    Yes.  I didn't have any authority.

2    Q    And when you say you didn't have any authority, you

3    described working at Eagan Avenatti as doing it "defendant's

4    way or the highway"; isn't that correct?

02:11PM 5    A    Yes.  I believe I said that.

6    Q    For you to do anything, you needed defendant's approval;

7    is that correct?

8    A    Yes.

9         MR. AVENATTI:  Objection.  Lacks foundation,

02:11PM 10   Your Honor.

11        THE COURT:  Overruled.

12        THE WITNESS:  Nothing in terms of my work and

13   drafting things, nothing got filed without his approval.

14   Q    BY MR. SAGEL:  Did you ever enter into a fee agreement or

02:11PM 15   a fee contract with a client?

16   A    No.

17   Q    Who, to your understanding, was the only one who could

18   enter into a fee agreement or fee contract with the client?

19   A    To my knowledge, Mr. Avenatti.

02:12PM 20   Q    Defendant asked you some questions about whether you knew

21   anything about the arrangements with Mr. Barela on any other

22   matters.  At any point, did defendant ever tell you he had

23   other arrangements with Mr. Barela?

24   A    No, I don't think so.

02:12PM 25   Q    I'm going to ask you some questions about the Barela case

```
         1    you went over.  Your role in the Barela case, you -- I think
         2    you used the word "researched."  So you researched the law and
         3    the facts?
         4    A    Yes.
02:12PM  5    Q    You drafted and filed documents?
         6    A    I drafted them.  I wouldn't say that I filed them, but I
         7    drafted them.
         8    Q    When you say you wouldn't say you filed them, why are you
         9    saying you didn't file them?
02:12PM 10    A    I was never the person who actually sent something off to
        11    be filed.  I didn't sign any of the documents.  So someone else
        12    would take care of the filing and signing of the documents.
        13    Everything I did was sent to Mr. Avenatti for -- potentially
        14    others as well -- for review.
02:13PM 15    Q    So, for example, if you drafted a response to a motion or
        16    document in the Brock/Barela matter, you would first send it to
        17    defendant for his approval; is that correct?
        18             MR. AVENATTI:  Objection.  Lacks foundation.
        19             THE COURT:  Overruled.
02:13PM 20             THE WITNESS:  In the Brock matter, it may have
        21    first, depending on the document, gone to Mr. Ibrahim.  But
        22    ultimately, it would have gone to Mr. Avenatti.
        23    Q    BY MR. SAGEL:  And then after you sent it to
        24    Mr. Avenatti, he would sometimes reply to you, "Good.  Please
02:13PM 25    file"?
```

A     Yes.

Q     So if he gave you permission, you would file documents?

A     Yes.  Someone in the office would file.

Q     2014, when the Brock/Barela matter started, through 2017, who did the heavy lifting on the Brock/Barela matter?

          MR. AVENATTI:  Objection, Your Honor.  Vague. Ambiguous.

          THE WITNESS:  Depends on what task --

          THE COURT:  Just a minute.

          Rephrase the question.

Q     BY MR. SAGEL:  During the pendency of the arbitration and the litigation, who did the most work on the case in the Brock/Barela matter?

A     It depends on what particular tasks you're talking about. But I did a lot of work on the case.

Q     How would you describe the amount of work you did on the case from 2014 to '17 in comparison to the defendant?

          MR. AVENATTI:  Lacks foundation, Your Honor.

          THE COURT:  Overruled.

          THE WITNESS:  Generally speaking, on the day-to-day, I thought -- I would just say that I did more of the day-to-day work.

Q     BY MR. SAGEL:  And towards the end of 2017 is when the case moved towards the ultimate mediation; is that correct?

A     Yes.

1   Q    Who took over the responsibilities for the case when it

2   went to mediation?

3   A    Mr. Avenatti.

4   Q    And whose decision was it to take over the

02:15PM 5   responsibilities of the case when it went to arbitration -- or

6   mediation?  I'm sorry.

7   A    Mr. Avenatti.  I wouldn't have done that sort of thing.

8   Q    And you were at -- defendant asked you questions about

9   being at the mediation in December of 2017 in Colorado; is that

02:15PM 10   correct?

11   A    Yes.

12   Q    And while you were at that mediation, you had discussions

13   with the defendant about the settlement in that matter; isn't

14   that correct?

02:15PM 15   A    With the defendant?

16   Q    When I say "defendant," I'm talking about the defendant

17   sitting right here, not the one in the civil case.

18   A    Yes, I understand.

19        Yes, I had discussions with him during the

02:16PM 20   mediation.

21   Q    And some of those discussions talked about what was being

22   offered by the other side; is that correct?

23   A    Yes.

24   Q    And what defendant was trying to get on behalf of your

02:16PM 25   client, Greg Barela?

A      Yes.

Q      And during those discussions, defendant told you what
Mr. Barela would get from the settlement based on the fee
agreement and the costs and the expenses in the case; isn't
that right?

A      I'm not sure what he based his opinion on, but he made a
statement about how much he thought Mr. Barela would get out of
the settlement.

Q      And defendant told you if he could get Greg Barela about
a $2 million settlement, Greg Barela would clear $1 million;
isn't that correct?

                MR. AVENATTI:  Lacks foundation.

                THE COURT:  Overruled.

                THE WITNESS:  Yes, I remember him saying that.

Q      BY MR. SAGEL:  And when defendant just asked you about
your costs and your expenses that you might have had to incur
while you were in Denver, Colorado, for the mediation, did you
incur $1 million in expenses?

A      No, I did not.

Q      When the mediation was over and a settlement agreement
was signed, you learned of that from a text message from the
defendant; isn't that correct?

A      That's correct.

Q      And your understanding at that time was the case settled
in and around the $2 million mark; isn't that correct?

```
 1   A    That was generally my understanding at the time.
 2   Q    And when you found out that the case had settled for that
 3   amount, you felt good about your work?
 4   A    I did.
 5   Q    You felt good for Greg Barela?
 6   A    I did.
 7   Q    Because you thought a normal guy got about a million
 8   dollars out of his settlement agreement?
 9        MR. AVENATTI:  Objection, Your Honor.  Lacks
10   foundation.
11        THE COURT:  Overruled.
12        MR. AVENATTI:  Argumentative.
13        THE COURT:  Overruled.
14        THE WITNESS:  That's what I thought.  I thought that
15   the settlement was a good result for him.
16   Q    BY MR. SAGEL:  At any time when the case settled in
17   December 2017, did defendant tell you that Greg Barela deserved
18   no money from that settlement agreement?
19   A    No.
20   Q    At any time did defendant tell you the costs and expenses
21   from the case did not entitle Greg Barela to anything?
22   A    No.
23   Q    Would you have thought that was a good deal for Greg
24   Barela if the settlement amounted to zero?
25        MR. AVENATTI:  Speculation and conjecture, Your
```

02:17PM 5
02:18PM 10
02:18PM 15
02:18PM 20
02:18PM 25

```
 1    Honor.  Lacks foundation.  Argumentative.
 2              THE COURT:  Sustained.
 3    Q    BY MR. SAGEL:  After the case was settled, what role did
 4    you have in handling Greg Barela's matter as it related to the
 5    Brock settlement?
 6    A    No role.
 7    Q    What access did you have to the attorney-client trust
 8    account in which the settlement money was deposited?
 9    A    No access.
10    Q    Who had access to the attorney-client trust account that
11    you know of?
12              MR. AVENATTI:  Lacks foundation.  Calls for
13    speculation, Your Honor.
14              THE COURT:  Overruled.
15              THE WITNESS:  I would have understood Mr. Avenatti
16    to have access and perhaps Ms. Regnier.
17    Q    BY MR. SAGEL:  While you were at the mediation -- strike
18    that.  Let me start that over.
19              During your work on the Greg Barela case from 2014
20    through 2017 when it settled, did Ed Ricci ever work on the
21    case?
22    A    Not to my knowledge.
23    Q    Did Filippo Marchino or The X-Law Group ever work on the
24    case?
25    A    I don't think so.
```

02:19PM (lines 5, 10, 15, 20, 25)

UNITED STATES DISTRICT COURT

```
 1   Q    Did Richard Beada ever work on the case?

 2   A    I'm not sure I know who that is.

 3   Q    Dennis Brager ever work on the case?

 4   A    That's not familiar to me; so I don't think so.

 5   Q    Did Dillanos Coffee Roasters ever work on the case?

 6   A    I don't think so.

 7   Q    What about Alki Bakery?

 8   A    I wouldn't think so.

 9   Q    And as someone who worked on the case for those

10   three-plus years, you were familiar with who was working on the

11   case?

12   A    Yes.  On a day-to-day.

13   Q    Do you have any explanation why money from Greg Barela's

14   attorney-client trust account from his settlement money was

15   paid to any of the people I just named?

16              MR. AVENATTI:  Objection, Your Honor.  Lacks

17   foundation, and it's argumentative.

18              THE COURT:  Overruled.

19              THE WITNESS:  No, I don't have any -- I don't know

20   why.

21   Q    BY MR. SAGEL:  You do know what Global Baristas is; isn't

22   that correct?

23   A    Generally, yes.

24   Q    And you know that to be a company that defendant owns

25   some interest in; isn't that right?
```

02:20PM 5
02:20PM 10
02:20PM 15
02:20PM 20
02:21PM 25

```
 1   A     Yes.
 2   Q     And the reason you know that is defendant asked you to do
 3   legal work for Global Baristas; isn't --
 4              MR. AVENATTI:  Objection, Your Honor.  Beyond the
02:21PM  5   scope.
 6              MR. SAGEL:  It relates to the money spent out of the
 7   attorney-client trust account.
 8              THE COURT:  Overruled.
 9              THE WITNESS:  Yes.
02:21PM 10   Q     BY MR. SAGEL:  Is there any reason why money was spent
11   out of the Greg Barela attorney-client trust account from the
12   settlement money to Global Baristas?
13              MR. AVENATTI:  Your Honor, lacks foundation.  He
14   doesn't know anything about the trust account.
02:21PM 15              THE COURT:  Overruled.
16              THE WITNESS:  Not that I know of.
17   Q     BY MR. SAGEL:  I'm just going to skip ahead.
18              Defendant asked you if you knew about Morgan Witos
19   working at the firm.  He didn't ask you when she worked at the
02:21PM 20   firm, did he?
21   A     I don't think that was one of the questions.
22   Q     She stopped working at the firm in 2014; isn't that
23   correct?
24   A     I'm not sure of the exact year, but that sounds about
02:21PM 25   right.
```

Q    So if the Geoffrey Johnson matter didn't even settle

until 2015, Morgan Witos wouldn't have been there?

          MR. AVENATTI:  Objection, Your Honor.  Calls for

speculation, conjecture.  It lacks foundation.

02:22PM           THE COURT:  Overruled.

          THE WITNESS:  I don't know exactly when she left,

but I don't -- I don't have any reason to think that she was --

specific reason to think she was there at the time.

Q    BY MR. SAGEL:  And with regards to -- let's just turn

02:22PM straight to Greg Barela that took place in December 2017.

Morgan Witos wasn't working at the firm at that time either,

was she?

A    No.

Q    You're wearing a face shield, so I might ask you a

02:23PM question about your hair underneath it.  But the way you wear

your hair right now behind the face shield, is that how you

wore your hair in 2018?

A    Yeah.  It was probably actually a little longer then.

Q    And when you met with the Government and you were asked

02:23PM about the incident that Greg Barela described relating to

seeing you, you told the Government that you thought maybe he

saw you moving your hair out of your head because you found

some way of doing that because of how you wear your hair?

A    Yes, I do that, a lot.  And I think I mentioned that.

02:23PM I've struggled to come up with possible explanations, and that

```
  1   was one.
  2   Q    And you don't know what was in -- what Mr. Barela thought
  3   he saw, but you were thinking that might have been an
  4   explanation; that he saw you moving your hair out of your face?
02:23PM 5   A    That's -- yes.  That's something that I thought.
  6   Q    Defendant asked you a decent number of questions about
  7   the November 2018 phone call; correct?
  8   A    Uh-huh.
  9   Q    Let's start with, who was on that phone call?
02:24PM 10   A    Mr. Barela, myself, Ahmed Ibrahim, and Judy Regnier.
 11   Q    And was Judy Regnier on the phone call from the
 12   beginning, or did she join later?
 13   A    I think she was on the phone from the beginning, but I'm
 14   not 100 percent certain.
02:24PM 15   Q    And during that phone call, Greg Barela stated that he
 16   didn't get paid his money from the Brock settlement; isn't that
 17   correct?
 18        MR. AVENATTI:  Objection.  Calls for hearsay,
 19   Your Honor.
02:24PM 20        THE COURT:  Mr. Sagel.
 21        MR. SAGEL:  Goes to -- well, consistent statement
 22   after an accusation of false -- of changing testimony.
 23        THE COURT:  Overruled.
 24        THE WITNESS:  Yes.  He said something to the effect
02:25PM 25   that he had not gotten paid.
```

```
  1   Q    BY MR. SAGEL:  And when Mr. Barela said that to you, you
  2   were shocked?
  3   A    Yes.  I was shocked.
  4   Q    Because his settlement had been signed, at that point,
02:25PM 5   almost 11 months earlier?
  6   A    Yeah.  I was -- I don't know -- yeah, the settlement would
  7   have been signed in December of 2017, and it was November 2018.
  8   So yes, by that point in time I was quite surprised.
  9   Q    But there would be no reason Greg Barela had not gotten
02:25PM 10   paid his portion of the settlement by 11 months after the
 11   settlement agreement; isn't that correct?
 12        MR. AVENATTI:  Objection, Your Honor.  Calls for
 13   speculation.  Lacks foundation.  Argumentative.
 14        THE COURT:  Overruled.
02:25PM 15        THE WITNESS:  I was not aware of any reason.
 16        MR. AVENATTI:  I'm sorry, can I have the answer read
 17   back, Your Honor.
 18        (The answer was read as follows:
 19        "I was not aware of any reason.")
02:26PM 20   Q    BY MR. SAGEL:  And the next day, defendant talked to you
 21   about your phone call you had the night before with Mr. Barela;
 22   isn't that correct?
 23   A    Yes.  I believe it was the next day.
 24   Q    And defendant was furious with you for talking to a
02:26PM 25   client about their settlement money; isn't that correct?
```

                            1    MR. AVENATTI:  Objection, Your Honor.  Lacks
            2    foundation.
            3                    THE COURT:  Overruled.
            4                    THE WITNESS:  He was angry.
02:26PM     5    Q    BY MR. SAGEL:  Why was he angry with you?
            6    A    I didn't know why he was angry.
            7    Q    Did he -- did you ever say to him what the conversation
            8    was about the night before?
            9    A    I don't remember exactly what I said to him.  I think that
02:26PM    10    the conversation with Mr. Avenatti came after I had forwarded
           11    the letter I received.  I think I actually got -- the timing of
           12    this conversation was more after I received the letter, as
           13    opposed to immediately after the phone call.  But I could be
           14    wrong with thinking -- talking it out now, I believe that
02:27PM    15    that's when the conversation took place.
           16    Q    You believe the conversation took place when?
           17    A    After I received the letter from Mr. Barela's counsel.
           18    Q    The phone call that you just referenced -- the one with
           19    Ms. Regnier, Mr. Ibrahim, Mr. Barela and yourself -- prior to
02:27PM    20    that phone call, you got a text message from Greg Barela; isn't
           21    that correct?
           22    A    Yes.
           23    Q    And in response to that text message, you then had the
           24    phone call that evening; isn't that correct?
02:27PM    25    A    Yes.

|       |    |                                                                  |
|-------|----|------------------------------------------------------------------|
|       | 1  | MR. SAGEL:  I believe it's Exhibit 176.  It's                    |
|       | 2  | probably going to be Volume III.  And we can probably put it on   |
|       | 3  | the screen.  Give me one second.  Page 11 -- Exhibit 176,         |
|       | 4  | page 11, line 10.  And it says "UTC time."                        |
| 02:28PM | 5 | Q    So while the date is 11/15, this actually took place on      |
|       | 6  | 11/14, when you subtract out the UTC time.  Do you see this       |
|       | 7  | text message to you?                                              |
|       | 8  | A    Yes.                                                         |
|       | 9  | Q    And it says:                                                 |
| 02:28PM | 10 | "Hi John.  Out of professional courtesy, I                      |
|       | 11 | would appreciate a call or a text back when you get              |
|       | 12 | a chance.  I have a few things I would like to                  |
|       | 13 | discuss with you before I move forward.  Thank you.            |
|       | 14 | Bye."                                                           |
| 02:28PM | 15 | Is this a text message you received from Greg Barela          |
|       | 16 | in advance of that phone call?                                   |
|       | 17 | A    Yes.  I believe so.                                          |
|       | 18 | Q    And this is five days before you received the letter from   |
|       | 19 | Larson O'Brien?                                                  |
| 02:28PM | 20 | A    That sounds right.                                          |
|       | 21 | Q    And when you met with the Government, you told the          |
|       | 22 | Government that the date following this phone call, defendant     |
|       | 23 | came into the office and was furious with you?                   |
|       | 24 | MR. AVENATTI:  Asked and answered, Your Honor.                  |
| 02:29PM | 25 | THE COURT:  Sustained.                                          |

```
 1   Q    BY MR. SAGEL:  Does this refresh your recollection that
 2   the meeting where he was furious with you was in response to
 3   the phone call and not with the Larson O'Brien letter?
 4           MR. AVENATTI:  Objection.  Asked and answered,
 5   Your Honor.
 6           THE COURT:  Overruled.
 7           THE WITNESS:  It doesn't reflect -- refresh my
 8   recollection.  Sitting here today, I feel my recollection is
 9   that it was after having received the letter.
10   Q    BY MR. SAGEL:  He was furious at you for getting a letter
11   in the mail?
12           MR. AVENATTI:  Objection, Your Honor.
13   Argumentative.  Asked and answered.
14           THE COURT:  Overruled.
15           THE WITNESS:  My recollection is that because after
16   having received the letter, that's when it was -- became
17   apparent that the call had taken place.  I don't think I had
18   spoken -- my recollection now is that I had not spoken to
19   Mr. Avenatti after the call about the call until after I
20   received the letter.
21   Q    BY MR. SAGEL:  Regardless of when it took place, he was
22   mad at you for talking to the client?
23           MR. AVENATTI:  Objection, Your Honor.  Asked and
24   answered, argumentative.
25           THE COURT:  Asked and answered.  Sustained.
```

```
 1   Q    BY MR. SAGEL:  Mr. Avenatti gave all his lawyers the
 2   permission to talk to clients whenever they wanted, didn't he?
 3   A    I generally didn't talk to clients, but other people --
 4   with the exception -- Mr. Barela was sort of an exception.  But
 5   other people in the office did talk to clients.
 6   Q    Is there any reason you did anything wrong for talking to
 7   the client on November 14?
 8        MR. AVENATTI:  Objection, Your Honor.  Speculation.
 9   Conjecture.
10        THE COURT:  Overruled.
11        MR. AVENATTI:  Argumentative.
12        THE COURT:  Overruled.
13        THE WITNESS:  No.
14   Q    BY MR. SAGEL:  At the time defendant talked to you about
15   the conversation with Mr. Barela, at that time did he tell you
16   whether or not he paid Mr. Barela any portion of his settlement
17   money?
18   A    No.  He didn't say anything.
19   Q    At that time, did he say anything about Mr. Barela not
20   being entitled to any portion of his settlement money?
21   A    I don't think so.
22   Q    If Mr. Barela wasn't entitled to any of his settlement
23   money, wouldn't you expect him to say it to you at that point?
24        MR. AVENATTI:  Objection, Your Honor.  Speculation.
25   Conjecture.
```

```
 1              THE COURT:  Let's hear the question.
 2              Finish the question.
 3              MR. SAGEL:  I thought I did.
 4              THE COURT:  Sustained.
```
02:31PM  5   Q    BY MR. SAGEL:  At the time you talked to the defendant
```
 6   after the letter and after the phone call, at any point did you
 7   tell the defendant of the accusation that Greg Barela made?
 8   A    I'm not -- I'm not sure.
 9   Q    Do you know whether, based on your conversation with the
```
02:32PM 10   defendant, if he knew the accusation that Greg Barela made?
```
11   A    I'm not sure.
12   Q    The letter that you received from Larson O'Brien stated
13   that Greg Barela is -- did not get his portion of the
14   $1.6 million settlement agreement; is that correct?
```
02:32PM 15              MR. AVENATTI:  Lacks foundation, Your Honor.
```
16              THE WITNESS:  I think it's implied, if not stated.
17              THE COURT:  Overruled.
18              MR. AVENATTI:  Move to strike.
19              THE COURT:  Denied.
```
02:32PM 20   Q    BY MR. SAGEL:  And at any point when you discussed what
```
21   you were going to -- actually, let me ask you a question first.
22   The letter you sent back that the defendant had you read the
23   sentences for, did defendant know you were writing that letter
24   back?
```
02:32PM 25   A    Yes.

```
         1   Q    And at any time while you were writing back to Gregory

         2   Barela's new attorneys, did he ever tell you Gregory Barela got

         3   his portion of the $1.6 million?

         4   A    No.

02:33PM  5   Q    Did he ever tell you when you were writing back to them

         6   that Gregory Barela was not entitled to any portion of his

         7   $1.6 million?

         8   A    No.

         9   Q    The last sentence of that letter -- and I can pull it up

02:33PM 10   if you want -- which defendant did not have you read or did not

        11   read to you, said, "All further correspondence should be

        12   directed to Mr. Avenatti"; is that correct?

        13   A    Yes.

        14   Q    Did you have a discussion with the defendant at that time

02:33PM 15   of who would handle the Greg Barela situation with the

        16   settlement money going forward, after November of 2018?

        17   A    I think he knew that that was going to be in the letter,

        18   and so I think it's implied.

        19   Q    Let me ask it a different way.

02:34PM 20        Defendant told you he would handle it going forward;

        21   isn't that correct?

        22        MR. AVENATTI:  Objection.  Asked and answered,

        23   Your Honor.

        24        THE COURT:  Sustained.

02:34PM 25        MR. SAGEL:  I didn't ask if he said it to him,
```

**UNITED STATES DISTRICT COURT**

```
 1  Your Honor.
 2          THE COURT:  Sustained.
 3  Q    BY MR. SAGEL:  Did you think you had any role going
 4  forward in dealing with Gregory Barela as of that time?
 5  A    No.
 6  Q    Why not?
 7  A    Not something I would have normally handled.
 8  Q    I'm going to pull up Exhibit 257.  This is a letter from
 9  Larson O'Brien dated December 3rd, 2018.  Do you see that?
10  A    Yes.
11  Q    And this is a letter that's in evidence that was drafted
12  to Michael Avenatti, Michael Avenatti & Associates, APC, and
13  Eagan Avenatti, LLP.  And the Regards line is "Proceeds from
14  confidential settlement agreement - Barela v. Brock, USA, LLC";
15  is that correct?
16  A    That's correct.
17          MR. SAGEL:  And if we can scroll down, start there.
18  Q    It talks about a letter that was sent to Mr. Avenatti in
19  November of 2018 relating to the Brock/Barela matter.  And it
20  has a few bullet points asking about whether or not the
21  settlement money was paid, asking for a true and correct copy
22  of the settlement agreement and to provide immediate accounting
23  for the settlement.  Do you see that?
24  A    Yes.
25  Q    Let's start with in December of 2018, did defendant show
```

| | | |
|---|---|---|
| | 1 | this letter to you? |
| | 2 | MR. AVENATTI:  Objection, Your Honor.  Foundation. |
| | 3 | THE COURT:  Overruled. |
| | 4 | THE WITNESS:  No, he did not. |
| 02:36PM | 5 | MR. SAGEL:  And if we can look a little bit further |
| | 6 | below. |
| | 7 | MR. AVENATTI:  Your Honor, I object to any further |
| | 8 | questions.  There's no foundation for the letter.  He's never |
| | 9 | seen the letter. |
| 02:36PM | 10 | THE COURT:  Overruled. |
| | 11 | Q    BY MR. SAGEL:  They then said there was no response to |
| | 12 | the November 18 letter; is that correct? |
| | 13 | MR. AVENATTI:  Your Honor, he's just having him read |
| | 14 | from the document.  Lacks foundation. |
| 02:36PM | 15 | THE COURT:  Overruled.  Be seated. |
| | 16 | Q    BY MR. SAGEL:  Is that correct? |
| | 17 | A    That's correct. |
| | 18 | Q    And then if we could go right below that, do you see the |
| | 19 | paragraph that starts "You have created"? |
| 02:37PM | 20 | A    I do. |
| | 21 | Q    Can you read the paragraph that starts "You have |
| | 22 | created." |
| | 23 | MR. AVENATTI:  Your Honor, objection.  Lacks |
| | 24 | foundation.  Best evidence. |
| 02:37PM | 25 | THE COURT:  Overruled. |

**UNITED STATES DISTRICT COURT**

1          THE WITNESS:  "You have created a very unfortunate

2          situation for all involved.  In any event,

3          Mr. Barela remains willing to resolve this matter

4          without pursuing litigation against you,

02:37PM  5          Mr. Ibrahim, and Mr. Arden.  Your time to avoid

6          litigation, however, is quickly running out."

7  Q    BY MR. SAGEL:  In December 2018, did defendant tell you

8  that litigation may be coming your way if answers weren't being

9  provided to Mr. Barela?

02:37PM 10  A    No, he did not.

11  Q    And when you were served with the arbitration claim in

12  January of 2019, that defendant went over with you, that was

13  the first time you heard about the Barela matter again since

14  the November 2018 letter; isn't that correct?

02:38PM 15  A    That's correct.

16  Q    And at that time you were, again, surprised, because you

17  thought defendant was handling the matter?

18  A    Yes, I was very surprised.

19  Q    Just going back real quickly to the November 2018 phone

02:38PM 20  call.  Defendant read a lot of testimony.  And Mr. Barela's

21  answers to a handful of those questions were "I believe so"

22  that he read to you; is that correct?

