1          **UNITED STATES DISTRICT COURT**

2     **CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

3       **HONORABLE JAMES V. SELNA, U.S. DISTRICT JUDGE**

4

5   UNITED STATES OF AMERICA,              )
                                           )
6                    Plaintiff,            )   <u>**CERTIFIED TRANSCRIPT**</u>
                                           )
7          vs.                             )   Case No.
                                           )   SACR-19-00061-JVS
8   MICHAEL JOHN AVENATTI,                 )
                                           )   **TRIAL DAY 22**
9                    Defendant.            )   **VOLUME 2**
    _____)

10

11

12

13

14

                    REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                   WEDNESDAY, AUGUST 18, 2021

16                        1:26 P.M.

17                   SANTA ANA, CALIFORNIA

18

19

20

21

22

23   _____

              **DEBBIE HINO-SPAAN, CSR 7953, CRR**
24          FEDERAL OFFICIAL COURT REPORTER
            411 WEST 4TH STREET, ROOM 1-053
25                SANTA ANA, CA 92701
                 dhinospaan@yahoo.com


**UNITED STATES DISTRICT COURT**

1                    **APPEARANCES OF COUNSEL:**

2

3    **FOR THE PLAINTIFF:**

4            NICOLA T. HANNA
             United States Attorney
5            BY:  BRETT SAGEL
                  Assistant United States Attorney
6            411 West 4th Street
             Suite 8000
7            Santa Ana, California 92701
             714-338-3598
8            brett.sagel@usdoj.gov

9            NICOLA T. HANNA
             United States Attorney
10           BY:  ALEXANDER WYMAN
                  Assistant United States Attorney
11           312 North Spring Street
             Suite 1100
12           Los Angeles, California 90012
             213-894-2435
13           alex.wyman@usdoj.gov

14   **FOR THE DEFENDANT IN PRO SE:**

15           MICHAEL JOHN AVENATTI, ESQ.

16

     **STANDBY COUNSEL FOR MR. AVENATTI:**
17

             H. DEAN STEWARD LAW OFFICES
18           BY:  H. DEAN STEWARD, ESQ.
             17 Corporate Plaza
19           Suite 254
             Newport Beach, California 92660
20           949-481-4900
             deansteward7777@gmail.com

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1                          **I N D E X**

2  **WITNESSES**                                              **PAGE**

3  **REMOUN KARLOUS, CALLED BY THE DEFENSE**
       Direct Examination by Mr. Avenatti                    9
4      Cross-Examination by Mr. Sagel                       20
       Redirect Examination by Mr. Avenatti                 57
5      Recross-Examination by Mr. Sagel                     74

6  **HILLARY WOLETT, CALLED BY THE DEFENSE**
       Direct Examination by Mr. Avenatti                   79
7      Cross-Examination by Mr. Wyman                       94

8  **KATHERINE (MOSBY) SNEDDON, CALLED BY THE DEFENSE**
       Direct Examination by Mr. Avenatti                   95

9

10

11

12

13

14

15                         **EXHIBITS**

16                     (None offered.)

17

18

19

20

21

22

23

24

25

|     |     |
| --- | --- |
| 1 | **SANTA ANA, CALIFORNIA; WEDNESDAY, AUGUST 18, 2021** |
| 2 | **1:26 P.M.** |
| 3 | **- - -** |
| 4 | |
| 01:26PM 5 | **(Out of the presence of the jury.)** |
| 6 | MR. AVENATTI:  Your Honor, I have two questions for |
| 7 | the Court when it's appropriate. |
| 8 | THE COURT:  Do we need to take this up now? |
| 9 | MR. AVENATTI:  One of them, possibly, but they're |
| 01:27PM 10 | going to be very quick. |
| 11 | THE COURT:  Proceed. |
| 12 | MR. AVENATTI:  I plan on introducing and admitting, |
| 13 | provided that the Court approves, the CNN declaration, |
| 14 | Exhibit 1094, and the three videos, 1095, 1096, 1097. |
| 01:28PM 15 | THE COURT:  I won't admit the declaration.  The |
| 16 | declaration is foundational.  I'll admit the exhibits.  I don't |
| 17 | believe we received in evidence any of the Government's 1006 |
| 18 | declarations. |
| 19 | Am I mistaken? |
| 01:28PM 20 | MR. SAGEL:  90201. |
| 21 | THE COURT:  I'm sorry? |
| 22 | MR. SAGEL:  90201. |
| 23 | THE COURT:  90201.  All right. |
| 24 | MR. SAGEL:  That's correct. |
| 01:28PM 25 | THE COURT:  Okay.  Then it's just the foundation for |

```
 1   the exhibits.
 2            MR. AVENATTI:  So this raises -- this raises the
 3   issue of why I wanted Ms. Rose for a witness.  Because --
 4            THE COURT:  Sir, just offer the three CDs.  I
 5   believe the declaration is sufficient.  If you want to play
 6   some or all of them at that point, you're welcome to do that.
 7            MR. AVENATTI:  When I offer the video --
 8            THE COURT:  Right.
 9            MR. AVENATTI:  -- can I identify the date on the
10   video in my offer?
11            THE COURT:  Yes.
12            MR. AVENATTI:  Okay.  That's solves it.
13            THE COURT:  Okay.
14            MR. AVENATTI:  You understand, otherwise, the
15   problem?
16            THE COURT:  I understand.
17            MR. AVENATTI:  Okay.  I wasn't aware that you would
18   allow me to do that, and now that I know that, that will solve
19   it.
20            THE COURT:  It's also in the declaration.  But...
21            MR. AVENATTI:  Correct.
22            THE COURT:  I think you're just describing what it
23   is.  It says what it is on it too.  Except one of those dates
24   is off.  I think May 3 should have been May 2.
25            MR. AVENATTI:  Well, ultimately, when it goes back
```

01:28PM   5
01:29PM  10
01:29PM  15
01:29PM  20
01:29PM  25

1    into the jury room, I'm sure that will be fixed.  But obviously

2    when we play it, there's no -- just so Your Honor's aware --

3              THE COURT:  I understand.  I've watched parts of it.

4              MR. AVENATTI:  Okay.  And we're not going to play

01:29PM  5    the whole thing, obviously.  We're only going to play --

6              THE COURT:  Just your part?

7              MR. AVENATTI:  No.  We're only going to play, like,

8    I think 30 seconds of one, maybe a minute of another, and maybe

9    three or four minutes of the other and that's it.

01:29PM 10              THE COURT:  Yes.  But the parts were in your --

11              MR. AVENATTI:  Yeah.  I'm not going to play the

12    other part.

13              THE COURT:  Okay.  Mr. Sagel.

14              MR. SAGEL:  We do have an objection on multiple

01:30PM 15    grounds.  First and foremost, there is a Rule 16 issue.  And I

16    say that because nothing changed at trial for the production

17    now other than --

18              THE COURT:  Well...

19              MR. SAGEL:  Because the interview -- which it's not

01:30PM 20    even improper impeachment, because she never said he was there

21    on May 1st.  She said, "He may have typed this e-mail."

22              We also get to a 403 issue where it's already there.

23    The Government at all times has said, "We'll stipulate to where

24    he is on days."  He wanted to say that he was on these shows,

01:30PM 25    which we didn't even have at the time.  We'll stipulate to

```
 1    where he is.  It gets to a 403 issue on multiple levels of the
 2    length and what it is to prove a fact that's not even really an
 3    impeachable fact.
 4           So I don't know that exhibits of these videos need
 5    to be provided or played to them.  If the only establishment is
 6    he was in New York on May 1st, we would stipulate to that.  And
 7    I think we pretty much have.  And so it begs the question, why
 8    does he need to be introducing videos that are lengthy,
 9    especially if he's only producing a few, to establish a fact
10    that is not in dispute?
11           THE COURT:  Mr. Avenatti, why can't we do it via
12    stip?
13           MR. AVENATTI:  Your Honor, we can do it via stip,
14    which is why I proposed a stip that was rejected by the
15    Government.
16           THE COURT:  Well, apparently they're now willing to
17    stipulate.
18           MR. AVENATTI:  Okay.  So here's the proposed
19    stipulation.  I'm happy to do it this way:
20           "Mr. Avenatti was in Washington, D.C. and in
21        New York City on April 29.  On April 30, he was in
22        New York City.  On May 1st, he was in New York
23        City.  On May 2nd, he was in New York City.  Video
24        evidence establishes these facts."
25           That's the proposed stipulation.
```

**UNITED STATES DISTRICT COURT**

1          THE COURT:  Well, you can -- the facts are

2    established, and they'll accept them as proved if I tell them

3    it's part of the stipulation.  We don't need the last part

4    about the video.

01:32PM 5          MR. AVENATTI:  Okay.

6          THE COURT:  Okay.  Fine.

7          MR. AVENATTI:  Is that agreeable to the Government?

8          MR. SAGEL:  That was always agreeable.

9          MR. AVENATTI:  No.

01:32PM 10         MR. SAGEL:  We never had video evidence.  So we said

11   we knew where he was.

12         THE COURT:  Okay.

13         MR. SAGEL:  So yes.

14         MR. AVENATTI:  They wanted me to agree to May 4

01:32PM 15   because they need that piece of evidence, despite the fact they

16   closed without establishing that fact.  And that's what I would

17   not agree with, just so we're clear.  But now that I have the

18   stipulation, then we can do away with the videos.  I never

19   wanted to play the videos.

01:32PM 20         THE COURT:  Okay.  If you recite it again at some

21   point this afternoon, I'll -- or unless you can type it up

22   quick enough.

23         MR. AVENATTI:  We can type it up now, because

24   what -- I would like it read at the conclusion of Special Agent

01:32PM 25   Karlous's testimony.

| | |
|---|---|
| 1 | THE COURT:  That's fine.  Okay. |
| 2 | Let's bring the jury in, please. |
| 3 | **(In the presence of the jury.)** |
| 4 | THE COURT:  Good afternoon, ladies and gentlemen. |
| 01:33PM 5 | Mr. Avenatti. |
| 6 | **REMOUN KARLOUS, WITNESS, RESUMED THE STAND** |
| 7 | **DIRECT EXAMINATION (continued)** |
| 8 | BY MR. AVENATTI: |
| 9 | Q    Special Agent Karlous, before we broke for the lunch |
| 01:33PM 10 | break, we were talking about Mr. Barela telling you and the |
| 11 | other federal agents about this phone call that he claimed took |
| 12 | place with Ms. Jenness.  Do you recall that? |
| 13 | A    Yes. |
| 14 | Q    And we established before the lunch break that after |
| 01:34PM 15 | Mr. Barela told you that, you sought to verify it with |
| 16 | Mr. Arden; correct? |
| 17 | A    Yes. |
| 18 | Q    And Mr. Arden informed you, did he not, that what |
| 19 | Mr. Barela had stated was not true? |
| 01:34PM 20 | MR. SAGEL:  Asked and answered, Your Honor. |
| 21 | THE COURT:  Overruled. |
| 22 | THE WITNESS:  Yes. |
| 23 | Q    BY MR. AVENATTI:  And then when you asked Mr. Ibrahim |
| 24 | about it, Mr. Ibrahim also told you that what Mr. Barela had |
| 01:34PM 25 | told you and the other federal agents was untrue? |

```
 1   A     Yes.  Just in regards to Evan Jenness, not being --
 2              MR. AVENATTI:  Move to strike everything after "Yes"
 3   as nonresponsive.
 4              THE COURT:  Denied.
```
01:34PM 5   Q     BY MR. AVENATTI:  Now, Mr. -- Special Agent Karlous, did
```
 6   you ever ask Mr. Ibrahim or Mr. Arden whether they had told
 7   Mr. Barela that the money had not been paid, as Mr. Barela's
 8   attorney had claimed in the letter?
 9   A     I don't recall.
```
01:35PM 10   Q     Now, you found out from Mr. Ibrahim and Mr. Arden that,
```
11   according to them, what Mr. Barela had told you was untrue.
12   You found that out before Mr. Barela was called to testify in
13   this case; correct?
14   A     Yes, regarding Evan Jenness.
```
01:35PM 15   Q     And, in fact, Mr. Sagel was aware of that fact as well
```
16   before Mr. Barela was called to the stand to testify before the
17   jury; right?
18   A     Yes.
19   Q     Now, the other thing that Mr. Barela had told you before
```
01:35PM 20   the trial was he had recounted for you this conference room
```
21   incident relating to Mr. Arden supposedly motioning to
22   Mr. Ibrahim to not tell Mr. Barela anything about the
23   settlement.  He had told you about that; right?
24   A     Yes.
```
01:36PM 25   Q     And did you ask Mr. Arden, when you met with Mr. Arden,

```
 1   whether that was true, what Mr. Barela had said?

 2   A     Yes.

 3   Q     And Mr. Arden told you that he had never made any motion

 4   to prevent Mr. Ibrahim or suggest to him not to tell Mr. Barela

 5   about the settlement, didn't he?

 6   A     Just the motion to fix his hair.

 7               MR. AVENATTI:  Move to strike.

 8               THE COURT:  It will be stricken.

 9   Q     BY MR. AVENATTI:  Special Agent Karlous, please just

10   answer my questions.

11               Here's my question:  Mr. Arden told you and

12   Mr. Sagel that he did not motion to Mr. Ibrahim in an effort to

13   keep Mr. Ibrahim quiet, didn't he?

14   A     Yes.

15   Q     And you then asked Mr. Ibrahim whether this incident that

16   Mr. Barela had recounted actually happened, didn't you?

17   A     Yes.

18   Q     And Mr. Ibrahim also told you that Mr. Barela did not

19   have his facts straight, didn't he?

20   A     Yes; that it didn't happen.

21   Q     And that, too, was before Mr. Sagel called Mr. Barela in

22   this case as a government witness to provide sworn testimony

23   before the jury, isn't it?

24   A     Yes.

25   Q     Did you also come to learn before Mr. Barela took the
```

The timestamps in the left margin are: 01:36PM (line 5), 01:36PM (line 10), 01:36PM (line 15), 01:37PM (line 20), 01:37PM (line 25).

```
 1   stand that, in fact, he had made a sworn declaration under
 2   penalty of perjury claiming that he had received a signed copy
 3   of the settlement agreement contrary to his testimony in this
 4   case?
```
01:38PM  5   A    He filed the wrong copy, yes.
```
 6            MR. AVENATTI:  Move to strike, Your Honor.
 7            THE COURT:  It will be stricken.
 8   Q    BY MR. AVENATTI:  Special Agent Karlous, please just
 9   answer my questions as opposed to advocating for the
```
01:38PM 10   Government.
```
11            Here's my question --
12            MR. SAGEL:  Objection.  Please have him --
13            THE COURT:  Sir, I'll give any further admonitions
14   to the witness.
```
01:38PM 15            MR. AVENATTI:  Fair enough, Your Honor.  I
```
16   understand.
17   Q    Here's my question, sir:  Before Mr. Barela testified,
18   you knew, did you not, that he had submitted a declaration
19   under penalty of perjury attaching a settlement agreement which
```
01:38PM 20   he claimed he had received that was fully signed?
```
21   A    Yes.
22   Q    And you also learned that that declaration under penalty
23   of perjury sat undisturbed for at least four months after it
24   was submitted.  You learned that; right?
```
01:39PM 25   A    I don't know how many months it was.

1   Q    But it was at least one month; right?

2   A    I actually don't even have the dates in mind.

3        MR. AVENATTI:  Your Honor, can I approach in an

4   effort to refresh?

01:39PM 5        THE COURT:  You may.

6        MR. SAGEL:  Your Honor, I'll -- both a 403 objection

7   and, also, this is not proper refreshing recollection.  He said

8   he's never seen the website.  So he's trying to introduce a

9   document that --

01:40PM 10        THE COURT:  He can show him anything under the sun.

11  And if it refreshes his recollection, it does.  If it doesn't,

12  it doesn't.

13  Q    BY MR. AVENATTI:  Special Agent Karlous, directing your

14  attention to the second-to-the-last page, second paragraph,

01:40PM 15  does that refresh your recollection that Mr. Sagel has referred

16  to Mr. Stolper as being a good friend?

17  A    No, it doesn't refresh my recollection.

18  Q    Now, during the course of your investigation, you were

19  present when Mr. Sagel asked a number of witnesses about at

01:41PM 20  least two printouts from Tabs; right?

21  A    Could you be a little bit more specific on which Tabs

22  printouts you're talking about?

23  Q    Well, I'm trying to shortcut this.  I can get them out of

24  the books if necessary.  But what I'm referring to is the jury

01:42PM 25  has seen a couple Tabs printouts that say "Draft" across the

**UNITED STATES DISTRICT COURT**

```
 1   page.
 2   A    You're talking about Johnson and Barela?
 3   Q    Yes.
 4   A    Yes.
 5   Q    Okay.  And you were present when a number of witnesses
 6   were asked about those printouts from Tabs; correct?
 7   A    I'm sure I was.
 8   Q    And at any point in time, did you or any other member of
 9   the investigative team state out loud, "You know, maybe we
10   should look at the data to see if these are legit."  Did
11   anybody ever say anything like that?
12   A    I don't recall.
13   Q    You don't recall that ever happening, as you sit here
14   today; correct?
15   A    I just don't recall.
16   Q    Now, the jury heard from Mr. Tashchyan and Mr. Varani.
17   They testified in this case.  You're aware of that; correct?
18   A    Yes.
19   Q    And Mr. Tashchyan and Mr. Varani were involved in the
20   imaging and analysis of the Eagan Avenatti servers; is that
21   right?
22   A    Tashchyan was.  I don't know what Varani did or didn't do.
23   Q    I believe Mr. Varani testified that he received forensic
24   images from Mr. Tashchyan.  Do you recall that?
25   A    I think that's correct.
```

01:42PM
01:42PM
01:42PM
01:43PM
01:43PM

**UNITED STATES DISTRICT COURT**

```
 1   Q    Do you know if Mr. Tashchyan or Mr. Varani were ever
 2   asked to look for the Tabs data on the servers?
 3   A    I don't know.
 4   Q    Do you have any idea what the electronic Tabs data shows
 5   as it relates to Mr. Johnson's case?
 6   A    Just the printout.
 7   Q    That's not what I'm asking about.
 8        Well, let me ask this question:  Do you have any
 9   idea if we had the Tabs data, whether it would reflect the same
10   thing that's in the printout?  Do you know?
11   A    I don't know.
12   Q    You have no idea what the Tabs data would show for the
13   Johnson case; correct?
14   A    I don't know.
15   Q    You have no idea what the Tabs data would show for the
16   Barela case; correct?
17   A    I don't know.
18   Q    You have no idea what the Tabs data would show for the
19   Michelle Phan case -- or matter, do you?
20   A    I do know that.  It would be zero.
21   Q    Sir, how do you know that there were no expenses input
22   into Tabs for Michelle Phan, sir?  How do you know that?
23   A    Costs were not allowed per the contract.
24   Q    That's not what I asked.
25        MR. AVENATTI:  Move to strike, Your Honor.
```

01:44PM 5

01:44PM 10

01:44PM 15

01:44PM 20

01:45PM 25

1           THE COURT:  Denied.

2    Q    BY MR. AVENATTI:  Special Agent Karlous, please just

3    answer my question.

4           THE COURT:  Sir, he did answer it.

01:45PM 5    Q    BY MR. AVENATTI:  Do you -- here's my question:  Do you

6    know -- I'm talking about the Tabs program.  Do you know

7    whether any expenses were input into Tabs for Michelle Phan?

8    I'm not talking about whether they could be deducted.  I'm

9    talking about whether they were input.

01:45PM 10   A    I don't know.

11   Q    How about Long Tran?  Do you know if any expenses were

12   input into Tabs for Long Tran?

13   A    I'm assuming there wasn't.

14   Q    Well, do you know?

01:45PM 15   A    No.

16   Q    You've heard the phrase that "When you assume, you make

17   an ass out of you and me."  Have you ever heard that?

18   A    No.

19   Q    Okay.  Well, first time for everything.

01:45PM 20          But you have no personal knowledge as to whether

21   there were any expenses input into Tabs for Mr. Tran, do you?

22   A    I do not.

23   Q    Because you never bothered to look; right?

24   A    I don't know that we have it.

01:46PM 25   Q    And you don't know that you don't have it either, do you,

1    sir?

2    A    I don't know.

3    Q    Answer my question.  I'm sorry.

4    A    I don't know because of the taint process.

01:46PM 5         MR. AVENATTI:  Move to strike, Your Honor, as

6    nonresponsive.

7             THE COURT:  It will be stricken.

8    Q    BY MR. AVENATTI:  As you sit here today, you have no idea

9    whether you have the Tabs data or not, do you?

01:46PM 10   A    I do not know.

11   Q    What does the Tabs data for Ms. Gardner show?

12   A    I don't know.

13   Q    Do you know if the QuickBooks data for Mr. Johnson is

14   accurate?  And by "data," I'm talking about the data that

01:47PM 15   Mr. Drum relied on.

16   A    I don't know.

17   Q    Do you know if the QuickBooks data that he relied on for

18   Ms. Gardner's case is accurate?

19   A    I don't know.

01:47PM 20   Q    How about Mr. Barela?

21   A    Same.  Don't know.

22   Q    How about Ms. Phan or Mr. Tran?

23   A    Don't know.

24   Q    Did the investigative team, to the best of your

01:47PM 25   knowledge, ever attempt to acquire banking records from

```
 1   Geoffrey Johnson?
 2   A    I don't believe so.
 3   Q    How about from Geoffrey Johnson's financial institution?
 4   A    I don't believe so.
 5   Q    Same question as it relates to Ms. Gardner.  Did anyone
 6   in the investigative team ever try to get Ms. Gardner's banking
 7   records?
 8   A    I don't believe so.
 9   Q    How about from Ms. Gardner's financial institution?
10   A    I don't believe so.
11   Q    Did anyone from the investigative team ever try to get
12   the financial records from Ms. Phan or Mr. Tran?
13   A    No.
14   Q    How about from their financial institutions?
15   A    No.
16   Q    Did anyone from the investigative team ever try to get
17   the banking records relating to Mr. Barela's accounts?
18   A    No.
19   Q    How about from Mr. Barela's financial institution?
20   A    No.
21   Q    Did you ever participate on any calls or communications
22   with Mr. John Drum?
23   A    Yes.
24   Q    When?
25   A    I don't recall.
```

01:47PM 5
01:48PM 10
01:48PM 15
01:48PM 20
01:49PM 25

```
 1    Q    Was it recently?

 2    A    I think so.

 3    Q    Was it more than one?

 4    A    Over the two-year period?  Yes.

 5    Q    There were a lot of calls; right?

 6    A    I don't know about "a lot."  I wasn't on all the calls.

 7    Q    And during the times you communicated with Mr. Drum, he

 8    was sharing drafts of the exhibits and the charts that were

 9    shown to the jury; right?

10    A    I believe so.

11    Q    I mean, do you recall reviewing those with the

12    prosecutors?

13    A    Not recently.  That would have been, like, last year, is

14    what I remember.

15    Q    Do you have any recollection of Mr. Drum ever asking you

16    or anyone else from the investigative team for the Tabs data?

17    A    I don't recall.

18         MR. AVENATTI:  One moment, Your Honor, please.

19         (Counsel conferred off the record.)

20    Q    BY MR. AVENATTI:  Last question.  After you leave the

21    stand, do you have any plan to look for the Tabs data?

22    A    I don't know if we have it or not.

23    Q    I think you shook your head "No."  Do you have a plan to

24    try to look for it?  Yes or no, sir?

25    A    I don't know.
```

|  | |
|---|---|
| 1 | Q      Thank you. |
| 2 | THE COURT:  Mr. Sagel. |
| 3 | **CROSS-EXAMINATION** |
| 4 | BY MR. SAGEL: |
| 01:51PM 5 | Q      Good afternoon, Special Agent Karlous. |
| 6 | A      Good afternoon. |
| 7 | Q      Throughout the direct examination, you were asked a lot |
| 8 | of questions about the search warrants and the process.  So let |
| 9 | me give you an opportunity to explain the actual process.  Were |
| 01:51PM 10 | you on any of the search teams? |
| 11 | A      No. |
| 12 | Q      Isn't it true -- well, let's start with -- defendant is a |
| 13 | lawyer; is that correct? |
| 14 | A      Yes. |
| 01:52PM 15 | Q      And because he's a lawyer and because he worked for a law |
| 16 | firm, there were special procedures in place in the search |
| 17 | protocols; is that correct? |
| 18 | MR. AVENATTI:  Objection, Your Honor.  403.  401. |
| 19 | THE COURT:  Overruled. |
| 01:52PM 20 | THE WITNESS:  Yes, there is. |
| 21 | Q      BY MR. SAGEL:  And let me back up even further.  Before |
| 22 | you obtained any search warrants, you swore out an affidavit |
| 23 | basically providing facts under oath to a federal judge to |
| 24 | obtain these search warrants; is that correct? |
| 01:52PM 25 | A      Correct. |

**UNITED STATES DISTRICT COURT**

```
      1   Q     And the federal judge approves these search warrants,

      2   which included special protocols in it; is that correct?

      3   A     That's correct.

      4   Q     And those protocols involve making sure that you and the

01:52PM 5   prosecution team did not gain access to any potentially

      6   privileged documents; is that correct?

      7               MR. AVENATTI:  Same objections, Your Honor.

      8               THE COURT:  Overruled.

      9               THE WITNESS:  Yes.  That's correct.

01:53PM 10  Q     BY MR. SAGEL:  So when defendant kept asking you about

     11   your access and what did you get, did you have access to the

     12   actual documents seized in the search warrants at the time they

     13   were seized?

     14   A     We did not.

01:53PM 15  Q     Did you have access to the actual digital devices at the

     16   time they were seized pursuant to the search warrants?

     17   A     No.

     18   Q     When defendant kept saying you were there with those

     19   agents at Ms. Regnier's house, and he kept lumping you in with

01:53PM 20  the agents conducting the search, were you part of the search

     21   team?

     22   A     No.

     23   Q     You were walled off from them; is that correct?

     24   A     That's correct.

01:53PM 25  Q     And that's to protect the clients of the law firm and the
```

```
     1    defendant; isn't that correct?
     2                MR. AVENATTI:  Objection.  Leading.
     3                MR. SAGEL:  611(c), Your Honor.
     4                MR. AVENATTI:  Leading.
01:53PM 5                THE COURT:  Overruled.
     6                THE WITNESS:  Yes.
     7    Q    BY MR. SAGEL:  And defendant asked you about the search
     8    warrant at Ms. Regnier's house.  You obtained numerous search
     9    warrants in this case; isn't that correct?
01:54PM 10                MR. AVENATTI:  Objection, Your Honor.  Outside the
    11    scope.  He was not asked about the warrant.  403.  401.
    12                THE COURT:  Sustained.  Scope.
    13                MR. SAGEL:  He asked about obtaining financial
    14    records, all financial records of himself, his firm and his
01:54PM 15    entities.  I need to ask questions about how he did that.
    16                MR. AVENATTI:  Your Honor --
    17                THE COURT:  Overruled.
    18                MR. AVENATTI:  Your Honor, there was no mention --
    19                THE COURT:  Overruled.
01:54PM 20    Q    BY MR. SAGEL:  In addition to the search warrant at
    21    Ms. Regnier's house, you conducted other search warrants; isn't
    22    that correct?
    23    A    Yes, we did.
    24    Q    Those other search warrants included the servers of Eagan
01:54PM 25    Avenatti?
```

```
        1   A    Yes.

        2   Q    The residence of the defendant?

        3   A    Yes.

        4   Q    The law firm of The X-Law Group?

01:54PM  5   A    Yes.

        6   Q    And the search warrant of the digital devices related to

        7   Global Baristas?

        8   A    Yes.

        9   Q    And with every one of those search warrants, a federal

01:55PM 10   judge approved the protocols and the ability for you to search?

       11   A    Yes.

       12   Q    Defendant asked you about obtaining the financial records

       13   about him, his firm, and his entities in the search warrant;

       14   isn't that correct?

01:55PM 15   A    Yes.

       16   Q    And you were seeking that information based on your

       17   investigation into the defendant and his entities.  Isn't that

       18   correct?

       19   A    Yes.

01:55PM 20   Q    At the time of the search warrants, March 20 -- the time

       21   of the search warrants at Ms. Regnier's house, at defendant's

       22   residence and at The X-Law Group on March 25th, 2019, was your

       23   investigation public?

       24   A    It was not.

01:56PM 25   Q    And the reason -- well, tell us the reason why you might
```

```
 1   sometimes keep an investigation covert or secretive.
 2   A     We don't want any publicity, whether positive or negative,
 3   to effect the defendant in any way until we're ready to come
 4   out with search warrants or indictments or something along that
 5   line.
 6   Q     And with regards to evidence, what is your experience on
 7   whether or not evidence is kept?  Is it better or not for
 8   evidence purposes to keep a case covert?
 9   A     Yes.  You want the element of surprise when you do the
10   search warrants so that you're able to obtain whatever is on
11   the servers or whatever financial documents can be found
12   without the defendant knowing in advance that we're coming.
13   Q     And part of the way you keep an investigation in --
14   covert is you limit the number of people you actually interview
15   at that time, if you don't know whether or not they'll share
16   the information; is that correct?
17              MR. AVENATTI:  Leading.
18              THE COURT:  Overruled.
19              THE WITNESS:  Yes.
20   Q     BY MR. SAGEL:  And at the time you executed the search
21   warrants at Ms. Regnier's residence, as well as the defendant's
22   residence and The X-Law Group, you had not even interviewed
23   Geoffrey Johnson -- or the prosecution or investigative team
24   had not even interviewed Geoffrey Johnson yet ; is that
25   correct?
```

```
 1   A     That's correct.

 2   Q     And not even interviewed Alexis Gardner yet?

 3   A     That's correct.

 4   Q     Your investigation at the time of the search warrants on

 5   March 25th, 2019, included other matters than just these four

 6   clients?

 7             MR. AVENATTI:  Objection, Your Honor.  401, 403.

 8             THE COURT:  Overruled.

 9             THE WITNESS:  Yes, I did.

10   Q     BY MR. SAGEL:  While you were at Ms. Regnier's residence

11   and you were interviewing her on March 25th, 2019, Ms. Regnier

12   told you on that day that the firm used QuickBooks for some of

13   their financial recordkeeping; isn't that correct?

14   A     Yes.

15   Q     And during the interview, while the search is going on

16   around -- in her house, Ms. Regnier, at one point, stopped to

17   assist the computer forensic agent to find the QuickBooks on an

18   Eagan Avenatti computer at that time?

19             MR. AVENATTI:  Objection.  Leading, Your Honor.

20             THE COURT:  Overruled.  This is cross-examination.

21             MR. AVENATTI:  It's not an adverse witness, and it's

22   hardly cross-examination.

23             MR. SAGEL:  611(c).

24             THE COURT:  Proceed.

25             THE WITNESS:  Yes.  That occurred just like you said
```

01:58PM (lines 5, 10, 15)
01:59PM (lines 20, 25)

it.

Q    BY MR. SAGEL:  At no point on March 25th, 2019, while you were interviewing Ms. Regnier and she was helping the computer forensic agent, did she talk about or show the Tabs at that point?

A    I don't believe she did.

Q    Do you still have your November 19, 2019 memorandum of interview defendant asked you about in front of you?  I think it's Exhibit 1085.

