1

2

3

4                UNITED STATES DISTRICT COURT

5               CENTRAL DISTRICT OF CALIFORNIA

6                     SOUTHERN DIVISION

7                         - - -

8        THE HONORABLE JAMES V. SELNA, JUDGE PRESIDING

9
         UNITED STATES OF AMERICA,    )CERTIFIED TRANSCRIPT
10                        Plaintiff,  )
             vs.                      )
11                                    )  SACR-19-00061-JVS
         MICHAEL JOHN AVENATTI,       )
12                        Defendant.  )TRIAL DAY 22, VOL. 1
         -----------------------------)
13

14

15         REPORTER'S TRANSCRIPT OF PROCEEDINGS

16               Santa Ana, California

17               August 18, 2021

18

19                    SHARON A. SEFFENS, RPR
                      United States Courthouse
20                    411 West 4th Street, Suite 1-1053
                      Santa Ana, CA  92701
21                    (714) 543-0870

22

23

24

25

```
 1    APPEARANCES OF COUNSEL:

 2    For the Plaintiff:

 3    NICOLA T. HANNA
      United States Attorney
 4    BRANDON D. FOX
      Assistant United States Attorney
 5    Chief, Criminal Division
      ALEXANDER WYMAN
 6    Assistant United States Attorney
      Major Frauds Section
 7    1100 United States Courthouse
      312 North Spring Street
 8    Los Angeles, CA  90012
      (213) 894-6683
 9
      BRETT A. SAGEL
10    Assistant United States Attorney
      Ronald Reagan Federal Building
11    411 West Fourth Street, Suite 8000
      Santa Ana, CA  92701
12    (714) 338-3598

13    For the Defendant:

14    MICHAEL JOHN AVENATTI, PRO SE

15    H. DEAN STEWARD, ADVISORY COUNSEL
      H. DEAN STEWARD LAW OFFICES
16    107 Avenida Miramar, Suite C
      San Clemente, CA  92672
17    (949) 481-4900

18

19

20

21

22

23

24

25
```

```
1

2                              I-N-D-E-X

3

4    PLAINTIFF'S
     WITNESSES:                DIRECT   CROSS   REDIRECT   RECROSS
5
     (None)
6
     PLAINTIFF'S
7    EXHIBITS:                               MARKED     RECEIVED

8    (None)

9    DEFENSE
     WITNESSES:          DIRECT   CROSS    REDIRECT    RECROSS
10
     REMOUN KARLOUS           18
11
     DEFENSE
12   EXHIBITS:                              MARKED     RECEIVED

13   (None)

14

15

16

17

18

19

20

21

22

23

24

25
```

|   |   |
|---|---|
| | 1 | SANTA ANA, CALIFORNIA; WEDNESDAY, AUGUST 18, 2021; 8:28 A.M. |
| | 2 | (Jury not present) |
| 08:28 | 3 | THE CLERK:  Item 1, SACR-19-00061-JVS, United |
| 08:28 | 4 | States of America versus Michael John Avenatti. |
| 08:28 | 5 | MR. SAGEL:  Good morning, Your Honor.  Brett Sagel |
| 08:28 | 6 | and Alexander Wyman on behalf of the United States.  And |
| 08:28 | 7 | also at counsel table is Special Agent Remoun Karlous. |
| 08:28 | 8 | THE COURT:  Good morning. |
| 08:28 | 9 | MR. AVENATTI:  Good morning, Your Honor.  Michael |
| 08:29 | 10 | Avenatti present with Mr. Steward and Ms. Cummings-Cefali. |
| 08:29 | 11 | THE COURT:  Good morning. |
| 08:29 | 12 | The government filed its opposition to the Rule 29 |
| 08:29 | 13 | motion at Docket 717.  The government's opposition is at |
| 08:29 | 14 | Docket 726.  And Mr. Avenatti also filed a supplement at |
| 08:29 | 15 | Docket 727. |
| 08:29 | 16 | As I indicated yesterday, I'm going to reserve on |
| 08:29 | 17 | everything but Counts 1, 2, 4, and 5. |
| 08:29 | 18 | Do you want to be heard? |
| 08:29 | 19 | MR. AVENATTI:  Briefly.  Your Honor, I would like |
| 08:29 | 20 | the opportunity -- we just got of the government's |
| 08:29 | 21 | opposition last night. |
| 08:29 | 22 | THE COURT:  Well, sir, yes, that's true. |
| 08:29 | 23 | MR. AVENATTI:  They cited some case law within |
| 08:29 | 24 | that document and they cited some facts that I don't believe |
| 08:29 | 25 | are accurate.  I don't believe the cases stand for the |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

08:29  1   propositions that they're cited for.  So what I would like

08:30  2   is an opportunity to submit a reply in support of the

08:30  3   Rule 29 by 6:00 p.m. tonight.

08:30  4              THE COURT:  Where are you in your case-in-chief?

08:30  5              MR. AVENATTI:  Your Honor, I anticipate wrapping

08:30  6   probably on Friday.

08:30  7              THE COURT:  A brief by 6:00 p.m. will be fine.  We

08:30  8   will take it up Thursday, the Rule 29 motion.

08:30  9              MR. AVENATTI:  Your Honor, I appreciate the

08:30  10  briefing opportunity.  I didn't hear the part about -- take

08:30  11  it up in the morning?

08:31  12             THE COURT:  Correct.

08:31  13             MR. AVENATTI:  Okay.  Thank you, sir.

08:31  14             THE COURT:  Mr. Avenatti put in an opposition to

08:31  15  Ms. Carter's motion to quash the subpoena.  I indicated to

08:31  16  Ms. Marino yesterday that she would have until noon to put

08:31  17  in a reply.  So I'll look for that, and I'll rule on it

08:31  18  promptly.  We have a little bit more time if you now expect

08:31  19  your case is going to go into Friday.

08:31  20             MR. AVENATTI:  And in that regard, Your Honor, we

08:31  21  filed a witness list last night.

08:31  22             THE COURT:  Noted.

08:31  23             MR. AVENATTI:  I would like to have the

08:31  24  opportunity if possible to make a proffer in camera relating

08:31  25  to a number of those witnesses because I anticipate that

08:31  1    there may be issues relating to them, and I would like to at

08:31  2    least make the proffer for the benefit of the Court and the

08:31  3    record in order to get some guidance from the Court as to

08:31  4    whether some of those witnesses will be permitted or not.

08:32  5    It will allow me to plan out my case-in-chief over the next

08:32  6    few days, which is of obvious critical importance.

08:32  7              THE COURT:  Does the government have any thoughts

08:32  8    on that?  It's somewhat unusual for a party to have someone

08:32  9    on the witness list and then want to make a proffer.

08:32  10             MR. SAGEL:  I'm sorry.  Did you say unusual?

08:32  11             THE COURT:  Unusual.

08:32  12             MR. SAGEL:  I would agree with that statement.

08:32  13   And to ask whether or not, if I am understanding what was

08:32  14   just said, to ask the Court to give basically a preliminary

08:32  15   ruling on whether it would be admissible under 403 or some

08:32  16   other reason, I don't really know that that's appropriate

08:32  17   especially without the other side in light of what may have

08:33  18   occurred in the last in-camera.

08:33  19             I don't know that the proffer in camera on its own

08:33  20   would be supported by the facts in the record.  I think

08:33  21   that -- I look at some of these people on the witness list

08:33  22   and, I mean, at least for some of them -- well, I won't

08:33  23   guess right now as I sit here, but I don't really know that

08:33  24   that's the mechanism to go forward.

08:33  25             Your Honor obviously has discretion under 611 and

08:33   1   a lot of different modes of how you want to conduct your

08:33   2   courtroom and trials.

08:33   3           THE COURT:  Well, it seems to me from what

08:33   4   Mr. Avenatti presents, I'm going to be called upon to make

08:33   5   determinations about what subjects can or cannot be

08:33   6   addressed, what specific evidence can or cannot come in.

08:34   7           I don't believe doing that ex parte is

08:34   8   appropriate.  So I'm not going to afford you an in-camera

08:34   9   hearing with respect to your witnesses.

08:34   10          MR. AVENATTI:  Understood, Your Honor.  But before

08:34   11  any witness is precluded from my case-in-chief, because it's

08:34   12  so critical to my due process right and my right under the

08:34   13  Sixth Amendment to present a defense, I want to have an

08:34   14  ample opportunity to be heard by the Court and I want to

08:34   15  have an ample opportunity to make a record.

08:34   16          So whether that's in an in-camera proffer or

08:34   17  whether it's before Your Honor in open court like this,

08:34   18  either is fine by me, but I want to have the opportunity to

08:34   19  make a record.

08:34   20          And what I am concerned about is curtailed

08:34   21  discussion about some of these witnesses and just having

08:35   22  them eliminated without my ability to make that record and

08:35   23  explain why they're critical to my defense.

08:35   24          THE COURT:  Sir, no one has made a motion to

08:35   25  exclude any of your witnesses at this point, so we will

08:35   1   proceed in the normal fashion.  Obviously if you perceive
08:35   2   evidentiary issues will come up during the witness's
08:35   3   testimony, you are free to raise that with the Court in the
08:35   4   presence of the government so we can, if at all possible,
08:35   5   deal with the issue and move expeditiously through the
08:35   6   testimony.
08:35   7       MR. AVENATTI:  Understood, Your Honor.  I'm trying
08:35   8   to make this run as smoothly as possible.  I will give an
08:35   9   example.
08:35   10      THE COURT:  Well, my point is due process cuts
08:35   11  both ways.
08:35   12      MR. AVENATTI:  Understood, Your Honor.  I'll give
08:35   13  you an example.  I want to call Ms. Phan back to the stand,
08:35   14  and I want to talk to her about what the Newport Beach
08:36   15  investigator told her.
08:36   16      Now, you sustained objections while she was on the
08:36   17  stand relating to that questioning.  I want to be able to
08:36   18  present argument to Your Honor, preferably before she gets
08:36   19  on the stand, about why that questioning is appropriate and
08:36   20  permissible under the rules of evidence in light of
08:36   21  especially what she's already testified to.
08:36   22      THE COURT:  Sir, you tell me how much time you
08:36   23  think you're going to need, and we'll schedule a hearing
08:36   24  sufficiently in advance of the day she's going to come on to
08:36   25  deal with that.  I have no problem with that.  I think

08:36  1   that's the appropriate way to proceed.

08:36  2           MR. AVENATTI:  Thank you.

08:36  3           THE COURT:  We've been getting together at 8:30

08:36  4   regularly.  We got together at 8:00 yesterday.  We can get

08:36  5   together even earlier if you think you need additional time

08:36  6   to present issues to the Court with regard to the witnesses

08:36  7   on your witness list.

08:37  8           With regard to Mr. Amenta, I have read

08:37  9   Mr. Avenatti's reply to the government shown at Docket 720.

08:37  10  I'm going to deny the motion to strike Mr. Amenta's

08:37  11  testimony or to grant a mistrial.

08:37  12          I believe that the document on which Mr. Avenatti

08:37  13  focuses is -- would have been appropriate ground for

08:37  14  cross-examination, but I don't believe it's material to the

08:37  15  government's overall showing with that witness.  You don't

08:37  16  have Mr. Amenta on your witness list.  If you want to call

08:37  17  him back, so be it.

08:38  18          MR. AVENATTI:  Your Honor, briefly.  The Jencks

08:38  19  Act and 26.2 do not have an exception that states:  If,

08:38  20  however, the information was provided in some other form,

08:38  21  the government need not disclose it.  That is nowhere in the

08:38  22  Jencks Act.  It's nowhere in 26.2.

08:38  23          Those two statutes and the case of Jencks which is

08:38  24  still operative, as Your Honor knows, are very simple and

08:38  25  they are very straightforward, all statements of a witness

08:38   1   in the possession of the government.  That did not happen.

08:38   2           That's beyond dispute.  There was no even attempt

08:38   3   to have it happen.  They didn't even look for the documents.

08:38   4   They didn't even ask the witness for any documents.

08:38   5           THE COURT:  Well, that's not quite true.  In the

08:38   6   filing that the government made at Docket 690, there's five

08:39   7   documents, three of which had been previously produced.  I

08:39   8   don't think it's accurate to say that the government made no

08:39   9   effort.

08:39   10          MR. AVENATTI:  Your Honor, they produced

08:39   11  typewritten interview summaries.  And this is one of the

08:39   12  fundamental problems in this case, and it's been a

08:39   13  fundamental problem.  Despite them mocking me, claiming that

08:39   14  I don't know what Jencks is -- so, Your Honor, Jencks is not

08:39   15  just whatever they type into a summary.  That's not what

08:39   16  Jencks is limited to.

08:39   17          They never looked for the e-mails, and they never

08:39   18  produced the e-mails.  And, Your Honor, it's actually more

08:39   19  serious than that, because we still don't have the e-mails

08:39   20  from the witness relating to the work that he did.  And

08:39   21  those two are Jencks statements, and they're statements

08:39   22  under 26.2.

08:39   23          We don't have the e-mails, for instance,

08:40   24  from Mr. Amenta when he went to go verify the wires.  That's

08:40   25  Jencks.  It's in the possession of the government.  We still

08:40  1    don't have that information.  And I should have had the
08:40  2    benefit of all of that information and the two e-mails
08:40  3    before I began the cross-examination of the witness,
08:40  4    especially in light of the fact that I have repeatedly
08:40  5    complained in this case about not having Jencks information
08:40  6    produced.  And I have now been proven right on at least two
08:40  7    occasions as it relates to Mr. Amenta and Mr. Drum.

08:40  8            So the analysis, Your Honor, under the case law is
08:40  9    very simple.  Were those two e-mails Jencks or not?  I don't
08:40  10   think there is any question that they were Jencks.  If they
08:40  11   were Jencks, were they produced before I began my
08:40  12   cross-examination?  Obviously the answer to that question is
08:41  13   no.

08:41  14           If those two questions are answered yes and no,
08:41  15   there is only two results permitted under the case law and
08:41  16   the statute -- striking the witness, or a mistrial.  That's
08:41  17   it.  There is no other option, and that's what we have asked
08:41  18   for, because the statements were clearly Jencks and they
08:41  19   were not produced.  And we still don't have all the
08:41  20   statements.

08:41  21           And the same thing is going to be true as it
08:41  22   relates to Mr. Drum when we get to Mr. Drum.  So this is
08:41  23   their problem.  This is their fault.  This is their failure,
08:41  24   and they should pay the price that's set forth in the
08:41  25   statute and the case law.  There is no other action.

08:41    1              THE COURT:  Sir, I have your position.

08:41    2              Does the government want to respond?

08:41    3              MR. WYMAN:  Briefly.  Your Honor, we're prepared

08:42    4    to file a written response on Mr. Drum.  Unfortunately,

08:42    5    we've been holding off hoping that the defendant might file

08:42    6    a supplement after we produced what was previously the

08:42    7    in-camera filing about 48 hours ago -- or it's a little bit

08:42    8    less than that -- to the defense.  Because he hasn't filed

08:42    9    anything yet, we will probably --

08:42   10              THE COURT:  Well, I didn't set a specific

08:42   11    deadline.  Mr. Avenatti indicated he was going to file

08:42   12    something in response your, quote, in-camera showing.

08:42   13              MR. WYMAN:  Of course, Your Honor.  I just was

08:42   14    going to say we will probably file something soon so that

08:42   15    the Court has the law in front of it on this issue, because

08:42   16    it's not case that those are the only two remedies.

08:42   17              In fact, the law makes clear that the appropriate

08:42   18    remedy in a situation like this is to make the witness

08:42   19    available for further cross-examination if he so desires.

08:42   20    We will do that with Mr. Amenta and Mr. Drum.  As Your Honor

08:42   21    can see from his witness list, Mr. Amenta isn't on it.  If

08:42   22    he wishes to cross-examine him on these e-mails, we will

08:43   23    make him available.

08:43   24              THE COURT:  He did reserve on Mr. Amenta and he

08:43   25    did reserve on Mr. Drum.

08:43   1          MR. WYMAN:  Yes, Your Honor.

08:43   2          And with regard to his claim that he doesn't have

08:43   3   the e-mails for Mr. Amenta to verify the wire, I understood

08:43   4   Mr. Amenta to be saying those were e-mails he sent

08:43   5   internally at Fed Ref.

08:43   6          If the defendant is suggesting that the Federal

08:43   7   Reserve Bank of New York is somehow within our custody,

08:43   8   possession, and control, I don't believe there's any support

08:43   9   for that whatsoever.  And if he's not suggesting that and if

08:43   10  he's referring to other e-mails, I'm not sure what e-mails

08:43   11  he's referring to.

08:43   12         MR. AVENATTI:  Your Honor, for the record what I'm

08:43   13  referring to is as follows.  Anytime we talk about an

08:43   14  obligation of the prosecution in this case, they prefer that

08:43   15  the Court define government as the two AUSAs sitting at the

08:43   16  table.

08:43   17         That's not the definition of government under the

08:43   18  law when it relates to Jencks or 26.2 or Brady or Giglio.

08:44   19  And the other issue is this, Your Honor.  That e-mail where

08:44   20  he corrected the chart and basically said the IMAD numbers

08:44   21  were wrong because they didn't have the year, that was Brady

08:44   22  and it was Giglio.

08:44   23         I was entitled to that a long time ago.  I was

08:44   24  entitled to that when the e-mail was sent to the government.

08:44   25  It should have been immediately produced as Brady and Giglio

08:44   1    before the trial even began.  I certainly should have been

08:44   2    given it before he took the stand, and I wasn't.

08:44   3          Furthermore, Your Honor, there is a reason why

08:44   4    Jencks and 26.2 has a temporal requirement that the

08:44   5    information be produced before cross-examination begins.

08:44   6    The reason for that is so that you can strategize and

08:44   7    determine how you're going to cross-examine a witness.

08:45   8    That's why the temporal requirement is in place.

08:45   9          Otherwise, Your Honor, if the law was as Mr. Wyman

08:45 10    has stated --

08:45 11          THE COURT:  We'll find out when he presents his

08:45 12    memorandum.

08:45 13          MR. AVENATTI:  And I'm going to submit, Your

08:45 14    Honor, that's not the law, because if that was the law --

08:45 15          THE COURT:  We'll find out when he submits his

08:45 16    memorandum.

08:45 17          MR. AVENATTI:  I understand.  If that was the law,

08:45 18    Your Honor, then every time there was a Jencks violation and

08:45 19    it was discovered during the trial, you would just recall

08:45 20    the witness.  No problem.  That's not the law.  That's not

08:45 21    what it requires.

08:45 22          So we have a Jencks violation, a 26.2 violation, a

08:45 23    Giglio violation, and a Brady violation.  And it's not

08:45 24    enough to say, well, he can just recall him and now

08:45 25    cross-examine him.

08:45   1                THE COURT:  Sir, you have stated your position.

08:45   2                MR. AVENATTI:  Thank you.

08:45   3                Did you want to hear about Drum now, or do you

08:45   4        want to --

08:45   5                THE COURT:  No.  I indicated that I didn't want to

08:46   6        take that up until you had an opportunity to respond to the

08:46   7        396-page filing that the government made in camera and I

08:46   8        ordered be delivered to you.

08:46   9                MR. AVENATTI:  Understood.

08:46   10               THE COURT:  396 pages is a lot of paper.

08:46   11               MR. AVENATTI:  It certainly is.

08:46   12               THE COURT:  And I want to give you a fair

08:46   13       opportunity to assimilate what the government has assembled.

08:46   14               MR. AVENATTI:  It certainly is, Your Honor, and we

08:46   15       still don't have what we're entitled to.  We still don't

08:46   16       have it.  We don't have it.  So at some point that's going

08:46   17       to have to be addressed because we don't have it.

08:46   18               THE COURT:  Sir, we're going to take this up after

08:46   19       you have had a fair opportunity to respond to the

08:46   20       government's filing.

08:46   21               Anything else we can take up at this time?

08:46   22               MR. SAGEL:  Very briefly.  The witness list we

08:47   23       received for today, at least the first witness is Special

08:47   24       Agent Karlous.  I don't know if should have to say this, but

08:47   25       I will say it so that it's clear and Your Honor will know

08:47  1    where we're coming from.

08:47  2            If Mr. Avenatti asks questions that opens the door

08:47  3    to his investigation, what he did, why he did it, the scope,

08:47  4    anything like that, the mere fact that when the case

08:47  5    started, the manner in which it started, the crimes in which

08:47  6    it led to, and so forth, may be open.

08:47  7            THE COURT:  Let's just see what the direct is.

08:47  8            MR. SAGEL:  Understood.  But just so that there is

08:47  9    no question about that that's our anticipation based on

08:47  10   those questions --

08:47  11           THE COURT:  Let's see what the direct is.

08:47  12           MR. SAGEL:  Absolutely, Your Honor.

08:47  13           THE COURT:  Some directs are more surgical than

08:47  14   others.

08:47  15           MR. SAGEL:  Understood.  I just want Your Honor to

08:47  16   know where we'll come from, so especially if we ask

08:48  17   questions or -- to take it up with Your Honor.

08:48  18           THE COURT:  That's fine.

08:48  19           Mr. Avenatti, do any of the witnesses that you

08:48  20   intend to call today raise any of the issues that suggest

08:48  21   they might or should have been taken up in-camera?

08:48  22           MR. AVENATTI:  Not that I can think of right now.

08:48  23           THE COURT:  Okay.

08:48  24           MR. AVENATTI:  I do have one other request.

08:48  25           THE COURT:  Okay.

08:48  1            MR. AVENATTI:  Am I ever going to get the Tabs

08:48  2     data?  It's Brady.  I'm entitled to it.  I should have had

08:48  3     it a long time ago.  Your honor will recall the

08:48  4     representation that Mr. Sagel made yesterday, and we are

08:48  5     going to hear testimony today about this.  We're going to

08:48  6     find out if what he told the Court is true.  Today we're

08:48  7     going to hear it.

08:48  8            But regardless, Your Honor, I'm entitled to the

08:49  9     Tabs data, and it's never been produced.  It should have

08:49  10    been produced, and I want it produced.

08:49  11            THE COURT:  Sir, I understand your position.

08:49  12            MR. AVENATTI:  I need it for my defense.

08:49  13            THE COURT:  There is nothing further to add at

08:49  14    this time on that subject.  You've made your record.

08:49  15            MR. AVENATTI:  Has there been a ruling from the

08:49  16    Court that I'm not entitled to it?

08:49  17            THE COURT:  We're going to take this up as part of

08:49  18    the Drum issue.

08:49  19            Okay, we'll be in recess.

08:49  20                   (Recess taken at 8:49 a.m.;

08:49  21                    proceedings resumed at 9:18 a.m.)

08:49  22                   (Jury present)

09:18  23            THE CLERK:  Item 1, SACR-19-00061-JVS, United

09:18  24    States of America versus Michael John Avenatti.

09:18  25            MR. SAGEL:  Good morning, Your Honor.  Brett Sagel

09:18   1   and Alexander Wyman on behalf of the United States.  And at

09:18   2   counsel table is Special Agent Remoun Karlous.

09:18   3             THE COURT:  Good morning.

09:18   4             MR. AVENATTI:  Good morning, Your Honor.  Michael

09:18   5   Avenatti, present with Mr. Dean Steward and

09:18   6   Ms. Cummings-Cefali.  Ms. Hernandez will be joining us

09:18   7   momentarily.

09:18   8             THE COURT:  Good morning.

09:18   9             And good morning, ladies and gentlemen.

09:18   10           THE JURY:  Good morning.

09:18   11           THE COURT:  Mr. Avenatti, would you call your next

09:18   12   witness, please.

09:18   13           MR. AVENATTI:  Yes, Your Honor.

09:18   14           The defense calls Special Agent Remoun Karlous.

09:18   15             REMOUN KARLOUS, DEFENSE WITNESS, SWORN

09:19   16           THE CLERK:  If you would please state and spell

09:19   17   your first and last name.

09:19   18           THE WITNESS:  Remoun Karlous, R-e-m-o-u-n,

09:19   19   K-a-r-l-o-u-s.

09:19   20           THE CLERK:  Thank you.

09:19   21           THE COURT:  Mr. Avenatti.

09:19   22                   DIRECT EXAMINATION

09:19   23   BY MR. AVENATTI:

09:19   24   Q     Special Agent Karlous, good morning.

09:19   25   A     Good morning.

09:19   1    Q    Are you employed by the Department of Justice?

09:19   2    A    I am not.

09:19   3    Q    Who are you employed by?

09:19   4    A    The United States Treasury Department.

09:19   5    Q    And how long have you been employed by the Treasury

09:20   6    Department?

09:20   7    A    Approximately 26 years.

09:20   8    Q    What is your current title?

09:20   9    A    Special agent.

09:20   10   Q    How long have you held that title?

09:20   11   A    Approximately 26 years.

09:20   12   Q    Did you hold that same title in 2018 and '19?

09:20   13   A    Yes.

09:20   14   Q    What did you do to prepare to testify here today?

09:20   15   A    Not much.  I have sat through the trial.  That's about

09:20   16   it.

09:20   17   Q    You didn't have any discussions with Mr. Sagel or

09:20   18   Mr. Wyman or anybody in preparation for your testimony here

09:20   19   today?

09:20   20   A    Just brief discussions that we have every morning.

09:20   21   Q    Did you review any documents in preparation for your

09:20   22   testimony here today?

09:20   23   A    I did not.

09:20   24   Q    You didn't review anything yesterday or last night in

09:20   25   preparation to testify, sir?

```
09:21    1    A    No.
09:21    2    Q    Now, in March of 2019 you were present when a search
09:21    3    warrant was executed at the home of Ms. Judy Regnier; is
09:21    4    that correct?
09:21    5    A    That's correct.
09:21    6    Q    And before appearing at Ms. Regnier's home on that
09:21    7    morning, you were involved in the planning of that search
09:21    8    warrant; were you not?
09:21    9    A    No.  There was a team leader who was responsible for
09:21   10    that search warrant site.
09:21   11    Q    And what was his or her name?
09:21   12    A    I don't recall.
09:21   13    Q    Were you generally aware of what was going to happen on
09:21   14    the morning of March 25th before you showed up at
09:21   15    Ms. Regnier's residence?
09:21   16    A    Yes.
09:22   17    Q    Were you aware -- well, strike that.  What was your
09:22   18    understanding as to how many law enforcement individuals
09:22   19    were going to appear at Ms. Regnier's residence on the
09:22   20    morning of March 25th?
09:22   21    A    I didn't prepare any of those details.  That was the
09:22   22    team leader.
09:22   23    Q    So when you showed up at Ms. Regnier's residence, you
09:22   24    thought it was just going to be you and Mr. Sagel?
09:22   25    A    No.  It was a search warrant, so they were well
```

09:22   1    prepared to execute a search warrant.

09:22   2    Q    And how many people do you recall seeing on the morning

09:22   3    of March 25th from the federal government at Ms. Regnier's

09:22   4    residence?

09:22   5    A    An estimate, 10 to 15.

09:22   6    Q    And that included you and Mr. Sagel, correct?

09:22   7    A    No.  We were not on the search warrant team.

09:23   8    Q    So the 10 to 15 individuals on the search warrant team

09:23   9    were in addition to you and Mr. Sagel, right?

09:23   10   A    Yes.

09:23   11   Q    Was there anyone else from the federal government

09:23   12   present other than the 10 to 15 individuals plus you and

09:23   13   Mr. Sagel?

09:23   14   A    No.

09:23   15   Q    Were you aware that a helicopter was going to be used

09:23   16   in connection with the search warrant?

09:23   17   A    We don't have a helicopter.

09:23   18            MR. AVENATTI:  More move to strike, Your Honor.

09:23   19            THE COURT:  It will be stricken.

09:23   20   BY MR. AVENATTI:

09:23   21   Q    Sir, before you showed up on the morning of March 25th

09:23   22   at Ms. Regnier's front door together with 10 to 15 other

09:23   23   federal law enforcement individuals, were you aware that

09:23   24   there was going to be a helicopter?

09:24   25   A    No.

09:24 1    Q    You had no idea?

09:24 2    A    No idea.

09:24 3    Q    So that came as a complete surprise to you, right?

09:24 4    A    Absolutely.  As a matter of fact, I've never seen the

09:24 5    helicopter.

09:24 6    Q    You don't dispute that in fact there was a law

09:24 7    enforcement helicopter; do you?

09:24 8    A    I know of no helicopter.  I did not see a helicopter

09:24 9    that day.

09:24 10   Q    Well, you sat here when Ms. Regnier testified that in

09:24 11   fact there was an Orange County sheriff's helicopter

09:24 12   overhead.  You heard that testimony, correct?

09:24 13   A    I heard her say that.

09:24 14   Q    Do you dispute that?

09:24 15   A    I have no idea.

09:24 16   Q    When you showed up on the morning of March 25th, did

09:24 17   you have a concern that Ms. Regnier would flee her

09:24 18   residence, thus requiring the use of a helicopter?

09:25 19              MR. SAGEL:  Objection.  Foundation, 403.

09:25 20              THE COURT:  Sustained.

09:25 21   BY MR. AVENATTI:

09:25 22   Q    Sir, did you have a concern when you showed up at the

09:25 23   residence of Ms. Regnier that there was a risk that she

09:25 24   would attempt to flee the residence?

09:25 25   A    I did not have that concern, no.

09:25    1   Q     But what you did know was that a major press conference
09:25    2   had been scheduled by the U.S. Attorney's Office for later
09:25    3   that morning.  You knew that, right?
09:25    4   A     I don't recall.
09:25    5          MR. SAGEL:  Objection.  Vague as to U.S.
09:25    6   Attorney's Office, Your Honor.
09:25    7          THE COURT:  Overruled.
09:25    8          THE WITNESS:  I don't recall there being a press
09:26    9   conference that day.  I was busy all day.
09:26   10   BY MR. AVENATTI:
09:26   11   Q     So when you appeared at Ms. Regnier's home, you were
09:26   12   not aware that the U.S. Attorney's Office in Los Angeles was
09:26   13   going to be holding a press conference about Michael
09:26   14   Avenatti.  Is that your testimony?
09:26   15   A     I don't recall.
09:26   16   Q     Now, what was your role that day at Ms. Regnier's home?
09:26   17   A     We wanted to give Ms. Regnier an opportunity to speak
09:26   18   with us if she wanted to.
09:26   19   Q     Well, I'm not asking about we.  I'm asking about you,
09:26   20   Special Agent Karlous.  What was your role at Ms. Regnier's
09:27   21   home that day?
09:27   22   A     Attempt an interview of Ms. Regnier.
09:27   23   Q     Together with Mr. Sagel, right?
09:27   24   A     Yes.
09:27   25   Q     Anyone else?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:27  1    A    There was another agent with us.

09:27  2    Q    Who was that?

09:27  3    A    Melinda Ball.

09:27  4    Q    Anyone else?

09:27  5    A    I don't recall anyone else.

09:27  6    Q    And in connection with your attempt to interview

09:27  7    Ms. Regnier, you separated her from husband who also lived

09:27  8    in the home, right?

09:27  9    A    No.

09:27  10   Q    So when Ms. Regnier testified on the stand under oath

09:27  11   that in fact she had been separated from her husband, that

09:27  12   was untrue to the best of your knowledge; is that right?

09:27  13   A    No, it's not.

09:27  14   Q    So when she stated that she had been separated from her

09:28  15   husband that morning, that was true; am I correct?

09:28  16   A    That may have been true.  I wasn't there at the time.

09:28  17   Q    Well, when you were interviewing her, her husband was

09:28  18   not present; is that right?

09:28  19   A    He was not.

09:28  20   Q    He was outside; is that correct?

09:28  21   A    He was not at the residence when I arrived.

09:28  22   Q    Well, how long were you at the residence that day?

09:28  23   A    Approximately six hours.

09:28  24   Q    And is it your testimony that during that six-hour time

09:28  25   period, Robert Regnier, Ms. Regnier's husband, never came

09:28   1    home?

09:28   2    A    I believe I saw him at the end of the day.

09:28   3    Q    And you saw him outside?

09:28   4    A    Yes.

09:28   5    Q    Did you have the understanding when you saw him outside

09:28   6    that in fact he had been instructed to be outside?

09:28   7    A    I have no idea because I wasn't there during the entry

09:29   8    and clearing of the house.

