Michael John Avenatti (Pro Se)

H. Dean Steward, SBN 85317
17 Corporate Plaza, Suite 254
Newport Beach, California 92660
Tel (949) 481-4900
Fax (949) 706-9994
Email: DeanSteward7777@gmail.com

Advisory Counsel for Defendant
MICHAEL JOHN AVENATTI

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | SA CR No. 19-061-JVS |
| Plaintiff, | |
| v. | DECLARATION OF MICHAEL JOHN AVENATTI IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS DUE TO DOUBLE JEOPARDY, PROSECUTORIAL MISCONDUCT, CONTEMPT OF THIS COURT'S JANUARY 25, 2021 ORDER [Dkt. 408], AND VIOLATIONS OF DEFENDANT'S RIGHT TO DUE PROCESS |
| MICHAEL JOHN AVENATTI, | |
| Defendant. | |
| | (Exhibits attached hereto) |

## DECLARATION OF MICHAEL JOHN AVENATTI

I, Michael John Avenatti, declare as follows:

1. I have knowledge of the facts set forth below. Each of the following statements are true and correct to the best of my knowledge.

2. I am the defendant in *United States v. Michael John Avenatti* (CDCA Case No. SA CR No. 19-061-JVS) and am appearing in this matter *pro se*. I was previously represented in this case by John Littrell, Esq. and H. Dean Steward, Esq.  The government was initially represented in this matter by AUSA Brett Sagel and AUSA Julian Andre. AUSA Andre later left the U.S. Attorney's Office in early 2021 and was replaced with AUSA Alexander Wyman.  AUSA Wyman and AUSA Sagel represent the government as of this filing.

3. Attached hereto as Exhibit A is a true and correct copy of two separate emails exchanged on April 11, 2019 and April 12, 2019 between defense counsel John Littrell and AUSA Brett Sagel and AUSA Julian Andre.

4. Attached hereto as Exhibit B is a true and correct copy of a letter sent from defense counsel H. Dean Steward to AUSA Brett Sagel and AUSA Julian Andre on May 15, 2019.

5. Attached hereto as Exhibit C is a true and correct copy of a letter sent from defense counsel H. Dean Steward to AUSA Brett Sagel and AUSA Julian Andre on May 22, 2019.

6. Attached hereto as <u>Exhibit D</u> is a true and correct copy of a search warrant application authored by IRS Special Agent Remoun Karlous and submitted by AUSAs Sagel and Andre. This search warrant application was sworn before Magistrate Judge Douglas F. McCormick on <u>May 24, 2019</u>. The search warrant application case is entitled, "In the Matter of the Search of Ten Digital Devices in the Custody of the Internal Revenue Service – Criminal Investigation," and was filed in case number 8:19-mj-00419 under docket entry 4-1.

7. Attached hereto as <u>Exhibit E</u> is a true and correct copy of the search and seizure warrant authorized and issued by Magistrate Judge Douglas F. McCormick on <u>May 24, 2019</u>. The search warrant was filed in case number 8:19-mj-00419 under docket entry 4.

8. Attached hereto as <u>Exhibit F</u> is a true and correct copy of a letter sent to defense counsel H. Dean Steward from AUSA Julian Andre dated <u>May 24, 2019</u>. AUSA Brett Sagel was copied on this correspondence.

9.  Attached hereto as <u>Exhibit G</u> is a true and correct copy of a letter sent from defense counsel H. Dean Steward to AUSA Brett Sagel and AUSA Julian Andre on <u>June 25, 2019</u>.

10. Attached hereto as <u>Exhibit H</u> is a true and correct copy of a Department of the Treasury IRS Memorandum of Interview prepared after the <u>July 25, 2019</u> interview of Judy Regnier. Attached to the memorandum are handwritten notes that accompanied the type-written summary, which were taken contemporaneously with the interview by IRS-CID Special Agent

Remoun Karlous, the co-lead agent assigned to this matter at all relevant times. The entirety of Exhibit H was previously identified during trial as Defense Exhibit 1084.

11. Attached hereto as <u>Exhibit I</u> is a true and correct copy of a Department of the Treasury IRS Memorandum of Interview prepared after the <u>November 19, 2019</u> interview of Judy Regnier. Exhibit I was previously identified during trial as Defense Exhibit 1085.

12. Attached hereto as <u>Exhibit J</u> is a true and correct copy of the Court's <u>January 25, 2021</u> Order granting the Defendant's Motion for an Order Requiring the Government's Prompt Compliance with the Due Process Protections Act and Advising the Government of the Consequences for Failing to Comply. This Order was filed as docket entry 408.

13. Attached hereto as <u>Exhibit K</u> is a true and correct copy of a letter sent from defense counsel H. Dean Steward to AUSA Brandon D. Fox on <u>February 17, 2021</u>.  At the time of this letter, AUSA Fox served as the Chief of the Criminal Division for the U.S. Attorney's Office for the Central District of California and regularly appeared on the filings for the government in this matter. AUSA Brett Sagel and AUSA Julian Andre were sent a copy of this correspondence on February 17, 2021.

14. Attached hereto as <u>Exhibit L</u> is a true and correct copy of a letter sent to defense counsel H. Dean Steward from AUSA Brett Sagel on <u>March 1, 2021</u>. AUSA Brandon Fox and AUSA Alexander Wyman were also copied on this correspondence.

15. Attached hereto as <u>Exhibit M</u> is a true and correct copy of a letter sent from defense counsel H. Dean Steward to AUSA Brett Sagel and AUSA Alexander Wyman on <u>April 8, 2021</u>.

16. Attached hereto as <u>Exhibit N</u> is a true and correct copy of an email sent from AUSA Brett Sagel to defense counsel H. Dean Steward and AUSA Alexander Wyman on <u>April 14, 2021</u>.

17. Attached hereto as <u>Exhibit O</u> is a true and correct copy of a letter sent from defense counsel H. Dean Steward to AUSA Brett Sagel and AUSA Alexander Wyman on <u>April 15, 2021</u>.

18. Attached hereto as <u>Exhibit P</u> is a true and correct copy of an email sent from AUSA Brett Sagel to defense counsel H. Dean Steward and AUSA Alexander Wyman on <u>April 21, 2021</u>.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  September 17, 2021



MICHAEL JOHN AVENATTI

# Exhibit A

**From:** Andre, Julian L. (USACAC) ▮
**Sent:** Friday, April 12, 2019 4:44 PM
**To:** John Littrell ▮
**Cc:** Sagel, Brett (USACAC) ▮
**Subject:** RE: EA Servers

John,

As we previously discussed, Eagan Avenatti LLP ("EA LLP") is now managed and controlled by a court-appointed Receiver, Brian Weiss. Your client stipulated to the appointment of the Receiver in February 2019. The Receiver for EA LLP has consented to IRS-CI creating a forensic image of the EA LLP servers. We anticipate that the imaging process should be completed in approximately one week, at which point the servers will be returned to the Receiver. To the extent your client has a need to access particular data on EA LLP's servers to serve existing or former clients, you will need to raise those specific issues with the Receiver. Because the servers belong to EA LLP, it is ultimately up to the Receiver for EA LLP to determine the extent to which your client is entitled to access the servers and/or any other EA LLP files and records. To the extent the servers contain evidence relevant to the prosecution of Mr. Avenatti, as we mentioned yesterday, such materials will be produced to the defense during the discovery process.

Thank you.

Julian

**From:** John Littrell ▮
**Sent:** Thursday, April 11, 2019 7:28 PM
**To:** Sagel, Brett (USACAC) ▮            , Andre, Julian L. (USACAC) ▮
**Subject:** EA Servers

Guys, as I mentioned earlier today, Mr. Avenatti has an urgent need to access some of the data on the Eagan Avenatti Servers. As I understand it the servers have confidential client files and other material that he needs in order to serve his existing clients and cases, and other files that he has a duty to review and return to former clients. I'll also need access to those files in order to defend this case. I am having a hard time determining where the servers are actually located and who has possession of them. Are the original servers in your possession, the receiver's, or someone else's? If they are in your possession, were they seized pursuant to a warrant or via consent? I'm sure these questions will be answered in due course, but in the meantime, can we arrange for Mr. Avenatti to access his client files?

Let me know if there is a good time to discuss tomorrow. Thanks.

## John Littrell

## Partner

Bienert | Katzman, PLC

903 Calle Amanecer, Suite 350

San Clemente, CA 92673

Main (949) 369-3700

Website: www.bmkattorneys.com

Exhibit B

H. Dean Steward
ATTORNEY AT LAW

107 Avenida Miramar
Suite "C"
San Clemente, CA 92672
949-481-4900

May 15, 2019

Brett Sagel & Julian Andre
Asst. U.S. Attorneys
411 W. 4th St., 8th Floor
Santa Ana, CA 92701

Re: US v. Michael Avenatti discovery

Gentlemen-

I request the following discovery:

1.  All documents, information, materials, electronic information,
etc. referenced in the complaint, including but not limited to
forensic copies of all electronic files, computers, servers, drives,
USB keys, cell phones, and iPads.

2.  All documents, information, materials, electronic information,
etc. referenced in the indictment, including but not limited to
forensic copies of all electronic files,  computers, servers, drives,
USB keys, cell phones, and iPads.

3. All documents, information, materials, electronic information,
etc. obtained from Michael Avenatti at the time of his arrest,
including but not limited to forensic copies of all electronic files,
computers, servers, drives, USB keys, cell phones, and iPads.

1

• Admitted-California & Hawaii • Fellow-American College of Trial Lawyers •
fax: 949-496-6753 • e-mail: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4. All documents, information, materials, electronic information, etc. obtained from Judy Regnier and/or a search of the residence of Judy Regnier, including but not limited to forensic copies of all electronic files, computers, servers, drives, USB keys, cell phones, and iPads.

5. All documents, information, materials, electronic information, etc. obtained from Filippo Marchino and/or The X-Law Group or any corresponding search including but not limited to forensic copies of all electronic files, computers, servers, drives, USB keys, cell phones, and iPads.

6. All documents, information, materials, electronic information, etc. obtained from Brian Weiss and/or Eagan Avenatti, LLP or any corresponding search including but not limited to forensic copies of all electronic files, computers, servers, drives, USB keys, cell phones, and iPads.

7. All documents, information, materials, electronic information, etc. obtained from the residence of Michael Avenatti, including but not limited to forensic copies of all electronic files, computers, servers, drives, USB keys, cell phones, and iPads.

8. All documents, information, materials, electronic information, etc. obtained from Jason Frank, Andrew Stolper, or Scott Sims, including but not limited to forensic copies of all electronic files, computers, servers, drives, USB keys, cell phones, and iPads.

9. All documents, text messages, emails, materials, etc. relating to or reflecting any communications regarding Mr. Avenatti with Jason Frank, Andrew Stolper, or Scott Sims.

10. All documents, text messages, emails, materials, etc. relating to or reflecting any communications regarding Mr. Avenatti with Donald J. Trump, or any other individual employed at the White House, and William Barr of the Department of Justice.

11. Copies of any search warrants concerning Mr. Avenatti.

2

12.  Copies of any subpoenas concerning Mr. Avenatti.

13.  Copies of all information and recordings obtained in connection
with any wiretap, wire, electronic monitoring or surveillance of Mr.
Avenatti, Ms. Regnier, Mr. Marchino or any other witness.

14. All documents, information, materials, electronic information,
etc. obtained from David Nold, including but not limited to forensic
copies of all electronic files, computers, servers, drives, USB keys,
cell phones, and iPads.

15. All documents, text messages, emails, materials, etc. relating to
or reflecting any communications regarding Mr. Avenatti with David
Nold.

16. All documents, information, materials, electronic information,
etc. obtained from any current or former employee associated with
any company that you maintain was controlled by Michael Avenatti
in whole or in part, including but not limited to forensic copies of all
electronic files, computers, servers, drives, USB keys, cell phones,
and iPads.

15. All documents, text messages, emails, materials, etc. relating to
or reflecting any communications regarding Mr. Avenatti with any
current or former employee associated with any company that you
maintain was controlled by a Michael Avenatti in whole or in part.

16.  My client's statements:  Under Fed. R. Crim. P. 16(a)(1)(A), the
defendant is entitled to disclosure of all copies of any written or
recorded statements made by the defendant.

17.  All arrest reports, together with notes.  This request includes,
but is not limited to, any rough notes records, reports, transcripts
or other documents in which statements of the defendant or any
other discoverable material is contained.  This is all discoverable
under Fed. R. Crim. P. 16(a)(1)(A) and *Brady v. Maryland*, 373 U.S.
83 (1963).  See also *Loux v. U.S.* 389 F.2d 911 (9th Cir. 1968); U.S.

3

v. Johnson, 525 F.2d 999 (2d Cir. 1975); U.S. v. Lewis, 511 F.2d 798 (D.C. Cir. 1975); *U.S. v. Pilnick,* 267 F. Supp. 791 (S.D.N.Y. 1967).

19. *Brady* material:  I request all documents, statements, agents' reports, and tangible evidence favorable to the defendant on the issue of guilt and/or which affects the credibility of the government's case.  ( i.e. 8, 9 and 10, above). Impeachment as well as exculpatory evidence falls within Brady's definition of evidence favorable to the accused.  See *U.S. v. Bagley*, 473 U.S. 667 (1985); *U.S. v. Agurs*, 427 U.S. 97 (1976).

20.  Tangible objects:  I'd request, under Fed. R. Crim. P. 16(a)(2)(C), the opportunity to inspect and copy as well as test, if necessary, all other documents and tangible objects, including photographs, books, papers, documents, buildings, automobiles, or places, or copies, depictions, or portions thereof which are material to the defense or intended for use in the government's case-in-chief, or were obtained for or belong to the defendant.

21.  Information regarding informants and cooperating witnesses: I'd request that the government provide all relevant information concerning any informants or cooperating witnesses involved in this case.  At a minimum, the government is obligated to disclose the identification and location of any informants or cooperating witnesses, as well as the identity and location of any other percipient witnesses unknown to the defendant.  *Roviaro v. U.S.*, 353 U.S. 53 (1957).  Specifically, the defendant requests all "'documents, and information relating to the period between [all potential or actual informer/accomplice/cooperating witness's] initial contact with the government regarding possible cooperation and the point at which the witness and the government reached an agreement concerning [such person's possible] testimony' in this case." *United States v. Sudikoff,* 36 F.Supp.2d 1196 (C.D. Cal. 1999).

4

22.  Evidence of bias or motive to lie-  The defendant requests any evidence that any prospective government witness is biased or prejudiced against the defendant, or has a motive to falsify or distort his or her testimony.  *Pennsylvania v. Ritchie,* 480 U.S. 39 (1987); *U.S. v. Strifler*, 851 F.2d 1197 (9th Cir. 1988).

23.  *Impeachment evidence*:  The defendant requests any evidence that any prospective government witness has engaged in any criminal act, whether or not resulting in a conviction, and whether any witness has made a statement favorable to the defendant.  See Fed. R. Evid. 608, 609 and 613.  Such evidence is discoverable under *Brady*, 373 U.S. at 83.  See *U.S. v. Strifler*, above (witness' prior record), *Thomas v. U.S.*, 353 F.2d 49 (9th Cir. 1965) (evidence that detracts from a witness' credibility).

23.  Evidence of criminal investigation of any government witness:  I'd request any evidence that any prospective witness is under investigation by federal, state or local authorities for any criminal conduct.  *U.S. v. Chitty,* 760 F.2d 425 (2d Cir. 1985).

24.  Names of witnesses favorable to the defendant:  I'd request the name of any witness who has made an arguably favorable statement concerning the defendant.  *Jackson v. Wainwright,* 390 F.2d 288 (5th Cir. 1968); *Chavis v. North Carolina,* 637 F.2d 213, 223 (4th Cir. 1980); *Jones v. Jago*, 575 F.2d 1164, 1168 (6th Cir. 1978); *Hudson v. Blackburn,* 601 F.2d 785 (5th Cir. 1979).

25. Jencks Act Material:  The defense requests all material to which defendant is entitled pursuant to the Jencks Act, 18 U.S.C. § 3500, and Fed. R. Crim. P. 26.2.  The defendant specifically requests pretrial production of these statements so that the court may avoid unnecessary recesses and delays for defense counsel to properly use any Jencks statements and prepare for cross-examination.

5

26.   Giglio information:  Pursuant to *Giglio v. U.S.*, 405 U.S. 150 (1972), the defendant requests all statements and/or promises, express or implied, made to any government witnesses, in exchange for their testimony in this case, and all other information that could arguably be used for the impeachment of any government witnesses.

27.   Government examination of law enforcement personnel files: I'd request that the government examine the personnel files and any other files within its custody, care or control, or which could be obtained by the government, for all testifying witnesses, including testifying officers and agents who may have been controlling or contacting the confidential information in this case.  The defendant requests that these files be reviewed by the government attorney for evidence of perjurious conduct or other like dishonesty, or any other material relevant to impeachment, or any information that is exculpatory, pursuant to its duty under *U.S. v. Henthorn,* 931 F.2d (9th Cir. 1991).

28.  Expert witness notification and summary of testimony:  I'd request that the government provide notice of any witness it intends to proffer as an expert to give opinion testimony and a summary of the witness's opinion, bases and reasons for the opinions, and the witness's qualifications pursuant to its duty under Federal Rule of Criminal Procedure 16(a)(1)(G).

Thank you in advance for your consideration of each of these requests.

Sincerely,

H. Dean Steward

6

Exhibit C

H. Dean Steward

ATTORNEY AT LAW

107 Avenida Miramar
Suite "C"
San Clemente, CA 92672
949-481-4900

May 22, 2019

Julian Andre & Brett Sagal
Asst. U.S. Attorneys
Via E-mail

Re: Avenatti case

Gentlemen:

I write relating to the status of the production of the electronic discovery concerning my client, Michael Avenatti.  As you know, in connection with his arrest on March 25, from informal demands, and various search warrants obtained by the government before and after that arrest, the government has obtained significant electronic evidence including but not limited to:  multiple computer servers, desktop computers, hard drives, cell phones, laptops, and USB drives.

Some of this evidence has been in the possession of the government for months (prior to my client's arrest) and yet my client has received none of it to date.  To be clear, not a single image or electronic file has been produced to date.

1

• Admitted-California & Hawaii • Fellow-American College of Trial Lawyers •
fax: 949-496-6753 • e-mail:

Exhibit C - 001

Mr. Avenatti does not have images of the computer servers for his law firm (which he owns 100 percent), his laptop, his cell phone, other desktop computers, etc. He has been provided nothing. This is not acceptable and certainly is not in keeping with the government's significant discovery obligations in a criminal case of this magnitude under Rule 16.

This failure to timely provide discovery is highly prejudicial and is not excused by the alleged attorney-client issue you identified during our last court appearance, nor is it excused by any alleged need for an attorney-client "taint" review. Mr. Avenatti was counsel for the clients at all relevant times and is still counsel in many instances.

He previously had unfettered access to this information and he has an immediate right to this information now. The government's failure to provide this information is even more egregious considering that I understand that the government has given images of certain electronic files to third-parties who are not attorneys, have no attorney-client relationship with any client, and who, unlike Mr. Avenatti, do not have an urgent need for the information. This includes providing images to the Receiver for Eagan Avenatti, LLP.

If the government was able to provide this information to those third-parties, there can be no legitimate reason why the government did not provide that same information contemporaneously.

Accordingly, and pursuant to our previous discovery demand letter, I ask that (1) forensic images of all electronic data and information be provided to my office no later than Tuesday, May 27 and (2) you provide an inventory of all electronic devices imaged or

2

Exhibit C - 002

accessed, together with the size of each device, at the same time.

Sincerely,

H. Dean Steward

3

Exhibit C - 003

Exhibit D

USAO_00134447

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of ) | |
| *(Briefly describe the property to be searched or identify the* ) | Case No. 8:19-MJ-419 |
| *person by name and address)* ) | |
| ) | |
| Ten Digital Devices in the Custody of the Internal ) | |
| Revenue Service – Criminal Investigation ) | |
| ) | |
| ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of:

| Code Section | Offense Description |
|---|---|
| 26 U.S.C. § 7201 | Attempt to Evade or Defeat Tax |
| 26 U.S.C. § 7202 | Willful Failure to Collect or Pay Over Tax |
| 26 U.S.C. § 7203 | Willful Failure to Pay Tax or File Return |
| 26 U.S.C. § 7212 | Interference with Administration of Internal Revenue Laws |
| 18 U.S.C. § 152 | Concealment of Assets in Bankruptcy |
| 18 U.S.C. § 157 | Bankruptcy Fraud |
| 18 U.S.C. § 371 | Conspiracy |
| 18 U.S.C. § 1001 | False Statements |
| 18 U.S.C. § 1014 | False Statement to a Bank or Other Federally Insured Institution |
| 18 U.S.C. § 1028A | Aggravated Identity Theft |
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1344 | Bank Fraud |
| 18 U.S.C. § 1957 | Money Laundering |

*///*

*///*

*///*

USAO_00134447

USAO_00134447

Case 8:19-mj-00419-DUTY *SEALED*   Document 4-1 *SEALED*   Filed 05/24/19   Page 2 of 330   Page ID #:508

The application is based on these facts:

    *See attached Affidavit*

    ☒ Continued on the attached sheet.

☐ Delayed notice of_____days (*give exact ending date if more than 30 days*: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
/s/
*Applicant's signature*

_____
IRS-CI Special Agent Remoun Karlous
*Printed name and title*

Sworn to before me and signed in my presence.

Date:   May 24, 2019

**DOUGLAS F. McCORMICK**
*Judge's signature*

City and state:   Santa Ana, CA

_____
United States Magistrate Judge Douglas F. McCormick
*Printed name and title*

AUSAs:  Julian L. André (213.894.6683) & Brett A. Sagel (714.338.3598)

USAO_00134448

USAO_00134447

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

The following digital devices (the "SUBJECT DEVICES") or forensic images thereof, which are currently maintained in the custody of the Internal Revenue Service-Criminal Investigation ("IRS-CI") in Los Angeles and Santa Ana, California:

1.   Dell PowerEdge R410, bearing serial number 52RKCK1, obtained by IRS-CI from MixinIT via consent from the court-appointed receiver for Eagan Avenatti LLP ("EA LLP") on or about April 4, 2019 ("SUBJECT DEVICE 1");

2.   Dell PowerEdge R710, bearing serial number 2GMPCK1, obtained by IRS-CI from MixinIT via consent from the court-appointed receiver for EA LLP on or about April 4, 2019 ("SUBJECT DEVICE 2");

3.   HP ProLiant DL380 G7, bearing serial number A1979827, obtained by IRS-CI from MixinIT via consent from the court-appointed receiver for EA LLP on or about April 4, 2019 ("SUBJECT DEVICE 3");

4.   HP ProLiant DL380 G7, bearing serial number A1979828, obtained by IRS-CI from MixinIT via consent from the court-appointed receiver for EA LLP on or about April 4, 2019 ("SUBJECT DEVICE 4");

5.   HP ProLiant DL380 G7, bearing serial number A1884814, obtained by IRS-CI from MixinIT via consent from the court-appointed receiver for EA LLP on or about April 4, 2019 ("SUBJECT DEVICE 5");

USAO_00134449

USAO_00134447

6.    HP ProLiant DL160 G6, bearing serial number
MXQ9520ABM, obtained by IRS-CI from MixinIT via consent from the
court-appointed receiver for EA LLP on or about April 4, 2019
("SUBJECT DEVICE 6");

7.    A black USB drive marked "27989," which was seized by
law enforcement agents from AVENATTI on March 25, 2019.  IRS-CI
obtained the forensic image of the digital device from the
United States Attorney's Office for the Southern District of New
York ("SDNY USAO") on or about May 22, 2019 ("SUBJECT DEVICE
7");

8.    A blue and silver USB drive marked "RAEN," which was
seized by law enforcement agents from AVENATTI on March 25,
2019.  IRS-CI obtained the forensic image of the digital device
from the SDNY USAO on or about May 22, 2019 ("SUBJECT DEVICE
8");

9.    A silver and purple USB drive marked "8025328," which
was seized by law enforcement agents from VENATTI on March 25,
2019.  IRS-CI obtained the forensic image of the digital device
from the SDNY USAO on or about May 22, 2019 ("SUBJECT DEVICE
9"); and

10.    A compact disc containing scanned copies of
miscellaneous documents that were seized by law enforcement
agents from AVENATTI's briefcase on March 25, 2019.  The SDNY
USAO scanned the documents and placed them on the disc and
provided the disc to IRS-CI on or about May 17, 2019 ("SUBJECT
DEVICE 10") (collectively, the "SUBJECT DEVICES").

USAO_00134450

USAO_00134447

SUBJECT DEVICES 1 through 6 are currently held in the custody of IRS-CI in Los Angeles, California.  SUBJECT DEVICES 7 through 10 are currently held in the custody of IRS-CI in Santa Ana, California.

USAO_00134451

Exhibit D - 005

USAO_00134447

## ATTACHMENT B

I.   **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, and/or instrumentalities of violations of 26 U.S.C. § 7201 (attempt to evade or defeat tax); 26 U.S.C. § 7202 (willful failure to collect or pay over tax); 26 U.S.C. § 7203 (willful failure to pay tax or file return); 26 U.S.C. § 7212 (interference with administration of internal revenue laws); 18 U.S.C. § 152 (concealment of assets in bankruptcy); 18 U.S.C. § 157 (bankruptcy fraud); 18 U.S.C. § 1028A (aggravated identity theft); 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1344 (bank fraud); and 18 U.S.C. § 1957 (money laundering) (the "Subject Offenses"), namely:

a.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to the ownership of Global Baristas US, LLC ("GBUS"); Global Baristas, LLC ("GB LLC"); GB Autosport, LLC ("GB Auto"); GB Hospitality LLC ("GB Hospitality"); Doppio Inc. ("Doppio"); Eagan Avenatti LLP ("EA LLP"); Avenatti & Associates, APC ("A&A"); and Augustus LLP (collectively, the "Subject Entities").

b.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to Michael J. Avenatti's ("AVENATTI") control or management of any of the Subject Entities and/or The X-Law Group, PC ("X-Law Group").

i

USAO_00134452

USAO_00134447

c.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to the organizational or management structure of any of the Subject Entities and/or X-Law Group.

d.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to the finances of any of the Subject Entities, including assets, income, liabilities, accounts receivable, accounts payable, and expenses.

e.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to the personal finances of Michael Avenatti ("AVENATTI"), including information relating to AVENATTI's assets, debts, income, expenses, and net worth.

f.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to the accounting records for AVENATTI and/or any of the Subject Entities, including any Microsoft Dynamics NAV, QuickBooks, or other electronic accounting data, files, or records.

g.   Records, documents, programs, applications, or materials from January 201 through March 25, 2019, relating to any financial transactions, including any proposed or potential financial transactions, involving any of the Subject Entities, and/or AVENATTI.

h.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to any payments, checks, credits, wire transfers, commodities,

ii

USAO_00134453

USAO_00134447

services, or other things of value paid, provided, delivered, or
transferred, directly or indirectly, to AVENATTI and/or any of
the Subject Entities.

      i.   Records, documents, programs, applications, or
materials from January 2011 through March 25, 2019, relating to
any financial relationship between AVENATTI and/or any of the
Subject Entities on one hand and X-Law Group and/or F.M. on the
other hand.

      j.   Records, documents, programs, applications, or
materials from January 2011 through March 25, 2019, relating to
financial decisions AVENATTI and/or J.R. made on behalf of any
of the Subject Entities, including decisions to authorize
payments on behalf of any of the Subject Entities and transfer
money to or from any of the Subject Entities.

      k.   Records, documents, programs, applications, or
materials from January 2011 through March 25, 2019, relating to
communications between AVENATTI and/or J.R. and any financial
institution regarding the transfer of funds to or from any
account associated with AVENATTI and/or any of the Subject
Entities.

      l.   Records, documents, programs, applications, or
materials from January 2011 through March 25, 2019, relating to
any loans or other financing agreements, including any proposed
or potential loans or other financing agreements, involving any
of the Subject Entities and/or AVENATTI.

USAO_00134454

USAO_00134447

    m. Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to the payroll obligations of the Subject Entities.

    n. Non-privileged records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to the federal, state, and/or local tax obligations, tax returns, tax liabilities, or tax payments of any of the Subject Entities and/or AVENATTI.

    o. Non-privileged records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to any liens, levies, garnishments, judgments, encumbrances, or tax-related investigations or actions associated with any of the Subject Entities and/or AVENATTI.

    p. Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to attorneys' fees or costs earned or collected by EA LLP, A&A, and/or AVENATTI, including attorney-client fee contracts, engagement letters, fee agreements, cost-sharing agreements, fee-sharing agreements, settlement agreements, and client billing records, but excluding any such records relating to the representations of Stephanie Clifford or Julie Swetnick.

    q. Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to any of the Subject Entities' and/or AVENATTI's contractual relationships, including drafts and final versions of any executed, proposed, or potential contracts and agreements, bills of sale, correspondence regarding payments, and correspondence

<div align="center">iv</div>

USAO_00134455

USAO_00134447

regarding the cancellation or modification of contracts and/or
agreements.

     r.   Records, documents, programs, applications, or
materials from January 2011 through March 25, 2019, relating to
any of the Subject Entities' and/or AVENATTI's bank account
information.

     s.   Records, documents, programs, applications, or
materials from January 2011 through March 25, 2019, relating to
the physical whereabouts of AVENATTI, and/or J.R., including
calendars and calendar entries.

     t.   Records, documents, programs, applications, or
materials from April 1, 2011, to March 25, 2019, relating to
AVENATTI and/or EA LLP's representation of Client 1, including
the approximately $4 million settlement payment that was
transferred to one of EA LLP's California Bank & Trust attorney
trust account in or around January 2015.

     u.   Records, documents, programs, applications, or
materials from December 2016 to March 25, 2019, relating to
AVENATTI and/or EA LLP's representation of Client 2, including
the approximately $2.75 million settlement payment that was
transferred to one of EA LLP's California Bank & Trust attorney
trust account in or around January 2017.

     v.   Records, documents, programs, applications, or
materials relating to an agreement to purchase and the purchase
of a private Honda jet from Honda Aircraft Company LLC and/or
the funds used to purchase the private Honda jet.

USAO_00134456

USAO_00134447

w.   Records, documents, programs, applications, or materials from January 1, 2014, to March 25, 2019, relating to AVENATTI and/or EA LLP's representation of Client 3, including the approximately $1.6 million settlement payment that was transferred to one of AVENATTI's City National Bank attorney trust account in or around January 2018.

x.   Records, documents, programs, applications, or materials from January 1, 2017, to March 25, 2019, relating to AVENATTI's, EA LLP's, X-Law Group, and/or F.M.'s representation of Client 4 and Client 5, including the approximately $8,146,288 payment that was transferred to one of AVENATTI's City National Bank attorney trust accounts in or around March 2018.

y.   Non-privileged records, documents, programs, applications, or materials from March 7, 2013, to March 25, 2019, relating to the settlement of litigation against the National Football League ("NFL") relating to the 2011 Super Bowl (the "Super Bowl Litigation"), including documents reflecting settlement payments, attorney fees, costs, expenses, and the distribution of settlement proceeds to EA LLP, AVENATTI, and any of EA LLP or AVENATTI's clients in the Super Bowl Litigation.

z.   Records, documents, programs, applications, or materials from January 2013 through March 25, 2019, relating to the payroll and tax preparation services that Paychex provided to EA LLP and/or A&A, including any records, documents, programs, applications, or materials relating to changes in the payroll and tax services to be provided by Paychex.

USAO_00134457

USAO_00134447

        aa.  Records, documents, programs, applications, or
materials from January 2013 through March 25, 2019, relating to
the payroll and tax preparation services that Ceridian HCM Inc.
("Ceridian") provided to GBUS, including any records, documents,
programs, applications, or materials relating to changes in the
payroll and tax services to be provided by Ceridian.

        bb.  Records, documents, programs, applications, or
materials from January 2013 through March 25, 2019, relating to
the sale or purchase of TC Global, Inc. or Tully's Coffee.

        cc.  Records, documents, programs, applications, or
materials from January 2013 through March 25, 2019, relating to
the purchase or sale, including any proposed or attempted
purchase or sale, of GBUS, GB LLC, or Doppio.

        dd.  Records, documents, programs, applications, or
materials from January 2013 through March 25, 2019, relating to
the value of GBUS or GB LLC.

        ee.  Records, documents, programs, applications, or
materials from January 2013 through March 25, 2019, relating to
GBUS's and GB LLC's merchant credit card processing accounts
(the "merchant accounts"), including contracts, agreements,
account applications, and correspondence regarding changes to
the merchant accounts.

        ff.  Records, documents, programs, applications, or
materials from January 2018 through March 25, 2019, relating to
creation, formation, business purpose, ownership agreement,
finances, of Augustus LLP.

USAO_00134458

USAO_00134447

gg.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to the sale, rental, lease, purchase, maintenance, renovation, or remodeling of any of AVENATTI's residences, including his residences in Newport Beach, California; Laguna Beach, California; and Los Angeles, California.

hh.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to continuing legal education ("CLE") courses taken by AVENATTI, including any professional responsibility CLE courses, ethics CLE courses, or tax CLE courses.

ii.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to any of the Subject Entities' employee handbooks or manuals, employment contracts, compensation records, and employee lists.

jj.   Records, documents, programs, applications, or materials relating to any locations or services used by AVENATTI and/or any of the Subject Entities to store physical or electronic records.

kk.   With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents,

USAO_00134459

USAO_00134447

browsing history, user profiles, e-mail, e-mail contacts, chat
and instant messaging logs, photographs, and correspondence;

      ii.  evidence of the presence or absence of
software that would allow others to control the device, such as
viruses, Trojan horses, and other forms of malicious software,
as well as evidence of the presence or absence of security
software designed to detect malicious software;

      iii. evidence of the attachment of other devices;

      iv.  evidence of counter-forensic programs (and
associated data) that are designed to eliminate data from the
device;

      v.   evidence of the times the device was used;

      vi.  passwords, encryption keys, and other access
devices that may be necessary to access the device;

      vii. applications, utility programs, compilers,
interpreters, or other software, as well as documentation and
manuals, that may be necessary to access the device or to
conduct a forensic examination of it;

      viii.    records of or information about
Internet Protocol addresses used by the device;

      ix.  records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

    2.  As used herein, the terms "records," "documents,"
"correspondence," "programs," "applications," and "materials"

USAO_00134460

USAO_00134447

include records, documents, correspondence, programs,
applications, and materials created, modified, or stored in any
form, including in digital form on any digital device and any
forensic copies thereof.

## II.   SEARCH PROCEDURES FOR HANDLING POTENTIALLY PRIVILEGED INFORMATION ON THE SUBJECT DEVICES

3.    In searching the SUBJECT DEVICES (including the
forensic copies thereof), the following procedures will be
followed at the time of the search in order to avoid unnecessary
disclosures of any privileged attorney-client communications or
attorney work product.

4.    Law enforcement personnel conducting the investigation
and search and other individuals assisting law enforcement
personnel in the search (the "Investigation Team") have already
obtained custody of the SUBJECT DEVICES, which are capable of
containing evidence of the Subject Offenses, or capable of
containing data falling within the scope of the items to be
seized.   The Investigation Team shall facilitate the transfer of
the SUBJECT DEVICES to the "Privilege Review Team" (previously
designated individuals not participating in the investigation of
the case).   The Privilege Review Team, including a Privilege
Review Team Assistant United States Attorney ("PRTAUSA") or
PRTAUSAs, will then review the SUBJECT DEVICES as set forth
herein.   The Investigation Team will review only data from the
SUBJECT DEVICES that has been released by the Privilege Review
Team to the Investigation Team.

x

USAO_00134461

USAO_00134447

5.    The Privilege Review Team will, in their discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

6.    The Privilege Review Team and the Investigation Team shall complete the search discussed herein as soon as is practicable but not more than 180 days from the date of execution of the warrant.  The government will not search the SUBJECT DEVICES beyond this 180-day period without obtaining an extension of time order from the Court.

7.    The Investigation Team will provide the Privilege Review Team and/or appropriate litigation support personnel[25] with a list of "scope key words" to search for on the digital devices, to include words relating to the items to be seized as detailed above.  The Privilege Review Team will conduct an initial review of the SUBJECT DEVICES using the scope key words, and by using search protocols specifically chosen to identify documents and data that appear to be within the scope of the warrant.  The Privilege Review Team may also do a more detailed quality check of this data and the results of this initial review, to ensure that the key word search is effective. Documents and data that are identified by this initial review, after quality check, as not within the scope of the warrant will

_____

[25] Litigation support personnel and computer forensics agents or personnel, including IRS Computer Investigative Specialists, are authorized to assist both the Privilege Review Team and the Investigation Team in processing, filtering, and transferring documents and data seized during the execution of the warrant.

USAO_00134462

USAO_00134447

be maintained under seal and not further reviewed absent
subsequent authorization.

8.    The Investigation Team will also provide the Privilege
Review Team with a list of "privilege key words" to search for
among the documents and data that are identified by the initial
review and quality check described above as appearing to fall
within the scope of the warrant, to include specific words
associated with AVENATTI, J.R., F.M., and any of the following
law firms (a) EA LLP; (b) A&A; (c) X-Law Group; (d) Foster
Pepper PLLC; (e) Osborn Machler PLLC; (f) Eisenhower Carlson
PLLC; (g) Talmadge/Fitzpatrick/ Tribe, PPLC; (h) The Brager Tax
Law Group; (i) SulmeyerKupetz; (j) Baker & Hostetler LLP;
(k) Shulman Hodges & Bastian LLP; (l) Legal & Tax Consulting
Group; (m) Pachulski Stang Ziehl & Jones LLP; (n) Foley &
Lardner LLP; (o) Raines Feldman, LLP; and (p) Pansky Markle
Attorneys at Law.  The privilege key words shall also include
the above referenced law firms' domain names and lawyers' email
addresses, and generic words such as "privileged," "work
product."  The Privilege Review Team will conduct a review of
these documents and data using the privilege key words, and by
using search protocols specifically chosen to identify documents
and data containing potentially privileged information.
Documents or data which are identified by this review as not
potentially privileged may be given to the Investigation Team.

9.    Documents or data that the privilege key word searches
identify as potentially privileged will be reviewed by a
Privilege Review Team member to confirm that they contain

xii

USAO_00134463

USAO_00134447

potentially privileged information.  Documents or data that are determined by this review not to be potentially privileged may be given to the Investigation Team.  Documents or data that are determined by this review to be potentially privileged will be given to the United States Attorney's Office for further review by a PRTAUSA.  Documents or data identified by the PRTAUSA after review as not potentially privileged may be given to the Investigation Team.  If, after review, the PRTAUSA determines it to be appropriate, the PRTAUSA may apply to the court for a finding with respect to particular documents or data that no privilege, or an exception to the privilege, applies.  Documents or data that are the subject of such a finding may be given to the Investigation Team.

10.  Documents or data identified by the PRTAUSA(s) after review as privileged (that are not subject to a finding by a court of no privilege or an exception to the privilege) or potentially privileged and outside the scope of the items to be seized shall be segregated and sealed together in an enclosure, the outer portion of which will be marked as containing potentially privileged information, and maintained by the investigative agency.  Such data or documents shall not be accessible by or given to the Investigation Team at any time absent authorization of the Court.  However, the Privilege Review Team may, in its discretion, store the privileged and potentially privileged data and documents in a folder or a set of folders in a document review platform database, such as Relativity or Eclipse, that remains inaccessible to the

xiii

USAO_00134464

Exhibit D - 018

USAO_00134447

Investigation Team.  The Privilege Review Team's access to this separate document review platform database shall cease upon expiration of the warrant.  However, litigation support personnel from the United States Attorney's Office, United States Department of Justice, and/or the investigating agency may continue to access this separately-maintained document review database for the purpose of database maintenance.

11.  The Investigation Team will search only the documents and data that the Privilege Review Team provides to the Investigation Team at any step listed above in order to locate documents and data that are within the scope of the search warrant.  The Investigation Team does not have to wait until the entire privilege review is concluded to begin its review for documents and data that are within the scope of the search warrant.  The Privilege Review Team may also conduct the search for documents and data within the scope of the search warrant if that is more efficient.  This second "scope" review is intended only to ensure that the initial scope key word review successfully eliminated data outside the scope of the search warrant from seizure.

12.  The Privilege Review Team will segregate any identifiable documents and/or data that it discovers during the search of the Subject Devices relating to Stephanie Clifford v. Donald J. Trump, No. 2:18-CV-2217-SJO-FFM (C.D. Cal.), the representation of Stephanie Clifford, and/or the representation of Julie Swetnick.  Such documents and/or data will be maintained under seal by the investigating agency without

xiv

USAO_00134465

USAO_00134447

further review as set forth in paragraphs 7 and 10 above absent subsequent authorization from the Court.  This provision, however, shall not preclude the Privilege Review Team or Investigation Team from reviewing financial and accounting records covered by paragraphs 1.d, 1.f, 1.g, and 1.r above, which reference the representations of Ms. Clifford or Ms. Swetnick.

13.   To the extent that any documents and/or data covered by paragraph 1.p above, such as attorney-client fee contracts, engagement letters, and client billing records, contain information that is potentially protected by the attorney-client privileged or the attorney-work-product doctrine, the Privilege Review Team shall redact all such potentially privileged information from the documents or data before releasing the documents and/or data to the Investigation Team unless the specific client agrees to waive the attorney-client privilege.

14.   If, upon review, a member of the Investigation Team determines that a document or data appears to contain potentially privileged information, the Investigation Team member shall discontinue its review of the document or data and shall immediately notify a member of the Privilege Review Team. The Investigation Team member may record identifying information regarding the potentially privileged document or data that is reasonably necessary to identify the document or data for the Privilege Review Team.  The Investigation Team shall not further review any documents or data that appears to contain such potentially privileged information until after the Privilege

xv

USAO_00134466

USAO_00134447

Review Team has completed its review of the additional potentially privileged information discovered by the Investigation Team member.

15.  In performing the reviews, both the Privilege Review Team and the Investigation Team may:

a.  search for and attempt to recover deleted, "hidden," or encrypted data;

b.  use tools to exclude normal operating system files and standard third-party software that do not need to be searched; and

c.  use forensic examination and searching tools, such as "EnCase," "FTK" (Forensic Tool Kit), Nuix, Axiom, Relativity, and Eclipse, which tools may use hashing and other sophisticated techniques.

16.  If either the Privilege Review Team or the Investigation Team, while searching a SUBJECT DEVICE encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, they shall immediately discontinue the search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

17.  If the search determines that a SUBJECT DEVICES does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

xvi

USAO_00134467

USAO_00134447

18.   The government may retain the SUBJECT DEVICES (including any forensic copy thereof), which have already been obtained by the Investigation Team, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) on the SUBJECT DEVICES absent further court order.

19.   After the completion of the search of the SUBJECT DEVICES, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

20.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

**III.   REQUESTS FOR APPOINTMENT OF A SPECIAL MASTER**

21.   To the extent that AVENATTI, EA LLP, or any other party intends to request that a special master be appointed to handle the review of any potentially privileged information seized during the execution of this Search Warrant, such a request must be filed with this Court within seven days of the execution of this Search Warrant.   The government will then have seven days to file any opposition to such a request.

22.   Any request for the appointment of a special master must, at a minimum, address the following issues:   (a) the legal basis for the request; (b) the anticipated role of the special master, should one be appointed; (c) proposed search and review

xvii

USAO_00134468

USAO_00134447

procedures to be followed by the special master, should one be appointed; (d) proposed procedures for the selection of a special master; (e) the names of at least three proposed special masters; and (f) the party's ability to pay for any costs and fees incurred by a special master.

xviii

USAO_00134469

USAO_00134447

Case 8:19-mj-00419-DUTY *SEALED*   Document 4-1 *SEALED*   Filed 05/24/19   Page 24 of 330   Page ID #:530

## AFFIDAVIT

I, Remoun Karlous, being duly sworn, declare and state as follows:

### I.   INTRODUCTION

1.   I am a Special Agent ("SA") with the Internal Revenue Service-Criminal Investigation ("IRS-CI") in the Los Angeles Field Office and have been so employed since April 1995.  As an IRS-CI SA, I have investigated numerous cases involving criminal violations of Title 18, Title 21, Title 26, and Title 31 of the United States Code, which have resulted in seizure, search, and arrest warrants.  In particular, I have investigated cases involving money laundering, international money laundering, securities fraud, tax evasion (domestic and international cases), and subscribing to false tax returns.

### II.   PURPOSE OF AFFIDAVIT

2.   This affidavit is made in support of an application for a warrant to search the following digital devices or forensic images thereof, which are currently held in the custody of IRS-CI in Los Angeles and Santa Ana, California:[1]

a.   Dell PowerEdge R410, bearing serial number 52RKCK1, obtained by IRS-CI from MixinIT via consent from the court-appointed receiver for Eagan Avenatti LLP ("EA LLP") on or about April 4, 2019 ("SUBJECT DEVICE 1");

─────────────────

[1]   SUBJECT DEVICES 1 through 6 are currently held in the custody of IRS-CI in Los Angeles, California.  SUBJECT DEVICES 7 through 10 are currently held in the custody of IRS-CI in Santa Ana, California.

USAO_00134470

USAO_00134447

b.    Dell PowerEdge R710, bearing serial number 2GMPCK1, obtained by IRS-CI from MixinIT via consent from the court-appointed receiver for EA LLP on or about April 4, 2019 ("SUBJECT DEVICE 2");

c.    HP ProLiant DL380 G7, bearing serial number A1979827, obtained by IRS-CI from MixinIT via consent from the court-appointed receiver for EA LLP on or about April 4, 2019 ("SUBJECT DEVICE 3");

d.    HP ProLiant DL380 G7, bearing serial number A1979828, obtained by IRS-CI from MixinIT via consent from the court-appointed receiver for EA LLP on or about April 4, 2019 ("SUBJECT DEVICE 4");

e.    HP ProLiant DL380 G7, bearing serial number A1884814, obtained by IRS-CI from MixinIT via consent from the court-appointed receiver for EA LLP on or about April 4, 2019 ("SUBJECT DEVICE 5");

f.    HP ProLiant DL160 G6, bearing serial number MXQ9520ABM, obtained by IRS-CI from MixinIT via consent from the court-appointed receiver for EA LLP on or about April 4, 2019 ("SUBJECT DEVICE 6");

g.    A black USB drive marked "27989," which was seized by law enforcement agents from AVENATTI on March 25, 2019, upon his arrest.  IRS-CI obtained the forensic image of the digital device from the United States Attorney's Office for the Southern District of New York ("SDNY USAO") on or about May 22, 2019  ("SUBJECT DEVICE 7");

2

USAO_00134471

USAO_00134447

       h.    A blue and silver USB drive marked "RAEN," which
was seized by law enforcement agents from AVENATTI on March 25,
2019, upon his arrest.  IRS-CI obtained the forensic image of
the digital device from the SDNY USAO on or about May 22, 2019
("SUBJECT DEVICE 8");

       i.    A silver and purple USB drive marked "8025328,"
which was seized by law enforcement agents from AVENATTI on
March 25, 2019, upon his arrest.  IRS-CI obtained the forensic
image of the digital device from the SDNY USAO on or about May
22, 2019  ("SUBJECT DEVICE 9"); and

       j.    A compact disc containing scanned copies of
miscellaneous documents that were seized by law enforcement
agents from AVENATTI's briefcase on March 25, 2019, upon his
arrest.  The SDNY USAO scanned the documents and placed them on
the disc and provided the disc to IRS-CI on or about May 17,
2019 ("SUBJECT DEVICE 10") (collectively, the "SUBJECT
DEVICES").

      3.    The requested search warrant seeks authorization to
seize any data on the SUBJECT DEVICES that constitutes evidence,
contraband, instrumentalities, and/or fruits of violations of:
26 U.S.C. § 7201 (attempt to evade or defeat tax); 26 U.S.C.
§ 7202 (willful failure to collect or pay over tax); 26 U.S.C.
§ 7203 (willful failure to pay tax or file return); 26 U.S.C.
§ 7212 (interference with administration of internal revenue
laws); 18 U.S.C. § 152 (concealment of assets and false oaths
and declarations in bankruptcy); 18 U.S.C. § 157 (bankruptcy
fraud); 18 U.S.C. § 1028A (aggravated identity theft); 18 U.S.C.

3

USAO_00134472

Exhibit D - 026

USAO_00134447

§ 1343 (wire fraud); 18 U.S.C. § 1344 (bank fraud); and 18 U.S.C. § 1957 (money laundering) (the "Subject Offenses"), and any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

4.    The SUBJECT DEVICES are identified in Attachment A to the search warrant application.  The list of items to be seized is set forth in Attachment B to the search warrant application.  Attachments A and B are incorporated herein by reference.

5.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III.  SUMMARY OF PROBABLE CAUSE

6.    AVENATTI was and is an attorney licensed to practice law in the State of California.  AVENATTI practiced law through Avenatti & Associates, APC ("A&A") and EA LLP in Newport Beach and Los Angeles, California.  AVENATTI was the sole owner of A&A, which owned at least 75 percent of EA LLP.

7.    AVENATTI was also the principal owner and Chief Executive Officer ("CEO") of Global Baristas US LLC ("GBUS"), which operated Tully's Coffee ("Tully's") stores in Washington

4

USAO_00134473

USAO_00134447

and California.  In 2013, AVENATTI's company, Global Baristas LLC ("GB LLC"), acquired TC Global Inc., which previously operated Tully's, out of bankruptcy for approximately $9.15 million.  AVENATTI's company, A&A, owned 100 percent of Doppio Inc., which in turn owned 80 percent of GB LLC.  GB LLC wholly owned GBUS, which handled the day-to-day business operations of Tully's.

8.    As set forth herein and in the affidavits that I submitted in February 2019 (attached hereto as Exhibit 1) and March 2019 (attached hereto as Exhibit 3) in support of prior search warrant applications, there is probable cause to believe that between approximately 2011 and March 2019 AVENATTI engaged in the following criminal conduct: (a) wire fraud and money laundering offenses relating to millions of dollars AVENATTI embezzled from his legal clients; (b) tax offenses relating to GBUS's payroll tax obligations and AVENATTI's efforts to obstruct an IRS collection action; (c) tax offenses relating to the tax obligations of EA LLP and A&A, including the payroll tax obligations of EA LLP; (d) tax offenses relating to AVENATTI's personal tax obligations; (e) bank fraud and aggravated identity theft offenses relating to loans AVENATTI and his companies obtained from The Peoples Bank in Mississippi; and (f) bankruptcy fraud offenses relating to false statements AVENATTI made in federal bankruptcy proceedings involving AVENATTI and EA LLP.

9.    First, between as early as January 2015 and continuing through at least March 2019, AVENATTI executed a scheme to

<center>5</center>

USAO_00134474

USAO_00134447

defraud and embezzle money from clients to whom AVENATTI had agreed to provide legal services. AVENATTI's scheme to defraud his victim-clients generally operated in the following manner: (a) AVENATTI would negotiate a settlement on behalf of a victim-client that would require the payment of funds to the victim-client; (b) AVENATTI would cause the settlement proceeds to be deposited in or transferred to attorney trust accounts AVENATTI controlled; (c) AVENATTI would misrepresent, conceal, and falsely describe to the victim-client the true terms of the settlement and/or make false statements regarding the disposition of the settlement proceeds; (d) AVENATTI would embezzle and misappropriate settlement proceeds to which he was not entitled; and (e) AVENATTI would lull the victim-client to prevent the victim-client from discovering the embezzlement and misappropriation by, among other things, falsely denying the settlement proceeds had been paid, sending funds to the victim-client under the false pretense that such funds were "advances" on the purportedly yet-to-be received settlement proceeds, and falsely claiming that payment of the settlement proceeds to the victim-client had been delayed for legitimate reasons and would occur at a later time.

10.  Specifically, there is probable cause to believe that AVENATTI defrauded and embezzled funds from the following victim-clients:

USAO_00134475

USAO_00134447

a.   Client 1:  Beginning as early as in or about 2012, AVENATTI and EA LLP represented Client 1² in connection with a lawsuit against the County of Los Angeles and others. Between in or about January 2015 and the present, AVENATTI defrauded Client 1 out of Client 1's portion of an approximately $4,000,000 settlement payment from the County of Los Angeles.

b.   Client 2:  Beginning as early as in or about December 2016, AVENATTI and EA LLP represented Client 2 in connection with potential litigation against an individual with whom Client 2 had a personal relationship ("Individual 1"). Between in or about December 2016 and the present, AVENATTI defrauded Client 2 out of Client 2's portion of an approximately $2,750,000 settlement payment from Individual 1.

c.   Client 3:  Beginning as early as in or about July 2014, AVENATTI and EA LLP represented Client 3³ in connection with an intellectual property dispute against a Colorado-based company ("Company 1").  Between in or about December 2017 and

---

² As noted herein, on April 10, 2019, a ████████████ returned a 36-count indictment against AVENATTI in United States v. Avenatti, SA CR No. 19-061-JVS (the "Indictment," Exhibit 4, attached).  The Indictment refers to the victim-clients by number (e.g., "Client 1") rather than by the victim-clients' initials or other identifiers.  In the interest of protecting the client-victims' right to privacy should this affidavit later be unsealed, as well as to maintain consistency with the Indictment, the government is referring to the individuals in this affidavit in the same manner as the Indictment.  The privilege review team and other agents executing the search will be provided with the names of the relevant client-victims before conducting a search of the SUBJECT DEVICES.

³ In the affidavits I submitted in support of the February 2019 and March 2019 search warrant applications, Client 3 is referred to as G.B.

7

USAO_00134476

USAO_00134447

the present, AVENATTI defrauded Client 3 out of Client 3's portion of an approximately $1,600,000 settlement payment from Company 1.

d.   <u>Client 4 and Client 5</u>:  Beginning as early as in or about August 2017, AVENATTI and/or EA LLP represented Client 4 and Client 5[1] in connection with their separation and divestment from one of the companies in which Client 4 and Client 5 owned shares ("Company 2").  (<u>See</u> Ex. 1, ¶ 50.h. n.31; Ex. 3, § VI.)  Between in or about March 2018 and the present, AVENATTI defrauded Client 4 out of $4,000,000 of Client 4's funds.

e.   <u>Super Bowl Clients</u>:  Beginning as early as in or about 2012, AVENATTI and EA LLP represented approximately 200 individuals (the "Super Bowl Clients") in connection with litigation against the National Football League ("NFL") relating to the 2011 Super Bowl (the "Super Bowl Litigation").  The evidence IRS-CI has collected to date demonstrates that AVENATTI embezzled substantial portions of the settlement proceeds from the Super Bowl Litigation intended for clients, which AVENATTI received in or about May 2017.

11.   <u>Second</u>, between the fourth quarter of 2015 and the third quarter of 2017, inclusive, GBUS failed to timely file employment tax returns (IRS Forms 941) and pay approximately $3,207,144 in federal payroll taxes, including approximately $2,390,048 in trust fund taxes, which had been withheld from

---

[1] In the affidavits I submitted in support of the February 2019 and March 2019 search warrant applications, Client 4 is referred to as M.P. and Client 5 is referred to as L.T.

USAO_00134477

USAO_00134447

GBUS employees' paychecks.  AVENATTI was responsible for all of GBUS's significant financial and business decisions, including the decision not to pay the payroll and trust fund taxes that GBUS owed to the IRS.  Indeed, AVENATTI was well aware of GBUS's outstanding tax obligations, yet repeatedly refused to authorize the required tax payments to the IRS.

12.  Additionally, after the IRS initiated a collection action relating to GBUS's outstanding payroll tax obligations in September 2016, issued an approximately $5,000,000 tax lien against GBUS in July 2017, and levied multiple GBUS bank accounts, AVENATTI directed repeated attempts to evade collection of those payroll taxes and obstruct the IRS collection action.  Among other things, AVENATTI: (a) made false statements to an IRS Revenue Officer regarding GBUS's payroll taxes and AVENATTI's involvement in GBUS's finances; (b) directed GBUS employees to deposit the cash receipts from Tully's stores into a bank account associated with a different entity AVENATTI controlled; (c) changed the company name, Employer Identification Number ("EIN"), and bank account information associated with GBUS's merchant credit card processing accounts; (d) changed the company name on various contracts with The Boeing Company; and (e) caused significant amounts of GBUS's funds, which could and should have been used to pay GBUS's payroll taxes, to be transferred to other entities AVENATTI controlled, including EA LLP and A&A.

13.  Third, AVENATTI filed federal personal income tax returns for the 2009 and 2010 tax years indicating that he owed

USAO_00134478

USAO_00134447

the IRS a total of approximately $850,438, plus interest and penalties.  AVENATTI, however, did not pay the IRS the amounts he owed for those tax years.[5]  AVENATTI then failed to file personal tax returns for the 2011 through 2017 tax years. During these tax years, AVENATTI generated substantial income and lived lavishly, yet largely failed to pay any federal income tax.

14.  Fourth, AVENATTI's other companies, EA LLP and A&A, repeatedly failed to meet their tax obligations despite generating substantial revenues.  Between 2015 and 2017, EA LLP failed to file payroll tax returns and pay approximately $2.4 million in payroll taxes, including approximately $1,279,001 in trust fund taxes that had been withheld from EA LLP employees' paychecks.  Additionally, EA LLP did not file partnership tax returns (IRS Form 1065) for the 2013, 2014, 2015, 2016, and 2017 tax years.  Similarly, A&A did not file corporate tax returns (IRS Form 1120S) for the 2011, 2012, 2013, 2014, 2015, 2016, or 2017 tax years.

15.  Fifth, between approximately January 2014 and December 2014, AVENATTI obtained three separate loans from The Peoples Bank, a federally insured bank in Mississippi: (1) a $850,500 loan to GB LLC in January 2014; (2) a $2,750,000 loan to EA LLP in March 2014; and (3) a $500,000 loan to EA LLP in December 2014.  In connection with these loans, AVENATTI provided The

---

[5] The tax due and owing to the IRS for the 2009 and 2010 tax years was not paid until November 2015, when AVENATTI sold his residence in Laguna Beach, California, upon which there was an IRS tax lien.

10

USAO_00134479

USAO_00134447

Peoples Bank with false federal individual income tax returns
for the 2011, 2012, and 2013 tax years.  AVENATTI, however,
never filed individual income tax returns for the 2011, 2012,
and 2013 tax years, and did not make any estimated tax payments
during the 2012 and 2013 tax years, as claimed on the returns
submitted to The Peoples Bank.  In addition, in March 2014,
AVENATTI provided The Peoples Bank with a 2012 federal tax
return for EA LLP which differed materially from the federal tax
return EA LLP actually filed with the IRS in October 2014.

    16.  Sixth, in March 2017, AVENATTI, as the managing member
of EA LLP, consented to EA LLP being placed in Chapter 11
bankruptcy (the "2017 EA Bankruptcy").  Among other things, the
Chapter 11 bankruptcy guidelines and requirements: (a) required
AVENATTI to close all pre-petition bank accounts controlled by
EA LLP, immediately open debtor-in-possession ("DIP") bank
accounts, and deposit all business revenues into the DIP
operating account; and (b) required AVENATTI to file monthly
operating reports ("MOR") for EA LLP and report all of EA LLP's
financial information for the reporting period.  From
approximately March 2017 through March 2018, AVENATTI failed to
report, among other information, all revenues of EA LLP and
payments and distributions AVENATTI, as an insider, received
from EA LLP funds.  Additionally, between March 2017 and March
2018, AVENATTI defrauded the bankruptcy court, the Office of the
United States Trustee, and the creditors of EA LLP, by
concealing bank accounts controlled by EA LLP, the true revenues
generated by EA LLP, and the sources of revenue to EA LLP.

USAO_00134480

USAO_00134447

17.   On March 25, 2019, federal agents arrested AVENATTI in
New York pursuant to a criminal complaint and arrest warrant
issued in this district in case number 8:19-MJ-241, as well as
pursuant to a separate criminal complaint and arrest warrant
issued in the Southern District of New York in case number
19MAG2927.  Simultaneously with AVENATTI's arrest, IRS-CI
executed search warrants issued in this district in case numbers
8:19-MJ-243, 8:19-MJ-244, and 8:19-MJ-247 at three locations
associated with AVENATTI and EA LLP.  Upon AVENATTI's arrest,
federal agents in New York seized several digital devices,
forensic copies of which have been provided to IRS-CI (i.e.,
SUBJECT DEVICES 7 through 9), and miscellaneous documents found
in AVENATTI's briefcase, scanned copies of which have been
provided to IRS-CI (i.e., SUBJECT DEVICE 10).⁶  There is probable
cause to believe that the digital devices and miscellaneous
document found on AVENATTI at the time of his arrest (i.e.,
SUBJECT DEVICES 7 through 10) will contain evidence of the
Subject Offenses, including business records, financial
documents, and emails.

18.   Following AVENATTI's arrest and the execution of the
March 2019 search warrants, IRS-CI learned that in or about
November 2018 AVENATTI caused computer servers belonging to EA

_____

⁶ Federal agents in New York also seized a black Apple
iPhone X, a silver Apple MacBook Pro, and a black and grey Apple
iPad from AVENATTI upon his arrest.  Currently, the agents in
New York are still attempting to gain access to the contents of
these three digital devices.  If they are able to access these
additional devices, we anticipate receiving forensic images of
them and seeking a warrant to search the contents of these
devices as well.

12

USAO_00134481

USAO_00134447

LLP (i.e., SUBJECT DEVICES 1 through 6) to be moved to a data
center in Orange County, California, operated by MixinIT.   On
April 3, 2019, the court-appointed receiver for EA LLP consented
to IRS-CI taking physical custody of the EA LLP servers so that
IRS-CI could create forensic images of the EA LLP servers.
There is probable cause to believe that the EA LLP servers
(i.e., SUBJECT DEVICES 1 through 6) will contain additional
evidence of the Subject Offenses, including business records,
financial documents, and emails.

### IV.   STATEMENT OF PROBABLE CAUSE

### A.   February 2019 Warrant to Search GBUS Digital Devices

19.   On February 22, 2019, in case number 8:19-MJ-103, I
submitted an affidavit in support of an application for a
warrant to search seven digital devices, which had been produced
by former GBUS employees, in the custody of IRS-CI in Laguna
Niguel, California (the "February 2019 affidavit").   The
Honorable Douglas F. McCormick, United States Magistrate Judge,
issued the warrant that same day (the "February 2019 search
warrant").   The application for a search warrant in case number
8:19-MJ-103, as well as my February 2019 affidavit in support
thereof, are attached hereto as Exhibit 1 and incorporated
herein by reference.

### B.   March 2019 Criminal Complaint

20.   On March 22, 2019, in case number 8:19-MJ-241, I
submitted an affidavit in support of a criminal complaint and
arrest warrant against AVENATTI (the "complaint affidavit").
The criminal complaint charged AVENATTI with one count of bank

USAO_00134482

USAO_00134447

fraud, in violation of 18 U.S.C. § 1344(1), relating to
AVENATTI's fraudulent scheme to obtain a $500,000 loan from The
Peoples Bank on or about December 12, 2014, and one count of
wire fraud, in violation of 18 U.S.C. § 1343, relating to
AVENATTI's fraudulent scheme to embezzle clients' funds,
specifically the $1.6 million settlement on behalf of Client 3.
The Honorable Douglas F. McCormick, United States Magistrate
Judge, issued the arrest warrant that same day.  The criminal
complaint in case number 8:19-MJ-241, as well as my complaint
affidavit in support thereof, are attached hereto as Exhibit 2
and incorporated herein by reference.[7]

C.    **March 2019 Warrants to Search Locations Associated with
      AVENATTI and EA LLP**

      21.   On March 24, 2019, in case numbers 8:19-MJ-242, 8:19-
MJ-243, and 8:19-MJ-244, I submitted an affidavit in support of
applications for warrants to search AVENATTI's residence in Los
Angeles and two other locations (the "March 2019 affidavit").
The Honorable Douglas F. McCormick, United States Magistrate
Judge, issued the warrants that same day (the "March 2019 search
warrant").  The March 2019 affidavit in support for the search
warrants in case numbers 8:19-MJ-242,[8] 8:19-MJ-243, and 8:19-MJ-

---

      [7] A copy of the application for the February 2019 search
warrant, including my February 2019 affidavit, were also
incorporated by reference and attached to the criminal complaint
in case number 8:19-MJ-241.  Accordingly, I have not included a
duplicate copy of the February 2019 search warrant application,
as part of Exhibit 2 to this affidavit.

      [8] On March 25, 2019, to execute the warrant issued in case
number 8:19-MJ-242, IRS-CI agents went to 10000 Santa Monica
Boulevard, Unit 2205 in Los Angeles, California, the location
identified as the premise to be search in case number 8:19-MJ-

USAO_00134483

USAO_00134447

244, is attached hereto as Exhibit 3 and incorporated herein by reference.⁹

22.   The items to be seized set forth in Attachment B to this search warrant application are largely identical to the items to be seized set forth in Attachments B-1 through B-3 of the March 2019 search warrants.   The items to be seized in Attachment B to this search warrant application principally differ from items to be seized set forth in Attachments B-1 through B-3 of the March 2019 warrants in that Attachment B to this search warrant application includes items pertaining to Client 1, Client 2, the private jet AVENATTI purchased using Client 2's settlement funds, the Super Bowl Clients, and a separate entity controlled by AVENATTI called "Augustus LLP." (See Attachment B ¶¶ 1.a, 1.t, 1.u, 1.v, 1.y, 1.ff.)

23.   The privilege review protocols set forth in Attachment B to this search warrant application are also largely identical to the privilege review protocols set forth in Attachments B-1 through B-3 of the March 2019 search warrants.   The principal

---

242, and learned that AVENATTI moved from Unit 2205 to Unit 2107.   As a result, IRS-CI SA Leia R. Bellis presented a new application for search warrant with an affidavit that she swore out for Unit 2107, to Judge McCormick on March 25, 2019, in case number 8:19-MJ-247.   As the facts and circumstances related to the change in apartment numbers were the only different facts presented in that affidavit and warrant, I have not attached that warrant as an exhibit.

⁹ A copy of the application for the February 2019 search warrant, including my February 2019 affidavit, and the criminal complaint, were also incorporated by reference and attached to the March 2019 search warrant applications and the affidavits attached thereto in case numbers 8:19-MJ-242, 8:19-MJ-243, and 8:19-MJ-244.   Accordingly, I have not included a duplicate copy of the February 2019 search warrant application or the criminal complaint, as part of Exhibit 3 to this affidavit.

15

USAO_00134484

USAO_00134447

difference is that the privilege review protocol set forth in
Attachment B to this search warrant application does not address
the search of physical locations and non-digital evidence
because the instant search warrant application only covers the
search of digital devices that are already in IRS-CI's custody.

**D.    Additional Evidence Regarding AVENATTI's Scheme to Defraud
His Legal Clients**

24.   As noted above, evidence establishing probable cause
to believe AVENATTI committed all of the Subject Offenses is set
forth in my February 2019 (Ex. 1) and March 2019 affidavit
(Ex. 3).  This evidence includes evidence that AVENATTI
embezzled funds from at least two sets of his legal clients,
namely, Client 3 (Ex. 1, § IV.G; Ex. 3, § VI.C), and Clients 4
and 5 (Ex. 3, § VI.D).  In this section of the instant
affidavit, I set forth additional evidence that IRS-CI has
discovered since the execution of the March 2019 search warrants
regarding the embezzlement offenses.  This additional evidence
shows that AVENATTI embezzled from additional victim-clients
beyond those discussed in the February 2019 and March 2019
affidavits.

**1.    *Evidence Regarding AVENATTI's Embezzlement of
Client 1's Settlement Funds***

25.   There is probable cause to believe that in or about
January 2015 AVENATTI embezzled Client 1's portion of a
$4,000,000 settlement payment from the County of Los Angeles.
As set forth in greater detail below, the evidence collected to
date demonstrates that AVENATTI: (a) negotiated a $4,000,000
settlement with the County of Los Angeles on behalf of Client 1;

16

USAO_00134485

USAO_00134447

(b) made false representations to Client 1 regarding the terms
of the settlement agreement; (c) embezzled Client 1's portion of
the $4,000,000 settlement payment; (d) provided Client 1 with
periodic payments of $1,000 to $1,900, which AVENATTI falsely
described as "advances" on the yet-to-be-received $4,000,000
settlement payment, in order to lull Client 1 and prevent Client
1 from discovering that AVENATTI embezzled Client 1's portion of
the $4,000,000 settlement payment.

> a.   The $4,000,000 Settlement Agreement with the
>      County of Los Angeles

26.   Based on my review of publicly available court
documents and records obtained from Hurrell Cantrall LLP, which
represented the County of Los Angeles in litigation involving
Client 1, I have learned the following:

a.   In or about October 2012, EA LLP and AVENATTI
filed a lawsuit against the County of Los Angeles and others on
behalf of Client 1 (the "L.A. County Lawsuit").

b.   In or about June 2013, the L.A. County Lawsuit
was removed to the United States District Court for the Central
District of California.

c.   The L.A. County Lawsuit alleged that the County
of Los Angeles violated Client 1's constitutional rights,
causing Client 1 to suffer severe emotional distress and severe
physical injuries, including paraplegia.

d.   On or about November 7, 2014, the parties
appeared in federal court for a status conference in connection

17

USAO_00134486

USAO_00134447

with the L.A. County Lawsuit.  During the status conference,
AVENATTI stated the following:

> Your Honor, for the last week or two, we've been in
> active settlement discussions involving a retired
> judge, Louis Meisinger. The good news is is [sic] that
> the parties have reached a tentative settlement
> relating to all material terms with the exception of
> one material term, which is providing some angst and
> for which Mr. Hurrell and I decided yesterday that
> perhaps the Court, based on Your Honor's experience,
> could assist us with resolving.
>
> And that one material term is mainly when the settlement
> dollars are to be paid to [Client 1], who, as the Court
> knows, is a paraplegic and is in need of the funds.

AVENATTI further stated:  "[Client 1] would like the moneys paid
within 60 days, namely today or Monday so that he can utilize
the money for his living expenses and other needs."

        e.   On or about December 11, 2014, the parties filed
a status report regarding the settlement of the L.A. County
Lawsuit, which settlement required approval from the Los Angeles
County Board of Supervisors.  In the status report, the parties
stated they expected the settlement to be approved by the Board
of Supervisors and funded by March 6, 2015.

        f.   On or about January 6, 2015, AVENATTI sent an
email to counsel for the County of Los Angeles regarding the
settlement agreement.  AVENATTI stated:  "Can you please provide
an update on the schedule?  We are trying to get [Client 1]
taken care of."

        g.   On or about January 13, 2015, the Board of
Supervisors approved the settlement agreement for the L.A.
County Lawsuit.

USAO_00134487

Exhibit D - 041

USAO_00134447

      h.   On or about January 21, 2015, AVENATTI emailed counsel for the County of Los Angeles the signature page for the settlement agreement with the County of Los Angeles.

      i.   On or about January 22, 2015, counsel for the County of Los Angeles sent AVENATTI via email and U.S. mail the fully executed settlement agreement.  The settlement agreement stated:

> In exchange for a complete resolution of the [L.A. County] Lawsuit, Defendants, by and through the County of Los Angeles, shall pay to Plaintiff **Four Million Dollas ($4,000,000)** (the "Settlement Funds"), subject to approval by the Los Angeles County Board of Supervisors.  The parties acknowledge that the Court in this matter has issued an order outlining a time table to present this settlement for approval by the Los Angeles County Board of Supervisors, and thereafter issuance of a settlement draft.  It is understood by the parties that if the time table is not complied with, this settlement agreement may be revoked by either party.

> The Parties expressly agree that the Lawsuit shall not be dismissed until **five (5)** business days following receipt by Eagan Avenatti of the Settlement Funds as provided above.

(Emphasis in original.)  The executed settlement agreement was signed by a representative for the County of Los Angeles, counsel for the County of Los Angeles, and AVENATTI, and purportedly signed by Client 1.[10]  The settlement agreement did not contain any confidentiality provisions.  Additionally, the settlement agreement was not dependent on the creation of any sort of trust for Client 1.

---------------------------------------

[10]   When IRS-CI interviewed Client 1, he indicated that the signature on the settlement agreement looked funny to him, but that it could possibly have been his signature.

USAO_00134488

USAO_00134447

j.    On or about January 22, 2015, AVENATTI sent an
email to counsel for the County of Los Angeles instructing the
County to make the check for the settlement payable to "Eagan
Avenatti, LLP Client Trust Account."

k.    On or about January 29, 2015, the Count of Los
Angeles sent to AVENATTI and EA LLP via messenger: (1) a letter
enclosing the "settlement check" of $4,000,000; (2) check number
TS 0021400949, dated January 26, 2015, to "Eagan Avenatti, LLP
Attorney Client Trust Account" in the amount of $4,000,000; and
(3) a stipulation to dismiss the L.A. County Lawsuit and
corresponding proposed order.

l.    On or about February 10, 2015, the parties filed
a stipulation to dismiss the L.A. County Lawsuit with prejudice.
The order dismissing the L.A. County Lawsuit was entered later
that same date.

b.    Bank Account Records Relating to the $4,000,000
        Settlement and Client 1

27.   Based on my review of bank records, I have learned the
following regarding the disposition of the $4,000,000 settlement
payment from the County of Los Angeles:

a.    On or about January 29, 2015, the $4,000,000
settlement check (check number TS 0021400949) from the County of
Los Angeles to EA LLP's attorney client trust account was
deposited into EA LLP's California Bank & Trust ("CB&T")
attorney trust account ending in 8541 ("EA Trust Account 8541").
Prior to the $4,000,000 deposit, EA Trust Account 8541 had an
account balance of $0.00.

USAO_00134489

USAO_00134447

Case 8:19-mj-00419-DUTY *SEALED*   Document 4-1 *SEALED*   Filed 05/24/19   Page 44 of 330   Page ID #:550

     b.   Between on or about January 30, 2015, and on or about March 30, 2015, a total of approximately $3,125,898 was transferred from EA Trust Account 8541 to a EA LLP's CB&T operating account ending in 2851 ("EA Account 2851").

     c.   Between on or about January 30, 2015, and on or about March 30, 2015, approximately $1,721,000, the vast majority of which derived from the $4,000,000 settlement payment, was transferred from EA Account 2851 to A&A's CB&T account ending in 0661 ("A&A Account 0661").[11] Substantial portions of the funds transferred to A&A Account 0661 were then used for AVENATTI's own purposes.[12] For example, during this time period, AVENATTI made the following payments from A&A Account 0661 for his personal purposes:

     i.   Between on or about January 30, 2015, and on or about February 27, 2015, A&A paid approximately $505,000 to GBUS.

     ii.   Between on or about January 30, 2015, and on or about March 27, 2015, A&A paid a total of approximately

---

    [11] Prior to the transfer of approximately $3,125,898 from EA Trust Account 8541 to EA Account 2851, EA Account 2851 had an account balance of approximately $25,318. Between January 30, 2015, and March 30, 2015, approximately $84,161 was transferred to EA Account 2851 from other sources, and approximately $50,000 that had originally been transferred from EA Account 2851 to A&A Account 0661 was transferred back to EA Account 2851.

    [12] Prior to the transfer of approximately $450,000 from EA Account 2851 to A&A Account 0661 on or about January 30, 2015, A&A Account had an account balance of approximately $17,491. Between January 30, 2015, and March 30, 2015, the only deposits into A&A Account 0661 came from EA Account 2851.

21

USAO_00134490

Exhibit D - 044

USAO_00134447

$315,000 to GB Autosport LLC, which managed AVENATTI's car racing team.

        iii. Between on or about February 20, 2015, and on or about March 30, 2015, A&A paid approximately $220,000 to AVENATTI's personal Bank of America account.

        iv.  Between on or about January 30, 2015, and on or about February 6, 2015, A&A paid a total of approximately $200,000 to Gallo Builders, Inc., a custom home builder in Newport Beach, California.[13]

        v.   Between on or about February 3, 2015, and on or about March 18, 2015, A&A paid a total of approximately $82,236 to Porsche, including an approximately $79,800 payment on March 18, 2015.

        vi.  Between on or about January 30, 2015, and on or about March 9, 2015, A&A paid a total of approximately $36,500 to AVENATTI's ex-wife, C.C.

        vii. On or about February 3, 2015, A&A paid approximately $80,372 to Chase Home Finance in connection with the mortgage on AVENATTI's residence in Laguna Beach, California.[14]

---

[13] During a Judgment Debtor examination on March 15, 2019, AVENATTI testified under oath and admitted that the payments from the A&A Account 0661 to Gallo Builders were personal expenses of AVENATTI at his personal residence and not business expenses of A&A.

[14]  Bank records reflect that on or about January 29, 2015, a prior payment to Chase Home Finance of approximately $80,372 was returned to A&A Account 0661 due to insufficient funds in A&A Account 0661.

USAO_00134491

Exhibit D - 045

USAO_00134447

d.   By no later than July 6, 2015, the entire $4,000,000 settlement payment from the County of Los Angeles for Client 1 had been drained from EA Trust Account 8541.[15]

e.   IRS-CI has yet to identify any direct payments from EA Trust Account 8541 to Client 1 of money that was traceable to the $4,000,000 settlement payment EA LLP received from the County of Los Angeles to hold in trust on Client 1's behalf.

28.   Rather than transfer Client 1's portion of the $4,000,000 settlement to Client 1, AVENATTI made relatively-small periodic payments to Client 1, which AVENATTI described as advances on the purportedly yet-to-be-received settlement payment.  (See infra ¶ 30.i.)  Specifically, based on IRS-CI's review of records for bank accounts AVENATTI controlled, I understand that between in or about July 2015 and in or about December 2018, AVENATTI caused EA LLP or A&A to make at least 69 payments, each ranging from approximately $1,000 to $1,900 and totaling approximately $122,200, to Client 1.  The $122,200 total, however, does not currently include any purported "advance" payments AVENATTI made to Client 1 between December 2018 and March 2019, as IRS-CI is still in the process of analyzing bank records for that time period.

29.   AVENATTI also appears to have paid for Client 1's rent at various assisted living facilities.  Specifically, based on

_____

[15] On March 31, 2015, approximately $3,034,514 was deposited into EA Trust Account 8541 from another source.  This intervening deposit makes it more difficult for IRS-CI to trace the disposition of the remaining portions of the $4,000,000 settlement payment.

USAO_00134492

USAO_00134447

IRS-CI's review of bank records, I understand that between in or about February 2015 and in or about December 2018, AVENATTI caused a total of at least approximately $72,000 to be paid from bank accounts AVENATTI controlled to assisted living facilities where Client 1 resided.[16]  This total, however, does not currently include any rent payments AVENATTI made on Client 1's behalf between December 2018 and March 2019, as IRS-CI is still in the process of analyzing bank records for that time period.

c.   Information Client 1 Provided to IRS-CI

30.   On or about March 31, 2019, IRS-CI SA Gerry Carmona and IRS-CI SA James Kim participated in an interview of Client 1.  Client 1 was accompanied by his personal attorney.  Based on my review of a memorandum summarizing the interview with Client 1 and discussions with SA Carmona and SA Kim, I understand that Client 1 provided, in substance and in part, the following information:

a.   EA LLP and AVENATTI represented Client 1 in connection with a lawsuit against the County of Los Angeles. Client 1's parents and sister helped Client 1 select EA LLP and AVENATTI to represent Client 1.

b.   Client 1 did not recall signing an engagement letter or contract with AVENATTI or EA LLP, but assumed a contract was signed.

---

[16]   I understand that EA LLP also paid for Client 1's rent at assisted living and/or rehabilitation facilities prior to the execution of the settlement agreement with the County of Los Angeles in January 2015. Although additional financial analysis is necessary, IRS-CI currently believes that the total amount EA LLP paid prior to the execution of the January 2015 settlement agreement was between approximately $350,000 and $400,000.

24

USAO_00134493

USAO_00134447

c.   Client 1 reviewed the signature page of the January 21, 2015, settlement agreement with the County of Los Angeles.  Client 1 thought his signature looked "funny" to him, but said that he may have signed the document.  Client 1 said that he was never presented with the full settlement agreement and never saw the $4,000,000 settlement amount.

d.   AVENATTI told Client 1 that a settlement had been reached with the County of Los Angeles.  AVENATTI may have told Client 1 the amount Client 1 would receive after fees and expenses, but Client 1 did not recall ever being told the settlement was for $4,000,000.

e.   AVENATTI told Client 1 that under the terms of the settlement agreement, he would receive approximately $46,000 per quarter for 10 years.  AVENATTI told Client 1 that the County of Los Angeles does not pay settlements in a lump-sum and would only pay the settlement in quarterly payments over a certain period of time.  AVENATTI also told Client 1 that the settlement proceeds could not be paid until the County of Los Angeles approved a Special Needs Trust[17] for Client 1.

f.   Prior to the interview with IRS-CI, Client 1 had never seen the $4,000,000 settlement payment from the County of Los Angeles.  AVENATTI never told Client 1 that EA LLP had received a $4,000,000 settlement payment from the County of Los Angeles in January 2015.

---

[17] A "Special Needs Trust" is a specialized trust that allows for a person living with disabilities to maintain his or her eligibility for public assistance benefits.  (See infra ¶ 32.)

25

USAO_00134494

USAO_00134447

g.    Client 1 never authorized AVENATTI to use any of the settlement funds intended for Client 1 for AVENATTI's personal or business purposes.  AVENATTI never told Client 1 that Client 1's portion of the settlement funds would be used for AVENATTI's own personal or business purposes.

h.    Had Client 1 known that EA LLP received the $4,000,000 settlement payment, Client 1 would have wanted a lump-sum payment and would have put the money into a Special Needs Trust.  Client 1 had been advised by various people to create a Special Needs Trust so he would not lose his Supplemental Security Income ("SSI") or Medi-Cal benefits.  AVENATTI told Client 1 that AVENATTI would create a Special Needs Trust for Client 1 and that he had created Special Needs Trusts for other clients in the past.

i.    Client 1 was shown a spreadsheet detailing approximately 69 payments, each ranging from $1,000 to $1,9000, to Client 1 from EA LLP or A&A between July 2015 and December 2018.  During this time period, Client 1 was told that the settlement had not been finalized, but that AVENATTI would "advance" Client 1 money against the settlement amount.  Client 1 said that he last received a payment from AVENATTI on or about March 18, 2019, while Client 1 was visiting family.

j.    Client 1 also said that AVENATTI paid Client 1's rent at various assisted living facilities.  Client 1 said that recently Client 1's rent had not been paid for a period of approximately six months, resulting in late fees.

USAO_00134495

Exhibit D - 049

USAO_00134447

k.    In approximately 2017, Client 1 told AVENATTI he
wanted to buy a house.  AVENATTI told Client 1 buying a house
would be a good investment and agreed to help Client 1.
AVENATTI found a real estate broker ("Broker 1") to represent
Client 1.  AVENATTI, however, wanted Client 1 to deal with
AVENATTI instead of dealing with Broker 1 directly.

l.    Client 1 eventually went into escrow on a
property in the Canoga Park area.  While in escrow, AVENATTI
told Client 1 that there was a problem and the County of Los
Angeles still needed to approve Client 1's Special Needs Trust.
AVENATTI told Client 1 he had a meeting with the County of Los
Angeles to resolve the issue, but the story from AVENATTI went
on and on and the house eventually fell out of escrow.

m.    Client 1 is no longer receiving SSI benefits.
Client 1 said that, sometime in the three months prior to the
interview with IRS-CI, Client 1 received a letter from SSI
indicating that Client 1's SSI benefits would be stopped.[18]
AVENATTI told Client 1 that this was a mistake and that AVENATTI
would take care of it.

n.    In or about February or March 2019 (approximately
one month before the interview with IRS-CI), AVENATTI told
Client 1 that the County of Los Angeles was still not making the
settlement payments because the Special Needs Trust still had
not been approved.

---------------------------------------

[18]    Client 1's counsel subsequently provided IRS-CI with the
documents Client 1 received from the Social Security
Administration ("SSA").  (See infra ¶ 31.e.i.)

USAO_00134496

USAO_00134447

o.    On Friday, March 22, 2019, AVENATTI called Client 1 and told Client 1 that AVENATTI was in Client 1's neighborhood and wanted to stop by Client 1's residence. AVENATTI told Client 1 that the Special Needs Trust had been approved and asked Client 1 what kind of payment plan Client 1 wanted.

p.    The next day, Saturday, March 23, 2019, AVENATTI returned to Client 1's residence with a document for Client 1 to sign.  AVENATTI told Client 1 that the Special Needs Trust was done and that once Client 1 signed the document he would start receiving the settlement payments.  Client 1 did not read the document.  Rather, AVENATTI pointed out the highlights of the document to Client 1 and then had Client 1 sign the document. AVENATTI had the document open to the specific page for Client 1 to sign.  AVENATTI did not have Client 1 date the document and Client 1 did not recall there being a line for the date on the signature page.  Client 1 did not receive a copy of the document from AVENATTI.  AVENATTI instead told Client 1 that J.R., AVENATTI's office manager, would send Client 1 a copy of the document at a later time.  AVENATTI also told Client 1 not to discuss the matter with anyone or Client 1 would lose the money.

q.    During the March 23, 2019, meeting there was also discussions regarding Client 1's portion of the settlement. Based on these discussions, Client 1 understood that he was to receive approximately $1.9 million.  AVENATTI told Client 1 that AVENATTI's share had already been deducted or factored into the $1.9 million settlement amount.

28

USAO_00134497

Exhibit D - 051

USAO_00134447

r.   On Sunday, March 24, 2019, AVENATTI returned to Client 1's residence again.  During this meeting, AVENATTI wanted Client 1 to initial the document that Client 1 had signed on March 23, 2019.  AVENATTI told Client 1 that J.R. would be mad at AVENATTI if AVENATTI did not get Client 1's initials on the document.

s.   Client 1 also recalled signing a second document during the meetings on March 23 and March 24, 2019, which document stated that AVENATTI had done a diligent job representing Client 1.  AVENATTI told Client 1 that AVENATTI wanted to put the document on AVENATTI's website to show what a great job AVENATTI had done on Client 1's case.[9]  Client 1 also recalled AVENATTI asking Client 1 about Client 1's medication.

t.   Client 1 trusted AVENATTI with everything. AVENATTI was involved in any big decisions involving Client 1.

u.   Client 1 was asked whether any of Client 1's mental health issues affected his memory.  Client 1 said that his mental health issues have no impact on his memory, he has never had memory issues, and he does not take any medication for memory issues.

v.   SA Carmona and SA Kim both indicated that Client 1 appeared to be in full possession of his faculties throughout the interview and that Client 1 appeared to them to be intelligent and articulate.

---------------------------------------

[9]  On April 11, 2019, shortly after the Indictment was publicly disclosed, AVENATTI posted what appeared to be a copy of this document on Twitter.com in support of his claim that he is innocent of the charges.  I understand that AVENATTI has since deleted this message from his Twitter account.

USAO_00134498

USAO_00134447

31.   Client 1 allowed IRS-CI to take photographs of text messages between Client 1 and AVENATTI and/or J.R., which were dated between April 2017 and March 2019.   Client 1 also provided a copy of a text message with a family friend, B.P.   Client 1's text messages, including the following, appear to be consistent with Client 1's statements to IRS-CI regarding the purported "advance" payments Client 1 received from AVENATTI and Client 1's attempt to purchase a house in 2017:

a.   Between in or about May 2017 and in or about June 2017, Client 1 sent AVENATTI and J.R. multiple text messages regarding Client 1's attempted purchase of a house.   For example, on or about May 24, 2017, Client 1 sent AVENATTI a text message asking if there was "[a]ny word from the seller on our latest offer?"   AVENATTI responded the next day and provided Client 1 with the details of the seller's counter offer and AVENATTI's planned response.

b.   On or about August 14, 2017, Client 1 sent a text message to B.P. stating: "House didn't close move is off for tomorrow."   The next day, on or about August 15, 2017, B.P. asked Client 1: "Any problem with close other than a delay?"   Client 1 responded:   "Waiting for the county to approve the special needs trust."

c.   Between 2017 and March 2019, Client 1 sent AVENATTI and/or J.R. numerous text messages asking AVENATTI and/or J.R. to deposit funds into Client 1's bank account.   Client 1 often had to make repeated requests for funds before AVENATTI or J.R. made a deposit into Client 1's bank account.

30

USAO_00134499

USAO_00134447

For example, on or about October 6, 2018, Client 1 sent AVENATTI

two text messages stating:

> Just FYI I asked for a deposit last Friday to take
> place this past thurs. two days ago.  That is a weeks
> notice.  [J.R.] didn't do it till yesterday so the
> deposit is not available.  I now have no money over
> the weekend.  I literally have no money for food.
> This is really hard on me Michael, I don't know what
> to do.

> And it's a holiday weekend so the funds are not
> available at the earliest till Tuesday.  That is if I
> can convince them to take off the hold.

    d.   Between September 2017 and March 2019, Client 1

sent a number of text messages to AVENATTI and/or J.R. in which

Client 1 indicated that his rent at his assisted living facility

was late and requested that AVENATTI and/or J.R. send payment to

his landlord.  For example, on or about February 15, 2019,

Client 1 sent AVENATTI and J.R. a text message stating that

Client 1's landlord "just gave me a notice saying I have three

days to pay the rent or else I have to move out."

    e.   Between in or about October 2018 and in or about

March 2019, Client 1 sent multiple text messages to AVENATTI

and/or J.R. regarding Client 1's SSI benefits, including the

following:

        i.   On or about November 10, 2018, Client 1

appears to have sent J.R. photographs of a letter Client 1

received from SSA regarding Client 1's SSI benefits.[20]  Client 1

---

    [20]   Although the photographs associated with this text
message were no longer available on Client 1's phone when
Client 1 met with IRS-CI, based on the date of the letter from
SSA, the date of the text message to J.R., and Client 1's
subsequent text messages to AVENATTI and/or J.R. regarding the
SSA issue, I believe that photographs of the SSA letter were
likely attached to this particular text message.

USAO_00134500

USAO_00134447

subsequently provided, through his counsel, a copy of this
letter to IRS-CI.  The letter from SSA stated that SSA needed
additional information in order to further evaluate Client 1's
eligibility for SSI benefits, including information regarding:
(1) Client 1's rental agreement; (2) the "settlement award
letter" from the County of Los Angeles; (3) disbursements from
the settlement since October 2016; (4) verification that the
"trust has or has not been established"; and (5) a letter from
Client 1's attorney about "monthly loan amounts" since October
2016.

   ii.  On or about November 26, 2018, Client 1 sent
a text message to AVENATTI stating:  "I sent that letter [from]
SSI that is requesting docs from you to [J.R.] a week and a half
ago.  I included a doc you don't have which u will need to send
along with the rest, my rental agreement with [Client 1's
landlord].  I think it needs to be sent this week."  AVENATTI
responded that same day, "We will handle."

   iii. On or about January 21, 2019, Client 1 sent
a text message to AVENATTI and J.R. stating:  "I received a
letter from SSI on Saturday.  They have stopped my SSI as of
February because they did not receive the requested documents.
I will text the letter to [J.R.] as soon as I get up in my
chair."  AVENATTI responded that same day:  "This is in error.
We will fix it forthwith.  Don't worry."

   f.  On or about March 22, 2019, at approximately 7:00
p.m., after meeting with AVENATTI, Client 1 sent AVENATTI a text

USAO_00134501

USAO_00134447

message telling him that he would be available to meet with AVENATTI again from 1:00 p.m. to 5:30 p.m. on March 23, 2019.

d.   Information Regarding the Purported Special Needs Trust for Client 1

32.   As noted above, between in or about January 2015 and in or about March 2019, AVENATTI falsely represented to Client 1 that the County of Los Angeles could not make the settlement payment until a Special Needs Trust for Client 1 had been approved.   (See supra ¶¶ 30.e., 30.n.)   Based on my review of publicly available information and discussions with a representative from the California Department of Health Care Services ("CA DHCS"), I have learned the following regarding Special Needs Trusts:

a.   A Special Needs Trust is a specialized trust that allows for a person living with disabilities to maintain his or her eligibility for public assistance benefits despite having assets that would make the person ineligible for those benefits.

b.   According to CA DHCS's website, there are two different types of Special Needs Trusts: (1) a first party Special Needs Trust; and (2) a third party Special Needs Trust. First party Special Needs Trusts are "funded with assets that belong to the trust beneficiary or to which the beneficiary was legally entitled (e.g., assets from an award or settlement, etc.).   Third party Special Needs Trusts are funded with "assets belonging to a person other than the trust beneficiary, and to which the beneficiary never had possession or legal interest."

USAO_00134502

Exhibit D - 056

USAO_00134447

It appears that any Special Needs Trust for Client 1 would have needed to be a first party Special Needs Trust.

c.    First party Special Needs Trusts typically require notice and payback to the State of California upon the death of a beneficiary or earlier termination of the trust. Based on my discussions with a CA DHCS representative, I understand that such notice would typically need to be provided to CA DHCS and to Medi-Cal through the Los Angeles County Department of Public Social Services ("LA DPSS").

33.   IRS-CI's investigation to date has not discovered any evidence suggesting that AVENATTI made a legitimate effort to establish a Special Needs Trust for Client 1, let alone that AVENATTI submitted to the County of Los Angeles for approval a Special Needs Trust for Client 1.

a.    First, on or about April 5, 2019, after a thorough search of Cal DHCS's records, CA DHCS's Special Needs Trust Unit advised IRS-CI that it does not possess any documents or records relating to an actual or proposed Special Needs Trust for Client 1.

b.    Second, on or about April 9, 2019, after searching LA DPSS's case records from June 2015 to the present, LA DPSS advised IRS-CI that it was unable to locate any Special Needs Trust records relating to Client 1.  LA DPSS also conducted a search for conservatorship/authorized representative documents and found no such records for Client 1.

USAO_00134503

USAO_00134447

e.   Information Regarding Client 1's SSI Benefits

34.   As noted above, AVENATTI told Client 1 that AVENATTI
would respond on Client 1's behalf to a request that Client 1
provide SSA information that SSA requested to evaluate
Client 1's continued eligibility for SSI benefits, including
information regarding the settlement agreement with the County
of Los Angeles, the purported Special Needs Trust, and the
monthly payments from AVENATTI.   (See supra ¶ 31.e.)   Based on
discussions with Special Agents with SSA's Office of Inspector
General, I have learned the following:

a.   On or about April 13, 2016, AVENATTI and EA LLP
submitted a letter to SSA on behalf of Client 1.   In this
letter, AVENATTI stated:

> From February 2014 to the present, this law firm has
> been advancing [Client 1] approximately $1,250 a
> month.   As of this time, the court has not entered an
> "award letter" to Client 1.

AVENATTI's statements to SSA appear to be consistent with the
false statements that AVENATTI made to Client 1.

b.   On or about April 8, 2019, SSA advised IRS-CI
that it had searched its files and was unable to locate any
other letters from AVENATTI relating to Client 1.   SSA was also
unable to locate any records of calls to SSA from AVENATTI or EA
LLP.

f.   Information Regarding AVENATTI's Meetings with
Client 1 on March 22, 23, and 24, 2019

35.   The evidence IRS-CI has collected to date demonstrates
that, after AVENATTI was accused of stealing Client 1's money
during a public judgment debtor examination on March 22, 2019,

35

USAO_00134504

Exhibit D - 058

USAO_00134447

AVENATTI met with Client 1 in an attempt to lull Client 1 and prevent Client 1 from discovering that AVENATTI had embezzled Client 1's portion of the $4,000,000 settlement payment.

a.    First, on or about March 22, 2019, AVENATTI testified under oath during a judgment debtor examination in In re: Eagan Avenatti, LLP, No. 8:18-CV-10644-VAP-KES (C.D. Cal.), in Courtroom 8A of the United States Courthouse in Los Angeles. Based on my review of a transcript of those proceedings, I learned that AVENATTI was questioned regarding Client 1.  For example, AVENATTI was directly asked whether he stole Client 1's money and responded, "Absolutely not."

b.    Second, as noted above, Client 1 told IRS-CI that AVENATTI met with Client 1 at Client 1's residence on March 22, 2019, and that AVENATTI then returned to Client's residence on March 23 and March 24, 2019, to have Client 1 sign two documents.

c.    Third, cell-site and GPS information[21] for AVENATTI's cellular telephone confirmed that AVENATTI visited Client 1's residence on March 22, March 23, and March 24, 2019. Specifically, based on IRS-CI's review of the cell-site and GPS information, I have learned the following:

i.    On March 22, 2019, at approximately 6:30 p.m., AVENATTI's cellular telephone was in the vicinity of Client 1's residence.

---

[21]   On March 7, 2019, in case number 8:19-MJ-151, the Honorable Douglas F. McCormick issued a warrant for historical cell-site and prospective cell-site and GPS information relating to the cellular telephone used by AVENATTI.

36

USAO_00134505

Exhibit D - 059

USAO_00134447

          ii.  On March 23, 2019, at approximately 1:30 p.m., AVENATTI's cellular telephone was in the vicinity of Client 1's residence.

          iii. On March 24, 2019, at approximately 2:30 p.m., AVENATTI's cellular telephone was in the vicinity of Client 1's residence.

### 2. *Evidence Regarding AVENATTI's Embezzlement of Client 2's Settlement Funds*

36.  There is probable cause to believe that in or about January 2017, AVENATTI embezzled Client 2's portion of a $2,750,000 settlement payment from Individual 1.  As set forth in greater detail below, the evidence collected to date demonstrates that AVENATTI: (a) negotiated a $3,000,000 settlement with Individual 1 on behalf of Client 2; (b) made numerous false representations to Client 2 regarding the terms of the settlement agreement; (c) embezzled Client 2's portion of the initial $2,750,000 settlement payment from Individual 1 and used the funds to purchase a private jet; (d) provided Client 2 with monthly payments of approximately $16,000, which AVENATTI falsely described as monthly settlement payments from Individual 1, in order to lull Client 2 and prevent Client 2 from discovering that AVENATTI embezzled Client 2's portion of the initial $2,750,000 settlement payment.

        a.  Client 2's $3,000,000 Settlement Agreement with Individual 1

37.  Based on my review of documents IRS-CI obtained through the investigation, I have learned the following:

37

USAO_00134506

USAO_00134447

      a.   Between in or about December 2016 and in or about January 2017, EA LLP and AVENATTI represented Client 2 in connection with potential legal claims against Individual 1.

      b.   On or about January 7, 2017, during a confidential mediation proceeding in Los Angeles, California, AVENATTI negotiated a settlement agreement between Client 2 and Individual 1.   Under the terms of the settlement agreement, Individual 1 was required to make an initial payment to Client 2 of approximately $2,750,000 by on or about January 28, 2017, and an additional payment to Client 2 of approximately $250,000 on or about November 1, 2020, if certain additional specified conditions were met, for a total of approximately $3,000,000.

      c.   Between on or about January 16, 2017, and on or about January 25, 2017, AVENATTI sent Individual 1's lawyer multiple emails regarding the status of the initial $2,750,000 settlement payment.   AVENATTI also left Individual 1's lawyers a number of voicemails regarding the status of the settlement payment and expressing concern that the initial $2,750,000 settlement payment had yet to be received.

      d.   On or about January 25, 2017, Individual 1 wired approximately $2,750,000 to EA LLP's CB&T attorney trust account ending in 8671 ("EA Trust Account 8671").

      b.   <u>Bank Account Records Relating to the $2,750,000 Settlement Payment and Client 2</u>

    38.   Based on IRS-CI's review of bank account records, I have learned the following information regarding the disposition of the initial $2,750,000 settlement payment from Individual 1:

USAO_00134507

USAO_00134447

a.   As of on or about January 1, 2017, the account
balance in EA Trust Account 8671 was approximately $0.23.

b.   On or about January 25, 2017, EA Trust Account
8671 received an approximately $2,750,000 wire transfer from
Individual 1.

c.   On or about January 26, 2017, AVENATTI caused
approximately $2,500,000 to be transferred from EA Trust Account
8671 to a Chase Bank attorney trust account for The X-Law Group
ending in 7608 ("X-Law Account 7608").  That same day, at the
direction of AVENATTI, The X-Law Group wired approximately
$2,500,000 from X-Law Account 7608 to Honda Aircraft Company
LLC.  I understand that these funds were applied to the purchase
of a private Honda jet.

d.   On or about January 26, 2017, AVENATTI also
caused the remaining $250,000 of the $2,750,000 settlement
payment to be transferred from EA Trust Account 8671 to EA
Account 2851 and then from EA Account 2851 to A&A Account 0661.

e.   Between on or about March 15, 2017, and on or
about June 18, 2018, defendant AVENATTI caused approximately 11
payments totaling approximately $194,000 to be deposited into
Client 2's bank account.  These payments were made from a
variety of bank accounts controlled by AVENATTI, including A&A
Account 0661, EA LLP's CB&T attorney trust account ending in
4613 ("EA Trust Account 4613"), EA LLP's CB&T attorney trust
account ending in 3714 ("EA Trust Account 3714"), and a City
National Bank account in the name of "Michal Avenatti Esq."
ending in 3504 ("Avenatti Account 3504").  As noted below,

USAO_00134508

USAO_00134447

AVENATTI falsely represented to Client 2 that these 11 payments
constituted monthly settlement payments from Individual 1.  (See
infra ¶ 39.f.)

      c.   Information Provided by Client 2

   39.  On or about April 2, 2019, I participated in an
interview with Client 2.  I also participated in a follow-up
interview with Client 2 on or about April 8, 2019.  During these
interviews, Client 2 provided, in substance and in part, the
following information:

      a.   In or about December 2016, Client 2 retained EA
LLP and AVENATTI to represent her in connection with potential
claims against Individual 1.  Under the terms of the attorney-
client fee contract Client 2 signed, a copy of which was
provided to IRS-CI, EA LLP was entitled to 33 percent of any
recovery obtained prior to the filing of a lawsuit or
arbitration claim, and 40 percent of any recovery obtained after
the filing of a lawsuit or arbitration proceeding.

      b.   In or about January 2017, Client 2 and AVENATTI
attended a mediation with Individual 1 in Los Angeles,
California.  At the conclusion of the mediation, AVENATTI told
Client 2 that they had reached a settlement with Individual 1.

      c.   Client 2 told IRS-CI she believed that the total
settlement amount was $3,600,000.  AVENATTI did not provide
Client 2 with an opportunity to read the settlement agreement
before Client 2 signed the agreement.  AVENATTI also did not
give Client 2 a copy of the settlement agreement.

USAO_00134509

USAO_00134447

     d.   AVENATTI falsely represented to Client 2 that, under the terms of the settlement agreement, Individual 1 would make an initial lump-sum payment, the entirety of which would be used to pay EA LLP's attorney fees (i.e., 33 percent of the total settlement amount) and costs, and then make approximately 96 monthly payments of approximately $20,000 over the course of the next eight years by which the remaining settlement funds would be paid to Client 2.  Client 2, however, understood that the first 12 monthly payments from Individual 1 would be approximately $16,000 per month because approximately $4,000 per month would be deducted to pay for Client 2's rent.[22]

     e.   AVENATTI never disclosed to Client 2 that in January 2015 Individual 1 had wired an initial payment of $2,750,000 to EA Trust Account 8671.  AVENATTI never disclosed to Client 2 that AVENATTI used Client 2's portion of the $2,750,000 settlement payment for his own purposes, including to purchase a private jet.

     f.   Client 2 confirmed that between March 2017 and June 2018 she received approximately 11 monthly payments totaling approximately $194,000.  AVENATTI falsely represented to Client 2 that these monthly payments were coming from Individual 1 in accordance with the terms of the settlement agreement.

     g.   After Client 2 stopped receiving the purported monthly settlement payments in or about July 2018, AVENATTI

---

[22] On or about January 24, 2017, AVENATTI also caused a cashier's check to be purchased from EA Account 2851 for $51,935, which represented one year's rent for Client 2.

41

USAO_00134510

USAO_00134447

represented to Client 2 that Individual 1 was not complying with the settlement agreement.  Between July 2018 and March 2019, AVENATTI repeatedly told Client 2 that AVENATTI would work on obtaining the missing monthly settlement payments from Individual 1.  Among other things, AVENATTI and Client 2 discussed the possibility of publicly attempting to garnish Individual 1's wages if Individual 1 did not make the monthly payments.

   h. On or about March 24, 2019, AVENATTI met with Client 2 in Los Angeles, California.  During this meeting, AVENATTI told Client 2 that Client 2 would soon be receiving a payment from Individual 1 to make up for the purportedly missing monthly settlement payments from Individual 1 for July 2018 through March 2019.

   40. Client 2 also produced documents to IRS-CI, including text message and email communications between Client 2 and AVENATTI.  The documents Client 2 produced to IRS-CI appear to be consistent with Client 2's statements to IRS-CI.  For example:

   a. On or about July 31, 2018, Client 2 sent AVENATTI a text message stating:  "[S]orry to catch up so late but I have not received my deposit.  Is there anything we can do about the time, it's become a pattern of them not sending it unless you reach out."  AVENATTI responded:  "Still?  Let me see as this is not right.  I'm on it."

   b. On or about September 25, 2018, Client 2 sent AVENATTI a text message stating:  "I wanted to follow up on the

<div align="center">42</div>

USAO_00134511

USAO_00134447

deposits and let you know I haven't received anything from them."  AVENATTI responded:  "???? I will find out what the hell is going on."

        c.  On or about February 24, 2019, Client 2 sent AVENATTI an email regarding a number of topics, including the settlement with Individual 1.  The email stated, in part:

> Maybe we can settle the agreement for a lump sum rather than the monthly. From my understanding the original lump sum from the agreement was 33% which covered legal fees the additional to be paid to me stretched over 8 years (2 of which have passed).  They are currently 8 months behind on payments totaling $160,000 with the rest of this year and the additional 5 years we are looking at 1.4 Million for a total $1,560,000. Maybe we can find a median to settle for a lump sum payout.

The email also referenced "filing publicly" against Individual 1.

        ***3.   Evidence Regarding AVENATTI's Embezzlement of Settlement Funds from the Super Bowl Litigation and Concealment of the Receipt of Funds from the Super Bowl Litigation During the 2017 EA Bankruptcy***

        41.  There is probable cause to believe that in or about May 2018 AVENATTI embezzled a portion of a $1.55 million settlement received on behalf of the Super Bowl Clients, who were represented by EA LLP in the Super Bowl Litigation.  As set forth in greater detail below, the evidence collected to date demonstrates that: (a) on or about May 11, 2018, AVENATTI and EA LLP negotiated a $1,550,000 settlement with the defendants in the Super Bowl Litigation on behalf of the Super Bowl Clients (approximately 200 individual plaintiffs), the litigation that resulted in this settlement was initiated in the Northern District of Texas on or about March 7, 2013; (b) on or about May

USAO_00134512

USAO_00134447

15, 2017, AVENATTI requested that approximately $408,724 of the
settlement proceeds be transferred to EA Account 2851 and
approximately $952,995 be transferred to an attorney client
trust account at City National Bank ("CNB"); (c) between July
2017 and October 2018, AVENATTI caused payments totaling
approximately $145,222 to be made to approximately 31 of the
Super Bowl Clients; (d) AVENATTI used the remainder of the
approximately $1.31 million dollars AVENATTI and his law firm
received from the settlement of the Super Bowl Litigation for
AVENATTI's own personal and business purposes.  There is also
probable cause to believe that AVENATTI concealed the receipt of
settlement proceeds and attorneys' fees from the Super Bowl
Litigation during the 2017 EA Bankruptcy.

42.  On March 25, 2019, I participated in an interview with
J.R., EA LLP's office manager.  In response to a question as to
whether she was aware of AVENATTI taking money from client
funds, J.R. said that the plaintiffs in the Super Bowl
Litigation had not all been paid out.  When asked how she knew,
J.R. stated because some of the Super Bowl Clients called her
asking for their portion of the settlement money.  When the
Super Bowl Clients called, J.R. referred them to AVENATTI.  J.R.
stated that she knew the settlement funds had come into the firm
approximately two years earlier, however, AVENATTI did not
authorize her to pay the Super Bowl Clients, even though there
had been money available to pay them.

USAO_00134513

USAO_00134447

43.   Based on my review of records obtained from EA LLP's
co-counsel in the Super Bowl Litigation, C.A., I have learned
the following:

a.   On or about May 11, 2018, AVENATTI and EA LLP
negotiated a $1,550,000 settlement with the defendants in the
Super Bowl Litigation on behalf of the Super Bowl Clients
(approximately 200 individual plaintiffs).

b.   On or about May 15, 2017, AVENATTI sent C.A. an
email requesting that C.A. transfer approximately $408,725 of
the settlement proceeds to EA Account 2851 and transfer
approximately $952,995 of the settlement proceeds to an attorney
client trust account at CNB ending in 3512 ("Avenatti Trust
Account 3512").

44.   Based on IRS-CI's review of bank account records and
other records obtained during the investigation, I have learned
that between July 2017 and October 2018, AVENATTI caused
payments totaling approximately $145,222 to be made to
approximately 31 of the approximately 200 Super Bowl Clients.

45.   Based on IRS-CI's review of bank account records, I
have learned the following regarding AVENATTI's use of the
settlement proceeds from the Super Bowl Litigation, which were
transferred from C.A.'s law firm to EA Account 2851 and Avenatti
Trust Account 3512:

a.   After C.A.'s law firm wired approximately
$408,725 into EA Account 2851 on or about May 17, 2017, AVENATTI
used nearly all of the money to pay expenses of EA LLP,

USAO_00134514

USAO_00134447

including salary to EA LLP employees, rent, and payments to the IRS, among others.

b.   Avenatti Trust Account 3512 was opened on or about May 17, 2017.  C.A.'s law firm wired approximately $952,995 of the settlement proceeds to Avenatti Trust Account 3512 that same day.  AVENATTI then caused the following financial transactions:

i.   Between May 17 and May 23, 2017, AVENATTI caused the purchase of three cashier's checks from Avenatti Trust Account 3512 totaling $640,000, which cashier's checks were then deposited into Avenatti Account 3504.  Avenatti Account 3504 was also opened on or about May 17, 2017.

ii.   Between May 17 and May 23, 2017, AVENATTI caused three wires transfers totaling $640,000 to be made from Avenatti Account 3504 to A&A Account 0661.  Substantial portions of the funds transferred to A&A Account 0661 were then used for AVENATTI's own purposes, including a $40,000 wire transfer to C.C., AVENATTI's ex-wife; a $60,000 wire transfer to a bank account in the name of AVENATTI and L.S.A. (AVENATTI's wife at the time); and a $150,000 wire transfer to a GBUS bank account.

iii.   Between June 6 and June 23, 2017, AVENATTI caused the purchase of three cashier's checks from Avenatti Trust Account 3512 totaling $300,000, which cashier's checks were then deposited into Avenatti Account 3504.  During this same time period, AVENATTI caused three wire transfers totaling approximately $310,000 to be made from Avenatti Account 3504 to A&A Account 0061.

USAO_00134515

USAO_00134447

46.    I have also participated in telephonic interviews of two of the Super Bowl Clients in the Super Bowl Litigation, who provided in substance and in part the following information:

a.    On March 27, 2019, I participated in an interview of D.W.  D.W. retained EA LLP to represent him against the NFL in D.W.'s attempt to obtain a refund for the tickets he purchased and other expenses related to his experience attending the 2011 Super Bowl in Dallas.  D.W. provided EA LLP with all of his receipts regarding his expenses, which totaled $7,045.  D.W. stated that J.R. was his contact at EA LLP, and after D.W. learned that there was a settlement with the NFL, D.W. called at least fifteen to twenty times in an attempt to find out what money he would be receiving.  He did not recall the exact date, but a few months prior to the telephonic interview with IRS-CI, D.W. stated that AVENATTI had contacted D.W. and told D.W. that he would get his money back.  To date, D.W. had not received any settlement money.

b.    On April 17, 2019, I participated in an interview of D.B.  D.B. retained EA LLP to represent him against the NFL in D.B.'s attempt to obtain a refund for the tickets and other expenses related to his experience attending the 2011 Super Bowl in Dallas.  D.B. had correspondence with at least two people at EA LLP, but had no contact with AVENATTI.  D.B. recalled receiving information from J.R. that a settlement had been reached with the NFL for about 200 victims, and that D.B. fell within one of the three types of victims that would be receiving settlement funds, but that D.B. needed to wait a few weeks for

47

USAO_00134516

Exhibit D - 070

USAO_00134447

all of the settlement funds to be worked out.  D.B. called and
emailed EA LLP numerous times about his settlement money, but he
never got responses.  D.B. stated that his claim against the NFL
was for $5,269, but he still has yet to receive a dime in
settlement money.

47.  I have reviewed the Confidential Settlement Agreement
and Release in the Super Bowl Litigation, which was a settlement
on behalf of the approximately 200 plaintiffs listed in Exhibit
A of the settlement agreement (i.e., the Super Bowl Clients").
The agreement provided, among other things, that "The NFL shall
pay to the plaintiffs an aggregate total sum of $1,550,000.00
("Settlement Consideration") on or before May 18, 2017."
AVENATTI signed the settlement agreement on behalf of the Super
Bowl Clients on or about May 11, 2017.  Both D.W. and D.B. are
listed in Exhibit A of the settlement agreement as plaintiffs
entitled to the benefit of the settlement consideration.²⁵

48.  Based on my review of documents from the 2017 EA
Bankruptcy, In re: Eagan Avenatti LLP, No. 8:17-bk-11961-CB, and
other evidence IRS-CI has collected during this investigation, I
have learned the following:

a.    AVENATTI failed to disclose on the MOR for EA LLP
for the period May 1, 2017, through May 30, 2017 (the "May 2017
MOR") the funds AVENATTI received from the Super Bowl

---

²⁵ The privilege review team and other agents executing the
search will be provided with the names of the Super Bowl Clients
from the Super Bowl Litigation before conducting a search of the
SUBJECT DEVICES for non-privileged material.

48

USAO_00134517

USAO_00134447

Litigation.  AVENATTI signed the May 2017 MOR on behalf of EA
LLP under the penalty of perjury.

        b.   AVENATTI failed to disclose to the Bankruptcy
Court and the U.S. Trustee the existence of Avenatti Trust
Account 3512 and Avenatti Account 3504, both of which appear to
have been used to conceal the receipt of the settlement funds
from the Super Bowl Litigation.

        c.   On or about June 12, 2017, defendant testified
under oath at the Section 341(a) debtor's examination in the
2017 EA Bankruptcy and stated "no" when asked whether the
debtor, EA LLP, had received any counsel fees from the Super
Bowl Litigation.  In truth and in fact, as discussed above in
paragraphs 43 to 44, AVENATTI knew that AVENATTI and EA LLP had
received fees from the Super Bowl Litigation, namely, two wire
transfers totaling approximately $1,361,000, including
attorneys' fees, on or about May 17, 2017.

**E.    Evidence Relating to Augustus LLP**

    49.   Based on my review of the evidence IRS-CI has
collected during this investigation to date, I have learned the
following regarding Augustus LLP:

        a.   On March 25, 2019, during the interview with
J.R., the office manager for EA LLP, J.R. stated that "Augustus
LLP" is the name of a new company and/or law firm AVENATTI was
starting.

        b.   I have reviewed Union Bank records that show that
on or about February 13, 2019, AVENATTI caused business bank
accounts at Union Bank to be opened under Augustus LLP.  The

USAO_00134518

USAO_00134447

application to open the accounts listed AVENATTI's home address
at 10000 Santa Monica Blvd, Unit 2107, Los Angeles, California,
as the mailing address for Augustus LLP.  On the forms submitted
to Union Bank regarding the accounts, AVENATTI was listed as the
owner/partner of the business and had signature authority over
the accounts, as did J.R., who was listed as the office manager.
The Augustus LLP bank records at Union Bank further reveal:

      i.   On or about March 19, 2019, at least twelve
cashier's checks were purchased from Union Bank from the
Augustus LLP accounts, including several made payable to
individuals who were previously employed by EA LLP, as well as a
$22,400 cashier's check made payable to SM10000 Property LLC,
the property management company of AVENATTI's personal
residence, for February and March rent.

      ii.  On or about March 21, 2019, AVENATTI caused
a wire transfer in the amount of $1,398 to be paid to an
assisted living facility for Client 1's rent;

      iii. On or about March 22, 2019, AVENATTI caused
a wire transfer in the amount of $6,000 to be paid to Client 2;

      iv.  AVENATTI also caused checks and cashier's
checks to be written from the Augustus LLP bank account at Union
Bank to attorneys that have represented AVENATTI in various
legal matters.

      c.   I know from my review of IRS records based on
information submitted to the IRS regarding Augustus LLP, that
AVENATTI was listed as the general partner of Augustus LLP and
AVENATTI's personal residence was listed as the business's

USAO_00134519

USAO_00134447

address.   In addition, the records indicate that Augustus LLP was established in December 2018 and is required to file Form 1065 partnership returns on an annual basis.

d.   Based on my training and experience and the investigation to date, I believe that Augustus LLP is the latest in the line of companies that AVENATTI has used and is using to pay for both personal and business expenses and possibly launder the proceeds of his prior wire fraud scheme.

**F.   Probable Cause to Search the SUBJECT DEVICES**

 **1.   *SUBJECT DEVICES 1 through 6 Obtained from MixinIT***

50.   During the interview with IRS-CI on March 25, 2019, J.R., the office manager for EA LLP, stated, among other things, that EA LLP had previously maintained its computer servers at EA LLP's offices at 520 Newport Center Drive, in Newport Beach, California.   J.R. further said that, when EA LLP received notice that it would be evicted from its offices in or around October or November 2018, AVENATTI caused the EA LLP servers to be moved to MixinIT, a company in Orange County that stored and managed computer servers.

51.   On March 28, 2019, MixinIT provided records in response to a subpoena showing that EA LLP had contracted with MixinIT to store EA LLP's servers starting on November 19, 2018.

52.   On April 3, 2019, the court-appointed receiver[24] for EA LLP authorized agents from IRS-CI to take possession of the EA

_____

[24] EA LLP is currently a Judgment Debtor in a litigation with a former partner of EA LLP that arose from the 2017 EA LLP Bankruptcy.  On February 12, 2019, the former partner filed a

51

USAO_00134520

USAO_00134447

LLP servers from MixinIT, house the servers at IRS-CI's forensic
lab, and create a forensic image of the servers.

53.   On April 4, 2019, based on the consent of the court-
appointed receiver, IRS-CI SA Nshan Tashchyan and SA John Weeks
obtained SUBJECT DEVICES 1 through 6, which comprised the EA LLP
servers, from MixinIT.  After bringing SUBJECT DEVICES 1 through
6 to IRS-CI's forensic lab in Laguna Niguel, California, IRS-CI
began making a forensic image of SUBJECT DEVICES 1 through 6.
The forensic image of SUBJECT DEVICES 1 through 6 was completed
on April 19, 2019.

54.   Based on the evidence collected during the course of
this investigation, there is probable cause to believe that
evidence of the Subject Offenses will be found on SUBJECT
DEVICES 1 through 6, which comprise the EA LLP servers.  For
example:

a.   During March 25, 2019, interview with IRS-CI,
J.R. stated that she can work on EA LLP matters remotely using a
desktop connection, which allows her to use her EA LLP email as
well as to access QuickBooks and excel spreadsheets.  J.R.
stated that the EA LLP emails were backed up on the EA LLP

---

motion in the litigation seeking the appointment of a receiver
for EA LLP and accusing AVENATTI of bankruptcy fraud.  On
February 13, 2019, AVENATTI acting on behalf of EA LLP,
stipulated to the appointment of Brian Weiss as the EA LLP
Receiver and consented to the jurisdiction of the Honorable
Karen E. Scott, United States Magistrate Judge, to enter an
order appointing the EA LLP Receiver.  Judge Scott entered the
order appointing the EA LLP Receiver later that same day.  The
order stated, among other things, that the EA LLP Receiver shall
have the power to take possession of and manage the business of
EA LLP.  The order further required that EA LLP and AVENATTI
immediately turn over all EA LLP property to the EA LLP Receiver
and provide access to all EA LLP computer systems.

USAO_00134521

USAO_00134447

servers stored at MixinIT.  J.R. stated when she logged into the
servers remotely, she had access to emails and could download EA
LLP documents like a virtual desktop.  J.R. stated in or around
December 2018, around the time EA LLP was evicted from its
offices, EA LLP obtained a service, Voice Nation, to answer the
phone calls and the service sent the voicemails for AVENATTI to
MA@augustusLLP.com and other voicemails to JR@augustusLLP.com.

        b.   During the course of this investigation, I have
reviewed evidence relating to the Subject Offenses including
emails sent to and from AVENATTI and J.R. in which AVENATTI and
J.R. used their EA LLP email addresses.  Many of the emails that
I have reviewed that were sent to and from AVENATTI and J.R.
also contained attachments that related to the Subject Offenses.

        c.   I have reviewed under oath testimony that
AVENATTI provided during the EA LLP Bankruptcy proceedings, as
well as during judgment debtor examinations relating to
litigation with his former partner.  In response to various
questions about where AVENATTI kept financial documents and
contracts, among other items, AVENATTI testified that they would
have been kept at his offices.  During a judgment debtor
examination on March 15, 2019, AVENATTI testified that he
sometimes connects to a server when working on his computer.

      55.  In addition to the foregoing facts, based my training
and experience and discussions with other law enforcement agents
who have investigated tax offenses and complex fraud schemes, as
described more fully in my March 2019 affidavit (see Ex. 3,

USAO_00134522

USAO_00134447

§ VII),[25] I believe SUBJECT DEVICES 1 through 6, namely, the EA LLP servers, will contain evidence of the Subject Offenses, including, among other items, emails and attachments that AVENATTI and J.R. sent and received from their EA LLP email addresses, financial documents and records, and other personal and business records.

### 2.    SUBJECT DEVICES 7 Through 10 Obtained During AVENATTI's Arrest

56.    On March 25, 2019, federal agents arrested AVENATTI in New York and found several digital devices among his personal belongings, including the original digital devices from which SUBJECT DEVICES 7 through 9 were forensically imaged.  In addition, federal agents seized miscellaneous documents from AVENATTI's briefcase upon his arrest, and these documents were scanned and saved on SUBJECT DEVICE 10.  On or about May 17, 2019, and May 22, 2019, the SDNY USAO provided to IRS-CI SUBJECT DEVICE 10, and SUBJECT DEVICES 7 through 9, respectively, which are currently held in the custody of IRS-CI in Santa Ana, California.

57.    Based on the evidence set forth herein and in my prior affidavits, and my training and experience and discussions with other law enforcement agents who have investigated tax offenses and complex fraud schemes, which is described more fully in my March 2019 affidavit (see Ex. 3, § VII), I believe SUBJECT DEVICES 7 through 10 will likely contain other evidence of the

_____

[25] The March 2019 affidavit included a section detailing my training, experience, and knowledge of tax offenses and fraud schemes (see Ex. 3, § VII), which is incorporated by reference herein.

54

USAO_00134523

USAO_00134447

Subject Offenses, including, among other items, emails and attachments that AVENATTI and J.R. sent and received from their EA LLP email addresses, financial documents and records, and other personal and business records.

58.   Additionally, SUBJECT DEVICES 7 through 9, are the forensic images of three USB drives that were found on AVENATTI's person upon arrest, while AVENATTI was in New York on March 25, 2019.   SUBJECT DEVICE 10 contains miscellaneous documents AVENATTI had on his person at the time of his arrest. As stated above, AVENATTI met with Client 1 and Client 2 on March 22, 23, and 24, 2019 (see supra ¶¶ 35, 39.h), prior to travelling to New York on the evening of March 24, 2019.   I therefore believe documents, correspondence, and records relating to AVENATTI's meetings with these two clients in the days immediately prior to his arrest, as well as documents relating to AVENATTI's and EA LLP's representation of Client 1 and Client 2, are likely to be found on SUBJECT DEVICES 7 through 10.

G.   **The April 10, 2019, Indictment**

59.   On April 10, 2019, a ▮▮▮▮▮▮▮ in the Central District of California returned a thirty-six count indictment against AVENATTI, which included the following charges: (a) ten counts of wire fraud, in violation of 18 U.S.C. § 1343, involving AVENATTI's embezzlement of his clients' funds; (b) eight counts of willful failure to collect and pay over withheld taxes, in violation of 26 U.S.C. § 7202, relating to AVENATTI's and GBUS's failure to pay over to the IRS payroll

USAO_00134524

Exhibit D - 078

USAO_00134447

taxes that had been withheld from GBUS employee' paychecks; (c) one count of endeavoring to obstruct the administration of the Internal Revenue Code, in violation of 26 U.S.C. § 7212(a), relating to AVENATTI's attempt to obstruct and impede the IRS's attempts to collect the payroll taxes GBUS owed to the IRS; (d) ten counts of willful failure to file tax returns, in violation of 26 U.S.C. § 7203, relating to AVENATTI's failure to file individual tax returns for 2014 through 2017, failure to file partnership tax returns for EA LLP for 2015 through 2017, and failure to file corporate tax returns for A&A for 2015 through 2017; (e) two counts of bank fraud, in violation of 18 U.S.C. § 1344(1), relating to two loans AVENATTI obtained from The People's Bank in 2014; (f) one count of aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1), relating to the use of another person's means of identification in furtherance of the bank fraud offense; (g) three counts of false declaration in a bankruptcy, in violation of 18 U.S.C. § 152(3), relating to AVENATTI's failure to disclose all of EA LLP's receipts on EA LLP's monthly operating reports; and (h) one count of false oath in a bankruptcy proceeding, in violation of 18 U.S.C. § 152(2), related to AVENATTI's false testimony at a Section 341(a) hearing during EA LLP's bankruptcy.  A copy of the indictment in United States v. Michael John Avenatti, SA CR 19-61-JVS, is attached hereto as Exhibit 4 and incorporated herein by reference.

USAO_00134525

USAO_00134447

## V.   POTENTIAL PRIVILEGE ISSUES

60.   As noted in my March 2019 affidavit, and above, AVENATTI is a licensed attorney and EA LLP and A&A are  law firms.  (See Ex. 3, § VII.)  I also understand that at various times AVENATTI, EA LLP, and/or A&A may have had attorney-client relationships with other attorneys, including the following law firms: (a) Foster Pepper PLLC; (b) Osborn Machler PLLC; (c) Eisenhower Carlson PLLC; (d) Talmadge/Fitzpatrick/Tribe, PPLC; (e) The Brager Tax Law Group; (f) SulmeyerKupetz; (g) Baker & Hostetler LLP; (h) Shulman Hodges & Bastian LLP; (i) Legal & Tax Consulting Group; (j) Pachulski Stang Ziehl & Jones LLP; (k) Foley & Lardner LLP; (l) Raines Feldman, LLP; and (m) Pansky Markle Attorneys at Law.  (See id.)

61.   Although the proposed search warrant primarily seeks financial records and non-privileged information, there is a significant likelihood that the SUBJECT DEVICES will contain documents and records that are covered by the attorney-client privilege or attorney-work-product doctrine.  Accordingly, Attachment B to the proposed search warrant contains specific procedures designed to avoid unnecessary disclosures of any privileged attorney-client communications or attorney-work-product.

62.   The privileged information sought by the proposed search warrant is limited to the following former clients or potential clients of AVENATTI, EA LLP, and A&A:  (a) GBUS; (b) Client 1; (c) Client 2; (d) Client 3; and (e) Client 4 and Client 5.  Each of these former clients or potential clients,

USAO_00134526

USAO_00134447

however, has already executed a written waiver of the attorney-client-privilege.

a.   First, as noted in my February 2019 affidavit, on February 19, 2019, the Chapter 7 bankruptcy trustee for GBUS (the "GBUS Trustee") executed a written waiver of the attorney-client privilege as to any communications between GBUS's officer, directors, employees, and agents, and any lawyer acting on GBUS's behalf, including any communications with AVENATTI. (Ex. 1, ¶ 83.a.)  A copy of the GBUS Trustee's written waiver of the attorney-client privilege was attached as Exhibit 1 to my February 2019 affidavit.

b.   Second, on April 4, 2019, Client 1 executed a written waiver of the attorney-client privilege and attorney-work-product protections as to legal advice Client 1 sought or received from EA LLP, AVENATTI, and any other current or former EA LLP officers, directors, employees, or agents.  Client 1 also consented to the government's search of any of EA LLP's or AVENATTI's files relating to EA LLP's and AVENATTI's representation of Client 1.  A redacted copy of Client 1's written waiver of the attorney-client privilege is attached hereto as Exhibit 5.

c.   Third, on April 8, 2019, Client 2 executed a written waiver of the attorney-client privilege and attorney-work-product protections as to legal advice Client 2 sought or received from EA LLP, AVENATTI, F.M. (an attorney with the X-Law Group), and any other current or former EA LLP officers, directors, employees, or agents.  Client 2 also consented to the

USAO_00134527

USAO_00134447

government's search of any of EA LLP's or AVENATTI's files relating to EA LLP's and AVENATTI's representation of Client 2. A redacted copy of Client 2's written waiver of the attorney-client privilege is attached hereto as Exhibit 6.

    d.    Fourth, on March 18, 2019, Client 3 executed a written waiver of the attorney-client privilege and attorney-work-product protections as to any legal advice Client 3 sought or received from EA LLP, AVENATTI, and any other current or former EA LLP officers, directors, employees, or agents.  Client 3 also consented to the government's search of any of EA LLP's and AVENATTI's files relating to EA LLP's and AVENATTI's representation of Client 3.  A redacted copy of Client 3's written waiver of the attorney-client privilege is attached hereto as Exhibit 7.

    e.    Fifth, on April 4, 2019, Client 4 and Client 5 executed written waivers of the attorney-client privilege and attorney-work-product protections as to legal advice Client 4 and Client 5 sought or received from EA LLP, AVENATTI, F.M., and/or any other current or former officers, directors, employees, or agents of EA LLP.  Client 4 and Client 5 also consented to the government's search of the files of EA LLP, AVENATTI, and F.M. relating to the representation of Client 4 and Client 5.  A redacted copy of Client 4's and Client 5's written waivers of the attorney-client privilege are attached hereto as Exhibit 8.

    63.   I am aware that AVENATTI represented the plaintiff in Stephanie Clifford v. Donald J. Trump, No. 2:18-CV-2217-SJO-FFM

USAO_00134528

USAO_00134447

(C.D. Cal.), a lawsuit against the President of the United States.[26]  I am also aware that AVENATTI represented Julie Swetnick, an individual who accused United States Supreme Court Justice Brett Kavanaugh of sexual assault in connection with Justice Kavanaugh's confirmation hearing in or around September 2018.  Attachment B to the proposed search warrant specifically requires, in addition to the procedures to avoid unnecessary disclosure of attorney-client privileged materials and attorney-work-product, that any materials relating to AVENATTI's representation of Ms. Clifford or Ms. Swetnick that are identified by the Privilege Review Team, other than financial and accounting records identified in paragraphs 1.d, 1.f, 1.g, and 1.r of Attachment B, be segregated and not further reviewed absent subsequent authorization from this Court.[27]

64.  Attachment B to the proposed search warrant also sets forth a procedure to allow EA LLP, AVENATTI, and/or others to seek the appointment of a special master within seven days of

---

[26]  On May 22, 2019, AVENATTI was indicted in the Southern District of New York for wire fraud and aggravated identity theft, in connection with a scheme to defraud Ms. Clifford out of approximately $148,000.  Although we are not seeking to seize information relating to AVENATTI's representation of Ms. Clifford at this time, such information could be relevant to this investigation at a later date or to the SDNY USAO's investigation.

[27]  Other than non-privileged financial or accounting records that may reference these representations, the only documents or records relating to these representations that may fall within the scope of the items to be seized would likely be engagement letters and/or client billing records.  Nevertheless, due the nature of these representations and the parties at issue therein, the privilege review protocols set forth in Attachment B to the proposed warrant calls for any such records to be segregated and not further reviewed once identified.

USAO_00134529

USAO_00134447

the execution of the proposed search warrants.[33]   Although the
government does not believe that the appointment of a special
master would be necessary in this investigation, the government
has included this provision to ensure that any such request is
handled in a timely manner and does not unnecessarily delay IRS-
CI's ongoing criminal investigation.

### VI.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

65.   The March 2019 affidavit also included a section
detailing my training experience on digital devices (see Ex. 3,
§ IX), which is incorporated by reference herein.

66.   The search of the SUBJECT DEVICES will likely take a
considerable amount of time for multiple reasons.   First, I
understand that the SUBJECT DEVICES contain approximately 10-15
terabytes of data.   Second, the search of the SUBJECT DEVICES
will require the use of a Privilege Review Team and the search
protocols set forth in Attachment B to the search warrant
application.

67.   Other than what has been described herein, to my
knowledge, the United States has not attempted to obtain this
data by other means.

### VII. REQUEST FOR SEALING

68.   I request that the search warrant, the search warrant
application, and this affidavit be kept under seal to maintain
the integrity of this ongoing investigation until further order

---

[33] An identical provision was included in Attachments B-1
through B-3 of the March 2019 warrants.   To date, no request for
the appointment of a special master has been made following the
execution of the March 2019 warrants on March 25, 2019.

USAO_00134530

USAO_00134447

of the Court, or until the government determines that these materials are subject to its discovery obligations in connection with criminal proceedings, at which time they may be produced to defense counsel.

a.  First, this criminal investigation is ongoing and not all aspects of the investigation are public or known to AVENATTI and other potential subjects of the investigation. Although the government anticipates producing the search warrant, the search warrant application, and this affidavit to defense counsel for AVENATTI shortly after the execution of the search warrants, public disclosure of these materials could cause other subjects of the government's ongoing investigation to accelerate any existing or evolving plans to, and give them an opportunity to, destroy or tamper with evidence, tamper with or intimidate witnesses, change patterns of behavior, or notify confederates.

b.  Second, IRS-CI is still in the process of interviewing additional witnesses and subjects as part of its ongoing investigation.  This affidavit and the March 2019 Affidavit, which remains sealed and is attached as an exhibit hereto, contain information regarding additional areas of investigation and certain facts regarding the pending charges against AVENATTI that are not publicly known at this time. Public disclosure of such information provide witnesses and other subjects of the investigation an opportunity to coordinate their statements prior to being interviewed by IRS-CI.

USAO_00134531

USAO_00134447

c.   Third, this Affidavit and the sealed March 2019 Affidavit contain detailed information regarding AVENATTI's victim-clients and cooperating government witnesses.  Although the identities of some of AVENATTI's victim-clients and some of the government's witnesses have now been reported in the press, the government is concerned that premature public disclosure of this affidavit will unnecessarily impact the victim-clients and witnesses right to privacy.  This is particularly true given the high-profile nature of the prosecution against AVENATTI.

### VIII.   CONCLUSION

69.  For the reasons described above, I respectfully submit there is probable cause to believe that evidence, fruits, and instrumentalities of the Subject Offenses, as described with particularity in Attachment B, will be found on the SUBJECT DEVICES, as described with particularity in Attachment A.

/s/
_____
Remoun Karlous, Special Agent
Internal Revenue Service -
Criminal Investigation

Subscribed to and sworn before me
this 24th day of May, 2019.

## DOUGLAS F. McCORMICK
_____
HONORABLE DOUGLAS F. McCORMICK
UNITED STATES MAGISTRATE JUDGE

63

USAO_00134532

USAO_00134447

# EXHIBIT 1

USAO_00134533

USAO_00134447

AO 106 Case 8:19-mj-00103-DUTY *SEALED*   Document 1-1 *SEALED*   Filed 05/22/19   Page 8 of 100   Page ID #:395

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) |
| | )   Case No. 8:19-MJ-103 |
| Seven Digital Devices in the Custody of the Internal | ) |
| Revenue Service –Criminal Investigation in Laguna | ) |
| Niguel, California | ) |
| | ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of:

| Code Section | Offense Description |
|---|---|
| 26 U.S.C. § 7201 | Attempt to Evade or Defeat Tax |
| 26 U.S.C. § 7202 | Willful Failure to Collect or Pay Over Tax |
| 26 U.S.C. § 7203 | Willful Failure to Pay Tax or File Return |
| 26 U.S.C. § 7212 | Interference with Administration of Internal |
| | Revenue Laws |
| 18 U.S.C. § 152 | Concealment of Assets in Bankruptcy |
| 18 U.S.C. § 157 | Bankruptcy Fraud |
| 18 U.S.C. § 371 | Conspiracy |
| 18 U.S.C. § 1001 | False Statements |
| 18 U.S.C. § 1014 | False Statement to a Bank or Other Federally |
| | Insured Institution |
| 18 U.S.C. § 1028A | Aggravated Identity Theft |
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1344 | Bank Fraud |
| 18 U.S.C. § 1957 | Money Laundering |

*///*

*///*

*///*

USAO_00134534

USAO_00134447

Case 8:19-mj-00018-DUTY *SEALED*   Document 44-1 *SEALED*   Filed 02/22/19   Page 89 of 180   Page ID #:296

The application is based on these facts:

  *See attached Affidavit*

  ☒ Continued on the attached sheet.

☐ Delayed notice of _____ days (*give exact ending date if more than 30 days:* _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

<div align="right">

/s/
_____
*Applicant's signature*

IRS CI Special Agent Remoun Karlous
*Printed name and title*

</div>

Sworn to before me and signed in my presence.

Date: <u>February 22, 2019</u>

<div align="right">

**DOUGLAS F. McCORMICK**
*Judge's signature*

</div>

City and state: <u>Santa Ana, CA</u>

<div align="right">

<u>United States Magistrate Judge Douglas F. McCormick</u>
*Printed name and title*

</div>

AUSAs:  Julian L. André (213.894.6683) & Brett A. Sagel (714.338.3598)

USAO_00134535

USAO_00134447

## ATTACHMENT A

PROPERTY TO BE SEARCHED

Forensic images of the following digital devices (the "SUBJECT DEVICES"), which are currently maintained in the custody of the Internal Revenue Service-Criminal Investigation ("IRS-CI") in Laguna Niguel, California:

1.   Dell XPS 128 GB Samsung SSD, bearing serial number S1D2NSAG5000777, provided to IRS-CI by M.E. on or about October 22, 2018 ("SUBJECT DEVICE 1");

2.   Dell Precision, Model M4800, bearing service tag number 252M262, provided to IRC-CI by S.F. on or about October 21, 2018 ("SUBJECT DEVICE 2");

3.   Seagate External Hard Drive, model number SRD00F1, bearing serial number NA44HLQH, provided to IRS-CI by M.G. on or about October 22, 2018 ("SUBJECT DEVICE 3");

4.   Samsung flash drive  provided to IRS-CI by V.S. on or about October 31, 2018 ("SUBJECT DEVICE 4");

5.   Seagate Hard Drive, bearing serial number 5VJC1GXV provided to IRS-CI by A.G. on or about November 13, 2018 ("SUBJECT DEVICE 5");

6.   Veeam 2GB flash drive provided to IRS-CI by A.G. on or about November 13, 2018 ("SUBJECT DEVICE 6"); and

7.   Seagate Hard Drive, bearing serial number 5VJC1GXV provided to IRS-CI by A.G. on or about November 20, 2018 ("SUBJECT DEVICE 7").

USAO_00134536

USAO_00134447

## ATTACHMENT B

**I.   ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband,
fruits, and/or instrumentalities of violations of 26 U.S.C.
§ 7201 (attempt to evade or defeat tax); 26 U.S.C. § 7202
(willful failure to collect or pay over tax); 26 U.S.C. § 7203
(willful failure to pay tax or file return); 26 U.S.C. § 7212
(interference with administration of internal revenue laws); 18
U.S.C. § 152 (concealment of assets in bankruptcy); 18 U.S.C.
§ 157 (bankruptcy fraud); 18 U.S.C. § 371 (conspiracy); 18
U.S.C. § 1001 (false statements); 18 U.S.C. § 1014 (false
statement to a bank or other federally insured institution); 18
U.S.C. § 1028A (aggravated identity theft); 18 U.S.C. § 1343
(wire fraud); 18 U.S.C. § 1344 (bank fraud); and 18 U.S.C.
§ 1957 (money laundering) (the "Subject Offenses"), namely:

a.   Records, documents, correspondence, programs,
applications, or materials from January 2013 through September
2018 that evidence, discuss, reflect, or relate to the ownership
of Global Baristas US, LLC ("GBUS"); Global Baristas, LLC ("GB
LLC"); GB Autosport, LLC ("GB Auto"); GB Hospitality LLC ("GB
Hospitality"); Doppio Inc. ("Doppio"); Eagan Avenatti LLP ("EA
LLP"); and Avenatti & Associates, APC ("A&A") (collectively, the
"Subject Entities").

i

USAO_00134537

USAO_00134447

b.   Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to the sale or purchase of TC Global, Inc. or Tully's Coffee.

c.   Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to the purchase or sale of GBUS, GB LLC, or Doppio.

d.   Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to AVENATTI's control or management of any of the Subject Entities.

e.   Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to the organizational or management structure of any of the Subject Entities.

f.   Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to the finances of any of the Subject Entities, including assets, liabilities, accounts receivable, and accounts payable.

g.   Records, documents, correspondence, programs, applications, or materials from January 2013 through September

USAO_00134538

USAO_00134447

2018 that evidence, discuss, reflect, or relate to value of GBUS or GB LLC.

        h.    Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to the accounting records for GBUS and GB LLC, including any Microsoft Dynamics NAV accounting data, files, or records.

        i.    Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to GBUS employee handbooks or manuals, employment contracts, compensation records, and employee lists.

        j.    Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to the personal finances of Michael J. Avenatti ("AVENATTI"), including information relating to AVENATTI's assets, debts, income, expenses, and net worth.

        k.    Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to any financial transactions, including any proposed or potential financial transactions, involving any of the Subject Entities and/or AVENATTI.

<div align="center">iii</div>

USAO_00134539

USAO_00134447

l.   Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to financial decisions AVENATTI made on behalf of any of the Subject Entities, including decisions to authorize payments on behalf of any of the Subject Entities and transfer money to or from any of the Subject Entities.

m.   Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to any loans or other financing agreements, including any proposed or potential loans or other financing agreements, involving any of the Subject Entities and/or AVENATTI.

n.   Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to the payroll and tax preparation services that Ceridian HCM Inc. ("Ceridian") provided to GBUS, including any records, documents, correspondence, programs, applications, or materials evidencing, discussing, reflecting, or relating to changes in the payroll and tax services to be provided by Ceridian.

o.   Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to the federal,

iv

USAO_00134540

USAO_00134447

state, and/or local tax obligations, tax returns, tax liabilities, or tax payments of any of the Subject Entities and/or AVENATTI.

p.   Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to any liens, levies, garnishments, judgments, encumbrances, or tax-related investigations or actions associated with any of the Subject Entities and/or AVENATTI.

q.   Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to GBUS's and GB LLC's merchant credit card processing accounts (the "merchant accounts"), including contracts, agreements, account applications, and correspondence regarding changes to the merchant accounts.

r.   Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to any of the Subject Entities' and/or AVENATTI's contractual relationships, including drafts and final versions of any executed, proposed, or potential contracts and agreements, bills of sale, correspondence regarding payments, and correspondence regarding the cancellation or modification of contracts and/or agreements.

v

USAO_00134541

USAO_00134447

        s.    Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to changes in any of the Subject Entities' and/or AVENATTI's bank account information.

        t.    Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses and forensic copies thereof.

        u.    With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

            i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

            ii.  evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

            iii. evidence of the attachment of other devices;

USAO_00134542

USAO_00134447

          iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

          v.   evidence of the times the device was used;

          vi.  passwords, encryption keys, and other access devices that may be necessary to access the device;

          vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

          viii.    records of or information about Internet Protocol addresses used by the device;

          ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

    2.   As used herein, the terms "records," "documents," "correspondence," "programs," "applications," and "materials" include records, documents, correspondence, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

<div align="center">vii</div>

USAO_00134543

USAO_00134447

## II.   SEARCH PROCEDURES FOR HANDLING POTENTIALLY PRIVILEGED INFORMATION ON THE SUBJECT DEVICES

3.   In searching the SUBJECT DEVICES (including the forensic copies thereof), the following procedures will be followed at the time of the search in order to avoid unnecessary disclosures of any privileged attorney-client communications or attorney work product.

4.   Law enforcement personnel conducting the investigation and search and other individuals assisting law enforcement personnel in the search (the "Search Team") have already obtained custody of the SUBJECT DEVICES, which are capable of containing evidence of the Subject Offenses, or capable of containing data falling within the scope of the items to be seized.   The Search Team shall facilitate the transfer of the SUBJECT DEVICES to the "Privilege Review Team" (previously designated individuals not participating in the investigation of the case).   The Privilege Review Team, including a Privilege Review Team Assistant United States Attorney ("PRTAUSA") or PRTAUSAs, will then review the SUBJECT DEVICES as set forth herein.   The Search Team will review only data from the SUBJECT DEVICES that has been released by the Privilege Review Team to the Search Team.

5.   The Privilege Review Team will, in their discretion, either search each SUBJECT DEVICE where it is currently located

USAO_00134544

USAO_00134447

or transport it to an appropriate law enforcement laboratory or
similar facility to be searched at that location.

6.    The Privilege Review Team and the Search Team shall
complete the search discussed herein as soon as is practicable
but not more than 180 days from the date of execution of the
warrant.  The government will not search the SUBJECT DEVICES
beyond this 180-day period without obtaining an extension of
time order from the Court.

7.    The Search Team will provide the Privilege Review Team
and/or appropriate litigation support personnel[35] with a list of
"privilege key words" to search the SUBJECT DEVICES for
communications, data, or documents relating to the following law
firms:  (a) Foster Pepper PLLC; (b) Osborn Machler PLLC;
(c) Eisenhower Carlson PLLC; (d) Talmadge/Fitzpatrick/Tribe,
PPLC; and (e) Brager Tax Law Group.  Such "privilege key words"
shall include specific words like "Foster Pepper," "Osborn,"
"Machler," "Eisenhower," "Carlson," "Talmadge," "Fitzpatrick,"
"Tribe," "Brager," as well as other email addresses and domain
names associated with those individuals and law firms.  Because
the Chapter 7 bankruptcy trustee for GBUS (the "GBUS Trustee")
has executed a waiver of the attorney-client privilege as to all

---

[35] Litigation support personnel and computer forensics
agents or personnel, including IRS Computer Investigative
Specialists, are authorized to assist both the Privilege Review
Team and the Search Team in processing, filtering, and
transferring data contained on the SUBJECT DEVICES.

ix

USAO_00134545

USAO_00134447

communications between GBUS's officer, directors, employees, and agents, and any lawyer acting on GBUS's behalf (see Affidavit ¶ 83.a, Ex. 1), including AVENATTI, the "privilege key words" need not include specific words designed to capture all communications with AVENATTI or his law firms, EA LLP and A&A, or standard privilege terms.

8.   The Privilege Review Team will segregate and will not search or review the contents of AVENATTI's GBUS email accounts, including: (1) MichaelA@globalbaristas.com; and (2) MAvenatti@globalbaristas.com.   Such data will be maintained under seal by the investigating agency without further review absent subsequent authorization as set forth in paragraph 12 below.

9.   The Privilege Review Team will conduct an initial review of the data on the SUBJECT DEVICES using the "privilege key words," and by using search protocols specifically chosen to identify documents or data containing potentially privileged information.   The Privilege Review Team may subject to this initial review all of the data contained in the SUBJECT DEVICES capable of containing any of the items to be seized.   Documents or data that are identified by this initial review as not potentially privileged may be given to the Search Team.

10.   All documents or data that the initial review identifies as containing any of the "privilege key words" will

x

USAO_00134546

USAO_00134447

be reviewed by a Privilege Review Team member to confirm that

the documents or data contain potentially privileged

information.  Documents or data that are determined by this

secondary review not to be potentially privileged may be given

to the Search Team.  Documents or data that are determined by

this review to be potentially privileged or privileged will be

given to the United States Attorney's Office for further review

by the PRTAUSA(s).  Documents or data identified by the

PRTAUSA(s) after further review as not potentially privileged

may be given to the Search Team.  If, after further review, the

PRTAUSA(s) determines it to be appropriate, the PRTAUSA may

apply to the Court for a finding with respect to particular

documents or data that no privilege, or an exception to the

privilege, applies.  Documents or data that are the subject of

such a finding may be given to the Search Team.  In such an

instance, the PRTAUSA(s) shall conduct a review of the documents

or data to determine whether they fall within the scope of the

items to be seized prior to applying to the Court for relief.

Documents or data identified by the PRTAUSA(s) after review as

privileged will be maintained under seal by the investigating

agency without further review absent subsequent authorization as

set forth in paragraph 12 below.

     11.  The Privilege Review Team may, in its discretion, also

use "scope key words" to search any documents or data that were

<div align="center">xi</div>

USAO_00134547

USAO_00134447

identified as potentially privileged using the "privilege key words" if the Privilege Review Team determines that such a procedure would allow the Privilege Review Team to complete its review of potentially privileged documents more effectively and efficiently.  The Privilege Review Team may also, in its discretion, apply the "scope key words" to a subset of the potentially privileged data.   At the Privilege Review Team's request, the Search Team may provide the Privilege Review Team and/or appropriate litigation support personnel with a list of "scope key words" designed to search for data relating to the items to be seized.  These "scope key words" may then be applied to the potentially privileged data identified by using the "privilege key words."  The Privilege Review Team may conduct a detailed quality check on any data that did not contain the "scope key words" to ensure that the scope key word search is effective.  Additional "scope key words" designed to locate the items to be seized may also be applied at the discretion of the PRTAUSA(s).  Any data or documents that contain both any of the "privilege key words" and any of "scope key words" shall be then reviewed by the Privilege Review Team and the PRTAUSA(s) in accordance with the procedures set forth in paragraph 9 above. Documents and data that are identified by the "scope key word" searches and quality checks as falling outside the scope of the warrant will be maintained under seal as set forth in paragraph

xii

USAO_00134548

USAO_00134447

12 below and not further reviewed absent subsequent
authorization.

     12.   Documents or data identified by the PRTAUSA(s) after
review as privileged (that are not subject to a finding by a
court of no privilege or an exception to the privilege) or
potentially privileged and outside the scope of the items to be
seized shall be segregated and sealed together in an enclosure,
the outer portion of which will be marked as containing
potentially privileged information, and maintained by the
investigative agency.  Such data or documents shall not be
accessible by or given to the Search Team at any time absent
authorization of the Court.  However, the Privilege Review Team
may, in its discretion, store the privileged and potentially
privileged data and documents in a folder or a set of folders in
a document review platform database, such as Relativity or
Eclipse, that remains inaccessible to the Search Team.  The
Privilege Review Team's access to this separate document review
platform database shall cease upon expiration of the warrant.
However, litigation support personnel from the United States
Attorney's Office, United States Department of Justice, and/or
the investigating agency may continue to access this separately-
maintained document review database for the purpose of database
maintenance.

<center>xiii</center>

USAO_00134549

USAO_00134447

13.  The Search Team will search only the documents and data that the Privilege Review Team provides to the Search Team at any step listed above in order to locate documents and data that are within the scope of the search warrant.  The Search Team does not have to wait until the entire privilege review is concluded to begin its review for documents and data within the scope of the search warrant.  The Privilege Review Team may also conduct the search for documents and data within the scope of the search warrant if that is more efficient, but is not required to do so.  In conducting its review, the Search Team may, in its discretion, use key word searches and other searches to determine whether documents or data fall within the scope of the search warrant.  Data that is identified after these scope reviews as outside the scope of the items to be seized will be maintained under seal by the Search Team and not further reviewed absent subsequent authorization from the Court.

14.  All members of the Search Team shall be advised that AVENATTI may hold an individual attorney-client relationship with the law firms identified in paragraph 7 above or other law firms and lawyers not previously identified, and that communications with or records involving those law firms and lawyers may not be covered by GBUS Trustee's waiver of the attorney-client privilege.  If, upon review, a member of the Search Team determines that a document or data from the SUBJECT

xiv

USAO_00134550

USAO_00134447

DEVICES appears to contain potentially privileged information
that may not be covered by GBUS's limited waiver of the
attorney-client privilege, such as communications with the
lawyers and law firms identified in paragraph 7 above or other
law firms and lawyers not previously identified, the Search Team
member shall discontinue its review of the document or data and
shall immediately notify a member of the Privilege Review Team.
The Search Team member may record identifying information
regarding the potentially privilege document or data that is
reasonably necessary to identity the document or data for the
Privilege Review Team.  The Search Team shall not further review
any documents or data that appears to contain such potentially
privileged information until after the Privilege Review Team has
completed its review of the additional potentially privileged
information discovered by the Search Team member.

     15.  In performing the reviews, both the Privilege Review
Team and the Search Team may:

        a.   search for and attempt to recover deleted,
"hidden," or encrypted data;

        b.   use tools to exclude normal operating system
files and standard third-party software that do not need to be
searched; and

        c.   use forensic examination and searching tools,
such as "EnCase," "FTK" (Forensic Tool Kit), Nuix, Axiom,

USAO_00134551

USAO_00134447

Relativity, and Eclipse, which tools may use hashing and other sophisticated techniques.

16.   If either the Privilege Review Team or the Search Team, while searching a SUBJECT DEVICE encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, they shall immediately discontinue the search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

17.   If the search determines that a SUBJECT DEVICES does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

18.   The government may retain the SUBJECT DEVICES (including any forensic copy thereof), which have already been obtained by the Search Team, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) on the SUBJECT DEVICES absent further court order.

19.   After the completion of the search of the SUBJECT DEVICES, the government shall not access digital data falling

USAO_00134552

USAO_00134447

outside the scope of the items to be seized absent further order
of the Court.

    20.  The special procedures relating to digital devices
found in this warrant govern only the search of digital devices
pursuant to the authority conferred by this warrant and do not
apply to any search of digital devices pursuant to any other
court order.

USAO_00134553

Exhibit D - 107

USAO_00134447

## <u>AFFIDAVIT</u>

### TABLE OF CONTENTS

I.    INTRODUCTION.........................................1

II.   PURPOSE OF AFFIDAVIT................................1

III. SUMMARY OF PROBABLE CAUSE..........................3

IV.  STATEMENT OF PROBABLE CAUSE.......................12

      A.    Federal Tax Obligations.......................12

           1.    Federal Payroll Tax Obligations...........12

           2.    Federal Income Tax Obligations for
                 Corporations, Partnerships, and Limited
                 Liability Companies.......................14

           3.    Federal Income Tax Obligations for
                 Individuals...............................14

      B.    Background Information........................15

      C.    Tax Offenses Relating to Global Baristas US LLC
           (GBUS) and Global Baristas LLC (GB LLC).........18

           1.    Tax Information Regarding GBUS and GB LLC..18

           2.    The IRS Payroll Tax Collection Case........21

           3.    GBUS Employee Interviews...................38

           4.    Information Regarding TSYS Merchant
                 Solutions.................................81

           5.    Information Regarding The Boeing Company...86

           6.    Preliminary Review of GBUS and GB LLC Bank
                 Account Information.......................93

           7.    GBUS Bankruptcy Proceedings...............95

      D.    Tax Offenses Relating to Eagan Avenatti LLP (EA
           LLP) and Avenatti & Associates, APC (A&A).......97

           1.    The IRS Payroll Tax Collection Case........97

           2.    EA LLP Bankruptcy Proceedings.............101

           3.    Information Obtained from Paychex Regarding
                 EA LLP's Payroll Taxes....................104

USAO_00134554

USAO_00134447

|  | 4. | Other Tax Information Regarding EA LLP and A&A.......................................105 |
|--|--|--|
|  | 5. | Preliminary Review of EA LLP's and A&A's Bank Account Information..................107 |
| E. | | Tax Offenses Relating to AVENATTI's Personal Income Tax Obligations........................108 |
|  | 1. | Information Regarding AVENATTI's Personal Income Tax Obligation.....................109 |
|  | 2. | Preliminary Review of AVENATTI's Bank Records...................................111 |
|  | 3. | Information Regarding the Sale of AVENATTI's Residence in Laguna Beach and Purchase of AVENATTI's Residence in Newport Beach.....115 |
|  |  | a.  The Laguna Beach Residence...........115 |
|  |  | b.  The Newport Beach Residence.........119 |
|  | 4. | Information from AVENATTI's Divorce Proceedings...............................120 |
|  | 5. | AVENATTI's Statements Regarding His Net Worth...................................122 |
| F. | | Fraud Offenses Relating to The Peoples Bank....123 |
|  | 1. | $850,000 Loan to GB LLC in January 2014...124 |
|  | 2. | $2,750,000 Loan to EA LLP in March 2014...126 |
|  | 3. | $500,000 Loan to EA LLP in December 2014..128 |
| G. | | Fraud Offenses Relating to the $1.6 Million G.B. Settlement...................................135 |
| V. | | ADDITIONAL INFORMATION REGARDING THE SUBJECT DEVICES.........................................142 |
| A. | | Collection of the Subject Devices.............142 |
| B. | | The SUBJECT DEVICES Are Unlikely to Contain Attorney-Client Privileged Communications or Records....................................147 |
| VI. | | TRAINING AND EXPERIENCE ON DIGITAL DEVICES.........150 |
| VII. | | REQUEST FOR SEALING.................................156 |
| VIII. | | CONCLUSION........................................158 |

USAO_00134555

USAO_00134447

## AFFIDAVIT

I, Remoun Karlous, being duly sworn, declare and state as follows:

### I.   INTRODUCTION

1.     I am a Special Agent ("SA") with the Internal Revenue Service-Criminal Investigation ("IRS-CI") in the Los Angeles Field Office and have been so employed since April 1995.  As an IRS-CI SA, I have investigated numerous cases involving criminal violations of Title 18, Title 21, Title 26, and Title 31 of the United States Code, which have resulted in seizure, search, and arrest warrants.  In particular, I have investigated cases involving money laundering, international money laundering, securities fraud, tax evasion (domestic and international cases), and subscribing to false tax returns.

### II.   PURPOSE OF AFFIDAVIT

2.     This affidavit is made in support of an application for a warrant to search the forensic images of the following digital devices, which are currently held in the custody of IRS-CI in Laguna Niguel, California:

        a.     Dell XPS 128 GB Samsung SSD, bearing serial number S1D2NSAG5000777, provided to IRS-CI by M.E.[1] on or about October 22, 2018 ("SUBJECT DEVICE 1");

-----------------------------------

        Although the government has requested that this affidavit, as well as the search warrant and application, be filed under seal, I have referred to victims and witnesses by their initials throughout the affidavit to protect their privacy in the event the affidavit is later unsealed by the Court.

USAO_00134556

USAO_00134447

b.   Dell Precision, Model M4800, bearing service tag
number 252M262, provided to IRC-CI by S.F. on or about October
21, 2018 ("SUBJECT DEVICE 2");

c.   Seagate External Hard Drive, model number
SRD00F1, bearing serial number NA44HLQH, provided to IRS-CI by
M.G. on or about October 22, 2018 ("SUBJECT DEVICE 3");

d.   Samsung flash drive provided to IRS-CI by V.S. on
or about October 31, 2018 ("SUBJECT DEVICE 4");

e.   Seagate Hard Drive, bearing serial number
5VJC1GXV, provided to IRS-CI by A.G. on or about November 13,
2018 ("SUBJECT DEVICE 5");

f.   Veeam 2GB flash drive provided to IRS-CI by A.G.
on or about November 13, 2018 ("SUBJECT DEVICE 6"); and

g.   Seagate Hard Drive, bearing serial number
5VJC1GXV, provided to IRS-CI by A.G. on or about November 20,
2018 ("SUBJECT DEVICE 7")` (collectively, the "SUBJECT DEVICES").

3.   The requested search warrant seeks authorization to
seize any data on the SUBJECT DEVICES that constitutes evidence,
contraband, instrumentalities, and/or fruits of violations of:
26 U.S.C. § 7201 (attempt to evade or defeat tax); 26 U.S.C.
§ 7202 (willful failure to collect or pay over tax); 26 U.S.C.
§ 7203 (willful failure to pay tax or file return); 26 U.S.C.
§ 7212 (interference with administration of internal revenue
laws); 18 U.S.C. § 152 (concealment of assets in bankruptcy); 18

---

` As discussed in paragraphs 81-82 below, A.G. used the same
hard drive to produce to IRS-CI two different sets of data.
IRS-CI created two separate forensic images of the hard drive,
each of which is identified herein as a separate SUBJECT DEVICE,
namely SUBJECT DEVICE 5 and SUBJECT DEVICE 7.

USAO_00134557

USAO_00134447

U.S.C. § 157 (bankruptcy fraud); 18 18 U.S.C. § 371
(conspiracy); 18 U.S.C. § 1001 (false statements); 18 U.S.C.
§ 1014 (false statement to a bank or other federally insured
institution); 18 U.S.C. § 1028A (aggravated identity theft); 18
U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1344 (bank fraud); and
18 U.S.C. § 1957 (money laundering) (the "Subject Offenses"),
and any SUBJECT DEVICE which is itself or which contains
evidence, contraband, fruits, or instrumentalities of the
Subject Offenses, and forensic copies thereof.

    4.   The SUBJECT DEVICES are identified in Attachment A to
the search warrant application.  The list of items to be seized
is set forth in Attachment B to the search warrant application.
Attachments A and B are incorporated herein by reference.

    5.   The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested warrant and does
not purport to set forth all of my knowledge of or investigation
into this matter.  Unless specifically indicated otherwise, all
conversations and statements described in this affidavit are
related in substance and in part only.

### III. SUMMARY OF PROBABLE CAUSE

    6.   Michael J. Avenatti ("AVENATTI") was and is an
attorney licensed to practice law in the State of California.
AVENATTI practiced law through Avenatti & Associates, APC
("A&A") and Eagan Avenatti LLP ("EA LLP") in Newport Beach,

3

USAO_00134558

USAO_00134447

California.  AVENATTI was the sole owner of A&A, which owned 75
percent of EA LLP.

7.   AVENATTI was also the principal owner and Chief
Executive Officer ("CEO") of Global Baristas US LLC ("GBUS"),
which operated Tully's Coffee ("Tully's") stores in Washington
and California.  In 2013, AVENATTI's company, Global Baristas
LLC ("GB LLC"), acquired TC Global Inc., which previously
operated Tully's, out of bankruptcy for approximately $9.2
million.  AVENATTI's company, A&A, owned 100 percent of Doppio
Inc., which in turn owned 80 percent of GB LLC.  GB LLC wholly
owned GBUS, which handled the day-to-day business operations of
Tully's.

8.   As set forth herein, there is probable cause to
believe that between at least 2011 and the present AVENATTI
committed federal offenses, including the following: (a) tax
offenses relating to GBUS's payroll tax obligations and
AVENATTI's efforts to obstruct an IRS collection action; (b) tax
offenses relating to the tax obligations of EA LLP and A&A,
including the payroll tax obligations of EA LLP; (c) tax
offenses relating to AVENATTI's personal tax obligations;
(d) fraud-related offenses relating to loans AVENATTI and his
companies obtained from The Peoples Bank in Mississippi; and (e)
wire fraud, money laundering, and bankruptcy fraud offenses
relating to an approximately $1.6 million settlement payment
AVENATTI and EA LLP received in January 2018, but failed to
transfer to EA LLP's client or disclose in federal bankruptcy
proceedings involving AVENATTI and EA LLP.

4

USAO_00134559

USAO_00134447

9.   First, between the fourth quarter of 2015 and the fourth quarter of 2017, inclusive, GBUS failed to file employment tax returns and pay approximately $3,121,460 in federal payroll taxes, including approximately $2,390,048 in trust fund taxes, which had been withheld from GBUS employees' paychecks.  Multiple former GBUS employees have said that AVENATTI was responsible for all of GBUS's significant financial and business decisions, including the decision not to pay the payroll and trust fund taxes that GBUS owed to the IRS.  Indeed, AVENATTI was well aware of GBUS's outstanding tax obligations, yet repeatedly refused to authorize the required tax payments to the IRS.

10.   Although GBUS failed to pay to the IRS its payroll taxes between the fourth quarter of 2015 and the fourth quarter of 2017, AVENATTI caused substantial amounts of money to be transferred from GBUS's or GB LLC's bank accounts during this same time period.  For example, a preliminary analysis of GBUS's and GB LLC's bank account records shows that between 2015 and 2017 AVENATTI caused a net of approximately $1.7 million to be transferred from GBUS's or GB LLC's bank accounts to bank accounts associated with A&A or EA LLP.  This money could have and should have been used to pay GBUS payroll tax obligations.

11.   Additionally, after the IRS initiated a collection action relating to GBUS's outstanding payroll tax obligations in September 2016, issued an approximately $5,000,000 tax lien against GBUS in July 2017, and levied multiple GBUS bank accounts, AVENATTI directed repeated attempts to evade

USAO_00134560

USAO_00134447

collection of those payroll taxes and obstruct the IRS collection action. Among other things, AVENATTI took the following steps to evade the collection of payroll taxes due to the IRS and obstruct the IRS collection action:

a. In October 2016, when first contacted by an IRS Revenue Officer ("RO 1") regarding GBUS's unpaid payroll taxes, AVENATTI falsely stated that a third-party payroll company was responsible for filing GBUS's payroll tax returns and making GBUS's federal tax deposits. AVENATTI, however, knew that GBUS's third-party payroll company, Ceridian HCM Inc. ("Ceridian"), had discontinued the tax services it had previously provided to GBUS and was, therefore, no longer responsible for filing GBUS's payroll tax returns and making the necessary federal tax deposits. AVENATTI was well aware that GBUS was not paying its payroll taxes. GBUS employees repeatedly asked him to authorize the payment of GBUS's payroll taxes to the IRS, yet he refused to do so.

b. In September 2017, after IRS RO 1 advised GBUS of the possibility of criminal proceedings and levied multiple GBUS bank accounts, including a GBUS account at KeyBank, AVENATTI directed GBUS employees to stop depositing cash receipts from the Tully's stores into the account at KeyBank. Instead, in order to avoid the levies, AVENATTI directed GBUS employees to deposit all cash receipts from Tully's stores into a little-used bank account at Bank of America associated with his car racing entity, GB Autosport, LLC ("GB Auto"). Between September 2017

USAO_00134561

USAO_00134447

and December 2017, approximately $859,784 in cash was deposited into the GB Auto account at AVENATTI's direction.

      c.   In late-September and early-October 2017, in order to avoid IRS levies issued to the sponsoring bank for GBUS's merchant credit card processing accounts ("merchant accounts"), AVENATTI directed GBUS's credit card processing company, TSYS Merchant Solutions ("TSYS"), to change the company name and Employer Identification Number ("EIN") associated with the merchant accounts from GBUS to GB LLC. AVENATTI also directed TSYS to have all credit card receipts paid to a new bank account under the name of GB LLC, which AVENATTI had opened that same day in Orange County, California, instead of the bank accounts associated with GBUS, which were already subject to the IRS levies.

      d.   In November 2016, approximately one month after the IRS RO first contacted AVENATTI, AVENATTI changed the name of the party to a contract with The Boeing Company ("Boeing") from GBUS to "GB Hospitality LLC," a company which does not appear to have ever been registered with any government agency or operated. Later, in September 2017, after the IRS had issued levies to Boeing and a number of banks with which GBUS had accounts, Boeing cancelled the contract because GBUS had failed to make the required commission payments. In connection with the cancellation of the contract, Boeing agreed to purchase two existing Tully's "kiosks" at Boeing facilities and other Tully's equipment in exchange for a total of $155,010 and the forgiveness of GBUS's debt to Boeing. Although all of the

USAO_00134562

USAO_00134447

Tully's locations were operated by GBUS, AVENATTI told an attorney at Boeing to use the name GB LLC on the two bills of sale for the kiosks and equipment, and instructed Boeing to wire the $155,010 payment to an attorney trust account associated with EA LLP rather than any of the bank accounts associated with GBUS.  Had the Boeing contract and subsequent bills of sale been under the name GBUS, Boeing would not have made the $155,010 payment due to the existing GBUS tax lien.  After receiving the $155,010 payment from Boeing, AVENATTI transferred the $155,010 to an A&A bank account, from which he then transferred $15,000 to his personal checking account, paid approximately $13,073 for rent at his residential apartment in Los Angeles, California, and paid approximately $8,459 to Neiman Marcus.  Indeed, out of the $155,010 Boeing transferred to the EA LLP trust account, it appears that only approximately half ever ended up in GBUS's bank accounts.

    12.  <u>Second</u>, AVENATTI's other companies, EA LLP and A&A, have repeatedly failed to meet their tax obligations despite generating substantial revenues.  Between 2015 and 2017, EA LLP failed to file payroll tax returns and pay approximately $2.4 million in payroll taxes, including approximately $1,279,001 in trust fund taxes that had been withheld from EA LLP employees' paychecks.  Just as he did in connection with GBUS, AVENATTI lied to the IRS when initially contacted regarding EA LLP's failure to pay its payroll taxes, and falsely claimed that a third-party payroll company, Paychex, was responsible for making the required tax payments even though the payroll company had

USAO_00134563

USAO_00134447

notified AVENATTI in January 2015 that it was discontinuing various payroll tax services. Additionally, EA LLP has not filed partnership tax returns (IRS Form 1065) for the 2013, 2014, 2015, 2016, and 2017 tax years, even though EA LLP appears to have received approximately $137,890,016 of deposits into its bank accounts during these tax years. Indeed, AVENATTI's personal website claims that AVENATTI has recovered over one billion dollars in verdicts and settlements for his clients. Similarly, A&A has not filed corporate tax returns (IRS Form 1120S) for the 2011, 2012, 2013, 2014, 2015, 2016, or 2017 tax years, even though A&A appears to have received approximately $37,961,633 of deposits into its bank accounts during these tax years, including net payments of approximately $23,820,816 from EA LLP.

13. <u>Third</u>, AVENATTI filed federal personal income tax returns for the 2009 and 2010 tax years indicating that he owed the IRS a total of approximately $850,438, plus interest and penalties. AVENATTI, however, did not pay the IRS the amounts he owed for those tax years. AVENATTI then failed to file personal tax returns for the 2011 through 2017 tax years. During these tax years, AVENATTI generated substantial income and lived lavishly, yet largely failed to pay any federal income tax. A preliminary analysis of AVENATTI's personal bank accounts reflects that AVENATTI received net payments of approximately $8,464,064 from A&A and EA LLP between 2011 to 2017. AVENATTI also repeatedly used money that had been transferred from GBUS, GB LLC, and EA LLP to A&A to pay for

9

USAO_00134564

USAO_00134447

personal expenses.  Further, AVENATTI received proceeds of
approximately $5.4 million when he sold his home in Laguna
Beach, California in 2015.  Finally, in connection with recent
divorce proceedings, AVENATTI's wife said that AVENATTI told her
that he earned $3.7 million dollars in 2016.  His wife also said
that their family's monthly expenses were over $200,000 per
month.  Financial and escrow company records show that from
approximately September 2015 to September 2016, AVENATTI and his
wife rented a home in Newport Beach for $100,000 per month,
after making a $1,000,000 deposit.

    14.  Fourth, between approximately January 2014 and
December 2014, AVENATTI obtained three separate loans from The
Peoples Bank, a federally insured bank in Mississippi: (1) a
$850,500 loan to GB LLC in January 2014; (2) a $2,750,000 loan
to EA LLP in March 2014; and (3) a $500,000 loan to EA LLP in
December 2014.  In connection with these loans, AVENATTI
provided The Peoples Bank with false federal personal income tax
returns for the 2011, 2012, and 2013 tax years.  In these
purported tax returns, AVENATTI claimed that he earned
$4,562,881 in adjusted gross income in 2011, $5,423,099 in
adjusted gross income in 2012, and $4,082,803 in adjusted gross
income in 2013.  He also claimed that he had paid to the IRS
$1,600,000 in estimated tax payments in 2012, and $1,250,000 in
estimated tax payments in 2013.  However, AVENATTI never filed
personal income tax returns for the 2011, 2012, and 2013 tax
years, and did not make any estimated tax payments during the
2012 and 2013 tax years.  In fact, as noted above, at the time,

USAO_00134565

USAO_00134447

Case 8:19-mj-00043-DUTY *SEALED*   Document 41-1 *SEALED*   Filed 05/24/19   Page 120 of
180   Page ID #:286

AVENATTI still owed the IRS approximately $850,438 in unpaid
personal income taxes, plus interest and penalties, from the
2009 and 2010 tax years.  Additionally, in March 2014, AVENATTI
provided The Peoples Bank with a 2012 federal tax return for EA
LLP which claimed total income of $11,426,021 and ordinary
business income of $5,819,456.  However, the 2012 federal tax
return EA LLP actually filed with the IRS in October 2014
claimed total income of only $6,212,605 and an ordinary business
loss of $2,128,849.

   15.  <u>Fifth</u>, between January 2018 and November 2018,
AVENATTI defrauded one of EA LLP's client, G.B., out of the
client's portion of an approximately $1.6 million settlement
payment.  Specifically, in January 2018, AVENATTI arranged for
the $1.6 million settlement payment to be transferred to one of
his attorney trust accounts.  Rather than transfer his client's
portion of the settlement proceeds to his client, AVENATTI used
the entire $1.6 million for his own purposes, including to pay
for expenses relating to GBUS.  He then lied to his client and
claimed that the settlement payment was not due until March
2018.  When the fake March 2018 deadline passed, AVENATTI led
his client to believe that the $1.6 million payment had never
been received.  Additionally, AVENATTI failed to disclose in
federal bankruptcy proceedings involving AVENATTI and EA LLP
that he had received the $1.6 million settlement payment,
despite being aware that he was required to do so.

   16.  Judy Regnier ("REGNIER") has been described by
AVENATTI as his office manager, chief paralegal, and bookkeeper.

USAO_00134566

USAO_00134447

She appears to have worked for EA LLP in an administrative
capacity since at least 2010.  At various times, REGNIER was a
signatory on bank accounts associated with GBUS, GB LLC, GB
Auto, EA LLP, and A&A.  REGNIER was personally involved in many
of the events described herein, including directing or executing
the transfer of funds between various entities associated with
AVENATTI, directing the actions of GBUS employees, and
transmitting signed contracts and agreements on behalf of GBUS,
GB LLC, EA LLP, or A&A to other parties.

### IV.   STATEMENT OF PROBABLE CAUSE

**A.   Federal Tax Obligations**

#### 1.   *Federal Payroll Tax Obligations*

17.   Based on my training and experience, as well as
discussions with other IRS-CI SAs and IRS revenue agents, I have
learned the following regarding federal payroll taxes:

a.   The Internal Revenue Code imposes four types of
tax with respect to wages paid to employees:  (1) income tax;
(2) Social Security tax; (3) Medicare tax; and (4) federal
unemployment tax (collectively, "payroll taxes").

b.   Income tax is imposed upon employees based upon
the amount of wages they receive.

c.   Social Security tax and Medicare tax are imposed
by the Federal Insurance Contributions Act, and are collectively
referred to as "FICA" taxes.  FICA taxes are imposed separately
on employees and on employers.

12

USAO_00134567

USAO_00134447

d.   Federal unemployment tax is imposed under the
Federal Unemployment Tax Act ("FUTA").  FUTA taxes are imposed
solely on employers.

e.   Employers are required to withhold employee FICA
taxes and income taxes from the wages paid to their employees,
and to pay over the withheld amounts to the United States.  The
employers duty to pay over income taxes required to be collected
exists even if the taxes are not actually withheld from the
employees' wages.  The employee FICA taxes and income taxes that
employers are required to withhold and pay over to the United
States are commonly referred to as "trust fund taxes" because of
the provision in the Internal Revenue Code requiring that such
taxes "shall be held to be a special fund in trust for the
United States."

f.   Employers are required to file an Employer's
Quarterly Federal Tax Return ("IRS Form 941") quarterly.  On IRS
Form 941, the employer is required to report the income tax,
Social Security tax, and Medicare tax withheld from employees'
paychecks.  The employer is also required to report and pay the
employer's portion of Social Security and Medicare tax for its
employees.

g.   Employers are required to file an Annual Federal
Unemployment (FUTA) Tax Return ("IRS Form 940") yearly.  In
connection with the IRS Form 940, the employer is required to
report its FUTA tax liability for each quarter.

13

USAO_00134568

USAO_00134447

### 2. Federal Income Tax Obligations for Corporations, Partnerships, and Limited Liability Companies

18. Based on my training and experience, as well as discussions with other IRS-CI SAs and IRS revenue agents, I have learned the following regarding federal income tax obligations for corporations, partnerships, and limited liability companies, such as GBUS, GB LLC, EA LLP, and A&A:

a. Under 26 U.S.C. § 6012(a)(1)(A), corporations and partnerships are required to file tax returns yearly, irrespective of their income. Similarly, the general rule is that every partnership shall file a return for each taxable year. Single-member LLCs are treated as disregarded entities for tax purposes unless they affirmatively elect to be treated as corporations.

### 3. Federal Income Tax Obligations for Individuals

19. Based on my training and experience, as well as discussions with other IRS-CI SAs and IRS revenue agents, I have learned the following regarding federal income tax obligations for individuals:

a. Under 26 U.S.C. § 6012, "every individual having for the taxable year gross income which equals or exceeds the exemption amount" is required to file a federal tax return. The receipt of a specified amount of gross income generally determines whether an income tax return must be filed. The threshold gross income amount for a married person filing

14

USAO_00134569

USAO_00134447

separately for the 2011 to 2017 tax years ranged from $3,700 to
$4,050.[3]

     b.   Gross income is defined as all income from
whatever source derived, including, but not limited to, the
following items: (1) compensation for services, including fees,
commissions, fringe benefits, and similar items; (2) gross
income derived from business; (3) gains derived from dealings in
property; and (4) distributive shares of partnership gross
income.

     **B.**   **Background Information**

    20.  Based on publicly available information and other
information obtained during the course of this investigation, I
have learned the following information regarding AVENATTI and
his various companies:

     a.   AVENATTI is a plaintiff's attorney in Southern
California.  At all relevant times, AVENATTI lived and worked in
Orange County and Los Angeles County, within the Central
District of California.

     b.   In 2006, AVENATTI incorporated A&A, a California
subchapter S corporation.  In 2007, AVENATTI formed the law firm
Eagan O'Malley & Avenatti LLP.  In approximately December 2010,
O'Malley left the partnership and the firm changed its name to
Eagan Avenatti LLP.  As recently as January 2019, AVENATTI was
still practicing law under the name Eagan Avenatti LLP.
According to AVENATTI's website, www.avenatti.com, he has

--------------------------------------

    [3] Although AVENATTI was married to L.S. during the 2011 to
2017 tax years, based on my review of IRS tax records I know
that L.S. filed separate tax returns during each of these years.

15

USAO_00134570

USAO_00134447

obtained over "$1 billion in verdicts and settlements as lead
counsel" in cases throughout the country.  AVENATTI has become a
well-known public figure due to his representation of the
plaintiff in <u>Stephanie Clifford v. Donald J. Trump</u>, No. 2:18-CV-
2217-SJO-FFM (C.D. Cal.), a lawsuit against the President of the
United States,[4] and frequent appearances on cable news shows.

     c.   EA LLP's office was located in Newport Beach,
California until at least in or around November 2018.

     d.   AVENATTI has been since at least July 2013 the
principal owner and CEO of GBUS, which operated Tully's stores
in Washington and California.[5]  GBUS's corporate offices were
located in Seattle, Washington.  In 2013, AVENATTI's company, GB
LLC, acquired TC Global Inc., which previously operated Tully's,
at a bankruptcy auction for approximately $9.2 million.

     e.   During civil depositions taken in October 2016
and July 2017 in connection with <u>Bellevue Square LLC v. Global
Baristas US, LLC et al</u>, Case No. 15-2-27043-5-SEA (the "<u>Bellevue
Square</u> Litigation"), which was pending in the Superior Court of

----

    [4] I understand that the <u>Clifford</u> lawsuit was filed on March
6, 2018, well-after the EA LLP IRS collection case began in
September 2015 and the GBUS IRS collection case began in
September 2016.  Indeed, IRS RO 1 first discussed a fraud
referral to IRS-CI in connection with the GBUS collection case
with his manager in September 2017, approximately six months
before the <u>Clifford</u> lawsuit was filed.

    [5] In or around October 2018, AVENATTI made press statements
indicating that he was no longer the owner of GB LLC or GBUS and
had recently sold the company for close to $28 million.  To
date, the government has been unable to locate any information
confirming that AVENATTI sold GB LLC or GBUS.  To the contrary,
based on the information available to the government, it appears
these statements were false.

USAO_00134571

USAO_00134447

the State of Washington for King County, AVENATTI admitted the following:

> i.   A&A owns Doppio;
>
> ii.  Doppio owns at least 80% of GB LLC; and
>
> iii. GB LLC wholly owns GBUS, which handled "most of the day-to-day activities" of Tully's.

f.   Since approximately March 2017, EA LLP has been involved in bankruptcy proceedings; first in the Middle District of Florida and then transferred in April 2017 to the Central District of California, In re Eagan Avenatti, LLP, No. 8:17-BK-11961-CB (C.D. Cal.) (the "EA Bankruptcy"). (See infra § IV.D.2.)  In connection with the EA Bankruptcy, AVENATTI admitted the following:

> i.   AVENATTI owns 100 percent of A&A.
>
> ii.  A&A owns 75 percent of EA LLP, and Michael Eagan owns the remaining 25 percent of EA LLP.

g.   In documents publicly filed with the Washington Secretary of State, AVENATTI is listed as the sole officer and director of Doppio, the sole governor and president of GB LLC, and the sole manager of GBUS.

h.   AVENATTI was also a competitive racecar driver from at least 2007 to 2015.  The website www.driverdb.com indicates that AVENATTI competed in 34 races during that time period.  AVENATTI is also the sole governor of GB Auto, a Washington Limited Liability Company that was formed in 2013 shortly after AVENATTI's company GB LLC purchased TC Global Inc., the operator of Tully's.

<center>17</center>

USAO_00134572

USAO_00134447

> i.   In connection with the EA Bankruptcy, AVENATTI described REGNIER as his office manager, chief paralegal, and bookkeeper.

**C.   Tax Offenses Relating to Global Baristas US LLC (GBUS) and Global Baristas LLC (GB LLC)**

21.   As discussed below, there is probable cause to believe that AVENATTI committed a variety of tax offenses in connection with his ownership and control of GBUS.  Specifically, the investigation to date has revealed that AVENATTI intentionally failed to pay over to the IRS approximately $3,121,460 in payroll taxes, including approximately $2,390,048 in trust fund taxes that had been withheld from GBUS employees' paychecks.  AVENATTI also took a number of steps to obstruct the IRS collection action and evade the collection of GBUS's payroll taxes by, among other things, lying to IRS RO 1, changing GBUS's merchant accounts to avoid IRS tax levies, instructing employees to deposit over $800,000 in cash from Tully's Coffee shops into a bank account associated with a separate entity to avoid IRS levies, and changing the company name on contracts involving GBUS and Boeing.

**1.   *Tax Information Regarding GBUS and GB LLC***

22.   Based on my review of IRS tax records and discussions with IRS revenue officers and IRS revenue agents, I have learned the following regarding GBUS's payment of federal payroll taxes, including trust fund taxes (i.e., employee withholdings):

> a.   Between July 2013 and September 18, 2015, GBUS paid its federal tax deposits, including trust fund tax

18

USAO_00134573

USAO_00134447

payments, to the IRS on a bi-weekly basis.  During this time period, GBUS also filed its IRS Forms 941 each quarter.

b.   After the third quarter of 2015, GBUS stopped filing its IRS Forms 941 and paying its federal tax deposits to the IRS.

c.   On March 27, 2017, in connection with the IRS collection case, the IRS prepared substitute quarterly payroll tax returns for the fourth quarter of 2015 through the third quarter of 2016.

d.   On October 18, 2017, in connection with the IRS collection case, GBUS filed IRS Forms 941 for the fourth quarter of 2015 through the second quarter of 2017, and an IRS Form 940 for 2016.

e.   As detailed in the below chart, GBUS has failed to pay over approximately $3,121,460 in federal payroll taxes, including approximately $2,390,048 in trust fund taxes:[6]

| Period | Payroll Tax Assessed | Trust Fund Tax Assessed | Payments | Payroll Tax Owed | Trust Fund Tax Owed |
|---|---|---|---|---|---|
| 2015, Q4 | $466,215 | $292,724 | $173,489 | $292,725 | $292,724 |
| 2016, Q1 | $556,290 | $382,100 | $0 | $556,290 | $382,100 |
| 2016, Q2 | $437,336 | $297,791 | $0 | $437,336 | $297,791 |
| 2016, Q3 | $487,296 | $333,969 | $88,170 | $399,126 | $333,969 |
| 2016, Q4 | $405,440 | $277,681 | $0 | $405,410 | $277,681 |
| 2017, Q1 | $455,289 | $309,702 | $0 | $455,289 | $309,702 |

---

[6]  The tax figures included throughout this affidavit are approximate figures based on my preliminary review of IRS tax records, information provided to me by IRS revenue officers, and/or discussions with an IRS revenue agent.  IRS-CI is still in the process of completing its tax calculations.

19

USAO_00134574

USAO_00134447

Case 8:19-mj-00163-DUTY *SEALED*   Document 41-1 *SEALED*   Filed 05/24/19   Page 129 of
180   Page ID #:236

| Period | Payroll Tax Assessed | Trust Fund Tax Assessed | Payments | Payroll Tax Owed | Trust Fund Tax Owed |
|---|---|---|---|---|---|
| 2017, Q2 | $502,969 | $345,094 | $0 | $502,969 | $345,094 |
| 2017, Q3 | $421,648 | $291,222 | $263,678 | $157,969 | $150,989 |
| 2017, Q4 | Unknown | Unknown | $85,684 | -$85,684 | Unknown |
| 2018, Q1 | Unknown | Unknown | $0 | Unknown | Unknown |
| TOTALS | $3,732,483 | $2,530,281 | $611,023 | $3,121,460 | $2,390,048 |

   f. Although the IRS received approximately $611,023
in payroll tax payments during the IRS collection case, such
payments only account for a small portion (approximately 16
percent) of the total amount of payroll taxes GBUS owed to the
IRS.  Moreover, approximately $261,661 of the payroll tax
payments the IRS received was attributable to money received
from financial institutions in response to the IRS levies, and
approximately $349,362 is attributable to payments GBUS or EA
LLP made to the IRS during the IRS collection case.'

   g. GBUS, GB LLC, and Doppio did not file federal
corporate or partnership income tax returns for the 2013, 2014,
2015, 2016, or 2017 tax years.  In fact, GBUS, GB LLC, and
Doppio have never filed federal corporate or partnership income
tax returns.

---

 ' Bank records show that on or about October 31, 2017, EA
LLP sent the IRS two wire transfers totaling approximately
$263,660 as partial payment for GBUS's outstanding payroll tax
liability.

USAO_00134575

USAO_00134447

### 2.   The IRS Payroll Tax Collection Case

23.   In or about September 2016, the IRS initiated a collection action against GBUS due to its failure to file IRS Forms 941 and pay its payroll taxes.  I have reviewed the collection case file, including the ICS History.[8]  I also participated in an interview with IRS RO 1 on September 26, 2018.  Based on my review of the collection case file and the interview with RO 1, I have learned, among other things, the following information:

a.   On September 24, 2016, the IRS opened a collection case against GBUS based on a federal tax deposit alert ("FTDA").  A FTDA is generated when a company that was paying quarterly payroll taxes to the IRS stops making such payments.

b.   On September 26, 2016, the collection case was assigned to RO 1.  RO 1 ran an initial compliance check on GBUS and determined that GBUS had already missed filing several quarters of payroll tax returns.

c.   On October 7, 2016, RO 1 made a field visit to GBUS's corporate offices in Seattle, Washington.  RO 1 met with GBUS's Human Resources Director, M.E., and GBUS's Controller, V.S.  RO 1 told M.E. and V.S. that the purpose of his visit was to verify federal tax deposits, and that a FTDA had been

---

[8]  Based on my training and experience, I know that the ICS History is a chronology of events that occurred during the collection case.  During his interview, RO 1 explained that not all of the information he receives is included in the ICS History.  The ICS History is not meant to document every statement, but is instead just a log of events.

USAO_00134576

USAO_00134447

generated based on the possibility that the company had fallen
behind in its federal tax deposit payments.  Neither M.E. nor
V.S. appeared surprised by RO 1's visit.  M.E. and V.S. both
told RO 1 that AVENATTI was the corporate officer responsible
for all of GBUS's business affairs.  RO 1 attempted to obtain
payroll information from M.E. and V.S., but they did not want to
give RO 1 any additional information until RO 1 had spoken with
AVENATTI.  M.E. and V.S. gave RO 1 AVENATTI's contact
information.

     d.   Later on October 7, 2016, RO 1 called AVENATTI
and left a voicemail asking AVENATTI to call him back
immediately.  When AVENATTI called RO 1, RO 1 stated the purpose
of his visit to GBUS's corporate headquarters was to verify
GBUS's federal tax deposits.  RO 1 also confirmed that AVENATTI
was the corporate officer for GBUS.  AVENATTI appeared shocked
and did not appear to understand how payroll taxes worked.
AVENATTI said that he was not personally involved in the
company's finances, and that his payroll staff and a third-party
payroll company handled the company's payroll responsibilities
and payroll taxes.  AVENATTI did not tell RO 1 the name of the
third-party payroll company, but said that he would provide the
information to RO 1 later.  RO 1 told AVENATTI that since
September 2015 GBUS had not filed any payroll tax returns or
made any federal tax deposit payments.  AVENATTI said he was
very confused about this as well, and that he would talk to his
accountant to see if the business had changed payroll companies
in late-2015.  AVENATTI asked to speak to his accountant and

USAO_00134577

USAO_00134447

said he would call RO 1 back by October 13, 2016.  RO 1 also told AVENATTI that GBUS owed a balance of $7,758 for the 2015 third-quarter federal tax deposits, and was delinquent for the fourth quarter of 2015 and the first and second quarters of 2016.

e.  On October 14, 2016, AVENATTI called RO 1 and said that he had talked to his accountant, M.H. (a certified public accountant in Los Angeles, California), who would be handling the collection case as the Power of Attorney ("POA") for GBUS because AVENATTI did not have time.

f.  On October 20, 2016, RO 1 spoke with M.H.  M.H. did not have any information regarding GBUS's payroll taxes at the time.  M.H. said she had just been hired, and would need to obtain information regarding the business from AVENATTI.  RO 1 told M.H. that by November 14, 2016, GBUS needed to pay the remaining balance of $7,758 for the third-quarter of 2015, and file the delinquent quarterly payroll returns for the fourth-quarter of 2015 and the first three quarters of 2016.  RO 1 also requested that GBUS provide 12 months of bank statements, a 2016 profit and loss statement, and a fully completed IRS Form 433B (collection information statement for business).  RO 1 further told M.H. that he would need to set up an appointment for an IRS Form 4180 trust fund interview, the purpose of which is the determination of which corporate officers are responsible for making the federal tax deposits.  RO 1 explained to M.H. the consequences that would result if GBUS did not meet these deadlines, including the possibility of levies, summonses, and

USAO_00134578

USAO_00134447

seizures.  At no point during the call, did M.H. suggest that
AVENATTI was not the responsible party for GBUS's payroll tax
liabilities.

      g.  On November 18, 2016, M.H. called RO 1 to request
an extension of the November 14, 2016, deadline to pay the
$7,758 remaining balance, file the delinquent returns, and
provide the requested financial information and IRS Form 433B.
M.H. told RO 1 that AVENATTI, GBUS's managing member, had been
out of the country for work and M.H. had not been able to have a
meaningful discussion with him regarding the status of the
business or its taxes.  M.H. said that AVENATTI was coming home
for the holidays and that she planned to meet with him
"intensely" to discuss the issues with the business.  RO 1
agreed to extend the deadline to December 19, 2016, and again
explained to M.H. the consequences that would result if GBUS did
not meet this deadline.

      h.  As of the December 19, 2016, deadline, RO 1 had
not heard back from GBUS, M.H., or AVENATTI.  The IRS had not
received from GBUS any additional payments, the delinquent
returns, or the requested financial information.  As a result,
RO 1 mailed to GBUS and M.H. via certified U.S. Mail completed
substitute returns prepared by the IRS ("IRS Form 6020B"); IRS
Publication 5, which detailed appeal rights; blank IRS Form 940
and IRS Form 941 returns; and IRS Letter 1085, detailing the
proposed assessment and advising GBUS that the IRS had prepared
tax returns on the company's behalf and providing GBUS with 30
days to contest the assessment or file its own returns.  Based

USAO_00134579

USAO_00134447

on the IRS Form 6020B substitute returns, GBUS owed the IRS a balance of approximately $4.8 million in unpaid payroll taxes.

　　　i.　On or about December 22, 2016, GBUS paid the $7,758 balance due for the 2015 third quarter federal tax deposits.

　　　j.　On or about February 9, 2017, RO 1 filed IRS Form 6020B substitute returns with the IRS for the fourth quarter of 2015, and the first three quarters of 2016.

　　　k.　As of March 13, 2017, GBUS still had not filed its delinquent returns or provided any of the requested financial information.  RO 1 attempted to contact M.H., but was unable to reach her.  RO 1 left M.H. a message informing her that liens would be filed for all balances due from the IRS Form 6020B assessments.  RO 1 also mailed out an IRS Form 9297 to GBUS and M.H., which stated that GBUS had until April 10, 2017, to file the delinquent returns and to provide the requested financial information and IRS Form 433B.  GBUS did not comply with the April 10, 2017, deadline.

　　　l.　Because RO 1 had not heard back from GBUS or M.H. as of June 22, 2017, RO 1 began the process of filing notices of liens against GBUS for all amounts due to the IRS.  On June 26, 2017, the IRS filed a federal tax lien against GBUS for approximately $4,998,227 with King County in Washington.

USAO_00134580

USAO_00134447

m.    On August 16, 2017, at RO 1's request, IRS levies[9] were issued to a number of financial institutions and companies associated with GBUS, including: (1) Bank of America ("BofA"); (2) California Bank & Trust ("CB&T"); (3) JP Morgan Chase Bank NA ("Chase"); (4) HomeStreet Bank ("HomeStreet"); (5) KeyBank; (6) Heartland Payment Systems ("Heartland"); (7) First National Bank of Omaha ("FNB Omaha"); and (8) Boeing.  The levy notices indicated that GBUS owed the IRS a total of approximately $5,210,769.  The levy notices were simultaneously mailed to GBUS's corporate offices.  As noted in paragraph 29.q below, funds provided to the IRS by the recipient financial institutions as a result of the levies were routinely noted on the monthly financial statements provided to GBUS and AVENATTI by the financial institutions.  RO 1 continued to issue additional levy notices to financial institutions and companies associated with GBUS throughout January 2018.  Because IRS levies only apply to funds in the accounts at the time the levy is issued, RO 1 issued levies on a nearly daily basis at various points in time.  In total, RO 1 issued approximately 125 levy notices.

n.    On or about August 21, 2017, RO 1 began the process of bypassing GBUS's representative, M.H.  Before

----

[9]  Based on my training and experience, I know that an IRS levy is used to collect money that a taxpayer owes to the IRS. The levy requires the recipient to turn over to the United States Treasury the taxpayer's property and rights to property, such as money, credits, and bank deposits, that the recipient of the levy has or is already obligated to pay to the taxpayer. Banks, savings and loans, and credit unions are obligated to hold any funds subject to the levy for 21 days before sending payment to the United States Treasury.

26

USAO_00134581

USAO_00134447

bypassing a taxpayer's representative, RO 1 was first required to issue a warning to M.H. RO 1 called M.H. and left her a message stating that three separate attempts had been made to obtain information from her regarding GBUS, but that no information had been provided, and his calls had not been returned. RO D.L also said that he would be bypassing M.H. if she made no further contact. RO 1 did not receive a response.

     o.   On September 1, 2017, RO 1 visited GBUS's corporate headquarters. RO 1 spoke to a GBUS employee, S.F., who confirmed that AVENATTI was the sole person responsible for GBUS's finances and served as both the CEO and Chief Financial Officer ("CFO"). S.F. also confirmed that the various notices the IRS sent to GBUS had been received by GBUS, and that the notices were being scanned and then emailed to AVENATTI. S.F. said that AVENATTI was a practicing attorney in California. When asked for AVENATTI's email address, S.F. said she could not give that out. S.F. did not appear surprised that RO 1 was visiting GBUS. S.F. said she was aware of the IRS levies. RO 1 also provided S.F. with a copy of IRS Letter 903, which stated that the Department of Justice was considering initiating a civil suit or criminal prosecution due to GBUS's failure to make its required trust fund payments to the IRS. RO 1 also read the letter to S.F., who confirmed that she understood the letter. As noted in paragraph 32.f below, during a subsequent interview, S.F. confirmed that she told AVENATTI about RO 1's visit and provided him with a copy of the IRS 903 Letter.

USAO_00134582

USAO_00134447

     p.    On September 1, 2017, upon returning to his
office, RO 1 consulted with his general manager about a possible
fraud referral to IRS-CI due to GBUS's non-compliance. RO 1's
justification for the potential fraud referral was that GBUS had
not provided any documents; RO 1 had been attempting to collect
the taxes owed for one year and had only received one payment of
approximately $7,000; the POA, M.H., had been dismissed; and
Tully's stores were still operating.

     q.    On September 5, 2017, Dennis Brager ("Brager"),
an attorney from the Brager Tax Law Group, contacted RO 1.
Brager said we would serve as the new POA for GBUS.  Brager told
RO 1 that the payroll tax issues were all due to a financial
error and that GBUS had gone through staffing changes in the
financial or accounting department that had caused the payroll
tax issue.  Brager also told RO 1 that AVENATTI knew nothing
about the IRS issues until the delivery of the 903 Letter "last
Friday" (i.e., September 1, 2017).  RO 1 explained to Brager
that the case was a year old, he had been unable to get any
information from the prior POA, M.H., and that liens and levies
had already been issued.  Brager told RO 1 that the left hand
did not know what the right hand was doing, that AVENATTI was
busy, and that employees were not doing their jobs.  RO 1 told
Brager that the balance due to the IRS was currently at
$5,274,460.  Brager told RO 1 that GBUS would file original
returns and correct all balances due.

     r.    On September 6, 2017, S.F. contacted RO 1 and
said she wanted to provide information to him confidentially due

<div align="center">28</div>

USAO_00134583

USAO_00134447

to fear of reprisal from AVENATTI if he learned she had spoken to the IRS.  RO 1 asked S.F. why she changed her mind and wanted to talk to him.  S.F. said that after hearing RO 1 read the 903 Letter she became uncomfortable with AVENATTI's response to the situation and the scramble she had had to go through to pay vendors because of the filed levies.

    s.   On September 15 and September 25, 2017, RO 1 called Brager's office, but was unable to reach him.  During the call on September 25, RO 1 told the receptionist that he would be faxing Brager a number of forms, and also mailing the forms to Brager via certified mail.  Among other things, RO 1 sent Brager a Form 9297, summary of contact letter, requesting full payment of the approximately $5.3 million balance due, and setting a deadline of October 16, 2017, for GBUS to file original returns to correct the Form 6020B substitute returns. The Form 9297 letter also advised GBUS that the IRS would seize corporate assets from a number of Tully's locations if GBUS were unable to pay the balance due.

    t.   On September 26, 2017, RO 1 conducted a IRS Form 4180 trust fund interview with A.H., a former GBUS employee. A.H. confirmed that she had been a payroll clerk and bookkeeper at GBUS.  A.H. told RO 1 that AVENATTI was in charge of GBUS and made all of the financial decisions for the company.

    u.   On September 26, 2017, RO 1 also attempted to conduct an IRS Form 4180 trust fund interview with T.M., GBUS's former CFO and Chief Operating Officer ("COO"), at his home.  RO 1 eventually spoke with T.M. via telephone.  T.M. said he needed

USAO_00134584

USAO_00134447

to speak with counsel before speaking to RO 1.  Subsequently, on
or about November 3, 2017, RO 1 received a letter from T.M.'s
attorney attaching the completed Form 4180, a signed declaration
from T.M., and a copy of T.M.'s September 24, 2015, resignation
email to AVENATTI.  In the Form 4180, T.M. stated that AVENATTI
was the sole corporate officer for GBUS and was responsible for
GBUS's financial decisions.  The letter from T.M.'s attorney
also argued that T.M. was not personally liable for any of
GBUS's tax liabilities.

        v.    On October 3, 2017, RO 1 spoke with Brager.
Brager expressed shock that levies had been issued.  RO 1 told
Brager that the levies were issued because no federal tax
deposits had been received from GBUS and that GBUS was an
"egregious pyramider."[ ]  RO 1 told Brager that RO 1 would agree
not to issue additional levies against GBUS until October 16,
2017, so that GBUS could take steps to make immediate federal
tax deposits.  Brager asked RO 1 for a "levy release," which RO
1 declined to provide because GBUS had not been in compliance
and had failed to provide any financial information.  When
Brager said that GBUS would not be able to make any federal tax
deposits due to the levies in place, RO 1 told Brager that GBUS
had not made any federal tax deposits since the fourth-quarter
of 2015, that the levies did not start until August 2017, and
that GBUS therefore had almost two years of payroll taxes
stashed away.  When asked what happened to the payroll taxes

---------------------------------------

        [ ] RO 1 explained during his September 2018 interview that a
"pyramider" is a business that is accumulating payroll taxes
every quarter without making the required payments to the IRS.

USAO_00134585

USAO_00134447

Case 8:19-mj-00419-DUTY *SEALED*   Document 41-1 *SEALED*   Filed 05/22/19   Page 140 of 180   Page ID #:236

that had been withheld from the employees from October 2015 to July 2017, Brager told RO 1 that he did not know and that he needed to talk to AVENATTI.

     w.   On October 13, 2017, Brager contacted RO 1 and told him that GBUS had made a federal tax deposit payment for its payroll taxes.  Brager also said that GBUS had filed its original payroll tax return.

     x.   On October 18, 2017, RO 1 received four payroll tax returns from GBUS for processing and four payroll tax returns for 6020B reconsideration.  As of October 18, 2017, however, the IRS still had not received any federal tax deposits from GBUS.  RO 1 left a message for Brager informing him that there had "still been no FTDS!"  In the message, RO 1 told Brager that the payment of the federal tax deposits needed to be immediate and retroactive since the last federal tax deposit payment had been made on November 2, 2015.

     y.   On October 20, 2017, having still not received federal tax deposit payments from GBUS, RO 1 again began issuing daily levies to the financial institutions associated with GBUS, including KeyBank, CB&T, and FNB Omaha.  RO 1 also noted in the ICS History that the case was being considered for a fraud referral to IRS-CI.

     z.   On October 26, 2017, the IRS received a $23,763 payment from GBUS.

     aa.  In late October 2017, RO 1 noticed that the levies issued were not producing the expected amount of seized

31

USAO_00134586

USAO_00134447

funds.  This raised a red flag for RO 1 regarding GBUS's financial arrangements.

         bb.  On November 2, 2017, Brager called RO 1 and faxed over two copies of federal tax deposits made by GBUS.  Brager requested that the IRS enter into an installment agreement with GBUS.  RO 1, however, told Brager that GBUS did not qualify for an installment agreement because GBUS had never provided the IRS with any financial information.  RO 1 told Brager that he believed the request for an installment agreement was merely a stall tactic and attempt to delay collection.[11]  During the call, Brager repeatedly told RO 1 that AVENATTI had relied on the payroll service provider to make payments but the provider had failed to make the deposits.  RO 1 responded that GBUS should have had the money at issue readily available since the federal tax deposits were never made.  Brager said he didn't know the financial information for GBUS, but would get together with AVENATTI and provide RO 1 with all the financial information within 10 days.  RO 1 told Brager that enforcement (i.e., additional levies) would continue during that time period.

         cc.  On November 6, 2017, the IRS received a Form 941 payroll return for GBUS for the third-quarter of 2017.  The payroll return was signed by M.E.

         dd.  On November 14, 2017, RO 1 spoke with a FNB Omaha employee.  RO 1 wanted to know why there had been no funds from the latest levies issued to FNB Omaha.  The FNB Omaha employee

-------------------------------------

    [11]  RO 1's general manager reviewed the installment agreement request and agreed with RO 1's assessment that it was merely a delay tactic.

USAO_00134587

USAO_00134447

told RO 1 that GBUS had changed merchant accounts and was no
longer using FNB Omaha as the sponsoring bank.  The employee
said that GBUS might still be using TSYS as its credit card
processor, but a different sponsoring bank.  RO 1 considered the
change in merchant accounts to be a red flag.

   ee.  On November 14, 2017, a GBUS employee told RO 1
that: (1) the merchant account IDs had been changed in all of
the Tully's stores on October 5, 2017; (2) FNB Omaha had
requested the GBUS accounts be closed due to risk; (3) the
account into which cash from the Tully's stores was deposited
had been changed from a KeyBank account to a subsidiary account
under the name of GB Auto; (4) cash was being deposited into a
BofA account ending in 7412 ("GB Auto BofA Account 7412"); and
(5) cash was retrieved from the coffee shops twice a week on
Monday and Thursday mornings.  At this point, RO 1 believed that
GBUS was actively placing assets out of the reach of the
government.

   ff.  On November 17, 2017, M.G. called RO 1 to say
that M.G. wanted to cooperate and remain anonymous due to fear
of reprisal.  M.G. was the Director of Retail Operations for
GBUS.[12]  M.G. said she was responsible for daily cash deposits
and setting up merchant credit card processing services for all
of the Tully's stores.  M.G. told RO 1 that GBUS's corporate
headquarters and one of the Tully's retail locations had been
closed due to non-payment of the lease.  M.G. said that she had

_____

   [12] Based on interviews of M.G. and S.F. conducted in
September 2018, I know that M.G. and S.F. are sisters.

33

USAO_00134588

USAO_00134447

been instructed by V.S., GBUS's controller, to make numerous changes to the cash deposits and the merchant accounts, which made her feel uneasy and suspicious as to whether fraud was occurring.  M.G. said she had all the financial information and correspondence from AVENATTI regarding changes to the merchant accounts.  RO 1 told her that he would be summonsing her into the office to provide the documents.  He also asked M.G. to let him know if AVENATTI changed the bank accounts or merchant accounts again.

gg.  Later, on November 17, 2017, two GBUS employees, M.G. and V.S. were served with IRS summonses requiring them to appear before RO 1 and produce relevant GBUS business records.

hh.  On November 28, 2017, M.E. appeared for an interview in response to the collection summons RO 1 issued. During the interview, M.E. filled out a Form 4180.  M.E. said that since April 2016 she prepared, reviewed, signed, and authorized the transmission of payroll tax returns.  M.E., however, confirmed that AVENATTI was the owner and operator of GBUS, and that all financial obligations, if paid, were paid at the direction of AVENATTI.

ii.  On November 29, 2017, M.G. appeared for an interview in response to the collection summons RO 1 issued. M.G. provided RO 1 with bank account information for GBUS, GB LLC, and GB Auto.  M.G. confirmed that GBUS had changed both its credit card processing and cash deposit accounts.  M.G. said that cash from the Tully's stores were previously being deposited into a KeyBank account, but was now being deposited

USAO_00134589

USAO_00134447

into an account for GB Auto.  M.G. said that the entity name for
the merchant accounts had been changed from GBUS to GB LLC.
M.G. said that REGNIER, from EA LLP, had set up the new bank
account for GB LLC.  M.G. also provided RO 1 with emails
regarding the company's business, including emails regarding the
merchant account changes.[13]

     jj.  On November 30, 2017, V.S. appeared for an
interview in response to the collection summons RO 1 issued.
V.S. told RO 1 that no payments for GBUS were made unless
authorized by AVENATTI.  V.S. repeatedly said that AVENATTI
refers to himself as the owner, CEO, and sole member of GBUS and
that any and all decisions go through him.  V.S. said that funds
were frequently transferred between GBUS and EA LLP, and that
unreasonable legal fees were being paid to EA LLP.  V.S. also
said that GBUS sponsored the International Motor Sports
Association ("IMSA"), and spent approximately $200,000 in
license fees and other investments relating to AVENATTI's racing
team.  V.S. said that T.M., GBUS's former COO/CFO, and B.H.,
GBUS's former Director of Operations were both aware of the
financial irregularities at GBUS.  V.S. also provided RO 1 with
email correspondence involving AVENATTI, as well emails
regarding the changes to the TSYS merchant accounts.[14]

     kk.  On December 5, 2017, M.G. told RO 1 that AVENATTI
had instructed all of the Tully's stores to hold their cash

---

[13] IRS-CI's collection and review of these emails is
discussed further in footnote 15 below.

[14] IRS-CI's collection and review of the emails V.S.
provided is discussed further in footnote 15 below.

USAO_00134590

USAO_00134447

deposits until further notice.  M.G. said AVENATTI was also very curious about what documents were submitted to the IRS in response to the summons and wanted a full account of the documents submitted.

    ll.  On or about December 7, 2017, Brager sent a letter to RO 1's general manager complaining about the summonses issued to GBUS employees.  Among other things, Brager's letter claimed that the IRS had provided inadequate notice of the summonses to GBUS.  Brager further claimed that RO 1 may have obtained privileged information from the employees because AVENATTI is both the managing member of GBUS and its general counsel.[15]

    mm.  On December 11, 2017, RO 1 contacted A.R.G., a lawyer for Boeing, regarding the sale of the Tully's kiosks while IRS liens were pending.  On December 12, 2017, A.R.G. emailed RO 1 a copy of the Global Baristas contract, and an email exchange with AVENATTI.  A.G. stated that the contract was

_____

    [15]  In April 2018, following the fraud referral to IRS-CI, RO 1 provided me with PDFs of six documents he had received in response to the summonses.  In May 2018, RO 1 also provided me with a disk containing additional documents he had received in response to the summonses.  I briefly reviewed the six PDFs, but did not review any of the materials on the disk.  Later in May 2018, while reviewing RO 1's case file, I learned of Brager's privilege claim.  I then provided the materials I received from RO 1 to an attorney with the Department of Justice's Tax Division so that a privilege review could be conducted.  I understand that a Privilege Review Team AUSA ("PRTAUSA") subsequently conducted a review of the materials in August 2018.  The PRTAUSA redacted two portions of one email on the basis that GBUS might be able to claim that the redacted portions were protected by the attorney-client privilege, but concluded that none of the other documents RO 1 had provided were protected or potentially protected by the attorney-client privilege.  The redacted email and the remaining documents were then released to IRS-CI and the prosecution team for us to review.

USAO_00134591

USAO_00134447

actually with GB Hospitality, LLC.  In the email, A.G. said that
AVENATTI "verbally had asked me to use the entity Global
Baristas, LLC on the Bill of Sale as he said it was the entity
that held title to the equipment."

      nn.  On December 14, 2017, RO 1 spoke with M.G. and
S.F.  They told him AVENATTI had instructed the Tully's stores
to hold the cash deposits because he was in the process of
setting up new accounts to take cash deposits.  They also told
RO 1 that GBUS was in the process of finalizing a new merchant
credit card account with Chase Bank under the name of GB LLC.

      oo.  On December 14, 2017, RO 1 issued a summons for
AVENATTI to appear for a 4180 trust fund interview.  On January
11, 2018, Brager advised RO 1 that AVENATTI would not appear
because AVENATTI had not been properly served with the summons.

      pp.  As of January 2018, RO 1 was still issuing levies
to known bank accounts associated with GBUS, as well as to bank
accounts associated with GB LLC and GB Auto.  These levies
typically resulted in the recovery of only $50 to $100.

      qq.  On February 2, 2018, Brager sent RO 1 a protest
of the proposed trust fund recovery penalty assessments against
AVENATTI and GBUS.  Among other things, Brager claimed that
AVENATTI "did not act willfully since he was not involved in the
preparation, or calculation of the payroll taxes" and "did not
have knowledge of the fact that the taxes were unpaid until
after the taxes had accrued."  Brager therefore argued that
AVENATTI was not a "responsible person" for GBUS and "cannot be

USAO_00134592

USAO_00134447

held personally liable for the trust fund taxes owed by Global
Baristas, US LLC."

     rr.  On March 12, 2018, RO 1 made field visits to a
number of Tully's locations, each of which had signs posted on
the door stating that the store was temporarily closed.  RO 1
then contacted a GBUS employee, who told him that the closures
were in fact permanent.

     ss.  On March 19, 2018, the IRS Fraud Technical
Advisor's Manager approved a fraud referral to IRS-CI.

### 3.   GBUS Employee Interviews

24.  As part of its investigation, IRS-CI has interviewed
numerous former GBUS employees.  At the outset of each
interview, Assistant United States Attorneys ("AUSAs") working
on this investigation requested that the employee not provide
the government with any information that might be covered by the
attorney-client privilege.  The AUSAs explained that any legal
discussions the employee may have had with lawyers acting on
behalf of GBUS or any other company the employee worked for
could potentially be covered by the attorney-client privileged,
and that the company would hold the privilege -- meaning that
only the company could decide to disclose privileged
communications to the government.  The AUSAs further explained
that the government understood that GBUS's owner and CEO,
AVENATTI, was also a lawyer and may have acted both in a
business capacity and a legal capacity on behalf of GBUS.  The
AUSAs asked the employees to inform the interviewers if at any
point the questions might require the employees to disclose

USAO_00134593

USAO_00134447

legal discussions they had with AVENATTI, and to not disclose
any legal discussions they may have had with AVENATTI in his
capacity as a lawyer for GBUS.  Each of the employees said they
understood and agreed not to provide any information that they
believed could be potentially privileged.

25.  On November 13, 2018, I participated in an interview
of T.M., GBUS's former Chief Operating Officer ("COO") and Chief
Financial Officer ("CFO").  T.M. was accompanied by his personal
attorney.  T.M. provided the following information:

a.    T.M. met AVENATTI in approximately 2011 through
T.M.'s work for Cascade Capital Group ("Cascade").  In 2012,
T.M., AVENATTI, and others were attending a bankruptcy hearing
in connection with the Meridian Mortgage Funds ("Meridian")
bankruptcy case.  Prior to the Meridian hearing, there was a
hearing regarding the auction to purchase TC Global, Tully's
parent company, out of bankruptcy.  During that hearing,
AVENATTI expressed an interest in purchasing TC Global out of
bankruptcy.  AVENATTI then hired Cascade to do due diligence on
TC Global and Tully's.  In January 2013, AVENATTI, through GB
LLC, put in a successful bid of $9.15 million to purchase TC
Global at a bankruptcy auction.  The purchase closed in June
2013.

b.    T.M. worked as a consultant for GBUS beginning in
July 2013.  In October or November 2013, T.M. took a full-time
position as GBUS's COO and CFO.  T.M worked for GBUS until
September 24, 2015, when he resigned.  Between approximately
January 2015 and September 2015, T.M. worked for GBUS only half-

USAO_00134594

USAO_00134447

time.  T.M.'s base salary was $250,000, with incentives of up to $150,000 annually.  T.M. was also supposed to receive "phantom equity" in GBUS, under which T.M. would receive six percent of the sale proceeds of GBUS equity in excess of $9,150,000.

        c.    AVENATTI's title at GBUS was CEO and he was on GBUS's payroll as its CEO.  T.M. considered AVENATTI to be the owner and CEO.  T.M said he "treated this as if I was working for the owner."  AVENATTI's role was to identify strategy and make decisions for GBUS.  T.M. said that AVENATTI was the ultimate decision maker for GBUS and that every important decision was approved by AVENATTI.  For example, AVENATTI made all of the hiring decisions for GBUS, and interviewed and vetted the candidates.

        d.    T.M. said that AVENATTI's default position at GBUS was not as a lawyer.  When asked whether AVENATTI ever acted as a lawyer for GBUS, T.M. said he did not know and that this was a gray area.  T.M., however, said that he did not see any invoices from EA LLP and was not aware of GBUS ever hiring EA LLP to do legal work for GBUS.  T.M. considered his conversations with AVENATTI to be about business matters, not legal matters.

        e.    T.M. said that for the entire time he worked for GBUS, Foster Pepper PLLC was GBUS's operational counsel.  T.M. saw invoices from Foster Pepper to GBUS, which were then routed to AVENATTI.

        f.    T.M. said that GBUS used a third-party payroll company, but was not sure of the company's name.  The prior

40

USAO_00134595

Exhibit D - 149

USAO_00134447

payroll company had not been allowing direct deposit of wages
for employees because of cash flow issues.  When GBUS switched
to a new payroll company, GBUS set up direct deposit for its
employees.[15]  As cash flow got tighter at GBUS, direct deposit
was rolled back.  T.M. discussed rolling back direct deposit and
reverting to paper checks with AVENATTI.

      g.   T.M. explained that after direct deposit was
stopped in 2015, the payroll company would generate payroll
checks on GBUS's stock checks.  When GBUS had direct deposit,
the payroll company would pull the funds for payroll and payroll
taxes out of GBUS's payroll account on the Friday before the
Monday payday.  The money for payroll would therefore be gone
immediately.  Cancelling direct deposit gave GBUS "float time"
until the employees' checks cleared the following week, meaning
that the payroll funds would still be in GBUS's bank account and
GBUS had more time to make funds available to pay the employees
and its payroll taxes.

      h.   T.M. resigned his position at GBUS in large part
due to payroll tax issues at GBUS and because he was concerned
about his personal liability.  Payroll was very tight and GBUS
could not always meet its payroll obligations.  On three or four
occasions, T.M. loaned GBUS money so that it could cover the
gaps in its payroll obligations.  T.M. estimated that he loaned

--------------------------------------------------

    [15] Based on interviews with other GBUS witnesses, I learned
that GBUS used Ceridian for its payroll services at all times.
While T.M. appears to have been mistaken about GBUS's use of a
prior payroll company, T.M.'s statements regarding direct
deposit are consistent with statements made by other former GBUS
employees.

USAO_00134596

USAO_00134447

GBUS $10,000 to $40,000 to meet its payroll obligations.  This
money was paid back prior to T.M.'s resignation.

       i.   On September 24, 2015, T.M. had a phone
conversation with AVENATTI regarding the outflow of funds for
that week.  T.M. told AVENATTI that GBUS needed funds to pay its
payroll taxes the next day.  AVENATTI told T.M. not to count on
that.[17]  Based on AVENATTI's response, T.M. told AVENATTI that it
would be his last day.  He then emailed AVENATTI a resignation
letter later that same day.

       j.   T.M. said that AVENATTI was aware that GBUS
needed to pay its payroll taxes.  T.M. specifically discussed
GBUS's obligation to pay its payroll taxes with AVENATTI on more
than one occasion.[18]

       k.   M.D. was the head of Human Resources and Payroll
for GBUS.  GBUS's IRS Forms 940 and IRS Forms 941 were normally
filed by M.D.  T.M. would be notified when they were filed.

       l.   T.M. was asked whether AVENATTI ever withdrew
money from GBUS.  T.M. said that money was flowing out of GBUS
as early as August 2013.  AVENATTI was a signer on GBUS's bank
accounts, and there were frequent transfers from GBUS to EA LLP

---

[17]  As detailed in paragraph 22.b above, IRS records show
that GBUS stopped making federal tax deposit payments to the IRS
after the third quarter of 2015.

[18]  During the discussion of GBUS's payroll tax obligations,
T.M. began to mention a discussion he and AVENATTI had with a
labor lawyer from Foster Pepper in early 2015.  The AUSAs
immediately instructed T.M. not to provide any information
regarding the substance of his conversations with Foster Pepper.
T.M. followed that instruction and did not provide any
information regarding the substance of his discussions with
GBUS's lawyers.

USAO_00134597

USAO_00134447

and from EA LLP to GBUS.  T.M. said that none of the transfers
to EA LLP were for legal services EA LLP provided to GBUS.
AVENATTI would not tell T.M. in advance that he would be taking
money out of GBUS's bank accounts -- the money would just be
gone.  M.B., GBUS's controller at the time, would tell T.M. when
AVENATTI had taken money out of the GBUS bank accounts.  When
T.M. asked AVENATTI if he was going to stop taking money in and
out of GBUS's bank accounts, AVENATTI responded that he did not
foresee that happening.  AVENATTI did not tell T.M. what the
funds AVENATTI was taking out of GBUS's bank accounts were being
used for.  GBUS's accounting team tracked the money AVENATTI
transferred into and out of GBUS.

     m.   T.M. initially had authority to sign company
checks, which were cut whenever vendor invoices were due.  By
approximately March 2015, however, this had changed.[19]  T.M.
would provide AVENATTI with a list of vendors' invoices.
Sometimes T.M. would make the decision to pay vendors on his
own, and other times AVENATTI would approve the payments to
vendors.

     n.   T.M. said that the daily operations of the
Tully's stores went through GBUS.  All cash receipts came from
GBUS and everything happened under GBUS.  T.M. did not recall
any cash receipts coming from GB LLC.

---

[19] Based on my review of GBUS bank account records, I know
that in February 2015 GBUS opened two new accounts at CB&T.
AVENATTI and REGNIER were the only signatories on these bank
accounts.

USAO_00134598

USAO_00134447

o.   T.M. said that the majority of GBUS's profits came from the Tully's stores at Boeing facilities.  The commission payments to Boeing were delayed more than once because of working capital restrictions.  T.M. had never heard of a company called "GB Hospitality," which was the name AVENATTI used on the Boeing contract in November 2016 (see ¶ 39.d).

p.   T.M. is familiar with The Peoples Bank in Mississippi because of litigation that Cascade and AVENATTI worked on involving Mississippi Power.  T.M., however, was not aware of AVENATTI obtaining a loan from The Peoples Bank.  T.M. did not recall seeing any loan documents, and there was no debit or credit item for a loan from The Peoples Bank in GBUS's financial statements.

q.   T.M. was also asked about GB Auto.  T.M. said GB Auto was AVENATTI's racing team in IMSA.  Money that was sent from GBUS to GB Auto would have been tracked by the accounting team.  AVENATTI also signed GBUS up as a coffee sponsor for IMSA.  AVENATTI used the Tully's logo on his race car and an employee would serve Tully's coffee at IMSA events.  T.M. said that the IMSA expenses did not help with GBUS's operations.

r.   T.M. did not know whether corporate tax returns for GBUS had been completed or filed.  T.M. had arranged for GBUS to hire a tax accountant in Tampa, Florida, to prepare GBUS's tax returns.  AVENATTI participated in meetings with the accountants by phone.  The accountants provided GBUS with a list of documents that were needed to prepare the tax returns,

44

USAO_00134599

USAO_00134447

Case 8:19-mj-00493-DUTY *SEALED*   Document 41-1 *SEALED*   Filed 05/24/19   Page 154 of 180   Page ID #:800

including a number of documents that would have been in AVENATTI's control.  T.M. did not know if AVENATTI ever provided the required documents to the accountants.

s.   AVENATTI had a GBUS email address, but T.M. always emailed AVENATTI at his EA LLP email address.

t.   T.M. said that REGNIER was responsible for all of AVENATTI's administrative needs.  REGNIER would have been copied on all emails to AVENATTI regarding GBUS's cash needs.  T.M. understood that REGNIER had been with AVENATTI for a very long time.

u.   T.M. was asked about a settlement agreement he entered into with AVENATTI and GBUS in 2018 relating to money GBUS still owed T.M. as part of his employment agreement.  As part of the settlement, on or about October 2, 2018, T.M. received a $35,000 check from A&A's CB&T bank account, which bounced.  T.M. guessed that the check was signed by REGNIER.

v.   Prior to the interview with T.M., I learned that on or about October 31, 2018, T.M. filed a civil lawsuit against AVENATTI in the Superior Court of the State of Washington for King County for wrongful wage withholding; breach of contract; dishonored check; and fraud and misrepresentation.  The civil complaint alleges that AVENATTI failed to pay T.M. money he was owed under his employment agreement with GBUS.  In addition to the incentive payments mentioned in paragraph 25.b above, the complaint notes that AVENATTI had recently been quoted in a October 24, 2018, Seattle Times article as saying that he sold "Global Baristas . . . for $28 million a long time ago."  T.M.

45

USAO_00134600

USAO_00134447

claimed that under the terms of his employment agreement, he
would have been entitled to six percent of the sale proceeds
above $9.15 million.

      w.    T.M. said he had never discussed selling GBUS
with AVENATTI and does not know if AVENATTI ever sold GBUS.

    26.  On October 24, 2018, I participated in an interview of
M.B., GBUS's former Controller.  M.B. provided the following
information:

      a.    In October 2013, M.B. began working at GBUS as
its Controller.  M.B. had been recruited by T.M., and
interviewed for the position with T.M. and AVENATTI.  She
reported to T.M.  M.B. worked full-time at GBUS until December
2015, and part-time at GBUS in January 2016.

      b.    M.B. managed GBUS's accounting department.
M.B.'s role at GBUS included assessing and running the
accounting systems, overseeing the financials, and looking at
the day-to-day accounting figures.

      c.    AVENATTI was the owner and CEO of GBUS.  M.B. did
not know AVENATTI to be the General Counsel of GBUS.

      d.    AVENATTI would authorize payments for GBUS.  M.B.
would email T.M. and AVENATTI to ask what bills to pay.  M.B.
would usually get a response of approval from T.M., and
sometimes from AVENATTI.

      e.    GBUS used Ceridian for its payroll services.
Ceridian was initially responsible for paying the payroll taxes
and preparing and filing the payroll tax returns.  M.B. believed
this was set up by T.M. or AVENATTI.

<div align="center">46</div>

USAO_00134601

USAO_00134447

f.   In the second or third quarter of 2015, AVENATTI directed Ceridian to stop paying GBUS's payroll tax withholdings and told Ceridian that GBUS would pay the payroll taxes itself. This gave GBUS float time for the payroll payments.  M.B. explained that AVENATTI was the only signatory on GBUS's payroll account and that no one other than AVENATTI was empowered to pay the payroll tax withholdings.  After this change, M.D. (GBUS's Human Resources and Payroll Director) was responsible for filing the payroll tax returns, and AVENATTI was responsible for paying the payroll tax withholdings.  M.B. said the decision to change the payment process for GBUS's payroll tax withholdings with Ceridian was made by AVENATTI, and went from AVENATTI to T.M., and then from T.M. to M.D.  M.B. believes that AVENATTI would have signed the forms authorizing the change with Ceridian.

g.   For the third-quarter of 2015, Ceridian paid the net salary to GBUS employees, Ceridian prepared the IRS Form 941 payroll tax return, and GBUS was responsible for paying the payroll tax withholdings to the IRS.  AVENATTI, however, would not approve the payment of the payroll tax withholdings.  M.B. said that AVENATTI directed M.D. not to pay GBUS's payroll taxes for the third-quarter of 2015.  M.D. was mortified by this directive and told M.B. about it.

h.   M.B. documented AVENATTI's instruction not to pay GBUS's payroll taxes and sent AVENATTI an email explaining the ramifications of not paying the payroll taxes.  AVENATTI did not respond to her email.  When M.B. asked AVENATTI over the phone whether he had received her email, he responded that it was

USAO_00134602

USAO_00134447

"mine to deal with."  M.B. did not believe she saved a copy of
this email, and was unable to locate a copy of it in her
personal emails following her interview.

        i.   M.B. remembered seeing emails from M.D. to
AVENATTI requesting that AVENATTI approve the payment of the
payroll tax payments.  M.B. also sent similar requests to
AVENATTI.

        j.   M.B. said that V.S. and B.C. from the accounting
department knew that GBUS's payroll taxes were not being paid
because they had access to GBUS's financials.  M.E. from the
human resources department also knew that the payroll taxes were
not being paid.  In fact, M.B. speculated that everyone in
GBUS's corporate office knew about the payroll tax issues
because the corporate office was small, and the employees were
close on a professional level.

        k.   M.B. said the payroll tax issue was the "nail in
the coffin" as to her decision to leave GBUS.  She left GBUS a
few months later in December 2015, and actually took a pay cut
to leave GBUS.  She said that AVENATTI's "moral compass didn't
point north."

        l.   M.B. thought GBUS spent approximately $750,000 in
connection with its IMSA sponsorship.  GBUS was hemorrhaging
money at the time and M.B. did not think the IMSA sponsorship
was the best use of funds.  Without the IMSA expenses GBUS would
have been cash neutral and in a better financial position.  M.B.
considered the IMSA sponsorship to be a "vanity" decision by
AVENATTI.

<div align="center">48</div>

USAO_00134603

USAO_00134447

m.   M.B. said that AVENATTI would frequently transfer money in and out of GBUS's bank accounts.  This happened for months.  M.B. would login into GBUS's bank accounts and see wires to and from EA LLP or A&A.  M.B. would reconcile the bank accounts every day and tracked the funds deposited or withdrawn by AVENATTI.  M.B. said the amount AVENATTI deposited was likely more than the amount he withdrew, but that if you included the money AVENATTI spent on IMSA he would likely have owed GBUS money.  M.B. said that AVENATTI's deposits and withdrawals from GBUS's bank account had an impact on GBUS's operations.  GBUS was operating with a cash loss and some of the money AVENATTI withdrew could have been used to pay vendors.

n.   AVENATTI would wonder why GBUS was short on cash. In response, M.B. would prepare cash reports and give them to AVENATTI.

o.   M.B. said that AVENATTI's law firm was not an investor in GBUS.  There were no invoices between the law firm and GBUS, and no formal loan documents between GBUS and AVENATTI's law firm.

p.   M.B. would send emails to AVENATTI at his EA LLP email address.  M.B. would typically communicate with AVENATTI via email or by phone.  M.B. only saw AVENATTI a few times a year.

q.   REGNIER was the right hand person for AVENATTI at his law firm.  M.B. dealt with REGNIER a few times when M.B. needed AVENATTI to get something done for GBUS.  REGNIER would get AVENATTI to take action at M.B.'s request.

49

USAO_00134604

USAO_00134447

Case 8:19-mj-00419-DUTY *SEALED*   Document 41-1 *SEALED*   Filed 05/22/19   Page 159 of 180   Page ID #:806

27.   On October 24, 2018, I participated in an interview
with M.D., GBUS's former human resources and payroll director.
M.D. provided the following information:

a.   M.D. started working at Tully's in 2000 in the
payroll department.  He worked for Tully's when it was sold to
TC Global in 2008, and stayed on after AVENATTI bought TC Global
out of bankruptcy.  His job duties at GBUS included overseeing
payroll, human resources, and facilities.  M.D. resigned from
GBUS in November 2015.  M.D., however, worked part-time at GBUS
until April 2016 to help with payroll.

b.   GBUS used Ceridian to handle its payroll the
entire time that M.D. worked for GBUS.  Payroll was on Mondays,
so the funds would need to be available in GBUS's payroll
account on the prior Thursday or Friday.  In 2013 and 2014,
Ceridian was a full service payroll processor for GBUS.
Ceridian's services during this time included direct deposit
drawn on Ceridian's bank account, withholding, tax filings, and
W-2s, among other things.  These were the services provided for
the first year-and-a-half, at which point T.M. instructed M.D.
to stop the direct deposit service.   Thereafter, payroll was no
longer paid from Ceridian's bank account, but instead from
GBUS's payroll bank account.  The checks were still cut by
Ceridian, but the money was drawn on GBUS's payroll bank
account.

c.   M.D. said another change occurred in the summer
of 2015, when the wires to pay the payroll taxes were not
approved.  Ceridian requested the payroll tax money and the

USAO_00134605

USAO_00134447

payment did not get approved by GBUS. M.D. recalled telling M.B. that he had been notified by Ceridian about the non-payment of the payroll taxes by GBUS. M.D. did not know if the payroll tax payments were ever made to Ceridian.

> d.   M.D. said that a couple of times the payroll payments to Ceridian were late. After a while, Ceridian told M.D. that it was no longer going to make payroll payments due to GBUS failing to pay Ceridian on time. Ceridian was also no longer filing GBUS's payroll tax returns. M.D. told M.B. about this, who then told T.M. and AVENATTI.

> e.   M.D. said that bi-weekly payments to the IRS stopped once the Ceridian services and payments were discontinued. He believed that AVENATTI, not T.M., made the ultimate decision to terminate Ceridian's services.

> f.   In the third quarter of 2015, GBUS's payroll tax payments were not made because AVENATTI did not approve the payments. M.B. told M.D. that AVENATTI did not approve the tax payments.

> g.   M.D. said he started looking for a new job because of the lack of payroll tax payments. He thought it was "unethical" that payroll tax payments were not being made even though GBUS was withholding taxes from GBUS employees. He was concerned someone would blame him so he started looking for a new job. He described GBUS's failure to pay its payroll taxes as the final straw in his decision to leave GBUS because he believed GBUS had the fiduciary responsibility to pay the IRS. M.D. ultimately took a pay cut to leave GBUS for another job.

51

USAO_00134606

USAO_00134447

h.   M.D. did not know if the payroll tax payments for the third or fourth quarter of 2015 were ever paid by GBUS. M.D., however, said that the payroll tax payment requests would have been sent to GBUS's accounting team.  M.D. would send check requests for the state and federal tax payments to V.S.

i.   M.D. shared his concerns regarding the payroll tax issues with M.B., because T.M. had already left GBUS at the time.

j.   M.D. understood that M.B. was speaking to AVENATTI about the payroll taxes that needed to be paid.  M.B. told him about her discussions and communications with AVENATTI regarding the payroll tax issues.

k.   M.D. believed that he, M.B., and M.E., who worked for him in the human resources and payroll department, were the only employees that knew GBUS was not paying its payroll taxes.

l.   M.D. believed that AVENATTI and T.M. were signatories on the GBUS bank accounts.  M.D. said that no checks could be cut without AVENATTI's approval.

m.   M.D. considered AVENATTI to be the owner, President, and CEO of GBUS.  This is how AVENATTI presented himself.  M.D. did not consider AVENATTI to be GBUS's General Counsel, and never heard AVENATTI refer to himself as GBUS's General Counsel.  M.D. was not aware of GBUS ever hiring EA LLP to perform any legal services for GBUS.

n.   M.D. had limited interactions with AVENATTI during his time at GBUS.  M.D. had seen AVENATTI only four or five times.  He did not recall having any significant

52

USAO_00134607

USAO_00134447

conversations with AVENATTI or any one-on-one phone calls with
him.  M.D. typically interacted with T.M. and M.B.

      o.   M.D. emailed AVENATTI approximately 10 times at
his EA LLP email address.  AVENATTI had a GBUS email address,
but did not use it.

      p.   M.D. was scared of AVENATTI when he worked at
GBUS because he did not want to be personally sued.  M.D.
respected AVENATTI at first, but over time he no longer trusted
AVENATTI and became concerned that AVENATTI would sue him for
anything.  M.D. also expressed concern that AVENATTI might
attempt to retaliate against him if he learned that M.D. was
cooperating with the government's investigation.

    28.  On October 22, 2018, I participated in an interview of
B.H., GBUS's former Director of Operations.  B.H. provided the
following information:

      a.   From early 2014 to early 2016, B.H. worked at
GBUS as its Director of Operations.  T.M. recruited B.H. for the
position because they had previously worked together at Cascade.
B.H. met with T.M. and AVENATTI before accepting the position.

      b.   As Director of Operations, B.H. was responsible
for overseeing the district managers, dealing with store-related
issues, and dealing with IMSA-related issues.  The individual
store managers reported to the district managers, and the
district managers reported to B.H.  B.H. said 90 percent of
their focus was on reaching the stores' revenue goals.

USAO_00134608

USAO_00134447

c.   B.H. knew AVENATTI as the owner and head of GBUS. AVENATTI's role at GBUS was to make major decisions, such as decisions regarding finances and lease agreements.

d.   B.H. was aware that AVENATTI was a lawyer. B.H.'s legal experience with AVENATTI related to a dispute between GBUS and Green Mountain.  B.H. said that if there was a legal issue, AVENATTI handled it.  B.H. had no knowledge of AVENATTI's law firm doing any work for GBUS.

e.   B.H. said payroll time was stressful at GBUS because cash was always tight.  B.H. heard rumors around the office that GBUS was not paying payroll taxes.  B.H. thought he heard these rumors from T.M., M.B., and M.D. when he discussed the need to pay bonuses to GBUS's district managers.  B.H. said he did not have first-hand knowledge of GBUS not paying taxes, but stated that not paying taxes went into the "barrel of bad," and believed that AVENATTI would have been aware of such issues.

f.   The Tully's stores at Boeing facilities were a very important part of business for GBUS.  AVENATTI was aware of this.  B.H. dealt with the paperwork for the GBUS stores at Boeing.  B.H. had never heard of the name GB Hospitality, which was the name AVENATTI used on the Boeing contract in November 2016 (see ¶ 39.d).  The only name B.H. was aware of was GBUS.

g.   B.H. spoke with AVENATTI about once or twice a month, and saw AVENATTI once a month at most.  Most of B.H.'s conversations with AVENATTI related to the IMSA sponsorship. B.H. said he never understood why AVENATTI wanted to have GBUS at IMSA when GBUS already had enough problems.  B.H. felt that

54

USAO_00134609

USAO_00134447

GBUS was losing money on the IMSA sponsorship, and said that AVENATTI could have been using the money he spent on IMSA on coffee supply.

h.   B.H. said he left GBUS because AVENATTI did not follow through on the future plans for GBUS.  AVENATTI did not reinvest into the company and the stores were failing.  B.H. said there was a "steady bleeding" of GBUS and AVENATTI placed "band aids" on it.  The big reason B.H. decided to work for GBUS was AVENATTI's promise of growing the business, but this never happened.  B.H. assumed T.M. left for similar reasons.

i.   GBUS stored its corporate records on a server hosted by Amazon Web Services ("AWS").

j.   B.H. would call REGNIER to schedule things with AVENATTI.

29.   On October 22, 2018, I participated in an interview with V.S.  V.S. provided the following information:

a.   V.S. started working at Tully's Coffee Inc. in 2003 or 2004.  He worked for Tully's Coffee Inc., TC Global, and then eventually GBUS.  He resigned from GBUS on September 18, 2018.  V.S. stopped working for GBUS because his paycheck bounced.

b.   V.S. became the Assistant Controller when GBUS bought out TC Global.  V.S. then became the Controller when M.B. left GBUS in 2015 or 2016.

c.   V.S. knew AVENATTI to be the owner and operator of GBUS.  AVENATTI was the CEO, and T.M. was the CFO.

USAO_00134610

USAO_00134447

d.   When he was Assistant Controller, V.S. reported to M.B.  For financial decisions, M.B. reported to T.M., who in turn reported to AVENATTI.  AVENATTI was T.M.'s boss.

e.   V.S. said that AVENATTI was not physically present at GBUS's corporate office, but was actively involved in operating the company.  T.M. would relay messages to AVENATTI regarding the day-to-day operations of the company.

f.   After T.M. left GBUS, AVENATTI communicated with M.B. and B.H. regarding GBUS's day-to-day operations.  Once M.B. left, V.S. reported directly to AVENATTI, who was effectively the head of the financial department.  V.S. communicated with AVENATTI by email 90 percent of the time and by phone 10 percent of the time.  AVENATTI used his EA LLP email address, rather than his GBUS email address.

g.   When T.M. left GBUS, he received bonus and severance pay from GBUS.  AVENATTI authorized those payments, and REGNIER handled the wire transfers.  V.S. saw the wires on the bank account records, but did not have wiring authority for GBUS's bank accounts.

h.   V.S. would email AVENATTI cash reports daily. V.S. said that the accounts payable department wanted bills to be paid weekly, but there was never enough money to pay all of the bills.

i.   AVENATTI moved money in and out of GBUS bank accounts on a regular basis.  This happened from the beginning of GBUS's operations.  V.S. had access to GBUS's bank account

USAO_00134611

USAO_00134447

records.  V.S. saw the movement of funds when he would do the
bank account reconciliations for GBUS.

       j.   V.S. said he reported to AVENATTI because
AVENATTI was the CEO and owner of GBUS.  V.S.'s primary
discussions with AVENATTI were about what bills to pay and what
was in the bank account.  V.S. said he often could not tell how
much money was in the bank accounts because money moved in and
out frequently.

       k.   V.S. said he asked AVENATTI for supporting
documents for some bank account activities once or twice.
AVENATTI's response was that he was the CEO and owner, and that
he makes the final decisions.

       l.   V.S. described the accounts payable process.
V.S. said that the invoices were entered into the accounting
system.  A list of invoices that were due soon was sent to
AVENATTI.  AVENATTI would then decide which invoices were to be
paid and which invoices were to have their payments held off.
AVENATTI would tell S.F. to cut a check for the invoice payments
he approved.  For the invoices AVENATTI did not approve, V.S.
would wait another week and then bring the invoices up to
AVENATTI again.  If payment of the outstanding invoices became
more imperative, V.S. would bring the issue to AVENATTI's
attention more quickly.  V.S. said he knew what invoices needed
to be paid, but still needed AVENATTI's approval to pay the
invoices.

       m.   Ceridian handled the payroll for GBUS.  Ceridian
was also responsible for paying the payroll tax withholdings on

USAO_00134612

USAO_00134447

behalf of GBUS.  In approximately 2015 or 2016, however, GBUS
had Ceridian stop paying the payroll tax withholdings.  V.S. did
not know why this change occurred.

     n.   V.S. said that GBUS did not pay the payroll tax
withholdings.  Ceridian would calculate the payroll
withholdings, and M.E. would book the accounting entry in
Microsoft Dynamics Nav, GBUS's accounting software.  M.E. would
email AVENATTI, with a copy to V.S., the amount needed to pay
the payroll tax withholdings.  AVENATTI would respond by saying
that he would take care of it.  V.S. said that AVENATTI knew
that the payroll tax withholdings were not being paid to the IRS
before RO 1 first showed up to GBUS's corporate office in
October 2016.  V.S. said AVENATTI made the decision not to pay
the payroll tax withholdings and no one else at GBUS could have
made that decision.

     o.   V.S. said that the State of Washington also
contacted GBUS and AVENATTI regarding GBUS's failure to pay
state tax withholdings.

     p.   IRS notices and levies were received at GBUS's
corporate office, and then emailed to AVENATTI.  V.S. said that
AVENATTI did not respond to the IRS notices or the levies.
Initially, the IRS notices and levies GBUS received were sent to
AVENATTI only, but later the IRS notices and levies were sent to
AVENATTI and REGNIER.

     q.   V.S. said that AVENATTI knew what was levied
because the bank made notations of what money was levied on the

USAO_00134613

USAO_00134447

bank account statements.⁺⁺  V.S. also emailed AVENATTI daily cash
reports that included the levy notations.

     r.  After GBUS's bank account at KeyBank was levied,
AVENATTI told M.G. to hold cash deposits at the stores.  The
cash deposits were collected, brought to the office to be
counted, and then deposited to a different bank account with a
different account name.  M.G. would forward a copy of the
deposit slips to AVENATTI.  This made V.S. feel uncomfortable
because he thought it was being done to avoid the levies.  V.S.
discussed this with M.G., who eventually stopped collecting and
depositing cash for GBUS.

     s.  V.S. had never heard of GB Hospitality except
seeing it on the November 2016 contract with Boeing.  V.S. had
been given a copy of the contract.  There were not separate
books and records for GB Hospitality, and V.S. did not think GB
Hospitality was registered.  The revenue from the Boeing stores
was transferred into a GBUS account, and not to a GB Hospitality
account.

     t.  GBUS had to make quarterly commission payments to
Boeing.  V.S. said that some of the commission payments were
late.  M.G. told V.S. that AVENATTI justified the late payment
by saying that the wire transfer had been lost, but V.S. did not
see a wire out of the GBUS accounts' payable account that
corresponded to when AVENATTI had said the wire to Boeing had
been lost.

-----------------------------------

   ⁺⁺ I have reviewed bank records for GBUS's bank accounts at
CB&T and KeyBank, and confirmed that the monthly account
statements referenced the IRS levies.

USAO_00134614

USAO_00134447

      u.   V.S. was aware that there were different company
names for Global Baristas on contracts, but V.S. did not want to
question AVENATTI about the different company names.  One of the
reasons V.S. thought there were different company names listed
for Global Baristas on contracts was to avoid liens and levies.

      v.   In September or early-October 2017, GBUS changed
its merchant IDs for its merchant accounts with TSYS.  The
change was made at AVENATTI's direction.  AVENATTI wanted to
make the change fast, and dealt directly with a representative
from TSYS ("TSYS Rep. 1") to make the change.

      w.   V.S. reviewed an October 2, 2017, email from TSYS
Rep. 1 to V.S. in which TSYS Rep. 1 wrote the following:

> Michael Avenatti called me on Friday.  The accounts
> should be under Global Baristas LLC, not Global
> Baristas "US" LLC.  We have to make changes as the IRS
> with [sic] withholding funds.  Michael has asked that
> I rush this as much as possible.

After reviewing this email, V.S. said that AVENATTI had
instructed V.S. to give him TSYS Rep. 1's contact number.  V.S.
also said that AVENATTI knew the purpose of the change was to
avoid the IRS liens and levies.  V.S. said that changing the
merchant IDs was a big deal because every store had to be
changed.  The new merchant IDs was also associated with a
different bank account.

      x.   V.S. said that TSYS later dropped GBUS as a
client, at which point GBUS changed its merchant accounts from
TSYS to Chase.  V.S. reviewed the Chase merchant account
application, which listed Doppio Inc. as the parent company of
GB LLC.  V.S. did not know the purpose of Doppio, did not

USAO_00134615

USAO_00134447

believe Doppio owned GBUS, and said that GBUS had never done any work for Doppio.

    y.   V.S. knew that AVENATTI was a lawyer and owned EA LLP.  V.S. never saw AVENATTI as the General Counsel of GBUS. He only heard from reports in the media that AVENATTI was the General Counsel for GBUS.[1]

    z.   AVENATTI's salary at GBUS was approximately $250,000 a year, and it was the highest salary at GBUS. AVENATTI was paid this salary as the CEO of GBUS.  AVENATTI was not paid as a lawyer.  The money that AVENATTI was transferring in and out of GBUS's bank account was not compensation to AVENATTI or his law firm.  Some money went to EA LLP, but GBUS never received an invoice from EA LLP.  V.S. believed that there was more outflow than inflow of cash from EA LLP into GBUS's bank account.

    aa.  V.S. remembered a $100,000 wire being sent to EA LLP in March 2017.  V.S. said that REGNIER sent the wire from GBUS's bank account to EA LLP.  Based on my review of EA LLP's bank account records, I know that AVENATTI used the proceeds of this $100,000 wire transfer to pay EA LLP's lawyers in connection with the EA LLP bankruptcy.

    bb.  V.S said that the last Tully's stores closed in March 2018.  After that, there was no work to be done.  V.S. was waiting to find out what the next plan of action would be for

------------------------------------
    [1] After the Clifford lawsuit was filed, a number of press articles regarding AVENATTI and GBUS appeared.  In some of these articles, AVENATTI or a GBUS spokesperson were quoted as saying that AVENATTI no longer owned GBUS and was only acting as its General Counsel.

USAO_00134616

USAO_00134447

GBUS, but never heard from GBUS.  M.E. emailed AVENATTI to ask
him to lay off the remaining GBUS employees after the last
Tully's stores closed, but never heard back from AVENATTI.  As a
result, M.E. kept the remaining employees on payroll.  GBUS's
payroll continued to be funded until September 2018, at which
point V.S. and the remaining employees' checks bounced.

cc.  GBUS's accounting records were stored in the
cloud.  In April or May 2017, V.S. asked A.G. to back up GBUS's
accounting data from the cloud because 2nd Watch (the company
that managed GBUS's cloud-based server from AWS) was
discontinuing GBUS's services.

30.  On September 25, 2018, I participated in an interview
with M.E., GBUS's former Human Resources Director.  M.E.
provided the following information:

a.  M.E. started working for Tully's (i.e., TC
Global) in 2009 as a temporary employee.  M.E. became the human
resources coordinator in 2010 and the payroll coordinator at the
end of 2013.  M.E. was promoted to Human Resources Director in
April 2016 after M.D. left GBUS.  M.E. resigned from GBUS in
September 2018 after her payroll paycheck bounced.

b.  AVENATTI was the owner and manager of GBUS.  At
one point, AVENATTI said he was the Chairman and CEO.  AVENATTI
received payroll paychecks in his capacity as the CEO of GBUS.
AVENATTI made $250,000 per year as the CEO and Chairman of GBUS.

c.  AVENATTI was the final decision maker for GBUS.
M.E. would copy REGNIER on emails to AVENATTI to make sure that

62

USAO_00134617

USAO_00134447

AVENATTI saw the emails.  M.E. emailed payroll figures to
AVENATTI every other week.

   d. M.E. said that S.F. and V.S. would send AVENATTI
emails regarding accounts payable, and AVENATTI would tell them
what they could or could not pay.

   e. M.E. never heard AVENATTI refer to himself as the
General Counsel of GBUS.  M.E. never dealt with AVENATTI as the
company's lawyer.  M.E. said that GBUS was AVENATTI's company
and that AVENATTI happened to be a lawyer.  M.E. read in the
newspaper that AVENATTI said he was the General Counsel of GBUS,
but not the owner.  When M.E. read that statement, she laughed
in disbelief.  No one at GBUS knew or was aware of AVENATTI
being GBUS's General Counsel.

   f. M.E. once dealt with AVENATTI on a tricky
personnel issue.  M.E., however, said that if AVENATTI had not
been a lawyer she would have still brought the issue to him in
his capacity as CEO.  M.E. also believed that AVENATTI may have
given legal advice regarding employee issues, employee policies,
and the employee guidebook for GBUS.  M.E. was not aware of
AVENATTI handling any other legal issues for GBUS.

   g. M.E. knew that GBUS had not been paying its
payroll taxes to the IRS.  M.E. said that AVENATTI did not pay
the payroll withholdings, but still withheld taxes from the
employees' payroll checks.

   h. M.D. told M.E. that Ceridian stopped paying the
payroll withholdings because GBUS did not have the funds to pay
the withholdings.  M.E. thought that M.D. was preparing the

USAO_00134618

USAO_00134447

federal payroll tax returns, but not filing them.  M.E. said that M.D. believed that payroll tax returns could not be filed without paying the tax liabilities.

      i.   M.E. found out later that GBUS's federal payroll tax returns for the third-quarter of 2015 and subsequent quarters had not been filed with the IRS.  AVENATTI asked M.E. to sign and file the IRS Forms 940 and IRS Forms 941 for 2015 and 2016.  M.E. did not feel comfortable doing so and thought there might be negative implications for her, but signed the returns because she did not think she was responsible for them. M.E. sent AVENATTI the returns at the same time as she filed them with the IRS.  There were no payments made with the returns.  M.E. informed the accounting team, V.S. and S.F., of the amounts of payroll taxes owed.

      j.   M.E. learned from M.D. and V.S. that M.B. sent AVENATTI an email explaining to him the consequences of GBUS not paying its payroll taxes.

      k.   M.E. spoke with REGNIER twice on the phone in 2017 when she filed GBUS's IRS Forms 940 and IRS Forms 941s with the IRS.  M.E. said that REGNIER knew how to file the forms online, but REGNIER wanted to mail the forms instead.  AVENATTI instructed M.E. to sign the forms.

      l.   M.E. was interviewed by RO 1 in November 2017. M.E. spoke to AVENATTI a few days later, and told AVENATTI everything that she had told RO 1.  When M.E. told AVENATTI that she had told RO 1 that AVENATTI instructed her not to file the tax returns, AVENATTI was shocked.  M.E. then reminded AVENATTI

USAO_00134619

USAO_00134447

that he had sent her an email telling her not to file the tax returns.

m.   M.G. told M.E. that the merchant accounts had changed, but M.G. did not understand why the change had been made.

n.   V.S. told M.E. that AVENATTI had instructed him to change the bank account for GBUS.

o.   M.E. took part in collecting cash deposits from the Tully's stores.  M.E. would help M.G. count the cash that had been collected.  Store managers were told to hold all the cash from the stores, and then the GBUS's district managers were supposed to collect the cash.  This occurred in late 2017 or early 2018 when the Tully's stores were being closed down.  M.G. told M.E. that the directive to hold the cash deposits came from AVENATTI.  M.E. also said that the IRS liens were common knowledge throughout GBUS when the stores were holding the cash deposits.

p.   When the last Tully's stores closed in approximately March 2018, M.E. emailed AVENATTI to ask him what the next step was.  AVENATTI did not respond.  M.E. did not understand why employees were still being paid until September 2018 or why GBUS was still operating after the stores closed. M.E. wasn't doing much for GBUS during this time period other than processing unemployment claims and payroll.  M.E. was on "autopilot" and was just processing the payroll every week. This continued until September 2018, when her last paycheck from

65

USAO_00134620

USAO_00134447

GBUS bounced.  M.E. did not know how AVENATTI was paying for
payroll after the stores closed.

    31.  On September 26, 2018, I participated in an interview
of M.G., GBUS's former Director of Retail Operations.  M.G.
provided the following information:

        a.  M.G. started working at Tully's as a barista in
2004 and became a store manager in 2005.  In approximately 2012,
M.G. became a District Manager and was responsible for the
Tully's stores at Boeing facilities.  In March 2016, M.G. became
the Director of Retail Operations.  M.G. resigned her position
at GBUS in April 2018, after the last of the Tully's stores
closed.  M.G.'s sister, S.F., also worked for GBUS.

        b.  AVENATTI was the owner, CEO, and Chairman of
GBUS.  As the Director of Retail Operations, M.G. reported to
AVENATTI.

        c.  M.G. never heard AVENATTI referred to as the
General Counsel for GBUS, and did not consider AVENATTI to be
GBUS's General Counsel.  M.G.'s interactions with AVENATTI
involved standard business decisions, and were not legal
discussions.  M.G. was also unaware of AVENATTI's law firm being
hired to represent GBUS.  M.G. said that she asked AVENATTI for
legal advice regarding eviction notices, legal documents, and
the firing of a store manager on one occasion.  She discussed
these issues with AVENATTI because he was the owner of the
company, not because she considered him to be GBUS's General
Counsel.

66

USAO_00134621

USAO_00134447

     d.    GBUS was the operating company for the Tully's
stores, and GB LLC was GBUS's parent company.

     e.    Ceridian handled the payroll for GBUS. M.E. told
M.G. that Ceridian also handled the payment of payroll taxes
until there was not enough money in GBUS's accounts to make the
tax payments. At that point, GBUS was responsible for paying
its payroll taxes itself.

     f.    M.G. had heard that GBUS was not paying its
payroll taxes. M.G. believes that B.H. told her that GBUS's
payroll taxes were not being paid. M.G. also saw an email from
M.B. that warned AVENATTI about the consequences of not paying
taxes. M.G. believes that B.H. was copied on this email and
that she saw it because she had access to B.H.'s emails after he
left GBUS in 2016.

     g.    In connection with discussions to renew a lease
for GBUS's training facility in 2016, M.G. forwarded an email to
AVENATTI about an IRS lien relating to unpaid taxes. M.G. told
AVENATTI that these things needed to be addressed to move
forward. AVENATTI asked her how she learned about the lien,
told her that it had nothing to do with GBUS's revenues, and
said it was not her concern.

     h.    M.G. spoke with M.E. and V.S. about AVENATTI not
paying the payroll taxes and withholdings. M.G. felt that
AVENATTI's actions were questionable, and that she needed to
make sure she would not be held personally responsible. M.G.
was worried that it would be her word against AVENATTI's word,
so she backed up her work files on her personal laptop in case

USAO_00134622

USAO_00134447

she needed them for proof down the road.  As noted in paragraph
79 below, I understand that these records are contained on
SUBJECT DEVICE 3.

      i.   Around September 2017, either AVENATTI or REGNIER
told M.G. that the Tully's stores could no longer make deposits
into GBUS's KeyBank account because there was a lien on the
account and the money would be gone.  M.G. was instructed to
tell the Tully's stores to hold all of their cash deposits.
AVENATTI later instructed M.G. to deposit the cash from Tully's
stores into GB Auto's account at BofA.  M.G. said that AVENATTI
texted her GB Auto's bank account information and instructed her
to text him a picture of the deposit slip whenever she made a
cash deposit.

      j.   On or about September 7, 2017, M.G. sent AVENATTI
a text message with a picture of the deposit slip for the first
deposit she made to the GB Auto account.  M.G. continued to send
AVENATTI a picture of the deposit slip whenever she made a cash
deposit into the GB Auto account.  M.G. would give the physical
copy of the deposit slip to V.S.  M.G. said that the last
deposit was made in December 2017, at which point she told
AVENATTI that she was not going to make any more cash deposits
into the GB Auto account.  After this, the Tully's stores began
depositing cash into a KeyBank account again.

      k.   M.G. was shown a spreadsheet detailing
approximately 27 cash deposits made into GB Auto BofA Account
7412 between September 2017 and December 2017, totaling

USAO_00134623

USAO_00134447

approximately $882,884.  M.G. confirmed that these were the cash deposits she made at AVENATTI's direction.

l.   M.G. said that she was aware of the IRS liens and GBUS's non-payment of payroll taxes and withholdings when she made the first cash deposit into GB Auto BofA Account 7412.

m.   M.G. was asked about the change in the merchant accounts for the Tully's stores.  M.G. said that GBUS's merchant accounts were initially with TSYS.  When TSYS eventually terminated its agreement with GBUS, GBUS switched its merchant accounts to Chase.  M.G. understood that the change in the merchant IDs for the TSYS merchant account was made at AVENATTI's direction.  M.G. said nobody at GBUS other than AVENATTI could make that type of decision.  V.S. told M.G. that the change in the merchant IDs for the TSYS account was done because of the liens on the account.

n.   M.G. was responsible for overseeing the Tully's stores at Boeing facilities.  The Boeing stores were GBUS's most profitable stores.

o.   M.G. was shown a redlined draft of the November 2016 contract with Boeing in which the name of the contracting party had been changed from GBUS to GB Hospitality.  M.G. said that AVENATTI handled the Boeing contract.  When M.G. asked AVENATTI about this change, he told her not to worry about it.  M.G. and V.S. looked to see if GB Hospitality was a Global Baristas subsidiary, but couldn't find a record of it anywhere.  The Boeing contract was only time M.G. ever saw the name GB Hospitality.

USAO_00134624

USAO_00134447

p.    The Boeing contact was cancelled in September 2017.  M.G. understood that the contract was cancelled because GBUS had not paid Boeing the commissions GBUS owed.  In connection with the cancellation of the contract, GBUS agreed to sell certain equipment to Boeing as payment for the unpaid commissions GBUS owed Boeing.  Separately, GBUS agreed to sell two coffee kiosks to Boeing.  M.G. was shown redline drafts of the two bills of sale for these transactions, in which the name GB Hospitality had been replaced with GB LLC.  M.G. did not know who made that change.  M.G. had received copies of the two bills of sale from Boeing and shared them with V.S.

q.    GBUS was evicted from its corporate headquarters in Seattle, Washington, in November 2017.  All of GBUS's business records stayed at the corporate office when GBUS was evicted.  AVENATTI said he would deal with getting the business records back."

r.    M.G. told AVENATTI about the summons she received from RO 1 in November 2017 and sent him a copy of the summons.  AVENATTI called M.G. and asked her if she went to the hearing to which she had been summonsed, what documents she brought to the hearing, and what was said in the hearing.  When M.G. told AVENATTI she brought documents regarding the change in GBUS's bank accounts, AVENATTI was livid.  AVENATTI told her that she

---

"    Based on my discussions with representatives from Unico, which served as the property manager for GBUS's corporate offices, I learned that GBUS's property, including any remaining business records, were abandoned and either sold at auction or destroyed.

USAO_00134625

USAO_00134447

should not have given the records to RO 1, and should have instead sent them to AVENATTI.

s.   As of January 2018, it was getting more difficult to get answers from AVENATTI.  M.G. began copying REGNIER on emails because AVENATTI was passing GBUS matters on to REGNIER.

t.   M.G. was aware that in March 2018 AVENATTI made statements to the press indicating that he was not the owner of GBUS.  M.G.'s understanding was that AVENATTI had always been GBUS's owner and believed these statements to be false.  On March 8, 2018, M.G. sent AVENATTI a text message confronting him.  M.G. asked AVENATTI if he was not the owner of GBUS, then who should she go to for GBUS business decisions.  AVENATTI responded that everything still went through him and that M.G. should discuss all matters with him.

u.   Sometime after the Tully's stores closed in March 2018, AVENATTI called M.G. and yelled at her because a store manager had released confidential information to the press. AVENATTI told M.G., "I will fucking destroy him."  AVENATTI also said that if he was willing to sue the President then he was willing to sue an employee.  After that conversation, M.G. felt that AVENATTI was no longer responsive to GBUS employees.

v.   During her interview, M.G. consented to have the IRS retrieve text messages between her and five specific contacts that were stored on her personal cell phone, including all text messages between her and AVENATTI.  IRS SA John Medunic captured images of the text messages, returned the phone to M.G., and then mailed a copy of the images to the Privilege

71

USAO_00134447

Review Team AUSA assigned to this investigation.  I understand that a privilege review of the text messages is ongoing.

32.  On or about September 25, 2018, I participated in an interview of S.F., GBUS's former Accounts Manager.  S.F. provided the following information:

a.  S.F started working for Tully's in 2008, but eventually resigned due to health reasons.  In December 2013, S.F. returned to work for GBUS as an assistant store manager. In October 2015, S.F. became the office manager at GBUS's corporate headquarters.  In September 2016, she was promoted to Accounts Manager and Franchise License Business Manager.  S.F. resigned in September 2018, after her last paycheck bounced. S.F.'s sister, M.G., also worked at GBUS.

b.  S.F.'s role as Accounts Manager was to enter vendor invoices into GBUS's accounts payable system.  Most invoices for GBUS went through S.F.  S.F. had little involvement with account receivables.

c.  S.F. understood that AVENATTI was the CEO and owner of GBUS.  AVENATTI operated GBUS from EA LLP's office in Newport Beach, California.  S.F. used AVENATTI's EA LLP email address to communicate with him.  S.F. only met AVENATTI once and did not speak to him frequently.

d.  S.F. never saw AVENATTI act as the General Counsel for GBUS.  S.F. also did not prepare any payments to AVENATTI's law firm.  The first time S.F. heard AVENATTI referred to as General Counsel was in connection with statements AVENATTI made to the press in 2018.

USAO_00134627

USAO_00134447

e.   M.G. told S.F. that GBUS was not paying its payroll taxes.  S.F. recalled seeing a detailed email to AVENATTI explaining the consequences of GBUS not paying its payroll taxes.

f.   S.F. recalled RO 1 visiting GBUS's corporate offices in the fall of 2017.  RO 1 gave S.F. a letter during his visit.  S.F. remembered that the letter referenced a possible criminal prosecution.  S.F. said that she either scanned the letter and emailed it to AVENATTI or typed out its contents in an email to AVENATTI.  S.F. spoke to AVENATTI later that day. AVENATTI seemed rattled and concerned.  AVENATTI asked what RO 1 wanted, what RO 1 had asked, what S.F. told RO 1, and whether RO 1 came with other people.  At the end of the conversation, AVENATTI thanked her for letting him know about the visit, and asked her to keep the situation between the two of them.

g.   S.F. was aware of the IRS levies on the GBUS bank accounts because she had access to GBUS bank account information.  S.F. said that the State of Washington had also placed levies on GBUS's bank accounts at one point.

h.   REGNIER worked at EA LLP, and was AVENATTI's paralegal and assistant.  S.F. said the best way to get a hold of AVENATTI was through REGNIER.

i.   When GBUS received IRS notices, S.F. scanned and emailed the notices to AVENATTI and REGNIER.

j.   S.F. was aware that AVENATTI told M.G. to collect the cash deposits from the Tully's stores and deposit the cash into a bank account held in the name of GB Auto.

USAO_00134628

USAO_00134447

k.   S.F. was aware that GBUS had changed its merchant accounts with TSYS.  The company associated with the TSYS merchant accounts was changed from GBUS to GB LLC.  S.F. assumed this was done to avoid liens.  Later, GBUS switched its merchant accounts from TSYS to Chase.

l.   S.F. heard from V.S. that AVENATTI was withdrawing money from GBUS's bank account.

m.   In November 2017, GBUS was evicted from its corporate offices in Seattle, Washington.  The locks were changed and GBUS did not have an opportunity to move out of the office.

n.   GBUS used Microsoft Dynamics NAV for its accounting software.  The information was stored in an AWS cloud-based server through a company called 2nd Watch.  In approximately May 2018, GBUS lost access to its cloud-based server.

33.   On November 14, 2018, I participated in an interview of B.C., who previously worked in GBUS's accounting department. B.C. provided the following information:

a.   B.C. started working for TC Global/Tully's in 2011 or 2012 as a contractor setting up its point-of-sales ("POS") system.  After GBUS took over Tully's stores, T.M. asked B.C. to come back and help with other projects.  B.C. worked part-time (20 to 25 hours a week) for GBUS until September 2018 when her final paycheck bounced.  B.C. primarily worked remotely from her home.

74

USAO_00134629

Exhibit D - 183

USAO_00134447

   b.   B.C.'s primary role at GBUS was to pull reports
for month end sales and book them into the correct accounting
entries.  B.C. pulled credit-card-sales data, tax-sales data,
and reports from the POS system, then inputted this data into
the general ledger.  At the end of the month, she reconciled
cash to sales figures.  B.C. reported to M.B. until M.B.
resigned.  After M.B. resigned, she reported to V.S.

   c.   AVENATTI was GBUS's CEO.  AVENATTI appointed T.M.
as the CFO and COO.  M.B. was GBUS's Controller.  B.C.
understood from M.B. that AVENATTI was very involved in the
financial aspects of GBUS, and approved payments and contracts
for GBUS.

   d.   B.C. did not consider AVENATTI to be GBUS's
lawyer.

   e.   B.C. had seen AVENATTI before, but had never been
introduced to him.  She never had a direct conversation with
him.  Although she had been copied on emails to or from
AVENATTI, she never had direct email communications with
AVENATTI.

   f.   GBUS changed the location of its bank accounts
from HomeStreet to CB&T.  Cash deposits were made at KeyBank
while GBUS was banking with CB&T.  B.C. did not have direct
access to bank reports from CB&T, and would instead receive the
reports from M.B. or V.S.  B.C. had access to the KeyBank
account, and would pull reports from the KeyBank account to do
the cash reconciliation.

USAO_00134630

USAO_00134447

      g.   GBUS used Ceridian for payroll services. Ceridian used to handle the payroll taxes for GBUS, but later GBUS handled the payroll taxes on its own.

      h.   B.C. knew that GBUS was not paying its payroll taxes.  B.C. knew there were levies on all of the GBUS bank accounts because she reconciled the bank accounts.  V.S. told B.C. what the levies were for, but did not go into great detail. V.S. told B.C. that GBUS owed the IRS millions of dollars, that AVENATTI was aware of this, and that AVENATTI had decided not to pay the IRS.

      i.   B.C. said that anything and everything was sent to AVENATTI.  AVENATTI made all of the decisions for GBUS and no other employees had authority to make decisions.  AVENATTI approved all account payable checks, and all GBUS checks had AVENATTI's signature.

      j.   In 2015, GBUS switched its merchant accounts from Heartland to TSYS.  TSYS Rep. 1 was GBUS's sales representative at TSYS.

      k.   B.C. was asked about an email TSYS Rep. 1 sent her on October 2, 2017 in which TSYS Rep. 1 said:

> Michael Avenatti called me on Friday.  The accounts should be under Global Baristas LLC, not Global Baristas "US" LLC.  We have to make changes as the IRS with [sic] withholding funds.

B.C. explained that if the merchant IDs were changed, then the credit card terminals at each Tully's store would need to be reprogrammed.  B.C. did not understand why AVENATTI would want to make this change.  TSYS Rep. 1 told B.C. that AVENATTI had

USAO_00134631

USAO_00134447

claimed that the merchant IDs were supposed to be under GB LLC's name and EIN, rather than GBUS's name and EIN. AVENATTI had called TSYS Rep. 1 and authorized the name change. B.C. believed this change was made to alter the banking deposits and avoid the IRS levies, which were occurring at the same time.

l.    TSYS Rep. 1 provided B.C. with the paperwork to fill out for the changes to the merchant accounts. B.C. partially filed out the paperwork and then sent it to REGNIER. B.C. was not comfortable filing out the paperwork because the change was clearly being made to avoid the levies. She believed that she expressed this concern to V.S. and TSYS Rep. 1 over the phone.

m.    In November 2017, TSYS Rep. 1 called B.C. and told her that TSYS was dropping GBUS as a client. TSYS Rep. 1 initially offered to help B.C. identify another credit card processing company, but was later advised not to communicate with her further. B.C. believes that TSYS dropped GBUS as a client because of the merchant account changes to avoid the IRS levies.

n.    B.C. learned from emails between AVENATTI and M.G. that the Tully's stores had been instructed to hold cash for deposit, and then email the cash deposit amounts. B.C. was on the email chain because she had to enter the cash deposits in the general ledger. The cash deposits were made into a BofA account instead of the KeyBank account and then transferred to a CB&T account.

USAO_00134632

USAO_00134447

o.   B.C. believed the cash deposits were timed.
AVENATTI instructed when to make the cash deposit, when to
transfer the funds, and when to sweep the account.  B.C. said
that these actions were designed to avoid the levies.

p.   AVENATTI took money from the KeyBank account
randomly.  M.B. instructed B.C. on how to record the money
AVENATTI was transferring in and out of GBUS's bank account in
GBUS's accounting records.

q.   GBUS used Microsoft Dynamics NAV for its
accounting records.  The accounting data was stored and backed
up on an AWS cloud-based server.  Eventually, GBUS's AWS cloud
account was shut down because of non-payment.

34.  On November 13, 2018, I participated in an interview
with A.H., who previously worked in GBUS's accounting
department.  A.H. provided the following information:

a.   A.H. worked in the accounting department at GBUS
from approximately April 2014 to October 2016.  A.H. did basic
accounting work involving accounts payable and accounts
receivable.

b.   A.H. reported to M.B. and worked with V.S. on a
daily basis.  After M.B. left GBUS, A.H. reported to V.S.  A.H.
participated in weekly conference calls with AVENATTI, M.G., and
V.S.

c.   A.H. was aware from discussions she had or
overheard in the office that GBUS was not paying its payroll
taxes.  M.B. told her she was leaving GBUS because AVENATTI was
not paying GBUS's payroll taxes.

78

USAO_00134633

USAO_00134447

      d.   A.H. recalled telling AVENATTI that GBUS had received another IRS letter.  GBUS employees would ask AVENATTI to get on a payment plan with the IRS, but AVENATTI would say no.  AVENATTI would say that he was negotiating with the IRS and taking care of it.

      e.   A.H. dealt with vendors who were waiting for payments.  GBUS was frequently late paying its vendors.  A.H. said that AVENATTI was well aware of what was owed to vendors, as well as what was owed to the IRS.

      f.   A.H. recalls telling AVENATTI that A.H. could not pay vendors because AVENATTI had pulled money out of the GBUS bank account.  AVENATTI responded by saying it was his money.  AVENATTI always made it clear that he was the boss and it was his company.  GBUS could not pay bills without AVENATTI's approval, and he approved all vendor payments.

      g.   A.H. said that AVENATTI never wanted anything in writing.  AVENATTI would not respond by email, but would instead either call or email back saying "call me."

    35.  On October 25, 2018, I participated in an interview with A.G., GBUS's former Information Technology ("IT") Manager.  A.G. provided the following information:

      a.   A.G. started working for Tully's (TC Global) before GBUS took over operations.  A.G. was a System Engineer and then took over as IT Manager.  He stopped working for GBUS when his last paycheck bounced in September 2018.

USAO_00134634

USAO_00134447

b.   A.G. understood AVENATTI to be the owner and CEO of GBUS.  A.G. never heard of AVENATTI being GBUS's General Counsel and never had any legal discussions with him.

c.   A.G. said that AVENATTI approved the expenses at GBUS.

d.   A.G. heard that GBUS changed its bank accounts to avoid IRS levies.  A.G. also heard that GBUS owed a lot of taxes and was getting IRS notices.

e.   A.G. knew that M.G. picked up cash deposit bags from the Tully's stores and counted the cash at the corporate office.  M.G. eventually told AVENATTI that she did not want to do that anymore.

f.   In April or May 2018, AVENATTI told A.G. that, if A.G. was ever approached by the IRS, A.G. should contact AVENATTI first.

g.   AVENATTI had a GBUS email address, but instead used his law firm email account for GBUS business.

h.   GBUS's corporate computer system was setup on a hybrid environment through a managed cloud service called 2nd Watch.[23]  2nd Watch managed GBUS's desktop operating system and server.  GBUS's desktop operating system used a cloud computing service called Microsoft Azure that included programs like Microsoft Office Online 365.  GBUS used a cloud-based server

_____

[23]   Based on documents received from 2nd Watch and a preliminary review of GBUS bank records, it appears that GBUS paid 2nd Watch on a monthly basis throughout the life of the contract.  The contract with 2nd Watch was, however, entered into by "Tully's Coffee."

USAO_00134635

USAO_00134447

called Amazon Elastic Compute Cloud (Amazon EC2) that stored its
data in the AWS cloud.

      i.  A.G. showed the interviewers an email he sent to
AVENATTI on April 5, 2018.  In the email, A.G. told AVENATTI
that 2nd Watch had turned off GBUS's server access to AWS and
that GBUS was without functioning email.  A.G. had begged
AVENATTI to keep paying 2nd Watch for the cloud services.
AVENATTI initially paid for the services, but he later stopped.

      j.  J.S., an IT contractor, made a backup of GBUS's
data and emails from the AWS cloud-based server before 2nd Watch
turned off access to the servers.  Based on my discussions with
A.G., I understand that this data is contained on SUBJECT DEVICE
5, SUBJECT DEVICE 6, and SUBJECT DEVICE 7.  (See supra ¶¶ 81-
82.)

#### 4.   Information Regarding TSYS Merchant Solutions

    36.  IRS-CI's investigation has revealed that AVENATTI
attempted to evade the collection of payroll taxes and obstruct
the IRS collection case by directing TSYS to change the business
name, EIN, and bank account information for GBUS's merchant
accounts.

    37.  On November 6, 2018, I participated in an interview
with TSYS Rep. 1.  Based on my review of documents obtained from
TSYS and the interview with TSYS Rep. 1, I have learned, among
other things, the following information:

      a.  On or about June 29, 2015, GBUS entered into a
Merchant Transaction Processing Agreement with TSYS.  The
merchant name on the agreement was GBUS, and the agreement was

USAO_00134636

USAO_00134447

signed by M.B.  The sponsoring bank under the TSYS agreement was
FNB Omaha.[24]

b.   On or about July 10, 2015, AVENATTI signed an ACH
Agreement with TSYS and provided a blank check for GBUS's CB&T
operating account ending in 2240 ("GBUS CB&T Account 2240").
GBUS CB&T Account 2240 began receiving deposits from TSYS via
FNB Omaha in or around July 2015.

c.   On or about August 16, 2017, the IRS issued a
levy for GBUS's merchant accounts with FNB Omaha.  FNB Omaha
began withholding funds from GBUS's account by no later than
September 25, 2017.

d.   On Friday, September 29, 2017, AVENATTI called
TSYS Rep. 1.  This was the first time TSYS Rep. 1 had ever
spoken to AVENATTI, as he primarily dealt with M.B. or B.C.
TSYS Rep. 1 believes he spoke with AVENATTI multiple times that
day.  During these calls, AVENATTI told TSYS Rep. 1 that TSYS
was holding GBUS's money, and that he did not know what was
going on.  TSYS Rep. 1 told AVENATTI that there were no normal
holds on the GBUS account.  After AVENATTI mentioned the IRS,
TSYS Rep. 1 suggested that it could be the result of an IRS
"1099 hold."  B.V. explained that a "1099 hold" related to a new
IRS reporting requirement and occurred when there were issues

_____

[24]  TSYS Rep. 1 explained that the sponsoring bank must be a
registered financial institution and is responsible to Visa and
Master Card.  TSYS processed the credit card transaction data.
The funds would be paid to FNB Omaha, and then transferred from
FNB Omaha to the GBUS's bank account, after the fees were paid
to TSYS.

USAO_00134637

Exhibit D - 191

USAO_00134447

with the company's name or EIN.[25]   AVENATTI told TSYS Rep. 1 that TSYS had made a mistake and placed the accounts under the wrong company name.   AVENATTI said that the merchant accounts should have been under GB LLC, not GBUS.   AVENATTI told TSYS Rep. 1 that TSYS needed to get this changed.   AVENATTI never disclosed to TSYS Rep. 1 that there was an IRS tax lien on GBUS, that the IRS had issued levies on GBUS's bank accounts, or that GBUS had outstanding payroll tax obligations.   Rather, AVENATTI suggested to TSYS Rep. 1 that he had no idea why TSYS was holding its funds.

  e. TSYS Rep. 1 and AVENATTI also exchanged multiple emails on September 29, 2017.   TSYS Rep. 1 asked AVENATTI to confirm the "correct tax ID" and provide him with "the exact legal name as filed with the IRS."   AVENATTI responded by providing TSYS Rep. 1 with GB LLC's name and federal tax ID number (EIN).   TSYS Rep. 1 then emailed AVENATTI a list of items that would be "needed to perform the change of ownership."   TSYS Rep. 1 said that the "change in ownership will create new merchant accounts under the correct business info."   At AVENATTI's direction, V.S. also emailed TSYS Rep. 1 a spreadsheet detailing the GBUS funds that were being held by TSYS and FNB Omaha.

  f. On October 2, 2017, TSYS Rep. 1 emailed B.C. and V.S. to obtain information he needed to change the merchant accounts, which would be a complicated process.   When B.C. asked

---

  [25] A call-log received from TSYS shows that on September 29, 2017, TSYS Rep. 1 called TSYS's client services department to check if there was a 1099 hold on GBUS's account.

USAO_00134638

USAO_00134447

TSYS Rep. 1 what he had been asked to do, TSYS Rep. 1 responded
as follows:

> Michael Avenatti called me on Friday.  The accounts
> should be under Global Baristas LLC, not Global
> Baristas "US" LLC.  We have to make changes as the IRS
> with [sic] withholding funds.  Michael has asked that
> I rush this as much as possible.

g.   On October 2, 2017, TSYS Rep. 1 emailed AVENATTI
and V.S. to request the banking information for each Tully's
store, as well as bank letters for each account.  AVENATTI
responded that the "accounts will likely change."  In a
subsequent email that day, AVENATTI told TSYS Rep. 1 that "[w]e
want to do it the same way we have done it in the past.  The
account number and ownership merely changes."

h.   Later on October 2, 2017, TSYS Rep. 1 emailed
AVENATTI and told him there "appears to be a bank levy directed
by [sic] our Sponsor Bank - First National Bank of Omaha."  TSYS
Rep. 1 explained to AVENATTI that TSYS does not "get any details
on the levy" and provided AVENATTI with the contact information
for FNB Omaha.  TSYS Rep. 1 also asked AVENATTI to "[l]et me
know what you find out and if there are any possible
implications when we set up the new accounts with the correct
TAX IDs."  During his interview, TSYS Rep. 1 said that he
believes that he learned of the levy on October 2, 2017.  TSYS
Rep. 1, however, noted that he did not have any or all of the
information from FNB Omaha, and AVENATTI was telling TSYS that
TSYS had made a mistake when it set up the merchant accounts.

i.   On October 3, 2017, TSYS Rep. 1 emailed AVENATTI
and V.S. and asked them to send him the bank letters and the

84

USAO_00134639

USAO_00134447

signed agreement.  TSYS Rep. 1 also asked AVENATTI again to "let me know if you found out anything yesterday with First National Bank of Omaha and any possible implications or things needed on my end."  This was the second time TSYS Rep. 1 had asked AVENATTI that question.  AVENATTI never responded to his question or provided TSYS Rep. 1 with any information regarding the IRS levies or his discussions with FNB Omaha.

   j. Later on October 3, 2017, REGNIER emailed TSYS Rep. 1 the new Merchant Transaction Processing Agreement, which was signed by AVENATTI on behalf of GB LLC in his capacity as CEO.  REGNIER also emailed TSYS Rep. 1 a bank letter identifying a GB LLC account at CB&T ending in 3730 ("GB LLC CB&T Account 3730").  Based on my review of CB&T bank records, I know that GB LLC CB&T Account 3730 was a new bank account that AVENATTI and REGNIER opened in Orange County, California, earlier that same day.  AVENATTI and V.S. were copied on all of the emails REGNIER sent TSYS Rep. 1.

   k. The change in merchant accounts was completed on or about October 7, 2017.

   l. On November 7, 2017, TSYS informed AVENATTI and GBUS that it was closing GBUS's and GB LLC's merchant accounts.  TSYS Rep. 1 understood that TSYS decided to close the merchant accounts because GBUS had huge tax liens and levies with the IRS.

   m. TSYS Rep. 1 does not believe that TSYS made a mistake or used the incorrect name when it opened the GBUS merchant accounts in June 2015, as AVENATTI had claimed.  TSYS

USAO_00134640

USAO_00134447

Rep. 1 said that when the GBUS merchant accounts were first opened there were discussions as to whether the correct legal name should be GBUS or GB LLC.

n.    TSYS Rep. 1 said that had AVENATTI disclosed the existence of the IRS liens and levies to him he would have raised the issue with TSYS's legal department and risk management team.  TSYS Rep. 1 felt that information regarding the IRS tax liens and levies would have been highly valuable information to TSYS.  Indeed, TSYS ultimately cancelled the GBUS contract because of the IRS tax liens and levies.

### 5.    *Information Regarding The Boeing Company*

38.    The investigation has also revealed that AVENATTI attempted to evade the collection of payroll taxes and obstruct the IRS collection case by changing the company name on contracts with Boeing.  As noted above, GBUS operated a number of Tully's stores at Boeing facilities in Washington.  These stores were the most profitable part of GBUS's business.

39.    On October 23, 2018, I participated in interviews with three Boeing employees, P.K., C.M, and A.R.G.  P.K. and C.M. were both Procurement Agents at Boeing, and A.R.G. was a Senior Counsel in Boeing's legal department.  Based on these interviews and my review of documents produced by Boeing, I learned, among other thing the following information:

a.    On September 2, 2016, AVENATTI submitted a contract renewal proposal to Boeing.  AVENATTI signed the proposal as the "CEO/Chairman of Global Baristas US, LLC (dba Tully's Coffee)."

86

USAO_00134641

USAO_00134447

     b.   On October 28, 2016, P.K. emailed AVENATTI the proposed Shared Services contract between Boeing and GBUS.

     c.   On November 15, 2016, AVENATTI emailed P.K. a revised Shared Services contract in which he changed the contracting party's name from "Global Baristas US LLC" to "GB Hospitality LLC."  In the email, AVENATTI told P.K. that the name change was "occasioned by us having formed an additional wholly owned subsidiary that serves as the contracting party for all our relationships where we are proving onsite coffee service within corporate environments."

     d.   On November 16, 2016, AVENATTI signed the Shared Services contract with Boeing on behalf of "GB Hospitality LLC." The Shared Services contract required GB Hospitality to make $110,000 quarterly commission payments to Boeing in 2017.  The contract identified AVENATTI's title as "Chairman/CEO."  P.K. said that when he was responsible for the GBUS/GB Hospitality/Tully's account he viewed AVENATTI as the CEO of the contracting party, not as an attorney.

     e.   Between May 24, 2017, and August 15, 2017, P.K. and A.R.G. sent AVENATTI multiple emails and letters regarding GB Hospitality's failure to make the required commission payments for the first and second quarters of 2017.  C.M. and A.R.G. both said that AVENATTI repeatedly failed to respond to Boeing's emails and letters.  C.M. said that she knew AVENATTI was a lawyer, but was communicating with him because he was the owner of GBUS rather than because he was GBUS's lawyer.

USAO_00134642

USAO_00134447

    f.   On August 16, 2017, Boeing received an IRS Notice
of Levy relating to GBUS.  On or about September 19, 2017,
Boeing returned the Notice of Levy to the IRS and indicated that
it did not owe GBUS any money.  As a result, the levy was
closed.  A.R.G. was aware of the levy at the time and may have
been responsible for filling out and returning the levy form to
the IRS.

    g.   On September 5, 2017, Boeing sent AVENATTI via
email and FedEx a letter notifying him that Boeing was
cancelling its contract with GB Hospitality due to the company's
failure to make the required commission payments.  A.R.G. said
that Boeing sent the cancellation notice to AVENATTI because he
was the owner of GB Hospitality/GBUS.

    h.   On September 6, 2017, AVENATTI responded to the
cancellation letter.  Among other things, AVENATTI claimed that
he had never received the prior notice of default from Boeing,
even though that notice had been delivered to EA LLP's offices
via FedEx.

    i.   On September 7, 2017, A.R.G. spoke to AVENATTI
regarding the cancellation of the contract and transition
discussions.  A.R.G. said that all transition calls had to go
through AVENATTI.  A.R.G. believed that she was communicating
with AVENATTI both as the person operating GBUS and as the
lawyer for GBUS.  A.R.G. always believed that AVENATTI was the

USAO_00134643

USAO_00134447

decision maker for GBUS.  At one point, however, AVENATTI told
Boeing that he had to run a decision by the Board of Directors.[26]

j.   On or about September 18, 2017, A.R.G., C.M. and
others met with AVENATTI regarding Boeing's transition from
GBUS.  During this meeting, Boeing and AVENATTI discussed the
sale of GBUS equipment to Boeing.  A.R.G. said that AVENATTI
asked to be the point of contact for the sale of GBUS equipment.

k.   On September 20, 2017, REGNIER emailed AVENATTI a
list of GBUS equipment at the Boeing stores.  AVENATTI then
forwarded this email to C.M., with a copy to M.G. from GBUS.
A.R.G. said that it made sense for Boeing to buy the equipment
from GBUS because it still wanted to supply coffee to its
employees.

l.   On September 22, 2017, AVENATTI emailed C.M. and
said:  "We have discussed it internally and we propose that we
assign the equipment to Boeing in exchange for any commissions
due and owing to Boeing."

m.   On September 26, 2017, A.R.G. emailed AVENATTI a
bill of sale relating to the GBUS equipment at the Boeing
stores.  A.R.G. drafted the bill of sale.  She identified GB
Hospitality as the seller on the bill of sale because that was
the entity name on the contract with Boeing.  Under the terms of
the proposed sale, Boeing would pay GB Hospitality $10 and
forgive all remaining debt in exchange for the equipment.

_____

[26]   This statement appears to have been false.  Multiple
former GBUS employees have said that GBUS did not have a Board
of Directors.

USAO_00134644

USAO_00134447

       n.   On September 27, 2017, A.R.G. and AVENATTI
discussed Boeing purchasing two coffee kiosks[27] from GBUS for
$155,000.  C.M. said that the kiosk discussions occurred at the
end of the transition talks.

       o.   On September 28, 2017, AVENATTI emailed A.R.G.
and agreed to sell the kiosks for $155,000.  AVENATTI asked
A.R.G. to send him a revised bill of sale.  He also indicated
that he would "need payment no later than next Friday" (i.e.,
October 6, 2017).  Later that day, A.R.G. emailed AVENATTI two
separate bills of sale -- one for the purchase of the equipment
and one for the purchase of the kiosks.  Both Bills of Sale
identified GB Hospitality as the seller.

       p.   On September 29, 2017, A.R.G. emailed AVENATTI
revised drafts of the two Bills of Sale in which the name of the
seller was changed from GB Hospitality to "Global Baristas,
LLC."  A.R.G. said that AVENATTI asked her to change the seller
name because GB LLC was the owner of the equipment, not GB
Hospitality.  In her email, A.R.G. also wrote the following:

> As part of my due diligence, I ran a quick UCC search
> on Global Baristas, LLC.  I see one secured credit
> [sic] for office furniture that doesn't look relevant
> for our purposes. There is another secured creditor
> for equipment, Farnam Street Financial? Can you
> confirm that is also not covering any of this
> equipment?

In an email response just a few minutes later, AVENATTI said
"You are correct – neither covers any of the equipment."

---------------------------------------

    [27]  I understand that the coffee kiosks were separate stand-
alone structures that were owned by GBUS, but located at
Boeing's facilities.

USAO_00134645

USAO_00134447

q.   Later on September 29, 2017, AVENATTI emailed A.R.G. and C.M. the executed copies of the two bills of sale. AVENATTI signed the bills of sale on behalf GB LLC and identified his title as "Chairman."

r.   On October 2, 2017, AVENATTI emailed wiring instructions to A.R.G. and C.M.  Specifically, AVENATTI instructed Boeing to wire the sale proceeds to an EA LLP attorney trust account at CB&T ending in 8671 ("EA CB&T Trust Account 8671").  AVENATTI also asked when the wire would be sent.  C.M. said that AVENATTI seemed anxious to receive the wire payment from Boeing.

s.   On October 5, 2017, AVENATTI emailed A.R.G. and C.M. a letter on GB LLC letterhead containing the same wiring instructions.  REGNIER was copied on the email.  According to A.R.G., Boeing had asked AVENATTI to provide Boeing the wiring instructions on GB LLC letterhead.  Prior to receiving this letter, neither A.R.G. nor C.M. had ever seen any other documents on GB LLC letterhead.

t.   A.R.G. indicated that she was concerned that the change of the entity name on the bill of sale may have violated the tax lien or levies, but that Boeing checked and neither "GB Hospitality, LLC" nor "Global Baristas, LLC" were identified on the lien and levies.  Boeing determined that it was not in violation of the lien because the lien related to GBUS and the seller identified on the two bills of sale was a different legal entity.  A.R.G. said that the only other entity name she had seen on the contracts with Boeing prior to the two bills of sale

USAO_00134646

USAO_00134447

was GB Hospitality.  Boeing would not have paid the $155,010 if GBUS's name had been on the two bills of sale or the 2016 contract.

40.  Based on a preliminary review[24] of bank records relating to GBUS, GB LLC, EA LLP, A&A, and AVENATTI, I have learned the following regarding the $155,010 payment from Boeing for the kiosks and equipment:

a.  On October 5, 2017, Boeing transferred $155,010 via wire to EA CB&T Trust Account 8671.

b.  On October 5, 2017, EA LLP transferred $155,010 from EA CB&T Trust Account 8671 to A&A's CB&T account ending in 0661 ("A&A CB&T Account 0661").  AVENATTI then made the following payments from A&A CB&T Account 0661, among others:

i.  $15,000 wire transfer to AVENATTI and his wife's personal checking account at BofA ending in 5546 ("Avenatti BofA Account 5446");

ii.  $8,459 payment to Neiman Marcus in Newport Beach, California on October 10, 2017; and

iii. $13,073 payment for rent for AVENATTI's residential apartment in Los Angeles, California on October 10, 2017.

c.  Out of the $155,010 that Boeing wired to EA CB&T Trust Account 8671 and which was subsequently transferred to A&A

---

[24]  IRS-CI's review of the bank account records referenced throughout this affidavit is ongoing.  The approximate amounts referenced herein are based on a preliminary analysis of those bank records and my discussions with an IRS-CI revenue agent. These amounts may change as IRS-CI completes its analysis and discovers additional bank account information.

USAO_00134647

USAO_00134447

CB&T Account 0661, it appears that only approximately half was
ever transferred to bank accounts associated with GBUS.

### 6. Preliminary Review of GBUS and GB LLC Bank Account Information

41.   In connection with this investigation, IRS-CI has
obtained bank records relating to a number of accounts
associated with GBUS and GB LLC.  Based on a preliminary review
of these bank account records, it appears that AVENATTI caused
approximately $1.7 million to be transferred from GBUS or GB LLC
to other entities AVENATTI controlled during the same time
period in which GBUS failed to pay to the IRS approximately
$3,121,460 in payroll taxes.

42.   Based on a preliminary review of the GBUS and GB LLC
bank records, I have learned, among other things, the following:

a.   In February and March 2015, GBUS opened three new
bank accounts with CB&T in Orange County, California, including
a payroll account and an operating account (GBUS CB&T Account
2240).  AVENATTI and REGNIER were the only two signatories on
the GBUS CB&T accounts.

b.   As noted above, on October 3, 2017, GB LLC opened
GB LLC CB&T Account 3730 in Orange County, California.  (See
supra ¶ 37.j.)  AVENATTI and REGNIER were the only two
signatories on this GB LLC account.

43.   Based on a preliminary review of the GBUS's CB&T bank
accounts, I have learned, among other things, the following
regarding the transfer of funds from GBUS or GB LLC to bank
accounts associated with A&A or EA LLP:

93

USAO_00134648

USAO_00134447

a.   Between 2015 and 2017, there were a substantial number of wire transfers or payments between GBUS's or GB LLC's bank accounts on one hand, and EA LLP's or A&A's bank accounts on the other hand.

b.   As detailed in the below chart, between 2015 and 2017, there was a net total of approximately $1,701,800 in payments from GBUS's or GB LLC's bank accounts to A&A's or EA LLP's bank accounts.

| Transfers (Net) | 2015 | 2016 | 2017 | TOTALS |
|---|---|---|---|---|
| GBUS & GB LLC to A&A | -$576,500 | $440,500 | $1,360,250 | $1,224,250 |
| GBUS & GB LLC to EA LLP | -$127,436 | $517,400 | $87,586 | $477,550 |
| TOTALS | -$703,936 | $957,900 | $1,447,836 | $1,701,800 |

c.   There was a net transfer of approximately $703,936 from A&A and EA LLP into GBUS's or GB LLC's bank accounts in 2015.  However, there was a net transfer of approximately $2,406,006 out of GBUS's and GB LLC's bank accounts to A&A and EA LLP during 2016 and 2017, while the IRS collection case was ongoing and payroll taxes were due.

44.   As set forth further below in Section IV.D.4, it appears that portions of the approximately $1.7 million that was transferred from GBUS's and GB LLC's bank accounts to A&A or EA LLP were subsequently transferred to AVENATTI's personal bank accounts or used to pay for AVENATTI's personal expenses.

45.   It also appears that AVENATTI directly used GBUS funds to pay for personal expenses.  For example, on or about March 30, 2016, a total of $200,000 was paid to the G.P. Family Trust

94

USAO_00134649

USAO_00134447

from GBUS CB&T Account 2240.  These payments were for two months
of rent for AVENATTI's residence in Newport Beach, California.
(See infra § IV.E.3.b.)

### 7.   *GBUS Bankruptcy Proceedings*

46.  GBUS is currently the debtor in Chapter 7 bankruptcy
proceedings pending in the United States Bankruptcy Court for
the Western District of Washington, in In re: Global Baristas US
LLC, No. 18-14095-TWD (the "GBUS Bankruptcy").  Based on my
review of documents filed in the GBUS Bankruptcy, I have
learned, among other things, the following:

a.  On October 24, 2018, a Chapter 7 involuntary
bankruptcy petition was filed against GBUS.  GBUS did not appear
or oppose the involuntary petition.

b.  On November 30, 2018, an Order for Relief was
entered by default.  On or about that same date, Nancy L. James
was appointed as the Chapter 7 bankruptcy trustee for GBUS (the
"GBUS Trustee").

c.  On or about November 30, 2018, GBUS was also
directed to file financial statements and other documents with
the bankruptcy court.  To date, GBUS has not filed any such
documents.

d.  On January 25, 2019, the GBUS Trustee filed a
motion for an order directing three law firms, Osborn Machler
PLLC; Eisenhower Carlson PLLC ("Eisenhower"); Talmadge/
Fitzpatrick/Tribe, PPLC, to turn over all files and records
relating to the law firms' representation of GBUS.  Among other
things, the GBUS Trustee noted that because the GBUS Trustee now

USAO_00134650

USAO_00134447

manages GBUS, the GBUS Trustee now holds the attorney-client
privilege.

     e.  On January 31, 2019, the GBUS Trustee held the
creditors meeting required under 11 U.S.C. § 341.  No one
appeared on behalf of GBUS at the meeting.

     f.  On February 8, 2019, Eisenhower, which
represented GBUS in the <u>Bellevue Square</u> Litigation, filed an
opposition to the GBUS Trustee's motion for turnover.
Eisenhower argued, among other things, that AVENATTI may believe
that Eisenhower represented him in his personal capacity and
that the motion should be denied until AVENATTI was provided
notice and an opportunity to respond.  Eisenhower stated:

> During the course of the litigation, Bellevue Square
> LLC asserted liability against Michael Avenatti
> personally.  While [Eisenhower] was not formally
> retained by Mr. Avenatti, [Eisenhower] is concerned
> that Mr. Avenatti may assert attorney-client privilege
> as to his personal communications with [Eisenhower].

     g.  On February 15, 2018, the Bankruptcy Court held a
hearing on the GBUS Trustee's motion.  I understand that during
the hearing the Bankruptcy Court held that the GBUS Trustee
holds the attorney-client privilege as to communications between
GBUS and its lawyers, that the law firms were required to turn
over their files to the GBUS Trustee, and ordered the parties to
submit an agreed upon order for the Court to sign by February
22, 2018.

    47.  Although AVENATTI is not personally named in the GBUS
Bankruptcy and has not appeared in it, he is aware of the
proceedings.  On February 13, 2019, AVENATTI sent an email to an

USAO_00134651

USAO_00134447

attorney representing IMSA in a separate civil action, the GBUS
Trustee, and the GBUS Trustee's counsel, which stated:

> It has come to my attention that you are purporting to
> proceed with a hearing tomorrow in a Florida
> collection matter in which Global Baristas US, LLC, me
> [sic] and others are defendants.  Separate [sic] apart
> from the fact that service has never been properly
> effectuated, your attempt to proceed with this matter
> is entirely inappropriate as there has long been a
> bankruptcy stay in place as a result of the attached
> bankruptcy filing (the Trustee and counsel are copied
> above).  Indeed, your continued pursuit of this matter
> over the last several months may subject your client
> to liability for violating the bankruptcy stay, which
> your client is well aware of.

**D.   Tax Offenses Relating to Eagan Avenatti LLP (EA LLP)
and Avenatti & Associates, APC (A&A)**

48.   As discussed below, there is probable cause to believe
that AVENATTI has caused his other companies, EA LLP and A&A, to
evade their federal tax obligations.  Between 2015 and 2017, EA
LLP failed to pay to the IRS approximately $2.4 million in
payroll taxes, including approximately $1,279,001 in trust fund
taxes that had been withheld from EA LLP employees' paychecks.
EA LLP and A&A have also repeatedly failed to file federal
income tax returns or pay federal income taxes, despite
generating substantial income.  Indeed, despite previously
filing tax returns, EA LLP has not filed federal tax returns for
the 2013 through 2017 tax years, and A&A has not filed federal
tax returns for the 2011 through 2017 tax years.

*1.   The IRS Payroll Tax Collection Case*

49.   In September 2015, the IRS initiated a collection case
against EA LLP due to its failure to file its payroll tax
returns and pay payroll taxes.  Based on my review of IRS tax

USAO_00134652

USAO_00134447

information, including the ICS History, I have learned, among
other things, the following information regarding EA LLP's
payroll tax obligations:

   a.   Between 2011 and the first quarter of 2014, EA
LLP paid its federal tax deposits, including trust fund tax
payments, to the IRS on a regular basis.  During this time
period, EA LLP also filed its IRS Forms 941 each quarter and IRS
Forms 940 each year.[29]  On the various EA LLP IRS Forms 940 and
IRS Forms 941 filed with the IRS between 2011 and 2014 that I
have reviewed, AVENATTI signed the forms under penalty of
perjury as the Managing Partner of EA LLP.

   b.   On or about April 30, 2015, EA LLP filed its IRS
Form 941 for the first quarter of 2015.  The IRS Form 941
indicated that EA LLP was required to pay to the IRS
approximately $194,545 in payroll taxes, including approximately
$152,562 in trust fund payments.  EA LLP, however, did not make
the required payroll tax payments to the IRS.

   c.   On September 26, 2015, the IRS opened a
collection case against EA LLP based on a FTDA.

   d.   On September 28, 2015, the collection case was
assigned to an IRS revenue officer ("RO 2").

   e.   On October 8, 2015, RO 2 made a field visit to EA
LLP's office in Newport Beach, California.  RO 2 spoke with
AVENATTI and told him that the field call was being made because

---

   [29] During this time period, Paychex was responsible for
filing EA LLP's IRS Forms 941 and paying to the IRS EA LLP's
federal tax deposits.  (See infra ¶ 52.)  These services were
discontinued at the end of 2014.  (See id.)

USAO_00134653

USAO_00134447

EA LLP had not made its federal tax deposits.  RO 2 asked
AVENATTI if REGNIER could attend the meeting because she was the
POA on file with IRS for EA LLP and was in the office at that
time, but AVENATTI said no.  RO 2 told AVENATTI that EA LLP last
filed a payroll tax return for the first quarter of 2015, but
that it had not paid to the IRS the $194,545 in payroll taxes
that were due.  RO 2 also told AVENATTI that EA LLP had not
filed its payroll tax return or paid its federal tax deposits
for the second quarter of 2015, and that the payroll tax return
and federal tax deposits for the third quarter of 2015 were due
that same day.  RO 2 explained that unless there was a reduction
in EA LLP's payroll since the first quarter of 2015, EA LLP
would likely owe the IRS over $200,000 in payroll taxes for each
of these additional quarters as well.  AVENATTI told RO 2 that
he was not aware that the federal tax deposits were not being
paid.  When asked who prepared the payroll tax returns and made
the federal tax deposits, AVENATTI said that Paychex was
responsible for the payroll taxes.[31]  AVENATTI also said that he
was not sure what was going on with the taxes.  RO 2 set a
deadline of October 23, 2015, for EA LLP to make the outstanding
payroll tax payments.  RO 2 also set deadlines for EA LLP to
file its missing IRS Forms 940 and provide certain financial
documentation, including bank statements and a balance sheet.
Finally, RO 2 instructed AVENATTI to file any other unfiled tax

---

[31]  AVENATTI made a nearly identical statement to RO 1 when
he was contacted about GBUS failure to pay its payroll taxes one
year later on October 7, 2016.  (See supra ¶ 23.d.)

99

USAO_00134654

USAO_00134447

returns, including his unfiled personal income tax returns for the 2011 to 2014 tax years.

   f. On October 14, 2015, M.H. contacted RO 2 and advised her that she was the POA for EA LLP.  RO 2 advised M.H. of the deadline she had set for EA LLP to make the outstanding payroll tax payments, file its IRS Forms 941, and produce financial documents.

   g. On October 23, 2015, EA LLP filed its IRS Forms 941 for the second and third quarters of 2015.  Both IRS Forms 941 were signed by AVENATTI.  Although EA LLP filed these two IRS Forms 941 for the second and third quarters of 2015, EA LLP did not make the required outstanding payroll tax payments nor did it produce the required financial information RO S.M requested.

   h. On March 14, 2017, RO 2 filed IRS Form 6020B substitute returns for the fourth quarter of 2015 and the first, second, third, and fourth quarters of 2016.

   i. As discussed below in Section IV.D.2, in March 2017, an involuntary Chapter 11 bankruptcy petition was filed against EA LLP.  Due to the automatic stay issued in the EA Bankruptcy, RO 2's efforts to collect the outstanding payroll taxes largely ceased.

   j. In connection with the EA Bankruptcy, EA LLP and the IRS reached a settlement regarding EA LLP's unpaid payroll taxes in which EA LLP agreed to pay to the IRS approximately $2,389,005, including trust fund taxes of $1,288,277, non-trust

USAO_00134655

USAO_00134447

fund taxes of $311,673, penalties of $635,631, and interest of $153,424.

   k. On or about September 28, 2017, the IRS received EA LLP's IRS Forms 941 for the fourth quarter of 2015 through the fourth quarter of 2016.  The IRS Forms 941 appear to have been signed by AVENATTI.

    *2. EA LLP Bankruptcy Proceedings*

  50. Based on my review of documents filed in connection with the EA Bankruptcy, I have learned, among other things, the following information:

   a. On or about March 1, 2017, an involuntary petition was filed against EA LLP in the Middle District of Florida.

   b. On or about March 10, 2017, EA LLP filed its answer to the involuntary petition and consented to the order for relief.

   c. In April 2017, the EA Bankruptcy was transferred to the Central District of California.

   d. In connection with the EA Bankruptcy, the United States claimed that it was a secured creditor of EA LLP due to the filing of federal tax liens.  The United States also filed a number of claims against the bankruptcy estate.

   e. On or about October 10, 2017, the United States filed its Fifth Amended Proof of Claim in the amount of approximately $2,357,202, which consisted of a secured claim in the amount of $677,410, a priority tax claim of $1,259,355, and a general unsecured claim of $420,436.

<center>101</center>

USAO_00134656

USAO_00134447

    f. On January 30, 2018, EA LLP, AVENATTI, and the United States entered into a stipulation regarding the payment of taxes, in which the parties described the terms of the settlement reached between EA LLP, AVENATTI, and the United States.  In the stipulation, the parties agreed that the total amount EA LLP owed to the IRS as of February 28, 2018, would be approximately $2,389,005, consisting of trust fund taxes of $1,288,277, non-trust fund taxes of $311,673, penalties of $635,631, and interest of $153,424.  Under the terms of the settlement, EA LLP was required to make an initial payment to the United States Treasury of $1,508,422, which consisted of all of the $1,288,277 in trust fund taxes due to the IRS, and 20% of the non-trust fund taxes, penalties, and interest in the amount of $220,146 within 10 days of the settlement being approved and bankruptcy being dismissed.  EA LLP was required to pay the remaining balance of $880,583, plus accrued interest, within 120 days of the dismissal order.  Specifically, EA LLP was required to pay $440,291, plus accrued interest of $11,709.07, on the 60th day following the dismissal order, and an additional $440,291 on the 120th day following the dismissal order.

    g. On March 15, 2018, the Bankruptcy Court issued an order approving the settlement between EA LLP, AVENATTI, and the United States, and dismissed the EA Bankruptcy.

    h. On March 26, 2018, the IRS received the initial settlement payment of $1,508,422 from a trust account for SulmeyerKupetz, which was the law firm representing A&A and

<div align="center">102</div>

USAO_00134657

USAO_00134447

AVENATTI in the EA Bankruptcy.[21]   EA LLP and AVENATTI, however, failed to make the remaining payments to the IRS as scheduled.

        i.   On July 3, 2018, the United States filed a motion to enforce the settlement agreement between EA LLP, AVENATTI, and the United States.   Among other things, the United States noted that EA LLP had failed to make the required payment of approximately $440,291, plus $11,709 by May 14, 2018, as required under the settlement agreement.

        j.   On August 20, 2018, EA LLP, AVENATTI, and the United States entered into a stipulation to resolve the United States July 2018 motion to enforce the settlement agreement. Under the stipulation, EA LLP agreed to make monthly payments to the United States in the amount of $75,000.

---

[21]   Based on information I received from the Newport Beach Police Department and a preliminary review of the relevant bank account records, it appears that this payment was derived from money that AVENATTI had received in trust for two clients, M.P. and L.T.   AVENATTI represented M.P. and L.T. in connection with the divestment and separation from M.P.'s business.   Under the engagement agreement, AVENATTI was entitled to 7.5 percent of the approximately $35.6 million transaction amount (or approximately $2.67 million).   In September 2017, the first portion of the transaction amount was wired to a City National Bank attorney trust account ending in 4704 ("Avenatti CNB Trust Account 4704").   After AVENATTI deducted his entire 7.5 percent fee, he then transferred the remaining proceeds to M.P.   On March 14, 2018, the balance of the transaction amount (approximately $8,146,288) was transferred to CNB Trust Account 4704.   But AVENATTI did not remit this entire sum to M.P. as he was required to do.   Rather, on March 15, 2018, AVENATTI transferred $3,000,000 to an EA LLP CB&T attorney trust account ending in 4613 ("EA CB&T Trust Account 4613").   AVENATTI then transferred $2,828,423 from EA CB&T Trust Account 4613 to the SulmeyerKupetz trust account later that same day.   The following day, AVENATTI's attorney from SulmeyerKupetz filed a declaration in the EA Bankruptcy indicating that he had received the approximately $2.8 million payment so that it could be distributed to creditors, including the IRS.

USAO_00134658

USAO_00134447

k.   On or about August 20, 2018, EA LLP paid the United States Department of Treasury approximately $75,000 via a check from one of EA LLP's CB&T bank accounts.  I understand that no further payments have been received since August 2018 and that EA LLP and AVENATTI still owe the United States approximately $765,015, plus accrued interest and penalties.

51.   As part of the EA Bankruptcy, EA LLP was required to close pre-petition bank accounts and open new "debtor in possession" bank accounts.  EA LLP and AVENATTI were also required to file with the Bankruptcy Court a monthly operating report ("MOR") detailing all funds received and disbursed by EA LLP.

### 3.   Information Obtained from Paychex Regarding EA LLP's Payroll Taxes

52.   As noted above in paragraph 49.e, when AVENATTI was first contacted by RO 2, AVENATTI claimed that Paychex was responsible for preparing the payroll tax returns and paying to the IRS EA LLP's federal tax deposits.  These claims appear to have been false.  Based on documents produced by Paychex, I have learned, among other things, the following information:

a.   On or about May 31, 2014, AVENATTI signed a Paychex Proprietor Services Agreement as the Managing Partner of EA LLP.

b.   On or about January 5, 2015, Paychex mailed two letters to EA LLP and AVENATTI confirming "that your Paychex Taxpay® service has been discontinued at your request, effective December 28, 2014."  The letters further advised AVENATTI and EA

104

USAO_00134659

USAO_00134447

LLP that "[y]ou will be responsible for making timely tax deposits and filing tax return beginning on December 28, 2014."[32]

### 4.   Other Tax Information Regarding EA LLP and A&A

53.   Based on my review of IRS tax information, I have learned, among other things, the following information regarding EA LLP's filing of federal partnership income tax returns:

a.   On or about August 13, 2010, Eagan O'Malley & Avenatti LLP, which later became EA LLP, filed its 2009 partnership income federal tax return (IRS Form 1065).  The return stated that in the 2009 tax year Eagan O'Malley Avenatti LLP had gross receipts of $12,547,675 and ordinary business income of $5,025,947.  The return listed G.M. in Encino, California, as the paid preparer, and O'Malley as the designated Tax Matters Partner ("TMP") before the IRS.

b.   On or about April 15, 2011, Eagan O'Malley & Avenatti LLP, filed its 2010 partnership income federal tax return (IRS Form 1065).  The return stated that in the 2010 tax year Eagan O'Malley & Avenatti LLP had gross receipts of $7,287,551 and ordinary business income of $1,691,667.  The return listed M.H. as the paid preparer, and A&A as the designated TMP before the IRS.

---------------------------------------------------

[32]   At the June 12, 2017, Section 341 hearing as part of the EA Bankruptcy, AVENATTI testified under penalty of perjury that Paychex was EA LLP's payroll service since "the inception of the firm . . . may have been as long as 10 [years]."  In response to a question regarding EA LLP making deposits for federal and state payroll taxes, AVENATTI testified: "Well, they're made now directly by the firm, but at some point they were being made by Paychex, or at least were to be made by Paychex."  When asked when EA LLP switched from sending money to Paychex to pay the payroll taxes to paying the tax deposits directly, AVENATTI testified "sometime in 2016."

USAO_00134660

USAO_00134447

c.    On or about March 17, 2014, EA LLP filed its 2011 partnership income federal tax return (IRS Form 1065).  The return stated that in the 2011 tax year EA LLP had gross receipts of $13,819,836 and ordinary business income of $5,850,102.  The return indicated that it was "Self Prepared" and appears to have been signed by AVENATTI on March 12, 2014. The return listed A&A as the designated TMP before the IRS, and AVENATTI as the TMP representative.

d.    On or about October 8, 2014, EA LLP filed its 2012 partnership income federal tax return (IRS Form 1065).  The return stated that in 2012 EA LLP had gross receipts of $6,212,605 and an ordinary business loss of 2,128,849.  The return appears to have been signed by AVENATTI on October 1, 2014.  The return listed M.H. as the paid preparer, and A&A as the designated TMP before the IRS.

e.    EA LLP never filed a partnership income federal tax return (IRS Form 1065) for the 2013, 2014, 2015, 2016, or 2017 tax years.

54.  Based on my review of IRS tax information, I have learned, among other things, the following information regarding A&A:

a.    A&A's 2009 IRS Form 1120S Corporate Tax Return stated that A&A had total income of $3,391,224 and ordinary business income of $1,578,558 for the 2009 tax year.  The return listed AVENATTI as the President of A&A and M.H.'s firm as the return preparer (the return does not state M.H.'s name, simply the firm at which she worked).

106

USAO_00134661

USAO_00134447

        b.   A&A's 2010 IRS Form 1120S Corporate Tax Return stated that A&A had total income of $1,421,028 and ordinary business income of $821,634 for the 2010 tax year.  AVENATTI appears to have signed the return on September 15, 2011, as the President of A&A.  The return listed M.H. as the return preparer.

        c.   A&A did not file federal corporate tax returns for the 2011, 2012, 2013, 2014, 2015, 2016, or 2017 tax years.  The last federal income tax return that A&A filed was the return for the 2010 tax year.

**5.    *Preliminary Review of EA LLP's and A&A's Bank Account Information***

    55.  A preliminary review of the bank records for accounts associated with EA LLP, A&A, and AVENATTI demonstrates that: (a) EA LLP generated significant income between 2013 and 2017 and would likely have been required to file federal income tax returns for the 2013 to 2017 tax years; (b) A&A generated significant income between 2011 and 2017 and would likely have been required to file income tax returns during the 2011 to 2017 tax years; and (c) EA LLP and AVENATTI had sufficient funds to make the required payroll tax payments due to the IRS in 2015 and 2016.  Specifically, based on a preliminary review of bank account records associated with EA LLP, A&A, AVENATTI, I have learned, among other things, the following information:

USAO_00134662

USAO_00134447

      a.   Between 2013 and 2017, EA LLP received approximately $137,890,016 of deposits[33] into its bank accounts.

      b.   Between 2011 and 2017, A&A received approximately $37,961,633 of deposits into its bank accounts, including net payments of approximately $23,820,816 from EA LLP.

      c.   Between 2015 and 2017, EA LLP transferred approximately $13,360,560 to A&A's bank accounts, and A&A transferred approximately $4,424,740 to EA LLP's bank accounts. Thus, between 2015 and 2017, A&A received a net total of approximately $8,935,820 from EA LLP.

      d.   Between 2015 and 2017, approximately $3,697,500 was transferred from A&A's bank accounts to AVENATTI's personal bank account, and approximately $190,000 was transferred from EA LLP's bank accounts to AVENATTI's personal bank account. Moreover, as discussed further in paragraph 58.c below, AVENATTI repeatedly used A&A funds to pay for personal expenses between 2015 and 2017.

**E.   Tax Offenses Relating to AVENATTI's Personal Income Tax Obligations**

56.   As discussed below, there is probable cause to believe that AVENATTI committed various tax offenses in connection with his personal income tax obligations. AVENATTI failed to file personal federal income tax returns for the 2011 through 2017 tax years. During these tax years, AVENATTI generated substantial income and lived lavishly, yet largely failed to pay

---

     [33]   I understand that the $137,890,016 of deposits likely includes some transfers between different EA LLP bank accounts. Therefore, EA LLP's total receipts during this time period could be substantially lower.

USAO_00134663

USAO_00134447

any federal income tax.  AVENATTI also appears to have evaded
the assessment and collection of federal income taxes during
these tax years by using the entities he controlled, such as
GBUS, EA LLP, and A&A, to hide and conceal his personal income.

>   **1.  Information Regarding AVENATTI's Personal Income
>        Tax Obligation**

57.  Based on my review of IRS tax information, I have
learned, among other things, the following regarding AVENATTI's
personal income tax obligations:

a.   On or about October 15, 2010, AVENATTI filed his
individual income tax return for the 2009 tax year.  The 2009
return indicated that AVENATTI had total income of $1,939,942,
and a total tax due to the IRS in the amount of $570,816.
According to the return, AVENATTI received $300,000 in W-2 wage
income from A&A in 2009, but only had $1,186 withheld in federal
taxes.  AVENATTI, therefore, owed the IRS approximately $569,630
for the 2009 tax year.  AVENATTI, however, did not pay the
remaining tax due for the 2009 tax year until November 2015,
when he sold his residence in Laguna Beach, California, upon
which there was an IRS tax lien.

b.   On or about October 11, 2011, AVENATTI filed his
individual income tax return for the 2010 tax year.  The 2010
return indicated that AVENATTI had total income of $1,154,800,
and a total tax due to the IRS of $275,947.  According to the
return, AVENATTI had $77 of taxes withheld during 2010.
AVENATTI, therefore, owed the IRS approximately $281,786 for
2010 tax year.  AVENATTI, however, did not pay the remaining

USAO_00134664

USAO_00134447

taxes due to the IRS for the 2010 tax year until November 2015,
when he sold his residence in Laguna Beach, California, upon
which there was an IRS tax lien.

     c.  AVENATTI never filed a 2011 individual tax
return.  In April 2012, however, AVENATTI or his tax preparer
filed an extension request for his 2011 individual tax return in
which $0 in tax liability was reported.[34]

     d.  AVENATTI never filed a 2012 individual tax
return.  In April 2013, however, AVENATTI or his tax preparer
filed an extension request for the 2012 individual tax return in
which $0 in tax liability was reported.

     e.  AVENATTI never filed a 2013 individual tax
return.  In April 2014, however, AVENATTI or his tax preparer
filed an extension request for the 2013 individual tax return in
which $0 in tax liability was reported.

     f.  AVENATTI never filed a 2014 individual tax
return.  In April 2015, however, AVENATTI or his tax preparer
filed an extension request for the 2014 individual tax return in
which $0 in tax liability was reported.

     g.  On September 2, 2015, the IRS filed a federal tax
lien for approximately $903,987 due to AVENATTI's non-payment of
taxes due for the 2009 and 2010 tax years.

---

[34] Based on my review of IRS tax information, I believe that
AVENATTI's extension requests for the 2011 to 2015 tax years
were submitted to the IRS by M.H.  Because we have not
interviewed M.H. at this time, it is unclear whether AVENATTI
knew the extension requests were being filed or knew what
information was being provided on the extension requests.

USAO_00134665

USAO_00134447

       h.   On or about October 23, 2015, AVENATTI's POA, M.H., contacted the IRS and advised it that AVENATTI would file his personal federal income tax returns for the 2012, 2013, and 2014 tax years by November 7, 2015.  However, no such returns were ever filed.

       i.   On October 30, 2015, the IRS sent AVENATTI a demand letter indicating that he had an outstanding debt of $1,042,878 for the 2009 and 2010 tax years.  A copy of the demand letter was also sent to AVENATTI's POA, M.H.

       j.   On November 2, 2015, as a result of the September 2015 federal tax lien, a copy of which was provided to the escrow company handling the sale of AVENATTI's Laguna Beach, California, residence, the IRS received a payment of $1,042,878 for the unpaid 2009 and 2010 taxes from the escrow company after the completion of the sale of AVENATTI's home.

       k.   AVENATTI never filed a 2015 individual tax return.  In April 2016, however, AVENATTI or his tax preparer filed an extension request for the 2015 individual tax return in which $0 in tax liability was reported.

       l.   AVENATTI never filed an individual tax return for the 2016 or 2017 tax years.  To date, AVENATTI has not filed requests for extensions for the 2016 or 2017 tax years.

       **2.   *Preliminary Review of AVENATTI's Bank Records***

    58.   A preliminary review of AVENATTI's bank account records demonstrates that AVENATTI generated substantial personal income between 2011 and 2017.  Specifically, based on a preliminary review of bank records associated with bank accounts

USAO_00134666

USAO_00134447

for AVENATTI, GBUS, EA LLP, and A&A, I have learned, among other things, the following:

        a.   Between 2011 and 2017, it appears that AVENATTI received net payments of approximately $8,464,064 from EA LLP's and A&A's bank accounts.[35]   This amount excludes any amounts that may have been transferred to AVENATTI's personal bank accounts from EA LLP's and A&A's attorney trust accounts.

        b.   Between 2014 and 2017, AVENATTI's personal bank accounts appear to have received a total of approximately $556,134 in direct payments from GBUS.

        c.   Between 2011 and 2017, approximately $37,961,633 was deposited into A&A's bank accounts, including approximately $28,541,055 from EA LLP.   After deducting the approximately $4,720,240 that A&A paid to EA LLP, A&A appears to have received net payments of approximately $23,820,815 from EA LLP during this time period.

        d.   AVENATTI appears to have used money that was deposited into A&A's bank accounts for a variety of personal expenses and to conceal his personal income.   For example, based on a preliminary review of A&A CB&T Account 0661, the investigation has identified the following payments that appear personal in nature and would therefore constitute additional evidence of AVENATTI's unreported personal income and tax evasion:

---

[35]   During this same time period, there were total deposits into AVENATTI's personal bank accounts of approximately $18,025,134.

112

USAO_00134667

USAO_00134447

           i.   Between 2011 and 2018, A&A paid AVENATTI's ex-wife, C.C, approximately $979,590.  The investigation has not yet identified any other payments from AVENATTI to C.C, which supports the inference that these payments constituted either child support or alimony, or both.

           ii.  Between 2011 and 2017, a total of $237,985 in cash was withdrawn from A&A CB&T Account 0661 via check or ATM Withdrawal.

           iii. Between 2011 and 2017, A&A paid a total of approximately $216,720 to Neiman Marcus.

           iv.  Between March and June 2011, A&A paid approximately $10,500 to Jewelers On Time, a luxury watch store in Newport Beach, California.

           v.   Between 2013 and 2015, A&A paid a total of approximately $462,499 to Chase Home Finance in connection with the mortgage on AVENATTI's residence in Laguna Beach, California.[36]

           vi.  In June 2014, A&A paid $58,000 to Jewelers On Time.[37]

           vii. Between 2014 and 2015, A&A paid a total of approximately $1,220,201 to Gallo Builders, Inc., a custom home builder in Newport Beach, California.

---

    [36]  Based on records Chase submitted to the IRS, I know that between approximately November 2011 and November 2015 AVENATTI paid to Chase a total of approximately $698,909 in mortgage interest payments for his Laguna Beach home.

    [37]  GB Auto also paid Jewelers On Time approximately $48,500 on November 27, 2015.

USAO_00134668

USAO_00134447

viii.    Between February and March 2015, A&A
paid a total of approximately $82,236 to Porsche.

ix.  In May 2016, A&A paid approximately $195,000
to Circle Porsche in Long Beach, California.

x.   Between April 2016 and July 2016, A&A paid a
total of approximately $500,000 to the G.P. Family Trust.  Based
on my review of other records, I understand that these were rent
payments made pursuant to the lease on AVENATTI's residence in
Newport Beach, California.[33]

xi.  In September 2016, A&A paid approximately
$176,500 to Exclusive Resorts, which is described on its website
as the "World's Elite Private Vacation Club."

xii. Between January 2016 and November 2016, A&A
paid approximately $65,855 to Halaby Restoration, a custom home
painting contractor located in Lake Forest, California.

xiii.    Between February 2016 and September
2016, A&A paid a total approximately $138,611 to Vincent
Builders Inc., a custom home builder in Fountain Valley,
California.[34]  A photo of AVENATTI's former residence in Newport
Beach is shown on Vincent Builder's website under "Projects."

---

[33]    Approximately $200,000 was also paid to the G.P. Family
Trust from GBUS CB&T Account 2240 in March 2016.

[34]    Between December 2015 and April 2016, approximately
$187,611 in additional payments were made to Vincent Builders
from an EA LLP CB&T bank account ending in 2851 ("EA CB&T
Account 2851"), an EA LLP attorney trust account ending in 8541
("EA CB&T Trust Account 8541"), GB Auto BofA Account 7412, and
one of AVENATTI's personal bank accounts.

114

USAO_00134669

USAO_00134447

xiv. Between February 2017 and December 2017, A&A paid a total of approximately $39,762 to Ferrari Financial Lease.

xv.  Between March 2017 and December 2017, A&A paid a total of approximately $123,825 to Ten Thousand in Los Angeles, California, as rent for AVENATTI's residential apartment.

### 3. Information Regarding the Sale of AVENATTI's Residence in Laguna Beach and Purchase of AVENATTI's Residence in Newport Beach

59.  As set forth below, the investigation has revealed that in November 2015 AVENATTI and L.S., AVENATTI's second wife, sold their home on McKnight Drive in Laguna Beach, California (the "Laguna Beach Residence"), for approximately $12.65 million, resulting in proceeds of approximately $5.4 million. It appears that the net proceeds of the sale were transferred to various entities AVENATTI controlled in an effort to conceal the proceeds of the sale.  Substantial portions of the sale proceeds were also used for AVENATTI's personal purposes, including to finance the purchase of a $15.75 million home on Via Lido Nord in Newport Beach, California (the "Newport Beach Residence").

#### a.   The Laguna Beach Residence

60.  Based on my review of mortgage records obtained from Chase, I have learned that AVENATTI and L.S. purchased the Laguna Beach Residence for approximately $7.2 million in October 2011.  AVENATTI and L.S. made a down-payment of approximately $2.2 million, and received a loan from Chase for approximately $5 million.

USAO_00134670

USAO_00134447

61.   Based on my review of records obtained from the escrow company that worked on the sale of the Laguna Beach Residence ("Escrow Company 1") and discussions with Escrow Company 1's manager, J.M., I have learned, among other things, the following information regarding the sale of AVENATTI's Laguna Beach Residence in November 2015:

a.   On or about October 22, 2015, AVENATTI and L.S. entered into a contract to sell the Laguna Beach Residence for approximately $12,625,000 in cash.   Among other things, the contract required that escrow close on or before November 2, 2015, and that the buyer make a $350,000 non-refundable deposit that would be released to AVENATTI and L.S. on October 26, 2015.

b.   On October 23, 2015, AVENATTI emailed his real estate broker, R.S., and instructed him to have Escrow Company 1 wire the $350,000 deposit funds to GBUS's KeyBank account ending in 6193 ("GBUS KeyBank 6193").   This email was then forwarded to J.M., who confirmed the wiring instructions by phone with AVENATTI on October 26, 2015.

c.   On or about October 23, 2015, AVENATTI and L.S. also signed a form directing Escrow Company 1 to send the sale proceeds via wire to GBUS KeyBank 6193.

d.   On or about October 26, 2015, Escrow Company 1 wired $350,000 to GBUS KeyBank Account 6193.

e.   Escrow Company 1's files included a copy of a demand letter the IRS sent to M.H. on October 30, 2015.   The demand letter indicated that AVENATTI's outstanding tax debt included on the notice of federal tax lien for the 2009 and 2010

116

USAO_00134671

USAO_00134447

tax years was approximately $1,042,879.  J.M. did not recall
having specific discussions with AVENATTI regarding the tax
lien, but said that his standard practice in such situations was
to discuss the issue with his client or, if his client was not
challenging the lien, to instruct the client to get a demand
letter or payoff amount.

f.   On or about October 30, 2015, AVENATTI and L.S.
electronically signed a seller's estimated closing statement,
which indicated, among other things, that $1,042,879 would be
disbursed to the IRS in connection with the IRS demand.

g.   On November 2, 2015, Escrow Company 1 wired the
remaining sale proceeds of approximately $4,553,889 to GBUS
KeyBank 6193.

h.   On or about November 3, 2015, Escrow Company 1
sent AVENATTI and L.S. a letter via their real estate broker
confirming that escrow had closed on November 2, 2015.  The
letter confirmed the remaining proceeds of the sale in the
amount of $4,553,889 had been wired on November 2, 2015.  The
letter also enclosed a copy of the final settlement and closing
costs statement, as well as a copy of an IRS Form 1099-S
(Proceeds From Real Estate Transactions), which indicated that
the gross proceeds of the sale of the Laguna Beach property were
$12,625,000.

i.   When asked whether Escrow Company 1 submitted the
IRS Form 1099-S to the IRS, J.M. said that Escrow Company 1's
standard practice was to file each IRS Form 1099-S with the IRS
through First American Title.  During a subsequent conversation,

117

USAO_00134672

USAO_00134447

however, J.M. confirmed that the IRS Form 1099-S for the sale of AVENATTI's Laguna Beach Residence was never submitted to the IRS due to an error by Escrow Company 1.[4]

62.   Based on a preliminary analysis of bank records associated with AVENATTI, GBUS, EA LLP, and other entities, it appears that AVENATTI diverted the profits he obtained from the sale of Laguna Beach Residence to a number of different entities that he controlled and to his personal bank accounts. Specifically, I have learned, among other things, the following regarding the proceeds from the sale of the Laguna Beach Residence:

a.   On or about November 2, 2015, approximately $4,553,889 was transferred from Escrow Company 1 to GBUS KeyBank Account 6193.

b.   On or about November 2, 2015, approximately $4,620,000 was transferred from GBUS KeyBank Account 6193 to GBUS CB&T Account 2240.

c.   On or about November 2, 2015, approximately $4,600,000 was transferred from GBUS CB&T Account 2240 to an IOLTA attorney trust account associated with The X-Law Group in Los Angeles, California.

d.   On or about November 3, 2015, the X-Law Group wired approximately $3,600,000 to GB Auto BofA Account 7412.   As set forth in paragraphs 63.b and 63.c below, it appears that the

---

[4]   Based on my training and experience, I know that AVENATTI would still have been required to report the proceeds from the sale of the Laguna Beach Residence on his 2015 personal income tax return regardless of whether Escrow Company 1 filed the IRS Form 1099-S with the IRS.

118

USAO_00134673

USAO_00134447

remaining $1,000,000 that had been transferred to The X-Law
Group was used to pay $1,000,000 in deposits for AVENATTI's
purchase of the Newport Beach Residence.

> e.   Between on or about November 3 and November 4,
2015, $2,700,000 was paid from GB Auto Account 7412 to EA CB&T
Account 2851.

> f.   On or about November 4, 2015, approximately
$300,000 was transferred from EA CB&T Account 2851 to A&A CB&T
Account 0661.

> g.   On or about November 4, 2015, approximately
$300,000 was transferred from A&A CB&T Account 0661 to
AVENATTI's personal bank account.

### b.   The Newport Beach Residence

63.   Based on my review of records obtained from Escrow
Company 1 and discussions with J.M., I have learned, among other
things, the following regarding AVENATTI's Newport Beach
Residence:

> a.   On or about September 23, 2015, AVENATTI and L.S.
entered into an agreement to purchase the Newport Beach
Residence from the G.P. Family Trust for approximately
$15,750,000.  The purchase agreement required AVENATTI and L.S.
to pay an initial $200,000 deposit within three days, an
additional non-refundable deposit of $800,000 by November 15,
2015, and monthly rent of $100,000 from December 1, 2015, until
August 1, 2016, or the close of escrow.

USAO_00134674

USAO_00134447

       b.   On September 28, 2015, AVENATTI paid a $200,000 deposit to Escrow Company 1 via a cashier's check from The X-Law Group.

       c.   On or about November 6, 2015, AVENATTI paid an additional $800,000 deposit to Escrow Company 1 via two wire transfers from The X-Law Group's IOLTA attorney trust account in the amounts of $450,000 and $350,000.

       d.   In August 2016, approximately two days before escrow on the Newport Beach Residence was supposed to close, a lawsuit was filed in the Superior Court of California for Orange County by a Swiss company named Maseco, S.A., in which Maseco claimed that it was entitled to possession and title of the Newport Beach Residence.  As a result, the close of escrow was delayed significantly due to litigation.

       e.   Ultimately, AVENATTI and L.S. never completed their purchase of the Newport Beach Residence.

    64.   As noted above, in 2016, AVENATTI paid to the G.P. Family Trust a total of $500,000 from A&A CB&T Account 0661 (see supra ¶ 58.d.x) and a total of $200,000 from GBUS CB&T Account 2240 (see supra ¶ 45).

       ***4.   Information from AVENATTI's Divorce Proceedings***

    65.   On or about January 2, 2018, L.S. filed a declaration in connection with the divorce proceedings regarding her marriage to AVENATTI.  In the declaration, L.S. said, among other things, the following:

       a.   AVENATTI and L.S. were married in May 2011 and separated in October 2017.

USAO_00134675

USAO_00134447

        b.   Until November 2017, AVENATTI and L.S. "enjoyed a lavish marital lifestyle due to [AVENATTI's] multi-million dollar annual income."

        c.   In November 2016, AVENATTI told L.S. he had earned $3.7 million in 2016.

        d.   L.S. suspected that AVENATTI's actual earnings are "substantially higher" than $3.7 million based on his self-published verdicts, their family's monthly expenses, and the fact that AVENATTI failed to share with her his tax returns or bank account records.

        e.   In 2016, L.S. spent approximately $215,643 per month on expenses for her and her son.

        f.   AVENATTI and L.S. made an approximately $5.4 million profit when they sold the Laguna Beach Residence in 2015.

        g.   AVENATTI's and L.S.'s home in Newport Beach was worth approximately $19 million and they were leasing the home for a monthly rent of $100,000.  L.S. said that they spent "hundreds of thousands of dollars to fully remodel the Newport Beach residence."

        h.   AVENATTI and L.S. employed two nannies and various housekeepers at a cost of approximately $15,000 per month.

        i.   AVENATTI made quarterly payments to L.S. in the amount of $60,000 to $80,000 that AVENATTI and L.S. agreed could be added to her personal savings.

USAO_00134676

USAO_00134447

j.   AVENATTI and L.S. spent approximately $30,000 per month on travel, entertainment, and gifts.

k.   L.S. spent approximately $20,000 per month on clothing.

l.   L.S.'s monthly American Express bill typically ranged from $60,000 to $70,000 and was always paid in full.

m.   AVENATTI and L.S. owned two different private jets -- one through A&A and one through an entity called Passport 420.  L.S. believed each private jet was worth approximately $4.5 million.

n.   AVENATTI and L.S. had an investment in Exclusive Resorts.  (See supra ¶ 58.d.xi.)  L.S. indicated that the total yearly cost for the investment in, and use of, Exclusive Resorts was approximately $158,000.

o.   In 2017, AVENATTI and L.S. bought an antique Ferrari at Ferrari Southbay.

p.   AVENATTI drives a 2016 Ferrari GT Spider, leased in L.S.'s name, valued at $410,000.

q.   AVENATTI has an extensive watch collection, including three or four Patek Phillippe watches AVENATTI told L.S. were worth $60,000 to $70,000 each.

### 5.   *AVENATTI's Statements Regarding His Net Worth*

66.  Based on my review of documents collected in connection with this investigation, I have learned that AVENATTI previously provided various banks with the following information regarding his net worth:

USAO_00134677

USAO_00134447

a.   On or about May 19, 2013, AVENATTI provided HomeStreet with a "Personal Balance Sheet."  The Personal Balance Sheet indicated that he had: (1) total assets of $40,039,000; (2) liabilities of $5,463,000; and (3) a net worth of $34,576,000.

b.   On or about March 11, 2014, AVENATTI provided The Peoples Bank with a "Personal Balance Sheet."  The Personal Balance Sheet indicated that AVENATTI had (1) total assets of $69,583,000; (2) total liabilities of $5,495,000; and (3) a net worth of $64,088,000.  At the bottom of the Personal Balance Sheet there is a handwritten note signed by AVENATTI which states:  "The above is true and correct to the best of my knowledge as of March 11, 2014."

c.   On or about November 1, 2014, AVENATTI provided The Peoples Bank with an updated "Personal Balance Sheet."  The updated Personal Balance Sheet stated that AVENATTI had: (1) total assets of $75,698,000; (2) total liabilities of $5,456,000; and (3) a net worth of $70,242,000.

67.  Despite claiming that he had a net worth in 2013 and 2014 ranging from $34 million to $70 million, AVENATTI did not file any personal income tax returns during these tax years.

F.   **Fraud Offenses Relating to The Peoples Bank**

68.  As discussed below, there is probable cause to believe that between approximately January 2014 and April 2016 AVENATTI engaged in a scheme to defraud The Peoples Bank in Mississippi by submitting false documents, including false tax returns and

123

USAO_00134678

USAO_00134447

balance sheets, in connection with three separate loans AVENATTI
and his companies sought and obtained.

69.   Based on my review of publicly available information,
I know that The Peoples Bank, which is located in Biloxi,
Mississippi, has been federally insured by the Federal Insurance
Deposit Commission ("FDIC") since approximately 1934.

70.   Based on my review of records obtained from The
Peoples Bank, I have learned, among other things, that AVENATTI
obtained three separate loans from The Peoples Bank during 2014:
(1) a loan to GB LLC for $850,500 on January 16, 2014 to mature
on April 15, 2014; (2) a loan to EA LLP for $2,750,000 on March
14, 2014 to mature on June 15, 2014; and (3) a loan to EA LLP
for $500,000 on December 12, 2014 to mature on December 12,
2015.[41]  I have also reviewed IRS tax records and other bank
account records that are relevant to these loans.

### 1.   $850,000 Loan to GB LLC in January 2014

71.   In or about January 2014, AVENATTI sought a three-
month loan from The Peoples Bank for GB LLC in the amount of
$850,500 for the specific purpose of "working capital."  I have
learned, among other things, the following regarding this loan:

a.   AVENATTI personally guaranteed the loan, as did
Doppio, and AVENATTI signed the loan documents as Manager of GB
LLC.  AVENATTI told C.S. -- the President and CEO of The Peoples

---

[41]  Based on the interview with T.M. and the records
obtained from The Peoples Bank, I have learned that M.C., an
individual with whom AVENATTI had a business and litigation
relationship in Seattle, Washington, introduced AVENATTI to
C.S., the president and CEO of The Peoples Bank.

USAO_00134679

USAO_00134447

Bank -- that AVENATTI "own[ed] 90% of [GB] LLC through Doppio,
Inc., which [he] wholly own[ed]."

            b.    The Peoples Bank provided a list of information
they would need from AVENATTI before the bank could approve the
loan.  AVENATTI provided numerous documents to The Peoples Bank,
including financial statements for GB LLC that listed over $41
million in assets for the company (including over $22 million in
"International rights") and nearly $38 million in member's
equity.  AVENATTI also provided GB LLC's Operating Agreement
dated December 12, 2012, the stock certificates for GB LLC and
Doppio, and an irrevocable stock transfer signing over the stock
certificates as collateral for the loan.

            c.    The Peoples Bank also told AVENATTI that, prior
to authorizing the loan, the bank needed a "Taxpayer Statement
and copy of most recent filed tax return."  The Peoples Bank had
a copy in its files of AVENATTI's 2011 U.S. Individual Income
Tax Return (Form 1040).  The AVENATTI 2011 Form 1040 that was
provided to the bank listed AVENATTI's total income and adjusted
gross income as $4,562,881, and indicated that he owed the IRS
$1,506,707 in taxes for the 2011 tax year.  The 2011 Form 1040
listed M.H. as the preparer.  Based on a review of IRS records,
however, I know that AVENATTI did not file any IRS Form 1040 for
the 2011 tax year nor did he pay any taxes to the IRS for the
2011 tax year.

            d.    The Peoples Bank approved the loan and wired the
loan proceeds to GB LLC's HomeStreet account, pursuant to
AVENATTI's wire instructions.  A third party, J.R.C., then

USAO_00134680

USAO_00134447

accepted assignment of the loan and became the "grantor" on the loan requiring AVENATTI to repay the loan to J.R.C.

### 2.   $2,750,000 Loan to EA LLP in March 2014

72.   In early March 2014, AVENATTI sought and obtained a three-month loan from The Peoples Bank for EA LLP in the amount of $2.75 million.  I have learned, among other things, the following information regarding this loan:

a.   AVENATTI told The Peoples Bank that the $2.75 million loan to EA LLP would be used to repay J.R.C. for the earlier $850,000 loan (plus interest), and for "working capital."

b.   When seeking the loan, AVENATTI said that his firm was due approximately $19 million shortly from the settlement of the Scott v. SCI litigation, and that EA LLP and AVENATTI would sign a commercial pledge agreement requiring the escrow company in charge of the settlement proceeds to pay off the loan from The Peoples Bank first upon disbursement of the settlement funds.  AVENATTI submitted a commercial loan application, which he signed both individually and on behalf of EA LLP.  In the loan application, AVENATTI claimed that, as of March 10, 2014, EA LLP had assets and a net worth of approximately $21 million, and had income and revenues of approximately $15.7 million.  AVENATTI also submitted Balance Sheets and Profit and Loss Statements for EA LLP through March 10, 2014, which stated, among other information, that the firm earned over $40 million in total income from January 2011 through March 10, 2014.

126

USAO_00134681

USAO_00134447

USAO_00134447

income on the Peoples Bank 2012 Form 1065 and the business loss
on the IRS 2012 Form 1065) than was reported on the actual Form
1065 that was filed with the IRS.

e.   On or about March 14, 2014, the loan in the
amount of $2.75 million was approved with a maturity date of
June 15, 2014.  In support of the loan, AVENATTI signed
commercial pledge agreements on behalf of EA LLP, GB LLC, and
Doppio, and a personal commercial guaranty.  AVENATTI also
signed a loan disbursement request, which instructed The Peoples
Bank to repay J.R.C. the approximately $884,165.63 that was owed
from the January 2014 $850,000 loan (plus interest), and to wire
the remaining $1,824,584 to an EA LLP bank account at CB&T.

f.   On or about May 23, 2014, after the Scott v. SCI
settlement was finalized, the escrow company wired approximately
$2,787,430 to The Peoples Bank to pay off the outstanding
balance of the March 2014 loan.

### 3.   $500,000 Loan to EA LLP in December 2014

73.  In December 2014, AVENATTI obtained a $500,000 loan
from The Peoples Bank to EA LLP.  I have learned, among other
things, the following information regarding this loan:

a.   On November 10, 2014, AVENATTI emailed C.S. at
The Peoples Bank to follow up on a prior discussion in which
AVENATTI sought a $2.5 million line of credit from the bank for
EA LLP to provide working capital for the needs of the law firm.
AVENATTI offered certain guarantees and protections to the bank,
including pledging an interest in an ongoing litigation to the

128

USAO_00134683

USAO_00134447

bank and a full security agreement to secure the loan, and to provide any further financial information the bank needed.

b.   Two days later, on November 12, 2014, AVENATTI sent an additional email to C.S. attaching a spreadsheet that included EA LLP's "expected and estimated contingency fees in 2015." The spreadsheet indicated that the firm expected to receive approximately $165 million in gross recoveries from contingency cases, and the net costs and attorneys' fees due to EA LLP from these contingency cases would be approximately $47.6 million. AVENATTI further explained that the attached expected earnings of the firm "obviously does not reflect our projected gross hourly revenue from non-contingency cases in 2015."

c.   On November 15, 2014, the bank told AVENATTI that for the bank to consider and move forward on the credit facility, AVENATTI would need to provide: an updated personal balance sheet; personal income tax returns for 2012 and 2013; interim internal financials of EA LLP through September or October 2014; and an audited financial statement for GB LLC and its subsidiaries.

d.   Later on November 15, 2014, AVENATTI emailed back his personal balance sheet as of November 1, 2014, and stated that he would get the bank the other requested documents later. AVENATTI noted, however, that GB LLC and its subsidiaries did not have audited financials on an annual basis, but that there had been no material change to the audited GB LLC balance sheet from sixteen months earlier, which AVENATTI had previously provided to the bank. On the personal balance sheet, AVENATTI

USAO_00134684

USAO_00134447

listed over $75 million in total personal assets and a net worth
of over $70 million.  (See supra ¶ 66.c.)

       e.   On November 16, 2014, AVENATTI emailed The
Peoples Bank the updated financials for EA LLP, including a
Profit and Loss Statement, and a Balance Sheet for January 2014
through September 2014.  The Profit and Loss Statement listed EA
LLP's total income for the year up through September 2014 as
approximately $23.4 million and its net income as approximately
$18.2 million.  The EA LLP Balance Sheet for the same time
period claimed total current assets of over $31 million and net
income of over $27 million (which is $9 million more than listed
on the Profit and Loss statement for the same period).  In
addition, the EA LLP Balance Sheet that AVENATTI provided the
bank indicated that EA LLP had approximately $712,729 in its
operating account with CB&T ("EA LLP CB&T Account 8461"), as of
September 30, 2014.  Based on a review of the CB&T bank records,
however, I know that EA LLP CB&T Account 8461 had a balance of
approximately $27,710 as of September 30, 2014.

       f.   On November 22, 2014, C.S. at The Peoples Bank
emailed AVENATTI stating that the bank still needed financial
information on GB LLC (even if not audited) and AVENATTI's
personal tax returns for 2012 and 2013.  Soon thereafter,
AVENATTI replied that he "had asked that the remaining info be
forwarded to you [C.S.] and will follow-up in short order."

       g.   On November 25, 2014, AVENATTI emailed C.S. and
attached a Profit and Loss Statement and Balance Sheet for GB
LLC as of November 2, 2014, which listed the company's total

USAO_00134685

USAO_00134447

assets as approximately $41.3 million and total equity of
approximately $35.4 million.

   h.   On or about December 1, 2014, AVENATTI provided
The Peoples Bank with what were purported to be his 2012 and
2013 U.S. Individual Income Tax Returns (IRS Forms 1040).[42]

   i.   The 2012 IRS Form 1040 that AVENATTI provided to
the Peoples Bank, included the following information: AVENATTI's
filing status was "single;"[43] AVENATTI's total income and
adjusted gross income were $5,423,099; the total tax due was
$1,790,744; AVENATTI had made $1,600,000 in estimated tax
payments in 2012 and still owed $190,744 in taxes; and the
return was prepared by M.H.  According to IRS records, however,
AVENATTI did not file a 2012 Form 1040, and did not make any tax
payments toward his 2012 individual tax liability.

   j.   Both the "draft" and subsequent version of the
2013 Form 1040 that AVENATTI provided to The Peoples Bank
included the following information: AVENATTI's filing status was
"single;" AVENATTI's total income and adjusted gross income were
$4,082,803; AVENATTI had paid $1,353,511 to the IRS in 2013
($1,250,000 in estimated tax payments and $103,511 in

-------------------------------

   [42] The Peoples Bank deemed the 2013 IRS Form 1040 they
received from AVENATTI via email on December 1, 2014, as a draft
because they received a slightly different and updated 2013 IRS
Form 1040 soon thereafter.  The Peoples Bank also received 2011
and 2012 IRS Forms 1040 for AVENATTI.  However, neither the 2011
Form 1040, 2012 Form 1040, nor the updated 2013 Form 1040 were
attached to an email, so the bank is not certain if they
received the documents via United States Postal Service or
another method.
   [43] AVENATTI married L.S. in 2011, however, the 2012 Form
1040 listed AVENATTI as single rather than married filing
jointly or separately.

USAO_00134686

USAO_00134447

withholdings from W-2s or 1099s); and the return was prepared by
M.H.  The "draft" 2013 Form 1040 stated AVENATTI owed $1,305,482
in taxes for calendar year 2013, and based on his tax payments
during the year, he wanted $48,029 applied to his 2014 estimated
tax.  The subsequent 2013 Form 1040 provided to The Peoples Bank
claimed AVENATTI owed $1,459,000 in taxes for calendar year
2013, and that based on his tax payments during the year, he
owed $105,489 to the IRS.  According to IRS records, however,
AVENATTI did not file a 2013 Form 1040, did not make any
estimated tax payments toward his 2013 individual tax liability,
and did not have any tax withholdings in 2013.

     k.    Although AVENATTI initially requested a $2.5
million line of credit for EA LLP, after receiving the required
documentation from AVENATTI, The Peoples Bank issued EA LLP a
$500,000 loan on December 12, 2014, which was set to mature on
December 12, 2015.  The loan was guaranteed by AVENATTI
individually and by AVENATTI on behalf of EA LLP, GB LLC, and
Doppio.  AVENATTI also signed a Commercial Pledge Agreement in
which EA LLP agreed to the "Assignment of the first $500,000
plus interest of settlement proceeds in the Meridian related
cases, said attorney's fees to be $10.5 million plus out of
pocket costs for class counsel [EA] LLP." M.C., who was the
individual that initially put AVENATTI in touch with C.S. at The
Peoples Bank, was serving as the Meridian Liquidating Trustee on
the litigation.  As part of the loan documents, on December 12,
2014, AVENATTI also signed a disbursement request and

USAO_00134687

USAO_00134447

authorization, which stated that the "specific purpose of this loan is: Case Costs and Working Capital."

l.   On December 12, 2014, The Peoples Bank wired the loan proceeds, $494,500, to EA CB&T Account 8461.  The same day, $350,000 was wired to a bank account for a lawyer who worked for EA LLP, and $105,000 was transferred to A&A CB&T Account 0661.

m.   On February 24, 2015, M.C. informed C.S. at The Peoples Bank that the Meridian case settled and AVENATTI would be receiving approximately $2.5 million as part of the settlement.  M.C. wanted to know if he had signed an assignment of proceeds to The Peoples Bank so he could determine where to send AVENATTI's money.  C.S. told M.C. that EA LLP was obligated to pay off the loan, and said the bank could give AVENATTI the pay-off amount if he called.

n.   On June 6, 2015, C.S. sent M.C. an email (forwarding the February 24, 2015 emails) after realizing that neither EA LLP nor AVENATTI had paid off the $500,000 loan to The Peoples Bank in February 2015 after the Meridian settlement.  M.C. then forwarded the email to AVENATTI (copying C.S.) asking AVENATTI what his status or plan for the loan was.  The bank's records do not show AVENATTI replied to the email.

o.   On November 14, 2015, The Peoples Bank emailed AVENATTI regarding the $500,000 loan to EA LLP, which would be maturing on December 12, 2015.  The Peoples Bank wanted to get an update because the bank's files showed it was supposed to be paid off months earlier with the proceeds of the Meridian settlement.  Approximately 30 minutes later, C.S. emailed

133

USAO_00134688

USAO_00134447

AVENATTI thanking him for the quick response to the prior email
(presumably, AVENATTI responded by phone), and C.S. told
AVENATTI that he would need to pay off his current loan before
The Peoples Bank could establish a line of credit for EA LLP as
AVENATTI sought.  C.S. also provided a list of documentation
that AVENATTI would need to provide before the bank could
authorize a line of credit.

      p.   On December 23, 2015, C.S. responded to the above
emails and informed AVENATTI that the loan matured on December
12, 2015, and wanted to make sure the loan was paid off by the
end of the year.

      q.   From February through April 2016, C.S. and others
from The Peoples Bank reached out to AVENATTI on numerous dates
to get an update on the past-due loan and find out when AVENATTI
was going to pay off the loan.  On a couple of occasions,
AVENATTI said that a wire to pay off the loan would be coming by
a certain date, but the money was never transferred to the bank.

      r.   In April 2016, C.S. informed AVENATTI that the
bank would send the loan to its collections department on April
20, 2016, if the loan was not paid off by then, which would
result in additional costs and fees to AVENATTI.  On April 20,
2016, AVENATTI emailed the bank attaching documentation
establishing that he would soon receive proceeds from a case and
would instruct that the first part of the settlement proceeds be
used to pay The Peoples Bank.

      s.   On April 22, 2016, the $500,000 EA LLP loan was
finally paid off.

USAO_00134689

USAO_00134447

### G.   Fraud Offenses Relating to the $1.6 Million G.B. Settlement

74.   As discussed below, there is probable cause to believe that AVENATTI: (a) defrauded EA LLP's client, G.B., out of his portion of an approximately $1.6 million settlement payment; (b) used the settlement proceeds for AVENATTI's own purposes; and (c) failed to disclose in the EA Bankruptcy that he had received the $1.6 million settlement payment, despite being aware that he was required to do so.

75.   On or about January 14, 2019, G.B. filed an arbitration claim alleging that AVENATTI received $1.6 million in settlement proceeds from a prior arbitration proceeding against a Colorado-based company ("Company 1") and failed to turn over G.B.'s portion of the settlement proceeds to G.B. G.B. also reported the alleged fraud to the Federal Bureau of Investigation and Newport Beach Police Department.  I have reviewed various records relating to G.B.'s claim, including, but not limited to, documents provided to the government by G.B.'s present counsel and by D.S., Company 1's counsel in the arbitration, and bank records from City National Bank.[44]  Based on my review of these documents and records, I have learned, among other things, the following:

a.   In approximately July 2014, G.B. retained EA LLP to represent him in various litigation matters, including an intellectual property dispute against Company 1.  The fee

---

[44] I have learned that G.B. pleaded guilty to a felony theft count and received a term of probation.  As such, I have relied primarily on the documentary evidence I have reviewed as it relates to possible fraud committed against G.B.

USAO_00134690

USAO_00134447

agreement entered into by G.B. and AVENATTI on behalf of EA LLP, included a 40 percent contingency agreement based on the amount of the recovery.  After AVENATTI and EA LLP initially filed a civil complaint in federal court on behalf of G.B. against Company 1, the parties agreed to handle the case through private arbitration in Colorado.

    b.    On December 22, 2017, D.S. sent AVENATTI a draft settlement agreement to resolve the arbitration, which required Company 1 to pay G.B. $1.9 million, with $1.6 million due on January 10, 2018, and $100,000 due on January 10 of the three subsequent years.

    c.    On December 26, 2017, AVENATTI sent an email to D.S. with a Microsoft Word document entitled, "MJA Revised Draft," which still had the same payment amounts and dates. AVENATTI also stated in the email that he would provide wire instructions immediately prior to the execution of the agreement.

    d.    On December 27, 2017, AVENATTI sent another Microsoft Word document titled "Further Revised," to D.S., which was a revised version of the settlement agreement, with red-lines of the revisions AVENATTI made to the document.  This revised settlement agreement also set the payment due dates as January 10, 2018 through 2021.  The primary change AVENATTI made to this draft of the settlement agreement was to remove the requirement that the settlement payment be sent via wire transfer to a specific account identified in the agreement and instead required that the settlement payment be sent via wire

USAO_00134691

USAO_00134447

transfer to an account that AVENATTI would identify to D.S. via
email by January 3, 2018.

     e.  On December 28, 2017, D.S. emailed AVENATTI a
copy of the fully executed settlement agreement with both
parties' signatures, as well as a stipulation to dismiss the
matter from arbitration.  The settlement agreement again listed
the payment dates as January 10, 2018 through 2021.

     f.  The copy of the settlement agreement that was
provided to G.B., however, listed the payment dates for the $1.9
million settlement as $1.6 million on March 10, 2018, and
$100,000 on March 10 of each of the next three years.

     g.  On January 2, 2018, AVENATTI emailed D.S. with
instructions to wire the settlement money to a City National
Bank attorney trust account ending in 5566 ("CNB Trust Account
5566").[15]  AVENATTI also wanted to confirm "that we are on
track."  D.S. responded that they were "on track."

     h.  On January 5, 2018, Company 1 wired the $1.6
million settlement into CNB Trust Account 5566 as directed by
AVENATTI.  City National Bank records confirm that the $1.6
million wire transfer was received in CNB Trust Account 5566.
Prior to the $1.6 million wire transfer, CNB Trust Account 5566
had a balance of $0.

     i.  None of the $1.6 million in settlement funds that
were deposited into CNB Trust Account 5566 were ever paid to
G.B.  Rather, between January 5, 2018, and March 14, 2018,

---

    [15] City National Bank records show that AVENATTI opened CNB
Trust Account 5566 on December 28, 2017, the same date the
settlement agreement was finalized and executed.

USAO_00134692

USAO_00134447

AVENATTI caused approximately $1,599,058 to be paid out of CNB Trust Account 5566 for his own personal purposes, including the following payments:

        i.   approximately $617,000 to a Florida-based attorney AVENATTI worked with on an unrelated contingency case;

        ii.  a total of approximately $350,000 paid to EA LLP bank accounts;

        iii. a total of approximately $200,000 to GBUS and vendors of GBUS;

        iv.  a total of approximately $112,000 to a bank account in the name of "Michael Avenatti, Esq.";

        v.   approximately $46,000 to The X-Law Group; and

        vi.  approximately $27,000 to Dennis Brager, the lawyer who was representing GBUS in the IRS payroll collection case.

        j.   G.B. sent numerous text messages and emails to AVENATTI between January 2018 and November 2018. These text messages are consistent with G.B.'s claims that he believed the first settlement payment was due on March 10, 2018; did not know that Company 1 had made the $1.6 million settlement payment; and did not know that AVENATTI had received the settlement payment in January 2018.

        k.   As set forth below, beginning on March 10, 2018, the date that G.B. believed the settlement proceeds from Company 1 would be arriving, G.B. repeatedly asked AVENATTI if he had received the settlement proceeds, whether AVENATTI had heard

<center>138</center>

USAO_00134693

USAO_00134447

anything from Company 1 regarding when the money would arrive, and what, if anything, G.B. and AVENATTI could do to get the money G.B. was owed.  It appears that AVENATTI did not respond to most of the messages from G.B. to AVENATTI relating to the settlement payment from Company 1.  G.B. also made clear to AVENATTI that he had would be having financial difficulties without the settlement proceeds and that it was imperative for G.B. to get the money.

i.   On or about March 10, 2018, G.B. sent a text message to AVENATTI stating "I was just thinking is this a big day from our friends at [Company 1]?"

ii.  On March 12, G.B. sent AVENATTI a text message in which he said "[h]ere is my account information for the wire."

iii. On March 13, 2018, G.B. sent AVENATTI a text message saying, among other things, "any word on that wire from [Company 1]?"

iv.  On March 14, 2018, G.B. sent AVENATTI a text message saying that he needed the settlement money and would be in trouble without the cash because he had made investments over the last four months in reliance on the settlement money coming in.  The next day, March 15, 2018, AVENATTI replied, "Let's chat today – I'm sure it will be resolved."

v.   Over the next couple weeks, G.B. sent several additional text messages to AVENATTI explaining how concerned G.B. was and expressing his need for the settlement money.  On March 23, 2018, AVENATTI texted G.B. back and told

USAO_00134694

USAO_00134447

him "don't worry.  Let's chat tmrw.  We will figure this out.
Michael."

        vi.  Through the rest of March to May 2018, G.B.
repeatedly asked AVENATTI about the money, whether AVENATTI had
heard from Company 1 about when the money was going to be sent,
and what actions G.B. and AVENATTI could take to cause Company 1
to pay the agreed-upon settlement.  AVENATTI never told G.B. the
money had already come in.  AVENATTI, however, agreed via text
message to provide G.B. "advances" of money to assist him with
expenses.  Based on records provided by G.B.'s attorney, it
appears that AVENATTI "advanced" G.B. approximately $130,000
between April 2018 and November 2018.

        vii. Throughout October 2018 and up until
approximately November 16, 2018, G.B. sent numerous text
messages and emails to AVENATTI again describing G.B.'s dire
financial situation and asking numerous questions about what
actions they could take going forward to get G.B. his money.
AVENATTI did not respond to most of the messages, but on a few
occasions, AVENATTI replied, saying he was working on a solution
and they could set a time to talk.  AVENATTI never responded in
writing to G.B.'s specific questions regarding the Company 1
settlement.

        1.  On or about November 16, 2018, after retaining
new counsel to attempt to collect his settlement proceeds, G.B.,
through his counsel, learned that the actual settlement
agreement had provided for the initial $1.6 million dollars to
be paid on January 10, 2018, as opposed to March 10, 2018, as

USAO_00134695

USAO_00134447

G.B. had been led to believe, and that Company 1 had in fact made the $1.6 million settlement payment on January 5, 2018.

m.    On November 17, 2018, G.B.'s new counsel sent a letter to AVENATTI via email, which stated that G.B. had been led to believe that Company 1 had not made the initial $1.6 million payment required under the settlement agreement and sought confirmation of this fact.  The letter also requested a true and correct copy of the Settlement Agreement and any fee agreements AVENATTI and EA LLP had with G.B.  Finally, the letter requested that if the settlement money had actually already been paid, to provide an immediate accounting concerning the funds.

n.    At approximately 10:12 p.m. on November 17, 2018, AVENATTI sent two text messages to G.B. stating "Pls call me" and "What is this all about? Pls call me ASAP."[46]  AVENATTI also called G.B.'s phone twice that night and left a voicemail at approximately 10:14 p.m., which included, in part, AVENATTI stating, "Give me a call when you get a chance.  I mean as soon as possible if you get this please it's urgent.  Thank you."  At approximately 10:26 p.m., AVENATTI sent G.B. an email saying, "I just tried you on your cell.  Please call me when you receive this.  Thanks, Michael."  To date, AVENATTI never responded to or provided documents as requested in the letter G.B.'s counsel sent AVENATTI on November 17, 2018.

---

[46] Although AVENATTI was on notice that G.B. was represented by new counsel and had been contacted by said counsel rather than by G.B., AVENATTI contacted G.B. directly and made no known effort to communicate with G.B.'s new counsel.

141

USAO_00134696

USAO_00134447

76.   As noted in paragraph 51 above, in connection with the
EA Bankruptcy, EA LLP and AVENATTI were required to file with
the Bankruptcy Court a MOR each month.  AVENATTI, however, never
disclosed the $1.6 million settlement payment from the G.B. case
nor the existence of CNB Trust Account 5566 to the Bankruptcy
Court, as he was required to do.[47]  Rather, on February 15, 2018,
AVENATTI signed and filed EA LLP's January 2018 MOR under
penalty of perjury, which falsely stated that EA LLP had total
receipts of approximately $232,221 during January 2018, based
solely on deposits into the EA LLP's DIP CB&T bank account.
Additionally, approximately $141,113 out of the $232,221
reported on the MOR was made up of two cashier's checks written
from CNB Trust Account 5566, which came from the settlement
proceeds.  By using cashier's checks for these payments from CNB
Trust Account 5566, AVENATTI hid the existence of this bank
account from the Bankruptcy Court and EA LLP's creditors.
Finally, based on the records it is clear that G.B. was
represented by EA LLP in his case against Company 1; thus, I
understand that any payment AVENATTI received from the G.B. case
would be property of the bankruptcy estate.

V.   ADDITIONAL INFORMATION REGARDING THE SUBJECT DEVICES

A.   Collection of the Subject Devices

77.   SUBEJECT DEVICE 1:  On October 5, 2018, M.E. was
served with a subpoena demanding that she produce certain

---

[47]   It appears that AVENATTI also failed to disclose in the
EA Bankruptcy the payments he received in connection with his
representation of M.P. and L.T. and the CNB bank account into
which such payments were deposited. (See supra page 103 n. 31.)

USAO_00134697

USAO_00134447

records relating to GBUS and GB LLC, including any digital
devices used to conduct business on behalf of GBUS, GB LLC, and
other related entities.  On October 22, 2018, M.E. met with me
and IRS-CI SA John Weeks[4] to produce responsive records.  M.E.
consented to have IRS-CI copy and secure evidence from her
laptop computer.  SA John Weeks took possession of the laptop,
created an image of the laptop's hard drive (SUBJECT DEVICE 1),
and returned the laptop to M.E.  M.E. also produced a number of
hard copy GBUS emails responsive to the subpoena.  The hard copy
emails were sealed in an envelope, marked as potentially
tainted, and sent to a PRTAUSA in Los Angeles.[4]  Neither the
contents of SUBJECT DEVICE 1 nor the hard copy records produced
by M.E. have been reviewed by me or any other member of the
prosecution team.  Based on my discussions with M.E., however, I
understand that SUBJECT DEVICE 1 contains copies of her GBUS
emails and other GBUS records.

78.  SUBJECT DEVICE 2:  On October 5, 2018, S.F. was served
with a subpoena demanding that she produce certain records
relating to GBUS and GB LLC, including any digital devices used
to conduct business on behalf of GBUS, GB LLC, and other related
entities.  On October 21, 2018, SA James Kim and I met with S.F.
to obtain records responsive to the subpoena.  S.F. produced to

_____

[4]  SA Weeks is an IRS Computer Investigative Specialist
("CIS").  SA Weeks is not part of the investigative team.
Rather, SA Weeks involvement in this investigation has been
limited to the forensic collection of digital evidence.

[4]  Because the hard copy documents were produced by M.E. in
response to specific requests in the subpoena, the government is
not seeking a warrant to search these documents.

USAO_00134698

USAO_00134447

us two boxes of documents, which she indicated consisted of GBUS mail and invoices. S.F. also consented to have IRS agents copy and secure evidence from her laptop computer, and allowed us to take temporary custody of the computer. SA Weeks subsequently created a forensic image of S.F.'s laptop (SUBJECT DEVICE 2), which we returned to her on October 25, 2018. The contents of SUBJECT DEVICE 2 have not been reviewed by me or any other member of the prosecution team. Based on my discussions with S.F., however, I understand that SUBJECT DEVICE 2 contains copies of her GBUS emails and other GBUS records. The hard copy documents were mailed to IRS-CI's office in Laguna Niguel and reviewed by an IRS-CI privilege review SA. The privilege review SA confirmed, after consulting with a PRTAUSA, that the hard copy documents did not contain potentially privileged information, and then released them to me to review.

79.  SUBJECT DEVICE 3: On October 5, 2018, M.G. was served with a subpoena demanding that she produce certain records relating to GBUS and GB LLC, including any external hard drives that she used to store business records relating to GBUS, GB LLC, and other entities. On October 22, 2018, M.G. met with me and SA Weeks to produce responsive records. M.G. consented to have IRS-CI copy and secure evidence from her external hard drive. SA Weeks took possession of the hard drive, created a forensic image of the hard drive (SUBJECT DEVICE 3), and returned the hard drive to M.G. M.G. also consented to have IRS-CI secure all text messages between her and RO 1, which SA Weeks retrieved from her cell phone. Neither the contents of

144

USAO_00134699

USAO_00134447

SUBJECT DEVICE 3 nor the text messages have been reviewed by me or any other member of the prosecution team.  Based on my discussions with M.G., however, I understand that SUBJECT DEVICE 3 contains copies of M.G.'s GBUS emails and other GBUS records.

80.  SUBJECT DEVICE 4:  On October 22, 2018, V.S. was served with a subpoena demanding that he produce certain records relating to GBUS and GB LLC, including any digital devices used to conduct business on behalf of GBUS, GB LLC, and other related entities.  In response to the subpoena, on October 29, 2018, I received SUBJECT DEVICE 4 and certain hard copy records from V.S.  SUBJECT DEVICE 4 was sent to IRS-CI SA John Weeks to download and secure the evidence.  The hard copy documents were sealed and then provided to an IRS-CI privilege review SA.  The privilege review SA confirmed, after consulting with a PRTAUSA, that the hard copy documents did not contain potentially privileged information, and then released the documents to me to review.  The contents of SUBJECT DEVICE 4 have been not reviewed by me or any other member of the prosecution team.  Based on my discussions with V.S., however, I understand that SUBJECT DEVICE 4 contains copies of V.S.'s GBUS emails and other GBUS records.

81.  SUBJECT DEVICE 5 and SUBJECT DEVICE 6:  On October 25, 2018, A.G. was served with a subpoena demanding that he produce certain records relating to GBUS and GB LLC, including any digital devices used to conduct business on behalf of GBUS, GB LLC, and other related entities.  On November 13, 2018, A.G. met with me and an IRS CIS, and provided us with a Seagate external hard drive and Veeam 2GB flash drive.  A.G. consented to have

145

USAO_00134700

USAO_00134447

IRS-CI copy and secure the evidence from these devices.  An IRS
CIS took possession of the devices, created forensic images of
the hard drive (SUBJECT DEVICE 5) and the flash drive (SUBJECT
DEVICE 6), and then returned the devices to A.G. the next day.
Based on my discussions with A.G., I understand that SUBJECT
DEVICE 5 and SUBJECT DEVICE 6 contain GBUS business records,
including GBUS business records that an IT consultant, J.S.,
downloaded from the AWS cloud server before AWS and 2nd Watch
discontinued GBUS's services for non-payment of its fees.  The
contents of SUBJECT DEVICE 5 and SUBJECT DEVICE 6 have not been
reviewed by me or any other member of the prosecution team.

    82.  SUBJECT DEVICE 7:  On November 20, 2018, SA Weeks
received from A.G. a Seagate external hard drive[5] containing
additional records responsive to the October 25, 2018, subpoena.
SA Weeks then created a forensic image of the hard drive
(described herein as SUBJECT DEVICE 7).  I then mailed the
device back to A.G. on December 3, 2018.  Based on my
discussions with A.G. and SA Weeks, I understand that SUBJECT
DEVICE 7 contains approximately 1.5 million emails that J.S.
downloaded from the AWS cloud server before GBUS's services were
discontinued.  SA Weeks further advised me that SUBJECT DEVICE 7
contains a number of GBUS email mailboxes, including email
mailboxes associated with the following former GBUS employees:
A.G.; B.H.; M.D.; M.E.; M.G.; S.F.; T.M.; and V.S.  Notably,

_____

    [5]  I understand that A.G. used the same Seagate external
hard drive he provided to IRS-CI on November 13, 2018, to
produce this additional data to IRS-CI.

USAO_00134701

USAO_00134447

SUBJECT DEVICE 7 does not appear to contain any email mailboxes
associated with AVENATTI.[51]  Although SA Weeks provided me with a
list of the email mailboxes stored on SUBJECT DEVICE 7, the
specific contents of SUBJECT DEVICE 7 have not been reviewed by
me or any other member of the prosecution team.

**B.    The SUBJECT DEVICES Are Unlikely to Contain Attorney-
Client Privileged Communications or Records**

83.  Although AVENATTI is a licensed attorney and has
previously claimed in connection with the IRS collection case
that he served as GBUS's General Counsel, it is highly unlikely
that the SUBJECT DEVICES will contain information protected by
the attorney-client privilege for the following reasons:

a.   <u>First</u>, on February 19, 2019, the GBUS Trustee
(see supra Section IV.C.7) executed a written waiver of the
attorney-client privilege as to any communications between
GBUS's officer, directors, employees, and agents, and any lawyer
acting on GBUS's behalf, including any communications with
AVENATTI.[52]  The Trustee has also consented to a search of the

------------------------------

[51]  As noted in Section IV.C.3 above, multiple former GBUS
employees indicated that although AVENATTI had a GBUS email
account, he did not use it to conduct business on behalf of
GBUS, and used his EA LLP email account instead.

[52]  The written waiver is limited to attorney-client
communications prior to the filing of the involuntary bankruptcy
petition on October 24, 2018, and does not cover communications
between the GBUS Trustee and any lawyers acting on behalf of the
GBUS Trustee.  Based on when the SUBJECT DEVICES were collected
and my discussions with the former GBUS employees regarding the
general contents of the SUBJECT DEVICES, I do not believe the
SUBJECT DEVICES include any communications that occurred or
records that were created after October 24, 2018, or any
communications involving the GBUS Trustee.

147

USAO_00134702

USAO_00134447

SUBJECT DEVICES.  A copy of the Trustee's written waiver of the
attorney-client privilege is attached hereto as Exhibit 1.

        b.  Second, the former GBUS employees who have been
interviewed during the investigation have all indicated that
AVENATTI primarily, if not exclusively, served in a business
capacity, and did little to no legal work for GBUS.  Indeed, all
of the former GBUS employees considered AVENATTI to be the CEO
and Chairman of GBUS, as opposed to its General Counsel.  It is
therefore highly unlikely that any of the former GBUS employees'
emails contained on the SUBJECT DEVICES would constitute
attorney-client privileged communications.  But, to the extent
AVENATTI was acting as GBUS's lawyer, any of the individual GBUS
employees' communications with AVENATTI are covered by the
Trustee's written waiver of the attorney-client privilege
referenced in paragraph 83.a above and attached hereto as
Exhibit 1.

        84.  Third, I understand AVENATTI could potentially assert
that he had an individual attorney-client relationship with
certain lawyers that also represented GBUS, such as the
Eisenhower law firm, which represented GBUS in the Bellevue
Square Litigation, or The Brager Tax Law Group.  I have no
reason to believe, however, that communications between AVENATTI
and any lawyers representing him in an individual capacity are
contained on the SUBJECT DEVICES.  Based on the evidence
collected to date and witness interviews, I understand that
AVENATTI exclusively used his EA LLP email account to conduct
business on behalf of GBUS.  Further, to the best of my

148

USAO_00134703

USAO_00134447

knowledge, the SUBJECT DEVICES do not contain a backup of
AVENATTI's GBUS email account, which in any case GBUS employees
said AVENATTI never used.[32]

85.  For the foregoing reasons, I believe that the SUBJECT
DEVICES will contain limited, if any, attorney-client
communications and that any such attorney-client communications
on the SUBJECT DEVICES are subject to the written waiver of the
attorney-client privilege executed by the Trustee for GBUS.
Accordingly, a privilege review search protocol that encompasses
all of AVENATTI's communications with GBUS employees is
unnecessary and would significantly delay this investigation.
Nevertheless, as set forth in Attachment B to the search warrant
application, a privilege review team will conduct a limited
search of the devices for communications with the following five
law firms with which AVENATTI may claim that he had an
individual attorney-client relationship: (a) Foster Pepper PLLC;
(b) Osborn Machler PLLC; (c) Eisenhower Carlson PLLC; (d)
Talmadge/Fitzpatrick/Tribe, PPLC; and (e) The Brager Tax Law
Group.  The search team will also be advised of the possibility
that AVENATTI could claim that he had an individual attorney-
client relationship with other law firms or lawyers.  To the
extent the search team discovers any individual communications
between AVENATTI and lawyers from the five identified law firms

---

[32] To the extent any of the SUBJECT DEVICES do in fact
contain a backup of AVENATTI's GBUS email accounts, paragraph 8
of Attachment B to the search warrant application requires that
any such email accounts be immediately segregated and not
searched or reviewed absent further authorization from the
Court.

USAO_00134704

USAO_00134447

or any other law firms, the search team will immediately cease
its review of those communications and provide them to the
PRTAUSA for further review and, if necessary, relief from the
Court.

## VI.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

86.   As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS); and
security devices.

87.   Based on my knowledge, training, and experience, as
well as information related to me by agents and others involved
in the forensic examination of digital devices, I know that it
is not always possible to search digital devices for digital
data in a single day or even over several weeks for a number of
reasons, including the following:

150

USAO_00134705

USAO_00134447

        a.    Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital devices and software programs in use today that it takes time to conduct a thorough search.  In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the type of digital device, operating system, and software application being searched.

        b.    Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

        c.    Based on my discussions with IRS-CI SA John Weeks, I understand the SUBJECT DEVICES may contain a substantial of data.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.

        d.    Electronic files or remnants of such files can be recovered months or even years after they have been downloaded

USAO_00134706

USAO_00134447

onto a hard drive, deleted, or viewed via the Internet.[54]
Electronic files saved to a hard drive can be stored for years
with little or no cost.  Even when such files have been deleted,
they can be recovered months or years later using readily-
available forensics tools.  Normally, when a person deletes a
file on a computer, the data contained in the file does not
actually disappear; rather, that data remains on the hard drive
until it is overwritten by new data.  Therefore, deleted files,
or remnants of deleted files, may reside in free space or slack
space, i.e., space on a hard drive that is not allocated to an
active file or that is unused after a file has been allocated to
a set block of storage space, for long periods of time before
they are overwritten.  In addition, a computer's operating
system may also keep a record of deleted data in a swap or
recovery file.  Similarly, files that have been viewed on the
Internet are often automatically downloaded into a temporary
directory or cache.  The browser typically maintains a fixed
amount of hard drive space devoted to these files, and the files
are only overwritten as they are replaced with more recently
downloaded or viewed content.  Thus, the ability to retrieve
residue of an electronic file from a hard drive depends less on
when the file was downloaded or viewed than on a particular
user's operating system, storage capacity, and computer habits.
Recovery of residue of electronic files from a hard drive

---

[54] These statements do not generally apply to data stored in
volatile memory such as random-access memory, or "RAM," which
data is, generally speaking, deleted once a device is turned
off.

USAO_00134707

USAO_00134447

requires specialized tools and a controlled laboratory
environment.  Recovery also can require substantial time.

      e.  Although some of the records called for by this
warrant might be found in the form of user-generated documents
(such as word processing, picture, and movie files), digital
devices can contain other forms of electronic evidence as well.
In particular, records of how a digital device has been used,
what it has been used for, who has used it, and who has been
responsible for creating or maintaining records, documents,
programs, applications and materials contained on the digital
devices are, as described further in the attachments, called for
by this warrant.  Those records will not always be found in
digital data that is neatly segregable from the hard drive image
as a whole.  Digital data on the hard drive not currently
associated with any file can provide evidence of a file that was
once on the hard drive but has since been deleted or edited, or
of a deleted portion of a file (such as a paragraph that has
been deleted from a word processing file).  Virtual memory
paging systems can leave digital data on the hard drive that
show what tasks and processes on the computer were recently
used.  Web browsers, e-mail programs, and chat programs often
store configuration data on the hard drive that can reveal
information such as online nicknames and passwords.  Operating
systems can record additional data, such as the attachment of
peripherals, the attachment of USB flash storage devices, and
the times the computer was in use.  Computer file systems can
record data about the dates files were created and the sequence

USAO_00134708

USAO_00134447

in which they were created.  This data can be evidence of a
crime, indicate the identity of the user of the digital device,
or point toward the existence of evidence in other locations.
Recovery of this data requires specialized tools and a
controlled laboratory environment, and also can require
substantial time.

       f.    Further, evidence of how a digital device has
been used, what it has been used for, and who has used it, may
be the absence of particular data on a digital device.  For
example, to rebut a claim that the owner of a digital device was
not responsible for a particular use because the device was
being controlled remotely by malicious software, it may be
necessary to show that malicious software that allows someone
else to control the digital device remotely is not present on
the digital device.  Evidence of the absence of particular data
on a digital device is not segregable from the digital device.
Analysis of the digital device as a whole to demonstrate the
absence of particular data requires specialized tools and a
controlled laboratory environment, and can require substantial
time.

       g.    Digital device users can attempt to conceal data
within digital devices through a number of methods, including
the use of innocuous or misleading filenames and extensions.
For example, files with the extension ".jpg" often are image
files; however, a user can easily change the extension to ".txt"
to conceal the image and make it appear that the file contains
text.  Digital device users can also attempt to conceal data by

154

USAO_00134709

USAO_00134447

using encryption, which means that a password or device, such as
a "dongle" or "keycard," is necessary to decrypt the data into
readable form.  In addition, digital device users can conceal
data within another seemingly unrelated and innocuous file in a
process called "steganography."  For example, by using
steganography a digital device user can conceal text in an image
file that cannot be viewed when the image file is opened.
Digital devices may also contain "booby traps" that destroy or
alter data if certain procedures are not scrupulously followed.
A substantial amount of time is necessary to extract and sort
through data that is concealed, encrypted, or subject to booby
traps, to determine whether it is evidence, contraband or
instrumentalities of a crime.  In addition, decryption of
devices and data stored thereon is a constantly evolving field,
and law enforcement agencies continuously develop or acquire new
methods of decryption, even for devices or data that cannot
currently be decrypted.

> h.   The search of the SUBJECT DEVICES will likely
take a considerable amount of time for multiple reasons.  First,
as noted above, the SUBJECT DEVICES contain a substantial amount
of data.  For example, I understand that SUBJECT DEVICE 7 alone
contains approximately 1.5 million emails.  Second, the search
of the SUBJECT DEVICES will require the use of a Privilege
Review Team and the search protocols set forth in Attachment B
to the search warrant application.

USAO_00134710

USAO_00134447

88. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. REQUEST FOR SEALING

89. I request that the search warrant, the search warrant application, and this affidavit be kept under seal to maintain the integrity of this investigation until further order of the Court, or until the government determines that these materials are subject to its discovery obligations in connection with criminal proceedings, at which time they may be produced to defense counsel. I make this request for several reasons.

a. First, this criminal investigation is ongoing and is neither public nor known to AVENATTI and other subjects of the investigation. Disclosure of the search warrant, application, and this affidavit could cause AVENATTI and others to accelerate any existing or evolving plans to, and give them an opportunity to, destroy or tamper with evidence, tamper with or intimidate witnesses, change patterns of behavior, or notify confederates.

b. Second, based on evidence collected to date and described herein, there is probable cause to believe that AVENATTI took a number of affirmative actions to obstruct the IRS civil collection action relating to GBUS's unpaid payroll taxes by, among other things, lying to RO 1, changing contracts, merchant accounts, and bank account information to avoid liens and levies imposed by the IRS, and instructing employees to deposit over $800,000 in cash from Tully's stores, which were

156

USAO_00134447

owned and operated by GBUS, into a bank account associated with
a separate entity to avoid liens and levies by the IRS.  If
AVENATTI were to learn of the instant investigation he might
engage in similarly obstructive conduct.

      c.   Third, a number of former GBUS employees have
expressed concerns that AVENATTI might attempt to retaliate
against them if he learned they were cooperating with the
government's investigation.

      d.   Fourth, there is a possibility that some evidence
relating to GBUS's operations may have already been lost when
GBUS was evicted from its corporate offices and AVENATTI refused
to pay the bill for GBUS's cloud-based server.  Although IRS-CI
has been able to obtain some GBUS records, including the data
stored on the SUBJECT DEVICES, from other sources, AVENATTI's
apparent willingness to allow GBUS records to be lost or
destroyed raises a concern that, were AVENATTI to learn of the
instant investigation, he might not hesitate to destroy any
remaining GBUS records and other relevant evidence.

      e.   Fifth, the government is still attempting to
locate additional documentary evidence that is relevant to the
investigation, including emails and electronic records that may
be stored by AVENATTI, EA LLP, A&A, or other related entities.
As noted herein, AVENATTI appears to have worked primarily out
of EA LLP's office and used solely his EA LLP email address to
conduct business.  The government is still attempting to
identify the internet service provider AVENATTI used for EA
LLP's email accounts and/or the location of his email server.

157

USAO_00134712

USAO_00134447

Additionally, EA LLP was recently evicted from its offices in Newport Beach, California, and investigators have yet to determine where EA LLP's records are being currently stored. If alerted to the government's investigation, it is therefore possible that AVENATTI would attempt to destroy such records and that the government would have no other means to obtain this evidence.

### VIII.   <u>CONCLUSION</u>

90.   For the reasons described above, I respectfully submit there is probable cause to believe that evidence, fruits, and instrumentalities of the Subject Offenses, as described with particularity in Attachment B, will be found on the SUBJECT DEVICES, as described with particularity in Attachment A.

/s/
_____
Remoun Karlous, Special Agent
Internal Revenue Service –
Criminal Investigation

Subscribed to and sworn before me
this 22nd day of February, 2019.

**DOUGLAS F. McCORMICK**
_____
HONORABLE DOUGLAS F. McCORMICK
UNITED STATES MAGISTRATE JUDGE

158

USAO_00134713

USAO_00134447

# EXHIBIT 1

USAO_00134714

USAO_00134447

Case 8:19-mj-00409-DUTY *SEALED*   Document 4-1 *SEALED*   Filed 05/24/19   Page 269 of 384   Page ID #:416

### LIMITED WAIVER OF ATTORNEY-CLIENT PRIVILEGE AND CONSENT TO SEARCH BY NANCY L. JAMES IN HER CAPACITY AS TRUSTEE FOR GLOBAL BARISTAS US, LLC

I, Nancy L. James, in my capacity as the Trustee for Global Baristas US LLC, hereby agree and state as follows:

1.      On or about October 24, 2018, a Chapter 7 involuntary bankruptcy petition was filed against Global Baristas US, LLC ("GBUS"), in the United States Bankruptcy Court for the Western District of Washington, in In re: Global Baristas US LLC, No. 18-14095-TWD (the "GBUS Bankruptcy"). On November 30, 2018, an Order for Relief was issued in connection with GBUS Bankruptcy, and I was appointed as the Trustee for GBUS.

2.      I understand that the Internal Revenue Service – Criminal Investigations ("IRS-CI") is in possession of certain GBUS business records and communications it obtained from former GBUS employees in both hard-copy and electronic form, as described in paragraph 3, below.

3.      In my capacity as Trustee for GBUS, I consent to the search of the following items currently in the possession of IRS-CI:

        a.      A forensic image of a Dell XPS 128 GB Samsung SSD, bearing serial number S1D2NSAG5000777, provided to IRS-CI by M█████ E███ on or about October 22, 2018.

        b.      Hard-copy GBUS records provided by M█████ E███ on or about October 22, 2018.

        c.      A forensic image of a Dell Precision, Model M4800, bearing service tag number 252M262, provided to IRC-CI by S█████ F██████████ on or about October 21, 2018.

        d.      Hard-copy GBUS records provided by S█████ F██████ on or about October 21, 2018.

1

USAO_00134715

USAO_00134447

e.      A forensic image of a Seagate External Hard Drive, model number SRD00F1, bearing serial number NA44HLQH, provided to IRS-CI by M███ G███ on or about October 22, 2018.

f.      Copies of text messages between M███ G███ and other GBUS employees obtained from Grice on or about September 26, 2018.

g.      A forensic image of a Samsung flash drive  provided to IRS-CI by V███ S███ on or about October 31, 2018.

h.      Hard-copy GBUS business records provided to IRS-CI by V███ S███ on or about October 31, 2018.

i.      A forensic image of a Seagate Hard Drive, bearing serial number 5VJC1GXV provided to IRS-CI by A███ G███ on or about November 13, 2018.

j.      A forensic image of a Veeam 2GB flash drive provided to IRS-CI by A███ G███ on or about November 13, 2018.

k.      A forensic image of a Seagate Hard Drive, bearing serial number 5VJC1GXV provided to IRS-CI by A███ G███ on or about November 20, 2018.

4.      With respect to any GBUS business records, including those records and communications in the possession of IRS-CI described in paragraph 3 above, in my capacity as the Trustee for GBUS, I agree to waive any claims of the attorney-client privilege that may exist between GBUS and any legal counsel acting on its behalf.  More specifically, and subject to the limitations below, I agree to waive the attorney-client privilege as to any attorney-client communications which may exist between any officer, director, employee, or agent of GBUS on the one hand, and on the other hand any lawyer acting on behalf of GBUS, including, but not limited to, the following individuals and law firms: Michael Avenatti; Eagan Avenatti LLP; Avenatti & Associates APC; Foster Pepper PLLC; Osborn Machler PLLC; Eisenhower Carlson PLLC; and Talmadge/Fitzpatrick/Tribe, PPLC.

5.      This waiver of the attorney-client privilege is limited in that it does not apply to any attorney-client privileged communications that took place after the involuntary petition was

2

USAO_00134716

USAO_00134447

filed in the GBUS Bankruptcy on October 24, 2018.  Nor does it apply to any communications

between the Trustee of GBUS and any lawyers acting on behalf of the Trustee, including, but not

limited to, Rory C. Livesey and the Livesey Law Firm.  This waiver of the attorney-client

privilege is further limited to the United States government and its employees and agents, for any

purpose related to the official performance of their duties, and does not extend to any other

individual, entity or third party.

6.      In my capacity as Trustee for GBUS, I also authorize any former or current

officer, directors, employees, or agents of GBUS to disclose to the United States government all

materials, written or oral, relating to any attorney-client privileged communications covered by

the limited attorney-client privilege waiver set forth in paragraphs 5 and 6 above.

7.      I have read this Limited Waiver of the Attorney-Client Privilege and Consent to

Search carefully and understand it thoroughly.  I, in my capacity as Trustee for GBUS, have

agreed to this Limited Waiver of the Attorney-Client Privilege and Consent to Search freely and

voluntarily.

| | |
|---|---|
| _____ | _2-19-19_____ |
| NANCY L. JAMES | Date |

Trustee for Global Baristas US LLC

3

USAO_00134717

USAO_00134447

# EXHIBIT 2

USAO_00134718

USAO_00134447

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | **WARRANT FOR** |
| PLAINTIFF, | **ARREST** |
| v. | |
| MICHAEL J. AVENATTI | ON COMPLAINT |
| DEFENDANT(S) | CASE NO.: SA 1 9 - 2 4 1 M |

To:   UNITED STATES MARSHAL AND ANY AUTHORIZED UNITED STATES OFFICER

**YOU ARE HEREBY COMMANDED** to arrest **MICHAEL J. AVENATTI** and bring

him forthwith to the nearest Magistrate Judge to answer a complaint charging him with

Bank Fraud, in violation of Title 18, United States Code, Section 1344(1), and Wire

Fraud, in violation of Title 18, United States Code, Section 1343.

REC: BY AUSAs Julian L. André and Brett A. Sagel       [Detention]

_____
Date

_____
Name of Magistrate Judge

DOUGLAS F. McCORMICK

_____
Signature of Magistrate Judge

| RETURN | | |
|---|---|---|
| This warrant was received and executed with the arrest of the above-named defendant at (location): | | |
| DATE RECEIVED | NAME AND TITLE OF ARRESTING OFFICER | SIGNATURE OF ARRESTING OFFICER |
| DATE OF ARREST | | |

DESCRIPTIVE INFORMATION FOR DEFENDANT CONTAINED ON PAGE TWO

WARRANT FOR ARREST ON COMPLAINT                    Page 1 of 4

USAO_00134719

USAO_00134447

Case 8:19-mj-00419-DUTY *SEALED*   Document 4-1 *SEALED*   Filed 05/24/19   Page 274 of 330   Page ID #:780

## ADDITIONAL DEFENDANT INFORMATION

| RACE: | SEX: | HEIGHT: | WEIGHT: | HAIR: | EYES: | OTHER: |
|-------|------|---------|---------|-------|-------|--------|

| DATE OF BIRTH | PLACE OF BIRTH | SOCIAL SECURITY NO.: | DRIVERS LICENSE NO. | ISSUING STATE |
|---------------|----------------|----------------------|---------------------|---------------|

| ALIASES: | SCARS, TATTOOS OR OTHER DISTINGUISHING MARKS: |
|----------|-----------------------------------------------|

| AUTO YEAR: | AUTO MAKE: | AUTO MODEL: | AUTO COLOR: | AUTO LICENSE NO.: | ISSUING STATE |
|------------|------------|-------------|-------------|-------------------|---------------|

| LAST KNOWN RESIDENCE | LAST KNOWN EMPLOYMENT |
|----------------------|-----------------------|

PHONE NUMBERS:

ADDITIONAL INFORMATION:

| INVESTIGATIVE AGENCY NAME | INVESTIGATIVE AGENCY ADDRESS |
|---------------------------|------------------------------|

NOTES:

WARRANT FOR ARREST ON COMPLAINT                    Page 3 of 4

USAO_00134720

Exhibit D - 274

USAO_00134447

COPY

AO 91 (Rev. 12/83)                                        **CRIMINAL COMPLAINT**

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br>MICHAEL J. AVENATTI | DOCKET NO.<br><br>FILED<br>CLERK, U.S. DISTRICT COURT<br>MAR 22 2019<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY _____ DEPUTY<br><br>MAGISTRATE'S CASE NO.<br>SA19 - 241M |

Complaint for violations of Title 18, United States Code, Sections 1343 and 1344(1)

| NAME OF MAGISTRATE JUDGE<br>HONORABLE DOUGLAS F. MCCORMICK | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Santa Ana, California |
|---|---|---|

| DATE OF OFFENSES<br>Beginning in or around January 2014 and continuing through in or around March 2019 | PLACE OF OFFENSE<br>Orange County and Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN)<br>10000 Santa Monica Boulevard, Unit 2205, Los Angeles, California 90067 |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

(See attached Complaint's Statement of Facts Constituting the Offense or Violation which is incorporated as part of this Complaint)

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached Affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>Remoun Karlous<br><br>OFFICIAL TITLE<br>Special Agent, Internal Revenue Service -- Criminal Investigation |
|---|---|

Sworn to before me and subscribed in my presence.

| SIGNATURE OF MAGISTRATE JUDGE[1)<br>DOUGLAS F. MCCORMICK | DATE<br>March 22, 2019 |
|---|---|

[1) See Federal Rules of Criminal Procedure 3 and 54

AUSAs Julian L. André 213.894.6683 and Brett A. Sagel 714.338.3598          REC: Detention

USAO_00134721

USAO_00134447

Complaint's Statement of Facts

Constituting the Offense or Violation

COUNT ONE

[18 U.S.C. § 1344(1)]

Beginning in or about January 2014, and continuing through in or about April 2016, in Orange County, within the Central District of California, and elsewhere, defendant MICHAEL J. AVENATTI ("AVENATTI"), together with others known and unknown, knowingly and with intent to defraud, executed and attempted to execute a scheme to defraud The Peoples Bank as to material matters.

On or about December 12, 2014, in Orange County, within the Central District of California, and elsewhere, defendant AVENATTI, together with others known and unknown, committed and willfully caused others to commit the following act, which constituted an execution of, or an attempt to execute, the fraudulent scheme: (1) wire transfer of approximately $494,500 from The Peoples Bank in Biloxi, Mississippi, to a California Bank & Trust bank account in the name of Eagan Avenatti LLP in Irvine, California.

USAO_00134722

USAO_00134447

COUNT TWO

[18 U.S.C. § 1343]

Beginning as early as in or around December 2017 and continuing through in or around March 2019, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, defendant MICHAEL J. AVENATTI ("AVENATTI"), knowingly and with intent to defraud, devised participate in, and executed a scheme to defraud clients to whom defendant AVENATTI had agreed to provide legal services, as to material matters, and to obtain money and property from his legal clients by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

On or about January 5, 2018, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, defendant AVENATTI, for the purpose of executing the above-described scheme to defraud, transmitted or caused the transmission of the following items by means of wire communication in interstate and foreign commerce:  (1) wire transfer of approximately $1,600,000 sent from Silicon Valley Bank through the interstate Fedwire system to defendant AVENATTI's City National Bank attorney trust account in Los Angeles, California.

USAO_00134723

USAO_00134447

## AFFIDAVIT

I, Remoun Karlous, being duly sworn, declare and state as follows:

### I.   INTRODUCTION

1.   I am a Special Agent ("SA") with the Internal Revenue Service-Criminal Investigation ("IRS-CI") in the Los Angeles Field Office and have been so employed since April 1995.  As an IRS-CI SA, I have investigated numerous cases involving criminal violations of Title 18, Title 21, Title 26, and Title 31 of the United States Code, which have resulted in seizure, search, and arrest warrants.  In particular, I have investigated cases involving money laundering, international money laundering, securities fraud, tax evasion (domestic and international cases), and subscribing to false tax returns.

### II. PURPOSE OF AFFIDAVIT

2.   This affidavit is submitted in support of an arrest warrant for and criminal complaint charging Michael J. Avenatti ("AVENATTI") with:  (a) one count of bank fraud, in violation of 18 U.S.C. § 1344(1); and (b) one count of wire fraud, in violation of 18 U.S.C. § 1343.

3.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and complaint, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically

1

USAO_00134724

USAO_00134447

indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. STATEMENT OF PROBABLE CAUSE

A.   February 2019 Warrant to Search GBUS Digital Devices

4.   On February 22, 2019, in case number 8:19-MJ-103, I submitted an affidavit in support of an application for a warrant to search seven digital devices in the custody of IRS-CI in Laguna Niguel, California (the "prior affidavit"); the seven digital devices had been produced by former Global Baristas US LLC ("GBUS") employees.  The Honorable Douglas F. McCormick, United States Magistrate Judge, authorized the warrant that same day (the "February 2019 search warrant").  The application for a search warrant in case number 8:19-MJ-103, as well as my prior affidavit in support thereof, are attached hereto as Exhibit 1 and incorporated herein by reference.  In summary, my prior affidavit stated, among other things, the following:

a.   AVENATTI was and is an attorney licensed to practice law in the State of California.  AVENATTI practiced law through Avenatti & Associates, APC ("A&A") and Eagan Avenatti LLP ("EA LLP") in Newport Beach, California.  AVENATTI was the sole owner of A&A.

b.   AVENATTI was also the principal owner and Chief Executive Officer ("CEO") of GBUS, which operated Tully's Coffee ("Tully's") stores in Washington and California.  In 2013, AVENATTI's company, Global Baristas LLC ("GB LLC"), acquired TC Global Inc., which previously operated Tully's, out of bankruptcy for approximately $9.2 million.  AVENATTI's company,

2

USAO_00134725

USAO_00134447

A&A, owned 100 percent of Doppio Inc., which in turn owned 80 percent of GB LLC. GB LLC wholly owned GBUS, which handled the day-to-day business operations of Tully's.

      c.    There is probable cause to believe that between at least 2011 and the present AVENATTI committed federal offenses, including, but not limited to, the following: (i) fraud-related offenses relating to loans AVENATTI and his companies obtained from The Peoples Bank in Mississippi (Ex. 1, § IV.F); and (ii) wire fraud and money laundering offenses relating to an approximately $1.6 million settlement payment AVENATTI and EA LLP received in January 2018, but failed to transfer to EA LLP's client (Ex. 1, § IV.G).

      d.    _First_, between approximately January 2014 and December 2014, AVENATTI obtained three separate loans from The Peoples Bank, a FDIC insured bank in Mississippi: (1) a $850,500 loan to GB LLC in January 2014; (2) a $2,750,000 loan to EA LLP in March 2014; and (3) a $500,000 loan to EA LLP in December 2014. In connection with these loans, AVENATTI provided The Peoples Bank with false federal personal income tax returns for the 2011, 2012, and 2013 tax years. In these purported tax returns, AVENATTI claimed that he earned $4,562,881 in adjusted gross income in 2011, $5,423,099 in adjusted gross income in 2012, and $4,082,803 in adjusted gross income in 2013. He also claimed that he had paid to the IRS $1,600,000 in estimated tax payments in 2012, and $1,250,000 in estimated tax payments in 2013. However, AVENATTI never filed personal income tax returns for the 2011, 2012, and 2013 tax years, and did not make any

USAO_00134726

USAO_00134447

estimated tax payments to the IRS during the 2012 and 2013 tax years.  In fact, at the time, AVENATTI still owed the IRS approximately $850,438 in unpaid personal income taxes, plus interest and penalties, from the 2009 and 2010 tax years. Additionally, in March 2014, AVENATTI provided The Peoples Bank with a 2012 federal tax return for EA LLP which claimed total income of $11,426,021 and ordinary business income of $5,819,456.  However, the 2012 federal tax return EA LLP actually filed with the IRS in October 2014 claimed total income of only $6,212,605 and an ordinary business loss of $2,128,949.

     e.   Second, from in or about December 2017 and the present, AVENATTI defrauded one of EA LLP's client, G.B., out of the client's portion of an approximately $1.6 million settlement payment.  Specifically, in January 2018, AVENATTI arranged for the $1.6 million settlement payment to be transferred to a newly opened attorney trust account.  Rather than transfer his client's portion of the settlement proceeds to his client, AVENATTI used the entire $1.6 million for his own purposes, including to pay for expenses relating to GBUS.  AVENATTI lied to his client and claimed that the settlement payment was not due until March 2018.  When the fake March 2018 deadline passed, AVENATTI led his client to believe that the $1.6 million payment had never been received.

B.   **Additional Evidence Regarding AVENATTI's Scheme to Defraud His Legal Client, G.B.**

     5.   As set forth in my prior affidavit, AVENATTI engaged in a scheme to defraud his client, G.B., out of G.B.'s portion

4

USAO_00134727

USAO_00134447

of an approximately $1.6 million settlement payment AVENATTI and EA LLP received in January 2018 in connection with an arbitration proceeding against a Colorado-based company ("Company 1"). (See Ex. 1, § IV.G.) On March 15, 2019, I participated in an interview of G.B. The information G.B. provided during the interview was consistent with the information G.B. and his counsel had previously provided to IRS-CI and the Newport Beach Police Department ("NBPD"). During the interview, G.B.[1] also provided the following additional information:

      a.    On or about December 28, 2017, G.B. met with AVENATTI at EA LLP's offices in Newport Beach, California, to go over the proposed settlement agreement with Company 1. During this meeting, AVENATTI provided G.B. with a copy of the $1.9 million settlement agreement to review. The settlement agreement AVENATTI provided to G.B. listed the payment dates as $1.6 million on March 10, 2018, and $100,000 on March 10 of each of the next three years. As noted in my prior affidavit, this information was false and the actual settlement agreement required Company 1 to pay G.B. $1.9 million on January 10, 2018, and $100,000 on January 10 of each of the three subsequent years. (Ex. 1, ¶ 75.e.)

---

[1]  G.B. previously pleaded guilty to a felony theft count in approximately September 2018 and was sentenced to probation. (See Ex. 1, ¶ 75 n.44.) During his interview, G.B. said that AVENATTI had encouraged him to plead guilty and that AVENATTI continued working with G.B. and one of G.B.'s companies after G.B.'s guilty plea.

5

USAO_00134728

USAO_00134447

  b. Based on my review of documents produced by G.B.'s counsel, I know that on or about June 29, 2018, G.B. sent an email to an EA LLP employee ("EA Employee 1") asking her to forward to G.B. the signed settlement agreement with Company 1. During his interview, G.B. said that sometime after he sent this email EA Employee 1 brought him a physical copy of the fully-executed settlement agreement while G.B. was at EA LLP's offices. EA Employee 1 handed AVENATTI the settlement agreement. AVENATTI flipped through the settlement agreement and then handed it to G.B. This copy of the settlement agreement also falsely stated that the settlement payments were due on March 10 of 2018 through 2021, as opposed to January 10 of 2018 through 2021.

  c. As noted in my prior affidavit, between April 2018 and November 2018, AVENATTI "advanced" G.B. approximately $130,000 to help G.B. meet certain financial obligations while he waited for his portion of the $1.6 million settlement payment from Company 1. During his interview, G.B. said that in approximately October 2018, AVENATTI told G.B. that AVENATTI would be able to loan G.B. another $100,000 sometime during the first two weeks of January 2019. Notably, under the terms of the true settlement agreement, Company 1 was scheduled to make an additional $100,000 settlement payment to AVENATTI's trust account on January 10, 2019. Thus, it appears that AVENATTI was offering to loan G.B.'s own money to G.B.

  6. During the interview on March 15, 2019, G.B's current counsel also confirmed that AVENATTI still has not turned over

<div align="center">6</div>

USAO_00134729

<div align="center">Exhibit D - 283</div>

USAO_00134447

G.B.'s client file to his current attorneys despite repeated requests that he do so.

7.    Based on my review of bank records and other documents, I have learned that on or about January 5, 2019, a wire transfer of approximately $1,600,000 was transmitted from Silicon Valley Bank through the interstate Fedwire system to a City National Bank attorney trust account ending in 5566 ("CNB Trust Account 5566") associated with AVENATTI.[2]

## IV.   REQUEST FOR SEALING

8.    I request that the criminal complaint, the arrest warrant, and this affidavit be kept under seal to maintain the integrity of this investigation until further order of the Court, or until defendant makes his initial appearance on the arrest warrant.   I make this request for several reasons.

a.    First, this criminal investigation is ongoing and is neither public nor known to AVENATTI and other subjects of the investigation.   Public disclosure of the complaint, arrest warrant, and this affidavit prior to AVENATTI's arrest and initial appearance could cause AVENATTI and others to accelerate any existing or evolving plans to, and give them an opportunity to, destroy or tamper with evidence, tamper with or intimidate witnesses, change patterns of behavior, or notify confederates.

---

[2] I understand that the State Bar of California has specific rules that apply to the proper use of attorney trust accounts.  For example, I understand that Rule 1.15 of the State Bar of California states that "[f]unds belonging to the lawyer or the law firm shall not be deposited or otherwise commingled with funds held in a trust account."

7

USAO_00134730

USAO_00134447

b.   Second, based on evidence collected to date and described in my prior affidavit, there is probable cause to believe that AVENATTI took a number of affirmative actions to obstruct an IRS collection action relating to GBUS's unpaid payroll taxes by, among other things, lying to an IRS Revenue Officer, changing contracts, merchant accounts, and bank account information to avoid liens and levies imposed by the IRS, and instructing employees to deposit over $800,000 in cash from Tully's stores, which were owned and operated by GBUS, into a bank account associated with a separate entity to avoid liens and levies by the IRS.  If AVENATTI were to learn of the instant investigation prior to his arrest he might engage in similarly obstructive conduct.

c.   Third, a number of former GBUS employees have expressed concerns that AVENATTI might attempt to retaliate against them if he learned they were cooperating with the government's investigation.

d.   Fourth, there is a possibility that some evidence relating to GBUS's operations may have already been lost when GBUS was evicted from its corporate offices and AVENATTI refused to pay the bill for GBUS's cloud-based server.  Although IRS-CI has been able to obtain some GBUS records, including the data stored on the SUBJECT DEVICES, from other sources, AVENATTI's apparent willingness to allow GBUS records to be lost or destroyed raises a concern that, were AVENATTI to learn of the criminal complaint and arrest warrant, he might not hesitate to destroy any remaining GBUS records and other relevant evidence.

8

USAO_00134731

USAO_00134447

## V.   CONCLUSION

9.    For all the reasons described above, there is probable cause to believe that AVENATTI has committed bank fraud, in violation of 18 U.S.C. § 1344(1), and wire fraud, in violation of 18 U.S.C. § 1343.

Remoun Karlous, Special Agent
Internal Revenue Service -
Criminal Investigation

Subscribed to and sworn before me
this ____ day of March, 2019.

DOUGLAS F. McCORMICK

HONORABLE DOUGLAS F. MCCORMICK
UNITED STATES MAGISTRATE JUDGE

9

USAO_00134732

USAO_00134447

**Exhibit 1 to the March 22, 2019, Criminal Complaint is attached as Exhibit 1 to this Affidavit**

USAO_00134733

USAO_00134447

# EXHIBIT 3

USAO_00134734

USAO_00134447

AO 106 (Rev. 04/10)  Application for a Search Warrant

COPY UNITED STATES DISTRICT COURT

for the

Central District of California

UNDER SEAL

| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) |
| | ) Case No. 8:19-MJ-242 |
| 10000 Santa Monica Boulevard, Unit 2205, | ) |
| Los Angeles, California 90067 | ) |
| | ) |
| | ) |

### APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-1*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B-1*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of:

| Code Section | Offense Description |
|---|---|
| 26 U.S.C. § 7201 | Attempt to Evade or Defeat Tax |
| 26 U.S.C. § 7202 | Willful Failure to Collect or Pay Over Tax |
| 26 U.S.C. § 7203 | Willful Failure to Pay Tax or File Return |
| 26 U.S.C. § 7212 | Interference with Administration of Internal Revenue Laws |
| 18 U.S.C. § 152 | Concealment of Assets in Bankruptcy |
| 18 U.S.C. § 157 | Bankruptcy Fraud |
| 18 U.S.C. § 371 | Conspiracy |
| 18 U.S.C. § 1001 | False Statements |
| 18 U.S.C. § 1014 | False Statement to a Bank or Other Federally Insured Institution |
| 18 U.S.C. § 1028A | Aggravated Identity Theft |
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1344 | Bank Fraud |
| 18 U.S.C. § 1957 | Money Laundering |

///

///

///

USAO_00134735

USAO_00134447

The application is based on these facts:

    *See attached Affidavit*

    ☒ Continued on the attached sheet.

    ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/

*Applicant's signature*

IRS CI Special Agent Remoun Karlous

*Printed name and title*

Sworn to before me and signed in my presence.

Date: March 21, 2019

/s/

*Judge's signature*

City and state:  Santa Ana, CA

United States Magistrate Judge Douglas F. McCormick

*Printed name and title*

**DOUGLAS F. McCORMICK**

AUSAs:  Julian L. André (213.894.6683) & Brett A. Sagel (714.338.3598)

USAO_00134736

USAO_00134447

## ATTACHMENT A-1

### PREMISES TO BE SEARCHED

The premises to be searched is Unit Number 2205 of the Ten Thousand residential condominium complex, located at 10000 Santa Monica Boulevard, Los Angeles, California 90067 ("SUBJECT PREMISES 1").  The Ten Thousand condominium complex is a 40-story luxury residential tower located on Santa Monica Boulevard.  The building is a modern all-glass structure with floor to ceiling windows.  The Ten Thousand condominium complex sits directly on the corner of Santa Monica Boulevard and Moreno Drive.  The driveway to the main entrance is off Santa Monica Boulevard, which is a one way road.  The driveway into the main entrance is screened for privacy by an evergreen hedge and is accessible from both Santa Monica Boulevard and Moreno Drive.  The front doors are covered by a roof canopy.  The front doors to the main entrance of the building are approximately two 12-15 foot glass doors accompanied by two doormen.  Unit 2205 is located on the 22nd floor.

i

USAO_00134737

USAO_00134447

ATTACHMENT B-1

I.   ITEMS TO BE SEIZED

1.   Evidence, contraband, fruits, and/or instrumentalities of violations of 26 U.S.C. § 7201 (attempt to evade or defeat tax); 26 U.S.C. § 7202 (willful failure to collect or pay over tax); 26 U.S.C. § 7203 (willful failure to pay tax or file return); 26 U.S.C. § 7212 (interference with administration of internal revenue laws); 18 U.S.C. § 152 (concealment of assets in bankruptcy); 18 U.S.C. § 157 (bankruptcy fraud); 18 U.S.C. § 371 (conspiracy); 18 U.S.C. § 1001 (false statements); 18 U.S.C. § 1014 (false statement to a bank or other federally insured institution); 18 U.S.C. § 1028A (aggravated identity theft); 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1344 (bank fraud); and 18 U.S.C. § 1957 (money laundering) (the "Subject Offenses"), namely:

a.   Records, documents, programs, applications, or materials from January 2011 through the present relating to the ownership of Global Baristas US, LLC ("GBUS"); Global Baristas, LLC ("GB LLC"); GB Autosport, LLC ("GB Auto"); GB Hospitality LLC ("GB Hospitality"); Doppio Inc. ("Doppio"); Eagan Avenatti LLP ("EA LLP"); and Avenatti & Associates, APC ("A&A") (collectively, the "Subject Entities").

b.   Records, documents, programs, applications, or materials from January 2011 through the present relating to Michael J. Avenatti's ("AVENATTI") control or management of any

USAO_00134738

USAO_00134447

of the Subject Entities and/or The X-Law Group, PC ("X-Law Group").

c.   Records, documents, programs, applications, or materials from January 2011 through the present relating to the organizational or management structure of any of the Subject Entities and/or X-Law Group.

d.   Records, documents, programs, applications, or materials from January 2011 through the present relating to the finances of any of the Subject Entities, including assets, income, liabilities, accounts receivable, accounts payable, and expenses.

e.   Records, documents, programs, applications, or materials from January 2011 through the present relating to the personal finances of Michael Avenatti ("AVENATTI"), including information relating to AVENATTI's assets, debts, income, expenses, and net worth.

f.   Records, documents, programs, applications, or materials from January 2011 through the present relating to the accounting records for AVENATTI and/or any of the Subject Entities, including any Microsoft Dynamics NAV, QuickBooks, or other electronic accounting data, files, or records.

g.   Records, documents, programs, applications, or materials from January 201 through the present relating to any financial transactions, including any proposed or potential

ii

USAO_00134447

financial transactions, involving any of the Subject Entities,
and/or AVENATTI.

b.   Records, documents, programs, applications, or
materials from January 2011 through the present relating to any
payments, checks, credits, wire transfers, commodities,
services, or other things of value paid, provided, delivered, or
transferred, directly or indirectly, to AVENATTI and/or any of
the Subject Entities

i.   Records, documents, programs, applications, or
materials from January 2011 through the present relating to any
financial relationship between AVENATTI and/or any of the
Subject Entities on one hand and X-Law Group and/or Filippo
Marchino ("MARCHINO") on the other hand.

j.   Records, documents, programs, applications, or
materials from January 2011 through the present relating to
financial decisions AVENATTI and/or JUDY REGNIER ("REGNIER")
made on behalf of any of the Subject Entities, including
decisions to authorize payments on behalf of any of the Subject
Entities and transfer money to or from any of the Subject
Entities.

k.   Records, documents, programs, applications, or
materials from January 2011 through the present relating to
communications between AVENATTI and/or REGNIER and any financial
institution regarding the transfer of funds to or from any

iii

USAO_00134740

USAO_00134447

account associated with AVENATTI and/or any of the Subject Entities.

l.   Records, documents, programs, applications, or materials from January 2011 through the present relating to any loans or other financing agreements, including any proposed or potential loans or other financing agreements, involving any of the Subject Entities and/or AVENATTI.

m.   Records, documents, programs, applications, or materials from January 2011 through the present relating to the payroll obligations of the Subject Entities.

n.   Non-privileged records, documents, programs, applications, or materials from January 2011 through the present relating to the federal, state, and/or local tax obligations, tax returns, tax liabilities, or tax payments of any of the Subject Entities and/or AVENATTI.

o.   Non-privileged records, documents, programs, applications, or materials from January 2011 through the present relating to any liens, levies, garnishments, judgments, encumbrances, or tax-related investigations or actions associated with any of the Subject Entities and/or AVENATTI.

p.   Records, documents, programs, applications, or materials from January 2011 through the present relating to attorneys' fees or costs earned or collected by EA LLP, A&A, and/or AVENATTI, including attorney-client fee contracts,

iv

USAO_00134741

USAO_00134447

engagement letters, fee agreements, cost-sharing agreements,
fee-sharing agreements, settlement agreements, and client
billing records, but excluding any such records relating to the
representations of Stephanie Clifford or Julie Swetnick.

      q.  Records, documents, programs, applications, or
materials from January 2011 through the present relating to any
of the Subject Entities' and/or AVENATTI's contractual
relationships, including drafts and final versions of any
executed, proposed, or potential contracts and agreements, bills
of sale, correspondence regarding payments, and correspondence
regarding the cancellation or modification of contracts and/or
agreements.

      r.  Records, documents, programs, applications, or
materials from January 2011 through the present relating to any
of the Subject Entities' and/or AVENATTI's bank account
information.

      s.  Records, documents, programs, applications, or
materials from January 2011 through the present relating to the
physical whereabouts of AVENATTI, and/or REGNIER, including
calendars and calendar entries.

      t.  Records, documents, programs, applications, or
materials from January 1, 2014, to the present relating to
AVENATTI and/or EA LLP's representation of G.B., including the
approximately $1.6 million settlement payment that was

<div align="center">v</div>

USAO_00134742

USAO_00134447

transferred to one of AVENATTI's City National Bank attorney trust account in or around January 2018.

u.   Records, documents, programs, applications, or materials from January 1, 2017, to the present relating to AVENATTI's, EA LLP's, X-Law Group, and/or MARCHINO's representation of M.P. and L.T., including the approximately $8,146,286 payment that was transferred to one of AVENATTI's City National Bank attorney trust accounts in or around March 2018.

v.   Records, documents, programs, applications, or materials from January 2013 through the present relating to the payroll and tax preparation services that Paychex provided to EA LLP and/or A&A, including any records, documents, programs, applications, or materials relating to changes in the payroll and tax services to be provided by Paychex.

w.   Records, documents, programs, applications, or materials from January 2013 through the present relating to the payroll and tax preparation services that Ceridian HCM Inc. ("Ceridian") provided to GBUS, including any records, documents, programs, applications, or materials relating to changes in the payroll and tax services to be provided by Ceridian.

x.   Records, documents, programs, applications, or materials from January 2013 through the present relating to the sale or purchase of TC Global, Inc. or Tully's Coffee.

vi

USAO_00134743

USAO_00134447

y.   Records, documents, programs, applications, or materials from January 2013 through the present relating to the purchase or sale, including any proposed or attempted purchase or sale, of GBUS, GB LLC, or Doppio.

z.   Records, documents, programs, applications, or materials from January 2013 through the present relating to value of GBUS or GB LLC.

aa.   Records, documents, programs, applications, or materials from January 2013 through the present relating to GBUS's and GB LLC's merchant credit card processing accounts (the "merchant accounts"), including contracts, agreements, account applications, and correspondence regarding changes to the merchant accounts.

bb.   Records, documents, programs, applications, or materials from January 2011 through the present relating to the sale, rental, lease, purchase, maintenance, renovation, or remodeling of any of AVENATTI's residences, including his residences in Newport Beach, California; Laguna Beach, California; and Los Angeles, California.

cc.   Records, documents, programs, applications, or materials from January 2011 through the present relating to continuing legal education ("CLE") courses taken by AVENATTI, including any professional responsibility CLE courses, ethics CLE courses, or tax CLE courses.

vii

USAO_00134744

USAO_00134447

Case 8:19-mj-00242-DUTY *SEALED*   Document 43-1 *SEALED*   Filed 03/24/19   Page 299 of 100   Page ID #:806

dd.   Records, documents, programs, applications, or materials from January 2011 through the present relating to any of the Subject Entities' employee handbooks or manuals, employment contracts, compensation records, and employee lists.

ee.   Records, documents, programs, applications, or materials relating to any locations or services used by AVENATTI and/or any of the Subject Entities to store physical or electronic records.

ff.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

gg.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

viii

USAO_00134745

USAO_00134447

iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.  evidence of the times the device was used;

vi.  passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.   records of or information about Internet Protocol addresses used by the device;

ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.  As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal

ix

USAO_00134746

USAO_00134447

digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS); and
security devices.

II.   <u>SEARCH PROCEDURES FOR HANDLING POTENTIALLY PRIVILEGED
      INFORMATION</u>

     4.   The following procedures will be followed at the time
of the search in order to avoid unnecessary disclosures of any
privileged attorney-client communications or work product:

     A.   <u>Non-Digital Evidence</u>

     5.   Law enforcement personnel conducting the investigation
("the Investigation Team") may be present at the search, but may
not search or review any item prior to it being given to them by
the "Privilege Review Team" (previously designated individual(s)
not participating in the investigation of the case);

     6.   The Privilege Review Team will review documents to see
whether or not the document appears to contain or refer to
communications between AVENATTI, REGNIER, MARCHINO and/or any
other lawyers from EA LLP, A&A, and the X-Law Group on the one
hand and any person on the other hand; contain the work product

x

USAO_00134747

USAO_00134447

of AVENATTI, REGNIER, MARCHINO, and any other lawyers from EA
LLP, A&A, and the X-Law Group; or contain communications or
documents relating to the following law firms' representation of
AVENATTI, EA LLP, or A&A:  (a) Foster Pepper PLLC; (b) Osborn
Machler PLLC; (c) Eisenhower Carlson PLLC;
(d) Talmadge/Fitzpatrick/ Tribe, PPLC; (e) The Bruger Tax Law
Group; (f) SulmeyerKupetz; (g) Baker & Hostetler LLP;
(h) Shulman Hodges & Bastian LLP; (i) Legal & Tax Consulting
Group; (j) Pachulski Stang Ziehl & Jones LLP; (k) Foley &
Lardner LLP; (l) Raines Feldman, LLP; and (m) Pansky Markle
Attorneys at Law (collectively, the "potentially privileged
information").  Those documents not containing or referring to
such communications or work product may be turned over to the
Investigation Team for review.

7.    In consultation with a Privilege Review Team Assistant
United States Attorney ("PRTAUSA"), if appropriate, the
Privilege Review Team member will review any document identified
as appearing to contain potentially privileged information to
confirm that it contains potentially privileged information.  If
it does not, it may be returned to an Investigation Team member.
If a member of the Privilege Review Team confirms that a
document contains potentially privileged information, then the
member will review only as much of the document as is necessary
to determine whether or not the document is within the scope of
the warrant.  These documents which contain potentially
privileged information but are not within the scope of the
warrant will be set aside and will not be subject to further

xi

USAO_00134748

USAO_00134447

review or seizure absent subsequent authorization.  Those
documents which contain potentially privileged information and
are within the scope of the warrant will be seized and sealed
together in an enclosure, the outer portion of which will be
marked as containing potentially privileged information.  The
Privilege Review Team member will also make sure that the
locations where the documents containing potentially privileged
information were seized have been documented.

8.    The seized documents containing potentially privileged
information will be delivered to the United States Attorney's
Office for further review by a PRTAUSA.  If that review reveals
that a document does not contain potentially privileged
information, or that an exception to the privilege applies, the
document may be returned to the Investigation Team.  If
appropriate based on review of particular documents, the PRTAUSA
may apply to the court for a finding with respect to the
particular documents that no privilege, or an exception to the
privilege, applies.

B.    **Digital Evidence**

9.    The Privilege Review Team will search for digital
devices capable of being used to facilitate the Subject Offenses
or capable of containing data falling within the scope of the
items to be seized.  The Privilege Review Team will then review
the identified digital devices as set forth herein.  The
Investigation Team will review only digital device data which
has been released by the Privilege Review Team.

xii

USAO_00134749

USAO_00134447

10.   The Privilege Review Team will, in their discretion,
either search the digital device(s) on-site or seize and
transport the device(s) to an appropriate law enforcement
laboratory or similar facility to be searched at that location.

11.   The Privilege Review Team and the Investigation Team
shall complete both stages of the search discussed herein as
soon as is practicable but not to exceed 180 days from the date
of execution of the warrant.  The government will not search the
digital device(s) beyond this 180-day period without obtaining
an extension of time order from the Court.

12.   The Investigation Team will provide the Privilege
Review Team and/or appropriate litigation support personnel[1] with
a list of "scope key words" to search for on the digital
devices, to include words relating to the items to be seized as
detailed above.  The Privilege Review Team will conduct an
initial review of the digital devices using the scope key words,
and by using search protocols specifically chosen to identify
documents and data that appear to be within the scope of the
warrant.  The Privilege Review Team may also do a more detailed
quality check of this data and the results of this initial
review, to ensure that the key word search is effective.
Documents and data that are identified by this initial review,
after quality check, as not within the scope of the warrant will

---

[1] Litigation support personnel and computer forensics agents
or personnel, including IRS Computer Investigative Specialists,
are authorized to assist both the Privilege Review Team and the
Investigation Team in processing, filtering, and transferring
documents and data seized during the execution of the warrant.

xiii

USAO_00134750

USAO_00134447

be maintained under seal and not further reviewed absent subsequent authorization.

13.    The Investigation Team will also provide the Privilege Review Team with a list of "privilege key words" to search for among the documents and data that are identified by the initial review and quality check described above as appearing to fall within the scope of the warrant, to include specific words associated with AVENATTI, REGNIER, MARCHINO, and any of the following law firms (a) EA LLP; (b) A&A; (c) X-Law Group; (d) Foster Pepper PLLC; (e) Osborn Machler PLLC; (f) Eisenhower Carlson PLLC; (g) Talmadge/Fitzpatrick/ Tribe, PPLC; (h) The Brager Tax Law Group; (i) SulmeyerKupetz; (j) Baker & Hostetler LLP; (k) Shulman Hodges & Bastian LLP; (l) Legal & Tax Consulting Group; (m) Pachulski Stang Ziehl & Jones LLP; (n) Foley & Lardner LLP; (o) Raines Feldman, LLP; and (p) Pansky Markle Attorneys at Law.   The privilege key words shall also include the above referenced law firms' domain names and lawyers' email addresses, and generic words such as "privileged," "work product."  The Privilege Review Team will conduct a review of these documents and data using the privilege key words, and by using search protocols specifically chosen to identify documents and data containing potentially privileged information.  Documents or data which are identified by this review as not potentially privileged may be given to the Investigation Team.

14.    Documents or data that the privilege key word searches identify as potentially privileged will be reviewed by a

USAO_00134751

USAO_00134447

Privilege Review Team member to confirm that they contain
potentially privileged information.  Documents or data that are
determined by this review not to be potentially privileged may
be given to the Investigation Team.  Documents or data that are
determined by this review to be potentially privileged will be
given to the United States Attorney's Office for further review
by a PRTAUSA.  Documents or data identified by the PRTAUSA after
review as not potentially privileged may be given to the
Investigation Team.  If, after review, the PRTAUSA determines it
to be appropriate, the PRTAUSA may apply to the court for a
finding with respect to particular documents or data that no
privilege, or an exception to the privilege, applies.  Documents
or data that are the subject of such a finding may be given to
the Investigation Team.

     15.  Documents or data identified by the PRTAUSA(s) after
review as privileged (that are not subject to a finding by a
court of no privilege or an exception to the privilege) or
potentially privileged and outside the scope of the items to be
seized shall be segregated and sealed together in an enclosure,
the outer portion of which will be marked as containing
potentially privileged information, and maintained by the
investigative agency.  Such data or documents shall not be
accessible by or given to the Investigation Team at any time
absent authorization of the Court.  However, the Privilege
Review Team may, in its discretion, store the privileged and
potentially privileged data and documents in a folder or a set
of folders in a document review platform database, such as

xv

USAO_00134752

USAO_00134447

Relativity or Eclipse, that remains inaccessible to the
Investigation Team.  The Privilege Review Team's access to this
separate document review platform database shall cease upon
expiration of the warrant.  However, litigation support
personnel from the United States Attorney's Office, United
States Department of Justice, and/or the investigating agency
may continue to access this separately-maintained document
review database for the purpose of database maintenance.

16.  The Investigation Team will search only the documents
and data that the Privilege Review Team provides to the
Investigation Team at any step listed above in order to locate
documents and data that are within the scope of the search
warrant.  The Investigation Team does not have to wait until the
entire privilege review is concluded to begin its review for
documents and data that are within the scope of the search
warrant.  The Privilege Review Team may also conduct the search
for documents and data within the scope of the search warrant if
that is more efficient.  This second "scope" review is intended
only to ensure that the initial scope key word review
successfully eliminated data outside the scope of the search
warrant from seizure.

C.  **Additional Privilege Review Procedures**

17.  The Privilege Review Team will segregate any
identifiable documents and/or data relating to Stephanie
Clifford v. Donald J. Trump, No. 2:18-CV-2217-SJO-FFM (C.D.
Cal.), the representation of Stephanie Clifford, and/or the
representation of Julie Swetnick.  Such documents and/or data

xvi

USAO_00134753

USAO_00134447

will be maintained under seal by the investigating agency
without further review as set forth in paragraphs 7 and 15 above
absent subsequent authorization from the Court.  This provision,
however, shall not preclude the Privilege Review Team or
Investigation Team from reviewing financial and accounting
records covered by paragraphs 1.d, 1.f, 1.g, and 1.i above,
which reference the representations of Ms. Clifford or Ms.
Swetnick.

18.   To the extent that any documents and/or data covered
by paragraph 1.p above, such as attorney-client fee contracts,
engagement letters, and client billing records, contain
information that is potentially protected by the attorney-client
privileged or the attorney-work-product doctrine, the Privilege
Review Team shall redact all such potentially privileged
information from the documents or data before releasing the
documents and/or data to the Investigation Team unless the
specific client agrees to waive the attorney-client privilege.

19.   If, upon review, a member of the Investigation Team
determines that a document or data appears to contain
potentially privileged information, the Investigation Team
member shall discontinue its review of the document or data and
shall immediately notify a member of the Privilege Review Team.
The Investigation Team member may record identifying information
regarding the potentially privileged document or data that is
reasonably necessary to identify the document or data for the
Privilege Review Team.  The Investigation Team shall not further
review any documents or data that appears to contain such

xvii

USAO_00134447

potentially privileged information until after the Privilege
Review Team has completed its review of the additional
potentially privileged information discovered by the
Investigation Team member.

20.   In performing the reviews, both the Privilege Review
Team and the Investigation Team may:

a.   search for and attempt to recover deleted,
"hidden," or encrypted data;

b.   use tools to exclude normal operating system
files and standard third-party software that do not need to be
searched; and

c.   use forensic examination and searching tools,
such as "EnCase," "FTK" (Forensic Tool Kit), Nuix, Axiom,
Relativity, and Eclipse, which tools may use hashing and other
sophisticated techniques.

21.   If either the Privilege Review Team or the
Investigation Team, while searching a digital device, encounters
immediately apparent contraband or other evidence of a crime
outside the scope of the items to be seized, they shall
immediately discontinue the search of that device pending
further order of the Court and shall make and retain notes
detailing how the contraband or other evidence of a crime was
encountered, including how it was immediately apparent
contraband or evidence of a crime.

22.   If the search determines that a digital device does
not contain any data falling within the list of items to be

xviii

USAO_00134755

USAO_00134447

seized, the government will, as soon as is practicable, return
the device and delete or destroy all forensic copies thereof.

23.   If the search determines that a digital device does
contain data falling within the list of items to be seized, the
government may make and retain copies of such data, and may
access such data at any time.

24.   If the search determines that a digital device is
(1) itself an item to be seized and/or (2) contains data falling
within the list of other items to be seized, the government may
retain the digital device and any forensic copies of the digital
device, but may not access data falling outside the scope of the
items to be seized (after the time for searching the device has
expired) absent further court order.

25.   The government may retain also a digital device if the
government, within 14 days following the time period authorized
by the Court for completing the search, obtains an order from
the Court authorizing retention of the device (or while an
application for such an order is pending), including in
circumstances where the government has not been able to fully
search a device because the device or files contained therein
is/are encrypted.

26.   After the completion of the search of the digital
devices, the government shall not access digital data falling
outside the scope of the items to be seized absent further order
of the Court.

<center>xix</center>

USAO_00134756

<center>Exhibit D - 310</center>

USAO_00134447

27.   In order to search for data capable of being read or interpreted by a digital device, the Investigation Team is authorized to seize the following items:

a.   Any digital device capable of being used to commit, further or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

28.   During the execution of this search warrant, with respect to a biometric sensor-enabled device that is located at the SUBJECT PREMISES and falls within the scope of the warrant, the law enforcement personnel are authorized to: (1) depress the

xx

USAO_00134757

USAO_00134447

thumb- and/or fingerprints of AVENATTI, REGNIER, and/or MARCHINO onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the face of AVENATTI, REGNIER, and/or MARCHINO his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.

29.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

III.  <u>REQUESTS FOR APPOINTMENT OF A SPECIAL MASTER</u>

30.   To the extent that AVENATTI, REGNIER, EA LLP, A&A, and/or X-Law Group intend to request that a special master be appointed to handle the review of any potentially privileged information seized during the execution of this Search Warrant, such a request must be filed with this Court within seven days of the execution of this Search Warrant.  The government will then have seven days to file any opposition to such a request.

31.   Any request for the appointment of a special master must, at a minimum, address the following issues:  (a) the legal basis for the request; (b) the anticipated role of the special master, should one be appointed; (c) proposed search and review procedures to be followed by the special master, should one be appointed; (d) proposed procedures for the selection of a

xxi

USAO_00134758

USAO_00134447

special master; (e) the names of at least three proposed special

masters; and (f) the party's ability to pay for any costs and

fees incurred by a special master.

USAO_00134759

USAO_00134447

## AFFIDAVIT

I, Remoun Karlous, being duly sworn, declare and state as
follows:

### I.  INTRODUCTION

1.   I am a Special Agent ("SA") with the Internal Revenue
Service-Criminal Investigation ("IRS-CI") in the Los Angeles
Field Office and have been so employed since April 1995.  As an
IRS-CI SA, I have investigated numerous cases involving criminal
violations of Title 18, Title 21, Title 26, and Title 31 of the
United States Code, which have resulted in seizure, search, and
arrest warrants.  In particular, I have investigated cases
involving money laundering, international money laundering,
securities fraud, tax evasion (domestic and international
cases), and subscribing to false tax returns.

### II. PURPOSE OF AFFIDAVIT

2.   This affidavit is submitted in support of the
following:

a.   An application for a warrant to search the
residence of Michael J. Avenatti ("AVENATTI") located at 10000
Santa Monica Boulevard, Unit 2205, Los Angeles, California 90067
("SUBJECT PREMISES 1"), as further described in Attachment A-1,
for the list of items to be seized as set forth in Attachment B-
1.

b.   An application for a warrant to search the
residence of Judy K. Regnier ("REGNIER") located at 4491 Rainbow
Lane, Yorba Linda, California 92886 ("SUBJECT PREMISES 2"), as

USAO_00134760

USAO_00134447

further described in Attachment A-3 for the list of items to be
seized as set forth in Attachment B-2.

      c.   An application for a warrant to search the
business premises of The X-Law Group ("X-Law Group") located at
1910 West Sunset Boulevard, Suite 450, Los Angeles, California
90026 ("SUBJECT PREMISE 3" and, collectively with SUBJECT
PREMISES 1 and SUBJECT PREMISES 2, the "SUBJECT PREMISES"), as
further described in Attachment A-3 for the list of items to be
seized as set forth in Attachment B-3.

      3.   The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested warrants and does
not purport to set forth all of my knowledge of or investigation
into this matter.  Unless specifically indicated otherwise, all
conversations and statements described in this affidavit are
related in substance and in part only.

### III.  PROPERTY TO BE SEARCHED

      4.   The property to be searched are the SUBJECT PREMISES,
including any individuals, containers, or digital devices found
therein, as described in Attachments A-1, A-2, and A-3.
Attachments A-1, A-2, and A-3 are incorporated herein by
reference.

### IV. ITEMS TO BE SEIZED

      5.   The requested search warrants seek authorization to
seize from the SUBJECT PREMISES any evidence, fruits, or

USAO_00134761

USAO_00134447

instrumentalities of violations of 26 U.S.C. § 7201 (attempt to
evade or defeat tax); 26 U.S.C. § 7202 (willful failure to
collect or pay over tax); 26 U.S.C. § 7203 (willful failure to
pay tax or file return); 26 U.S.C. § 7212 (interference with
administration of internal revenue laws); 18 U.S.C. § 152
(concealment of assets in bankruptcy); 18 U.S.C. § 157
(bankruptcy fraud); 18 U.S.C. § 371 (conspiracy); 18 U.S.C.
§ 1001 (false statements); 18 U.S.C. § 1014 (false statement to
a bank or other federally insured institution); 18 U.S.C.
§ 1028A (aggravated identity theft); 18 U.S.C. § 1343 (wire
fraud); 18 U.S.C. § 1344 (bank fraud); and 18 U.S.C. § 1957
(money laundering) (collectively, the "Subject Offenses").  The
list of items to be seized is set forth in Attachments B-1, B-2,
and B-3.  Attachments B-1, B-2, and B-3 are incorporated by
reference herein.

### V.  SUMMARY OF PROBABLE CAUSE

6.  AVENATTI was and is an attorney licensed to practice
law in the State of California.  AVENATTI practiced law through
Avenatti & Associates, APC ("A&A") and Eagan Avenatti LLP ("EA
LLP") in Newport Beach and Los Angeles, California.  AVENATTI
was the sole owner of A&A, which owned 75 percent of EA LLP.

7.  AVENATTI was also the principal owner and Chief
Executive Officer ("CEO") of Global Baristas US LLC ("GBUS"),
which operated Tully's Coffee ("Tully's") stores in Washington
and California.  In 2013, AVENATTI's company, Global Baristas
LLC ("GB LLC"), acquired TC Global Inc., which previously
operated Tully's, out of bankruptcy for approximately 99.2

USAO_00134762

USAO_00134447

Case 8:19-mj-00242-DUTY *SEALED*   Document 43-1 *SEALED*   Filed 03/24/19   Page 297 of
100   Page ID #:823

million.  AVENATTI's company, A&A, owned 100 percent of Doppio
Inc., which in turn owned 80 percent of GB LLC.  GB LLC wholly
owned GBUS, which handled the day-to-day business operations of
Tully's.

8.    There is probable cause to believe that AVENATTI and
others engaged in the following criminal conduct:  (a) tax
offenses relating to GBUS's failure to pay to the IRS payroll
taxes, including federal income taxes, Social Security taxes,
and Medicare taxes (collectively, "trust fund taxes") that GBUS
withheld from its employees' paychecks, and AVENATTI's
subsequent efforts to obstruct a related IRS collection action;
(b) tax offenses relating to the tax obligations of EA LLP and
A&A, including EA LLP's failure to pay to the IRS its payroll
taxes, and EA LLP's and A&A's failure to file federal corporate
or partnership tax returns and pay federal income taxes; (c) tax
offenses relating to AVENATTI's failure to file federal
individual income tax returns and pay federal income taxes
between 2011 and 2017; (d) fraud-related offenses relating to
loans AVENATTI and his companies obtained from The Peoples Bank
in Mississippi; (e) fraud and money laundering offenses relating
to a total of approximately $5 million that AVENATTI embezzled
from his legal clients (G.B., M.P., and L.T.) in 2018; and
(f) bankruptcy fraud offenses relating to AVENATTI's and EA
LLP's efforts to conceal assets and bank accounts during federal
bankruptcy proceedings involving AVENATTI and EA LLP.

9.    On March 22, 2019, in case number SA 19-241M, I
submitted an affidavit in support of an arrest warrant and

4

USAO_00134763

USAO_00134447

criminal complaint charging AVENATTI with one count of bank
fraud, in violation of 18 U.S.C. § 1344(1), and one count of
wire fraud, in violation of 18 U.S.C. § 1343.  The Honorable
Douglas F. McCormick, United States Magistrate Judge, authorized
the arrest warrant that same day.  IRS-CI anticipates executing
the arrest warrant concurrently with the proposed search
warrants.

    10.  There is probable cause to believe that evidence of
the SUBJECT OFFENSES will be found at the SUBJECT PREMISES for
the following reasons:

        a.   First, SUBJECT PREMISES 1 is AVENATTI's personal
residence.  Based on my training and experience and evidence
obtained during the course of this investigation, I know that
SUBJECT PREMISES 1 is likely to contain AVENATTI's personal and
business records, as well as digital devices that are likely to
contain such records.

        b.   Second, SUBJECT PREMISES 2 is REGNIER's personal
residence.  Based on my training and experience and
investigation to date, as well as REGNIER's substantial
involvement in the alleged criminal conduct, I believe SUBJECT
PREMISES 2 is also likely to contain relevant business records
and/or digital devices containing such records.  For example, I
understand that EA LLP's and A&A's mail is currently being
forwarded to a mailbox at a Postal Annex store less than a mile
from SUBJECT PREMISES 2 and since EA LLP was evicted from their
offices in Newport Beach, California, between November 2018 and

5

USAO_00134764

USAO_00134447

January 2019, I believe REGNIER has primarily been working from her home.

c.   Third, SUBJECT PREMISES 3 is the business premises of The X-Law Group ("X-Law Group").   AVENATTI has been leasing SUBJECT PREMISES 3 and used it as additional office space for EA LLP since the summer of 2016.   Additionally, X-Law Group was directly involved in a number of significant financial transactions with GBUS, GB LLC, GB Autosport LLC ("GB Auto"), EA LLP, and A&A.   Moreover, in 2018, Filippo Marchino ("MARCHINO"), the Founding Partner of X-Law Group, was directly involved in discussions with AVENATTI's clients, M.P. and L.T., regarding the approximately $4 million that AVENATTI embezzled from M.P. and L.T. in March 2018.

## VI. STATEMENT OF PROBABLE CAUSE

### A.   February 2019 Warrant to Search GBUS Digital Devices

11.   On February 22, 2019, in case number 8:19-MJ-103, I submitted an affidavit in support of an application for a warrant to search seven digital devices in the custody of IRS-CI in Laguna Niguel, California (the "February 2019 affidavit"), which had been produced by former GBUS employees.   The Honorable Douglas F. McCormick, United States Magistrate Judge, authorized the warrant that same day (the "February 2019 search warrant").   The application for a search warrant in case number 8:19-MJ-103, as well as my February 2019 affidavit in support thereof, are attached hereto as Exhibit 1 and incorporated herein by

6

USAO_00134765

USAO_00134447

reference.[1]  In summary, my February 2019 affidavit stated the
following:

     a.    AVENATTI was and is an attorney licensed to
practice law in the State of California.  AVENATTI practiced law
through A&A and EA LLP in Newport Beach, California.  AVENATTI
was the sole owner of A&A, which owned 75 percent of EA LLP.

     b.    AVENATTI was also the principal owner and Chief
Executive Officer ("CEO") of GBUS, which operated Tully's stores
in Washington and California.  In 2013, AVENATTI's company, GB
LLC, acquired TC Global Inc., which previously operated Tully's,
out of bankruptcy for approximately $9.2 million.  AVENATTI's
company, A&A, owned 100 percent of Doppio Inc., which in turn
owned 80 percent of GB LLC.  GB LLC wholly owned GBUS, which
handled the day-to-day business operations of Tully's.

     c.    There is probable cause to believe that between
at least 2011 and the present AVENATTI committed federal
offenses, including the following: (a) tax offenses relating to
GBUS's payroll tax obligations and AVENATTI's efforts to
obstruct an IRS collection action; (b) tax offenses relating to
the tax obligations of EA LLP and A&A, including the payroll tax
obligations of EA LLP; (c) tax offenses relating to AVENATTI's
personal tax obligations; (d) fraud-related offenses relating to

---

[1] The search warrant and application in case number 8:19-
MJ-103 were filed under seal and remain under seal to protect
the integrity of the government's ongoing investigation.
Because the search warrants sought in connection with this
application are likely to be executed concurrently with
AVENATTI's arrest warrant, the government will likely be moving
to unseal this application and the February 2019 search warrant
after AVENATTI's arrest.

7

USAO_00134766

USAO_00134447

loans AVENATTI and his companies obtained from The Peoples Bank in Mississippi; and (e) wire fraud, money laundering, and bankruptcy fraud offenses relating to an approximately $1.6 million settlement payment AVENATTI and EA LLP received in January 2018, but failed to transfer to EA LLP's client or disclose in federal bankruptcy proceedings involving AVENATTI and EA LLP.

d.   First, between the fourth quarter of 2015 and the fourth quarter of 2017, inclusive, GBUS failed to file employment tax returns and pay approximately $3,121,460 in federal payroll taxes, including approximately $2,390,948 in trust fund taxes, which had been withheld from GBUS employees' paychecks.  Multiple former GBUS employees have said that AVENATTI was responsible for all of GBUS's significant financial and business decisions, including the decision not to pay the payroll and trust fund taxes that GBUS owed to the IRS.  Indeed, AVENATTI was well aware of GBUS's outstanding tax obligations, yet repeatedly refused to authorize the required tax payments to the IRS.

e.   Although GBUS failed to pay to the IRS its payroll taxes between the fourth quarter of 2015 and the fourth quarter of 2017, AVENATTI caused substantial amounts of money to be transferred from GBUS's or GB LLC's bank accounts during this same time period.  For example, a preliminary analysis of GBUS's and GB LLC's bank account records shows that between 2015 and 2017 AVENATTI caused a net of approximately $1.7 million to be transferred from GBUS's or GB LLC's bank accounts to bank

8

USAO_00134767

USAO_00134447

accounts associated with A&A or EA LLP.[2]  This money could have
and should have been used to pay GBUS payroll tax obligations.

       f.    Additionally, after the IRS initiated a
collection action relating to GBUS's outstanding payroll tax
obligations in September 2016, issued an approximately
$5,000,000 tax lien against GBUS in July 2017, and levied
multiple GBUS bank accounts, AVENATTI directed repeated attempts
to evade collection of those payroll taxes and obstruct the IRS
collection action.  Among other things, AVENATTI took the
following steps to evade the collection of payroll taxes due to
the IRS and obstruct the IRS collection action:

          i.    In October 2016, when first contacted by an
IRS Revenue Officer ("RO 1") regarding GBUS's unpaid payroll
taxes, AVENATTI falsely stated that a third-party payroll
company was responsible for filing GBUS's payroll tax returns
and making GBUS's federal tax deposits.  AVENATTI, however, knew
that GBUS's third-party payroll company, Ceridian HCM Inc., had
discontinued the tax services it had previously provided to GBUS
and was, therefore, no longer responsible for filing GBUS's
payroll tax returns and making the necessary federal tax
deposits.  AVENATTI was well aware that GBUS was not paying its
payroll taxes.  GBUS employees repeatedly asked him to authorize

---

[2]  A further analysis of GBUS's and GB LLC's bank account
records shows that between September 2015 and December 2017,
AVENATTI caused a net of approximately $2,527,318 to be
transferred from GBUS's and GB LLC's bank accounts to bank
accounts associated with A&A and EA LLP.  Moreover, in September
2015 and October 2015 alone, when GBUS first stopped paying its
payroll taxes to the IRS, AVENATTI caused a net of approximately
$501,582 to be transferred to EA LLP's and A&A's bank accounts.

USAO_00134768

USAO_00134447

the payment of GBUS's payroll taxes to the IRS, yet he refused
to do so.

        ii.  In September 2017, after IRS RO 1 advised
GBUS of the possibility of criminal proceedings and levied
multiple GBUS bank accounts, including a GBUS account at
KeyBank, AVENATTI directed GBUS employees to stop depositing
cash receipts from the Tully's stores into the account at
KeyBank.  Instead, in order to avoid the levies, AVENATTI
directed GBUS employees to deposit all cash receipts from
Tully's stores into a little-used bank account at Bank of
America associated with his car racing entity, GB Auto.  Between
September 2017 and December 2017, GBUS employees deposited
approximately $859,784 in cash into the GB Auto account at
AVENATTI's direction.

        iii. In late-September and early-October 2017, in
order to avoid IRS levies issued to the sponsoring bank for
GBUS's merchant credit card processing accounts ("merchant
accounts"), AVENATTI directed GBUS's credit card processing
company, TSYS Merchant Solutions ("TSYS"), to change the company
name and Employer Identification Number ("EIN") associated with
the merchant accounts from GBUS to GB LLC.  AVENATTI also
directed TSYS to have all credit card receipts paid to a new
bank account under the name of GB LLC, which AVENATTI and
REGNIER had opened that same day in Orange County, California,
instead of the bank accounts associated with GBUS, which were
already subject to the IRS levies.

USAO_00134769

USAO_00134447

iv.   In November 2016, approximately one month
after RO 1 first contacted AVENATTI, AVENATTI changed the name
of the party to a contract with The Boeing Company ("Boeing")
from GBUS to "GB Hospitality LLC," a company which does not
appear to have ever been registered with any government agency
or operated.   Later, in September 2017, after the IRS had issued
levies to Boeing and a number of banks with which GBUS had
accounts, Boeing cancelled the contract because GBUS had failed
to make the required commission payments.   In connection with
the cancellation of the contract, Boeing agreed to purchase two
existing Tully's "kiosks" at Boeing facilities and other Tully's
equipment in exchange for a total of $155,010 and the
forgiveness of GBUS's debt to Boeing.   Although all of the
Tully's locations were operated by GBUS, AVENATTI told an
attorney at Boeing to use the name GB LLC on the two bills of
sale for the kiosks and equipment, and instructed Boeing to wire
the $155,010 payment to an attorney trust account associated
with EA LLP rather than any of the bank accounts associated with
GBUS.   Had the Boeing contract and subsequent bills of sale been
under the name GBUS, Boeing would not have made the $155,010
payment due to the existing GBUS tax lien.   After receiving the
$155,010 payment from Boeing, AVENATTI transferred the $155,010
to an A&A bank account, from which he then transferred $15,000
to his personal checking account, paid approximately $13,073 for
rent at his residential apartment in Los Angeles, California
(SUBJECT PREMISES 1), and paid approximately $8,459 to Neiman
Marcus.   Indeed, out of the $155,010 Boeing transferred to the

11

USAO_00134770

Exhibit D - 324

USAO_00134447

EA LLP trust account, it appears that only approximately half
ever ended up in GBUS's bank accounts.

g.   Second, AVENATTI's other companies, EA LLP and
A&A, have repeatedly failed to meet their tax obligations
despite generating substantial revenues.  Between 2015 and 2017,
EA LLP failed to file payroll tax returns and pay approximately
$2.4 million in payroll taxes, including approximately
$1,279,001 in trust fund taxes that had been withheld from EA
LLP employees' paychecks.  Just as he did in connection with
GBUS, AVENATTI lied to the IRS when initially contacted
regarding EA LLP's failure to pay its payroll taxes, and falsely
claimed that a third-party payroll company, Paychex, was
responsible for making the required tax payments even though the
payroll company had notified AVENATTI in January 2015 that it
was discontinuing various payroll tax services.  Additionally,
EA LLP has not filed partnership tax returns (IRS Form 1065) for
the 2013, 2014, 2015, 2016, and 2017 tax years, even though EA
LLP appears to have received approximately $137,899,036 of
deposits into its bank accounts during these tax years.  Indeed,
AVENATTI's personal website claims that AVENATTI has recovered
over one billion dollars in verdicts and settlements for his
clients.  Similarly, A&A has not filed corporate tax returns
(IRS Form 1120S) for the 2011, 2012, 2013, 2014, 2015, 2016, or
2017 tax years, even though A&A appears to have received
approximately $37,961,533 of deposits into its bank accounts
during these tax years, including net payments of approximately
$23,820,816 from EA LLP.

12

USAO_00134771

USAO_00134447

h.    Third, AVENATTI filed federal personal income tax returns for the 2009 and 2010 tax years indicating that he owed the IRS a total of approximately $850,438, plus interest and penalties.  AVENATTI, however, did not pay the IRS the amounts he owed for those tax years.[9]  AVENATTI then failed to file personal tax returns for the 2011 through 2017 tax years. During these tax years, AVENATTI generated substantial income and lived lavishly, yet largely failed to pay any federal income tax.  A preliminary analysis of AVENATTI's personal bank accounts reflects that AVENATTI received net payments of approximately $8,464,064 from A&A and EA LLP between 2011 to 2017.  AVENATTI also repeatedly used money that had been transferred from GBUS, GB LLC, and EA LLP to A&A to pay for personal expenses.  Further, AVENATTI received proceeds of approximately $6.4 million when he sold his home in Laguna Beach, California in 2015.  Finally, in connection with recent divorce proceedings, AVENATTI's wife said that AVENATTI told her that he earned $3.7 million dollars in 2016.  His wife also said that their family's monthly expenses were over $200,000 per month.  Financial and escrow company records show that from approximately September 2015 to September 2016, AVENATTI and his wife rented a home in Newport Beach for $100,000 per month, after making a $1,000,000 deposit.

---

[9] The tax due and owing to the IRS for the 2009 and 2010 tax years was not paid until November 2015, when AVENATTI sold his residence in Laguna Beach, California, upon which there was an IRS tax lien.

USAO_00134772

USAO_00134447

i.   Fourth, between approximately January 2014 and December 2014, AVENATTI obtained three separate loans from The Peoples Bank, a federally insured bank in Mississippi: (1) a $850,500 loan to GB LLC in January 2014; (2) a $2,750,000 loan to EA LLP in March 2014; and (3) a $500,000 loan to EA LLP in December 2014.  In connection with these loans, AVENATTI provided The Peoples Bank with false federal personal income tax returns for the 2011, 2012, and 2013 tax years.  In these purported tax returns, AVENATTI claimed that he earned $4,562,881 in adjusted gross income in 2011, $5,423,099 in adjusted gross income in 2012, and $4,082,803 in adjusted gross income in 2013.  He also claimed that he had paid to the IRS $1,600,000 in estimated tax payments in 2012, and $1,250,000 in estimated tax payments in 2013.  However, AVENATTI never filed personal income tax returns for the 2011, 2012, and 2013 tax years, and did not make any estimated tax payments during the 2012 and 2013 tax years.  In fact, as noted above, at the time, AVENATTI still owed the IRS approximately $850,438 in unpaid personal income taxes, plus interest and penalties, from the 2009 and 2010 tax years.  Additionally, in March 2014, AVENATTI provided The Peoples Bank with a 2012 federal tax return for EA LLP which claimed total income of $11,426,021 and ordinary business income of $5,819,436.  However, the 2012 federal tax return EA LLP actually filed with the IRS in October 2014 claimed total income of only $6,212,605 and an ordinary business loss of $2,128,849.

14

USAO_00134773

USAO_00134447

Case 8:19-mj-00242-DUTY *SEALED*   Document 43-1 *SEALED*   Filed 05/24/19   Page 328 of
360   Page ID #:854

   j. <u>Fifth</u>, between January 2018 and November 2018,
AVENATTI defrauded one of EA LLP's client, G.B., out of the
client's portion of an approximately $1.6 million settlement
payment.  Specifically, in January 2018, AVENATTI arranged for
the $1.6 million settlement payment to be transferred to one of
his attorney trust accounts.  Rather than transfer his client's
portion of the settlement proceeds to his client, AVENATTI used
the entire $1.6 million for his own purposes, including to pay
for expenses relating to GBUS.  He then lied to his client and
claimed that the settlement payment was not due until March
2018.  When the fake March 2018 deadline passed, AVENATTI led
his client to believe that the $1.6 million payment had never
been received.  Additionally, AVENATTI failed to disclose in
federal bankruptcy proceedings involving AVENATTI and EA LLP
that he had received the $1.6 million settlement payment,
despite being aware that he was required to do so.

   k. AVENATTI has described REGNIER as his office
manager, chief paralegal, and bookkeeper.  She appears to have
worked for EA LLP (or its predecessor firm Eagan O'Malley &
Avenatti LLP) in an administrative capacity since at least 2008.[4]
At various times, REGNIER was a signatory on bank accounts
associated with GBUS, GB LLC, GB Auto, EA LLP, and A&A.  REGNIER
was personally involved in many of the events at issue in the
government's investigation, including directing or executing the

_____

  4   Although my February 2019 affidavit said that REGNIER
worked for EA LLP since at least 2010, I have since reviewed
publicly available information indicating that she worked at
Eagan O'Malley & Avenatti since at least 2008.

USAO_00134774

USAO_00134447

transfer of funds between various entities associated with
AVENATTI, directing the actions of GBUS employees, and
transmitting signed contracts and agreements on behalf of GBUS,
GB LLC, EA LLP, or A&A to other parties.

**B.   Additional Evidence Regarding the GBUS Tax Offenses**

12.  As noted in my February 2019 affidavit, between the
fourth quarter of 2015 and the fourth quarter of 2017, GBUS
failed to pay to the IRS approximately $3,121,460 in federal
payroll taxes, including approximately $2,390,048 in trust fund
taxes.  AVENATTI also repeatedly attempted to obstruct the IRS
collection action arising from GBUS's failure to pay its payroll
taxes.  Since I submitted my February 2019 affidavit, the
investigation has uncovered additional evidence regarding this
conduct.

13.  In my February 2019 affidavit, I noted that GBUS's
former controller, M.B., told IRS-CI that she sent AVENATTI an
email explaining the ramifications of GBUS not paying its
payroll taxes to the IRS.  (Ex. 1, ¶ 26.h.)  Based on my review
of evidence obtained from the February 2019 search warrant, I
have learned that on November 5, 2015, M.B. sent AVENATTI an
email[5] titled "Information only – Q4 2015 941 Payroll Tax."  The
email stated, in full, the following:

> Michael,
>
> Per you instruction, 941 payroll tax and unemployment
> tax payments (federal withholding, Medicare and social

---

[5]  This email was sent to mavenatti@eaganavenatti.com.
Based on the evidence collected during IRS-CI's investigation, I
know that AVENATTI almost exclusively used his EA LLP email
address mavenatti@eaganavenatti.com to conduct business on
behalf of GBUS and his other companies.

16

USAO_00134775

USAO_00134447

security) are not to be paid on an as-we-go basis but will be paid in total at the 1/31/16 filing due date. Two implications result from this strategy:

1. Estimated total tax payment due at 1/31/16 will be about $575,000 - $600,000, exclusive of penalties and interest.

   a. 6 payrolls each with an $83,000 941 tax obligation for a total of $500,000
   b. Federal unemployment of about $8,200
   c. State (CA and WA) unemployment of about $26,000
   d. Washington L&I (workers comp) of about $50,000

2. Global Baristas is a semiweekly filer for 941 tax per the Internal Revenue Service. Per Publication 15 for semiweekly filers, if the pay day falls on a Saturday, Sunday, Monday and/or Tuesday, (Monday as the case of GB) then taxes are required to be deposited by the following Friday. Again per Publication 15 "you are required to deposit 100% of your tax liability on or before the due date". Deposit penalties are as follows:

   a. 2% - Deposit made 1-5 days late
   b. 5% - Deposit made 6-15 days late
   c. 10% - Deposit made 16 or more days late. Also applies to amounts paid within 10 days of the date of the first notice the IRS sent asking for the tax due
   d. 15% - Amounts still unpaid more than 10 days after the date of the first notice the IRS sent asking for the tax due or the day on which you received notice and demand for immediate payment, whichever is earlier.

I have attached Publication 15 for your reference. Unemployment will also carry penalties and interest.

Again, this is for your information, thus I am not looking for a response or direction. I wanted to ensure that you were aware of the implications.

A copy of the "Employer's Tax Guide," IRS Publication 15 for

2015 was attached to the email. M.B. forwarded a copy of this

17

USAO_00134776

USAO_00134447

email to M.E., GBUS's former Director of Human Resources, on or
about December 18, 2015.

    14.  As noted in my February 2019 affidavit, M.E. told IRS-
CI that AVENATTI had instructed her not to file GBUS's quarterly
payroll tax returns ("IRS Forms 941").  (Ex. 1, ¶ 30.1.)  The
following hard-copy documents M.E. produced to IRS-CI
corroborate M.E.'s statements:

        a.   On July 29, 2016, M.E. sent AVENATTI and V.S. an
email titled "Q2 Tax Filing Review."  The email included a
spreadsheet detailing amounts owed to various tax agencies,
including a total of approximately $1,406,554 in federal payroll
taxes due to the IRS for the fourth quarter of 2015, and the
first and second quarters of 2016, as well as Federal
Unemployment Tax Act ("FUTA") taxes due to the IRS for the 2015
tax year.  The email also attached a letter that GBUS had
received "from the IRS referring to the FUTA Unemployment Tax
from 2015."[6]  M.E. sent this email to AVENATTI over two months
before AVENATTI told IRS RO 1 on October 7, 2016, that he was
unaware that GBUS had failed to pay its payroll taxes, and
blamed the error on GBUS's third-party payroll company.  (See
Ex. 1, ¶ 23(d).)

        b.   On October 27, 2016, M.E. sent AVENATTI and V.S.
an email titled "Q3 Tax Filing Review."  The email included an
updated spreadsheet detailing GBUS's outstanding tax
liabilities, including a total of approximately $1,953,850 in

---

    [6] The attachment to this email was not included in the hard-
copy documents that M.E. produced to IRS-CI.

USAO_00134777

USAO_00134447

federal payroll taxes due to the IRS for the fourth quarter of
2015 and the first through third quarters of 2016, as well as
FUTA taxes due to the IRS for the 2015 tax year.  M.E. appears
to have attached to the email drafts of GBUS's IRS Form 941 for
the third quarter of 2016.  AVENATTI responded later that same
day, "Thanks [M.E.]  Please do not file anything yet.  I am
having our outside CPA look at the attached and other tax
issues."

        c.   On January 30, 2017, M.E. sent AVENATTI and V.S.
an email titled "Q4 Tax filing Review."  The email included an
updated spreadsheet detailing GBUS's outstanding tax
liabilities, including a total of approximately $2,836,269 in
federal payroll taxes due to the IRS for the fourth quarter of
2015, the first through fourth quarters of 2016, and the first
quarter of 2017, as well as FUTA Unemployment taxes payments due
to the IRS for the 2015 and 2016 tax years.  AVENATTI responded
moments later:  "We are handling.  Thanks."

       15.  As noted in my February 2019 affidavit, GBUS's former
Director of Retail Operations, M.G., told IRS-CI that in
September 2017 AVENATTI had directed M.G. to deposit cash from
the Tully's stores at a Bank of America account associated with
GB Auto ("GB Auto BofA Account 7412").  (Ex. 1, ¶¶ 31.i-31.k.)
Based on my review of evidence obtained from the February 2019
search warrant, I have learned the following additional
information demonstrating that AVENATTI and REGNIER were already
aware of the IRS levy notices when AVENATTI directed the Tully's

USAO_00134778

USAO_00134447

stores to deposit all cash into GB Auto BofA Account 7412.  For example:

        a.   On or about August 25, 2017, V.S. emailed a KeyBank representative and said:  "There is a hold(s) on the account #4-**93 for Global Baristas Us, LLC; can you send me a copy of what order/lien this may be for, thanks."  In response, the KeyBank representative told V.S. that KeyBank had two levies on the GBUS account, including one levy from the IRS.  On August 28, 2017, another KeyBank representative sent a further response to V.S. advising V.S. that KeyBank was "required to sweep the available funds from the account and send them to the parties in the order" and that KeyBank "will probably be served randomly until the judgments are satisfied."  V.S. then forwarded this email string to AVENATTI, who responded moments later stating "Please send me the email you sent him before his response."

      16.   As noted in my February 2019 affidavit, M.G. also said that she would send AVENATTI text messages attaching pictures of the deposit slips after each cash deposit.  (Ex. 1, ¶¶ 31.i-31.k.)  Text messages M.G. produced to IRS-CI confirm that AVENATTI instructed M.G. to make these cash deposits and that M.G. sent him pictures of the deposit slips after most of the cash deposits.  For example:

        a.   On September 7, 2017, AVENATTI sent a text message to M.G. with the account information for GB Auto BofA Account 7412.  Later that day, M.G. sent AVENATTI a text message stating:  "On my way to the bank.  If they ask is the business address and phone number for GB Autosport the Western Avenue

USAO_00134779

USAO_00134447

address [i.e., GBUS's address]?"  AVENATTI responded via text
message, "Yes."  M.G. then sent AVENATTI a text message
attaching a deposit slip indicating that approximately $81,524
had been deposited into GB Auto BofA Account 7412.  AVENATTI
responded, "Thanks."

       b.   On September 18, 2017, M.G. sent a text message
to AVENATTI asking:  "Are stores able to deposit at Key Bank
[sic] yet?"  Moments later, AVENATTI responded via text message
stating:  "Not yet but hopefully in next two days.  Can you
collect deposits tmrw and deposit pls?"

       c.   On September 28, 2017, AVENATTI sent a text
message to M.G. and V.S. asking:  "When are we depositing
again?"  V.S. responded "Friday afternoon."  Moments later,
AVENATTI sent another text message asking: "When was the last
deposit and what did it include?"  After V.S. responded,
AVENATTI sent another text message stating: "It is important
that these deposits be made regularly.  Thanks."

       d.   Between September 7, 2017, and December 1, 2017,
M.G. sent AVENATTI or AVENATTI and V.S. text messages with
pictures of deposit slips reflecting deposits into GB Auto BofA
Account 7412 on 24 separate occasions.  On multiple occasions,
AVENATTI responded to these text messages by stating, "Thanks."
Based on my review of bank account information, I know that the
information on the deposit slips directly corresponds to
deposits that were actually made into GB Auto BofA Account 7412.

       17.  In my February 2019 affidavit, I indicated that on or
about September 29, 2017, AVENATTI instructed a TSYS

USAO_00134780

USAO_00134447

representative ("TSYS Rep. 1") to change the name and EIN
associated with GBUS's merchant accounts from "Global Baristas
US LLC" to "Global Baristas, LLC."  (Ex. 1 ¶ 37.d.)  During this
conversation, AVENATTI suggested that he did not know why TSYS
was holding GBUS's funds.  Based on my review of evidence
obtained from the search warrant authorized in February 2019, I
have learned the following additional information demonstrating
that AVENATTI and REGNIER were already aware of the IRS levy
notices at that time:

     a.  On September 12, 2017, REGNIER sent an email to
V.S. titled "CBT Levy."  In this email, REGNIER listed the
amounts of various levies on the CBST accounts since June 1,
2017, and asked V.S. to provide information regarding levies on
KeyBank and BofA.  In response, V.S. said, among other things,
that "IRS also hit tsys account 9-29-17, still confirming."

     b.  On or about September 28, 2017, V.S. sent an
email to AVENATTI titled "IRS Levies 9/30 and 9/25 and 9/27."
The email included, among other things, the following
information:  "9.25.17 tsys - $22,135.19 IRS levy."

     c.  On or about September 29, 2017, at approximately
10:57 a.m., V.S. sent an email to AVENATTI titled "Levies," in
which he stated that "IRS took as [sic] additional $23,73.02
from tsys yesterday."  Based on the timing of other emails
between AVENATTI and TSYS Rep. 1 on September 29, 2017, it
appears that AVENATTI received this email from V.S. before he
first called TSYS Rep. 1 on September 29, 2017.

USAO_00134781

USAO_00134447

## C.   Additional Evidence Relating to AVENATTI's Scheme to Defraud His Legal Client, G.B.

18.   As set forth in my February 2019 affidavit, AVENATTI engaged in a scheme to defraud his client, G.B., out of G.B.'s portion of an approximately $1.6 million settlement payment AVENATTI and EA LLP that received in January 2018 in connection with an arbitration proceeding against a Colorado-based company ("Company 1"). (See Ex. 1, § IV.G.) Specifically, in January 2018, AVENATTI arranged for the $1.6 million settlement payment to be transferred to a City National Bank attorney trust account[7] ending in 5566 ("CNB Trust Account 5566"). (See id.) AVENATTI then used the entire $1.6 million for his own purposes, including to pay for expenses relating to GBUS.[8] (See id.) AVENATTI then lied to his client and claimed that the settlement payment was not due until March 2018. (See id.) When the March 2018 deadline passed, AVENATTI led his client to believe that the $1.6 million payment had never been received. (See id.)

19.   On March 15, 2019, I participated in an interview of G.B. The information G.B. provided during the interview was consistent with the information G.B. and his counsel had

---

[7]   I understand that the State Bar of California has specific rules that apply to the proper use of attorney trust accounts. For example, I understand that Rule 1.15 of the State Bar of California states that "[f]unds belonging to the lawyer or the law firm shall not be deposited or otherwise commingled with funds held in a trust account."

[8]   AVENATTI and REGNIER were the only two signatories for CNB Trust Account 5566. Moreover, based on a further review of the bank records for CNB Trust Account 5566, I have learned that REGNIER authorized at least eight of the payments from CNB Trust Account 5566.

23

USAO_00134782

USAO_00134447

previously provided to IRS-CI and the Newport Beach Police
Department ("NBPD"). During the interview, G.B.[9] also provided
the following additional information:

      a.  On or about December 28, 2017, G.B. met with
AVENATTI at EA LLP's offices in Newport Beach, California, to go
over the proposed settlement agreement with Company 1. During
this meeting, AVENATTI provided G.B. with a copy of the $1.9
million settlement agreement to review. The settlement
agreement AVENATTI provided to G.B. listed the payment dates as
$1.6 million on March 10, 2018, and $100,000 on March 10 of each
of the next three years. As noted in my February 2019
affidavit, this information was false and the actual settlement
agreement required Company 1 to pay G.B. $1.6 million on January
10, 2018, and $100,000 on January 10 of each of the three
subsequent years. (Ex. 1, ¶ 75.a.)

      b.  Based on my review of documents produced by
G.B.'s counsel, I know that on or about June 29, 2018, G.B. sent
an email to REGNIER asking her to forward to G.B. the signed
settlement agreement with Company 1. During his interview, G.B.
said that sometime after he sent this email REGNIER brought him
a physical copy of the fully-executed settlement agreement while
G.B. was at EA LLP's offices. REGNIER handed AVENATTI the
settlement agreement. AVENATTI flipped through the settlement

---

[9] G.B. previously pleaded guilty to a felony theft count in
approximately September 2018 and was sentenced to probation.
(See Ex. 1, ¶ 75 n.44.) During his interview, G.B. said that
AVENATTI had encouraged him to plead guilty and that AVENATTI
continued working with G.B. and one of G.B.'s companies after
G.B.'s guilty plea.

USAO_00134783

USAO_00134447

agreement and then handed it to G.B.  This copy of the
settlement agreement also falsely stated that the settlement
payments were due on March 10 of 2018 through 2021, as opposed
to January 10 of 2018 through 2021.

       c.  As noted in my February 2019 affidavit, between
April 2018 and November 2018, AVENATTI "advanced" G.B.
approximately $130,000 to help G.B. meet certain financial
obligations while he waited for his portion of the $1.6 million
settlement payment from Company 1.  During his interview, G.B.
said that in approximately October 2018, AVENATTI told G.B. that
AVENATTI would be able to loan G.B. another $100,000 sometime
during the first two weeks of January 2019.  Notably, under the
terms of the true settlement agreement, Company 1 was scheduled
to make an additional $100,000 settlement payment to AVENATTI's
trust account on January 10, 2019.  Thus, it appears that
AVENATTI was offering to loan G.B.'s own money to G.B.

       20.  During the interview on March 15, 2019, G.B's current
counsel also confirmed that AVENATTI still has not turned over
G.B.'s client file to his current attorneys despite repeated
requests that he do so.

**D.    Additional Evidence Relating to AVENATTI's Scheme to
Defraud His Legal Clients, M.P. and L.T.**

       21.  As set forth in my February 2019 affidavit, it appears
that in or around March 2018 AVENATTI embezzled approximately $4
million from his client's M.P. and L.T.  (Ex. 1, ¶ 50.h n.31.)
Based on a further review of information I received from NBPD,
including recorded interviews of M.P. and L.T. and documents

USAO_00134784

USAO_00134447

M.P. and L.T. provided to Newport Beach Police Department ("NBPD") and IRS-CI, I have learned the following information regarding AVENATTI's scheme to defraud M.P. and L.T.:

       a.    In or around August 2017, M.P. and her business manager, L.T., hired AVENATTI to assist them in separating from one of the companies that M.P. owned ("MP Company 1").

       b.    On or about August 15, 2017, M.P. and L.T. entered into an "Attorney-Client Fee Contract (Contingency)" with AVENATTI and EA LLP.[19]  Under the terms of the agreement, AVENATTI would receive 7.5 percent of the "recovery" or transaction amount.  In other words, AVENATTI would receive 7.5 percent of the total amount M.P. would receive when she sold her shares in MP Company 1 back to MP Company 1.  To the extent the transaction resulted in multiple payments to M.P., AVENATTI was to receive his entire 7.5 percent fee from the initial lump-sum payment.  The agreement also authorized AVENATTI to retain MARCHINO, the founding partner of X-Law Group, to serve as outside or local counsel in connection with the representation.

       c.    On or about September 17, 2017, MP Company 1 entered into a "Common Stock Repurchase Agreement" with M.P.  In sum, under the terms of the Common Stock Repurchase Agreement, MP Company 1 agreed to repurchase 361,565 shares of MP Company 1 from M.P. for approximately $27,478,940, and to subsequently repurchase from M.P. an additional 107,188 shares of MP Company 1 for approximately $8,146,288.  Thus, M.P. was to receive a

---

    [19] The Attorney-Client Fee Contract identifies "Michael Avenatti, Esq." as the attorney, but is signed by AVENATTI on behalf of EA LLP.

USAO_00134785

USAO_00134447

total of approximately $35,625,228 under the terms of the Common
Stock Repurchase Agreement.  AVENATTI's fee of 7.5 percent would
amount to approximately $2,671,892 out of the $35,625,228.

d.    On or about September 18, 2017, MP Company 1
wired approximately $27,414,668 to AVENATTI's trust account at
City National Bank ending in 4705 ("Avenatti CNB Trust Account
4705").[11]  After receiving the $27,414,668 wire on September 18,
2017, AVENATTI caused approximately $2,789,650 (which
constituted AVENATTI's attorney fees for the entire $35,625,228
transaction amount) to be transferred to a separate bank account
at City National Bank under the name "Michael Avenatti, Esq."
("Avenatti CNB Account 3504").[12]  Between September 21, 2017, and
October 3, 2017, AVENATTI then caused the remaining $24,747,466
MP Company 1 had transferred to Avenatti CNB Trust Account 4705
to be transferred to M.P.'s personal bank account and the bank
account for another company M.P. controlled ("MP Company 2").

e.    On or about March 6, 2018, MP Company 1's Chief
Financial Officer ("CFO") contacted M.P. and told her that MP
Company 1 was prepared to repurchase the remaining 107,198
shares of MP Company 1 and would be making the final payment of
approximately $8,146,288.  The CFO asked M.P. to confirm that
the funds should again be wired to Avenatti CNB Trust Account
4705.  M.P. then forwarded this email to L.T.  M.P. and/or L.T.
then spoke with AVENATTI.  AVENATTI agreed that MP Company 1

[11] AVENATTI and REGNIER were the only two signatories on
Avenatti CNB Trust Account 4705.
[12] AVENATTI and REGNIER were the only two signatories on
Avenatti CNB Account 3504.

27

Exhibit D - 340

USAO_00134786

could wire the final payment to Avenatti CNB Trust Account 4705
and that he would then wire the money to M.P. and L.T.

    f.   On or about March 13, 2018, M.P. emailed MP
Company 1's CFO and confirmed that the wire information for
Avenatti CNB Trust Account 4705 was correct.

    g.   On or about March 14, 2018, MP Company 1 wired
approximately $8,146,268 to Avenatti CNB Trust Account 4705 to
be held in trust for M.P.

    h.   AVENATTI did not immediately transfer the
$8,146,268 funds to M.P. as he had promised to do and as he was
required to do under the Attorney-Client Fee Contract. Rather,
based on my review of bank account records, I know that AVENATTI
used substantial portions of the $8,146,268 for his own personal
purposes. For instance:

    i.   On March 15, 2018, AVENATTI caused
approximately $3,000,000 to be transferred to an EA LLP CB&T
attorney trust account ending in 4613 ("EA CB&T Trust Account
4613").[13] AVENATTI then caused approximately $2,928,423 to be
transferred from EA CB&T Trust Account 4613 to an attorney trust
account for SulmeyerKupetz, which was the law firm representing
A&A and AVENATTI in the 2017 EA LLP bankruptcy proceedings, In
re: Eagan Avenatti, LLP, No. 8:17-BK-11961-CB (C.D. Cal.) (the
"2017 EA Bankruptcy"), later that same day. As noted in my
February 2019 affidavit, on March 26, 2018, these funds were
then used to repay creditors in the 2017 EA Bankruptcy,

---

    [13] AVENATTI and REGNIER were the only two signatories on EA
CB&T Trust Account 4613.

USAO_00134787

Exhibit D - 341

USAO_00134447

including an approximately $1,508,442 payment to the IRS.  (Ex.
1, ¶ 50.h.)

        ii.  Between March 20, 2018, and May 1, 2018,
AVENATTI caused a total of approximately $786,138 of M.P.'s
funds to be transferred to EA CB&T Trust Account 4613 and a
total of approximately $260,000 to be paid to an EA LLP CB&T
debtor in possession account ending in 0313 ("EA CB&T DIP
Account 0313.  Once M.P.'s funds had been transferred to EA CB&T
Trust Account 4613, AVENATTI used M.P.'s funds for a variety of
other improper and unauthorized purposes, including:
(a) transferring a total of over $300,000 to bank accounts
associated with GBUS and GB LLC; (b) transferring a total of
over $275,000 to bank accounts associated with A&A; and
(c) transferring a total of approximately $12,000 to his
girlfriend at the time, M.M.

        i.  After AVENATTI received the $8,146,288 payment
from MP Company 1 on March 14, 2018, L.T. and M.P. repeatedly
asked AVENATTI when M.P. could expect to receive the funds.
AVENATTI would often not respond to the L.T.'s calls or text
messages.  When AVENATTI did respond, he falsely represented to
M.P. and L.T. that he would transfer the money to them at a
later time and failed to disclose that he had already spent a
substantial portion of M.P.'s funds for his own personal
purposes.  For instance:

        i.  On or about March 23, 2018, L.T. sent
AVENATTI a text message stating: "Hi Michael, checking in on the

USAO_00134788

USAO_00134447

wire.   Let me know when we should expect it to come our way.
Thanks!"

　　　　　　ii.   On or about April 5, 2018, L.T. sent
AVENATTI a text message stating "Good morning Michael!  Just
wanted to follow-up on the wire and plane[14] availability.
Thanks!"  AVENATTI responded that same day stating "In NYC -
back tmrw and then we should be able to clear wire."

　　　　　　iii. On or about April 23, 2018, L.T. sent
AVENATTI a text message stating: "Good morning Michael.  Please
confirm after the wire is sent today.  Thanks."  Later that day,
L.T. sent another text message later that day stating:  "Can
your office provide Fed Ref number for [M.P.'s] wire?  It is
neither posted nor pending status on our end."  AVENATTI then
responded "I will have [REGNIER] get it."

　　　　　　iv.   On or about April 24, 2018, L.T. sent
AVENATTI a text message stating:  "Just following up on the Fed
Ref #.  We haven't been able to track down [M.P.'s] wire yet."
AVENATTI responded that "I've asked [REGNIER] to get you what u
need."

　　　　　　v.   On or about April 24, 2018, M.P. met
AVENATTI for lunch.  M.P. asked AVENATTI if everything was okay
with the money.  AVENATTI responded that everything was okay and
that he just needed to go to the bank once he got back to
Newport Beach and sign the paperwork.

---

　　　[14]  As set forth in my February 2019 affidavit, AVENATTI had
at least one private jet at this time.  (Ex. 1, ¶ 65.m.)

USAO_00134789

USAO_00134447

vi.   On or about April 25, 2018, L.T. sent an
email to REGNIER and AVENATTI stating: "Hi Judy [REGNIER], Can
you please provide me with the Fed Ref # for [M.P.'s] wire from
Monday?"  AVENATTI responded less than an hour later "Pls
handle."

vii. On or about April 26, 2018, L.T. sent
another email to AVENATTI and REGNIER stating:

> We've been in contact with the bank all week and they
> have not been able to track the wire. Please provide
> the Fed Ref # with immediacy.  This is becoming very
> urgent.  There is $6M of [M.P.'s] money in the ether
> somewhere, and we have been given the runaround for
> over 6 weeks.  I'm becoming extremely concerned.
> Please advise asap.

viii.     On or about April 30, 2018, AVENATTI
sent a text message to L.T. stating "I am dealing with getting a
summons issued from the SDNY and will call you shortly.  Sorry
for delay."  That same day, AVENATTI sent an email to REGNIER
and L.T. stating:

> Judy [REGNIER] -- I know you are trying to dig out
> from last week, but please get with [L.T.] and figure
> out what the issue is on the CNB wire. This needs to
> be a priority. If I need to do something or find a
> branch on the East coast let me know but I want this
> resolved. Thanks.

ix.  On or about May 1, 2018, L.T. responded to
AVENATTI's April 30, 2018, email stating:

> Hi Judy [REGNIER], The wire hasn't come through, and
> we can only trace it via the Fed Ref #. Please provide
> ASAP so we can see where it got held up.  This is very
> urgent.  Thank you.

REGNIER responded "I asked the bank to put a trace on it.  As
soon as I get the results I will let you know ASAP."

USAO_00134790

USAO_00134447

j.    Between March 14, 2018, and May 4, 2018, L.T.
also repeatedly attempted to obtain information from AVENATTI's
associate, MARCHINO, regarding the $8,146,288 payment from MP
Company 1.  For instance:

i.    On or about March 14, 2018, MARCHINO sent a
text message to L.T. stating: "Hi - let me know when the wires
have been sent by [MP Company 1].  That way we can turn around
quickly."  L.T. responded that the wire had just been sent and
that he would provide MARCHINO the wire information.

ii.   On or about March 20, 2018, L.T. sent a text
message to MARCHINO to ask if AVENATTI received the wire.
MARCHINO responded:  "Hi. No idea.  Need to ask Michael
[AVENATTI].  He's knee deep in the stormy."

iii.  On or about April 22, 2018, L.T. sent a text
message to MARCHINO stating:  "Please call me back."  MARCHINO
then asked if it was urgent.  L.T. responded:  "Same
conversation as last time, so yes I'm concerned and losing
patience."

iv.   On or about May 3, 2018, L.T. sent a text
message to MARCHINO stating:  "Please call me back ASAP."
MARCHINO responded:  "I put a call in.  Will have news shortly.
Hang tight until tomorrow and I'll get this sorted for you."
MARCHINO then sent L.T. another text message stating:  "I've got
you.  Don't worry."

k.    On or about May 4, 2018, AVENATTI caused two wire
transfers in the amounts of $4,000,000 and $146,288 to be sent
from Avenatti CNB Trust Account 4705 to one of M.P.'s companies

32

USAO_00134791

USAO_00134447

("MP Company 3").  This amounted to just over half of the
$8,146,288 that was supposed to have been transferred to M.P on
or about March 14, 2018.  Yet, after making these two wire
transfers, there was only $29 remaining in Avenatti CNB Trust
Account 4705.

l.    After M.P. received the two wire transfers
totaling approximately $4,146,286 on or about May 4, 2018, L.T.
repeatedly contacted AVENATTI and MARCHINO in an attempt to find
out what happened to the other $4,000,000 of M.P.'s money.  L.T.
was largely unable to get a hold of AVENATTI.  MARCHINO,
however, repeatedly suggested that the third wire of $4,000,000
had already been sent.  For instance:

i.    On or about May 4, 2018, MARCHINO sent a
text message to L.T. asking "Did the other 4 arrive?"  L.T.
responded that he would have to check on Monday.

ii.   On or about May 7, 2018, MARCHINO sent L.T.
a text message asking if there were any updates.  L.T.
responded:  "No sign of it.  Do you have the Fed Ref # for
tracking?"  L.T. received no further response that day.

iii.  On or about May 9, 2018, MARCHINO sent a
text message to L.T. stating:  "I just got text from bank.  We
should have fed number shortly."

iv.   On or about May 10, 2018, MARCHINO sent a
text message to L.T. and provided him with an IMAD wire transfer
reference number that purportedly corresponded to the final
$4,000,000 payment.

USAO_00134792

Exhibit D - 346

USAO_00134447

v.   On or about May 31, 2018, AVENATTI emailed MARCHINO a wire transfer confirmation document detailing the $4,000,000 wire transfer from Avenatti CNB Trust Account 4705 that M.P. had already received on May 4, 2018.  MARCHINO then forwarded this email to L.T.  That same day MARCHINO and L.T. exchanged numerous text messages regarding the missing $4,000,000 payment.  In these text messages, L.T. told MARCHINO that he needed the reference numbers for all three purported wire transfers.  MARCHINO indicated that he had texted AVENATTI about this but had not heard back.

vi.  On or about May 24, 2018, L.T. sent a text message to AVENATTI asking him to "Please call me when you have a chance."  AVENATTI does not appear to have responded to this text message.

vii. On or about June 4, 2018, L.T. sent a text message to AVENATTI stating:  "Hi Michael, I really need to talk to you.  Please call me back so we can figure things out."  AVENATTI does not appear to have responded to this text message.

n.   On or about August 6, 2018, current counsel for M.P. and L.T. sent a letter to AVENATTI advising him that they now represented M.P. and L.T. and demanded that AVENATTI immediately disburse to M.P. the remaining $4,000,000 that was owed to M.P.  AVENATTI did not respond.  AVENATTI still has not paid over to M.P. the remaining $4,000,000 he received from MP Company 1 on her behalf.  Nor has AVENATTI turned over M.P. and L.T.'s client file to their current attorneys as they have repeatedly asked him to do.

USAO_00134793

Exhibit D - 347

USAO_00134447

22.   Additionally, as set forth in my February 2019
affidavit, in connection with the EA Bankruptcy, EA LLP and
AVENATTI were required to close pre-petition bank accounts and
open new "debtor in possession" bank accounts.  (Ex. 1, ¶ 51.)
EA LLP and AVENATTI were also required to file with the
Bankruptcy Court a monthly operating report ("MOR") detailing
all funds received and disbursed by EA LLP.  (Id.)  AVENATTI,
however, failed to disclose the existence of Avenatti CNB Trust
Account 4705 or the funds he received from the Phan and Tran
representation to the Bankruptcy Court or his creditors.

E.   **Criminal Complaint and Arrest Warrant**

23.   On March 22, 2019, in case number SA 19-241M, I
submitted an affidavit in support of an arrest warrant and
criminal complaint charging AVENATTI with one count of bank
fraud, in violation of 18 U.S.C. § 1344(1), and one count of
wire fraud, in violation of 18 U.S.C. § 1343.  The Honorable
Douglas F. McCormick, United States Magistrate Judge, authorized
the arrest warrant that same day.  A true and correct copy of
the arrest warrant and criminal complaint are attached hereto as
Exhibit 2 and incorporated by reference herein.[15]

F.   **Probable Cause to Search AVENATTI's Residence (SUBJECT PREMISES 1)**

24.   Based on the evidence collected during the course of
this investigation, there is probable cause to believe that

---

[15]   A copy of the application for the February 2019 search
warrant, including my February 2019 affidavit, were also
incorporated by reference and attached to the criminal complaint
in case number SA 19-241M.  Accordingly, I have not included a
duplicate copy of the February 2019 search warrant application,
as part of Exhibit 2 to this affidavit.

USAO_00134794

evidence of the SUBJECT OFFENSES will be found at SUBJECT
PREMISES 1.  For example:

  a.   On or about November 14, 2018, AVENATTI was
arrested by the Los Angeles Police Department ("LAPD") on
suspicion of domestic violence.[16]  Based on my review of the LAPD
police report, I have learned that as of November 14, 2018,
AVENATTI resided in Unit 2205 at the Ten Thousand luxury
condominium complex ("Ten Thousand") located at 10000 Santa
Monica Boulevard in Los Angeles, California (i.e., SUBJECT
PREMISES 1.)

  b.   Based on my review of bank records, I know that
A&A has been paying monthly rent to Ten Thousand since at least
March 2017.  Specifically, between March 2017 and August 2018,
approximately $227,736 (between $12,800 and $16,320 per month)
was paid to Ten Thousand from A&A CB&T Account 0661.
Additionally, on or about November 30, 2018, approximately
$69,119 was paid via cashier's check to Ten Thousand from an
account at City National Bank under the name "Avenatti LLP"
("Avenatti LLP CNB Account 1844").  Avenatti LLP CNB Account
1844 had been opened that very same day and the cashier's check
had been obtained by REGNIER.

  c.   On March 7, 2019, in case number 8:19-MJ-151, the
Honorable Douglas F. McCormick authorized a warrant for
historical cell-site and prospective cell-site and GPS
information relating to cellular telephones used by AVENATTI and

---

  [16]  AVENATTI was never formally charged with any crime in
connection with this arrest.

USAO_00134795

Exhibit D - 349

USAO_00134447

REGNIER.  Although I served the cell-site warrant on Verizon on
March 7, 2019, I did not start receiving returns on the warrant
until March 18, 2019.  Based on IRS-CI's review of this data, I
have learned the following:

      i.   On or about March 21, 2019, AVENATTI
returned to the Los Angeles area after travelling to another
state.  AVENATTI was in the vicinity of SUBJECT PREMISES 1 that
night.[17]

      ii.  On or about March 22, 2019, AVENATTI was in
the vicinity of SUBJECT PREMISES 1 in the early morning hours as
well during the night.

      iii. On or about March 23, 2019, AVENATTI was in
the vicinity of SUBJECT PREMISES 1 early in the morning.

    d.   Based on my discussions with a United States
Postal Inspector ("USPI"), I know that as recently as March 6,
2019, AVENATTI was receiving mail at 10000 Santa Monica
Boulevard, Unit 2205 in Los Angeles, California (i.e., SUBJECT
PREMISES 1.)

    e.   As noted in section VII below, based on my
training and experience, I know that people who engage in fraud
schemes and commit tax offenses frequently maintain hard copy
and electronic records at their residences.  Additionally, I
know that lawyers often use portable laptop computers and
cellular telephones to conduct business remotely from their

---

    [17]   The cell-site and GPS information IRS-CI obtained was
only accurate to within approximately 900 meters of AVENATTI's
cell phone.

USAO_00134796

USAO_00134447

residences and/or while traveling.  Thus, lawyers typically keep
such digital devices on their person or at their residences.

f.   Here, I have reviewed numerous text messages sent
by AVENATTI to GBUS employees.  I have also reviewed a number of
emails AVENATTI appears to have sent after normal business
hours, further suggesting that he uses his laptop and cellular
telephone to conduct business.

g.   On or about March 15, 2019, I participated in an
interview with G.B.  During the interview, G.B. said that he
frequently saw AVENATTI using a laptop computer.

h.   I have also reviewed a profile of AVENATTI
published by the New York Times Magazine on or about July 10,
2018.  This article explicitly noted that AVENATTI was using a
laptop computer and an iPhone while he was being interviewed at
a hotel in New York in May 2018.  See "The Fast and Furious
Michael Avenatti," New York Times Magazine, July 10, 2018,
available at
https://www.nytimes.com/2018/07/10/magazine/michael-avenatti-
stormy-daniels-donald-trump-media.html.

G.   **Probable Cause to Search REGNIER's Residence (SUBJECT
     PREMISES 2)**

25.   As noted in my February 2019 affidavit, AVENATTI has
previously described REGNIER as his office manager, chief
paralegal, and bookkeeper.  (Ex. 1, ¶ 20.i.)  REGNIER was
personally involved in many of the events described in my
February 2019 affidavit and herein, including directing or
executing the transfer of funds between various entities

36

USAO_00134797

USAO_00134447

associated with AVENATTI, directing the actions of GBUS employees, receiving and executing directives from AVENATTI, and transmitting signed contracts and agreements on behalf of AVENATTI, GBUS, GB LLC, EA LLP, or A&A to other parties.

26.   Based on my review of publicly available information and law enforcement databases, I know that REGNIER resides at 4491 Rainbow Lane, Yorba Linda, California (i.e., SUBJECT PREMISES 2.)

27.   Based on the evidence collected during the course of this investigation, there is probable cause to believe that evidence of the SUBJECT OFFENSES will be found at REGNIER's residence (i.e., SUBJECT PREMISES 2).  For example:

a.   Based on my discussions with a USPI, I understand that since approximately December 6, 2018, EA LLP's United States mail has been forwarded from EA LLP's prior offices in Newport Beach to Private Mailbox number 404 ("PMB 404") at 18032 Lemon Drive, Suite C.[16]  18032 Lemon Drive, Suite C is the address of a Postal Annex store located less than one mile from REGNIER's residence (SUBJECT PREMISES 2).  The USPI also provided me with a copy of the "Application for Delivery of Mail Through Agent" for PMB 404 dated on or about December 3, 2018. The application is signed by REGNIER on behalf of EA LLP, and indicates the PMB 404 will be used to receive mail for REGNIER, "Avenatti LLP," EA LLP, and A&A.  The application also lists

---

[16]   I also understand that EA LLP's United States mail was being forwarded to X-Law Group's office in Los Angeles (i.e., SUBJECT PREMISES 3) for a short period of time after EA LLP was evicted from its offices in Newport Beach, California.

USAO_00134798

Exhibit D - 352

USAO_00134447

AVENATTI as the corporation's officer.  Due to the proximity of PMB 404 to REGNIER's residence, I believe there is a strong likelihood that REGNIER is collecting or storing EA LLP and A&A mail, as well as other relevant records at her residence.

b.   Based on my review of text messages produced by M.G. and S.F., I know that REGNIER communicated with GBUS employees using a cellular telephone.

c.   Based on my review of toll records for AVENATTI's and REGNIER's cell phones, I have learned the following:

i.   Between January 1, 2019 and March 6, 2019,[19] there were over 100 calls between AVENATTI's cell phone number and REGNIER's cell phone number.  Often times, there would be multiple calls between AVENATTI's cell phone and REGNIER's cell phone each day.

ii.   This information strongly suggests that REGNIER still works for AVENATTI and that REGNIER and AVENATTI do not work at the same location since EA LLP was evicted from its law offices in Newport Beach, California, between November 2018 and January 2019.

d.   On or about March 15, 2019, I participated in an interview with G.B.  During the interview, G.B. said that in December 2018 EA LLP's receptionist, H.W., told him via an instant message that all of EA LLP's staff members were working from home because EA LLP had been evicted from its offices.

---

[19]   The toll records for AVENATTI's and REGNIER's cell phones that IRS-CI obtained from Verizon Wireless do not go past March 6, 2019.

USAO_00134799

Exhibit D - 353

USAO_00134447

e.   Based on IRS-CI's review of the data obtained
from the prospective cell-site and GPS information relating to a
cellular telephone used by REGNIER, I have learned that from
March 18, 2019 until March 22, 2019, REGNIER was in the vicinity
of SUBJECT PREMISES 2 and PMB 404 during daytime and/or business
hours, likely demonstrating that REGNIER has been working from
home since EA LLP was evicted from its offices.

f.   On March 22, 2019, IRS-CI SA James Kim attended a
judgment debtor examination of AVENATTI in the In re: Eagan
Avenatti, LLP, No. 8:18-CV-10644-VAP-KES, matter in Courtroom 8A
of the United States Courthouse in Los Angeles.  I learned from
SA Kim that AVENATTI testified under oath that he believed EA
LLP's QuickBooks records were likely with REGNIER.

g.   On June 12, 2017, in connection with the 2017 EA
Bankruptcy, AVENATTI testified under oath during a creditors
meeting required under 11 U.S.C. § 341 ("341 meeting").  During
this proceeding, AVENATTI testified that REGNIER was his "in-
house bookkeeper" and she used "QuickBooks and Excel" for
financial reporting.

h.   Based on my training and experience, and
investigation to date, I believe that REGNIER is working from
home at SUBJECT PREMISES 2 and likely will maintain financial
records of EA LLP and related entities at her home, as well as
digital devices at SUBJECT PREMISES 2, all of which will likely
contain evidence of the SUBJECT OFFENSES.

i.   Additionally, as noted above and in section VII
below, based on my training and experience I know that people

USAO_00134800

USAO_00134447

engaged in fraud schemes frequently maintain hard copy and
electronic business records at their residences.  I also know
that lawyers and those who work for law firms often use portable
laptop computers and cellular telephones to conduct business and
typically keep such digital devices on their person or at their
residence.

**H.    Probable Cause to Search the Business Premises of X-Law
       Group (SUBJECT PREMISES 3)**

        28.  Based on my review of publicly available information,
including X-Law Group's website (www.thexlawgroup.com), I know
X-Law Group is a law firm operating in Los Angeles, California.
MARCHINO is X-Law Group's founding partner.  X-Law Group's
business premises are located at 1910 Sunset Boulevard, Suite
450, in Los Angeles, California (i.e., SUBJECT PREMISES 3).

        29.  There are at least three reasons to believe that
evidence of the SUBJECT OFFENSES will be found at the business
premises of X-Law Group (SUBJECT PREMISES 3):  (1) Since at
least the summer of 2016, AVENATTI and EA LLP have been using X-
Law Group's offices to conduct business; (2) X-Law Group has
been involved in significant and suspicious financial
transaction involving GBUS, GB LLC, EA LLP, A&A, and AVENATTI;
and (3) X-Law Group's founding partner, MARCHINO, was directly
involved in the representation of M.F. and L.T., and subsequent
communications regarding the $4 million AVENATTI embezzled from
M.F. in March 2018.

USAO_00134801

Exhibit D - 355

USAO_00134447

> 1.  AVENATTI's and EA LLP's Use of SUBJECT PREMISES 3
>     to Conduct Business

30.  IRS-CI's investigation has revealed the following
facts establishing that AVENATTI has been using SUBJECT PREMISES
3 to conduct business and practice law since at least August
2016, and that SUBJECT PREMISES 3 is EA LLP's and A&A's current
business premises:

a.   During AVENATTI's June 12, 2017, 341 meeting,
AVENATTI said the following:

i.   In the summer of 2016, EA LLP entered into a
written agreement with X-Law Group.  Under the terms of this
agreement, X-Law Group would contribute various cases and assets
to EA LLP; EA LLP would get a percentage of the fees from those
cases; and X-Law Group would get a percentage of fees from
pending cases held by EA LLP.

ii.  Some of the attorneys from X-Law Group also
worked for EA LLP.

b.   On July 14, 2017, AVENATTI testified under oath
during the continued 341 meeting in connection with the 2017 EA
Bankruptcy.  During this proceeding, AVENATTI said the
following:

i.   Since the summer of 2016, there was an
agreement in place between EA LLP and X-Law Group relating to
various EA LLP cases and X-Law Group's right to fees from those
cases.

USAO_00134802

USAO_00134447

ii.   As part of this agreement, AVENATTI agreed that EA LLP would pay a portion of the salaries for certain X-Law Group attorneys.

iii.  AVENATTI and/or EA LLP agreed to pay the rent for X-Law Group's office in Los Angeles.

iv.   AVENATTI has known MARCHINO for approximately five years, and considers him a friend.

v.    MARCHINO and other X-Law Group lawyers were previously employed by EA LLP.

c.    Based on a preliminary review of bank records, I know the following:

i.    Between approximately September 2016 and July 2018, A&A and EA LLP paid to the International Church of the Foursquare a total of approximately $110,352.  Public records reflect that the International Church of the Foursquare owns SUBJECT PREMISES 3.

ii.   Between approximately March 2017 and June 2017, EA LLP paid MARCHINO a total of approximately $34,892.

d.    W-2 information EA LLP submitted to the IRS reflects that MARCHINO received approximately $83,333 in gross wages from EA LLP in 2016, and approximately $91,666 in gross wages from EA LLP in 2017.

e.    On or about January 24, 2018, AVENATTI filed a Substitution of Attorney form in the Superior Court of California, San Diego County in Carthey v. Pirch et al., No. 37-201823387.  The Substitution of Attorney form listed A&A's

44

USAO_00134803

USAO_00134447

mailing address as 1910 West Sunset Boulevard, Suite 450 in Los
Angeles, California (i.e., SUBJECT PREMISES 3).

f.   On or about January 30, 2018, AVENATTI filed a
declaration in the 2017 EA Bankruptcy.  AVENATTI stated under
the penalty of perjury that EA LLP "maintains an office in Los
Angeles under an arrangement with The X-Law Group, P.C. ("X-Law
Group") where X-Law Group is the primary tenant."

g.   On March 7, 2019, AVENATTI filed a Voluntary
Petition for Non-Individuals Filing for Bankruptcy on behalf of
EA LLP in In re The Trial Group, LLP a/k/a Eagan Avenatti, LLP,
No. 8:19-BK-10822 (C.D. Cal.) (the "2019 EA Bankruptcy").[20]  The
bankruptcy petition identifies the debtor's address as 1910
Sunset Boulevard, Suite 450 in Los Angeles, California (i.e.,
SUBJECT PREMISES 3).

h.   On March 7, 2019, AVENATTI filed a Notice of
Bankruptcy Filing on behalf of EA LLP in In re: Eagan Avenatti,
LLP, No. 8:18-CV-10644-VAP-KES (C.D. Cal.).  The attorney
caption on the Notice of Bankruptcy Filing identifies AVENATTI's
address as "1910 Sunset Boulevard, Suite 450," in Los Angeles,
California (i.e., SUBJECT PREMISES 3).

_____

[20]  The 2019 EA Bankruptcy petition identifies the debtor as
The Trial Group, LLP, but indicates that it was previously known
as EA LLP.  This petition appears to have been filed for the
specific purpose of avoiding a judgment debtor exam of AVENATTI
that had been scheduled for March 8, 2019, in In re: Eagan
Avenatti, LLP, No. 8:18-CV-10644-VAP-KES (C.D. Cal.).  AVENATTI
did not have authorization to file such a petition because in
February 2019 a receiver had been appointed to oversee EA LLP's
business affairs and had the "sole authority regarding whether
to file a petition for bankruptcy."  On March 13, 2019, the
Bankruptcy Court dismissed the 2019 EA Bankruptcy on those
grounds.

45

USAO_00134804

Exhibit D - 358

USAO_00134447

2.   X-Law Group's Involvement in Suspicious Financial
Transactions

31.   As detailed in my February 2019 affidavit (Ex. 1),
IRS-CI's investigation to date has revealed the following facts
establishing that AVENATTI has used X-Law Group to conduct a
number of suspicious financial transactions:

a.   On or about November 2, 2015, AVENATTI caused
approximately $4,600,000 of the proceeds of the sale of his
residence in Laguna Beach, California, to be transferred from
GBUS CB&T Account 2240 to X-Law Group.  (See Ex. 1, ¶ 62.)

b.   On or about November 3, 2015, X-Law Group then
transferred approximately $3,600,000 to GB Auto BofA Account
7412.  (See id.)

c.   It appears that the remaining $1,000,000 that had
been transferred to X-Law Group was used to pay $1,000,000 in
deposits for AVENATTI's purchase of a residence in Newport
Beach, California.  (See id.)  For example:

i.   On September 28, 2015, AVENATTI paid a
$200,000 deposit to the escrow company handling the purchase of
the Newport Beach residence ("Escrow Company 1") via a cashier's
check purchased by X-Law Group.  (See Ex. 1, ¶ 63.)

ii.   On or about November 6, 2015, AVENATTI paid
an additional $800,000 deposit to Escrow Company 1 via two wire
transfers from X-Law Group's IOLTA attorney trust account in the
amounts of $450,000 and $750,000.  (See id.)

46

USAO_00134805

Exhibit D - 359

USAO_00134447

3.   X-Law Group's Involvement in the Scheme to
Defraud M.P. and L.T.

32.   As noted in section VI.0 above, X-Law Group's founding
partner, MARCHINO was directly involved in discussions with L.T.
regarding the approximately $4 million AVENATTI embezzled from
M.P. in March 2018.  MARCHINO introduced M.P.'s business
manager, L.T., to AVENATTI.  Moreover, between March 2018 and
May 2018, MARCHINO sent L.T. well over 50 text messages
regarding the money that MP Company 1 transferred to Avenatti
CNS Trust Account 4705 to be held in trust for M.P.'s benefit.
In a number of these text messages, MARCHINO referenced
communications or attempted communications with AVENATTI.
Accordingly, there is probably to believe that X-Law Group's and
MARCHINO's files and digital devices will contain additional
evidence regarding AVENATTI's scheme to defraud M.P.

## VII.  TRAINING AND EXPERIENCE REGARDING TAX OFFENSES AND FRAUD SCHEMES

33.   In addition to the foregoing facts, based on my
training, experience, and conversations with other law
enforcement agents who have investigated tax offenses and
complex fraud schemes, I have learned the following:

a.   Individuals who carry out complex fraud schemes
or commit tax offenses often use computers, cellular telephones,
and mobile "smart phones" to conduct their fraudulent
activities.  For example, such individuals often use computers,
cellular telephones, and mobile smart phones to conduct online
banking, the records of which may be stored on digital devices
rather than paper records, and to exchange communications,

47

USAO_00134806

Exhibit D - 360

including email and text messages. Here, as noted above, I know that AVENATTI, REGNIER, and others, such as MARCHINO from X-Law Group, frequently conducted business via email and text message.

b. Individuals who carry out complex fraud schemes or commit tax offenses often use USB storage devices (commonly referred to as thumb-drives or memory sticks) and external hard drives to store financial records, including banking records and statements, other financial account records, checks, balances, transactions, records of purchases, records reflecting the transfer of assets, and records which are maintained, stored, and utilized to conduct online banking activities.

c. Businesses, including law firms, often maintain servers that host email accounts for their employees, and that emails may be stored exclusively on those servers. In other instances, emails may be stored in the "cloud" or directly on employees' computers. For example, in this case, I know that important information was exchanged over email, including communications between AVENATTI or REGNIER and GBUS employees or business partners.

d. Individuals who engage in fraud schemes or commit tax offenses often keep records of their fraudulent activities, including financial records, fraudulent documents, and electronic communications, on computers, USB drives, external hard drives, servers, or other digital devices for years after the fraudulent scheme has been completed.

e. Businesses, including law firms, commonly maintain paper records like bank statements, wire records,

USAO_00134447

receipts, expense reports, ledgers, balance sheets, income
statements, investment agreements, and other financial documents
commonly used in fraudulent schemes on their premises.

       f.   Lawyers and individuals who work for law firms
often use portable laptop computers, mobile smart phones, or
other digital devices to work remotely, including from their
residences or while traveling.  For example, in this case, I
have reviewed records demonstrating that AVENATTI sent emails,
text messages, or other communications late at night or while
traveling.

## VIII.    POTENTIAL PRIVILEGE ISSUES

    34.  As noted herein, AVENATTI is a licensed attorney,
REGNIER worked or works as a paralegal for AVENATTI and for EA
LLP, and X-Law Group is an active law-firm.  I also understand
that at various times AVENATTI, EA LLP, and/or A&A may have had
attorney-client relationships with other attorneys, including
the following law firms: (a) Foster Pepper PLLC; (b) Osborn
Machler PLLC; (c) Eisenhower Carlson PLLC;
(d) Talmadge/Fitzpatrick/Tribe, PPLC; (e) The Brager Tax Law
Group; (f) SulmeyerKupetz; (g) Baker & Hostetler LLP;
(h) Shulman Hodges & Bastian LLP; (i) Legal & Tax Consulting
Group; (j) Pachulski Stang Ziehl & Jones LLP; (k) Foley &
Lardner LLP; (l) Raines Feldman, LLP; and (m) Pansky Markle
Attorneys at Law.

    35.  While the proposed search warrant primarily seeks
financial records and non-privileged information there is a
significant likelihood that the SUBJECT PREMISES will contain

USAO_00134808

documents and records that are covered by the attorney-client
privilege or attorney-work-product doctrine.  Accordingly,
Attachments B-1, B-2, and B-3 to the proposed search warrants
contains specific procedures designed to avoid unnecessary
disclosures of any privileged attorney-client communications or
attorney-work-product.

36.  The privileged information sought by the proposed
search warrant is limited to three former clients or potentials
clients of AVENATTI, EA LLP, and A&A:  (a) GBUS; (b) G.B.; and
(c) M.P. and L.T.  Each of these clients, however, have already
executed, or indicated through counsel that they will execute,
written waivers of the attorney-client-privilege.

a.  First, as noted in my February 2019 affidavit, on
February 19, 2019, the Chapter 7 bankruptcy trustee for GBUS
(the "GBUS Trustee") executed a written waiver of the attorney-
client privilege as to any communications between GBUS's
officer, directors, employees, and agents, and any lawyer acting
on GBUS's behalf, including any communications with AVENATTI.
(Ex. 1, ¶ 83.a.)  A copy of the GBUS Trustee's written waiver of
the attorney-client privilege was attached as Exhibit 1 to my
February 2019 affidavit.

b.  Second, on March 18, 2019, G.B. executed a
written waiver of the attorney-client privilege and attorney-
work-product protections as to any legal advice G.B. sought or
received from EA LLP, AVENATTI, and any other current or former
EA LLP officers, directors, employees, or agents.  G.B. also
consented to the government's search of any of EA LLP's or

50

USAO_00134809

USAO_00134447

AVENATTI's files relating to EA LLP's and AVENATTI's
representation of G.B.  A copy of the G.B.'s written waiver of
the attorney-client privilege is attached hereto as Exhibit 3.

  c. Third, counsel for M.P. and L.T. informed the
government that M.P. and L.T. are both willing to execute
written waivers of the attorney-client privilege and attorney-
work-product protections as to legal advice M.P. and L.T. sought
or received from EA LLP, AVENATTI, MARCHINO, and/or any other
current or former officers, directors, employees, or agents of
EA LLP.  M.P. and L.T. are also willing to consent to the
government's search of the files of EA LLP, AVENATTI, and
MARCHINO relating to the representation of M.P. and L.T.  M.P.
and L.T. are expected to execute the written waivers of the
attorney-client privilege within the next seven days.

  37.  I am aware that AVENATTI represented the plaintiff in
Stephanie Clifford v. Donald J. Trump, No. 2:18-CV-2217-SJO-FFM
(C.D. Cal.), a lawsuit against the President of the United
States.  I am also aware that AVENATTI represented Julie
Swetnick, an individual who accused United States Supreme Court
Justice Brett Kavanaugh of sexual assault in connection with
Justice Kavanaugh's confirmation hearing in or around September
2018.  Given the likelihood that the SUBJECT PREMISES may
contain privileged information regarding these representations,
which are irrelevant to this investigation, Attachments B-1, B-
2, and B-3 to the proposed search warrants specifically
requires, in addition to the procedures to avoid unnecessary
disclosure of attorney-client privileged materials and attorney-

USAO_00134810

USAO_00134447

work-product, that any materials relating to AVENATTI's representation of Ms. Clifford or Ms. Swetnick that are identified by the Privilege Review Team, other than financial and accounting records identified in paragraphs 1.d, 1.f, 1.g, and 1.r of Attachments B-1, B-2, and B-3, be segregated and not further reviewed.[21]

38. Attachments B-1, B-2, and B-3 to the proposed search warrants also set forth a procedure to allow AVENATTI and others to seek the appointment of a special master within seven days of the execution of the proposed search warrants. Although the government does not believe that the appointment of a special master would be necessary in this investigation, the government has included this provision to ensure that any such request is handled in a timely manner and does not unnecessarily delay IRS-CI's ongoing criminal investigation.

IX. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[22]

39. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

---

[21] Other than non-privileged financial or accounting records that may reference these representations, the only documents or records relating to these representations that may fall within the scope of the items to be seized would likely be engagement letters and/or client billing records. Nevertheless, due to the political nature of these representations and because such records are irrelevant to this investigation, the privilege review protocols set forth in Attachments B-1, B-2, and B-3 to the proposed search warrants calls for any such records to be segregated and not further reviewed once identified.

[22] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as

USAO_00134811

USAO_00134447

know that the following electronic evidence, inter alia, is often retrievable from digital devices:

　　　　a.　Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

　　　　b.　Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the

_____

paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

USAO_00134812

Case 8:19-cr-00061-JVS   Document 818-1   Filed 09/17/21   Page 386 of 560   Page ID
#:18327

USAO_00134447

form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

c.   The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

40.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it is not always possible to search devices for data
during a search of the premises for a number of reasons,
including the following:

a.   Digital data are particularly vulnerable to
inadvertent or intentional modification or destruction.  Thus,
often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above.  Also, there are now so

USAO_00134813

USAO_00134447

many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

  b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

  41. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

  a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

  b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after

USAO_00134814

USAO_00134447

a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress AVENATTI's, REGNIER's, and MARCHINO's thumbs and/or fingers on the device(s); and (2) hold the device(s) in front of AVENATTI's, REGNIER's, and MARCHINO's faces with their eyes open to activate the facial-, iris-, and/or retina-recognition feature.

## X.    REQUEST FOR SEALING

42.  I request that the search warrant, the search warrant application, and this affidavit be kept under seal to maintain the integrity of this investigation until further order of the Court, or until the government determines that these materials are subject to its discovery obligations in connection with criminal proceedings, at which time they may be produced to defense counsel.  I make this request for several reasons.

a.    First, this criminal investigation is ongoing and is neither public nor known to AVENATTI and other subjects of the investigation.  Disclosure of the search warrant, application, and this affidavit could cause AVENATTI and others to accelerate any existing or evolving plans to, and give them an opportunity to, destroy or tamper with evidence, tamper with

Exhibit D - 369

USAO_00134815

USAO_00134447

or intimidate witnesses, change patterns of behavior, or notify confederates.

b.   Second, based on evidence collected to date and described herein, there is probable cause to believe that AVENATTI took a number of affirmative actions to obstruct the IRS civil collection action relating to GBUS's unpaid payroll taxes by, among other things, lying to RO 1, changing contracts, merchant accounts, and bank account information to avoid liens and levies imposed by the IRS, and instructing employees to deposit over $800,000 in cash from Tully's stores, which were owned and operated by GBUS, into a bank account associated with a separate entity to avoid liens and levies by the IRS.   If AVENATTI were to learn of the instant investigation he might engage in similarly obstructive conduct.

c.   Third, a number of former GBUS employees have expressed concerns that AVENATTI might attempt to retaliate against them if he learned they were cooperating with the government's investigation.

d.   Fourth, there is a possibility that some evidence relating to GBUS's operations may have already been lost when GBUS was evicted from its corporate offices and AVENATTI refused to pay the bill for GBUS's cloud-based server.   Although IRS-CI has been able to obtain some GBUS records, including the data stored on the SUBJECT DEVICES, from other sources, AVENATTI's apparent willingness to allow GBUS records to be lost or destroyed raises a concern that, were AVENATTI to learn of the

57

USAO_00134816

USAO_00134447

instant investigation, he might not hesitate to destroy any
remaining CBUS records and other relevant evidence.

e.   Fifth, the government is still attempting to
locate additional documentary evidence that is relevant to the
investigation, including emails and electronic records that may
be stored by AVENATTI, EA LLP, A&A, or other related entities.
If alerted to the government's investigation prior to the
execution of the proposed search warrants, it is therefore
possible that AVENATTI would attempt to destroy such records and
that the government would have no other means to obtain this
evidence.

43.  Other than what has been described herein, to my
knowledge, the United States has not attempted to obtain this
data by other means.

///

///

///

58

USAO_00134817

Exhibit D - 371

USAO_00134447

## XI. CONCLUSION

44.   For all the reasons described above, there is probable cause to believe that the items listed in Attachments B-1 through B-3, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found at the SUBJECT PREMISES, as described in Attachments A-1 through A-3.

/s/

Remoun Karlous, Special Agent
Internal Revenue Service –
Criminal Investigation

Subscribed to and sworn before me
this ____ day of March 2019.

HONORABLE DOUGLAS F. MCCORMICK
UNITED STATES MAGISTRATE JUDGE

**DOUGLAS F. McCORMICK**

59

USAO_00134818

USAO_00134447

**Exhibit 1 to the March 24, 2019, Search Warrant Application and Supporting Affidavit is attached as Exhibit 1 to this Affidavit**

USAO_00134819

USAO_00134447

**Exhibit 2 to the March 24, 2019, Search Warrant Application and Supporting Affidavit is attached as Exhibit 2 to this Affidavit**

USAO_00134820

USAO_00134447

# EXHIBIT 4

USAO_00134821

USAO_00134447



COPY

FILED - SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

APR 10 2019

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

September 2018 Grand Jury

UNITED STATES OF AMERICA,

      Plaintiff,

      v.

MICHAEL JOHN AVENATTI,

      Defendant.

SA CR No. **SACR19-00061**
JVS

I N D I C T M E N T

[18 U.S.C. § 1343: Wire Fraud;
26 U.S.C. § 7202: Willful Failure
to Collect and Pay Over Withheld
Taxes; 26 U.S.C. § 7212(a):
Endeavoring to Obstruct the
Administration of the Internal
Revenue Code; 26 U.S.C. § 7203:
Willful Failure to File Tax
Return; 18 U.S.C. § 1344(1): Bank
Fraud; 18 U.S.C. § 1028A(a)(1):
Aggravated Identity Theft; 18
U.S.C. § 152(3): False Declaration
in Bankruptcy; 18 U.S.C. § 152(2):
False Testimony Under Oath in
Bankruptcy; 18 U.S.C. § 2(b):
Causing an Act to Be Done;
18 U.S.C. §§ 981(a)(1)(C), 982,
1028 and 28 U.S.C. § 2461(c):
Criminal Forfeiture]

The Grand Jury charges:

USAO_00134822

USAO_00134447

COUNTS ONE THROUGH TEN

(18 U.S.C. § 1343)

A.   INTRODUCTORY ALLEGATIONS

1.   At all relevant times:

a.   Defendant MICHAEL JOHN AVENATTI ("AVENATTI") was a
resident of Orange and Los Angeles Counties, within the Central
District of California.

b.   Defendant AVENATTI was an attorney licensed to
practice law in the State of California.  Defendant AVENATTI provided
legal services to clients in exchange for attorneys' fees.

c.   Defendant AVENATTI practiced law through Eagan
Avenatti LLP ("EA LLP") and Avenatti & Associates, APC ("A&A").  EA
LLP and A&A's principal offices were located in Newport Beach and Los
Angeles, California.

d.   A&A was a professional corporation organized in
California.  Defendant AVENATTI was A&A's Chief Executive Officer
("CEO"), Secretary, Chief Financial Officer, and sole director.
Defendant AVENATTI owned 100 percent of A&A.

e.   EA LLP was a limited liability partnership organized
in California.  Defendant AVENATTI was EA LLP's managing member and
managing partner.  Through A&A, defendant AVENATTI owned at least 75
percent of EA LLP.

f.   Defendant AVENATTI was also the effective owner and
controlled a number of other entities, including:

i.   Global Baristas US LLC ("GBUS"), which operated
Tully's Coffee ("Tully's") stores in Washington and California;

ii.   Global Baristas, LLC ("GB LLC"), which wholly
owned GBUS;

2

1              iii. GB Autosport, LLC ("GB Auto"), which managed

2    defendant AVENATTI's car racing team; and

3              iv.  Passport 420, LLC ("Passport 420"), which held

4    title to a private airplane defendant AVENATTI used.

5         g.   Defendant AVENATTI was a signatory on and exercised

6    control over the following bank accounts, which were all maintained

7    in Orange and Los Angeles Counties, within the Central District of

8    California:

9              i.   California Bank & Trust ("CB&T") attorney trust

10   account ending in x8541 in the name of "The State Bar of California,

11   Eagan Avenatti LLP, Attorney Client Trust Fund" ("EA Trust Account

12   8541").

13             ii.  CB&T attorney trust account ending in x3714 in

14   the name of "The State Bar of California, Eagan Avenatti LLP,

15   Attorney Client Trust Account" ("EA Trust Account 3714").

16             iii. CB&T attorney trust account ending in x4613 in

17   the name of "State Bar of California, Eagan Avenatti LLP, Attorney

18   Client Trust Account" ("EA Trust Account 4613").

19             iv.  CB&T attorney trust account ending in x8671 in

20   the name of "The State Bar of California, Eagan Avenatti LLP,

21   Attorney Client Trust Account" ("EA Trust Account 8671").

22             v.   CB&T account ending in x2851 in the name of

23   "Eagan Avenatti LLP" ("EA Account 2851").

24             vi.  CB&T account ending in x8461 in the name of

25   "Eagan Avenatti LLP, Operating Account" ("EA Account 8461").

26             vii. CB&T account ending in x0313 in the name of

27   "Eagan Avenatti LLP, Debtor-in-Possession Case 8:17-BK-11961-CB,

28   General Account" ("EA DIP Account 0313").

3

USAO_00134447

1          viii.    CB&T account ending in x0661 in the name of

2    "Avenatti & Assoc. A Professional Corp." ("A&A Account 0661").

3          ix.   City National Bank ("CNB") attorney trust account

4    ending in x5566 in the name of "Michael J. Avenatti, Attorney Client

5    Trust Account" ("Avenatti Trust Account 5566").

6          x.    CNB attorney trust account ending in x4705 in the

7    name of "Michael J. Avenatti, Esq., Attorney Client Trust Account"

8    ("Avenatti Trust Account 4705").

9          xi.   CB&T account ending in x2240 in the name of

10   "Global Baristas US LLC, Operating Account" ("GBUS Operating Account

11   2240").

12         xii.  CB&T account ending in x3730 in the name of

13   "Global Baristas LLC" ("GB LLC Account 3730").

14        h.   Defendant AVENATTI was a signatory on and exercised

15   control over a KeyBank account ending in x6193 in the name of "Global

16   Baristas US LLC" ("GBUS KeyBank Account 6193"), which was maintained

17   in Seattle, Washington.

18        i.   As a member of the State Bar of California, defendant

19   AVENATTI was obligated to comply with the California Rules of

20   Professional Conduct.  Defendant AVENATTI was required, among other

21   things, to promptly notify a client of the receipt of any funds the

22   client was entitled to receive, and to promptly pay or deliver to the

23   client or such payees as designated by the client any such funds that

24   defendant AVENATTI held in trust for the client upon the client's

25   request.

26        j.   Money transmitted through the Fedwire Funds Transfer

27   System (the "Fedwire system") was routed from its origin to its

28   destination through Texas and New Jersey.

                                  4

USAO_00134825

k.    A "Special Needs Trust" was a specialized trust that allowed for a disabled person to maintain his or her eligibility for public assistance benefits, despite having assets that would otherwise make the person ineligible for those benefits.

2.    "Client 1" was an individual who resided in Los Angeles County, within the Central District of California.  Beginning as early as in or about 2012 and continuing until in or about March 2019, defendant AVENATTI and EA LLP had a formal attorney-client relationship with Client 1.  Specifically, defendant AVENATTI and EA LLP agreed to represent Client 1 in connection with a lawsuit against the County of Los Angeles and others, alleging violations of Client 1's constitutional rights that led to severe emotional distress and severe physical injuries, including paraplegia (the "L.A. County Lawsuit").

3.    "Client 2" was an individual who resided in Los Angeles County, within the Central District of California.  Beginning as early as in or about December 2016 and continuing until in or about March 2019, defendant AVENATTI and EA LLP had a formal attorney-client relationship with Client 2.  Specifically, defendant AVENATTI and EA LLP agreed to represent Client 2 in connection with potential litigation against an individual with whom Client 2 had a personal relationship ("Individual 1").

4.    "Client 3" was an individual who resided in Orange County, within the Central District of California.  Beginning as early as in or about July 2014 and continuing until in or about November 2018, defendant AVENATTI and EA LLP had a formal attorney-client relationship with Client 3.  Specifically, defendant AVENATTI and EA

5

USAO_00134447

USAO_00134826

1   LLP agreed to represent Client 3 in connection with an intellectual
2   property dispute against a Colorado-based company ("Company 1").
3         5.   "Client 4" and "Client 5" were both individuals who resided
4   in Los Angeles County, within the Central District of California.
5   Beginning as early as in or about August 2017 and continuing until in
6   or about August 2018, defendant AVENATTI had a formal attorney-client
7   relationship with both Client 4 and Client 5.  Specifically,
8   defendant AVENATTI agreed to represent both Client 4 and Client 5 in
9   connection with their separation and divestment from one of the
10  companies in which Client 4 and Client 5 owned shares ("Company 2").
11  B.   **THE SCHEME TO DEFRAUD**
12        6.   Beginning as early as in or about January 2015 and
13  continuing through at least in or about March 2019, in Orange and Los
14  Angeles Counties, within the Central District of California, and
15  elsewhere, defendant AVENATTI, knowingly and with intent to defraud,
16  devised, participated in, and executed a scheme to defraud victim-
17  clients to whom defendant AVENATTI had agreed to provide legal
18  services, including, but not limited to, Client 1, Client 2, Client
19  3, Client 4, and Client 5, as to material matters, and to obtain
20  money and property from such victim-clients by means of material
21  false and fraudulent pretenses, representations, and promises, and
22  the concealment of material facts that defendant AVENATTI had a duty
23  to disclose.
24  C.   **THE MANNER AND MEANS OF THE SCHEME TO DEFRAUD**
25        7.   The fraudulent scheme operated, in substance, in the
26  following manner:
27
28

6

USAO_00134447

USAO_00134447

1          a.    Defendant AVENATTI would negotiate a settlement on

2    behalf of a client that would require the payment of funds to the

3    client.

4          b.    Defendant AVENATTI would misrepresent, conceal, and

5    falsely describe to the client the true terms of the settlement

6    and/or the disposition the settlement proceeds.

7          c.    Defendant AVENATTI would cause the settlement proceeds

8    to be deposited in or transferred to attorney trust accounts

9    defendant AVENATTI controlled.

10         d.    Defendant AVENATTI would embezzle and misappropriate

11   settlement proceeds to which he was not entitled.

12         e.    Defendant AVENATTI would lull the client to prevent

13   the client from discovering the embezzlement and misappropriation by,

14   among other things, falsely denying the settlement proceeds had been

15   paid, sending funds to the client under the false pretense that such

16   funds were "advances" on the purportedly yet-to-be received

17   settlement proceeds, and falsely claiming that payment of the

18   settlement proceeds to the client had been delayed for legitimate

19   reasons and would occur at a later time.

20                    **Embezzlement of Client 1's Funds**

21         f.    On or about January 21, 2015, defendant AVENATTI

22   negotiated a settlement of the L.A. County Lawsuit on behalf of

23   Client 1.  Under the terms of the negotiated settlement agreement,

24   the County of Los Angeles agreed to pay $4,000,000 to Client 1 in

25   exchange for Client 1 dismissing the L.A. County Lawsuit.  Client 1

26   was entitled to receive the $4,000,000 settlement payment, less EA

27   LLP's attorneys' fees, costs, and expenses.

28

USAO_00134828

USAO_00134447

g.    In or around January 2015, defendant AVENATTI told Client 1 that the County of Los Angeles had agreed to a settlement. Defendant AVENATTI falsely represented to Client 1 that the settlement agreement had to remain confidential, the County of Los Angeles could not pay the settlement to Client 1 in one lump-sum, and the settlement proceeds could not be paid until the County of Los Angeles approved a Special Needs Trust for Client 1.   In truth and in fact, as defendant AVENATTI then well knew, the settlement agreement did not contain a confidentiality provision, the County of Los Angeles had agreed to make a lump-sum $4,000,000 settlement payment to Client 1, and the settlement payment from the County of Los Angeles was not conditioned on the approval of a Special Needs Trust for Client 1.

h.    On or about January 26, 2015, defendant AVENATTI caused the approximately $4,000,000 settlement payment to be deposited into EA Trust Account 8541 to be held in trust for Client 1.   Knowing that the full settlement amount had been paid by the County of Los Angeles, defendant AVENATTI concealed and failed to disclose to Client 1 that EA LLP had received the $4,000,000 settlement payment.   Further, defendant AVENATTI and EA LLP retained and did not transfer Client 1's portion of the settlement payment to Client 1.

i.    Between on or about January 26, 2015, and on or about March 30, 2015, defendant AVENATTI caused approximately $3,125,000 of the $4,000,000 settlement payment to be transferred from EA Trust Account 8541 to EA Account 2851.   Thereafter, defendant AVENATTI caused substantial portions of the settlement proceeds to be transferred from EA Account 2851 to A&A Account 0661, and then

8

USAO_00134829

1   further transferred to other bank accounts defendant AVENATTI

2   controlled, including defendant AVENATTI's personal bank account and

3   bank accounts associated with GBUS and GB Auto, or used to pay

4   defendant AVENATTI's personal expenses.  By no later than July 6,

5   2015, defendant AVENATTI had drained all of the settlement proceeds

6   out of EA Trust Account 8541.  Defendant AVENATTI concealed and

7   failed to disclose to Client 1 that the entire $4,000,000 settlement

8   payment had been expended and that substantial portions of the

9   settlement proceeds had been used for defendant AVENATTI's own

10  purposes.

11          j.   In order to lull Client 1 and prevent Client 1 from

12  discovering that defendant AVENATTI had embezzled Client 1's portion

13  of the $4,000,000 settlement payment, defendant AVENATTI committed

14  and caused to be committed the following acts:

15          i.   Starting as early as in or about July 2015 and

16  continuing to in or about March 2019, defendant AVENATTI caused at

17  least 69 payments, each ranging from approximately $1,000 to

18  approximately $1,900 and together totaling at least approximately

19  $124,000, to be made to Client 1.  During this same time period,

20  defendant AVENATTI also caused payments to be made to various

21  assisted living facilities to pay for rent on Client 1's behalf.

22  Defendant AVENATTI falsely represented to Client 1 that the payments

23  made to Client 1 and to the assisted living facilities where Client 1

24  resided were "advances" on the settlement payment from the County of

25  Los Angeles, which defendant AVENATTI falsely represented had not yet

26  been received..

27          ii.  In or about 2017, after Client 1 told defendant

28  AVENATTI that Client 1 wanted to purchase his own residence,

9

USAO_00134447

USAO_00134830

USAO_00134447

1   defendant AVENATTI agreed to help Client 1 find a real estate broker
2   and purchase a house.  Defendant AVENATTI represented and promised to
3   Client 1 that Client 1 would be able to use the settlement proceeds
4   to fund the purchase of a house.  After Client 1 was in escrow on the
5   purchase of a house, however, defendant AVENATTI falsely told Client
6   1 that Client 1 could not purchase the house after all because the
7   County of Los Angeles still had not approved the Special Needs Trust
8   and therefore could not make the settlement payment to Client 1.
9   Client 1 was unable to close escrow and did not purchase the house.
10              iii. On or about November 26, 2018, defendant AVENATTI
11  told Client 1 that defendant AVENATTI would respond on Client 1's
12  behalf to a request that Client 1 provide the United States Social
13  Security Administration ("SSA") information it requested to evaluate
14  Client 1's continued eligibility for Supplemental Security Income
15  ("SSI") benefits, including information regarding the settlement
16  agreement with the County of Los Angeles, the purported Special Needs
17  Trust, and the monthly payments from defendant AVENATTI.  Knowing
18  full well that the requested information could lead to inquiries that
19  could reveal that defendant AVENATTI had embezzled Client 1's portion
20  of the settlement proceeds, defendant AVENATTI failed to provide the
21  requested information to SSA, which resulted in Client 1's SSI
22  benefits being discontinued in or about February 2019.
23              k.   On or about March 22, 2019, defendant AVENATTI was
24  questioned regarding the alleged embezzlement of the Client 1
25  Settlement Proceeds during a public judgment-debtor examination
26  conducted in federal court in Los Angeles, California.  Shortly
27  thereafter, in order to lull Client 1 and prevent Client 1 from
28  discovering that defendant AVENATTI had embezzled Client 1's portion

<center>10</center>

USAO_00134831

USAO_00134447

of the $4,000,000 settlement, defendant AVENATTI falsely told Client

1 that the County of Los Angeles had finally approved the Special

Needs Trust for Client 1 and that Client 1 would begin receiving

settlement payments from the County of Los Angeles through the

Special Needs Trust.

1.    In order to further lull Client 1 and to attempt to

establish a defense against any claims Client 1 could bring against

defendant AVENATTI, on or about March 23, 2019, and on or about March

24, 2019, defendant AVENATTI caused Client 1 to sign a document

defendant AVENATTI claimed was necessary to effectuate the settlement

agreement and finalize the Special Needs Trust that defendant

AVENATTI claimed was required before Client 1 could begin receiving

payments due under the settlement, and a document stating that Client

1 was satisfied with defendant AVENATTI's representation of Client 1.

### Embezzlement of Client 2's Funds

m.    On or about January 7, 2017, defendant AVENATTI

negotiated a settlement on behalf of Client 2 with Individual 1.

Under the terms of the settlement agreement, Individual 1 was

required to make an initial payment to Client 2 of approximately

$2,750,000 by on or about January 28, 2017, and an additional payment

to Client 2 of approximately $250,000 on or about November 1, 2020,

if certain additional specified conditions were met, for a total of

approximately $3,000,000.   Client 2 was entitled to receive the

initial $2,750,000 settlement payment, less EA LLP's attorneys' fees

(i.e., 33 percent of the total $3,000,000 settlement amount), costs,

and expenses.

n.    In order to conceal the true details of the settlement

agreement from Client 2, defendant AVENATTI did not provide a copy of

11

USAO_00134832

USAO_00134447

1   the settlement agreement to Client 2.  Rather, in or about January

2   2017, defendant AVENATTI falsely represented to Client 2 that

3   Individual 1 would make an initial lump-sum payment, the entirety of

4   which would be used to pay EA LLP's attorney fees (i.e., 33 percent

5   of the total settlement amount) and costs, and then approximately 96

6   monthly payments over the course of the next eight years by which the

7   remaining settlement funds would be paid to Client 2.  In truth and

8   in fact, as defendant AVENATTI then well knew, the actual settlement

9   agreement required Individual 1 to make the initial $2,750,000

10  settlement payment, which far exceeded the money owed to EA LLP for

11  attorneys' fees, by on or about January 28, 2017, and Individual 1

12  was not required to make any monthly payments to Client 2 thereafter.

13          o.   On or about January 25, 2017, defendant AVENATTI

14  caused the initial $2,750,000 settlement payment from Individual 1 to

15  be transferred to EA Trust Account 8671 to be held in trust for

16  Client 2.  Defendant AVENATTI concealed and failed to disclose to

17  Client 2 that EA LLP had received the initial $2,750,000 settlement

18  payment.  Further, defendant AVENATTI and EA LLP retained and did not

19  transfer Client 2's portion of the $2,750,000 settlement payment to

20  Client 2.

21          p.   On or about January 26, 2017, defendant AVENATTI

22  caused $2,500,000 of the $2,750,000 settlement payment to be

23  transferred to an attorney trust account for another law firm ("Law

24  Firm 1").  That same day, defendant AVENATTI caused Law Firm 1 to

25  transfer the entire $2,500,000 to Honda Aircraft Company, LLC, to

26  purchase a private airplane for defendant AVENATTI's company,

27  Passport 420.  Defendant AVENATTI also caused the remaining $250,000

28  of the $2,750,000 settlement payment to be transferred first to EA

USAO_00134833

USAO_00134447

1   Account 2351 and then to A&A Account 0661.  Defendant AVENATTI

2   concealed and failed to disclose to Client 2 that defendant AVENATTI

3   had used the settlement proceeds in this manner.

4          q.   In order to lull Client 2 and prevent Client 2 from

5   discovering that defendant AVENATTI had embezzled Client 2's portion

6   of the initial $2,750,000 settlement payment, defendant AVENATTI

7   committed and caused to be committed the following acts:

8          i.   Between on or about March 15, 2017, and on or

9   about June 18, 2018, defendant AVENATTI caused approximately 11

10  payments totaling approximately $194,000 to be deposited into Client

11  2's bank account.  Defendant AVENATTI falsely represented to Client 2

12  that these payments constituted the monthly settlement payments that

13  were purportedly due from Individual 1.  For example, on or about

14  February 20, 2019, defendant AVENATTI caused a $16,000 cashier's

15  check drawn on EA Account 4613 to be deposited into Client 2's bank

16  account, which falsely identified Individual 1 as the "remitter."

17         ii.   Between in or about June 2018 and in or about

18  March 2019, after defendant AVENATTI stopped making the purported

19  monthly payments to Client 2, defendant AVENATTI falsely represented

20  to Client 2 that Individual 1 was not complying with the settlement

21  agreement and falsely told Client 2 that defendant AVENATTI was

22  working on obtaining the missing monthly settlement payments

23  purportedly due to Client 2 from Individual 1.

24         iii. On or about March 24, 2019, at a meeting with

25  Client 2 at defendant AVENATTI's residence in Los Angeles,

26  California, defendant AVENATTI falsely represented to Client 2 that

27  Client 2 would soon be receiving a payment from Individual 1 to make

28

USAO_00134834

1   up for the purportedly missing monthly settlement payments from

2   Individual 1 for July 2018 through March 2019.

### Embezzlement of Client 3's Funds

4         r.   Between on or about December 22, 2017, and on or about

5   December 28, 2017, defendant AVENATTI negotiated a settlement

6   agreement with Company 1 on behalf of Client 3.  The settlement

7   agreement required Company 1 to make an initial payment of $1,600,000

8   by January 10, 2018, and three additional payments of $100,000 by

9   January 10 of 2019, 2020, and 2021, respectively, for a total of

10  $1,900,000.  Client 3 was entitled to receive the initial $1,600,000

11  settlement payment, less EA LLP's attorneys' fees of $760,000 (i.e.,

12  40 percent of the total $1,900,000 settlement amount), costs, and

13  expenses.

14        s.   On or about December 28, 2017, at a meeting with

15  Client 3 at EA LLP's offices in Newport Beach, California, to discuss

16  the proposed settlement agreement with Company 1, defendant AVENATTI

17  provided an altered copy of the settlement agreement to Client 3 for

18  Client 3's review, which copy falsely represented the payment

19  schedule as $1,600,000 due by March 10, 2018, and $100,000 due by

20  March 10 of each of the three subsequent years.  That same day,

21  defendant AVENATTI emailed the attorney for Company 1 the signature

22  page for the actual settlement agreement, bearing Client 3's

23  signature.

24        t.   On or about December 29, 2017, defendant AVENATTI

25  received a complete copy of the fully executed settlement agreement

26  with Client 3's and Company 1's signatures from Company 1's attorney,

27  which included the payment schedule that had actually been negotiated

28  by defendant AVENATTI but had been concealed from Client 3, namely,

USAO_00134447

1  an initial $1,600,000 payment due by January 10, 2018, and additional

2  payments of $100,000 due by January 10 of each of the three

3  subsequent years.

4        u.   On or about January 2, 2018, defendant AVENATTI

5  emailed instructions to Company 1's attorney to wire the initial

6  $1,600,000 settlement payment to Avenatti Trust Account 5566.

7        v.   On or about January 5, 2018, as instructed by

8  defendant AVENATTI, Company 1 wired the initial $1,600,000 settlement

9  payment to Avenatti Trust Account 5566 to be held in trust for Client

10  3.  Defendant AVENATTI concealed and failed to disclose to Client 3

11  that defendant AVENATTI had received the initial $1,600,000

12  settlement payment from Company 1.  Further, defendant AVENATTI

13  retained Client 3's portion of the $1,600,000 settlement payment and

14  did not transfer Client 3's portion of the $1,600,000 settlement

15  payment to Client 3.

16        w.   Between on or about January 5, 2018, and on or about

17  March 14, 2018, defendant AVENATTI caused approximately $1,599,400 of

18  the initial $1,600,000 settlement payment to be used for his own

19  purposes, including to pay for expenses relating to GBUS.  Defendant

20  AVENATTI concealed and failed to disclose to Client 3 that defendant

21  AVENATTI used the settlement proceeds for his own purposes.

22        x.   In order to lull Client 3 and prevent Client 3 from

23  discovering that defendant AVENATTI had embezzled Client 3's portion

24  of the initial $1,600,000 settlement payment, defendant AVENATTI

25  committed and caused to be committed the following acts:

26          i.   Between on or about March 10, 2018, and in or

27  about November 2018, defendant AVENATTI falsely represented to Client

28  3 that Company 1 had not made the initial $1,600,000 settlement

USAO_00134836

USAO_00134447

1  payment, and that defendant AVENATTI was working on obtaining the
2  purportedly missing $1,600,000 settlement payment from Company 1.
3  ii.  Between in or about April 2018 and in or about
4  November 2018, defendant AVENATTI caused multiple payments totaling
5  approximately $130,000 to be paid to Client 3 and/or Client 3's
6  spouse, which payments defendant AVENATTI falsely claimed represented
7  "advances" on Client 3's portion of the $1,600,000 settlement payment
8  from Company 1, so that Client 3 could meet certain financial
9  obligations while Client 3 was purportedly "waiting" for his portion
10 of the $1,600,000 settlement payment from Company 1.
11 **Embezzlement of Client 4's Funds**
12 y.  On or about September 17, 2017, defendant AVENATTI
13 negotiated a "Common Stock Repurchase Agreement" with Company 2 on
14 behalf of Client 4 and Client 5.  Under the terms of Client 4's
15 Common Stock Repurchase Agreement, Company 2 agreed to repurchase
16 from Client 4 361,565 shares of Company 2 for approximately
17 $27,478,940, and thereafter an additional 107,188 shares of Company 2
18 for approximately $8,146,288, which resulted in a total repurchase
19 amount of approximately $35,625,228.
20 z.  On or about September 18, 2017, Company 2 wired
21 approximately $27,414,668 to Avenatti Trust Account 4705.
22 Approximately $2,797,651 of this amount constituted defendant
23 AVENATTI's and/or EA LLP's attorneys' fees (i.e., 7.5 percent of the
24 total $35,625,228 repurchase amount), costs, and expenses.  Between
25 on or about September 21, 2017, and on or about October 3, 2017,
26 defendant AVENATTI caused the remainder of the initial $27,414,668
27 payment to be transferred to bank accounts associated with Client 4.
28

16

USAO_00134837

USAO_00134447

1        aa.  On or about March 13, 2018, after Company 2 informed

2   Client 4 and Client 5 that Company 2 was ready to repurchase the

3   remaining 107,188 shares of Company 2 from Client 4 as contemplated

4   in the Common Stock Purchase Agreement, defendant AVENATTI told

5   Client 5 that Company 2 should wire the remaining $8,146,288 payment

6   due to Client 4 to Avenatti Trust Account 4705, and that defendant

7   AVENATTI would then wire the $8,146,288 payment from Avenatti Trust

8   Account 4705 to Client 4.

9        bb.  On or about March 14, 2018, following defendant

10  AVENATTI's instructions, Company 2 transferred approximately

11  $8,146,288 to Avenatti Trust Account 4705 to be held in trust for

12  Client 4.  Defendant AVENATTI retained and did not transfer the

13  $8,146,288 payment to Client 4 as defendant AVENATTI had promised to

14  do.

15       cc.  Between on or about March 15, 2018, and on or about

16  May 4, 2018, defendant AVENATTI caused approximately $4,000,000 out

17  of the $8,146,288 payment from Company 2 due to Client 4 to be used

18  for defendant AVENATTI's own purposes, including the following:

19            i.  On or about March 15, 2018, defendant AVENATTI

20  caused approximately $3,000,000 of Client 4's funds to be transferred

21  to EA Trust Account 4613.  Later that same day, defendant AVENATTI

22  then caused approximately $2,828,423 to be transferred from EA Trust

23  Account 4613 to an attorney trust account for SulmeyerKupetz, a law

24  firm representing A&A and defendant AVENATTI in bankruptcy

25  proceedings involving EA LLP, so that SulmeyerKupetz could use the

26  money to pay some of EA LLP's creditors in the bankruptcy

27  proceedings, including the Internal Revenue Service.

28

USAO_00134838

USAO_00134447

1          ii.   Between on or about March 20, 2018, and on or
2     about May 1, 2018, defendant AVENATTI caused a total of approximately
3     $750,000 of Client 4's funds to be paid to EA Trust Account 4613,
4     which defendant AVENATTI then used for his own purposes, including
5     transferring the funds to bank accounts associated with defendant
6     AVENATTI's other companies, namely, GBUS, GB LLC, A&A, and Passport
7     420.
8          iii.  Between on or about March 20, 2018, and May 1,
9     2018, defendant AVENATTI caused a total of approximately $260,000 of
10    Client 4's funds to be paid to EA DIP Account 0313.
11         iv.   In order to lull Client 1 and prevent Client 1
12    from discovering that defendant AVENATTI had embezzled Client 1's
13    portion of the $4,000,000 settlement payment from the County of Los
14    Angeles, on or about April 9, 2018, defendant AVENATTI used Client
15    4's funds, which had been transferred from Avenatti Trust Account
16    4705 to EA DIP Account 0313 and then to EA Trust Account 4613, to
17    make an approximately $1,900 payment to Client 1.
18         v.    In order to lull Client 2 and prevent Client 2
19    from discovering that defendant AVENATTI had embezzled Client 2's
20    portion of the $2,750,000 settlement payment from Individual 1, on or
21    about April 17, 2018, defendant AVENATTI used Client 4's funds, which
22    had been transferred from Avenatti Trust Account 4705 to EA Trust
23    Account 4613, to make an approximately $34,000 payment to Client 2.
24         dd.   Between on or about March 14, 2018, and on or about
25    May 3, 2018, defendant AVENATTI failed to disclose to Client 4 and
26    Client 5 that defendant AVENATTI had used approximately $4,000,000 of
27    Client 4's funds for defendant AVENATTI's own purposes.
28

USAO_00134839

USAO_00134447

1         ee.  In order to lull Client 4 and Client 5 and prevent

2  them from discovering that defendant AVENATTI had embezzled

3  approximately $4,000,000 from the approximately $8,146,288 payment

4  defendant AVENATTI received from Company 2, between on or about

5  March 14, 2018, and on or about May 3, 2018, defendant AVENATTI

6  falsely represented and promised Client 4 and Client 5 that defendant

7  AVENATTI would transfer Client 4's funds to Client 4 at a later date,

8  and that defendant AVENATTI needed to go to the bank to fill out

9  paperwork to effectuate the wire transfers.  In truth and in fact, as

10  defendant AVENATTI then well knew, he had already caused

11  approximately $4,000,000 of Client 4's funds to be transferred or

12  paid to other bank accounts defendant AVENATTI controlled, and then

13  used for defendant AVENATTI's own purposes.

14         ff.  In order to lull Client 4 and Client 5 and prevent

15  them from discovering that he had embezzled approximately $4,000,000

16  of Client 4's funds, on or about May 4, 2018, defendant AVENATTI

17  caused two wire transfers in the amounts of $4,000,000 and $146,288

18  to be sent from Avenatti Trust Account 4705 to a bank account

19  associated with Client 4.  Defendant AVENATTI retained and failed to

20  transfer to Client 4 the remainder of the $8,146,288 payment that

21  Company 2 had transferred on or about March 14, 2018, to Avenatti

22  Trust Account 4705 for the benefit of Client 4.

23         gg.  Between on or about May 4, 2018, and on or about

24  June 4, 2018, defendant AVENATTI and another attorney with whom

25  defendant AVENATTI worked ("Attorney 1") falsely represented to

26  Client 4 and Client 5 that the entire $8,146,288 payment from Company

27  2 had been transferred to Client 4 in three separate wire transfers.

28  For example, in response to a request from Client 5 that defendant

USAO_00134840

USAO_00134447

1 AVENATTI provide the wire transfer information for the remaining

2 $4,000,000 of Client 4's funds, on or about May 11, 2018, defendant

3 AVENATTI emailed Attorney 1 a wire transfer confirmation document

4 purporting to reflect a second $4,000,000 wire transfer to Client 4.

5 In truth and in fact, as defendant AVENATTI then well knew, defendant

6 AVENATTI had never transferred the remaining $4,000,000 to Client 4,

7 defendant AVENATTI had already used the remaining $4,000,000 for his

8 own purposes, and the wire transfer confirmation document that

9 defendant AVENATTI provided on or about May 11, 2018, related to the

10 first $4,000,000 wire transfer from Avenatti Trust Account 4705 that

11 Client 4 had already received on May 4, 2018.

12 **D.   THE USE OF THE WIRES**

13  8.   On or about the following dates, within the Central

14 District of California, and elsewhere, defendant AVENATTI, for the

15 purpose of executing the above-described scheme to defraud,

16 transmitted and caused to be transmitted by means of wire and radio

17 communications in interstate commerce the following items:

| COUNT | DATE | ITEM WIRED |
|-------|------|------------|
| ONE | 1/30/2015 | Wire transfer of approximately $250,000 sent from A&A Account 0661 through the Fedwire system to CBBS's Homestreet bank account in Seattle, Washington. |
| TWO | 2/10/2015 | Wire transfer of approximately $50,000 from A&A Account 0661 through the Fedwire system to defendant AVENATTI's personal Bank of America bank account. |
| THREE | 1/26/2017 | Wire transfer of approximately $2,500,000 from EA Trust Account 8671 through the Fedwire system to Law Firm 1's J.P. Morgan Chase Bank, N.A. ("Chase") IOLTA trust account. |

27

28

USAO_00134841

USAO_00134447

| COUNT | DATE | ITEM WIRED |
|-------|------|-----------|
| FOUR | 1/5/2018 | Wire transfer of approximately $1,600,000 sent from Company 1's Silicon Valley Bank account through the Fedwire system to Avenatti Trust Account 5566. |
| FIVE | 1/10/2018 | Wire transfer of approximately $60,000 sent from Avenatti CNB Trust Account 5566 through the Fedwire system to EA Trust Account 3714. |
| SIX | 3/15/2018 | Wire transfer of approximately $3,000,000 from Avenatti Trust Account 4705 through the Fedwire system to EA CB&T Trust Account 4613. |
| SEVEN | 3/15/2018 | Wire transfer of approximately $2,828,423 from EA CB&T Trust Account 4613 through the Fedwire system to an attorney trust account for SulmeyerKupetz at CNB. |
| EIGHT | 3/20/2018 | Wire transfer of approximately $200,000 from Avenatti CNB Trust Account 4705 through the Fedwire system to EA Trust Account 4613. |
| NINE | 6/18/2018 | Wire transfer of approximately $16,000 from EA Trust Account 4613 through the Fedwire system to Client 2's Chase bank account. |
| TEN | 7/13/2018 | Wire transfer of approximately $1,900 from EA Trust Account 4613 through the Fedwire system to Client 1's Bank of America bank account. |

21

USAO_00134842

Exhibit D - 396

USAO_00134447

1   COUNTS ELEVEN THROUGH EIGHTEEN

2   [26 U.S.C. § 7202; 18 U.S.C. § 2(b)]

3   **A.   INTRODUCTORY ALLEGATIONS**

4   Background

5   9.   The Grand Jury re-alleges and incorporates by reference

6   paragraph 1 through 7 of this Indictment as though fully set forth

7   herein.

8   10.   At all relevant times:

9   a.   GBUS was a limited liability company organized in

10   Washington, which operated Tully's stores in Washington and

11   California.   Until in or around November 2017, GBUS's corporate

12   office was in Seattle, Washington.

13   b.   GB LLC was a limited liability company organized in

14   Washington.   Defendant MICHAEL JOHN AVENATTI ("AVENATTI") was the

15   sole managing member of GB LLC.

16   c.   GB Auto was a limited liability company organized in

17   Washington.   Defendant AVENATTI was the sole manager of GB Auto.

18   d.   Doppio, Inc. ("Doppio") was a for-profit corporation

19   incorporated in Washington.   Defendant AVENATTI was the sole governor

20   of Doppio.

21   e.   Defendant AVENATTI was the effective owner of GBUS.

22   In or around June 2013, defendant AVENATTI's company GB LLC acquired

23   TC Global Inc., which previously operated Tully's, at a bankruptcy

24   auction for approximately $9.15 million, namely, $6.95 million in

25   cash and $2.2 million in assumed liabilities.   On or about June 25,

26   2013, defendant AVENATTI caused a wire transfer in the amount of

27   $7,000,000 from EA Trust Account 8541 to a bank account for Foster

28   Pepper PLLC, the law firm representing GB LLC in Tully's bankruptcy

22

USAO_00134843

USAO_00134447

1   auction.  A&A owned 100 percent of Doppio, which in turn owned at

2   least 80 percent of GB LLC.  GB LLC wholly owned GBUS, which handled

3   the day-to-day business operations of Tully's.

4          f.   Defendant AVENATTI served as GBUS's CEO, for which he

5   was paid a yearly salary of approximately $250,000.  As GBUS's CEO,

6   defendant AVENATTI exercised control over every aspect of GBUS's

7   business affairs, including approving payments GBUS made and

8   controlling GBUS's bank accounts.  Defendant AVENATTI managed and

9   exercised control over GBUS's business affairs from Orange and Los

10  Angeles Counties, within the Central District of California, and

11  elsewhere.

12         g.   The Internal Revenue Service ("IRS") was an agency of

13  the United States within the Department of Treasury of the United

14  States and was responsible for enforcing and administering the tax

15  laws of the United States.

16         11.  Beginning in or about February 2015 and continuing until at

17  least in or about July 2018, GBUS maintained multiple bank accounts

18  at CB&T in Orange County, California, including GBUS's payroll

19  account ending in x2976 ("GBUS Payroll Account 2976") and GBUS

20  Operating Account 2240.  Defendant AVENATTI and an EA LLP employee

21  ("EA Employee 1") were the only signatories on GBUS Payroll Account

22  2976 and GBUS Operating Account 2240.

23         12.  In addition to defendant AVENATTI's yearly salary as GBUS's

24  CEO, between as early as in or about September 2015 and continuing

25  until at least in or about December 2017, defendant AVENATTI caused

26  GBUS to make substantial payments for defendant AVENATTI's personal

27  benefit and the benefit of other entities defendant AVENATTI

28

USAO_00134844

USAO_00134447

1   controlled, while, at the same time, failing to pay over to the IRS
2   payroll taxes withheld from GBUS employees' paychecks.  For example:
3          a.   Between on or about September 1, 2015, and on or about
4   December 31, 2017, defendant AVENATTI caused a net of approximately
5   $2.5 million to be transferred from GBUS's and GB LLC's bank accounts
6   to bank accounts associated with A&A and EA LLP.
7          b.   On or about March 30, 2016, defendant AVENATTI caused
8   GBUS to transfer $200,000 to the G.P. Family Trust as payment for two
9   months of rent for defendant AVENATTI's residence in Newport Beach,
10  California.
11         c.   In order to lull Client 1 and prevent Client 1 from
12  discovering that defendant AVENATTI had embezzled Client 1's portion
13  of the $4,000,000 settlement payment from the County of Los Angeles,
14  on or about April 7, 2016, defendant AVENATTI used GBUS funds, which
15  had been transferred from GBUS Account 2240 to EA Account 2851, to
16  make an approximately $1,900 payment to Client 1.
17         d.   In order to lull Client 2 and prevent Client 2 from
18  discovering that defendant AVENATTI had embezzled Client 2's portion
19  of the initial $2,750,000 settlement payment from Individual 1,
20  defendant AVENATTI caused GBUS funds to be used to make payments to
21  Client 2, including the following:
22              i.   On or about April 14, 2017, defendant AVENATTI
23  used GBUS funds, which had been transferred from GBUS Account 2240 to
24  A&A Account 0661, to make an approximately $16,000 payment to Client
25  2.
26              ii.  On or about May 15, 2017, defendant AVENATTI used
27  GBUS funds, which had been transferred from GBUS Account 2240 to A&A
28  Account 0661, to make an approximately $16,000 payment to Client 2.

24

USAO_00134845

USAO_00134447

<center>Federal Payroll Taxes</center>

1   13.   At all relevant times:

2        a.   Title 26 of the United States Code imposed four types
3   of tax with respect to wages paid to employees:  (1) income tax;
4   (2) Social Security tax; (3) Medicare tax; and (4) federal
5   unemployment tax (collectively, "payroll taxes").

6        b.   Federal income tax was imposed upon employees based
7   upon the amount of wages they received.

8        c.   Social Security tax and Medicare tax were imposed by
9   the Federal Insurance Contributions Act (collectively referred to as
10  "FICA taxes").  FICA taxes were imposed separately on employees and
11  on employers.

12       d.   Federal unemployment tax was imposed under the Federal
13  Unemployment Tax Act ("FUTA").  FUTA taxes were imposed solely on
14  employers.

<center>GBUS's Obligation to Collect, Truthfully Account For, and
Pay Over to the IRS Federal Payroll Taxes</center>

15  14.   At all relevant times:

16       a.   GBUS was required to withhold employee income taxes
17  and FICA taxes from the wages paid to its employees, and to pay over
18  the withheld amounts to the IRS.  The employee income taxes and FICA
19  taxes that GBUS was required to withhold and pay over to the IRS were
20  commonly referred to as "trust fund taxes" because of the provision
21  in the Internal Revenue Code requiring that such taxes "shall be held
22  to be a special fund in trust for the United States."

23       b.   GBUS was required to make deposits of payroll taxes,
24  including trust fund taxes, to the IRS on a periodic basis.  In
25  addition, GBUS was required to file, following the end of each

<center>25</center>

USAO_00134447

1  calendar quarter, an Employer's Quarterly Federal Tax Return (Form
2  941), setting forth for the quarter the total amount of wages and
3  other compensation subject to withholding paid by GBUS, the total
4  amount of income tax withheld, the amount of Social Security and
5  Medicare taxes (i.e., FICA taxes) due, and the total federal tax
6  deposits.

7          c.   Defendant AVENATTI was a "responsible person" for
8  GBUS, that is, defendant AVENATTI had the corporate responsibility to
9  collect, truthfully account for, and pay over to the IRS GBUS's
10 payroll taxes.

11         15.  Beginning in or about June 2013 and continuing until at
12 least in or about October 2017, GBUS withheld tax payments from its
13 employees' paychecks, including federal income taxes and FICA taxes.

14         16.  Beginning in or about September 2015 and continuing until
15 at least in or about October 2017, GBUS failed to pay over to the IRS
16 payroll taxes due and owing, including federal income taxes and FICA
17 taxes GBUS withheld from its employees' paychecks.  In total, between
18 in or around September 2015 and in or around October 2017, GBUS
19 failed to pay over to the IRS at least approximately $3,207,144 in
20 federal payroll taxes, including at least approximately $2,390,048 in
21 trust fund taxes that GBUS withheld from its employees' paychecks.

22         17.  Beginning in or about January 2016 and continuing until at
23 least in or about October 2017, GBUS failed to timely file its
24 quarterly employment tax returns (Forms 941) with the IRS for the
25 fourth quarter of 2015 through the third quarter of 2017, inclusive.

26 B.   **FAILURE TO ACCOUNT FOR AND PAY OVER PAYROLL TAXES**

27         18.  Beginning in or about October 2015 and continuing until at
28 least on or about October 31, 2017, in Orange County, within the

USAO_00134847

USAO_00134447

Central District of California, and elsewhere, defendant AVENATTI, a
responsible person of GBUS, willfully failed and willfully caused
GBUS to fail to pay over to the United States, namely, the IRS, all
of the federal income taxes and FICA taxes (i.e., trust fund taxes)
that GBUS withheld from GBUS employees' total taxable wages, which
were due and owing to the United States by the dates set forth below
and in the amounts set forth below, for each of the following
calendar year quarters:

| COUNT | QUARTER AND YEAR | QUARTERLY DUE DATE | APPROXIMATE TRUST FUND TAXES DUE AND OWING |
|---|---|---|---|
| ELEVEN | Fourth Quarter of 2015 | 1/31/2016 | $292,724 |
| TWELVE | First Quarter of 2016 | 4/30/2016 | $382,100 |
| THIRTEEN | Second Quarter of 2016 | 7/31/2016 | $297,791 |
| FOURTEEN | Third Quarter of 2016 | 10/31/2016 | $333,969 |
| FIFTEEN | Fourth Quarter of 2016 | 1/31/2017 | $277,681 |
| SIXTEEN | First Quarter of 2017 | 4/30/2017 | $309,702 |
| SEVENTEEN | Second Quarter of 2017 | 7/31/2017 | $345,094 |
| EIGHTEEN | Third Quarter of 2017 | 10/31/2017 | $150,549 |

USAO_00134848

Exhibit D - 402

USAO_00134447

```
 1                        COUNT NINETEEN

 2                     (26 U.S.C. § 7212(a))

 3   A.   INTRODUCTORY ALLEGATIONS

 4        19.   The Grand Jury re-alleges and incorporates by reference

 5   paragraphs 1 through 7 and 10 through 17 of this Indictment as though

 6   fully set forth herein.

 7        20.   In or about September 2016, the IRS initiated a collection

 8   action relating to GBUS's failure to file its quarterly employment

 9   tax returns (Forms 941) and pay over to the IRS payroll taxes that

10   were due and owing, including federal income taxes and FICA taxes

11   that GBUS had withheld (collectively, "trust fund taxes") from GBUS

12   employees' paychecks.

13        21.   On or about October 7, 2016, an IRS Revenue Officer ("IRS

14   RO-1") spoke with defendant MICHAEL JOHN AVENATTI ("AVENATTI") and

15   other GBUS employees regarding the IRS's collection action and

16   advised them that since approximately September 2015 GBUS had not

17   paid over to the IRS any federal payroll taxes.

18        22.   On or about June 26, 2017, IRS RO-1 filed a notice of

19   federal tax lien against GBUS in King County in the State of

20   Washington.   The federal tax lien indicated that GBUS owed the IRS

21   approximately $4,998,227 in unpaid federal payroll taxes.   A copy of

22   the federal tax lien notice was also mailed to GBUS.

23        23.   Between in or about August 2017 and in or about January

24   2018, IRS RO-1 issued levy notices to a number of financial

25   institutions and companies associated with GBUS.   The levy notices

26   indicated that GBUS owed the IRS as much as approximately $5,210,769.

27   Each levy notice required the recipient of the levy notice to turn

28   over to the United States Treasury GBUS's property and rights to
```

USAO_00134849

USAO_00134447

1   property, such as money, credits, and bank deposits, that the

2   recipient of the levy had or was already obligated to pay to GBUS.

3   Banks, savings and loans, and credit unions were obligated to hold

4   any funds subject to the levy notices for 21 days before sending

5   payment to the United States Treasury.  Copies of the levy notices

6   issued by IRS RO-1 were mailed to GBUS.

7       24.  Beginning as early as in or about August 2017, defendant

8   AVENATTI knew that the IRS had issued levies to certain financial

9   institutions at which GBUS maintained bank accounts.

10  **B.   THE ATTEMPT TO OBSTRUCT AND IMPEDE THE ADMINISTRATION OF THE**

11  **INTERNAL REVENUE LAWS**

12      25.  Beginning on or about October 7, 2016, and continuing until

13  at least in or around September 2018, in Orange and Los Angeles

14  Counties, within the Central District of California, and elsewhere,

15  defendant AVENATTI corruptly obstructed and impeded, and corruptly

16  endeavored to obstruct and impede, the due administration of the

17  internal revenue laws of the United States.

18      26.  The attempt to obstruct and impede the due administration

19  of the internal revenue laws of the United States operated, in

20  substance, in the following manner:

21          a.   On or about October 7, 2016, defendant AVENATTI made

22  false statements to IRS RO-1 in connection with the IRS's collection

23  action, including that:  (i) defendant AVENATTI was not personally

24  involved in GBUS's finances; and (ii) defendant AVENATTI was unaware

25  that since approximately September 2015 GBUS had failed to pay over

26  to the IRS any federal payroll taxes.  In truth and in fact, as

27  defendant AVENATTI then well knew, (i) defendant AVENATTI was

28  personally involved in GBUS's finances in that he had authority to

29

USAO_00134850

USAO_00134447

1  approve payments on behalf of GBUS and had control over GBUS's bank

2  accounts; and (ii) defendant AVENATTI was aware that since

3  approximately September 2015 GBUS had failed to pay over to the IRS

4  any federal payroll taxes because, among other reasons, on or about

5  November 5, 2015, GBUS's controller had sent defendant AVENATTI an

6  email explaining to defendant AVENATTI the "implications" of GBUS not

7  paying to the IRS its payroll taxes in a timely manner, and, between

8  in or about September 2015 and in or about October 2016, defendant

9  AVENATTI had refused to authorize GBUS to pay over to the IRS the

10  federal payroll taxes that GBUS had withheld from its employees'

11  paychecks.

12          b.   In order to further obstruct and impede the IRS's

13  collection action and the IRS's efforts to collect the payroll taxes

14  that GBUS owed to the IRS, defendant AVENATTI directed GBUS employees

15  to stop depositing cash receipts from the Tully's stores into GBUS

16  KeyBank Account 6193, which defendant AVENATTI knew was already

17  subject to IRS levy notices, and instructed GBUS employees to instead

18  deposit all cash receipts from Tully's stores into a little-used Bank

19  of America account for a separate entity defendant AVENATTI

20  controlled, GB Auto.  Defendant AVENATTI did so by, among other acts,

21  the following:

22              i.   In or about September 2017, defendant AVENATTI

23  directed and instructed a GBUS employee ("GBUS Employee 1") to tell

24  the Tully's stores that the stores could no longer make cash deposits

25  into GBUS KeyBank Account 6193 and should hold all of the stores'

26  cash deposits.

27              ii.  On or about September 7, 2017, defendant

28  AVENATTI sent GBUS Employee 1 a text message containing the bank

30

USAO_00134851

USAO_00134447

1  account information for the GB Auto account at Bank of America (the
2  "GB Auto Account"), in order to cause the cash deposits from the
3  Tully's stores to be made into the GB Auto Account.

4           iii. On or about September 18, 2017, after receiving a
5  text message from GBUS Employee 1 asking if the Tully's stores were
6  able to deposit at KeyBank yet, defendant AVENATTI responded via text
7  message "Not yet but hopefully in next two days.  Can you collect
8  deposits tmrw and deposit pls?"

9           iv.  On or about September 18, 2017, defendant
10 AVENATTI sent a text message to GBUS Employee 1 and another GBUS
11 employee ("GBUS Employee 2"), asking, "When are we depositing again?"
12 and, later that same day, another text message, stating, "It is
13 important that these deposits be made regularly.  Thanks."

14           v.   Between on or about September 7, 2017, and in or
15 about December 2017, GBUS Employee 1, acting at defendant AVENATTI's
16 direction, made approximately 27 cash deposits totaling approximately
17 $859,794 into the GB Auto Account.  After approximately 24 of the
18 cash deposits, GBUS Employee 1 sent defendant AVENATTI a text message
19 attaching a photograph of the deposit slip.

20      c.   In order to further obstruct and impede the IRS's
21 collection action and the IRS's efforts to collect the payroll taxes
22 that GBUS owed to the IRS, defendant AVENATTI caused GBUS's credit
23 card processing company, TSYS Merchant Solutions ("TSYS"), to change
24 the company name, Employer Identification Number ("EIN"), and bank
25 account information associated with GBUS's merchant credit card
26 processing accounts ("merchant accounts"), which defendant AVENATTI
27 knew were already subject to IRS levy notices.  Defendant AVENATTI
28 did so by, among other acts, the following:

                                31

USAO_00134852

i.   On or about September 29, 2017, defendant
AVENATTI received an email from GBUS Employee 2, which stated, among
other things, "9.25.17 tsys - $22,135.19 IRS levy."

ii.   On or about September 29, 2017, defendant
AVENATTI received an email from GBUS Employee 2 titled "Levies,"
which stated that "IRS took as [sic] additional $23,763.02 from tsys
yesterday."

iii.  On or about September 29, 2017, defendant
AVENATTI directed a TSYS representative ("TSYS Rep. 1") to change the
company name associated with the merchant accounts from "Global
Baristas US LLC" to "Global Baristas, LLC" and to change the EIN from
GBUS's EIN to GB LLC's EIN.

iv.   On or about October 2, 2017, defendant AVENATTI
sent TSYS Rep. 1 an email regarding changes to the merchant accounts
and said "we need this done ASAP."

v.    On or about October 3, 2017, defendant AVENATTI
entered into a new Merchant Transaction Processing Agreement with
TSYS on behalf of GB LLC.

vi.   On or about October 3, 2017, defendant AVENATTI
and EA Employee 1 opened a new bank account, GB LLC Account 3730, for
GB LLC at CB&T in Orange County, California.  Later that day, EA LLP
Employee 1 emailed TSYS Rep. 1 the bank account and routing number
for GB CB&T Account 3730, which was to be the new bank account into
which the proceeds of the credit card transactions were to be
deposited.

d.    In order to further obstruct and impede the IRS's
collection action and the IRS's efforts to collect the payroll taxes
that GBUS owed to the IRS, in or about December 2017, after TSYS

32

USAO_00134447

USAO_00134853

USAO_00134447

1   closed GBUS and GB LLC's merchant accounts, defendant AVENATTI caused

2   GBUS to open new merchant accounts with Chase for the Tully's stores

3   under the name GB LLC and directed Chase to deposit all credit card

4   receipts in to GB LLC Account 3730.

5           e.   In order to further obstruct and impede the IRS's

6   efforts to collect the payroll taxes that GBUS owed to the IRS,

7   defendant AVENATTI changed the name of the contracting party on

8   various contracts with The Boeing Company ("Boeing"), which had

9   agreed to allow GBUS to operate Tully's stores at Boeing facilities

10  in Washington.  Defendant AVENATTI did so by, among other acts, the

11  following:

12          i.   In or about November 2016, approximately one

13  month after defendant AVENATTI learned of the IRS's collection

14  action, defendant AVENATTI caused the contracting party's name on a

15  contract with Boeing to be changed from "Global Baristas US LLC" to

16  "GB Hospitality LLC," even though, as defendant AVENATTI then well

17  knew, GBUS operated the Tully's stores at the Boeing facilities and

18  "GB Hospitality LLC" had never been registered with any government

19  agency and had never operated.

20          ii.  In or about September 2017 and in or about

21  October 2017, after IRS RO-1 had issued levy notices to Boeing and

22  numerous financial institutions at which GBUS maintained accounts,

23  defendant AVENATTI, having agreed on behalf of GBUS to sell Boeing

24  two Tully's coffee kiosks and other Tully's equipment in exchange for

25  a payment from Boeing of approximately $155,010 and forgiveness of

26  certain debts, directed a Boeing attorney to change the seller's name

27  from "GB Hospitality, LLC" to "Global Baristas, LLC" on the two bills

28  of sales relating to the transaction.  Defendant AVENATTI further

33

USAO_00134854

Exhibit D - 408

USAO_00134447

1   instructed Boeing to transfer the approximately $155,010 payment to

2   EA Trust Account 8671, rather than to GBUS's bank account.  Defendant

3   AVENATTI then transferred the approximately $155,010 payment from EA

4   Trust Account 8671 to A&A Account 0661, from which defendant AVENATTI

5   used a substantial portion of the proceeds of the sale for defendant

6   AVENATTI's personal purposes, including to: (1) transfer

7   approximately $15,000 to a personal bank account; (2) pay

8   approximately $13,070 for rent at defendant AVENATTI's residential

9   apartment in Los Angeles, California; and (3) pay approximately

10   $8,459 that defendant AVENATTI owed to Neiman Marcus.

11          f.    After learning of the IRS's collection action,

12   defendant AVENATTI used GBUS funds that should and could have been

13   used to pay over to the IRS federal incomes taxes and FICA taxes that

14   had been withheld from GBUS employees' paychecks for his own personal

15   benefit and the benefit of other entities defendant AVENATTI

16   controlled, including, but not limited to, the following:

17          i.    Between in or about October 2016 and in or about

18   December 2017, defendant AVENATTI caused a net of approximately $1.6

19   million to be transferred from GBUS's and GB LLC's bank accounts to

20   bank accounts associated with defendant AVENATTI's other companies,

21   namely, A&A and EA LLP.

22          ii.   In order to lull Client 1 and prevent Client 1

23   from discovering that defendant AVENATTI had embezzled Client 1's

24   portion of the $4,000,000 settlement payment from the County of Los

25   Angeles, defendant AVENATTI used GBUS funds, including credit card

26   receipts from Tully's stores that Chase deposited into GB LLC Account

27   3730, to make the following additional payments to Client 1:

28

USAO_00134855

USAO_00134447

1                          (I)  On or about January 19, 2018, defendant

2    AVENATTI used GBUS funds, which had been transferred from GB LLC

3    Account 3730 and/or KeyBank Account 6193 to EA Trust Account 3714, to

4    make an approximately $1,900 payment to Client 1.

5                          (II) On or about February 15, 2018, defendant

6    AVENATTI used GBUS funds, which had been transferred from GB LLC

7    Account 3730 and/or GBUS KeyBank Account 6193 to EA Trust Account

8    4613, to make an approximately $1,900 payment to Client 1.

9                          iii. In order to lull Client 2 and prevent Client 2

10   from discovering that defendant AVENATTI had embezzled Client 2's

11   portion of the initial $2,750,000 settlement payment from Individual

12   1, defendant AVENATTI used GBUS funds, including credit card receipts

13   from Tully's stores that Chase deposited into GB LLC Account 3730, to

14   make the following additional payments to Client 2:

15                         (I)  On or about January 16, 2018, defendant

16   AVENATTI used GBUS funds, which had been transferred from GB LLC

17   Account 3730 and/or GBUS KeyBank Account 6193 to EA Trust Account

18   3714, to make an approximately $16,000 payment to Client 2.

19                         (II) On or about February 20, 2018, defendant

20   AVENATTI used GBUS funds, which had been transferred from GB LLC

21   Account 3730 and/or GBUS KeyBank Account 6193 to EA Trust Account

22   4613, to make an approximately $16,000 payment to Client 2.

23

24

25

26

27

28

USAO_00134856

Exhibit D - 410

USAO_00134447

COUNTS TWENTY THROUGH TWENTY-THREE

[26 U.S.C. § 7203]

A.  **INTRODUCTORY ALLEGATIONS**

27.  The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 7, 10 through 17, 20 through 24, and 26 of this Indictment as though fully set forth herein.

28.  On or about October 15, 2010, defendant MICHAEL JOHN AVENATTI ("AVENATTI") filed his U.S. Individual Income Tax Return (Form 1040) for the 2009 calendar year, which claimed defendant AVENATTI had total income of $1,939,942 and that defendant AVENATTI owed the IRS approximately $569,630 in taxes for the 2009 calendar year.  Defendant AVENATTI, however, did not pay the remaining tax due for the 2009 calendar year until November 2015, when he sold his residence in Laguna Beach, California, upon which there was an IRS tax lien.

29.  On or about October 11, 2011, defendant AVENATTI filed his U.S. Individual Income Tax Return (Form 1040) for the 2010 calendar year, which claimed defendant AVENATTI had total income of $1,154,800 and that defendant AVENATTI owed the IRS approximately $281,796 in taxes for the 2010 calendar year.  Defendant AVENATTI, however, did not pay the remaining taxes due to the IRS for the 2010 calendar year until November 2015, when he sold his residence in Laguna Beach, California, upon which there was an IRS tax lien.

30.  The 2010 Form 1040 was the last U.S. Individual Income Tax Return defendant AVENATTI filed with the IRS.

B.  **THE WILLFUL FAILURES TO FILE TAX RETURNS**

31.  During the calendar years set forth below, defendant AVENATTI, who resided in Orange and Los Angeles Counties, within the

36

USAO_00134857

Exhibit D - 411

USAO_00134447

1  Central District of California, had and received gross income in
2  excess of the amounts ("threshold gross income amounts") set forth
3  below.  By reason of such gross income, defendant AVENATTI was
4  required by law, following the close of each of the calendar years
5  set forth below and on or before the dates set forth below ("due
6  dates"), to make an income tax return to the IRS Center, at Fresno,
7  California, to a person assigned to receive returns at the local
8  office of the IRS in the Central District of California, or to
9  another IRS officer permitted by the Commissioner of the Internal
10 Revenue, stating specifically the items of his gross income and any
11 deductions and credits to which he was entitled.  Well knowing and
12 believing all of the foregoing, defendant AVENATTI willfully failed,
13 on or about the due dates set forth below, in the Central District of
14 California and elsewhere, to make an income tax return.

| COUNT | CALENDAR YEAR | THRESHHOLD GROSS INCOME AMOUNT | DUE DATE |
|---|---|---|---|
| TWENTY | 2014 | $20,300 | October 15, 2015, pursuant to a request for an automatic extension of time filed on defendant AVENATTI's behalf |
| TWENTY-ONE | 2015 | $20,600 | October 17, 2016, pursuant to a request for an automatic extension of time filed on defendant AVENATTI's behalf |
| TWENTY-TWO | 2016 | $20,700 | April 15, 2017 |
| TWENTY-THREE | 2017 | $20,800 | April 16, 2018 |

37

USAO_00134858

Exhibit D - 412

USAO_00134447

COUNTS TWENTY-FOUR THROUGH TWENTY-SIX

(26 U.S.C. § 7203)

A.   **INTRODUCTORY ALLEGATIONS**

32.   The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 7, 10 through 17, 20 through 24, 26, and 28 through 30 of this Indictment as though fully set forth herein.

33.   On or about March 17, 2014, EA LLP filed its 2011 U.S. Return of Partnership Income federal tax return (Form 1065), and defendant MICHAEL JOHN AVENATTI ("AVENATTI") signed the return on or about March 12, 2014, as the general partner or member manager.   The return listed A&A as the designated Tax Matters Partner ("TMP") before the IRS, and defendant AVENATTI as the TMP representative.

34.   On or about October 8, 2014, EA LLP filed its 2012 U.S. Return of Partnership Income federal tax return (Form 1065), and defendant AVENATTI signed the return on or about October 1, 2014, as the general partner or member manager.   The return listed A&A as the designated TMP before the IRS.

35.   The 2012 Form 1065 for EA LLP was the last U.S. Return of Partnership Income for EA LLP filed with the IRS.

B.   **THE WILLFUL FAILURES TO FILE TAX RETURNS**

36.   During the calendar years set forth below, defendant AVENATTI conducted a business as a partnership under the name of EA LLP, with its principal place of business in Orange County, within the Central District of California.   Defendant AVENATTI therefore was required by law, following the close of each of the calendar years set forth below and on or before the dates set forth below ("due dates"), to make, for and on behalf of the partnership, a partnership return of income to the IRS Center, at Ogden, Utah, to a person

38

USAO_00134859

USAO_00134447

1   assigned to receive returns at the local office of the IRS in the

2   Central District of California, or to another IRS officer permitted

3   by the Commissioner of the Internal Revenue, stating specifically the

4   items of the partnership's gross income and the deductions and

5   credits allowed by law.  Well knowing and believing all of the

6   foregoing, defendant AVENATTI willfully failed, on or about the due

7   dates set forth below, in the Central District of California and

8   elsewhere, to make a partnership return.

| COUNT | CALENDAR YEAR | DUE DATE |
|---|---|---|
| TWENTY-FOUR | 2015 | September 15, 2016, pursuant to a request for an automatic extension of time filed on EA LLP's behalf. |
| TWENTY-FIVE | 2016 | September 15, 2017, pursuant to a request for an automatic extension of time filed on EA LLP's behalf. |
| TWENTY-SIX | 2017 | March 15, 2018. |

39

USAO_00134860

USAO_00134447

COUNTS TWENTY-SEVEN THROUGH TWENTY-NINE

[26 U.S.C. § 7203]

A.   **INTRODUCTORY ALLEGATIONS**

37.   The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 7, 10 through 17, 20 through 24, 26, 28 through 30, and 33 through 35 of this Indictment as though fully set forth herein.

38.   On or about September 15, 2010, defendant MICHAEL JOHN AVENATTI ("AVENATTI") filed a 2009 U.S. Income Tax Return for an S Corporation (Form 1120S) for A&A, which claimed A&A had total income of $3,391,224 and ordinary business income of $1,976,658 for the 2009 calendar year.   The return listed defendant AVENATTI as the President of A&A.

39.   On or about September 30, 2011, defendant AVENATTI filed a 2010 U.S. Income Tax Return for an S Corporation (Form 1120S) for A&A, which claimed A&A had total income of $1,421,026 and ordinary business income of $821,634 for the 2010 calendar year.   The return listed defendant AVENATTI as the President of A&A.

40.   The 2010 Form 1120S for A&A was the last U.S. Income Tax Return for an S Corporation (Form 1120S) that defendant AVENATTI filed for A&A with the IRS.

B.   **THE WILLFUL FAILURE TO FILE TAX RETURN**

41.   During the calendar years set forth below, defendant AVENATTI was the President and CEO of A&A, with its principal place of business in Orange County, within the Central District of California.   Defendant AVENATTI therefore was required by law, following the close of each of the calendar years set forth below and on or before the dates set forth below ("due dates"), to make an

40

USAO_00134861

USAO_00134447

1   income tax return, for and on behalf of the corporation, to the IRS

2   Center, at Ogden, Utah, to a person assigned to receive returns at

3   the local office of the IRS in the Central District of California, or

4   to another IRS officer permitted by the Commissioner of the Internal

5   Revenue, stating specifically the items of the corporation's gross

6   income and the deductions and credits allowed by law.  Well knowing

7   and believing all of the foregoing, defendant AVENATTI willfully

8   failed, on or about the due dates set forth below, in the Central

9   District of California and elsewhere, to make an income tax return at

10  the time required by law.

| COUNT | CALENDAR YEAR | DUE DATE |
|---|---|---|
| TWENTY-SEVEN | 2015 | September 15, 2016, pursuant to a request for an automatic extension of time filed on AsA's behalf. |
| TWENTY-EIGHT | 2016 | September 15, 2017, pursuant to a request for an automatic extension of time filed on AsA's behalf. |
| TWENTY-NINE | 2017 | March 15, 2018. |

41

USAO_00134862

Exhibit D - 416

USAO_00134447

1          COUNTS THIRTY AND THIRTY-ONE

2              [18 U.S.C. §§ 1344(1), 2(b)]

3    **A.    INTRODUCTORY ALLEGATIONS**

4          42.   The Grand Jury re-alleges and incorporates by reference

5    paragraphs 1, 10, 28 through 30, 33 through 35, and 38 through 40 of

6    this Indictment as though fully set forth herein.

7          43.   Between in or about January 2014 and in or about April

8    2016, defendant MICHAEL JOHN AVENATTI ("AVENATTI") operated and

9    controlled GB LLC and EA LLP from EA LLP's offices in Newport Beach,

10   California.

11         44.   At all times relevant to this Indictment, The Peoples Bank

12   was a financial institution located in Biloxi, Mississippi, the

13   accounts and deposits of which were insured by the Federal Deposit

14   Insurance Corporation.

15   **B.    THE SCHEME TO DEFRAUD**

16         45.   Beginning in or about January 2014, and continuing through

17   in or about April 2016, in Orange County, within the Central District

18   of California, and elsewhere, defendant AVENATTI, together with

19   others known and unknown to the Grand Jury, knowingly and with intent

20   to defraud, executed and attempted to execute a scheme to defraud The

21   Peoples Bank as to material matters.

22         46.   The fraudulent scheme operated, in substance, in the

23   following manner:

24              a.    Between in or about January 2014 and in or about

25   December 2014, defendant AVENATTI sought and obtained the following

26   three loans from The Peoples Bank on behalf of the following

27   companies that defendant AVENATTI controlled:

28

                                  42

USAO_00134863

i.    In or about January 2014, defendant AVENATTI sought and obtained a $850,000 loan to GB LLC (the "January 2014 GB LLC Loan");

ii.   In or about March 2014, defendant AVENATTI sought and obtained a $2,750,000 loan to EA LLP (the "March 2014 EA LLP Loan"), from which defendant AVENATTI used approximately $884,166 to pay off the January 2014 GB LLC Loan; and

iii.  In or about December 2014, defendant AVENATTI sought and obtained a $500,000 loan to EA LLP (the "December 2014 EA LLP Loan").

b.    In order to obtain the March 2014 EA LLP Loan and the December 2014 EA LLP Loan from The Peoples Bank, defendant AVENATTI omitted and concealed material facts, and provided The Peoples Bank with materially false financial information, including, but not limited to, false and fraudulent individual and partnership tax returns, and false and fraudulent balance sheets and financial statements, as described below.

c.    In support of the application for the March 2014 EA LLP Loan, defendant AVENATTI submitted to The Peoples Bank a 2011 U.S. Individual Income Tax Return (Form 1040) (the "Peoples Bank 2011 Form 1040") stating that defendant AVENATTI had an adjusted gross income for the 2011 calendar year of approximately $4,562,881, and had a tax due and owing to the IRS for the 2011 calendar year of approximately $1,506,707.  In truth and in fact, as defendant AVENATTI then well knew, defendant AVENATTI had not filed the Peoples Bank 2011 Form 1040 with the IRS, had not filed any 2011 U.S. Individual Income Tax Return with the IRS, and had not paid to the

43

USAO_00134447

1   IRS the 91,506,707 defendant AVENATTI purportedly owed for the 2011

2   calendar year.

3           d.   In support of the application for the March 2014 EA

4   LLP Loan, on or about March 11, 2014, defendant AVENATTI submitted to

5   The Peoples Bank a personal financial statement as of March 11, 2014,

6   in which defendant AVENATTI failed to disclose to The Peoples Bank

7   that defendant AVENATTI still owed the IRS approximately $850,438 in

8   unpaid personal income taxes, plus interest and penalties, for the

9   2009 and 2010 calendar years.

10          e.   In support of the application for the March 2014 EA

11   LLP Loan, on or about March 11, 2014, defendant AVENATTI submitted to

12   The Peoples Bank a Balance Sheet for January 2014 through March 10,

13   2014 for EA LLP, which stated, among other things, that EA LLP had

14   approximately $508,299 in its operating account, EA Account 8461, as

15   of March 10, 2014.   In truth and in fact, as defendant AVENATTI then

16   well knew, the balance in EA Account 8461 as of March 10, 2014, was

17   approximately $42,013.

18          f.   In support of the application for the March 2014 EA

19   LLP Loan, on or about March 13, 2014, defendant AVENATTI submitted to

20   The Peoples Bank a 2012 U.S. Partnership Return (Form 1065) for EA

21   LLP (the "Peoples Bank 2012 Form 1065"), which stated that in the

22   2012 calendar year EA LLP had total income of approximately

23   $11,426,021, and ordinary business income of approximately

24   $5,819,496.   In truth and in fact, as defendant AVENATTI then well

25   knew, the Peoples Bank 2012 Form 1065, had not been filed with the

26   IRS.   Rather, in or about October 2014, defendant AVENATTI caused a

27   different 2012 U.S. Partnership Return (Form 1065) to be filed with

28

44

USAO_00134865

USAO_00134447

1   the IRS (the "IRS 2012 Form 1065"), which differed materially from

2   the Peoples Bank 2012 EA 1065 in the following ways:

3                   i.    The Peoples Bank 2012 Form 1065 stated that in

4   the 2012 calendar year EA LLP had total income of approximately

5   $11,426,021, whereas the IRS 2012 Form 1065 stated that in the 2012

6   calendar year EA LLP had gross receipts and total income of

7   approximately $6,212,605.

8                   ii.   The Peoples Bank 2012 Form 1065 stated that in

9   the 2012 calendar year EA LLP had ordinary business income of

10  approximately $5,819,458, whereas the IRS 2012 Form 1065 stated that

11  EA LLP had an ordinary business loss of approximately $2,128,849.

12             g.   In reliance on the false and fraudulent information

13  defendant AVENATTI submitted to The Peoples Bank in support of the

14  March 2014 EA LLP Loan, on or about March 14, 2014, The Peoples Bank

15  approved the March 2014 EA LLP Loan and transferred approximately

16  $1,824,584 to EA Account 8461.

17             h.   In support of the application for the December 2014 EA

18  LLP Loan, on or about November 16, 2014, defendant AVENATTI submitted

19  to The Peoples Bank a Balance Sheet for January 2014 through

20  September 2014 for EA LLP, which stated, among other things, that EA

21  LLP had approximately $712,729 in EA Account 8461 as of September 30,

22  2014.   In truth and in fact, as defendant AVENATTI then well knew,

23  the balance in EA Account 8461 as of September 30, 2014, was

24  approximately $27,710.

25             i.   In support of the application for the December 2014 EA

26  LLP Loan, on or about November 22, 2014, defendant AVENATTI submitted

27  to The Peoples Bank a personal financial statement as of November 1,

28  2014, in which defendant AVENATTI failed to disclose to The Peoples

USAO_00134866

USAO_00134447

1   Bank that defendant AVENATTI still owed the IRS approximately

2   $860,438 in unpaid personal income taxes, plus interest and

3   penalties, for the 2009 and 2010 calendar years.

4          j.   In support of the application for the December 2014 EA

5   LLP Loan, on or about December 1, 2014, defendant AVENATTI submitted

6   to The Peoples Bank a 2012 U.S. Individual Income Tax Return (Form

7   1040) (the "Peoples Bank 2012 Form 1040"), stating that defendant

8   AVENATTI had total income for the 2012 calendar year of approximately

9   $5,423,099, and had paid to the IRS $1,600,000 in estimated tax

10  payments.  In truth and in fact, as defendant AVENATTI then well

11  knew, defendant AVENATTI had not filed the Peoples Bank 2012 Form

12  1040 with the IRS, had not filed any 2012 U.S. Individual Income Tax

13  Return with the IRS, and had not made any payments to the IRS towards

14  his 2012 individual tax liability.

15         k.   In support of the application for the December 2014 EA

16  LLP Loan, on or about December 1, 2014, defendant AVENATTI submitted

17  to The Peoples Bank a 2013 U.S. Individual Income Tax Return (Form

18  1040) (the "Peoples Bank 2013 Form 1040"), stating that defendant

19  AVENATTI had total income for the 2013 calendar year of approximately

20  $4,082,803, and had paid to the IRS approximately $1,250,000 in

21  estimated tax payments and approximately $103,511 in withholdings.

22  In truth and in fact, as defendant AVENATTI then well knew, defendant

23  AVENATTI had not filed the Peoples Bank 2013 Form 1040 with the IRS,

24  had not filed any 2013 U.S. Individual Income Tax Return with the

25  IRS, had not made any estimated tax payments to the IRS towards his

26  2013 individual tax liability, and did not have any tax withholdings

27  during the 2013 calendar year.

28

USAO_00134867

USAO_00134447

1.   In order to obtain the December 2014 EA LLP Loan, on or about December 12, 2014, defendant AVENATTI, on behalf of EA LLP, signed a commercial pledge agreement whereby EA LLP agreed to "Assignment of the First $500,000 Plus Interest of Settlement Proceeds in the Meridian related cases, said attorney's fees to be $10.8 million plus out of pocket costs for class counsel (EA LLP)." On or about March 31, 2015, after EA LLP received a $3,034,514 wire transfer from the trustee of the Meridian settlement, defendant AVENATTI concealed and did not disclose, and caused EA LLP to conceal and not disclose, the receipt of the funds to The Peoples Bank, and did not distribute and caused EA LLP not to distribute the first $500,000 to The Peoples Bank as defendant AVENATTI on behalf of EA LLP had agreed to do.

m.   In reliance on the false and fraudulent information defendant AVENATTI submitted to The Peoples Bank in support of the March 2014 EA LLP Loan and the December 2014 EA LLP Loan, on or about December 12, 2014, The Peoples Bank approved the December 2014 EA LLP Loan and transferred approximately $494,900 to EA Account 8461.

## C.   EXECUTIONS OF THE SCHEME TO DEFRAUD

47.   On or about the dates set forth below, in Orange County, within the Central District of California, and elsewhere, defendant AVENATTI, together with others known and unknown to the Grand Jury, executed the fraudulent scheme by committing and willfully causing others to commit the following acts:

| COUNT | DATE | ACT |
|---|---|---|
| THIRTY | 3/14/2014 | Receipt of March 2014 EA LLP Loan proceeds in the amount of approximately $1,824,584. |

47

USAO_00134868

| COUNT | DATE | ACT |
|-------|------|-----|
| THIRTY-ONE | 12/12/2014 | Receipt of December 2014 EA LLP Loan proceeds in the amount of approximately $494,500. |

Exhibit D - 423

USAO_00134447

COUNT THIRTY-TWO

[18 U.S.C. §§ 1028A(a)(1), 2(b)]

48.  The Grand Jury re-alleges and incorporates by reference paragraphs 1, 18, 28 through 30, 33 through 35, 38 through 40, and 43 through 46 of this Indictment as though fully set forth herein.

49.  On or about December 1, 2014, in Orange County, within the Central District of California, and elsewhere, defendant MICHAEL JOHN AVENATTI ("AVENATTI") knowingly transferred, possessed, and used, and willfully caused to be transferred, possessed, and used, without lawful authority, a means of identification that defendant AVENATTI knew belonged to another person, namely, the name and preparer tax identification number ("PTIN") of M.B., during and in relation to the offense of Bank Fraud, a felony violation of Title 18, United States Code, Section 1344(1), as charged in Count Thirty-One of this Indictment.

49

USAO_00134447

1
                        COUNT THIRTY-THREE

2
                   [18 U.S.C. §§ 152(3), 2(b)]

3
A.   INTRODUCTORY ALLEGATIONS

4
       50.  The Grand Jury re-alleges and incorporates by reference

5
paragraphs 1 through 7 of this Indictment as though fully set forth

6
herein.

7
       51.  In or about February 2016, J.F., a former partner at EA

8
LLP, filed an arbitration claim against EA LLP and defendant MICHAEL

9
JOHN AVENATTI ("AVENATTI").  In or about February 2017, the

10
arbitration panel ordered the depositions of defendant AVENATTI and

11
EA Employee 1 to take place on March 3, 2017.

12
       52.  On or about March 1, 2017, a creditor of EA LLP, filed an

13
involuntary Chapter 11 bankruptcy petition against EA LLP in the

14
Middle District of Florida.  By law, the filing of the bankruptcy

15
petition created an automatic stay under Section 362 of Title 11 of

16
the arbitration between J.F. and EA LLP and defendant AVENATTI.

17
       53.  On or about March 9, 2017, in response to an emergency

18
motion filed by J.F. for relief from the automatic stay, the

19
Bankruptcy Court in the Middle District of Florida ordered that

20
unless EA LLP consented to the bankruptcy by March 10, 2017, the

21
Court would grant relief from the automatic stay and thereby allow

22
the arbitration to proceed.

23
       54.  On or about March 10, 2017, EA LLP consented to an order

24
for relief under Chapter 11 of Title 11 and, as a result, EA LLP

25
became a debtor in possession in bankruptcy.

26
       55.  On or about April 11, 2017, defendant AVENATTI certified

27
and declared under penalty of perjury as the managing partner of EA

28
LLP that the United States Trustee Financial Requirements Checklist,

USAO_00134871

USAO_00134447

1   Certifications, and any Attachments Thereto, were true and correct to

2   the best of his knowledge and belief.  Defendant AVENATTI on behalf

3   of EA LLP further certified that he had "read and underst[ood] the

4   United States Trustee Chapter 11 'Operating Guidelines and Reporting

5   Requirements for Debtors in Possession and Trustees'" and "agree[d]

6   to perform in accordance with said guidelines and requirements."

7   Specifically, defendant AVENATTI certified as the managing partner of

8   EA LLP that he understood, among other things, that EA LLP was

9   required to: (a) close all pre-petition bank accounts controlled by

10  the debtor, EA LLP; (b) immediately open new debtor-in-possession

11  ("DIP") operating, payroll, and tax accounts; and (c) deposit all

12  business revenues into the DIP operating account.

13      56.  On or about April 28, 2017, the EA LLP Chapter 11

14  bankruptcy was transferred from the Middle District of Florida to the

15  Central District of California as In re: Eagan Avenatti LLP, bearing

16  case number 8:17-bk-11961-CB.  In the bankruptcy case, EA LLP was the

17  debtor in possession, and all property and assets in which the debtor

18  had any ownership or interest at the time of the filing of the

19  bankruptcy petition as well as any interest in property that the

20  debtor acquired after the commencement of the bankruptcy case was the

21  "bankruptcy estate," and was under the management and control of the

22  debtor in possession.

23      57.  On or about May 12, 2017, the Office of the United States

24  Trustee in the Central District of California provided defendant

25  AVENATTI the Guidelines and Requirements for Chapter 11 Debtors in

26  Possession (the "Guidelines and Requirements"), which required EA LLP

27  to close all existing bank accounts and open new DIP general,

28

USAO_00134872

USAO_00134447

1    payroll, and tax bank accounts, and to file a declaration regarding

2    EA LLP's compliance with the Guidelines and Requirements.

3         58.  On or about May 30, 2017, defendant AVENATTI signed under

4    penalty of perjury as the managing partner of EA LLP a "Declaration

5    of Debtor Regarding Compliance with the United States Trustee

6    Guidelines and Requirements for Chapter 11 Debtors in Possession,"

7    which included the following information:

8              a.   Defendant AVENATTI, on behalf of EA LLP, confirmed

9    that EA LLP had closed all pre-petition bank accounts, and provided

10   the account information for EA LLP's three new DIP bank accounts.

11             b.   Defendant AVENATTI, on behalf of EA LLP, provided the

12   United States Trustee with evidence that EA LLP had closed EA LLP's

13   prior general account and opened three new DIP bank accounts.

14             c.   In response to the requirement that EA LLP list the

15   last two years for which EA LLP filed federal and state tax returns,

16   defendant AVENATTI, on behalf of EA LLP, stated that neither "[t]he

17   debtor nor its accountant has copies of its 2014 and 2015 federal or

18   state income tax returns.  The Debtor will seek to obtain copies of

19   them from the IRS and the State of California."

20        59.  Pursuant to the Guidelines and Requirements, EA LLP had

21   additional and ongoing requirements during the course of the

22   bankruptcy, including the following:

23             a.   Before any insiders, including the owners, partners,

24   officers, directors, and shareholders of EA LLP and relatives of

25   insiders, could receive compensation from the bankruptcy estate, EA

26   LLP was required to provide notice to the creditors and the United

27   States Trustee.  No such compensation could be paid to any insiders

28   until 15 days after service of the notice and (i) no objection had

52

USAO_00134873

USAO_00134447

1   been received by the Bankruptcy Court; or (ii) if an objection had

2   been received, the Bankruptcy Court had resolved the objection.

3          b.   EA LLP was required to file Monthly Operating Reports

4   ("MOR") to include, among other things, "information regarding bank

5   accounts over which the debtor ha[d] possession, custody, control,

6   access or signatory authority, even if the account [was] not in the

7   debtor's name and whether or not the account contain[ed] only post-

8   petition income."  EA LLP was "required to report all of [its]

9   financial information in the MOR."

10         60.   From on or about May 25, 2017, through on or about February

11   15, 2018, defendant AVENATTI signed under penalty of perjury and

12   filed MORs for EA LLP for eleven months, namely, March 2017 through

13   January 2018, inclusive, which included the following information:

14         a.   The first page of each MOR stated that "All receipts

15   must be deposited into the general account," and required EA LLP to

16   itemize: (i) the beginning balance of the general account for the

17   month at issue; (ii) all receipts EA LLP obtained during the month;

18   (iii) all of the disbursements EA LLP made during the month,

19   including transfers to other DIP accounts; and (iv) the ending

20   balance of the general account for the month at issue.

21         b.   Each MOR required EA LLP to include all receipts and

22   expenditures during the monthly reporting period, as well as the

23   cumulative post-petition amounts.  On all eleven MORs that defendant

24   AVENATTI signed under penalty of perjury on behalf of EA LLP,

25   defendant AVENATTI claimed zero payroll was made to insiders.

26   Immediately above the penalty of perjury declaration, each MOR sought

27   answers to several questions, including whether EA LLP provided

28   compensation or remuneration to any officers, directors, principals,

53

Exhibit D - 428

USAO_00134874

USAO_00134447

1  or other insiders without appropriate authorization during the
2  reporting period.  On all eleven MORs that defendant AVENATTI signed
3  under penalty of perjury on behalf of EA LLP, defendant AVENATTI
4  answered "no" to the question whether any compensation or
5  remuneration was made to any officers, directors, principals, or
6  other insiders.
7  B.    FALSE DECLARATION
8      61.  On or about June 19, 2017, in Orange County, within the
9  Central District of California, defendant AVENATTI knowingly and
10 fraudulently made and willfully caused to be made a materially false
11 declaration and statement under penalty of perjury within the meaning
12 of Title 28, United States Code, Section 1746, in and in relation to
13 a case under Title 11 of the United States Code, namely, In re: Eagan
14 Avenatti LLP, No. 8:17-bk-11961-CB in United States Bankruptcy Court
15 for the Central District of California, by submitting and declaring
16 under penalty of perjury to be true and complete the Monthly
17 Operating Report for EA LLP for the period May 1, 2017, through
18 May 30, 2017 (the "May 2017 MOR"), in which defendant AVENATTI, as
19 the Managing Partner for EA LLP, falsely stated that EA LLP's
20 "Receipts During Current Period; Accounts Receivable – Post Filing"
21 were $469,953.70, whereas, in truth and in fact, as defendant
22 AVENATTI then well knew, EA LLP's receipts during the May 2017 MOR
23 period, accounts receivable – post filing were greater than
24 $409,953.70.
25
26
27
28

54

USAO_00134447

COUNT THIRTY-FOUR

[18 U.S.C. § 152(3), 2(b)]

62.   The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 7 and 51 through 60 of this Indictment as though fully set forth herein.

63.   On or about October 16, 2017, in Orange County, within the Central District of California, defendant MICHAEL JOHN AVENATTI ("AVENATTI") knowingly and fraudulently made and willfully caused to be made a materially false declaration and statement under penalty of perjury within the meaning of Title 28, United States Code, Section 1746, in and in relation to a case under Title 11 of the United States Code, namely, In re: Eagan Avenatti LLP, No. 8:17-bk-11961-CB in United States Bankruptcy Court for the Central District of California, by submitting and declaring under penalty of perjury to be true and complete the Monthly Operating Report for EA LLP for the period September 1, 2017, through September 30, 2017 ("September 2017 MOR"), in which defendant AVENATTI, as the Managing Partner for EA LLP, falsely stated that EA LLP's "Receipts During Current Period; Accounts Receivable – Post Filing" were $829,635.28, whereas, in truth and in fact, as defendant AVENATTI then well knew, EA LLP's receipts during the September 2017 MOR period, accounts receivable – post filing were greater than $829,635.28.

USAO_00134876

Exhibit D - 430

USAO_00134447

COUNT THIRTY-FIVE

[18 U.S.C. § 152(3), 2(b)]

64. The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 7 and 51 through 60 of this Indictment as though fully set forth herein.

65. On or about February 15, 2018, in Orange County, within the Central District of California, defendant MICHAEL JOHN AVENATTI ("AVENATTI") knowingly and fraudulently made and willfully caused to be made a materially false declaration and statement under penalty of perjury within the meaning of Title 28, United States Code, Section 1746, in and in relation to a case under Title 11 of the United States Code, namely, In re: Eagan Avenatti LLP, No. 8:17-bk-11961-CB in United States Bankruptcy Court for the Central District of California, by submitting and declaring under penalty of perjury to be true and complete the Monthly Operating Report for EA LLP for the period January 1, 2018, through January 31, 2018 ("January 2018 MOR"), in which defendant AVENATTI, as the Managing Partner for EA LLP, falsely stated that EA LLP's "Receipts During Current Period; Accounts Receivable - Post Filing" were $232,221.11, whereas, in truth and in fact, as defendant AVENATTI then well knew, EA LLP's receipts during the January 2018 MOR period, accounts receivable - post filing were greater than $232,221.11.

56

USAO_00134877

1                    COUNT THIRTY-SIX

2                    [18 U.S.C. § 152(2)]

3          66.   The Grand Jury re-alleges and incorporates by reference

4    paragraphs 1 through 7 and 51 through 60 of this Indictment as though

5    fully set forth herein.

6          67.   On or about June 12, 2017, in Orange County, within the

7    Central District of California, defendant MICHAEL JOHN AVENATTI

8    ("AVENATTI") knowingly and fraudulently made a false oath as to a

9    material matter in and in relation to a case under Title 11 of the

10   United States Code, namely, In re: Eagan Avenatti LLP, No. 8:17-bk-

11   11961-CB in United States Bankruptcy Court for the Central District

12   of California, in that defendant AVENATTI testified under oath at the

13   Section 341(a) debtor's examination and stated "no" when asked

14   whether the debtor, EA LLP, received any counsel fees from the Super

15   Bowl NFL litigation.  In truth and in fact, as defendant AVENATTI

16   well knew at the time he made the false oath, defendant AVENATTI and

17   EA LLP had received fees from the Super Bowl NFL litigation, namely,

18   two wire transfers totaling approximately $1,361,000, including

19   attorneys' fees, on or about May 17, 2017.

20

21

22

23

24

25

26

27

28

                              57

USAO_00134447

                    FORFEITURE ALLEGATION ONE

          [18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

     68.   Pursuant to Rule 32.2 of the Federal Rules of Criminal
Procedure, notice is hereby given that the United States of America
will seek forfeiture as part of any sentence, pursuant to Title 18,
United States Code, Section 981(a)(1)(C) and Title 28, United States
Code, Section 2461(c), in the event of the defendant's conviction of
the offenses set forth in any of Counts One through Ten, Thirty,
Thirty-One, or Thirty-Three through Thirty-Six of this Indictment.

     69.   Defendant shall forfeit to the United States of America the
following:

          a.   all right, title, and interest in any and all
property, real or personal, constituting or derived from any proceeds
obtained, directly or indirectly, as a result of the offense, or
property traceable to such proceeds; and

          b.   To the extent such property is not available for
forfeiture, a sum of money equal to the total value of the property
described in subparagraph (a).

     70.   Pursuant to Title 21, United States Code, Section 853(p),
as incorporated by Title 28, United States Code, Section 2461(c), the
defendant shall forfeit substitute property, up to the value of the
property described in the preceding paragraph if, as the result of
any act or omission of the defendant, the property described in the
preceding paragraph or any portion thereof (a) cannot be located upon
the exercise of due diligence; (b) has been transferred, sold to, or
deposited with a third party; (c) has been placed beyond the
jurisdiction of the court; (d) has been substantially diminished in

                              58

USAO_00134879

USAO_00134447



1    value; or (e) has been commingled with other property that cannot be

2    divided without difficulty.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

USAO_00134880

Exhibit D - 434

USAO_00134447

                      FORFEITURE ALLEGATION TWO

              [18 U.S.C. §§ 982 and 1028, and 28 U.S.C. §2461(c)]

     71.  Pursuant to Rule 32.2 of the Federal Rules of Criminal
Procedure, notice is hereby given that the United States of America
will seek forfeiture as part of any sentence, pursuant to Title 18,
United States Code, Sections 982 and 1028, and Title 28, United
States Code, Section 2461(c), in the event of defendant's conviction
of the offense set forth in Count Thirty-Two of this Indictment.

     72.  Defendant, if so convicted, shall forfeit to the United
States of America the following:

          a.   All right, title and interest in any and all property,
real or personal, constituting or derived from any proceeds obtained,
directly or indirectly, as a result of the offense, and any property
traceable thereto;

          b.   Any personal property used or intended to be used to
commit the offense; and

          c.   To the extent such property is not available for
forfeiture, a sum of money equal to the total value of the property
described in subparagraphs (a) and (b).

     73.  Pursuant to Title 21, United States Code, Section 853(p),
as incorporated by Title 18, United States Code, Sections 982(b) and
1028(g), the defendant, if so convicted, shall forfeit substitute
property, up to the total value of the property described in the
preceding paragraph if, as the result of any act or omission of the
defendant, the property described in the preceding paragraph, or any
portion thereof: (a) cannot be located upon the exercise of due
diligence; (b) has been transferred, sold to or deposited with a
third party; (c) has been placed beyond the jurisdiction of the

                               60

USAO_00134881

USAO_00134447

1   court; (d) has been substantially diminished in value; or (e) has

2   been commingled with other property that cannot be divided without

3   difficulty.

4                                    A TRUE BILL

5

6

7                                    Foreperson

8   NICOLA T. HANNA
    United States Attorney
9

10

11  LAWRENCE S. MIDDLETON
    Assistant United States Attorney
12  Chief, Criminal Division

13  RANEE A. KATZENSTEIN
    Assistant United States Attorney
14  Chief, Major Frauds Section

15  JULIAN L. ANDRÉ
    Assistant United States Attorney
16  Major Frauds Section

17  BRETT A. SAGEL
    Assistant United States Attorney
18  Santa Ana Branch Office

19

20

21

22

23

24

25

26

27

28

                                    61

USAO_00134882

Exhibit D - 436

USAO_00134447

# EXHIBIT 5

USAO_00134883

USAO_00134447

Case 8:19-mj-00419-DUTY *SEALED*   Document 4-3 *SEALED*   Filed 05/24/19   Page 50 of 59   Page ID #:944

## LIMITED WAIVER OF ATTORNEY-CLIENT PRIVILEGE AND CONSENT TO SEARCH BY ████████████████

I, ████████████████, hereby agree and state as follows:

1.   In or about 2012, I entered into an Attorney-Client Fee Contract (the "Agreement") with Eagan Avenatti LLP ("EA LLP") on behalf of myself.  Under the terms of the Agreement, EA LLP was to represent me in connection with personal injury claims, among others, against the County of Los Angeles.

2.   Subject to the limitations set forth in paragraphs 3 and 4 below, I agree to waive any claims of the attorney-client privilege or attorney-work-product doctrine relating to any legal advice I sought or received from EA LLP and/or any of EA LLP's current or former officers, directors, employees, or agents, including, but not limited, to Michael J. Avenatti, Judy Regnier, Scott Sims, and Carlos Colorado, concerning ████████████████████████████ ████████████████████████████

3.   This waiver of the attorney-client privilege does not apply to any attorney-client privileged documents or communications between me and any other attorneys acting on my behalf, including, but not limited to, Greenberg Gross LLP and Joshua M. Robbins.

4.   This waiver of the attorney-client privilege is limited to the United States government and its employees and agents, for any purpose related to the official performance of their duties, and does not extend to any other individual, entity or third party.

5.   I further authorize any former or current officer, directors, employees, or agents of EA LLP to disclose to the United States government all materials, written or oral, relating to any attorney-client privileged communications covered by the limited attorney-client privilege waiver set forth in paragraph 2 above.

6.   I further consent to the United States government searching any documents or materials relating to EA LLP's representation of me currently in possession of EA LLP and/or any of EA LLP's current or former employees and agents, including, but not limited, to Michael J. Avenatti, Judy Regnier, Scott Sims, and Carlos Colorado.

1

USAO_00134884

USAO_00134447

Case 8:19-mj-00419-DUTY *SEALED*   Document 4-3 *SEALED*   Filed 05/24/19   Page 51 of 59   Page ID #:945

7.      I have read this Limited Waiver of the Attorney-Client Privilege and Consent to Search carefully. I have discussed this Limited Waiver of the Attorney-Client Privilege and Consent to Search with my lawyer and fully understand the consequences of waiving the attorney-client privilege and attorney-work-product doctrine. No one has threatened or forced me to execute this Limited Waiver of the Attorney-Client Privilege and Consent to Search. I do so knowingly and voluntarily.



Date

I am ████████████████'s attorney. I have carefully and thoroughly discussed every part of this Limited Waiver of the Attorney-Client Privilege and Consent to Search with my client. Further, I have fully advised my client of his rights and the consequences of waiving any attorney-client privilege or attorney-work-product protections. To the best of my knowledge, my client's decision to waive the attorney-client privilege and attorney-work product protections is an informed and voluntary one.


April 5, 2019

JOSHUA M. ROBBINS                                    Date
GREENBERG GROSS LLP
Attorneys for ████████████████


2

USAO_00134885

USAO_00134447

# EXHIBIT 6

USAO_00134886

USAO_00134447

## LIMITED WAIVER OF ATTORNEY-CLIENT PRIVILEGE
## AND CONSENT TO SEARCH BY ▓▓▓▓▓▓▓▓▓▓▓▓▓

I, ▓▓▓▓▓▓▓▓▓▓ hereby agree and state as follows:

1.      In or about December 2016, I entered into an Attorney-Client Fee Contract (the "Agreement") with Eagan Avenatti LLP ("EA LLP") on behalf of myself. Under the terms of the Agreement, EA LLP was to represent me in connection with claims relating to an individual that I had a prior relationship.

2.      Subject to the limitations set forth in paragraphs 3 and 4 below, I agree to waive any claims of the attorney-client privilege or attorney-work-product doctrine relating to any legal advice I sought or received from EA LLP and/or any of EA LLP's current or former officers, directors, employees, or agents, including, but not limited, to Michael J. Avenatti or Judy Regnier.

3.      This waiver of the attorney-client privilege does not apply to any attorney-client privileged documents or communications between me and any other attorneys acting on my behalf.

4.      This waiver of the attorney-client privilege is limited to the United States government and its employees and agents, for any purpose related to the official performance of their duties, and does not extend to any other individual, entity or third party.

5.      I further authorize any former or current officer, directors, employees, or agents of EA LLP to disclose to the United States government all materials, written or oral, relating to any attorney-client privileged communications covered by the limited attorney-client privilege waiver set forth in paragraph 2 above.

6.      I further consent to the United States government searching any documents or materials relating to EA LLP's representation of me currently in possession of EA LLP and/or any of EA LLP's current or former employees and agents, including, but not limited, to Michael J. Avenatti or Judy Regnier.

1

USAO_00134887

Exhibit D - 441

USAO_00134447

Case 8:19-mj-00419-DUTY *SEALED*   Document 4-3 *SEALED*   Filed 05/24/19   Page 54 of 59   Page ID #:948

7.      I have read this Limited Waiver of the Attorney-Client Privilege and Consent to Search carefully. I have discussed this Limited Waiver of the Attorney-Client Privilege and Consent to Search with my lawyer and fully understand the consequences of waiving the attorney-client privilege and attorney-work-product doctrine. No one has threatened or forced me to execute this Limited Waiver of the Attorney-Client Privilege and Consent to Search. I do so knowingly and voluntarily.

4/8/2019

_____        _____
                              Date

I am █████████████'s attorney. I have carefully and thoroughly discussed every part of this Limited Waiver of the Attorney-Client Privilege and Consent to Search with my client. Further, I have fully advised my client of her rights and the consequences of waiving any attorney-client privilege or attorney-work-product protections. To the best of my knowledge, my client's decision to waive the attorney-client privilege and attorney-work product protections is an informed and voluntary one.

_____        4/10/2019
DAVID GAMMILL                  Date
Attorney for █████████

2

USAO_00134888

USAO_00134447

# EXHIBIT 7

USAO_00134889

USAO_00134447

## LIMITED WAIVER OF ATTORNEY-CLIENT PRIVILEGE AND CONSENT TO SEARCH BY ▉▉▉▉▉▉▉▉▉

I, ▉▉▉▉▉▉▉▉▉, hereby agree and state as follows:

1.     On or about July 2, 2014, I entered into an Attorney-Client Fee Contract (the "Agreement") with Eagan Avenatti LLP ("EA LLP") on behalf of myself and my company, ▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉. Under the terms of the Agreement, EA LLP was to represent me and my company in connection with claims relating to my intellectual property rights in hardscape underlayment technology.

2.     Subject to the limitations set forth in paragraphs 3 and 4 below, I agree to waive any claims of the attorney-client privilege or attorney-work-product doctrine relating to any legal advice I and/or my company, ▉▉▉▉▉▉▉▉ sought or received from EA LLP and/or any of EA LLP's current or former officers, directors, employees, or agents, including, but not limited, to Michael J. Avenatti, Judy Regnier, John Adren, and Ahmed Ibrahim.

3.     This waiver of the attorney-client privilege does not apply to any attorney-client privileged documents or communications between me or ▉▉▉▉▉▉▉ and any other attorneys acting on my behalf, including, but not limited to, Larson O'Brien LLP, Stephen G. Larson, Steven E. Bledsoe, and R.C. Harlan.

4.     This waiver of the attorney-client privilege is limited to the United States government and its employees and agents, for any purpose related to the official performance of their duties, and does not extend to any other individual, entity or third party.

5.     I further authorize any former or current officer, directors, employees, or agents of EA LLP to disclose to the United States government all materials, written or oral, relating to any attorney-client privileged communications covered by the limited attorney-client privilege waiver set forth in paragraph 2 above.

6.     I further consent to the United States government searching any documents or materials relating to EA LLP's representation of me and ▉▉▉▉▉▉▉ currently in possession of

1



USAO_00134890

USAO_00134447

Case 8:19-mj-00419-DUTY *SEALED*   Document 4-3 *SEALED*   Filed 05/24/19   Page 57 of 59   Page ID #:951

EA LLP and/or any of EA LLP's current or former employees and agents, including, but not limited, to Michael J. Avenatti, Judy Regnier, John Adren, and Ahmed Ibrahim.

7.        I have read this Limited Waiver of the Attorney-Client Privilege and Consent to Search carefully.  I have discussed this Limited Waiver of the Attorney-Client Privilege and Consent to Search with my lawyer and fully understand the consequences of waiving the attorney-client privilege and attorney-work-product doctrine.  No one has threatened or forced me to execute this Limited Waiver of the Attorney-Client Privilege and Consent to Search.  I do so knowingly and voluntarily.

_____        3-18-19
                                        Date

I am _____'s attorney.  I have carefully and thoroughly discussed every part of this Limited Waiver of the Attorney-Client Privilege and Consent to Search with my client.  Further, I have fully advised my client of his rights and the consequences of waiving any attorney-client privilege or attorney-work-product protections.  To the best of my knowledge, my client's decision to waive the attorney-client privilege and attorney-work product protections is an informed and voluntary one.

_____        3/18/19
STEVEN E. BLEDSOE                       Date
R.C. HARLAN
Larson O'Brien LLP
Attorneys for _____

2

USAO_00134891

USAO_00134447

# EXHIBIT 8

USAO_00134892

USAO_00134447

## LIMITED WAIVER OF ATTORNEY-CLIENT PRIVILEGE
## AND CONSENT TO SEARCH BY ████████

I, ██████████ hereby agree and state as follows:

1.      On or about August 15, 2017, I entered into an Attorney-Client Fee Contract (the
"Agreement") with Michael Avenatti, Esq. ("AVENATTI") and/or Eagan Avenatti LLP ("EA
LLP"). Under the terms of the Agreement, AVENATTI and/or EA LLP were to represent me
and ██████████ in connection with our divestiture and exit from ████████████████████
████████

2.      Subject to the limitations set forth in paragraphs 3 and 4 below, I agree to waive
any claims of the attorney-client privilege or attorney-work-product doctrine relating to any legal
advice or services that I sought or received from AVENATTI, EA LLP, Filippo Marchino
("MARCHINO"), any of EA LLP's current or former officers, directors, employees, or agents,
and/or any current or former employees or agents of AVENATTI.

3.      This waiver of the attorney-client privilege does not apply to any attorney-client
privileged or attorney-work product documents or communications between me and any other
attorneys acting on my behalf, including, but not limited to, Orrick Herrington & Sutcliffe LLP,
Walter Brown, William Molinski, or any attorney-client privileged or attorney-work product
documents arising out of any such separate representation.

4.      This waiver of the attorney-client privilege is limited to the United States
government and its employees and agents, for any purpose related to the official performance of
their duties, and does not extend to any other individual, entity or third party.

5.      I further authorize AVENATTI, EA LLP, MARCHINO, any current or former
officers, directors, employees, or agents of EA LLP, and/or any current or former employees or
agents of AVENATTI to disclose to the United States government all materials, written or oral,
relating to any attorney-client privileged communications covered by the limited attorney-client
privilege waiver set forth in paragraph 2 above.

USAO_00134893

USAO_00134447

6.       I further consent to the United States government searching any documents or materials relating to AVENATTI's and/or EA LLP's representation of me currently in possession of AVENATTI, EA LLP, MARCHINO, any of EA LLP's current or former officers, directors, employees, or agents, and/or any current or former employees or agents of AVENATTI.

7.       I have read this Limited Waiver of the Attorney-Client Privilege and Consent to Search carefully. I have discussed this Limited Waiver of the Attorney-Client Privilege and Consent to Search with my lawyer and fully understand the consequences of waiving the attorney-client privilege and attorney-work-product doctrine. No one has threatened or forced me to execute this Limited Waiver of the Attorney-Client Privilege and Consent to Search. I do so knowingly and voluntarily.

04-04-2019
Date

I am ▓▓▓▓▓▓▓▓'s attorney. I have carefully and thoroughly discussed every part of this Limited Waiver of the Attorney-Client Privilege and Consent to Search with my client. Further, I have fully advised my client of her rights and the consequences of waiving any attorney-client privilege or attorney-work-product protections. To the best of my knowledge, my client's decision to waive the attorney-client privilege and attorney-work product protections is an informed and voluntary one.

4-4-19
Date

WALTER BROWN
WILLIAM MOLINSKI
Orrick Herrington & Sutcliffe LLP
Attorneys for ▓▓▓▓▓▓▓▓▓

Exhibit D - 448

USAO_00134894

USAO_00134447

## LIMITED WAIVER OF ATTORNEY-CLIENT PRIVILEGE
## AND CONSENT TO SEARCH BY ▉▉▉▉▉▉

I, ▉▉▉▉▉▉, hereby agree and state as follows:

1.     On or about August 15, 2017, I entered into an Attorney-Client Fee Contract (the "Agreement") with Michael Avenatti, Esq. ("AVENATTI") and/or Eagan Avenatti LLP ("EA LLP"). Under the terms of the Agreement, AVENATTI and/or EA LLP were to represent me and ▉▉▉▉▉▉ in connection with our divestiture and exit from ▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉.

2.     Subject to the limitations set forth in paragraphs 3 and 4 below, I agree to waive any claims of the attorney-client privilege or attorney-work-product doctrine relating to any legal advice or services that I sought or received from AVENATTI, EA LLP, Filippo Marchino ("MARCHINO"), any of EA LLP's current or former officers, directors, employees, or agents, and/or any current or former employees or agents of AVENATTI.

3.     This waiver of the attorney-client privilege does not apply to any attorney-client privileged or attorney-work product documents or communications between me and any other attorneys acting on my behalf, including, but not limited to, Orrick Herrington & Sutcliffe LLP, Walter Brown, William Molinski, or any attorney-client privileged or attorney-work product documents arising out of any such separate representation.

4.     This waiver of the attorney-client privilege is limited to the United States government and its employees and agents, for any purpose related to the official performance of their duties, and does not extend to any other individual, entity or third party.

5.     I further authorize AVENATTI, EA LLP, MARCHINO, any current or former officers, directors, employees, or agents of EA LLP, and/or any current or former employees or agents of AVENATTI to disclose to the United States government all materials, written or oral, relating to any attorney-client privileged communications covered by the limited attorney-client privilege waiver set forth in paragraph 2 above.

i

USAO_00134895

USAO_00134447

6.      I further consent to the United States government searching any documents or materials relating to AVENATTI's and/or EA LLP's representation of me currently in possession of AVENATTI, EA LLP, MARCHINO, any of EA LLP's current or former officers, directors, employees, or agents, and/or any current or former employees or agents of AVENATTI.

7.      I have read this Limited Waiver of the Attorney-Client Privilege and Consent to Search carefully. I have discussed this Limited Waiver of the Attorney-Client Privilege and Consent to Search with my lawyer and fully understand the consequences of waiving the attorney-client privilege and attorney-work-product doctrine. No one has threatened or forced me to execute this Limited Waiver of the Attorney-Client Privilege and Consent to Search. I do so knowingly and voluntarily.



_____        4/4/19
                                     Date

I am _____'s attorney. I have carefully and thoroughly discussed every part of this Limited Waiver of the Attorney-Client Privilege and Consent to Search with my client. Further, I have fully advised my client of his rights and the consequences of waiving any attorney-client privilege or attorney-work-product protections. To the best of my knowledge, my client's decision to waive the attorney-client privilege and attorney-work product protections is an informed and voluntary one.

_____        4.4.19
WALTER BROWN                         Date
WILLIAM MOLINSKI
Orrick Herrington & Sutcliffe LLP
Attorneys for _____

2

USAO_00134896

Exhibit E

USAO_00134424

Case 8:19-mj-00419-DUTY *SEALED*   Document 4 *SEALED*   Filed 05/24/19   Page 1 of 23
Page ID #:484

AO 93 (Rev. 11/13) Search and Seizure Warrant (USAO CDCA Rev. 04/17)

# UNITED STATES DISTRICT COURT
## for the
### Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br><br>Ten Digital Devices in the Custody of the Internal Revenue Service – Criminal Investigation | )<br>)<br>)   Case No. 8:19-MJ-419<br>)<br>)<br>)<br>) |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Central District of California *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

*See Attachment B*

Such affidavit(s) or testimony are incorporated herein by reference.

**YOU ARE COMMANDED** to execute this warrant on or before 14 days from the date of its issuance *(not to exceed 14 days)*

☒ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to the U.S. Magistrate Judge on duty at the time of the return through a filing with the Clerk's Office.

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for_____days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:    May 24, 2019, at 11:30 am

**DOUGLAS F. McCORMICK**
*Judge's signature*

City and state:    Santa Ana, CA

United States Magistrate Judge Douglas F. McCormick
*Printed name and title*

AUSAs:  Julian L. André (213.894.6683) & Brett A. Sagel (714.338.3598)

USAO_00134424

USAO_00134424

Case 8:19-mj-00419-DUTY *SEALED*   Document 4 *SEALED*   Filed 05/24/19   Page 2 of 23
Page ID #:485

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

| Certification |
|---|
| I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.<br><br><br>Date:  _____<br><br><br><br>                                                      *Executing officer's signature*<br><br>                                        _____<br>                                                      *Printed name and title* |

USAO_00134425

USAO_00134424

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

The following digital devices (the "SUBJECT DEVICES") or forensic images thereof, which are currently maintained in the custody of the Internal Revenue Service-Criminal Investigation ("IRS-CI") in Los Angeles and Santa Ana, California:

1.   Dell PowerEdge R410, bearing serial number 52RKCK1, obtained by IRS-CI from MixinIT via consent from the court-appointed receiver for Eagan Avenatti LLP ("EA LLP") on or about April 4, 2019 ("SUBJECT DEVICE 1");

2.   Dell PowerEdge R710, bearing serial number 2GMPCK1, obtained by IRS-CI from MixinIT via consent from the court-appointed receiver for EA LLP on or about April 4, 2019 ("SUBJECT DEVICE 2");

3.   HP ProLiant DL380 G7, bearing serial number A1979827, obtained by IRS-CI from MixinIT via consent from the court-appointed receiver for EA LLP on or about April 4, 2019 ("SUBJECT DEVICE 3");

4.   HP ProLiant DL380 G7, bearing serial number A1979828, obtained by IRS-CI from MixinIT via consent from the court-appointed receiver for EA LLP on or about April 4, 2019 ("SUBJECT DEVICE 4");

5.   HP ProLiant DL380 G7, bearing serial number A1884814, obtained by IRS-CI from MixinIT via consent from the court-appointed receiver for EA LLP on or about April 4, 2019 ("SUBJECT DEVICE 5");

USAO_00134426

USAO_00134424

6.   HP ProLiant DL160 G6, bearing serial number
MXQ9520ABM, obtained by IRS-CI from MixinIT via consent from the
court-appointed receiver for EA LLP on or about April 4, 2019
("SUBJECT DEVICE 6");

7.   A black USB drive marked "27989," which was seized by
law enforcement agents from AVENATTI on March 25, 2019.  IRS-CI
obtained the forensic image of the digital device from the
United States Attorney's Office for the Southern District of New
York ("SDNY USAO") on or about May 22, 2019 ("SUBJECT DEVICE
7");

8.   A blue and silver USB drive marked "RAEN," which was
seized by law enforcement agents from AVENATTI on March 25,
2019.  IRS-CI obtained the forensic image of the digital device
from the SDNY USAO on or about May 22, 2019 ("SUBJECT DEVICE
8");

9.   A silver and purple USB drive marked "8025328," which
was seized by law enforcement agents from VENATTI on March 25,
2019.  IRS-CI obtained the forensic image of the digital device
from the SDNY USAO on or about May 22, 2019 ("SUBJECT DEVICE
9"); and

10.   A compact disc containing scanned copies of
miscellaneous documents that were seized by law enforcement
agents from AVENATTI's briefcase on March 25, 2019.  The SDNY
USAO scanned the documents and placed them on the disc and
provided the disc to IRS-CI on or about May 17, 2019 ("SUBJECT
DEVICE 10") (collectively, the "SUBJECT DEVICES").

USAO_00134427

USAO_00134424

SUBJECT DEVICES 1 through 6 are currently held in the custody of IRS-CI in Los Angeles, California.  SUBJECT DEVICES 7 through 10 are currently held in the custody of IRS-CI in Santa Ana, California.

iii

USAO_00134428

USAO_00134424

## ATTACHMENT B

I. **ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband, fruits, and/or instrumentalities of violations of 26 U.S.C. § 7201 (attempt to evade or defeat tax); 26 U.S.C. § 7202 (willful failure to collect or pay over tax); 26 U.S.C. § 7203 (willful failure to pay tax or file return); 26 U.S.C. § 7212 (interference with administration of internal revenue laws); 18 U.S.C. § 152 (concealment of assets in bankruptcy); 18 U.S.C. § 157 (bankruptcy fraud); 18 U.S.C. § 1028A (aggravated identity theft); 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1344 (bank fraud); and 18 U.S.C. § 1957 (money laundering) (the "Subject Offenses"), namely:

       a.    Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to the ownership of Global Baristas US, LLC ("GBUS"); Global Baristas, LLC ("GB LLC"); GB Autosport, LLC ("GB Auto"); GB Hospitality LLC ("GB Hospitality"); Doppio Inc. ("Doppio"); Eagan Avenatti LLP ("EA LLP"); Avenatti & Associates, APC ("A&A"); and Augustus LLP (collectively, the "Subject Entities").

       b.    Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to Michael J. Avenatti's ("AVENATTI") control or management of any of the Subject Entities and/or The X-Law Group, PC ("X-Law Group").

i

USAO_00134429

USAO_00134424

      c.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to the organizational or management structure of any of the Subject Entities and/or X-Law Group.

      d.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to the finances of any of the Subject Entities, including assets, income, liabilities, accounts receivable, accounts payable, and expenses.

      e.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to the personal finances of Michael Avenatti ("AVENATTI"), including information relating to AVENATTI's assets, debts, income, expenses, and net worth.

      f.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to the accounting records for AVENATTI and/or any of the Subject Entities, including any Microsoft Dynamics NAV, QuickBooks, or other electronic accounting data, files, or records.

      g.   Records, documents, programs, applications, or materials from January 201 through March 25, 2019, relating to any financial transactions, including any proposed or potential financial transactions, involving any of the Subject Entities, and/or AVENATTI.

      h.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to any payments, checks, credits, wire transfers, commodities,

ii

USAO_00134430

USAO_00134424

services, or other things of value paid, provided, delivered, or transferred, directly or indirectly, to AVENATTI and/or any of the Subject Entities.

i.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to any financial relationship between AVENATTI and/or any of the Subject Entities on one hand and X-Law Group and/or F.M. on the other hand.

j.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to financial decisions AVENATTI and/or J.R. made on behalf of any of the Subject Entities, including decisions to authorize payments on behalf of any of the Subject Entities and transfer money to or from any of the Subject Entities.

k.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to communications between AVENATTI and/or J.R. and any financial institution regarding the transfer of funds to or from any account associated with AVENATTI and/or any of the Subject Entities.

l.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to any loans or other financing agreements, including any proposed or potential loans or other financing agreements, involving any of the Subject Entities and/or AVENATTI.

USAO_00134431

USAO_00134424

m.   Records, documents, programs, applications, or
materials from January 2011 through March 25, 2019, relating to
the payroll obligations of the Subject Entities.

n.   Non-privileged records, documents, programs,
applications, or materials from January 2011 through March 25,
2019, relating to the federal, state, and/or local tax
obligations, tax returns, tax liabilities, or tax payments of
any of the Subject Entities and/or AVENATTI.

o.   Non-privileged records, documents, programs,
applications, or materials from January 2011 through March 25,
2019, relating to any liens, levies, garnishments, judgments,
encumbrances, or tax-related investigations or actions
associated with any of the Subject Entities and/or AVENATTI.

p.   Records, documents, programs, applications, or
materials from January 2011 through March 25, 2019, relating to
attorneys' fees or costs earned or collected by EA LLP, A&A,
and/or AVENATTI, including attorney-client fee contracts,
engagement letters, fee agreements, cost-sharing agreements,
fee-sharing agreements, settlement agreements, and client
billing records, but excluding any such records relating to the
representations of Stephanie Clifford or Julie Swetnick.

q.   Records, documents, programs, applications, or
materials from January 2011 through March 25, 2019, relating to
any of the Subject Entities' and/or AVENATTI's contractual
relationships, including drafts and final versions of any
executed, proposed, or potential contracts and agreements, bills
of sale, correspondence regarding payments, and correspondence

iv

USAO_00134432

USAO_00134424

regarding the cancellation or modification of contracts and/or agreements.

r.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to any of the Subject Entities' and/or AVENATTI's bank account information.

s.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to the physical whereabouts of AVENATTI, and/or J.R., including calendars and calendar entries.

t.   Records, documents, programs, applications, or materials from April 1, 2011, to March 25, 2019, relating to AVENATTI and/or EA LLP's representation of Client 1, including the approximately $4 million settlement payment that was transferred to one of EA LLP's California Bank & Trust attorney trust account in or around January 2015.

u.   Records, documents, programs, applications, or materials from December 2016 to March 25, 2019, relating to AVENATTI and/or EA LLP's representation of Client 2, including the approximately $2.75 million settlement payment that was transferred to one of EA LLP's California Bank & Trust attorney trust account in or around January 2017.

v.   Records, documents, programs, applications, or materials relating to an agreement to purchase and the purchase of a private Honda jet from Honda Aircraft Company LLC and/or the funds used to purchase the private Honda jet.

v

USAO_00134433

Exhibit E - 010

USAO_00134424

w.     Records, documents, programs, applications, or
materials from January 1, 2014, to March 25, 2019, relating to
AVENATTI and/or EA LLP's representation of Client 3, including
the approximately $1.6 million settlement payment that was
transferred to one of AVENATTI's City National Bank attorney
trust account in or around January 2018.

x.     Records, documents, programs, applications, or
materials from January 1, 2017, to March 25, 2019, relating to
AVENATTI's, EA LLP's, X-Law Group, and/or F.M.'s representation
of Client 4 and Client 5, including the approximately $8,146,288
payment that was transferred to one of AVENATTI's City National
Bank attorney trust accounts in or around March 2018.

y.     Non-privileged records, documents, programs,
applications, or materials from March 7, 2013, to March 25,
2019, relating to the settlement of litigation against the
National Football League ("NFL") relating to the 2011 Super Bowl
(the "Super Bowl Litigation"), including documents reflecting
settlement payments, attorney fees, costs, expenses, and the
distribution of settlement proceeds to EA LLP, AVENATTI, and any
of EA LLP or AVENATTI's clients in the Super Bowl Litigation.

z.     Records, documents, programs, applications, or
materials from January 2013 through March 25, 2019, relating to
the payroll and tax preparation services that Paychex provided
to EA LLP and/or A&A, including any records, documents,
programs, applications, or materials relating to changes in the
payroll and tax services to be provided by Paychex.

USAO_00134434

USAO_00134424

aa.  Records, documents, programs, applications, or materials from January 2013 through March 25, 2019, relating to the payroll and tax preparation services that Ceridian HCM Inc. ("Ceridian") provided to GBUS, including any records, documents, programs, applications, or materials relating to changes in the payroll and tax services to be provided by Ceridian.

bb.  Records, documents, programs, applications, or materials from January 2013 through March 25, 2019, relating to the sale or purchase of TC Global, Inc. or Tully's Coffee.

cc.  Records, documents, programs, applications, or materials from January 2013 through March 25, 2019, relating to the purchase or sale, including any proposed or attempted purchase or sale, of GBUS, GB LLC, or Doppio.

dd.  Records, documents, programs, applications, or materials from January 2013 through March 25, 2019, relating to the value of GBUS or GB LLC.

ee.  Records, documents, programs, applications, or materials from January 2013 through March 25, 2019, relating to GBUS's and GB LLC's merchant credit card processing accounts (the "merchant accounts"), including contracts, agreements, account applications, and correspondence regarding changes to the merchant accounts.

ff.  Records, documents, programs, applications, or materials from January 2018 through March 25, 2019, relating to creation, formation, business purpose, ownership agreement, finances, of Augustus LLP.

vii

USAO_00134435

USAO_00134424

gg.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to the sale, rental, lease, purchase, maintenance, renovation, or remodeling of any of AVENATTI's residences, including his residences in Newport Beach, California; Laguna Beach, California; and Los Angeles, California.

hh.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to continuing legal education ("CLE") courses taken by AVENATTI, including any professional responsibility CLE courses, ethics CLE courses, or tax CLE courses.

ii.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to any of the Subject Entities' employee handbooks or manuals, employment contracts, compensation records, and employee lists.

jj.   Records, documents, programs, applications, or materials relating to any locations or services used by AVENATTI and/or any of the Subject Entities to store physical or electronic records.

kk.   With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents,

viii

USAO_00134436

USAO_00134424

browsing history, user profiles, e-mail, e-mail contacts, chat
and instant messaging logs, photographs, and correspondence;

         ii.  evidence of the presence or absence of
software that would allow others to control the device, such as
viruses, Trojan horses, and other forms of malicious software,
as well as evidence of the presence or absence of security
software designed to detect malicious software;

         iii. evidence of the attachment of other devices;

         iv.  evidence of counter-forensic programs (and
associated data) that are designed to eliminate data from the
device;

         v.   evidence of the times the device was used;

         vi.  passwords, encryption keys, and other access
devices that may be necessary to access the device;

         vii. applications, utility programs, compilers,
interpreters, or other software, as well as documentation and
manuals, that may be necessary to access the device or to
conduct a forensic examination of it;

         viii.    records of or information about
Internet Protocol addresses used by the device;

         ix.  records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

    2.   As used herein, the terms "records," "documents,"
"correspondence," "programs," "applications," and "materials"

ix

USAO_00134437

USAO_00134424

include records, documents, correspondence, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

## II.   SEARCH PROCEDURES FOR HANDLING POTENTIALLY PRIVILEGED INFORMATION ON THE SUBJECT DEVICES

3.   In searching the SUBJECT DEVICES (including the forensic copies thereof), the following procedures will be followed at the time of the search in order to avoid unnecessary disclosures of any privileged attorney-client communications or attorney work product.

4.   Law enforcement personnel conducting the investigation and search and other individuals assisting law enforcement personnel in the search (the "Investigation Team") have already obtained custody of the SUBJECT DEVICES, which are capable of containing evidence of the Subject Offenses, or capable of containing data falling within the scope of the items to be seized.  The Investigation Team shall facilitate the transfer of the SUBJECT DEVICES to the "Privilege Review Team" (previously designated individuals not participating in the investigation of the case).  The Privilege Review Team, including a Privilege Review Team Assistant United States Attorney ("PRTAUSA") or PRTAUSAs, will then review the SUBJECT DEVICES as set forth herein.  The Investigation Team will review only data from the SUBJECT DEVICES that has been released by the Privilege Review Team to the Investigation Team.

x

USAO_00134438

USAO_00134424

5.    The Privilege Review Team will, in their discretion,
either search each SUBJECT DEVICE where it is currently located
or transport it to an appropriate law enforcement laboratory or
similar facility to be searched at that location.

6.    The Privilege Review Team and the Investigation Team
shall complete the search discussed herein as soon as is
practicable but not more than 180 days from the date of
execution of the warrant.  The government will not search the
SUBJECT DEVICES beyond this 180-day period without obtaining an
extension of time order from the Court.

7.    The Investigation Team will provide the Privilege
Review Team and/or appropriate litigation support personnel[29]
with a list of "scope key words" to search for on the digital
devices, to include words relating to the items to be seized as
detailed above.  The Privilege Review Team will conduct an
initial review of the SUBJECT DEVICES using the scope key words,
and by using search protocols specifically chosen to identify
documents and data that appear to be within the scope of the
warrant.  The Privilege Review Team may also do a more detailed
quality check of this data and the results of this initial
review, to ensure that the key word search is effective.
Documents and data that are identified by this initial review,
after quality check, as not within the scope of the warrant will

---

[29] Litigation support personnel and computer forensics
agents or personnel, including IRS Computer Investigative
Specialists, are authorized to assist both the Privilege Review
Team and the Investigation Team in processing, filtering, and
transferring documents and data seized during the execution of
the warrant.

xi

USAO_00134439

USAO_00134424

be maintained under seal and not further reviewed absent
subsequent authorization.

8.    The Investigation Team will also provide the Privilege
Review Team with a list of "privilege key words" to search for
among the documents and data that are identified by the initial
review and quality check described above as appearing to fall
within the scope of the warrant, to include specific words
associated with AVENATTI, J.R., F.M., and any of the following
law firms (a) EA LLP; (b) A&A; (c) X-Law Group; (d) Foster
Pepper PLLC; (e) Osborn Machler PLLC; (f) Eisenhower Carlson
PLLC; (g) Talmadge/Fitzpatrick/ Tribe, PPLC; (h) The Brager Tax
Law Group; (i) SulmeyerKupetz; (j) Baker & Hostetler LLP;
(k) Shulman Hodges & Bastian LLP; (l) Legal & Tax Consulting
Group; (m) Pachulski Stang Ziehl & Jones LLP; (n) Foley &
Lardner LLP; (o) Raines Feldman, LLP; and (p) Pansky Markle
Attorneys at Law.  The privilege key words shall also include
the above referenced law firms' domain names and lawyers' email
addresses, and generic words such as "privileged," "work
product."  The Privilege Review Team will conduct a review of
these documents and data using the privilege key words, and by
using search protocols specifically chosen to identify documents
and data containing potentially privileged information.
Documents or data which are identified by this review as not
potentially privileged may be given to the Investigation Team.

9.    Documents or data that the privilege key word searches
identify as potentially privileged will be reviewed by a
Privilege Review Team member to confirm that they contain

xii

USAO_00134440

USAO_00134424

potentially privileged information.  Documents or data that are determined by this review not to be potentially privileged may be given to the Investigation Team.  Documents or data that are determined by this review to be potentially privileged will be given to the United States Attorney's Office for further review by a PRTAUSA.  Documents or data identified by the PRTAUSA after review as not potentially privileged may be given to the Investigation Team.  If, after review, the PRTAUSA determines it to be appropriate, the PRTAUSA may apply to the court for a finding with respect to particular documents or data that no privilege, or an exception to the privilege, applies.  Documents or data that are the subject of such a finding may be given to the Investigation Team.

10.  Documents or data identified by the PRTAUSA(s) after review as privileged (that are not subject to a finding by a court of no privilege or an exception to the privilege) or potentially privileged and outside the scope of the items to be seized shall be segregated and sealed together in an enclosure, the outer portion of which will be marked as containing potentially privileged information, and maintained by the investigative agency.  Such data or documents shall not be accessible by or given to the Investigation Team at any time absent authorization of the Court.  However, the Privilege Review Team may, in its discretion, store the privileged and potentially privileged data and documents in a folder or a set of folders in a document review platform database, such as Relativity or Eclipse, that remains inaccessible to the

xiii

USAO_00134441

USAO_00134424

Investigation Team.  The Privilege Review Team's access to this
separate document review platform database shall cease upon
expiration of the warrant.  However, litigation support
personnel from the United States Attorney's Office, United
States Department of Justice, and/or the investigating agency
may continue to access this separately-maintained document
review database for the purpose of database maintenance.

    11.  The Investigation Team will search only the documents
and data that the Privilege Review Team provides to the
Investigation Team at any step listed above in order to locate
documents and data that are within the scope of the search
warrant.  The Investigation Team does not have to wait until the
entire privilege review is concluded to begin its review for
documents and data that are within the scope of the search
warrant.  The Privilege Review Team may also conduct the search
for documents and data within the scope of the search warrant if
that is more efficient.  This second "scope" review is intended
only to ensure that the initial scope key word review
successfully eliminated data outside the scope of the search
warrant from seizure.

    12.  The Privilege Review Team will segregate any
identifiable documents and/or data that it discovers during the
search of the Subject Devices relating to <u>Stephanie Clifford v.
Donald J. Trump</u>, No. 2:18-CV-2217-SJO-FFM (C.D. Cal.), the
representation of Stephanie Clifford, and/or the representation
of Julie Swetnick.  Such documents and/or data will be
maintained under seal by the investigating agency without

                              xiv

USAO_00134442

USAO_00134424

further review as set forth in paragraphs 7 and 10 above absent subsequent authorization from the Court.  This provision, however, shall not preclude the Privilege Review Team or Investigation Team from reviewing financial and accounting records covered by paragraphs 1.d, 1.f, 1.g, and 1.r above, which reference the representations of Ms. Clifford or Ms. Swetnick.

13.  To the extent that any documents and/or data covered by paragraph 1.p above, such as attorney-client fee contracts, engagement letters, and client billing records, contain information that is potentially protected by the attorney-client privileged or the attorney-work-product doctrine, the Privilege Review Team shall redact all such potentially privileged information from the documents or data before releasing the documents and/or data to the Investigation Team unless the specific client agrees to waive the attorney-client privilege.

14.  If, upon review, a member of the Investigation Team determines that a document or data appears to contain potentially privileged information, the Investigation Team member shall discontinue its review of the document or data and shall immediately notify a member of the Privilege Review Team. The Investigation Team member may record identifying information regarding the potentially privileged document or data that is reasonably necessary to identify the document or data for the Privilege Review Team.  The Investigation Team shall not further review any documents or data that appears to contain such potentially privileged information until after the Privilege

xv

USAO_00134443

Exhibit E - 020

USAO_00134424

Review Team has completed its review of the additional potentially privileged information discovered by the Investigation Team member.

15.   In performing the reviews, both the Privilege Review Team and the Investigation Team may:

a.   search for and attempt to recover deleted, "hidden," or encrypted data;

b.   use tools to exclude normal operating system files and standard third-party software that do not need to be searched; and

c.   use forensic examination and searching tools, such as "EnCase," "FTK" (Forensic Tool Kit), Nuix, Axiom, Relativity, and Eclipse, which tools may use hashing and other sophisticated techniques.

16.   If either the Privilege Review Team or the Investigation Team, while searching a SUBJECT DEVICE encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, they shall immediately discontinue the search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

17.   If the search determines that a SUBJECT DEVICES does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

xvi

USAO_00134444

USAO_00134424

18.  The government may retain the SUBJECT DEVICES
(including any forensic copy thereof), which have already been
obtained by the Investigation Team, but may not access data
falling outside the scope of the other items to be seized (after
the time for searching the device has expired) on the SUBJECT
DEVICES absent further court order.

19.  After the completion of the search of the SUBJECT
DEVICES, the government shall not access digital data falling
outside the scope of the items to be seized absent further order
of the Court.

20.  The special procedures relating to digital devices
found in this warrant govern only the search of digital devices
pursuant to the authority conferred by this warrant and do not
apply to any search of digital devices pursuant to any other
court order.

III. **REQUESTS FOR APPOINTMENT OF A SPECIAL MASTER**

21.  To the extent that AVENATTI, EA LLP, or any other
party intends to request that a special master be appointed to
handle the review of any potentially privileged information
seized during the execution of this Search Warrant, such a
request must be filed with this Court within seven days of the
execution of this Search Warrant.  The government will then have
seven days to file any opposition to such a request.

22.  Any request for the appointment of a special master
must, at a minimum, address the following issues:  (a) the legal
basis for the request; (b) the anticipated role of the special
master, should one be appointed; (c) proposed search and review

xvii

USAO_00134445

USAO_00134424

procedures to be followed by the special master, should one be

appointed; (d) proposed procedures for the selection of a

special master; (e) the names of at least three proposed special

masters; and (f) the party's ability to pay for any costs and

fees incurred by a special master.

xviii

USAO_00134446

# Exhibit F



# United States Department of Justice

## United States Attorney's Office
## Central District of California

*Julian L. André*
*Phone: (213) 894-6683*
*E-mail:* ▊▊▊▊▊▊

*1100 United States Courthouse*
*312 North Spring Street*
*Los Angeles, California 90012*

May 24, 2019

**VIA EMAIL**

H. Dean Steward
107 Avenida Miramar, Suite C
San Clemente, California 92672
▊▊▊▊▊▊▊▊▊

> Re:  United States v. Michael John Avenatti,
>        SA CR No. 19-061-JVS

Dear Counsel:

We write to respond to your May 15, 2019, discovery request and your subsequent May 22, 2019, letter regarding the production of electronic discovery.

## I.      Defendant's May 15, 2019, Discovery Request

As a threshold matter, there is no merit to your claim that the government has failed to provide discovery to your client, defendant MICHAEL JOHN AVENATTI ("defendant"), in a timely manner or has failed to comply with its discovery obligations under Federal Rule of Criminal Procedure 16.  (5/22/19 Letter at 2.)

First, under Rule 16(a), the government is not required to produce discovery until it receives a request for such discovery from defendant. Although the indictment in this case was filed on April 10, 2019, defendant did not request discovery in this case until May 15, 2019 – over one month later. Thus, under Rule 16, the government was under no obligation to produce discovery prior to that date.

Second, any purported delay in producing discovery in this case was due to defendant's own inaction and failure to resolve his representation issues. Although defendant was represented by John Littrell from Beinert Katzman PLC in connection with the criminal complaint and defendant's initial appearance on April 1, 2019, Mr. Littrell repeatedly advised the government that he was unsure whether his law firm would be representing defendant in connection with the indictment.[1] After Mr. Littrell indicated that he would not be representing defendant going

---

[1] As discussed further below, although the government had preliminary discussions with Mr. Littrell regarding defendant's ability to access to the Eagan Avenatti LLP ("EA LLP")

H. Dean Steward
RE: United States v. Avenatti
May 24, 2019
Page 2

forward, defendant delayed obtaining new counsel for weeks.  (See CR 26; CR 27; CR 28; CR 33.) Defendant did not resolve his representation issues until May 15, 2019, when you were retained to represent defendant the morning of the May 15, 2019, status conference.

Third, since you were retained to represent defendant the government has worked diligently to produce discovery to your client in a timely manner.  Even before you were retained and requested discovery, the government worked diligently to have discovery prepared in order to produce it in a timely manner upon request.  Within hours of the May 15 status conference, the government provided you with a draft stipulation and proposed protective order.  You, however, did not return the signed stipulation to us until May 20, 2019, at which point we immediately filed it with the Court that same day.  The first round of discovery, which consists of over 110,000 pages of materials, was then made available to be picked up from our Santa Ana office on May 22, 2019 – less than 48 hours after the Court entered the protective order.

As I stated during the May 15 status conference, the government is committed to working with the defense to resolve any discovery issues amicably and to produce all discovery to which defendant is entitled as quickly as possible.  Instead of attempting to blame the government for delays defendant himself has caused, we would you encourage you to work with us to resolve these discovery issues in a constructive manner.

## II.    Production of Digital Evidence Obtained During the Government's Investigation

In your May 15, 2019, discovery request and May 22, 2019, letter you requested that the government produce, among other things, forensic copies of digital devices the government has obtained during the course of its investigation.  The digital devices obtained during the government's investigation fall into the following six categories: (1) digital devices provided by former employees of Global Baristas US LLC ("GBUS"); (2) digital devices seized during defendant's arrest in New York; (3) digital devices seized during the execution of a search warrant at defendant's residence; (4) digital devices constituting the EA LLP server; (5) digital devices seized during the execution of a search warrant at the residence of Judy Regnier; and (6) digital devices seized during the execution of a search warrant at The X-Law Group.

As discussed in greater detail below, we have no objection to providing your client with forensic copies of the GBUS digital devices and any accessible devices seized during defendant's arrest or the execution of the search warrant at defendant's residence.  As I stated during the May 15, 2019, status conference, however, we have significant concerns regarding the production of the forensic copies of the EA LLP server and devices seized during the execution of search warrants

---

servers, Mr. Littrell never formally requested the government provide defendant with a copy of the servers.  Indeed, Mr. Littrell never requested that the government produce any discovery to defendant – presumably because Mr. Littrell did not know if he would be representing defendant going forward.

H. Dean Steward
RE: United States v. Avenatti
May 24, 2019
Page 3

at Ms. Regnier's residence and The X-Law Group's office, all of which are likely to contain
significant amounts of attorney-client information relating to third-parties.

### A.    Global Baristas US LLC Digital Devices

As set forth in the criminal complaint, in February 2019, the government obtained a warrant to
search seven digital devices that former employees of GBUS provided to the Internal Revenue
Service – Criminal Investigations.  (See CR 1.)  In total, we understand that these seven digital
devices contain approximately 1 terabyte ("TB") of data.  Although the government's review of
these digital devices is still ongoing, the government will provide defendant with forensic copies
of these devices subject to the existing Protective Order.[2]

### B.    Digital Devices Seized During Defendant's Arrest

During defendant's arrest on March 25, 2019, in New York, the Federal Bureau of Investigation
("FBI") and United States Attorney's Office for the Southern District of New York ("SDNY
USAO") seized the following six digital devices from your client;

1.  A black Apple iPhone X with IMEI No. 357204095086820;

2.  A silver Apple MacBook Pro with Serial No. C02TP26RHTD8;

3.  A black and grey Apple iPad with Serial No. DLXX30YCJ262;

4.  A black USB drive marked "27989;"

5.  A blue and silver USB drive marked "RAEN;" and

6.  A silver and purple USB drive marked "8025328."

The SDNY USAO provided an IRS-CI privilege review agent with copies of the three USB
drives (i.e., items 4 through 6 above) on May 22, 2019.  We, however, understand that the SDNY
USAO has not yet been able to access defendant's iPhone X, MacBook, or iPad because those
three digital devices are encrypted.  Accordingly, the SDNY USAO has yet to provide our office
or IRS-CI with forensic copies of these devices.

---

[2]  GBUS is now controlled by a Court-appointed bankruptcy trustee.  Although defendant
no longer controls GBUS and some of the GBUS devices may contain personal information
relating to former GBUS employees, we are nevertheless willing to provide defendant with
copies of these devices because we believe it is unlikely that these devices will contain any
attorney-client privileged information of third-parties.

H. Dean Steward
RE:  United States v. Avenatti
May 24, 2019
Page 4

The FBI and SDNY USAO also seized various miscellaneous documents from your client's
briefcase during his arrest.  The SDNY USAO provided an IRS-CI privilege review agent with
scanned copies of these documents on or about May 17, 2019.

The government has obtained a warrant to search the three USB drives and miscellaneous
documents, and will be reviewing such evidence pursuant to the search and privilege review
protocols set forth therein.  Although the government's review of these materials is ongoing, the
government will provide defendant with a copy of the three USB drives and miscellaneous
documents subject to the existing protective order.

As for defendant's iPhone, MacBook Pro, and iPad, we will not be able to provide defendant
with a copy of these devices until after the SDNY USAO gains access to the encrypted devices
and provides IRS-CI with copies of the resulting forensic images.  If defendant would like to
expedite this process, we would recommend that you contact the SDNY USAO and provide
them with defendant's passwords.

### C.    Digital Devices Seized from Defendant's Residence

On March 25, 2019, IRS-CI executed a search warrant at defendant's residence.  A copy of the
search warrant inventory was left at defendant's residence and is attached hereto as Exhibit A for
your convenience.  As detailed in the inventory, IRS-CI seized eight digital devices during the
execution of the search warrant, including two Apple iPad Mini tablets; an SD card, two USB
drives; three cell phones; an external hard drive; and an Apple iMac computer.  We understand
that the iPads, SD card, USB drives, cell phones, and external hard drive contain a total of
approximately 2 TB of data.  Although the government's review of these devices is ongoing, the
government will agree to provide defendant with copies of these devices subject to the existing
protective order.

IRS-CI, however, has not yet to be able to access the iMac computer because it is encrypted.
Accordingly, we will not be able to provide defendant with a useable forensic image of this
device until after IRS-CI has cracked the password and accessed the device.  If defendant would
like to expedite this process, defendant is welcome to provide IRS-CI with the password to
access the device.

### D.    The EA LLP Server

In connection with the government's investigation, the Court-appointed Receiver for EA LLP
(the "EA Receiver") consented to IRS-CI creating forensic images of the six digital devices that
comprise the EA LLP server (collectively, the "EA LLP server"), which were being stored by
MixinIT, a company in Orange County that stored and managed computer servers.  After
creating a forensic image of the EA LLP server, the EA LLP server was returned to the EA

H. Dean Steward
RE: United States v. Avenatti
May 24, 2019
Page 5


Receiver.[3]  The government has since obtained a warrant to search the forensic copy of the EA
LLP server for relevant evidence. We will produce any relevant evidence seized from the EA
LLP server once the government completes the review protocols set forth in the search warrant.
We, however, have significant concerns regarding producing a forensic copy of the EA LLP
server to defendant at this time.

First, our understanding is that the EA LLP servers are not defendant's personal property, but are
instead owned by EA LLP. Although your May 22, 2019, letter claims that defendant owns
"100%" of EA LLP, your letter fails to address or acknowledge the fact that defendant no longer
has any legal authority over EA LLP's operations or control over EA LLP's property. As you
are likely aware, EA LLP is currently a Judgment Debtor in litigation with Jason Frank Law
("JFL"), a former partner of EA LLP. See In re Eagan Avenatti LLP, No. CV 18-1644-VAP
(C.D. Cal.). On February 12, 2019, JFL filed a motion seeking the appointment of a receiver for
EA LLP and accusing defendant of bankruptcy fraud. Id., Dkt. No. 51. On February 13, 2019,
defendant, acting on behalf of EA LLP, stipulated to the appointment of Brian Weiss as a
Receiver for EA LLP (the "EA Receiver") and consented to the jurisdiction of the Honorable
Karen E. Scott, United States Magistrate Judge, to enter an order appointing the EA
Receiver. Id., Dkt. No. 52. Judge Scott entered the order appointing the EA Receiver later that
same day. Id., Dkt. No. 53. The order stated, among other things, that the EA Receiver shall
have the power to take possession of and manage the business of EA LLP. The order further
required that EA LLP and defendant immediately turn over all EA LLP property to the EA
Receiver and provide access to all EA LLP computer systems.[4]  To the extent you believe
defendant is still legally entitled to access the EA LLP server or has an "urgent need" to access
the server in connection with a current legal representation, defendant should – if he has not
already – raise that issue with the EA Receiver or Judge Scott in the first instance as the EA
Receiver is currently in possession of the actual EA LLP server.

Second, we believe the EA LLP server will contain a substantial amount of attorney-client
privileged information relating to third-parties, the vast majority of which is likely irrelevant to
this prosecution and your client's defense. Although your letter claims that defendant may still
have an attorney-client relationship with some of EA LLP's clients, we understand that

---

[3] Your May 22, 2019, letter claims that the government provided the EA LLP servers to
the EA Receiver. You have this backwards. The EA Receiver consented to IRS-CI accessing
and imaging the EA LLP servers. IRS-CI then immediately returned the servers to EA LLP,
which owns the servers and is controlled by the EA Receiver. The EA Receiver is not, as you
claim, a "third-party."

[4] Despite the Court's stipulated order appointing the EA Receiver and setting forth the
terms of the Receivership, the EA Receiver has recently accused defendant of taking actions to
prevent the EA Receiver from obtaining access to EA LLP's servers. See Receiver's Second
Interim Report, In re Eagan Avenatti LLP, No. 8:18-CV-1644-VAP, Dkt. No. 81 (filed May 15,
2019).

H. Dean Steward
RE:  United States v. Avenatti
May 24, 2019
Page 6

defendant no longer represents a number of EA LLP's former clients.  Indeed, your letter concedes this point, stating that defendant "is still counsel in many instances."  (5/22/19 Letter at 2.)  Providing defendant with unfettered access to attorney-client privileged information for clients whom defendant no longer represents therefore raises significant ethical concerns for us – particularly in light of the wire fraud charges in the indictment which allege that defendant repeatedly breached his ethical obligations to his former legal clients.  Indeed, the search warrant contains very specific privilege review protocols and does not authorize us to seize such privileged information.

In light of these facts, we do not believe it would be appropriate for the government to provide defendant with a forensic copy of the EA LLP server without either obtaining consent from the EA Receiver or a Court order requiring us to do so.  We are also unaware of any legal precedent that would require us to provide defendant with a copy of the entire EA LLP server at this time.  If you are aware of any such case law or other factual information establishing that defendant has an independent right to access the EA LLP, please provide it to us as soon as possible so we can evaluate it.  We would also be glad to discuss alternative procedures to ensure that you are able to access any information on the EA LLP server that you believe may be relevant to your client's defense, such as providing you and your client an opportunity to review the forensic image of the EA LLP server at IRS-CI's offices.

**E.    Digital Devices Seized from Judy Regnier's Residence**

On March 25, 2019, IRS-CI executed a search warrant at the residence of Judy Regnier, EA LLP's former office manager and chief paralegal.  A copy of the search warrant inventory is attached hereto is Exhibit B.  As detailed in the inventory, IRS-CI seized numerous digital devices during the execution of the search warrant, including cellphones, computers, iPads, and USB drives.  Our understanding is that the digital devices seized from Ms. Regnier's residence contain a total of approximately 2 TB of data.[5]  The government will produce any relevant evidence from these digital devices once it completes the review protocols set forth in the search warrant.  We, however, have significant concerns regarding producing a forensic copy of these devices to defendant at this time.

First, based on our discussions with Ms. Regnier, we understand that all of the digital devices seized from her residence either belonged to EA LLP or were Ms. Regnier's own personal property.  We understand that most of the digital devices Ms. Regnier identified as belonging to EA LLP have been imaged and returned to EA LLP through the EA Receiver.  The devices belonging to Ms. Regnier have been returned to Ms. Regnier.  As with the EA LLP servers

---

[5] We understand that IRS-CI has not yet been able to access two cell phones which EA LLP had previously issued to its former employees.  IRS-CI is still attempting to access these devices.

H. Dean Steward
RE: United States v. Avenatti
May 24, 2019
Page 7

discussed above, the government does not believe that defendant has an independent right to access the materials on the devices found at Ms. Regnier's residence.

Second, as with the EA LLP servers, the government believes that many of the digital devices seized from Ms. Regnier's residence will contain a substantial amount of attorney-client privileged information relating to third-parties, the vast majority of which is likely irrelevant to this prosecution and your client's defense.

In light of these facts, we do not believe it would be appropriate for the government to provide defendant with a forensic copy of these devices without either obtaining consent from the EA Receiver and Ms. Regnier or a Court order requiring us to do so. We, however, would be glad to discuss alternative procedures to ensure that you are able to access any information on the devices that you believe may be relevant to your client's defense, such as providing you and your client an opportunity to review the forensic images of the devices at IRS-CI's offices.

In addition to the items identified above, IRS-CI seized approximately 69 backup tapes, which we believe belong to EA LLP, from Ms. Regnier's residence. We understand specialized equipment may be required to restore and then review the data on the backup tapes. We will attempt to determine what data is stored on the backup tapes, whether such data falls within the scope of the search warrant, and whether the data is duplicative of the data stored on the EA LLP server or other seized devices. Please let us know if you would like to examine the backup tapes at IRS-CI's offices, and we will work with you to make the necessary arrangements.

## F.    Digital Devices Seized from The X-Law Group

On March 25, 2019, IRS-CI executed a search warrant at the business premises of The X-Law Group. A copy of the search warrant inventory is attached hereto as Exhibit C. As detailed in the inventory, IRS-CI seized numerous computers, USB drives, and external hard drives. We understand that these devices contain a total of 12 TB of data. The government will produce any relevant evidence from these digital devices once it completes the review protocols set forth in the search warrant. We, however, have significant concerns regarding producing a forensic copy of these devices to defendant at this time.

First, it is unclear to us whether defendant has any ownership interest in The X-Law Group or its property. Rather, we understand that The X-Law Group and EA LLP shared responsibility over certain cases, but that The X-Law Group remained a separate law firm and owned its own property. If this understanding is incorrect, please let us know and provide us with additional information regarding defendant's contractual relationship with The X-Law Group.

Second, we believe the devices seized from The X-Law Group are likely to contain significant amounts of attorney-client privileged information of third-parties, the vast majority of which would be irrelevant to this prosecution and your client's defense. Indeed, we understand The X-Law Group had its own separate legal clients, none of whom would have had an attorney-client relationship with defendant at any time.

H. Dean Steward
RE:  United States v. Avenatti
May 24, 2019
Page 8

In light of these facts, we do not believe it would be appropriate for the government to provide defendant with a forensic copy of these devices without either obtaining consent from The X-Law Group or a Court order requiring us to do so.  As with the EA LLP server and devices from Ms. Regnier's residence, however, we would be glad to discuss alternative procedures to ensure that you are able to access any information on the devices that you believe may be relevant to your client's defense, including providing you t an opportunity to review the forensic images of the devices at IRS-CI's offices.

## III.    Conclusion

As set forth above, the government will agree to provide you with forensic copies of the GBUS devices, the accessible devices seized from defendant's residence, and the accessible devices seized during defendant's arrest.  These devices contain a total of approximately 3 TB of data. Please provide us with a 5 TB external hard drive that we can use to transmit the forensic copies to you as soon as possible.  Given the volume of data, we expect it could take at least one week to load the images onto the hard drive and would like to start this process as soon as possible.

With respect to the EA LLP server and the devices seized from Ms. Regnier's residence and the X-Law Group, as discussed above, we do not believe it would be appropriate for the government to provide defendant with copies of those devices and unfettered access to attorney-client privileged information of third-parties.  Accordingly, please provide us with any legal support for your request or additional facts you would like to us to consider in analyzing this issue.  We also remain willing to discuss alternative means for you to access any relevant information on those particular devices and to make the devices available for you to review at IRS-CI's offices. However, if we cannot reach a prompt resolution of this issue, the government believes that the parties should raise the issue with the Court prior to the July 8, 2019, status conference.

Please let me know if you have any questions, or would like to further discuss any of the matters raised above.

Very truly yours,

JULIAN L. ANDRÉ
Assistant United States Attorney
Major Frauds Section

cc:    Assistant United States Attorney Brett A. Sagel

Exhibit G

# H. Dean Steward
ATTORNEY AT LAW

107 Avenida Miramar
Suite "C"
San Clemente, CA 92672
949-481-4900

June 25, 2019

Julian Andre
Brett Sagel
Asst. U.S. Attorneys

**VIA E-MAIL**

Re: Avenatti matter

Gentlemen:

In advance of our call tomorrow and the status conference scheduled for July 8, I write to address a serious issue relating to discovery - the government's failure to produce the following, at a minimum:

1. The return of the laptop and cell phone seized from Mr. Avenatti upon his arrest.

2. All data - emails, pleadings, settlement agreements, accounting information, etc. from the servers and computers relating to Mr. Avenatti's law firm.

I have previously requested this information, in writing, without success.[1] As you know, the government has charged my client with multiple counts relating to numerous client matters in which he served as counsel. Despite this fact, you continue to fail to provide us the discovery relating to these matters necessary for him to defend himself.  Indeed, there can be

---

[1] Please see my letter to you, May 15, 2019, §1 through §15, detailed requests.

• Admitted-California & Hawaii • Fellow-American College of Trial Lawyers •   1
fax: 949-496-6753 • e-mail: ████████████████

no question that the items above are critically important in this case and critical to the defense.  Further, I understand  that the information is voluminous and will require significant time to review.  Accordingly, time is of the essence.

The above information has been in the possession of the government since the last week of March - 3 months.  We ask that it be produced immediately.


Sincerely,

H. Dean Steward

2

Exhibit H

USAO_00460588



# DEPARTMENT OF THE TREASURY
## Internal Revenue Service
### Criminal Investigation

## Memorandum of Interview

| | | | |
|---|---|---|---|
| **Investigation #:** | ▮▮▮▮▮▮▮ | **Location:** | Telephonic |
| **Investigation Name:** | Michael J. Avenatti | | |
| **Date:** | July 25, 2019 | | |
| **Time:** | 1:30-2:10pm | | |
| **Participant(s):** | Judy Regnier, Witness | | |
| | Remoun Karlous and James Kim, Special Agents | | |
| | Julian Andre and Brett Sagel, AUSA's | | |

On July 25, 2019, the investigate team called and spoke to Judy Regnier.  The purpose of the call was to ask questions regarding the Eagan Avenatti LLP server and how client files are created and maintained on the server.

See attached agent notes regarding this phone call.

I prepared this memorandum on August 2, 2019.

Remoun Karlous
Special Agent

James Kim
Special Agent

Memorandum  Page 1 of 1



AO386-B
**DEFENDANT'S EXHIBIT**
CASE NO.  SACR 19-61-JVS
EXHIBIT NO.  1084

U.S. Treasury Criminal Investigation

3514-019
Page 1 of 1
USAO_00460588

Exhibit H - 001

USAO_00460585

Judy Regnier                    Telephonic  1:30 - 2:10pm
7/25/19                          Julian/Brett
                                 James/Lemon

①

File Site - filer are kept on
EA server. The cases are not password protected

Ex, → Smith vs Jones - main folder
      and then other filer with

Acess Microsoft Outlook → connected too File Site
      so we can search thru outlook
      for each case by name and
      click on folder which would open
      to sub folders.

Everyone had a personal folder in File Site

2014 - 3/2019 → Always used file site
      at EA. Upgraded file site when
      they got new servers. files were not
      changed.

Open new case : adding Name of case
      procedure

                        Mills → possible last name
IT Guy → Jordan Mills → Co. → KNJ Congruity
Last 5 years
      Worked for EA until last Sept 2018.
→ Managed Concordance & trial prep
      (Discovery)

USAO_00460585

You can get to file site thru "Microsoft" "Word"

Barela vs Brock

ex. Barela.001   1st case
ex. Barela.002   2nd case

(2) Michael did the Michelle Thompson case his own on his computer. The Thom case may not be on File Site.

Hard copy files stored at Iron Martin

A list of cases was put together & was email to her (Judy) by the receptionist & to Iron Martin.

Atty time records are kept in TABS not on file site.
↓
desk top icon

They did not have a misc file to put docments in.

File → EA_ General in File Site
EA_ Confidential "  "

Templates for fee agreements & other templates.

Start → to access driver
bottom

parsing document

USAO_00460585

Client Billing → TABS would be used
Client acctg

③ A word document would be generated & sent to the client

A few cases where no time was tracked
class action you would keep track to time

Atty's would enter their own time 50/50 of the time.

MA never turned in any time but he would keep track of it on his own.

Ahmad turned in all of his time

NOV/DEC 2018 → March 2019
→ MA did not ask her to pull records regarding Mr. Barela.

Ahmad has his personal computer & may have EA records on that computer

She has not spoken to anyone since the SW.

# Exhibit I

USAO_00265034



**DEPARTMENT OF THE TREASURY**
**Internal Revenue Service**
**Criminal Investigation**

## Memorandum of Interview

| | | | |
|---|---|---|---|
| **Investigation #:** | ▓▓▓▓▓▓▓ | **Location:** | United States Attorney's Office |
| **Investigation Name:** | Michael Avenatti | | 411 W Fourth Street, 8th Floor |
| | | | Santa Ana, California 92701 |
| **Date:** | November 19, 2019 | | |
| **Time:** | Approximately 9:05 AM – 5:42 PM | | |
| **Participant(s):** | Judy Regnier, Witness | | |
| | Ryan Roberson, Special Agent | | |
| | Remoun Karlous, Special Agent | | |
| | Brett Sagel, Assistant United State Attorney | | |

On the date and time listed above, Assistant United States Attorney Brett Sagel (AUSA Sagel) and Special Agents Ryan Roberson and Remoun Karlous met with Judy Regnier (Regnier). AUSA Sagel explained the importance of being truthful during the interview. AUSA Sagel informed Regnier privilege waivers for Geoffrey Johnson, Gregory Barela, Alexis Gardner, Michelle Phan, Long Tran, and Global Baristas US LLC had been obtained and were available for her review should she have any concerns about disclosing privileged information. Regnier said she had no questions and then voluntarily provided the following information:

1. Regnier has been taking Xanax three times daily over the past few months. Regnier has not taken Xanax since Sunday, November 17, 2019 because she did not want her memory or mental state of mind to be impaired during this interview. Regnier's civil attorney is Ted Donahue.

2. Eagan and Avenatti LLP (EA) used App river to host their e-mail server. Last night, November 18, she got an e-mail saying the EA server went down last night and that it had come back up. This was the first time in two years she had received an e-mail like this.

3. Regnier has not had any communications with Michael Avenatti (Avenatti), or his attorneys, since the Search Warrants at her residence on March 25, 2019. Regnier obtained a new phone number after the Search Warrants were executed.

**Geoff Johnson**

4. Regnier helped set up Johnson's living and care situation with Richard Beada, Johnson's Criminal defense attorney. Regnier does not recall how EA obtained the Johnson case. Regnier also spoke with Beada on other occasions.

5. Regnier knew the Johnson case settled because Avenatti told the EA employees. Avenatti may have done a press release. Suzie Quinn is the individual who helped EA with their press releases.



A0386-B
**DEFENDANT'S EXHIBIT**

CASE NO. SACR 19-61-JVS
EXHIBIT NO. 1085

Memorandum   Page 1 of 14

U.S. Treasury Criminal Investigation

USAO_00265034

Exhibit I - 001

USAO_00265034

6.  Regnier or Kathy Mosby (Mosby) may have seen the Johnson settlement agreement. Regnier did not typically read settlement agreements and is not certain if she actually saw the settlement agreement. Once the agreement was signed, it was placed into the physical case file along with the retainer. In most cases, the signed settlement agreement being placed in the physical case file was standard operating procedure at EA.

7.  Before the Johnson case settled, Regnier gave Avenatti the information regarding a Special Needs Trust so that Avenatti could set up a trust on Johnson's behalf. Regnier did this on her own initiative and did not have a specific attorney in mind. As far as Regnier knows, Avenatti never contacted a Special Needs Trust attorney for Johnson or set up a Special Needs Trust for Johnson. Regnier does not know if Avenatti had discussions with other EA attorneys about a Special Needs Trust for Johnson.

**Regnier was shown Exhibit 11 – Johnson Settlement Agreement signed and dated by EA on January 21, 2015 and Exhibit 12 – Check for $4,000,000.00 to EA from the County of Los Angeles dated January 26, 2015 and deposit slip for $4,000,000.00 deposit on January 29, 2015 and provided the following information:**

8.  Regnier recognizes the deposit slip and believes this is her handwriting on the checking deposit dated January 29, 2015 for $4,000,000.00. Regnier believes the funds were held in EA's client trust account for the client. Avenatti told Regnier where to send the funds, and then Regnier followed directions and sent the funds to where Avenatti directed. Regnier always followed Avenatti's directions and sent the funds wherever Avenatti directed.

9.  Avenatti occasionally worked cases where no one else in EA knew what he was doing. Regnier did not always know what funds were supposed to go to whom. For this reason, Regnier relied on Avenatti to instruct her on where to send funds. Avenatti had several fee disputes after settlements were paid to EA, with co-case attorneys who assisted EA.

10. The costs incurred by EA for the Johnson case were extensive because EA covered Johnson's living expenses. After the Johnson settlement, Regnier was not aware of Avenatti doing other work for Johnson. Despite not doing other work for Johnson, Avenatti visited Johnson quite often. Regnier does not know why Avenatti visited Johnson so often.

11. Regnier did not know what agreement Avenatti, Johnson, and Johnson's family had with each other. Regnier was unsure why EA was paying Johnson's expenses after the settlement. The funds EA used to pay Johnson's expenses came from EA's operating account, not a specific account set up by EA for Johnson.

12. Regnier never actually met Johnson face-to-face. While communicating with Johnson, Regnier found Johnson to be nice and intelligent. Regnier also believes Johnson to be gullible and easily influenced. Regnier always took Johnson's calls unless EA was in trial.

**Regnier was shown Exhibit 13 – EA QuickBooks Deposit Detail on January 29, 2015 and provided the following information:**

13. Regnier may have made these accounting entries into QuickBooks. These entries were standard operating procedure for EA and showed how EA accounted for its client accounts. Regnier operated EA's QuickBooks and made the accounting entries. Prior to Regnier, two other assistants operated EA's QuickBooks and made the accounting entries. Regnier cannot recall the names of these two assistants.

Exhibit I - 002

USAO_00265035

USAO_00265034

**Regnier was shown Exhibit 14 – EA QuickBooks Income by Customer Detail, January 2011 through December 2018 and provided the following information:**

14. EA used two systems to track case expenses. The first was QuickBooks, and the accounting entries came from expense reports, court reports, etc. The second system used by EA to track case expenses was TABS.

15. At Avenatti's request, Regnier kept QuickBooks records of Johnson's post-settlement expenses incurred by EA. Regnier assumed this was just to keep track of expenses EA accumulated on behalf of Johnson, but she is not certain. Doing it this way also made it easy to provide figures for Johnson's social security supplement income payments. The Johnson case was the only case in which EA kept track of costs post-settlement.

16. When asked why there were no entries for Johnson from Feb 2017 through June 2018 in EA's QuickBooks, Regnier explained she maintained QuickBooks how Avenatti asked her to. Regnier believes Avenatti instructed her to stop making entries, but she does not recall a specific conversation. Regnier would not have stopped making QuickBooks entries on her own.

17. EA's monthly reports for the bankruptcy were completed using an excel spreadsheet, outside of QuickBooks. Regnier typically printed out the QuickBooks ledger report, then compiled the totals into a monthly report, and provided this to Avenatti.

18. When Johnson asked Regnier for money, Regnier almost always asked Avenatti for permission to give Johnson money. Regnier asked Avenatti because Avenatti did not want Regnier sending funds anywhere without his approval. In one specific instance, Johnson asked Regnier for funds so he could purchase a hearing aid for his dad. Avenatti said no to this request without an explanation. Johnson often called Regnier at 3:00 PM on a Friday to ask for money, but it was difficult for Regnier to pay Johnson on short notice because she had to wait for Avenatti to authorize the payment and funds to be available. In another specific instance, Regnier used her personal Credit card and ordered Johnson groceries so he could have food over the weekend. Regnier recalls Johnson ordering bologna and cheese. Johnson did not take advantage of Regnier and order anything extravagant. Johnson told Regnier his checking accounts could not exceed a certain threshold, otherwise his social security disability insurance benefits would be affected.

19. Regnier made the payments to Johnson but she was not aware of how much funds were sent from EA to Johnson, or how often the funds were sent from EA to Johnson. Regnier asked Avenatti what Johnson receives each month, but she was told that was between him and Johnson, and never answered the question.

20. Regnier made rent payments on behalf of Johnson to his landlord, Joe LNU, via both wire and check. Avenatti often let the rent payments go 60 days late at a time. When this happened, Johnson typically contacted Judy to inform her he received eviction notices and requested his rent be paid. Johnson typically reminded Regnier on the 25th of the given month what amount was due for his next month's rent. Regnier then informed Avenatti that Johnson's rent needed to be paid. In one instance Avenatti told Regnier, "I can't fucking be bothered by this right now." This statement was made in 2018 after Regnier informed Avenatti Johnson's rent needed to be paid because Johnson received an eviction notice. By this time EA was tight on funds and may not have had the funds to pay Johnson's rent.

U.S. Treasury Criminal Investigation

USAO_00265036

Exhibit I - 003

USAO_00265034

**Regnier was shown Exhibit 18 – Text messages between Regnier and Avenatti on March 22, 2019 and provided the following information:**

21. At the time of these messages, Regnier did not know why it was so urgent for Avenatti to see Johnson on March 22, 2019. Regnier did not know the physical location of Avenatti when these messages were exchanged. Now, at present day, Regnier knows why Avenatti wanted to speak with Johnson. Avenatti did not have Regnier create false documents in any matter related to Johnson.

22. Avenatti did not regularly obtain client testimonials, but Avenatti did conduct press releases. It was not common practice for Avenatti to have clients sign documents after the fact.

23. Regnier did not know if the Johnson settlement was confidential. Regnier does not know if Johnson got a copy of the settlement agreement, but there was no reason for Johnson not to get a copy of the settlement agreement. Johnson never asked Regnier for a copy.

24. Avenatti asked Regnier to set up a Limited Liability Company (LLC). At the time, Regnier did not know the purpose of the LLC, but after reading the indictment Regnier understood why the LLC was set up. It was common for Avenatti to ask Regnier to set up LLC's.

25. When asked about a potential real estate property for Johnson, Regnier recalled Johnson calling or e-mailing her to have Avenatti sign some escrow papers. This was the only mention of a real estate between Johnson and Regnier.

**Regnier was shown Exhibit 19 – Letter from the Social Security Administration to Johnson and provided the following information:**

26. Johnson sent these documents from the Social Security Administration (SSA) to Regnier, and then she forwarded the correspondence to Avenatti. The documents requested Johnson provided additional documents to the SSA to keep his benefits, and Johnson needed EA to provide these additional documents to the SSA on his behalf. In years prior to this notice, Regnier and EA had submitted documents to the SSA on Johnson's behalf to ensure he kept his benefits. Avenatti told Regnier he would take care of the this notice from the SSA, but he never followed through therefore Johnson lost his benefits. In response to finding out Johnson lost his benefits, Avenatti told Regnier they would get it straightened out and he would handle it.

27. Avenatti did ask Regnier to sign for other people electronically on a PDF. Avenatti said EA had permission to electronically sign for the clients. Usually Avenatti gave a reason as to why they were signing for a client, such as they were travelling overseas or something else.

*Alexis Gardner*

28. Regnier never interacted with Alexis Gardner (Gardner) in any capacity. Gardner was a client of EA's, but this was a deal between Filippo Marchino (Marchino), Tom Cassaro, and Avenatti. In one instance, Marchino called and asked Regnier about something related to Gardner. Regnier then asked Avenatti who Gardner was, to which Avenatti responded and said there was a settlement involving Gardner. Regnier recognized the names of the parties involved prior to Avenatti being indicted.

**Regnier was shown Exhibits 20 – Attorney Client Fee Contract between EA and Gardner dated December 5, 2016 and Exhibit 21 – Settlement Agreement dated January 7, 2017 and provided the following information:**

29. Regnier may have seen these settlement agreements, but she is not positive because Avenatti may have told her about it. EA's fee agreements and settlement agreements were not always kept in the physical and electronic case files. On some occasions Avenatti would not put the settlement agreements into EA's case files.

USAO_00265037

Exhibit I - 004

USAO_00265034

**Regnier was shown Exhibit 29 – Calendar from Regnier's iPhone and provided the following information:**

30. Regnier must have known of the final settlement payment to Gardner and assumed she put this on the calendar.

**Regnier was shown Exhibit 22 – Letter from EA to Rachel Dourec regarding Gardner's lease and provided the following information:**

31. This letter was sent via e-mail to set up Gardner's housing. Regnier was aware EA helped set up Gardner's housing but does not believe she prepared this letter. Regnier does not know how Gardner was supposed to be paid her funds from the settlement.

**Regnier was shown Exhibit 23 – EA's California Bank and Trust Client Trust Account bank statement for January 31, 2017, and provided the following information:**

32. Regnier may have processed these wire requests, but she is not certain. If Regnier processed the wire requests, it was after Avenatti directed her to do so. Regnier assumed EA sent the $2,500,000.00 wire to the X-Law Group (XLG) because they obtained Gardner as the client, and therefore would have paid Gardner.

**Regnier was shown Exhibit 24 – XLG's JPMorgan Chase Bank Account bank statement for January 31, 2017 and provided the following information:**

33. Passport 420 is Avenatti's company he owns with Bill Parish (Parish). The company was set up to purchase an airplane. When Honda Jet said they were coming out with an airplane around 2013, Avenatti told Regnier he would be purchasing an airplane and then reserved one. Regnier never asked Avenatti how much the airplane cost because Parish is extremely wealthy.

34. Regnier did not know the $2,500,000.00 in funds from the Gardner settlement were going to purchase an airplane. Regnier explained how she thought the funds were going to XLG, who would then pass the funds on to Gardner.

**Regnier was shown Exhibit 25 – EA QuickBooks Income by Customer Detail, January 2011 through December 2018 and provided the following information:**

35. Regnier is unsure why EA's QuickBooks entries stopped in March of 2017. Gardner received additional payments form EA after March of 2017, even though they are not recorded in EA's QuickBooks.

**Regnier was shown Exhibit 26 – Spreadsheet showing Avenatti Payments to Gardner and provided the following information:**

36. These show the funds sent to Gardner after March 2017. Avenatti told Regnier to pay Gardner $34,000.00 and this was done through cashier's check 596467. The remitter was EA on this cashier's check because the bank employee who create the cashier's check put EA down as the remitter. Regnier explained how some bank tellers used the name of the account drawn off as the remitter, while other bank tellers asked EA who they wanted to list as remitter. Pages 10, 11, and 12 of exhibit 26 shows the funds coming from EA, not from Whiteside. Regnier did not ask the teller to list Whiteside as the remitter on the cashier's checks. Only Avenatti would have asked the tellers to list Whiteside as the remitter. Regnier is unsure why Avenatti would have wanted Whiteside to be the remitter listed on the cashier's checks.

U.S. Treasury Criminal Investigation

USAO_00265038

Exhibit I - 005

USAO_00265034

37. On a normal case, a separate confidential file was kept and labeled "EA-CONF." On a normal case the accounting for a settlement would be the settlement amount less attorney fees, less EA's costs. Regnier typically prepared this accounting after being asked to do so. Regnier does not believe a formal accounting was prepared for the Johnson or Gardner cases.

38. Regnier is unsure if Gardner got a copy of the settlement agreement. Regnier is unsure if Gardner asked for a copy of the settlement agreement. If it was in the EA's system, Regnier could have retrieved the settlement agreement easily. On several occasions, settlement agreements were not in the files, so Regnier could not retrieve them. If Avenatti requested a settlement agreement to be retrieved, it normally took Regnier less than five minutes assuming the settlement agreement was in the case file.

**Regnier was shown Exhibit 27 – Text messages between Regnier and Tom Cassaro on August 14, 2018 and provided the following information:**

39. Regnier talked to Avenatti on the phone and he said he would handle it. Regnier would not have said this unless she spoke with Avenatti. Regnier did not know the details of the matter.

**Regnier was shown Exhibit 18 – Text messages between Regnier and Avenatti on February 7, 2019 and provided the following information:**

40. Regnier sent these funds at Avenatti's direction to Gardner. James Scott might be related to Stormy Daniels, but Regnier was not certain. Louise Messinger (Messinger) was the mediator used by EA. Regnier recalled Avenatti purchased a car from Messinger. Regnier does not believe Avenatti's purchase of the car from Messinger was related to any cases. Regnier is unsure how Avenatti paid for the car.

41. Regnier does not know if Avenatti went to see Gardner on the same weekend of Friday, March 22 2019 that he went to see Johnson.

**Regnier was shown Exhibit 1 – Attorney Client Fee Contract between EA and Barela dated July 2, 2014 and Exhibit 2 – Letter from  Lee Sheikh Megley & Haan dated November 21, 2018 with confidential settlement agreement attached and Exhibit 3 – paragraphs identifying how Barela is supposed to be paid from Brock and provided the following information:**

42. Regnier assisted in a small capacity with the Greg Barela (Barela) case. John Arden (Arden) did most of the work with Mosby's assistance. The arbitration and mediation took place in the state of Colorado. When the case settled Regnier believed there was supposed to be an initial settlement payment, followed by subsequent payments to Barela. EA was supposed to get the entire amount of their attorney fees from the initial settlement payment.

43. EA did not typically receive payments on time, therefore it was not unusual for payments be late.

44. Regnier did not know about the two separate settlement agreements until the arbitration filing. Regnier does not believe she had a copy of the Barela settlement agreement because Barela asked for it but Regnier did not provide it to Barela . Regnier does not recall a final accounting for the Barela case ever taking place. Eventually, Barela was provided with a settlement agreement.

45. There could be multiple unsigned versions of a settlement agreement on EA's system. However, there would only be one copy of a signed settlement agreement.

USAO_00265039

Exhibit I - 006

USAO_00265034

**Regnier was shown Exhibit 7 – Michael Avenatti City National Bank Client Trust Account bank statement for December 28, 2017 and provided the following information:**

46. Avenatti set up a Trust Settlement Account for Barela. This is not normal, but it does happen. Regnier is unsure why Avenatti set up this account, but she did not think it was weird. Around this time, EA's bank California Bank and Trust informed EA due to Global Barista's overdrafts, EA's California Bank and Trust accounts may be closed.

47. Regnier obtained cashier's checks out of this account because Avenatti instructed Regnier to do so. Avenatti specifically told Regnier the amount, who the remitter should be, and who should be the payee of each cashier's check. Regnier did not know the reasons why Avenatti asked her to obtain these cashier's checks.

48. According to Avenatti, only the amounts earned by EA needed to be reported on the bankruptcy reports. Regnier understood this meant whatever Avenatti earned outside of EA was not reported to the bankruptcy trustee. Regnier gave Avenatti hard copies of the bankruptcy reports, and then Avenatti made edits to these reports. Regnier occasionally e-mailed these reports to Avenatti.

49. Avenatti told Regnier how much money to transfer to the debtor in process (dip) accounts. Regnier does not know how Avenatti decided the amounts to transfer. Sometimes the amounts Regnier transferred had to do with Payroll. The amounts Avenatti moved over was not enough to pay for all of EA's expenses. Regnier was unsure why more funds were not moved to the dip accounts.

**Regnier was shown Exhibit 5 – Michael Avenatti Trust Account ending in 5566 spreadsheet and provided the following information:**

50. Edward Ricci (Ricci) worked on a few legal cases with Avenatti. Regnier does not think Ricci was involved in the Barela case.

51. Regnier does not believe Avenatti ever handled any criminal defense work while she was at EA.

52. Avenatti told Regnier who to pay, and how much to pay them.

53. Regnier is unsure why none of this money was paid to Barela. Regnier knew Barela was entitled to funds from the settlement, but Regnier did not know the details.

54. Regnier does not have any knowledge about the payment of $16,146.64 to Miller Nash Graham & Dunn LLP. Regnier does not have any knowledge about the payment of $30,000.00 to James R Gailey & Associates PA. Regnier does not have any knowledge about the payment of $17,000.00 to Richard Beada, Johnson's criminal defense attorney. The payment of $41,884.67 to Dillanos Coffee Roasters was related to Global Baristas, US LLC (GB). The payment of $10,588.74 to Alki Bakery was related to Global Baristas, US LLC (GB). The payment of $30,000.00 to Burke Contracting LLC may have been related to Avenatti's personal residence.

55. EA helped Barela with a civil suit in San Diego. Avenatti and Barela were in touch weekly, and Avenatti assisted Barela quite often. Regnier did not know what Avenatti and Barela were working on. Regnier is unsure why Avenatti instructed her to send the Barela funds, in the manner they were sent, because she did not know their agreement. Regnier never discussed the Barela settlement agreement with Avenatti.

USAO_00265040

Exhibit I - 007

USAO_00265034

**Regnier was shown Exhibit 10 – Barela e-mails to Avenatti and Regnier and provided the
following information:**

56. This is an e-mail from Barela. Regnier does not know why Barela mentioned the Brock filing for
the $1,600,000.00 due. Avenatti never instructed Regnier, or anyone else as far as Regnier
knows, to ignore Barela. Avenatti may have told Regnier early to have Barela call Avenatti if
Barela asks Regnier about the $1,600,000.00 settlement.

57. Regnier was present with Ibrahim and Arden at the end of a phone conversation they had with
Barela.

**Regnier was shown Exhibit 9 – Text message between Regnier and Arden on November 20, 2018
with attachment of EA letter to attorney Steven Bledsoe and provided the following information:**

58. Ibrahim drafted this letter, and Regnier reviewed this letter before she faxed it.

59. Regnier realized EA failed to pay Barela his settlement funds when he filed arbitration in
January of 2019. At this time, Avenatti called Regnier and told her not to tell Arden or Ibrahim
that Barela had filed for arbitration.

60. Regnier does not remember sending Barela's new counsel the Brock case file. Regnier does
not remember sending the California state bar the Brock case file.

61. Regnier is unsure if Avenatti assisted Barela with the criminal case in San Diego. Avenatti was
not on the docket.

62. The first time Avenatti mentioned Barela was a convicted felon was after Barela publicly voiced
his negative experience with Avenatti and EA.

63. Regnier began looking to leave EA in July of 2018.

**Regnier was shown Exhibit 16 – Text messages between Regnier and Avenatti on January 23,
2019 and provided the following information:**

64. These texts in January 2019 were about Regnier looking up criminal records on Barela at
Avenatti's direction. This was just after Barela filed the complaint against EA / Avenatti.

**Regnier was shown Exhibit 4 – EA QuickBooks deposit detail for January 2018 and Exhibit 8 –
EA QuickBooks Income by Customer Detail for Barela for January 2011 through December 2018
and provided the following information:**

65. When asked why there was no $1,600,000.00 deposit for Barela recorded in EA's QuickBooks
records Regnier explained EA's QuickBooks records only included activity in EA's California
Bank and Trust accounts. The $1,600,000.00 was deposited by Regnier into EA's City National
Bank account, not one of EA's California Bank and Trust accounts. Avenatti instructed Regnier
to deposit the Barela settlement funds into EA's City National Bank account. Avenatti physically
went into the City National Bank branch location at the bottom floor of the building EA occupied,
and opened a bank account prior to Regnier making the $1,600,000.00 deposit into this
account.

66. EA's QuickBooks account was password protected. Regnier and the IT contractor Jordan LNU
had the password to access EA's QuickBooks account.

67. Regnier is unsure why the $111,113.22 deposit was listed as a reimbursed expense. Avenatti
directed Regnier on how accounting entries were to be made. In some instances, Avenatti
reviewed EA's QuickBooks records and asked Regnier to make adjustments.

USAO_00265041

Exhibit I - 008

USAO_00265034

**Michelle Phan**

68. Avenatti asked Regnier to do some tasks for the Michell Phan (Phan) matter but was not
involved beyond this extent. There was not much paperwork involved with this deal. Avenatti
told Regnier he was getting a deal done for a young girl that could not have gotten the same
deal without his help. Avenatti also told Regnier it was a several million-dollar deal for Phan and
her partner, Long Tran (Tran). Regnier does not recall completing any accounting work on the
Phan matter.

69. Avenatti never worked on any Mergers & Acquisitions while Regnier worked at EA.

**Regnier was shown Exhibit 32 – Michael Avenatti Trust Account ending in 4705 spreadsheet and
provided the following information:**

70. Regnier vaguely recalls Avenatti telling her how he would be paying the IRS in March of 2018.
Avenatti also told Regnier that EA would be getting out of bankruptcy. Regnier recalls
wondering how EA and Avenatti could possibly make the necessary payments. On March 14,
2018 $8,146,288.00 came into EA's Trust account from Personalized Beauty Discover, Inc. At
the time, Regnier did not know all of these funds were intended for Phan. On March 15, 2018
$3,000,000.00 was then sent from EA's Trust account to EA's operating account. Regnier does
not specifically recall making this $3,000,000.00 transfer, but if she did it was certainly at the
direction of Avenatti. If Avenatti wanted to wire Phan the entire balance of $8,146,288.00 sent to
EA's trust account, it could have been done very easily. Avenatti could have done it from
wherever he was physically located. All it would have taken was a phone call, an e-mail, or
several other ways. EA never had any dollar limitations on a wire transfer in the past, at any of
their banks. Ensuring that a wire was sent from EA to a payee was both quick and easy.

71. Regnier sent the $2,800,000.00 wire form EA's California Bank and Trust account to Sulmeyer
Kupetz after the $3,000,000.00 transfer came in.

**Regnier was shown Exhibit 38 – E-mails between Long Tran, Avenatti, and Regnier and provided
the following information:**

72. None of the $8,146,288.00 had been paid Phan at the time of these e-mails. Despite knowing
the funds had yet to be paid, Avenatti is still stating in these e-mails the funds had been sent.
Avenatti is lying and being deceptive in these e-mails. After sending the April 30, 2018 e-mail to
Regnier, Avenatti called Regnier to tell her not to do anything and that he would take care of it.
Regnier explicitly asked Avenatti why EA does not just pay Phan the funds she is owed.
Avenatti told Regnier not to worry and that he would take care of it.

73. On May 1, 2018 at 3:08 PM Avenatti told Regnier to send this e-mail with those exact words.
Regnier never actually initiated a wire like she stated in the e-mail and as far as Regnier knew,
a wire had never been sent.

74. There is a good chance Regnier requested the 5/4/2018 wires for $146,288 and $4,000,000.00
be sent to Phan, but Regnier is not certain. Regnier said there is no good reason to break up an
$8,000,000.00 wire and split this into two $4,000,000.00 wires.

75. At no time in 2018 did Regnier ever have any health-related concerns or conditions which would
have prevented her from wiring funds to Phan or Tran.

**Regnier was shown Exhibit 48 – Avenatti's 2011 Form 1040 stamped "Draft" and Exhibit 49 –
Avenatti's 2011 Form 1040 without the "Draft" stamp and provided the following information:**

76. Regnier does not recall removing the "draft" from the 1040 and forwarding the 1040 to anyone
else.

USAO_00265042

Exhibit I - 009

USAO_00265034

**Regnier was shown Exhibit 50 – EA QuickBooks balance sheet as of March 20, 2014 and EA profit & loss for the time period of January 1, 2011 through March 10, 2014 and provided the following information:**

77. Avenatti may have asked for the balance sheet and Regnier may have printed the balance sheet, but she is not certain. Occasionally, Avenatti would ask Regnier for financial documents. Regnier does not recall Avenatti asking her to fabricate financial documents for any bank loans.

**Regnier was shown Exhibit 52 – E-mail from Avenatti to Peoples Bank with EA's 2012 Form 1065 tax return and provided the following information:**

78. Avenatti provided the numbers reported on the 2012 Form 1065 to Regnier because Michael Eagan (Eagan) needed K-1's for EA, and therefore a Form 1065 was necessary. Regnier input the numbers Avenatti provided into the tax return software. Avenatti obtained his numbers from EA's QuickBooks records, as far as Regnier knows. Regnier had Marjorie Hendricks (Hendricks) review this 2012 Form 1065 before Regnier saved it to a PDF and forwarded it to Avenatti. Regnier did not know this 1012 Form 1065 was used for a bank loan. Instead, Regnier thought it was created for Eagan's K-1's.

**Regnier was shown Exhibit 53 – EA's 2012 Form 1065 tax return that was filed with the IRS and provided the following information:**

79. The actual 2012 Form 1065 filed by Hendricks showed a ($2,128, 849) loss.

**Regnier was shown Exhibit 54 – E-mails from Avenatti to Peoples Bank along with attachments and Exhibit 55 – EA's California Bank and Trust bank statements for account ending in 8461 dated September 30, 2014 and provided the following information:**

80. Regnier does not recall manipulating the balance sheet. Regnier may have exported these numbers to an excel spreadsheet, and then provided the spreadsheet to Avenatti.

**Regnier was shown Exhibit 56 – Avenatti's 2012 Form 1040 tax return and an e-mail from Avenatti to People's bank with an e-mail attachment of Avenatti's 2013 Form 1040 tax return and provided the following information:**

81. Regnier does not recall Avenatti asking her to prepare Avenatti's draft Forms 1040. Regnier does not recall Avenatti asking her to help gather records needed to prepare his Forms 1040.

**Regnier was shown Exhibit 57 – EA's 2011 through 2016 K-1's for Eagan and provided the following information:**

82. If Avenatti gave Regnier the numbers, she would sometimes prepare Eagan's K-1's. Regnier did not have the tax returns when she prepared Eagan's K-1's. Instead, Avenatti simply gave Regnier the numbers for the K-1's.

83. Up until the bankruptcy, Regnier would tell Avenatti that the IRS notices should be addressed. Avenatti was not concerned and never took any actions to address these notices.

84. Avenatti claims to understand taxes very well. If Regnier asked Avenatti a specific question about a specific line item on a tax return, Avenatti would have an explanation. Regnier believes Avenatti knew what he was doing by not filing his personal tax returns and not paying EA's payroll taxes. Regnier believes Avenatti did not think he would get caught by the IRS. Avenatti signed the tax returns filed by EA.

USAO_00265043

Exhibit I - 010

USAO_00265034

85. Paychex used to send funds on EA's behalf to EA employees for payroll, and to the IRS for payroll taxes. However, checks began to bounce, and while Paychex continued to send payroll to employees, Paychex did stop sending funds to the IRS for payroll taxes. Despite not sending funds to the IRS for payroll taxes, Paychex still provided unfiled employment tax returns to EA. These returns reflected the correct amount of payroll taxes which should have been paid by EA to IRS. Avenatti signed and submitted these tax returns to the IRS, but EA never actually paid the employment taxes. Avenatti received notices from the IRS for EA's failure to pay the payroll taxes, but he ignored the notices after reviewing them.

86. Regnier was not aware the IRS took $1,000,000.00 from Avenatti after the sale of Avenatti's house in 2015.

87. There has never been an Avenatti signature stamp at EA. For this reason, anytime Avenatti's signature is present, he is the one who signed the document.

**Regnier was shown Exhibit 66 – Paychex service agreements and correspondence between Paychex and EA and provided the following information:**

88. This is Avenatti's signature on the bottom of page two.

89. Avenatti knew GB owed taxes, but the primary discussions between Avenatti and Regnier were about EA's payroll taxes. Regnier saw the e-mail from GB and was aware GB owed payroll taxes. The only GB person Regnier ever met from GB was Todd McDonald. Regnier had minimal dealings with him.

90. Marie Scott was hired to help Avenatti with his Desert Harvest pot venture. Scott did not do any official work for EA. Scott also worked for The PAC when Avenatti decided to run for President. Scott was paid out of EA's payroll.

91. Regnier recognizes the name Ryan Hendricks and vaguely recalls him being in trouble criminally in Florida and charged in Pittsburgh. Regnier does not know about Hendricks having large amounts of cash. Regnier does not know if Hendricks is related to Desert Harvest.

92. The Desert Harvest pot venture included a piece of land, and permits obtained by Avenatti. Since Avenatti did not pay the bills, the venture ceased operations.

93. When asked if EA dealt in cash, Regnier said Avenatti brought down a large amount of cash. Avenatti told Regnier the cash was from GB and supposed to be used so EA could stay afloat. Regnier deposited the cash over multiple deposits. The first deposit was for $194,000.00 and the others were between $40,000.00 and $60,000.00. These deposits were made after the bankruptcy filing.

94. EA employees stayed at the California club downtown Los Angeles during the Kimberly Clark trial. Regnier paid cash to the California club receptionist for the EA employees to stay at the California club. Regnier was told it was easier for Rick Kramer if EA paid for the stay in cash. Regnier had the cash in a manila envelope. Regnier was not sure where the cash came from. The amount of cash was less than $10,000.00. After the winning verdict, the EA team went to dinner at an Italian Restaurant downtown Los Angeles that was within walking distance from the California Club.

95. EA did not have any credit cards by the time of the bankruptcy filing. EA maintained credit cards with California Bank and Trust prior to the credit card accounts being closed.

U.S. Treasury Criminal Investigation

USAO_00265044

Exhibit I - 011

USAO_00265034

**Regnier was shown Exhibit 40 – E-mails between Regnier and Hendricks along with attachments showing IRS correspondence stating GB has yet to file Form 941 tax returns and provided the following information:**

96. By November of 2016, Regnier was aware that GB had tax issues.

**Regnier was shown Exhibit 41 – E-mails between Regnier and Vitaliy Shved on August 29, 2017 and provided the following information:**

97. Vitaliy Shved (Shved) worked in the accounting department at GB. Regnier was aware the IRS had levies on GB's KeyBank and Bank of America bank accounts. Regnier believes her e-mail stating "Key account is clear" meant that it was safe to make deposits. Oftentimes, Avenatti told Regnier to instruct GB not to make deposits to prevent GB's accounts from being levied. In this instance, Avenatti said the account was clear so deposits could be made. In general, after deposits were made funds would then be immediately withdrawn or wired out of the account. Sometimes wires were sent to EA accounts so that Regnier could pay GB's vendors from EA's accounts. All the actions taken by Regnier were at the direction of Avenatti.

98. Regnier described the flow of funds like this: 1. Avenatti gave the go ahead that GB's bank accounts were clear. 2. Funds were deposited to GB's bank accounts. 3. Funds were immediately transferred to EA's bank accounts. 4. GB's vendors were paid from EA's bank accounts. Regnier explained without taking these steps the IRS would have levied GB's bank accounts, and that would have resulted in GB not being able to pay its vendors and GB ultimately going out of business. Regnier emphasized all these actions took place at the sole direction of Avenatti.

**Regnier was shown Exhibit 43 – E-mails between Regnier, Ben Venuto, Avenatti, and Vitaliy with attachment of California Bank and Trust letter for GB and provided the following information:**

99. GB's account with TSYS was levied by the IRS in August of 2017. In October of 2017 GB opened a new account at California Bank & Trust, after the TSYS employee asked for a letter from California Bank & Trust to confirm EA had bank accounts with them. In November 2017 TSYS informed GB they were shutting GB's accounts. GB was primarily based out of Washington state, and never had an account with California Bank & Trust until the account was opened in October of 2017.

**Regnier was shown Exhibit 45 – JPMorgan Chase Bank application for GB dated December 1, 2017 and provided the following information**

100. Regnier is filling out a new agreement with JPMorgan Chase Bank using the new entity name, Doppio, Inc. Regnier probably helped prepare this, but she is not certain. Avenatti would have certainly reviewed and approved this agreement prior to it being submitted. Avenatti told Regnier to use the name Doppio, Inc. as opposed to GB.

**Regnier was shown Exhibit 44 – E-mails between Regnier, Ben Venuto, Avenatti, and Vitaliy with attachment of TSYS merchant processing agreement for GB and provided the following information:**

101. Avenatti asked Regnier to change the entity name because Avenatti told her GB USA was the wrong entity name. The new application is dated October 2, 2017. Prior to the TSYS levies, Avenatti never asked Regnier to change the entity name.

102. Either the IRS or the Washington state Department of Revenue went into GB's office to interview the GB's employees. When Avenatti heard about this he screamed at everyone involved for not informing him prior to these interviews.

103. Regnier speculated that Avenatti never sold GB.

U.S. Treasury Criminal Investigation

USAO_00265045

Exhibit I - 012

USAO_00265034

104.    Regnier does not have knowledge of the entity 420 Operation LLC.

105.    An escrow account existed to buy the desert property from an individual but Avenatti
missed some payments, and the project architects stopped working with him. Regnier is unsure
what happened with the property and project after this took place. Regnier does not know the
name of the individual who Avenatti was buying the property from. Regnier believes the
property was being purchased for Avenatti.

106.    Regnier does not remember ever seeing a "pelican type" suitcase coming into EA's
office. Regnier believes Avenatti may have bought one but does not recall anything out of the
ordinary.

107.    Regnier often saw James Cameron (Cameron) bringing items into the EA office.
Cameron would often take items to Marchino. The last time Regnier saw Cameron was before
the search warrant in March of 2019. Cameron drove Avenatti everywhere. Cameron also drove
EA attorneys and employees around. Avenatti trusted Cameron.

108.    Avenatti's Driver's License lists Regnier's Arizona address because Avenatti has an
awful driving record. Avenatti registered his cars to Regnier's Arizona address to avoid
California sales and use taxes. Regnier has not seen any correspondence for Avenatti recently
sent to her Arizona address.

109.    Avenatti was involved in the Maseco vs. Herbert litigation behind the scenes. Regnier
speculated the only reason Avenatti was involved in the litigation was to delay the sale of the
Gary Primm house. Regnier further speculated Avenatti did not buy the house because he
could not afford it, Avenatti and Lisa were not doing well, and EA was not doing well.

110.    Regnier was not tipped off about the Avenatti indictment. Regnier was not sure why
there was a google search for Avenatti's indictment in February and early March 2019.

111.    Regnier often asked Avenatti why he was spending lavishly, while EA was having
trouble making payroll. These conversations usually ended badly and did not go anywhere.

112.    Avenatti knew that GB was still paying payroll, even after GB shut its doors.

113.    Over the years, Avenatti did ask Regnier to delete e-mails and texts from time to time.
Regnier does not specifically recall which e-mails or texts Avenatti asked her to delete.

114.    Avenatti told Regnier that EA did not have the funds to pay the bankruptcy creditors
therefore the Trial Group LLP bankruptcy filing on March 7, 2019 was necessary.

115.    Avenatti always had control over all bank accounts and funds. Avenatti instructed
Regnier to provide him with regular updates on all the bank accounts she helped maintain for
Avenatti.

116.    When asked about a text to Avenatti on November 1, 2017 sent from Regnier's iPhone
6s that read, "Ok to pay payroll taxes of $23K?" Regnier said she had to get Avenatti's
permission to pay all expenses, including payroll taxes. In this instance Avenatti said yes. There
were some instances when Avenatti told Regnier it was not okay to pay payroll taxes.

USAO_00265046

Exhibit I - 013

USAO_00265034

**National Football League**

117.     Regnier gave a spreadsheet to Avenatti based upon the variables of each ticketholder. Avenatti told Regnier he would not pay the individuals until they threatened to sue, at which point Avenatti would pay them out. Besides these individuals who threatened legal action, nobody else was paid their portion of the settlement. Regnier and Carlos Colorado took the individuals calls, and then said EA was working on it. However, nothing actually happened.

118.     Regnier does not recall when the settlement funds came in. Regnier said Avenatti directed where the funds from the settlement went.

119.     Towards the end of 2018 Regnier started to believe Avenatti was stealing funds from EA's clients. Everyone at EA knew the NFL clients had not been paid because they all got the calls from the individuals who were owed money.

120.     At one-point Regnier confronted Avenatti about the NFL clients not being paid. Avenatti just said he would eventually get to it. Regnier also confronted Avenatti about Barela, to which Avenatti said there are other reasons why Barela had yet to be paid. Regnier never actually looked back through the bank records or accounting records. Regnier was working so hard that she never really took a step back to figure it out all out.

AUSA Sagel thanked Regnier for her time and the interview was concluded at 5:42 PM.

I prepared this memorandum on November 25, 2019, after refreshing my memory from notes made during and immediately after the interview with Regnier.

Ryan Roberson
Special Agent

Special Agent

U.S. Treasury Criminal Investigation

Exhibit I - 014

USAO_00265047

Exhibit J

NOTE: CHANGES MADE BY THE COURT

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL JOHN AVENATTI,<br><br>Defendant. | SA CR No. 19-061-JVS<br><br>ORDER |

Good cause having been shown, it is ordered that Defendant Michael John Avenatti's Motion For An Order Requiring the Government's Prompt Compliance With the Due Process Protections Act and Advising the Government of the Consequences for Failing to Comply is granted.

Under federal law, including Rule 5(f) of the Federal Rules of Criminal Procedure, *Brady v. Maryland*, 373 U.S. 83 (1963), and all applicable decisions interpreting *Brady*, The government has a continuing obligation to produce all information or evidence known to the government that is relevant to the guilt or punishment of a defendant, including, but not limited to, exculpatory evidence.

Accordingly, the Court Orders the government to produce to the defendant in a timely manner all information or evidence known to the government that is either: (1) relevant to the defendant's guilt or punishment; or (2) favorable to the defendant on the issue of guilt or punishment.

This Order is entered under Rule 5(f) and does not relieve any party in this matter of any other discovery obligation. The consequences for violating either this Order or the

government's obligations under *Brady* include, but are not limited to, the following: contempt, sanction, referral to a disciplinary authority, adverse jury instruction, exclusion of evidence, and dismissal of charges.

**So ordered.**

Dated: January 25, 2021

Hon. James V. Selna

U.S. District Judge

**<u>CERTIFICATE OF SERVICE</u>**

I, H. Dean Steward, am a citizen of the United States, and am at least 18 years of age. My business address is 107 Avenida Miramar, Ste. C, San Clemente, CA 92672.  I

2

1  am not a party to the above-entitled action.  I have caused, on January 18, 2021 service of

2  the defendant's:

3                                    [PROPOSED] ORDER

4

5  on the following party, using the Court's ECF system:

6  AUSA BRETT SAGEL AND AUSA JULIAN ANDRE

7  I declare under penalty of perjury that the foregoing is true and correct.

8  Executed on January 18, 2021

9                                    /s/ H. Dean Steward

10                                   H. Dean Steward

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

Exhibit K

# H. Dean Steward
### ATTORNEY AT LAW

107 Avenida Miramar
Suite "C"
San Clemente, CA 92672
949-481-4900

February 17, 2021

Via U.S. Mail and E-Mail

Mr. Brandon D. Fox
Assistant United States Attorney
Chief, Criminal Division
1300 United States Courthouse
312 North Spring Street
Los Angeles, CA 90012

Re: **United States v. Avenatti (SA CR No. 19-061-JVS)**
Demand for Immediate and Full Compliance with Court
Order (Dkt. 408);
*Brady v. Maryland;* and Rule 16

Dear Mr. Fox:

    I write to request that the government immediately and fully comply with (1) the Court's Order issued in the above referenced matter on January 25, 2021 at Docket No. 408; (2) its obligations under *Brady v. Maryland*; and (3) its obligations pursuant to Rule 16. Unfortunately, due to the purposeful and repeated failures of Assistant United States Attorneys Brett Sagel and Julian Andre to timely produce information and discovery, it has become necessary to bring this critical issue to your attention in a final effort aimed at

• Admitted-California & Hawaii • Fellow-American College of Trial Lawyers •  1
fax: 949-496-6753 • e-mail:

Exhibit K - 001

securing full compliance and avoiding motion practice before the
Court.

The Court's January 25, 2021 Order (Dkt. 408)

On January 25, 2021 and over the government's objection, the
Court issued an Order directing the government to produce to the
defense "all information or evidence known to the government that
is either: (1) relevant to the defendant's guilt or punishment; **or** (2)
favorable to the defendant on the issue of guilt or punishment."
(emphasis added).  Importantly, in opposing Mr. Avenatti's motion
seeking the order, AUSAs Sagel and Andre argued that such an
order, if entered by the Court, would require disclosure to the
defense that is more expansive than the parameters of *Brady v.
Maryland*, 373 U.S. 83 (1963).  *See* Dkt. 405, p.2, fn. 1.  Despite
this argument, the Court issued the Order.[1]

Three days later, on January 28, 2021, in a letter addressed to
Chief Judge Sidney R. Thomas of the U.S. Court of Appeals for the
Ninth Circuit, your office (through Acting U.S. Attorney Tracy L.
Wilkinson) stated that the Order "orders the production of material
far beyond what is required under *Brady* and its progeny." Your
office further admitted that under the Order, the government is
"required to produce all information *relevant* to the crime,
regardless whether the material is exculpatory or helpful to the
defense, even if the material is wholly inculpatory" (emphasis in
original).  Your office also acknowledged that under the Order, the
government is required to "produce every witness statement,
regardless of whether that witness testifies against the defendant."
In that same letter, your office admitted that the Order "orders the
production of information regardless of its materiality."  Again,
these are the exact words of your office, as stated to the Chief Judge
of the Ninth Circuit within days *after* the issuance of the Order in
this case.  Accordingly, the government cannot now claim that the

---

[1] It is worth noting that district judges always have the ability to order
discovery greater than the absolute minimums required under the law.  *See,
e.g., U.S. v. W.R. Grace*, 526 F.3d 499, 510 (9th Cir. 2008).

2

Order requires something different or that the Order's requirements are less exacting.

Three weeks have now passed, and the government has not sought reconsideration or modification of the Order. This is presumably because the government correctly recognizes that its prior objections and arguments were considered and overruled by the Court, and there are no legitimate grounds on which to seek reconsideration. As a result, the Order is valid and remains in full force and effect.

Despite the clear requirements of the Court's Order, and the Court warning the government in the Order of the severe consequences for non-compliance, AUSAs Sagel and Andre have produced *nothing* to the defense since the issuance of the Order. This failure is not a mere oversight, it is purposeful as there can be no serious debate that there is significant information and evidence "known to the government that is either: (1) relevant to the defendant's guilt or punishment; **or** (2) favorable to the defendant on the issue of guilt or punishment." (emphasis added). Indeed, by way of example only, and there are many, the government has failed to produce (a) all information relating to the prior criminal conduct of various alleged victims identified in the Indictment, (b) all information relating to the statements and information provided by Ms. Christine Carlin and her counsel (including information demonstrating that statements made to the Court by AUSA Sagel when attempting to have my client remanded last January are demonstrably false, he knew them to be false when they made, and the government has failed to subsequently alert the Court to this fact as required); (c) communications provided to the government by Mr. James Cameron; (d) all communications between the government and various witnesses; (e) every witness statement; and (f) exculpatory financial information relating to fees and expenses due Mr. Avenatti and his law firm from the alleged victims. To be clear, this is not an exhaustive list of what the government has failed to produce and how the government has failed to comply with its obligations under the Order – they are mere examples. **The Order is clear - government is required to produce all**

3

**"relevant" information and nothing less.  The Order is just that
- an Order.  It is not optional.**

The government's failure to comply with the Order is even
more egregious seeing as much of this information should have
been produced long ago pursuant to *Brady* and/or Rule 16.  Worse
yet, these failures have occurred despite recent decisions by the
Ninth Circuit finding significant high-profile *Brady* violations by
prosecutors in the Central District of California.  *See, e.g., U.S. v.
Obagi*, 965 F.3d 993, 996 (9th Cir. 2020)[2] (prosecutors failed to
disclose an immunity agreement with a witness while telling the
jury in closing that the witness "had no agreement" and should
therefore be believed.); *U.S. v. Bundy*, 968 F.3d 1019, 1028 (9th Cir.
2020) (upholding a dismissal as a result of a *Brady* violation in one
of the most watched trials in the country where the defendants
"sought materials showing the presence of armed officers in tactical
gear taking positions around the Bundy Ranch" and other related
evidence, the government called it a "fantastical fishing
expedition,"[3] and the information was later discovered to exist).

Moreover, Rule 16 requires prosecutors to disclose any
information to the defense that may assist the defense in preparing
a defense.  *See, e.g., U.S. v. Hernandez-Meza*, 720 F.3d 760, 768 (9th
Cir. 2013)(Rule 16(a)(1)(E) requires disclosure of any relevant
information that "would have helped [defendant] prepare a defense
. . . even if it simply causes a defendant to 'completely abandon' a
planned defense and take an entirely different path").  And even
where doubt exists as to the usefulness of the evidence to the
defendant, the government must resolve all such doubts in favor of
full disclosure.  *See United States v. Paxson*, 861 F.2d 730, 737
(D.C. Cir. 1988).

Accordingly, we demand that the government, no later than
March 5, 2021, <u>fully</u> comply with (1) the Court's Order issued in the
above referenced matter on January 25, 2021 at Docket No. 408; (2)

---

[2] My case.
[3] Similar language has been used by the government in this case to describe
requests for information made by the defense.

4

its obligations under *Brady v. Maryland*; and (3) its obligations pursuant to Rule 16.  In the event the government fails to do so, we will have no choice but to bring these failures to the attention of the Court and seek the imposition of significant consequences for the government's conduct, including but not limited to dismissal of all charges.

Very truly yours,

H. Dean Steward

Cc: AUSA's Brett Sagel and Julian Andre

5

Exhibit L



# United States Department of Justice

### United States Attorney's Office
### Central District of California

---

BRETT A. SAGEL
Phone:  (714) 338-3598
E-mail: ███████████████

*411 W. 4th Street, Suite 8000*
*Santa Ana, California  92701*

March 1, 2021

**VIA U.S. Mail (with enclosure) and EMAIL (without enclosure)**

H. Dean Steward
107 Avenida Miramar, Suite C
San Clemente, California 92672

███████████████████████████████████

Re:     <u>United States v. Michael John Avenatti</u>, SA CR No. 19-061-JVS

Dear Counsel:

We are writing in response to your February 17, 2021, letter to this Office's Criminal Division Chief, Brandon D. Fox.  As we have previously represented to you, the government is aware of its discovery obligations, has complied with them, and will continue to do so.  In addition to providing your client with discovery to which he is entitled, we have produced discovery far in advance of our obligations -- for example, we provided nearly all Jencks material in May and June 2019, over two years before the current trial date -- and we have voluntarily produced a significant amount of materials in excess of our discovery obligations. The government acknowledges the utmost importance of fulfilling its discovery obligations in every case, particularly as to *Brady* material; however, neither Federal Rule of Criminal Procedure 5(f) nor the Court's January 25, 2021, Order (CR 408) expands the government's discovery obligations.  Your repeated accusations that the government has withheld discovery material are baseless.

Pursuant to your requests in the letter, enclosed please find additional materials, which have been Bates-labeled USAO_01141175-USAO_01141241. These materials are being produced subject to the Court's May 20, 2019, Protective Order.  (CR 36.)  The government is providing these materials to you voluntarily, at your request, even though they either exceed the government's discovery obligations or are being produced far in advance of the government's discovery deadlines.

The enclosed materials, information, and any future discovery provided to you that may exceed the scope of discovery mandated by the Federal Rules of Criminal Procedure, federal statute, or relevant case law are provided voluntarily and solely as a matter of discretion.  By producing such materials and information to you at this time, the government does not waive its right to object to any future discovery requests beyond the ambit of its legal obligations and does not waive any privileges the government holds.

Included in the material are criminal history reports regarding the victims listed in the indictment as you requested.  We previously provided you with all materials in our possession regarding any criminal histories of the victims and will run criminal history reports on our witnesses prior to trial to ensure that we have complied with our discovery obligations under *Giglio*.  At your request, however, we ran these reports now for your convenience, far in advance of when any *Giglio* material is due to be produced.  At least with respect to one victim, who is

Exhibit L - 001

H. Dean Steward
RE:  United States v. Avenatti
March 1, 2021
Page 2


identified in the Indictment as Client 3, your client appears already to have been in possession of this information for some time, given that your client spent over a day at his state bar proceedings cross-examining Client 3 about his criminal history and the details regarding his criminal history.  Client 3's felony conviction was also included in the complaint affidavit (CR 1 at 5 n.1), which your client received when arrested on March 25, 2019.  We have also included correspondence and documents we received from James Cameron as well as further communications with an employee of GBUS that might not have been previously produced.  To be clear, these documents are similarly being produced voluntarily at this time as they exceed our discovery obligations.

Please let us know if you have any questions or wish to discuss this matter further.

Very truly yours,


BRETT A. SAGEL
Assistant United States Attorney

cc:     Assistant United States Attorney Brandon D. Fox
        Assistant United States Attorney Alexander C.K. Wyman


Enclosure

Exhibit L - 002

# Exhibit M

# H. Dean Steward
ATTORNEY AT LAW

107 Avenida Miramar
Suite "C"
San Clemente, CA 92672
949-481-4900

April 8, 2021

Via E-Mail

Mr. Alexander Wyman
Assistant United States Attorney

███████████

Mr. Brett Sagel
Assistant United States Attorney

███████████

Re:   **United States v. Avenatti (SA CR No. 19-061-JVS)**
Request for Immediate and Full Compliance with *Brady,
Bundy, Price, Olsen,* Rule 16, the Court's January 25,
2021 Order [Dkt. 408], and the RPC

Dear Mr. Wyman and Mr. Sagel:

I write to request that the government ensure that the defense promptly receives all of the information to which it is entitled and that any prior misrepresentations made to the defense or the Court in this case by any current or former member of your office, whether in writing or on the record, be immediately corrected. As you know, the government has an obligation at all times to see to it that my client receives all information required to be produced and

• Admitted-California & Hawaii • Fellow-American College of Trial Lawyers •   1
fax: 949-496-6753 • e-mail: ███████████

that neither the defense nor the Court is misled as to any issue.
Further, the government cannot turn a blind eye, or be indifferent,
to conduct or actions that they learn of that are inconsistent with
either the government's production obligations or the ethical rules.

Applicable Law

The law is clear that the government is required to promptly
produce to the defense all favorable information to the defense,
regardless of materiality. *See, e.g., United States v. Bundy*, 968
F.3d 1019, 1033 (9th Cir. 2020)(requiring all favorable evidence to
be disclosed by prosecutors pretrial, without regard to materiality:
"[T]rial prosecutors must disclose favorable information without
attempting to predict whether its disclosure might affect the
outcome of the trial. . . . The retrospective definition of materiality is
appropriate only in the context of appellate review" and not at the
trial level.)(citation omitted); *United States v. Price*, 566 F.3d 900
(9th Cir. 2009)(requiring prosecutors to produce all potentially
exculpatory or otherwise favorable evidence without regard to how
the withholding of such evidence might be viewed as affecting the
outcome of the trial); *United States v. Olsen*, 704 F.3d 1172, 1183
n.3 (9th Cir. 2013)(explaining that a prosecutor should not produce
only what he considers "material" because it is "just too difficult to
analyze before trial" what may be material). *See also* California RPC
3.8 (applicable to federal prosecutors pursuant to 28 U.S.C. §
530B(a) and requiring disclosure to the defense without regard to
materiality); Justice Manual 9-5.001(B)(1) (requiring AUSAs to "err
on the side of disclosing exculpatory and impeaching evidence.").

The government's *Brady* obligation to promptly provide
favorable information to the defense is not diminished by the fact
that such information may also be required to be produced later
pursuant to 18 U.S.C. § 3500 (the "Jencks Act") or by the fact that
such information need not be produced according to Rule 16. *See,
e.g.*, Advisory Committee Note to Fed. R. Crim. P. 16 (1974) ("the
rule is designed to prescribe the minimum amount of discovery to
which the parties are entitled.").

2

Further, Rule 16 requires prosecutors to disclose any information to the defense that may assist the defense in preparing a defense. *See, e.g., U.S. v. Hernandez-Meza*, 720 F.3d 760, 768 (9th Cir. 2013)(Rule 16(a)(1)(E) requires disclosure of any relevant information that "would have helped [defendant] prepare a defense . . . even if it simply causes a defendant to 'completely abandon' a planned defense and take an entirely different path"). Even where doubt exists as to the usefulness of the evidence to the defendant, the government must resolve all such doubts in favor of full disclosure. *See United States v. Paxson*, 861 F.2d 730, 737 (D.C. Cir. 1988).

Moreover, over two months ago on January 25, 2021, the Court issued an Order in this case directing the government to produce to the defense "all information or evidence known to the government that is either: (1) relevant to the defendant's guilt or punishment; **or** (2) favorable to the defendant on the issue of guilt or punishment." [Dkt. 408, the "Order" (emphasis added)]. The Court reaffirmed this Order at the status conference held on April 7, 2021. Within days of the Order being issued in January, your office acknowledged to the Chief Judge of the Ninth Circuit that the Order requires, among other things, (1) "the production of material far beyond what is required under *Brady* and its progeny;" (2) the production of "all information *relevant* to the crime, regardless whether the material is exculpatory or helpful to the defense, even if the material is wholly inculpatory;" (3) the production of "every witness statement, regardless of whether that witness testifies against the defendant;" and (4) "the production of information regardless of its materiality." As a result, you cannot now take the position that the Order requires the production of something different or less. At an absolute minimum, the defense in this case is entitled to all of the information required to be produced under the interpretation of the Order you provided to the Ninth Circuit.

Finally, the California Rules of Professional Conduct ("RPC"), which are applicable to federal prosecutors pursuant to 28 U.S.C. § 530B(a), are clear that prosecutors have a duty to correct any misstatement of fact or law made to a tribunal, as well as to disclose any false evidence previously placed before a tribunal, even

3

if they are not directly responsible. *See, e.g.*, California RPC 3.3(a). Further, Rule 3.3(b) requires that any lawyer who becomes aware of any fraudulent conduct related to a proceeding has a duty to take remedial measures to rectify such conduct. Importantly, the duties of Rules 3.3(a) and (b) "continue to the conclusion of the proceeding," meaning so long as this case remains open, you have an obligation to ensure these requirements are met. Rule 3.4(a) provides that a lawyer shall not "unlawfully obstruct another party's access to evidence . . . or unlawfully alter, destroy or conceal a document or other material having potential evidentiary value. A lawyer shall not counsel or *assist another person* to do any such act." (emphasis added). Rule 3.4(b) prohibits a lawyer from suppressing "*any evidence* that the lawyer or the lawyer's client has a legal obligation to reveal or to produce." (emphasis added) Rule 3.8(d) specifically requires that a prosecutor "make timely disclosure to the defense of all evidence *or information* known to the prosecutor that the prosecutor knows or reasonably should know tends to negate the guilt of the accused, mitigate the offense, or mitigate the sentence . . ." (emphasis added). Critically, state and federal courts have repeatedly held prosecutors to account when they fail to adhere to these requirements. *See, e.g., N. Mariana Islands v. Bowie*, 243 F.3d 1109, 1117-18 (9th Cir. Haw. 2001); *People v. Centino*, 60 Cal. 4th 659, 666-67 (2014); *DiSabatino v. State Bar*, 27 Cal. 3d 159 (1980); *United States v. Scruggs*, Case No. 3:07-cr-192-B-A, Dkt. 368 (Order granting motion to disqualify prosecutor due to misstatements) (N.D. Miss. May 2011).

<u>Information and Materials the Government Has Failed to Produce</u>

The government has not complied with its obligations under *Brady, Bundy, Price, Olsen,* Rule 16, the Court's Order, the RPC, and the Justice Manual. These failures are significant and must be rectified immediately. By way of example only:

1.    *Handwritten Notes from the Interview of Client 1.* On March 31, 2019, the government interviewed a former client of Mr. Avenatti's identified as victim Client 1 in the Indictment [Dkt. 16]. Client 1 was shown a settlement agreement that the government claims in the Indictment Mr. Avenatti hid the terms of and deceived

4

Client 1 about (Indictment, ¶¶ 7.(f) and (g)).  According to a typewritten summary prepared later from "notes made during and immediately after the interview," Client 1 admitted in the interview "he may have signed the document" when his case was settled and that Mr. Avenatti went to Client 1's residence at the time to "deliver this document to [Client 1]" [*See* USAO_0013358, 62.]  The government has withheld the handwritten notes from the defense. This is improper.  Mr. Avenatti could not have hidden the terms of a settlement agreement from the client and misled the client about those terms when the client admits signing the actual agreement and contemporaneously receiving a copy.  The notes should have been produced two years ago pursuant to *Brady, Bundy, Price* and *Olsen* as they are exculpatory.

      2.    *Notes and Documents from the Meetings with Judy Regnier.*  The government has failed to produce to the defense in this case (a) handwritten notes from a March 25, 2019 interview of government witness Judy Regnier attended by two agents and AUSA Sagel (approximately 5 hours); (b) handwritten notes from a March 26, 2019 meeting between Ms. Regnier and two agents; (c) handwritten notes from a November 19, 2019 interview of Ms. Regnier attended by two agents and AUSA Sagel (approximately 8.5 hours); (d) handwritten notes from interactions with Ms. Regnier on October 24, 2019 and December 5, 2019 and (e) certain documents referenced in other interview memoranda and notes produced to the defense from interviews with Ms. Regnier (*e.g.*, the screenshot sent to Special Agent Penland and referenced during Ms. Regnier's interview in connection with the *Nike-related* case (USAO_460560)). Other typewritten summaries and reports relating to Ms. Regnier likewise appear not to have been produced.  All of this information was required to be turned over to the defense long ago pursuant to the authorities cited above and the Court's Order.

      To compound matters, before Ms. Regnier testified at trial in the Nike-related case (No. 19-cr-373 (PGG), SDNY), <u>all</u> of this information was required to be produced by the government pursuant to (a) 18 U.S.C. § 3500 (the "Jencks Act") and (b) the letter agreement submitted to the court in that matter on October 17, 2019 [Dkt. 68, p. 2 (requiring 3500 material to be produced on or

5

before January 14, 2020 and stating that the obligation is
continuing and requires "timely" production, meaning "the same
day it is generated, and prior to the witness to whom it applies
taking the stand."].  Further, some of this information was also
likely required to be turned over to Mr. Avenatti well before trial
pursuant to *Brady v. Maryland*, 363 U.S. 83 (1963) and its progeny,
as well as pursuant to *Giglio*.  And yet the information was never
provided before Ms. Regnier testified on February 6, 2020 (during
which AUSAs Sagel and Andre were present in the gallery after
assisting in preparing her), before Ms. Regnier's testimony was used
by the government in closing argument, or at any time in the
fourteen months since.

     In addition, the withheld information is responsive to the Nike
court's October 2020 Order, which directs the government to
produce certain documents and information to the defense,
including any that could be used to impeach a government witness
at trial.  *See* SDNY Dkt No. 305 (the "Order").  Your office was
specifically made aware of the terms of this Order no later than
January of this year, when it was referenced in connection with a
defense motion in this case and attached as an exhibit.  *See* CDCA
Dkt. No. 398, p. 1-2 and Ex. A.  The Order makes clear that the
government is required to produce <u>all information</u> that "can be used
to impeach the trial testimony of a Government witness . . . ."  It
further provides that the government's "<u>obligations are continuing
ones and apply to materials that become known to the Government
in the future</u>.  Additionally, if information is otherwise subject to
disclosure, it must be disclosed regardless of whether the
Government credits it."  The obligations apply to all information,
regardless of whether it would "constitute admissible evidence."
The Order requires the government to disclose information to Mr.
Avenatti that is material either to guilt or to punishment "promptly
after its existence becomes known to the Government so that the
defense may make effective use of the information in the
preparation of its case" and provides for severe consequences for
failure to do so.  The Order was issued nearly six months ago but
the information has yet to be produced.

6

Further, the government's continued failure to timely produce
this information is especially unsettling in light of the opinion
recently issued by the Hon. Alison Nathan of the Southern District
of New York in the case of Ali Sadr Hashemi Nejad (18-cr-224 (AJN))
(Dkt. 379), which found significant and systemic prosecutorial
misconduct surrounding the failure to timely produce information
to the defense, including 3500 material, and noted that "the
Government's failure to further pursue the question of whether the
[] 302s were required to be disclosed under *Brady* is shocking . . .
With each document wrongfully withheld, an innocent person faces
the chance of wrongful conviction." *Id.* at pp. 11, 33. Judge
Nathan specifically ordered every AUSA and SAUSA in SDNY to read
her opinion and the Acting U.S. Attorney to file a declaration within
one week affirming this had been done. Even though this Order
was issued in September 2020 and the government was put on
notice of the serious consequences of not producing *Brady* and
*Giglio* information, the government continued to withhold the
Regnier information.

The facts demonstrate that one of three scenarios occurred:
(1) For well over a year (in some instances, two years), your office
withheld this information not only from the defense teams in this
case and the Nike case, but also from the AUSAs from the Southern
District of New York; (2) Your office made USAO-SDNY aware of this
information prior to the Nike trial and/or since the conclusion of
the Nike trial, and they made the decision to withhold the
information from the defense and not alert the Nike court; or (3) The
information and materials were destroyed despite the fact that the
government was aware since at least March 25, 2019 (prior to the
original creation of the information and materials) that Ms. Regnier
was a key witness likely to testify. <u>In any event, this constitutes a
serious breach of the government's obligations and Mr. Avenatti's
rights in at least two cases, and possibly a third (the Daniels related
case where Ms. Regnier is also a witness). These failures must be
addressed by the government immediately and all applicable
information and materials produced so that a determination may be
made as to the degree of prejudice suffered by Mr. Avenatti.</u>

7

3.    *Information and Materials Relating to Immunity Requests, Leniency and Similar Communications with Judy Regnier.*  The defense has learned within the last two weeks that Ms. Regnier is refusing to testify unless she is granted immunity or provided similar consideration or assurance.  Pursuant to *Brady* and *Giglio*, the defense is entitled to know about all communications that have occurred between the government and Ms. Regnier (or any of her attorneys or representatives) concerning this issue.  This is true even if such communications have yet to be reduced to writing.  Further, if any of these communications occurred before February 6, 2020, this information was required to be produced to the defense before Ms. Regnier testified in the Nike related matter.  However, no such information was produced.

4.    *Handwritten Notes from Other Interviews.*  The government has interviewed approximately 100 witnesses in connection with this case, sometimes for multiple days.  Most of these interviews have been attended by multiple agents and members of the prosecution team.  And yet the government has not produced the handwritten notes from the interviews.  Further, the government has not produced all of the 302s and memoranda of interviews, and the documents referred to in those memoranda.

5.    *Immunity and Proffer Agreements.*  The government entered into immunity and/or proffer agreements with at least five government witnesses (Ms. Hendricks, Mr. Cassaro, Mr. Marchino, Mrs. Carlin, and Mr. Tobin).  These agreements have not been produced.  All similar agreements and communications concerning leniency, immunity, etc. are likewise required to be produced.  This is likewise true if any such agreements or communications exist relating to Ms. Regnier.

6.    *The Regnier Search Warrant Materials.*  On March 25, 2019, the government executed a search warrant at the residence of Ms. Regnier, Mr. Avenatti's office manager and lead paralegal.  The government obtained eleven (11) boxes of hardcopy documents (comprising thousands of pages) from the residence relating to the charges in the Indictment.  [*See* Search Warrant Return, Dkt. 6, Case No. 8:19-mj-00243, filed 05/16/19.].  These documents were

8

required to be produced long ago but have not been produced.
Worse yet, the government has repeatedly represented to the
defense in writing since 2019 that these materials were produced as
part of the government's production No. 5 made on August 26,
2019.  These representations are false.

7.     *Thank You Notes, Emails and Awards.*  The government
obtained files containing thank you notes and emails Mr. Avenatti
received from countless clients between 2007 and 2019, as well as
various awards.  All of this information is favorable to the defense
not only in this case, but in the Nike-related case as well, especially
as it relates to sentencing and mitigation.  It is believed that these
files include communications from clients identified in the
Indictment and various government witnesses, including some
related to the government's efforts to introduce Rule 404(b)
evidence.  This information should have been produced long ago.

8.     *The Notes from the Interview with Lisa Storie.*  The
government interviewed Ms. Lisa Storie, Mr. Avenatti's second wife
to whom he is still legally married, for 45 minutes on January 6,
2020.  [*See* Memorandum of Contact at USAO_454799.].  The
government has failed to produce the notes from this interview.  In
addition, this interview and the notes may raise additional issues
relating to the government's use of information protected by the
marital communications privilege.

9.     *The Information Relating to Mrs. Carlin.*  Mrs. Carlin is
referenced in the complaint filed in March 2019 [Dkt. 1].  She was
subpoenaed to testify before the grand jury in this case in 2019 and
subsequently sat for an interview with AUSAs Sagel and Andre on
July 25, 2019.  The government later produced a Memorandum of
Interview from the July 25, 2019 interview to the defense on
October 5, 2019 (USAO_00173598) but failed to produce any
handwritten notes from the interview.  In March 2020, the
government provided follow-up questions to Mrs. Carlin, through
her counsel, relating to her 2019 interview.  The government has
not produced those questions or the emails relating to them.  On or
about April 1, 2020, the government conducted a subsequent
interview/proffer session with Mrs. Carlin's counsel relating to the

9

2019 interview.  This lasted approximately 2.5 hours.  The defense has learned that during this interview, the government was confronted with the fact that (a) statements they attributed to Mrs. Carlin in their Memorandum of Mrs. Carlin's July 25, 2019 interview were not accurate (i.e. the memo did not reflect what the government had actually been told during the interview) and (b) the government's representations made to the defense and the Court that Mrs. Carlin had informed them that Mr. Avenatti did not owe Mrs. Carlin money when he made payments to her, including while on bond, were demonstrably false.  No notes have been produced relating to the April 1, 2020 interview/proffer session.  The defense is entitled to the notes from the July 2019 interview, the questions the government sent in March 2020 and the related emails, and all notes and memoranda relating to the April 2020 interview/proffer session.  Further, the prior representations made to the Court by the government in connection with Mr. Avenatti's remand to custody in January 2020, on the eve of the Nike trial, must be corrected immediately as they are demonstrably false.

10.  *Financial Information Relating to the Clients Identified in the Indictment and the Government's 404(b) Notice.*  Despite repeated representations to the Court and the defense, the government has failed to produce all of the accounting and financial information relating to the clients identified in the Indictment and the clients identified in the government's 404(b) notice, including those relating to the NFL case.  The information withheld includes information concerning fees, costs and expenses, as well as time records.  The defense is entitled to all of this information and it was required to be produced long ago pursuant to *Brady, Bundy, Price, Olsen,* Rule 16, and the Court's Order at a minimum.  Indeed, it is difficult to imagine information more fundamental to the defense than this information.

Defendant's Requests

In addition to the specific requests made above, we request that you ensure that we promptly receive all of the requested information no later than April 22, 2021.  To the extent no such information exists, we ask that you state that in writing.  We also

10

request that you ensure that all other information to which the defense is entitled pursuant to *Brady, Bundy, Price, Olsen,* Rule 16, and/or the Court's Order, but which has not been previously produced, likewise be provided to the defense no later than April 22, 2021. Finally, we ask that you comply with your obligations as set forth above, including those delineated under the California Rules of Professional Conduct, and guarantee that all prior misrepresentations made to the defense or the Court, whether in writing or on the record, are immediately corrected.

In the event these requests are not met or ignored, we will have no choice but to bring these failures to the attention of the Court and seek the imposition of significant consequences/sanctions. We are hopeful that will not be necessary.

Very truly yours,

H. Dean Steward

11

Exhibit N

From: **Sagel, Brett (USACAC)** ████████████████
Date: Wed, Apr 14, 2021, 5:54 PM
Subject: RE: discovery in Avenatti case
To: Dean Steward ██████████████████████████>, Wyman, Alex (USACAC)
████████████████████

Dean-

In reviewing the attached letter, I wanted to follow-up on a couple of the requests/comments before we respond in full, as we have attempted – and will continue to attempt -- to get you discoverable material well in advance of any of our deadlines.  First, on page 5, you state "other typewritten summaries and reports relating to Ms. Regnier likewise appear not to have been produced." What additional reports do you believe you do not have? Next, on Page 8, number 4, it says "the government has not produced all of the 302s and memoranda of interviews, and the documents referred to in those memoranda." Please let us know what 302s/MOIs you believe have not been produced.  Thanks,

Brett

Exhibit O

H. Dean Steward
ATTORNEY AT LAW
_____

107 Avenida Miramar
Suite "C"
San Clemente, CA 92672
949-481-4900

April 15, 2021

Via E-Mail

Mr. Alexander Wyman
Assistant United States Attorney
███████████████████████

Mr. Brett Sagel
Assistant United States Attorney
███████████████████

Re:  **United States v. Avenatti (SA CR No. 19-061-JVS)**
     Letter in Response to April 14 E-Mail Regarding April 8
     Letter

Dear Mr. Wyman and Mr. Sagel:

I write in response to the government's email sent late
yesterday in partial response to my detailed letter of April 8, 2021.
By way of the email, the government seeks to have the defendant
further identify for the government certain information and
materials the government has withheld from the defense.

First, it is not the defendant's duty to tell the government
everything they have failed to produce. This is true because the
information and materials are in the exclusive possession of the

• Admitted-California & Hawaii • Fellow-American College of Trial Lawyers •   1
        fax: 949-496-6753 • e-mail: ████████████████████

government.  Rather, it is the government's duty at all times to act
with the utmost of good faith and identify and ensure that **all** (not
some) required information and materials are timely provided to the
defense.  Contrary to your repeated representations to the Court
and the defense, and as set forth in the letter, this has not
occurred.

Second, as explained in the letter, it is the government's
obligation to produce to the defense all information and materials
required to be produced pursuant to the Court's January 25, 2021
Order (under the government's interpretation provided to the Ninth
Circuit),  *Brady, Bundy, Price, Olsen,* Rule 16, and the California
Rules of Professional Conduct.  "All" means "all."  Further, this
obligation includes all information known to the government,
regardless of whether it was written down.  Accordingly, we repeat
the request made in the letter (and many times before) – that the
government immediately comply with its obligations and the legal
requirements we have outlined and produce ALL of the information
and materials requested.  This should be able to be easily
accomplished by a simple review of the government's file.

Third, the government has had a separate obligation in the
Nike-related case (No. 19-cr-373 (PGG), SDNY) to produce all
information and materials required to be produced pursuant to
*Brady*, *Giglio*, Rule 16, 18 U.S.C. § 3500 (the "Jencks Act"), the
letter agreement submitted to the court in that matter on October
17, 2019, and Judge Gardephe's Order issued over six months ago
in October 2020 [Dkt No. 305].  The "government" includes your
office, the USAO-SDNY, and all other government agencies involved
in the investigation of Mr. Avenatti.  *See, e.g.*, *United States v.
Martoma*, 990 F. Supp. 2d 458 (SDNY 2014, J. Gardephe).

Despite these requirements, all indications are that your office
failed to produce information required to be produced well over a
year ago in connection with the Nike case, including in connection
with Ms. Regnier's trial testimony.  To make matters worse, the
government never voluntarily disclosed this failure to the defense or
brought it to the attention of the Nike court.  Moreover, in light of
the uncontroverted facts, including your involvement with

2

interviewing Ms. Regnier, preparing Ms. Regnier to testify in that case and your close working relationship with USAO-SDNY as it relates to Mr. Avenatti, beginning with your coordination during the week of March 18, 2019 relating to his March 25, 2019 arrest, it is difficult to see how this failure could be determined by any court to have been "inadvertent."  Finally, as you know, if _any_ handwritten notes or other materials relating to Ms. Regnier (or any other alleged victim or witness) have been destroyed, the consequences for the government promise to be significant.  *See, e.g., United States v. Bufalino*, 576 F.2d 446 (2d Cir. 1978) (warning the government that the court "will look with an exceedingly jaundiced eye upon future efforts to justify non-production of a Rule 16 or Jencks Act 'statement' by reference to 'department policy' or 'established practice' or anything of the like. There simply is no longer any excuse for official ignorance regarding the mandate of the law.")

Fourth, even a cursory review of the Regnier materials demonstrates that not all reports, summaries, contacts, notes and memoranda relating to Ms. Regnier have been produced in this case or in the Nike-related matter.  And we suggest you re-review your file in full before stating otherwise.  In addition, in connection with a related issue and by way of example only (there are others), where are (a) the documents relating to *Ms. Regnier contacting the government* when seeking counsel in late 2019; (b) the documents relating to your communications with Ms. Regnier's criminal and civil counsel; and (c) the documents relating to your communications with Ms. Regnier and her counsel concerning her criminal liability and her concerns relating to criminal exposure?

Fifth, presumably the government knows what witnesses it has had contact with as part of its investigation of Mr. Avenatti and has records documenting each of these contacts.  Based on the defense investigation to date, the number is approximately 100. And yet all documents relating to every witness contact and interview have not been produced despite the government's obligations, including its recent representation to the Chief Judge of the Ninth Circuit that the language of the Order issued in this case requires (1) "the production of material far beyond what is required under *Brady* and its progeny;" (2) the production of "all information

3

*relevant* to the crime, regardless whether the material is exculpatory or helpful to the defense, even if the material is wholly inculpatory;" (3) the production of "every witness statement, regardless of whether that witness testifies against the defendant;" and (4) "the production of information regardless of its materiality." Is it the government's position that they have produced all of this information, including all information, materials, summaries and memorandum relating to any witness contact or interview? Further, has the government produced all of its contacts, notes, statements and emails relating to and evidencing communications with counsel for witnesses and proffers? The obvious answer to both of these questions is "No." In fact, a review of the May 2020 witness list against the discovery in this case alone reveals that all information, notes and memoranda concerning these witnesses have not been produced. As explained in the letter, all of the witness information was required to be produced pursuant to the legal authority cited in the letter and the Order.

We look forward to the government's prompt compliance with each of the obligations identified in the April 8, 2021 letter.

Very truly yours,

H. Dean Steward

4

Exhibit P

From: **Sagel, Brett (USACAC)** ███████████████
Date: Wed, Apr 21, 2021 at 4:06 PM
Subject: Response to Discovery Letter(s)
To: Dean Steward ████████████████
Cc: Wyman, Alex (USACAC) ██████████████████

Dean-

Your April 8, 2021, discovery letter requested a response from the government by April 22, 2021.  As we have repeatedly represented to you, the government is aware of its discovery obligations, has complied with them, and will continue to do so.  In addition to providing defendant with discovery to which he is entitled, we have produced discovery far in advance of our obligations, including much of the material you reference in said letter.  On April 14, 2021, the government attempted to work with you to identify with particularity any discovery you believe was not actually provided.  Rather than engage professionally to identify any real discovery issue, you chose again in your April 15, 2021, letter, to simply make further baseless accusations.  The government will continue to comply with its discovery obligations and the deadlines set by the Court -- not to arbitrary deadlines set by defendant.

Brett

## **CERTIFICATE OF SERVICE**

I, H. Dean Steward, am a citizen of the United States, and am at least 18 years of age. My business address is 17 Corporate Plaza, Suite 254 in Newport Beach, California. I am not a party to the above-entitled action. I have caused, on September 17, 2021 service of the:

DECLARATION OF MICHAEL JOHN AVENATTI IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS DUE TO DOUBLE JEOPARDY, PROSECUTORIAL MISCONDUCT, CONTEMPT OF THIS COURT'S JANUARY 25, 2021 ORDER [Dkt. 408], AND VIOLATIONS OF DEFENDANT'S RIGHT TO DUE PROCESS

on the following party, using the Court's ECF system:

AUSA BRETT SAGEL AND AUSA ALEXANDER WYMAN

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 17, 2021

/s/ H. Dean Steward

H. Dean Steward

6