Michael John Avenatti (Pro Se)

H. Dean Steward, SBN 85317
17 Corporate Plaza, Suite 254
Newport Beach, California 92660
Tel (949) 481-4900
Fax (949) 706-9994
Email: DeanSteward7777@gmail.com

Advisory Counsel for Defendant
MICHAEL JOHN AVENATTI

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL JOHN AVENATTI,<br><br>Defendant. | SA CR No. 19-061-JVS<br><br>DEFENDANT'S MOTION TO DISMISS DUE TO DOUBLE JEOPARDY, PROSECUTORIAL MISCONDUCT, CONTEMPT OF THIS COURT'S JANUARY 25, 2021 ORDER [Dkt. 408], AND VIOLATIONS OF DEFENDANT'S RIGHT TO DUE PROCESS<br><br>([Proposed] Order and Declaration of Michael John Avenatti (with exhibits), filed concurrently herewith) |

Defendant MICHAEL JOHN AVENATTI ("Mr. Avenatti") by and through his advisory counsel of record, H. Dean Steward, hereby moves and files his Motion to Dismiss Due to Double Jeopardy, Prosecutorial Misconduct, Contempt of this Court's January 25, 2021 Order [Dkt. 408] and Violations of Defendant's Right to Due Process. Defendant's motion is based on the attached memorandum of points and authorities; the evidence referenced in the attached; the files, records and transcripts in this case and the

other cases cited herein; and such further evidence and argument as the Court may permit on reply or at a hearing on this matter.

Dated:  September 20, 2021                    Respectfully submitted,

                                                        /s/ Michael J. Avenatti

                                                        Defendant
                                                        MICHAEL JOHN AVENATTI

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES………………..…………………………..…………….ii

MEMORANDUM OF POINTS AND AUTHORITIES…………………………….1

I.     INTRODUCTION…………………………………………………....1

II.    FACTUAL BACKGROUND……………………………………………3

   A. The Government Learns of the Importance of the Servers and the *Brady* Materials Stored on the Servers in the Spring and Summer of 2019, But Ignores It………………………………………………………....3

   B. In Response to Defendant's Continued Efforts in 2019 to Get the *Brady* Materials, the Government Misleads the Court and Withholds the Information……………………………………………………………8

   C. Defendant Continues to Attempt to Get the Critical Information Throughout 2020; The Government Successfully Withholds It…………………………...10

   D. The Government Stonewalls Defendant's Efforts to Acquire the *Brady* Information in the Months Leading to Trial in 2021 and Violates this Court's Order……………………………………………………………………..10

   E. The Government's Misconduct, *Brady* Violations and Contempt Are Exposed at Trial…………………………………………………………...11

   F. The Court Holds Two Hearings on the Motion and Declares a Mistrial……..16

   G. The Government's Discovery Misconduct Is Not Limited to Withholding Exculpatory Financial Data……………………………………………...19

III.   ARGUMENT……………………………………………………...20

   A. The Double Jeopardy Clause of the Fifth Amendment………………………20

   B. Outrageous Government Conduct and Due Process………………..……..23

   C. Prosecutorial Misconduct and the Court's Supervisory Powers…………..24

   D. The Facts and the Law Require the Court to Preclude the Government from Re-Trying the Defendant and Issue a Dismissal With Prejudice……………..28

IV.   CONCLUSION……………………………………………………30

# TABLE OF AUTHORITIES

## FEDERAL CASES                                                    Page

*Arizona v. Washington*,
434 U.S. 497, 503 (1978)……………………………………………………………..20

*Brady v. Maryland*,
373 U.S. 83, 87 (1963)……………………………………………………………..*passim*

*Dean v. United States*,
1990 U.S. Dist. LEXIS 19954 (E.D. Tex. 1990)…………………………………..22

*Giglio v. United States*,
405 U.S. 150, 154 (1972)…………………………………………………………..*passim*

*Green v. United States*,
355 U.S. 184 (1957)………………………………………………………………..20

*Kyles v. Whitley*,
514 U.S. 419, 445-449 (1995) ……………………………………………………17

*Martinez v. Caldwell*,
644 F.3d 238 (5th Cir. 2011)………………………………………………………22

*McNabb v. United States*,
318 U.S. 332 (1943)………………………………………………………………..24

*Oregon v. Kennedy*,
456 U.S. 667 (1982)………………………………………………………………..21

*Tibbs v. Florida*,
457 U.S. 31 (1982)…………………………………………………………………20

*United States v. Aguilar Noriega*,
831 F. Supp. 2d 1180 (C.D. Cal. 2011)……………………………………………28

*United States v. Bates*,
917 F.2 388 (9th Cir. 1990)………………………………………………………..20

*United States v Barrera-Moreno*,
951 F.2d 1089 (9th Cir. 1991)……………………………………………………23,25

*United States v. Blanco*,
392 F.3d 382 (9th Cir.2004)………………………………………………………25,26

*United States v. Brumel-Alvarez*,
991 F.2d 1452 (9th Cir. 1992)………………………………………………………26

*United States v. Bundy*,
968 F.3d 1019 (9th Cir. 2020)………………………………………………*passim*

*United States v. Chapman*,
524 F.3d 1073 (9th Cir. 2008)………………………………………………*passim*

*United States v. Dinitz*,
424 U.S. 600 (1975)………………………………………………………………20, 21

*United States v. Dodd*,
2014 U.S. Dist. LEXIS 92697 (E.D. Wash. 2014)………………………………24

*United States v. Fern*,
155 F.3d 1318 (11th Cir. 1998)……………………………………………….......21

*United States v. Fitzgerald*,
615 F.Supp.2d 1156 (S.D. Cal. 2009)………………………………………27, 28

*United States v. Fola*,
2015 U.S. Dist. LEXIS 191820 (D. Haw. 2015)………………………………24

*United States v. Gaytan*,
115 F.3d 737 (1997)………………………………………………………………20

*United States v. Govey*,
284 F.Supp.3d 1054 (C.D. Cal. 2018)…………………………………………28

*United States v. Holler*,
411 F.3d 1061 (9th Cir. 2005)……………………………………………………23

*United States v. Jorn*,
400 U.S. 470 (1971)………………………………………………………………20, 21

*United States v. Kearns,*
5 F.3d 1251 (9th Cir. 1993)………………………………………………………..24

*United States v. Kohring,*
637 F.3d 895 (9th Cir. 2011)……………………...……………………………..24

*United States v. Matta-Ballesteros,*
71 F.3d 754 (9th Cir. 1995)………………………………………………………..25

*United States v. Olsen,*
704 F.3d 1172 (9th Cir. 2013)………………………………………………….25, 26

*United States v. Omni Int'l Corp.,*
634 F.Supp. 1414 (D. Md. 1986)…………………………………………………..24

*United States v. Pedrin,*
797 F.3d 792 (9th Cir. 2015)………………………………………………………23

*United States v. Price,*
566 F.3d 900 (9th Cir. 2009)……………………………………………….....*passim*

*United States v. Ross,*
372 F.3d 1097 (9th Cir. 2004)……………………………………………………..24

*United States v. Russell,*
411 U.S. 423 (1973)………………………………………………………………..23

*United States v. Serra,*
882 F.2d 471 (11th Cir. 1989)……………………………………………………..21

*United States v. Sterba,*
22 F. Supp. 2d 1333, 1343 (M.D. Fl. 1998)………………………….…………..22

*United States v. Wallach (II),*
979 F.2d 912 (2d. Cir. 1992)……………………………………………………..22

*United States v. Weems,*
49 F.3d 528 (9th Cir. 1995)………………………………………………………..20

*United States v. Williams,*
504 U.S. 36 (1992)………………………………………………………………..24

*United States v. Zuno-Acre*,
44 F.3d 1420 (9th Cir. 1997)…………………………………………………26

## **STATE CASES**

*Bauder v. State*, 921 S.W.2d 696 (Tex. Crim. App. 1996)……………………………...22

*Commonwealth v. Smith*, 532 P.A. 177, 182 (1992)……………………………………23

*People v. Batts*, 30 Cal. 4th 660 (2003)………………………………………….......22

*Pool v. Superior Court*, 139 Ariz. 98 (1984)…………………………………………23

*State v. Kennedy*, 666 P.2d 1316 (Or. 1983)…………………………………………23

## **STATUTES, CODE SECTIONS AND ORDERS**

18 U.S.C. § 3500…………………………………………………………………*passim*

28 U.S.C. § 530B(a)………………………………………………………………25

California Rule Professional Conduct 3.8……………………………………………25

Justice Manual 9-5.001(B)(1)……………………………………………………..25

Federal Rule of Criminal Procedure 16……………………………………..2, 4, 15, 28

Federal Rule of Criminal Procedure 26.2  ……………………………….…19, 20

U.S. Const. Amend. V………………………………………………………..20

## **OTHER SOURCES**

*Prosecutorial Misconduct and Constitutional Remedies*,
77 Wash. U. L, Q. 713 (Fall, 1999)………………………………………………22

Webster's Third New International Dictionary 972 (3d ed. 1976)……………………...21

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   <u>INTRODUCTION</u>

In April 2019, Michael John Avenatti ("Mr. Avenatti"), a practicing attorney and the managing partner of the law firm Eagan Avenatti, LLP (fka Eagan O'Malley & Avenatti, LLP, "EA"),[1] was charged with 36 felony counts, including 10 counts of wire fraud relating to his representation of five clients.  In furtherance of its case, and in an effort to establish that Mr. Avenatti committed wire fraud and misappropriated client funds, the government obtained and executed broad search warrants in early 2019 to obtain information related to Mr. Avenatti's bank records, accounting records, client records, and complete access to the EA servers containing expansive documentation and data related to the alleged client victims.

