TRACY L. WILKISON
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
ALEXANDER C.K. WYMAN (Cal. Bar No. 295339)
Assistant United States Attorney
Major Frauds Section
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-2435
    Facsimile: (213) 894-6269
    Email:   Alex.Wyman@usdoj.gov

BRETT A. SAGEL (Cal. Bar No. 243918)
Assistant United States Attorney
    Ronald Reagan Federal Building
    411 West Fourth Street, Suite 8000
    Santa Ana, California 92701
    Telephone:  (714) 338-3598
    Facsimile:  (714) 338-3708
    Email:    Brett.Sagel@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | SA CR No. 19-061-JVS |
|       Plaintiff, | GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS (CR 822); EXHIBIT |
|         v. | |
| MICHAEL JOHN AVENATTI, | Hearing Date: October 4, 2021 |
|       Defendant. | Hearing Time: 9:00 AM |
| | Location:    Courtroom of the Hon. James V. Selna |

Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorneys Brett A. Sagel and Alexander C.K. Wyman, hereby files its opposition to defendant's motion to dismiss (CR 822).

This opposition is based upon the attached memorandum of points and authorities, the attached exhibit, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: September 24, 2021

Respectfully submitted,

TRACY L. WILKISON
Acting United States Attorney

SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division


              /s/
_____
BRETT A. SAGEL
ALEXANDER C.K. WYMAN
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# TABLE OF CONTENTS

I.    INTRODUCTION..................................................1

II.   BACKGROUND....................................................1

    A.   Procedural Background Regarding the EA LLP Servers........1

    B.   The Court's Finding of a Brady Violation.................13

    C.   The Tabs Data on the EA LLP Servers.....................15

III.  ARGUMENT.....................................................16

    A.   Defendant's Motion to Dismiss Fails Because There Was
        No Government Misconduct, Let Alone Outrageous
        Misconduct..............................................16

        1.   The Court Already Found That There Was No
            Misconduct.........................................17

        2.   There Was No Government Misconduct..................19

    B.   The Double Jeopardy Clause Does Not Prevent
        Prosecution.............................................26

        1.   The Court Did Not Abuse Its Discretion in Finding
            a Mistrial Justified by "Manifest Necessity"........27

        2.   Defendant Affirmatively Requested The Mistrial......28

    C.   Defendant's Remaining Unsupported Accusations of
        Misconduct Are Meritless and Provide No Basis for
        Relief..................................................30

IV.   CONCLUSION...................................................30

**TABLE OF AUTHORITIES**

**Cases**

Benn v. Lambert,
    283 F.3d 1040 (9th Cir. 2002) .................................. 22

Bonnaudet v. Henry,
    303 F. App'x 375 (9th Cir. 2008) ........................... 23-24

Comstock v. Humphries,
    786 F.3d 701 (9th Cir. 2015) .................................. 21

Cunningham v. Wong,
    704 F.3d 1143 (9th Cir. 2013) ............................. 23, 24

Diep v. Cate,
    749 F. App'x 534 (9th Cir. 2018) ................... 21, 23, 24

Evans v. Michigan,
    568 U.S. 313 (2013) ...................................... 26, 29

Jeffers v. United States,
    432 U.S. 137 (1977) .......................................... 30

Paonessa v. Hall,
    241 F. App'x 391 (9th Cir. 2007) ......................... 22-23

Pennsylvania v. Ritchey,
    480 U.S. 39 (1987) ...................................... *passim*

Raley v. Ylst,
    470 F.3d 792 (9th Cir. 2006) ..................... 21, 22, 23, 24

Sanchez v. United States,
    50 F.3d 1448 (9th Cir. 1995) ................................. 25

Spencer v. Coursey, No. 2:18-CV-00126-AC,
    2020 WL 10505228 (D. Or. Mar. 26, 2020) ..................... 21

Tennison v. City & Cnty. of San Francisco,
    570 F.3d 1078 (9th Cir. 2009) ................................ 22

Oregon v. Kennedy,
    456 U.S. 667 (1982) ...................................... 27, 29

United States v. Price,
    566 F.3d 900 (9th Cir. 2009) ................................. 20

United States v. Aichele,
    941 F.2d 761 (9th Cir. 1991) ....................... 21, 22, 24

ii

United States v. Bailleaux,
  685 F.2d 1105 (9th Cir. 1982) ................................ 22

United States v. Bond,
  552 F.3d 1092 (9th Cir. 2009) ............................ 21-22

United States v. Bundy,
  968 F.3d 1019 (9th Cir. 2020) .................... 17, 18, 19, 28

United States v. Cano,
  934 F.3d 1002 (9th Cir. 2019) ................................ 25

United States v. Chapman,
  524 F.3d 1073 (9th Cir. 2008) ........................ 18, 27, 28

United States v. Dinitz,
  424 U.S. 600 (1976) ..................................... 28, 30

United States v. Doe,
  125 F.3d 1249 (9th Cir. 1997) ............................... 18

United States v. Dupuy,
  760 F.2d 1492 (9th Cir. 1985) ............................... 21

United States v. Fern,
  155 F.3d 1318 (11th Cir. 1998) .............................. 29

United States v. Fernandez,
  231 F.3d 1240 (9th Cir. 2000) ............................... 25

United States v. Gaytan,
  115 F.3d 737 (9th Cir. 1997) ............................ 26, 28

United States v. Gordon,
  844 F.2d 1397 (9th Cir. 1988) ............................... 25

United States v. Higgs,
  663 F.3d 726 (4th Cir. 2011) ................................ 23

United States v. Jernigan,
  492 F.3d 1050 (9th Cir. 2007) (en banc) ................. 19, 20

United States v. Kearns,
  5 F.3d 1251 (9th Cir. 1993) ............................. 17, 18

United States v. Kohring,
  637 F.3d 895-13 (9th Cir. 2011) ......................... 18, 26

United States v. Pedrin,
  797 F.3d 792 (9th Cir. 2015) ............................ 17, 18

United States v. Scott,
  437 U.S. 82 (1978) ...................................... 29, 30

United States v. Toilolo,
    666 F. App'x 618 (9th Cir. 2016) ............................ 18

United States v. Wilson,
    160 F.3d 732 (D.C. Cir. 1998) .............................. 25

United States v. You,
    382 F.3d 958 (9th Cir. 2004) ............................... 28

Currier v. Virginia,
    138 S. Ct. 2144 ..................................... 28, 29, 30

**Other**

U.S. Const. Amend. V .......................................... 26

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

### I.   INTRODUCTION

3    "I find no misconduct on the part of the Prosecution Team and no

4    misconduct on the part of the Taint Team."  (RT 8/24/2021 at 64.)

5    Those were the Court's findings in granting defendant's motion for a

6    mistrial.  Defendant seeks to ignore those findings in his motion to

7    dismiss, in which he mischaracterizes the record; lodges unsupported,

8    ad hominem accusations against the prosecutors; and pretends that the

9    government "goaded" him into seeking a mistrial despite the

10   government's consistent opposition to his serial mistrial motions.

11   Defendant provides no basis for dismissal.  Dismissal of an

12   indictment under either the Due Process Clause or the Court's

13   supervisory powers requires the Court to find "outrageous,"

14   "flagrant" misconduct found only in the most "egregious" of cases.

15   Defendant cannot establish any such misconduct because, as the Court

16   has already held, there was no government misconduct at all.

17   Moreover, defendant's double jeopardy claim fails both because there

18   was manifest necessity for a new trial and because defendant was the

19   one who asked for the mistrial, thereby consenting to the retrial.

20   And although defendant includes his usual bluster accusing the

21   government of all sorts of misconduct, none of his accusations are

22   supported by any evidence, and none provides any basis for dismissal.

