Michael John Avenatti (Pro Se)

H. Dean Steward, SBN 85317
17 Corporate Plaza, Suite 254
Newport Beach, California 92660
Tel (949) 481-4900
Fax (949) 497-6753

Advisory Counsel for Defendant
MICHAEL JOHN AVENATTI

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | SA CR No. 19-061-JVS |
| Plaintiff, | DEFENDANT'S EX PARTE APPLICATION FOR AN ORDER EXTENDING DEFENDANT'S TEMPORARY RELEASE |
| v. | |
| MICHAEL JOHN AVENATTI, | [Proposed Order filed concurrently herewith] |
| Defendant. | |

Defendant MICHAEL JOHN AVENATTI ("Mr. Avenatti"), by and through his advisory counsel of record, H. Dean Steward, hereby files this *Ex Parte* Application for an Order Extending Defendant's Temporary Release from December 1, 2021 to March 1, 2022. The government has informed the defense that the government opposes this request.

Dated: November 18, 2021                    Respectfully submitted,


                                        /s/ Michael John Avenatti
                                        MICHAEL JOHN AVENATTI

## DECLARATION OF MICHAEL J. AVENATTI

I, Michael J. Avenatti, declare:

1.     I am the defendant in *United States v. Michael John Avenatti* (CDCA Case No. SA CR No. 19-061-JVS) and am appearing in this matter *pro se*. I make this declaration in support of the Defendant's *Ex Parte* Application for An Order Extending Defendant's Temporary Release from December 1, 2021 to March 1, 2022.

2.     Pursuant to this Court's prior Orders, defendant is presently on temporary release and home confinement in Venice, California. Absent a further extension, defendant will be required to self-surrender on December 1, 2021. For the reasons that follow, Defendant respectfully requests the ability to remain on temporary release for an additional ninety (90) days - until March 1, 2022.

3.     On November 3, 2021, the Hon. Paul Gardephe, U.S. District Court Judge for the Southern District of New York, granted, over the objection of the government, defendant's application to extend his surrender date in connection with his 30-month sentence to February 28, 2022 so that defendant could assist with an upcoming trial and his Ninth Circuit appeal relating to the denial of his claim of double jeopardy, which this Court has held raises a "substantial question" and which the Ninth Circuit recently declined to dismiss. A copy of Judge Gardephe's Order and the defendant's application is attached hereto as Exhibit A. The reasons included in that application have equal weight here.

4.     On January 24, 2022, Defendant is scheduled to appear for trial in the Southern District of New York before the Hon. Jesse M. Furman (Case No. 19-00374-JMF).  *See* Dkt. 160. Jury selection is set to begin on January 13, 2022, with motions in limine due December 9, 2021, and a final pre-trial conference set for January 18, 2022. Defendant cannot adequately prepare for trial, assist and meet

with his counsel, review the necessary discovery and meaningfully participate in the pre-trial and trial proceedings if he is remanded to custody.

5.      Defendant is presently assisting his pro bono appellate counsel, Mr. Howard Srebnick, who did not participate in the six-week trial, with the Ninth Circuit appeal. Because defendant represented himself at trial and was intricately involved with the *Brady* issues that arose, which led to the mistrial, defendant's knowledge of the record and assistance on the appeal is critical. Defendant successfully motioned the Ninth Circuit for expedited treatment of his appeal – his opening brief is now due November 30, with his reply likely due January 21, 2022. The Ninth Circuit has set oral argument for the week of March 7-11, 2022. Defendant cannot provide the necessary assistance if he is remanded now, especially in light of the continuing Covid-19 restrictions applicable to federal inmates.

6.      Defendant continues to review the recently produced discovery from this case in anticipation of a possible re-trial (in the event his appeal is denied). This case involves well over 1,000,000 pages of discovery, hundreds of exhibits identified by the government, over 35 government witnesses, and a number of complex legal issues. The government only recently, on or about September 16, 2021 produced forensic copies of the servers from defendant's law firm, which contain over 19.86 terabytes of data. Defendant continues to review this data, together with his computer expert and paralegals, as well as the Tabs data. *See*, *e.g.*, Dkt. 859 filed *in camera*. In order to properly prepare for a potential trial in this complex case, Mr. Avenatti requires regular access to (a) the vast amount of discovery in this case, including the 6 GB of Tabs and QuickBooks data recently produced by the government; (b) his advisory counsel and paralegals; (c) a computer, printer and legal research; and (d) defense witnesses. This access cannot occur if defendant is in custody.

7.     The Bureau of Prisons ("BOP") COVID-19 protocols associated with holding defendant in custody will severely impede defendant's ability to meet with his defense teams and witnesses, his access to discovery, trial exhibits, etc., and infringe on his right to meaningfully participate in his defense and mount a defense in this case and in the case before Judge Furman. Defendant also needs to be able to easily exchange facts and information with his team as the trial progresses.

