Michael John Avenatti (Pro Se)

H. Dean Steward, SBN 85317
17 Corporate Plaza, Suite 254
Newport Beach, California 92660
Tel (949) 481-4900
Fax (949) 497-6753

Advisory Counsel for Defendant
MICHAEL JOHN AVENATTI

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL JOHN AVENATTI,<br><br>Defendant. | SA CR No. 19-061-JVS<br><br>DEFENDANT'S BRIEF AND DECLARATION IN SUPPORT OF MOTION FOR MODIFICATION OF TERMS OF TEMPORARY RELEASE<br><br>Hearing Date: December 16, 2021<br>Hearing Time: 10 a.m. |

Defendant MICHAEL JOHN AVENATTI ("Mr. Avenatti"), by and through his advisory counsel of record, H. Dean Steward, and in advance of the hearing set on this matter for December 16, 2021, hereby files this Brief and Declaration in Support of Motion for Modification of Terms of Temporary Release.  For each of the reasons set forth herein, as well as those to be argued and presented at the hearing on this matter, defendant respectfully requests that the Court modify his conditions of release as requested herein.

 Dated: December 15, 2021           Respectfully submitted,


                                    /s/ Michael John Avenatti
                                     MICHAEL JOHN AVENATTI

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................. ii

I.      INTRODUCTION ................................................................................1

II.     BACKGROUND ..................................................................................3

III.    LEGAL AUTHORITY .........................................................................5

IV.     FACTS SUPPORTING
        MODIFICATION OF TERMS OF RELEASE.......................................10

V.      CONCLUSION ...................................................................................16

# TABLE OF AUTHORITIES

## Cases

*Faretta v. California,*
    422 U.S. 806 (1975) ...................................................................................9

*Gannett Co. v. DePasquale,*
    443 U.S. 368 (1979) ...................................................................................9

*McCoy v. Louisiana,*
    138 S.Ct. 150 (2008) ..................................................................................9

*United States v. Bell,*
    2008 WL 11411709 (C.D. Cal. 2008) ......................................................8

*United States v. Byrd,*
969 F.2d 106 (5th Cir. 1992) ........................................................................7

*United States v. Djoko,*
    2019 WL 4849537 (W.D. Wash. 2019) ...................................................8

*United States v. Friedman,*
    837 F.2d 48 (2d Cir. 1988) ........................................................................7

*United States v. Gebro,*
    948 F.2d 1118 (9th Cir. 1991) ...............................................................6, 9

*United States v. Gentry,*
    455 F. Supp. 2d 1018 (D. Ariz. 2006) ......................................................8

*United States v. Himler,*
    797 F.2d 156 (3d Cir. 1986) ......................................................................7

*United States v. Hir*
    517 F.3d 1081 (9th Cir. 2008) ...................................................................6

*United States v. Motamedi,*
    767 F.2d 1403 (9th Cir. 1985) ...................................................................6

*United States v. Ploof,*
  851 F.2d 7 (1st Cir. 1988) ......................................................................7

*United States v. Qazi,*
  2017 WL 2484102 (D. Nev. 2017) ..........................................................8

*United States v. Read*,
  918 F.3d 712 (9th Cir. 2019) ...................................................................9

*United States v. Singleton,*
  182 F.3d 7 (D.C. Cir. 1999) .....................................................................7

*United States v. Tortora*
  922 F.2d 880 (1st Cir. 1990) ....................................................................6

*United States v. Twine*
  344 F.3d 987 (9th Cir. 2003) ...............................................................7, 10

*United States v. Winsor*
  785 F.2d 755 (9th Cir. 1986) ...................................................................9

## Constitution and Statutes

U.S. Const. Amend. VI....................................................................... *passim*

18 U.S.C. § 3141 ............................................................................... *passim*

18 U.S.C. § 3142 ............................................................................... *passim*

## DECLARATION OF MICHAEL J. AVENATTI

### I.      Introduction

I, Michael J. Avenatti, declare:

1.      I am the defendant in this case and am appearing *pro se*. I make this declaration in support of my motion to modify the terms of my temporary release. Pursuant to this Court's prior Orders, I am presently on temporary release and home confinement in Venice, California under conditions set approximately 20 months ago.

