Michael John Avenatti (Pro Se)

H. Dean Steward, SBN 85317
17 Corporate Plaza, Suite 254
Newport Beach, California 92660
Tel (949) 481-4900
Fax (949) 497-6753

Advisory Counsel for Defendant
MICHAEL JOHN AVENATTI

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | SA CR No. 19-061-JVS |
|---|---|
| Plaintiff, | DEFENDANT'S EX PARTE APPLICATION FOR AN ORDER EXTENDING DEFENDANT'S TEMPORARY RELEASE |
| v. | |
| MICHAEL JOHN AVENATTI, | |
| Defendant. | [Proposed Order filed concurrently herewith] |

Defendant MICHAEL JOHN AVENATTI ("Mr. Avenatti"), by and through his advisory counsel of record, H. Dean Steward, hereby files this *Ex Parte* Application for an Order Extending Defendant's Temporary Release from February 1, 2022 to March 15, 2022. The government has informed the defense that the government opposes this request.

Dated: January 18, 2022      Respectfully submitted,


                             /s/ Michael John Avenatti
                             MICHAEL JOHN AVENATTI

## DECLARATION OF MICHAEL J. AVENATTI

I, Michael J. Avenatti, declare:

1. I am the defendant in *United States v. Michael John Avenatti* (CDCA Case No. SA CR No. 19-061-JVS) and am appearing in this matter *pro se*. I make this declaration in support of the Defendant's *Ex Parte* Application for An Order Extending Defendant's Temporary Release from February 1, 2022 to March 15, 2022.

2. Pursuant to this Court's prior Orders, defendant is presently on temporary release and home confinement in Venice, California. Absent a further extension, defendant will be required to self-surrender on February 1, 2022. For the reasons that follow, Defendant respectfully requests the ability to remain on temporary release for an additional forty-two (42) days - until March 15, 2022.

3. On January 24, 2022, Defendant is scheduled to appear for trial in the Southern District of New York before the Hon. Jesse M. Furman (Case No. 19-cr-00374-JMF). *See* Dkt. 160. Jury selection began on January 13, 2022 and the final pre-trial conference is set for January 18, 2022. In the written questionnaire that was provided to members of the venire last week, Judge Furman stated, "The trial is expected to last up to four weeks (ending no later than Friday, February 18, 2022)." [SDNY Case No. 19-cr-00372, Dkt. 233, p. 4] (emphasis from original omitted). If I am remanded to custody, in the middle of trial, my ability to assist with my defense, prepare for trial, meet with counsel and meaningfully participate in the trial will be severely impeded. Absent the extension of my temporary release, I will be required to surrender in the middle of trial, which would likely cause a quarantine period and disrupt trial proceedings.

4. Defendant is presently assisting his pro bono appellate counsel, Mr. Howard Srebnick, who did not participate in the six-week trial in this case, with

1

the Ninth Circuit appeal. Because defendant represented himself at trial and was intricately involved with the *Brady* issues that arose, which led to the mistrial, defendant's knowledge of the record and assistance on the appeal is critical. Defendant successfully motioned the Ninth Circuit for expedited treatment of his appeal – his reply brief is due January 28, 2022. The Ninth Circuit has set oral argument for March 10, 2022. Defendant cannot provide the necessary assistance if he is remanded now, especially in light of the continuing Covid-19 restrictions applicable to federal inmates.

5. Defendant continues to review the recently produced discovery from this case in anticipation of a possible re-trial (in the event his appeal is denied). This case involves well over 1,000,000 pages of discovery, hundreds of exhibits identified by the government, over 35 government witnesses, and a number of complex legal issues. The government only recently, on or about September 16, 2021 produced forensic copies of the servers from defendant's law firm, which contain over 19.86 terabytes of data. Defendant continues to review this data, together with his computer expert and paralegals, as well as the Tabs data. *See*, *e.g.*, Dkt. 859 filed *in camera*. In order to properly prepare for a potential trial in this complex case, Mr. Avenatti requires regular access to (a) the vast amount of discovery in this case, including the 6 GB of Tabs and QuickBooks data recently produced by the government; (b) his advisory counsel and paralegals; (c) a computer, printer and legal research; and (d) defense witnesses. This access cannot occur if defendant is in custody. As of the date of this declaration, Defendant continues to work with the PRT, the defense expert, and Software Technology, LLC in severing the files related to this case from all other files. His ability to assist in this process will be extremely limited, if not eliminated, if he is remanded.

