Michael John Avenatti (Pro Se)

H. Dean Steward, SBN 85317
17 Corporate Plaza, Suite 254
Newport Beach, California 92660
Tel (949) 481-4900
Fax (949) 497-6753

Advisory Counsel for Defendant
MICHAEL JOHN AVENATTI

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | SA CR No. 19-061-JVS |
| Plaintiff, | |
| | DEFENDANT'S (A) NOTICE OF INTENT TO CHANGE PLEA AND REQUEST SENTENCING AND (B) REQUEST FOR TELEPHONIC OR VIDEO STATUS CONFERENCE |
| v. | |
| MICHAEL JOHN AVENATTI, | |
| Defendant. | |

Defendant MICHAEL JOHN AVENATTI ("Mr. Avenatti") by and through his advisory counsel of record, H. Dean Steward, hereby moves and files the instant (A) Notice of Intent to Change Plea and Request Sentencing and (B) Request for Telephonic or Video Status Conference.

Mr. Avenatti hereby provides notice of his intent to change his plea and plead guilty to multiple counts in the Indictment and request sentencing on those counts. Mr. Avenatti intends to plead open.[1] Defendant, who is presently in the custody of the Bureau of Prisons

---

[1] Despite repeated efforts over the last year by Mr. Avenatti and his counsel, including substantial efforts made in the last 30 days, defendant has been unable to reach a plea agreement with the government. Mr. Avenatti wishes to plea in order to be accountable;

1

and serving two sentences imposed in two other cases,[2] respectfully requests that the Court hold a status conference for the purpose of scheduling Mr. Avenatti's change of plea and to discuss the impact of said plea on the existing deadlines and trial date. Mr. Avenatti requests the ability to appear telephonically or by video conference at that status conference.

Dated: June 12, 2022       Respectfully submitted,

            /s/ Michael John Avenatti
            MICHAEL JOHN AVENATTI

---

accept responsibility; avoid his former clients being further burdened; save the Court and the government significant resources; and save his family further embarrassment.

[2] Less than two weeks ago, Mr. Avenatti was sentenced by the Hon. Jesse Furman in the Southern District of New York. A true and correct copy of the transcript from that sentencing is attached as Exhibit A.

2

**EXHIBIT A**

M626AVIS

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4                 v.                          19 CR 374(JMF)
                                              Sentence
5   MICHAEL AVENATTI,

6                 Defendant.

7   ------------------------------x

8                                             New York, N.Y.
                                              June 2, 2022
9                                             10:00 a.m.
    Before:
10
                      HON. JESSE M. FURMAN,
11
                                              District Judge
12
                          APPEARANCES
13

14  DAMIAN WILLIAMS,
         United States Attorney for the
15       Southern District of New York
    BY:  MATTHEW D. PODOLSKY
16       ANDREW ROHRBACH
         Assistant United States Attorneys
17
    DAVID PATTON
18  FEDERAL DEFENDERS OF NEW YORK, INC.
         Attorneys for Defendant
19  BY:  ROBERT M. BAUM
         TAMARA GIWA
20       MALINI MALHOTRA

21  BREWSTER & DE ANGELIS, P.L.L.C.
         Attorney for Defendant Interested Party
22  BY:  CLARK O. BREWSTER

23  Also Present:
    Special Agent DeLeassa Penland
24  Emily Abrams, USAO Paralegal
    Juliet Vicari, Paralegal
25

M626AVIS

```
 1            (Case called)
 2            DEPUTY CLERK:  Counsel, please state your name for the
 3   record.
 4            MR. PODOLSKY:  Good morning, your Honor.
 5            Matthew Podolsky and Andrew Rohrbach for the
 6   government.  We're joined at counsel table by Special Agent
 7   DeLeassa Penland, and Emily Abrams, a paralegal with our
 8   office.
 9            THE COURT:  Good morning.
10            MR. BAUM:  Good morning, your Honor.
11            Robert M. Baum, and we have Michael Avenatti.
12            THE COURT:  Can you just speak into the microphone,
13   Mr. Baum?
14            MR. BAUM:  Thank you.  Robert M. Baum.  I don't know
15   if this is on, Judge.  Judge, you know about my technical
16   skills.  You've seen it in action.
17            THE COURT:  I think I've even taught you something
18   about texting and swiping.  Anyway...
19            MR. BAUM:  That's what I'm talking about.
20            Robert M. Baum on behalf of Michael Avenatti.  And I'm
21   joined by my co-counsel, Tamara Giwa.  And I'm also joined by
22   another attorney to my far left, Malini Malhotra, and my
23   paralegal Juliet Vicari.
24            Good morning, your Honor.
25            THE COURT:  Good morning to all of you.  You may be
```

M626AVIS

1    seated.

2             I recently tested negative for COVID-19, and our rules

3    allow me to unmask on the bench, so I will take advantage of

4    that.

5             We're here for purposes of sentencing.  In preparation

6    for today's proceeding, I have reviewed the presentence report

7    dated May 3, 2022.  I've also received and reviewed the

8    following additional submissions:  First, the defendant's

9    submission dated May 19, 2022, as well as the attachments to

10   that submission, which include a DOJ press release, an ABA

11   report of reform of the fraud guideline, letters addressed to

12   me from the defendant's ex-wife, his daughters, his ex-brother

13   and sister-in-law, and a friend; and a letter written by the

14   defendant to Ms. Daniels.  I've also received and reviewed the

15   government's submission dated May 26, 2022.  And for what it's

16   worth, I've also read the transcript of Mr. Avenatti's

17   sentencing before Judge Gardaphe.

18            First, have the parties each received the other's

19   submissions in unredacted form?

20            MR. PODOLSKY:  We have, your Honor.

21            MR. BAUM:  We have, your Honor.

22            THE COURT:  Just to underscore, we have an overflow

23   courtroom, there's also a press feed, so please make sure you

24   speak directly into the microphones to ensure that everybody

25   can hear.

M626AVIS

1              And are there any additional submissions that I should

2       have received?

3              MR. PODOLSKY:  Not from the government, your Honor.

4              MR. BAUM:  Not from the defense, your Honor.

5              THE COURT:  All right.  I have reviewed the proposed

6       redactions to the defense submission.  I find that they are

7       justified on the basis of principally the privacy interests of

8       third parties, and they are narrowly tailored to that

9       justification, so I will approve those.

10             Mr. Podolsky, can you confirm?  My understanding is

11      that Ms. Daniels' lawyer may be here to speak on her behalf; is

12      that correct?

13             MR. PODOLSKY:  That is right.  Mr. Brewster,

14      Clark Brewster, is in attendance, and I believe wishes to relay

15      a statement or a comment from Ms. Daniels.

16             THE COURT:  All right.  And, obviously, that does mean

17      that she has notice of this proceeding.

18             Mr. Brewster, I'll give you an opportunity to be heard

19      later in this proceeding.

20             Turning to the presentence report, Mr. Baum, have you

21      reviewed the presentence report?  Use the microphone.

22             MR. BAUM:  Yes, I have, your Honor.

23             THE COURT:  And have you reviewed it and discussed it

24      with Mr. Avenatti?

25             MR. BAUM:  We have, your Honor.

M626AVIS

1              THE COURT:  All right.  And, Mr. Avenatti, have you

2     reviewed the presentence report?

3              THE DEFENDANT:  Yes, your Honor.

4              THE COURT:  And did you have enough time to go over

5     the report and to discuss with your lawyers anything and

6     everything you would wish to bring to my attention in

7     connection with your sentencing?

8              THE DEFENDANT:  Yes, your Honor.

9              THE COURT:  All right.  And, Mr. Baum, I will make the

10    corrections that you request at Pages 11 and 12 of your

11    sentencing submission, to which the government has indicated in

12    Footnote 3 of its submission, does not object.

13             Putting aside those and putting aside the guidelines

14    for a moment, any other objections or corrections?

15             MR. BAUM:  Of course we are prepared to discuss our

16    objections to the guidelines calculation, but there is one

17    additional objection, which, unfortunately, we didn't raise

18    with the Court in our sentencing submission because, at the

19    time, we did not have an opportunity to talk to Mr. Avenatti —

20    he was in transit — until after the sentencing submission was

21    due.

22             We do object to one of the special conditions

23    recommended by probation, and that is the special conditions

24    related to a search.  We are prepared to provide the Court with

25    our reasons.

M626AVIS

1        THE COURT:  All right.  So I'll give you an

2   opportunity to be heard on that.

3        Mr. Podolsky, have you reviewed the presentence

4   report?

5        MR. PODOLSKY:  We have, your Honor.

6        THE COURT:  And putting aside the guidelines, any

7   objections or corrections to the factual recitation?

8        MR. PODOLSKY:  No, your Honor.

9        THE COURT:  Hearing no other objections, I will adopt

10   the factual recitations set forth in the presentence report as

11   modified by the corrections at Pages 11 and 12 of the defense

12   submission.  The presentence report will be made part of the

13   record in this matter and kept under seal.  In the event of an

14   appeal, counsel on appeal may have access to the sealed report

15   without further application to me.

16        Turning, then, to the guidelines.  As counsel are

17   aware, I'm not required to follow the guidelines in the wake of

18   *United States v. Booker*, but I am required to consider the

19   applicable guidelines range in imposing a reasonable sentence,

20   and must, therefore, accurately calculate the sentencing

21   guidelines range.

22        In this case, the presentence report calculates that

23   the total offense level is 21, criminal history category is II,

24   and the guidelines range with the 24-month consecutive sentence

25   required for Count Two is 65 to 75 months' imprisonment,

M626AVIS

1    supervised release range of one to three years, and a fine

2    range of 15,000 to $595,000.

