E. MARTIN ESTRADA
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
RANEE A. KATZENSTEIN (Cal. Bar No. 187111)
Assistant United States Attorney
Chief, Major Frauds Section
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-2432
    Facsimile: (213) 894-6269
    Email: Ranee.Katzenstein@usdoj.gov

BRETT A. SAGEL (Cal. Bar No. 243918)
Assistant United States Attorney
    Ronald Reagan Federal Building
    411 West Fourth Street, Suite 8000
    Santa Ana, California 92701
    Telephone:  (714) 338-3598
    Facsimile:  (714) 338-3708
    Email:      Brett.Sagel@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>           v.<br><br>MICHAEL JOHN AVENATTI,<br><br>        Defendant. | SA CR No. 19-061-JVS<br><br>GOVERNMENT'S SENTENCING POSITION AND RESPONSE TO PRESENTENCE REPORT AND RECOMMENDATION LETTER FOR DEFENDANT MICHAEL JOHN AVENATTI; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF SPECIAL AGENT REMOUN KARLOUS; EXHIBITS<br><br>[Victim Impact Statements Lodged Concurrently Under Seal]<br><br>SENTENCING HEARING:<br>Date: November 7, 2022<br>Time: 9:00 a.m. |

     Plaintiff, United States of America, by and through its counsel of record, the United States Attorney for the Central District of

California and Assistant U.S. Attorneys Brett A. Sagel and Ranee A. Katzenstein, hereby files its sentencing position and response to the Presentence Report and Recommendation Letter disclosed on August 22, 2022 (CR 977, 978) for defendant Michael John Avenatti.

The government's sentencing position is based upon the attached memorandum of points and authorities; the attached declaration of Special Agent Remoun Karlous and exhibits thereto; the victim impact statements concurrently lodged under seal; the files and records in this case, including the evidence and testimony at trial; and such further evidence and argument as the Court may permit at the sentencing hearing.

Dated: October 11, 2022          Respectfully submitted,

                                 E. MARTIN ESTRADA
                                 United States Attorney

                                 SCOTT M. GARRINGER
                                 Assistant United States Attorney
                                 Chief, Criminal Division


                                 _____/s/_____
                                 BRETT A. SAGEL
                                 RANEE A. KATZENSTEIN
                                 Assistant United States Attorneys

                                 Attorneys for Plaintiff
                                 UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                      PAGE

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.    INTRODUCTION..................................................1

II.   GOVERNMENT'S GUIDELINES CALCULATION AND RESPONSE TO THE PSR....3

      A.    Factual Findings.......................................4

            1.    Offense Conduct..................................4

            2.    Objections to the PSR's Factual Findings.........6

      B.    Sentencing Guidelines..................................8

            1.    Summary..........................................8

            2.    Objections to the PSR's Guidelines Calculation...9

III.  A SENTENCE OF 210 MONTHS IS REASONABLE AND APPROPRIATE
      BASED ON THE 3553(A) FACTORS................................20

      A.    Overview..............................................20

      B.    Nature and Circumstances of the Offenses
            (§ 3553(a)(1))........................................21

      C.    History and Characteristics of Defendant
            (§ 3553(a)(1))........................................28

      D.    Need to Reflect the Seriousness of the Offense,
            Promote Respect for the Law, provide Just Punishment,
            Afford Deterrence, and Protect the Public from Further
            Crimes of the Defendant (§ 3553(a)(2))................35

      E.    Policy Statements and Need to Avoid Unwarranted
            Sentencing Disparities (§ 3553(a)(6)).................41

      F.    The USPO's Sentencing Recommendation Is Factually and
            Legally Flawed........................................41

IV.   RESTITUTION.................................................44

V.    CONCLUSION..................................................46

i

**TABLE OF AUTHORITIES**

<u>**CASES:**</u>

<u>Gall v. United States</u>,
   552 U.S. 38 (2007) ...................................... 20, 41

<u>United States v. Fellows</u>,
   157 F.3d 1197 (9th Cir. 1998) ............................. 15

<u>United States v. Batson</u>,
   608 F.3d 630 (9th Cir. 2010) ........................... 20, 46

<u>United States v. Bergman</u>,
   416 F.Supp. 496 (S.D.N.Y. 1976) ........................... 39

<u>United States v. Gagarin</u>,
   950 F.3d 596 (9th Cir. 2020) .............................. 45

<u>United States v. Gordon</u>,
   393 F.3d 1044 (9th Cir. 2004) ............................. 46

<u>United States v. Halamek</u>,
   5 F.4th 1081 (9th Cir. 2021) ............................... 8

<u>United States v. Iniguez</u>,
   368 F.3d 1113 (9th Cir. 2004) (en banc) ................... 19

<u>United States v. Joetzki</u>,
   952 F.2d 1090 (9th Cir. 1991) ............................. 19

<u>United States v. Orlando</u>,
   553 F.3d 1235 (9th Cir. 2008) ............................. 36

<u>United States v. Ramos</u>,
   923 F.2d 1346 (9th Cir. 1991) ............................. 15

<u>United States v. Rutledge</u>,
   28 F.3d 998 (9th Cir. 1994) ............................... 14

<u>United States v. Thomsen</u>,
   830 F.3d 1049 (9th Cir. 2016) ............................. 45

<u>United States v. Valle</u>,
   940 F.3d 473 (9th Cir. 2019) (en banc) ..................... 8

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                 PAGE

**STATUTES:**

18 U.S.C. § 1028A ................................................ 42

18 U.S.C. § 1343 ................................................. 1

18 U.S.C. § 3572 ................................................ 45

18 U.S.C. § 3663A ............................................ 44, 45

18 U.S.C. § 3664 ............................................... 45

26 U.S.C. § 7212 ................................................. 1

**RULES:**

Federal Rule of Criminal Procedure 8 ........................... 17

Federal Rule of Criminal Procedure 11 .......................... 14

Federal Rule of Criminal Procedure 32 ........................... 6

**SENTENCING GUIDELINES:**

USSG § 1B1.3 ............................................... 12, 18

USSG § 2B1.1 ................................................ 8, 9

USSG § 2T1.1 .................................................. 9

USSG § 3A1.1 .................................................. 9

USSG § 3B1.3 .................................................. 9

USSG § 3C1.1 .............................................. passim

USSG §§ 3D1.1–4 ............................................... 9

USSG § 3E1.1 ............................................... 12, 16

USSG § 4A1.3 ............................................... 16, 17

USSG § 5E1.1 ............................................... 20, 46

USSG § 5G1.2 .............................................. passim

USSG § 5G1.3 ................................................. 41

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Defendant Michael John Avenatti is due to be sentenced following his pleas of guilty to four counts of wire fraud, in violation of 18 U.S.C. § 1343, and one count of obstructing the due administration of the internal revenue laws, in violation of 26 U.S.C. § 7212.

Defendant, a now-suspended plaintiff's attorney, stole from his clients instead of advocating for them.  Although the details pertaining to each of the four clients underlying the charges in the indictment differ, the general pattern was the same.  Defendant would lie about the true terms of the settlement agreement he had negotiated for the client, conceal the settlement payments that the counterparty had made, secretly take and spend the settlement proceeds that belonged to the client, and lull the client into not complaining or investigating further by providing small "advances" on the supposedly yet-to-be paid funds.  Through this multi-year fraudulent scheme, defendant stole millions of dollars from his clients.[1]

Defendant was also a tax cheat.  Defendant failed to file Forms 941 and pay payroll taxes for Global Baristas US LLC ("GBUS"), and then willfully obstructed the Internal Revenue Service's ("IRS") efforts to collect the amounts due.  Defendant obstructed the IRS, by, among other means: making false statements to the revenue officer; directing employees to stop depositing cash receipts; and

---

[1] A detailed description of this scheme is set out in paragraphs 26-67 of the Presentence Report ("PSR").  For this reason, and because the Court heard the evidence presented at the trial on Counts 1-10, this memorandum does not include a full recitation of the facts of the wire fraud scheme.

changing the company name, Employer Identification Number, and bank account information listed with his credit card processing company to avoid IRS levies.[2]  (PSR ¶ 77.)  In addition, defendant failed to file individual tax returns (Forms 1040) or pay any personal income taxes for 2011 through 2017, even though he had a substantial income and lived lavishly; failed to file partnership returns (Forms 1065) or pay taxes for Eagan Avenatti, LLP ("EA LLP"), of which he was the managing partner, for 2013 through 2017, even though EA LLP received many millions of dollars during those years; failed to file corporate tax returns (Forms 1120) or pay taxes for Avenatti & Avenatti ("A&A"), of which he was president, for 2011 through 2017, even though this entity also received substantial funds; and failed to file Forms 941 and pay payroll taxes for EA LLP.[3]

Defendant's scheme to defraud his clients was cruel -- often reducing those clients to begging for needed funds and making them feel beholden to him when he "advanced" or "loaned" them funds that were, in fact, the clients' own money; callous -- blaming and disparaging the supposedly derelict counterparties for the "missing" money that defendant himself had stolen; and calculating -- with defendant exploiting his knowledge of the legal system to conceal his thefts by falsely telling his victims that the settlements were confidential and dire consequences would follow if they discussed their cases with anyone other than defendant.  Defendant's tax fraud scheme was massive, resulting in losses to the federal treasury of

---

[2] The PSR contains a detailed description of defendant's obstruction of the tax laws at paragraphs 68-77.

[3] Defendant's failures to file and pay his personal taxes and the taxes of the entities he controlled are described in the PSR at paragraphs 141-146.

2

over $3.2 million from just the failure to pay GBUS payroll taxes and harming hundreds of his employees whose payroll taxes he stole. There was no excuse for defendant's criminal conduct, which was motivated solely by arrogance and greed.

The seriousness of defendant's crimes, the deleterious impact -- both financial and emotional -- on the victims, the other aggravating factors, and the need for specific and general deterrence call for a significant sentence.  Defendant's advisory United States Sentencing Guidelines ("USSG") range is 262 to 327 months if the Court finds that he has accepted responsibility for his offenses, and 324 to 405 months if the Court does not so find.[4]  As set forth more fully below, if defendant accepts responsibility for his conduct, the government submits that a sentence of 210 months (consecutive to any previously imposed sentences) is appropriate and necessary to achieve the goals of sentencing in this case.[5]  In the event that defendant does not accept responsibility for his offenses, the government recommends that a higher sentence be imposed.

**II.   GOVERNMENT'S GUIDELINES CALCULATION AND RESPONSE TO THE PSR**

The United States Probation Office ("USPO") disclosed the PSR on August 22, 2022 (CR 978).  A brief summary of the factual support for the guideline calculations as well as objections to the factual findings and guidelines calculation are set forth below.

