Michael John Avenatti (Pro Se)

H. Dean Steward, SBN 85317
17 Corporate Plaza, Suite 254
Newport Beach, California 92660
Tel (949) 481-4900
Fax (949) 706-9994

Advisory Counsel for Defendant
MICHAEL JOHN AVENATTI

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | SA CR No. 19-061-JVS |
| Plaintiff, | |
| | DEFENDANT'S SENTENCING MEMORANDUM AND OBJECTIONS TO THE PSR |
| v. | |
| | Date: November 7, 2022 |
| | Time: 9:00 a.m. |
| MICHAEL JOHN AVENATTI, | |
| Defendant. | |

Defendant MICHAEL JOHN AVENATTI ("Defendant"), by and through his advisory counsel of record, H. Dean Steward, hereby files Defendant's Sentencing Memorandum and Objections to the PSR. Defendant's filing is based on the attached; the evidence referenced in the attached; the files, records and transcripts in this case and the other cases cited herein; and such further evidence and argument as the Court may permit at a hearing on this matter.

 Dated: October 14, 2022          Respectfully submitted,

                                  /s/ Michael John Avenatti
                                   MICHAEL JOHN AVENATTI

## **TABLE OF CONTENTS**

**TABLE OF AUTHORITIES** ................................................................ iv

**MEMORANDUM OF POINTS AND AUTHORITIES** ..................................... 1

I.    **INTRODUCTION** ..................................................................... 1

II.   **THE §3553 FACTORS SUPPORT A DOWNWARD VARIANCE**…2

    A.   Findings by the Hon. Paul G. Gardephe & Hon. Jesse M. Furman ..... 3

    B.   Disparity in Sentences ................................................................ 4

    C.   Challenging Childhood & Upbringing ........................................... 4

    D.   Positive Work Performed While an Attorney ................................. 5

    E.   Defendant's Close Family & Personal Relationships ....................... 7

    F.   Custody Conditions ................................................................... 8

        1.   *"Horrific Conditions" at MCC* ........................................... 8

        2.   *Harsh Conditions Due to Covid-19 and Associated Risks* ......... 9

    G.   Exemplary Conduct While in Custody .......................................... 9

    H.   Defendant's Low Risk of Recidivism .......................................... 10

        1.   *Defendant's DOJ PATTERN Score* ...................................... 10

        2.   *RDAP* ........................................................................... 11

        3.   *Age Upon Release* .......................................................... 12

    I.   Little Need for Further Deterrence ............................................. 12

    J.   The Government's Spoilation of Mitigation Evidence ..................... 13

    K.   Criminal Conduct ................................................................... 14

III.  **ACCEPTANCE OF RESPONSIBILITY** .................................... 14

IV.   **CRIMINAL HISTORY CATEGORY** ...................................... 15

V.    **OBJECTION TO JUDICIAL FINDINGS OF FACT**
     **AND CONDUCT OUTSIDE OF DEFENDANT'S PLEA** .............. 17

VI.   **OBJECTIONS TO THE PSR** .................................................. 18

VII.  **WIRE FRAUD COUNTS 5, 8, 9 & 10** ...................................... 18

    A.   Loss Amount .......................................................................... 31

B. Section 2B1.1 & Disproportionate Sentence ..................................... 33

C. Obstruction of Justice................................................................... 34

D. Substantial Financial Hardship ..................................................... 37

E. Sophisticated Means & Abuse of Position of Trust........................... 40

F. Misrepresentation During Bankruptcy Proceeding........................... 41

G. Vulnerable Victim........................................................................ 42

VIII. CONCURRENT SENTENCING ........................................................ 43

IX.   DEFENDANT'S PROPOSED SENTENCING CALCULATION .. 44

X.    CONDITIONS OF SUPERVISED RELEASE ................................... 44

XI.   CONCLUSION ................................................................................ 45

# TABLE OF AUTHORITIES

## CASES:                                                                    Page

*Arizona v. Youngblood,*
488 U.S. 51 (1988)…………………………………..……………………….13

*Britt v. Plumley,*
2018 U.S. Dist. LEXIS 213904 (E.D. Cal. 2018)……………………..……….11

*Concepcion v. United States,*
142 S. Ct. 2389 (2022)………………………………………………..……..10

*Dillon v. United States,*
560 U.S. 817 (2010)……………………………..…………………….2

*Hance v. Super Store Industries,*
44 Cal. App. 5th 676 (2020)…………..…………………...…..…………….33

*Jones v. United States,*
135 S. Ct. 8 (2014)(Scalia, J., Dissenting)……………………..…….………..18

*MacInnis v. Pope,*
134 Cal. App. 2d 528 (1955)………………………..………….…….33

*Oliver v. Campbell,*
43 Cal. 2d 298 (1954)……..…………………………..…….……..……33

*Sheppard, Mullin, Richter & Hampton, LLP v. J-M Manufacturing Co., Inc.,*
6 Cal. 5th 59 (2018)……………………………………..…..……………...33

*Toyota Motor Mfg., Inc. v. Williams,*
534 U.S. 184 (2002)……..…...……………………..………………..…..……37

*United States v. Abdellatiff,*
205 Fed. Appx. 601 (9th Cir. 2006)(unpublished)..……………..…….……..33

*United States v. Adelson,*
441 F. Supp. 2d 506 (S.D.N.Y. 2006)...……...………………..…….………2

*United States v. Armstead,*
552 F.3d 769 (9th Cir. 2008)……………………………..……...……...32

iv

*United States v. Backman*,
817 F.3d 662 (9th Cir. 2016)………………………….……....……...42

*United States v. Bell*,
808 F.3d 926 (D.C. Cir. 2015)(Kavanaugh, J., concurring)………………………….…….…18

*United States v. Blitz*,
151 F.3d 1002 (9th Cir. 1998)…………….………………………….…….33

*United States v. Booker*,
543 U.S. 220 (2005)………………………………………………………..…………..2

*United States v. Boykin*,
785 F.3d 1352 (9th Cir. 2015)…..……………………...……....…..……..15

*United States v. Bright*,
353 F.3d 1114 (9th Cir. 2004)………………………….………………….…….33

*United States v. Castaneda*,
239 F.3d 978 (9th Cir. 2001)…………..………………………….……....…..42

*United States v. Carson*,
2021 U.S. Dist. LEXIS 1611 (W.D. Wash. 2021)…..…………………..……..……...11

*United States v. Cavera*,
550 F.3d 180 (2d. Cir. 2008)……………………….……...……….…..……...3

*United States v. Door*,
996 F.3d 606 (9th Cir. 2021)……………………….……...………………36

*United States v. Dudley*,
1992 U.S. App. LEXIS 13556 (9th Cir. 1992)……………………….……...……..36

*United States v. Ebbers*,
458 F.3d 110 (2d Cir. 2006)………………………….……...……....…...34

*United States v. Fatico*,
603 F.2d 1053 (2d Cir. 1979)………………………..……...…………..33

*United States v. George*,
949 F.3d 1181 (9th Cir. 2020)……………………….……...……....…...37

*United States v. Goddard*,
537 F.3d 1087 (9th Cir. 2008)…..………………………….……….…45

*United States v. Green*,
940 F.3d 1038 (9th Cir. 2019)……………………….…………..…….….14

*United States v. Grusd*,
787 Fed. Appx. 922 (9th Cir. 2019)(unpublished)……….…..……….…….33

*United States v. Henderson*,
649 F.3d 955 (9th Cir. 2011)……………….……….…….…….……….33

*United States v. Jenkins*,
275 F.3d 283 (3d. Cir. 2001)……………….……….……….……...…….35

*United States v. Lonich*,
23 F.4th 881 (9th Cir. 2022)……………….……….……..……….…...32

*United States v. Lofton*,
905 F.2d 1315 (9th Cir. 1990)……….…...…….……….……...…….…35

*United States v. McLaughlin*,
203 Fed. Appx. 891 (9th Cir. 2006)(unpublished)……………………..…….40

*United States v. McRae*,
2021 U.S. Dist. LEXIS 8777 (S.D.N.Y 2021)…..…………………….…...…9

*United States v. Moody*,
2013 U.S. Dist. LEXIS 109506 (D. Colo. 2013)………………..….…….……34

*United States v. Monge*,
2015 U.S. Dist. LEXIS 23034 (C.D. Cal. 2015)…………….……..……....33

*United States v. Parris*,
573 F. Supp. 2d 744 (E.D.N.Y. 2008)…………….……..……….…….34

*United States v. Plouffe*,
445 F.3d 1126 (9th Cir. 2006)………….……….…….…….…….…..2

*United States v. Reese*,
2 F.3d 870 (9th Cir. 1993)……………….…..……...…….…….……41

*United States v. Rodriguez*,
2021 U.S. Dist. LEXIS 73233 (S.D. Ca. 2021)……………...…...…….……....9

*United States v. Saeteurn*,
504 F.3d 1175 (9th Cir. 2007)……………..……..……………..……….....4

*United States v. Scheele*,
231 F.3d 492 (9th Cir. 2000)…………………………..…….……36

*United States v. Spencer*,
1995 U.S. App. LEXIS 2697 (9th Cir. 1995)……………………..……..15

*United States v. Stroud*,
893 F.2d 504 (2d Cir. 1990)……………………………..….…….35

*United States v. Sung*,
740 Fed. Appx 878 (9th Cir. 2018)………………………………………..4

*United States v. Watson*,
582 F.3d 974 (9th Cir. 2009)…………………………...……….44

*United States v. Wetchie*,
207 F.3d 632 (9th Cir. 2000)……………......…….….………….…….42

*United States v. Williams*,
2021 U.S. Dist. LEXIS 141123 (D. Mont. 2021)……………………..…..12

**STATUTES AND CODE SECTION:**

18 U.S.C. § 3013………………………………………….30, 31

18 U.S.C. § 3553…………………………………………passim

26 U.S.C. § 7212 …………………………………………14, 27

28 C.F.R. § 550.53 ………………………………………...11

U.S.S.G. § 5G1.3 ………………………………………..43, 44

U.S.S.G. §2B1.1……………………………………………passim

U.S.S.G. §3A1.1……………………………………27, 42

U.S.S.G. §3C1.1…………………………………………………………………34

U.S.S.G. §3E1.1…………………………………………………………………14

U.S.S.G. §4A1.1………………………………………………………………...15


**OTHER SOURCES:**

*2020 Review and Revalidation of the First Step Act Risk Assessment Tool*, U.S Department of Justice - National Institute of Justice (January 2021)……………..….10,11

B. Boss & K. Kapp, *How the Economic Loss Guideline Lost its Way, and How to Save It*, Ohio State Journal of Criminal Law, Vol.: 18.2: 605 (2021)………………………………………………………..33

Bowman III, Frank O., *Sentencing High-Loss Corporate Insider Frauds after Booker*, University of Missouri School of Law Scholarship Repository, Vol 20, n. 3 (2008)……………………………………………………………41

California Rule of Professional Conduct 1.15…………………………………..33

E. Podgor, *Throwing Away the Key*, 116 Yale Law Journal, Pocket Part 279 (2007) *Recidivism and Federal Bureau of Prisons Programs*, U.S. Sentencing Commission (May 2022)……………………………………...34

U.S. Department of Justice – Office of the Inspector General, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* (May 2015, Revised February 2016)……………………………………………12

## MEMORANDUM OF POINTS AND AUTHORITIES[1]

## I.    INTRODUCTION

Defendant misappropriated monies due four of his legal clients, misled them repeatedly, and violated their trust. In doing so, he put his own selfish interests ahead of his clients, committed federal crimes, and broke some of the most important rules governing attorneys in the State of California.[2] He also impeded the ability of the Internal Revenue Service to collect taxes that were due. Defendant deserves just punishment for his crimes, including a prison sentence. He likewise deserves to lose his law license, his 22-year career, his assets, his countless personal and professional relationships, and his reputation, almost all of which have already been rightly taken from him.

However, defendant also deserves to be sentenced according to the law and similar to other defendants who committed frauds in the seven figures. He should be sentenced based on his life as a whole across the last 51 years, not his notoriety; the desire of the government and others to make an example out of him; unbridled vindictiveness; and/or what those in the media, or on social media, may say after his sentencing. To do otherwise is not consistent with the law or our most basic concepts of justice.

