**EXHIBIT A**

# Criminal Conduct, Offense and Guideline Chart

| Criminal Conduct | Offense Level Before Any Reduction for Acceptance | Guideline |
|---|---|---|
| Selling or buying a child for use in the production of pornography. | 38 | § 2A1.2 |
| Second degree murder. | 38 | § 2A1.2 |
| Voluntary manslaughter. | 29 | § 2A1.3 |
| Successful extortion of $1 Billion by threatening to kill a woman and her family. | 27 | § 2B3.2 |
| Committing a home invasion robbery by brandishing a gun and using restraints against a family, and absconding with $100 million in art, collectibles, and cash. | 34 | § 2B3.1 |
| Trafficking in over 600 images of child pornography involving an infant or toddler that portray sadistic conduct or depictions of violence. | 33 | § 2G2.2 |
| Sex trafficking of a child aged 12. | 24-34 | § 2G1.3 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT B

| Case Name/Number | Description of the Case | Loss Amount | Sentence |
|---|---|---|---|
| *United States v. Harvey Newkirk*, 14-Cr-534-JSR (SDNY) | Defendant was an attorney convicted of wire fraud after a jury trial. He was acquitted of conspiracy and aggravated identity theft. He defrauded lenders of millions of dollars. His skills as an attorney were critical to the fraud and the government claimed that his crime was marked by lies to his law firm and victims. | Government alleged $37,400,000 | 6 months |
| *United States v. Joseph Farkas*, 18-Cr-340-LGS (SDNY) | Defendant Farkas was charged with four counts including conspiracy to commit securities fraud, securities fraud, conspiracy to commit wire fraud, and wire fraud. The government alleged that he participated in a scheme to defraud victims out of money after telling them to cumulatively invest more than $25 million in a cryptocurrency production company, which he and his co-conspirators created. In order to lure investors, he misrepresented the nature of the business, the members of the executive team, and represented false partnerships with large companies such as Visa or Mastercard. | Probation determined $25,000,000-$65,000,000 | 12 months, 1 day |
| *United States v. Jonathan Smith*, 21-Cr-00272-JFW (CDCA) | Defendant Smith pled guilty to wire fraud in connection with a scheme wherein he was the CEO of two Hollywood production companies. He fraudulently obtained a $2,000,000 loan using fabricated documents and misrepresenting the companies' finances. | At least $2,000,000 | 12 months, 1 day |
| *United States v. Evan Greebel*, 15-Cr-637-KAM (EDNY) | Defendant Greebel was a former attorney and partner of a New York law firm who served as outside counsel for a biopharmaceutical company. He engaged in a conspiracy wherein he stole millions of dollars in cash and stock from the pharmaceutical company by manipulating the price of the stock and trading high volumes of stock. The government argued that he leveraged his skill as an attorney and violated his ethical duties owed to his client. Defendant was ordered to pay $10,447,979.00 in restitution. | Government alleged >$10,447,979 | 18 months |

1

| Case Name/Number | Description of the Case | Loss Amount | Sentence |
|---|---|---|---|
| *United States v. Alice Belmonte*, 16-Cr-260-DRH (EDNY) | Defendant Belamonte was a former and disbarred attorney who was convicted in connection with a wire fraud scheme wherein it was alleged that she stole $2 million from victims. These victims believed they were providing her with money in order to invest the funds in real estate. Even after being disbarred, she held herself out as an attorney and continued the scheme. The victims' funds were never invested in real estate, and they never received funds back. | $2,000,000 | 24 months |
| *United States v. Martin Weisberg*, 8-Cr-347-NGG (EDNY) | Defendant Martin Weisberg, a former corporate partner in an international law firm was charged after it was alleged that he took money from one of his client's escrow accounts, advised the client that the funds could not accrue interest and then diverted the interest from the $30,000,000 escrow account for himself. | Probation determined $55,000,000 | 24 months |
| *United States v. Julian Garcia*, 15-Cr-02820-BAS (SDCA) | Defendant pled guilty to conspiracy to commit honest services mail fraud and health care fraud. He was charged in connection with a massive kickback scheme involving Workers' Compensation. The Court determined at Defendant Garcia's sentencing that the lost amount was between $3,500,000 to $9,500,000. | $3,500,000-$9,500,000 | 33 months |
| *United States v. Scott Allensworth*, 21-Cr-00216-JAK (CDCA) | Defendant Allensworth pled guilty to wire fraud in connection with his role as the owner and CEO of Capital Growth Group Associates, which provided financial services to clients. He misled his clients to invest in a brokerage account, which would limit their losses and generate monthly returns. He did not invest the funds as promised and instead used a portion of the funds for his own personal expenses. He provided lulling payments disguised as monthly returns and also provided false account statements to his victims. As a result of the scheme, Defendant Allensworth and Co-Defendant Weddle caused loss to more than 50 victims. Co-defendant Weddle pled guilty to wire fraud and was sentenced to 41 months in prison. | Government alleged $2,321,000 | 33 months |

2

| Case Name/Number | Description of the Case | Loss Amount | Sentence |
|---|---|---|---|
| *United States v. David Kaplan*, 19-Cr-00237 (D. Co.) | Defendant Kaplan was charged with seven counts of securities fraud, thirty-five counts of wire fraud, eight counts of mail fraud, and eighteen counts of money laundering (seventy-one total counts). It was determined that Mr. Kaplan alongside two co-defendants conspired to obtain approximately $12 million from investors promising risk-free offshore investments. Using his position as an attorney and his trust accounts, he gained the trust of investors and led clients to believe that their money was being held. He also paid his clients occasional lulling payments. | $3,500,000 - $9,500,000 | 36 months |
| *United States v. Michael Godfree*, 19-Cr-00242-JAK (CDCA) | Defendant Godfree pled guilty to wire fraud in connection with a scheme where he defrauded his victim purchasers into buying "ancient slag" that he said could be used to extract precious metals from the slag. He also represented that there was a process/technology that would soon be available to extract the slag. The government argued that the slag was nothing more than worthless dirt. Not a single person saw return on their investment. The scheme involved over 100 victim-purchasers. | $8,336,965 | 36 months |
| *United States v. Efstratios Argyropoulos*, 18-Cr-00039-GW (CDCA) | Defendant pled guilty to wire fraud. He was charged in connection with a scheme where he was the president of a financial services firm. He represented that he had access to investment opportunities that would provide high rate of return. He misled investors by telling them he would pool investors' funds to purchase stocks in well-known companies. He used their funds for other uses. He also actively sought out victims by meeting them at church gatherings to develop relationships. He was charged in connection with misleading 130 victims. | Government alleged >$4,121,461.04 | 36 months |
| *United States v. Schlomo Schmuel*, 19-Cr-3006-BAS (SDCA) | Defendant Schmuel was a licensed doctor. He paid and recovered kickbacks and bribes in connection with a referral scheme involving patients and medical procedures. He pled guilty to conspiracy to commit honest services fraud. He agreed to a base offense level of 6, a loss between $3.5 - $9.5 million, as well as three levels of enhancements due to loss over $1 million involving a government health care program, sophisticated means, and abuse of a position of trust. | Government alleged $9,486,713 | 37 months |

3

| Case Name/Number | Description of the Case | Loss Amount | Sentence |
|---|---|---|---|
| *United States v. Richard Gaffey*, 18-Cr-693-RMB (SDNY) | The defendant was an accountant who was convicted of wire fraud, conspiracy to commit tax evasion, and aggravated identity theft. Acting within his capacity as an accountant, He helped his clients evade taxes by hiding ownership of offshore shell companies assets contained within these companies. He also helped with setting up bank accounts for those shell companies exceeding tens of millions of dollars. The government claimed that the loss amount to the U.S. Treasury exceeded 3.4 million dollars. | Government alleged >3,400,000 | 39 months |
| *United States v. Fermin Iglesias*, 16-Cr-00131-BAS-1 (SDCA) | Defendant Iglesias and his codefendants operated a patient capping scheme where the found individuals willing to file Workers' Compensation claims against their employers. Using a network of attorneys, physicians, and medical goods providers, they recruited patients and forced the patients to work within this network of individuals within the scheme. The professionals in turn received kickbacks payments from each other. The entire scheme involved more than $200,000,000. | ~$9,500,000 | 42 months |
| *United States v. Lobsang Dargey*, 17-Cr-001-RSL (WDWA) | Defendant Dargey was a real estate developer who pled guilty to defrauding investors, federal regulators and institutional investors. Dargey recruited numerous international investors to fund developments through a program that would allow for the investors to then qualify for residency. He represented that he was investing funds in compliance with this federal program but instead he used the funds for impermissible purposes not allowed under the federal program and deprived the victims of what they believed to be a path towards citizenship. | $24,242,220 | 48 months |
| *United States v. Raghavender Reddy Budamala*, 22-Cr-00077-ODW (CDCA) | Defendant pled guilty to bank fraud and money laundering in connection with a scheme where he formed three shell companies with no operations and submitted applications to take advantage of federal programs designed to help companies through the economic turmoil caused by Covid-19 (i.e., PPP loans). The SBA and banks funded six of the loans and caused a disbursement of $5,151,497. He applied for several of the loans to be forgiven and represented that he used the funds entirely for payroll, when in reality, he used the funds for personal expenses inclusive of an investment property in Eagle Rock, a property in Malibu and another personal residence in Irvine. He had also attempted to abscond to Mexico. | $5,151,497 | 48 months |

4

| Case Name/Number | Description of the Case | Loss Amount | Sentence |
|---|---|---|---|
| *United States v. Stephen Gordon*, 15-Cr-116-RSM (WDWA) | Defendant Gordon pled guilty to wire fraud. Over the period of six years, Gordon solicited investments and loans from individuals promising a high rate of return, indicative of a Ponzi scheme. Defendant Gordon agreed that at least 30 individuals suffered financial losses of at least $4,000,000 as a result of this scheme. | At least $4,000,000 | 50 months |
| *United States v. Steven Brown*, 20-CR-381-PSG (CDCA) | Defendant Brown pled guilty to wire fraud in connection with a scheme where he ran a consulting and investment company despite not being a registered broker or dealer in securities. He induced investors by promising a monthly payout. He represented falsely that he had experience investing in the foreign exchange currency trading and had routinely made profitable trades. He instead used investor funds in large part for other personal purposes and routinely gave them some recurring "lulling" payouts. He caused losses of over $3 million to 48 victims. | Government alleged >$3,000,000 | 51 months |
| *United States v. Steven Michael Banks Hubbard*, 19-Cr-00399-CAS (CDCA) | Defendant Hubbard operated a scheme in which he gained control of other people's checking accounts to make phony fraud loss claims. Over the period of over four years, he deposited funds into the account, he would then withdraw the funds from the account via an ATM, and then he would pose as the account holder to report that the funds had been stolen. Wells Fargo would then grant a provisional credit to the account and then he would remove that money as well. This scheme involved more than 900 bank accounts. | Government alleged >$2,400,000 | 51 months |
| *United States v. Richard Finger*, 11-Cr-382-RSM (WDWA) | Defendant Finger previously worked at a Seattle brokerage firm. He misrepresented the success of investments made by his numerous clients. He also transferred funds from the brokerage accounts to his personal account for his personal use. | Government alleged "close to" $7,000,000 | 54 months |
| *United States v. Akram Alrahib*, 21-Cr-00185-WBS (EDCA) | Defendant Alrahib pled guilty to conspiracy to commit mail fraud and was ordered to pay $10 million in restitution after he agreed that he led two conspiracies where he distributed non-cigarette tobacco products without collecting the required tax. The government determined that the defendant cost the State of California over $10 million in tax revenue. His plea agreement called for a loss amount over $9,500,000, the sophisticated means enhancement, an obstruction of justice enhancement, as well as +4 for role in the offense. Defendant was also charged separately in the Southern District of Florida (19-Cr-21065), which resulted in a | >$9,500,000 | 60 months |

5

| Case Name/Number | Description of the Case | Loss Amount | Sentence |
|---|---|---|---|
| | sentence of 60 months. The California matter was ordered to be served concurrently with the Florida case. Restitution was ordered in the amount of $10,039,126. | | |
| *United States v. John Steele,* 16-Cr-00334 (D. MN) | Defendant John Steele, while an attorney, executed a scheme to obtain millions of dollars by threatening copyright lawsuits against individuals who downloaded pornography from websites that he had surreptitiously lured them to through file sharing websites. Defendant created sham entities, lied to state and federal courts in filing fraudulent lawsuits and secured subpoenas to obtain victims' information. When questioned about defendant's scheme in open court, he lied and caused others to lie to judicial officers to conceal the scheme. In his plea agreement, he agreed that the offense involved 10 or more victims, he engaged in sophisticated means, he took an aggravating role, he abused his position of trust, and he obstructed justice. | $1,500,000-$3,500,000 | 60 months |
| *United States v. Thul Van Le,* 18-Cr-00119-RGK (CDCA) | Defendant Le was a former pharmacist who owed a Pharmacy in Corona. He pled guilty to health care fraud. He pled guilty to a scheme where his pharmacy submitted more than $13 million in bogus claims to Tricare and AmPlan and paid marketers kickbacks with a portion of the reimbursement he received from Tricare. | Restitution set at $10,982,759 (Tricare) & $768,488 (AmPlan) | 70 months |
| *United States v. William McFarland,* 17-Cr-00600-NRB (SDNY) | Notorious Defendant McFarland was charged and pled guilty in connection with two separate schemes whereby he defrauded and misled thousands of people, promising a luxurious music festival ("the Fyre Festival") located in the Bahamas. He also induced investors by claiming that he had investment promises from capital firms, had earned millions in talent bookings, and provided them false documentation. | Government alleged >$26,000,000 | 72 months |
| *United States v. Peter Heinrich Conrad Reinert,* 15-Cr-0035-JLS (CDCA) | Defendant and former attorney Reinert pled guilty to a single count of wire fraud. The government alleged that Defendant Reinert operated three schemes wherein he created a false product that promised to highly increase gas mileage, claimed to be developing a technology that guarded against counterfeiting and could be used on state ID cards, and told victims that he ran a company that converted used tires to oil. He falsely told victims that he was a Secret Service agent, a U.S. Marine, and had business ties with Tesla and General Electric. He lured funds from victims, claiming the monies would be used to develop the technology, but instead used the funds for personal expenses. | $3,500,000 - $9,500,000 (Government alleged >$7,000,000) | 78 months + was granted early release to home confinement. |

6

| Case Name/Number | Description of the Case | Loss Amount | Sentence |
|---|---|---|---|
| *United States v. Michael Sweaney*, 20-Cr-00159-JLS (CDCA) | Defendant Sweaney pled guilty to wire fraud after his company used high pressure tactics to raise more than $9.5 million. He lied to investors by telling them that his company had utilized a technology that generated three times more electricity than other types of solar panels. The technology, referred to as Nanopanel, did not exist. Instead of using the investors' funds for the company and manufacturing the technology, he used it on himself and his lavish lifestyle. | Government alleged $9,771,052.80 | 78 months. |
| *United States v. Robert Cirillo*, 22-Cr-00077-DOC (CDCA) | Defendant Cirillo pled guilty to securities fraud, filing a false tax return and conspiracy to commit wire fraud. He misled more than 100 victims by leading to them believe that he was investing their funds in construction loans that would pay high rates of return. He provided false documentation in support of his lies in the way of fabricated bank statements. He specifically targeted vulnerable members of the Hispanic community. In a separate scheme, which the government referred to as a "grandparent scam," he led a senior into believing that his grandson had been arrested and needed $400,000 for bail. He also filed false income taxes and failed to declare millions in income. | $4,312,710 | 78 months |
| *United States v. Dennis Blieden*, 19-Cr-00399-AB (CDCA) | Defendant Blieden pled guilty to wire fraud and aggravated identity theft. As part of his job with StyleHaul, Inc., he had control over the company's bank accounts. He unlawfully wired company money to his own account to pay for personal expenses, gambling, and to fund his cryptocurrency investments. In an effort to conceal his scheme, he labeled the wire transfers as being authorized payments or equity draws. | $22,669,979.07 | 79 months |
| *United States v. Rhonda Breard*, 10-Cr-081-MJP (WDWA) | Defendant Breard pled guilty to wire fraud. For a period of six years, she worked as an investor who would recommend that her clients liquidate their assets and transfer their funds into what she represented to be more lucrative investments. During this time, she agreed that she defrauded at least 37 individuals out of at least $9.4 million. | Government alleged $11,457,526.45 | 80 months |

7

| Case Name/Number | Description of the Case | Loss Amount | Sentence |
|---|---|---|---|
| *United States v. Martin Shkreli,* 15-Cr-00637-KAM (EDNY) | Defendant Shkreli (aka "Pharma Bro") was found guilty of multiple counts of securities fraud and conspiracy to commit securities fraud. Notorious Defendant Shkreli was the founder of a hedge fund and CEO of a biopharmaceutical company. He was found guilty of making false representations to induce investors to invest in his healthcare hedge fund. He sent investors fabricated performance updates and withdrew funds for his own personal benefit. He also engaged in a conspiracy with Evan Greebel (above), wherein they defrauded investors and potential investors regarding the company Retrophin. Prior to trial, Defendant Shkreli made online threats against Hillary Clinton and was remanded into custody as a result. The government alleged that the offense involved more than 10 victims, employed sophisticated means, he was the leader or organizer, and that he obstructed justice. | Government alleged >$9,500,000 | 84 months |
| *United States v. Aaron Beaird,* 12-Cr-247-RSM (WDWA) | Defendant Beaird pled guilty to multiple counts of wire fraud. He agreed that over the period of six years, he would recommend to clients that they liquidate their investments and transfer assets to a financial product he recommended. Instead of investing the funds as promised, he would use the funds for his own personal benefit. He defrauded at least 11 individuals. | $5,701,943.27 | 84 months |
| *United States v. Donald Lee,* 16-Cr-00415-GW (CDCA) | Defendant Lee proceeded to trial wherein he was found guilty of seven counts of health care fraud and one count of adulteration of a medical device. After trial, he pled guilty to a single count of false declarations in a bankruptcy proceeding. Defendant Lee was a doctor who acted as a Medicare provider and billed for medically unnecessary procedures using inappropriate codes to obtain higher reimbursement amounts. The evidence also established that he reused catheters that were clearly marketed as single use devices, which put his patients at risk of infection and injury. Despite being ordered to stop practicing medicine and surrender his license, he continued to practice medicine and performed invasive procedures, thus putting the patients at considerable risk. | Government alleged $12,476,350 | 93 months |
| *United States v. Adam Joiner,* 19-Cr-00744-AB (CDCA) | Defendant Joiner pled guilty to wire fraud and was additionally penalized for committing an office while on release in violation of 18 U.S.C. § 3147. He pled guilty in connection with a scheme where he acquired $14 million by falsely claiming he would use $14 million to produce a feature film distributed by Netflix. He then diverted the monies for his own personal use and unrelated projects. After signing the original plea agreement, but before sentencing, he sold his Manhattan Beach residence and fraudulently removed the liens his victims had placed on the house by filing false documentation through the use of forged signatures. | Government alleged ~$14,000,000 | 97 months |

8

| Case Name/Number | Description of the Case | Loss Amount | Sentence |
|---|---|---|---|
| *United States v. Ronald Grusd,* 15-Cr-0281-BAS (SDCA) | Defendant Grusd was found guilty of 39 counts of fraud after a jury trial. Dr. Grusd and his companies paid kickbacks in exchange for client referrals from clinics throughout the San Diego and Imperial County areas. He was found to have fraudulently billed over $22 million. During his trial, the district court made a finding that he lied and perjured himself at trial. At sentencing, the district court failed to provide Defendant Grusd with credit against the loss, determined the loss amount exceeded $22,000,000, and concluded that his net offense level was 39. After a successful appeal to the Ninth Circuit, the district court's sentence was vacated, and Grusd was resentenced to a total term of 48 months. | >$22,000,000 | 9 years, 364 days (resentenced to 48 months) |
| *United States v. Charles Sebesta,* 19-Cr-00463-SVW (CDCA) | Defendant Sebesta pled guilty to one count of wire fraud and one count of bank fraud in connection with his work as a chairman of a church. He issued checks and made payments from the church bank accounts to fictitious companies that he created. He also oversaw the sale of a church property for approximately $12,800,000 and diverted a significant portion of the proceeds for his own personal gain. He defrauded the church and numerous vulnerable, elderly members of the church over a ten year period of more than $11 million. | Government alleged $11,438,213 | 130 months |
| *United States v. Robert Benlevi,* 21-Cr-00246-PA (CDCA) | After trial, Defendant Benlevi was found guilty of six counts of bank fraud, six counts of false statements to a financial institution, and four counts of conducting monetary transactions in criminally deprived property over $10,000. Between the period of April 2020 and May 2020, the defendant submitted 27 applications for SBA applications, each seeking $1 million in PPP loans. He made fraudulent representations about the value of each business and the amount of employees and their corresponding payroll. | Government alleged between $9,500,000 and $25,000,000 | 135 months |

9

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT C**



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

**EXHIBIT D**

28



# THE GEORGE WASHINGTON LAW REVIEW

THE GEORGE WASHINGTON UNIVERSITY
2008 G STREET, N.W., 2ND FLOOR
WASHINGTON, D.C. 20052
(202) 676-3868    FACSIMILE (202) 676-3876    E-MAIL. gwlr@gwis2.circ.gwu.edu

Jeffrey A. Wadsworth
*Editor-in-Chief*

Behnaz L. Kibria
*Senior Notes Editor*

Shari Ross Lahlou
*Senior Managing Editor*

Michael J. Puma
*Senior Articles Editor*

Rebecca C. Shore
*Senior Projects Editor*

Amy C. Christensen
*Notes Editor*

Jeremy A. Gans
*Notes Editor*

Cordelia A. Glenn
*Articles Editor*

Richard G. Green
*Articles Editor*

J. Alexander Hershey
*Notes Editor*

Valerie Hinko
*Articles Editor*

Christopher D. Lang
*Managing Editor*

Daniel Lee
*Managing Editor*

Sasha A. Mason
*Articles Editor*

Douglas C. Melcher
*Notes Editor*

Adam J. Schwartz
*Notes Editor*

Amy E. Serino
*Articles Editor*

Oliver A. Taillieu
*Managing Editor*

James W. Thomas, Jr.
*Book Reviews Editor*

Reb D. Wheeler
*Articles Editor*

Matthew C. Zirzow
*Notes & Projects Editor*

July 28, 1998

Dear : Michael

Congratulations on your selection to *The George Washington Law Review*. As you may know, the *Law Review* is a scholarly journal that is published six times a year. We publish Articles, Book Reviews, and student-written Notes that stimulate academic debate, clarify the state of existing law, and propose original solutions to legal problems. We welcome your help in this endeavor.

*Law Review* is a serious commitment. As a second year Member of *Law Review*, you will have both production and writing responsibilities. You will be required to complete three hours of office hours each week as well as a few citechecking files each semester. Each member also is required to write a Case note on a recently released D.C. Circuit opinion and a Note on the topic of your choice. Please see the accompanying letters from Rebecca Shore and Behnaz Kibria for more information about the Case notes and Notes. In all, your *Law Review* responsibilities should require you to spend from twenty to twenty-five hours per week. The first semester of your second year is an especially busy time.

You will, however, be rewarded for your commitment and effort. Your legal writing, researching, and editing skills will improve immeasurably. You will develop your ability to create a detailed and carefully crafted argument. Most important, you will join an organization that will serve you well throughout your legal career. While developing as a lawyer, you also will form new friendships, enjoy a great law school experience, and have fun.

I look forward to meeting you. There will be a *Law Review* orientation beginning, **Tuesday, August 18 at 10:00 a.m. in the Moot Court room**. The orientation will last into the evening on Tuesday and into the mid-afternoon on Wednesday. It is crucial that you attend because orientation serves to familiarize you with what *Law Review* is all about, and what your responsibilities will be. It is also a great way to meet your new colleagues and have some fun before the semester begins.

Again, congratulations on making *Law Review*; it is a distinction that you have earned. I look forward to an exciting and productive year. See you on August 18th!

Sincerely,

Jeffrey A. Wadsworth



The
George
Washington
University
WASHINGTON DC

LAW SCHOOL

April 14, 1997

Michael Avenatti
GW Law School
Washington, DC  20052

Dear Michael,

I am pleased to inform you that, based upon your outstanding performance in the 1997 First-Year Moot Court Competition, you are invited to join the Moot Court Board. As you may know, we are an honor organization composed of individuals who have demonstrated excellence in oral and written advocacy. Your recent achievement in these areas indicates that you would be a valuable addition to the Moot Court Board.

The Board plays a very active role at the law school through our sponsorship of numerous competitions and programs. In addition to hosting first-year and upper-level moot court competitions, we also sponsor teams for interscholastic competitions and publish the only directory of interscholastic moot court competitions in the nation. We are hoping to further expand the scope of our activities in the coming year.

As a member of the Board, you will be asked to assist us in these efforts in several ways. All members serve on one of several committees, assisting the Chair(s) with a variety of substantive and administrative duties. In lieu of serving on a committee, you may wish to seek election for one of the three positions on the Executive Committee reserved for first-year honorees. These three positions - Secretary, Social Chair, and Archivist - will be elected at the last Board meeting of the year.

In addition, all members take an active role working with the Judges and First-Year Competition committees which require full Board assistance during the most hectic times of the year. This participation includes, but is not limited to, timekeeping and coaching responsibilities. Finally, all members must compete in an upper-level moot court competition during their second year. Exceptions are made on an individual basis for those wishing to compete during their third or fourth year.

Board membership is both an honor and a challenge. We hope that you will accept both with the same commitment and dedication that you demonstrated in the First-Year Competition. If you accept our invitation for membership, you will be asked to indicate your committee preferences and pay a nominal membership fee in the Fall.

Our last full membership meeting of the year will be held on **Thursday, April 17, 1997 at 7:50 p.m. In Room LL-101.** The meeting will be quite brief, and will include the election of a new Secretary, Social Chair, and Archivist. It will be followed by a reception to celebrate your success in the First-Year Competition.

Once again, let me congratulate you on your fine achievement and welcome you to the Moot Court Board.

Sincerely,

Liza Korsah
President

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT E**

# THE GEORGE WASHINGTON UNIVERSITY
### WASHINGTON DC

# GW law school

## A MAGAZINE FOR ALUMNI AND FRIENDS

**WINTER 2010**

**PHILANTHROPY**

SEARCH

## features

- An Expert's View on Judicial Review*By Jamie L. Freedman*
- The Power of Pro Bono *By Carrie Madren*
- On the Front Lines of the Financial Crisis*By Ari Kaplan*

## departments

- As Seen by the Dean
- GW Law Briefs
  - GW Law Briefs
  - International Update
  - Faculty File
  - New Faculty
- A Faculty for Writing
- Alumni Events
- Philanthropy
- Alumni Newsmakers
  - Class Notes
  - Working for a Cure
  - Legal Leadership in the Fleet
  - In Memoriam

## GWmagazine

- Home
- Archives
- Subscribe
- Contact Us
  - Letter to the Editor
  - Submit a Class Note
  - Change of Address
  - Contact GW Magazine
- Advertising
- Alumni Association
- Law Alumni Association
- GW News Center

## A Zest for Advocacy



*Michael J. Avenatti, JD '00, established a law scholarship for future trial lawyers enrolled in the part-time evening division program.*

There is nothing faint-hearted about Michael J. Avenatti, JD '00. From aggressively pursuing justice for clients to driving a Porsche 997 professionally for fun, Mr. Avenatti moves full steam ahead.

Mr. Avenatti's vitality also applies to his philanthropy to GW Law. His first gift came in 2000 when the ink on his degree was barely dry. The Michael J. Avenatti Award for Excellence in Pre-Trial and Trial Advocacy is given annually to a member of the graduating JD class for demonstrating excellence in pre-trial and trial advocacy courses. Mr. Avenatti followed this with a gift to renovate the Jacob Burns Moot Court Room, where he participated as a member of GW's Moot Court Board from 1997 to 1999.

Mr. Avenatti's latest donation is a $250,000 endowed scholarship—a five-year pledge for an annual $10,000 scholarship and a $40,000 investment in an endowment. After five years, the endowment's investment income will fund annual scholarships. Recipients of the Michael J. Avenatti Scholarship will be JD students having "diverse undergraduate extracurricular achievements and demonstrated leadership qualities indicating unique potential for becoming an effective trial advocate, with particular emphasis on prior work experience. First preference shall be given to students enrolled in the part time evening division,"

as defined by the award.

"I think students enrolled in evening classes face more challenges," explains Mr. Avenatti, who was a GW Law evening division student. "They are effectively juggling two jobs—their regular day job and law school. The financial aid community sometimes overlooks them because they don't fit the traditional law student profile. This scholarship provides them with another opportunity to receive financial aid."

Mr. Avenatti found GW Law's evening program to be "exceptional and challenging." He particularly enjoyed torts taught by Professor Jonathan Turley and pre-trial advocacy taught by Professor Alfreda Robinson. "This is why I endowed an award to benefit and promote the Pre-trial Advocacy Program. I think it is an outstanding program," Mr. Avenatti says.

Advocacy also spurred Mr. Avenatti to become an attorney. "The desire to be an advocate and speak for others drove me to the legal field. This drive went hand-in-hand with my experience in politics," he says.

Mr. Avenatti's path toward law began after graduating from the University of Pennsylvania in 1996. A job with a political consulting firm run by Rahm Emanuel (now President Barack Obama's White House chief of staff) brought him to Washington, D.C., where he enrolled in GW Law School's evening division. During his stint in politics, Mr. Avenatti worked on more than 100 campaigns nationwide.

Following his GW Law graduation, he joined O'Melveny & Myers as an attorney in his native state of California. The switch to the plaintiff's side came within three years, when Mr. Avenatti joined Greene Broillet & Wheeler. In 2006, he settled a $22.5 million case against accounting giant KPMG, which harmed Mr. Avenatti's client by not discovering a multi-year embezzlement by a chief financial officer. He also settled before trial a $10 million defamation case against Paris Hilton and an idea theft lawsuit against Mark Burnett, the producer of *The Apprentice* reality show.

During work on one case against KPMG for professional malpractice and negligence, Mr. Avenatti teamed with attorneys Michael Eagan and John O'Malley. This collaboration led to establishment in 2007 of Eagan O'Malley & Avenatti. The firm took the unusual move of promoting itself as a contingency firm, with an emphasis on representing businesses in multi-million dollar civil litigation cases.

One of the firm's first victories was an audit malpractice case, which produced a $31.8 million verdict ($40 million with interest) for the plaintiff in late 2008. This past September, the firm announced a class action suit against publicly traded Service Corporation International alleging improper burials and discarding of human remains. Mr. Avenatti is lead attorney on this case and estimates the suit could award in excess of $500 million for the plaintiffs, who are families of the deceased.

With offices in Los Angeles, Orange County, and San Francisco, Eagan O'Malley & Avenatti employs about a dozen attorneys. Mr. Avenatti's practice includes business litigation, trial practice, products liability, and personal injury.

On the personal side, Mr. Avenatti has two interests close to his heart. One is spending time with his daughters, Lauren, 7, and Nicole, 5. The other is auto racing, which he has done since 1992.

Mr. Avenatti considers racing part of his overall philosophy: "Life is meant to be lived; there are no dress rehearsals."

Mr. Avenatti plans to race professionally next year on the American Le Mans circuit, driving a factory prepared Porsche 997. In 2007, he raced at Daytona International Speedway as part of the KONI series—while also donating his car's livery for the race to promote Paul Newman's Hole in the Wall camps for seriously ill children.

Meanwhile, Mr. Avenatti is expanding his support to GW as a new member of the Law School's Board of Advisors. He attended his first meeting this past fall.

