Michael John Avenatti (Pro Se)

H. Dean Steward, SBN 85317
17 Corporate Plaza, Suite 254
Newport Beach, California 92660
Tel (949) 481-4900
Fax (949) 706-9994

Advisory Counsel for Defendant
MICHAEL JOHN AVENATTI

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | SA CR No. 19-061-JVS |
| Plaintiff, | |
| | DEFENDANT'S MOTION FOR EVIDENTIARY HEARING PRIOR TO SENTENCING |
| v. | |
| MICHAEL JOHN AVENATTI, | |
| Defendant. | |

Defendant MICHAEL JOHN AVENATTI ("Defendant"), by and through his advisory counsel of record, H. Dean Steward, hereby files Defendant's Motion for an Evidentiary Hearing Prior to Sentencing. Defendant's filing is based on the attached; the evidence referenced in the attached; the files, records and transcripts in this case and the other cases cited herein; and such further evidence and argument as the Court may permit at a hearing on this matter.

 Dated: October 25, 2022                    Respectfully submitted,

                              /s/ Michael John Avenatti
                               MICHAEL JOHN AVENATTI

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................. iii

**MEMORANDUM OF POINTS AND AUTHORITIES** ...................................... 1

   **I.**      **INTRODUCTION** ...................................................................... 1

   **II.**     **LEGAL AUTHORITY** ............................................................... 1

   **III.**    **ARGUMENT** ............................................................................ 1

       A. Defendant Requests that the Court an Evidentiary

         Hearing to Determine the Appropriate Loss & Restitution Amounts .. 2

          1.  *Credit Against Loss* ....................................................... 2

          2.  *California Law & Quantum Meruit*

              *Support Defendant's Position* ...................................... 4

          3.  *Attorneys' Fees Earned Upon Receipt of Settlement* ................. 5

          4.  *Summary of Defendant's Work for the Four Victims* ................. 7

       B. Defendant Requests that the Court an Evidentiary

         Hearing on All Other Enhancements in Dispute .............................. 13

   **IV.**    **CONCLUSION** ......................................................................... 13

# TABLE OF AUTHORITIES

## <u>CASE</u>                                                          <u>PAGE NO.</u>

*Fracasse v. Brent,*
6 Cal 3d 784 (1972).………………………………………………………6

*Hance v. Super Store Industries*,
44 Cal. App. 5th 676 (2020).………………………………………………...5

 *Joseph E. Di Loreto, Inc. v. O'Neill*,
1 Cal. App. 4th 149 (1991).…………………………………………….....6

*MacInnis v. Pope*,
134 Cal. App. 2d 528 (1955).……………………………………………6

*Oliver v. Campbell*,
43 Cal. 2d 298 (1954).…………………………………………….....6

*Sheppard, Mullin, Richter & Hampton, LLP v. J-M Manufacturing Co., Inc.*,
6 Cal. 5th 59 (2018).…………………………………………………5

*United States v. Abdellatiff*,
205 Fed. Appx. 601 (9th Cir. 2006)(unpublished).………………………………………3

*United States v. Anders*,
333 Fed. Appx. 950 (6th Cir. 2009).…………………………………………4

*United States v. Barnes*,
125 F.3d 1287 (9th Cir. 1997).…………………………………………3

*United States v. Blitz*,
151 F.3d 1002 (9th Cir. 1998).…………………………………………3

*United States v. Bright*,
353 F.3d 1114 (9th Cir. 2004).…………………………………………2

*United States v. Fatico*,
603 F.2d 1053 (2d Cir. 1979).…………………………………………1

*United States v. Gordon*,
393 F3d 1044 (9th Cir. 2004).…………………………………………1

iii

*United States v. Green*,
940 F.3d 1038 (9th Cir. 2019)……………………………………………………………2

*United States v. Grusd*,
787 Fed. Appx. 922 (9th Cir. 2019)(unpublished)………………………………………3

*United States v. Hai Waknine*,
543 F.3d 546 (9th Cir. 2008)(Ikuta, concurring in part, dissenting in part)…………..1

*United States v. Harris*,
821 F.3d 589 (5th Cir. 2016)……………………………………………………………4

*United States v. Hausmann*,
345 F.3d 952 (7th Cir. 2003)……………………………………………………………3

*United States v. Jimenez Martinez*,
83 F.3d 488 (1st Cir. 1996)………………………………………………………………1

