Michael John Avenatti (Pro Se)

H. Dean Steward, SBN 85317
17 Corporate Plaza, Suite 254
Newport Beach, California 92660
Tel (949) 481-4900
Fax (949) 706-9994

Advisory Counsel for Defendant
MICHAEL JOHN AVENATTI

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>v.<br><br>MICHAEL JOHN AVENATTI,<br><br>  Defendant. | SA CR No. 19-061-JVS<br><br>DEFENDANT'S OPPOSITION TO THE GOVERNMENT'S SENTENCING POSTION AND RESPONSE TO PRESENTECE REPORT<br><br>Date: November 7, 2022<br>Time: 9:00 a.m. |

Defendant MICHAEL JOHN AVENATTI ("Defendant"), by and through his advisory counsel of record, H. Dean Steward, hereby files Defendant's Opposition to the Government's Sentencing Position and Response to the Presentence Report. Defendant's filing is based on the attached; the evidence referenced in the attached; the files, records and transcripts in this case and the other cases cited herein; and such further evidence and argument as the Court may permit at a hearing on this matter.

  Dated: October 25, 2022                    Respectfully submitted,

                                  /s/ Michael John Avenatti
                                   MICHAEL JOHN AVENATTI

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................ iv

I.     **INTRODUCTION** ................................................ 1

II.    **DISPARITY IN SENTENCING** ................................ 1

III.   **CONCURRENT SENTENCING** ............................... 2

IV.   **THE §3553(a) FACTORS SUPPORT A DOWNWARD VARIANCE**

     A. <u>The Government's Callous Disregard for Mitigating Factors</u> ............ 3

     B. <u>The Court Should Reject the Government's Attempt to Ignore
The Prior Findings of Judge Gardephe and Judge Furman
and the Facts in the Prior Unchallenged PSRs</u> ................................ 4

V.     **LOSS AMOUNT & RESTITUTION** ....................... 5

     A. <u>The Government's Loss Amount is Incorrect</u> ...................... 5

     B. <u>Restitution</u> ........................................................ 6

VI.   **OTHER FACTORS AFFECTING THE GUIDELINES
CALCULATION** ................................................ 8

     A. <u>Acceptance of Responsibility</u> .............................. 8

     B. <u>Criminal History Category</u> ................................ 10

     C. <u>Obstruction of Justice</u> ..................................... 11

     D. <u>Reduction Under §5G1.2(d)</u> .............................. 12

VII.   **RELEVANT CONDUCT** ................................... 12

     A. <u>Pre Trial & Trial Conduct</u> ................................ 13

     B. <u>Other Offense Conduct</u> ................................... 15

VIII. **CONCLUSION** ............................................... 16

ii

# TABLE OF AUTHORITIES

## CASES

*Gall v. United States*,
552 U.S. 38 (2007)……………………………………………………………………………….1

*Jones v. United States*,
574 U.S. 948 (2014)(Scalia, J., dissenting)……………………………….…….……………12

*Lagos v. United States*,
138 S. Ct. 1684 (2018)………………………………………………………………………….7

*Marlow v. United States*,
555 U.S. 963 (2008)(Scalia, J., dissenting)…………………………….……..…………….12

*Taylor v. Illinois*,
484 U.S. 400 (1988)…………………………………………………………………….……11

*United States v. Barany*,
884 F.2d 1255 (9th Cir. 1989)…………………………………………………….……………7

*United States v. Bell*,
808 F.3d 926 (D.C. Cir. 2015)(Millett, concurring)……………………….………………12

*United States v. Boscarino*,
437 F.3d 634 (7th Cir. 2006)………………………………………………………….………1

*United States v. DeGeorge*,
380 F.3d 1203 (9th Cir. 2004) …………………………………………………….…………11

*United States v. Gamma Tech. Indus.*,
265 F.3d 917 (9th Cir. 2011) ……………………………………………...…………………7

*United States v. Green*,
940 F.3d 1038 (9th Cir. 2019) ……………………………………………….………………8

*United States v. Gussi*,
608 F.3d 574 (9th Cir. 2010) …………………………………...……………………………7

*United States v. Hernandez*,
894 F.3d 1104 (9th Cir. 2018)……………………………………………………….………13

*United States v. Jawara,*
474 F.3d  565 (9th Cir. 2007) …………………………………..…………………10

*United States v. Jimenez,*
258 F.3d 1120 (9th Cir. 2001)………………………………………………………5

*United States v. Koenig,*
952 F.2d 267 (9th Cir. 1991) ………………………………………………………7

*United States v. Kohring,*
637 F.3d 895 (9th Cir. 2011) …………………………………………………….14

*United States v. Ladwig,*
192 F.Supp. 1153 (E.D. Wa. 2016)…………………………………………………5

*United States v. Margiotta,*
475 Supp. 3d 1152 (D. Mont. 2020) …………………………..………………….7