23  A    I think so, yes.

24  Q    You don't know why Mr. Barela thought the person, the

02:39PM 25  woman on the phone was Evan Jenness, do you?

```
 1    A     No, I don't.

 2    Q     When the arbitration claim against you -- and the

 3    arbitration is basically a civil lawsuit but just in a private

 4    matter.  Is that a fair way to describe it?

 5    A     I think so.

 6    Q     And when the arbitration claim came against you in

 7    January of 2019, defendant wanted you, Mr. Ibrahim, and himself

 8    to all be represented by the same attorney?

 9          MR. AVENATTI:  Objection, Your Honor.  403.  Outside

10    the scope.

11          THE COURT:  Overruled.

12          THE WITNESS:  That was my understanding, yes.

13    Q     BY MR. SAGEL:  When you say that's your understanding,

14    that's from what defendant told you?

15    A     Yes.  Yes.

16    Q     You didn't want the same lawyer to represent you as

17    Mr. Avenatti?

18          MR. AVENATTI:  Same objections, Your Honor.

19          THE COURT:  Sustained.

20    Q     BY MR. SAGEL:  You didn't believe you were in the same

21    position as it related to the Greg Barela matter as the

22    defendant?

23          MR. AVENATTI:  Same objections, Your Honor.

24          THE COURT:  Overruled.

25          THE WITNESS:  That's correct, yes.
```

**UNITED STATES DISTRICT COURT**

```
 1    Q    BY MR. SAGEL:  Because you had no way of knowing if the
 2    settlement money had come in?
 3    A    That's correct.
 4    Q    You had no way of knowing if any of the money was
 5    actually paid to Mr. Barela?
 6    A    That's true.
 7    Q    And you hadn't been getting text messages from Mr. Barela
 8    for the last eight months asking about the settlement money; is
 9    that correct?
10              MR. AVENATTI:  Objection, Your Honor.
11    Argumentative.  Lacks foundation.
12              THE COURT:  Overruled.
13              THE WITNESS:  That's true.
14    Q    BY MR. SAGEL:  You didn't get e-mails over the last eight
15    months asking you about the Brock payment?
16              MR. AVENATTI:  Same objections.
17              THE COURT:  Overruled.
18              THE WITNESS:  That's true.
19    Q    BY MR. SAGEL:  At any time between the settlement
20    agreement and the time -- we'll say November 2018, did you ever
21    tell Greg Barela that you would need to file claims against
22    Brock for lack of payment?
23    A    No, I did not.
24    Q    I think when defendant showed you -- I think it's
25    Exhibit 1061.  It's the letter that you and Mr. Ibrahim wrote
```

The timestamps in the left margin read: 02:40PM (line 5), 02:40PM (line 10), 02:41PM (line 15), 02:41PM (line 20), 02:42PM (line 25).

```
  1   back to Greg Barela's letter to you guys.  But in that letter,
  2   I think if I understood what you started to say before you were
  3   cut off, was, it was to give you an opportunity to confirm or
  4   deny what you did or didn't do; is that correct?
02:42PM 5  A    Yes.  I think the letter states that.
  6   Q    And you felt if someone said something to you or made a
  7   claim to you, you thought it was important to clarify whether
  8   something was true or accurate?
  9   A    Yes.
02:42PM 10 Q    And if Greg Barela had sent you e-mails saying, "Brock
 11   hasn't paid the $1.6 million.  What are we going to do next?"
 12   you would have felt the need to respond to something like that;
 13   is that correct?
 14        MR. AVENATTI:  Objection, Your Honor.  Lacks
02:43PM 15 foundation.  Trying to testify through the witness.
 16        THE COURT:  Overruled.
 17        THE WITNESS:  Yes, I would have responded.
 18   Q    BY MR. SAGEL:  And the same thing with the text message.
 19   If Greg Barela had sent you text after text after text asking
02:43PM 20 about the settlement money and what was going to be new next,
 21   you would have felt the need to reply and give an answer?
 22   A    Yes.
 23        MR. AVENATTI:  Same objections, Your Honor.
 24   Argumentative.
02:43PM 25        THE COURT:  Overruled.
```

```
 1            THE WITNESS:  Yes.  When he did text me, I got back
 2   to him that day.
 3   Q    BY MR. SAGEL:  Defendant asked you a couple questions
 4   about you keeping time.  I think you said you did it off and on
02:43PM 5   and how you kept track of your time on where attorney's fees
 6   may be recovered, if I'm saying your answers correctly.
 7            Is that -- did I say that right?
 8   A    Yes.  If I had a reason to think that there might be a
 9   court application.
02:44PM 10   Q    Was your understanding that Gregory Barela's matter was a
11   contingency fee case?
12   A    I wouldn't have known for sure, but that was generally my
13   understanding.
14   Q    Did your hours matter for the Gregory Barela matter?
02:44PM 15            MR. AVENATTI:  Objection.  Calls for speculation.
16   Conjecture.
17            THE COURT:  Overruled.
18            THE WITNESS:  I don't think that they mattered.
19   Q    BY MR. SAGEL:  I think you talked about working at the
02:45PM 20   firm for about ten years -- almost ten years.  The entirety of
21   the time you worked for Eagan Avenatti, was that here in
22   California?
23   A    Yes.
24   Q    And the person who was -- defendant was the one who
02:45PM 25   determined your salary the entire time?
```

```
 1   A    That was always my understanding.

 2   Q    And he was the one who determined that you continued

 3   working there for those ten years?

 4   A    Yes.  I think so.

 5   Q    And in ten years of working for Eagan Avenatti in

 6   California, defendant never made you be a licensed attorney in

 7   California?

 8   A    I asked to take the bar exam on several occasions, and it

 9   was my understanding that at some point in time I would.  And

10   it would -- whenever I would ask, it was not a good time.

11   Q    And who told you that?

12   A    Mr. Avenatti.

13   Q    And he continued to employ you as an attorney at his firm

14   without a license in California?

15               MR. AVENATTI:  Objection, Your Honor.

16   Argumentative.  Lacks foundation.  403.

17               THE COURT:  Sustained.

18   Q    BY MR. SAGEL:  You're not an expert coming in on a

19   one-day matter from out of state, are you?

20               MR. AVENATTI:  Objection.  Argumentative.  403,

21   Your Honor.

22               THE COURT:  Sustained.

23               MR. AVENATTI:  He wasn't paid $600,000.

24               MR. SAGEL:  Your Honor -- I'll take it up at the

25   break, Your Honor.
```

02:45PM (line 5)
02:46PM (line 10)
02:46PM (line 15)
02:46PM (line 20)
02:46PM (line 25)

```
 1   Q    I asked you about how you felt when Mr. Barela got a

 2   settlement, and you said you felt good about the matter; is

 3   that correct?

 4        MR. AVENATTI:  Asked and answered, Your Honor.

 5        THE COURT:  Overruled.

 6        THE WITNESS:  Yes.

 7   Q    BY MR. SAGEL:  When you received the arbitration claim in

 8   January 2019, did you still feel good for Mr. Barela?

 9        MR. AVENATTI:  403, Your Honor.  401.

10   Argumentative.

11        THE COURT:  Sustained.

12   Q    BY MR. SAGEL:  You, in response to Mr. Barela's

13   arbitration claim, paid out a portion -- or you paid money to

14   Mr. Barela based on his civil claim against you; isn't that

15   correct?

16        MR. AVENATTI:  Same objections, Your Honor.  401,

17   403.

18        MR. SAGEL:  Goes to bias, Your Honor.

19        THE COURT:  Overruled.

20        THE WITNESS:  The matter was settled, yes.

21   Q    BY MR. SAGEL:  And you paid money to Mr. Barela?

22        MR. AVENATTI:  Same objections, Your Honor.

23        THE COURT:  Overruled.

24        THE WITNESS:  Yes.

25        MR. SAGEL:  No further questions, Your Honor.
```

02:47PM 5
02:48PM 10
02:48PM 15
02:48PM 20
02:48PM 25

1          THE COURT:  Mr. Avenatti.

2                    **REDIRECT-EXAMINATION**

3     BY MR. AVENATTI:

4     Q    Mr. Arden, when you were working at the firm, in how many

02:49PM 5     places were you licensed to practice law?

6     A    I was licensed in three other states, not always active.

7     Q    I'm sorry?

8     A    Not always active.

9     Q    That's not what I asked you.

02:49PM 10              What other states were you licensed to practice law

11    when you were working at the firm?

12    A    I had been licensed in New York, Connecticut, and

13    Pennsylvania.

14    Q    And did you understand during the ten years that you were

02:49PM 15    working at the firm that you were violating the State Bar rules

16    of the State of California as it related to practicing law?

17    Did you think that you were doing that at the time?

18    A    No.

19    Q    And the reason why you didn't think that you were

02:50PM 20    violating any regulations or Bar rules was because you

21    understood that you could do the work that you were doing at

22    the firm without being licensed in California; right?

23    A    Yes.

24    Q    Correct?

02:50PM 25    A    Yes.

Q    Okay.  So if anyone were to suggest that you were engaged
in the unauthorized practice of law in the State of California
while you were working at Eagan Avenatti, as far as you're
concerned, that would be a bogus allegation; right?

02:50PM  A    I do not think that that's true.

Q    You do not think what's true?

A    That I ever did that.

Q    So if someone were to make that accusation, as far as
you're concerned, that would be a false accusation and a

02:50PM  serious one; right?

A    Yes.

Q    Did you ever do any work or carry out any
responsibilities at the law firm for anyone other than me?

A    Ultimately, I thought all work came through --

02:51PM  Q    Sir --

             MR. AVENATTI:  Move to strike, Your Honor.

             THE COURT:  Stricken.

             MR. AVENATTI:  Can I have the question read back?

Q    Please just answer my question.

02:51PM             THE COURT:  Yes.

             **(The question was read by the reporter as follows:**

             **"Did you ever do any work or carry out any**

             **responsibilities at the law firm for anyone other**

             **than me.")**

02:51PM             THE WITNESS:  I don't think so.  I worked under

1    other people as well.

2    Q    BY MR. AVENATTI:  Did you ever report to Jason Frank?

3    A    Yes.

4    Q    You did work for Mr. Frank, did you not?

02:52PM 5    A    I worked on matters where Mr. Frank -- that Mr. Frank was

6    involved in, yes.

7    Q    What matters did you work on where Mr. Frank was the lead

8    attorney?

9         MR. SAGEL:  Objection.  Outside the scope and

02:52PM 10   relevance, Your Honor.

11        THE COURT:  Overruled.

12        THE WITNESS:  I'm not sure that he was a lead

13   attorney on any matters that I worked on.

14   Q    BY MR. AVENATTI:  Did you ever work on any matter for

02:52PM 15   AT&T?

16   A    I think I did do some minimal -- some work for AT&T.

17   Q    Okay.  And you recall that Jason Frank was the lead

18   attorney for AT&T in the firm?  Do you recall that?

19   A    Yes.

02:52PM 20   Q    Okay.  Did I have anything to do with AT&T, to the best

21   of your knowledge?

22   A    I don't know.

23   Q    Well, as you sit there now, can you recall me having

24   anything to do with AT&T as a client for the firm?

02:52PM 25   A    I don't know.  I recall discussions about work for AT&T.

```
 1   Q    Sir, that's not what I'm asking you.  Isn't it true that,
 2   generally speaking, AT&T was Mr. Frank's client, and I had
 3   virtually nothing to do with that client?  Isn't that true,
 4   sir?
 5            MR. SAGEL:  Objection.  Asked and answered.
 6            THE COURT:  Overruled.
 7            THE WITNESS:  I don't really know what you had to do
 8   with.  I know that Mr. Frank was very involved in AT&T.
 9   Q    BY MR. AVENATTI:  And you were reporting in the AT&T
10   matter for Mr. Frank and not me; isn't that true?
11   A    I dealt primarily with Mr. Frank, yes.
12   Q    Well, did you ever deal with me, Mr. Arden, on the AT&T
13   matter?
14   A    I don't remember.
15   Q    Do you recall that ever happening?
16   A    I don't think so.
17   Q    Okay.  Did you work on any other matters with other
18   attorneys who were in charge of the day-to-day on the case?
19   A    I worked with other attorneys in the office and they had,
20   you know, supervisory responsibility for me.
21   Q    Attorneys other than me; isn't that true?
22   A    Yes.
23   Q    Now, Mr. Sagel made a number -- or asked you a number of
24   questions about whether you were told about financial conduct
25   and other things at the firm.  Do you recall those questions
```

02:53PM (lines 5, 10, 15)
02:54PM (lines 20, 25)

```
 1    generally during the cross-examination that he just did?
 2    A    Yes.
 3    Q    Sir, isn't it true that your role at the firm had nothing
 4    to do -- well, strike that.
 5              Did you have any management role at the law firm
 6    when you were there?
 7    A    No.
 8    Q    Did you have any responsibility or role relating to the
 9    finances of the law firm?
10    A    No.
11    Q    Did you have any responsibilities or role relating to the
12    tracking of costs or fees on cases?
13    A    No.
14    Q    Were you generally aware of how much clients were due to
15    be paid on cases?
16    A    No.
17    Q    In fact, you practically never knew those details for any
18    client at the law firm, did you?
19    A    No.
20    Q    In ten years, did you ever know what the accounting was
21    for any client as it relates to their settlement?
22    A    No.
23    Q    And that was because that wasn't your job.  That wasn't
24    what you were doing; isn't that true?
25    A    That's correct.
```

02:54PM (line 5)
02:54PM (line 10)
02:55PM (line 15)
02:55PM (line 20)
02:55PM (line 25)

Q    So in that regard, Mr. Barela wasn't different than any

other client at the law firm as it related to that; isn't that

true?

A    That's true.

Q    And there were times where you would do work, and you

would present that work to other attorneys at the firm for

their review and approval; right?

A    Yes.

Q    And sometimes they would give you review and approval,

and things would be filed without my approval; isn't that true?

A    I think most of the time it also went to you.

Q    Well, that's not what I asked you.  There were times

where things were approved and filed without my approval by

another attorney; isn't that true?

A    I can't think of a specific example.

Q    Well, can you think of an example where -- strike that.

Let me ask you this:  When you prepared things for

Mr. Frank, was it your understanding that I approved everything

before it was filed after Mr. Frank looked at it in connection

with the AT&T matter?

A    Not -- probably not in connection with the AT&T matter --

AT&T.

Q    You were asked about the Barela matter -- about the work

that was done from 2014 to 2017.  Do you recall that?

A    Yes.

```
        1    Q    During the entire ten years that you were at the law
        2    firm, did you ever make a court appearance?
        3            MR. SAGEL:  Objection.  Outside the scope and
        4    relevance.
02:57PM 5            THE COURT:  Overruled.
        6            THE WITNESS:  Not a substantive court appearance.  I
        7    attended hearings from time to time.  I didn't make -- I didn't
        8    speak.
        9    Q    BY MR. AVENATTI:  You never argued a single motion in
02:57PM 10   court in ten years at the firm, did you?
        11   A    No, I did not.
        12   Q    You never played any role in any trial, a speaking role,
        13   in ten years at the firm, did you?
        14   A    No, I did not.
02:57PM 15   Q    What's a deposition?
        16           MR. SAGEL:  Objection.  Relevance and outside the
        17   scope, Your Honor.
        18           THE COURT:  Sustained.
        19   Q    BY MR. AVENATTI:  Did you ever take a single deposition
02:58PM 20   in ten years at the firm?
        21   A    No, I did not take a deposition.
        22           MR. SAGEL:  Same objections.
        23   Q    BY MR. AVENATTI:  So now let's talk about the Barela
        24   matter, 2014 to 2017.  Do you remember that Mr. Sagel asked you
02:58PM 25   about the heavy lifting?  Do you recall that?
```

```
 1   A     Yes.
 2   Q     Were there court appearances or arbitration appearances
 3   in the Barela matter?
 4   A     Yes.
 5   Q     Were you the one that played the -- strike that.
 6         Were you the one that had the speaking roles and
 7   made the arguments during those matters?
 8   A     No.
 9   Q     Who was?
10   A     Mostly you.
11   Q     Were there depositions in the Barela matter during that
12   three-, four-year time period?
13   A     Yes.
14   Q     Did you ever take a single one of those depositions in
15   the Barela matter?
16   A     No.
17   Q     Who did?
18   A     Either you or Mr. Ibrahim.
19   Q     You're not suggesting to this jury that I did virtually
20   nothing on the Barela matter until it came time for mediation,
21   are you?
22   A     No.
23   Q     And let's talk about mediation.  In the ten years that
24   you were at the law firm, how many mediations were you the lead
25   attorney at the actual mediation?
```

02:58PM 5
02:58PM 10
02:58PM 15
02:59PM 20
02:59PM 25

UNITED STATES DISTRICT COURT

```
 1   A    Not a single one.

 2   Q    As of the date of the Barela mediation, how many times

 3   had you served as -- strike that.

 4              As of that date of the Barela mediation, how many

 5   cases had you, as the primary lawyer, settled?

 6   A    Not a single one.

 7   Q    Was there anything unusual in connection with the Barela

 8   matter as it related to having the lead attorney at the law

 9   firm handle the mediation?

10   A    No.

11   Q    When we went to Denver for the Barela mediation, did you

12   believe that you could handle it on your own as the lead

13   attorney?

14   A    No.  I could not have done that.

15   Q    I'm sorry.  I didn't hear the last part.

16   A    No.  I could not have done that.

17   Q    Why not?

18   A    I wasn't the lead attorney.  It wasn't within the realm of

19   my responsibilities.  It's not what I did at the firm.

20   Q    That wasn't within your skill set; right?

21   A    No.

22   Q    Meaning I'm correct; it was not within your skill set?

23   A    Yes, it was not within my skill set or responsibilities.

24              THE COURT:  We'll take the mid-afternoon break here,

25   ladies and gentlemen.  Please remember the admonition not to
```

02:59PM 5

03:00PM 10

03:00PM 15

03:01PM 20

03:01PM 25

```
 1   discuss the case with anyone, not to form any opinions on

 2   issues of the case until it's submitted to you, and no

 3   research, please.

 4            We'll be in recess for 15 minutes.

 5            THE COURTROOM DEPUTY:  All rise.

 6            (Out of the presence of the jury.)

 7            THE COURT:  I didn't mention it this morning, but I

 8   did indicate yesterday we'd spend some time at the end of the

 9   day with the jury instructions.

10            MR. AVENATTI:  Today?

11            THE COURT:  Today.  It won't be our final session.

12   I want to take a quick pass and see if we can knock some of the

13   chat out of the way.  I've got some questions for you, as I

14   indicated in the last trial.

15            MR. AVENATTI:  So there will be an additional charge

16   conference?

17            THE COURT:  There will be.

18            MR. AVENATTI:  Thank you.

19            MR. SAGEL:  And real quickly, it can either be on

20   this end or 15-minute end.  But before we get to the next

21   witness or maybe two, I just want to raise something with

22   Your Honor.

23            THE COURT:  Go ahead and do it now.

24            MR. SAGEL:  Two parts.  Part one, which we put in

25   our filing as it related to when he was calling the special
```

03:01PM 5

03:02PM 10

03:02PM 15

03:02PM 20

03:02PM 25

1    agents from the Southern District of New York.  From our

2    understanding, one of them will be his next witness.  Our

3    position, we've already made it clear, just by putting her on

4    the stand -- I don't know what he's going to ask, but he's

03:03PM  5    basically opening the door to a criminal investigator in

6    another district, not related to our case, that we would be

7    allowed to ask her what her job is and it's not on this case

8    and it's on another matter.

9            Just by calling her, that's probably opening the

03:03PM 10    door.  Obviously we'll go from there.  But I just want to put

11    Your Honor on notice of where we probably plan on going.

12            And then the second thing is, as we were --

13            THE COURT:  As far as that goes, let's see what his

14    questions are.

03:03PM 15            MR. SAGEL:  Understood of how expansive it opens the

16    door, but just by calling an agent who is not part of this case

17    who had a -- who has two separate criminal investigations into

18    defendant that is not part of this case, it's hard for me to

19    believe by just calling her and asking her who she is, that's

03:03PM 20    almost not --

21            THE COURT:  Let's see what the questions bear.

22            MR. SAGEL:  Understood.

23            And then the second matter, which is obviously

24    contingent on where things go, when we were here on Friday, one

03:04PM 25    of our first comments when we got the list of witnesses was the

1    first witness, which Your Honor took up this morning, we

2    said -- has already said she's going to quash it.  We didn't

3    think they had enough witnesses to fill.

4         They said they were very -- when I say "they," the

03:04PM 5    defendant said he was very appreciative of the issue and so

6    forth.  After court on Friday, we got an additional name, which

7    is Special Agent Galicia.  Yesterday afternoon, for the first

8    time, he added two more witnesses to that which we brought up

9    twice on Friday.

03:04PM 10        If we get to those witnesses, our request of the

11   Court is that we can defer cross-examination until tomorrow.

12   He can call them on direct so that we fill the time that's

13   needed, but then I have the night to prepare any exhibits as

14   necessary for cross-examination, if any are necessary.

03:04PM 15        THE COURT:  What time were you apprised of these two

16   new witnesses?

17        MR. SAGEL:  Was I?  I'd have to check my e-mail, but

18   I'd say it was about 3:00 o'clock yesterday.

19        THE COURT:  It would have been preferable to do it

03:05PM 20   at the end of the court day on Friday, but I think that's

21   adequate notice.

22        MR. AVENATTI:  Thank you, Your Honor.

23        **(Recess from 3:05 p.m. to 3:21 p.m.)**

24        MR. AVENATTI:  Your Honor, my understanding is that

03:21PM 25   the Court requested a witness list.  I'd like to file that

         1    shortly after court today, if that's okay.

         2            THE COURT:  That's fine.  But I thought I'd ordered

         3    the witness list be filed when you rested -- or when the

         4    Government rested.  But whatever.

03:21PM  5            MR. AVENATTI:  If you ordered that, then I

         6    misunderstood and I apologize to the Court, Your Honor.  But I

         7    anticipate -- we can file one by 6:00 p.m. tonight.

         8            THE COURT:  That's fine.

         9            THE COURTROOM DEPUTY:  Ready, Judge?

03:21PM 10            THE COURT:  Ready.

        11            **(In the presence of the jury.)**

        12            THE COURT:  Mr. Avenatti.

        13    Q    BY MR. AVENATTI:  Mr. Arden, do you recall these

        14    questions from Mr. Sagel about Greg Barela being a normal guy?

03:23PM 15    Do you recall those general questions?

        16    A    Yes.

        17    Q    In your experience, do normal guys come into federal

        18    court and lie to juries?

        19            MR. SAGEL:  Objection.  Argumentative.  Calls for

03:23PM 20    speculation and assumes facts not in evidence.

        21            THE COURT:  Sustained.

        22    Q    BY MR. AVENATTI:  Mr. Arden, you were asked about your

        23    hair on cross-examination.  Do you recall that?

        24    A    Yes.

03:23PM 25    Q    Do you think that your hair is the reason why Greg Barela

```
 1  said that Evan Jenness was on a call that she never
 2  participated on?
 3  A     No.
 4  Q     Do you think that -- do you think that your hair was the
 5  reason why Greg Barela told his attorney and this -- and then
 6  this jury that you had said on the call that the money had
 7  never been paid?
 8  A     No.
 9  Q     Greg Barela lied about what happened during that call and
10  what you said, didn't he?
11           MR. SAGEL:  Objection.  Argumentative.  Assumes
12  facts not in evidence, Your Honor.
13           THE COURT:  Sustained.
14  Q     BY MR. AVENATTI:  Mr. Arden, based on your recollection
15  of what happened during that call, what Mr. Greg Barela told
16  this jury was false, wasn't it?
17           MR. SAGEL:  Objection.  Asked and answered and calls
18  for a legal conclusion.
19           THE COURT:  Overruled.
20           THE WITNESS:  Yes, it was not correct.
21  Q     BY MR. AVENATTI:  And the allegations that Mr. Barela
22  made against you in the arbitration were false, weren't they?
23  A     Yes.
24  Q     You have never known what the cost or expenses were for
25  the Barela matter, have you?
```

```
           1    A     No, I have not.

           2    Q     And you have never known what fees were due the law firm

           3    from the Barela matter, have you?

           4    A     No, I have not known that.

03:26PM    5    Q     You were asked about Mr. Ed Ricci.  You had no idea if

           6    there was ever an agreement with Mr. Ricci relating to

           7    Mr. Barela's case, do you?

           8    A     No, I don't.

           9    Q     And you don't know if me or others at the firm consulted

03:26PM   10    with Mr. Ricci in connection with the Barela case, do you?

          11    A     I'm not aware of that, no.

          12    Q     Who is Frank Azar?

          13    A     I believe he was an attorney that was local counsel for a

          14    period of time in the arbitration.

03:27PM   15    Q     Mr. Azar was another attorney who assisted on the case in

          16    Denver; right?

          17    A     Yes, I think so.

          18    Q     Do you have any idea what the financial arrangement with

          19    Mr. Azar was as it related to the Barela matter?

03:27PM   20    A     No.

          21    Q     Do you have any idea how much money Mr. Azar was due from

          22    the Barela matter?

          23    A     No.

          24    Q     You were asked about Mr. Marchino, Mr. Beada, Mr. Brager,

03:27PM   25    Dillanos Coffee and Alki Bakery.  Do you recall that?
```

```
  1   A    Yes.
  2   Q    Do you have any idea whether any of those payments came
  3   out of money rightfully due the law firm?
  4   A    I don't know.
03:28PM 5   Q    And as you sit there today, you have no personal
  6   knowledge as to whether any money was ever stolen from Greg
  7   Barela, do you?
  8   A    No, I have no personal knowledge.
  9   Q    You were asked about Morgan Witos by Mr. Sagel.  Do you
03:28PM 10  recall that?
 11   A    Yes.
 12   Q    And Mr. Sagel asked you a question that went something
 13   along the lines of:  Well, if she left in 2014 and the Johnson
 14   settlement was paid after she left, then what possible
03:29PM 15  relevance would she have to the Johnson matter?
 16           Do you recall that general question?
 17   A    Yes.
 18   Q    Do you recall that Morgan Witos worked at the firm for
 19   about five years, from 2009 to 2014-ish?
03:29PM 20  A    That sounds about right.
 21   Q    Was the firm working on the Johnson matter during that
 22   five-year time period?
 23   A    I'm not sure when it started, when that matter started.  I
 24   don't know.
03:29PM 25  Q    Well, it certainly started before early 2015; right?
```

```
 1   A     Well, I would assume so, yes.

 2   Q     Okay.  So isn't it true that in that five-year time

 3   period -- from 2009 to 2014 -- isn't it true that Ms. Witos

 4   would have been recording costs and expenses for the matters

 5   that were then pending at the firm during that time period?

 6   A     Probably.  But like I said, I didn't have a lot of

 7   familiarity with exactly what she did.

 8   Q     You understood, did you not, sir, generally, when you

 9   were at the firm, that when the firm resolved a case, it was

10   entitled to deduct its fees and all of the expenses that it had

11   incurred?

12   A     I would assume -- yes, generally.  Although I would

13   imagine it would vary based on whatever agreements there were

14   with clients.

15   Q     And again, you didn't know -- you didn't know the inner

16   workings of those agreements because that's not what you did?

17   A     That's correct.

18   Q     I mean, a law firm is like a football team.  People have

19   different positions.  They play different positions; right?

20   A     Sure.

21   Q     Yes?

22   A     Yes.

23   Q     And they had different skill sets, in your experience;

24   correct?

25   A     Yes.
```

```
 1   Q    Were you involved in the Barela matter from the
 2   inception?
 3   A    I think from pretty early on.  I don't know about the
 4   exact beginning, but pretty early.
 5   Q    And so was it your understanding that costs and expenses
 6   were being incurred by the firm from the inception of the
 7   Barela matter up through the settlement?
 8   A    I would have assumed so.
 9   Q    And you would have assumed that because that's generally
10   what would happen during a case; right?
11   A    Yes.  Although, like I said, I didn't have a lot of
12   involvement in costs and calculation of costs and things like
13   that.
14   Q    And did you have the understanding when you were at the
15   firm that sometimes the firm would expend an enormous amount of
16   money and have to wait years to be reimbursed?
17              MR. SAGEL:  Objection.  Outside the scope and
18   relevance.
19              THE COURT:  Outside the scope.  Sustained.
20   Q    BY MR. AVENATTI:  Assuming that the Barela matter started
21   in 2014, and assuming that Ms. Witos did not leave until the
22   latter part of 2014, Ms. Witos would have overlapped with the
23   expenses in the Barela matter; correct?
24   A    I assume so.
25   Q    And assuming that the Johnson matter had been filed well
```

03:31PM 5
03:32PM 10
03:32PM 15
03:32PM 20
03:32PM 25

prior to 2015, Ms. Witos would have overlapped with the Johnson

matter as well; correct?