A    Yes.

Q    Defendant referred to it as an eight-and-a-half-hour interview.  Do you remember him saying that?

A    I don't really remember him saying that.

Q    Do you remember him talking about the length of the interview?

A    Yeah.  I think I said six hours or something like that. But I don't recall.

Q    And defendant went over paragraph 14 with you; is that correct?

A    Yes.

MR. AVENATTI:  Objection.  Misstates the testimony and the evidence, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  Yes.

Q    BY MR. SAGEL:  Let me start with this memorandum of

```
 1   interview has 120 paragraphs; isn't that correct?
 2   A     Yes.
 3   Q     And he asked you about one word in one paragraph from the
 4   full memorandum of interview?
 5   A     Yes.
 6   Q     During that eight-and-a-half-hour interview that he asked
 7   you about on November 19, 2019, were you interviewing
 8   Ms. Regnier on matters other than just these four clients?
 9             MR. AVENATTI:  Objection, Your Honor.  401, 403.
10             THE COURT:  Overruled.
11             THE WITNESS:  Yes.
12   Q     BY MR. SAGEL:  Defendant asked you at length about the
13   Tabs data:  "Where is the Tabs data?  Are you going to find the
14   Tabs data?"  Based on your training and experience, is it
15   better to have something on a computer or having an e-mail to a
16   defendant with the data?
17             MR. AVENATTI:  Objection.  Speculation.  Conjecture.
18   Lacks foundation, Your Honor.
19             THE COURT:  Overruled.
20             THE WITNESS:  Both would be great.  But the e-mails
21   are sufficient, in my opinion.
22   Q     BY MR. SAGEL:  And to prove knowledge and notice to a
23   defendant, you need to be able to show that he actually knew of
24   the information; is that correct?
25             MR. AVENATTI:  Objection, Your Honor.  Leading.
```

```
 1   Seeks an improper conclusion.  Speculation.  Conjecture.
 2             THE COURT:  Sustained.
 3   Q    BY MR. SAGEL:  Let me have you look at Exhibit 48.  And
 4   we're going to find out if attorneys know how to use the
 5   computer.
 6             If we could pull up the first page.  Let's see the
 7   first page first.
 8             As part of your investigation, you came across this
 9   exhibit that's already been moved in in trial Exhibit 48, which
10   is Ms. Regnier's e-mail to the defendant on February 4th, 2015.
11   Do you remember this e-mail?
12   A    Yes.
13   Q    And this is the e-mail that's titled "Updated Johnson
14   Cost Bill" with the PDF attached.  And that's what has been
15   referred to as the Tabs data regarding Mr. Johnson; is that
16   right?
17             MR. AVENATTI:  Objection.  Referred to by whom?
18   Vague, Your Honor.
19             THE COURT:  Rephrase the question.
20   Q    BY MR. SAGEL:  This was the Tabs data that defendant
21   asked you about that has the big old "Draft" across the top,
22   according to the defendant.
23             MR. AVENATTI:  Misstates the testimony, Your Honor,
24   and the question.
25             THE COURT:  Overruled.
```

02:02PM appears at line 5
02:03PM appears at line 10
02:03PM appears at line 15
02:03PM appears at line 20
02:03PM appears at line 25

                    THE WITNESS:  Yes, it is.

Q    BY MR. SAGEL:  And if we turn to the Tabs data and you --
and as part of your investigation, you reviewed both the e-mail
and this draft Tabs data that was attached to the e-mail on
02:03PM  February 4th; is that correct?

A    Yes.

Q    And in addition to just looking at e-mails and
attachments to e-mails, one of the things you did in your
investigation was to review bank records; is that correct?

02:04PM  A    Correct.

Q    Defendant asked you about whether or not you obtained
bank records from financial institutions or from victims for
the victims' accounts; is that correct?

A    Yes.

02:04PM  Q    Let's talk about the financial records you got in this
case.  You got all financial records that were able to be found
relating to the defendant; isn't that correct?

A    Correct.

Q    Including any personal accounts?

02:04PM  A    Yes.

Q    Any business accounts?

A    Yes.

Q    Any accounts -- credit card accounts?

A    Yes.

02:04PM  Q    Attorney-client trust accounts?

A     Yes.

Q     All accounts where defendant was the signatory on; is that correct?

         MR. AVENATTI:  Objection.  Lacks foundation, Your Honor.

         THE COURT:  Overruled.

         THE WITNESS:  Yes.

Q     BY MR. SAGEL:  And you received these records through subpoenas, and many of those records we've gone over during this trial; is that correct?

A     Correct.

Q     So in addition to seeing an e-mail with the costs on the document that has a big old "Draft" on it, you also then looked at the bank records; is that correct?

A     We did.

Q     And despite the big old "Draft" across it, you would have seen Exhibit 384 at page 7?

         MR. AVENATTI:  Objection, Your Honor.  Testifying through the witness.  Lacks foundation.

         THE COURT:  Overruled.

Q     BY MR. SAGEL:  Before I get there, why don't I look at the last page with the total amount on page 8 of 9.  According to this draft Tabs report attached to the e-mail on February 4, what is the total cost and expenses or advances and expenses, according to this?

```
 1   A     $736,883.89.
 2   Q     And this e-mail, on February 4th, 2015, is several days
 3   after the $4 million check was deposited into defendant's
 4   attorney-client trust account; isn't that correct?
 5   A     Correct.
 6   Q     In the Geoffrey Johnson matter?
 7   A     Yes.
 8   Q     And if we were to look at Exhibit 384, page 7, despite
 9   the big old "Draft" on February 4th, 2015, defendant withdrew
10   that exact same amount; isn't that correct?
11   A     That's the exact dollar amount.
12   Q     Even to the penny?
13   A     To the penny.
14         MR. AVENATTI:  Objection.  Argumentative,
15   Your Honor.
16         THE COURT:  Overruled.
17         MR. SAGEL:  If we could look at Exhibit 174.
18   Q     This is another e-mail that you would have obtained as
19   part of your investigation; is that correct?
20         MR. AVENATTI:  Objection.  Foundation.  "Would have
21   obtained."  Either he knows or he doesn't.
22         THE COURT:  Overruled.
23         THE WITNESS:  Yes, we obtained it.
24   Q     BY MR. SAGEL:  Let's clarify.  You didn't go on the
25   computer and get this e-mail, did you?
```

```
 1   A      No.
 2   Q      After agents and attorneys, who were separate from you,
 3   who were on the taint process, who review all the e-mails and
 4   the digital devices to make sure no privileged material gets in
 5   your hands, then it comes to you; is that correct?
 6   A      That's correct.
 7   Q      And then after it came to you and the prosecution team
 8   and the investigation team, you reviewed many of these e-mails;
 9   is that correct?
10   A      Yes.
11   Q      And this is an e-mail dated December 19, 2017, from
12   Ms. Regnier to the defendant; is that correct?
13   A      Yes.
14   Q      The subject is "Barela Cost Bill."  And it has an
15   attachment called "Barela Cost.pdf"; is that correct?
16              MR. AVENATTI:  Objection.  Leading.
17              THE COURT:  Overruled.
18              THE WITNESS:  Yes.
19   Q      BY MR. SAGEL:  And in the e-mail, Ms. Regnier says to the
20   defendant, "Michael, total Barela costs $109,200.72"; is that
21   correct?
22   A      Yes.
23   Q      And based on your review of the evidence and your
24   interviews in this case, you knew this took place -- this
25   e-mail took place around the time the Barela matter was going
```

1    to mediation?

2    A    Yes.

3    Q    Towards the end of defendant's examination of you, he

4    asked you about the Tabs data about the Michelle Phan case.

02:09PM 5    And you said there wouldn't have been.

6    A    I did say that.

7    Q    And I think you said, "We're not talking about whether

8    they could.  We're talking about whether it's there," was his

9    question.  Did you, as part of your investigation, review the

02:09PM 10   attorney-client fee contract between Michelle Phan, Long Tran,

11   and the defendant?

12   A    Yes.

13         MR. AVENATTI:  Objection.  Outside the scope,

14   Your Honor.

02:09PM 15         THE COURT:  Overruled.

16         MR. SAGEL:  If we could look at Exhibit 266.

17   Q    BY MR. SAGEL:  In your review of the agreement and your

18   interviews of Ms. Phan and Mr. Tran, what was your

19   understanding of whether or not the costs and expenses could be

02:10PM 20   deducted from their settlement agreement?

21   A    It was not part of the agreement.  It was just a

22   contingency fee of 7.5 percent with no cost.

23   Q    Defendant asked you about obtaining financial records

24   from self, his businesses, his entities from the search

02:10PM 25   warrants.  Do you recall that?

```
  1   A     Yes.

  2   Q     You obtained those same records in other ways, such as

  3   subpoenas; is that correct?

  4   A     Correct.

02:10PM 5   Q     Also interviewed witnesses, and sometimes witnesses

  6   provided you records of the same?

  7   A     Yes.

  8   Q     And sometimes you interviewed witnesses and subpoenaed

  9   witnesses for their records; is that right?

02:11PM 10  A     Yes.

 11   Q     Do you know who Marjorie Hendricks is?

 12   A     Yes.

 13   Q     Marjorie Hendricks was the --

 14             MR. AVENATTI:  Outside the scope, Your Honor.

02:11PM 15  Objection.

 16             THE COURT:  Mr. Sagel.

 17             MR. SAGEL:  It was his CPA, who he provided

 18   financial records to --

 19             MR. AVENATTI:  Your Honor -- Your Honor, that's

02:11PM 20  completely inappropriate.

 21             THE COURT:  Sir.

 22             MR. AVENATTI:  Completely inappropriate.

 23             THE COURT:  Objection's overruled.

 24   Q     BY MR. SAGEL:  Marjorie Hendricks was the defendant's

02:11PM 25  CPA; is that correct?
```

35

```
        1   A     Yes.  And tax preparer.

        2   Q     And you obtained records from Ms. Hendricks; is that

        3   correct?

        4   A     Yes.

02:11PM  5   Q     As well as interviewing Ms. Hendricks?

        6   A     Yes.

        7   Q     And as part of that interview of Ms. Hendricks, she told

        8   you that defendant provided his financials of his firm and his

        9   expenses of his firms on QuickBooks; is that correct?

02:12PM 10   A     That's what she said.

       11   Q     On the November 19, 2019 interview, defendant asked you

       12   whether or not Ms. Regnier told you that the QuickBooks records

       13   were incomplete.  And he cut you off when you tried to say what

       14   she actually told you; is that correct?

02:13PM 15             MR. AVENATTI:  Objection.  It was struck,

       16   Your Honor.

       17             THE COURT:  That's correct.

       18             MR. SAGEL:  Let me ask you the question then.

       19   Q     Did Ms. Regnier only tell you that the QuickBooks records

02:13PM 20   were incomplete?

       21   A     No.

       22   Q     In fact, what Ms. Regnier told you was there were no

       23   entries for Johnson from February 2017 through June 2018 in

       24   EA's QuickBooks, because she maintained the QuickBooks how the

02:13PM 25   defendant asked her to.  Isn't that what she told you?
```

```
 1   A     That's what she said.
 2   Q     And in that same period of time, where it was about
 3   Mr. Johnson's QuickBooks entries, the defendant's firm was in
 4   bankruptcy?
02:13PM 5   A     Yes.
 6   Q     And the same period of time that Ms. Regnier told you
 7   about this February of 2017 through June 2018, that was over
 8   two years after the County of Los Angeles had paid $4 million
 9   into defendant's attorney-client trust account?
02:14PM 10   A     That's correct.
11   Q     And Ms. Regnier also told you she would not have stopped
12   making QuickBooks entries on her own?
13   A     Correct.
14             MR. AVENATTI:  Objection.  Hearsay.
02:14PM 15             THE COURT:  It will be received but not for the
16   truth of the answer that Ms. Regnier gave.
17   Q     BY MR. SAGEL:  Defendant asked you about Exhibit 281.
18             So why don't we pull up Exhibit 281.
19             He primarily asked you about this May 1, 2018 e-mail
02:15PM 20   of Judy Regnier sent to Long Tran.  Do you recall that?
21   A     Yes.
22   Q     Did Ms. Regnier ever tell you that the defendant
23   definitively typed this e-mail?
24   A     She did not.
02:15PM 25   Q     Ms. Regnier -- and you mentioned it a few times -- said
```

UNITED STATES DISTRICT COURT

```
 1    "He may have typed this e-mail"; is that correct?

 2    A    That's what she said.

 3    Q    And at the same time, she said the reason he may have was

 4    there were various times defendant typed e-mails on her

 5    computer and she didn't know if this was one of them?

 6    A    That's correct.

 7    Q    Now, as one of the things you did as part of your

 8    investigation, you would look to corroborate information

 9    witnesses provide you; isn't that correct?

10    A    Yes.

11    Q    And when I say "corroborate," you looked to see if

12    information you see either in an e-mail or in a statement

13    matches up to other things; is that right?

14    A    That's correct.

15    Q    So one thing you would have done is to see if, in fact,

16    any wire had been made to Long Tran or Michelle Phan as of

17    May 1, 2018?

18          MR. AVENATTI:  Objection.  Outside the scope,

19    Your Honor.

20          THE COURT:  Overruled.

21          THE WITNESS:  Yes.  That was easy to do.

22    Q    BY MR. SAGEL:  And had any wires been made on -- let me

23    back up for a second.

24          This e-mail that defendant asked you about was sent

25    from Ms. Regnier to Mr. Tran and the defendant; is that
```

The timestamps in the left margin are: 02:15PM (line 5), 02:16PM (line 10), 02:16PM (line 15), 02:16PM (line 20), 02:17PM (line 25).

```
 1    correct?
 2    A    Yes.
 3    Q    And as of May 1st, 2018, had any wires from the bank
 4    records been transferred for Michelle Phan?
 5    A    No.
 6    Q    And this e-mail that defendant showed you, on May 1st,
 7    2018, wasn't the last e-mail in this chain, was it?
 8    A    It was not.
 9    Q    If we look at page 2, defendant even replies to one later
10    that day; is that correct?
11    A    Yes.
12    Q    And he doesn't say, "There has been no wire to Michelle
13    Phan"?
14              MR. AVENATTI:  Objection.  Argumentative,
15    Your Honor.  Outside the scope.
16              THE COURT:  Overruled.
17              THE WITNESS:  He does not say that.
18    Q    BY MR. SAGEL:  He says, "Pls handle"; is that correct?
19    A    Yes.
20    Q    He doesn't say, "I'm in New York.  I can't send it"?
21              MR. AVENATTI:  Objection.  Asked and answered,
22    Your Honor.
23              THE COURT:  Overruled.
24              THE WITNESS:  He does not say that.
25    Q    BY MR. SAGEL:  And based on your investigation, your
```

1   interviews and your review of records, in 2018 Michelle Phan is

2   due $8.1 million; is that correct?

3   A    Correct.

4   Q    And as of these e-mails on May 1st, 2018, was there

02:18PM 5   $8.1 million in the attorney-client trust account for

6   Ms. Phan's settlement money?

7   A    There was not.

8   Q    Approximately how much was there?

9   A    I believe there was 4.1 million approximately.

02:19PM 10   Q    Defendant asked you -- actually, before I get there, let

11   me ask you one other question.  He asked you about the six or

12   seven boxes that Ms. Regnier contacted you about a handful of

13   months after the search warrant.  Did you just stop and do

14   nothing after Ms. Regnier called you?

02:20PM 15   A    No.

16   Q    What did you do after you learned that she claimed there

17   were six to seven boxes of materials at her house several

18   months later?

19   A    I spoke to the team leader at that site, and he assured me

02:20PM 20   that all those boxes were reviewed and were outside the scope

21   of the search warrant, meaning we could not take them.  They

22   were outside the scope of what we could take.

23   Q    When you say "outside the scope," in addition to having

24   your search warrants approved by a federal judge, the judge

02:20PM 25   tells you the scope, the types of documents you're allowed to

```
 1   take; is that correct?
 2   A     That's correct.
 3   Q     And sometimes limited by what years?
 4   A     A date range and specifically which documents we could
 5   take.
 6   Q     And so those boxes were left behind because you had --
 7   not you.  The agents who were conducting the search, based on
 8   your understanding, did not have the authority to take those
 9   boxes; is that correct?
10            MR. AVENATTI:  Objection.  Leading.
11            THE COURT:  Overruled.
12            THE WITNESS:  That's what the team leader told me.
13   Q     BY MR. SAGEL:  The May 1, 2018 e-mail, when defendant
14   asked you questions about it and about her saying that he may
15   have typed it, defendant asked you, "Did it sound" -- I think I
16   got this right.  I think he asked you, "Did it sound
17   fantastical, her claim?"  Did it sound, based on your
18   investigation, to be something crazy or fantastical?
19   A     No, it did not.
20   Q     Why not?
21   A     She had mentioned before that the defendant would tell her
22   what to write into e-mails.
23   Q     And not only did she say that, you saw countless e-mails
24   where he would e-mail her telling her what to write, and then
25   she would write the same e-mail; is that correct?
```

```
 1              MR. AVENATTI:  Objection.  Lacks foundation.

 2              THE COURT:  Overruled.

 3              MR. AVENATTI:  Calls for speculation.

 4              THE COURT:  Overruled.

 5              THE WITNESS:  Correct.

 6    Q    BY MR. SAGEL:  Even as you've sat here through this

 7    trial, as defendant asked you about numerous exhibits and

 8    numerous witnesses who've testified in this trial, you were

 9    here during Ms. Regnier's testimony where she showed examples

10    of defendant sending her via e-mail what to write and having

11    her write the exact same document; isn't that correct?

12    A    That's correct.

13    Q    Defendant went over on his board where he was on certain

14    dates.  Do you remember that?

15    A    Yes.

16    Q    You were able -- as part of this investigation, one of

17    the types of records that you obtained were defendant's cell

18    phone records; isn't that right?

19    A    Correct.

20    Q    And defendant's cell phone records also provide cell site

21    data; is that correct?

22    A    Yes.

23    Q    So you can determine if he places a call, sends a text or

24    does something with his phone that records off of a cell site

25    where his presence is at a certain time, if the records show
```

1   that; is that correct?

2   A     Yes.

3   Q     And based on your investigation, you knew that defendant

4   was telling Michelle Phan and Long Tran that he needed to be in

02:24PM 5   California to send the wire to Michelle Phan; is that correct?

6             MR. AVENATTI:  Objection, Your Honor.  Outside the

7   scope.

8             THE COURT:  Overruled.

9             THE WITNESS:  That's what he was telling them.

02:24PM 10   Q     BY MR. SAGEL:  When defendant wrote his dates on the

11   board and asked where there was evidence, he did not include

12   May 4th, did he?

13   A     He did not.

14   Q     Because defendant was also not in California?

02:24PM 15             MR. AVENATTI:  Objection.  Outside the scope,

16   Your Honor.

17             THE COURT:  Restate your question.

18   Q     BY MR. SEGAL:  He asked you if you were able to determine

19   from the cell phone records where he was on the day -- the day

02:24PM 20   before and the day after and on May 1st, based on cell phone

21   records, which placed him in either New York or Washington,

22   D.C.; is that correct?

23   A     Yes.

24   Q     And those same cell phone records would show you where he

02:24PM 25   was on May 4th as well?

```
 1              MR. AVENATTI:  Outside the scope, Your Honor.

 2              THE COURT:  Overruled.

 3              THE WITNESS:  Yes, they do.

 4    Q    BY MR. SAGEL:  And the defendant was not in California

 5    during the day of May 4th; is that correct?

 6              MR. AVENATTI:  Outside the scope, Your Honor.

 7              THE COURT:  Overruled.

 8              THE WITNESS:  Yes.

 9    Q    BY MR. SAGEL:  So when defendant told Michelle Phan and

10    Long Tran he needed to be in California to issue them their

11    wires, he wasn't even in California when the partial wires were

12    made to them?

13    A    That's correct.

14    Q    The defendant asked you numerous questions about Andrew

15    Stolper.  Do you remember those?

16    A    Yes.

17    Q    Defendant asked you questions about Andrew Stolper

18    contacting you and the Government.  Did Andrew Stolper's

19    contact to the Government have anything to do with you opening

20    an investigation?

21    A    This investigation was opened before we made contact or

22    before Andrew Stolper contacted us.

23              MR. SAGEL:  Your Honor, can I -- before I proceed

24    with the next questions, out of caution, can I have a sidebar.

25              (Sidebar out of the presence of the jury:)
```

02:25PM 5

02:25PM 10

02:26PM 15

02:26PM 20

02:33PM 25

1           MR. SAGEL:  Out of an abundance of caution, I didn't

2   want to proceed first.  There was an extremely long line of

3   questions on direct about Andrew Stolper, him calling or

4   contacting the U.S. Attorney's Office.  There was a specific

02:33PM 5   question, "Andrew Stolper called to get me criminally

6   prosecuted."  In 2017, upwards of six or eight months before

7   the contact he elicited, there was also a fraud referral from

8   the IRS based on his failure to pay payroll taxes in the Global

9   Baristas matter, his failure to pay taxes of his own, and

02:33PM 10  payroll tax issues dealing with Eagan Avenatti.

11          The civil IRS had already referred -- started the

12  process and referred the matter to the IRS, in which Remoun

13  Karlous already had an open investigation into multiple areas

14  of tax fraud going back a decade with the defendant.  I

02:33PM 15  believe.

16          THE COURT:  I think you're entitled to establish

17  that other federal agencies had made a referral prior to

18  Mr. Stolper's contact.  Disagree?

19          MR. AVENATTI:  Well, Your Honor, I would disagree

02:33PM 20  because I don't believe what was just recounted for Your Honor

21  is accurate.  My understanding --

22          THE COURT:  Is he not entitled to establish that the

23  investigation was initiated earlier on the basis of a contact

24  from some other governmental agency?

02:33PM 25          MR. AVENATTI:  Provided it's true, perhaps.  But the

1    point is, Your Honor, there was a civil IRS investigation that

2    was ongoing.

3           Now, my understanding is that did not become a

4    criminal referral until the end of 2018.  But regardless, let's

02:33PM  5    assume --

6           THE COURT:  Let's get the answer to the question.

7    Let's ask him.  Was there a criminal referral?

8           MR. AVENATTI:  Well, I don't want there to be a

9    criminal referral in front of the jury.

02:33PM 10           THE COURT:  The representation is he's going to say

11   "Yes."

12           MR. AVENATTI:  Your Honor, that's highly prejudicial

13   and relates to the severed counts.

14           THE COURT:  Well, sir --

02:33PM 15           MR. AVENATTI:  Can I finish?  I'm sorry.  Go ahead.

16           THE COURT:  No.  Go ahead.

17           MR. AVENATTI:  If the issue is he just established

18   on the record through the witness that the investigation was

19   already underway before Mr. Stolper contacted the

02:33PM 20   U.S. Attorney's Office, we just heard that question and answer

21   before the jury.  So that's already been -- that's already been

22   established --

23           THE COURT:  Okay.

24           MR. AVENATTI:  -- in front of the jury.  The jury

02:33PM 25   already knows that the criminal investigation was underway

before Stolper contacted the office.  What more is needed?

Anything more would be prejudicial under 403 and not relevant.

MR. SAGEL:  I did that for a foundational question

so that I could say to Your Honor -- Your Honor's direction

02:33PM this morning was, "We'll see how surgical things are."

I have four pages of notes where things were not

surgical.  This wasn't even subtle, "It was to get me

criminally prosecuted."  He opened the door so that I should be

able to show what led to the investigation and what's going on.

02:33PM I still haven't even asked for it or said he's been charged

with other cases.  I've been purposely saying not just this

matter.  I think he's opened the door to the other matters,

but --

THE COURT:  What's the question you want to ask?

02:33PM MR. SAGEL:  That in 2017, the IRS civil had already

started the procedures of referring the matter over for

criminal fraud prosecution in the IRS and that you had already

opened it before Mr. Stolper had ever even contacted you.

MR. AVENATTI:  Your Honor, the question was, "And

02:33PM Mr. Stolper contacted your office to have me criminally

charged."  It goes to what Mr. Stolper wanted.  It went to what

Mr. Stolper wanted.  This question has nothing to do with what

Mr. Stolper wanted.  It doesn't.  It has nothing to do with it,

and it is highly prejudicial to interject now these other

02:33PM charges into the case that had been severed from the case.

And I will also note for the record, and I'll make the request now, I don't believe we have the Stolper e-mail. And that was clear Brady under our theory of the case, and it should have been produced.  Now, if I'm wrong about that --

02:33PM 5        THE COURT:  Let's stick to the problem we have right here.

MR. AVENATTI:  Okay.

THE COURT:  I'll allow you to ask this question: "Prior to the date Mr. Stolper contacted the U.S. Attorney's Office did another federal agency -- no reference -- make a referral for a criminal investigation?"  But don't name the agency.  Just "Did another agency make a referral for a criminal prosecution?"

MR. SAGEL:  And I'm not quibbling in any way.  The reason I'm about to clarify is because it's the same agency. It's the civil side of the IRS referring it to the criminal side.  So he may become confused when I say "another agency," because it was the IRS.

MR. AVENATTI:  Your Honor, he's not going to be confused.  He might be confused on direct, but he's not going to be confused on cross.  He's not going to be confused, and it's highly prejudicial, Your Honor.  I object to this, but at most it should be Your Honor's question.

THE COURT:  You can ask my question.  If we have a problem, we'll see where we go.

**(Open court in the presence of the jury.)**

Q    BY MR. SEGAL:  Special Agent Karlous, prior to Andrew Stolper reaching out to the Government, had a federal agency provided a fraud referral or a criminal referral to you to open an investigation into the defendant?

A    Yes.

Q    Is that why you were investigating the defendant?

A    Yes, it is.

Q    Defendant asked you questions about the March 22nd, 2019 hearing in which defendant was giving under oath testimony.  Do you recall that?

A    Yes.

Q    On the same day as that hearing, had you already sworn out an affidavit to a federal judge to obtain an arrest warrant on the defendant?

MR. AVENATTI:  Objection, Your Honor.  403 -- 401, 403.

THE COURT:  Overruled.

THE WITNESS:  Yes.  And we had our arrest warrant that day.

Q    BY MR. SAGEL:  The affidavit that you swore out to which had facts to support your arrest warrant and that charges the defendant on March 22nd, 2019, is about 180 pages; is that correct?

MR. AVENATTI:  Objection, Your Honor.  Outside the

```
 1    scope.
 2              THE COURT:  Overruled.
 3              MR. AVENATTI:  403.
 4              THE COURT:  Overruled.
 5              THE WITNESS:  Yes, it was.
 6    Q    BY MR. SAGEL:  What part of Andrew Stolper asking the
 7    defendant questions on the very same day were included in your
 8    affidavit for an arrest warrant on March 22nd, 2019?
 9    A    Nothing.
10    Q    With regard to Geoffrey Johnson, what, if anything, does
11    Andrew Stolper have to do with Geoffrey Johnson's matter?
12    A    I don't know.
13    Q    Based on your interviews, based on your review of the
14    records, was Andrew Stolper even a lawyer on the Geoffrey
15    Johnson matter?
16    A    I don't think he was.
17    Q    As it relates to the Alexis Gardner matter, have you seen
18    any evidence that Andrew Stolper had anything to do with the
19    Alexis Gardner matter?
20    A    Had nothing to do with it.
21    Q    With regards to the Gregory Barela matter, have you seen
22    any evidence, any testimony or any witness statements that says
23    that Andrew Stolper had anything to do with Gregory Barela?
24    A    I don't think so.
25    Q    And finally, Michelle and Long Tran.  Based on your
```

```
           1   investigation, your review of evidence, witness statements and
           2   testimony, have you seen anything that Andrew Stolper had
           3   anything to do with Long Tran or Michelle Phan?
           4   A    He had nothing to do with them.
02:37PM    5   Q    Defendant talked about how Andrew Stolper left the
           6   U.S. Attorney's Office, in his word, disgraced in a
           7   high-profile matter and that you knew about it because it was a
           8   big deal.  Do you remember him saying that to you?
           9   A    Yes.
02:37PM   10   Q    And then the defendant hired Andrew Stolper to work at
          11   his firm for several years; correct?
          12   A    That's correct.
          13   Q    So this individual that the defendant is trying to claim
          14   left the U.S. Attorney's Office in disgrace --
02:38PM   15          MR. AVENATTI:  Objection, testimony.
          16          THE COURT:  Let him finish the question.
          17   Q    BY MR. SEGAL:  The individual defendant is trying to say
          18   left the U.S. Attorney's Office in disgrace, based on
          19   prosecutorial misconduct, the defendant had no problem hiring
02:38PM   20   him on as a lawyer?
          21          MR. AVENATTI:  Objection.  Argumentative.  Assumes
          22   facts.  Testifying through the witness.
          23          THE COURT:  Sustained.
          24          MR. AVENATTI:  Move to strike.
02:38PM   25          MR. SAGEL:  There was no answer.
```

```
 1   Q    Defendant asked you about whether you know about

 2   conflicts of interest to assist a friend.  Let's start with

 3   you.  Have you done anything in this case to assist a friend or

 4   in which you have any kind of conflict of interest?

 5   A    I have not.

 6   Q    You mentioned communications with Andrew Stolper.  To

 7   avoid any claims by someone that there could be any potential

 8   conflict of interest or appearance of conflict of interest, the

 9   prosecution team decided that all communications with Andrew

10   Stolper be handled by Julian Andre, the former AUSA?

11   A    That's correct.

12   Q    And as it relates to this case, defendant asked you about

13   contacts with Mr. Stolper.  That was primarily to obtain these

14   judgment debtor exam transcripts and evidence from that ongoing

15   case; is that correct?

16   A    That's correct.

17              MR. SAGEL:  If we could pull up Exhibit 342,

18   page 11.

19   Q    You were here when Mark Horoupian testified.  Do you

20   recall that?

21              MR. AVENATTI:  Outside the scope, Your Honor.

22              MR. SAGEL:  It relates to the --

23              MR. AVENATTI:  Outside the scope.

24              MR. SAGEL:  It relates to the March 22nd, 2019

25   examination and why there was an examination.
```

Timestamps in left margin: 02:38PM (line 5), 02:39PM (line 10), 02:39PM (line 15), 02:40PM (line 20), 02:40PM (line 25)

```
 1              THE COURT:  Overruled.
 2   Q    BY MR. SAGEL:  You were here when Mr. Horoupian
 3   testified; is that correct?
 4   A    Yes, I was.
 5   Q    When I asked him, "What were some of the things defendant
 6   was agreeing to to get out of his bankruptcy," he mentioned
 7   there were several agreements with several creditors; isn't
 8   that correct?
 9   A    Yes.
10   Q    And one of them was that defendant had agreed, pursuant
11   to Exhibit 342, that he would make payments to his former
12   partners, including Jason Frank, millions of dollars; isn't
13   that correct?
14              MR. AVENATTI:  Objection, Your Honor.  Misstates the
15   evidence.  Misstates the document.  He knows that's false.
16              MR. SAGEL:  I can read the document.
17              THE COURT:  Sustained.
18   Q    BY MR. SAGEL:  As part of the motion to have his
19   bankruptcy dismissed, defendant signed a settlement agreement
20   with Jason Frank Law, which was the law firm of Jason Frank; is
21   that correct?
22   A    Correct.
23   Q    And under his stipulation -- or his motion to get the
24   bankruptcy dismissed, defendant said, "Under" -- defendant
25   agreed to:
```

02:40PM (5)
02:40PM (10)
02:41PM (15)
02:41PM (20)
02:41PM (25)

1          "Under the JFL settlement, JFL, which filed a

2      general unsecured claim for over $18,615,886 would

3      receive an allowed general unsecured claim of

4      $10 million.  However, absent default by the debtor

02:42PM 5      and Avenatti, as guarantor, JFL would be paid by

6      the debtor $4,850,000 in full for its allowed

7      claim.  Payment will be made in two installments:

8      A, $2 million to be paid within 60 days after the

9      dismissal date, defined below; and B, $2,850,000 to

02:42PM 10      be paid within 120 days after the dismissal date,

11      subject to the terms of the settlement agreement."