09:29   9    Q    What do you mean when you say the clearing of the

09:29   10   house?

09:29   11   A    Just making the house safe.  They have gone through.

09:29   12   They know who is in the house and who is not in the house.

09:29   13   Q    And another thing they look for in order to make the

09:29   14   house safe is guns, right?

09:29   15   A    Yes.

09:29   16   Q    Did they locate any guns on the premises of

09:29   17   Ms. Regnier's home on that morning?

09:29   18            MR. SAGEL:  Objection.  403, Your Honor.

09:29   19            THE COURT:  Sustained.

09:29   20   BY MR. AVENATTI:

09:29   21   Q    Sir, isn't it true that unregistered firearms were

09:29   22   found at the residence that morning?

09:29   23            MR. SAGEL:  Objection.  403, Your Honor.

09:29   24            THE COURT:  Sustained.

09:29   25   BY MR. AVENATTI:

```
09:29   1   Q    Now, when you interviewed Ms. Regnier, who did the
09:30   2   talking for the government?
09:30   3   A    Mr. Sagel.  And I asked some questions as well.
09:30   4   Q    And what about Ms. Ball?  Did she ask any questions?
09:30   5   A    She did not.
09:30   6   Q    And where was Ms. Regnier physically located at the
09:30   7   time that you conducted this interview?
09:30   8   A    In her living room.
09:30   9   Q    Was she seated?
09:30  10   A    Yes.
09:30  11   Q    Where?
09:30  12   A    On a chair or on the couch.
09:30  13   Q    Do you remember if it was a chair or a couch?
09:30  14   A    I don't.
09:30  15   Q    Where were you located?
09:30  16   A    On the chair or on the couch.
09:30  17   Q    Where was Mr. Sagel located?
09:30  18   A    In around the same living room.
09:30  19   Q    Well, were you sitting around a table?
09:30  20   A    No.  Sofa, loveseat, and a couple of chairs is what I
09:30  21   recall.
09:30  22   Q    And was Ms. Ball also present during the interview?
09:30  23   A    Yes.
09:30  24   Q    Now, you said that you were on site for approximately
09:31  25   six hours; is that right?
```

09:31   1   A    Approximately.

09:31   2   Q    And the interview lasted approximately six hours?

09:31   3   A    Approximately.

09:31   4   Q    And Mr. Sagel did most of the talking for the

09:31   5   government?  I think that's what you said.

09:31   6   A    Yes.

09:31   7   Q    And from time to time you would ask questions as well,

09:31   8   right?

09:31   9   A    Correct.

09:31   10  Q    And who took notes, if anyone, from the interview?

09:31   11  A    Special Agent Melinda Ball.

09:31   12  Q    You took no notes; am I right?

09:31   13  A    I took no notes.

09:31   14  Q    And Mr. Sagel took no notes, right?

09:31   15  A    I'm unaware of whether he took notes or not.

09:31   16  Q    And that was actually not an accident.  That was agreed

09:31   17  on before you got to Ms. Regnier's home, namely, that only

09:32   18  one person was going to take notes; isn't that right?

09:32   19  A    That's the common practice.

09:32   20           MR. AVENATTI:  Move to strike, Your Honor.

09:32   21           THE COURT:  It will be stricken.

09:32   22           MR. AVENATTI:  Can I have it read back, please?

09:32   23           THE COURT:  Yes.

09:32   24           (Record read)

09:32   25           THE WITNESS:  Yes.

09:32  1   BY MR. AVENATTI:

09:32  2   Q    And you understood that the reason why only one person

09:32  3   was going to take notes was because if later we found

09:32  4   ourselves in an environment like this and multiple people

09:32  5   had taken notes, there might be inconsistencies that could

09:32  6   be used.  You understood that was the reason why only one

09:32  7   person would take notes; isn't that true?

09:32  8   A    It's part of our policy.

09:32  9   Q    And the reason for the policy is exactly what I just

09:32  10  stated, so that if there is a trial, a defendant cannot

09:33  11  point to inconsistencies in the notes; isn't that true, sir?

09:33  12  A    Sure.

09:33  13  Q    Now, we're going to talk about this interview in a

09:33  14  moment.  But before we do, at the end of the interview --

09:33  15  well, strike that.  Did Ms. Ball take the notes on a laptop

09:33  16  or did she handwrite the notes?

09:33  17  A    Handwritten.

09:33  18  Q    Did you review the notes at any point in time?

09:33  19  A    Yes, I believe so.

09:33  20  Q    When did you review her notes?

09:33  21  A    At the very beginning when she was typing up a report.

09:34  22  Q    So at some point she took her handwritten notes and put

09:34  23  them in a typewritten report; is that right?

09:34  24  A    Yes.

09:34  25  Q    And before she completed her typewritten report, you

09:34   1   reviewed her handwritten notes; is that right?

09:34   2   A   As well as the report.

09:34   3   Q   Did you review that with Ms. Ball?

09:34   4   A   No.

09:34   5   Q   You reviewed that on your own?

09:34   6   A   Yes.

09:34   7   Q   Do you know if Mr. Sagel reviewed the typewritten

09:34   8   report before it was finalized?

09:34   9   A   I don't know.

09:34   10   Q   Did you find any -- well, strike that.  What do you

09:34   11   recall about the length of these notes from this six-hour

09:34   12   interview?

09:34   13   A   There was several pages.

09:34   14   Q   Ten, 15, 20?

09:34   15   A   I don't recall.

09:34   16   Q   There were a number of pages because the interview

09:34   17   lasted six hours, right?

09:34   18   A   I'm sure there was.

09:34   19   Q   Did you see any errors in Ms. Ball's notes?

09:35   20   A   I don't recall there being any errors.

09:35   21   Q   Do you recall remembering things that Ms. Ball had not

09:35   22   written in her notes?

09:35   23   A   No.

09:35   24   Q   So you made no corrections to the report that Ms. Ball

09:35   25   prepared; is that right?

09:35  1   A    I don't recall.

09:35  2   Q    Well, do you recall making any corrections or

09:35  3   suggestions relating to the preparation of Ms. Ball's final

09:35  4   report?

09:35  5   A    I don't recall.

09:35  6   Q    Did you ever learn what information was removed from

09:35  7   Ms. Regnier's residence?

09:35  8   A    Can you ask the question again.

09:35  9            MR. AVENATTI:  Can I have it read back, Your

09:35  10  Honor?

09:35  11           THE COURT:  Yes.

09:35  12           (Record read)

09:36  13           THE WITNESS:  Yes.  At some point I did learn.

09:36  14  BY MR. AVENATTI:

09:36  15  Q    And how did you learn that?

09:36  16  A    I'm not sure when I received it.  There is an inventory

09:36  17  that is taken of the records that were taken from her

09:36  18  residence.  That inventory report, a copy is left at

09:36  19  Ms. Regnier's residence, as well as one is kept in the file

09:36  20  as inventory taken from her residence.

09:36  21  Q    And you learned that among the things that were taken

09:36  22  from her residence were some electronic devices; am I

09:36  23  correct?

09:36  24  A    Yes.

09:36  25  Q    And what is your understanding as to what happened to

| | | |
|---|---|---|
| 09:36 | 1 | those electronic devices that were removed from |
| 09:37 | 2 | Ms. Regnier's residence after they were taken on the morning |
| 09:37 | 3 | of March 25th? |
| 09:37 | 4 | A    A computer forensic agent took the devices and made an |
| 09:37 | 5 | image of them. |
| 09:37 | 6 | Q    And which agent was that? |
| 09:37 | 7 | A    I believe Special Agent John Weeks. |
| 09:37 | 8 | Q    Can you spell it for the court reporter, please. |
| 09:37 | 9 | A    W-e-e-k-s. |
| 09:37 | 10 | Q    And why were the electronic devices given to Mr. Weeks |
| 09:37 | 11 | for a forensic image to be taken? |
| 09:37 | 12 | A    He was our computer forensics person with the IRS at |
| 09:37 | 13 | the time, and that was his duty and his job. |
| 09:37 | 14 | Q    Were all of the devices removed from Ms. Regnier's home |
| 09:37 | 15 | that day to the best of your knowledge forensically imaged? |
| 09:37 | 16 | A    I don't know.  I wasn't involved. |
| 09:38 | 17 | Q    When was the first time, Special Agent Karlous, that |
| 09:38 | 18 | you ever heard about Tabs? |
| 09:38 | 19 | A    I don't recall. |
| 09:38 | 20 | Q    Before this trial had you ever heard about Tabs? |
| 09:38 | 21 | A    Yes.  I think it was mentioned by Ms. Regnier. |
| 09:38 | 22 | Q    So if someone were to state that before this trial the |
| 09:38 | 23 | government had no idea about Tabs, that would be untrue, |
| 09:39 | 24 | right? |
| 09:39 | 25 | A    Yes. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

32

09:39    1    Q    Do you recall that Ms. Regnier specifically told you

09:39    2    and Mr. Sagel on November 19th, 2019, almost two years ago,

09:39    3    about Tabs?

09:39    4    A    Yes.

09:39    5    Q    A moment ago you didn't remember the date.  Now you do

09:39    6    remember the date; is that right?

09:39    7    A    I knew it wasn't -- I didn't recall it during the

09:39    8    search warrant.  That's why I was hesitant.

09:39    9    Q    And do you have a recollection that on November 19th of

09:40   10    2019 you and Special Agent Roberson -- by the way, what

09:40   11    division is he with?

09:40   12    A    The IRS criminal investigation.  He is a special agent.

09:40   13    Q    You and Special Agent Roberson and Mr. Sagel met with

09:40   14    Ms. Regnier from 9:05 a.m. to 5:42 p.m., about eight and a

09:40   15    half hours.  Do you recall that?

09:41   16    A    Yes.

09:41   17    Q    Do you recall during that interview almost two years

09:41   18    ago, Ms. Regnier was asked what systems were used at Eagan

09:41   19    Avenatti to keep track of client expenses?

09:41   20    A    I believe so.

09:41   21              MR. AVENATTI:  Your Honor, can I approach?

09:41   22              THE COURT:  You may.

09:42   23              (Document handed to the witness)

09:42   24    BY MR. AVENATTI:

09:42   25    Q    Sir, directing your attention to Exhibit 1085,

09:43   1   paragraph 14, does this refresh your recollection that on
09:43   2   November 19th, 2019, you and AUSA Brett Sagel was
09:43   3   specifically told about Tabs?
09:43   4   A    Yes.
09:43   5   Q    And to the best of your knowledge, was that the first
09:43   6   time that anyone had mentioned Tabs to you as it related to
09:43   7   Eagan Avenatti?
09:43   8   A    I believe so.
09:44   9   Q    In fact, that document that I just handed you, that's a
09:44  10   memorandum of interview that you prepared and signed,
09:44  11   correct?
09:44  12   A    I don't recall that I prepared this.  It may have been
09:44  13   Special Agent Roberson.  In fact, I think it was him.
09:45  14   Q    Well, sir, you don't dispute that the document says:
09:45  15   "I prepared this memorandum on November 25, 2019, after
09:45  16   refreshing my memory from notes made during and immediately
09:45  17   after the interview with Regnier."
09:45  18        You don't dispute that; do you?
09:45  19   A    No, but I don't think I prepared this.
09:45  20   Q    Well, can you explain, then, why your signature appears
09:45  21   under the statement that I just read above the words special
09:45  22   agent?
09:45  23   A    Yes -- because I was a witness to this interview.  We
09:45  24   usually have two witnesses for interviews.  I read the
09:45  25   report and I concurred with the report.

| | | |
|---|---|---|
| 09:45 | 1 | Q    Did you sign this document? |
| 09:45 | 2 | A    Yes. |
| 09:45 | 3 | Q    Together with Mr. Roberson, right? |
| 09:45 | 4 | A    Yes. |
| 09:45 | 5 | Q    And again, this interview was on November 19th of 2019; |
| 09:45 | 6 | is that correct? |
| 09:46 | 7 | A    Yes. |
| 09:46 | 8 | Q    I believe you testified moments ago -- in fact, I know |
| 09:46 | 9 | you testified moments ago that this was the first date on |
| 09:46 | 10 | which anyone had mentioned Tabs to the best of your |
| 09:46 | 11 | knowledge, correct? |
| 09:46 | 12 | A    To the best of my knowledge, yes. |
| 09:46 | 13 |          MR. AVENATTI:  Your Honor, can I approach? |
| 09:46 | 14 |          THE COURT:  You may. |
| 09:46 | 15 |          (Document handed to the witness) |
| 09:47 | 16 |          MR. AVENATTI:  Your Honor, the defense offers 1084 |
| 09:47 | 17 | as impeachment of Mr. Karlous, directing the Court's |
| 09:47 | 18 | attention to the second to the last page in the middle of |
| 09:47 | 19 | the page as well as the top of the third page. |
| 09:48 | 20 |          MR. SAGEL:  Objection, Your Honor.  Improper |
| 09:48 | 21 | impeachment.  The question called for to the best of his |
| 09:48 | 22 | recollection.  And hearsay. |
| 09:48 | 23 |          THE COURT:  Mr. Avenatti. |
| 09:48 | 24 |          MR. AVENATTI:  Your Honor, these are his |
| 09:48 | 25 | handwritten notes.  It's not offered for the truth of the |

09:48   1    matter asserted.  It's offered for impeachment purposes.

09:48   2              I'm happy to lay more of a foundation if you'd

09:48   3    like.

09:48   4              THE COURT:  Please.

09:48   5    BY MR. AVENATTI:

09:48   6    Q    Special Agent Karlous, do you have what has been marked

09:48   7    as Exhibit 1084 in front of you?

09:48   8    A    Yes.

09:48   9    Q    Isn't it true that November 19th was not the first time

09:48   10   that you learned that the law firm Eagan Avenatti used Tabs

09:48   11   to track client expenses?

09:48   12   A    After reviewing this exhibit, yes, I knew earlier about

09:49   13   Tabs.

09:49   14   Q    And you knew earlier because you and Special Agent

09:49   15   James Kim and AUSAs Julian Andre and Brett Sagel called

09:49   16   Ms. Regnier at approximately 1:30 p.m. on July 25th of 2019

09:49   17   for the specific purpose of asking her questions regarding

09:49   18   the Eagan Avenatti, LLP, server and how client files were

09:49   19   created and maintained on the server; isn't that true?

09:49   20   A    Yes.

09:50   21   Q    Special Agent Karlous, isn't it true that you, Special

09:50   22   Agent Kim, former AUSA Julian Andre, and AUSA Brett Sagel

09:51   23   have known for over two years that client expenses were

09:51   24   maintained on the EA, Eagan Avenatti, server in Tabs?

09:51   25   A    After reviewing this exhibit, it refreshes my memory,

09:51    1    yes.

09:51    2    Q    And the reason why this exhibit refreshes your memory

09:51    3    is because this is your typewritten summary and your

09:51    4    handwritten notes from that call with Ms. Regnier, right?

09:51    5    A    Yes.

09:52    6    Q    Just so we are clear, on July 25th Ms. Regnier did not

09:52    7    call you.  You called Ms. Regnier, right?

09:52    8    A    Yes.

09:52    9    Q    Whose idea was it to call Ms. Regnier that day and ask

09:52   10    about how the information was maintained within the Eagan

09:52   11    Avenatti servers?

09:52   12    A    The investigative team.

09:52   13    Q    Who does that include?

09:52   14    A    That includes who is on this memo of that day.

09:52   15    Q    So it was a joint decision generally?

09:52   16    A    Generally.

09:52   17    Q    All right.  It was a joint decision made by you,

09:52   18    Special Agent Kim, AUSA Julian Andre, and AUSA Brett Sagel,

09:52   19    correct?

09:52   20    A    Yes.

09:53   21    Q    And you understood that one of the reasons why you

09:53   22    wanted to call Ms. Regnier and ask her questions about how

09:53   23    the financial information was maintained on the servers was

09:53   24    to ensure that you did an adequate investigation; is that

09:53   25    right?

37

09:53  1   A    Yes.
09:53  2   Q    And during that discussion Ms. Regnier explained to you
09:53  3   generally how the client and financial information was
09:53  4   stored on the EA servers, right?
09:53  5   A    Yes.
09:54  6   Q    And as of this date, July 25, 2019, you were aware,
09:54  7   were you not, that the government had in its possession
09:54  8   forensic images of the servers?
09:54  9   A    Yes.
09:54  10  Q    When you spoke with Ms. Regnier on July 25, 2019, did
09:54  11  she refuse to answer any of your questions about how
09:54  12  financial information was stored on the Eagan Avenatti
09:54  13  servers?
09:54  14  A    No.
09:54  15  Q    Was there anything that she said that you thought you
09:54  16  did not understand?
09:54  17  A    I don't recall.
09:54  18  Q    As you sit here today, you do not recall any such
09:54  19  instance of that; is that true?
09:54  20  A    True.
09:55  21  Q    One of the things that you and the rest of the
09:55  22  investigative team, including AUSA Sagel, one of the things
09:55  23  that you learned on that day in July was that attorney time
09:55  24  records were kept in Tabs, not within a program on the
09:55  25  servers called FileSite, right?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

38

09:55   1   A   I don't recall that.

09:55   2   Q   Please take a look at the second to the last page,

09:55   3   middle of the page, and see if that refreshes your

09:55   4   recollection.

09:55   5   A   (Witness complies.)  Can you ask your question again.

09:56   6   Q   Yes, sir.  One of the things that you learned that day

09:56   7   together with Mr. Sagel and others was that attorney time

09:56   8   records were kept in Tabs on the EA servers, not on

09:56   9   FileSite?

09:56   10   A   Yes.

09:56   11   Q   And another thing you learned about Tabs was that it

09:56   12   was accessible via a desktop icon at the law firm, right?

09:56   13   A   Yes.

09:56   14   Q   And then you asked Ms. Regnier about client billing and

09:56   15   accounting records.  Do you recall that?

09:57   16   A   Yes.

09:57   17   Q   By the way, during this phone call who was asking the

09:57   18   questions?

09:57   19   A   Probably one of the prosecutors.

09:57   20   Q   So either Mr. Sagel or his former colleague Mr. Andre?

09:57   21   A   I think so.

09:57   22   Q   You were the one taking the notes, right?

09:57   23   A   Yes.

09:57   24   Q   Was anyone else taking notes?

09:57   25   A   No.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 09:57 | 1 | Q    And that was in accordance with that policy and for the |
| 09:57 | 2 | reason that we mentioned earlier, right? |
| 09:57 | 3 | A    Yes. |
| 09:57 | 4 | Q    And when Ms. Regnier was asked about how the client |
| 09:57 | 5 | billing and client accounting records were kept at the law |
| 09:57 | 6 | firm, she identified Tabs; didn't she? |
| 09:57 | 7 | A    Yes. |
| 09:58 | 8 | Q    Sir, during the interview with Ms. Regnier on July 25tj |
| 09:58 | 9 | when you were taking your notes, did you make it a point to |
| 09:58 | 10 | write down what Ms. Regnier said? |
| 09:58 | 11 | A    Yes -- not word for word. |
| 09:58 | 12 | Q    Do you recall anything that she said that you left out? |
| 09:58 | 13 | A    No. |
| 09:58 | 14 | Q    You understood at the time it was important for you to |
| 09:58 | 15 | record anything of any substance that Ms. Regnier said in |
| 09:58 | 16 | response to this inquiry about how the electronic data was |
| 09:58 | 17 | maintained on the servers, right? |
| 09:58 | 18 | A    Yes. |
| 09:59 | 19 | Q    During this 40-minute phone call, Ms. Regnier mentioned |
| 09:59 | 20 | Tabs at least twice, correct? |
| 09:59 | 21 | A    Yes, I believe so. |
| 09:59 | 22 | Q    How many times did she mention QuickBooks during this |
| 09:59 | 23 | interview? |
| 09:59 | 24 | A    (Witness reading document)  I don't see it in my notes. |
| 10:01 | 25 | Q    So as of the conclusion of the interview, you were |

| | | |
|---|---|---|
| 10:01 | 1 | aware that according to Ms. Regnier there was Tabs data on |
| 10:01 | 2 | the servers, correct? |
| 10:01 | 3 | A     That's what she said. |
| 10:01 | 4 | Q     Did you have any reason to dispute that? |
| 10:01 | 5 | A     I had no idea whether it was true or not. |
| 10:01 | 6 | Q     What did you do next to find out, sir? |
| 10:02 | 7 | A     I don't recall. |
| 10:02 | 8 | Q     How about nothing?  Does that refresh your |
| 10:02 | 9 | recollection, Special Agent Karlous? |
| 10:02 | 10 | A     No, it does not. |
| 10:03 | 11 | Q     As you sit here today, two years after being told in |
| 10:03 | 12 | the conference call with other members of the investigative |
| 10:03 | 13 | team about the Tabs data, as you sit here today, do you |
| 10:03 | 14 | recall a single thing that you or anyone else did to confirm |
| 10:03 | 15 | or deny the existence of the Tabs data on the servers? |
| 10:03 | 16 | A     I don't know if we have the Tabs data. |
| 10:03 | 17 |           MR. AVENATTI:  Move to strike. |
| 10:03 | 18 |           THE COURT:  It will be stricken. |
| 10:04 | 19 |           MR. AVENATTI:  Can I have it read back, please? |
| 10:04 | 20 |           THE COURT:  Yes. |
| 10:04 | 21 |        (Record read) |
| 10:04 | 22 |           THE WITNESS:  I don't know. |
| 10:04 | 23 | BY MR. AVENATTI: |
| 10:04 | 24 | Q     After you got off that call, do you have a recollection |
| 10:04 | 25 | of sending anyone an e-mail about the Tabs data ever? |

| | | |
|---|---|---|
| 10:04 | 1 | A    I don't recall sending an e-mail, no. |
| 10:04 | 2 | Q    How about a text message?  Do you recall sending a text |
| 10:04 | 3 | message at any point in time between July 25th, 2019, and |
| 10:04 | 4 | this trial, actually until you took the stand today, and |
| 10:04 | 5 | inquiring about the Tabs data? |
| 10:04 | 6 | A    No, I didn't send a text message.  No. |
| 10:04 | 7 | Q    Letter?  Did you send a letter? |
| 10:04 | 8 | A    Me personally?  No. |
| 10:04 | 9 | Q    Did you place a phone call? |
| 10:04 | 10 | A    Me personally?  No. |
| 10:04 | 11 | Q    Okay.  Well, in light of your answer of me personally, |
| 10:04 | 12 | let me ask you this:  Are you aware of anyone on the |
| 10:04 | 13 | investigative team in the last two years making an inquiry |
| 10:05 | 14 | as to whether the Tabs data was included within the forensic |
| 10:05 | 15 | images of the servers? |
| 10:05 | 16 | A    It may have occurred, but I wouldn't know. |
| 10:05 | 17 | Q    Well, a lot of things may have occurred.  My question |
| 10:05 | 18 | is not whether they may have occurred.  My question is, sir: |
| 10:05 | 19 | Do you have a recollection of anyone doing that? |
| 10:05 | 20 | A    Possibly.  I don't know. |
| 10:05 | 21 | Q    Possibly you have a recollection, or you don't have a |
| 10:05 | 22 | recollection but it possibly may have happened? |
| 10:05 | 23 |         MR. SAGEL:  Objection, Your Honor.  Argumentative. |
| 10:05 | 24 | asked and answered. |
| 10:05 | 25 |         THE COURT:  Overruled. |

```
10:05   1              THE WITNESS:  I don't know.
10:05   2   BY MR. AVENATTI:
10:05   3   Q    As you sit here today, you know of no such instance,
10:05   4   true?
10:05   5   A    I don't --
10:05   6   Q    Just answer my question.
10:05   7   A    I do not.
10:05   8   Q    Okay.  Over the last two years, was that something that
10:06   9   interested you, namely, whether this data about the expenses
10:06   10  for the clients existed?
10:06   11  A    We wanted all that data, and we were waiting on the
10:06   12  taint team.
10:06   13             MR. AVENATTI:  Move to strike, Your Honor.
10:06   14             THE COURT:  It will be stricken.
10:06   15             MR. AVENATTI:  Can I have it read back, please?
10:06   16             THE COURT:  Yes.
10:06   17             (Record read)
10:06   18  BY MR. AVENATTI:
10:06   19  Q    Yes or no, sir?
10:06   20  A    Yes.  We wanted all financial records.
10:07   21  Q    You wanted all financial records relating to me, the
10:07   22  law firm, and my businesses, right?
10:07   23  A    Yes.
10:07   24  Q    And that was at all times from March 25th, 2019, to the
10:07   25  present, right?
```

43

| | | |
|---|---|---|
| 10:07 | 1 | A    Yes. |
| 10:07 | 2 | Q    In whatever form those records were, whether it be |
| 10:07 | 3 | electronic or hard copy, right? |
| 10:07 | 4 | A    Yes. |
| 10:08 | 5 | MR. AVENATTI:  One moment, Your Honor, please. |
| 10:08 | 6 | (Pause in proceedings) |
| 10:08 | 7 | BY MR. AVENATTI: |
| 10:08 | 8 | Q    Special Agent Karlous, did you ever have any |
| 10:08 | 9 | discussions with Mr. Sagel or any other member of the |
| 10:09 | 10 | investigative team relating to the need to acquire the Tabs |
| 10:09 | 11 | data? |
| 10:09 | 12 | A    I don't recall. |
| 10:09 | 13 | Q    As you sit here today, you do not recall any such |
| 10:09 | 14 | instance, true? |
| 10:09 | 15 | A    I'm sure we did, but I don't recall specifics. |
| 10:09 | 16 | Q    Well, sir, do you have a recollection of you conversing |
| 10:09 | 17 | about that or not? |
| 10:09 | 18 | A    We must have. |
| 10:09 | 19 | Q    Well, let the record reflect you just held up your |
| 10:09 | 20 | interview notes, right? |
| 10:09 | 21 | A    Exhibit 1084. |
| 10:09 | 22 | Q    1084, the July 25th notes, correct? |
| 10:09 | 23 | A    Yes. |
| 10:09 | 24 | Q    Those notes don't reflect what your communications were |
| 10:09 | 25 | with Mr. Sagel and other members of the investigative team. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 10:09 | 1 | Those notes reflect what your communications were with |
| 10:09 | 2 | Ms. Regnier, right? |
| 10:10 | 3 | A    True. |
| 10:10 | 4 | Q    Okay.  I'm talking about after you got off the call |
| 10:10 | 5 | with Ms. Regnier up through this morning when you took the |
| 10:10 | 6 | stand.  Do you have a recollection of ever conversing with |
| 10:10 | 7 | Mr. Sagel or anyone else about the need to actually get the |
| 10:10 | 8 | data from Tabs in connection with a major federal criminal |
| 10:10 | 9 | prosecution, sir? |
| 10:10 | 10 | MR. SAGEL:  Objection.  Argumentative. |
| 10:10 | 11 | THE COURT:  Overruled. |
| 10:10 | 12 | THE WITNESS:  We don't know if we have it or not. |
| 10:10 | 13 | MR. AVENATTI:  Move to strike, Your Honor. |
| 10:10 | 14 | THE COURT:  It will be stricken. |
| 10:10 | 15 | MR. AVENATTI:  Can I have the question read back, |
| 10:10 | 16 | please? |
| 10:10 | 17 | THE COURT:  You may. |
| 10:10 | 18 | (Record read) |
| 10:11 | 19 | THE WITNESS:  No. |
| 10:11 | 20 | BY MR. AVENATTI: |
| 10:11 | 21 | Q    Special Agent Karlous, you made no effort to acquire |
| 10:11 | 22 | and look at the Tabs data because you and the rest of the |
| 10:11 | 23 | members of the investigative team were afraid of what you |
| 10:11 | 24 | might find; isn't that true? |
| 10:11 | 25 | A    No, that's not true. |

45

| | | |
|---|---|---|
| 10:12 | 1 | Q    Sir, isn't it true even before Ms. Regnier told you |
| 10:12 | 2 | what she told you on July 25th of 2019, that you believed |
| 10:12 | 3 | that there was accounting data and programs on the Eagan |
| 10:12 | 4 | Avenatti, LLP, servers? |
| 10:12 | 5 | A    Yes.  That's why we did a search warrant. |
| 10:13 | 6 | MR. AVENATTI:  Move to strike after yes as |
| 10:13 | 7 | nonresponsive, Your Honor. |
| 10:13 | 8 | THE COURT:  It will be stricken. |
| 10:13 | 9 | BY MR. AVENATTI: |
| 10:13 | 10 | Q    Mr. Karlous, do you have a recollection of conversing |
| 10:13 | 11 | with Ms. Regnier about QuickBooks? |
| 10:13 | 12 | A    I believe so. |
| 10:13 | 13 | Q    And do you have a recollection of Ms. Regnier informing |
| 10:13 | 14 | you that the QuickBooks records were incomplete? |
| 10:14 | 15 | A    I don't recall. |
| 10:14 | 16 | Q    Do you still have the interview memorandum from |
| 10:14 | 17 | November 19th, 2019, up there? |
| 10:14 | 18 | A    Yes. |
| 10:14 | 19 | Q    Take a look at paragraphs 16 and 17 and see if that |
| 10:14 | 20 | refreshes your recollection that Ms. Regnier informed you |
| 10:14 | 21 | that the QuickBooks records were incomplete. |
| 10:14 | 22 | A    Yes, because she told us it was. |
| 10:14 | 23 | MR. AVENATTI:  Move to strike, Your Honor. |
| 10:14 | 24 | THE COURT:  It will be stricken. |
| | 25 | |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

BY MR. AVENATTI:

Q    Special Agent Karlous, what steps after November 19th, 2019, did you take to see if there were any QuickBooks records on the Eagan Avenatti servers?

A    My recollection is the taint team was made aware that there were QuickBooks or -- and that we wanted them.

Q    Did you ever make anyone aware that there were Tabs records and, to use your words, you wanted them?  Yes or no?

A    I don't recall.

Q    Mr. Drum testified that he used QuickBooks records in connection with compiling his summaries.  Were you here for that testimony?

A    Yes.

Q    Do you know where he got those QuickBooks records?

A    From the government.

Q    What version of the data file did he use?  Do you have any idea?

A    Whatever the computer forensic people pulled off from your server.

        MR. AVENATTI:  Move to strike, Your Honor.  It's nonresponsive.

        THE COURT:  Denied.