In order to properly prepare and present his defense, Mr. Avenatti demanded, in April 2019 and immediately after the Indictment was issued, a forensic copy of the servers so that he could obtain the financial information necessary for his defense, properly calculate the fees, costs and advances related to his prior representation of his clients, and present this information to the jury.  He did so because a central pillar of his defense is that he was entitled at all times to the attorney's fees he earned in connection with his legal services for his clients, as well as all expenses, costs, and advances made on their behalf, and therefore Mr. Avenatti cannot be convicted of any federal crime for "misappropriating" money that was rightfully his.

The government successfully opposed Mr. Avenatti's initial effort to obtain the data from the servers, and similar repeated efforts for over two-and-a-half years, by repeatedly falsely representing to the defendant and the Court that all *Brady* and *Giglio* material from the servers had been produced.  Indeed, as demonstrated below, the record is replete with **numerous** instances of defendant routinely requesting that the government fully comply with its *Brady* obligations and produce all information

---

[1] At all relevant times, Mr. Avenatti owned 100% of the equity of the law firm through another wholly owned entity, Avenatti & Associates, APC.

favorable to the defense, including all accounting information and all discovery related to the calculation of client costs, expenses and advances. These demands, however, resulted in no action by the government.  Instead, for two and a half years, the prosecution team continued to withhold critical financial information at the center of the case, while falsely and recklessly representing to the defendant and to the Court that the government had fulfilled all of its discovery obligations and produced all information favorable to the defense.  Worse yet, they openly mocked defendant and his counsel, including to the Court, when they raised their concerns relating to the lack of disclosure. These misrepresentations and this misconduct and suppression continued even after the Court specifically ordered in January 2021 all relevant information to be produced.

The trial in this matter began on July 13. As the trial progressed, it became apparent that Mr. Avenatti had not been provided critical discovery owed to him under Rule 16, *Brady, Giglio, Jencks* and this Court's January 25, 2021 Order directing the government to comply with its discovery obligations. And yet, the government continued to withhold the information. Ultimately, the government's conduct led the Court to declare a mistrial and order a new trial.

However, justice and the law demand more. Simply put, in an effort to gain a conviction of a high-profile defendant, the prosecution at best deliberately ignored their most basic discovery obligations and defendant's due process rights and "blew off" the defendant's requests for *Brady* materials. The government's failures were consistent, recurring, willful and permeated the entire case from its inception. The government should not be permitted to make repeated misrepresentations to the Court, mock the defendant for claiming the prosecution has failed to fulfill its *Brady* obligations (when they know he is right), suppress critical information, roll the dice and hope the defendant cannot demonstrate the government's misconduct before a verdict is reached, and then, once caught, be permitted to start anew, armed with the benefit of having observed defendant's defense strategy, opening statement and cross-examination of 21 government witnesses during the first trial.  For each of the reasons set forth herein,

double jeopardy, the government's misconduct, this Court's January 25, 2021 Order [Dkt. 408] and defendant's due process rights all require that the Court dismiss the Indictment with prejudice and prevent the government from re-trying the defendant.[2]

## II.    FACTUAL BACKGROUND

### A.    The Government Learns of the Importance of the Servers and the *Brady* Materials Stored on the Servers in the Spring and Summer of 2019, But Ignores It

On March 25, 2019 at approximately 9:00 a.m. PST, Mr. Avenatti was arrested pursuant to a criminal complaint and arrest warrant. [Dkt. 1, 13]. A search warrant was simultaneously executed at the home of Ms. Judy Regnier, Mr. Avenatti's former longtime office manager and lead paralegal. During a lengthy nearly five-hour interview conducted at the time of the search by AUSA Brett Sagel and co-lead IRS-CID Special Agent Remoun Karlous, Ms. Regnier informed the government that the computer servers for the law firm were located in an e-storage facility.  Ms. Regnier later testified under oath that she "probably" also told the government during the interview about the fact that EA kept its financial records relating to its clients in two software programs located on the servers – QuickBooks and Tabs.[3] *See, e.g.*, Trial Tr. (7/28/2021, Vol. 1) p. 91-93.

On April 3, 2019, the government obtained a forensic copy of the EA computer servers. On April 10, 2019, defendant was purportedly charged with the 36 counts by

---

[2] As of this filing, the government has yet to produce all of the relevant financial data and information to the defendant nor has defendant been able to complete his review of the data first produced on August 23, 2021 and additional data produced yesterday. Accordingly, defendant reserves the right to supplement his briefing once the government has fully complied with its discovery obligations and defendant has had ample opportunity to review the information.

[3] QuickBooks is an accounting software package that is used by businesses for various financial functions, including maintaining checking account registers and a business' general ledger.  Tabs, otherwise known as Tabs3, is a software package specifically designed for law firms that is used to track and bill attorney time on client matters, out-of-pocket costs incurred on client matters, and advances made to, and for the benefit of, clients.  The evidence at trial established that the client information tracked in QuickBooks and Tabs at EA was not the same.

way of an indictment, which was docketed on the morning of April 11, 2019 [Dkt. 16]. That same day, defendant's counsel (Mr. John Littrell) wrote AUSA Sagel and then AUSA Julian Andre and informed them that the defense needed urgent access to the information from the EA servers for multiple reasons, including "in order to defend the case." *See* Exh. A.[4] AUSAs Sagel and Andre committed to Mr. Littrell during a subsequent conversation that all relevant documents from the servers would be promptly produced to the defendant during discovery. AUSA Andre confirmed this agreement in writing the next day: **"To the extent the servers contain evidence relevant to the prosecution of Mr. Avenatti, as we mentioned yesterday, such materials will be produced to the defense during the discovery process."** *See id.* (emphasis added). In the weeks that followed, however, no such information was produced.

On May 15, 2019, and immediately after defendant's new counsel, Mr. H. Dean Steward, was retained on this case, defendant sent the government a letter demanding that the government comply with its obligations under Rule 16 as well as *Brady* and *Giglio*. Among other items, defendant specifically sought access to "all documents, information, materials, electronic information, etc., obtained from Brian Weiss and/or Eagan Avenatti, LLP or any corresponding search including but not limited to forensic copies of all electronic files, computers, servers, drives, USB keys, cell phones and iPads." *See* Ex. B, p. 2. The word "servers" was mentioned **ten times** in the letter, as were the words "computers" and "drives." Further, *Brady* was mentioned at least twice, with one request for *Brady* information clearly stating, "I request all documents, statements, agents' reports, and tangible evidence favorable to the defendant on the issue of guilt and/or which affects the credibility of the government's case." *See* Ex. B, p. 4

One week later, on May 22, 2019, having not received any electronic evidence nor any of the materials requested, Mr. Steward sent another letter to the government

---

[4] All references to "Ex." herein refer to the exhibits attached to the Declaration of Michael John Avenatti filed concurrently herewith and in support of this motion ("Avenatti Decl.").

4

specifically addressing the importance of obtaining a copy of the servers. *See* Ex. C.  In the letter, defense counsel described the prejudice to the defense caused by the government continuing to withhold the data, demanded that the forensic images be provided no later than Tuesday, May 27, and also requested an inventory of the materials seized.  *See id*.

On May 24, 2019, SA Karlous and the government submitted a search warrant application to search the EA servers, which were already in the possession of the government. *See* CDCA Case No. 8:19-mj-00419, Dkt. 4-1. By way of the application, the government sought access to extensive accounting and financial data from the servers relating to the allegations in the Indictment and the five clients. In particular, several of the items sought to be seized and searched were specific to attorney costs, expenses, advances, fees, time and accounting.  *See* Ex. D; *Id*. at pp. 7-11 (items f., g., p., t., u., w. and x.). The application was granted that afternoon, and the government was permitted broad access to seize and search for a myriad of documents and materials relating to the allegations in the Indictment, including the financial and accounting information relating to the clients at the center of counts 1-10 that was in "QuickBooks, or other electronic accounting data, files or records."  *See* Ex. E.