23   The Court should deny defendant's motion in its entirety.

24

### II.  BACKGROUND

25

#### A.   Procedural Background Regarding the EA LLP Servers

26   On March 25, 2019, federal agents arrested defendant and

27   executed search warrants at defendant's home, Judy Regnier's home,

28   and the offices of the X-Law Group (8:19-mj-247, 8:19-mj-242, 8:19-

mj-244.)  On April 3, 2019, the court-appointed receiver for Eagan Avenatti LLP ("EA LLP") consented to IRS-CI creating a forensic copy of the EA LLP computer servers.  (CR 55, Ex. 7.)  On May 24, 2019, the government obtained a warrant to search the six digital devices that constituted the EA LLP servers.  (8:19-mj-419.)  Based on the initial warrant and subsequent orders extending the time to search the servers, the government was authorized to search the servers between approximately May 24, 2019, and November 20, 2020.  The warrants contained detailed protocols for the process and manner in which the government could search the digital devices, including the use of a Privilege Review Team ("PRT").

Throughout this case, the government provided updates to the Court and defendant about the discovery produced to defendant and the ongoing procedures and protocols used to produce discovery from the servers and other digital devices.  (See, e.g., CR 44, CR 49, CR 99, CR 109, CR 111, CR 168, CR 195, CR 293, CR 317, CR 399, CR 418.)  Even though the procedures and protocols the government would use to search the servers have been known since May 2019 -- and defendant at one point challenged the process before withdrawing his motion (CR 286, CR 378) -- defendant now repeatedly claims the government did not immediately produce materials from the servers.  (CR 822 at 4, 5, 7.)  Indeed, defendant's entire "Factual Background" section simply ignores the search protocols and assumes the prosecution team had full possession of the servers and their content throughout this case and could have produced materials on the servers at any time.

Defendant claims that he "demanded, in April 2019 . . . a forensic copy of the servers so that he could obtain the financial information necessary for his defense, properly calculate the fees,

costs and advances related to his prior representation of his
clients, and present this information to the jury." (CR 822 at 1.)
Defendant does not provide support for this statement, but it appears
he is referring to the email correspondence between defendant's
former counsel John Littrell and the government. (Id. Ex A.) At no
point in the email exchange does Mr. Littrell ask for a copy of the
servers; he only seeks access to the servers and to determine where
they are. (Id.) The government responded that defendant could work
with the EA LLP Receiver to get access to the servers and the
government would produce evidence obtained from the servers "during
the discovery process." (Id.) Defendant's Exhibit A fails to
include Mr. Littrell's response to the government, in which he
stated, "Ok, thanks. We will follow up with the receiver." (Exhibit
1.)[1] The government never stated it would produce such materials "in
the weeks that followed" (CR 822 at 4) because the government knew
the process involved in conducting the privilege review and search
protocols on a multi-Terabyte server would be time-consuming.

Defendant includes information from his May 15, 2019 discovery
letter and his follow-up letter on May 22, 2019, which he claims was
necessitated by not "having [] received any electronic evidence nor
any of the materials requested" the prior week. (CR 822 at 4-5, Exs.
B, C.) Defendant attaches Exhibit F, the government's May 24, 2019
response to defendant's letters, and claims the government "lulled
defendant into believing the government understood their obligations
and would comply with them," but failed to produce the material in

---

[1] Without any citation, defendant claims government counsel
"committed to Mr. Littrell during a subsequent conversation that all
relevant documents from the servers would be promptly produced."

1   the following weeks.  (CR 822 at 5.)  The government's letter (Def.

2   Mot. Exhibit F) shows defendant is not being candid with the Court.[2]

3       Although defendant was initially arrested on March 25, 2019,

4   defendant did not request discovery until May 15, 2019, after H. Dean

5   Steward made his first appearance representing defendant that day.

6   Within hours of the May 15, 2019 status conference, the government

7   provided defendant a draft stipulation and proposed protective order;

8   however, defendant did not return the stipulation to the government

9   until May 20, 2019.  (CR 822 Ex. F at 2.)  The government immediately

10  filed the stipulation for a protective order and provided the first

11  110,000 pages of discovery within 48 hours of the Court issuing the

12  Protective Order.  (Id.)  As the government stated at the May 15,

13  2019 status conference and memorialized in a letter (id.):

> [T]he government is committed to working with the defense
> to resolve any discovery issues amicably and to produce all
> discovery to which defendant is entitled as quickly as
> possible.  Instead of attempting to blame the government
> for delays defendant himself has caused, we would []
> encourage you to work with us to resolve these discovery
> issues in a constructive manner.

18      This letter explained that the government would "produce any

19  relevant evidence seized from the EA LLP server once the government

20  completes the review protocols set forth in the search warrant."

21  (Id. at 5.)  It also detailed the issues with providing defendant

22  with a forensic copy of the servers without consent of the Receiver

23  or a court order.  (Id. at 5-6.)  In relation to defendant's access

24  to the servers, the government also stated: "We would also be glad to

26      [2] Defendant states that his May 22, 2019 letter "also requested
an inventory of the materials seized." (CR 822 at 5.)  Defendant's
27  Exhibit F does not include the additional sixteen pages produced to
defendant in the government's May 24, 2019 letter that includes the
28  requested search warrant inventories.  The government immediately
provided defendant with the discovery in the government's possession.

4

discuss alternative procedures to ensure that you are able to access any information on the EA LLP server that you believe may be relevant to your client's defense, such as providing you and your client an opportunity to review the forensic image of the EA LLP server at IRS-CI's offices." (Id. at 6.)  In response, defendant neither sought to review the servers at IRS-CI nor sought a court order to get a copy of the server (until the government raised it with the Court).

At the status conference on July 8, 2019, the government asked the Court to "set a deadline for the defendant to file a motion" as to whether he was entitled to a copy of the servers, which the Court set for July 29, 2019. (RT 7/8/19 at 3, 6.)  At the hearing, the government described the protocols and process being used to search the servers, and discussed with the Court how the government was prioritizing identifying the client files related to the counts in the indictment. (Id. at 10, 11.)  The Court asked the government to file a status report by July 22, 2019 with a timetable to produce the client files related to counts in the indictment. (Id. at 11-12.)

On July 22, 2019, the government filed its status report, again detailing the procedures and protocols the government was using to search the servers. (CR 49 at 2-5.)  The government detailed how the PRT was "attempting to identify any folders on the EA LLP server that contain information relating to the individual client-victims or other specific categories of documents covered by the search warrants so that the review of these materials can be prioritized." (Id. at 5.)  The government noted:

> The defense is welcome to provide the [PRT] with any
> information defendant believes may assist the [PRT] in
> identifying specific client files or any other relevant
> information on the EA LLP server or other devices.  Such
> information would allow the [PRT] to expedite the review

1  and production of such records to defendant, including the
2  documents and records identified in defendant's portion of
   the July 1, 2019, joint report (CR 44 at 6).

3  (Id. at 5 n.3.)  To the government's knowledge, defendant did not

4  provide any information to the PRT or anyone else to assist in

5  expediting the review and production of the relevant information,

6  including the client files defendant claimed he was seeking.

7       On July 25, 2019, the government called and spoke with Judy

8  Regnier; the "purpose of the call was to ask questions regarding the

9  Eagan Avenatti LLP server and how client files are created and

10  maintained on the server."  (CR 822 Ex. H.)  Without citation or

11  support, defendant claims in his motion that the government

12  repeatedly told the Court and defendant that the prosecution team had

13  "nothing to do with determining what information from the EA servers

14  was relevant to the case or should be produced."  (CR 822 at 7 n.5.)[3]

15  Defendant then asks -- disingenuously -- "why would four members of

16  the prosecution team have conducted a lengthy[4] interview with Ms.

17  Regnier about the servers and what client information was contained

18  on the servers?"  (Id.)  The cover of the report states the reason:

19  to obtain information regarding how client files were maintained on

20  the server.  Moreover, the Court and the government had discussed for

21  the prior few weeks the government making all efforts to identify the

22  client files as defendant claimed they were vital.  (CR 44 at 6.)