8.     As the Court noted during the final pre-trial conference in this case, the risks associated with COVID-19 are still significant and the vaccine is "no silver bullet" – even if one is vaccinated, you can still contract the virus and suffer serious illness. In fact, the virus still poses a significant threat as evidenced by the recent number of cases, hospitalizations and deaths in Orange County. *See* "Orange County's Covid-19 hospitalizations inch up," Nov. 17, 2021, attached as Exhibit B. And health experts predict a rise in cases that exceeds last Summer's numbers. *See id.* Further, the risks of placing someone in custody generally, and the risks to defendant in particular, are already well documented in the record in this case.[1] *See also* "Fast, frequent and widespread: Covid-19 outbreaks inside federal prisons," UCLA, November 2021 (attached as Exhibit C).

9.     Defendant has been vaccinated but is not yet eligible for the booster shot because his second vaccine shot was less than six months ago. When he is eligible, he will promptly receive the booster.

10.     Defendant has complied with the terms of his temporary release for nearly 19 months and continues to comply with the terms without incident. The Court recently observed defendant in trial for over six weeks – defendant

---

[1] *See*, *e.g.*, (a) the Opposition [Docket No. 271] to the Government's Motion to Terminate and Not Further Extend Defendant Michael John Avenatti's Temporary Release, which is pending, and (b) the accompanying declarations filed with the Opposition, including that of board-certified infectious disease specialist Dr. F. Ramzi Asfour (under seal) [Docket No. 280].

consistently appeared as directed, complied with the directives of the Court and demonstrated respect for the Court, its staff and the process. Further, on May 14, 2021, the Pretrial Services Agency submitted a report to the Court stating that "Throughout the period of temporary release, the defendant has remained in compliance and has been cooperative with directives from Pretrial Services" (page 3)(emphasis added). According to PSA, defendant "has shown a pattern of consistently compliant behavior" and PSA "has not received any new information that would suggest [Mr. Avenatti] is a flight risk or danger to the community." *Id*. In addition, in PSA's view, the government has not provided anything new that would suggest defendant is currently a flight risk or danger to the community. *Id*. Moreover, defendant travelled to New York and back for his sentencing in the Nike related case in early July with no issues or complications.

11.    In connection with defendant's sentencing in New York on July 8, 2021, Judge Gardephe found that defendant had faced "horrific conditions" while in custody in New York for 100 days, almost all of which was in solitary confinement and/or under lock down status. He also specifically stated it was hard to believe that the conditions defendant had to endure could occur in the United States: "Mr. Avenatti was held in horrific conditions at the MCC for more than three months, in solitary confinement for much of the time and in lockdown for nearly all of it; first, because a loaded handgun had been smuggled by someone into the facility, and later because of the Covid-19 pandemic. Conditions were terrible. It's hard to believe they could occur in the United States of America. Mr. Avenatti himself was at risk from the Covid-19 virus as the result of a preexisting medical condition." *See, e.g.,* SDNY Case No. 19-CR-00373-PGG, Dkt. 341, p. 43. In particular, defendant was held in solitary confinement for weeks in "10 South" – the highest security pre-trial unit in the United States, with only six to seven cells, which was constructed after 9/11 for the purpose of holding suspected

international terrorists and has been described as worse than Guantanamo Bay. The conditions at the jail generally are so substandard and barbaric, that it was recently announced by the Department of Justice that it is being shut down. *See*, *e.g.*, "Justice Dept. to Close Troubled Jail Where Jeffrey Epstein Died," New York Times, August 26, 2021.

12.    Placing defendant in custody now will result in additional burdens and impediments being placed on this Court and the court in New York, the defense in this case and the defense in New York, and the government in connection with both cases. This situation is already challenging enough for all involved without these added challenges and obstacles.

13.    Remanding defendant now would serve no legitimate purpose. There is no prejudice to the government if defendant is permitted to remain on release, but as outlined above, there is significant prejudice to the defendant if he is remanded.