2.      On November 30, the Hon. Jesse M. Furman issued an order confirming that the trial in the Stormy Daniels related criminal case (SDNY: 19-cr-374(JMF) (the "*Daniels*" case)) will begin on January 24, 2022 in the Southern District of New York. Jury selection is set to begin on January 13, 2022 and a final pre-trial conference is set for January 18, 2022.

3.      Defendant cannot adequately prepare for his upcoming trial in New York; assist and meet with his counsel, including next week; review the necessary discovery; and meaningfully participate in the pre-trial and trial proceedings if he is unable to travel to New York or is required to adhere to the same release conditions in connection with such travel. Those conditions are simply not conducive to defendant's exercise of his Sixth Amendment rights, economically feasible, or necessary considering the facts of the last 20 months and the current circumstances.

4.      Further, defendant's confinement to a small apartment and inability to exercise over the last 20 months has begun to adversely affect his health.

5.      Accordingly, defendant respectfully requests that the Court modify his current conditions of release as follows:

1

a.     Defendant is permitted to travel to the Southern District of New York without a custodian between the dates of December 19, 2021 and February 28, 2022 to meet with his counsel and prepare for trial, provided (i) he remains under the supervision of Pretrial Services in the Central District of California; (ii) he continues to be monitored electronically by Pretrial Services; and (iii) obtains prior approval from Pretrial Services in connection with any travel.

b.     Defendant is permitted to leave his residence in Venice, California for up to 2.0 hours each day without a custodian for the purposes of exercise, provided he obtains prior approval from Pretrial Services and remains subject to electronic monitoring.

## II.     Background

6.     Defendant was arrested on a criminal complaint in this case on March 25, 2019, in New York City.  He was placed under the supervision of Pretrial Services on that same date, under the following conditions as requested by the government:  $300,000 personal recognizance bond, cosigned by two financially responsible persons; travel limited to SDNY, EDNY, CDCA, and points in between for travel to court/personal attorney; temporary additional domestic travel upon consent of AUSAs and approval of AUSAs and PS; surrender travel documents within 48 hours, and no new applications; pretrial supervision as directed by Pretrial Services; defendant to be released on his own signature with remaining conditions to be met by April 5, 2019; report to Pretrial Services any transaction of $5,000 or greater in any account controlled by the defendant; and report to CDCA on April 1, 2019, at 2:00 p.m.  He was subsequently assigned for supervision to Ms. Shakira Davis of the U.S. Pretrial Office in the Central District.

Importantly, at the time of this hearing, the government did not claim or argue that defendant was a flight risk.

7.      Within a couple of days, defendant returned from New York to his home in Los Angeles and then surrendered a passport that he had with him when he was released, which the government knew about. In other words, for days, the government permitted defendant to travel and retain possession of his passport following his arrest and release. On April 1, 2019, defendant appeared before this Court for arraignment.  He was ordered released on the same bail conditions as previously set on the date of his arrest.  Once again, the government did not claim or argue that defendant was a flight risk.

8.      On June 6, 2019, defendant requested that his conditions of release be modified to allow increased travel and argued that there was nothing suggesting that he was a flight risk.  [Dkt. 40, pp. 3-5].  The government opposed the request for modification at the hearing but did not dispute that defendant posed no risk of flight.  On June 10, 2019, the court (Magistrate Judge John D. Early) agreed with the defense, overruled the objection of the government, and modified defendant's travel restrictions as follows: travel restricted to SDNY, EDNY, SDFL, and CDCA, with domestic travel to other locations permitted with at least two business days' notice to Pretrial Services prior to travel to such other location(s).  It was further ordered that international travel required prior Court permission.  All other conditions remained unchanged and in effect.  [Dkt. 42].

9.      Between March 25, 2019 and mid-January 2020, defendant never missed a single court appearance in any of his three criminal proceedings, this case included.  Nor did he attempt to flee prosecution.

10.      On January 15, 2020, six days before the Nike trial was set to begin, the government had defendant remanded based on allegations by the government that defendant committed crimes while on bail. The government knew about the

alleged conduct six to seven months earlier but waited to seek remand until just hours before defendant was to board a flight to New York to meet with his counsel and prepare for trial. Defendant denies that any crimes were committed and no charges associated with this alleged conduct have ever been filed.