6. The Bureau of Prisons ("BOP") COVID-19 protocols associated with holding defendant in custody will severely impede defendant's ability to meet with

his defense teams and witnesses, his access to discovery, trial exhibits, etc., and infringe on his right to meaningfully participate in his defense and mount a defense in this case and in the case before Judge Furman. Defendant also needs to be able to easily exchange facts and information with his team as the trial progresses.

7.  As the Court noted during the final pre-trial conference in this case, the risks associated with COVID-19 are still significant and the vaccine is "no silver bullet" – even if one is vaccinated, you can still contract the virus and suffer serious illness. In fact, the virus poses a significant threat as evidenced by the recent number of cases, hospitalizations and deaths in Orange County. On January 3, 2022, the Central District of California issued a notice suspending jury trials until January 24, 2022, as a result of "an alarming surge of COVID-19 cases nationwide and in the Central District of California largely due to a new variant of the virus that causes COVID-19 – Omicron."[1] The State of California "is still reporting record numbers of coronavirus cases. For the seven-day period that ended Wednesday [Jan. 12], the state was averaging 114,000 new cases a day. That's nearly double the prior week's 63,000 daily cases and far greater than last year's peak of 46,000."[2] New York is similarly experiencing a severe Covid-19 surge, "Hospitalizations and deaths are now steadily rising in the Empire State following the recent surge in COVID-19 cases fueled by the Omicron variant."[3]

---

[1] *See* "Temporary Suspension of Jury Trials," Kiry K. Gray, District Court Executive/Clerk of Court (Jan. 3, 2022) (accessed January 18, 2022). Available at : https://www.cacd.uscourts.gov/news/temporary-suspension-jury-trials.

[2] *See* "California Omicron Surge Expected to Peak Within Weeks," Los Angeles Times (Jan. 13, 2022) (accessed January 18, 2022). Available at: https://www.latimes.com/california/story/2022-01-13/california-omicron-surge-expected-to-peak-within-weeks.

[3] *See* "COVID-19 hospitalizations, death rise in New York as Omicron surges," New York Post (January 6, 2022)(accessed January 18, 2022). Available at:

Further, the risks of placing someone in custody generally, and the risks to defendant in particular, are already well documented in the record in this case.[4] *See also* "Fast, frequent and widespread: Covid-19 outbreaks inside federal prisons," UCLA, November 2021 (attached as Exhibit A). Although defendant has been vaccinated he is still at risk for the virus. Defendant anticipates receiving the booster shot in the near future.

8. Defendant has complied with the terms of his temporary release for nearly 21 months and continues to comply with the terms without incident. The Court recently observed defendant in trial for over six weeks – defendant consistently appeared as directed, complied with the directives of the Court and demonstrated respect for the Court, its staff and the process. Further, on May 14, 2021, the Pretrial Services Agency submitted a report to the Court stating that "<u>Throughout the period of temporary release, the defendant has remained in compliance and has been cooperative with directives from Pretrial Services</u>" (page 3)(emphasis added). According to PSA, defendant "<u>has shown a pattern of consistently compliant behavior</u>" and PSA "<u>has not received any new information that would suggest [Mr. Avenatti] is a flight risk or danger to the community</u>." *Id*. In addition, in PSA's view, the government has not provided anything new that would suggest defendant is currently a flight risk or danger to the community. *Id*. Moreover, defendant travelled to New York and back for his sentencing in the Nike related case in early July with no issues or complications. Defendant again

---

https://nypost.com/2022/01/06/hospitalizations-deaths-rise-in-new-york-in-omicron-surge/.