3            That calculation is based, in part, on probation's

4    conclusion that the loss amount for purposes of guidelines was

5    $297,500 based on the third and fourth book payments that were

6    due to Ms. Daniels.

7            I understand in his sentencing submission,

8    Mr. Avenatti objects to that calculation on two grounds; first,

9    on the ground that he made Ms. Daniels whole with respect to

10   the third book payment as the evidence at trial made clear; and

11   second, in essence, based on the costs and expenses that he

12   incurred and the benefits that he allegedly bestowed on

13   Ms. Daniels in connection with his representation of her

14   generally, that, in essence, she got more than he took from

15   her.  I reject both those arguments.  They are both meritless.

16           First, with respect to the first argument about making

17   her whole, it's not clear that he, quote/unquote, returned the

18   money within the meaning of the applicable guideline note,

19   namely 3E(i)(II).  The record at trial made clear that he used

20   the money that he took for his own purposes and paid

21   Ms. Daniels with other funds, which he had borrowed under false

22   pretenses from a third party.  But, ultimately, I need not

23   decide that question, because even if the funds paid could be

24   deemed returned within the meaning of the applicable note, I

25   agree with the government that the evidence at trial was

M626AVIS

1    overwhelming, that Mr. Avenatti paid Ms. Daniels the equivalent

2    of the third book payment to forestall her imminent discovery

3    of his crime.

4            See Page 6 of the government's sentencing letter,

5    which marshals some of the relevant evidence at trial.  And,

6    indeed, I think the evidence is clear that that is the only

7    reason Mr. Avenatti paid Ms. Daniels, let alone paid her at

8    that time.

9            The second argument I also find without merit.

10   Mr. Avenatti cites no authority, that I'm aware of, none that

11   supports a view of loss of the sort that he presents.  Indeed,

12   what authority there is points in the opposite direction.  See,

13   for example, *United States v. Byors*, 586 F.3d 222, 226 (2d Cir.

14   2009).

15           So the argument is not supported by law, nor is it

16   supported by logic.  Mr. Avenatti got what he bargained for,

17   and then some.  That is, he used his representation of

18   Ms. Daniels to get fame, notoriety, and money for himself.

19   Indeed, he secured his own book contract worth $2 million.

20   Ultimately, he obviously didn't get paid that.  But no doubt,

21   in large part based on his representation of her, he obtained

22   part of the fee that Mr. Janklow had received without

23   disclosing that to Ms. Daniels, so on and so forth.  In other

24   words, he received substantial remuneration, financially, and

25   through exposure through his representation.

M626AVIS

1           Finally, I would note that there's no merit to the

2    suggestion made in Mr. Avenatti's sentencing memorandum that

3    the government conceded at trial that the loss amount was

4    $148,750.  A review of the relevant transcript page, 1525,

5    makes plain that that suggestion takes the government's comment

6    made as part of a discussion during the charge conference about

7    what would or would not constitute a defense completely out of

8    context.  It's certainly not a concession regarding the loss

9    amount within the meaning of the guidelines, which was

10   obviously not an issue at that stage of the case.

11          Accordingly, for those reasons, I reject the

12   objections to the guidelines calculation that are set forth in

13   the defense submission.

14          The defense makes an additional argument about

15   downward departure under 4A1.3, which I'll address in short

16   order.  But first let me check if there are any other

17   objections or corrections to the guidelines calculations set

18   forth in the presentence report.

19          Mr. Podolsky?

20          MR. PODOLSKY:  No, your Honor.

21          THE COURT:  Mr. Baum?

22          MR. BAUM:  No others, Judge.  But if I may, I'd like

23   to just add some additional arguments, and I will not repeat

24   anything you said --

25          THE COURT:  You need the microphone.  But if it's on

M626AVIS

1    the issues I just resolved, the answer is no.

2              MR. BAUM:  It's to add something.

3              THE COURT:  Do you want to use the podium?

4              MR. BAUM:  Please.  I have it.

5              THE COURT:  Why don't you use the podium?  Then you

6    can actually unmask, if you'd like.

7              MR. BAUM:  Thank you, Judge.  My point --

8              THE COURT:  Hold on.  You need to turn the microphone

9    on.  Go ahead.

10             MR. BAUM:  It looks like it's on, Judge.

11             THE COURT:  Go ahead.

12             MR. BAUM:  I'm not going to repeat anything that

13   you've already ruled on in terms of the arguments or the basis

14   for your ruling, but I would like to add something, which I

15   think it is important for the Court to consider.

16             First, your Honor just ruled that the fact that

17   Mr. Avenatti returned the money was not consistent with the

18   manner in which a return is required.  The government argued

19   that it had to be the same money that was taken.  I merely want

20   to point out two things:

21             One is that in the guidelines application note, there

22   was no reference to the definition of what the return would be.

23   And if the definition, as advocated by the government that it

24   had to be the same money, that easily could have been addressed

25   by the sentencing commission by way of explanation.  Because it

1    was not addressed, I think it's an indication that the broader

2    sense of money returned is not the identical funds that were

3    taken, since money is fungible, but basically the amount of the

4    money is the issue.

5         I would add one other factor to this, Judge.  Clearly,

6    the government cited a case from the Third Department,

7    *United States v. Fumo*, 655 F.3d 288, for the proposition that

8    money returned must be the same money.  I point out that there

9    is no corresponding law in the Second Circuit, that there's no

10   corresponding law in accord with that Third Circuit decision

11   from any other circuit.  But the important thing about the

12   government citing *Fumo* is this:

13        That they cited *Fumo*, and by doing so, they concede

14   one of our other points.  What do I mean?  The government cited

15   *Fumo* for this issue that the return must be the same.  But they

16   also cited *Fumo* for the proposition that either the defendant

17   had to return the money, or that the defendant had to provide

18   services in compensation other than money.

19        By making this argument and the reliance on *Fumo*, they

20   clearly have adopted the second prong of *Fumo*, which is that

21   services can serve as a credit against the loss, and this is

22   consistent with the guidelines note, that services can serve as

23   a credit for loss.

24        The Court remarked during the trial that the services

25   that Mr. Avenatti performed in relation to the book were

M626AVIS

substantial.  We quoted the Court's comments in our sentencing

submission.  Clearly, Mr. Avenatti provided services related

directly to the book, involving hundreds of hours of work in

all manners of services related to the negotiations and the

finalization of the book deal.  And those services should be a

credit against the loss based not only on the government's

citation to *Fumo*, but on the application notes themselves.

And if the Court is relying on the fact that there can

be no credit for loss where the victim was either aware or

about to become aware of the loss, I merely point this out for

the Court, which I know the Court is probably aware of:

Mr. Avenatti is alleged to have taken the second payment and

paid it back.  Now, Ms. Daniels had no knowledge of anything

about the second loss being stolen.  She thought it was merely

late, and I believe that was the testimony.

But the interesting thing, which I want to point out

to the Court, is that Mr. Avenatti then is alleged to have

taken the third payment, and that was sometime after the second

payment.  So there is no doubt that when the second payment was

taken, Ms. Daniels was not aware that anything was stolen

because she kept on asking about a third payment.  And the

record at the trial reflects that Ms. Daniels did not become

aware that anything was stolen until almost six months later

when she contacted the publisher who told her that Mr. Avenatti

had received the second and third payments.

1          So I think the idea that Mr. Avenatti cannot get a

2     credit for loss because it was either discovered or about to be

3     discovered is inconsistent with the evidence at the trial.  So

4     on that basis, I'm asking you to reconsider your ruling.

5          THE COURT:  All right.  That request is denied.

6          First, I didn't reach the question of whether it

7     constituted a return within the meaning of the guidelines.  I

8     adverted to that but said I didn't need to resolve it because I

9     did find that he paid her back when he had reason to believe

10    that his fraud would be discovered.

11         To the extent that Ms. Daniels believed the payment

12    was late, I think that was based on Mr. Avenatti's own false

13    statements to her and misimpression that he caused to her.  And

14    I think the record is quite clear that she said she was going

15    to reach out to the publisher and/or agent directly, and it was

16    presumably that that prompted Mr. Avenatti to scramble in order

17    to find a source of funds to pay her that money back.

18         So, again, I'm not reaching the *Fumo* question, but

19    find on the basis of the relevant language and the note that it

20    doesn't apply here.  With respect to the services, again, I

21    think Mr. Avenatti was handsomely compensated for his services,

22    both in kind and through various funds.  But for reasons that

23    I've discussed at length elsewhere and at trial, there's no

24    basis to the argument that he was entitled on the basis of

25    whatever efforts he made on Ms. Daniels' behalf, to simply take

M626AVIS

1    her money, let alone lie to her in service of that.  So

2    understood.

3           MR. BAUM:  Thank you, Judge.  And just to correct the

4    record, although in talking about the service, I focused on the

5    services provided for the book deal, we did allege in our

6    sentencing memorandum, and I would also note for the Court that

7    we also believed that he should receive a credit for loss for

8    all the legal services that he provided to Ms. Daniels.

9           THE COURT:  All right.  Thank you.  I also think that

10   *Byors*, which I referenced before, stands for different

11   propositions.

12          Mr. Podolsky, is there anything you want to say on

13   these issues?

14          MR. PODOLSKY:  No, your Honor.  I think that, frankly,

15   defense counsel's interpretation of *Fumo* is incorrect, but I

16   don't think it's relevant to the decision at hand, so I don't

17   think there's any use in pursuing that issue.

18          THE COURT:  All right.  In light of the foregoing,

19   using the November 2021 edition of the guidelines, I accept and

20   adopt the guidelines calculation set forth in the presentence

21   report; that is, I find  that the offense level is 21, criminal

22   history category is II, and the guidelines range, with the

23   24-month mandatory consecutive sentence for Count Two, is 65 to

24   75 months' imprisonment.