---

[4] Because defendant pleaded guilty to four wire fraud offenses and one tax fraud offense, the statutory maximum for his crimes is 83 years, and therefore the Probation Officer erred when she applied USSG § 5G1.2(d) and reduced defendant's guidelines sentence to 240 months.  (PSR ¶ 265.) See Section II.B.2.d, below.

[5] This recommendation is based on defendant's conduct and the sentencing factors in this case and recognizes that the sentence to be imposed will be in addition to the total of five years' imprisonment that has been imposed in defendant's two other federal cases.

1   **A.   Factual Findings**

2          1.   <u>Offense Conduct</u>

3          The government generally concurs in the PSR's factual findings.

4   As the PSR sets forth, because defendant lied to his clients about

5   their settlements and his receipt of the settlement money, and stole

6   from his clients, defendant is not entitled to any credit for his

7   fees and expenses in determining the loss amount.  (PSR ¶ 95 and

8   n.15.)  Therefore, the loss in this matter is $12,350,000 based on

9   defendant stealing: the $4 million settlement of Geoffrey Johnson's

10  ("Johnson") lawsuit against the County of Los Angeles (Count 10

11  ("Client 1"); PSR ¶¶ 42-47); $2,750,000 of Alexis Gardner's

12  ("Gardner") $3 million settlement with her ex-boyfriend, which

13  defendant used to buy a private jet (Count 9 ("Client 2"); PSR ¶¶ 48-

14  52); the initial $1,600,000 settlement payment of Gregory Barela's

15  ("Barela") $1,900,000 intellectual property settlement (Count 5

16  ("Client 3"); PSR ¶¶ 53-58); and $4,000,000 from Michelle Phan's

17  ("Phan") settlement with her former company (Count 8 ("Clients 4 and

18  5"); PSR ¶¶ 59-67).  Defendant's theft of his clients' money resulted

19  in substantial financial hardship to Johnson, Gardner, and Barela.

20  (PSR ¶¶ 98-101.)

21          To conceal his fraudulent scheme, defendant made

22  misrepresentations and took other fraudulent actions during the

23  course of EA LLP's bankruptcy (<u>In re Eagan Avenatti, LLP</u>, No. 8:17-

24  bk-11961-CB), including, but not limited to: failing to include

25  Gardner's settlement payment (or at least the fees) in January 2017

26  on the statement of financial affairs (or the amended statement of

27  financial affairs) that defendant signed under penalty of perjury;

28  opening new bank accounts to deposit Barela and Phan's settlement

payments and failing to include his receipt of these payments on the respective Monthly Operating Reports that defendant signed under penalty of perjury; and stealing Phan's money to pay creditors, including the IRS, to get EA LLP out of bankruptcy.  (PSR ¶¶ 102-105.)  Defendant carried out his fraudulent scheme for over four years through sophisticated means including, among other actions: forging Johnson's signature on his settlement agreement without providing Johnson the agreement or the terms; providing Barela with a bogus settlement agreement; moving the stolen settlement proceeds through multiple bank accounts; failing to provide Gardner with a copy of her settlement agreement, lying about the true terms of the agreement, and depositing money into Gardner's account in a form designed to make her believe the payments were from her ex-boyfriend; splitting up the wire transfers to Phan to enable defendant to claim to Phan and Long Tran ("Tran") that there were three wire transfers when there were only two; and making lulling payments to Johnson, Gardner, and Barela.  (PSR ¶¶ 106-109.)

Defendant lied to Johnson and stole Johnson's settlement money knowing he was a vulnerable victim, namely, he was a paraplegic with mental health issues who was in need of the money for his living and medical expenses.  (PSR ¶¶ 110-113.)  Defendant also used his special skills as an attorney and abused the trust placed in him by his clients to carry out his scheme.  (PSR ¶¶ 114-115.)  Finally, defendant obstructed justice by perjuring himself in civil proceedings pertaining to the conduct in this case; threatening and intimidating witnesses; and producing false documents in an official proceeding.  (PSR ¶¶ 116-117; see also Section II.B.2.a., below.)

With respect to obstructing the IRS's ability to collect taxes owed, defendant failed to pay over to the IRS approximately $3.2 million in federal payroll taxes that had been withheld from the paychecks of his employees at GBUS; failed to pay over to the IRS approximately $1.6 million in federal payroll taxes that had been withheld from the paychecks of his employees of EA LLP; and corruptly obstructed the IRS' efforts to collect the moneys that GBUS, which he controlled, owed to the United States.  (Count 19; PSR ¶¶ 68-77.)

2.    Objections to the PSR's Factual Findings

The government notes the following updates, clarifications and corrections.[6]  The government submits that the Court need not rule on these updates, clarifications and corrections because they are either undisputed or will not be considered and/or affect sentencing (See Fed. R. Crim. P. 32(i)(3)(B)):

¶ 47(a): Payments to Johnson and on Johnson's behalf: From January 30, 2015, through March 22, 2019, approximately 99 payments totaling approximately $282,070 were made to Johnson and for his rent.

¶ 52(a): Payments to Gardner:  From March 2017 to March 2019, approximately 15 payments (either through cashier's checks or wire transfers) totaling $218,000 were made to Gardner.

¶ 60: Ipsy repurchase agreement:  Ipsy -- not Phan -- agreed to repurchase the Ipsy shares.

---

[6] The PSR includes findings that are based only on defendant's own statements and are not otherwise corroborated.  Although the government does not specifically object, except as noted, to these findings because it submits that the information should not materially affect the Court's sentencing determinations, the government does not concede the accuracy of this information.

6

¶ 61: <u>Ipsy repurchase agreement</u>:  The total repurchase amount was $37,168,678.85, not $35,625,228.

¶ 181: <u>Self-surrender date</u>: Defendant self-surrendered on February 7, 2022, not 2020.

¶ 215: <u>Donation to George Washington University Law School</u>: According to information developed in <u>Parris et al. v. Avenatti et al.</u>, Case No. 19CV1686 (Santa Barbara Superior Court), defendant funded this payment with monies that he stole from Stoll, Nussbaum & Polakov, to whom he owed the money pursuant to a fee-sharing agreement.

¶¶ 219-230: <u>Employment Record</u>:  Defendant's ownership and control of GBUS (as well as his role as CEO), operating Tully's Coffee, and GB Autosport, LLC, which managed defendant's car racing team, and the related time periods, should be included (and should have been disclosed by defendant).[7]  (<u>See</u> ¶ 31(a), (c).)

¶¶ 233-235:  <u>Financial Condition</u>:  Without explanation or authority, defendant failed to provide a personal financial statement and instead relied on a <u>Declaration . . . in Continued Support of CJA</u>

---

[7] The PSR reports, based on information defendant supplied, that defendant formed a new law firm, Augustus LLP, in 2019.  (PSR ¶ 230.) In two separate judgment-debtor examinations ("JDE"), however, defendant hid his interests in Augustus LLP from creditors.  (Dec. of Remoun Karlous, Sentencing Exhibit ("Sent. Ex") 1 ("Q: who owns Augustus LLP? A: I'm not at liberty to disclose that.  It's not me. Q: Do you have any direct or indirect interest in Augustus, LLP. A: No. Q: Why are you not at liberty to disclose who owns it? A: Because it was established for a client."); Sent. Ex 2 ("Q: With respect to - - have you ever heard of something called Augusta, LLP? A: Yes. Q: Do you know what it is? A: Yeah. It's a limited liability partnership. Q: Are you a member? A: No. Q: Do you know who the partners are? A: No. Q: Do you have any interest in the partnership? A: No.").) Moreover, although defendant now claims he started Augustus LLP for a "clean start" with "different clients," (PSR ¶ 230) he used the Augustus LLP bank account to make lulling payments to the victims in this case and to pay EA LLP employees.  (Sent. Exs 3, 4.)

1  Appointment.  Much of the financial information provided is

2  unverified. (E.g., ¶¶ 241, 243, 244, 246, 248, 253, 254, 255.)  For

3  example, although defendant claims to owe approximately $465,000 in

4  principal on three outstanding loans, no information is provided

5  identifying the lenders, the terms of the loans or what collateral if

6  any defendant provided to secure the loans.  (¶ 248.)

7      **B.   Sentencing Guidelines**

8          1.   Summary

9      Except as noted below, the government concurs with the

10  guideline analysis in the PSR (¶¶ 85-137) and submits that the

11  applicable guidelines are as follows based on all of the evidence in

12  the record:[8]

13  **WIRE FRAUD**
    **(Counts 5, 8-10)**

14

15  Base Offense Level:          7      USSG § 2B1.1(a)(1)          PSR ¶ 92

16  Loss Greater than
    $9,500,000:           +20    USSG § 2B1.1(b)(1)(K)      PSR ¶¶ 93-95

17  Substantial Financial
    Hardship to One or More
18  Victims:             +2     USSG § 2B1.(b)(2)(A)      PSR ¶¶ 96-101

19  Misrepresentation or
    Other Fraudulent Action   +2     USSG § 2B1.1(b)(9)(B)      PSR ¶¶ 102-105

20

21  _____

22      [8] The Ninth Circuit has explained that "[i]n the sentencing
    context, "[w]e review the district court's factual findings for clear
23  error, its construction of the United States Sentencing Guidelines de
    novo, and its application of the Guidelines to the facts for abuse of
24  discretion." United States v. Halamek, 5 F.4th 1081, 1087 (9th Cir.
    2021) (internal citation omitted).  "A finding of fact is clearly
25  erroneous if it is '(1) illogical, (2) implausible, or (3) without
    support in inferences that may be drawn from the facts in the
26  record.'" United States v. Valle, 940 F.3d 473, 478 (9th Cir. 2019)
    (quoting United States v. Hinkson, 585 F.3d 1247, 1262 (9th Cir.
27  2009) (en banc) (cleaned up)).  Here, the Court can clearly find
    factual support for the guideline calculations in the record,
28  including the trial testimony and evidence as well as in the sworn
    affidavits in support of the criminal complaint, search warrants, and
    motion to revoke bail in this case.