This case, while serious, does not begin to approach a case involving a crime of violence or a fraud resulting in a loss of tens of millions or hundreds of millions of dollars. It does not involve scores of victims; a Ponzi or fraud scheme that left hundreds or thousands destitute; a widespread fraud that put a major company or financial institution, together with thousands of jobs and retirement benefits, at risk; a defendant who fled; or a defendant who proceeded to verdict or who has refused to accept any responsibility or remorse for the harm he did. Nor does it involve a defendant with a lifelong history of criminal conduct, who never positively contributed to society or the greater good. The conduct and defendants at the center of these types of cases deserve to spend a decade or

---

[1] Defendant's under seal supplemental filing (Dkt. 1012) is incorporated herein by reference.

[2] Defendant reiterates and stands by the entirety of his written apology and promises to his four clients as quoted in the Presentence Investigation Report ("PSR") at p. 24.

more in prison.

Such a sentence in this case, however, involving these facts, the §3553(a) factors, and this defendant, would be unreasonable and inconsistent with sentences in similar cases and the appropriate Guideline range.[3] Instead, for each of the reasons set forth herein, *defendant respectfully submits that a sentence of **no more than seventy-two (72) months in prison*** – to be served concurrently with both sentences previously imposed in the Southern District of New York - followed by three (3) years of supervised release, is "sufficient, but not greater than necessary" to achieve the purposes of sentencing.

## II.   THE §3553 FACTORS SUPPORT A DOWNWARD VARIANCE

"[I]f ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance." *United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006).[4] The "clear and unambiguous language of the Supreme Court in *Booker* has established that district courts must now view the Guidelines as advisory." *United States v. Plouffe*, 445 F.3d 1126, 1130 (9th Cir. 2006), *citing United States v. Booker*, 543 U.S. 220, 245-46 (2005). A sentencing court "may not presume [the Guidelines] are correct or reasonable when it considers an individual sentencing decision." *Dillon v. United States*, 560 U.S. 817, 841 (2010). In addition, the

---

[3] As explained below, the offense level and Guideline range included in the PSR are grossly inflated due to a flawed loss calculation and overlapping and stacking of <u>32</u> levels of enhancements beyond the base offense level of 7. This is an example of how the misapplication of the fraud Guidelines, including loss amount and other enhancements, together with little consideration for reasonableness, can produce results that are indisputably far "greater than necessary" and nearly meaningless in determining an appropriate sentence. For instance, as reflected on Exhibit A, the offense level of 39 calculated in the PSR is <u>greater than</u> that for selling or buying <u>a child</u> for production of pornography; second degree murder; trafficking in over 600 images of child pornography involving infants and depicting violence; and robbing a family of over $100 million at gun point.

[4] Importantly, the PSR contains little to no mention or consideration of the positive work, for the benefit of thousands, that defendant did across over two decades as a lawyer despite Probation being provided this information well before the PSR was completed.

Court has "very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *United States v. Cavera*, 550 F.3d 180, 188 (2d. Cir. 2008). In determining the proper degree of punishment for the instant offense, defendant requests that the Court consider his life as a whole and credit him for the good he has done. He further respectfully requests that the Court take into account the following facts when determining defendant's sentence.

### A. Findings by the Hon. Paul G. Gardephe and Hon. Jesse M. Furman

During defendant's two recent sentencing proceedings, the district courts made factual findings regarding defendant's positive character traits, contributions to society, strong familial ties, and the conditions he endured while in custody. These findings must be taken as true because they were never appealed or challenged by the government.

On July 8, 2021, Judge Paul G. Gardephe made the following factual findings in SDNY 19-Cr-00373-PGG: (1) "By all accounts, Mr. Avenatti is a loving and devoted father."; (2) "As to education and employment, Mr. Avenatti's early years were marked by hard work, determination, and ambition… Because his parents were not in a position to fund his education, he worked full time to do so."; (3) "Mr. Avenatti has no criminal record."; (4) "[] Mr. Avenatti had expressed what I believe to be sincere remorse today. . ."; and, (5) "A variance is also necessary because Mr. Avenatti was held in horrific conditions at the MCC for more than three months, in solitary confinement for much of the time and in lockdown for nearly all of it. . . Conditions were terrible. It's hard to believe they could occur in the United States of America." *See,* SDNY 19-Cr-00373-PGG [Dkt. 341, pgs. 38-39, 42-43].

On June 2, 2022, Judge Jesse M. Furman made the following findings in SDNY 19-Cr-00374-JMF: (1) "[][I]t is certainly clear to me that there is more to Mr. Avenatti than the conduct that led to his legal troubles may suggest. They do reveal a thoughtful and hardworking person devoted to his family **and his clients**."; (2) "I think it's clear from his record in law school, his earlier legal career, not to mention his handling of trial in this case -- as much as I took issue with some of his conduct at trial -- that he is quite smart

3

and has formidable legal skills."; (3) "I acknowledge that there are ways in which you have done **good in the world and on behalf of your clients**, and that is part of the reason I think a below-guideline sentence is appropriate."; (4) "[] it is clear to me that who you were as a person is certainly more than the conduct that landed you here." *See,* SDNY 19-Cr-00374-JMF [Dkt. 447, pgs. 47, 56 (emphasis added)].

B. Disparity in Sentences

Pursuant to §3553(a)(6), the Court must consider the need to avoid unwarranted sentence disparities with *similar cases nationwide. See, e.g., United States v. Sung,* 740 Fed. Appx 878, 880 (9th Cir. 2018)(vacating sentence and remanding for resentencing because "The district court stated that it could not consider this factor because it had never sentenced a defendant for a similar crime and need not consider similar cases from other jurisdictions. This was error [due to need for national uniformity]")(*quoting and citing United States v. Saeteurn,* 504 F.3d 1175, 1181 (9th Cir. 2007)(unpublished). Here, the sentence recommended by Probation is <u>dramatically and punitively higher than that for similar fraud and tax cases and defendants.</u> [Exhibit B]. Exhibit B demonstrates that defendant's requested sentence of 72 months is more than reasonable when analyzed in the context of other fraud and tax cases with similar loss amounts and conduct.

C. Challenging Childhood & Upbringing[5]

Defendant was born on February 16, 1971, as the only child of Marcene and William Avenatti. ████████████████████████████████████████

---

[5] Defendant directs the Court to paragraphs 158-187 of the PSR for additional details of defendant's childhood and the conditions he overcame.

1 ███████████████████████████████████████████████████████

2 ██████████████████████████████ Defendant knew at a young age that he needed to

3 work hard and rely solely on himself to achieve success and contribute to society.

4     Defendant always maintained a strong work ethic. Starting at age 15, defendant

5 worked several minimum wage jobs, including at a McDonalds, a grocery store stocking

6 produce at 4 a.m., and the shoe department of Marshall's discount clothing store. When

7 he was 17 years old, he worked at an athletic complex in St. Louis, Missouri, where he

8 managed five employees and umpired over 500 baseball games.

9     Because his family could not afford it, defendant was required to pay for his higher

10 education entirely on his own. Defendant completed the first two years of college at St.

11 Louis University and used his academic achievement there to transfer to the University of

12 Pennsylvania, where he obtained a degree in political science, becoming the first member

13 of his family to graduate from college. Defendant worked full-time throughout his college

14 years until his graduation in 1996. Following college, defendant was accepted into George

15 Washington University Law School, where he attended evening classes so that he could

16 continue to work full-time and pay his own way. Even with these obstacles against him,

17 he was a member of the Law Review, participated in extra-curricular activities, and

18 performed pro bono work. [Exhibit D]. One of his well-known law school professors,

19 Jonathan Turley, has publicly described defendant as one of his brightest and most hard-

20 working students in over 25 years of teaching. Defendant subsequently earned law clerk

21 positions with prestigious international law firms, and in December 1999 he graduated at

22 the top of his class. Defendant's parents did not attend his law school graduation. Soon

23 after graduating from law school, his *alma mater* established the Michael J. Avenatti

24 Award for Excellence in Pre-Trial and Trial Advocacy. [Exhibit E]. In 2010, the law

25 school honored defendant with its prestigious "Recent Alumni Achievement Award" and

26 a seat on its Board of Advisors.

27     D. Positive Work Performed While an Attorney

28     Defendant asks that the Court consider the positive contributions defendant has

made and the countless lives he has changed for the better when determining his sentence. Defendant respectfully requests that the Court review the letters submitted by defendant's former clients and colleagues attesting to his positive contributions. [Exhibit F].

After law school, defendant moved to California and passed the bar exam on his first attempt. He was licensed in June 2000. He settled in Newport Beach and worked as an associate with O'Melveny & Myers, LLP, where he worked closely with Gary Singer and Daniel Petrocelli. In 2003, he left O'Melveny and joined the boutique plaintiffs' firm Greene Broillet Panish & Wheeler, LLP, where he represented numerous individuals harmed by large corporations and wrongdoers. In 2006, he obtained a $22.5 million settlement on behalf of investors harmed by a large Orange County embezzlement scheme perpetrated by William Anthony Lloyd.[6] [Exhibit G].

In approximately 2006, defendant opened two firms, Avenatti & Associates, APC and Eagan O'Malley & Avenatti, LLP (later known as Eagan Avenatti, LLP). In 2008, he obtained a $41 million jury verdict after five weeks of trial on behalf of investors who had been defrauded. In 2009, he was voted by his peers as the Trial Lawyer of the Year and was also honored by the California Assembly for "his unwavering commitment to the principles of legal ethics and the preservation of the justice system." In 2014, defendant settled, during trial, a $80 million class action he brought on behalf of thousands of Jewish families whose loved ones' graves had been desecrated, including by having their remains thrown in a mass grave (some of whom were Holocaust survivors). [Exhibit H].

Defendant also recovered tens of millions of dollars for thousands of victims and investors (many of whom were elderly or disabled) in connection with two other frauds: a huge Ponzi scheme in Seattle[7] and a $37 million embezzlement involving the publicly traded company Koss Corporation (Koss).[8] [Exhibits I, J]. In April 2017, after a trial in

---

[6] Llloyd was also convicted and sentenced in the Central District (Santa Ana).

[7] The perpetrator, Darren Berg, was sentenced in U.S. District Court in Seattle to an 18-year prison term in 2012.

[8] Sue Sachdeva, the embezzler, was sentenced to 11 years in federal prison in Milwaukee in 2010.

1  the Central District, defendant obtained a $454 million jury verdict[9] in a fraud case brought
2  against Kimberly-Clark Corp. relating to the sale of defective personal protective
3  equipment. Defendant, after years of work, proved that manufacturers had knowingly put
4  thousands of medical providers – doctors, nurses, and first responders – at risk by selling
5  defective surgical gowns for years, including during the Ebola pandemic. [Exhibit K]. As
6  a result of defendant's efforts, the gowns were removed from the U.S. National Strategic
7  Stockpile, which resulted in numerous lives being saved when the Covid-19 pandemic hit
8  just three years later. Defendant subsequently earned the National Public Justice Trial
9  Lawyer of the Year Award for his dedication to the common good. [Exhibit L]. In 2018
10  and 2019, defendant was responsible for reuniting over 70 children with their parents after
11  they were purposely separated at our Southern Border as a result of the Trump
12  Administration's draconian policy. [Exhibit M]. This work was done pro bono and
13  required exhaustive efforts and significant out-of-pocket costs.

14      The above recitation are mere examples of the thousands of people that defendant
15  helped and represented, ethically and with great success, over the last twenty years.
16  Indeed, during this time period, defendant obtained over $500 million in payments to his
17  clients. Accordingly, defendant asks that the Court recognize that the conduct at issue is
18  an outlier to what was otherwise a career marked by the highest standards, both ethically
19  and professionally, and fashion a sentence accordingly.

20      E. Defendant's Close Family & Personal Relationships

21      In 1994, defendant married Christine Avenatti-Carlin, his college sweetheart.
22  Defendant was readily welcomed by his wife's family. Defendant found the security and
23  affection that he had yearned for as a child. When his mother-in-law became ill, he moved
24  into her home to help provide lay palliative care in the final months of her life. Defendant
25  is most proud of his children. Defendant and Ms. Avenatti-Carlin have two daughters,

26

27
28  [9] The verdict was later overturned in 2020, after defendant was indicted, thus rendering
defendant's work entirely pro bono and costing defendant millions in out-of-pocket costs.
(Defense counsel was paid $51 million (not a typo) to defend the case).

7

1    ████████████████ Defendant has maintained communication with his children
2    throughout these proceedings and has prioritized their relationship above all. By all
3    accounts, he is a loyal, loving, supportive, and fun father. He has instilled integrity,
4    confidence, and a drive for success in each of his children in whatever they do. Attached
5    are photos of defendant with his children [Exhibit N] as well as letters from family
6    members, friends, and loved ones who continue to support him. [Exhibit O]. Defendant
7    has also attached examples of cards he received from some of those who worked for him,
8    including witnesses Judy Regnier and Kathy Mosby, further evidencing his generosity and
9    the positive work environment he fostered for years. [Exhibit P].