"Looking around the room was a rather humbling experience. The breadth of experience and knowledge was pretty staggering. I considered myself lucky to just be in the room," Mr. Avenatti says. "As a board member, I'm hoping to do everything I can to provide the same opportunities for students at GW that I had, and to further grow GW Law School's reputation as one of the premier law schools in the country."

*—Kathleen Kocks*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT F**

**DE ANDA LAW FIRM, PC**
ATTORNEY AND COUNSELOR AT LAW
**PLAZA DE SAN AGUSTIN**
**212 FLORES AVENUE**
**LAREDO, TEXAS 78040**

**Ricardo de Anda**

**TELEPHONE**
956-726-0038

**Email Address**

deandalaw@gmail.com

October 6, 2022

Honorable James V Selna
US District Court Judge
US District Court
Central District of California

Re: Sentencing - Michael Avenatti

Dear Judge Selna,
I am an attorney in private practice with an office located in Laredo, Texas. During the spring of 2018, my office was deeply involved in representing refugee separated families ensnared in the government's infamous family separation policy. It was lonely work as the affected refugees could not afford paying for legal assistance.
In April of 2018,  I received a call from Michael Avenatti, whom I did not then know, volunteering his assistance in my representation of separated families. I explained the drastic situation of my clients, not only being separated from their children while in detention, but, most frighteningly,  being subject to deportation without their children. Michael was in Laredo with an assistant within 3 days after I asked for his help.

Over the next week Michael assisted our office in interviewing clients in detention (mothers), helped locate their separated children, and facilitated phone communications between the mothers and their children. Michael subsequently traveled with me to Phoenix to visit a separated child in government detention. He also worked with me in federal litigation in New York,  which resulted in the release of a child in detention to his by then deported mother, and traveled with me and the child to deliver him to his mother in Guatemala City.

All of this work was done pro bono, at his expense, solely from Michael's heart and care for these families.  He spent a considerable amount of time in this effort, and helped our

office reunite dozens of separated families. I personally saw him break down in emotional tears  when listening to the experience of a separated mother during an interview in detention. I can say your honor, from personal professional experience, that the real and true Michael Avenatti is a caring and respectful man who emphathizeswith the downtrodden.  He deserves mercy, and I ask that the court consider the above in his sentencing.

Sincerely,

Ricardo de Anda
Attorney at Law

Hon. Judge James V. Selna                                                October 10, 2022
U.S. District Court
411 West 4th Street
Santa Ana, CA 92701-4516

RE: Michael Avenatti

Your Honor:

I learned recently that you are presiding over a case against Michael Avenatti and that you will sentence him soon in that case. I am writing now to present my story about Mr. Avenatti, which reveals a side of him that you may not have seen. I have never met Mr. Avenatti and knew nothing of him until I saw him on TV in June 2018, but I have seen a goodness/kindness in him that I hope will not go unrecognized by the court.

On June 17, 2018, I read an article in the New York Times, titled "'I Can't Go Without My Son,' a Mother Pleaded as She Was Deported to Guatemala". It was about a 25-year-old Guatemalan woman named Elsa Ortiz, whose 8-year-old son, Antony, was taken from her shortly after they crossed the border into Texas in May 2018. Two days later she was deported to Guatemala without Antony. I was appalled and shaken by what I read in the article. I began reading other articles about similar cases. "This is not what the country I grew up in does!", I thought. My wife, Tina, and I were scheduled to travel to Guatemala eight days later for a vacation with our son. He was there to treat patients with severe burns from a recent volcanic eruption and had invited us down for a week before he returned to New York. I thought that we might be able to help get some of these children reunited with their parents while we were there." We had seen Mr. Avenatti on CNN, saying that he would represent such cases *pro bono*. I was skeptical, but I sent an email to him directly and called his office to leave a message with his receptionist. We were both surprised and excited when one of his partners called me the next day. I learned later that Mr. Avenatti had forwarded my email to this partner and several others in his firm less than 30 minutes after I sent it, with the short message "We should help here." Tina immediately got on social media to find Elsa and other mothers/fathers who also had their children taken and kept in the U.S. after they were deported to Guatemala. She was able to contact three such families and Mr. Avenatti agreed to represent all of them. His partner sent the papers to be signed. We took them to Guatemala and, with the help of a lawyer there, got signatures from Elsa and Lourdes de Leon. (The third parent already had representation that he was happy with.) Mr. Avenatti and an immigration lawyer in Laredo, Texas, got both children reunited with their mothers. During Antony's hearing Mr. Avenatti offered to personally return Antony to Elsa at his own expense. He did so immediately after the hearing in Dallas. Elsa had a friend video the reunion as the two lawyers and Antony met her in the Guatemala City airport. There were hugs and tears of joy all around. In that video, my wife and I saw a genuine kindness in Mr. Avenatti that we will always admire and appreciate. Elsa is grateful beyond words. She refused to believe it when we told her that Mr. Avenatti had been arrested. In her mind, he is probably the kindest man in the world.

Sincerely,

Randy L. Carter

Professor Emeritus
University at Buffalo

7 de Octubre, 2022

Sr. Juez:

Conocí al abogado Michael en el 2018.  El gobierno americano me detuvo cuando llegué a los Estados Unidos y me iban a deportar.  Antes de deportarme, me quitaron a mi hijo. Él solo tenia seis años.  Me dijeron que cuando llegara a Guatemala, me lo iban a entregar allí en Guatemala.  Llegué a Guatemala y no me lo entregaron. No sabía nada de él.  Nadie sabía nada.  Pedia información y no me podían dar ningún dato de el – ni de donde estaba. Tengo una prima que me ayudó preguntar. Ella se puso en contacto con la cadena de televisión – Univisión. El canal Univisión me puso en contacto con el abogado Michael.  Michael me hacia preguntas y Juan (su asistente) le traducía lo que yo le decía y luego le di como un poder para que me ayudara.

Una vez que supo lo que paso, el abogado empezó hacer llamadas y el me ayudo a encontrar a mi niño. Pasaron varios meses antes de encontrar a mi niño. Lo encontraron en un centro de detención en Nueva York.  Cuando el abogado lo encontró, me consiguió un video de mi niño en ese lugar en Nueva York para que pudiera ver que estaba bien. Y después de eso, me conectaron con el por una videollamada.  El abogado puso los papeles para que me lo devolvieran.  Y fue entonces cuando la trabajadora social que le habían dado a mi niño empezó hablar con migo cada semana para que pudiera verlo y hablar con el.  Me lo devolvieron después de cuatro meses. Me sentía impotente con el niño en los Estados Unidos y yo en Guatemala.

Estoy agradecida por lo que hizo por nosotros el licenciado Michael. No me cobraron por ayudarme encontrar a mi hijo ni por traermelo.  Mi hijo ya tiene dies años, esta bien y estudiando.  Nos trato bien y nos dio fe. Yo se que con la ayuda de dios va salir adelante.

Entiendo que el señor Michael tiene estos problemas y que esta detenido.  Quiero que sepan que el abogado Michael es buena persona con un gran corazón que ayudo a muchas familias que tuvieron el mismo problema que el mio: que les quitaron a sus hijos.  El trabaja duro y va salir adelante.  Ojala que pueda tomar en cuenta lo bueno que hizo en los casos de nosotros. No cualquier persona hubiera hecho eso.

Gracis, Sr. Juez, por sus atenciones.

Lourdes De Leon

[TRANSLATION FROM SPANISH TO ENGLISH]

October 7, 2022

Dear Judge:

I met the attorney Michael in 2018.  The American government detained me when I arrived in the United States and they were going to deport me.  Before they deported me, they took my son from me.  He was only six years old.  They told me that when I arrived in Guatemala, they would return him to me in Guatemala.  I arrived in Guatemala and they did not return him to me.  I didn't know anything about his whereabouts.  No one knew anything.  I would ask for information and they couldn't give me any information about him - not even where he was located.  I had a cousin who helped me ask around.  She contacted the Univision television station.  The Univision network put me in touch with Michael.  Michael asked me questions and Juan (his assistant) would translate what I would say and then I gave him a release so he could help me.

Once he knew what had happened, the attorney began to make calls and he helped me find my son.  It was a number of months before they found my son.  They found him in a detention center in New York.  When the attorney found him, he was able to obtain a video of my son at the place in New York so that I could see that he was fine.  After that, he arranged for him to have a video call with me.  The attorney then filed the paperwork so they could return him to me.  It was then that the social worker they had given my son, started to call me every week so I could see my son and speak to him.  They returned him to me 4 months after they had taken him from me.  I felt powerless with my son in the United States and me in Guatemala.

I am grateful for what the attorney Michael did for us.  They didn't charge me for helping me find my son nor for bringing him to me.  My son is now ten years old, he is fine and is studying. He treated us well and he gave us faith. I know that with the help of God, he will get through this.

I understand that Mr. Michael has these problems and he is in custody. I would like you to know that the attorney Michael is a good person with a great heart that helped many families with the same problems as mine: where they had taken their children from them.  He works hard and will get ahead.  I hope you can take into consideration the good he did in our cases.  Not just any person would have done that.

Thank you Judge for your consideration.

Lourdes de Leon

5 de Octubre, 2022

Estimado Sr. Juez:

He tenido muchas bendiciones gracias al señor Michael.  Estoy donde estoy por la ayuda que nos dio cuando todo esto sucedió - cuando me quitaron a mi hijo.  Fue en el 2018 cuando me detuvieron en Estados Unidos.  Me dijeron que me iban a deportar. Nos habían quitado todo - hasta los zapatos. Estaba en la estación donde nos tenían detenidos y me mandaron a otra sala a recoger nuestros zapatos. Me dijeron que dejara a mi hijo allí.  Cuando volví al cuarto ya se habían llevado a mi niño sin decirme que se lo iban a llevar.  Me dijeron que me lo iban a entregar en Guatemala.

De verdad, de corazón, yo estoy muy agradecida por la ayuda de Michael.  No entiendo por el gobierno nos separo - a mi de mi hijo.  Sin el abogado Michael, no me hubieran devuelto mi hijo.  Yo no podía hacer nada desde Guatemala.  Fue un ángel enviado por Dios.  Michael trabajo incansablemente.  Trabajó muchas horas - aveces hasta muy tarde y siguió luchando para recuperar a mi hijo. Nunca nos cobro nada.  Le estoy muy agradecida.

Me entere que el abogado Michael se encontraba en esta situación - con estos problemas.  Fui notificada por el otro abogado.  Quiero decirle que estoy triste por lo que esta pasando con Michael - incluso tengo ganas de llorar.  Aveces la vida es muy difícil.  El abogado era mi poder. Voy a ser fuerte por el y no sé si cre en Dios, pero le dije a Michael que aunque esté donde está - que no pierda fe.

Ayudaría al abogado si pudiera. Pero voy a rezar por el.  Algún día le agradeceré lo que hizo por mí y por mi hijo personalmente.  Espero que pueda tomar en cuenta lo bueno que fue con nosotros, todo lo que hizo por nosotros y las otras familias. Éramos varios los que teníamos el mismo problema - el de que nos quitaron a nuestros hijos.

Señor Juez, espero que pueda tener esto en cuenta cuando decida qué hacer con Michael.  Ha ayudado a mucha gente y tiene un gran corazón.

Gracias por sus atenciones.

Elsa Ortiz Enriquez

**[TRANSLATION FROM SPANISH TO ENGLISH]**

October 5, 2022

Dear Hon. Judge:

I have had many blessings thanks to Michael.  I am where I am because of the help he gave us when all of this happened - when they took my son from me.  It was in 2018 when I was detained in the United States.  They told me that I was going to be deported. They had taken everything from us - even our shoes.  I was at the detention center and they told me to go to the other room to get our shoes.  They told me to leave my son there. When I returned to the room they had already taken my son without telling me where they were going to take him. They said they were going to return him to me in Guatemala.

Honestly, from my heart, I am very grateful for Michael's help.  I do not understand why the government separated us - me from my son.  Without Michael's help, they wouldn't have returned my son.  I could not do anything from Guatemala.  He was an angel sent by God.  Michael worked tirelessly.  He worked many hours - sometimes late into the evening and he kept fighting to get my son back.  He never charged us anything. I am very grateful.

I learned that the attorney Michael found himself in this situation - with these problems.  I was told by the other attorney.  I would like to say that I am saddened by what is happening to Michael - it makes me want to cry.  Sometimes life is very difficult.  The attorney was my strength. I am going to be strong for him and I don't know if he believes in God, but I told Michael that even though he is where he is - that he should not lose faith.

I would help the attorney if I could.  But I am going to pray for him.  One day I will be able to thank him in person for what he did for me and my son.  I hope you can consider how good he was to us, all that he did for us and for the other families.  There were a number of us with the same problem - where they had taken our children from us.

Judge, I hope you can take this into consideration when you decide what you will do with Michael.  He has helped many people and has a big heart.

Thank you for your consideration.

Elsa Ortiz Enriquez

September 15 ,2022


Hon. Judge Selna:

Please be so kind to read this letter regarding Michael Avenatti.  By way of introduction, I am Rick Kraemer owner of a company which provides in court trial presentation support for litigators in the Southern California legal community since 1986.

I first met Michael shortly after he joined the law firm of Greene, Broillet, Wheeler and Panish in the early 2000's.  He had previously worked at O'Melveny & Myers in Orange County. Over the years we worked closely together on cases where I witnessed Michaels creative talents, tireless work ethic and compassion for his clients. We became close - personally sharing many mutual interests.  He worked tirelessly and we quickly became friends.  He has been a friend ever since.

My Godfather (Catholic) once said to me "Rick, there is good in everyone." I remember his words daily when evaluating and dealing with people from all walks of life. People who know I am friends with Michael ask me why I still communicate with him. I tell them the same thing my grandfather used to say - there is good in everyone. I don't just say that about Michael.  I also say that about other individuals I come across who have also made mistakes in their lives.

Michael always talked about his daughters and their importance to him. Although his daughters lived with Michael's first wife, he saw them regularly and was a devoted father. His son from his second marriage is extremely important to him as well. His family is important to him.

In the past 20 years, I observed Michael's high energy, intelligence, and dedication to his work. Yes, Michael has made mistakes. But as all too often happens, his hard work on behalf of many deserving clients over many, many years is sometimes overlooked.

Your honor, I believe Michael can do good for/in society after his release from his pending sentence.  I believe Michael will give hope to his fellow inmates with his positive attitude and having owned up to his mistakes as he has done.

Hopefully, you will see things as my Godfather did. There is good in Michael to be considered.


Respectfully,

 Rick Kraemer

October 7, 2022


Dear Judge Selna:


I am an Army Veteran.  I served for for three years and was a Sergeant when I was honorably discharged. And I am also a business man and have been for over 50 years.  I met Michael Avenatti around 2004 when my partners and I needed an attorney to represent us.  My business partner introduced us and I immediately liked him.  We had a thriving business, we then partnered with what we now know was a shady company and we ended up in a civil courtroom with Michael Avenatti as our counsel.

I was impressed with how smart Michael was. I appreciated how hard he worked.  He kept us informed on what was going on and was always open and honest with us.  And, he also took on our case knowing if we lost, he would not get paid.  And though we got a $42 million dollar verdict - the judge ended up tossing the verdict and none of us got paid - including Michael.  I get it, things like that happen.  But that didn't change how Michael treated us and it didn't change how hard he worked on other matters he assisted me with.  I also didn't have a problem referring him to others who needed legal help.   Michael was a fighter and I appreciated that – I liked that about him.  He was a good attorney.

Michael was always there for me.  When I was in trouble, I could speak to him honestly and sincerely.  There were no judgments.  He was always up front with me.  And I have kept in touch with him throughout the years – checking in and speaking to him at least once or twice a year.

Michael is a family man like me.  He's Italian. I'm Italian.  He was a perfect gentleman with my family.  I know he cares about his family. What I saw on television was not the Michael that I know.

I understand Michael has made mistakes. He made decisions which put him in this situation. I understand he will no longer be an attorney.  He doesn't take that lightly and it is hard for him.  But, I also know Michael and he will make things right.  He will work hard, do his time and he will find a new path. People make mistakes.  Michael plead guilty and admitted his mistakes.

Your Honor, I hope you will see what we see in Michael.  His life will be completely different after this case. I will be there for Michael when he finishes with his commitment to the court because he is a good person.

I appreciate you taking my letter into consideration.

Best,

Frank Colapinto

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

**EXHIBIT G**

28

# THE WALL STREET JOURNAL.

English Edition ▼ | Print Edition | Video | Podcasts | Latest Headlines

Home | World | U.S. | Politics | Economy | Business | Tech | **Markets** | Opinion | Books & Arts | Real Estate | Life & Work

SHARE





# KPMG Settles Targus Audit Case

*By David Reilly*

March 29, 2006 12:01 am ET

SAVE | PRINT | TEXT

KPMG LLP agreed to pay a former audit client $22.5 million as part of a legal settlement that also calls for a California judge to set aside a sanctions order imposed on the accounting giant last July, according to a person familiar with the matter and documents related to the case.

The settlement terms will allow KPMG to clear the legal record of a disciplinary action that could potentially be used against it by other parties who might sue the firm in the future. Orange County Superior Court Judge Geoffrey T. Glass sanctioned KPMG last summer for obstruction during pretrial proceedings.

The order emanated from proceedings related to a lawsuit brought against KPMG by former client Targus Group International Inc. The California-based computer-case maker sued the firm for malpractice, alleging KPMG's audit failed to spot alleged embezzlement by a former executive that cost the company as much as $50 million.

In settling the case, KPMG had proposed that Targus agree not to oppose a request for Judge Glass to vacate the sanctions order, according to a draft settlement proposal reviewed by The Wall Street Journal. The accounting firm also wanted records related to the case, as well as the sanctions order and its own appeal of that order, sealed, while precluding executives at Targus, or their attorneys, from speaking about or referring to the matter, according to the draft settlement proposal.

In a statement released yesterday, KPMG said: "The parties have reached a settlement. We cannot discuss the terms, which are confidential. We have settled the case to avoid more costly litigation." An attorney for Targus didn't return a call seeking comment. The company's general counsel, Michael Ward, was traveling outside the country and was unavailable for comment.

KPMG's efforts to clear the legal record in regard to the Targus case are an example of how big accounting firms are pursuing every means possible to limit their litigation liability and curtail the ability of clients to bring cases against them.

**Write to** David Reilly at [david.reilly@wsj.com](mailto:david.reilly@wsj.com)



**BUSINESS**

# KPMG settles Targus lawsuit

By **REUTERS** |
March 29, 2006 at 3:00 a.m.

Accounting firm **KPMG LLP** said Tuesday it will pay an undisclosed amount to settle a $50 million malpractice lawsuit brought by former client Targus Group International Inc.

The settlement was reached Tuesday after six months of negotiations between KPMG and privately held Targus, an Anaheimbased maker of computer cases, court officials said.

"We cannot discuss the terms, which are confidential," said KPMG spokesman Tom Fitzgerald.

Targus sued KPMG in 2003 for failing to discover that the company's chief financial officer had embezzled $40 million, according to court documents.

KPMG was Targus' global auditor and business and tax accountant from 1993 to 2001, when William Anthony Lloyd was found to have "utilized the company's credit facilities and cash flow for his personal benefit" and "covered up his activities by creating false and fraudulent entries on the company's books and records," according to court documents.

Lloyd pleaded guilty in 2001 to 15 counts of wire fraud and was sentenced to 37 months in federal prison.

Targus claimed it lost an additional $10 million in related costs.

KPMG said it had relied on false information from its audits and was not aware that anything was wrong, court documents said.

Targus attorney Michael Avenatti declined to comment.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT H



(CBS News) Roxie Williams' family struggled to pay for a proper burial for her father, but years later when she went to find his grave, the headstone was missing. She has no idea where her father is. An investigation found that cemetery workers dug up hundreds of bodies and dumped them in mass graves so they could resell the plots. This Sunday on 60 Minutes, Anderson Cooper investigates big profits and big problems in the burial business.

*The following script is from "Final Resting Places" which originally aired on May 20, 2012. Anderson Cooper is the correspondent. Andy Court, producer.*

Everyday in this country, grieving families spend thousands and sometimes tens of thousands of dollars on funerals, cremations and burials. They often have to make decisions quickly, at a difficult time, without doing much research or reading the fine print on contracts. And while the bereaved may believe they're dealing with mom-and-pop operations that have been in the community for many years, a lot of funeral homes and cemeteries these days are owned by big corporations, part of a multibillion dollar industry known as the "death-care" business.

The nation's graveyards are a lucrative and little-noticed part of the industry. Most of the time they're every bit as orderly and peaceful as they seem. But when things go wrong, they can go very wrong, for many years, without anyone noticing. And for the families involved, it can be a nightmare.

There are more than 40,000 active cemeteries in this country, from small churchyards to sprawling memorial parks owned by big corporations. We think of them as spiritual places, sacred ground. But in the cemetery where Roxie Williams' family buried her father, she can find no peace. She has no idea where her father's body is.

[Roxie Williams: It's row one, and it's lot 16.]

She was 11 when her father was laid to rest here at Burr Oak, an historic African-American cemetery in Cook County, Illinois. Her mother, a nurse, struggled to pay for the burial.

Roxie Williams: It's traditional in our culture to give that last rite. My brother and I ate beans, I mean, we didn't eat because she was so committed to making sure her husband was put down in a decent fashion.

Anderson Cooper: So, buying that headstone was, financially, a big deal.

Roxie Williams: A burden. I mean, a burden.

That was in 1978. Years later, when she came back to visit her father's grave, she couldn't find his headstone. When she demanded an explanation from cemetery staff, she says they acted like she was confused or crazy and threatened to call police if she didn't leave. Roxie Williams, however, wasn't crazy.

In 2009, acting on an insider's tip, the sheriff's department discovered workers at Burr Oak had been removing headstones, digging up coffins and dumping remains in mass graves so they could resell the plots. It soon became apparent an entire community had been deceived. Hundreds of bodies were thrown out over a period of many years - without anybody figuring out what was going on.

Tom Dart: We first came out here we found femurs, skulls, parts of jaws, just laying out in the open.

Anderson Cooper: Laying out on the ground?

Tom Dart: Oh yeah. I mean, we found one right over here.

Cook County Sheriff Tom Dart led the investigation at Burr Oak.

Anderson Cooper: And this was all about greed?

Tom Dart: Oh, absolutely. This was all about greed and overarching that is the fact that these areas are so horribly unregulated it allows for that to happen.

Anderson Cooper: When you say it's unregulated, what do you mean?

Tom Dart: There was no records of anything. There was no records of how many people are supposed to be buried here. We couldn't even find a blueprint of the place. And truly, in any cemetery, do you know underneath the ground who is under there? You really don't know.

What happened at Burr Oak is unusual, but the conditions that enabled it to go on for so long without being detected are quite common. Most states have few licensing requirements, no on-the-ground inspections, not even a hotline consumers can call with complaints.

Josh Slocum: It's sort of the Wild West out there.

Josh Slocum is executive director of the Funeral Consumers Alliance, a nonprofit watchdog group.
Josh Slocum: There isn't much regulation at all. And what is there, is a patchwork.

Anderson Cooper: Aren't cemeteries regulated by the Federal Trade Commission?

Josh Slocum: No. And that is a goal that we have been trying to get achieved for a long time. Since 1984, funeral homes have been regulated by the Federal Trade Commission's funeral rule. You can think of that as a consumer bill of rights at the funeral home. But those rights stop at the cemeteries.

Under that consumer bill of rights, funeral homes are required to provide their customers with a clear price list and other disclosures. Those rules, however, generally don't apply to cemeteries.

In 2004, when Lucy Perez pre-purchased a burial plot at Mt. Olive Cemetery in Chicago for $2,500, she says the salesman told her she'd paid for everything and she believed him. But when her grandson died unexpectedly six years later, she was told the cemetery would not bury him unless she paid an additional $2,550 fee for digging the grave and covering it back up. That was a month's pay for Lucy, and more than she paid for the plot itself.

Anderson Cooper: So, they were charging you $2,500 or about $2,500 for--

Lucy Perez: $2,500 to take out dirt and put it back in.

Anderson Cooper: Did you think about not paying?

Lucy Perez: We did, we started thinking about maybe going to see a lawyer and stuff because it didn't sound right. But we were grieving. You know, we had to get my grandson buried.

Anderson Cooper: So even though you sensed you were being ripped off--

Lucy Perez: Right.

Anderson Cooper: You had--

Lucy Perez: We had no choice.

Mt. Olive Cemetery may look like a local operation, but since 2006 it's been owned by Service Corporation International, or SCI, the largest provider of funeral homes and cemeteries in North America. SCI is known by the brand "Dignity Memorial." Last year the company reported an operating profit of $363 million.

Anderson Cooper: What's your experience been with SCI?

Josh Slocum: They generate a disproportionately large number of the complaints that we get from consumers.

Anderson Cooper: Is that just because they're one of the biggest organizations out there?

Josh Slocum: I don't think so because the complaints are so similar. High pressure sales tactics, misleading or outright dishonest information given to consumers, double-sold plots.

A "double-sold plot" is when the same grave is sold to two different people. That's what happened to Julie Ramirez's family after her father was buried at SCI's Mont Meta Memorial Park in Texas in 2001. The manager wanted to move him over to a different spot.

Julie Ramirez: They wanted--

Anderson Cooper: --exhume your father.

Julie Ramirez: --to exhume Daddy right away. They wanted us to--

Anderson Cooper: In order to give the plots to--

Julie Ramirez: Uh-huh (affirm).

Anderson Cooper: --somebody else.

Julie Ramirez: Yeah, absolutely.

Anderson Cooper: Why not just tell the people who hadn't yet buried their loved one that, "We're gonna have to give you a different plot"?

Julie Ramirez: That was our suggestion. We said, "Look, do not move Dad. Just leave him

*Page 4 of 7*

alone."

The cemetery, however, dug him up and moved him anyway - without the family's
permission.

Julie Ramirez: It just didn't seem fair. That was his final resting place. I can see a person
making a mistake but it's the way they handled it afterwards.

Anderson Cooper: Moving the body without your permission.

Julie Ramirez: Moving the body without our permission like thieves.

Michael Avenatti: I think that this company is driven by profits above all else.

Attorney Michael Avenatti has been investigating SCI-owned facilities all over the country.
One of his biggest cases involves Eden Memorial Park, a large Jewish cemetery north of Los
Angeles.

Anderson Cooper: How much does one plot cost, or can it cost?

Michael Avenatti: One plot at Eden Memorial Park Cemetery may cost upwards of $25,000,
on a per square foot--

Anderson Cooper: Twenty-five thousand? To bury one person?

Michael Avenatti: Twenty-five thousand dollars. The average plot is approximately $8,000.
But when you look at this on a per-square-foot basis, this is some of the most expensive
property in California, if not in the country.

With prices that high, Avenatti says SCI had an incentive to squeeze as many customers in
as possible. In a Los Angeles court, he's presented the testimony of groundskeepers who say
they were ordered to cram new graves so close to old ones they had to break existing burial
containers and throw human remains into the cemetery dump.

[Sands vs. SCI Courtroom preliminary hearing, Elias Medina: About 200 graves are missing
bones.]

The case is still being litigated. It's not the first involving the company. In 2003, SCI agreed
to pay more than a $100 million for the desecration of graves at the Menorah Gardens
cemeteries in Florida. In April, Avenatti was busy gathering evidence against another SCI
cemetery in Florida. Acting on a tip, he put divers in a pond at the edge of the Star of David

Cemetery in North Lauderdale. They found engraved stones and what appear to be parts of
concrete containers used to line graves.

SCI declined to give us an interview. Off-camera, its executives told us the problems that led
to the $100 million settlement at Menorah Gardens began before the SCI purchased the
cemetery, and since then the company has improved its training and procedures. At Star of
David, which SCI acquired six years ago, the company says it's taking the new allegations
seriously but does not believe human remains were dumped in the pond.

At Eden Memorial, where a groundskeeper testified 200 graves are missing bones, the
company says it discovered potential problems with only four graves, and took steps to
notify the families. As for moving Julie Ramirez's father without permission, SCI says that
was against its policy, and it has reached a confidential settlement with the family.

In a statement SCI told us it's "dedicated to providing the highest quality funeral and
cemetery services" and added, "while not perfect...we have consistently raised standards in
this evolving industry."

Paul Elvig: Obviously, as a corporation, they're not gonna have a policy of somehow, "Work
the public over," or, "Screw the public over." They'd be foolish to do that.

Paul Elvig is a former cemetery operator and regulator and a leading spokesman for the
industry.

Anderson Cooper: When you look at what's gone on just over the last two years in a number
of places across the country, I mean, do you ever just say to yourself, "What is goin' on
here?"

Paul Elvig: Well, I put it in perspective to the volume. When you talk about 6,500 burials
and cremations a day, in over 45,000 possibly active cemeteries, when we look at that, it is
very uncommon.

Josh Slocum: I have no problem conceding that most cemeteries aren't digging up bodies.
But there are everyday, ongoing abuses that happen to funeral and cemetery consumers that
are not headline-grabbing, and that desperately need attention. Financial exploitation,
misrepresentations of legal requirements. Pressuring emotionally vulnerable people into
believing that the more they spend the more love and respect that they're showing for
somebody.

Anderson Cooper: Industry representatives say, look, those are isolated incidents.

Josh Slocum: Oh, nonsense. It's not a few bad apples. It's not isolated incidents. It's-- it is embedded in the fabric of the death business in this country.

Paul Elvig: I think any scenario you want to say probably has happened. I don't think it happens on a broad scale, I really don't.

Anderson Cooper: Is there a lack of oversight of cemeteries?

Paul Elvig: No. I can't buy into that general notion there's a lack of oversight. No.

Anderson Cooper: I just don't understand how you can say that. For instance, again, at Burr Oak, hundreds of bodies were dug up and tossed away for years and years and years. If there had been a regulator who came by, any inspector who'd come by, they could've actually found bones.

Paul Elvig: If they knew where to look.

Anderson Cooper: I've been to Burr Oak. And it's not that hard to find if you're walking around.

Paul Elvig: I'm aware of the Burr Oak situation. I do know that inspection in that state seemed to be lax. And I don't think it is now. It's got their undivided attention.

Nearly three years after the Burr Oak scandal, the state of Illinois has adopted new laws, but has yet to hire its first cemetery inspector. The scandal did prompt Illinois Congressman Bobby Rush to introduce federal legislation that would apply the same consumer protections to cemeteries that already exist at funeral homes. But so far, Rush has been unable to find a co-sponsor in the Senate.

[Sheriff: This is the approximate location of the grave.]

With the help of the sheriff's department, Roxie Williams was able to locate the spot at Burr Oak where her father's grave is supposed to be. But she has no idea if he's still in it.

Roxie Williams: If I had the money, I'd exhume this durn body and they'd have to prove my dad was my dad, you know? But sometimes, you just let it go.



**NEWS**

# L.A. cemetery settles lawsuit alleging body dumping

USATODAY

Published 9:39 p.m. ET Feb. 27, 2014

   

LOS ANGELES (AP) — A Los Angeles cemetery has agreed to an estimated $80.5 million settlement of a lawsuit that claimed it dumped human remains from hundreds of graves.

Owners of Eden Memorial Park agreed to the deal about a week ago in the midst of a jury trial, and a Superior Court judge granted preliminary approval Thursday, said Michael Avenatti, an attorney representing plaintiffs in the class-action suit.

Final approval is expected in May, he said.

The cemetery's owner, Houston-based Service Corporation International, denied wrongdoing.

"While we certainly understand that our clients wanted to avoid prolonged litigation, I am disappointed that we did not try this case to a conclusion," said Steve Gurnee, the company's lead attorney in the case. "I am confident that the facts would have established that Eden Memorial Park did not do anything wrong and would have been fully vindicated."