*United States v. Klein*,
543 F.3d 206 (5th Cir. 2008)……………………………………………………………4

*United States v. Liveoak*,
377 F.3d 859 (8th Cir. 2004)……………………………………………………………3

*United States v. Nagle*,
803 F.3d 167 (3d Cir. 2015)………………………………………………………………3

*United States v. Roberts*,
14 F.3d 502 (10th Cir. 1993)……………………………………………………………1

*United States v. Rutgard*,
116 F.3d 1270 (9th Cir. 1997)……………………………………………………………3

*United States v. Sayakhom*,
186 F.3d 928 (9th Cir. 1997)……………………………………………………………3

*United States v. Shields*,
2014 U.S. Dist. LEXIS 145745 (N.D. Cal. 2014)………………………………………3

*United States v. Williams*,
41 F.3d 496 (9th Cir. 1994)………………………………………………………………1

## <u>OTHER SOURCES</u>

§2B1.1…………………………………………………………………………………2, 13

§6A1.3…………………………………………………………………………………1

§3A1.1………………………………………………………………………………..13

§3C1.1………………………………………………………………………………13

Ca. R. of Prof. Conduct 1.15……………………………………………………...6

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.     INTRODUCTION

The difference between the sentences recommended by the defendant and the government is 138 months (*i.e.*, 11.5 years). There is great disparity in the positions of the defendant, the government and even Probation. On top of the base offense level of 7, the government (and Probation) asks that the Court apply 32 levels of enhancements. The parties' respective sentencing briefs further evidence the large number of facts in dispute, especially relating to the enhancements. Accordingly, as shown below, an evidentiary hearing is the only reliable way to properly resolve the disputed issues and arrive at the correct Guideline range for defendant's sentencing.

## II.    LEGAL AUTHORITY

The Guidelines make clear that, "when any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court regarding that factor." §6A1.3(a). The Guidelines also provide that "[a]n evidentiary hearing may sometimes be the only reliable way to resolve disputed issues." §6A1.3, *Commentary* (emphasis added), *citing United States v. Jimenez Martinez*, 83 F.3d 488, 494-95 (1st Cir. 1996)(Finding it was an abuse of discretion to rely on an affidavit and not hold an evidentiary hearing, "such hearings may be burdensome, but the stakes are high."); *United States v. Roberts*, 14 F.3d 502, 521 (10th Cir. 1993)(remanding for resentencing to hold evidentiary hearing); *See also, United States v. Williams*, 41 F.3d 496, 501, n. 7 (9th Cir. 1994)(The defendant "should be given an adequate opportunity to demonstrate the lack of reliability of the government's proof."), *citing United States v. Fatico*, 603 F.2d 1053, 1057, n. 9 (2d Cir. 1979).

Further, when "the evidentiary basis of a district court's sentencing decision is of questionable reliability, it may be error for a district court to decline a defendant's request for an evidentiary hearing." *United States v. Hai Waknine*, 543 F.3d 546, 561 (9th Cir. 2008)(Ikuta, concurring in part, dissenting in part); *See also, United States v. Gordon*, 393 F.3d 1044, 1049-50 (9th Cir. 2004)(district court conducted an evidentiary hearing to

1

resolve disputed restitution issues)(overruled on other grounds); *United States v. Green*, 940 F.3d 1038, 1044 (9th Cir. 2019)("Thus, the Guidelines recognize that in some circumstances, determining the applicable Guideline range may require a sentencing judge to evaluate affidavits, hear testimony or hold argument, depending on the nature of the factor in dispute.")(internal citation and quotation omitted).

### III.   ARGUMENT

#### A.   Defendant Requests that the Court Hold an Evidentiary Hearing to Determine the Appropriate Loss & Restitution Amounts

In the instant matter, the most determining factor in the Court's calculation of the Guidelines is the loss amount. Without legitimate legal (or factual) support, the government claims the loss amount in this case is $12,350,000. The defendant, however, has presented evidence that the loss amount is less than $3,500,000. *See,* Exhibit A. The difference between these determinations has the potential to add years to defendant's sentence.[1] As such, defendant requests that the Court hold an evidentiary hearing to determine the proper loss amount, including the credits against loss that should be credited to defendant, inclusive of the attorneys' fees he was entitled to take upon receipt of the settlement proceeds, as well as all costs, expenses, advances, and time spent for the benefit of the clients (on both the settlements at issue and on other matters). These determinations are also necessary for a proper determination of restitution.