*United States v. Mateo-Medina,*
845 F.3d 546 (3d Cir. 2017) ………………………………..……………………13

*United States v. Parker,*
462 F.3d 273 (3d Cir. 2006)………………………………………………………...1

*United States v. Sabillon-Umana,*
772 F.3d 1328 (10th Cir. 2014)………………………………..…………………..1, 12

*United States v. Stanley,*
309 F.3d 611 (9th Cir. 2002)………………………………………………………6

*United States v. Thompson,*
792 F.3d 273 (2d. Cir 2015)……………………………………………………….7

*United States v. Watt,*
910 F.2d 587 (9th Cir. 1990)……………………………………………………….9

**OTHER AUTHORITIES**
U.S.S.G. §2B1.1………………………………………………………………………5
U.S.S.G. §3C1.1………………………………………………………..…………….11
U.S.S.G. §4A1.2(a)(2) ………………………………..…………………………….10
U.S.S.G. §5G1.2 …………………………………………………………………….12
U.S.S.G. §5G1.3 …………………………………………………………..…………3

iv

## I.    INTRODUCTION[1]

Sentencing someone to prison has to be one of the district judge's toughest tasks. So much is at stake for the defendant, the victim, and the community. So much responsibility rests on the judge's shoulders, along with the high expectation that the judge will wisely weigh things that cannot be easily weighed. How much punishment is enough to protect the public? To deter future wrongdoing? To reflect the gravity of the offense? And how much punishment suffices to accomplish all these things without verging on cold revenge or needless retribution? There's rarely a single right answer to hard questions like these. So our system depends, as perhaps it must, on the discretion of thoughtful judges. *U.S. v. Sabillon-Umana*, 772 F.3d 1328, 1330 (J. Gorsuch, 10th Cir. 2014).

The above words of Justice Gorsuch are especially applicable here. The government's demand that defendant spend <u>at least 22.5 years in prison</u> is unreasonable, vindictive, and, unfortunately, personal. It is inconsistent with the law and the fundamental purpose of sentencing. And it completely ignores the critical issue of sentencing disparity and the reality of the sentences similar defendants in similar fraud cases routinely receive (less than five years). For the reasons below and in defendant's opening brief, defendant requests that the court overrule each of the government's objections to the PSR and soundly reject their requested sentence.

## II.    DISPARITY IN SENTENCING

Citing *Gall v. United States*, 552 U.S. 38 (2007), the government claims that the disparity of sentencing analysis is limited to a simple question: is the sentence imposed within the Guideline range? [Dkt. 1000, p. 41]. This is a fundamental misstatement of the law and one that is not supported by *Gall* (or the Guidelines). The government's view, if correct, would render the requirements of §3553(a)(6) unnecessary and meaningless. But the section is clear - the Court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *See also*, *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006)("Congress's primary goal in enacting §3663(a)(6) was to promote national uniformity in sentencing…"); *United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006)("[T]he kind

---

[1] This brief is being filed on the two-week deadline provided by the Court at Dkt. 982.

of 'disparity' with which §3663(a)(6) is concerned is an unjustified difference across judges (or districts)…"). Knowing full well that a sentence of 17.5 years is grossly punitive and well beyond the norm for similarly situated defendants in fraud and tax cases (see chart at Exhibit B), the government simply ignores the requirement.

Instead, in passing, however, the government mentions *United States v. Layfield*, a case where the defendant received a sentence of 144 months. But *Layfield* is easily distinguishable and actually <u>supports</u> the reasonableness of defendant's requested sentence. [Exhibit EE]. There, attorney Layfield, among other things, (a) committed misconduct against <u>89</u> victims; (b) fled to Costa Rica; (c) stole from his employees' retirement accounts; (d) engaged in a separate fraudulent scheme while at counsel's table during his own trial; and (e) caused a loss greater than $7,000,000. *See* Chart at Exhibit at EE and Government's Sentencing Brief, Exhibit FF. The government's position here, and its recommended sentence, cannot be rectified with the position it took, and the sentence imposed, in a case more serious than this.[2]

Moreover, a review of the U.S. Sentencing Commission's analysis of cases in the Central District over the last three years demonstrates the unreasonableness of the sentences requested by the government and Probation. Less than 2% (15 out of 772) of fraud defendants have received a sentence of 10 years or more. [Exhibit GG]. The instant offense, while serious, does not fall within the top 2% of fraud cases within this district across the last three years. Further, the requested sentences reflect an extremely severe and "off the chart," sentence to loss ratio when compared to other nationwide high profile fraud cases. [Exhibit HH].