A    I assume so.

Q    Now, Mr. Sagel asked you about me learning about this

03:33PM 5   phone call that had taken place with Mr. Barela and that I was

angry.  Do you remember that?

A    Yes.

Q    And the phone call came in on the evening of November 14.

Do you recall that?

03:34PM 10   A    That sounds right.

Q    And the letter from Mr. Bledsoe was five days later,

November 19.  Do you recall that?

A    Yes.  There was a weekend in between.

Q    Well, it was more than a weekend.  It was five days in

03:34PM 15   between; right?

A    That sounds -- yeah.  14 to 19, yes.

Q    14 to 19 is five days; right?

A    Uh-huh.

Q    Yes?

03:34PM 20   A    Yes.

Q    And during those five days, you did not tell me that Greg

Barela called you and this call had taken place; right?

A    No.  I don't think so.

Q    Okay.

03:34PM 25   A    I don't think I had any interactions with you.

```
 1              MR. AVENATTI:  Move to strike the last part as
 2   nonresponsive.
 3              THE COURT:  It will be stricken.
 4   Q    BY MR. AVENATTI:  Mr. Arden, you had my cell phone at the
 5   time; right?  We'd worked together ten years; correct?
 6   A    Yes.
 7   Q    You had my e-mail address; right?
 8   A    Yes.
 9   Q    Okay.  And so in those five days, you did not tell me
10   about this call from a client of the firm who was upset, did
11   you?  Yes or no?
12   A    No.
13   Q    Okay.  And to the best of your knowledge, had Mr. Ibrahim
14   told me about -- or told me about this call, to the best of
15   your knowledge?
16   A    I don't know.
17   Q    Okay.  And isn't it true that when I was angry, I told
18   you and Mr. Ibrahim that I should have been informed about this
19   call where a client of the firm called and made such a serious
20   accusation and that I should have been told about it
21   immediately.  Isn't that true, sir?
22   A    I'm not sure about that.  I don't think I could have told
23   you about it immediately.
24   Q    Well --
25              MR. AVENATTI:  Move to strike as nonresponsive,
```

1    Your Honor.

2          THE COURT:  Everything after "I'm not sure" will be

3    stricken.

4    Q    BY MR. AVENATTI:  I'm not asking you about the five-day

03:36PM  5    lag time period.  I'm asking you about me being angry.

6          Isn't it true, sir, that I was angry because neither

7    you nor Mr. Ibrahim had told me about this call where a client

8    calls up the firm and accuses the firm of theft?

9          MR. SAGEL:  Objection.  Calls for speculation as to

03:37PM 10    what Mr. Avenatti thought.

11          MR. AVENATTI:  Let me rephrase.

12    Q    BY MR. AVENATTI:  Sir, isn't it true that I expressed to

13    you and Mr. Ibrahim that I could not believe that, in five

14    days, neither you nor Mr. Ibrahim had called to tell me about

03:37PM 15    such a serious accusation?

16          MR. SAGEL:  Objection.  Calls for hearsay.

17          THE COURT:  Overruled.

18          THE WITNESS:  I don't remember that.

19    Q    BY MR. AVENATTI:  Do you recall me being angry, sir, that

03:37PM 20    nobody had told me about the call?  Yes or no?

21    A    No.

22    Q    It's your testimony that I was not angry that I found out

23    about the call by way of a letter from Mr. Barela's counsel?

24          MR. SAGEL:  Objection.  Asked and answered.

03:37PM 25          THE COURT:  Overruled.

```
 1              THE WITNESS:  I didn't know why you were angry.
 2   Q    BY MR. AVENATTI:  At the time I voiced to you that I did
 3   not know about the call, did I -- didn't I?
 4   A    I don't really remember the details of the conversation,
 5   to be honest.  I don't know what you --
 6   Q    So you don't know one way or the other as to whether I
 7   was angry about not being informed of the call or not.  Is that
 8   your testimony?
 9   A    I was flustered at the time.
10   Q    Is that your testimony, sir?  As you sit here today, you
11   don't know why I was angry.  Is that your testimony?
12   A    I wasn't sure why you were angry.
13   Q    Mr. Sagel asked you whether I ever told you that
14   Mr. Barela got his money.  Do you recall that?
15   A    Yes.
16   Q    Did I ever tell you that I stole Mr. Barela's money?
17   A    No.
18   Q    Did I ever tell you that Mr. Barela did not get the money
19   that he was entitled to based on his arrangements with the law
20   firm?
21   A    No.
22              MR. AVENATTI:  Can we please have 1059.  Can we
23   please blow that up.
24   Q    Mr. Arden, you were asked by Mr. Sagel about this letter
25   and, in particular, about Mr. Bledsoe asking you to confirm or
```

Timestamps in left margin:
03:38PM 5
03:38PM 10
03:38PM 15
03:39PM 20
03:40PM 25

**UNITED STATES DISTRICT COURT**

```
  1   deny what you had told Mr. Barela.  Do you recall that?
  2               MR. SAGEL:  Objection.
  3               THE WITNESS:  Yes.
  4               MR. SAGEL:  I didn't even ask about this exhibit,
03:40PM 5   Your Honor.
  6               THE COURT:  Overruled.
  7   Q    BY MR. AVENATTI:  Sir, where in the letter does it ask
  8   for you to deny it?
  9   A    This letter here?  It says, "We offer you the opportunity
03:41PM 10  to confirm or deny this information."
 11   Q    Correct.  And you promptly denied it, because what was
 12   contained within the letter and what Mr. Barela was saying was
 13   completely false?
 14   A    I denied it because I did not make the representation
03:41PM 15  stated in the letter.
 16   Q    You denied it because what Mr. Barela was claiming and
 17   accusing you of was untrue; right?
 18   A    What the letter is accusing me of was untrue, yes.
 19   Q    And you understood the letter was coming from Mr. Barela?
03:41PM 20  A    From his counsel.
 21   Q    And when you got this letter, did you feel bad for the
 22   normal guy, Greg Barela, who was accusing you of something that
 23   you had not done?
 24   A    No, not in that moment.
03:42PM 25  Q    And, in fact, we had a discussion about this letter.  And
```

| | |
|---|---|
| 1 | you were upset that Mr. Barela would accuse you and Mr. Ibrahim |
| 2 | of something that you had not done; isn't that true? |
| 3 | A    Yes.  I was upset by the letter. |
| 4 | Q    Because it was fabricated? |
| 03:43PM 5 | MR. SAGEL:  Objection.  Argumentative, asked and |
| 6 | answered about seven times now. |
| 7 | THE COURT:  Sustained. |
| 8 | Q    BY MR. AVENATTI:  Here's my last question:  When you got |
| 9 | this letter and you realized that Mr. Barela had lied about |
| 03:43PM 10 | what had happened during the call, did you tell Mr. Ibrahim or |
| 11 | me or anyone else, "That's okay.  It must be my hair"? |
| 12 | A    No, I did not. |
| 13 | MR. AVENATTI:  Nothing further. |
| 14 | THE COURT:  Mr. Sagel. |
| 03:44PM 15 | **RECROSS-EXAMINATION** |
| 16 | BY MR. SAGEL: |
| 17 | Q    I'm not going to go through the long list of things, but |
| 18 | at the start of your redirect there were a lot of questions |
| 19 | about whether you had any management responsibilities, |
| 03:45PM 20 | responsibilities of finances, responsibilities for tracking the |
| 21 | fees, accountings and settlements, a lot of different things |
| 22 | like that. |
| 23 | It was defendant who chose that you had none of |
| 24 | those responsibilities at the firm; isn't that correct? |
| 03:45PM 25 | A    Yes. |

```
 1   Q    And the fact that you had no speaking roles and you
 2   didn't do depositions and you didn't handle the mediations,
 3   that was defendant's choice that you didn't take on those
 4   roles; correct?
 5   A    Yes.  Although I --
 6   Q    Yes or no, please.
 7   A    Yes.
 8          MR. AVENATTI:  Well, Your Honor, I'd like him to be
 9   able to finish his answer.  He began to explain his answer.
10          MR. SAGEL:  To a yes-or-no question?
11          MR. AVENATTI:  He was trying to explain his answer.
12   He said --
13          THE COURT:  He answered the question when he said
14   "Yes."
15          MR. AVENATTI:  He said "Although," and he tried to
16   explain.
17          THE COURT:  Well, Mr. Avenatti, the same ground
18   rules apply for everyone.
19   Q    BY MR. SAGEL:  You said "Yes"?
20   A    Yes.
21   Q    Now, with regards to all these speaking roles and the
22   depositions, depositions in the Barela matter, who got all the
23   exhibits and all the information prepared for the defendant to
24   take on those speaking roles?
25   A    I pulled together exhibits and documents.
```

```
 1   Q    Defendant asked you who Frank Azar was and how he's local

 2   counsel on the Barela matter; is that correct?

 3   A    That's my recollection, yes.

 4   Q    Mr. Azar stopped being local counsel on the Barela matter

 5   over a year before the case settled; isn't that true?

 6   A    I'm not sure of the timeline, but I know that he did stop.

 7   Q    And what you were not asked was whether or not Mr. Azar

 8   was paid anything for his work on the Barela matter; is that

 9   correct?

10   A    I don't think I was asked that question.

11   Q    Do you know whether Mr. Azar was paid anything for his

12   role as local counsel?

13   A    No, I do not.

14   Q    Do you know if Mr. Azar was listed in Eagan Avenatti's

15   bankruptcy petitions because he was not paid by Eagan Avenatti?

16        MR. AVENATTI:  Objection, Your Honor.  Lacks

17   foundation.  Speculation.

18        MR. SAGEL:  It's actually in an admitted exhibit,

19   Your Honor.

20        MR. AVENATTI:  Your Honor --

21        Enough with the speaking objections, please.

22        Lacks foundation.  He has no idea.  Calls for

23   speculation.

24        THE COURT:  Overruled.

25        THE WITNESS:  I don't know.
```

03:46PM (line 5)
03:47PM (line 10)
03:47PM (line 15)
03:47PM (line 20)
03:47PM (line 25)

```
 1  Q    BY MR. SAGEL:  And he didn't show you the Gregory Barela
 2  attorney-client trust account, where the settlement money was
 3  in, where any payments were paid to Frank Azar, did he?
 4              MR. AVENATTI:  Objection, Your Honor.
 5  Argumentative.  Lacks foundation.  Outside the scope.
 6              THE COURT:  Overruled.
 7              THE WITNESS:  No.
 8  Q    BY MR. SAGEL:  Because if Mr. Azar was paid for his work
 9  on the Gregory Barela matter, it would likely be seen in the
10  attorney-client trust account where the settlement money was
11  deposited?
12              MR. AVENATTI:  Objection, Your Honor.  Lacks
13  foundation.
14              THE COURT:  Sustained.
15              Move on.
16  Q    BY MR. SAGEL:  Defendant asked you questions about
17  whether or not you knew what the costs and the expenses were on
18  the Barela matter; correct?
19  A    I think so, yes.
20  Q    You said you didn't know that; is that right?
21  A    That's correct.
22              MR. SAGEL:  If we could pull up Exhibit 174, which
23  is already in evidence.  If we can just highlight the top half
24  of the page.
25  Q    On December 19, 2017, on the eve of the mediation, you
```

```
  1   weren't cc'd or included on an e-mail with the total costs for

  2   the Barela matter as of that time, were you?

  3              MR. AVENATTI:  Objection, Your Honor.  Foundation.

  4   Outside the scope.

03:49PM 5         THE COURT:  Overruled.

  6              THE WITNESS:  No.

  7   Q    BY MR. SAGEL:  But Mr. Avenatti was told what the total

  8   costs in the Barela matter was at that time?

  9              MR. AVENATTI:  Objection.  Misstates the evidence.

03:49PM 10  Lacks foundation.

 11              THE COURT:  Overruled.

 12              THE WITNESS:  That's what it appears to do.

 13   Q    BY MR. SAGEL:  And you weren't the one, on January 11th,

 14   2018, who directed Judy Regnier to take $111,000 out of the

03:50PM 15  attorney-client trust account for the total costs in the Barela

 16   matter, were you?

 17              MR. AVENATTI:  Same objections, Your Honor.

 18   Testifying through the witness.

 19              THE COURT:  Sustained.

03:50PM 20  Q    BY MR. SAGEL:  What role, if any, did you have in telling

 21   Ms. Regnier what the total costs were to be removed from the

 22   attorney-client trust account?

 23              MR. AVENATTI:  Lacks foundation, Your Honor.

 24              THE COURT:  Overruled.

03:50PM 25              THE WITNESS:  No role.
```

UNITED STATES DISTRICT COURT

```
 1              MR. SAGEL:  No further questions, Your Honor.

 2              THE COURT:  May the witness be excused?

 3              MR. AVENATTI:  Your Honor, I'd request that he be

 4    subject to recall.

 5              THE COURT:  Sir, you're excused, but you are subject

 6    to recall.

 7              Would you call your next witness, please.

 8              MR. AVENATTI:  Yes, sir.  The defense calls Special

 9    Agent Melissa Galicia.

10              THE COURTROOM DEPUTY:  If you'll please stand behind

11    the court reporter and raise your right hand.

12         MELISSA GALICIA, DEFENSE WITNESS, WAS SWORN

13              THE COURTROOM DEPUTY:  If you'll please state and

14    spell your first and last name.

15              THE WITNESS:  My name is Melissa Galicia.

16    G-a-l-i-c-i-a.

17              THE COURTROOM DEPUTY:  And Melissa, M-e-l-i-s-s-a?

18              THE WITNESS:  That's correct.

19              THE COURTROOM DEPUTY:  Thank you.

20              THE COURT:  Mr. Avenatti.

21                      DIRECT EXAMINATION

22    BY MR. AVENATTI:

23    Q    Ms. Galicia, good afternoon.

24    A    Good afternoon.

25    Q    Where do you -- well, strike that.
```

03:50PM (line 5)
03:52PM (line 10)
03:52PM (line 15)
03:52PM (line 20)
03:52PM (line 25)

1                  Are you an employee of the Department of Justice?

2      A    Yes.

3      Q    What is your title?

4      A    I'm a special agent.

03:53PM  5    Q    Have you ever attended the FBI Academy?

6      A    I have.

7      Q    Where is that located?

8      A    In Quantico, Virginia.

9      Q    When did you graduate from the FBI Academy?

03:53PM 10    A    In August 2015.

11     Q    2015?

12     A    Yes.

13     Q    How long were you at the FBI Academy before graduating?

14     A    Around five months, five and a half.

03:53PM 15    Q    And at the end of your time at the FBI Academy, were you

16     commissioned as an agent?

17     A    Yes, I was.

18     Q    And when was that?

19     A    I think it was August 10th, 2015.  It might have been a

03:54PM 20    couple days before then.  Around -- on or about August 10th.

21     Q    It was just your anniversary?

22     A    It was, yes.

23     Q    So it's been six years now; right?

24     A    Yes.

03:54PM 25    Q    And you carry the title of special agent; is that right?

**UNITED STATES DISTRICT COURT**

```
    1   A     That's correct.
    2   Q     And that's the same title you've had for six years;
    3   right?
    4   A     Correct.
03:54PM  5   Q     And before attending the FBI Academy, what did you do?
    6   A     I was a lawyer.
    7   Q     And how long had you been a lawyer before you went to the
    8   FBI Academy?
    9   A     I practiced for about five and a half years.
03:54PM 10   Q     And where did you go to law school?
   11   A     Boston College.
   12   Q     I'm sorry?
   13   A     Boston College Law School.
   14   Q     Now, when you were at the FBI Academy -- well, strike
03:55PM 15   that.
   16          Have you undergone any training since you graduated
   17   from the FBI Academy?
   18   A     Yes.
   19   Q     Has any of that training involved computer forensics?
03:55PM 20   A     No.
   21   Q     Were you trained at all on computer forensics when you
   22   were at the academy?
   23   A     Not on computer forensics, no.
   24   Q     Have you ever been trained on any -- strike that.
03:55PM 25          Have you ever undergone any training relating to
```

**UNITED STATES DISTRICT COURT**

1  digital forensics or electronic forensics?

2  A    No.

3  Q    Have you ever received any instruction on how to obtain

4  electronic data?

03:55PM 5  A    I'd gotten general overviews on what to do when we come

6  across electronic media.  But nothing specifically about the

7  extraction of that data.

8  Q    When you say "general overviews," what do you mean?

9  A    For example, if I'm on a search and there's a cell phone,

03:56PM 10  there's instruction on what to do with that cell phone; to keep

11  it until it actually gets extracted by the forensic examiners.

12  Q    So you just brought up -- I think you said if you're on a

13  search?

14  A    Yes.

03:56PM 15  Q    What do you mean when you say if you're on a search?

16  You're talking about the execution of a search warrant?

17  A    That's correct.

18  Q    And generally, over the last six years, have you executed

19  search warrants?

03:56PM 20  A    I have.

21  Q    And what have you been trained to do as it relates to --

22  if you execute a search warrant and come across a cell phone,

23  what have you been trained to do as it relates to that cell

24  phone?

03:57PM 25  A    Generally our practice is to put it in airplane mode so

that it can't be tampered with remotely.  Also, we are told to

keep it charged as best as possible.

Q    And you're told to do that before a forensic image could

be taken of the device; correct?

03:57PM 5   A    Yes.

Q    That's the standard protocol.  Am I right?

A    Yes.

Q    And you said that you're instructed to put it in airplane

mode so it can't be tampered with.  What do you mean by that?

03:57PM 10  A    Generally, there's a concern that someone who has, you

know, access to the phone might be able to tamper with the data

on it remotely, through sending some sort of signal or command

to the phone.  So in order to prevent that, we make sure that

the Wi-Fi is turned off, the Bluetooth is turned off, it's in

03:58PM 15  airplane mode so that no one is able to, you know, tamper with

that phone, and it is preserved as we have found it.

Q    What is your understanding as to why it's important to

preserve the data on the phone as you find it?

A    It's important for -- you know, for evidentiary purposes,

03:58PM 20  that the phone is in the condition that it's found and hasn't

been -- there hasn't been any, you know, deletions from anyone

who might have had access to the phone, in order to preserve

evidence and to keep -- to keep it -- all the files as we have

found it.

03:58PM 25  Q    It's important because if the individual has access to

1    the phone, based on your training, they can delete text

2    messages, modify data, and otherwise tamper with evidence;

3    right?

4           MR. SAGEL:  Objection.  Foundation, Your Honor.

03:59PM  5           THE COURT:  Overruled.

6           THE WITNESS:  I'm sorry, could you repeat that.

7           MR. AVENATTI:  Can I have it read back, Your Honor?

8           THE COURT:  You may.

9           **(The question was read by the reporter as follows:**

03:58PM 10          **"It's important because if the individual has**

11          **access to the phone, based on your training, they**

12          **can delete text messages, modify data, and**

13          **otherwise tamper with evidence; right?")**

14          THE WITNESS:  It is important to keep the phone in

03:59PM 15   the condition that it's found.  Generally, you know, all sorts

16   of things could be happening.  That is one measure that we take

17   to make sure that nothing has -- that that phone, for example,

18   if we're talking about a phone, hasn't been tampered with or

19   altered in any way until it is further examined.

03:59PM 20   Q    BY MR. AVENATTI:  In your experience, one of the reasons

21   why you forensically -- well, strike that.

22          In your experience, one of the reasons why you

23   preserve these phones until they can be forensically imaged is

24   because you want to ensure that the evidence is as pure and

04:00PM 25   complete as possible; correct?

A     Again, we want to preserve the evidence as we found it.
And if -- you know, in whatever condition that it's in.  So it
is important for us that we maintain it as it was found.

Q     Now, I want to switch topics momentarily if I could.

04:00PM   What have you understood the policy of the FBI to be as it
relates to communicating with witnesses during the course of an
investigation and prosecution?  And in particular, what I'm
talking about is the retention of text message communications
with witnesses.  Do you understand my question?

04:01PM   A     I do.  In general, my understanding is that if there are
what's called -- let's call them substantive discussions with
the witness, those text messages would be preserved and turned
over.  If there are text messages that are purely logistical or
are just about coordinating, those are not preserved.

04:01PM   Q     So just so I'm clear, you've understood, since you've
been out of the academy, that if an agent communicates with a
witness during the course of an investigation or prosecution,
that the agent is required, based on your understanding of the
policy, to retain those text messages with the witness if they
04:02PM   are at all substantive ; am I correct?

A     If they are substantive in nature, yes, they should be
retained.

Q     Is it a violation of policy, based on your knowledge and
experience, to delete those communications with the witness
04:02PM   during the investigation?

```
 1   A    I'm not exactly sure if that's a policy, but that is

 2   certainly best -- best practice is to maintain all substantive

 3   text messages.

 4   Q    And again, that's in order to preserve evidence; right?

 5   A    It would preserve communications with a witness.  I don't

 6   know if they would actually be the evidence, but they would be

 7   of interest, I suppose.

 8   Q    It's potential evidence at that point; right?

 9   A    I'm sure that it's relevant at some point.

10   Q    What is Cellebrite?

11   A    I believe it's a program that is used to extract digital

12   data.

13   Q    Now, you mentioned earlier that from time to time you go

14   on these searches.  And you are instructed to, if you come

15   across a cell phone, put it in airplane mode and keep it

16   charged; is that right?

17   A    That's correct.

18   Q    And then, generally, what do you do with the cell phone

19   next as it relates to preserving the data?

20   A    At that point, generally at the conclusion of the search

21   and when we're back to the office, that -- those phones or

22   those digital devices would be turned over to our computer

23   forensics unit.  And they would actually do the extraction of

24   the data.

25   Q    And is that generally used -- or strike that.
```

**UNITED STATES DISTRICT COURT**

1            Is the program Cellebrite generally used in

2    connection with that?

3    A    I'm certainly not an expert on that.  I've heard that

4    program used often, but I'm not exactly sure on the technology.

04:04PM 5    Q    In your experience over the last six years, when you have

6    taken possession of some of these cell phones, there are times

7    where the individual who owns the cell phone gives you the

8    passcode to the cell phone; correct?

9    A    Yes.

04:04PM 10   Q    And there are times where they agree to allow the

11   Department of Justice to forensically copy their cell phone for

12   evidence; correct?

13   A    Yes.

14   Q    And then there are other instances where the individual

04:05PM 15   does not provide their passcode to the phone; is that right?

16   A    That's correct.

17   Q    And in those instances, the Department of Justice has

18   tools that will allow them to crack the passcode and

19   forensically image the phone; right?

04:05PM 20   A    Yes.

21   Q    In the last six years, can you estimate for the jury how

22   many times you have been present when a cell phone has been

23   taken for forensic imaging?

24   A    Could you be more specific?  Scenario?

04:06PM 25   Q    Sure.  You testified earlier that from time to time you

**UNITED STATES DISTRICT COURT**

1   go on searches; correct?

2   A    Yes.

3   Q    And I'm assuming that's pursuant to search warrants;

4   right?

04:06PM  5   A    Correct.

6   Q    And very often, cell phones are seized in connection with

7   that; am I correct?

8   A    Yes.

9   Q    In fact, that's a regular occurrence due to the

04:06PM 10   proliferation of cell phones; right?

11   A    I would agree cell phones are often taken during searches.

12   Q    And very often when you execute a search, you'll find

13   multiple cell phones; right?

14   A    Sometimes, yes.

04:06PM 15   Q    So based on your experience, it's a fairly regular

16   occurrence, in connection with a search warrant at least, to

17   seize a cell phone and then, in order to preserve the evidence,

18   have it forensically copied; true?

19   A    I would say that I've participated on numerous searches

04:07PM 20   where cell phones were taken.  What the case agents did with

21   those cell phones, I don't necessarily know what they did.

22   Q    But you've been involved in some instances where you

23   ensure that they were forensically copied by giving them to

24   somebody else; correct?

04:07PM 25   A    That's correct.

UNITED STATES DISTRICT COURT

1          MR. AVENATTI:  Nothing further, Your Honor.

2          THE COURT:  Mr. Sagel.

3          MR. SAGEL:  Your Honor, based on our -- what we

4   raised before, I'd ask for a quick sidebar before asking

04:08PM 5   questions.

6          **(Sidebar out of the presence of the jury:)**

7          MR. SAGEL:  I'll leave my comments on why she's here

8   for a different time.  But I guess my point, before I ask the

9   question, is, there was a search warrant of Mr. Avenatti that

04:20PM 10  was executed upon his arrest in New York that she was part of a

11   team of.  I need to ask her -- I believe I should be able to

12   ask her where she is employed, had she had any contact with the

13   search warrant obtaining a digital device of Mr. Avenatti.

14          The FBI is not part of this case whatsoever.  And

04:20PM 15  she's not the case agent on this matter and that she's a case

16   agent in the Southern District of New York.  I don't need to

17   mention the other criminal matters, but she is aware that a

18   cell phone, which was encrypted by Mr. Avenatti, was seized

19   pursuant to a search, and he did not provide his password.  He

04:20PM 20  opened the door to questions about searches and encrypted

21   devices.  He called this witness.

22          THE COURT:  Wait a minute.  What I heard was that

23   she was present at a search in Los Angeles.  No?

24          MR. AVENATTI:  No.  I didn't even elicit that,

04:20PM 25  Your Honor.  Let me finish.  Your Honor, I purposely did not

ask her about anything she did in connection with this case,

with the New York case or any other case.  I asked her to -- I

asked her about the general policies of the Department of

Justice relating to the forensic copying of devices.  That's

it.

I never asked her about what she did with

Ms. Regnier because of what counsel threatened to do before I

called her to the stand.  I didn't ask her whether she's ever

had any involvement with me.  I didn't ask her about any of

those, Your Honor.  I didn't open the door to anything other

than the standard Department of Justice policies relating to

the seizure of cell phones, et cetera.

And to now permit inquiry into something that

happened in New York unrelated to this case is highly

prejudicial under 403.  Highly prejudicial.  If he wants to ask

about the general policies and the scope and how those work,

that's fine.  But to tie this back to me now, Your Honor, would

be highly prejudicial.

MR. SAGEL:  Your Honor, if I can.

THE COURT:  You made an offer of proof that you

participated in a search.  When was that search and where was

it?

MR. AVENATTI:  That search on my offer of proof --

THE COURT:  Yes.

MR. AVENATTI:  -- related to a device of

UNITED STATES DISTRICT COURT

Ms. Regnier's.  But I didn't ask her about the device of

Ms. Regnier's because of my concern about this exact point,

Your Honor.  Because I didn't want to get into an argument that

somehow we would then bring in the SDNY matter.  She's from

04:20PM  SDNY.  She has nothing to do with this case.

THE COURT:  Look.  One at a time.

MR. SAGEL:  I'm sorry.  I apologize, Your Honor.

MR. AVENATTI:  Your Honor, I specifically did not

get into this in order to avoid any potential prejudice.  The

04:20PM  jury has no idea whether she had anything to do with anything

other than she's a six-year academy graduate from the FBI, and

she just testified as to what the general policies and

procedures are.  And I left it at that.

And allowing them to now tie it to me in some other

04:20PM  matter and some seizure of a cell phone is well outside the

scope.  And it's highly prejudicial, Your Honor.

MR. SAGEL:  Can I respond briefly?

THE COURT:  Please.