12          Do you see what I just read?

13  A    Yes.

14  Q    And based on your investigation, the March 22nd, 2019

02:42PM 15  judgment debtor exam in federal court was because defendant did

16  not pay pursuant to the settlement agreement?

17  A    That's correct.

18  Q    And that March 22nd hearing was open to the public in

19  federal court?

02:43PM 20  A    Yes, it was.

21  Q    Defendant asked you what you did about Mr. Barela's claim

22  about the Evan Jenness call to verify the accuracy of it; is

23  that correct?

24  A    Yes.

02:43PM 25  Q    And I believe he also asked you about -- I think -- my

```
  1    notes are awful.  So I think it was about the hair-flipping or
  2    the throat-slashing thing.  He asked you about two events from
  3    the Greg Barela interview.  When you interview a witness, do
  4    you just take the witness's word for everything?
02:44PM  5    A    We do not.
  6    Q    What else do you do to determine whether or not you trust
  7    what the witness is providing you?
  8    A    We look at everything:  Financial records, e-mails, text
  9    messages, interviewing other witnesses.
02:44PM 10    Q    And with Mr. Barela, did you only look into a November
 11    phone call and the incident with Mr. Arden?
 12    A    No.
 13    Q    Mr. Barela also told you that defendant provided him a
 14    fabricated and forged and fraudulent settlement agreement with
02:45PM 15    dates that did not match up to the true settlement agreement;
 16    isn't that correct?
 17              MR. AVENATTI:  Objection.  Misstates the testimony
 18    and the evidence, Your Honor.
 19              THE COURT:  Overruled.
02:45PM 20              THE WITNESS:  That's correct.
 21    Q    BY MR. SAGEL:  And in addition to him telling you that,
 22    you looked at his text messages and his e-mails between himself
 23    and the defendant?
 24    A    Yes.
02:45PM 25    Q    And you looked at bank records?
```

```
 1   A     Yes, we did.  We followed the money.

 2   Q     And in this courtroom, your understanding is it's not

 3   whether you or I or the defendant believes Mr. Barela.  All

 4   credibility determinations are made by the jury?

 5   A     Correct.

 6   Q     Defendant can call Mr. Barela any name he wants, but it's

 7   irrelevant; isn't that correct?

 8   A     Yes, it is.

 9   Q     At the end of the examination, the direct examination by

10   the defendant, he asked you what the Tabs data shows.  I'm

11   going to ask you a slightly different form of those questions.

12          You've reviewed the attorney-client trust accounts

13   and the bank records in this matter as it relates to the four

14   victims in this case; is that correct?

15          MR. AVENATTI:  Outside the scope, Your Honor.

16   Objection.

17          THE COURT:  Sustained.

18          THE WITNESS:  Yes, I have.

19          THE COURT:  The answer will be stricken.

20   Q     BY MR. SAGEL:  Defendant didn't ask you what the bank

21   records show in this matter, did he?

22   A     He did not.

23   Q     And based on your review of all the records in this case,

24   including the bank records, the text messages, the e-mails, the

25   witness interviews and testimony, do you need -- do you feel
```

```
         1    that you need the Tabs data to tell you whether or not the

         2    victims got the money they were entitled to?

         3            MR. AVENATTI:  Objection, Your Honor.  Outside the

         4    scope.

02:48PM  5            THE COURT:  Overruled.

         6            THE WITNESS:  No, I don't.  The Tabs data is

         7    irrelevant at this point.

         8            MR. AVENATTI:  Move to strike the last portion,

         9    Your Honor.

02:48PM 10            THE COURT:  It will it will be stricken.

        11    Q    BY MR. SAGEL:  Why don't you feel the need to review the

        12    Tabs data at this point?

        13    A    It's because of the two e-mails with the cost breakdown

        14    for Barela and Johnson.  It's pretty clear that those are the

02:48PM 15    funds that came out of the attorney-client trust accounts as

        16    expenses.  Furthermore, the Gardner case is a one-month case.

        17    And even if you add $100,000 in expenses, it's not going to

        18    make a difference.  She never got her money.

        19    Q    What about Michelle Phan and Long Tran?

02:49PM 20    A    In regards to Michelle Phan, she got ripped off $4 million

        21    and she never got her money.

        22            MR. AVENATTI:  Move to strike as argumentative,

        23    Your Honor.  403.

        24            THE COURT:  Everything but "She never got her money"

02:49PM 25    will be stricken.
```

```
 1   Q    BY MR. SAGEL:  And were the costs and expenses relevant
 2   to the determination in Michelle Phan's money?
 3   A    Absolutely.  It was a 7.5 percent across the board with no
 4   cost.  So, therefore, Tabs was -- doesn't help.
 5              MR. SAGEL:  No further questions, Your Honor.
 6              THE COURT:  Mr. Avenatti.
 7                    REDIRECT EXAMINATION
 8   BY MR. AVENATTI:
 9   Q    Special Agent Karlous, when did you become a plaintiff's
10   lawyer?
11              MR. SAGEL:  Objection.  Vague and argumentative.
12   Q    BY MR. AVENATTI:  When did you become a plaintiff's
13   lawyer, sir?
14              THE COURT:  Sustained.
15   Q    BY MR. AVENATTI:  Did you ever go to law school?
16   A    No.
17   Q    Did you ever represent a plaintiff on a contingency
18   basis?
19   A    I'm not an attorney.
20   Q    So I'm going to take that as a "no."  Is that fair?
21   A    It's a "no."
22   Q    All right.  You have no idea what the expenses were in
23   the Gardner matter in a single month, do you, sir?  Do you have
24   any firsthand knowledge of that?  Yes or no?
25   A    No.
```

1    Q     You think $100,000 in a month in a case, in expenses, you

2    think that's a lot of money, according to you?  Is that your

3    belief, sir?  Yes or no?

4    A     It can be.  Depends on --

02:51PM 5    Q     You have no clue, sir, isn't that true?  You have no clue

6    what a case costs to prosecute in a month, do you, sir?

7    A     No.

8    Q     Would it surprise you to learn that in some months you

9    incur a half a million dollars in expense in a case?  Would

02:51PM 10   that surprise you?

11   A     Yes, it would.

12   Q     But you have no basis of knowledge as to what these cases

13   cost to prosecute on a monthly basis, do you, sir?

14   A     I've seen the bank records.

02:51PM 15   Q     No.  Do you, sir?  Based on your personal experience.  Do

16   you?

17   A     No.

18   Q     You didn't look for the Tabs data because you thought it

19   might screw up your case.  Isn't that true, sir?

02:52PM 20            MR. SAGEL:  Objection.  Argumentative.  Asked and

21   answered.

22            THE COURT:  Asked and answered.  Sustained.

23   Q     BY MR. AVENATTI:  You said that one of the things you

24   considered as it related to Mr. Barela's credibility were his

02:53PM 25   text messages; right?

**UNITED STATES DISTRICT COURT**

```
 1   A     Yes.
 2   Q     Did you happen to see this one, the one in mid-November
 3   of 2018, when he invited me out for a martini?
 4   A     Yes.
 5   Q     And do you recall that that was around the same time
 6   period that your colleague, Mr. Sagel, got him to tell the jury
 7   on direct that he thought I had stolen his money already?  Do
 8   you recall the time frame --
 9               MR. SAGEL:  Objection.
10   Q     BY MR. AVENATTI:  -- of that?
11               MR. SAGEL:  Objection.  Argumentative.
12               THE COURT:  Rephrase the question.
13   Q     BY MR. AVENATTI:  Sir, do you recall that this martini
14   text message was in mid-November of 2018?
15   A     Yes.
16   Q     And you were sitting here when, before I brought this to
17   the attention of the jury, your colleague, Mr. Sagel here, got
18   Mr. Barela to testify that he was very upset with me in
19   November and thought I had stolen my money.  Do you recall
20   that?
21   A     Vaguely.
22   Q     You were asked about this bankruptcy filing,
23   Document 342.  Take as much time as you'd like, and point the
24   jury to the portion of the document that Mr. Sagel asked you
25   about where it says Andrew Stolper gets paid.
```

```
 1   A      It was Chase and Frank.
 2              MR. AVENATTI:  Move to strike, Your Honor.
 3              THE COURT:  It will be stricken.
 4   Q   BY MR. AVENATTI:  Sir, it's a big document.  It's a big
 5   document.  Take as much time as you need.  And my question is,
 6   is there any place within that document where I agreed to pay
 7   Andrew Stolper anything?
 8   A      I don't believe so.
 9   Q      Were you in the room when Andrew Stolper came to me years
10   after he left the U.S. Attorney's Office and practically begged
11   me for a job?  Were you in the room when that happened?
12   A      No.
13   Q      Were you in the room when I caught him stealing from the
14   law firm?
15   A      No.
16   Q      Were you in the room when Judy Regnier called me in late
17   May of 2016 to tell me that Andrew Stolper had committed fraud
18   against the law firm?
19              MR. SAGEL:  Assumes facts not in evidence,
20   Your Honor.
21              THE COURT:  Overruled.
22              THE WITNESS:  No.
23   Q   BY MR. AVENATTI:  Were you at the law firm when he was
24   walked out of the offices of the law firm due to his fraud?
25   A      No.
```

02:54PM 5
02:54PM 10
02:55PM 15
02:55PM 20
02:55PM 25

Q    You and Mr. Sagel made a big deal about this taint team
moments ago.  I want to make sure the jury understands what
happened.

         What was the first time that you remember a member
of the investigative team calling up a member of the taint team
and saying, "Hey, guys, or ladies, we need the Tabs data."
What happened?

A    I don't know.

Q    Well, I mean, I don't need the details.  I just want the
general gist for the benefit of the jury.  Tell the jury what
happened when you asked the taint team for the Tabs data,
Special Agent Karlous.

A    I didn't deal with the taint team.

Q    And no one, to the best of your knowledge, ever asked the
taint team for the Tabs data, did they?

A    I don't know whether they did or not.

Q    Well, to the best of your knowledge, did it ever happen,
sir?

         MR. SAGEL:  Objection.  Asked and answered.

         THE COURT:  Overruled.

         THE WITNESS:  I don't know.

Q    BY MR. AVENATTI:  To the best of your knowledge --
certainly you know whether, to the best of your knowledge, it
happened.  Please listen to my question.

         To the best of your knowledge, did anyone ever ask

```
 1    the taint team for the Tabs data?  Yes or no?
 2              MR. SAGEL:  Asked and answered.
 3              THE COURT:  Overruled.
 4              THE WITNESS:  I don't know.
02:57PM 5    Q    BY MR. AVENATTI:  Mr. Sagel asked you about the
 6    QuickBooks records for Marjorie Hendricks.  Do you recall that?
 7    A    Yes.
 8    Q    So how current was the QuickBooks -- were the QuickBooks
 9    records that Marjorie Hendricks had?
02:58PM 10   A    I don't recall.
 11   Q    I mean, were those QuickBooks records a year old?
 12   A    We would have subpoenaed her in 2019.
 13   Q    Sir, that --
 14             MR. AVENATTI:  Move to strike as nonresponsive.
02:58PM 15             THE COURT:  It will be stricken.
 16   Q    BY MR. AVENATTI:  Special Agent Karlous, my question is
 17   very simple.  Mr. Sagel asked you a question and got you to
 18   tell the jury that you got QuickBooks records from Marjorie
 19   Hendricks.  Do you recall that, moments ago?
02:58PM 20   A    Yes.
 21   Q    Okay.  How current was the QuickBooks data you got from
 22   Marjorie Hendricks?
 23   A    I don't know.  I haven't reviewed those records in a long
 24   time.
02:58PM 25   Q    When was the last time that Marjorie Hendricks got a copy
```

1    of the Eagan Avenatti QuickBooks records?

2    A    I don't know.  I don't recall.

3    Q    So for all you know, the QuickBooks data that you

4    obtained from Marjorie Hendricks was five years old; right?

02:59PM  5    A    It could have been.

6    Q    You don't know; right?

7    A    Sitting here right now, I haven't reviewed the records.

8    Q    And so you don't know?

9    A    Sitting here right now, I don't know.

02:59PM 10    Q    And you've been sitting here the entire trial; right?

11    A    Yes.

12    Q    And the jury doesn't know either how current the

13    QuickBooks data was; right?  They have no way of knowing that,

14    do they, based on what you've seen?

02:59PM 15    A    Correct.

16    Q    And the QuickBooks files that Ms. Regnier mentioned,

17    according to Mr. Sagel during the search warrant, do you know

18    what the -- how current that data was?

19    A    Off the top of my head, I can't recall.

02:59PM 20    Q    Do you know if that was a backup from years prior?

21    A    I don't recall.

22    Q    What was the last entry on the QuickBooks data, as far as

23    a date, that John Drum used?

24    A    I'd be guessing.

03:00PM 25    Q    You have no idea, do you?

```
      1    A    I have an idea, but I'd be guessing.

      2    Q    Okay.  Did you look at the last update on the QuickBooks

      3    data file that John Drum used?

      4    A    I don't recall.

03:00PM  5    Q    Sir, do you generally like to deal with stale data or

      6    current data?

      7    A    Both.

      8    Q    Exhibit 48.  You were asked about this document.  You're

      9    not suggesting that this is electronic data, are you?

03:01PM 10    A    I don't know.

     11    Q    Well, no, this page, this is not electronic data, is it?

     12    A    It's a page.

     13    Q    Right.  It's a page printed from some program at some

     14    point in time; right?

03:02PM 15    A    Yes.

     16    Q    Sir, did the law firm ever deduct multiple cost payments

     17    from a client's settlement?

     18              MR. SAGEL:  Objection.  Outside the scope.

     19              THE COURT:  Overruled.

03:02PM 20              MR. SAGEL:  And foundation.

     21              THE COURT:  Overruled.

     22              THE WITNESS:  Yes, I think so.

     23    Q    BY MR. AVENATTI:  So you have no idea if the Barela cost

     24    and the Johnson cost that Mr. Sagel had you testify about were

03:02PM 25    complete cost deductions or interim cost deductions, do you,
```

```
 1   sir?  You don't know?

 2   A     That you took out of the bank account.

 3   Q     So what?

 4         Here's my question:  You don't know if those cost

 5   deductions were partial or complete, do you?

 6   A     Really doesn't matter at this point.

 7         MR. AVENATTI:  Move to strike, Your Honor.

 8         THE COURT:  It will be stricken.

 9   Q     BY MR. AVENATTI:  Sir, you don't know whether those cost

10   amounts were interim or final, do you?

11   A     I do not know.

12         THE COURT:  We'll take the midafternoon break here,

13   ladies and gentlemen.  Be in recess for 15 minutes.  Please

14   remember the admonition not to discuss the case with anyone,

15   not to form any opinions on the issues in the case until it's

16   submitted to you, and no research, please.

17         THE COURTROOM DEPUTY:  All rise.

18         (Out of the presence of the jury.)

19         THE COURT:  Yes?

20         MR. AVENATTI:  Your Honor, I object to and I request

21   a curative instruction relating to this taint team issue for

22   the following reason:  The idea that the Government is now

23   going to try to blame the taint team for not giving them the

24   Tabs data is completely erroneous and baseless.

25         THE COURT:  Sir, that's an argument to be made to
```

```
 1    the Court when we get to discussion of the Tabs data.
 2              MR. AVENATTI:  I want to make --
 3              THE COURT:  I don't see a need for a curative
 4    instruction for that purpose.
03:05PM 5              MR. AVENATTI:  Well, the idea that they can point
 6    the finger, Your Honor, in front of the jury to the taint team,
 7    I object to that.  I think it's erroneous.  It's prejudicial.
 8    And it's just simply not accurate.
 9              And the last thing I'll say about this at this point
03:05PM 10    is as follows:  Your Honor has seen all kinds of bank records
 11    in this case relating to payments to other clients.  If there
 12    was any privilege issue associated with that, then they have
 13    purposely violated the attorney-client privilege that existed
 14    with those other clients.  They've taken the position there is
03:05PM 15    no privilege.  So how could there possibly be any privilege in
 16    the Tabs data, Your Honor?
 17              THE COURT:  I haven't heard one asserted.
 18              MR. AVENATTI:  I'm sorry?
 19              THE COURT:  I haven't heard a privilege asserted
03:05PM 20    with respect to the Tabs data.
 21              MR. AVENATTI:  That's my point.  There was never any
 22    privilege associated with the Tabs data --
 23              THE COURT:  Sir, you're tilt at windmills.  They
 24    never asserted privilege with respect to it.
03:06PM 25              MR. AVENATTI:  Your Honor, they're blaming the taint
```

```
 1    team for not giving them the data associated with Tabs, acting

 2    like it was privileged.

 3              THE COURT:  I see no need for cautionary instruction

 4    at this point.  What the Government's obligation is -- what the

 5    prosecution team's obligations were vis-a-vis the taint team,

 6    we'll take up as part of the discussion of the Tabs data.

 7              We'll be in recess.

 8              (Recess from 3:06 p.m. to 3:25 p.m.)

 9              (In the presence of the jury.)

10              THE COURT:  Mr. Avenatti.

11    Q    BY MR. AVENATTI:  Special Agent Karlous, everyone who

12    works on the taint team in this case works for the Department

13    of Justice; isn't that true?  Yes or no?

14    A    There were some that worked for the U.S. Treasury

15    Department as well.

16    Q    So everyone on the taint team worked for either the

17    Department of Justice or the U.S. Treasury Department; correct?

18    A    I believe so.

19    Q    And just so the jury's clear, you were the lead agent on

20    this case; is that right?

21    A    I started the case and Special Agent James Kim joined me

22    as a co-case agent.

23    Q    So you were co-lead agents with Special Agent Kim; right?

24    A    Correct.

25    Q    And Mr. Sagel asked you about Ms. Regnier telling you
```

```
     1    that the QuickBooks records did not include entries for

     2    Mr. Johnson from February 2017 through June 2018.  Do you

     3    recall that?

     4    A    Yes.

03:26PM  5    Q    Did the QuickBooks file that Mr. Drum used include

     6    entries for those dates, or was that also incomplete?  Or do

     7    you know?

     8    A    He got the QuickBooks.  So if they were missing for those

     9    days, I'm assuming he did have those dates.

03:27PM 10    Q    You don't know which version of the QuickBooks he got

    11    though; correct?

    12    A    No.

    13    Q    Meaning I'm correct; you don't know?

    14    A    I don't even know if there's more than one version.

03:27PM 15    Q    Because you never checked; right?  That's why you don't

    16    know whether there's more than one version, because you never

    17    attempted to verify it, did you?  Yes or no?

    18    A    I think it's incorrect.

    19    Q    So you did attempt to verify whether there was more than

03:27PM 20    one version, sir?  Yes or no?

    21    A    When you install a new version, it's going to pick up the

    22    old data, and that will become the new version.

    23    Q    Sir --

    24              Move to strike as nonresponsive.

03:28PM 25              THE COURT:  Denied.
```

```
 1   Q    BY MR. AVENATTI:  Here's my question.  I'm talking about
 2   the data file.  I'm not talking about the software version.
 3   I'm talking about the actual data file, the database that
 4   QuickBooks uses.  Do you have that in mind?
 5   A    Yes.
 6   Q    Okay.  What is the extension on the data file for
 7   QuickBooks?
 8   A    I don't recall.
 9   Q    Isn't it .qdb?
10   A    I don't recall.
11   Q    Have you ever known?
12   A    Sure.
13   Q    Okay.  Did you ever take multiple QuickBooks data files
14   and compare them from this case to see which one was the most
15   current?
16   A    Whatever the taint team gave us is what we used.
17             MR. AVENATTI:  Move to strike.
18             THE COURT:  It will be stricken.
19             MR. AVENATTI:  Can I have it read back please.
20             THE COURT:  You may.
21             MR. AVENATTI:  Please just answer my question.
22             **(The question was read by the reporter as follows:**
23             **"Okay.  Did you ever take multiple QuickBooks**
24        **data files and compare them from this case to see**
25        **which one was the most current.")**
```

03:28PM timestamps appear at lines 5, 10, 15, 20, 25.

```
 1              THE WITNESS:  No.
 2    Q    BY MR. AVENATTI:  Now, you were asked about the six to
 3    seven boxes of materials.  And you said that you called the
 4    team leader who executed the search to see if they were within
 5    the scope or outside of the scope.  Do I have that correct?
 6    A    Partially.
 7    Q    Well, Mr. Sagel asked you about the six to seven boxes of
 8    materials; right?
 9    A    Yes.
10    Q    And he asked you whether you had contacted the team
11    leader after Ms. Regnier had called you.  He asked you that;
12    right?
13    A    Yes.
14    Q    And you said that you had; correct?
15    A    Yes.
16    Q    Okay.  I want to write down his or her name.  Who was
17    that?
18    A    First name is Greg, and I don't recall his last name.
19    Q    I mean, do you recall an initial or anything?  I mean,
20    you were the co-lead agent; right?
21    A    I can get it for you.  I'm just -- I'm going to butcher
22    it.  I don't recall exactly his last name.
23    Q    All right.  But you'll agree to give it to me later;
24    right?
25    A    Sure.
```

03:30PM  5
03:30PM 10
03:30PM 15
03:30PM 20
03:31PM 25

**UNITED STATES DISTRICT COURT**

```
 1    Q    Okay.  And when did you call -- I guess we'll call him
 2    Greg.  When did you call Greg, exactly, after Ms. Regnier
 3    called you about these boxes of documents?
 4    A    Shortly thereafter.
 5    Q    So is that, like, the next day?  A week?  A month?  What?
 6    A    No.  Same day.  Couple days.  I'm going off of memory.
 7    Q    And then Mr. Sagel asked you about the fact that because
 8    they were outside the scope, by law you could not seize the
 9    documents.  Do you remember he asked you that question,
10    pursuant to the search warrant?
11    A    Correct.
12    Q    Right.  Ms. Regnier offered to allow you to take the
13    documents, didn't she?
14    A    She did.
15    Q    No warrant was required in light of her offer to allow
16    you to take the documents; isn't that true, sir?
17    A    I didn't think she had the authority to handle the
18    documents.
19    Q    But you thought she had the authority to hand over that
20    box of documents on March 26th, didn't you?  Yes or no?
21    A    Yes.  Because we forgot it.
22              MR. AVENATTI:  Move to strike after "yes" as
23    nonresponsive.
24              THE COURT:  It will be stricken.
25    Q    BY MR. AVENATTI:  The search warrant, sir, that you
```

Timestamps in left margin: 03:31PM (line 5), 03:31PM (line 10), 03:32PM (line 15), 03:32PM (line 20), 03:32PM (line 25)

```
 1   executed didn't have some limited date range, it had a range of
 2   2011 to 2019, about eight to nine years; isn't that true?
 3   A    That sounds about right, but I haven't looked at it in a
 4   long time.
 5   Q    And you have no firsthand knowledge as to whether any of
 6   the documents in those six to seven boxes that were ultimately
 7   shredded, whether any of those documents fell within that time
 8   period?  You don't know personally, do you?
 9   A    I don't know, and I shouldn't have known.
10             MR. AVENATTI:  Move to strike after "I don't know"
11   as nonresponsive.
12             THE COURT:  After "I don't know" will be stricken.
13   Q    BY MR. AVENATTI:  You were asked about some wire
14   transfer --
15             Bless you.
16             You were asked about some wire transfer that took
17   place on May 4.  Do you recall that?
18   A    Yes.
19   Q    You don't know what communications occurred between me
20   and my bank on that day, do you?
21   A    I do not.
22   Q    You don't know who I spoke with, if anyone, at the bank
23   that day, do you?
24   A    Correct.
25   Q    You don't know what steps I had to take, if any, on that
```

03:33PM 5
03:33PM 10
03:34PM 15
03:34PM 20
03:34PM 25

 1    day to execute a wire, do you, on that day?

 2    A    No.

 3    Q    And you don't know if any exception was made to execute

 4    that wire, even though I may have been either in town or out of

03:35PM 5    town, do you?

 6    A    No.

 7    Q    You were asked about Mr. Stolper and the fact that the

 8    precaution had been taken to have Mr. Andre deal with

 9    Mr. Stolper instead of Mr. Sagel.  Do you recall that?

03:35PM 10   A    Yes.

 11   Q    How many people work in the U.S. Attorney's Office as

 12   assistant U.S. attorneys for the Central District of

 13   California, sir?

 14   A    No idea.

03:35PM 15   Q    About 100?

 16   A    Possibly.

 17   Q    And despite Mr. Sagel's personal relationship with Andrew

 18   Stolper, a witness in the case and a, quote, "good friend,"

 19   closed quote, Mr. Sagel was never taken off this case, was he?

03:36PM 20   A    He's not our witness.

 21        MR. AVENATTI:  Move to strike, Your Honor.

 22        THE COURT:  It will be stricken.

 23   Q    BY MR. AVENATTI:  Sir, please just answer my question.

 24        Can I have it read back?

03:36PM 25        THE COURT:  You may.

```
             1          (The question was read by the reporter as follows:

             2          "And despite Mr. Sagel's personal

             3      relationship with Andrew Stolper, a witness in the

             4      case and a, quote, 'good friend,' closed quote,

03:36PM      5      Mr. Sagel was never taken off this case, was he.")

             6          MR. SAGEL:  Objection, Your Honor.  Based on the

             7  answer, assumes fact not in evidence.

             8          THE COURT:  Overruled.

             9          THE WITNESS:  I don't know anything about their

03:36PM     10  personal relationship.

            11  Q    BY MR. AVENATTI:  Was Mr. Sagel ever asked to get off the

            12  case?

            13  A    I'm not aware of that.

            14  Q    Did Mr. Sagel ever offer to withdraw from the case

03:37PM     15  because of his relationship with Mr. Stolper?

            16  A    No.

            17          MR. AVENATTI:  Nothing further.

            18                    RECROSS-EXAMINATION

            19  BY MR. SAGEL:

03:37PM     20  Q    I'll just ask the simplest question that was just asked

            21  to be struck.

            22          Was Mr. Stolper ever a witness in this case?

            23  A    No.

            24  Q    Defendant asked you -- defendant asked you questions

03:38PM     25  about Mr. Drum's analysis and whether he relied on an
```

incomplete data set from the QuickBooks.  Do you remember that question?

        MR. AVENATTI:  Misstates the question and the evidence, Your Honor.

        THE COURT:  Overruled.

        MR. SAGEL:  I'll start over because I don't even remember what I said.  So let me start over.

Q   Do you remember being asked a question about Drum's analysis and whether or not he was relying on missing or incomplete QuickBooks based on what Ms. Regnier told you about the 2017 and 2018 Johnson payments?  Do you remember those questions?

A   Yes.

Q   And you were here for John Drum's testimony?

A   Yes.

Q   John Drum testified, and what he was relying upon were records up until 2015; isn't that correct?

A   I believe so.

Q   So any of the QuickBooks records that, at defendant's direction, Ms. Regnier did not input in 2017 and 2018 was not what Mr. Drum was relying upon at all, was it?

A   Correct.