BY MR. AVENATTI:

Q    Sir, is it your testimony that the QuickBooks records that Mr. Drum used came off the Eagan Avenatti server?  Is

```
10:16    1   that your testimony?
10:16    2   A    It came off of one of the computer devices that were
10:16    3   taken during the search warrant.
10:16    4   Q    Well, you just made it a point to tell the jury that it
10:17    5   came off the server.  You just used the word server; did you
10:17    6   not?  Just answer my question.  Did you use the word server?
10:17    7   A    Yes.
10:17    8   Q    All right.  And you don't know whether those records
10:17    9   came off of any server; do you?  Do you, sir?
10:17   10   A    Me, no.  Our forensic people will know.
10:17   11   Q    You don't know if that QuickBooks file was a current
10:17   12   file or an old file; do you?
10:17   13   A    I have no idea.
10:17   14   Q    You don't know if that QuickBooks file was laying
10:17   15   around on a hard drive somewhere or was on somebody's
10:17   16   computer or was on the Eagan Avenatti server; do you?
10:17   17   A    It's on the inventory where it was found.
10:17   18   Q    You don't know where it was found; do you?
10:17   19   A    Sitting here right now, no.
10:18   20   Q    After Ms. Regnier informed you that the QuickBooks data
10:18   21   was not complete, did you take any steps to ensure that you
10:18   22   had the most current, most complete data file?  Yes or no?
10:18   23   A    The forensic agents do that.
10:18   24   Q    Is that Mr. Tashchyan?
10:18   25   A    He would be one of them, yes.
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 10:18 | 1 | Q    Well, did you ask the forensic agents to make sure that |
| 10:18 | 2 | you had the most up-to-date, complete QuickBooks data file? |
| 10:19 | 3 | A    There is a taint process, so, no. |
| 10:19 | 4 | MR. AVENATTI:  Move to strike, Your Honor. |
| 10:19 | 5 | THE COURT:  It will be stricken. |
| 10:19 | 6 | MR. AVENATTI:  Can I have it read back, please? |
| 10:19 | 7 | THE COURT:  Yes. |
| 10:19 | 8 | (Record read) |
| 10:19 | 9 | THE WITNESS:  No. |
| 10:19 | 10 | BY MR. AVENATTI: |
| 10:19 | 11 | Q    Now, you communicated with Ms. Regnier on a number of |
| 10:19 | 12 | occasions during these last two years about this case, true? |
| 10:19 | 13 | A    I have communicated with her.  I don't know how many |
| 10:19 | 14 | times. |
| 10:19 | 15 | Q    It's been more than a few, right? |
| 10:20 | 16 | A    I don't have the number in my head, but, yes. |
| 10:20 | 17 | Q    More than ten? |
| 10:20 | 18 | A    I don't know. |
| 10:20 | 19 | Q    What's your best estimate? |
| 10:20 | 20 | A    Including preparation for trial? |
| 10:20 | 21 | Q    Yes. |
| 10:20 | 22 | A    Less than ten. |
| 10:20 | 23 | Q    More than five? |
| 10:20 | 24 | A    Yes. |
| 10:20 | 25 | Q    Okay.  And one of those meetings took place on |

| | | |
|---|---|---|
| 10:20 | 1 | June 14th of 2021, about two months ago.  Do you recall |
| 10:20 | 2 | that? |
| 10:20 | 3 | A    Not the date, but, yes. |
| 10:20 | 4 | Q    And do you recall that you met with Ms. Regnier with |
| 10:20 | 5 | her attorney, Special Agent Roberson, AUSA Sagel, and AUSA |
| 10:21 | 6 | Wyman?  Do you recall that? |
| 10:21 | 7 | A    Was that on Zoom? |
| 10:21 | 8 | MR. AVENATTI:  Can I approach, Your Honor? |
| 10:21 | 9 | BY MR. AVENATTI: |
| 10:21 | 10 | Q    According to the memorandum of interview, it is, but if |
| 10:21 | 11 | you would like to refresh your recollection ... |
| 10:21 | 12 | A    I recall it now. |
| 10:21 | 13 | Q    Special Agent Karlous, as a general proposition, is it |
| 10:21 | 14 | important to you when you meet with witnesses especially on |
| 10:21 | 15 | the eve of trial, is it important to you that they tell you |
| 10:21 | 16 | the truth? |
| 10:21 | 17 | A    Yes. |
| 10:22 | 18 | Q    Do you take that obligation seriously when you meet |
| 10:22 | 19 | with witnesses? |
| 10:22 | 20 | A    Yes. |
| 10:22 | 21 | Q    In fact, as a federal agent, you are aware that if a |
| 10:22 | 22 | witness lies to you when you are interviewing them, that is |
| 10:22 | 23 | a serious felony that can be punishable by up to five years |
| 10:22 | 24 | in federal prison, right? |
| 10:22 | 25 | A    Yes, if it's material. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

50

| | | |
|---|---|---|
| 10:22 | 1 | Q    And it is common practice to advise witnesses at the |
| 10:22 | 2 | beginning of any interview that it is incredibly important |
| 10:22 | 3 | that they tell the truth when meeting with federal agents |
| 10:22 | 4 | and that there are serious consequences for not doing so, |
| 10:22 | 5 | right? |
| 10:22 | 6 | A    Yes. |
| 10:22 | 7 | Q    And because you are a 20-plus-year federal agent, you |
| 10:22 | 8 | take great offense when you meet with people about serious |
| 10:22 | 9 | federal criminal matters and they lie to you?  You are |
| 10:23 | 10 | offended by that, right? |
| 10:23 | 11 | A    If it's purposefully, yes. |
| 10:23 | 12 | Q    That's a big deal to you, right? |
| 10:23 | 13 | A    Yes. |
| 10:23 | 14 |           MR. AVENATTI:  Let's have Exhibit 281, please, |
| 10:23 | 15 | which is in evidence. |
| 10:23 | 16 | BY MR. AVENATTI: |
| 10:23 | 17 | Q    Special Agent Karlous, you can look at it on your |
| 10:23 | 18 | screen or in the binder, whatever is easiest. |
| 10:24 | 19 |           Do you have that there, sir? |
| 10:24 | 20 | A    Yes. |
| 10:24 | 21 | Q    And do you have a recollection that when you met with |
| 10:24 | 22 | Ms. Regnier, Mr. Sagel specifically asked Ms. Regnier about |
| 10:24 | 23 | this e-mail exchange that has now been put into evidence by |
| 10:24 | 24 | the government at Exhibit 281 relating to Ms. Phan? |
| 10:25 | 25 | A    Yes. |

| | | |
|---|---|---|
| 10:25 | 1 | MR. AVENATTI:  Ms. Hernandez, can you please blow |
| 10:25 | 2 | up the bottom e-mail. |
| 10:25 | 3 | BY MR. AVENATTI: |
| 10:25 | 4 | Q    Can you see that, Special Agent Karlous? |
| 10:25 | 5 | A    Yes. |
| 10:25 | 6 | Q    And do you recall that in preparation for trial when |
| 10:26 | 7 | you met with Ms. Regnier together with AUSA Sagel, that |
| 10:26 | 8 | Ms. Regnier was asked about this particular e-mail that is |
| 10:26 | 9 | part of Exhibit 281?  Do you recall that? |
| 10:26 | 10 | A    Yes. |
| 10:26 | 11 | Q    And this e-mail is dated Tuesday, May 1st, 2018, at |
| 10:26 | 12 | 3:08 p.m., correct? |
| 10:26 | 13 | A    Yes. |
| 10:26 | 14 | Q    And it's from Ms. Regnier to Mr. Tran and myself.  Do |
| 10:26 | 15 | you see that? |
| 10:26 | 16 | A    Yes. |
| 10:26 | 17 | Q    And this e-mail reads: "Long, I asked the bank to put a |
| 10:26 | 18 | trace on it.  As soon as I get the results, I will let you |
| 10:26 | 19 | know ASAP.  Judy."  Did I read that correctly? |
| 10:27 | 20 | A    Yes. |
| 10:27 | 21 | Q    Was this another meeting where Mr. Sagel was asking |
| 10:27 | 22 | most of the questions? |
| 10:27 | 23 | A    Yes. |
| 10:27 | 24 | Q    And during that meeting Mr. Sagel asked about this |
| 10:27 | 25 | e-mail that Ms. Regnier had sent and asked for an |

| | | |
|---|---|---|
| 10:27 | 1 | explanation for it; didn't he? |
| 10:27 | 2 | A    Yes, I believe so. |
| 10:27 | 3 | Q    And the explanation that Ms. Regnier gave to you and |
| 10:27 | 4 | Mr. Sagel and to the other federal agents was that I may |
| 10:27 | 5 | have sent this e-mail by typing it on her computer here in |
| 10:28 | 6 | California; isn't that true? |
| 10:28 | 7 | A    Yes -- may have. |
| 10:28 | 8 | Q    And as soon as she told you that, you knew that that |
| 10:28 | 9 | was a lie and was not possible; didn't you? |
| 10:28 | 10 | A    I did not know that at that time. |
| 10:28 | 11 | Q    And you had no evidence in your possession that would |
| 10:28 | 12 | have told you that that was a lie and impossible.  Is that |
| 10:28 | 13 | your testimony? |
| 10:29 | 14 | A    No. |
| 10:29 | 15 | MR. AVENATTI:  Your Honor, now is a good time if |
| 10:29 | 16 | it's acceptable to Your Honor. |
| 10:29 | 17 | THE COURT:  Do you want to take a break now, |
| 10:29 | 18 | ladies and gentlemen, or a little bit later? |
| 10:29 | 19 | THE JURY:  Now. |
| 10:29 | 20 | THE COURT:  Fine.  We'll take the mid-morning |
| 10:29 | 21 | break here.  We'll be in recess for 15 minutes. |
| 10:29 | 22 | Please remember the admonition not to discuss the |
| 10:29 | 23 | case with anyone and not to form any opinions on the issues |
| 10:29 | 24 | in the case until it is submitted to you.  And do not do any |
| 10:29 | 25 | research. |

53

```
10:29    1              (Jury not present)
10:29    2                  (Recess taken at 10:29 a.m.;
10:29    3                  proceedings resumed at 10:48 a.m.)
10:29    4              (Jury present)
10:48    5          THE COURT:  Mr. Avenatti.
10:48    6    BY MR. AVENATTI:
10:49    7    Q    Special Agent Karlous, before the break I was asking
10:49    8    about this statement that Ms. Regnier had made relating to
10:49    9    this bottom portion of Exhibit 281, the May 1st, 2018,
10:49   10    e-mail.  Do you recall that generally?
10:49   11    A    Yes.
10:49   12    Q    And I asked you if it was your testimony to the jury
10:49   13    that you had no evidence in your possession when you met
10:50   14    with Ms. Regnier that would show that what she said was
10:50   15    untrue.  And your answer right before we broke was that
10:50   16    would not be accurate, or no.  Do you recall that?
10:50   17    A    Yes.
10:50   18    Q    Because the fact of the matter is that at the time that
10:50   19    Ms. Regnier told you and AUSA Sagel and others that I may
10:50   20    have typed that e-mail on her computer, you did have
10:50   21    evidence in your possession showing that that was not
10:50   22    physically possible; didn't you?
10:50   23    A    Yes, I believe so.
10:50   24    Q    And in particular you had in your possession evidence
10:50   25    that showed that on May 1st, I was in New York City; isn't
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 10:51 | 1 | that true? |
| 10:51 | 2 | A    I believe so. |
| 10:51 | 3 | Q    And in particular you had data from my cell phone |
| 10:51 | 4 | company showing my locations during the days leading up to |
| 10:51 | 5 | May 1st and the days after May 1st; isn't that true? |
| 10:51 | 6 | A    Yes, I believe so. |
| 10:51 | 7 | MR. SAGEL:  Your Honor, we just had a 15-minute |
| 10:52 | 8 | break.  Could we have a question, please. |
| 10:52 | 9 | BY MR. AVENATTI: |
| 10:52 | 10 | Q    Sir, the government had data from my cell phone company |
| 10:52 | 11 | showing that I was in Washington, D.C., on April 28th, |
| 10:52 | 12 | Washington, D.C., and New York City on April 29th, New York |
| 10:53 | 13 | City on April 30th, New York City on May 1st, and New York |
| 10:53 | 14 | City on May 2nd, all of 2018; isn't that true? |
| 10:53 | 15 | A    Sitting here right now I can't answer that, that I know |
| 10:53 | 16 | that for sure. |
| 10:53 | 17 | Q    Well, after Ms. Regnier told you that I may have typed |
| 10:53 | 18 | this piece of evidence, did you do anything to check? |
| 10:53 | 19 | A    I personally did not. |
| 10:53 | 20 | Q    Are you aware of anyone on the investigative team |
| 10:53 | 21 | making any effort to see if what Ms. Regnier had told you |
| 10:53 | 22 | before trial was true? |
| 10:53 | 23 | A    I don't know. |
| 10:53 | 24 | Q    Is that something you would have wanted to know? |
| 10:53 | 25 | A    We want to know the truth, absolutely. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 10:53 | 1 | Q    Sir, as you sit here today, you know for a fact that I |
| 10:54 | 2 | was not in California on May 1st, 2018; isn't that true? |
| 10:54 | 3 | A    I believe so. |
| 10:54 | 4 | Q    And you know that from two pieces of evidence -- the |
| 10:54 | 5 | cell phone records and video evidence; isn't that true? |
| 10:54 | 6 | A    I'm not sure that I have video evidence. |
| 10:54 | 7 | Q    Are you aware of the existence of video footage that |
| 10:54 | 8 | shows me in New York City on May 1st? |
| 10:54 | 9 | A    I don't have that, no. |
| 10:54 | 10 | Q    Are you aware of it? |
| 10:54 | 11 | A    It might be there, but I don't know. |
| 10:54 | 12 | Q    Have you ever made any effort to find out if there is |
| 10:54 | 13 | any video evidence showing that what Ms. Regnier told you |
| 10:54 | 14 | and the other agents was not true? |
| 10:54 | 15 | A    I personally did not. |
| 10:54 | 16 | Q    Are you aware of anyone doing that? |
| 10:54 | 17 | A    No. |
| 10:55 | 18 | Q    When Ms. Regnier told you that I may have physically |
| 10:55 | 19 | gone to her computer and typed out this e-mail, the one |
| 10:55 | 20 | that's on the screen, didn't that strike you as a little |
| 10:55 | 21 | fantastical? a little crazy? |
| 10:55 | 22 | A    Well, not really because she said "may have." |
| 10:55 | 23 | Q    You didn't think that perhaps Ms. Regnier was trying to |
| 10:55 | 24 | excuse away an e-mail that she had drafted by claiming that |
| 10:55 | 25 | somehow I had physically sent it from her computer?  Did you |

| | | |
|---|---|---|
| 10:55 | 1 | ever think of that possibility?  Yes or no? |
| 10:56 | 2 | A    No. |
| 10:56 | 3 | Q    And you knew at the time when Ms. Regnier told you this |
| 10:56 | 4 | story, you knew that around that time period of this e-mail, |
| 10:56 | 5 | May 1st, 2018, that I was spending a lot of time on the East |
| 10:56 | 6 | Coast.  You knew that, right? |
| 10:56 | 7 | A    When she told us this in June? |
| 10:56 | 8 | Q    Yes, in June of 2021.  When you and Mr. Sagel asked her |
| 10:56 | 9 | about this e-mail on May 1st, 2018, as of that time period |
| 10:56 | 10 | you knew that back in 2018 in the spring, I was spending a |
| 10:56 | 11 | lot of time in New York City.  You already knew that, right? |
| 10:56 | 12 | A    Yes. |
| 10:56 | 13 | Q    And it never occurred to you -- when she told you this, |
| 10:56 | 14 | it never occurred to you to say, you know, maybe I should |
| 10:57 | 15 | check if Avenatti was even in California at that time and |
| 10:57 | 16 | whether it was even possible?  That never occurred to you? |
| 10:57 | 17 | Yes or no? |
| 10:57 | 18 | A    No, because she said may have. |
| 10:57 | 19 | MR. AVENATTI:  Thank you.  Move to strike as |
| 10:57 | 20 | nonresponsive after no. |
| 10:57 | 21 | THE COURT:  It will be stricken. |
| 10:57 | 22 | BY MR. AVENATTI: |
| 10:57 | 23 | Q    And the reason why that never occurred to you was |
| 10:57 | 24 | because she said may, right? |
| 10:57 | 25 | A    May have, yes. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

57

| | | |
|---|---|---|
| 10:57 | 1 | Q    And because she said may have, you didn't think that |
| 10:57 | 2 | there was any investigation needed, right? |
| 10:57 | 3 | A    No. |
| 10:57 | 4 | Q    Meaning I'm right? |
| 10:57 | 5 | A    Yes. |
| 10:57 | 6 | Q    Okay.  Special Agent Karlous, I may have killed someone |
| 10:57 | 7 | this morning.  Are you going to investigate?  Or because I |
| 10:58 | 8 | said may have, you just blow it off? |
| 10:58 | 9 | A    Bad example.  It's an e-mail. |
| 10:58 | 10 | Q    I think it's a good example. |
| 10:58 | 11 | THE COURT:  Sir, ask questions.  Do not comment on |
| 10:58 | 12 | his testimony. |
| 10:58 | 13 | MR. AVENATTI:  I'm going to move to strike the |
| 10:58 | 14 | answer as nonresponsive. |
| 10:58 | 15 | THE COURT:  It's stricken. |
| 10:58 | 16 | BY MR. AVENATTI: |
| 10:58 | 17 | Q    Sir, the fact of the matter is you did nothing to |
| 10:58 | 18 | verify whether Ms. Regnier, what she had told you may have |
| 10:58 | 19 | happened was possible; did you? |
| 10:58 | 20 | A    I did not know in June that you were not around on |
| 10:58 | 21 | May 1st, 2018. |
| 10:58 | 22 | MR. AVENATTI:  Move to strike. |
| 10:58 | 23 | THE COURT:  Denied. |
| 10:58 | 24 | BY MR. AVENATTI: |
| 10:58 | 25 | Q    My question is:  Did you do anything to find out? |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 10:58 | 1 | A    No.  She was uncertain. |
| 10:59 | 2 | MR. AVENATTI:  Move to strike after no. |
| 10:59 | 3 | THE COURT:  Everything after "No" is stricken. |
| 10:59 | 4 | BY MR. AVENATTI: |
| 10:59 | 5 | Q    Now, before the break I believe you testified that the |
| 10:59 | 6 | government wanted all financial information and evidence |
| 10:59 | 7 | from at least March of 2019 until this trial, right?  Do you |
| 10:59 | 8 | recall that? |
| 10:59 | 9 | A    Yes. |
| 10:59 | 10 | Q    And was that truthful testimony when you gave it? |
| 10:59 | 11 | A    Yes. |
| 10:59 | 12 | Q    And I believe you testified that that related -- that |
| 11:00 | 13 | included financial information for me, the law firm, and my |
| 11:00 | 14 | entities, correct? |
| 11:00 | 15 | A    Yes. |
| 11:00 | 16 | Q    Now, do you recall on March 26, 2019, the day after the |
| 11:00 | 17 | search warrant was executed, do you recall that Ms. Regnier |
| 11:00 | 18 | contacted you about some information that had been left |
| 11:00 | 19 | behind by the agents? |
| 11:00 | 20 | A    Yes. |
| 11:00 | 21 | Q    And do you recall that she had contacted you and told |
| 11:00 | 22 | you that there was a box at her residence that was full of |
| 11:00 | 23 | business records pertaining to the law firm? |
| 11:00 | 24 | A    Yes. |
| 11:00 | 25 | Q    And do you have a recollection of calling another agent |

| | | |
|---|---|---|
| 11:00 | 1 | to go retrieve that box that had been left behind? |
| 11:00 | 2 | A    Yes. |
| 11:00 | 3 | Q    And how was it that with 10 to 15 agents plus you and |
| 11:01 | 4 | Mr. Sagel and Ms. Ball, how was it that a box of financial |
| 11:01 | 5 | records from Eagan Avenatti were left at Ms. Regnier's home? |
| 11:01 | 6 | Did you ever find out? |
| 11:01 | 7 | A    Human error. |
| 11:01 | 8 | Q    So you did find out, and you found out it was error; is |
| 11:01 | 9 | that right? |
| 11:01 | 10 | A    That's my understanding. |
| 11:01 | 11 | Q    Did you do anything to actually look into how this |
| 11:01 | 12 | could have happened? |
| 11:01 | 13 | A    No. |
| 11:01 | 14 | Q    Did anyone to the best of your knowledge ever take any |
| 11:01 | 15 | steps to find out how that would be possible, with all of |
| 11:01 | 16 | those federal agents in her home, that a box got left |
| 11:01 | 17 | behind? |
| 11:01 | 18 | A    No. |
| 11:01 | 19 | Q    And you don't know what happened to that box between |
| 11:01 | 20 | the time period that the agents left Ms. Regnier's home and |
| 11:01 | 21 | when she called; do you? |
| 11:01 | 22 | A    No. |
| 11:02 | 23 | Q    While you were at Ms. Regnier's home on March 25th |
| 11:02 | 24 | while the search warrant was being executed, was Ms. Regnier |
| 11:02 | 25 | permitted to have access to any of her files or boxes of |

11:02   1   documents?

11:02   2   A    I don't believe so.

11:02   3   Q    And the reason why she wasn't given access was because

11:02   4   the whole idea behind the search warrant is that you, when

11:02   5   you execute a search warrant, you gather all of the evidence

11:02   6   as it existed at that time; isn't that true?

11:02   7   A    Yes.

11:02   8   Q    And that's why you don't let the target of the search

11:02   9   warrant have access to and potentially tamper with evidence;

11:02   10  is that right?

11:02   11          MR. SAGEL:  Objection.  Assumes facts not in

11:02   12  evidence, use of the word target.

11:02   13          THE COURT:  Overruled.

11:02   14          THE WITNESS:  Yes, and for safety reasons.

11:02   15  BY MR. AVENATTI:

11:03   16  Q    After you got this call from Ms. Regnier the next day,

11:03   17  you contacted a Special Agent Schabilion.  Did I pronounce

11:03   18  that correctly?

11:03   19  A    Schabilion, yes.

11:03   20  Q    And you instructed Ms. Schabilion to go out to

11:03   21  Ms. Regnier's residence and pick up this box of documents

11:03   22  that the 15 agents had left behind, right?

11:03   23  A    Yes.

11:03   24  Q    Because again you wanted to make sure that the

11:03   25  government had all of the financial records relating to the

| 11:03 | 1 | law firm, me, and my entities, correct? |
| 11:03 | 2 | A    Yes. |
| 11:04 | 3 | Q    So that was on March 26th. |
| 11:04 | 4 | Then on June 14th, 2019, you had a telephone call |
| 11:04 | 5 | with Ms. Regnier.  Do you recall that? |
| 11:04 | 6 | A    No, I don't recall it. |
| 11:04 | 7 | Q    This would have been before July 25th when she told you |
| 11:04 | 8 | about Tabs.  You don't recall that? |
| 11:04 | 9 | A    I don't recall the telephone call. |
| 11:04 | 10 | MR. AVENATTI:  Your Honor, can I approach? |
| 11:04 | 11 | THE COURT:  You may. |
| 11:04 | 12 | (Document handed to the witness) |
| 11:04 | 13 | BY MR. AVENATTI: |
| 11:05 | 14 | Q    Special Agent Karlous, does this refresh your |
| 11:05 | 15 | recollection that indeed on June 14th, 2019, you had a call |
| 11:05 | 16 | with Ms. Regnier about this case? |
| 11:05 | 17 | A    Yes. |
| 11:05 | 18 | Q    And, in fact, you took handwritten notes on that day; |
| 11:05 | 19 | am I right? |
| 11:05 | 20 | A    Correct. |
| 11:05 | 21 | Q    And do you recall if anyone else was on the call? |
| 11:05 | 22 | A    I don't believe so because the notes don't reflect it. |
| 11:05 | 23 | Q    So you believe it was just you and Ms. Regnier? |
| 11:06 | 24 | A    Yes.  She called me. |
| 11:06 | 25 | Q    And during this call Ms. Regnier told you that she had |

62

11:06   1    six to seven miscellaneous boxes of documents; didn't she?

11:06   2    A    Yes.

11:06   3    Q    And she told you that these boxes included

11:06   4    correspondence from, quote, fans, close quote, personal

11:06   5    records, MA finances, other companies, and a ton of EA

11:07   6    records, as well as other case related, right?

11:07   7    A    Yes.

11:07   8    Q    And she told you that she was going to either move

11:07   9    them, burn them, or possibly trash them; didn't she?

11:07   10   A    Yes.

11:07   11   Q    And she also told you that instead of moving them or

11:07   12   burning them or trashing them, that she was willing to hand

11:07   13   over the boxes to the federal government; didn't she?

11:08   14   A    Yes.

11:08   15   Q    And in your notes you placed an asterisk next to what

11:08   16   Ms. Regnier told you about these boxes and about moving

11:08   17   them, burning them, and trashing them, as well as the fact

11:08   18   that she was willing to hand over the boxes.  You put

11:08   19   asterisks around that; didn't you?

11:08   20   A    Yes.

11:08   21   Q    Please tell the jury about what happened when the

11:08   22   government went out to Ms. Regnier's residence, like it had

11:08   23   done a couple months before to pick up the single box of

11:08   24   documents, please tell the jury what happened when the

11:09   25   government went out to pick up these six to seven boxes of

11:09   1   documents.

11:09   2   A    We never picked them up.

11:09   3   Q    Who met Ms. Regnier when she dropped off the boxes of

11:09   4   documents?

11:09   5   A    These boxes that you're referring to, the six or seven?

11:09   6   Q    Yes.

11:09   7   A    We never picked them up.  She never dropped them off.

11:09   8   Q    Where did Ms. Regnier live when you executed the search

11:09   9   warrant?  What was the city?

11:09   10  A    I believe it was Yorba Linda.

11:10   11  Q    About a half hour from the courthouse?

11:10   12  A    Approximately.

11:10   13  Q    You were here for Ms. Regnier's testimony, correct?

11:10   14  A    Yes.

11:10   15  Q    And you know based on her testimony that after this

11:10   16  phone call and before this trial started, those six to seven

11:10   17  boxes of documents that you did not pick up were shredded?

11:10   18  You know that based on her testimony; don't you, sir?

11:10   19  A    I believe that's what she said.

11:11   20  Q    Did you ever follow up with Ms. Regnier after this

11:11   21  phone call to see if you could send someone over to pick up

11:11   22  the boxes of documents?  Yes or no?

11:11   23  A    No.

11:11   24  Q    Beyond what Ms. Regnier told you as reflected in your

11:11   25  notes, do you know what else was contained within these six

| | | |
|---|---|---|
| 11:11 | 1 | to seven boxes of documents? |
| 11:11 | 2 | A    From what she told me? |
| 11:12 | 3 | Q    Sir, listen to my question.  Strike the question. |
| 11:12 | 4 | You made notes of everything of any substance that |
| 11:12 | 5 | Ms. Regnier told you that day; did you not? |
| 11:12 | 6 | A    Yes. |
| 11:12 | 7 | Q    Beyond what I have asked you about as reflected in your |
| 11:12 | 8 | notes, you had no knowledge of anything else in those boxes; |
| 11:12 | 9 | did you? |
| 11:12 | 10 | A    No other knowledge from her. |
| 11:12 | 11 | Q    You had no other knowledge as to what was contained |
| 11:12 | 12 | within these boxes; did you, sir -- personal knowledge? |
| 11:12 | 13 | A    I found out later -- |
| 11:12 | 14 | MR. AVENATTI:  Move to strike. |
| 11:12 | 15 | THE COURT:  It will be stricken. |
| 11:12 | 16 | BY MR. AVENATTI: |
| 11:12 | 17 | Q    Sir, when you spoke with Ms. Regnier in June of 2019, |
| 11:12 | 18 | the totality of what you were told about what was in these |
| 11:13 | 19 | boxes is what you wrote in your notes; is that right? |
| 11:13 | 20 | MR. SAGEL:  Objection.  Asked and answered twice |
| 11:13 | 21 | now. |
| 11:13 | 22 | THE COURT:  Sustained. |
| 11:13 | 23 | BY MR. AVENATTI: |
| 11:13 | 24 | Q    When is the next time, if ever, you conversed with |
| 11:13 | 25 | Ms. Regnier about what was contained in these boxes? |

| 11:13 | 1 | A    I don't recall. |
| 11:13 | 2 | Q    Do you recall ever doing that? |
| 11:13 | 3 | A    I just don't recall. |
| 11:13 | 4 | Q    And the reason why you wanted -- well, strike that. |
| 11:14 | 5 | The reason why according to you the government wanted all of |
| 11:14 | 6 | the financial records was so that you could determine |
| 11:14 | 7 | whether a crime was committed in connection with the ten |
| 11:14 | 8 | counts in this case; is that right? |
| 11:14 | 9 | A    We already had the evidence. |
| 11:14 | 10 |         MR. AVENATTI:  Move to strike, Your Honor. |
| 11:14 | 11 |         THE COURT:  It will be stricken. |
| 11:14 | 12 | BY MR. AVENATTI: |
| 11:14 | 13 | Q    Special Agent Karlous, you understood in 2019 and 2020 |
| 11:14 | 14 | that the reason why you wanted the financial records which |
| 11:14 | 15 | you have already told the jury you wanted was in connection |
| 11:15 | 16 | with your investigation, right? |
| 11:15 | 17 | A    Yes. |
| 11:15 | 18 | Q    And did you have the understanding that the information |
| 11:15 | 19 | relating to the expenses that the law firm incurred for the |
| 11:15 | 20 | clients was important information? |
| 11:15 | 21 | A    Yes. |
| 11:15 | 22 | Q    You understood that that information would help answer |
| 11:15 | 23 | this question, the calculation as to how much money was due |
| 11:15 | 24 | the clients.  Did you understand that?  Yes or no? |
| 11:16 | 25 | A    Yes. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 11:16 | 1 | Q    And despite that knowledge, you never asked for the |
| 11:16 | 2 | Tabs data; did you?  Yes or no? |
| 11:16 | 3 | A    I don't know. |
| 11:16 | 4 | Q    I am asking you, sir, despite that knowledge, did you |
| 11:16 | 5 | ever ask for the Tabs data? |
| 11:16 | 6 | MR. SAGEL:  Objection, Your Honor.  Asked and |
| 11:16 | 7 | answered, 403. |
| 11:16 | 8 | THE COURT:  Overruled. |
| 11:16 | 9 | THE WITNESS:  Me personally, no. |
| 11:16 | 10 | BY MR. AVENATTI: |
| 11:16 | 11 | Q    Do you know of anyone who ever did? |
| 11:16 | 12 | A    I don't know. |
| 11:16 | 13 | Q    Now, during the pendency of this case -- well, strike |
| 11:16 | 14 | that.  Since late March of 2019 up through this morning, |
| 11:17 | 15 | have you exchanged text messages with any witness in this |
| 11:17 | 16 | case? |
| 11:17 | 17 | A    This case?  No, I don't believe so. |
| 11:17 | 18 | Q    So Ms. Regnier's testimony that she recalled exchanging |
| 11:17 | 19 | text messages with you, to the best of your knowledge she is |
| 11:17 | 20 | wrong about that, right? |
| 11:17 | 21 | A    I believe so. |
| 11:17 | 22 | Q    Do you know so? |
| 11:17 | 23 | A    I have had no text messages with her. |
| 11:17 | 24 | Q    So you went back to the phone that you had in 2019 to |
| 11:17 | 25 | check whether you had text exchanges with Ms. Regnier after |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

11:17  1   you heard her testify to that, right?

11:17  2   A    No, I did not.  I no longer have access to that phone.

11:18  3   Q    What happened to that phone?

11:18  4   A    I don't know.  We get new phones for work and we turn

11:18  5   them in and get a new phone.

11:18  6   Q    When did you turn in this phone?

11:18  7   A    There's been at least two phones since I left the IRS.

11:18  8   Q    Well, let's just talk about the time period March 25th,

11:18  9   2019, until today.  When you executed the search warrant on

11:18  10  Ms. Regnier's home, you had one cell phone, correct?

11:18  11  A    Yes.

11:18  12  Q    By the way, did you give Ms. Regnier your cell phone

11:18  13  number when you left that day?

11:18  14  A    Possibly.

11:18  15  Q    That was your custom and practice at the time?

11:18  16  A    I don't recall whether I gave her my number or not.

11:18  17  Q    And then how long did you have that phone that you had

11:18  18  with you on March 25th?

11:18  19  A    I don't recall.  Maybe six or 12 months.  I don't

11:19  20  recall.

11:19  21  Q    All right.  So that takes us to the latter part of

11:19  22  2019, maybe early 2020.  You then got a new phone?

11:19  23  A    Yes.

11:19  24  Q    What did you do with the old phone?

11:19  25  A    I turned it in and got a new phone.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

68

11:19   1   Q   Was any forensic copy made of your old phone?

11:19   2   A   Not that I'm aware of.

11:19   3   Q   Who did you turn it in to?

11:19   4   A   The tech person.

11:19   5   Q   Then when you got your new phone in 2020, how long did

11:19   6   you have that phone?

11:19   7   A   Until I left in January 2021.

11:19   8   Q   And did you turn that phone in?

11:19   9   A   Yes.

11:19   10   Q   Was any forensic image made of that phone?

11:19   11   A   Not that I'm aware of.

11:20   12   Q   Now, during this two-year time period of 2019, 2020,

11:20   13   end of 2021, were you generally, in the course of your

11:20   14   duties, communicating with witnesses about investigations?

11:20   15   A   Yes.

11:20   16   Q   And were you doing some of that by text message?

11:20   17   A   I don't believe so.

11:20   18   Q   It's not your testimony that you had no text message

11:20   19   communications with witnesses on one or more investigations

11:20   20   during that time period; is it?

11:20   21   A   One or more?  I don't understand your question.

11:20   22   Q   Is it your testimony that during that two-year time

11:20   23   period, you didn't text message with a single witness in a

11:20   24   single one of the cases you were investigating?