Later that day, the government provided a response to Mr. Steward's letters. *See* Ex. F. Importantly, the government promised that it would provide Mr. Avenatti with a copy of all of the relevant information from the servers, stating as follows: "**<u>We will produce any relevant evidence seized from the EA LLP server once the government completes the review protocols set forth in the search warrant</u>**." Ex. F, pp. 4-5. (emphasis added). In other words, the government further lulled the defendant into believing that the government understood their obligations and would comply with them. Weeks passed by, however, and no information from the servers was produced.

On June 25, 2019, defense counsel sent AUSA Andre and AUSA Sagel a letter itemizing the government's failures to produce "all data – emails, pleadings, settlement

agreements, accounting information, etc. from the servers and computers relating to Mr. Avenatti's law firm." *See, e.g.,* Ex. G.  Counsel made clear to the government that the information was critical to the defense and time was of the essence:  "Indeed, there can be no question that *the items above are critically important in this case and critical to the defense*. . . . Accordingly, *time is of the essence.*  The above information has been in the possession of the government since the last week of march – 3 months.  We ask that it be produced *immediately*." *Id.*

On July 1, 2019, in anticipation of a status conference, the parties submitted a joint report to the Court. [Dkt. 44]. Within this report, the defendant challenged the inadequacies of the government's discovery productions, "[t]he government's production to date has been woefully inadequate …  the information produced to date is far less than five percent (5%) of what is required. . . . [T]he government now refuses to produce millions of pages of documents and huge amounts of electronic data (likely well over 20 terabytes) that Defendant needs to defend himself-including potentially *Brady* and *Giglio* material." [Dkt. 44, p. 8]. Mr. Avenatti also specifically delineated what information that the government had failed to produce:  (a) defendant's correspondence and emails with clients referenced in the Indictment;  (b) defendant's client files;  (c) defendant's <u>accounting, tax and costs records</u>; (d) defendant's <u>time records</u>; (e) defendant's settlement communications and documentation; (f) defendant's emails relating to the charges in the indictment; and, (g) defendant's emails with his tax professionals. [Dkt. 44, p. 6 (emphasis added)]. In the report, the government stated that it continued to review the content of the EA servers and committed to "produce any non-privileged documents falling within the scope of the search warrants to the defense on a rolling basis."  [Dkt. 44, p. 12]. The Court subsequently issued an Order on July 8, 2019 directing the government to submit "a report re privilege review and a time table to produce documents to the defendant including how the documents will be produced." [Dkt. 45].

On July 22, 2019, the prosecution submitted its "Status Report Regarding the Government's Privilege Review." Within this report, the government stated that the

Privilege Review Team continued to extract data from the EA Servers and was "attempting to identify any folders on the EA LLP server that contain information relating to the individual client-victims…" [Dkt. 49, p. 7]. The prosecution also told the Court that "the documents and data from the EA LLP server will be loaded into the document review database on a rolling basis." [Dkt. 49, p. 6]. The government further assured the Court and the defense that information relating to the individual clients in the Indictment or other categories of documents covered by the search warrants would be prioritized. [Dkt. 49, p. 7].

Three days later, the four most senior members of the prosecution team - both assigned AUSAs (Sagel and Andre) and both assigned co-lead Special Agents (Remoun Karlous and James Kim) - conducted another interview of Ms. Regnier. According to the notes from this interview, its sole purpose was "to ask questions regarding the Eagan Avenatti LLP server and how client files are created and maintained on the server."[5] *See* Ex. H. During this interview, on at least two occasions, Ms. Regnier told the government that EA used the software program Tabs to track financial information (i.e. costs) and attorney time for client matters. For instance, within the handwritten notes associated with the interview, SA Karlous wrote "atty time records are kept in TABS not on file site…." *See* Ex. H, p. 2. Another portion of the interview notes reads, "client billing… client accounting… TABS would be used." *See* Ex. H, p. 4. ***Despite being told this and despite defendant's numerous prior requests for the accounting data necessary for his defense, the government continued to withhold the Tabs and other financial information.***

---

[5] The prosecution team has previously represented to the Court and the defendant on repeated occasions that it had nothing to do with determining what information from the EA servers was relevant to the case or should be produced. If true, then why would four members of the prosecution team have conducted a lengthy interview with Ms. Regnier about the servers and what client information was contained on the servers?

## B.   In Response to Continued Efforts in 2019 to Get the *Brady* Materials, the Government Misleads the Court & Withholds the Information

Having received no response or information in response to his June 25 letter demanding the exculpatory financial data contained on the servers, the defendant filed a "Motion to Compel Discovery" on July 28, 2019. [Dkt. 50]. The motion requested "immediate and unfettered access to the Eagan Avenatti, LLP ('EA') servers, and digital devices seized from an Eagan Avenatti employee, so that Mr. Avenatti may properly defend himself in this matter." [Dkt. 50, p. 3]. Defendant specifically requested access to the following materials: "(1) correspondence with clients and others; (2) client files; (3) *time records*; (4) settlement communications and documentation of settlements; (5) correspondence and files in relation to the other charges in the indictment; (6) defendant's emails with his tax professionals and others relating to his taxes; and *(7) accounting information relating to the clients at issue, including documents showing client costs and expenses, and associated fees.*" [Dkt. 50, p. 3](emphasis added).

On August 12, 2019, the government filed its "Opposition to Defendant Michael John Avenatti's Motion to Compel Discovery." [Dkt. 55]. Therein, the government indicated "the USAO's Privilege Review Team has already located on one of the EA Devices copies of EA LLP's QuickBooks accounting records, which are being processed and should be produced to defendant shortly. In fact, *the only category of records that defendant identified in his motion that have not already been produced* are defendant's 'time records.'" [Dkt. 55, p. 15 (emphasis added)].  This misrepresentation was made with full knowledge that no Tabs data had been produced.  And under a heading entitled, "The USAO Has Complied With and Will Continue to Comply with its Obligations Under *Brady* and *Giglio*" the government stated, "the USAO is aware of its obligations under Brady and Giglio. The USAO has already made, and will continue to make timely disclosures of any such materials to the defendant, including any such documents that are located on and seized from the EA Devices." [Dkt. 55, p. 16] (emphasis added). [6]

---

[6] These misrepresentations were made a mere 18 days after the interview of Ms. Regnier.

On August 29, 2019, the Court denied Mr. Avenatti's Motion to Compel and addressed the categories of information sought by the defendant. Relevant to this discussion, the Court referred to Mr. Avenatti's request for access for client files, time records, and "accounting information" relating to the clients at issue. [Dkt. 63, p. 3]. Relying on representations made to the Court by the government and the government's presumed good faith, the Court found that "[t]o the extent that these categories relate [sic] the specifics in the Indictment, the Government has or is in the process of producing the materials." [Dkt. 63, p. 3](emphasis added). The Court added, "the Government has acknowledged its obligation to produce all documents within the scope of the search warrants as well as its *Brady* and *Giglio* obligations." [Dkt. 63, p. 3](footnote citations omitted).[7] Despite these statements, the government continued to withhold financial information favorable to the defendant from the servers.

Less than sixty days later, the government was reminded of the existence and importance of the financial data contained on the servers. On November 19, 2019, AUSA Sagel, Special Agent Remoun Karlous, and Special Agent Ryan Roberson conducted another interview with Ms. Regnier. During this interview, Ms. Regnier again explained the importance of both Tabs and QuickBooks: "EA used two systems to track case expenses. The first was QuickBooks, and the accounting entries came from expense reports, court reports, etc. The second system used by EA to track case expenses was TABS." *See* Ex. I, p. 3. Ms. Regnier later confirmed in sworn testimony that during this interview, she informed AUSA Sagel and Special Agents Karlous and Roberson that the firm used Tabs and QuickBooks to track expenses for clients. *See, e.g.*, Trial Tr. (7/29/2021, Vol. 1) p. 68. Despite this, the government suppressed this critical financial data and withheld it from the defendant.

---

[7] Mr. Avenatti and his counsel were subsequently permitted access to certain emails and client pleadings stored on the servers by visiting the IRS-CI's Los Angeles office on two occasions in September and October of 2019 but were not permitted any access to any other files, data or software programs on the servers.

9

### C.   Defendant Continues to Attempt to Get the Critical Information Throughout 2020; The Government Successfully Withholds It

In May, June, July and August of 2020, defendant again raised the issue of his need to have access to the servers and/or obtain critical financial information relating to the client matters. *See*, *e.g.*, Avenatti Decl. ¶¶ 12-17.  Each time, the government improperly withheld the information and/or made representations regarding its alleged compliance that were not true.  *See*, *e.g.*, Dkt. 164, 168, 181, 176, 178, 182, 193, 195, 199, 289.