23

24  ───────────────

25  [3] The prosecution team has repeatedly described to the Court and
   defendant the process for searching the digital devices, which
26  included the prosecution team providing to the PRT key word searches
   and the information within scope so the PRT could conduct the
27  searches.  The prosecution team, however, was not involved in looking
   at the digital devices and never had the devices in its possession.

28  [4] As the report demonstrates, the phone call lasted
   approximately 40 minutes.  (CR 822 Ex. H.)

On July 28, 2019, defendant filed a motion seeking "unfettered access" to servers, claiming that access to the servers was critical to his defense.  (CR 50.)  Defendant made no reference to "Tabs" data.  On August 12, 2019, the government opposed defendant's request as the servers did not belong to defendant, but noted that the government had offered alternative procedures to defendant for over three months to have access to the servers, including inspecting the servers at IRS-CI and working with the PRT to identify any information on the servers defendant believed was relevant to his defense.  (CR 55 at 22-23.)  The government had offered defendant to work with the PRT or the Receiver, but defendant refused the alternatives.  The government also stated that defendant had failed to specify any files or documents he believed were missing or that he needed, and the government identified the financial records it had already produced, including the QuickBooks files.  (Id. at 10-11.)

On August 19, 2019, defendant filed a reply in which he failed to address anything in the government's opposition and merely continued to claim he wanted unfettered access to the servers.  (CR 62.)  Defendant again said nothing about wanting Tabs data.  (Id.)  The Court denied defendant's motion, ruling that neither defendant's "broad brush demand for 'unfettered' access to the Subject Devices nor his list of categories" provided defendant with a right to the servers.  (CR 63.)  The Court remarked that the government was already producing financial discovery, including the QuickBooks records, and defendant had two alternative means to obtain the records he sought, but failed to avail himself of them.  (Id.)

After the Court denied defendant's request for unfettered access to the servers, defendant requested for the first time to review the

servers and the government arranged for defendant to meet with the PRT at IRS-CI's offices in Los Angeles.  To facilitate this review, an IRS-CI computer specialist, Special Agent Nshan Tashchyan, set up a virtual computer system to access and search the forensic copy of the servers under the supervision of the PRT.  Defendant and his counsel only visited IRS-CI on two occasions, once in September 2019 and once in October 2019.  (CR 822 at 9.)  According to defendant, defendant twice requested that the PRT run searches on the servers relating to the victim-clients named in the indictment.  (CR 178 at 2.)  Based on defendant's visits to IRS-CI and his search requests, the PRT made three discovery productions to defendant consisting of 10,156 files, 244 files, and 40,960 files on October 1, 2019, October 21, 2019, and October 24, 2019, respectively.  (CR 195 at 5.)

In his motion, defendant claims that after the Court denied his motion for unfettered access to the servers, "[defendant] and his counsel were subsequently permitted access to certain emails and client pleadings stored on the servers by visiting IRS-CI's Los Angeles office on two occasions in September and October of 2019 but were not permitted any access to any other files, data or software programs on the servers."  (CR 822 at 9 n.7.)  Defendant provides no support for this statement, and the record, including testimony at trial and statements by defendant's counsel, flatly contradicts it.

First, the government offered defendant access to the servers from the start of the case (see, e.g., CR 822 Ex. F at 6), and defendant first sought access six months after being charged.

Second, Agent Tashchyan testified at trial that when defendant and his attorney reviewed the servers, Agent Tashchyan "gave them everything they asked for."  (RT 8/19/21, Vol. 2, at 13-16.)  As

1   Agent Tashchyan testified, "[w]hatever [defendant and his attorney]

2   wanted, it was exported out and provided to [them]," he never told

3   "defendant or his attorney that they could not have anything that

4   they asked for," and defendant never "ask[ed] [Agent Tashchyan] for

5   access to a software program called Tabs."  (Id. at 15-16.)  After

6   defendant on cross-examination argued that Agent Tashchyan had to ask

7   the PRT for approval before disclosing materials to defendant, Agent

8   Tashchyan testified on redirect that no one "ever [told him] that

9   [he] could not provide the defendant with anything on that list" from

10  the defense: "Everything on the list was provided."  (Id. at 24.)

11      Third, the defense itself consistently stated that the PRT

12  provided everything defendant wanted.  At the December 12, 2019

13  status conference, defense counsel stated that the PRT had "been very

14  cooperative in terms of being available for us and giving us what we

15  request."  (RT 12/2/2019 at 5-6.)  On April 27, 2020, defense counsel

16  reiterated that the PRT was "very accommodating" and "cooperative."

17  (RT 4/27/2020 at 5.)  In defendant's June 7, 2020 supplemental status

18  report, defendant stated the defense "enjoyed a professional,

19  cooperative relationship with the [PRT] with no disputes."  (CR 178

20  at 2.)  Defendant had access to the forensic copy of the servers and

21  the PRT gave him the files "[he] request[ed]" with "no disputes."

22      In addition to the files produced to defendant based on his

23  requests and visits to IRS-CI in September and October 2019, the PRT

24  also produced other discovery to defendant as detailed in various

25  status reports throughout the case.  For example, based on the

26  interview with Ms. Regnier that identified the FileSite system for

27  maintaining client files, the PRT provided to defendant directly

28  approximately 2,760 files (the entire contents) from the electronic

1  FileSite case files system on the servers for client files related to

2  Geoffrey Johnson, Alexis Gardner, and Gregory Barela (produced in

3  September 2019).[5]  (CR 99 at 4.)  Consistent with the testimony of

4  Mr. Johnson, Ms. Gardner, and Mr. Barela that defendant never

5  provided them an accounting for their cases, there appear to be no

6  accounting records and costs and expense records in the individual

7  client files maintained on FileSite.  The PRT also provided defendant

8  a list of folder names on the servers in September 2019.  (CR 99 at

9  10.)  To the government's knowledge, despite having the folder names

10  on the servers, defendant did not ask for any Tabs data.[6]

11      In his motion, defendant maintains that the government "was

12  reminded of the existence and importance of the financial data

13  contained on the servers" during the November 19, 2019 interview with

14  Ms. Regnier when she mentioned Tabs.  (CR 822 at 9.)  Ms. Regnier did

15  mention Tabs in her interview, which lasted the entire day, as

16  documented in one sentence of paragraph 14 -- the entire report has

17  120 paragraphs over 14 single-spaced pages.  (CR 822 Ex. I.)  When

18  Ms. Regnier made this statement, the PRT was still conducting its

19  review of the servers and defendant never once asked for Tabs data.

20      In May 2020, defendant filed several status reports complaining

21  about various issues, including purported discovery issues.  (CR 164;

22  CR 165; CR 167).  The government responded to defendant's discovery

23  complaints demonstrating that defendant was -- as the Court itself

24  _____

25  [5] As Ms. Regnier stated in her July 25, 2019 telephone call, she
did not believe there would be a case file for Michelle Phan on
26  FileSite as defendant handled this case on his own outside the firm.

27  [6] The prosecution team is not privy to communications between
defendant and the PRT, but if defendant continues to claim the PRT
denied his access to certain files, data, or software programs, the
28  Court should permit the PRT to provide communications between the PRT
and defendant to the prosecution team to be made part of the record.

1  stated at the next hearing -- not being candid with the Court.  (CR

2  168.)  Responding to defendant's general claims that he should be

3  able to use the PRT to conduct any searches he wanted regardless of

4  whether the information was already produced in discovery, the

5  government noted: "if defendant believes that there are any

6  discoverable documents that have not yet been produced, defendant

7  should be required to identify such documents with specificity to the

8  Prosecution Team or the Court so that any such issues can be resolved

9  efficiently and effectively."  (Id. at 8-9.)  In response to

10  defendant's general claims that discovery was missing, the government

11  responded, "[i]f defendant believes there are relevant discoverable

12  materials that are missing, he should file a properly noticed motion

13  and identify those materials with specificity."  (Id. at 11.)