14.    The Bail Reform Act of 1984, 18 U.S.C. §§ 3141, *et seq*. requires the release of a person facing trial under the least restrictive condition or combination of conditions that will reasonably assure the appearance of the person as required and the safety of the community. *See United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991); *United States v. Motamedi*, 767 F.2dd 1403, 1405 (9th Cir. 1985). Only in rare circumstances should release be denied, and doubts regarding the propriety of release must be resolved in favor of release. *See Gebro*, 948 F.2d at 1121; *Motamedi*, 767 F.2d at 1405. The Act requires release unless no combination of conditions can reasonably assure the appearance of the person and the safety of the community.  18 U.S.C. § 3142. Further, § 3142 does not seek ironclad guarantees and the requirement that conditions of release will "reasonably assure" the safety of the community cannot be read to require a set of conditions that make it a near certainty that the community will be protected at all times under any

conceivable set of circumstances. *See*, *e.g.*, *United States v. Tortora*, 922 F.2d 880, 884 (1st Cir. 1990) (where the issue is the safety of the community, Congress did not require guarantees in enacting the Bail Reform Act). Critically, "A finding that a defendant is a danger to any other person or the community must be supported by 'clear and convincing evidence,'" *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008), as must a finding that no combination of conditions will reasonably assure the safety of the community. *See* U.S.C. § 3142(f)(2)(B). Moreover, this requirement remains constant throughout a case, and must take into account changed circumstances, the introduction of new facts and information, and the passage of time. As a result, findings that defendant is <u>presently</u> a danger to the community <u>and</u> no conditions can reasonably assure safety must both be supported by clear and convincing evidence. <u>The government is unable to meet either of these two requirements under the current facts.</u>

15.     The Ninth Circuit has held that the Bail Reform Act does not authorize pretrial detention on the ground that the defendant presents a risk of danger to the community <u>unless one of the two § 3142(f) factors is also applicable</u>: (1) the defendant is charged with one of the enumerated offenses listed in U.S.C. § 3142(f)(1)(A)-(E) (involving crimes of violence, offenses for which the maximum sentence is life imprisonment or death, drug trafficking offenses, felonies involving a minor victim, and offenses involving the possession or use of a firearm (the "enumerated offenses"), or (2) the government shows that there is a "*serious* risk that [the defendant] will flee" or obstruct justice.[2] 18 U.S.C. § 3142(f)(2). As the Ninth Circuit held in *United States v. Twine*, 344 F.3d 987 (9th Cir. 2003): "We are not persuaded that the Bail Reform Act authorizes pretrial detention without

---

[2] This is a far higher standard than ordinary "risk of flight" and requires the government to substantiate its request that no bail be granted with evidence that there is a <u>serious</u> risk the defendant will flee.

bail based solely on a finding of dangerousness. This interpretation of the Act would render meaningless 18 U.S.C. § 3142(f)(1) and (2). Our interpretation is in accord with our sister circuits who have ruled on this issue. *See United States v. Byrd*, 969 F.2d 106 (5th Cir. 1992); *United States v. Ploof*, 851 F.2d 7 (1st Cir. 1988); *United States v. Himler*, 797 F.2d 156 (3d Cir. 1986)." Accordingly, <u>alleged danger to the community, standing alone, is not enough. Absent one of these two factors, a defendant must be granted bail</u>. Every other circuit court that has addressed this issue – the First, Second, Third, Fifth and D.C. – agrees with the Ninth Circuit's decision in *Twine*. *See United States v. Friedman*, 837 F.2d 48, 49 (2d Cir. 1988)("The Bail Reform Act does not permit detention on the basis of dangerousness in the absence of risk of flight, obstruction of justice, or an indictment for the offenses enumerated [in § 3142(f)(1)]."); *United States v. Singleton*, 182 F.3d 7, 9 (D.C. Cir. 1999); *United States v. Byrd*, 969 F.2d 106, 110 (5th Cir. 1992)("[W]e find ourselves in agreement with the First and Third Circuits:  a defendant's threat to safety of other persons or to the community, standing alone, will not justify pre-trial detention" and even "a defendant who <u>clearly</u> may pose a danger to society cannot be detained on that basis alone." (emphasis added); *United States v. Ploof*, 851 F.2d 7 (1st Cir. 1988); *United States v. Himler*, 797 F.2d 156 (3d Cir. 1986).

16.     Moreover, district courts in the Ninth Circuit have consistently followed the Ninth Circuit's holding in *Twine* and granted bail, including over the objection of the government, in cases where only danger to the community is alleged. *See*, *e.g.*, *United States v. Djoko*, 2019 WL 4849537, at *2 (W.D. Wash. Oct. 1, 2019) (revoking a U.S. Magistrate Judge's order of detention for a defendant charged with cyberstalking, citing legislative history for its finding that "Congress limited the categories of cases eligible for pretrial detention to those listed in 18 U.S.C. § 3142(f)" and that it did so "[t]o ensure that pretrial detention

would continue to be an exception[,]" and noting that "unless the government can show by a preponderance of the evidence that a case falls into one of those [§ 3142(f)] categories, a defendant cannot be detained pending trial"); *United States v. Gentry*, 455 F. Supp. 2d 1018, 1019 n.2 (D. Ariz. Oct. 5, 2006) ("Since none of the crimes charged in the indictment meet the statutory definition of 'crime of violence' . . . the Government does not argue as a basis for detention that Defendant is a danger to the community."). *See also United States v. Qazi*, 2017 WL 2484102, at *11 (D. Nev. June 8, 2017) (noting that the defendant was "eligible for detention based on the offense charged" because "in 2006, Congress amended the Bail Reform Act to authorize detention of a defendant charged with any felony that involves possession or use of a firearm"); *United States v. Bell*, 2008 WL 11411709, at *2 (C.D. Cal. June 6, 2008) (noting that the court was authorized to detain the defendant as a danger to the community because the defendant was charged with an enumerated offense).