11. The government caused defendant to be placed in solitary confinement in Santa Ana and then flown under incredibly tight security – shackled, on a dedicated plane accompanied by four U.S. Marshalls – to the notorious Metropolitan Correctional Center ("MCC") in New York. The conditions at the jail are so substandard and barbaric that it was recently announced by the Department of Justice that it is being shut down. *See*, *e.g.*, "Justice Dept. to Close Troubled Jail Where Jeffrey Epstein Died," New York Times, August 26, 2021.

12. Defendant was held in solitary confinement for weeks in "10 South" – the highest security pre-trial unit in the United States, with only six to seven cells, which was constructed after 9/11 for the purpose of holding suspected international terrorists. It has routinely been described as worse than Guantanamo Bay.[1] U.S. District Court Judge Paul G. Gardephe later found that defendant had faced "horrific conditions" while in custody at MCC for 100 days. <u>He also specifically stated it was hard to believe that the conditions defendant had to endure could occur in the United States.</u> "Mr. Avenatti was held in horrific conditions at the MCC for more than three months, in solitary confinement for much of the time and in lockdown for nearly all of it; first, because a loaded handgun had been smuggled by someone into  the facility, and later because of the Covid-19 pandemic.

---

[1]   The government has never adequately explained why defendant, a then 48-year-old American attorney with no history of crime or violence and who had yet to be convicted of anything, was held in solitary confinement for 24 hours a day in the highest security pre-trial unit in the United States, which is almost uniformly reserved for suspected terrorists and those facing the death penalty for acts against the national interests of the United States.

Conditions were terrible. It's hard to believe they could occur in the United States of America. Mr. Avenatti himself was at risk from the Covid-19 virus as the result of a preexisting medical condition." *See* SDNY Case No. 19-CR-00373-PGG, Dkt. 341, p. 43.

13.    In late April 2020, this Court placed defendant on temporary release over the objections of the government, which claimed the conditions of defendant's confinement at MCC were excellent, with no problems.

14.    Within weeks, the government attempted to have defendant remanded back into custody for using a computer, which was not connected to the Internet, to work on his defense at the direction of his counsel. Following a search of his residence and all devices, Pretrial Services did not recommend that defendant be remanded, and defendant submitted significant briefing and evidence showing that no condition of his temporary release had been violated. Indeed, any claim by the government that defendant violated the conditions of his release approximately 18 months ago is without merit for all of the reasons set forth in detail in (a) the Opposition [Dkt. No. 271] to the Government's Motion to Terminate and Not Further Extend Defendant Michael John Avenatti's Temporary Release and (b) the accompanying declarations filed with the Opposition, including that of defendant's counsel.  In the interest of brevity, defendant will not repeat that same information again here.

15.    The Court deferred ruling on the motion and later extended defendant's release on multiple occasions, including most recently on November 19, 2021. [Dkt. 885].

### III.    Legal Authority

16.    The Bail Reform Act of 1984, 18 U.S.C. §§ 3141, *et seq*. requires the release of a person facing trial under <u>the least restrictive condition or combination of conditions that will reasonably assure the appearance of the person as required</u>

and the safety of the community.  *See United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991); *United States v. Motamedi*, 767 F.2d 1403, 1405 (9th Cir. 1985). Further, § 3142 does not seek ironclad guarantees and the requirement that conditions of release will "reasonably assure" the safety of the community cannot be read to require a set of conditions that make it a near certainty that the community will be protected at all times under any conceivable set of circumstances.  *See, e.g., United States v. Tortora*, 922 F.2d 880, 884 (1st Cir. 1990) (where the issue is the safety of the community, Congress did not require guarantees in enacting the Bail Reform Act).  Critically, "A finding that a defendant is a danger to any other person or the community must be supported by 'clear and convincing evidence,'" *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008), as must a finding that no combination of conditions will reasonably assure the safety of the community.  *See* U.S.C. § 3142(f)(2)(B).  Moreover, this requirement remains constant throughout a case, and must take into account changed circumstances, the introduction of new facts and information, and the passage of time.  As a result, findings that defendant is <u>presently</u> a danger to the community <u>and</u> no conditions can reasonably assure safety must both be supported by clear and convincing evidence.