[4] *See, e.g.*, (a) the Opposition [Docket No. 271] to the Government's Motion to Terminate and Not Further Extend Defendant Michael John Avenatti's Temporary Release, which is pending, and (b) the accompanying declarations filed with the Opposition, including that of board-certified infectious disease specialist Dr. F. Ramzi Asfour (under seal) [Docket No. 280].

4

traveled to New York and back in December of 2021 with no issues or complications.

9. In connection with defendant's sentencing in New York on July 8, 2021, Judge Gardephe found that defendant had faced "horrific conditions" while in custody in New York for 100 days, almost all of which was in solitary confinement and/or under lock down status. <u>He also specifically stated it was hard to believe that the conditions defendant had to endure could occur in the United States</u>: "Mr. Avenatti was held in horrific conditions at the MCC for more than three months, in solitary confinement for much of the time and in lockdown for nearly all of it; first, because a loaded handgun had been smuggled by someone into the facility, and later because of the Covid-19 pandemic. Conditions were terrible. It's hard to believe they could occur in the United States of America. Mr. Avenatti himself was at risk from the Covid-19 virus as the result of a preexisting medical condition." *See, e.g.,* SDNY Case No. 19-CR-00373-PGG, Dkt. 341, p. 43. In particular, defendant was held in solitary confinement for weeks in "10 South" – the highest security pre-trial unit in the United States, with only six to seven cells, which was constructed after 9/11 for the purpose of holding suspected international terrorists and has been described as worse than Guantanamo Bay. The conditions at the jail generally are so substandard and barbaric, that it was recently announced by the Department of Justice that it is being shut down. *See*, *e.g.*, "Justice Dept. to Close Troubled Jail Where Jeffrey Epstein Died," New York Times, August 26, 2021.

10. Placing defendant in custody now will result in additional burdens and impediments being placed on this Court and the court in New York, the defense in this case and the defense in New York, and the government in connection with both cases. This situation is already challenging enough for all involved without these added challenges and obstacles.

11. There is no prejudice to the government if defendant is permitted to remain on release, but as outlined above, there is significant prejudice to the defendant if he is remanded.

12. For each of the above reasons, defendant respectfully requests that the Court extend his temporary release to March 15, 2022, under the same conditions previously ordered.

13. On January 17, 2022, the defendant contacted the government and was informed that the government opposes this Application. On January 18, 2022, the government stated the following: "The government objects to proceeding by way of ex parte application because the Court's procedures state that "Ex Parte applications are for extraordinary relief only," and defendant's request to extend his temporary release beyond a date that has been set since November 19, 2021, is not extraordinary. The government does not object to shortened time for a noticed motion provided the government is afforded 72 hours to prepare its response. Regarding the merits, the government opposes any extension of defendant's temporary release beyond 48 hours after the termination of the trial in U.S. v. Avenatti, Case No 19-374-JMF (S.D.N.Y.), which the presiding judge (Judge Furman) is instructing prospective jurors 'should end no later than February 18, 2022.' The pending appeal in the instant case is not a basis for any further extension of defendant's temporary release beyond 48 hours after the termination of the trial in New York because defendant's reply brief on appeal is due on January 28, 2022, and -- although the argument is set for March 10 -- the matters at issue are legal questions that will have been fully briefed."

14. The government's position is incorrect. First, defendant's temporary release has routinely been handled on an *ex parte* basis during this case. Second, there is insufficient time for a noticed motion. Third, the government fails to address defendant's Covid-19 concerns and risk to his health, defendant's need to

6

assist his counsel in preparing for and at oral argument before the Ninth Circuit, defendant's need to have access to the discovery in this case and prepare for any retrial, and defendant's need to assist his expert in reviewing the servers.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: January 18, 2022

                                      /s/ Michael John Avenatti
                                MICHAEL JOHN AVENATTI

**EXHIBIT A**



UCLACOVIDBEHINDBARS.ORG

# Fast, frequent, and widespread: COVID-19 outbreaks inside federal prisons

Alix M.B. Lacoste, Independent researcher
Erika Tyagi, UCLA Law COVID Behind Bars Data Project
Hope Johnson, UCLA Law COVID Behind Bars Data Project

November 2021

# Introduction

Over the course of the pandemic, nearly 50,000 people in federal prisons have been infected with COVID-19, and at least 256 people have died after testing positive.[1] As studies have shown, the rates of infection and mortality in federal prisons — like in state prisons, ICE detention centers, and other carceral settings — have been much higher than the overall rates in the United States throughout the pandemic.