25          That brings me to the question of departures.  In his

M626AVIS

sentencing submission, Mr. Avenatti argues that pursuant to
Section 4A1.3(b)(1) of the guidelines, I should downwardly
depart from criminal history category II to criminal history
category I because three criminal history categories
substantially overstates his record.

Mr. Baum, anything else you want to say on that score,
or do you rest on your written submission?

MR. BAUM:  Judge, there is one additional thing I
would like to say on that score.

Aside from the fact that probation agrees with us that
a variance is warranted because criminal history overstates, we
do point out to the Court that Mr. Avenatti was being
investigated for the fraud and aggravated ID theft against
Stormy Daniels before he was arrested and charged with the Nike
case.  The government, nevertheless, chose to prosecute him in
two separate prosecutions.

And as set forth, in our sentencing memorandum, while
we are not alleging that the government did it intentionally to
cause the issue, which we now raise with the Court, it had to
the same effect.  By prosecuting him on two separate occasions,
they had the ability to now argue that he should be placed in
criminal history category III as opposed to category I or II.
And we believe that their strategic decision that led to this
should not be condoned by the Court.  And probation, to some
degree, agrees with that assessment.

M626AVIS

1          THE COURT:  Okay.  And it seems to me that as the

2    government argues in its submission, that had the government

3    chosen to charge those two crimes together, or multiple crimes

4    together, that Mr. Avenatti almost certainly would have moved

5    for, and probably been granted, a severance since the Nike

6    conduct had absolutely nothing to do with the conduct at issue

7    here.  So doesn't that somewhat undermine the argument?

8          MR. BAUM:  It could undermine the argument, Judge.

9    But at the same time, counsel could have chosen to let both

10   trials proceed in the same indictment with the understanding

11   that the result of two separate trials could lead to a dramatic

12   change in the guidelines if he were convicted at one trial.

13         THE COURT:  All right.  Mr. Podolsky, anything else

14   you wish to say?

15         MR. PODOLSKY:  Simply to say, as we allude to in our

16   submission, that the decision to charge Mr. Avenatti in two

17   separate indictments is not a strategic one; it was one to

18   follow the rules of criminal procedure, and, frankly, it's not

19   relevant to the analysis at issue today.

20         Other than that, we rely on our submission.

21         THE COURT:  All right.  So I'm obviously aware of my

22   authority to depart under 4A1.3 but find there's no basis to do

23   so here.  There's no dispute that the Nike conviction is a

24   prior conviction within the meaning of the guidelines.  It's

25   not relevant conduct with respect to this case within the

M626AVIS

1   meaning of the guidelines, which to say it's discrete criminal

2   conduct, and the defendant cites no authority other than the

3   guidelines provision itself to justify a departure in these

4   circumstances.

5            The fact that the government could have charged the

6   crimes together is neither here nor there.  It didn't.  And

7   even if it had, I suspect the charges would have been severed

8   and treated separately because the conduct has nothing to do

9   with one another.  So the fact of the matter is, he went to

10  trial on the Nike case first, was convicted, sentenced, and

11  under the guidelines, that warrants three points.  And I see no

12  basis to reduce it in light of that record.

13           Does either counsel believe that there are any other

14  grounds for a departure that is within the meaning of the

15  guidelines and as distinct from what has become known as a

16  variance?

17           Mr. Baum?

18           MR. BAUM:  No, your Honor.

19           THE COURT:  Mr. Podolsky?

20           MR. PODOLSKY:  No, your Honor.

21           THE COURT:  All right.  I've nevertheless considered

22  whether there's any other basis for a departure, again, within

23  the meaning of the guidelines, and find there are no grounds

24  that would justify a departure.

25           With that, I will hear first from counsel, then from

M626AVIS

1    Mr. Avenatti, and then from Mr. Brewster.  Let me stress that I

2    have read your sentencing submissions, read them with care, and

3    I obviously also presided over a trial in this matter, so you

4    don't need to repeat things that you've already said to me in

5    writing and/or that I would already know.  But that being said,

6    it's your opportunity to make arguments to me about what you

7    think is relevant for purposes of sentencing.

8           I would propose that counsel and Mr. Avenatti, if he

9    wishes, use the podium, and then you can unmask, if you wish.

10   But I'll hear first from the government.

11          Mr. Podolsky.

12          MR. PODOLSKY:  Thank you, your Honor.

13          We have given some thought as to what would be useful

14   to the Court to hear today given your intimate knowledge of the

15   case, and, frankly, I think knowledge of the defendant -- more

16   than would be the case in many other trials where the defendant

17   did not represent himself.

18          I think one thing to note is that this is really the

19   conclusion, or substantially the conclusion of what, thanks to

20   the pandemic, has been about three years of investigating and

21   prosecuting this defendant for a litany of crimes.  And I

22   thought I would emphasize one or two things that we observed

23   during the course of speaking with the victims and witnesses in

24   these cases.

25          And what I want to emphasize about this case is that

when you strip away the -- I would say large personalities at

trial, some of the, I suppose, media aspects, it's a very

personal and somewhat sorry story.

One thing that really came through to us in

Ms. Daniels' testimony and in meeting with her is that she

really trusted Mr. Avenatti implicitly and deeply for a long

period of time -- as she should.  He was her attorney, and I

think he was involved in her life in a very intimate way.  And

it appears that he did good things for her for a certain period

and, certainly, she believed so.

The second thing that we really observed in her

testimony and in meeting with her is the incredible pride that

she took in her book and telling her story, and that the money

from that book meant a great deal to her, both emotionally and

financially.  She testified about the feeling of pride that she

had when she received her first payment and actually spoke

immediately with her lawyer, Mr. Avenatti.

There was also testimony and text message evidence

about what she was going to do with the later payments;

primarily to finance having her own home so she could move out

from the home she shared with her ex-husband at the time.

Again, something that she shared with Mr. Avenatti, telling him

about the house she wanted to buy.

And so you can, I think, imagine and saw during the

trial the incredible personal betrayal that happened when she

1    found out that for a period of eight months, her lawyer,

2    Mr. Avenatti, had not only stolen her money but lied to her

3    over and over again.

4           And the guidelines talk about abuse of trust.  I think

5    that's an apt phrase here.  The only reason that Mr. Avenatti

6    was able to get away with a, frankly, somewhat cockamamie

7    scheme for such a long time is because Ms. Daniels trusted him.

8    She absolutely believed he was working for her and that he

9    would not lie to her.  And so did Mr. Janklow and Ms. Beier,

10   who were also working with Ms. Daniels.  And they trusted

11   Mr. Avenatti because of his personal relationship with

12   Ms. Daniels but also because he's an attorney.

13          Many jokes and ideas in popular culture about trusting

14   or not trusting attorneys, but people do trust their attorney,

15   and Ms. Daniels certainly did here.  And it's absolutely

16   critical in our society that people do trust their attorneys.

17   We saw really much the same type of abuse of trust in the Nike

18   case with his client, Gary Johnson, and that is really what

19   these cases are about.

20          We do say in our sentencing submission that we think a

21   guideline sentence of 65 to 75 months would be harsh.  But we

22   also think that, effectively, a mandatory minimum sentence, the

23   sentence of the minimum that Congress would permit, as, in

24   substance, requested by the defendant, would not be sufficient

25   in this case.  And it would not be because just punishment,

M626AVIS

 1    punishment for this type of betrayal and deterrence for

 2    Mr. Avenatti, and particularly for other attorneys, would not

 3    be served by a mandatory minimum sentence in this case.

 4              With that, your Honor, we're happy to answer any

 5    questions but would rest on our submission.

 6              THE COURT:  I guess the only question I have, and it

 7    may be that I should give you an opportunity to speak after

 8    Mr. Baum, is just if you want to speak to the search condition

 9    recommended by probation, or if you would prefer to wait and

10    hear what Mr. Baum has to say.

11              MR. PODOLSKY:  I would.  I suspect our position to be

12    to defer to the wisdom of probation on this, but perhaps we can

13    wait have to hear from Mr. Baum.

14              THE COURT:  You wouldn't defer to my wisdom, just

15    probation?

16              MR. PODOLSKY:  In terms of the recommendation, of

17    course we will defer to whatever the Court orders.

18              THE COURT:  Okay.  Thank you.

19              Mr. Baum, anything you wish to say?  And do you want

20    to use the podium?

21              MR. BAUM:  Judge, with the Court's permission, I'd ask

22    that you allow Ms. Giwa to make the presentation related to the

23    3553 factors for the Court to consider.

24              THE COURT:  Let me pose in advance of that two things

25    Ms. Giwa might want to address:  One is the search condition,

1    whatever argument you wish to make on that front; but second,

2    and maybe more fundamentally is -- and I don't know if this is

3    a question for Ms. Giwa or Mr. Avenatti himself.  But I wanted

4    to sort of press on the letter that Mr. Avenatti wrote to

5    Ms. Daniels that was included in the sentencing submission to

6    me.

7         I guess the question I have is whether and to what

8    extent it should be viewed as an acceptance of responsibility.

9    And putting aside the late part of it, whether it's too little,

10   indeed, and that's where -- let me stress that at trial,

11   Mr. Avenatti conceded that he had been dishonest with

12   Ms. Daniels, that he told her lies in various texts and e-mails

13   and calls, but argued that he was entitled to the money because

14   he had performed services for her under, again, some quantum

15   meruit type theory.