During the Course of a
Bankruptcy Proceeding:

| | | | |
|---|---|---|---|
| Sophisticated Means: | +2 | USSG § 2B1.1(b)(10)(C) | PSR ¶¶ 106-109 |
| Vulnerable Victim: | +2 | USSG § 3A1.1(b)(1) | PSR ¶¶ 110-113 |
| Abuse of Position of Trust or Special Skill: | +2 | USSG § 3B1.3 | PSR ¶¶ 114-115 |
| Obstruction of Justice | +2 | USSG § 3C1.1 | PSR ¶¶ 116-117 |

**TAX OFFENSE
(Count 19)**

| | | | |
|---|---|---|---|
| Base Offense Level (Loss Greater than $1,500,000) | 22 | USSG §§ 2T1.1(a)(1); 2T4.1(I) | PSR ¶¶ 119-123 |
| Sophisticated Means | +2 | USSG § 2T1.1(b)(2) | PSR ¶ 124 |

| | | | |
|---|---|---|---|
| **MULTIPLE COUNT ADJUSTMENT** | -- | USSG §§ 3D1.1-4 | PSR ¶¶ 129-132 |

    2.   Objections to the PSR's Guidelines Calculation

         a.   *Additional Bases for Applying the Obstruction of
              Justice Enhancement*

     The USPO correctly applied a two-level upward adjustment

pursuant to USSG § 3C1.1 because defendant willfully obstructed the

administration of justice with respect to the investigation and

prosecution of his offense.  This enhancement applies when a

defendant "threaten[s], intimidat[es] . . . a witness directly or

indirectly, or attempt[s] to do so."  USSG § 3C1.1, comment.

(n.4(A)).  The USPO applied the enhancement based on the threat to

Gardner and her ex-boyfriend implied in a tweet defendant posted

after a Los Angeles Times article named them as a victim and related

party who had been listed anonymously in the indictment.  (PSR ¶

117.)

9

1    Application of this enhancement is also supported by the

2    following additional facts.  In another instance of threatening and

3    intimidating a witness, defendant served a trial subpoena on Barela's

4    wife when she accompanied Barela to Court, and then used the subpoena

5    to force her out of the courtroom because there was a witness

6    exclusion rule.  It is clear these acts were meant to intimidate

7    Barela and ensure that his wife was not present to support him

8    because at no point before or after did defendant list Barela's wife

9    as a witness.  (CR 723; Sent. Ex 5.)

10    The commentary to the obstruction guideline provides other

11    examples of obstructive conduct warranting the enhancement, two of

12    which are also relevant here.  First, the enhancement also applies if

13    the defendant committed perjury, including in civil proceedings, if

14    such perjury pertains to conduct that forms the basis of the offense

15    of conviction.  USSG § 3C1.1, comment. (n.4(B)).  Defendant provided

16    perjurious under-oath testimony pertaining to the conduct that forms

17    the basis of his offenses of conviction at various JDEs, at his state

18    bar disciplinary hearing, and during the Section 341 hearing during

19    EA LLP's bankruptcy (at which defendant testified as the managing

20    partner).  For example:

21    • During a JDE on March 15, 2022, defendant testified that,

22    to the best of his knowledge, Johnson had been paid all the money he

23    was owed and neither defendant nor his firm had any current

24    obligation to make payments to Johnson.  (Trial Exhibit ("Tr. Ex")

25    404 at 12-14.)[9]

26

27    ───────────────

    [9] The Trial Exhibits are not attached to the government's
    sentencing position memorandum because the government understands the
28    Court has a copy of the Trial Exhibits; however, upon the Court's
    request, the government can provide the Trial Exhibits to the Court.

- During a JDE on March 22, 2022, defendant falsely testified that: (a) the $1,600,000 from Brock USA that was deposited into defendant's attorney client trust account did not belong to Barela; (b) Johnson's matter with the County of Los Angeles had not been settled in its entirety; (c) the settlement agreement in the Johnson matter was not the settlement agreement; (d) the Johnson settlement agreement was confidential; (e) he had "absolutely not" stolen Johnson's money; (f) it was "absolutely false" to say that, instead of paying Johnson his settlement money, defendant had been making small payments; (g) he was sure he gave Johnson a lump sum payment after the $4,000,000 came in; (h) the monies paid to Johnson over the years were "an advance" on future settlement monies; and (i) it was "absolutely false" that Phan, like Barela, had accused him of stealing her money.  (Tr. Ex 405 at 8-26; 406.)

- During defendant's state bar disciplinary hearing on January 14, 2020 (after the indictment was filed in this case), when the judge asked defendant whether he had informed Barela of the $1,600,000 in settlement funds, defendant: (a) falsely stated "Mr. Barela was fully informed of the receipt of those monies"; (b) falsely claimed that it was Barela who was lying when he said he had not been notified of the $1,600,000 settlement money; and (c) falsely claimed he provided Barela an accounting.  (Sent. Ex 6.)[10]

Second, the enhancement applies if the defendant "produc[ed] or attempt[ed] to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding."

---

[10] Sentencing Exhibit 6 is a transcript of the recording of the January 14, 2020, proceeding.  Upon the Court's request, the government will also file a copy of the recording itself.

11

1   USSG § 3C1.1, comment. (n.4(C)).  Defendant forged the signature of

2   his law partner, Michael Eagan, on a settlement agreement to be used

3   as part of the stipulation to dismiss the EA LLP bankruptcy

4   proceedings.  (Tr. Ex 342.)  Defendant admitted that he forged

5   Eagan's signature on the document during a recorded phone call with

6   Eagan. (Sent. Ex 7.)[11]

7                       *b.   No Acceptance of Responsibility*

8        The government objects to the PSR's reduction of defendant's

9   offense level pursuant to USSG § 3E1.1 based on his purported

10  acceptance of responsibility.  (PSR ¶¶ 83-84, 135.)  To date,

11  defendant's actions and admissions to the Court and the USPO -- which

12  have not included admissions to any specific offense conduct -- do

13  not reflect true acceptance of responsibility for his crimes.

14       The guidelines explain that "[i]n determining whether a

15  defendant qualifies under subsection (a) of USSG § 3E1.1, appropriate

16  considerations include" whether defendant "truthfully admit[s] the

17  conduct comprising the offense(s) of conviction, and truthfully

18  admit[s] or [does] not falsely deny[] any additional relevant conduct

19  for which the defendant is accountable under § 1B1.3 (Relevant

20  Conduct)."  Although a defendant is not required to affirmatively

21  admit relevant conduct beyond the offense of conviction to qualify

22  for the reduction, "a defendant who falsely denies, or frivolously

23  contests, relevant conduct that the court determines to be true has

24  acted in a manner inconsistent with acceptance of responsibility."

25  USSG § 3E1.1 (comment. (n.1(A)).

26  _____

27       [11] Sentencing Exhibit 7 is a transcript of the recorded call
    between defendant and Michael Eagan on August 22, 2019.  Upon the
28  Court's request, the government will also file a copy of the
    recording itself.

Here, defendant's statements at the change-of-plea hearing show that he has not yet accepted responsibility for his conduct.  As he had done at trial, defendant continued to deny the full scope of the harm his criminal conduct caused.  After government counsel stated the amount of restitution to be ordered based on all the conduct encompassed by the fraudulent scheme to which he was pleading guilty, defendant stated "I don't' agree that the restitution amount or the loss amount is $9 million, nor the tax loss amount is $5 million." (RT 6/16/2022 at 14.)  These assertions are empty and frivolous denials of the uncontested evidence that was presented at trial, with respect to the wire fraud counts, and provided through the documents produced in discovery, with respect to the tax offense.

At trial, defendant repeatedly implied through his cross-examinations of witnesses that there were additional reimbursable costs that dramatically reduced the amount he owed his clients.  But defendant never produced evidence of these purported additional costs.  He repeatedly speculated that the TABS accounting data that he claimed to have not received before trial would show these additional costs.  When the data was examined, however, it showed that the government's loss calculations were correct -- indeed, if anything, they were generous because they gave defendant credit for "costs" to which he was not actually entitled.  (CR 809, 825.)[12]

Defendant's false denials at the change-of-plea hearing about the scope of harm he inflicted show that he has not accepted

_____

[12] Notably, at no point during trial, nor after trial when defendant gained full access to the TABS records from the EA LLP servers, has defendant ever identified any evidence that the costs and the expenses incurred on the cases at issue were more than the costs and expenses for which the government gave defendant credit.

responsibility for the offenses to which he has pleaded guilty.  "The goals of the acceptance of responsibility provision would not be fulfilled if a defendant were eligible to receive the reduction even though he falsely denied relevant conduct. . . . . [T]he district court may weigh the false denial in considering a reduction for acceptance of responsibility."  United States v. Rutledge, 28 F.3d 998, 1002 (9th Cir. 1994) (affirming denial of acceptance of responsibility where defendant who pleaded guilty to being a felon in possession of a firearm falsely denied that he used the firearm during the commission of an attempted robbery).

Defendant's statements at the change-of-plea hearing also show that he has not truly accepted responsibility for his offenses but is only saying what he thinks will gain him a reduction in his offense level.  When asked to clarify, with respect to the wire fraud, that he understood that he made the false statements underlying each of the counts to which he was pleading guilty, that the statements were material, and that he acted with the intent to defraud, defendant refused.  Instead, he said:

> I have stated my allocution. I think it's acceptable under the law. I will cite the Court to United States versus Nickle. It's a Ninth Circuit case, 816 F.3d 1230. Basically, a District Court must accept an unconditional guilty plea so long as it meets the requirements of Federal Rule of Criminal Procedure 11(b). And I am going to paraphrase the case. Unless I denied an element of the offense, that's sufficient enough to support my guilty plea. I think I have stated and I have allocuted in sufficient detail here today to support my unconditional guilty plea.

(RT 6/16/2022 at 24-25.)  The scant facts that defendant admitted and his acknowledged plan to admit only the absolute minimum needed to enter his guilty pleas, show that defendant has not accepted

1    responsibility for the offenses to which he pleaded guilty.[13]  See

2    United States v. Ramos, 923 F.2d 1346, 1360 (9th Cir. 1991)

3    (affirming district court's finding that defendant had not accepted

4    responsibility where the defendant's "minimalist description of his

5    involvement in the affair (two or three sentences) did not suffice,

6    in the eyes of the probation officer or the district court, given

7    evidence which suggested a much deeper involvement in the scheme")

8    (overruled on unrelated grounds); United States v. Fellows, 157 F.3d

9    1197, 1200, 1202-1203 (9th Cir. 1998) (affirming denial of acceptance

10   of responsibility where the district court found that defendant's

11   letter expressing remorse "was merely 'an effort to manipulate the

12   system and say only as absolutely much as he thinks he needs to in

13   order to gain acceptance' rather than an actual acceptance of

14   responsibility for his criminal actions").