10          F.  Custody Conditions

11               1.  "Horrific Conditions" at MCC

12          Defendant was arrested on January 14, 2020, with his *Nike* trial scheduled to
13    commence the following week. He was subsequently remanded into custody and
14    transported to MCC in New York, where he was housed in solitary confinement within
15    the notorious "10 South" unit, the highest security pre-trial facility in the United States.
16    This facility has historically been used to house the most dangerous inmates who pose
17    national security threats to the United States including international terrorists and Joaquin
18    "El Chapo" Guzman. Attached hereto as Exhibit Q is a portion of the sentencing brief
19    submitted in the Southern District of New York detailing the horrendous conditions
20    defendant faced while in custody at MCC New York. Judge Gardephe later determined
21    that his treatment at MCC and the surrounding circumstances were "horrific" and that
22    "[i]t's hard to believe they could occur in the United States of America." The degree of
23    punishment inflicted on defendant is unique in our justice system – and rightly so. It is
24    intolerable and should never be inflicted on anyone. Accordingly, defendant respectfully
25    requests a downward variance due to the inhumane conditions of his confinement at MCC.

26               2.  Harsh Conditions Due to Covid-19 and Associated Risks

27          It is beyond dispute that prison time now is far harsher due to the Covid-19
28    pandemic, which causes heightened concerns regarding safety, risk of disease, restricted

8

access to programming, frequent lockdowns, and inability to see and communicate with one's family. *See, e.g., United States v. McRae*, 2021 U.S. Dist. LEXIS 8777, *12 (S.D.N.Y 2021)("[][A] day spent in prison under extreme lockdown and in well-founded fear of contracting a once-in-a-century deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison. While such conditions are not intended as punishment, incarceration in such circumstances is, unavoidably, experienced as more punishing."); *United States v. Rodriguez*, 2021 U.S. Dist. LEXIS 73233, *19 (S.D. Ca. 2021)("It is also significant that Defendant has endured the uncertainty, danger and extraordinarily restrictive conditions created by the COVID-19 during her incarceration."). These concerns are even more intensified due to defendant's health conditions. Infectious Disease Specialist Dr. Asfour previously determined "[d]ue to his underlying history of respiratory infections and pneumonia, and his long standing history of hypertension, were Mr. Avenatti to acquire COVID-19, he will have a high risk of severe disease, long term sequelae and even death." [Dkt. 280-281]. Judge Gardephe similarly found, "Mr. Avenatti was at risk [at MCC] from the Covid-19 virus as a result of a preexisting medical condition."

Indeed, because of Covid-19, defendant has already endured beyond challenging conditions while incarcerated, including multiple lockdowns and quarantines, and repeated isolation from his family and even his counsel. Most recently, on July 27, 2022, an individual in defendant's unit tested positive for Covid-19, prompting the Warden of Terminal Island to lockdown and quarantine the entire unit. Defendant's unit remained on lockdown until September 8, 2022 (approximately six weeks). During this time, defendant was deprived of all in-person visits, had limited access to his legal team and communication with his family, programming was eliminated, and defendant had approximately five hours of fresh air in total each week. Incarceration during Covid-19 has taken, and will take, a significant toll on defendant and his family. It is simply beyond dispute that each day spent in prison today is far worse than in prior years.

G. <u>Exemplary Conduct While in Custody</u>

It is appropriate for the Court to consider defendant's conduct in prison in fashioning his sentence. *See, e.g., Concepcion v. United States*, 142 S. Ct. 2389, 2400 (2022). During the last three years, defendant has been held in no fewer than seven different jails/prisons across the country, often in solitary confinement.[10] Further, he has been unable to be designated to a federal prison camp because of the manner in which the government charged him (*i.e.*, three different cases).[11] This has also resulted in defendant being incarcerated in facilities and units with violent offenders and sex offenders. For instance, approximately **30-35%** of the inmates at Terminal Island, where defendant is currently incarcerated, are serving sentences for sex crimes against children.

Despite all of this, he has maintained a spotless disciplinary record, has been a model inmate, and currently has a security classification of minimum. In addition, defendant has already been accepted into, and begun treatment through, the Bureau of Prison's intensive Residential Drug Treatment Program, is participating in Alcoholics Anonymous meetings, has completed an OSHA course and earned his certification, and has taken other courses designed to prepare him for a life after prison (*i.e.*, an entrepreneurship course and a vocational training course). Defendant has also volunteered to work in the BOP's Suicide Prevention Program, where inmates observe and assist inmates on suicide watch to ensure they regain stability and do not engage in self-harm.

H. <u>Defendant's Low Risk of Recidivism</u>

*1. Defendant's DOJ PATTERN Score*

In 2019, the Department of Justice, together with acclaimed criminal justice experts, developed the DOJ Prisoner Assessment Tool Targeting Estimate Risk and Needs ("PATTERN"). *2020 Review and Revalidation of the First Step Act Risk Assessment Tool*,

---

[10] MCC-Manhattan; MDC-Brooklyn; MDC-Los Angeles; FCI-Victorville; Grady County, Oklahoma; Santa Ana Jail; and FCI-Terminal Island.

[11] Any total cumulative sentence equal to or greater than 10 years across defendant's three cases will also likewise disqualify defendant from a minimum security camp, irrespective of his security classification (which is de minimis).

10

U.S Department of Justice - National Institute of Justice, p. 1 (January 2021). This assessment is "designed to predict the likelihood of general and violent recidivism for all BOP inmates three years postrelease [sic]." [*Id.* at 2]. For men, a general score of 5 or less places them in the "minimum" risk category. A violence score of 7 or less, similarly places male inmates in the minimum risk category. In 2021, the National Institute of Justice performed an analysis of the accuracy of the PATTERN scores in predicting recidivism. *2020 Review and Revalidation of the First Step Act Risk Assessment Tool*, U.S Department of Justice - National Institute of Justice, p. 1 (January 2021). It was determined that the PATTERN score "displays a high level of predictive accuracy across all four of its tools. The PATTERN risk scores are accurate predictors of recidivism at both the first and last assessments." *Id*. On March 21, 2022, defendant's Recidivism Assessment was performed by DOJ. [Exhibit R]. He was given a general score of 3 and a violence score of 2. On August 26, 2022, another recidivism analysis was done on defendant by DOJ using the PATTERN scoring system. [*Id.*].  Defendant was given a general score of 4 and a violence score of 1.[12] These scores show that defendant's recidivism risk upon release from custody, according to the DOJ, is minimum – the lowest category possible.

### *2.  RDAP*

The Bureau of Prisons offers a Residential Drug Abuse Treatment Program ("RDAP"), which is "an intensive drug treatment program for federal inmates with verifiable substance abuse disorders." *Britt v. Plumley*, 2018 U.S. Dist. LEXIS 213904, *3 (E.D. Cal. 2018), *citing* 28 C.F.R. § 550.53(b). The verifiable disorder must have been present during the 12 months preceding defendant's arrest and been a contributing factor to the criminal conduct.

A 2022 Sentencing Commission study revealed, "[l]ess than half of RDAP Completers (48.2%) recidivated in the eight-year follow-up period of this study, compared to 68.0 percent of RDAP Eligible Non-Participants." *Recidivism and Federal Bureau of Prisons Programs,* U.S. Sentencing Commission (May 2022), p. 6. District courts

---

[12] Between the two analyses, the DOJ made small changes to the scoring system.

routinely recognize the benefits of the program. *See, e.g., United States v. Carson*, 2021 U.S. Dist. LEXIS 1611, at *9 (W.D. Wash. 2021)(granting Motion for Sentencing Reduction in part due to his "service to fellow inmates through the suicide companion program, completion of the 'RDAP' drug abuse program, and other activities."); *United States v. Williams*, 2021 U.S. Dist. LEXIS 141123, *5 (D. Mont. 2021). As soon as he was able to secure a spot in the program, defendant enrolled in RDAP to address his alcohol abuse and its history in defendant's family, including its significant contribution to the criminal conduct at issue in this case. He remains in the program, which is five days a week (it is a 500 hour program) and is presently scheduled to graduate in May 2023.

### 3. Age Upon Release

The Office of the Inspector General has determined that aging inmates (defined as 50 and older) are costly to incarcerate, commit less misconduct while incarcerated, and have a lower rate of re-arrest once released. U.S. Department of Justice – Office of the Inspector General, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* (May 2015, Revised February 2016). Defendant is currently 51 years old. As a result, his likelihood of recidivism is reduced and his financial strain on BOP is increased.

### I.  Little Need for Further Deterrence

Defendant's cataclysmic fall and the resulting humiliation has played out in a very public way, across three years, nationwide and, due to the way he was charged (across three cases and two coasts), repeatedly. This has had a tremendous, negative impact on his family, his friends, his support system, and him. He will forever be branded with his criminal convictions and the title "disgraced former attorney." All of this will make it exponentially harder, if not nearly impossible, for him to attempt to pick up the pieces and attempt to regain some semblance of a normal life once released from prison. He rightly has paid, and will continue to pay for the balance of his life, a very steep price for his criminal conduct. Further, defendant will never be able to practice law again or engage in the conduct at issue. Accordingly, there is no need for additional specific deterrence.

Moreover, defendant has already been made an example of on a national stage,

12

repeatedly. The message has already been sent to the public and attorneys nationwide, plastered across DOJ press releases and press conferences, TV, social media, and newspapers. *See,* SDNY, 19-cr-00374-JMF, Dkt. 153 (detailing the widespread negative media attention directed at defendant in connection with his bi-coastal prosecutions). As a result, minimal, if any, additional general deterrence will be gained by adding numerous years to defendant's existing prison sentence.

J.   The Government's Spoilation of Mitigation Evidence

When the government fails to preserve potentially exculpatory material and the government acted in bad faith, the Due Process Clause has been violated. *Arizona v. Youngblood,* 488 U.S. 51 (1988). At trial, former office manager Judy Regnier testified that after the execution of the March 2019 search warrant at her home, she called Special Agent Karlous and informed him that the government left behind six to seven boxes of items described as "correspondence from fans, personal records, MA finances, other companies, and a ton of EA records case related." [Tr. 7/28/21, Vol. 1, p. 95]. SA Karlous testified that he remembered being alerted about these materials, was told that she was going to "either move them, burn them, or possibly trash them" and he still made no effort to pick up the boxes. [Tr. 8/18/21, Vol. 1, p. 62-63].

Ms. Regnier later testified she caused these materials to be shredded. *See, e.g.* [Tr. 7/28/21, Vol. 1, p. 97]. These boxes contained eighteen years' worth of mitigation materials, including thank you cards, notes of appreciation, letters, awards, etc., spanning defendant's legal career and representation of thousands of clients. When contacted by advisory counsel, through her counsel, Ms. Regnier relayed that she no longer has any such thank you cards, notes, or other items described in her possession. Counsel for Ms. Regnier further relayed to advisory counsel that according to Ms. Regnier, the mitigation materials sought by the defense were contained within the materials destroyed.[13] These materials are irreplaceable and cannot be duplicated or obtained by other means. As a

---

[13] Neither defense counsel nor defendant were given any advance notice of the likely destruction or provided any opportunity to acquire the evidence.

result, defendant asks that the Court consider a variance due to the defendant's inability to present contemporaneous mitigation materials from countless former clients attesting to the good he has done over his over two decades in the law.

### K. Criminal Conduct

As explained in the first paragraph of this submission, defendant's criminal conduct at the center of his case is substantial. He pled guilty to four counts of wire fraud, violations of 18 U.S.C. § 1343, for misappropriating funds due to four of his legal clients. Defendant took large sums of money due his legal clients, lied to them repeatedly, and violated numerous professional standards and rules of ethics. Defendant also pled guilty to a single count of violating 26 U.S.C. § 7212, for impending the ability of the IRS to collect taxes that were due to the federal treasury. As described above and below, defendant takes responsibility for his crimes, appreciates the seriousness of his misconduct, and recognizes and agrees that punishment and a prison sentence is deserved.

## III.    ACCEPTANCE OF RESPONSIBILITY

Pursuant to §3E1.1(a), "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels." Subsection (b) provides an additional one-level reduction upon motion of the government.[14] The "primary goal of the reduction is to reward defendants who are genuinely contrite." *United States v. Green*, 940 F.3d 1038, 1042 (9th Cir. 2019). The PSR recommended that defendant's base offense level be reduced by two levels due to his acceptance of responsibility, but refused to recommend that defendant receive the additional one level reduction. This is not equitable under the facts. [PSR ¶¶ 134-35].