The company agreed to settle a similar lawsuit in Florida in 2003 for $100 million.

The Eden lawsuit, filed in 2009, claimed that for about 25 years, management at the Jewish cemetery ordered employees to make new graves fit "even if it required breaking outer burial containers in adjacent graves," according to a settlement notice.

"The groundskeepers testified that on hundreds of occasions, they broke into adjacent vaults and discarded remains," which included those of a baby, Avenatti said.

Pieces of caskets and remains were buried in the cemetery's dump section, which was buried by later cemetery development, and they won't be disinterred, Avenatti said.

After consulting with rabbis, "we collectively decided that they were better left where they were," he said.

The settlement involves about 25,000 families. It sets up a $35.25 million reimbursement fund for people who want to remove their loved ones from the cemetery or bought services such as prepaid gravesites.

The company also agreed to pay $250,000 to notify people of the settlement, and it will make changes to correct problems and prevent future misconduct that could cost it an additional $45 million, including loss of future business.

Service Corporation International is the world's largest funeral services company.

"We are very pleased to put this litigation behind us," said company spokeswoman Lisa Marshall. "While we do not believe the allegations represent the standard of care and service our professionals provide, it is in the best interest of our customer families, our shareholders and our associates that we move forward and focus on the work we do every day, serving families with respect, compassion and transparency."

In 2003, the company agreed to a $100 million settlement of a class-action lawsuit involving about 700 families. The suit alleged that Menorah Gardens cemeteries in Broward and Palm Beach counties in Florida buried people in the wrong places, broke open vaults to squeeze in other remains and, in some instances, tossed bones into the woods.

The company also settled a lawsuit by the state of Florida for $14 million.

  

# California cemetery agrees to $80 million settlement over desecrating remains

Artemis Moshtaghian, CNN

Published 11:04 PM EST, Thu February 27, 2014

**Los Angeles (CNN) –** One of the largest Jewish cemeteries in the Los Angeles area has agreed to an $80.5 million settlement of a lawsuit that accused it of desecrating remains, according to court documents.

The suit, filed in Los Angeles Superior Court, alleged that employees at Eden Memorial Park, in Mission Hills, California, "intentionally, willfully and secretly desecrated the remains of deceased individuals," often moving them to make room for new remains. The cemetery is owned by Service Corporation International, or SCI, the largest owner of cemeteries in the United States.

The court granted preliminary approval of the settlement Thursday.

The case was brought on behalf of more than 25,000 Jewish families, according to plaintiffs' attorneys.

"This settlement is a testament to the thousands of Jewish families who have been traumatized because of the conduct of Eden Memorial Park and SCI," lead attorney Michael Avenatti said in a statement.

"We have been honored to represent these families and as promised nearly five years ago, we did not rest until truth prevailed. We are pleased with the settlement and are proud that this lawsuit resulted in SCI immediately changing its business practices at Eden to ensure this never happens to another family again," he said.

This is not the first time Service Corporation International has faced allegations of digging up graves and moving bodies to make room for new remains. It reached a $100 million settlement with families of victims whose remains were desecrated at Menorah Gardens in Florida. The company also reached a $14 million settlement with the Florida state attorney's office over issues related to those same claims.

*CNN's Carma Hassan, Abbie Boudreau and Scott Zamost contributed to this report.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT I



HOME    SERVICES    NEWS    EDUCATION    ABOUT US          Search

# Eagan Avenatti, LLP Announces Lawsuit against Moss Adams, LLP and Frederick Darren Berg over Northwest's Largest Ponzi Scheme

December 07, 2011 05:40 PM Eastern Standard Time

SEATTLE--(BUSINESS WIRE)--Eagan Avenatti, LLP announced today that the Trustee of the Meridian Investors Trust under the confirmed plan of liquidation in the Meridian Mortgage bankruptcy filed a lawsuit earlier today in King County Superior Court on behalf of investors seeking to recover in excess of $150 million as a result of what is believed to be the Northwest's largest Ponzi scheme in history. The suit names auditors Moss Adams, LLP and Frederick Darren Berg as defendants and alleges that Berg, with the knowledge and assistance of Moss Adams, engaged in a massive fraud designed to misappropriate millions of dollars from hundreds of investors in order to fund Berg's own lavish lifestyle and further enrich Moss Adams.

"Berg, with the assistance of Moss Adams, orchestrated one of the largest Ponzi schemes in history"

 Tweet this

The funds include the Meridian Mortgage Investors Funds and Meridian Real Estate Opportunity Funds. According to the complaint, for approximately a decade, Berg raised more than $360 million from more than 1,000 investors as part of his Ponzi scheme and used auditing firm Moss Adams to vouch for the accuracy and health of the funds when Moss Adams knew or should have known Berg was engaged in fraud. The suit further alleges that Moss Adams failed to conduct even the most basic tasks in connection with their audits of the funds and purposely turned a "blind eye" to Berg's fraud in order to earn more fees for the firm. Berg is currently being held without bail at the Federal Detention Center in SeaTac, Washington while he awaits trial next year on related criminal charges.

"My sole objective from the beginning has been to maximize recovery of assets for the investors," said Mark Calvert, the Trustee of the Meridian Investors Trust and Founder of Cascade Capital Group. "We have worked diligently to accomplish this goal and this lawsuit is a significant step."

"Berg, with the assistance of Moss Adams, orchestrated one of the largest Ponzi schemes in history," said attorney Michael Avenatti of Eagan Avenatti, LLP, the law firm representing Calvert in his role as Trustee for the Meridian Investors Trust. "We look forward to trying this case and presenting the mountain of evidence of Defendants' conduct to a jury."

**About Cascade Capital Group**

Cascade Capital Group provides a select set of services to its clients, with a primary focus on financial and operational management and investment banking, and as advisors to businesses, investors, and lenders. The firm is also experienced in forensic accounting. More information about Cascade Capital Group and its services can be found at www.cascadecapitalgroup.com.

**About Eagan Avenatti, LLP**

Michael J. Avenatti, Esq. is a founding partner of Eagan Avenatti, LLP, a firm of trial attorneys that specializes in litigating a variety of high profile legal disputes in courts throughout the United States. Avenatti and EA are consistently ranked among the best attorneys in America. The firm is based in Los Angeles, California.

## Contacts

Eagan Avenatti, LLP
Suzy Quinn
Director of Media Relations
Office: 949.706.7000
Cell: 310.465.9893
Email: squinn@eoalaw.com

**Business**

# CPA firm Moss Adams sued for $150 million over Meridian founder's Ponzi scheme

Originally published December 7, 2011 at 7:17 pm Updated December 8, 2011 at 11:41 am

**The trustee for the bankrupt Meridian Mortgage funds has sued Seattle-based accounting firm Moss Adams for $150 million, claiming negligent audits allowed Meridian founder Frederick Darren Berg to pull off what prosecutors called the biggest Ponzi scheme in Pacific Northwest** By

## By Rami Grunbaum
*Seattle Times business editor*

The trustee for the bankrupt Meridian Mortgage funds has sued Seattle-based accounting firm Moss Adams for $150 million, claiming negligent audits failed to detect the biggest Ponzi scheme in Pacific Northwest history.

The lawsuit, filed Wednesday in King County Superior Court, faults the nation's 11th-largest CPA firm for issuing "clean" audit reports for six of the Meridian funds at various times between 2001 and 2007.

A dozen Meridian funds collapsed in summer 2010, and last August Meridian founder Frederick Darren Berg pleaded guilty to fraud and admitted diverting "approximately $100 million" to personal uses and to perpetuate the Ponzi scheme.

"It is impossible to have a fraud that is this pervasive and not have significant audit failures," said Los Angeles attorney Michael Avenatti, who filed the suit on behalf of bankruptcy trustee Mark Calvert.

Had Moss Adams given Meridian the proper scrutiny, "this Ponzi scheme would have come to a screeching halt years earlier than it did," Avenatti said.

A Moss Adams spokeswoman did not respond to requests for comment. At least 750 individuals and others lost more than $150 million in Meridian's real-estate funds, according to the lawsuit. (Berg's plea agreement put the total raised at $280 million.)

The suit alleges that if not for "Moss Adams' gross negligence and turning a 'blind eye' to Berg's fraud, investors would have lost but a small fraction of this amount."

The audits conducted by Moss Adams assured investors the financial statements Berg produced for his Meridian funds were accurate, says the suit. But once Meridian fell into bankruptcy, it was discovered that Berg had misappropriated about $45 million to create and run a luxury-bus company, an additional $11 million to buy and remodel a Mercer Island mansion, and millions more for condos, yachts and private jets.

The suit, which also names Berg as a defendant, alleges the CPA firm failed to meet professional standards in conducting its audits. It also claims Moss Adams "intentionally or recklessly" ignored warning signs at Meridian and wasn't a truly independent auditor because Berg was paying it substantial fees for personal-tax and business-consulting services.

Among other things, said Calvert, "They were discussing taking the bus company public."

When Berg was indicted, prosecutors said that in 2007 he'd fooled independent auditors by renting dozens of private mailboxes in the names of fictitious borrowers whose names were on the loans he created to hide his fraud. The auditor sent loan-confirmation documents to those mailboxes and Berg personally completed and returned the paperwork, they charged.

Prosecutors also said Berg used "fake loan files, fake loan servicing files, fake bank-account statements and fabricated accounting workbooks to mislead the independent auditors as to the true health and makeup of the mortgage investment funds."

The indictment didn't identify the audit firm or say whether Berg had used such subterfuges during previous audits.

In October Calvert obtained a court order requiring Moss Adams to turn over documents and correspondence dealing with Berg's personal tax returns. He declined to comment on what those papers may show.

Excluding the lawsuit, Meridian investors are now estimated to recover approximately 10 percent of their initial money, Calvert said.

*Rami Grunbaum: 206-464-8541 or rgrunbaum@seattletimes.com*

**Business**

# CPA firm ordered to pay $180K to Meridian trustee

Originally published May 20, 2013 at 11:30 am Updated May 21, 2013 at 10:00 am

By Seattle Times staff

Seattle accounting firm Moss Adams was ordered Friday to pay $180,000 over a judge's earlier contempt ruling for not fully complying with a subpoena for audit documents from Meridian Mortgage investment funds and its founder, Frederick Darren Berg.

Judge Karen Overstreet ordered the CPA firm to pay Meridian bankruptcy trustee Mark Calvert to reimburse costs he says were incurred because Moss Adams took more than two years to turn over some documents from its work for Berg, hindering Calvert's investigation on behalf of creditors.

Calvert's attorney, Michael Avenatti, said his research indicates the sanction is a record amount against a U.S. audit firm in a contempt-of-court case.

Kelly Corr, an attorney representing Moss Adams, said the firm believes the ruling is in error and has asked the judge to reconsider it. "This ruling will have no impact on Moss Adams' professional standing," he added in a statement. "The judge specifically found that there was no evidence of any intentional withholding of documents.""

Moss Adams, the nation's 11th-largest CPA firm, audited some of Meridian Mortgage's real-estate-investment funds in some years, and it did Berg's personal taxes as well.

$

years in prison.

Bankruptcy trustee Calvert sued Moss Adams in December 2011, contending the firm was negligent in its audits of six of the Meridian funds at various times between 2001 and 2007, and should have detected Berg's fraud.

Overstreet ruled in April that Moss Adams "did not take all reasonable steps" to comply with Calvert's subpoena in 2010, shortly after Meridian's collapse.

Calvert asked for $277,000 after Overstreet's contempt ruling. But the judge Friday reduced some claims, and reserved for future consideration Calvert's request for almost $51,000 in hourly billing fees.

*Seattle Times staff*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

**EXHIBIT J**

28

# Forbes

# Sachdeva Fraud: Another lost soul without a Wales.

**Bill Singer**
Contributor
*I am a critic of the inept and ineffective*
Jan 14, 2011, 11:45am EST

On January 20, 2010, a federal grand jury sitting in Milwaukee returned a six-count indictment charging the former Vice President of Finance, Secretary, and Principal Accounting Officer for Koss Corporation, Sujata a/k/a "Sue" Sachdeva, 46, with six counts of wire fraud. The indictment alleged that Sachdeva used her position at Koss to fraudulently obtain more than $31 million from Koss, which she used to purchase personal items and pay for personal expenses.

**Koss** is a Delaware corporation headquartered in Milwaukee, Wisconsin. Koss designs, manufactures and sells stereo headphones.

According to the indictment, Sachdeva authorized numerous wire transfers from bank accounts maintained by Koss to pay for her American Express credit card bills. In addition, Sachdeva used money from Koss's bank accounts to fund numerous cashier's checks, which she also used to pay her personal expenses.

## Unadulterated Greed

In what is becoming an all too common tale, we learn that the thefts were not undertaken in response to some dire financial emergency or from the need to pay mounting medical bills. No, to the contrary, the theft in this case is of the more mundane variety. The explanation for these crimes was not necessity but simply greed – the unbridled desire to accumulate more things.

The indictment alleged that Sachdeva used the stolen funds to purchase clothing, furs, purses, shoes, jewelry, automobiles, china, statues, and other household furnishings. Beyond the mere accumulation of personal property, she also stole to pay for hotels, airline tickets, and other travel expenses for herself and others. Moreover, she used the stolen money to pay for renovations and improvements to her home, and to compensate individuals providing personal services to her and her family.

## Koss Restatements

As a result of uncovering Sachdeva's fraud, Koss dismissed Grant Thornton, LLP as its independent auditor effective December 31, 2009, and restated its annual report to disclose, in part, the following:

*Unauthorized Transactions* — On December 18, 2009, the Company learned of certain unauthorized transactions made by Sujata Sachdeva, its former Vice President of Finance and Principal Accounting Officer.  The Company subsequently learned that Ms. Sachdeva colluded with two other employees of the accounting department in the misappropriation and circumvention of the Company's existing internal controls and established operating procedures.  In carrying out the unauthorized transactions, these three former employees failed to adhere to the Company's existing procedures for processing payments and concealed the misappropriations from management, including the directors and remaining officers of the Company.  Ms. Sachdeva and these other former employees were terminated shortly after the Company learned of the unauthorized transactions. On January 20, 2010, Ms. Sachdeva was indicted in connection with these misappropriations from the Company.

As previously disclosed, approximately $31,500,000 was misappropriated from fiscal year 2005 through December 2009.  Approximately $30,900,000 or 98.1% of the total $31,500,000 of the unauthorized transactions was misappropriated by circumventing the Company's internal controls and other operating procedures for the payment of Company expenditures by using wire transfers or cashier's checks to pay for Ms. Sachdeva's personal expenditures.  Of the $30,900,000, approximately $8,500,000 and $5,100,000 was misappropriated by use of these means during

> 2009 and 2008, respectively.  Misappropriations by use of wire transfers or cashier's checks totaled $10,300,000 during fiscal year 2010.  The balance of the misappropriations of approximately $600,000, or 1.9% from the total amount of $31,500,000 from fiscal year 2005 through December 2009, was carried out by circumventing the Company's internal controls and other operating procedures involving the Company's petty cash system, manual check system and traveler's checks policy.  Out of the estimated $600,000 of these types of transactions, approximately $91,000 and $110,000 occurred during years 2009 and 2008, respectively.  Approximately $107,000 of misappropriations involving the use of the Company's petty cash system, manual check system and traveler's checks policy occurred during 2010. . .

Additionally, on February 18, 2010, Koss filed an action against American Express Company, American Express Travel Related Services Company, Inc., AMEX Card Services Company, Decision Science, and Pamela S. Hopkins in Superior Court of Maricopa County, Arizona, case no. CV2010-006631, alleging various claims of aiding and abetting breach of fiduciary duty, aiding and abetting fraud, conversion, and negligence relating to the unauthorized transactions. Also, on June 24, 2010, Koss filed an action against its former independent auditor, Grant Thornton, LLP, and Ms. Sachdeva, in Circuit Court of Cook County, Illinois, alleging various claims of accounting malpractice, negligent misrepresentation, and fraud relating to the unauthorized transactions.

## Cover-Up

Sachdeva clearly knew that she was engaged in fraud because she embarked upon a fairly extensive effort to cover her tracks.  The indictment asserted that she attempted to depict her thefts as legitimate business transactions by directing other Koss employees to make numerous fraudulent entries in Koss's books and records, and to further conceal such entries from Koss's management and auditors.

## 120 Years in Jail

Each count of the indictment carried a maximum possible penalty of up to 20 years in prison and a fine of up to $250,000. Sachdeva faced up to 120 years in prison and fines of up to $1.5 million, plus forfeiture of the items identified in the indictment and restitution.

## SEC Steps In

About eight months after the indictment, on August 31, 2010, the Securities and Exchange Commission ("SEC") filed a civil Complaint  in the U.S. District Court of the Eastern District of Wisconsin charging Sachdeva and Julie Mulvaney, Koss's Senior Accountant, with accounting fraud, books and records violations and related misconduct arising from Sachdeva's embezzlement of over $30 million from their employer, Koss Corporation.

The Complaint alleged that Sachdeva and Mulvaney attempted to hide the embezzlement on Koss's balance sheet and income statement by overstating assets, expenses, and cost of sales, and by understating liabilities and sales. Because of Sachdeva and Mulvaney fraud, Koss prepared materially false financial statements and reports. After discovering the embezzlement, Koss amended and restated its financial statements for fiscal years 2008 and 2009 and the first three quarters of fiscal year 2010.

The Complaint sought an order to permanently enjoin Sachdeva and Mulvaney from violating federal securities laws; disgorgement; prejudgment interest; and payment of a civil monetary penalty. Also, the Complaint sought an order permanently barring Sachdeva from acting as an officer or director of any public company.

## Endgame

On November 17, 2010, in U.S. District Court for the Eastern District of Wisconsin, Sachdeva pleaded guilty to six counts of wire fraud and was ordered to pay $34 million in restitution and was sentenced to 11 years in prison.

On January 11, 2011, an order of permanent injunction was entered against Sachdeva in the SEC's matter.

## Final Thoughts

As is often the case with such descents into hell, I am put in mind of the famous scene in the movie "A Man for All Seasons" (1966) in which Sir Thomas More is being tried for treason in the 16th Century. Upon hearing the perjured testimony of Richard Rich that will likely condemn him to death, More learns that Rich's falsehood was apparently rewarded with the position of Attorney General for Wales. More then delivers the withering line: ***Richard, it profits a man nothing to give his soul for the whole world. But for Wales***?

**MILWAUKEE**
**JOURNAL SENTINEL**

**BUSINESS**

# Koss settles claims against former auditor Grant Thornton

*By Cary Spivak of the Journal Sentinel*

July 05, 2013

Koss Corp. collected $8.5 million from Grant Thornton, the accounting firm that audited Koss' books during a portion of the time that Sujata "Sue" Sachdeva was stealing millions from the company.

The payment made Wednesday settles a lawsuit filed in Cook County, Ill., in which Koss charged Grant Thornton with negligence for not discovering Sachdeva's thievery. Sachdeva's scheme ran for about 12 years and cost Koss, a maker of headphones, about $34 million. Her embezzlement, which financed an extravagant lifestyle that included trips and shopping sprees, intensified in the final years of the scheme.

Sachdeva, who had been the company's vice president of finance, is serving an 11-year federal prison sentence and is expected to be released in August 2020, according to the Federal Bureau of Prisons.

"I don't think it is possible to look at the size of the settlement and conclude that Grant Thornton didn't see some risk if this case came to trial," said Jeremy Levinson, a Milwaukee attorney not involved in the case. "Every story that gets written on this case, including this one, is bad for Grant Thornton."

Grant Thornton charged Koss nearly $700,000 for work it performed from 2004 until it was fired shortly after Sachdeva was arrested in December 2009, according to records filed with the U.S. Securities and Exchange Commission. Baker Tilly, the auditing firm that replaced Grant Thornton, collected $570,679 for its first year of work — a time when the FBI, auditors and company officials scoured Koss' books to determine the level of damages she caused.

Tracy Coenen, a Milwaukee forensic accountant who criticized Koss management on her Fraud Files blog, said the company should shoulder the blame for not detecting Sachdeva's crimes earlier.

"Upper management was at least negligent in not properly overseeing what she was doing and for not having proper internal controls," Coenen said. Koss "management bears the bulk of the responsibility, if not all of it."

In 2011, Koss settled a shareholder's suit resulting from the Sachdeva crimes for $1 million and resolved an SEC action by agreeing to institute better internal controls.

*Facebook: fb.me/cary.spivak*

*Twitter: twitter.com/cspivak*

MILWAUKEE
BUSINESS JOURNAL

**Professional Services**

# Koss to receive $3 million in American Express settlement in Sachdeva embezzlement case

By David Schuyler –
Digital Producer, Milwaukee Business Journal
Feb 12, 2016

Koss Corp. said Friday that it has settled its lawsuit against American Express Co. related to the embezzlement of $34 million of Koss funds by a former Koss employee.

The settlement calls for Koss to receive a gross payment of $3 million, but net proceeds will include expenses relating to attorneys' fees and costs, Koss said in a press release.

"The matter has been resolved to the mutual satisfaction of the parties," said Michael Koss, CEO of Koss Corp., a Milwaukee-based designer and marketer of stereo headphones and other audio products.

Koss (Nasdaq: KOSS) had accused American Express of profiting from the embezzlement activities by former employee Sujata "Sue" Sachdeva, who spent the stolen funds lavishly on luxury goods using her American Express account. The accusation and lawsuit came despite the fact that the embezzlement came to light because American Express alerted Koss of Sachdeva's potentially fraudulent activity.

Koss alleged that the credit card firm waited months to report that Sachdeva paid an estimated $20 million of her charge bills with Koss funds. The lawsuit contended that American Express executives delayed exposing Sachdeva's activities after discovering the embezzlement in an effort to avoid losses and to profit from Sachdeva's business.

American Express had called the claims preposterous and moved to dismiss the lawsuit, which was filed in 2010. Trial dates in the matter were scheduled for later this month, according to online court records from Superior Court of Maricopa County, Arizona.

Under the settlement, the parties provided mutual releases that resolved all claims involved in the litigation between Koss and American Express Co., according to the Koss press release.

**EXHIBIT K**

# Los Angeles Times

BUSINESS

# Hospital gowns didn't protect as promised, jury says in $454-million fraud verdict



The world headquarters of Kimberly-Clark Corp. in Irving, Texas. (Donna McWilliam / Associated Press)

BY ASSOCIATED PRESS

APRIL 10, 2017 4:20 PM PT

Kimberly-Clark Corp. and its spinoff medical technology firm Halyard Health have been hit with $454 million in compensatory and punitive damages, after a federal jury found the companies misled California buyers about the impermeability of their MicroCool surgical gowns.

Jurors in Los Angeles returned the verdict Friday in a class-action lawsuit brought by more than 400 hospitals and health centers in California.

The lawsuit claimed the gowns were falsely represented as providing protection against serious diseases such as Ebola.

Michael Avenatti, an attorney for the plaintiffs, said during closing arguments that the case was about failure to disclose important facts to purchasers.

Kimberly-Clark said in a statement Monday that it would appeal the verdict, which it called baseless and excessive. The company says nearly 70 million MicroCool gowns have been sold without a single injury complaint.



*Update: The Centers for Disease Control and Prevention (CDC), which maintains the Strategic National Stockpile, says it has "quarantined" the equipment featured in this report.*

During the last major outbreak of the Ebola virus in 2014, more than 500 health care workers died of the disease, and something called Personal Protective Equipment became essential to preventing the deaths of even more.  We're talking about gowns, gloves, masks and other gear designed to block the transmission of deadly bacteria and viruses. They're used every day in hospitals to protect doctors, nurses, and patients. But Ebola was so lethal, it raised the stakes enormously.  If the protective equipment fails, infectious bodily fluids can get through -- a problem known as "strike-through." At the height of the Ebola outbreak, we received a tip that a major American manufacturer had knowingly provided defective protective equipment to health care workers in the U.S. and abroad. It's a serious accusation that had never been publicly examined until we first broadcast this story last year.



The 60 Minutes report "Strike-through," reported by Anderson Cooper, first aired on May 1, 2016.
CBS NEWS

*Page 1 of 10*

If there's one thing that became evident during the Ebola outbreak of 2014, it's that Personal Protective Equipment, properly used, could mean the difference between life and death. You probably remember the tragic images from West Africa, and the workers in biohazard suits trying to help without getting infected themselves.

[Nurses in Liberia praying: May you help us to be a blessing to our patients...]

Certain types of gowns were also used during the outbreak. The nurses at this hospital in Liberia used gowns and full-body suits to protect themselves after two of their top doctors died of the disease.

Every day in the U.S., doctors and nurses rely on some of the same gowns the Centers for Disease Control recommended for Ebola. One of them is the MICROCOOL surgical gown, made by Halyard Health, which sells about 13 million gowns a year worldwide, including a quarter of the U.S. market. The MICROCOOL gown is supposed to provide the highest level of protection available against blood-borne bacteria and viruses. Its label says it meets a rigorous industry standard known as AAMI Level 4 which means it's impermeable, so that blood containing viruses like hepatitis and HIV won't get on surgeon's skin during an operation. There's just one problem.

Anderson Cooper: What was wrong with the Level 4 gowns?

Bernard Vezeau: They would leak. They would leak. When we pressure tested them, especially in the seams.



Bernard Vezeau was the global strategic marketing director for MICROCOOL and other products from 2012 to early 2015. He worked for Halyard Health, which was part of the Kimberly-Clark corporation until November 2014. When two nurses at a Dallas hospital became infected after caring for a patient with Ebola, Vezeau says he was relieved the nurses hadn't been using MICROCOOL gowns, but he was concerned by the way the company went into high gear to sell the product.

Anderson Cooper: These gowns were being recommended for use with Ebola.

Bernard Vezeau: Aggressively being recommended.

Anderson Cooper: In what way aggressively?

Bernard Vezeau: We put a full court press to drive MICROCOOL sales. We told hospitals to stock up on our MICROCOOL products. We told 'em to have at least 8 to 12 weeks of product on hand. And that's when things became very difficult for me.

Difficult because Vezeau says he knew the gowns were not consistently meeting industry standards.

Anderson Cooper: There's a test for this, right?

Bernard Vezeau: There is a test. And it's conducted in outside facilities.

Anderson Cooper: So did your gowns consistently pass this test?

Bernard Vezeau: No, they did not.

Anderson Cooper: Was the FDA aware of this? Were they notified?

Bernard Vezeau: No, not that I'm aware of.

Anderson Cooper: Were customers warned?

Bernard Vezeau: No. Customers were not warned either.

Anderson Cooper: Why not?

Bernard Vezeau: Well, because Kimberly-Clark knew that if they-- they told customers, it would cost us a lot of business.

*Page 3 of 10*



Michael Avenatti is a California attorney who represents hospitals that are suing Halyard Health and Kimberly-Clark for fraud.
CBS NEWS

Michael Avenatti: They didn't tell the public. They didn't tell the FDA. They didn't tell physicians. They told no one. They kept selling the gown to the tune of millions of dollars every month.

Michael Avenatti is a California attorney who represents hospitals that are suing Halyard Health and Kimberly-Clark for fraud. He showed us this report by an independent, certified laboratory that tested the sleeves of MICROCOOL gowns in December 2012 at the request of one of Kimberly-Clark's competitors, Cardinal Health.

Michael Avenatti: At the time, Cardinal and Kimberly-Clark were in litigation against one another. And Cardinal had these gowns tested and, in fact-- the results were disastrous for Kimberly-Clark.

Anderson Cooper: What do you mean, "disastrous?"

Michael Avenatti: Well, if you look through the report, you'll see that 77 percent of the gowns that were tested failed.

Anderson Cooper: Seventy-seven percent?

Michael Avenatti: Seventy-seven percent.

*Page 4 of 10*

At hospitals like UF Health in Jacksonville, Florida, we found surgeons who told us they repeatedly experienced strike-through, with blood getting through their gowns and onto their skin. Some surgeons were so upset about it they took pictures of their bloody arms and gowns and sent them to the company.

Anderson Cooper: Did you receive complaints from nurses, from surgeons at all?

Bernard Vezeau: On these gowns?

Anderson Cooper: Yeah.

Bernard Vezeau: Oh, frequently. On a very frequent basis.

Anderson Cooper: What kinda complaints?

Bernard Vezeau: Oh, complaints of strike-through, sleeves falling off, ties falling off.

Anderson Cooper: Sleeves falling off.

Bernard Vezeau: Sleeves falling off. Sleeves falling off during a procedure.

Anderson Cooper: Were you at meetings where these problems were discussed?

Bernard Vezeau: Every time. We were the ones who were telling senior management the problems that we were having.

Anderson Cooper: And what was their response?

Bernard Vezeau: Well, it's-- I remember the response one time from the COO was, "Nobody really cares about this. Nobody really cares about surgical gowns."

Chris Lowery: Yeah, that's just not true.

Chris Lowery is the COO, Vezeau was talking about, the chief operating officer of Halyard Health.

Anderson Cooper: Did you sell protective equipment for Ebola that you knew was defective?

Chris Lowery: No. And, frankly, I think the allegations aren't based in the facts.

Anderson Cooper: You're saying they're completely false?



Chris Lowery is the chief operating officer of Halyard Health.
CBS NEWS

Chris Lowery: Yes. We get less than one complaint for every million gowns sold. And even more so is we've never received even one report of a health care professional contracting an infection as a result of a flaw in our product.

Lowery says Bernard Vezeau didn't raise his concerns until after he left the company; Vezeau says he was fired because he was vocal about the problems. The company also questions the motives of this man, Keith Edgett, the former head of research and engineering for the gowns. In this video deposition, Edgett expresses the same concerns as Vezeau about what was going on at the company.

[Keith Edgett: I believe that they were putting customers in harm's way, and I was struggling with that.]

Anderson Cooper: I want to show you the results of a test performed by Intertek Labs. It shows that 77 percent of your MICROCOOL gowns failed one or both of the sleeves.

Chris Lowery: Yeah.

Anderson Cooper: Seventy-seven percent is a lot.

Chris Lowery: Anderson, it's very important to put this Cardinal test data into context.

*Page 6 of 10*

First, extreme outlier test results. We had never seen test data that reflected anything like this before or, for that matter, since.

Halyard showed us its own test results from independent laboratories. The reports show the sleeves passed some of the time, and failed at others, but Chris Lowery says they passed far more than they failed, and when they failed it was at much lower rates than the Cardinal test suggests.

Anderson Cooper: For the test in February 13, 18 out of 85 samples fail. That's 21 percent.

Chris Lowery: We have to look at a test failure in the context of all the tests that are passing.

Anderson Cooper: But you have failures in the product. You're still selling the product. And you don't inform the FDA and you're not informing customers?

Chris Lowery: It's important to understand that the-- no manufacturing process is perfect. You take that into...

Anderson Cooper: But these failures were above the industry standard. You're allowed a certain amount of failures. When you actually fail a test, though, that's above the failure rate that's already built in.

Chris Lowery: And the testing that we completed after the Cardinal testing, we believe that we were fully compliant with our requirements for the product as it had been cleared.

Michael Avenatti: Is that what he told you?

Anderson Cooper: Yeah.

Michael Avenatti: Evidently he forgot the 11th commandment.

Anderson Cooper: Which is?

Michael Avenatti: Do not lie to 60 Minutes.

The company had shown us this March 2013 lab report as part of its proof the gowns passed the test. But Attorney Michael Avenatti says that's not what really happened.

Michael Avenatti: They claim to have submitted 79 samples and 75 passed.

*Page 7 of 10*

Anderson Cooper: They said they passed, yeah.

Michael Avenatti: Well, they didn't pass; they failed because they didn't submit 79 samples. They submitted 85 samples and, in fact, six of the samples weren't even tested because the sleeves were so bad. The lab took 'em outta the package and they were so bad that they didn't even test 'em because it was obvious what was going to happen.