#### 1.   *Credit Against Loss*

The law is clear: any "loss <u>shall</u> be reduced…." by (i) "<u>the money returned</u>, and the fair market value of the property returned <u>and the services rendered</u>, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected." §2B1.1, *Application Note 3(E)(i)*(emphasis added)*, see also United States v. Bright*, 353 F.3d 1114 (9th Cir. 2004)("A fraud defendant is entitled to credit for refunds

---

[1] Other enhancements aside, should the §2B1.1 base level be increased by 16 levels for a loss less than $3,500,000, then the Guideline range for Criminal History Category I is 46-57 months. However, for a loss amount exceeding $9,500,000, the comparable Guideline range is 70-87 months.

paid prior to the discovery of the offense. Repayments before detection show an untainted intent to reduce any loss. . ." (internal quotation and citation omitted)). Money that is "returned to a victim before the offense was detected is a credit against loss." *United States v. Shields*, 2014 U.S. Dist. LEXIS 145745, *2 (N.D. Cal. 2014). The discovery of the offense means, "detection by a victim, regardless of evidence whether the refunds were paid to avoid detection by law enforcement." *United States v. Abdellatiff*, 205 Fed. Appx. 601, 602 (9th Cir. 2006)(unpublished)(internal citation omitted).

The Ninth Circuit has routinely recognized that "value may be rendered even amid fraudulent conduct, and that in calculating intended loss, the district court should give credit for any legitimate services rendered to the victims." *United States v. Blitz*, 151 F.3d 1002, 1012 (9th Cir. 1998), *quoting United States v. Barnes,* 125 F.3d 1287, 1291 & n. 1 (9th Cir. 1997); *See also, United States v. Sayakhom*, 186 F.3d 928, 946 (9th Cir. 1997). Without more, "a general determination that some of the procedures were illegitimate or tainted by fraud is insufficient to conclude that no deductions for the fair market value of the services [are] warranted." *United States v. Grusd*, 787 Fed. Appx. 922, 925 (9th Cir. 2019)(unpublished), *citing United States v. Rutgard*, 116 F.3d 1270, 1294 (9th Cir. 1997)("As always, the burden is on the government…"). The Guidelines call for the court "to determine the net detriment to the victim, rather than the gross amount of money that changes hands." *United States v. Hausmann*, 345 F.3d 952, 960 (7th Cir. 2003)(internal citation omitted), *see also, United States v. Nagle*, 803 F.3d 167 (3d Cir. 2015)("In a normal fraud case, where value passes in both directions [between defrauded and defrauder] . . . . the victim's loss will normally be the difference between the value he or she gave up and the value he or she received." (internal citation omitted)). After the sentencing court estimates the amount of loss, it "must credit the fairmarket [sic] value of the services rendered against this figure." *United States v. Liveoak*, 377 F.3d 859, 867 (8th Cir. 2004).

A district court commits reversible error when it fails to reduce the loss amount by credits against loss. *See, e.g., Barnes*, 125 F.3d at 1291 ("In light of the extensive precedent

3

acknowledging that value may be rendered even amid fraudulent conduct, the district court erred in failing to award Appellant credit for the value of the services he provided satisfactorily."); *United States v. Klein*, 543 F.3d 206, 214-15 (5th Cir. 2008)(although physician was unlawfully dispensing drugs, the district court erred when it failed to discount the actual loss by the value of the drugs dispensed); *United States v. Anders*, 333 Fed. Appx. 950, 955 (6th Cir. 2009)(unpublished)(finding that the district court erred when it failed to reduce the loss amount by "an amount equal to the value of services rendered [] under the contract.")

Because the government alone bears the burden of establishing the loss amount, the government must <u>prove</u> the loss amount actually suffered by the victims, the amounts paid to them, all costs and expenses incurred on their behalf, and the reasonable value of all services rendered for their benefit or to them, or to others for their benefit, on <u>all matters</u> (not just the settled matters). *See, e.g., United States v. Harris*, 821 F.3d 589, 607 (5th Cir. 2016)("the government will bear the burden of proof to show any difference between the contract price and the fair market value of the services rendered…"). To be clear, defendant is entitled to a deduction for <u>all</u> monies paid to, or for the benefit of, the clients, and all attorneys' fees, costs, expenses, advances, and funds relating to his work on all matters for the clients at issue. It is improper and inconsistent with well-established law and the Guidelines to do what the government and Probation has done - simply add the gross amounts of the four settlements and then use that as the loss amount.

### 2. *California Law & Quantum Meruit Support Defendant's Position*

In making its determination that defendant is not entitled to any credit, Probation and the government rely on cases for the proposition that when a California attorney commits an ethical violation, he is entitled to no attorneys' fees.[2] [PSR, p. 26 ¶ 95, n. 15]. The cases cited involved situations where an attorney brought actions against former clients for the collection of legal fees. In those cases, the California state court determined

---

[2] This position and these cases were presumably provided by the government to Probation during preparation of the PSR.