### III.   CONCURRENT SENTENCING

Defendant reasserts that any sentence in this case must be ordered concurrent to all

---

[2] The government also makes reference to *United States v. Terry Christensen*, which involved a convicted attorney, but does not inform the Court that Christensen received a sentence of 36 months. The *United States v. Ohanian* matter is also easily distinguishable from the instant case. [Exhibits RR, SS]. These cases are yet further evidence of the reasonableness of defendant's requested sentence.

sentences imposed in the two prior SDNY cases. *See,* §5G1.3(b)(if the defendant has a term of imprisonment resulting from another offense that is *relevant* conduct, then "the instant offense *shall* be imposed to run concurrently."). In its sentencing position, the government repeatedly cites the negative findings of Judge Gardephe and Judge Furman, claims that the SDNY offenses are analogous to the instant case, and even uses the loss amounts in both the *Nike* and *Daniels* cases.[3] [Dkt. 1000, p. 16, 18, 29, 30, 39, 40, 42, 44]. As such, the prosecution has conceded that both convictions involve relevant conduct for the purposes of §5G1, thus requiring concurrent sentences.

In addition, the government claims that the Court must impose a consecutive sentence to defendant's prior aggravated identity theft conviction. Although defendant disagrees and objects, to the extent that the law requires consecutive treatment of a prior §1028A conviction, this is a determination that must be made by the Bureau of Prisons when computing defendant's total sentence. This Court does not have jurisdiction to modify the sentence imposed in the *Daniels* case to order it consecutive to this sentence.

## IV.   THE §3553(a) FACTORS SUPPORT A DOWNWARD VARIANCE

### A. The Government's Callous Disregard for Mitigating Factors

In an effort to convince the Court to endorse needless retribution, the prosecution disregards every positive attribute of defendant, casts aside all mitigating factors as bogus, and dismisses his life struggles as a sham. To hear the government tell it, Judges Gardephe and Furman's positive findings regarding defendant, all three PSRs, and all letters of support are pure fiction. And only the AUSAs assigned to this case are the truth tellers when it comes to defendant. In fact, in their sentencing submission, the prosecution goes as far as to object to Probation's findings regarding the circumstances of defendant's childhood and the obstacles he overcame [PSR ¶161-62] and accuse defendant and his ex-

---

[3] The government here takes an entirely contrary position to what it claimed in both cases as it relates to loss. The government previously successfully claimed, over defendant's objection, that the loss amount was $297,500 in *Daniels* and approximately $22.5 million in *Nike*.

wife of fabricating them (which is a crime). [Dkt. 1000, p. 42, n. 34].[4] The prosecutors also criticize Probation for not confronting defendant's elderly parents, who are 86 and 87. [*Id.*]. In addition, the government dismisses defendant's "alleged" (their word in quotes) brutal and inhumane treatment while at MCC (which was found by a federal judge) and falsely claims defendant wished to remain there.[5] The prosecution also attempts to discredit defendant's alcoholism, undermining the findings and integrity of the BOP, its well-regarded RDAP program, and its experts. [Exhibit KK]. Defendant's efforts to better himself and finally resolve a multi-generational substance abuse problem are likewise belittled.[6] All of this further demonstrates the unreasonableness of the government.

B. The Court Should Reject the Government's Attempt to Ignore the Prior Findings of Judge Gardephe and Judge Furman and the Facts in the Prior Unchallenged PSRs

Faced with factual findings recently made by two other federal judges (Judge Gardephe and Judge Furman), which are helpful to defendant and fully contradict numerous accusations made by the government in its brief, the government simply pretends they never occurred.[7] But they did. Even worse for the government, their DOJ colleagues never disagreed with them, challenged them, or appealed them. The reason – because they are true. Further, the government repeats this strategy as it relates to

---

[4] This accusation is baseless and especially vindictive. It is directly contradicted by factual findings in two prior PSRs, to which the government never objected, as well as attached Exhibits II and JJ and Exhibit O submitted with defendant's opening brief.

[5] After defendant was isolated in solitary confinement, he was briefly (about eight days) released to general population before suffering two additional lockdowns. During the interim period, CDCA prosecutors sought to give him some "diesel therapy" and bring him to California for a March 2020 status conference and then ship him back to New York prior to the SDNY *Daniels* trial, scheduled for April 2020. This request was opposed (and then properly denied). [Dkts. 100-102].

[6] The government claims defendant is seeking a RDAP referral from this Court to get a year off his sentence. This is not accurate. First, defendant is already in RDAP. Second, the BOP has informed defendant he is ineligible for the year off because of how he was charged (in three cases).

[7] The government is well aware of the findings because they quote other portions of the sentencing transcripts in their brief.

4

defendant's two prior PSRs, which were drafted by two different probation officers.[8] Accordingly, the Court should not permit the government to take positions in this case relating to defendant's character, history, work ethic, family history, etc. that are entirely contrary to the express findings of Judge Gardephe and Judge Furman. *See, e.g, United States v. Jimenez,* 258 F.3d 1120, 1123-24 (9th Cir. 2001)(recognizing effect of failure to object to factual findings in a PSR); *United States v. Ladwig*, 192 F.Supp. 1153, 1156 (E.D. Wa. 2016)(failure to object to PSR's finding of a prior conviction was a concession of the criminal history).