MR. SAGEL:  I have no idea -- obviously, I

04:20PM  shouldn't -- and I don't know what the offer of proof of -- he

wanted Special Agent Galicia to fly in from New York, who is a

special agent in his New York matter, who has nothing to do

with the search of Judy Regnier's house.  He asked her on

direct about how many searches she had, how many phones she

04:20PM  had, and she's seized and done downloads, including asking

1  questions about whether or not sometimes they're encrypted and

2  you can get a password and whether you can break into them.

3        He knows she was one of the agents who was involved

4  in the search warrant of him in New York, having nothing to do

04:20PM 5  with this matter.  And why she was flown across the country for

6  that is mind-boggling on its face, but that she was

7  participating in one of those search warrants.  He asked her to

8  enumerate the numbers and times that involves him.

9        THE COURT:  Did she come out to the Regnier search?

04:20PM 10       MR. SAGEL:  No.

11       MR. AVENATTI:  Your Honor, and I didn't ask her

12  about this.  I didn't ask her about this.

13       THE COURT:  I feel a little bit misled.

14       MR. AVENATTI:  I don't want you to feel misled.  I'd

04:20PM 15  like you to look at the document I have here.

16       THE COURT:  No, sir.  It was represented to me that

17  one of the prime reasons was that she had participated in a

18  search in this case.  I was led to believe that it was Regnier

19  and that you -- your general theory is the Government's

04:20PM 20  conducted a sloppy and improper investigation.

21       MR. AVENATTI:  Correct.

22       THE COURT:  Fine.

23       MR. AVENATTI:  Correct, Your Honor.  To be clear,

24  here is the -- it's got a USAO Bates number on it.  This is the

04:20PM 25  United States Department of Justice consent to search

electronic equipment, stored media, or online account.  This is

from Ms. Regnier.  She's a witness to it.  She --

THE COURT:  She was here?

MR. AVENATTI:  She was here.  Yes.

MR. SAGEL:  Your Honor.

MR. AVENATTI:  Wait.  Let me finish.

She was here and along with Ms. Penland.

THE COURT:  Let me see the signature.

MR. AVENATTI:  Melissa Galicia.  And there's

Ms. Regnier's signature (indicating).

THE COURT:  Okay.

MR. AVENATTI:  So I want to be clear.  Your Honor

has not been misled.  Okay.

But after I heard Mr. Sagel's threat earlier about

opening the door, then I got very concerned about bringing --

about having her talk about this particular thing relating to

Regnier and then have him say, "Well, that didn't relate to

this case.  It related to the New York case."  And then we'd be

done, the Pandora's box would be open.

But Your Honor, I just asked her general questions

with no specifics about anything.  But allowing him to now

interject anything that happened in New York would be highly

prejudicial.

And let me also just make this point if I could.

She was not involved in the search in New York.  She was not

present at the time of my arrest in New York.  She was present

later, but she wasn't present at the time of my arrest.  She

wasn't present at the time that my cell phone was taken from

me.  And in any event, that wasn't done in connection with this

case.  It was done in connection with another case.  And it's

highly prejudicial.

        MR. SAGEL:  Your Honor, can I respond to that, what

he just showed you?

        THE COURT:  Yeah.

        MR. SAGEL:  That document, the searches of

Ms. Regnier's phone were done on March 25th, 2019, pursuant to

our case.  Pursuant to our search warrants at her house, the

agents took them.  And Special Agent Tashchyan testified about

those and so forth.

        When the SDNY agents flew out here to interview

Ms. Regnier for the first time on their matter, it was

November-ish of 2020, a year and a half later.  Because we

already had the phones and the search warrant, they asked for a

signature for her to consent to turn over.

        THE COURT:  What's the date on that?

        MR. SAGEL:  November 20, 2020.

        MR. AVENATTI:  It's dated October 20.  But I didn't

ask her about any of this.

        THE COURT:  Wait a minute.  So she wasn't here for

the search of Regnier's premises and the initial capture of her

```
 1   cell phone; is that accurate?
 2               MR. AVENATTI:  Well, I --
 3               THE COURT:  Is that accurate?
 4               MR. AVENATTI:  Sir, I don't believe that is
 5   accurate.  She was not present -- let me explain.  She was not
 6   physically present at Ms. Regnier's home.  That is true.  I
 7   never represented that she was.  But she was certainly present
 8   at the time that Ms. Regnier's cell phone was downloaded.  I
 9   mean, that's what this is.
10               Now, I don't know what Mr. Sagel is representing
11   relating to the sequencing of what was imaged when.  All I know
12   is I get this produced in discovery.  It shows that she was
13   involved in the imaging of a cell phone.  Regardless,
14   Your Honor, I didn't ask about this document.  I didn't ask
15   anything about Regnier.  I asked none of that.
16               MR. SAGEL:  Your Honor --
17               THE COURT:  I think I've heard enough.  I'm going to
18   limit you to the scope of the direct, which is basically the
19   policies and procedures.  I'm not going to let you go beyond
20   that.
21               MR. AVENATTI:  Thank you.  I'm sorry for the "thank
22   you," by the way.
23               MR. SAGEL:  Can I inquire where she works and why
24   she was flown out here for that testimony?
25               MR. AVENATTI:  Your Honor, where she works is
```

1    irrelevant.

2              MR. SAGEL:  The only reason --

3              MR. AVENATTI:  I already established --

4              THE COURT:  Sir, each of you, late in the day.  This

04:20PM 5    isn't kindergarten where people get to go "Nah, Nah, Nah."

6    We're in a court of law.  You've got to act like the trained

7    lawyers you are.  One at a time.

8              MR. AVENATTI:  Understood, sir.

9              Your Honor, I specifically asked whether she was

04:20PM 10   employed at the Department of Justice and then whether she had

11   gone to the FBI Academy, and I left it at that.  I didn't

12   suggest she worked there or anywhere else.  She could work

13   anywhere in the world.

14             THE COURT:  What's the relevance of where she works?

04:20PM 15             MR. SAGEL:  I'm going backwards, and apologize.  The

16   defendant filed -- moved subpoenas of five or nine agents.  We

17   had briefings with Your Honor.  He said these three are

18   relevant because of interviews with Ms. Regnier, and he needed

19   them.  He moved to quash them on that basis.

04:20PM 20             What he provided to the Court was their relevant --

21   this is in the public filings, so I admit I don't know what

22   happened in camera.  He put in his filing the reasons she was

23   relevant was she was a case agent who interviewed Ms. Regnier.

24             THE COURT:  Sir, if you want to come back and do

04:20PM 25   rebuttal with her, so be it.  But for now, you're going to be

```
 1    limited to the general practices and procedures with regard to

 2    securing digital devices.

 3            MR. SAGEL:  Am I allowed to ask that FBI is not an

 4    investigative agency on this case right here?

 5            THE COURT:  No.

 6            MR. SAGEL:  Why is this?

 7            THE COURT:  Sir, I made my ruling.  I think you

 8    understand the scope of the cross you conduct.  It's limited to

 9    what she testified to the department's general policies and

10    procedures with regard to capturing digital devices.

11            (Open court in the presence of the jury.)

12                        CROSS-EXAMINATION

13    BY MR. SAGEL:

14    Q    You worked at the FBI for five -- I got it right, six

15    years?

16    A    Yes, for six years.

17    Q    At any time have you worked at the Internal Revenue

18    Service?

19    A    I'm sorry, say that again.

20    Q    Have you ever worked at the Internal Revenue Service?

21    A    With the Internal --

22    Q    Have you ever been employed by the Internal Revenue

23    Service?

24    A    No, I have not.

25    Q    By criminal investigations of the Internal Revenue
```

1  Service?

2  A     No, I have not.

3           MR. SAGEL:  No further questions, Your Honor.

4           THE COURT:  Mr. Avenatti.

04:20PM 5                    **REDIRECT EXAMINATION**

6  BY MR. AVENATTI:

7  Q     Miss, from time to time, does the FBI work in

8  coordination with the Internal Revenue Service Criminal

9  Investigation Division?

04:21PM 10  A     Yes.  I think there are cases that are worked jointly with

11  the IRS.

12           MR. AVENATTI:  Nothing further.

13           MR. SAGEL:  No further questions, Your Honor.

14           THE COURT:  May the witness be excused?

04:21PM 15           MR. AVENATTI:  Yes, sir.

16           THE COURT:  Mr. Sagel?

17           MR. SAGEL:  Yes, Your Honor.

18           THE COURT:  You may be excused.  Thank you.

19           What's the length of your next witness?

04:21PM 20           MR. AVENATTI:  Probably at least an hour,

21  Your Honor, but I'm prepared to start or finish right now.

22           THE COURT:  That's fine.

23           Ladies and gentlemen, we're going to conclude here

24  for the day.  I have matters -- some matters I need to take up

04:22PM 25  with counsel.

**UNITED STATES DISTRICT COURT**

1           Please remember the admonition not to discuss the

2      case with anyone, not to form any opinions on the issues in the

3      case until it's submitted to you.  And please, no research.

4      I'll see you tomorrow for a regular day, 9:00 o'clock.  Have a

04:22PM 5      good evening.

6           THE COURTROOM DEPUTY:  All rise.

7           **(Out of the presence of the jury.)**

8           THE COURT:  I'm going to take a short break before

9      we turn to the jury instructions.

04:22PM 10          MR. AVENATTI:  About ten minutes, Your Honor?

11          THE COURT:  That's fine.

12          **(Recess from 4:22 p.m. to 4:33 p.m.)**

13          MR. SAGEL:  Your Honor, very briefly, before we get

14     to the jury instructions.  I don't want to take up much of your

04:33PM 15     time, but we had two special agents fly out from New York at

16     the defendant's request.  The other agent is at the hotel

17     waiting to be called tomorrow.

18          In light of what we just saw in the filing -- and

19     just to be clear, today was not the first time I mentioned

04:34PM 20     opening the door.  It's been in several filings.  So I guess I

21     want to know if Special Agent Penland is actually testifying

22     tomorrow and to what.  Because the testimony we just heard

23     should probably be stricken as irrelevant, because she didn't

24     participate in this case.  FBI is not part of this case, and

04:34PM 25     her testimony is completely irrelevant to this matter on a 401,

1    403.

2              And I'm not sure why we have a second agent who is

3    related to the Michael Avenatti prosecutions in New York

4    scheduled to testify if it's not about anything related to this

04:34PM  5    case, the witnesses in this case and so forth.

6              So I want to be able to tell Ms. Penland she doesn't

7    need to stay here for another day if she's not actually going

8    to be testifying about this matter.

9              THE COURT:  Do you still want Ms. Penland?

04:35PM 10              MR. AVENATTI:  Your Honor, at this moment I do.  But

11   here's what I would like.  I'd like to have the opportunity to

12   confer with Mr. Steward and Ms. Cummings-Cefali for 15 minutes

13   after court today.  And then I will tell the Government within

14   that 15 minutes whether I still want Ms. Penland.

04:35PM 15              I will state that my proffer relating to Ms. Penland

16   was different than my proffer relating to --

17              THE COURT:  I recall.

18              MR. AVENATTI:  So -- but in light of the testimony

19   that just occurred -- which I have a disagreement with

04:35PM 20   Mr. Sagel about its importance and relevance in this case, but

21   in light of that, I may not need Ms. Penland.  So I want to

22   confer with Mr. Steward and Ms. Cummings-Cefali.

23              THE COURT:  That's fine.  What I'd like to do is

24   just go through the set of jury instructions at a relatively

04:35PM 25   high level, identify -- get the answers to some of my questions

1    and identify places where you or I need to bore in a little bit

2    further.  So I just want to start from the beginning.

3            On Instruction Number 5, page 7, at line 11, I

4    eliminated the word "necessarily" and substituted "by itself."

04:36PM 5            MR. WYMAN:  No objection from the Government.

6            THE COURT:  I also added at the very end that

7    instruction on page 11 at line 9, a sentence which the

8    defendant requested.

9            MR. AVENATTI:  Your Honor, I just want to make sure

04:37PM 10   that I understand what we're doing here presently.  If I have

11   an objection, are you requiring me to make it now?  Or are you

12   just -- is this --

13           THE COURT:  I want to have a constructive session so

14   that we can narrow the differences and I understand what the

04:37PM 15   differences are and, as I said, understand where the parties

16   need to bore in further and so do I.  That's the purpose of

17   this.

18           MR. AVENATTI:  Okay.  So if I don't object, there's

19   no waiver?

04:37PM 20           THE COURT:  There's no waiver.  But sir, I expect

21   you to participate in good faith so that we have a constructive

22   and -- a constructive session here.

23           MR. AVENATTI:  I agree, Your Honor.  So can I give

24   comment on those changes?

04:37PM 25           THE COURT:  Sure.

1        MR. AVENATTI:  Okay.  Your Honor, the inclusion of

2    "by itself" on line 11, we had asked that the word

3    "necessarily" be excised, which the Court did.  We believe -- I

4    believe it should read, "Does not mean that the defendant is

04:38PM 5    guilty of the charged offenses of wire fraud."

6        THE COURT:  I understand your position, and I'm

7    rejecting it.

8        MR. AVENATTI:  Understood, Your Honor.

9        And then I believe Your Honor said that you added a

04:38PM 10   sentence at the end of 11 -- or on page 11?

11       THE COURT:  I did.

12       Sir, have you looked at these instructions prior to

13   the start of this session right now?

14       MR. AVENATTI:  Yes.

04:38PM 15   THE COURT:  Okay.

16       MR. AVENATTI:  Yes.  A number of times.

17       THE COURT:  This particular set that bears August 16

18   in the footer?

19       MR. AVENATTI:  No.

04:38PM 20   Do we have August 16?

21       Your Honor, the most recent version I have is

22   August 11th.

23       THE COURT:  Sir, Ms. Bredahl sent out yesterday a

24   set -- early in the afternoon a set dated August 16.  If you'll

04:39PM 25   recall --

```
 1              THE COURTROOM DEPUTY:  3:24, Judge.

 2              THE COURT:  3:24.

 3              You'll recall that I had mentioned last week that I

 4    wanted to have a session, and I said specifically "at the end

 5    of the day."  I advised you of my protocol so that neither I

 6    nor you get confused about drafts -- about putting the date of

 7    draft on the footer.

 8              MR. AVENATTI:  Your Honor, understood.  I had filed

 9    my position regarding the jury instructions at 7- -- at

10    Docket 709.  I'm assuming this came out after that.

11              THE COURT:  Well, yes, sir.  Because it reflects a

12    number of points that you made and some specific language you

13    requested.  With regard to Instruction Number 5, the language

14    at page 11, lines 9 to 11.

15              MR. AVENATTI:  Okay.  Court's indulgence, please.

16              (Counsel conferred off the record.)

17              MR. AVENATTI:  Your Honor, I know

18    Ms. Cummings-Cefali wouldn't have been included on the e-mail

19    because that's not her role in the case.  But Mr. Steward --

20              MR. STEWARD:  I'm sorry.  I did get it late

21    yesterday afternoon.

22              THE COURT:  It was sent at 3:24.

23              MR. AVENATTI:  Mr. Steward has just informed me that

24    he did get it late yesterday afternoon but it was not provided

25    to me.  But, Your Honor, if he can forward it to
```

1    Ms. Cummings-Cefali, I'll do it on the fly right now with you

2    if you'd like.

3              THE COURT:  Sir, I don't want to do it on the fly.

4    I want to have a constructive session where you have an

04:40PM  5    opportunity to consider the Court's revisions.

6              We'll take this up tomorrow evening.  We're

7    adjourned.

8              MR. AVENATTI:  Your Honor, I apologize.  I had no

9    idea, Your Honor.  I apologize.

04:40PM 10              THE COURT:  Well, sir, you need to keep yourself

11    informed as to what your advisory counsel perceives on your

12    behalf.

13              THE COURTROOM DEPUTY:  All rise.  This court is now

14    in recess.

04:41PM 15              **(Proceedings concluded at 4:41 p.m.)**

16                            **--oOo--**

17

18

19

20

21

22

23

24

25

1          *CERTIFICATE OF OFFICIAL REPORTER*

2

3    COUNTY OF LOS ANGELES   )
                             )
4    STATE OF CALIFORNIA     )

5              I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME

6    COURT REPORTER, in and for the United States District Court for

7    the Central District of California, do hereby certify that

8    pursuant to Section 753, Title 28, United States Code that the

9    foregoing is a true and correct transcript of the

10   stenographically reported proceedings held in the

11   above-entitled matter and that the transcript page format is in

12   conformance with the regulations of the Judicial Conference of

13   the United States.

14

15   *Date:  August 17, 2021*

16

17

18

19                        */S/ DEBBIE HINO-SPAAN*

20                        *Debbie Hino-Spaan, CSR No. 7953*
                          *Federal Official Court Reporter*
21

22

23

24

25

**$**

**$111,000** [1] - 81:14
**$600,000** [1] - 52:23

**'**

**'17** [1] - 29:17

**/**

**/S** [1] - 108:19

**1**

**1** [2] - 31:10, 31:18
**1-053** [1] - 1:24
**1.6** [4] - 43:14, 44:3, 44:7, 50:11
**10** [2] - 3:3, 40:4
**100** [2] - 3:7, 37:14
**101** [1] - 3:7
**1059** [1] - 75:22
**1061** [2] - 10:9, 49:25
**10th** [2] - 83:19, 83:20
**11** [11] - 38:5, 38:10, 40:3, 40:4, 104:3, 104:7, 105:2, 105:10, 106:14
**11/14** [1] - 40:6
**11/15** [1] - 40:5
**1100** [1] - 2:11
**11th** [2] - 81:13, 105:22
**14** [4] - 42:7, 72:8, 72:16, 72:17
**15** [3] - 63:4, 103:12, 103:14
**15-minute** [1] - 63:20
**16** [3] - 105:17, 105:20, 105:24
**17** [4] - 1:15, 2:18, 4:1, 108:15
**174** [1] - 80:22
**176** [2] - 40:1, 40:3
**18** [1] - 46:12
**19** [4] - 72:12, 72:16, 72:17, 80:25
**1:27** [2] - 1:16, 4:2

**2**

**2** [3] - 1:9, 31:10, 31:25
**20** [2] - 97:21, 97:22
**2009** [3] - 22:11, 69:19, 70:3
**2014** [10] - 29:4, 29:17, 33:19, 35:22, 59:24, 60:24, 69:13, 70:3,

71:21, 71:22
**2014-ish** [1] - 69:19
**2015** [6] - 36:2, 69:25, 72:1, 83:10, 83:11, 83:19
**2017** [10] - 29:4, 29:23, 30:9, 32:17, 33:20, 36:10, 38:7, 59:24, 60:24, 80:25
**2018** [13] - 12:14, 36:17, 37:7, 38:7, 44:16, 45:9, 45:19, 45:25, 47:7, 47:14, 47:19, 49:20, 81:14
**2019** [17] - 12:14, 12:15, 12:16, 12:19, 14:22, 15:2, 15:13, 15:15, 15:25, 17:13, 19:16, 20:4, 20:12, 47:12, 48:7, 53:8, 97:11
**2020** [3] - 6:5, 97:17, 97:21
**2021** [3] - 1:15, 4:1, 108:15
**21** [1] - 1:8
**213-894-2435** [1] - 2:12
**254** [1] - 2:19
**257** [1] - 45:8
**25th** [1] - 97:11
**26** [1] - 3:4
**28** [1] - 108:8

**3**

**312** [1] - 2:11
**36** [3] - 16:5, 16:7, 16:16
**39** [1] - 16:10
**3:00** [1] - 65:18
**3:05** [1] - 65:23
**3:21** [1] - 65:23
**3:24** [3] - 106:1, 106:2, 106:22
**3rd** [1] - 45:9

**4**

**40** [1] - 19:7
**401** [3] - 53:9, 53:16, 102:25
**403** [7] - 48:9, 52:16, 52:20, 53:9, 53:17, 93:15, 103:1
**411** [2] - 1:24, 2:6
**4:22** [1] - 102:12
**4:33** [1] - 102:12
**4:41** [1] - 107:15
**4th** [1] - 2:6

**4TH** [1] - 1:24

**5**

**5** [24] - 5:12, 5:15, 5:18, 5:21, 6:1, 6:4, 6:7, 6:16, 6:19, 6:23, 7:2, 7:6, 7:11, 7:15, 7:22, 7:25, 8:2, 8:5, 8:9, 8:14, 8:15, 9:7, 104:3, 106:13
**54** [1] - 3:4

**6**

**6:00** [1] - 66:7

**7**

**7** [2] - 104:3, 106:9
**709** [1] - 106:10
**714-338-3598** [1] - 2:7
**753** [1] - 108:8
**77** [1] - 3:5
**7953** [2] - 1:23, 108:20
**7th** [1] - 14:22

**8**

**8000** [1] - 2:6
**82** [1] - 3:6

**9**

**9** [2] - 104:7, 106:14
**90012** [1] - 2:12
**92660** [1] - 2:19
**92701** [2] - 1:25, 2:7
**949-481-4900** [1] - 2:20
**9:00** [1] - 102:4

**A**

**ability** [1] - 7:20
**able** [5] - 78:9, 86:11, 86:15, 92:11, 103:6
**above-entitled** [1] - 108:11
**Academy** [9] - 83:5, 83:9, 83:13, 83:15, 84:5, 84:8, 84:14, 84:17, 99:11
**academy** [3] - 84:22, 88:16, 94:11
**access** [11] - 23:9, 23:12, 23:17, 33:7, 33:9, 33:10, 33:16, 86:11, 86:22, 86:25, 87:11

**account** [11] - 33:8, 33:10, 34:14, 35:7, 35:11, 35:14, 80:2, 80:10, 81:15, 81:22, 96:1
**accounting** [4] - 21:3, 25:14, 45:22, 58:20
**accountings** [1] - 77:21
**accurate** [5] - 19:23, 50:8, 98:1, 98:3, 98:5
**accusation** [1] - 37:22, 43:7, 43:10, 55:8, 55:9, 73:20, 74:15
**accuse** [1] - 77:1
**accuses** [1] - 74:8
**accusing** [3] - 76:17, 76:18, 76:22
**act** [1] - 99:6
**active** [2] - 54:6, 54:8
**actual** [2] - 16:17, 61:25
**added** [3] - 65:8, 104:6, 105:9
**addition** [1] - 4:7
**additional** [2] - 63:15, 65:6
**address** [1] - 73:7
**addressed** [1] - 10:14
**adequate** [1] - 65:21
**adjourned** [1] - 107:7
**admit** [1] - 99:21
**admitted** [1] - 79:18
**admonition** [2] - 62:25, 102:1
**advance** [1] - 40:16
**advised** [1] - 106:5
**advisory** [1] - 107:11
**afternoon** [12] - 5:14, 10:4, 10:6, 26:16, 26:17, 62:24, 65:7, 82:23, 82:24, 105:24, 106:21, 106:24
**agency** [1] - 100:4
**agent** [12] - 64:16, 83:4, 83:16, 83:25, 88:16, 88:18, 92:15, 92:16, 94:22, 99:23, 102:16, 103:2
**Agent** [5] - 65:7, 82:9, 94:21, 97:13, 102:21
**agents** [7] - 64:1, 91:20, 95:3, 97:13, 97:15, 99:16, 102:15
**agree** [3] - 90:10, 91:11, 104:23
**agreement** [24] - 11:4,

11:11, 11:14, 11:17, 11:20, 12:5, 12:8, 12:9, 12:17, 12:21, 20:25, 21:2, 27:14, 27:18, 31:4, 31:20, 32:8, 32:18, 38:11, 43:14, 45:14, 45:22, 49:20, 68:6
**agreements** [2] - 70:13, 70:16
**ahead** [4] - 4:14, 35:17, 63:23
**Ahmed** [2] - 17:13, 37:10
**airplane** [4] - 85:25, 86:8, 86:15, 89:15
**alex.wyman@usdoj. gov** [1] - 2:13
**ALEXANDER** [1] - 2:10
**Alki** [2] - 34:7, 68:25
**allegation** [2] - 18:10, 55:4
**allegations** [1] - 67:21
**allow** [2] - 90:10, 90:18
**allowed** [2] - 64:7, 100:3
**allowing** [2] - 94:14, 96:21
**almost** [3] - 38:5, 51:20, 64:20
**alone** [1] - 6:23
**altered** [1] - 87:19
**ambiguous** [1] - 29:7
**Amenta** [1] - 4:15
**AMERICA** [1] - 1:5
**amount** [3] - 29:16, 32:3, 71:15
**amounted** [1] - 32:24
**Ana** [1] - 2:7
**ANA** [3] - 1:17, 1:25, 4:1
**ANGELES** [1] - 108:3
**Angeles** [6] - 2:12, 15:6, 15:7, 15:18, 15:20, 92:23
**angry** [13] - 39:4, 39:5, 39:6, 72:6, 73:17, 74:5, 74:6, 74:19, 74:22, 75:1, 75:7, 75:11, 75:12
**anniversary** [1] - 83:21
**answer** [9] - 21:20, 21:21, 38:16, 38:18, 50:21, 55:19, 78:9, 78:11
**answered** [13] - 19:12, 40:24, 41:4, 41:13,

41:24, 41:25, 44:22, 53:4, 57:5, 67:17, 74:24, 77:6, 78:13
**answers** [4] - 47:8, 47:21, 51:6, 103:25
**anticipate** [1] - 66:7
**anyway** [1] - 6:8
**APC** [1] - 45:12
**apologize** [5] - 66:6, 94:7, 99:15, 107:8, 107:9
**apparent** [1] - 41:17
**appearance** [2] - 60:2, 60:6
**APPEARANCES** [1] - 2:1
**appearances** [2] - 61:2
**application** [1] - 51:9
**apply** [1] - 78:18
**appreciate** [1] - 40:11
**appreciative** [1] - 65:5
**apprised** [1] - 65:15
**approach** [3] - 15:8, 16:23, 19:5
**approval** [7] - 27:6, 27:13, 28:17, 59:7, 59:9, 59:10, 59:13
**approved** [2] - 59:13, 59:18
**arbitration** [18] - 12:10, 12:11, 12:13, 16:5, 16:12, 16:16, 16:17, 29:11, 30:5, 47:11, 48:2, 48:3, 48:6, 53:7, 53:13, 61:2, 67:22, 68:14
**ARDEN** [2] - 3:3, 10:10
**Arden** [14] - 15:11, 16:25, 17:12, 18:4, 19:7, 26:16, 47:5, 54:4, 57:12, 66:13, 66:22, 67:14, 73:4, 75:24
**argue** [1] - 4:25
**argued** [1] - 60:9
**argument** [2] - 5:8, 94:3
**Argumentative** [5] - 52:20, 66:19, 67:11, 77:5, 80:5
**argumentative** [11] - 32:12, 33:1, 34:17, 38:13, 41:13, 41:24, 42:11, 49:11, 50:24, 52:16, 53:10
**arguments** [1] - 61:7
**arrangement** [2] - 13:11, 26:6, 68:18