Q   Defendant asked you questions whether or not you had firsthand knowledge of the Gardner cost and whether or not a half a million dollars in a month of costs in a case would

```
          1   surprise you.  Do you remember those questions?
          2   A     Yes.
          3   Q     He didn't show you anything with those costs, did he?
          4   A     No.
03:40PM   5              MR. AVENATTI:  Objection.  Argumentative,
          6   Your Honor.
          7              THE COURT:  Overruled.
          8              THE WITNESS:  No.  No receipts.
          9              MR. AVENATTI:  Move to strike everything after "No"
03:40PM  10   as argumentative.
         11              THE COURT:  It will be stricken as nonresponsive.
         12   Q     BY MR. SAGEL:  He didn't show you any receipts?
         13              MR. AVENATTI:  Objection.  Argumentative,
         14   Your Honor.
03:40PM  15              THE COURT:  Overruled.
         16              MR. AVENATTI:  I don't have to prove anything.
         17              THE WITNESS:  He did not.
         18   Q     BY MR. SAGEL:  And you have, however, looked at
         19   Exhibit 148, which is -- if I pull up the right thing -- the
03:41PM  20   attorney-client trust account where the $2.75 million of
         21   Ms. Gardner's settlement payment was made; is that correct?
         22   A     Yes, I have.
         23   Q     And you've seen the two withdrawals from that case; is
         24   that correct?
03:41PM  25   A     Yes.
```

```
          1   Q    Let's start with --
          2            MR. AVENATTI:  Outside the scope, Your Honor.
          3   Objection.
          4            THE COURT:  Overruled.
03:41PM   5   Q    BY MR. SAGEL:  With regards to the half a million dollars
          6   in a month, was there a withdrawal for a half a million dollars
          7   in the two withdrawals the following day?
          8   A    No.
          9   Q    Defendant asked you about the May 4th wire to Michelle
03:42PM  10   Phan.  He asked you whether or not you know who he spoke to on
         11   that day; is that correct?
         12   A    Correct.
         13   Q    He asked you, you don't know what steps he took to
         14   execute the wire on that day.  Do you remember that question?
03:42PM  15   A    Yes.
         16   Q    He asked you, you don't know, even if he was in town or
         17   not, what he would need to do; is that correct?
         18   A    Yes.
         19   Q    What you also do not know is why, if Michelle Phan's
03:42PM  20   money went into the account two months earlier, it took until
         21   May 4, 2018, to pay her any of her money, do you?
         22            MR. AVENATTI:  Objection.  Argumentative,
         23   Your Honor.
         24            THE COURT:  Overruled.
03:42PM  25            THE WITNESS:  Correct.
```

```
 1    Q    BY MR. SAGEL:  And you do know where $4 million of her
 2    money went during those two months, don't you?
 3              MR. AVENATTI:  Objection.  Argumentative.  Outside
 4    the scope.
 5              THE COURT:  Overruled.
 6              THE WITNESS:  Yes, I do.  We followed the money.
 7              MR. AVENATTI:  Move to strike everything after "I
 8    do" as nonresponsive and argumentative.
 9              THE COURT:  Denied.
10    Q    BY MR. SAGEL:  And who received that $4 million from
11    Ms. Phan's second payment in March of 2018?
12    A    Mr. Avenatti did, plus it went to his bankruptcy attorney.
13    And then approximately 1.5 million went to the IRS to pay a
14    debt.
15              MR. SAGEL:  No further questions, Your Honor.
16              THE COURT:  May the witness be excused?
17              MR. AVENATTI:  No.
18              MR. SAGEL:  He'll be sitting here, Your Honor.
19              THE COURT:  You may step down, sir.
20              Are we at the point the parties wanted me to read a
21    stipulation?
22              MR. AVENATTI:  Your Honor, I think we're going to
23    take care of that in the morning.  I'd like to call my next
24    witness.
25              THE COURT:  That's fine.
```

**UNITED STATES DISTRICT COURT**

```
 1              MR. AVENATTI:  The defense calls Hillary Wolett.
 2              THE COURTROOM DEPUTY:  Please stand behind the court
 3      reporter and raise your right hand.
 4              HILLARY WOLETT, DEFENSE WITNESS, WAS SWORN
03:45PM  5              THE COURTROOM DEPUTY:  If you'll please state and
 6      spell your first and last name.
 7              THE WITNESS:  Yes.  It's Hillary Wolett.
 8      H-i-l-l-a-r-y, W-o-l-e-t-t.
 9              THE COURT:  Mr. Avenatti.
03:46PM 10                     DIRECT EXAMINATION
11      BY MR. AVENATTI:
12      Q    Ms. Wolett, good morning -- or afternoon, actually.  It's
13      been a long day.
14      A    Yes.
03:46PM 15      Q    You and I have not spoken in some time; is that right?
16      A    Correct.
17      Q    And you're here pursuant to a subpoena that I caused to
18      be served on you to testify; is that right?
19      A    Yes.
03:46PM 20      Q    Can you please tell the jury a little bit about your
21      educational background.
22      A    Sure.  I grew up in Laguna Beach.  Went to Laguna Beach
23      High School.  Transferred to Saddleback College.  Transferred
24      to Concordia College.  And then I transferred to TCU in Dallas
03:46PM 25      area where I graduated with a degree in history.
```

UNITED STATES DISTRICT COURT

```
 1  Q     And at some point in time, you came to work at Eagan
 2  Avenatti, LLP; is that right?
 3  A     Yes.
 4  Q     And when was that?
 5  A     August 2011.
 6  Q     And initially you interviewed with Ms. Regnier; is that
 7  right?
 8  A     Correct.
 9  Q     And you were then hired into the job as a receptionist;
10  is that right?
11  A     Yes.
12  Q     And you stayed at the firm until early 2019; is that
13  right?
14  A     Yes.
15  Q     So you were there for a little less than -- about seven
16  and a half years?
17  A     Yes.
18  Q     And during that seven-and-a-half-year time period, did
19  your responsibilities and your role at the firm change?
20  A     Yes.
21  Q     Could you please describe generally for the jury what you
22  did when you first got at the firm and then how your role
23  expanded over that time period.
24  A     Sure.  So when I started, I basically just answered the
25  phones, got the mail, received packages from FedEx or UPS.  And
```

```
 1    then a -- I think a legal assistant left, and so I kind of took

 2    on some her responsibilities with our legal filing and

 3    indexing.  And our bookkeeper left, and I helped take over her

 4    attorney time and ordering supplies for our office.

 5    Q    And you said the bookkeeper left?

 6    A    Uh-huh.

 7    Q    That was Ms. Morgan Witos; right?

 8    A    Yes.  Correct.

 9    Q    And Ms. Witos assisted Ms. Regnier with the financial

10    bookkeeping of the firm; is that right?

11    A    Yes.

12              MR. WYMAN:  Objection.  Leading.

13              THE COURT:  Overruled.

14    Q    BY MR. AVENATTI:  And do you recall when Ms. Witos

15    approximately left the firm?

16    A    I believe it was the fall of 2014.

17    Q    Do you recall the last time that you and I communicated

18    via text?

19    A    I do not.

20              MR. AVENATTI:  Your Honor, can I approach to

21    refresh?

22              THE COURT:  You may.

23    Q    BY MR. AVENATTI:  Ms. Wolett, does that refresh your

24    recollection that the last time you and I communicated by text

25    was in December of 2018?
```

03:48PM (5)
03:49PM (10)
03:49PM (15)
03:49PM (20)
03:50PM (25)

**UNITED STATES DISTRICT COURT**

```
 1   A    Correct.  Yes, it does.
 2   Q    And at that time, do you recall sending me a message?
 3   A    Yes, I do.
 4   Q    And what do you recall sending me?
03:50PM 5   A    I sent you --
 6              MR. WYMAN:  Objection.  Calls for hearsay.
 7              THE COURT:  It will be received but not for the
 8   truth.
 9   Q    BY MR. AVENATTI:  Go ahead.
03:51PM 10  A    I sent you a thank you text message.
11   Q    And within that text message, you said that you looked
12   forward to continuing to work with me after the first of the
13   year; is that right?
14   A    Yes.
03:51PM 15  Q    And you and I generally enjoyed a good relationship when
16   you worked at the firm; is that fair?
17   A    Yes.
18   Q    A very good relationship; right?
19   A    Yes.
03:51PM 20  Q    I'm sorry?
21   A    Yes.
22   Q    Okay.  You enjoyed working at the firm?
23   A    I did.
24   Q    And did you enjoy working with me?
03:51PM 25  A    I did.
```

```
 1    Q    Now, I want to focus, if I could, on the work that you
 2    did after Ms. Witos left.
 3    A    Uh-huh.
 4    Q    Did you begin to take on more of an administrative role
 5    after she left?
 6    A    I'd say so, yes.
 7    Q    And one of the things that you did from the time that she
 8    left up through late 2018 was you maintained certain records in
 9    a program called Tabs; is that right?
10    A    Yes.
11              MR. WYMAN:  Objection.  Leading.
12              THE COURT:  Overruled.
13    Q    BY MR. AVENATTI:  And when you would enter information
14    into Tabs, how would you do that?
15    A    It was a program where I would put which attorney was
16    working on the case, the description of their work, and the
17    hours for which they worked, for that entry.
18    Q    And did you also understand that financial information
19    was kept in Tabs?
20    A    No.
21    Q    Did you -- were you responsible at all for any financial
22    information in Tabs?
23    A    No.  No.
24    Q    Did you know if Ms. Regnier or others input information
25    in Tabs?
```

03:52PM  5
03:52PM 10
03:52PM 15
03:52PM 20
03:53PM 25

```
         1    A     Judy did, yes.
         2    Q     Okay.  So you knew that financial information was tracked
         3    in Tabs, but you were not -- you did not deal with inputting
         4    it?
03:53PM  5    A     Correct.
         6    Q     You only dealt with inputting the time?
         7    A     Yes.
         8    Q     And when you would input the time for attorneys, would
         9    you get that from attorneys?
03:53PM 10    A     Yes.  Directly.
        11    Q     And did you understand that that was so that attorney
        12    time could be tracked at the firm to potentially be billed?
        13    A     Yes.
        14    Q     And from time to time, did you generate draft bills from
03:53PM 15    Tabs?
        16    A     No.
        17    Q     Who would do that when you were at the firm?
        18    A     Judy.
        19    Q     Ms. Regnier?
03:53PM 20    A     Yes.  Sorry.
        21    Q     And did you have the understanding when you were at the
        22    firm, at least during 2015 until early 2019, that the
        23    information that you put into Tabs was kept on the servers of
        24    the firm?
03:54PM 25    A     I did not know that, but...
```

**UNITED STATES DISTRICT COURT**

```
 1    Q    Well, it was kept on your --
 2    A    On my computer.
 3    Q    I'm sorry?
 4    A    On my computer.
 5    Q    When you say your computer, you don't know if it was
 6    either on your desktop computer or on a server though; right?
 7    A    Correct.
 8    Q    When you input information into Tabs, you would just
 9    double-click on an icon that was on your desktop, and you're
10    not certain where that would take you?
11    A    Yeah, to the program, I assumed.
12    Q    I'm sorry?
13    A    To the program, the Tabs program, yes.
14    Q    But you understood at the time that it was either on your
15    desktop or on the server?
16    A    Correct.
17              MR. WYMAN:  Foundation.
18              THE COURT:  Overruled.
19    Q    BY MR. AVENATTI:  Did you ever input any information into
20    QuickBooks?
21    A    No.
22    Q    Can you please briefly walk the jury through how it would
23    be that you would input the information into Tabs.  What would
24    you do?  Just so they understand.
25    A    Sure.  So it's just an icon on my desktop that I click.
```

03:54PM (line 5)
03:54PM (line 10)
03:55PM (line 15)
03:55PM (line 20)
03:55PM (line 25)

|  |  |
|---|---|
| 1 | It would open up.  I had to click a couple buttons to get to |
| 2 | where I could input the time.  I don't recall what those were. |
| 3 | And there was a drop-down list.  I could click down the list of |
| 4 | all of our cases and then a drop-down list that listed all the |
| 03:55PM 5 | attorneys in the office -- |
| 6 | Q    Ms. Wolett, please slow down just because the court |
| 7 | reporter's going to kill at least me and maybe both of us, |
| 8 | okay? |
| 9 | A    Sure. |
| 03:55PM 10 | Q    All right. |
| 11 | A    So I would select the right attorney and the right case. |
| 12 | And then I would enter the time frame that the attorney had |
| 13 | said that they worked on that.  And then I'd have to write a |
| 14 | description of the work that they did in that case. |
| 03:56PM 15 | Q    And then would you save it? |
| 16 | A    Yes.  And then I clicked "Save." |
| 17 | Q    And did you do that fairly regularly in the five years |
| 18 | between 2014 and 2019? |
| 19 | A    Yes. |
| 03:56PM 20 | Q    Do you recall tracking time for Mr. John Arden? |
| 21 | A    Yes. |
| 22 | Q    Mr. Ahmed Ibrahim? |
| 23 | A    Yes. |
| 24 | Q    Mr. Carlos Colorado? |
| 03:56PM 25 | A    Yes. |

```
 1    Q    Mr. Scott Sims, when he was at the firm?

 2    A    No.

 3    Q    Mr. Sims would track his own time?

 4    A    I don't recall.

 5    Q    You don't recall one way or the other?

 6    A    Huh-uh.

 7              THE COURT:  You need to say "yes" or "no," please.

 8              THE WITNESS:  Oh.  No.

 9    Q    BY MR. AVENATTI:  But needless to say, you recall

10    entering time for a number of attorneys; right?

11    A    Right.  Yes.

12    Q    And would Ms. Regnier ask you to generate any reports

13    from Tabs?

14    A    No.

15    Q    Did you have the understanding that she would do that on

16    her own?

17    A    Yes.

18    Q    And do you have a recollection that before you could

19    enter anything into Tabs for a particular client, that the

20    client would have to be set up with an account on Tabs?

21    A    Yes.

22    Q    And was that something that you would do?

23    A    No.

24    Q    Do you recall that while you were at the firm, that was

25    something that Ms. Regnier would do; she would establish the
```

03:56PM (line 5)
03:57PM (line 10)
03:57PM (line 15)
03:57PM (line 20)
03:58PM (line 25)

88

```
 1    client account on Tabs in order to accept the data?
 2    A    Yes.
 3    Q    And there were times when you would go to input time for
 4    a matter and, because it was fairly new, it didn't have an
 5    account set up; right?
 6    A    Right.
 7    Q    And in those instances, would you contact Ms. Regnier and
 8    ask her to set up the client matter in order to track time and
 9    costs?
10    A    I would.
11    Q    Do you recall a gentleman by the name of Greg Barela?
12    A    Yes.
13    Q    And do you remember seeing Mr. Barela in the year 2018?
14    A    Yes.
15    Q    Was Mr. Barela often in the physical offices of the law
16    firm during the year 2018?
17    A    Yes.
18    Q    How often?
19    A    I feel like I saw him probably a few times a month.
20    Q    Three?  Four?
21    A    Yeah.  I'd say about four times a month.
22    Q    So generally about once a week?
23    A    Yes.
24    Q    And that was during 2018; right?
25    A    Yes.
```

**UNITED STATES DISTRICT COURT**

```
 1    Q     And did you have the understanding that I had authorized
 2    Mr. Barela to come into the offices of our law firm and use our
 3    conference rooms and our facility as he needed?
 4    A     Yes.
 5    Q     And when you observed Mr. Barela during the year 2018,
 6    did you understand that he was restricted in what he could do
 7    within our office space?
 8    A     No.
 9    Q     Did you observe Mr. Barela treat the law firm offices as
10    his own?
11    A     Yes.
12    Q     Did you observe him use our conference rooms?
13    A     Yes.
14    Q     Did you observe him use our kitchen?
15    A     Yes.
16    Q     Did you observe him have meetings with other people in
17    the offices?
18    A     Yes.
19    Q     Did you observe him utilize our copy facilities?
20                MR. WYMAN:  403, Your Honor.
21                THE COURT:  One more question in this line.
22    Q     BY MR. AVENATTI:  Did you observe Mr. Barela utilize our
23    copy facilities?
24    A     I can't say, because it wasn't the direction I was facing
25    in the office.
```

04:00PM  5
04:00PM 10
04:00PM 15
04:00PM 20
04:01PM 25

```
 1   Q    It was in the back part of the office?

 2   A    Uh-huh.

 3   Q    During 2018, did you observe Mr. Barela walk back to the

 4   attorney offices from time to time?

 5   A    Yes.

 6              MR. WYMAN:  403.

 7              THE COURT:  Overruled.

 8   Q    BY MR. AVENATTI:  Yes?

 9   A    Yes.

10   Q    And were you aware in 2018 that Mr. Barela at times would

11   go back to the offices to meet with the other attorneys?

12   A    I can't say, because it's not the direction I was facing

13   again.

14   Q    BY MR. AVENATTI:  But you saw him walk in that direction?

15   A    Yes.

16   Q    And during 2018, did you observe Mr. Barela meet with

17   Ms. Regnier?

18   A    Not from where I was facing, again.

19   Q    Did you observe Mr. Barela meet with me in the conference

20   rooms?

21   A    Yes.

22   Q    Did you observe Mr. Barela meet with Mr. Ibrahim?

23   A    I can't remember.

24   Q    How about Mr. John Arden?

25   A    I think so.
```

04:01PM (lines 5, 10, 15)
04:02PM (lines 20, 25)

```
 1    Q    But you're not certain?

 2    A    Right.

 3    Q    In 2018, March, did Mr. Barela voice any complaints to

 4    you about Mr. Ibrahim or Mr. Barela [sic]?

 5    A    Mr. Arden?

 6    Q    I'm sorry.  Strike that.  It's been a long day.

 7              In March of 2018, did Mr. Barela voice any

 8    complaints to you about Mr. Ibrahim or Mr. Arden?

 9    A    No.

10    Q    Did Mr. Barela generally appear to be happy when he was

11    in the offices of the law firm?

12    A    Yes.

13    Q    I'm going to warn you in advance, this is going to be a

14    terrible drawing, but please bear with me.

15              (Pause in proceedings.)

16    Q    Do you see that?

17    A    Yes.

18    Q    Okay.  Now, I think everyone will stipulate that I am no

19    artist.  But here is my question:  Is this generally the layout

20    of the reception area and the law firm?

21    A    Yes.

22    Q    And you sat approximately here?

23    A    Yes.

24    Q    This is the reception desk?

25    A    Yes.
```

04:02PM appears at line 5
04:02PM appears at line 10
04:04PM appears at line 15
04:05PM appears at line 20
04:05PM appears at line 25

**UNITED STATES DISTRICT COURT**

```
 1   Q    Entrance to the firm?

 2   A    Yes.

 3   Q    The lobby sitting area here?

 4   A    Yes.

 5   Q    The small conference room here, which I've labeled "B"?

 6   A    Yes.

 7   Q    And a large conference room labeled "A"; correct?

 8   A    Yes.

 9   Q    And then down this hallway and around the corner were the

10   attorney offices; is that right?

11   A    Yes.

12   Q    In March of 2018 or at any point -- at that -- I'll

13   strike that.

14        At any point in time ever, did you observe Mr. Arden

15   anywhere in this area, in the lobby area or in the hallway

16   motioning to Mr. Ahmed, who was sitting with Mr. Barela in the

17   conference room?

18   A    No.

19   Q    Did you ever observe Mr. Barela with Mr. Ibrahim, and at

20   the same time Mr. Arden make a motion across his throat to say

21   "stop talking"?

22             MR. WYMAN:  Asked and answered.

23             THE COURT:  Overruled.

24             THE WITNESS:  No.

25   Q    BY MR. AVENATTI:  Did you ever observe Mr. Ibrahim with
```

```
    1   Mr. Barela and Mr. Arden toss his hair in a way that would

    2   signal anything to Mr. Ibrahim?

    3           You're looking at me in a puzzled look.  I'm going

    4   to take that as a no.

04:06PM 5   A    Yeah.  No.

    6   Q    Never happened?

    7   A    No.

    8   Q    And during the working hours of the firm, you were

    9   regularly in this spot near the reception desk; right?

04:07PM 10  A    Yes.

   11   Q    This is where you did your work?

   12   A    Right.

   13   Q    Now, at any point in time, did Mr. Barela say to you or

   14   anyone else, to the best of your knowledge, "John Arden and

04:07PM 15  Ahmed Ibrahim are avoiding me"?

   16   A    No.

   17   Q    Did he ever say anything to you along the lines of, "I

   18   don't know why they won't tell me about my settlement payment"?

   19   A    No.

04:07PM 20  Q    Did Mr. Barela ever complain to you that Mr. Ibrahim or

   21   Mr. Arden were avoiding him?

   22   A    No.

   23   Q    Did Mr. Barela ever complain to you about not having

   24   adequate access to the law firm or its attorneys?

04:08PM 25  A    No.
```

**UNITED STATES DISTRICT COURT**

```
 1              MR. AVENATTI:  Thank you.  Nothing further,
 2    Your Honor.
 3              THE COURT:  Mr. Wyman.
 4                      CROSS-EXAMINATION
 5    BY MR. WYMAN:
 6    Q    Good afternoon, Ms. Wolett.
 7    A    Hello.
 8    Q    The defendant asked you a bunch of questions about Tabs.
 9    A    Uh-huh.
10    Q    As I understand your testimony, you had no involvement
11    with the finances of the firm; is that right?
12    A    That's correct.
13              MR. WYMAN:  No further questions.  Thank you.
14              THE COURT:  Mr. Avenatti.
15              MR. AVENATTI:  Nothing further.
16              THE COURT:  May the witness be excused?
17              MR. AVENATTI:  Yes.
18              MR. WYMAN:  Yes, Your Honor.
19              THE COURT:  You may be excused.  Thank you.
20              Call your next witness, please.
21              MR. AVENATTI:  Yes, sir.  The defense calls Kathy
22    Mosby.
23              THE COURTROOM DEPUTY:  Please stand behind the court
24    reporter and raise your right hand.
25              KATHERINE SNEDDON, DEFENSE WITNESS, WAS SWORN
```

Timestamps: 04:09PM (line 5), 04:09PM (line 10), 04:09PM (line 15), 04:10PM (line 20), 04:12PM (line 25)

**UNITED STATES DISTRICT COURT**

```
 1              THE COURTROOM DEPUTY:  Please state and spell your
 2   first and last name.
 3              THE WITNESS:  Katherine Sneddon, K-a-t-h-e-r-i-n-e,
 4   S-n-e-d-d-o-n.
 5              THE COURT:  Mr. Avenatti.
 6                        DIRECT EXAMINATION
 7   BY MR. AVENATTI:
 8   Q    Ms. Mosby, good afternoon.  You and I have not spoken in
 9   some time?
10   A    Correct.  Yes.
11   Q    When did we first start working together?
12   A    Probably in 2004.  '3 or '4.
13   Q    And at the time, you and I did not work at the same law
14   firm; is that right?
15   A    Yes.
16   Q    And you were working for another law firm that was
17   co-counsel with me on a case; is that right?
18   A    Yes.
19   Q    And then in August of 2007, you began working at a new
20   law firm; right?
21   A    Yes.
22   Q    And the name of that law firm was Eagan O'Malley &
23   Avenatti?
24   A    Yes.
25   Q    And when you first started working at that new law firm,
```

04:12PM (line 5)
04:12PM (line 10)
04:13PM (line 15)
04:13PM (line 20)
04:13PM (line 25)

```
 1    you were Co-Employee Number 1; is that right?
 2    A     Yes.
 3    Q     And who was the other part of Co-Employee Number 1?
 4    A     Judy Regnier.
 5    Q     And initially when we started that firm, it was you and
 6    Ms. Regnier and me and a gentleman by the name of John O'Malley
 7    and a gentleman by the name of Michael Eagan; right?
 8    A     Correct.
 9    Q     And at the time, we were at 450 Newport Center Drive; is
10    that right?
11    A     Yes.
12    Q     And then later, the firm moved to 520 Newport Center
13    Drive?
14    A     Yes.
15    Q     Now, when we started the firm in August of 2007 or
16    thereabouts, what was your role?
17    A     Legal assistant.
18    Q     We didn't have a lot of people that worked with us at
19    that point, did we?
20    A     No.
21    Q     It was a start-up firm; right?
22    A     Yes.
23    Q     So all of us did a little bit of everything; right?
24    A     Yes.
25    Q     From making copies or whatever had to be done; right?
```

04:14PM  (line 5)
04:14PM  (line 10)
04:15PM  (line 15)
04:15PM  (line 20)
04:15PM  (line 25)

UNITED STATES DISTRICT COURT

```
 1   A    Yes.
 2   Q    Now, at the time the firm was founded, I had brought
 3   cases with me to start the firm, as had Mr. O'Malley; right?
 4   A    I believe so, yes.
 5   Q    And you served as a legal assistant to a number of
 6   attorneys in the firm on a go-forward basis, but predominantly
 7   you were a legal assistant for me; is that right?
 8   A    Yes.
 9   Q    And is it fair to say that you and I enjoyed a very close
10   working relationship?
11   A    Yes.
12   Q    A professional one at all times but a very close one?
13   A    Yes.
14   Q    And can you describe generally for the jury what tasks
15   you performed at the firm, at least initially?
16   A    Legal work, making sure the mail comes in in the law firm,
17   to see what comes in, and make sure everything gets calendared
18   correctly and all the dates are calendared so that nothing gets
19   missed, and filing documents with the Court, and generally
20   making sure everything ran smoothly.
21   Q    And, ultimately, you were at the firm until -- well,
22   technically, I think 2018; is that right?
23   A    Correct.
24   Q    You had actually wanted to leave in 2017 to go pursue
25   some other interest; is that right?
```

```
              1    A      Correct.
              2    Q      And you came to me, and you asked me if you could do
              3    that; right?
              4    A      No.
    04:18PM   5    Q      Okay.  Ultimately you were able to continue to be paid
              6    even after you had left the firm?
              7    A      Yes.
              8    Q      And that was something that I had agreed to do to help
              9    you out; right?
    04:18PM  10    A      Yes.
             11    Q      Because you were ready to pursue your dreams?
             12    A      Correct.
             13    Q      And up until that time, you and I had been through a lot;
             14    right?
    04:18PM  15    A      Yes.
             16    Q      Now, during this time period, as the firm grew, we added
             17    other employees; is that right?
             18    A      Yes.
             19    Q      And one of the individuals who you mentioned earlier,
    04:19PM  20    Ms. Regnier, she also assisted with the management of the firm;
             21    is that right?
             22    A      Yes.
             23    Q      And at one point, you and Ms. Regnier were very close
             24    early on; right?
    04:19PM  25    A      Yes.
```

```
  1   Q    But ultimately, one of the reasons why you left was
  2   because you could no longer work with Ms. Regnier?
  3   A    Yes.
  4   Q    Now, during the approximate ten years that you were at
04:20PM 5   the firm, did you deal with clients?
  6   A    Somewhat, yes.
  7   Q    You would take their calls, sometimes answer their
  8   questions, pass their messages along, things of that nature; is
  9   that right?
04:20PM 10  A    Correct.
 11   Q    And generally speaking, you worked a lot of hours at the
 12   law firm during the ten years that you were there; is that
 13   right?
 14   A    Yes.
04:20PM 15  Q    And do you recall generally as a group, we all worked
 16   pretty hard during that ten-year time period?
 17            MR. SAGEL:  Objection.  401, 403 at this time,
 18   Your Honor.
 19            THE COURT:  Sustained.
04:20PM 20  Q    BY MR. AVENATTI:  Ms. Regnier [sic], there's been a --
 21   I'm not going to call it a suggestion, I'm going to call it
 22   more than a suggestion --
 23            MR. SAGEL:  I don't think --
 24            MR. AVENATTI:  I'm not even done.  I'm not even
04:21PM 25  done.
```

1      MR. SAGEL:  You called her Ms. Regnier.

2   Q   BY MR. AVENATTI:  Ms. Mosby.  Apologize.

3   A   Thank you.

4   Q   Ms. Mosby, there's been a suggestion, more than a

04:21PM 5   suggestion in this case, by Mr. Sagel and Mr. Wyman, that I was

6   a slacker, a glory hound, who never really put in the work day

7   to day.

8      So here's my question:  While you were at the firm

9   for ten years, how would you describe my work ethic?

04:22PM 10      MR. SAGEL:  Is he asking for 404 evidence,

11  Your Honor?

12      THE COURT:  Sounds like it.

13      MR. AVENATTI:  Strike that.  I'll ask a different

14  question.

04:22PM 15  Q   BY MR. AVENATTI:  What did you observe when you were at

16  the firm as it related to the amount of work that I did in

17  connection with the client matters that we had at the firm?

18  A   That you worked very hard.

19  Q   Did you observe that I was involved day to day on many

04:22PM 20  matters at the firm?

21  A   Yes.

22  Q   Did I only get involved in cases when it came time for

23  them to settle or go to mediation?

24  A   No.

04:22PM 25  Q   I worked up the cases, didn't I?

```
 1   A     Yes.
 2   Q     Now, you and I have not communicated about this case at
 3   all, have we?
 4   A     No.
 5   Q     You and I have not communicated since late 2018, when you
 6   invited me over for Thanksgiving?
 7   A     Correct.
 8   Q     You have met with the Government at their request?
 9   A     Yes.
10   Q     Do you recall that at some point in time the firm began
11   to represent a gentleman by the name of Geoffrey Johnson?
12   A     Yes.
13   Q     And do you recall approximately when that was?
14   A     No.
15   Q     Do you recall assisting me and others on Mr. Johnson's
16   case?
17   A     Yes.
18   Q     Who else do you recall working on Mr. Johnson's case?
19   A     Judy worked on Mr. Johnson's case and probably Maritza.
20   Attorneywise, I don't recall.
21   Q     You recall me working on it?
22   A     Yes.
23   Q     How about Carlos Colorado?
24   A     I don't recall.
25   Q     Do you recall a gentleman by the name of Richard Beada,
```

B-e-a-d-a, working on Mr. Johnson's case, although he was not

with our law firm?

A     Yes.

Q     And did you communicate with Mr. Beada from time to time

04:25PM 5 relating to Mr. Johnson's matter?

A     Yes.

Q     And do you recall that Mr. Johnson's matter lasted a

number of years?

A     Yes.

04:25PM 10 Q     And is it accurate to say that most of the cases at the

law firm would last a number of years?

A     Yes.

Q     And during those cases, did you have the understanding

that the firm was advancing not only its time on the cases but

04:25PM 15 also advancing out-of-pocket expenses and costs for the benefit

of the clients?

A     Yes.

Q     That was generally what we did during the ten years you

were there?

04:25PM 20 A     Yes.

Q     There were some exceptions to that, but for the most part

that was the rule?

A     Correct.

Q     And do you have a recollection that in connection with

04:26PM 25 some of those cases, not only the amount of time, but the

1    amount of expense that would be incurred and advanced for the

2    clients would be astronomical?

3    A    Yes.

4    Q    And did you have the understanding that in some instances

04:26PM 5    the firm would wait years to be repaid the cost?

6    A    I don't know.

7    Q    Do you have a recollection that there were some cases

8    where the firm was never repaid anything?

9    A    I do not know.

04:26PM 10   Q    You don't recall that?

11   A    I don't know.

12   Q    We're going to come back to the Johnson matter in a

13   little bit.  But let me ask you about a gentleman by the name

14   of Greg Barela.  Do you recall that name?

04:27PM 15   A    Yes.

16   Q    Was Mr. Barela a client of the firm?

17   A    Yes.

18          THE COURT:  All right.  We'll conclude here today,

19   ladies and gentlemen.  Please remember the admonition not to

04:27PM 20   discuss the case with anyone, not to form any opinions on the

21   issues of the case until it's submitted to you, and please no

22   research.  Trust you have a good evening, and we'll see you at

23   9:00 in the morning.

24          THE COURTROOM DEPUTY:  All rise.

04:28PM 25          **(Out of the presence of the jury.)**

```
1              THE COURT:  Anything before we conclude?

2              MR. SAGEL:  Nothing from the Government.

3              Just for my own edification, because I might have

4    missed it, did you set a time for the jury instructions, or

5    you're just deferring it as of now?

6              THE COURT:  I was going to let you come back to me,

7    but I want to do it before we conclude on Friday.

8              MR. AVENATTI:  Your Honor, point of clarification.

9    We're filing our brief, our reply on the Rule 29 by 6:00 p.m.

10   as I stated, Your Honor.  And Your Honor was gracious enough to

11   provide us an opportunity, so you'll have it by 6:00 p.m.

12             When do you anticipate taking argument on that?

13             THE COURT:  Tomorrow at 8:30.

14             MR. AVENATTI:  Secondly, what is the timing that is

15   best for the Court relating to the submission of the brief

16   concerning Mr. Drum and then the setting of that argument?

17             THE COURT:  Noon tomorrow.  And we'll take it up

18   Friday morning.  Anything further by noon tomorrow.  I already

19   have a number of briefs, and I've asked for a supplement

20   specific to the Tabs data.  But I'd like to receive that by

21   noon tomorrow and take it up Friday morning.

22             MR. AVENATTI:  Okay.  Understood, Your Honor.

23             And then Evan Carter, we -- out of an abundance of

24   caution, I believe that her counsel is on the ECF, but we also

25   e-mailed her the opposition earlier today to make sure that she
```

```
 1    had it.
 2              THE COURT:  Right.  And I directed her to file any
 3    response by the end of the day, and that hasn't happened.  Let
 4    me just take a look.
 5              THE COURTROOM DEPUTY:  She's not on ECF.  They don't
 6    get service on ECF.
 7              THE COURT:  Nothing further's been filed.  We'll
 8    take it up in the morning.
 9              MR. AVENATTI:  Understood.
10              And, Your Honor, I want to make sure that I do
11    exactly what the Court has asked.  As it relates to Mr. Drum
12    and the Tabs information, we filed an opening brief on the Tabs
13    issue relating to *Brady*, *Giglio*, et cetera.  And then we have a
14    pending motion relating to Mr. Drum.  Obviously we had not had
15    the benefit of the Government's 300-page-plus submission on
16    Mr. Drum.  We're going to file a response to that.  Are you
17    also looking for a -- or can we file a supplement relating to
18    the Tabs *Brady*?
19              THE COURT:  I've asked for that.
20              MR. AVENATTI:  Okay.
21              THE COURT:  I asked for that before we adjourned at
22    noon.
23              MR. AVENATTI:  Okay.  We'll file a supplement on
24    both.
25              THE COURT:  Okay.
```

1      MR. AVENATTI:  And the only other request that I
2   would make -- and I made it at the sidebar, and I apologize if
3   it wasn't an appropriate time.  To the extent that the
4   Government is in possession of an e-mail from Mr. Stolper, the
04:32PM 5   e-mail that was referenced by Special Agent Karlous, I'm
6   talking about the first-quarter 2018 e-mail, I don't believe
7   that we have that.  We've looked for it.  To the extent that it
8   exists, I believe it's *Brady* and it should have been produced a
9   long time ago.  It certainly would have aided the defense.  And
04:32PM 10   so I would ask that it be produced forthwith.
11      THE COURT:  Direct the Government to consider your
12   request.
13      MR. AVENATTI:  Thank you.
14      THE COURT:  Anything from the Government?
04:32PM 15      MR. SAGEL:  No, Your Honor -- well, I'm about to say
16   "yes."  I guess the only question that I have with regards to
17   what we're about to get, witness list, I think if I understood
18   Your Honor's rule from before, anybody who's an out-of-town
19   witness needs 48-hours' notice.  And at least the last two days
04:32PM 20   we've gotten names who were clearly out-of-town witnesses who
21   we're not aware of knowing they're coming here.
22      So am I correct that if a witness is from out of
23   town, they need to be given 48-hours' notice to be here the
24   following day?
04:33PM 25      THE COURT:  I think as a practical matter, yes.