11:20   25   A   No.  I have.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 11:20 | 1 | Q     Who is Andrew Stolper? |
| 11:21 | 2 | MR. SAGEL:  Objection.  403, Your Honor. |
| 11:21 | 3 | THE COURT:  Overruled. |
| 11:21 | 4 | THE WITNESS:  A former prosecutor in this office. |
| 11:21 | 5 | BY MR. AVENATTI: |
| 11:21 | 6 | Q     Mr. Stolper is a former prosecutor who had a major |
| 11:21 | 7 | criminal case thrown out because of his misconduct; isn't |
| 11:21 | 8 | that true? |
| 11:21 | 9 | MR. SAGEL:  Same objection, Your Honor. |
| 11:21 | 10 | THE COURT:  Sustained. |
| 11:21 | 11 | BY MR. AVENATTI: |
| 11:21 | 12 | Q     Mr. Stolper is a friend of Mr. Sagel; isn't that true? |
| 11:21 | 13 | A     I don't know.  Define friend. |
| 11:22 | 14 | Q     Well, how would you define the word friend? |
| 11:22 | 15 | A     They're colleagues.  They work together in the office. |
| 11:22 | 16 | Q     Well, Mr. Stolper is no longer in the office, right? |
| 11:22 | 17 | A     That's correct. |
| 11:22 | 18 | Q     Okay.  Isn't it true that Mr. Stolper is a friend of |
| 11:22 | 19 | Mr. Sagel's? |
| 11:22 | 20 | A     I believe so. |
| 11:22 | 21 | Q     Have you ever met Mr. Stolper? |
| 11:22 | 22 | A     Yes. |
| 11:22 | 23 | Q     Where have you met him? |
| 11:22 | 24 | A     When he was a prosecutor here in this building. |
| 11:22 | 25 | Q     Did you ever meet Mr. Stolper after he left the office? |

11:22   1   A     Once or twice.

11:22   2   Q     Where?

11:22   3   A     Once for lunch shortly after he left, and the second

11:23   4   time is when I picked up deposition records from his office.

11:23   5   Q     Because he's now in private practice, right?

11:23   6   A     Yes.

11:23   7   Q     And when you went to lunch with Mr. Stolper, was

11:23   8   Mr. Sagel present?

11:23   9   A     No.

11:23   10  Q     Are you aware that Mr. Sagel has referred to

11:23   11  Mr. Stolper as one of his closest friends?

11:23   12  A     No.

11:23   13  Q     Are you aware that Mr. Stolper's website has a link to

11:23   14  an article quoting Mr. Sagel saying very nice things about

11:24   15  his close friend, Mr. Stolper?

11:24   16         MR. SAGEL:  Objection, Your Honor.  403 and calls

11:24   17  for hearsay.

11:24   18         THE COURT:  Overruled.

11:24   19         THE WITNESS:  No.  I have never been on his

11:24   20  website.

11:24   21  BY MR. AVENATTI:

11:24   22  Q     And you are aware, are you not, that before you

11:24   23  executed that search warrant in March of 2019, long before

11:24   24  that, I had fired Mr. Stolper for fraud?  You are aware of

11:24   25  that; are you not, sir?

| | | |
|---|---|---|
| 11:24 | 1 | A    No, I wasn't aware of that. |
| 11:24 | 2 | Q    Prior to today you had never heard any claim that I |
| 11:25 | 3 | fired Mr. Stolper?  Is that your testimony, sir? |
| 11:25 | 4 | A    No.  I believe earlier you said March 2019.  So if |
| 11:25 | 5 | you're asking as of -- |
| 11:25 | 6 | Q    No.  Let me clarify the question. |
| 11:25 | 7 |         Are you aware that I fired Mr. Stolper before |
| 11:25 | 8 | March of 2019? |
| 11:25 | 9 | A    No. |
| 11:25 | 10 | Q    Have you ever been made aware of any claim that I |
| 11:25 | 11 | terminated Mr. Stolper from my law firm prior to March of |
| 11:25 | 12 | 2019? |
| 11:25 | 13 | A    I think you said that during the trial. |
| 11:25 | 14 |         MR. AVENATTI:  Move to strike, Your Honor. |
| 11:25 | 15 |         THE COURT:  It will be stricken. |
| 11:25 | 16 | BY MR. AVENATTI: |
| 11:25 | 17 | Q    Other than what you have heard during the trial, are |
| 11:25 | 18 | you aware of any claim that I terminated Mr. Stolper prior |
| 11:25 | 19 | to March of 2019? |
| 11:25 | 20 | A    No. |
| 11:26 | 21 | Q    Now, Mr. Stolper has played a role in this case; hasn't |
| 11:26 | 22 | he?  Yes or no? |
| 11:26 | 23 | A    I don't know. |
| 11:26 | 24 | Q    Has Mr. Stolper ever been interviewed by the |
| 11:26 | 25 | government -- strike that.  Has Mr. Stolper ever had any |

72

| | | |
|---|---|---|
| 11:26 | 1 | contact with Mr. Sagel and other members of the |
| 11:26 | 2 | investigative team relating to this criminal prosecution of |
| 11:26 | 3 | me?  Yes or no? |
| 11:26 | 4 | A    Yes. |
| 11:27 | 5 | Q    Now, I want to ask you about a couple days before |
| 11:27 | 6 | March 25th, 2019.  March 25th, 2019, was on a Monday, right? |
| 11:27 | 7 | A    I don't have a calendar in front of me.  I believe so. |
| 11:27 | 8 | Q    Well, I will represent to you that it was.  And if I'm |
| 11:27 | 9 | wrong, Mr. Sagel I'm sure will correct me. |
| 11:27 | 10 | Do you recall that on the preceding Friday -- |
| 11:27 | 11 | you're shaking your head.  The preceding Friday do you |
| 11:27 | 12 | recall that you were in Los Angeles? |
| 11:27 | 13 | A    I don't believe so. |
| 11:27 | 14 | Q    Were you ever at any hearing or proceeding where |
| 11:27 | 15 | Mr. Stolper was asking me questions? |
| 11:28 | 16 | A    No. |
| 11:28 | 17 | Q    Are you aware of the fact that three days before the |
| 11:28 | 18 | search warrant was executed, Mr. Stolper was asking me |
| 11:28 | 19 | questions in another proceeding with one or more of your |
| 11:28 | 20 | colleagues sitting in the gallery? |
| 11:28 | 21 | A    Yes, I was aware. |
| 11:28 | 22 | Q    And you were aware of that at the time, correct? |
| 11:28 | 23 | A    Yes. |
| 11:28 | 24 | Q    But you were not there? |
| 11:28 | 25 | A    No. |

| | | |
|---|---|---|
| 11:28 | 1 | Q    And who was there on that Friday, three days before the |
| 11:28 | 2 | search warrant was executed, on behalf of the government? |
| 11:28 | 3 | A    I believe Special Agent James Kim was sitting listening |
| 11:29 | 4 | to the testimony. |
| 11:29 | 5 | Q    Anyone else? |
| 11:29 | 6 | A    Inside listening? |
| 11:29 | 7 | Q    Yes. |
| 11:29 | 8 | A    No, but there may have been an arrest team outside. |
| 11:29 | 9 |      MR. AVENATTI:  Your Honor, move to strike. |
| 11:29 | 10 |      THE COURT:  It will be stricken. |
| 11:29 | 11 | BY MR. AVENATTI: |
| 11:29 | 12 | Q    Mr. Kim was there listening to the questions posed by |
| 11:29 | 13 | Mr. Stolper, right? |
| 11:29 | 14 | A    I believe so. |
| 11:29 | 15 | Q    And at the time, just so the jury is clear, Mr. Stolper |
| 11:29 | 16 | wasn't a prosecutor; was he? |
| 11:29 | 17 | A    No. |
| 11:29 | 18 | Q    He wasn't an FBI agent; was he? |
| 11:29 | 19 | A    No. |
| 11:29 | 20 | Q    He wasn't an IRS CID agent; was he? |
| 11:29 | 21 | A    No. |
| 11:29 | 22 | Q    He was a private lawyer who had been fired by me; |
| 11:29 | 23 | wasn't he? |
| 11:30 | 24 | A    I don't know that. |
| 11:30 | 25 | Q    He was a private lawyer, right? |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

74

| | | |
|---|---|---|
| 11:30 | 1 | A    Yes. |
| 11:30 | 2 |         MR. AVENATTI:  One moment, Your Honor. |
| 11:30 | 3 |         (Pause in proceedings) |
| 11:30 | 4 | BY MR. AVENATTI: |
| 11:30 | 5 | Q    Now, you have been sitting here in the trial, correct? |
| 11:30 | 6 | A    Yes. |
| 11:30 | 7 | Q    And do you recall earlier in the trial Mr. Sagel called |
| 11:30 | 8 | one of his colleagues to the stand and they read some |
| 11:30 | 9 | transcript from a preceding hearing in which I had |
| 11:30 | 10 | testified?  Do you remember that? |
| 11:30 | 11 | A    Yes. |
| 11:31 | 12 | Q    And when they did that, do you recall Mr. Sagel |
| 11:31 | 13 | mentioning the person's name who did the questioning? |
| 11:31 | 14 | A    I don't recall. |
| 11:31 | 15 | Q    But you know the person's name who did the questioning |
| 11:31 | 16 | at that hearing; don't you? |
| 11:31 | 17 | A    I'm not sure which hearing transcript you're referring |
| 11:31 | 18 | to. |
| 11:31 | 19 | Q    I'm talking about the hearing transcript from the |
| 11:31 | 20 | Friday before you executed the search warrant on |
| 11:31 | 21 | Ms. Regnier's home, complete with the helicopter. |
| 11:31 | 22 |         MR. SAGEL:  Objection.  Argumentative, Your Honor. |
| 11:31 | 23 |         THE COURT:  Rephrase the question. |
| 11:31 | 24 | BY MR. AVENATTI: |
| 11:31 | 25 | Q    I'm talking about the hearing that took place on Friday |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

11:31   1   before the search warrant was executed on the Monday, the

11:31   2   one that Mr. Stolper was at.

11:31   3   A     Yes.  That transcript was read, part of it.

11:32   4   Q     Part of it.  And the person doing the questioning in

11:32   5   that hearing was Mr. Stolper, right?

11:32   6   A     I believe so.  I'm not a hundred percent sure.

11:32   7   Q     Do you have any reason to dispute that?

11:32   8   A     No.

11:32   9   Q     Sir, you know that it was no accident that Special

11:32   10   Agent Kim happened to be sitting in the audience that day

11:32   11   listening to the testimony, right?  Yes or no?

11:32   12   A     I don't understand your question.

11:32   13   Q     Well, I'll strike the question.  Maybe I'll ask Special

11:32   14   Agent Kim that question.

11:32   15           Let me go to a different topic.

11:32   16           Have you been present for any interviews that

11:32   17   Mr. Stolper has given the government?

11:33   18   A     No.

11:33   19   Q     Do you know who, if anyone, has?

11:33   20   A     I believe it was former prosecutor Julian Andre and

11:33   21   Special Agent James Kim, I believe.

11:33   22   Q     And you are aware, are you not, that Mr. Stolper

11:33   23   provided documents to the government in connection with an

11:33   24   attempt to criminally prosecute me?

11:33   25   A     He provided documents I believe, yes.

11:33  1   Q    How many times has Mr. Stolper met with prosecutors or

11:33  2   agents in an attempt to have me criminally prosecuted?

11:34  3   A    I don't know except for that former interview that

11:34  4   you're referring to.

11:34  5   Q    And you understand that Mr. Stolper represents another

11:34  6   attorney who I had terminated along with Mr. Stolper, right?

11:34  7   A    I don't know who he represents.

11:34  8   Q    Well, did you understand when he was conducting this

11:34  9   hearing that he was representing another attorney who I had

11:34  10  terminated?

11:34  11         MR. SAGEL:  Objection.  Foundation as to

11:34  12  termination?

11:35  13         THE COURT:  Overruled.

11:35  14  BY MR. AVENATTI:

11:35  15  Q    Yes or no?

11:35  16  A    The termination part, no.

11:35  17  Q    You understood he represented another attorney that was

11:35  18  no longer at my firm, right?

11:35  19  A    Yes.

11:35  20  Q    But you didn't have an understanding as to the

11:35  21  circumstances under which they left the firm; is that right?

11:35  22  A    Correct.

11:36  23  Q    Sir, let me show you a portion of the transcript that

11:36  24  Mr. Sagel previously used in the trial.

11:37  25         MR. SAGEL:  Your Honor, the transcript itself is

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

11:37  1   not in evidence.  It was read in.

11:37  2              THE COURT:  That's correct.

11:37  3              MR. AVENATTI:  Your Honor, can I approach to

11:37  4   refresh?

11:37  5              THE COURT:  You may.

11:37  6              MR. AVENATTI:  The March 22 transcript.  It's 405

11:37  7   in the binder.

11:37  8              (Document handed to the witness)

11:37  9   BY MR. AVENATTI:

11:37  10  Q    Special Agent Karlous, does that refresh your

11:37  11  recollection that the individual who was asking me questions

11:37  12  three days before Ms. Regnier's home was searched was Andrew

11:37  13  Stolper?

11:38  14  A    Yes.

11:38  15  Q    Do you know what contact Mr. Stolper had with

11:38  16  Mr. Sagel, Mr. Andre, or Mr. Kim before he decided what

11:38  17  questions to ask on that fateful Friday?

11:38  18  A    I don't know of any contact.

11:38  19  Q    Are you aware of all of the contacts of all of the

11:38  20  members in the investigative team?

11:38  21  A    No.

11:38  22  Q    So you don't know one way or the other; is that true?

11:38  23  A    I don't know of any contact.

11:38  24             MR. AVENATTI:  Move to strike.

11:38  25             THE COURT:  Denied.

11:38    1    BY MR. AVENATTI:

11:38    2    Q    Sir, do you know whether there were any contacts?

11:39    3    A    I do not.

11:39    4    Q    So it's possible that there may have been contacts that

11:39    5    you were just not a party to, true?

11:39    6    A    Could be.

11:39    7    Q    When did Mr. Stolper first have contact with the U.S.

11:39    8    Attorney's Office about me?  Just a date.

11:39    9    A    I don't have an exact date.  I would say first quarter

11:39   10    of 2018.

11:39   11    Q    So Mr. Stolper's first contact with the U.S. Attorney's

11:39   12    Office was in the first quarter of 2018, correct?

11:40   13    A    That's an estimate.

11:40   14    Q    That's your best estimate, right?

11:40   15    A    Yes.

11:40   16    Q    About a year before this questioning occurred, right?

11:40   17    A    Yes.

11:40   18    Q    And about a year before the search warrant on

11:40   19    Ms. Regnier's home was executed, right?

11:40   20    A    Yes.

11:40   21    Q    And who did Mr. Stolper first contact in early 2018

11:40   22    about me -- the name of the person?

11:40   23    A    I believe it was Mr. Sagel initially, and then it was

11:40   24    Mr. Sagel and myself at some point.

11:40   25    Q    And how did that contact occur?  Was it by phone or was

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 11:40 | 1 | it in person? |
| 11:41 | 2 | A    Possibly by e-mail. |
| 11:41 | 3 | Q    Well, when you say possibly by e-mail, do you have a |
| 11:41 | 4 | recollection of there being an e-mail? |
| 11:41 | 5 | A    It wasn't by phone and it wasn't in person, so I |
| 11:41 | 6 | believe it was by e-mail. |
| 11:41 | 7 | Q    And after you received the e-mail from Mr. Stolper who |
| 11:41 | 8 | was no longer at my firm in early 2018, what happened next? |
| 11:41 | 9 | A    Nothing. |
| 11:41 | 10 | Q    Did anyone have any contact with Mr. Stolper, or do you |
| 11:41 | 11 | know? |
| 11:41 | 12 | A    I did not. |
| 11:41 | 13 | Q    And you don't know if anyone else did, right? |
| 11:41 | 14 | A    I don't know. |
| 11:41 | 15 | Q    Do you know if there were any other e-mails from |
| 11:41 | 16 | Mr. Stolper? |
| 11:41 | 17 | A    I don't know. |
| 11:42 | 18 | Q    Now, you said that that was through Mr. Sagel and |
| 11:42 | 19 | possibly through you, right? |
| 11:42 | 20 | A    I believe so. |
| 11:42 | 21 | Q    Did you have any further contact with Mr. Stolper after |
| 11:42 | 22 | that e-mail? |
| 11:42 | 23 | A    I don't recall there being any. |
| 11:42 | 24 | Q    When you received that e-mail from Mr. Stolper, you |
| 11:42 | 25 | knew of Mr. Stolper's history, right? |

| | | |
|---|---|---|
| 11:42 | 1 | A    With the U.S. Attorney's Office? |
| 11:42 | 2 | Q    Yes. |
| 11:42 | 3 | A    Yes. |
| 11:42 | 4 | Q    And you knew the circumstances under which he was no |
| 11:42 | 5 | longer at the office; didn't you? |
| 11:43 | 6 | A    No. |
| 11:43 | 7 | Q    Sir, it's your testimony that when you got that e-mail |
| 11:43 | 8 | in early 2018, that you had no knowledge of the |
| 11:43 | 9 | circumstances under which Mr. Stolper had left the U.S. |
| 11:43 | 10 | Attorney's Office? |
| 11:43 | 11 | A    No. |
| 11:43 | 12 | THE COURT:  Let's get that clarified.  It's |
| 11:43 | 13 | ambiguous. |
| 11:43 | 14 | MR. AVENATTI:  Thank you, Your Honor. |
| 11:43 | 15 | BY MR. AVENATTI: |
| 11:43 | 16 | Q    Sir, is it your testimony that when you got that e-mail |
| 11:43 | 17 | from Mr. Stolper in early 2018, that you were not aware that |
| 11:43 | 18 | Mr. Stolper had left the U.S. Attorney's Office in disgrace? |
| 11:43 | 19 | A    I know that he left.  I don't know if he left on his |
| 11:43 | 20 | own or some other reason.  I don't know. |
| 11:43 | 21 | Q    When you got that e-mail, you were aware, were you not, |
| 11:44 | 22 | that Mr. Stolper had got caught committing prosecutorial |
| 11:44 | 23 | misconduct by another judge in this building in connection |
| 11:44 | 24 | with a high-profile case by the name of Broadcom.  You knew |
| 11:44 | 25 | that; did you not? |

| | | |
|---|---|---|
| 11:44 | 1 | A    I do recall that. |
| 11:44 | 2 | Q    And when that happened, you knew about it because it |
| 11:44 | 3 | was a big deal; wasn't it? |
| 11:44 | 4 | A    I guess. |
| 11:44 | 5 | Q    Well, it's not every day that a federal judge dismisses |
| 11:44 | 6 | a major criminal prosecution because the prosecutor has |
| 11:44 | 7 | engaged in misconduct and misled the judge.  That doesn't |
| 11:45 | 8 | happen every day in your experience; does it, sir? |
| 11:45 | 9 | A    It does not. |
| 11:45 | 10 | Q    Now, in the 26 years that you have been at the Treasury |
| 11:45 | 11 | Department -- I guess, is that the most accurate way to |
| 11:45 | 12 | describe your 26 years? |
| 11:45 | 13 | A    Twenty-five-plus years with the IRS criminal |
| 11:45 | 14 | investigation. |
| 11:45 | 15 | Q    Right now you're no longer with that division? |
| 11:45 | 16 | A    Correct. |
| 11:45 | 17 | Q    Okay.  So in the 25-plus years when you were with the |
| 11:45 | 18 | Internal Revenue Service, did you ever receive any training |
| 11:46 | 19 | on conflict-of-interest issues? |
| 11:46 | 20 | A    Yes. |
| 11:46 | 21 | Q    And how did you receive that training? |
| 11:46 | 22 | A    I don't recall. |
| 11:46 | 23 | Q    Was it in person? online? |
| 11:46 | 24 | A    Over 25 years it's kind of hard to pinpoint. |
| 11:46 | 25 | Q    Well, did you receive the training on more than one |

11:46   1    occasion?

11:46   2    A    Yes.

11:46   3    Q    And generally what do you recall about that training?

11:46   4    A    Not much.

11:46   5    Q    Well, is it fair to say that when you were trained on

11:46   6    conflict-of-interest issues, that you were trained that you

11:46   7    should not be handling investigations for people that you

11:46   8    know?

11:46   9    A    Yes.

11:46   10   Q    And you were generally trained that it is in conflict

11:47   11   for a federal member of law enforcement to attempt to

11:47   12   utilize the power of the federal government and the

11:47   13   Department of Justice to assist a friend.  You learned that,

11:47   14   right?

11:47   15   A    Yes.

11:47   16   Q    Pretty basic stuff, right?

11:47   17   A    Yes.

11:47   18   Q    And one of the reasons -- strike that.  And in the

11:47   19   course of being trained, you have learned that one of the

11:47   20   reasons why that is so important is because of how powerful

11:47   21   the United States government is, right?

11:47   22   A    I don't think it's described that way.

11:47   23   Q    Well, do you believe the Department of Justice and the

11:47   24   Department of Treasury in the United States is powerful?

11:47   25   A    Yes.

| | | |
|---|---|---|
| 11:48 | 1 | Q    And what is supposed to happen when a member of the |
| 11:48 | 2 | Department of Justice or the Department of Treasury, what is |
| 11:48 | 3 | supposed to happen if that individual discovers that in fact |
| 11:48 | 4 | a criminal prosecution involves somebody that they know |
| 11:48 | 5 | either as a witness or as a target?  What is generally |
| 11:48 | 6 | supposed to happen? |
| 11:48 | 7 | A    You communicate with your supervisor.  And if need be, |
| 11:48 | 8 | you have someone else handle the case. |
| 11:48 | 9 | Q    In order to avoid a potential conflict, right? |
| 11:48 | 10 | A    Yes. |
| 11:49 | 11 | Q    In fact, you were trained that it was an obligation to |
| 11:49 | 12 | avoid even the appearance of a conflict of interest or |
| 11:49 | 13 | impropriety; isn't that true? |
| 11:49 | 14 | A    Yes. |
| 11:49 | 15 | Q    So even if there wasn't an actual conflict or |
| 11:49 | 16 | impropriety, you understood at all times that there was an |
| 11:49 | 17 | obligation to avoid it even remotely looking like that? |
| 11:49 | 18 | A    Yes.  That's what they advise. |
| 11:49 | 19 | Q    When you received the e-mail, you knew that Mr. Sagel |
| 11:49 | 20 | knew Mr. Stolper, correct? |
| 11:49 | 21 | A    I stated that earlier, that they worked together. |
| 11:50 | 22 | MR. AVENATTI:  Move to strike everything after |
| 11:50 | 23 | "Yes" as nonresponsive, Your Honor. |
| 11:50 | 24 | MR. SAGEL:  He didn't say yes, Your Honor. |
| 11:50 | 25 | THE COURT:  He didn't say yes.  Denied. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

11:50   1   BY MR. AVENATTI:

11:50   2   Q    Sir, did you know if they had a relationship outside of

11:50   3   working together?

11:50   4   A    I don't know that.

11:50   5   Q    And you didn't know it at the time, right?

11:50   6   A    No.

11:50   7   Q    Do you know if any steps were taken by Mr. Sagel or

11:50   8   anyone else on the investigative team relating to

11:50   9   Mr. Stolper's e-mail?  And what I mean by that is, was it

11:50   10   elevated to a supervisor?

11:50   11   A    The investigative team decided that Julian Andre would

11:50   12   handle anything coming from Mr. Stolper.

11:50   13         MR. AVENATTI:  Move to strike.  I asked about a

11:51   14   supervisor.

11:51   15         THE COURT:  It will be stricken.

11:51   16         MR. AVENATTI:  May I have it read back, Your

11:51   17   Honor?

11:51   18         THE COURT:  Yes.

11:51   19         (Record read)

11:51   20         THE WITNESS:  I'm not aware.

11:51   21   BY MR. AVENATTI:

11:51   22   Q    You were not aware of that happening?

11:51   23   A    No.

11:51   24   Q    And I believe you said that there was a subsequent

11:51   25   meeting with Mr. Stolper, but that was with Mr. Andre and

85

11:51  1    Mr. Kim; is that right?

11:51  2    A    Yes.

11:51  3    Q    And that was after this e-mail in the first quarter of

11:51  4    2018, right?

11:52  5    A    Yes.

11:52  6    Q    Did you read the interview notes from that meeting?

11:52  7    A    I don't recall reading them.

11:52  8    Q    Were you debriefed about what happened during that

11:52  9    meeting?

11:52  10   A    Possibly.

11:52  11   Q    Well, anything is possible.  That's why we're here

11:52  12   trying to find out what happened.

11:52  13           So do you recall learning about what happened at

11:52  14   that meeting?

11:52  15   A    No, I don't recall.

11:52  16   Q    After that meeting did anyone else from the

11:52  17   investigative team have any further contact with

11:52  18   Mr. Stolper?

11:52  19   A    I don't know.

11:52  20   Q    You did not?

11:52  21   A    I did not.

11:53  22   Q    If somebody wanted to find out, how would they do that?

11:53  23   Is there a log of contacts?

11:53  24   A    There is not a log of contacts, no.

11:53  25   Q    So if it's not written down somewhere, then there is

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 11:53 | 1 | really no way to find out, right? |
| 11:53 | 2 | A    Yes. |
| 11:53 | 3 | Q    Now, when Mr. Barela testified in this trial and you |
| 11:53 | 4 | heard his claims about Ms. Jenness being on the phone call, |
| 11:53 | 5 | when you heard him tell the jury that that happened under |
| 11:53 | 6 | oath, that was not the first time that he had told that |
| 11:54 | 7 | story in front of you; was it? |
| 11:54 | 8 | A    Correct. |
| 11:54 | 9 | Q    You had heard that before? |
| 11:54 | 10 | A    Yes. |
| 11:54 | 11 | Q    Did you believe it when you heard it? |
| 11:54 | 12 | MR. SAGEL:  Objection.  Vague and calls for -- |
| 11:54 | 13 | it's just an improper question, Your Honor. |
| 11:54 | 14 | THE COURT:  Sustained. |
| 11:54 | 15 | BY MR. AVENATTI: |
| 11:54 | 16 | Q    Sir, after Mr. Barela told you this, did you do |
| 11:54 | 17 | anything to figure out if it was true? |
| 11:54 | 18 | A    Yes. |
| 11:54 | 19 | Q    And one of the things you did to figure out whether it |
| 11:54 | 20 | was true was you asked Mr. Arden or somebody asked |
| 11:54 | 21 | Mr. Arden? |
| 11:55 | 22 | A    Yes. |
| 11:55 | 23 | Q    And Mr. Arden told you and others that it did not |
| 11:55 | 24 | happen; isn't that true? |
| 11:55 | 25 | A    He said the phone call happened but that Evan Jenness |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

11:55    1    was not on the call.

11:55    2    Q    And then you asked Mr. Ahmed Ibrahim, another attorney

11:55    3    that worked at the firm, whether the call had gone down as

11:55    4    Mr. Barela had stated, right?

11:55    5            MR. SAGEL:  Objection, Your Honor.  Calls for

11:55    6    hearsay.

11:55    7            THE COURT:  Overruled.

11:55    8            THE WITNESS:  Yes, we did ask him.

11:55    9    BY MR. AVENATTI:

11:55   10    Q    And Mr. Ibrahim told you the same thing, that the call

11:55   11    did not occur as Mr. Barela had stated; didn't he?

11:55   12            MR. SAGEL:  Same objection, Your Honor.

11:55   13            THE COURT:  It will be received but not for the

11:55   14    truth.

11:55   15            THE WITNESS:  That the call occurred but that Evan

11:55   16    Jenness was not on the call.

11:55   17            THE COURT:  I think we will take the lunch break

11:56   18    here.

11:56   19            Ladies and gentlemen, we will be in recess until

11:56   20    1:30.  Please remember the admonition not to discuss the

11:56   21    case with anyone and not to form any opinions on the issues

11:56   22    in the case until it is submitted to you.  And please do not

11:56   23    do any research.

11:56   24            (Jury not present)

11:56   25            THE COURT:  Earlier this morning Mr. Avenatti

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | |
|---|---|
| 11:56 | 1 |
| 11:56 | 2 |
| 11:57 | 3 |
| 11:57 | 4 |

11:56    1    filed a brief entitled defendant's objection to public

11:56    2    access to exhibits during trial at Docket No. 727.  He

11:57    3    specifically drew my attention to United States versus

11:57    4    DeLorean, 561 F.Supp. 797-800 (CD Cal. 1983).

11:57    5           In that case the Court did not allow access to

11:57    6    court filings.  It was also a criminal case.  One, DeLorean

11:57    7    is not controlling here.  It may be relevant authority but

11:57    8    it's not controlling.

11:57    9           Two, there is a major distinction in that the

11:57   10    documents in DeLorean, all filed documents were subject to a

11:57   11    sealing order which was in place.  The Court in this case

11:57   12    has issued no such sealing orders, general sealing orders.

11:57   13           With respect to the trial exhibits which I ordered

11:57   14    be available, I disagree with the statements that the

11:58   15    DeLorean Court made.

11:58   16           In part, the DeLorean Court said:  "However, this

11:58   17    Court is unconvinced that public scrutiny of and access to

11:58   18    documents would to any significant degree enhance the

11:58   19    quality of or contribute to the integrity of a criminal

11:58   20    trial when the trial itself, i.e., all in-court proceedings,

11:58   21    is completely open to public scrutiny and criticism, and

11:58   22    when in almost every instance all facts and arguments

11:58   23    contained in the documents, if relevant and probative of the

11:58   24    particular issue at hand, will necessarily stand revealed at

11:58   25    the in-court proceeding."

11:58    1          I disagree with that statement.  I specifically
11:59    2    find that the public's appreciation of this criminal trial
11:59    3    would be materially enhanced by allowing the availability of
11:59    4    the trial exhibits.  I point specifically to the trial
11:59    5    exhibits used with Mr. Drum, including Exhibits 420 through
11:59    6    450, and 456.  Of particular note are what I'll call the
11:59    7    bubble charts that were used to trace funds.
11:59    8          I believe those graphics would materially assist
11:59    9    any member of the press or the public in appreciating what
11:59   10    the charges are and what the government's contentions are.
11:59   11    Those bubble charts are found in Exhibits 425, 431, 433,
11:59   12    440, 442, 445, and 447.
11:59   13          The DeLorean Court also averred that the documents
12:00   14    sought there could mislead the public and contain matters
12:00   15    that had been held inadmissible.  By definition, with
12:00   16    respect to the trial exhibits, they are admissible.  Trial
12:00   17    exhibits don't contain extraneous matter that might be found
12:00   18    in other court filings, particularly other court filings
12:00   19    under seal.
12:00   20          For all those reasons, I direct that the order
12:00   21    which I issued the day before yesterday be filed and that
12:00   22    any member of the public wishing a trial exhibit may contact
12:00   23    the Clerk's Office and request such exhibit and pay the
12:00   24    appropriate fee.  That's the Court's ruling.
12:01   25          MR. AVENATTI:  Understood, Your Honor.

12:01  1          I had a related issue that I wanted to raise.

12:01  2          THE COURT:  Please proceed.

12:01  3          MR. AVENATTI:  Your Honor, I would make a request

12:01  4   that under Rule 43 and the Sixth Amendment, Federal Rule of

12:01  5   Criminal Procedure 43 and the Sixth Amendment, I'm objecting

12:01  6   to any further ex-parte communications from the press to the

12:01  7   Court.

12:01  8          To the extent that the press would like access to

12:01  9   anything in this case, if it doesn't go through the Clerk's

12:01  10  Office, if it goes through this Court, I have a right to

12:01  11  know about it contemporaneously, not on an ex-parte basis

12:01  12  and in camera.  I don't believe that is appropriate under

12:01  13  the law, and I am used to members of the press making

12:01  14  requests in writing to the Court and being given notice.

12:01  15         Now, whether I ultimately prevail or not on any

12:02  16  objection I may or may not have is a different issue, but

12:02  17  I'm certainly entitled to know about it when it happens.

12:02  18  And so I'm making that request under Rule 43 and my Sixth

12:02  19  Amendment rights and my right to due process.

12:02  20         THE COURT:  Your position is noted.