### D.   The Government Stonewalls Defendant's Efforts to Acquire the *Brady* Information in the Months Leading to Trial in 2021 and Violates this Court's Order

Due to the importance of the information to his defense, Mr. Avenatti continued to seek access to the critical financial information relating to the clients as well as the other discovery to which he was entitled in early 2021 as he prepared for trial. Mr. Avenatti demanded that the government comply with its discovery obligations and motioned the Court repeatedly to hold the prosecution accountable for their conduct.  *See*, *e.g.*, Avenatti Decl. ¶¶ 18-31; *see also*, Dkt. 398, 405, 408, Ex. J, Ex. K, Ex. L, 415, 418, 431, 433, 436, Ex. M, Ex. N, Ex. O, Ex. P, 447, 449, 511, 523, 535.  This included by obtaining this Court's January 25, 2021 Order, which required the government "to produce to the defendant in a timely manner all information or evidence known to the government that is either: (1) relevant to the defendant's guilt or punishment; or (2) favorable to the defendant on the issue of guilt or punishment." Exhibit J [Dkt. 408, p. 1]. In the Order, the Court warned the government of the consequences for violating the Order: "contempt, sanction, referral to a disciplinary authority, adverse jury instruction, exclusion of evidence, and dismissal of charges.*" Id.* at 2. Moreover, in his final pretrial status report filed on June 25, 2021, the defendant yet again raised concerns relating to the failure of the government to produce *Brady* information and specifically warned of the possibility of a mistrial if the government failed to comply. [Dkt. 511, p. 9]

As established above, the record in this case is replete with the defendant making repeated pre-trial demands for the financial information related to the alleged victims in

10

this case.  Each time, prosecutors falsely assured the defendant that they had fulfilled their obligations.  In those instances when the defendant alerted the Court that the government had withheld exculpatory financial information, the government routinely misled the Court by stating that Mr. Avenatti's accusations were baseless, false, and that the government had complied with all of its discovery obligations. These representations were later proven at trial to be grossly false.

### E.   The Government's Misconduct, *Brady* Violations and Contempt Are Exposed at Trial

 Over the objections of the defendant and with full knowledge that critical *Brady* material had been suppressed, and they were in violation of this Court's January 25, 2021 Order, the government insisted on proceeding to trial in this case on July 13, 2021.  In its case-in-chief, the government repeatedly placed the issue of what the clients were owed from their settlements before the jury.  They did so by way of numerous questions regarding the costs or expenses incurred for each of the clients and the introduction of various exhibits – i.e. government exhibits 48[8] and 174[9]. Indeed, the government asked questions of witness after witness, including the clients, relating to (a) how much money the clients were owed and when, and (b) what the costs and expenses were for each of the client matters. *See, e.g.,* Trial Tr. (7/21/21, Vol. 1) pp. 101-02, 104-05 (direct examination of Patrick McNicholas); Trial Tr. (7/22/21, Vol. 1) pp.32-33, 45, 82-83 (direct examination of Geoffrey Johnson); Trial Tr. (7/27/21, Vol. 1) pp. 61, 63-69, 71, 87, 125-130; Trial Tr. (7/27/21, Vol. 2) pp. 39-42, 62-64, 72-74 (direct examination of Judy Regnier); *See, e.g.,* Trial Tr. (7/30/21, Vol. 1) pp. 74, 78-79, 86; Trial Tr. (7/30/21, Vol. 2) pp. 35-36, 38-39 (direct examination of Alexis Gardner); Trial Tr. (8/03/21, Vol. 2) pp. 50-54, 61, 69-75, 104 (direct examination of Filippo Marchino); Trial Tr. (8/04/21, Vol. 2) pp. 39, 41, 45, 57-58, 60; Trial Tr. (8/05/21, Vol. 1) pp. 63, 85-86 (direct examination of Gregory Barela); Trial Tr. (8/06/21, Vol. 2) pp. 61, 65, 68-69, 71, 74-76, 87; Trial Tr. (8/10/21, Vol. 1) pp.

---

[8] Draft Tabs printout for costs associated with the Johnson matter.

[9] Draft Tabs printout for costs associated with the Barela matter.

27-29, 34 (direct examination of Long Tran); Trial Tr. (8/10/21, Vol. 2) pp. 27-30, 35, 54 (direct examination of David Sheikh); Trial Tr. (8/12/21, Vol. 1) pp. 26-28, 30, 36, 38-39 (direct examination of Michelle Phan); *See, e.g.,* Trial Tr. (8/12/21, Vol. 2) pp. 49-62 (direct examination of John Drum); Trial Tr. (8/13/21, Vol. 1) pp. 23-84 (continued direct examination of John Drum).

For instance, one such witness was Ms. Regnier, who the government called early in the trial and proceeded to examine for close to seven (7) hours on direct examination alone. Indeed, Ms. Regnier was the government's most critical witness as evidenced by the fact that the government spent far more time on her examination than any other witness and admitted no fewer than <u>seventy (70) exhibits through her testimony</u>, including exhibits 48 and 174. On cross examination, Ms. Regnier admitted what she had told the government over two years prior - that the financial records of the law firm were maintained on two separate and independently operated accounting systems, QuickBooks, and Tabs. *See, e.g.,* Trial Tr. (7/28/2021, Vol. 1) p. 92. She further admitted that in order to properly calculate the costs for a particular case, it was necessary to review both QuickBooks and Tabs; relying exclusively on one accounting system would result in inaccurate calculations. *See, e.g.,* Trial Tr. (7/28/2021, Vol. 1) p. 93; Trial Tr. (7/28/2021, Vol. 2) p. 29. In connection with government exhibit 48, Ms. Regnier testified that it was "a draft bill," that she did not know whether the costs listed were 100 percent accurate, and she agreed that "if you wanted to figure out what the exact costs on the Johnson case were … you would go to the electronic file of QuickBooks, the most recent file, and the electronic file of Tabs and look at the data." *See, e.g.,* Trial Tr. (7/28/2021, Vol. 2) p. 31. Although the last entry of exhibit 48 revealed a date of December 15, 2014, Ms. Regnier testified that payments were made to Mr. Johnson after this date. *See, e.g.,* Trial Tr. (7/29/2021, Vol. 1) p. 98-99. Ms. Regnier similarly testified that exhibit 174 was only a draft and she could not verify whether it was complete or not. *See, e.g.,* Trial Tr. (7/28/2021, Vol. 2) p. 61. Despite the last entry of the Tabs cost sheet being December 22, 2017, Ms. Regnier testified that she believed payments were made to Mr. Barela after that

date. *See, e.g.*, Trial Tr. (7/29/2021, Vol. 2) p. 17. Further, Ms. Regnier also admitted that Tabs was also used to track hourly time and fees for matters that were non-contingency. *See, e.g.*, Trial Tr. (7/29/2021, Vol. 2) p. 64-65.  In other words, if the firm performed work for a contingency client on another legal matter that was being billed hourly (i.e. the other Barela and Gardner matters), that time and that fee would be tracked in Tabs, not QuickBooks.  Despite this testimony, the government continued to withhold the missing *Brady* material in the days that followed.

On August 12, 2021 and in connection with the testimony of the government's financial expert, Mr. John Drum,[10] Mr. Avenatti again raised the issue of the missing discovery with the Court:  "[I]n preparing for Mr. Drum's testimony today, it became apparent to me that the government has not produced the Tabs data relating to the costs to the various clients. That is a serious Brady and Giglio violation. It's been in their possession for two and a half years….We don't have the Tabs data." *See, e.g.,* Trial Tr. (8/12/2021, Vol. 1) p. 18.  The government continued to withhold the exculpatory information.

On August 12, 2021, the government called Mr. Drum to testify as its final witness in its case-in-chief. *See, e.g.,* Trial Tr. (8/12/2021, Vol. 2) p. 49. On direct and over defendant's objection, the government used Mr. Drum to admit thirty-two (32) demonstrative summary exhibits allegedly showing, among other things, how much money was due the clients from each of their settlements net of fees, costs and expenses. *See*, *e.g.*, government exhibits 420-450, 456.  On cross-examination, Mr. Drum testified that in order to perform his financial analysis, he was provided access to QuickBooks records, settlement agreements, retention agreements and bank records. *See, e.g.,* Trial Tr. (8/13/2021, Vol. 1) p. 102. Other than the two draft Tabs spreadsheets (marked as government exhibits 48 and 174), Mr. Drum was never provided access to, and did not request access to, the Tabs software database. *See, e.g.,* Trial Tr. (8/13/2021, Vol. 1) p.

---

[10] As of the time of his trial testimony, Mr. Drum and his company had been paid well over $600,000 by the government for his financial analysis.