14  Defendant never identified Tabs data to the government or the Court

15  as missing discovery nor filed a motion identifying any missing

16  discovery with specificity.  The PRT substantially completed its

17  review of the servers and produced the discovery from the servers

18  directly to defendant in March 2020.  (Id. at 2.)

19       After receiving the discovery from the servers, on June 15,

20  2020, defendant sought further access to the EA LLP devices claiming

21  he needed access to critical material for his defense, but again did

22  not mention Tabs.  (CR 193.)  The government opposed, noting that

23  defendant simply offered vague and conclusory claims that he was

24  entitled to the servers and had failed to identify any specific

25  evidence or files that he claimed were not produced.  (CR 195.)  The

26  government described in detail (and attached as exhibits) the records

27  that were obtained from the search (and were in the possession of the

28  prosecution team), including cost and fee information.  The

1   government provided examples of the QuickBooks records produced to

2   defendant (CR 195 Exs. 3-5) as well as the <u>Tabs</u> cost bills attached

3   to emails sent to defendant (<u>id.</u> Exs. 6-7).  These emails with Tabs

4   printouts are what the government introduced into evidence at trial.

5   (Trial Exhibits 48, 174).  At least as of the time of the filing in

6   June 2020, defendant had the reports referencing Tabs data, and after

7   the government filed its opposition on June 22, 2020, defendant knew

8   what the prosecution team had in its possession in relation to Tabs

9   data -- or printouts of the data attached to emails.  Defendant,

10   however, never once asked for additional Tabs data prior to trial.

11        Defendant did <u>not</u> raise the Tabs data at the July 6, 2020

12   hearing on his motion seeking further access to the servers.  The

13   Court addressed defendant's claims as well as "how th[e] situation

14   came about."  (RT 7/6/20 at 11.)  The Court first recognized that the

15   government provided defendant opportunities to meet with the PRT to

16   search the servers, which defendant only availed himself of twice the

17   previous year, but had made no efforts since.  (<u>Id.</u>)  The Court,

18   citing <u>Pennsylvania v. Ritchey</u>, 480 U.S. 39, 59 (1987), found there

19   was no discovery obligation to provide defendant further access, but

20   directed defendant to file a motion to compel if he "believes that

21   there is a gap in the production."  (RT 7/6/20 at 12-13.)  The Court

22   denied defendant's motion.  (CR 199.)  Defendant never filed a motion

23   to compel or identified Tabs data as a "gap in the production."

24        In March 2021, defendant filed a civil contempt motion, which

25   alleged that the government failed to produce "exculpatory financial

26   information relating to fees and expenses."  (CR 415 at 8.)  The

27   government responded that the information was not in its possession,

28   likely did not exist, or was provided to defendant in the previously

produced discovery.  (CR 418 at 14.)  The government detailed the
financial records that the government had produced to defendant
relating to fees and expenses and remarked that it was not the first
time defendant had failed to specify any such missing exculpatory
materials.  (Id.)  Defendant filed a reply and itemized things he did
not believe he received in discovery, but did not identify any
financial documents or programs, specifically Tabs.  (CR 428.)

Defendant now claims that "the record in this case is replete
with the defendant making repeated pre-trial demands for the
financial information related to the alleged victims in this case."
(CR 822 at 10-11.)  Despite the approximately 570 pages comprising
his declaration and exhibits, defendant cannot point to a single time
pre-trial -- or during the first four weeks of trial -- when he asked
for Tabs data or files, because he did not.  Defendant's claims for
over two years were generalized claims identifying nothing specific.

**B.    The Court's Finding of a Brady Violation**

During his opening statement, defendant argued that his victim-
clients did not understand how much of their money he was entitled to
take because of the costs that he incurred during their matters.
(See, e.g., RT 7/21/2021, Vol. 1, at 65, 67.)  Defendant also wrote
out a chart to explain how fees, advances, and expenses are deducted
from the settlement award.  Defendant's cross-examinations focused on
case costs throughout the government's case-in-chief.

On August 12, 2021, day 19 of trial, defendant for the first
time requested the Tabs data from the government as the government
prepared to call its last witness, John Drum.  (RT 8/12/2021, Vol. 1,
at 18 ("Your Honor, in preparing for Mr. Drum's testimony today, it
became apparent to me that the government has not produced the Tabs

13

data relating to the costs to the various clients.").)  Defendant

attempted to prevent Mr. Drum from testifying on the basis that his

testimony was purportedly unreliable because he had not reviewed Tabs

data.  (RT 8/12/2021, Vol. 2, at 66-67.)  The Court responded,

"Assuming you're correct that it wasn't produced, I believe it's a

subject for cross-examination and it goes to the weight, not the

admissibility of his testimony."  (Id. at 67.)

On August 15, 2021, defendant filed a motion to dismiss or, in

the alternative, for a mistrial based on the fact that the government

did not produce the Tabs data.  (CR 706, 733.)  The government

opposed (CR 737), and defendant replied (CR 745).  On August 23,

2021, defendant filed a status report, characterizing as "critical"

and "exculpatory" the Tabs data he had reviewed that day after the

Court directed the PRT to make the servers available to defendant

again so that he could look for the Tabs data.  (CR 775 at 4, 5.)

On August 24, 2021, the Court held a hearing on defendant's

motion to dismiss or for a mistrial, and during the hearing, stated:

> [I]f there is evidence out there that would have allowed
> the defendant to make a challenge under any theory, I think
> the defendant was entitled to have the data to do that,
> even if in some other fashion you can show prima facie that
> it was correct.  In other words, I think he is entitled to
> make non-winning challenges as well as winning challenges.
> The point is he is entitled to that data to make the
> challenges.

(RT 8/24/21 at 23.)  The government noted that defendant, "on two

occasions that he took advantage of -- and on more occasions, as many

as he wanted, had access to the virtual servers."  (Id.)  The Court

responded, "[T]hat doesn't convince me.  It's the obligation of the

government to produce Brady, Giglio, et cetera.  He is entitled to

sit back and wait for you to serve it up on a platter."  (Id.)

14

1    The Court then made various findings, including that the

2  government had "made a good-faith showing that the Prosecution Team

3  produced all of the Tabs data that it had at Docket No. 737 and the

4  attachment," and that the government "put before the Court and the

5  defendant the totality of the Tabs data that the Prosecution Team

6  had."  (Id. at 24.)  The Court also found that there had been no

7  misconduct by the prosecution team or the PRT.  (Id. at 62, 64.)[7]

8    Nevertheless, the Court declared a mistrial and found a Brady

9  violation on the bases that (1) "the Tabs and other accounting data

10  that was not produced would have been favorable to the defendant";

11  (2) the data "wasn't produced through inadvertence and a failure to

12  appreciate what was there"; and (3) defendant was prejudiced by not

13  having the data because it denied him the ability to use it to cross-

14  examine witnesses, it may have affected the way he "craft[ed] his

15  overall theory of the case and presentation, including the opening

16  statement," and it may have undermined his "ability to question the

17  government's preparation techniques generally."  (Id. at 62-65.)

18    **C.   The Tabs Data on the EA LLP Servers**

19    On August 25, 2021, defendant requested a status conference to

20  discuss five issues, including a briefing schedule for this motion.

21  (CR 779.)  He claimed he needed to review the Tabs/QuickBooks

22  discovery from the PRT as well as the 6GB of data already produced

23  before filing his brief "to argue associated prejudice."  (Id.)  The

24  Court ordered the stipulated briefing schedule.  (CR 800, 802.)

25

26    [7] Defendant stated his claim was not based on "an isolated, one-
   time failure" of the government, but the Court opted "to concentrate
27  on Tabs and QuickBooks," noting that defendant "made a number of
   [mistrial] motions . . . with respect to allegedly missing documents"
28  and that "[o]n a number of those . . . the claim wasn't substantiated
   when the government made a full showing."  (RT 8/24/21 at 20.)