17.     Under *Twine* and its progeny, in order to have defendant placed in custody pre-trial, the government must show that defendant is not only *presently* a danger to the community but also that he is *a serious flight risk*. And the government must show that no combination of conditions can reasonably assure the appearance of the defendant and the safety of the community. Under the facts of the last nearly nineteen months, the government cannot meet their burden. Defendant has shown that there is a set of conditions that can assure the safety of the community and his appearance in court - indeed he has appeared *at least 30 times* before this Court on time. Further, this Court, together with (a) every other court faced with the question of defendant's risk of flight, (b) PSA, and (c) U.S. Probation (in connection with the Nike sentencing), has previously found that defendant is not a flight risk, let alone a serious flight risk as required pursuant to *Twine*.

18.     For each of the above reasons, defendant respectfully requests that the Court extend his temporary release to March 1, 2022, under the same conditions previously ordered.

19.     On November 17, 2021, the defendant contacted the government and was informed that the government opposes this Application. Defendant reserves the right to respond to any opposition the government may file.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  November 18, 2021

/s/ Michael John Avenatti
MICHAEL JOHN AVENATTI

9

**EXHIBIT A**

# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

*David E. Patton*
*Executive Director*
*and Attorney-in-Chief*

Southern District of New York
*Jennifer L. Brown*
*Attorney-in-Charge*

October 29, 2021

**BY ECF**

The Honorable Paul G. Gardephe
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

RE:   **United States v. Michael Avenatti**
      **19 Cr. 373 (PGG)**

MEMO ENDORSED

The application is granted.  Defendant Michael Avenatti's surrender date is adjourned from December 15, 2021 to February 28, 2022.

SO ORDERED.

*[signature]*

_____
Paul G. Gardephe
United States District Judge

November 3, 2021

Dear Judge Gardephe:

Alongside counsel for Michael Avenatti in <u>United States v. Michael Avenatti</u>, 19 Cr. 374 (JMF), I write in response to the Government's letter motion requesting that the Court reschedule Mr. Avenatti's surrender date from December 15, 2021 to November 12, 2021, which was filed without notice to the defense. The Court should deny the Government's motion and, instead, extend Mr. Avenatti's surrender date from December 15, 2021 to February 28, 2022. This extension is necessary to afford Mr. Avenatti a meaningful opportunity to participate in his trial preparation in 19 Cr. 374 (JMF), which is currently scheduled to begin on January 10, 2022, and his pending Ninth Circuit appeal, which includes an expedited briefing schedule (at Mr. Avenatti's request).

Since sentencing Mr. Avenatti to 30 months this past July, the Court granted Mr. Avenatti's requests for a delay in his surrender date, recognizing that his incarceration would interfere with his ability defend himself against a separate prosecution in the Central District of California. As the Court is aware, Mr. Avenatti's case in the Central District of California was declared a mistrial due to a significant <u>Brady</u> violation,[1] and the issue of whether Mr. Avenatti can be retried is currently pending before the Ninth Circuit Court of Appeals. Earlier this week, Mr. Avenatti successfully moved for an expedited briefing schedule for that appeal—his opening brief is due November 30, 2021 and his reply is due 21 days after the Government's response, which is due December 30, 2021. Mr. Avenatti remains on

---

[1] <u>See</u> <u>United States v. Michael Avenatti</u>, CR-19-061-JVS, Dkt. No. 867, page 4, lines 10-12 ("I found a Brady violation with respect to a very important range of documents relating to the financial affairs of Mr. Avenatti's firm.").

home confinement in connection with that prosecution, under strict conditions.

In addition, Mr. Avenatti is actively preparing for his upcoming trial before Judge Furman in 19 Cr. 374. It is axiomatic that Mr. Avenatti's ability to both participate in his pending appeal before the Ninth Circuit (which is critical as he is most familiar with the record having proceeded <u>pro se</u>) and in his upcoming trial before Judge Furman would be significantly and unfairly hampered by his remand to custody.