17.    The Ninth Circuit has held that the Bail Reform Act does not authorize pretrial detention on the ground that the defendant presents a risk of danger to the community <u>unless one of the two § 3142(f) factors is also applicable</u>: (1) the defendant is charged with one of the enumerated offenses listed in U.S.C. § 3142(f)(1)(A)-(E) (involving crimes of violence, offenses for which the maximum sentence is life imprisonment or death, drug trafficking offenses, felonies involving a minor victim, and offenses involving the possession or use of a firearm (the "enumerated offenses"), or (2) the government shows that there is a "*serious* risk

that [the defendant] will flee" or obstruct justice.[2]  18 U.S.C. § 3142(f)(2).  As the Ninth Circuit held in *United States v. Twine*, 344 F.3d 987 (9th Cir. 2003):  "We are not persuaded that the Bail Reform Act authorizes pretrial detention without bail based solely on a finding of dangerousness.  This interpretation of the Act would render meaningless 18 U.S.C. § 3142(f)(1) and (2).  Our interpretation is in accord with our sister circuits who have ruled on this issue.  *See United States v. Byrd*, 969 F.2d 106 (5th Cir. 1992); *United States v. Ploof*, 851 F.2d 7 (1st Cir. 1988); *United States v. Himler*, 797 F.2d 156 (3d Cir. 1986)."  Accordingly, alleged danger to the community, standing alone, is not enough.  Absent one of these two factors, a defendant must be granted bail.  Every other circuit court that has addressed this issue – the First, Second, Third, Fifth and D.C. – agrees with the Ninth Circuit's decision in *Twine*.  *See United States v. Friedman*, 837 F.2d 48, 49 (2d Cir. 1988)("The Bail Reform Act does not permit detention on the basis of dangerousness in the absence of risk of flight, obstruction of justice, or an indictment for the offenses enumerated [in § 3142(f)(1)]."); *United States v. Singleton*, 182 F.3d 7, 9 (D.C. Cir. 1999); *Byrd*, 969 F.2d at 110 ("[W]e find ourselves in agreement with the First and Third Circuits:  a defendant's threat to safety of other persons or to the community, standing alone, will not justify pre-trial detention" and even "a defendant who <u>clearly</u> may pose a danger to society cannot be detained on that basis alone." (emphasis added); *Ploof*, 851 F.2d 7; *Himler*, 797 F.2d 156.

18.    Moreover, district courts in the Ninth Circuit have consistently followed the Ninth Circuit's holding in *Twine* and granted bail, including over the objection of the government, in cases where only danger to the community is

---

[2] This is a far higher standard than ordinary "risk of flight" and requires the government to substantiate its request that no bail be granted with evidence that there is a <u>serious</u> risk the defendant will flee.

alleged.  *See, e.g., United States v. Djoko*, 2019 WL 4849537, at *2 (W.D. Wash. Oct. 1, 2019) (revoking a U.S. Magistrate Judge's order of detention for a defendant charged with cyberstalking, citing legislative history for its finding that "Congress limited the categories of cases eligible for pretrial detention to those listed in 18 U.S.C. § 3142(f)" and that it did so "[t]o ensure that pretrial detention would continue to be an exception[,]" and noting that "unless the government can show by a preponderance of the evidence that a case falls into one of those [§ 3142(f)] categories, a defendant cannot be detained pending trial"); *United States v. Gentry*, 455 F. Supp. 2d 1018, 1019 n.2 (D. Ariz. Oct. 5, 2006) ("Since none of the crimes charged in the indictment meet the statutory definition of 'crime of violence' . . . the Government does not argue as a basis for detention that Defendant is a danger to the community.").  *See also United States v. Qazi*, 2017 WL 2484102, at *11 (D. Nev. June 8, 2017) (noting that the defendant was "eligible for detention based on the offense charged" because "in 2006, Congress amended the Bail Reform Act to authorize detention of a defendant charged with any felony that involves possession or use of a firearm"); *United States v. Bell*, 2008 WL 11411709, at *2 (C.D. Cal. June 6, 2008) (noting that the court was authorized to detain the defendant as a danger to the community because the defendant was charged with an enumerated offense).

19.     Section 3142(g) provides that the Court shall take into account a number of factors when determining whether there are conditions of release that will reasonably assure a defendant's appearance and the safety of the community. Included among these factors are: the nature and circumstances of the offense charged, including whether the offense is a crime of violence; the person's character; the person's physical and mental condition; the person's family ties and employment; the person's financial resources; length of residence in the community, the person's criminal history; record concerning appearance at court

proceedings; and the nature and seriousness of the danger to any person or the community that would be posed by the person's release. *See* § 3142(g). Evidence of guilt is the least important of the § 3142(g) factors. *See United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986). Further, the determination of pretrial release under § 3142 neither requires nor permits a pretrial determination of guilt. *See Gebro*, 948 F.2d at 1121-22.