We have conducted a deeper analysis of the pandemic inside federal prisons and identified several alarming patterns behind these numbers: across the federal prison system, outbreaks have been frequent and wide-reaching. After being first detected inside facilities, these outbreaks have also spread extremely quickly.[2]

## At the height of the pandemic, over 90% of all federal prisons experienced outbreaks

In this analysis, we defined an outbreak as the window of time during which five or more people — staff or incarcerated people or a combination — were actively infected with COVID-19 inside a given facility.[3] Using this definition, every single federal prison has experienced at least one outbreak since March 31, 2020, when the Bureau of Prisons (BOP) began reporting COVD-19 data.

During the winter of 2020-21, when cases peaked across the federal prison system, more than 90% of federal prisons experienced an outbreak (Figure 1).[4] While fewer facilities experienced outbreaks during the subsequent months, the number began rising again in July 2021, when the Delta variant of COVID-19 began to spread more widely.

During the first year of the pandemic, many prisons were in a nearly constant state of outbreak, with seven facilities experiencing an outbreak more than 90% of the time.[5] This pattern shifted after April 2021, when vaccines became more widely available to incarcerated people in federal prisons.

As of October 28, 2021, 30% of all federal prisons were in a state of outbreak.



**Figure 1. Percent of federal prisons experiencing an outbreak.** Each data point represents the percent of facilities experiencing an outbreak (5 or more incarcerated people or staff actively infected with COVID-19) at that time point.

## In the worst outbreaks, more than 70% of incarcerated people inside a prison were infected at one time

Outbreaks were not only frequent in number, but also wide-reaching within facilities. While eight facilities reportedly never reached more than 3% of incarcerated people actively infected at any given time, five had outbreaks where more than 60% were actively infected at once. Of those, three saw more than 70% infected (Figure 2).[6]



**Figure 2**

Maximum number of incarcerated people actively infected and population at the time of each facility's outbreak peak

**Figure 2. Maximum number of incarcerated people actively infected and population at the time of each facility's outbreak peak.** Dashed lines indicate infection rates.

The high infection rates caused by the outbreaks have led to infection rates among incarcerated people in federal prisons that are consistently higher than among the U.S. population as a whole. In May 2020, the rate of infection among incarcerated people in federal custody was more than 15 times the rate among the overall U.S. population (Figure 3).

At the height of the pandemic in the winter of 2020-2021, at least 6% of all people incarcerated in federal prisons were actively infected with COVID-19 and 5% of staff were. The corresponding rate in the U.S. population as a whole has never, throughout the entire pandemic, exceeded 1%.[7]

Over the last several months, rising case rates inside federal prisons have been driven increasingly by infections among staff, rather than among incarcerated people (Figure 4). While the percentage of incarcerated people testing positive has remained relatively low during the latest Delta-driven wave, the percentage of staff testing positive has increased steeply since July 2021.



**Figure 3**

Active COVID-19 cases in federal prisons and overall U.S. population

**Figure 3. Active COVID-19 cases in federal prisons and the overall U.S. population.** Percent of incarcerated people/staff in federal prisons and the overall U.S. population actively infected with COVID-19 across time. Active cases in the overall population are estimated by summing new cases reported in the previous 14 days based on data from the CDC. Population estimates for incarcerated people are based on data reported by the BOP, estimates for staff are based on data from The Marshall Project, and estimates for the overall U.S. population are based on 2020 Census data.



**Figure 4**

Percent of active cases in federal prisons from staff

**Figure 4. Percent of active cases in federal prisons from staff.** Percent of total active cases in federal prisons from staff (vs. from incarcerated people) across time.