16        For the reasons I explained elsewhere and won't repeat

17   here, that was not a valid defense.  It also, separate and

18   apart from its legal infirmity, defies belief that Mr. Avenatti

19   actually believed that at that time as opposed to it being a

20   post hoc, clever argument to be made at trial.

21        Mr. Avenatti is too experienced and is too skilled a

22   lawyer to simply think he can simply take Ms. Daniels' money

23   and lie to her.  But the bottom line is that apologizing to her

24   for his, quote/unquote, failures doesn't mean that he is

25   accepting responsibility for the crimes for which he was

M626AVIS

1   charged.  It may be that he is simply alluding to the

2   dishonesty that he's already acknowledged.

3           So I guess the question I have is, what is

4   Mr. Avenatti actually apologizing for?  If the letter is

5   intended to apologize for what he's already apologized for at

6   trial and in his closing, I think, that he wasn't honest with

7   her, it strikes me as, indeed, being too little, and if not too

8   late as well.

9           If he is apologizing for having committed the crimes

10  that he was convicted of, then that is a different story.  Now,

11  I recognize that this puts Mr. Avenatti in a bit of a bind that

12  he has stated his intention to appeal, and therefore may not

13  want to admit his guilt of the crimes charged.  That's

14  obviously fine; that's his right.  I'm not requiring that he

15  confess to the crimes.  But if he doesn't, if he doesn't

16  acknowledge that he defrauded Ms. Daniels and stole her

17  identity, then he deserves no credit for accepting

18  responsibility beyond what he's already done at trial.

19          So, again, Ms. Giwa, you're welcome to address that.

20  Mr. Avenatti is welcome to address that when he speaks.  I just

21  wanted to push a little bit on what he is accepting

22  responsibility for in that letter.

23          Ms. Giwa.

24          MS. GIWA:  Your Honor, I would like to approach the

25  podium for my presentation.  I just need a minute to speak to

M626AVIS

1   Mr. Avenatti.

2              THE COURT:  Okay.

3              MR. BAUM:  Judge, perhaps, at this point, Ms. Giwa was

4   not going to address the special condition.  Should I address

5   it at this point and then allow Ms. Giwa to continue?

6              THE COURT:  Yes, please.

7              MR. BAUM:  Thank you.

8              As your Honor is aware, probation recommended a

9   special condition.  It's a special condition related to search

10  of electronic devices.  When I reviewed the special condition,

11  I certainly then looked into the guidelines issues related to

12  special conditions.

13             I point out first that probation gives no validation

14  or rationale for the imposition of the special condition.  And

15  when I looked at the guidelines, I found that under

16  Guideline Section 5D1.3(d), which is entitled special

17  conditions, the specific special condition which probation

18  recommended is listed under Subdivision 7, sex offenses.  And

19  probation took the exact language from 7(C), and that's the

20  recommendation they made.  Clearly, Mr. Avenatti is not charged

21  with a sex offense.

22             I then did, as your Honor knows I'm apt to do, the

23  research related to special conditions in the Second Circuit.

24  I acknowledged that the Court has broad discretion to tailor

25  conditions of supervised release to the goals and purposes

M626AVIS

outlined in the guideline section I just mentioned.  And,

certainly, the Court can impose a special condition but only —

only — where that special condition is reasonably related to

the factors set forth in 18 U.S.C. 3553(a), and, in addition,

if that special condition involves no greater deprivation of

liberty than is reasonably necessary and is consistent with

pertinent policy statements issued by the sentencing

conditions.

I cite the case of *United States v. Myers*, 426 F.3d

117, 124 (2d Cir. 2005), for the proposition that the district

court's discretion is not "untrammeled" and that the

Second Circuit will carefully scrutinize for unusual or severe

conditions.  So my objection is that clearly the guidelines

recommend this condition in sex offenses, and probation offers

no validation why it should be imposed in this instance.

It also provides for an additional deprivation of

liberty, which is inconsistent with case law and the

guidelines.  And we think on that basis, the Court should

reject this, unless probation comes back with a further

rationale for the imposition of this condition.

THE COURT:  Okay.  Thank you.

Mr. Podolsky, I will give you an opportunity, even

though you said you would defer to probation's wisdom.

Anything else you want to say on that?

MR. PODOLSKY:  I'll say this, your Honor:  First of

M626AVIS

1    all, the condition, to be clear, is that the devices would be

2    subject to search upon reasonable suspicion concerning a

3    violation of a condition of supervision.  So it's not simply a

4    blanket provision to search on whim.  I do think there is ample

5    evidence in the record of the defendant's repeated financial

6    crimes that would justify such a condition.

7            With that said, to be clear, we do defer to the wisdom

8    of the Court on this particular condition.

9            THE COURT:  All right.  Thank you.  And do either of

10   you happen to know whether that condition was imposed as part

11   of Judge Gardephe's sentence?  It's fairly standard.

12           MR. BAUM:  Yes, Judge.  We actually looked as soon as

13   we realized this was a condition we would like to contest.

14   Judge Gardephe did not impose that condition, and I believe it

15   was not recommended.  Probation did not recommend it, and

16   Judge Gardephe did not impose it.

17           THE COURT:  All right.  Thank you.

18           Ms. Giwa.

19           MS. GIWA:  Your Honor, before I really begin my

20   presentation -- can you hear me?  Okay.  I'd like to make an

21   introduction of sorts.  Today in the court are Mr. Avenatti's

22   close friends.  They are sitting in the second row right behind

23   me.  These are people who have come to court to demonstrate

24   their support for Mr. Avenatti.  They've been here with him

25   through the trial and will be with him going forward.

M626AVIS

1          As your Honor noted, we filed with our submission note

2     letters of support from Mr. Avenatti's family.  They've been in

3     close communication with us.  And although they couldn't be in

4     court today, the reason for that is largely due to COVID.  Some

5     of them noted in their letters to you that they are

6     immunocompromised, and the pandemic makes travel to New York

7     City difficult.  But I suspect they are eagerly anticipating

8     your decision today, and I expect they will be in touch with us

9     as soon as we leave here.

10          And so I raise that just to remind the Court that

11     although they are not physically present in support of

12     Mr. Avenatti, their support continues for him.

13          Your Honor, of course, as you know, we're asking for a

14     sentence of 36 months and one day.  And as you noted, we

15     submitted quite a comprehensive sentencing letter, and I will

16     heed the Court's mandate and not repeat everything that's in

17     our letter.  But I do think that some of the highlights are

18     worth discussing.  And Mr. Avenatti also intends to address the

19     Court directly.  When he addresses the Court, he will also

20     address the point that your Honor raised just moments ago, so

21     I'm going to leave that to him.

22          I hope, your Honor, that at the end of the

23     presentation in considering our written submission, letters of

24     support, and then having the opportunity to hear directly from

25     Mr. Avenatti that it will be clear why the sentence we're

M626AVIS

1    asking for is the reasonable and appropriate sentence here.

2         Your Honor, I'd like to begin just briefly by

3    discussing Mr. Avenatti's background.  I'm not going to detail

4    the challenges of his childhood.  Those were laid out quite

5    honestly and clearly in the presentencing report.  But I think

6    it's fair to say that Mr. Avenatti had a very difficult

7    childhood.  His family unit was very troubled.  And even today,

8    he bears some of the scars of growing up in a family like that.

9         But I think the more remarkable consequence, the more

10   remarkable point to raise about how he emerged from that family

11   is that he developed an outstanding work ethic.  He started

12   working when he was 15 years old, and he has worked every

13   single day until the day that he was arrested.  He's now

14   51 years old.

15        His work ethic was made clear in all of the jobs he

16   held as a teenager that your Honor is you aware of, and also in

17   his academic performance.  He put himself through college, he

18   put himself through law school, and he did that by himself

19   without the help of any family members.  And he attended very

20   prestigious schools.  And he had very high academic achievement

21   at the schools.

22        I think that one of the vignettes described in the

23   letter from Christine Carlin, his ex-wife, really captures

24   those early days in Mr. Avenatti's life.  She describes the two

25   of them barely making ends meet.  Mr. Avenatti was working a

M626AVIS

full-time job all day and then attending law school at night.

And I think that really captures the ethic that came out of his

family, out of his family circumstances I should say.

I think another remarkable consequence of

Mr. Avenatti's childhood was that he himself was committed to

creating a very stable and loving family.  Your Honor

referenced the letters of support that were filed with our

submission, and I think they really are beautiful -- in

particular, the letter from Mr. Avenatti's daughters.

He has two daughters; one of them is in college, the

other is in high school, and he has a seven-year-old son.  In

their letter to the Court, his daughters describe a childhood

that was filled with love and support from Mr. Avenatti and

also just a lot of fun.  They described childhood activities,

going to the zoo, going to Build-A-Bear, and really engaging in

all of the normal activities of raising young children and

raising a family.

And Mr. Avenatti's daughters also speak to the fact

that Mr. Avenatti has been absent for the last few years.  They

detail some of the things he's missed.  He's missed their prom

photos, he missed graduations, he missed his daughter's dad's

day, father's day at her sorority in college.  And they

acknowledge going forward he is going to miss all sorts of

things in their lives.

We're asking, your Honor, as you consider an

M626AVIS

1    appropriate sentence here, take into account both

2    Mr. Avenatti's childhood but also what he made of that

3    childhood and the family that he created out of that childhood.

4          Your Honor, I'd like to just shift gears and turn very

5    briefly to some of the conduct at issue here.  I won't spend

6    much time on this.  I won't discuss the issue of the costs and

7    services rendered.  I understand that your Honor rejects the

8    arguments that we've made in our submission and that Mr. Baum

9    makes again today.  But I do want to point out that the

10   relationship that Mr. Avenatti and Ms. Daniels had was quite

11   complicated.  And Mr. Avenatti, really, in his representation,

12   was leaning on the adviser and the counselor part of being a

13   lawyer.  He was there for Ms. Daniels all of the time.  As

14   reflected, in part, by their constant text messages and as your

15   Honor noted at trial, it is undisputed the amount of work he

16   did for her.