15        Defendant submitted to the USPO an "apology" letter addressed to

16   all of the wire fraud victims together but did not identify any

17   specific conduct for which he was apologizing.  (PSR ¶ 84.)  Again,

18   defendant said the bare minimum and only said it when the issue of

19

20        [13] Even after defendant filed his notice of intent to change his
21   plea (CR 945) and pleaded guilty in June 2022 (CR 955), defendant
     continued to -- falsely -- blame others for his predicament,
22   including the former President, a former lawyer at his firm, and a
     prosecutor in this case (CR 951; Sent. Exs 8, 9).  In July 2022,
23   defendant caused two letters to be posted on his Twitter account
     seeking an investigation into "the likely misuse of the [IRS] and the
24   Treasury Department by former President Donald J. Trump and his
     allies in order to target [defendant] for political and personal
25   gain." (Sent. Exs 8, 9.)  Defendant knew that he had been the subject
     of three separate civil IRS audits and collection activities
26   (including the collection activities he admitted obstructing when he
     pleaded guilty to count 19) between 2011 and 2017 and that an IRS
27   revenue agent had made a criminal referral in early 2018, before
     defendant ever met or filed a claim on behalf of Stephanie Clifford
28   against the former President. (PSR ¶¶ 76, 144, 146; RT 8/18/21 v.II
     at 44, 48.)

his "acceptance of responsibility" is being considered in connection with his sentencing.  This self-serving "apology" does not reflect an acceptance of responsibility worthy of recognition by a 2-level reduction in his offense level under USSG § 3E1.1.[14]

Defendant says that he will address the Court at the sentencing hearing "regarding his acceptance of responsibility" (PSR ¶ 83). Based on what he has done and said to date, however, he has not yet accepted responsibility for his crimes.

### c. Criminal History Category III Does Not Substantially Overrepresent the Seriousness of Defendant's Criminal History

Defendant has previously been convicted of a total of five felony offenses in two cases prosecuted in the Southern District of New York ("SDNY").  (PSR ¶¶ 150-151.)  He has 6 criminal history points, placing him in Criminal History Category ("CHC") III. (PSR ¶ 152.)

Section 4A1.3 of the Sentencing Guidelines sets out criteria for upward and downward departures based on "inadequacy of criminal history category."  A downward departure "may be warranted" "[i]f reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the

_____

[14] Defendant had multiple opportunities to accept responsibility, admit his conduct, and apologize to his victims, but on every occasion, he did the opposite.  When his victims tried to get their money, defendant repeatedly lied and provided excuses, and made lulling payments to keep his victims at bay.  After Barela and Phan hired new attorneys, defendant neither responded to their requests for information and documentation nor admitted what had happened; instead, in the case of Barela, defendant repeatedly and publicly attacked Barela -- and continued to do so for the next several years -- as a "career criminal" who could not be trusted.  And when confronted with stealing Johnson's money on March 22, 2019, instead of acknowledging what he did, defendant lied under oath and rushed to Johnson's residence to lie to him further and trick him into signing other documents. (PSR ¶ 47d.)

16

defendant's criminal history or the likelihood that the defendant will commit other crimes." USSG § 4A1.3(b)(1).  As illustration for this concept, the Sentencing Guidelines provides the example that a downward departure may be warranted if "the defendant had two minor misdemeanor convictions close to ten years prior to the instant offense and no other evidence of prior criminal behavior in the intervening period." USSG § 4A1.3, comment. (n.3).

Here, the USPO asserts that a downward departure to CHC II is appropriate for a different reason, namely, that the SDNY matters "could have been combined into one criminal case" and, if that had occurred, defendant would have only 3 criminal history points, placing him in CHC II. (Recommendation Letter ("Rec. Let.") at 9.) The USPO's analysis is wrong.

Sentencing Guideline 4A1.2(a)(2) provides that "[i]f there is no intervening arrest [i.e., between the conduct underlying the two offenses], prior sentences are counted separately unless . . .  the sentences resulted from offenses contained in the same charging instrument."  Defendant's extortion offenses (CR 19-373-PGG (SDNY)) and his embezzlement and aggravated identity theft offenses (CR 19-374-JMF (SDNY)) could not have been joined in the same charging instrument.  Under Federal Rule of Criminal Procedure 8, joinder is only permissible where the offenses are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.  The offenses charged in the two SDNY cases were of a completely different character, involved completely different acts, and were not part of a common scheme or plan.  Although the offenses occurred in the same time frame, neither the extortion offenses nor the embezzlement

1    offenses are relevant conduct within the meaning of USSG 1B1.3 for

2    each other.[15]

3        In any case, defendant's criminal history score properly

4    includes 6 points, placing him in CHC III.  This category accurately

5    reflects defendant's conduct and likelihood of recidivism given his

6    extensive criminal behavior, the fact that his multiple crimes have

7    not all accrued their own criminal history points, his lack of

8    remorse, and his demonstrated willingness to lie to further his own

9    interests at the expense of others. (See Sections II.B.2.b, above,

10   and III.C, below.)

11              *d.    No Reduction Under USSG § 5G1.2(d)*

12       The government objects to the reduction of defendant's

13   sentencing range to 240 months based on the purported applicability

14   of USSG § 5G1.2(d).  (PSR Guideline Summary, ¶ 265, Rec. Let. at 9.)

15       Defendant pleaded guilty to four wire fraud counts (each with a

16   statutory maximum sentence of 20 years) and a tax offense (with a

17   statutory maximum sentence of 3 years). (See PSR ¶ 264.)  The total

18   statutory maximum sentence that may be imposed for his five crimes is

19   83 years.

20

21       _____

         [15] Judge Furman rejected defendant's downward departure request
22   on this very ground in the SDNY embezzlement case.  Defendant
     complained that "by prosecuting him on two separate occasions, [the
23   government] had the ability to now argue that he should be placed in
     criminal history category III as opposed to category I or II."
24   (6/2/2022 RT 18 (CR 19-374-JMF).)  Judge Furman found that
     defendant's criminal history score was not overstated.  Judge Furman
25   reasoned that, "had the government chosen to charge those two crimes
     together, or multiple crimes together, [defendant] almost certainly
26   would have moved for, and probably been granted, a severance since
     the Nike [extortion] conduct had absolutely nothing to do with the
27   [embezzlement] conduct at issue here. . . .  [The Nike conviction] is
     not relevant conduct with respect to this case within the meaning of
28   the guidelines, which is to say it's discrete criminal conduct."
     (Id. at 19-20.)

                                    18

1        The Sentencing Guidelines includes instructions regarding the
2   interplay of advisory sentencing ranges and statutory maximums.
3   First, the Court determines the total punishment to be imposed.
4   Then, "[i]f no count carries an adequate statutory maximum,
5   consecutive sentences are to be imposed to the extent necessary to
6   achieve the total punishment."  USSG § 5G1.2(d), comment. (n.1 (final
7   paragraph)); see also United States v. Iniguez, 368 F.3d 1113, 1115-
8   16 (9th Cir. 2004) (en banc); United States v. Joetzki, 952 F.2d
9   1090, 1097-98 (9th Cir. 1991).

10       Here, the USPO has found that the total offense level is 37 (39
11  if no reduction for acceptance of responsibility applies).  Defendant
12  is properly assigned to CHC III so his guidelines range is 262-327
13  months (level 37) or 324-405 (level 39).  Should the Court determine
14  that a sentence in either of these ranges is appropriate, § 5G1.2(d)
15  instructs the Court to impose 240 months as the sentence for one of
16  the wire fraud counts and then impose consecutive sentences on one or
17  more of the other counts "to the extent necessary to produce a
18  combined sentence equal to the total punishment."  The guidelines
19  provide no authority for reducing the total punishment the Court
20  otherwise finds appropriate to the statutory maximum for a single
21  count where defendant -- as here -- has pleaded guilty to multiple
22  counts.

23                  *e.   Restitution for the Tax Offense*

24       The government objects to the USPO's statement that restitution
25  can only be ordered in a tax case to the extent agreed to by the
26  parties in a plea agreement.  (PSR ¶ 280.)  As described more fully
27  below in Section IV, this is incorrect.  The Court can order
28  restitution as a condition of supervised release to the victim of any

19

criminal offense, including those in Title 26, for which supervised release is properly imposed, limited to the losses caused by the count of conviction.  <u>United States v. Batson</u>, 608 F.3d 630, 633-37 (9th Cir. 2010); <u>see also</u> USSG § 5E1.1(a)(2).

## III. A SENTENCE OF 210 MONTHS IS REASONABLE AND APPROPRIATE BASED ON THE 3553(A) FACTORS

### A.   Overview

Defendant's criminal conduct arose from calculated choices that resulted in multiple blatant and egregious violations of the trust placed in him by his clients over the course of many years.  The malevolence of defendant's actions is magnified by the undisputed fact that defendant did not need to do what he did.  Defendant was not driven to commit his crimes by need, desperation, or the inability to legitimately earn a living.  Despite the significant advantages defendant enjoyed -- including a first-rate education and a thriving professional career -- defendant chose to commit numerous, deplorable crimes harming vulnerable victims over a lengthy period of time.

The advisory Sentencing Guidelines are the starting point for sentencing.  <u>Gall v. United States</u>, 552 U.S. 38, 49 & n.6 (2007). With an advisory range of 262-327 months' imprisonment (or 324-405 months if the Court finds that a two-level reduction for acceptance of responsibility does not apply), and based on the numerous aggravating circumstances that far outweigh any mitigating circumstances present here, the government submits that a sentence of 210 months, consecutive to the previously imposed sentences defendant is serving for separate crimes, is appropriate, just, and not greater

1   than necessary to achieve the goals of sentencing.[16]   Because the

2   aggravating factors far outweigh any mitigating factors, the

3   circumstances of defendant's case do not support an exercise of

4   leniency.

5        **B.   Nature and Circumstances of the Offenses (§ 3553(a)(1))**

6        Defendant's crimes were exceedingly serious.  With respect to

7   the wire fraud scheme, defendant inflicted tremendous harm on his

8   victims.  The victims testified about those harms at trial and have

9   submitted victim impact statements ("VIS") that further describe the

10  financial and emotional harms defendant caused over the course of

11  many years, the deleterious effects of which will endure for

12  additional years to come.  The emotional damage was particularly

13  acute because defendant stole from clients who had turned to him for

14  help addressing harms they had already suffered and had put their

15  trust in him and relied on him to represent their interests.  Rather

16  than honor his obligations and fulfill his duties -- legal,

17  professional, and ethical -- defendant stole from his legal clients,

18  lied to them for months and years, forged and fabricated documents,

19  testified falsely under oath, and went to great lengths to conceal

20  his fraud.  Defendant did not commit his crimes to support his

21  family, pay child support, or for any other arguably mitigating

22  reason; to the contrary, he stole from his clients to live an

23  extravagant lifestyle while some of his victims could barely make

24  ends meet.

25

26

27       [16] This recommendation is contingent upon defendant's acceptance
     of responsibility for his crimes. (See Section II.B.2.b, above.)  In
28   the event that defendant does not accept responsibility, the
     government will recommend a higher sentence.