By pleading guilty, absent an agreement, defendant cumulatively prevented (a) two trials, totaling at least ten to twelve weeks; (b) additional emotional and other burdens on the clients; (c) significant costs to the Court and the government; and (d) likely multiple

---

[14] On July 8, 2022, defendant, through advisory counsel, made a written request to the government for a third level reduction pursuant to 3E1.1(b). [Exhibit S]. The government did not respond.

appeals.[15] Accordingly, defendant's base offense level should be reduced by three, not two, levels.

## IV.   CRIMINAL HISTORY CATEGORY

The criminal history category "is designed expressly to account for a defendant's *prior* criminal conduct." *United States v. Spencer*, 1995 U.S. App. LEXIS 2697, *5 (9th Cir. 1995)(emphasis added). A "defendant with a record of *prior* criminal behavior is more culpable than a first offender and thus deserving of greater punishment . . ." §4A1.1, *Introductory Commentary* (emphasis added). The district court "retains discretion to depart downward from the guidelines should it find 'mitigating circumstances of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.'" *United States v. Boykin*, 785 F.3d 1352, 1363 (9th Cir. 2015).

Prior to being sentenced on the *Nike* matter, defendant had a criminal history score of zero. Defendant's criminal history was reevaluated before he was sentenced on the *Daniels* matter. The *Nike* conviction resulted in a criminal history score of three, placing defendant in criminal history category II. The SDNY Probation Department determined, "[b]ased on the nature of these offenses, their proximity to one another, and the defendant's lack of other criminal history, it appears his criminal history may be overstated in the Criminal History Computation . . . . It appears as though defendant has done a lot of good work in his legal career up until the events of his criminal activity." Thereafter, defendant was sentenced to a period of 24 months for Count 1, and 24 months for Count 2, with 18 months to be served concurrently with the sentence imposed in the *Nike* matter.

The instant PSR concluded that defendant now has a total criminal history score of six, which places him in a criminal history category of III, but recommended a departure

---

[15] Defendant has also taken practical steps to evidence his acceptance of responsibility, inclusive of sending a letter to his victim clients [PSR ¶ 84], voluntarily relinquishing his interest in a jet claimed by the government to be purchased with misappropriated funds [Dkt. 974, Exh. B]; and, attempting to voluntarily and permanently resign from the practice of law. [Exhibit T].

to Category II. [PSR ¶¶ 153, 282, Dkt. 977, p. 9]. However, a downward departure to category I is warranted here. Prior to the filing of three federal indictments, defendant had never been charged with a crime. That changed in early 2019, when DOJ filed <u>three</u> separate cases against defendant within approximately 60 days. [Exhibit U]. Because each case involved a single defendant, charged similar allegations (particularly the *Daniels* matter), and had overlapping periods of conduct, the normal course (followed in almost all federal prosecutions) would have been to bring one case. Instead, defendant was subjected to defending three criminal cases, on two coasts, at once. Now, defendant's criminal history category is similarly negatively affected by the government's decision not to bring one case, but instead three. And a criminal history category of III has the potential to add *years* to his sentence.

The defense submits that this highly unusual decision resulted from defendant's notoriety, the government's desire to have three high-profile prosecutions of defendant, and an internal "turf" battle within DOJ. This is improper and highly prejudicial. In fact, it was recently revealed that former SDNY U.S. Attorney Geoffrey Berman acted in concert with former CDCA U.S. Attorney Nicola Hanna to determine when the agencies would effectuate the arrest and charging of defendant in multiple cases in two districts as opposed to having one office charge defendant. On September 13, 2022, Berman released his book, "Holding the Line: Inside the Nation's Preeminent US Attorney's Office and its Battle with the Trump Justice Department." In the book, Berman states: "We prosecuted friends of the president [Trump]. And we prosecuted one of his most persistent antagonists: Michael Avenatti, the lawyer who represented Stormy Daniels." In "Part Three: Priorities" an entire chapter is devoted to defendant. [Exhibit BB][16]

Mr. Berman reveals in the book that prosecutors in the Southern District and the Central District had ample knowledge and opportunity to bring the instant matter and the *Nike* matter (as well as the later filed *Daniels* matter) in one case to be filed in the Central

---

[16] There are numerous erroneous "facts" in the chapter, many of which are contradicted by the government's own filings in the Southern District of New York and the evidence presented at trial.

16

District, consistent with the normal course and DOJ policy. Instead, they chose to pursue the cases separately, made no efforts of consolidating the cases and conserving resources, and were instead more concerned over who would benefit from a high-profile prosecution of defendant and avoid being "punished" by Main Justice.[17] These statements also undermine the repeated representations from the government that Main Justice was never involved in the prosecution of defendant.

The conduct at issue in this case occurred prior to the conduct in both New York matters. Although those cases proceeded to trial and sentencing prior to the instant case, the underlying conduct for each occurred <u>after</u> the relevant conduct here. The spirit of the criminal history category is to prevent recidivism after a defendant has served his sentence and has been given a chance to do better. Thus, it would not be just to increase defendant's sentence in this case due to conduct that occurred after the fact, especially under the circumstances. Defendant asks that the Court perform a downward departure to criminal history category I. Defendant's lack of prior criminal conduct, his age of 51, the proximity of the relevant offenses, and the government's act of knowingly pursuing three indictments at the same time, warrants such a departure.

## V.    OBJECTION TO JUDICIAL FINDINGS OF FACT AND CONDUCT OUTSIDE OF DEFENDANT'S PLEA

Defendant is entitled to a jury trial as to any conduct not specifically pled to, and the government may not rely on judicial fact finding for enhancements, relevant conduct, or offense behavior in connection with defendant's sentencing. Indeed, it is unconstitutional for the Court to engage in judicial fact finding as to any conduct beyond that specifically pled to at the time of defendant's guilty plea, and then use such conduct either to enhance defendant's sentence (*i.e.*, to support a sentence enhancement such as obstruction of justice, bankruptcy enhancement, etc.) or as "relevant conduct" in connection with defendant's sentence. Doing so violates defendant's right to due process,

---

[17] The government also later refused on multiple occasions to transfer the *Daniels* case to the Central District for consolidation. [SDNY 19-Cr-00374, Dkts. 20, 59].

his rights under the Sixth Amendment, and the guarantee of a jury trial.

Under the Constitution, defendant is entitled to have a jury determine, using a beyond a reasonable doubt standard, any fact that defendant has not specifically pled to that is used to increase his sentence. *See, e.g.*, *Jones v. United States*, 135 S. Ct. 8, 8-9 (2014)(Scalia, J., Dissenting)("It unavoidably follows that any fact necessary to prevent a sentence from being substantively unreasonable – thereby exposing the defendant to the longer sentence – is an element that must be either admitted by the defendant or found by the jury. It *may not* be found by a judge."); *United States v. Bell*, 808 F.3d 926, 928 (D.C. Cir. 2015)(Kavanaugh, J., concurring)("Allowing judges to rely on acquitted or uncharged conduct to impose higher sentences than they otherwise would impose seems a dubious infringement of the rights to due process and to a jury trial."). Accordingly, defendant objects to any judicial fact finding or reliance by the government on facts outside defendant's prior plea, as stated on the record, in connection with defendant's sentencing. The Court must decide defendant's sentence solely based on the conduct and facts he pled to, together with the §3553 factors.

## VI.    OBJECTIONS TO THE PSR

On August 22, 2022, the PSR and a Letter to the Court were filed. [Dkt. 977, 978]. As detailed below, defendant objects to many of the PSR's findings and much of its content as incorrect, unreasonable, and excessive. Among other things, the PSR drastically overstates the applicable Guideline range; performs a faulty "loss" analysis; provides defendant with no credit for the tremendous work he performed on behalf of his clients; includes double counting by relying on an inaccurate recitation of defendant's conduct and the facts to justify the stacking of enhancements;[18] and improperly "convicts" defendant

---

[18] In preparation of the PSR, Probation never made any inquiry of the defendant or his advisory counsel as to the offense conduct, despite being invited to do so on multiple occasions. Instead, it appears that the government provided an inflammatory, one-sided, lengthy factual recitation (totaling over 15 single-spaced pages) to Probation that was then inserted in the PSR, without any verification by Probation or attribution stating it came from the government. This, in turn, leads the reader to erroneously conclude that these are "facts" independently determined by Probation. The CDCA PSR also fails to include many

18

of other conduct for which he has not pled guilty, all in an attempt to account for the suggested unreasonable sentence of 151 months. This is not proper. Thus, defendant makes the following objections to the PSR and the Letter to the Court.

1 - PSR Page 2, Release Status, Dk. 977, p. 7: Defendant was arrested and released on March 25, 2019, not April 1, 2019. [Dkt. 9]. Defendant was released from Metropolitan Correctional Center ("MCC") in New York and transported back to California on April 24, 2020, not April 20, 2020. The PSR states that defendant self-surrendered on February 7, 2022, to commence the sentence imposed in 19-CR-00374-JMF. This is incorrect. He self-surrendered on that date to await sentencing in that case and to begin serving his sentence in SDNY 19-CR-00373-PGG.

2 - PSR Page 4, Guidelines Summary; ¶¶ 128-132; ¶ 265; Dkt. 977, p. 9: As addressed below, defendant objects to the calculation of the Guidelines range.

3 - PSR ¶ 1, n. 1: Defendant objects to the procedural history as incomplete and asks that the PSR include that the mistrial was declared due to the government's failure to produce significant *Brady* material "with respect to a very important range of documents relating to the financial affairs of Mr. Avenatti's firm." [Tr. 10/15/21, p. 4]. Defendant also asks that the impetus behind the Preliminary Order of Forfeiture be included, namely that as part of his acceptance of responsibility, defendant proactively waived his interest in the property and did not contest the issuance of the Order.

4 - PSR ¶ 9; ¶ 81; ¶ 280: Defendant objects to the finding that he agreed (by stating he "understood") that he would be required to pay full restitution to the victims of the wire fraud offenses "which may be to victims and in amounts based on any relevant conduct as to the wire fraud scheme, and to the victim of the tax offenses (count 19) to which he was pleading guilty." Instead, during the change of plea hearing, AUSA Katzenstein stated, "defendant will be required to pay full restitution to the victims of the wire fraud offenses, that is, Counts 5, 8, 9, and 10, to which defendant is pleading guilty." [Tr. 6/16/22, p. 12].

---

positive facts and other mitigation factors [SDNY Dkt. 429] that were included in the SDNY *Daniels* PSR.

She also stated: "the Court **may** order defendant to pay restitution in the form of any additional taxes, interest, and penalties that the defendant may owe to the United States based on the tax offense, Count 19, to which he is pleading guilty." [*Id.* (emphasis added)]. Although defendant acknowledged he understood the potential penalties, he stated that he did not agree with the restitution amount or the loss amount. [*Id.* at 14]. In any event, defendant never agreed any restitution was due or owing as a result of his guilty plea to Count 19.

5 - PSR ¶ 18-19; ¶ 82; ¶ 116-17; Dkt. 977, p. 6: The PSR states, "According to the government, on April 21, 2019, Avenatti intimidated and threatened witnesses Gardner and Whiteside when he sent a tweet stating that he looked forward to the facts underlying their civil case coming out." Defendant objects to these findings and addresses them in the Obstruction of Justice section below. There was never any effort to intimidate or threaten any witness in this case.

6 - PSR ¶ 20; Dkt. 977, p. 6: Defendant objects to this recitation of facts as incomplete and asks that the PSR also include that no charges were ever filed, and the government never proved any of the alleged offenses. As a result of the government's allegations, defendant was detained at MCC. The conditions of defendant's incarceration as a result of these allegations, including his incarceration in the 10 South solitary confinement terrorist unit, are further addressed above and should be included in the PSR.

7 - PSR 7 ¶ 21: Defendant was released from MCC on April 24, 2020, not April 20, 2020. Defendant asks that the PSR include information about his extensive and restrictive conditions. Defendant was placed on temporary release on thirty conditions on home confinement, no ability to leave for the first year, electronic GPS monitoring, monitoring of financial transactions, lack of access to the internet, and the retention of a third-party custodian (among other restrictive conditions). [Dkt. 140, 151].

8 - PSR ¶ 23; Dkt. 977, p. 7: Defendant self-surrendered to the U.S. Marshals Service following his trial (not sentencing).