Anderson Cooper: And they didn't include that in as failures?

Michael Avenatti: No, they didn't. And, in fact-- I mean, I brought the document that shows it. It's a spread sheet prepared internally at Kimberly-Clark.

Anderson Cooper: "Six failed, not tested due to unsealed seams." Lot fails. You're saying this is an example of fuzzy math?

Michael Avenatti: No, this isn't fuzzy math; this is fraud.

When we asked Halyard about this, the company acknowledged it hadn't told us about those untested samples but denied it was trying to deceive us. The company says even if a sleeve seam fails, the risk of a doctor or nurse getting infected is extremely low.

Chris Lowery: They'd have to have some type of cut that would allow transmission. The defect would have to be in that exact place. The surgeon would have not covered the cut or abrasion as they should have per their procedure. There's so many factors that have to align for that to occur.

Sherry Wren: I think it's really easy for him to say that. But he's not the guy doing it.

Dr. Sherry Wren is a vice chair of surgery at Stanford University School of Medicine.

Sherry Wren: The bottom line is, is he going to stand there and volunteer to let me paint some Hepatitis C blood on his arms and on his stomach? Probably not is going to be my guess.

Anderson Cooper: And you've had Hepatitis C blood on your arms and on your stomach?

Sherry Wren: Of course.

Dr. Wren specializes in gastro-intestinal surgery, and is co-author of guidelines for surgeons operating on patients with Ebola. She has no connection to the lawsuit against Halyard, but she does wear MICROCOOL gowns for procedures like this one, in which she knew the person she was operating on had Hepatitis C. Shortly after we recorded this

*Page 8 of 10*

surgery, Dr. Wren told us she got blood on her arms and hands three times, while wearing three different MICROCOOL gowns and operating on another patient who also had Hepatitis C.

Anderson Cooper: We've been told that as long as your skin is intact, you're OK.

Dr. Sherry Wren: Actually with that case, I finished operating at 5:00 in the morning and I looked down at my hand and I realized I had eroded off a callus. So I had ripped my own skin in the OR.

Anderson Cooper: It does matter then to you that these gowns are impervious?

Dr. Sherry Wren: Yes. Of course it matters. Do I really want to have somebody else's infected bodily fluids on my body? No, I do not.

Internal documents we obtained suggest the company knew for a long time that it had a problem which is why we wanted to ask the COO Chris Lowery about this November 2014 PowerPoint presentation that identifies a year-and-a-half "gap in sleeve seams passing" the industry test.

Anderson Cooper: We've been told that in November of 2014, a timeline was presented. And your own people acknowledged that there was a year and a half period in which the sleeve seams didn't pass the test, which demonstrates the gown is impervious. Is that true?

Chris Lowery: It's not.

Anderson Cooper: This is the presentation and on the second page it says--

Chris Lowery: Yeah.

Anderson Cooper: --gap in sleeve seams passing ASTM 1671. And it shows a year and a half gap.

Chris Lowery: Yeah, Anderson, if it's OK, I've not seen this presentation, to my recollection. And so I don't think that it's appropriate, particularly out of any context, to react to it.

Anderson Cooper: Do you think stuff like this happens--

Chris Lowery: I think and Anderson probably from a time perspective, if you don't mind--

Anderson Cooper: You want to stop?

*Page 9 of 10*

Chris Lowery: Yeah, I mean, I think that-- we probably-- I think we've spent the time that we agreed to. And team?

After our interview, Halyard told us it was not required to meet new more-stringent testing criteria during that gap shown on the timeline. By January 2015, the company says it had new sealing machines in place to improve the quality of its sleeves. But before the new machines were up and running, the company sold thousands of MICROCOOL gowns to the CDC's Strategic National Stockpile of medical supplies, for use in future outbreaks and emergencies.

Anderson Cooper: Are federal or state authorities looking into this at all?

Michael Avenatti: I can't comment on that. They certainly should be because forget about the civil liability-- this is criminal conduct.

In its most recent annual report, Halyard Health said it had been "served with a subpoena" that is related to "a United States Department of Justice investigation." The Justice Department and the Food and Drug Administration, which regulates medical devices, declined to comment further.

Anderson Cooper: The company's said to us basically, there's no evidence that anybody got sick or died directly related to a failure of any gowns. If it was so egregious wouldn't there be many cases or even one clear case that you could point to that says, "Look, there was this failure of a gown and this doctor became infected with Ebola or HIV or any other disease?"

Michael Avenatti: Until now why would any doctor or nurse, have any reason to question Kimberly-Clark's representations regarding the effectiveness of this gown? This story may, in fact, be the first time that physicians and nurses who have contracted disease take a step back and say, "You know, maybe that's how I got it."

Since our story first aired, one of the people we interviewed, former marketing director Bernard Vezeau, has passed away. Also in April, after a nine-day trial, a Los Angeles jury found Kimberly-Clark and Halyard Health liable for fraud and awarded $454 million dollars in damages.  Both companies say they will challenge the decision in court.

Produced by Andy Court and Sarah Fitzpatrick.

*Page 10 of  10*

# CDC "quarantines" its own equipment

## UPDATED ON: AUGUST 11, 2017 / 9:52 AM / CBS NEWS

The Centers for Disease Control and Prevention (CDC) says it has "quarantined" some of its own stock-piled equipment following a 60 Minutes report that questioned whether the gear, recommended for protection against the Ebola virus, was defective.

The 60 Minutes story quoted former employees and internal company documents regarding MICROCOOL surgical gowns made by Halyard Health (formerly a division of Kimberly-Clark).  The investigation first aired in May 2016 and was re-broadcast this Sunday at 7 p.m. ET on the CBS Television network.



The 60 Minutes report "Strike-through,"reported by Anderson Cooper, first aired on May 1, 2016.CBS NEWS

Based on documents obtained under the Freedom of Information Act, 60 Minutes reported that MICROCOOL gowns were part of the U.S. Strategic National Stockpile of medical supplies for use in future outbreaks and emergencies. The stockpile is maintained by the CDC.

https://www.cbsnews.com/news/cdc-quarantines-its-own-equipment/

In response to an inquiry from 60 Minutes, the CDC sent the broadcast a statement saying, "The gowns are being quarantined within the SNS [Strategic National Stockpile] inventory and there are no current plans to use them." The CDC's full statement can be found here.

In April, a group of hospitals sued Kimberly-Clark and Halyard Health in Los Angeles federal court over the alleged defects in the MICROCOOL gowns. After a nine-day trial, a jury found the companies liable for fraud and awarded $454 million in damages.  Kimberly-Clark and Halyard Health are challenging the decision in court.

In a statement to 60 Minutes after the story was rebroadcast, Halyard Health said its gowns had passed tests conducted by the CDC's National Institute for Occupational Safety and Health,  proving that they meet the "highest standards" in the industry.  "We continue to stand behind the quality and efficacy of our MicroCool gowns," the statement said.

But attorney Michael Avenatti, who represented the plaintiffs in the recent Los Angeles court case, said in response to the CDC statement, "The CDC has finally determined what we have known for years and what the federal jury determined in April -- the gowns are defective and place healthcare workers at risk for serious injury and death. You don't quarantine a product that has no problems and is safe."

*Reported by Andy Court, Sarah Fitzpatrick & Evie Salomon.*

https://www.cbsnews.com/news/cdc-quarantines-its-own-equipment/

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT L**



July 10, 2018   /   In Updates

## CASES REGARDING FAULTY MEDICAL EQUIPMENT AND FRAUDULENT DEBT COLLECTION AWARDED PUBLIC JUSTICE'S 2018 TRIAL LAWYER OF THE YEAR AWARD



The *Bahamas Surgery* team

The *Inetianbor* team

Public Justice's 2018 Trial Lawyer of the Year award was awarded to two legal teams: one that won a significant jury verdict regarding faulty medical equipment that was marketed as safe despite the manufacturers' knowledge to the contrary, and the other that ended fraudulent debt collection in Florida and reimbursed victims. The award was presented on the evening of Monday, July 9 at Public Justice's Annual Gala & Awards Dinner at the Denver Center for the Performing Arts in Colorado.

Bahamas Surgery Center v. Kimberly-Clark was a class action lawsuit concerning MicroCool surgical gowns which were marketed as the safest and most protective gowns in the world, and were recommended for healthcare professionals working with Ebola patients or those performing surgeries on patients with HIV/AIDS or Hepatitis. However, the gowns' manufacturers—Kimberly-Clark Corporation and Halyard Health, Inc.—knew as far back as 2012 that the gowns were defective and had failed numerous tests, but failed to alert the FDA, health professionals, or patients. Employees who knew too much were fired and the manufacturers even exploited the Ebola crisis to increase sales, selling millions to unsuspecting medical professionals.

When sued, Kimberly-Clark and Halyard paid their own lawyers more than $50 million

trying to avoid accountability. They fought on every front, even seeking to disqualify plaintiffs' counsel. Eventually, a unanimous jury awarded more than $454 million in punitive and compensatory damages against them.  The Centers for Disease Control and Prevention subsequently "quarantined" some of its own stock-piled MicroCool gowns and announced it had no intention of ever using them.

Inetianbor v. Western Sky Financial was a class action against predatory payday lender CashCall, notorious for charging excessive interest rates and then evading justice by forcing borrowers into a Native American tribal law-based arbitration system that, it claimed, was protected by tribal sovereign immunity and off-limits to American courts. One CashCall client, Abraham Inetianbor, already had a federal court order entered against him forcing him to arbitrate against CashCall when he contacted the law firm of Wallace & Graham for help. Using recordings of the arbitration, the firm persuaded the court to vacate its prior order. That ruling was upheld by the federal appeals court, allowing Inetianbor his day in court.

Critically, the ruling also enabled his counsel to challenge and stop a proposed settlement with CashCall in South Dakota that would have recovered $7 million for all claims nationwide. After they did so, state-by state settlements with CashCall were reached for more than ten times that amount. In Florida, for example, a settlement worth nearly $30 million was obtained. Coordinating closely with the Florida Attorney General and Office of Financial Regulation, the legal team won payment of fines and restitution to Florida agencies, $14,417,810 for the class members, and the voiding of thousands worth nearly $15 million. The defendants were permanently enjoined from future lending in Florida.

The other finalists for the award were Cote v. Wal-Mart, and Vang v. Prataya, read about the accomplishments of those finalist teams here. Information about previous TLOY winners is available here.

2018 Trial Lawyer of the Year Teams:

Bahamas Surgery Center v. Kimberly-Clark

Lead counsel: Michael J. Avenatti, Eagan Avenatti LLP, Newport Beach, CA. Co-counsel: Edward Ricci, Ed Ricci Law, Palm Beach Gardens, FL; Ahmed Ibrahim, Filippo Marchino, Eagan Avenatti, LLP; William C. Hearon, Miami, Fla.

Inetianbor v. Western Sky Financial

Lead counsel: Mona Lisa Wallace, Wallace & Graham, PA, Salisbury, NC; Janet Varnell, Varnell & Warwick, PA, Lady Lake, FL. Co-counsel: John S. Hughes, Wallace & Graham; Cathy Anne Williams, and Aaron Goss, formerly of Wallace & Graham; Brian Warwick, Varnell & Warwick.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT M**

# How Michael Avenatti helped a 9-year-old Guatemalan boy make it back to his mother



By <u>Sara Sidner</u> and Alberto Moya, CNN
Updated 7:59 PM EDT, Wed August 15, 2018

   

**Guatemala City, Guatemala (CNN)** — Antony Ortiz walked into the courtroom in Houston wearing a light gray hoodie, khakis and black tennis shoes with red laces. He looked his age, but he didn't act it. He didn't smile or fidget. He sat up straight and waited patiently.

The 9-year-old was filled with hope that Tuesday would be the day he finally reunited with his mother. The two had been separated for 81 days since they arrived together at the US-Mexico border. Under the Trump administration's zero tolerance policy, Elsa Ortiz Enriquez, had been sent back to Guatemala without her son – and she had been fighting to get him back ever since.

Meantime, Antony had been among more than 380 children who, as of last week, were in the custody of the US Department of Health and Human Services, or HHS, and whose parents had been deported, data reported by the government show.



Sara Sidner/CNN

Attorney Michael Avenatti hugs his client, Antony Ortiz, 9.

At 9 a.m. on Tuesday, the judge called his case. By 9:15 a.m., Antony was wiping away tears.

Through big headphones filled with a court translator's voice, Antony learned that Immigration Judge Chris Brisack ruled that he could "voluntarily depart" the United States, a process that could take the government as long as 60 days to arrange. The prospect of having to wait two more months to see his mom rattled the boy and his attorneys.

But then, just hours later, a phone call brought unexpected news – and Antony was boarding his first flight ever, en route to his mom.

## 'This is an outrage'

Unlike many children brought to court by the vanload, Antony had private attorneys: Michael Avenatti, perhaps best known for representing adult film star Stormy Daniels, who has alleged an affair with President Donald Trump, which he denies; and Ricardo de Anda, a civil rights attorney Avenatti hired to assist in the case.

Avenatti had gone to court Tuesday offering a quick solution: At his own expense, he'd been ready to escort Antony back to his mother the same day. But the government insisted on its own process, and the court set a timetable of no more than 60 days.

Antony cried at the prospect that he'd have to wait even longer to see his mother again. And Avenatti fumed.

"This is an outrage, and now we have to work through bureaucratic red tape in order to ensure this boy is released at some point, and it could take upwards of 45 to 60 days. It makes no sense," Avenatti said. "I am offering to take him today, right now."

Avenatti and de Anda broke the news to Antony's mom by phone. She said she'd been nervous, waiting to hear what happened. They told her it might be another 60 days until she could see her son again. She began to cry.

"I am crying because I cannot do anything. I am not there," Ortiz Enriquez said in Spanish. "I thought about going back and finding him, but they told me that would complicate things."

## HHS delivers unexpected news

Then, Avenatti's phone rang. It was an HHS official.

She'd heard about the lawyer's offer to temporarily take custody of the child and return him to his mom. She didn't understand why the government attorney or the court hadn't just agreed to it, especially since the Justice Department has faced pressure from a federal judge who ruled the government must reunite as quickly as possible families separated under the zero tolerance rule.

Several conversations later – and eight hours after the court hearing – HHS employees escorted the 9-year-old to George Bush Intercontinental Airport and handed him over to his lawyers. Antony boarded a plane with de Anda and Avenatti, whose sudden foray into the immigration debate raised eyebrows after he announced he was seriously considering running for President.



But Avenatti, who said he's taken on dozens of similar cases, pushed back on critics who claim his immigration casework is all about the news coverage.

"That is ludicrous. This isn't a publicity stunt. I've been quietly representing dozens of families for weeks now, traveling around the country doing good work," he said. "My record speaks for itself."

# 'It's a miracle God's given me'

Three hours later, Antony landed in Guatemala City.

His mother saw him and fell to her knees. She grabbed him, her tears flowing.

The boy used both his hands to wipe her face. He told her not to cry.

But she wept all the more. And again, he wiped her tears.



Anthony Ortiz, 9, and his mother reunite Tuesday night in their native Guatemala.

Michael Avenatti

"I started crying with joy, and he kept telling me not to cry because if there is one thing he does not like is seeing me cry," Ortiz Enriquez told CNN.

Her son was tired and shy, surrounded by strangers. His mother was relieved and thankful.

"It's such unexpected news. It's a miracle God's given me," she said. "I never thought I was going to be surprised. It was supposed to just (be) a day in court."

# THE HILL

News   Policy   Opinion   Events   Jobs   Newsletters   THE HILL TV   Changing America

LATINO

# Avenatti helps Guatemalan boy reunite with his mother

BY JUSTIN WISE - 08/16/18 9:52 AM ET



Stormy Daniels' attorney, Michael Avenatti, helped reunite a a nine-year-old Guatemalan boy with his mother this week.

CNN reported on Wednesday that Avenatti completed the effort on Tuesday while representing Antony Ortiz Enriquez, who had been separated from his mother, Elsa Ortiz Enriquez, for over two months as a result of President Trump's "zero tolerance" policy at the southern border.

{mosads} Antony had arrived at a courtroom in Houston earlier this week after being in the custody of the U.S. Department of Health and Human Services. His mother on the other hand had already been deported back to Guatemala, according to CNN.

Antony was told by a judge that day that he could "voluntarily depart" the U.S., a process that could take the government as many as 60 days.

That's where Avenatti came in, who, along with civil rights attorney, Ricardo de Anda, represented Antony in his case. Avenatti said at the court on Tuesday that he would be prepared to escort Antony back to Guatemala, but the court insisted that its procedure be the one carried through, according to CNN.

"This is an outrage, and now we have to work through bureaucratic red tape in order to ensure this boy is released at some point, and it could take upwards of 45 to 60 days. It makes no sense," Avenatti said, according to CNN. "I am offering to take him today, right now."

CNN notes that Avennatti was later reached by an HHS official who agreed that the attorney's offer to take temporary custody of Antony and reunify him with his mother was justified.

Eight hours after the court hearing, HHS employees escorted Antony to George Bush Intercontinental Airport and handed him to Avenatti and de Anda. Three hours after that, Antony arrived in Guatemala and was greeted by his mother, according to CNN.

"It ends today at 81 days for Antony and Elsa," Avenatti tweeted. "But continues for over 500 others…"

Avenatti's effort to reunify the Guatemalan child with his mother comes as many lawmakers

continue to scrutinize the Trump administration over how it will reunite every family that was separated at the U.S.-Mexico border.

Avenatti is currently representing adult-film star Stormy Daniels, who is suing President Trump and his personal attorney Michael Cohen for defamation and to void a nondisclosure agreement that blocks her from speaking publicly about an alleged affair with Trump years ago.

But he's also offered offered legal services to migrant parents who have been separated from their children. In addition, he's continued to make his voice heard on issues related to immigration, and has said he's considering running for president in 2020.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT N









**EXHIBIT O**

September 27, 2022

Dear Honorable Judge Selna:

My sister and I wanted to introduce ourselves and share with you our thoughts on our father, Michael John Avenatti. My name is Lauren Louise and I was born in October of 2002. Fortunately, through academic scholarships and financial aid I have just started my sophomore year at Arizona State University - Walter Cronkite School of Journalism – Barett Honors College. I had a successful Freshman year ending up on the Dean's list both semesters and interned this summer at Fox 24 Arkansas. My sister is Nicole Frances and she was born October of 2004. She is starting her Senior year of high school as a 4.0 student and a member of the highly ranked Corona Del Mar tennis team. Sadly, the last couple of years have painted a very one-dimensional view of our father and do not adequately convey the man we know and love. We would like to share with you the countless good things he has done, the clients he has helped, and the important role he plays in our daily lives.

When Grandpoppy, our paternal grandfather, was forced into early retirement by a large corporate giant, it caused a spark in my Dad to want to earn a law degree and to fight against injustice. Through photo albums we have seen the struggle our parents went through to get our Dad through law school and achieve his dream of becoming a lawyer. After law school, and for as long as we can remember, he has been pursuing justice for hudreds of clients. We have seen him take on pro-bono clients, help friends with legal challenges, and take cases others wouldn't. We witnessed his tenacity as some of these cases lasted over ten years. We understood the significance of his work and it has inspired us to help others. Our mom would send him photos of us holding posters we made and video clips of the cheer we created before many important hearings or trials. The "Argue Daddy, Argue!" cheer is as important to us today as it was through our entire childhood when hoped for victories for his clients. We need him to know that we are still behind him and still rooting for him.

To us, our Dad is the father who tells us he loves us just because, gives us a hug, kiss and a shutter when saying goodbye, took us to plays and concerts, and always has encouraging words for us and coaches us through life's challenges. We have been taught to value God and family above all else, to use our blessings to be kind, helpful and compassionate to others, and always to live with grace and forgiveness in our hearts.

Even after our parents got divorced, they remained committed to amicably co-parenting us. Our parents were clear nothing mattered more to them than us. Dad would come over in the mornings before work to bring us pancakes and as a family we would meet a Chili's for family dinner. We spent hours playing in the park with him in El Segundo. We loved to hang out and have Sunday dinners with him and our brother. We made trips to the zoo, beach, Disneyland, and lots of other places, and have so much fun just being together. He is kind and compassionate with us and loves animals. When we were little girls he surprised us with a puppy on Christmas morning, and we had Romo as part of our family until his death in in 2019.

He always encouraged us to be our best selves and make the most of our potential and lives, and to be assertive, independent, strong women and to strive to make our goals a reality. He told us not to be negative. He taught us that if you put your energy into it, you can achieve anything you want in life, and that anything is possible. He always instilled in us the importance of getting good grades, being active academically and being involved in clubs and extracurricular activities. When Nicole was scared to sleep away from home, our Dad insisted we go to tennis camp, so that we could learn to be independent and be prepared for a college setting. It was always an expectation that we would go to college and get a good education, our Dad implemented that in us from a very young age. He always wanted us to be successful and self-reliant.

Growing up, we have seen many examples of his kindness to other people. Not that long ago, we were with him when he stopped to change a stranger's tire on the side of the road, and our uncle recently told us about my Dad helping him out of situations when they were younger that we didn't even know about. Our dad has always been a source of strength for us, and a great role model, and taught us not to be judgmental or cruel because people come from all walks of life and we don't always know their story. When I was a freshman in high school and a classmate was bullying me, my dad talked me through it and comforted me, and then mediated with his parents and helped solve the problem. When I was young, I had a lazy eye and had to have multiple procedures and countless trips to the doctor and wear a patch. It was a difficult experience for me and my Dad helped me through it, because he had gone through it as a child too and understood what it was like. He taught me to be strong and overcome it.

Whenever my dad talks about us succeeding in the future and how we are equipped with all the skills to be whatever we want to be, his soft side comes out. He worked so hard to make his dreams a reality, and he has embedded that into us from a very young age. Dad wants us to put our best foot forward and always try our best. From a very young age, he has given us so much strength to go out and to make our dreams come true. Our dad loves us so much, he wants the very best for us. Whenever he talks about us, his fatherly and soft side comes out. He has never failed to express to us how proud he is of us and how he thinks we are so gifted and special. He has given us courage and strength by setting an amazing example of resiliency. Throughout his life, our dad has never given up. He has put his incredible strength and resiliency into us. He always finds a way to get back up and keep on fighting. We know he will find a way to come back from this adversity and be better and more productive than fully making amends. We are so thankful that my mom and my dad have always encouraged us in that as the last few years have tested us and we have been able to find the strength to persist and to keep excelling.

One of our favorite memories with our dad is running around the house for hours playing "tickle monster." He would make us laugh so hard to the point where our stomachs would ache. We also loved when dad set up egg hunts on Easter for us. Our dad did so much for us to make us feel special. He would take us to Build-A-Bear at Fashion Island and then we would spend time watching the Koi fish, riding the carousel, playing in the water fountains. Our family adventures were so fun; we loved being out and about with Dad and learning

about history and the world. When we were super little, we would all go to Starbucks before the school Halloween parade. Since our birthdays are in October, we would show up in our costumes and he would bring us cupcakes and buy us a Horizon chocolate milk. Most people might not know that our dad is extremely funny. He always makes the funniest jokes and we poke fun at each other. Our dad is also a great dancer. The "monkey dance" was our favorite. He would raise his hands in the middle of a restaurant and wave them in the air. Even though he appears really serious on TV and when he is working, he is actually very funny and goofy. Seeing our dad help so many people has inspired Nicole to go into a career in Deaf Studies/Speech Pathology where she helps people too. He has helped thousands of people, and we want to do the same. Although we want to help people in a different way, seeing the impact he had on so many people's lives has inspired us to hopefully have that same impact.

The last few years have been extremely trying as he has been unable to participate in our lives the way he used to due to his prior restrictions and now incarceration. He has missed choral performances, plays, academic award ceremonies, tennis matches, prom pictures, Senior celebrations, High School graduation, moving into college, college parent's weekend, and Dad's weekend at my sorority, holidays and most importantly family time. Due to the advanced age of his parents, Grandmommy and Grandpoppy could not travel during the pandemic and he could not travel to them, so we have missed family time and our holiday celebrations together. We tried our best to adjust to these restrictions and learned during our visits and phone calls, when he is not in isolation or on Covid lockdown, how to stay connected and share our stories through more vivid story telling. Fortunately, we have been able to remain close and I think even grown closer during this immensely challenging time for our family.

He is our family, we love him, we see the good in him, and we need him in our lives and we will be there to love and support him in any way possible.

We pray that you will take this information into consideration when determining his fate.


Lauren Louise Avenatti

Nicole Frances Avenatti

September 28, 2022

Dear Honorable Judge Selna:

I am writing to you as the ex-wife, co-parent, and forever family member of Michael Avenatti. As you can imagine, the last several years have been beyond traumatic for me, my daughters, and my entire family as we have watched Michael's entire life be condensed down to an unrecognizable sad, short, tragic chapter focusing on a few things versus a complete and complex novel that we know and feel deserves to be told and understood. I hope I can share some details that will give you a better understanding of the complete story and not just this excerpt of his life.

In March of 1992, I met a young man on a financial hardship leave from University of Pennsylvania as a result of his father's forced retirement. Michael grew up in middle America with a stay-at-home mom, and a dad who worked for corporate America. His father's dedication to his career led to several moves throughout the US and Michael often had a hard time adjusting with his lazy eye, different clothes, and the changes in vernacular. Michael's mother did not deal well with the changes either and developed a heavy reliance on alcohol which would further complicate Michael's adolescence. Michael developed many deep physical and emotional scars during his childhood - the neglect, rage, ridicule, abuse and punishment he constantly received has deeply impacted who he is and the triggers and defenses he now has. After four states and more than 25 years of service, Michael's father was dealt a devastating blow and forced into an early retirement and Michael was shown the door of his family home. He left his home for college virtually penniless and with a mother who would not cooperate with the educational system to enable him to secure the proper financial aid to fund his education.

Michael's father's forced retirement would cement Michael's career path. Michael was determined to go to secure his college degree and then attend law school, so that he could work for the causes and people that mattered to him. In order to pay for his education, Michael worked for a political consulting firm and when we met, he was living in the guest room of a campaign manager in Philadelphia. Michael had a brown briefcase, two pairs of khaki pants, and a few polo shirts to his name. Michael worked tirelessly advancing political candidates as well as important causes and referendums. The people and causes he advocated for required immense dedication and sacrifice -- Saturday night stays to save on airfare, minimal food budgets, and cheap motels.

In the first months of our relationship, my 47-year-old mother was diagnosed with a terminal heart condition. Michael was an invaluable asset to my family putting his research skills to work and helping to secure the care my mother needed. I gave up my apartment, and Michael and I moved into my parent's home to help care for her. In order to complete his degree, with the ultimate plan of him attending law school, we formulated a plan to marry in 1994 and work multiple jobs while living with my parents. Through our hard work, and his exceptional academic record, Michael was able to start law school at George Washington University in Washington, D.C. My red, stick-shift Volkswagen Jetta with manual windows and I worked tirelessly over the next years to assist Michael, as he worked full-time and attended evening classes to earn his degree. These years were filled with challenges, as we endured financial stresses. Popeye's after church on Sundays was our splurge of the week using a buy one get one coupon. Illnesses, surgeries and the untimely and tragic deaths of several close family members, including my mother and grandmother were really tough hurdles. Despite these challenges, in May 2000, Michael attended his law school graduation. Sadly, his mother and father opted not to attend exacerbating his childhood wounds. Michael was so grateful for the opportunity afforded him by George Washington University he set up a scholarship in trial advocacy there.

After graduation, Michael and I moved to the West Coast for him to start his career with a large law firm and me as a litigation claims adjuster. We rented an apartment and busied ourselves with our careers, recruitment activities with the firm, friends, and we were involved with many charities that were close to our hearts such as Make-A-Wish and Zen Hospice. In 2002, we started our family welcoming our daughter Lauren. In Lauren's baby book, there is a letter of apology from the head of the business litigation department where our first family picture should be. One of the drawbacks of being an associate in a large firm was that Michael was sent to the east coast for trial preparation and missed Lauren's birth which destroyed him. He heard her first cries over an airplane phone. Shortly after our first daughter's birth, Michael left the large law firm and went to work for a boutique litigation firm, where he achieved great successes for the firm's clients. In 2004, we welcomed our second child, Nicole, but the stresses of extremely long workdays coupled with business travel (both domestic and international), deposition schedules and long trials throughout the country started to crack our foundation.

Ultimately, we separated in 2006 and divorced in 2007. As with any relationship, married or divorced, we had disagreements (often large disagreements), yet we were always able to put the needs of our children ahead of ourselves and co-parent amicably. My current husband, Michael and I have been able to sit at funerals, weddings, and school functions together as a cohesive family unit and provide stability and support to our children. Together we have raised two

beautiful, educated, hardworking, caring and compassionate daughters. Our Nicole in particular, has been inspired since childhood to help others and plans to go into a career of service as a speech pathologist.

I share this background with you in hopes that you will see a bit of the Michael Avenatti I know - the Michael who worked full-time to educate himself after a family hardship. The Michael who overcame challenge after challenge in his life. The Michael who faced a very abusive and traumatic childhood and had channeled that into becoming a passionate advocate. The Michael who tirelessly worked and sacrificed to achieve success for his hundreds of clients. The Michael who loves his parents despite the history. The Michael who adored his Grams and was at her side after his grandfather's death in his early 50's and cared for her during her final years even being at her bedside when she took her final breath. The Michael that has helped my family and his friends over the years too many times to count. The Michael who helped me grieve and bury my mother and helped my sister get married in our darkest times. The Michael who checked in daily as I was battling cancer and cried out of fear that our girls would lose me. The Michael who loves his daughters and has always made sure that they know that and value themselves and others. The Michael who his daughters love and want him to remain an active part of their lives.

My sincere hope is that you will take into account the full story of Michael Avenatti when evaluating his sentence. I pray there will be new chapters to write and I know if given the chance, just like he left home for college penniless, he can once again build a productive life to share with the friends and family that love him and to fully make amends.

Thank you for your time and consideration.

*Christine Avenatti Carlin*

Hon. Judge Selna:

I've known Michael since 1989. He hired me at Creve Coeur Athletic Association - a little league baseball complex in suburban St. Louis. When he took over the field crew duties, he needed help and I came aboard to mow the fields, set the bases and manage the concession stand. It was evident from day one that Michael, even at that young age, had high expectations for himself and could see potential where others didn't. That was the kind of innate drive that got him working at 16 years old - not just one job at McDonald's, but also delivering pizzas, and umpiring little league while excelling in school. And that's why he was able to put himself through college and law school. He certainly wasn't born with a silver spoon in his mouth, just the determination to succeed.

In the 30-plus years I've known Michael, he has been a loyal friend and like a brother, so when he needed a place to stay under home confinement due to Covid, I valued the opportunity to help him. I saw firsthand what a devoted father he is to his two teenage daughters during their frequent visits. And when his young son came over on Sunday afternoons, it was something special to see them play together and giggle like lots of fathers and sons get to do all the time. But Michael cherished those moments even more.

Michael is obviously facing the toughest period of his life. But there's more to him than just the last few years. He's a good person who has always been there to help people, personally and professionally. Now, I'm sure he's eager to get a second chance to put these latest life lessons to work and figure out what his next chapter will become.

Thank you,

Jay Manheimer

September 23, 2022

Dear Honorable Judge Selna:

My name is Stephen Rodier and I met Michael Avenatti 30 years ago when he started dating my
sister, Christine. I felt it is important to write because while sometimes amusing and often tragic
the Michael Avenatti being portrayed in the media over the past few years is an incomplete and
often inaccurate version of the Michael I know. I am hopeful I can shed some light into a better
version than you have gotten to see.