4

that because the attorney committed significant ethical violations, the attorney was not contractually entitled to reimbursements for attorneys' fees that were due prior to the date of violation. Each of these cases are <u>civil</u> matters where various state courts recognized that when an attorney commits a significant ethical violation, he is not entitled to seek full relief from the courts to obtain past due attorneys' fees pursuant to the terms of the contract. Not a single case stands for the proposition that an attorney defendant in a criminal case is not entitled, at sentencing, for credit against loss for the work performed for the client or for reimbursement of costs, a proposition that is directly contrary to the Application Note. Even so, California law is clear that even when an attorney commits an ethical violation against the California Rules of Professional Conduct, he is entitled to seek relief for the reasonable value of services rendered by way of a *quantum meruit* theory of relief. *See, e.g., Hance v. Super Store Industries*, 44 Cal. App. 5th 676 (2020); *Sheppard, Mullin, Richter & Hampton, LLP v. J-M Manufacturing Co., Inc.,* 6 Cal. 5th 59 (2018). Further, as described immediately below, defendant was entitled to much more than *quantum meruit* and instead was entitled to the full amount due to him by way of his contracts as well as the costs, expenses, and time spent on other matters on behalf of each client.

### 3.  Attorneys' Fees Earned Upon Receipt of Settlement

Probation determined that because of defendant's lies and omissions, "he is not entitled to a credit against the full amount of the client monies he stole for his fees and expenses." [PSR Pages 25-26 ¶95]. However, this finding disregards the law and assumes that defendant was not immediately due the attorneys' fees, costs, and advances upon receipt of the settlement. Defendant's contractual agreements, California law, and the California Rules of Professional Conduct prove otherwise.

In each respective attorney-client fee agreement, Mr. Barela, Ms. Gardner, and Mr. Johnson agreed that, "If payment of all or any part of the amount to be received will be deferred (such as in the case of an annuity, a structured settlement, or periodic payments), the *'Recovery'* for purposes of calculating the Attorney's fees, will be the initial lump-sum

payment plus the present value, as of the time of the binding resolution, of the payments to be received thereafter. The attorney's fees will be paid out of the initial lump-sum payment." [Gov. Exh. 46 (Johnson), 132 (Gardner), and 171 (Barela) (emphasis added)]. Pursuant to the terms of the contract, defendant was entitled to take the attorneys' fees (along with all costs and expenses incurred, and all advances made) as soon as the initial lump-sum payment was received. Ms. Phan also agreed that defendant would take his full fee related to the Common Stock Repurchase Agreement out of the initial payment. [Tr. 8/12/21, Vol. 1, p. 32].

The California Bar Rules similarly require an attorney to withdraw the funds as soon as it is reasonably possible. California Rule of Professional Conduct 1.15 states, "funds belonging in part to a client or other person and in part presently or potentially to the law or the law firm, in which case the portion belonging to the lawyer or law firm must be withdrawn at the earliest reasonable time after the lawyer or law firm's interest in that portion becomes fixed." [Asterix omitted](emphasis added).

Defendant was entitled to the contingent fee immediately after the occurrence of the contingency (*i.e.*, the settlement and resolution of the claims). When an attorney is employed under a contingency fee contract and discharged prior to the occurrence of the contingency, *then* the attorneys' fees are limited to *quantum meruit* recovery for the reasonable value of services rendered up to the time of discharge. *Joseph E. Di Loreto, Inc. v. O'Neill*, 1 Cal. App. 4th 149, 156 (1991), *citing Fracasse v. Brent,* 6 Cal. 3d 784, 792 (1972). However, when a discharge occurs "on the courthouse steps" after "the client executes a settlement obtained after much work by the attorney, the factors involved in a determination of reasonableness would certainly justify a finding that the entire fee was the reasonable value of the attorney's services." *Id.* When "an attorney fully performs the services required by the contract he is entitled to the fee stipulated in the contract." *MacInnis v. Pope*, 134 Cal. App. 2d 528 (1955)(emphasis added). *See also, Oliver v. Campbell*, 43 Cal. 2d 298, 306-07 (1954)(when attorney completed the performance of his services and was discharged after the trial was complete, he was entitled to full contract

price).