## V.    LOSS & RESTITUTION AMOUNT

### A. The Government's Loss Amount is Incorrect

The government's loss analysis, which mirrors that in the PSR, is incorrect as a matter of law as explained in defendant's opening brief  [Dkt. 1016, p. 32-34] and grossly overstates the loss amount, leading to a 20 level enhancement. Among other things, it fails to credit defendant for the money returned and the services rendered as required[9] by §2B1.1, n. 3(E)(i).[10]

In fact, prior to its sentencing position, the government agreed and consistently took the position that the loss amount in this case is equal to the net amount defendant stole from his clients (*i.e.,* the funds to which defendant was not entitled). When agents searched the law firm servers, prosecutors seized items specific to attorney costs, expenses, advances, fees, and accounting to establish what defendant was lawfully owed. [19-mj-00419, Dkt. 4-1]. Further, investigators questioned witnesses regarding how costs

---

[8] The government effectively claims that two district court judges, three probation officers (two from SDNY and one from CDCA), defendant's ex-wife, his children, numerous former clients, friends, and defendant, are all wrong in finding any mitigating personal or professional attributes of defendant. This is simply not credible.

[9] California law relating to civil disputes is irrelevant and, in any event, does not support the government's re-writing of the Guidelines to void the deductions.

[10] Even though he has no burden to prove loss, defendant has prepared a draft chart detailing some of the required deductions. [Exhibit LL]. This exhibit shows that the loss amount is approximately $3,124,821 and the restitution amount (discussed immediately below) is less than $1,587,777.13.

and expenses were maintained at defendant's law firm in an attempt to access these materials. [Dkt. 822, Exh. H]. At trial, prosecutors affirmatively presented evidence that provided defendant credit for attorneys' fees as well as some of the costs and expenses his firm incurred for the benefit of the clients. [Gov. Exh. 48, 174, 420, 430, 439]. And the government's forensic accountant admitted at trial that the firm was entitled to deduct its fees and costs. [Tr. 8/13/21, Vol. 2, p. 77 ("Q: Mr. Drum, is it your position that the law firm was not entitled to deduct its legal fees and costs from the settlement amounts? Is that your position yes or no? A: That is not my position.")]. Finally, even during their press conference held immediately after the change of plea hearing, prosecutors acknowledged that the loss amount was not the gross amount of the victims' settlements. [Exhibit MM]. They should not be permitted to reverse course now.

B. Restitution

Defendant objects to the government's request for restitution as follows and, as with the issue of the loss amount, requests that the Court conduct an evidentiary or *Fatico* hearing before sentencing to address various relevant legal and factual disputes.

First, defendant objects to the amounts requested for the four fraud victims because such amounts do not account for credits due defendant, as required, for (1) all monies paid and advances to the clients by defendant; (2) all costs and attorneys' fees due defendant for his work on other matters for the clients; and (3) all monies advanced by defendant for the benefit of the four clients. [Dkt. 1016, p. 32-33].

Second, the requested restitution for the four fraud victims fails to credit defendant with the full amount of all monies paid to date by third parties with respect to the losses as required by 18 U.S.C. § 3664(j)(2).[11] *United States v. Stanley*, 309 F.3d 611, 613 (9th Cir. 2002)(the Court must engage in a two-step process (1) determine the full amount of

---

[11] Defendant has repeatedly requested this information from the government, but they have not provided it. Most recently, the government claimed that they do not have all of this information and implied they cannot get it from at least one of the victims. [Dkt. 1000-1 ¶18]. This strains credibility. Defendant is entitled to this information and it should be immediately provided for each of the four victims. Otherwise, restitution should be denied.

loss to the victim; and, (2) subtract the amount "other parties have paid civil damages for the same loss."). In addition, defendant maintains that the third parties who have resolved civil claims with the victims are not entitled to restitution under §3664(j)(1). *See, United States v. Thompson*, 792 F.3d 273 (2d. Cir 2015)(determining that restitution is applicable to third parties only "where a third party has assumed the victim's losses by reimbursing the victim…"). For instance, instead of assuming the loss of one of the victim clients, Mr. Eagan settled a lawsuit to release himself from civil claims and allegations that he participated in the scheme to defraud. Unlike an insurance provider, he did not assume the victims' loss with the expectation that he would be reimbursed.