**arrangements** [5] - 24:21, 24:22, 27:21, 27:23, 75:19
**arrest** [3] - 92:10, 97:1, 97:2
**Assistant** [2] - 2:5, 2:10
**assisted** [1] - 68:15
**assisting** [1] - 13:2
**associated** [3] - 13:15, 14:11, 14:17
**Associates** [1] - 45:12
**assume** [5] - 21:18, 70:1, 70:12, 71:24, 72:3
**assumed** [2] - 71:8, 71:9
**assumes** [2] - 66:20, 67:11
**assuming** [5] - 71:20, 71:21, 71:25, 91:3, 106:10
**AT&T** [13] - 56:15, 56:16, 56:18, 56:20, 56:24, 56:25, 57:2, 57:8, 57:9, 57:12, 59:20, 59:21, 59:22
**attached** [1] - 12:10
**attended** [2] - 60:7, 83:5
**attending** [1] - 84:5
**attorney** [24] - 14:19, 33:7, 33:10, 34:14, 35:7, 35:11, 48:8, 52:6, 52:13, 56:8, 56:13, 56:18, 59:14, 61:25, 62:8, 62:13, 62:18, 67:5, 68:13, 68:15, 80:2, 80:10, 81:15, 81:22
**Attorney** [4] - 2:4, 2:5, 2:9, 2:10
**attorney's** [1] - 51:5
**Attorney's** [2] - 15:6, 15:18
**attorney-client** [9] - 33:7, 33:10, 34:14, 35:7, 35:11, 80:2, 80:10, 81:15, 81:22
**attorneys** [11] - 14:4, 14:6, 44:2, 57:18, 57:19, 57:21, 59:6
**attorneys'** [1] - 24:4
**AUGUST** [2] - 1:15, 4:1
**August** [8] - 83:10, 83:19, 83:20, 105:17, 105:20, 105:22, 105:24,

108:15
**authority** [2] - 27:1, 27:2
**Avenatti** [41] - 3:3, 3:4, 3:6, 3:7, 6:12, 7:9, 9:1, 26:21, 27:3, 27:19, 28:13, 28:22, 28:24, 30:3, 30:7, 33:15, 39:10, 41:19, 42:1, 44:12, 45:12, 45:13, 45:18, 48:17, 51:21, 52:5, 52:12, 54:1, 55:3, 66:12, 74:10, 78:17, 79:15, 81:7, 82:20, 92:9, 92:13, 92:18, 101:4, 103:3
**AVENATTI** [178] - 1:8, 2:15, 2:16, 4:13, 4:16, 4:20, 4:22, 4:24, 5:3, 5:7, 5:10, 7:10, 7:12, 7:18, 7:24, 8:1, 8:3, 8:6, 8:19, 9:8, 10:8, 10:12, 14:21, 15:3, 15:8, 15:11, 16:23, 16:25, 17:9, 17:12, 17:21, 18:4, 18:11, 18:18, 18:21, 19:5, 19:7, 19:15, 20:20, 20:23, 21:22, 23:5, 26:10, 26:12, 27:9, 28:18, 29:6, 29:18, 31:12, 32:9, 32:12, 32:25, 33:12, 34:16, 35:4, 35:13, 36:3, 37:18, 38:12, 38:16, 39:1, 40:24, 41:4, 41:12, 41:23, 42:8, 42:11, 42:24, 43:15, 43:18, 44:2, 46:2, 46:7, 46:13, 46:23, 48:9, 48:18, 48:23, 49:10, 49:16, 50:14, 50:23, 51:15, 52:15, 52:20, 52:23, 53:4, 53:9, 53:16, 53:22, 54:3, 55:16, 55:18, 56:2, 56:14, 57:9, 60:9, 60:19, 60:23, 63:10, 63:15, 63:18, 65:22, 65:24, 66:5, 66:13, 66:22, 67:14, 67:21, 71:20, 73:1, 73:4, 73:25, 74:4, 74:11, 74:12, 74:19, 75:2, 75:22, 76:7, 77:8, 77:13, 78:8, 78:11, 78:15, 79:16, 79:20, 80:4, 80:12, 81:3, 81:9, 81:17,

81:23, 82:3, 82:8, 82:22, 87:7, 87:20, 92:1, 92:24, 93:23, 93:25, 94:8, 95:11, 95:14, 95:21, 95:23, 96:4, 96:6, 96:9, 96:12, 97:22, 98:2, 98:4, 98:21, 98:25, 99:3, 99:8, 101:6, 101:12, 101:15, 101:20, 102:10, 103:10, 103:18, 104:9, 104:18, 104:23, 105:1, 105:8, 105:14, 105:16, 105:19, 106:8, 106:15, 106:17, 106:23, 107:8
**avenatti** [1] - 10:7
**Avenatti's** [3] - 9:16, 9:23, 79:14
**avoid** [2] - 47:5, 94:9
**aware** [7] - 12:19, 13:4, 38:15, 38:19, 58:14, 68:11, 92:17
**Azar** [11] - 68:12, 68:15, 68:19, 68:21, 79:1, 79:4, 79:7, 79:11, 79:14, 80:3, 80:8

## B

**backwards** [1] - 99:15
**bad** [3] - 8:2, 8:3, 76:21
**Bakery** [2] - 34:7, 68:25
**bankruptcy** [1] - 79:15
**bar** [1] - 52:8
**Bar** [2] - 54:15, 54:20
**Barela** [129] - 11:16, 11:19, 11:23, 12:11, 13:2, 13:4, 13:8, 13:12, 13:15, 13:18, 13:22, 14:3, 14:4, 14:9, 14:11, 16:2, 17:14, 18:24, 19:10, 19:18, 20:5, 20:23, 21:2, 21:5, 24:14, 25:24, 26:7, 27:21, 27:23, 27:25, 28:1, 30:25, 31:3, 31:7, 31:9, 31:10, 32:5, 32:17, 32:21, 32:24, 33:19, 35:11, 36:10, 36:20, 37:2, 37:10, 37:15, 38:1, 38:9, 38:21, 39:19, 39:20,

40:15, 42:4, 42:15, 42:16, 42:19, 42:22, 43:7, 43:10, 43:13, 44:2, 44:6, 44:15, 45:4, 45:14, 47:3, 47:9, 47:13, 47:24, 48:21, 49:5, 49:7, 49:21, 50:10, 50:19, 51:14, 53:1, 53:8, 53:14, 53:21, 59:1, 59:23, 60:23, 61:3, 61:11, 61:15, 61:20, 62:2, 62:4, 62:7, 62:11, 66:14, 66:25, 67:5, 67:9, 67:15, 67:21, 67:25, 68:3, 68:10, 68:19, 68:22, 69:7, 71:1, 71:7, 71:20, 71:23, 72:5, 72:22, 75:14, 75:18, 76:1, 76:12, 76:16, 76:19, 76:22, 77:1, 77:9, 78:22, 79:2, 79:4, 79:8, 80:1, 80:9, 80:18, 81:2, 81:8, 81:15
**Barela's** [14] - 13:24, 14:20, 21:4, 33:4, 34:13, 39:17, 44:2, 47:20, 50:1, 51:10, 53:12, 68:7, 74:23, 75:16
**Baristas** [3] - 34:21, 35:3, 35:12
**based** [16] - 5:22, 21:19, 22:1, 31:3, 31:6, 43:9, 53:14, 67:14, 70:13, 75:19, 87:1, 87:11, 88:18, 88:23, 91:15, 92:3
**basis** [2] - 9:5, 99:19
**Bates** [1] - 95:24
**Beach** [1] - 2:19
**Beada** [2] - 34:1, 68:24
**bear** [1] - 64:21
**bears** [1] - 105:17
**became** [1] - 41:16
**began** [1] - 78:9
**beginning** [6] - 10:18, 26:18, 37:12, 37:13, 71:4, 104:2
**begins** [1] - 10:21
**behalf** [3] - 13:25, 30:24, 107:12
**behind** [2] - 36:16, 82:10
**below** [2] - 46:6, 46:18
**best** [12] - 5:11, 12:14, 15:21, 15:22, 22:23,

46:24, 56:20, 73:13, 73:14, 86:2, 89:2
**between** [8] - 9:7, 12:20, 12:23, 13:17, 13:21, 49:19, 72:13, 72:15
**beyond** [2] - 35:4, 98:19
**bias** [1] - 53:18
**billed** [1] - 13:15
**binding** [1] - 12:21
**bit** [5] - 5:19, 24:1, 46:5, 95:13, 104:1
**Bledsoe** [3] - 10:14, 72:11, 75:25
**blow** [2] - 10:8, 75:23
**Bluetooth** [1] - 86:14
**body** [1] - 10:9
**boggling** [1] - 95:6
**bogus** [1] - 55:4
**bore** [2] - 104:1, 104:16
**Boston** [2] - 84:11, 84:13
**box** [1] - 96:19
**Brager** [2] - 34:3, 68:24
**break** [5] - 10:13, 52:25, 62:24, 95:2, 102:8
**Bredahl** [5] - 4:10, 8:8, 9:7, 9:11, 105:23
**BRETT** [1] - 2:5
**brett.sagel@usdoj. gov** [1] - 2:8
**brief** [1] - 4:7
**briefings** [1] - 99:17
**briefly** [3] - 25:24, 94:17, 102:13
**bring** [2] - 10:2, 94:4
**bringing** [2] - 4:10, 96:15
**Brock** [8] - 11:5, 28:20, 33:5, 37:16, 45:14, 49:15, 49:22, 50:10
**Brock/Barela** [5] - 28:16, 29:4, 29:5, 29:13, 45:19
**brought** [2] - 65:8, 85:12
**bullet** [1] - 45:20
**bunch** [1] - 5:22
**business** [2] - 13:3, 13:5
**BY** [89] - 2:5, 2:18, 3:3, 3:6, 10:12, 14:21, 15:3, 15:11, 16:25, 17:12, 17:21, 18:4, 18:11, 18:21, 19:7,

19:15, 20:23, 21:22, 23:5, 26:15, 27:14, 28:23, 29:11, 29:23, 31:15, 32:16, 33:3, 33:17, 34:21, 35:10, 35:17, 36:9, 38:1, 38:20, 39:5, 41:1, 41:10, 41:21, 42:1, 42:14, 43:5, 43:20, 45:3, 46:11, 46:16, 47:7, 48:13, 48:20, 49:1, 49:14, 49:19, 50:18, 51:3, 51:19, 52:18, 53:7, 53:12, 53:21, 54:3, 56:2, 56:14, 57:9, 60:9, 60:19, 60:23, 66:13, 66:22, 67:14, 67:21, 71:20, 73:4, 74:4, 74:12, 74:19, 75:2, 76:7, 77:8, 77:16, 78:19, 80:1, 80:8, 80:16, 81:7, 81:13, 81:20, 82:22, 87:20, 100:13, 101:6
**bye** [1] - 40:14

# C

**CA** [1] - 1:25
**calculation** [1] - 71:12
**California** [11] - 2:7, 2:12, 2:19, 51:22, 52:6, 52:7, 52:14, 54:16, 54:22, 55:2, 108:7
**CALIFORNIA** [4] - 1:2, 1:17, 4:1, 108:4
**CALLED** [2] - 3:3, 3:6
**camera** [1] - 99:22
**capture** [1] - 97:25
**capturing** [1] - 100:10
**care** [1] - 28:12
**carry** [3] - 55:12, 55:22, 83:25
**case** [70] - 7:14, 7:21, 15:14, 17:14, 21:4, 24:3, 24:22, 25:1, 27:25, 28:1, 29:12, 29:15, 29:17, 29:24, 30:1, 30:5, 30:17, 31:4, 31:24, 32:2, 32:16, 32:21, 33:3, 33:19, 33:21, 33:24, 34:1, 34:3, 34:5, 34:9, 34:11, 51:11, 57:18, 63:1, 63:2, 64:6, 64:7, 64:16, 64:18, 68:7, 68:10, 68:15, 70:9, 71:10,

79:5, 91:20, 92:14, 92:15, 93:1, 93:2, 93:14, 94:5, 95:18, 96:18, 97:5, 97:12, 99:23, 100:4, 102:2, 102:3, 102:24, 103:5, 103:20, 106:19
**Case** [1] - 1:7
**cases** [5] - 6:1, 58:12, 58:15, 62:5, 101:10
**cc'd** [1] - 81:1
**Cefali** [4] - 103:12, 103:22, 106:18, 107:1
**cell** [26] - 73:4, 85:9, 85:10, 85:22, 85:23, 89:15, 89:18, 90:6, 90:7, 90:8, 90:11, 90:22, 91:6, 91:10, 91:11, 91:13, 91:17, 91:20, 91:21, 92:18, 93:12, 94:15, 97:3, 98:1, 98:8, 98:13
**Cellebrite** [2] - 89:10, 90:1
**CENTRAL** [1] - 1:2
**Central** [1] - 108:7
**certain** [2] - 25:13, 37:14
**certainly** [4] - 69:25, 89:2, 90:3, 98:7
**CERTIFICATE** [1] - 108:1
**CERTIFIED** [1] - 1:6
**certify** [1] - 108:7
**cetera** [1] - 93:12
**chance** [1] - 40:12
**changes** [1] - 104:24
**changing** [1] - 37:22
**charge** [2] - 57:18, 63:15
**charged** [3] - 86:2, 89:16, 105:5
**chat** [1] - 63:13
**check** [2] - 25:18, 65:17
**choice** [1] - 78:3
**chose** [1] - 77:23
**civil** [4] - 14:18, 30:17, 48:3, 53:14
**claim** [15] - 16:1, 16:5, 16:13, 16:16, 16:17, 17:2, 17:4, 47:11, 48:2, 48:6, 50:7, 53:7, 53:13, 53:14
**claimed** [1] - 14:9
**claiming** [1] - 76:16
**claims** [2] - 6:5, 49:21
**clarify** [1] - 50:7

**clear** [9] - 8:23, 20:4, 20:6, 31:10, 64:3, 88:15, 95:23, 96:12, 102:19
**client** [24] - 27:15, 27:18, 30:25, 33:7, 33:10, 34:14, 35:7, 35:11, 38:25, 41:22, 42:7, 56:24, 57:2, 57:3, 58:18, 58:21, 59:2, 73:10, 73:19, 74:7, 80:2, 80:10, 81:15, 81:22
**clients** [5] - 42:2, 42:3, 42:5, 58:14, 70:14
**clue** [1] - 5:21
**Code** [1] - 108:8
**Coffee** [2] - 34:5, 68:25
**collectively** [1] - 10:5
**College** [2] - 84:11, 84:13
**Colorado** [2] - 30:9, 31:17
**coming** [3] - 47:8, 52:18, 76:19
**command** [1] - 86:12
**comment** [1] - 104:24
**comments** [2] - 64:25, 92:7
**commissioned** [1] - 83:16
**communicates** [1] - 88:16
**communicating** [1] - 88:6
**communications** [8] - 11:22, 11:25, 12:23, 13:17, 13:21, 88:8, 88:24, 89:5
**company** [1] - 34:24
**comparison** [1] - 29:17
**complete** [1] - 87:25
**completely** [2] - 76:13, 102:25
**computer** [11] - 21:11, 21:17, 21:24, 23:7, 23:8, 23:18, 25:21, 84:19, 84:21, 84:23, 89:22
**concern** [2] - 86:10, 94:2
**concerned** [3] - 55:4, 55:9, 96:15
**conclude** [1] - 101:23
**concluded** [1] - 107:15
**conclusion** [2] - 67:18, 89:20

**condition** [3] - 86:20, 87:15, 88:2
**conduct** [2] - 57:24, 100:8
**conducted** [1] - 95:20
**confer** [2] - 103:12, 103:22
**conference** [15] - 14:5, 14:10, 16:2, 16:21, 17:2, 17:4, 18:12, 18:16, 18:17, 18:22, 18:23, 19:17, 19:21, 63:16
**Conference** [1] - 108:12
**conferred** [3] - 15:10, 26:11, 106:16
**confident** [1] - 7:19
**confidential** [1] - 45:14
**confirm** [3] - 50:3, 75:25, 76:10
**conformance** [1] - 108:12
**confused** [3] - 14:15, 18:9, 106:6
**conjecture** [5] - 32:25, 36:4, 42:9, 42:25, 51:16
**Connecticut** [1] - 54:12
**connection** [14] - 14:4, 15:14, 24:25, 26:8, 56:19, 59:21, 62:7, 68:10, 90:2, 91:6, 91:16, 93:1, 97:4, 97:5
**conscientious** [1] - 24:5
**consent** [2] - 95:25, 97:19
**consider** [1] - 107:5
**consistent** [1] - 37:21
**constituted** [1] - 12:21
**constructive** [4] - 104:13, 104:21, 104:22, 107:4
**consulted** [1] - 68:9
**contact** [1] - 92:12
**contained** [1] - 76:12
**contingency** [1] - 51:11
**contingent** [1] - 64:24
**continued** [3] - 10:11, 52:2, 52:13
**contract** [2] - 27:15, 27:18
**conversation** [10] - 8:8, 22:2, 39:7, 39:10, 39:12, 39:15,

39:16, 42:15, 43:9,
75:4
**coordinating** [1] -
88:14
**coordination** [1] -
101:8
**copied** [2] - 91:18,
91:23
**copies** [2] - 12:6, 12:9
**copy** [5] - 12:8, 20:24,
21:2, 45:21, 90:11
**copying** [1] - 93:4
**Corporate** [1] - 2:18
**correct** [83] - 4:22,
11:12, 11:15, 11:18,
11:20, 15:2, 17:20,
23:15, 24:13, 26:22,
27:4, 27:7, 28:17,
29:24, 30:10, 30:14,
30:22, 31:11, 31:22,
31:23, 31:25, 34:22,
35:23, 37:7, 37:17,
38:11, 38:22, 38:25,
39:21, 39:24, 43:14,
44:12, 44:21, 45:15,
45:16, 45:21, 46:12,
46:16, 46:17, 47:14,
47:15, 47:22, 48:25,
49:3, 49:9, 50:4,
50:13, 53:3, 53:15,
58:25, 62:22, 67:20,
70:17, 70:24, 71:23,
72:2, 73:5, 76:11,
77:24, 78:4, 79:2,
79:9, 80:18, 80:21,
82:18, 84:1, 84:4,
85:17, 86:4, 87:25,
88:20, 89:17, 90:8,
90:12, 90:16, 91:1,
91:5, 91:7, 91:24,
91:25, 95:21, 95:23,
108:9
**Correct** [1] - 54:24
**correctly** [1] - 51:6
**correspondence** [1] -
44:11
**cost** [1] - 67:24
**costs** [15] - 22:18,
24:4, 31:4, 31:16,
32:20, 58:12, 70:4,
71:5, 71:12, 80:17,
81:1, 81:8, 81:15,
81:21
**Counsel** [3] - 15:10,
26:11, 106:16
**COUNSEL** [2] - 2:1,
2:16
**counsel** [10] - 39:17,
68:13, 74:23, 76:20,
79:2, 79:4, 79:12,

93:7, 101:25, 107:11
**country** [1] - 95:5
**COUNTY** [1] - 108:3
**couple** [2] - 51:3,
83:20
**course** [2] - 88:6,
88:17
**COURT** [188] - 1:1,
1:24, 4:8, 4:10, 4:15,
4:17, 4:21, 4:23, 5:2,
5:5, 5:8, 5:14, 5:16,
5:19, 5:25, 6:3, 6:6,
6:14, 6:18, 6:22,
6:25, 7:4, 7:7, 7:9,
8:7, 8:13, 8:16, 9:2,
9:16, 9:23, 10:1,
10:4, 10:7, 14:13,
14:25, 15:9, 16:24,
17:11, 17:17, 18:3,
18:8, 18:20, 19:6,
19:14, 20:22, 21:21,
23:4, 26:13, 27:11,
28:19, 29:9, 29:19,
31:13, 32:11, 32:13,
33:2, 33:14, 34:18,
35:8, 35:15, 36:5,
37:20, 37:23, 38:14,
39:3, 40:25, 41:6,
41:14, 41:25, 42:10,
42:12, 43:1, 43:4,
43:17, 43:19, 44:24,
45:2, 46:3, 46:10,
46:15, 46:25, 48:11,
48:19, 48:24, 49:12,
49:17, 50:16, 50:25,
51:17, 52:17, 52:22,
53:5, 53:11, 53:19,
53:23, 54:1, 55:17,
55:20, 56:11, 57:6,
60:5, 60:18, 62:24,
63:7, 63:11, 63:17,
63:23, 64:13, 64:21,
65:15, 65:19, 66:2,
66:8, 66:10, 66:12,
66:21, 67:13, 67:19,
71:19, 73:3, 74:2,
74:17, 74:25, 76:6,
77:7, 77:14, 78:13,
78:17, 79:24, 80:6,
80:14, 81:5, 81:11,
81:19, 81:24, 82:2,
82:5, 82:20, 87:5,
87:8, 92:2, 92:22,
93:20, 93:24, 94:6,
94:18, 95:9, 95:13,
95:16, 95:22, 96:3,
96:8, 96:11, 97:9,
97:20, 97:24, 98:3,
98:17, 99:4, 99:14,
99:24, 100:5, 100:7,

101:4, 101:14,
101:16, 101:18,
101:22, 102:8,
102:11, 103:9,
103:17, 103:23,
104:6, 104:13,
104:20, 104:25,
105:6, 105:11,
105:15, 105:17,
105:23, 106:2,
106:11, 106:22,
107:3, 107:10, 108:6
**court** [14] - 51:9, 60:2,
60:6, 60:10, 61:2,
65:6, 65:20, 66:1,
66:18, 82:11, 99:6,
100:11, 103:13,
107:13
**Court** [9] - 5:16, 9:3,
65:11, 65:25, 66:6,
99:20, 105:3, 108:6,
108:20
**Court's** [2] - 4:13,
107:5
**court's** [1] - 106:15
**courtesy** [1] - 40:10
**courthouse** [1] -
15:23
**courtroom** [1] - 8:15
**COURTROOM** [12] -
9:14, 9:17, 9:25,
63:5, 66:9, 82:10,
82:13, 82:17, 82:19,
102:6, 106:1, 107:13
**CPA** [1] - 25:12
**crack** [1] - 90:18
**created** [3] - 46:19,
46:22, 47:1
**Criminal** [1] - 101:8
**criminal** [5] - 7:21,
64:5, 64:17, 92:17,
100:25
**cross** [5] - 58:1,
65:11, 65:14, 66:23,
100:8
**Cross** [2] - 3:4, 3:7
**CROSS** [2] - 26:14,
100:12
**cross-examination** [4]
- 58:1, 65:11, 65:14,
66:23
**CROSS-
EXAMINATION** [2] -
26:14, 100:12
**Cross-Examination**
[2] - 3:4, 3:7
**CRR** [1] - 1:23
**CSR** [2] - 1:23, 108:20
**Cummings** [4] -
103:12, 103:22,

106:18, 107:1
**Cummings-Cefali** [4]
- 103:12, 103:22,
106:18, 107:1
**cut** [1] - 50:3

# D

**data** [9] - 85:4, 85:7,
86:11, 86:18, 87:2,
87:12, 89:12, 89:19,
89:24
**Date** [1] - 108:15
**date** [7] - 15:2, 40:5,
40:22, 62:2, 62:4,
97:20, 106:6
**dated** [3] - 45:9,
97:22, 105:24
**DAY** [1] - 1:8
**day-to-day** [4] - 29:20,
29:21, 34:12, 57:18
**days** [8] - 40:18,
72:11, 72:14, 72:17,
72:21, 73:9, 74:14,
83:20
**deal** [2] - 32:23, 57:12
**dealing** [4] - 11:5,
11:13, 11:16, 45:4
**dealt** [2] - 11:19, 57:11
**DEAN** [2] - 2:17, 2:18
**deansteward7777@
gmail.com** [1] - 2:20
**Debbie** [1] - 108:20
**DEBBIE** [1] - 1:23,
108:5, 108:19
**December** [8] - 30:9,
32:17, 36:10, 38:7,
45:9, 45:25, 47:7,
80:25
**decent** [1] - 37:6
**decision** [1] - 30:4
**deduct** [1] - 70:10
**DEFENDANT** [1] -
2:14
**defendant** [8] - 8:25,
26:18, 26:22, 27:20,
27:22, 28:17, 29:17,
30:8, 30:13, 30:15,
30:16, 30:24, 31:2,
31:9, 31:15, 31:22,
32:17, 32:20, 34:24,
35:2, 35:18, 37:6,
38:20, 38:24, 40:22,
42:14, 43:5, 43:7,
43:10, 43:22, 43:23,
44:10, 44:14, 44:20,
45:25, 47:7, 47:12,
47:17, 47:20, 48:7,
48:14, 48:22, 49:24,
51:3, 51:24, 52:6,

64:18, 65:5, 77:23,
78:23, 79:1, 80:16,
99:16, 104:8, 105:4
**Defendant** [1] - 1:9
**defendant's** [5] -
26:25, 27:3, 27:6,
78:3, 102:16
**defense** [1] - 82:8
**DEFENSE** [3] - 3:3,
3:6, 82:12
**defer** [1] - 65:11
**delete** [3] - 87:1,
87:12, 88:24
**deletions** [1] - 86:21
**deliberate** [1] - 7:13
**denied** [4] - 43:19,
76:11, 76:14, 76:16
**Dennis** [1] - 34:3
**Denver** [3] - 31:17,
62:11, 68:16
**deny** [4] - 50:4, 76:1,
76:8, 76:10
**Department** [7] - 83:1,
90:11, 90:17, 93:3,
93:11, 95:25, 99:10
**department's** [1] -
100:9
**deposited** [2] - 33:8,
80:11
**deposition** [3] - 60:15,
60:19, 60:21
**depositions** [5] -
61:11, 61:14, 78:2,
78:22
**DEPUTY** [12] - 9:14,
9:17, 9:25, 63:5,
66:9, 82:10, 82:13,
82:17, 82:19, 102:6,
106:1, 107:13
**describe** [2] - 29:16,
48:4
**described** [2] - 27:3,
36:20
**deserved** [1] - 32:17
**details** [3] - 13:5,
58:17, 75:4
**determine** [2] - 23:23,
23:24
**determined** [2] -
51:25, 52:2
**determining** [1] - 13:7
**device** [4] - 86:4,
92:13, 93:25, 94:1
**devices** [5] - 89:22,
92:21, 93:4, 100:2,
100:10
**dhinospaan@yahoo.
com** [1] - 1:25
**Diego** [3] - 6:9, 25:23,
26:1

differences [2] - 104:14, 104:15
different [8] - 44:19, 59:1, 70:19, 70:23, 77:21, 92:8, 103:16
digital [6] - 85:1, 89:11, 89:22, 92:13, 100:2, 100:10
Dillanos [2] - 34:5, 68:25
direct [3] - 65:12, 94:24, 98:18
DIRECT [2] - 10:11, 82:21
Direct [2] - 3:3, 3:6
directed [2] - 44:12, 81:14
direction [2] - 26:22, 26:25
directly [2] - 7:4, 14:19
disagreement [1] - 103:19
discovery [1] - 98:12
discuss [4] - 7:4, 40:13, 63:1, 102:1
discussed [4] - 6:25, 14:15, 18:14, 43:20
discussing [3] - 16:13, 16:22, 17:19
discussion [2] - 44:14, 76:25
Discussion [1] - 5:12
discussions [6] - 30:12, 30:19, 30:21, 31:2, 56:25, 88:11
dismissed [1] - 7:17
dismisses [1] - 6:10
dispute [2] - 19:23, 19:25
DISTRICT [3] - 1:1, 1:2, 1:3
District [4] - 64:1, 92:16, 108:6, 108:7
district [1] - 64:6
Division [1] - 101:9
DIVISION [1] - 1:2
Docket [1] - 106:10
document [10] - 15:16, 15:20, 17:10, 20:21, 28:16, 28:21, 46:14, 95:15, 97:10, 98:14
documents [5] - 28:5, 28:11, 28:12, 29:2, 78:25
dollars [1] - 32:8
done [13] - 13:24, 26:3, 30:7, 59:24, 62:14, 62:16, 76:23,