UNITED STATES DISTRICT COURT

1         MR. AVENATTI:  My understanding, Your Honor, was

2    that you asked for the 48 hours as it relates to the Government

3    agents from the East Coast.

4         THE COURT:  Right.

04:33PM 5         MR. AVENATTI:  So yet -- you know, again, I don't

6    know that the Government should be concerning itself relating

7    to subpoenas that I -- or witnesses that I've subpoenaed and

8    whether they're going to be traveling here or not, frankly.  I

9    mean, this is my case-in-chief.  If I've subpoenaed witnesses,

04:33PM 10   then I'm going to expect them to be here.  And if they don't

11   appear, and if -- unless the order or the subpoena has been

12   quashed, then that will lead to another issue.

13        But I'm going to do everything I can, as I have, to

14   have witnesses come here and appear.  Because I don't believe

04:33PM 15   that it's optional, when one receives a subpoena, as to whether

16   they're going to come and testify in a criminal matter.

17        MR. SAGEL:  I'm not disputing any of that,

18   Your Honor.  The only issue is, is for today, for example, the

19   witness list we were provided had Evan Carter and Morgan Witos

04:34PM 20   on it, two of which Your Honor took up yesterday as potentially

21   quashing or quashing pending follow-up.  And another one there

22   was a letter to potentially quash it for further information.

23        So we're not aware of whether it's in good faith

24   when we're getting a witness list for the following day with

04:34PM 25   two witnesses who are out of town who we're under the belief is

1    either about to be quashed, have been pending quashing or

2    whatever it may be.  So that's the question for the out-of-town

3    witnesses.

4              THE COURT:  Okay.  We'll be adjourned.

04:34PM  5              THE COURTROOM DEPUTY:  All rise.  This court is now

6    in recess.

7              **(Proceedings concluded at 4:35 p.m.)**

8                          **--oOo--**

1                    *CERTIFICATE OF OFFICIAL REPORTER*

2

3    COUNTY OF LOS ANGELES   )
                            )
4    STATE OF CALIFORNIA     )

5              I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME

6    COURT REPORTER, in and for the United States District Court for

7    the Central District of California, do hereby certify that

8    pursuant to Section 753, Title 28, United States Code that the

9    foregoing is a true and correct transcript of the

10   stenographically reported proceedings held in the

11   above-entitled matter and that the transcript page format is in

12   conformance with the regulations of the Judicial Conference of

13   the United States.

14

15   *Date:  August 18, 2021*

16

17

18

19                              */S/ DEBBIE HINO-SPAAN*

20                         *Debbie Hino-Spaan, CSR No. 7953*
                           *Federal Official Court Reporter*
21

22

23

24

25

## $

**$10** [1] - 53:2
**$100,000** [2] - 56:15, 57:24
**$109,200.72** [1] - 32:18
**$18,615,886** [1] - 52:25
**$2,850,000** [1] - 53:7
**$2.75** [1] - 76:18
**$4,850,000** [1] - 53:4
**$736,883.89** [1] - 30:24

## '

**'4** [1] - 95:10
**'good** [1] - 74:2

## /

**/S** [1] - 109:19

## 1

**1** [5] - 36:17, 37:15, 40:11, 95:24, 96:1
**1-053** [1] - 1:24
**1.5** [1] - 78:11
**100** [1] - 73:13
**1006** [1] - 4:17
**1085** [1] - 26:7
**1094** [1] - 4:14
**1095** [1] - 4:14
**1096** [1] - 4:14
**1097** [1] - 4:14
**11** [1] - 51:16
**1100** [1] - 2:11
**120** [2] - 26:24, 53:8
**14** [1] - 26:16
**148** [1] - 76:17
**15** [1] - 65:11
**16** [1] - 6:14
**17** [1] - 2:18
**174** [1] - 31:15
**18** [3] - 1:15, 4:1, 109:15
**180** [1] - 48:21
**19** [4] - 26:5, 27:5, 32:9, 35:9
**1:26** [2] - 1:16, 4:2
**1st** [7] - 6:20, 7:5, 7:21, 38:1, 38:4, 39:2, 42:18

## 2

**2** [4] - 1:9, 5:23, 38:7, 53:6

**20** [2] - 3:4, 23:19
**2004** [1] - 95:10
**2007** [2] - 95:17, 96:13
**2011** [2] - 71:25, 80:3
**2014** [2] - 81:14, 86:16
**2015** [5] - 28:8, 30:25, 31:7, 75:15, 84:20
**2016** [1] - 60:15
**2017** [9] - 32:9, 35:21, 36:5, 44:4, 46:13, 67:25, 75:9, 75:18, 97:22
**2018** [32] - 35:21, 36:5, 36:17, 37:15, 38:1, 38:5, 38:24, 39:2, 40:11, 45:2, 59:1, 59:12, 67:25, 75:9, 75:18, 77:19, 78:9, 81:23, 83:6, 88:11, 88:14, 88:22, 89:3, 90:1, 90:8, 90:14, 91:1, 91:5, 92:10, 97:20, 101:3, 106:4
**2019** [17] - 23:21, 25:3, 25:9, 25:25, 26:5, 27:5, 35:9, 48:7, 48:21, 49:6, 51:22, 53:12, 62:10, 71:25, 80:10, 84:20, 86:16
**2021** [3] - 1:15, 4:1, 109:15
**213-894-2435** [1] - 2:12
**22** [1] - 1:8
**22nd** [6] - 48:7, 48:21, 49:6, 51:22, 53:12, 53:16
**254** [1] - 2:19
**25th** [4] - 23:21, 25:3, 25:9, 25:25
**266** [1] - 33:14
**26th** [1] - 71:18
**28** [1] - 109:8
**281** [2] - 36:15, 36:16
**29** [2] - 7:20, 104:7
**2nd** [1] - 7:22

## 3

**3** [2] - 5:23, 95:10
**30** [2] - 6:7, 7:20
**300-page-plus** [1] - 105:13
**312** [1] - 2:11
**342** [3] - 51:15, 52:9, 59:21
**384** [2] - 30:15, 31:6
**3:06** [1] - 67:6
**3:25** [1] - 67:6

## 4

**4** [9] - 8:13, 30:21, 31:1, 36:6, 56:18, 72:15, 77:19, 77:24, 78:8
**4.1** [1] - 39:7
**401** [6] - 20:17, 22:10, 25:5, 27:7, 48:14, 99:15
**403** [15] - 6:21, 6:25, 13:5, 20:17, 22:10, 25:5, 27:7, 45:25, 48:14, 48:15, 49:1, 56:21, 89:18, 90:4, 99:15
**404** [1] - 100:8
**411** [2] - 1:24, 2:6
**450** [1] - 96:7
**48** [4] - 28:1, 28:7, 64:6, 106:25
**48-hours'** [2] - 106:17, 106:21
**4:35** [1] - 108:5
**4th** [9] - 2:6, 28:8, 29:3, 30:25, 31:7, 42:10, 42:23, 43:3, 77:7
**4TH** [1] - 1:24

## 5

**520** [1] - 96:10
**57** [1] - 3:4

## 6

**60** [1] - 53:6
**611(c** [1] - 22:2
**611(c)** [1] - 25:21
**6:00** [2] - 104:7, 104:9

## 7

**7** [2] - 30:15, 31:6
**7.5** [2] - 33:20, 57:1
**714-338-3598** [1] - 2:7
**74** [1] - 3:5
**753** [1] - 109:8
**79** [1] - 3:6
**7953** [2] - 1:23, 109:20

## 8

**8** [1] - 30:20
**8.1** [2] - 38:25, 39:3
**8000** [1] - 2:6
**8:30** [1] - 104:11

## 9

**9** [2] - 3:3, 30:20
**90012** [1] - 2:12
**90201** [3] - 4:19, 4:21, 4:22
**92660** [1] - 2:19
**92701** [2] - 1:25, 2:7
**94** [1] - 3:7
**949-481-4900** [1] - 2:20
**95** [1] - 3:8
**9:00** [1] - 103:21

## A

**ability** [1] - 23:9
**able** [7] - 24:9, 27:21, 29:14, 41:14, 42:16, 46:7, 98:3
**above-entitled** [1] - 109:11
**absent** [1] - 53:2
**absolutely** [1] - 57:1
**abundance** [2] - 43:24, 104:21
**accept** [2] - 8:1, 87:24
**access** [5] - 21:4, 21:10, 21:14, 93:22
**according** [6] - 10:10, 28:20, 30:20, 30:23, 57:25, 63:15
**account** [9] - 31:2, 36:7, 39:3, 64:25, 76:18, 77:18, 87:18, 87:24, 88:3
**accounts** [10] - 18:16, 29:11, 29:17, 29:19, 29:21, 29:23, 29:25, 55:10, 56:13
**accuracy** [1] - 53:20
**accurate** [5] - 17:13, 17:17, 44:19, 66:6, 102:8
**acquire** [1] - 17:24
**acting** [1] - 66:24
**actual** [4] - 20:8, 21:11, 21:14, 69:1
**add** [1] - 56:15
**added** [1] - 98:14
**addition** [5] - 22:19, 29:5, 30:10, 39:21, 54:19
**adequate** [1] - 93:22
**adjourned** [2] - 105:19, 108:5
**administrative** [1] - 83:2
**admit** [2] - 4:15, 4:16
**admitting** [1] - 4:12

**admonition** [2] - 65:12, 103:17
**admonitions** [1] - 12:12
**advance** [2] - 24:11, 91:11
**advanced** [1] - 102:24
**advances** [1] - 30:22
**advancing** [2] - 102:12, 102:13
**adverse** [1] - 25:19
**advocating** [1] - 12:8
**affidavit** [4] - 20:21, 48:12, 48:19, 49:6
**afternoon** [7] - 8:20, 9:3, 20:4, 20:5, 79:10, 94:4, 95:6
**agencies** [1] - 44:15
**agency** [7] - 44:22, 47:8, 47:10, 47:13, 47:15, 48:1
**agent** [5] - 25:15, 26:2, 67:17, 67:20, 70:18
**Agent** [16] - 8:23, 9:8, 10:4, 11:8, 12:7, 13:12, 16:1, 20:4, 47:25, 57:7, 61:10, 62:14, 67:9, 67:19, 67:21, 106:3
**agents** [8] - 9:10, 9:24, 21:18, 21:19, 31:25, 40:5, 67:21, 107:1
**ago** [3] - 60:25, 62:17, 106:7
**agree** [3] - 8:13, 8:16, 70:21
**agreeable** [2] - 8:6, 8:7
**agreed** [4] - 52:8, 52:23, 60:4, 98:6
**agreeing** [1] - 52:4
**agreement** [10] - 12:2, 12:18, 33:15, 33:18, 33:19, 52:17, 53:9, 53:14, 54:12, 54:13
**agreements** [1] - 52:5
**ahead** [3] - 45:13, 45:14, 82:7
**Ahmed** [3] - 86:20, 92:14, 93:13
**aided** [1] - 106:7
**alex.wyman@usdoj. gov** [1] - 2:13
**ALEXANDER** [1] - 2:10
**Alexis** [3] - 24:25, 49:15, 49:17
**allow** [4] - 5:17, 47:6,

71:10, 71:13
**allowed** [4] - 15:22, 39:23, 53:1, 53:4
**AMERICA** [1] - 1:5
**amount** [6] - 30:20, 31:8, 31:9, 100:14, 102:23, 102:24
**amounts** [1] - 65:8
**Ana** [1] - 2:7
**ANA** [3] - 1:17, 1:25, 4:1
**analysis** [3] - 14:19, 74:23, 75:7
**Andre** [2] - 51:8, 73:6
**Andrew** [23] - 43:12, 43:15, 43:16, 43:20, 44:1, 44:3, 47:25, 49:4, 49:9, 49:12, 49:16, 49:21, 49:25, 50:3, 50:8, 51:4, 51:7, 59:23, 60:5, 60:7, 60:15, 73:15, 74:1
**ANGELES** [1] - 109:3
**Angeles** [2] - 2:12, 36:6
**answer** [14] - 11:9, 12:8, 16:2, 16:3, 17:2, 36:14, 45:4, 45:18, 50:23, 55:17, 69:19, 73:21, 74:5, 99:5
**answered** [8] - 9:19, 38:19, 58:19, 58:20, 61:17, 61:25, 80:22, 92:20
**anticipate** [1] - 104:10
**apologize** [2] - 99:25, 105:25
**appear** [3] - 91:8, 107:9, 107:12
**appearance** [1] - 51:6
**APPEARANCES** [1] - 2:1
**approach** [2] - 13:2, 81:18
**appropriate** [2] - 4:7, 106:1
**approved** [2] - 23:9, 39:22
**approves** [2] - 4:13, 20:25
**approximate** [1] - 99:2
**April** [2] - 7:20
**Arden** [19] - 9:15, 9:17, 10:5, 10:9, 10:20, 10:24, 11:2, 11:10, 54:9, 86:18, 90:22, 91:3, 91:6, 92:12, 92:18, 92:24,

93:12, 93:19
**area** [5] - 79:23, 91:18, 92:1, 92:13
**areas** [1] - 44:11
**argument** [3] - 65:23, 104:10, 104:14
**argumentative** [4] - 56:20, 57:9, 76:8, 78:6
**Argumentative** [9] - 31:12, 38:12, 50:19, 58:18, 59:9, 76:3, 76:11, 77:20, 78:1
**arrest** [4] - 48:12, 48:17, 48:20, 49:6
**artist** [1] - 91:17
**ass** [1] - 16:16
**asserted** [3] - 66:15, 66:17, 66:22
**assist** [3] - 25:15, 50:25, 51:1
**assistant** [5] - 73:10, 80:24, 96:15, 97:3, 97:5
**Assistant** [2] - 2:5, 2:10
**assisted** [2] - 81:7, 98:18
**assisting** [1] - 101:13
**associated** [3] - 66:10, 66:20, 66:24
**assume** [2] - 16:15, 45:3
**assumed** [1] - 85:9
**assumes** [3] - 50:19, 60:17, 74:5
**assuming** [2] - 16:12, 68:7
**assured** [1] - 39:17
**astronomical** [1] - 102:25
**attached** [3] - 28:12, 29:2, 30:21
**attaching** [1] - 12:18
**attachment** [1] - 32:13
**attachments** [1] - 29:6
**attempt** [2] - 17:24, 68:17
**attempted** [1] - 68:15
**attention** [2] - 13:13, 59:15
**Attorney** [4] - 2:4, 2:5, 2:9, 2:10
**attorney** [19] - 10:7, 29:23, 31:2, 33:8, 36:7, 39:3, 55:10, 56:13, 57:17, 66:11, 76:18, 78:10, 81:2, 83:13, 84:9, 86:9, 86:10, 90:2, 92:8

**Attorney's** [8] - 44:2, 45:18, 47:7, 50:4, 50:12, 50:16, 60:8, 73:9
**attorney-client** [9] - 29:23, 31:2, 33:8, 36:7, 39:3, 55:10, 56:13, 66:11, 76:18
**attorneys** [10] - 28:2, 31:25, 73:10, 84:6, 84:7, 86:3, 87:8, 90:9, 93:22, 97:4
**attorneywise** [1] - 101:18
**AUGUST** [2] - 1:15, 4:1
**August** [4] - 80:3, 95:17, 96:13, 109:15
**AUSA** [1] - 51:8
**authority** [3] - 40:6, 71:15, 71:17
**authorized** [1] - 88:24
**AVENATTI** [184] - 1:8, 2:15, 2:16, 4:6, 4:9, 4:12, 5:1, 5:6, 5:8, 5:11, 5:13, 5:16, 5:20, 5:24, 6:3, 6:6, 6:10, 7:12, 7:17, 8:4, 8:6, 8:8, 8:13, 8:22, 9:7, 9:22, 10:1, 10:4, 11:6, 11:8, 12:5, 12:7, 12:14, 13:2, 13:12, 15:24, 16:1, 16:4, 17:4, 17:7, 19:17, 19:19, 20:17, 21:6, 22:1, 22:3, 22:9, 22:15, 22:17, 24:16, 25:5, 25:17, 25:19, 26:19, 27:7, 27:15, 27:23, 28:15, 28:21, 30:2, 30:16, 31:12, 31:18, 32:14, 33:11, 34:12, 34:17, 34:20, 35:13, 36:12, 37:16, 38:12, 38:19, 40:8, 40:24, 41:1, 42:4, 42:13, 42:24, 43:4, 44:17, 44:23, 45:6, 45:10, 45:13, 45:15, 45:22, 46:17, 47:5, 47:17, 48:14, 48:23, 49:1, 50:13, 50:19, 50:22, 51:19, 51:21, 52:12, 54:15, 55:13, 56:1, 56:6, 56:20, 57:6, 57:10, 57:13, 58:21, 59:8, 59:11, 59:25, 60:2, 60:21, 61:20, 62:3, 62:12, 62:14, 64:21,

65:5, 65:7, 65:18, 65:25, 66:3, 66:16, 66:19, 66:23, 67:9, 68:24, 69:15, 69:17, 69:19, 69:25, 71:20, 71:23, 72:8, 72:11, 73:19, 73:21, 74:9, 74:15, 75:1, 76:3, 76:7, 76:11, 76:14, 76:25, 77:20, 78:1, 78:5, 78:15, 78:20, 78:24, 79:9, 81:12, 81:18, 81:21, 82:7, 83:11, 85:17, 87:7, 89:20, 90:6, 90:12, 92:23, 93:24, 94:13, 94:15, 94:19, 95:5, 99:18, 99:22, 99:25, 100:11, 100:13, 104:6, 104:12, 104:20, 105:7, 105:18, 105:21, 105:24, 106:11, 106:24, 107:3
**avenatti** [1] - 57:4
**Avenatti** [20] - 3:3, 3:4, 3:6, 3:8, 7:10, 7:19, 9:4, 14:19, 22:24, 25:16, 44:8, 53:3, 62:24, 67:8, 78:10, 79:7, 79:25, 94:12, 95:3, 95:21
**avoid** [1] - 51:5
**avoiding** [2] - 93:13, 93:19
**aware** [8] - 5:16, 6:1, 10:14, 14:16, 74:11, 90:8, 106:19, 107:21
**awful** [1] - 53:24

## B

**background** [1] - 79:19
**backup** [1] - 63:18
**bank** [13] - 29:7, 29:10, 30:12, 38:1, 54:23, 55:11, 55:18, 55:22, 58:12, 64:25, 66:8, 72:18, 72:20
**banking** [3] - 17:24, 18:5, 18:16
**bankruptcy** [6] - 36:2, 52:4, 52:17, 52:22, 59:20, 78:10
**Barela** [58] - 9:9, 9:14, 9:18, 9:23, 10:6, 10:10, 10:11, 10:15, 10:18, 10:21, 10:25, 11:3, 11:15, 11:17,

11:20, 11:24, 12:16, 14:1, 15:15, 17:19, 32:12, 32:13, 32:18, 32:23, 49:19, 49:21, 54:1, 54:8, 54:11, 55:1, 55:4, 56:12, 59:16, 64:21, 88:9, 88:11, 88:13, 88:25, 89:3, 89:7, 89:20, 90:1, 90:8, 90:14, 90:17, 90:20, 91:1, 91:2, 91:5, 91:8, 92:14, 92:17, 92:24, 93:11, 93:18, 93:21, 103:12, 103:14
**Barela's** [5] - 10:6, 18:16, 18:18, 53:19, 58:22
**Baristas** [2] - 23:6, 44:7
**based** [19] - 23:15, 27:12, 32:21, 38:23, 40:5, 40:15, 42:1, 42:18, 44:6, 49:11, 49:23, 50:16, 53:12, 55:21, 58:13, 63:12, 74:4, 75:8
**baseless** [1] - 65:22
**basis** [5] - 44:21, 57:16, 58:10, 58:11, 97:4
**Beach** [3] - 2:19, 79:20
**Beada** [2] - 101:23, 102:2
**BEADA** [1] - 101:24
**bear** [1] - 91:12
**become** [5] - 45:1, 47:15, 57:7, 57:10, 68:20
**began** [2] - 95:17, 101:8
**begged** [1] - 60:8
**begin** [1] - 83:2
**begs** [1] - 7:6
**behind** [3] - 40:4, 78:25, 94:21
**belief** [2] - 58:1, 107:23
**believes** [1] - 55:1
**below** [1] - 53:7
**benefit** [3] - 61:8, 102:13, 105:13
**best** [8] - 17:23, 61:12, 61:15, 61:20, 61:21, 61:23, 93:12, 104:13
**better** [2] - 24:6, 27:13
**between** [4] - 33:8, 54:20, 72:17, 86:16
**big** [8] - 28:19, 30:11,

30:14, 31:7, 50:6, 60:2, 60:24
**Bill** [2] - 28:12, 32:12
**billed** [1] - 84:10
**bills** [1] - 84:12
**bit** [4] - 13:20, 79:18, 96:21, 103:11
**blame** [1] - 65:21
**blaming** [1] - 66:23
**bless** [1] - 72:13
**board** [3] - 41:11, 42:9, 57:1
**bookkeeper** [2] - 81:1, 81:3
**bookkeeping** [1] - 81:8
**books** [1] - 13:23
**bothered** [1] - 16:22
**box** [1] - 71:18
**boxes** [9] - 39:10, 39:15, 39:18, 40:4, 40:7, 70:1, 70:5, 71:1, 72:4
**Brady** [4] - 47:1, 105:11, 105:16, 106:6
**break** [3] - 9:9, 9:13, 65:10
**breakdown** [1] - 56:11
**BRETT** [1] - 2:5
**brett.sagel@usdoj. gov** [1] - 2:8
**brief** [3] - 104:7, 104:13, 105:10
**briefly** [1] - 85:20
**briefs** [1] - 104:17
**bring** [1] - 9:1
**broke** [1] - 9:8
**brought** [2] - 59:14, 96:25
**bunch** [1] - 94:6
**business** [1] - 29:19
**businesses** [1] - 33:22
**but..** [2] - 5:19, 84:23
**butcher** [1] - 70:19
**buttons** [1] - 85:24
**BY** [97] - 2:5, 2:18, 3:3, 3:6, 3:8, 9:7, 9:22, 10:4, 11:8, 12:7, 13:12, 16:1, 16:4, 17:7, 19:19, 20:3, 20:20, 21:9, 22:6, 22:19, 24:19, 25:8, 25:25, 26:23, 27:10, 27:20, 28:1, 28:18, 28:25, 30:6, 30:19, 31:22, 32:17, 33:15, 34:22, 36:15, 37:20, 38:16, 38:23, 40:11,

41:4, 42:8, 42:16, 43:2, 43:7, 47:25, 48:19, 49:4, 50:15, 51:25, 52:16, 54:19, 55:18, 56:9, 56:24, 57:6, 57:10, 57:13, 58:21, 59:8, 59:11, 60:2, 60:21, 61:20, 62:3, 62:14, 64:21, 65:7, 67:9, 68:24, 69:25, 71:23, 72:11, 73:21, 74:9, 74:17, 76:10, 76:16, 77:3, 77:24, 78:8, 79:9, 81:12, 81:21, 82:7, 83:11, 85:17, 87:7, 89:20, 90:6, 90:12, 92:23, 94:3, 95:5, 99:18, 99:25, 100:13

## C

**CA** [1] - 1:25
**calendared** [2] - 97:15, 97:16
**CALIFORNIA** [4] - 1:2, 1:17, 4:1, 109:4
**California** [10] - 2:7, 2:12, 2:19, 42:3, 42:12, 43:2, 43:8, 43:9, 73:11, 109:7
**CALLED** [3] - 3:3, 3:6, 3:8
**card** [1] - 29:21
**care** [1] - 78:21
**Carlos** [2] - 86:22, 101:21
**Carter** [2] - 104:21, 107:17
**case** [59] - 10:12, 11:21, 12:3, 14:16, 15:4, 15:12, 15:15, 15:18, 17:17, 22:8, 24:7, 29:14, 32:22, 33:2, 46:23, 47:1, 51:1, 51:10, 51:13, 55:12, 55:21, 56:14, 57:24, 58:4, 58:7, 58:17, 65:12, 65:13, 66:9, 67:10, 67:18, 67:19, 67:20, 69:12, 69:22, 73:16, 73:17, 74:2, 74:3, 74:10, 74:12, 74:20, 75:23, 76:21, 83:14, 86:9, 86:12, 95:15, 100:3, 100:25, 101:14, 101:16, 101:17, 101:24, 103:18, 103:19, 107:7

**Case** [1] - 1:7
**case-in-chief** [1] - 107:7
**cases** [11] - 46:9, 58:10, 86:2, 97:1, 100:20, 100:23, 102:8, 102:11, 102:12, 102:23, 103:5
**caught** [1] - 60:11
**caused** [1] - 79:15
**caution** [3] - 43:22, 43:24, 104:22
**cautionary** [1] - 67:1
**CDs** [1] - 5:3
**cell** [7] - 41:15, 41:18, 41:22, 42:17, 42:18, 42:22
**Center** [2] - 96:7, 96:10
**CENTRAL** [1] - 1:2
**Central** [2] - 73:10, 109:7
**certain** [5] - 41:11, 41:23, 83:6, 85:8, 90:24
**certainly** [2] - 61:21, 106:7
**CERTIFICATE** [1] - 109:1
**CERTIFIED** [1] - 1:6
**certify** [1] - 109:7
**cetera** [1] - 105:11
**chain** [1] - 38:5
**change** [1] - 80:17
**changed** [1] - 6:15
**charged** [2] - 46:8, 46:19
**charges** [2] - 46:23, 48:20
**charts** [1] - 19:7
**Chase** [1] - 59:24
**check** [1] - 31:1
**checked** [1] - 68:13
**chief** [1] - 107:7
**City** [4] - 7:20, 7:21, 7:22
**civil** [4] - 44:9, 44:24, 46:13, 47:14
**claim** [6] - 40:15, 50:11, 52:25, 53:1, 53:5, 53:19
**claimed** [4] - 9:10, 10:7, 12:19, 39:14
**claiming** [1] - 12:1
**claims** [1] - 51:5
**clarification** [1] - 104:6
**clarify** [2] - 31:22, 47:13

**clear** [4] - 8:16, 47:1, 56:12, 67:17
**clearly** [1] - 106:18
**click** [4] - 85:7, 85:23, 85:24, 86:1
**clicked** [1] - 86:14
**client** [15] - 29:23, 31:2, 33:8, 36:7, 39:3, 55:10, 56:13, 66:11, 76:18, 87:17, 87:18, 87:24, 88:6, 100:15, 103:14
**client's** [1] - 64:15
**clients** [8] - 21:24, 25:4, 27:6, 66:9, 66:12, 99:3, 102:14, 102:25
**close** [3] - 97:7, 97:10, 98:21
**closed** [3] - 8:15, 73:17, 74:2
**clue** [2] - 58:3
**CNN** [1] - 4:13
**Co** [2] - 95:24, 96:1
**co** [4] - 67:20, 67:21, 70:18, 95:15
**co-case** [1] - 67:20
**co-counsel** [1] - 95:15
**Co-Employee** [2] - 95:24, 96:1
**co-lead** [2] - 67:21, 70:18
**Coast** [1] - 107:1
**Code** [1] - 109:8
**colleague** [2] - 59:4, 59:15
**College** [2] - 79:21, 79:22
**Colorado** [2] - 86:22, 101:21
**coming** [2] - 24:11, 106:19
**committed** [1] - 60:15
**communicate** [1] - 102:2
**communicated** [5] - 19:6, 81:15, 81:22, 100:25, 101:3
**communications** [4] - 18:20, 51:4, 51:7, 72:17
**compare** [2] - 69:12, 69:22
**complain** [2] - 93:18, 93:21
**complaints** [2] - 91:1, 91:6
**complete** [2] - 64:23, 65:3
**completely** [3] -

34:18, 34:20, 65:22
**computer** [11] - 25:15, 25:16, 26:1, 27:13, 28:3, 31:23, 37:3, 84:25, 85:2, 85:3, 85:4
**concerning** [2] - 104:14, 107:4
**conclude** [4] - 103:16, 103:24, 104:5
**concluded** [1] - 108:5
**conclusion** [2] - 8:23, 27:24
**Concordia** [1] - 79:22
**conducted** [1] - 22:20
**conducting** [2] - 21:19, 40:5
**Conference** [1] - 109:12
**conference** [7] - 10:19, 89:1, 89:10, 90:17, 92:3, 92:5, 92:15
**conferred** [1] - 19:18
**conflict** [2] - 51:2, 51:6
**conflicts** [1] - 50:25
**conformance** [1] - 109:12
**confused** [5] - 47:15, 47:18, 47:19
**conjecture** [2] - 27:15, 27:24
**connection** [2] - 100:15, 102:22
**consider** [1] - 106:9
**considered** [1] - 58:22
**contact** [6] - 43:17, 43:19, 44:5, 44:16, 44:21, 88:5
**contacted** [8] - 39:10, 43:20, 45:17, 45:24, 46:16, 46:18, 47:7, 70:8
**contacting** [2] - 43:16, 44:2
**contacts** [1] - 51:11
**contingency** [2] - 33:20, 57:15
**continue** [1] - 98:3
**continued** [1] - 9:6
**continuing** [1] - 82:10
**contract** [2] - 15:22, 33:8
**contrary** [1] - 12:2
**copies** [1] - 96:23
**copy** [5] - 12:1, 12:4, 62:23, 89:17, 89:21
**corner** [1] - 92:7
**Corporate** [1] - 2:18