12:02  21         MR. AVENATTI:  In addition, Your Honor, can I now

12:02  22  have the Tabs data?  I mean --

12:02  23         THE COURT:  Sir, we're going to take that up, so

12:02  24  you don't need to ask that question repeatedly.  There will

12:02  25  be an answer or there will be a solution.  In that regard I

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 12:02 | 1 | direct the parties to present me with supplemental briefing |
| 12:02 | 2 | with regard to the applicability of the Jencks Act and 26.2 |
| 12:02 | 3 | to the Tabs data. |
| 12:02 | 4 | If the defendant believes they have already |
| 12:03 | 5 | covered that, fine, but it would be very helpful to me to |
| 12:03 | 6 | have a single document with the parties' view with respect |
| 12:03 | 7 | to the Tabs data.  If it's more convenient to cite passages |
| 12:03 | 8 | you have already filed, so be it, but it would be of greater |
| 12:03 | 9 | assistance to me if you put your view in a separate |
| 12:03 | 10 | document.  Once I have that, we'll have a discussion. |
| 12:03 | 11 | MR. AVENATTI:  But, Your Honor, I may be able to |
| 12:03 | 12 | shortcut this.  I am not maintaining that the Tabs data is |
| 12:03 | 13 | subject to Jencks or 26.2. |
| 12:03 | 14 | THE COURT:  Okay. |
| 12:03 | 15 | MR. AVENATTI:  I am maintaining that the Tabs data |
| 12:03 | 16 | was required to be produced under Rule 16, under Brady most |
| 12:03 | 17 | certainly; under Giglio; under Bundy, the Ninth Circuit |
| 12:03 | 18 | case; Price, the Ninth Circuit case; and Olson, the Ninth |
| 12:03 | 19 | Circuit case.  I'm sure I probably left a couple out, but |
| 12:04 | 20 | that's good for now. |
| 12:04 | 21 | THE COURT:  Whatever your grounds are for seeking |
| 12:04 | 22 | the Tabs data, whether it goes beyond 26.2 and Jencks, I |
| 12:04 | 23 | request that you put it in a single document, and the |
| 12:04 | 24 | government do likewise, and we will discuss all grounds that |
| 12:04 | 25 | relate to production or nonproduction of the Tabs data. |

92

12:04  1          MR. AVENATTI:  I will do it in the form of a

12:04  2   supplement to the motion to dismiss for the Brady

12:04  3   violations.

12:04  4          THE COURT:  That's fine.

12:04  5          MR. AVENATTI:  Okay.

12:04  6          MR. SAGEL:  The only question we have is an

12:04  7   estimate on time.  We were told an hour and a half with this

12:04  8   witness.

12:04  9          MR. AVENATTI:  I expect to wrap up in the next 30

12:04  10  minutes, Your Honor.

12:05  11         THE COURT:  Given that it's apparent that we're

12:05  12  not going to be instructing and arguing on Friday, I'm not

12:05  13  wedded to getting together for a first pass on the jury

12:05  14  instructions.  If it's convenient, we can do that, or you

12:05  15  might want to defer that.  So just let me know before the

12:05  16  mid-afternoon break what you want to do.

12:05  17         MR. AVENATTI:  The defense would ask to defer if

12:05  18  that's acceptable to Your Honor.

12:05  19         THE COURT:  That's fine.

12:05  20         MR. AVENATTI:  Thank you.

12:05  21         MR. SAGEL:  I don't know what Your Honor's

12:05  22  preference is.  I have taken note of every time defendant

12:05  23  has opened the door to outside of this case --

12:05  24         THE COURT:  Sir, ask your question.

12:05  25         MR. SAGEL:  I just wanted to get that permission,

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

12:05  1    that I didn't need to have a sidebar before I do it.

12:05  2           THE COURT:  If I think we need a sidebar as we go

12:05  3    along, I will sua sponte direct one.

12:05  4           MR. SAGEL:  I appreciate that, Your Honor.  I just

12:05  5    didn't want to ask before Your Honor's permission.

12:06  6           MR. AVENATTI:  Again, my preference would be if

12:06  7    this is going to be an issue, that it be handled prior to

12:06  8    the question being asked, because I don't think that I have

12:06  9    opened the door, Your Honor.

12:06  10          Now, maybe I will be convinced otherwise, but I

12:06  11   don't know that I have opened the door, and I certainly

12:06  12   don't want the jury tainted with other charges that are not

12:06  13   in the case especially because of how prejudicial they might

12:06  14   be under 403.

12:06  15          THE COURT:  We're in recess.

12:06  16              (Recess taken at 12:06 p.m.)

12:06  17                    *    *    *

12:06  18

12:06  19

12:06  20

12:06  21

12:06  22

12:06  23

12:06  24

12:06  25

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

CERTIFICATE


I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.


Date:  August 18, 2021



/s/   Sharon A. Seffens  8/18/21
_____
SHARON A. SEFFENS, U.S. COURT REPORTER

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**MR. AVENATTI: [80]** 4/9 4/19 4/23 5/5 5/9
5/13 5/20 5/23 7/10 8/7 8/12 9/2 9/18 10/10
13/12 14/13 14/17 15/2 15/9 15/11 15/14
16/22 16/24 17/1 17/12 17/15 18/4 18/13
34/24 40/17 40/19 42/13 42/15 43/5 44/13
44/15 45/6 45/23 46/20 48/4 48/6 49/8 50/14
51/1 52/15 56/19 57/13 57/22 58/2 61/10
64/14 65/10 71/14 73/9 74/2 77/3 77/6 77/24
80/14 83/22 84/13 84/16 89/25 90/3 90/21
91/1 91/15 92/1 92/5 92/9 92/17 92/20 93/6
**MR. SAGEL: [33]** 4/5 6/10 6/12 15/22 16/8
16/12 16/15 17/25 22/19 23/5 25/18 25/23
34/20 41/23 44/10 54/7 60/11 64/20 66/6 69/2
69/9 70/16 74/22 76/11 76/25 83/24 86/12
87/5 87/12 92/6 92/21 92/25 93/4
**MR. WYMAN: [3]** 12/3 12/13 13/1
**THE CLERK: [4]** 4/3 17/23 18/16 18/20
**THE COURT: [108]**
**THE WITNESS: [16]** 18/13 23/8 27/25 30/13
40/22 42/1 44/12 44/19 48/9 60/14 66/9 69/4
70/19 84/20 87/8 87/15

**'**

**'19 [1]** 19/12

**/**

**/s [1]** 94/15

**0**

**0870 [1]** 1/21

**1**

**1-1053 [1]** 1/20
**10 [5]** 21/5 21/8 21/12 21/22 59/3
**1053 [1]** 1/20
**107 [1]** 2/16
**1084 [4]** 34/16 35/7 43/21 43/22
**1085 [1]** 32/25
**10:29 [1]** 53/2
**10:48 [1]** 53/3
**1100 [1]** 2/7
**12 [1]** 67/19
**12:06 [1]** 93/16
**14 [1]** 33/1
**14th [3]** 49/1 61/4 61/15
**15 [8]** 21/5 21/8 21/12 21/22 29/14 52/21 59/3
60/22
**15-minute [1]** 54/7
**16 [2]** 45/19 91/16
**17 [1]** 45/19
**18 [4]** 1/17 3/10 4/1 94/13
**1983 [1]** 88/4
**19th [7]** 32/2 32/9 33/2 34/5 35/9 45/17 46/2
**1:30 [2]** 35/16 87/20
**1st [11]** 51/1 53/9 53/25 54/5 54/5 54/13
55/2 55/8 56/5 56/9 57/21

**2**

**20 [1]** 29/14
**20-plus-year [1]** 50/7
**2018 [16]** 19/12 51/11 53/9 54/14 55/2 56/5
56/9 56/10 57/21 78/10 78/12 78/21 79/8 80/8
80/17 85/4
**2019 [32]** 20/2 32/2 32/10 33/2 33/15 34/5
35/16 37/6 37/10 41/3 42/24 45/2 45/17 46/3
58/7 58/16 61/4 61/15 64/17 65/13 66/14
66/24 67/9 67/22 68/12 70/23 71/4 71/8 71/12
71/19 72/6 72/6
**2020 [4]** 65/13 67/22 68/5 68/12
**2021 [7]** 1/17 4/1 49/1 56/8 68/7 68/13 94/13
**21 [1]** 94/15
**213 [1]** 2/8
**22 [2]** 1/12 77/6
**25 [4]** 33/15 37/6 37/10 81/24
**25-plus [1]** 81/17
**25th [18]** 20/14 20/20 21/3 21/21 22/16 31/3
35/16 36/6 41/3 42/24 43/22 45/2 59/23 61/7

67/8 67/18 72/6 72/6
**25i [1]** 99/8
**26 [5]** 19/7 19/11 58/16 81/10 81/12
**26.2 [9]** 9/19 9/22 10/22 13/18 14/4 14/22
91/2 91/13 91/22
**26th [1]** 61/3
**28 [1]** 94/7
**281 [4]** 50/14 50/24 51/9 53/9
**28th [1]** 54/11
**29 [3]** 4/12 5/3 5/8
**29th [1]** 54/12
**2nd [1]** 54/14

**3**

**30 [1]** 92/9
**30th [1]** 54/13
**312 [1]** 2/7
**338-3598 [1]** 2/12
**3598 [1]** 2/12
**396 [1]** 15/10
**396-page [1]** 15/7
**3:08 p.m [1]** 51/12

**4**

**40-minute [1]** 39/19
**403 [8]** 6/15 22/19 25/18 25/23 66/7 69/2
70/16 93/14
**405 [1]** 77/6
**411 [2]** 1/20 2/11
**420 [1]** 89/5
**425 [1]** 89/11
**43 [3]** 90/4 90/5 90/18
**431 [1]** 89/11
**433 [1]** 89/11
**440 [1]** 89/12
**442 [1]** 89/12
**445 [1]** 89/12
**447 [1]** 89/12
**450 [1]** 89/6
**456 [1]** 89/6
**48 [1]** 12/7
**481-4900 [1]** 2/17
**4900 [1]** 2/17
**4th [1]** 1/20

**5**

**543-0870 [1]** 1/21
**561 [1]** 58/3
**5:42 p.m [1]** 32/14

**6**

**611 [1]** 6/25
**6683 [1]** 2/8
**690 [1]** 10/6
**6:00 p.m [2]** 5/3 5/7

**7**

**714 [2]** 1/21 2/12
**717 [1]** 4/13
**720 [1]** 9/9
**726 [1]** 4/14
**727 [2]** 4/15 88/2
**753 [1]** 94/6
**797-800 [1]** 88/4

**8**

**8/18/21 [1]** 94/15
**800 [1]** 88/4
**8000 [1]** 2/11
**894-6683 [1]** 2/8
**8:00 [1]** 9/4
**8:28 [1]** 4/1
**8:30 [1]** 9/3
**8:49 [1]** 17/20

**9**

**90012 [1]** 2/8
**92672 [1]** 2/16
**92701 [1]** 1/20 2/11

**949 [1]** 2/17
**93051 p.m [1]** 32/14
**9:18 [1]** 17/21

**A**

**a.m [6]** 4/1 17/20 17/21 32/14 53/2 53/3
**ability [1]** 7/22
**able [2]** 8/17 91/11
**about [80]** 5/10 7/5 7/20 7/21 8/14 8/19 11/5
12/7 13/13 15/3 16/9 17/5 19/15 23/13 23/19
23/19 26/4 28/13 29/11 31/18 31/20 31/23
32/3 32/14 33/3 35/12 36/10 36/22 37/11
38/11 38/14 39/4 39/16 40/8 40/13 40/25 41/2
41/5 42/9 43/17 44/4 44/7 45/11 48/12 49/11
50/8 50/22 51/8 51/24 53/8 56/9 58/18 61/8
61/16 62/16 62/16 62/21 63/11 64/7 64/18
64/25 66/20 67/8 68/14 70/14 72/5 74/19
74/25 78/8 78/16 78/18 78/22 81/2 82/3 84/13
85/8 85/13 86/4 90/11 90/17
**above [2]** 33/21 94/9
**above-entitled [1]** 94/9
**absolutely [3]** 16/12 22/4 54/25
**acceptable [2]** 52/16 92/18
**access [8]** 59/25 60/3 60/9 67/2 88/2 88/5
88/17 90/8
**accessible [1]** 38/12
**accident [2]** 27/16 75/9
**accordance [1]** 39/1
**according [3]** 40/1 49/10 65/5
**accounting [3]** 38/15 39/5 45/3
**accurate [4]** 4/25 10/8 53/16 81/11
**acquire [2]** 43/10 44/21
**Act [3]** 9/19 9/22 91/2
**action [1]** 11/25
**actual [1]** 83/15
**actually [5]** 10/18 27/16 41/4 44/7 59/11
**add [1]** 17/13
**addition [2]** 21/9 90/21
**additional [1]** 9/5
**addressed [2]** 7/6 15/17
**adequate [1]** 36/24
**admissible [2]** 6/15 89/16
**admonition [2]** 52/22 87/20
**advance [1]** 8/24
**advise [2]** 50/1 83/18
**ADVISORY [1]** 2/15
**afford [1]** 7/8
**afraid [1]** 44/23
**after [31]** 12/6 15/18 31/2 33/15 33/17 35/12
35/25 40/11 40/24 44/4 45/6 46/2 47/20 54/5
54/17 56/20 58/2 58/3 58/16 60/16 63/15
63/20 66/25 69/25 70/3 79/7 79/21 83/22 85/3
85/16 86/16
**afternoon [1]** 92/16
**again [5]** 30/8 34/5 38/5 60/24 93/6
**agent [46]** 4/7 15/24 18/2 18/14 18/24 19/9
23/20 24/1 27/11 31/4 31/6 31/7 31/17 32/10
32/12 32/13 33/13 33/22 35/6 35/14 35/21
35/22 36/18 40/9 43/8 44/21 46/2 49/5 49/13
49/21 50/7 50/17 51/4 53/7 57/6 58/25 60/17
61/14 65/13 73/3 73/18 73/20 75/10 75/14
75/21 77/10
**agents [11]** 47/23 48/1 50/3 52/4 55/14 58/19
59/3 59/16 59/20 60/22 76/2
**ago [9]** 12/7 13/23 17/3 32/2 32/5 32/18 34/8
34/9 49/1
**agree [1]** 6/12
**agreed [1]** 27/16
**Ahmed [1]** 87/2
**ALEXANDER [3]** 2/5 4/6 18/1
**all [27]** 8/4 9/25 11/2 11/19 23/9 31/14 36/17
42/11 42/20 42/21 42/24 47/8 54/14 58/6
59/15 60/25 65/5 67/21 77/19 77/19
83/16 88/10 88/20 88/22 89/20 91/24
**allow [2]** 6/5 88/5
**allowing [1]** 89/3
**almost [3]** 32/2 32/17 88/22
**along [2]** 76/6 93/3
**already [6]** 8/21 56/11 65/9 65/15 91/4 91/8

# A

**also [7]** 4/7 4/14 24/7 26/22 62/11 88/6 89/13
**am [12]** 6/13 7/20 17/1 19/2 24/15 27/12 30/22 61/19 66/4 90/13 91/12 91/15
**ambiguous [1]** 80/13
**Amendment [4]** 7/13 90/4 90/5 90/19
**Amenta [9]** 9/8 9/16 10/24 11/7 12/20 12/21 12/24 13/3 13/4
**Amenta's [1]** 9/10
**AMERICA [3]** 1/9 4/4 17/24
**among [1]** 30/21
**ample [2]** 7/14 7/15
**Ana [4]** 1/16 1/20 2/11 4/1
**analysis [1]** 11/8
**Andre [8]** 35/15 35/22 36/18 38/20 75/20 77/16 84/11 84/25
**Andrew [2]** 69/1 77/12
**Angeles [3]** 2/8 23/12 72/12
**another [11]** 24/1 25/13 38/11 51/21 58/25 72/19 76/5 76/9 76/17 80/23 87/2
**answer [10]** 11/12 37/11 41/11 42/6 47/6 53/15 54/15 57/14 65/22 90/25
**answered [4]** 11/14 41/24 64/20 66/7
**anticipate [2]** 5/5 5/25
**anticipation [1]** 16/9
**any [67]** 6/7 7/11 7/25 10/4 11/10 13/8 16/19 16/20 19/17 19/21 20/21 25/16 26/4 28/18 29/10 29/19 29/20 30/2 37/11 37/18 39/15 40/4 41/3 43/8 43/9 43/13 46/3 46/17 47/9 47/21 50/2 52/23 52/24 54/21 55/12 55/13 57/2 59/14 59/25 64/4 66/15 68/1 68/10 71/2 71/10 71/18 71/25 72/14 75/7 75/16 77/18 77/23 78/2 79/10 79/15 79/21 79/23 81/18 84/7 85/17 87/21 87/23 88/18 89/9 89/22 90/6 90/15
**anybody [1]** 19/18
**anyone [27]** 21/11 23/25 24/4 24/5 27/10 33/6 34/10 38/24 40/14 40/25 41/12 41/19 44/7 46/7 52/23 54/20 55/16 59/14 61/21 66/11 73/5 75/19 79/10 79/13 84/6 85/16 87/21
**anything [15]** 12/9 15/21 16/4 19/24 37/15 39/12 39/15 54/18 57/25 59/11 64/8 84/12 85/11 86/17 90/9
**Anytime [1]** 13/13
**apparent [1]** 92/11
**appear [1]** 20/19
**appearance [1]** 83/12
**APPEARANCES [1]** 2/1
**appeared [1]** 23/11
**appearing [1]** 20/6
**appears [1]** 33/20
**applicability [1]** 91/2
**appreciate [2]** 5/9 93/4
**appreciating [1]** 89/9
**appreciation [1]** 89/2
**approach [5]** 32/21 34/13 49/8 61/10 77/3
**appropriate [8]** 6/16 7/8 87/8 91/9 9/13 12/17 89/24 90/12
**approximately [9]** 19/7 19/11 24/23 26/24 27/1 27/2 27/3 35/16 63/12
**April [3]** 54/11 54/12 54/13
**April 28th [1]** 54/11
**April 29th [1]** 54/12
**April 30th [1]** 54/13
**Arden [3]** 86/20 86/21 86/23
**are [44]** 4/25 5/4 8/3 9/24 9/25 10/21 11/14 12/16 16/13 17/4 19/1 19/3 34/3 46/6 41/12 49/21 49/22 50/4 50/7 50/9 54/20 55/7 55/10 55/16 57/7 70/10 70/12 70/22 70/24 70/25 71/7 71/17 72/17 75/22 75/22 77/19 89/6 89/10 89/10 89/11 89/16 91/21 93/12
**arguing [1]** 92/12
**argument [1]** 8/18
**Argumentative [3]** 41/23 44/10 74/22
**arguments [1]** 88/22
**around [6]** 26/18 26/19 47/15 56/4 57/20 62/19
**arrest [1]** 73/8
**arrived [1]** 24/21

# B

**article [1]** 70/14
**as [70]** 4/16 5/8 6/24 6/24 11/7 ... (various)
**12/20 13/13 13/15 13/25 14/9 17/17 20/18 22/23 22/4 23/5 26/3 27/7 29/2 29/2 30/19 30/19 30/20 30/25 33/6 34/17 34/19 34/19 35/7 37/6 37/18 39/25 40/11 40/13 41/14 42/3 43/13 45/6 49/13 49/21 51/18 51/18 52/8 52/8 55/1 55/20 56/9 56/19 57/14 60/6 62/6 62/6 62/17 62/17 63/24 64/7 64/11 65/23 70/11 71/5 76/11 76/20 83/5 83/5 83/23 87/3 87/11 93/2**
**ASAP [1]** 51/19
**ask [22]** 6/13 6/14 10/4 16/16 26/4 27/7 30/8 36/9 36/22 38/5 41/12 48/1 57/11 66/5 72/5 75/13 77/17 87/8 90/24 92/17 92/24 93/5
**asked [22]** 11/17 26/3 32/18 38/14 39/4 41/24 50/22 51/8 51/17 51/24 51/25 52/12 56/8 64/7 64/20 66/1 66/6 84/13 86/20 86/20 87/2 93/8
**asking [11]** 23/19 35/17 38/17 51/21 53/7 66/4 71/5 72/15 72/18 77/11
**asks [1]** 16/2
**assembled [1]** 15/13
**asserted [1]** 35/1
**assimilate [1]** 15/13
**assist [2]** 82/13 89/8
**assistance [1]** 91/9
**Assistant [3]** 2/4 2/6 2/10
**Assumes [1]** 60/11
**asterisk [1]** 62/15
**asterisks [1]** 62/19
**attempt [7]** 10/2 22/24 23/22 24/6 75/24 76/2 82/11
**attention [4]** 23/25 34/18 88/3
**attorney [11]** 2/3 2/4 2/6 2/10 37/23 38/7 49/5 76/6 76/9 76/17 87/17
**Attorney's [8]** 23/2 23/6 23/12 78/8 78/11 80/1 80/10 80/18
**audience [1]** 75/10
**August [1]** 1/17 4/1 94/13
**AUSA [10]** 33/2 35/22 35/22 36/18 36/18 37/22 49/5 49/5 51/7 53/19
**AUSAs [2]** 13/15 35/15
**authority [1]** 88/7
**availability [1]** 89/3
**available [3]** 12/19 12/23 88/14
**AVENATTI [32]** 1/11 2/14 4/4 4/10 4/14 5/14 7/4 9/12 12/11 16/2 16/19 17/24 18/5 18/11 18/21 23/14 32/19 33/7 34/23 35/10 35/18 35/24 36/11 37/12 45/4 46/4 46/25 47/16 53/5 56/15 59/5 87/25
**Avenatti's [1]** 9/9
**Avenida [1]** 2/16
**averred [1]** 89/13
**avoid [3]** 83/9 83/12 83/17
**aware [34]** 20/13 20/17 21/15 21/23 23/12 37/6 40/11 41/12 46/5 46/7 49/21 54/20 55/7 55/10 55/16 68/2 68/11 70/10 70/13 70/22 70/24 71/1 71/7 71/10 71/18 72/17 72/21 72/22 75/22 77/19 80/17 80/21 84/20 84/22
**away [1]** 55/24

# B

**back [11]** 8/13 9/17 27/22 30/9 40/19 42/15 44/15 48/6 56/10 66/24 84/16
**Bad [1]** 57/9
**Ball [9]** 24/3 26/4 26/22 27/11 28/15 29/3 29/21 29/24 59/4
**Ball's [2]** 29/19 30/3
**bank [2]** 13/7 51/17
**Barela [4]** 86/3 86/16 87/4 87/11
**based [3]** 16/9 63/15 63/18
**basic [1]** 82/16
**basically [2]** 6/14 13/20
**basis [1]** 90/11
**be [73]** 4/18 5/7 6/1 6/4 6/15 6/20 7/4 7/5 7/14 8/17 9/17 11/21 13/4 14/5 15/8 15/17 16/6 17/19 18/6 20/24 21/15 21/19 21/24 23/13 25/6 27/21 28/5 28/6 31/11 31/23 40/18 42/14 43/2 44/14 45/8 45/24 47/25 48/5 49/23 52/21

# C

**53/16 55/11 56/21 59/15 64/15 65/11 71/15 75/9 76/10 78/8 82/9 83/7 84/16 87/9 87/19 88/7 88/14 89/3 89/17 89/21 90/25 90/25 91/5 91/8 91/11 91/16 92/12 93/6 93/7 93/7 93/10 93/14**
**Beach [1]** 8/14
**because [34]** 5/25 7/11 10/19 11/18 12/8 12/15 13/21 14/14 15/17 25/7 28/3 29/16 33/23 35/14 36/3 44/22 45/22 50/7 53/18 55/22 56/18 56/24 57/1 57/7 60/3 60/24 61/22 69/7 70/5 81/2 81/6 82/20 93/8 93/13
**been [36]** 9/3 9/13 10/7 10/12 11/6 12/5 13/25 14/1 16/21 17/9 17/10 17/15 19/5 23/2 24/11 24/14 24/16 25/9 35/12 35/6 48/15 50/23 58/18 59/1 61/7 67/7 70/19 71/10 71/24 73/8 73/22 74/5 75/16 78/4 81/10 89/15
**before [42]** 7/10 7/17 8/18 11/3 11/11 14/1 14/2 14/5 20/6 20/14 21/21 27/17 28/14 28/25 29/8 31/20 31/22 45/1 53/7 53/15 54/22 58/5 61/7 62/23 63/16 70/22 71/3 71/7 72/5 72/17 73/1 74/20 75/7 77/12 77/16 78/16 78/18 86/9 89/21 92/15 93/1 93/5
**began [3]** 11/3 11/11 14/1
**beginning [1]** 28/21 50/2
**begins [1]** 14/5
**behalf [3]** 4/6 18/1 73/2
**behind [5]** 58/19 59/1 59/17 60/4 60/22
**being [10]** 23/8 29/20 40/11 59/24 79/4 79/23 82/19 86/4 90/14 93/8
**believe [47]** 4/24 4/25 7/7 9/12 9/14 13/8 25/2 28/19 31/7 32/20 33/8 34/8 43/17 45/12 52/2 53/23 54/2 54/6 55/3 58/5 58/12 60/2 61/22 61/23 63/10 63/19 66/17 66/21 68/17 69/20 71/4 72/7 72/13 73/3 73/14 75/6 75/20 75/21 75/25 78/23 79/6 79/20 82/23 84/24 86/11 89/8 90/12
**believed [1]** 45/2
**believes [1]** 91/4
**benefit [2]** 6/2 11/2
**best [10]** 24/12 31/15 33/5 34/10 34/12 34/21 48/19 59/14 66/19 78/14
**between [4]** 41/3 59/19
**beyond [4]** 10/2 63/24 64/7 91/22
**big [2]** 50/12 81/3
**billing [2]** 38/14 39/5
**binder [2]** 50/18 77/7
**bit [5]** 5/18 12/7 52/18
**blow [2]** 51/1 57/8
**both [1]** 8/11
**bottom [2]** 51/2 53/9
**box [7]** 58/22 59/1 59/4 59/16 59/19 60/21 62/23
**boxes [16]** 59/25 62/1 62/3 62/13 62/16 62/18 62/25 63/3 63/5 63/17 63/22 64/1 64/8 64/12 64/19 64/25
**Brady [7]** 13/18 13/21 13/25 14/23 17/2 91/16 92/2
**BRANDON [2]** 2/4
**break [5]** 52/17 52/21 53/7 54/8 58/5 87/7 92/16
**BRETT [7]** 2/9 4/5 17/25 33/2 35/15 35/22 36/18
**brief [3]** 5/7 19/20 88/1
**briefing [2]** 5/10 91/1
**briefly [4]** 4/19 9/18 12/3 15/22
**Broadcom [1]** 80/24
**broke [1]** 53/15
**bubble [2]** 89/7 89/11
**building [3]** 2/10 69/24 80/23
**Bundy [1]** 91/17
**burn [1]** 62/9
**burning [2]** 62/12 62/17
**business [1]** 58/23
**businesses [1]** 42/22
**busy [1]** 23/9

# C

**CA [4]** 1/20 2/8 2/11 2/16
**Cal [1]** 88/4

**C**

calculation [1] 65/23
calendar [1] 72/7
CALIFORNIA [6] 1/5 1/16 4/1 52/6 55/2 56/15
call [30] 8/13 9/16 16/20 18/11 36/4 36/7 36/9
36/22 38/17 39/19 40/12 40/24 41/9 44/4
60/16 61/4 61/9 61/15 61/21 61/25 63/16
63/21 86/4 86/25 87/1 87/3 87/10 87/15 87/16
89/6
called [8] 7/4 34/21 35/15 36/7 37/25 59/21
61/24 74/7
calling [1] 58/25
calls [4] 18/14 70/16 86/12 87/5
came [6] 22/3 24/25 46/25 47/2 47/5 47/9
camera [10] 5/24 6/18 6/19 7/8 7/16 12/7
12/12 15/7 16/21 90/12
can [30] 7/5 7/6 8/4 9/4 12/21 14/6 14/24
15/21 16/22 27/22 30/8 30/9 31/8 32/21 33/20
34/13 38/5 40/19 42/15 44/15 48/6 49/8 49/23
50/17 51/1 51/4 61/10 77/3 90/21 92/14
can't [1] 54/15
cannot [3] 7/5 7/6 28/10
Carter's [1] 5/15
case [38] 4/23 5/4 5/19 6/5 7/11 9/23 10/12
11/5 11/8 11/15 11/25 12/16 13/14 16/4 48/12
52/23 52/24 61/16 62/6 65/8 66/13 66/16
66/17 69/7 71/21 80/24 83/8 87/21 87/22 88/5
88/6 88/11 90/9 91/18 91/19 92/23
93/13
cases [2] 4/25 68/24
caught [1] 80/22
CD [1] 88/4
Cefali [2] 4/10 18/6
cell [5] 54/3 54/10 55/5 67/10 67/12
CENTRAL [1] 1/5
certainly [6] 14/1 15/11 15/14 90/17 91/17
93/11
CERTIFICATE [1] 94/4
CERTIFIED [1] 1/9
certify [1] 94/6
chair [3] 26/12 26/13 26/16
chairs [1] 26/20
charges [2] 89/10 93/12
chart [1] 13/20
charts [2] 89/7 89/11
check [3] 54/18 56/15 66/25
chief [4] 2/5 5/4 6/5 7/11
CID [1] 73/20
Circuit [3] 91/17 91/18 91/19
circumstances [3] 76/21 80/4 80/9
cite [1] 91/7
cited [3] 4/23 4/24 5/1
city [8] 53/25 54/12 54/13 54/13 54/14 55/8
56/11 63/9
claim [4] 13/2 71/2 71/10 71/18
claiming [2] 10/13 55/24
claims [1] 86/4
clarified [1] 80/12
clarify [1] 71/4
clear [4] 12/17 15/25 36/6 73/15
clearing [2] 25/8 25/9
clearly [1] 11/18
Clemente [1] 2/16
Clerk's [2] 89/23 90/9
client [8] 32/19 35/11 35/18 35/23 37/3 38/14
39/4 39/5
clients [3] 42/10 65/20 65/24
close [2] 62/4 70/15
closest [1] 70/11
Coast [1] 56/6
Code [1] 94/7
colleague [1] 38/20
colleagues [3] 69/15 72/20 74/8
come [4] 7/6 8/2 8/24 16/16
coming [2] 16/1 84/12
comment [1] 57/11
committed [1] 65/7
committing [1] 80/22
common [1] 27/19 50/1

communicate [1] 83/7
communicated [2] 48/4 48/13
communicating [1] 68/14
communications [4] 43/24 44/1 68/19 90/6
companies [1] 62/5
company [2] 54/4 54/10
compiling [1] 46/11
complained [1] 11/5
complete [5] 22/3 47/21 47/22 48/2 74/21
completed [1] 28/25
completely [1] 88/21
complies [1] 38/5
computer [9] 31/4 31/12 46/18 47/2 47/16
52/5 53/20 55/19 55/25
concern [3] 22/17 22/22 22/25
concerned [1] 7/20
conclusion [1] 39/25
concurred [1] 33/25
conduct [1] 7/1
conducted [1] 26/7
conducting [1] 76/8
conference [5] 23/1 23/9 23/13 40/12 94/11
confirm [1] 40/14
conflict [6] 81/19 82/6 82/10 83/9 83/12 83/15
conformance [1] 94/10
connection [8] 21/16 24/6 44/8 46/11 65/7
65/15 75/23 80/23
consequences [1] 50/4
contact [12] 72/1 77/15 77/18 77/23 78/7
78/11 78/21 78/25 79/10 79/21 85/17 89/22
contacted [3] 58/18 58/21 60/17
contacts [5] 77/19 78/2 78/4 85/23 85/24
contain [2] 89/14 89/17
contained [4] 63/25 64/11 64/25 88/23
contemporaneously [1] 90/11
contentions [1] 89/10
contribute [1] 88/19
control [1] 13/8
controlling [2] 88/7 88/8
convenient [2] 91/7 92/14
conversed [1] 64/24
conversing [3] 43/16 44/6 45/10
convinced [1] 93/10
copy [3] 30/18 43/3 68/1
correct [33] 5/12 20/4 20/5 21/6 22/12 24/15
24/20 27/9 30/23 33/11 34/6 34/11 36/19
39/20 40/2 43/22 51/12 58/14 61/1 61/20
63/13 67/10 69/17 72/9 72/22 74/5 76/22 77/2
78/12 81/16 83/20 86/8 94/8
corrected [1] 13/20
corrections [2] 29/24 30/2
correctly [2] 51/19 60/18
correspondence [1] 62/4
couch [2] 26/12 26/13 26/16
could [7] 28/5 54/8 59/12 63/21 65/6 78/6
89/14
counsel [4] 2/1 2/15 4/7 18/2
counts [2] 4/17 65/8
County [1] 22/11
couple [4] 26/20 62/23 72/5 91/19
course [2] 12/13 68/13 82/19
court [28] 1/4 6/2 6/3 6/14 7/14 7/17 8/3 9/6
12/15 13/15 17/6 17/16 31/8 88/5 88/6 88/11
88/15 88/16 88/17 88/20 88/25 89/13 89/18
89/18 90/7 90/10 90/14 94/16
Court's [2] 34/17 89/24
courthouse [1] 1/19 2/7 63/11
courtroom [1] 7/2
covered [1] 91/5
crazy [1] 55/21
created [1] 35/19
crime [1] 65/7
crimes [1] 16/5
criminal [13] 2/5 32/12 44/8 50/9 69/7 72/2
81/6 81/13 83/4 88/6 88/19 89/2 90/5
criminally [2] 75/24 76/2
critical [3] 6/6 7/12 7/23
criticism [1] 88/21
cross [10] 3/4 3/9 9/14 11/3 11/12 12/19