13

104. Mr. Drum was asked, "Do you have any understanding beyond the two draft documents that you referred to that Ms. Regnier sent, do you have any understanding of what was tracked in Tabs for clients?" to which he answered "Other than those two spreadsheets, no." *See, e.g.,* Trial Tr. (8/13/2021, Vol. 1) p. 105. He stated to the jury that the government "did not give me Tabs data other than the two spreadsheets." *See, e.g.,* Trial Tr. (8/13/2021, Vol. 1) p. 108. He also testified that he never made any effort to learn how Tabs worked and likewise never "googled it." He also testified that the government provided Mr. Drum with the QuickBooks electronic file, but he made no effort before using it for his analysis to see how current the data was or when the last time it had been updated. *See, e.g.,* Trial Tr. (8/13/2021, Vol. 2) p. 26-27. Mr. Drum stated that he "had no way to verify how complete or incomplete the data was." *See, e.g.,* Trial Tr. (8/13/2021, Vol. 2) p. 27.

On August 13, 2021, Mr. Avenatti again complained about the suppressed financial data and requested that the government provide him with information regarding where he could find the Tabs data in the discovery, if it was ever produced: "Where is the Tabs data? … I just want the government to provide the Bates stamp number for the Tabs data which they have had for two-and-a-half years." *See, e.g.,* Trial Tr. (8/13/21, Vol. 1) p. 15. AUSA Sagel stated, "I will start with the obvious. Everything that is in the prosecution team's possession he has." The Court asked again, "Does the government have the Tabs data?" *See, e.g.,* Trial Tr. (8/13/21, Vol. 1) p. 16. Rather than provide a simple "yes" or "no" answer, AUSA Sagel instead stated, "With regard to the Tabs, I don't know where – if it even exists and so forth. So I don't know about the extractions. We don't have anything in our database separate of Tabs and so forth." *See, e.g.,* Trial Tr. (8/13/21, Vol. 1) p. 17. The government again failed to make any effort to produce the information.

On August 15, 2021, the defendant filed a Notice of Motion and Motion to Dismiss or, in the Alternative, Motion for Mistrial, due to the Government's (1) Failure

14

to Produce Information as Required by Rule 16, *Brady*, and *Giglio*, and (2) Contempt of this Court's January 25, 2021 Order. [Dkt. 706 ("The Mistrial Motion")].

On August 17, 2021, the withheld data was once again raised in Court.  AUSA Sagel represented to the Court that as to the Tabs data, "It's never been brought up. And what I also point out and defendant ignores is even Ms. Regnier's testimony, she didn't even know of it as Tabs until he said the word and she said, yeah that might be the name of it. At no point did she mention Tabs, and it just jumps to many things."  *See, e.g.,* Trial Tr. (8/17/21, Vol. 1) p. 36. In response, Mr. Avenatti alerted the Court, "This idea that Ms. Regnier did not mention Tabs to Mr. Sagel and the agents, it's in the notes, Your Honor. It's in interview notes, their own interview notes. And Mr. Sagel can correct me if I'm wrong. But this idea that he is leading the Court to believe that they had no idea about Tabs before she mentioned the name [of the software], that's false. And I would challenge Mr. Sagel to tell the Court that they had never heard about Tabs in the two-and-a-half years of this investigation before Ms. Regnier took the stand. I challenge him to make that representation now again to this Court." *See, e.g.,* Trial Tr. (8/17/21, Vol. 1) p. 38. The government did not respond. Nor did they produce any of the suppressed information.

Later on August 17, 2021, the defendant re-called Department of Justice Senior Digital Investigative Analyst Joseph Varani to the stand in his case-in-chief.  Mr. Varani testified that he previously analyzed the forensic images of the computer servers seized from Eagan Avenatti. *See, e.g.,* Trial Tr. (8/17/21, Vol. 1) p. 59. He also testified that during the course of his work on this case no one communicated with him regarding the need to locate financial data from the Tabs program. *See, e.g.,* Trial Tr. (8/17/21, Vol. 1) p. 63. Mr. Varani indicated that if he were instructed to look for the Tabs data he would be able to determine within a matter of a half hour whether there was any Tabs data located on the server. *See, e.g.,* Trial Tr. (8/17/21, Vol. 1) p. 64.

The next day, defendant called SA Karlous to testify.  SA Karlous admitted that Ms. Regnier had informed him and others about the Tabs data in 2019.  *See, e.g.,* Trial

Tr. (8/18/21, Vol. 1) p. 31. He also admitted that despite being informed about the Tabs data in 2019, he did not know of anyone on the investigative team making any inquiry as to whether the Tabs data was included within the forensic image of the servers. *See, e.g.,* Trial Tr. (8/17/21, Vol. 1) p. 41-42. SA Karlous was asked, "did you ever ask for the Tabs data?" to which he responded, "Me personally, no." *See, e.g.,* Trial Tr. (8/17/21, Vol. 1) p. 66. He also could not recall ever doing anything to attempt to locate or produce the Tabs data.

On August 18, 2021, the defendant filed a supplement to the Mistrial Motion. [Dkt. 733.]. The following day, defendant called SA Kim to testify.  Defendant asked SA Kim what Tabs was.  Incredibly, SA Kim laughed, before then stating, "I don't know what Tab is." *See* Trial Tr. (8/19/21, Vol. 1) p. 70. He made this statement despite the fact that he was on the call with Ms. Regnier in July 2019 when she specifically informed the four most senior members of the prosecution team about the importance of Tabs and what it was.  *See* Ex. H. SA Kim subsequently claimed that he did nothing to collect the Tabs data despite being told about its existence in July of 2019. *See* Trial Tr. (8/19/21, Vol. 1) p. 77. On August 19, 2021, the government filed their opposition to the Mistrial Motion [Dkt. 737]. The defendant filed a reply that same day [Dkt. 745].

### F.    The Court Holds Two Hearings on the Motion and Declares a Mistrial

After hearing the aforementioned testimony and reviewing the contents of Mr. Avenatti's Mistrial Motion, the Court held a hearing on the matter on Friday, August 20, 2021 [Dkt. 749.] At the conclusion of the hearing, the Court ordered the Privilege Review Team ("PRT") to cooperate with the defense over the weekend to search for the financial information on the servers. During the late afternoon of Monday, August 23, 2021, defendant was provided with approximately 6 GB[11] of data from the servers that

---

[11] One GB holds a tremendous amount of data.  For instance, E-mail files typically average 100,099 pages *per gigabyte*, while Microsoft Word files typically average 64,782 pages *per gigabyte*. Text files, on average, consist of a whopping 677,963 pages *per gigabyte*. At the opposite end of the spectrum, the average

16

had been located by Mr. Varani of the Department of Justice Computer Lab in Washington, D.C.  This information consists of approximately 1,992 electronic files, with 1,822 files (in 98 folders) relating to Tabs and 170 files (in 150 folders) relating to QuickBooks. All of this information was obtained from the forensic copies of the EA servers that have been in the possession of the DOJ since the Spring of 2019.[12] None of the Tabs files were previously produced to the defendant prior to August 23, 2021. Even a preliminary review of this data revealed that the government's presentation of draft Tabs exhibits were demonstrably false and incomplete and there were over 111 separate financial transactions in the Tabs data that show monies paid by the firm to clients in the indictment or on behalf of those clients, which were not considered by Mr. Drum and were never included on other exhibits the government moved into evidence.  As defendant explained in his submission to the Court later that night, the suppression of this information prevented Mr. Avenatti from, among other things, (a) highlighting portions of it in his opening statement; (b) using the information to conduct cross-examinations of, and impeach, multiple clients, Ms. Regnier, Special Agent Remoun Karlous and Mr. Drum; (c) demonstrating before the jury that Exhibits 48 and 174, repeatedly relied on by the government, were demonstrably false; (d) attacking Mr. Drum's credibility by showing that his calculations were wrong because he failed to account for over 111 financial transactions (among other Tabs data); (e) showing that the clients were not owed what the government claims; (f) showing why the government's deliberate disregard for the Tabs data during their alleged "investigation" was so material and egregious (*see, e.g.*, *Kyles v. Whitley*, 514 U.S. 419, 445-449 (1995); and (g) formulating and implementing a trial strategy designed around using this exculpatory data to its fullest potential. *See* Dkt. 775.

_____

gigabyte of images contains 15,477 pages; the average gigabyte of PowerPoint slides typically includes 17,552 pages.

[12] Mr. Varani previously testified in the trial concerning the timing and method by which the DOJ obtained the forensic copies of the servers. *See, e.g.,* Trial. Tr. (7/23/21, Vol. 1) pp. 11-14; Trial Tr. (8/17/21, Vol. 1) pp. 59-63.

On August 24, 2021, the Court heard oral argument on the defendant's Motion. During the hearing, the Court made several factual findings bearing on this motion. First, the Court determined that "financial data is critical to this case… if one looks to Mr. Drum's charts, particularly [exhibit] 430 through 457 that sum up the case, those charts are based almost exclusively on financial data." Trial Tr. (8/24/21, Vol. 1) p. 56. Second, the Court found that the government was "on notice for some time of the existence of the Tabs data… the government was fully on notice of the significance of the Tabs data. The questioning at trial I believe established that no effort was made to secure the Tabs data." Trial Tr. (8/24/21, Vol. 1) p. 57. The Court indicated, "I think that the testimony in and of itself is sufficient to establish the materiality of the Tabs data, particularly where at least in the case of three of the victim clients the costs were an element in determining what net payment Mr. Avenatti was entitled to out of the settlement." Trial Tr. (8/24/21, Vol. 1) p. 58-59. The Court found that the Tabs data "would have been useful in an overall showing that the government's accounting records, the methods of Mr. Drum in particular, weren't accurate." Trial Tr. (8/24/21, Vol. 1) p. 60.