15

1    Defendant's motion makes passing references to the Tabs data he
2    received in August 2021 and since (CR 822 at 16-17), but does not
3    cite to a single exhibit, file, or record demonstrating that the Tabs
4    data undermines the evidence at trial in any way -- because it does
5    not.  Without any citation or support, defendant claims the Tabs
6    exhibits at trial "were demonstrably false and incomplete and there
7    were over 111 separate financial transactions in the Tabs data that
8    show monies paid by the firm to clients in the indictment or on
9    behalf of those clients."  (Id. at 17.)  Defendant does not attach or
10   identify these specific transactions because these were lulling
11   payments defendant made after he already embezzled his clients'
12   settlement funds.  These payments -- which all took place well after
13   defendant received his clients' settlement money, lied to his
14   clients, and embezzled his clients' money -- were not costs and
15   expenses of the case that would be deducted.  The government provided
16   exhibits and details of the Tabs records in its previous filing (CR
17   809), which it will not repeat here, that demonstrate that the Tabs
18   data on the servers corroborated the government's evidence -- and in
19   some instances showed the government gave defendant credit to which
20   he was not entitled.  (CR 809 at 6-13, Exs. 1-4.)

## III. ARGUMENT

### A.  Defendant's Motion to Dismiss Fails Because There Was No Government Misconduct, Let Alone Outrageous Misconduct

Defendant seeks dismissal of the Indictment under the Due
Process Clause of the Fifth Amendment and under the Court's
supervisory powers.  As his motion concedes, and as the case law
makes plain, dismissal under either theory is only warranted when
there was outrageous government misconduct.  Indeed, "[a]n indictment

16

can be dismissed [for due process violations] only where the
government's conduct is so grossly shocking and so outrageous as to
violate the universal sense of justice." United States v. Pedrin,
797 F.3d 792, 795-96 (9th Cir. 2015) (quotations omitted)).
Similarly, although a court "can dismiss an indictment under its
supervisory powers even if the conduct does not rise to the level of
a due process violation," United States v. Bundy, 968 F.3d 1019, 1030
(9th Cir. 2020) (quotations omitted), the court may do so "only if
there is '(1) flagrant misbehavior and (2) substantial prejudice,'"
id. at 1031 (quoting United States v. Kearns, 5 F.3d 1251, 1253 (9th
Cir. 1993)); see also id. ("Only where the government withheld Brady
material through 'flagrant misconduct,' causing 'substantial
prejudice' to the accused, will justify the court's exercise of its
supervisory powers to dismiss the case with prejudice.").

Accordingly, under either theory, defendant must demonstrate
that the government committed flagrant or outrageous misconduct (in
addition to establishing prejudice).  That he cannot do.  The Court
has already found that there was no government misconduct -- by
either the prosecution team or the PRT -- and there was none.
Defendant's motion fails for that reason alone.

1.   The Court Already Found That There Was No Misconduct

On August 24, 2021, the Court granted defendant's motion for a
mistrial on the basis that defendant was entitled to the Tabs data
under Brady and its progeny.  In doing so, the Court explicitly
stated: "I find no willful conduct on the part of the Prosecution
Team.  I find no willful conduct on the part of the Privilege Review
Team."  (RT 8/24/2021 at 62.)  The Court then repeated those findings
later in the hearing, "I want to go back and emphasize two points.  I

1  repeat my findings that **I find no misconduct on the part of the**

2  **Prosecution Team and no misconduct on the part of the Taint Team.**

3  Shortcomings there may have been, but I find no misconduct,

4  intentional or otherwise, on the part of the Taint Team in carrying

5  out its activity."  (Id. at 64 (emphasis added).)

6      Because the Court has already found that there was no misconduct

7  by the government, the Court must deny defendant's request for

8  dismissal under both the Due Process Clause and the Court's

9  supervisory powers.  See Pedrin, 797 F.3d at 795-96; Bundy, 968 F.3d

10  at 1031; Kearns, 5 F.3d at 1253, 1255 (holding that even though the

11  government's conduct "may have been negligent, or even grossly

12  negligent," it did not rise to the level of flagrant misconduct); see

13  also United States v. Kohring, 637 F.3d 895, 912-13 (9th Cir. 2011)

14  ("The government clearly should have disclosed a substantial amount

15  of the information in question.  However, we do not have sufficient

16  evidence to conclude the prosecution acted flagrantly, willfully, and

17  in bad faith.  As a result, we do not exercise our supervisory

18  authority by dismissing the Superceding Indictment."); United States

19  v. Chapman, 524 F.3d 1073, 1085 (9th Cir. 2008) ("[A]ccidental or

20  merely negligent governmental conduct is insufficient to establish

21  flagrant misbehavior."); United States v. Doe, 125 F.3d 1249, 1257

22  (9th Cir. 1997) ("This [standard for the court's supervisory power to

23  dismiss an indictment] is a high standard, limiting the availability

24  of the defense to extreme cases, and even in some of the most

25  egregious situations it has not been met."); United States v.

26  Toilolo, 666 F. App'x 618, 620 (9th Cir. 2016) ("'extremely high' due

27  process dismissal standard" not met even where the prosecution was

28  "sloppy, inexcusably tardy, and almost grossly negligent").

1

        2.   There Was No Government Misconduct

2    To the extent defendant's motion seeks reconsideration of the

3 Court's finding of no misconduct, he has provided no basis for

4 reconsideration, because there is none.  Indeed, the government

5 maintains that there was no Brady violation at all because the

6 government did not "suppress" any evidence.  But even if there was a

7 violation based on the nondisclosure of the Tabs data, there is no

8 basis to reconsider the Court's finding that such nondisclosure was

9 neither "willful" nor "misconduct."  (RT 8/24/2021 at 62, 64.)

10             a.   The government did not "suppress" any material

11    "[U]nder Brady a defendant is entitled to evidence both

12 favorable to the accused and material either to guilt or to

13 punishment.  Brady evidence can be favorable either because it is

14 exculpatory or impeaching."  Bundy, 968 F.3d at 1031.  To find a

15 Brady violation, a court must find both that the government either

16 "willfully or inadvertently failed to produce the evidence" and that

17 "the suppression . . . prejudiced the defendant."  Id.  In other

18 words, as the Court acknowledged, there are three elements to a Brady

19 claim: (1) "the evidence at issue must be favorable to the accused";

20 (2) "the evidence must have been suppressed by the government

21 willfully or inadvertently"; and (3) "there must be a finding that

22 prejudice must have ensued."  (RT 8/24/2021 at 62); United States v.

23 Jernigan, 492 F.3d 1050, 1053 (9th Cir. 2007) (en banc).

24    Elements one and three -- whether the evidence at issue was

25 "favorable to the accused" and whether there was prejudice -- depend

26 on the nature of the evidence and the effect of the nondisclosure.

27 As a result, these factors are more case-specific than the second

28 element.  For example, in finding a Brady violation, this Court

                              19

1    determined that "the Tabs and other accounting data that was not

2    produced would have been favorable to the defendant."  (RT 8/24/2021

3    at 62.)  Although the data is not "favorable" to defendant in the

4    traditional sense -- it does not negate any of the elements of wire

5    fraud or undermine any of the government's evidence -- the Court

6    nevertheless found that defendant was "entitled [under Brady] to make

7    non-winning challenges as well as winning challenges."[8]  (RT

8    8/24/2021 at 23.)  Consequently, the Court found that defendant was

9    prejudiced (element three) by not having the Tabs data because it

10   deprived him of the ability to use it for cross-examination,[9] because

11   it may have affected the way he "craft[ed] his overall theory of the

12   case and presentation, including the opening statement," and because

13   it may have undermined his "ability to question the government's

14   preparation techniques generally."  (Id. at 62-63.)