Against this backdrop, the Government's request to expedite Mr. Avenatti's surrender date is unjustifiable and unsupported by the totality of the circumstances. Mr. Avenatti is neither a flight risk nor a danger to the community, a finding that has been repeatedly made, including in the Pre-Sentence Report prepared in connection with this case in May 2020 (Dkt. No. 295) and in a report issued approximately five months ago by Pre-Trial Services in the Central District of California. In particular, the C.D. Ca. report indicated that Mr. Avenatti "has remained in compliance and been cooperative with directives from Pretrial Services" and that there is no information suggesting Mr. Avenatti is a flight risk or a danger to the community. In that same report, C.D. Ca. Pre-Trial Services recommended that the district court grant Mr. Avenatti permanent bond.

In addition, Mr. Avenatti still has not received his designation from the Bureau of Prisons. This means that should Mr. Avenatti be forced to surrender in connection with this case on the timeline suggested by the Government, he would likely be remanded to a high-security pre-trial facility in C.D. Ca. or in this District—<u>i.e.</u>, MDC Brooklyn. This Court previously found as follows as it relates to Mr. Avenatti's prior incarceration at MCC: "[M]r. Avenatti was held in horrific conditions at the MCC for more than three months, in solitary confinement for much of the time and in lockdown for nearly all of it . . . . Conditions were terrible. It's hard to believe they could occur in the United States of America. Mr. Avenatti himself was at risk from the Covid-19 virus as the result of a preexisting medical condition." Tr. July 8, 2021, page 43, lines 2-10. We respectfully submit that the conditions that existed at the time of Mr. Avenatti's imprisonment at MCC have not abated and are just as bad now, if not worse, at MDC Brooklyn, where COVID, overcrowding, and neglect remain a pervasive feature of daily life.

For all these reasons, we respectfully submit that extending Mr. Avenatti's surrender date until at least the conclusion of his case in 19 Cr. 374 (JMF) is appropriate and in the interests of justice.

Respectfully Submitted,

/s/
Scott Srebnick, Esq.
Counsel of Record in 19 Cr. 373 (PGG)

/s/
Robert M. Baum, Esq.
Andrew J. Dalack, Esq.
Tamara L. Giwa, Esq.
Counsel of Record in 19 Cr. 374 (JMF)

3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT B**



LA - WEST  ›  | NOVEMBER 18, 2021 | 11:32AM PT   61°

**WATCH LIVE** | **LOG IN**  

NEWS    TRANSPORTATION    POLITICS    ARTS+CULTURE    COMMUNITY    WEATHER    SHOWS    PODCASTS    OUR JOURNALISTS    Search 🔍

**GET OUR APP** Our Spectrum News app is the most convenient way to get the stories that matter to you. Download it here.



*In this Aug. 28, 2021, file photo, registered nurse Noleen Nobleza, center, inoculates Julio Quinones with a COVID-19 vaccine at a clinic set up in the parking lot of CalOptima in Orange, Calif. (AP Photo/Jae C. Hong)*

**CORONAVIRUS**

## Orange County's COVID-19 hospitalizations inch up

**BY CITY NEWS SERVICE | ORANGE**
**PUBLISHED 2:48 PM PT NOV. 17, 2021**

SANTA ANA, Calif. (CNS) — Orange County's COVID-19 hospitalizations ticked up Wednesday, increasing to 216 from 210 on Tuesday, according to the Orange County Health Care Agency.

The number of those patients in intensive care declined from 55 to 52.



**What You Need To Know**

- Orange County's COVID-19 hospitalizations ticked up Wednesday, increasing to 216 from 210 on Tuesday






**What You Need To Know**

- Orange County's COVID-19 hospitalizations ticked up Wednesday, increasing to 216 from 210 on Tuesday
- The county also reported 341 new cases of COVID-19 but just one additional death, which occurred in September
- The county's weekly COVID-19 case rate per 100,000 residents remained at 7.3, the same as last Tuesday
- November's death toll remains at three, with October's death toll at 82

The county also reported 341 new cases of COVID-19 but just one additional death, which occurred in September.

The county had 22.8% of its intensive care unit beds available and 68% of its ventilators.

Wednesday's numbers brought the county's cumulative totals to 309,769 cases and 5,653 fatalities since the pandemic began.

Orange County's averages for infections have remained about the same as last week, according to the latest weekly data released Tuesday by the OCHCA.

The county's weekly COVID-19 case rate per 100,000 residents remained at 7.3, the same as last Tuesday, while the test-positivity rate stayed at 2.8%.

The county's Health Equity Quartile positivity rate — which measures progress in low-income communities — inched down from 3% to 2.9%.

The death reported Wednesday occurred on Sept. 16, raising that month's death toll to 172, just behind August's toll of 174.

November's death toll remains at three, with October's death toll at 82.