20.    The Sixth Amendment to the United States Constitution and over 200 years of legal jurisprudence guarantee defendant the right to assist in his defense and meaningfully contribute. It is black-letter law in the United States that a criminal defendant is permitted to protect his liberty, defend himself and assist counsel in his criminal defense. *See*, *e.g.*, *McCoy v. Louisiana*, 138 S.Ct. 1500, 1507-08 (2018) (noting that the Sixth Amendment "speaks of the assistance of counsel of counsel, and an assistant, however expert, is still an assistant" and that "the accused, not a lawyer, is master of his own defense.") (quoting *Faretta v. California*, 422 U.S. 806, 819-20 (1975) and *Gannett Co. v. DePasquale*, 443 U.S. 368, 382 n. 10 (1979); *see also*, *United States v. Read*, 918 F.3d 712 (9th Cir. 2019). Indeed, the "Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense . . . The need to protect the individual's role in the defense is punctuated by the fact that it is the defendant and no one else who confronts a loss of liberty." *Faretta*, 422 U.S. at 819, 834. Thus, defendant must be permitted to review documents and discovery, draft documents, work and comment on pleadings, communicate and meet with his counsel, and assist in trial preparation in connection with each of his legal matters, the *Daniels* case included. This is especially true for defendant, who has skills and knowledge as a 20-year attorney.

## IV.   Facts Supporting Modification of the Terms of Release

21.     Defendant is a well-known figure with a strong work ethic and deep ties to the community and his children. He also has no means to flee.

22.     Defendant was born in 1971 in California - he is presently 50 years old. He began his legal career with O'Melveny & Myers, LLP in Newport Beach, California over 21 years ago and has remained a resident of the Central District since the year 2000. He has three children (ages 19, 17, and 7), all of whom he is close with, were born in Newport Beach and have permanent residences in Orange County. He also has many friends in the Central District, owing to his longstanding ties to the community.

23.     Defendant's roots in the Central District date back to the early 1900s (around 1905), when his great grandparents on his father's side immigrated from Italy to Los Angeles. His grandfather was born in Los Angeles and ultimately taught upholstery at a trade school in Los Angeles. His grandmother was born in the Central District in La Verne. Defendant's father was born in Los Angeles in the 1930s and went to high school in Los Angeles. His mother and father later met in Los Angeles in the 1960s and were married there.

24.     Defendant is not a flight risk, and no court has ever found that defendant is a flight risk, let alone a serious flight risk. In fact, this Court, together with (a) every other court faced with the question of defendant's risk of flight, (b) the Pretrial Services Agency ("PSA"), and (c) U.S. Probation (in connection with the Nike sentencing), has previously noted that defendant is **not** a flight risk, let alone a serious flight risk as required for detention pursuant to *U.S. v. Twine,* 344 F.3d 987 (9th Cir. 2003).[3]

---

[3] A transcript for the last bail hearing before this Court, held on May 28, 2021, is not presently available. However, notes from the hearing indicate that the Court made a statement that no one has ever claimed defendant is a flight risk.

25.     Since his arrest nearly three years ago, defendant has never attempted to flee nor has he ever been late to or missed a single court appearance in any of his three cases (there have been well over 50 appearances). The Court recently observed defendant in trial for approximately six weeks – defendant consistently appeared as directed, complied with the directives of the Court and demonstrated respect for the Court, its staff and the process.

26.     As recently found by the Hon. Paul Gardephe on July 8, 2021: "By all accounts, Mr. Avenatti is a loving and devoted father. . . . Mr. Avenatti's early years were marked by hard work, determination, and ambition. He started college at St. Louis University. He transferred to Penn in 1991. Because his parents were not in a position to fund his education, he worked full time to do so. After graduating from Penn, Mr. Avenatti entered law school at George Washington University. Again, he worked full time during the day and attended evening classes. He was working at well-known law firms, King & Spalding, and later at Anderson Kill. Despite the fact that he was working full time, he nonetheless managed to graduate with high honors at the top of his class. He then took an associate position at a well-known firm, O'Melveny & Myers, where he worked for four years. He then briefly joined a litigation boutique, and in 2006 he formed his first law firm . . ." SDNY Case No. 19-CR-00373-PGG, Dkt. 341, p. 38.