That staff have accounted for a greater share of infections is likely due, in part, to lower vaccination rates among staff relative to incarcerated people in federal custody. The BOP reports that 72% of incarcerated people are fully vaccinated, compared to just 57% of staff.

Evidence is also emerging that high vaccination rates among incarcerated people are not sufficient to prevent or control outbreaks inside federal prisons. According to a report by the Centers for Disease Control and Prevention (CDC), an outbreak at a federal prison in Texas infected 74% of incarcerated people in two housing units between July and August 2021, even though 79% of them were fully vaccinated at the time. A recent report published in the New England Journal of Medicine also found lower vaccine effectiveness among incarcerated people relative to studies conducted before the Delta wave, demonstrating the continued risk that COVID-19 poses even in those carceral settings with high vaccine coverage.

## Outbreaks have spread quickly inside federal prisons

We define the most severe outbreaks as those in which more than 5% of incarcerated people inside a facility had active COVID-19 infections at once.[8] When such outbreaks occurred, we found, it took an average of just 20 days after reaching 5 active cases among staff and incarcerated people to surpass the 5% threshold (Figure 5).[9]

There have been 104 outbreaks inside federal prisons where at least 5% of incarcerated people at the facility were actively infected.[10] 7 of these outbreaks passed the 5% threshold on the very first day,[11] 30 outbreaks passed the 5% threshold within just ten days, and 60 outbreaks passed within 30 days.

**Figure 5**

**Cumulative distribution of days from the start of an outbreak until caseload reaches 5% of incarcerated people actively infected (among outbreaks crossing that threshold)**

Cumulative number of outbreaks
100
75
50
25
0
60 outbreaks passed the 5% threshold within 30 days
30 outbreaks passed the 5% threshold within 10 days
7 outbreaks passed the 5% threshold on the first day
0
50
100
150
Days from 5 active cases to 5% of population actively infected

**Figure 5. Cumulative distribution of days from the start of an outbreak until caseload reaches 5% of incarcerated people actively infected.** Among the 104 outbreaks where at least 5% of incarcerated people were actively infected at a point in time, the cumulative number of outbreaks that reached the threshold within the specified number of days, after reaching outbreak status (5 or more active cases among incarcerated people and staff).

In FCI Schuylkill in Pennsylvania, for example, there were just 6 active infections among staff and incarcerated people on December 8, 2020. The following week, more than 140 active infections among incarcerated people were reported. And after one month, that number increased to more than 200, or nearly 20% of the facility's total population at the time. After this initial outbreak subsided, FCI Schuylkill saw another massive outbreak two months later, this time infecting more than 270 incarcerated people.

Similarly, in FCI Texarkana in Texas, there were just 12 active cases among incarcerated people on November 15, 2020. The very next day, 119 active cases were detected inside the facility, and this number steadily climbed until December 15, when the BOP reported more than 400 active cases among incarcerated people inside the facility — nearly 40% of the incarcerated population at the time.

Case 8:19-cr-00061-JVS   Document 904   Filed 01/18/22   Page 14 of 16   Page ID #:22476

UCLACOVIDBEHINDBARS.ORG

FCI Schuylkill and FCI Texarkana are just two demonstrations of the rapid and unpredictable speed at which the virus spreads inside carceral settings (Figure 6).

But as recent evidence demonstrates, high vaccination rates alone aren't enough to prevent devastating outbreaks in prisons. For this reason, officials responsible for the health and safety of the



Figure 6. Outbreaks among incarcerated people at selected facilities. Active cases among incarcerated people across time at selected facilities with outbreaks that reached the 5% threshold. Colors indicate whether the facility is experiencing an outbreak (defined as 5 or more active cases among incarcerated people and staff and colored in orange) or one of the most severe outbreaks (defined as more than 5% of the facility's current incarcerated population being actively infected and colored in red).