17         He, as the government acknowledges, as Ms. Daniels

18   acknowledges, made a significant amount of money for her.  He

19   provided her with a national platform, and he helped her

20   fulfill her lifelong dream of writing a book.  And I raise that

21   because I think that that snapshot, that snapshot the Court saw

22   at trial, captures really the type of work that Mr. Avenatti

23   did for innumerable clients over the course of a 20-year

24   career.  He's somebody who strived, dreamed of being a lawyer

25   from a very young age.

M626AVIS

1            On the eve of his high school graduation, his father

2    was downsized.  And in witnessing the way that his father had

3    been treated by his employer, Mr. Avenatti was motivated to

4    pursue a career where he could fight for the underdog, and

5    that, in fact, is what he did.

6            He represented people who were vulnerable and elderly

7    and disabled.  He represented people that are so often ignored

8    by society.  And not only did he do that, but he did it

9    exceptionally well, and he won large settlements for clients.

10   He was able to reunite families.  He counseled victims of

11   sexual assault.  And his legal work was recognized again and

12   again by peers, his peers in the field.

13           And so after a career like that, the fact that

14   Mr. Avenatti will never practice law again is really tragic to

15   him.  And he recognizes that that is the consequence.  Losing

16   the only profession that he knows and that he loves is the

17   consequence of what's happened here, but it's still a reality,

18   and it's still a devastating fact for him.

19           And I raise the issue, this fact that Mr. Avenatti

20   will never again practice law, because I think it addresses

21   some of the concerns that the government has and the Court, I

22   suspect, has about the harm that Mr. Avenatti could cause to

23   clients.  He will never again have clients.  He will never

24   again represent people.  The future harm contemplated just

25   doesn't exist.  And I think it also addresses the concern that

 1    the government just raised about any deterrence.

 2              Your Honor, I'm going to wrap up, but I'd like to just

 3    discuss one final issue as it relates to Mr. Avenatti as a

 4    lawyer.

 5              The government has raised in their submission and

 6    again today the issue of Mr. Avenatti abusing his position of

 7    trust; that as a lawyer, he was trusted by Ms. Daniels and by

 8    his clients, and he abused that.  And they argue that a

 9    substantial sentence is warranted because of that fact and also

10    to send a message to other lawyers about abusing your position

11    of trust, and I just want to first remind the Court that

12    Mr. Avenatti's position is accounted for in the guidelines.

13    There's a two-point enhancement that was applied.  We made many

14    objections; we did not object to that.  We certainly agree that

15    adjustment is appropriate here.  In addition to that, your

16    Honor, the Court is mandated to consider other similarly

17    situated defendants, both in our district and outside of the

18    district.

19              In our written submission, we provided quite a

20    detailed list of other cases, other defendants, and the

21    sentences they received.  I'm not going to repeat those here.

22    But I think what those cases illustrate is that the sentence

23    that we're seeking from your Honor, a sentence of 36 months and

24    one day, really falls squarely within the types of sentences

25    that people have received.

M626AVIS

1    In the cases we cited, a number of them involved

2    attorneys.  All of the cases involved more victims, they

3    involved far greater loss than is at issue here, and despite

4    that, those defendants received the same sentence or very

5    similar sentences to the one that we're seeking.  And so we,

6    again, submit that a sentence of 36 months really is a

7    reasonable sentence and is consistent with other sentences in

8    the district and outside the district.

9    Your Honor, clearly Mr. Avenatti is incarcerated.

10    He's currently serving a sentence, and further future

11    incarceration for him is a certainty.  And so in light of that,

12    in light of his personal history and his background, in

13    consideration of all of the mitigating factors that we've

14    raised, including the work that he did for Ms. Daniels, the

15    work he's done for other clients, the fact that he will never

16    again be a lawyer, never again represent clients, and in

17    considering all of the comparative sentences that we've raised,

18    we're asking the Court to impose a sentence of 36 months and

19    one day.

20    And with the Court's permission, the last thing I'd

21    like to do is just read into the record a statement made by

22    Judge Rakoff, your colleague in the Southern District, and his

23    sentencing in *United States v. Adelson*.

24    Judge Rakoff wrote, "Surely, if ever a man is to

25    receive credit for the good he has done and his immediate

M626AVIS

1    misconduct assessed in the context of his overall life

2    hitherto, it should be at the moment of his sentencing, when

3    his very future hangs in the balance.  This elementary

4    principle of weighing the good with the bad, which is basic to

5    all the great religions, moral philosophies, and systems of

6    justice, was plainly part of what Congress had in mind when it

7    directed courts to consider as a necessary sentencing factor

8    the history and characteristics of the defendant."

9           Thank you, your Honor.

10          THE COURT:  Thank you.  Just two quick questions

11    before you sit down and then turn to Mr. Avenatti.  The

12    government seeks forfeiture and restitution; $297,500 in

13    forfeiture, and there's a proposed order to that effect, I

14    don't know if you have seen, and restitution for which I didn't

15    get a proposed order, but in the amount of $148,750.  Do you

16    have a position on either of those or any objection?

17          MS. GIWA:  Could I have one moment, your Honor?

18          THE COURT:  Sure.

19        (Pause)

20          MS. GIWA:  Your Honor, with regards to the

21    restitution, we have no objection to that.  We understand that

22    that is required under the statute.

23          With regards to the forfeiture, our only objection is

24    that it should also reflect the amount of the restitution, so

25    that it should be approximately $148,000.

M626AVIS

1          THE COURT:  Okay.  Mr. Podolsky, do you want to just

2     address that?  That is to the say to the extent Mr. Avenatti

3     did make Ms. Daniels whole for the third payment, why should

4     the forfeiture reflect that payment?

5          MR. PODOLSKY:  Briefly, your Honor, that's how we

6     understand the statute to operate.  Both payments constitute or

7     are derived from proceeds traceable to the commission of said

8     offense.  And under 18 United States Code Section 981(a)(2)(A),

9     in cases involving illegal activity, forfeiture is not limited

10    to the net gain or profit.  So we think the full amount stolen

11    is subject to the forfeiture, even when returned, a portion was

12    returned -- or not returned, but replaced to Ms. Daniels.

13         THE COURT:  All right.  And Ms. Giwa or Mr. Baum, do

14    you have any authority to the contrary?

15         MR. BAUM:  No, your Honor.

16         THE COURT:  All right.  Mr. Avenatti, if you wish to

17    speak before I impose sentence, this is your opportunity to do

18    so.  You're welcome to use the podium as well, and once there,

19    to remove your mask.

20         THE DEFENDANT:  Your Honor, there is no doubt that I

21    made a series of mistakes and exercised poor judgment.  I own

22    the conduct for which I was convicted.  I'm accountable for it

23    and deserve just punishment.  I stand by the sincerity of my

24    letter to Ms. Daniels.  I have brought embarrassment and

25    ridicule upon myself and innocent third parties, including my

M626AVIS

1  family, my children, my friends, and the legal profession.

2  Some have forgiven me; many — most — never will.  I

3  disappointed scores of people and failed in a cataclysmic way.

4         Because of my actions, I will never practice law

5  again.  I will forever be branded a "disgraced lawyer" and

6  worse.  I will never have the honor and privilege of appearing

7  in a court like this as an advocate, never have the honor and

8  privilege of representing those who need an advocate and a

9  fighter the most.  I will never again experience the thrill of

10  delivering justice for someone who thought there was no justice

11  and believed they had no chance.  I have destroyed my career,

12  my relationships, and my reputation, and have done collateral

13  damage to my family and my life.

14         There is serious doubt as to how, or if, I will every

15  recover any semblance of a normal life or peace.  Much has been

16  said and written about me, my life, and my conduct.  Some true,

17  much false.  I respectfully ask that your Honor take into

18  account and consider my background and my life as a whole when

19  imposing a sentence.  I ask that the Court consider all of the

20  good work I did across two decades, long before that fateful

21  day in February 2018 when I first agreed to meet Ms. Daniels.

22         During this time period, I represented the underdogs,

23  and I gave those who had no chance a fighting chance.  I took

24  on the clients and the causes that no one else would touch.

25  And I was blessed enough to deliver over a billion dollars in

M626AVIS

1    verdicts and settlements for those clients in courts across the

2    country.  Oftentimes, I took no fee.

3           Those cases included representing thousands of Jewish

4    families whose loved ones' remains had been dug up and

5    scattered in a mass grave in Los Angeles.  Some of whose family

6    members were Holocaust victims.  I was able to obtain an

7    $85 million settlement, a settlement valid at $85 million, to

8    provide them some peace.

9           I represented thousands of doctors and nurses who had

10   been sold defective PPE that placed their lives at risk.

11   Because of my work in that case, tens of thousands of defective

12   surgical gowns were removed from the national stockpile of the

13   United States in 2017.  That work saved lives in light of the

14   subsequent COVID pandemic.  My work in that case also led to

15   the Department of Justice obtaining a $20 million criminal fine

16   within the last 12 months against the manufacturer of those

17   gowns.

18          I represented a grieving mother who lost her

19   16-year-old son, Michael, to an opioid overdose facilitated by

20   a rich and powerful celebrity.

21          I represented thousands of investors who were

22   victimized by a $200 million Ponzi scheme.  I recovered

23   millions of dollars for those clients so they would not lose

24   everything and be destitute.