Defendant stole nearly two million dollars from Johnson, a paraplegic client with mental health issues who needed the money to pay for his living and medical expenses.  Defendant lied to Johnson for years and when defendant was caught, he lied some more and tricked Johnson into signing documents designed to support a self-serving defense that defendant intended to use to defeat any claims of misconduct that might be made against him.  Defendant's scheme derailed Johnson's efforts to purchase a handicap accessible house[17] and caused him to lose his SSI benefits. (PSR ¶¶ 42-47.)

Defendant also stole nearly two million dollars from Gardner who, at the time, was living in her car and needed money to get back on her feet.  Defendant misappropriated this money to buy a private plane.  Defendant lied to Gardner for years and concealed his fraud by blaming the purported non-payment of the agreed upon settlement on her ex-boyfriend, which caused Gardner further emotional distress.  (PSR ¶¶ 48-52.)

Defendant stole nearly a million dollars from Barela by providing him a bogus settlement agreement and lying to him for months while Barela's financial situation worsened.  Then, when Barela uncovered defendant's fraud, defendant publicly -- and ruthlessly -- attacked Barela for daring to accuse defendant of doing exactly what defendant had, in fact, actually done.  At the

---

[17] In 2015, defendant stole Johnson's settlement money that he could have used to buy the house in 2017 for $600,000. Although defendant was flush with cash in September 2017 (having received nearly $5 million dollars in attorneys' fees combined from the Phan/Tran settlement and the settlement in another case (Tr. Exs 368, 386)), defendant did not pay Johnson his money but, instead, in October 2017, forged Johnson's name without his knowledge on loan documents and then caused the house deal to collapse.  (Tr. Exs 89, 94, 95.)

same time, defendant sought a percentage of Barela's other business ventures and offered to "lend" Barela -- with interest -- money in January 2019 that was, in fact, Barela's own money (the concealed second settlement payment that defendant would also steal). (PSR ¶¶ 53-58.)

Finally, defendant stole four million dollars from Phan so he could pay off creditors, including the IRS, to get his law firm out of bankruptcy. Defendant lied to Phan and her business manager for months to conceal his fraud, providing them with false documentation that increased their anxiety about the missing money. (PSR ¶¶ 59-67.)

The VISs describe in detail the effects defendant's conduct had on the victims up through trial, including from the crimes themselves as well as defendant's treatment of his victims after the crimes were uncovered.[18]  Johnson described defendant's conduct and its impact: "To this day, I do not know why Michael lied and deceived me, why he broke my trust, why he broke my heart. I trusted him implicitly, I believed the things he told me, but it was all part of his plan to defraud me of my settlement. To this day, I have a hard time trusting people because of what Michael did, and I live in constant fear of being taken advantage of again, particularly given my physical disability." (Johnson VIS ¶ 23.)  Gardner explained the effects defendant's actions have had on her: "It creates resentment, a wave of bitter anger at having been mistreated. I have lost job opportunities, personal relationships,

---

[18] The VISs have been provided to the Court, the USPO, and defendant and their contents are for this reason not repeated fully herein.

and friendships where I have pushed people away in fear of being taken advantage of. I am constantly plagued by my wounds, as my heart truly hurts. I have felt pain writing this. To elaborate on these moments causes me chest pain, jitters, a throbbing migraine, sweat, blurred vision, and my throat becomes so tight I can barely speak." (Gardner VIS at 6.)

Barela detailed the impact that defendant's criminal conduct had on him when it was added on top of the circumstances that had led Barela to hire defendant in the first place: "And, as the months go by and with an even further pit in the stomach, you must now face the truth that, yes, you have been swindled, not once, but twice, and the second time by the very person who swore to help. Not only is there the realization that the money that you needed to keep your family and your business afloat is not coming to you, you realize the man you have admired and even felt a friendship towards, has, without any apparent regard for your well-being, cheated you, lied to you repeatedly, and is still trying to convince you otherwise." (Barela VIS at 1.) Finally, Tran itemized the harm defendant caused to both Phan and Tran: "I must live with this heavy burden, this overwhelming guilt, this immense shame in knowing that my closest friend endured a great deal of suffering because I chose to hire Michael Avenatti. I can't fix this and that knowledge will eat away at me for the rest of my life." (Tran VIS.)

The advisory guidelines account for some of the aggravating factors involved in defendant's wire fraud scheme, including: the millions of dollars in actual loss; the abuse of trust and abuse of his role as the victims' attorney to commit and conceal his crimes; the substantial financial hardship he caused to at least three of

his victims; his use of sophisticated means to carry out the crime; his misrepresentations and fraudulent actions during the course of bankruptcy proceedings, which served to conceal his thefts; the crimes being committed against someone defendant knew was a vulnerable victim; and defendant's obstruction of justice.  The guidelines, however, do not capture many other aggravating aspects of defendant's criminal conduct, which the Court should consider.

First, defendant's wire fraud scheme entailed other crimes, including identity theft and making false statements under penalty of perjury in civil proceedings, including in EA LLP's bankruptcy, which defendant committed to conceal his thefts.  For example, defendant engaged in aggravated identity theft and other fraud relating to the attempted purchase of the house for Johnson in 2017 by forging Johnson's name on loan documentation. (See footnote 18, above.)  Defendant made misleading statements at various JDEs to conceal his theft of client funds.  For example, although defendant improperly used his various attorney client trust accounts to pay for his personal and business expenses (see, e.g., Tr. Exs 368-370, 372, 386-387), he refused to answer questions about where he held trust accounts at JDEs and suggested he had no control over those funds -- much less that he had, in fact stolen those funds -- by claiming "those funds don't belong to me." (Tr. Ex 403 at 7-8.) Defendant also made false statements under oath and/or under penalties of perjury about his filing of tax returns for himself, A&A, and EA LLP, and the efforts he purportedly took to locate the returns, even though defendant knew he had never filed the returns.

(Sent. Exs 2, 10, 11, 12.).[19]

Second, defendant's wire fraud scheme harmed more than the four victims underlying the counts of conviction. Defendant also stole settlement money from other clients, including nearly 170 clients he represented in connection with Greco v. NFL, from whom he stole approximately $807,000 (PSR ¶¶ 139-140), and Amélia Racine, from whom he stole $15,000 (Sent. Ex 21).

Third, defendant's wire fraud scheme caused harm to more than just the proximate victims of his scheme, wreaking havoc in the lives and affairs of many third parties. For example, other members of EA LLP have been sued and have paid civil settlements based on defendant's criminal conduct. Both EA LLP and GBUS were placed into bankruptcy due to defendant's actions, and countless creditors are owed millions of dollars that they will almost certainly never recover. In addition, the parties to some of the underlying civil cases that resulted in the settlements that defendant stole, resolved their matters through confidential agreements; those parties lost the privacy protections of those agreements when the agreements became issues in defendant's public criminal trial. The final resolutions that the parties in the civil matters believed they had reached have also been upended; instead, the parties have needed to expend more time and money in connection with defendant's criminal case.[20]

---

[19] Defendant also fraudulently submitted tax returns that he never filed to The Peoples Bank in order to secure loans in 2014. (See Indictment, Counts 30-31.)

[20] Defendant's course of conduct regarding the failed purchase of a home for Johnson epitomizes the collateral damage defendant caused. In addition to preventing Johnson from being able to purchase a handicap-accessible home, which was one of Johnson's primary goals in

*(footnote cont'd on next page)*

1    Fourth, the guidelines do not fully capture all of defendant's

2 reprehensible conduct and the harm it inflicted.  Defendant's

3 offense level would be the same if defendant had simply lied to his

4 clients about their settlement agreements and payments, and then

5 just stolen their money.  But defendant did far more than that. He

6 prevented Johnson from buying a handicap-accessible home; caused

7 Johnson to lose his SSI benefits; lied to Johnson and provided him

8 with yet more bogus documentation in March 2019; caused Gardner to

9 suffer additional emotional harm by making her believe her ex-

10 boyfriend was continuing to mistreat her; and violated his duty of

11 loyalty to his clients by publicly attacking them.

12    Fifth, the harms caused when a lawyer betrays his clients go

13 far beyond the financial harm that is the focus of the Sentencing

14 Guidelines.  Earlier this year, the Honorable Michael W. Fitzgerald,

15 United States District Judge, recognized these additional harms when

16 he sentenced another plaintiff's lawyer who stole approximately $5.5

17 million from his clients to 144 months' imprisonment. Judge

18 Fitzgerald's analysis, especially in relation to the nature and

19 circumstances of the crime, is apropos here.  United States v.

20 Layfield, CR 18-124-MWF, Dkt 443.  Judge Fitzgerald described "the

21

22 pursuing his case against the County of Los Angeles, defendant wasted
   considerable time and money of others, including the seller, two real
23 estate agents, the escrow officers, and the loan agent.  Defendant
   took no action to help Johnson buy the property but instead lied to
24 Johnson and everyone involved to string them along.  After months of
   false promises by defendant that caused the seller to move out of her
25 home, store her belongings, and pay for a short-term lease, the
   seller finally decided to cancel the escrow after becoming
26 emotionally and physically ill due to the stress.  (Sent. Ex 13.)
   And despite defendant's preventing the sale from closing based on
27 repeated lies about delays in connection with a purportedly required
   special needs trust for Johnson, defendant refused to sign the escrow
28 cancellation documents and threatened to sue the other side.  (Sent.
   Exs 14, 15, 16.)

seriousness of the crime, indeed the heinousness, the sheer evil of the crime" of a lawyer stealing from his clients as "utterly reprehensible" and "pretty much the worst thing that a lawyer could ever do." Id. at 11, 25, 53.  Judge Fitzgerald called defendant's actions an "appalling and shocking violation of the attorney-client relationship," whereby the victims "were vulnerable because they had been injured . . . [a]nd they were vulnerable in the sense because of the fiduciary relationship" and "were reluctant" to believe they "were at odds with their own lawyer" who they believed "was their champion." Id. at 43.

Finally, the guidelines do not capture the harms caused by defendant's tax crime, since no multi-count adjustment apples.  But the tax crime is also extremely serious, resulting in over $3.2 million in federal payroll taxes not being paid. (PSR ¶¶ 71-77.) This crime, too, caused harm not just to the immediate victim -- the U.S. Treasury -- but also to the hundreds of GBUS employees whose tax accounts were affected.

In short, defendant's crimes were exceedingly serious and caused widespread harm.  Such significant misconduct warrants a correspondingly significant term of imprisonment.