9 - PSR ¶ 30: Defendant was not EA LLP's managing member. The managing

20

member was instead Avenatti & Associates, APC ("A&A"), of which defendant served as its President. Also, at all times relevant to this case, defendant owned 75-100% of the equity in EA LLP (through A&A).

10 - PSR ¶ 31(a), (c), (d): Defendant objects to the statement that he was the effective owner and controlled these entities. GBUS was owned by GB LLC, GB Auto was owed by GB LLC, and Passport 420 was an entity owned 50/50 by defendant (through A&A) and William Parrish (through Spring Creek Research).

11 - PSR ¶ 36: Defendant objects to the inclusion of the provision regarding the special needs trust as inaccurate and unsupported by the evidence. The definition and the nature of a special needs trust was never presented through expert testimony at trial despite the prosecution's pre-trial claim they would do so.

12 - PSR ¶ 41: Defendant objects to the language of this paragraph as it implies that there were more than four wire fraud victims. Defendant pled to four counts of wire fraud relating to the only four client victims in this case. Mr. Long Tran testified at trial he was not a victim (Tr. 8/10/21, Vol. 1, p. 68-69) nor was there any other wire fraud victim.

13 - PSR ¶ 41, n. 5; ¶ 50, n. 9; ¶ 55, n. 10: As discussed below, defendant objects to the PSR's findings regarding Eagan Avenatti, LLP's bankruptcy and defendant's obligations stemming from the relevant proceedings.

14 - PSR ¶ 43, n. 7; ¶ 107: The PSR states, "At trial, Johnson testified that the signature above his printed name on the settlement agreement did not resemble his true signature." This is not accurate. The PSR cites "1-7-21 Vol 1 34:24-35:4[,]" but this testimony does not support the statement in the PSR. At trial, the evidence did not show that the signature was forged. In March 2019, Mr. Johnson met with prosecutors and told agents he may have signed the settlement agreement. [Tr. 7/22/21, Vol. 2, p. 9]. In the corresponding memorandum of interview dated March 31, 2019, agents described that "Johnson stated that his signature looked funny to him. The 'G' and 'E' in his signature looked funny. Johnson stated that he may have signed the document but his signature looks funny." [USAO_000133557]. At trial, Mr. Johnson agreed that he also told the agents that

the settlement document was delivered to him by defendant while Mr. Johnson was living at Sunrise of West Hills. [Tr. 7/22/21. Vol. 2, p. 12]. When asked to look at the date on the signature page at trial, he testified, "Dated 1 – my signature is dated January 2nd, 2015." [*Id*]. (emphasis added). The finding that defendant forged Mr. Johnson's signature is also improperly used to support a finding of sophisticated means.

15 - PSR ¶¶ 45-47(a)-(e): Defendant objects to the PSR's factual findings and the loss amount associated with Mr. Johnson as inaccurate.

16 - PSR ¶ 47(c); ¶ 98; 112: Defendant objects to the PSR's finding that defendant "failed to provide the requested information to SSA, which resulted in Johnson's SSI benefits being discontinued in or about February 2019." During trial, it was established that in February 2012, Mr. Johnson applied for SSI benefits. [Tr. 7/23/21, Vol. 1, p. 94]. Elsa Guerrero with Social Security Administration ("SSA") testified that she had a phone call with Mr. Johnson on November 1, 2018. Following the call, Mr. Johnson received a letter describing items SSA required so that Mr. Johnson could continue to receive SSI. [*Id*. at 84, Gov. Exh. 108]. Ms. Guerrero revealed that following the November 2018 call, and after requesting documents from Mr. Johnson, she learned Mr. Johnson was receiving cash gifts, "gambled away $15,000" and testified, "that is why I could not reinstate his benefits in May 2019." [Tr. 7/23/21, Vol. 2, p. 6-7]. Further, defendant was in no way obligated to assist Mr. Johnson with his SSI benefits but did so anyway. The finding that defendant was the cause of Mr. Johnson not having his SSI benefits is incorrect and is improperly used to support the PSR's finding of substantial financial hardship and vulnerable victim.

17 - PSR ¶ 47(e), n. 8; ¶113; Dkt. 977, p. 6: The PSR describes defendant's conduct following Mr. Johnson's initiation of the civil lawsuit against him. Specifically, the PSR describes defendant posting on Twitter a series of documents and messages related to Mr. Johnson. Defendant objects to this recitation as incomplete. Defendant's conduct followed a July 2019 press conference held by Mr. Johnson's civil counsel.[19] During the press

---

[19] *See,* [https://www.kron4.com/news/national/paraplegic-man-sues-says-avenatti-kept-

conference, counsel publicly commented on the pending criminal case and repeatedly disparaged defendant. Defendant maintains that he was properly exercising his First Amendment rights to defend himself in the public arena, only after Mr. Johnson's counsel publicly disparaged defendant during his press conference.

18 - PSR ¶¶ 48-52(b): Defendant objects to the recitation of the facts related to Ms. Gardner as incomplete.

19 - PSR ¶48; ¶50-51: The PSR fails to include the work defendant performed on behalf of Ms. Gardner including immediately providing her a hotel and meals and later short-term housing on her behalf due to her financial condition. The PSR fails to provide defendant credit for costs and expenses he incurred on her behalf and the work he performed for Ms. Gardner on other matters. The PSR goes as far to suggest that defendant diverted all of Ms. Gardner's money and none of it went to her. This is inaccurate. Defendant also objects to the findings by the PSR related to the loss suffered by Ms. Gardner.

20 - PSR ¶49; ¶107: The PSR states, "In order to conceal the true details of the settlement agreement from Gardner, Avenatti did not provide a copy of the settlement agreement to Gardner, did not allow her to read it before signing it, and did not go over it with her prior to signing it." Ms. Gardner was actively involved in the resolution of her case. At trial, Ms. Gardner testified that she participated in a very lengthy mediation, which she estimated was a "15-hour day." [Tr. 7/30/21, Vol. 1, p. 77]. This mediation led to the settlement at issue in this case. Ms. Gardner stated that because it was late in the evening, defendant did not read the entire agreement but told her the amount, read her portions of the agreement, and she ultimately signed the settlement agreement. [*Id.* at 77-80]. Ms. Gardner also agreed that she had an opportunity to communicate with the mediator. [Tr. 7/30/21 Vol. 2, p. 58-59]. Assertions that Ms. Gardner was completely kept in the dark, had no knowledge regarding the terms of the settlement and was never allowed to view

settlement-money/].

23

the agreement or its terms are incorrect.

21 - PSR ¶ 52(a); ¶99; ¶107: The PSR states that defendant and Ms. Regnier "direct deposit[ed] cashier's checks into Gardner's bank account, at Avenatti's direction, to make it appear as if the money had come from Whiteside by, for instance, putting Whiteside's name on the checks as the remitter of the cashier's checks. (Trial Exhs. 158-159. [sic]) For example, on June 18, 2018, Avenatti caused a $16,000 cashier's check drawn on EA Account 4613 to be deposited into Gardner's bank account, which falsely identified Whiteside as the 'remitter.'" However, a review of Exhibits 158 and 159 (cited by the PSR) reveal that many of the cashier's checks coming from the same bank account were issued to Ms. Gardner with various remitters including "Whiteside[,]" "Avenatti and Associates – Whiteside[,]" "Michael J. Avenatti[,]" and "Eagan Avenatti[.]" The incorrect finding that "Whiteside" was listed as the remitter in an effort to deceive Ms. Gardner is used to support the PSR's application of the substantial financial hardship and sophisticated means enhancements. Defendant objects to any finding that the "Whiteside" remitter was a means of intentionally deceiving Ms. Gardner and also objects to its use for an enhancement.

22 - PSR ¶ 52(b); ¶ 99: The PSR describes, "As a result of the missing payments, Gardner was unable to pay her living expenses, causing her to rely on friends for housing." However, the evidence presented at trial established that Ms. Gardner was living with a man and ultimately left his home after she suffered an assault. In February 2019, Ms. Gardner texted defendant about needing money because she was moving out of his home based on their personal issues. During this exchange, she relayed she was moving in with her friend. [Tr. 8/3/21, Vol. 1, p. 64-65; Gov. Exh. 160, p. 19]. As described below, at the time of trial, Ms. Gardner not only had a place to live, but she was living in a luxurious high rise apartment complex in downtown Los Angeles as a result of the settlement money defendant had obtained for her.

23 - PSR ¶ 54; ¶ 100: The PSR states that defendant told Mr. Barela that he could incur charges on his credit cards for his business ventures while he waited for the

settlement funds. This factual finding is repeated: "When Barela did not receive his settlement money, he could not pay these charges, and likewise could no pay rent, other credit bills, and other living expenses. Barela kept Avenatti updated on how dire his financial condition was, but Avenatti did nothing other than continue to lie to Barela." Defendant objects to these findings and denies making these statements to Mr. Barela. Defendant also denies any allegation that he "did nothing other than continue to lie to Mr. Barela" in response to his financial condition.

24 - PSR ¶¶ 55-57: The PSR describes defendant's legal fees and costs associated with his representation of Mr. Barela. Defendant objects to these findings.

25 - PSR ¶¶ 53-58: Defendant objects to the recitation of the facts related to Mr. Barela as incomplete.

26 - PSR ¶ 57(b): The PSR states, "In November 2018, when Barela told Avenatti how badly he needed money, Avenatti told Barela that Avenatti could lend him $100,000 in January but would charge him at a ten percent interest rate." The testimony at trial did not establish that defendant offered to personally loan Mr. Barela $100,000. Mr. Barela instead testified that he did not know the source of the funds defendant referred to. [Tr. 8/5/21, Vol. 1, p. 56-57]. The PSR is incorrect to assert that defendant told Mr. Barela that he could not publicly enforce the settlement. Instead, the evidence established that defendant alerted Mr. Barela regarding the settlement agreement's confidentiality clause, a breach of which could jeopardize the agreement. [Tr. 8/4/21, Vol. 2, p. 91-92; 8/5/21, Vol. 1, p. 49]. The PSR also states that defendant refused to provide Mr. Barela with a copy of the fully executed settlement agreement. However, on June 3, 2019, an application for involuntary inactive enrollment was filed in the State Bar Court. Attached to the application was a Declaration of Gregory Barela. In the declaration, which he signed under penalty of perjury, Mr. Barela declared that on December 28, 2017, he was provided a copy of the signed settlement agreement. Attached to the declaration was a copy of the settlement agreement with Mr. Barela's signature page attached.

27 - PSR ¶ 63: Defendant objects to the finding that he collected all fees owed to

25

him related to Ms. Phan on March 15, 2018. Defendant never received all of the compensation he was due (*i.e.*, he received no payment in connection with his negotiation of Ms. Phan's ownership of EM Cosmetics and acquisition of other valuable assets). He is entitled to a credit against loss for what he is due.

28 - PSR ¶ 65: The PSR states that both defendant and Ms. Phan happened to be in New York City between April 23, 2019, and April 24, 2019. These interactions occurred on April 23, 2018, and April 24, 2018. The PSR then describes that the April 23, 2018, payment of $147,972 was done to "smooth the way to the meeting…" However, Ms. Phan stated that when they met at the party on April 23, 2018, she did not want to bring up business at her celebration and in front of her colleagues. [Tr. 8/12/21, Vol. 1, p. 45]. The next day when they had lunch privately, they discussed the matter in a limited sense and Ms. Phan testified she did not confront him. [*Id.* at 48]. There is no evidence that defendant attempted to smooth anything over or sought to meet up with Ms. Phan to do so.

29 - PSR ¶¶ 59-67: Defendant objects to the recitation of the facts and the relevant loss amount related to Ms. Phan as incomplete.

30 - PSR ¶ 71-75: Defendant objects to the factual findings underlying, "Failure to Pay Over Federal Payroll Taxes for GBUS Employees[.]" Defendant did not plead guilty in connection with this conduct. The facts described in this section are not based on evidence and are unsupported by the record. As discussed below, defendant objects to judicial fact finding used to justify an increased sentence outside of conduct he pled guilty to.

31 - PSR ¶ 79; ¶93-95: The PSR describes the loss in this matter as $12,350,000. As addressed below, this loss amount and the analysis is inconsistent with the law; the sentencing Guidelines; and the position that other district courts and prosecutors in the Central District of California have routinely taken in similar cases. Accordingly, defendant objects to this loss amount as grossly inflated and inaccurate, resulting in an incorrect Guidelines range.

32 - PSR ¶ 94: Defendant objects to the statements made in this paragraph as to each

client.