When Christine brought Michael home, he was a politically active liberal wearing pressed khaki
pants and polo shirts and wore "tennis shoes" on weekends cheering on the Dallas Cowboys. I
grew up in an area where President Ronald Reagan visited, wore sport shorts and "sneakers" on
the weekends cheering on the Philadelphia Eagles. The debate into tennis shoes vs. sneakers still
rages today, so does the Cowboys vs. the Eagles debate for that matter.  My grandmother, a Rush
Limbaugh top rated fan, and Michael would spiritedly debate the politics of the day. Michael
was a passionate advocate for the causes he believed in, yet he was still able to come into the
family respecting and honoring the differences we had. Over the years, we had great fun
celebrating our differences and created some irreplaceable memories.

Michael was cut from a different mold and the intensity he brought into his education and work
was different than most 21-year-olds. Clearly, the difficulties Michael faced as a child had turned
him into an overachiever in search of independence and acceptance he had lacked as a child. He
and my sister set a path for Michael to finish his education, go to law school and for him to start
his career as a lawyer. Michael and Christine moved into my parents' home to help care for my
terminally ill mother. Michael affectionately called my parents Jim and the Dude and would
become an integral part of our family.  Michael shared an office with my dad and a computer
with my sister, Michelle, competed in our fantasy football league, served as a groomsman in my
wedding and as a Godparent to my son, Bradley Michael.

Over the years, Michael helped to secure care for my mother, helped with my mother's burial,
planned and paid for my sister's wedding, facilitated the end-of-life planning and care for my
grandmother, assisted me financially, provided legal advice countless times, and is a mentor to
my boys. My sister and Michael divorced in 2007, but they remained amicable, and Michael is
still considered an important part of our family. They have remained committed, and laser
focused on raising two remarkable daughters. Christine and Michael are a yin and yang, and their
daughters are thriving even during these tumultuous last few years. I am proud of the work that
Christine and Michael put into parenting and to see my nieces blooming into smart, independent,
strong young women.

Thank you for taking the time to learn a bit more about the Michael that is a part of my family
and not the Michael you have seen. I am hopeful soon he can return to the role of a committed
co-parent to my sister, father to my nieces, and valued family member.

Stephen J. Rodier Jr.

September 25, 2022

Honorable Judge Selna,

My name is Michelle Rodier Greene. I am writing to share some of my personal experiences with Michael Avenatti. I have known Michael for almost thirty years. I knew Michael as a college student at the University of Pennsylvania, a law student at George Washington University, a husband to my sister, my brother-in-law and a father to my intelligent, beautiful nieces. It's been weird to see his name and face on TV and in the media these past few years, to see such a single sided portrayal of a man I consider family.

Back in 1992, my sister, Christine, met Michael and he quickly became a part of our family. During the course of their relationship, I learned a lot about Michael and the tremendous impact that his childhood had on his life. From financial stressors, his father's forced retirement and his mother's alcoholism, Michael's youth lacked the tenderness, love and security that allows a child to thrive emotionally. Michael was forced to grow up quickly. Knowing that he deserved more, Michael was determined to attend the University of Pennsylvania and pursue his dreams. Without the financial help of his family, Michael moved to Philadelphia and funded his own education. During his time at the University of Pennsylvania, Michael attended class and worked tirelessly on his coursework. At times, we even shared the same Macintosh computer in my parent's home. Whenever he wasn't studying or attending class, Michael was working to pay for his education. My sister would often drive him so that he could work in the car. His dedication to his education and future was nothing short of remarkable.

In June of 1992, my mother was diagnosed with a serious heart condition. Over the years that followed, my sister, Christine, and Michael were a part of the circle that surrounded my mother. This circle gave her the love and support needed to live another seven years. Michael and Christine even moved into our family home to be closer to her. As a family, we supported each other through all of life's challenges. My parents and sister worked hard to support Michael through law school. They knew that Michael wanted to make a difference in this world so sacrifices were made to help make his dream come true. While Michael was still attending law school, my mother passed away in June of 1999. Michael offered financial assistance to help give my mother the funeral that she deserved. After burying my mother, I decided to change my wedding plans for the following November. It was too emotional planning a wedding without my mother. It was then that Michael offered to pay for my husband and I to travel to Hawaii for a small, beach wedding. Not only did Michael pay for our trip, but he served as our official wedding

photographer. It was a special trip with beautiful memories. I will always be grateful for these acts of kindness and selflessness.

In April of 2002, I was blessed with my firstborn child and my sister flew in to visit. She couldn't wait to share that she and Michael were expecting their first child. Knowing the painful details regarding Michael's childhood experiences, I knew that he was determined to give his children the childhood that he did not have. The excitement that my sister had when she told me about her pregnancy was equally shared by Michael. When my sister went into early labor with her first daughter, Michael was on a flight on the way back from a trial in New Jersey. His inability to be at the hospital gutted him. I vividly remember his phone call to me from the airplane. It was heartbreaking. From that moment on, I knew that Michael would do whatever he could for his family. When their second child arrived, I received a bright and early morning phone call from the west coast. It was the proud father once again beaming about his new daughter. While visiting the Avenatti's in California each summer, I was able to witness Michael parent his little girls. From walks to Starbucks for a treat, trips to Build a Bear and riding elephants at the Orange County Fair, the love that Michael has for his girls and their adoration of him was always beautiful to witness. As the girls move into adulthood, their relationship with their father will enter a new phase. This phase is made even more complicated by current circumstances but I know how valuable their father-daughter relationship is to both Michael and the girls. It's a relationship Michael prioritizes and will fight for. The girls want and need him to be a part of their next chapters – college, relationships, marriage and their own children.

The media has portrayed Michael to be someone different than the man that I have known for decades. The man that will be sitting before you has provided for his ex-wife and children, loved his family and made a difference in the lives of his loved ones. I am asking you to please take this information into consideration when deciding upon Michael's future.


Sincerely,

*Michelle R. Greene*

Michelle R. Greene

October 3, 2022

Hon. Judge Selna:

Michael Avenatti was my next door neighbor during his home confinement due to the extraordinary circumstances of Covid-19. I didn't know who he was until we started talking over the fence and became "pod friends."

I was struck by his intelligence and generosity. We had many long conversations during that time and his love for this country was immediately apparent along with how much he cared about our justice system and the direction of the country in general. Despite his predicament, he rarely complained.

It was sometimes difficult to watch when his young son visited and they would have to play catch in the limited space near the outside stairs. But it was obvious that Michael was a natural at fatherhood as they had fun just being with each other. I also had the opportunity to meet his older daughters and they were always very sweet, smart and supportive young women. Especially considering the circumstances.

Another thing that struck me about Michael was how he genuinely cared about what was going on in my life, and he supported me through the tough Covid years. I am a freelance musician so all of my work, recording sessions, and tours, were canceled. His tiny bedroom looked over my backyard and music studio. Often times, I would practice piano after dinner and when I walked back to the house there was a big smile and applause waiting for me. Believe me, that felt so good.

I can't imagine how hard it must be for Michael, coming from his humble beginnings to being one of the best legal minds of his generation back to being humbled. A far as I can tell, he has handled it with as much grace as could be expected. I know when he has paid his debt to society, he will keep paying it forward, that's the kind of man he is.

Thank You,

John Beasley

October 4, 2022

Dear Honorable Judge Selna,

My name is Shannon Faulk, and I am writing on behalf of Michael Avenatti to share what I know to be the man before he lost his way.  I met Michael when he was 21 years old and was dating my sister friend, his first wife Christine.  Being a few years older than Christine and Michael, I remember how I always felt that Michael had an amazing future ahead of him because I could tell right away how smart he was, yet he was always so down to earth and had a great sense of humor.  I watched Michael and Christine build a life together, how he helped care for Christine's mother, who was like a mother to me, when she became ill.  And because over the years I had gratefully become a part of Christine's family, when I stood as a bridesmaid in their wedding, he became my family too.

When Christine and Michael moved out west and started their family, I would fly west after the birth of each daughter, and I've remained close to the girls because I love them as my own.  When their marriage ended Michael was happy to support Christine and the girls so that she could stay home with the girls while they were young, and he has remained a major part of the girls' lives.  Michael, Christine and Christine's 2nd husband have co-parented all of the children with love and dedication that I have witnessed in no other family that I know.  Because of this, the girls are super intelligent, well adjusted and have bright futures ahead of them.

I also would like to take this opportunity to address the trauma that Michael experienced growing up.  I too experienced trauma as a child, although nothing close to what Michael experienced.  One thing that I found was that I didn't even realize my childhood was traumatic and the negative effects that it was having on my life until just a few years ago.  I just thought I had a lousy childhood.  I can see how trauma has contributed to Michaels losing his way because I'm guessing he too may not have viewed his childhood as traumatic just lousy and never thought to seek help for it just as I didn't until I was 50+ years old.

I am confident that if given a second chance, that Michael can address those issues and put his heart and brilliance into something great.  That he can show his children the great man that he was and can be again.  And I'm hoping that he won't miss out on too much of his children's lives.

In closing, I'd like to focus on the brilliant career Michael had before the current media attention.  The Michael that in 2011 was in Fortune Magazines 40 under 40, a list of individuals the publication considers to be the most influential young leaders for the year, the Michael that was on 60 Minutes in 2014 as he was representing people whose loved

ones were buried at Eden Memorial Park but found that the grave sites had been double sold and their loved ones bodies dug up and discarded, the Michael who again was on 60 Minutes, as he went up against Kimberly-Clark when they were knowingly supplying the healthcare community with surgical gowns that leaked during the Ebola crisis.

This is the Michael that I know and love, the loving father, the champion for the underdog, the down to earth friend.

Thank you very much for your time and consideration.


Sincerely,

Shannon D. Faulk

Honorable Judge Selna,

I have known Michael for more than 30 years.  We developed our friendship at the Creve Coeur
Athletic Association where Michael was a youth baseball umpire, and I managed the concession
stand.  Soon after, he became the manager of the full complex – from field maintenance to the
concession stand – and his drive to surpass expectation was apparent when he made
impressive improvements to every facet of the park.

I've always admired Michael's intellect, work ethic, and tenacity. He worked multiple jobs to
pay his way through college while maintaining a stellar academic career. I've known him to be a
loyal, generous, and caring person who always put his family and friends first.

This is a challenging time for Michael, but there's no doubt that he will learn and grow from this
experience and put it to positive use in whatever his future holds.

Sincerely,

Tripp Manheimer

October 3, 2022

Dear Honorable Judge Selna

My name is Jamie Avenatti-Kryck. I am Michael Avenatti's cousin. I too would like to shed some light on the Michael Avenatti that I have known for my entire life, and the person that I grew up with.

When Michael was a child, he was definitely different from other kids -- very wise and extremely observant. He seemed to be already grown up by the time he was ten years old. He grew up as an only child even though he had two older half siblings. His older half-sister and half-brother had already left home at very young ages due to issues with his mother.

He was very close with his Grandmother Katherine, as was I, and my parents as well. He spent as much time with his grandmother in Southern California as he was able to. His Grandmother was actually the role model that he was closest to growing up. He spent time in the summers with his Grams, as he called her, and they would even come to our house and stay in Huntington Beach. He also spent any holidays that he could with her. She was a very kind and loving person in his life.

Unfortunately, he had a very difficult childhood when he was at home with his mother. She was an alcoholic and had some very obvious mental health issues towards her children. Her two oldest children are estranged from her, and she was only really interested in seeing Michael after he started making money in his professional life. He graduated first in his class at George Washington University and his own parents didn't even attend his graduation. His father knew never to cross his wife -- he knew the wrath of her would be intolerable. His grandmother Katherine passed away in 2007, that was a very difficult time. Michael and Christine were always there for my Auntie K as I called her. She was my great Aunt, and I adored her. I was so grateful for how Michael took care of her at the end of her life.

The Michael that I knew always worked extremely hard and was gifted in life, and with the help of his first wife Christine and her family, he was able to go to law school. I always knew he would go far in his life and become well known, but unfortunately, not the way the media has made him out to be.

He truly cares about his family, his daughters, and his very young son.  I am sure if he could go back to the beginning of the last ten years or so and make changes and different choices he would. The person who he became in the last decade is not the person that I grew up with my entire life.  He has still so much to offer people that I don't think that his actions in the last decade make up his entire future for the rest of his life. It was a different time in his life that I know he regrets. Unfortunately, so much of how our behavior as an adult stems from our childhood. Everything that we experience shapes us into the person that we become as adults, good and bad experiences.

Michael worked with what he had to become the "right" person in life. Unfortunately, he had some very difficult obstacles to overcome that were completely out of his control.  His core personality is actually a person always wanting to please. He was always working. I think that's where he always felt most comfortable in his life.

It is so unfortunate how the last decade has played out.  He is still a fairly young man in today's modern world.  Please take into consideration all things about Michael and about his family and his children.

Thank you for your time and consideration.

Jamie L. Avenatti-Kryck

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT P**





michael -
I just wanted
to say thank
you. This has
been an incredible
experience. You
are a wonderful
caring person -
despite what you
want the world to
think. looking forward
to many years of
success. Judy



the best things
in the world
aren't things.



TO THE MOON DESIGNS

© JESSICA SPORN



**USA 2.99**
CANADA 4.25

14533994

10495431
4428813

Made in the USA
©Papyrus-Recycled Greetings, Inc.
111 N. Canal Street
Chicago, IL 60606

RECYCLED
Paper Greetings®
Saving the Earth One Smile at a Time™
On recycled paper since 1971

0 42823 10731 3     0 0 0 0 1


SUSTAINABLE
FORESTRY
INITIATIVE
Certified Fiber Sourcing
www.sfiprogram.org

They're people like you.
Thank You
with all of my heart.

said

Couldn't have
it better myself.

Michael — THANK you
for this year and so
just appreciate what
just appreciate have done
for you

and I
appreciate you.

Love,
Missy



Christmas means the joy of trimming trees and the fun of making memories***

I love you thanks the Universe for you (I know—put this card Somewhere for no one else to see)

love you, Mesh.

AMERICAN GREETINGS
Printed on sustainably sourced paper

0   67008 03669   1
USA 279   4295778   0201
CANADA 369   AXO2017-20V
©AGC LLC   MADE IN U.S.A.

AMERICAN GREETINGS  CLEVELAND OHIO 44144

Christmas means
the magic of snowfall
and the mystery
of Santa Claus.

Christmas means
the warmest of hugs
and the happiest
of surprises...

But most of all,
Christmas means
special people
like you.

Have a
Very Merry Christmas

12-09

Dear Michael —
No words could ever
convey to you how much you
mean to me & how much I
appreciate you. You have
changed my life — from the depths of my
heart I thank you —
(from both perspectives)
& drinking & recovery.

Love,
Todd.





ONE PERSON can make all the difference — that one is YOU.

Dear Michael —
As I said before, there are no words. Thanks you for being you & for changing my life. I appreciate you & what you've done for me more than you will ever know... I am so blessed to be part of this team.

love,
MOSH



*To Thank You*

*Out of the abundance
of a giving heart...
gifts of joy*



 AMERICAN GREETINGS





00002

6 15266 63760 8

USA 499   3956384
CANADA 649   ATY38667-16X
©AGC, INC. MADE IN CHINA

AMERICAN GREETINGS CLEVELAND, OHIO 44144



Dear Michael —
I could go
on forever to let
you know how
much you have
changed my life —
lifting the burdens
I have had for so
very long — thank
you from my heart —
for All you do......

Moss



Dear Michael —

There are no words. Truly, no words. The only thing I can say is Thank You from my heart. I know you know — that I would do / have done / will do / whatever I can to make sure EOA is THE best... a/k/a — the best, most successful firm... your (EOA) only! Thank you to me was life altering... what does not happen very often or ever. I will always HAVE YOUR BACK... MOSB.

Dear Michael -

There are no words. Truly, no words. The only thing I can say is Thank you from my heart. I know you know - but I would do / have done / will do - whatever I can to make sure EOA is THE SHIT ..... a/k/a - the best, most successful firm ... EVER! ... Your (EOA) guys' thank you to me was life altering. - that does not happen very often ... or ever. I WILL ALWAYS HAVE YOUR BACK.

MOSB.

Dear Michael —

I could go on forever to let you know how much you have changed my life — lifting the burdens I have had for so very long — thank you from my heart — for ALL you do......

Thinking of you
and wanting you to know
you're appreciated
for all you are
and all you do.

Love
Mom

Christmas means
the magic of snowfall
and the mystery
of Santa Claus.

Christmas means
the warmest of hugs
and the happiest
of surprises…

But most of all,
Christmas means
special people
like you.

Have a
Very Merry Christmas

12.09

Dear Michael —
No words could ever
convey to you how much you
mean to me & how much I
appreciate you. You have
changed my life — from the depths o
heart ✦ I thank y
from both pers
Prof
p

Love,
Moss.



I love you + thank
the Universe for
you! (I know I put
this card
somewhere for
no one
else
to see!)
love you!
MBsb.

AMERICAN GREETINGS
Printed on sustainably sourced paper
AMERICAN GREETINGS  CLEVELAND, OHIO 44144

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

**EXHIBIT Q**

28

## H.     **Additional Factors That Support a Variance**

Avenatti requests a downward variance from the guidelines range recommended in the PSR due to the inhumane conditions of his confinement while at the MCC before, during, and after trial.  The degree of punishment inflicted on Avenatti before sentencing is unique in our justice system – and rightly so. It is intolerable and should not be inflicted on anyone.

On the evening of January 14, 2020, with the trial in this case scheduled to commence the following week, the U.S. Attorney's Office in California caused Avenatti to be arrested while he was attending a State Bar hearing in Los Angeles.  The Court noted that the timing of the arrest was especially troublesome, given that the alleged conduct used by the government to justify the arrest had been known to the government for months prior.[21]

Upon being booked in the Santa Ana jail that night, Avenatti was placed in solitary confinement in a wing of the jail generally reserved for violent inmates with disciplinary problems.[22]  Avenatti's request to take a shower upon his arrival was denied.  The following day, despite repeatedly asking to be housed in general population, Avenatti remained in solitary confinement.  He was again denied a shower.  On January 16, 2020, Avenatti spent the entire day in his cell with no ability to use the phone, or have any contact with his attorneys.

Early in the morning of Friday, January 17, 2020, Avenatti was removed from his cell and flown to Teterboro, New Jersey.  At all times, he was handcuffed, shackled at the waist and required to wear leg irons around his ankles.  He was permitted to use the toilet only with the door

---

[21] The timing of his arrest resulted in a substantial waste of taxpayer money because Avenatti subsequently had to be flown, accompanied by three U.S. Marshals, on a chartered private jet from Orange County to New York.

[22] Prior to March 2019, he had never been charged with any crime, let alone convicted of any crime.

open. He still had not been permitted to shower. He was transported to the MCC, whose substandard conditions are widely considered among the worst, if not the worst, in the nation.

Despite Avenatti's repeated request that he not be placed in solitary confinement, the Bureau of Prisons placed him in the notorious "10 South" unit of the jail,[23] a unit of only six to seven individual cells that is considered the highest security pre-trial facility in the United States. It typically holds those individuals classified as the most dangerous and who pose dire national security threats to the United States (*e.g.,* international terrorists and drug kingpins, such as Joaquin "El Chapo" Guzman and Sayfullo Saipov, who currently faces eight murder charges and the death penalty for an alleged terror attack carried out in New York City in 2017).[24] Avenatti's cell previously had been used to hold "El Chapo" Guzman before, during, and after his trial in Brooklyn, New York. The abhorrent and brutal conditions of 10 South have been widely reported and routinely described by experts as being "diabolical," a form of torture, worse than those at Guantanamo Bay, and causing severe psychological trauma.[25]

---

[23] The extreme isolation and brutal conditions of 10 South have been described as "a punitive measure that is unworthy of the United States as a civilized democracy," according to a former special monitor on torture and punishment for the United Nations who investigated the case of one prisoner held in the unit. *See Evidence from US experts to the House of Lords Select Committee on the Extradition Law*, Center for Constitutional Rights (Sept. 12, 2014), https://ccrjustice.org/sites/default/files/assets/files/US%20experts%20submission%20to%20House%20of%20Lords%20extradition%20committee.pdf (accessed June 8, 2021), Sally Eberhardt and Jeanne Theoharis, *Five Years Ago, Obama Pledged to End Torture. He Still Hasn't*, The Nation (Jan. 22, 2014), https://www.thenation.com/article/archive/five-years-ago-obama-pledged-end-torture-he-still-hasnt.

[24] The government has never adequately explained why Avenatti, a 48-year-old American attorney with no history of crime or violence and who had yet to be convicted of anything, was held in solitary confinement for 24 hours a day in the highest security pre-trial unit in the United States, which is almost uniformly reserved for suspected terrorists and those facing the death penalty for acts against the national interests of the United States.

[25] *See*, *e.g.*, Jeanne Theoharis, *I Tried to Tell the World About Epstein's Jail. No One Wanted to Listen*, The Atlantic (Aug. 16, 2019), https://www.theatlantic.com/ideas/archive/2019/08/real-scandal-mcc/596257, Arun Kundnani, *The Guantánamo in New York You're Not Allowed to Know*

19

Despite repeated requests by undersigned counsel and Avenatti that he be moved from 10 South, he was held in solitary confinement in the unit for nearly five weeks (except for time in court or in attorney meetings) until February 20, at which time Avenatti was finally placed in general population in Unit 5 South. During the five weeks he was confined to 10 South, Avenatti was not permitted to go outside to breathe fresh air or see the sky. For the first three weeks, a guard was stationed immediately outside the door of his cell 24 hours a day. He was rarely permitted to view any television, was not allowed to use a radio, and was never permitted to read a newspaper. He was not permitted a single social visit.[26] His every move (including showers and use of the toilet) was recorded on two cameras located inside his cell, and he was told that if he tried to cover himself when using the toilet, he would be disciplined. He could not control the lights within his cell, which were routinely left on without interruption. The temperature inside his cell reached approximately 45 degrees Fahrenheit at night. Attorney visits and access to discovery materials were also repeatedly delayed and often restricted. Further, Avenatti was not

---

*About*, The Intercept (Feb. 5, 2016), https://theintercept.com/2016/02/05/mahdi-hashi-metropolitan-correctional-center-manhattan-guantanamo-pretrial-solitary-confinement, Mary Emily O'Hara, *NYC's 'Little Gitmo' Holds Terrorism Suspects in Extreme Isolation for Years*, Vice (Apr. 7, 2014), https://www.vice.com/en_us/article/vbnpg9/nycs-little-gitmo-holds-terrorism-suspects-in-extreme-isolation-for-years, Aviva Stahl, *Prisoners Endure a Nightmare 'Gulag' in Lower Manhattan, Hidden in Plain Sight*, Gothamist (June 19, 2018), https://gothamist.com/news/prisoners-endure-a-nightmare-gulag-in-lower-manhattan-hidden-in-plain-sight, Joseph Goldstein, *Manhattan Jail That Holds El Chapo Is Called Tougher Than Guantánamo Bay*, N.Y. Times (Jan. 23, 2017), https://www.nytimes.com/2017/01/23/nyregion/el-chapo-guzman-manhattan-jail.html, Larry Neumeister and Michael Biesecker, *For Inmates Like Epstein, Suicide Watch is Meant to be Short*, Associated Press (Aug. 14, 2019), https://apnews.com/article/6bd16a2216664ca1bf8eabbfebc72c7c.

[26] Avenatti was never permitted a social visit during his approximate 100 days at MCC, even though his family and close friends went to great lengths to attempt to see him, including traveling to New York only to be turned away at the facility.

20

allowed to have email access. His calls, including attorney calls, were severely limited, and he was not permitted to use the law library. He was generally cut off from the outside world.

On February 27, 2020 – a mere seven days after he was moved out of 10 South – the entire MCC was placed on lockdown status after it was discovered that a corrections officer had smuggled a loaded firearm into the facility and provided it to an inmate. Attorney visits and contact were immediately and indefinitely suspended that day. All inmates were locked in their cells 24 hours a day so that a search could begin prison-wide for the firearm. "Sort" teams (*i.e.*, SWAT-like teams) and other corrections officers from maximum security United States Penitentiaries from across the country were brought to MCC to conduct repeated cell raids, often in the middle of the night.[27] In the 13 days that followed, Avenatti was permitted only two showers, each five minutes in length. He was locked in rat-infested cells 24 hours a day with no clean laundry;[28] he was cut off entirely from his counsel and family; he had no phone or email access; and he was not given a single hot meal. Instead, he was fed frozen peanut butter and jelly sandwiches every night for 13 nights straight, to be later followed by an additional 32 nights straight.

On March 10, 2020, days after the firearm was recovered, MCC finally removed the lockdown status and Avenatti was transferred to Unit 11 South. Only 12 days later, on March 22, 2020, his unit was again locked down for what was then described as a "staff shortage." The next

---

[27] For instance, Avenatti had his cell searched *seven times* by officers in full tactical gear, often at 3:00 or 4:00 a.m., across thirteen days. At one point, Avenatti, together with other inmates, was required to place his hands on his head for three consecutive hours and was told if he removed his hands, there would be "hell to pay" and he would get a "shot" (a disciplinary charge) and taken to the SHU. He was also strip searched repeatedly. Further, his personal property, including many of his legal documents, were taken and "lost." During one strip search at approximately 3:30 in the morning on March 4, a corrections officer said to another "He doesn't look as tough now as he thought he did when he was going after Trump on TV."

[28] Avenatti was ultimately allowed one change of clothes and sheets across approximately five weeks.

21

day, March 23, 2020, MCC informed his unit that it would remain locked down and quarantined
as a result of an inmate in the unit testing positive for COVID-19.  All attorney visits were once
again stopped; all law library/discovery access was immediately suspended; no inmate was
permitted to leave the unit unless he was being released; and inmates were permitted to leave their
cells only approximately three times per week for a total of five hours per week to use the phone
or email system.  Occasionally, a hot lunch would be served, but generally all meals were cold or
frozen.  Rats infested his unit.  Toilets overflowed constantly, and Avenatti was told to use his
hands to clean it up.  The conditions were inhumane and beyond brutal.

In late March, Avenatti's counsel in California requested that the district judge in
California order Avenatti's release to home confinement as a result of his underlying health
conditions and risk for serious injury or death were he to contract COVID-19 while incarcerated.
The government opposed this effort, and on March 21, 2020, the California district court denied
the request.

On April 10, 2020, the district court in California reversed course and ordered the
government to release Avenatti to home confinement under severe restrictions; however, the
government demanded that Avenatti first be quarantined.  On Saturday, April 11, 2020, the BOP
moved Avenatti back to solitary confinement in 10 South and again placed him under unreasonably
restrictive conditions.  He was not permitted email access, access to a computer, or regular contact
with his attorneys or family.  Nor was he permitted to leave his cell on a single occasion until his
release to home confinement two weeks later, on April 24, 2020.

In sum, the government placed Avenatti in custody for approximately 100 days, during
which he was permitted to see the sky and breathe fresh air for one hour in total.  For 80 of those
days, he was held in solitary confinement or under lockdown status.  During this time, he was

forced to endure abhorrent, brutal conditions almost unheard of even for inmates with long, violent criminal histories or serious disciplinary problems.

Since his temporary release due to COVID-19 over a year ago on April 24, 2020, Avenatti has remained confined to a two bedroom, one-bath apartment with his friend, Jay Manheimer, under substantial restrictions. For more than 13 months, Avenatti has not been permitted to leave Mr. Manheimer's apartment, nor asked for the opportunity to leave, even for medical or dental care, with two exceptions – to receive the two doses of the COVID-19 vaccine.

Avenatti remains subject to the January 15, 2020 detention order and is presently on temporary release, in the custody of Mr. Manheimer. While his conditions of confinement are better than prison, he is not on traditional home confinement and his liberty is severely restricted. On May 14, 2021, Pretrial Services submitted a report to the district court in California and stated that "[t]hroughout the period of temporary release, the defendant has remained in compliance and has been cooperative with directives from Pretrial Services." According to Pretrial Services, Avenatti "has shown a pattern of consistently compliant behavior" and Pretrial "has not received any new information that would suggest [Avenatti] is a flight risk or danger to the community." *Id*.

The Second Circuit has held that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures." *United States v. Carty*, 264 F. 3d 191, 196 (2d Cir. 2001). District court judges in the Southern District of New York have previously granted departures on this basis. In *United States v. Mateo*, 299 F. Supp. 2d 201 (S.D.N.Y. 2004), Judge Marrero downwardly departed nine levels from the guidelines range on the grounds of harsh pre-sentence confinement conditions and extraordinary family circumstances. The defendant was pregnant while incarcerated. She suffered labor pains for over 15 hours before assistance arrived.

23

She was afraid and in severe pain. She eventually gave birth in the prison without medication. Judge Marrero found that the trauma suffered by the defendant during custody, "the full effects of which can never be comprehensively gauged, has inflicted forms of pain and suffering that have effectively enhanced, to a disproportionate degree, the level of punishment contemplated to be experienced by inmates in the typical case during the period of incarceration prescribed by the Guidelines for [the] offense." *Id.* at 212.

Similarly, in *United States v. Salvador*, 2006 WL 2034637 (S.D.N.Y. 2006), the Court found that unsanitary conditions and a lack of food were among the reasons justifying a departure for incarceration in the Dominican Republic while awaiting extradition to the United States. And, in *United States v. Francis*, 129 F. Supp. 2d 612, 619 (S.D.N.Y. 2001), the district court downwardly departed due to the conditions of pre-sentence detention, finding that the defendant had suffered "extraordinary stress and fear" while incarcerated in a state correctional facility as a federal detainee.

Since the COVID-19 pandemic, judges within this district have considered the impact of the virus as a §3553(a) factor and granted downward variances based on the conditions endured by inmates at BOP facilities. *See, e.g., United States v. Morgan*, 19 Cr. 209 (RMB) (S.D.N.Y. May 5, 2020), ECF No. 90 (cutting the sentence to less than half of the low end of the guidelines based in part on conditions at MDC during the pandemic and condemning the conditions at MCC and MDC prior to the current crisis); *United States v. Casillas*, 19 Cr. 863 (VSB) (S.D.N.Y. May 4, 2020), ECF No. 27 (reducing the length of the sentence in part based on conditions at MCC during the COVID-19 crisis); *United States v. Pierson*, 14 Cr. 855 (LTS) (S.D.N.Y. May 4, 2020), ECF No. 73 (same for defendant detained at MDC).

In the recent sentencing of *Tiffany Days*, 19 Cr. 619 (CM), held on April 29, 2021, former Chief Judge McMahon made the following comments about the MCC: "It is the finding of this Court that the conditions to which she was subjected are as disgusting, inhuman as anything I've heard about in any Colombian prison, but more so because we are supposed to be better than that." (ECF No. 35, at p. 19) (transcript attached hereto as Exhibit 2). Similarly, Judge Engelmayer's thoughtful comments during the imposition of sentence in *United States v. Aracena De Jesus*, 20 Cr. 19 (PAE) (S.D.N.Y. July 1, 2020), ECF No. 27, speak volumes about the harsh conditions of detention and its impact on inmates.

> "Finally, I am mindful . . . that you have served most of your time in prison so far during the worst pandemic in this country during the past 100 years. I'm mindful that you may have contracted COVID-19 while in prison. I'm mindful that your experience in prison as a result of the pandemic, the preceding lockdown, the ensuing lockdown, and your own illness was frightful. Prison is supposed to be punishment, but it is not supposed to be trauma of that nature or close. My colleagues and I commonly informally credit prisoners who have served time awaiting extradition in dreadful prisons overseas with more time served than measured by the calendar. The same logic applies here, and then some ....
>
> Bottom line, your time in the MCC was way harder than anyone intended when you were detained following your arrest. Any mature system of justice, any thoughtful judge in imposing the reasonable sentence here would have to recognize the unexpected and regrettable ardors that you experienced since your arrest in December."