Each client engaged in a contingency fee agreement with defendant. The contracts called for defendant to receive attorneys' fees in the form of a percentage of the settlement, upon resolution of the claims (through settlement or verdict). Defendant settled claims for each victim and upon resolution of the claim, he was entitled to the full sum of the attorneys' fees and costs. In fact, upon receipt of the settlement funds, defendant was obligated to take the funds he was due from the settlement. As a result, defendant's acts of doing so were not in violation of the laws, but instead in compliance with them. The immediate taking of funds lawfully due to him cannot possibly be used to increase his sentencing exposure here. Further, the funds due defendant and his firm must be deducted from the gross amounts.

### 4.   Summary of Defendant's Work for the Four Victims

#### a.   Geoffrey Johnson

Defendant represented Mr. Johnson and negotiated a $4,000,000 settlement after Mr. Johnson was critically injured at the Los Angeles County Jail after he attempted to commit suicide twice while in police custody. Defendant was entitled to forty percent of the settlement (*i.e.*, $1,600,000) plus all costs, expenses, and advances. [Tr. 7/22/21, Vol. 2, p. 12-14]. Prior to resolving Mr. Johnson's claim, defendant arranged for Mr. Johnson's release from "hell[ish]" jail facilities where he was held for almost eight months and expended significant resources on his case, which came out of defendant's own pocket. [Tr. 7/22/21, Vol. 1, p. 84-88]. Defendant and his firm subsequently spent over 3,000 hours on his case, funded Mr. Johnson's housing at multiple expensive live-in rehabilitation facilities, provided Mr. Johnson with funds for living expenses, offered Mr. Johnson use of the law firm's credit card, and paid for Mr. Johnson's criminal defense counsel. *See, e.g.,* [Tr. 7/22/21, Vol. 1, p. 32, 88-94, 103-07; Vol. 2, p. 41], [Def. Sent. Exhibit V]. Indeed, from defendant's retention in November 2011 to the receipt of Mr. Johnson's settlement funds in late January 2015 (over three years), defendant paid well over 90% of

all of Mr. Johnson's living and medical expenses.[3] At trial, Mr. Johnson agreed that if it wasn't for defendant, he would still be in "hell" and he appreciated "every bit of [defendant's] time and energy." [Tr. 7/22/21, Vol. 1, p. 100]. Mr. Johnson agreed that defendant worked "tirelessly with [his] team to navigate a system that had cracks wide enough for whole populations to fall through[,]" and came to believe that defendant cared about him. [Tr. 7/22/21, Vol. 1, p. 99-100, 110]. Mr. Johnson never sought to report defendant for any illegal or unethical conduct. Instead, Mr. Johnson agreed that the government sought him out. [Tr. 7/21/21, Vol. 1, p. 111-12].

Defendant earned $1,600,000 in attorneys' fees upon execution of the settlement agreement. By the government's own calculation at trial, defendant and his firm expended $543,062.00 in costs and expenses. [Gov. Exh. 420]. However, this analysis was shown to be incomplete. For example, at trial, the government presented limited costs and expenses that defendant incurred through a Tabs draft printout. [Gov. Exh. 48]. The *expenses* portion of this printout captured costs incurred by defendant through December 15, 2014. [*Id.* at 4]. However, the Tabs materials accessed after trial established several additional *expenses* incurred through December 19, 2017, totaling at least $108,477.80. [Dkt. 809, Exh. 1]. Additionally, the Tabs materials presented at trial evidenced *advances* incurred by defendant's firm through February 3, 2015, totaling $352,866.88. [Gov. Exh. 48, p. 8]. The advances captured by the materials accessed after trial showed additional *advances* extending through August 31, 2016, in the amount of $68,349.72. [*Id.*]. In its sentencing submission, the government concluded that the payments, costs, and expenses from January 30, 2015 through March 22, 2019 totaled $282,070. [Dkt. 1000-1, pgs. 3-4].

To conclude, at an absolute minimum, defendant was entitled to legal fees of $1,600,000, in addition to costs and expenses and advances paid directly to Mr. Johnson totaling at least $825,132; Defendant is also entitled to a credit for the work he and his firm performed on Mr. Johnson's behalf on other matters for Mr. Johnson including his

---

[3] This is highly unusual and not something that most attorneys would even consider doing, let alone do.

8

Social Security benefits, real estate matters, and legal issues relating to his family in an amount totaling at least $90,000. Providing defendant with credit for these fees, costs, expenses, and payments the loss amount is reduced to less than $1,484,868.[4]

### b.  Alexis Gardner

Defendant represented Ms. Gardner in connection with a claim she pursued against her ex-boyfriend Hassan Whiteside. Defendant negotiated a total settlement of $3,000,000, an initial payment of $2,750,000 on or around January 21, 2017, and a subsequent payment on $250,000 on November 1, 2020. [Gov. Exh. 139]. By contract, defendant was entitled to 33% of the total settlement. Pursuant to the government's own financial analysis at trial, defendant was entitled to $990,000 in attorneys' fees and $65,615 in expenses. [Gov. Exh. 430].