Third, the requested restitution for the four fraud victims improperly charges defendant with attorneys' fees, costs and other expenses that are not recoverable under the law. *See, e.g., Lagos v. United States*, 138 S. Ct. 1684 (2018); *United States v. Barany*, 884 F.2d 1255 (9th Cir. 1989); *United States v. Margiotta*, 475 Supp. 3d 1152, 1157-60 (D. Mont. 2020); 18 U.S.C. §3663. This includes the government's attempt to charge defendant with unsupported fees, costs, and expenses of $828,250 relating to Mr. Johnson. *See,* [Karlous Dec., Dkt. 1000-1, Exh. C].[12] In addition, permitting this will allow for an impermissible double recovery.

Fourth, once the above is taken into account and a proper calculation is performed, the four fraud victims are due less than $2,000,000 in total restitution. *See,* [Exhibit LL].

Fifth, the requested restitution allegedly relating to the tax amount, $3,207,144, was not directly and proximately caused by the offense defendant pled to as required for recovery. *See, e.g., United States v. Koenig*, 952 F.2d 267, 275 (9th Cir. 1991)(holding restitution is permitted "only for losses <u>directly resulting</u> from the defendant's offense.")(internal quotations and citations omitted)(emphasis added); *United States v. Gussi*, 608 F.3d 574, 581 (9th Cir. 2010); *United States v. Gamma Tech. Indus.,* 265 F.3d 917, 927 (9th Cir. 2011). The PSR also correctly noted that because a plea agreement was

---

[12] Defendant has requested from the government the backup documentation and information supporting each claimed amount, but none has been provided.

not entered in this case, "discretionary restitution is not applicable." [PSR ¶ 280]. As a result, this amount may not be ordered to be paid as restitution.

Sixth, the government has failed, in connection with its restitution request, to submit any evidentiary support for the alleged $3,207,144 in restitution due the IRS, thus requiring that the Court deny the request because it is unsupported and defendant has not been timely provided the required information and documentation.

## VI.   OTHER FACTORS AFFECTING THE GUIDELINES CALCULATION

### A. Acceptance of Responsibility

The government claims (falsely) that defendant is not entitled to a two level reduction pursuant to §3E1.1(a),(b). Contrary to the government's assertions, defendant is entitled to a three level reduction for acceptance of responsibility.

First, defendant's allocution during his open plea does not undermine his entitlement to the reduction, it supports it. Defendant agreed that he had committed crimes and the elements of counts 5, 8-10, and 19.[13] The inquiry for a lengthier factual basis was not from the Court, but instead from the government. [Exhibit NN]. The fact that defendant refused to parrot a script the government wrote and wanted read does not mean defendant did not accept responsibility. *See, United States v. Green*, 940 F.3d 1038, 1042 (9th Cir. 2019)("When a district court determines [at a plea hearing] that a defendant's plea [is] adequately supported by the defendant's admissions, as the district court did here, that determination compels the inference that [the defendant] had truthfully admitted the conduct comprising the offense of conviction" thus satisfying the Guidelines.)(internal quotation and citation omitted). Further, defendant has since apologized to his victims and has taken practical steps to show his remorse. [Dkt. 1016, p. 15, n. 15]. Meanwhile, the government has taken an adversarial position each time defendant has expressed a desire

---

[13] At the change of plea hearing, the government made no representations about how it planned to proceed on the remaining counts. As a result, defendant was aware that statements he made under oath could be used against him in connection with Counts 1-4, 6-7, 11-18, and 20-36.

to accept responsibility – including during his guilty plea.[14]

Second, the government argues that defendant's conduct at trial undercuts the applicability of §3E1.1 based on his implications "that there were additional reimbursable costs that dramatically reduced the amount due to his clients." [Dkt. 1000, p. 13]. Defendant's position throughout this case has remained unchanged: after he resolved a client's claim, his firm was entitled to its legal fees and all out-of-pocket costs expended in connection with the matter. Defendant's act of cross-examining witnesses regarding additional costs and expenses spent, advances made, and time incurred on other matters was an exercise of a constitutional right to present a defense, which cannot be used to justify a denial of a §3E1.1 departure. *United States v. Watt*, 910 F.2d 587, 592 (9th Cir. 1990)("[] in determining a defendant's acceptance of responsibility, a sentencing court cannot consider against a defendant any constitutionally protected conduct…").

Third, the prosecution claims that the basis of the mistrial, the government's suppression of the Tabs data, "showed that that the government's loss calculations were correct" and any claims that the suppressed materials are favorable evidences a lack of remorse. The government's repeated assertions that the Tabs data did not undermine its case are untrue. Indeed this representation is especially surprising given the prosecution's reliance on the Tabs materials discovered after trial for its restitution analysis, which shows additional costs, expenses, and advances not reflected in the government's trial exhibits. [Gov. Sent. Exh. B, F]. Further, after the mistrial, the government sent its financial analyst "data sets from Tabs [it] obtained in August 2021" to which Mr. Drum responded that he needed an additional $50,000 to update his analysis and prepare to