77:2, 94:25, 96:19, 97:4, 97:5, 97:11
door [7] - 64:5, 64:10, 64:16, 92:20, 93:10, 96:15, 102:20
down [1] - 45:17
downloaded [1] - 98:8
downloads [1] - 94:25
draft [1] - 106:7
drafted [5] - 28:5, 28:6, 28:7, 28:15, 45:11
drafting [1] - 27:13
drafts [1] - 106:6
driving [1] - 6:8
Drum [4] - 4:20, 4:25, 5:4
due [5] - 58:14, 68:2, 68:21, 69:3, 91:9
during [24] - 15:25, 16:18, 22:4, 29:11, 30:19, 31:2, 33:19, 37:15, 54:14, 58:1, 60:1, 61:7, 61:11, 67:9, 67:15, 69:21, 70:5, 71:10, 72:21, 77:10, 88:6, 88:17, 88:25, 91:11

E

e-mail [6] - 12:19, 12:23, 65:17, 73:7, 81:1, 106:18
e-mails [2] - 49:14, 50:10
Eagan [8] - 26:21, 27:3, 45:13, 51:21, 52:5, 55:3, 79:14, 79:15
early [6] - 12:14, 22:10, 69:25, 71:3, 71:4, 105:24
Ed [1] - 33:20
ed [1] - 68:5
effect [1] - 37:24
effectiveness [1] - 9:2
eight [2] - 49:8, 49:14
either [4] - 8:21, 36:11, 61:18, 63:19
election [1] - 6:5
electronic [4] - 85:1, 85:4, 85:6, 96:1
elicit [1] - 92:24
eliminated [1] - 104:4
employ [1] - 52:13
employed [3] - 92:12, 99:10, 100:22
employee [1] - 83:1
encrypted [3] - 92:18,

92:20, 95:1
end [9] - 29:23, 63:8, 63:20, 65:20, 83:15, 104:6, 105:10, 106:4
engaged [1] - 55:1
enormous [1] - 71:15
ensure [2] - 87:24, 91:23
enter [4] - 23:13, 23:14, 27:14, 27:18
entered [1] - 24:7
entering [1] - 24:5
entire [2] - 51:25, 60:1
entirety [1] - 51:20
entitle [1] - 32:21
entitled [4] - 42:20, 42:22, 44:6, 70:10, 75:19, 108:11
enumerate [1] - 95:8
equipment [1] - 96:1
ESQ [2] - 2:15, 2:18
established [1] - 99:3
estimate [1] - 90:21
et [1] - 93:12
Evan [6] - 20:9, 20:14, 20:16, 20:18, 47:25, 67:1
eve [1] - 80:25
evening [4] - 39:24, 72:8, 102:5, 107:6
event [2] - 14:5, 47:2, 97:4
events [1] - 14:9
eventually [1] - 23:10
evidence [17] - 7:20, 45:11, 46:24, 66:20, 67:12, 80:23, 81:9, 86:23, 87:2, 87:13, 87:24, 88:1, 89:4, 89:6, 89:8, 90:12, 91:17
evidentiary [1] - 86:19
exact [6] - 15:2, 17:7, 17:19, 35:24, 71:4, 94:2
exactly [7] - 9:15, 36:6, 39:9, 70:7, 89:1, 90:4
exam [1] - 52:8
EXAMINATION [7] - 10:11, 26:14, 54:2, 77:15, 82:21, 100:12, 101:5
examination [4] - 58:1, 65:11, 65:14, 66:23
Examination [7] - 3:3, 3:4, 3:4, 3:5, 3:6, 3:7, 3:7
examined [1] - 87:19

examiners [1] - 85:11
example [5] - 28:15, 59:15, 59:16, 85:9, 87:17
exception [2] - 42:4
exchange [2] - 9:7, 12:20
excised [1] - 105:3
excused [4] - 82:2, 82:5, 101:14, 101:18
execute [2] - 85:22, 91:12
executed [2] - 85:18, 92:10
execution [1] - 85:16
Exhibit [5] - 40:1, 40:3, 45:8, 49:25, 80:22
exhibit [2] - 76:4, 79:18
exhibits [1] - 65:13, 78:23, 78:25
EXHIBITS [1] - 3:15
expansive [1] - 64:15
expect [2] - 42:23, 104:20
expend [1] - 71:15
expense [1] - 25:1, 25:2
expenses [15] - 22:17, 24:15, 24:18, 25:17, 25:20, 31:4, 31:16, 31:18, 32:20, 67:24, 70:4, 70:10, 71:5, 71:23, 80:17
experience [7] - 66:17, 70:23, 87:20, 87:22, 88:24, 90:5, 91:15
expert [2] - 52:18, 90:3
explain [6] - 18:5, 18:11, 78:9, 78:11, 78:16, 98:5
explained [4] - 17:23, 17:25, 18:9, 19:9
explanation [2] - 34:13, 37:4
explanations [1] - 36:25
expressed [1] - 74:12
extent [1] - 8:20
extract [1] - 89:11
extracted [1] - 85:11
extraction [1] - 85:7, 89:23

F

fabricated [1] - 77:4

face [4] - 36:14, 36:16, 37:4, 95:6
fact [7] - 6:25, 17:1, 17:21, 58:17, 76:25, 78:1, 91:9
facts [3] - 28:3, 66:20, 67:12
fair [3] - 7:13, 7:21, 48:4
fairly [2] - 7:20, 91:15
faith [1] - 104:21
false [5] - 37:22, 55:9, 67:16, 67:22, 76:13
familiar [2] - 34:4, 34:10
familiarity [1] - 70:7
far [3] - 55:3, 55:8, 64:13
FBI [16] - 83:5, 83:9, 83:13, 83:15, 84:5, 84:8, 84:14, 84:17, 88:5, 92:14, 94:11, 99:11, 100:3, 100:14, 101:7, 102:24
Federal [1] - 108:20
federal [2] - 6:10, 66:17
FEDERAL [2] - 1:24, 108:5
fee [6] - 27:14, 27:15, 27:18, 31:3, 51:11
fees [9] - 13:14, 13:18, 13:22, 24:4, 51:5, 58:12, 68:2, 70:10, 77:21
felt [8] - 24:3, 32:3, 32:5, 50:6, 50:12, 50:21, 53:1, 53:2
few [2] - 40:12, 45:20
Fi [1] - 86:14
file [7] - 28:9, 28:25, 29:2, 29:3, 49:21, 65:25, 66:7
filed [15] - 4:14, 12:13, 16:6, 27:13, 28:5, 28:6, 28:8, 28:11, 59:10, 59:13, 59:19, 66:3, 71:25, 99:16, 106:8
files [1] - 86:23
filing [6] - 4:18, 12:11, 28:12, 63:25, 99:22, 102:18
filings [2] - 99:21, 102:20
Filippo [1] - 33:23
fill [3] - 25:1, 65:3, 65:12
filled [1] - 25:2

**final** [2] - 12:18, 63:11
**finalizing** [2] - 11:4, 11:10
**finances** [2] - 58:9, 77:20
**financial** [2] - 57:24, 68:18
**fine** [7] - 66:2, 66:8, 93:17, 95:22, 101:22, 102:11, 103:23
**finish** [5] - 43:2, 78:9, 92:25, 96:6, 101:21
**firm** [66] - 13:2, 13:25, 18:13, 22:5, 22:6, 22:15, 22:23, 23:2, 23:6, 23:9, 23:20, 24:11, 25:4, 25:11, 25:12, 25:15, 25:21, 26:6, 26:7, 26:19, 35:19, 35:20, 35:22, 36:11, 51:20, 52:13, 54:4, 54:11, 54:15, 54:22, 55:13, 55:23, 56:18, 56:24, 57:25, 58:3, 58:5, 58:9, 58:18, 59:2, 59:6, 60:2, 60:10, 60:13, 60:20, 61:24, 62:9, 62:19, 68:2, 68:9, 69:3, 69:18, 69:21, 70:5, 70:9, 70:18, 71:6, 71:15, 73:10, 73:19, 74:8, 75:20, 77:24
**first** [13] - 5:20, 15:12, 15:16, 28:16, 28:21, 43:21, 47:13, 64:25, 65:1, 65:7, 82:14, 97:16, 102:19
**five** [16] - 40:18, 69:19, 69:22, 70:2, 72:11, 72:14, 72:17, 72:21, 73:9, 74:4, 74:13, 83:14, 84:9, 99:16, 100:14
**five-day** [1] - 74:4
**five-year** [2] - 69:22, 70:2
**flew** [1] - 97:15
**flown** [2] - 95:5, 98:24
**flustered** [1] - 75:9
**fly** [4] - 94:21, 102:15, 107:1, 107:3
**following** [2] - 11:10, 40:22
**follows** [3] - 38:18, 55:21, 87:9
**football** [1] - 70:18
**footer** [2] - 105:18,

106:7
**FOR** [3] - 2:3, 2:14, 2:16
**foregoing** [1] - 108:9
**forensic** [4] - 85:11, 86:3, 90:23, 93:4
**forensically** [6] - 87:21, 87:23, 90:11, 90:19, 91:18, 91:23
**forensics** [6] - 84:19, 84:21, 84:23, 85:1, 89:23
**form** [2] - 63:1, 102:2
**format** [1] - 108:11
**former** [1] - 19:1
**forth** [3] - 65:6, 97:14, 103:5
**forward** [5] - 40:13, 44:16, 44:20, 45:4, 106:25
**forwarded** [1] - 39:10
**Foundation** [2] - 23:3, 87:4
**foundation** [28] - 23:4, 27:9, 28:18, 29:18, 31:12, 32:10, 33:1, 33:12, 34:17, 35:13, 36:4, 38:13, 39:2, 43:15, 46:2, 46:8, 46:14, 46:24, 49:11, 50:15, 52:16, 79:17, 79:22, 80:5, 80:13, 81:3, 81:10, 81:23
**four** [1] - 61:12
**four-year** [1] - 61:12
**Frank** [6] - 56:2, 56:4, 56:17, 68:12, 79:1, 80:3
**frank** [8] - 56:5, 56:7, 57:8, 57:10, 57:11, 59:18, 59:19
**Frank's** [1] - 57:2
**frankly** [1] - 8:21
**fraud** [1] - 105:5
**Friday** [4] - 64:24, 65:6, 65:9, 65:20
**front** [2] - 7:2, 16:8
**full** [1] - 8:19
**furious** [4] - 38:24, 40:23, 41:2, 41:10

**G**

**G-a-l-i-c-i-a** [1] - 82:16
**GALICIA** [2] - 3:6, 82:12
**Galicia** [6] - 65:7, 82:9, 82:15, 82:23, 94:21, 96:9
**general** [12] - 66:15,

69:16, 85:5, 85:8, 88:10, 93:3, 93:16, 94:12, 95:19, 96:20, 100:1, 100:9
**generalized** [1] - 8:24
**generally** [23] - 13:4, 17:19, 25:5, 25:16, 29:20, 32:1, 34:23, 42:3, 51:12, 57:2, 58:1, 58:14, 70:8, 70:12, 71:9, 85:18, 85:25, 86:10, 87:15, 89:18, 89:20, 89:25, 90:1
**gentlemen** [3] - 10:4, 62:25, 101:23
**Geoffrey** [1] - 36:1
**gesture** [2] - 14:10, 16:21
**given** [1] - 25:17
**Global** [3] - 34:21, 35:3, 35:12
**government** [12] - 4:6, 7:7, 12:7, 14:16, 19:16, 36:19, 36:21, 40:21, 40:22, 66:4, 103:13, 104:5
**Government's** [2] - 4:18, 95:19
**graduate** [2] - 83:9, 94:11
**graduated** [1] - 84:16
**graduating** [1] - 83:13
**Greg** [34] - 30:25, 31:9, 31:10, 32:5, 32:17, 32:21, 32:23, 33:4, 33:19, 34:13, 35:11, 36:10, 36:20, 37:15, 38:9, 39:20, 40:15, 43:7, 43:10, 43:13, 44:15, 48:21, 49:21, 50:1, 50:10, 50:19, 66:14, 66:25, 67:5, 67:9, 67:15, 69:6, 72:21, 76:22
**Gregory** [8] - 44:1, 44:2, 44:6, 45:4, 51:10, 51:14, 80:1, 80:9
**ground** [1] - 78:17
**Group** [1] - 33:23
**guess** [2] - 92:8, 102:20
**guilty** [1] - 105:5
**Guy** [2] - 5:24, 6:4
**guy** [3] - 32:7, 66:14, 76:22
**guys** [2] - 50:1, 66:17

**H**

**hair** [10] - 36:15, 36:16, 36:17, 36:22, 36:23, 37:4, 66:23, 66:25, 67:4, 77:11
**half** [4] - 80:23, 83:14, 84:9, 97:17
**halfway** [1] - 9:18
**hand** [2] - 14:10, 82:11
**handful** [1] - 47:21
**handle** [5] - 44:15, 44:20, 62:9, 62:12, 78:2
**handled** [1] - 45:7
**handling** [2] - 33:4, 47:17
**HANNA** [2] - 2:4, 2:9
**happy** [1] - 8:17
**hard** [1] - 64:18
**head** [1] - 36:22
**headline** [4] - 5:17, 7:3, 8:10, 9:17
**hear** [3] - 8:17, 43:1, 62:15
**heard** [9] - 8:20, 8:23, 18:24, 47:13, 90:3, 92:22, 96:14, 98:17, 102:22
**hearings** [1] - 60:7
**hearsay** [5] - 14:12, 14:23, 17:16, 37:18, 74:16
**heavy** [2] - 29:5, 60:25
**held** [1] - 108:10
**hereby** [1] - 108:7
**Hernandez** [1] - 10:8
**Hi** [1] - 40:10
**hi** [2] - 5:15, 7:11
**high** [1] - 103:25
**highlight** [1] - 80:23
**highly** [6] - 93:14, 93:15, 93:18, 94:16, 96:22, 97:6
**highway** [1] - 27:4
**Hillary** [1] - 21:14
**himself** [1] - 48:7
**HINO** [3] - 1:23, 108:5, 108:19
**Hino** [1] - 108:20
**HINO-SPAAN** [3] - 1:23, 108:5, 108:19
**Hino-Spaan** [1] - 108:20
**home** [1] - 98:6
**honest** [1] - 75:5
**Honor** [125] - 4:6, 4:13, 5:3, 7:8, 7:10, 8:6, 8:19, 9:8, 14:12,

15:8, 16:23, 17:9, 19:5, 19:11, 20:20, 26:10, 26:12, 27:10, 29:6, 29:18, 32:9, 33:1, 33:13, 34:16, 35:4, 35:13, 36:3, 37:19, 38:12, 38:17, 39:1, 40:24, 41:5, 41:12, 41:23, 42:8, 42:24, 43:15, 44:23, 45:1, 46:2, 46:7, 46:13, 46:23, 48:9, 48:18, 48:23, 49:10, 50:14, 50:23, 52:15, 52:21, 52:24, 52:25, 53:4, 53:9, 53:16, 53:18, 53:22, 53:25, 55:6, 56:10, 60:17, 63:22, 64:11, 65:1, 65:22, 65:24, 66:6, 67:12, 74:1, 76:5, 78:8, 79:16, 79:19, 79:20, 80:4, 80:12, 81:3, 81:17, 81:23, 82:1, 82:3, 87:4, 87:7, 92:1, 92:3, 92:25, 93:10, 93:17, 93:19, 94:3, 94:7, 94:8, 94:16, 95:11, 95:23, 96:5, 96:12, 96:20, 97:7, 98:14, 98:16, 98:25, 99:9, 99:17, 101:3, 101:13, 101:17, 101:21, 102:10, 102:13, 103:10, 104:9, 104:23, 105:1, 105:8, 105:9, 105:21, 106:8, 106:17, 106:25, 107:8, 107:9
**HONORABLE** [1] - 1:3
**hotel** [1] - 102:16
**hour** [1] - 101:20
**hours** [1] - 51:14
**house** [2] - 94:23, 97:12
**hurried** [1] - 6:12

**I**

**Ibrahim** [16] - 17:14, 18:24, 28:21, 37:10, 39:19, 47:5, 48:7, 49:25, 61:18, 73:13, 73:18, 74:7, 74:13, 74:14, 77:1, 77:10, 108:8
**idea** [9] - 13:11, 68:5, 68:18, 68:21, 69:2, 79:22, 94:10, 94:19, 107:9

**identify** [2] - 103:25, 104:1

**III** [1] - 40:2

**image** [2] - 86:3, 90:19

**imaged** [2] - 87:23, 98:11

**imagine** [1] - 70:13

**imaging** [1] - 90:23, 98:13

**immediate** [1] - 45:22

**immediately** [5] - 10:13, 10:20, 39:13, 73:21, 73:23

**impacted** [1] - 7:20

**impeachment** [2] - 14:24, 17:15

**implied** [2] - 43:16, 44:18

**importance** [1] - 103:20

**important** [7] - 50:7, 86:17, 86:19, 86:25, 87:10, 87:14, 88:3

**improper** [3] - 14:24, 17:15, 95:20

**IN** [1] - 2:14

**inception** [2] - 71:2, 71:6

**incident** [2] - 16:2, 36:20

**included** [2] - 81:1, 106:18

**including** [1] - 94:25

**inclusion** [1] - 105:1

**incur** [3] - 24:15, 31:16, 31:18

**incurred** [2] - 70:11, 71:6

**indicate** [1] - 63:8

**indicated** [1] - 63:14

**indicating)** [1] - 96:10

**individual** [4] - 86:25, 87:10, 90:7, 90:14

**individuals** [2] - 13:25, 25:7

**indulgence** [1] - 106:15

**information** [5] - 4:14, 21:3, 21:5, 76:10, 78:23

**informed** [4] - 73:18, 75:7, 106:23, 107:11

**initial** [1] - 97:25

**inner** [1] - 70:15

**input** [3] - 21:10, 21:16, 21:23

**inquire** [1] - 98:23

**inquiry** [3] - 8:22, 9:9, 93:13

**installed** [1] - 23:8

**instances** [3] - 90:14, 90:17, 91:22

**instructed** [2] - 86:8, 89:14

**Instruction** [2] - 104:3, 106:13

**instruction** [4] - 9:3, 85:3, 85:10, 104:7

**instructions** [6] - 63:9, 102:9, 102:14, 103:24, 105:12, 106:9

**interactions** [1] - 72:25

**interest** [2] - 34:25, 89:7

**interject** [1] - 96:22

**Internal** [6] - 100:17, 100:20, 100:21, 100:22, 100:25, 101:8

**interview** [1] - 97:15

**interviewed** [2] - 14:15, 99:23

**interviews** [1] - 99:18

**investigation** [4] - 88:7, 88:17, 88:25, 95:20

**Investigation** [1] - 101:9

**investigations** [2] - 64:17, 100:25

**investigative** [1] - 100:4

**investigator** [1] - 64:5

**involved** [13] - 13:6, 13:7, 14:19, 25:14, 47:2, 56:6, 57:8, 71:1, 84:19, 91:22, 95:3, 96:25, 98:13

**involvement** [2] - 71:12, 93:9

**involves** [1] - 95:8

**irrelevant** [3] - 99:1, 102:23, 102:25

**IRS** [1] - 101:11

**ish** [1] - 97:17

**issue** [2] - 5:1, 65:5

**issues** [3] - 22:22, 63:2, 102:2

**itself** [2] - 104:4, 105:2

**J**

**JAMES** [1] - 1:3

**January** [7] - 12:15, 12:16, 12:19, 47:12, 48:7, 53:8, 81:13

**Jason** [2] - 56:2, 56:17

**Jenness** [6] - 20:10,

20:14, 20:16, 20:18, 47:25, 67:1

**job** [2] - 58:23, 64:7

**John** [1] - 40:10

**JOHN** [4] - 1:8, 2:15, 3:3, 10:10

**Johnson** [6] - 36:1, 69:13, 69:15, 69:21, 71:25, 72:1

**join** [1] - 37:12

**jointly** [1] - 101:10

**judge** [3] - 6:10, 7:16, 9:14

**JUDGE** [1] - 1:3

**Judge** [2] - 66:9, 106:1

**Judicial** [1] - 108:12

**Judy** [5] - 25:6, 37:10, 37:11, 81:14, 94:23

**juries** [1] - 66:18

**juror** [2] - 4:7, 8:21

**Juror** [3] - 5:12, 8:15, 9:7

**JUROR** [19] - 5:15, 5:18, 5:21, 6:1, 6:4, 6:7, 6:16, 6:19, 6:23, 7:2, 7:6, 7:11, 7:15, 7:22, 7:25, 8:2, 8:5, 8:9, 8:14

**jurors** [12] - 4:11, 7:1, 7:5, 8:7, 8:17, 8:20, 8:22, 9:6, 9:10, 9:12, 10:2, 10:5

**jury** [19] - 4:5, 5:13, 10:3, 20:24, 61:19, 63:6, 63:9, 66:11, 67:6, 67:16, 90:21, 92:6, 94:10, 100:11, 102:7, 102:9, 102:14, 103:24, 106:9

**Justice** [7] - 83:1, 90:11, 90:17, 93:4, 93:11, 95:25, 99:10

**K**

**K.Lu** [1] - 9:4

**keep** [8] - 22:16, 85:10, 86:2, 86:23, 87:14, 89:15, 107:10

**keeping** [1] - 51:4

**kept** [1] - 51:5

**kind** [1] - 13:4

**kindergarten** [1] - 99:5

**knock** [1] - 63:12

**knowing** [2] - 49:1, 49:4

**knowledge** [9] -

22:23, 27:19, 33:22, 56:21, 69:6, 69:8, 73:13, 73:15, 88:23

**knowledgeable** [1] - 22:22

**known** [5] - 16:8, 51:12, 67:24, 68:2, 68:4

**knows** [2] - 8:21, 95:3

**L**

**lack** [1] - 49:22

**Lacks** [3] - 27:9, 28:18, 46:23

**lacks** [21] - 29:18, 31:12, 32:9, 33:1, 33:12, 34:16, 35:13, 36:4, 38:13, 39:1, 43:15, 46:14, 49:11, 50:14, 52:16, 79:16, 79:22, 80:5, 80:12, 81:10, 81:23

**ladies** [3] - 10:4, 62:25, 101:23

**lag** [1] - 74:5

**language** [2] - 106:12, 106:13

**large** [1] - 4:18

**Larson** [4] - 40:19, 41:3, 43:12, 45:9

**last** [12] - 44:9, 49:8, 49:14, 62:15, 63:14, 73:1, 77:8, 82:14, 85:18, 90:5, 90:21, 106:3

**late** [4] - 12:14, 99:4, 106:20, 106:24

**latter** [2] - 19:1, 71:22

**law** [27] - 13:25, 18:13, 23:2, 25:15, 25:21, 26:6, 26:7, 28:2, 54:5, 54:10, 54:16, 55:2, 55:13, 55:23, 58:5, 58:9, 58:18, 59:2, 60:1, 61:24, 62:8, 68:2, 69:3, 70:18, 75:19, 84:10, 99:6

**Law** [2] - 33:23, 84:13

**LAW** [1] - 2:17

**lawsuit** [2] - 14:18, 48:3

**lawyer** [4] - 48:16, 62:5, 84:6, 84:7

**lawyers** [2] - 42:1, 99:7

**lay** [1] - 23:4

**lead** [7] - 56:7, 56:12, 56:17, 61:24, 62:8,

62:12, 62:18

**Leading** [1] - 18:2

**learned** [1] - 31:21

**learning** [1] - 72:4

**least** [3] - 19:3, 91:16, 101:20

**leave** [3] - 10:1, 71:21, 92:7

**led** [1] - 95:18

**left** [10] - 5:22, 6:9, 6:23, 8:15, 20:3, 36:6, 69:13, 69:14, 94:13, 99:11

**legal** [5] - 13:14, 13:18, 13:22, 35:3, 67:18

**length** [1] - 101:19

**letter** [43] - 8:11, 10:14, 11:8, 39:11, 39:12, 39:17, 40:18, 41:3, 41:9, 41:10, 41:16, 41:20, 43:6, 43:12, 43:22, 43:23, 44:9, 44:17, 45:8, 45:11, 45:18, 46:1, 46:8, 46:9, 46:12, 47:14, 49:25, 50:1, 50:5, 72:11, 74:23, 75:24, 76:7, 76:9, 76:12, 76:15, 76:18, 76:19, 76:21, 76:25, 77:3, 77:9

**level** [1] - 103:25

**license** [1] - 52:14

**licensed** [6] - 52:6, 54:5, 54:6, 54:10, 54:12, 54:22

**lie** [1] - 66:18

**lied** [2] - 67:9, 77:9

**lifting** [2] - 29:5, 60:25

**light** [3] - 102:18, 103:18, 103:21

**likely** [1] - 80:9

**limit** [1] - 98:18

**limited** [2] - 100:1, 100:8

**line** [5] - 40:4, 45:13, 104:3, 104:7, 105:2

**lines** [2] - 69:13, 106:14

**Lisa** [1] - 7:3

**list** [4] - 64:25, 65:25, 66:3, 77:17

**listed** [1] - 79:14

**litigation** [4] - 29:12, 47:4, 47:6, 47:8

**LLC** [1] - 45:14

**LLP** [1] - 45:13

**local** [4] - 68:13, 79:1, 79:4, 79:12

located [1] - 83:7
logistical [1] - 88:13
look [6] - 15:11, 16:9, 19:7, 46:5, 94:6, 95:15
looked [2] - 59:19, 105:12
looking [5] - 16:12, 16:14, 16:17, 19:22
LOS [1] - 108:3
Los [6] - 2:12, 15:6, 15:7, 15:18, 15:20, 92:23
lunch [1] - 10:13

**M**

mad [1] - 41:22
mail [7] - 12:19, 12:23, 41:11, 65:17, 73:7, 81:1, 106:18
mails [2] - 49:14, 50:10
maintain [2] - 88:3, 89:2
management [2] - 58:5, 77:19
March [1] - 97:11
Marchino [2] - 33:23, 68:24
mark [1] - 31:25
mask [1] - 10:25
matter [70] - 4:7, 25:23, 25:25, 26:1, 26:4, 28:16, 28:20, 29:4, 29:5, 29:13, 30:13, 33:4, 36:1, 45:19, 47:3, 47:13, 47:17, 48:4, 48:21, 51:10, 51:14, 52:19, 53:2, 53:20, 56:14, 57:10, 57:13, 59:20, 59:21, 59:23, 60:24, 61:3, 61:11, 61:15, 61:20, 62:8, 64:8, 64:23, 67:25, 68:3, 68:19, 68:22, 69:15, 69:21, 69:23, 71:1, 71:7, 71:20, 71:23, 71:25, 72:2, 78:22, 79:2, 79:4, 79:8, 80:9, 80:18, 81:2, 81:8, 81:16, 92:15, 94:4, 94:15, 94:22, 95:5, 97:16, 102:25, 103:8, 108:11
mattered [1] - 51:18
matters [12] - 13:22, 21:7, 27:22, 56:5, 56:7, 56:13, 57:17,