**correct** [139] - 4:23, 5:20, 9:15, 10:12, 14:5, 14:13, 14:16, 14:24, 15:12, 15:15, 20:12, 20:16, 20:23, 20:24, 21:1, 21:2, 21:5, 21:8, 21:22, 21:23, 21:25, 22:8, 22:21, 23:13, 23:17, 24:15, 24:23, 24:24, 25:1, 25:11, 26:17, 26:24, 27:22, 29:3, 29:7, 29:8, 29:11, 29:15, 29:16, 30:1, 30:8, 30:9, 30:12, 31:2, 31:3, 31:8, 31:17, 32:3, 32:4, 32:7, 32:10, 32:13, 32:19, 34:1, 34:2, 34:23, 35:1, 35:7, 35:12, 35:15, 36:8, 36:11, 36:24, 37:4, 37:7, 37:12, 37:24, 38:8, 38:16, 38:25, 39:1, 39:24, 39:25, 40:7, 40:23, 41:3, 41:9, 41:10, 41:17, 41:19, 41:24, 42:3, 42:20, 43:3, 43:11, 48:22, 50:9, 50:10, 51:9, 51:13, 51:14, 52:1, 52:6, 52:11, 52:19, 52:20, 53:15, 53:21, 54:14, 54:18, 55:3, 55:5, 55:12, 63:13, 67:15, 67:22, 68:9, 68:11, 70:3, 70:12, 71:9, 72:22, 75:15, 75:20, 76:19, 76:22, 77:9, 77:10, 77:15, 77:23, 79:14, 80:6, 81:6, 81:24, 84:3, 85:5, 85:14, 92:5, 94:10, 95:8, 96:6, 97:21, 97:24, 98:10, 99:8, 101:5, 102:21, 106:20, 109:9
**correctly** [1] - 97:16
**corroborate** [2] - 37:6, 37:9
**cost** [14] - 30:22, 33:20, 56:11, 57:2, 58:11, 64:14, 64:21, 64:22, 64:23, 65:2, 65:7, 75:22, 103:3
**Cost** [2] - 28:12, 32:12
**Cost.pdf** [1] - 32:13
**costs** [10] - 15:22, 30:10, 32:18, 33:17,

56:24, 58:4, 75:23, 76:1, 88:7, 102:13
**COUNSEL** [2] - 2:1, 2:16
**counsel** [2] - 95:15, 104:22
**Counsel** [1] - 19:18
**countless** [1] - 40:21
**counts** [1] - 45:11
**COUNTY** [1] - 109:3
**County** [1] - 36:6
**couple** [3] - 13:24, 71:4, 85:24
**course** [1] - 13:17
**COURT** [173] - 1:1, 1:24, 4:8, 4:11, 4:15, 4:20, 4:22, 4:24, 5:3, 5:7, 5:10, 5:12, 5:15, 5:19, 5:21, 6:2, 6:5, 6:9, 6:12, 6:17, 7:10, 7:15, 7:25, 8:5, 8:11, 8:19, 8:25, 9:3, 9:20, 10:3, 11:7, 12:6, 12:12, 13:4, 13:9, 15:25, 16:3, 17:6, 20:1, 20:18, 21:7, 22:4, 22:11, 22:16, 22:18, 24:17, 25:6, 25:18, 25:22, 26:21, 27:8, 27:17, 27:25, 28:17, 28:23, 30:4, 30:18, 31:14, 31:20, 32:15, 33:13, 34:14, 34:19, 34:21, 35:15, 36:13, 37:18, 38:14, 38:21, 40:9, 40:25, 41:2, 42:6, 42:15, 42:25, 43:5, 44:14, 44:20, 45:4, 45:8, 45:12, 45:14, 45:21, 46:12, 47:3, 47:6, 47:22, 48:16, 48:25, 49:2, 50:14, 50:21, 51:24, 52:15, 54:17, 55:15, 55:17, 56:3, 56:8, 56:22, 57:4, 57:12, 58:20, 59:10, 60:1, 60:19, 61:18, 62:1, 62:13, 64:17, 64:19, 65:6, 65:10, 65:17, 65:23, 66:1, 66:15, 66:17, 66:21, 67:1, 67:8, 68:23, 69:16, 69:18, 71:22, 72:10, 73:20, 73:23, 74:6, 75:3, 76:5, 76:9, 76:13, 77:2, 77:22, 78:3, 78:7, 78:14, 78:17, 78:23, 79:7, 81:11, 81:20,

82:5, 83:10, 85:16, 87:5, 89:19, 90:5, 92:21, 94:1, 94:12, 94:14, 94:17, 95:3, 99:17, 100:10, 103:16, 103:24, 104:4, 104:11, 104:15, 104:25, 105:5, 105:17, 105:19, 105:23, 106:9, 106:12, 106:23, 107:2, 108:2, 109:6
**Court** [8] - 4:7, 4:13, 65:24, 97:17, 104:13, 105:9, 109:6, 109:20
**court** [7] - 47:24, 53:13, 53:17, 78:25, 86:4, 94:21, 108:3
**courtroom** [1] - 54:25
**COURTROOM** [8] - 65:15, 78:25, 79:3, 94:21, 94:24, 103:22, 105:3, 108:3
**covert** [3] - 23:25, 24:7, 24:13
**CPA** [2] - 34:15, 34:23
**crazy** [1] - 40:16
**credibility** [2] - 55:2, 58:22
**credit** [1] - 29:21
**creditors** [1] - 52:5
**criminal** [10] - 45:2, 45:5, 45:7, 45:23, 46:15, 47:9, 47:11, 47:14, 48:2, 107:14
**criminally** [3] - 44:3, 46:6, 46:18
**cross** [3] - 25:18, 25:20, 47:19
**Cross** [2] - 3:4, 3:7
**CROSS** [2] - 20:2, 94:2
**Cross-Examination** [2] - 3:4, 3:7
**CROSS-EXAMINATION** [2] - 20:2, 94:2
**cross-examination** [2] - 25:18, 25:20
**CRR** [1] - 1:23
**CSR** [2] - 1:23, 109:20
**curative** [2] - 65:19, 66:1
**current** [7] - 62:6, 62:19, 63:10, 63:16, 64:4, 69:13, 69:23
**cut** [1] - 35:11

**D**

**D.C** [2] - 7:19, 42:20
**Dallas** [1] - 79:22
**data** [60] - 14:9, 15:1, 15:3, 15:8, 15:11, 15:14, 15:17, 17:8, 17:10, 17:12, 17:13, 17:16, 19:15, 19:20, 27:11, 27:12, 27:14, 28:13, 28:18, 28:25, 29:2, 33:2, 41:19, 55:8, 55:24, 56:4, 56:10, 58:16, 61:4, 61:9, 61:13, 61:24, 62:19, 63:1, 63:11, 63:16, 63:20, 64:1, 64:3, 64:4, 64:7, 64:9, 65:22, 65:24, 66:14, 66:18, 66:20, 66:24, 67:4, 68:20, 68:25, 69:1, 69:4, 69:11, 69:22, 74:24, 87:24, 104:18
**database** [1] - 69:1
**date** [7] - 5:8, 40:2, 47:7, 53:7, 53:8, 63:21, 71:24
**Date** [1] - 109:15
**dated** [1] - 32:9
**dates** [8] - 5:22, 13:1, 41:12, 42:8, 54:13, 68:4, 68:7, 97:16
**DAY** [1] - 1:8
**days** [7] - 6:23, 30:25, 53:6, 53:8, 68:7, 71:4, 106:17
**deal** [7] - 50:6, 60:24, 61:11, 64:3, 73:6, 84:1, 99:3
**dealing** [1] - 44:8
**dealt** [1] - 84:4
**DEAN** [2] - 2:17, 2:18
**deansteward7777@gmail.com** [1] - 2:20
**DEBBIE** [3] - 1:23, 109:5, 109:19
**Debbie** [1] - 109:20
**debt** [1] - 78:12
**debtor** [4] - 51:12, 53:2, 53:4, 53:13
**decade** [1] - 44:12
**December** [2] - 32:9, 81:23
**decided** [1] - 51:7
**declaration** [8] - 4:13, 4:15, 4:16, 5:4, 5:19, 11:25, 12:17, 12:21
**declarations** [1] - 4:18
**deduct** [1] - 64:14

**deducted** [2] - 16:7, 33:18
**deductions** [3] - 64:23, 65:3
**default** [1] - 53:2
**DEFENDANT** [1] - 2:14
**Defendant** [1] - 1:9
**defendant** [84] - 20:11, 21:9, 21:17, 21:25, 22:6, 23:1, 23:11, 23:16, 24:2, 24:11, 26:6, 26:9, 26:16, 27:10, 27:14, 27:21, 28:8, 28:18, 28:20, 29:9, 29:15, 29:25, 31:7, 32:10, 32:18, 33:9, 33:21, 35:6, 35:9, 35:23, 36:15, 36:20, 37:2, 37:22, 37:23, 38:4, 38:7, 39:8, 40:11, 40:13, 40:19, 41:5, 41:8, 41:11, 42:1, 42:8, 42:12, 43:2, 43:7, 43:12, 43:15, 44:12, 48:3, 48:5, 48:7, 48:8, 48:13, 48:21, 49:5, 50:3, 50:8, 50:11, 50:15, 50:17, 50:24, 51:10, 52:3, 52:8, 52:17, 52:22, 53:13, 53:19, 54:11, 54:21, 55:1, 55:4, 55:8, 55:18, 74:22, 75:21, 77:7, 94:6
**defendant's** [10] - 23:20, 24:20, 31:1, 33:1, 34:22, 36:1, 36:7, 41:15, 41:18, 75:17
**defense** [3] - 78:24, 94:19, 106:7
**DEFENSE** [3] - 3:3, 3:6, 3:8, 79:2, 94:23
**deferring** [1] - 104:3
**defined** [1] - 53:7
**definitively** [1] - 36:21
**degree** [1] - 79:23
**denied** [4] - 10:3, 15:25, 68:23, 78:7
**Department** [4] - 67:10, 67:13, 67:15
**deposited** [1] - 31:1
**DEPUTY** [8] - 65:15, 78:25, 79:3, 94:21, 94:24, 103:22, 105:3, 108:3
**describe** [3] - 80:19,

97:12, 100:7
**describing** [1] - 5:21
**description** [2] -
83:14, 86:12
**desk** [2] - 91:22, 93:7
**desktop** [4] - 85:4,
85:7, 85:13, 85:23
**despite** [5] - 8:14,
30:14, 31:6, 73:15,
73:25
**details** [1] - 61:7
**determination** [1] -
56:25
**determinations** [1] -
55:2
**determine** [3] - 41:21,
42:16, 54:4
**devices** [3] - 21:14,
23:5, 32:2
**dhinospaan@yahoo.
com** [1] - 1:25
**difference** [1] - 56:16
**different** [2] - 55:9,
100:11
**digital** [3] - 21:14,
23:5, 32:2
**Direct** [3] - 3:3, 3:6,
3:8
**DIRECT** [3] - 9:6, 79:8,
95:4
**direct** [6] - 20:6, 44:1,
47:18, 55:7, 59:5,
106:9
**directed** [1] - 104:25
**directing** [1] - 13:12
**direction** [5] - 46:2,
75:18, 89:22, 90:10,
90:12
**directly** [1] - 84:8
**disagree** [2] - 44:16,
44:17
**discuss** [2] - 65:12,
103:18
**discussion** [2] -
65:24, 67:4
**disgrace** [2] - 50:12,
50:16
**disgraced** [1] - 50:4
**dismissal** [2] - 53:7,
53:8
**dismissed** [2] - 52:17,
52:22
**dispute** [1] - 7:9
**disputing** [1] - 107:15
**District** [3] - 73:10,
109:6, 109:7
**DISTRICT** [3] - 1:1,
1:2, 1:3
**DIVISION** [1] - 1:2
**document** [10] - 13:8,

30:11, 41:9, 52:13,
52:14, 59:22, 60:2,
60:3, 60:4, 64:6
**Document** [1] - 59:21
**documents** [14] -
21:5, 21:11, 24:10,
39:23, 40:2, 71:1,
71:7, 71:11, 71:14,
71:16, 71:18, 72:4,
72:5, 97:17
**dollar** [1] - 31:9
**dollars** [5] - 52:10,
58:7, 75:23, 77:3,
77:4
**done** [5] - 37:13, 51:1,
96:23, 99:22, 99:23
**door** [2] - 46:6, 46:10
**double** [1] - 85:7
**double-click** [1] - 85:7
**down** [7] - 70:14,
78:17, 86:1, 86:2,
86:4, 92:7
**draft** [3] - 29:2, 30:21,
84:12
**Draft** [5] - 13:24,
28:19, 30:11, 30:14,
31:7
**drafts** [1] - 19:7
**drawing** [1] - 91:12
**dreams** [1] - 98:9
**Drive** [2] - 96:7, 96:11
**drop** [2] - 86:1, 86:2
**drop-down** [2] - 86:1,
86:2
**Drum** [13] - 17:14,
18:21, 19:6, 19:14,
63:21, 64:1, 68:3,
75:14, 75:19,
104:14, 105:9,
105:12, 105:14
**Drum's** [3] - 74:23,
75:6, 75:12
**due** [2] - 38:25, 60:22
**during** [23] - 13:17,
19:6, 25:13, 27:4,
30:7, 41:7, 43:3,
63:15, 77:25, 80:16,
84:20, 88:14, 88:22,
89:3, 90:1, 90:14,
93:6, 98:14, 99:2,
99:10, 99:14,
102:11, 102:16

### E

**e-mail** [30] - 6:20,
27:13, 28:8, 28:9,
28:11, 29:1, 29:2,
30:10, 30:21, 30:25,
31:16, 31:23, 32:9,

32:17, 32:23, 36:17,
36:21, 36:24, 37:10,
37:22, 38:4, 38:5,
40:11, 40:22, 40:23,
41:8, 46:25, 106:2,
106:3, 106:4
**e-mailed** [1] - 104:23
**e-mails** [13] - 27:18,
29:5, 29:6, 32:1,
32:6, 37:2, 39:2,
40:20, 40:21, 54:6,
54:20, 55:22, 56:11
**EA's** [1] - 35:22
**Eagan** [8] - 14:19,
22:23, 25:16, 44:8,
62:24, 79:24, 95:20,
96:5
**early** [3] - 80:10,
84:20, 98:22
**East** [1] - 107:1
**easy** [1] - 37:19
**ECF** [3] - 104:22,
105:3, 105:4
**edification** [1] - 104:1
**educational** [1] -
79:19
**effect** [1] - 24:2
**effort** [2] - 11:11, 13:3
**eight** [4] - 26:9, 27:4,
44:4, 71:25
**eight-and-a-half-
hour** [1] - 26:9, 27:4
**either** [10] - 16:24,
31:19, 37:10, 42:19,
63:10, 67:14, 73:2,
85:4, 85:12, 107:24
**electronic** [3] - 15:3,
64:7, 64:9
**element** [1] - 24:8
**elicited** [1] - 44:5
**Employee** [2] - 95:24,
96:1
**employees** [1] - 98:15
**end** [4] - 33:1, 45:2,
55:7, 105:1
**enjoy** [1] - 82:22
**enjoyed** [3] - 82:13,
82:20, 97:7
**enter** [3] - 83:11,
86:10, 87:17
**entering** [1] - 87:8
**entire** [1] - 63:8
**entities** [4] - 22:14,
23:12, 23:16, 33:22
**entitled** [4] - 44:14,
44:20, 55:25, 109:11
**entrance** [1] - 91:24
**entries** [5] - 35:21,
36:1, 36:10, 67:24,
68:4

**entry** [2] - 63:20,
83:15
**erroneous** [2] - 65:22,
66:5
**especially** [1] - 7:8
**ESQ** [2] - 2:15, 2:18
**establish** [4] - 7:8,
44:14, 44:20, 87:23
**established** [4] - 8:1,
9:13, 45:15, 45:20
**establishes** [1] - 7:23
**establishing** [1] - 8:15
**establishment** [1] -
7:4
**et** [1] - 105:11
**ethic** [1] - 100:7
**Evan** [5] - 9:25, 10:13,
53:20, 104:21,
107:17
**evening** [1] - 103:20
**events** [1] - 53:25
**evidence** [20] - 4:17,
7:23, 8:9, 8:14, 24:5,
24:6, 24:7, 26:20,
32:21, 42:9, 49:16,
49:20, 49:24, 51:12,
52:13, 54:16, 60:17,
74:5, 75:2, 100:8
**exact** [2] - 31:8, 31:9,
41:9
**exactly** [3] - 70:20,
70:25, 105:9
**exam** [2] - 51:12,
53:13
**Examination** [7] - 3:3,
3:4, 3:4, 3:5, 3:6,
3:7, 3:8
**examination** [8] -
20:6, 25:18, 25:20,
33:1, 51:23, 55:7
**EXAMINATION** [7] -
9:6, 20:2, 57:5,
74:16, 79:8, 94:2,
95:4
**example** [1] - 107:16
**examples** [1] - 41:7
**except** [1] - 5:22
**exception** [1] - 73:1
**exceptions** [1] -
102:19
**excused** [3] - 78:14,
94:14, 94:17
**execute** [3] - 72:24,
73:1, 77:12
**executed** [2] - 24:19,
70:2, 71:24
**exhibit** [1] - 28:7
**Exhibit** [14] - 4:14,
26:7, 28:1, 28:7,
30:15, 31:6, 31:15,

33:14, 36:15, 36:16,
51:15, 52:9, 64:6,
76:17
**EXHIBITS** [1] - 3:15
**exhibits** [5] - 4:16,
4:25, 7:3, 19:7, 41:5
**existed** [1] - 66:11
**exists** [1] - 106:6
**expanded** [1] - 80:21
**expect** [1] - 107:8
**expense** [2] - 58:7,
102:24
**expenses** [14] - 15:20,
16:6, 16:10, 16:20,
30:22, 33:17, 35:7,
56:14, 56:15, 56:24,
57:20, 57:24, 102:13
**experience** [3] - 24:5,
27:12, 58:13
**explain** [1] - 20:8
**extension** [1] - 69:4
**extent** [2] - 106:1,
106:5
**extremely** [1] - 43:25

### F

**fabricated** [1] - 54:12
**facilities** [2] - 89:17,
89:21
**facility** [1] - 89:1
**facing** [3] - 89:22,
90:10, 90:16
**fact** [13] - 7:1, 7:2, 7:8,
8:14, 8:15, 10:14,
11:25, 35:20, 37:13,
71:5, 73:5, 74:5
**facts** [7] - 7:23, 7:25,
11:18, 20:22, 48:20,
50:20, 60:17
**failure** [2] - 44:6, 44:7
**fair** [4] - 12:14, 57:18,
82:14, 97:7
**fairly** [2] - 86:15, 88:2
**faith** [1] - 107:21
**fall** [1] - 81:14
**false** [1] - 52:13
**fantastical** [2] - 40:15,
40:16
**far** [1] - 63:20
**February** [8] - 28:8,
29:3, 30:21, 30:25,
31:7, 35:21, 36:5,
67:25
**FEDERAL** [2] - 1:24,
109:5
**federal** [12] - 9:10,
9:24, 20:22, 20:25,
23:8, 39:22, 44:15,
47:8, 48:1, 48:12,

53:13, 53:17
**Federal** [1] - 109:20
**FedEx** [1] - 80:23
**fee** [2] - 33:8, 33:20
**fell** [1] - 72:5
**few** [3] - 7:8, 36:23, 88:17
**file** [9] - 64:1, 68:3, 68:25, 69:1, 69:4, 104:25, 105:14, 105:15, 105:21
**filed** [4] - 12:4, 52:24, 105:5, 105:10
**files** [3] - 63:14, 69:11, 69:22
**filing** [4] - 59:20, 80:25, 97:17, 104:7
**final** [1] - 65:8
**finally** [1] - 49:23
**finances** [1] - 94:9
**financial** [20] - 18:2, 18:8, 18:11, 18:13, 18:18, 22:12, 22:13, 23:11, 24:10, 25:11, 29:10, 29:13, 29:14, 33:21, 34:16, 54:6, 81:7, 83:16, 83:19, 83:25
**financials** [1] - 35:6
**fine** [3] - 8:5, 8:25, 78:23
**finger** [1] - 66:4
**finish** [2] - 45:13, 50:14
**firm** [68] - 20:15, 21:24, 22:13, 23:3, 23:12, 25:10, 35:6, 36:1, 50:9, 52:18, 60:12, 60:16, 60:21, 60:22, 64:14, 80:10, 80:17, 80:20, 81:8, 81:13, 82:14, 82:20, 84:10, 84:15, 84:20, 84:22, 86:24, 87:22, 88:14, 88:25, 89:7, 91:9, 91:18, 91:24, 93:6, 93:22, 94:9, 95:12, 95:14, 95:18, 95:20, 95:23, 96:3, 96:10, 96:13, 96:19, 96:25, 97:1, 97:4, 97:13, 97:14, 97:19, 98:4, 98:14, 98:18, 99:3, 99:10, 100:6, 100:14, 100:15, 100:18, 101:8, 101:25, 102:9, 102:12, 103:3, 103:6, 103:14
**firms** [1] - 35:7

**first** [15] - 6:14, 16:18, 28:4, 28:5, 43:25, 61:2, 70:16, 79:4, 80:20, 82:10, 94:25, 95:9, 95:23, 106:4
**first-quarter** [1] - 106:4
**firsthand** [3] - 57:22, 72:3, 75:22
**five** [2] - 63:2, 86:15
**fix** [1] - 11:5
**fixed** [1] - 5:25
**flipping** [1] - 53:24
**focus** [1] - 82:24
**follow** [1] - 107:19
**follow-up** [1] - 107:19
**followed** [2] - 54:24, 78:4
**following** [4] - 65:20, 77:5, 106:22, 107:22
**follows** [3] - 66:8, 69:20, 73:24
**FOR** [3] - 2:3, 2:14, 2:16
**foregoing** [1] - 109:9
**foremost** [1] - 6:14
**forensic** [3] - 14:22, 25:15, 26:2
**forged** [1] - 54:12
**forgot** [1] - 71:19
**form** [3] - 55:9, 65:13, 103:18
**format** [1] - 109:11
**former** [2] - 51:8, 52:9
**forthwith** [1] - 106:8
**forward** [2] - 82:10, 97:4
**foundation** [8] - 4:24, 27:16, 30:2, 30:17, 31:18, 40:24, 64:18, 85:15
**foundational** [2] - 4:16, 46:1
**founded** [1] - 96:25
**four** [8] - 6:8, 12:22, 25:3, 27:6, 46:4, 55:11, 88:18, 88:19
**frame** [2] - 59:6, 86:10
**Frank** [4] - 52:10, 52:18, 59:24
**frankly** [1] - 107:6
**fraud** [6] - 44:5, 44:12, 46:15, 48:2, 60:15, 60:22
**fraudulent** [1] - 54:12
**Friday** [3] - 104:5, 104:16, 104:19
**friend** [5] - 13:15, 50:25, 51:1, 73:16, 74:2

**front** [4] - 26:6, 45:7, 45:22, 66:4
**full** [2] - 27:2, 53:4
**fully** [1] - 12:19
**funds** [1] - 56:13
**further's** [1] - 105:5
**furthermore** [1] - 56:14

## G

**gain** [1] - 21:4
**Gardner** [8] - 17:10, 18:4, 24:25, 49:15, 49:17, 56:14, 57:21, 75:22
**Gardner's** [4] - 17:17, 18:5, 18:8, 76:19
**general** [3] - 52:25, 53:1, 61:8
**generally** [11] - 64:3, 80:19, 82:13, 88:20, 91:8, 91:17, 97:12, 97:17, 99:9, 99:13, 102:16
**generate** [2] - 84:12, 87:10
**gentleman** [6] - 88:9, 96:4, 96:5, 101:9, 101:23, 103:11
**gentlemen** [3] - 9:3, 65:11, 103:17
**Geoffrey** [9] - 17:25, 18:2, 24:22, 24:23, 31:4, 49:8, 49:9, 49:12, 101:9
**Giglio** [1] - 105:11
**gist** [1] - 61:8
**given** [1] - 106:21
**Global** [2] - 23:6, 44:6
**glory** [1] - 100:4
**go-forward** [1] - 97:4
**government** [16] - 6:22, 7:14, 8:6, 11:21, 12:9, 43:16, 43:17, 48:1, 65:20, 101:6, 103:25, 106:2, 106:9, 106:12, 106:25, 107:4
**Government's** [3] - 4:17, 67:2, 105:13
**governmental** [1] - 44:22
**gracious** [1] - 104:8
**graduated** [1] - 79:23
**great** [1] - 27:18
**Greg** [6] - 54:1, 70:16, 70:25, 88:9, 103:12
**Gregory** [2] - 49:19,

49:21
**grew** [2] - 79:20, 98:14
**grounds** [1] - 6:14
**Group** [2] - 23:3, 23:21, 24:21
**group** [1] - 99:13
**guarantor** [1] - 53:3
**guess** [2] - 70:24, 106:14
**guessing** [2] - 63:22, 63:24
**guys** [1] - 61:4

## H

**hair** [3] - 11:5, 53:24, 92:24
**hair-flipping** [1] - 53:24
**half** [8] - 26:9, 27:4, 58:7, 75:23, 77:3, 77:4, 80:14, 80:16
**hallway** [2] - 92:7, 92:13
**hand** [3] - 71:17, 79:1, 94:22
**handful** [1] - 39:10
**handle** [2] - 38:16, 71:15
**handled** [1] - 51:8
**hands** [1] - 32:3
**HANNA** [2] - 2:4, 2:9
**happy** [2] - 7:18, 91:8
**hard** [2] - 99:14, 100:16
**hardly** [1] - 25:20
**head** [2] - 19:22, 63:17
**heard** [6] - 14:15, 16:15, 16:16, 45:18, 66:15, 66:17
**hearing** [3] - 48:8, 48:11, 53:16
**hearsay** [1] - 82:4
**Hearsay** [1] - 36:12
**held** [1] - 109:10
**hello** [1] - 94:5
**help** [2] - 57:2, 98:6
**helped** [1] - 81:1
**helping** [1] - 26:1
**Hendricks** [12] - 34:9, 34:11, 34:22, 34:25, 35:3, 35:5, 62:4, 62:7, 62:17, 62:20, 62:23, 63:2
**hereby** [1] - 109:7
**high** [1] - 50:5
**High** [1] - 79:21
**high-profile** [1] - 50:5
**highly** [3] - 45:10, 46:22, 47:20

**HILLARY** [3] - 3:6, 79:2, 79:6
**Hillary** [2] - 78:24, 79:5
**himself** [2] - 22:13, 54:20
**HINO** [3] - 1:23, 109:5, 109:19
**Hino** [1] - 109:20
**HINO-SPAAN** [3] - 1:23, 109:5, 109:19
**Hino-Spaan** [1] - 109:20
**hired** [2] - 50:8, 80:7
**hiring** [1] - 50:17
**history** [1] - 79:23
**Honor** [91] - 4:6, 7:12, 9:19, 12:5, 12:14, 13:2, 13:5, 15:24, 17:4, 19:17, 20:17, 21:6, 22:2, 22:9, 22:15, 22:17, 25:5, 25:17, 26:20, 27:7, 27:16, 27:23, 28:16, 28:21, 30:3, 30:16, 31:13, 33:12, 34:12, 34:17, 35:14, 37:17, 38:13, 38:20, 42:4, 42:14, 42:24, 43:4, 43:21, 44:17, 44:18, 44:24, 45:10, 46:2, 46:17, 47:17, 47:20, 48:14, 48:23, 51:19, 52:12, 54:16, 55:13, 56:1, 56:7, 56:21, 57:3, 59:25, 60:18, 65:5, 65:18, 66:4, 66:8, 66:14, 66:23, 73:19, 74:4, 75:2, 76:4, 76:12, 76:25, 77:21, 78:13, 78:16, 78:20, 81:18, 89:18, 93:25, 94:16, 99:16, 100:9, 104:6, 104:8, 104:20, 105:8, 106:13, 106:24, 107:16, 107:18
**Honor's** [4] - 6:1, 46:2, 47:21, 106:16
**HONORABLE** [1] - 1:3
**Horoupian** [2] - 51:17, 51:25
**hound** [1] - 100:4
**hour** [2] - 26:9, 27:4
**hours** [5] - 26:14, 83:15, 93:6, 99:9, 106:25
**house** [6] - 21:18, 22:7, 22:20, 23:20, 25:14, 39:15

## I

**Ibrahim** [19] - 9:22, 9:23, 10:5, 10:9, 10:21, 11:3, 11:11, 11:12, 11:14, 11:17, 86:20, 90:20, 91:2, 91:6, 92:17, 92:23, 92:25, 93:13, 93:18
**icon** [2] - 85:7, 85:23
**idea** [13] - 15:3, 15:8, 15:11, 15:14, 15:17, 17:7, 57:20, 63:23, 63:24, 64:21, 65:20, 66:3, 73:12
**identify** [1] - 5:8
**images** [1] - 14:23
**imaging** [1] - 14:19
**impeachable** [1] - 7:2
**impeachment** [1] - 6:19
**improper** [2] - 6:19, 27:24
**IN** [1] - 2:14
**inappropriate** [2] - 34:18, 34:20
**incident** [3] - 10:20, 11:14, 54:9
**include** [3] - 42:9, 67:24, 68:3
**included** [4] - 21:1, 22:23, 25:3, 49:5
**including** [3] - 29:17, 52:10, 55:22
**incomplete** [5] - 35:11, 35:18, 68:4, 74:24, 75:8
**incorrect** [1] - 68:16
**incur** [1] - 58:7
**incurred** [1] - 102:24
**indexing** [1] - 81:1
**indictments** [1] - 24:3
**individual** [2] - 50:11, 50:15
**individuals** [1] - 98:17
**information** [16] - 23:15, 24:15, 27:22, 37:6, 37:10, 83:11, 83:16, 83:20, 83:22, 83:25, 84:21, 85:6, 85:17, 85:21, 105:10, 107:20
**informed** [1] - 9:17
**initial** [1] - 70:17
**initiated** [1] - 44:21
**input** [13] - 15:20, 16:6, 16:8, 16:11, 16:20, 75:18, 83:22, 84:6, 85:6, 85:17, 85:21, 85:25, 88:1

**inputting** [2] - 84:1, 84:4
**install** [1] - 68:19
**installments** [1] - 53:5
**instances** [2] - 88:5, 103:2
**instead** [1] - 73:7
**institution** [3] - 18:2, 18:8, 18:18
**institutions** [2] - 18:13, 29:10
**instruction** [3] - 65:19, 66:2, 67:1
**instructions** [1] - 104:2
**interest** [5] - 50:25, 51:2, 51:6, 97:23
**interim** [2] - 64:23, 65:8
**interject** [1] - 46:22
**interview** [13] - 6:18, 24:13, 25:13, 26:6, 26:10, 26:13, 26:24, 27:2, 27:4, 35:5, 35:9, 54:1
**interviewed** [6] - 24:21, 24:23, 24:25, 34:3, 34:6, 80:4
**interviewing** [5] - 25:9, 26:1, 27:5, 35:3, 54:7
**interviews** [5] - 32:22, 33:16, 38:24, 49:11, 55:23
**introduce** [1] - 13:7
**introducing** [2] - 4:12, 7:7
**investigating** [1] - 48:5
**investigation** [29] - 13:17, 23:16, 23:22, 23:25, 24:12, 25:2, 28:6, 29:1, 29:7, 31:17, 32:6, 33:7, 37:6, 38:23, 40:16, 41:14, 42:1, 43:18, 43:19, 44:11, 44:21, 44:24, 45:16, 45:23, 46:7, 47:9, 48:3, 49:24, 53:12
**investigative** [8] - 14:8, 17:23, 18:5, 18:10, 18:15, 19:15, 24:22, 61:3
**invited** [2] - 59:1, 101:4
**involve** [1] - 21:3
**involved** [3] - 14:18, 100:17, 100:20
**involvement** [1] - 94:8