12/22 14/5 14/7 14/25
cross-examination [5] 9/14 11/3 11/12 12/19
14/5
cross-examine [3] 12/22 14/7 14/25
Cummings [2] 4/10 18/6
Cummings-Cefali [1] 4/10
current [3] 19/8 47/11 47/22
curtailed [1] 13/7
custody [1] 13/7
custom [1] 67/15
cuts [1] 8/10

**D**

D.C [2] 54/11 54/12
data [31] 17/2 17/9 39/16 40/1 40/13 40/15
40/16 40/25 41/5 41/14 42/9 42/11 43/11 44/8
44/22 45/3 46/16 47/20 47/22 48/2 54/3 54/10
66/2 66/5 90/22 91/3 91/7 91/12 91/15 91/22
91/25
date [9] 32/5 32/6 34/9 37/6 48/2 49/3 78/8
78/9 94/13
dated [1] 51/11
day [23] 1/12 8/24 22/9 23/9 23/9 23/16 23/21
24/22 25/2 31/15 36/9 36/14 37/23 38/6 58/16
60/16 61/18 64/5 67/13 75/10 81/5 81/8 89/21
days [7] 6/6 54/4 54/5 72/5 72/17 73/1 77/12
deadline [1] 12/11
deal [4] 8/5 8/25 50/12 81/3
DEAN [2] 2/15 2/15 18/5
debriefed [1] 85/8
decided [2] 77/16 84/11
decision [2] 36/15 36/17
defendant [7] 1/12 2/13 12/5 13/6 28/10 91/4
92/22
defendant's [1] 88/1
defense [2] 3/9 3/11 7/13 7/23 12/8 17/12
18/14 18/15 34/16 92/17
defer [2] 92/15 92/17
define [3] 13/15 69/13 69/14
definition [3] 13/17 89/15
degree [1] 88/18
delivered [1] 15/8
DeLorean [6] 88/4 88/6 88/10 88/15 88/16
89/13
Denied [4] 46/22 57/23 77/25 83/25
deny [2] 9/10 40/15
Department [9] 19/1 19/4 19/6 81/11 82/13
82/23 82/24 83/2 83/2
deposition [1] 70/4
describe [1] 81/12
described [1] 82/22
desires [1] 12/19
desktop [1] 38/12
despite [2] 10/13 66/1 66/4
details [1] 20/21
determinations [1] 7/5
determine [2] 14/7 65/6
devices [6] 30/22 31/1 31/4 31/10 31/14 47/2
did [118]
didn't [32] 5/10 10/3 10/4 12/10 13/25 15/5
19/17 19/24 20/21 32/5 32/7 39/6 41/6 52/1
52/9 53/22 55/20 55/23 57/1 62/1 62/9 62/13
62/19 68/23 76/20 80/5 83/24 83/25 84/5
87/11 93/1 93/5
different [1] 71/15 90/16
direct [8] 3/4 3/9 16/7 16/11 18/22 89/20 91/1
93/3
directing [2] 32/25 34/17
directs [1] 16/13
disagree [2] 88/14 89/1
disclose [1] 9/21
discovered [1] 14/19
discovers [1] 83/3
discretion [1] 6/25
discuss [2] 52/22 87/20 91/24
discussion [3] 7/21 37/2 91/10
discussions [3] 19/17 19/20 43/9
disgrace [1] 80/18
dismiss [1] 92/2

## D

**dismisses [1]** 81/5
**dispute [7]** 10/2 22/6 22/14 33/14 33/18 40/4 75/7
**distinction [1]** 88/9
**DISTRICT [2]** 1/4 1/5
**division [1]** 1/6 2/5 32/11 81/15
**do [105]**
**Docket [6]** 4/13 4/14 4/15 9/9 10/6 88/2
**document [13]** 4/24 9/12 32/23 33/9 33/14 34/1 34/15 39/24 61/12 77/8 91/6 91/10 91/23
**documents [20]** 10/3 10/4 10/7 19/21 60/1 60/21 62/1 62/24 63/1 63/4 63/17 63/22 64/1 75/23 75/25 88/10 88/10 88/18 88/23 89/13
**does [10]** 6/7 12/2 33/1 36/13 40/8 40/10 61/14 77/10 81/8 81/9
**doesn't [3]** 13/2 81/7 90/9
**doing [7]** 7/7 41/19 50/4 55/16 65/2 68/16 75/4
**don't [120]**
**done [1]** 62/23
**door [5]** 16/2 21/22 92/23 93/9 93/11
**down [3]** 39/10 85/25 87/3
**drafted [1]** 55/24
**drew [1]** 88/3
**drive [1]** 47/15
**dropped [2]** 63/3 63/7
**Drum [11]** 11/7 11/22 11/22 12/4 12/20 12/25 15/3 17/18 46/10 46/25 89/5
**due [4]** 7/12 8/10 65/23 90/19
**during [26]** 8/2 14/19 24/24 25/7 26/22 32/7 32/17 33/16 37/2 38/17 39/8 39/19 39/22 47/3 48/12 51/24 54/4 61/25 66/13 68/12 68/20 68/22 71/13 71/17 85/8 88/2
**duties [1]** 68/14
**duty [1]** 31/13

## E

**e-mail [31]** 13/19 13/24 40/25 41/1 50/23 51/2 51/8 51/11 51/17 51/25 52/5 53/10 53/20 55/19 55/24 56/4 56/9 57/9 79/2 79/3 79/4 79/6 79/7 79/22 79/24 80/7 80/16 80/21 83/19 84/9 85/3
**e-mails [12]** 10/17 10/18 10/19 10/23 11/2 11/9 12/22 13/3 13/4 13/10 13/10 79/15
**EA [4]** 35/24 37/4 38/8 62/5
**Eagan [2]** 32/18 33/7 35/10 35/18 35/24 36/10 37/12 45/3 46/4 46/25 47/16 59/5
**earlier [8]** 9/5 35/12 35/14 39/2 71/4 74/7 83/21 87/25
**early [5]** 67/22 78/21 79/8 80/8 80/17
**easiest [1]** 50/18
**East [1]** 56/5
**effort [4]** 10/9 44/21 54/21 55/12
**eight [1]** 32/14
**either [4]** 7/18 38/20 62/8 83/5
**electronic [5]** 30/22 31/1 31/10 39/16 43/3
**elevated [1]** 84/10
**eliminated [1]** 7/22
**else [16]** 15/21 21/11 23/25 24/4 24/5 38/24 40/14 44/7 61/21 63/25 64/8 73/5 79/13 83/8 84/8 85/16
**employed [3]** 19/1 19/3 19/5
**end [3]** 25/2 28/14 68/13
**enforcement [4]** 20/18 21/23 22/7 82/11
**engaged [1]** 81/7
**enhance [1]** 88/18
**enhanced [1]** 89/3
**enough [1]** 14/24
**ensure [2]** 36/24 47/21
**entities [2]** 58/14 61/11
**entitled [9]** 13/23 13/24 15/15 17/2 17/8 17/16 88/1 90/17 94/9
**entry [1]** 25/7
**environment [1]** 28/4
**error [2]** 59/7 59/8
**errors [2]** 29/19 29/20
**especially [6]** 6/17 8/21 11/4 16/16 49/14 93/13

**estimate [5]** 21/5 48/19 78/13 78/14 92/7
**evan [2]** 86/23 91/19
**eve [1]** 49/15
**even [11]** 9/5 10/2 10/3 10/4 14/1 45/1 56/15 56/16 83/12 83/15 83/17
**ever [24]** 17/1 30/6 31/18 31/20 40/25 43/8 44/6 46/7 55/12 56/1 59/6 59/14 63/20 64/24 65/2 66/5 66/11 69/21 69/25 71/10 71/24 71/25 72/14 81/18
**every [6]** 14/18 19/20 81/5 81/8 88/22 92/22
**everything [4]** 4/17 58/3 64/4 83/22
**evidence [19]** 7/6 8/20 50/15 50/23 52/11 53/13 53/21 53/24 54/18 55/4 55/5 55/6 55/13 58/6 60/5 60/9 60/12 65/9 77/1
**evidentiary [1]** 8/2
**ex [3]** 7/7 90/6 90/11
**ex-parte [2]** 90/6 90/11
**exact [1]** 78/9
**exactly [1]** 28/9
**examination [6]** 9/14 11/3 11/12 12/19 14/5 18/22
**examine [3]** 12/22 14/7 14/25
**example [4]** 8/9 8/13 57/9 57/10
**except [1]** 76/3
**exception [1]** 9/19
**exchange [1]** 50/23
**exchanged [1]** 66/15
**exchanges [1]** 66/25
**exchanging [1]** 66/18
**exclude [1]** 7/25
**excuse [1]** 55/24
**execute [2]** 21/1 60/5
**executed [11]** 20/3 58/17 59/24 63/8 67/9 70/23 72/18 73/2 74/20 75/1 78/19
**exhibit [12]** 32/25 35/7 35/12 35/25 36/2 43/21 50/14 50/24 51/9 53/9 89/22 89/23
**Exhibit 1084 [2]** 35/7 43/21
**Exhibit 1085 [1]** 32/25
**Exhibit 281 [4]** 50/14 50/24 51/9 53/9
**exhibits [10]** 3/7 3/12 88/2 88/13 89/4 89/5 89/5 89/11 89/16 89/17
**existed [2]** 42/10 60/6
**existence [2]** 40/15 55/7
**expect [2]** 5/18 92/9
**expeditiously [1]** 8/5
**expenses [5]** 32/19 35/11 35/23 42/9 65/19
**experience [1]** 81/8
**explain [2]** 7/23 33/20
**explained [1]** 37/2
**explanation [2]** 52/1 52/3
**extent [1]** 90/8
**extraneous [1]** 89/17

## F

**F.Supp [1]** 88/4
**fact [20]** 11/4 12/17 16/4 22/4 22/6 22/11 24/11 25/6 33/9 33/13 34/8 49/21 53/18 55/1 57/7 67/18 62/17 72/17 83/3 83/11
**facts [4]** 4/24 6/20 60/11 88/22
**failure [1]** 11/23
**fair [3]** 15/12 15/19 82/5
**fans [1]** 62/4
**fantastical [1]** 55/21
**fashion [1]** 8/1
**fateful [1]** 77/17
**fault [1]** 11/23
**FBI [1]** 73/18
**Fed [1]** 13/5
**federal [18]** 2/10 13/6 21/3 21/11 21/23 44/8 49/21 49/24 50/3 50/7 50/9 52/4 59/16 62/13 81/5 82/11 82/12 90/4
**fee [1]** 89/24
**felony [1]** 49/23
**few [2]** 6/6 48/15
**figure [2]** 86/17 86/19
**file [12]** 12/4 12/5 12/11 12/14 30/19 46/16 47/11 47/12 47/12 47/14 47/22 48/2
**filed [8]** 4/12 4/14 5/21 12/8 88/1 88/10 89/21 91/8

**files [2]** 35/18 59/25
**filesite [2]** 37/24 38/6
**filing [4]** 10/6 12/7 15/7 15/20
**filings [3]** 88/6 89/18 89/18
**final [1]** 30/3
**finalized [1]** 29/8
**finances [1]** 62/5
**financial [11]** 36/23 37/3 37/12 42/20 42/21 58/6 58/13 59/4 60/25 65/6 65/14
**find [15]** 14/11 14/15 17/6 29/10 40/6 44/24 55/12 57/25 59/6 59/8 59/15 85/12 85/22 86/1 89/2
**fine [7]** 5/7 7/18 16/18 52/20 91/5 92/4 92/19
**firearms [1]** 25/21
**fired [4]** 70/24 71/3 71/7 73/22
**firm [13]** 35/10 38/12 39/6 42/22 58/13 58/23 61/1 65/19 71/11 76/18 76/21 79/8 87/3
**first [14]** 15/23 18/17 31/17 33/5 34/9 35/9 78/7 78/9 78/11 78/12 78/21 85/3 86/6 92/13
**five [4]** 10/6 48/23 49/23 81/13
**flee [2]** 22/17 22/24
**focuses [1]** 9/13
**follow [1]** 63/20
**follows [1]** 13/13
**footage [1]** 55/7
**foregoing [1]** 94/7
**forensic [10]** 31/4 31/11 37/8 41/14 46/18 47/10 47/23 48/1 68/1 68/10
**forensically [1]** 31/15
**forensics [1]** 31/12
**form [5]** 9/20 43/2 52/23 87/21 92/1
**format [1]** 94/10
**former [6]** 35/22 38/20 69/4 69/6 75/20 76/3
**forth [2]** 11/24 16/6
**forward [1]** 6/24
**found [8]** 25/22 28/3 47/17 47/18 59/8 64/13 89/11 89/17
**foundation [3]** 22/19 35/2 76/11
**Fourth [2]** 2/11
**FOX [1]** 2/4
**fraud [1]** 70/24
**Frauds [1]** 2/6
**free [1]** 8/3
**Friday [5]** 5/6 5/19 72/10 72/11 73/1 74/20 74/25 77/17 92/12
**friend [6]** 69/12 69/13 69/14 69/18 70/15 82/13
**friends [1]** 70/11
**front [5]** 12/15 21/22 35/7 72/7 86/7
**full [1]** 58/22
**fundamental [2]** 10/12 10/13
**funds [1]** 89/7
**further [5]** 12/19 17/13 79/21 85/17 90/6
**Furthermore [1]** 14/3

## G

**gallery [1]** 72/20
**gather [1]** 60/5
**gave [3]** 52/3 58/10 67/16
**general [2]** 49/13 88/12
**generally [9]** 20/13 36/15 36/16 37/3 53/10 68/13 82/3 82/10 83/5
**gentlemen [3]** 18/9 52/18 87/19
**get [10]** 6/3 9/4 11/22 17/1 44/7 51/18 67/4 67/5 80/12 92/25
**gets [1]** 8/18
**getting [2]** 9/3 92/13
**Giglio [5]** 13/18 13/22 13/25 14/23 91/17
**give [6]** 6/14 8/8 8/12 15/12 23/17 67/12
**given [6]** 14/2 31/10 60/3 75/17 90/14 92/11
**go [8]** 5/19 6/24 10/24 59/1 60/20 75/15 90/9 93/2
**goes [2]** 90/10 91/22
**going [34]** 4/16 5/19 7/4 7/8 8/23 8/24 9/10 11/21 12/11 12/14 14/7 14/13 15/16 15/18 17/1 17/5 17/5 17/7 17/17 20/13 20/19 20/24 21/15 21/24 23/13 27/18 28/3 28/13 57/7 57/13 62/8 90/23 92/12 93/7
**gone [2]** 25/11 55/19 87/3

**G**

good [15] 4/5 4/8 4/9 4/11 17/25 18/3 18/4 18/8 18/9 18/10 18/24 18/25 52/15 57/10 91/20

got [15] 4/20 9/4 27/17 40/24 44/4 46/14 59/16 60/16 67/22 67/25 68/5 80/7 80/16 80/21 80/22

government [37] 4/12 6/7 8/4 9/9 9/21 10/1 10/6 10/8 10/25 12/2 13/15 13/17 13/24 15/7 15/13 21/3 21/11 26/2 27/5 31/23 37/7 46/15 50/24 54/10 58/6 60/25 62/13 62/22 62/25 65/5 71/25 73/2 75/17 75/23 82/12 82/21 91/24

government's [5] 4/13 4/20 9/15 15/20 89/10

grant [1] 9/11

graphics [1] 89/8

great [1] 50/8

greater [1] 91/8

ground [1] 9/13

grounds [2] 91/21 91/24

guess [3] 6/23 81/4 81/11

guidance [1] 6/3

guns [2] 25/14 25/16

**H**

had [71] 10/7 11/1 15/6 15/19 17/2 22/1 23/2 24/11 24/14 25/6 28/5 29/21 31/10 31/23 33/6 34/10 37/7 40/5 47/22 48/2 51/25 52/11 53/8 53/13 53/24 54/3 54/7 54/12 54/21 55/24 55/25 57/18 58/18 58/21 59/1 60/22 60/25 61/4 61/15 61/25 62/22 64/8 64/11 65/9 66/23 66/24 66/25 67/10 67/17 68/8 69/6 70/24 71/2 71/25 73/22 74/9 76/6 76/9 77/15 80/8 80/9 80/18 80/22 84/2 86/6 86/9 87/3 87/4 87/11 89/15 90/1

half [3] 32/15 63/11 92/7

hand [3] 62/12 62/18 88/24

handed [5] 32/23 33/9 34/15 61/12 77/8

handle [2] 83/8 84/12

handled [1] 93/7

handling [1] 82/7

handwrite [1] 28/16

handwritten [6] 28/17 28/22 29/1 34/25 36/4 61/18

HANNA [1] 2/3

happen [8] 10/1 10/3 20/13 81/8 83/1 83/3 83/6 86/24

happened [16] 30/25 41/22 57/19 59/12 59/19 62/21 62/24 67/3 75/10 79/8 81/2 85/8 85/12 85/13 86/5 86/25

happening [1] 84/22

happens [1] 90/17

happy [1] 35/2

hard [3] 43/3 47/15 81/24

has [20] 6/25 7/24 12/15 14/4 14/10 15/13 17/15 35/6 50/23 70/10 70/13 71/21 71/24 71/25 75/17 75/19 76/1 81/6 88/12 92/23

hasn't [2] 12/8 71/21

have [160]

having [2] 7/21 11/5

he [58] 10/20 10/24 12/8 12/11 12/19 12/22 12/24 12/24 13/2 13/4 13/20 14/2 14/11 14/15 14/24 16/3 16/3 17/6 24/19 24/20 24/21 25/6 27/15 31/12 32/11 32/12 46/10 46/14 46/16 47/25 52/1 69/24 69/25 70/3 71/22 73/16 73/18 73/18 73/20 73/20 73/22 73/22 73/25 75/25 76/7 76/8 76/9 76/17 77/16 80/4 80/19 80/19 83/24 83/25 86/6 86/25 87/11 88/2

he's [4] 13/9 13/10 13/11 70/5

head [2] 48/16 72/11

hear [4] 5/10 15/3 17/5 77/7

heard [13] 4/18 7/14 22/12 22/13 31/18 31/20 67/1 71/2 71/17 86/4 86/5 86/9 86/11

hearing [10] 7/9 8/23 72/14 74/9 74/16 74/17 74/19 74/25 75/5 76/9

hearsay [3] 34/22 70/17 87/6

held [4] 19/10 43/19 89/15 94/9

helicopter [10] 21/15 21/17 21/24 22/5 22/7 22/8 22/8 22/11 22/18 74/21

help [1] 65/22

helpful [1] 7/16

her [37] 8/14 8/15 20/11 22/13 22/17 24/7 24/11 24/14 24/17 24/17 26/8 28/20 28/22 28/25 29/1 29/22 30/17 30/20 30/22 35/17 36/22 48/13 45/9 52/5 53/20 55/19 55/25 56/8 58/22 59/16 59/25 63/15 63/18 64/10 66/23 67/1 67/16

here [22] 6/23 19/14 19/18 19/22 22/10 37/18 40/11 40/13 42/3 43/13 46/11 47/19 52/5 52/21 54/15 55/1 63/13 69/24 74/5 85/11 87/18 88/7

hereby [1] 94/6

Hernandez [2] 18/6 51/1

hesitant [1] 32/8

high [1] 80/24

high-profile [1] 80/24

him [12] 9/17 12/22 12/23 14/24 14/25 25/2 25/3 25/5 53/13 69/23 86/5 87/8

his [21] 12/21 13/2 14/11 14/15 16/3 20/11 31/13 31/13 34/21 34/24 38/20 46/11 57/12 69/7 70/4 70/11 70/15 70/19 74/8 80/19 86/4

history [1] 79/25

hold [1] 19/12

holding [2] 12/5 23/13

home [18] 20/3 20/6 23/11 23/16 23/21 24/8 25/1 25/17 27/17 31/14 59/5 59/16 59/20 59/23 67/10 74/21 77/12 78/19

honor [88] 4/5 4/9 4/19 5/5 5/9 5/20 6/25 7/10 7/17 8/7 8/12 8/18 9/18 9/24 10/10 10/14 10/18 11/8 12/3 12/13 12/21 13/1 13/12 13/19 14/3 14/9 14/14 14/18 15/14 15/25 16/12 16/15 16/17 17/13 17/25 18/4 18/13 21/18 23/6 25/18 25/23 27/20 30/10 32/21 34/13 34/16 34/20 34/24 41/23 42/13 43/5 44/13 45/7 45/23 46/20 48/4 49/8 52/15 52/16 54/7 61/10 65/10 66/8 70/16 71/14 73/9 74/2 74/22 76/25 77/3 80/14 83/23 83/24 84/17 86/13 87/5 87/12 89/25 90/3 90/21 91/11 92/10 92/18 93/4 93/9

Honor's [2] 92/21 93/5

HONORABLE [1] 1/8

hoping [1] 12/5

hour [4] 24/24 29/11 63/11 92/7

hours [6] 12/7 24/23 26/25 27/2 29/17 32/15

house [6] 25/8 25/10 25/11 25/12 25/12 25/14

how [34] 7/1 8/22 14/7 19/5 19/10 20/18 21/2 24/22 30/15 35/18 36/10 36/22 37/3 37/11 39/4 39/16 39/22 40/8 41/2 48/13 59/3 59/4 59/11 59/15 65/23 67/17 68/5 69/14 76/1 78/25 81/21 82/20 85/22 93/13

however [2] 9/20 88/16

Human [1] 59/7

hundred [1] 76/2

husband [5] 24/7 24/11 24/15 24/17 24/25

**I**

I'll [6] 5/17 5/17 8/12 75/13 75/13 89/6

I'm [37] 4/16 6/10 7/4 7/8 8/7 9/10 13/10 13/12 14/13 17/2 17/8 17/16 23/19 23/19 27/15 29/18 30/16 35/2 43/15 44/4 55/6 57/4 57/13 68/2 68/11 72/8 72/9 74/17 74/19 74/25 75/6 84/20 90/5 90/17 90/18 91/19 92/12

I've [1] 22/4

I-N-D-E-X [1] 3/2

i.e [1] 88/20

Ibrahim [2] 87/2 87/10

icon [1] 38/12

idea [10] 22/1 22/2 22/15 25/7 31/23 36/9 40/5 46/17 47/13 60/4

identified [1] 39/6

IMAD [1] 13/20

image [3] 31/5 31/11 68/10

imaged [1] 31/15

images [2] 31/4 47/15

immediately [2] 13/25 33/16

impeachment [3] 34/17 34/21 35/1

importance [1] 6/6

important [6] 39/14 49/14 49/15 50/2 65/20

82/20

impossible [1] 52/22

improper [2] 34/20 86/13

impropriety [2] 83/13 83/16

inadmissible [1] 89/15

include [1] 36/13

included [4] 21/6 41/14 58/13 62/3

includes [1] 36/14

including [3] 37/22 48/20 89/5

incomplete [2] 45/14 45/21

inconsistencies [2] 28/5 28/11

incredibly [1] 50/2

incurred [1] 65/19

indeed [1] 61/15

indicated [4] 4/16 5/15 12/11 15/5

individual [2] 77/11 83/3

individuals [4] 20/18 21/8 21/12 21/23

information [16] 9/20 11/1 11/2 11/5 14/5 30/6 36/10 36/23 37/3 37/12 58/6 58/13 58/18 65/18 65/20 65/22

informed [2] 45/20 47/20

informing [1] 45/13

initially [1] 78/23

inquiring [1] 41/5

inquiry [2] 39/16 41/13

Inside [1] 73/6

instance [5] 10/23 37/19 42/3 43/14 88/22

instead [1] 62/11

instructed [2] 25/6 60/20

instructing [1] 92/12

instructions [1] 92/14

integrity [1] 88/19

intend [1] 61/10

interest [3] 81/19 82/6 83/12

interested [1] 42/9

Internal [1] 81/18

internally [1] 13/5

interview [25] 10/11 23/22 24/6 26/7 26/22 27/2 27/10 28/13 28/14 29/12 29/16 32/17 33/10 33/17 33/23 34/5 39/8 39/23 39/25 43/20 45/16 49/10 50/2 76/3 85/6

interviewed [2] 26/1 71/24

interviewing [2] 24/17 49/22

interviews [2] 33/24 75/16

inventory [4] 30/16 30/18 30/20 47/17

investigate [1] 68/24

investigating [1] 92/14

investigation [6] 16/3 32/12 36/24 57/2 65/16 81/14

investigations [3] 68/14 68/19 82/7

investigative [13] 36/12 37/22 40/12 41/13 43/10 43/25 44/23 54/20 72/2 77/20 84/8 84/11 85/17

investigator [1] 8/15

involved [2] 20/7 31/16

involves [1] 83/4

IRS [5] 31/12 32/12 67/7 73/20 81/13

is [155]

isn't [22] 12/21 25/21 27/18 28/7 28/11 35/9 35/19 35/21 44/24 45/1 52/6 53/25 54/5 54/14 55/2 55/5 60/6 69/7 69/12 69/18 83/13 86/24

issue [8] 8/5 12/15 13/19 17/18 88/24 90/1 90/16 93/7

issued [2] 88/12 89/21

issues [8] 6/1 8/2 9/6 16/20 52/3 81/19 82/6 84/11

it [179]

it's [43] 6/8 7/11 7/17 9/14 9/22 10/8 10/12 10/18 10/25 12/7 12/16 14/23 15/25 17/2 17/9 24/13 28/8 34/25 35/1 46/20 47/17 48/15 49/25 50/11 51/14 52/16 57/9 57/10 57/15 68/18 77/6 78/4 80/7 80/12 81/5 81/24 82/22 85/25 86/13 88/8 91/7 92/11 92/14

Item [2] 4/3 17/23

its [3] 4/12 6/19 37/7

itself [2] 76/25 88/20

**J**

JAMES [4] 1/8 35/15 73/3 75/21

**J**

**January** [1] 68/7
**January 2021** [1] 68/7
**Jencks** [20] 9/18 9/22 9/23 10/14 10/14 10/16 10/21 10/25 11/5 11/9 11/10 11/11 11/18 13/18 14/4 14/18 14/22 91/2 91/13 91/22
**Jenness** [3] 86/4 86/25 87/16
**job** [1] 31/13
**JOHN** [5] 1/11 2/14 4/4 17/24 31/7
**joining** [1] 18/6
**joint** [2] 36/15 36/17
**judge** [4] 1/8 80/23 81/5 81/7
**Judicial** [1] 94/11
**Judy** [2] 20/3 51/19
**Julian** [5] 35/15 35/22 36/18 75/20 84/11
**July** [10] 35/16 36/6 37/6 37/10 37/23 39/8 41/3 43/22 45/2 61/7
**July 25** [2] 37/6 37/10
**July 25th** [6] 35/16 36/6 41/3 43/22 45/2 61/7
**July 25tj** [1] 39/8
**June** [7] 49/1 56/7 56/8 57/20 61/4 61/15 64/17
**June 14th** [3] 49/1 61/4 61/15
**jury** [16] 4/2 17/22 18/10 47/4 52/19 53/1 53/4 53/12 62/21 62/24 65/15 73/15 86/5 87/24 92/13 93/12
**just** [34] 4/20 6/14 7/20 10/15 12/13 14/19 14/24 16/7 16/8 16/15 19/20 20/24 25/11 28/9 33/9 33/21 36/6 42/6 43/19 47/4 47/5 47/6 54/7 57/8 61/23 65/3 67/8 73/15 78/5 78/8 86/13 92/15 92/25 93/4
**Justice** [4] 19/1 82/13 82/23 83/2
**JVS** [3] 1/11 4/3 17/23

**K**

**K-a-r-l-o-u-s** [1] 18/19
**KARLOUS** [26] 3/10 4/7 15/24 18/2 18/14 18/15 18/18 18/24 23/20 31/17 34/17 35/6 35/21 40/9 43/8 44/21 45/10 46/2 49/13 50/17 51/4 53/7 57/6 61/14 65/13 77/10
**keep** [1] 32/19
**kept** [4] 30/19 37/24 38/8 39/5
**killed** [1] 57/6
**Kim** [10] 35/15 35/22 36/18 73/3 73/12 75/10 75/14 75/21 77/16 85/1
**kind** [1] 81/24
**knew** [16] 23/3 32/7 35/12 35/14 52/8 56/3 56/4 56/6 56/10 56/11 79/25 80/4 80/24 81/2 83/19 83/20
**know** [82] 6/16 6/19 6/23 10/14 15/24 15/25 16/16 22/8 23/1 25/12 29/7 29/9 31/16 34/8 40/16 40/22 41/16 41/20 42/1 42/3 44/12 46/14 47/8 47/10 47/11 47/14 47/18 48/13 48/18 51/19 52/10 54/15 54/23 54/24 54/25 55/1 55/4 55/11 56/14 57/20 59/19 63/15 63/18 63/25 66/3 66/11 66/12 66/22 67/4 69/13 71/23 73/24 74/15 75/9 75/19 76/3 76/7 77/15 77/18 77/22 77/23 78/2 79/11 79/13 79/14 79/15 79/20 79/24 80/2 80/20 82/8 83/4 84/2 84/4 84/5 84/7 85/19 90/11 90/17 92/15 92/21 93/11
**knowledge** [14] 24/12 31/15 33/5 34/11 34/12 59/14 64/8 64/10 64/11 64/12 66/1 66/4 66/19 80/8
**known** [1] 35/23
**knows** [1] 9/24

**L**

**ladies** [3] 18/9 52/18 87/19
**laptop** [1] 28/15
**last** [10] 4/21 5/21 6/18 18/17 19/24 34/18 38/2 41/13 42/8 48/12
**lasted** [2] 27/2 29/17
**late** [1] 66/14
**later** [4] 23/2 28/3 52/18 64/13
**latter** [1] 67/21
**law** [27] 2/15 4/23 11/8 11/15 11/25 12/15 12/17 13/18 14/9 14/14 14/14 14/17 14/20 20/18 21/23 22/6 35/10 38/12 39/5 42/22