Before concluding that the government had committed a *Brady* violation by suppressing the Tabs and QuickBooks data, the Court performed a three-part analysis. *See* Trial Tr. (8/24/21, Vol. 1) p. 62. First, the Court found that "the Tabs data and other accounting data that was not produced would have been favorable to the accused." *See* Trial Tr. (8/24/21, Vol. 1) p. 62. Second, the Court determined that the materials were not produced. *See* Trial Tr. (8/24/21, Vol. 1) p. 62. Finally, the Court found that the defendant suffered prejudice as a result of the government's suppression of evidence:

> I find that prejudice occurred here in a number of ways. I think the defendant was denied an opportunity to craft his overall theory of the case and presentation, including the opening statement, by not having this additional material. I believe that the defense was prejudiced in its ability to cross-examine certain witnesses, in particular, Mr. Drum. . . . At page 5 of his most recent report at Docket 775, Mr. Avenatti outlines a number of things that he could have done had he had the Tabs information, including cross-

examination of certain witnesses, ability to question the government's preparation techniques generally, and so on…" Trial Tr. (8/24/21, Vol. 1) p. 62-63.

The Court then granted defendant's request for a mistrial new trial.  In response to a request by the defendant, the Court permitted defendant to brief the issue as to whether the government should be permitted to re-try the defendant.

### G.   The Government's Discovery Misconduct Is Not Limited to Withholding Exculpatory Financial Data

The government's failures to produce discovery is not limited to the financial data withheld for over two years, some of which was belatedly produced to the defendant for the first time on August 23, 2021 in the middle of trial. Prior to trial, and throughout the trial, Mr. Avenatti made repeated demands for the government to comply with its obligations under the Jencks Act and Rule 26.2. [Dkt. 511 (Defendant's Status Report for June 28, 2021 Status Conference), Dkt. 535 (Defendant's Trial Brief), Dkt. 561 (Trial Motion for Disclosure of Jencks Act / 26.2 Materials)]. Indeed, early in the trial, in response to Mr. Avenatti again raising the issue, the Court instructed Mr. Avenatti: "The Government's under an ongoing obligation with respect to each witness to provide any *Jencks* material that has not been provided by the time the witness finishes his direct. There's no need to make that request every time, Mr. Avenatti." Trial Tr. (7/21/21, Vol. 2) p. 5. Similar to the government's representations that it was aware of its obligations under *Brady*, the prosecution repeatedly represented to the Court and to the defendant that it was aware of its obligations under Rule 26.2 and Jencks. In fact, AUSA Sagel routinely ridiculed the defendant and claimed he did not know the law. *See, e.g.,* Trial Tr. (7/22/21, Vol 2) p. 53 ("Maybe it might behoove the defendant to talk to his advisory counsel or figure out himself what Jencks is … I think that might save us from these sidebars, because he does not know what Jencks is."). As the trial proceeded, however, defendant's knowledge of *Jencks* and Rule 26.2, together with his beliefs that the government were ignoring their basic discovery obligations, were proven accurate on multiple occasions.  *See*, *e.g.*, Avenatti Decl. ¶¶ 32-40.

19

1  **III.    ARGUMENT**

2  **A.    The Double Jeopardy Clause of the Fifth Amendment**

3       The Double Jeopardy Clause of the Fifth Amendment protects against multiple

4  criminal prosecutions for the same offense. U.S. Const. Amend. V ("[N]or shall any

5  person be subject for the same offense to be twice put in jeopardy of life or limb."). The

6  protections of the double jeopardy clause attach once a jury is empaneled and sworn.

7  *United States v. Jorn*, 400 U.S. 470, 479 (1971). Once jeopardy attaches, the defendant

8  has the right to have his case presented to and decided by that jury. *United States v.*

9  *Gaytan*, 115 F.3d 737, 742 (1997); *See also, United States v. Bates*, 917 F.2 388, 392

10  (9th Cir. 1990). As a general rule, "the prosecutor is entitled to one, and only one,

11  opportunity to require an accused to stand trial." *Id.* The core of the double jeopardy's

12  prohibition on multiple prosecutions "is denying the prosecution a second opportunity to

13  supply evidence which it failed to muster in the first proceeding." *United States v.*

14  *Weems*, 49 F.3d 528, 531 (9th Cir. 1995); *citing Tibbs v. Florida*, 457 U.S. 31 (1982).

15  When the "initial prosecution ends in mistrial, a subsequent retrial will increase the

16  emotional and financial burden imposed on the defendant, and may give the state an

17  unfair opportunity to tailor its case based on what it learned the first time around."

18  *United States v. Chapman*, 524 F.3d 1073, 1081 (9th Cir. 2008); *quoting Arizona v.*

19  *Washington*, 434 U.S. 497, 503-504 (1978); *See also, Green v. United States*, 355 U.S.

20  184, 187 (1957) (Multiple trials "enhance the possibility that even an innocent

21  [defendant] may be found guilty"). Criminal defendants "will not be required to live in a

22  'continuing state of anxiety and insecurity,' without a definite resolution of the criminal

23  charges against them." *Gaytan*, 115 F.3d at 742; *citing United States v. Dinitz*, 424 U.S.

24  600 (1975).

25       While the double jeopardy clause unequivocally prohibits a second trial following

26  an acquittal, "when a mistrial is declared, the rules are more complex." *Gaytan*, 115 F.3d

27  at 742. A defendant's own motion for a mistral typically removes this barrier to a second

28

prosecution. However, this principal does not apply when the prosecution engages in misconduct, which provokes the defendant to request the mistrial.

The Supreme Court has made it clear that when the prosecution engages in bad-faith tactics to bait the defendant into moving for a mistrial, the government is barred by Double Jeopardy:

> "The Double Jeopardy Clause does protect a defendant against governmental actions intended to provoke mistrial requests and thereby to subject defendants to the substantial burdens imposed by multiple prosecutions. It bars retrials where 'bad-faith conduct by judge or prosecutor,' threatens the '[harassment] of an accused by successive prosecutions or declaration of a mistrial so as to afford the prosecution a more favorable opportunity to convict' the defendant." *Dinitz*, *supra*, 424 U.S. at 611; *citing United States v. Jorn, supra,* 400 U.S. at 485.

When the "government conduct in question is intended to 'goad' the defendant into moving for a mistrial," the defendant may "raise the bar of double jeopardy to a second trial after having succeeded in aborting the first one on his own motion." *Oregon v. Kennedy*, 456 U.S. 667, 673 (1982). The inquiry into the prosecution's intent is inferred from the objective facts and circumstances of the case. *Id.* at 679-80 (Powell, J. concurring) ("Because 'subjective' intent often may be unknowable, I emphasize that a court – in considering a double jeopardy motion – should rely primarily upon the objective facts and circumstances of a particular case."). The term "goad" is defined in part as "to drive, incite or rouse." *United States v. Fern*, 155 F.3d 1318, 1324, fn. 7 (11th Cir. 1998); *citing* Webster's Third New International Dictionary 972 (3d ed. 1976). When used as a noun, goad  is "something that urges or stipulates like a goad: spur, stimulus." *Id.*

Circuit and district courts have found that prosecutorial *goading* is present where, as here, "the conduct of the government in bringing about the original mistrial is due to 'gross negligence or intentional misconduct.'" *Fern*, 155 F.3d at 1324, fn. 7; *citing United States v. Serra*, 882 F.2d 471, 473 (11th Cir. 1989)(holding that in order to

21

support a motion to dismiss indictment on double jeopardy grounds the defendant must establish that the government engaged in "gross negligence or intentional misconduct."); *Dean v. United States*, 1990 U.S. Dist. LEXIS 19954, *24 (E.D. Tex. 1990)("when an initial prosecution has been terminated by a mistrial granted on the defendant's motion, a second trial is barred … [if] 'there is gross negligence or intentional misconduct on the part of the government which has seriously prejudiced the defendant.'"); *Martinez v. Caldwell*, 644 F.3d 238, 243(5th Cir. 2011)(the government is barred from re-prosecution following a defendant's request for mistrial if the defense presents evidence of "bad faith" <u>or</u> an "intent to goad."). A course of intentional misconduct, discovered serendipitously by the defense during trial, *goads* a defendant into moving for a mistrial, bars re-prosecution and requires the dismissal of the indictment. *See*, *e.g.*, *United States v. Sterba*, 22 F. Supp. 2d 1333, 1343 (M.D. Fl. 1998); *United States v. Wallach (II),* 979 F.2d 912 (2d. Cir. 1992)(a defendant's double jeopardy rights are implicated not only when prosecutor intends to and does provoke a mistrial, but also when a prosecutor intentionally commits misconduct in order to deprive the defendant of an acquittal that the prosecutor believed was likely to occur).