15        The second element -- suppression by the government -- is

16   somewhat less fact-specific than elements one and three.  Whether

17   evidence is considered to have been "suppressed" by the government in

18   a given situation has been the subject of many opinions by the

19   Supreme Court and the Ninth Circuit.  It is axiomatic that, "in order

20   for a Brady violation to have occurred, the evidence at issue must

21   have been suppressed by the State."  United States v. Price, 566 F.3d

22   900, 907 (9th Cir. 2009) (quotations omitted)).  "Suppression" of

23   exculpatory evidence occurs "where it is known to the State and not

24

25        [8] The fact that Brady requires only the disclosure of material
26   favorable evidence -- that is, evidence having a reasonable
     probability of affecting the outcome -- undercuts the suggestion that
27   a defendant is entitled to make "non-winning" challenges.

28        [9] As the government argued during the August 24, 2021 hearing
     (RT 8/24/2021 at 22-23), and as is evident from the Tabs printouts
     (CR 809, Exs. 1-4), the data is consistent with Mr. Drum's testimony.

disclosed to the defendant." <u>Comstock v. Humphries</u>, 786 F.3d 701, 709 (9th Cir. 2015). However, "if the means of obtaining the exculpatory evidence has been provided to the defense, the <u>Brady</u> claim fails." <u>United States v. Dupuy</u>, 760 F.2d 1492, 1502 (9th Cir. 1985); <u>see also</u> <u>Spencer v. Coursey</u>, No. 2:18-CV-00126-AC, 2020 WL 10505228, at *11 (D. Or. Mar. 26, 2020) ("<u>Brady</u> applies only to evidence unknown to the defendant at the time of the trial.").

Indeed, the Ninth Circuit has repeatedly held that "where the defendant is aware of the essential facts enabling him to take advantage of any exculpatory evidence, the Government does not commit a <u>Brady</u> violation by not bringing the evidence to the attention of the defense." <u>Raley v. Ylst</u>, 470 F.3d 792, 804 (9th Cir. 2006). Accordingly, the government does not "suppress" evidence where the evidence at issue is "equally and readily available to defense counsel." <u>Diep v. Cate</u>, 749 F. App'x 534, 536 (9th Cir. 2018); <u>see also</u> <u>United States v. Aichele</u>, 941 F.2d 761, 764 (9th Cir. 1991) ("When, as here, a defendant has enough information to be able to ascertain the supposed <u>Brady</u> material on his own, there is no suppression by the government."). Similarly, even if the defense does not actually know of the specific information at issue, there is no suppression if "defendant has enough information to be able to ascertain the supposed <u>Brady</u> material on his own" so long as "there was no government action to throw the defendant off the path of the alleged <u>Brady</u> information." <u>United States v. Bond</u>, 552 F.3d 1092, 1095-96 (9th Cir. 2009) (government did not suppress witness's testimony by failing to call him after indicating it would where defense knew both of witness's existence and substance of likely testimony because it received transcripts of witness's earlier

1  testimony); see also Raley, 470 F.3d at 804 (no Brady violation from

2  failure to disclose exculpatory evidence contained in defendant's

3  medical records because defendant had the "salient facts regarding

4  the existence of the records that he claims were withheld"); Aichele,

5  941 F.2d at 764 (no suppression of witness's file "under the control

6  of California officials" because when "a defendant has enough

7  information to be able to ascertain the supposed Brady material on

8  his own, there is no suppression by the government").[10]

9        During the hearing on August 24, 2021, the Court asked the

10  government: "Would access free you of your obligation under Brady to

11  produce Brady material?  Does access free you of your Brady

12  obligation to produce Brady material?"  (RT 8/24/2021 at 27.)  The

13  answer to those questions is "yes," providing access to the defense

14  does satisfy the government's discovery obligations.  See, e.g.,

15  United States v. Bailleaux, 685 F.2d 1105, 1113 (9th Cir. 1982)

16  ("[Brady] obligates the Government to make available to the defendant

17  all 'evidence favorable to the accused upon request where the

18  evidence is material either to guilt or punishment.'" (quoting Brady,

19  373 U.S. at 87) (emphasis added)); Paonessa v. Hall, 241 F. App'x

20  391, 393 (9th Cir. 2007) (failure to transcribe interview not a Brady

21  violation where tape of the interview "was made available to defense

22

23  ───────────────

24        [10] Cf. Tennison v. City & Cnty. of San Francisco, 570 F.3d 1078,
    1091-92 (9th Cir. 2009) (defendants' awareness that witness "might
25  have information helpful to their case" not equivalent to knowledge
    of witness's extensive exculpatory statements to police, rejecting
26  "as untenable a broad rule that any information possessed by a
    defense witness must be considered available to the defense"
27  (quotations omitted)); Benn v. Lambert, 283 F.3d 1040, 1062 (9th Cir.
    2002) (government suppressed expert opinions because, while
    disclosing experts' names, it "actually misled the defense by
28  disclosing a part of the experts' findings that, read alone, would
    lead to a conclusion directly opposite to the one they reached").

counsel"); <u>United States v. Higgs</u>, 663 F.3d 726, 735 (4th Cir. 2011) (no <u>Brady</u> violation "if the evidence is available to the defense from other sources or the defense already possesses the evidence").  In fact, affirmatively providing access to information -- as the government did here for a year but defendant only availed himself of it on two separate occasions in 2019 and again, at the Court's direction, during trial -- is <u>more</u> than what is required under <u>Brady</u> "where the defendant is aware of the essential facts enabling him to take advantage of any exculpatory evidence," <u>Raley</u>, 470 F.3d at 804, or where the evidence "was equally and readily available to defense counsel," <u>Diep</u>, 749 F. App'x at 536.  In such situations, there is no "suppression" by the government, and therefore no <u>Brady</u> violation.

In nevertheless finding a <u>Brady</u> violation, the Court acknowledged that "suppression" was probably not an "appropriate word in the context," but that the data "wasn't produced through inadvertence and a failure to appreciate what was there."  (RT 8/24/2021 at 62.)  The basis for the Court's finding of "suppression" here appears to be the Court's belief, as expressed at the hearing, that a defendant "<u>is entitled to sit back and wait for</u> [the government] <u>to serve</u> [<u>Brady</u> and <u>Giglio</u> evidence] <u>up on a platter</u>." (<u>Id.</u> at 23 (emphasis added).)  That is not the law.

Rather, as the above case law illustrates, there is no "suppression" of favorable evidence -- and thus no violation of <u>Brady</u> -- where the defendant has sufficient facts to access the evidence for himself.  <u>See, e.g.</u>, <u>Cunningham v. Wong</u>, 704 F.3d 1143, 1154 (9th Cir. 2013) (because the defendant's attorneys possessed the "salient facts" to access the alleged <u>Brady</u> evidence, "[t]here was no suppression of this easily attainable evidence"); <u>Bonnaudet v. Henry</u>,

303 F. App'x 375, 376 (9th Cir. 2008) (because the defendant "took the van to the body shop herself and knew its condition," she was "aware of the essential facts enabling her to take advantage of the exculpatory evidence").  Here, despite making no request for Tabs data prior to August 12, 2021 -- almost one month into trial -- defendant was without question aware of the Tabs data on the servers well in advance of trial.  Defendant was the owner of EA LLP while the firm used the software, and the government's trial exhibits containing Tabs data (Trial Exhibits 48 and 174) show defendant's paralegal, Judy Regnier, sending the Tabs data printouts to defendant in 2015 and 2018.  Moreover, the emails and Tabs data in Trial Exhibits 48 and 174 were attached to the government's response to defendant's second attempt to obtain a forensic copy of the servers in June 2020.  (CR 195 Exs. 6-7.)  Specifically, the government attached the exhibits to show the discovery in the prosecution team's possession already provided to defendant (CR 195 at 18-19) in response to defendant's claim that he needed "cost and fee information" for the cases involving defendant's victims (CR 193 at 2).  Similarly, the references to Tabs in two interview reports with Ms. Regnier in July and November 2019 -- which were the basis for the Court finding that the government was "on notice of the significance of the Tabs data" (RT 8/24/2021 at 56-57) -- were produced to defendant approximately a year and a half before trial began -- on October 5, 2019, and on March 17, 2020.  Accordingly, notwithstanding the Court's finding to the contrary, there was no "suppression" of the Tabs data.  See Cunningham, 704 F.3d at 1154; Raley, 470 F.3d at 804; Aichele, 941 F.2d 761, 764; Diep, 749 F. App'x at 536.