In contrast, the death toll before the more contagious delta variant-fueled summer surge was 30 in July, 19 for June, 26 for May, 46 for April, 200 for March, 615 for February, 1,589 for January — the deadliest month of the pandemic — and 980 for December, the next-deadliest.

Andrew Noymer, an epidemiologist and UC Irvine professor of population health and disease prevention, told news sources on Tuesday that the county's infection rates are "pretty flat" as of now. But Noymer expects a rise in cases as the temperatures drop.

"There's going to be more this winter," Noymer said. "People forget how bad last winter was, but this winter will be worse than last summer, but not as bad as last winter."

Last winter, the county's hospitals were nearly full.

The number of fully vaccinated residents in Orange County increased from 2,190,754 on Nov. 4 to 2,200,493 as of last Wednesday.

That number includes an increase from 2,045,291 to 2,053,496 residents who have received the two-dose regimen of vaccines from Pfizer or Moderna. The number of residents receiving the one-dose Johnson & Johnson vaccine increased from 145,463 to 146,997.

**Related Stories**

- Number of COVID shots given to kids 5-11 to hit 2.6 million Wednesday
- Number of patients hospitalized for COVID-19 in OC increases
- CDC panel to discuss expanding COVID booster shots Friday
- Pfizer agrees to let other companies make its COVID-19 pill

There are 189,201 residents who have received one dose of the Pfizer or Moderna vaccines.

The top dispensers of COVID-19 vaccines as of Nov. 8, the latest figures available, are:

- The OCHCA, 26%
- CVS, 19%
- Walgreens, 6%
- Kaiser Permanente, 5%
- UCI Health, 3%
- Walmart, 2%

Since children ages 5 to 11 were authorized to receive the Pfizer vaccine earlier this month, officials said nearly 7,780 doses overall have been administered.

As of last Monday, 69% of the total population had received at least one dose of a COVID vaccine, and 64% were fully vaccinated, according to Dr. Regina Chinsio-Kwong, the county's deputy health officer.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT C**


UCLACOVIDBEHINDBARS.ORG

# Fast, frequent, and widespread: COVID-19 outbreaks inside federal prisons

―――――

Alix M.B. Lacoste, Independent researcher
Erika Tyagi, UCLA Law COVID Behind Bars Data Project
Hope Johnson, UCLA Law COVID Behind Bars Data Project

November 2021


UCLACOVIDBEHINDBARS.ORG

# Introduction

Over the course of the pandemic, nearly 50,000 people in federal prisons have been infected with COVID-19, and at least 256 people have died after testing positive.[1] As studies have shown, the rates of infection and mortality in federal prisons — like in state prisons, ICE detention centers, and other carceral settings — have been much higher than the overall rates in the United States throughout the pandemic.

We have conducted a deeper analysis of the pandemic inside federal prisons and identified several alarming patterns behind these numbers: across the federal prison system, outbreaks have been frequent and wide-reaching. After being first detected inside facilities, these outbreaks have also spread extremely quickly.[2]

## At the height of the pandemic, over 90% of all federal prisons experienced outbreaks

In this analysis, we defined an outbreak as the window of time during which five or more people — staff or incarcerated people or a combination — were actively infected with COVID-19 inside a given facility.[3] Using this definition, every single federal prison has experienced at least one outbreak since March 31, 2020, when the Bureau of Prisons (BOP) began reporting COVD-19 data.

During the winter of 2020-21, when cases peaked across the federal prison system, more than 90% of federal prisons experienced an outbreak (Figure 1).[4] While fewer facilities experienced outbreaks during the subsequent months, the number began rising again in July 2021, when the Delta variant of COVID-19 began to spread more widely.

During the first year of the pandemic, many

prisons were in a nearly constant state of outbreak, with seven facilities experiencing an outbreak more than 90% of the time.[5] This pattern shifted after April 2021, when vaccines became more widely available to incarcerated people in federal prisons.

As of October 28, 2021, 30% of all federal prisons were in a state of outbreak.



**Figure 1**
Percent of federal prisons experiencing an outbreak

**Figure 1. Percent of federal prisons experiencing an outbreak.** Each data point represents the percent of facilities experiencing an outbreak (5 or more incarcerated people or staff actively infected with COVID-19) at that time point.

## In the worst outbreaks, more than 70% of incarcerated people inside a prison were infected at one time

Outbreaks were not only frequent in number, but also wide-reaching within facilities. While eight facilities reportedly never reached more than 3% of incarcerated people actively infected at any given time, five had outbreaks where more than 60% were actively infected at once. Of those, three saw more than 70% infected (Figure 2).[6]

UCLACOVIDBEHINDBARS.ORG

## Figure 2

**Maximum number of incarcerated people actively infected and population at the time of each facility's outbreak peak**



**Figure 2. Maximum number of incarcerated people actively infected and population at the time of each facility's outbreak peak.** Dashed lines indicate infection rates.