27.     While at the litigation boutique - Greene Broillet & Wheeler, LLP – defendant was primarily responsible for, among other things, obtaining a $22.5 million settlement against an accounting firm on behalf a client who had been defrauded by a corrupt Chief Financial Officer (William Anthony Lloyd).[4]

28.     In 2007, defendant was recognized out of thousands of attorneys in California as one of the top 20 attorneys under the age of 40.

---

[4] Mr. Lloyd was also prosecuted by the USAO in the Central District.

29.     In 2009, defendant was voted by his peers in Orange County as the Trial Lawyer of the Year.  That same year, he was honored by the California Assembly for "his unwavering commitment to the principles of legal ethics and the preservation of the justice system."

30.     In 2010, George Washington University Law School honored defendant with its prestigious "Recent Alumni Achievement Award."  Prior to this honor, the law school had placed defendant on its Board of Advisors and had also named an annual award to a graduating student after defendant – the "Michael J. Avenatti Award for Excellence in Pre-Trial and Trial Advocacy."

31.     From 2000 until 2019, defendant successfully represented thousands of clients across the United States.  Almost all of the cases were handled on a contingency fee basis.

32.     Between approximately 2012 to 2016, defendant also served as lead counsel for close to one thousand victims of Mr. Darren Berg of Seattle.  Mr. Berg perpetrated one of the largest ponzi schemes in the history of the Western United States, estimated at $140 million, and was sentenced to 18 years in federal prison. After years of work, defendant recovered millions of dollars for his client victims, many of whom were vulnerable, elderly and disabled.

33.     Although they made up less than 10% of his practice, defendant also handled select class actions.  For instance, in the middle of a jury trial in 2014, defendant settled a class action he had brought against a publicly traded company on behalf of Jewish families whose loved ones' remains had been removed from plots in a Los Angeles cemetery and dumped in a mass grave, all in the name of profits.  Tragically, many of those remains belonged to individuals who had managed to survive the Holocaust and who had been freed from Nazi concentrations camps at the end of the Second World War.  After extensive work in the case, defendant procured a settlement for his clients valued in the tens of

millions of dollars.  The case was featured on *60 Minutes* in 2012 in a story titled "Final Resting Place."

34.    In April 2017, defendant obtained a significant jury verdict[5] in Federal District Court (Los Angeles) on behalf of doctors, nurses and first responders after they were sold fraudulent and defective personal protective equipment during the Ebola pandemic by one of the largest publicly traded companies in the world.  As a result of the verdict, defective personal protective equipment (PPE) was removed from the United States National Stockpile in 2017, ensuring the safety of hundreds of thousands healthcare workers in the future (i.e. during the current Covid-19 pandemic).  *60 Minutes* featured the case and the health risks exposed by it in a story entitled "Strike-Through."  Defendant's work resulted in him receiving the national Public Justice Trial Lawyer of the Year Award in 2018, an annual award given to the attorney(s) in the nation who made the greatest public contribution to the public interest within the preceding year by trying or settling a precedent setting, socially significant case.  The Department of Justice, relying on defendant's work, recently settled a criminal matter against the corporate defendants and required them to pay a criminal fine in excess of $20 million.

35.    Defendant remains under his original bail conditions, set in 2019, in both cases in New York: SDNY: 19-cr-373(PGG) (the "*Nike*" case) and 19-cr-374(JMF) (the "*Daniels*" case)). The government has never sought to modify those conditions or argued that they are insufficient. The prosecutors in New York have likewise never claimed that defendant is a flight risk or a danger to the community.

36.    Following defendant's sentencing in the *Nike* case in July 2021 to 30 months of incarceration, the Hon. Paul G. Gardephe permitted defendant to remain

---

[5] The verdict was later reversed on appeal.

on bond under the original conditions set in March 2019 and to self-surrender to the Bureau of Prisons.

37.     On May 14, 2021, Pretrial Services submitted a report to this Court stating: "[t]hroughout the period of temporary release, the defendant has remained in compliance and has been cooperative with directives from Pretrial Services" (page 3)(emphasis added).  According to Pretrial Services, defendant "has shown a pattern of consistently compliant behavior" and it "has not received any new information that would suggest [Mr. Avenatti] is a flight risk or danger to the community." *Id*.  Further, in its view, the government has not provided anything that would suggest Mr. Avenatti is currently a flight risk or danger to the community. *Id*.