# Conclusion

As the pandemic continues behind bars, it is critical for federal legislators and BOP leadership to take steps to protect incarcerated people and the staff who enter the prisons and return home each day to their communities. Such steps must include encouraging higher rates of vaccination among both incarcerated people and staff.

people who live and work in BOP facilities must also take immediate steps to decarcerate and keep population levels as low as possible. This strategy should include allowing the thousands of people who were placed on home confinement during the pandemic to remain at home, granting broad clemency to people in federal prisons, and affirmatively advocating for compassionate release at much higher rates it has thus far.


# Endnotes

1. Because the Federal Bureau of Prisons (BOP) removes from its cumulative count individuals who have been infected with COVID-19 but since been released, it is impossible to compute the total number of people who have tested positive inside federal prisons. It is certain, however, that the number reported by the BOP is an undercount.

2. Our analysis includes 98 facilities operated by the BOP. We exclude private federal facilities and residential reentry centers, for which data has not been consistently and reliably reported throughout the pandemic. We also aggregate facilities to the most granular level reported across the BOP's COVID-19, population, and vaccine data. For example, FCI Aliceville and Aliceville Camp are combined and considered a single unit for this analysis, as included in the BOP's reported list of locations.

3. The CDC defines an outbreak as two or more active infections linked through case investigation, contact tracing, or other linkage. Because we do not have information on case investigation or contact tracing, we define an outbreak more conservatively as five or more simultaneous active infections in a facility.

4. On December 18, 2020, 93 of the 98 federal facilities considered in this analysis were experiencing an outbreak.

5. The following seven facilities experienced an outbreak more than 90% of the time between March 31, 2020, and April 1, 2021: USP Atlanta, MCC New York, MCC Chicago, FDC Miami, FCC Oakdale, FTC Oklahoma City, and FMC Fort Worth.

6. The five facilities where more than 65% of incarcerated people were infected at their peak outbreak are the following: FCI Englewood (72% in December 2020), FCI Seagoville (71% in July 2020), FCI Loretto (71% in December 2020), FCI Safford (69% in January 2021), and FCI Terminal Island (66% in May 2020).

7. While it may be possible that federal prisons report higher infection rates if they are testing more frequently than the overall U.S. population, the BOP does not publicly report data on the number of COVID-19 tests administered. As a result, it is impossible to empirically validate this claim. Additionally, dozens of lawsuits have reported severe undertesting across federal prisons, suggesting that the true infection rates inside federal prisons may be even higher than those reported by the BOP.

8. Because the BOP does not report staff population data at the facility level, it is impossible to estimate staff infection rates at facilities. As a result, our definition of the most severe outbreaks only accounts for infections among incarcerated people. Note that our definition of outbreaks includes both incarcerated people and staff, as previously defined (5 or more active cases at a facility).

9. Across the 104 outbreaks in which more than 5% of incarcerated people had active COVID-19 infections, the median time to go from reporting just 5 active cases to crossing the 5% threshold was 20 days, and the mean was 41.7 days. Among the facilities where these outbreaks took place, 5 cases represents an extremely small share of the total population: the smallest facility to reach the 5% threshold is FPC Duluth (which has an incarcerated population of around 300 people), and the average incarcerated population across all federal prisons to reach the 5% threshold exceeds 1,000 people.

10. These 104 outbreaks occurred inside 87 different facilities, with some facilities reporting multiple distinct outbreaks that infected more than 5% of incarcerated people.

11. This may be in part due to testing practices, whereby the facility conducted broader testing in response to an outbreak and reported a number of previously undetected cases.

# **CERTIFICATE OF SERVICE**

I, H. Dean Steward, am a citizen of the United States, and am at least 18 years of age. My business address is 17 Corporate Plaza, Suite 254, Newport Beach, California 92660. I am not a party to the above-entitled action. I have caused, on January 18, 2022, service of the:

DEFENDANT'S EX PARTE APPLICATION FOR AN ORDER EXTENDING DEFENDANT'S TEMPORARY RELEASE

on the following party, using the Court's ECF system:

AUSA RANEE KATZENSTEIN and AUSA BRETT SAGEL

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 18, 2022

/s/ H. Dean Steward
H. Dean Steward