25          I represented numerous sexual assault victims of

M626AVIS

1    Robert Kelly, R. Kelly, including by assisting prosecutors and

2    Homeland Security agents from the Northern District of Illinois

3    and the Eastern District of New York while out on bail in this

4    case.

5              I represented a 21-year-old young woman who was raped

6    by a hotel employee while celebrating her mother's birthday in

7    Palm Springs while out on bail in this case.  My work allowed

8    her to move on with her life.

9              I represented a Guatemalan family who witnessed and

10   heard 12 family members burned to death in a passenger van

11   after it went off an Arizona road, had its fuel tank rupture,

12   and burst into flames.

13             I reunited over 70 children with their families after

14   they were stripped from their parents at our southern border.

15   This included a young boy by the name of Anthony, a

16   ten-year-old who I personally was able to get released to my

17   custody by agreeing to personally fly him back to Guatemala.  I

18   did so and witnessed him, once again, experience his mother's

19   embrace in what I considered to be the greatest accomplishment

20   of my legal career.

21             There are literally hundreds of other clients that I

22   helped across the years.  And I was fortunate enough to receive

23   many awards and a lot of recognition for my work and dedication

24   to the little guy.

25             Your Honor, I am not suggesting that this work excuses

M626AVIS

1    away my conduct at issue in this case, because it does not.

2    But it does reflect the reality of my career, my life, my

3    values, and the sum of who I am as a man.

4           The government and others claim, your Honor, that I

5    took on Ms. Daniels as a client for fame and to gain a national

6    platform.  This is entirely untrue.  I agreed to represent

7    Ms. Daniels because she, at the time, was an underdoing and was

8    desperate for someone to represent her because no one else

9    would.  Nobody at the time, me included, could have predicted

10   the success we would have and the notoriety that would follow.

11   Nobody.

12          To be clear, I agreed to represent Ms. Daniels because

13   no one else had the guts to take her case, and I believed we

14   could take down a sitting U.S. president who was the single

15   biggest threat to American democracy in modern times.

16          Your Honor, I took on her causes for all of the right

17   reasons.  And the success that followed was the result of

18   thousands of hours of work and 24-hour/7 dedication of my

19   client and her causes, not just by me, but others at my firm.

20   It was not through luck or mere happenstance.  My

21   representation of Ms. Daniels and her numerous legal matters

22   was all-consuming for me and my firm.  Her matters demanded

23   constant attention.

24          There are less than five attorneys living in America

25   today who have any real insight into how much representing a

client in a situation like that costs: personally, emotionally,

financially, and professionally.  People who think it was so

glamorous and think I benefited so handsomely are mistaken.

Me, my family, and the others at my firm made huge personal

sacrifices for Ms. Daniels and her causes throughout 2018, and

we did so for all of the right reasons.

Again, your Honor, I do not offer this as an excuse

for what I have been convicted of.  I merely offer it to the

Court so that the Court may consider the totality of my

representation of Ms. Daniels.

I also respectfully ask that your Honor take into

consideration the horrific conditions I experienced during my

incarceration at MCC as found by Judge Gardephe.  It has never

been explained why I was subjected to solitary confinement in

10 South, a six-cell unit that is considered the highest

security pretrial facility in the United States, reserved for

terrorists and those who allegedly are national security

threats against this country.  No one has ever explained why I

was cut off from the world and placed under 24-hour

surveillance in a cell next to known terrorists who had cost

American lives.

I was born in this country, have lived in this country

my entire life, and love the United States of America.  During

the first 48 years of my life, I was never arrested and had no

history of violence against anyone.  I should have never been

M626AVIS

1   subjected to the torture of 10 South.

2          For decades, your Honor, I was a contributing member

3   of society and a good, loving man.  I know that I can be that

4   once again if given the chance.

5          Thank you, your Honor.

6          THE COURT:  Thank you, Mr. Avenatti.

7          Mr. Brewster, if you want to step forward I'll hear

8   from you now.

9          MR. BREWSTER:  Your Honor, my name is Clark Brewster,

10  and I represent Stormy Daniels and have since February 17,

11  2018.  It was my letter written on February 19 outlining the

12  crimes that Mr. Avenatti was indicted for in this district that

13  put in motion this case.

14         I want to commend the prosecutors in the

15  Southern District, specifically Matt Podolsky and

16  Robert Sobelman.  They really proved that the system works.

17  They took a person that was very manipulative, deceitful, and

18  exposed the truth.  It was a simple truth, the chronology, and

19  the events and the forgery were obvious once disclosed to me,

20  at least, and to them.  But it's been a hard fight over the

21  last three years to get to this point.  And it approves our

22  system works.

23         I don't know who Mr. Avenatti includes in the five

24  people in the U.S. that could take on Ms. Daniels' case, but I

25  believe I would have been one of them and have done so.

1              To be an attorney, especially a trial lawyer, the
2    desire to step up and champion another's cause who's in the
3    hole or in the worst circumstances of their life is very noble.
4    You receive their confidences, you counsel their decisions, you
5    are their advocate.  You stand up and deliver their voice.  You
6    obtain their trust.  They give you reliance, and they brag to
7    their friends and family about how good you are as their
8    advocate, and they vest in you the belief in our justice system
9    because you are their champion.  And that was Mr. Avenatti's
10   pitch, and he was able to persuade Ms. Daniels to that
11   particular position that he held.  It's a high calling.

12             But they become very vulnerable because when you
13   deceive them, mislead them, steal from them, it's with
14   disbelief.  They couldn't believe that would occur, and they
15   become the most vulnerable person to perpetrate crimes against.
16   And that's what Mr. Avenatti did and thought that he could just
17   take Ms. Daniels' money and either lie his way out of it or
18   convince her that he was entitled to it.

19             But you stop and think.  When you look at a criminal
20   act that gives rise to a prosecution, a conviction,
21   incarceration, many times it's a single decision someone makes
22   out of desperation, maybe out of mistaken belief of protecting
23   another, and that may lead to a criminal act.  But in this
24   case, Mr. Avenatti engaged in a series of deceit, lies,
25   scheming, not just lying to Ms. Daniels, but to others, and,

M626AVIS

1    ultimately, to disguise his theft and embezzlement.  He had to

2    turn on her and make the others that she'd be communicating

3    with, the publishing company and the agent, believe that she

4    was incredible when she called or to not take her calls.

5         So not only did he deceive her and steal her money,

6    the champion that he was and had her confidence, but then he

7    went into a series of lies to third parties and also

8    disparagement of her to make sure that she won't be believed.

9    It is truly shocking, because I believe strongly in our legal

10   system but also the advocacy --

11        MR. BAUM:  Your Honor, I really need to object.

12        It is appropriate for Mr. Brewster to provide the

13   statement of the victim; it is not appropriate for Mr. Brewster

14   to provide his personal statement as to his beliefs, to provide

15   statements as to his own experience as an attorney.  He can

16   read, he can relate what Ms. Daniels wants, but he has gone far

17   beyond that.  I have the greatest respect for Mr. Brewster, but

18   I think at this point his statements are objectionable.

19        THE COURT:  Okay.  Thank you, Mr. Baum, I think

20   Mr. Baum's point is somewhat well taken.  The Crime Victims'

21   Rights Act certainly gives Ms. Daniels a reasonable right to be

22   heard.  You're here on her behalf and making a statement on her

23   behalf, but why don't you stick to her statement and leave

24   yourself out of it?

25        MR. BREWSTER:  Thank you, your Honor.  I'm getting to

M626AVIS

the point where the circumstance where her and I have discussed
these crimes being committed against her and just the complete
loss of disbelief that she had and just overwhelming impact it
had on her life.

        She suddenly had this person that she would repose all
trust in jerked out from under her, from her reliance, and also
he became the perpetrator of crimes against her.  And I'm just
trying to convey that.

        One thing I would also say is that he virtually left
her abandoned.  I mean, she had cases in Texas that he failed
to enter an appearance.  I hear about all the good work he had
done.  He had filed a case against President Trump for
defamation in California against her wishes.  She said that
from the stand.  And as a matter of fact, he lost and had a
$292,000 attorneys' fee award against her and failed to timely
appeal it.  The appeal ran out in January before she learned of
his deviousness.  He failed to appeal that, and so she was
stuck with $292,000 in attorneys' fees, which we're dealing
with now.

        He put her in a position where not only was she
victimized by his criminal conduct in the embezzlement scheme
but also completely left her.  They also talk about his great
legal work.  In Ohio, he filed a case.  Didn't get admitted pro
hoc, failed to name the proper parties --

        MR. BAUM:  Judge, again, this is not Ms. Daniels'

M626AVIS

1    statement, this is Mr. Brewster's.

2          THE COURT:  I got it, Mr. Baum.  I will take it for

3    whatever weight it's worth and only on behalf of Ms. Daniels,

4    but I do think this is responsible to arguments you've made and

5    with respect to the quality or nature of the representation of

6    Ms. Daniels.  So, Mr. Brewster, you may continue.

7          MR. BREWSTER:  Thank you.  And I'm just telling you

8    what pieces she had to pick up.  And when you hear the

9    presentation that he's this great lawyer and he did all the

10   great work, it just isn't true.

11         As a matter of fact, he didn't timely appeal the

12   verdict in California.  He didn't name the proper parties in

13   Ohio.  And when Ms. Daniels came to me, he had no files.  Not a

14   single file on any case.  There were cases in Texas, Ohio, and

15   California, two of them.  Not a single file on any matter that

16   he provided.  And we reached out to try to get any work that he

17   had.  There was nothing.  It was just complete abandonment.  So

18   to talk about how great a champion he was is really kind of

19   offensive to her.