**C.   History and Characteristics of Defendant (§ 3553(a)(1))**

Defendant's history and characteristics present further aggravating factors that justify a significant custodial sentence. Defendant's education and work history show that he had every opportunity to live a prosperous, law-abiding life running a legitimate and lucrative law practice.  Defendant is well-educated and well-credentialed.  Instead of using his skills and personal qualities to build up his legal practice and help his clients, he

28

stole millions of dollars from them.  When confronted, defendant

used his superior knowledge of the legal system to conceal his

thefts by lying over and over again.  Defendant consistently puts

his own interests and desires ahead of the interests and needs of

others and will say and do anything -- whether or not legal and/or

truthful -- that he believes will benefit himself.[21]

These characteristics are clear not just in the instant case

but also in the matters underlying defendant's two other federal

prosecutions.  The convictions in those matters similarly involved

defendant's violations of his duties as a lawyer by lying to and

betraying his clients for his own personal benefit.  In connection

with the sentencing in the Nike extortion case, the Honorable Paul

G. Gardephe, United States District Judge, described defendant's

criminal conduct as follows:

---

[21] For example, in 2018, before he was indicted, defendant
repeatedly gave assurances during media interviews (and on Twitter)
that he would release his tax returns if he ran for president,
despite not having filed tax returns for nearly a decade.  (Sent. Ex
17; ABC This Week interview on August 12, 2018,
https://abcnews.go.com/Politics/stormy-daniels-lawyer-michael-
avenatti-presidential-hopeful/story?id=57142701, at 7:20-7:50; and
The Texas Tribune One on One with Michael Avenatti,
https://www.youtube.com/watch?v=NdbAMCs2FFQ&t=32s, at 52:40-53:12.)
Likewise, defendant repeatedly touted, including during trial and in
filings in this case, the "billion dollars in verdicts and
settlements" he obtained as a lawyer, which included a $454 million
dollar verdict.  That verdict was immediately reduced to $25 million
and ultimately overturned on appeal by the Ninth Circuit resulting in
no recovery.  When asked in a JDE what value defendant placed on the
$454 million Kimberly Clark verdict about which he constantly bragged
(including at trial), defendant testified: "zero. . . .  Because any
experienced trial lawyer will tell you that you cannot put a value to
it until it's actually received."  (Sent. Ex 2.)  In fact, at trial
defendant attempted to mislead the jury about the verdict by
eliciting testimony from his office manager about the $454 million
verdict to attempt to contradict her testimony about the dire
financial condition of the firm (RT 7/28/21 v.2 at 33-34), and then
sought to prevent the jury from learning that the case actually
resulted in nothing for the firm (RT 7/29/21 v.1 at 11-14).

1        Mr. Avenatti's conduct was outrageous.  He hijacked his
2    client's claims and he used those claims to further his own
     agenda, which was to extort millions of dollars from Nike
3    for himself. . . .  [Defendant's client] was never more
     than a convenient pawn for Avenatti, a vehicle for Avenatti
4    to extract millions from Nike.  But Mr. Avenatti did more
     than hijack his client's claims for his own financial gain.
5    He outright betrayed his client. . . .  He had become
     someone who operated as if the laws and rules that apply to
6    everyone else didn't apply to him.

7    (19-CR-373-PGG (SDNY), RT 7/8/21 at 39-40.)

8        The Honorable Jesse M. Furman, United States District Judge, in

9    the wire fraud and identity theft case, was struck by the same

10   characteristic.  At sentencing, he described defendant's conduct as

11   follows: "Mr. Avenatti [used] his intelligence and formidable legal

12   skills, not for good, not for his clients' interest, but for his

13   own" and noted that defendant was "brazenly lying to and stealing

14   from [his clients], indeed, [] defaming them, both privately and

15   publicly, when they had the audacity to confront him for his

16   crimes."  (19-CR-374-JMF (SDNY), RT 6/2/22 at 47.)

17       Here, defendant's callous abuse of his clients extended beyond

18   the crimes he committed.[22]  After the indictment was returned and its

19   allegations of defendant's abuse of Johnson became public, and then

20   again after Johnson sued defendant for fraud, defendant publicly

---

    [22] Defendant also threatened and bullied many others, including
lay individuals, lawyers, and members of the media, if they accused
defendant of impropriety.  For example, when an attorney in Seattle
alleged misconduct by defendant -- allegations that later proved to
be accurate -- defendant attacked the attorney publicly and made
baseless and outlandish claims about the attorney's character and
even threatened the newspaper if it continued its reporting.  (Sent.
Exs 18, 19; see also https://lawandcrime.com/opinion/michael-
avenatti-threatened-to-sue-our-reporter-after-unfavorable-coverage-
then-trolled-him-on-twitter/; CR 549, 679 (baseless allegations in
filings about a reporter covering defendant's case).)

vilified Johnson claiming he was "disturbed" and not credible.[23]  At trial, defendant attacked, berated and attempted to embarrass his clients by posing questions during cross-examination based on irrelevant -- and confidential -- information that he only knew because of his prior representation of the clients.

For example, defendant asked questions of Gardner about an instance in which she had been sexually assaulted and questioned Johnson about having been naked on the street during a mental health episode, his hallucinations, and his purported assault of a nurse. (RT 8/3/21 v.I at 64; RT 7/22/21 v.I at 89, v.II at 33; see also Johnson VIS ¶ 20 (describing defendant's cross-examination as "abusive," with defendant "shout[ing]" at Johnson, "ridicul[ing]" him, and claiming he was "mentally ill for simply testifying truthfully"); Gardner VIS at 4, 7 (referring to defendant's "manipulation and purely evil" cross-examination of Gardner as an attempt to "mak[e] a damn fool of [her] again and trying to break [her] further" as well as "seek[ing] to destroy [her] mentally, physically, and emotionally.")[24]  Defendant's cross-examination of Tran included allegations that Tran and Phan were trying to evade paying taxes on their settlement money even though -- as defendant knew -- they were handling the money in the way to which defendant -

_____

[23] PSR ¶47e, n.8; see also CR 283 Exs 2, 3; "Paraplegic Man Sues Michael Avenatti For Allegedly Embezzling $4M Settlement," https://www.cbsnews.com/losangeles/news/paraplegic-man-sues-michael-avenatti-for-embezzling-4m-settlement/; "Paraplegic man sues former attorney Michael Avenatti, claims he stole settlement money," https://abc7.com/michael-avenatti-lawsuit-orange-county-geoffrey-johnson/5345745/.

[24] Defendant's continuing abuse of his victims was also demonstrated by his effort to intimidate Barela by serving his wife with a trial subpoena when she accompanied Barela to Court.  See Section II.B.2.a., above.

31

1   - their lawyer -- had advised them.  (RT 8/10/21 v.II at 91.)

2   Defendant's shameless cross-examinations of his victims -- which

3   could elicit almost nothing that could actually advance his defense

4   -- showed he had no remorse for the harm he had already inflicted on

5   them and has no empathy for anyone who he believes stands in his way

6   of obtaining what he wants.[25]

7        Defendant's abusive cross-examinations were in keeping with his

8   pre-trial conduct, in which defendant attempted to intimidate and

9   embarrass his victims when they confronted him about his illegal

10  actions.  For example, in May 2019, U.S. Probation and Pretrial

11  Services ("USPPS") advised the Court that defendant had made

12  statements (in violation of his duty of loyalty and confidentiality)

13  about Gardner and her former boyfriend that USPPS interpreted as

14  potential threats and witness intimidation.  (PSR ¶ 18.)  Although

15  defendant promised to "refrain from any similar conduct," he

16  subsequently attacked Johnson in the media with information to which

17  he had access solely due to his representation of him.[26]  (See n.24,

18

19       [25] Defendant's abusive cross-examinations came several weeks
     after defendant's sentencing hearing in the Nike extortion case, when
20   he said during his allocution: "I am truly sorry for all of the pain
     that I have caused to Mr. Franklin and others. I am deeply humbled
21   before you here today. Despite the deep shame and remorse, I still
     feel positive because I know that I can do better, that I can be the
22   person I dreamed of being when I was a child. I look forward to
     working hard to become the person I once was, and I will, if given
23   the chance." (19-CR-373-PGG, RT 7/8/21 at 29.) Defendant had the
     chance but did not act on it and, instead, brow-beat his victims
24   during his cross-examinations in this case shortly after his
     allocution, demonstrating that his purported contrition was simply an
25   attempt to garner a benefit for himself at sentencing.

26       [26] Barela was the first client to publicly accuse defendant of
     stealing his money, and defendant mercilessly attacked Barela and
27   Barela's character, including with false information. See, e.g.,
     "Michael Avenatti Gives First Interview Since Arrest," 3/27/19,
28   https://www.youtube.com/watch?app=desktop&v=z2iYbRUbMNE at 2:37-3:05.
     At a public judgment debtor examination, when asked simply to

*(footnote cont'd on next page)*

above.)

Defendant has also shown himself to be willing to say anything -- truthful or not -- to the Court that he thinks will benefit him or serve his purposes.  For example, on May 14, 2019, at the beginning of this case and seven days after defendant received $1 million in attorney's fees, defendant applied for representation by the Federal Public Defender, claiming he was financially unable to obtain counsel.  (CR 98 at 13, 26.)  During trial, defendant made false statements to the Court in connection with his efforts to call witnesses who were hardly relevant.  For example, defendant told the Court he needed to call Morgan Witos because she "was a CPA at the law firm."  (RT 8/19/21 v.1 at 26.)  Defendant also repeatedly implied that Ms. Witos was a CPA through his cross-examination questions.  (RT 7/28/21 v.II at 30; RT 8/17/21 v.II at 25.) But defendant knew Ms. Witos was not a CPA and had never claimed to be one.  (Sent. Ex 20.)  Similarly, defendant sought to justify calling two FBI agents based in New York by claiming that they had participated in the execution of search warrants in this district, when, as defendant knew, they had not participated in the search warrants or any other aspect of this case.[27]

identify Barela, defendant answered: "Gregory Barela is currently on felony probation for making false statements in an effort to get paid money.  He's a former client of the firm.  I think he's been convicted two or three times of various felonies."  (Sent. Ex 11.)

[27] Although the government is not privy to defendant's _in camera_ proffer to the Court to call the SDNY case agents as witnesses in this case, based on the colloquy with the Court after defendant's direct examination of one of the agents, it became clear defendant had not been truthful with the Court. (RT 8/17/21 v.II at 95.) Defendant did not call the second agent despite making her travel from New York to California based on his claims.

1    Defendant's willingness to twist the truth to serve his own

2    purposes continued throughout trial.  For example, during his cross-

3    examination of his office manager, defendant referred to his

4    representation of a family that had lost their son to a drug

5    overdose in a case involving a famous comedian and asserted that he

6    had paid the settlement money to the family appropriately.  (RT

7    7/29/21 v.I 46-47, 57; Tr. Ex 387 at 15.)  In truth, defendant had

8    spent the settlement money that was received in October 2017 (Tr. Ex

9    386) and only paid the family the amounts they were due five months

10   later on March 20, 2018, using $200,000 that defendant had stolen

11   from Phan.  (Tr. Exs 368 at 9, 369 at 2, 386, 387.)