33 - PSR ¶ 98: The PSR states, "By stealing Johnson's entire settlement payment, Avenatti forced Johnson to rely on small payments from Avenatti to be able to pay his living expenses." Any statement that defendant stole the entirety of Mr. Johnson's settlement is false. In addition, the payments referred to as *advances* were provided to Mr. Johnson in small increments at Mr. Johnson's request. Mr. Johnson testified that defendant said that "the firm can advance [him] whatever [he] need[ed], and [Mr. Johnson] said that it had to be less than $2,000" because Mr. Johnson was required by SSA to have less than $2,000 in his bank account. [Tr. 7/22/21, Vol. 1, p. 45].

34 - PSR ¶¶ 96-101: Defendant objects to the two level enhancement pursuant to §2B1.1(b)(2)(A). He also objects to the factual findings underlying this determination, which are discussed below.

35 - PSR ¶¶ 102-105, ¶ 50 n. 9; ¶55, n. 10; ¶ 61, n. 12: Defendant objects to the two level enhancement pursuant to §2B1.1(b)(9)(B). He further objects to the factual findings underlying this determination, which are discussed below.

36 - PSR ¶¶ 106-109: Defendant objects to the two level enhancement pursuant to §2B1.1(b)(10)(C). He objects to the factual findings underlying this determination, which are discussed below.

37 - PSR ¶ 108: Defendant objects to the PSR's finding that defendant's act of splitting up the wire transfers was done in an effort to deceive Ms. Phan and Mr. Tran. There is no evidence to support this assertion.

38 - PSR ¶¶ 110-113: Defendant objects to the two level enhancement pursuant to §3A1.1. He further objects to the factual findings underlying this determination, which are discussed below.

39 - PSR ¶¶ 121; Pages 21-22 ¶ 76: Defendant objects to the finding that he pled guilty to the omnibus clause of 18 U.S.C. § 7212(a).

40 - PSR ¶ 123; ¶ 76 : Defendant objects to the finding that the base offense level for Count 19 is 22. The PSR came to this conclusion after determining that the amount

27

due to the IRS is $3,207,144. However, defendant did not plead guilty to failure to file the tax or pay this amount. Instead, defendant pled guilty to obstructing the IRS' ability to collect taxes. Prior to coming to this conclusion regarding the tax loss amount, the government must establish that but for defendant's efforts to obstruct, the IRS would have been able to collect a specific amount. No such showing has been made here. As a result, this finding (which lacks any evidentiary support), cannot be used to justify an elevated loss amount or restitution amount.

41 - PSR ¶ 124: Defendant objects to the application of the sophisticated means enhancement related to Count 19. These factual findings were never proven in the record and cannot be used to justify an enhanced sentence. By way of example only, defendant objects to the finding that he changed the company names and EIN numbers to avoid the IRS levies.

42 - PSR ¶¶ 139-140; Dkt. 977, p. 6: Defendant objects to the finding of any "offense behavior" related to "wire fraud" and the National Football League ("NFL") litigation. As an initial matter, the PSR's statement of facts regarding the NFL litigation is incorrect. The NFL litigation was not a class action, as class certification was denied. Further, the PSR cites to *In Re Eagan Avenatti, LLP*, 8:18-cv-01644-VAP-KES, Dkt. 51, Exhs. 32, 33, 34 for the proposition that "The Super Bowl Clients were entitled to approximately $952,995 of the $1,550,000 settlement funds." A review of these exhibits does not establish these facts. Further, defendant disputes that he was required to declare the transfer of funds associated with this settlement for the purposes of his EA Bankruptcy proceedings. Defendant also objects to the finding of loss associated with these clients. The basis of the $807,773 alleged loss amount[20] is unclear and certainly fails to account for the enormous costs and expenses associated with this massive litigation, which spanned <u>two</u> cases, not one.[21] Not a single plaintiff of this case has sued defendant civilly

---

[20] The government has failed to prove the loss amount as required by law and has also failed to produce all information and *Brady* material bearing on the loss amount.
[21] One of the cases proceeded to trial, Northern District of Texas 11-cv-00248-M, and verdict, with significant out-of-pocket costs and expenses being incurred.

in connection with this litigation and the government has not sought to charge defendant for this conduct. Although the government indicated that it was going to introduce evidence regarding the NFL litigation during trial, no such evidence was ever presented. As described above, defendant objects to the Court's consideration of this uncharged and inaccurately described conduct to increase his sentencing exposure.

43 - PSR ¶¶ 141-146; Dkt. 977, p. 6: Defendant objects to the finding of any "offense behavior" related to the "tax fraud scheme" which the PSR refers to as the failure to file tax returns for EA LLP and A&A and failure to pay federal payroll taxes for EA LLP employees. Defendant further objects to the Court's consideration of this conduct (to which he has not pled guilty) to increase his sentencing exposure. In addition, defendant objects to the recitation of facts associated with this alleged conduct. By way of example only, the PSR describes that EA LLP received $137,890,016 in bank deposits between the tax years of 2011 through 2017. Defendant objects to this dollar amount as irrelevant because it includes monies that clearly are not <u>income</u>, including settlement monies and other monies due to clients and others. These factual findings were never proven in the record and cannot be used to justify an enhanced sentence.

44 - PSR ¶¶ 145-146; Dkt. 977, p. 6: Defendant objects to the finding of any "offense behavior" related to his alleged failure to file personal income tax returns. As described above, defendant objects to the Court's consideration of this conduct (to which he has not pled guilty) to increase his sentencing exposure.

45 - PSR ¶ 136: Defendant objects to the PSR's two level, as opposed to three level, reduction for acceptance of responsibility.

46 - PSR Page 38, Adjustment to Pretrial Supervision: The PSR writes that defendant was released on bond on April 1, 2019. However, he was released on bond after being arrested on March 25, 2019. He later had his initial appearance on April 1, 2019. Further, defendant was alleged to have violated his condition of reporting transactions in excess of $5,000. However, the dollar amount associated with this condition was $500.

47 - PSR Page 38, Adjustment to Incarceration: Defendant asks that the PSR include

that he self-surrendered and begun serving his sentences on both SDNY cases. Defendant also asks that the PSR accurately reflect each facility where he has been incarcerated since he surrendered in February 2022. *See,* fn. 10.

<u>48 - PSR ¶¶ 152-153, Dkt. 977, p. 6, 9</u>: As explained elsewhere herein, defendant objects to the criminal history category determination. Defendant further objects to the finding that his prior federal fraud offense speaks to his need for deterrence and recidivism.

<u>49 – PSR ¶156</u>: Defendant objects to the description of his November 14, 2018, arrest. The description entitled "charge" incorrectly implies that he was charged, but he never was. He was arrested on suspicion of domestic violence, but <u>no charges were ever filed</u> because it was shown during the investigation that the allegation was part of a planned extortion attempt and hoax. Further, the statement "prosecution prefiling deferral[,]" under the heading "disposition[,]" implies that a diversion program was used. No program was completed in exchange for defendant never being charged because he never engaged in any criminal conduct, which is why he was never charged.

<u>50 - PSR ¶216</u>: Defendant objects to this statement regarding the status of his proceedings before the State Bar of California.

<u>51 - PSR ¶218, Dkt. 977, p. 8</u>: Defendant objects to this paragraph regarding his programming while at FCI Terminal Island as incomplete. The work he has performed while in custody is described elsewhere herein.

<u>52 - PSR ¶ 233</u>: On June 24, 2022 (rather than June 23, 2022), defendant submitted an under seal and in-camera Declaration with the Court in continued support of CJA appointment on his behalf. After the PSR was issued, on August 24, 2022, defendant submitted another filing as required (every sixty days).

<u>53 - PSR ¶¶ 235, 242, 244</u>: Since the June 24, 2022, financial filing (the version Probation was provided), several minor changes were made and should be reflected here. In defendant's updated financial affidavit, he relayed that the Court of Appeal later affirmed the ruling. In defendant's updated financial declaration he removed "Fox News Network, LLC and certain of its on-air talent" as one of the parties he has a potential tort

claim against. Additionally, the recently filed declaration included an update regarding his claim against the BOP.

54 - PSR ¶ 274: Defendant objects to the special assessment determination of $500 per count. Pursuant to 18 U.S.C. § 3013, the special assessment associated with a felony is in "the amount of $100 if the defendant is an individual[.]" 18 U.S.C. § 3013(a)(2)(A). Here, defendant has pled guilty to five counts for a total of $500 ($100 x 5).

55 - PSR Page 61 ¶¶ 278-279; Dkt. 977, p. 1, 5: Defendant objects to any deferred restitution hearing or determination. The government, and its well compensated financial expert, have had ample time to determine their position on restitution and provide the evidence to defendant and the Court.[22]

56 - Dkt. 977, Pages 2, 6, 9: Defendant objects to the PSR's sentence recommendation as unreasonable and unnecessary, and inconsistent with the requirement that it be "sufficient, but not greater than necessary, to comply with the purposes set forth" in §3553(a)(2). Defendant also specifically objects to the finding that the lengthy term of imprisonment is necessary to protect the public.

57 - Dkt. 977, Pages 2-4, 11-12: Defendant objects to the PSR's recommended conditions of supervised release as discussed below.

58 - Dkt. 977, Page 4: Defendant objects to the PSR's implication that defendant suffers from "narcotic addiction or drug dependency." Defendant struggles with alcoholism, but has never had any narcotic addiction or drug dependency, nor is there any evidence of this.

59 - Dkt. 977, Page 5: Defendant objects to the findings concerning the loss amount as described herein as to the victim clients, the IRS, and the NFL clients.

60 - Dkt. 977, Page 10: Defendant objects to the inaccurate determination that the sentence recommended avoids unwarranted disparities among similarly situated defendants. Defendant addresses this issue above and by way of his exhibits (Exhibit B).

61 – PSR Cover Page, Pg. 2 Dependents, ¶¶ 17, 64, 37, 226: Attached hereto as

[22] Defendant requested all applicable information weeks ago but it has not been provided.

Exhibit CC are six pages of the PSR with annotated corrections. These annotations are limited to typographical errors contained in the PSR.

## VII.   WIRE FRAUD COUNTS 5, 8, 9, & 10

### A. <u>Loss Amount</u>

In evaluating the loss amount, <u>the government</u>, and <u>the government alone</u>, bears the burden of establishing the loss suffered by the victims, including any and all credits due the defendant. The Guidelines define actual loss as "the reasonably foreseeable pecuniary harm that resulted from the offense." §2B1.1, *Application Note* 3(A). Here, the government must prove the loss-related enhancements (*i.e.*, the loss amount) by *clear and convincing evidence. United States v. Lonich*, 23 F.4th 881, 914 (9th Cir. 2022)(finding that the government did not demonstrate by clear and convincing evidence the requisite loss amount to support the 20-level loss enhancement); *see also, United States v. Armstead*, 552 F.3d 769, 776 (9th Cir. 2008). The clear and convincing standard requires that the factfinder have "'an abiding conviction that the truth of [the] factual contentions' at issue is 'highly probable.'" *Lonich,* 23 F.4th at 914.