Tr. 7/1/20, at p. 36-37 (transcript attached hereto as Exhibit 3); *see also United States v. Jervis Cerino*, 19 Cr. 323 (S.D.N.Y. July 21, 2020) (Judge Rakoff) (district court granted a variance from a guideline range of 57-71 months for a Hobbs Act robbery and imposed a sentence of 10 months, noting: "[I]t is fair to say that conditions in the prison system now result in a harshness that is not the norm and that ought to be recognized by the court as a mitigating factor. In effect, you are serving harder time every day you are in the federal prisons.").

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT R**

## U.S. DEPARTMENT OF JUSTICE

### FEDERAL BUREAU OF PRISONS

| | |
|---|---|
| Register Number: 86743-054 | Risk Level Inmate....: R-MIN |
| Inmate Name |   General Level......: R-MIN (3) |
|   Last.........: AVENATTI |   Violent Level......: R-MIN (2) |
|   First........: MICHAEL | Security Level Inmate: MINIMUM |
|   Middle.......: | Security Level Facl..: LOW |
|   Suffix.......: | Responsible Facility.: TRM |
| Gender.........: MALE | Start Incarceration..: 02/08/2022 |

### PATTERN Worksheet Summary

| Item | - Value | - General Score | - Violent Score |
|---|---|---|---|
| Current Age | 51 | 7 | 4 |
| Walsh w/Conviction | FALSE | 0 | 0 |
| Violent Offense (PATTERN) | FALSE | 0 | 0 |
| Criminal History Points | 0 | 0 | 0 |
| History of Escapes | 0 | 0 | 0 |
| History of Violence | 0 | 0 | 0 |
| Education Score | HighSchoolDegreeOrGED | -4 | -2 |
| Drug Program Status | NoDAPCompletion | 0 | 0 |
| All Incident Reports (120 Months) | 0 | 0 | 0 |
| Serious Incident Reports (120 Months) | 0 | 0 | 0 |
| Time Since Last Incident Report | N/A | 0 | 0 |
| Time Since Last Serious Incident Report | N/A | 0 | 0 |
| FRP Refuse | FALSE | 0 | 0 |
| Programs Completed | 0 | 0 | 0 |
| Work Programs | 0 | 0 | 0 |
| | Total | 3 | 2 |

Assessment Date: 03/31/2022                                    Assessment# R-314716802E

FSA RISK Scoring Detail (Current Snapshot)          **Program Review (Team)**

**8.26.22 TeamD 08-26-2022**

AVENATTI, MICHAEL    (86743-054)

AVENATTI, MICHAEL

PERRY, JAMES

| Evaluation | General | Violent |
|---|---|---|
| Gender: | 0 | 0 |
| Current Age: | 7 | 4 |
| Walsh Act With Conviction: | | |
| Instant Violent Offense: | 0 | 0 |
| Criminal History Points: | 0 | 0 |
| History Of Escape: | 0 | 0 |
| History Of Violence: | 0 | 0 |
| Education Score Status: | -2 | -2 |
| Drug Program Status: | 0 | 0 |
| Incident Report Count: | 0 | 0 |
| Serious Incident Report Count: | 0 | 0 |
| Time Since Last Incident: | 0 | 0 |
| Time Since Last Serious Incident: | 0 | 0 |
| FRP Refuse: | 0 | 0 |
| Number of Programs Completed: | 0 | 0 |
| Number of Tech and VT Programs Completed: | -1 | -1 |
| Total Score | 4 | 1 |
| Risk Level | R-MIN | R-MIN |

Close

❮ Back to Dockets

**86743-054**

AVENATTI, MICHAEL

Qtrs: D01-001L

Age: 51

| Profile | Other | CMA | Work | EDC | Disc | ARS | Health | FRP | PTP/DRG | Hist | Feed | FSA |

| FRP | Progress | Next Review | Long Term | Notes | Contacts | RRC/HC | Questions | Assessments |



AVENATTI, MICHAEL    (86743-054)

**FSA NEEDS Re-Assessment**

**EXHIBIT S**

# H. Dean Steward

ATTORNEY AT LAW

17 Corporate Plaza Drive
Suite 254
Newport Beach, CA 92660
949-481-4900

July 8, 2022

Ranee Katzenstein

Brent Sagel

U.S. Attorney's Office

*Via Email*

Dear Ms. Katzenstein & Mr. Sagel:

In advance of sentencing, Mr. Avenatti respectfully requests that
the government file a motion in accordance with U.S.S.G. 3E1.1(b)
so that Mr. Avenatti may receive the benefit of an additional one
level reduction at the time of sentencing. In light of the amount of
time, money and resources Mr. Avenatti saved the Court and the
prosecution, as well as the government's agents and experts, by
pleading guilty in this complex case in early June (i.e. two lengthy
trials, expert fees, multiple appeals, etc.), Mr. Avenatti should
receive the additional level reduction. Thank you in advance.

Sincerely,

H. Dean Steward
Advisory Counsel for
Michael J. Avenatti

• Admitted-California & Hawaii • Fellow-American College of Trial Lawyers •
fax: 949-706-9994 • e-mail: deansteward7777@gmail.com

**EXHIBIT T**

August 20, 2022

Ms. Leah T. Wilson
The State Bar of California
180 Howard St.
San Francisco, California 94105

Re: Michael J. Avenatti, Bar No. 206929 (Voluntary Relinquishment of License and Membership)

Ms. Leah T. Wilson:

I have been a licensed member of the State Bar of California since approximately June 2000. I write to voluntarily relinquish my license to practice law in California and my membership in the State Bar of California effective immediately, and to request that the State Bar effectuate this request as soon as possible.

In the event you have any questions or concerns regarding the foregoing, you may contact me via mail at the following address:

Michael Avenatti
Reg. No. 86743-054
FCI Terminal Island
P.O. Box 3007
San Pedro, CA 90733

Thank you in advance for your prompt attention to this matter.

Very truly yours,

Michael J. Avenatti

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT U**



Timeline of
March 22, 2019 – May 22, 2019
(Period of 62 Days)

5/22/19
Indictment filed in Nike case

5/22/19
Indictment filed in Clifford

4/10/19
Indictment filed in instant case

3/24/19
Complaint filed in Nike case

3/22/19
Complaint filed in instant case

SDNY US Attorney Burman informed Main Justice about defendant's imminent arrest on Nike matter. Burman was told that SDNY "should stand down until the turf issue got settled" between the CDCA prosecution and SDNY prosecution. SDNY "was able to reach an understanding with [Nicola] Hanna: if [SDNY] arrested Avenatti on Monday, Hanna would announce their charges as well."

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

**EXHIBIT V**

28

(AJWx),CLOSED,DISCOVERY,MANADR

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA (Western Division - Los Angeles)
### CIVIL DOCKET FOR CASE #: 2:13-cv-04496-MMM-AJW

Geoffrey Ernest Johnson v. Leroy Baca et al
Assigned to: Judge Margaret M. Morrow
Referred to: Magistrate Judge Andrew J. Wistrich
Case in other court: Superior Court of CA for the County of Los
                         Angeles, BC493409
Cause: 28:1441 Notice of Removal - Personal Injury

Date Filed: 06/21/2013
Date Terminated: 02/11/2015
Jury Demand: Both
Nature of Suit: 360 P.I.: Other
Jurisdiction: Federal Question

**Plaintiff**

**Geoffrey Ernest Johnson**

represented by **Carlos X Colorado**
Eagan Avenatti LLP
520 Newport Center Drive
Suite 1400
Newport Beach, CA 92660
949-706-7000
Fax: 949-706-7050
Email: ccolorado@eaganavenatti.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael J. Avenatti**
Avenatti LLP
520 Newport Center Drive Suite 1400
Newport Beach, CA 92660
949-706-7000
Fax: 949-706-7050
Email: mavenatti@eaganavenatti.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Scott Howard Sims**
Eagan Avenatti LLP
520 Newport Center Drive
Suite 1400
Newport Beach, CA 92660
949-706-7000
Fax: 949-706-7050
Email: ssims@lawfss.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John P McNicholas , III**
McNicholas and McNicholas
10866 Wilshire Boulevard Suite 1400
Los Angeles, CA 90024-4338
310-474-1582
Fax: 310-475-7871

Email: john@nicholaslaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Leroy Baca**
*an individual*

represented by **Charles Phan**
San Bernardino County Counsel Office
385 North Arrowhead Avenue 4th Floor
San Bernardino, CA 92415
909-387-5465
Fax: 909-3873070
Email: charles.phan@cc.sbcounty.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas C Hurrell**
Hurrell Cantrall, LLP
725 South Figueroa Street Suite 3800
Los Angeles, CA 90017
213-426-2000
Fax: 213-426-2020
Email: thurrell@hurrellcantrall.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amie S Park**
Lewis Brisbois Bisgaard and Smith LLP
633 West 5th Street
Suite 4000
Los Angeles, CA 90071
213-250-1800
Fax: 213-250-7900
Email: APark@counsel.lacounty.gov
*TERMINATED: 02/18/2014*

**Rebecca N Herman**
Pettit Kohn Ingrassia and Lutz PC
5901 West Century Boulevard Suite 1100
Los Angeles, CA 90045
310-649-5772
Fax: 310-649-5777
Email: rherman@pettitkohn.com
*TERMINATED: 08/10/2016*

**Defendant**

**Los Angeles Sheriff's Department**
*a division of the County of Los Angeles*

represented by **Charles Phan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas C Hurrell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Amie S Park
(See above for address)
*TERMINATED: 02/18/2014*

Rebecca N Herman
(See above for address)
*TERMINATED: 08/10/2016*

**Defendant**

**County of Los Angeles**                    represented by   **Charles Phan**
*a political body*                                              (See above for address)
                                                               *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Thomas C Hurrell**
                                                               (See above for address)
                                                               *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Amie S Park**
                                                               (See above for address)
                                                               *TERMINATED: 02/18/2014*

                                                               **Rebecca N Herman**
                                                               (See above for address)
                                                               *TERMINATED: 08/10/2016*

**Defendant**

**Does**                                       represented by   **Thomas C Hurrell**
*1 through 50 Inclusive*                                         (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

**Mediator (ADR Panel)**

**Linda K Lefkowitz**

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 06/21/2013 | 1 | NOTICE OF REMOVAL from Superior Court of CA for the County of Los Angeles, case number BC493409 with CONFORMED FILED copy of summons and complaint. Case assigned to Judge Margaret M. Morrow, Discovery to Magistrate Judge Andrew J Wistrich. (Filing fee $ 400 PAID. ), filed by Defendants Los Angeles Sheriff's Department, Leroy Baca, County of Los Angeles.(et) (Additional attachment(s) added on 7/2/2013: # 1 Notice of Assignment, # 2 Civil Cover Sheet) (mg). (Additional attachment(s) added on 7/2/2013: # 3 Exhibit A-L Part 1, # 4 Exhibit A-L Part 2, # 5 Exhibit A-L Part 3) (mg). (Additional attachment(s) added on 7/2/2013: # 6 Exhibit M-R Part 1, # 7 Exhibit M-R Part 2, # 8 Exhibit M-R Part 3) (mg). (Additional attachment(s) added on 7/2/2013: # 9 Exhibit S-Z) (mg). (Entered: 06/24/2013) |
| 06/21/2013 | 2 | NOTICE of Interested Parties filed by Defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. (et) (mg). (Entered: 06/24/2013) |
| 06/21/2013 | 3 | CERTIFICATE OF SERVICE filed by Defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department, re Certificate/Notice of Interested Parties 2 , Notice of Removal, 1 served on 6/21/2013. (et) (mg). (Entered: 06/24/2013) |

| 06/21/2013 | 4 | NOTICE TO PARTIES OF COURT-DIRECTED ADR PROGRAM filed. (et) (Entered: 06/24/2013) |
|---|---|---|
| 06/28/2013 | 5 | NOTICE OF MOTION AND MOTION to Dismiss for a more definite Statement, and Motion to Strike Portions of Plaintiff's First Amended Complaint filed by defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. Motion set for hearing on 9/23/2013 at 10:00 AM before Judge Margaret M. Morrow. (Attachments: # 1 Declaration, # 2 Proposed Order, # 3 Request for Judicial Notice, # 4 Exhibit A, # 5 Exhibit B)(Park, Amie) (Entered: 06/28/2013) |
| 07/01/2013 | 6 | ORDER SETTING SCHEDULING CONFERENCE by Judge Margaret M. Morrow. Rule 26 Meeting Report due by 9/13/2013. Status Conference set for 9/23/2013 10:00 AM before Judge Margaret M. Morrow. (ah) (Entered: 07/01/2013) |
| 07/08/2013 | 7 | TEXT ENTRY ONLY: Judge Margaret M. Morrow is participating in a pilot project regarding the submission of SEALED DOCUMENTS. Effective July 8, 2013, all proposed sealed documents must be submitted via e-mail to the Judge's Chambers email at MMM_chambers@cacd.uscourts.gov. Please refer to the judge's procedures and schedules for detailed instructions for submission of sealed documents. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY.(ah) TEXT ONLY ENTRY (Entered: 07/08/2013) |
| 09/02/2013 | 8 | Plaintiff's Opposition re: MOTION to Dismiss for a more definite Statement, and Motion to Strike Portions of Plaintiff's First Amended Complaint 5 filed by Plaintiff Geoffrey Ernest Johnson. (Attachments: # 1 Proposed Order)(Avenatti, Michael) (Entered: 09/02/2013) |
| 09/02/2013 | 9 | STIPULATION to of Voluntary Dismissal of Certain Causes of Action as to Certain Defendants Only filed by Plaintiff Geoffrey Ernest Johnson. (Attachments: # 1 Proposed Order)(Avenatti, Michael) (Entered: 09/02/2013) |
| 09/03/2013 | 10 | ORDER GRANTING JOINT STIPULATION OF VOLUNTARY DISMISSAL OF CERTAIN CAUSES OF ACTION AS TO CERTAIN DEFENDANTS ONLY by Judge Margaret M. Morrow, re Stipulation to Amend/Correct 9 . The Court GRANTS the Stipulation. It is hereby ORDERED that: Plaintiff Geoffrey Johnson ("Plaintiff") first through fourth causes of action against Leroy Baca ("Baca") are dismissed with prejudice to the extent they are brought against Baca in his official capacity as the Los Angeles County Sheriff. Plaintiff's third cause of action against Baca under Government Code Section 845.6 for failure to summon immediate necessary medical care is further dismissed to the extent it to brought against Baca in his individual capacity. This Order shall have no effect on Plaintiff's first, second and fourth causes of action against Baca in his individual capacity. Plaintiff's first and second causes of action against County of Los Angeles and the Los Angeles Sheriff's Department for violation of the Bane Civil Rights Act (California Civil Code 52.1) and the Ralph Civil Rights Act (California Civil Code 51.7) are dismissed with prejudice; Defendant's Motion to Dismiss, Motion for a More Definite Statement, and Motion to Strike Portions of Plaintiff's Complaint, currently set for hearing on September 23, 2013, will proceed as scheduled, except that all argument made in the motion relating to the causes of action addressed in this Stipulation are deemed moot. (bp) (Entered: 09/04/2013) |
| 09/04/2013 | 11 | AMENDED DOCUMENT filed by Plaintiff Geoffrey Ernest Johnson. Amendment to Stipulation to Amend/Correct 9 (Attachments: # 1 Proposed Order)(Avenatti, Michael) (Entered: 09/04/2013) |
| 09/09/2013 | 12 | REPLY in support of MOTION to Dismiss for a more definite Statement, and Motion to Strike Portions of Plaintiff's First Amended Complaint 5 filed by Defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. (Phan, Charles) (Entered: 09/09/2013) |
| 09/10/2013 | 14 | AMENDED ORDER GRANTING JOINT STIPULATION OF VOLUNTARY DISMISSAL OF CERTAIN CAUSES OF ACTION AS TO CERTAIN DEFENDANTS ONLY by Judge |

Margaret M. Morrow, re Stipulation to Amend/Correct 9 : Having considered the parties' Joint Stipulation Joint Stipulation Of Voluntary Dismissal Of Certain Causes Of Action As To Certain Defendants Only filed September 2, 2013 (Dkt. No. 9) and the arties Amended Joint Stipulation Joint Stipulation Of Voluntary Dismissal Of Certain Causes Of Action As To Certain Defendants Only filed September 2, 2013 good cause appearing, the Court hereby GRANTS the Amended Joint Stipulation and modifies its September 4, 2013 Order Joint Stipulation Joint Stipulation Of Voluntary Dismissal Of Certain Causes Of Action As To Certain Defendants Only to read in full as follows: 1. Plaintiff Geoffrey Johnson' ("Plaintiff") first through fourth causes of action against Leroy Baca ("Baca") are dismissed with prejudice to the extent they are brought against Baca in his official capacity as the Los Angeles County Sheriff. 2. Plaintiff's third cause of action against Baca under Government Code section 845.6 for failure to summon immediate necessary medical care is further dismissed with prejudice to the extent it is brought against Baca in his individual capacity. This Order shall have no effect on Plaintiff's first, second and fourth causes of action against Baca in his individual capacity. 3. Plaintiff's first and second causes of action against the County of Los Angeles and the Los Angeles Sheriff's Department for violation of the Bane Civil Rights Act (California Civil Code 52.1) and the Ralph Civil Rights Act (California Civil Code § 51.7) are dismissed with prejudice; 4. Defendant's Motion to Dismiss, Motion for a More Definite Statement, and Motion to Strike Portions of Plaintiff's Complaint, currently set for hearing on September 23, 2013, will proceed as scheduled, except that all arguments made in the motion relating to the causes of action addressed in the Stipulation are deemed moot. (bm) (Entered: 09/11/2013)

| | | |
|---|---|---|
| 09/11/2013 | 13 | JOINT REPORT of Rule 26(f) Report of Counsel filed by Defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. (Phan, Charles) (Entered: 09/11/2013) |
| 09/20/2013 | 15 | TEXT ONLY ENTRY: (IN CHAMBERS) ORDER TAKING HEARING ON MOTION TO DISMISS 5 OFF CALENDAR; CONTINUING SCHEDULING CONFERENCE by Judge Margaret M. Morrow. Defendants' motion to dismiss; Alternatively, more definite statement, and motion to strike is currently on calendar for 09/23/2013 at 10:00 a.m. Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the court finds that this matter is appropriate for decision without oral argument. The hearing calendared for 09/23/2013, is hereby vacated, and the matter is taken off calendar. The matter will be deemed submitted on the vacated hearing date, and the clerk will notify the parties when the court has reached a decision. Scheduling Conference is continued to 11/04/2013 at 9:00 AM. An updated Joint 26(f) Report shall be filed by 10/25/2013. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (ah) TEXT ONLY ENTRY (Entered: 09/20/2013) |
| 09/24/2013 | 16 | ORDER GRANTING DEFENDANTS' MOTION TO DISMISS, AND DENYING DEFENDANTS MOTION FOR MORE DEFINITE STATEMENT AND MOTION TO STRIKE by Judge Margaret M. Morrow granting in part and denying in part 5 Motion to Dismiss: For the reasons stated, the court grants defendants' motion to dismiss. Their motion to strike, construed as a motion to dismiss, is denied, as is their motion for more definite statement. As it is possible that Johnson can plausibly state a § 1983 claim against Baca and the County defendants, the court grants him leave to amend. See Doe v. United States, 58 F.3d 494, 497 (9th Cir. 1995) ("'[A] district court should grant leave to amend... unless it determines that the pleading could not possibly be cured by the allegation of other facts,'" quoting Cook, Perkiss and Liehe v. N. Cal. Collection Serv., 911 F.2d 242, 247 (9th Cir. 1990)). Should Johnson reallege his § 1983 claim, he may include the same state claims in this amended complaint that he alleged in the original complaint. No new federal or state law claims may be included in the amended complaint. Any amended complaint must be filed within twenty days of the date of this order. (see document for further details) (bm) (Entered: 09/24/2013) |
| 10/10/2013 | 17 | Joint STIPULATION for Extension of Time to Amend Order on Motion to Dismiss,,,,, 16 filed by plaintiff Geoffrey Ernest Johnson. (Attachments: # 1 Proposed Order)(Avenatti, |

| | | |
|---|---|---|
| | | Michael) (Entered: 10/10/2013) |
| 10/11/2013 | 18 | STIPULATION AND ORDER GRANTING JOINT STIPULATION RE FILING OF SECOND AMENDED COMPLAINT by Judge Margaret M. Morrow: re Stipulation for Extension of Time to Amend 17 . The deadline for Plaintiff to manually file his Second Amended Complaint shall be October 15, 2013. (ah) (Entered: 10/11/2013) |
| 10/15/2013 | 19 | SECOND AMENDED COMPLAINT against defendants Leroy Baca, County of Los Angeles, Does, Los Angeles Sheriff's Department amending Notice of Removal 1 , filed by plaintiff Geoffrey Ernest Johnson. (bm) (Entered: 10/17/2013) |
| 10/25/2013 | 20 | JOINT REPORT Rule 26(f) Discovery Plan *Updated Joint Rule 26(f) Report of Counsel* ; estimated length of trial 2-3 weeks, filed by Defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department.. (Phan, Charles) (Entered: 10/25/2013) |
| 10/29/2013 | 21 | NOTICE OF MOTION AND MOTION to Dismiss *Defts Mtn to Dismiss or Alternatively, Mtn for a More Definite Stmt as to Plt's Second Amended Complaint; Decl Charles Phan* filed by defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. Motion set for hearing on 2/3/2014 at 10:00 AM before Judge Margaret M. Morrow. (Attachments: # 1 Proposed Order)(Phan, Charles) (Entered: 10/29/2013) |
| 11/04/2013 | 22 | MINUTES OF SCHEDULING CONFERENCE held before Judge Margaret M. Morrow. Final Pretrial Conference set for 9/8/2014 09:00 AM before Judge Margaret M. Morrow. Jury Trial set for 10/6/2014 08:30 AM before Judge Margaret M. Morrow. Telephone Conference set for 4/16/2014 05:15 PM. Court Reporter: C. Nirenberg. (ah) (Entered: 11/04/2013) |
| 11/04/2013 | 23 | ORDER/REFERRAL to ADR Procedure No 2 by Judge Margaret M. Morrow. Case ordered to Court Mediation Panel for mediation. (ah) (Entered: 11/04/2013) |
| 12/02/2013 | 24 | STIPULATION REGARDING SELECTION of Panel Mediator filed. Parties stipulate that Linda K. Lefkowitz may serve as Panel Mediator. Plaintiff obtained the Panel Mediators consent to serve. Filed by Plaintiff Geoffrey Ernest Johnson(Avenatti, Michael) (Entered: 12/02/2013) |
| 12/05/2013 | 25 | NOTICE OF ASSIGNMENT of Panel Mediator. Mediator (ADR Panel) Linda K Lefkowitz has been assigned to serve as Panel Mediator. (mb) (Entered: 12/05/2013) |
| 12/16/2013 | 26 | EX PARTE APPLICATION to Amend re Scheduling Conference, Set/Reset Hearing,, 22 (Attachments: # 1 Memorandum of Points and Authorities, # 2 Declaration of Scott H. Sims, # 3 Proposed Order)(Avenatti, Michael) (Entered: 12/16/2013) |
| 12/17/2013 | 27 | Defendants' Opposition to Plaintiff's Ex Parte Application to Amend the Scheduling Order to Extend Deadline to File Motions/Stipulations Amending the Pleadings; Declaration of Charles Phan Opposition re: EX PARTE APPLICATION to Amend re Scheduling Conference, Set/Reset Hearing,, 22 26 filed by Defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. (Phan, Charles) (Entered: 12/17/2013) |
| 12/17/2013 | 28 | REPLY in support of EX PARTE APPLICATION to Amend re Scheduling Conference, Set/Reset Hearing,, 22 26 filed by Plaintiff Geoffrey Ernest Johnson. (Attachments: # 1 Declaration of Scott H. Sims)(Avenatti, Michael) (Entered: 12/17/2013) |
| 12/27/2013 | 29 | SCHEDULING NOTICE CONTINUING TRIAL DATE by Judge Margaret M. Morrow previously scheduled for 10/6/2014 8:30 AM has been rescheduled. Jury Trial set for 10/14/2014 08:30 AM before Judge Margaret M. Morrow. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (ah) TEXT ONLY ENTRY (Entered: 12/27/2013) |
| 12/30/2013 | 30 | IN CHAMBERS ORDER Granting Ex Parte Application to Extend Deadline to FileMotions/Stipulations Amending the Pleadings 26 by Judge Margaret M. Morrow: The court grants Johnson's ex parte application for relief from the amendment deadline set forth in the scheduling order. Johnson may file a motion or stipulation seeking to amend his |

| | | complaint to add new defendants only, on or before February 21, 2014. The Court continues defendants' motion to dismiss 21 to 03/03/2014 at 10:00 AM. See order for details. (ah) (Entered: 12/30/2013) |
|---|---|---|
| 02/10/2014 | 31 | PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS re: MOTION to Dismiss *Defts Mtn to Dismiss or Alternatively, Mtn for a More Definite Stmt as to Plt's Second Amended Complaint; Decl Charles Phan* 21 filed by Plaintiff Geoffrey Ernest Johnson. (Avenatti, Michael) (Entered: 02/10/2014) |
| 02/11/2014 | 32 | Notice of Appearance or Withdrawal of Counsel: for attorney Rebecca Herman Snader counsel for Defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. Adding Rebecca H. Snader as attorney as counsel of record for Defendants for the reason indicated in the G-123 Notice. Filed by Defendants Rebecca H. Snader. (Attorney Rebecca Herman Snader added to party Leroy Baca(pty:dft), Attorney Rebecca Herman Snader added to party County of Los Angeles(pty:dft), Attorney Rebecca Herman Snader added to party Los Angeles Sheriff's Department(pty:dft))(Snader, Rebecca) (Entered: 02/11/2014) |
| 02/14/2014 | 33 | REPLY In Support of MOTION to Dismiss *Defts Mtn to Dismiss or Alternatively, Mtn for a More Definite Stmt as to Plt's Second Amended Complaint; Decl Charles Phan* 21 filed by Defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. (Snader, Rebecca) (Entered: 02/14/2014) |
| 02/20/2014 | 34 | Joint STIPULATION for Trial on November 25, 2014 Geoffrey Ernest Johnson. (Attachments: # 1 Proposed Order)(Avenatti, Michael) (Entered: 02/20/2014) |
| 02/20/2014 | 35 | Notice of Appearance or Withdrawal of Counsel: for attorney Amie S Park counsel for Defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. Amie S. Park is no longer attorney of record for the aforementioned party in this case for the reason indicated in the G-123 Notice. Filed by Defendant Defendants, County of Los Angeles, Los Angeles County Sheriff's Department and Leroy Baca. (Park, Amie) (Entered: 02/20/2014) |
| 02/24/2014 | 36 | STIPULATION for Order Medical Examination of Plaintiff Geoffrey Johnson filed by defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. (Attachments: # 1 Proposed Order)(Phan, Charles) (Entered: 02/24/2014) |
| 02/25/2014 | 37 | NOTICE TO FILER OF DEFICIENCIES in Electronically Filed Documents RE: Stipulation for Order 36 . The following error(s) was found: Other error(s) with document(s) are specified below. Other error(s) with document(s): Stipulation is set before the wrong judge.. In response to this notice the court may order (1) an amended or correct document to be filed (2) the document stricken or (3) take other action as the court deems appropriate. You need not take any action in response to this notice unless and until the court directs you to do so. (mz) (Entered: 02/25/2014) |
| 02/26/2014 | 38 | TEXT ONLY ENTRY: Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the court finds that Defendants' Motion to Dismiss 21 is appropriate for decision without oral argument. The hearing calendared for 3/3/2014, is hereby vacated, and the matter is taken off calendar. The matter will be deemed submitted on the vacated hearing date, and the clerk will notify the parties when the court has reached a decision. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (ah) TEXT ONLY ENTRY (Entered: 02/26/2014) |
| 02/27/2014 | 39 | ORDER ON STIPULATION FOR A MEDICAL EXAMINATION OF PLAINTIFF GEOFFREY JOHNSON, 36 by Magistrate Judge Andrew J. Wistrich. The examination shall take place on March 4, 2014 at 1:30 p.m. at Sunrise of West Hills, located at 9012 Topanga Canyon Blvd, West Hills, California, 91304, or at a date and time mutually agreeable by the parties. IT IS SO ORDERED. (mz) (Entered: 02/27/2014) |
| 03/03/2014 | 40 | ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT, AND DENYING DEFENDANTS' |

| | | |
|---|---|---|
| | | MOTION FOR MORE DEFINITE STATEMENT 21 by Judge Margaret M. Morrow: The court grants defendants' motion to dismiss Johnson's Bane Act claim with leave to amend. Any amended complaint must be filed within twenty days of the date of this order. (ah) (Entered: 03/03/2014) |
| 03/07/2014 | 41 | STIPULATION AND ORDER CONTINUING PRETRIAL AND TRIAL DATES by Judge Margaret M. Morrow: re Stipulation for Trial 34 . Final Pretrial Conference set for 10/6/2014 09:00 AM before Judge Margaret M. Morrow. Jury Trial set for 10/28/2014 08:30 AM before Judge Margaret M. Morrow. See order for details. (ah) (Entered: 03/07/2014) |
| 03/17/2014 | 42 | NOTICE OF MOTION AND MOTION to Compel Production of Documents Pursuant to Local Rule 37-2 *by Plaintiff* Geoffrey Ernest Johnson. Motion set for hearing on 4/7/2014 at 10:00 AM before Magistrate Judge Andrew J. Wistrich. (Attachments: # 1 Joint Stipulation, # 2 Declaration of Scott Sims Part 1 of 3, # 3 Declaration of Scott Sims Part 2 of 3, # 4 Declaration of Scott Sims Part 3 of 3, # 5 Proposed Order)(Avenatti, Michael) (Entered: 03/17/2014) |
| 03/24/2014 | 43 | SUPPLEMENT to MOTION to Compel Production of Documents Pursuant to Local Rule 37-2 *by Plaintiff* 42 filed by Plaintiff Geoffrey Ernest Johnson. (Avenatti, Michael) (Entered: 03/24/2014) |
| 03/31/2014 | 44 | (STRICKEN PER COURT ORDER)NOTICE OF MOTION AND Joint MOTION to Compel request for admission *Joint Stipulation Pursuant to Local Rule 37-2.2 re: Deft Leroy Baca's Request for Admission to Geoffrey Earnest Johnson, set one* filed by defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. Motion set for hearing on 4/21/2014 at 10:00 AM before Magistrate Judge Andrew J. Wistrich. (Attachments: # 1 Declaration Scott H. Sims)(Phan, Charles) Modified on 4/1/2014 (yb). (Entered: 03/31/2014) |
| 04/01/2014 | 45 | NOTICE TO FILER OF DEFICIENCIES in Electronically Filed Documents RE: Joint MOTION to Compel request for admission *Joint Stipulation Pursuant to Local Rule 37-2.2 re: Deft Leroy Baca's Request for Admission to Geoffrey Earnest Johnson, set one* 44 . The following error(s) was found: Other error(s) with document(s) are specified below. The correct event is: Joint Stipulation re Discovery Motion. Other error(s) with document(s): No notice of motion filed- see Local Rule 6.1. Docketing entry does not match the title of the document.. In response to this notice the court may order (1) an amended or correct document to be filed (2) the document stricken or (3) take other action as the court deems appropriate. You need not take any action in response to this notice unless and until the court directs you to do so. (yb) (Entered: 04/01/2014) |
| 04/01/2014 | 46 | ORDER by Magistrate Judge Andrew J. Wistrich The document is stricken and counsel is ordered to file an amended or corrected document by April 3, 2014. RE: Notice of Deficiency in Electronically Filed Documents (G-112),,, 45 (yb) (Entered: 04/01/2014) |
| 04/02/2014 | 47 | NOTICE OF MOTION AND MOTION for Admissions of Plaintiff Geoffrey Johnson filed by defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. Motion set for hearing on 4/21/2014 at 10:00 AM before Magistrate Judge Andrew J. Wistrich. (Phan, Charles) (Entered: 04/02/2014) |
| 04/02/2014 | 48 | JOINT STIPULATION to Joint MOTION to Compel request for admission *Joint Stipulation Pursuant to Local Rule 37-2.2 re: Deft Leroy Baca's Request for Admission to Geoffrey Earnest Johnson, set one* 44 , MOTION for Admissions of Plaintiff Geoffrey Johnson 47 filed by Defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. (Attachments: # 1 Declaration Scott H. Sims)(Phan, Charles) (Entered: 04/02/2014) |
| 04/02/2014 | 49 | MINUTE ORDER IN CHAMBERS by Magistrate Judge Andrew J. Wistrich: re: MOTION to Compel Production of Documents Pursuant to Local Rule 37-2 *by Plaintiff* 42 . The hearings originally scheduled have been rescheduled( Motion set for hearing on 4/21/2014 at 10:00 AM before Magistrate Judge Andrew J. Wistrich.) (yb) (Entered: 04/02/2014) |
| 04/07/2014 | 50 | Joint STIPULATION for Extension of Time to Amend Geoffery Ernest Johnson. |