Defendant worked tirelessly on Ms. Gardner's case and immediately helped her out of her impoverished condition. Ms. Gardner was living in her car when she met defendant and he immediately (that same day) secured her housing in a hotel, made sure she had food to eat, paid her rent, and financed her living expenses. Aside from incurring time and resources on Ms. Gardner's dispute with her ex-boyfriend, Ms. Gardner agreed that she asked defendant "to assist [her] with a number of things that had nothing to do with Mr. Whiteside during 2018 and 2019. . ." [Tr. 8/3/21, Vol. 2, p. 17].  For example, defendant acted as a guarantor so that Ms. Gardner could obtain an apartment due to her insufficient rental history, paid $51,935 towards the rent before any settlement was received [8/31/21, Vol. 1, p. 40; Gov. Exh. 147]  and also assisted Ms. Gardner with her career. [Tr. 8/3/21, Vol. 1, p. 48-49].

Probation and the government are wrong to suggest that defendant should be provided no credit for his work on Ms. Gardner's case. Defendant was entitled to

---

[4] Mr. Johnson also testified that he received $1.5 million from defendant's former law partner Michael Eagan in early 2020 in connection with the firm's prior representation. [Tr. 7/22/21, Vol. 2, p. 26]. This means that at the time of trial last year, and to this day, Mr. Johnson is owed no further money from the settlement proceeds - he has been made whole.

$990,000, which represented 33% of the entire agreement in attorneys' fees, in addition, defendant was entitled to reimbursement for all costs and expenses, including the money he paid towards her rent. At trial, the government estimated that these costs totaled $65,615.00. After trial, it was revealed that defendant spent additional monies on behalf of Ms. Gardner. [Dkt. 809, Exh. 2]. The government has since determined that defendant spent in excess of $299,215 on costs, expenses, and payments made directly to Ms. Gardner between December 2016 and March 2019.

Providing defendant credit with these fees, costs, expenses, and payments, the total amount due to Ms. Gardner in early 2019, when the fraud was detected, was no greater than $1,460,750, but the government has yet to prove the proper amount as required.[5] This analysis does not include the reasonable value of services defendant rendered on work for her music career, securing Ms. Gardner housing, litigating issues with her landlords, and reviewing contracts for her benefit. This amount totals at least $100,000, which must also be deducted from the loss amount.

### c.   Gregory Barela

Defendant represented Mr. Barela in connection with an intellectual property dispute against Brock USA, wherein defendant negotiated a total settlement of 1.9 million dollars - an initial lump sum of $1,600,000 followed by three payments of $100,000 across three years. [Tr. 8/4/21, Vol. 2, p. 37, 45]. By the government's own calculation, defendant was entitled to forty percent of the total settlement as attorneys' fees (*i.e.*, $760,000) as well as all costs, expenses, and advances paid by defendant and his firm. The government identified that defendant spent $180,797 in case related expenses. [Gov. Exh. 439]. Defendant also paid Mr. Barela approximately $130,000 before the fraud was detected.

In addition to the work performed on the Brock USA case, defendant spent significant time and resources on other matters for Mr. Barela. For example, defendant represented Mr. Barela in *Carthey v. Pirch* and was ultimately forced to withdraw as counsel due to Mr. Barela's failure to communicate with him about the case. [Tr. 8/5/21,

---

[5] Before trial, she also received the $250,000 payment due under the settlement agreement.

Vol. 2, p. 27-32; Def. Exh. 1057]. The Tabs material accessed after trial revealed additional evidence substantiating defendant's work for Mr. Barela. Further, additional work was performed, but not inputted in Tabs, and defendant must be provided credit for this work for the purposes of determining the loss amount. Defendant also assisted Mr. Barela in the *Oldcastle* case, which was separate from the Brock USA arbitration matter, and required defendant to retain out of state counsel. [Trial. Tr. 8/6/21, Vol. 1, p. 87].