---

[14] After the mistrial last year, defendant sought to engage in a settlement conference – the government refused (for the second time). [Dkt. 781]. This year, defendant attempted to enter into a plea agreement – the government did not negotiate in good faith. When defendant presented an open plea, the prosecution objected to his ability to speak with advisory counsel [Tr. 6/16/22, p. 3] and also falsely claimed they were unaware of defendant's intent to plead guilty to Counts 5, 8-10, and 19. [*Id.* at 3, 31]. But the government (AUSA Katzenstein) was informed by Mr. Steward of this intention the day before during a telephone conference.

testify. [Exhibit OO]. If the government's calculations remain unchanged, Mr. Drum would not have required $50,000. The prosecution is well aware that the suppressed Tabs data established over $150,000 of additional costs, expenses, and advances made for the benefit of the clients (inclusive of over 100 transactions), as well as references to defendant's (and his firm's) time spent on other matters for the benefit of the clients.[15]

B. <u>Criminal History Category</u>

The government claims that "defendant's criminal history score properly includes 6 points, placing him in CHC III[.]" Disagreeing with the findings of Probation, the prosecution argues that no departure is warranted because defendant's SDNY conduct could not have been joined in the same charging instrument under Rule 8 as the SDNY convictions were "of completely different character, involved completely different acts, and were not part of the same common plan or scheme." [Dkt. 1000, p. 17]. Later in its brief, however, the government takes a different approach: "The convictions in those [SDNY] matters similarly involved defendant's violation of his duties as a lawyer by lying to and betraying his clients for his own personal benefit." [Dkt. 1000, p. 29]. Further evidencing its ever-changing position, the government has previously described Rule 8 in a broader fashion than it does here. [Dkt. 298, p. 11 ("'Courts have broadly construed Rule 8 in favor of joinder because joint trials conserve government funds, minimize inconvenience to witnesses and public authorities, and avoid delays in bringing a defendant to trial.' *United States v. Jawara*, 474 F.3d 565, 572-73 (9th Cir. 2007).")].

Defendant maintains that due to the temporal overlap, the similarity of conduct, and the one defendant nature, a single case (instead of three) should have been filed. Moreover, <u>even if the charges would have later been severed for the purposes of trial, defendant's criminal history category at sentencing would have remained one (I) because the charges would have stemmed from the same charging instrument</u>. *See* Guideline §4A1.2(a)(2). The

---

[15] All of these materials should have been provided to defendant prior to the first trial, and would have supported the theories advanced by the defense. Among other things, they would have been used to impeach the credibility of Mr. Drum, who was paid over $600,000, and the accuracy of his financial analysis.

prejudice from the government's failure to bring a single case has caused significant undue prejudice and now an unwarranted increase to defendant's criminal history score. Accordingly, a downward departure to criminal history category I is warranted.

C. <u>Obstruction of Justice</u>

The obstruction of justice enhancement is applicable where a defendant threatens witnesses, risks the confidentiality of an informant, destroys evidences, or willfully interferes with a pending criminal investigation. The government's (and Probation's) application of §3C1.1 is improper when applied to the facts here.

<u>First</u>, as discussed in defendant's prior brief, the 2019 post to Twitter cannot be used to justify an §3C1.1 enhancement. [Dkt. 1016, p. 35].

<u>Second</u>, the government incorrectly asserts that defendant sought to intimidate Mr. Barela when he "served a trial subpoena on Barela's wife when she accompanied Barela to Court, and then used the subpoena to force her out of the courtroom…" [Dkt. 1000, p. 10]. But the service of Talitha Barela with a subpoena was done in anticipation of calling her as a witness. *Taylor v. Illinois*, 484 U.S. 400, 409 (1988). Indeed, Ms. Barela was even listed on the government's April 1, 2019 and May 15, 2020, "Victim & Witness List." [Exhibit Z; Exhibit PP]. Ms. Barela also personally sued defendant in connection with the conduct at issue here, further establishing her relevance. There is no evidence defendant attempted to intimidate Ms. Barela (or anyone else) through the service of this subpoena.

<u>Third</u>, the government urges the Court to apply the two level enhancement based on statements defendant made during two Judgment Debtor Examinations ("JDEs") and a State Bar hearing, and unrelated and irrelevant statements to his law partner. This is not a proper exercise of the obstruction of justice enhancement. The two level increase is warranted only when the *willful* obstruction is performed *during* the course of the investigation, prosecution, or sentencing of the instant offense or conviction. *United States v. DeGeorge*, 380 F.3d 1203, 1222 (9th Cir. 2004)(remanding the district court's application of §3C1.1 because defendant's "perjury occurred during the *civil* trial as part of his scheme to defraud and not during the *criminal* investigation as part of an attempt to

obstruct justice."). During the conduct at issue, there is no evidence that defendant was aware of any ongoing or impending criminal investigation. As such, there can be no finding that defendant *willfully* obstructed anything.