61:7, 70:4, 92:17, 101:24
mean [12] - 14:6, 14:15, 14:17, 17:18, 19:2, 22:14, 70:18, 85:8, 85:15, 86:9, 98:9, 105:4
meaning [1] - 62:22
means [1] - 22:16
measure [1] - 87:16
media [2] - 85:6, 96:1
mediation [24] - 11:6, 11:10, 12:1, 12:24, 24:14, 24:17, 24:19, 29:24, 30:2, 30:6, 30:9, 30:12, 30:20, 31:17, 31:20, 33:17, 61:20, 61:23, 61:25, 62:2, 62:4, 62:9, 62:11, 80:25
mediations [2] - 61:24, 78:2
meet [1] - 15:15
meeting [8] - 12:7, 14:21, 15:23, 16:1, 16:18, 20:3, 20:12, 41:2
Melissa [4] - 82:9, 82:15, 82:17, 96:9
MELISSA [3] - 3:6, 82:12, 82:17
members [1] - 13:2
mention [4] - 9:16, 9:23, 63:7, 92:17
mentioned [5] - 25:23, 36:24, 89:13, 102:19, 106:3
mentioning [1] - 25:25
message [7] - 31:21, 39:20, 39:23, 40:7, 40:15, 50:18, 88:8
messages [7] - 49:7, 87:2, 87:12, 88:12, 88:13, 88:19, 89:3
met [10] - 15:4, 15:5, 15:13, 15:17, 16:15, 17:2, 18:4, 19:15, 36:19, 40:21
MICHAEL [2] - 1:8, 2:15
Michael [4] - 6:11, 45:12, 103:3
microphone [1] - 10:25
mid [1] - 62:24
mid-afternoon [1] - 62:24
might [10] - 24:4, 24:20, 25:7, 31:16, 36:14, 37:3, 51:8,

83:19, 86:11, 86:22
million [9] - 31:10, 31:18, 31:23, 32:7, 43:14, 44:3, 44:7, 50:11
mind [2] - 7:18, 95:6
mind-boggling [1] - 95:6
minimal [1] - 56:16
minute [3] - 29:9, 92:22, 97:24
minutes [4] - 63:4, 102:10, 103:12, 103:14
misled [3] - 95:13, 95:14, 96:13
Miss [1] - 101:7
misstates [1] - 81:9
misunderstood [1] - 66:6
mode [4] - 85:25, 86:9, 86:15, 89:15
modify [2] - 87:2, 87:12
moment [3] - 26:10, 76:24, 103:10
momentarily [1] - 88:4
money [30] - 32:18, 33:8, 34:13, 34:14, 35:6, 35:10, 35:12, 37:16, 38:25, 42:17, 42:20, 42:23, 44:16, 45:21, 49:2, 49:4, 49:8, 50:20, 53:13, 53:21, 67:6, 68:21, 69:3, 69:6, 71:16, 75:14, 75:16, 75:18, 80:2, 80:10
months [5] - 38:5, 38:10, 49:8, 49:15, 83:14
Morgan [7] - 25:8, 25:10, 35:18, 36:2, 36:11, 69:9, 69:18
morning [2] - 63:7, 65:1
most [3] - 29:12, 59:11, 105:21
mostly [1] - 61:10
motion [2] - 28:15, 60:9
move [7] - 18:18, 40:13, 43:18, 55:16, 73:1, 73:25, 80:15
moved [3] - 29:24, 99:16, 99:19
moving [3] - 5:11, 36:22, 37:4
MR [294] - 2:16, 4:6, 4:9, 4:12, 4:13, 4:16,

4:20, 4:22, 4:24, 5:3, 5:7, 5:10, 7:8, 7:10, 7:12, 7:18, 7:24, 8:1, 8:3, 8:6, 8:19, 9:8, 10:8, 10:12, 14:12, 14:21, 14:23, 15:3, 15:8, 15:11, 16:23, 16:25, 17:9, 17:12, 17:15, 17:21, 18:2, 18:4, 18:7, 18:11, 18:18, 18:21, 19:5, 19:7, 19:11, 19:15, 20:20, 20:23, 21:19, 21:22, 23:3, 23:5, 26:10, 26:12, 26:15, 27:9, 27:14, 28:18, 28:23, 29:6, 29:11, 29:18, 29:23, 31:12, 31:15, 32:9, 32:12, 32:16, 32:25, 33:3, 33:12, 33:17, 34:16, 34:21, 35:4, 35:6, 35:10, 35:13, 35:17, 36:3, 36:9, 37:18, 37:21, 38:1, 38:12, 38:16, 38:20, 39:1, 39:5, 40:1, 40:24, 41:1, 41:4, 41:10, 41:12, 41:21, 41:23, 42:1, 42:8, 42:11, 42:14, 42:24, 43:3, 43:5, 43:15, 43:18, 43:20, 44:22, 44:25, 45:3, 45:17, 46:2, 46:5, 46:7, 46:11, 46:13, 46:16, 46:23, 47:7, 48:9, 48:13, 48:18, 48:20, 48:23, 49:1, 49:10, 49:14, 49:16, 49:19, 50:14, 50:18, 50:23, 51:3, 51:15, 51:19, 52:15, 52:18, 52:20, 52:23, 52:24, 53:4, 53:7, 53:9, 53:12, 53:16, 53:18, 53:21, 53:22, 53:25, 54:3, 55:16, 55:18, 56:2, 56:9, 56:14, 57:5, 57:9, 60:3, 60:9, 60:16, 60:19, 60:22, 60:23, 63:10, 63:15, 63:18, 63:19, 63:24, 64:15, 64:22, 65:17, 65:22, 65:24, 66:5, 66:13, 66:19, 66:22, 67:11, 67:14, 67:17, 67:21, 71:17, 71:20, 73:1, 73:4, 73:25, 74:4, 74:9, 74:11, 74:12, 74:16, 74:19, 74:24,

75:2, 75:22, 76:2, 76:4, 76:7, 77:5, 77:8, 77:13, 77:16, 78:8, 78:10, 78:11, 78:15, 78:19, 79:16, 79:18, 79:20, 80:1, 80:4, 80:8, 80:12, 80:16, 80:22, 81:3, 81:7, 81:9, 81:13, 81:17, 81:20, 81:23, 82:1, 82:3, 82:8, 82:22, 87:4, 87:7, 87:20, 92:1, 92:3, 92:7, 92:24, 93:19, 93:23, 93:25, 94:7, 94:8, 94:17, 94:19, 95:10, 95:11, 95:14, 95:21, 95:23, 96:4, 96:5, 96:6, 96:9, 96:12, 97:7, 97:10, 97:21, 97:22, 98:2, 98:4, 98:16, 98:21, 98:23, 98:25, 99:2, 99:3, 99:8, 99:15, 100:3, 100:6, 100:13, 101:3, 101:6, 101:12, 101:13, 101:15, 101:17, 101:20, 102:10, 102:13, 103:10, 103:18, 104:5, 104:9, 104:18, 104:23, 105:1, 105:8, 105:14, 105:16, 105:19, 106:8, 106:15, 106:17, 106:20, 106:23, 107:8
multiple [1] - 91:13
must [1] - 77:11

**N**

Nah [3] - 99:5
name [11] - 6:21, 7:16, 8:10, 9:16, 9:24, 21:17, 22:5, 25:8, 65:6, 82:14, 82:15
named [1] - 34:15
narrow [1] - 104:14
nature [2] - 18:10, 88:21
necessarily [3] - 91:21, 104:4, 105:3
necessary [2] - 65:14
need [13] - 9:19, 24:22, 49:21, 50:12, 50:21, 92:11, 92:16, 101:24, 103:7,

103:21, 104:1, 104:16, 107:10
**needed** [5] - 19:12, 23:24, 27:6, 65:13, 99:18
**never** [17] - 14:5, 14:19, 17:13, 19:11, 24:1, 28:10, 46:8, 52:6, 58:17, 60:9, 60:12, 67:1, 67:7, 67:24, 68:2, 93:6, 98:7
**New** [15] - 54:12, 64:1, 92:10, 92:16, 93:2, 93:14, 94:21, 94:22, 95:4, 96:18, 96:22, 96:25, 97:1, 102:15, 103:3
**new** [4] - 13:2, 44:2, 50:20, 65:16
**Newport** [1] - 2:19
**news** [1] - 5:22
**next** [9] - 38:20, 38:23, 50:11, 50:20, 63:20, 64:2, 82:7, 89:19, 101:19
**NICOLA** [2] - 2:4, 2:9
**night** [3] - 38:21, 39:8, 65:13
**nine** [1] - 99:16
**nobody** [1] - 74:20
**None** [1] - 3:16
**none** [2] - 77:23, 98:15
**nonresponsive** [3] - 18:19, 73:2, 73:25
**normal** [4] - 32:7, 66:14, 66:17, 76:22
**normally** [2] - 5:23, 45:7
**North** [1] - 2:11
**note** [1] - 5:16
**notes** [4] - 16:9, 16:10, 16:14, 19:23
**nothing** [14] - 26:12, 27:12, 27:13, 57:3, 58:3, 61:20, 77:13, 85:6, 87:17, 92:1, 94:5, 94:22, 95:4, 101:12
**notice** [3] - 4:7, 64:11, 65:21
**November** [13] - 37:7, 38:7, 42:7, 44:16, 45:19, 46:12, 47:14, 47:19, 49:20, 72:8, 72:12, 97:17, 97:21
**November-ish** [1] - 97:17
**Number** [5] - 5:12,

8:15, 9:7, 104:3, 106:13
**NUMBER** [19] - 5:15, 5:18, 5:21, 6:1, 6:4, 6:7, 6:16, 6:19, 6:23, 7:2, 7:6, 7:11, 7:15, 7:22, 7:25, 8:2, 8:5, 8:9, 8:14
**number** [6] - 37:6, 57:23, 95:24, 105:16, 106:12
**numbers** [1] - 95:8
**numerous** [1] - 91:19

## O

**O'Brien** [4] - 40:19, 41:3, 43:12, 45:9
**o'clock** [2] - 65:18, 102:4
**object** [2] - 46:7, 104:18
**Objection** [2] - 23:3, 87:4
**objection** [50] - 14:23, 17:15, 18:2, 18:7, 19:11, 21:19, 27:9, 28:18, 29:6, 32:9, 34:16, 35:4, 36:3, 37:18, 38:12, 39:1, 41:4, 41:12, 41:23, 42:8, 42:24, 44:22, 46:2, 46:23, 48:9, 49:10, 50:14, 51:15, 52:15, 52:20, 56:9, 57:5, 60:3, 60:16, 66:19, 67:11, 67:17, 71:17, 74:9, 74:16, 74:24, 76:2, 77:5, 79:16, 80:4, 80:12, 81:3, 81:9, 104:5, 104:11
**objections** [9] - 48:18, 48:23, 49:16, 50:23, 53:16, 53:22, 60:22, 79:21, 81:17
**obtain** [1] - 85:3
**obtaining** [1] - 92:13
**obviously** [4] - 14:18, 64:10, 64:23, 94:19
**occasions** [1] - 52:8
**occur** [1] - 14:11
**occurred** [3] - 12:20, 19:10, 103:19
**occurrence** [2] - 91:9, 91:16
**October** [10] - 14:22, 15:2, 15:13, 15:15, 15:25, 17:13, 19:16, 20:3, 20:12, 97:22

**OF** [7] - 1:2, 1:5, 1:14, 2:1, 108:1, 108:3, 108:4
**offenses** [1] - 105:5
**offer** [4] - 76:9, 93:20, 93:23, 94:20
**offered** [2] - 3:16, 30:22
**Office** [2] - 15:6, 15:18
**office** [6] - 21:12, 29:3, 40:23, 42:5, 57:19, 89:21
**OFFICES** [1] - 2:17
**OFFICIAL** [3] - 1:24, 108:1, 108:5
**Official** [1] - 108:20
**often** [4] - 90:4, 91:6, 91:11, 91:12
**once** [3] - 6:11, 6:21, 7:16
**one** [38] - 4:6, 4:14, 5:2, 7:10, 12:3, 20:2, 22:20, 26:10, 27:17, 30:17, 35:21, 37:1, 39:18, 40:3, 51:24, 52:2, 52:19, 55:10, 61:5, 61:6, 61:14, 62:1, 62:6, 63:24, 64:2, 64:24, 66:7, 75:6, 81:13, 86:15, 87:16, 87:20, 87:22, 94:6, 95:3, 95:7, 95:17, 99:7
**one-day** [1] - 52:19
**online** [1] - 96:1
**oOo** [1] - 107:16
**Open** [1] - 100:11
**open** [3] - 6:16, 93:10, 96:19
**opened** [1] - 92:20
**opening** [4] - 64:5, 64:9, 96:15, 102:20
**opens** [1] - 64:15
**opinion** [1] - 31:6
**opinions** [2] - 63:1, 102:2
**opportunity** [5] - 4:25, 50:3, 76:9, 103:11, 107:5
**opposed** [3] - 19:22, 23:15, 39:13
**order** [6] - 23:17, 86:13, 86:22, 89:4, 91:17, 94:9
**ordered** [2] - 66:2, 66:5
**otherwise** [2] - 87:2, 87:13
**outside** [11] - 18:16, 18:23, 48:9, 56:9,

60:3, 60:16, 71:17, 71:19, 80:5, 81:4, 94:15
**overheard** [3] - 8:7, 9:6, 9:11
**overlapped** [2] - 71:22, 72:1
**Overruled** [1] - 41:14
**overruled** [49] - 14:13, 14:25, 17:17, 18:8, 27:11, 28:19, 29:19, 31:13, 32:11, 32:13, 33:14, 34:18, 35:8, 35:15, 36:5, 37:23, 38:14, 39:3, 41:6, 42:10, 42:12, 43:17, 46:3, 46:10, 46:15, 46:25, 48:11, 48:24, 49:12, 49:17, 50:16, 50:25, 51:17, 53:5, 53:19, 53:23, 56:11, 57:6, 60:5, 67:19, 74:17, 74:25, 76:6, 79:24, 80:6, 81:5, 81:11, 81:24, 87:5
**overviews** [2] - 85:5, 85:8
**own** [2] - 23:14, 62:12
**owns** [2] - 34:24, 90:7

## P

**P.M** [2] - 1:16, 4:2
**p.m** [6] - 65:23, 66:7, 102:12, 107:15
**PAGE** [1] - 3:2
**page** [10] - 15:12, 15:16, 40:3, 40:4, 80:24, 104:3, 104:7, 105:10, 106:14, 108:11
**paid** [24] - 24:23, 24:25, 26:7, 34:15, 37:16, 37:25, 38:10, 42:16, 45:21, 49:5, 50:11, 52:23, 53:13, 53:21, 58:15, 67:7, 69:14, 79:8, 79:11, 79:15, 80:3, 80:8
**Pandora's** [1] - 96:19
**paper** [3] - 5:9, 5:10, 9:22
**paragraph** [7] - 16:5, 16:7, 16:10, 16:16, 19:7, 46:19, 46:21
**part** [11] - 5:17, 23:1, 62:15, 63:24, 64:16, 64:18, 71:22, 73:1, 92:10, 92:14, 102:24
**participate** [2] -

102:24, 104:21
**participated** [4] - 67:2, 91:19, 93:21, 95:17
**participating** [1] - 95:7
**particular** [6] - 16:4, 29:14, 75:25, 88:7, 96:16, 105:17
**parties** [1] - 104:15
**parts** [1] - 63:24
**party** [3] - 12:23, 13:17, 13:21
**pass** [1] - 63:12
**passcode** [3] - 90:8, 90:15, 90:18
**password** [2] - 92:19, 95:2
**payment** [2] - 49:15, 49:22
**payments** [2] - 69:2, 80:3
**pendency** [1] - 29:11
**pending** [1] - 70:5
**Penland** [7] - 96:7, 102:21, 103:6, 103:9, 103:14, 103:15, 103:21
**Pennsylvania** [1] - 54:13
**people** [6] - 34:15, 42:3, 42:5, 56:1, 70:18, 99:5
**perceives** [1] - 107:11
**percent** [1] - 37:14
**performed** [1] - 13:8
**perhaps** [1] - 33:16
**period** [6] - 61:12, 68:14, 69:22, 70:3, 70:5, 74:5
**permission** [2] - 29:2, 42:2
**permit** [1] - 93:13
**person** [4] - 11:19, 28:10, 47:24, 51:24
**personal** [2] - 69:5, 69:8
**pertaining** [1] - 7:17
**petitions** [1] - 79:15
**phone** [51] - 5:21, 37:7, 37:9, 37:11, 37:13, 37:15, 38:21, 39:13, 39:18, 39:20, 39:24, 40:16, 40:22, 41:3, 43:6, 47:19, 47:25, 72:5, 72:8, 73:4, 85:9, 85:10, 85:22, 85:24, 86:11, 86:13, 86:16, 86:18, 86:20, 86:22, 87:1, 87:11, 87:14, 87:17,

87:18, 89:15, 89:18, 90:7, 90:8, 90:11, 90:15, 90:19, 90:22, 91:17, 92:18, 94:15, 97:3, 97:11, 98:1, 98:8, 98:13
**phones** [12] - 87:23, 89:21, 90:6, 91:6, 91:10, 91:11, 91:13, 91:20, 91:21, 93:12, 94:24, 97:18
**physically** [1] - 98:6
**pieces** [1] - 5:11
**Pillow** [2] - 5:23, 6:4
**place** [9] - 18:10, 36:10, 39:15, 39:16, 40:5, 41:17, 41:21, 72:5, 72:22
**places** [2] - 54:5, 104:1
**Plaintiff** [1] - 1:6
**PLAINTIFF** [1] - 2:3
**plan** [1] - 64:11
**planning** [1] - 4:24
**play** [1] - 70:19
**played** [2] - 60:12, 61:5
**Plaza** [1] - 2:18
**plus** [1] - 34:10
**pocket** [3] - 24:23, 24:24, 24:25
**point** [21] - 12:6, 13:1, 22:3, 22:4, 22:10, 23:10, 23:14, 25:6, 27:22, 38:4, 38:8, 42:23, 43:6, 43:20, 52:9, 89:8, 89:9, 89:20, 92:8, 94:2, 96:24
**points** [2] - 45:20, 106:12
**policies** [6] - 93:3, 93:11, 93:16, 94:12, 98:19, 100:9
**policy** [4] - 88:5, 88:19, 88:23, 89:11
**portion** [7] - 38:10, 42:16, 42:20, 43:13, 44:3, 44:6, 53:13
**position** [4] - 48:21, 64:3, 105:6, 106:9
**positioned** [1] - 18:13
**positions** [2] - 70:19
**possession** [1] - 90:6
**possible** [6] - 17:23, 18:5, 19:3, 19:9, 36:25, 69:14, 86:2, 87:25
**potential** [2] - 89:8, 94:9

**potentially** [2] - 9:12, 28:13
**practically** [2] - 5:5, 58:17
**practice** [5] - 54:5, 54:10, 55:2, 85:25, 89:2
**practiced** [1] - 84:9
**practices** [1] - 100:1
**practicing** [1] - 54:16
**preferable** [1] - 65:19
**prejudice** [1] - 94:9
**prejudicial** [6] - 93:15, 93:18, 94:16, 96:23, 97:6
**premises** [1] - 97:25
**prepare** [1] - 65:13
**prepared** [3] - 59:17, 78:23, 101:21
**presence** [8] - 4:5, 5:13, 10:3, 63:6, 66:11, 92:6, 100:11, 102:7
**present** [10] - 59:6, 90:22, 92:23, 97:1, 97:2, 97:3, 98:5, 98:6, 98:7
**presently** [1] - 104:10
**preserve** [7] - 86:18, 86:22, 87:23, 88:1, 89:4, 89:5, 91:17
**preserved** [3] - 86:16, 88:12, 88:14
**preserving** [1] - 89:19
**press** [1] - 8:25
**pretty** [2] - 71:3, 71:4
**prevent** [1] - 86:13
**primarily** [1] - 57:11
**primary** [1] - 62:5
**prime** [1] - 95:17
**private** [1] - 48:3
**privy** [2] - 11:22, 11:25
**PRO** [1] - 2:14
**problem** [1] - 8:5
**procedures** [4] - 94:13, 98:19, 100:1, 100:10
**proceeding** [2] - 12:11, 12:13
**Proceedings** [1] - 107:15
**PROCEEDINGS** [1] - 1:14
**proceedings** [1] - 108:10
**Proceeds** [1] - 45:13
**process** [1] - 25:4
**processed** [1] - 25:20
**produced** [1] - 98:12
**professional** [1] -

40:10
**proffer** [2] - 103:15, 103:16
**program** [10] - 21:17, 22:5, 22:13, 23:1, 23:6, 23:18, 24:7, 89:11, 90:1, 90:4
**proliferation** [1] - 91:10
**promptly** [1] - 76:11
**proof** [3] - 93:20, 93:23, 94:20
**prosecution** [2] - 88:7, 88:17
**prosecutions** [1] - 103:3
**protocol** [2] - 86:6, 106:5
**proven** [1] - 9:3
**provide** [3] - 45:22, 90:15, 92:19
**provided** [5] - 16:9, 21:22, 47:9, 99:20, 106:24
**public** [1] - 99:21
**publication** [2] - 5:20, 6:21
**pull** [3] - 44:9, 45:8, 80:22
**pulled** [1] - 78:25
**pure** [1] - 87:24
**purely** [1] - 88:13
**purpose** [1] - 104:16
**purposely** [1] - 92:25
**purposes** [1] - 86:19
**pursuant** [5] - 91:3, 92:19, 97:11, 97:12, 108:8
**pursue** [1] - 8:17
**pursuing** [1] - 47:4
**put** [10] - 9:20, 10:24, 11:7, 40:2, 63:24, 64:10, 85:25, 86:8, 89:15, 99:22
**putting** [2] - 64:3, 106:6

**Q**

**qualifications** [1] - 25:13
**Quantico** [1] - 83:8
**quash** [2] - 65:2, 99:19
**questions** [29] - 7:7, 20:9, 26:20, 27:20, 27:25, 30:8, 35:21, 37:6, 46:8, 47:21, 51:3, 53:25, 57:24, 57:25, 63:13, 64:14,

64:21, 66:14, 66:15, 77:18, 80:16, 82:1, 92:5, 92:20, 95:1, 96:20, 101:3, 101:13, 103:25
**quick** [2] - 63:12, 92:4
**quickly** [3] - 47:6, 47:19, 63:19
**quit** [1] - 9:18
**quite** [1] - 38:8

**R**

**raise** [2] - 63:21, 82:11
**raised** [1] - 92:4
**ran** [1] - 6:25
**random** [1] - 24:1
**Rather** [1] - 10:18
**read** [26] - 4:17, 5:17, 5:23, 6:11, 6:13, 6:17, 7:12, 7:19, 8:25, 9:18, 10:17, 10:22, 38:16, 38:18, 43:22, 44:10, 44:11, 46:13, 46:21, 47:20, 47:22, 55:18, 55:21, 87:7, 87:9, 105:4
**reading** [4] - 5:23, 6:10, 6:12, 8:10
**ready** [2] - 66:9, 66:10
**real** [2] - 47:19, 63:19
**realized** [1] - 77:9
**really** [6] - 14:16, 24:8, 24:10, 26:5, 57:7, 75:4
**realm** [1] - 62:18
**REALTIME** [1] - 108:5
**reason** [13] - 35:2, 35:10, 36:7, 36:8, 38:9, 38:15, 38:19, 42:6, 51:8, 54:19, 66:25, 67:5, 99:2
**reasons** [4] - 87:20, 87:22, 95:17, 99:22
**rebuttal** [1] - 99:25
**receipts** [2] - 25:3, 25:5
**received** [12] - 4:18, 39:11, 39:12, 39:17, 40:15, 40:18, 41:9, 41:16, 41:20, 43:12, 53:7, 85:3
**recent** [1] - 105:21
**receptionist** [2] - 21:12, 23:15
**Recess** [2] - 65:23, 102:12
**recess** [2] - 63:4, 107:14
**recollection** [20] -

12:14, 14:21, 15:3, 15:5, 15:13, 15:17, 15:21, 15:22, 16:11, 16:15, 17:1, 19:8, 19:12, 41:1, 41:8, 41:15, 41:18, 67:14, 79:3
**record** [6] - 5:12, 10:17, 10:22, 15:10, 26:11, 106:16
**recording** [1] - 70:4
**recovered** [2] - 24:4, 51:6
**RECROSS** [1] - 77:15
**Recross** [1] - 3:5
**RECROSS-EXAMINATION** [1] - 77:15
**Recross-Examination** [1] - 3:5
**REDIRECT** [2] - 54:2, 101:5
**redirect** [1] - 77:18
**Redirect** [2] - 3:4, 3:7
**REDIRECT-EXAMINATION** [1] - 54:2
**reference** [1] - 12:10
**referenced** [1] - 39:18
**referencing** [1] - 16:7
**reflect** [1] - 41:7
**reflection** [5] - 18:22, 19:2, 19:4, 19:18, 19:22
**reflects** [1] - 106:11
**refresh** [7] - 15:12, 15:17, 16:11, 16:15, 16:25, 41:1, 41:7
**refreshed** [1] - 19:12
**refreshes** [1] - 19:8
**regard** [5] - 4:15, 59:1, 100:1, 100:10, 106:13
**regarding** [1] - 106:9
**regardless** [2] - 41:21, 98:13
**regards** [2] - 36:9, 78:21
**Regards** [1] - 45:13
**Regnier** [20] - 22:24, 22:25, 24:21, 25:6, 25:17, 33:16, 37:10, 37:11, 39:19, 81:14, 81:21, 93:7, 95:9, 95:18, 96:2, 96:17, 97:16, 98:15, 99:18, 99:23
**Regnier's** [8] - 94:1, 94:2, 94:23, 96:10,

97:11, 97:25, 98:6, 98:8
**regular** [3] - 91:9, 91:15, 102:4
**regularly** [1] - 23:21
**regulations** [2] - 54:20, 108:12
**reimburse** [1] - 24:22
**reimbursed** [1] - 71:16
**reimbursement** [2] - 24:20, 24:24
**rejecting** [1] - 105:7
**relate** [1] - 96:17
**related** [13] - 11:17, 33:4, 48:21, 54:16, 59:2, 62:8, 63:25, 64:6, 68:19, 93:25, 96:18, 103:3, 103:4
**relates** [6] - 35:6, 58:21, 85:21, 85:23, 88:6, 89:19
**relating** [33] - 4:20, 5:4, 8:22, 8:25, 9:1, 9:11, 11:6, 11:13, 11:19, 11:23, 12:1, 12:24, 13:8, 13:12, 13:18, 13:20, 13:22, 14:9, 21:4, 25:24, 26:7, 36:20, 45:19, 58:8, 58:11, 68:6, 84:25, 93:4, 93:11, 96:16, 98:11, 103:15, 103:16
**relatively** [1] - 103:24
**relevance** [6] - 56:10, 60:4, 69:15, 71:18, 99:14, 103:20
**Relevance** [1] - 60:16
**relevant** [4] - 89:9, 99:18, 99:20, 99:23
**remains** [1] - 47:3
**remember** [24] - 15:2, 16:12, 16:13, 16:17, 16:18, 16:21, 17:7, 17:19, 19:1, 19:24, 20:1, 24:19, 25:2, 25:8, 31:14, 39:9, 57:14, 60:24, 62:25, 72:6, 74:18, 75:4, 102:1
**remotely** [2] - 86:1, 86:12
**removed** [1] - 81:21
**repeat** [1] - 87:6
**rephrase** [3] - 19:14, 29:10, 74:11
**reply** [2] - 28:24, 50:21
**report** [3] - 9:3, 25:1, 56:2
**reported** [1] - 108:10