**irrelevant** [2] - 55:5, 56:5
**IRS** [9] - 44:6, 44:9, 44:10, 44:24, 46:13, 46:15, 47:14, 47:16, 78:11
**issue** [11] - 5:2, 6:14, 6:21, 6:25, 43:8, 45:15, 65:19, 66:10, 105:11, 107:10, 107:16
**issues** [2] - 44:8, 65:13, 103:19
**itself** [1] - 107:4

## J

**James** [1] - 67:19
**JAMES** [1] - 1:3
**Jason** [3] - 52:10, 52:18
**Jenness** [4] - 9:11, 9:25, 10:13, 53:20
**JFL** [3] - 52:24, 53:3
**job** [2] - 60:9, 80:7
**John** [9] - 18:21, 63:21, 64:1, 75:12, 75:14, 86:18, 90:22, 93:12, 96:4
**JOHN** [2] - 1:8, 2:15
**Johnson** [18] - 14:1, 15:12, 17:12, 17:25, 24:22, 24:23, 28:11, 28:13, 31:4, 35:21, 49:8, 49:13, 56:12, 64:22, 67:25, 75:9, 101:9, 103:10
**Johnson's** [10] - 15:4, 18:2, 36:1, 49:9, 101:13, 101:16, 101:17, 101:24, 102:3, 102:5
**joined** [1] - 67:19
**judge** [6] - 20:22, 20:25, 23:9, 39:22, 48:12
**JUDGE** [1] - 1:3
**judgment** [2] - 51:12, 53:13
**Judicial** [1] - 109:12
**Judy** [6] - 36:18, 60:14, 83:24, 84:16, 96:2, 101:17
**Julian** [1] - 51:8
**June** [3] - 35:21, 36:5, 67:25
**jury** [33] - 4:5, 5:25, 9:1, 9:2, 10:16, 11:22, 13:23, 14:15, 19:8, 43:23, 45:7,

45:19, 45:22, 47:24, 55:2, 59:4, 59:15, 59:22, 60:25, 61:8, 62:16, 63:10, 65:16, 66:4, 67:7, 79:18, 80:19, 85:20, 97:12, 103:23, 104:2
**jury's** [1] - 67:17
**Justice** [2] - 67:11, 67:15

## K

**Karlous** [14] - 9:8, 10:4, 11:8, 12:7, 13:12, 16:1, 20:4, 44:11, 47:25, 57:7, 61:10, 62:14, 67:9, 106:3
**KARLOUS** [2] - 3:3, 9:5
**Karlous's** [1] - 8:24
**Katherine** [1] - 95:1
**KATHERINE** [3] - 3:8, 94:23, 95:1
**Kathy** [1] - 94:19
**keep** [4] - 11:12, 23:25, 24:7, 24:12
**kept** [7] - 21:9, 21:17, 21:18, 24:6, 83:17, 84:21, 84:24
**kill** [1] - 86:5
**Kim** [2] - 67:19, 67:21
**kind** [2] - 51:2, 80:24
**kinds** [1] - 66:8
**kitchen** [1] - 89:12
**knowing** [3] - 24:11, 63:11, 106:19
**knowledge** [13] - 16:19, 17:24, 27:20, 57:22, 58:10, 61:12, 61:15, 61:20, 61:21, 61:23, 72:3, 75:22, 93:12
**known** [2] - 69:9, 72:7
**knows** [3] - 31:19, 45:23, 52:13

## L

**labeled** [2] - 92:3, 92:5
**lacks** [2] - 27:16, 30:17
**Lacks** [2] - 30:2, 40:24
**ladies** [4] - 9:3, 61:4, 65:11, 103:17
**Laguna** [2] - 79:20
**large** [1] - 92:5
**last** [18] - 8:2, 13:13, 19:12, 30:20, 38:5,

56:6, 62:23, 63:20, 63:25, 66:7, 70:16, 70:20, 79:4, 81:15, 81:22, 94:25, 102:9, 106:17
**Last** [1] - 19:19
**lasted** [1] - 102:5
**late** [3] - 60:14, 83:6, 101:3
**Law** [4] - 23:3, 23:21, 24:21, 52:18
**LAW** [1] - 2:17
**law** [26] - 20:14, 21:24, 23:3, 52:18, 57:13, 60:12, 60:16, 60:21, 60:22, 64:14, 71:6, 88:13, 88:25, 89:7, 91:9, 91:18, 93:22, 95:11, 95:14, 95:18, 95:20, 95:23, 97:14, 99:10, 101:25, 102:9
**lawyer** [6] - 20:12, 20:14, 49:12, 50:18, 57:8, 57:11
**layout** [1] - 91:17
**lead** [4] - 67:17, 67:21, 70:18, 107:10
**leader** [4] - 39:17, 40:10, 70:2, 70:9
**Leading** [6] - 22:1, 25:17, 32:14, 40:8, 81:10, 83:9
**leading** [2] - 22:3, 24:16, 27:23
**learn** [1] - 11:24, 58:6
**learned** [3] - 12:21, 12:23, 39:14
**least** [7] - 12:22, 12:25, 13:19, 84:20, 86:5, 97:13, 106:17
**leave** [2] - 19:19, 97:22
**led** [1] - 46:7
**left** [14] - 40:4, 50:3, 50:12, 50:16, 60:8, 80:24, 81:1, 81:3, 81:13, 82:25, 83:3, 83:6, 98:4, 98:24
**legal** [6] - 80:24, 80:25, 96:15, 97:3, 97:5, 97:14
**legit** [1] - 14:9
**length** [3] - 7:1, 26:12, 27:10
**lengthy** [1] - 7:7
**less** [1] - 80:13
**letter** [2] - 10:7, 107:20
**levels** [1] - 6:25
**light** [1] - 71:13

**limit** [1] - 24:13
**limited** [2] - 40:1, 71:24
**line** [3] - 24:4, 43:25, 89:19
**lines** [1] - 93:15
**list** [6] - 86:1, 86:2, 106:15, 107:17, 107:22
**listed** [1] - 86:2
**listen** [1] - 61:22
**LLP** [1] - 79:25
**lobby** [2] - 92:1, 92:13
**look** [18] - 14:9, 15:1, 16:22, 19:20, 19:23, 28:1, 30:19, 31:6, 31:15, 33:14, 37:6, 38:7, 54:6, 54:8, 58:16, 63:25, 93:1, 105:2
**looked** [8] - 30:11, 37:9, 54:20, 54:23, 72:1, 76:16, 82:9, 106:5
**looking** [3] - 29:5, 93:1, 105:15
**LOS** [1] - 109:3
**Los** [2] - 2:12, 36:6
**loud** [1] - 14:8
**lumping** [1] - 21:18
**lunch** [2] - 9:8, 9:13

## M

**mail** [32] - 6:20, 27:13, 28:8, 28:9, 28:11, 29:1, 29:2, 30:10, 30:21, 30:25, 31:16, 31:23, 32:9, 32:17, 32:23, 36:17, 36:21, 36:24, 37:10, 37:22, 38:4, 38:5, 40:11, 40:22, 40:23, 41:8, 46:25, 80:23, 97:14, 106:2, 106:3, 106:4
**mailed** [1] - 104:23
**mails** [13] - 27:18, 29:5, 29:6, 32:1, 32:6, 37:2, 39:2, 40:20, 40:21, 54:6, 54:20, 55:22, 56:11
**maintained** [2] - 35:22, 83:6
**management** [1] - 98:18
**March** [16] - 23:19, 23:21, 25:3, 25:9, 25:25, 48:7, 48:21, 49:6, 51:22, 53:12, 53:16, 71:18, 78:9,

91:1, 91:5, 92:10
**Maritza** [1] - 101:17
**Marjorie** [9] - 34:9, 34:11, 34:22, 62:4, 62:7, 62:16, 62:20, 62:23, 63:2
**Mark** [1] - 51:17
**martini** [2] - 59:1, 59:11
**match** [1] - 54:13
**matches** [1] - 37:11
**material** [1] - 32:2
**materials** [3] - 39:15, 70:1, 70:6
**matter** [25] - 15:18, 31:4, 32:23, 44:7, 44:10, 46:10, 46:14, 49:9, 49:13, 49:15, 49:17, 49:19, 50:5, 55:11, 55:19, 57:21, 65:4, 88:2, 88:6, 102:3, 102:5, 103:10, 106:23, 107:14, 109:11
**matters** [5] - 25:3, 27:6, 46:10, 100:15, 100:18
**mean** [6] - 19:10, 61:7, 62:9, 70:17, 107:7
**meaning** [2] - 39:19, 68:11
**mediation** [2] - 32:24, 100:21
**meet** [4] - 90:9, 90:14, 90:17, 90:20
**meetings** [1] - 89:14
**member** [3] - 14:7, 61:2, 61:3
**memorandum** [3] - 26:5, 26:23, 27:2
**memory** [1] - 71:4
**mention** [1] - 22:17
**mentioned** [6] - 36:23, 40:19, 51:4, 52:4, 63:14, 98:17
**message** [4] - 59:12, 81:25, 82:8, 82:9
**messages** [5] - 54:7, 54:20, 55:22, 58:23, 99:6
**met** [2] - 10:24, 101:6
**Michael** [2] - 32:18, 96:5
**MICHAEL** [2] - 1:8, 2:15
**Michelle** [19] - 15:18, 15:21, 16:6, 33:2, 33:8, 37:14, 38:2, 38:10, 38:24, 42:2, 42:3, 43:7, 49:23,

50:1, 56:17, 56:18, 56:25, 77:7, 77:17
**mid** [2] - 58:25, 59:12
**mid-November** [2] - 58:25, 59:12
**midafternoon** [1] - 65:10
**might** [4] - 23:24, 47:18, 58:17, 104:1
**million** [16] - 31:1, 36:6, 38:25, 39:3, 39:7, 53:2, 53:6, 56:18, 58:7, 75:23, 76:18, 77:3, 77:4, 77:24, 78:8, 78:11
**millions** [1] - 52:10
**mind** [2] - 13:1, 69:2
**minute** [1] - 6:7
**minutes** [2] - 6:8, 65:11
**misconduct** [1] - 50:17
**missed** [2] - 97:17, 104:2
**missing** [2] - 68:6, 75:7
**Misstates** [1] - 54:15
**misstates** [5] - 26:19, 28:21, 52:12, 52:13, 75:1
**mistaken** [1] - 4:18
**moment** [1] - 19:17
**moments** [2] - 60:25, 62:17
**money** [15] - 10:6, 39:4, 54:24, 55:25, 56:16, 56:19, 56:22, 56:25, 57:25, 59:5, 59:17, 77:18, 77:19, 77:25, 78:4
**month** [10] - 12:25, 56:14, 57:21, 57:24, 58:4, 71:3, 75:23, 77:4, 88:17, 88:19
**monthly** [1] - 58:11
**months** [8] - 12:22, 12:24, 39:11, 39:16, 44:4, 58:6, 77:18, 77:25
**Morgan** [2] - 81:5, 107:17
**morning** [7] - 46:3, 78:21, 79:10, 103:21, 104:16, 104:19, 105:6
**Mosby** [4] - 94:20, 95:6, 99:25, 100:2
**MOSBY** [1] - 3:8
**most** [5] - 47:21, 69:12, 69:23, 102:8,

102:19
**motion** [7] - 11:2, 11:5, 11:11, 52:16, 52:21, 92:18, 105:12
**motioning** [2] - 10:20, 92:14
**move** [18] - 10:1, 11:6, 12:5, 15:24, 17:4, 50:22, 56:6, 56:20, 59:25, 62:12, 65:5, 68:22, 69:15, 71:20, 72:8, 73:19, 76:7, 78:5
**moved** [2] - 28:7, 96:10
**MR** [287] - 2:16, 4:6, 4:9, 4:12, 4:19, 4:21, 4:23, 5:1, 5:6, 5:8, 5:11, 5:13, 5:16, 5:20, 5:24, 6:3, 6:6, 6:10, 6:13, 6:18, 7:12, 7:17, 8:4, 8:6, 8:7, 8:8, 8:9, 8:12, 8:13, 8:22, 9:7, 9:19, 9:22, 10:1, 10:4, 11:6, 11:8, 12:5, 12:7, 12:11, 12:14, 13:2, 13:5, 13:12, 15:24, 16:1, 16:4, 17:4, 17:7, 19:17, 19:19, 20:3, 20:17, 20:20, 21:6, 21:9, 22:1, 22:2, 22:3, 22:6, 22:9, 22:12, 22:15, 22:17, 22:19, 24:16, 24:19, 25:5, 25:8, 25:17, 25:19, 25:21, 25:25, 26:19, 26:23, 27:7, 27:10, 27:15, 27:20, 27:23, 28:1, 28:15, 28:18, 28:21, 28:25, 30:2, 30:6, 30:16, 30:19, 31:12, 31:15, 31:18, 31:22, 32:14, 32:17, 33:11, 33:14, 33:15, 34:12, 34:15, 34:17, 34:20, 34:22, 35:13, 35:16, 36:12, 36:15, 37:16, 37:20, 38:12, 38:16, 38:19, 38:23, 40:8, 40:11, 40:24, 41:1, 41:4, 42:4, 42:8, 42:13, 42:16, 42:24, 43:2, 43:4, 43:7, 43:21, 43:24, 44:17, 44:23, 45:6, 45:10, 45:13, 45:15, 45:22, 46:1, 46:13, 46:17, 47:5, 47:12,

47:17, 47:25, 48:14, 48:19, 48:23, 49:1, 49:4, 50:13, 50:15, 50:19, 50:22, 50:23, 51:15, 51:19, 51:20, 51:21, 51:22, 51:25, 52:12, 52:14, 52:16, 54:15, 54:19, 55:13, 55:18, 56:1, 56:6, 56:9, 56:20, 56:24, 57:3, 57:6, 57:9, 57:10, 57:13, 58:18, 58:21, 59:7, 59:8, 59:9, 59:11, 59:25, 60:2, 60:17, 60:21, 61:17, 61:20, 61:25, 62:3, 62:12, 62:14, 64:16, 64:18, 64:21, 65:5, 65:7, 65:18, 65:25, 66:3, 66:16, 66:19, 66:23, 67:9, 68:24, 69:15, 69:17, 69:19, 69:25, 71:20, 71:23, 72:8, 72:11, 73:19, 73:21, 74:4, 74:9, 74:15, 74:17, 75:1, 75:4, 76:3, 76:7, 76:10, 76:11, 76:14, 76:16, 76:25, 77:3, 77:20, 77:24, 78:1, 78:5, 78:8, 78:13, 78:15, 78:16, 78:20, 78:24, 79:9, 81:10, 81:12, 81:18, 81:21, 82:4, 82:7, 83:9, 83:11, 85:15, 85:17, 87:7, 89:18, 89:20, 90:4, 90:6, 90:12, 92:20, 92:23, 93:24, 94:3, 94:11, 94:13, 94:15, 94:16, 94:19, 95:5, 99:15, 99:18, 99:21, 99:22, 99:24, 99:25, 100:8, 100:11, 100:13, 103:25, 104:6, 104:12, 104:20, 105:7, 105:18, 105:21, 105:24, 106:11, 106:13, 106:24, 107:3, 107:15
**multiple** [6] - 6:13, 6:25, 44:11, 64:14, 69:11, 69:21

## N

**name** [16] - 47:9, 55:4, 70:14, 70:16, 70:20, 79:4, 88:9, 94:25,

95:20, 96:4, 96:5, 101:9, 101:23, 103:11, 103:12
**names** [1] - 106:18
**nature** [1] - 99:6
**near** [1] - 93:7
**necessary** [1] - 13:23
**need** [18] - 4:8, 7:3, 7:7, 8:2, 8:14, 22:14, 27:21, 55:23, 55:24, 56:9, 60:3, 61:4, 61:7, 66:1, 67:1, 77:15, 87:5, 106:21
**needed** [4] - 42:2, 43:8, 45:24, 89:1
**needless** [1] - 87:7
**needs** [1] - 106:17
**negative** [1] - 24:1
**never** [18] - 6:19, 8:9, 8:17, 11:2, 13:7, 16:22, 56:16, 56:19, 56:22, 66:19, 66:22, 68:13, 68:14, 73:17, 74:3, 93:4, 100:4, 103:6
**New** [7] - 7:5, 7:20, 7:21, 7:22, 38:18, 42:19
**new** [5] - 68:19, 68:20, 88:2, 95:17, 95:23
**Newport** [3] - 2:19, 96:7, 96:10
**next** [4] - 43:22, 71:3, 78:21, 94:18
**NICOLA** [2] - 2:4, 2:9
**nine** [1] - 71:25
**None** [1] - 3:16
**nonresponsive** [8] - 10:2, 17:5, 62:12, 68:22, 71:21, 72:9, 76:9, 78:6
**noon** [4] - 104:15, 104:16, 104:19, 105:20
**North** [1] - 2:11
**note** [1] - 46:24
**notes** [2] - 46:4, 53:24
**nothing** [13] - 6:15, 39:12, 46:20, 46:21, 49:7, 49:18, 50:2, 74:15, 93:24, 94:13, 97:16, 103:25, 105:5
**notice** [3] - 27:20, 106:17, 106:21
**November** [7] - 26:5, 27:5, 35:9, 54:8, 58:25, 59:12, 59:17
**number** [8] - 13:18, 14:4, 24:13, 87:8, 97:3, 102:6, 102:9,
104:17
**Number** [2] - 95:24, 96:1
**numerous** [4] - 22:7, 41:5, 41:6, 43:12

**O**

**O'Malley** [3] - 95:20, 96:4, 97:1
**oath** [2] - 20:22, 48:8
**object** [3] - 47:20, 65:18, 66:5
**objection** [53] - 6:13, 12:11, 13:5, 20:17, 22:1, 22:9, 25:5, 25:17, 26:19, 27:7, 27:15, 27:23, 28:15, 30:2, 30:16, 31:12, 31:18, 32:14, 33:11, 34:13, 35:13, 36:12, 37:16, 38:12, 38:19, 40:8, 40:24, 42:4, 42:13, 48:14, 48:23, 50:13, 50:19, 52:12, 54:15, 55:14, 56:1, 57:9, 58:18, 59:7, 59:9, 61:17, 64:16, 74:4, 76:3, 76:11, 77:1, 77:20, 78:1, 81:10, 82:4, 83:9, 99:15
**objection's** [1] - 34:21
**objections** [1] - 21:6
**obligation** [1] - 67:2
**obligations** [1] - 67:3
**observe** [15] - 89:7, 89:10, 89:12, 89:14, 89:17, 89:20, 90:1, 90:14, 90:17, 90:20, 92:12, 92:17, 92:23, 100:13, 100:17
**observed** [1] - 89:3
**obtain** [4] - 20:23, 24:9, 48:12, 51:11
**obtained** [10] - 20:21, 22:7, 29:9, 31:16, 31:19, 31:21, 33:25, 34:25, 41:15, 63:2
**obtaining** [3] - 22:12, 23:11, 33:21
**obviously** [3] - 5:25, 6:4, 105:12
**occurred** [2] - 25:23, 72:17
**OF** [7] - 1:2, 1:5, 1:14, 2:1, 109:1, 109:3, 109:4
**offer** [5] - 5:3, 5:6, 5:9, 71:13, 74:12
**offered** [2] - 3:16, 71:10
**office** [7] - 45:24, 46:18, 81:2, 86:3, 89:5, 89:23, 89:24
**Office** [8] - 44:2, 45:18, 47:8, 50:4, 50:12, 50:16, 60:8, 73:9
**offices** [9] - 60:22, 88:13, 88:25, 89:7, 89:15, 90:2, 90:9, 91:9, 92:8
**OFFICES** [1] - 2:17
**OFFICIAL** [3] - 1:24, 109:1, 109:5
**Official** [1] - 109:20
**often** [2] - 88:13, 88:16
**old** [7] - 28:19, 30:11, 30:14, 31:7, 62:9, 63:2, 68:20
**once** [1] - 88:20
**one** [39] - 4:9, 5:22, 6:7, 12:25, 19:2, 19:17, 23:8, 25:14, 27:1, 29:6, 37:3, 37:5, 37:13, 38:7, 39:9, 41:14, 52:8, 56:14, 58:21, 58:25, 61:12, 66:15, 68:12, 68:14, 68:18, 69:12, 69:23, 83:5, 87:3, 89:19, 97:10, 98:17, 98:21, 98:24, 107:13, 107:19
**one-month** [1] - 56:14
**ongoing** [2] - 44:25, 51:12
**oOo** [1] - 108:6
**Open** [1] - 47:24
**open** [4] - 44:11, 48:2, 53:16, 85:24
**opened** [4] - 43:19, 46:6, 46:10, 46:16
**opening** [2] - 43:17, 105:10
**opinion** [1] - 27:19
**opinions** [2] - 65:13, 103:18
**opportunity** [2] - 20:8, 104:9
**opposed** [1] - 12:8
**opposition** [1] - 104:23
**optional** [1] - 107:13
**order** [3] - 87:24, 88:6, 107:9
**ordering** [1] - 81:2
**otherwise** [1] - 5:13
**offered** [2] - 3:16, 71:10

**out-of-pocket** [1] - 102:13
**out-of-town** [3] - 106:16, 106:18, 107:25
**outside** [22] - 22:9, 33:11, 34:12, 37:16, 38:13, 39:18, 39:20, 39:21, 42:4, 42:13, 42:24, 43:4, 48:23, 51:19, 51:21, 53:13, 56:1, 64:16, 70:3, 71:6, 76:25, 78:1
**overruled** [52] - 9:20, 20:18, 21:7, 22:4, 22:16, 22:18, 24:17, 25:6, 25:18, 26:21, 27:8, 27:17, 28:23, 30:4, 30:18, 31:14, 31:20, 32:15, 33:13, 34:21, 37:18, 38:14, 38:21, 40:9, 40:25, 41:2, 42:6, 42:25, 43:5, 48:16, 48:25, 49:2, 51:24, 54:17, 56:3, 60:19, 61:18, 62:1, 64:17, 64:19, 74:6, 75:3, 76:5, 76:13, 77:2, 77:22, 78:3, 81:11, 83:10, 85:16, 90:5, 92:21
**own** [6] - 36:10, 44:7, 87:1, 87:14, 89:8, 104:1

**P**

**p.m** [5] - 67:6, 104:7, 104:9, 108:5
**P.M** [2] - 1:16, 4:2
**packages** [1] - 80:23
**PAGE** [1] - 3:2
**page** [14] - 13:13, 13:25, 28:4, 28:5, 30:15, 30:20, 31:6, 38:7, 51:16, 64:9, 64:10, 64:11, 109:11
**pages** [2] - 46:4, 48:21
**paid** [7] - 10:6, 36:6, 53:3, 53:6, 53:8, 59:23, 98:3
**paragraph** [3] - 13:13, 26:16, 27:1
**paragraphs** [1] - 26:24
**part** [20] - 6:5, 6:11, 8:2, 21:19, 24:12, 28:6, 29:1, 31:17, 33:7, 33:19, 35:5, 37:5, 41:14, 49:4, 52:16, 67:4, 89:24,

96:1, 102:19
**partial** [2] - 43:9, 65:3
**partially** [1] - 70:4
**participate** [1] - 18:20
**particular** [1] - 87:17
**parties** [1] - 78:18
**partners** [1] - 52:10
**parts** [2] - 6:2, 6:9
**pass** [1] - 99:6
**Pause** [1] - 91:13
**pay** [6] - 44:6, 44:7, 53:14, 60:4, 77:19, 78:11
**payment** [4] - 53:5, 76:19, 78:9, 93:16
**payments** [4] - 52:9, 64:14, 66:9, 75:9
**payroll** [2] - 44:6, 44:8
**PDF** [1] - 28:12
**penalty** [3] - 12:1, 12:18, 12:21
**pending** [3] - 105:12, 107:19, 107:24
**penny** [2] - 31:10, 31:11
**people** [4] - 24:13, 73:9, 89:14, 96:16
**per** [1] - 15:22
**percent** [2] - 33:20, 57:1
**performed** [1] - 97:13
**perhaps** [1] - 44:23
**period** [9] - 19:3, 35:25, 36:4, 59:4, 72:6, 80:16, 80:21, 98:14, 99:14
**perjury** [3] - 12:1, 12:18, 12:22
**personal** [6] - 16:19, 29:17, 58:13, 73:15, 73:25, 74:8
**personally** [1] - 72:6
**Phan** [19] - 15:18, 15:21, 16:6, 17:21, 18:11, 33:2, 33:8, 33:16, 37:14, 38:2, 38:11, 38:24, 42:2, 42:3, 43:7, 50:1, 56:17, 56:18, 77:8
**Phan's** [4] - 39:4, 56:25, 77:17, 78:9
**phone** [8] - 9:10, 41:16, 41:18, 41:22, 42:17, 42:18, 42:22, 54:9
**phones** [1] - 80:23
**phrase** [1] - 16:15
**physical** [1] - 88:13
**pick** [1] - 68:19
**piece** [1] - 8:14

**UNITED STATES DISTRICT COURT**

**place** [6] - 9:11, 20:15, 32:22, 32:23, 60:4, 72:15
**placed** [1] - 42:19
**places** [1] - 41:21
**Plaintiff** [1] - 1:6
**plaintiff** [1] - 57:15
**PLAINTIFF** [1] - 2:3
**plaintiff's** [2] - 57:7, 57:10
**plan** [3] - 4:12, 19:20, 19:22
**play** [7] - 5:4, 6:1, 6:3, 6:4, 6:6, 6:10, 8:18
**played** [1] - 7:4
**Plaza** [1] - 2:18
**Pls** [1] - 38:16
**plus** [1] - 78:10
**pocket** [1] - 102:13
**point** [25] - 5:5, 8:20, 14:7, 25:14, 25:25, 26:3, 44:24, 56:5, 56:10, 59:21, 64:12, 65:4, 66:3, 66:7, 66:19, 67:2, 78:18, 79:24, 92:10, 92:12, 93:11, 96:17, 98:21, 101:8, 104:6
**portion** [2] - 56:6, 59:22
**position** [1] - 66:12
**positive** [1] - 24:1
**possession** [1] - 106:2
**possibly** [3] - 4:9, 66:13, 73:14
**potential** [1] - 51:5
**potentially** [4] - 21:4, 84:10, 107:18, 107:20
**practical** [1] - 106:23
**practically** [1] - 60:8
**precaution** [1] - 73:6
**predominantly** [1] - 97:4
**prejudicial** [5] - 45:10, 45:25, 46:22, 47:20, 66:5
**preparer** [1] - 34:24
**presence** [8] - 4:5, 9:2, 41:23, 43:23, 47:24, 65:16, 67:7, 103:23
**present** [2] - 13:18, 14:4
**pretty** [3] - 7:6, 56:12, 99:14
**prevent** [1] - 11:3
**primarily** [2] - 36:17, 51:11

**printed** [1] - 64:11
**printout** [2] - 15:5, 15:9
**printouts** [4] - 13:19, 13:21, 13:24, 14:5
**privilege** [7] - 66:10, 66:11, 66:13, 66:17, 66:20, 66:22
**privileged** [3] - 21:5, 32:2, 66:25
**PRO** [1] - 2:14
**problem** [4] - 5:14, 47:3, 47:23, 50:17
**procedures** [2] - 20:15, 46:14
**proceed** [4] - 4:11, 25:22, 43:21, 43:25
**PROCEEDINGS** [1] - 1:14
**Proceedings** [1] - 108:5
**proceedings** [2] - 91:13, 109:10
**process** [5] - 17:3, 20:7, 20:8, 32:1, 44:10
**produced** [3] - 47:2, 106:6, 106:8
**producing** [1] - 7:8
**production** [1] - 6:15
**professional** [1] - 97:10
**profile** [1] - 50:5
**program** [7] - 16:5, 64:11, 83:7, 83:13, 85:9, 85:11
**proper** [1] - 13:6
**proposed** [3] - 7:13, 7:17, 7:24
**prosecute** [2] - 58:4, 58:11
**prosecuted** [2] - 44:4, 46:6
**prosecution** [7] - 21:4, 24:22, 32:5, 46:15, 47:11, 51:7, 67:3
**prosecutorial** [1] - 50:17
**prosecutors** [1] - 19:11
**protect** [1] - 21:24
**protocols** [4] - 20:16, 21:1, 21:3, 23:9
**prove** [3] - 7:1, 27:20, 76:14
**proved** [1] - 8:1
**provide** [4] - 11:21, 37:7, 41:18, 104:9
**provided** [9] - 4:13,

7:4, 34:4, 34:15, 35:6, 44:23, 48:2, 54:11, 107:17
**providing** [2] - 20:22, 54:5
**public** [2] - 23:22, 53:16
**publicity** [1] - 24:1
**pull** [4] - 28:4, 36:16, 51:15, 76:17
**purpose** [1] - 66:2
**purposely** [2] - 46:9, 66:11
**purposes** [1] - 24:7
**pursuant** [6] - 21:15, 52:8, 53:14, 71:8, 79:15, 109:8
**pursue** [2] - 97:22, 98:9
**put** [3] - 83:13, 84:21, 100:4
**puzzled** [1] - 93:1

## Q

**qdb** [1] - 69:7
**quarter** [1] - 106:4
**quash** [1] - 107:20
**quashed** [2] - 107:10, 107:24
**quashing** [3] - 107:19, 107:24
**questions** [22] - 4:6, 11:9, 12:8, 20:7, 22:14, 40:12, 43:12, 43:15, 43:22, 44:1, 48:7, 49:5, 55:9, 57:3, 74:22, 75:10, 75:21, 75:24, 78:13, 94:6, 94:11, 99:6
**quibbling** [1] - 47:12
**quick** [2] - 4:10, 8:21
**QuickBooks** [35] - 17:12, 17:16, 25:10, 25:15, 35:7, 35:10, 35:17, 35:22, 36:1, 36:10, 62:4, 62:6, 62:9, 62:16, 62:19, 62:24, 63:1, 63:11, 63:14, 63:20, 63:25, 67:24, 68:3, 68:6, 68:8, 69:2, 69:5, 69:11, 69:21, 74:24, 75:8, 75:17, 85:18
**quiet** [1] - 11:12
**quote** [4] - 73:16, 73:17, 74:2

## R

**raise** [2] - 79:1, 94:22
**raises** [2] - 5:1
**ran** [1] - 97:18
**range** [3] - 40:2, 71:24
**reaching** [1] - 48:1
**read** [8] - 8:23, 52:14, 53:10, 69:17, 69:20, 73:22, 73:24, 78:18
**ready** [2] - 24:2, 98:9
**really** [4] - 7:1, 26:11, 65:4, 100:4
**REALTIME** [1] - 109:5
**reason** [5] - 23:24, 37:1, 47:13, 65:20
**reasons** [1] - 98:24
**receipts** [2] - 76:6, 76:10
**receive** [2] - 53:1, 104:18
**received** [9] - 4:17, 12:1, 12:19, 14:22, 30:6, 36:13, 78:8, 80:23, 82:5
**receives** [1] - 107:13
**recently** [2] - 18:25, 19:12
**reception** [3] - 91:18, 91:22, 93:7
**receptionist** [1] - 80:7
**recess** [3] - 65:11, 67:5, 108:4
**Recess** [1] - 67:6
**recite** [1] - 8:19
**recollection** [9] - 13:6, 13:10, 13:14, 13:16, 19:14, 81:22, 87:16, 102:22, 103:5
**record** [3] - 19:18, 45:16, 46:24
**recordkeeping** [1] - 25:11
**records** [52] - 17:24, 18:6, 18:11, 18:16, 22:13, 23:11, 29:7, 29:10, 29:13, 29:14, 30:6, 30:7, 30:12, 33:21, 33:25, 34:4, 34:7, 34:16, 34:25, 35:10, 35:17, 38:2, 38:24, 41:15, 41:16, 41:18, 41:22, 41:23, 42:17, 42:19, 42:22, 49:12, 54:6, 54:23, 55:11, 55:19, 55:21, 55:22, 58:12, 62:4, 62:7, 62:9, 62:16, 62:21, 62:24, 63:5, 66:8, 67:24, 75:15,