**lay** [1] 35/2
**laying** [1] 47/14
**leader** [2] 20/9 20/22
**leading** [1] 54/4
**learn** [3] 30/6 30/13 30/15
**learned** [7] 30/21 35/10 37/23 38/6 38/11 82/13 82/19
**learning** [1] 85/13
**least** [7] 6/2 6/22 11/6 15/23 39/20 58/7 67/7
**led** [1] 16/6
**left** [19] 30/18 39/12 58/18 59/1 59/5 59/16 59/20 60/22 67/7 67/13 68/7 69/25 70/3 76/21 80/9 80/18 80/19 80/19 91/19
**length** [1] 29/11
**less** [2] 12/8 48/22
**let** [8] 41/12 43/19 51/18 60/8 71/6 75/15 76/15 84/5
**let's** [5] 16/7 16/11 50/14 67/8 80/12
**letter** [2] 41/7 41/7
**lie** [3] 50/9 52/9 52/12
**lies** [1] 49/22
**light** [4] 61/7 8/20 11/4 41/11
**like** [13] 4/19 5/1 5/23 6/1 7/17 12/18 16/4 28/4 35/3 49/11 62/22 83/17 90/8
**likewise** [1] 91/24
**limited** [1] 10/16
**Linda** [1] 63/10
**link** [1] 70/13
**list** [5] 6/9 6/21 9/7 9/16 12/21 15/22
**listen** [1] 64/3
**listening** [4] 73/3 73/6 73/12 75/11
**little** [5] 5/18 12/7 52/18 55/20 55/21
**live** [1] 63/8
**lived** [1] 24/7
**living** [2] 26/8 26/18
**LLP** [2] 35/18 45/4
**locate** [1] 25/16
**located** [3] 26/6 26/15 26/17
**locations** [1] 54/4
**log** [2] 85/23 85/24
**long** [9] 13/23 17/3 19/5 19/10 24/22 51/17 67/17 68/5 70/23
**longer** [6] 67/2 69/16 76/18 79/8 80/5 81/15
**look** [9] 5/17 6/21 10/3 25/13 38/2 44/22 45/19 50/17 59/11
**looked** [1] 10/17
**looking** [1] 83/17
**Los** [3] 2/8 23/12 72/12
**lot** [5] 7/1 15/10 41/17 56/5 56/11
**loveseat** [1] 26/20
**lunch** [3] 70/3 70/7 87/17

**M**

**MA** [1] 62/5
**made** [20] 7/24 10/6 10/8 15/7 17/4 17/14 29/24 31/4 33/16 36/17 44/21 46/5 47/4 53/8 55/12 64/4 68/1 68/10 71/10 88/15
**mail** [13] 11/9 13/24 40/25 41/1 50/23 51/2 51/8 51/11 51/17 51/25 52/5 53/10 53/20 55/19 55/24 56/4 56/9 79/2 79/3 79/4 79/6 79/7 79/22 79/24 80/7 80/16 80/21 83/19 84/9 85/3
**mails** [12] 10/17 10/18 10/19 10/23 11/2 11/9 12/22 13/3 13/4 13/10 13/10 79/15
**maintained** [5] 35/19 35/24 36/10 36/23 39/17
**maintaining** [2] 91/12 91/15
**major** [2] 2/6 23/1 44/8 69/6 81/6 88/9
**make** [16] 5/24 6/2 6/9 7/4 7/15 7/19 7/20 8/2 12/18 12/23 25/13 33/9 46/7 48/1 60/24 90/3
**makes** [1] 7/1
**making** [6] 25/11 30/2 41/13 54/21 90/13 90/18
**manner** [1] 16/5
**many** [5] 6/8 21/2 39/22 48/13 76/1
**March** [23] 20/2 20/14 20/20 21/3 21/21 22/16 31/3 42/24 58/7 58/16 59/23 61/3 66/14 67/8

**lawyer** [2] 73/20 73/25
**lawyers** [1] 73/12

**March 2019** [1] 71/4
**March 22** [1] 77/6
**March 25th** [12] 20/14 20/20 21/3 21/21 22/16 31/3 42/24 59/23 67/8 67/18 72/6 72/6
**March 26** [1] 58/16
**March 26th** [1] 61/3
**Marino** [1] 5/16
**marked** [3] 3/7 3/12 35/6
**material** [2] 9/14 49/25
**materially** [2] 89/3 89/8
**matter** [6] 22/4 35/1 53/18 57/17 89/17 94/9
**matters** [2] 50/9 89/14
**may** [47] 6/1 6/17 16/6 24/16 32/22 33/12 34/14 41/16 41/17 41/18 44/17 51/11 52/4 52/7 53/9 53/19 53/25 54/5 54/13 54/14 54/17 55/2 55/8 55/18 55/22 56/5 56/9 56/18 56/24 56/25 57/1 57/6 57/8 57/18 57/21 61/11 73/8 77/5 78/4 84/16 88/7 89/22 90/16 90/16 91/11
**May 1st** [10] 51/11 53/9 53/25 54/5 54/5 54/13 55/2 55/8 56/9 57/21
**May 2nd** [1] 54/14
**maybe** [5] 56/14 67/19 67/22 75/13 93/10
**me** [35] 6/5 7/3 7/18 8/22 10/13 41/8 41/10 41/11 41/12 42/21 47/10 55/8 58/13 61/1 61/24 64/2 66/9 71/6 72/3 72/7 72/9 72/15 72/18 73/22 75/15 75/24 76/2 76/23 77/11 78/8 78/22 91/1 91/5 91/9 92/15
**mean** [4] 6/22 25/9 84/9 90/22
**Meaning** [1] 57/4
**mechanism** [1] 6/24
**meet** [4] 49/14 49/18 50/8 69/25
**meeting** [8] 50/3 51/21 51/24 84/25 85/6 85/9 85/14 85/16
**meetings** [1] 48/25
**Melinda** [2] 24/3 27/11
**member** [5] 43/9 82/11 83/1 89/9 89/22
**members** [6] 40/12 43/25 44/23 72/1 77/20 90/13
**memo** [1] 36/14
**memorandum** [6] 14/12 14/16 33/10 33/15 45/16 49/10
**memory** [3] 33/16 35/25 36/2
**mention** [1] 39/22
**mentioned** [5] 31/21 33/6 34/10 39/2 39/19
**mentioning** [1] 74/13
**mere** [1] 16/4
**message** [6] 41/2 41/3 41/6 68/16 68/18 68/23
**messages** [3] 66/15 66/19 66/23
**met** [9] 32/13 49/4 50/21 51/7 53/13 63/3 69/21 69/23 76/1
**MICHAEL** [7] 1/11 2/14 4/4 4/9 17/24 18/4 23/13
**mid** [2] 52/20 92/16
**mid-afternoon** [1] 92/16
**mid-morning** [1] 52/20
**middle** [2] 34/18 38/3
**might** [8] 12/5 16/21 28/5 44/24 55/11 89/17 92/15 93/13
**minute** [2] 39/19 54/7
**minutes** [2] 52/21 92/10
**Miramar** [1] 2/16
**miscellaneous** [1] 62/1
**misconduct** [3] 69/7 80/23 81/7
**mislead** [1] 89/14
**misled** [1] 81/7
**mistrial** [2] 9/11 11/16
**mocking** [1] 10/13
**modes** [1] 7/1
**moment** [4] 28/14 32/5 43/5 74/2
**momentarily** [1] 18/7
**moments** [2] 34/8 34/9
**Monday** [2] 72/6 75/1
**money** [1] 65/23
**months** [3] 49/1 62/23 67/19
**more** [13] 5/18 10/18 16/13 21/18 35/2 48/15

**M**

**more... [7]** 48/17 48/23 68/19 68/21 72/19 81/25 91/7
**morning [30]** 4/5 4/8 4/9 4/11 5/11 17/25 18/3 18/4 18/8 18/9 18/10 18/24 18/25 19/20 20/7 20/14 20/20 21/2 21/21 22/16 23/3 24/15 25/17 25/22 31/2 44/5 52/20 57/7 66/14 87/25
**most [7]** 27/4 47/22 47/22 48/2 51/22 81/11 91/16
**motion [6]** 4/13 5/8 5/15 7/24 9/10 92/2
**move [22]** 8/5 21/18 27/20 40/17 42/13 44/13 45/6 45/23 46/20 48/4 56/19 57/13 57/22 58/2 62/8 64/14 65/10 71/14 73/9 77/24 83/22 84/13
**moving [2]** 62/11 62/16
**Mr [4]** 12/4 18/11 69/12 87/2
**Mr. [142]**
**Mr. Amenta [8]** 9/8 9/16 11/7 12/20 12/21 12/24 13/3 13/4
**Mr. Amenta's [1]** 9/10
**Mr. Andre [3]** 38/20 77/16 84/25
**Mr. Arden [3]** 86/20 86/21 86/23
**Mr. Avenatti [11]** 4/14 5/14 7/4 9/12 12/11 16/2 16/19 18/21 34/23 53/5 87/25
**Mr. Avenatti's [1]** 9/9
**Mr. Barela [4]** 86/3 86/16 87/4 87/11
**Mr. Dean [1]** 18/5
**Mr. Drum [8]** 11/7 11/22 11/22 12/20 12/25 46/10 46/25 89/5
**Mr. Ibrahim [1]** 87/10
**Mr. Karlous [2]** 34/17 45/10
**Mr. Kim [3]** 73/12 77/16 85/1
**Mr. Roberson [1]** 34/3
**Mr. Sagel [39]** 17/4 19/17 20/24 21/6 21/9 21/13 23/23 26/3 26/17 27/4 27/14 29/7 32/2 32/13 38/7 38/20 43/9 43/25 44/7 50/22 51/21 51/24 52/4 56/8 59/4 70/8 70/10 70/14 72/1 72/9 74/7 74/12 76/24 77/16 78/23 78/24 79/18 83/19 84/7
**Mr. Sagel's [1]** 69/19
**Mr. Steward [1]** 4/10
**Mr. Stolper [44]** 69/6 69/12 69/16 69/18 69/21 69/25 70/7 70/11 70/15 70/24 71/3 71/7 71/11 71/18 71/21 71/24 72/15 72/24 73/18 73/13 73/15 75/2 75/5 75/17 75/22 76/1 76/5 76/6 77/15 78/7 78/21 79/7 79/10 79/16 79/21 79/24 80/9 80/17 80/18 80/22 83/20 84/12 84/25 85/18
**Mr. Stolper's [4]** 70/13 78/11 79/25 84/9
**Mr. Tashchyan [1]** 47/24
**Mr. Tran [1]** 51/14
**Mr. Weeks [1]** 31/10
**Mr. Wyman [2]** 14/9 19/18
**Ms [85]** 4/10 20/6 20/19 20/23 21/3 21/22 22/10 22/17 22/23 23/11 23/16 23/17 23/20 23/22 24/10 24/25 26/1 26/6 27/17 30/7 31/14 32/11 32/14 32/18 36/4 36/6 36/7 36/9 36/22 37/2 37/10 38/14 39/4 39/8 39/10 39/15 39/19 40/1 44/5 45/11 45/11 45/13 45/20 47/20 48/11 49/4 50/22 51/1 51/7 51/14 51/25 52/3 53/8 53/19 54/17 54/21 55/13 55/18 55/23 56/3 57/18 58/17 59/5 59/20 59/23 59/24 60/16 61/5 61/16 61/23 61/25 62/19 62/23 63/8 63/13 63/20 63/24 64/5 64/17 66/18 66/25 67/10 67/12 77/12
**Ms. [33]** 5/15 5/16 8/13 18/6 18/6 20/3 20/15 24/7 25/17 26/4 26/22 28/15 29/3 29/21 29/24 30/19 31/2 31/21 35/16 44/2 50/22 50/24 51/8 53/14 59/4 60/20 60/21 64/25 74/21 78/19 86/4
**Ms. Ball [7]** 26/4 26/22 28/15 29/3 29/21 29/24 59/4
**Ms. Ball's [2]** 29/19 30/3
**Ms. Carter's [1]** 5/15
**Ms. Cummings-Cefali [1]** 18/6
**Ms. Hernandez [1]** 18/6
**Ms. Jenness [1]** 86/4
**Ms. Judy [1]** 20/3
**Ms. Marino [1]** 5/16

**Ms. Phan [2]** 8/13 50/24
**Ms. Regnier [8]** 28/16 36/16 44/2 50/22 51/8 53/14 64/25
**Ms. Regnier's [7]** 20/15 25/17 30/19 31/2 60/21 74/21 78/19
**Ms. Schabilion [1]** 60/20
**much [4]** 8/22 19/15 65/23 82/4
**multiple [1]** 28/4
**must [1]** 43/18
**my [36]** 6/5 7/11 7/12 7/12 7/22 7/23 8/10 11/11 17/12 33/16 34/12 35/25 39/24 41/17 41/18 42/6 42/22 46/5 47/6 48/16 54/3 54/4 54/10 57/25 58/13 59/10 61/1 64/3 67/16 71/11 76/18 79/8 88/3 90/18 90/19 93/6
**myself [1]** 51/14 78/24

**N**

**name [6]** 18/17 20/11 74/13 74/15 78/22 80/24
**namely [2]** 27/17 42/9
**necessarily [1]** 88/24
**need [10]** 8/23 9/5 9/21 17/12 43/10 44/7 83/7 90/24 93/1 93/2
**needed [1]** 57/2
**never [15]** 10/17 10/17 17/9 22/4 24/25 56/13 56/14 56/16 56/23 63/2 63/7 63/7 66/1 70/19 71/2
**new [13]** 13/7 53/25 54/12 54/12 54/13 54/13 55/8 56/11 67/4 67/5 67/22 67/25 68/5
**Newport [1]** 8/14
**next [8]** 6/5 18/11 40/6 60/16 62/15 64/24 79/8 92/9
**nice [1]** 70/14
**NICOLA [1]** 2/3
**night [3]** 4/21 5/21 19/24
**Ninth [3]** 91/17 91/18 91/18
**no [127]**
**None [3]** 3/5 3/8 3/13
**nonproduction [1]** 91/25
**nonresponsive [5]** 45/7 46/21 56/20 57/14 83/23
**noon [1]** 5/16
**normal [1]** 8/1
**North [1]** 2/7
**not [131]**
**note [2]** 89/6 92/22
**noted [2]** 5/22 90/20
**notes [38]** 27/10 27/12 27/13 27/14 27/15 27/18 28/3 28/5 28/7 28/11 28/15 28/16 28/18 28/20 28/22 29/1 29/11 29/19 29/22 33/16 34/25 36/4 38/22 38/24 39/9 39/24 43/20 43/22 43/24 44/1 61/8 61/22 62/15 63/25 64/4 64/8 64/19 85/6
**nothing [4]** 17/13 40/8 57/17 79/9
**notice [1]** 90/14
**November [8]** 32/2 32/9 33/2 33/15 34/5 35/9 45/17 46/2
**November 19th [7]** 32/2 32/9 33/2 34/5 35/9 45/17 46/2
**November 25 [1]** 33/15
**now [38]** 5/18 6/23 8/16 11/6 14/24 15/3 16/22 20/2 23/16 26/1 26/24 28/13 32/5 47/19 48/11 49/12 50/23 52/15 52/17 52/19 54/15 58/5 58/16 64/21 66/13 68/12 70/5 71/21 72/5 74/5 79/18 81/10 81/15 86/13 90/21 91/20 93/10
**nowhere [2]** 9/21 9/22
**number [6]** 5/25 29/16 48/11 48/16 67/13 67/16
**numbers [1]** 13/20

**O**

**oath [2]** 24/10 86/6
**objecting [1]** 90/5
**objection [20]** 2/19 23/5 25/18 25/23 34/20 41/23 44/10 60/11 64/20 66/6 69/2 69/9 70/16 74/22 76/11 86/12 87/5 87/12 88/1 90/16
**objections [1]** 8/16
**obligation [4]** 13/14 49/18 83/11 83/17

**obvious [1]** 6/6
**obviously [3]** 6/25 40/4 41/2
**occasion [1]** 82/1
**occasions [2]** 11/7 48/12
**occur [2]** 78/25 87/11
**occurred [10]** 6/18 41/16 41/17 41/18 56/13 56/14 56/16 56/23 78/16 87/15
**off [12]** 12/5 40/24 44/4 46/18 46/25 47/2 47/5 47/9 57/8 63/3 63/7
**offended [1]** 50/10
**offense [1]** 50/8
**offered [2]** 34/25 35/1
**offers [1]** 34/16
**office [16]** 23/2 23/6 23/12 69/4 69/15 69/16 69/25 70/4 78/8 78/12 80/1 80/5 80/10 80/18 89/23 90/10
**OFFICES [1]** 2/15
**Okay [13]** 5/13 16/23 16/25 17/19 41/11 42/8 44/4 48/25 57/6 69/18 81/7 91/14 92/5
**old [3]** 47/12 67/24 68/1
**Olson [1]** 91/18
**Once [3]** 70/1 70/3 91/10
**one [34]** 7/24 10/11 16/24 27/18 28/2 28/6 30/19 36/21 37/21 37/22 38/6 38/19 38/22 43/5 47/2 47/25 48/25 55/19 67/10 68/19 68/21 68/24 70/11 72/19 74/2 74/8 75/2 77/22 81/25 82/18 82/19 86/19 88/6 93/3
**online [1]** 81/23
**only [6]** 11/15 12/16 27/17 28/2 28/6 92/6
**open [3]** 7/17 16/6 88/21
**opened [3]** 92/23 93/9 93/11
**opens [1]** 16/2
**operative [1]** 9/24
**opinions [2]** 52/23 87/21
**opportunity [11]** 4/20 5/2 5/10 5/24 7/14 7/15 7/18 15/6 15/13 15/19 23/17
**opposition [4]** 4/12 4/13 4/21 5/14
**option [1]** 11/17
**Orange [1]** 22/11
**order [5]** 6/3 25/13 83/9 88/11 89/20
**ordered [2]** 15/8 88/13
**orders [2]** 88/12 88/12
**other [27]** 6/16 6/17 9/20 11/7 11/25 13/10 13/19 16/24 21/12 21/22 40/12 43/9 43/25 52/4 55/14 62/5 62/6 64/10 64/11 71/17 72/1 77/22 79/15 80/20 89/18 89/18 93/12
**others [4]** 16/14 38/7 53/19 86/23
**otherwise [2]** 14/9 93/10
**our [5]** 13/7 16/9 28/8 31/12 47/10
**ourselves [1]** 28/4
**out [24]** 6/5 14/11 14/15 17/6 39/12 40/6 55/12 55/19 57/25 59/6 59/8 59/8 59/15 60/20 62/22 62/25 64/13 69/7 85/12 85/22 86/1 86/17 86/19 91/19
**outside [7]** 24/20 25/3 25/5 25/6 73/8 84/2 92/23
**over [7]** 6/5 35/23 42/8 62/13 62/18 63/21 81/24
**overall [1]** 9/15
**overhead [1]** 22/12
**Overruled [9]** 23/7 41/25 44/11 60/13 66/8 69/3 70/18 76/13 87/7
**own [3]** 6/19 29/5 80/20

**P**

**p.m [6]** 5/3 5/7 32/14 35/16 51/12 93/16
**page [7]** 15/7 34/18 34/19 34/19 38/2 38/3 94/10
**pages [2]** 15/10 29/13 29/16
**paper [1]** 15/10
**paragraph [1]** 33/1
**paragraphs [1]** 45/19
**part [5]** 5/10 17/17 28/8 51/9 67/21 75/3 75/4 76/16 88/16
**parte [3]** 7/7 90/6 90/11
**particular [5]** 51/8 53/24 54/3 88/24 89/6
**particularly [1]** 89/18
**parties [1]** 91/1
**parties' [1]** 91/6

## P

party [2]  6/8 78/5
pass [1]  92/13
passages [1]  91/7
Pause [2]  43/6 74/3
pay [2]  11/24 89/23
pendency [1]  66/13
people [7]  6/21 21/2 28/4 46/18 47/10 50/8 82/7
perceive [1]  8/1
percent [1]  75/6
perhaps [1]  55/23
period [8]  24/25 56/4 56/9 59/20 67/8 68/12 68/20 68/23
permissible [1]  8/20
permission [2]  92/25 93/5
permitted [3]  6/4 11/15 59/25
person [10]  27/18 28/2 28/7 31/12 68/4 75/4 78/22 79/1 79/5 81/23
person's [2]  74/13 74/15
personal [2]  62/4 64/12
personally [6]  41/8 41/10 41/11 54/19 55/15 66/9
pertaining [1]  58/23
Phan [2]  8/13 50/24
phone [28]  38/17 39/19 41/9 54/3 54/10 55/5 63/16 63/21 66/24 67/2 67/3 67/5 67/6 67/10 67/12 67/17 67/22 67/24 67/25 68/1 68/5 68/6 68/8 68/10 78/25 79/5 86/4 86/25
phones [2]  67/4 67/7
physically [4]  26/6 53/22 55/18 55/25
pick [5]  60/21 62/23 62/25 63/17 63/21
picked [3]  63/2 63/7 70/4
piece [1]  54/18
pieces [1]  55/4
pinpoint [1]  81/24
place [5]  14/8 41/9 48/25 74/25 88/11
placed [1]  62/15
Plaintiff [1]  1/10 2/2
PLAINTIFF'S [2]  3/4 3/6
plan [1]  6/5
planning [1]  20/7
played [1]  71/21
please [20]  18/12 18/16 27/22 31/8 35/4 38/2 40/19 42/15 43/5 44/16 48/6 50/14 51/1 52/22 54/8 62/21 62/24 87/20 87/22 90/2
plus [5]  21/12 50/7 59/3 81/13 81/17
point [12]  7/25 8/10 15/16 28/11 28/18 28/22 30/13 39/9 41/3 47/4 78/24 89/4
policy [3]  28/8 28/9 39/1
portion [2]  53/9 76/23
posed [1]  73/12
position [4]  12/1 15/1 17/11 90/20
possession [8]  10/1 10/25 13/8 37/7 52/11 53/13 53/21 53/24
possibility [1]  56/1
possible [10]  5/24 8/4 8/8 52/9 53/22 56/16 57/19 59/15 78/4 85/11
possibly [9]  41/20 41/21 41/22 62/9 67/14 79/2 79/3 79/19 85/10
potential [1]  83/9
potentially [1]  60/9
power [1]  82/12
powerful [2]  82/20 82/24
practice [4]  27/19 50/1 67/15 70/5
preceding [3]  72/10 72/11 74/9
precluded [1]  7/11
prefer [1]  13/14
preferably [1]  8/18
preference [2]  92/22 93/6
prejudicial [1]  93/13
preliminary [1]  6/14
premises [1]  25/16
preparation [6]  19/18 19/21 19/25 30/3 48/20 51/6
prepare [2]  19/14 20/21
prepared [7]  12/3 21/1 29/25 33/10 33/12 33/15 33/19
presence [1]  8/4

present [18]  4/2 4/10 7/13 8/18 9/6 17/22 18/3 20/2 27/11 29/1 30/23 42/25 53/4 55/17 70/8 75/16 87/24 91/1
presents [2]  7/4 14/11
PRESIDING [1]  1/8
press [7]  23/1 23/8 23/13 89/9 90/6 90/8 90/13
Pretty [1]  82/16
prevail [1]  90/15
previously [3]  10/7 12/6 76/24
price [2]  11/24 91/18
prior [4]  71/2 71/11 71/18 93/7
prison [1]  49/24
private [3]  70/5 73/22 73/25
PRO [1]  2/14
probably [5]  5/6 12/9 12/14 38/19 91/19
probative [1]  88/23
problem [4]  8/25 10/13 11/23 14/20
problems [1]  10/12
Procedure [1]  90/5
proceed [3]  8/1 9/1 90/2
proceeding [3]  72/14 72/19 88/25
proceedings [7]  1/15 17/21 43/6 53/3 74/3 88/20 94/9
process [4]  7/12 8/10 48/3 90/19
produced [13]  10/7 10/10 10/18 11/6 11/11 11/19 12/6 13/25 14/5 17/9 17/10 17/10 91/16
production [1]  91/25
proffer [5]  5/24 6/2 6/9 6/19 7/16
profile [1]  80/24
program [1]  37/24
programs [1]  45/3
promptly [1]  5/18
pronounce [1]  60/17
proposition [1]  49/13
propositions [1]  5/1
prosecute [1]  75/24
prosecuted [1]  76/2
prosecution [5]  13/14 44/9 72/2 81/6 83/4
prosecutor [6]  69/4 69/6 69/24 73/16 75/20 81/6
prosecutorial [1]  80/22
prosecutors [2]  38/19 76/1
proven [1]  11/6
provided [3]  9/20 75/23 75/25
public [6]  88/1 88/17 88/21 89/9 89/14 89/22
public's [1]  89/2
pulled [1]  46/18
punishable [1]  49/23
purpose [1]  35/17
purposefully [1]  50/11
purposes [1]  37/15
pursuant [1]  94/6
put [8]  5/14 5/16 28/22 50/23 51/17 62/18 91/9 91/23

## Q

quality [1]  88/19
quarter [3]  78/9 78/12 85/3
quash [1]  5/15
question [27]  11/10 11/12 16/9 30/8 34/21 38/5 41/17 41/18 42/6 44/15 47/6 54/8 57/25 64/3 64/3 65/23 68/21 71/6 74/23 75/12 75/13 75/14 86/13 90/24 92/6 92/24 93/8
questioning [6]  8/17 8/19 74/13 74/15 75/4 78/16
questions [18]  11/14 16/2 16/10 16/17 26/3 26/4 27/7 35/17 36/22 37/11 38/18 51/22 57/11 72/15 72/19 73/12 77/11 77/17
QuickBooks [13]  39/22 45/11 45/14 45/21 46/3 46/6 46/10 46/14 46/24 47/11 47/14 47/20 48/2
quite [1]  10/5
quote [2]  12/12 62/4 62/4
quoting [1]  70/14

## R

R-e-m-o-u-n [1]  18/18
raise [3]  8/3 16/20 90/1

read [22]  9/8 27/22 27/24 30/9 30/12 33/21 33/24 40/25 40/1 44/06 41/09 42/17 44/15 44/18 48/6 48/8 51/19 74/8 75/3 77/1 84/16 84/19 85/6
reading [2]  39/24 85/7
reads [1]  51/17
Reagan [1]  2/10
really [6]  6/16 6/23 55/22 86/1
reason [16]  6/16 14/3 14/6 28/2 28/6 28/9 36/2 39/2 40/4 56/23 60/3 65/4 65/5 65/14 75/7 80/20
reasons [5]  36/21 60/14 82/18 82/20 89/20
recall [72]  14/19 14/24 17/3 20/12 21/2 23/4 23/8 23/15 24/5 26/21 29/11 29/15 29/20 29/21 30/1 30/2 30/5 31/19 32/1 32/7 32/15 32/17 33/12 37/17 37/18 38/1 38/15 39/12 40/7 40/14 41/1 41/2 43/12 43/13 43/15 45/15 46/9 49/1 49/4 49/6 49/12 51/6 51/9 53/10 53/16 58/8 58/16 58/17 58/21 61/5 61/6 61/8 61/9 61/21 65/1 65/2 65/3 67/16 67/19 67/20 72/10 72/12 74/7 74/12 74/14 79/23 81/1 81/22 82/3 85/7 85/13 85/15
recalled [1]  66/18
receive [3]  81/18 81/21 81/25
received [6]  3/7 3/12 15/23 30/16 79/7 79/24 83/19 87/13
recess [7]  17/19 17/20 52/21 53/2 87/19 93/15 93/16
recollection [21]  32/9 33/1 34/22 38/4 40/9 40/24 41/19 41/21 41/22 43/16 44/6 45/10 45/13 45/20 46/5 49/11 50/21 58/25 61/15 77/11 79/4
record [16]  6/3 6/20 7/15 7/19 7/22 13/12 17/14 27/24 30/12 39/15 40/21 42/17 43/19 44/18 48/8 84/19
records [25]  30/17 37/24 38/8 38/15 39/5 42/20 42/21 44/15 45/21 46/4 46/8 46/10 46/14 46/24 47/8 55/5 58/23 59/5 60/25 62/5 62/6 65/6 61/5 61/4 70/4
RECROSS [2]  3/4 3/9
REDIRECT [2]  3/4 3/9
Ref [1]  13/5
referred [1]  70/10
referring [3]  13/10 13/11 13/13 63/5 74/17 76/4
reflect [4]  43/19 43/24 44/1 61/22
reflected [2]  63/24 64/7
refresh [6]  33/1 40/8 49/11 61/14 77/4 77/10
refreshes [4]  35/25 36/2 38/3 45/20
refreshing [1]  33/16
refuse [1]  37/11
regard [6]  5/20 9/6 9/8 13/2 90/25 91/2
regarding [1]  35/17
regardless [1]  17/8
Regnier [74]  20/3 22/10 22/17 22/23 23/17 23/22 24/7 24/10 24/25 26/1 26/6 31/21 32/1 32/14 32/18 33/17 35/16 36/4 36/6 36/7 36/9 36/22 37/2 37/10 38/14 39/4 39/8 39/10 39/15 39/19 40/1 44/2 44/5 45/1 45/11 45/13 45/20 47/20 48/11 49/4 50/22 50/22 51/7 51/8 51/14 51/25 52/3 53/8 53/14 53/19 54/17 54/21 55/13 55/18 55/23 56/3 57/18 58/17 59/24 60/16 61/5 61/16 61/23 61/25 62/6 63/3 63/8 63/20 63/24 64/5 64/17 64/25 66/25 67/12
Regnier's [27]  20/6 20/15 20/19 20/23 21/3 21/22 23/11 23/16 23/20 24/25 25/17 27/17 30/7 30/19 31/2 31/14 59/5 59/20 59/23 60/21 62/22 63/13 66/18 67/10 74/21 77/12 78/19
regularly [1]  9/4
regulations [1]  94/11
relate [1]  91/25
related [4]  33/6 58/12 62/6 90/1
relates [3]  11/7 11/22 13/18
relating [13]  5/24 6/1 8/17 10/20 30/3 42/21 43/10 50/24 53/8 60/25 65/19 72/2 84/8
relationship [1]  84/2
relevant [2]  88/7 88/23
remedies [1]  12/16
remedy [1]  12/18

**R**

**remember [6]** 26/13 32/5 32/6 52/22 74/10 87/20
**remembering [1]** 29/21
**remotely [1]** 83/17
**REMOUN [6]** 3/10 4/7 18/2 18/14 18/15 18/18
**removed [3]** 30/6 31/1 31/14
**repeatedly [2]** 11/4 90/24
**Rephrase [1]** 74/23
**reply [3]** 5/2 5/17 9/9
**report [10]** 28/21 28/23 28/23 28/25 29/2 29/8 29/24 30/4 30/18 33/25 33/25
**reported [1]** 94/8
**reporter [2]** 31/8 94/16
**REPORTER'S [1]** 1/15
**represent [1]** 72/8
**representation [1]** 17/4
**represented [1]** 76/17
**representing [1]** 76/9
**represents [2]** 76/5 76/7
**request [5]** 16/24 89/23 90/3 90/18 91/23
**requests [1]** 90/14
**required [1]** 91/16
**requirement [2]** 14/4 14/8
**requires [1]** 14/21
**requiring [1]** 22/18
**research [2]** 52/25 87/23
**reserve [4]** 4/16 12/24 12/25 13/7
**residence [19]** 20/15 20/19 20/23 21/4 22/18 22/23 22/24 24/21 24/22 25/22 30/7 30/18 30/19 30/20 30/22 31/2 58/22 60/21 62/22
**respect [4]** 7/9 88/13 89/16 91/6
**respond [1]** 12/2 15/6 15/19
**response [3]** 12/4 12/12 39/16
**responsible [1]** 20/9
**rest [2]** 37/21 44/22
**results [2]** 11/15 51/18
**resumed [2]** 17/21 53/3
**retrieve [1]** 59/1
**revealed [1]** 88/24
**Revenue [1]** 81/18
**review [5]** 19/21 19/24 28/18 28/20 29/3
**reviewed [3]** 29/1 29/5 29/7
**reviewing [2]** 35/12 35/25
**right [94]** 6/23 7/12 7/12 11/6 16/22 21/9 22/3 23/3 23/23 24/8 24/12 24/18 25/14 26/25 27/8 27/12 27/14 27/18 28/23 29/1 29/17 29/25 31/24 32/6 34/3 36/4 36/7 36/17 36/25 37/4 37/25 38/12 38/22 39/2 39/17 42/22 42/25 43/3 43/20 44/2 47/8 47/19 48/15 49/24 50/5 50/10 50/12 53/15 54/15 56/6 56/11 56/24 57/2 57/4 58/7 59/9 60/10 60/22 61/19 62/6 64/19 65/8 65/16 66/20 67/1 67/21 69/16 70/5 72/6 73/13 73/25 75/5 75/11 76/6 76/18 76/21 78/14 78/16 78/19 79/13 79/19 79/25 81/15 82/14 82/16 82/21 83/9 84/5 85/1 85/4 86/1 87/4 90/10 90/19
**rights [1]** 90/19
**risk [1]** 22/23
**Roberson [5]** 32/10 32/13 33/13 34/3 49/5
**Robert [1]** 24/25
**role [3]** 23/16 23/20 71/21
**Ronald [1]** 2/10
**room [2]** 26/8 26/18
**RPR [1]** 1/19
**rule [8]** 4/12 5/3 5/8 5/17 90/4 90/4 90/18 91/16
**Rule 29 [1]** 5/3
**rules [1]** 8/20
**ruling [3]** 6/15 17/15 89/24
**run [1]** 8/8