Various state courts have similarly expanded the Supreme Court's interpretation of the Fifth Amendment Double Jeopardy Clause and found that government misconduct, regardless of a specific intent to goad the defendant, may warrant the dismissal of the indictment and bar further prosecutions. *See, e.g., People v. Batts*, 30 Cal. 4th 660, 696 (2003)(California Supreme Court determined that double jeopardy clause bars subsequent prosecution when (1) prosecution engages in misconduct for the purpose of triggering a mistrial; or, (2) when the prosecution intentionally and knowingly commits misconduct to thwart a potential acquittal); *see also, Prosecutorial Misconduct and Constitutional Remedies*, 77 Wash. U. L, Q. 713 (Fall, 1999); *citing Bauder v. State*, 921 S.W.2d 696, 699(Tex. Crim. App. 1996)(en banc)("a successive prosecution is jeopardy barred after declaration of mistrial at the defendant's request, not only when the objectional conduct of the prosecutor was intended to induce a motion for

mistrial, but also when the prosecutor was aware but consciously disregarded the risk that an objectionable event for which he was responsible would require a mistrial at the defendant's request."); *Commonwealth v. Smith*, 532 P.A. 177, 182 (1992)(the Pennsylvania Supreme Court determined the double jeopardy clause "prohibits retrial of a defendant when prosecutorial misconduct is intended to provoke the defendant into moving for a mistrial, but also when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial."); *State v. Kennedy*, 666 P.2d 1316, 1326 (Or. 1983)(Oregon Supreme Court determined that retrial is barred by double jeopardy when "improper official conduct is so prejudicial to the defendant that it cannot be cured by means short of a mistrial, and if the official knows that the conduct is improper and prejudicial and either intends or is indifferent to the resulting mistrial or reversal."); *Pool v. Superior Court*, 139 Ariz. 98, 108-109 (1984)(The Arizona Supreme Court determined that double jeopardy bars further prosecution despite defendant's own request for a mistrial when (1) mistrial is granted because of improper conduct or actions by prosecution, (2) conduct is not merely the result of legal error, negligence, mistake, but amounts to intentional conduct, and (3) prejudicial ensues which cannot be cured by means short of a mistrial).

## B. Outrageous Government Conduct and Due Process

When the governmental conduct is "so grossly shocking and so outrageous as to violate the universal sense of justice" the indictment must be dismissed. *United States v. Holler*, 411 F.3d 1061 (9th Cir. 2005). A prosecution results from outrageous government conduct when the actions of government agents are "so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *United States v. Pedrin*, 797 F.3d 792, 795 (9th Cir. 2015); *citing United States v. Russell*, 411 U.S. 423, 431-32 (1973). When a sufficient showing of outrageous government conduct is made, the "federal court <u>must dismiss a prosecution based on such actions</u>." *Id.* (emphasis added); *See also, Chapman*, 524 F.3d at 1084; *United States v Barrera-Moreno*, 951 F.2d 1089, 1091 (9th Cir. 1991); *United*

23

*States v. Kohring*, 637 F.3d 895 (9th Cir. 2011)(In the context of a *Brady/Giglio* claim, outrageous government conduct that amounts to a due process violation warrants dismissal of the indictment); *United States v. Fola*, 2015 U.S. Dist. LEXIS 191820, at *8 (D. Haw. 2015)(Finding that if a district court finds *Brady*, *Giglio*, or *Jencks* violations, dismissal of the indictment is warranted if the prosecution's actions amounts to outrageous government conduct); *United States v. Dodd*, 2014 U.S. Dist. LEXIS 92697 (E.D. Wash. 2014)(offensive or outrageous conduct on the part of the USAO may support dismissal of the indictment).  The power to dismiss the indictment for prosecutorial misconduct amounting to due process should be used sparingly, but "[s]paring use, of course, does not mean no use. Even 'disfavored remedies' must be used in certain situations.'" *Id. citing United States v. Omni Int'l Corp.,* 634 F.Supp. 1414, 1438 (D. Md. 1986).

### C.  Prosecutorial Misconduct and the Court's Supervisory Powers

The district court's supervisory powers "are a means by which the federal courts fulfill their role in the criminal justice system: judicial supervision of the administration of criminal justice in the federal courts implies the duty of establishing and maintaining civilized standards of procedure and evidence." *United States v. Ross*, 372 F.3d 1097, 1107 (9th Cir. 2004); *citing McNabb v. United States*, 318 U.S. 332, 340 (1943). The supervisory powers are meant to be used "to prevent parties from <u>reaping benefit or incurring harm</u> from violations of substantive or procedural rules…" *Ross,* 372 F.3d at 1109 (emphasis added); *citing United States v. Williams*, 504 U.S. 36, 46 (1992).  The court's power to dismiss an indictment "protects the integrity of the federal courts and prevents the courts from making themselves 'accomplices in willful disobedience of law.'" *United States v. Bundy*, 968 F.3d 1019, 1030 (9th Cir. 2020);  *citing McNabb v. United States*, 318 U.S. 332, 345 (1943). Brady violations, like other constitutional violations, may warrant the dismissal of the indictment.  *See*, *e.g.*, *Chapman*, 524 F.3d at 1077; *United States v. Kearns,* 5 F.3d 1251, 1253-54 (9th Cir. 1993). Importantly, a district court has the authority to dismiss an indictment even if the conduct does not rise

to the level of a due process violation. *Id. citing United States v. Barrera-Moreno*, 951 F.2d 1089, 1091 (9th Cir. 1991).

The Ninth Circuit has articulated three legitimate bases for the dismissal of an indictment with prejudice: (1) to implement a remedy for a violation of a recognized statutory or constitutional right; (2) to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and (3) to deter future illegal conduct. *United States v. Matta-Ballesteros*, 71 F.3d 754, 763 (9th Cir. 1995).

The law is clear that the government is required to promptly produce to the defense all information favorable to the defense, regardless of materiality. *See, e.g., United States v. Bundy*, 968 F.3d 1019, 1033 (9th Cir. 2020)(requiring all favorable evidence to be disclosed by prosecutors pretrial, without regard to materiality: "[T]rial prosecutors must disclose favorable information without attempting to predict whether its disclosure might affect the outcome of the trial. . . . The retrospective definition of materiality is appropriate only in the context of appellate review" and not at the trial level.)(citation omitted); *United States v. Price*, 566 F.3d 900 (9th Cir. 2009)(requiring prosecutors to produce all potentially exculpatory or otherwise favorable evidence without regard to how the withholding of such evidence might be viewed as affecting the outcome of the trial); *United States v. Olsen*, 704 F.3d 1172, 1183 n.3 (9th Cir. 2013)(explaining that a prosecutor should not produce only what he considers "material" because it is "just too difficult to analyze before trial" what may be material). *See also* California RPC 3.8 (applicable to federal prosecutors pursuant to 28 U.S.C. § 530B(a) and requiring disclosure to the defense without regard to materiality); Justice Manual 9-5.001(B)(1) (requiring AUSAs to "err on the side of disclosing exculpatory and impeaching evidence.").

Moreover, *Brady* encompasses impeachment evidence, and evidence that would impeach a central prosecution witness is indisputably favorable to the accused. *See Giglio v. United States*, 405 U.S. 150, 154 (1972); *see also United States v. Blanco*, 392

F.3d 382, 387 (9th Cir. 2004)("*Brady/Giglio* information includes 'material . . . that bears on the credibility of a significant witness in the case.'") (omission in original) (quoting *United States v. Brumel-Alvarez*, 991 F.2d 1452, 1461 (9th Cir. 1992)).

The suppression of evidence favorable to an accused is itself sufficient to amount to a denial of due process. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The prosecution's suppression of evidence that is favorable to the accused "violates due process where the evidence is material either to guilt or to punishment, irrespective of good faith or bad faith of the prosecution." *Id.* at 88. Under *Brady*, the prosecution is "trusted to turn over evidence to the defense because its interest is not that it shall win a case, but that justice shall be done." *United States v. Bundy*, 968 F.3d 1019, 1023 (9th Cir. 2020)(affirming the district court's dismissal of a twenty-one defendant obstruction case because the government disregarded its *Brady* obligations by failing to disclose materials until several days into trial).  Because the prosecution is in a unique position to obtain information known to other agents of the government, it may not be excused from disclosing what it does not know but could have learned." *Price*, 566 F.3d at 909; *quoting United States v. Zuno-Acre*, 44 F.3d 1420, 1427 (9th Cir. 1997).  Indeed, the Ninth Circuit has made clear that a Brady violation is **NOT** contingent on whether the prosecution team had the information in their possession or even knew of the information.  *Price*, 566 F.3d at 908 ("The District Court misunderstood the law").