1    Moreover, there is no <u>Brady</u> violation if the material is

2    disclosed "at a time when disclosure would be of value to the

3    accused." <u>United States v. Gordon</u>, 844 F.2d 1397, 1403 (9th Cir.

4    1988).  "<u>Brady</u> merely requires the government to turn over the

5    evidence in time for it to be of use at trial." <u>United States v.</u>

6    <u>Fernandez</u>, 231 F.3d 1240, 1248 n.5 (9th Cir. 2000); <u>see</u> <u>United States</u>

7    <u>v. Wilson</u>, 160 F.3d 732, 742 (D.C. Cir. 1998) (new trial "rarely

8    warranted" if information obtained "in time to make use of it").

9    The government thus respectfully disagrees with the Court's

10   finding of a <u>Brady</u> violation.[11]  Because no <u>Brady</u> violation occurred,

11   there was no flagrant or outrageous government conduct, and therefore

12   no basis to dismiss the Indictment under either the Due Process

13   Clause or the Court's supervisory powers.

14                 *b.    Any "suppression" of material was neither*
                          *flagrant nor intentional*
15

16   To the extent there was a <u>Brady</u> violation, defendant has

17   provided no evidence supporting his accusations that the

18   nondisclosure of the Tabs data was intentional or "flagrant."

19   Indeed, it is undisputed that the Tabs data was never in the

20   prosecution team's possession.  It is, of course, black-letter law

21   that "[t]he government has no obligation to produce information [] it

22   does not possess or of which it is unaware." <u>Sanchez v. United</u>

23   <u>States</u>, 50 F.3d 1448, 1453 (9th Cir. 1995); <u>see also</u> <u>United States v.</u>

24   <u>Cano</u>, 934 F.3d 1002, 1024 (9th Cir. 2019) ("[T]he prosecutor's

25   disclosure obligations turn on the extent to which the prosecutor has

26   knowledge of and access to the documents sought by the defendant.").

27   _____

28       [11] As the government noted in its prior filing (CR 809), the
     government does not seek the Court to reconsider its prior ruling.

1    The Court's finding of a <u>Brady</u> violation appears to depend on

2    its determination that the government was put on notice of the Tabs

3    data due to two interviews with Judy Regnier in 2019 in which she

4    mentioned Tabs.  (RT 8/24/2021 at 56-57.)  But even if the government

5    should have sought access to the Tabs data after these references by

6    Ms. Regnier, there is no basis to suggest that it failed to do so

7    intentionally to deprive defendant of this data, especially since, as

8    discussed above, the data does not help defendant's case -- it only

9    confirms the government's mountain of other evidence introduced at

10   trial showing that defendant stole his clients' money.

11   Absent any evidence of intentional misconduct -- and here there

12   is none -- the remedy for a <u>Brady</u> violation is the remedy defendant

13   already received: a mistrial.  <u>Kohring</u>, 637 F.3d at 913 ("We have

14   previously observed that the appropriate remedy for a <u>Brady</u>/<u>Giglio</u>

15   violation will usually be a new trial." (quotations omitted)).  He is

16   not entitled to any other remedy.  His motion should be denied.

17   **B.   The Double Jeopardy Clause Does Not Prevent Prosecution**

18   Defendant's other basis for his request for dismissal likewise

19   fails.  The Double Jeopardy Clause provides that no person shall "be

20   subject for the same offence to be twice put in jeopardy of life or

21   limb."  U.S. Const. Amend. V.  The Clause generally prevents retrial

22   after a trial has commenced, unless the court finds the mistrial

23   "justified by manifest necessity," <u>United States v. Gaytan</u>, 115 F.3d

24   737, 742 (9th Cir. 1997), or unless "the defendant consents to a

25   disposition that contemplates reprosecution," <u>Evans v. Michigan</u>, 568

26   U.S. 313, 326 (2013).  Either manifest necessity or consent is

27   sufficient to allow retrial.  <u>Gaytan</u>, 115 F.3d at 742.  Accordingly,

28   in a case involving "manifest necessity," where the Court "believes

1  to a high degree that a new trial is needed," the parties' consent is

2  irrelevant.  United States v. Chapman, 524 F.3d 1073, 1081 (9th Cir.

3  2008).  Conversely, "in the case of a mistrial declared at the behest

4  of the defendant . . . the defendant himself has elected to terminate

5  the proceedings against him, and the 'manifest necessity' standard

6  has no place in the application of the Double Jeopardy Clause."

7  Oregon v. Kennedy, 456 U.S. 667, 672 (1982).[12]

8                    1.   The Court Did Not Abuse Its Discretion in Finding a
                         Mistrial Justified by "Manifest Necessity"
9

10      Defendant's entire argument in his motion to dismiss is that a

11  mistrial was necessary, and even more that the government's

12  "[r]eckless disregard or flagrant misconduct is sufficient to justify

13  the dismissal of the indictment with prejudice."  (CR 822 at 27.)

14  And defendant concedes that the Court granted a mistrial at his

15  request.  (See, e.g., id. at 14-15 (referring to CR 706 as "The

16  Mistrial Motion"); id. at 30 (claiming that the government "goaded

17  the defendant into having to move for a mistrial").)[13]  Although the

18  government disagrees that a Brady violation occurred, the Court's

19  granting of a mistrial was correct and supported by law because it

20  was (1) at defendant's request and (2) supported by manifest

21  necessity based on (a) the defendant's need to review the Tabs

22  material and (b) the inability of the jury to keep more than five

23

24  ───────────────────

25      [12] The Court acknowledged as much when defendant first raised his
    intent to file the instant motion, observing: "The strong presumption
26  is that when a mistrial is granted at the request of the defendant,
    the grant of a new trial is proper."  (RT 8/24/2021 at 65.)

27      [13] When questioned on August 24, 2021 as to whether "this trial
    could proceed in some fashion," defendant replied, "No, Your Honor, I
28  do not believe that it is possible for this trial to proceed in this
    fashion for many, many reasons."  (RT 8/24/2021 at 19.)

weeks of facts in mind if an extended continuance had been granted in lieu of a mistrial.  <u>Chapman</u>, 524 F.3d at 1083.

Indeed, one of the primary cases defendant relies on makes clear that a necessary predicate of defendant's argument is that a mistrial <u>was</u> necessary.  In <u>Chapman</u>, the Ninth Circuit first determined that a "mistrial was supported by a valid determination of manifest necessity," and only then went on to examine whether the district court abused its discretion under its supervisory powers by dismissing the case with prejudice.  524 F.3d at 1083-84; <u>see also</u> <u>Bundy</u>, 968 F.3d at 1043-44 (discussing standard for a dismissal under supervisory powers, distinct from the double-jeopardy analysis).

In short, unless this Court is inclined to revisit its decision to grant defendant's request for a mistrial in this case, defendant's double-jeopardy argument necessarily fails.