## Figure 3

**Active COVID-19 cases in federal prisons and overall U.S. population**



**Figure 3. Active COVID-19 cases in federal prisons and the overall U.S. population.** Percent of incarcerated people/staff in federal prisons and the overall U.S. population actively infected with COVID-19 across time. Active cases in the overall population are estimated by summing new cases reported in the previous 14 days based on data from the CDC. Population estimates for incarcerated people are based on data reported by the BOP, estimates for staff are based on data from The Marshall Project, and estimates for the overall U.S. population are based on 2020 Census data.

The high infection rates caused by the outbreaks have led to infection rates among incarcerated people in federal prisons that are consistently higher than among the U.S. population as a whole. In May 2020, the rate of infection among incarcerated people in federal custody was more than 15 times the rate among the overall U.S. population (Figure 3).

At the height of the pandemic in the winter of 2020-2021, at least 6% of all people incarcerated in federal prisons were actively infected with COVID-19 and 5% of staff were. The corresponding rate in the U.S. population as a whole has never, throughout the entire pandemic, exceeded 1%.[7]

Over the last several months, rising case rates inside federal prisons have been driven increasingly by infections among staff, rather than among incarcerated people (Figure 4). While the

percentage of incarcerated people testing positive has remained relatively low during the latest Delta-driven wave, the percentage of staff testing positive has increased steeply since July 2021.

## Figure 4

**Percent of active cases in federal prisons from staff**



**Figure 4. Percent of active cases in federal prisons from staff.** Percent of total active cases in federal prisons from staff (vs. from incarcerated people) across time.



UCLACOVIDBEHINDBARS.ORG

That staff have accounted for a greater share of infections is likely due, in part, to lower vaccination rates among staff relative to incarcerated people in federal custody. The BOP reports that 72% of incarcerated people are fully vaccinated, compared to just 57% of staff.

Evidence is also emerging that high vaccination rates among incarcerated people are not sufficient to prevent or control outbreaks inside federal prisons. According to a report by the Centers for Disease Control and Prevention (CDC), an outbreak at a federal prison in Texas infected 74% of incarcerated people in two housing units between July and August 2021, even though 79% of them were fully vaccinated at the time. A recent report published in the New England Journal of Medicine also found lower vaccine effectiveness among incarcerated people relative to studies conducted before the Delta wave, demonstrating the continued risk that COVID-19 poses even in those carceral settings with high vaccine coverage.

# Outbreaks have spread quickly inside federal prisons

We define the most severe outbreaks as those in which more than 5% of incarcerated people inside a facility had active COVID-19 infections at once.[8] When such outbreaks occurred, we found, it took an average of just 20 days after reaching 5 active cases among staff and incarcerated people to surpass the 5% threshold (Figure 5).[9]

There have been 104 outbreaks inside federal prisons where at least 5% of incarcerated people at the facility were actively infected.[10] 7 of these outbreaks passed the 5% threshold on the very first day,[11] 30 outbreaks passed the 5% threshold within just ten days, and 60 outbreaks passed within 30 days.



**Figure 5**

**Cumulative distribution of days from the start of an outbreak until caseload reaches 5% of incarcerated people actively infected (among outbreaks crossing that threshold)**

**Figure 5. Cumulative distribution of days from the start of an outbreak until caseload reaches 5% of incarcerated people actively infected.** Among the 104 outbreaks where at least 5% of incarcerated people were actively infected at a point in time, the cumulative number of outbreaks that reached the threshold within the specified number of days, after reaching outbreak status (5 or more active cases among incarcerated people and staff).

In FCI Schuylkill in Pennsylvania, for example, there were just 6 active infections among staff and incarcerated people on December 8, 2020. The following week, more than 140 active infections among incarcerated people were reported. And after one month, that number increased to more than 200, or nearly 20% of the facility's total population at the time. After this initial outbreak subsided, FCI Schuylkill saw another massive outbreak two months later, this time infecting more than 270 incarcerated people.

Similarly, in FCI Texarkana in Texas, there were just 12 active cases among incarcerated people on November 15, 2020. The very next day, 119 active cases were detected inside the facility, and this number steadily climbed until December 15, when the BOP reported more than 400 active cases among incarcerated people inside the facility — nearly 40% of the incarcerated population at the time.

3



UCLACOVIDBEHINDBARS.ORG

FCI Schuylkill and FCI Texarkana are just two demonstrations of the rapid and unpredictable speed at which the virus spreads inside carceral settings (Figure 6).