38.     These determinations by Pretrial Services are entirely consistent with the May 2020 conclusions of the U.S. Probation Office as documented in their presentence report filed in the *Nike* case [Dkt. 295].  That report states:  "[Mr. Avenatti] is not viewed as a flight risk or a danger to the community."  Despite having every opportunity to object to this finding or challenge it in the *Nike* case, the government has never done so.

39.     Since his temporary release to home confinement due to Covid-19 on April 24, 2020, defendant has taken the terms of his release seriously and has been fully compliant with each of his approximate 30 bond conditions.  Among other things, defendant (a) did everything he was required to do prior to being released from MCC, including being placed in solitary confinement and securing the $1 million bond; (b) met all of the requirements relating to his travel to California from New York with no issues; (c) promptly reported to Pretrial Services upon his arrival and regularly thereafter; (d) has timely made all necessary financial reports and disclosures to Pretrial Services as required (24 separate reports over the last eleven months), including asset and financial account disclosures; (e) has avoided

all prohibited contact with witnesses; (f) has complied with the orders of his release in his other two criminal matters pending in the Southern District of New York and made all associated court appearances; (g) has executed all documents as required by this Court; (h) has complied with the General Conditions of Release set forth in the Central District of California Release Order and Bond Form; (i) has maintained an exceptional relationship and perfect record with Pretrial Services; (j) has been monitored regularly and consistently by Pretrial Services through in-person, unannounced visits, FaceTime calls and emails (through Mr. Jay Manheimer as directed by Pretrial Services) and 24-hour electronic monitoring; and (k) has remained confined in Mr. Manheimer's 1,000 square foot, two-bedroom, one-bath apartment, except to attend court, meet with his defense team, and/or attend to medical needs.  Further, defendant has not engaged in any improper financial transactions, dissipated assets or improperly accessed any financial accounts.  There is also <u>no evidence</u> that he has harmed any members of the community or attempted to.

40.   Moreover, defendant travelled to New York in connection with his sentencing in the *Nike* case in July without incident or controversy.

41.   In addition, the current status of defendant's cases shows that defendant has significant reason to continue to fight the allegations against him and remain fully compliant with all bail conditions: (1) defendant has a strong appeal pending in the Ninth Circuit, which seeks dismissal of the entire Indictment in this case, not only counts 1-10, due to the government's *Brady* violations and misconduct (as documented in defendant's recently filed opening brief); (2) defendant has a pending motion for new trial in the *Nike* case due to another recently discovered serious *Brady* violation (Dkt. 358, SDNY Case No. 19-CR-

00373-PGG);[6] and (3) the *Daniels* prosecution is faltering because it is beginning to become apparent that the government has been duped and key evidence has been withheld by one or more government witnesses, thus creating a very real likelihood of acquittal.

42.     Defendant requires the ability to freely meet with his defense counsel in New York so that he may properly prepare for trial and participate in his defense. Defendant's counsel in the *Daniels* case from the Federal Defenders of New York will be prepared to address the Court during the hearing on this matter as to why the current bail conditions impinge on defendant's Sixth Amendment rights.

## V.     Conclusion

43.     For each of these reasons, defendant respectfully requests that the Court modify defendant's current conditions of release as requested above.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  December 15, 2021

/s/ Michael John Avenatti
MICHAEL JOHN AVENATTI

---

[6] The government suppressed *Brady* material from government expert John Drum that is directly contrary to the government's claims in its opening statement and both summations. This information was in the government's files long before trial in the *Nike* case and yet it was first produced only after the mistrial in this case (following repeated demands by the defendant).

## **CERTIFICATE OF SERVICE**

I, H. Dean Steward, am a citizen of the United States, and am at least 18 years of age. My business address is 17 Corporate Plaza, Suite 254, Newport Beach, California 92660. I am not a party to the above-entitled action.  I have caused, on December 15, 2021, service of the:

DEFENDANT'S BRIEF AND DECLARATION IN SUPPORT OF MOTION
FOR MODIFICATION OF TERMS OF TEMPORARY RELEASE

on the following party, using the Court's ECF system:

AUSA BRETT SAGEL AND AUSA ALEXANDER WYMAN

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 15, 2021

/s/ H. Dean Steward

H. Dean Steward

17