20         I last want to say that Ms. Daniels went through a

21   lot.  I mean, she came to New York on every occasion she needed

22   to to present and meet with the prosecutors.  She was

23   absolutely involved in this case from the beginning, truthfully

24   forthcoming in every respect.  She couldn't be here today, but

25   this day will be tremendously resolving for her with regard to

M626AVIS

1   her involvement with Mr. Avenatti, and I urge the Court to

2   follow the guidelines in this case at the highest level.

3          Thank you.

4          THE COURT:  Thank you.  All right.

5          Counsel, is there any reason why sentence should not

6   be imposed at this time?

7          MR. PODOLSKY:  No, your Honor.

8          MR. BAUM:  No, your Honor.

9          THE COURT:  In imposing sentence, I'm required to

10  consider the factors set forth in 18 U.S. Code, Section

11  3553(a).  Given how long we've been going, I won't recite them

12  in full, but suffice it to say that I have and will consider

13  all seven of the statutory factors.  And, ultimately, my task

14  is to impose a sentence that is sufficient but no greater than

15  necessary to advance the purposes of sentencing set forth in

16  subsection (a)(2) of the statute; namely, to reflect the

17  seriousness of the offense, to promote respect for the law and

18  to provide just punishment for the offense, to afford adequate

19  deterrence to criminal conduct, to protect the public from

20  further crimes of the defendant, and to provide the defendant

21  with needed education or vocational training, medical care, or

22  other correctional treatment in the most effective manner.

23         Now, let me start by saying that I think this is in

24  many respects a tragic, sad, or to use Mr. Podolsky's word,

25  sorry case.  To read the sentencing materials and presentence

1  report, and especially the letters from Mr. Avenatti's

2  daughters and his ex-wife and ex-siblings in law, it is

3  certainly clear to me that there is more to Mr. Avenatti than

4  the conduct that led to his legal troubles may suggest.

5       They do reveal a thoughtful and hardworking person

6  devoted to his family and his clients.  And, moreover, I think

7  it's clear from his record in law school, his earlier legal

8  career, not to mention his handling of trial in this case -- as

9  much as I took issue with some of his conduct at trial -- that

10 he is quite smart and has formidable legal skills.

11       So the question is, what happened?  What led him

12 astray?  What changed that caused Mr. Avenatti to use his

13 intelligence and formidable legal skills, not for good, not for

14 his clients' interest, but for his own.  I don't know the

15 answer to that question.  I don't know if that moment occurred

16 before Mr. Avenatti met Ms. Daniels or whether in meeting her

17 he saw her as a ticket to fame, power, and fortune for himself

18 and decided to pursue those things to the exclusion of his

19 principal obligations.  Only Mr. Avenatti knows what led him

20 from a healthy ambition, driven by his childhood circumstances,

21 to the blind ambition that I think led him to the conduct that

22 he stands before me to be sentenced for.  What led him from

23 fighting for his clients to brazenly lying to and stealing from

24 them, indeed, to defaming them, both privately and publicly,

25 when they had the audacity to confront him for his crimes?

M626AVIS

1          So the question is, what is the appropriate sentence?

2     Let me start by saying that I agree with both parties and the

3     probation department that a guideline sentence would be

4     unreasonable; that is that it would be greater than necessary

5     to serve the purposes of punishment set forth in subsection

6     (a)(2) of the statute.

7          I come to that view, in part, based on the sentences

8     that are referenced in the defense submission but also, in

9     part, because I agree that the guidelines at issue here results

10    in an unreasonably harsh sentence.  That is not only because

11    Section 2B1.2 of the guidelines gives undue weight of the loss

12    amount but because loss amount here, arguably, is overstated

13    for reasons that I'll explain in a moment.  I don't mean that

14    within the meaning of the guidelines, as I've already

15    indicated, but I think it's hard to imagine Mr. Avenatti's

16    intent and conduct at issue here was simply to take

17    Ms. Daniels' money as his own and never give it to her.  That

18    would make no sense whatsoever.  To use Mr. Podolsky's word, it

19    would be a cockamamie scheme because, at some point, his

20    conduct would have caught up with him, and it would have been

21    revealed.

22          Instead, I think it's clear that what was going on is

23    that out of desperation, in a moment where Mr. Avenatti needed

24    money to make ends meet, he saw Ms. Daniels' funds as a source

25    of a way of doing that, that he took them for himself, but with

M626AVIS

1    the intention, ultimately, of finding other sources, other

2    funds to pay her back.  In other words, I think his plan was

3    not so much to steal the money outright as it was to deprive

4    her temporarily of her funds, though, obviously, he never did

5    pay her back the fourth book payment.

6         In any event, the bottom line is I share the view of

7    probation and the government, not to the mention the defense

8    that five-plus years on top of what Mr. Avenatti already

9    received in the Nike case would be an unreasonable sentence.

10        That said, I do think that Mr. Avenatti's conduct

11   warrants a substantial sentence and marginal sentence, if you

12   will, above the mandatory minimum of two years for Count Two,

13   because it was so brazen and egregious.  He did, as

14   Mr. Podolsky stressed and Ms. Giwa conceded, abuse a position

15   of trust and breach the highest duty that a lawyer owes to his

16   client, the duty of loyalty, and did so in a despicable way, by

17   brazenly stealing from Ms. Daniels, then lying to her face, and

18   then defaming her when she called him on his conduct.

19        And I think in many respects it's clear that he did so

20   because he viewed that he took advantage of really a vulnerable

21   victim, is that his texts and e-mails with Mr. Janklow, for

22   example, made clear that Mr. Avenatti thought he could get away

23   with it because people would believe him over Ms. Daniels,

24   given her unorthodox career and somewhat unorthodox beliefs.

25        For these reasons, I think a substantial sentence is

warranted to reflect the seriousness of his conduct, to promote

respect for the law, it is also warranted by the need for

adequate deterrence, both general and specific.  I do think

that this case will send a message to lawyers and others in the

legal profession that if you go astray in the way that

Mr. Avenatti did, you will pay a steep price, not only in

losing your right to practice your profession, but also in

losing your liberty.

          And, finally, I gave Mr. Avenatti an opportunity to

elaborate on his acceptance of responsibility, and it's 2 and

noteworthy to me that he didn't really elaborate.  That is to

say I pressed on what he was acknowledging and confessing in

that letter, and he didn't address it.  And given that, I do

view that letter as too little, too late.  It certainly comes

too late, and it's too little in the sense I have no idea

whether he is acknowledging that he committed the crimes and

defrauded Ms. Daniels or simply acknowledging what he

acknowledged at trial, which is that he lied to her, which is

indisputable and obviously condemnatory in its own way.

          All that leads me to the conclusion that the four-year

sentence recommended by probation, 30 months of which should be

consecutive to the sentence imposed in the Nike case, would be

at appropriate sentence here in my view.  It would not give

adequate weight to the wire fraud conviction, to run that

sentence completely concurrent with the sentence in the Nike

M626AVIS

1    case, and to do so, as the defense suggests and probation has

2    recommended, I think would make for a lower sentence than the

3    comparable sentences that are referenced in the defense

4    submission.

5         At the same time, to run the sentence completely

6    consecutive to the sentence imposed in the Nike case,

7    particularly, when the sentence for Count Two must be imposed

8    to run consecutive would, in my view, result in an unduly harsh

9    and unreasonable sentence overall.

10        Ultimately, the right balance, in my view, is a

11   partially concurrent and partially consecutive sentence — in

12   essence, to give Mr. Avenatti an additional 30 months of

13   imprisonment on top of what he has already received and may

14   receive in California in the event he is convicted there.

15        So I will now state the sentence I intend to impose.

16   And, Mr. Avenatti, I ask you to please rise.

17        Mr. Avenatti, it is the judgment of this Court that

18   you are remanded to the custody of the Bureau of Prisons for a

19   total of 48 months.  That is four years; and more specifically,

20   24 months on Count One and 24 months on Count Two with

21   18 months of the sentence on Count One to be served

22   concurrently with the sentence in 19 CR 373 and six months to

23   be served consecutive to that sentence, to be followed by the

24   24 month mandatory consecutive sentence on Count Two.  That

25   term is to be followed by a period of three years of supervised

M626AVIS

1   release on Count One and one year of supervised release on

2   Count Two, to be served concurrently.

3          During your term of supervised release, you will be

4   subject to the mandatory conditions set forth on Pages 29 and

5   30 of the presentence report; that is, you shall not commit

6   another federal, state, or local crime; you shall not illegally

7   possess a controlled substance; you shall refrain from any

8   unlawful use of a controlled substance and submit to one drug

9   test within 15 days of your release on supervised release and

10  at least two periodic drug tests as determined by probation;

11  you shall cooperate in the collection of DNA as reflected by

12  probation; and you shall satisfy your financial obligations

13  that I will discuss shortly.

14          In addition, the standard conditions of supervised

15  release, which are set forth on Pages 30 and 31 of the

16  presentence report and will be set forth in the judgment shall

17  apply.  Among other things, you shall not possess a firearm or

18  destructive device, and you shall report to the probation

19  office in the judicial district where you are authorized to

20  reside within 72 hours of your release from custody.

21          Finally, you must meet the following special

22  conditions.  These are set forth on Page 31 of the presentence

23  report.  The first is the search condition.  I do find that it

24  would be reasonably related to Mr. Avenatti's conduct here.

25  Whether or not in the guidelines, it is listed as a special

M626AVIS

1    condition for sex offenses.  I think given the nature of

2    Mr. Avenatti's conduct in this case and the Nike case, it is

3    appropriate that where reasonable suspicion concerning a

4    violation of the condition of supervised release or unlawful

5    conduct is found, probation have the right to search, among

6    other things, his electronic communications.  And the record in

7    this case is replete with Mr. Avenatti's use of texts and

8    WhatsApp messages and the like to commit the crimes for which

9    he was convicted.