12       Even now, defendant continues to make self-serving statements

13   designed to obtain a reduced sentence, regardless of defendant's

14   prior statements contradicting his newly made claims.  For example,

15   defendant now maintains that he has alcohol and substance abuse

16   issues that peaked between 2018 and 2020 and seeks a recommendation

17   from this Court that defendant qualify for the RDAP program (PSR ¶¶

18   206-211), which could provide defendant with a credit against his

19   sentence.  Defendant never previously mentioned his purported

20   alcohol and substance abuse issues at any time during the several

21   years he was on pretrial release.  Indeed, USPPS stated in its

22   initial April 2019 report that "defendant indicated no history of .

23   . . substance abuse history, alcohol abuse or substance abuse

24   treatment."  Of course, had defendant mentioned his purported

25   substance abuse issues then, he would have had to comply with

26   substance-related conditions of release which would have been

27   imposed.  (CR 10, 13.)  Mentioning these issues now, however, serves

28   his interests of attempting to obtain every possible sentence

34

reduction that he can.

In sum, although defendant has constantly portrayed himself in the media and elsewhere (including in his opening statement at trial) as someone who represents "Davids" versus "Goliaths", as a "fighter" for the little guys and a person who gives "people who had no chance a fighting chance" (RT 7/21/21 v.I 64), in fact, defendant did not and does not fight for anyone but himself.

**D.   Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, provide Just Punishment, Afford Deterrence, and Protect the Public from Further Crimes of the Defendant (§ 3553(a)(2))**

It is frequently impossible for a Court to right all wrongs, make victims whole or give victims a sense of closure and that is, unfortunately, the case here.  The victims in this case have lost millions of dollars, been deceived for years by the person they believed was fighting for them, and then endured abuse and re-victimization when they confronted defendant and sought to obtain justice.  The monetary and emotional harms caused by defendant's crimes are extreme, and a substantial sentence is necessary to reflect the seriousness of the offenses, promote respect for the law, provide just punishment, and deter future criminal conduct.

The need for specific and general deterrence is particularly pronounced.  As to the former, defendant's lack of remorse and continued infliction of harm for years even after his thefts were revealed shows that a significant sentence is necessary if there is to be any hope that he will conform his future conduct to the law.  Indeed, in revoking defendant's bail, the Court found probable cause to believe defendant committed federal and state crimes while on pretrial release and found defendant presented an "ongoing danger"

1  to the community, which was "real and palpable."  (RT 1/15/20 at

2  37.)  The Court stated on several occasions thereafter: "The Court

3  has not lost sight and neither should the parties of this Court's

4  finding, and the Ninth Circuit's affirmance, that Avenatti is a

5  danger to the community. . . . That remains the case." (CR 128 at 2;

6  CR 132; RT 3/31/20 at 6.)  Defendant's failure to accept full

7  responsibility for his wrongful conduct or even admit its full

8  scope, as well as his conduct throughout this case, as described

9  above, including his willingness to engage in further criminal

10  conduct to try to conceal his prior criminal activity, all make

11  clear that a significant sentence is needed to achieve specific

12  deterrence.

13      Defendant's lengthy history of flouting the tax laws likewise

14  shows the need for a significant sentence to deter further crimes.[28]

15  In addition to defendant's criminal conduct in relation to the

16  payroll taxes for GBUS employees, defendant also has failed to file

17  his individual tax returns from 2011 through 2017, notwithstanding

18  his receipt of substantial income in those years.  (PSR ¶¶ 145-146.)

19  Likewise, he repeatedly failed to meet his tax obligations with

20  respect to his companies EA LLP and A&A, despite their generating

21  substantial revenues.  (PSR ¶¶ 142-143.)  Defendant's contempt for

22  his obligation to follow the tax laws is clear not only from his

23  failure to file returns and pay the amounts owed but also from his

24  

25      [28] The Ninth Circuit has observed that tax crime sentences should
    reflect a particular sensitivity to deterrence under the section
26  3553(a) factors.  United States v. Orlando, 553 F.3d 1235, 1239 (9th
    Cir. 2008); see also USSG Part T, Introductory Commentary (November
27  1, 2012) ("Because of the limited number of criminal tax prosecutions
    relative to the estimated incidence of such violations, deterring
28  others from violating the tax laws is a primary consideration
    underlying these guidelines.").

brazen lies about his supposed tax compliance.[29]

As to general deterrence, defendant's conduct in this case exemplifies the danger posed by an attorney who abuses his unique position of trust to defraud his clients.  Given the nature of attorneys' relationships with their clients, attorney theft is not easily detectible and, in fact, is extremely hard to uncover.[30]  The legal system depends on clients being able to trust that their attorneys are working in the clients' best interests and, because of that trust, few clients second-guess their attorney's actions. Moreover, the attorney-client privilege shields this relationship from public scrutiny, making detecting attorney fraud against clients even more difficult.

Defendant obviously never intended for his clients to discover that he had stolen their money, and he abused his relationship with his clients and his knowledge of the legal system to try to keep them in the dark so that he would not get caught.  As the Court heard at trial, defendant insisted that only he discuss settlement issues with his clients, and he became irate when he learned that other members of his firm had discussed the settlement agreement with Barela.  (RT 7/28/21 v.I at 16; RT 8/17/21 v.II at 38-39.) When clients asked questions about their purportedly missing settlement payments or options to collect on the settlement agreement, defendant repeatedly told them they could take no action and were not permitted to discuss the situation with anyone else due to the supposed confidential nature of their settlement agreements.

---

[29] See Section III.B, above.

[30] Indeed, special procedures including the use of taint teams are required simply to investigate attorneys for fraud involving their legal practice.

(See, e.g., RT 8/4/21 v.II at 92; RT 8/5/21 v.I at 49.)  And when Johnson and Gardner did discuss their settlement agreements with others, defendant became furious and instructed them to never again talk to anyone other than defendant about their settlements.  (RT 7/22/21 v.I at 44; RT 7/30/21 v.II at 17-18; RT 8/3/21 v.I at 58.) In these ways, defendant prevented his clients from uncovering sooner the fraud he had perpetrated against them.  Turning justice on its head, defendant used the legal system to cover his tracks and continue to exploit the very clients whose interests he had sworn to uphold.

Concerns for general deterrence also call for a substantial sentence to send a message to attorneys and other fiduciaries who take advantage of their positions to benefit and enrich themselves at their clients' expense.  The victims of defendant's criminal conduct include the entire legal profession.  Whenever a lawyer commits a crime in breach of his/her legal and ethical responsibilities, it casts doubt on other dedicated, honest, and ethical lawyers and brings the legal profession, and here the plaintiff's bar in particular, into disrepute.  That defendant was able to conceal his criminal acts for so long serves to increase the harm to the reputation of lawyers through a loss of public confidence in the integrity of the profession.  A significant sentence is needed to deter other lawyers from believing they can violate the very laws they swear to uphold without consequences, and to reassure the public that the criminal justice system holds

lawyers as accountable for their misdeeds as it does everyone else.[31]

The need for just punishment also supports a significant term of incarceration in this case. Defendant maintained during the recent sentencings in New York that the fact that he will never be able to practice law again and the damage resulting from his convictions to the reputation he spent decades cultivating constitute sufficient punishment. (CR 19-373-PGG (SDNY), Dkt 317 at 11; CR 19-374-JMF (SDNY), Dkt 433 at 20.)  Not so.  As the Honorable Dale S. Fischer, United States District Judge, stated when rejecting similar claims raised by another prominent attorney who had been convicted of federal crimes:

> Most criminals lose their jobs and livelihood and the respect of people who believe they knew them.  These things are a natural consequence of [defendant's] deliberate conduct.  They are not punishment and certainly not sufficient punishment.  I agree with my colleague in the Southern District of New York[32] that it is not possible to

[31] Judge Furman addressed this issue at defendant's sentencing hearing: "I do think that this case will send a message to lawyers and others in the legal profession that if you go astray in the way that Mr. Avenatti did, you will pay a steep price, not only in losing your right to practice your profession, but also in losing your liberty." (CR 19-374-JMF (SDNY), RT 6/2/22 at 49-50.)

[32] Judge Fischer was referencing the statements of the Honorable Marvin E. Frankel, United States District Judge, in sentencing a prominent rabbi:

> If punishment were wholly or mainly retributive, [public humiliation] might be a weighty factor.  In the end, however, it must be a matter of little or no force. Defendant's notoriety should not in the last analysis serve to lighten, any more than it may be permitted to aggravate, his sentence.  The fact that he has been pilloried by journalists is essentially a consequence of the prestige and privileges he enjoyed before he was exposed as a wrongdoer.  The long fall from grace was possible only because of the height he had reached.  The suffering from loss of public esteem reflects a body of opinion that the esteem had been, in at least some measure, wrongly bestowed and enjoyed.  It is not possible to justify the notion that this mode of nonjudicial punishment should be an occasion for lenience not given to a defendant who never basked in
> *(footnote cont'd on next page)*

justify the notion that public humiliation and other forms
of non-judicial punishment should be an occasion for
lenience not given to a defendant who has never had the
opportunity to reach the same heights in the community. . .
The concept of equal justice requires that the Court give
little weight to this particular defendant's personal and
professional accomplishments and the somewhat unique
collateral consequences his own conduct has caused.

United States v. Terry Christensen, CR 04-1046(E)-DSF, Sentencing

Hearing, Nov. 24, 2008, at 56-57.  Any collateral consequences

defendant has or will suffer are the direct result of defendant's own

deliberate criminal conduct and do not justify a lenient sentence.

In arguments at his sentencings in New York and statements to

the USPO in this case, defendant maintains that his incarceration --

and specifically the alleged "horrible" conditions of his confinement

and "intense lockdown for over 100 days" -- at MCC warrant a downward

variance.  (PSR ¶ 202; CR 19-373-PGG (SDNY), Dkt 317 at 18-25; CR 19-

374-JMF (SDNY), Dkt 433 at 18-19.)  But even though defendant's

counsel thought it would be a "good idea" to return defendant to this

District following the conclusion of his Nike trial (RT 1/31/20 at

20-21), defendant opposed being returned to this district on February

20, 2020, claiming his conditions of confinement had "substantially

improved."  (CR 100, CR 101 at 2-3, CR 102.)[33]  To the extent this

issue warrants any variance, Judge Gardephe already varied downward

---

such an admiring light at all.  The quest for both the
appearance and the substance of equal justice prompts the
court to discount the thought that the public humiliation
serves the function of imprisonment.