The PSR incorrectly determined, "Avenatti did not render services to his clients pursuant to the terms of his fee agreements with his clients or pursuant to the terms of the California Rules of Professional Conduct." [PSR ¶ 94]. The PSR also erroneously found, "[b]ecause Avenatti lied to his clients about the settlements and his receipt of the settlement money, he is not entitled to a credit against the full amount of the client monies he stole for his fees and expenses." [PSR ¶ 95]. The PSR recommends that the Court increase the base offense level by 20 levels based on a $12,350,000 loss amount: $4,000,000 (Johnson), $2,750,000 (Gardner), $1,600,000 (Barela), and $4,000,000 (Phan). [PSR ¶¶ 94-95].[23]

Defendant vehemently disagrees with this analysis and assessment of the loss

---

[23] Probation simply took the gross amount of each monetary settlement, without any deduction, and added them together. In fact, Probation did not even deduct from the loss amount any of the monies that defendant paid <u>directly to the clients</u> before the fraud was detected.

amount because it is contrary to the law and the Guidelines. Among other things, it grossly overstates the loss amount by millions of dollars and provides defendant with no credit for his earned attorneys' fees, the costs and expenses spent for the benefit of his former clients, the advances and payments he made to and for the benefit of the clients, and/or the work he performed on other matters for the clients, all of which must be included in the loss analysis and deducted.[24] *See, e.g.,* §2B1.1, *Application Note 3(E)(i)*, *United States v. Grusd*, 787 Fed. Appx. 922, 925 (9th Cir. 2019)(overturning sentence due to failure to properly determine credits due in loss calculation)(unpublished). *See also, United States v. Bright*, 353 F.3d 1114 (9th Cir. 2004), *United States v. Abdellatiff*, 205 Fed. Appx. 601, 602 (9th Cir. 2006)(unpublished), *United States v. Blitz*, 151 F.3d 1002 (9th Cir. 1998)*, Hance v. Super Store Industries*, 44 Cal. App. 5th 676 (2020), *Sheppard, Mullin, Richter & Hampton, LLP v. J-M Manufacturing Co., Inc.,* 6 Cal. 5th 59 (2018), *MacInnis v. Pope*, 134 Cal. App. 2d 528 (1955), *Oliver v. Campbell*, 43 Cal. 2d 298, 306-07 (1954), California Rule of Professional Conduct 1.15. <u>In addition, because of the importance of the loss amount in determining defendant's Guidelines and sentence, defendant specifically requests an evidentiary or *Fatico* (*United States v. Fatico*, 603 F.2d 1053 (2d Cir. 1979)) hearing on the issue prior to sentencing</u>. The proper loss amount in this case, if calculated pursuant to the Guidelines and California law, is between $1,500,000 to $3,500,000.[25]

### B. <u>Section 2B1.1 & Disproportionate Sentencing</u>

Defendant requests that the Court consider the widespread criticisms of §2B1.1 when fashioning a sentence. Indeed, it is well established "that the court may vary from the Guidelines based on policy disagreements with them…" *United States v. Monge*, 2015 U.S. Dist. LEXIS 23034, *6 (C.D. Cal. 2015), *citing United States v. Henderson*, 649 F.3d

---

[24] Defendant alerted Probation to this in writing before the PSR was issued.

[25] Even though he has no burden to prove the loss amount, defendant provides a preliminary calculation of the loss amounts for the four clients as follows: Mr. Johnson – less than $1,491,000; Ms. Gardner – less than $1,376,385; Mr. Barela – less than $529,203; Ms. Phan – less than $0; total – less than $3,396,588. Citations to some of the evidence relating to this loss amount calculation are set forth on Exhibit DD.

955, 963 (9th Cir. 2011). The sentences recommended by the 2B1.1 loss table "are widely viewed as unduly severe, increasingly arbitrary, and manifestly disproportionate to the non-violent nature of the underlying economic crimes[.]" B. Boss & K. Kapp, *How the Economic Loss Guideline Lost its Way, and How to Save It*, Ohio State Journal of Criminal Law, Vol.: 18.2: 605, 619 (2021), *citing* E. Podgor, *Throwing Away the Key*, 116 Yale Law Journal, Pocket Part 279, 280 (2007). For instance, a first-time fraud offender convicted of an offense involving a loss of $9.5 million would face a Guidelines sentence that is comparable to a defendant convicted of attempted murder, arson, and assault with the intent to commit murder. *Id.*

Many courts across the country have criticized the loss amount figures and their impact on sentences for white collar criminal defendants. *See, e.g., United States v. Ebbers*, 458 F.3d 110 (2d Cir. 2006)("Under the Guidelines, it may be well that all but the most trivial frauds in publicly traded companies may trigger a sentence amounting to life imprisonment."); *United States v. Parris*, 573 F. Supp. 2d 744, 750-51 (E.D.N.Y. 2008)(In regards to the 2B1.1 calculation, "[] if not for the wisdom of the Supreme Court in recognizing the need to free district courts from the shackles of the mandatory guidelines regime, I would have been confronted with the prospect of having to impose what I believe any rational jurist would consider to be a draconian sentence."); *United States v. Moody*, 2013 U.S. Dist. LEXIS 109506 (D. Colo. 2013)(agreeing that the "fraud guideline is not the product of the Sentencing Commission employing an empirical study…"). In defendant's June 2022 sentencing, Judge Furman echoed these sentiments: "[] I agree that the guidelines at issue here results in an unreasonably harsh sentence. That is not only because Section 2B1.2 [sic] of the guidelines gives undue weight of the loss amount…." *See,* SDNY 19-Cr-00374-JMF [Dkt. 477, p. 48].

Defendant recognizes the conduct at issue is serious and warrants punishment. However, using the loss amount suggested by the PSR, together with the other 32 levels of enhancements, results in a corresponding Guideline range that is unreasonable, excessive, and comparable to one used in a case involving a heinous violent crime. *See,*

34

Exhibit A.

C. <u>Obstruction of Justice</u>

Pursuant to §3C1.1, if a defendant (1) <u>willfully</u> obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution or sentencing of the offense, and (2) the obstructive conduct related to (A) the offense of conviction or related conduct; or, (B) the a closely related offense, then the Court is directed to apply a two level enhancement. The "term 'willfully' requires that defendant consciously act with the purpose of obstructing justice." *United States v. Lofton*, 905 F.2d 1315, 1317 (9th Cir. 1990), *citing United States v. Stroud*, 893 F.2d 504, 507 (2d Cir. 1990); *see also, United States v. Jenkins*, 275 F.3d 283, 287 (3d. Cir. 2001)(determining that willfully is deliberately or intentionally and is "not 'negligently, inadvertently, or accidentally.'"). The PSR incorrectly determined that the two level enhancement is warranted as a result of a message defendant posted to his Twitter. [PSR ¶117].

The facts demonstrate that on April 21, 2019, a L.A. Times article was published wherein confidential details of the settlement agreement between Ms. Gardner and Mr. Whiteside were released.[26] Defendant was contacted for comment and he replied stating that no monies were embezzled and "I look forward to all of the relevant documents and facts being presented at trial." In further response, on April 21, 2019, defendant made a post to Twitter. [PSR ¶18]. The government sent former defense counsel a letter describing defendant's conduct as attempted intimidation. The government noted, "The government has no objection to defendant's direct statements to the <u>Los Angeles Times</u> or other public statements denying wrongdoing." Soon thereafter on April 25, defendant emailed Pretrial Services denying any malicious intent. [Exhibit Y]. Later, Pretrial Services submitted a letter to the Court but <u>did not</u> allege, as claimed in the PSR, "that Mr. Avenatti violated the no contact condition in an attempt to threaten or intimidate victims/witnesses through

---

[26] This leak must have come from the government because it obviously did not come from the defense, Ms. Gardner or Mr. Whiteside.

35

social media." Instead, the letter stated these allegations were made by the prosecution. [Dkt. 25]. Pretrial Services determined, "The defendant denies any malicious intent, and Pretrial Services cannot substantiate either the defendant's or the victim's position in this case." [*Id.* at 3 (emphasis added)]. No further action was taken in this case; by either court in New York; or by any of the prosecutors here or in the Southern District of New York.

Second, defendant did not disseminate any of the confidential terms of the settlement agreement between Ms. Gardner and Hassan Whiteside. The relevant tweet did not even include Ms. Gardner's name. Even so, Ms. Gardner had already executed a waiver of her attorney-client relationship by April 21, 2019. The details of the settlement, the money received by Ms. Gardner, and the money deducted for fees and costs were all issues at the center of the case and had already been reported on at the time of the tweet. The tweet was in no way a threat or a means of intimidation and was instead a public denial of wrongdoing. The Guidelines specifically state, "This provision is not intended to punish a defendant for the exercise of a constitutional right. A defendant's denial of guilt … is not a basis for application of this provision." Defendant's statements that he looked forward to evidence being presented at trial is not an actual or implied threat but instead a public comment about his denial of guilt.

Third, the instant matter is drastically different from other cases where district courts have applied the obstruction of justice enhancement. *See, e.g., United States v. Door*, 996 F.3d 606, 611 (9th Cir. 2021)(two level obstruction enhancement was properly applied after the defendant threatened to kill case agent on multiple occasions); *United States v. Scheele*, 231 F.3d 492, 500-01 (9th Cir. 2000)(the obstruction of justice enhancement was proper when the defendant was recorded saying that he would "thrash you within an inch of your life" to an individual he referred to as a "narc"); *United States v. Dudley*, 1992 U.S. App. LEXIS 13556 (9th Cir. 1992)(the obstruction enhancement applied after the court determined that the defendant threatened to kill a potential witness).

Finally, at the time of the tweet, Mr. Whiteside was not even a government witness. On April 1, 2019, several days before the tweet was published, the defense was provided

the government's "Victim & Witness List[.]" This list included 37 individuals, but Hassan Whiteside was not referenced as a victim or witness. [Exhibit Z]. Further, Mr. Whiteside was not a witness at the first trial. The two level obstruction enhancement should not be applied to increase defendant's sentence based on his conduct affecting a non-witness. Accordingly, the two level obstruction of justice enhancement is inapplicable.

### D. Substantial Financial Hardship

If the offense "resulted in substantial financial hardship to one or more victims," the district court is directed to increase the offense level by two levels. §2B1.1(b)(2). The Court is directed to consider a variety of factors: whether the offense resulted in the victim being insolvent, filing for bankruptcy, suffering a loss of a retirement, education, or other savings funds, making substantial changes to employment or living arrangements, and suffering substantial harm to his ability to obtain credit. §2B1.1, *Application Note 4(F)(i)-(vi)*. The term *substantial* indicates "considerable" or "to a large degree[.]" *United States v. George*, 949 F.3d 1181, 1184 (9th Cir. 2020), *quoting Toyota Motor Mfg., Inc. v. Williams*, 534 U.S. 184, 196 (2002). Whether a loss has resulted in a substantial loss for the purposes of the enhancement "'will, in most cases be gauged relative to each victim,' and '[t]he same dollar harm to one victim may result in a substantial hardship, while for another it may be only a minor hiccup.'" *Id.* at 1185. The substantial financial harm enhancement has also been "interpreted to impose a causation requirement." *George*, 949 F.3d at 1187. The government must establish both but-for causation and proximate causation. *Id.* at 1187. But-for cause of harm is "anything without which the harm would not have happened." *Id.* However, proximate causation "is a more restrictive requirement that excludes some of the improbable or remote causal connections that would satisfy a pure but-for cause standard." *Id.* The PSR identified three victims who suffered substantial financial hardship. [PSR ¶ 98]. However, based on the following, this enhancement is inapplicable.

### 1. *Geoffrey Johnson*

As addressed above, defendant objects to the factual findings used to justify this

specific offense characteristic. [PSR ¶98]. These factual objections are addressed individually above. *See, e.g.* PSR Objection Nos. 16, 33.

When defendant met Mr. Johnson, Mr. Johnson had no means of paying his living expenses and was in jail. [Tr. 7/22/21, Vol. 1, p. 90]. Mr. Johnson had been cut off from his family's financial support. [*Id.* at 89, 99-100]. Defendant (alongside Mr. Johnson's criminal defense counsel who defendant retained) managed to have Mr. Johnson released jail and arranged for him to have a place to live. [*Id.* at 90]. Defendant paid his bills when no one else would. Indeed, Mr. Johnson agreed that over the last ten years, there was no other individual who paid more of his bills and supported him financially than defendant. [Tr. 7/22/21, Vol. 2, p. 36]. This included the three years before defendant obtained the settlement for Mr. Johnson, during which defendant supported Mr. Johnson and paid nearly all of his living and medical expenses. Defendant did not cause Mr. Johnson *substantial* financial harm for the purposes of §2B1.1(b)(2).

### 2. *Alexis Gardner*

As described above, defendant objects to the factual findings used to justify this enhancement. [PSR ¶ 99]. Many of these factual objections are addressed individually above. *See, e.g.* PSR Objection Nos. 19, 22.

When defendant and Ms. Gardner were introduced, Ms. Gardner was living in her car, with no one willing to pay her bills or assist her. Defendant immediately arranged for Ms. Gardner to stay at a hotel that evening and then found her an Airbnb before more permanent housing (*i.e.*, an apartment) was arranged by defendant (at a cost to defendant over $56,000). [Tr. 7/30/21, Vol. 2, p. 49-51]. Ms. Gardner repeatedly told defendant that she was much better off than when they met. In November 2018, Ms. Gardner wrote to defendant, "I'm so thankful for you and how you came into my life and changed it for the better." [*Id.* at 26 (emphasis added)]. On another occasion, Ms. Gardner wrote to defendant, "Hassan hasn't been compliant, but at best, I have a million times more than I started with when we met at Starbucks, and that's more than enough to be excited about." [*Id.* at 36 (emphasis added)]. At the time of trial, it did not appear as if Ms. Gardner was

38

financially destitute - she was living in a luxurious high rise building in downtown Los Angeles equipped with a pool, cabanas, private cinema, fitness center, business center, and a concierge service, presumably as a result of the additional monies ($250,000) she received from the settlement defendant obtained for her. *See,* [metropolislosangeles.com].