| | | (Attachments: # 1 Proposed Order)(Agenatti, Michael) (Entered: 04/07/2014) |
|---|---|---|
| 04/07/2014 | 51 | ANSWER to Amended Complaint 19 JURY DEMAND. *Answer to Plaintiff's Second Amended Complaint; Demand for Jury Trial* filed by Defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department.(Snader, Rebecca) (Entered: 04/07/2014) |
| 04/15/2014 | 52 | TEXT ONLY ENTRY ADVANCING TIME OF TELEPHONE CONFERENCE by Judge Margaret M. Morrow previously scheduled for 4/16/2014 5:15 pm has been rescheduled. Telephone Conference set for 4/16/2014 04:45 PM before Judge Margaret M. Morrow. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (ah) TEXT ONLY ENTRY (Entered: 04/15/2014) |
| 04/16/2014 | 53 | MINUTES OF Telephone Conference held before Judge Margaret M. Morrow: The parties and the court discuss the status of discovery and settlement discussions. Court Reporter: N/A. (ah) (Entered: 04/17/2014) |
| 04/17/2014 | 54 | STIPULATION AND ORDER GRANTING JOINT STIPULATION TO EXTEND THE DEADLINE TO FILE MOTIONS/STIPULATIONS SEEKING AMENDMENT OF PLEADINGS TO ADD NEW PARTIES FROM APRIL 7, 2014 TO MAY 19, 2014. by Judge Margaret M. Morrow: re Stipulation for Extension of Time to Amend 50 . The deadline to file motions/stipulations seeking amendment of pleadings is extended to May 19, 2014. (ah) (Entered: 04/17/2014) |
| 04/18/2014 | 55 | NOTICE of Association of Counsel associating attorney John Patrick McNicholas on behalf of Plaintiff Geoffrey Ernest Johnson. Filed by Plaintiff Geoffrey Ernest Johnson (Attorney John P McNicholas, III added to party Geoffrey Ernest Johnson(pty:pla))(McNicholas, John) (Entered: 04/18/2014) |
| 04/21/2014 | 56 | MINUTES OF DISCOVERY MOTIONSgranting in part and denying in part 42 Motion to Compel; granting 47 Motion for Admissions; Discovery Hearing held before Magistrate Judge Andrew J. Wistrich. Court Recorder: CS 04/21/2014. (yb) (Entered: 04/21/2014) |
| 05/02/2014 | 57 | NOTICE OF MOTION AND MOTION to Compel Third-Party, Alicia Cross, M.D.'s Compliance with Subpoena to Produce Documents Under Federal Rules of Civil Procedure, Rule 45 filed by defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. Motion set for hearing on 6/9/2014 at 10:00 AM before Magistrate Judge Andrew J. Wistrich. (Attachments: # 1 Proposed Order)(Phan, Charles) (Entered: 05/02/2014) |
| 05/06/2014 | 58 | NOTICE taking off calendar defts' motion to compel third-party Alicia Cross, M.D.'s compliance w/ subpoena to produce records filed by defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. (Phan, Charles) (Entered: 05/06/2014) |
| 05/14/2014 | 59 | DECLARATION of Sonja Marzett *In Support of Defendants' Supplemental Responses to Request for Production* filed by Defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. (Snader, Rebecca) (Entered: 05/14/2014) |
| 05/14/2014 | 60 | DECLARATION of Deputy Christopher Deacon *In Support of Defendants' Supplemental Responses to Request for Production* filed by Defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. (Snader, Rebecca) (Entered: 05/14/2014) |
| 05/14/2014 | 61 | DECLARATION of Rebecca H. Snader *In Support of Defendants' Supplemental Responses to Request for Production* filed by Defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. (Snader, Rebecca) (Entered: 05/14/2014) |
| 06/02/2014 | 62 | EX PARTE APPLICATION for Sanctions Against Defendants for Failure to Comply with Discovery Orders, Pursuant to Local Rules 7-19 and 37-2 filed by Plaintiff Geoffrey Ernest Johnson. (Attachments: # 1 Memorandum, # 2 Declaration, # 3 Exhibit (A through T), # 4 Proposed Order)(Sims, Scott) (Entered: 06/02/2014) |
| 06/03/2014 | 63 | OPPOSITION re: EX PARTE APPLICATION for Sanctions Against Defendants for Failure |

| | | |
|---|---|---|
| | | to Comply with Discovery Orders, Pursuant to Local Rules 7-19 and 37-2 62 *Decl of Charles Phan* filed by Defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. (Attachments: # 1 Exhibit A to E)(Phan, Charles) (Entered: 06/03/2014) |
| 06/12/2014 | 64 | ORDER CALENDARING PLAINTIFF'S EX PARTE APPLICATION FOR SANCTIONS AGAINST DEFENDANTS FOR FAILURE TO COMPLY WITH DISCOVERY ORDERS. ( Motion set for hearing on 6/23/2014 at 10:00 AM before Magistrate Judge Andrew J. Wistrich. RE EX PARTE APPLICATION for Sanctions Against Defendants for Failure to Comply with Discovery Orders, Pursuant to Local Rules 7-19 and 37-2 62 . (yb) (Entered: 06/12/2014) |
| 06/23/2014 | 65 | MINUTES (IN CHAMBERS): ORDER REGARDING PLAINTIFFS EX PARTE APPLICATION FOR SANCTIONS AGAINST DEFENDANTS by Magistrate Judge Andrew J. Wistrich: granting in part and denying in part 62 Ex Parte Application for Sanctions. After considering defendants opposition and the arguments of counsel during the hearing, the ex parte application is granted in part and denied in part as stated on the record. The discovery cutoff date is not extended, but defendants must produce one or more properly prepared Fed. R. Civ. P. 30(b)(6) witnesses within 14 days. If plaintiff believes he requires additional discovery, he may apply for it by utilizing the procedure described by the court on the record.IT IS SO ORDERED. (mz) (Entered: 06/23/2014) |
| 07/28/2014 | 66 | EX PARTE APPLICATION to Extend Discovery Cut-Off Date to 9/15/2014 *(Expert Discovery Cut-Off)* filed by Plaintiff Geoffrey Ernest Johnson. (Attachments: # 1 Memorandum, # 2 Declaration of Carlos X. Colorado, # 3 Exhibit Exhibits A - D, # 4 Exhibit Exhibit E, # 5 Exhibit Exhibit F, # 6 Exhibit Exhibits G - H, # 7 Exhibit Exhibits I - W, # 8 Proposed Order)(Avenatti, Michael) (Entered: 07/28/2014) |
| 07/29/2014 | 67 | OPPOSITION TO re: EX PARTE APPLICATION to Extend Discovery Cut-Off Date to 9/15/2014 *(Expert Discovery Cut-Off)* 66 filed by Defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. (Snader, Rebecca) (Entered: 07/29/2014) |
| 07/30/2014 | 68 | REPLY In Support Of EX PARTE APPLICATION to Extend Discovery Cut-Off Date to 9/15/2014 *(Expert Discovery Cut-Off)* 66 filed by Plaintiff Geoffry Ernest Johnson. (Avenatti, Michael) (Entered: 07/30/2014) |
| 08/01/2014 | 69 | MINUTES (IN CHAMBERS) ORDER Granting Ex Parte Application to Extend Time for Plaintiff to Serve Expert Witness Reports by Judge Margaret M. Morrow granting 66 Ex Parte Application: For the reasons stated, the court grants Johnson's ex parte application for an extension of the expert disclosure and discovery cut-off dates. It extends the initial expert disclosure deadline to August 15, 2014, the rebuttal expert disclosure deadline to August 29, 2014, and the expert discovery cut-off date to September 12, 2014. Colorado is directed not to show any of Johnson's experts the initial expert reports prepared by defendants' experts, nor to discuss their contents with any other counsel or with the experts. In light of this modification of the case management dates, the court also continues the deadline for completion of a mediation to September 22, 2014, the motion hearing cut-off date to October 6, 2014, the final pretrial conference to October 27, 2014, and the trial date to November 18, 2014. This will be the final extension of dates the court will grant in this case. Should either party fail to meet these dates, the opposing party may move for appropriate sanctions including inference and/or issue preclusion sanctions. (see document for further details) (bm) (Entered: 08/01/2014) |
| 09/05/2014 | 70 | NOTICE OF MOTION AND MOTION for Summary Judgment as to or in the Alternative Motion for Summary Adjudication filed by Defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. Motion set for hearing on 10/6/2014 at 10:00 AM before Judge Margaret M. Morrow. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B, # 3 Exhibit Exhibit C, # 4 Exhibit Exhibit D, # 5 Exhibit Exhibit E, # 6 Exhibit Exhibit F, # 7 Exhibit Exhibit G, # 8 Exhibit Exhibit H, # 9 Exhibit Exhibit I, # 10 Exhibit Exhibit J, # 11 |

| | | |
|---|---|---|
| | | Proposed Order Proposed Order Proposed Order in MSJ, # 12 Proposed Order Proposed Judgment, # 13 Separate Statement re Defendants' MSJ)(Snader, Rebecca) (Entered: 09/05/2014) |
| 09/09/2014 | 71 | NOTICE Errata re Declarations in Support of Deft' MSJ filed by defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. (Attachments: # 1 Declaration Nurse Gapac, # 2 Declaration Dr. Khajuria, # 3 Declaration Susanna Giuliano-Ghahramani, # 4 Declaration Deputy Vitogiannis, # 5 Declaration Dr. Horst, # 6 Declaration Deputy Perez-Argueta)(Phan, Charles) (Entered: 09/09/2014) |
| 09/09/2014 | 72 | NOTICE Errata re Declarations in Support of Deft' MSJ filed by defendants Leroy Baca, County of Los Angeles, Does, Linda K Lefkowitz, Los Angeles Sheriff's Department. (Attachments: # 1 Declaration Nurse Gomonit, # 2 Declaration CA Marshall, # 3 Declaration Dr. Ortego)(Phan, Charles) (Entered: 09/09/2014) |
| 09/09/2014 | 73 | NOTICE Errata re Declarations in Support of Deft' MSJ filed by defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. (Attachments: # 1 Declaration Capt. McCorkle, # 2 Exhibit A to Capt. McCorkle decl, # 3 Exhibit B to Capt. McCorkle decl)(Phan, Charles) (Entered: 09/09/2014) |
| 09/09/2014 | 74 | DECLARATION of Rebecca H. Snader, Esq. In Support of MOTION for Summary Judgment as to or in the Alternative Motion for Summary Adjudication 70 filed by Defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. (Snader, Rebecca) (Entered: 09/09/2014) |
| 09/09/2014 | 75 | EX PARTE APPLICATION to Strike re MOTION for Summary Judgment as to or in the Alternative Motion for Summary Adjudication 70 filed by plaintiff Geoffrey Ernest Johnson. (Attachments: # 1 Declaration of Carlos X. Colorado In Support of Ex Parte Application, # 2 Exhibit 1-6, # 3 Proposed Order)(Avenatti, Michael) (Entered: 09/09/2014) |
| 09/10/2014 | 76 | NOTICE TO FILER OF DEFICIENCIES in Electronically Filed Documents RE: Notices of Errata 71 , 72 , 73 . (bm) (Entered: 09/10/2014) |
| 09/10/2014 | 77 | OPPOSITION re: EX PARTE APPLICATION to Strike re MOTION for Summary Judgment as to or in the Alternative Motion for Summary Adjudication 70 75 filed by Defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. (Snader, Rebecca) (Entered: 09/10/2014) |
| 09/10/2014 | 78 | REPLY EX PARTE APPLICATION to Strike re MOTION for Summary Judgment as to or in the Alternative Motion for Summary Adjudication 70 75 filed by Plaintiff Geoffrey Ernest Johnson. (Avenatti, Michael) (Entered: 09/10/2014) |
| 09/11/2014 | 79 | IN CHAMBERS: ORDER Denying Plaintiffs' Ex Parte Application to Strike Defendant's Motion for Summary Judgment 75 by Judge Margaret M. Morrow. The court denies Johnson's application to strike. The court will extend plaintiff's time to file opposition to September 17, 2014. Defendants' reply is due asset forth in the Local Rules, on September 22, 2014. (ah) (Entered: 09/11/2014) |
| 09/17/2014 | 80 | OPPOSITION re: MOTION for Summary Judgment as to or in the Alternative Motion for Summary Adjudication 70 filed by Plaintiff Geoffrey Ernest Johnson. (Attachments: # 1 Response to Separate Statement, # 2 Declaration of Scott H. Sims, # 3 Exhibit 1-12, # 4 Exhibit 13-22, # 5 Exhibit 23-26, # 6 Exhibit 27, # 7 Exhibit 28-29, # 8 Exhibit 30-31, # 9 Exhibit 32-35, # 10 Evidentiary Objections - Ortega, # 11 Evidentiary Objections - Horst, # 12 Evidentiary Objections - Gomonit, # 13 Evidentiary Objections - Giuliano-Ghahramani, # 14 Evidentiary Objections - Vitogiannis, # 15 Evidentiary Objections - Marshall, # 16 Evidentiary Objections - Gapac, # 17 Evidentiary Objections - Khajuria)(Avenatti, Michael) (Entered: 09/17/2014) |
| 09/18/2014 | 81 | NOTICE OF ERRATA filed by Plaintiff Geoffrey Ernest Johnson. correcting Objection/Opposition (Motion related),,, 80 (Attachments: # 1 Exhibit A to Errata)(Avenatti, Michael) (Entered: 09/18/2014) |

| | | |
|---|---|---|
| 09/22/2014 | 82 | REPLY In Support of MOTION for Summary Judgment as to or in the Alternative Motion for Summary Adjudication 70 filed by Defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. (Attachments: # 1 Evidentiary Objections to Plaintiff's Evidence in Opposition to Defts' Motion for Summary Judgment or, Alternatively, Summary Adjudication, # 2 Response to Plaintiff's Evidentiary Objections, # 3 Reply to Plaintiff's Response to Separate Statement of Uncontroverted Facst and Conclusions of Law in Support of Motion for Summary Judgment, or in the Alternatively, Summary Adjudication, # 4 Proposed Order Re: Defendants' Evidentiary Objections to Plaintiff's Exhibits in Opposition to Defendants' Motion for Summary Judgment, or in the Alternatively, Summary Adjudication)(Phan, Charles) (Entered: 09/22/2014) |
| 09/23/2014 | 83 | Joint STIPULATION to Continue Pre-Trial Conference from October 27, 2014 to November 3, 2014 filed by plaintiff Geoffrey Ernest Johnson. (Attachments: # 1 Declaration of Michael J. Avenatti, # 2 Proposed Order)(Avenatti, Michael) (Entered: 09/23/2014) |
| 09/29/2014 | 84 | Joint STIPULATION for Trial filed by Plaintiff Geoffrey Ernest Johnson.(Avenatti, Michael) (Entered: 09/29/2014) |
| 09/29/2014 | 85 | NOTICE OF MOTION AND MOTION to Bifurcate the trial into two phases filed by defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. Motion set for hearing on 10/27/2014 at 09:00 AM before Judge Margaret M. Morrow. (Attachments: # 1 Proposed Order)(Phan, Charles) (Entered: 09/29/2014) |
| 09/29/2014 | 86 | NOTICE OF MOTION AND MOTION IN LIMINE (1-6) to Exclude Evidence and/or Arguments filed by Plaintiff Geoffrey Ernest Johnson. Motion set for hearing on 10/27/2014 at 09:00 AM before Judge Margaret M. Morrow. (Attachments: # 1 Motion in Limine No. 1, # 2 Motion in Limine No. 2, # 3 Motion in Limine No. 3, # 4 Motion in Limine No. 4, # 5 Motion in Limine No. 5, # 6 Motion in Limine No. 6, # 7 Declaration of Scott H. Sims, # 8 Proposed Order)(Avenatti, Michael) (Entered: 09/29/2014) |
| 09/29/2014 | 87 | NOTICE OF MOTION AND MOTION IN LIMINE (MIL #1) to Preclude Testimony of Plts Expert Roger Clark *or Substantially Limit the Testimony* filed by defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. Motion set for hearing on 10/27/2014 at 09:00 AM before Judge Margaret M. Morrow. (Attachments: # 1 Exhibit A, # 2 Exhibit B and C, # 3 Proposed Order)(Phan, Charles) (Entered: 09/29/2014) |
| 09/29/2014 | 88 | NOTICE OF MOTION AND MOTION IN LIMINE (MIL #2) to Preclude Any References to Reports or Letters Issued by the US Dept. of Justice filed by defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. Motion set for hearing on 10/27/2014 at 09:00 AM before Judge Margaret M. Morrow. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Proposed Order)(Phan, Charles) (Entered: 09/29/2014) |
| 09/29/2014 | 89 | NOTICE OF MOTION AND MOTION IN LIMINE (MIL #3) to Preclude Any Reference to the Citizen's Commission on Jail Violence and Evidence of Said Commission's May 14, 2012 Status Report and Sept. 2012 Final Report filed by defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. Motion set for hearing on 10/27/2014 at 09:00 AM before Judge Margaret M. Morrow. (Attachments: # 1 Proposed Order)(Phan, Charles) (Entered: 09/29/2014) |
| 09/29/2014 | 90 | NOTICE OF MOTION AND MOTION IN LIMINE (MIL #4) to Preclude Any references to the memo of agreement between the US and LA Co. CA re Mental Health Services at the LA County Jails filed by defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. Motion set for hearing on 10/27/2014 at 09:00 AM before Judge Margaret M. Morrow. (Attachments: # 1 Proposed Order)(Phan, Charles) (Entered: 09/29/2014) |
| 09/29/2014 | 91 | NOTICE OF MOTION AND MOTION IN LIMINE (MIL #5) to Preclude Any reference to the ACLU's report entitled Mental Health Issues at LA County Jail filed by defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. Motion set for hearing on |

10/27/2014 at 09:00 AM before Judge Margaret M. Morrow. (Attachments: # 1 Proposed Order)(Phan, Charles) (Entered: 09/29/2014)

| 09/29/2014 | 92 | NOTICE OF MOTION AND MOTION IN LIMINE (MIL #6) to Preclude Reference to prior incidents of unrelated inmate on inmate violence and/or prior unrelated suicide attempts filed by defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. Motion set for hearing on 10/27/2014 at 09:00 AM before Judge Margaret M. Morrow. (Attachments: # 1 Proposed Order)(Phan, Charles) (Entered: 09/29/2014) |
|---|---|---|
| 09/29/2014 | 93 | NOTICE OF MOTION AND MOTION IN LIMINE (MIL #7) to Preclude reference to subsequent remedial measures filed by defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. Motion set for hearing on 10/27/2014 at 09:00 AM before Judge Margaret M. Morrow. (Attachments: # 1 Proposed Order)(Phan, Charles) (Entered: 09/29/2014) |
| 09/29/2014 | 94 | NOTICE OF MOTION AND MOTION IN LIMINE (MIL #8) to Preclude Reference to the cost of medical care received by plaintiff from LAC/USC medical center filed by defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. Motion set for hearing on 10/27/2014 at 09:00 AM before Judge Margaret M. Morrow. (Attachments: # 1 Proposed Order)(Phan, Charles) (Entered: 09/29/2014) |
| 09/29/2014 | 95 | NOTICE OF MOTION AND MOTION IN LIMINE (MIL #9) to Exclude evidence of prior or subsequent claims or lawsuits involving the defendants filed by defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. Motion set for hearing on 10/27/2014 at 09:00 AM before Judge Margaret M. Morrow. (Attachments: # 1 Proposed Order)(Phan, Charles) (Entered: 09/29/2014) |
| 09/29/2014 | 96 | NOTICE OF MOTION AND MOTION IN LIMINE MIL #10) to Preclude plaintiff from introducing any evidence relating to the outcome of plaintiff's criminal proceedings filed by defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. Motion set for hearing on 10/27/2014 at 09:00 AM before Judge Margaret M. Morrow. (Attachments: # 1 Proposed Order)(Phan, Charles) (Entered: 09/29/2014) |
| 09/29/2014 | 97 | NOTICE OF MOTION AND MOTION IN LIMINE (MIL #11) to Preclude Reference to media reports pertaining to the subject incident and the LA Co. Sheriff's Dept. filed by defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. Motion set for hearing on 10/27/2014 at 09:00 AM before Judge Margaret M. Morrow. (Attachments: # 1 Proposed Order)(Phan, Charles) (Entered: 09/29/2014) |
| 09/30/2014 | 98 | EX PARTE APPLICATION to Compel Deposition of Thomas Hedge, M.D. filed by defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. (Attachments: # 1 Exhibit B and C, # 2 Exhibit D, # 3 Exhibit E to H, # 4 Proposed Order) (Phan, Charles) (Entered: 09/30/2014) |
| 09/30/2014 | 99 | TEXT ONLY ENTRY: (IN CHAMBERS) ORDER STRIKING MOTIONS IN LIMINE 1-6 86 by Judge Margaret M. Morrow previously scheduled for 10/27/2014 9:00 has been terminated. Plaintiff must file each motion in limine separately. Such motions must be re-filed by 10am, October 1, 2014. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (ah) TEXT ONLY ENTRY (Entered: 09/30/2014) |
| 09/30/2014 | 100 | NOTICE OF MOTION AND MOTION IN LIMINE (1) to Exclude Evidence or Argument that Defendants' Policies, Procedures and Training Related to Mentally Ill and/or Suicidal Inmates Were Not Inadequate and Regarding Notice Thereof filed by Plaintiff Geoffrey Ernest Johnson. Motion set for hearing on 10/27/2014 at 09:00 AM before Judge Margaret M. Morrow. (Attachments: # 1 Memorandum, # 2 Declaration of Scott H. Sims, # 3 Proposed Order)(Avenatti, Michael) (Entered: 09/30/2014) |
| 09/30/2014 | 101 | NOTICE OF MOTION AND MOTION IN LIMINE (2) to Exclude Evidence of Collateral Source Payments filed by Plaintiff Geoffrey Ernest Johnson. Motion set for hearing on 10/27/2014 at 09:00 AM before Judge Margaret M. Morrow. (Attachments: # 1 |

| | | Memorandum, # 2 Declaration of Scott H. Sims, # 3 Proposed Order)(Avenatti, Michael) (Entered: 09/30/2014) |
|---|---|---|
| 09/30/2014 | 102 | NOTICE OF MOTION AND MOTION IN LIMINE (3) to Exclude Evidence that Plaintiff was Charged with Attempted Rape filed by Plaintiff Geoffrey Ernest Johnson. Motion set for hearing on 10/27/2014 at 09:00 AM before Judge Margaret M. Morrow. (Attachments: # 1 Memorandum, # 2 Declaration of Scott H. Sims, # 3 Proposed Order)(Avenatti, Michael) (Entered: 09/30/2014) |
| 09/30/2014 | 103 | NOTICE OF MOTION AND MOTION IN LIMINE (4) to Exclude Argument that Plaintiff Should Have Sued Additional or Other Defendants filed by Plaintiff Geoffrey Ernest Johnson. Motion set for hearing on 10/27/2014 at 09:00 AM before Judge Margaret M. Morrow. (Attachments: # 1 Memorandum, # 2 Declaration of Scott H. Sims, # 3 Proposed Order)(Avenatti, Michael) (Entered: 09/30/2014) |
| 09/30/2014 | 104 | NOTICE OF MOTION AND MOTION IN LIMINE (5) to Exclude Reference to Plaintiff's Purportedly Aggressive Behavior filed by Plaintiff Geoffrey Ernest Johnson. Motion set for hearing on 10/27/2014 at 09:00 AM before Judge Margaret M. Morrow. (Attachments: # 1 Memorandum, # 2 Declaration of Scott H. Sims, # 3 Proposed Order)(Avenatti, Michael) (Entered: 09/30/2014) |
| 09/30/2014 | 105 | NOTICE OF MOTION AND MOTION IN LIMINE (6) to Exclude Evidence or Argument Relating to Plaintiff's Past Alcoholism filed by Plaintiff Geoffrey Ernest Johnson. Motion set for hearing on 10/27/2014 at 09:00 AM before Judge Margaret M. Morrow. (Attachments: # 1 Memorandum, # 2 Declaration of Scott H. Sims, # 3 Proposed Order)(Avenatti, Michael) (Entered: 09/30/2014) |
| 10/01/2014 | 106 | OPPOSITION OPPOSITION re: EX PARTE APPLICATION to Compel Deposition of Thomas Hedge, M.D. 98 filed by Plaintiff Geoffrey Ernest Johnson. (Attachments: # 1 Declaration of Carlos X. Colorado In Support of Opposition to Defendants' Ex Parte Application)(Avenatti, Michael) (Entered: 10/01/2014) |
| 10/02/2014 | 107 | REPLY EX PARTE APPLICATION to Compel Deposition of Thomas Hedge, M.D. 98 *Defts Reply in Support of the Ex Parte Application for an Order for the deposition of Thomas Hedge, M.D.* filed by Defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. (Phan, Charles) (Entered: 10/02/2014) |
| 10/03/2014 | 108 | SCHEDULING NOTICE by Magistrate Judge Andrew J. Wistrich re: EX PARTE APPLICATION to Compel Deposition of Thomas Hedge, M.D. 98 Ex Parte Application hearing set for 10/17/2014 at 10:00 AM before Magistrate Judge Andrew J. Wistrich in Courtroom 690, Roybal Federal Building.THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (yb) TEXT ONLY ENTRY (Entered: 10/03/2014) |
| 10/06/2014 | 109 | MINUTES OF Defendants Motion for Summary Judgment 70 held before Judge Margaret M. Morrow: The court takes the motion under submission. Court Reporter: Lisa Gonzalez. (ah) (Entered: 10/06/2014) |
| 10/06/2014 | 110 | OPPOSITION re: MOTION IN LIMINE (1) to Exclude Evidence or Argument that Defendants' Policies, Procedures and Training Related to Mentally Ill and/or Suicidal Inmates Were Not Inadequate and Regarding Notice Thereof 100 *Dec of Brent J. Lehman* filed by Defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. (Attachments: # 1 Exhibit A to I, # 2 Exhibit J to N, # 3 Exhibit O to R)(Phan, Charles) (Entered: 10/06/2014) |
| 10/06/2014 | 111 | OPPOSITION re: MOTION IN LIMINE (2) to Exclude Evidence of Collateral Source Payments 101 *Decl Rebecca Snader* filed by Defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. (Phan, Charles) (Entered: 10/06/2014) |
| 10/06/2014 | 112 | OPPOSITION re: MOTION IN LIMINE (3) to Exclude Evidence that Plaintiff was Charged with Attempted Rape 102 filed by Defendants Leroy Baca, County of Los Angeles, Los |

| | | |
|---|---|---|
| | | Angeles Sheriff's Department. (Phan, Charles) (Entered: 10/06/2014) |
| 10/06/2014 | 113 | OPPOSITION re: MOTION IN LIMINE (4) to Exclude Argument that Plaintiff Should Have Sued Additional or Other Defendants 103 filed by Defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. (Phan, Charles) (Entered: 10/06/2014) |
| 10/06/2014 | 114 | OPPOSITION re: MOTION IN LIMINE (5) to Exclude Reference to Plaintiff's Purportedly Aggressive Behavior 104 *Decl CA Stephanie Medina* filed by Defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. (Phan, Charles) (Entered: 10/06/2014) |
| 10/06/2014 | 115 | OPPOSITION re: MOTION IN LIMINE (6) to Exclude Evidence or Argument Relating to Plaintiff's Past Alcoholism 105 *Decl of Charles Phan* filed by Defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. (Phan, Charles) (Entered: 10/06/2014) |
| 10/06/2014 | 116 | Witness List Geoffrey Ernest Johnson.. (Avenatti, Michael) (Entered: 10/06/2014) |
| 10/06/2014 | 117 | JOINT Exhibit List filed by Plaintiff Geoffrey Ernest Johnson.. (Avenatti, Michael) (Entered: 10/06/2014) |
| 10/06/2014 | 118 | OPPOSITION re: MOTION to Bifurcate the trial into two phases 85 filed by Plaintiff Geoffrey Ernest Johnson. (Attachments: # 1 Declaration of Scott H. Sims)(Avenatti, Michael) (Entered: 10/06/2014) |
| 10/06/2014 | 119 | MEMORANDUM of CONTENTIONS of FACT and LAW filed by Plaintiff Geoffrey Ernest Johnson. (Avenatti, Michael) (Entered: 10/06/2014) |
| 10/06/2014 | 120 | OPPOSITION re: MOTION IN LIMINE (MIL #1) to Preclude Testimony of Plts Expert Roger Clark *or Substantially Limit the Testimony* 87 filed by Plaintiff Geoffrey Ernest Johnson. (Attachments: # 1 Declaration of Roger Clark)(Avenatti, Michael) (Entered: 10/06/2014) |
| 10/06/2014 | 121 | OPPOSITION re: MOTION IN LIMINE (MIL #2) to Preclude Any References to Reports or Letters Issued by the US Dept. of Justice 88 filed by Plaintiff Geoffrey Ernest Johnson. (Avenatti, Michael) (Entered: 10/06/2014) |
| 10/06/2014 | 122 | OPPOSITION re: MOTION IN LIMINE (MIL #3) to Preclude Any Reference to the Citizen's Commission on Jail Violence and Evidence of Said Commission's May 14, 2012 Status Report and Sept. 2012 Final Report 89 filed by Plaintiff Geoffrey Ernest Johnson. (Attachments: # 1 Exhibit 1)(Avenatti, Michael) (Entered: 10/06/2014) |
| 10/06/2014 | 123 | OPPOSITION re: MOTION IN LIMINE (MIL #4) to Preclude Any references to the memo of agreement between the US and LA Co. CA re Mental Health Services at the LA County Jails 90 filed by Plaintiff Geoffrey Ernest Johnson. (Avenatti, Michael) (Entered: 10/06/2014) |
| 10/06/2014 | 124 | Response re: MOTION IN LIMINE (MIL #5) to Preclude Any reference to the ACLU's report entitled Mental Health Issues at LA County Jail 91 filed by Plaintiff Geoffrey Ernest Johnson. (Avenatti, Michael) (Entered: 10/06/2014) |
| 10/06/2014 | 125 | OPPOSITION re: MOTION IN LIMINE (MIL #6) to Preclude Reference to prior incidents of unrelated inmate on inmate violence and/or prior unrelated suicide attempts 92 filed by Plaintiff Geoffrey Ernest Johnson. (Avenatti, Michael) (Entered: 10/06/2014) |
| 10/06/2014 | 126 | OPPOSITION re: MOTION IN LIMINE (MIL #7) to Preclude reference to subsequent remedial measures 93 filed by Plaintiff Geoffrey Ernest Johnson. (Attachments: # 1 Exhibit 1-6)(Avenatti, Michael) (Entered: 10/06/2014) |
| 10/06/2014 | 127 | OPPOSITION re: MOTION IN LIMINE (MIL #8) to Preclude Reference to the cost of medical care received by plaintiff from LAC/USC medical center 94 filed by Plaintiff Geoffrey Ernest Johnson. (Avenatti, Michael) (Entered: 10/06/2014) |