Mr. Barela also admitted at trial that defendant performed significant professional services and legal work for his business Quix, where it was agreed that defendant would receive 10% of the business and a board seat. Although defendant spent significant time and resources to benefit Mr. Barela's ongoing business venture (inclusive of meetings, introductions, assistance with securing funds, etc.), Mr. Barela never provided defendant with any equity or a board seat. [Tr. 8/4/21, Vol. 2, p. 62, 64-67; 8/6/21, Vol. 1, p. 78-79]. Defendant was in regular communication with Mr. Barela, provided him with legal advice regarding Mr. Barela's then ongoing criminal case, and allowed for Mr. Barela to use his law firm as his own office space where Mr. Barela would come 1-2 times per week, use defendant's staff, and conduct his own business meetings. [Tr. 8/5/21, Vol. 2, p. 35-36]. Defendant is entitled by law to deductions for all of this, and the government bears the burden.

To conclude, at a bare minimum, defendant is entitled to $760,000 in attorneys' fees, $180,797 in cost and expenses [Gov. Exh. 439] and a deduction for the approximately $130,000 paid directly to Mr. Barela. [Dkt. 1000-1, p. 7]. Additionally, defendant should be provided with credit for the hourly work he and his firm spent for Mr. Barela's benefit on a myriad of matters, as well as the value of the equity and board seat defendant was promised in exchange for his consistent work on Mr. Barela's current business, Quix.

### d.  Michelle Phan

Defendant represented Ms. Phan in connection with her complex and contentious exit from her beauty subscription service Ipsy (a corporation originally founded by Ms. Phan). In addition to negotiating Ms. Phan's exit from Ipsy and securing payment for her

equity, Ms. Phan and defendant agreed that defendant would negotiate Ms. Phan's acquisition of other benefits and valuable assets, including EM Cosmetics, a company she wished to acquire in her separation from Ipsy. [Tr. 8/12/21, Vol. 1, p. 27; Gov. Exh. 265]. Defendant accomplished both of these goals. The Common Stock Repurchase Agreement called for two payments to Ms. Phan: an initial payment of $27,400,000 and a second payment of $8,146,000. Defendant was entitled to receive 7.5 percent of the recovery. [Tr. 8/12/21, Vol. 1, p. 26-27]. Ms. Phan testified that she received the full portion of the first payment and $4,146,000 of the second payment. [Tr. 8/12/21, Vol. 1, p. 32, 50]. By all accounts, defendant successfully transmitted the full initial payment of $27.4 million.

However, in addition to the attorneys' fees received for the purchase of Ipsy shares, defendant and Ms. Phan's fee agreement (which she agreed at trial was never amended) provided that defendant was entitled to receive 7.5% of "the fair market value of any benefit, refund, carried interest, business accommodation, loan and/or funding received in connection with the settlement, judgement, or any other resolution of any of Clients' claims, divestiture, and/or exits as referenced above." [Gov. Exh. 266]. During trial, the government presented evidence of the Common Stock Repurchase Agreement that was executed between Ms. Phan and Ipsy. However, as part of the exit and negotiated settlement, defendant was able convince Ipsy to enter into additional agreements whereby Ms. Phan acquired the "Purchased Assets" (as defined in a negotiated Asset Purchase Agreement) at a significantly reduced price and also received additional benefits. [Def. Sent. Exhibit W]. These assets/benefits included the cosmetics line known as "EM cosmetics," as well as full rights to other valuable assets, including trademarks, likeness, and image. Defendant never received 7.5% (or any portion) of these assets from Ms. Phan despite his contractual entitlement to them. These assets/benefits are valued at, upon information and belief, well over $58 million. [Def. Sent. Exhibit X].

To conclude, in calculating the loss amount, Probation and the government fails to properly provide defendant with a credit for the amount he is due totaling at least $4,387,500. Accordingly, the amount of loss for Ms. Phan for the purposes of sentencing

is no greater than negative $387,500.

B. <u>Defendant Requests that the Court Hold an Evidentiary Hearing on All Other Enhancements in Dispute</u>

In addition to the loss amount calculation, the defendant and the government dispute the application of five (two-level) enhancements related to Counts 5, 8, 9, 10, and 19: (1) substantial financial hardship to one or more victims [§2B1.1(b)(2)(A)]; (2) misrepresentation or other fraudulent action during the course of a bankruptcy proceeding [§2B1.1(b)(9)(B)]; (3) sophisticated means [§2B1.1(b)(10)(c)]; (4) vulnerable victim [§3A1.1(b)(1)]; and, (5) obstruction of justice [§3C1.1]. Each of these enhancements depend on disputed issues of fact.

Because of the disparity between the sentence recommended by the prosecution and that requested by the defense, defendant respectfully requests that the Court also hold an evidentiary hearing on the application of the disputed enhancements and the factual disputes that underlie the disputed enhancements.

## IV. CONCLUSION

Based on the foregoing, defendant respectfully requests that the Court, prior to sentencing defendant, hold an evidentiary hearing to resolve issues in dispute.