D. Reduction Under §5G1.2(d)

Using an incorrect Guideline calculation, Probation erroneously determined that the conduct at issue here resulted in a Guideline range of 262 to 327 months. [PSR ¶265]. Because the maximum sentence for wire fraud is 20 years, the PSR then reduced the Guideline range to 240 months. In response, the government objects based on a tortured reading of §5G1.2(d). But the Guidelines make clear that the "sentence imposed on [the wire fraud] count shall not be greater than the statutorily authorized maximum sentence on that count" (§5G1.2(d), App. Note 3 (emphasis added)) and that all similar counts are to be grouped and run concurrently. §5G1.2(c). Accordingly, the maximum total sentence on each of the four wire fraud counts is 20 years, each of the counts to run concurrent with each other. However, as explained previously, the appropriate Guideline range and other facts require a sentence nowhere near 240 months.

**VII.  RELEVANT CONDUCT**

Defendant objects to any judicial fact finding or reliance on unproven facts to justify an increase in his sentence. Defendant is entitled to a jury trial (and a *beyond a reasonable doubt* burden of proof) as to any conduct not specifically pled to. The consideration of facts outside of his guilty plea violates defendant's right to due process, the Sixth Amendment, and the guarantee of a jury trial. *See, e.g., Jones v. United States*, 574 U.S. 948 (2014)(Scalia, J., joined by Thomas & Ginsburg, JJ, dissenting); *United States v. Bell*, 808 F.3d 926, 929 (D.C. Cir. 2015)(Millett, concurring)("I agree with Justices Scalia, Thomas, and Ginsburg … the circuit case law's incursion on the Sixth Amendment 'has gone long enough.'"); *Sabillon-Umana*, 772 F.3d at 1331 (10th Cir. 2014)("…based on facts the judge finds without aid of a jury or the defendant's consent. It is far from certain whether the Constitution allows at least the second half of that equation"); *Marlow v. United States*, 555 U.S. 963 (2008)(Scalia, J., dissenting)(finding that the judicial fact

12

finding "falls short of what we have held the right to a trial by jury demands…"); *United States v. Mateo-Medina*, 845 F.3d 546, 554 (3d Cir. 2017)("[C]alculating a person's sentence based on crimes for which he or she was not convicted undoubtedly undermines the fairness, integrity, and public reputation of judicial proceedings.").

Attached hereto as Exhibit QQ is the government's sentencing brief, with highlighted portions representing irrelevant and/or unproven "facts". Defendant objects to the Court's consideration of these statements/accusations as violative of the Sixth Amendment, due process, and defendant's right to a jury trial. By way of example only, defendant addresses several of the government's unsupported allegations below.

A. <u>Pre Trial & Trial Conduct</u>

The government describes defendant's pretrial and trial conduct as an aggravating factor sufficient to "justify a significant custodial status." [Dkt. 1000, p. 28]. However, the government's false accusations about defendant's conduct at trial are nothing more than a disguised trial penalty[16] and are <u>unsupported by the trial record</u>. Throughout the trial, defendant exercised decorum and treated the Court and witnesses with respect and professionalism. The Court was present throughout all proceedings and never once admonished defendant about any alleged abusive tactics as now claimed by the government. Pointing to three examples, the government argues that defendant "brow-beat his victims" during cross-examination with "almost nothing that could actually help his defense." [Dkt. 1000, p. 32, n. 25]. These claims are <u>false</u> and suggest that this Court allowed defendant to run amok during the trial and engage in rampant misconduct. The Court knows this never happened. It would <u>never</u> tolerate the defendant (or any party or attorney) purposely humiliating a witness, eliciting testimony solely intended to cause emotional harm, or attempting to degrade a witness as the government now claims.

The government states that defendant unnecessarily asked Ms. Gardner about an

---

[16] Defendant cannot be punished for exercising his constitutional right to proceed to trial (and represent himself). *See, United States v. Hernandez*, 894 F.3d 1104, 1112 (9th Cir. 2018)("Permitting courts to impose a harsher sentence on those few defendants who do go to trial could in practice restrict the exercise of the [Sixth Amendment] right…").

1  incident when she was ███████████████████████  The prosecution is wrong.

2  Instead, <u>the government</u> first presented the false narrative that defendant (rather than ████

3  ██████████) was the cause of Ms. Gardner moving out of her home.[17] Prior to

4  defendant's cross-examination, a sidebar was held and the Court allowed defendant to

5  elicit the testimony at issue: "Your point is the jury was left with the impression that the

6  money was cut off and she had to go find someplace to live..." [Tr. 8/3/21 (Under Seal),

7  p. 5]. The record is clear that defendant's questioning was done in response to the

8  government's presentation of misleading evidence.

9       <u>Second</u>, defendant cross-examined Mr. Johnson regarding his mental health issues.