**reporter** [3] - 55:21, 82:11, 87:9
**REPORTER** [5] - 1:24, 10:24, 11:2, 108:1, 108:6
**Reporter** [1] - 108:20
**REPORTER'S** [1] - 1:14
**reporting** [1] - 57:9
**reports** [1] - 25:2
**represent** [1] - 48:16
**representation** [1] - 76:14
**represented** [3] - 48:8, 95:16, 98:7
**representing** [1] - 98:10
**request** [4] - 24:24, 65:10, 82:3, 102:16
**requested** [3] - 65:25, 104:8, 106:13
**required** [1] - 88:18
**requiring** [1] - 104:11
**research** [2] - 63:3, 102:3
**researched** [2] - 28:2
**resolve** [1] - 47:3
**resolved** [1] - 70:9
**respond** [3] - 50:12, 94:17, 97:7
**responded** [2] - 10:5, 50:17
**response** [6] - 4:18, 28:15, 39:23, 41:2, 46:11, 53:12
**responsibilities** [13] - 24:11, 26:24, 30:1, 30:5, 55:13, 55:23, 58:11, 62:19, 62:23, 77:19, 77:20, 77:24
**responsibility** [2] - 57:20, 58:8
**rest** [2] - 6:13, 6:17
**rested** [2] - 66:3, 66:4
**result** [1] - 32:15
**RESUMED** [1] - 10:10
**resumed** [1] - 3:3
**retain** [1] - 88:19
**retained** [1] - 88:22
**retention** [1] - 88:8
**retrieve** [2] - 17:9, 20:20
**Revenue** [5] - 100:17, 100:20, 100:22, 100:25, 101:8
**review** [3] - 28:14, 59:7, 59:9
**revisions** [1] - 107:5
**Ricci** [4] - 33:20, 68:5, 68:6, 68:10

**Richard** [1] - 34:1
**rightfully** [1] - 69:3
**rise** [3] - 63:5, 102:6, 107:13
**Roasters** [1] - 34:5
**role** [18] - 11:4, 11:10, 11:13, 11:16, 28:1, 33:3, 33:6, 45:3, 58:3, 58:5, 58:8, 58:11, 60:12, 79:12, 81:20, 81:25, 106:19
**roles** [5] - 61:6, 78:1, 78:4, 78:21, 78:24
**ROOM** [1] - 1:24
**room** [15] - 8:12, 14:5, 14:10, 16:2, 16:21, 17:2, 17:4, 18:12, 18:16, 18:17, 18:22, 18:23, 19:17, 19:21
**rule** [1] - 24:20
**rules** [3] - 54:15, 54:20, 78:18
**ruling** [1] - 100:7
**running** [1] - 47:6

## S

**SACR-19-00061-JVS** [1] - 1:7
**SAGEL** [117] - 2:5, 4:6, 4:9, 4:12, 7:8, 14:12, 14:23, 17:15, 18:2, 18:7, 19:11, 21:19, 23:3, 26:15, 27:14, 28:23, 29:11, 29:23, 31:15, 32:16, 33:3, 33:17, 34:21, 35:6, 35:10, 35:17, 36:9, 37:21, 38:1, 38:20, 39:5, 40:1, 41:1, 41:10, 41:21, 42:1, 42:14, 43:3, 43:5, 43:20, 44:25, 45:3, 45:17, 46:5, 46:11, 46:16, 47:7, 48:13, 48:20, 49:1, 49:14, 49:19, 50:18, 51:3, 51:19, 52:18, 52:24, 53:7, 53:12, 53:18, 53:21, 53:25, 56:9, 57:5, 60:3, 60:16, 60:22, 63:19, 63:24, 64:15, 64:22, 65:17, 66:19, 67:11, 67:17, 71:17, 74:9, 74:16, 74:24, 76:2, 76:4, 77:5, 77:16, 78:10, 78:19, 79:18, 80:1, 80:8, 80:16, 80:22, 81:7, 81:13, 81:20,

82:1, 87:4, 92:3, 92:7, 93:19, 94:7, 94:17, 94:19, 95:10, 96:5, 97:7, 97:10, 97:21, 98:16, 98:23, 99:2, 99:15, 100:3, 100:6, 100:13, 101:3, 101:13, 101:17, 102:13
**Sagel** [42] - 3:4, 3:5, 3:7, 14:22, 15:4, 15:5, 15:13, 15:15, 16:1, 16:4, 16:15, 17:3, 17:5, 17:12, 17:22, 17:23, 18:4, 18:5, 18:11, 18:21, 19:9, 19:16, 20:3, 20:4, 20:9, 20:14, 20:17, 26:13, 37:20, 57:23, 60:24, 66:14, 69:9, 69:12, 72:4, 75:13, 75:24, 77:14, 92:2, 98:10, 101:16, 103:20
**Sagel's** [1] - 96:14
**salary** [1] - 51:25
**San** [3] - 6:9, 25:23, 26:1
**SANTA** [3] - 1:17, 1:25, 4:1
**Santa** [1] - 2:7
**saw** [8] - 6:21, 7:3, 7:16, 9:17, 36:22, 37:3, 37:4, 102:18
**scenario** [1] - 90:24
**scheduled** [1] - 103:4
**school** [1] - 84:10
**School** [1] - 84:13
**scope** [13] - 35:5, 48:10, 56:9, 60:3, 60:17, 71:17, 71:19, 80:5, 81:4, 93:16, 94:16, 98:18, 100:8
**screen** [1] - 40:3
**scroll** [1] - 45:17
**scrolled** [1] - 6:13
**SDNY** [3] - 94:4, 94:5, 97:15
**SE** [1] - 2:14
**search** [27] - 85:9, 85:13, 85:15, 85:16, 85:19, 85:22, 89:20, 91:3, 91:12, 91:16, 92:9, 92:13, 92:19, 92:23, 93:21, 93:23, 94:23, 95:4, 95:7, 95:9, 95:18, 95:25, 96:25, 97:12, 97:18, 97:25
**searches** [7] - 89:14,

91:1, 91:11, 91:19, 92:20, 94:24, 97:10
**seated** [1] - 46:15
**second** [4] - 40:3, 64:12, 64:23, 103:2
**Section** [1] - 108:8
**securing** [1] - 100:2
**see** [12] - 10:21, 16:8, 23:6, 40:6, 45:9, 45:23, 46:18, 63:12, 64:13, 64:21, 96:8, 102:4
**seeing** [1] - 36:21
**seize** [1] - 91:17
**seized** [3] - 91:6, 92:18, 94:25
**seizure** [2] - 93:12, 94:15
**SELNA** [1] - 1:3
**send** [1] - 28:16
**sending** [1] - 86:12
**sense** [1] - 8:24
**sent** [11] - 5:16, 21:12, 28:10, 28:13, 28:23, 43:22, 45:18, 50:10, 50:19, 105:23, 106:22
**sentence** [6] - 10:18, 10:20, 44:9, 104:7, 105:10
**sentences** [1] - 43:23
**separate** [1] - 64:17
**sequencing** [1] - 98:11
**serious** [3] - 55:10, 73:19, 74:15
**seriously** [1] - 7:16
**served** [2] - 47:11, 62:3
**Service** [5] - 100:18, 100:20, 100:23, 101:1, 101:8
**session** [6] - 63:11, 104:13, 104:22, 105:13, 106:4, 107:4
**set** [7] - 62:20, 62:22, 62:23, 103:24, 105:17, 105:24
**sets** [1] - 70:23
**settle** [1] - 36:1
**settled** [8] - 31:24, 32:2, 32:16, 33:3, 33:20, 53:20, 62:5, 79:5
**settlement** [55] - 11:4, 11:6, 11:11, 11:14, 11:17, 11:20, 11:23, 12:1, 12:5, 12:8, 12:9, 12:16, 12:21, 12:24, 20:8, 20:24,

21:2, 30:13, 31:3,
31:8; 31:10, 31:20,
32:8, 32:15, 32:18,
32:24, 33:5, 33:8,
34:14, 35:12, 37:16,
38:4, 38:6, 38:10,
38:11, 38:25, 42:16,
42:20, 42:22, 43:14,
44:16, 45:14, 45:21,
45:22, 45:23, 49:2,
49:8, 49:19, 50:20,
53:2, 58:21, 69:14,
71:7, 80:2, 80:10

**settlements** [1] -
77:21

**setup** [1] - 18:12

**seven** [1] - 77:6

**several** [2] - 52:8,
102:20

**shake** [1] - 7:13

**Sheikh** [4] - 11:13,
12:1, 12:20, 12:24

**shield** [2] - 36:14,
36:16

**shocked** [2] - 38:2,
38:3

**short** [1] - 102:8

**shortly** [1] - 66:1

**show** [2] - 45:25, 80:1

**showed** [2] - 49:24,
97:8

**shown** [3] - 22:10,
22:13, 23:5

**shows** [1] - 98:12

**side** [2] - 14:20, 30:22

**sidebar** [2] - 92:4,
92:6

**sign** [1] - 28:11

**signal** [2] - 20:7, 86:12

**signature** [3] - 96:8,
96:10, 97:19

**signed** [4] - 10:14,
31:21, 38:4, 38:7

**signing** [1] - 28:12

**silent** [1] - 20:8

**single** [5] - 60:9,
60:19, 61:14, 62:1,
62:6

**sit** [3] - 56:23, 69:5,
75:10

**sitting** [2] - 30:17,
41:8

**situation** [2] - 44:15,
47:2

**six** [8] - 83:23, 84:2,
85:18, 90:5, 90:21,
94:11, 100:14,
100:16

**six-year** [1] - 94:11

**skill** [4] - 62:20, 62:22,

62:23, 70:23

**skimming** [1] - 6:19

**skip** [1] - 35:17

**sloppy** [1] - 95:20

**someone** [9] - 19:21,
22:15, 25:3, 28:11,
29:3, 34:9, 50:6,
55:8, 86:10

**sometimes** [8] - 21:9,
24:2, 24:20, 28:24,
59:9, 71:15, 91:14,
95:1

**soon** [1] - 5:5

**sorry** [15] - 7:25, 8:1,
10:23, 10:24, 24:9,
30:6, 38:16, 54:7,
62:15, 84:12, 87:6,
94:7, 98:21, 100:19,
106:20

**sort** [3] - 30:7, 42:4,
86:12

**sorts** [1] - 87:15

**sounds** [6] - 10:19,
15:1, 26:2, 35:24,
40:20, 69:20, 72:10,
72:16

**SOUTHERN** [1] - 1:2

**Southern** [2] - 64:1,
92:16

**SPAAN** [3] - 1:23,
108:5, 108:19

**Spaan** [1] - 108:20

**speaking** [8] - 29:20,
57:2, 60:12, 61:6,
78:1, 78:21, 78:24,
79:21

**special** [5] - 63:25,
83:4, 83:25, 94:22,
102:15

**Special** [5] - 65:7,
82:8, 94:21, 97:13,
102:21

**specific** [4] - 36:8,
59:15, 90:24, 106:12

**specifically** [10] -
16:1, 16:12, 17:1,
19:17, 24:19, 26:4,
85:6, 94:8, 99:9,
106:4

**specifics** [1] - 96:21

**speculation** [11] -
32:25, 33:13, 36:4,
38:13, 42:8, 42:24,
51:15, 66:20, 74:9,
79:17, 79:23

**Speculation** [1] -
21:19

**spell** [1] - 82:14

**spend** [1] - 63:8

**spent** [2] - 35:6, 35:10

**spoken** [2] - 41:18

**Spring** [1] - 2:11

**STAND** [1] - 10:10

**stand** [4] - 14:8, 64:4,
82:10, 93:8

**standard** [2] - 86:6,
93:11

**STANDBY** [1] - 2:16

**start** [8] - 33:18, 37:9,
45:17, 45:25, 77:18,
101:21, 104:2,
105:13

**started** [11] - 6:2, 6:9,
8:10, 22:10, 23:6,
29:4, 50:2, 69:23,
69:25, 71:20

**starts** [2] - 46:19,
46:21

**STATE** [1] - 108:4

**state** [3] - 52:19,
82:13, 103:15

**State** [3] - 54:15,
54:16, 55:2

**statement** [3] - 11:7,
31:7, 37:21

**states** [3] - 50:5, 54:6,
54:10

**STATES** [2] - 1:1, 1:5

**States** [8] - 2:4, 2:5,
2:9, 2:10, 95:25,
108:6, 108:8, 108:13

**stay** [1] - 103:7

**stenographically** [1] -
108:10

**step** [1] - 4:14

**STEWARD** [3] - 2:17,
2:18, 106:20

**Steward** [4] - 103:12,
103:22, 106:19,
106:23

**still** [3] - 53:8, 103:9,
103:14

**stole** [1] - 75:16

**stolen** [1] - 69:6

**stop** [1] - 79:6

**stopped** [5] - 6:12,
8:11, 23:11, 35:22,
79:4

**stored** [2] - 25:21,
96:1

**story** [1] - 6:15

**straight** [1] - 36:10

**Street** [2] - 2:6, 2:11

**STREET** [1] - 1:24

**stricken** [6] - 18:20,
21:21, 55:17, 73:3,
74:3, 102:23

**strike** [12] - 12:4,
12:12, 13:20, 14:7,
18:18, 22:8, 23:23,

33:17, 43:18, 55:16,
58:4, 59:16, 61:5,
62:3, 73:1, 73:25,
82:25, 84:14, 84:24,
87:21, 89:25

**struggled** [1] - 36:25

**subject** [2] - 82:4,
82:5

**submission** [1] - 5:4

**submit** [2] - 5:9, 24:20

**submitted** [3] - 25:3,
63:2, 102:3

**submitting** [1] - 4:24

**subpoenas** [1] - 99:16

**substance** [5] - 16:13,
16:20, 16:22, 17:20

**substantive** [5] - 60:6,
88:11, 88:20, 88:21,
89:2

**substituted** [1] - 104:4

**subtract** [1] - 40:6

**suggest** [2] - 55:1,
99:12

**suggested** [1] - 19:10

**suggesting** [1] - 61:19

**suit** [1] - 6:18

**Suite** [3] - 2:6, 2:11,
2:19

**supervisory** [1] -
57:20

**suppose** [1] - 89:7

**supposed** [2] - 18:15,
18:16

**surprised** [3] - 38:8,
47:16, 47:18

**sustained** [18] - 18:3,
33:2, 40:25, 41:25,
43:4, 44:24, 45:2,
48:19, 52:17, 52:22,
53:11, 60:18, 66:21,
67:13, 71:19, 77:7,
80:14, 81:19

**swipe** [1] - 5:22

**swiped** [1] - 6:9

**switch** [1] - 88:4

**SWORN** [1] - 82:12

**system** [3] - 21:11,
21:24, 23:7

**systems** [2] - 23:2,
25:21

**T**

**Tabs** [9] - 21:17, 22:6,
22:9, 22:18, 23:1,
23:5, 23:9, 23:12,
24:7

**tainted** [1] - 9:13

**talks** [1] - 45:18

**tamper** [4] - 86:11,

86:15, 87:2, 87:13

**tampered** [3] - 86:1,
86:9, 87:18

**Tashchyan** [1] - 97:13

**task** [1] - 29:8

**tasks** [1] - 29:14

**team** [2] - 70:18, 92:11

**technology** [1] - 90:4

**ten** [15] - 22:4, 23:20,
51:20, 52:3, 52:5,
54:14, 58:20, 60:1,
60:10, 60:13, 60:20,
61:23, 73:5, 102:10

**terms** [1] - 27:12

**testified** [5] - 20:23,
90:25, 94:12, 97:13,
100:9

**testify** [2] - 50:15,
103:4

**testifying** [3] - 81:18,
102:21, 103:8

**testimony** [11] - 26:18,
37:22, 47:20, 74:22,
75:8, 75:10, 75:11,
98:24, 102:22,
102:25, 103:18

**text** [20] - 6:14, 31:21,
39:20, 39:23, 40:7,
40:11, 40:15, 49:7,
50:18, 50:19, 51:1,
87:1, 87:12, 88:8,
88:12, 88:13, 88:19,
89:3

**THE** [257] - 2:3, 2:14,
3:3, 3:6, 4:8, 4:10,
4:15, 4:17, 4:21,
4:23, 5:2, 5:5, 5:8,
5:14, 5:16, 5:19,
5:25, 6:3, 6:6, 6:14,
6:18, 6:22, 6:25, 7:4,
7:7, 7:9, 8:7, 8:13,
8:16, 9:2, 9:14, 9:16,
9:17, 9:23, 9:25,
10:1, 10:4, 10:7,
10:10, 10:24, 11:1,
11:2, 11:3, 14:13,
14:14, 14:25, 15:1,
15:9, 16:24, 17:11,
17:17, 17:18, 18:3,
18:8, 18:9, 18:20,
19:6, 19:14, 20:22,
21:21, 23:4, 26:13,
27:11, 27:12, 28:19,
28:20, 29:8, 29:9,
29:19, 29:20, 31:13,
31:14, 32:11, 32:13,
32:14, 33:2, 33:14,
33:15, 34:18, 34:19,
35:8, 35:9, 35:15,
35:16, 36:5, 36:6,

37:20, 37:23, 37:24, 38:14, 38:15, 39:3, 39:4, 40:25, 41:6, 41:7, 41:14, 41:15, 41:25, 42:10, 42:12, 42:13, 43:1, 43:4, 43:16, 43:17, 43:19, 44:24, 45:2, 46:3, 46:4, 46:10, 46:15, 46:25, 47:1, 48:11, 48:12, 48:19, 48:24, 48:25, 49:12, 49:13, 49:17, 49:18, 50:16, 50:17, 50:25, 51:1, 51:17, 51:18, 52:17, 52:22, 53:5, 53:6, 53:11, 53:19, 53:20, 53:23, 53:24, 54:1, 55:17, 55:20, 55:25, 56:11, 56:12, 57:6, 57:7, 60:5, 60:6, 60:18, 62:24, 63:5, 63:7, 63:11, 63:17, 63:23, 64:13, 64:21, 65:15, 65:19, 66:2, 66:8, 66:9, 66:10, 66:12, 66:21, 67:13, 67:19, 67:20, 71:19, 73:3, 74:2, 74:17, 74:18, 74:25, 75:1, 76:3, 76:6, 77:7, 77:14, 78:13, 78:17, 79:24, 79:25, 80:6, 80:7, 80:14, 81:5, 81:6, 81:11, 81:12, 81:19, 81:24, 81:25, 82:2, 82:5, 82:10, 82:13, 82:15, 82:17, 82:18, 82:19, 82:20, 87:5, 87:6, 87:8, 87:14, 92:2, 92:22, 93:20, 93:24, 94:6, 94:18, 95:9, 95:13, 95:16, 95:22, 96:3, 96:8, 96:11, 97:9, 97:20, 97:24, 98:3, 98:17, 99:4, 99:14, 99:24, 100:5, 100:7, 101:4, 101:14, 101:16, 101:18, 101:22, 102:6, 102:8, 102:11, 103:9, 103:17, 103:23, 104:6, 104:13, 104:20, 104:25, 105:6, 105:11, 105:15, 105:17, 105:23, 106:1, 106:2, 106:11, 106:22, 107:3, 107:10,

107:13
**theft** [1] - 74:8
**theory** [3] - 19:3, 19:18, 95:19
**they've** [1] - 8:24
**thinking** [2] - 37:3, 39:14
**thoughts** [1] - 8:18
**threat** [1] - 96:14
**threatened** [1] - 93:7
**three** [4] - 34:10, 54:6, 61:12, 99:17
**three-plus** [1] - 34:10
**tie** [2] - 93:17, 94:14
**timeline** [1] - 79:6
**timing** [1] - 39:11
**Title** [1] - 108:8
**title** [5] - 6:17, 6:20, 83:3, 83:25, 84:2
**today** [10] - 14:3, 14:8, 41:8, 63:10, 63:11, 66:1, 69:5, 75:10, 102:19, 103:13
**together** [2] - 73:5, 78:25
**tomorrow** [5] - 65:11, 102:4, 102:17, 102:22, 107:6
**tonight** [1] - 66:7
**took** [9] - 9:21, 30:1, 36:10, 39:15, 39:16, 40:5, 41:21, 65:1, 97:13
**tools** [1] - 90:18
**top** [1] - 80:23
**topics** [1] - 88:4
**total** [4] - 81:1, 81:7, 81:15, 81:21
**towards** [2] - 29:23, 29:24
**track** [6] - 21:7, 22:16, 23:21, 23:25, 24:2, 51:5
**tracked** [1] - 22:18
**tracking** [2] - 58:12, 77:20
**trained** [5] - 84:21, 84:24, 85:21, 85:23, 99:6
**training** [5] - 84:16, 84:19, 84:25, 87:1, 87:11
**TRANSCRIPT** [2] - 1:6, 1:14
**transcript** [2] - 108:9, 108:11
**travel** [1] - 24:21
**traveled** [1] - 24:14
**trial** [2] - 60:12, 63:14
**TRIAL** [1] - 1:8

**tried** [1] - 78:15
**trouble** [1] - 6:24
**true** [32] - 11:11, 19:15, 19:19, 20:25, 45:21, 49:6, 49:13, 49:18, 50:8, 55:5, 55:6, 57:1, 57:3, 57:10, 57:21, 58:3, 58:24, 59:3, 59:4, 59:10, 59:14, 70:2, 70:3, 73:17, 73:21, 74:6, 74:12, 77:2, 79:5, 91:18, 98:6, 108:9
**trust** [10] - 33:7, 33:10, 34:14, 35:7, 35:11, 35:14, 80:2, 80:10, 81:15, 81:22
**truthful** [1] - 11:7
**try** [1] - 24:4
**trying** [4] - 20:7, 30:24, 50:15, 78:11
**TUESDAY** [2] - 1:15, 4:1
**turn** [3] - 36:9, 97:19, 102:9
**turned** [4] - 86:14, 88:12, 89:22
**twice** [1] - 65:9
**two** [7] - 7:10, 63:21, 63:24, 64:17, 65:8, 65:15, 102:15

## U

**U.S** [3] - 1:3, 15:6, 15:18
**ultimate** [1] - 29:24
**ultimately** [3] - 25:18, 28:22, 55:14
**unauthorized** [1] - 55:2
**unclear** [1] - 18:10
**under** [2] - 55:25, 93:15
**undergone** [2] - 84:16, 84:25
**underneath** [2] - 10:25, 36:15
**understood** [13] - 5:10, 33:15, 50:2, 54:21, 64:15, 64:22, 70:8, 76:19, 88:5, 88:15, 99:8, 105:8, 106:8
**unfortunate** [1] - 47:1
**unit** [1] - 89:23
**UNITED** [2] - 1:1, 1:5
**United** [8] - 2:4, 2:5, 2:9, 2:10, 95:25,

108:6, 108:8, 108:13
**unrelated** [1] - 93:14
**untrue** [2] - 76:17, 76:18
**unusual** [1] - 62:7
**up** [17] - 6:12, 6:13, 10:8, 36:25, 44:9, 45:8, 52:24, 65:1, 65:8, 71:7, 74:8, 75:23, 80:22, 85:12, 101:24, 102:14, 107:6
**upset** [3] - 73:10, 77:1, 77:3
**USA** [1] - 45:14
**USAO** [1] - 95:24
**UTC** [2] - 40:4, 40:6

## V

**vague** [1] - 29:6
**vary** [1] - 70:13
**venture** [5] - 13:3, 13:5, 13:9, 13:12, 13:15
**verdict** [1] - 7:21
**version** [2] - 12:18, 105:21
**violating** [1] - 54:15, 54:20
**violation** [1] - 88:23
**Virginia** [1] - 83:8
**virtually** [2] - 57:3, 61:19
**voiced** [1] - 75:2
**VOLUME** [1] - 1:9
**Volume** [1] - 40:2
**vs** [1] - 1:7

## W

**wait** [4] - 71:16, 92:22, 96:6, 97:24
**waited** [1] - 9:20
**waiting** [1] - 102:17
**waiver** [1] - 104:19, 104:20
**wants** [1] - 93:15
**warrant** [7] - 85:16, 85:22, 91:16, 92:9, 92:13, 95:4, 97:18
**warrants** [4] - 85:19, 91:3, 95:7, 97:12
**WAS** [1] - 82:12
**wear** [2] - 36:15, 36:23
**wearing** [1] - 36:14
**week** [1] - 106:3
**weekend** [3] - 6:9, 72:13, 72:14
**weigh** [1] - 7:20

**West** [1] - 2:6
**WEST** [1] - 1:24
**whatsoever** [1] - 92:14
**whole** [1] - 6:20
**Wi** [1] - 86:14
**Wi-Fi** [1] - 86:14
**willing** [1] - 47:3
**window** [3] - 16:21, 19:3
**wire** [1] - 105:5
**WITNESS** [55] - 10:10, 11:1, 11:3, 14:14, 15:1, 17:18, 18:9, 27:12, 28:20, 29:8, 29:20, 31:14, 32:14, 33:15, 34:19, 35:9, 35:16, 36:6, 37:24, 38:15, 39:4, 41:7, 41:15, 42:13, 43:16, 46:4, 47:1, 48:12, 48:25, 49:13, 49:18, 50:17, 51:1, 51:18, 53:6, 53:20, 53:24, 55:25, 56:12, 57:7, 60:6, 67:20, 74:18, 75:1, 76:3, 79:25, 80:7, 81:6, 81:12, 81:25, 82:12, 82:15, 82:18, 87:6, 87:14
**witness** [18] - 50:15, 63:21, 64:2, 65:1, 65:25, 66:3, 81:18, 82:2, 82:7, 88:12, 88:17, 88:19, 88:24, 89:5, 92:21, 96:2, 101:14, 101:19
**witnesses** [8] - 64:25, 65:3, 65:8, 65:10, 65:16, 88:6, 88:9, 103:5
**WITNESSES** [1] - 3:2
**Witos** [12] - 25:8, 25:10, 25:14, 35:18, 36:2, 36:11, 69:9, 69:18, 70:3, 71:21, 71:22, 72:1
**Wollett** [2] - 21:14, 21:23
**woman** [2] - 25:8, 47:25
**word** [3] - 28:2, 104:4, 105:2
**words** [2] - 17:7, 17:20
**wore** [1] - 36:17
**workings** [1] - 70:16
**works** [3] - 98:23, 98:25, 99:14
**world** [1] - 99:13

**worries** [1] - 7:11
**worth** [1] - 9:14
**Write** [1] - 8:11
**writing** [4] - 9:20,
  43:23, 44:1, 44:5
**wrote** [1] - 49:25
**WYMAN** [2] - 2:10,
  104:5

## X

**X-Law** [1] - 33:23

## Y

**year** [7] - 35:24, 61:12,
  69:22, 70:2, 79:5,
  94:11, 97:17
**years** [25] - 22:4,
  23:20, 34:10, 51:20,
  52:3, 52:5, 54:14,
  58:20, 60:1, 60:10,
  60:13, 60:20, 61:23,
  69:19, 71:16, 73:5,
  83:23, 84:2, 84:9,
  85:18, 90:5, 90:21,
  100:15, 100:16
**yes-or-no** [1] - 78:10
**yesterday** [7] - 4:19,
  63:8, 65:7, 65:18,
  105:23, 106:21,
  106:24
**York** [15] - 54:12, 64:1,
  92:10, 92:16, 93:2,
  93:14, 94:21, 94:22,
  95:4, 96:18, 96:22,
  96:25, 97:1, 102:15,
  103:3
**yourself** [3] - 14:1,
  39:19, 107:10

## Z

**zero** [1] - 32:24