75:17, 83:6
**recounted** [3] - 10:19, 11:15, 44:18
**Recross** [1] - 3:5
**RECROSS** [1] - 74:16
**Recross-Examination** [1] - 3:5
**RECROSS-EXAMINATION** [1] - 74:16
**REDIRECT** [1] - 57:5
**Redirect** [1] - 3:4
**reference** [1] - 47:8
**referenced** [1] - 106:3
**referral** [9] - 44:5, 44:15, 45:2, 45:5, 45:7, 47:9, 47:10, 48:2
**referred** [6] - 13:14, 26:9, 28:13, 28:15, 44:9, 44:10
**referring** [3] - 13:23, 46:14, 47:14
**reflect** [1] - 15:8
**refresh** [5] - 13:3, 13:14, 13:16, 81:19, 81:21
**refreshes** [1] - 13:10
**refreshing** [1] - 13:6
**regard** [1] - 49:8
**regarding** [2] - 10:13, 28:13
**regardless** [1] - 45:2
**regards** [6] - 9:25, 24:5, 49:19, 56:18, 77:3, 106:14
**Regnier** [41] - 25:9, 25:14, 26:1, 27:6, 32:10, 32:17, 35:10, 35:17, 35:20, 36:4, 36:9, 36:14, 36:18, 36:20, 36:23, 37:23, 39:10, 39:12, 60:14, 63:14, 67:23, 70:9, 70:25, 71:10, 75:8, 75:18, 80:4, 81:7, 83:22, 84:17, 87:10, 87:23, 88:5, 90:15, 96:2, 96:4, 98:18, 98:21, 98:25, 99:18, 99:24
**Regnier's** [8] - 21:18, 22:7, 22:20, 23:20, 24:20, 25:8, 28:8, 41:7
**regularly** [2] - 86:15, 93:7
**regulations** [1] - 109:12

**rejected** [1] - 7:13
**related** [3] - 23:5, 58:22, 100:14
**relates** [10] - 15:4, 18:4, 45:11, 49:15, 51:10, 51:20, 51:22, 55:11, 105:9, 106:25
**relating** [11] - 10:20, 18:16, 29:15, 65:19, 66:9, 102:3, 104:13, 105:11, 105:12, 105:15, 107:4
**relationship** [7] - 73:15, 74:1, 74:8, 74:13, 82:13, 82:16, 97:8
**relevant** [2] - 45:25, 56:24
**relied** [3] - 17:14, 17:16, 74:23
**relying** [3] - 75:7, 75:14, 75:19
**remember** [20] - 19:13, 26:10, 26:11, 26:12, 28:9, 41:12, 43:13, 50:6, 61:2, 65:12, 71:7, 74:24, 75:5, 75:6, 75:9, 75:24, 77:12, 88:11, 90:21, 103:17
**Remoun** [1] - 44:10
**REMOUN** [2] - 3:3, 9:5
**repaid** [2] - 103:3, 103:6
**rephrase** [2] - 28:17, 59:10
**replies** [1] - 38:7
**reply** [1] - 104:7
**report** [1] - 30:21
**reported** [1] - 109:10
**Reporter** [1] - 109:20
**reporter** [4] - 69:20, 73:24, 79:1, 94:22
**REPORTER** [3] - 1:24, 109:1, 109:6
**reporter's** [1] - 86:5
**REPORTER'S** [1] - 1:14
**reports** [1] - 87:10
**represent** [2] - 57:15, 101:9
**representation** [1] - 45:8
**request** [5] - 46:25, 65:18, 101:6, 105:24, 106:10
**required** [1] - 71:13
**research** [2] - 65:14, 103:20
**residence** [5] - 23:1,

23:21, 24:20, 24:21, 25:8
**respect** [2] - 66:18, 66:22
**response** [2] - 105:1, 105:14
**responsibilities** [2] - 80:17, 80:25
**responsible** [1] - 83:19
**restate** [1] - 42:15
**restricted** [1] - 89:4
**RESUMED** [1] - 9:5
**review** [10] - 29:7, 32:1, 32:21, 33:7, 33:15, 38:24, 49:11, 49:24, 55:21, 56:9
**reviewed** [6] - 29:1, 32:6, 39:18, 55:10, 62:21, 63:5
**reviewing** [1] - 19:10
**Richard** [1] - 101:23
**ripped** [1] - 56:18
**rise** [3] - 65:15, 103:22, 108:3
**role** [4] - 80:17, 80:20, 83:2, 96:14
**ROOM** [1] - 1:24
**room** [9] - 5:25, 10:19, 60:7, 60:9, 60:11, 60:14, 92:3, 92:5, 92:15
**rooms** [3] - 89:1, 89:10, 90:18
**rose** [1] - 5:2
**rule** [2] - 102:20, 106:16
**Rule** [2] - 6:14, 104:7

---

**S**

**S-n-e-d-d-o-n** [1] - 95:2
**SACR-19-00061-JVS** [1] - 1:7
**Saddleback** [1] - 79:21
**SAGEL** [93] - 2:5, 4:19, 4:21, 4:23, 6:13, 6:18, 8:7, 8:9, 8:12, 9:19, 12:11, 13:5, 20:3, 20:20, 21:9, 22:2, 22:6, 22:12, 22:19, 24:19, 25:8, 25:21, 25:25, 26:23, 27:10, 27:20, 28:1, 28:18, 28:25, 30:6, 30:19, 31:15, 31:22, 32:17, 33:14, 33:15, 34:15, 34:22,

35:16, 36:15, 37:20, 38:16, 38:23, 40:11, 41:4, 42:8, 43:2, 43:7, 43:21, 43:24, 46:1, 46:13, 47:12, 48:19, 49:4, 50:23, 51:15, 51:20, 51:22, 51:25, 52:14, 52:16, 54:19, 55:18, 56:9, 56:24, 57:3, 57:9, 58:18, 59:7, 59:9, 60:17, 61:17, 61:25, 64:16, 64:18, 74:4, 74:17, 75:4, 76:10, 76:16, 77:3, 77:24, 78:8, 78:13, 78:16, 99:15, 99:21, 99:24, 100:8, 103:25, 106:13, 107:15
**Sagel** [27] - 3:4, 3:5, 6:12, 10:14, 11:11, 11:20, 13:14, 13:18, 20:1, 34:14, 59:4, 59:15, 59:22, 60:24, 62:3, 62:15, 63:15, 64:22, 67:23, 70:5, 71:5, 73:7, 73:17, 74:3, 74:9, 74:12, 100:3
**Sagel's** [2] - 73:15, 73:25
**SANTA** [3] - 1:17, 1:25, 4:1
**Santa** [1] - 2:7
**sat** [3] - 12:22, 41:4, 91:20
**save** [1] - 86:13
**Save** [1] - 86:14
**saw** [3] - 40:21, 88:17, 90:12
**school** [1] - 57:13
**School** [1] - 79:21
**scope** [25] - 22:10, 22:11, 33:11, 34:12, 37:16, 38:13, 39:18, 39:20, 39:21, 39:23, 42:5, 42:13, 42:24, 43:4, 48:24, 51:19, 51:21, 55:13, 56:2, 64:16, 70:3, 71:6, 76:25, 78:2
**Scott** [1] - 86:24
**screw** [1] - 58:17
**SE** [1] - 2:14
**search** [35] - 20:7, 20:9, 20:15, 20:21, 20:23, 20:25, 21:11, 21:15, 21:19, 22:6, 22:7, 22:19, 22:20, 22:23, 23:5, 23:8,

23:9, 23:12, 23:19, 23:20, 24:3, 24:9, 24:19, 25:2, 25:13, 33:22, 39:11, 39:19, 39:22, 40:5, 63:15, 70:2, 71:8, 71:23
**second** [4] - 13:13, 37:21, 78:9
**second-to-the-last** [1] - 13:13
**secondly** [1] - 104:12
**seconds** [1] - 6:7
**secretive** [1] - 23:25
**Section** [1] - 109:8
**see** [17] - 14:9, 28:4, 37:9, 37:10, 37:13, 46:3, 47:23, 53:10, 58:25, 66:1, 67:1, 69:12, 69:22, 70:2, 91:14, 97:15, 103:20
**seeing** [2] - 30:10, 88:11
**seeking** [1] - 23:15
**seeks** [1] - 27:24
**SEGAL** [3] - 42:16, 47:25, 50:15
**seize** [1] - 71:6
**seized** [3] - 21:11, 21:12, 21:15
**select** [1] - 86:9
**self** [1] - 33:22
**SELNA** [1] - 1:3
**send** [2] - 38:18, 42:3
**sending** [3] - 41:8, 81:25, 82:2
**sends** [1] - 41:21
**sent** [4] - 36:18, 37:22, 82:3, 82:8
**separate** [1] - 31:25
**served** [2] - 79:16, 97:3
**server** [2] - 85:4, 85:13
**servers** [5] - 14:19, 15:1, 22:23, 24:10, 84:21
**service** [1] - 105:4
**set** [5] - 74:24, 87:18, 88:3, 88:6, 104:2
**setting** [1] - 104:14
**settle** [1] - 100:21
**settlement** [15] - 10:22, 11:4, 12:2, 12:18, 33:18, 39:4, 52:17, 52:24, 53:9, 53:14, 54:12, 54:13, 64:15, 76:19, 93:16
**seven** [7] - 39:10, 39:15, 70:1, 70:5, 72:4, 80:13, 80:16

**seven-and-a-half-year** [1] - 80:16
**several** [5] - 30:25, 39:15, 50:9, 52:5
**severed** [2] - 45:11, 46:23
**share** [1] - 24:14
**sharing** [1] - 19:7
**shook** [1] - 19:22
**shortcut** [1] - 13:22
**shortly** [1] - 71:2
**show** [13] - 13:9, 15:11, 15:14, 15:17, 17:10, 26:2, 27:21, 41:23, 42:22, 46:7, 55:19, 76:1, 76:10
**showed** [2] - 38:4, 41:7
**shown** [1] - 19:8
**shows** [3] - 6:23, 15:3, 55:8
**shredded** [1] - 72:5
**sic** [2] - 91:2, 99:18
**side** [2] - 47:14, 47:15
**sidebar** [3] - 43:22, 43:23, 105:25
**signal** [1] - 92:25
**signatory** [1] - 29:25
**signed** [3] - 12:1, 12:19, 52:17
**simple** [1] - 62:15
**simplest** [1] - 74:18
**simply** [1] - 66:6
**Sims** [2] - 86:24, 87:1
**single** [1] - 57:21
**sit** [2] - 14:12, 17:7
**site** [3] - 39:17, 41:18, 41:22
**sitting** [7] - 59:14, 63:5, 63:7, 63:8, 78:16, 92:1, 92:14
**six** [7] - 26:14, 39:9, 39:15, 44:4, 69:25, 70:5, 72:4
**slacker** [1] - 100:4
**slashing** [1] - 53:25
**slightly** [1] - 55:9
**slow** [1] - 86:4
**small** [1] - 92:3
**smoothly** [1] - 97:18
**SNEDDON** [2] - 3:8, 94:23
**Sneddon** [1] - 95:1
**software** [1] - 68:25
**solve** [1] - 5:17
**solves** [1] - 5:11
**someone** [1] - 51:5
**sometimes** [5] - 23:25, 34:3, 34:6,

40:1, 99:5
**somewhat** [1] - 99:4
**sorry** [9] - 4:20, 17:2, 45:13, 65:13, 66:16, 82:18, 84:18, 85:1, 85:10, 91:4
**sought** [1] - 9:14
**sound** [3] - 40:13, 40:14, 40:15
**sounds** [2] - 72:1, 100:10
**SOUTHERN** [1] - 1:2
**Spaan** [1] - 109:20
**SPAAN** [3] - 1:23, 109:5, 109:19
**space** [1] - 89:5
**speaking** [1] - 99:9
**Special** [15] - 8:23, 10:4, 11:8, 12:7, 13:12, 16:1, 20:4, 47:25, 57:7, 61:10, 62:14, 67:9, 67:19, 67:21, 106:3
**special** [3] - 9:8, 20:15, 21:1
**specific** [3] - 13:20, 44:2, 104:18
**specifically** [1] - 40:2
**Speculation** [1] - 27:15
**speculation** [2] - 27:24, 41:1
**spell** [2] - 79:4, 94:24
**spoken** [2] - 79:13, 95:6
**spot** [1] - 93:7
**Spring** [1] - 2:11
**stale** [1] - 64:3
**stand** [5] - 10:15, 11:25, 19:20, 78:25, 94:21
**STAND** [1] - 9:5
**STANDBY** [1] - 2:16
**start** [9] - 20:11, 26:23, 50:25, 75:4, 75:5, 76:24, 95:9, 96:19, 97:1
**start-up** [1] - 96:19
**started** [7] - 44:9, 46:14, 67:19, 80:22, 95:23, 96:3, 96:13
**state** [3] - 14:8, 79:3, 94:24
**STATE** [1] - 109:4
**statement** [1] - 37:10
**statements** [2] - 49:20, 49:24
**States** [7] - 2:4, 2:5, 2:9, 2:10, 109:6, 109:8, 109:13

**STATES** [2] - 1:1, 1:5
**stayed** [1] - 80:10
**stealing** [1] - 60:11
**stenographically** [1] - 109:10
**step** [1] - 78:17
**steps** [2] - 72:23, 77:11
**STEWARD** [2] - 2:17, 2:18
**stick** [1] - 47:3
**still** [2] - 26:5, 46:8
**stip** [3] - 7:11, 7:12, 7:13
**stipulate** [5] - 6:22, 6:24, 7:5, 7:16, 91:16
**stipulation** [6] - 7:18, 7:24, 8:2, 8:17, 52:21, 78:19
**stolen** [2] - 59:5, 59:17
**Stolper** [38] - 13:15, 43:13, 43:15, 43:20, 44:1, 44:3, 45:17, 45:24, 46:16, 46:18, 46:19, 46:20, 46:21, 46:25, 47:7, 48:1, 49:4, 49:9, 49:12, 49:16, 49:21, 49:25, 50:3, 50:8, 51:4, 51:8, 51:11, 59:23, 60:5, 60:7, 60:15, 73:5, 73:7, 73:16, 74:1, 74:13, 74:20, 106:2
**Stolper's** [2] - 43:16, 44:16
**stop** [2] - 39:11, 92:19
**stopped** [2] - 25:14, 36:9
**straight** [1] - 11:18
**STREET** [1] - 1:24
**Street** [2] - 2:6, 2:11
**stricken** [14] - 11:7, 12:6, 17:6, 55:17, 56:8, 56:23, 60:1, 62:13, 65:6, 69:16, 71:22, 72:10, 73:20, 76:9
**strike** [21] - 10:1, 11:6, 12:5, 15:24, 17:4, 50:22, 56:6, 56:20, 59:25, 62:12, 65:5, 68:22, 69:15, 71:20, 72:8, 73:19, 76:7, 78:5, 91:4, 92:11, 100:11
**struck** [2] - 35:13, 74:19

**subject** [2] - 32:12, 53:9
**submission** [2] - 104:13, 105:13
**submitted** [4] - 12:17, 12:23, 65:14, 103:19
**subpoena** [3] - 79:15, 107:9, 107:13
**subpoenaed** [4] - 34:6, 62:10, 107:5, 107:7
**subpoenas** [3] - 30:7, 34:1, 107:5
**subtle** [1] - 46:5
**sufficient** [2] - 5:4, 27:19
**suggest** [1] - 11:3
**suggesting** [1] - 64:7
**suggestion** [4] - 99:19, 99:20, 100:2, 100:3
**Suite** [3] - 2:6, 2:11, 2:19
**sun** [1] - 13:9
**supplement** [3] - 104:17, 105:15, 105:21
**supplies** [1] - 81:2
**support** [1] - 48:20
**supposedly** [1] - 10:20
**surgical** [2] - 46:3, 46:5
**surprise** [4] - 24:8, 58:6, 58:8, 75:24
**sustained** [8] - 22:11, 27:25, 50:21, 52:15, 55:15, 57:12, 58:20, 99:17
**swore** [1] - 20:21
**sworn** [3] - 11:21, 11:25, 48:11
**SWORN** [1] - 79:2, 94:23

**T**

**Tabs** [66] - 13:19, 13:20, 13:24, 14:5, 15:1, 15:3, 15:8, 15:11, 15:14, 15:17, 15:21, 16:5, 16:6, 16:11, 16:20, 17:8, 17:10, 19:15, 19:20, 26:2, 27:11, 27:12, 28:13, 28:18, 28:25, 29:2, 30:21, 33:2, 55:8, 55:24, 56:4, 56:10, 57:2, 58:16,

61:4, 61:9, 61:13, 61:24, 65:22, 65:24, 66:14, 66:18, 66:20, 66:24, 67:4, 83:7, 83:12, 83:17, 83:20, 83:23, 84:1, 84:13, 84:21, 85:6, 85:11, 85:21, 87:11, 87:17, 87:18, 87:24, 94:6, 104:18, 105:10, 105:16
**taint** [16] - 17:3, 32:1, 60:24, 61:3, 61:9, 61:11, 61:13, 61:24, 65:19, 65:21, 66:4, 66:23, 67:3, 67:10, 67:14, 69:14
**Tashchyan** [5] - 14:15, 14:18, 14:21, 14:23, 14:25
**tasks** [1] - 97:12
**tax** [3] - 34:24, 44:8, 44:12
**taxes** [2] - 44:6, 44:7
**TCU** [1] - 79:22
**team** [31] - 14:8, 17:23, 18:5, 18:10, 18:15, 19:15, 21:4, 21:20, 24:22, 32:5, 32:6, 39:17, 40:10, 51:7, 60:24, 61:3, 61:9, 61:11, 61:13, 61:24, 65:19, 65:21, 66:4, 66:24, 67:3, 67:10, 67:14, 69:14, 70:2, 70:8
**team's** [1] - 67:3
**teams** [1] - 20:9
**technically** [1] - 97:20
**ten** [5] - 99:2, 99:10, 99:14, 100:7, 102:16
**ten-year** [1] - 99:14
**terms** [1] - 53:9
**terrible** [1] - 91:12
**testified** [7] - 12:16, 14:16, 14:22, 41:6, 51:17, 52:1, 75:14
**testify** [6] - 10:11, 10:15, 59:16, 64:22, 79:16, 107:14
**testifying** [2] - 30:16, 50:20
**testimony** [14] - 8:24, 11:21, 12:2, 26:19, 28:21, 41:7, 48:8, 49:20, 49:25, 50:13, 54:15, 55:23, 75:12, 94:8
**text** [10] - 41:21, 54:6, 54:20, 55:22, 58:23,

59:12, 81:16, 81:22, 82:8, 82:9
**Thanksgiving** [1] - 101:4
**THE** [225] - 2:3, 2:14, 3:3, 3:6, 3:8, 4:8, 4:11, 4:15, 4:20, 4:22, 4:24, 5:3, 5:7, 5:10, 5:12, 5:15, 5:19, 5:21, 6:2, 6:5, 6:9, 6:12, 6:17, 7:10, 7:15, 7:25, 8:5, 8:11, 8:19, 8:25, 9:3, 9:5, 9:20, 9:21, 10:3, 11:7, 12:6, 12:12, 13:4, 13:9, 15:25, 16:3, 17:6, 20:1, 20:18, 20:19, 21:7, 21:8, 22:4, 22:5, 22:11, 22:16, 22:18, 24:17, 24:18, 25:6, 25:7, 25:18, 25:22, 25:23, 26:21, 26:22, 27:8, 27:9, 27:17, 27:18, 27:25, 28:17, 28:23, 28:24, 30:4, 30:5, 30:18, 31:14, 31:20, 31:21, 32:15, 32:16, 33:13, 34:14, 34:19, 34:21, 35:15, 36:13, 37:18, 37:19, 38:14, 38:15, 38:21, 38:22, 40:9, 40:10, 40:25, 41:2, 41:3, 42:6, 42:7, 42:15, 42:25, 43:1, 43:5, 43:6, 44:14, 44:20, 45:4, 45:8, 45:12, 45:14, 45:21, 46:12, 47:3, 47:6, 47:22, 48:16, 48:17, 48:25, 49:2, 49:3, 50:14, 50:21, 51:24, 52:15, 54:17, 54:18, 55:15, 55:16, 55:17, 56:3, 56:4, 56:8, 56:22, 57:4, 57:12, 58:20, 59:10, 60:1, 60:19, 60:20, 61:18, 61:19, 62:1, 62:2, 62:13, 64:17, 64:19, 64:20, 65:6, 65:10, 65:15, 65:17, 65:23, 66:1, 66:15, 66:17, 66:21, 67:1, 67:8, 68:23, 69:16, 69:18, 69:24, 71:22, 72:10, 73:20, 73:23, 74:6, 74:7, 75:3, 76:5, 76:6, 76:9, 76:13, 76:15, 77:2, 77:22, 77:23,

78:3, 78:4, 78:7, 78:14, 78:17, 78:23, 78:25, 79:3, 79:5, 79:7, 81:11, 81:20, 82:5, 83:10, 85:16, 87:5, 87:6, 89:19, 90:5, 92:21, 92:22, 94:1, 94:12, 94:14, 94:17, 94:21, 94:24, 95:1, 95:3, 99:17, 100:10, 103:16, 103:22, 103:24, 104:4, 104:11, 104:15, 104:25, 105:3, 105:5, 105:17, 105:19, 105:23, 106:9, 106:12, 106:23, 107:2, 108:2, 108:3
**theory** [1] - 47:1
**thereabouts** [1] - 96:14
**thereafter** [1] - 71:2
**therefore** [1] - 57:2
**they've** [1] - 66:12
**three** [4] - 4:14, 5:3, 6:8, 88:18
**throat** [2] - 53:25, 92:18
**throat-slashing** [1] - 53:25
**throughout** [1] - 20:6
**tilt** [1] - 66:21
**timing** [1] - 104:12
**Title** [1] - 109:8
**titled** [1] - 28:11
**today** [5] - 14:13, 17:7, 103:16, 104:23, 107:16
**together** [1] - 95:9
**tomorrow** [4] - 104:11, 104:15, 104:16, 104:19
**took** [10] - 9:10, 11:24, 32:22, 32:23, 64:25, 72:14, 77:11, 77:18, 80:24, 107:18
**top** [2] - 28:19, 63:17
**toss** [1] - 92:24
**total** [3] - 30:20, 30:22, 32:18
**towards** [1] - 33:1
**town** [8] - 73:2, 73:3, 77:14, 106:16, 106:18, 106:21, 107:23, 107:25
**track** [2] - 87:1, 88:6
**tracked** [2] - 83:25, 84:10
**tracking** [1] - 86:18

**training** [1] - 27:12
**Tran** [15] - 16:10, 16:11, 16:20, 17:21, 18:11, 33:8, 33:16, 36:18, 37:14, 37:23, 42:2, 43:8, 49:23, 50:1, 56:17
**TRANSCRIPT** [2] - 1:6, 1:14
**transcript** [2] - 109:9, 109:11
**transcripts** [1] - 51:12
**transfer** [2] - 72:12, 72:14
**transferred** [4] - 38:2, 79:21, 79:22
**traveling** [1] - 107:6
**Treasury** [2] - 67:12, 67:15
**treat** [1] - 89:7
**trial** [7] - 6:15, 10:19, 28:7, 30:8, 41:5, 41:6, 63:8
**TRIAL** [1] - 1:8
**tried** [1] - 35:11
**true** [11] - 9:18, 10:25, 20:11, 44:23, 54:13, 58:3, 58:17, 67:11, 71:14, 71:25, 109:9
**trust** [9] - 29:23, 31:2, 36:7, 39:3, 54:4, 55:10, 56:13, 76:18, 103:20
**truth** [2] - 36:14, 82:6
**try** [5] - 18:5, 18:10, 18:15, 19:23, 65:21
**trying** [4] - 13:7, 13:22, 50:11, 50:15
**turn** [1] - 28:25
**two** [14] - 4:6, 13:19, 19:3, 36:6, 53:5, 53:25, 56:11, 76:21, 77:5, 77:18, 77:25, 106:17, 107:18, 107:23
**two-year** [1] - 19:3
**type** [2] - 8:20, 8:22
**typed** [5] - 6:20, 36:21, 36:24, 37:2, 40:13
**types** [2] - 39:23, 41:15

**U**

**U.S** [12] - 1:3, 44:2, 45:18, 47:7, 50:4, 50:12, 50:16, 60:8, 67:12, 67:15, 73:9, 73:10
**ultimately** [5] - 5:24,

72:4, 97:19, 98:3, 98:24
**under** [10] - 11:25, 12:18, 12:21, 13:9, 20:22, 45:25, 47:1, 48:8, 52:21, 107:23
**Under** [2] - 52:22, 52:24
**understood** [4] - 85:12, 104:20, 105:7, 106:15
**underway** [2] - 45:17, 45:23
**undisturbed** [1] - 12:22
**UNITED** [2] - 1:1, 1:5
**United** [7] - 2:4, 2:5, 2:9, 2:10, 109:6, 109:8, 109:13
**unless** [2] - 8:20, 107:9
**unsecured** [2] - 52:25, 53:1
**untrue** [2] - 9:24, 10:10
**up** [30] - 4:8, 8:20, 8:22, 20:20, 28:4, 36:16, 37:11, 37:21, 51:15, 54:13, 58:17, 61:3, 67:4, 68:19, 75:15, 76:17, 79:20, 83:6, 85:24, 87:18, 88:3, 88:6, 96:19, 98:11, 100:23, 104:15, 104:19, 105:6, 107:18, 107:19
**update** [1] - 63:25
**Updated** [1] - 28:11
**UPS** [1] - 80:23
**upset** [1] - 59:16
**upwards** [1] - 44:4
**uses** [1] - 69:2
**utilize** [2] - 89:17, 89:20

**V**

**vague** [1] - 28:16
**Vague** [1] - 57:9
**vaguely** [1] - 59:19
**Varani** [5] - 14:15, 14:18, 14:21, 14:22, 14:25
**various** [1] - 37:2
**verify** [4] - 9:14, 53:20, 68:15, 68:17
**version** [7] - 68:8, 68:12, 68:14, 68:18, 68:19, 68:20, 68:25

**via** [4] - 7:10, 7:12, 41:8, 81:16
**victims** [3] - 29:10, 55:12, 55:25
**victims'** [1] - 29:11
**video** [5] - 5:6, 5:9, 7:22, 8:3, 8:9
**videos** [5] - 4:14, 7:3, 7:7, 8:17, 8:18
**violated** [1] - 66:11
**vis** [2] - 67:3
**vis-a-vis** [1] - 67:3
**voice** [2] - 91:1, 91:5
**VOLUME** [1] - 1:9
**vs** [1] - 1:7

**W**

**W-o-l-e-t-t** [1] - 79:6
**wait** [1] - 103:3
**walk** [3] - 85:20, 90:1, 90:12
**walked** [1] - 60:22
**walled** [1] - 21:22
**wants** [1] - 55:4
**warn** [1] - 91:11
**warrant** [15] - 22:7, 22:10, 22:19, 23:5, 23:12, 39:11, 39:19, 48:12, 48:17, 48:20, 49:6, 63:15, 71:8, 71:13, 71:23
**warrants** [18] - 20:7, 20:21, 20:23, 20:25, 21:11, 21:15, 22:8, 22:20, 22:23, 23:8, 23:19, 23:20, 24:3, 24:9, 24:20, 25:2, 33:23, 39:22
**WAS** [2] - 79:2, 94:23
**Washington** [2] - 7:19, 42:19
**watched** [1] - 6:2
**ways** [1] - 33:25
**website** [1] - 13:7
**WEDNESDAY** [2] - 1:15, 4:1
**week** [2] - 71:3, 88:20
**welcome** [1] - 5:5
**well..** [1] - 6:17
**WEST** [1] - 1:24
**West** [1] - 2:6
**who've** [1] - 41:6
**whole** [1] - 6:4
**willing** [1] - 7:15
**windmills** [1] - 66:21
**wire** [9] - 37:14, 38:10, 42:3, 72:11, 72:14, 72:24, 73:2, 77:7, 77:12

**wires** [4] - 37:20, 38:1, 43:9
**withdraw** [1] - 74:12
**withdrawal** [1] - 77:4
**withdrawals** [2] - 76:21, 77:5
**withdrew** [1] - 31:7
**WITNESS** [44] - 9:5, 9:21, 20:19, 21:8, 22:5, 24:18, 25:7, 25:23, 26:22, 27:9, 27:18, 28:24, 30:5, 31:21, 32:16, 37:19, 38:15, 38:22, 40:10, 41:3, 42:7, 43:1, 43:6, 48:17, 49:3, 54:18, 55:16, 56:4, 60:20, 61:19, 62:2, 64:20, 69:24, 74:7, 76:6, 76:15, 77:23, 78:4, 79:2, 79:5, 87:6, 92:22, 94:23, 95:1
**witness** [25] - 5:2, 11:21, 12:13, 25:19, 30:17, 45:16, 49:20, 49:24, 50:20, 54:1, 54:5, 55:23, 73:16, 73:18, 74:1, 74:20, 78:14, 78:22, 94:14, 94:18, 106:15, 106:17, 106:20, 107:17, 107:22
**witness's** [1] - 54:2
**witnesses** [15] - 13:18, 14:4, 34:3, 34:6, 34:7, 37:7, 41:6, 54:7, 106:18, 107:5, 107:7, 107:12, 107:23, 108:1
**WITNESSES** [1] - 3:2
**Witos** [5] - 81:5, 81:7, 81:12, 82:25, 107:17
**WOLETT** [2] - 3:6, 79:2
**Wolett** [6] - 78:24, 79:5, 79:10, 81:21, 86:4, 94:4
**word** [3] - 27:1, 50:4, 54:2
**works** [2] - 67:10
**write** [7] - 40:20, 40:22, 40:23, 41:8, 41:9, 70:14, 86:11
**wrote** [1] - 42:8
**WYMAN** [11] - 2:10, 81:10, 82:4, 83:9, 85:15, 89:18, 90:4, 92:20, 94:3, 94:11,

94:16
**Wyman** [3] - 3:7, 94:1, 100:3

## X

**X-Law** [3] - 23:3, 23:21, 24:21

## Y

**year** [9] - 19:3, 19:12, 62:9, 80:16, 82:11, 88:11, 88:14, 89:3, 99:14
**years** [16] - 36:6, 40:1, 50:9, 60:7, 63:2, 63:18, 71:25, 80:14, 86:15, 99:2, 99:10, 100:7, 102:6, 102:9, 102:16, 103:3
**yesterday** [1] - 107:18
**York** [7] - 7:5, 7:20, 7:21, 7:22, 38:18, 42:19

## Z

**zero** [1] - 15:19