**S**

**SACR [3]** 1/11 4/3 17/23
**SACR-19-00061-JVS [1]** 1/11 4/3 17/23
**safe [2]** 25/11 25/14
**safety [1]** 60/14
**SAGEL [51]** 2/9 4/5 17/4 17/25 19/17 20/24 21/6 21/9 21/13 23/23 26/3 26/17 27/4 27/14

29/7 32/2 32/13 33/2 35/15 35/22 36/18 37/22 36/7 88/20 41/24 44/23 45/6 50/23 50/22 51/21 51/24 52/4 53/19 56/8 59/4 69/12 70/8 70/10 70/14 72/1 72/9 74/7 74/12 76/24 77/16 78/23 78/24 79/18 83/19 84/7
**Sagel's [1]** 69/19
**said [22]** 6/14 13/20 26/24 27/5 37/15 39/10 39/12 39/15 40/3 53/14 55/22 56/18 56/24 57/1 57/8 63/19 71/4 71/13 79/18 84/24 86/25 88/16
**same [6]** 11/21 19/12 26/18 69/9 87/10 87/12
**San [1]** 2/16
**Santa [4]** 1/16 1/20 2/11 4/1
**sat [2]** 19/15 22/10
**saw [3]** 25/2 25/3 25/5
**say [14]** 6/10 10/8 12/14 14/24 15/24 15/25 22/13 25/9 56/14 78/9 79/3 82/5 83/24 83/25
**saying [2]** 13/4 70/14
**says [1]** 33/14
**Schabilion [3]** 60/17 60/19 60/20
**schedule [1]** 8/23
**scheduled [1]** 23/2
**scope [1]** 16/3
**screen [2]** 50/18 55/20
**scrutiny [2]** 88/17 88/21
**SE [1]** 2/14
**seal [1]** 89/19
**sealing [3]** 88/11 88/12 88/12
**search [24]** 20/15 20/19 20/20 20/25 21/1 21/7 21/8 21/16 32/8 45/5 47/3 58/17 59/24 60/4 60/5 60/8 63/8 67/9 70/23 72/18 73/2 74/20 75/1 78/18
**searched [1]** 77/12
**seated [1]** 26/9
**second [3]** 34/18 38/2 70/3
**Section [2]** 2/6 94/6
**see [13]** 12/21 16/7 16/11 22/8 29/19 38/3 39/24 45/19 46/3 51/4 51/15 54/21 63/21
**seeing [1]** 21/2
**seeking [1]** 91/21
**seems [1]** 7/3
**seen [1]** 22/4
**SEFFENS [3]** 1/19 94/15 94/16
**SELNA [1]** 1/8
**send [3]** 41/6 41/7 63/21
**sending [3]** 40/25 41/1 41/2
**sent [5]** 13/4 13/24 51/25 52/5 55/25
**separate [1]** 91/9
**separated [3]** 24/7 24/11 24/14
**serious [4]** 10/19 49/23 50/4 50/8
**seriously [1]** 49/18
**server [10]** 35/18 35/19 35/24 46/19 46/25 47/5 47/5 47/6 47/9 47/16
**servers [3]** 36/11 36/23 37/4 37/8 37/13 37/25 38/8 39/17 40/2 40/15 41/15 45/4 46/4
**Service [1]** 81/18
**set [2]** 11/24 12/10
**seven [5]** 62/1 62/25 63/5 63/16 64/1
**several [2]** 29/13
**shaking [1]** 72/11
**SHARON [3]** 1/19 94/15 94/16
**she [56]** 5/16 8/16 8/18 22/23 23/18 24/11 24/14 24/14 26/4 26/5 26/9 28/16 28/21 28/22 28/25 37/11 37/15 39/6 39/6 39/12 39/24 40/3 45/2 45/22 52/8 53/14 55/22 55/24 56/7 56/13 56/18 56/24 57/1 57/18 58/1 58/21 59/21 60/3 61/7 61/24 61/25 62/1 62/3 62/8 62/8 62/9 62/11 62/12 62/13 62/18 63/3 63/7 63/19 64/2 66/18 66/19 **she's [2]** 8/21 8/24
**sheriff's [1]** 22/11
**shortcut [1]** 91/12
**shortly [1]** 70/3
**should [10]** 11/1 11/24 13/25 14/1 15/24 57/13 69/18 75/14 76/14 82/7
**show [2]** 53/14 76/23
**showed [6]** 20/14 20/23 21/21 22/16 22/22 53/25
**showing [6]** 9/15 12/12 53/21 54/4 54/11

55/13
**shows [1]** 55/8
**shredded [1]** 63/17
**side [1]** 6/17
**sidebar [2]** 93/1 93/2
**sign [1]** 34/1
**signature [1]** 33/20
**signed [1]** 33/10
**significant [1]** 88/18
**simple [2]** 9/24 11/9
**since [2]** 64/14 67/7
**single [6]** 40/14 62/23 68/23 68/24 91/6 91/23
**sir [47]** 4/22 5/13 7/24 8/22 12/1 15/1 15/18 17/11 19/25 21/21 22/22 25/21 28/11 32/25 33/14 38/6 39/8 40/6 41/18 42/19 43/16 44/9 45/1 46/24 47/9 50/19 54/10 55/1 57/11 57/17 63/18 64/3 64/12 64/17 66/4 70/25 71/3 75/9 76/23 78/2 80/7 80/16 81/8 84/2 86/16 90/23 92/24
**sit [7]** 6/23 37/18 40/11 40/13 42/3 43/13 55/1
**site [2]** 20/10 26/24
**sitting [8]** 13/15 26/19 47/19 54/15 72/20 73/3 74/5 75/10
**situation [1]** 12/18
**six [12]** 24/23 24/24 26/25 27/2 29/11 29/17 62/1 62/25 63/5 63/16 63/25 67/19
**six-hour [2]** 24/24 29/11
**Sixth [1]** 7/13 90/4 90/5 90/18
**smoothly [1]** 8/8
**so [82]** 5/1 5/17 7/8 7/12 7/16 7/25 8/4 9/17 10/14 11/8 11/22 12/14 12/19 14/6 14/22 15/16 15/25 16/6 16/8 16/16 20/23 20/25 21/8 22/3 23/11 24/10 24/14 28/10 28/19 28/22 29/24 31/22 32/20 33/8 36/6 36/15 38/20 38/21 39/21 39/25 45/12 48/3 50/4 52/23 54/2 54/6 55/3 59/8 60/2 61/3 61/22 61/23 65/6 66/17 66/18 66/21 66/22 66/24 67/21 68/17 69/20 71/4 72/7 72/13 73/14 73/15 75/6 77/22 78/4 78/11 79/5 79/20 81/17 82/20 83/15 85/13 85/25 90/18 90/23 91/8 92/15
**Sofa [1]** 26/20
**solution [1]** 90/25
**some [20]** 4/23 4/24 6/3 6/4 6/15 6/21 6/22 7/21 9/20 15/16 16/13 26/3 28/22 30/13 30/22 58/18 68/16 74/8 78/24 80/20
**somebody [3]** 83/4 85/22 86/20
**somebody's [1]** 47/15
**somehow [2]** 13/7 55/25
**someone [5]** 6/8 31/22 57/6 63/21 83/8
**something [2]** 12/12 12/14 42/8 54/24
**somewhat [1]** 6/13
**somewhere [2]** 47/15 85/25
**soon [3]** 12/14 51/18 52/8
**sorry [1]** 6/10
**sought [1]** 89/14
**SOUTHERN [1]** 1/6
**speak [1]** 23/17
**special [38]** 4/7 15/23 18/2 18/14 18/24 19/9 23/20 27/11 31/7 31/17 32/10 32/12 32/13 33/13 33/21 35/6 35/14 35/21 35/21 36/18 40/9 43/8 44/2 45/2 49/5 49/13 50/17 51/4 53/7 57/6 60/17 61/14 65/13 73/3 75/9 75/13 75/21 77/10
**specific [3]** 7/6 12/10 35/17
**specifically [6]** 32/1 33/3 50/22 88/3 89/1 89/4
**specifics [1]** 43/15
**spell [2]** 18/16 31/8
**spending [1]** 56/5 56/10
**spoke [2]** 37/10 64/17
**sponte [1]** 93/3
**spring [2]** 2/7 56/10
**stand [10]** 4/25 8/13 8/17 8/19 14/2 24/10 41/4 44/6 74/8 88/24
**started [2]** 16/5 16/5 63/16
**state [2]** 18/16 31/22
**stated [7]** 14/10 15/1 24/14 28/10 83/21 87/4 87/11

**S**

statement [4]  6/12 33/21 53/8 89/1
statements [6]  9/25 10/21 10/21 11/18 11/20 88/14
states [19]  1/4 1/9 1/19 2/3 2/4 2/6 2/7 2/10 4/4 4/6 6/19 17/24 18/1 19/4 82/21 82/24 88/3 94/7 94/11
statute [2]  11/16 11/25
statutes [1]  9/23
stenographically [1]  94/8
steps [4]  46/2 47/21 59/15 84/7
STEWARD [4]  2/15 2/15 4/10 18/5
still [7]  9/24 10/19 10/25 11/19 15/15 15/15 45/16
Stolper [46]  69/1 69/6 69/12 69/16 69/18 69/21 69/25 70/7 70/11 70/15 70/24 71/3 71/7 71/11 71/18 71/21 71/24 71/25 72/15 72/18 73/13 73/15 75/2 75/5 75/17 75/22 76/1 76/5 76/6 77/13 77/15 78/7 78/21 79/7 79/10 79/16 79/21 79/24 80/9 80/17 80/18 80/22 83/20 84/12 84/25 85/18
Stolper's [4]  70/13 78/11 79/25 84/9
stored [2]  37/4 37/12
story [2]  56/4 86/7
straightforward [1]  9/25
strategize [1]  14/6
Street [3]  1/20 2/7 2/11
stricken [16]  21/19 27/21 40/18 42/14 44/14 45/8 45/24 48/5 56/21 57/15 58/3 64/15 65/11 71/15 73/10 84/15
strike [31]  9/10 20/17 21/18 27/20 28/15 29/10 40/17 42/13 44/13 45/6 45/23 46/20 48/4 55/20 56/19 57/13 57/22 58/2 64/3 64/14 65/4 65/10 66/13 71/14 71/25 73/9 75/13 77/24 82/18 83/22 84/13
striking [1]  11/16
stuff [1]  82/16
sua [1]  93/3
subject [3]  17/14 88/10 91/13
subjects [1]  7/5
submit [2]  5/2 14/13
submits [1]  14/15
submitted [2]  52/24 87/22
subpoena [1]  5/15
subsequent [1]  84/24
substance [2]  39/15 64/4
such [5]  37/18 42/3 43/13 88/12 89/23
sufficiently [1]  8/24
suggest [1]  16/20
suggesting [2]  13/6 13/9
suggestions [1]  30/3
Suite [3]  1/20 2/11 2/16
summaries [2]  10/11 46/11
summary [2]  10/15 36/3
supervisor [3]  83/7 84/10 84/14
supplement [3]  4/14 12/6 92/2
supplemental [1]  91/1
support [2]  5/2 13/8
supported [1]  6/20
supposed [3]  83/1 83/3 83/6
sure [13]  13/10 28/12 29/18 30/16 43/15 48/1 54/16 55/6 60/24 72/9 74/17 75/6 91/19
surgical [1]  16/13
surprise [1]  22/3
sustained [7]  8/16 22/20 25/19 25/24 64/22 69/10 86/14
SWORN [1]  18/15
systems [1]  32/18

**T**

table [4]  4/7 13/16 18/2 26/19
Tabs [38]  17/1 17/9 31/18 31/20 31/23 32/3 33/3 33/6 34/10 35/10 35/13 38/1 38/24 38/8 38/11 39/6 39/20 40/1 40/13 40/15 40/16 40/25 41/5 41/14 43/10 44/8 44/22 46/7 61/8 66/2 66/5 90/22 91/3 91/7 91/12 91/15 91/22 91/25
taint [3]  42/12 46/5 48/3
tainted [1]  93/12

take [22]  5/8 5/10 15/6 15/18 15/21 16/17 17/22 18/20 20/9 20/14 36/2 45/19 45/24 47/14 47/21 49/18 50/8 52/17 52/20 59/14 87/17 90/23
taken [14]  16/21 17/20 28/5 30/17 30/17 30/20 30/21 31/2 31/11 47/3 53/2 84/7 92/22 93/16
takes [1]  67/21
taking [3]  38/22 38/24 39/9
talk [4]  8/14 13/13 28/13 67/8
talking [5]  26/2 27/4 44/4 74/19 74/25
tamper [1]  60/9
target [3]  60/8 60/12 83/5
Tashchyan [1]  47/24
team [20]  20/9 20/22 21/7 21/8 36/12 37/22 40/13 41/13 42/12 43/10 43/25 44/23 46/5 54/20 72/2 73/8 77/20 84/8 84/11 85/17
tech [1]  68/4
telephone [2]  61/4 61/9
tell [7]  8/22 47/4 49/15 50/3 62/21 62/24 86/5
temporal [2]  14/4 14/8
ten [4]  29/14 48/17 48/22 65/7
terminated [4]  71/11 71/18 76/6 76/10
termination [2]  76/12 76/16
testified [10]  8/21 22/10 24/10 34/8 34/9 46/10 58/5 58/12 74/10 86/3
testify [5]  19/14 19/25 67/1
testimony [27]  8/3 8/6 9/11 17/5 19/18 19/22 22/12 23/14 24/24 46/12 46/24 47/1 52/13 53/12 57/12 58/10 63/13 63/15 63/18 66/18 68/18 68/22 71/3 73/4 73/11 80/7 80/16
text [10]  41/2 41/2 41/6 66/15 66/19 66/23 66/25 68/16 68/18 68/23
than [10]  10/19 12/8 16/13 21/12 48/15 48/17 48/22 48/23 71/17 81/25
Thank [7]  5/13 9/2 15/2 18/20 56/19 80/14 92/20
that [572]
that's [45]  4/22 6/16 6/24 7/16 9/1 10/2 10/5 10/15 10/24 11/16 11/17 11/24 13/17 14/8 14/14 14/20 14/20 15/16 16/9 16/18 19/15 20/5 27/5 27/19 32/8 33/9 40/3 44/25 45/5 50/12 55/20 59/10 60/8 63/19 69/17 77/2 78/13 78/14 83/18 85/11 89/24 91/20 92/4 92/18 92/19
their [3]  11/23 11/23 11/23
them [24]  6/1 6/22 7/22 10/13 28/23 31/6 46/6 46/8 47/25 49/22 62/9 62/9 62/9 62/11 62/12 62/12 62/17 62/17 63/2 63/7 65/7 85/7
then [11]  6/9 14/18 33/20 38/14 61/4 67/17 67/22 68/5 78/23 85/25 87/2
there [61]  6/1 10/2 11/0 11/15 11/17 11/25 14/3 14/18 16/8 17/13 17/15 20/9 21/11 21/24 22/6 22/11 22/23 23/8 24/1 24/16 25/7 28/5 28/10 29/13 29/16 29/18 29/20 30/16 37/15 40/1 45/3 45/17 46/3 46/6 46/7 48/3 50/4 50/19 55/11 55/12 57/2 58/22 72/24 73/1 73/8 73/12 78/2 78/4 79/4 79/15 79/23 83/15 83/16 84/24 85/23 85/24 85/25 88/9 89/14 90/24 90/25
there's [3]  10/6 13/8 67/7
these [14]  6/21 7/21 12/22 29/11 34/24 48/12 62/3 62/16 62/25 63/5 63/25 64/12 64/18 64/25
they [39]  4/23 4/24 7/25 10/3 10/6 10/10 10/15 10/17 10/17 11/0 11/10 11/11 11/18 11/24 13/14 13/21 16/21 20/25 25/11 25/12 25/13 25/16 31/2 41/18 49/15 50/3 50/9 69/15 74/8 74/12 76/21 83/4 83/18 83/21 84/2 85/22 86/19 91/4 92/13
they're [4]  5/1 7/23 10/21 69/15
thing [5]  11/21 25/13 38/1 40/14 87/10
things [8]  29/21 30/21 37/21 37/22 38/6 41/17 70/14 86/19
think [21]  6/20 8/23 8/25 9/5 10/8 11/10 16/22 27/5 31/21 33/19 38/21 55/23 56/1 57/1 57/10 71/13 82/22 87/17 91/2 93/8
third [1]  34/19

this [104]
whose [28]  5/7 5/8 6/2 6/9 ... 11/6 11/7
12/16 13/4 16/10 20/21 31/1 43/2 43/24 44/1 46/14 47/8 48/25 59/16 63/16 64/8 89/8 89/11 89/20
thought [2]  20/24 37/15
thoughts [1]  6/7
three [4]  10/7 72/17 73/1 77/12
through [10]  8/5 19/15 25/11 44/5 66/14 79/18 79/19 89/5 90/9 90/10
thrown [1]  69/7
Thursday [1]  5/8
thus [1]  22/18
time [46]  5/18 8/22 9/5 13/23 14/18 15/21 17/3 17/14 24/16 24/24 26/7 27/7 27/7 28/18 31/13 31/17 33/6 35/9 37/23 38/7 39/14 41/3 52/10 52/15 53/18 56/3 56/4 56/5 56/9 56/11 56/15 59/20 60/6 64/24 67/8 67/15 68/12 68/20 68/22 70/4 72/22 73/15 84/5 86/6 92/7 92/22
times [3]  39/22 42/24 48/14 76/1 83/16
title [4]  19/8 19/10 19/12 94/7
today [5]  15/23 16/20 17/5 17/6 19/14 19/19 19/22 37/18 40/11 40/13 41/4 42/3 43/13 55/1 67/9 71/2
together [12]  9/3 9/4 9/5 21/22 22/3 34/3 38/7 51/7 69/15 83/21 84/3 92/13
told [36]  8/15 17/6 32/1 33/3 40/11 45/1 45/2 45/22 52/8 52/12 53/19 54/17 54/21 55/13 55/18 56/3 56/7 56/13 57/18 58/21 61/7 61/25 62/3 62/8 62/11 62/16 63/24 64/2 64/5 64/18 65/15 86/6 86/16 86/23 87/10 92/7
ton [1]  62/5
tonight [1]  5/3
took [13]  14/2 27/10 27/12 27/13 27/14 27/15 28/22 31/4 41/4 44/5 48/25 61/18 74/25
top [1]  34/19
topic [1]  75/15
totality [1]  64/18
trace [2]  51/18 89/7
track [2]  32/19 35/11
trained [5]  82/5 82/6 82/10 82/19 83/11
training [4]  81/18 81/21 81/25 82/3
Tran [1]  51/14
transcript [11]  1/9 1/15 74/9 74/17 74/19 75/3 76/23 76/25 77/6 94/8 94/10
trash [1]  62/9
trashing [2]  62/12 62/17
Treasury [5]  19/4 19/5 81/10 82/24 83/2
trial [30]  1/12 14/1 14/19 19/15 28/10 31/20 31/22 41/4 48/20 49/15 51/6 54/22 58/7 63/16 71/13 71/17 74/7 74/24 76/24 86/3 88/2 88/13 88/20 88/20 89/2 89/4 89/4 89/16 89/16 89/22
trials [1]  7/2
true [41]  4/22 10/5 11/21 17/6 24/15 24/16 25/21 28/7 28/11 35/9 35/19 35/21 37/19 37/20 40/5 42/4 43/14 44/3 44/24 44/25 45/1 48/12 52/6 54/1 54/5 54/14 54/22 55/2 55/5 55/14 60/6 69/8 69/12 69/18 77/22 78/5 83/13 86/17 86/20 86/24 87/14
truth [5]  34/25 49/16 50/3 54/25 87/14
truthful [1]  58/10
trying [3]  8/7 55/23 85/12
Tuesday [1]  51/11
turn [4]  67/4 67/6 68/3 68/8
turned [1]  67/25
Twenty [1]  81/13
Twenty-five-plus [1]  81/13
twice [3]  39/20 64/20 70/1
two [23]  9/23 10/21 11/2 11/6 11/9 11/14 11/15 12/16 13/15 32/2 32/17 33/24 35/23 40/11 41/13 42/8 48/12 49/1 55/4 67/7 68/12 68/22 88/9
two-year [2]  68/12 68/22
type [1]  10/15
typed [3]  53/20 54/17 55/19
typewritten [5]  10/11 28/23 28/25 29/7 36/3
typing [2]  28/21 52/5

**U**

ultimately [1] 90/15
unaware [1] 27/15
uncertain [1] 58/1
unconvinced [1] 88/17
under [23] 6/15 6/25 7/12 8/20 10/22 11/8
11/15 13/17 24/10 33/21 76/21 80/4 80/9 86/5
89/19 90/4 90/12 90/18 91/16 91/16 91/17
91/17 93/14
understand [8] 14/17 17/11 37/16 65/24
68/21 75/12 76/5 76/8
understanding [7] 6/13 20/18 25/5 30/25
59/10 65/18 76/20
understood [16] 7/10 8/7 8/12 13/3 15/9 16/8
16/15 28/2 28/6 36/21 39/14 65/13 65/22
76/17 83/16 89/25
Unfortunately [1] 12/4
UNITED [18] 1/4 1/9 1/19 2/3 2/4 2/6 2/7 2/10
4/3 4/6 17/23 18/1 19/4 82/21 82/24 88/3 94/7
94/11
unregistered [1] 25/21
until [9] 5/16 15/6 41/4 52/24 58/7 67/9 68/7
87/19 87/22
untrue [3] 24/12 31/23 53/15
unusual [1] 6/8 6/10 6/11
up [34] 5/8 5/11 8/2 15/6 15/18 15/21 16/17
16/21 17/17 20/14 20/23 21/21 22/16 22/22
28/21 43/19 44/5 45/17 48/2 49/23 51/2 54/4
60/21 62/23 62/25 63/2 63/7 63/17 63/20
63/21 66/14 70/4 90/23 92/9
upon [1] 7/4
us [6] 18/6 23/18 24/1 45/22 56/7 67/21
use [5] 22/18 46/8 46/16 47/6 60/12
used [11] 21/15 28/6 32/18 35/10 46/10 46/25
47/5 76/24 89/5 89/7 90/13
usually [1] 33/24
utilize [1] 82/12

**V**

Vague [2] 23/5 86/12
verify [3] 10/24 13/3 57/18
version [1] 46/16
versus [3] 4/4 17/24 88/3
very [7] 9/24 9/25 11/9 15/22 28/21 70/14
91/5
via [1] 38/12
video [4] 55/5 55/6 55/7 55/13
view [2] 91/6 91/9
violation [4] 14/18 14/22 14/22 14/23 14/23
violations [1] 92/3
VOL [1] 1/12
vs [1] 1/10

**W**

W-e-e-k-s [1] 31/9
waiting [1] 42/11
want [24] 4/18 6/9 7/1 7/13 7/14 7/18 8/13
8/14 8/17 9/16 12/2 15/3 15/4 15/5 15/12
16/15 17/10 52/17 54/25 72/5 92/15 92/16
93/5 93/12
wanted [18] 23/17 23/18 36/22 42/11 42/20
42/21 46/6 46/8 54/24 58/6 60/24 65/4 65/5
65/14 65/15 85/22 90/1 92/10
warrant [24] 20/3 20/8 20/10 20/25 21/1 21/7
21/8 21/16 32/8 45/5 47/3 58/17 59/24 60/4
60/5 60/9 63/9 67/9 70/23 72/18 73/2 74/20
75/1 78/18
was [224]
Washington [2] 54/11 54/12
wasn't [15] 14/2 24/16 25/7 31/16 32/7 60/3
71/1 73/16 73/18 73/20 73/23 79/5 79/5 81/3
83/15
way [8] 9/1 32/10 38/17 67/12 77/22 81/11
82/22 86/1
ways [1] 8/11
we [67] 4/20 5/7 5/18 5/20 7/25 8/4 9/4 9/4
10/19 10/23 10/25 11/7 11/19 11/22 12/6
12/9 12/14 12/20 12/22 13/13 14/22 15/14
15/15 15/16 15/17 15/21 15/22 16/16 17/4

19/20 21/7 21/17 23/17 23/19 28/3 28/14
36/23 38/6 39/20 48/23 42/11 42/20
43/15 43/18 44/12 44/12 45/5 46/6 53/15 54/7
54/8 54/25 63/2 63/7 65/9 67/4 67/4 87/8
87/17 87/19 91/24 92/6 92/7 92/14 93/2 93/2
we'll [8] 8/23 14/11 14/15 16/16 17/19 52/20
52/21 91/10
we're [12] 12/3 15/15 15/18 16/1 17/5 17/6
17/17 18/13 85/11 90/23 92/11 93/15
we've [2] 9/3 12/5
website [2] 70/13 70/20
wedded [1] 92/13
WEDNESDAY [1] 4/1
Weeks [2] 31/7 31/10
well [48] 4/22 6/22 7/3 8/10 10/5 12/10 14/24
20/17 20/25 22/10 23/19 24/17 24/22 26/3
26/19 27/7 28/15 29/2 29/10 30/2 30/19 33/14
33/20 34/19 41/11 41/17 43/16 43/19 47/4
48/1 54/17 55/22 62/6 62/17 65/4 66/13 67/8
69/14 69/16 72/8 75/13 76/8 79/3 81/5 81/25
82/23 82/23 85/11
went [5] 10/24 62/22 62/25 66/24 70/7
were [88] 11/9 11/10 11/11 11/11 11/18 11/19
13/4 13/21 20/2 20/7 20/8 20/13 20/17 20/19
20/25 21/7 21/9 21/15 21/23 23/11 24/17
24/22 26/1 26/15 26/19 26/24 29/16 30/17
30/21 30/22 31/1 31/2 31/10 31/14 31/22
32/18 35/18 35/23 37/6 37/7 37/24 38/8 38/22
39/5 39/9 39/25 42/11 43/2 43/24 44/11 45/5
45/14 45/21 46/3 46/6 46/7 46/11 47/2 57/20
59/5 59/23 63/5 63/12 64/17 64/18 68/18
68/24 72/12 72/14 72/22 72/24 78/2 78/5
79/15 80/17 80/21 80/21 81/7 82/5 82/6
82/10 83/11 84/7 84/22 85/8 88/10 89/7 92/7
West [2] 1/20 2/11
what [90] 5/1 6/13 6/17 7/3 7/5 7/6 7/20 8/14
8/21 10/14 10/15 11/17 12/6 13/10 13/12
14/21 15/13 15/15 16/3 16/7 16/11 17/6 19/8
19/14 20/11 20/13 20/17 23/1 23/16 23/20
25/9 26/4 26/20 27/5 28/9 29/10 30/6 30/25
30/25 32/10 32/18 35/6 39/10 40/3 40/6 43/24
44/1 44/23 45/2 46/2 46/16 53/14 54/21 55/13
57/18 59/19 62/15 62/21 62/24 63/9 63/19
63/24 63/25 64/2 64/7 64/11 64/18 64/18
64/19 64/25 67/3 67/24 71/17 77/15 77/16
79/8 82/3 83/1 83/2 83/5 83/18 84/9 85/8
85/12 85/13 89/6 89/9 89/10 92/16 92/21
What's [1] 48/19
whatever [5] 10/15 43/2 46/18 50/18 91/21
whatsoever [1] 13/9
when [77] 10/24 11/22 13/18 13/24 14/11
14/15 16/4 20/2 20/23 22/10 22/16 22/22
23/11 24/10 24/14 24/17 24/21 25/5 25/9 26/1
28/20 28/21 30/16 31/17 37/10 39/4 39/9 44/5
49/14 49/18 49/22 50/3 50/8 50/21 51/6 53/13
55/18 56/3 56/7 56/8 56/13 58/10 59/21 60/4
61/7 62/21 62/24 63/3 63/8 64/17 64/24 67/6
67/9 67/13 68/5 69/24 70/4 70/7 71/2 73/4 74/6
78/7 79/3 79/24 80/7 80/16 80/21 81/2 81/17
82/5 83/1 83/19 86/3 86/5 86/11 88/20 88/22
90/17
where [5] 5/4 13/19 16/1 16/16 26/6 26/11
26/15 26/17 46/14 47/17 47/18 51/21 63/8
69/23 70/2 72/14
whether [22] 6/4 6/13 6/15 7/16 7/17 27/15
40/5 41/14 41/18 42/9 43/2 47/8 56/16 57/18
65/7 66/25 67/16 78/2 86/19 87/3 90/15 91/22
which [18] 6/6 9/12 9/23 10/7 16/5 16/5 31/6
34/10 50/15 65/14 74/9 74/17 76/21 80/4 80/9
88/11 88/13 89/21
while [3] 8/16 59/23 59/24
who [27] 19/3 20/9 24/2 24/7 25/12 25/12
26/1 27/10 36/13 36/14 36/17 63/3 66/11 68/3
69/1 69/6 73/1 73/22 74/13 74/15 75/19 76/6
76/7 76/9 77/11 78/21 79/7
whole [1] 60/4
Whose [1] 36/9
why [21] 7/23 8/19 14/3 14/8 16/3 28/2 28/6
31/10 32/8 33/20 36/2 36/21 45/5 56/23 60/3

60/8 65/4 65/5 65/14 82/20 85/11
65/14 72/17
12/14 12/20 12/22 15/25 15/25 17/3 18/6
21/19 27/21 40/18 42/14 44/14 45/8 45/24
47/10 48/5 51/18 56/21 64/15 65/11 71/15
72/8 72/9 73/10 84/15 87/13 87/17 87/19
88/24 90/24 90/25 91/24 92/13 93/10
willing [2] 62/12 62/18
wire [1] 13/3
wires [1] 10/24
wishes [1] 12/22
wishing [1] 12/7
within [7] 4/23 13/7 36/10 37/24 41/14 63/25
64/12
without [2] 6/17 7/22
witness [32] 5/21 6/9 6/21 7/11 9/7 9/15 9/16
9/25 10/4 10/20 11/3 11/16 12/18 12/21 14/7
14/20 15/22 15/23 18/12 18/15 32/23 33/23
34/15 38/5 39/24 49/22 61/12 66/15 68/23
77/8 83/5 92/8
witness's [1] 8/2
witnesses [15] 3/4 3/9 5/25 6/4 7/9 7/21 7/25
9/6 16/19 33/24 49/14 49/19 50/1 68/14 68/19
won't [1] 6/22
word [6] 39/11 39/11 47/5 47/6 60/12 69/14
words [2] 33/21 46/8
work [5] 10/20 67/4 69/15
worked [2] 83/21 87/3
working [1] 84/3
would [39] 4/19 5/1 5/16 5/23 6/1 6/12 6/15
6/20 9/13 14/19 18/1 18/16 22/17 22/24 27/7
28/7 31/23 47/25 49/11 52/11 53/14 53/16
54/24 59/15 61/7 65/22 69/14 78/9 84/11
85/22 88/18 89/3 89/8 90/3 90/8 91/5 91/8
92/17 93/6
wouldn't [1] 41/16
wrap [1] 92/9
wrapping [1] 5/5
write [1] 39/10
writing [1] 90/14
written [3] 12/4 29/22 85/25
wrong [3] 13/21 66/20 72/9
wrote [1] 64/19
WYMAN [6] 2/5 4/6 14/9 18/1 19/18 49/6

**Y**

year [6] 13/21 50/7 68/12 68/22 78/16 78/18
years [9] 19/7 19/11 32/2 32/17 35/23 40/11
41/13 42/8 48/12 49/23 81/10 81/12 81/13
81/17 81/24
yes [172]
yesterday [6] 4/16 5/16 9/4 17/4 19/24 89/21
yet [1] 12/9
Yorba [1] 63/10
York [8] 13/7 53/25 54/12 54/12 54/13 54/13
55/8 56/11
you [560]
you find [1] 29/10
you'd [1] 35/2
you're [6] 8/23 14/7 63/5 71/5 72/11 74/17
76/4 81/15
You've [1] 17/14
your [180]

**Z**

Zoom [1] 49/7