The Ninth Circuit's decision in *Bundy* is especially instructive. In *Bundy*, the Court determined that in connection with a *Brady* violation that occurs prior to a conviction, "whether a jury would ultimately find the evidence convincing and lead to an acquittal is not the measuring rod here." *United States v. Bundy*, 968 F.3d 1019, 1033 (9th Cir. 2020). Because there has been no verdict, the "retrospective test, evaluating the strength of the evidence after trial has concluded" is not applicable. *Id.* citing *United States v. Olsen*, 704 F.3d 1172, 1183 (9th Cir. 2013). The Ninth Circuit in *Bundy* determined that "[s]ince the new evidence emerged mid-trial, neither the district court (in the first instance) nor we (as a reviewing court) can measure prejudice against all the

evidence produced during the trial." *Id.* Indeed, the misconduct by the government need not be intentional or malicious to justify the dismissal of the indictment. *Id.* at 1038. In *Bundy*, the Ninth Circuit upheld the district court's granting of a motion for a mistrial and ultimately the dismissal of the indictment with prejudice when the government may not have made a conscious choice to withhold the exculpatory material but, "[a]t best, the government failed to appreciate the relevance of the evidence. At worst, it sought to handicap the defendants by withholding evidence directly relevant to mens rea. In either circumstance, the government fell well short of its obligations to work toward fairly and faithfully dispensing justice rather than simply notching another win." *Id.* at 1041. The Court concluded that retrial was inappropriate:

> "[the district court] found that retrying the case 'would only advantage the government by allowing them to strengthen their witnesses' testimony based on the knowledge gained from the information provided by the defense and revealed thus far.' The district court explained that the government could 'perfect its opening statements based on the revealed defense strategy in its opening and … conduct more strategic voir dire at the retrial. . . . Not only would the *Brady* documents affect the *defendants'* strategy, it might well have altered the *prosecution's* strategy. Having 'tr[ied] out its case' and 'identif[ied] … problem area[s],' the government could have 'correct[ed] those problems in a retrial.'" *Id.* at 1044 (emphasis in original); *citing Chapman*, 524 F.3d at 1087.

Reckless disregard or flagrant misconduct is sufficient to justify the dismissal of the indictment with prejudice. *Id.* The Bundy court also acknowledged the need to impose a stiff sanction to deter future government misconduct. In *Bundy*, the district court described how, like in this case, "the government blamed the defense for not requesting more specific information … the government continued to maintain that it never had an obligation to turn these documents over and that any omission on the government's part was the fault of the defendants…" *Id.* at 1044. In upholding the decision, the Ninth Circuit stated, "given the government's efforts to minimize the defendants' discovery requests and its misrepresentations to the district court in such a

high-profile case, the district court understandably sought a remedy that would reinforce the seriousness of the violations here." *Id.* at 1045. The *Bundy* matter has many parallels to the case before the Court, and the same remedy should be granted to Mr. Avenatti.

Several other courts have similarly determined that the dismissal of the indictment was the only remedy that could cure the prejudice caused to the defendant. *See Chapman*, *supra*, 524 F.3d 1073 (9th Cir. 2008)(upholding the district court's dismissal of the indictment when the government suppressed *Brady* and *Giglio* materials and made affirmative misrepresentations of full compliance, which amounted to a finding of flagrant prosecutorial misconduct despite the court's finding that the discovery omissions were unintentional); *United States v. Fitzgerald*, 615 F.Supp.2d 1156 (S.D. Cal. 2009)(dismissal of the indictment was proper when the government recklessly disregarded its discovery obligations by failing to disclose defendants' prior recorded statements and a retrial would have substantially prejudiced the defendant); *United States v. Aguilar Noriega*, 831 F. Supp. 2d 1180 (C.D. Cal. 2011)(vacating conviction and dismissing indictment after the discovery of *Brady* violations and finding that "charges were filed against [the defendants] as a result of a sloppy, incomplete and notably over-zealous investigation that was so flawed that the Government's lawyers tried to prevent inquiry into it."); *United States v. Govey*, 284 F.Supp.3d 1054 (C.D. Cal. 2018)("the Government's belated and voluminous production of material documents on the eve of trial created an impossible situation and forced the court to decide between either dismissing the charges or violating the Defendant's constitutional rights.").

### D. The Facts and the Law Require the Court to Preclude The Government from Re-Trying the Defendant and Issue a Dismissal With Prejudice

The law and the facts support a dismissal of the Indictment with prejudice and an order that the government is precluded from re-trying the defendant.  For years, defendant sought highly relevant financial discovery that was required to be produced by the government pursuant to significant authority, including Rule 16, *Brady*, *Giglio*, *Price*, *Bundy*, and the Court's January 2021 Order. In response, time and time again, the

government misled the defense and the Court, and withheld the materials. Even when defendant raised his concerns on the eve of trial and during trial, the government made no effort to acquire the information and produce it to the defendant, while at the same time falsely claiming that all discovery and *Brady* material had been produced. All of this conduct was undertaken by the government will full knowledge that critical information had not been produced and, if such failures were discovered before a verdict was reached, defendant would be required to seek a mistrial, thus giving the government two bites at the same apple.

The record simply does not support any determination or inference that the government did not engage in purposeful misconduct designed to severely prejudice the defendant, including by goading the defendant into seeking a mistrial.  The government was informed repeatedly for years about the importance of the financial data - by Ms. Regnier, by government expert John Drum, and by the defense.  Indeed, the record is replete with countless instances of the defendant requesting copies of the data and information so that he could properly mount a defense.  These requests began on the day the indictment was filed in April 2019 and continued up through late August 2021 (some six weeks into trial).  Despite the requests, and this Court's Order of January 25, 2021, <u>the government continued to withhold the information and made no effort to produce it</u>. **This was not mere negligence, it was purposeful conduct inconsistent with justice and defendant's constitutional rights.**

The government should not be permitted to benefit from its acts of withholding highly relevant discovery for years and causing the mistrial. Due to the timing of the mistrial, after the completion of the government's case-in-chief and near the end of the defendant's case, most of the defendant's strategies were revealed to the prosecution team. The prosecution had the benefit of learning Mr. Avenatti's strategies utilized during his voir dire and the defense's precise attacks on the government's case were revealed during his opening statement. The government also now has the benefit of knowing precisely which questions Mr. Avenatti will likely ask 21 of its witnesses,

including its key financial expert. Retrying this case would only advantage the government by allowing the prosecution, armed with the knowledge obtained from the first trial, to strengthen their witness' testimony and prepare them for Mr. Avenatti's cross-examination. The government will tailor its opening statement and voir dire to Mr. Avenatti's defense and will also likely limit their direct examination of witnesses to prevent Mr. Avenatti from being afforded the opportunity to explore unfavorable areas of testimony on cross-examination.  In essence, the government will only benefit from the retrial and will be permitted to fill in evidentiary gaps, correct loose ends, and clean up its prosecution to Mr. Avenatti's detriment. Indeed, as a result of the government's act of withholding evidence and a resulting re-trial, Mr. Avenatti would continue to suffer the prejudicial results while the prosecution would benefit from being given a *free* trial with no adverse consequences.

The government flagrantly and blatantly disregarded its discovery obligations, misled the Court and the defendant on numerous occasions, violated this Court's January 25, 2021 Order [Dkt. 408] and defendant's right to due process as guaranteed under the Constitution, and goaded the defendant into having to move for a mistrial.  Accordingly, double jeopardy, the government's misconduct, this Court's January 25, 2021 Order and defendant's due process rights all require that the Court dismiss the Indictment with prejudice and prevent the government from re-trying the defendant.

## IV.    CONCLUSION

For each of the reasons stated above, defendant respectfully requests that the Court dismiss the indictment in its entirety with prejudice and enter an order precluding the government from re-trying the defendant.

Dated:  September 20, 2021                    Respectfully submitted,

/s/ Michael J. Avenatti

Defendant
MICHAEL JOHN AVENATTI

30

### CERTIFICATE OF SERVICE

I, H. Dean Steward, am a citizen of the United States, and am at least 18 years of age. My business address is 17 Corporate Plaza, Suite 254 in Newport Beach, California. I am not a party to the above-entitled action.  I have caused, on September 20, 2021, service of the:

DEFENDANT'S MOTION TO DISMISS DUE TO DOUBLE JEOPARDY, PROSECUTORIAL MISCONDUCT, CONTEMPT OF THIS COURT'S JANUARY 25, 2021 ORDER [Dkt. 408], AND VIOLATIONS OF DEFENDANT'S RIGHT TO DUE PROCESS

on the following party, using the Court's ECF system:

AUSA BRETT SAGEL AND AUSA ALEXANDER WYMAN

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 20, 2021

/s/ H. Dean Steward

H. Dean Steward