2.   <u>Defendant Affirmatively Requested The Mistrial</u>

Defendant also cannot argue that the Double Jeopardy Clause bars retrial when he was the one who asked for a mistrial.  Indeed, the standard is lower than that: either "[i]mplied consent" or "express consent" is sufficient.  <u>United States v. You</u>, 382 F.3d 958, 964 (9th Cir. 2004) (following <u>Gaytan</u>, 115 F.3d 737).

This principle is based on a long line of Supreme Court double-jeopardy precedent.  As the Court recently explained, "a defendant's mistrial motion implicitly invite[s] a second trial and [is] enough to foreclose any double jeopardy complaint about it."  <u>Currier v. Virginia</u>, 138 S. Ct. 2144, 2151 (2018) (citing <u>United States v. Dinitz</u>, 424 U.S. 600 (1976)); <u>see also</u> <u>id.</u> at 2151 ("[A] defendant's motion effectively invited a retrial of the same offense, and the Double Jeopardy Clause, which guards against Government oppression,

28

does not relieve a defendant from the consequences of a voluntary choice like that." (citing United States v. Scott, 437 U.S. 82, 96, 99 (1978)); Evans v. Michigan, 568 U.S. 313, 326 (2013) (retrial "generally allowed" when defendant consents to "disposition that contemplates reprosecution").

Defendant's only response to this rule is to claim that the government "goaded" him into seeking a mistrial.  (CR 822 at 21-23, 29-30.)  He makes clear, however, that the only basis for his "goading" claim is his underlying Brady claim.  But the case he cites (CR 822 at 21), Oregon v. Kennedy, 456 U.S. 667 (1982), squarely forecloses that argument.  In that case, the Supreme Court rejected a defendant's argument that the "goading" test should be "broaden[ed] . . . from one of intent to provoke a motion for a mistrial to a more generalized standard of 'bad faith conduct' or 'harassment' on the part of the judge or prosecutor."  Kennedy, 456 U.S. at 674.[14]  Here, there is no basis to find that the government affirmatively sought to bring about a mistrial.  To the contrary, the government consistently objected to defendant's numerous attempts to obtain a mistrial.

Defendant's extensive citation to state cases suggesting it is unfair to allow retrial following "government misconduct" likewise fails.  (CR 822 at 22-23.)  Even if there had been egregious error, that would not relieve defendant of his own "voluntary [litigation] choice."  Currier, 138 S. Ct. at 2151.  In Dinitz, the trial court -- in an apparent "overreaction" -- "banish[ed]" the defendant's lawyer

---

[14] Defendant's citation of a footnote in an Eleventh Circuit decision (CR 822 at 21) is unavailing, as that circuit similarly requires that the "the prosecution intentionally goad[] the defendant into moving for a mistrial."  United States v. Fern, 155 F.3d 1318, 1324 (11th Cir. 1998) (emphasis added).

1   from the courtroom, forcing him to proceed with a new lawyer whom he

2   did not want.  424 U.S. at 611.  The defendant then moved for a

3   mistrial, which was granted, and the Supreme Court held that the

4   defendant could not later claim that double jeopardy barred his

5   retrial.  Id.  Even if a defendant who has been wronged during the

6   trial process faces a "hard choice," that does relieve him of the

7   consequences of that choice: "litigants every day face difficult

8   decisions," including being "forced to choose between allowing an

9   imperfect trial to proceed or seeking a second that promises its own

10  risks."  Currier, 138 S. Ct. at 2152 (citing Dinitz, Scott, 437 U.S.

11  82, and Jeffers v. United States, 432 U.S. 137 (1977)).

12      Defendant sought a mistrial.  He got one.  He cannot now

13  complain that it constitutionally bars his retrial.

14  **C.   Defendant's Remaining Unsupported Accusations of Misconduct
         Are Meritless and Provide No Basis for Relief**

15

16      Although the primary basis of defendant's motion is the Tabs

17  data underlying the Court's declaration of a mistrial, defendant also

18  lobs unsupported accusations of misconduct both in his motion (CR 822

19  at 19) and in his lengthy and argumentative declaration (CR 822-1),

20  to which he transferred approximately 14 pages from his motion after

21  being required by the Court to reduce the length of his motion.

22  These accusations are meritless, as the government has explained in

23  other briefing (see, e.g., CR 732), and, even if credited, provide no

24  relief greater than what he has already obtained: a mistrial.

25  Defendant provides no support for his accusations of misconduct, nor

26  does he provide authority that they would warrant dismissal.

27  **IV.  CONCLUSION**

28      The Court should deny defendant's motion in its entirety.

# EXHIBIT 1

**Sagel, Brett (USACAC)**

---

| | |
|---|---|
| **From:** | John Littrell <jlittrell@bienertkatzman.com> |
| **Sent:** | Friday, April 12, 2019 4:46 PM |
| **To:** | Andre, Julian L. (USACAC) |
| **Cc:** | Sagel, Brett (USACAC) |
| **Subject:** | RE: EA Servers |

Ok, thanks.  We will follow up with the receiver.


**John Littrell** | Partner
Bienert | Katzman, PLC

**From:** Andre, Julian L. (USACAC) <Julian.L.Andre@usdoj.gov>
**Sent:** Friday, April 12, 2019 4:44 PM
**To:** John Littrell <jlittrell@bienertkatzman.com>
**Cc:** Sagel, Brett (USACAC) <Brett.Sagel@usdoj.gov>
**Subject:** RE: EA Servers

John,

As we previously discussed, Eagan Avenatti LLP ("EA LLP") is now managed and controlled by a court-appointed
Receiver, Brian Weiss.  Your client stipulated to the appointment of the Receiver in February 2019.  The Receiver for EA
LLP has consented to IRS-CI creating a forensic image of the EA LLP servers.  We anticipate that the imaging process
should be completed in approximately one week, at which point the servers will be returned to the Receiver.  To the
extent your client has a need to access particular data on EA LLP's servers to serve existing or former clients, you will
need to raise those specific issues with the Receiver.  Because the servers belong to EA LLP, it is ultimately up to the
Receiver for EA LLP to determine the extent to which your client is entitled to access the servers and/or any other EA LLP
files and records.  To the extent the servers contain evidence relevant to the prosecution of Mr. Avenatti, as we
mentioned yesterday, such materials will be produced to the defense during the discovery process.

Thank you.

Julian

**From:** John Littrell <jlittrell@bienertkatzman.com>
**Sent:** Thursday, April 11, 2019 7:28 PM
**To:** Sagel, Brett (USACAC) <BSagel@usa.doj.gov>; Andre, Julian L. (USACAC) <JAndre1@usa.doj.gov>
**Subject:** EA Servers

Guys, as I mentioned earlier today, Mr. Avenatti has an urgent need to access some of the data on the Eagan Avenatti
Servers.  As I understand it the servers have confidential client files and other material that he needs in order to serve
his existing clients and cases, and other files that he has a duty to review and return to former clients.  I'll also need
access to those files in order to defend this case.  I am having a hard time determining where the servers are actually
located and who has possession of them.  Are the original servers in your possession, the receiver's, or someone
else's?  If they are in your possession, were they seized pursuant to a warrant or via consent?   I'm sure these questions
will be answered in due course, but in the meantime, can we arrange for Mr. Avenatti to access his client files?

Let me know if there is a good time to discuss tomorrow.  Thanks.


**John Littrell**
**Partner**
Bienert | Katzman, PLC
903 Calle Amanecer, Suite 350
San Clemente, CA 92673
Main (949) 369-3700
Website: www.bmkattorneys.com



The foregoing message is confidential and intended for the designated recipient only.  The foregoing information may be protected by attorney-client and/or work product privileges.  Accordingly, if you have received this message in error, please contact BIENERT | KATZMAN, PLC at (949) 369-3700 immediately, and delete the message without reviewing, copying, or making further use of the information contained herein.