But as recent evidence demonstrates, high vaccination rates alone aren't enough to prevent devastating outbreaks in prisons. For this reason, officials responsible for the health and safety of the



**Figure 6. Outbreaks among incarcerated people at selected facilities.** Active cases among incarcerated people across time at selected facilities with outbreaks that reached the 5% threshold. Colors indicate whether the facility is experiencing an outbreak (defined as 5 or more active cases among incarcerated people and staff and colored in orange) or one of the most severe outbreaks (defined as more than 5% of the facility's current incarcerated population being actively infected and colored in red).

# Conclusion

As the pandemic continues behind bars, it is critical for federal legislators and BOP leadership to take steps to protect incarcerated people and the staff who enter the prisons and return home each day to their communities. Such steps must include encouraging higher rates of vaccination among both incarcerated people and staff.

people who live and work in BOP facilities must also take immediate steps to decarcerate and keep population levels as low as possible. This strategy should include allowing the thousands of people who were placed on home confinement during the pandemic to remain at home, granting broad clemency to people in federal prisons, and affirmatively advocating for compassionate release at much higher rates it has thus far.



UCLACOVIDBEHINDBARS.ORG

# Endnotes

1. Because the Federal Bureau of Prisons (BOP) removes from its cumulative count individuals who have been infected with COVID-19 but since been released, it is impossible to compute the total number of people who have tested positive inside federal prisons. It is certain, however, that the number reported by the BOP is an undercount.

2. Our analysis includes 98 facilities operated by the BOP. We exclude private federal facilities and residential reentry centers, for which data has not been consistently and reliably reported throughout the pandemic. We also aggregate facilities to the most granular level reported across the BOP's COVID-19, population, and vaccine data. For example, FCI Aliceville and Aliceville Camp are combined and considered a single unit for this analysis, as included in the BOP's reported list of locations.

3. The CDC defines an outbreak as two or more active infections linked through case investigation, contact tracing, or other linkage. Because we do not have information on case investigation or contact tracing, we define an outbreak more conservatively as five or more simultaneous active infections in a facility.

4. On December 18, 2020, 93 of the 98 federal facilities considered in this analysis were experiencing an outbreak.

5. The following seven facilities experienced an outbreak more than 90% of the time between March 31, 2020, and April 1, 2021: USP Atlanta, MCC New York, MCC Chicago, FDC Miami, FCC Oakdale, FTC Oklahoma City, and FMC Fort Worth.

6. The five facilities where more than 65% of incarcerated people were infected at their peak outbreak are the following: FCI Englewood (72% in December 2020), FCI Seagoville (71% in July 2020), FCI Loretto (71% in December 2020), FCI Safford (69% in January 2021), and FCI Terminal Island (66% in May 2020).

7. While it may be possible that federal prisons report higher infection rates if they are testing more frequently than the overall U.S. population, the BOP does not publicly report data on the number of COVID-19 tests administered. As a result, it is impossible to empirically validate this claim. Additionally, dozens of lawsuits have reported severe undertesting across federal prisons, suggesting that the true infection rates inside federal prisons may be even higher than those reported by the BOP.

8. Because the BOP does not report staff population data at the facility level, it is impossible to estimate staff infection rates at facilities. As a result, our definition of the most severe outbreaks only accounts for infections among incarcerated people. Note that our definition of outbreaks includes both incarcerated people and staff, as previously defined (5 or more active cases at a facility).

9. Across the 104 outbreaks in which more than 5% of incarcerated people had active COVID-19 infections, the median time to go from reporting just 5 active cases to crossing the 5% threshold was 20 days, and the mean was 41.7 days. Among the facilities where these outbreaks took place, 5 cases represents an extremely small share of the total population: the smallest facility to reach the 5% threshold is FPC Duluth (which has an incarcerated population of around 300 people), and the average incarcerated population across all federal prisons to reach the 5% threshold exceeds 1,000 people.

10. These 104 outbreaks occurred inside 87 different facilities, with some facilities reporting multiple distinct outbreaks that infected more than 5% of incarcerated people.

11. This may be in part due to testing practices, whereby the facility conducted broader testing in response to an outbreak and reported a number of previously undetected cases.

## CERTIFICATE OF SERVICE

I, H. Dean Steward, am a citizen of the United States, and am at least 18 years of age. My business address is 17 Corporate Plaza, Suite 254, Newport Beach, California 92660. I am not a party to the above-entitled action.  I have caused, on November 18, 2021, service of the defendant's:

EX PARTE APPLICATION FOR AN ORDER EXTENDING DEFENDANT'S

TEMPORARY RELEASE

on the following party, using the Court's ECF system:

AUSA BRETT SAGEL AND AUSA ALEXANDER WYMAN

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 18, 2021

/s/ H. Dean Steward

H. Dean Steward