10          Given that, you shall submit your person and any

11   property, residence, vehicle, papers, computer, other

12   electronic communication, data storage devices, Cloud storage

13   or media, and effects to a search by any United States

14   Probation Officer, if needed, with the assistance of any law

15   enforcement.  Such a search is to be conducted only where there

16   is reasonable suspicion concerning violation of a condition of

17   supervised release or unlawful conduct.  Failure to submit to a

18   search may be grounds for revocation.  And you shall warn any

19   other occupants that the premises may be subject to search

20   pursuant to this condition.  Any search shall be conducted at a

21   reasonable time in a reasonable manner.

22          You will participate in an outpatient treatment

23   program approved by the United States Probation Office, which

24   program may include testing to determine whether you have used

25   drugs or alcohol.  You must contribute to the costs of services

1  rendered based on your ability to pay and the availability of

2  third-party payment.  And I authorize the release of available

3  drug and alcohol treatment evaluations and reports, including

4  the presentence investigation report, to the substance abuse

5  treatment provider.

6          Unless you have satisfied your financial obligations,

7  which I'll discuss in one moment, you shall provide the

8  probation officer with access to any requested financial

9  information, and you shall not incur any new credit charges or

10  open additional lines of credit without the approval of your

11  probation officer unless you have satisfied your financial

12  obligations.

13          Finally, you shall be supervised in the district of

14  your residence.

15          I will not impose a fine because I find that

16  Mr. Avenatti would not have the ability to pay a fine at

17  present between his current financial circumstances.  It would

18  interfere with his restitution payments.  On that score, it is

19  the further judgment of the Court that you are to pay

20  restitution in the amount of $148,750 in accordance with

21  18 U.S. Code Section 3663(a) payable to the clerk of this court

22  for disbursement to Ms. Daniels.  I will waive the requirement

23  of interest under Section 3664(f)(3).

24          In light of your financial circumstances, if you are

25  engaged in a BOP non-UNICOR work program, you shall pay $25 per

M626AVIS

1    quarter towards the restitution penalties.  However, if you

2    participate in the UNICOR program as a Grade 1 through 4, you

3    shall pay 50 percent of your UNICOR earnings toward the

4    criminal financial penalties consistent with BOP regulations at

5    28 CFR Section 545.11.

6          The restitution shall be made in monthly installments

7    of 15 percent of gross monthly income over the period of

8    supervision to commence 30 days after your release from

9    custody, and you are to notify the Court and the probation

10   office of any material change in your economic circumstances

11   that might affect your ability to pay restitution.

12         I'm also imposing mandatory special assessment of $100

13   per count for a total of $200, which shall be due and payable

14   immediately.

15         And, finally, I order you to forfeit to the

16   United States $297,500, which represents the proceeds that you

17   obtained, directly or indirectly, as a result of your criminal

18   activity.

19         Does either counsel know of any legal reason why this

20   sentence should not be imposed as stated?

21         Mr. Podolsky?

22         MR. PODOLSKY:  No, your Honor.

23         MR. BAUM:  No, your Honor.

24         THE COURT:  Sentence as stated is imposed.  I find the

25   sentence is sufficient but no greater than necessary to satisfy

M626AVIS

the sentencing purposes set forth in Section 3553(a)(2),
including the need to promote respect for the law.  To provide
just punishment for the offense, to afford adequate deterrence
to Mr. Avenatti and to others, and to protect the public from
further crimes of the defendant.

That's where, Mr. Avenatti, I hope that the days of
further crimes are over and that when the day comes, when you
have served your time from this case, the Nike case, and in the
event you're convicted in the California case, from that case,
that you put your formidable talents to better use as you did
in the years that you led you to this courtroom.

I acknowledge that there are ways in which you have
done good in the world and on behalf of your clients, and that
is part of the reason I think a below-guideline sentence is
appropriate.  I agree with you that sentence should take
account, not just of your conduct in this case, but who you are
as a person.  And as I said, it is clear to me that who you
were as a person is certainly more than the conduct that landed
you here.  So I hope when the time comes and you get out, that
you can use your skills, even if you can't do so in a
courtroom, that do you so to make the world a better place, to
help your daughters, to help your son, to help yourself, but
that you don't do anything that could land you back in front of
me or in any other courtroom as a defendant -- a criminal
defendant for that matter.

M626AVIS

1          Mr. Baum, are there any requests for a designation

2     location?

3          MR. BAUM:  Yes, there is, your Honor.

4          We'd ask that you recommend that Mr. Avenatti be

5     designated to FPC Sheridan, which is in Oregon, and closer to

6     his family and residence.

7          And we also ask, Judge, he was ordered to make

8     restitution in the Nike case, and your Honor just ordered him

9     to make the restitution within 30 days after his release in

10    this case.  So he would effectively be required to make double

11    restitution, a significant portion of any earnings, and we ask,

12    because Nike was imposed first, that you order that the

13    restitution is to be made after he completes the restitution in

14    the Nike case.

15         THE COURT:  All right.  So, first of all, to be clear,

16    I didn't say he had to pay restitution within 30 days.  It was

17    just that --

18         MR. BAUM:  No.  The restitution would begin, payments,

19    within 30 days after his release, which is the same order he

20    received in the Nike case.

21         THE COURT:  Mr. Podolsky.

22         MR. PODOLSKY:  We have no objection, your Honor.

23         Candidly, in the Nike case, Nike had actually

24    requested their restitution follow restitution in any future

25    case, but I believe Judge Gardephe determined he wasn't able to

M626AVIS

1    do that, and I'm not honestly sure that there's a way to

2    organize that now.  So I don't think we have a position on this

3    request, your Honor.

4            THE COURT:  All right.  And what was the restitution

5    amount in the Nike case?

6            MR. PODOLSKY:  I don't have the exact figure.  I

7    believe it was a few hundred thousand dollars to account for

8    Nike's costs and expenses.

9            MR. BAUM:  I believe it was $259,000.

10           THE COURT:  All right.  Well, I think it is a

11   reasonable request, so I will grant that request and say that

12   restitution payments, again, in the amounts that I indicated

13   are to begin once the restitution is made in the Nike case, and

14   that seems reasonable.  I'll also recommend to the Bureau of

15   Prisons that he be designated to -- was it FCI Sheridan?

16           MR. BAUM:  That's correct, Judge.  Judge Gardephe also

17   made the same recommendation.

18           THE COURT:  Yes.  I'm looking and seeing that now.  So

19   I'll make that recommendation.

20           You can be seated.

21           Mr. Podolsky, I don't think there are any open counts

22   to be dismissed; is that correct?

23           MR. PODOLSKY:  That's correct, your Honor, although

24   for the record, we're happy to say we move to dismiss any open

25   counts there may be.

M626AVIS

1        THE COURT:  All right.  Any open counts there may be,

2    I'm not sure of any, are dismissed at this time.

3        Let me advise you, Mr. Avenatti, that to the extent

4    that you have a right to appeal, any notice of appeal must be

5    filed within 14 days of entry of the judgment of conviction.

6    And if you cannot afford to pay the cost of an appeal, you may

7    file for leave to appeal in forma pauperis.

8        Before I ask if there's anything else from the

9    parties, I would be remiss if I didn't acknowledge that

10   Mr. Baum is in the final days of a storied 50-year career as a

11   Federal Defender in this district.  And over the course of

12   those decades, he has served his clients, including

13   Mr. Avenatti, and this Court extraordinarily well.  And I just

14   wanted to acknowledge, Mr. Baum, I commend you on your service

15   to the bar, to this Court, to Mr. Avenatti, to your other

16   clients, and wish you well.

17        MR. BAUM:  Thank you, Judge.

18        THE COURT:  All right.  Is there anything else from

19   the government?

20        MR. PODOLSKY:  No, your Honor.

21        THE COURT:  Mr. Baum, is there anything else from the

22   defense?

23        MR. BAUM:  Yes, judge.

24        As your Honor is aware, he's going to be returned to

25   California so that he may prepare for trial, and your Honor

M626AVIS

1    ordered that he be returned as expeditiously as possible.  Is

2    it possible that you would also order that he be returned to

3    the same location he came from, which is Terminal Island?

4    Because that's where all his legal papers and other work is.

5    We're just concerned that he may be returned elsewhere.

6              THE COURT:  All right.  That makes sense to me.  And I

7    will convey to the Marshal that I think he should be returned

8    from where he came in order to prepare for trial.  I have no

9    idea what goes into that.  I can't imagine the intention was to

10   do otherwise, but I'll convey that to the Marshal.

11             MR. BAUM:  Thank you, your Honor.

12             THE COURT:  All right.  We stand adjourned.  Thank you

13   very much.

14             (Adjourned)

15

16

17

18

19

20

21

22

23

24

25

## **CERTIFICATE OF SERVICE**

I, H. Dean Steward, am a citizen of the United States, and am at least 18 years of age. My business address is 17 Corporate Plaza, Suite 254 in Newport Beach, California. I am not a party to the above-entitled action.  I have caused, on June 12, 2022 service of the:

DEFENDANT'S (A) NOTICE OF INTENT TO CHANGE PLEA AND REQUEST SENTENCING AND (B) REQUEST FOR TELEPHONIC OR VIDEO STATUS CONFERENCE

on the following party, using the Court's ECF system:

AUSA RANEE KATZENSTEIN AND AUSA BRETT SAGEL

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 12, 2022

/s/ H. Dean Steward

H. Dean Steward