United States v. Bergman, 416 F.Supp. 496, 502-03 (S.D.N.Y. 1976).

[33] Defendant has also repeatedly complained about his being
confined to a 1,000 square foot, two-bedroom apartment during his
temporary release. (CR 271, CR 448, CR 891.)  Defendant chose this
apartment to live after he violated his bail conditions, and these
living conditions were better than the conditions two of his victims
endured due directly to defendant's criminal conduct.

on this basis when he imposed the sentence in the Nike extortion case.  (PSR ¶ 202.)  No further variance on this basis is appropriate here.

###    E.    Policy Statements and Need to Avoid Unwarranted Sentencing Disparities (§ 3553(a)(6))

Because the government's recommended sentence is within or below the Sentencing Guidelines range, it will not cause unwarranted sentencing disparities with other defendants in similar circumstances.  See Gall v. United States, 552 U.S. 38, 54 (2007) ("[A]voidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges.").

###    F.    The USPO's Sentencing Recommendation Is Factually and Legally Flawed

Notwithstanding the seriousness of the crimes defendant committed, the significant harms he inflicted on his former clients and many others, and his utter lack of true remorse, the USPO has recommended an extraordinarily lenient sentence of effectively 91 months.  Although the USPO ostensibly recommends 151 months, she proposes that it be served concurrently with the total 60-month sentence defendant is already serving for the SDNY convictions.  The Court should reject the recommendation.

First, as explained above, defendant's offense level is 37 (39 if acceptance of responsibility is denied) and his CHC is III, resulting in an advisory guidelines range of 262-327 (or 324-405) months.  Defendant's guidelines range is not reduced to 240 by operation of USSG § 5G1.3(d) as the USPO contends and no downward departure based on over-statement of criminal history is appropriate.

Second, defendant's sentence should not run concurrent to at least 24 months of the sentence imposed for the New York convictions. One of those convictions was for a violation of 18 U.S.C. § 1028A. That statute provides: "Notwithstanding any other provision of law . . . except [in circumstances not relevant here], no term of imprisonment imposed on a person under this section shall run concurrently with any other term of imprisonment imposed on that person under any other provision of law." 18 U.S.C. § 1028A(b)(2).

Third, the arguments advanced in support of a downward variance are without merit. The USPO recognizes the amount of loss is accurate under the guidelines but argues that it should be mitigated because "defendant should benefit from the legal work he successfully performed to acquire settlements for his victim-clients." (Rec. Letter at 9.) But defendant did not perform this work -- whether successful or not -- for his clients. He hijacked their claims and the work he did was not for their benefit but for his own, putting the money he would eventually steal within his grasp.

The USPO also finds mitigating the "unstable and abusive childhood" defendant "endured." (Rec. Let. at 9.) The USPO's view of defendant's upbringing is based on defendant's current description.[34] Defendant, however, has made numerous public

---

[34] Although both of defendant's parents are alive, the USPO did not interview either of them. The USPO "corroborated" defendant's statements by interviewing his first wife, Christine Avenatti-Carlin, who has no first-hand knowledge of the relevant facts. Moreover, she was intimately involved in defendant's criminal activity that resulted in defendant's bail being revoked, specifically assisting defendant in hiding over $700,000 from creditors and buying a car for defendant in her name. (CR 98.) Avenatti-Carlin's other statements in the PSR also demonstrate her bias (referring to defendant's criminal convictions as "mistakes" and blaming defendant's failure to pay child support on the instant case (PSR ¶ 175) even though she

*(footnote cont'd on next page)*

42

statements throughout the last few years about his childhood, which paint an entirely different picture than what defendant now depicts to justify a lighter sentence.  For example, in March 2018, defendant described having fond memories of his middle-class upbringing in St. Louis; in May 2019, he maintained he lived a perfectly normal childhood in a middle-class family; and in February 2020, he described his childhood in a solid middle-class household during which he regularly went skiing, attended baseball games and races, drove go-carts, and went to racing school.[35]  Defendant's childhood, which defendant himself has conceded was less challenging than most defendants' experiences (PSR ¶ 162), does not justify a downward variance.

The USPO also bases her variance recommendation on defendant's having had a "stable work history as an attorney" and being "a devoted father to his children."  (Rec. Let. at 9.)  Even if true, these characteristics would be no more than what is expected of a law-abiding member of society; they are hardly a reason for a downward variance.  In any case, they aren't completely true.  Defendant used his skills as a lawyer to defraud his clients.  Despite the money he earned as a lawyer, the money he stole from his victim-clients, and the money he failed to pay in taxes for years,

---

previously claimed that defendant had not been paying child support for over a decade and owes over $5 million dollars in arrears (CR 448 at 18).

[35] "Porn star Stormy Daniels' lawyer graduated from Parkway Central," https://www.stltoday.com/news/local/columns/joe-holleman/porn-star-stormy-daniels-lawyer-graduated-from-parkway-central/article_8ce4cfef-818e-58db-8250-a8f7d317effa.html; "I Flew Too Close to the Sun. No Question. Icarus": Inside the Epic Fall of Michael Avenatti," https://www.vanityfair.com/news/2019/05/inside-the-epic-fall-of-michael-avenatti; Dinner with Racers Episode 155 – Michael Avenatti, https://dinnerwithracers.com/ep-155-michael-avenatti/ at 11:30-17:15.

defendant still, by his own admission, did not pay millions of dollars in child support for his children.  (CR 448 at 18; see also PSR ¶ 167.)

The USPO bases her recommendation that the sentence in this case be imposed to run concurrently with the New York sentences on her belief that "the instant federal matter is an exponential punishment from past judgments" and that running the term in this case consecutively to the New York terms would be "an unreasonable incremental punishment."  (Rec. Let. at 10.)  This conclusionary assertion should be rejected.  It is true that defendant's sentencing exposure in this case is greater than the sentences imposed in the New York cases but that is appropriate given the different facts. For example, here, the wire fraud victims' losses exceeded $12 million dollars and the tax loss exceeded $3 million, and there were multiple victims who suffered substantial financial hardship and at least one vulnerable victim, a paraplegic client; the victims in the New York cases were a massive corporation whose losses were only its attorney's fees ($259,800) and a single individual whose actual losses were under $150,000.

## IV.  RESTITUTION

The Mandatory Victim Restitution Act, 18 U.S.C. § 3663A, requires courts to order restitution to all identifiable victims of applicable crimes who have suffered pecuniary loss. A "victim" is defined as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." 18 U.S.C. § 3663A(a)(2). For scheme offenses such as wire fraud, this includes "any person directly harmed by the defendant's criminal conduct in the course of the scheme." Id. "Section 3663 . . .

provides that if the offense of conviction involves a scheme, . . .
restitution may include all losses caused during the course of that
scheme." United States v. Thomsen, 830 F.3d 1049, 1064 (9th Cir.
2016) (quoting United States v. Gamma Tech Indus., Inc., 265 F.3d
917, 927 n.10 (9th Cir. 2001)).  Here, counts 5 and 8-10 to which
defendant pleaded guilty involved a scheme.  Restitution is limited
to the victims' actual losses.  United States v. Gagarin, 950 F.3d
596, 607 (9th Cir. 2020) ("Because the purpose of restitution is to
put the victim back in the position he or she would have been but for
the defendant's criminal conduct, the amount of restitution is
limited to the victim's 'actual losses' that are a direct and
proximate result of the defendant's offense.") (Internal citations
and quotations omitted).

Section 3663A requires the Court to order full restitution
without regard to defendant's economic situation.  18 U.S.C.
§ 3664(f)(1)(A).  The Court must order full and immediate payment of
restitution, unless, in the interest of justice, the Court provides
for payment on a date certain or in installments.  18 U.S.C.
§ 3572(d)(1).

Here, defendant was convicted of wire fraud, which is an offense
against property under Title 18 for purposes of § 3663A.  Therefore,
pursuant to 18 U.S.C. § 3663A, and to put the victims in the
positions they would have been but for defendant's fraud, the
government requests that the Court order that defendant pay the
following restitution amounts to the following victims: $1,572,092 to
Geoffrey Johnson; $1,460,785 to Alexis Gardner; $598,887 to Gregory
Barela; and $4,000,000 to Michelle Phan.  (See attached declaration
of Special Agent Remoun Karlous and exhibits establishing these

45

1   amounts.)   Pursuant to 18 U.S.C. § 3664(j)(1), the Court must order

2   the restitution to be paid to the victims first, with any amounts due

3   to other parties be paid subsequently.

4        The Court may order restitution as a condition of supervised

5   release to the victim of any criminal offense, including those in

6   Title 26, for which supervised release is properly imposed, limited

7   to the count of conviction.  Batson, 608 F.3d at 633-37; see also

8   USSG § 5E1.1(a)(2) (instructing courts to order restitution as a

9   condition of supervised release when a defendant has been found

10  guilty of certain crimes that would include tax crimes under Title

11  26).  Although the Court could impose interest upon the restitution

12  up to the date of sentencing, the government only seeks restitution

13  for the unpaid taxes related to Count 19.  See Batson, 608 F.3d at

14  637; United States v. Gordon, 393 F.3d 1044, 1058-59 (9th Cir. 2004),

15  abrogated on other grounds by Lagos v. United States, 138 S. Ct. 1684

16  (2018).  Therefore, the government requests that the Court order

17  restitution in the amount of the unpaid payroll taxes for GBUS,

18  namely $3,207,144, to be paid to the IRS as a condition of supervised

19  release.  (PSR ¶ 73.)[36]

20  **V.   CONCLUSION**

21       For the foregoing reasons, the government recommends that the

22  Court sentence defendant to 210 months in prison on each of counts

23  5, 8, 9 and 10, to run concurrently to one another, and 36 months on

24  count 19, to run concurrently with the sentences imposed on counts

25  5, 8, 9 and 10, with all sentences to be consecutive to the

26

27       [36] The government is not seeking a fine in addition to the
    restitution because defendant appears to be currently unable to pay a
28  fine and unlikely to become able to pay a fine in addition to the
    restitution.

sentences imposed in the New York cases; a three-year period of
supervised release; a mandatory special assessment of $500; and
restitution in the amount of $7,631,764 due to the wire fraud
victims and $3,207,144 to the IRS as a condition of supervised
release.


 Dated: October 11, 2022            Respectfully submitted,

                                    E. MARTIN ESTRADA
                                    United States Attorney

                                    SCOTT M. GARRINGER
                                    Assistant United States Attorney
                                    Chief, Criminal Division


                                    _____/s/_____
                                    BRETT A. SAGEL
                                    RANEE A. KATZENSTEIN
                                    Assistant United States Attorneys

                                    Attorneys for Plaintiff
                                    UNITED STATES OF AMERICA