Ms. Gardner's inability to pay her bills was not caused by defendant, but was instead a pre-existing issue. Further, Ms. Gardner's housing challenges were not caused by defendant's conduct. Instead, the evidence shows that personal struggles she faced with a man she was living with caused her to relocate. Although Ms. Gardner suffered financial harm, she did not incur *substantial* financial harm that was actually and proximately caused by defendant's misconduct.

### 3. Gregory Barela

As described above, defendant objects to the factual findings used to justify this enhancement. [PSR ¶ 100]. These factual objections are addressed individually above. *See, e.g.* PSR Objection No. 23.

During the relevant period and prior to meeting defendant, Mr. Barela engaged in several business ventures. As a result of the nature of Mr. Barela's entrepreneurial work, the testimony at trial showed that Mr. Barela was tight on cash and struggling to pay his bills long before he met defendant. Even before any settlement was reached, Mr. Barela needed money to repay loans, pay credit off cards, pay his criminal restitution order, and maintain his business ventures. However, Mr. Barela's financial condition never arose to a substantial financial hardship caused by defendant.

Defendant takes responsibility for his misappropriation of funds to Mr. Barela's detriment. However, Mr. Barela did not suffer permanent financial harm due to defendant's conduct. Defendant provided Mr. Barela with what he called "advances" on multiple occasions to cover his living expenses. Mr. Barela did not declare bankruptcy, become insolvent, lose his retirement or other savings fund, or make any changes to his residence or employment as a result of defendant's conduct. Quix, the primary business to which Mr. Barela needed funds to allow the company to stay afloat, remained active and

39

a source of Mr. Barela's income at the time of the first trial according to Mr. Barela. Further, Mr. Barela received the additional $300,000 due him under the settlement defendant obtained. Defendant did not cause Mr. Barela *substantial* financial harm for the purposes of §2B1.1(b)(2).

### E. <u>Sophisticated Means & Abuse of Position of Trust</u>

Pursuant to §2B1.1(b)(10)(C), if the offense "involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means. . ." then the Court is instructed to increase the offense level by two levels. The Guidelines defines *sophisticated means* as an "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense…Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means." §2B1.1, *Application Note* 9(B). *See also, United States v. McLaughlin*, 203 Fed. Appx. 891, 893 (9th Cir. 2006)(unpublished)("Although the PSR stated that [defendant] deposited client funds into a separate, private account in her name and that she lied to her law-firm partners about the status of cases, these facts alone do not indicate that her concealment was carried out in a particularly sophisticated manner."). Defendant objects to the use of a sophisticated means enhancement here. [PSR ¶ 109].

First, defendant objects to many of the statements that make up the factual basis for the sophisticated means enhancement. These factual objections are addressed individually above. *See, e.g.* PSR Objection Nos. 14, 20, 21, and 37.

Second, the conduct at issue in this case is not at all sophisticated and instead is no different than many other fraud schemes. Defendant misappropriated legal fees to which he was not entitled. After obtaining settlement funds on behalf of his clients, he used a portion of the funds that did not belong to him and concealed his conduct from his victims through lies. The conduct is very straightforward, does not employ the use of offshore accounts, did not involve fictious entities, and did not employ any corporate shells.

Third, an enhancement pursuant to §3B1.3 is more appropriate here (*i.e.*, Abuse of

40

Position of Trust or Use of Special Skill). Lawyers are clearly included as a class of people who possess "a skill not possessed by members of the general public and usually requiring substantial education, training or licensing." §3B1.3, *Application Note 4*. However, "[t]his adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic." §3B1.3. The application of both the sophisticated means specific offense characteristic and the abuse of position of trust or special skill adjustment is violative of §3B1.3's directives. Although some courts have determined that both enhancements apply, the government under similar circumstances has correctly chosen not to seek both the sophisticated means special offense characteristic and the abuse of position of trust or special skill adjustment. *See, e.g., United States v. Layfield*, CDCA Case No. 18-Cr-00124; *United States v. Myers*, D. Ak. Case No. 12-Cr-097-RRB; *United States v. Hall*, CDCA Case No. 16-Cr-00132-CJC. <u>Further</u>, in the most recent *Daniels* matter, the 2022 PSR recommended that the district court apply the special skill or abuse of position of trust adjustment but made no such recommendation regarding sophisticated means.

Finally, the application of both the adjustment and the special offense characteristic would violate the Guidelines unequivocal ban on *impermissible double counting*. Impermissible double counting occurs "where one part of the U.S. Sentencing Guidelines Manual is applied to increase a defendant's punishment on account of a kind of harm that has already been fully accounted for by the application of another part of the U.S. Sentencing Guidelines Manual." *United States v. Reese*, 2 F.3d 870, 895 (9th Cir. 1993), *see also,* Bowman III, *supra, Sentencing High-Loss Corporate Insider Frauds After Booker*, at 170 ("Judges should be particularly sensitive to the Commission's failure to consider adequately the cumulative effects of a number of closely correlated sentence enhancements that cluster in cases of high -loss fraud by corporate officers."). The conduct underlying this enhancement is used to substantiate a more appropriate and narrowly tailored sentencing enhancement, the abuse of position of trust/special skill. The application of both punishes defendant for conduct fully accounted for by that

enhancement. Accordingly, the sophisticated means enhancement is inapplicable.

F. Misrepresentation During Bankruptcy Proceeding

If it is determined that the defendant's offense involved "a misrepresentation or other fraudulent action during the course of a bankruptcy proceeding" the district court is instructed to increase the offense level by two levels. §2B1.1(b)(9)(B). The enhancement is inappropriate for at least the following reasons: (a) the PSR fails to show a contemporaneous legal obligation on behalf of defendant to disclose the information; (b) the PSR misstates which clients were actually represented by the firm that was in bankruptcy as opposed to another of defendant's firms or him individually; and (c) at all relevant times, defendant relied on the advice of legal counsel in connection with the bankruptcy and his filings, representations, and conduct. Further, as set forth above, defendant objects to any use of this enhancement or associated judicial fact finding as violative of his rights under the Constitution, due process, and right to a beyond a reasonable doubt burden of proof before a jury.

G. Vulnerable Victim

Pursuant to §3A1.1(b)(1), "if the defendant knew or should have known that a victim of the offense was a vulnerable victim, increase by 2 levels." A *vulnerable victim* is "unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly suspectable to the criminal conduct." §3A1.1, *Application Note 2*. Vulnerable victims are "those who are in need of greater societal protection" or "when targeted by a defendant, render the defendant's conduct more criminally depraved." *United States v. Wetchie*, 207 F.3d 632, 636 (9th Cir. 2000)(emphasis added)(internal citation omitted). Whether an individual victim is vulnerable is "*not* measured against the general population." *United States v. Backman*, 817 F.3d 662, 670 (9th Cir. 2016). Instead, "an 'unusually vulnerable victim is one who is less able to resist than the typical victim of the offense of conviction.'" *Id., quoting United States v. Castaneda*, 239 F.3d 978, 980 (9th Cir. 2001). The PSR determined that a two level increase is applicable as a result of defendant's representation of Mr. Johnson. [PSR ¶ 110-13].

42

First, defendant objects to many of the factual findings underlying the PSR's determination here. *See, e.g.,* PSR Objection Nos. 16, 33. Long before any settlement was reached, for three years, defendant provided Mr. Johnson with live-in medical facilities, arranged his release from jail and retained his counsel, provided him with living expenses, and gave him access to the company credit card. Mr. Johnson testified that during the relevant time period, no individual paid more of his bills and supported him financially than defendant. [Tr. 7/22/21, Vol. 2, p. 36]. In addition, the vulnerable victim enhancement is not a means of punishing defendant for his efforts to conceal his scheme. The purpose of the enhancement is focused on the victim and whether that victim is more susceptible to the scheme than a similarly situated individual.

Second, the victims here were no more vulnerable than any other individual who fell victim to a scheme to which their legal counsel misappropriated a portion of client funds. The nature of the attorney-client relationship allows for an inherent inequitable power dynamic wherein the client relies on the representations of his counsel and trusts his or her knowledge and experience. The Guidelines punish the abuse of this relationship by way of the special skills enhancement. There is nothing about the victims in this case that make Mr. Johnson, Mr. Barela, Ms. Gardner, or Ms. Phan more vulnerable than any other intended victim of a similar scheme. Nor is there any evidence that defendant targeted any victim because of any alleged vulnerability. Although Mr. Johnson was physically paralyzed as a result of his suicide attempt and independently suffered from mental health issues, these conditions did not make him any more suspectable to be taken advantage of by an attorney than a similarly situated plaintiff. Mr. Johnson was no more vulnerable to a scheme to defraud than another other client pursuing a serious personal injury case.

Finally, defendant did not solicit or target any of the clients at issue in this case. They all came to him and were anxious to have him represent them. Thus, the vulnerable victim enhancement is inapplicable.

## VIII.   CONCURRENT SENTENCING

Defendant requests that the Court determine that he is entitled to concurrent treatment of the sentence here to the sentences imposed in the Southern District of New York. Pursuant to § 5G1.3(b), if a defendant has a term of imprisonment that resulted from another offense that is relevant conduct, the court "shall adjust the sentence for any period of imprisonment already served on the undischarged term of imprisonment if the court determines that such period of imprisonment will not be credited to the federal sentence by the Bureau of Prisons; and, the sentence for the instant offense shall be imposed to run concurrently to the remainder of the undischarged term of imprisonment." (emphasis added). Given the overlap in time, the similar modus operandi, and the financial nature of the *Nike* and *Daniels* convictions as compared to Counts 5, 8, 9, 10, and 19, not to mention the manner in which defendant was charged (three cases within 62 days), defendant asserts that the Guidelines require that the sentences run concurrently.

However, should the Court find that concurrent treatment is discretionary, defendant requests that the Court exercise that discretion here. *See, e.g.*, *Setser v. United States*, 132 S. Ct. 1463, 1468 (2012); *See also,* 5G1.3(d).

## IX.   DEFENDANT'S PROPOSED SENTENCING CALCULATION

Defendant agrees that the base offense level for the wire fraud offenses is 7. §2B1.1(a). Defendant maintains that the loss amount is between $1,500,000 and $3,500,000. As a result, the base offense level shall be increased by 16 levels. §2B1.1(b)(1)(I). Defendant anticipates that the Court may apply four levels of enhancements resulting in offense level of 27. Defendant maintains that at this level, the tax count would result in no additional points. Defendant respectfully requests that the Court then reduce the adjusted offense level by three levels for acceptance of responsibility for a total net offense level of 24.

## X.   CONDITIONS OF SUPERVISED RELEASE

The Court is permitted to impose a term of supervised release along with conditions that are related to the nature and circumstances of the offense. 18 U.S.C. § 3583.

44

Conditions must be "reasonably related to the goals of deterrence, protection of the public, or rehabilitation of the offender, taking into account the offender's history and personal characteristics, and involve no greater deprivation of liberty than is reasonably necessary for the purposes of supervised release." *United States v. Watson*, 582 F.3d 974, 982 (9th Cir. 2009), *quoting United States v. Goddard*, 537 F.3d 1087, 1089 (9th Cir. 2008). It is the government's "burden of showing that these statutory standards are met." *Id.*, *citing United States v. Stoteau*, 524 F.3d 988, 1002 (9th Cir. 2008). Defendant objects to proposed conditions 2, 4, 5, 8, and 9, as overly broad and unduly oppressive and restrictive, and requests that the Court compare the proposed conditions here to those imposed in the *Nike* matter and impose consistent conditions. [Exhibit AA].

## XI.   CONCLUSION

Based on the foregoing, defendant respectfully requests that the Court impose a sentence of no greater than seventy-two (72) months in prison, to be served concurrently with both sentences previously imposed, followed by three (3) years of supervised release.

Dated: October 14, 2022                         Respectfully submitted,

                                                 /s/ Michael John Avenatti

                                                MICHAEL JOHN AVENATTI

45

## **CERTIFICATE OF SERVICE**

I, H. Dean Steward, am a citizen of the United States, and am at least 18 years of age. My business address is 17 Corporate Plaza, Suite 254 in Newport Beach, California. I am not a party to the above-entitled action.  I have caused, on October 14, 2022, service of the:

DEFENDANT'S SENTENCING MEMORANDUM AND OBJECTIONS TO THE PSR on the following party, using the Court's ECF system:

AUSA RANEE KATZENSTEIN AND AUSA BRETT SAGEL

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 14, 2022

/s/ H. Dean Steward
H. Dean Steward

46