| 10/06/2014 | 128 | OPPOSITION re: MOTION IN LIMINE (MIL #9) to Exclude evidence of prior or subsequent claims or lawsuits involving the defendants 95 filed by Plaintiff Geoffrey Ernest Johnson. (Avenatti, Michael) (Entered: 10/06/2014) |
| 10/06/2014 | 129 | OPPOSITION re: MOTION IN LIMINE MIL #10) to Preclude plaintiff from introducing any evidence relating to the outcome of plaintiff's criminal proceedings 96 filed by Plaintiff Geoffrey Ernest Johnson. (Avenatti, Michael) (Entered: 10/06/2014) |
| 10/06/2014 | 130 | OPPOSITION re: MOTION IN LIMINE (MIL #11) to Preclude Reference to media reports pertaining to the subject incident and the LA Co. Sheriff's Dept. 97 filed by Plaintiff Geoffrey Ernest Johnson. (Avenatti, Michael) (Entered: 10/06/2014) |
| 10/06/2014 | 131 | Witness List filed by defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department.. (Phan, Charles) (Entered: 10/06/2014) |
| 10/06/2014 | 132 | MEMORANDUM of CONTENTIONS of FACT and LAW filed by defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. (Phan, Charles) (Entered: 10/06/2014) |
| 10/09/2014 | 133 | ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT 70 by Judge Margaret M. Morrow: The court grants summary judgment in defendants' favor on Johnson's § 1983 claim to the extent it is premised on excessive force, unsanitary conditions, and failure to protect him from inmate Wes. The court also grants summary judgment in defendants' favor on Johnson's Ralph Act claim. The court denies defendants' motion for summary judgment on the balance of Johnson's claims. (ah) (Entered: 10/09/2014) |
| 10/10/2014 | 134 | REPLY MOTION to Bifurcate the trial into two phases 85 filed by Defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. (Phan, Charles) (Entered: 10/10/2014) |
| 10/10/2014 | 135 | REPLY MOTION IN LIMINE (MIL #1) to Preclude Testimony of Plts Expert Roger Clark *or Substantially Limit the Testimony* 87 filed by Defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. (Phan, Charles) (Entered: 10/10/2014) |
| 10/10/2014 | 136 | REPLY MOTION IN LIMINE (MIL #2) to Preclude Any References to Reports or Letters Issued by the US Dept. of Justice 88 filed by Defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. (Phan, Charles) (Entered: 10/10/2014) |
| 10/10/2014 | 137 | REPLY MOTION IN LIMINE (MIL #3) to Preclude Any Reference to the Citizen's Commission on Jail Violence and Evidence of Said Commission's May 14, 2012 Status Report and Sept. 2012 Final Report 89 filed by Defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. (Phan, Charles) (Entered: 10/10/2014) |
| 10/10/2014 | 138 | REPLY MOTION IN LIMINE (MIL #4) to Preclude Any references to the memo of agreement between the US and LA Co. CA re Mental Health Services at the LA County Jails 90 filed by Defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. (Phan, Charles) (Entered: 10/10/2014) |
| 10/10/2014 | 139 | REPLY MOTION IN LIMINE (MIL #6) to Preclude Reference to prior incidents of unrelated inmate on inmate violence and/or prior unrelated suicide attempts 92 filed by Defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. (Phan, Charles) (Entered: 10/10/2014) |
| 10/10/2014 | 140 | REPLY MOTION IN LIMINE (MIL #7) to Preclude reference to subsequent remedial measures 93 filed by Defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. (Phan, Charles) (Entered: 10/10/2014) |
| 10/10/2014 | 141 | REPLY MOTION IN LIMINE (MIL #8) to Preclude Reference to the cost of medical care received by plaintiff from LAC/USC medical center 94 filed by Defendants Leroy Baca, |

| | | County of Los Angeles, Los Angeles Sheriff's Department. (Phan, Charles) (Entered: 10/10/2014) |
|---|---|---|
| 10/10/2014 | 142 | REPLY MOTION IN LIMINE MIL #10) to Preclude plaintiff from introducing any evidence relating to the outcome of plaintiff's criminal proceedings 96 filed by Defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. (Phan, Charles) (Entered: 10/10/2014) |
| 10/10/2014 | 143 | JOINT AMENDED Exhibit List filed by defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department.. (Snader, Rebecca) (Entered: 10/10/2014) |
| 10/10/2014 | 144 | REPLY in support of MOTION IN LIMINE (1) to Exclude Evidence or Argument that Defendants' Policies, Procedures and Training Related to Mentally Ill and/or Suicidal Inmates Were Not Inadequate and Regarding Notice Thereof 100 filed by Plaintiff Geoffrey Ernest Johnson. (Sims, Scott) (Entered: 10/10/2014) |
| 10/10/2014 | 145 | REPLY in support of MOTION IN LIMINE (2) to Exclude Evidence of Collateral Source Payments 101 filed by Plaintiff Geoffrey Ernest Johnson. (Sims, Scott) (Entered: 10/10/2014) |
| 10/10/2014 | 146 | REPLY in support of MOTION IN LIMINE (3) to Exclude Evidence that Plaintiff was Charged with Attempted Rape 102 filed by Plaintiff Geoffrey Ernest Johnson. (Sims, Scott) (Entered: 10/10/2014) |
| 10/10/2014 | 147 | REPLY in support of MOTION IN LIMINE (4) to Exclude Argument that Plaintiff Should Have Sued Additional or Other Defendants 103 filed by Plaintiff Geoffrey Ernest Johnson. (Sims, Scott) (Entered: 10/10/2014) |
| 10/10/2014 | 148 | REPLY in support of MOTION IN LIMINE (5) to Exclude Reference to Plaintiff's Purportedly Aggressive Behavior 104 ; Declaration of Scott H. Sims filed by Plaintiff Geoffrey Ernest Johnson. (Sims, Scott) (Entered: 10/10/2014) |
| 10/10/2014 | 149 | REPLY in support of MOTION IN LIMINE (6) to Exclude Evidence or Argument Relating to Plaintiff's Past Alcoholism 105 filed by Plaintiff Geoffrey Ernest Johnson. (Sims, Scott) (Entered: 10/10/2014) |
| 10/16/2014 | 150 | NOTICE OF LODGING Proposed Pretrial Conference Order Plaintiff Geoffrey Ernest Johnson. (Attachments: # 1 [Proposed] Final Pretrial Conference Order)(Avenatti, Michael) (Entered: 10/16/2014) |
| 10/17/2014 | 151 | MINUTES OF Discovery Hearing held before Magistrate Judge Andrew J. Wistrich: RE EX PARTE APPLICATION to Compel Deposition of Thomas Hedge, M.D. 98 . The matter is submitted for decision; separate order to issue. Court Recorder: CS 10-17-2014. (yb) (Entered: 10/17/2014) |
| 10/24/2014 | 152 | SCHEDULING NOTICE CONTINUING FINAL PRETRIAL CONFERENCE by Judge Margaret M. Morrow. The court, on its own motion, continues the Final Pretrial Conference, including motions in limine, to 10/30/2014 09:00 AM before Judge Margaret M. Morrow. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (ah) (Entered: 10/24/2014) |
| 10/24/2014 | 153 | MINUTES (IN CHAMBERS): ORDER by Magistrate Judge Andrew J. Wistrich: granting 98 Ex Parte Application to Compel Deposition of Thomas Hedge, M.D. (yb) (Entered: 10/27/2014) |
| 10/28/2014 | 154 | SCHEDULING NOTICE CONTINUING TIME OF FINAL PRETRIAL CONFERENCE by Judge Margaret M. Morrow previously scheduled for 10/30/2014 9:00 am has been rescheduled. Final Pretrial Conference set for 10/30/2014 09:30 AM before Judge Margaret M. Morrow. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (ah) TEXT ONLY ENTRY (Entered: 10/28/2014) |
| 10/29/2014 | 155 | Second Amended Joint Exhibit List filed by Plaintiff Geoffrey Ernest Johnson re: Exhibit |

List 142 (Avenatti, Michael) (Entered: 10/29/2014)

| | | |
|---|---|---|
| 10/30/2014 | 156 | MINUTES OF FINAL PRETRIAL CONFERENCE AND MOTIONS IN LIMINE held before Judge Margaret M. Morrow: Final order to issue on motions in limine. Pretrial Conference order not signed. The parties may file supplemental briefing, not to exceed seven pages, regarding issues stated on the record on or before November 7, 2014. Any responses there to must be filed on or before November 11, 2014. Joint Jury Instructions due November 7, 2014. One-page statement to jury due November 7, 2014. Voir Dire questions due November 7, 2014. Special Verdict Form due November 7, 2014. Second Amended Joint Exhibit List due November 12, 2014. Witness statements due November 4, 2014. Witness statements on cross-examination due November 7, 2014.Court Reporter: C. Nirenberg. (ah) (Entered: 10/31/2014) |
| 11/04/2014 | 157 | WITNESS TESTIMONY SUMMARIES filed by Plaintiff Geoffrey Ernest Johnson. (Avenatti, Michael) (Entered: 11/04/2014) |
| 11/04/2014 | 158 | Witness List filed by defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department.. (Phan, Charles) (Entered: 11/04/2014) |
| 11/04/2014 | 159 | NOTICE of Election Not to File Additional Briefing Regarding DOJ Expert Reports filed by Plaintiff Geoffrey Ernest Johnson. (Avenatti, Michael) (Entered: 11/04/2014) |
| 11/05/2014 | 160 | NOTICE of Lodgment of the memorandum of agreement between the United States and Los Angeles Co., CA re Mental Health Services at the LA Co. Jail filed by defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. (Phan, Charles) (Entered: 11/05/2014) |
| 11/05/2014 | 161 | NOTICE OF LODGING filed *of Limiting Instruction for Trial Regarding Plaintiff's Criminal Charges* re Pretrial Conference - Final,,,, Terminate Hearings,,, 156 (Phan, Charles) (Entered: 11/05/2014) |
| 11/05/2014 | 162 | NOTICE OF LODGING filed *Limiting Instruction for Trial Regarding Other Suicide Attempts and Suicides at the Twin Towers Correctional Facility* re Pretrial Conference - Final,,,, Terminate Hearings,,, 156 (Phan, Charles) (Entered: 11/05/2014) |
| 11/05/2014 | 163 | NOTICE OF LODGING filed *Limiting Instruction for Trial Regarding Documents by the Dept. of Justice* re Pretrial Conference - Final,,,, Terminate Hearings,,, 156 (Phan, Charles) (Entered: 11/05/2014) |
| 11/05/2014 | 164 | TRIAL REPORT of Applicability of Government Code 855.8 and 856 for Trial filed by Defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. (Phan, Charles) (Entered: 11/05/2014) |
| 11/05/2014 | 165 | JOINT REPORT of Source of Plaintiff's Ongoing and Future Medical Care filed by Plaintiff Geoffrey Ernest Johnson. (Sims, Scott) (Entered: 11/05/2014) |
| 11/05/2014 | 166 | PROPOSED JURY INSTRUCTIONS (Joint [Proposed] Limiting Instruction Re: Plaintiff's Alleged Use of Alcohol set) filed by Plaintiff Geoffrey Ernest Johnson.. (Sims, Scott) (Entered: 11/05/2014) |
| 11/05/2014 | 167 | DRAFT JOINT REPORT of Media Reports and Other Lawsuits that Plaintiff Proposes to Introduce for Trial filed by Plaintiff Geoffrey Ernest Johnson. (Sims, Scott) (Entered: 11/05/2014) |
| 11/05/2014 | 168 | NOTICE OF LODGING filed *Limiting Instruction Regarding the Feasibility of the Installation of Physical Barriers* re Pretrial Conference - Final,,,, Terminate Hearings,,, 156 (Phan, Charles) (Entered: 11/05/2014) |
| 11/06/2014 | 169 | TEXT ONLY ENTRY: (IN CHAMBERS) ORDER REGARDING JOINT EXHIBIT LIST AND WITNESS LISTS by Judge Margaret M. Morrow. Counsel are directed to provide the clerk with three copies of Joint Exhibit List and three copies of the Witness Lists the morning |

| | | of trial. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (ah) TEXT ONLY ENTRY (Entered: 11/06/2014) |
|---|---|---|
| 11/06/2014 | 170 | TEXT ONLY ENTRY: (IN CHAMBERS) ORDER SETTING TELEPHONE CONFERENCE by Judge Margaret M. Morrow. A Telephone Conference is set for 11/7/2014 10:00 AM before Judge Margaret M. Morrow. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (ah) TEXT ONLY ENTRY (Entered: 11/06/2014) |
| 11/10/2014 | 171 | NOTICE TO FILER OF DEFICIENCIES in Electronically Filed Documents RE: Notice of Lodgment 160 . (bm) (Entered: 11/10/2014) |
| 12/11/2014 | 172 | STATUS REPORT filed by Defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. (Phan, Charles) (Entered: 12/11/2014) |
| 12/12/2014 | 173 | TRANSCRIPT for proceedings held on FRIDAY, NOVEMBER 7, 2014 10:00 AM. Court Reporter: C. NIRENBERG, CONTACT www.msfedreporter.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through Court Reporter: C. NIRENBERG, CONTACT www.msfedreporter.com, or PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 1/2/2015. Redacted Transcript Deadline set for 1/12/2015. Release of Transcript Restriction set for 3/12/2015. (Nirenberg, C) (Entered: 12/12/2014) |
| 12/12/2014 | 174 | NOTICE OF FILING TRANSCRIPT filed for proceedings FRIDAY, NOVEMBER 7, 2014 10:00 AM re Transcript 173 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (Nirenberg, C) TEXT ONLY ENTRY (Entered: 12/12/2014) |
| 12/12/2014 | 175 | TEXT ONLY ENTRY: (IN CHAMBERS) ORDER VACATING STATUS CONFERENCE by Judge Margaret M. Morrow. In light of the parties' Joint Report filed on December 11, 2014, the Court vacates the Status Conference set for Monday, December 15, 2014. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (ah) TEXT ONLY ENTRY (Entered: 12/12/2014) |
| 02/10/2015 | 176 | STIPULATION to Dismiss Case filed by defendants Leroy Baca, County of Los Angeles, Los Angeles Sheriff's Department. (Attachments: # 1 Proposed Order)(Phan, Charles) (Entered: 02/10/2015) |
| 02/11/2015 | 177 | STIPULATION AND ORDER OF DISMISSAL OF ENTIRE ACTION WITH PREJUDICE by Judge Margaret M. Morrow. re Stipulation to Dismiss Case 176 . (Made JS-6. Case Terminated.) (ah) (Entered: 02/11/2015) |
| 08/10/2016 | 178 | Notice of Appearance or Withdrawal of Counsel: for attorney Thomas C Hurrell counsel for Defendants Leroy Baca, County of Los Angeles, Does, Los Angeles Sheriff's Department. Rebecca H. Snader is no longer counsel of record for the aforementioned party in this case for the reason indicated in the G-123 Notice. Filed by Defendants Thomas C. Hurrell. (Attorney Thomas C Hurrell added to party Does(pty:dft))(Hurrell, Thomas) (Entered: 08/10/2016) |

**UNDER SEAL
EXHIBIT W**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT X



HOME    SERVICES    NEWS    EDUCATION    ABOUT US

## ipsy Launches Shopper and Reaches Agreement to Sell EM Cosmetics to Michelle Phan

September 21, 2017 04:24 PM Eastern Daylight Time

SAN MATEO, Calif.--(BUSINESS WIRE)--ipsy and Michelle Phan announced today that they have entered into a definitive agreement for Divinium Labs, LLC, a company owned by Michelle Phan, to acquire EM Cosmetics from ipsy. Michelle will be moving on from ipsy to focus on leading EM Cosmetics. ipsy will continue to grow as a partner to beauty brands with the launch of ipsy Shopper, a personalized beauty shopping service.

"At ipsy, we have always embraced an entrepreneurial spirit supporting over 300 beauty brands from the largest name brands to start-ups disrupting the space. Being objective is what allows us to serve our community of ipsters with a broad range of looks and products that help them express their unique beauty. Consistent with that strategy, we're now excited to announce ipsy Shopper, a personalized beauty shopping experience, that will launch in November to support our wide variety of brand partners with over tens of thousands of SKUs," said Marcelo Camberos, ipsy co-founder and CEO.

"The idea of building an innovative beauty company for the creator generation is what created ipsy. Michelle was pivotal in growing our creator community to over 8,000 creators, 4 successful yearly Generation Beauty events and over half a billion monthly content views. We thank Michelle and are excited to see where she will lead EM Cosmetics in the future," said Jennifer Goldfarb, ipsy co-founder and President.

"I'm excited to continue to develop EM Cosmetics for my community. Leading EM Cosmetics will allow me to realize my vision of building a global beauty brand with innovative R&D and increased vertical integration. It's been fun and rewarding to help build ipsy from the ground up, as we've seen creators fundamentally change the face of the beauty industry," said Michelle Phan.

**ipsy:**

Personalized Beauty Discovery, Inc., (dba ipsy), the beauty company of the creator movement, and was co-founded in 2011 by Marcelo Camberos, Jennifer Goldfarb, and Michelle Phan. ipsy now works with more than 8,000 creators and reaches more than 20 million individuals every month through its owned and operated channels. The company operates the Glam Bag, a personalized beauty sampling service for more than 2.5 million members, and ipsy Shopper, the largest online beauty marketplace, with over 30,000 SKUs that provides customized recommendations plus 10-30% cash back on every single purchase.

**EM Cosmetics:**

EM Cosmetics is a different kind of cosmetics brand, created by a different kind of founder. Michelle's goal was to develop a beauty brand for today's modern consumer. EM's products are designed to be refined, effortless and instrumental for the personal journey of self expression. Beauty and art have always been a central part of Michelle Phan's life since a young age. From the moment she drew the first line on her eyes, she understood that makeup was a powerful medium of self-expression. And so her mission throughout her career has been to inspire people everywhere to claim their power, share their art and rethink beauty.

Contacts
ipsy
415-780-2568
Press@ipsy.com

BY



Obi Anyanwu

PUBLISHED

📅 Sep 22, 2017



# Michelle Phan acquires EM Cosmetics from Ipsy

YouTube personality Michelle Phan is shuffling her businesses. The beauty expert that rose to fame through makeup tutorial videos on YouTube has formed an agreement with her company Divinium Labs and Ipsy, the online beauty shop she co-founded, to acquire EM Cosmetics from Ipsy.



EM Cosmetics

Phan co-founded Ipsy with Marcelo Camberos and Jennifer Goldfarb in 2011 and expanded the business to work with over 8,000 creators and reach 20 million individuals. Ipsy also operates Glam Bag, a personalized beauty sampling service, and will launch in November Ipsy Shopper, an online beauty marketplace with over 30,000 SKUs.

Two years after co-founding Ipsy, Phan launched EM Cosmetics in the US with L'Oréal. The line, which gets its name from a Vietnamese term of endearment, did not perform well, with outlets reporting that the line was too expensive for Phan's fan base.

With the acquisition, Phan will be moving on from Ipsy to focus on leading EM Cosmetics.

"I'm excited to continue to develop EM Cosmetics for my community," said Phan. "Leading EM Cosmetics will allow me to realize my vision of building a global beauty brand with innovative R&D and increased vertical integration. It's been fun and rewarding to help build Ipsy from the

ground up, as we've seen creators fundamentally change the face of the beauty industry."

The new EM Cosmetics launched with affordable lip creams and eyeliners and will expand its product offering around these products.

Copyright © 2022 FashionNetwork.com All rights reserved.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT Y**



**Michael Avenatti**
Letter Re Tweet
**To:** John Littrell,   Shakira_davis@

April 25, 2019 at 6:59 PM

Ms. Davis:

Good evening. My attorney just forwarded to me the letter from the Central District regarding a tweet posted five days ago. Please understand that I have never intended or attempted to intimidate anyone or any witness. In any event, I have now deleted the tweet to avoid any misunderstanding and will be more cautious in the future.

Thank you.

Michael
--
Michael J. Avenatti

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNDER SEAL
# EXHIBIT Z

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27          **EXHIBIT AA**
28

AO 245C (Rev. 09/19)  Amended Judgment in a Criminal Case
Sheet 1

(NOTE:  Identify Changes with Asterisks (*))

# UNITED STATES DISTRICT COURT

| | |
|---|---|
| UNITED STATES OF AMERICA | ) **AMENDED JUDGMENT IN A CRIMINAL CASE** |
| v. | ) |
| Michael Avenatti | ) Case Number:  (S1) 19CR00373-1(PGG) |
| | ) USM Number:  86743-054 |
| **Date of Original Judgment:**  7/15/2021 | ) Scott Alan Srebnick / E. Danya Perry |
| *(Or Date of Last Amended Judgment)* | ) Defendant's Attorney |

## THE DEFENDANT:
☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
which was accepted by the court.

☑ was found guilty on count(s)  1, 2, and 3
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 875(d) | Transmission of Interstate Communications with Intent to Extort | 5/22/2019 | 1 |
| 18 U.S.C. § 1951 | Attempted Extortion | 5/22/2019 | 2 |

The defendant is sentenced as provided in pages 2 through ____8____ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☑ Count(s)  all open counts          ☐ is  ☑ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

7/8/2021
Date of Imposition of Judgment

*Paul G. Gardephe*
Signature of Judge

Hon. Paul G. Gardephe, U.S.D.
Name and Title of Judge

Feb. 18, 2022
Date

Judgment — Page __2__ of __8__

DEFENDANT: Michael Avenatti
CASE NUMBER: (S1) 19CR00373-1(PGG)

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 1343 | Honest Services Wire Fraud | 5/22/2019 | 3 |

AO 245C (Rev. 09/19)   Amended Judgment in a Criminal Case
Sheet 2 — Imprisonment                                                    (NOTE: Identify Changes with Asterisks (*))

DEFENDANT:   Michael Avenatti
CASE NUMBER:   (S1) 19CR00373-1(PGG)

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of :
24 months' imprisonment on Count One, and 30 months' imprisonment on each of Counts Two and Three, with all terms to be served concurrently.

☑   The court makes the following recommendations to the Bureau of Prisons:
The Court recommends that Defendant be assigned to the Camp at FCI Sheridan in Sheridan, Oregon.

☐   The defendant is remanded to the custody of the United States Marshal.

☐   The defendant shall surrender to the United States Marshal for this district:

☐   at _____   ☐ a.m.   ☐ p.m.   on _____ .

☐   as notified by the United States Marshal.

☐   The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐   before 2 p.m. on _____ .

☐   as notified by the United States Marshal.

☐   as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

DEFENDANT:  Michael Avenatti
CASE NUMBER:  (S1) 19CR00373-1(PGG)

# SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of :

1 year supervised release on Count One, and 3 years' supervised release on each of Counts Two and Three,
with all terms to run concurrently.

# MANDATORY CONDITIONS

1.    You must not commit another federal, state or local crime.
2.    You must not unlawfully possess a controlled substance.
3.    You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from
      imprisonment and at least two periodic drug tests thereafter, as determined by the court.
          ☐   The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future
              substance abuse. *(check if applicable)*
4.    ☐   You must make restitution in accordance with 18 U.S.C. § 3663 and 3663A or any other statute authorizing a sentence of
          restitution. *(check if applicable)*
5.    ☑   You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.    ☐   You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as
          directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you
          reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.    ☐   You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

AO 245C (Rev. 09/19)   Amended Judgment in a Criminal Case
Sheet 3A — Supervised Release

Judgment—Page __5__ of __8__

DEFENDANT:   Michael Avenatti
CASE NUMBER:   (S1) 19CR00373-1(PGG)

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions,* available at: www.uscourts.gov.

Defendant's Signature _____        Date _____

AO 245C (Rev. 09/19)   Amended Judgment in a Criminal Case
Sheet 3D — Supervised Release                                    (NOTE: Identify Changes with Asterisks (*))

Judgment—Page    6    of    8

DEFENDANT:   Michael Avenatti
CASE NUMBER:   (S1) 19CR00373-1(PGG)

## SPECIAL CONDITIONS OF SUPERVISION

The Defendant will participate in an outpatient substance abuse treatment program approved by the United States Probation Office, which program may include testing to determine whether he has reverted to using drugs or alcohol.  I authorize the release of any available substance abuse treatment evaluations and reports to the substance abuse treatment provider.

DEFENDANT:  Michael Avenatti
CASE NUMBER:  (S1) 19CR00373-1(PGG)

# CRIMINAL MONETARY PENALTIES

The defendant must pay the following total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $ 300.00 | $ 259,800.50 | $ | $ | $ |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☑ The defendant shall make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| Nike, Inc. | | $259,800.50 | |

| **TOTALS** | | $ 0.00 | $ 259,800.50 | |
|---|---|---|---|

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest, and it is ordered that:

  ☐ the interest requirement is waived for    ☐ fine    ☐ restitution.

  ☐ the interest requirement for the    ☐ fine    ☐ restitution is modified as follows:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

DEFENDANT:  Michael Avenatti
CASE NUMBER:  (S1) 19CR00373-1(PGG)

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

**A**  ☑  Lump sum payment of $  300.00  due immediately, balance due

☐ not later than _____ , or
☐ in accordance with  ☐ C,  ☐ D,  ☐ E, or  ☐ F below; or

**B**  ☐  Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ☐ F below); or

**C**  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

**D**  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

**E**  ☐  Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**  ☐  Special instructions regarding the payment of criminal monetary penalties:

See Order of Restitution (Dkt. No. 376).

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>*(including defendant number)* | Total Amount | Joint and Several Amount | Corresponding Payee, if appropriate. |
|---|---|---|---|

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

**EXHIBIT BB**

improperly taken $300,000 of her advance from the publisher.

———

By the Friday of that week, just five days after getting involved, we knew we had enough to charge and convict Avenatti. He had a meeting set up for the coming Monday at Boies Schiller, Nike's law firm. We planned to arrest him after he arrived.

That weekend, we worked on the complaint, the related search warrants, and a plan for the arrest. We arranged for an FBI agent to park outside Franklin's house to be ready—right after Avenatti was in custody—to interview the coach to determine what, if anything, he knew about his lawyer's threats to Nike.

The answer, it turned out, was that he didn't know anything. The coach wasn't involved in the plot.

When we informed Main Justice about Avenatti's imminent arrest, as we typically did with anything likely to generate media attention, it turned out there was one other matter we had to deal with. Federal authorities in California were a year into a tax and wire fraud investigation against Avenatti, and I was told to coordinate with Nicola Hanna, the US Attorney for LA.

We could not initially come to an agreement, and Ed O'Callaghan in Main Justice told me that we should stand down until the turf issue got settled. Our interactions with Main Justice had been strained, to say the least, and I thought O'Callaghan might have just been punishing the Southern District. But over the weekend, I was able to reach an understanding with Hanna: if we arrested Avenatti

on Monday, Hanna would announce their charges as well.

The meeting at the law firm was scheduled for 1:00 p.m. Avenatti arrived on time, but was waiting to be joined by Mark Geragos, another well-known LA lawyer, who was to be part of the meeting. (Geragos was not charged.)

The FBI agent outside the coach's house thought he had the go-ahead to proceed at 1:00 p.m. New York time. After he knocked at the front door and introduced himself to Franklin, the first thing the coach did was text Avenatti to tell him he had a visitor at his house—an FBI agent.

Avenatti immediately fled the Boies Schiller waiting room and walked into the massive Hudson Yards complex. The agent who was supposed to have eyes on him lost him. In the meantime, we see that he's tweeting that he intends to hold a press conference at 2:00 p.m.

In retrospect, it's funny, a true comedy of errors. In retrospect. That afternoon, I was in Diskant's office with Podolsky and Sobelman following the blow-by-blow, and the humor had yet to register. Finally, we got word that one of our in-house investigators, Deleassa Penland, tracked him down in Hudson Yards, arrested him, and took his phone. We notified Los Angeles that we had him, and they executed their search warrant and announced their indictment of him that day.

I had been so intensely involved in the preceding days that I couldn't miss the presentment. When Avenatti walked into the courtroom, I was struck by how diminutive he looked. He was no more than five feet eight and very thin.



# HOLDING THE LINE

INSIDE THE NATION'S PREEMINENT US ATTORNEY'S OFFICE AND ITS BATTLE WITH THE TRUMP JUSTICE DEPARTMENT

# GEOFFREY BERMAN

FORMER US ATTORNEY FOR THE SOUTHERN DISTRICT OF NEW YORK

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNDER SEAL
EXHIBIT CC**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

**EXHIBIT DD**

28

# EVIDENCE CITATIONS

<u>Mr. Johnson</u>

1. Dkt. 809, Exh. 1
2. Def. Sentencing Exh. V
3. Gov. Exh. 1
4. Gov. Exh. 37
5. Gov. Exh. 46
6. Gov. Exh. 48
7. Gov. Exh. 102
8. Gov. Exh. 420
9. Tr. 7/21/21, Vol. 1, p. 111-12
10. Tr. 7/22/21, Vol. 1, p. 32
11. Tr. 7/22/21, Vol. 1, p. 84-88
12. Tr. 7/22/21, Vol. 1, p. 88-94
13. Tr. 7/22/21, Vol. 1, p. 100
14. Tr. 7/22/21, Vol. 1, p. 99-100, 110
15. Tr. 7/22/21, Vol. 1, p. 103-07
16. Tr. 7/22/21, Vol. 2, p. 12-14
17. Tr. 7/22/21, Vol. 2, p. 26
18. Tr. 7/22/21, Vol. 2, p. 41

<u>Ms. Gardner</u>

1. Dkt. 809, Exh. 2
2. Gov. Exh. 132
3. Gov. Exh. 139
4. Gov. Exh. 146
5. Gov. Exh. 147
6. Gov. Exh. 157
7. Gov. Exh. 158
8. Gov. Exh. 164
9. Gov. Exh. 430
10. Tr. 8/3/21, Vol. 1, p. 40
11. Tr. 8/3/21, Vol. 1, p. 48-49
12. Tr. 8/3/21, Vol. 2, p. 17

Mr. Barela

1. Dkt. 809, Exh. 3
2. Def. Exh. 1057
3. Gov. Exh. 171
4. Gov. Exh. 174
5. Gov. Exh. 439
6. Tr. 8/4/21, Vol. 2, p. 37
7. Tr. 8/4/21, Vol. 2, p. 45
8. Tr. 8/4/21, Vol. 2, p. 62
9. Tr. 8/4/21, Vol. 2, p. 64-67
10. Tr. 8/5/21, Vol. 2, p. 27-32
11. Tr. 8/6/21, Vol. 1, p. 78-79
12. Tr. 8/6/21, Vol. 1, p. 87

Ms. Phan

1. Gov. Exh. 265
2. Gov. Exh. 266
3. Def. Sentencing Exh. W
4. Def. Sentencing Exh. X
5. Tr.  8/12/21, Vol. 1, p. 26-27
6. Tr. 8/12/21, Vol. 1, p. 27
7. Tr. 8/12/21, Vol. 1, p. 32
8. Tr. 8/12/21, Vol. 1, p. 50