Dated: October 25, 2022

Respectfully submitted,

<u>/s/ Michael John Avenatti</u>

MICHAEL JOHN AVENATTI

13

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT A**

# MR. JOHNSON

**Loss Amount**

| Description | Amount | Source |
|---|---|---|
| Total Settlement Amount Paid | $4,000,000 | [Gov. Exh. 420] |
| Attorneys' Fees | -$1,600,000 | [Gov. Exh. 420] |
| Costs and Expenses through January 29, 2015 | -$543,062 | [Dkt. 1000-1, pgs. 3-4] |
| Payments, Costs and Expenses from January 30, 2015 through March 22, 2019 | -$282,070 | [Dkt. 1000-1, pgs. 3-4] |
| Defendant's Work on Other Matters | ~$90,000 | [Def. Sent. Exh. DD] |

Estimated Loss Amount: 1,484,868

**Additional Restitution Reductions**

| | | |
|---|---|---|
| Costs to Co-Counsel | -$2,776.00 | [Dkt. 1000-1, p. 3] |
| Funds Paid by Michael Eagan | -$1,500,000 | [Tr. 7/22/21, Vol. 2, p. 26] |

Estimated Restitution Amount: -17,908

# MS. GARDNER

**Loss Amount**

| Description | Amount | Source |
|---|---|---|
| Total Settlement Amount Paid 1/21/2017 | $2,750,000 | [Gov. Exh. 139] |
| Attorneys' Fees | -$990,000 | [Gov. Exh. 430] |
| Costs, Expenses, Security Deposit | -$71,715 | [Dkt. 1000-1, p. 5] |
| Payments made to Gardner (Dec. 2016 – March. 2019) | -$227,500 | [Dkt. 1000-1, p. 6; Exh. E]. |
| Defendant's Work on Other Matters | ~$100,000 | [Def. Sent. Exh. DD] |

Estimated Loss Amount: 1,360,750.00

**Additional Restitution Reductions**

| | | |
|---|---|---|
| Costs Claimed by Co-Counsel | -34,267.87 | [Gov. Exh. 168] |

Estimated Restitution Amount: 1,326,482.13

# MR. BARELA

## Loss Amount

| Description | Amount | Source |
|---|---|---|
| Total Settlement Amount Paid 1/5/18 | $1,600,000 | [Gov. Exh. 439] |
| Attorneys' Fees | -$760,000 | [Gov. Exh. 439] |
| Costs and Expenses | -$180,797 | [Dkt. 1000-1, p. 7] |
| Payments made to Barela | -$130,000 | [Dkt. 1000-1, p. 7; Gov. Exh. 239] |
| Defendant's Work on Quix, *Carthey*, and other matters. | ~$250,000 (at least) | [Def. Sent. Exh. DD] |
| Estimated Loss Amount: less than $279,203 | | |

## Additional Restitution Reductions

| Funds Received by Third Parties | Unknown | [Dkt. 1000, p. 7]. |
|---|---|---|
| Estimated Restitution Amount: $279,203 less the amounts third parties have paid on civil claims. | | |

# MS. PHAN

## Loss Amount

| Description | Amount | Source |
|---|---|---|
| Total Cash Settlement Amount for Common Stock Repurchase Agreement | $37,168,678 | [Gov. Exh. 444] |
| Attorneys' Fees | -$2,787,651 | [Gov. Exh. 444] |
| Cash Amount Received by Client | -$30,380,897 | [Gov. Exh. 444] |
| Attorney's fees of 7.5% on all other benefits and assets received (i.e., EM Cosmetics, likeness, trademarks, image) | -4,387,500 (at least) | [Def. Sent. Exh. W, X]. |
| Estimated Loss Amount: No less than $-387,500.00 | | |

## Additional Restitution Reductions

| None. | None. | N/A |
|---|---|---|
| Estimated Restitution Amount: No less than $-387,500.00 | | |

## **CERTIFICATE OF SERVICE**

I, H. Dean Steward, am a citizen of the United States, and am at least 18 years of age. My business address is 17 Corporate Plaza, Suite 254 in Newport Beach, California. I am not a party to the above-entitled action.  I have caused, on October 25, 2022, service of the:

DEFENDANT'S MOTION FOR EVIDENTIARY HEARING PRIOR TO
SENTENCING

on the following party, using the Court's ECF system:

AUSA RANEE KATZENSTEIN AND AUSA BRETT SAGEL

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 25, 2022

/s/ H. Dean Steward

H. Dean Steward

14