10  This was entirely proper under the law. *See, e.g., United States v. Kohring*, 637 F.3d 895,

11  912 (9th Cir. 2011)(mental health issues can be material as impeachment evidence because

12  they cast doubt on the accuracy of the witness' testimony).

13       <u>Third</u>, defendant did not *imply* that Tran and Phan were "trying to evade paying

14  their taxes on their settlement money..." [Dkt. 1000, p. 31]. Instead, at trial, after the

15  government claimed that Mr. Avenatti directed Mr. Tran to commit a tax offense, Mr. Tran

16  agreed that Ms. Phan had multiple "financial advisors relating to how this money would

17  be handled so that it could be sheltered from taxes" including her personal CPA. [Tr.

18  8/10/21, Vol. 1, p. 95-96]. Again, this was a proper exercise of cross-examination.

19       <u>Fourth</u>, citing to Morgan Witos and Special Agents Galicia and Penland, the

20  government accuses defendant of "making false statements to the Court in connection with

21  his efforts to call witnesses who were hardly relevant." [Dkt. 1000, p. 33]. Contrary to the

22  government's assertions, defendant reasonably believed that Ms. Witos was a CPA despite

23  the discovery that she was not licensed. [Tr. 7/28/21, Vol. 2, p. 30](when asked whether

24  Ms. Witos was a CPA, Ms. Regnier replied, "I believe so, yes."]. Even so, Ms. Witos

25

26  [17] The government was well aware of the truth as to why Ms. Gardner removed herself
27  from this living situation prior to trial, but presented the misleading testimony anyway.
    *See, e.g.,* [VIS, B ("...I didn't come to understand it was ████ until 2 years later. Brett
28  Segal [sic] told me <u>at my first interview for court</u>, that what happened to me was defined
    as ███.")(emphasis added)].

performed tasks at the firm consistent with that of a CPA: inputting costs and expenses and performing financial reporting - both issues central to the defense. Prior to allowing the testimony of the New York based agents, defendant was required to submit a written and oral proffer. [Dkt. 641]. Ultimately, defendant elicited limited testimony from SA Galicia, but only after prosecutors warned defendant that broad questioning would result in cross-examination about the SDNY investigation and prosecutions. [Tr. 8/17/21, Vol. 2, p. 63-64]. For this reason, defendant chose not to call SA Penland as a witness. These strategic decisions were not an abuse of process.[18]

    <u>Finally</u>, the government falsely accuses defendant of misrepresenting his financial status to gain the assistance of the Federal Public Defender. However, defendant consulted with the Federal Public Defender and proceeded with the requested appointment because of the uncertainty of his future financial stability given the three pending criminal cases, multiple civil lawsuits, and two forfeiture allegations. [Dkt. 28]. The concerns cited have come to fruition, and the government concedes defendant's financial condition through its decision to forgo a fine. [Dkt. 1000, p. 46, n. 36].

    B. <u>Other Offense Conduct</u>

    Without evidentiary support, the government argues that defendant stole approximately $807,773 from his clients in the *Greco v. NFL* matter,[19] $15,000 from Amelia Racine, and delayed payment to (but ultimately compensated) defendant's former clients who lost their son as a result of a drug overdose. The government's act of attaching a single interview and citing a portion of defendant's bank statements is insufficient to establish that these uncharged crimes occurred – they did not.

---

[18]Prior to trial, the government identified many witnesses (inclusive of an expert) and disclosed many proposed exhibits (and entire themes of evidence), many of which were never presented to jurors. A change of strategy is not synonymous with an abuse of process.

[19] Other than citing the PSR ¶¶139-140 (information presumably provided by prosecutors), the government offers <u>no support</u> of this contention. The PSR's findings and defendant's objections are discussed in defendant's sentencing position. [Dkt. 1016, p. 28].

## VIII.  CONCLUSION

Based on the foregoing, defendant renews his request for this Court to impose a sentence of no greater than seventy-two (72) months in prison, to be served concurrently with both sentences previously imposed, followed by three (3) years of supervised release.

Dated: October 25, 2022                           Respectfully submitted,

                                                  /s/ Michael John Avenatti

                                                  MICHAEL JOHN AVENATTI

## **CERTIFICATE OF SERVICE**

I, H. Dean Steward, am a citizen of the United States, and am at least 18 years of age. My business address is 17 Corporate Plaza, Suite 254 in Newport Beach, California. I am not a party to the above-entitled action. I have caused, on October 25, 2022, service of the:

DEFENDANT'S OPPOSITION TO THE GOVERNMENT'S SENTENCING
POSTION AND RESPONSE TO PRESENTECE REPORT

on the following party, using the Court's ECF system:

AUSA RANEE KATZENSTEIN AND AUSA BRETT SAGEL

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 25, 2022

/s/ H. Dean Steward

H. Dean Steward

17